No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## OPENING BRIEF OF APPELLANT BRANDON LEON BASHAM

JON M. SANDS
Federal Public Defender
District of Arizona
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iv

JURISDICTIONAL STATEMENT ...........................................................................1

STATEMENT OF ISSUES ........................................................................................2

STATEMENT OF THE CASE....................................................................................3

   I.  Procedural History...........................................................................................3

   II.  Relevant Facts.................................................................................................4

SUMMARY OF ARGUMENT ..................................................................................5

ARGUMENT ............................................................................................................8

   I.   BASHAM'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN HE WAS TRIED WHILE LEGALLY INCOMPETENT..................................8

      A.  Relevant Facts ........................................................................................9

         1.  Basham's psychological history and general mental state at the time of trial..........................................................................................9

         2.  Basham's vacillating physical and psychological state during trial .....11

         3.  Basham's perseverative behavior ..................................................13

         4.  The events of September 20, 2004........................................................14

         5.  The events of October 22 and October 26, 2004 ...............................16

      B.  The Competence Requirement................................................................21

      C.  Standard of Review ...............................................................................22

      D.  The District Court's Clear Error in Adjudicating the Competency Claim ....................................................................................................23

         1.  Incompetence on September 20, 2004 .................................................25

         2.  Incompetence on October 26, 2004 ....................................................28

   II.  BASHAM'S ATTORNEYS RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL WHEN THEY FAILED TO TAKE REASONABLE STEPS TO INFORM THE COURT OF HIS INCOMPETENCY. .................................................................................31

      A.  Relevant Facts ......................................................................................31

         1.  September 20, 2004..............................................................................31

    2. October 26, 2004 .................................................................................32

   B. Controlling Law and Standard of Review................................................33

   C. *Strickland* Analysis .................................................................................35

     1. Deficient Performance ......................................................................35

      a. Failure to object to September 20 video and audio on competence grounds ............................................................................................35

      b. Failure to contact Schwartz-Watts on October 26 ............................35

     2. Prejudice............................................................................................37

      a. Admission of the videotape and audiotape .......................................37

      b. Failure to consult with Schwartz-Watts on October 26....................38

III. BASHAM'S ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN (1) ALLOWING HIM TO BE QUESTIONED OUTSIDE THEIR PRESENCE ON NOVEMBER 28, 2002, AND (2) SUBSEQUENTLY FAILING TO CHALLENGE THE ADMISSIBILITY OF THE INCULPATORY STATEMENTS UNCONSTITUTIONALLY OBTAINED FROM HIM THAT DAY. ........38

   A. Relevant Facts ........................................................................................40

   B. *Strickland* Analysis ................................................................................42

     1. Monckton and Littlejohn rendered deficient performance ..................42

     2. Swerling and Harris rendered deficient performance .........................43

     3. Basham was prejudiced......................................................................45

IV. BASHAM'S TRIAL ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE WHEN THEY FAILED TO OBJECT TO THE ADMISSION OF UNFAIRLY PREJUDICIAL PRIOR ACT EVIDENCE DURING THE GUILT PHASE. ........................................................48

   A. Relevant Facts ........................................................................................48

   B. Deficient Performance.............................................................................53

   C. Prejudice................................................................................................55

   D. The District Court's Ruling......................................................................56

V. THE GOVERNMENT ENGAGED IN MISCONDUCT WHEN IT FAILED TO CORRECT TESTIMONY IT KNEW OR HAD REASON TO KNOW WAS FALSE. IT COMPOUNDED THIS MISCONDUCT

BY EMPHASIZING THE FALSE TESTIMONY DURING CLOSING ARGUMENT. BASHAM'S APPELLATE ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO RAISE THIS ISSUE ON APPEAL. ...............................................64

    A. Relevant Facts .................................................................64

    B. Cause to Overcome Procedural Default....................................67

    C. Standard of Review ..........................................................70

    D. The District Court's Merits Ruling .......................................70

VI. TRIAL COUNSEL'S FAILURE TO PROVIDE APPELLATE COUNSEL ALL FILES PRODUCED IN THE COURSE OF REPRESENTING BASHAM CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL AND NECESSARILY RESULTED IN BASHAM BEING DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL. ....................................................74

    A. Relevant Facts .................................................................74

    B. Relevant Authority ...........................................................80

    C. Standard of Review ..........................................................82

    D. The District Court's Ruling.................................................82

CONCLUSION ....................................................................88

REQUEST FOR ORAL ARGUMENT ...........................................88

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(A)(7)(C) AND CIRCUIT RULE 28.1(E).......................................89

CERTIFICATE OF SERVICE ....................................................90

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Dugger*, 841 F.2d 371 (11th Cir. 1988)..............................................35

*Arizona v. Roberson*, 486 U.S. 675 (1988)..................................................44

*Balderas v. United States*, 2012 WL 3544753 (E.D. Tex. 2012) ...........................37

*Basham v. United States*, 130 S. Ct. 3353 (2010)..........................................4

*Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005) ........................................22

*Berger v. United States*, 295 U.S. 78 (1935) ........................................72

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................22

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................70

*Brewer v. Williams*, 430 U.S. 387 (1977)..................................................45

*Brown v. Wainwright*, 785 F.2d 1457 (11th Cir. 1986)..........................................73

*Buckner v. Polk*, 453 F.3d 195 (4th Cir. 2006)................................................45, 55

*Carnel Const. Corp. v. Danville Redevelopment & Housing Authority*,
745 F.3d 703 (4th Cir. 2014) ........................................63

*Coleman v. Thompson*, 501 U.S. 722 (1991)..................................................68

*Cooper v. Oklahoma*, 517 U.S. 348 (1996) ................................................21, 22, 23

*Country v. Foster*, 806 F.2d 182 (8th Cir. 1986)..................................................37

*Drope v. Missouri*, 420 U.S. 162 (1975) ........................................*passim*

*Duncan v. Louisiana*, 391 U.S. 145 (1968) ........................................47

*Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008) ..................................................47

*Dusky v. United States*, 362 U.S. 402 (1960) ..................................................21, 31

*Edwards v. Arizona*, 451 U.S. 477 (1981) ..................................................39, 43

*Evitts v. Lucey*, 469 U.S. 387 (1985) ..................................................68

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002)..................................................59

*Futch v. Dugger*, 874 F.2d 1483 (11th Cir. 1989)..................................................35, 38

*Giglio v. United States*, 405 U.S. 150 (1972) ..................................................*passim*

*Griffin v. Warden*, 970 F.2d 1355 (4th Cir. 1992)..................................................63

*Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000) ..................................................40

*Jackson v. Virginia*, 443 U.S. 307 (1979)..................................................47

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ..................................................45

*Lanigan v. Maloney*, 853 F.2d 40 (1st Cir. 1988)..................................................47

*Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999)..................................................69

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ..................................................68

*Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006) ..................................................72

*Napue v. Illinois*, 360 U.S. 256 (1959) ..................................................*passim*

*Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001) ..................................................87

*Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013)..................................................68

*Pate v. Robinson*, 383 U.S. 375 (1966) ..................................................21

*Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647 (N.D. Tex. 1989)...........80, 81

*Riggins v. Nevada*, 504 U.S. 127 (1992) ..........................................................22, 29

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................*passim*

*Taylor v. Louisiana*, 419 U.S. 522 (1975) .................................................................47

*United States v. Adepoju*, 756 F.3d 250 (4th Cir. 2014)..........................................22

*United States v. Agurs*, 427 U.S. 97 (1976)......................................................73, 74

*United States v. Baker*, 719 F.3d 313 (4th Cir. 2013) ..................................33, 34, 39

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) .............................................4

*United States v. Chin*, 83 F.3d 83 (4th Cir. 1996) ..............................................48, 53

*United States v. Cronic*, 466 U.S. 648 (1984) ........................................................21

*United States v. Fortenberry*, 971 F.2d 717 (11th Cir. 1992) ................................54

*United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012) ..............................................34

*United States v. Harris*, 183 F.3d 313 (4th Cir. 1999) ...........................................67

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) .............................................55

*United States v. Kelly*, 35 F.3d 929 (4th Cir. 1994)................................................73

*United States v. Kojoyan*, 8 F.3d 1315 (9th Cir. 1993) ..........................................72

*United States v. Mason*, 52 F.3d 1286 (4th Cir. 1995) ...........................................21

*United States v. Nicholson*, 611 F.3d 191 (4th Cir. 2010).........................56, 70, 82

*United States v. Quintieri*, 306 F.3d 1217 (2nd Cir. 2002) ....................................29

*United States v. Robinson*, 404 F.3d 850 (4th Cir. 2005)........................................22

*United States v. Smith*, 640 F.3d 580 (4th Cir. 2011)................................56, 70, 82

*Wiggins v. Smith*, 539 U.S. 510, 534 (2003)...........................................................68

## STATE CASES

*Averill v. Cox*, 761 A.2d 1083 (N.H. 2000).............................................................81

*In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*,
689 N.E.2d 879 (N.Y. 1997).................................................................................81, 82

*People v. Barton*, 579 P.2d 1043 (Cal. 1978)...........................................................87

## FEDERAL STATUTES

18 U.S.C. § 1201(a) .....................................................................................................3

28 U.S.C. §§ 1291 ........................................................................................................1

18 U.S.C. § 2119 ..........................................................................................................3

18 U.S.C. § 2253 ..........................................................................................................1

28 U.S.C. § 2255 ..........................................................................................................1

18 U.S.C. § 371 ............................................................................................................3

18 U.S.C. § 922(j) ........................................................................................................3

18 U.S.C. § 924(c) ........................................................................................................3

## JURISDICTIONAL STATEMENT

On June 1, 2011, Appellant Brandon Leon Basham ("Basham") filed a timely Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 ("2255 Motion") in the United States District Court for the District of South Carolina. (JA 2503-2681.) Following an evidentiary hearing, the district court denied the 2255 Motion on June 5, 2013. (JA 0177-0374.) Basham filed a timely Rule 59(e) Motion to Alter or Amend Judgment on July 3, 2013, which the district court denied on August 21, 2013. (JA 7448, JA 0375.) The district court's denial of the 2255 Motion and Rule 59(e) motion resulted in a judgment that disposed of all of the parties' claims. Basham filed a timely notice of appeal on October 17, 2013. (JA 0383.) This Court has jurisdiction over Basham's appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

## STATEMENT OF ISSUES

1. Whether Basham was incompetent at any time during his trial.

2. Whether defense counsel rendered ineffective assistance in failing to adequately protect Basham's fundamental right not to be tried while incompetent.

3. Whether defense counsel rendered ineffective assistance in (a) permitting Basham to be questioned by law enforcement outside their presence, and (b) failing to challenge the admissibility of inculpatory statements Basham made during his interrogation outside counsel's presence.

4. Whether defense counsel rendered ineffective assistance in failing to challenge the admissibility and scope of the highly prejudicial evidence concerning Samantha Burns's murder.

5. Whether the prosecution engaged in misconduct in violation of *Napue v. Illinois*, 360 U.S. 256 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), and whether appellate counsel's failure to raise this issue in Basham's direct appeal constitutes cause for any procedural default of this claim.

6. Whether lead defense counsel rendered ineffective assistance when he refused to turn Basham's trial file over to his appellate attorneys.

## STATEMENT OF THE CASE

## I.    Procedural History

On September 30, 2004, a federal jury in South Carolina convicted Basham of the following crimes:

(1)    carjacking resulting in death, in violation of 18 U.S.C. § 2119;

(2)    kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a);

(3)    interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312;

(4)    conspiracy to commit (a) carjacking, (b) kidnapping, (c) interstate transportation of a stolen vehicle, (d) possession of firearms by a convicted felon, and (e) possession of stolen firearms, in violation of 18 U.S.C. § 371;

(5)    conspiracy to use, carry, and possess firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C. § 924(o);

(6)    carrying, using, and possessing firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C. § 924(c);

(7)     being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and

(8)    possession of stolen firearms, in violation of 18 U.S.C. § 922(j).

(JA 1641-1643.)

On November 2, 2004, the same jury returned verdicts imposing death on Counts 1 and 2 of the Superceding Indictment.  (JA 2451-61.)  The district court

3

subsequently sentenced Basham to death by lethal injection on Counts 1 and 2 and to various terms of years totaling 55 years (660 months) on the remaining counts. (JA 2493-2500.)

Basham appealed to this Court, which affirmed his convictions and sentences. *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009). The Supreme Court of the United States denied Basham's subsequent petition for writ of certiorari on June 1, 2010. *Basham v. United States*, 130 S. Ct. 3353 (2010).

On June 1, 2011, Basham filed his 2255 Motion in the district court. The motion raised 34 claims for relief, but Basham subsequently withdrew two of those claims. The district conducted an evidentiary hearing on the remaining claims in October and December 2012 ("2255 hearing"), and issued its order denying Basham relief on June 5, 2013. The district court granted Basham certificates of appealability on all of the remaining claims save two. (JA 0374.) In this appeal, Basham addresses eight of the 30 claims for which he received certificates of appealability.

## II.    Relevant Facts

The facts pertaining to the crimes for which Basham was convicted and sentenced are set forth in this Court's opinion in his direct appeal. *Basham*, 561 F.3d at 309-16. Basham sets forth separately in each of the issues raised below the facts relevant to this Court's adjudication of those issues.

## SUMMARY OF ARGUMENT

Of the 30 claims in his 2255 Motion for which the district court granted certificates of appealability, Basham presents this Court with six independent arguments covering eight of the 2255 Motion claims. Specifically, the six arguments raised in this brief address the following 2255 Motion claims: 1, 2, 4, 5, 11, 12, 15, and 30.

Argument I addresses Basham's competency at trial, which was the subject of Claim 4 of the 2255 Motion. In this argument, Basham demonstrates that the record before this Court reveals by a preponderance of the evidence that, on at least two occasions during his 2004 trial, he was legally incompetent, as that term is defined by well-established Supreme Court precedent. Because Basham's trial proceeded while he was demonstrably incompetent, he was deprived of his fundamental right to due process of law.

Argument II, which is related to Argument I, demonstrates that Basham's trial attorneys rendered constitutionally ineffective assistance of counsel when they failed to take appropriate steps to ensure that their client was not tried while legally incompetent. This argument is derived from Claim 5 of the 2255 Motion.

Argument III maintains that Basham was denied the effective assistance of counsel when (1) his original defense attorneys permitted him to be questioned by law enforcement outside their presence during a search for the victim conducted on

November 28, 2002; and (2) his subsequent defense attorneys failed to challenge the admissibility of the inculpatory statements Basham made during the illegal interrogation. This Argument derives from Claims 1 and 2 of the 2255 Motion.

Argument IV concerns trial counsel's deficient performance, and the resulting prejudice to Basham, with regard to the extensive evidence admitted during the guilt phase of trial concerning the murder of Samantha Burns. This Argument mirrors Claim 15 of the 2255 Motion. Basham maintains in this Argument that his attorneys were constitutionally ineffective in failing to challenge the admissibility and scope of the highly prejudicial evidence concerning Burns's murder.

Argument V is a prosecutorial misconduct claim addressing the Government's failure to comply with *Napue v. Illinois*, 360 U.S. 256 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), with respect to testimony from Brunswick County Sheriff Ronald Hewett. Hewett testified for the first time at Basham's trial (and contrary to all other evidence) that, during the November 28 interrogation conducted outside of counsel's presence, Basham admitted to being Alice Donovan's actual killer. Argument V further demonstrates that the Government compounded its misconduct by emphasizing Hewett's testimony during both the guilt and penalty phase closing arguments. Finally, because the district court found the prosecutorial misconduct claim procedurally defaulted

6

because it was not raised in Basham's direct appeal, Argument V also addresses appellate counsel's ineffectiveness in failing to raise the claim. This section of the brief derives from Claims 11 and 12 of the 2255 Motion.

Finally, in Argument VI, Basham submits that his trial attorney rendered constitutionally ineffective assistance of counsel when he refused to turn Basham's trial file over to his appellate attorneys. Because trial counsel's refusal to provide the record to appellate counsel left the appellate attorneys privy to only a small portion of Basham's record, they were necessarily rendered ineffective in litigating his direct appeal to this Court. Argument VI mirrors Claim 30 of the 2255 Motion.

**ARGUMENT**

## I. BASHAM'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN HE WAS TRIED WHILE LEGALLY INCOMPETENT.

Compared to the typical criminal trial, the Government's prosecution of Basham was gargantuan in scale. Spanning nine weeks, the guilt and penalty phase of the trial involved testimony from 166 witnesses. (*See* JA 2295.) As Judge Anderson told the jurors upon excusing them at the end of their service, Basham's trial was "by far" his longest trial in 18 years on the bench. (JA 2463.) While the stress of participating in a nine-week federal capital trial would try the stamina of even a seasoned jurist, the laser focus of this protracted and complex judicial proceeding fell each day on Basham, a brain-damaged and psychologically disturbed young man with an IQ of 68.

As Basham establishes below, the record in this case demonstrates by a preponderance of the evidence that, on at least two occasions during his trial, he was legally incompetent. Accordingly, he was deprived of due process and is entitled to relief.

### A. Relevant Facts

#### 1. Basham's psychological history and general mental state at the time of trial

Basham, who marked his 23rd birthday as he sat at the defense table on September 14, 2004, first began receiving mental health services at the age of seven. (JA 1895.) By the time he turned nineteen, Basham had been treated at no less than thirteen mental health facilities, and had received diagnoses of, among other things, bipolar disorder, seizure disorder, and attention deficit disorder with intermittent explosive disorder. (JA 1901, 1906; *see also* JA 5121.)

In addition to his mental health diagnoses, Basham's heavy drug use dating from childhood, including extensive inhalant abuse, contributed to his behavioral and cognitive limitations. As psychiatric neurologist Thomas Hyde testified at the 2255 hearing, Basham's drug use, combined with other hereditary and environmental facts, resulted in damage to the frontal lobe of his brain, the area responsible for executive functioning. (JA 4765-67.) This same inhalant drug use is what led Dr. Donna Schwartz-Watts, the defense psychiatric expert at trial, to opine that the then-23-year-old Basham was suffering from dementia in addition to inhalant-induced psychosis. (JA 2114-33.)

During his pretrial incarceration in 2003 and 2004, Basham was under the care of psychiatrist Donald Morgan.[1] (JA 1971.) At Morgan's direction, Basham was given a host of mood-altering drugs throughout his trial. The most notable of these medications was Seroquel, an antipsychotic.[2] (JA 2094-95.) As Dr. Hyde testified at the 2255 hearing, "One of the main problems with Seroquel is it tends to be a highly sedating medication. . . . [O]n a functional basis many patients find Seroquel a difficult medication to tolerate because it makes them so sleepy." (JA 4769-70.)

As his extensive psychiatric treatment before trial demonstrates, Basham was already in a fragile state before his lengthy trial even began. In fact, despite his ongoing psychiatric treatment, he attempted suicide on the eve of the *Jackson v. Denno* hearing in his case. (JA 5300.) *See Drope v. Missouri*, 420 U.S. 162, 180 (1975) (discussing significance of suicide attempts in competency determination). Aware of Basham's substantial limitations, his legal team proceeded to trial viewing him not as an active participant in his own defense, but as a childlike figure who needed to be distracted by games and coloring books. For example, on

---

[1] Morgan diagnosed Basham with an organic mood disorder with psychosis (including auditory hallucinations), Attention Deficit Disorder, Panic Disorder, and Polysubstance Abuse. (JA 2096-2097.)

[2] Basham was also medicated during trial with Concerta and Ritalin (for treatment of Attention Deficit Disorder), Neuronton (for mood stability), and Paxil and Valium (for treatment of anxiety). (JA 2094-2095.)

the Friday before trial commenced, the mitigation specialist assigned to Basham's case discussed the defense team's intention to keep Basham preoccupied during trial with activities intended to distract him and thereby control his behavior: "[Basham] said that he likes coloring books, connect the dot games and word seek and find puzzles. I told him that [another member of the team] would have them for him. And he is to work on them and focus on that." (JA 5302.) Exhibits admitted at the 2255 hearing reveal that, during trial, Basham frequently focused on drawing pictures and playing games in the activity books provided to him by counsel. (JA 5303-17.) His lack of active participation in the trial was evident to observers. (JA 5319.)

2. **Basham's vacillating physical and psychological state during trial**

The trial record also demonstrates numerous occasions on which the heavily-medicated Basham was unable to stay awake, and still other occasions when he apparently argued with his attorneys in front of the jury. (JA 1029-30 (discussing Mr. Basham's inability to stay awake); JA 1036 ("Apparently he just can't keep his head up. I am getting frustrated. I am trying to do the job here, I don't want the jury to see him in this fashion."); JA 7524 ("If you can sit there and stay awake today, we will have you some chewing tobacco Monday when we come back, I promise you. Work with us and try to stay awake today."); JA 1154

("Last Friday there were two issues: Your stress that you were almost having a panic attack, supposedly, and then, you were sleepy."); JA 1663 ("Why would someone, after having been charged, and arrested, and confronted with death penalty offenses, sleep in his trial and during his jury selection?  Why would someone argue with his lawyers during the trial?"); JA 1663-64 ("We see someone sleeping in a courtroom during his death penalty trial, and we logically conclude that he is uninterested. . . . We see someone arguing with his lawyers and we think to ourselves, how can he choose to argue with the same – with the only people that are trying to save his life?"); and JA 1764 ( "And at some point, he appeared to be dozing again, and that is when we got into the question about dip. . . .  I said, if that is what it takes to keep the Defendant awake and active in this proceeding, it is the thing to do.")).  In the third week of trial, lead defense counsel Jack Swerling wrote the following note to himself:

> *Brandon will not sit up.  He has his head down.  Then he sits back and sleeps back in chair.  He has refused my request, Greg's request and Paige's request.  He said "they can give him the D/P when I tell him the jury is looking at him[.]"*

(JA 5321.)

Standing alone, Basham's continuous vacillation between sleeping and arguing with his attorneys would seem to suggest some level of psychological instability.  Yet, as Dr. Schwartz-Watts, explained, even the substance of Basham's

disagreements with counsel reflected delusional thinking.  During one of several *ex parte* hearings concerning Basham's behavior during the trial, Schwartz-Watts informed the court that Basham's difficulties with the second-chair defense attorney, Greg Harris, were attributable to the fact that he had become "quite paranoid" about Harris and had developed "ideas of other things going on at the table than what are going on."  (JA 7519, 7521.)

### 3. Basham's perseverative behavior

The record likewise reveals that, as the trial progressed, Basham began to perseverate on his perceived need for chewing tobacco (or "dip") to calm himself.  (JA 7523-24.)  Schwartz-Watts explained:

> [T]here have been times where Mr. Basham wanted dip, for example. And I have seen people try to reason with him about something else that is very important, and he can't shift.  He cannot get off the fact that he needs that nicotine.  He will not deal with whatever that person is trying to speak with him about, he can't.  He can't shift from one set of ideas to another.  He is not the kind of person that he can multitask.  He definitely can't talk to you – to his attorney or the Court about something while he is thinking of this other thing.  He can't shift gears, so to speak, and that is a very prominent symptom of him.

(JA 2124-25.)

Contemporaneous notes by Swerling confirm that, even during the most important parts of the trial, such as the Government's closing argument during the guilt phase, Basham was unable to concentrate on the proceedings because of his

perseveration over dip.  For example, on September 29, Swerling wrote: *"After [Prosecutor's] closing, [Defendant] just wanted some 'dip.'"*  (JA 5327.)  The next day Swerling wrote: *"During this difficult discussion [Defendant] is driving me crazy about Dip."*  (JA 5327.)  On another day, Swerling wrote:

*Starts right off about Dip.*

*Before break   Dip*

*During Trial – Dip*

*After Break   Dip*

*Before lunch – Dip*

(JA 5325.)

Even during discussions regarding a jury question submitted during guilt-phase deliberations (on an issue the court called "the toughest call that has come along in the long history of this case"), Basham was preoccupied with when he would be receiving his dip.  (JA 1608, 1628, 1632-33.)

### 4. The events of September 20, 2004

The most blatant example of Basham's perseveration concerning dip, however, occurred on September 20, 2004. That day, Swerling wrote in his notes: *"[Defendant] is obsessing the whole time re 'dip.'"* (JA 5322.)  Following the lunch recess, the Court informed Basham that, in light of concerns raised by the United States Marshals, he had reconsidered his earlier decision to allow Basham

to have chewing tobacco in the courtroom. (JA 1159.) Basham responded that he wanted to leave the courtroom and return to his holding cell, but when that request was denied, he became agitated and the U.S. Marshals attempted to restrain him. A physical struggle ensued, with eight Marshals eventually pinning Basham to the ground. (JA 1161; JA 7563; JA 1800.)

Defense counsel Harris immediately requested a recess to permit Schwartz-Watts to evaluate Basham: "We would ask for a delay in the hearing. We have a doctor on the way, which is, approximately, three blocks away. Mr. Swerling and I have observed, obviously, what everyone has observed in the courtroom. We are concerned about the competency." (JA 1164.) In response to the Government's objection to a recess, Harris stated:

> To respond to [the Government], to get back on this issue about whether or not this is manipulation or whether he is competent, what I just saw in the courtroom didn't look like any attempt to manipulate I had ever seen. Looked like someone who didn't have the ability to control the simple function of sitting down in a seat. That is why we have a concern about the competence today. The 20th of September.

(JA 1168-69.)

Schwartz-Watts evaluated Basham immediately following the courtroom incident and informed the court that he was presently incompetent:

> I do have concerns about his competency. It is my opinion right now that because of his mental defect that he can't assist his attorneys. Now, the problem with that, and the good news probably is, his

mental state fluctuates, and there is going to be times in this trial where he has competence fluctuation.

(JA 1173.) The Government presented no evidence to contradict Schwartz-Watts's expert opinion concerning the state of Basham's competency that day.

Although Basham's struggle with the Marshals occurred outside the presence of the jury, and the Court granted the requested recess that day, the Government later played the video and audio of the incident to the jury in the penalty phase, despite the evidence (including Schwartz-Watts's expert testimony) that Basham was incompetent when the incident occurred. (JA 1806, *see generally* JA 1779-1837.)

### 5. The events of October 22 and October 26, 2004

The record further demonstrates that Basham's ability to "consult with his lawyer with a reasonable degree of rational understanding" did not improve during the penalty phase of his trial. *See Drope*, 420 U.S. at 172. For example, on October 22, 2004, the transcript reflects that Harris had to interrupt the court proceedings while Swerling was conducting a direct examination. (JA 1912.) After the jury left the courtroom, Harris informed the Court that "Mr. Basham has progressively worsened his condition over the course of the afternoon." (JA 1912.) The transcript of the proceeding then reflects the following:

THE DEFENDANT: I am trying, Jack. I can't take it. I cannot. I'm ready.

| | |
|---|---|
| THE COURT: | What is the Government's position to adjourn early? |
| MR. SCHOOLS: | It is fine, Judge. |
| THE COURT: | You agree to it? |
| MR. SCHOOLS: | Whatever they want. |
| THE DEFENDANT: | I do, too. I don't care. I can't take it no more. |
| THE COURT: | Mr. Basham, we will go ahead and recess. |
| THE DEFENDANT: | I'm sorry, man. I'm out of emotions. I don't even know how to express it. |
| THE COURT: | All right. Please bring in the jury. |
| THE DEFENDANT: | I want to see my family, man. |
| MR. SWERLING: | Before the jury come in, may he be taken out? |
| THE COURT: | Yeah, go ahead and take him out. |
| THE DEFENDANT: | Yeah, take me out after it is over. |
| MR. SWERLING: | Can you sit there? |
| THE DEFENDANT: | Yeah. |
| MR. SWERLING: | I was anticipating a problem. |
| THE DEFENDANT: | I ain't trying. |

(JA 1912-13.)

On October 26, 2004, trial counsel informed the Court that Basham had not been given his Seroquel that morning and was in a "very agitated state." (JA 1919.) When the Court ordered that Basham take his medication, Basham responded, "I can't stay awake. I think it is nighttime." (JA 1920.) When asked its position by the Court, the Government stated that the defense "need[s] someone here to see if he is competent to go forward before we proceed with the trial." (JA 1921.) The Court then recessed until 1:00 p.m.

While the Court was in recess, it held an *ex parte* hearing with Basham and his counsel. During the hearing, the Court told Basham that his lawyers had convinced the Court that he was "not competent to go forward in front of a jury." (JA7535-36.) At 1:00 p.m., however, Basham apparently was still not sufficiently competent to assist his attorneys, who asked for and received an additional 15 minutes. (JA1927.) When the Court returned, defense counsel expressed concern about Basham's ability to participate in his own defense:

MR. HARRIS: My observation of Mr. Basham is that he is not going to be able to sit in the courtroom and pay attention to the testimony, remain silent. And I am concerned that he will - - that this jury will not look favorably upon the way he is appearing to me to be acting this afternoon.

THE COURT: Mr. Schools.

MR. SCHOOLS: Our position is, we need to go, Judge. We have rearranged everybody's schedule to accommodate

Mr. Basham's feelings from moment to moment. I think we have done that enough. I think we now are to the point where he thought he would get this if he did this by habit. So, if we are there, I think we should bring the jury. At some point, he is going to have to suffer the consequences of his own behavior. And this is as good a time to start now as any.

THE COURT: Well, I agree with everything you said, except the failure to take the medicine was not really his fault.

MR. SCHOOLS: Once again, Judge, if it is a medical problem, Dr. Schwartz-Watts should be here to testify about it. I mean, that is why they are paying all of these doctors all of this money to treat him. I don't know where she is, but she is not here. So now, we go to Mr. Harris to opine about whether his own client is competent or not, rather than have a doctor here who might actually know.

THE COURT: Mr. Harris, I have tried to bend over backwards to do everything possible to keep the defendant on an even keel and a good frame of mind, and especially so that he won't show out in front of the jury. But the jury is really worn out. They have sent signals indirectly to me. They really want to see this case move along. I think there is a danger to be balanced against what you say. These continued delays are going to be held against the Defendant, I think. I think the jury will figure out that it is the Defendant that is causing these delays. So, I think I have got to weigh in the balance of the aspect of it, versus the danger of going forward with him appearing to be a little bit disheveled over there.

(JA 1927-29.)  Although defense counsel objected that Basham was not "in a state, frame of mind to go forward," the Court called the jury in and proceeded with testimony.[3]  (JA 1929-31.)  When the Court took its afternoon break, however, defense counsel informed the Court, "Mr. Basham is slurring his words.  He seems to be groggy and just out of it.  That is for lack of a better word.  He was sleeping when Mr. Harris was doing the direct examination of Dr. Brawley."  (JA 1936-37.)  Recognizing the possibility that Basham was incompetent, the Court observed, "Maybe I need to be hearing from a doctor about these matters."  (JA 1937.)  When the Court asked the Government for its position on recessing for the day, the Government responded: "Don't want to.  I mean, Dr. Schwartz-Watts, according to the defense counsel, is three blocks away.  And this problem has been ongoing for the whole afternoon, and she is still not here.  He is awake.  I think we need to go forward."  (JA 1939.)  Thus, despite defense counsel's—and its own—concerns about Basham's ability to assist in his defense, the Court concluded, "I think we need to at least make an effort to go forward.  I understand your request, Mr. Swerling, but I just respectfully disagree."  (JA 1939.)

---

[3]Harris furthered stated: "And I will point out that as I am addressing the Court right now, the record should reflect that my client is discussing over my shoulder, loud enough that I can hear, and certainly loud enough for the jury could hear, having discussions with Mr. Swerling about the fact that he will be good.  The fact that he is audibly saying, 'I will be good,' that is the kind –." (JA 1929.)

## B.     The Competence Requirement

"[T]he conviction of an accused person while he is legally incompetent violates due process."  *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995).  The "fundamental right" of a defendant to be competent at all stages of his trial is so central to the American justice system that "[n]o one questions [its] existence."  *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996).  It is likewise undisputed that "an erroneous determination of competence threatens a 'fundamental component of our criminal justice system' – the basic fairness of the trial itself."  *Id.* at 364 (quoting *United States v. Cronic*, 466 U.S. 648, 653 (1984)); *accord Drope*, 420 U.S. at 171-72 ("the prohibition [against the trial of an incompetent defendant] is fundamental to an adversary system of justice").

The test for whether a defendant is competent to stand trial "seeks to ascertain whether a criminal defendant 'has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'"  *Drope*, 420 U.S. at 172 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).  As the Supreme Court has emphasized:

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront,

and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper*, 517 U.S. at 354 (quoting *Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (opinion of Kennedy, J.)).

Where a preponderance of the evidence demonstrates that a defendant lacks the requisite understanding and ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper*, 517 U.S. at 355. This preponderance of the evidence standard applies in a 2255 proceeding. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). To satisfy this standard, Basham need only prove that it is more likely than not that he was incompetent within the meaning of *Drope* and *Dusky* at any time during his trial. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (discussing preponderance of evidence standard).

### C. Standard of Review

Following the 2255 hearing, the district court concluded that "Basham [had] not shown by a preponderance of the evidence that he was incompetent at the time of trial." (JA 0275.) This Court reviews that finding for clear error. *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005). "A clear error occurs where [this Court is] left with a firm and definite conviction that a mistake has been committed." *United States v. Adepoju*, 756 F.3d 250, 258 (4th Cir. 2014).

**D.     The District Court's Clear Error in Adjudicating the Competency Claim**

As the Supreme Court has observed, the common law has long recognized that a criminal defendant is entitled to have the trier of fact "diligently inquire" into the question of his competency to stand trial.  *See Cooper*, 517 U.S. at 356-57 (citing *King v. Frith*, 22 How. St. Tr. 307 (1790), and *Queen v. Goode*, 7 Ad. & E. 536, 112 Eng. Rep. 572 (K.B. 1837)).  The district court's analysis of Basham's competency claim, however, suggests less of a diligent inquiry than an inconsistently reasoned, post-hoc justification of the court's failure to protect Basham's fundamental right to be competent at trial.

The facts recounted in subsection A, *supra*, raise troubling concerns about Basham's "ability to consult with his lawyer with a reasonable degree of rational understanding" on numerous occasions during both the guilt and penalty phases of his trial.  In fact, the severity of Basham's impairments led one expert, Dr. Hyde, to opine that Basham could *never* be sufficiently competent to withstand the type of trial to which he was subjected.  (JA 4767-68.)  Hyde explained:

> On the basis of his psychiatric and neurological conditions, [Basham] is unable to attend to and fully comprehend the details of ongoing legal proceedings and offer effective assistance to his legal team based upon a reasoned evaluation of the information presented to him. Moreover, he has difficulty regulating his behavior under situations of great stress, such as court proceedings, due to organically based frontal lobe deficits.

(JA 5366.)

Even the independent competency expert retained by the district court during the 2255 proceeding, psychiatrist George Parker, acknowledged Basham's need for special accommodation during court proceedings:

> [M]y recommendation in a regular competence to stand trial evaluation for a gentleman like Mr. Basham I would recommend to the court that the proceedings move at a slower pace than usual, that the distractions in the court be minimized in an attempt to help Mr. Basham maintain his focus, which he can only do for brief periods anyway, and so take it in small bites.

(JA 3882.) According to Parker, "breaks every 20 to 30 minutes would probably be about as long as he could handle at any one time." (JA 3884.)

Of course, Basham's nine-week trial in 2004 did not proceed with "breaks every 20-30 minutes." Instead, the district court maintained a persistent pace at trial, and the record reveals the effects of that pace on the consistency of Basham's ability to consult with his lawyers with a reasonable degree of rational understanding. Specifically, the record demonstrates that, at the very least, the district court permitted Basham to be tried while incompetent on two occasions during his nine-week trial. The district court's subsequent determination that Basham was not incompetent on either of those occasions is belied by the court's very own statements and actions at the time of trial. The inconsistency between the district court's actions and statements at trial and its conclusions in Basham's

2255 proceeding undermine the court's expedient and self-serving finding that "[i]f there had been any indication that he was incompetent, the court would have sought the testimony of a doctor on Basham's competency." (JA 0272.)

### 1. Incompetence on September 20, 2004

Immediately following the altercation with the Marshals on September 20, the district court "sought the testimony of a doctor on Basham's competency." (*See* JA 0272.) Specifically, the court stated, "Let's take a short recess until your doctor gets here. I am not consenting to continue this case or delay the trial necessarily. I do want to hear what the doctor has to say."[4] (JA 1169.) Once Dr. Schwartz-Watts had evaluated Basham, she informed the court that she had "concerns about his competency": "It is my opinion right now that because of his mental defect that he can't assist his attorneys." (JA 1173.) The Government expressly declined the court's offer to bring in a doctor to offer a "rebuttal opinion." (JA 1174, 1176.)

---

[4] Moreover, the court's statements tellingly indicate both its concern that the trial might have to be "stop[ped]" because of questions concerning Basham's competency and its countervailing concern about the ramifications of doing so:

> This is such an important decision. I mean, we are talking about stopping the case in its tracks that has a lot of time and effort involved in it thus far. This is a second trial, 124 witnesses coming from distant states, 17 more jurors giving up their time to serve on the jury, not to mention all of the efforts that go in the trial. I would rather the doctor tell me what she knows about his competency in front of the Government.

(JA 1172.)

The following day, the court did not begin proceedings until it had received a report from Schwartz-Watts about Basham's competency, as well as receiving assurances from defense counsel that they were satisfied that their client was competent to go forward. (JA 1182-83.)

Remarkably, despite its obvious deference to Schwartz-Watts' opinion on September 20, 2004, that Basham was incompetent, in subsequently denying Basham 2255 relief, the court stated simply that it was "not bound by the testimony of Dr. Schwartz-Watts in making its determination as to Basham's competence at the time of the altercation during trial." (JA 0271.) Instead, the court chose to rely on two suspect factors in concluding that Basham was competent at the time of the courtroom altercation.

First, the court observed that Basham "had the presence of mind to make a last-ditch argument as to why he should have been allowed smokeless tobacco, even as he was being escorted out of the courtroom." (JA 0271.) The court failed to explain, however, how Basham's shouted pleas as he was being physically removed from the courtroom by eight U.S. Marshals had any bearing on his "ability to consult with his lawyer with a reasonable degree of rational understanding" at that moment. *See Drope*, 420 U.S. at 172. In fact, as the transcript, video, and audio of the courtroom incident plainly demonstrate, Basham was unable to heed his counsel's advice to sit down and remain quiet. As Harris

26

told the court that day, "[W]hat I just saw in the courtroom didn't look like any attempt to manipulate I had ever seen.  Looked like someone who didn't have the ability to control the simple function of sitting down in a seat."  (JA 1168-69.)  *See United States v. Willis*, 362 Fed. Appx. 531, 534 (6th Cir. 2010) ("An attorney's opinion about his client's competency is likewise a relevant factor" in determining competency).

Second, in lieu of relying on the expert testimony of Dr. Schwartz-Watts and the comments of Basham's attorneys concerning Basham's competency, the district court cited "some evidence" offered by the Government that Basham "may have planned to act out in court."  (JA 0271.)  That evidence was a comment allegedly made by Basham to a U.S. Marshal while being escorted from his holding cell that afternoon.  According to the Marshal, Basham had stated, "I am not going to be up there for the long.  I am coming back down."  (JA 0271.)  The district court, however, failed to explain how this comment was evidence of a deliberate and rational attempt by Basham to engage in the protracted struggle that ensued.  As a threshold matter, Basham did not know before entering the courtroom that the court had changed its mind about permitting him to have chewing tobacco, which was the precipitating factor in the altercation.  Moreover, before the altercation, Basham did politely request that he be allowed to return to his holding cell: "I would like to go back downstairs, if I may.  Go back.  I don't

feel good." (JA 1159.) That request was entirely consistent with the statement Basham allegedly made to the Marshals before returning to court. Nothing about this evidence supports the conclusion that Basham's violent altercation was an intentional and rational act.

It was unreasonable for the district court to dismiss the expert testimony of a psychiatrist and the avowal of Basham's own attorneys concerning Basham's competency in favor of the unpersuasive evidence upon which it relied. Plainly, the preponderance of the evidence before the court was that Basham was incompetent during his altercation with the U.S. Marshals. The district court's contrary finding constitutes clear error.

### 2. Incompetence on October 26, 2004

The district court's analysis of Basham's competence on October 26, is even more troubling than its reasoning concerning the September 20 incident. In fact, the court's "analysis" on the crucial issue is nothing more than a self-serving syllogism that, had there been "any indication that [Basham] was incompetent, the court would have sought the testimony of a doctor on Basham's competency, as [it] did on other occasions." (JA 0272.) The unspoken conclusion to the syllogism is that, because the court did not seek expert testimony concerning Basham's competency on the afternoon of October 26, Basham was necessarily competent. This reasoning does not survive scrutiny.

First, the court's assertion that there was no indication that Basham was incompetent on October 26 is wholly belied by the transcript from that day. As set forth more fully in Section A(5), *supra*, defense counsel repeatedly and unequivocally informed the court of their concerns about Basham's competency. (JA 1927, 1929, 1936.) *Accord Drope*, 420 U.S. 176-77 ("judges must depend to some extent on counsel to bring [competence] issues into focus"). Among other things, counsel informed the court, "Mr. Basham is slurring his words. He seems to be groggy and just out of it." (JA 1936-37.) Counsel continued:

> He was sleeping when Mr. Harris was doing the direct examination of Dr. Brawley. I just think the record needs to reflect that, Judge. I understand that in the past he has caused delays, but I think that this particular situation is not his fault. His medicine, I think, is taking effect on him that he normally had at night when he would go to sleep.

(JA 1937.)[5] The record leaves no doubt that defense counsel believed their client was unable to assist them in a rational manner and that they informed the court of

---

[5] "Certainly, the improper administration of psychiatric medicine can render an individual temporarily incompetent." *United States v. Quintieri*, 306 F.3d 1217, 1233 (2nd Cir. 2002). As the Supreme Court has observed, "It is clearly possible that such side effects [of psychiatric medication] had an impact upon not just [the defendant's] outward appearance, but also . . . his ability to follow the proceedings, or the substance of his communication with counsel." *Riggins v. Nevada*, 504 U.S. 127, 137 (1992). Justice Kennedy's observations in his concurring opinion in *Riggins* are particularly relevant to this case:

> As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to

their concerns. Thus, the district court's finding in the 2255 proceeding that there was no indication of Basham's incompetence that day is plainly inaccurate and constitutes clear error.

Second, the court itself voiced concern about Basham's mental state on October 26, observing, "Maybe I need to be hearing from a doctor about these matters." (JA 1937.) In other words, the court's more recent, confident assertion that it would have sought expert advice had it believed it necessary cannot be accepted in light of its statements on the record on October 26.

The record in this case indicates by a preponderance of the evidence, at the very least, that (1) Basham was incompetent when the videotape and audiotape were made of his struggle with the United States Marshals on September 20; and (2) Basham was incompetent on October 26, and that, while seemingly recognizing his incompetence, the district court nevertheless proceeded with trial. Basham is entitled to relief for these violations of his right to due process.

---

the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, or his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.

504 U.S. at 143-44 (Kennedy, J., concurring).

## II. BASHAM'S ATTORNEYS RENDERED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL WHEN THEY FAILED TO TAKE REASONABLE STEPS TO INFORM THE COURT OF HIS INCOMPETENCY.

In Section I of this brief, Basham set forth in detail the evidence of his incompetence at various times of his trial. Even if this Court were to reject the powerful evidence that, on at least two occasions (September 20 and October 26), Basham lacked the "present ability to consult with his lawyer with a reasonable degree of rational understanding," *Dusky*, 362 U.S. at 402, he has nevertheless satisfied the requirements of *Strickland v. Washington*, 466 U.S. 668 (1984), in demonstrating that his attorneys rendered ineffective assistance in responding to evidence of his possible incompetence.

### A. Relevant Facts

#### 1. September 20, 2004

Basham does not allege that his attorneys rendered deficient performance in the immediate aftermath of his altercations with the U.S. Marshals on September 20. To the contrary, counsel promptly notified their psychiatric expert, who then evaluated Basham and informed the court that he was presently incompetent. Rather, the inexplicable lapse in counsel's professional responsibilities with regard to Basham's incompetence on September 20 occurred several weeks later when, in response to the Government's request in the penalty phase to inform the jury of the

altercation and to play a videotape and audiotape of the incident, defense counsel failed entirely to argue that due process prohibited such evidence from being used against Basham because, as Schwartz-Watts opined without contradiction, he was incompetent at the time. Although defense counsel objected to the admission of all evidence concerning the courtroom struggle, their objections were premised solely on undue prejudice and were wholly unrelated to the issue of Basham's incompetence at the time of the incident. (JA 1678-81, 1699-1728, 1744-75.)

### 2.     October 26, 2004

The events of October 26, concerning Basham's competence to stand trial are set forth fully in Section I, *supra*. The facts relevant to the deficient performance of counsel on that day pertain to the defense attorneys' failure— despite prompting from both the Government and the court—to attempt to provide the court with expert testimony concerning their client's present level of competence. For example, when Harris informed the court that he did not believe that Basham was able to go forward with trial that day, the Government questioned why counsel had not contacted their psychiatric expert:

> Once again, Judge, if it is a medical problem, Dr. Schwartz-Watts should be here to testify about it. I mean, that is why they are paying all of these doctors all of this money to treat him. I don't know where she is, but she is not here. So now, we go to Mr. Harris to opine about whether his own client is competent or not, rather than have a doctor here who might actually know.

(JA 1928.) When asked by the court whether he had "thought about getting Dr. Schwartz-Watts over here," Harris responded merely, "She is at the office right now." (JA 1929.) When Swerling again raised the issue of Basham's competence later in the afternoon, the Court responded, "I think [the Government] is right. Maybe I need to be hearing from a doctor about these matters." (JA 1937.) When the court asked the Government its position about adjourning for the afternoon "because of the Defendant's position," the Government again stressed defense counsel's failure to seek assistance from their psychiatric expert: "Dr. Schwartz-Watts, according to defense counsel, is three blocks away. And this problem has been ongoing for the whole afternoon, and she is still not here. He is awake. I think we need to go forward." (JA 1939.) The court agreed with the Government, and the trial proceeded.

### B. Controlling Law and Standard of Review

"To show a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must prove (1) 'that [his] counsel's performance was deficient' and (2) 'that the deficient performance prejudiced the defense.'" *United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013) (quoting *Strickland*, 466 U.S. at 687). An attorney's performance is considered deficient when it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "To show prejudice, a defendant must demonstrate 'a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.'" *Baker*, 719 F.3d at 320 (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*

"In evaluating a district court's rulings on each [*Strickland*] prong, [the appellate court] review[s] its legal conclusions de novo and its factual findings for clear error." *Id.* at 318 (citing *United States v. Fulks*, 683 F.3d 512, 516 (4th Cir. 2012)). The sole factual finding by the district court that is relevant to this claim is the court's conclusion that Basham was not incompetent during the courtroom scuffle on September 20, 2004. (JA 0271.) As Basham argued in Section I, *supra*, that finding was clearly erroneous. Nevertheless, because of that finding, the district court made no finding concerning counsel's performance concerning the admission of the videotape and audiotape in the penalty phase. (*See* JA 0275-79.) The district court failed to discuss either prong of *Strickland* as it applied to counsel's failure to seek the assistance of Dr. Schwartz-Watts on October 26, although this aspect of the claim was specifically discussed in oral arguments in the 2255 proceeding. (*See* JA 4948-53.)

"[T]o demonstrate prejudice from counsel's failure to investigate his competency, petitioner has to show that there exists 'at least a reasonable probability that a psychological evaluation would have revealed that he was

incompetent to stand trial.'" *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989) (quoting *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988)).

## C. *Strickland* Analysis

### 1. Deficient Performance

#### a. Failure to object to September 20 video and audio on competence grounds

Defense counsel informed the court on September 20 that they believed their client was presently incompetent. (JA 1164, 1168-69.) Dr. Schwartz-Watts subsequently confirmed their suspicions. (JA 1173.) Counsel were also adamantly opposed to the admission of the videotape and audiotape of the courtroom struggle, arguing that it was unfairly prejudicial. (JA 1678-81, 1699-1728, 1744-75.) Yet, inexcusably, they failed to remind the court of the most important reason that Basham would be unfairly prejudiced if the jury were allowed to see their client in a struggle with U.S. Marshals: according to their expert, Basham was incompetent when the video and audio were made. Failure to remind the court of this critical fact fell below the performance expected of a minimally competent capital defense attorney.

#### b. Failure to contact Schwartz-Watts on October 26

At the 2255 hearing, Basham presented expert testimony from Larry Hammond concerning trial counsel's deficient performance in responding to the

myriad indications that Basham was incompetent to stand trial.[6] In concluding that trial counsel failed to satisfy the standard of care on this issue, Hammond opined about the critical importance of seeking expert advice whenever a lawyer has concerns about a client's present competency: "Lawyers can't do this alone, this is one of those areas where the assistance of qualified professionals is just critical." (JA 4583.)

Of course, trial counsel did not require the expert advice of Mr. Hammond on October 26, 2004: the prosecution and the judge themselves explained to defense counsel the importance of having their psychiatric expert evaluate Basham that day. (*See* JA 1928, 1937, 1939.) Nevertheless, despite repeatedly expressed concerns about Basham's competence, and despite the Government's and the court's indication that expert input was needed, counsel failed to request that the proceedings be stopped until Schwartz-Watts could evaluate Basham, as she had done on September 20. Failure to do this fell below the performance expected of a minimally competent capital defense attorney.

---

[6] The Government presented no expert testimony to refute Hammond's opinions concerning defense counsel's performance in this case.

### 2. Prejudice

### a. Admission of the videotape and audiotape

Even if this Court were to hold that the district court did not clearly err in its 2013 order denying 2255 relief when it concluded, contrary to the 2004 testimony of Dr. Schwartz-Watts, that Basham was actually competent during the courtroom altercation on September 20, Basham can still establish *Strickland* prejudice for his attorney's failure to argue his incompetence as a basis for excluding the videotape and audiotape of the courtroom altercation. The question before this Court on the IAC claim is whether a reasonable probability exists that counsel's failure to argue Basham's incompetence to the district court as a basis for excluding evidence of the courtroom struggle in the penalty phase would have led the district court to exclude the evidence on that basis. *See Country v. Foster*, 806 F.2d 182, 184 (8th Cir. 1986) ("Country has failed to show with a reasonable probability that any objection at the time of his plea would have led to a ruling that the testimony was inadmissible."); *and Balderas v. United States*, 2012 WL 3544753, at *12 (E.D. Tex. 2012) ("Balderas has failed to show a reasonable probability that had Curry made the objections which he suggests, these would have been granted and the tape ruled inadmissible."). The district court and counsel engaged in extensive debate concerning admissibility of evidence of the courtroom altercation. (JA 1658, 1670, 1678-81, 1699-1728, 1744-45.) Certainly, defense counsel's failure to

remind the court of Schwartz-Watts' opinion that Basham was incompetent on September 20 should undermine confidence as to whether the court would have reached the same conclusion on admissibility had it been informed of this critical fact.

### b. Failure to consult with Schwartz-Watts on October 26

The district court ultimately decided to continue with trial on the afternoon of October 26 despite defense counsel's concerns about Basham's competency. Before reluctantly deciding to proceed, however, the court expressed its concern that it should be receiving testimony from a doctor concerning Basham's competency. (JA 1937.) In light of Basham's behavior, "there exists 'at least a reasonable probability that a psychological evaluation would have revealed that he was incompetent'" that afternoon. *Futch*, 874 F.2d at 1487. Basham can therefore establish that he was prejudiced by counsel's failure to have him evaluated that day.

**III. BASHAM'S ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN (1) ALLOWING HIM TO BE QUESTIONED OUTSIDE THEIR PRESENCE ON NOVEMBER 28, 2002, AND (2) SUBSEQUENTLY FAILING TO CHALLENGE THE ADMISSIBILITY OF THE INCULPATORY STATEMENTS UNCONSTITUTIONALLY OBTAINED FROM HIM THAT DAY.**

In Claim 1 of his 2255 Motion, Basham argued that the two attorneys originally appointed to his case, Cameron Littlejohn and William Monckton,

rendered constitutionally ineffective assistance when, during a search for the victim conducted on November 28, 2002, they left him unattended in the presence of law enforcement officers who subsequently interrogated him. In Claim 2 of his Motion, Basham argued, among other things, that the lawyers subsequently appointed to represent him, Swerling and Harris, rendered constitutionally deficient performance when they failed to argue that law enforcement's interrogation of Basham outside the presence of his attorneys violated *Edwards v. Arizona*, 451 U.S. 477 (1981).

The district court denied Basham relief on both claims. With regard to Claim 1, the court dispensed with a deficient performance analysis in lieu of concluding that, even if Littlejohn and Monckton were deficient, Basham failed to establish prejudice under *Strickland*. (JA 0210-0222.) On Claim 2, the court reached alternative holdings. Specifically, it concluded that no *Edwards* violation occurred because Basham initiated the challenged contact with law enforcement on November 28. Alternatively, it held that, even if an *Edwards* violation had occurred, for the reasons it had previously stated with regard to Claim 1, Basham could not satisfy the prejudice prong of *Strickland*. (JA 0242-51.)

The district court erred in rejecting both claims. This Court reviews the district court's legal conclusions *de novo* and it factual findings for clear error. *Baker*, 719 F.3d at 318. Whether specific facts "constitute an 'initiation' under

*Edwards* is a legal question requiring *de novo* review." *Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir. 2000).

## A.    Relevant Facts

On November 28, 2002, Thanksgiving Day, Basham assisted in a search for Alice Donovan's body in the area of the Bee Tree Farms Hunt Club, in Brunswick, North Carolina.   Basham, Littlejohn, and Monckton were joined by the FBI, Conway police, and the Brunswick County Sheriff's Department.  (JA 1318.)

Because Basham did not have a proffer agreement with the Government, any statement he made that day could have been used against him.  (JA 1377, 1382.) Accordingly, it was of critical importance that Basham receive constant supervision from his attorneys during any interaction with law enforcement that day.

Basham rode in a van with his lawyers and various law enforcement officers, including Sheriff Ronald Hewett of Brunswick County.  (JA 1319.)  Throughout the search, Littlejohn and Monckton made it clear to law enforcement, by both their words and actions, that Basham was represented by counsel, that he was not to be interrogated, and that he was present only to offer directions to assist in locating Alice Donovan's body.  (*See, e.g.*, JA 3774, 4964, 4966.)

The record leaves no doubt that Hewett knew that Basham was represented by counsel that day.  A report of an interview later conducted with Hewett about

the search states: "Basham was at all times in the presence of his attorneys; he was afforded consultation to same attorneys prior to any action or statement made by Basham." (JA 2691.)

Contrary to the assertion in the Hewett Report, however, Basham was not "at all times in the presence of his attorneys." In fact, Hewett himself later testified that he spoke with Basham outside the presence of counsel. (JA 0765-66.) Specifically, late that afternoon, the group stopped at a cemetery where Basham and Fulks had been observed on the day of the crime. (JA 2695.) While the remainder of the group, including both Monckton and Littlejohn, were talking several feet away, Hewett and two Conway Police Officers (neither of whom testified at trial) walked with Basham to the edge of the cemetery. (JA 0764, 0766, 0782.) Both Littlejohn and Monckton testified at the 2255 hearing that they were unaware Hewett had walked off with Basham without their permission. (JA 4972-94, 3773.)

As the district court noted, Hewett gave varying accounts of the precise information Basham conveyed during his interrogation outside the presence of counsel. (JA 0203-09.) Ultimately, however, Hewett testified that Basham demonstrated how he (Basham) strangled Ms. Donovan. (JA 1358-59.)

The Government emphasized Hewett's comments in its closing arguments in both the guilt and penalty phases. During guilt-phase closing, it argued:

41

He demonstrates for that sheriff a Liz Claiborne purse strap was used to kill Alice Donovan. Then what does he say? I threw it in the woodline. Mr. Swerling asks Sheriff Hewitt [sic] says he didn't say I killed Alice Donovan. Sheriff Hewitt says he didn't say I killed Alice Donovan. Sheriff Hewitt said to you in this courtroom in front of you, the jury, no, he demonstrated it.

(JA 1471-72.) The Government continued:

Ladies and Gentlemen, I wanted to finish with that because how would you go back in your jury room after listening to Sheriff Hewitt [sic] and after seeing Sheriff Hewitt [sic] demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and the government submits those two witnesses and that limited testimony, alone, seals the deal.

(JA 1473-74.) The Government further argued that, to conclude that Basham himself did not kill Donovan, the jury would have to "disregard Sheriff Hewitt [sic] and disregard Mr. Jay." (JA 1565.) And in penalty-phase closing, the Government described Basham's demonstration of how the purse strap was used as a demonstration of "Basham's strangling of Alice Donovan," going so far as to state that "he killed Alice Donovan." (JA 2312, 2317.)

## B. *Strickland* Analysis

### 1. Monckton and Littlejohn rendered deficient performance

The district court did not conduct a *Strickland* deficient-performance analysis of defense counsel's representation during the November 28 search. At

the 2255 hearing, however, Basham presented expert testimony that counsel performed deficiently, at the very least, in failing to stay in close proximity to their client and protect him from inappropriate police interrogation that day.[7] (JA 4573-74.)

### 2. Swerling and Harris rendered deficient performance

Even the most cursory preparation for the *Jackson v. Denno* hearing in this case would have revealed to a minimally competent criminal defense attorney that Hewett's admitted questioning of Basham outside his counsel's presence on November 28 potentially violated *Edwards*, 451 U.S. 477. (*See* JA 4578-79.) In denying Basham 2255 relief, however, the district court attempted to avoid this obvious breach in counsel's standard of care by holding, by a highly questionable piecing together of the trial court record, that Basham had initiated contacted with Hewett on the day of the search and that, accordingly, no *Edwards* violation occurred. (JA 0249-50.)

The district court's ruling is wholly unsupportable. As a threshold matter, by relying on unchallenged statements from Hewett concerning Basham's actions on the day of the search, the court actually amplifies trial counsel's failure with

---

[7] Expert Larry Hammond in fact questioned defense counsel's decision to engage in the search Thanksgiving Day at all, (JA 4570-72), but it is sufficient for purposes of the argument raised here to limit review of counsel's performance to their failure to prevent their client from being questioned outside their presence.

regard to the *Jackson v. Denno* hearing.  Specifically, the court relies on the limited information in the trial record concerning who initiated the Hewett/Basham interaction on November 28, 2002, to conclude that Basham initiated contact and that, accordingly, no *Edwards* violation occurred.  This analysis, however, begs the question, for Basham argued that his attorneys were deficient in developing the record on this very point.  The whole of the district court's analysis that no *Edwards* violation occurred is built on the very sand of trial counsel's failure to develop the *Edwards* issue at the *Denno* hearing.  Such judicial slight-of-hand is indefensible.

More importantly, the district court's legal analysis of the *Edwards* issue is in direct conflict will long-established Supreme Court precedent.  The district court cursorily concluded that "Basham knowingly and intelligently waived his Fifth Amendment rights."  (JA 0250.)  The Government bears a "heavy burden" in proving that an accused waived his constitutional rights.  *Arizona v. Roberson*, 486 U.S. 675, 680-81 (1988).  Yet, the district court's analysis in this case fails entirely to recognize the Government's burden, and it relies on facts that have little bearing on whether Basham knew and/or understood that he was free not to talk to Hewett without his attorney present and that, by doing so, he was waiving his constitutional rights.  (JA 0250.)  In fact, the district court's cursory treatment of the Government's burden suggests that the court erroneously believed that it was

44

*Basham's* obligation to demonstrate that the waiver of his constitutional rights was *not* knowing and intelligent. Courts, however, must "indulge in every reasonable presumption against waiver," *Brewer v. Williams*, 430 U.S. 387, 404 (1977), and cannot "presume acquiescence in the loss of fundamental rights," *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

### 3. Basham was prejudiced

Prejudice exists under *Strickland* when there is a "reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 694. A "reasonable probability" is less than a "preponderance of the evidence." *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006).

The district court concluded that, even if Basham's attorneys performed deficiently with regard to Hewett's interrogation of him on November 28, Basham failed to demonstrate that he was prejudiced as a result. (JA 0213-22, 0250-51.) This Court reviews that determination *de novo*, which is important because portions of the district court's order suggest that it misapplied the *Strickland* "reasonable probability" standard. For example, in finding a lack of prejudice, the court held that "[i]t is not *certain* . . . that elimination of the strap evidence would have caused the jurors to attribute more weight to nonstatutory mitigating factor one." (JA 0221 (emphasis added).) The *Strickland* prejudice

standard, however, does not require a defendant to prove prejudice by a "certainty." Rather, he need only undermine the court's confidence in the outcome.[8]

In finding no prejudice, the district court also erred by failing to account for the intangible factors at play in each juror's evaluation of whether Basham was deserving of death. Rather, the court engaged in an overly mechanical analysis of how the improper evidence that Basham was the actual killer might have affected the jury's findings on the specific aggravating and mitigating circumstances. (JA 0220-21.) A jury's decision to sentence a man to death, however, is not so easily quantified.[9] Moreover, because Basham is required to demonstrate simply a reasonable probability that the decision of only one juror was affected by his or her exposure to the impermissible evidence that Basham admitted to being the actual killer, this Court must give due consideration to the unique role of the jury in American jurisprudence. "The purpose of a jury is . . . to make available the

---

[8] The Court, moreover, cannot make this determination in a vacuum; it must consider the totality of the circumstances. Thus, in determining whether trial counsel's failure to seek suppression of Basham's illegally obtained statements resulted in prejudice, this Court must consider the effect the Hewett testimony had on a jury already tainted by the other errors identified in this brief.

[9] Indeed, a review of the jury's special sentencing verdict reveals that the jurors were not consistent in their mitigation findings between Count 1 and 2, even though no rational explanation exists for why the mitigating evidence presented would be found mitigating for one count and not the other. (JA 2466, 2478.)

commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). As the First Circuit has emphasized:

> We reserve this task for the jurors not because they are more capable than judges of reaching a mathematically precise conclusion about guilt or innocence, but because they bring a fresh and impartial perspective to the criminal justice system. We tolerate even quixotic verdicts, and allow juries "to err upon the side of mercy," *Jackson v. Virginia*, 443 U.S. 307, 317 n. 10 (1979). *See id.* ("[T]he factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of 'not guilty.'"). *See also Duncan v. Louisiana*, 391 U.S. 145, 157 (1968) ("[W]hen juries differ with the result at which the judge would have arrived, it is usually because they are serving some of the very purposes for which they were created and for which they are now employed.").

*Lanigan v. Maloney*, 853 F.2d 40, 50 (1st Cir. 1988) (full citations omitted).

Certainly a reasonable probability exists in this case that the mitigating evidence presented to the jury might have carried greater weight had the jury not been told by the Government that Basham killed Donovan with his own hands. Absent the constitutionally unsound evidence that Basham was the actual killer, a reasonable probability exists that at least one juror might have voted for life. *See, e.g.*, *Duncan v. Ornoski*, 528 F.3d 1222, 1245 (9th Cir. 2008) (penalty-phase prejudice found when jury deprived of evidence that capital defendant might not have been actual killer).

## IV. BASHAM'S TRIAL ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE WHEN THEY FAILED TO OBJECT TO THE ADMISSION OF UNFAIRLY PREJUDICIAL PRIOR ACT EVIDENCE DURING THE GUILT PHASE.

At Basham's trial for the crimes against Donovan, the Government presented extensive evidence of the murder of Samantha Burns. Defense counsel never objected, and the Government called several witnesses who testified not only about Burns's murder, but its impact on her family and friends. No rational strategy supports defense counsel's failure to object to this testimony. Counsel's performance was plainly deficient, and the prejudice to Basham as a result is unquestionable. Accordingly, Basham is entitled to relief.

### A. Relevant Facts

At a pretrial conference on August 4, 2004, the Government informed both the Court and defense counsel that it intended "to offer evidence of the Samantha Burns' [sic] murder during the guilt of phase of this case." (JA 1010.) Citing *United States v. Chin*, 83 F.3d 83 (4th Cir. 1996), the Government maintained that evidence of the crimes against Burns was "intrinsic" to the Donovan case and, therefore, was not subject to exclusion on Rule 404(b) of the Federal Rules of Evidence. The following exchange then occurred:

> MR. SWERLING:      [The prosecutor] told us about that this morning. We would like an opportunity to think about that. I understand what their

|  |  |
|---|---|
|  | position is.  We certainly can let them know and let the Court know whether we object under 404.  Take the position we don't think it is. |
| THE COURT: | If you object, that is fine.  But I need some authority from both sides.  Just the fact that it hurts my client or it helps the Government's case is not persuasive.  I need some authority on what the Rules provide at a guilt phase where the Rules of Evidence do apply.  In other words, I guess the big question is, is it intrinsic to the crime charged here? |
| THE PROSECUTOR: | I think our obligation is to put them on notice that we intend to offer.  If they want to file a motion in limine to exclude it, they can do it.  We have to respond in writing. |

(JA 1011.)

Defense counsel never filed a motion in limine.  At a subsequent pre-trial hearing three weeks later, Harris appeared to concede that the facts of the Burns crimes "were all intrinsic to this case."  (JA 1017.)  Later in the same hearing, however, Swerling returned to the issue, although he did not take a firm position on the matter: "[T]he government's position is going to be that's intrinsic in the guilt phase, and therefore is admissible, we understand that we need to probably cover that, but I don't want the court to think the record is reflecting we are waiving an objection."  (JA 1022.)  Swerling reiterated, "I just didn't want Your Honor to think that – or the government to think that we were not objecting to the

Samantha Burns' evidence coming in during the guilt phase." (JA 1023.) The Court assured defense counsel that they had not waived their right to object to the evidence. (JA 1023.) Unfortunately for Basham, the objection Swerling wanted to ensure was not waived never came.

Early in the guilt phase of Basham's trial, the Government began to present evidence of the crimes against Burns. Defense counsel failed to object to the admission of this evidence in any form, and the Government proceeded to call eleven witnesses: Burns's mother, father, brother, aunt and close friends, to testify not only about her disappearance, but about her characteristics, personality, and plans for the future, as well as the impact of her disappearance on her family and friends. Defense counsel offered no objection during any of this extended testimony. At the adjournment of proceedings on September 15, 2004, the court finally raised the issue for the defense, offering to give the jury a cautionary instruction concerning the evidence:

THE COURT: I had one question before we adjourn. The Defendant has – the jury has heard about the Samantha Burns's [sic] incident. Does the Defendant want any cautionary instruction, any 404(b)-type instruction, opportunity, common scheme and plan? You don't have to tell me now, you can think about it overnight. I need to offer that instruction, if you wanted it. The Government will say it is all intrinsic to the crime. There is no cautionary instruction needed, right?

THE PROSECUTOR:     That's right.

THE COURT:     Expound on that a little bit. Intrinsic to what crime now. There are eight different counts.

THE PROSECUTOR:     Intrinsic to all of the crimes. Certainly intrinsic to the conspiracy count, which spans the time from the time of the escape to the time of Mr. Basham and Mr. Fulks's arrest. We also think it is because it is intrinsic to conspiracy. The other alleged crimes occurred within the course of the conspiracy. We think it is intrinsic to all of that. Certainly puts all of the evidence in context.

THE COURT:     Wait a minute now. Let's think about it. The conspiracy to carjacking and kidnapping Ms. Donovan, you are saying it occurred – that they formulated the plan to do that up in West Virginia?

THE PROSECUTOR:     Multi-objective conspiracy. One of its objects to steal firearms, have in possession firearms by felons, to transport a vehicle across state lines, carjack and kidnap Ms. Donovan. We think at the very least the conspiracy to have firearms began the night Mr. Fulks approached Ms. Severance and got acquisition of the firearms.

THE COURT:     I will find out what the defendants want tomorrow. Most of the time the defendant doesn't want a cautionary instruction, it sometimes hones it in for the jury, makes it worse. We will see what the defendant wants tomorrow and then decide.

(JA 1125-27.)

Defense counsel stood mute during this colloquy. Two days later, however, Swerling informed the Court, "We are not looking for a limiting instruction until possibly your final charge. We will discuss it at that time. Not now." (JA 1129.) Once again, despite saying they would raise the issue at a later time, defense counsel never addressed the issue again and, regardless, at this point the damage was done. While counsel stood idly by, the Government had turned the trial of Donovan's murder into the trial of the murders of both Donovan and Burns.

Basham raised this issue as Claim 15 in his 2255 Motion. At the 2255 hearing, Basham presented the expert testimony of Larry Hammond, who opined that the performance of trial counsel in this regard fell below the minimal standards of competence expected of a federal capital trial attorney. (JA 4593-96.) The Government offered no expert testimony to counter Hammond's opinion. Trial counsel testified at the evidentiary hearing concerning the bases for their decisions regarding this issue. Harris testified that, in all matters, Swerling was in charge. (JA 3874-75.) Swerling testified that, in his view, there were two victims in this case, although he conceded the Burns evidence was only ruled intrinsic to the case. (JA 4196.) Rather than a strategy based on research and case law, Swerling testified, "I used my experience as a trial lawyer to decide not to object, which is something that is instinctive in a trial lawyer." (JA 4326-27.) Astonishingly,

52

Swerling further testified that he believed "there's nothing in that testimony that's specifically hurting you." (JA 4327) Harris, however, viewed the heart-wrenching evidence very differently and conceded that he "absolutely" believed the Burns testimony affected the penalty phase of the trial. (JA 4133.) Finally, Swerling offered no strategy for refusing the court's offer of a limiting instruction beyond stating, "I don't like them." (JA 4333.)

The district court denied the claim. (JA 0298-0304.) Basham filed a 59(e) motion arguing that the court's justification for the admission of the evidence was erroneous (JA 7458-7462), and that too was denied. (JA 0375.)

### B.  Deficient Performance

No justifiable strategy could have supported trial counsel's utter failure to attempt to limit—in any respect—the extensive and emotional Burns testimony. Counsel failed on numerous fronts to adequately represent Basham.

First, counsel made no effort to challenge the Government's dubious claim that every crime committed between Basham's escape from jail and his arrest more than two weeks later was "intrinsic" to the charges for which he was on trial. The Government relied on this Court's ruling in *Chin*, 83 F.3d 83, but its overreaching reliance on this case was questionable. *Chin* does not stand for the broad rule the Government suggested, but because defense counsel made no effort whatsoever to challenge the Government's interpretation of *Chin*, the prosecution was able to use

that case as a gateway to admit extensive amounts of damaging—and arguably inadmissible—evidence against Basham.

Defense counsel further rendered deficient performance in failing to request that the district court determine whether, even if the evidence of the Burns kidnapping were admissible as evidence "intrinsic" to the Donovan kidnapping or under 404(b), its unfairly prejudicial effect on Basham's case rendered the evidence nevertheless subject to preclusion under Rule 403. Given the particularly damaging effect of the substantial evidence of Basham's role in Burns's disappearance on his ability to defend against the charges related to Donovan's disappearance, it is not improbable that the court would have determined that the evidence of Burns's disappearance should have been precluded or truncated.

Finally, even if the Court had ruled that evidence of Burns's disappearance was admissible, defense counsel nevertheless could have made sustainable objections to the width and breadth of testimony about her disappearance. Counsel could have argued that the evidence be excluded or limited pursuant to Rule 403 to avoid undue prejudice. *See United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992) (even intrinsic evidence may be excluded pursuant to Rule 403). Yet, defense counsel made no effort whatsoever to limit the Government in its presentation of this evidence. No reasonable strategy could possibly have justified this inaction on the part of defense counsel, nor was one proffered. Rather,

Swerling testified that he relied on his instinct and general dislike of limiting instructions to make a judgment call in this matter. Trial counsel's performance in this regard was plainly deficient.

### C. Prejudice

The prejudice to Basham as a result of the admission of the extensive evidence concerning the Burns kidnapping is unquestionable. It would be one thing to inform the jury of Burns's kidnapping; it was quite another to treat the Donovan trial as an opportunity to try the case of Burns's murder. Given the breadth and scope of the testimony, the Burns evidence had only one purpose: to impress upon the jury the tragedy of her death and the devastating loss experienced by those who loved her. To whatever extent such evidence might have been relevant at trial about Burns's murder, it was wholly irrelevant in the trial for Donovan's death. Nevertheless, Basham's attorneys took no steps to limit or preclude this evidence, or even request a jury instruction that the evidence was being admitted for a limited purpose.

To establish prejudice under *Strickland*, Basham need only establish a reasonable probability of a different outcome. *See United States v. Higgs*, 663 F.3d 726, 740 (4th Cir. 2011). A "reasonable probability" is less than a preponderance of the evidence standard. *Buckner*, 453 F.3d at 203. Basham submits that, had his attorneys presented the court with an argument that Rule 403

warranted exclusion of much of the Burns evidence, a reasonable probability exists that the Court would have agreed to limit the scope of the evidence. Moreover, given that the court expressly asked trial counsel if they wanted a limiting instruction, (JA 1125-26), it is almost a certainty the court would have given such an instruction.

### D.     The District Court's Ruling

Whether Basham was denied the effective assistance of counsel presents a mixed question of fact and law that this Court reviews *de novo*. *United States v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010). The district court's factual findings are reviewed for clear error. *United States v. Smith*, 640 F.3d 580, 590 (4th Cir. 2011). In both its denial of Basham's 2255 Motion and his subsequent 59(e) Motion, the district court's analysis of this claim was flawed.

In its order denying Basham's 2255 Motion, the court completely failed to address the legal basis of Basham's ineffective assistance claim. Instead, it found that any argument that evidence of Burns's death should not have been admitted at all was foreclosed by this Court's decision in Basham's direct appeal. The court erroneously conducted analysis only of whether the Burns testimony was properly admitted, and failed to perform any sort of *Strickland* analysis. (JA 0299-0300.) The court failed to distinguish that, on direct appeal, Basham contended that the court committed error when it permitted admission of such evidence, whereas here,

Basham alleged a claim of ineffective assistance of counsel and provided uncontroverted expert testimony in support of that claim. After initially acknowledging that Basham argued "his trial attorneys rendered ineffective assistance of counsel," (JA 0298), the subsequent seven pages of analysis never address *Strickland* or any other decision addressing ineffective assistance of counsel. Likewise, the court failed to conduct any deficient performance or prejudice analysis as required by *Strickland* and its progeny. Ironically, the court noted several times in its analysis of the evidence that trial counsel *failed to object* to it, precisely the point of Claim 15. (JA 0299, 0305.) Most egregiously, the court noted that there was no objection to testimony that the court found improper, and yet again, failed to apply any *Strickland* analysis. (JA 0304-05.)

Basham raised the issues outlined above in his 59(e) Motion. (JA 7448.) The court denied that motion, claiming that its failure to apply a *Strickland* analysis was intentional. "By determining that this court's decision to admit the testimony regarding the Burns murder was proper, the court simply meant to imply what it thought to be obvious: that any objection to the admissibility of such testimony would have been overruled." (JA 0379-80.) Just as before, however, the court's order entirely failed to address the meritorious argument that, even if admissible, counsel should have attempted to limit the scope of the testimony and the number of witnesses, and should have requested a limiting instruction (which

had even been offered by the court).  Instead, the court held that, because this Court had already ruled that evidence relating to the Burns murder was admissible when it addressed the question of intent, there could be no prejudice resulting from Basham's counsel's failure to object to that evidence, regardless of its content or quantity.  (JA 0380.)  Additionally, the court relied on trial counsel's testimony that they wanted to "front load" the Burns testimony to minimize its impact on the jury in penalty phase.  The court found this a reasonable strategy and stated that it would not "second guess" defense counsel's performance.  (JA0381.)  Finally the court found that, because there was no formal stipulation that Burns did not run away from home, the Government still had to prove that her disappearance was voluntary, and the evidence was thus necessary.  (JA 0381.)

As Basham argued here and below, trial counsel's performance was deficient in three ways.  First, they made no effort to challenge the Government's claim that this evidence was intrinsic to the crime.  Second, even if the evidence was indeed intrinsic and admissible on that basis, counsel failed to ask for a prejudice determination pursuant to Rule 403.  Finally, counsel failed to make any argument that, even if the testimony was not *per se* unduly prejudicial, allowing eleven witnesses to testify to the same issue was both unnecessary to prove the point at issue and unduly prejudicial. Rather than address these specific claims, the court glossed over the individual challenges and universally addressed the

admissibility of the evidence, concluding simply that counsel should not be second-guessed. This analysis was wholly insufficient.

Normally, "incantation of strategy does not insulate attorney behavior from review." *Fisher v. Gibson*, 282 F.3d 1283, 1305 (10th Cir. 2002). Yet, in this case, not only did the court accept counsel's incantation of strategy, it did not even inquire into what that strategy *might have been*. The idea of front-loading the Burns evidence was only suggested by Swerling after initially testifying that his decisions were based simply on his innate sense of when to object, as well as a general dislike of limiting instructions. It was only upon returning from lunch and being questioned about other issues that Swerling circled back and testified, "I was thinking going to lunch about Burns. One of the things that I *probably* was thinking about at that point about letting in that kind of evidence and not objecting to it would have been to get it all in to desensitize the jury . . . load it up front." (JA 4340 (emphasis added).) Harris, who testified prior to Swerling, was questioned about the Burns strategy and did not testify to any discussions about front-loading that evidence.

Despite uncontroverted expert testimony that counsel's performance fell below the minimal standards of competency, the court accepted counsel at their word and applied no analysis beyond accepting trial counsel's incantation of strategy. Although the court found that some of the Burns testimony should not

have been admitted, and presumably would not have been admissible in penalty phase either, it failed to address that testimony in the context of counsel's purported strategy, even though the court acknowledged that the improper evidence was admitted without objection.

Counsel's decision not to challenge or limit the Burns testimony fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Even if one accepts that there was in fact a strategic decision to frontload the emotional testimony into guilt phase, the jury still heard powerful emotional testimony from the Donovan family in the penalty phase. (JA 1840-89.) The emotional testimony the jury heard from the Donovan family during the penalty phase belies defense counsel's claim they intended to "frontload" and limit emotional testimony to the guilt phase.

Counsel's "strategy" permitted the jury to hear, without objection, victim impact testimony from two grieving families, at two points in the trial, when only Donovan's family should have been allowed to make such statements. At the 2255 hearing, Harris conceded that the Burns testimony was one of the more "damaging pieces of evidence." (JA 4040.) Testimony about the impact of Burns's death on her family was as heartbreaking as it was irrelevant to any issue in the case. The Government needed only to show that Burns was dead to support the element of intent. Testimony concerning the impact of her death on her loved ones went far

beyond the issue of intent. Minimally competent counsel would have recognized that the Burns evidence was some of the most emotional and damning in Basham's case, and would have made every effort to exclude or minimize it. Even if the evidence had been admissible in part, had counsel made any attempt to challenge it, it is reasonable to believe the court would have considered limiting the number of witnesses or the scope of the testimony. At the very least, the court could have given a limiting instruction. Swerling testified that he did not want to object to the testimony of family members in front of the jury, but conceded that he apparently did not consider moving outside the presence of the jury to limit the damaging evidence. (JA 4228.) Yet, the district court conducted no *Strickland* analysis concerning these issues.

The court also rejected Basham's ineffective assistance claim on the grounds that, even though both sides conceded Burns was dead, without a formal stipulation the Government had the burden of proof. This justification is erroneous on its face. Evidence of Burns's death was not an element of a single crime before the jury, but rather collateral evidence the court allowed so that the Government could prove up the intent element. The jury was specifically instructed that there were six charges for substantive offenses and two conspiracy counts in the case. (JA 1582.) The intent element at issue concerned the carjacking count. The jury was instructed that the Government was required to prove beyond a reasonable

doubt that Basham possessed the intent to seriously harm or kill Donovan the moment he demanded or took control of the vehicle. (JA 1583.) The instructions did not contain a single reference to the Burns disappearance, and the Government had no obligation to prove anything about it. Accordingly, the court's assertion that the Government was required to prove Burns was dead is inaccurate, and is an insufficient basis upon which to allow admission of the evidence. Moreover, in conducting this analysis, the court once again focused on the admissibility of the evidence itself, rather than counsel's performance. In discussing why it believed the evidence was admissible, the court failed to apply any *Strickland* analysis to the claim actually raised.

Finally, as Basham argued in his 59(e) motion, even if Claim 15 had merely been a generic challenge to the court's admission of the extensive and emotional Burns testimony (rather than a *Strickland* claim), the court's explanation of why the evidence was not unfairly prejudicial does not withstand cursory scrutiny. The court found that "it was necessary for the government to provide for the jury the precise details relating to Burns's disappearance" so that it could "disabuse the jury of any notion that Burns was a renegade teenager who might have run away from home, eloped with a boyfriend, or disappeared on her own." (JA 0301.) Yet, in opening statements, both the Government and Basham's own counsel told the jury that Burns was dead. (JA 1042-44, 1069-70.) Moreover, the jury heard ample

evidence that Burns was dead, including testimony from law enforcement about searching for her body and informing Burns's parents that she was dead. (JA 1200-19, 1224-25.) The court's justification that the extensive testimony from Burns's family and friends was "necessary" to establish that her disappearance was involuntary is thus belied by the factual record.

The testimony concerning Samantha Burns that the Government elicited from eleven witnesses was cumulative, emotional, and improper. The probative value of the evidence was marginal, especially given that the issue of Burns's death was conceded by Basham's counsel in opening statements. At the 2255 hearing, defense counsel testified that they never argued that Burns was not dead. (JA 4040.) When evidence has little probative value, and the risk of unfair prejudice is great, it should not be admitted. *See Carnel Const. Corp. v. Danville Redevelopment & Housing Authority*, 745 F.3d 703, 720 (4th Cir. 2014). A reasonably competent attorney would have attempted to limit the harmful consequences of the Government's attempt to turn the Donovan trial into one for the murder of Samantha Burns as well. Competent counsel would have, at a bare minimum, requested the limiting instruction offered by the court. Counsel's failure to request exclusion of some or all of the minimally probative and undeniably prejudicial testimony fell "below the range of professionally competent performance." *See Griffin v. Warden,* 970 F.2d 1355, 1357 (4th Cir. 1992).

**V. THE GOVERNMENT ENGAGED IN MISCONDUCT WHEN IT FAILED TO CORRECT TESTIMONY IT KNEW OR HAD REASON TO KNOW WAS FALSE. IT COMPOUNDED THIS MISCONDUCT BY EMPHASIZING THE FALSE TESTIMONY DURING CLOSING ARGUMENT. BASHAM'S APPELLATE ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO RAISE THIS ISSUE ON APPEAL.**

At Basham's trial, the Government presented testimony from Sheriff Hewett that it knew or should have known to be false. By failing to correct this false testimony, the Government violated its obligations under *Napue v. Illinois*, 360 U.S. 256 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). Standing alone, this misconduct entitled Basham to a new trial. The Government, however, compounded the misconduct by repeatedly using Hewett's false testimony to its advantage in guilt and penalty phase closing arguments. Basham's appellate attorneys failed to raise this issue, and Basham was prejudiced by their failure to raise this meritorious claim. Accordingly, Basham is entitled to relief.

**A. Relevant Facts**

On April 22, 2003, the Government presented the testimony of FBI Agent Jeffrey Long to the grand jury in its attempt to obtain a superseding indictment against Basham. (JA 0390-0412.) Long testified that, during the search of the Bee Tree Farms area on November 28, 2002, Basham indicated, among other things, that *Fulks* strangled Alice Donovan by the use of a purse strap. (JA 0403.) Long's testimony before the grand jury was consistent with the report he prepared

64

immediately after the search.  In that report, Long wrote, "After FULKS raped her, FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan."  (JA 2698.)  Moreover, at Fulks's trial, in a colloquy outside the presence of the jury, the Government stated, "Remember Sheriff Hewitt [sic] demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled."  (JA 1003-04.)

At Basham's trial, the Government presented the testimony of both Long and Hewett.  Long was not questioned about the purse strap or his report of Basham's statements about the strap.  On cross-examination, Hewett testified for the first time, and contrary to all other evidence in the case, that Basham had demonstrated for him how he (Basham), rather than Fulks, had used the purse strap to strangle Donovan.  (JA 1358-59.)  Specifically, Hewett gave the following responses to defense counsel's questions on cross-examination:

MR. HARRIS: There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?

SHERIFF HEWETT: No, sir.  He did not tell me he used the strap. He demonstrated, though.

MR. HARRIS: He demonstrated?

SHERIFF HEWETT: Yes, sir.

MR. HARRIS: Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?

SHERIFF HEWETT: That is true because he didn't say. He showed.

(JA 1358-59.)

In his 2255 proceeding, Basham argued that, in light of the reports previously prepared by both the FBI and the Brunswick County Sheriff's Office, the Government either (1) knew that Hewett's testimony that Basham was Donovan's actual killer was false; or (2) was on notice that the factual discrepancy needed to be explored. By failing to correct this false testimony, the Government violated its obligations under *Napue*, 360 U.S. 264, and *Giglio*, 405 U.S. 150. The Government's misconduct regarding this issue, however, did not stop with its passive failure to correct Hewett's false testimony. Instead, as set forth in Section III, *supra*, the Government repeatedly emphasized the testimony in its closing arguments at both the guilt and penalty phases of Basham's trial. (JA 1473-74, 2312, 2317.)

In response to the Government's heavy reliance on Hewett's testimony, defense counsel argued, "The Government is automatically asking you to consider that Brandon Basham was the one that did the act with the strap. That is what they are asking, at the conclusion, they are asking you to draw." (JA 1552.) Counsel tried to soften the blow of Hewett's damaging testimony by arguing that it was "far

66

more likely that Fulks was the one that did the strangulation with the strap, if that is what happened." (JA 1552.) In rebuttal closing argument, however, the Government argued that, to conclude that Basham himself did not kill Donovan, the jury would have to "disregard Sheriff Hewitt [sic] and disregard Mr. Jay." (JA 1565.)

Hewett's false statements were directly material to issues of both guilt and punishment in this case, a fact that is demonstrated by the Government's repeated use of those statements in its closing arguments at both the guilt and penalty phases. In fact, Hewett's testimony was the *only* evidence suggesting that Basham was the actual killer, and it was unquestionably damaging. The due process requirements enunciated in *Napue* and *Giglio* mandate that Basham's convictions and sentences be vacated and that he be afforded a new trial.

Remarkably, appellate counsel failed to raise this important issue on direct appeal. Accordingly, in the 2255 proceedings, the Government argued, and the court agreed, that the issue was procedurally defaulted. (JA 0223-24.) The court nevertheless gave an alternative merits ruling on the claim. (JA 0224-26.)

**B.    Cause to Overcome Procedural Default**

Where a petitioner can show cause for, and actual prejudice from, a default, he may raise the claim in federal habeas. *See United States v. Harris*, 183 F.3d 313, 317 (4th Cir. 1999). Basham was entitled to the effective assistance of both

trial and appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 395-96 (1985). The Supreme Court has recognized that, in the context of establishing cause for procedural default, the critical question is whether counsel is "constitutionally ineffective or merely negligent." *Nguyen v. Curry*, 736 F.3d 1287, 1294 (9th Cir. 2013) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)). An attorney's errors on direct appeal may provide cause to excuse procedural default when they deny an appellant fair process and access to raise his meritorious claims to the reviewing court. *See id.* (citing *Martinez v. Ryan*, 132 S.Ct. 1309, 1317 (2012)). In Basham's case, because appellate counsel's performance fell below *Strickland's* "objective standard of reasonableness," *Strickland*, 466 U.S. at 680, and "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), cause is established and Basham is entitled a merits review of his claim.

In rejecting Basham's cause argument, the district court conducted no analysis of appellate counsel's actual performance beyond noting that Basham was represented by ten appellate attorneys (including eight from the firm of Jenner & Block) and that those attorneys raised six claims on appeal. (JA 0224.) However, as the 2255 hearing demonstrated and as Issue VI, *infra*, argues in more detail, the *quantity* of counsel in this case did not translate into quality representation. Notably, the primary responsibility for Basham's appeal fell to a new Jenner

associate, Melissa Meister. Basham's appeal was the only criminal matter Meister worked on at the firm, and her background was in civil matters. (JA 3781, 3785.) Although Meister was initially supposed to write only one section of the brief, she ultimately took chief responsibility for the entire pleading. (JA 3785.) Jenner partner David Debruin, who was experienced in criminal law, was nominally charged with supervising the team. Shortly before filing the brief, however, he expressed his concern that he had handled Basham's appeal very poorly and should have been more involved. (JA 3785-86, 5152.) Basham's appeal was thus left to a team of new associates with little or no criminal experience and scant supervision. For example, less than a month before filing the brief, Meister and her team still did not have a complete copy of the file of Basham's case. (JA 3796-3805.) *See also* Claim VI, *infra*. Unsurprisingly, key issues were overlooked.

Specifically, appellate counsel failed to raise this meritorious issue concerning prosecutorial misconduct with regard to evidence the Government itself maintained was some of the strongest against Basham in both the guilt and penalty phase. No reasonable justification exists for appellate counsel's failure to raise this "significant and obvious" issue. *See Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999). Because appellate counsel's performance fell below the standard of competent counsel, and because the issue counsel failed to raise was both readily

apparent from the record and meritorious, Basham has shown cause and prejudice to overcome any default.

## C. Standard of Review

The district court's factual findings are reviewed for clear error. *Smith*, 640 F.3d at 590. This Court reviews mixed questions of law and fact *de novo*. *Nicholson*, 611 F.3d at 205.

## D. The District Court's Merits Ruling

The district court's primary error in its analysis of Basham's claim is its mistaken belief that the Government could have violated *Napue* and *Giglio* only if it actively took contradictory positions before the juries in the Basham and Fulks trials concerning which defendant actually killed Donovan, or if it otherwise "adopted" one version of events over the other. (*See* JA 0224-26.) This analysis misconstrues *Napue* and *Giglio*. It is uncontroverted that, prior to Hewett's testimony at Basham's trial, the only information the Government had concerning the strap purportedly used to strangle Donovan was that it had been wielded by Fulks. (JA 2691, 2698.) The record in both Basham's and Fulks's cases reveals that, prior to Hewett's testimony at Basham's trial, the Government's understanding from all sources was that Basham told Hewett that Fulks wielded the strap. Clearly, if the Government had any indication otherwise, it would have been obligated under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose that

information to Fulks's lawyers. Accordingly, prior to Hewett's testimony at Basham's trial, the Government had consistently maintained that Basham had demonstrated to Hewett that Fulks killed Donovan with the purse strap. (JA 1003-04.) Whether that information was presented to the jury in Fulks's case is simply irrelevant, as it was a position taken by the Government while under its duty of candor to the court and while under its *Brady* obligation to both Fulks and Basham.[10] The Government never disclosed to the Fulks team that Basham made statements to Hewett that inculpated Basham and exculpated Fulks as the actual killer.

Accordingly, when Hewett testified at Basham's trial for the first time (and contrary to all prior accounts) that Basham had identified himself, rather than Fulks, at the actual killer, the Government was under an obligation imposed by *Napue* and *Giglio* to either correct that testimony or, at a minimum, explore the discrepancy in Hewett's accounts of the events. Hewett's testimony alone, standing in conflict with all the previous information the Government possessed about Basham's statements regarding the purse strap, allowed the Government to change its position from the Fulks case and argue, for the first time, that it was Basham, rather than Fulks, who dealt the fatal blow. The dual obligation of a

---

[10] Moreover, even if presentation of the evidence to the jury in the Fulks case were somehow required, the theory that Basham said Fulks wielded the strap *was* presented to the grand jury that found probable cause in Fulks's case. (JA 0403.)

federal prosecutor in our justice system is to "strike hard blows" while refraining from striking "foul ones," to use legitimate means to attempt to secure a conviction without employing improper methods to do so. *Berger v. United States*, 295 U.S. 78, 88 (1935). The prosecution's job is not "just to win, but to win fairly, staying well within the rules." *United States v. Kojoyan*, 8 F.3d 1315, 1323 (9th Cir. 1993). Unfortunately, the Government ran afoul of that duty here, when it not only failed to investigate and correct Hewett's testimony, but seized upon that testimony to bolster its case in both guilt and penalty phases.

The Supreme Court has long held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio*, 405 U.S. 153 (internal citations omitted.) The jury depends on the truthfulness and reliability of witnesses to determine guilt or innocence in any given case. *Napue*, 360 U.S. at 269. When a prosecutor allows false testimony to go unchecked, it is a violation of due process. *Id.* Further, "[w]hen a prosecutor suspects perjury, the prosecutor must at least investigate. The duty to act is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it." *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (internal quotations omitted.) Hewett's testimony was contrary to what the Government had previously disclosed, presented, and argued, both in Fulks' case and before the grand jury, and it

triggered a duty to investigate. It is unnecessary to prove that the Government affirmatively knew the testimony was false, it is enough that it "should have known." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). Once this standard is met, the conviction must be reversed if there is *any probability* that the evidence impacted the jury verdict. *Napue*, 360 U.S. at 269-272; *Giglio*, 405 U.S. at 154. It is irrelevant whether the Government "adopted" Basham's statements. Having previously argued, presented, and disclosed only statements that Basham implicated Fulks as the actual killer, the Government cannot in good faith argue that it should not have known Hewett's testimony was false. "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair." *Agurs*, 427 U.S. at 103.

Rather than doing the bare minimum required by due process and attempting to resolve the conflict created by Hewett's new testimony, the Government doubled down on its misconduct and relied on Hewett's testimony in guilt and penalty phase closing arguments. Exploitation of such false statements in closing arguments is grounds for reversal. *See Brown v. Wainwright*, 785 F.2d 1457, 1458 (11th Cir. 1986). The Government's own emphasis on the importance of the testimony leaves no doubt that it was material to the guilt and penalty phases. (JA 1473-74, 2312, 2317.) Accordingly, the Government's reliance on Hewett's false testimony was a "corruption of the truth-seeking function of the trial process."

*Agurs*, 427 U.S. at 104. The due process requirements enunciated in *Napue* and *Giglio* mandate that Basham's convictions and sentences be vacated.

**VI. TRIAL COUNSEL'S FAILURE TO PROVIDE APPELLATE COUNSEL ALL FILES PRODUCED IN THE COURSE OF REPRESENTING BASHAM CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL AND NECESSARILY RESULTED IN BASHAM BEING DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL.**

Basham's lead trial attorney, Jack Swerling, failed to protect Basham's interests by repeatedly refusing to surrender, or allow reasonable access to, the thousands of trial-related documents in his possession. In denying appellate counsel unfettered access to those documents—and whatever claims may have lain therein—Swerling compromised Basham's appeal to an unknowable extent. Nevertheless, the record plainly demonstrates that, at the very least, because of their lack of access to the file, appellate counsel erroneously omitted viable claims, thereby depriving Basham of his due process right to the effective assistance of appellate counsel. Basham is entitled to relief for this violation of his constitutional and statutory rights.

### A. Relevant Facts

Swerling treated Basham's files as his own, and unreasonably withheld or limited access to those files when appellate counsel sought to take custody of what was rightfully Basham's. Appellate counsel first requested Basham's trial file in a

letter dated January 14, 2008. (*See* JA 3699 ("[Y]ou have known of our need for the file since at least January 14, 2008, when Mr. Sullivan wrote you a letter[.]").) Over the next ten weeks, appellate counsel made five more requests, one of them in person. (JA 3699.) None, however, were honored. (JA 3699.)

On March 31, 2008, with the filing deadline for the opening brief less than a month away and none of the documents requested from Swerling in hand, appellate counsel made a sixth request, prompting Swerling to respond that he "did not understand the urgency" and would "get with staff in am." (JA 3699.) The following day, Melissa Meister sent Swerling a detailed letter wherein she noted the gravity of the situation and informed him, as she had a week earlier, that he was "welcome to Federal Express all of Basham's trial files to [her]" at her firm's expense so she could "go through them for the relevant materials." (JA 3700.) In reply, Swerling simply reiterated that "the files were available to [co-counsel] or anyone else and copies could be made of whatever was wanted." (JA 3706.)

Ultimately, it took an ultimatum from Meister to put the wheels in motion: "If I do not receive the files that I requested on Wednesday, March 31st, by 5:00 p.m. on Friday, April 4th, I will file a motion with the United States Court of Appeals for the Fourth Circuit, asking for court-ordered production of the files." (JA 3699.) Although Swerling characterized Meister's demand as "totally unnecessary in its tone and content," viewed objectively, it was in fact quite

appropriate. (JA 3706.) Swerling took the unsupportable position "that until last wednesday march 26 [sic], no request was made of me as to any specific document from the file." (JA 3708). Meister relented and traveled to South Carolina on April 3, 2008, to spend an afternoon reviewing Basham's files. (JA 3802.) Meister testified that she was attempting to do what she could to accommodate Swerling's "requirements" to get access to the file. (JA 3803.) The massive record filled an entire conference room, and Meister, working alone, had only one afternoon to go through it. (JA 3791, 3804, 5390-93.)

Meister planned to make copies of important records and then ship those copies back to her firm. (JA 3804.) All told, Meister culled two boxes' worth of documents, which she delivered to a copy center for copying and shipment to her offices in Washington.[11] Yet even this modest foray into Basham's files exceeded the bounds Swerling had set. (JA 3713.) As Meister wrote in an e-mail to Swerling that evening:

---

[11] Three employees of the Office of the Federal Public Defender for the District of Arizona, which experienced similar difficulties with Swerling in its attempt to obtain Basham's file, traveled to Swerling's office in Columbia, South Carolina, in February 2011, to review the file. Even a cursory review of the file, which encompassed 77 boxes of materials, took five days. (JA 3716.) The fact that Meister, working alone, was afforded only one day to conduct a similar review and was able to cull only two boxes of documents is itself evidence that Swerling's obfuscation rendered Basham's appellate attorneys ineffective.

> [The] boxes were handed off to Brandon at Document Technologies Inc. to be copied and shipped. However, after learning that you did not want the boxes to be stored out of your office overnight, I made arrangements to have the boxes returned to your office . . . and to have Document Technologies pick those two boxes back up at 8:30 a.m. from your office to be copied off-site, the originals returned to you, and the copies sent to me in D.C.

(JA 3713-14.)  Swerling responded: "Just so you know i don't let files out my office [sic] without knowing what's going or being copied by me first."  (JA 3713.) Despite the unreasonable obstacles he had created to appellate counsel's access to the file in Basham's case, Swerling ironically closed his email to Meister by stating, "If you need anything further just ask and we will try to accommodate." (JA 3713.)[12]  Meister testified that Swerling's requirements made things "extra difficult" and that she complied with his rules as far as she was able.  (JA 3804-05.)  She further testified that, although a single afternoon was enough time to look for "the list of items [she] had that [they] needed to find," she also found additional things that were not on her list.  (JA 3805.)

With only two boxes of documents from a roomful, and the filing deadline for the opening brief just twenty-two days away, the guess-and-peck process of

---

[12] Of course, as a matter of law, Meister, as Basham's counsel, was perfectly at liberty to tote the boxes containing Basham's file to Washington, with or without Swerling's permission. As to why Swerling could not countenance Basham's file spending an evening off the premises, even when entrusted to the professional care of a nationwide document services firm, his sole explanation was to opaquely remark, "I have had a couple of bad experiences." (JA 3713.)

locating meritorious claims only intensified. A brief sampling of the correspondence between Swerling and appellate counsel amply illustrates how inexact and damaging a process it was:

MEISTER: Jack, were there ever any exhibits regarding Basham's statements, to the FBI, regarding the Burns carjacking and murder? I have Fulks' statement, but they're rather incriminatory toward Brandon, and I'm guessing he said something different?

SWERLING: There we're [sic] statements. Are you referring to a physical statement introduced?

MEISTER: Well, I'm bound by whatever is in the record, so the extent [sic] that there were 302s introduced by the Government . . . I'm looking for those . . . . Does that help?

SWERLING: I was in trial when you asked and I am off today. Did I answer you.[sic]

MEISTER: I have the testimony from Vito and Long re the statements Basham made to authorities about Donovan, but I have no statements regarding Burns, yet he pled guilty in WV. To your knowledge, is there any record of Basham relating the events of the Burns' murder to authorities that would be in the Basham or Fulks' record. If not I'll go with what I have, but . . . I'd like to insert Basham's account to the extent it's on the record.

(JA 3718-19.)

MEISTER: Jack, I am quite sure that you have other matters on your plate, but finding a place where you and Harris explicitly challenged the Government's 'intrinsic acts' position is critical to Brandon's

> appeal. Have you found anything on this issue? I know that you mentioned a joint motion with Fulks. We have not found anything, unfortunately. Also, to the extent that you can find anything that was introduced by Basham regarding the Burns matter, that would also be very helpful. *Unfortunately, time is running short for filing this appeal, so the sooner you can get back to me, the better*.

(JA 3724-25 (emphasis added).)[13]

The foregoing is indeed troubling, but nowhere is the damage wrought by this process more apparent than in an e-mail Meister sent to Swerling on April 16, 2008. The message in this case is more of a confession than a request: "I was wondering if it's possible to get all of the FBI statements (the agent reports) from Basham's file? I don't recall those when I was down in your office, *but given the amount of paper, I could have easily missed them.*" (JA 3727 (emphasis added).) Swerling's adamant refusal to turn over Basham's files—which rightfully belong to Basham—resulted in appellate counsel working from Washington, D.C., without the benefit of even an index to the scores of boxes of files in South Carolina. Appellate counsel were forced to rely upon the trial docket, supposition, and blind instinct in requesting materials. (*See* App. Dkt. 152 (citing number of boxes).)

---

[13] On April 18, 2008, appellate counsel filed an unopposed motion for extension of time with this Court, in which counsel requested a fourteen-day extension of the filing deadline for the opening brief. (*See* App. Dkt. 152.) The court subsequently granted the motion, extending the deadline to May 13, 2008. (App. Dkt. 155.)

Appellate counsel were, from the outset, at Swerling's mercy in attempting to discern meritorious issues. Despite repeated requests, appellate counsel were unable to obtain the trial file from Swerling. Instead, appellate counsel were forced, days before filing the opening brief, to travel to South Carolina to obtain necessary documents. Even after that trip, however, appellate counsel lacked most of the trial file in Basham's case.

## B. Relevant Authority

As the district court conceded, Swerling refused to surrender the file to Basham's appellate counsel. (JA 0368.) This steadfast refusal was contrary to legal authority, the Restatement of the Law Governing Lawyers, and the South Carolina Rules of Professional Conduct, which uniformly require that "a lawyer must deliver to [a] client or former client, at an appropriate time and in any event promptly after the representation ends, such originals and copies of other documents possessed by the lawyer relating to the representation as the client or former client reasonably needs." Restatement (Third) of the Law Governing Lawyers § 46(3) (2000); *see also Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 648 (N.D. Tex. 1989) (noting "the virtually universal practice of former attorneys transferring the entire client file to new counsel"); S.C. Rules of Prof'l Conduct R. 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . .

surrendering papers and property to which the client is entitled . . . .").  This rule derives from the fact that the client, not counsel, "owns his file," and therefore counsel, not the client, must "bear the expense of retaining a copy."  *Averill v. Cox*, 761 A.2d 1083, 1092 (N.H. 2000); *see also Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. at 648 ("[A]ny materials which [former counsel] wish to keep are copied at their own expense.").

To deny a former client any documents produced in the course of representation is to "deny the client *the full benefit* of the services for which he paid, *often dearly*."  *Resolution Trust Corp.* 128 F.R.D at 650 (emphasis added).  By not "surrendering papers and property to which [Basham was] entitled," Swerling placed appellate counsel in an untenable position, one in which the only answer was denied by the very circumstances of the problem.  S.C. Rules of Prof'l Conduct R. 1.16(d).  "[T]his case is illustrative that in a complex [appeal] where the file may be voluminous (commensurably increasing the likely usefulness of work product materials to advise the client concerning ongoing rights and obligations), the client's need for access to a particular paper cannot be demonstrated except in the most general terms, in the absence of prior disclosure of the content of the very document to which access is sought."  *In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*, 689 N.E.2d 879, 882 (N.Y. 1997).  Just as unfettered access to Basham's files would have "commensurably

increas[ed] the likely usefulness of work product materials" in pursuing his appeal, Swerling's refusal to surrender Basham's files, or permit appellate counsel reasonable access to those files, ensured that counsel would fall far short of providing Basham the effective assistance to which he was entitled. *See* i*d.*

### C.    Standard of Review

The district court's holding that Swerling's conduct neither constituted ineffective assistance of trial counsel nor rendered appellate counsel ineffective, rests on unsupportable findings of fact, and fails to appropriately apply the law. Whether Basham was denied the effective assistance of counsel presents a mixed question of fact and law, and this Court reviews it *de novo*. *Nicholson*, 611 F.3d at 205. The district court's factual findings are reviewed for clear error. *Smith*, 640 F.3d at 590.

### D.    The District Court's Ruling

The district court concluded that the damage caused by Swerling's violation of his obligation to Basham was negated by the fact that numerous attorneys represented Basham on appeal. Specifically, the court found that Harris and Swerling were initially appointed as his appellate attorneys, and that Harris remained as attorney of record for two years. The court reasoned that Harris "undoubtedly had access to Basham's entire trial file" during that time period. (JA 0367.) Harris's testimony at the 2255 hearing belies this conclusion. Harris

testified that he was appointed as appellate counsel "primarily to act as part of the transition team" and did not participate in writing or preparing the appellate brief. (JA 4065.) He further testified that Swerling kept the master file, that he (Harris) never had the file in his office, and that he was never involved in any conversations between Swerling and Jenner & Block about acquiring the file. (JA 4065.) Further, the emails among Sullivan, Meister and Swerling make clear that it was Swerling who had the file. Had appellate counsel had any other means of accessing the file rather than going through Swerling, they certainly would have done so give the hurdles their correspondence illuminates. The record does not show a single email between Harris and other appellate counsel where he assisted them in obtaining the file. Therefore, the district court's conclusion that appellate counsel were rendered effective by Harris's appointment on the appeal is untenable, given that there is no evidence suggesting that he did any work on the appeal, had the master file, or had any role in providing the file to successor counsel.

The district court further stated that Basham's final "ten-member team which prepared his appeal briefs had extensive resources and was probably as good as any that could be assembled." (JA 0367.) The court neglected to recognize that, regardless of how talented or well-funded Basham's appellate team was, without the record they were stumbling in the dark. Further, as noted in Claim V,

83

*supra*, the court again mistakenly conflated quantity of counsel with quality representation. As with the other ineffective-assistance-of-appellate-counsel claims raised in the 2255 Motion, the court's analysis of this claim fails to acknowledge that Basham's case was left to a team of Jenner associates with little or no criminal experience or supervision, and an incomplete record. Even highly experienced counsel would have been hindered by lack of a compete record.

Accordingly, despite finding that appellate counsel's job would have been "easier" if they had possession of the file, and that they might not "have had to work as hard with the file at hand," the district court found no ineffective assistance of counsel. (JA 0369.) In rejecting the claim, the court found that Swerling's refusal to allow appellate counsel to remove the file, even for overnight copying, nevertheless constituted reasonable access. (JA 0368.) The court further found that "it appears that appellate counsel obtained access to Basham's file shortly after each time they requested it." (JA 0368.) This finding conflicts with Meister's testimony that, in one of her initial meetings with Sullivan, the two of them discussed that Sullivan had asked for the records from Swerling and was having trouble getting them. (JA 3791.) The difficulty with obtaining the record was substantial enough that Meister assigned two associates to research the issue of appellate counsel's right to trial counsel's records. (JA 3791-93.) Meister also testified that her records indicated that Swerling did not respond to her initial

phone calls to him. (JA 3795.) After months of attempting to get the record, Meister issued her ultimatum, stating that, if Swerling did not respond, she would ask this Court for an order demanding that the records be produced. Finally, under threat of court action, Swerling responded both by email and phone, angry that Meister dared to impugn his integrity and belittling her by telling her that he had been a member of the South Carolina bar longer than she had been alive. Swerling maintained, despite the record of Meister's previous attempts to contact him, that no one had ever asked him for the file. (JA 3801.) The court's finding even conflicts with Swerling's own testimony, where he conceded that appellate counsel did not receive his handwritten notes. (JA 4154.)

The court's finding that Meister's single day with the file was reasonable access is also unsupportable in light of the nature of case. Both Swerling and Harris acknowledged that the size and scope of the Basham case was beyond the norm. Swerling testified about the enormity of the record, and how he and his large team developed strategies for "an efficient way of dealing with the massive amount of materials, people, and discovery, mental health, records." (JA 4509-10.) Harris testified that Basham's case was a "massive undertaking" and said that, "in terms of witnesses and amount of discovery that was created not only by the government but also by the defense team, it was one of the largest cases I've ever seen anyone involved in." (JA 3994.) Basham's was not a file that could be

reviewed in a short period of time.  Accordingly, Swerling's refusal to relinquish custody of the file, even for brief copying, unreasonably denied appellate counsel adequate access.[14]

Contrary to the district court's assertion that Basham did not identify any specific issues appellate counsel overlooked as a result of limited access to the file, Basham raised several areas where appellate counsel was ineffective in failing to raise meritorious claims that were apparent from the record.  The 2255 Motion and the evidentiary hearing demonstrate that numerous claims of ineffective assistance of appellate counsel were alleged.  In addition, Meister was questioned at the hearing about her failure to include any claims regarding Basham's competency. While neither the Constitution nor the case law of any federal or state court guarantees an appellant in a capital case the assistance of doubt-free counsel, Basham was entitled to the assistance of counsel who, unlike Meister, would not so readily concede that critical portions of the record "could have easily [been] missed."  (JA 3727.)  Any one of the scores of boxes of documents Meister was

---

[14] At the 2255 hearing, Swerling remained unapologetic about his refusal to give appellate counsel Basham's files, a refusal that he maintained with Basham's 2255 attorneys.  He asserted that he had the right to keep the file from habeas counsel and that his demands limiting habeas counsel's access to the file were reasonable because they "were the ones bringing the petition against me."  (JA 4154.) Swerling's testimony illuminated that he not only failed to understand the nature of a habeas proceeding, but was far more concerned with defending his reputation than honoring his continuing obligations to Basham.

forced to leave in South Carolina may have held a claim that, absent the error of its omission, would have demonstrated "a reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695, or for the purpose of this proceeding, "a reasonable probability that the omitted claim would have resulted in a reversal on appeal," *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). As Meister wrote in a letter to Swerling, "I am sure you understand the grave nature of a death penalty appeal and the necessity for a person facing imposition of the death penalty to be represented by able and informed counsel. *Basham's trial files are essential to our ability, as counsel on appeal, to represent Basham ably and effectively*." (JA 3699 (emphasis added).) Nevertheless, only a minute portion of Basham's files came into the hands of his appellate counsel. Impeded by an inadequate record, counsel could not, and therefore did not, provide Basham effective assistance. *See People v. Barton*, 579 P.2d 1043, 1047–48 (Cal. 1978) (holding that, where the record on appeal was incomplete, "[a]ppellant was denied his right under the Fourteenth Amendment to the competent assistance of counsel on appeal because [appellate] counsel failed to obtain an appellate record adequate for consideration of appellant's claims").

Because his trial counsel failed to provide his appellate attorneys with files and records necessary for them to effectively represent him on direct appeal,

Basham was deprived of the effective assistance of both his appellate counsel and his trial counsel. As is demonstrated by the several instances set forth in the 2255 Motion and the subsequent evidentiary hearing, appellate counsel's failure to raise meritorious claims in Basham's direct appeal prejudiced Basham and violated his federal constitutional and statutory rights.

## CONCLUSION

For the foregoing reasons, Basham respectfully requests the Court reverse the order of the district court denying him relief on his 2255 Motion and grant him appropriate relief.

## REQUEST FOR ORAL ARGUMENT

Basham respectfully requests that the Court set oral argument in this matter. Respectfully submitted this 3rd day of September, 2014.

> s/Michael L. Burke
> Michael L. Burke (Arizona Bar No. 013173)
> Sarah Stone (Arizona Bar No. 022713)
> Assistant Federal Public Defenders
> District of Arizona
> 850 West Adams, Suite 201
> Phoenix, Arizona 85007
> michael_burke@fd.org
> sarah_stone@fd.org
> Telephone: (602) 382-2818
> Facsimile: (602) 889-3960
>
> Attorneys for Defendant-Appellant
> Brandon Leon Basham

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(A)(7)(C) AND CIRCUIT RULE 28.1(E)**

I certify that this opening brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 28.2(e) and is proportionately spaced, and has a typeface of 14 points or more and contains 20,568 words.

By: <u>Michael L. Burke</u>
Counsel for Defendant-Appellant

Dated: September 3, 2014.

# CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service of this document will be accomplished by the appellate CM/ECF system.

I further certify that five copies of the Appendix, consisting of 26 volumes, will be sent by Federal Express to the Clerk of the United States Court of Appeals for the Fourth Circuit and one copy of the Sealed Joint Appendix will be sent to the following:

Thomas E. Booth
Department of Justice
950 Pennsylvania Avenue, Room 1511
Washington, DC 20530

s/Stephanie King
Legal Assistant