No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 1

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

## United States v. Basham, Case No. 13-9
## Joint Appendix Table Of Contents

**VOLUME 1**

JA 0001      Docket Sheet, USDC Case No. 4:02-CR-00992-JFA

JA 0172      Docket Sheet, USDC Case No. 4:02-CR-00992-JFA

JA 0174      Dkt. #23, Indictment

**VOLUME 2**

JA 0177      Dkt. #1577, Order Denying 2255 Petition

JA 0375      Dkt. #1583, Order Denying Motion to Alter Judgment

JA 0383      Dkt. #1585, Notice of Appeal

JA 0386      Dkt. #22, Motion to Determine Mental Competency

JA 0389      April 22, 2003, Grand Jury Transcript

JA 0413      June 18, 2003, Pre-Trial Transcript, Regarding Medical Issues

JA 0420      Dkt. #147, Order Extending Confinement at CCC

**VOLUME 3**

JA 0422      February 24, 2004, *Jackson v Denno* Transcript (morning)

JA 0453      February 24, 2004, *Jackson v Denno* Transcript (afternoon)

JA 0565      February 24, 2004, *Jackson v Denno* Transcript, testimony of Hacker & Smith

JA 0593      February 25, 2004, *Jackson v. Denno* Transcript (excluding testimony)

**VOLUME 4**

JA 0700     February 25, 2004, *Jackson v. Denno* Transcript, testimony of Long, Hewett, Monckton, Littlejohn & Parham

JA 0892     February 26, 2004, *Jackson v. Denno* Transcript

**VOLUME 5**

JA 1001     June 22, 2004, *Fulk's* Trial Transcript

JA 1007     August 4, 2004, Pre-Trial Conference Transcript

JA 1014     August 25, 2004, Pre-Trial Conference Transcript

JA 1026     September 7, 2004, Jury Selection Transcript, Volume 6

JA 1033     September 8, 2004, Jury Selection Transcript, Volume 7

JA 1039     September 13, 2004, Trial Transcript Excerpt, Volume 1

JA 1078     September 14, 2004, Trial Transcript Excerpt, Volume 2

JA 1084     September 15, 2004, Trial Transcript, Volume 3

JA 1128     September 17, 2004 Trial Transcript Excerpt, Volume 4

JA 1151     September 20, 2004 Trial Transcript Excerpt, Volume 5

JA 1179     September 21, 2004, Trial Transcript Excerpt, Volume 6

JA 1197     September 23, 2004, Trial Transcript Excerpt, Volume 8

JA 1228     September 24, 2004, Trial Transcript Excerpt, Volume 9

**VOLUME 6**

JA 1308     September 27, 2004, Trial Transcript, Volume 10

JA 1396    September 29, 2004, Trial Transcript, Volume 12

**VOLUME 7**

JA 1586    September 30, 2004, Trial Transcript, Volume 13

JA 1655    October 12, 2004, Penalty Phase Transcript Excerpt, Volume 15

JA 1667    October 13, 2004, Penalty Phase Transcript Excerpt, Volume 16

JA 1677    October 14, 2004, Penalty Phase Transcript Excerpt, Volume 17

JA 1730    October 15, 2004, Penalty Phase Transcript Excerpt, Volume 18

JA 1778    October 18, 2004, Penalty Phase Transcript Excerpt, Volume 19

**VOLUME 8**

JA 1892    October 19, 2004, Penalty Phase Transcript Excerpt, Volume 20

JA 1909    October 22, 2004, Penalty Phase Transcript Excerpt, Volume 23

JA 1916    October 26, 2004, Penalty Phase Transcript Excerpt, Volume 25

JA 1942    October 27, 2004, Penalty Phase Transcript Excerpt, Volume 26

**VOLUME 9**

JA 2140    October 28, 2004, Penalty Phase Transcript Excerpt, Volume 27

JA 2291    November 1, 2004, Penalty Phase Transcript Excerpt, Volume 29

**VOLUME 10**

JA 2448    November 2, 2004, Penalty Phase Transcript Excerpt, Volume 30

JA 2466    Dkt. #805, Special Jury Verdict

JA 2478    Dkt. #806, Special Jury Verdict

JA 2490      February 14, 2005, Sentencing Transcript Excerpt

JA 2503      Dkt. #1394, Amended 2255 Motion

**VOLUME 11**

JA 2682      Dkt. #1394.1-9, Exhibits to 2255 Motion

**VOLUME 12**

JA 3235      Dkt. #1416, Response to 2255 Motion

**VOLUME 13**

JA 3409      Dkt. #1465, Reply to 2255 Motion

**VOLUME 14**

JA 3605      Dkt. #1465.1-10, 1466-1468, Exhibits to Reply

**VOLUME 15**

JA 3731      October 9, 2012, 2255 Transcript, Day 1

**VOLUME 16**

JA 3851      October 10, 2012, 2255 Transcript, Day 2

**VOLUME 17**

JA 4011      October 11, 2012, 2255 Transcript, Day 3

**VOLUME 18**

JA 4242      October 15, 2012, 2255 Transcript, Day 4

**VOLUME 19**

JA 4430      October 16, 2012, 2255 Transcript, Day 5

**VOLUME 20**

JA 4662      October 17, 2012, 2255 Transcript, Day 6

JA 4733      December 3, 2012, 2255 Transcript, Day 7

**VOLUME 21**

JA 4923      December 4, 2012, 2255 Transcript, Day 8

**VOLUME 22**

JA 5115      Evidentiary Hearing Exhibits w/Index, Petitioner

**VOLUME 23**

JA 5367      Evidentiary Hearing Exhibits w/Index, Respondent

**VOLUME 24**

JA 7448      Dkt. #1580, Motion to Amend Judgment (Rule 59e)

JA 7465      Dkt. #1582, Response to Motion to Amend

JA 7485      Docket Sheet, 4th Circuit COA Case No. 05-5

**SEALED VOLUME 25**

JA 7498      Dkt. #95, Motion to Transfer the Defendant (SEALED)

JA 7502      Dkt. #99, Memo Opposing Motion to Determine Competency (SEALED)

JA 7506      Dkt. #110, Order to Transfer Defendant to CCC (SEALED)

JA 7508      February 24, 2004, *Jackson v. Denno* Transcript, Ex Parte Discussion (SEALED)

JA 7518     September 17, 2004, Trial Transcript, Ex Parte Hearing #1 (SEALED)

JA 7526     September 17, 2004, Trial Transcript, Ex Parte Hearing #2 (SEALED)

JA 7533     October 26, 2004, Penalty Phase Transcript, Ex Parte Hearing (SEALED)

JA 7546     October 10, 2012, 2255 Transcript, Day 2

JA 7556     October 15, 2012, 2255 Transcript, Day 4

JA 7559     October 16, 2012, 2255 Transcript, Day 5

**NON-ELECTRONIC VOLUME 26**

JA 7563     Exhibit No. 469 (A & B)-Video of Courtroom Scuffle1 DVD

JA 7564     Exhibit No. 252 (phone calls of Basham and mom – jail calls)

APPEAL,CLOSED,DEATH

# U.S. District Court
## District of South Carolina (Florence)
## CRIMINAL DOCKET FOR CASE #: 4:02-cr-00992-JFA All Defendants

Case title: USA v. Fulks et al

Related  Cases: [4:08-cv-70072-JFA](#)

[4:11-cv-70079-JFA](#)

Magistrate judge case number: 4:02-mj-00992

Date Filed: 12/17/2002

Date Terminated: 02/16/2005

---

**In Re Estate of**

**Alice Donovan**                    represented by  **Geoffrey H Waggoner**
Geoffrey H Waggoner Law Office
PO Box 865
Mt Pleasant, SC 29465
843-972-0426
Fax: 843-972-0427
Email:
ghwaggoner@waggonerfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

---

Assigned to: Honorable Joseph F
Anderson, Jr

Appeals court case numbers: 04-33, 04-
33-BethWalton, 11-3 4CCA

**Defendant (1)**

**Chadrick E Fulks**                    represented by  **Chadrick E Fulks**
*TERMINATED: 12/20/2004*                #16617-074
US Penitentiary
Federal Death Row
P.O. Box 33
Terre Haute, IN 47808
PRO SE

**Amy Jean Laurendeau**
O'Melveny and Myers
610 Newport Center Drive
Suite 1700
Newport Beach, CA 92660
949-760-9600

**JA 0001**

Email: alaurendeau@omm.com
*TERMINATED: 04/28/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

**Beattie B Ashmore**
Beattie B Ashmore Law Office
650 E Washington Street
Greenville, SC 29601
864-467-1001
Email: Beattie@BeattieAshmore.com
*TERMINATED: 09/03/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Danielle Nicole Oakley**
O'Melveny and Myers
610 Newport Center Drive
Suite 1700
Newport Beach, CA 92660
949-760-9600
Email: doakley@omm.com
*TERMINATED: 04/28/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

**David P Dalke**
O'Melveny and Myers
610 Newport Center Drive
Suite 1700
Newport Beach, CA 92660
949-760-9600
Email: ddalke@omm.com
*TERMINATED: 04/28/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

**John H Blume**
Blume Norris and Franklin-Best
900 Elmwood Avenue
Suite 101
Columbia, SC 29201

**JA 0002**

803-765-1044
Fax: 803-765-1143
Email: john@blumelaw.com
*TERMINATED: 12/20/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Keir M Weyble**
John H Blume Law Office
PO Box 11744
Columbia, SC 29211
803-765-1044
Fax: 803-765-1044
Email: keir@blumelaw.com
*TERMINATED: 12/20/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten Elena Small**
Nexsen Pruet (Gville)
PO Box 10648
Greenville, SC 29603
864-282-1112
Email: ksmall@nexsenpruet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Kymberleigh Damron-Hsiao**
O'Melveny and Myers
610 Newport Center Drive
Suite 1700
Newport Beach, CA 92660
949-760-9600
*TERMINATED: 04/28/2010*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

**Stephanie L Noble**
O'Melveny and Myers
610 Newport Center Drive
Suite 1700
Newport Beach, CA 92660
949-760-9600
*TERMINATED: 04/28/2010*
*LEAD ATTORNEY*

**JA 0003**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

**William F Nettles , IV**
Federal Public Defender's Office
McMillan Federal Building
401 West Evans Street
Suite 105
Florence, SC 29503
843-662-1510
Fax: 843-667-1355
Email: bill_nettles@fd.org
*TERMINATED: 12/20/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**William J Watkins , Jr**
US Attorneys Office (Gville)
55 Beattie Place
Suite 700
Greenville, SC 29601
864-282-2100
Fax: 864-233-3158
Email: bill.watkins@usdoj.gov
*TERMINATED: 02/05/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Amy Gershenfeld Donnella**
Federal Community Defender Office
Capital Habeas Unit
601 Walnut Street
Suite 545 West
Philadelphia, PA 19106
215-928-0520
Email: amy_donnella@fd.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Billy Nolas**
Federal Community Defender Office
Capital Habeas Unit
Suite 545 West

**JA 0004**

Curtis Center
Philadelphia, PA 19106
215-926-0520
Email: billy_nolas@fd.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sheri Lynn Johnson**
Cornell Law School
Myron Taylor Hall
Ithaca, NY 14853
(607) 255-6478
*TERMINATED: 12/20/2004*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:2119 MOTOR VEHICLE THEFT - CARJACKING and 18:2, with intent to cause death and serious bodily harm, by force violence and intimidation did take from the person of another a motor vehicle that had been transported in interstate and foreign commerce, 1994 BMW 318i, and death resulted (1s) | It is ordered that the defendant's sentence shall be executed by a US Marshal. Defendant's sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death. Defendant's sen tence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons which date shall be on sooner than 60 days from the entry of this judgment of death. The sentence shall be executed at a federal penal or cor rectional institution. Special Assessment of $200.00 is due immediately ($100 per count). Defendant is remanded to the custody of the USM. |
| 18:1201(a)(1) KIDNAPPING and 18:2, willfully and unlawfully did kinap, abduct and carry away Donovan and did willfully transport Donovan in interstate commerce from Conway SC to North Carolina and did hold her for ransom, and death resulted (2s) | It is ordered that the defendant's sentence shall be executed by a US Marshal. Defendant's sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death. Defendant's sen tence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons which date shall be on sooner than 60 days from the entry of this judgment of death. The sentence shall be executed at a federal penal or cor rectional institution. Special Assessment of $200.00 is due |

**JA 0005**

18:2312 TRANSPORTATION OF STOLEN VEHICLES and 18:2, knowingly and unlawfully did transport in interstate commerce a stolen motor vehicle, 1994 BMW 318i, from Conway SC to North Carolina knowing the same to have been stolen
(3s)

immediately ($100 per count). Defendant is remanded to the custody of the USM.

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Six Hundred Sixty (660) months as to counts 3, 4, 5, 7, and 8. This term consists of One Hundred Twenty (120) months on count 3, Si xty (60) months on count 4, Two Hundred Forty (240) months on count 5, One Hundred Twenty (120) months on count 7, and One Hundred Twenty (120) months on count 8, all to be served consecutively. As to count 6, the defendant is sentenced to a term of Eighty-four (84) months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is Seven Hundred Forty-four (744) months. Upon release from imprisonment, th e defendant shall be on supervised release for a term of for a term of Five (5) years. This term consists of Three (3) years as to counts 3, 4, 7, and 8 and Five (5) years as to counts 5 and 6, all terms to be served concurrently. The defendant shall also comply with the following additional condition: The defendant shall participate in a mental health treatment program as directed and approved by the US Probation Office. The defendant is remanded to the custody of the United States Marshal. Def endant is to pay a total of $600 special assessment ($100 per count) immediately.

18:371 CONSPIRACY TO DEFRAUD THE UNITED STATES, unlawfully knowingly and willfully did conspire and agree with each other to commit the following crimes: a) carjacking resulting in death, 18:2119; b) kidnapping resulting in death, 18:1201 (a); c) interstate transportation of a stolen motor vehicle, 18:2312; d)

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Six Hundred Sixty (660) months as to counts 3, 4, 5, 7, and 8. This term consists of One Hundred Twenty (120) months on count 3, Si xty (60) months on count 4, Two Hundred Forty (240) months on count 5, One Hundred

**JA 0006**

possession of firearms by a convicted felon, 18:922(g); e) possession of stolen firearms, 18:922(j)
(4s)

Twenty (120) months on count 7, and One Hundred Twenty (120) months on count 8, all to be served consecutively. As to count 6, the defendant is sentenced to a term of Eighty-four (84) months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is Seven Hundred Forty-four (744) months. Upon release from imprisonment, th e defendant shall be on supervised release for a term of for a term of Five (5) years. This term consists of Three (3) years as to counts 3, 4, 7, and 8 and Five (5) years as to counts 5 and 6, all terms to be served concurrently. The defendant shall also comply with the following additional condition: The defendant shall participate in a mental health treatment program as directed and approved by the US Probation Office. The defendant is remanded to the custody of the United States Marshal. Def endant is to pay a total of $600 special assessment ($100 per count) immediately.

18:924(o) CONSPIRACY TO COMMIT A VIOLENT CRIME/DRUGS/ MACHINE GUN, did knowingly intentionally and unlawfully conspire and agree together to knowingly use and carry firearms during and in relation to, and to possess firearms in the furtherance of, crimes of violence, as charged in counts 1 and 2 of superseding indictment
(5s)

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Six Hundred Sixty (660) months as to counts 3, 4, 5, 7, and 8. This term consists of One Hundred Twenty (120) months on count 3, Si xty (60) months on count 4, Two Hundred Forty (240) months on count 5, One Hundred Twenty (120) months on count 7, and One Hundred Twenty (120) months on count 8, all to be served consecutively. As to count 6, the defendant is sentenced to a term of Eighty-four (84) months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is Seven Hundred Forty-four (744) months. Upon release from imprisonment, th e defendant shall be on supervised release for a term of for a

**JA 0007**

term of Five (5) years. This term consists of Three (3) years as to counts 3, 4, 7, and 8 and Five (5) years as to counts 5 and 6, all terms to be served concurrently. The defendant shall also comply with the following additional condition: The defendant shall participate in a mental health treatment program as directed and approved by the US Probation Office. The defendant is remanded to the custody of the United States Marshal. Def endant is to pay a total of $600 special assessment ($100 per count) immediately.

18:924(c)(1)(A) VIOLENT CRIME/DRUGS/MACHINE GUN and 18:2, knowingly used and carried a firearm during and in relation to, and possessed a firearm in the furtherance of crimes of violence as charged in counts 1 and 2 of this superseding indictment
(6s)

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Six Hundred Sixty (660) months as to counts 3, 4, 5, 7, and 8. This term consists of One Hundred Twenty (120) months on count 3, Si xty (60) months on count 4, Two Hundred Forty (240) months on count 5, One Hundred Twenty (120) months on count 7, and One Hundred Twenty (120) months on count 8, all to be served consecutively. As to count 6, the defendant is sentenced to a term of Eighty-four (84) months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is Seven Hundred Forty-four (744) months. Upon release from imprisonment, th e defendant shall be on supervised release for a term of for a term of Five (5) years. This term consists of Three (3) years as to counts 3, 4, 7, and 8 and Five (5) years as to counts 5 and 6, all terms to be served concurrently. The defendant shall also comply with the following additional condition: The defendant shall participate in a mental health treatment program as directed and approved by the US Probation Office. The defendant is remanded to the custody of the United States Marshal. Def endant is to

**JA 0008**

pay a total of $600 special assessment ($100 per count) immediately.

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Six Hundred Sixty (660) months as to counts 3, 4, 5, 7, and 8. This term consists of One Hundred Twenty (120) months on count 3, Si xty (60) months on count 4, Two Hundred Forty (240) months on count 5, One Hundred Twenty (120) months on count 7, and One Hundred Twenty (120) months on count 8, all to be served consecutively. As to count 6, the defendant is sentenced to a term of Eighty-four (84) months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is Seven Hundred Forty-four (744) months. Upon release from imprisonment, th e defendant shall be on supervised release for a term of for a term of Five (5) years. This term consists of Three (3) years as to counts 3, 4, 7, and 8 and Five (5) years as to counts 5 and 6, all terms to be served concurrently. The defendant shall also comply with the following additional condition: The defendant shall participate in a mental health treatment program as directed and approved by the US Probation Office. The defendant is remanded to the custody of the United States Marshal. Def endant is to pay a total of $600 special assessment ($100 per count) immediately.

18:922(g)(1) UNLAWFUL TRANSPORT OF FIREARMS, ETC. and 18:924(a)(2) and 18:2, each having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce firearms, H&R .22 caliber 9 shot Model 949 revolver, a Llama Mini Max .45 caliber pistol, a Remington 870 12 gauge shotgun, a Marlin model 882SS .22 caliber rifle, Remington Model 1100 12 gauge shotgun, Marlin model 60 .22 caliber rifle, RPI Connecticut Valley Arms Magbolt 150 rifle, each of which had been shipped and transported in interstate commerce
(7s)

18:922(j) RECEIVE STOLEN FIREARMS and 18:924(a)(2) and 18:2, knowingly did possess stolen firearms, an H&R .22 caliber 9 shot Model 949 revolver, Llama Mini Max .45 caliber pistol, Remington 870 12 gauge shotgun, Marlin model 882SS .22 caliber rifle, Remington model 1100 12 gauge shotgun, Marlin model 60 .22 caliber rifle, RPI Connecticut Valley

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Six Hundred Sixty (660) months as to counts 3, 4, 5, 7, and 8. This term consists of One Hundred Twenty (120) months on count 3, Si xty (60) months on count 4, Two Hundred Forty (240) months on count 5, One Hundred Twenty (120) months on count 7, and

**JA 0009**

Arms Magbolt 150 rifle, each of which had been shipped and transported in interstate commerce, knowing and having reasonable cause to believe the firearms were stolen
(8s)

One Hundred Twenty (120) months on count 8, all to be served consecutively. As to count 6, the defendant is sentenced to a term of Eighty-four (84) months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is Seven Hundred Forty-four (744) months. Upon release from imprisonment, th e defendant shall be on supervised release for a term of for a term of Five (5) years. This term consists of Three (3) years as to counts 3, 4, 7, and 8 and Five (5) years as to counts 5 and 6, all terms to be served concurrently. The defendant shall also comply with the following additional condition: The defendant shall participate in a mental health treatment program as directed and approved by the US Probation Office. The defendant is remanded to the custody of the United States Marshal. Def endant is to pay a total of $600 special assessment ($100 per count) immediately.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

18:2119 MOTOR VEHICLE THEFT - CARJACKING did with intent to cause death and serious bodily harm by force take from the person of another a motor vehicle that had been transported in interstate and foreign commerce and 18:2 Aid and Abet
(1)

18:1201 KIDNAPPING did wilfully and unlawfully kidnap another and transport Alice Donovan from Conway, South Carolina to North Carolina and did hold her for ransom and death resulted and 18:2 Aid and Abet
(2)

**Disposition**

JA 0010

18:2312 TRANSPORTATION OF
STOLEN VEHICLES did knowingly
and unlawfully transport in interstate
commerce a stolen vehicle, 1994 BMW
318i from Conway, South Carolina to
North Carolina knowing same to be
stolen and 18:2 Aid and Abet
(3)

**Highest Offense Level (Terminated)**

Felony

**Complaints**

kidnapping and carjacking in violation
of 18:1201 and 18:2119 [ 4:02-m -992 ]

**Disposition**

Assigned to: Honorable Joseph F
Anderson, Jr

Appeals court case numbers: '05-5'
'4cca', 12-2 4CCA, 13-9 4CCA

**Defendant (2)**

| | | |
|---|---|---|
| **Brandon L Basham** | represented by | **Cameron B Littlejohn , Jr** |

98940-071
Special Confinement Unit
Federal Correctional Complex
P O Box 33
Terre Haute, IN 47808-0033
*TERMINATED: 02/16/2005*

1720 Main Street
Suite 202
Columbia, SC 29201-2850
803-799-1888
Fax: 803-799-5888
Email: camlittlejohn@yahoo.com
*TERMINATED: 04/18/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Gregory Poole Harris**
Harris and Gasser Law Firm
1529 Laurel Street
Columbia, SC 29201
803-779-7080
Fax: 803-746-0480
Email: greg@harrisgasserlaw.com
*TERMINATED: 02/16/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**JA 0011**

**Jack Bruce Swerling**
Jack Swerling Law Office
1720 Main Street
Suite 301
Columbia, SC 29201
803-765-2626
Fax: 803-799-4059
Email: jacklaw@aol.com
*TERMINATED: 02/16/2005*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**John F Hardaway**
Deceased 29003
803-252-1776
Fax: 803-252-6730
*TERMINATED: 04/18/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Julia G Mimms**
Julia G Mimms Law Office
1001 Elizabeth Ave
Suite 1A
Charlotte, NC 28204
704-333-1301
Fax: 704-333-1290
Email: jgmassistant@bellsouth.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Robert M Wilcox**
USC School of Law
Main and Greene Streets
Columbia, SC 29208
803-777-4155
*TERMINATED: 04/18/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**William H Monckton , VI**
Monckton Law Firm
1300 Professional Drive
Suite 102
Myrtle Beach, SC 29577

**JA 0012**

843-946-6556
Fax: 843-946-6996
Email: moncktonlawfirm@aol.com
*TERMINATED: 04/18/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Michael Llewellyn Burke**
Arizona Federal Public Defender
850 W Adams
#201
Phoenix, AZ 85007
602-382-2816
Email: michael_burke@fd.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Sarah Elizabeth Stone**
Arizona Federal Public Defender
850 W Adams
Suite 201
Phoenix, AZ 85007
602-382-2816
Email: sarah_stone@fd.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Pending Counts**

18:2119 MOTOR VEHICLE THEFT -
CARJACKING and 18:2, with intent to
cause death and serious bodily harm, by
force violence and intimidation did take
from the person of another a motor
vehicle that had been transported in
interstate and foreign commerce, 1994
BMW 318i, and death resulted
(1s)

**Disposition**

It is ordered that the defendant's
sentence shall be executed by the US
Marshal. Defendant's sentence shall be
executed by intravenous injection of a
lethal substance or substances in a
quantity sufficient to cause death.
Defendant's s entence shall be executed
on a date and at a place designated by
the Director of the Federal Bureau of
Prisons which date shall be no sooner
than 60 days from the entry of this
judgment of death. The sentence shall
be executed at a federal penal or c
orrectional institution. Special
Assessment of $200 is due immediately.

**JA 0013**

18:1201(a)(1) KIDNAPPING and 18:2, willfully and unlawfully did kinap, abduct and carry away Donovan and did willfully transport Donovan in interstate commerce from Conway SC to North Carolina and did hold her for ransom, and death resulted
(2s)

18:2312 TRANSPORTATION OF STOLEN VEHICLES and 18:2, knowingly and unlawfully did transport in interstate commerce a stolen motor vehicle, 1994 BMW 318i, from Conway SC to North Carolina knowing the same to have been stolen
(3s)

18:371 CONSPIRACY TO DEFRAUD THE UNITED STATES, unlawfully knowingly and willfully did conspire and agree with each other to commit the following crimes: a) carjacking resulting in death, 18:2119; b)

Defendant is remanded to the custody of the USM.

It is ordered that the defendant's sentence shall be executed by the US Marshal. Defendant's sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death. Defendant's s entence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons which date shall be no sooner than 60 days from the entry of this judgment of death. The sentence shall be executed at a federal penal or c orrectional institution. Special Assessment of $200 is due immediately. Defendant is remanded to the custody of the USM.

The defendant is hereby committed to the custody of the Bureau of Prisons for a term of 660 months as to counts 3,4,5,6,7and 8. This term consists of 10 years on count 3; 5 years on count 4; 20 years on count 5; 10 years on count 7 and 10 years on co unt 8, all to be served consecutively. As to count 6 the defendant is sentenced to a term of 84 months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment impos ed is 744 months. Upon release from imprisonment the defendant shall be on supervised release for a term of 5 years with the following special condition: The defendant shall participate in a mental health treatment program as directed by the US Proba tion Office. Special Assessment of $600 is due immediately. The defendant is remanded to the custody of the USM.

The defendant is hereby committed to the custody of the Bureau of Prisons for a term of 660 months as to counts 3,4,5,6,7and 8. This term consists of 10 years on count 3; 5 years on count 4; 20 years on count 5; 10 years on count 7

**JA 0014**

kidnapping resulting in death, 18:1201
(a); c) interstate transportation of a
stolen motor vehicle, 18:2312; d)
possession of firearms by a convicted
felon, 18:922(g); e) possession of stolen
firearms, 18:922(j)
(4s)

and 10 years on co unt 8, all to be
served consecutively. As to count 6 the
defendant is sentenced to a term of 84
months, to run consecutive to all other
sentences imposed today and previously
imposed by any other court. Therefore,
the total term of imprisonment impos ed
is 744 months. Upon release from
imprisonment the defendant shall be on
supervised release for a term of 5 years
with the following special condition:
The defendant shall participate in a
mental health treatment program as
directed by the US Proba tion Office.
Special Assessment of $600 is due
immediately. The defendant is
remanded to the custody of the USM.

The defendant is hereby committed to
the custody of the Bureau of Prisons for
a term of 660 months as to counts
3,4,5,6,7and 8. This term consists of 10
years on count 3; 5 years on count 4; 20
years on count 5; 10 years on count 7
and 10 years on co unt 8, all to be
served consecutively. As to count 6 the
defendant is sentenced to a term of 84
months, to run consecutive to all other
sentences imposed today and previously
imposed by any other court. Therefore,
the total term of imprisonment impos ed
is 744 months. Upon release from
imprisonment the defendant shall be on
supervised release for a term of 5 years
with the following special condition:
The defendant shall participate in a
mental health treatment program as
directed by the US Proba tion Office.
Special Assessment of $600 is due
immediately. The defendant is
remanded to the custody of the USM.

18:924(o) CONSPIRACY TO
COMMIT A VIOLENT
CRIME/DRUGS/ MACHINE GUN,
did knowingly intentionally and
unlawfully conspire and agree together
to knowingly use and carry firearms
during and in relation to, and to possess
firearms in the furtherance of, crimes of
violence, as charged in counts 1 and 2
of superseding indictment
(5s)

18:924(c)(1)(A) VIOLENT
CRIME/DRUGS/MACHINE GUN and
18:2, knowingly used and carried a
firearm during and in relation to, and
possessed a firearm in the furtherance
of crimes of violence as charged in
counts 1 and 2 of this superseding

The defendant is hereby committed to
the custody of the Bureau of Prisons for
a term of 660 months as to counts
3,4,5,6,7and 8. This term consists of 10
years on count 3; 5 years on count 4; 20
years on count 5; 10 years on count 7
and 10 years on co unt 8, all to be
served consecutively. As to count 6 the

JA 0015

indictment
(6s)

18:922(g)(1) UNLAWFUL
TRANSPORT OF FIREARMS, ETC.
and 18:924(a)(2) and 18:2, each having
been convicted of a crime punishable by
imprisonment for a term exceeding one
year, knowingly did possess in and
affecting commerce firearms, H&R .22
caliber 9 shot Model 949 revolver, a
Llama Mini Max .45 caliber pistol, a
Remington 870 12 gauge shotgun, a
Marlin model 882SS .22 caliber rifle,
Remington Model 1100 12 gauge
shotgun, Marlin model 60 .22 caliber
rifle, RPI Connecticut Valley Arms
Magbolt 150 rifle, each of which had
been shipped and transported in
interstate commerce
(7s)

18:922(j) RECEIVE STOLEN
FIREARMS and 18:924(a)(2) and 18:2,
knowingly did possess stolen firearms,
an H&R .22 caliber 9 shot Model 949
revolver, Llama Mini Max .45 caliber
pistol, Remington 870 12 gauge
shotgun, Marlin model 882SS .22
caliber rifle, Remington model 1100 12
gauge shotgun, Marlin model 60 .22
caliber rifle, RPI Connecticut Valley

defendant is sentenced to a term of 84
months, to run consecutive to all other
sentences imposed today and previously
imposed by any other court. Therefore,
the total term of imprisonment impos ed
is 744 months. Upon release from
imprisonment the defendant shall be on
supervised release for a term of 5 years
with the following special condition:
The defendant shall participate in a
mental health treatment program as
directed by the US Proba tion Office.
Special Assessment of $600 is due
immediately. The defendant is
remanded to the custody of the USM.

The defendant is hereby committed to
the custody of the Bureau of Prisons for
a term of 660 months as to counts
3,4,5,6,7and 8. This term consists of 10
years on count 3; 5 years on count 4; 20
years on count 5; 10 years on count 7
and 10 years on co unt 8, all to be
served consecutively. As to count 6 the
defendant is sentenced to a term of 84
months, to run consecutive to all other
sentences imposed today and previously
imposed by any other court. Therefore,
the total term of imprisonment impos ed
is 744 months. Upon release from
imprisonment the defendant shall be on
supervised release for a term of 5 years
with the following special condition:
The defendant shall participate in a
mental health treatment program as
directed by the US Proba tion Office.
Special Assessment of $600 is due
immediately. The defendant is
remanded to the custody of the USM.

The defendant is hereby committed to
the custody of the Bureau of Prisons for
a term of 660 months as to counts
3,4,5,6,7and 8. This term consists of 10
years on count 3; 5 years on count 4; 20
years on count 5; 10 years on count 7
and 10 years on co unt 8, all to be
served consecutively. As to count 6 the
defendant is sentenced to a term of 84
months, to run consecutive to all other

**JA 0016**

Arms Magbolt 150 rifle, each of which had been shipped and transported in interstate commerce, knowing and having reasonable cause to believe the firearms were stolen

(8s)

sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment impos ed is 744 months. Upon release from imprisonment the defendant shall be on supervised release for a term of 5 years with the following special condition: The defendant shall participate in a mental health treatment program as directed by the US Proba tion Office. Special Assessment of $600 is due immediately. The defendant is remanded to the custody of the USM.

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**

**Disposition**

18:2119 MOTOR VEHICLE THEFT - CARJACKING did with intent to cause death and serious bodily harm by force take from the person of another a motor vehicle that had been transported in interstate and foreign commerce and 18:2 Aid and Abet

(1)

18:1201 KIDNAPPING did wilfully and unlawfully kidnap another and transport Alice Donovan from Conway, South Carolina to North Carolina and did hold her for ransom and death resulted and 18:2 Aid and Abet

(2)

18:2312 TRANSPORTATION OF STOLEN VEHICLES did knowingly and unlawfully transport in interstate commerce a stolen vehicle, 1994 BMW 318i from Conway, South Carolina to North Carolina knowing same to be stolen and 18:2 Aid and Abet

(3)

**Highest Offense Level (Terminated)**

Felony

**Complaints**

**Disposition**

**JA 0017**

None

---

**Interested Party**

**William Monckton**
*TERMINATED: 11/16/2004*

represented by **Lonnie Morgan Martin**
L Morgan Martin Law Offices
1121 Third Avenue
Conway, SC 29526
843-248-3177
Email: fknowles@lmorganmartin.com
*TERMINATED: 04/18/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**Cameron B Littlejohn, Jr**
*TERMINATED: 04/18/2003*

represented by **John P Freeman**
John P Freeman Law Office
2329 Wilmot Avenue
Columbia, SC 29205
803-254-4667
Fax: 803-753-9870
Email: jfreemanusc@hotmail.com
*TERMINATED: 04/18/2003*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**Bill Fox**
*Asst Managing Editor The Greenville News*

represented by **Jerry Jay Bender**
Baker Ravenel and Bender
PO Box 8057
Columbia, SC 29202
803-799-9091
Fax: 803-779-3423
Email: jbender@brblegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

---

**Interested Party**

**Cynthia Wilson**

represented by

**JA 0018**

**Joseph Preston Strom , Jr**
Strom Law Firm
2110 Beltline Boulevard
Suite A
Columbia, SC 29204
803-252-4800
Fax: 803-252-4801
Email: petestrom@stromlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Interested Party**

**Walmart**                          represented by **David Starr Cobb**
Turner Padget Graham and Laney
PO Box 22129
Charleston, SC 29413-2129
843-576-2803
Fax: 843-577-1629
Email: dcobb@turnerpadget.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Huntington Mall Company**          represented by **Shannon Furr Bobertz**
Turner Padget Graham and Laney
PO Box 1473
Columbia, SC 29202
803-254-2200
Email: sbobertz@turnerpadget.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**Cafaro Company**                   represented by **Shannon Furr Bobertz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**JC Penny Properties Inc**          represented by

**JA 0019**

**Shannon Furr Bobertz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**National Security Consultants Inc**          represented by **Shannon Furr Bobertz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**USA**                                          represented by **C Todd Hagins**
Hagins Law Firm
701 Gervais Street
Suite 150-116
Columbia, SC 29201
803-200-1060
Fax: 888-959-3613
Email: todd@haginslaw.com
*TERMINATED: 07/22/2008*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J Strom Thurmond , Jr**
Smith Massey Brodie and Thurmond
PO Box 519
Aiken, SC 29802
803-643-4110
Fax: 803-643-8140
*TERMINATED: 09/12/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jimmie Ewing**
US Attorneys Office (Cola)
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3000
Email: jimmie.ewing@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John C Duane**

**JA 0020**

Motley Rice
28 Bridgeside Boulevard
Mt Pleasant, SC 29464
843-216-9000
Fax: 843-216-9450
Email: jduane@motleyrice.com
*TERMINATED: 09/12/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan S Gasser**
Harris and Gasser Law Firm
1529 Laurel Street
Columbia, SC 29201
803-779-7080
Fax: 803-746-0480
Email: johnny@harrisgasserlaw.com
*TERMINATED: 09/12/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert F Daley , Jr**
US Attorneys Office
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3000
Fax: 803-252-2759
Email: bob.daley@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rose Mary Parham**
Parham Law Office
PO Box 1514
Florence, SC 29503
843-407-7757
Email: parhamlaw@sc.twcbc.com
*TERMINATED: 07/02/2004*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott N Schools**
Moore and Van Allen (Chas)
78 Wentworth Street
Charleston, SC 29401
843-579-7031
Fax: 843-579-8747
Email: scottschools@mvalaw.com

**JA 0021**

*TERMINATED: 09/12/2007*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Mikell Johnson**
US Attorneys Office (Cola)
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3129
Email: jeff.m.johnson@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Robert C Jendron , Jr**
US Attorneys Office
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3000
Fax: 803-254-2943
Email: bob.jendron@usdoj.gov
*ATTORNEY TO BE NOTICED*

**William Kenneth Witherspoon**
US Attorneys Office
1441 Main Street
Suite 500
Columbia, SC 29201
803-929-3000
Fax: 803-256-0233
Email:
william.k.witherspoon@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2002 | 1 | COMPLAINT as to Chadrick E Fulks, Branden L Basham with sealed affidavit [ 4:02-m -992 ] (sealed) (Entered: 11/21/2002) |
| 11/20/2002 | | arrest WARRANT issued as to Chadrick E Fulks . [ 4:02-m -992 ] (sealed) (Entered: 11/21/2002) |
| 11/20/2002 | | arrest WARRANT issued as to Branden L Basham . [ 4:02-m -992 ] (sealed) Modified on 5/1/2006 (mflo, ). (Entered: 11/21/2002) |
| 11/21/2002 | 4 | WRIT of Habeas Corpus ad Prosequendum issued as to Branden L Basham for as needed (signed by Magistrate Judge Thomas E. Rogers III ) eod/mld 11/21/02 [ 4:02-m -992 ] (sealed) (Entered: 11/21/2002) |
| 11/21/2002 | | ARREST of Chadrick E Fulks in Northern District of Indiana [ 4:02-m -992 ] (tsin) (Entered: 12/02/2002) |

**JA 0022**

| | | |
|---|---|---|
| 11/26/2002 | 5 | WRIT of Habeas Corpus ad Prosequendum issued as to Branden L Basham for 11/27/02 (signed by Magistrate Judge Thomas E. Rogers III ) [ 4:02-m -992 ] (tsin) (Entered: 11/26/2002) |
| 11/26/2002 | 6 | Initial Appearance as to Chadrick E Fulks held before Magistrate Judge Thomas E. Rogers III (Attorney William F Nettles IV, AFPD appointed) Court will appoint additional counsel; Location custody Court reporter: Anna Miles Tape 3-71-02 3469-4270 [ 4:02-m -992 ] (tsin) (Entered: 11/26/2002) |
| 11/26/2002 | 7 | CJA 23 FINANCIAL AFFIDAVIT by Chadrick E Fulks [ 4:02-m -992 ] (tsin) (Entered: 11/26/2002) |
| 11/26/2002 | 8 | ORDER Appointing Federal Public Defender for Chadrick E Fulks ( Signed by Magistrate Judge Thomas E. Rogers III ) [ 4:02-m -992 ] (tsin) (Entered: 11/26/2002) |
| 11/26/2002 | 9 | ORDER OF TEMPORARY DETENTION as to Chadrick E Fulks; Detention hearing to be scheduled at a later date; ( Signed by Magistrate Judge Thomas E. Rogers III ) [ 4:02-m -992 ] (tsin) (Entered: 11/26/2002) |
| 11/27/2002 | | ARREST of Branden L Basham [ 4:02-m -992 ] (tsin) Modified on 5/8/2006 (bshr, ). (Entered: 11/27/2002) |
| 11/27/2002 | 10 | Initial Appearance as to Branden L Basham held Preliminary Examination set for 10:30 12/5/02 for Branden L Basham; before Magistrate Judge Thomas E. Rogers III Financial affidavit taken (Attorneys Cameron B. Littlejohn, Jr. and Billy Monckton appointed CJA death penalty case and present in court) Location custody Court reporter: Andrea Miner Tape 3-72-02 2599-3120 [ 4:02-m -992 ] (tsin) (Entered: 11/27/2002) |
| 11/27/2002 | 11 | CJA 23 FINANCIAL AFFIDAVIT by Branden L Basham [ 4:02-m -992 ] (tsin) (Entered: 11/27/2002) |
| 11/27/2002 | 12 | ORDER OF DETENTION PENDING TRIAL as to Branden L Basham ( Signed by Magistrate Judge Thomas E. Rogers III ) [ 4:02-m -992 ] (tsin) (Entered: 11/27/2002) |
| 11/27/2002 | 13 | NOTICE of Hearing as to Chadrick E Fulks set status conference for 10:30 12/4/02 for Chadrick E Fulks before Magistrate Judge Thomas E. Rogers III [ 4:02-m -992 ] (tsin) (Entered: 11/27/2002) |
| 11/27/2002 | 14 | NOTICE of Hearing as to Branden L Basham set Preliminary Examination for 10:30 12/5/02 for Branden L Basham [ 4:02-m -992 ] (tsin) (Entered: 11/27/2002) |
| 11/27/2002 | 16 | arrest WARRANT Returned Executed as to Chadrick E Fulks on 11/22/02 [ 4:02-m -992 ] (amil) (Entered: 11/29/2002) |
| 11/29/2002 | 17 | Rule 40 Documents as to Chadrick E Fulks received from Northern District of Indiana to include the following: docket sheet; CJA 23 Financial Affidavit; Order of temporary detention; Commitment to another district [ 4:02-m -992 ] (tsin) (Entered: 12/02/2002) |
| 12/03/2002 | 18 | |

**JA 0023**

| | | |
|---|---|---|
| | | Waiver of Preliminary Examination or Hearing by Branden L Basham [ 4:02-m -992 ] (amil) (Entered: 12/03/2002) |
| 12/03/2002 | 19 | Waiver of Preliminary Examination or Hearing by Chadrick E Fulks [ 4:02-m -992 ] (amil) (Entered: 12/03/2002) |
| 12/10/2002 | 20 | CJA 20 as to Branden L Basham : Appointment of Attorney William H Monckton VI ( Signed by Magistrate Judge Thomas E. Rogers III ) eod 12/11/02 [ 4:02-m -992 ] (amin) (Entered: 12/11/2002) |
| 12/10/2002 | 21 | CJA 20 as to Branden L Basham : Appointment of Attorney Cameron B. Littlejohn Jr. ( Signed by Magistrate Judge Thomas E. Rogers III ) eod 12/11/02 [ 4:02-m -992 ] (amin) Modified on 12/13/2002 (Entered: 12/11/2002) |
| 12/11/2002 | 22 | MOTION by Branden L Basham sealed [ 4:02-m -992 ] (amil) Modified on 01/13/2003 (Entered: 12/11/2002) |
| 12/17/2002 | 23 | INDICTMENT as to Chadrick E Fulks (1) count(s) 1, 2, 3, Branden L Basham (2) count(s) 1, 2, 3 (tsin) (Entered: 12/18/2002) |
| 12/18/2002 | 24 | ORDER OF DETENTION PENDING TRIAL as to Chadrick E Fulks ( Signed by Magistrate Judge Thomas E. Rogers III ) (tsin) (Entered: 12/19/2002) |
| 12/19/2002 | 25 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham set Arraignment for 10:00 1/7/03 for Chadrick E Fulks, for Branden L Basham before Magistrate Judge Thomas E. Rogers III (tsin) (Entered: 12/19/2002) |
| 12/19/2002 | 26 | Arrest WARRANT Returned Executed as to Branden L Basham on 11/27/02 (amil) Modified on 5/8/2006 (bshr, ). (Entered: 12/20/2002) |
| 12/20/2002 | | CASE assigned to Chief Judge Joseph F. Anderson Jr (cqui) Modified on 5/8/2006 (bshr, ). (Entered: 12/20/2002) |
| 12/26/2002 | 27 | MOTION by Branden L Basham for discovery and inspection (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/14/2003) |
| 12/31/2002 | 28 | MOTION by Branden L Basham for order limiting contact with federal prisoner (kbos) Modified on 01/14/2003 Modified on 5/8/2006 (bshr, ). (Entered: 12/31/2002) |
| 01/07/2003 | 29 | Arraignment as to Chadrick E Fulks held before Magistrate Judge Thomas E. Rogers III Chadrick E Fulks (1) count(s) 1, 2, 3 (Attorney Bill Nettles present) Defendant pleads not guilty Location custody Court reporter: Anna Miles Tape 3-3-03 2675-2775 (tsin) Modified on 01/14/2003 (Entered: 01/08/2003) |
| 01/07/2003 | 30 | PLEA entered by Chadrick E Fulks . Defendant enters plea of: not guilty. (tsin) Modified on 01/14/2003 (Entered: 01/08/2003) |
| 01/07/2003 | | ORAL ORDER as to Branden L Basham [28-1] motion for order limiting contact with federal prisoner referred to Magistrate Judge Thomas E. Rogers III as to Branden L Basham (2), [22-1] motion for determination of mental competency referred to Magistrate Judge Thomas E. Rogers III as to Branden |

**JA 0024**

| | | |
|---|---|---|
| | | L Basham (2) (Orally Entered by Chief Judge Joseph F. Anderson Jr ) (tsin) Modified on 01/14/2003 Modified on 5/8/2006 (bshr, ). (Entered: 01/08/2003) |
| 01/07/2003 | 31 | Arraignment as to Branden L Basham held before Magistrate Judge Thomas E. Rogers III Branden L Basham (2) count(s) 1, 2, 3 (Attorney Cam Littlejohn and Billy Monckton presnet) Defendant pleads not guilty; Defendants motion for evaluation heard; Counsel to prepare proposed order; Defendants motion to limit contact with federal prisoner heard; Counsel to prepare proposed order; Government has open file policy; All discovery should be given to counsel by middle of February; Location remains in custody Court reporter: Anna Miles Tape 3-3-03 5-1482 (tsin) Modified on 01/14/2003 Modified on 5/8/2006 (bshr, ). (Entered: 01/08/2003) |
| 01/07/2003 | 32 | PLEA entered by Branden L Basham . Defendant enters plea of: not guilty. (tsin) Modified on 01/14/2003 Modified on 5/8/2006 (bshr, ). (Entered: 01/08/2003) |
| 01/14/2003 | 35 | MEMORANDUM by USA as to Branden L Basham in opposition to [28-1] motion for order limiting contact with federal prisoner (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/14/2003) |
| 01/14/2003 | 36 | MOTION with Memorandum in Support by USA as to Branden L Basham for determination regarding disqualification of counsel (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/14/2003) |
| 01/14/2003 | 37 | MOTION by Branden L Basham to seal, [36-1] motion and memorandum of the US for determiniation regarding disqualification of counsel (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/14/2003) |
| 01/14/2003 | 38 | CJA 20 as to Chadrick E Fulks : Appointment of Attorney John H. Blume (Signed by Magistrate Judge Thomas E. Rogers III) (tsin) (Entered: 01/15/2003) |
| 01/15/2003 | 39 | MEMORANDUM by USA as to Branden L Basham in opposition to [37-1] motion to seal, the [36-1] motion and memorandum of the US for determiniation regarding disqualification of counsel (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/15/2003) |
| 01/15/2003 | 40 | MOTION HEARING as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying [37-1] motion to seal, [36-1] motion and memorandum of the US for determiniation regarding disqualification of counsel as to Branden L Basham (2), [36-1] motion for determination regarding disqualification of counsel taken under advisement as to Branden L Basham (2), denying [28-1] motion for order limiting contact with federal prisoner as to Branden L Basham (2); trial expected to be 3 weeks; defendants agree to continuance of trial; proposed consent order to be submitted; Counsel to file response to motions within 15 days of filing; Court Reporter: Jack Clarke. (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/15/2003) |
| 01/17/2003 | | |

**JA 0025**

| | | CJA 30 PAYMENT to Cameron B. Littlejohn Jr. for defendant Branden L Basham VOUCHER # 030117000021 (cqui) Modified on 5/8/2006 (bshr, ). (Entered: 01/17/2003) |
|---|---|---|
| 01/22/2003 | 41 | ORDER as to Branden L Basham for appointment of counsel for this defendant (John F. Hardaway and Robert Wilcox) for the purpose of the pending motion to disqualify counsel for the defendant (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/22/2003) |
| 01/24/2003 | 42 | MOTION by interested party William Monckton to extend time to file response on behalf of William Monckton on Government's motion to disqualify attorney Monckton representing defendant Basham (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/24/2003) |
| 01/27/2003 | | Minute entry as to Branden L Basham : [22-1] motion sealed . Motion Terminated. as to Branden L Basham (2), Sealed Order [34-1] takes care of this motion (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/27/2003) |
| 01/28/2003 | 43 | ORDER adding John P. Freeman to represent Cameron B. Littlejohn for the purpose of the hearing on Government's motion to disqualify attorneys; extending response time to Government's motion by 15 days (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/29/2003) |
| 01/29/2003 | 44 | ORDER/LETTER for attorneys to do exhaustive research on admissibility before filing briefs, hearing date will be set after all briefs are filed as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/29/2003) |
| 01/29/2003 | 45 | MOTION by Branden L Basham for Robert M. Wilcox to appear pro hac vice (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/30/2003) |
| 01/29/2003 | 46 | APPLICATION/AFFIDAVIT OF ROBERT WILCOX as to Branden L Basham Re: [45-1] motion for Robert M. Wilcox to appear pro hac vice (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 01/30/2003) |
| 02/03/2003 | 50 | MOTION by USA as to Chadrick E Fulks, Branden L Basham SEALED MOTION (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 02/04/2003) |
| 02/04/2003 | 47 | CJA 30 as to Branden L Basham : Appointment of Attorney Robert M. Wilcox for purpose of Governments' motion to disqualify attorneys ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 02/04/2003) |
| 02/04/2003 | 48 | CJA 30 as to Branden L Basham : Appointment of Attorney John F. Hardaway for the purpose of Governments' motion to disqualify attorneys ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 02/04/2003) |
| 02/04/2003 | 49 | ORDER as to Branden L Basham granting [45-1] motion for Robert M. Wilcox to appear pro hac vice (fee is waived) as to Branden L Basham (2) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (bshr, ). (Entered: 02/04/2003) |

**JA 0026**

| 02/10/2003 | 53 | CJA 30 as to Chadrick E Fulks : Appointment of Attorney John H. Blume ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 02/11/2003) |
| 03/07/2003 | 64 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (tsin) (Entered: 03/07/2003) |
| 03/11/2003 | 65 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [64-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/11/2003) |
| 04/07/2003 |  | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 030401000001 (cqui) (Entered: 04/07/2003) |
| 04/07/2003 |  | CJA PAYMENT to John P. Freeman for defendant Chadrick E Fulks VOUCHER # 03040100002 (cqui) (Entered: 04/07/2003) |
| 04/18/2003 | 70 | ORDER for FBI to take custody of defendant for purpose of conducting interviews and debriefings on 4/21/03 and from time to time as needed as to Chadrick E Fulks (Signed by Magistrate Judge Joseph R. McCrorey ) (mflo) (Entered: 04/18/2003) |
| 04/24/2003 | 74 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/24/2003) |
| 05/01/2003 | 77 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [74-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/01/2003) |
| 05/20/2003 | 85 | Arraignment on Superseding Indictment as to Chadrick E Fulks held before Magistrate Judge Bristow Marchant Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s; Defendant pleads NOT GUILTY Location custody ESR Operator: Angie Snipes (ctrm #2 5/20/03 56-3324) (mdea) (Entered: 05/20/2003) |
| 05/20/2003 | 86 | PLEA entered by Chadrick E Fulks . Defendant enters plea of: not guilty. (mdea) (Entered: 05/20/2003) |
| 05/22/2003 | 89 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/22/2003) |
| 05/28/2003 | 90 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [89-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2003) |
| 05/29/2003 | 91 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (tsin) (Entered: 05/30/2003) |
| 06/02/2003 | 92 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (suro) (Entered: 06/02/2003) |
| 06/04/2003 | 93 |  |

**JA 0027**

| | | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [92-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/04/2003) |
|---|---|---|
| 06/04/2003 | 94 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [91-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/04/2003) |
| 06/19/2003 | 101 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 06/19/2003) |
| 06/23/2003 | 102 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [101-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/23/2003) |
| 06/23/2003 | 103 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (suro) (Entered: 06/23/2003) |
| 06/24/2003 | 106 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 06/25/2003) |
| 06/24/2003 | 107 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [106-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/25/2003) |
| 07/01/2003 | 115 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 07/02/2003) |
| 07/02/2003 | 116 | ORDER as to Chadrick E Fulks, Branden L Basham granting [109-1] motion to compel the production of blood and hair samples as to Chadrick E Fulks (1), Branden L Basham (2) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 07/02/2003) |
| 07/08/2003 | 117 | ORDER OF PROTECTION for Gregory P. Harris from court proceedings between 7/7/03 and 7/22/03 as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 07/08/2003) |
| 07/08/2003 | 118 | ORDER OF CONTINUANCE (Order No. 5) as to Chadrick E Fulks, Branden L Basham Continuing due to preparation for a possible death penalty trial , set Jury trial for 4/5/04 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/6/2006 (bshr, ). (Entered: 07/08/2003) |
| 07/09/2003 | 119 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [103-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 07/09/2003) |

**JA 0028**

| 07/23/2003 | | CJA 30 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 03071800002 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 07/23/2003) |
| --- | --- | --- |
| 07/23/2003 | | CJA 30 PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 03071800003 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 07/23/2003) |
| 07/24/2003 | | CJA 30 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 0307180000010 (cqui) (Entered: 07/24/2003) |
| 07/24/2003 | | CJA 30 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 030718000012 (cqui) (Entered: 07/24/2003) |
| 07/29/2003 | 121 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 07/29/2003) |
| 07/31/2003 | 122 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [121-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 07/31/2003) |
| 08/04/2003 | 123 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (suro) (Entered: 08/05/2003) |
| 08/07/2003 | 124 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [123-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 08/07/2003) |
| 08/08/2003 | 125 | MOTION by Chadrick E Fulks for private contact visits with defendant at the Alvin S. Glenn Detention Center (mflo) (Entered: 08/11/2003) |
| 08/08/2003 | 126 | ORDER NO. 6 as to Chadrick E Fulks granting [125-1] motion for private contact visits with defendant at the Alvin S. Glenn Detention Center as to Chadrick E Fulks (1) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 (Entered: 08/11/2003) |
| 08/14/2003 | 127 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 08/14/2003) |
| 08/18/2003 | 128 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [127-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 08/19/2003) |
| 08/20/2003 | 129 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (tsin) (Entered: 08/20/2003) |
| 08/21/2003 | 130 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing, for 4:00 8/28/03 as to: Chadrick Fulks, ; Branden Basham, (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 08/21/2003) |
| 08/21/2003 | 131 | |

**JA 0029**

| | | |
|---|---|---|
| | | ORDER NO. 7 for Drs. Watts and Morgan be allowed to evaluate defendant and that no testing or evaluations are to be performed on defendant by any employee and/or agent of Columbia Care Center while he is incarcerated at the facility. as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/6/2006 (bshr, ). (Entered: 08/21/2003) |
| 08/22/2003 | 132 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [129-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 08/22/2003) |
| 08/27/2003 | 133 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 08/28/2003) |
| 08/27/2003 | 134 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) Modified on 08/28/2003 (Entered: 08/28/2003) |
| 08/28/2003 | 135 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 08/29/2003) |
| 08/28/2003 | 136 | MOTION HEARING as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER [135-1] ex parte motion taken under advisement, [115-1] ex parte motion taken under advisement, [114-1] ex parte motion taken under advisement, [113-1] ex parte motion taken under advisement, [112-1] ex parte motion taken under advisement, [111-1] ex parte motion taken under advisement, [108-1] ex parte motion taken under advisement; written order to be filed, Court Reporter: Debra Jernigan. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 08/29/2003) |
| 08/29/2003 | 137 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [135-1] ex parte motion as to Branden L Basham (2), granting [114-1] ex parte motion as to Branden L Basham (2), granting [113-1] ex parte motion as to Branden L Basham (2), granting [112-1] ex parte motion as to Branden L Basham (2), granting [111-1] ex parte motion as to Branden L Basham (2), granting [108-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 08/29/2003) |
| 08/29/2003 | 138 | EX PARTE ORDER (Sealed) as to Branden L Basham denying [115-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 08/29/2003) |
| 09/02/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 03071800002 to Paige Tarr (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 09/02/2003) |
| 09/02/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 030723000001 to Paige Tarr (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 09/02/2003) |

**JA 0030**

| 09/02/2003 | | CJA 31 PAYMENT for defendant Chadrick E Fulks VOUCHER # 03072400001 for paralegal (Blume and Weyble) Jill Rider (cqui) (Entered: 09/02/2003) |
|---|---|---|
| 09/02/2003 | 139 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [133-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 09/02/2003) |
| 09/02/2003 | 140 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [134-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 09/02/2003) |
| 09/04/2003 | 141 | EX PARTE ORDER (Sealed) to correct order entered 8/29/03 as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 09/05/2003) |
| 09/08/2003 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 030820000017 (cqui) (Entered: 09/08/2003) |
| 09/08/2003 | | CJA PAYMENT to John H. Blume (Keir Weyble) for defendant Chadrick E Fulks VOUCHER # 030820000018 (cqui) (Entered: 09/08/2003) |
| 09/08/2003 | | CJA PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 030902000001 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 09/08/2003) |
| 09/08/2003 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 030820000019 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 09/08/2003) |
| 09/08/2003 | 142 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 09/09/2003) |
| 09/08/2003 | 143 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [142-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 09/09/2003) |
| 09/12/2003 | 144 | NOTICE of INTENT TO SEEK DEATH PENALTY by USA as to Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 09/15/2003) |
| 09/12/2003 | 145 | NOTICE of INTENT TO SEEK DEATH PENALTY by USA as to Chadrick E Fulks (mflo) (Entered: 09/15/2003) |
| 09/23/2003 | | CJA 31 PAYMENT for defendant Chadrick E Fulks VOUCHER # 030820000008 paralegal services 7/1/03 to 7/31/03 (cqui) (Entered: 09/23/2003) |
| 09/23/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 03082000009 mitigation specialist 7/1/03- to 7/31/03 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 09/23/2003) |

**JA 0031**

| | | |
|---|---|---|
| 09/25/2003 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 0391500001 (cqui) (Entered: 09/25/2003) |
| 09/25/2003 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 03091500002 (cqui) (Entered: 09/25/2003) |
| 09/25/2003 | | CJA PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 03091500003 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 09/25/2003) |
| 09/25/2003 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 03091500004 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 09/25/2003) |
| 09/25/2003 | 146 | MOTION by Branden L Basham to extend time for pretrial confinement at Columbia Care Center until 10/15/03 (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 09/26/2003) |
| 09/26/2003 | 147 | ORDER NO. 8 as to Branden L Basham granting [146-1] motion to extend time for pretrial confinement at Columbia Care Center until 10/15/03 as to Branden L Basham (2); Clerk is to forward copy of this order to David Cooper, General Manager of Columbia Care Center, Mr. Cooper shall provide the court with a written report stating when the defendant began receiving his medication and explain the reason for the delay (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/6/2006 (bshr, ). (Entered: 09/26/2003) |
| 09/29/2003 | 148 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 09/30/2003) |
| 09/29/2003 | 149 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 09/30/2003) |
| 09/29/2003 | 150 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 09/30/2003) |
| 10/02/2003 | 151 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [150-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/02/2003) |
| 10/02/2003 | 152 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [148-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/02/2003) |
| 10/02/2003 | 153 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [149-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/02/2003) |
| 10/06/2003 | 154 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 155 | |

**JA 0032**

| | | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
|---|---|---|
| 10/06/2003 | 156 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 157 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 158 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 159 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 160 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 161 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 162 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 163 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 10/06/2003) |
| 10/06/2003 | 164 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [163-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 165 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [162-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 166 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [161-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 167 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [160-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 168 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [159-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 169 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [158-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. |

**JA 0033**

| | | |
|---|---|---|
| | | Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 170 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [157-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 171 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [156-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 172 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [155-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/06/2003 | 173 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [154-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 10/07/2003) |
| 10/09/2003 | 175 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 10/09/2003) |
| 10/09/2003 | 176 | MOTION by Chadrick E Fulks for Bill of Particulars , and Renewal Motion for Disclosure of intent to use evidence of other crimes, wrongs or acts under Rule 404(b) (mflo) (Entered: 10/09/2003) |
| 10/20/2003 | 177 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 10/21/2003) |
| 10/20/2003 | 178 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 10/21/2003) |
| 10/20/2003 | 179 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 10/21/2003) |
| 10/20/2003 | 180 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 10/21/2003) |
| 10/27/2003 | | CJA31 PAYMENT for defendant Branden L Basham VOUCHER # 030915000001 Paige Tarr (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 10/27/2003) |
| 10/27/2003 | | CJA 31 PAYMENT for defendant Chadrick E Fulks VOUCHER # 03091500004 Jill Ryder (cqui) (Entered: 10/27/2003) |
| 10/27/2003 | 181 | SEALED DOCUMENT (response to Order) as to Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 10/27/2003) |
| 10/31/2003 | 182 | |

**JA 0034**

| | | |
|---|---|---|
| | | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham set status conference for 9:00 11/5/03 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 10/31/2003) |
| 11/03/2003 | 183 | MOTION by Chadrick E Fulks to sever (kbos) (Entered: 11/04/2003) |
| 11/04/2003 | 184 | RESPONSE by USA as to Chadrick E Fulks re [176-1] motion for Bill of Particulars (mflo) (Entered: 11/05/2003) |
| 11/05/2003 | 185 | STATUS CONFERENCE as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr, discussion of scheduling order deadlines, but not set. ORAL ORDER allowing Jack Swerling to exceed the $1,000 on travel during the week of 11/10/03; Court to file order on exparte motions pending as to defendant Basham; Court Reporter: Gary Smith. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 11/06/2003) |
| 11/07/2003 | 186 | MOTION by USA as to Chadrick E Fulks for reciprocal discovery (mdea) (Entered: 11/10/2003) |
| 11/07/2003 | 187 | MOTION by USA as to Chadrick E Fulks, Branden L Basham for reciprocal discovery (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 11/10/2003) |
| 11/10/2003 | 188 | DEMAND FOR NOTICE OF ALIBI by USA as to Chadrick E Fulks (mflo) (Entered: 11/12/2003) |
| 11/10/2003 | 189 | DEMAND FOR NOTICE OF ALIBI by USA as to Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 11/12/2003) |
| 11/13/2003 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 031014000013 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/13/2003) |
| 11/13/2003 | | CJA PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 031014000014 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/13/2003) |
| 11/13/2003 | | CJA PAYMENT to Gregory Poole Harris for defendant Chadrick E Fulks VOUCHER # 031014000016 (cqui) (Entered: 11/13/2003) |
| 11/13/2003 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 03102400002 (cqui) (Entered: 11/13/2003) |
| 11/13/2003 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 031024000003 (cqui) (Entered: 11/13/2003) |
| 11/14/2003 | 194 | SCHEDULING ORDER (Order No. 9) as to Chadrick E Fulks, Branden L Basham setting Jury Selection for 4/5/04 for Chadrick E Fulks, for Branden L Basham ; Defendants shall file simultaneous briefs on legal issues; Motion Filing and defendants shall serve notice on the government if they intend to rely upon psychological testimony; deadline on 12/31/03 for Chadrick E Fulks, for Branden L Basham; 1/2/04 a hearing will be held if defendants intend to use psycholoical testimony ; Opposition memoranda to any motions filed on 12/31/03; 1/20/04 reply memoranda due; 2/9-10/04 oral argument on all pending motons; Jury Trial for 4/5/04 for Chadrick E Fulks, for Branden |

**JA 0035**

| | | |
|---|---|---|
| | | L Basham ; ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/6/2006 (bshr, ). (Entered: 11/17/2003) |
| 11/18/2003 | | CJA PAYMENT for defendant Branden L Basham VOUCHER # 031118000001GTA Swerling and Tarr (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/18/2003) |
| 11/18/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031014000006 Donna Schwartz-Watts (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/18/2003) |
| 11/18/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031014000007 Charlisle Mc Nair (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/18/2003) |
| 11/18/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 03101400008 Carlolyn Graham (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/18/2003) |
| 11/18/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031014000009 Paige Tarr (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/18/2003) |
| 11/18/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 03101400010 Lesa Watson (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/18/2003) |
| 11/18/2003 | | CJA31 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 031024000002 Paralegal Service (cqui) (Entered: 11/18/2003) |
| 11/24/2003 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 031118000016 Keir Weyble (cqui) (Entered: 11/24/2003) |
| 11/24/2003 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 031118000015 (cqui) (Entered: 11/24/2003) |
| 11/24/2003 | | CJA 30 PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 0311180000002 (cqui) Modified on 11/24/2003 Modified on 6/6/2006 (bshr, ). (Entered: 11/24/2003) |
| 11/24/2003 | | CJA 30 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 03118000001 (cqui) Modified on 6/6/2006 (bshr, ). (Entered: 11/24/2003) |
| 11/24/2003 | 195 | REPLY by defendant Chadrick E Fulks to USA response to [176-1] motion for Bill of Particulars (mflo) (Entered: 11/24/2003) |
| 12/02/2003 | 196 | EX PARTE FORTHWITH ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 12/03/2003) |
| 12/02/2003 | 197 | EX PARTE FORTHWITH ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the |

**JA 0036**

| | | case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 12/03/2003) |
|---|---|---|
| 12/04/2003 | 198 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 12/05/2003) |
| 12/04/2003 | 199 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (bshr, ). (Entered: 12/05/2003) |
| 12/05/2003 | 200 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [199-1] ex parte motion ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/05/2003) |
| 12/08/2003 | 201 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [198-1] ex parte motion ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/08/2003) |
| 12/11/2003 | 202 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 12/11/2003) |
| 12/12/2003 | 203 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham set status conference for 10:00 1/6/04 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/12/2003) |
| 12/12/2003 | 204 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing on all pending motion at 10:00 2/9/04 and 2/10/04 as to: Chadrick Fulks, To Sever (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/12/2003) |
| 12/15/2003 | 205 | MEMORANDUM by Branden L Basham of authority on Rule 12.2 examinations (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/15/2003 | 206 | MOTION with Memorandum in Support by USA as to Chadrick E Fulks, Branden L Basham regarding mental health evidence (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031117000009 Donald Morgan (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 0311170000010 Doanld Morgan (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031117000011 Donald Morgan (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA31 PAYMENT for defendant Branden L Basham VOUCHER # 031117000012 Donald Morgan (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| | | |

**JA 0037**

| | | |
|---|---|---|
| 12/16/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031118000003 Carlisle McNair (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031118000004 Lesa Watson (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031118000005 Carolyn Graham (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA 31 PAYMENT for defendant Chadrick E Fulks VOUCHER # 031118000009ll Jill Rider (Blume and Weyble) (cqui) (Entered: 12/16/2003) |
| 12/16/2003 | | CJA31 PAYMENT for defendant Branden L Basham VOUCHER # 03112400007 Paaige Tarr (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031212000001 Donna Swartz-Watts (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 12/16/2003) |
| 12/16/2003 | 207 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [202-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 12/16/2003) |
| 12/17/2003 | 208 | MEMORANDUM by Chadrick E Fulks in opposition to [206-1] motion regarding mental health evidence (jada) (Entered: 12/18/2003) |
| 12/30/2003 | 209 | MEMORANDUM by USA as to Chadrick E Fulks in opposition to [183-1] motion to sever (mflo) (Entered: 12/30/2003) |
| 12/30/2003 | 210 | REPLY by plaintiff USA to [208-1] opposition memorandum by Fulks in re mental examination, [205-1] support memorandum by Basham in re mental examination (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/30/2003) |
| 12/30/2003 | 211 | MOTION by USA as to Chadrick E Fulks, Branden L Basham in limine to exclude admission of polygraph evidence during trial (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 12/30/2003) |
| 12/31/2003 | 212 | MOTION with Memorandum in Support by Chadrick E Fulks for attorney conducted voir dire regarding the scope and nature of proper voir dire in a capital case (mflo) (Entered: 12/31/2003) |
| 12/31/2003 | 213 | MOTION by Chadrick E Fulks to quash the venire on the basis of underrepresentation of racial minorities (mflo) (Entered: 12/31/2003) |
| 12/31/2003 | 214 | MOTION by Chadrick E Fulks in limine to exclude evidence of unadjudicated offenses or in the alternative to establish procedure for pretrial determination of admissibility of such evidence and for specified burden of proof to be sustained by the Government with respect to unadjudicated offenses offered at the sentencing phase (mflo) (Entered: 12/31/2003) |
| | | |

**JA 0038**

| 12/31/2003 | 215 | MOTION by Chadrick E Fulks to preclude the Government from seeking death by Lethal Injection (mflo) (Entered: 12/31/2003) |
|---|---|---|
| 12/31/2003 | 216 | MOTION by Chadrick E Fulks for Continuance due to more time for discovery and trial preparation (mflo) (Entered: 12/31/2003) |
| 12/31/2003 | 217 | MOTION by Chadrick E Fulks to Adopt Motion of Other Defendant, defendant does reserve the right to opt out of any or all motions (mflo) (Entered: 12/31/2003) |
| 12/31/2003 | 218 | MOTION by Chadrick E Fulks to strike and or limit aggravating factors in Governments notice of intent to seek the death penalty (mflo) (Entered: 12/31/2003) |
| 12/31/2003 | 219 | MOTION by Chadrick E Fulks to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence (mflo) (Entered: 12/31/2003) |
| 12/31/2003 | 220 | REPLY by defendant Chadrick E Fulks to [206-1] motion regarding mental health evidence by USA (mflo) (Entered: 01/02/2004) |
| 12/31/2003 | 221 | MOTION by Chadrick E Fulks for Hearing pursuant to Jackson vs. Denno, 378 US 368 (1964) (mflo) (Entered: 01/02/2004) |
| 12/31/2003 | 222 | MOTION by Chadrick E Fulks to prohibit "Death Qualification" during jury selection (mflo) (Entered: 01/02/2004) |
| 12/31/2003 | 223 | MOTION by Chadrick E Fulks to admit polygraph evidence demonstrating that defendant Fulks did not kill Alice Donovan and Samantha Burns (mflo) (Entered: 01/02/2004) |
| 12/31/2003 | 224 | MOTION by Chadrick E Fulks to preclude the Government from seeking the Death Penalty in a racially discrimination manner re: [145-1] notice by Government to seek the death penalty (mflo) (Entered: 01/02/2004) |
| 12/31/2003 | 225 | MOTION by Chadrick E Fulks to strike [145-1] notice to seek the death penalty (mflo) (Entered: 01/02/2004) |
| 12/31/2003 | 226 | MOTION by Branden L Basham for production of list of venire persons 30 days in advance (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 227 | MEMORANDUM by Branden L Basham in support of [226-1] motion for production of list of venire persons 30 days in advance (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 228 | MOTION by Branden L Basham for discovery pursuant to Rule 16 , for early prodution of the Government's witness list , for early production of Jenks , for pretrial production of statements of individuals not to be called as witnesses , for Disclosure of any and all contact between Government agents or prosecutors and informants incarcerated with defendant , for discovery and inspection concerning Government's use of informants, operatives and cooperating individuals and detailed notice to the Government of exculpatory information requested , for immediate production of evidence or information regarding other crimes or bad acts by the defendant , for Disclosure of of co- |

**JA 0039**

| | | |
|---|---|---|
| | | conspirator hearsay , for notice of Government's intention to use residual hearsay exception under Rule 807 , for notice by the Government pursuant to Rule 12(b)(4) of its intention to use specific evidence arguably subject to suppression , for discovery regarding eyewitness identification and motion to disclose and suppress any attemped in court identification by any "eye-witness" , for discovery and inspection from co-defendant , for Disclosure to preserve rough notes memorana and or reports , for Bill of Particulars as to superseding indictment and the notice to seek the death penalty , for discovery and inspection of information and evidence in aggravation or mitigation of punishment , for specific discovery from Bureau of Prisons (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 229 | MEMORANDUM by Branden L Basham in support of [228-1] motion for discovery pursuant to Rule 16, [228-2] motion for early prodution of the Government's witness list, [228-3] motion for early production of Jenks, [228-4] motion for pretrial production of statements of individuals not to be called as witnesses, [228-5] motion for Disclosure of any and all contact between Government agents or prosecutors and informants incarcerated with defendant, [228-6] motion for discovery and inspection concerning Government's use of informants, operatives and cooperating individuals and detailed notice to the Government of exculpatory information requested, [228-7] motion for immediate production of evidence or information regarding other crimes or bad acts by the defendant, [228-8] motion for Disclosure of of co-conspirator hearsay, [228-9] motion for notice of Government's intention to use residual hearsay exception under Rule 807, [228-10] motion for notice by the Government pursuant to Rule 12(b)(4) of its intention to use specific evidence arguably subject to suppression, [228-11] motion for discovery regarding eyewitness identification and motion to disclose and suppress any attemped in court identification by any "eye-witness", [228-12] motion for discovery and inspection from co-defendant, [228-13] motion for Disclosure to preserve rough notes memorana and or reports, [228-14] motion for Bill of Particulars as to superseding indictment and the notice to seek the death penalty, [228-15] motion for discovery and inspection of information and evidence in aggravation or mitigation of punishment, [228-16] motion for specific discovery from Bureau of Prisons (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 230 | MOTION by Branden L Basham challenging the constitutionality of the Federal Death Penalty Statute (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 231 | MEMORANDUM by Branden L Basham in support of [230-1] motion challenging the constitutionality of the Federal Death Penalty Statute (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 232 | MOTION by Branden L Basham to suppress statements by the defendant , for leave to file additional grounds to suppress after court rules on pending motions and discovery has been completed (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 233 | |

**JA 0040**

| | | |
|---|---|---|
| | | MOTION by Branden L Basham to Adopt Motion of Other Defendant [216-1] motion for Continuance due to more time for discovery and trial preparation, [214-1] motion in limine to exclude evidence of unadjudicated offenses or in the alternative to establish procedure for pretrial determination of admissibility of such evidence and for specified burden of proof to be sustained by the Government with respect to unadjudicated offenses offered at the sentencing phase, [213-1] motion to quash the venire on the basis of underrepresentation of racial minorities, [222-1] motion to prohibit "Death Qualification" during jury selection including, but not limited to the above listed motions (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 234 | MOTION by Branden L Basham to strike [144-1] notice to seek the death penalty or in the alternative to strike or limit aggravating factors (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 235 | MOTION by Branden L Basham to sever trial (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 236 | MOTION by Branden L Basham to allow allocution without cross-examination during penalty phase (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 237 | MOTION by Branden L Basham for appropriate punishment related voir dire, attorney questioning, use of a jury questionnaire and for individual, sequestered voir dire on certain topics (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 12/31/2003 | 238 | MOTION by Branden L Basham to Adopt all trial objections of the co-defendant (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 01/02/2004 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 03121500002 (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 01/02/2004 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 031215000001 (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 01/02/2004 | | CJA PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 031215000004 (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 01/02/2004 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 031215000005 (cqui) (Entered: 01/02/2004) |
| 01/02/2004 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 031215000006 (cqui) (Entered: 01/02/2004) |
| 01/02/2004 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 031215000003 (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/02/2004) |
| 01/05/2004 | 239 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 01/06/2004) |

**JA 0041**

| | | |
|---|---|---|
| 01/06/2004 | 240 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [239-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 01/06/2004) |
| 01/06/2004 | 241 | MOTION HEARING as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER [206-1] motion regarding mental health evidence taken under advisement as to Chadrick E Fulks (1), Branden L Basham (2); written order to be filed Court Reporter: Ray Simmons. (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/06/2004) |
| 01/06/2004 | 242 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/06/2004) |
| 01/06/2004 | 243 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/06/2004) |
| 01/06/2004 | 244 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/06/2004) |
| 01/06/2004 | 245 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/14/2006 (bshr, ). (Entered: 01/06/2004) |
| 01/07/2004 | 246 | POST HEARING SUPPLEMENTAL MEMORANDUM by defendant Chadrick E Fulks regarding the scope of the Government's right to a rebuttal evaluation (mflo) (Entered: 01/07/2004) |
| 01/07/2004 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031215000003 o USC (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/07/2004) |
| 01/07/2004 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031215000004 to Paige Tarr (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/07/2004) |
| 01/07/2004 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031215000005 Lesa Watson (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/07/2004) |
| 01/07/2004 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 031215000006 to Carolyn Graham (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/07/2004) |
| 01/07/2004 | | CJA PAYMENT for defendant Branden L Basham VOUCHER # 03121500007 (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/07/2004) |
| 01/07/2004 | | CJA31 PAYMENT for defendant Chadrick E Fulks VOUCHER # 031215000008 Jill Ryder (cqui) (Entered: 01/07/2004) |
| 01/07/2004 | | CJA 31 PAYMENT for defendant Branden L Basham VOUCHER # 040107000007 Dr Morgan (cqui) Modified on 6/14/2006 (bshr, ). (Entered: 01/07/2004) |
| 01/07/2004 | 247 | ORDER NO. 10 as to Chadrick E Fulks, Branden L Basham for the duration of this case, each defendant will be deemed to have joined in any motion |

**JA 0042**

| | | |
|---|---|---|
| | | filed by the co-defendant, and each defendant will be deemed to have joined in any evidentiary objection at a hearing or at the trial of this case. Any defendant wishing not to join in a motion or objection must state after the motion or objection is made; mooting [217-1] motion to Adopt Motion of Other Defendant, defendant does reserve the right to opt out of any or all motions as to Chadrick E Fulks (1), mooting [233-1] motion to Adopt Motion of Other Defendant [216-1] motion for Continuance due to more time for discovery and trial preparation, [214-1] motion in limine to exclude evidence of unadjudicated offenses or in the alternative to establish procedure for pretrial determination of admissibility of such evidence and for specified burden of proof to be sustained by the Government with respect to unadjudicated offenses offered at the sentencing phase, [213-1] motion to quash the venire on the basis of underrepresentation of racial minorities, [222-1] motion to prohibit "Death Qualification" during jury selection including, but not limited to the above listed motions as to Branden L Basham (2), mooting [238-1] motion to Adopt all trial objections of the co-defendant as to Branden L Basham (2) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/14/2006 (bshr, ). (Entered: 01/08/2004) |
| 01/08/2004 | 248 | ORDER NO. 11 as to Chadrick E Fulks, Branden L Basham granting [206-1] motion regarding mental health evidence as to Chadrick E Fulks (1), Branden L Basham (2); The defendants are to be transported to FCI Butner where the examinations will be conducted strictly in accordance with the guidelines and conditions set forth in this order (see order); The defendants are to arrive no later than 1/19/04 and shall return no later than 2/16/04; motions for severance and for continuance shall be on 1/21/04 at 2:00 and the all other pending motions hearing shall be 2/24 and 2/25 at 10:00; a new trial date of 4/19/04 (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/14/2006 (bshr, ). (Entered: 01/08/2004) |
| 01/08/2004 | 249 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing, for 2:00 1/21/04 as to: Chadrick Fulks, For Continuance (Speedy Trial), To Sever; Branden Basham, To Sever (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/08/2004) |
| 01/08/2004 | 250 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 2/24/04 and 2/25/04 as to all remaining pending motions: , set pretrial conference for 10:00 2/24/04 and 2/25/04 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 01/08/2004 Modified on 6/14/2006 (mflo, ). (Entered: 01/08/2004) |
| 01/08/2004 | 251 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (tsin) (Entered: 01/09/2004) |
| 01/09/2004 | 252 | ORDER NO. 12 changing the motion hearing on severance and continuance to 1/20/04 and 1:00pm and the USM is to transport the defendant to FCI Butner as soon as possible after the conclusion of the hearing on 1/20/04 but no later than 1/21/04. This order supersedes the earlier order correcting the |

**JA 0043**

| | | |
|---|---|---|
| | | USM to have the defendants transported to Butner on or before 1/19/04. as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/14/2006 (mflo, ). (Entered: 01/09/2004) |
| 01/09/2004 | 253 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing, for 1:00 1/20/04 as to: Chadrick Fulks, For Continuance (Speedy Trial), To Sever; Branden Basham, To Sever (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/09/2004) |
| 01/09/2004 | 254 | ORDER NO. 13 to facilitate the transfer of defendant to FCI Butner; the USM is authorized to transport defendant to Butner on 1/20/04; Under no circumstances is defendant to be transferred later than 1/21/04; the USM shall return defendant to this district no later than 2/20/04. as to Chadrick E Fulks (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 (Entered: 01/09/2004) |
| 01/09/2004 | 255 | ORDER NO. 14 to facilitate the transfer of defendant to FCI Butner; the USM is authorized to transport defendant to Butner on 1/20/04; Under no circumstances is defendant to be transferred later than 1/21/04; the USM shall return defendant to this district no later than 2/20/04. as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/14/2006 (mflo, ). (Entered: 01/09/2004) |
| 01/09/2004 | 256 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/12/2004) |
| 01/09/2004 | 257 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/12/2004) |
| 01/12/2004 | 258 | ORDER NO. 15 a proposed death penalty questionnaire and the standard questionnaire are attached; counsel will need to be prepared to discuss this issue at the motion to sever and to continue hearing scheduled for 1/20/03 at 1:00pm as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/14/2006 (mflo, ). (Entered: 01/12/2004) |
| 01/13/2004 | 259 | JOINT MOTION by Chadrick E Fulks, Branden L Basham for reconsideration of [248-1] order concerning the government's request to evaluate the defendants for purposes of rebutting sentencing phase mental health evidence (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/14/2004) |
| 01/13/2004 | 260 | TRANSCRIPT OF MOTION/STATUS as to Chadrick E Fulks, Branden L Basham for dates of 6/18/03 before Chief Judge Joseph F. Anderson Jr held in Columbia, Court Reporter: Debra Jernigan (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/14/2004) |
| 01/13/2004 | 261 | TRANSCRIPT OF SEALED HEARING as to Chadrick E Fulks, Branden L Basham for dates of 6/18/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/14/2004) |

**JA 0044**

| 01/14/2004 | 262 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [251-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 01/14/2004) |
|---|---|---|
| 01/14/2004 | 263 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/15/2004) |
| 01/15/2004 | 264 | ORDER NO. 16 - ORDER TENTATIVELY ESTABLISHING PROCEDURES FOR JURY SELECTION the court will hear motions challenging the method of jury qualification on procedural issues at the hearing on 1/20/04; attached is a proposal and counsel should be prepared to discuss as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 Modified on 6/14/2006 (mflo, ). (Entered: 01/15/2004) |
| 01/15/2004 | 265 | PROPOSED JUROR QUESTIONNAIRE by Chadrick E Fulks as to Chadrick E Fulks (mflo) (Entered: 01/15/2004) |
| 01/15/2004 | 266 | MEMORANDUM by USA as to Chadrick E Fulks, Branden L Basham in opposition to [218-1] motion to strike and or limit aggravating factors in Governments notice of intent to seek the death penalty, [230-1] motion challenging the constitutionality of the Federal Death Penalty Statute (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 267 | MEMORANDUM by USA as to Branden L Basham in opposition to [236-1] motion to allow allocution without cross-examination during penalty phase (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 268 | MEMORANDUM by USA as to Chadrick E Fulks, Branden L Basham in opposition to [218-1] motion to strike and or limit aggravating factors in Governments notice of intent to seek the death penalty, [234-1] motion to strike [144-1] notice to seek the death penalty or in the alternative to strike or limit aggravating factors (jada) Modified on 5/8/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 269 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [224-1] motion to preclude the Government from seeking the Death Penalty in a racially discrimination manner re: [145-1] notice by Government to seek the death penalty (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 270 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [235-1] motion to sever trial (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 271 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [232-1] motion to suppress statements by the defendant, [232-2] motion for leave to file additional grounds to suppress after court rules on pending motions and discovery has been completed, [221-1] motion for Hearing pursuant to Jackson vs. Denno, 378 US 368 (1964) (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |

**JA 0045**

| 01/15/2004 | 272 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [219-1] motion to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| --- | --- | --- |
| 01/15/2004 | 273 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [237-1] motion for appropriate punishment related voir dire, attorney questioning, use of a jury questionnaire and for individual, sequestered voir dire on certain topics (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 274 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [216-1] motion for Continuance due to more time for discovery and trial preparation (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 275 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [215-1] motion to preclude the Government from seeking death by Lethal Injection (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 276 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [214-1] motion in limine to exclude evidence of unadjudicated offenses or in the alternative to establish procedure for pretrial determination of admissibility of such evidence and for specified burden of proof to be sustained by the Government with respect to unadjudicated offenses offered at the sentencing phase (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 277 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [213-1] motion to quash the venire on the basis of underrepresentation of racial minorities (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 278 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [228-1] motion for discovery pursuant to Rule 16 (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 279 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [226-1] motion for production of list of venire persons 30 days in advance (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 280 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [223-1] motion to admit polygraph evidence demonstrating that defendant Fulks did not kill Alice Donovan and Samantha Burns (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/15/2004 | 281 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [222-1] motion to prohibit "Death Qualification" during jury selection (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/16/2004 | 282 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr reset Motion Hearing for 11:00 1/20/04 as to: Chadrick Fulks, For Continuance (Speedy Trial) (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/16/2004 | 283 | RESPONSE by USA as to Chadrick E Fulks, Branden L Basham re [259-1] joint motion for reconsideration of [248-1] order concerning the |

**JA 0046**

| Date | No. | Docket Text |
|---|---|---|
| | | government's request to evaluate the defendants for purposes of rebutting sentencing phase mental health evidence (jada) Modified on 6/14/2006 (mflo, ). (Entered: 01/16/2004) |
| 01/20/2004 | 284 | MOTION and APPLICATION by Chadrick E Fulks for Sheri Lynn Johnson to appear pro hac vice FILING FEE AMOUNT 100.00 Receipt # 30001927 (mflo) (Entered: 01/21/2004) |
| 01/20/2004 | 285 | ORDER NO. 17 as to Chadrick E Fulks granting [284-1] motion for Sheri Lynn Johnson to appear pro hac vice FILING FEE AMOUNT 100.00 Receipt # 30001927 as to Chadrick E Fulks (1) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/23/2004 (Entered: 01/21/2004) |
| 01/20/2004 | 286 | REPLY by defendant Chadrick E Fulks to [270-1] memorandum in opposition to [235-1] motion to sever by defendant Fulks (mflo) (Entered: 01/21/2004) |
| 01/20/2004 | 287 | JOINT MOTION and MEMORANDUM by Chadrick E Fulks, Branden L Basham regarding Government access to the defendants' 12.2 notices (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/21/2004) |
| 01/20/2004 | 288 | TRANSCRIPT OF STATUS CONFERENCE as to Chadrick E Fulks, Branden L Basham for dates of 11/5/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/21/2004) |
| 01/20/2004 | | MOTION in open court by Branden L Basham for statewide jury pool (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/21/2004) |
| 01/20/2004 | | ORAL ORDER as to Branden L Basham granting [0-0] oral motion for statewide jury pool as to Branden L Basham (2) Per: Joseph F. Anderson, Jr. in open court; both counsel for defendants and government agree to statewide jury ( Entered by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/21/2004) |
| 01/20/2004 | 289 | MOTION HEARING as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying [259-1] joint motion for reconsideration of [248-1] order concerning the government's request to evaluate the defendants for purposes of rebutting sentencing phase mental health evidence as to Chadrick E Fulks (1), Branden L Basham (2), [216-1] motion for Continuance due to more time for discovery and trial preparation taken under advisement as to Chadrick E Fulks (1), [235-1] motion to sever trial taken under advisement as to Branden L Basham (2), [183-1] motion to sever taken under advisement as to Chadrick E Fulks (1); Government has until Friday, January 23, 2004 to decide if defendant statements will be used. Government is to notify defendants ASAP on forensic testing results. Government has until Tuesday, January 27th to file brief on evidence to be tested or not being tested, and defendants are to file reply brief within 5 days; Court will decide on motions after briefings have been filed; Government has until 2/15/04 to provide evidence information in the West Virginia case. Court will allow statewide jury pool. Jury Selection |

**JA 0047**

| | | |
|---|---|---|
| | | process will be decided at a later date. Court Reporter: Jack Clarke. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/21/2004) |
| 01/21/2004 | 290 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/22/2004) |
| 01/23/2004 | 291 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/23/2004) |
| 01/24/2004 | 840 | EX PARTE ORDER (Sealed) as to Brandon L Basham granting [830-1] ex parte motion as to Brandon L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 11/29/2004) |
| 01/28/2004 | 292 | ORDER as to Chadrick E Fulks, Branden L Basham memoranda regarding the government's proposal for dual juries due on or before 2/6/04 for Chadrick E Fulks, for Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (ttil) Modified on 6/14/2006 (mflo, ). (Entered: 01/28/2004) |
| 01/29/2004 | 293 | ORDER NO. 19 attached is juror questionnaire that is to be sent out to 800 perspective jurors; this order list the reasons the jury clerk can excuse jurors all other request shall be referred to the court and the court will consult with counsel; a statewide jury venire will be empaneled; the jury clerk will make the list of potential jurors available to the attorneys as soon as the list is created as to Chadrick E Fulks, Branden L Basham mooting [226-1] motion for production of list of venire persons 30 days in advance as to Branden L Basham (2) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 01/29/2004) |
| 01/29/2004 | 294 | ORDER NO.20 as to Chadrick E Fulks, Branden L Basham denying [287-1] joint motion regarding Government access to the defendants' 12.2 notices as to Chadrick E Fulks (1), Branden L Basham (2), [216-1] motion for Continuance due to more time for discovery and trial preparation taken under advisement as to Chadrick E Fulks (1), conditionally granting [235-1] motion to sever trial as to Branden L Basham (2), conditionally granting [183-1] motion to sever as to Chadrick E Fulks (1) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 01/30/2004 Modified on 6/14/2006 (mflo, ). (Entered: 01/29/2004) |
| 01/30/2004 | 295 | EXPARTE SUPPLEMENTAL MEMORANDUM by Branden L Basham in support of [257-1] ex parte motion, [245-1] ex parte motion, [244-1] ex parte motion, [242-1] ex parte motion (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/02/2004) |
| 01/30/2004 | 296 | EXPARTE MEMORANDUM as to Chadrick E Fulks (mflo) (Entered: 02/02/2004) |
| 02/02/2004 | | |

**JA 0048**

| | | |
|---|---|---|
| | | ORAL ORDER as to Branden L Basham granting [237-1] motion for appropriate punishment related voir dire, attorney questioning, use of a jury questionnaire and for individual, sequestered voir dire on certain topics as to Branden L Basham (2) Per: Order No. 19 1/29/04 ( Entered by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/02/2004) |
| 02/02/2004 | 297 | EXPARTE MEMORANDUM as to Branden L Basham (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/03/2004) |
| 02/03/2004 | 298 | ORDER NO. 21 for government to file a brief addressing the issue of government to produce tangible evidence to the defendants for inspection as soon as reasonably possible as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/03/2004) |
| 02/05/2004 | 299 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 02/05/2004) |
| 02/06/2004 | 300 | MEMORANDUM by Chadrick E Fulks in opposition to the Government's proposal that the defendants' trials be conducted before dual simultaneous juries (mflo) (Entered: 02/06/2004) |
| 02/06/2004 | 301 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks, Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/06/2004) |
| 02/06/2004 | 302 | JOINT MEMORANDUM by Chadrick E Fulks, Branden L Basham in opposition to Government's proposal that the defendant's trials be conducted before dual simultaneous juries (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/06/2004) |
| 02/06/2004 | 303 | ORDER NO. 22 ON DUPLICATE BRIEFS AND ATTORNEY TIME KEEPING REQUIREMENTS for attorneys submitting vouchers to indicate the specific nature of the research being performed by whoever does the research and for defendants not to file identical memos as previously filed by a co-defendant. as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 02/13/2004 Modified on 6/14/2006 (mflo, ). (Entered: 02/06/2004) |
| 02/09/2004 | 304 | RESPONSE by USA to the Court's Order of February 3, 2004 requesting that the Government brief the issue of the defendant's right to conduct testing of physical evidence as to Chadrick E Fulks, Branden L Basham (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/10/2004) |
| 02/11/2004 | 305 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [299-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 02/11/2004) |
| 02/12/2004 | 306 | |

**JA 0049**

| | | |
|---|---|---|
| | | FORTHWITH ORDER as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (ljon) Modified on 6/14/2006 (mflo, ). (Entered: 02/13/2004) |
| 02/13/2004 | 307 | ORDER NO. 23 counsel of defendant Basham are to furnish records to medical personnel at Butner within 24 hours of receipt of this order and shall file a memorandum with this court explaining their failure to comply with the court's order of 1/8/04 and 1/29/04; Counsel for Basham shall also file a memoranda setting forth position as to whether the government physicians are entitled to interview family members on or before 2/18/04 as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/13/2004) |
| 02/13/2004 | 308 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [257-1] ex parte motion as to Branden L Basham (2), granting [256-1] ex parte motion as to Branden L Basham (2), granting [245-1] ex parte motion as to Branden L Basham (2), granting [244-1] ex parte motion as to Branden L Basham (2), granting [243-1] ex parte motion as to Branden L Basham (2), granting [242-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/13/2004) |
| 02/13/2004 | 309 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/13/2004) |
| 02/13/2004 | 310 | EX PARTE MOTION (UnSealed on 6/28/06 per Order doc #981) by Branden L Basham (mflo) Modified on 6/14/2006 (mflo, ). Additional attachment(s) added on 7/11/2006 (mflo, ). Additional attachment(s) added on 7/11/2006 (mflo, ). (Entered: 02/17/2004) |
| 02/17/2004 | 311 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 02/17/2004) |
| 02/18/2004 | 312 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/18/2004) |
| 02/19/2004 | 313 | NOTICE of Exparte Motion Hearing as to Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 9:00 2/24/04 as to: Branden Basham, (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/19/2004) |
| 02/19/2004 | 314 | RESCHEDULED NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham reset pretrial conference and all pending motons for 9:30 2/24/04 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/19/2004) |
| 02/19/2004 | 315 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/14/2006 (mflo, ). (Entered: 02/19/2004) |

**JA 0050**

| | | |
|---|---|---|
| 02/20/2004 | | CJA PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 040202000014 (cqui) Modified on 6/14/2006 (mflo, ). (Entered: 02/20/2004) |
| 02/20/2004 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040202000015 (cqui) (Entered: 02/20/2004) |
| 02/20/2004 | | CJA PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040202000016 (cqui) (Entered: 02/20/2004) |
| 02/20/2004 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000017 (cqui) Modified on 6/14/2006 (mflo, ). (Entered: 02/20/2004) |
| 02/20/2004 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000018 (cqui) Modified on 6/14/2006 (mflo, ). (Entered: 02/20/2004) |
| 02/20/2004 | | CJA PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000019 (cqui) Modified on 6/6/2006 (mflo, ). (Entered: 02/20/2004) |
| 02/20/2004 | 316 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [311-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 02/20/2004) |
| 02/20/2004 | 317 | MEMORANDUM by plaintiff USA regarding the admissibility of statements made by or attributable to defendant Basham (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/20/2004) |
| 02/20/2004 | 318 | MEMORANDUM by plaintiff USA regarding the admissibility of statements made by defendant Fulks (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/20/2004) |
| 02/24/2004 | 319 | TRANSCRIPT OF EXCERPT MOTIONS HEARING RECORDS DISCLOSURE as to Chadrick E Fulks, Branden L Basham for dates of 1/20/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Jack Clarke (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/24/2004) |
| 02/24/2004 | 320 | SUPPLEMENTAL MEMORANDUM by Chadrick E Fulks in support of [216-1] motion for Continuance due to more time for discovery and trial preparation (mflo) (Entered: 02/24/2004) |
| 02/24/2004 | 321 | EVIDENTIARY HEARING as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying a number of motions to suppress statements made within the motion of [221-1] for hearing pursuant to Jackson v. Denno, 378 US 368 (1964) . Court adjourned to: 2/25/04 at 9:00 Court Reporter: Gary Smith. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/25/2004) |
| 02/25/2004 | 322 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte |

**JA 0051**

| | | |
|---|---|---|
| | | Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/25/2004) |
| 02/25/2004 | | EVIDENTIARY HEARING CONTINUED as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr, witnesses and oral argument : Court adjourned to: 2/26/04 Court Reporter: Gary Smith. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/26/2004) |
| 02/25/2004 | 323 | ORDER informing Butner Correctional Institution that they may now review the medical records of defendant Basham and that the defense attorneys will transmit all medical records received in the future, Clerk of Court is to forward this order to the Warden at Butner Correctional Institution as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/26/2004) |
| 02/26/2004 | 324 | ORDER of exhibits during evidentiary hearing as to Chadrick E Fulks, Branden L Basham directing the Clerk of court to return all exhibits to the parties introducing them. It is further ordered that the parties are to maintain the exhibits intact as returned until the time of filing an Appeal has expired. (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/26/2004) |
| 02/26/2004 | | EVIDENTIARY HEARING CONTINUED as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER on various motions, order to be filed , Exhibits returned to counsel: , Witness list and exhibit list attached. Court Reporter: Gary Smith. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 02/26/2004) |
| 02/27/2004 | 325 | EX PARTE ORDER as to Branden L Basham; signed by Joseph F. Anderson Jr ) eod 2/27/04 (ljon) Modified on 03/01/2004 Modified on 6/6/2006 (mflo, ). (Entered: 02/27/2004) |
| 02/27/2004 | 326 | LETTER/MOTION by USA as to Chadrick E Fulks, Branden L Basham for dual juries (mdea) Modified on 6/6/2006 (mflo, ). (Entered: 03/01/2004) |
| 03/01/2004 | 327 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/01/2004) |
| 03/01/2004 | 328 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/01/2004) |
| 03/01/2004 | 329 | EX PARTE MOTION (UnSealed per Order doc #981) by Branden L Basham to reconsider order filed 2/25/04. (mflo) Modified on 6/6/2006 (mflo, ). Additional attachment(s) added on 7/11/2006 (mflo, ). (Entered: 03/02/2004) |
| 03/01/2004 | 330 | TRANSCRIPT OF EXCERPT OF MOTIONS HEARING TESTIMONY OF JEFFREY LONG, RONALD HEWETT, WILLIAM H. MONCKTON, CAMERON B. LITTLEJOHN, JR. AND ROSEMARY PARHAM as to Chadrick E Fulks, Branden L Basham for dates of 2/25/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/02/2004) |
| 03/02/2004 | 331 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 9:30 3/8/04 as to: |

**JA 0052**

| | | |
|---|---|---|
| | | Chadrick Fulks, Branden Basham, all remaining pending motions (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/02/2004) |
| 03/03/2004 | 332 | RESCHEDULED NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 2:30 3/8/04 as to: Chadrick Fulks, Miscellaneous Relief; Branden Basham, Miscellaneous Relief (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/03/2004) |
| 03/04/2004 | 333 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [328-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/04/2004) |
| 03/04/2004 | 334 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [327-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/04/2004) |
| 03/05/2004 | 335 | ORDER NO. 24 as to Chadrick E Fulks, Branden L Basham denying [219-1] motion to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence as to Chadrick E Fulks (1), denying [218-1] motion to strike and or limit aggravating factors in Governments notice of intent to seek the death penalty as to Chadrick E Fulks (1)denying [214-1] motion in limine to exclude evidence of unadjudicated offenses or in the alternative to establish procedure for pretrial determination of admissibility of such evidence and for specified burden of proof to be sustained by the Government with respect to unadjudicated offenses offered at the sentencing phase as to Chadrick E Fulks (1), mooting [213-1] motion to quash the venire on the basis of underrepresentation of racial minorities as to Chadrick E Fulks (1), granting [212-1] motion for attorney conducted voir dire regarding the scope and nature of proper voir dire in a capital case as to Chadrick E Fulks (1), denying [236-1] motion to allow allocution without cross-examination during penalty phase as to Branden L Basham (2), denying [234-1] motion to strike [144-1] notice to seek the death penalty or in the alternative to strike or limit aggravating factors as to Branden L Basham (2), granting [232-1] motion to suppress statements by the defendant as to Branden L Basham (2)denying [230-1] motion challenging the constitutionality of the Federal Death Penalty Statute as to Branden L Basham (2), [228-1] motion for discovery pursuant to Rule 16 taken under advisement as to Branden L Basham (2), mooting [228-2] motion for early prodution of the Government's witness list as to Branden L Basham (2), mooting [228-3] motion for early production of Jenks as to Branden L Basham (2), mooting [228-4] motion for pretrial production of statements of individuals not to be called as witnesses as to Branden L Basham (2)mooting [228-5] motion for Disclosure of any and all contact between Government agents or prosecutors and informants incarcerated with defendant as to Branden L Basham (2), mooting [228-6] motion for discovery and inspection concerning Government's use of informants, operatives and cooperating individuals and detailed notice to the Government of exculpatory information requested as to Branden L Basham (2), mooting |

**JA 0053**

[228-7] motion for immediate production of evidence or information regarding other crimes or bad acts by the defendant as to Branden L Basham (2), mooting [228-8] motion for Disclosure of of co-conspirator hearsay as to Branden L Basham (2), mooting [228-9] motion for notice of Government's intention to use residual hearsay exception under Rule 807 as to Branden L Basham (2), mooting [228-10] motion for notice by the Government pursuant to Rule 12(b)(4) of its intention to use specific evidence arguably subject to suppression as to Branden L Basham (2)mooting [228-11] motion for discovery regarding eyewitness identification and motion to disclose and suppress any attemped in court identification by any "eye-witness" as to Branden L Basham (2), mooting [228-12] motion for discovery and inspection from co-defendant as to Branden L Basham (2), mooting [228-13] motion for Disclosure to preserve rough notes memorana and or reports as to Branden L Basham (2), denying [228-14] motion for Bill of Particulars as to superseding indictment and the notice to seek the death penalty as to Branden L Basham (2), denying [228-15] motion for discovery and inspection of information and evidence in aggravation or mitigation of punishment as to Branden L Basham (2), mooting [228-16] motion for specific discovery from Bureau of Prisons as to Branden L Basham (2)denying [215-1] motion to preclude the Government from seeking death by Lethal Injection as to Chadrick E Fulks (1), denying [225-1] motion to strike [145-1] notice to seek the death penalty as to Chadrick E Fulks (1), denying [224-1] motion to preclude the Government from seeking the Death Penalty in a racially discrimination manner re: [145-1] notice by Government to seek the death penalty as to Chadrick E Fulks (1), denying [223-1] motion to admit polygraph evidence demonstrating that defendant Fulks did not kill Alice Donovan and Samantha Burns as to Chadrick E Fulks (1), denying [222-1] motion to prohibit "Death Qualification" during jury selection as to Chadrick E Fulks (1), granting [221-1] motion for Hearing pursuant to Jackson vs. Denno, 378 US 368 (1964) as to Chadrick E Fulks (1), granting [211-1] motion in limine to exclude admission of polygraph evidence during trial as to Chadrick E Fulks (1), Branden L Basham (2)mooting [187-1] motion for reciprocal discovery as to Chadrick E Fulks (1), Branden L Basham (2), granting [186-1] motion for reciprocal discovery as to Chadrick E Fulks (1), denying [176-1] motion for Bill of Particulars as to Chadrick E Fulks (1), granting [176-2] motion for Disclosure of intent to use evidence of other crimes, wrongs or acts under Rule 404(b) as to Chadrick E Fulks (1) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/05/2004)

| | | |
|---|---|---|
| 03/05/2004 | 336 | MEMORANDUM ON PENALTY RELATED DISCOVERY by Branden L Basham in support of [228-1] motion for discovery pursuant to Rule 16 (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/08/2004) |
| 03/05/2004 | 337 | SUPPLEMENTAL AFFIDAVITS by Branden L Basham in support of motion to exclude the "Littlejohn Hypothetical"; W. Chad Jenkins, D. Ashley Pennington, I.S. Leevy Johnson, Reese I. Joye, Leland B. Greeley, A. Randolph Hough, James H. Babb, William T. Toal, John Christopher Mills, Christopher A. Wellborn (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/08/2004) |

| 03/05/2004 | 338 | SUPPLEMENTAL MEMORANDUM by Chadrick E Fulks in support of [223-1] motion to admit polygraph evidence demonstrating that defendant Fulks did not kill Alice Donovan and Samantha Burns (mflo) (Entered: 03/08/2004) |
|---|---|---|
| 03/08/2004 | 339 | SECOND SUPPLEMENTAL MEMORANDUM by Chadrick E Fulks in support of [223-1] motion to admit polygraph evidence demonstrating that defendant Fulks did not kill Alice Donovan and Samantha Burns (mflo) (Entered: 03/08/2004) |
| 03/08/2004 | 340 | SEALED MEMORANDUM (exparte) as to Chadrick E Fulks (mflo) (Entered: 03/08/2004) |
| 03/08/2004 | 341 | MEMORANDUM by USA as to Chadrick E Fulks, Branden L Basham in support of [211-1] motion in limine to exclude admission of polygraph evidence during trial (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/08/2004) |
| 03/08/2004 | 342 | MEMORANDUM by USA as to Chadrick E Fulks, Branden L Basham regarding the defendants' request to conduct physical testing of certain physical evidence (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/08/2004) |
| 03/08/2004 | 343 | MOTION HEARING as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying [326-1] motion for dual juries as to Chadrick E Fulks (1), Branden L Basham (2), granting [216-1] motion for Continuance due to more time for discovery and trial preparation as to Chadrick E Fulks (1) until 5/10/04 granting defendant Basham [235-1] motion to sever trial, granting Fulks [183-1] motion to sever, Continuing to May 10, 2004 due to additional testing of evidence and to receive the results of these test Defendant Fulks will go to trial first, 2 weeks for jury selection, 2 weeks for guilt phase and 2 weeks for penalty phase, Court Reporter: Debra Jernigan. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
| 03/08/2004 | | Ex Parte hearing as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr Court reporter: Debra Jernigan (mflo) (Entered: 03/09/2004) |
| 03/08/2004 | | Ex Parte hearing as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr Court reporter: Debra Jernigan (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
| 03/09/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000011 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
| 03/09/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000010 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
| 03/09/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000012 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |

**JA 0055**

| 03/09/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000013 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
|---|---|---|
| 03/09/2004 | | CJ 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 0402020000014 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
| 03/09/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000008 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
| 03/09/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040202000009 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/09/2004) |
| 03/09/2004 | | CJA 31 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040202000015 (ydav) (Entered: 03/09/2004) |
| 03/10/2004 | 344 | ORDER NO. 25 as to Branden L Basham temporarily granting [228-1] motion for discovery pursuant to Rule 16 as to Branden L Basham (2),if the defendant offers mental health evidence during the penalty phase, then the report and medical records sent to Butner may be unsealed and reviewed by the Government, if the defendant reverses course and decides not to offer expert testimony regarding mental health but instead offers medical records in the penalty phase the defendant shall furnish the goverment all medical records the defendant intends to offer during the penalty phase. (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/10/2004) |
| 03/10/2004 | 345 | ORDER NO. 26 as to Branden L Basham denying [329-1] ex parte motion as to Branden L Basham (2); 1) all medical records received in response to subpoenas shall be furnished to physicians at Butner within 10 days from the date they are received by the defense counsel 2) Any document or information that is of a non-medical nature that the defendant believes may legitimately be withheld from Butner Physicians must be immediately furnished to this court for in camera review with an explanation why the item need not be disclosed. 3) all documents must be either produced to physicians at Butner or this court (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/10/2004) |
| 03/10/2004 | 346 | ORDER NO. 27 REQUESTING INPUT ON VIDEO TAPE INSTRUCTIONS TO JURORS counsel shall have until Monday, March 22, 2004 to object to any of the proposed instructions or suggest modifications or additions as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/10/2004) |
| 03/10/2004 | 347 | ORDER NO. 28 REQUIRING INPUT FROM COUNSEL REGARDING JURORS SEEKING TO BE EXCUSED the Government and 2 defendants are requested to confer on or before Tuesday, March 16, 2004 and submit to the court a list of jurors (by number) that the parties agree may be excused |

**JA 0056**

| | | |
|---|---|---|
| | | for the reasons state in their prospective letters, the court will make the determination as to the excuse on any jurors for whom agreement cannot be reached as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/10/2004) |
| 03/15/2004 | 348 | TRANSCRIPT OF EXCERPT OF MOTIONS HEARING TESTIMONY OF DAVID J. HACKER AND LEONARD SCOTT SMITH as to Chadrick E Fulks, Branden L Basham for dates of 2/24/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/16/2004) |
| 03/16/2004 | | CJA 30 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040219000012 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/16/2004) |
| 03/16/2004 | | CJA 30 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040219000013 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/16/2004) |
| 03/16/2004 | | CJA 30 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040220000022 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/16/2004) |
| 03/16/2004 | | CJA 30 PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 040220000019 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/16/2004) |
| 03/16/2004 | | CJA 30 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040219000017 (ydav) (Entered: 03/16/2004) |
| 03/16/2004 | | CJA 30 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040219000018 (ydav) (Entered: 03/16/2004) |
| 03/16/2004 | 349 | ORDER NO. 29 EXCLUDING JURORS WHO HAVE PERSONAL HARDSHIPS for the jury clerk to immediately excuse all jurors to whom consent has been obtained from the attorneys, and all jurors whose numbers are circled on the attached memeorandum. Any party disagreeing with the court's determination that additional jurors should be excused should file objections in writing within a reasonable time. as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/17/2004) |
| 03/17/2004 | 350 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |
| 03/17/2004 | 351 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |
| 03/17/2004 | 352 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |
| 03/17/2004 | 353 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |

**JA 0057**

| 03/17/2004 | 354 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |
| 03/17/2004 | 355 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |
| 03/17/2004 | 356 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |
| 03/17/2004 | 357 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/17/2004) |
| 03/17/2004 | 358 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [350-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/17/2004 | 359 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [351-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/17/2004 | 360 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [352-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/17/2004 | 361 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [353-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/17/2004 | 362 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [354-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/17/2004 | 363 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [355-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/17/2004 | 364 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [356-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/17/2004 | 365 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [357-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/17/2004) |
| 03/18/2004 | 366 | |

**JA 0058**

| | | ORDER for agent Jeff Bruning to take custody of defendant for purposes of locating evidence in this case on 3/23/04 as to Chadrick E Fulks (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 03/18/2004) |
|---|---|---|
| 03/18/2004 | 367 | ORDER NO. 30 for counsel to review another series of letters requesting excuse from jury service, counsel are requested to confer and inform this court on or before 3/25/04 for which agreement can be reached as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 03/25/2004 Modified on 6/6/2006 (mflo, ). (Entered: 03/18/2004) |
| 03/18/2004 | 368 | ORDER for Special Agent Jeff Bruning of the FBI to transport defendant for purposes of locating evidence on Tuesday, March 23, 2004 as to Chadrick E Fulks (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 03/18/2004) |
| 03/19/2004 | 370 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 371 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 372 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 373 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 374 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 375 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 376 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 377 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 378 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 379 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 380 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 381 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/19/2004 | 382 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/19/2004) |
| 03/22/2004 | | |

**JA 0059**

| | | |
|---|---|---|
| | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040220000015 (ydav) Modified on 03/22/2004 Modified on 6/6/2006 (mflo, ). (Entered: 03/22/2004) |
| 03/22/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040220000016 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/22/2004) |
| 03/22/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040220000017 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/22/2004) |
| 03/22/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040220000018 (ydav) Modified on 03/22/2004 Modified on 6/6/2006 (mflo, ). (Entered: 03/22/2004) |
| 03/22/2004 | | CJA 31 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040220000019 (ydav) (Entered: 03/22/2004) |
| 03/22/2004 | 383 | AFFIDAVIT of Tara Dawn Shurling as to Branden L Basham Re: [337-1] support memorandum (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/22/2004) |
| 03/22/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040220000013 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/23/2004) |
| 03/22/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040220000014 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/23/2004) |
| 03/22/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Chadrick E Fulks, defendant Branden L Basham VOUCHER # 040220000012 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 03/23/2004) |
| 03/22/2004 | 385 | MEMORANDUM by USA in response to Order No. 27 requesting input on videotaped instructions to jurors (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/23/2004) |
| 03/23/2004 | 384 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 03/23/2004) |
| 03/23/2004 | 386 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [381-1] ex parte motion ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 387 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [380-1] ex parte motion ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 388 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [379-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. |

**JA 0060**

| | | Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
|---|---|---|
| 03/23/2004 | 389 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [378-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 390 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [376-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 391 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [375-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 392 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [370-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 393 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [371-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 394 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [372-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 395 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [373-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 396 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [374-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 397 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [377-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 398 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [382-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/23/2004 | 399 | |

**JA 0061**

| | | EX PARTE ORDER (Sealed) as to Chadrick E Fulks, Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/23/2004) |
|---|---|---|
| 03/23/2004 | 400 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [384-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 03/23/2004) |
| 03/24/2004 | 401 | ORDER NO. 31 instructing counsel for defendant that they are to participate in ALL pretrial matter unless this court specifically states otherwise as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 03/25/2004 Modified on 6/6/2006 (mflo, ). (Entered: 03/24/2004) |
| 03/24/2004 | 402 | Defendant's Proposed Version of the Jury Selection Video Introduction by Chadrick E Fulks (mflo) (Entered: 03/25/2004) |
| 03/25/2004 | | CJA PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 040319000006 (cqui) Modified on 6/6/2006 (mflo, ). (Entered: 03/25/2004) |
| 03/25/2004 | | CJA 31 PAYMENT for defendant Chadrick E Fulks VOUCHER # 040220000020 (cqui) (Entered: 03/25/2004) |
| 03/26/2004 | 403 | SEALED DOCUMENT as to Chadrick E Fulks, Branden L Basham (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/26/2004) |
| 03/26/2004 | 404 | SEALED DOCUMENT as to Chadrick E Fulks (mflo) (Entered: 03/26/2004) |
| 03/30/2004 | 405 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 03/30/2004) |
| 03/30/2004 | 406 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 03/30/2004) |
| 03/30/2004 | 407 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham set status conference for 9:30 4/7/04 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 03/30/2004) |
| 03/30/2004 | 408 | SEALED DOCUMENT as to Chadrick E Fulks (mflo) (Entered: 03/30/2004) |
| 04/01/2004 | 409 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/01/2004) |
| 04/01/2004 | 410 | LETTER of Jonathan S. Gasser by plaintiff USA Re: Butner Report (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/01/2004) |
| 04/01/2004 | 411 | SEALED DOCUMENT as to Chadrick E Fulks (mflo) (Entered: 04/01/2004) |
| 04/01/2004 | 412 | SEALED DOCUMENT as to Chadrick E Fulks (mflo) (Entered: 04/01/2004) |

**JA 0062**

| 04/01/2004 | 413 | RESCHEDULED NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham reset status conference for 2:00 4/8/04 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/01/2004) |
|---|---|---|
| 04/02/2004 | 414 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [406-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 04/02/2004) |
| 04/02/2004 | 415 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [405-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 04/02/2004) |
| 04/02/2004 | 416 | MOTION by Chadrick E Fulks for reconsideration of [335-1] order No. 24 (mflo) (Entered: 04/02/2004) |
| 04/02/2004 | 417 | MOTION by Chadrick E Fulks for John H. Blume and William Nettles to be relieved as attorney (mflo) (Entered: 04/02/2004) |
| 04/02/2004 | 418 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 04/02/2004) |
| 04/02/2004 | 419 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks, Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (ljon) Modified on 6/6/2006 (mflo, ). (Entered: 04/05/2004) |
| 04/05/2004 | 420 | ORDER NO. 32 as to Chadrick E Fulks granting [416-1] motion for reconsideration of [335-1] order No. 24 . Motion Terminated. as to Chadrick E Fulks (1) (Signed by Chief Judge Joseph F. Anderson Jr ) (ljon) Modified on 04/07/2004 (Entered: 04/06/2004) |
| 04/07/2004 | 421 | ORDER NO. 33 excluding jurors who have personal hardships (see order for list), any party disagreeing with the court shall file objections within a reasonable time as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/07/2004) |
| 04/07/2004 | 422 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/08/2004) |
| 04/08/2004 | 423 | MOTION by Chadrick E Fulks for discovery related to DNA testing (amil) (Entered: 04/08/2004) |
| 04/08/2004 | 424 | MOTION by Chadrick E Fulks for continuance (amil) (Entered: 04/08/2004) |
| 04/08/2004 | 425 | ORDER on video introduction for jurors with attachments as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/08/2004) |
| 04/08/2004 | 426 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 2:00 4/13/04 as to: |

**JA 0063**

| | | |
|---|---|---|
| | | Chadrick Fulks, To Withdraw as Attorney (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/08/2004) |
| 04/08/2004 | 427 | MOTION HEARING/STATUS CONFERENCE as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying without prejudice [424-1] motion for continuance as to Chadrick E Fulks (1), moot/resolved [423-1] motion for discovery related to DNA testing as to Chadrick E Fulks (1), [417-1] motion for John H. Blume and William Nettles to be relieved as attorney taken under advisement as to Chadrick E Fulks (1); motion hearing is continued until Tuesday April 13th at 2:00pm; Court Reporter: Gary Smith. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/08/2004) |
| 04/12/2004 | 428 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [422-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 04/13/2004) |
| 04/12/2004 | 429 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 04/13/2004) |
| 04/13/2004 | 430 | SUPPLEMENTAL IDENTIFICATION of potential mental health experts of by Chadrick E Fulks as to Chadrick E Fulks (mflo) (Entered: 04/13/2004) |
| 04/13/2004 | 431 | MOTION HEARING as to Chadrick E Fulks, Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying [418-1] ex parte motion as to Chadrick E Fulks (1), denying [417-1] motion for John H. Blume and William Nettles to be relieved as attorney as to Chadrick E Fulks (1), Court to file written order; Government is not use page 8 of the letter dated 4/1; Jury Selection discussions held; Court Reporter: Jack Clarke. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/13/2004) |
| 04/14/2004 | 432 | ORDER No. 35 as to Chadrick E Fulks mooting motion [423-1] for discovery related to DNA testing (Signed by Chief Judge Joseph F. Anderson Jr ) eod/mld (mdea) Modified on 04/15/2004 (Entered: 04/14/2004) |
| 04/14/2004 | 433 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/14/2004) |
| 04/14/2004 | 434 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/14/2004) |
| 04/14/2004 | 435 | ORDER No. 36 as to Chadrick E Fulks, re: [430-1] notice to supplement identification of potential mental health expert, medical personnel at the FCI Butner, NC is to be aware of this new disclosure so they could determine if they need information from the new mental health expert or need to re-examine defendant Fulks in light of the disclosure; the Clerk is directed to send a copy of order with attachement to the Warden of FCI Butner as well as to all parties of record as to Chadrick E Fulks (1) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 04/16/2004 Modified on 6/6/2006 (mflo, ). (Entered: 04/15/2004) |

**JA 0064**

| 04/15/2004 | 436 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/16/2004) |
| --- | --- | --- |
| 04/16/2004 | | CJA 30 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040331000002 (ydav) (Entered: 04/16/2004) |
| 04/16/2004 | | CJA 30 PAYMENT to John H. Blume (Keir Weyble) for defendant Chadrick E Fulks VOUCHER # 040325000022 (ydav) (Entered: 04/16/2004) |
| 04/16/2004 | | CJA 30 PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 040325000017 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/16/2004) |
| 04/16/2004 | | CJA 30 PAYMENT to Jack Bruce Swerling (Steven M. Hisker) for defendant Branden L Basham VOUCHER # 040325000015 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/16/2004) |
| 04/16/2004 | | CJA 30 PAYMENT to Jack Bruce Swerling (Harrison Saunders) for defendant Branden L Basham VOUCHER # 040325000013 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/16/2004) |
| 04/16/2004 | | CJA 30 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040325000011 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/16/2004) |
| 04/16/2004 | 437 | ORDER No. 37 listing juror excused per agreement of counsel as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/16/2004) |
| 04/16/2004 | 438 | ORDER No. 38 jurors on list labeled "cause jurors.wpd" excused by agreement of counsel as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/16/2004) |
| 04/16/2004 | 442 | MOTION by USA as to Chadrick E Fulks, Branden L Basham to strike jurors for cause (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/19/2004) |
| 04/19/2004 | 439 | ORDER NO. 39 as to Chadrick E Fulks denying [417-1] motion for John H. Blume and William Nettles to be relieved as attorney (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 04/19/2004) |
| 04/19/2004 | 441 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [436-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/19/2004) |
| 04/19/2004 | 443 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [433-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 04/20/2004) |
| 04/19/2004 | 444 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [434-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. |

**JA 0065**

| | | |
|---|---|---|
| | | Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 04/20/2004) |
| 04/19/2004 | 445 | ORDER No. 40 as to Chadrick E Fulks, Branden L Basham granting [442-1] motion to strike jurors for cause, all jurors who answered the relevant questions in a disqualifying manner are excused from both trials. Jurors who have vacation conflicts during the May-June time period are excused from jury selection for the Fulk's trial only as to Chadrick E Fulks (1), Branden L Basham (2); Clerk to provide list from Government motion to strike jurors for cause dated 4/16/04 (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/20/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to John H. Blume for defendant Chadrick E Fulks VOUCHER # 040325000010 (ydav) (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040325000009 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040325000008 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040325000007 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Gregory Poole Harris for defendant Branden L Basham VOUCHER # 040325000006 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040325000005 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040325000004 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040325000003 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040324000008 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040324000007 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |
| 04/21/2004 | | CJA 31 PAYMENT to Jack Bruce Swerling for defendant Branden L Basham VOUCHER # 040324000006 (ydav) Modified on 6/6/2006 (mflo, ). (Entered: 04/21/2004) |

**JA 0066**

| 04/26/2004 | 446 | WRIT of Habeas Corpus ad Testificandum issued for Betty McGuffin for 5/31/04 - 6/30/04 in case as to Chadrick E Fulks (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 04/26/2004) |
| --- | --- | --- |
| 04/26/2004 | 447 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/26/2004) |
| 04/27/2004 | 448 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 449 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 450 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 451 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 452 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 453 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 454 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 455 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 456 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 457 | EX PARTE MOTION (Sealed) by Chadrick E Fulks; with proposed order (mcam) (Entered: 04/27/2004) |
| 04/27/2004 | 458 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 459 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 460 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 461 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 462 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 463 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 464 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |

**JA 0067**

| 04/27/2004 | 465 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 466 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 467 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 468 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 469 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 470 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 471 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 472 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 473 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 474 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 475 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 476 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 477 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 478 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 479 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 480 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 481 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 482 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 483 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |

**JA 0068**

| 04/27/2004 | 484 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
|---|---|---|
| 04/27/2004 | 485 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 486 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 487 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 488 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 489 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/27/2004 | 490 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 04/27/2004) |
| 04/28/2004 | 491 | NOTICE of Hearing as to Chadrick E Fulks, Branden L Basham set pretrial conference for 10:00 5/7/04 for Chadrick E Fulks, for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/28/2004) |
| 04/28/2004 | 492 | NOTICE of Hearing as to Chadrick E Fulks set jury selection for 9:30 5/10/04 for Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr (mflo) (Entered: 04/28/2004) |
| 04/28/2004 | 493 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [447-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 04/29/2004) |
| 04/28/2004 | 494 | MOTION by USA as to Chadrick E Fulks for jury selection by the struck jury method (mflo) (Entered: 04/29/2004) |
| 04/29/2004 | 495 | NOTICE of Hearing as to Chadrick E Fulks set Change of Plea Hearing for 3:00 5/4/04 for Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr (mflo) (Entered: 04/29/2004) |
| 04/30/2004 | 496 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/03/2004) |
| 04/30/2004 | 497 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/03/2004) |
| 05/03/2004 | 498 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [457-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 499 | |

**JA 0069**

| | | |
|---|---|---|
| | | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [456-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 500 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [455-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 501 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [454-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 502 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [453-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 503 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [448-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 504 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [449-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 505 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [450-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 506 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [452-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 507 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [490-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 508 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [489-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 509 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [488-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. |

**JA 0070**

| | | Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
|---|---|---|
| 05/03/2004 | 510 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [487-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 511 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [485-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 512 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [486-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 513 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [484-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 514 | MOTION by Chadrick E Fulks for Continuance due to recent disclosures of quantities of discovery from the Government (mflo) (Entered: 05/03/2004) |
| 05/03/2004 | 515 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [483-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 516 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [482-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 517 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [481-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 518 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [480-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 519 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [479-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 520 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [478-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. |

**JA 0071**

| | | Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
|---|---|---|
| 05/03/2004 | 521 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [477-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 522 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [476-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 523 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [475-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 524 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [474-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 525 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [473-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 526 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [472-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 527 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [471-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 528 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [470-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 529 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [469-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 530 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [468-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 531 | |

**JA 0072**

| | | |
|---|---|---|
| | | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [466-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 532 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [465-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 533 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [467-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 534 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [464-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 535 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [463-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 536 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [462-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 537 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [461-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 538 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [460-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 539 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [459-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 540 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [458-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 541 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [451-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. |

**JA 0073**

| | | Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/04/2004) |
|---|---|---|
| 05/03/2004 | 543 | WRIT of Habeas Corpus ad Testificandum issued for Betty Jean McGuffin for 5/10/04 at 10:00 in case as to Chadrick E Fulks (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/04/2004) |
| 05/03/2004 | 544 | WRIT of Habeas Corpus ad Testificandum issued for Nickey Don Smith, II for 5/10/04 at 10:00 in case as to Chadrick E Fulks (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/04/2004) |
| 05/04/2004 | 542 | MEMORANDUM by USA as to Chadrick E Fulks in opposition to [514-1] motion for Continuance due to recent disclosures of quantities of discovery from the Government (mflo) (Entered: 05/04/2004) |
| 05/04/2004 | 545 | Fax Transmittal from Columbia Care Center re: Chadrick E Fulks Medication Administration Record (mflo) (Entered: 05/05/2004) |
| 05/04/2004 | 546 | Elements of the Offenses charged and maximum punishments as to counts 1-8 of the superseding indictment by USA as to Chadrick E Fulks (mflo) (Entered: 05/05/2004) |
| 05/04/2004 | 547 | GUILTY PLEA HEARING started and is continued until 5/7/04 as to Chadrick E Fulks of the superseding indictment. Court does not accept plea on this date. Defendant remains in custody. (before Chief Judge Joseph F. Anderson Jr ) Court Reporter: Gary Smith (mflo) (Entered: 05/05/2004) |
| 05/05/2004 | 548 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [496-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/05/2004) |
| 05/05/2004 | 549 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [497-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/05/2004) |
| 05/05/2004 | 550 | MEMORANDUM by plaintiff USA in response to issues raised by the court in connection with the defendant's attempt to plead guilty to the indictment (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 05/05/2004) |
| 05/05/2004 | 551 | ORDER No. 41 with attached proposed revised script for introductory video for jury selection. Also attached is a group of hardship excuse requests subitted by jurors. Counsel is requested to review and come to pretrial on 5/7/04 prepared to discuss. Defendant Fulks is to have Dr. Berg to be present on 5/7/04 to provide an opinion regarding Fulks competency and cognitive ability. as to Chadrick E Fulks, Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 05/25/2004 Modified on 6/6/2006 (mflo, ). (Entered: 05/05/2004) |
| 05/06/2004 | 552 | MEMORANDUM regarding the propriety of a guilty plea to counts 1 and 2 of the superseding indictment under the theory of vicarious liability established in Pinkerton vs. USA by defendant Chadrick E Fulks (mflo) (Entered: 05/06/2004) |

**JA 0074**

| 05/06/2004 | 553 | NOTICE TO ALL COUNSEL OF RECORD as to Chadrick E Fulks, Branden L Basham both defense attorneys are to come on 5/7/04 resumption of the Rule 11 hearing prepared to state their professional legal views as to whether the Pinkerton doctrine may be applied to support one or both of the capital charges (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 05/06/2004) |
|---|---|---|
| 05/07/2004 | 554 | WRIT of Habeas Corpus ad Testificandum issued for Stacy Ann Workman for 6/1/04 in case as to Chadrick E Fulks (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/07/2004) |
| 05/07/2004 | 555 | PLEA proffered by Chadrick E Fulks as to count(s) 1-8 of the superseding indictment. Court accepts plea, GUILTY PLEA ENTERED as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s (Terminated motions - ) Defendant remains in custody. (before Chief Judge Joseph F. Anderson Jr ) Court Reporter: Gary Smith (mflo) (Entered: 05/07/2004) |
| 05/07/2004 | 556 | PLEA entered by Chadrick E Fulks . Defendant enters plea of: GUILTY. (mflo) (Entered: 05/07/2004) |
| 05/07/2004 | 557 | FAX TRANSMITTAL FROM COLUMBIA CARE CENTER as to Chadrick E Fulks (mflo) (Entered: 05/07/2004) |
| 05/07/2004 | 558 | MOTION HEARING as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr ORAL ORDER [514-1] motion for Continuance due to recent disclosures of quantities of discovery from the Government taken under advisement as to Chadrick E Fulks (1), granting [494-1] motion for jury selection by the struck jury method as to Chadrick E Fulks (1) Court Reporter: Gary Smith. (mflo) (Entered: 05/07/2004) |
| 05/10/2004 | 559 | TRIAL BRIEF by USA as to Chadrick E Fulks (mflo) (Entered: 05/10/2004) |
| 05/10/2004 | 560 | RE-FILED MOTIONS by Chadrick E Fulks to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence , to allow allocution without cross examination during penalty phase , in limine to exclude evidence of unjudicated offenses, or in the alternative to establish procedure for pretrial determination of admissibility of such evidence, and for specified burden of proof to be sustained by the government with espect to unadjudicated offenses offered at the sentencing phase , to strike and/or limit aggravating factors , to strike (mflo) (Entered: 05/10/2004) |
| 05/10/2004 | 561 | JURY SELECTION begins before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s; Jurors Qualified 7; Jurors Excused 3; jury selection continues to 5/11/04 Court reporter: Gary Smith. (mflo) (Entered: 05/11/2004) |
| 05/11/2004 | 561 | JURY SELECTION continues before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s, Jurors Qualified: 8, Jurors Excused 6, Court reporter: Gary Smith. (mflo) Modified on 05/13/2004 (Entered: 05/12/2004) |
| 05/12/2004 | 562 | |

**JA 0075**

| | | |
|---|---|---|
| | | SUPPLEMENTAL MEMORANDUM by USA as to Chadrick E Fulks in opposition to [514-1] motion for Continuance due to recent disclosures of quantities of discovery from the Government (mflo) (Entered: 05/12/2004) |
| 05/12/2004 | 563 | SUPPLEMENTAL MEMORANDUM by Chadrick E Fulks in support of [514-1] motion for Continuance due to recent disclosures of quantities of discovery from the Government (mflo) (Entered: 05/13/2004) |
| 05/12/2004 | 561 | JURY SELECTION continues before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Jurors Qualified 8; Jurors Excused 6; Court reporter: Gary Smith. (mflo) (Entered: 05/13/2004) |
| 05/13/2004 | 561 | JURY SELECTION continues before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Jurors Qualified 4; Jurors Excused 11, Court to reconvene 10:00 on 5/14/04, Court reporter: Gary Smith. (mflo) Modified on 05/17/2004 (Entered: 05/14/2004) |
| 05/14/2004 | | ORAL ORDER as to Chadrick E Fulks granting [514-1] motion for Continuance due to recent disclosures of quantities of discovery from the Government as to Chadrick E Fulks (1), reset Jury trial for 6/1/04 for Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr Per: Judge Joe Anderson ( Entered by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/14/2004) |
| 05/14/2004 | 561 | JURY SELECTION continues before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Jurors Qualified 8 , Jurors Excused 12 , Court to reconvene on 5/17/04 at 9:30, Court reporter: Gary Smith. (mflo) Modified on 05/17/2004 (Entered: 05/14/2004) |
| 05/14/2004 | 564 | ORDER for Stacy Workman to transported by the FBI for the purpose of conducting interviews and debriefings on 5/14/04 and from time to time as needed as to Chadrick E Fulks (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/17/2004) |
| 05/17/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors 9; Excused Jurors 15; court in recess until 5/18/04 at 9:30, Court reporter: Gary Smith. (mflo) (Entered: 05/17/2004) |
| 05/18/2004 | 565 | MOTION by Chadrick E Fulks for Disclosure of Government communications with witnesses presently exposed to criminal liability (mflo) (Entered: 05/18/2004) |
| 05/18/2004 | 566 | MOTION by Chadrick E Fulks to preclude the Government from utilizing jailhouse snitch testimony (mflo) (Entered: 05/18/2004) |
| 05/18/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors 8; Excused Jurors 5; Jury Selection continues on 5/19/04 at 9:30; Court reporter: Gary Smith. (mflo) (Entered: 05/18/2004) |
| 05/19/2004 | 567 | Juror Questionnaire sent to potential jurors for the Chadrick E Fulks death penalty trial (mflo) (Entered: 05/19/2004) |

**JA 0076**

| 05/19/2004 | 568 | SUPPLEMENTAL JUROR QUESTIONNAIRE for potential jurors for the death penalty phase for defendant Chadrick E Fulks (mflo) Modified on 05/19/2004 (Entered: 05/19/2004) |
|---|---|---|
| 05/19/2004 | 569 | JURY SELECTION VIDEO INTRODUCTION for potential jurors for the penalty phase for defendant Chadrick E Fulks (mflo) (Entered: 05/19/2004) |
| 05/19/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors 9; Excused Jurors 3, selection will continue on 5/20 at 9:30 , Court reporter: Gary Smith. (mflo) (Entered: 05/19/2004) |
| 05/20/2004 | | JURY SELECTION CONTINUED held before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Jurors Qualified 5; Jurors Excused 7; jury selection continues until 5/21/04 at 9:30 , Court reporter: Gary Smith. (mflo) (Entered: 05/20/2004) |
| 05/21/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Baston Challenge by both defendant and Government, court in recess until 5/24/04 at 9:30, Court reporter: Gary Smith. (mflo) (Entered: 05/21/2004) |
| 05/24/2004 | 570 | TRANSCRIPT OF CHANGE OF PLEA HEARING as to Chadrick E Fulks for dates of 5/4/04 and 5/7/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 571 | NOTICE of Hearing as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr set Motion Hearing, for 9:30 5/26/04 as to: Chadrick Fulks, In Limine, For Disclosure, Miscellaneous Relief, Miscellaneous Relief, In Limine, To Strike, To Strike (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 572 | ORDER No. 42 instructing defendant to have both polygraphers present at 9:30 on 5/26/04 as to Chadrick E Fulks (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 05/25/2004 (Entered: 05/24/2004) |
| 05/24/2004 | 573 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |
| 05/24/2004 | 574 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |
| 05/24/2004 | 575 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |
| 05/24/2004 | 576 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |
| 05/24/2004 | 577 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |
| 05/24/2004 | 578 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |
| 05/24/2004 | 579 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |

**JA 0077**

| 05/24/2004 | 580 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/24/2004) |
|---|---|---|
| 05/24/2004 | 581 | MOTION by Chadrick E Fulks in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a realiability hearing (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 582 | MOTION by Chadrick E Fulks for Disclosure of exculpatory material information (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 583 | MOTION by Chadrick E Fulks in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 584 | MOTION by Chadrick E Fulks in limine to exclude to limit admission and consideration of evidence in support of future dangerousness to information showing that defendant poses a future danger within the confines of a Federal Prison (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 585 | MOTION by Chadrick E Fulks for John Blume and William Nettles to withdraw as attorney (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 586 | MOTION by Chadrick E Fulks in limine to exclude to redact portions of letters (mflo) (Entered: 05/24/2004) |
| 05/25/2004 | 587 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 05/25/2004) |
| 05/25/2004 | 588 | MOTION by Chadrick E Fulks for appropriate limitations on admission and consideration of evidence in support of non statutory aggravating factors (mflo) (Entered: 05/25/2004) |
| 05/25/2004 | 589 | MOTION by Chadrick E Fulks in limine to prohibit evidence of the abuse of Myles Evans (mflo) (Entered: 05/25/2004) |
| 05/25/2004 | 590 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [315-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 05/26/2004) |
| 05/26/2004 | 591 | MEMORANDUM by USA as to Chadrick E Fulks in opposition to [566-1] motion to preclude the Government from utilizing jailhouse snitch testimony (mflo) (Entered: 05/26/2004) |
| 05/26/2004 | 592 | RESPONSE by USA as to Chadrick E Fulks re [582-1] motion for Disclosure of exculpatory material information (mflo) (Entered: 05/26/2004) |
| 05/26/2004 | 593 | RESPONSE by USA as to Chadrick E Fulks re [585-1] motion for John Blume and William Nettles to withdraw as attorney (mflo) (Entered: 05/26/2004) |
| 05/26/2004 | 594 | RESPONSE by USA as to Chadrick E Fulks re [581-1] motion in limine to exclude the government from referring in opening statement to any |

**JA 0078**

| | | |
|---|---|---|
| | | unadjudicated prior offenses and from introducing evidence of such offenses prior to a realiability hearing (mflo) (Entered: 05/26/2004) |
| 05/26/2004 | 595 | RESPONSE by USA as to Chadrick E Fulks re [584-1] motion in limine to exclude to limit admission and consideration of evidence in support of future dangerousness to information showing that defendant poses a future danger within the confines of a Federal Prison (mflo) (Entered: 05/26/2004) |
| 05/26/2004 | 596 | RESPONSE by USA as to Chadrick E Fulks re [586-1] motion in limine to exclude to redact portions of letters (mflo) (Entered: 05/26/2004) |
| 05/26/2004 | 597 | RESPONSE by USA as to Chadrick E Fulks re [583-1] motion in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement (mflo) (Entered: 05/26/2004) |
| 05/26/2004 | 598 | RESPONSE by USA as to Chadrick E Fulks re [565-1] motion for Disclosure of Government communications with witnesses presently exposed to criminal liability (mflo) (Entered: 05/26/2004) |
| 05/27/2004 | 599 | MOTION HEARING as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr ORAL ORDER tentative denied [589-1] motion in limine to prohibit evidence of the abuse of Myles Evans as to Chadrick E Fulks (1), under advisement [588-1] motion for appropriate limitations on admission and consideration of evidence in support of non statutory aggravating factors as to Chadrick E Fulks (1), granted in part and denied in part [586-1] motion in limine to exclude to redact portions of letters as to Chadrick E Fulks (1), denying [585-1] motion for John Blume and William Nettles to withdraw as attorney as to Chadrick E Fulks (1), under advisement [584-1] motion in limine to exclude to limit admission and consideration of evidence in support of future dangerousness to information showing that defendant poses a future danger within the confines of a Federal Prison as to Chadrick E Fulks (1), denied [583-1] motion in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement as to Chadrick E Fulks (1), mooting [582-1] motion for Disclosure of exculpatory material information as to Chadrick E Fulks (1), denied in part and tentative granted in part [581-1] motion in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a realiability hearing as to Chadrick E Fulks (1), mooting [566-1] motion to preclude the Government from utilizing jailhouse snitch testimony as to Chadrick E Fulks (1), mooting [565-1] motion for Disclosure of Government communications with witnesses presently exposed to criminal liability as to Chadrick E Fulks (1), under advisement [560-1] motion to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence as to Chadrick E Fulks (1), under advisement [560-2] motion to allow allocution without cross examination during penalty phase as to Chadrick E Fulks (1), under advisement [560-3] motion in limine to exclude evidence of unjudicated offenses, or in the alternative to establish procedure for pretrial determination of admissibility of such evidence, and for specified burden of |

**JA 0079**

| | | |
|---|---|---|
| | | proof to be sustained by the government with espect to unadjudicated offenses offered at the sentencing phase as to Chadrick E Fulks (1), under advisement [560-4] motion to strike and/or limit aggravating factors as to Chadrick E Fulks (1), terminated [560-5] motion to strike as to Chadrick E Fulks (1); detailed order to be filed on these rulings; Court Reporter: Gary Smith. (mflo) Modified on 05/28/2004 (Entered: 05/27/2004) |
| 05/28/2004 | 600 | ORDER NO. 43 as to Chadrick E Fulks remains under adisement [589-1] motion in limine to prohibit evidence of the abuse of Myles Evans, denied [588-1] motion for appropriate limitations on admission and consideration of evidence in support of non statutory aggravating factors, denied [585-1] motion for John Blume and William Nettles to withdraw as attorney, denied [584-1] motion in limine to exclude to limit admission and consideration of evidence in support of future dangerousness to information showing that defendant poses a future danger within the confines of a Federal Prison, denied [583-1] motion in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement, mooting [582-1] motion for Disclosure of exculpatory material information, granted in part and denied in part [581-1] motion in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a realiability hearing, mooting [566-1] motion to preclude the Government from utilizing jailhouse snitch testimony, mooting [565-1] motion for Disclosure of Government communications with witnesses presently exposed to criminal liability, denied in part and deferred in part until trial [560-1] motion to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence, denied [560-2] motion to allow allocution without cross examination during penalty phase, denied in part and granted in part [560-3] motion in limine to exclude evidence of unjudicated offenses, or in the alternative to establish procedure for pretrial determination of admissibility of such evidence, and for specified burden of proof to be sustained by the government with espect to unadjudicated offenses offered at the sentencing phase, remains under advisement [560-4] motion to strike and/or limit aggravating factors, terminated [560-5] motion to strike (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 600 | ORDER No. 43 as to Chadrick E Fulks denying [586-1] motion in limine to exclude to redact portions of letters (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 601 | RESPONSE by USA as to Chadrick E Fulks re [589-1] motion in limine to prohibit evidence of the abuse of Myles Evans (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 602 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [573-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 603 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [574-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. |

**JA 0080**

| | | |
|---|---|---|
| | | Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 604 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [575-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 605 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [576-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 606 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [578-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 607 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [579-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 608 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [580-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 609 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [577-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 610 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [587-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | | WARRANT FOR ARREST OF WITNESS Heather Marie Goodman for the trial of Chadrick Evan Fulks (mflo) Modified on 6/6/2006 (mflo, ). (Entered: 05/28/2004) |
| 05/28/2004 | 611 | WRIT of Habeas Corpus ad Testificandum issued for Travis Ivan Robinson for 6/1/04 in case as to Chadrick E Fulks (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 612 | WRIT of Habeas Corpus ad Testificandum issued for Brian Fleming for 6/1/04 in case as to Chadrick E Fulks (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/28/2004) |
| 05/28/2004 | 615 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 06/01/2004) |
| 05/28/2004 | 616 | |

| | | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 06/01/2004) |
|---|---|---|
| 05/28/2004 | 617 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 06/01/2004) |
| 05/28/2004 | 618 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 06/01/2004) |
| 06/01/2004 | 613 | REPLY by Chadrick E Fulks to response to [589-1] motion in limine to prohibit evidence of the abuse of Myles Evans (mflo) (Entered: 06/01/2004) |
| 06/01/2004 | 614 | MOTION by Chadrick E Fulks in limine to exclude when defendant was sent to a Federal Medical Center in Kentucky for a competency evaulation (mflo) (Entered: 06/01/2004) |
| 06/01/2004 | 619 | ORDER NO. 44 as to Branden L Basham allowing one of co-defendant Chadrick Fulk's attorneys to attend the Fulks trial and be paid an hourly rate of $125. (Signed by Chief Judge Joseph F. Anderson Jr ) EOD 6/1/04 (kbos) Modified on 6/6/2006 (mflo, ). (Entered: 06/01/2004) |
| 06/01/2004 | 620 | JURY TRIAL as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr Panel Sworn: yes, preliminary instructions by the court, opening statments by government and defendant, Court adjourned to 6/2/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/01/2004) |
| 06/02/2004 | 621 | TRANSCRIPT OF MOTIONS HEARING as to Chadrick E Fulks, Branden L Basham for dates of 4/3/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 06/02/2004) |
| 06/02/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses, Court adjourned to 6/3/04 at 9:15 Court reporter: Debra Jernigan. (mflo) (Entered: 06/03/2004) |
| 06/03/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witness, Court adjourned to 6/4/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/03/2004) |
| 06/04/2004 | 622 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [617-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/04/2004) |
| 06/04/2004 | 623 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [618-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/04/2004) |
| 06/04/2004 | 624 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [615-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/04/2004) |
| 06/04/2004 | 625 | |

**JA 0082**

| | | |
|---|---|---|
| | | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [616-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/04/2004) |
| 06/04/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses Court adjourned to 6/7/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/07/2004) |
| 06/07/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses Court adjourned to 6/8/04 at 9:00 Court reporter: Debra Jernigan. (mflo) (Entered: 06/07/2004) |
| 06/08/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses Court adjourned to 6/9/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/08/2004) |
| 06/08/2004 | 626 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (amil) (Entered: 06/08/2004) |
| 06/09/2004 | 627 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [626-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/09/2004) |
| 06/09/2004 | 628 | Proposed Jury Instructions by Chadrick E Fulks as to Chadrick E Fulks (mflo) (Entered: 06/09/2004) |
| 06/09/2004 | 629 | ORDER No. 45 as to Chadrick E Fulks granting in part, denying in part [589-1] motion in limine to prohibit evidence of the abuse of Myles Evans, see written order for details (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 06/23/2004 (Entered: 06/09/2004) |
| 06/09/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and Witnesses Court adjourned to 6/10/04 at 12:00 Court reporter: Debra Jernigan. (mflo) (Entered: 06/09/2004) |
| 06/10/2004 | | JURY TRIAL CONTINUED as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr; Government Exhibits and witnesses submitted. Court will reconvene 9:30 6/11/04. Court reporter: Debra Jernigan. (ljon) (Entered: 06/10/2004) |
| 06/11/2004 | | JURY TRIAL CONTINUED as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr; Exhibits and witnesses by government; Court adjourned to 9:30 6/14/04. Court reporter: Debra Jernigan. (ljon) (Entered: 06/14/2004) |
| 06/14/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses : Court adjourned to 6/15/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/14/2004) |
| 06/14/2004 | 630 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 06/15/2004) |
| 06/15/2004 | 631 | |

**JA 0083**

| | | |
|---|---|---|
| | | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [630-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/15/2004) |
| 06/15/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses Court adjourned to 6/16/04 at 9:15 Court reporter: Debra Jernigan. (mflo) (Entered: 06/15/2004) |
| 06/16/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses : (Terminated motions -denying [614-1] motion in limine to exclude when defendant was sent to a Federal Medical Center in Kentucky for a competency evaulation as to Chadrick E Fulks (1) ) Court adjourned to 6/17/04 at 8:45 Court reporter: Debra Jernigan. (mflo) (Entered: 06/16/2004) |
| 06/17/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses : Court adjourned to 6/18/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/17/2004) |
| 06/18/2004 | 632 | TRANSCRIPT OF MOTIONS HEARING as to Chadrick E Fulks, Branden L Basham for dates of 1/15/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Jack Clarke (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 06/18/2004) |
| 06/18/2004 | 633 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 06/18/2004) |
| 06/18/2004 | 634 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [633-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/18/2004) |
| 06/18/2004 | 635 | WRIT of Habeas Corpus ad Testificandum issued for Patrick Thomas Fuhr for 6/21/04 in case as to Chadrick E Fulks (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 06/18/2004) |
| 06/18/2004 | | JURY TRIAL CONTINUES as Chadrick Evan Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses Court adjourned to 6/21/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/18/2004) |
| 06/18/2004 | 636 | MOTION by Chadrick E Fulks in limine to exclude government from seeking to impeach co defendant's inculpatory statements with hearsay statements purporting to implicate defendant (mflo) (Entered: 06/18/2004) |
| 06/21/2004 | 637 | ORDER for witness travel expenses pursuant to 17(b) subpoenas as to Chadrick E Fulks (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 06/21/2004) |
| 06/21/2004 | 638 | MOTION by Chadrick E Fulks to compel grant of use immunity to Ronnie Fulks in order to facilitate material, exculpatory testimony unavailable from any other source (mflo) (Entered: 06/21/2004) |
| 06/21/2004 | | |

**JA 0084**

| | | |
|---|---|---|
| | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses Court adjourned to 6/22/04 at 9:15 Court reporter: Debra Jernigan. (mflo) (Entered: 06/21/2004) |
| 06/22/2004 | 639 | Stipulations 1 - 5 by plaintiff USA, defendant Chadrick E Fulks, published to the jury. (mflo) (Entered: 06/22/2004) |
| 06/22/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses; Government rested and defense begins case; (Terminated motions -denying [638-1] motion to compel grant of use immunity to Ronnie Fulks in order to facilitate material, exculpatory testimony unavailable from any other source as to Chadrick E Fulks (1), granting [636-1] motion in limine to exclude government from seeking to impeach co defendant's inculpatory statements with hearsay statements purporting to implicate defendant as to Chadrick E Fulks (1) ) Court adjourned to 6/23/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/22/2004) |
| 06/22/2004 | 640 | EX PARTE MOTION (Sealed) by Chadrick E Fulks (mflo) (Entered: 06/23/2004) |
| 06/23/2004 | 641 | EX PARTE ORDER (Sealed) as to Chadrick E Fulks granting [640-1] ex parte motion as to Chadrick E Fulks (1) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) (Entered: 06/23/2004) |
| 06/23/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses, Court adjourned to 6/24/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/23/2004) |
| 06/24/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses, Court adjourned to 6/25/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/24/2004) |
| 06/25/2004 | 643 | Proposed Jury Instructions by USA as to Chadrick E Fulks (mflo) (Entered: 06/25/2004) |
| 06/25/2004 | 644 | OBJECTION by plaintiff USA to [628-1] defendant's proposed jury instructions (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 06/25/2004) |
| 06/25/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses, Court adjourned to 6/28/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/25/2004) |
| 06/28/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits, Defense Rest and Government Rebuttal case done, Charge Conference, Court adjourned to 6/29/04 at 9:00 Court reporter: Debra Jernigan. (mflo) (Entered: 06/28/2004) |
| 06/28/2004 | 645 | Proposed Request to Charge #13 by USA as to Chadrick E Fulks (mflo) (Entered: 06/29/2004) |
| 06/29/2004 | 646 | Government Request to Charge #14 and #15 by USA as to Chadrick E Fulks (mflo) (Entered: 06/29/2004) |

**JA 0085**

| 06/29/2004 | 647 | Proposed Final Jury Instructions by Chadrick E Fulks as to Chadrick E Fulks (mflo) (Entered: 06/29/2004) |
|---|---|---|
| 06/29/2004 | | JURY TRIAL CONTINUES as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr , Closing Arguments by Government and Defendant, Jury Charge by the Court , deliberations to begin on 6/30/04 , Court adjourned to 6/30/04 at 9:30 Court reporter: Debra Jernigan. (mflo) (Entered: 06/29/2004) |
| 06/30/2004 | | JURY TRIAL CONCLUDED as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr , Time/Date jury began deliberations: 10:00 on 6/30/04, Time/Date jury ended deliberations: 2:25 on 6/30/04, Verdict published at 2:30 on 6/30/04, Jury polled after verdict: yes, Exhibits returned to counsel: yes Jury list, witness list and exhibit list attached. Court reporter: Debra Jernigan. (mflo) (Entered: 06/30/2004) |
| 06/30/2004 | 648 | JURY VERDICT as to Chadrick E Fulks DEATH: Chadrick E Fulks (1) count(s) 1s Carjacking resulting in death (mflo) (Entered: 06/30/2004) |
| 06/30/2004 | 649 | JURY VERDICT as to Chadrick E Fulks DEATH: Chadrick E Fulks (1) count(s) 2s Kidnaping Resulting in Death (mflo) (Entered: 06/30/2004) |
| 07/01/2004 | 650 | ORDER that the parties are to maintain the exhibits intact as returned until the time of filing appeal has expired or during the appeal as to Chadrick E Fulks (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 07/01/2004) |
| 07/02/2004 | 651 | NOTICE of Hearing as to Branden L Basham set status conference for 10:00 7/23/04 for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/02/2004) |
| 07/06/2004 | 652 | NOTICE of Hearing as to Branden L Basham reset status conference for 2:00 7/21/04 for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mdea) Modified on 5/31/2006 (mflo, ). (Entered: 07/06/2004) |
| 07/06/2004 | 653 | NOTICE of Hearing as to Branden L Basham reset Jury selection and trial for 10:00 8/23/04 for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mdea) Modified on 5/31/2006 (mflo, ). (Entered: 07/06/2004) |
| 07/06/2004 | 654 | ORDER as to Branden L Basham directing the US Marshal to immediately transport defendant to FCI Butner for a follow-up evaluation, not to exceed 2 weeks in duration. The USM shall return the defendant to SC on the 15th day after his arrival at Butner, if not sooner. (Signed by Chief Judge Joseph F. Anderson Jr ) eod/mld (mdea) Modified on 5/31/2006 (mflo, ). (Entered: 07/06/2004) |
| 07/06/2004 | 655 | ORDER No. 47 as to Chadrick E Fulks in limine to exclude polygraph evidence (Signed by Chief Judge Joseph F. Anderson Jr ) (mdea) (Entered: 07/07/2004) |
| 07/07/2004 | 656 | TRANSCRIPT OF EXCERPT OF JURY SELECTION - voir dire examination of juror Sylvia Allison as to Chadrick E Fulks for dates of 5/19/04 before Chief Judge Joseph F. Anderson Jr held in Columbia; Court Reporter: Gary Smith (mdea) (Entered: 07/07/2004) |

**JA 0086**

| | | |
|---|---|---|
| 07/09/2004 | | CJA24 LOCATION as to Branden L Basham : Transcript of hearing date: 2/24/04 by Court Reporter: Gary Smith to JFA for approval of CJA24 (mdea) Modified on 5/31/2006 (mflo, ). (Entered: 07/09/2004) |
| 07/09/2004 | | CJA24 LOCATION as to Branden L Basham : Transcript of trial date: 6/1/04 - 6/30/04 by Court Reporter: Debra Jernigan to JFA for approval of CJA24 (mdea) Modified on 5/31/2006 (mflo, ). (Entered: 07/09/2004) |
| 07/09/2004 | 657 | MOTION by Chadrick E Fulks for new trial , or in the alternative for Evidentiary Hearing (mdea) (Entered: 07/09/2004) |
| 07/15/2004 | 658 | RESCHEDULED NOTICE of Hearing as to Branden L Basham reset status conference for 2:00 8/3/04 for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/15/2004) |
| 07/15/2004 | 659 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/15/2004) |
| 07/15/2004 | 660 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/15/2004) |
| 07/15/2004 | 661 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/15/2004) |
| 07/15/2004 | 662 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/15/2004) |
| 07/15/2004 | 663 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/15/2004) |
| 07/15/2004 | 664 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/15/2004) |
| 07/15/2004 | 665 | ORDER No. 48 the court will grant the request for a transcript of the trial of co-defendant Fulks, but will deny the request for a transcript of jury selection for the co-defendant Fulks as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/16/2004) |
| 07/16/2004 | 666 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [664-1] ex parte motion as to Branden L Basham (2), granting [663-1] ex parte motion as to Branden L Basham (2), granting [662-1] ex parte motion as to Branden L Basham (2), granting [661-1] ex parte motion as to Branden L Basham (2), granting [660-1] ex parte motion as to Branden L Basham (2), granting [659-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/19/2004) |
| 07/16/2004 | 667 | MOTION HEARING as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr ORAL ORDER [657-1] motion for new trial taken under advisement as to Chadrick E Fulks (1) Court Reporter: Debra Jernigan. (mflo) (Entered: 07/19/2004) |
| | | |

**JA 0087**

| 07/20/2004 | 668 | RESPONSE by USA as to Chadrick E Fulks re [657-1] motion for new trial (mflo) (Entered: 07/20/2004) |
|---|---|---|
| 07/22/2004 | 669 | REPLY by defendant Chadrick E Fulks to [668-1] motion response to, [657-1] motion for new trial (mflo) (Entered: 07/22/2004) |
| 07/23/2004 | 670 | ORDER No. 49 on Supplemental Mental Health Information for defense counsel to modify and/or supplement the 1/20/04 letter if necessary within 3 days of this Order as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/23/2004) |
| 07/23/2004 | 671 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/23/2004) |
| 07/23/2004 | 672 | ORDER No. 50 on transporting Basham from Butner to Columbia no later than 8/3/04 and the pretrial conference will be held on Wednesday, August 4, 2004 as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/23/2004) |
| 07/23/2004 | 673 | 2ND RESCHEDULED NOTICE of Hearing as to Branden L Basham set pretrial conference for 2:00 8/4/04 for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/23/2004) |
| 07/26/2004 | 674 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [671-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/26/2004) |
| 07/29/2004 | 675 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 07/30/2004) |
| 07/30/2004 | 676 | TRANSCRIPT OF JURY TRIAL VOLUME I as to Chadrick E Fulks for dates of 6/1/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 07/30/2004) |
| 07/30/2004 | 677 | TRANSCRIPT OF JURY TRIAL VOLUME II as to Chadrick E Fulks for dates of 6/2/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 07/30/2004) |
| 07/30/2004 | 678 | TRANSCRIPT OF JURY TRIAL VOLUME III as to Chadrick E Fulks for dates of 6/3/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 07/30/2004) |
| 08/02/2004 | 679 | STATUS CONFERENCE as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr discussing further testing of defendant,Mr. Swerling would like to delay jury selection by 1 - 2 weeks, court will address at pretrial conference, court to enter written order dealing with topics addressed during telephone conference,ORAL ORDER portion of this status conference is sealed. Court Reporter: Debra Jernigan. (jada) Modified on 5/31/2006 (mflo, ). (Entered: 08/02/2004) |
| 08/02/2004 | 680 | |

**JA 0088**

| | | TRANSCRIPT OF SEALED HEARING during Jury Trial as to Chadrick E Fulks for dates of 6/3/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/03/2004) |
|---|---|---|
| 08/02/2004 | 681 | TRANSCRIPT OF JURY TRIAL VOLUME IV as to Chadrick E Fulks for dates of 6/4/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/03/2004) |
| 08/02/2004 | 682 | TRANSCRIPT OF JURY TRIAL VOLUME V as to Chadrick E Fulks for dates of 6/7/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/03/2004) |
| 08/02/2004 | 683 | TRANSCRIPT OF JURY TRIAL VOLUME VI as to Chadrick E Fulks for dates of 6/8/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 08/03/2004 (Entered: 08/03/2004) |
| 08/02/2004 | 684 | ORDER No. 51 distributing a copy of an incident report and cover letter from FCI Butner as to this defendant, as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 08/03/2004 Modified on 5/31/2006 (mflo, ). (Entered: 08/03/2004) |
| 08/03/2004 | 685 | ORDER No. 52 the court will appoint an independent neuropsychologist or neuropsychiatrist to administer the MMPI-2 to defendant no later than 8/9/04; No person or entity associated with the defense team (including defense counsel and mental health experts) shall communicate with defendant in any respect about the MMPI-2 test prior to its administration; the raw data and scores, but interpretation, of the MMPI-2 administered shall be provided to both defense counsel and doctors at Butner but not to government lawyers; The parties shall brief the question of whether the MMPI-2 results may be used in any way at trial. Briefs from both sides shall be filed on or before 8/13/04. as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/03/2004) |
| 08/04/2004 | 686 | TRANSCRIPT OF JURY TRIAL Volume VII as to Chadrick E Fulks for dates of 6/9/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 7/8/2005 (mflo, ). (Entered: 08/04/2004) |
| 08/04/2004 | 687 | TRANSCRIPT OF JURY TRIAL VOLUME VIII as to Chadrick E Fulks for dates of 6/10/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/04/2004) |
| 08/04/2004 | 688 | PRETRIAL CONFERENCE - Jury Selection is to begin on 8/30/04 and the following dates no court will be held, 9/6/04, 9/16/04, 9/17/04, 10/15/04, 10/18/04, 10/19/04, 10/20/04; Brief to be filed by Government by 8/11/04 and reply by defendant due by 8/16/04 on Fulks case results; any renewed motions to be filed by 8/16/04 as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER [232-2] motion for leave to file additional grounds to suppress after court rules on pending motions and discovery has been completed taken under advisement as to Branden L |

**JA 0089**

| | | |
|---|---|---|
| | | Basham (2), [228-1] motion for discovery pursuant to Rule 16 taken under advisement as to Branden L Basham (2) Court Reporter: Debra Jernigan. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/05/2004) |
| 08/04/2004 | | Ex Parte hearing as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr Court reporter: Debra Jernigan (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/05/2004) |
| 08/04/2004 | 689 | LETTER of A.F. Beeler, Warden to Judge Joe Anderson Re: MMPI-2 test (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/05/2004) |
| 08/05/2004 | | Minute entry as to Branden L Basham :from Order #26 (doc #345) granting in part, denying in part [310-1] ex parte motion as to Branden L Basham (2) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/05/2004) |
| 08/05/2004 | 690 | RESCHEDULED NOTICE of Hearing as to Branden L Basham reset jury selection for 10:00 8/30/04 for Branden L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/05/2004) |
| 08/05/2004 | 691 | ORDER NO. 53 Pretrial Conference as to Branden L Basham Trial/Jury Selection set for 8/30/04; Scheduling: no court on 9/6/04; 9/16/04, 10/15/04, 10/18/04, 10/19/04, 10/20/04 and will adjourn early on 9/15 and 9/24; Videotape introduction objections due 8/9/04; Brief by Government due on 8/11/04 and reply due 8/16/04 on the evidence issue from co-defendant's trial; Renewal of Pretrial Motions due by 8/9/04; Court has appointed an independent neuropsychologist and will be tested in the courthouse; The court is inclined to keep out evidence of the Littlejohn hypotheticals during the guilty phase. Jury Venire will begin with a panel of 24 where the Fulks venire left off. The jury clerk will supply the parties with the daily lists in venire order. Horry County Jurors, the request to exclude all potential jurors from Horry County is denied. (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/05/2004) |
| 08/05/2004 | 692 | EX PARTE ORDER NO. 54 (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/05/2004) |
| 08/09/2004 | 693 | ORDER NO. 54 for defendant be administered the MMPI-2 test by court appointed, independent mental health expert, Dr. Clay Drummond on 8/11/04, defense counsel is instructed not to have any communication with defendant about this test until the test is completed as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/09/2004) |
| 08/09/2004 | 694 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/09/2004) |
| 08/09/2004 | 695 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte |

**JA 0090**

| | | |
|---|---|---|
| | | Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/09/2004) |
| 08/09/2004 | 696 | GOVERNMENT'S PROPOSED JUDGMENT AND ORDER IMPLEMENTING JUDGMENT by plaintiff USA (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/09/2004) |
| 08/09/2004 | 697 | MOTION by USA as to Branden L Basham in limine to exclude introduction of aggravation evidence that the government presented in co-defendant Chadrick Evan Fulks penalty trial (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/10/2004) |
| 08/09/2004 | 698 | TRANSCRIPT OF EXCERPT OF MOTIONS HEARING/EVIDENTIARY HEARING - AFTERNOON PROCEEDINGS as to Chadrick E Fulks, Branden L Basham for dates of 2/24/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/10/2004) |
| 08/09/2004 | 699 | TRANSCRIPT OF JURY TRIAL VOLUME IX as to Chadrick E Fulks for dates of 6/11/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/10/2004) |
| 08/09/2004 | 700 | TRANSCRIPT OF JURY TRIAL VOLUME X as to Chadrick E Fulks for dates of 6/14/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/10/2004) |
| 08/09/2004 | 701 | TRANSCRIPT OF JURY TRIAL VOLUME XI as to Chadrick E Fulks for dates of 6/15/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/10/2004) |
| 08/10/2004 | 702 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/10/2004) |
| 08/12/2004 | 703 | SEALED DOCUMENT MMPI-2 Test as to Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/12/2004) |
| 08/12/2004 | 704 | MOTION by USA as to Branden L Basham for suspension of the briefing schedule set forth in the Order No. 52 regarding Dr. Bruce Capehart's request to administer the MMPI-2 test to the defendant (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/13/2004) |
| 08/13/2004 | 705 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [702-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/13/2004) |
| 08/13/2004 | 706 | ORDER NO. 55 for counsel to only submit one copy of correspondence, Do not fax one and then mail a hard copy. as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 08/13/2004 Modified on 5/31/2006 (mflo, ). (Entered: 08/13/2004) |
| 08/13/2004 | 707 | MOTION by Branden L Basham to join in Motion of USA [704-1] motion for suspension of the briefing schedule set forth in the Order No. 52 |

**JA 0091**

| | | |
|---|---|---|
| | | regarding Dr. Bruce Capehart's request to administer the MMPI-2 test to the defendant (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/13/2004) |
| 08/13/2004 | 708 | ORDER NO. 56 as to Branden L Basham granting [707-1] motion to join in Motion of USA [704-1] motion for suspension of the briefing schedule set forth in the Order No. 52 regarding Dr. Bruce Capehart's request to administer the MMPI-2 test to the defendant as to Branden L Basham (2), granting [704-1] motion for suspension of the briefing schedule set forth in the Order No. 52 regarding Dr. Bruce Capehart's request to administer the MMPI-2 test to the defendant as to Branden L Basham (2) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/13/2004) |
| 08/13/2004 | 709 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/13/2004) |
| 08/16/2004 | 710 | ORDER NO. 57 as to Branden L Basham mooting [707-1] motion to join in Motion of USA [704-1] motion for suspension of the briefing schedule set forth in the Order No. 52 regarding Dr. Bruce Capehart's request to administer the MMPI-2 test to the defendant (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/16/2004) |
| 08/16/2004 | 711 | TRANSCRIPT OF EXCERPTS OF JURY SELECTION as to Chadrick E Fulks for dates of 5/10/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) (Entered: 08/16/2004) |
| 08/16/2004 | 712 | TRANSCRIPT OF EXCERPTS OF JURY SELECTION as to Chadrick E Fulks for dates of 5/12/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) (Entered: 08/16/2004) |
| 08/16/2004 | 713 | TRANSCRIPT OF EXCERPTS OF JURY SELECTION as to Chadrick E Fulks for dates of 5/14/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) (Entered: 08/16/2004) |
| 08/16/2004 | 714 | TRANSCRIPT OF EXCERPT OF JURY SELECTION as to Chadrick E Fulks for dates of 5/18/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) (Entered: 08/16/2004) |
| 08/16/2004 | 715 | TRANSCRIPT OF EXCERPT OF JURY SELECTION as to Chadrick E Fulks for dates of 5/19/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) (Entered: 08/16/2004) |
| 08/18/2004 | 716 | ORDER NO. 58 counsel has until 8/23/04 to object to this order on jurors requesting to be excused, as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 08/18/2004 Modified on 5/31/2006 (mflo, ). (Entered: 08/18/2004) |
| 08/19/2004 | 717 | MEMORANDUM by Branden L Basham in opposition to [697-1] motion in limine to exclude introduction of aggravation evidence that the government |

| | | |
|---|---|---|
| | | presented in co-defendant Chadrick Evan Fulks penalty trial (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/20/2004) |
| 08/20/2004 | 718 | WRIT of Habeas Corpus ad Testificandum issued for Stacy Ann Workman for 9/17/04 in case as to Branden L Basham (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/20/2004) |
| 08/20/2004 | 719 | WRIT of Habeas Corpus ad Testificandum issued for Betty McGuffin for 9/17/04 in case as to Branden L Basham (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/20/2004) |
| 08/20/2004 | 720 | NOTICE of Hearing as to Branden L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 10:00 8/25/04 as to: Branden Basham, In Limine (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/20/2004) |
| 08/23/2004 | 721 | REPLY MEMORANDUM by USA as to Branden L Basham to [717-1] opposition memorandum to , [697-1] motion in limine to exclude introduction of aggravation evidence that the government presented in co-defendant Chadrick Evan Fulks penalty trial (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/23/2004) |
| 08/24/2004 | 722 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/24/2004) |
| 08/25/2004 | 723 | MOTION by USA as to Branden L Basham to strike jurors for cause (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/25/2004) |
| 08/25/2004 | 724 | MEMORANDUM by defendant Branden L Basham in supporting defendant's introduction of the government's closing argument (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/25/2004) |
| 08/25/2004 | 725 | MOTION HEARING/PRETRIAL CONFERENCE as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER granting [723-1] motion to strike jurors for cause as to Branden L Basham (2), [697-1] motion in limine to exclude introduction of aggravation evidence that the government presented in co-defendant Chadrick Evan Fulks penalty trial taken under advisement as to Branden L Basham (2); Trial will not start before 9/13/04, 1st day of jury selection counsel to report at 9:30; Court takes under advisement request by USM for defendant to wear stun belt, some jurors request to be excused agreed on by counsel and court, and others given an extended time to report, Court will sequester witnesses except for victims family and Basham family members, Court Reporter: Gary Smith. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/26/2004) |
| 08/26/2004 | 726 | EX PARTE ORDER NO. 59 (Sealed) as to Branden L Basham granting [722-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 08/26/2004 Modified on 5/31/2006 (mflo, ). (Entered: 08/26/2004) |
| 08/26/2004 | 727 | ORDER NO. 60 as to Branden L Basham granting [723-1] motion to strike jurors for cause (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/26/2004) |
| | | |

**JA 0093**

| 08/26/2004 | 728 | WRIT of Habeas Corpus ad Testificandum issued for Henry Hardy for 8/30/04 in case as to Branden L Basham (signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/26/2004) |
|---|---|---|
| 08/26/2004 | 729 | EX PARTE ORDER (Sealed) as to Branden L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/26/2004) |
| 08/27/2004 | 730 | TRANSCRIPT OF JURY TRIAL VOLUME XII as to Chadrick E Fulks for dates of 6/16/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 731 | TRANSCRIPT OF JURY TRIAL/SEALED HEARING Volume XIII as to Chadrick E Fulks for dates of 6/17/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 732 | TRANSCRIPT OF JURY TRIAL VOLUME XIV as to Chadrick E Fulks for dates of 6/18/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 733 | TRANSCRIPT OF JURY TRIAL VOLUME XV as to Chadrick E Fulks for dates of 6/21/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 734 | TRANSCRIPT OF JURY TRIAL VOLUME XVI as to Chadrick E Fulks for dates of 6/22/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 735 | TRANSCRIPT OF JURY TRIAL VOLUME XVII as to Chadrick E Fulks for dates of June 23, 2004 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 736 | TRANSCRIPT OF JURY TRIAL VOLUME XVIII as to Chadrick E Fulks for dates of 6/24/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 737 | TRANSCRIPT OF JURY TRIAL VOLUME XIX as to Chadrick E Fulks for dates of 6/25/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 738 | TRANSCRIPT OF JURY TRIAL VOLUME XX as to Chadrick E Fulks for dates of 6/28/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 739 | TRANSCRIPT OF JURY TRIAL VOLUME XXI as to Chadrick E Fulks for dates of 6/29/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 740 | TRANSCRIPT OF JURY TRIAL VOLUME XIII as to Chadrick E Fulks for dates of 6/17/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
| 08/27/2004 | 741 | |

**JA 0094**

| | | TRANSCRIPT OF JURY TRIAL VOLUME XXII as to Chadrick E Fulks for dates of 6/30/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 08/27/2004) |
|---|---|---|
| 08/27/2004 | 742 | MEMORANDUM by plaintiff USA regarding qualification of prospective jurors (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/30/2004) |
| 08/30/2004 | 743 | JURY SELECTION begins before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s; jurors qualified 6; jurors excused 3, jury selection continues 8/31/04 at 9:00, Panel Sworn: no, Court reporter: Gary Smith. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/30/2004) |
| 08/30/2004 | 744 | SUPPLEMENTAL JUROR QUESTIONNAIRE as to Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/31/2004) |
| 08/31/2004 | 745 | MEMORANDUM by USA as to Branden L Basham in opposition to [724-1] memorandum requesting being able to introduce the Government's closing argument (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/31/2004) |
| 08/31/2004 | 746 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/31/2004) |
| 08/31/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors: 7 and Excused Jurors: 16 and 2 holdovers to report back at 9:00 on 9/1, Court reporter: Gary Smith. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 08/31/2004) |
| 08/31/2004 | 747 | ORDER NO. 61 for Dr. Richard Eddelson to discuss with Dr. Bruce Capehart any treatment rendered or diagnoses made by Dr. Eddelson regarding his former patient, Branden Basham, as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 09/01/2004) |
| 09/01/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors: 7 Excused Jurors: 3, Court continued until 9/2/04 at 9:10, Court reporter: Gary Smith. (mflo) Modified on 09/02/2004 Modified on 5/31/2006 (mflo, ). (Entered: 09/02/2004) |
| 09/02/2004 | 748 | RELEASE ORDER No. 62 to authorize any medical professionals who have treated the defendant to converse with Dr. Bruce Capehart and to provide any necessary information Dr. Capehart deems relevant for purposes of preparing his rebuttal report as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 09/03/2004) |
| 09/02/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors: 9, Excused Jurors: 6, Court to reconvene at 9:00am on 9/3/04, Court reporter: Gary Smith. (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 09/03/2004) |
| 09/03/2004 | | |

**JA 0095**

| | | |
|---|---|---|
| | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors: 8, Excused Jurors: 1 , jury selection is continued until 9/7/04 at 9:00 , Court reporter: Gary Smith. (mflo) Modified on 09/07/2004 Modified on 5/31/2006 (mflo, ). (Entered: 09/03/2004) |
| 09/07/2004 | 749 | TRANSCRIPT OF EXCERPT OF JURY SELECTION VOIR DIRE EXAMINATION OF CHARLIE BENTON as to Branden L Basham for dates of 8/31/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 09/07/2004) |
| 09/07/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Jurors Qualified: 10 and Excused Jurors: 4 , court to reconvene on 9/8/04 at 9:00, Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/08/2004) |
| 09/08/2004 | 750 | INCIDENT REPORTS by USM and Alvin S. Glenn Detention Center as to Branden L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/08/2004) |
| 09/08/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Jurors Qualified: 9 and Excused Jurors: 7, jury selection continues on 9/9/04 at 9:00 , Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/09/2004) |
| 09/09/2004 | 751 | TRIAL BRIEF by USA as to Branden L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/09/2004) |
| 09/09/2004 | | JURY SELECTION CONTINUES before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , Qualified Jurors: 8, Excused Jurors: 5, jury selection will continue on 9/10 at 2:00 , Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/10/2004) |
| 09/10/2004 | 752 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/10/2004) |
| 09/10/2004 | 753 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [746-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/10/2004) |
| 09/10/2004 | 754 | ORDER OF PROTECTION for Greg Harris from court proceedings between 9/13/04 and 10/31/04 as to Branden L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/13/2004) |
| 09/10/2004 | | JURY SELECTION CONCLUDED before Chief Judge Joseph F. Anderson Jr as to Branden L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s , 17 jurors |

**JA 0096**

| | | |
|---|---|---|
| | | selected for trial beginning on 9/13/04 at 9:30, (see attached list), Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/13/2004) |
| 09/13/2004 | 755 | JURY TRIAL as to Branden L Basham begins before Chief Judge Joseph F. Anderson Jr , Panel Sworn: yes, court gives preliminary instructions, opening statements, witnesses and exhibits . (Terminated motions - [697-1] motion in limine to exclude introduction of aggravation evidence that the government presented in co-defendant Chadrick Evan Fulks penalty trial . Motion Terminated. as to Branden L Basham (2) ) Court adjourned to 9/14/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/13/2004) |
| 09/14/2004 | | JURY TRIAL CONTINUES as to Branden L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits (Terminated motions - [232-2] motion for leave to file additional grounds to suppress after court rules on pending motions and discovery has been completed . Motion Terminated. as to Branden L Basham (2), [228-1] motion for discovery pursuant to Rule 16 . Motion Terminated. as to Branden L Basham (2) ) Court adjourned to 9/15/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/14/2004) |
| 09/15/2004 | 756 | EX PARTE ORDER (Sealed) as to Branden L Basham granting [752-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/15/2004) |
| 09/15/2004 | | JURY TRIAL CONTINUES as to Branden L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 9:00 9/17/04 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/15/2004) |
| 09/17/2004 | | JURY TRIAL CONTINUES as to Branden L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 9/20/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/17/2004) |
| 09/20/2004 | | JURY TRIAL CONTINUES as to Branden L Basham before Chief Judge Joseph F. Anderson Jr , Exhibits and witness, Court adjourned to 9/21/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/21/2004) |
| 09/21/2004 | | JURY TRIAL CONTINUES as to Branden L Basham before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses, Court adjourned to 9/22/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/21/2004) |
| 09/22/2004 | 757 | EX PARTE MOTION (Sealed) by Branden L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/22/2004) |
| 09/22/2004 | | JURY TRIAL CONTINUES as to Branden L Basham before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses, Court adjourned to 9/23/04 at |

**JA 0097**

| | | |
|---|---|---|
| | | 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/22/2004) |
| 09/22/2004 | 758 | EX PARTE ORDER NO. 63 (Sealed) as to Branden L Basham granting [757-1] ex parte motion as to Branden L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/23/2004) |
| 09/23/2004 | | JURY TRIAL CONTINUES as to Branden L Basham before Chief Judge Joseph F. Anderson Jr , Exhibits and witnesses, Court adjourned to 9/24/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/23/2004) |
| 09/24/2004 | | JURY TRIAL CONTINUED as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr; witnesses/exhibits; Court adjourned to 9/27/04 at 9:00 am; Court reporter: Debra Jernigan. (mdea) Modified on 5/19/2006 (mflo, ). (Entered: 09/24/2004) |
| 09/27/2004 | | JURY TRIAL CONTINUED as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr; witnesses and exhibits; Court adjourned to 9/28/04 at 10:00 am; jury excused until 9/29/04 at 9:00 am; Court reporter: Debra Jernigan. (mdea) Modified on 5/19/2006 (mflo, ). (Entered: 09/27/2004) |
| 09/28/2004 | | JURY TRIAL CONTINUED as to Branden L Basham held before Chief Judge Joseph F. Anderson Jr; defendant makes oral motions for judgment of acquital - denied; charge conference Court adjourned to 9/29/04 at 9:00 am; Court reporter: Debra Jernigan. (mdea) Modified on 5/19/2006 (mflo, ). (Entered: 09/28/2004) |
| 09/28/2004 | | MOTION in open court by Branden L Basham for Judgment of Acquittal (mdea) Modified on 5/19/2006 (mflo, ). (Entered: 09/28/2004) |
| 09/28/2004 | | ORAL ORDER as to Branden L Basham denying [0-0] oral motion for Judgment of Acquittal as to Branden L Basham (2) Per: 9/28/04 jury trial ( Entered by Chief Judge Joseph F. Anderson Jr ) (mdea) Modified on 5/19/2006 (mflo, ). (Entered: 09/28/2004) |
| 09/28/2004 | | ORAL ORDER as to Branden L Basham correcting spelling of defendant's first name to "Brandon" Per: 9/28/04 jury trial ( Entered by Chief Judge Joseph F. Anderson Jr ) (mdea) Modified on 5/19/2006 (mflo, ). (Entered: 09/28/2004) |
| 09/29/2004 | 759 | Proposed Jury Instructions 1-12 by Brandon L Basham as to Brandon L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/29/2004) |
| 09/29/2004 | 760 | Proposed Jury Instructions 1-6 for the guilt phase by USA as to Brandon L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/29/2004) |
| 09/29/2004 | 761 | Proposed Jury Instructions #7 for the guilt phase by USA as to Brandon L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/29/2004) |
| 09/29/2004 | 762 | |

**JA 0098**

| | | |
|---|---|---|
| | | Proposed Jury Instructions #8 for the guilt phase by USA as to Brandon L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/29/2004) |
| 09/29/2004 | 763 | Stipulations 1-9 by plaintiff USA, defendant Brandon L Basham for the guilt phase of the trial. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/29/2004) |
| 09/29/2004 | | JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Closing arguments, Jury Charge and jury to return on 9/30/04 to begin deliberations, Court adjourned to 9/30/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 09/30/2004) |
| 09/30/2004 | | JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Time/Date jury began deliberations: 9/30/04 at 9:40, Time/Date jury ended deliberations: 9/30/04 at 3:30, Verdict rendered GUILTY as to all counts 1-8, Jury polled after verdict: yes, Exhibits to remain in courthouse. FBI agents to take custody of weapons until the penalty phase begins on 10/12/04: , witness list and exhibit list attached. Court adjourned to 10/12/04 at 9:00 at which time the penalty phase will begin; Court reporter: Debra Jernigan. (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 10/01/2004) |
| 09/30/2004 | 764 | Jury notes filed as to Brandon L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 10/01/2004) |
| 09/30/2004 | 765 | ALVIN S. GLENN DETENTION CENTER incident report dated 9/26/04 as to Brandon L Basham (mflo) Modified on 5/19/2006 (mflo, ). (Entered: 10/01/2004) |
| 09/30/2004 | 766 | JURY VERDICT as to Brandon L Basham Guilty: Brandon L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/01/2004) |
| 10/01/2004 | 767 | EX PARTE ORDER (Sealed) as to Brandon L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/01/2004) |
| 10/04/2004 | 768 | NOTICE of Hearing as to Brandon L Basham set pretrial conference for 10:00 10/8/04 for Brandon L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/04/2004) |
| 10/04/2004 | 769 | ORDER NO. 64 the defendant shall provide to the court a memorandum no later than 10:00 am on Wednesday, October 6, 2004 addressing the basis for objecting the administration of the MMPI by physicians at Butner; the reason that the methodology employed by Dr. Drummond renders the MMPI results invalid and assuming the MMPI results are valid, because of the way the test was administered, whether the government should be allowed to put before the jury the fact that the defendant refused to take the MMPI (which the court understands to be a test that will detect, among other things, evidence of malingering) while at Butner as to Brandon L Basham; Government is requested to respond to the defendant's memorandum by 4:30pm on |

**JA 0099**

| | | |
|---|---|---|
| | | Thursday, October 7, 2004 (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/05/2004) |
| 10/06/2004 | 770 | MEMORANDUM Regarding the administration of the Minnesota Multphasic Personality Inventory II (MMPI) by defendant Brandon L Basham (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/06/2004) |
| 10/06/2004 | 771 | MOTION by Brandon L Basham in limine to exclude letter from victim (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/06/2004) |
| 10/06/2004 | 772 | SUPPLEMENTAL MEMORANDUM by Brandon L Basham in opposition to [697-1] motion in limine to exclude introduction of aggravation evidence that the government presented in co-defendant Chadrick Evan Fulks penalty trial (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/06/2004) |
| 10/07/2004 | 773 | MOTION by Brandon L Basham for appropriate limitations on admission and consideration of evidence in support of non-statutory aggravating factors (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/07/2004) |
| 10/07/2004 | 774 | MOTION by Brandon L Basham in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a reliability hearing (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/07/2004) |
| 10/07/2004 | 775 | TRANSCRIPT OF MOTION HEARING/ with sealed envelope of sealed portion of hearing as to Brandon L Basham for dates of 8/2/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/07/2004) |
| 10/07/2004 | 776 | MOTION by Brandon L Basham to extend time for filing motion for a new trial (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 777 | MEMORANDUM by plaintiff USA in opposition to [772-1] supplemental memorandum seeking to introduce evidence related to co-defendant (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 778 | RESPONSE by USA as to Brandon L Basham re [774-1] motion in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a reliability hearing (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 779 | RESPONSE by USA as to Brandon L Basham re [771-1] motion in limine to exclude letter from victim (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 780 | RESPONSE by USA as to Brandon L Basham re [773-1] motion for appropriate limitations on admission and consideration of evidence in support of non-statutory aggravating factors (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 781 | EX PARTE ORDER (Sealed) as to Brandon L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte |

**JA 0100**

| | | |
|---|---|---|
| | | Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 782 | EX PARTE MOTION (Sealed) by Brandon L Basham (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 783 | EX PARTE MOTION (Sealed) by Brandon L Basham (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/08/2004) |
| 10/08/2004 | 784 | PRETRIAL CONFERENCE/MOTION HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying [774-1] motion in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a reliability hearing as to Brandon L Basham (2), denying [773-1] motion for appropriate limitations on admission and consideration of evidence in support of non-statutory aggravating factors as to Brandon L Basham (2), granting [776-1] motion to extend time for filing motion for a new trial as to Brandon L Basham (2), [771-1] motion in limine to exclude letter from victim taken under advisement as to Brandon L Basham (2) Court Reporter: Debra Jernigan. (mflo) Modified on 10/15/2004 Modified on 5/18/2006 (mflo, ). (Entered: 10/12/2004) |
| 10/12/2004 | | CJA24 LOCATION as to Brandon L Basham : Transcript of hearing date: 8/2/04 by Court Reporter: Debra Jernigan to Debra Jernigan for preparation of CJA24 (asni) Modified on 5/18/2006 (mflo, ). (Entered: 10/12/2004) |
| 10/12/2004 | 785 | EX PARTE ORDER (Sealed) as to Brandon L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/12/2004) |
| 10/12/2004 | 786 | PENALTY PHASE/JURY TRIAL as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER denying [771-1] motion in limine to exclude letter from victim as to Brandon L Basham (2) Panel Sworn: yes, Government moves to incorporate all evidence, exhibits and testimony into the penalty phase; Court grants, Court gives preliminary instructions; Witnesses and Exhibits : Court adjourned to 9/13/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | 787 | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume IV as to Brandon L Basham for dates of 9/17/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | 788 | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume VI as to Brandon L Basham for dates of 9/21/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | 789 | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume VII as to Brandon L Basham for dates of 9/22/04 before Chief Judge Joseph F. Anderson Jr held |

**JA 0101**

| | | |
|---|---|---|
| | | in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | [790](#) | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume IX as to Brandon L Basham for dates of 9/24/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | [791](#) | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume X as to Brandon L Basham for dates of 9/27/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | [792](#) | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume XI as to Brandon L Basham for dates of 9/28/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | [793](#) | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume XIII as to Brandon Basham for dates of 9/30/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/13/2004) |
| 10/13/2004 | [794](#) | TRANSCRIPT OF JURY TRIAL EXCERPTS Volume V as to Brandon L Basham for dates of 9/20/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/14/2004) |
| 10/13/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 9/14/04 at 9:30 Court reporter: Debra Jernigan. (mflo) Modified on 10/14/2004 Modified on 5/18/2006 (mflo, ). (Entered: 10/14/2004) |
| 10/14/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 10/15/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 10/14/2004 Modified on 5/18/2006 (mflo, ). (Entered: 10/14/2004) |
| 10/15/2004 | [795](#) | ORDER NO. 65 as to Brandon L Basham granting [776-1] motion to extend time for filing motion for a new trial (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/15/2004) |
| 10/15/2004 | [796](#) | ORDER NO. 66 as to Brandon L Basham granting [697-1] motion in limine to exclude introduction of aggravation evidence that the government presented in co-defendant Chadrick Evan Fulks penalty trial (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/15/2004) |
| 10/15/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 10/18/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/15/2004) |

**JA 0102**

| 10/18/2004 | | MOTION in open court by Brandon L Basham in limine to exclude testimony of Jennifer Warner (ydav) Modified on 5/18/2006 (mflo, ). (Entered: 10/18/2004) |
|---|---|---|
| 10/18/2004 | | JURY TRIAL CONTINUED as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr Witnesses and Exhibits (Terminated motions -granting [0-0] oral motion in limine to exclude testimony of Jennifer Warner as to Brandon L Basham (2) ) Court adjourned to 10/19/04 at 9:00 Court reporter: Debra Jernigan. (ydav) Modified on 10/18/2004 Modified on 5/18/2006 (mflo, ). (Entered: 10/18/2004) |
| 10/18/2004 | 797 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/19/2004) |
| 10/19/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr , Witness and Exhibits, Defense begins Court adjourned to 10/20/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/19/2004) |
| 10/20/2004 | 798 | EX PARTE ORDER (Sealed) as to Brandon L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/20/2004) |
| 10/20/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 10/21/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/20/2004) |
| 10/21/2004 | 799 | MEMORANDUM OF AUTHORITY requiring the jury's option to return "Special" mitigation findings by defendant Brandon L Basham (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/21/2004) |
| 10/21/2004 | 800 | ORDER NO. 67 All requested jury instruction by both parties due 9:00am on 10/25/04 and a list of all statutory and non-statutory mitigating factors the defendant wishes to include in the jury instructions by the defendant only as to Brandon L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/21/2004) |
| 10/21/2004 | | PENALTY PHASE/JURY TRIAL CONTINUED as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 10/22/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/21/2004) |
| 10/22/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 10/25/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 10/22/2004) |
| 10/25/2004 | 801 | DEFENDANT'S PROPOSED PENALTY PHASE JURY INSTRUCTIONS by Brandon L Basham as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 10/25/2004) |
| 10/25/2004 | | |

**JA 0103**

| | | |
|---|---|---|
| | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witnesses and Exhibits Court adjourned to 10/26/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 10/25/2004) |
| 10/26/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr ,Witness and Exhibits, Court adjourned to 10/27/04 at 9:00 Court reporter: Debra Jernigan. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 10/27/2004) |
| 10/27/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witness and Exhibits Court adjourned to 10/28/04 at 9:00, Court reporter: Debra Jernigan. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 10/28/2004) |
| 10/28/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr ,Witnesses and Exhibits; Defense Rest and Government starts Rebuttal Case; with witness , Court adjourned to 10/29/04 at 3:30 Court reporter: Debra Jernigan. (mflo) Modified on 10/28/2004 Modified on 5/17/2006 (mflo, ). (Entered: 10/28/2004) |
| 10/29/2004 | 802 | DEFENDANT'S SUPPLEMENTAL PENALTY PHASE INSTRUCTIONS AND REQUEST FOR ADDITIONAL ENUMERATED MITIGATING FACTORS by Brandon L Basham as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 10/29/2004) |
| 10/29/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Charge Conference, Defendant waives presence, Court adjourned to 11/1/04 at 8:45 Court reporter: Debra Jernigan. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 10/29/2004) |
| 11/01/2004 | | PENALTY PHASE/JURY TRIAL CONTINUES as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Witness; Government Rest Rebuttal case; Closing arguments by the parties and Jury Charge; Counsel agree on exhibits; jury begins deliberations; Jury to return at 9:00 on 11/2/04 to continue deliberations; Counsel waive formal gathering in courtroom prior to jury continuing deliberations; Court reporter: Debra Jernigan. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/02/2004) |
| 11/02/2004 | 803 | Judge Anderson's video tape of jury instructions on 5/9/04 as to Chadrick E Fulks (mflo) (Entered: 11/03/2004) |
| 11/02/2004 | 804 | Judge Anderson's video tape jury instructions on 8/27/04 as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/03/2004) |
| 11/02/2004 | | PENALTY PHASE/JURY TRIAL CONCLUDED as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr , Time/Date jury continued deliberations: 9:00 11/2/04, Time/Date jury ended deliberations: 11/2/04 12:15, Verdict rendered at 1:20 on 11/2/04, Death as to counts 1 and 2; Jury polled after verdict: yes, Exhibits returned to counsel: yes Jury list, witness list and exhibit list attached. Court reporter: Debra Jernigan. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/03/2004) |
| | | |

**JA 0104**

| | | |
|---|---|---|
| 11/02/2004 | 805 | SPECIAL JURY VERDICT as to Brandon L Basham DEATH; as to carjacking resulting in death Brandon L Basham (2) count(s) 1s (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/03/2004) |
| 11/02/2004 | 806 | SPECIAL JURY VERDICT as to Brandon L Basham DEATH: as to kidnapping resulting in death Brandon L Basham (2) count(s) 2s (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/03/2004) |
| 11/04/2004 | 807 | ORDER as to Brandon L Basham directing the Clerk of court to return all exhibits to the parties introducing them. It is further ordered that the parties are to maintain the exhibits intact as returned until the time of filing an Appeal has expired. (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/04/2004) |
| 11/08/2004 | 808 | EX PARTE ORDER (Sealed) as to Brandon L Basham denying [675-1] ex parte motion as to Brandon L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/08/2004) |
| 11/08/2004 | 809 | EX PARTE ORDER (Sealed) as to Brandon L Basham granting [783-1] ex parte motion as to Brandon L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/08/2004) |
| 11/08/2004 | 810 | EX PARTE ORDER (Sealed) as to Brandon L Basham granting [782-1] ex parte motion as to Brandon L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/08/2004) |
| 11/09/2004 | 811 | MOTION by Brandon L Basham to extend time for filing a motion under Rule 29(c) and Rule 33 (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/09/2004) |
| 11/10/2004 | 812 | NOTICE of Hearing as to Brandon L Basham set status conference for 3:00 11/10/04 for Brandon L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/10/2004) |
| 11/10/2004 | 813 | EX PARTE MOTION (Sealed) by Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/10/2004) |
| 11/10/2004 | 814 | EX PARTE MOTION (Sealed) by Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/10/2004) |
| 11/10/2004 | 815 | SEALED STATUS CONFERENCE as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr Court Reporter: Gary Smith. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/12/2004) |
| 11/10/2004 | 816 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/12/2004) |
| 11/10/2004 | 817 | |

**JA 0105**

| | | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/12/2004) |
|---|---|---|
| 11/10/2004 | 818 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/12/2004) |
| 11/10/2004 | 819 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/12/2004) |
| 11/12/2004 | 820 | ORDER NO. 68 as to Brandon L Basham granting [811-1] motion to extend time for filing a motion under Rule 29(c) and Rule 33 all such motions should be filed on or before 12/1/04 as to Brandon L Basham (2) (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/12/2004) |
| 11/12/2004 | 821 | SEALED HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr , Court Reporter: Gary Smith. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/15/2004) |
| 11/15/2004 | 822 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/15/2004) |
| 11/15/2004 | 823 | TRANSCRIPT OF SEALED HEARING as to Brandon L Basham for dates of 11/12/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/15/2004) |
| 11/15/2004 | 824 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/15/2004) |
| 11/15/2004 | 827 | SEALED USM RETURN OF SERVICE EXECUTED (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/16/2004) |
| 11/16/2004 | 826 | EX PARTE ORDER NO. 70 (Sealed) as to Brandon L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 11/16/2004 Modified on 5/17/2006 (mflo, ). (Entered: 11/16/2004) |
| 11/16/2004 | 829 | ORDER for jurors to be paid $50 for attendance for each day exceeding 30 days as to Brandon L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/16/2004) |
| 11/18/2004 | 830 | EX PARTE MOTION (Sealed) by Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/19/2004) |
| 11/18/2004 | 831 | EX PARTE MOTION (Sealed) by Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/19/2004) |
| 11/18/2004 | 832 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/19/2004) |
| 11/18/2004 | 833 | SEALED STATUS HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr Court Reporter: Gary Smith. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/19/2004) |

**JA 0106**

| 11/19/2004 | 837 | EX PARTE ORDER (Sealed) as to Brandon L Basham ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/17/2006 (mflo, ). (Entered: 11/22/2004) |
|---|---|---|
| 11/22/2004 | 835 | NOTICE of Hearing as to Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 10:00 12/20/04 as to: Chadrick Fulks, For New Trial , set Sentencing for 10:00 12/20/04 for Chadrick E Fulks before Chief Judge Joseph F. Anderson Jr (mflo) (Entered: 11/22/2004) |
| 11/22/2004 | 836 | TRANSCRIPT OF SEALED HEARING as to Brandon L Basham for dates of 11/18/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Gary Smith (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 11/22/2004) |
| 11/23/2004 | 838 | SEALED HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr Court Reporter: Debra Jernigan. (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 11/23/2004) |
| 11/23/2004 | 839 | FORTHWITH ORDER as to Brandon L Basham for phone records (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 11/23/2004) |
| 11/24/2004 | 841 | EX PARTE ORDER (Sealed) as to Brandon L Basham granting [831-1] ex parte motion as to Brandon L Basham (2) ( Signed by Chief Judge Joseph F. Anderson Jr ) Upon the closing of the case, the Ex Parte Motion and Order shall be unsealed by the Clerk. (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 11/29/2004) |
| 11/24/2004 | 842 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 11/29/2004) |
| 11/30/2004 | 843 | NOTICE of Hearing as to Brandon L Basham set motion hearing for 10:00 12/13/04 for Brandon L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 11/30/2004) |
| 12/01/2004 | 844 | MOTION by Brandon L Basham for new trial (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/01/2004) |
| 12/06/2004 | 845 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/07/2004) |
| 12/06/2004 | 846 | RESPONSE by USA as to Brandon L Basham re [844-1] motion for new trial (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/07/2004) |
| 12/07/2004 | 847 | MEMORANDUM by USA as to Brandon L Basham in opposition to [844-1] motion for new trial (amil) Modified on 5/9/2006 (mflo, ). (Entered: 12/07/2004) |
| 12/09/2004 | 848 | ORDER as to Chadrick E Fulks, Brandon L Basham authorizing the government to release government's Exhibit Number 228 to Barry Donovan (Signed by Chief Judge Joseph F. Anderson Jr ) EOD 12/9/04 (kbos) Modified on 5/9/2006 (mflo, ). (Entered: 12/09/2004) |
| 12/09/2004 | 849 | |

**JA 0107**

| | | |
|---|---|---|
| | | TRANSCRIPT OF MOTIONS HEARING as to Brandon L Basham for dates of 11/23/04 before Chief Judge Joseph F. Anderson Jr held in Columbia, SC Court Reporter: Debra Jernigan (asni) Modified on 5/9/2006 (mflo, ). (Entered: 12/10/2004) |
| 12/10/2004 | | CJA24 LOCATION as to Brandon L Basham : Transcript of hearing date: Jury Trial by Court Reporter: Debra Jernigan to Judge Anderson for approval of CJA24 (asni) Modified on 5/9/2006 (mflo, ). (Entered: 12/10/2004) |
| 12/10/2004 | 850 | REPLY by Brandon L Basham to Government response to [844-1] motion for new trial (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/10/2004) |
| 12/13/2004 | | MOTION HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr, ORAL ORDER [844-1] motion for new trial taken under advisement as to Brandon L Basham (2) Court Reporter: Debra Jernigan. (Time: 1hr 45min) (mflo) Modified on 12/14/2004 Modified on 5/9/2006 (mflo, ). (Entered: 12/13/2004) |
| 12/13/2004 | 851 | NOTICE of Hearing as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 10:00 12/21/04 as to: Brandon Basham, For New Trial (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/14/2004) |
| 12/14/2004 | 852 | SEALED DOCUMENT as to Brandon L Basham (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/15/2004) |
| 12/17/2004 | 855 | GOVERNMENT'S PROPOSED Judgment and order implementing judgment by USA as to Brandon L Basham (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/20/2004) |
| 12/20/2004 | | SENTENCING held before Chief Judge Joseph F. Anderson Jr Chadrick E Fulks (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s Witness(es) n, Objections to Pre-Sentence Report: withdrawn, Court Reporter: Dan Mayo (1hr 30min) (mflo) Modified on 12/20/2004 (Entered: 12/20/2004) |
| 12/20/2004 | | ORAL ORDER as to Chadrick E Fulks denying [657-1] motion for new trial as to Chadrick E Fulks (1), mooting [657-2] motion for Evidentiary Hearing as to Chadrick E Fulks (1) Per: Judge Joe Anderson, written order to be filed ( Entered by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 12/20/2004) |
| 12/20/2004 | 853 | JUDGMENT Chadrick E Fulks (1) count(s) 3s, 4s , 5s , 6s , 7s , 8s . The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Six Hundred Sixty (660) months as to counts 3, 4, 5, 7, and 8. This term consists of One Hundred Twenty (120) months on count 3, Sixty (60) months on count 4, Two Hundred Forty (240) months on count 5, One Hundred Twenty (120) months on count 7, and One Hundred Twenty (120) months on count 8, all to be served consecutively. As to count 6, the defendant is sentenced to a term of Eighty-four (84) months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is Seven Hundred Forty-four (744) months. Upon release from imprisonment, the defendant shall be on supervised release for a term of for a term of Five (5) years. This term consists of Three (3) years as to counts 3, 4, |

**JA 0108**

| | | |
|---|---|---|
| | | 7, and 8 and Five (5) years as to counts 5 and 6, all terms to be served concurrently. The defendant shall also comply with the following additional condition: The defendant shall participate in a mental health treatment program as directed and approved by the US Probation Office. The defendant is remanded to the custody of the United States Marshal. Defendant is to pay a total of $600 special assessment ($100 per count) immediately. ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 12/20/2004) |
| 12/20/2004 | 854 | JUDGMENT AND ORDER IMPLEMENTING JUDGMENT Chadrick E Fulks (1) count(s) 1s, 2s . It is ordered that the defendant's sentence shall be executed by a US Marshal. Defendant's sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death. Defendant's sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons which date shall be no sooner than 60 days from the entry of this judgment of death. The sentence shall be executed at a federal penal or correctional institution. Special Assessment of $200.00 is due immediately ($100 per count). Defendant is remanded to the custody of the USM. ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 02/17/2005 (Entered: 12/20/2004) |
| 12/20/2004 | | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Chadrick E Fulks (mflo) (Entered: 12/20/2004) |
| 12/20/2004 | 856 | NOTICE OF APPEAL by Chadrick E Fulks (by attorney) from the judgment and sentence entered before Judge Anderson on 12/20/04 (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s (chen) (Entered: 12/21/2004) |
| 12/21/2004 | 857 | NOTICE of Hearing as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 2:00 12/28/04 as to: Brandon Basham, For New Trial (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/21/2004) |
| 12/21/2004 | | MOTION HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr on issue of news media ORAL ORDER sets another hearing for 12/28/04 at 2:00 Court Reporter: Dan Mayo. (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/21/2004) |
| 12/21/2004 | 858 | FORTHWITH ORDER as to Brandon L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/21/2004) |
| 12/22/2004 | 861 | RETURN OF SERVICE EXECUTED as to Stephanie Moore, WYFF TV as to defendant Brandon L Basham on 12/16/04 (mflo) Modified on 5/9/2006 (mflo, ). (Entered: 12/22/2004) |
| 12/23/2004 | | Notice of appeal and certified copy of docket as to Chadrick E Fulks to USCA: [856-1] appeal (asni) (Entered: 12/23/2004) |
| 12/23/2004 | 862 | ORDER NO. 72 as to Chadrick E Fulks denying [657-1] motion for new trial (Signed by Chief Judge Joseph F. Anderson Jr ) EOD 12/23/04 (kbos) (Entered: 12/23/2004) |
| 12/28/2004 | 863 | |

| | | NOTICE of Hearing as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 9:15 1/14/05 as to: Brandon Basham, For New Trial (kbos) Modified on 5/9/2006 (mflo, ). (Entered: 12/28/2004) |
|---|---|---|
| 12/28/2004 | 864 | MOTION by Bill Fox as to Brandon L Basham to quash subpoena (bwil) Modified on 5/9/2006 (mflo, ). (Entered: 12/28/2004) |
| 12/28/2004 | 865 | MEMORANDUM by Bill Fox as to Brandon L Basham in support of [864-1] motion to quash subpoena (bwil) Modified on 5/9/2006 (mflo, ). (Entered: 12/28/2004) |
| 12/28/2004 | 866 | AFFIDAVIT of Diane Norman for Spartanburg Herald-Journal as to Brandon L Basham Re: telephone call during trial proceedings (bwil) Modified on 5/8/2006 (mflo, ). (Entered: 12/28/2004) |
| 12/28/2004 | | MOTION HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr: Deputy Marshal Johnny Griffin sworn and states for record that Defendant Basham refused to attend court proceedings; Court considers this a waiver of presence; Attorney Jay Bender argues to quash subpoena to Bill Fox for Greenville News; ORAL ORDER [864-1] motion to quash subpoena taken under advisement as to Brandon L Basham (2) pending Defendant's brief in opposition due 1/4/05; Attorney Harris for Defendant Basham submits Exhibit 1 and argues for Court to bring jurors back for further questioning as to nature of calls on specific dates. Court takes all issues under advisement and directs counsel to read most recent 4CCA opinion on this subject and be ready to discuss at the next hearing on 1/14/05. Court Reporter: Debra Jernigan. (2:15-3:00) (bwil) Modified on 12/28/2004 Modified on 5/9/2006 (mflo, ). (Entered: 12/28/2004) |
| 12/28/2004 | 867 | Witness/Exhibit list for hearing on 12/28/04 as to Brandon L Basham (bwil) Modified on 5/8/2006 (mflo, ). (Entered: 12/28/2004) |
| 01/03/2005 | | NOTICE of Docketing ROA from USCA as to Chadrick E Fulks Re: [856-1] appeal USCA Number: 04-33 - Beth Walton (chen) (Entered: 01/03/2005) |
| 01/03/2005 | 868 | FOURTH CIRCUIT COURT OF APPEALS ORDER as to defendant Chadrick E Fulks appointing the Federal Public Defender at Columbia SC as counsel to represent the appellant in this case with nunc pro tunc date of 12/20/04 (chen) (Entered: 01/04/2005) |
| 01/03/2005 | 869 | FOURTH CIRCUIT COURT OF APPEALS ORDER as to defendant Chadrick E Fulks appointing John Henry Blume III of Columbia SC as lead counsel for appellant pursuant to the provisions of 21 USC Section 848 q(6) and the Criminal Justice Act with nunc pro tunc date of 12/20/04 (chen) (Entered: 01/04/2005) |
| 01/13/2005 | 871 | ORDER FOR CONTEMPT HEARING AND RULE TO SHOW CAUSE to Cynthia Wilson and Pete Strom, Esq. her attorney, to appear on 1/20/05 at 3:00 in re: to the trial of Brandon L Basham (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 01/13/2005) |
| 01/14/2005 | | MOTION HEARING as to Brandon L Basham held before Chief Judge Joseph F. Anderson Jr ORAL ORDER mooting [864-1] motion to quash by |

**JA 0110**

| | | |
|---|---|---|
| | | Bill Fox of the Greenville News subpoena; Court will deny motion for any more inquiry as to the phone conversations of Ms. Wilson. Motion Hearing and Sentencing will be scheduled for the same day sometime in February; exhibits 1-3 introduced as to Brandon L Basham (2) Court Reporter: Dan Mayo. (Time: 1 hour 25 min) (mflo) Modified on 01/14/2005 Modified on 5/8/2006 (mflo, ). (Entered: 01/14/2005) |
| 01/14/2005 | 872 | Exhibits 1-3 introduced in hearing on 1/14/05 by Brandon L Basham (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 01/14/2005) |
| 01/18/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 11/5/03 by Court Reporter: Gary Smith to Columbia, SC for preparation of CJA24 (asni) (Entered: 01/18/2005) |
| 01/18/2005 | 873 | NOTICE of Hearing as to Cynthia Wilson set show cause hearing for 3:00 11/10/04 before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 01/18/2005) |
| 01/19/2005 | 874 | NOTICE of Hearing as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 2:30 2/18/05 as to: Brandon Basham, For New Trial , set Sentencing for 2:30 2/18/05 for Brandon L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 01/19/2005) |
| 01/19/2005 | 875 | TRANSCRIPT OF MOTIONS HEARING as to Chadrick E Fulks, Brandon L Basham for dates of 1/6/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Raymond D. Simmons (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 01/20/2005) |
| 01/24/2005 | | CONTEMPT HEARING as to Cynthia Wilson, juror on the Brandon Leon Basham trials, for jury misconduct held before Chief Judge Joseph F. Anderson Jr ORAL ORDER for Ms. Wilson to perform 120 hours of community service with the US Probation Office and to repay $2,500 from fees received for jury service. Mr. Pete Strom has been retained by Ms. Wilson, so no CJA voucher will be submitted. Court Reporter: Dan Mayo. (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 01/25/2005) |
| 01/28/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 1/6/04 by Court Reporter: Ray Simmons to Ray Simmons for preparation of CJA24 (asni) (Entered: 01/28/2005) |
| 01/28/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 1/20/04,4/13/04 by Court Reporter: Jack Clarke to Jack Clarke for preparation of CJA24 (asni) (Entered: 01/28/2005) |
| 01/28/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 12/20/04 by Court Reporter: Dan Mayo to Dan Mayo for preparation of CJA24 (asni) (Entered: 01/28/2005) |
| 01/28/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 11/05/03 etc. by Court Reporter: Gary Smith to Gary Smith for preparation of CJA24 (asni) (Entered: 01/28/2005) |
| 01/31/2005 | | |

**JA 0111**

| | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 12/20/04 by Court Reporter: Dan Mayo to Judge Anderson for approval of CJA24 (asni) (Entered: 01/31/2005) |
|---|---|---|
| 01/31/2005 | 878 | TRANSCRIPT OF MOTION HEARING as to Chadrick E Fulks for dates of 7/16/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) (Entered: 02/02/2005) |
| 01/31/2005 | 879 | TRANSCRIPT OF MOTION HEARING as to Chadrick E Fulks, Brandon L Basham for dates of 8/28/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/02/2005) |
| 01/31/2005 | 880 | TRANSCRIPT OF MOTION HEARING as to Chadrick E Fulks, Brandon L Basham for dates of 3/8/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/02/2005) |
| 01/31/2005 | 881 | TRANSCRIPT OF SEALED MOTION HEARING as to Chadrick E Fulks, Brandon L Basham for dates of 8/28/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/02/2005) |
| 01/31/2005 | 882 | TRANSCRIPT OF SEALED MOTION HEARING as to Chadrick E Fulks, Brandon L Basham for dates of 8/28/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/02/2005) |
| 02/01/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 12/20/04 by Court Reporter: Dan Mayo to Dan Mayo for preparation of CJA24 (asni) (Entered: 02/01/2005) |
| 02/01/2005 | 883 | RESCHEDULED NOTICE of Hearing as to Brandon L Basham before Chief Judge Joseph F. Anderson Jr set Motion Hearing for 11:00 2/14/05 as to: Brandon Basham, For New Trial , set Sentencing for 11:00 2/14/05 for Brandon L Basham before Chief Judge Joseph F. Anderson Jr (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/02/2005) |
| 02/03/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 1/6/04 by Court Reporter: Raymond Simmons to Judge Anderson for final approval of CJA24 (asni) (Entered: 02/03/2005) |
| 02/03/2005 | | CJA24 LOCATION as to Chadrick E Fulks : Transcript of hearing date: 12/20/04 by Court Reporter: Dan Mayo to Judge Anderson for final approval of CJA24 (asni) (Entered: 02/03/2005) |
| 02/03/2005 | 884 | TRANSCRIPT OF SENTENCING HEARING as to Chadrick E Fulks for dates of 12/20/04 before Chief Judge Joseph F. Anderson Jr held in Columbia, SC Court Reporter: Dan Mayo (asni) (Entered: 02/03/2005) |
| 02/14/2005 | | SENTENCING held before Chief Judge Joseph F. Anderson Jr Brandon L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s Witness(es), Objections to Pre-Sentence Report: defendant/yes, Defendant remanded to the custody of |

**JA 0112**

| | | |
|---|---|---|
| | | the USM. Court Reporter: Gary Smith (Time: 2 hours) (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/14/2005) |
| 02/14/2005 | | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Brandon L Basham (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/14/2005) |
| 02/14/2005 | 885 | AFFIDAVIT of Gerry Riley as to Brandon L Basham Re: [0-0] hearing on 1/14/05 re: any conversation with Cynthia Wilson (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/14/2005) |
| 02/16/2005 | 886 | JUDGMENT Brandon L Basham (2) count(s) 3s, 4s , 5s , 6s , 7s , 8s . The defendant is hereby committed to the custody of the Bureau of Prisons for a term of 660 months as to counts 3,4,5,6,7 and 8. This term consists of 10 years on count 3; 5 years on count 4; 20 years on count 5; 10 years on count 7 and 10 years on count 8, all to be served consecutively. As to count 6 the defendant is sentenced to a term of 84 months, to run consecutive to all other sentences imposed today and previously imposed by any other court. Therefore, the total term of imprisonment imposed is 744 months. Upon release from imprisonment the defendant shall be on supervised release for a term of 5 years with the following special condition: The defendant shall participate in a mental health treatment program as directed by the US Probation Office. Special Assessment of $600 is due immediately. The defendant is remanded to the custody of the USM. ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/17/2005) |
| 02/16/2005 | 887 | JUDGMENT AND ORDER IMPLEMENTING JUDGMENT Brandon L Basham (2) count(s) 1s, 2s . It is ordered that the defendant's sentence shall be executed by the US Marshal. Defendant's sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death. Defendant's sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons which date shall be no sooner than 60 days from the entry of this judgment of death. The sentence shall be executed at a federal penal or correctional institution. Special Assessment of $200 is due immediately. Defendant is remanded to the custody of the USM. ( Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 02/17/2005 Modified on 5/8/2006 (mflo, ). (Entered: 02/17/2005) |
| 02/16/2005 | 888 | NOTICE OF APPEAL by Brandon L Basham (2) count(s) 1s, 2s, 3s, 4s, 5s, 6s, 7s, 8s Filing Fee $ ifp (asni) Modified on 5/8/2006 (mflo, ). (Entered: 02/17/2005) |
| 02/16/2005 | 889 | ORDER FOR CONTEMPT SANCTIONS as to Juror Cynthia Wilson in the trial of defendant Brandon Leon Basham that Ms. Wilson is in contempt of this court and should be sanctioned and punishment is hereby ordered as follows: 1. Ms. Wilson shall disgorge and return to the government via the Clerk's office $2,500 of the $5,624.84 dollars paid to her for her jury service, to be paid within 6 months. Mr. Strom, counsel for Ms. Wilson informed the court that Ms. Wilson has retained him and paid him directly and for that reason he will not be submitting a CJA voucher for services. 2. Ms. Wilson shall perform 120 hours of community sevice work to be completed within |

JA 0113

| | | |
|---|---|---|
| | | one year under the direction and supervision of the US Probation Office. (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) Modified on 5/8/2006 (mflo, ). (Entered: 02/17/2005) |
| 02/17/2005 | | Notice of appeal and certified copy of docket as to Brandon L Basham to USCA: [888-1] appeal (asni) Modified on 5/8/2006 (mflo, ). (Entered: 02/17/2005) |
| 03/02/2005 | | NOTICE of Docketing Record on Appeal from USCA as to Brandon L Basham re 888 Notice of Appeal - Final Judgment filed by Brandon L Basham,. USCA Case Number 05-5 consolidated with 04-33 Beth Walton (asni, ) Modified on 5/8/2006 (mflo, ). (Entered: 03/03/2005) |
| 03/14/2005 | 890 | ORDER denying 844 Motion for New Trial as to Brandon L Basham (2). Signed by Judge Joseph F Anderson Jr on 3/14/2005. (khin, ) Modified on 5/8/2006 (mflo, ). (Entered: 03/14/2005) |
| 04/22/2005 | 891 | ORDER of USCA (certified copy) extending time for filing the transcript without sanctions to 5/9/05 as to Chadrick E Fulks re 856 Notice of Appeal - Final Judgment (asni, ) (Entered: 04/25/2005) |
| 05/05/2005 | 892 | TRANSCRIPT of Proceedings as to Brandon L Basham post-trial motion held on December 21, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Dan Mayo. (dmayo, ) Modified on 5/8/2006 (mflo, ). (Entered: 05/05/2005) |
| 05/05/2005 | 893 | TRANSCRIPT of Proceedings as to Brandon L Basham post-trial motion held on January 14, 2005 before Judge Joseph F. Anderson, Jr.. Court Reporter: Dan Mayo. (dmayo, ) Modified on 5/8/2006 (mflo, ). (Entered: 05/05/2005) |
| 05/05/2005 | 894 | TRANSCRIPT of Proceedings as to Brandon L Basham rule to show cause/contempt hearing held on January 24, 2005 before Judge Joseph F. Anderson, Jr.. Court Reporter: Dan Mayo. (dmayo, ) Modified on 5/8/2006 (mflo, ). (Entered: 05/05/2005) |
| 05/23/2005 | 895 | TRANSCRIPT of Proceedings as to Chadrick E Fulks excerpts of status conference held on November 5, 2003 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 896 | TRANSCRIPT of Proceedings as to Chadrick E Fulks, Brandon L Basham excerpt of motions hearing, morning proceedings held on February 24, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 05/23/2005) |
| 05/23/2005 | 897 | TRANSCRIPT of Proceedings as to Chadrick E Fulks, Brandon L Basham ex parte hearing and motion hearing held on April 8, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 05/23/2005) |
| 05/23/2005 | 898 | TRANSCRIPT of Proceedings as to Chadrick E Fulks, Brandon L Basham motions hearing (excluding testimony) held on February 25, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 05/23/2005) |

**JA 0114**

| 05/23/2005 | 899 | TRANSCRIPT of Proceedings as to Chadrick E Fulks, Brandon L Basham motions hearing held on February 26, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 05/23/2005) |
|---|---|---|
| 05/23/2005 | 900 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume I of Jury Selection held on May 10, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 901 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume II of Jury Selection held on May 11, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 902 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume III of Jury Selection held on May 12, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 903 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume IV of Jury Selection held on May 13, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 904 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume V of Jury Selection held on May 14, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 905 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume VI of Jury Selection held on May 17, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 906 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume VII of Jury Selection held on May 18, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 907 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume VIII of Jury Selection held on May 19, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 908 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume IX of Jury Selection held on May 20, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 05/23/2005 | 909 | TRANSCRIPT of Proceedings as to Chadrick E Fulks Volume X of Jury Selection held on May 21, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) (Entered: 05/23/2005) |
| 06/01/2005 | 910 | Transcript of motions hearing as to Chadrick E Fulks, Brandon L Basham held on January 20, 2004 before Judge Anderson. Court Reporter: Jack Clarke. (jclarke, ) Modified on 5/8/2006 (mflo, ). (Entered: 06/01/2005) |
| 06/02/2005 | 911 | TRANSCRIPT of motions hearing as to Chadrick E Fulks, Brandon L Basham held on April 13, 2004 before Judge Anderson. Court Reporter: Jack Clarke. (jclarke, ) Modified on 5/8/2006 (mflo, ). (Entered: 06/02/2005) |
| 06/03/2005 | 912 | |

**JA 0115**

| | | TRANSCRIPT of Proceedings as to Chadrick E Fulks, Brandon L Basham SEALED MOTION held on 4/13/04 before Judge Joseph Anderson. Court Reporter: Jack Clarke. (sealed transcript only to be viewed by Fulks attorneys) (bbro, ) Modified on 5/8/2006 (mflo, ). (Entered: 06/03/2005) |
|---|---|---|
| 06/15/2005 | 913 | CERTIFICATE OF CLERK that record on appeal is complete and available for transmission to Court of Appeals upon request as to Chadrick E Fulks re 856 Notice of Appeal - Final Judgment (bbro, ) (Entered: 06/15/2005) |
| 08/14/2005 | 914 | TRANSCRIPT of Proceedings as to Chadrick E Fulks, Brandon L Basham, excerpt of status conference, in camera proceedings, held on November 5, 2003 before Judge Joseph F. Anderson, Jr.. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 915 | TRANSCRIPT of Proceedings as to Brandon L Basham, sealed hearing, held on November 10, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 916 | TRANSCRIPT of Proceedings as to Brandon L Basham, motion hearing, held on August 25, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 917 | TRANSCRIPT of Proceedings as to Brandon L Basham, sentencing hearing, held on February 14, 2005 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 918 | TRANSCRIPT of Proceedings as to Brandon L Basham, jury selection, Volume I, held on August 30, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 919 | TRANSCRIPT of Proceedings as to Brandon L Basham, jury selection, Volume II, held on August 30, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 920 | TRANSCRIPT of Proceedings as to Brandon L Basham, jury selection, Volume III, held on September 1, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 921 | TRANSCRIPT of Proceedings as to Brandon L Basham, jury selection, Volume IV, held on September 2, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 08/14/2005 | 922 | TRANSCRIPT of Proceedings as to Brandon L Basham, jury selection, Volume V, held on September 3, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) Modified on 5/8/2006 (mflo, ). (Entered: 08/14/2005) |
| 09/13/2005 | 926 | |

**JA 0116**

| | | |
|---|---|---|
| | | ORDER of USCA (certified copy) as to Brandon L Basham re 888 Notice of Appeal - Final Judgment that Jack Swerling is relieved as counsel for the appellant and Timothy Sullivan is appointed (bbro, ) Modified on 5/8/2006 (mflo, ). (Entered: 09/14/2005) |
| 10/14/2005 | 927 | TRANSCRIPT of Proceedings as to Chadrick E Fulks, motion hearing held on May 27, 2004, before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) (Entered: 10/14/2005) |
| 10/17/2005 | | ENTRY DELETED as to Chadrick E Fulks transcript of motion hearing filed 8/14/05 doc# 923. Reason Deleted: wrong dates on cover page. Correction must be re-filed within 1 working day. (mflo, ) (Entered: 10/17/2005) |
| 01/03/2006 | 928 | MOTION by the Estate of Alice Donovan to obtain a copy of the video tape from the Wal-Mart store depicting the kidnapping of Alice Donovan by Chadrick E Fulks, Brandon L Basham. (mflo, ) Modified on 5/8/2006 (mflo, ). (Entered: 01/04/2006) |
| 01/03/2006 | 929 | ORDER granting 928 Motion to obtain a copy of the video tape from the Wal-Mart store depicting the kidnapping of Alice Donovan by Chadrick E Fulks (1), Brandon L Basham (2) The United States Attorney is authorized to furnish a copy of the videotape to Geoffrey H. Waggoner, attorney for the Estate of Alice Donovan. Signed by Judge Joseph F Anderson Jr on 1/3/06. (mflo, ) Modified on 5/3/2006 (mflo, ). (Entered: 01/04/2006) |
| 01/11/2006 | 930 | MOTION by Walmart to obtain a copy of the video tape from the Walmart of the kidnapping of Alice Donovan by Chadrick E Fulks, Brandon L Basham. (mflo, ) Modified on 5/3/2006 (mflo, ). (Entered: 01/12/2006) |
| 01/12/2006 | 931 | ORDER granting 930 Motion by Walmart to obtain a copy of the video tape from the Walmart of the kidnapping of Alice Donovan by Chadrick E Fulks (1), Brandon L Basham (2). Signed by Judge Joseph F Anderson Jr on 1/12/06.(mflo, ) Modified on 5/3/2006 (mflo, ). (Entered: 01/12/2006) |
| 01/23/2006 | 932 | MOTION to Unseal Document by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Correspondence re consent by defense counsel)(Gasser, Jonathan) (Entered: 01/23/2006) |
| 01/23/2006 | 933 | ORDER granting 932 Motion to Unseal Document 642 Sealed Order as to Chadrick E Fulks (1). Signed by Judge Joseph F Anderson Jr on 1/23/06. (Attachments: # 1 Order #46 on late witness now unsealed)(mflo, ) (Entered: 01/23/2006) |
| 03/27/2006 | 945 | TRANSCRIPT of Proceedings as to Brandon L Basham Ex Parte Hearing, Sealed, held on September 21, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | | ENTRY DELETED 944 due to error as to Brandon L Basham Corrected Filing Document Number: 945 filed on 3/27/06. (mflo, ) (Entered: 03/27/2006) |
| 03/27/2006 | 946 | |

**JA 0117**

| | | |
|---|---|---|
| | | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume VII held on September 22, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 947 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume VIII, held on September 23, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 948 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume IX, held on September 24, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 949 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume X, held on September 27, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 950 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XI, held on September 28, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 951 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XII, held on September 29, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 952 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XIII, held on September 30, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 953 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XIV, held on October 8, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 954 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XV held on October 12, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 955 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XVI, held on October 13, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 956 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volumve XVII, held on October 14, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 957 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XVIII, held on October 15, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 958 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XIX, held on October 18, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 959 | TRANSCRIPT of Proceedings as to Brandon L Basham Ex Parte Hearing, Sealed, held on October 18, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |

**JA 0118**

| 03/27/2006 | 960 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volumve XX, held on October 19, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| --- | --- | --- |
| 03/27/2006 | 961 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXI, held on October 20, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 962 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXII, held on October 21, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 963 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXIII, held on October 22, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 965 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXV, held on October 26, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 966 | TRANSCRIPT of Proceedings as to Brandon L Basham Ex Parte Hearing, Sealed, held on October 26. 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 967 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXIV, held on October 25, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 968 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXVI, held on October 27, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 969 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXVII, held on October 28, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 970 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXVIII, held on October 29, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 971 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXIX, held on November 1, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/27/2006 | 972 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Trial, Volume XXX held on November 2, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 03/27/2006) |
| 03/28/2006 | | ENTRY DELETED #964 transcript Vol XIV on 10/25/06 incorrect volume number as to Brandon L Basham Corrected Filing Document Number: #967 transcript XXIV on 10/25/04. (mflo, ) (Entered: 03/28/2006) |
| 04/11/2006 | 975 | |

**JA 0119**

| | | CERTIFICATE OF CLERK that record on appeal is complete and available for transmission to Court of Appeals upon request as to Brandon L Basham re 888 Notice of Appeal - Final Judgment (bbro, ) (Entered: 04/11/2006) |
|---|---|---|
| 06/27/2006 | 980 | MOTION to Unseal Document by USA as to Brandon L Basham. Proposed Order sent to Judge Chambers email address? Yes. (Attachments: # 1 Attachment - docketing statement)(Gasser, Jonathan) (Entered: 06/27/2006) |
| 06/28/2006 | 981 | ORDER granting 980 Motion to Unseal Document as to Brandon L Basham (2). Signed by Judge Joseph F Anderson Jr on 06/28/06.(bshr, ) (Entered: 06/28/2006) |
| 07/13/2006 | 982 | TRANSCRIPT of Proceedings as to Brandon L Basham, ex parte hearing held on February 24, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: Gary Smith. (gsmith, ) (Entered: 07/13/2006) |
| 07/28/2006 | 983 | USCA OPINION as to Chadrick E Fulks for 856 Notice of Appeal - Final Judgment filed by Chadrick E Fulks, affirming the decision of the District Court. (bbro, ) (Entered: 07/28/2006) |
| 09/01/2006 | 984 | MANDATE and JUDGMENT of USCA (certified copy) as to Chadrick E Fulks re 856 Notice of Appeal - Final Judgment affirming the decision of the District Court. (bbro, ) (Entered: 09/05/2006) |
| 10/18/2006 | 985 | ORDER of USCA as to Brandon L Basham extending time for filing transcript without sanctions to 11/28/06; a 10 percent reduction will apply if not filed by that date and a 20 percent if not filed by 12/28/06 (ydav) (Entered: 10/18/2006) |
| 10/24/2006 | 989 | TRANSCRIPT of Proceedings as to Brandon L Basham, Motions Hearing held on August 2, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/24/2006) |
| 10/24/2006 | 991 | TRANSCRIPT of Proceedings as to Brandon L Basham Ex Parte Conference held on March 19, 2003 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 992 | TRANSCRIPT of Proceedings as to Brandon L Basham Motion Hearing held on June 18, 2003 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (Attachments: # 1 Ex Parte Hearing) (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 993 | TRANSCRIPT of Proceedings as to Brandon L Basham Motion Hearing held on August 28, 2003 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (Attachments: # 1 Ex Parte Hearing# 2 Ex Parte Hearing # 2) (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 994 | TRANSCRIPT of Proceedings as to Brandon L Basham Motion Hearing held on March 8, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | | ENTRY DELETED #986 as to Brandon L Basham Corrected Filing Document Number: 991.Modified filing date to that of original filing: 10/24/06 (mflo, ) (Entered: 10/25/2006) |

**JA 0120**

| | | |
|---|---|---|
| 10/25/2006 | 995 | TRANSCRIPT of Proceedings as to Brandon L Basham Motion Hearing held on August 2, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (Attachments: # 1 Ex Parte Hearing No. 1# 2 Ex Parte Hearing No. 2) (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 996 | TRANSCRIPT of Proceedings as to Brandon L Basham Motion Hearing held on April 4, 2003 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 997 | TRANSCRIPT of Proceedings as to Brandon L Basham Motion Hearing held on August 4, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (Attachments: # 1 Ex Parte Hearing) (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 998 | TRANSCRIPT of Proceedings as to Brandon L Basham Motions Hearing held on December 13, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 999 | TRANSCRIPT of Proceedings as to Brandon L Basham Motions Hearing held on November 23, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 1000 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Selection held on September 10, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | 1001 | TRANSCRIPT of Proceedings as to Brandon L Basham Motions Hearing held on December 28, 2004 before Judge Joseph F. Anderson, Jr.. Court Reporter: D Jernigan. (djernigan, ) (Entered: 10/25/2006) |
| 10/25/2006 | | ENTRY DELETED #987,988 and 990 as to Brandon L Basham Corrected Filing Document Number: 993, 994 and 996. Transcript corrections (mflo, ) (Entered: 10/25/2006) |
| 11/13/2006 | 1002 | TRANSCRIPT of Proceedings as to Brandon L Basham, Jury Selection,Volume VI held on September 7, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) Modified on 11/13/2006 (mflo, ). (Entered: 11/13/2006) |
| 11/13/2006 | 1003 | TRANSCRIPT of Proceedings as to Brandon L Basham, Jury Selection, held on September 8, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 11/13/2006) |
| 11/13/2006 | 1006 | TRANSCRIPT of Proceedings as to Brandon L Basham Jury Selection held on September 9, 2004 before Judge Joseph F. Anderson, Jr. Court Reporter: D Jernigan. (djernigan, ) (Entered: 11/14/2006) |
| 11/14/2006 | | ENTRY DELETED #1004 as to Brandon L Basham Corrected Filing Document Number: 1006. Modified filing date to that of original filing: 11/13/06 (mflo, ) (Entered: 11/14/2006) |
| 11/21/2006 | 1008 | CERTIFICATE OF CLERK that record on appeal is complete and available for transmission to Court of Appeals upon request as to Brandon L Basham (bbro, ) (Entered: 11/21/2006) |

**JA 0121**

| 12/14/2006 | 1009 | MOTION prompt execution date and Notice of waiver of all further post conviction proceedings by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Attachments: # 1 Affidavit Chadrick Fulks # 2 Exhibit notice to drop appeal process as of 11/9/06 # 3 Exhibit Letter to Clerk of Court, US Supreme Court)(mflo, ) (Entered: 12/14/2006) |
|---|---|---|
| 01/23/2007 | 1010 | ORDER for government to respond to the defendant's motion within 15 days of this order as to Chadrick E Fulks re 1009 (pro se)MOTION to waive all further post conviction proceedings and for a prompt execution date filed by Chadrick E Fulks Response to Motion due by 2/7/2007. Signed by Judge Joseph F Anderson Jr on 1/23/07.(mflo, ) (Entered: 01/23/2007) |
| 02/07/2007 | 1011 | RESPONSE to Motion by USA as to Chadrick E Fulks re 1009 MOTION prompt execution date Reply to Response to Motion due by 2/23/2007 (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Gasser, Jonathan) Modified on 2/8/2007 (mflo, ). See document #1012 and #1013 for additional attachment. Modified on 2/9/2007 (mflo, ). (Entered: 02/07/2007) |
| 02/07/2007 | 1012 | Additional Attachments to Main Document 1011 Response to Motion (Gasser, Jonathan) (Entered: 02/07/2007) |
| 02/08/2007 | 1013 | Additional Attachments to Main Document 1011 Response to Motion, (Gasser, Jonathan) (Entered: 02/08/2007) |
| 02/13/2007 | 1014 | SUPPLEMENTAL RESPONSE to Motion by USA as to Chadrick E Fulks re 1009 MOTION prompt execution date (Attachments: # 1 Exhibit 1# 2 Certificate of service)(Gasser, Jonathan) Modified on 2/13/2007 (mflo, ). (Entered: 02/13/2007) |
| 04/05/2007 | 1015 | MOTION to Withdraw Document 1009 MOTION prompt execution date by Chadrick E Fulks. (Attachments: # 1 Envelope)(mflo, ) (Entered: 04/06/2007) |
| 07/23/2007 | 1016 | First MOTION to Appoint Counsel by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? no. (Blume, John) (Entered: 07/23/2007) |
| 08/15/2007 | 1019 | ORDER of USCA (certified copy) as to Brandon L Basham relieving Greg Harris as counsel for the appellant and suspending the briefing schedule. (bbro, ) (Entered: 08/15/2007) |
| 08/21/2007 | 1022 | RESPONSE to Motion by USA as to Chadrick E Fulks re 1016 First MOTION to Appoint Counsel Reply to Response to Motion due by 8/31/2007 (Hagins, C) (Entered: 08/21/2007) |
| 09/07/2007 | 1025 | ENTRY DELETED #1025 as directed by Judge Anderson that was submitted by John Delgado (mflo, ) (Entered: 09/07/2007) |
| 09/10/2007 | 1026 | ORDER granting in part and denying in part 1016 Motion to Appoint Counsel as to Chadrick E Fulks (1) Court appoints Beattie Ashmore and William J. Watkins, Jr. as counsel to represent defendant Fulks in pursuit of any and all post conviction remedies in this case with compensation to be paid under the CJA. Signed by Judge Joseph F Anderson Jr on 9/10/07. (mflo, ) (Entered: 09/10/2007) |

JA 0122

| 09/11/2007 | 1027 | MOTION to Withdraw as Attorney by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Hagins, C) (Entered: 09/11/2007) |
| 09/11/2007 | 1028 | MOTION to Withdraw as Attorney by USA as to Brandon L Basham. Proposed Order sent to Judge Chambers email address? No. (Hagins, C) (Entered: 09/11/2007) |
| 09/12/2007 | 1029 | ORDER granting 1027 1028 Motions to Withdraw as Attorneys Scott Schools, Jonathan Gasser and John Duane as to Chadrick E Fulks and Brandon Basham. Signed by Judge Joseph F Anderson Jr on 9/12/2007. (ghay) (Entered: 09/12/2007) |
| 09/12/2007 | 1031 | CORRECTIVE ORDER APPOINTING COUNSEL granting in part and denying in part 1016 Motion to Appoint Counsel as to Chadrick E Fulks (1) Court appoints Beattie Ashmore and William J. Watkins, Jr. as counsel to represent defendant Fulks in pursuit of any and all post conviction remedies in this case with compensation to be paid under the CJA. Signed by Judge Joseph F Anderson Jr on 9/12/07.(mflo, ) (Entered: 09/12/2007) |
| 09/13/2007 | 1032 | CJA 30: Appointment of Attorney Beattie B Ashmore for in Capital habeas Corpus (28:2255) Proceedings as to Chadrick E Fulks. Signed by Judge Joseph F Anderson Jr on 9/10/07.(mflo, ) (Entered: 09/13/2007) |
| 09/13/2007 | 1033 | CJA 30: Appointment of Attorney William J Watkins, Jr for in Capital Habeas Corpus (28:2255) Proceedings as to Chadrick E Fulks. Signed by Judge Joseph F Anderson Jr on 9/10/07.(mflo, ) (Entered: 09/13/2007) |
| 09/14/2007 | 1034 | ORDER withdrawing 1009 Motion for prompt execution as to Chadrick E Fulks; granting 1015 Motion to Withdraw 1009 motion for prompt execution as to Chadrick E Fulks. Signed by Judge Joseph F Anderson Jr on 9/14/2007. (ghay) (Entered: 09/14/2007) |
| 09/17/2007 | 1035 | ***DOCUMENT MAILED as to Chadrick E Fulks re 1034 Order on Motion for prompt execution and Order on Motion to Withdraw motion for prompt execution Document placed in U.S. Mail to Chadrick Fulks (mflo, ) (Entered: 09/17/2007) |
| 09/18/2007 | 1038 | ENTRY DELETED #1036 due to no s/ on document as to Chadrick E Fulks Corrected Filing Document Number: 1037. (mflo, ) (Entered: 09/18/2007) |
| 10/01/2007 | 1042 | MOTION to Unseal Psychological Records by Cafaro Company, J C Penny Properties Inc, National Security Consultants Inc, Huntington Mall Company as to Chadrick E Fulks, Brandon L Basham. (mflo, ) (Entered: 10/01/2007) |
| 10/02/2007 | 1043 | ORDER REQUESTING RESPONSE as to Chadrick E Fulks, Brandon L Basham re 1042 MOTION to Unseal psychological evaluations of defendants Fulks and Bash filed by Cafaro Company, J C Penny Properties Inc, National Security Consultants Inc, Huntington Mall Company. Defendants are to file a memorandum by 10/22/07 if they object to the motion and stating grounds for the objections. Response to Motion due by 10/22/2007. Signed by Judge Joseph F Anderson Jr on 10/2/07.(mflo, ) (Entered: 10/02/2007) |
| | | |

**JA 0123**

| | | |
|---|---|---|
| 10/10/2007 | 1044 | ORDER the court hereby directs the clerk of court to provide Mr.Ashmore and Mr. Watkins access to all documents which are reflected in the docket as sealed or otherwise restricted. as to Chadrick E Fulks. Signed by Judge Joseph F Anderson Jr on 10/10/07.(mflo, ) (Entered: 10/10/2007) |
| 10/22/2007 | 1045 | RESPONSE in Opposition by Chadrick E Fulks re 1042 MOTION to Unseal Document (Attachments: # 1 Exhibit Complaint)(Watkins, William) (Entered: 10/22/2007) |
| 10/25/2007 | 1046 | ORDER denying 1042 Motion to Unseal Documents involving the psychological evaluations as to Chadrick E Fulks (1), Brandon L Basham (2). Signed by Judge Joseph F Anderson Jr on 10/25/07.(mflo, ) (Entered: 10/25/2007) |
| 10/29/2007 | 1048 | MOTION For Leave to File Application for Funds for Reasonably Necessary Investigation Ex Parte and Under Seal and Brief in Support by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Watkins, William) (Entered: 10/29/2007) |
| 10/29/2007 | 1049 | SEALED MOTION by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Attachments: # 1 Exhibit Exhibit A)(Watkins, William) (Entered: 10/29/2007) |
| 11/02/2007 | 1050 | ORDER granting 1048 Motion for leave to file application for funds for a reasonably necessary investigation as to Chadrick E Fulks (1). Signed by Judge Joseph F Anderson Jr on 11/2/07.(mflo, ) (Entered: 11/02/2007) |
| 11/05/2007 | 1053 | ***DOCUMENT MAILED as to Chadrick E Fulks re 1051 Ex Parte Order placed in U.S. Mail to William J Watkins and Beattie Ashmore (mflo, ) (Entered: 11/05/2007) |
| 11/19/2007 | 1054 | ORDER of USCA (certified copy) as to Chadrick E Fulks, Brandon L Basham re 888 Notice of Appeal - Final Judgment granting motion to appoint Melissa Meister as co-counsel for the appellant. (bbro, ) (Entered: 11/19/2007) |
| 01/02/2008 | 1061 | ***DOCUMENT EMAILED as to Chadrick E Fulks doc # 1060 emailed to Beattie Ashmore and William Watkins (mflo, ) (Entered: 01/02/2008) |
| 01/14/2008 | 1063 | ORDER allowing court appointed counsel (Timothy Sullivan and Melissa Meister) by the Fourth Circuit Court of Appeals to have access to all documents which are reflected in the docket as sealed or otherwise restricted as to Brandon L Basham. Signed by Honorable Joseph F Anderson, Jr on 1/14/08.(mflo, ) (Entered: 01/14/2008) |
| 01/14/2008 | 1064 | ***DOCUMENT MAILED as to Brandon L Basham re 1063 Order, placed in U.S. Mail to Timothy J. Sullivan at 6305 Ivy Lane, Suite 700, Greenbelt, Maryland 20770 (mflo, ) (Entered: 01/14/2008) |
| 01/15/2008 | 1065 | ORDER ON JUROR INTERVIEW PROCEDURES This order is being entered to establish clear guidelines for any future contact with jurors in this case as to Chadrick E Fulks. Signed by Honorable Joseph F Anderson, Jr on 1/15/08.(mflo, ) (Entered: 01/15/2008) |

**JA 0124**

| 02/01/2008 | 1068 | ***DOCUMENT EMAILED as to Chadrick E Fulks re 1067 Ex Parte Order, Attorneys Ashmore and Watkins (mflo, ) (Entered: 02/01/2008) |
| 02/08/2008 | 1069 | ENTRIES DELETED #'s 1066 and 1069 as to Brandon L Basham counsel for defendant Fulks selected entire case when filing these motions instead of selecting defendant Fulks (mflo, ) (Entered: 02/08/2008) |
| 03/03/2008 | 1075 | ***DOCUMENT EMAILED as to Chadrick E Fulks re 1073 Ex Parte Order, 1074 Ex Parte Order,, Terminate Motions, placed in U.S. Mail to Beattie Ashmore and Bill Watkins (mflo, ) (Entered: 03/03/2008) |
| 06/23/2008 | 1090 | MOTION to Vacate under 28 U.S.C. 2255 by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Appendix Appendix Index, # 2 Exhibit PA 1 - Lyons Declaration, # 3 Exhibit PA 2 Halleck Declaration, # 4 Exhibit PA 3 Melikian Declaration, # 5 Exhibit PA 4 Hilkey declaration, # 6 Exhibit PA 5 Morton declaration, # 7 Exhibit PA 6 Cunningham declaration, # 8 Exhibit PA 7 Aiken declaration, # 9 Exhibit PA 8 Thompson declaration, # 10 Exhibit PA 9 MarkFulks declaration, # 11 Exhibit PA 10 Martha Floyd declaration, # 12 Exhibit PA 11 Tim Kane declaration, # 13 Exhibit PA 12 Graybeal declaration, # 14 Exhibit PA 13 Wolowinski declaration, # 15 Exhibit PA 14 Ronnie Fulks declaration, # 16 Exhibit PA 15 Adkins declaration, # 17 Exhibit PA 16 Rawlings declaration, # 18 Exhibit PA 17 Roddy declaration, # 19 Exhibit PA 18 Nathan Fulks declaration, # 20 Exhibit PA 19 Elvin Taylor declaration, # 21 Exhibit PA 20 Harry Tyree delcaration, # 22 Exhibit PA 21 Sharon Dotson declaration, # 23 Exhibit PA 22 Beth McGuffin declaration, # 24 Exhibit PA 23 Christina Kirkman declaration, # 25 Exhibit PA 24 Fulks 5/10/03 polygraph results, # 26 Exhibit PA 25 Fulks 5/22/03 polygraph results, # 27 Exhibit Basham polygraph results, # 28 Exhibit PA 27 Verdict, # 29 Exhibit PA 28 MY Sun News, # 30 Exhibit PA 29 Beaufort Gazette, # 31 Exhibit PA 30 Ronnie Fulks Immunity Motion, # 32 Exhibit PA 31 Severance letter, # 33 Exhibit PA 32 Jury questionnaire, # 34 Exhibit PA 33 Thompson Judgment, # 35 Exhibit PA 34 Thompson Indictment, # 36 Exhibit PA 35 Def Memo Re: Guilty Plea, # 37 Exhibit PA 36 U.S. Memo re Issues, # 38 Exhibit PA 37 Hewitt Interview, # 39 Exhibit PA 38 art, # 40 Exhibit PA 38-1 Art, # 41 Exhibit PA 38-2 Art)(Watkins, William) Civil case 4:08-cv-70072 opened. (Entered: 06/23/2008) |
| 06/23/2008 | 1091 | MOTION for Leave to File *Memorandum of Law in Support of Section 2255 Motion* by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Watkins, William) (Entered: 06/23/2008) |
| 07/03/2008 | 1094 | NOTICE OF ATTORNEY APPEARANCE Jimmie Ewing appearing for USA. (Ewing, Jimmie) (Entered: 07/03/2008) |
| 07/22/2008 | 1096 | MOTION for Discovery by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Watkins, William) (Entered: 07/22/2008) |
| 07/22/2008 | 1097 | ORDER requesting the government to file a response by 8/6/08 explaining position on conducting discovery as to Chadrick E Fulks re 1096 MOTION for Discovery filed by Chadrick E Fulks, ( Response to Motion due by |

**JA 0125**

| | | |
|---|---|---|
| | | 8/6/2008). Signed by Honorable Joseph F Anderson, Jr on 7/22/08.(mflo, ) (Entered: 07/22/2008) |
| 08/06/2008 | 1099 | RESPONSE in Opposition by USA as to Chadrick E Fulks, Brandon L Basham re 1096 MOTION for Discovery (Ewing, Jimmie) (Entered: 08/06/2008) |
| 08/07/2008 | 1100 | Certificate of Service by USA as to Chadrick E Fulks, Brandon L Basham re 1099 Response in Opposition (Ewing, Jimmie) (Entered: 08/07/2008) |
| 08/11/2008 | 1101 | ORDER The petitioner is hereby requested to file a reply to the governments response within five days of the date of this order as to Chadrick E Fulks re 1099 Response in Opposition filed by USA, ( Reply to Response to Motion due by 8/21/2008). Signed by Honorable Joseph F Anderson, Jr on 8/11/08. (mflo, ) (Entered: 08/11/2008) |
| 08/11/2008 | 1103 | REPLY TO RESPONSE to Motion by Chadrick E Fulks re 1096 MOTION for Discovery (Watkins, William) (Entered: 08/11/2008) |
| 08/11/2008 | 1104 | ORDER It is ordered that Petitioner file a memorandum of law in support of the 2255 Motion on or before October 21, 2008. The government is directed to file a responsive pleading within 90 days of Petitioners filing of a memorandum of law in support of the 2255 Motion. Petitioner may file a reply within 30 days of the governments filing of a responsive pleading as to Chadrick E Fulks granting 1091 MOTION for Leave to File *Memorandum of Law in Support of Section 2255 Motion* filed by Chadrick E Fulks, ( Specific Document due by 10/21/2008.). Signed by Honorable Joseph F Anderson, Jr on 8/11/08.(mflo, ) (Entered: 08/11/2008) |
| 08/11/2008 | 1105 | NOTICE OF HEARING ON MOTION in case as to Chadrick E Fulks 1096 MOTION for Discovery : Motion Hearing set for 8/21/2008 09:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 08/11/2008) |
| 08/21/2008 | 1107 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 8/21/2008 re 1096 MOTION for Discovery filed by Chadrick E Fulks.granting in part and denying in part and taking under advisement in part 1096 Motion for Discovery as to Chadrick E Fulks (1); Counsel to submit copies of pages of transcripts with parts highlighted for court to consider within one week. Court Reporter Gary Smith.CJA Time 1 hour 15 minutes. (mflo, ) (Entered: 08/21/2008) |
| 08/27/2008 | 1109 | RESPONSE in Support by Chadrick E Fulks re 1096 MOTION for Discovery (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Watkins, William) (Entered: 08/27/2008) |
| 08/28/2008 | 1110 | RESPONSE in Opposition by USA as to Chadrick E Fulks re 1096 MOTION for Discovery (Attachments: # 1 Attachment A-Excerpts of 2/25/04 Motion hearing, # 2 Attachment B-Excerpts of 6/22/04 Fulks trial transcript, # 3 Attachment C-Excerpts of 9/27/04 Basham trial transcript, # 4 Attachment D-Excerpts of 9/29/04 Basham trial transcript, # 5 Attachment E-Excerpts of 6/29/04 Fulks trial transcript)(Ewing, Jimmie) (Entered: 08/28/2008) |
| | | |

**JA 0126**

| 09/09/2008 | 1114 | MOTION to Expedite Execution and to Waive all further post conviction proceedings by Chadrick E Fulks. (Attachments: # 1 Affidavit Chad Fulks, # 2 Notice to Drop Appeal, # 3 Envelope)(mflo, ) Modified on 9/26/2008 (mflo, ). 1119 affidavit in support (Entered: 09/09/2008) |
|---|---|---|
| 09/18/2008 | 1115 | ORDER as to Chadrick E Fulks granting in part and denying in part 1096 MOTION for Discovery filed by Chadrick E Fulks. Signed by Honorable Joseph F Anderson, Jr on 9/18/08.(mflo, ) (Entered: 09/18/2008) |
| 09/19/2008 | 1116 | MOTION to Appoint Counsel by Chadrick E Fulks as to Chadrick E Fulks, Brandon L Basham. Proposed Order sent to Judge Chambers email address? N. (Ashmore, Beattie) (Entered: 09/19/2008) |
| 09/19/2008 | 1117 | ORDER The court appoints Ms. Small as co-counsel to Mr. Ashmore in representing Mr. Fulks in pursuit of any and all post-conviction remedies in this case. The court will relieve Mr. Watkins of his responsibilities under the order of appointment once the memorandum is submitted as to Chadrick E Fulks; granting 1116 MOTION to Appoint Counsel filed by Chadrick E Fulks ; Added attorney Kirsten Elena Small for Chadrick E Fulks. Signed by Honorable Joseph F Anderson, Jr on 9/19/08.(mflo, ) (Entered: 09/19/2008) |
| 09/24/2008 | 1118 | CJA 30: Appointment of Attorney Kirsten Elena Small for Chadrick E Fulks in Death Penalty Proceedings as to Chadrick E Fulks.. Signed by Honorable Joseph F Anderson, Jr on 9/19/08.(mflo, ) (Entered: 09/24/2008) |
| 10/17/2008 | 1120 | MOTION to Compel *the Bureau of Prisons to Provide Necessary and Essential Medical Treatment to Chadrick E. Fulks* by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F, # 7 Exhibit Exhibit G, # 8 Exhibit Exhibit H, # 9 Exhibit Exhibit I, # 10 Exhibit Exhibit J, # 11 Exhibit Exhibit K, # 12 Exhibit Exhibit L, # 13 Exhibit Exhibit M, # 14 Exhibit Exhibit N, # 15 Exhibit Exhibit O, # 16 Exhibit Exhibit P, # 17 Exhibit Exhibit Q, # 18 Exhibit Exhibit R)(Ashmore, Beattie) (Entered: 10/17/2008) |
| 10/17/2008 | 1121 | AFFIDAVIT in Support by Chadrick E Fulks re 1120 MOTION to Compel *the Bureau of Prisons to Provide Necessary and Essential Medical Treatment to Chadrick E. Fulks* (Ashmore, Beattie) (Entered: 10/17/2008) |
| 10/17/2008 | 1122 | Certificate of Service by Chadrick E Fulks re 1121 Affidavit in Support of Motion, 1120 MOTION to Compel *the Bureau of Prisons to Provide Necessary and Essential Medical Treatment to Chadrick E. Fulks* (Ashmore, Beattie) (Entered: 10/17/2008) |
| 10/21/2008 | 1123 | Amended MOTION to Vacate under 28 U.S.C. 2255 by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit PA Document #39, # 2 Exhibit PA Document #40, # 3 Exhibit PA Document #41)(Ashmore, Beattie); see additional attachments in 1306 and 1312 (mflo, ). (Entered: 10/21/2008) |
| 10/27/2008 | 1126 | SECOND MOTION to Expedite Proceedings by Chadrick E Fulks. (Attachments: # 1 Envelope)(mflo, ) (Entered: 10/27/2008) |

**JA 0127**

| 10/27/2008 | 1127 | SECOND AFFIDAVIT by Chadrick E Fulks in support of 1126 MOTION to Expedite filed by Chadrick E Fulks (Attachments: # 1 sealed attachment 1, # 2 sealed attachment 2, # 3 Envelope)(mflo, ) (Entered: 10/27/2008) |
| --- | --- | --- |
| 11/07/2008 | 1128 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks, motion hearing held on August 21, 2008, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/28/2008. Redacted Transcript Deadline set for 12/8/2008. Release of Transcript Restriction set for 2/5/2009. (gsmith, ) (Entered: 11/07/2008) |
| 11/13/2008 | 1135 | ORDER denying 1120 Motion to Compel the Bureau of Prisons to Provide Necessary and Essential Medical Treatment to Chadrick E. Fulks as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 11/13/08.(bshr, ) (Entered: 11/13/2008) |
| 01/12/2009 | 1140 | MOTION to Produce by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Ewing, Jimmie) (Entered: 01/12/2009) |
| 01/12/2009 | 1141 | MOTION for Extension of Time to File Response/Reply as to 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Ewing, Jimmie) (Entered: 01/12/2009) |
| 01/13/2009 | 1142 | ORDER Government's response to amended 2255 petition is due 2/19/09 as to Chadrick E Fulks, granting 1141 MOTION for Extension of Time to File Response/Reply as to 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by USA, ( Response to Motion due by 2/19/2009). Signed by Honorable Joseph F Anderson, Jr on 1/13/09.(mflo, ) (Entered: 01/13/2009) |
| 01/13/2009 | 1143 | ORDER defendants trial counsel, as well as his present counsel, are invited to respond to the motion should they deem it appropriate. Any response must be filed with the court on or before January 23, 2009 as to Chadrick E Fulks re 1140 MOTION to Produce filed by USA, ( Response to Motion due by 1/23/2009). Signed by Honorable Joseph F Anderson, Jr on 1/13/09.(mflo, ) (Entered: 01/13/2009) |
| 01/23/2009 | 1144 | RESPONSE in Opposition by Chadrick E Fulks as to Chadrick E Fulks, Brandon L Basham re 1140 MOTION to Produce *(Trial Counsel's Response to the Government's Motion to Produce file January 12, 2009)* (Nettles, William) (Entered: 01/23/2009) |
| 01/23/2009 | 1145 | RESPONSE in Opposition by Chadrick E Fulks re 1140 MOTION to Produce *Records* (Ashmore, Beattie) (Entered: 01/23/2009) |
| 01/27/2009 | 1146 | ORDER denying 1140 Motion to Produce funding records as to Chadrick E Fulks (1) Signed by Honorable Joseph F Anderson, Jr on 1/27/09.(mflo, ) (Entered: 01/27/2009) |
| 02/05/2009 | 1147 | |

| | | Order Terminating Attorney in case as to Chadrick E Fulks ; representation by attorney William J Watkins, Jr Terminated as of 10/21/08. Signed by Honorable Joseph F Anderson, Jr on 2/5/09.(mflo, ) (Entered: 02/05/2009) |
|---|---|---|
| 02/12/2009 | 1149 | MOTION for Extension of Time to File Response/Reply as to 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Ewing, Jimmie) (Entered: 02/12/2009) |
| 02/12/2009 | 1150 | ORDER as to Chadrick E Fulks granting 1149 MOTION for Extension of Time to File Response/Reply as to 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by USA, ( Response to Motion due by 3/16/2009). Directed by Honorable Joseph F Anderson, Jr on 2/12/09.(mflo, ) (Entered: 02/12/2009) |
| 02/25/2009 | 1151 | MOTION to Withdraw Document 1114 MOTION to Expedite, 1126 MOTION to Expedite, 1127 Affidavit by Chadrick E Fulks as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit)(Small, Kirsten) Modified on 3/23/2009 (mflo, ) to correct docket text. (Entered: 02/25/2009) |
| 03/12/2009 | 1152 | MOTION for Extension of Time to File Response/Reply as to 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Ewing, Jimmie) (Entered: 03/12/2009) |
| 03/12/2009 | 1153 | ORDER granting 1152 Motion for Extension of Time to File Response/Reply by 4 days as to Chadrick E Fulks (1) (Reponse due 3/20/09) Directed by Honorable Joseph F Anderson, Jr on 3/12/09.(mflo, ) Modified on 3/12/2009 (mflo, )to edit docket text. (Entered: 03/12/2009) |
| 03/20/2009 | 1155 | NOTICE OF ATTORNEY APPEARANCE Robert F Daley, Jr appearing for USA. (Daley, Robert) (Entered: 03/20/2009) |
| 03/20/2009 | 1156 | MOTION for Leave to File Excess Pages by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? y. (Daley, Robert) (Entered: 03/20/2009) |
| 03/20/2009 | 1157 | RESPONSE in Opposition by USA as to Chadrick E Fulks re 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Response Part 2, Pages 51-100, # 2 Response Part 3, Pages 101-151, # 3 Response - Part 4, Pages 151-176, # 4 Exhibit A-Bio of John H. Blume, # 5 Exhibit B- Bio of Sheri Lynn Johnson, # 6 Exhibit C- Declaration of Scott N. Schools, # 7 Exhibit D- Special Verdict Form)(Daley, Robert) Please see entry # 1295 and 1302 for additional attachments. (Entered: 03/20/2009) |
| 03/23/2009 | 1159 | ORDER granting 1156 Motion for Leave to File Excess Pages as to Chadrick E Fulks (1) Directed by Honorable Joseph F Anderson, Jr on 3/23/09.(mflo, ) (Entered: 03/23/2009) |
| 03/23/2009 | 1160 | ORDER granting 1151 Motion to Withdraw Documents 1114 , 1126 and 1127 as to Chadrick E Fulks (1); withdrawing 1114 Motion to Expedite Execution and to Waive all further post conviction proceedings as to |

**JA 0129**

| | | |
|---|---|---|
| | | Chadrick E Fulks (1); withdrawing 1126 Second Motion to Expedite Proceedings as to Chadrick E Fulks (1); withdrawing 1127 SECOND AFFIDAVIT by Chadrick E Fulks in support of 1126 MOTION to Expedite (1). Directed by Honorable Joseph F Anderson, Jr on 3/23/09.(mflo, ) (Entered: 03/23/2009) |
| 03/25/2009 | 1161 | MOTION Authorization of Payment for Transcript by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit A (E-mail from Daniel Mayo to Kirsten Small), # 2 Exhibit B (CJA 24))(Small, Kirsten) (Entered: 03/25/2009) |
| 03/30/2009 | 1162 | USCA OPINION as to Brandon L Basham for 888 Notice of Appeal - Final Judgment. (swel, ) (Entered: 03/30/2009) |
| 03/30/2009 | 1163 | USCA JUDGMENT as to Brandon L Basham re 888 Notice of Appeal - Final Judgment (swel, ) (Entered: 03/30/2009) |
| 03/30/2009 | 1164 | ORDER for counsel to file a memorandum by 4/6/09 that (1) identifies by name each witness who testified at both the sentencing trial and civil trial; (2) identifies each witness whose testimony counsel believes allegedly differs in critical respects from their testimony during the sentencing trial; (3) the basis for counsels belief that the testimony differs in critical respects; and (4) why a transcript of the civil trial is reasonably necessary to support Petitioners § 2255 petition. The memorandum may be filed under seal. as to Chadrick E Fulks re 1161 MOTION Authorization of Payment for Transcript filed by Chadrick E Fulks, ( Specific Document due by 4/6/2009.). Signed by Honorable Joseph F Anderson, Jr on 3/30/09.(mflo, ) (Entered: 03/30/2009) |
| 04/06/2009 | 1165 | ORDER The court will inquire into the basis for Petitioners counsel representation that many of the witnesses who testified about the incident during the sentencing trial also testified during the civil trial and that these witnesses testimony at the civil trial may have differed in critical respects from their testimony during the sentencing trial. Counsel are directed to conference with one another and call chambers at 803-765-5136 to tie in Judge Anderson. as to Chadrick E Fulks re 1161 MOTION Authorization of Payment for Transcript filed by Chadrick E Fulks, ( Telephone Conference set for 4/17/2009 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr.). Signed by Honorable Joseph F Anderson, Jr on 4/6/09.(mflo, ) (Entered: 04/06/2009) |
| 04/06/2009 | 1166 | NOTICE OF HEARING as to Chadrick E Fulks Telephone Conference set for 4/17/2009 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. Counsel are directed to conference with one another and call chambers at 803-765-5136 to tie in Judge Anderson.(mflo, ) (Entered: 04/06/2009) |
| 04/07/2009 | 1169 | MOTION for Extension of Time, MOTION for Extension of Time to File Response/Reply as to 1157 Response in Opposition, by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? n. (Ashmore, Beattie) (Entered: 04/07/2009) |
| 04/07/2009 | 1170 | |

**JA 0130**

| | | |
|---|---|---|
| | | DELETION OF ENTRY NUMBER 1168 as to Chadrick E Fulks, Brandon L Basham Reason: counsel selected all defendants in case; Corrected Filing Document Number 1169 Modified filing date to that of original filing: 4/7/09 (mflo, ) (Entered: 04/07/2009) |
| 04/07/2009 | 1171 | TEXT ORDER granting an extension of 30 days to reply to government's response; response due 5/19/09; granting 1169 Motion for Extension of Time to File as to Chadrick E Fulks (1); granting 1169 Motion for Extension of Time to File Response/Reply as to Chadrick E Fulks (1)Directed by Honorable Joseph F Anderson, Jr on 4/7/09.(mflo, ) (Entered: 04/07/2009) |
| 04/08/2009 | 1172 | ORDER of USCA as to Brandon L Basham re 888 Notice of Appeal - Final Judgment filed 998071560 granting motion to substitute counsel [998065114-2] David W. DeBruin substituted in place of Melissa Meister as co-counsel for appellant for Basham, Brandon Leon in 05-5. Representation Type: D2.(swel, ) (Entered: 04/08/2009) |
| 04/17/2009 | 1173 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Chadrick E Fulks held on 4/17/2009. Court will authorize the civil trial transcript as to the testimony of 4 identified witnesses: Myrant, Lybrand, Mitchell and Allen only. Defense counsel to submit voucher.granting in part 1161 Motion Authorization of Payment for Transcript of civil trial as to Chadrick E Fulks (1); Court Reporter Dan Mayo.CJA Time 10 minutes. (mflo, ) (Entered: 04/17/2009) |
| 05/11/2009 | 1176 | MOTION for Extension of Time to File Response/Reply as to 1157 Response in Opposition, by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? N. (Ashmore, Beattie) Modified on 5/12/2009 (mflo, ). to correct filing date (Entered: 05/12/2009) |
| 05/12/2009 | 1177 | DELETION OF ENTRY NUMBER 1175 as to Chadrick E Fulks Reason: filers request Corrected Filing Document Number 1176 Modified filing date to that of original filing: 5/11/09 (mflo, ) (Entered: 05/12/2009) |
| 05/12/2009 | 1178 | ORDER granting 1176 Motion for Extension of Time to File Response/Reply on or before 6/19/09 as to Chadrick E Fulks (1) Directed by Honorable Joseph F Anderson, Jr on 5/12/09.(mflo, ) (Entered: 05/12/2009) |
| 06/10/2009 | 1181 | Third MOTION for Extension of Time to File Response/Reply as to 1157 Response in Opposition, by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Small, Kirsten) (Entered: 06/10/2009) |
| 06/12/2009 | 1182 | ORDER granting 1181 Motion for Extension of Time to File Response/Reply as to Chadrick E Fulks (1). Please note that No Further Extensions Will Be Granted. Directed by Honorable Joseph F Anderson, Jr on 6/12/09.(mflo, ) Modified on 6/12/2009 (mflo, ) to edit text. (Entered: 06/12/2009) |
| 06/15/2009 | 1183 | Appeal Remark as to Brandon L Basham re 888 Notice of Appeal - Final Judgment : Mandate stayed by FRAP 41(d)(1). (swel, ) (Entered: 06/15/2009) |
| 06/26/2009 | 1187 | |

**JA 0131**

| | | |
|---|---|---|
| | | ORDER of USCA as to Brandon L Basham re 888 Notice of Appeal - Final Judgment filed 998128419 denying motion for rehearing and rehearing en banc (swel, ) (Entered: 06/26/2009) |
| 07/06/2009 | 1188 | MANDATE of USCA The judgment of the 4CCA, entered March 30, 2009, takes effect today as to Brandon L Basham re 888 Notice of Appeal - Final Judgment (mflo, ) (Entered: 07/07/2009) |
| 07/17/2009 | 1189 | MOTION Expand the Record by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit Revised Index to Petitioner's Appendix, # 2 Exhibit PA Document #42, # 3 Exhibit PA Document #43, # 4 Exhibit PA Document #44, # 5 Exhibit PA Document #45, # 6 Exhibit PA Document #46, # 7 Exhibit PA Document #47, # 8 Exhibit PA Document #48, # 9 Exhibit PA Document #49, # 10 Exhibit PA Document #50, # 11 Exhibit PA Document #51, # 12 Exhibit PA Document #52, # 13 Exhibit PA Document #53, # 14 Exhibit PA Document #54, # 15 Exhibit PA Document #55, # 16 Exhibit PA Document #56, # 17 Exhibit Unpublished Decision)(Small, Kirsten) (Entered: 07/17/2009) |
| 07/17/2009 | 1190 | MOTION for Leave to File *Supplemental Claim* by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit Claim XXXIII, # 2 Exhibit PA Document #42, # 3 Exhibit PA Document #43, # 4 Exhibit PA Document #44, # 5 Exhibit PA Document #45, # 6 Exhibit PA Document #46, # 7 Exhibit PA Document #47, # 8 Exhibit PA Document #48, # 9 Exhibit PA Document #49, # 10 Exhibit PA Document #50, # 11 Exhibit PA Document #51, # 12 Exhibit PA Document #52, # 13 Exhibit PA Document #53, # 14 Exhibit PA Document #54, # 15 Exhibit Unpublished Decision)(Small, Kirsten) (Entered: 07/17/2009) |
| 07/17/2009 | 1191 | MOTION for Leave to File Excess Pages by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Small, Kirsten) (Entered: 07/17/2009) |
| 07/17/2009 | 1192 | REPLY TO RESPONSE to Motion by Chadrick E Fulks re 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Exhibit Revised Index of Petitioner's Appendix, # 2 Exhibit PA Document #42, # 3 Exhibit PA Document #43, # 4 Exhibit PA Document #44, # 5 Exhibit PA Document #45, # 6 Exhibit PA Document #46, # 7 Exhibit PA Document #47, # 8 Exhibit PA Document #48, # 9 Exhibit PA Document #49, # 10 Exhibit PA Document #50, # 11 Exhibit PA Document #51, # 12 Exhibit PA Document #52, # 13 Exhibit PA Document #53, # 14 Exhibit PA Document #54, # 15 Exhibit PA Document #55, # 16 Exhibit PA Document #56, # 17 Exhibit Unpublished Decisions part 1, # 18 Exhibit Unpublished Decisions Part 2 of 4, # 19 Summons Unpublished Decisions Part 3 of 4, # 20 Exhibit Unpublished Decisions Part 4 of 4)(Small, Kirsten) (Entered: 07/17/2009) |
| 07/20/2009 | 1193 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Chadrick E Fulks held on 7/20/2009. Petitioner to submit proposed witness list by 5:00 7/22/09 and Respondent due 7/24/09. Court Reporter not present.CJA Time 15 minutes. (mflo, ) (Entered: 07/20/2009) |
| | | |

**JA 0132**

| 07/21/2009 | 1194 | ORDER SETTING HEARING FOR ARGUMENT ON 2255 MOTION, Court grants petitioner's request for a hearing to present testimony in support of 2255 motion. Hearing is scheduled to begin on 8/3/09 as to Chadrick E Fulks re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. Signed by Honorable Joseph F Anderson, Jr on 7/20/09.(mflo, ) (Entered: 07/21/2009) |
|---|---|---|
| 07/21/2009 | 1195 | NOTICE OF HEARING ON MOTION in case as to Chadrick E Fulks 1090 MOTION to Vacate under 28 U.S.C. 2255 : Motion Hearing set for 8/3/2009 09:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 07/21/2009) |
| 07/22/2009 | 1196 | NOTICE OF HEARING as to Chadrick E Fulks Telephone Conference set for 7/23/2009 11:00 AM before Honorable Joseph F Anderson Jr. Counsel is to conference one another and then conference Judge Anderson at the number provided.(mflo, ) (Entered: 07/22/2009) |
| 07/22/2009 | 1197 | MOTION Memorandum Regarding Scheduling re 1194 Order, by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit Exhibit A)(Small, Kirsten) (Entered: 07/22/2009) |
| 07/23/2009 | 1198 | NOTICE OF CANCELLATION OF HEARING: Motion hearing on 8/3/09 at 9:30 as to Chadrick E Fulks (mflo, ) (Entered: 07/23/2009) |
| 07/23/2009 | 1199 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Chadrick E Fulks held on 7/23/2009. finding as moot 1197 Motion Regarding Scheduling as to Chadrick E Fulks (1); Court orally amends order 1194 language that pertains to Order 113. Court tentatively sets 2255 motions hearing for 9/28/09. Hearing with testimony to take approximately 5 days with 1 day of argument; Defendant to submit witness list by Monday, July 27th and Government by Wednesday July 29th.Court Reporter Dan Mayo.CJA Time 30 minutes. (mflo, ) Modified on 7/27/2009 (mflo, ) to edit text. Modified on 8/11/2009 (mflo, )to correct spelling. (Entered: 07/23/2009) |
| 07/27/2009 | 1200 | Letter sent to Judge Traxler on extension for ruling on 2255 motion from Judge Joe Anderson as to Chadrick E Fulks (mflo, ) (Entered: 07/27/2009) |
| 07/29/2009 | 1201 | Letter from Chief Judge William B. Traxler in response to 1200 Letter as to Chadrick E Fulks in re: Extension for Ruling on 2255 motion (mflo, ) (Entered: 07/29/2009) |
| 07/30/2009 | 1202 | ORDER setting a hearing to discuss the list of anticipated witnesses, together with a synopsis of the expected testimony, an explanation of why oral testimony is necessary from each witness and why written affidavits will not suffice as to Chadrick E Fulks ; In light of the extension granted by Chief Judge Traxler to the court pursuant to Order 113, the court will begin the hearing on the 2255 Motion on Monday, September 28, 2009. Counsel is advised to plan accordingly as to Chadrick E. Fulks; ( Status Conference set for 8/11/2009 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr.). Signed |

**JA 0133**

| | | |
|---|---|---|
| | | by Honorable Joseph F Anderson, Jr on 7/30/09. (Attachments: # 1 A Petitioner memorandum with proposed witness list and article, # 2 B Government's memorandum and proposed witness list)(mflo, ) (Entered: 07/30/2009) |
| 07/30/2009 | 1203 | NOTICE OF HEARING as to Chadrick E Fulks Status Conference on the issue of proposed witnesses for the 2255 motion hearing set for 8/11/2009 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 07/30/2009) |
| 07/30/2009 | 1204 | NOTICE OF HEARING ON MOTION in case as to Chadrick E Fulks 1090 MOTION to Vacate under 28 U.S.C. 2255 : Court will advise if defendant needs to be present; Motion Hearing set for 9/28/2009 09:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 07/30/2009) |
| 08/04/2009 | 1205 | MOTION for waiver of the attorney-client privilege and for an order requiring disclosure of trial counsel's papers and files by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? yes. (Attachments: # 1 Memo in Support)(Daley, Robert) (Entered: 08/04/2009) |
| 08/04/2009 | 1206 | ORDER the court requests that the Petitioner file a memorandum by noon on August 10, 2009, explaining his position with respect to the governments motion and whether the court should grant the request. The court will discuss this matter at the August 11, 2009 hearing as to Chadrick E Fulks re 1205 MOTION for waiver of the attorney-client privilege and for an order requiring disclosure of trial counsel's papers and files filed by USA, ( Response to Motion due by 8/10/2009). Signed by Honorable Joseph F Anderson, Jr on 8/4/09.(mflo, ) (Entered: 08/04/2009) |
| 08/07/2009 | 1207 | MOTION for Leave to Appear Pro Hac Vice Attorney: David P. Dalke. ( Filing fee $ 250 receipt number 04200000000002231341) by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? Yes. (Attachments: # 1 Exhibit Application for admission, # 2 Exhibit Certificate of good standing)(Small, Kirsten) (Entered: 08/07/2009) |
| 08/07/2009 | 1208 | MOTION for Leave to Appear Pro Hac Vice Attorney: Kymberleigh Damron-Hsiao. ( Filing fee $ 250 receipt number 04200000000002231353) by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? Yes. (Attachments: # 1 Exhibit Application, # 2 Exhibit Certificate of Good Standing)(Small, Kirsten) (Entered: 08/07/2009) |
| 08/07/2009 | 1209 | MOTION for Leave to Appear Pro Hac Vice Attorney: Amy Jean Laurendeau. ( Filing fee $ 250 receipt number 04200000000002231367) by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? Yes. (Small, Kirsten) (Additional attachment(s) added on 8/10/2009: # 1 application/affidavit for pro hac vice, # 2 certificate of good standing) (mflo, ). Modified on 8/17/2009 (mflo, ) to replace incorrect document with corrected document as provided by filing user. (Entered: 08/07/2009) |
| 08/07/2009 | 1210 | |

**JA 0134**

| | | |
|---|---|---|
| | | MOTION for Leave to Appear Pro Hac Vice Attorney: Stephanie L. Noble. ( Filing fee $ 250 receipt number 0420000000002231383) by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? Yes. (Attachments: # 1 Exhibit Application, # 2 Exhibit Certificate of Good Standing)(Small, Kirsten) (Entered: 08/07/2009) |
| 08/07/2009 | 1211 | MOTION for Leave to Appear Pro Hac Vice Attorney: Danielle Nicole Oakley. ( Filing fee $ 250 receipt number 0420000000002231390) by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? Yes. (Attachments: # 1 Exhibit Application, # 2 Exhibit Certificate of Good Standing)(Small, Kirsten) (Entered: 08/07/2009) |
| 08/07/2009 | 1213 | MOTION to limit testimony at evidentiary hearing by USA as to Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? no. (Attachments: # 1 Memo in Support, # 2 Exhibit A-Defendant's Summary of Testimony Defense Counsel Intends to Use, # 3 Exhibit B-Excerpts of Trial Testimony of Drucie Glass)(Daley, Robert) see document 1220 for additional attachments (Entered: 08/07/2009) |
| 08/10/2009 | 1214 | RESPONSE in Opposition by Chadrick E Fulks re 1205 MOTION for waiver of the attorney-client privilege and for an order requiring disclosure of trial counsel's papers and files (Attachments: # 1 Exhibit Unpublished Decisions Part 1, # 2 Exhibit Unpublished Decisions Part 2)(Small, Kirsten) (Entered: 08/10/2009) |
| 08/10/2009 | 1216 | REPLY TO RESPONSE to Motion by USA as to Chadrick E Fulks re 1205 MOTION for waiver of the attorney-client privilege and for an order requiring disclosure of trial counsel's papers and files (Daley, Robert) (Entered: 08/10/2009) |
| 08/11/2009 | 1217 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Status Conference/Motion Hearing as to Chadrick E Fulks held on 8/11/2009. Court reviews both government and petitioners witness list in respect to will appear live or affidavit. Hearing is rescheduled from 9/28/09 to 10/5/09 with petitioner (Fulks) to be present by video conference. Counsel to reserve 10/21/09 as a backup date for any additional witnesses, if necessary. granting 1205 Motion for waiver of the attorney-client privilege and for an order requiring disclosure of trial counsel's papers and files as to Chadrick E Fulks (1); granting 1207 Motion for Leave for David P Dalke to Appear Pro Hac Vice as to Chadrick E Fulks (1); granting 1208 Motion for Leave for Kymberleigh Damron Hsiao to Appear Pro Hac Vice as to Chadrick E Fulks (1); granting 1209 Motion for Leave for Amy Jean Laurendeau to Appear Pro Hac Vice as to Chadrick E Fulks (1); granting 1210 Motion for Leave for Stephanie L Noble to Appear Pro Hac Vice as to Chadrick E Fulks (1); granting 1211 Motion for Leave for Danielle Nicole Oakly to Appear Pro Hac Vice as to Chadrick E Fulks (1); written order to be filed. Court Reporter Gary Smith.CJA Time 1 hour 40 minutes. (mflo, ) (Entered: 08/11/2009) |
| 08/11/2009 | 1218 | NOTICE OF RESCHEDULED HEARING as to Chadrick E Fulks 2255 motion hearing on 9/28/09 at 9:30 cancelled and rescheduled to: Petitioner Chadrick E Fulks will appear by video conference. Motion Hearing on Motion to Vacate 1090 set for 10/5/2009 09:30 AM in Columbia # 4, |

| | | Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 08/11/2009) |
|---|---|---|
| 08/13/2009 | 1220 | Additional Attachments to Main Document 1213 MOTION to limit testimony at evidentiary hearing by USA as to Chadrick E Fulks. (Daley, Robert) Modified on 8/13/2009 to correct linkage and to edit text(bshr, ). (Entered: 08/13/2009) |
| 08/18/2009 | 1221 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks, status conference/motion hearing held on August 11, 2009, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/8/2009. Redacted Transcript Deadline set for 9/18/2009. Release of Transcript Restriction set for 11/16/2009. (gsmith, ) (Entered: 08/18/2009) |
| 08/21/2009 | 1222 | ORDER Petitioners counsel is ordered to provide immediate production to the government of the disks of scanned documents in counsels possession, together with the index to said scanned documents. The scanned documents are to be produced in their native form so that they are searchable. If counsel has been able to determine which documents were not scanned from the file boxes, counsel is directed to provide this information and the unscanned documents to the government. Any and all materials pertaining to communications and advice passing between Petitioner and trial counsel, John Blume, Sherri Johnson, and William Nettles, pretrial and trial, are ordered to be produced to the government immediately, whether the notes have been scanned or not. granting in part and denying in part 1213 Motion to limit testimony at evidentiary hearing as to Chadrick E Fulks (1) Signed by Honorable Joseph F Anderson, Jr on 8/20/09.(mflo, ) (Entered: 08/21/2009) |
| 08/24/2009 | 1224 | MOTION for Reconsideration re 1217 Status Conference; Hearing is rescheduled from 9/28/09 to 10/5/09 with petitioner (Fulks) to be present by video conference. by Chadrick E Fulks. (Attachments: # 1 Envelope)(mflo, ) (Entered: 08/24/2009) |
| 08/25/2009 | 1225 | ORDER the court directs counsel for petitioner to file a response by noon on August 31, 2009, explaining counsels position with respect to the issues outlined in this order. Should the government wish to file a response to Petitioners pro se motion, it should do so by noon on August 31, 2009 as to Chadrick E Fulks re 1224 MOTION for Reconsideration of Order for petitioner to appear by video conference for hearing on 10/5/09 filed by Chadrick E Fulks, ( Response to Motion due by 8/31/2009). Signed by Honorable Joseph F Anderson, Jr on 8/25/09.(mflo, ) (Entered: 08/25/2009) |
| 08/25/2009 | 1226 | MOTION for Reconsideration re 1222 Order on Motion for Miscellaneous Relief,,, by Chadrick E Fulks. Proposed Order sent to Judge Chambers email address? No. (Attachments: # 1 Exhibit Out-of-jurisdiction decision)(Small, Kirsten) (Entered: 08/25/2009) |
| 08/28/2009 | 1227 | |

**JA 0136**

| | | |
|---|---|---|
| | | RESPONSE in Opposition by USA as to Chadrick E Fulks re 1226 MOTION for Reconsideration re 1222 Order on Motion for Miscellaneous Relief,,, (Daley, Robert) (Entered: 08/28/2009) |
| 08/31/2009 | 1228 | RESPONSE to Motion by Chadrick E Fulks re 1224 MOTION for Reconsideration re 1217 Order on Motion for Miscellaneous Relief,,,,,, Order on Motion for Leave to Appear Pro Hac Vice,,,,,,,,,,,,,,,,,,,,,,,,,,,, Status Conference,,,,, Reply to Response to Motion due by 9/11/2009 (Small, Kirsten) (Entered: 08/31/2009) |
| 09/02/2009 | 1230 | REPLY TO RESPONSE to Motion by Chadrick E Fulks re 1226 MOTION for Reconsideration re 1222 Order on Motion for Miscellaneous Relief,,, (Small, Kirsten) (Entered: 09/02/2009) |
| 09/08/2009 | 1231 | REPLY TO RESPONSE (pro se) to Motion by Chadrick E Fulks re 1224 MOTION for Reconsideration re 1217 Order on Motion for Miscellaneous Relief,Order on Motion for Leave to Appear Pro Hac Vice, Status Conference, 1226 MOTION for Reconsideration re 1222 Order on Motion for Miscellaneous Relief. (mflo, ) (Entered: 09/08/2009) |
| 09/11/2009 | 1234 | ORDER The court will permit Petitioner to participate in the hearing via satellite. To the extent that Petitioner seeks replacement counsel, the court denies the request. The court expects all future filings to be directed through counsel. If Petitioner submits any further pro se documents, they will be forwarded to Petitioners counsel and will not be docketed in the case or considered by the court.;denying 1224 Motion for Reconsideration re 1224 MOTION for Reconsideration re 1217 Order on Motion for Miscellaneous Relief, Order on Motion for Leave to Appear Pro Hac Vice, Status Conference, filed by Chadrick E Fulks, 1228 Response to Motion, filed by Chadrick E Fulks, 1231 Reply to Response, filed by Chadrick E Fulks as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 9/11/09.(mflo, ) (Entered: 09/11/2009) |
| 09/11/2009 | 1235 | ***DOCUMENT MAILED as to Chadrick E Fulks re 1234 Order on Motion for Reconsideration, placed in U.S. Mail to Chadrick E Fulks(Terminated) #16617-074 US Penitentiary Federal Death Row P.O. Box 12015 Terre Haute, IN 47801-2015 (mflo, ) (Entered: 09/11/2009) |
| 09/11/2009 | 1236 | ORDER granting in part and denying in part 1226 Motion for Reconsideration order of the court dated August 21, 2009 as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 9/11/09.(mflo, ) (Entered: 09/11/2009) |
| 09/14/2009 | 1248 | MOTION for Hearing, MOTION copy of entire file by Chadrick E Fulks. No proposed order (Attachments: # 1 Envelope)(mflo, ) (Entered: 09/24/2009) |
| 09/15/2009 | 1237 | NOTICE OF APPEAL (Interlocutory) by Chadrick E Fulks re 1222 Order on Motion for Miscellaneous Relief,,, 1236 Order on Motion for Reconsideration. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Small, Kirsten) (Entered: 09/15/2009) |
| 09/15/2009 | 1238 | |

**JA 0137**

| | | |
|---|---|---|
| | | MOTION Stay of Proceedings by Chadrick E Fulks. No proposed order (Small, Kirsten) (Entered: 09/15/2009) |
| 09/15/2009 | 1240 | ORDER denying 1238 Motion to stay proceedings as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 9/15/09.(mflo, ) (Entered: 09/15/2009) |
| 09/15/2009 | 1241 | Transmittal Sheet for Notice of Appeal to USCA as to Chadrick E Fulks to US Court of Appeals re 1237 Notice of Appeal - Interlocutory, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mflo, ) (Entered: 09/15/2009) |
| 09/15/2009 | 1243 | MOTION to Appoint Counsel by Brandon L Basham. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Memo in Support)(Mimms, Julia) Modified on 9/16/2009 (mflo, )to correct filing date. (Entered: 09/16/2009) |
| 09/16/2009 | 1244 | DELETION OF ENTRY NUMBER 1242 as to Brandon L Basham Reason: Document incorporated into main document that should be attachment; Corrected Filing Document Number 1243 Modified filing date to that of original filing: 9/15/09 (mflo, ) (Entered: 09/16/2009) |
| 09/17/2009 | 1245 | ORDER of USCA The Court appoints Beattie B. Ashmore as lead counsel and Kirsten E. Small as co-counsel for the appellant pursuant to the provisions of 18 U.S.C. § 3599(c) and the Criminal Justice Act effective 09/15/2009. as to Chadrick E Fulks re 1237 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 09/17/2009) |
| 09/18/2009 | 1247 | ORDER granting 1243 Motion to Appoint Counsel, Julia Mimms as local counsel. The appointment called for herein shall take effect if and when the petition for a Writ of Certiorari is denied in the Supreme Court. If the Writ is granted, this order shall be void and of no effect. Mr. Sands, Federal Public Defender for the District of Arizona is authorized to designate two attorneys from his office who are also qualified to represent Mr. Basham. If and when this order takes effect, these additional attorneys may seek admission pro hac vice and enter an appearance as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 9/17/09.(mflo, ) (Entered: 09/18/2009) |
| 09/24/2009 | 1249 | ORDER Cancelling Hearing for Argument on Petitioner's 28:2255 motion. Setting hearing for 10/5/09 at 2:30 on the issue of petitioner requesting a copy of his case file. Petitioner is to appear via satellite.granting 1248 Motion for Hearing as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 9/24/09.(mflo, ) (Entered: 09/24/2009) |
| 09/24/2009 | 1250 | NOTICE OF CANCELLATION OF HEARING: Motion Hearing on Motion to Vacate 1090 set for 10/5/2009 09:30 AM as to Chadrick E Fulks (mflo, ) (Entered: 09/24/2009) |
| 09/24/2009 | 1251 | NOTICE OF HEARING ON MOTION in case as to Chadrick E Fulks 1248 MOTION for Hearing on MOTION for copy of entire file : Defendant Fulks shall appear via satellite. Motion Hearing set for 10/5/2009 02:30 PM in |

**JA 0138**

| | | |
|---|---|---|
| | | Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 09/24/2009) |
| 09/25/2009 | 1252 | ***DOCUMENT MAILED as to Chadrick E Fulks re 1249 Order on Motion for Hearing, placed in U.S. Mail to Chadrick E Fulks #16617-074 US Penitentiary Federal Death Row P.O. Box 12015 Terre Haute, IN 47801-2015 (mflo, ) (Entered: 09/25/2009) |
| 09/28/2009 | 1253 | ORDER of USCA relative to the motion for stay pending appeal and the motion to place this case in abeyance, the Court denies the motion as to Chadrick E Fulks re 1237 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 09/28/2009) |
| 10/02/2009 | 1254 | ***DOCUMENT REMAILED as to Chadrick E Fulks re 1249 Order on Motion for Hearing, placed in U.S. Mail to Chadrick E Fulks #16617-074 US Penitentiary Federal Death Row P.O. Box 33 Terre Haute, IN 47808. PO Box was incorrect. (mflo, ) (Entered: 10/02/2009) |
| 10/04/2009 | 1255 | MOTION conduct hearing ex parte re 1249 Order on Motion for Hearing, by Chadrick E Fulks. No proposed order (Attachments: # 1 Exhibit Unpublished Decisions)(Small, Kirsten) (Entered: 10/04/2009) |
| 10/05/2009 | 1256 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 10/5/2009 with defendant present by video conference; granting 1248 MOTION for Hearing; granting in part 1248 MOTION for copy of entire file filed by Chadrick E Fulks. Defendant informs the court that the sexual abuse portion of a claim in the 28:2255 motion will be abandoned. Counsel informs the court that the defendant has filed motion to stay with US Supreme Court. Court advises defendant not to file any pro se motions. Scanning process of materials not on CD's held in abeyance at this time. Court conducted Exparte Hearing on this date as well with defendant and defense counsel. Court Reporter Karen Martin.CJA Time 30 minutes. (mflo, ) (Entered: 10/06/2009) |
| 10/07/2009 | 1258 | ORDER With the consent of counsel for the government, the court granted petitioners motion to conduct the hearing ex parte. The court directed that Petitioner be provided a copy of the discs of already-scanned documents for his review at a reading room in the penitentiary at Terra Haute. Petitioner is not permitted to take notes during his review of the materials on the discs as to Chadrick E Fulks re 1255 MOTION conduct hearing ex parte re 1249 Order on Motion for Hearing, filed by Chadrick E Fulks, 1248 MOTION for Hearing MOTION copy of entire file filed by Chadrick E Fulks. Petitioner informed the court that he abandons Claim I(H) relating to being allegedly sexually abused. The court reiterated its directive to Petitioner to not file any more pro se motions with the court.. Signed by Honorable Joseph F Anderson, Jr on 10/6/09.(mflo, ) (Entered: 10/07/2009) |
| 10/07/2009 | 1259 | ***DOCUMENT MAILED as to Chadrick E Fulks re 1258 Order,,, placed in U.S. Mail to Chadrick E Fulks #16617-074 US Penitentiary Federal Death Row P.O. Box 33 Terre Haute, IN 47808 (mflo, ) (Entered: 10/07/2009) |
| 12/17/2009 | 1265 | |

**JA 0139**

| | | |
|---|---|---|
| | | RESPONSE in Opposition by USA as to Chadrick E Fulks re 1190 MOTION for Leave to File *Supplemental Claim* (Attachments: # 1 Exhibit 1 - Officer's Report, # 2 Exhibit 2 - DNA test results, # 3 Exhibit 3 - FBI 302)(Daley, Robert) (Entered: 12/17/2009) |
| 12/21/2009 | 1266 | Consent MOTION for Extension of Time *to file reply* by Chadrick E Fulks. No proposed order(Small, Kirsten) (Entered: 12/21/2009) |
| 12/23/2009 | 1267 | TEXT ORDER granting 1266 Motion for Extension of Time to File Reply to Motion to Supplement until 1/11/10 as to Chadrick E Fulks (1). Directed by Honorable Joseph F Anderson, Jr on 12/23/09.(mflo, ) (Entered: 12/23/2009) |
| 12/23/2009 | 1268 | ORDER of USCA The Court grants the motion and dismisses the appeal as to Chadrick E Fulks re 1237 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 12/23/2009) |
| 12/23/2009 | 1269 | USCA JUDGMENT the decision of this Court, the appeal is dismissed. This judgment shall take effect upon issuance of this Court's mandate as to Chadrick E Fulks re 1237 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 12/23/2009) |
| 12/31/2009 | 1270 | MOTION to Appoint Counsel by Chadrick E Fulks. No proposed order (Small, Kirsten) (Entered: 12/31/2009) |
| 01/05/2010 | 1271 | ORDER of USCA Upon consideration of the parties joint motion to issue the mandate forthwith, the Court grants the motion as to Chadrick E Fulks re 1237 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 01/05/2010) |
| 01/05/2010 | 1272 | MANDATE of USCA The judgment of this Court, entered December 23, 2009, takes effect today as to Chadrick E Fulks re 1237 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 01/05/2010) |
| 01/06/2010 | 1273 | NOTICE OF HEARING ON MOTION in case as to Chadrick E Fulks 1090 MOTION to Vacate under 28 U.S.C. 2255 : Motion Hearing set for 2/22/2010 09:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. Defendant is to be present by video conference.(mflo, ) (Entered: 01/06/2010) |
| 01/08/2010 | 1274 | ORDER from the United States Supreme Court as to Chadrick E Fulks; The order heretofore issued on October 19, 2009, is hereby vacated. The application for stay is, in all respects, denied. Signed by Chief Justice John G. Roberts, Jr. on 12/11/09.(mflo, ) (Entered: 01/08/2010) |
| 01/11/2010 | 1275 | REPLY TO RESPONSE to Motion by Chadrick E Fulks re 1190 MOTION for Leave to File *Supplemental Claim* (Small, Kirsten) (Entered: 01/11/2010) |
| 01/13/2010 | 1276 | NOTICE OF HEARING as to Chadrick E Fulks Telephone Conference set for 1/15/2010 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. Parties to conference one another and tie in the court at 803-765-5136.(mflo, ) (Entered: 01/13/2010) |
| 01/14/2010 | 1277 | |

**JA 0140**

| | | NOTICE OF CANCELLATION OF HEARING: Telephone Conference set for 1/15/2010 10:00 AM as to Chadrick E Fulks (mflo, ) (Entered: 01/14/2010) |
|---|---|---|
| 01/19/2010 | 1278 | ORDER denying 1270 Motion to Appoint Supplemental Counsel as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 1/19/10.(mflo, ) (Entered: 01/19/2010) |
| 01/29/2010 | 1280 | MOTION for Hearing *Status Conference* by Chadrick E Fulks. No proposed order (Attachments: # 1 Exhibit Exhibit A)(Small, Kirsten) (Entered: 01/29/2010) |
| 02/01/2010 | 1281 | NOTICE OF HEARING as to Chadrick E Fulks Telephone Conference set for 2/2/2010 04:00 PM before Honorable Joseph F Anderson Jr. Counsel are directed to conference with one another and call chambers at 803-765-5136 to tie in Judge Anderson.(mflo, ) (Entered: 02/01/2010) |
| 02/01/2010 | 1282 | MOTION for Writ of Habeas Corpus ad testificandum *for appearance at evidentiary hearing* by Chadrick E Fulks. No proposed order (Attachments: # 1 Exhibit Exhibit A)(Small, Kirsten) (Entered: 02/01/2010) |
| 02/02/2010 | 1284 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: granting 1280 Motion for Hearing as to Chadrick E Fulks (1); Telephone Conference as to Chadrick E Fulks held on 2/2/2010. Defendant states live witnesses and request witness Sherri Johnson be by telephone. Discussion of defendant being able to have confidential conversations with counsel if defendant appears by video conference. Court has set aside 2 weeks for hearing. Court Reporter Dan Mayo.CJA Time 30 minutes. (mflo, ) (Entered: 02/02/2010) |
| 02/12/2010 | 1288 | MOTION reinstatment of Claim I(H) by Chadrick E Fulks. No proposed order (Attachments: # 1 Exhibit A (Declaration of Chad Fulks), # 2 Exhibit B (Declaration of Harry Krop, PhD))(Small, Kirsten) (Entered: 02/12/2010) |
| 02/12/2010 | 1291 | ORDER it will be necessary to adjourn the hearing in the above entitled action no later than 1:00 p.m. on Thursday, February 25, 2010. The court will resume the hearing Friday, February 26, 2010 at 9:30 a.m. as to Chadrick E Fulks. Signed by Honorable Joseph F Anderson, Jr on 2/12/10.(mflo, ) (Entered: 02/12/2010) |
| 02/12/2010 | 1292 | MOTION to Continue *as to claims I(H), XX, and XXI only* by Chadrick E Fulks. No proposed order(Small, Kirsten) (Entered: 02/12/2010) |
| 02/15/2010 | 1295 | Additional Attachments to Main Document 1157 Response in Opposition, (Daley, Robert) (Entered: 02/15/2010) |
| 02/21/2010 | 1296 | RESPONSE to Motion by USA as to Chadrick E Fulks re 1288 MOTION reinstatment of Claim I(H), 1292 MOTION to Continue *as to claims I(H), XX, and XXI only* Reply to Response to Motion due by 3/1/2010 (Daley, Robert) (Entered: 02/21/2010) |
| 02/22/2010 | 1297 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 2/22/2010; Defendant, Fulks present by video conference with a phone available to speak with attorneys as |

**JA 0141**

| | | |
|---|---|---|
| | | needed. Court will go forward on the 2255 amended motion to vacate sentence. Counsel for the defendant informs the court they have not abandoned any claims as stated in the amended motion to vacate sentence. Counsel agree on exhibits by defendant #s 2-99 and Government #s 1-62 to be entered; Opening statements; witness and exhibits; Court will seal exhibit P55 by defendant due to personal identifiers; Court in recess until 2/23/10 at 9:00am. re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. Court Reporter Gary Smith.CJA Time 8 hours. (mflo, ) (Entered: 02/23/2010) |
| 02/23/2010 | 1299 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 2/23/2010. Fulks present by video conference with a phone available to speak with attorneys as needed. Witnesses and exhibits; Government withdraws exhibit #38; Exparte hearing held with defense team and defendant only. Court in recess until 2/24/10 at 9:30. re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. Court Reporter Gary Smith.CJA Time 8 hours 30 minutes. (mflo, ) (Entered: 02/24/2010) |
| 02/24/2010 | 1300 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 2/24/2010; Fulks present by video conference with a phone available to speak with attorneys as needed. Witnesses and exhibits; Government withdraws objection to exhibit P1 the declaration of Heather Roche, this exhibit is now entered. Exparte hearing held with defense team and defendant only. Court in recess until 2/25/10 at 9:00. re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. Court Reporter Gary Smith.CJA Time 8 hours 30 minutes. (mflo, ) (Entered: 02/25/2010) |
| 02/25/2010 | 1302 | Additional Attachments to Main Document 1157 Response in Opposition, (Daley, Robert) (Entered: 02/25/2010) |
| 02/25/2010 | 1303 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 2/25/2010; Fulks present by video conference with a phone available to speak with attorneys as needed. Witness by telephone and exhibits; court in recess until 2/26/10 at 9:30; re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. Court Reporter Gary Smith.CJA Time 2 hours. (mflo, ) (Entered: 02/26/2010) |
| 02/26/2010 | 1304 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 2/26/2010; Fulks present by video conference with a phone available to speak with attorneys as needed. Exhibits P4 and P56 are withdrawn. Oral arguments on petitioners/defendants amended 2255 motion to vacate on claims 17, 7, 28, 1, 18, 19 and 5. Counsel to argue claim 33 on Monday 3/1/10. Court in recess until 3/1/10 at 9:30; re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed |

| | | |
|---|---|---|
| | | by Chadrick E Fulks, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. Court Reporter Gary Smith.CJA Time 5 hours 15 minutes. (mflo, ) (Entered: 02/26/2010) |
| 02/28/2010 | 1305 | AFFIDAVIT by USA as to Chadrick E Fulks (Attachments: # 1 Exhibit 63 - Declaration of Jeffrey M. Long)(Daley, Robert) (Entered: 02/28/2010) |
| 02/28/2010 | 1306 | Additional Attachments to Main Document 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 (Small, Kirsten) (Entered: 02/28/2010) |
| 03/01/2010 | 1307 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 3/1/2010; Fulks present by video conference with a phone available to speak with attorneys as needed. Oral arguments on petitioners/defendants amended 2255 motion to vacate on claim 33; Closing arguments; Court exhibit; Government submits exhibit #63 affidavit of Agent Long; Court takes motion under advisement and will file written order re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. Court Reporter Gary Smith.CJA Time 3 hours. (mflo, ) (Entered: 03/01/2010) |
| 03/01/2010 | 1308 | EXHIBIT LIST from 28:2255 motion to vacate sentence hearing by petitioner/defendant Chadrick Fulks (mflo, ) (Entered: 03/01/2010) |
| 03/01/2010 | 1309 | EXHIBIT LIST by Government for 28:2255 motion to vacate sentence hearing as to Chadrick Fulks. (mflo, ) (Main Document 1309 replaced on 3/3/2010) (mflo, ). (Entered: 03/01/2010) |
| 03/04/2010 | 1312 | Additional Attachments to Main Document 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 (Small, Kirsten) (Entered: 03/04/2010) |
| 04/27/2010 | 1314 | MOTION to Withdraw as Attorney by Pro Bono Counsel. by Chadrick E Fulks. No proposed order(Small, Kirsten) (Entered: 04/27/2010) |
| 04/28/2010 | 1315 | TEXT ORDER granting 1314 Motion to Withdraw as Attorney as to Chadrick E Fulks. Amy J. Laurendeau, David P. Dalke, Kymberleigh Damron-Hsiao, Danielle N. Oakley, and Stephanie L. Noble of the firm of O'Melveny & Myers are withdrawn as pro bono counsel of record for Fulks. Directed by Honorable Joseph F Anderson, Jr on 4/28/2010. (ghay) (Entered: 04/28/2010) |
| 06/14/2010 | 1317 | MOTION requesting punishment for the crimes and to drop all appeals and request my right to a fast and speedy execution by Brandon L Basham. No proposed order (Attachments: # 1 Envelope)(mflo, ) (Entered: 06/15/2010) |
| 07/20/2010 | 1318 | MOTION for Leave to Appear Pro Hac Vice Attorney: Michael L. Burke. by Brandon L Basham. No proposed order(Mimms, Julia) (Entered: 07/20/2010) |
| 07/20/2010 | 1319 | MOTION for Leave to Appear Pro Hac Vice Attorney: Sarah E. Stone. by Brandon L Basham. No proposed order(Mimms, Julia) (Entered: 07/20/2010) |
| 07/21/2010 | 1321 | MOTION Waiver of Pro Hac Vice Fees re 1318 MOTION for Leave to Appear Pro Hac Vice Attorney: Michael L. Burke., 1319 MOTION for Leave to Appear Pro Hac Vice Attorney: Sarah E. Stone. by Brandon L Basham. No |

**JA 0143**

| | | |
|---|---|---|
| | | proposed order (Attachments: # 1 Exhibit, # 2 Exhibit)(Mimms, Julia) (Entered: 07/21/2010) |
| 07/22/2010 | 1322 | DELETION OF DOCKET ENTRY NUMBER 1320 as to Brandon L Basham Reason: at the request of the filer; Corrected Filing Document Number 1321 Modified filing date to that of original filing: 7/21/10 (mflo, ) . (Entered: 07/22/2010) |
| 07/27/2010 | 1323 | ORDER granting 1318 Motion for Leave to Appear Pro Hac Vice Michael L. Burke as to Brandon L Basham (2); granting 1319 Motion for Leave to Appear Pro Hac Vice Sarah E. Stone as to Brandon L Basham (2); granting 1321 Motion for Waiver of Pro Hac Vice Fees as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 7/27/10.(mflo, ) (Entered: 07/27/2010) |
| 08/03/2010 | 1326 | ORDER the court finds no merit to any of the grounds of error asserted and the petition is denied as to Chadrick E Fulks; re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks; and 1123 Amended MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks. The court issues a certificate of appealability as to Claims 1 through 28, and 32. The court denies a certificate of appealability on Claims 29,30 and 31.. Signed by Honorable Joseph F Anderson, Jr on 8/3/10.(mflo, ) (Entered: 08/03/2010) |
| 08/03/2010 | 1327 | JUDGMENT on 28:2255 PETITION as to Chadrick E Fulks re: 1090 MOTION to Vacate under 28 U.S.C. 2255, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255. The court having heard the merits in an evidentiary hearing, denies §2255 petition as to all 33 claims asserted. IT IS ORDERED AND ADJUDGED that petitioner, Chadrick Evans Fulks shall take nothing on the petition filed pursuant to 28 USC § 2255 and this action is dismissed with prejudice. (mflo, ) (Main Document 1327 replaced on 8/3/2010) (mflo, ). (Entered: 08/03/2010) |
| 08/11/2010 | 1329 | MOTION to Vacate *Entry of Judgment Pending Completion and Delivery of Official Transcripts of 2255 Hearing* by Chadrick E Fulks as to Chadrick E Fulks. No proposed order(Ashmore, Beattie) Modified on 8/23/2010 to edit text (mflo, ). (Entered: 08/11/2010) |
| 08/12/2010 | 1330 | ORDER The court hereby vacates the judgment in this case and will re-enter the judgment after the official versions of all transcripts have been filed with the Clerk.granting 1329 Motion to Vacate Judgment filed 8/3/10 as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 8/12/10.(mflo, ) (Entered: 08/12/2010) |
| 08/12/2010 | 1331 | ***DOCUMENT E-MAILED as to Chadrick E Fulks re 1330 Order on Motion to Vacate 2255 Judgment, to Gary Smith, Court Reporter (mflo, ) (Entered: 08/12/2010) |
| 08/16/2010 | 1332 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks held on February 22, 2010, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or |

**JA 0144**

| | | |
|---|---|---|
| | | purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/7/2010. Redacted Transcript Deadline set for 9/16/2010. Release of Transcript Restriction set for 11/15/2010. (gsmith, ) (Entered: 08/16/2010) |
| 08/16/2010 | 1334 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks held on February 23, 2010, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/7/2010. Redacted Transcript Deadline set for 9/16/2010. Release of Transcript Restriction set for 11/15/2010. (gsmith, ) (Entered: 08/16/2010) |
| 08/16/2010 | 1336 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks held on February 24, 2010, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/7/2010. Redacted Transcript Deadline set for 9/16/2010. Release of Transcript Restriction set for 11/15/2010. (gsmith, ) (Entered: 08/16/2010) |
| 08/16/2010 | 1337 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks held on February 25, 2010, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/7/2010. Redacted Transcript Deadline set for 9/16/2010. Release of Transcript Restriction set for 11/15/2010. (gsmith, ) (Entered: 08/16/2010) |
| 08/16/2010 | 1338 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks held on February 26, 2010, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/7/2010. Redacted Transcript Deadline set for 9/16/2010. Release of Transcript Restriction set for 11/15/2010. (gsmith, ) (Entered: 08/16/2010) |

**JA 0145**

| 08/16/2010 | 1339 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks held on March 1, 2010, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number (803) 256-7743. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 9/7/2010. Redacted Transcript Deadline set for 9/16/2010. Release of Transcript Restriction set for 11/15/2010. (gsmith, ) (Entered: 08/16/2010) |
|---|---|---|
| 08/20/2010 | 1343 | ORDER TO VACATE 1326 Order ; The Clerk is directed to vacate the August 3, 2010 order on the docket, and re-enter the courts order as of this date. Minor changes to the August 3, 2010 order have been made to reflect references to hearing transcript pages that were renumbered when the official transcript was filed. Judgment shall be entered forthwith as to Chadrick E Fulks.. Signed by Honorable Joseph F Anderson, Jr on 8/20/10.(mflo, ) (Entered: 08/20/2010) |
| 08/20/2010 | 1344 | ORDER the court finds no merit to any of the grounds of error asserted and the petition is denied as to Chadrick E Fulks; re 1090 MOTION to Vacate under 28 U.S.C. 2255 filed by Chadrick E Fulks; and 1123 Amended MOTION to Vacate under 28 U.S.C. 2 255 filed by Chadrick E Fulks. The court issues a certificate of appealability as to Claims 1 through 28, and 32. The court denies a certificate of appealability on Claims 29,30 and 31. Signed by Honorable Joseph F Anderson, Jr on 8/20/10.(mflo, ) (Entered: 08/20/2010) |
| 08/20/2010 | 1345 | JUDGMENT on 28:2255 PETITION as to Chadrick E Fulks re: 1090 MOTION to Vacate under 28 U.S.C. 2255, 1123 Amended MOTION to Vacate under 28 U.S.C. 2255. The court having heard the merits in an evidentiary hearing, denies §2255 petition as to all 33 claims asserted. IT IS ORDERED AND ADJUDGED that petitioner, Chadrick Evans Fulks shall take nothing on the petition filed pursuant to 28 USC § 2255 and this action is dismissed with prejudice.(mflo, ) (Main Document 1345 replaced on 8/23/2010 to correct date of entry) (mflo, ). (Entered: 08/20/2010) |
| 08/24/2010 | 1347 | MOTION to Amend/Correct 1344 Order, *Motion for Clarification* by Chadrick E Fulks. No proposed order(Small, Kirsten) (Entered: 08/24/2010) |
| 08/25/2010 | 1348 | ORDER the order of August 20, 2010 is hereby amended as follows: The Court has reviewed its order and pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 cases, issues a certificate of appealability as to Claims 1 through 29 and 33. As to Claims 30, 31, and 32, the petitioner has not made a substantial showing of the denial of a constitutional right, and therefore, a certificate of appealability is denied as to these Claims. granting 1347 Motion to Amend/Correct 1344 Order for clarification as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 8/25/10.(mflo, ) (Entered: 08/25/2010) |
| 08/27/2010 | 1349 | MOTION to Substitute Attorney by Chadrick E Fulks. No proposed order (Small, Kirsten) (Entered: 08/27/2010) |

JA 0146

| 08/30/2010 | 1350 | MOTION Access to ECF for Case File by Brandon L Basham. No proposed order(Mimms, Julia) (Entered: 08/30/2010) |
| 09/03/2010 | 1351 | ORDER granting 1349 Motion to Substitute Attorney as to Chadrick E Fulks (1), substituting Billy H. Nolas as counsel of record for Chadrick E Fulks and allowing Beattie B Ashmore to withdraw as counsel. Signed by Honorable Joseph F Anderson, Jr on 09/03/2010.(bshr, ) (Entered: 09/03/2010) |
| 09/16/2010 | 1355 | TEXT ORDER granting 1350 Motion Access to ECF for Case File as to Brandon L Basham (2). Directed by Honorable Joseph F Anderson, Jr on 9/16/10.(mflo, ) (Entered: 09/16/2010) |
| 09/17/2010 | 1356 | MOTION to Alter Judgment by Chadrick E Fulks. No proposed order (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit Exhibit A (Partee Declaration), # 3 Exhibit Exhibit B (Coggiola Declaration), # 4 Exhibit Exhibit C (Newberger Declaration), # 5 Exhibit Exhibit D (Hill Declaration), # 6 Exhibit Exhibit E (Krop Declaration), # 7 Exhibit Exhibit F (Lambert Jr. Declaration), # 8 Exhibit Exhibit G (Lambert Sr. Declaration), # 9 Exhibit Exhibit H (Maynard Declaration), # 10 Exhibit Exhibit I (Starks Declaration), # 11 Exhibit Exhibit J (Kaasee Declaration), # 12 Exhibit Exhibit K (Melikian Declaration), # 13 Exhibit Exhibit L (Hilkey Declaration), # 14 Exhibit Exhibit M (Halleck Declaration), # 15 Exhibit Exhibit N (McGuffin Declaration), # 16 Exhibit Exhibit O (Fowler Declaration), # 17 Exhibit Exhibit P (Oswalt Declaration), # 18 Exhibit Exhibit Q (Evans Declaration), # 19 Exhibit Exhibit R (Court Records)) (Small, Kirsten) (Attachment 19 replaced to redact SSN and DOB on 9/20/2010) (mflo, ). See 1359 and 1373 for an additional exhibit (mflo, ). (Attachment 4 replaced on 5/13/2011) (SSW). (Entered: 09/17/2010) |
| 09/29/2010 | 1357 | MOTION for Extension of Time to File Response/Reply as to 1356 MOTION to Alter Judgment by USA as to Chadrick E Fulks. No proposed order(Ewing, Jimmie) (Entered: 09/29/2010) |
| 09/30/2010 | 1358 | TEXT ORDER granting Government's 1357 Motion for Extension of Time to File Response/Reply as to Petitioner's Motion to Alter or Amend Judgment as to Chadrick E Fulks. The Government's response shall be due on or before October 12, 2010. Directed by Honorable Joseph F Anderson, Jr on 9/30/2010. (ghay) (Entered: 09/30/2010) |
| 10/04/2010 | 1359 | Additional Attachments to Main Document 1356 MOTION to Alter Judgment (Small, Kirsten) (Entered: 10/04/2010) |
| 10/12/2010 | 1360 | RESPONSE in Opposition by USA as to Chadrick E Fulks re 1356 MOTION to Alter Judgment (Attachments: # 1 Exhibit 1 - Declaration of Jeffrey Bruning, # 2 Exhibit 2- copy of check issued to Amber Fowler)(Daley, Robert) (Entered: 10/12/2010) |
| 10/15/2010 | 1362 | Consent MOTION for Extension of Time to File Response/Reply as to 1360 Response in Opposition *to 1356 Motion to Alter or Amend* by Chadrick E Fulks. No proposed order(Small, Kirsten) (Entered: 10/15/2010) |
| 10/15/2010 | 1363 | TEXT ORDER granting Petitioner's 1362 Motion for Extension of Time to File Reply to Motion to Alter or Amend Judgment as to Chadrick E Fulks. |

**JA 0147**

| | | The Petitioner's reply shall be due on or before November 1, 2010. Directed by Honorable Joseph F Anderson, Jr on 10/15/2010. (ghay) (Entered: 10/15/2010) |
|---|---|---|
| 11/01/2010 | 1364 | REPLY TO RESPONSE to Motion by Chadrick E Fulks re 1356 MOTION to Alter Judgment (Attachments: # 1 Exhibit Revised Index of Exhibits, # 2 Exhibit Exhibit T (Second Declaration of Amber Fowler))(Small, Kirsten) (Entered: 11/01/2010) |
| 11/08/2010 | 1365 | NOTICE OF HEARING ON MOTION in case as to Chadrick E Fulks 1356 MOTION to Alter Judgment : Motion Hearing set for 12/8/2010 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr.; Defendant Chadrick E Fulks shall appear by video conference (mflo, ) Modified on 11/17/2010 to add text (mflo, ). (Entered: 11/08/2010) |
| 12/02/2010 | 1368 | MOTION for Leave to Appear Pro Hac Vice Attorney: Amy Gershenfeld Donnella. by Chadrick E Fulks. Proposed order is being emailed to chambers with copy to opposing counsel (Attachments: # 1 Exhibit Application)(Small, Kirsten) (Entered: 12/02/2010) |
| 12/02/2010 | 1369 | TEXT ORDER granting 1368 Motion for Leave to Appear Pro Hac Vice of Amy Gershenfeld Donnella (FCD CHU) as co-counsel for Chadrick E Fulks (Kirsten Small, local counsel). Signed by Honorable Joseph F Anderson, Jr on 12/2/2010. (ghay) (Entered: 12/02/2010) |
| 12/08/2010 | 1371 | Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Chadrick E Fulks held on 12/8/2010 with defendant Fulks present by video conference; taking under advisement 1356 MOTION to Alter Judgment filed by Chadrick E Fulks. Court waives pro hac vice filing fee for attorneys Donnella and Nolas. FBI agents sequestered for a portion of hearing; Court takes under advisement request from defense counsel for an evidentiary hearing re: affidavits of McGuffin, Fowler, Oswalt and Evans. Court to file written order. Court Reporter Daniel Mayo. CJA Time 2 hours 45 minutes. (mflo, ) (Entered: 12/08/2010) |
| 12/08/2010 | 1372 | EXHIBIT LIST from motion to alter judgment hearing. Exhibits 100-117 were attached to 1356 motion. Exhibits 100 - 121 have been placed in the Clerk's Office vault until after all appeals have expired. (mflo, ) (Entered: 12/08/2010) |
| 12/14/2010 | 1373 | Additional Attachments to Main Document 1356 MOTION to Alter Judgment (Attachments: # 1 Exhibit Index of Exhibits 100-121, # 2 Exhibit #118 Declaration of Arlene Andrews, # 3 Exhibit #119 Second Declaration of Amber Fowler, # 4 Exhibit #120 Correspondence, # 5 Exhibit #121 Credentials of Jonathan Gasser)(Small, Kirsten) (Entered: 12/14/2010) |
| 01/12/2011 | 1375 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Chadrick E Fulks held on December 8, 2010, before Judge Joseph F. Anderson, Jr.. Court Reporter/Transcriber Dan Mayo, Telephone number 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for |

**JA 0148**

| | | |
|---|---|---|
| | | Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 2/2/2011. Redacted Transcript Deadline set for 2/14/2011. Release of Transcript Restriction set for 4/12/2011. (dmayo, ) (Entered: 01/12/2011) |
| 01/13/2011 | 1376 | **ORDER denying 1356 Motion to Alter Judgment pursuant to Rule 59(e) of theFederal Rules of Civil Procedure to alter or amend this courts order denying defendants motion to vacate his sentence under 28 U.S.C. § 2255 as to Chadrick E Fulks (1). Signed by Honorable Joseph F Anderson, Jr on 1/13/11.(mflo, )** (Entered: 01/13/2011) |
| 02/09/2011 | 1381 | PRO SE MOTION to Dismiss any appeal or in the alternative a MOTION to Withdraw any notice of appeal to 1376 Order on Motion to Alter Judgment, by Chadrick E Fulks. No proposed order (Attachments: # 1 Envelope)(mflo, ) (Entered: 02/09/2011) |
| 03/02/2011 | 1383 | WITHDRAWAL of Motion by Chadrick E Fulks re 1381 MOTION to Dismiss MOTION to Withdraw Document 1376 Order on Motion to Alter Judgment, filed by Chadrick E Fulks (Attachments: # 1 Exhibit A - Signed Notice)(Small, Kirsten) (Entered: 03/02/2011) |
| 03/02/2011 | 1384 | NOTICE OF APPEAL OF FINAL JUDGMENT by Chadrick E Fulks re 1344 Order, 1348 Order on Motion to Amend/Correct,, 1376 Order on Motion to Alter Judgment, - The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (Small, Kirsten) (Main Document 1384 replaced on 3/3/2011 to correct dates within the document) (mflo, ). (Entered: 03/02/2011) |
| 03/03/2011 | 1385 | Transmittal Sheet for Notice of Appeal to USCA as to Chadrick E Fulks to US Court of Appeals re 1384 Notice of Appeal - Final Judgment. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (bshr, ) (Entered: 03/04/2011) |
| 03/07/2011 | 1388 | ORDER of USCA The Court appoints Kirsten Elena Small as lead counsel as to Chadrick E Fulks re 1384 Notice of Appeal - Final Judgment,, (mflo, ) (Entered: 03/07/2011) |
| 03/07/2011 | 1389 | ORDER of USCA The Court appoints the Federal Defender for the District of Pennsylvania at Philadelphia as co-counsel as to Chadrick E Fulks re 1384 Notice of Appeal - Final Judgment,, (mflo, ) (Entered: 03/07/2011) |
| 05/19/2011 | 1391 | DEFENDANT'S Waiver of Any and All Proceedings Pursuant to 28 U.S.C. 2255 by Brandon L Basham (Attachments: # 1 Notice to the Court and Counsel, # 2 Cover Letter to the Clerk, # 3 Envelope)(bshr, ) (Entered: 05/20/2011) |
| 05/31/2011 | 1393 | MOTION to Vacate under 28 U.S.C. § 2255 by Brandon L Basham. No proposed order (Attachments: # 1 Exhibit Index, # 2 Exhibit 1 thru 8, # 3 Exhibit 9 part 1, # 4 Exhibit 9 part 2, # 5 Exhibit 9 part 3, # 6 Exhibit 9 part |

**JA 0149**

| | | |
|---|---|---|
| | | 4, # 7 Exhibit 10 thru 11, # 8 Exhibit 12 thru 16, # 9 Exhibit 17 thru 21) (Burke, Michael) Civil case 4:11-cv-70079-JFA opened. (Entered: 05/31/2011) |
| 06/01/2011 | 1394 | AMENDED MOTION to Vacate under 28 U.S.C. § 2255 by Brandon L Basham.To add Certification at the end of the motion. (Attachments: # 1 Exhibit Index, # 2 Exhibit 1 thru 8, # 3 Exhibit 9 part 1, # 4 Exhibit 9 part 2, # 5 Exhibit 9 part 3, # 6 Exhibit 9 part 4, # 7 Exhibit 10 thru 11, # 8 Exhibit 12 thru 16, # 9 Exhibit 17 thru 21)(Burke, Michael) Modified on 6/3/2011 to add text (mflo, ). (Entered: 06/01/2011) |
| 06/08/2011 | 1395 | NOTICE OF HEARING as to Brandon L Basham Telephone/Status Conference set for 6/10/2011 03:00 PM before Honorable Joseph F Anderson Jr. The defense team is requested to set up conference call with government attorneys and Judge Anderson.(mflo, ) (Entered: 06/08/2011) |
| 06/09/2011 | 1396 | NOTICE OF RESCHEDULED HEARING as to Brandon L Basham Telephone/Status Conference set for 6/10/2011 03:00 PM cancelled and rescheduled to: Status Conference set for 6/29/2011 10:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. Defendant will be present by video conference. (mflo, ) (Entered: 06/09/2011) |
| 06/29/2011 | 1397 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Status Conference as to Brandon L Basham held on 6/29/2011; Defendant present by video conference. Court to appoint Forensic Psychiatrist to evaluate the defendant on motion to withdraw all appeals; Government to file response to petition by 9/30/11 and defendant to file reply by 11/30/11 ( Response to Motion due by 9/30/2011 Reply due by 11/30/2011). Court Reporter Kathy Richardson. CJA Time 45 minutes. (mflo, )** (Entered: 06/30/2011) |
| 07/15/2011 | 1399 | Joint MOTION for Psychiatric Treatment *(Joint Notice of Proposed Psychiatric Experts to Conduct Competency Evaluation of Defendant Brandon Leon Basham)* by Brandon L Basham and USA. No proposed order (Burke, Michael) Modified on 7/18/2011 to add all filers(mflo, ). (Entered: 07/15/2011) |
| 07/19/2011 | 1400 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of status conference as to Brandon L Basham held on June 29, 2011, before Judge Joseph F. Anderson, Jr.. Court Reporter/Transcriber Kathleen Richardson, Telephone number/E-mail (803)779-6709 or Kathleen_Richardson@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 8/9/2011. Redacted Transcript Deadline set for 8/19/2011. Release of Transcript Restriction set for 10/17/2011. (kari, ) (Entered: 07/19/2011) |
| 07/22/2011 | 1401 | **ORDER FOR PSYCHIATRIC EVALUATION TO DETERMINE COMPETENCY the defendant has filed a pro se motion indicating his** |

**JA 0150**

| | | desire to withdraw all appeals and proceed to execution in this case. Before the court can act upon the request by Mr. Basham to withdraw his appeals and challenges to his conviction, the court must make a determination as to the competency of Mr. Basham. The court appoints Dr. Richard L. Frierson as the court's expert for purposes of conducting a full mental examination of Brandon Leon Basham and reporting his findings to the court as to Brandon L Basham. Signed by Honorable Joseph F Anderson, Jr on 7/22/11.(mflo, ) (Entered: 07/22/2011) |
|---|---|---|
| 07/25/2011 | 1403 | ***DOCUMENT MAILED as to Brandon L Basham re 1401 Order for Psychiatric Exam, placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 (mflo, ) (Entered: 07/25/2011) |
| 07/25/2011 | 1404 | ***DOCUMENT E-MAILED as to Brandon L Basham re 1401 Order for Psychiatric Exam, to Dr. Richard L. Frierson (mflo, ) (Entered: 07/25/2011) |
| 07/25/2011 | 1405 | ***DOCUMENT MAILED as to Brandon L Basham re 1401 Order for Psychiatric Exam, placed in U.S. Mail to Dr. Richard L. Frierson USC School of Medicine University Specialty Clinics 15 Medical Park, Ste. 141 Columbia, S.C. 29203 (mflo, ) (Entered: 07/25/2011) |
| 07/29/2011 | 1406 | CJA 30 as to Brandon L Bashem: Appointment of Attorney Julia G Mimms. Signed by Honorable Joseph F Anderson, Jr on 6/1/10.(mflo, ) (Entered: 07/29/2011) |
| 07/29/2011 | 1407 | ORDER FOR PSYCHIATRIC EVALUATION TO DETERMINE COMPETENCY the defendant has filed a pro se motion indicating his desire to withdraw all appeals and proceed to execution in this case. Before the court can act upon the request by Mr. Basham to withdraw his appeals and challenges to his conviction, the court must make a determination as to the competency of Mr. Basham. The court appoints Dr. George F. Parker as the court's expert for purposes of conducting a full mental examination of Brandon Leon Basham and reporting his findings to the court as to Brandon L Basham. ORDER TO VACATE 1401 ORDER FOR PSYCHIATRIC EXAM as to Brandon L Basham. Signed by Honorable Joseph F Anderson, Jr on 7/29/11. (Attachments: # 1 Dr. George Parker CV)(mflo, ) (Entered: 07/29/2011) |
| 07/29/2011 | 1408 | ***DOCUMENT MAILED as to Brandon L Basham re 1407 Order to Vacate, Order for Psychiatric Exam, placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 and George E. Parker, M.D. IU Department of Psychiatry 1111 West 10th Street Indianapolis, IN 46202 (mflo, ) (Entered: 07/29/2011) |
| 09/20/2011 | 1410 | MOTION for Extension of Time to File Response/Reply as to 1394 MOTION to Vacate under 28 U.S.C. § 2255 by USA as to Brandon L Basham. No proposed order(Daley, Robert) (Entered: 09/20/2011) |
| 09/22/2011 | 1411 | TEXT ORDER granting government's unopposed 1410 Motion for Extension of Time to File Response to Defendant Basham's Amended |

| | | 2255 motion. The government's response shall be due on or before October 31, 2011. Directed by Honorable Joseph F Anderson, Jr on 9/22/2011. (ghay, ) (Entered: 09/22/2011) |
|---|---|---|
| 10/24/2011 | 1413 | Second MOTION for Extension of Time to File by USA as to Brandon L Basham. Clerk refiled selecting only the defendant the document pertains to.No proposed order(mflo, ) (Entered: 10/25/2011) |
| 10/25/2011 | 1414 | **TEXT ORDER granting government's 1413 unopposed Motion for Extension of Time to File Response to Basham's Amended 2255 Motion. Response due on or before November 18, 2011. Directed by Honorable Joseph F Anderson, Jr on 10/25/2011. (ghay)** (Entered: 10/25/2011) |
| 11/15/2011 | 1415 | MOTION Authorizing Visits with Defendant by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 11/15/2011) |
| 11/18/2011 | 1416 | RESPONSE in Opposition by USA as to Brandon L Basham re 1394 MOTION to Vacate under 28 U.S.C. § 2255 (Daley, Robert) See additional attachment 1567 (mflo, ). (Entered: 11/18/2011) |
| 11/21/2011 | 1417 | MOTION by Petitioner for Clarification of Time to file Reply in His Petition for Relief Pursuant to 28 U.S.C. § 2255 by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 11/21/2011) |
| 11/22/2011 | 1418 | **ORDER granting 1417 Motion for Clarification of Time to file Reply in His Petition for Relief Pursuant to 28 U.S.C. § 2255 as to Brandon L Basham (2), notifying counsel the court will allow the petitioner 60 days from the day the government's response was filed, resulting in a due date of January 17, 2012. Signed by Honorable Joseph F Anderson, Jr on 11/22/2011.(bshr, )** (Entered: 11/22/2011) |
| 11/23/2011 | 1420 | RESPONSE in Opposition by USA as to Brandon L Basham re 1415 MOTION Authorizing Visits with Defendant (Daley, Robert) (Entered: 11/23/2011) |
| 11/29/2011 | 1421 | REPLY TO RESPONSE to Motion by Brandon L Basham re 1415 MOTION Authorizing Visits with Defendant (Burke, Michael) (Entered: 11/29/2011) |
| 12/01/2011 | 1422 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Brandon L Basham held on 12/1/2011. Court discusses with government and defense counsel scheduling issues only. Defendant not included in conference call. Court Reporter Daniel Mayo. CJA Time 15 minutes. (mflo, )** (Entered: 12/01/2011) |
| 12/05/2011 | 1423 | Psychiatric Report Received (Sealed) as to Brandon L Basham (mflo, ) (Entered: 12/05/2011) |
| 12/07/2011 | 1424 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Brandon L Basham held on 12/7/2011, defendant not present. Court discusses scheduling of competency hearing, date and location. Court has currently set hearing for 2/23/12 in Indianapolis, Indiana in the Federal Courthouse. Defendant to be present at this hearing. Court will issue order allowing** |

| | | |
|---|---|---|
| | | **Dr. Schwartz-Watts to evaluate defendant. Court Reporter Daniel Mayo. CJA Time 10 minutes. (mflo, )** (Entered: 12/07/2011) |
| 12/07/2011 | 1425 | **ORDER That Dr. Schwartz-Watts be allowed to evaluate defendant Basham on January 9, 2012. Dr. Schwartz-Watts shall submit a report detailing her opinion of defendant Basham's competency no later than January 19, 2012. The competency hearing is currently set for February 23, 2012 in Indianapolis, Indiana. granting 1415 Motion Authorizing Dr. Donna Schwartz-Watts to visit with Defendant as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 12/7/11.(mflo, )** (Entered: 12/07/2011) |
| 12/07/2011 | 1426 | ***DOCUMENT MAILED as to Brandon L Basham re 1425 Order on Motion placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 (mflo, ) (Entered: 12/07/2011) |
| 12/07/2011 | 1427 | NOTICE OF HEARING as to Brandon L Basham; Competency Hearing set for 2/23/2012 09:30 AM Indianapolis Federal Courthouse in Indiana before Honorable Joseph F Anderson Jr. Courtroom to be determined.(mflo, ) (Entered: 12/07/2011) |
| 12/09/2011 | 1428 | **ORDER The court will conduct a hearing on the defendant's pro se request to withdraw his § 2255 petition beginning at 9:30 a.m. on Thursday, February 23, 2012, in Courtroom 216 of the Birch Bayh Federal Building and United States Courthouse, 46 East Ohio Street, Indianapolis, Indiana 46204. The court hereby directs the United States Marshal Service to transport the defendant from his place of incarceration at the Terre Haute Indiana Federal Correctional Facility to the Indianapolis Courthouse for purposes of attending the hearing as to Brandon L Basham. The Clerk is requested to send a copy of this order to the Clerk of the United States District Court for the District of Indiana, the United States Marshals Service, Dr. George Parker, and all counsel of record in this case.. Signed by Honorable Joseph F Anderson, Jr on 12/9/11.(mflo, )** (Entered: 12/09/2011) |
| 12/12/2011 | 1429 | ***DOCUMENT MAILED as to Brandon L Basham re 1428 Order, placed in U.S. Mail to Clerk of the United States District Court for the District of Indiana, United States Marshal Service, Dr. George Parker and Charles Lockett, Warden of USP Terre Haute (mflo, ) (Entered: 12/12/2011) |
| 01/10/2012 | 1430 | MOTION for Extension of Time to File Response/Reply *in His Petition for Relief Pursuant to 28 U.S.C. § 2255 (Unopposed Motion)* by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 01/10/2012) |
| 01/11/2012 | 1431 | **ORDER granting 1430 Motion for Extension of Time to File Response/Reply *in His Petition for Relief Pursuant to 28 U.S.C. § 2255 (Unopposed Motion)* as to Brandon L Basham (2), extending time to file to 03/02/2012. Signed by Honorable Joseph F Anderson, Jr on 01/11/2012.(bshr, )** (Entered: 01/11/2012) |
| 01/19/2012 | 1433 | |

| | | |
|---|---|---|
| | | Psychiatric Report Received (Sealed Document) (Burke, Michael) Modified on 1/19/2012 to add text(mflo, ). (Entered: 01/19/2012) |
| 01/23/2012 | 1434 | (Ex Parte) EX PARTE MOTION SEALED by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 01/23/2012) |
| 01/23/2012 | 1435 | (Ex Parte) EX PARTE MOTION SEALED by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 01/23/2012) |
| 01/23/2012 | 1436 | MOTION for Telephonic Status conference on February 2, 2012 by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 01/23/2012) |
| 01/24/2012 | 1437 | NOTICE OF HEARING as to Brandon L Basham Telephone Conference set for 1/25/2012 03:00 PM before Honorable Joseph F Anderson Jr. The Government is directed to set up telephone conference between attorneys. The Court will set up the telephone conference with the defendant. The Government is asked to email everyone including the Clerk's Office the number to call that will have all counsel available to participate in telephone conference.(mflo, ) (Entered: 01/24/2012) |
| 01/24/2012 | 1438 | MOTION for Reconsideration re 1437 Notice of Hearing, *for January 25, 2012, at 3:00 p.m.,* by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 01/24/2012) |
| 01/24/2012 | 1439 | **ORDER denying 1438 Motion for Reconsideration of 1437 Notice of Hearing, as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 1/24/12.(mflo, )** (Entered: 01/24/2012) |
| 01/24/2012 | 1440 | Emergency MOTION for Order Directing United States Prison at Terre Haute to Allow Counsel to be Physically Present with Client for Telephonic Conference on January 25, 2012, at 3:00 p.m. re 1439 Order on Motion for Reconsideration by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 01/24/2012) |
| 01/25/2012 | 1441 | NOTICE OF EMERGENCY TELEPHONE CONFERENCE HEARING WITH COUNSEL ONLY as to Brandon L Basham Telephone Conference set for 1/25/2012 11:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. GOVERNMENT TO INITIATE CONFERENCE CALL WITH COUNSEL AND THEN CALL 803-765-5136 TO CONFERENCE IN JUDGE JOE ANDERSON.(mflo, ) (Entered: 01/25/2012) |
| 01/25/2012 | 1442 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Brandon L Basham held on 1/25/2012. Court reschedules telephone conference with defendant on 1/25/12 at 3:00PM. Court will conduct a video conference with defendant and defense counsel being present with defendant on Monday, January 30, 2012 at 11:00AM. Notice of hearing to be filed. finding as moot 1440 Motion for Order Directing United States Prison at Terre Haute to Allow Counsel to be Physically Present with Client for Telephonic Conference on January 25, 2012, at 3:00 p.m. as to Brandon L Basham (2); granting in part 1436 Motion for Telephonic Status Conference on** |

| | | |
|---|---|---|
| | | **February 2, 2012; Court Reporter Gary Smith. CJA Time FPD. (mflo, )** (Entered: 01/25/2012) |
| 01/25/2012 | 1443 | NOTICE OF HEARING ON MOTION in case as to Brandon L Basham 1317 MOTION requesting punishment for the crimes and to drop all appeals and request my right to a fast and speedy execution : Motion Hearing set for 1/30/2012 11:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. Defendant and defense counsel to be present by video conference from the prison in Terre Haute, Indiana. Government attorneys and any remaining defense attorneys may participate by telephone or in person. Please notify the Clerk's Office how you will be participating. (mflo, ) (Entered: 01/25/2012) |
| 01/30/2012 | 1444 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Brandon L Basham held on 1/30/2012; Defense counsel present with defendant Basham for hearing by video conference from FCI Terre Haute; Government attorneys present in court; Defense local counsel and co-counsel present by telephone; re 1317 MOTION requesting punishment for the crimes and to drop all appeals and request my right to a fast and speedy execution filed by Brandon L Basham. Court hears from defendant on his pro se motion. Briefing schedule stays on track and shall go forward as previously ordered with No more extensions; Court cancels hearing scheduled for 2/23/12 in Indiana; Court will correspond with the FCI Terre Haute prison re: defendant's medications. Court Reporter Gary Smith. CJA Time 30 minutes. (mflo, )** (Entered: 01/30/2012) |
| 01/30/2012 | 1445 | NOTICE OF CANCELLATION OF HEARING: Competency Hearing set for 2/23/2012 09:30 AM in Indianapolis Federal Courthouse in Indiana before Honorable Joseph F Anderson Jr as to Brandon L Basham (mflo, ) (Entered: 01/30/2012) |
| 02/07/2012 | 1446 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on January 25, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number/E-mail (803) 256-7743, Gary_Smith@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 2/28/2012. Redacted Transcript Deadline set for 3/9/2012. Release of Transcript Restriction set for 5/7/2012. (gsmith, ) (Entered: 02/07/2012) |
| 02/07/2012 | 1447 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on January 30, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Gary Smith, Telephone number/E-mail (803) 256-7743, Gary_Smith@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have |

**JA 0155**

| | | |
|---|---|---|
| | | 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 2/28/2012. Redacted Transcript Deadline set for 3/9/2012. Release of Transcript Restriction set for 5/7/2012. (gsmith, ) (Entered: 02/07/2012) |
| 02/14/2012 | 1448 | **ORDER on defendant's request to drop appeal. This court is not authorized to "bargain" with the defendant regarding a possible withdrawal of a § 2255 motion so this court will not alter the defendant's medical regimen, nor alter the BOP's family visitation policy. The court will afford the defendant one final opportunity to notify this court, in writing, of his desires regarding his request to drop his appeals. This response should be mailed on or before 2/29/12. If no response is received, this court will deny the motion to drop the 2255 motion as to Brandon L Basham. Signed by Honorable Joseph F Anderson, Jr on 2/14/12.(mflo, )** (Entered: 02/14/2012) |
| 02/14/2012 | 1449 | ***DOCUMENT MAILED as to Brandon L Basham re 1448 Order, placed in U.S. Mail to Brandon L Basham 98940-071 Special Confinement Unit Federal Correctional Complex P O Box 33 Terre Haute, IN 47808-0033 (mflo, ) (Entered: 02/14/2012) |
| 02/15/2012 | 1451 | Sealed Document in re 1448 Order (mflo, ) (Entered: 02/15/2012) |
| 02/21/2012 | 1452 | MOTION for Reconsideration re 1448 Order,, *on Defendant's Request to Drop Appeal* by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 02/21/2012) |
| 02/23/2012 | 1453 | (Ex Parte) Supplemental EX PARTE MOTION SEALED by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 02/23/2012) |
| 02/23/2012 | 1454 | MOTION to Seal Document by Brandon L Basham. No proposed order (Burke, Michael) (Entered: 02/23/2012) |
| 02/23/2012 | 1455 | Sealed Document in re document 1454 (Burke, Michael) (Entered: 02/23/2012) |
| 02/24/2012 | 1456 | MOTION for ruling on waiver of attorney-client privilege resulting from the filing of post-conviction motions and for an order requiring disclosure of trial and appellate counsel's papers and files by USA as to Brandon L Basham. No proposed order (Attachments: # 1 Memo in Support)(Daley, Robert) (Entered: 02/24/2012) |
| 02/28/2012 | 1457 | **EX PARTE ORDER, granting 1453 Supplemental EX PARTE MOTION SEALED filed by Brandon L Basham, 1435 EX PARTE MOTION SEALED filed by Brandon L Basham, 1434 EX PARTE MOTION SEALED filed by Brandon L Basham.. Signed by Honorable Joseph F Anderson, Jr on 2/28/12.(mflo, )** (Entered: 02/28/2012) |
| 02/28/2012 | 1458 | ***DOCUMENT MAILED as to Brandon L Basham re 1457 Ex Parte Order, placed in U.S. Mail to United States Prison at Terre Haute (mflo, ) (Entered: 02/28/2012) |
| 02/28/2012 | 1459 | |

**JA 0156**

| | | |
|---|---|---|
| | | **TEXT ORDER granting 1454 Motion to Seal Document 1455 as to Brandon L Basham (2). Directed by Honorable Joseph F Anderson, Jr on 2/28/12.(mflo, ) (Entered: 02/28/2012)** |
| 02/28/2012 | 1460 | **ORDER the time within which the defendant must respond to this court's inquiry regarding his desire to pursue this action is hereby extended for an additional 10 days, making a response due on or before March 10, 2012. The responsemay be submitted by the defendant through counsel and is to include a notarized attestation clause. Granting in part to extend the deadline for defendant's response until 3/10/12 as to 1452 Motion for Reconsideration to 1448 Order, as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 2/27/12.(mflo, ) (Entered: 02/28/2012)** |
| 02/28/2012 | 1462 | ***DOCUMENT MAILED as to Brandon L Basham re 1457 Ex Parte Order, placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 (mflo, ) (Entered: 02/29/2012) |
| 03/01/2012 | 1463 | NOTICE OF ATTORNEY APPEARANCE William Kenneth Witherspoon appearing for USA. (Witherspoon, William) (Entered: 03/01/2012) |
| 03/02/2012 | 1465 | REPLY TO RESPONSE to Motion by Brandon L Basham re 1394 MOTION to Vacate under 28 U.S.C. § 2255 (Attachments: # 1 Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Burke, Michael) Modified on 3/5/2012 to correct filing date (mflo, ). See additional attachments 1466 , 1467 , 1468 . (Entered: 03/05/2012) |
| 03/02/2012 | 1466 | Additional Attachments to Main Document 1465 Reply to Response, 1394 MOTION to Vacate under 28 U.S.C. § 2255 (Attachments: # 1 Exhibit 10, # 2 Exhibit 11, # 3 Exhibit 12, # 4 Exhibit 13, # 5 Exhibit 14, # 6 Exhibit 15, # 7 Exhibit 16, # 8 Exhibit 17, # 9 Exhibit 18, # 10 Exhibit 19)(Burke, Michael) Modified on 3/5/2012 to correct filing date (mflo, ). (Entered: 03/05/2012) |
| 03/02/2012 | 1467 | Additional Attachments to Main Document 1466 Additional Attachments to Main Document, 1465 Reply to Response, 1394 MOTION to Vacate under 28 U.S.C. § 2255 (Attachments: # 1 Exhibit 20, # 2 Exhibit 21, # 3 Exhibit 22, # 4 Exhibit 23, # 5 Exhibit 24, # 6 Exhibit 25, # 7 Exhibit 26, # 8 Exhibit 27, # 9 Exhibit 28, # 10 Exhibit 29)(Burke, Michael) Modified on 3/5/2012 to correct filing date(mflo, ). (Entered: 03/05/2012) |
| 03/02/2012 | 1468 | Additional Attachments to Main Document 1467 Additional Attachments to Main Document, 1466 Additional Attachments to Main Document, 1465 Reply to Response, 1394 MOTION to Vacate under 28 U.S.C. § 2255 (Attachments: # 1 Exhibit 30, # 2 Exhibit 31)(Burke, Michael) Modified on 3/5/2012 to correct filing date (mflo, ). (Entered: 03/05/2012) |
| 03/05/2012 | 1469 | DELETION OF DOCKET ENTRY NUMBER 1464 as to Brandon L Basham Reason: corrected by filing user; Corrected Filing Document |

| | | Number 1467 , 1468 , 1466 , 1465 Modified filing date to that of original filing: 3/2/12 (mflo, ) (Entered: 03/05/2012) |
|---|---|---|
| 03/07/2012 | 1470 | REPLY to 1460 Order on Motion for Reconsideration,, 1448 Order,, *Defendant's Response to Court Orders dated February 14 and 27, 2012* (Burke, Michael) (Entered: 03/07/2012) |
| 03/09/2012 | 1471 | **ORDER withdrawing 1317 Motion requesting punishment for the crimes and to drop all appeals and request my right to a fast and speedy execution as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 3/9/12.(mflo, )** (Entered: 03/09/2012) |
| 03/09/2012 | 1472 | **ORDER The court will conduct a hearing on the pending § 2255 motion beginning on Monday, June 4, 2012 at 9:30 a.m. as to Brandon L Basham. On Monday, April 16, 2012, at 2:30 p.m., the court will conduct a pretrial conference with counsel in order to prepare for the upcoming hearing.. Signed by Honorable Joseph F Anderson, Jr on 3/9/12.(mflo, )** (Entered: 03/09/2012) |
| 03/09/2012 | 1473 | NOTICE OF HEARING ON MOTION in case as to Brandon L Basham 1394 MOTION to Vacate under 28 U.S.C. § 2255, 1393 MOTION to Vacate under 28 U.S.C. § 2255 : Motion Hearing set for 6/4/2012 09:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. Defendant Basham to appear by video conference.(mflo, ) (Entered: 03/09/2012) |
| 03/09/2012 | 1474 | NOTICE OF HEARING as to Brandon L Basham Pretrial Conference set for 4/16/2012 02:30 PM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. Defendant to be present by video conference.(mflo, ) (Entered: 03/09/2012) |
| 03/09/2012 | 1475 | ***DOCUMENT MAILED as to Brandon L Basham re 1472 Order, placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 (mflo, ) (Entered: 03/09/2012) |
| 03/09/2012 | 1476 | MOTION to Continue *Pretrial Conference Set for April 16, 2012* by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 03/09/2012) |
| 03/12/2012 | 1477 | **TEXT ORDER the court deems defendant Brandon Basham to have waived his attorney client privilege as a result of his motion for post-conviction relief pursuant to 28 USC 2255. The court orders disclosure of trial and appellate counsel's papers and files. Granting 1456 Motion for ruling on waiver of attorney-client privilege resulting from the filing of post-conviction motions and for an order requiring disclosure of trial and appellate counsel's papers and files as to Brandon L Basham (2). Directed by Honorable Joseph F Anderson, Jr on 3/12/12.(mflo, )** (Entered: 03/12/2012) |
| 03/12/2012 | 1478 | NOTICE OF RESCHEDULED HEARING as to Brandon L Basham Pretrial Conference set for 4/16/2012 02:30 PM cancelled and rescheduled to: Pretrial Conference set for 4/9/2012 02:30 PM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F |

**JA 0158**

| | | |
|---|---|---|
| | | Anderson Jr. Defendant to be present by video conference.(mflo, ) (Entered: 03/12/2012) |
| 03/12/2012 | 1480 | MOTION to Vacate *as Improvidently Granted Order Granting Government's Motion re Attorney-client Privilege Waiver (Dkt. 1456)* by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 03/12/2012) |
| 03/12/2012 | 1481 | RESPONSE in Opposition by Brandon L Basham re 1456 MOTION for ruling on waiver of attorney-client privilege resulting from the filing of post-conviction motions and for an order requiring disclosure of trial and appellate counsel's papers and files (Attachments: # 1 Index of Unpublished Opinions Cited)(Burke, Michael) (Entered: 03/12/2012) |
| 03/12/2012 | 1482 | **ORDER TO VACATE 1477 Order on Motion for ruling on waiver of attorney-client privilege resulting from the filing of post-conviction motions and for an order requiring disclosure of trial and appellate counsel's papers and files as to Brandon L Basham. Granting 1480 MOTION to Vacate *as Improvidently Granted Order Granting Government's Motion re Attorney-client Privilege Waiver (Dkt. 1456)* filed by Brandon L Basham. The Government is ordered to respond to Defendants Response in Opposition (ECF No. 1481) on or before March 19, 2012. ( Response to Motion due by 3/19/2012). Signed by Honorable Joseph F Anderson, Jr on 3/12/12.(mflo, )** (Entered: 03/12/2012) |
| 03/13/2012 | 1484 | RESCHEDULED NOTICE OF HEARING ON MOTION in case as to Brandon L Basham 1394 MOTION to Vacate under 28 U.S.C. § 2255, 1393 MOTION to Vacate under 28 U.S.C. § 2255 : Motion Hearing set for 6/4/2012 09:30 AM is canceled and has been rescheduled: Motion Hearing set for 10/9/2012 09:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) Modified on 3/21/2012 to add: Defendant to be present by video conference with hearing for possibly 1 week. (mflo, ). (Entered: 03/13/2012) |
| 03/15/2012 | 1485 | NOTICE OF REQUEST FOR PROTECTION from Court Appearance as to Brandon L Basham for 10/25/12-11/5/12 (Mimms, Julia) (Entered: 03/15/2012) |
| 03/19/2012 | 1486 | REPLY by USA to 1481 Response in Opposition, (Daley, Robert) (Entered: 03/19/2012) |
| 03/19/2012 | 1487 | MOTION to Strike *Government's Memorandum in Reply (Dkt. 1486), or in the alternative, Motion to File Surreply,* by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 03/19/2012) |
| 03/20/2012 | 1488 | MOTION Nunc Pro Tunc Motion to file oversized Memorandum in Reply to Plaintiff's Response in Opposition re 1486 Reply(Do not use this event to reply to a Motion) by USA as to Brandon L Basham. No proposed order (Daley, Robert) (Entered: 03/20/2012) |
| 03/21/2012 | 1489 | **ORDER granting in part and denying in part 1487 MOTION to Strike *Government's Memorandum in Reply (Dkt. 1486), or in the alternative, Motion to File Surreply,* filed by Brandon L Basham; Granting 1488 MOTION Nunc Pro Tunc Motion to file oversized Memorandum in** |

**JA 0159**

| | | |
|---|---|---|
| | | **Reply to Plaintiff's Response in Opposition re 1486 Reply filed by USA ; The Government's Reply 1486 will not be striken. Court will permit defendant to file surreply by 3/28/2012, as to Brandon L Basham.. Signed by Honorable Joseph F Anderson, Jr on 3/21/12.(mflo, ) (Entered: 03/21/2012)** |
| 03/22/2012 | 1490 | ***DOCUMENT MAILED as to Brandon L Basham re 1484 Notice of Hearing on Motion, 1478 Notice of Rescheduled Hearing of Pretrial Conference, placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 (mflo, ) (Entered: 03/22/2012) |
| 03/27/2012 | 1491 | NOTICE OF HEARING as to Brandon L Basham Telephone Conference set for 3/27/2012 03:30 PM before Honorable Joseph F Anderson Jr to discuss the rescheduling of the pretrial conference presently scheduled for 4/9/12 at 2:30pm. Government is to initiate call with counsel and then call Judge Anderson at 803-765-5136.(mflo, ) (Entered: 03/27/2012) |
| 03/27/2012 | 1492 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Brandon L Basham held on 3/27/2012. Court will reschedule pretrial conference now set for 4/9/12 to a date to be determined in September 2012. No objection from counsel. Court Reporter Jenny Williams. CJA Time 10 minutes. (mflo, ) (Entered: 03/27/2012)** |
| 03/27/2012 | 1493 | NOTICE OF CANCELLATION OF HEARING: Pretrial Conference set for 4/9/2012 02:30 PM as to Brandon L Basham. Hearing to be rescheduled at a later date. (mflo, ) (Entered: 03/27/2012) |
| 03/28/2012 | 1494 | SUR REPLY BRIEF by Brandon L Basham re 1456 MOTION for ruling on waiver of attorney-client privilege resulting from the filing of post-conviction motions and for an order requiring disclosure of trial and appellate counsel's papers and files (Burke, Michael) (Entered: 03/28/2012) |
| 03/30/2012 | 1495 | ***DOCUMENT MAILED as to Brandon L Basham re 1493 Notice of Cancellation of Hearing placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 (mflo, ) (Entered: 03/30/2012) |
| 04/04/2012 | 1496 | **ORDER granting 1456 Motion for a ruling on waiver of the attorney-client privilege and for an order requiring disclosure of counsel's papers and files as to Brandon L Basham (2). The court (1) orders the disclosure of Petitioner Brandon Basham's trial and appellate counsel's papers and files, (2) rules that Petitioner has waived any attorney-client privilege and any work product privilege as to those documents, and (3) authorizes Petitioner's former trial and appellate counsel to speak with Government attorneys about Petitioner's claims of ineffective assistance of counsel without the presence of Petitioners current counsel. Signed by Honorable Joseph F Anderson, Jr on 04/04/2012.(bshr, ) (Entered: 04/04/2012)** |
| 04/04/2012 | 1498 | |

**JA 0160**

| | | |
|---|---|---|
| | | Emergency MOTION to Stay Order of April 4, 2012 by Brandon L Basham. No proposed order(Burke, Michael) (see additional attachment 1500 ) (Entered: 04/04/2012) |
| 04/04/2012 | 1499 | NOTICE OF APPEAL (Interlocutory) by Brandon L Basham re 1496 Order on Motion for Miscellaneous Relief,,,,. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Burke, Michael) (Entered: 04/04/2012) |
| 04/04/2012 | 1500 | Additional Attachments to Main Document 1498 Emergency MOTION to Stay Order of Aril 4, 2012 (Attachments: # 1 Appendix A)(Burke, Michael) (Entered: 04/04/2012) |
| 04/05/2012 | 1501 | DELETION OF DOCKET ENTRY NUMBER 1497 as to Brandon L Basham Reason: at the request of filer; Corrected Filing Document Number 1499 . (mflo, ) (Entered: 04/05/2012) |
| 04/05/2012 | 1502 | Transmittal Sheet for Notice of Appeal to USCA as to Brandon L Basham to US Court of Appeals re 1499 Notice of Appeal - Interlocutory, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mflo, ) (Entered: 04/05/2012) |
| 04/10/2012 | 1504 | **ORDER Temporarily Staying this Court's Order dated April 4, 2012 until June 11, 2012. granting 1498 Motion to Stay Order of April 4, 2012 as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 4/10/12.(mflo, )** (Entered: 04/10/2012) |
| 04/10/2012 | 1507 | ORDER of USCA This court appoints Julia G. Mimms as lead counsel for the appellant as to Brandon L Basham re 1499 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 04/11/2012) |
| 04/10/2012 | 1508 | ORDER of USCA court appoints the Federal Defender for the District of Arizona as to Brandon L Basham re 1499 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 04/11/2012) |
| 05/23/2012 | 1509 | NOTICE OF REQUEST FOR PROTECTION from Court Appearance as to Brandon L Basham for 7/16/12-7/20/12 (Mimms, Julia) (Entered: 05/23/2012) |
| 05/31/2012 | 1510 | ORDER of USCA Upon review of the submissions relative to the motion to dismiss, the Court grants the motion and dismisses this appeal as to Brandon L Basham re 1499 Notice of Appeal - Interlocutory, (mflo, ) (Entered: 05/31/2012) |
| 06/01/2012 | 1512 | MOTION to Continue *Stay Order of April 10, 2012* by Brandon L Basham. No proposed order (Attachments: # 1 Index, # 2 Appendix A)(Burke, Michael) (Entered: 06/01/2012) |
| 06/01/2012 | 1513 | AMENDED NOTICE OF APPEAL (Interlocutory) by Brandon L Basham re 1496 Order on Motion for a ruling on waiver of the attorney-client privilege and for an order requiring disclosure of counsel's papers and files. The Docketing Statement form, Transcript Order form, and CJA 24 form may be |

**JA 0161**

| | | |
|---|---|---|
| | | obtained from the Fourth Circuit website at www.ca4.uscourts.gov (mflo, ) Modified on 6/4/2012 to add docket script to correct event type (mflo, ). (Main Document 1513 replaced on 6/4/2012 to replace document with corrected signature as provided by filing user) (mflo, ). (Entered: 06/04/2012) |
| 06/04/2012 | 1514 | Transmittal Sheet for Notice of Appeal to USCA as to Brandon L Basham to US Court of Appeals re 1513 Notice of Appeal - Interlocutory, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mflo, ) (Entered: 06/04/2012) |
| 06/08/2012 | 1515 | RESPONSE in Opposition by USA as to Brandon L Basham re 1512 MOTION to Continue *Stay Order of April 10, 2012* (Daley, Robert) (Entered: 06/08/2012) |
| 06/12/2012 | 1516 | **ORDER denying 1512 Motion to Continue or Stay Order of April 10, 2012 as to Brandon L Basham (2); Discovery in this case may proceed as ordered by this court in its April 4, 2012 Order 1496 . Signed by Honorable Joseph F Anderson, Jr on 6/12/12.(mflo, )** (Entered: 06/12/2012) |
| 06/25/2012 | 1518 | ORDER of USCA The court denies the petition for rehearing en banc as to Brandon L Basham re 1513 Notice of Appeal - Interlocutory,, (mflo, ) (Entered: 06/25/2012) |
| 06/26/2012 | 1519 | USCA OPINION as to Chadrick E Fulks for 1384 Notice of Appeal - Final Judgment, filed by Chadrick E Fulks. Decision of Appeals Court Affirmed by published opinion Decision of District Court. (mflo, ) (Entered: 06/27/2012) |
| 06/28/2012 | 1520 | USCA AMENDED OPINION as to Chadrick E Fulks for 1384 Notice of Appeal - Final Judgment, filed by Chadrick E Fulks. Decision of Appeals Court Affirmed by published opinion Decision of District Court. (mflo, ) (Entered: 06/28/2012) |
| 07/23/2012 | 1521 | USCA MANDATE and Judgment as to Brandon L Basham re 1513 Notice of Appeal - Interlocutory, dismissing the appeal. (Attachments: # 1 Judgment)(bshr, ) (Entered: 07/23/2012) |
| 08/20/2012 | 1522 | Appeal Remark as to Chadrick E Fulks re 1384 Notice of Appeal - Final Judgment filed by Chadrick E Fulks : Mandate stayed by FRAP 41(d)(1) (swel, ) (Entered: 08/20/2012) |
| 09/11/2012 | 1524 | **ORDER the court hereby advises counsel to be prepared to go forward beginning on October 9, 2012 with whatever witnesses are available as to Brandon L Basham. Signed by Honorable Joseph F Anderson, Jr on 9/11/12.(mflo, )** (Entered: 09/11/2012) |
| 09/12/2012 | 1525 | NOTICE OF HEARING as to Brandon L Basham Telephone Conference set for 9/17/2012 03:00 PM to discuss scheduling before Honorable Joseph F Anderson Jr. The government is requested to initiate the call with counsel and Judge Anderson.(mflo, ) (Entered: 09/12/2012) |
| 09/13/2012 | 1526 | USCA MANDATE and JUDGMENT the judgment of the district court is AFFIRMED as to Chadrick E Fulks re 1384 Notice of Appeal - Final |

**JA 0162**

| | | |
|---|---|---|
| | | Judgment. (Attachments: # 1 4CCA Judgment, # 2 4CCA Order amending opinion to correct page 5, third line of text "South Carolina" is corrected to read "North Carolina")(mflo, ) (Entered: 09/13/2012) |
| 09/14/2012 | 1527 | Emergency MOTION for Expedited Order Permitting Defense Neurological Expert Contact Visit with Defendant by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 09/14/2012) |
| 09/14/2012 | 1528 | NOTICE OF RESCHEDULED HEARING as to Brandon L Basham Telephone Conference set for 9/17/2012 03:00 PM cancelled and rescheduled to: Telephone Conference set for 9/19/2012 02:30 PM to discuss scheduling before Honorable Joseph F Anderson Jr. The government is requested to initiate the call with counsel and Judge Anderson.(mflo, ) (Entered: 09/14/2012) |
| 09/17/2012 | 1529 | **ORDER granting 1527 Motion Expedited Order Permitting Defense Neurological Expert Contact Visit with Defendant as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 9/17/12. (mflo, )** (Entered: 09/17/2012) |
| 09/17/2012 | 1530 | MOTION Defendants Memorandum regarding Status Conference Scheduled for September 19, 2012 by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 09/17/2012) |
| 09/18/2012 | 1531 | MOTION for Ruling on Procedural Status of Claims in Advance of Evidentiary Hearing by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 09/18/2012) |
| 09/19/2012 | 1532 | REPLY by USA to 1530 MOTION Defendants Memorandum regarding Status Conference Scheduled for September 19, 2012 (Daley, Robert) (Entered: 09/19/2012) |
| 09/19/2012 | 1533 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Telephone Conference as to Brandon L Basham held on 9/19/2012. Hearing on 2255 motion will proceed in 2 stages to accommodate witnesses schedules. Stage 1 to begin on 10/9/12 and Stage 2 to begin on 12/3/12. Oral arguments to follow each stage on claims covered. Defense counsel to provide the government with a copy of report done by Neuropsychiatric Expert. Court Reporter Not Present. CJA Time FPD. (mflo, )** (Entered: 09/19/2012) |
| 09/24/2012 | 1534 | **ORDER Petitioner/Defendant's neuropsychiatric expert, Dr. Thomas M. Hyde, be allowed to testify in the second stage of the evidentiary hearing scheduled to begin December 3, 2012. The court will allow a paralegal to be present at the interviews of Jack Swerling and Greg Harris to prevent petitioner's counsel from being called as fact witnesses at the evidentiary hearing. The court denies the request for petitioner/defendant to be present at the evidentiary hearing. Because this is a death penalty case, the court anticipates reaching the merits on all of the claims raised in the § 2255 petition. The first stage of the evidentiary hearing for the §2255 petition in this case is scheduled to begin on October 9, 2012 at 9:30 a.m. The second stage will begin on December 3, 2012 at 9:30 a.m. granting in** |

**JA 0163**

| | | |
|---|---|---|
| | | **part and denying in part 1530 Defendant's Memorandum regarding Status Conference Scheduled for September 19, 2012 as to Brandon L Basham (2); granting 1531 Motion for Ruling on Procedural Status of Claims in Advance of Evidentiary Hearing as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 9/24/12.(mflo, ) (Entered: 09/24/2012)** |
| 09/24/2012 | 1535 | ***DOCUMENT MAILED as to Brandon L Basham re 1534 Order placed in U.S. Mail to CHARLES LOCKETT, WARDEN USP TERRE HAUTE U.S. PENITENTIARY 4700 BUREAU ROAD SOUTH TERRE HAUTE, IN 47802 (mflo, ) (Entered: 09/24/2012) |
| 09/24/2012 | 1536 | MOTION to Stay Proceedings Pending Resolution of Defendants Petition for Writ of Certiorari to the Supreme Court of the United States by Brandon L Basham. No proposed order(Burke, Michael) (Entered: 09/24/2012) |
| 09/24/2012 | 1537 | Sealed Document submitted by Basham defense team at the request of Judge Joseph F. Anderson during the telephonic scheduling conference of 9/19/12. (mflo, ) (Entered: 09/25/2012) |
| 09/25/2012 | 1538 | **ORDER DENYING 1536 Motion to Stay Proceedings Pending Resolution of Defendants Petition for Writ of Certiorari to the Supreme Court of the United States as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 9/25/12.(mflo, ) (Entered: 09/25/2012)** |
| 09/26/2012 | 1539 | (Ex Parte) EX PARTE MOTION SEALED by Brandon L Basham. No proposed order(Mimms, Julia) (Entered: 09/26/2012) |
| 10/09/2012 | 1540 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: 2255 Motion Hearing as to Brandon L Basham begins on 10/9/2012; Defendant present by video conference and a telephone is available for contact between counsel in courtroom and defendant at the Bureau of Prisons. Government enters exhibit numbers 1-223 with the exception of #49 and the defendant enters exhibit numbers1-101 with the exception of #45 by agreement. Witnesses and exhibits. Court in recess until 9:30. as to 1394 AMENDED MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, ) (Entered: 10/10/2012)** |
| 10/10/2012 | 1541 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Brandon L Basham held on 10/10/2012; Competency hearing with witnesses for this proceeding. Court finds defendant competent to proceed with this hearing. Defendant Basham not present for afternoon court proceedings. Exparte Hearing held with defense team. Court continues with 2255 motion hearing with witnesses and exhibits. Court in recess until 10/11 at 9:30. as to 1394 AMENDED MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, ) (Entered: 10/10/2012)** |
| 10/11/2012 | 1542 | |

**JA 0164**

| | | |
|---|---|---|
| | | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Brandon L Basham held on 10/11/2012; Defendant not present for today's proceedings; witnesses and exhibits; court in recess until Monday, 10/15 at 9:30. as to 1394 AMENDED MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, )** (Entered: 10/11/2012) |
| 10/12/2012 | 1543 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 10 & 11, 2021, testimony of Greg Harris from the hearing before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 11/2/2012. Redacted Transcript Deadline set for 11/13/2012. Release of Transcript Restriction set for 1/10/2013. (dmayo, ) (Entered: 10/12/2012) |
| 10/13/2012 | 1544 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 11, 2012, testimony of Jack Swerling before Judge Joseph F. Anderson, Jr.. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 11/5/2012. Redacted Transcript Deadline set for 11/13/2012. Release of Transcript Restriction set for 1/11/2013. (dmayo, ) (Entered: 10/13/2012) |
| 10/15/2012 | 1545 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Brandon L Basham held on 10/15/2012; Defendant not present for today's proceedings; witness and exhibits; court in recess until Tuesday 10/16 at 9:30; re 1394 MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, )** Modified on 10/16/2012 to edit text(mflo, ). (Entered: 10/15/2012) |
| 10/16/2012 | 1546 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Brandon L Basham held on 10/16/2012 ; Defendant was only present for the first 45 minutes of todays hearing. Witnesses and exhibits; court in recess until Wednesday 10/17 at 9:45; re 1394 MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, )** (Entered: 10/16/2012) |
| 10/17/2012 | 1547 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Brandon L Basham held on 10/17/2012 ; Defendant not present for today's proceedings; witness and** |

| | | |
|---|---|---|
| | | **exhibit; Court in recess until 12/3/12 at 9:30. as to 1394 MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, )** (Entered: 10/17/2012) |
| 10/17/2012 | 1548 | EXHIBIT LIST by the petitioner from part 1 of the 2255 motion hearing. (Attachments: # 1 Government Exhibit List from part 1 of the 2255 motion hearing, # 2 Witness List from part 1 of the 2255 motion hearing)(mflo, ) (Entered: 10/17/2012) |
| 10/23/2012 | 1549 | **ORDER APPOINTING Dr. George F. Parker as Court's Expert as to Brandon L Basham for a hearing on 10/10/12. Signed by Honorable Joseph F Anderson, Jr on 10/22/12.(mflo, )** (Entered: 10/23/2012) |
| 11/05/2012 | 1550 | **ORDER REGARDING PETITIONER'S COMPETENCY as to Brandon L Basham, concluding that Mr. Basham is competent to proceed with his § 2255 hearing. Signed by Honorable Joseph F Anderson, Jr on 11/05/2012.(bshr, )** (Entered: 11/05/2012) |
| 11/19/2012 | 1551 | NOTICE OF CONTINUATION OF HEARING ON MOTION in case as to Brandon L Basham 1394 MOTION to Vacate under 28 U.S.C. § 2255 : Motion Hearing set for 12/3/2012 09:30 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 11/19/2012) |
| 11/20/2012 | 1553 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 10, 2012, before Judge Joseph F. Anderson, Jr.. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 12/11/2012. Redacted Transcript Deadline set for 12/21/2012. Release of Transcript Restriction set for 2/19/2013. (dmayo, ) (Entered: 11/20/2012) |
| 11/20/2012 | 1555 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 11, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 12/11/2012. Redacted Transcript Deadline set for 12/21/2012. Release of Transcript Restriction set for 2/19/2013. (dmayo, ) (Entered: 11/20/2012) |
| 11/20/2012 | 1556 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 15, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public |

| | | |
|---|---|---|
| | | terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 12/11/2012. Redacted Transcript Deadline set for 12/21/2012. Release of Transcript Restriction set for 2/19/2013. (dmayo, ) (Entered: 11/20/2012) |
| 11/20/2012 | 1558 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 16, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 12/11/2012. Redacted Transcript Deadline set for 12/21/2012. Release of Transcript Restriction set for 2/19/2013. (dmayo, ) (Entered: 11/20/2012) |
| 11/20/2012 | 1560 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 17, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 12/11/2012. Redacted Transcript Deadline set for 12/21/2012. Release of Transcript Restriction set for 2/19/2013. (dmayo, ) (Entered: 11/20/2012) |
| 11/21/2012 | 1561 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on October 9, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 12/12/2012. Redacted Transcript Deadline set for 12/27/2012. Release of Transcript Restriction set for 2/19/2013. (dmayo, ) (Entered: 11/21/2012) |
| 11/26/2012 | 1562 | DELETION OF DOCKET ENTRY NUMBER 1552 as to Chadrick E Fulks, Brandon L Basham Reason: court reporter selected both Fulks and Basham when it was only as to Basham. Corrected Filing Document Number 1561 . Correction by court reporter made prior to being viewed in QUEST. (mflo, ) (Entered: 11/26/2012) |
| 11/29/2012 | 1563 | |

| | | |
|---|---|---|
| | | NOTICE OF RESCHEDULED HEARING as to Brandon L Basham Motion Hearing set for 12/3/2012 09:30 AM cancelled and rescheduled to: **CHANGE IN TIME ONLY** Motion Hearing set for 12/3/2012 09:00 AM in Columbia # 4, Matthew J. Perry Court House, 901 Richland St, Columbia before Honorable Joseph F Anderson Jr. (mflo, ) (Entered: 11/29/2012) |
| 12/03/2012 | 1564 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing continues from 10/17/12 as to Brandon L Basham held on 12/3/2012; Witnesses and exhibits; Defendant not present for these proceedings. Court in recess until 12/4/12 at 9:30. re 1393 MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham, 1394 AMENDED MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, )** (Entered: 12/04/2012) |
| 12/04/2012 | 1565 | **Minute Entry for proceedings held before Honorable Joseph F Anderson, Jr: Motion Hearing as to Brandon L Basham concluded on 12/4/2012 ; Last witness; Oral arguments on certain claims contained in the motion to vacate under 28:2255. Court takes motion under advisement and will file a written order; re 1393 MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham, 1394 AMENDED MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Court Reporter Daniel Mayo. CJA Time FPD. (mflo, )** (Entered: 12/05/2012) |
| 12/04/2012 | 1566 | EXHIBIT and WITNESS LIST for both Petitioner and Respondent during 2255 motion hearing. (Attachments: # 1 Petitioner Exhibit List, # 2 Motion Hearing Witness List)(mflo, ) (Entered: 12/05/2012) |
| 12/07/2012 | 1567 | Additional Attachments to Main Document 1416 Response in Opposition (Ewing, Jimmie) (Entered: 12/07/2012) |
| 12/23/2012 | 1568 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on December 3, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 1/14/2013. Redacted Transcript Deadline set for 1/23/2013. Release of Transcript Restriction set for 3/25/2013. (dmayo, ) (Entered: 12/23/2012) |
| 12/23/2012 | 1569 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham held on December 4, 2012, before Judge Joseph F. Anderson, Jr. Court Reporter/Transcriber Dan Mayo, Telephone number/E-mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the |

**JA 0168**

| | | transcript to file with the court a Notice of Intent to Request Redaction. Redaction Request due 1/14/2013. Redacted Transcript Deadline set for 1/23/2013. Release of Transcript Restriction set for 3/25/2013. (dmayo, ) (Entered: 12/23/2012) |
|---|---|---|
| 01/30/2013 | 1570 | **ORDER The court wishes to receive input from the parties on the question of whatimpact, if any, Federal Evidence Rule 606(b) has upon Claim 28. The parties' briefs should be filed with this court within fourteen days from the date of docketing of this order. No reply briefs are necessary as to Brandon L Basham; re 1394 AMENDED MOTION to Vacate under 28 U.S.C. § 2255 filed by Brandon L Basham. Signed by Honorable Joseph F Anderson, Jr on 1/30/13.(mflo, )** (Entered: 01/30/2013) |
| 02/06/2013 | 1572 | **ORDER FOR ADDITIONAL BRIEFING the court wishes to receive input on whether Basham's trial counsel rendered ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984) by failing to argue that statements Basham allegedly made to Sheriff Hewett outside the presence of counsel during the Thanksgiving Day search were taken in violation of Edwards, including whether the record in this case supports an argument that an Edwards violation in fact occurred as to Brandon L Basham. Briefs due 14 days from the date of this order. ( Briefs due by 2/20/2013.). Signed by Honorable Joseph F Anderson, Jr on 2/6/13.(mflo, )** (Entered: 02/06/2013) |
| 02/13/2013 | 1573 | REPLY by USA to 1570 Order,, *Supplemental Brief Regarding F.R.E. 606 (b) and Claim 28* (Daley, Robert) (Entered: 02/13/2013) |
| 02/13/2013 | 1574 | REPLY by Brandon L Basham to 1570 Order, */Defendant Brandon Lee Basham's Supplemental Brief on Federal Rule of Evidence 606(b)* (Burke, Michael) Modified on 2/15/2013 to edit text (mflo, ). (Entered: 02/13/2013) |
| 02/20/2013 | 1575 | REPLY by Brandon L Basham to 1572 Order, */Defendant Brandon Leon Basham's Supplemental Brief on Ineffective Assistance of Counsel Concerning Edwards v. Arizona* (Burke, Michael) Modified on 2/21/2013 to edit text (mflo, ). (Entered: 02/20/2013) |
| 02/20/2013 | 1576 | REPLY by USA to 1572 Order, Set Deadlines,,,, (Ewing, Jimmie) (Entered: 02/20/2013) |
| 06/05/2013 | 1577 | **ORDER denying 1393 Motion to Vacate 2255 as to Brandon L Basham (2); denying 1394 Amended Motion to Vacate 2255 as to Brandon L Basham (2), the court issues a certificate of appealability as to all of the claims asserted in this case except for Claims 33 and 34. Signed by the Honorable Joseph F. Anderson, Jr. on 06/05/2013.(bshr, )** Civil Case 4:11-cv-70079-JFA closed. (Entered: 06/05/2013) |
| 06/05/2013 | 1578 | JUDGMENT on 28:2255 PETITION as to Brandon L Basham re: 1393 MOTION to Vacate under 28 U.S.C. § 2255, 1394 Amended MOTION to Vacate under 28 U.S.C. § 2255. IT IS ORDERED AND ADJUDGED that Petitioner, Brandon Leon Basham, shall take nothing on the petition filed |

**JA 0169**

| | | |
|---|---|---|
| | | pursuant to 28 USC § 2255 and this action is dismissed with prejudice. (bshr, ) (Entered: 06/05/2013) |
| 06/05/2013 | 1579 | **TEXT EX PARTE ORDER finding as moot 1539 EX PARTE MOTION SEALED filed by Brandon L Basham. Entered at the direction of the Honorable Joseph F Anderson, Jr on 06/05/2013.(bshr, )** (Entered: 06/05/2013) |
| 07/03/2013 | 1580 | MOTION AND MEMORANDUM to Alter Judgment or Amend Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure by Brandon L Basham. (Clerk has refiled motion selecting the correct defendant)No proposed order(mflo, ) (Entered: 07/08/2013) |
| 07/15/2013 | 1581 | **TEXT ORDER the Government is requested to file a response on or before 7/31/13 to 1580 MOTION to Alter Judgment filed by Brandon L Basham, ( Response to Motion due by 7/31/2013.). Directed by Honorable Joseph F Anderson, Jr on 7/15/13.(mflo, )** (Entered: 07/15/2013) |
| 07/31/2013 | 1582 | RESPONSE in Opposition by USA as to Brandon L Basham re 1580 MOTION to Alter Judgment (Daley, Robert) (Entered: 07/31/2013) |
| 08/21/2013 | 1583 | **ORDER ON MOTION TO ALTER OR AMEND JUDGMENT denying 1580 Motion to Alter Judgment Order 1580 as to Brandon L Basham (2). Signed by Honorable Joseph F Anderson, Jr on 8/21/13.(mflo, )** (Entered: 08/21/2013) |
| 10/17/2013 | 1585 | NOTICE OF APPEAL OF FINAL JUDGMENT by Brandon L Basham re 1577 Order on Motion to Vacate 2255,- The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (refiled selecting the correct defendant) (mflo, ) (Entered: 10/18/2013) |
| 10/18/2013 | 1586 | DELETION OF DOCKET ENTRY NUMBER 1584 as to Chadrick E Fulks, Brandon L Basham Reason: attorney selected the incorrect filer; Corrected Filing Document Number 1585 (mflo, ) (Entered: 10/18/2013) |
| 10/18/2013 | 1587 | Transmittal Sheet for Notice of Appeal to USCA as to Brandon L Basham to US Court of Appeals re 1585 Notice of Appeal - Final Judgment, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mflo, ) (Entered: 10/18/2013) |
| 10/21/2013 | 1589 | ORDER of USCA The court appoints the Federal Defender for the District of Arizona to represent the appellant as co-counsel on appeal as to Brandon L Basham re 1585 Notice of Appeal - Final Judgment, (mflo, ) (Entered: 10/21/2013) |
| 10/21/2013 | 1590 | ORDER of USCA The court appoints Julia Grace Mimms as lead counsel for the appellant as to Brandon L Basham re 1585 Notice of Appeal - Final Judgment, (mflo, ) (Entered: 10/21/2013) |
| 11/05/2013 | 1591 | |

**JA 0170**

| | | |
|---|---|---|
| | | ORDER of USCA The court appoints the Federal Defender of Arizona as lead counsel for the appellant and Julia Grace Mimms is relieved of the obligation of further representation of appellant on appeal as to Brandon L Basham re 1585 Notice of Appeal - Final Judgment, (mflo, ) (Entered: 11/05/2013) |
| 12/09/2013 | 1593 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Brandon L Basham, telephone conference for dates of December 7, 2011 before Judge Joseph F. Anderson, Jr., re 1585 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Dan Mayo, Telephone number/E-Mail 803-799-9325. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? Y***<br><br>Redaction Request due 12/30/2013. Redacted Transcript Deadline set for 1/9/2014. Release of Transcript Restriction set for 3/10/2014. (dmayo, ) (Entered: 12/09/2013) |
| 07/21/2014 | 1594 | Letter from Chadrick E Fulks in re: requesting attorneys to file a clemency petition (Attachments: # 1 Envelope)(mflo, ) (Entered: 07/22/2014) |
| 08/01/2014 | 1595 | **ORDER as to Chadrick E Fulks re 1594 Letter, denying any request to appoint new counsel to represent him in connection with any executive clemency petition that he might file with the Office of the Pardon Attorney. Signed by Honorable Joseph F Anderson, Jr on 08/01/2014. (bshr, )** (Entered: 08/01/2014) |
| 08/01/2014 | 1596 | ***DOCUMENT MAILED as to Chadrick E Fulks re 1595 Order placed in U.S. Mail to Chadrick E Fulks, #16617-074, US Penitentiary, PO Box 12015, Terre Haute, IN 47801 (bshr, ) (Entered: 08/01/2014) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/25/2014 16:27:49 | | | |
| **PACER Login:** | fp0010 | **Client Code:** | Taylor-Basham |
| **Description:** | Docket Report | **Search Criteria:** | 4:02-cr-00992-JFA |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

JA 0171

AO 91 (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

**FILED**

NOV 2 0 2002

LARRY W. PROPES, CLERK
FLORENCE, SC

UNITED STATES OF AMERICA

v.

CHADRICK E. FULKS and
BRANDEN L. BASHAM

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: **4:02-992**

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about _November 14, 2002_ in _Horry_ County, in the District of South Carolina, the defendant(s) did: Track Statutory Language of Offense.

kidnap and carjack Alice Donovan

in violation of Title _18_, United States Code, Sections(s) _1201 and 2119_.

I further state that I am a(n) _Special Agent_ and that this complaint is based on the following
Official Title
facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: [x] Yes    [] No

_Janet M. Bray_
Signature of Complainant

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE,

November **20**, 2002                                        at    Florence, South Carolina
Date                                                                      City and State

Thomas E. Rogers, III, United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

JA 0172

United States District Court
District of South Carolina

# DOCUMENT

# NOT

# SCANNED -

# SEALED

# DOCUMENT

JA 0173

**FILED**

IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

DEC 1 7 2002

LARRY W. PROPES, CLERK
FLORENCE, SC

| | |
|---|---|
| UNITED STATES OF AMERICA | ) CRIMINAL NO.: *4:02-992* |
| | )  18 U.S.C. §2119 |
| vs. | )  18 U.S.C. §1201(a) |
| | )  18 U.S.C. §2312 |
| | )  18 U.S.C. §2 |
| CHADRICK EVAN FULKS | )  **INDICTMENT** |
| BRANDEN LEON BASHAM | ) |

## COUNT 1
(Carjacking resulting in death)

THE GRAND JURY CHARGES:

That on or about November 14, 2002, in the District of South Carolina and elsewhere, **CHADRICK EVAN FULKS** and **BRANDEN LEON BASHAM,** with intent to cause death and serious bodily harm, did by force, violence, and intimidation take from the person and presence of another, to wit Alice Donovan, a motor vehicle that had been transported in interstate and foreign commerce, that is a 1994 BMW 318i, and Alice Donovan's death resulted;

In violation of Title 18, United States Code, Section 2119 and Title 18, United States Code, Section 2.

**JA 0174**

## COUNT 2
### (Kidnapping resulting in death)

THE GRAND JURY FURTHER CHARGES:

On or about November 14, 2002, in the District of South Carolina and elsewhere, **CHADRICK EVAN FULKS** and **BRANDEN LEON BASHAM,** willfully and unlawfully did kidnap, abduct and carry away Alice Donovan, and did willfully transport Alice Donovan in interstate commerce from Conway, South Carolina to North Carolina, and did hold her for ransom, reward and otherwise, and Alice Donovan's death resulted;

In violation of Title 18, United States Code, Section 1201(a), and Title 18, United States Code, Section 2.

2

**JA 0175**

## COUNT 3
(Interstate transportation of stolen motor vehicle)

THE GRAND JURY FURTHER CHARGES:

On or about November 14, 2002, in the District of South Carolina and elsewhere, **CHADRICK EVAN FULKS** and **BRANDEN LEON BASHAM** knowingly and unlawfully did transport in interstate commerce a stolen motor vehicle, that is, a 1994 BMW 318i, from Conway, South Carolina, to North Carolina, knowing the same to be stolen;

In violation of Title 18, United States Code, Section 2312 and Title 18, United States Code, Section 2.

A _____ *True* _____ BILL

_____
FOREMAN

_____
J. STROM THURMOND, JR. (JSG)
UNITED STATES ATTORNEY

3

JA 0176

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

# JOINT APPENDIX AND INDEX
# VOLUME 2

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for
Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Brandon Leon Basham, | ) | CR No.:  4:02-992-JFA |
| | ) | C/A No.  4:11-70079-JFA |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ORDER DENYING PETITION FOR |
| | ) | RELIEF UNDER 28 U.S.C. § 2255 |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

INTRODUCTION

A South Carolina federal jury sentenced Brandon Basham to death for the 2002 carjacking and kidnapping resulting in the death of Alice Donovan.  After an unsuccessful appeal to the United States Court of Appeals for the Fourth Circuit, *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009), and the United States Supreme Court, *Basham v. United States*, 130 S. Ct. 3353 (2010), Basham returns to this court with a petition pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his federal death sentence.

Contending that his trial counsel were constitutionally ineffective in a variety of ways and that other violations of his constitutional rights render his death sentence infirm, Basham asserts thirty-two claims in his § 2255 petition, as amended.[1]  Because the court finds no merit to any of the grounds of error asserted, the petition is denied.

---

[1] The petition originally listed thirty-four claims. Prior to the evidentiary hearing, Basham's counsel wrote to the court and formally withdrew two of the claims (Claim 8 and Claim 31).  Due to the fact that the original petition filed on May 31, 2011 (ECF No. 1393) contained an error in the signature block, an amended petition was filed the next day on June 1, 2011 (ECF No. 1394). For simplicity, any reference to "the Petition" in this order shall be deemed to refer to the amended petition, ECF No. 1394.  Likewise, any reference to "the Reply" shall be deemed to refer to the petitioner's reply to the government's response in opposition, ECF No. 1465.  Citations to the petition and to the reply shall be designated as "Pet. at [page(s)]" and "Reply at [page(s)]," respectively.

1

PROCEDURAL HISTORY OF THE UNDERLYING CRIMINAL CASE

*Facts Relating to the Criminal Acts*

The Fourth Circuit Court of Appeals set out at length the facts surrounding the abduction, rape, and murder of Alice Donovan in Basham's direct appeal of this case. The court hereby incorporates the following facts in this order:

> In 2002, Basham, a lifelong Kentucky resident, was serving the final years of a felony forgery conviction sentence at the Hopkins County Detention Center in Kentucky. In October of that year, Chadrick Evan Fulks became Basham's new cell-mate. In early November, Fulks was charged with an additional (and serious) state offense, first degree abuse of a child aged twelve years or younger. On November 4, 2002, Basham and Fulks escaped the detention center together by scaling a wall in the recreation area and leaving the area on foot.
>
> By the evening of November 5, Basham and Fulks reached the home of James Hawkins in nearby Hanson, Kentucky. Basham approached the dwelling, knocked on the door, and asked to use the telephone. Basham told Hawkins that his car had broken down and, after Basham made two calls, Hawkins agreed to drive him to a nearby convenience store. When Basham and Hawkins left the residence, Fulks joined them and the three men left in Hawkins's truck. The two men then told Hawkins that their vehicle was disabled in Robards, Kentucky, and they asked for a ride. During the drive, Fulks told Hawkins that the disabled vehicle was actually in Indiana and directed Hawkins to drive there. Fulks later changed the directions again; by this point, Basham was pointing a knife at Hawkins to keep him driving to their preferred destination. At some point, Fulks took the wheel, drove the truck into a field, and ordered Basham to tie Hawkins to a tree. Fulks became dissatisfied with Basham's speed in tying and eventually completed the job himself. They left Hawkins clothed in shorts, flip-flops, and a short-sleeved vest. Fifteen hours later, Hawkins freed himself and flagged a passing motorist. When interviewed by police officers later that day, Hawkins identified Basham and Fulks as the individuals who kidnapped him.
>
> After abandoning Hawkins, Fulks and Basham drove to Portage, Indiana, to visit one of Fulks's former girlfriends, Tina Severance.[2] They

---

[2] Tina Severance and Fulks met while Fulks was imprisoned in Indiana. Severance worked as a correctional officer at the facility where he served his sentence.

abandoned Hawkins's vehicle at a hotel and walked to a trailer shared by Severance and her friend Andrea Roddy. The four then drove to a hotel in northern Indiana and stayed there for the next few days. At some point, Basham and Roddy began a consensual sexual relationship.

During their time in Indiana, Fulks asked Severance if she knew anyone from whom he could obtain firearms. Severance informed Fulks that a friend of hers, Robert Talsma, kept several firearms at his home; Severance and Roddy thereafter agreed to lure Talsma out of his house by offering to buy him breakfast. While Talsma was at breakfast with the women, Basham and Fulks entered Talsma's home and stole four firearms, a ring, and several blank checks. They then reunited with Severance and Roddy, and the four traveled in Severance's van to Sturgis, Michigan. That night, November 8, Basham and Roddy stayed at a hotel in Sturgis while Fulks and Severance drove to Goshen, Indiana, to smoke marijuana and methamphetamines with Fulks's brother, Ronnie Fulks.

That evening, two police officers began knocking on doors at the hotel where Basham and Roddy were staying in Sturgis. Basham opened his room door, saw the officers, closed the door, and cocked a .22 caliber revolver that he had stolen from Talsma. The officers ended up leaving before reaching Basham's door. Basham told Roddy, however, "I was about to shoot me a mother-f* * *er cop right. I was going to blow the f* * *ing cop away." The next morning, November 9, Basham and Roddy drove to a local Kmart to purchase sundries. Basham met a group of teenagers in the parking lot, and he reported to Roddy that they had some money and he wanted to kill them for it. After purchasing sundries with some of Talsma's stolen checks, Basham invited the teenagers back to the hotel room. Severance and Fulks arrived back at the hotel shortly thereafter, and the teenagers left. Fulks, Basham, Severance, and Roddy then drove Severance's van to the home of Fulks's brother, Ronnie Fulks, in Goshen, Indiana.

On November 10, 2002, the group of four drove to Piketon, Ohio, in Severance's van. Basham again used Talsma's checks to buy sundries, which Roddy later returned for cash. Basham and Fulks also bought two sets of camouflage clothing and Fulks stole a purse and cell phone from a Wal–Mart parking lot. On November 11, they drove to Kenova, West Virginia, near Huntington, and rented a hotel room. Fulks and Basham, wearing their sets of camouflage clothing, left the hotel room by themselves and did not return until the morning hours of November 12.

Samantha Burns, a nineteen-year-old Marshall University student, worked at the J.C. Penney's store in the Huntington Mall. In addition, Burns also participated in a school fundraiser by selling candy boxes, which she kept in her car. On November 11, Burns met her aunt at Penney's to purchase clothing for one of Burns's nieces; they parked in separate locations at the mall. At 9:46 p.m. that evening, Burns called her mother to say she was staying at a friend's house that night. Burns has never been seen since.

During the early morning hours of November 12, 2002, a local fire department responded to a reported explosion and fire at a rural area three miles outside of Huntington. The responding firemen found a car later identified as belonging to Burns burned out at a cemetery.

Meanwhile, Fulks and Basham returned to the hotel carrying muddy clothing, and Fulks indicated that they had stolen some money. Later that morning, the group of four checked out of the motel and drove to South Carolina, where Fulks had lived for several years in the 1990s. Several facts emerged linking Basham and Fulks to Burns's disappearance. Roddy and Severance reported seeing mud, as well as one of Burns's candy boxes, in the van. In addition, Basham began wearing a heart-shaped ring around his neck that belonged to Samantha Burns. Basham told the women that he had stolen the candy from a girl selling it and that he had stolen the ring from a car. Roddy also found Burns's photo ID discarded with other items linking Burns to Fulks and Basham. Moreover, it was later revealed that Fulks used Burns's ATM card twice on the evening of November 11 at local banks.

The evening of November 12, Fulks, Basham, Severance and Roddy arrived at a motel in Little River, South Carolina. The next day was a day of relative rest; Fulks and Basham stole several purses and wallets from unattended vehicles, went shopping, and then returned to the motel room to smoke marijuana, drink, and play cards. On November 14, the four moved to a motel in Myrtle Beach, South Carolina. Fulks and Basham left the women and drove to nearby Conway, South Carolina. Hoping to steal firearms, Fulks and Basham burglarized the Conway home of Sam Jordan. Carl Jordan, Sam's father, drove up to the home as Fulks and Basham were leaving. Fulks attempted to ram Jordan's car with Severance's van but stopped short; Basham exited the house and fired a shot at a nearby greenhouse. Fulks then fired a shot that shattered the back-window of Jordan's car. Jordan fled the area, with Fulks and Basham in pursuit, still firing. At some point, Fulks and Basham ceased their chase, abandoned Severance's van, and stole a truck, which they drove to the Wal–Mart in Conway.

4

**JA 0180**

Upon arriving at the Wal–Mart, Basham approached a blue BMW sedan driven by forty-four year old Alice Donovan. Basham entered the car and forced Donovan to drive to the back of the parking lot, where Fulks waited. There, Fulks entered the driver's side of the car and drove away; at 4:03 p.m., Fulks used Donovan's ATM card to purchase gas from a service station in Shallote, North Carolina. At 4:30 p.m., Donovan called her daughter to say she was shopping and would be home late. Later that day, several men at the Bee Tree Farms Hunt Club in Winnabow, North Carolina, saw two men and a woman in a blue BMW drive to the end of a road by the lodge, turn around, and leave the area. Donovan, like Burns, was never seen again.

Basham and Fulks returned to their Myrtle Beach motel later that day and told Severance and Roddy they had to leave town because Basham shot at some police officers and Severance's van had been seized. Basham and Fulks took Donovan's BMW and began driving to West Virginia, leaving Severance and Roddy behind in Myrtle Beach. Donovan's ATM card was used in Little River, Myrtle Beach, and Raleigh, North Carolina. Meanwhile, Severance filed a (false) police report alleging that her van had been stolen.

On November 15, 2002, Fulks and Basham arrived at the home of Beth McGuffin near Huntington, West Virginia. McGuffin, a childhood friend of Fulks, agreed to let Fulks and Basham stay at her home. Fulks introduced Basham to her as "Tommy Blake."  Later on November 15, Fulks and Basham purchased crack cocaine to share. Basham and McGuffin also began a sexual relationship and had sexual intercourse three times over the next several days. Basham also gave McGuffin Burns's heart-shaped ring. On November 16, the three watched a news story about the disappearance of Samantha Burns. When McGuffin remarked that Burns was likely dead, Fulks stated, "[s]he is dead."

At the same time, the Federal Bureau of Investigation ("FBI") was investigating the kidnapping of James Hawkins, which it believed Basham and Fulks had committed after escaping from prison. The FBI learned that the two men might be in Myrtle Beach, South Carolina, and that Severance had reported her van stolen. On November 16, the FBI and local authorities interviewed Severance and learned that Basham and Fulks had left the area. The FBI also became aware of the disappearance of Alice Donovan and suspected that Fulks and Basham might be involved.

On Sunday, November 17, Fulks, Basham, and McGuffin smoked marijuana before Fulks and Basham left McGuffin's house, telling her they were headed to Arizona. Instead, they stopped at the Ashland Mall in Ashland, Kentucky, about 20 minutes from Huntington. Sometime that evening, in a Wal–Mart parking lot, Basham approached Deanna Francis's fifteen-year-old

5

**JA 0181**

daughter as she entered the passenger side of their vehicle. Basham pointed a gun into the teenager's side, attempted to enter the car, and asked for directions to Greenville, Kentucky. When Basham realized Deanna's daughter was talking on her cell phone, he said "[M]y bad, I didn't mean to scare you" and walked away.  Deanna immediately called the police.

Ashland Police Officer Matt Davis was approximately four blocks from the Ashland Mall when he heard the dispatch about the attempted carjacking. Davis drove to the mall, where he saw Basham, who met the description of the suspected carjacker. Davis exited his patrol vehicle and approached Basham; Basham immediately began to flee. As Davis chased Basham through the mall area, Basham drew his weapon and fired a shot in the air. As the chase continued, Basham drew his weapon a second time, turned, and fired at Davis, who fired three shots of his own in return. Basham eventually made his way to a rail yard on the banks of the Ohio River where he hid. Davis radioed reinforcements, which surrounded the area. More than an hour later, at approximately 9:00 p.m., Basham surrendered to police, identifying himself as "Josh Rittman." Police recovered a knife—later identified as belonging to Alice Donovan—and a crack cocaine pipe on Basham's person. Basham's pistol was recovered from a rail car several days later.

Fulks returned to McGuffin's home that evening and watched a news report on Basham's arrest. The morning of November 18, Fulks left McGuffin's residence to drive Donovan's BMW to his brother's house in Goshen, Indiana. Fulks stopped at a rest area, where an Ohio state trooper, who had ascertained that the BMW was stolen, approached him; a high-speed chase then ensued at speeds in excess of 130 miles per hour. During this chase, Fulks nearly struck another trooper before managing to evade capture. Fulks eventually arrived at his brother's home in the early morning hours of November 20. Police officers were staking out Ronnie's home, however, and when Fulks, his brother Ronnie, and Ronnie's girlfriend drove to a barn to hide the BMW, Fulks was arrested. Fulks's semen and the bodily fluids from an unidentified female were later found in the back seat of the BMW.

Back in West Virginia, investigators determined that "Josh Rittman" was actually Basham, and that he was a recent prison escapee. At 2:00 a.m. on November 19, Basham was interviewed for the first time. Basham first told investigators that he and Fulks had escaped from prison and committed several crimes along the way. Later, he admitted that they had traveled to South Carolina and kidnapped a woman in Conway, South Carolina. Basham, however, insisted that the woman was alive and with Fulks.

6

**JA 0182**

At 9:45 a.m. on November 19, investigators re-interviewed Basham. Basham told investigators that he and Fulks kidnapped a man after escaping from prison, and carried firearms when kidnapping Donovan. He further told investigators that they used her credit cards to obtain cash, that they had driven Donovan to Ashland, Kentucky, and that Fulks was waiting for Basham when Basham was caught. This time, Basham said he thought Donovan was dead because she was not with Basham and Fulks at the Ashland Mall. During this interview, Basham also told investigators that Fulks "got a girl" in West Virginia as well.

On November 20, FBI agents interviewed Basham for seven hours. On this occasion, Basham told investigators that after they kidnapped Donovan, Fulks dropped Basham off at the hotel, drove Donovan to a resort area, raped her, tied her up, and left her. Basham also claimed that Fulks was the one who actually carjacked Donovan. Basham also clarified that when he said Fulks "got a girl" in West Virginia, that he meant they had stolen a girl's credit cards, not that they had kidnapped anyone else. At this point, investigators believed Donovan may have been still alive. Basham drew a map of the places Fulks and Basham had been with Donovan. This map roughly corresponded with the Savannah Bluff area of Horry County, South Carolina. A two-day search of the area, however, left investigators no closer to discovering Donovan's fate.

On November 25, Basham, now represented by counsel, agreed to further aid investigators in finding Donovan's body. He drew a map, mentioned passing through a cemetery, and informed investigators that Donovan's body was left covered but unburied in the woods. Basham was unable to identify any specific landmarks to aid investigators.

On November 26, through counsel, Basham informed investigators that Samantha Burns was dead and that he and Fulks had rolled her body down an embankment and into the Guyandotte River near Huntington.

Two days later, on November 28, FBI and state investigators organized a search team to search Brunswick County, North Carolina, for Donovan's body. Basham, now represented by Cameron B. Littlejohn, Jr. and William H. Monckton, VI, accompanied the agents. During the ride, Basham saw a deer and said, "I never could kill a deer and here I have," but was cut off before finishing his sentence. Later that day, Basham told the investigators that he and Fulks had driven past a park, taken Donovan's body out of the car, dragged it into the woods, and covered it. On two occasions, Basham became emotional as he identified landmarks where he and Fulks had taken Donovan. Later, Basham told the investigators he had thrown out a Liz Claiborne purse

7

strap at the Bee Tree Farms Cemetery. When they arrived, the local sheriff asked, "Is this where it happened?"  Basham responded, "This is it. It is."  The cemetery was searched to no avail. To date, Donovan's remains have not been identified.[3]

Starting in late November 2002, while in jail awaiting trial, Basham began writing letters to McGuffin, telling her his real name, claiming that he loved her, that he had not "hurt that girl from South Carolina," and that Fulks was responsible for their crime spree. On this last point, Basham wrote that Fulks "lied to me" and "told me he had all kinds of money, and a new car, and all of this stuff just waiting on him, and all he needed me to do was to show him the way away from the jail because I was raised in that area." Basham was not entirely forthright with McGuffin, however, as he also wrote that Burns's ring, which he had given to McGuffin, was "not stolen or anything like that." Basham also confided that he "did a lot of bad s* *t with [Fulks]."

On December 24, 2002, Basham called a former middle-school teacher in Madisonville, Kentucky, Clifford Jay. When Jay asked whether Basham had killed Alice Donovan, Basham replied, "Yes, Sir. We killed them."   Jay was surprised by the use of the term "them," because he had only heard about the Donovan killing.

*Basham*, 561 F.3d at 309–14 (citations omitted).

*The Criminal Indictment and Notice to Seek the Death Penalty*

Fulks and Basham were indicted in the District of South Carolina on December 17, 2002.  The Grand Jury returned a Superseding Indictment on April 23, 2003, charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the Death Penalty on the first two Counts: (1) carjacking resulting in Alice Donovan's death, 18 U.S.C. § 2119; and (2) kidnapping resulting in Alice Donovan's death, 18 U.S.C. § 3571.

---

[3] Subsequent to the direct appeal in this case, Donovan's remains were located in Horry County, South Carolina, at least twenty miles from the Brunswick County, North Carolina area where Basham had directed authorities to look.

The notice of intent to seek the death penalty was filed on September 13, 2003, pursuant to 18 U.S.C. § 3593(a) and the Federal Death Penalty Act (FDPA).[4]

*Appointment of Defense Counsel*

Pursuant to the FDPA, a Magistrate Judge of this court initially appointed two attorneys to represent Basham: Cameron B. Littlejohn and William H. Monckton.

Literally from the hour they were appointed to represent Basham, Littlejohn and Monckton were called upon to become deeply involved in the case, because Basham had already given statements, after being Mirandized and under the advice of counsel, to law enforcement officials after being apprehended in Kentucky, essentially admitting to his participation in the carjacking and kidnapping of Alice Donovan. Additionally, Basham had agreed to assist authorities in South Carolina in searching for Donovan, acting on the slim hope that she might still be alive or, at the very least, that her remains could be located. The location of Donovan's remains could conceivably have helped Basham avoid the death penalty.

To this end, arrangements were made to have Basham transported to Horry County, South Carolina, early in the morning of Thanksgiving Day, November 28, 2002. Basham, accompanied by Littlejohn and Monckton, and at least six law enforcement officers, including an investigator from the Federal Bureau of Investigation, traveled the back roads of Brunswick County, North Carolina, in a vain effort to locate the place where Basham and Fulks had left Alice Donovan. Approximately twenty local volunteers joined the effort.

---

[4] The Federal Death Penalty Act of 1994 was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994 and became effective on September 13, 1994. *See* Pub. L. No. 103–322, Title VI, §§ 60001-26, Sept. 13, 1994, 108 Stat. 1959 (codified at 18 U.S.C.§ 3591– 98).

During the search and in the presence of his attorneys, Basham made several inculpatory statements. Specifically, at one juncture, Basham stated, "You know I have never even killed a deer and here I have . . . ." Basham never finished the sentence because Littlejohn, who was seated beside Basham in the police van, put his hand on Basham's knee and indicated that he should stop talking.

At another point, while still in the van and in the presence of his attorneys, Basham, with the express permission of his attorneys, made reference to a strap that was used to strangle Alice Donovan. Later during the search for the purse strap, Basham apparently walked off with Sheriff Ronald Hewett (who, at that time, was the Sheriff of Brunswick County, North Carolina) and two additional law enforcement officers. During that sojourn, Basham made a statement to Hewett about the purse strap that had been used to strangle Donovan. This statement, as well as other statements about the purse strap, is the subject of much debate in this case and forms the basis for several of the claims asserted in this § 2255 proceeding. The statement will be discussed in more detail as the claims are analyzed by the court, but at this point it should suffice to say that Basham demonstrated to Sheriff Hewett how Alice Donovan "was strangled" and then Basham demonstrated to Sheriff Hewett how he (Basham) threw the strap into the woods.

The search for Donovan, which began at sunrise and lasted until the early part of the afternoon, was eventually called off. Donovan's remains were not located until 2010—after the trial and direct appeals of both Basham and Fulks.

During the preliminary stages of the criminal case, the government filed a motion with the court suggesting that the court conduct an investigation as to whether Littlejohn and

Monckton should continue to represent Basham, because Littlejohn made certain statements during the search, albeit on a "hypothetical" basis, which might cause Littlejohn to become a witness in the case or otherwise have a conflict of interest that would prevent his effective representation of Basham.

This court also appointed two respected ethics experts as the court's expert witnesses on the disqualification issue:  University of South Carolina Law School Dean Robert M. Wilcox and criminal defense attorney John F. Hardaway.  Littlejohn and Monckton thereupon retained two more legal ethics experts (Professor John P. Freeman and attorney Morgan Martin) to represent them in the case, and then persuaded the court to appoint yet another attorney (Michael O'Connell) as an expert on death penalty litigation issues.

In an unprecedented move for this court, the court thus convened a hearing with seven lawyers (Littlejohn, Monckton, Hardaway, Wilcox, Freeman, Martin, and O'Connell) on the question of whether Littlejohn and Monckton should continue their representation in the case.  At the conclusion of the hearing, the court determined that it would disqualify Littlejohn and Monckton and appoint new counsel.  The reasons for the disqualification are set out in this court's order dated April 9, 2003.  *See* ECF No. 69.

The court then appointed Columbia, South Carolina attorneys Jack B. Swerling and Gregory P. Harris to represent Basham and directed that Littlejohn and Monckton cooperate in turning over their files and otherwise assisting in the transition to new counsel.

Jack Swerling is widely regarded as one of the preeminent criminal defense lawyers in South Carolina.  Admitted to the South Carolina Bar in 1973, he has participated in hundreds of criminal trials in the federal and state courts of South Carolina, including, by his

estimate, 150 to 200 homicide cases, four of which involved the death penalty.  He stated that, at any given time, he usually found himself working on three to four murder cases.  His peers have elected him to membership in the American College of Trial Lawyers, the American Academy of Appellate Lawyers, the American Board of Criminal Lawyers, and the International Academy of Trial Lawyers.  He has written several books on criminal practice, and the South Carolina Supreme Court has called upon him to provide leadership in a number of bar-related areas, including service as a member of the Chief Justice's Commission on the Profession of Law, the Bar Board of Commissioners on Grievance and Discipline, and the Board of Bar Examiners.  He has served as an adjunct professor at the University of South Carolina School of Law and also at the University of South Carolina School of Medicine, Department of Neuropsychiatry.  Since 1990, he has served as coordinator and moderator of the South Carolina Bar's Bridge the Gap program for young lawyers entering the profession.

Gregory Harris, an attorney who at the time shared office space with Swerling, also enjoys a reputation as an excellent criminal defense attorney.  After completing law school in 1986, he served as a law clerk for a state trial judge and then began his career in the courtroom as an assistant solicitor (prosecuting attorney) in the state court system.  He moved from there to the U.S. Attorneys' Office where he served as a federal prosecutor for several years, rising to the position of deputy chief of the criminal division.  After nearly five years as a federal prosecutor, he left the United States Attorneys' Office to open his own practice, specializing in criminal defense.  Like Swerling, Harris has tried numerous cases in the federal and state courts of South Carolina.

During this court's twenty-six years on the trial court bench, the court has had numerous opportunities to observe both Swerling and Harris in a variety of criminal case settings. Suffice it to say that in selecting Swerling and Harris to assume responsibility of representing a capital murder defendant, the court endeavored to obtain the best possible legal representation in South Carolina for the defendant.

### The Jackson v. Denno Hearing

In late February 2004, the court held a three-day hearing on the motion by both Basham and Fulks to suppress certain statements made by them. Following the hearing, the court entered two orders: one denying the suppression motion with respect to most of Basham's statements (ECF No. 335), and another granting the motion to suppress the hypothetical statement made by Littlejohn (ECF No. 691 at 4–5).

### Severance of the Trial

Both defendants filed motions for separate trials, and following a hearing, the court ultimately determined that it was necessary to sever the trial of Basham and Fulks.[5] (ECF No. 292). Fulks's trial was scheduled first, with jury selection commencing on May 10, 2004. Fulks elected to plead guilty to all charges of the superseding indictment and proceed directly to the penalty phase of the death penalty component of the case. Following a trial that lasted five weeks, the jury imposed the death penalty on both Counts 1 and 2 against Fulks. The court entered a sentence of 744 months imprisonment on the remaining six

---

[5] The defendants urged that the court had a constitutional obligation to order separate trials for the two defendants, even though they were indicted together and allegedly worked together throughout their seventeen-day crime spree, because, among other things, the defendants had inconsistent defenses. Ultimately, neither Fulks nor Basham presented a guilt phase defense at their separate trials.

counts.

Basham's case was scheduled to be tried in the Fall of the same year as Fulks's case. Unlike Fulks, Basham did not plead guilty to any of the counts of the superseding indictment and so the court conducted both a guilt phase and a penalty phase trial. Jury selection began on August 30, 2004, and lasted nine days. Following a three-week trial, the jury convicted Basham on all counts. During the trial, Swerling conceded that Basham was guilty of Count 2, and, in regard to Count 1, indicated that the jury "probably" would be going to a penalty phase on that count as well. After the jury found Basham guilty on all counts, the court conducted the penalty phase, which consumed an additional four weeks. Following deliberations in the penalty phase, the jury imposed the death penalty on both Counts 1 and 2 against Basham. The court imposed a sentence of 744 months imprisonment on the remaining six counts.

*Direct Appeal of Basham's Conviction*

Basham thereafter appealed to the United States Court of Appeals for the Fourth Circuit, raising six issues.[6] Although Jack Swerling was appointed appellate counsel, the Fourth Circuit granted his motion to withdraw and appointed Timothy J. Sullivan in his place. Attorney Melissa Meister of the firm of Jenner & Block was also added as appellate counsel. These attorneys were assisted by eight additional attorneys from the Jenner & Block firm, each of whom contributed to the preparation of the appellate brief. Basham thus had

---

[6] The six contentions of error Basham raised on direct appeal included claims of (1) juror misconduct; (2) disqualification of appointed counsel; (3) improper admission of evidence during the guilt phase of the trial; (4) improper admission of evidence during the penalty phase of the trial; (5) error in the jury instructions regarding mitigation factors; and (6) whether the death sentence was imposed under an improper influence.

ten appellate attorneys working on his behalf for the appeal.

On March 30, 2009, the Fourth Circuit issued its decision rejecting all grounds for appeal and affirming the sentence of death on both Counts 1 and 2. *Basham*, 561 F.3d 302. Basham then petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court denied the petition on June 1, 2010. *Basham v. United States*, 130 S. Ct. 3353 (2010).

*Appointment of Counsel for the §2255 Petition*

On September 19, 2009, the court appointed Assistant Federal Public Defender Jon M. Sands of the Arizona Federal Public Defender's Capital Litigation Unit, and Charlotte, North Carolina attorney Julia Mimms to represent Basham on his yet-to-be-filed § 2255 petition. The court noted that the appointment would take effect if and when the petition for a writ of certiorari was denied in the Supreme Court. As noted above, the Supreme Court denied the petition for a writ on June 1, 2010. *Id.*

*28 U.S.C. § 2255*

Section 2255 provides federal prisoners with the statutory vehicle for collaterally challenging the lawfulness of their convictions. That section states in relevant part as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.
>
> * * *

15

**JA 0191**

> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255.

As a general rule, relief under § 2255 is limited to errors which were jurisdictional, rose to the level of a constitutional violation, resulted in a "complete miscarriage of justice," or led to proceedings which were "inconsistent with the rudimentary demands of fair procedure." *United States v. Timmreck*, 441 U.S. 780, 783–84 (1979) (citing *Hill v. United States*, 368 U.S. 424 (1962)).

*Basham's § 2255 Petition*

Basham's § 2255 petition was filed on June 1, 2011, just before the one-year statutory deadline established by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2255(f). All of the thirty-two claims filed in the initial petition as supplemented by the pleading filed on March 2, 2012, ECF No. 1465, are timely under the one-year statute of limitations.[7]

Shortly before the § 2255 petition was filed, Basham filed a *pro se* "Waiver of any and all proceedings pursuant to 28 U.S.C. § 2255." The court held a status conference on June 29, 2011 and appointed a forensic psychiatrist, Dr. George Parker of Indianapolis, Indiana, to evaluate the defendant regarding his motion to withdraw his appeal and proceed with execution.

---

[7] As will be seen, some of the claims are barred for procedural, but not timeliness, reasons.

Dr. Parker visited with Basham on two occasions and rendered a written report that Basham was competent to make a decision to drop his appeals. Before the court could conduct a hearing on the *pro se* motion, Basham's § 2255 counsel lodged a number of procedural objections. Basham ultimately proved to be equivocal on the question of whether he wished to drop his appeal. At one point, Basham suggested that he would drop the appeal and proceed to execution if the court would intervene and allow his family to visit with him and direct the Bureau of Prisons to administer certain medications to him. Ultimately, this court entered an order in which it deemed Basham to have withdrawn his request to drop his appeal and the issue did not arise again.

### *The Interlocutory Appeal on Production of Attorney Records*

In an order dated April 4, 2012, this court granted the government's motion for access to all of the case-related files of trial counsel Swerling and Harris as well as to interview former counsel. ECF No. 1496. Basham opposed the ruling, and requested an immediate stay of that order so that he could take an interlocutory appeal of this court's action. By order dated April 10, 2012, this court allowed a limited stay of its April 4, 2012 order, with the stay to expire on June 11, 2012. ECF No. 1504.

The Fourth Circuit dismissed the interlocutory appeal, and its mandate was entered on May 30, 2012. Counsel for Basham and the government then interviewed both Swerling and Harris and reviewed all of their files.

### *Necessity for an Evidentiary Hearing*

"If [a § 2255] motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted . . . to determine

17

**JA 0193**

whether an evidentiary hearing is warranted." Rule 8, Rules Governing Section 2255 Proceedings for the United States District Courts.

"Section 2255 of Title 28 U.S.C. provides that unless the record conclusively shows that the prisoner is entitled to no relief, the district court should conduct an evidentiary hearing and state its findings and conclusions." *United States v. Young*, 644 F.2d 1008, 1013 (4th Cir. 1981). "A hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed material facts and a credibility determination is necessary to resolve the issue." *United States v. Coon*, 205 Fed. Appx. 972, 973 (4th Cir. 2006) (citing *United States v. Witherspoon*, 231 F.3d 923, 925–27 (4th Cir. 2000)). Finding that some issues presented in the § 2255 petition contained a few disputes as to material facts, this court held an evidentiary hearing on the matter.

## *The § 2255 Evidentiary Hearing*

After the noted procedural delays, the court commenced the § 2255 evidentiary hearing on October 9, 2012. Arrangements were made to allow Basham to participate in the hearing via satellite from his place of incarceration, the Federal Correctional Institution in Terre Haute, Indiana. Basham was able to view the witnesses, the court, and the attorneys in real-time video conference, and was also provided a private telephone line through which he could conduct confidential communications with his counsel as the evidentiary hearing progressed. An attorney associated with Basham's § 2255 counsel was also present in the room with Basham for consultation and to ensure communication with counsel in the courtroom.

18
**JA 0194**

Unfortunately, as the court adjourned for the lunch break on the first day of the evidentiary hearing, Basham became involved in a scuffle with the security officers attending to him and it was reported to the court that Basham had injured two officers and bit a third officer. The court then adjourned the hearing for the rest of the day, and commissioned Dr. Parker[8] to examine Basham for purposes of determining whether he was competent to proceed with the evidentiary hearing.

The following day, after examining Basham in person at Terre Haute, Dr. Parker rendered an opinion that Basham was competent to go forward with the hearing. The court and attorneys for both the government and the defendant all questioned Dr. Parker.

Basham then offered the testimony of Dr. Thomas Hyde, a behavioral neurologist who had theretofore been unavailable to testify as to competency, but whose availability was arranged after it was determined that Dr. Parker would testify on the competency issue. After hearing from both experts, as well as counsel, on the competency issue, the court found Basham competent to proceed with the hearing, and later memorialized its findings in an order dated November 11, 2012. ECF No. 1550.

Later that same day, Basham left the hearing room where he was incarcerated in Terre Haute, indicating his desire not to further participate in the proceedings. On the third day, he reappeared for a brief portion of the testimony, but then left the satellite hearing room and did not return.[9]

---

[8] As noted previously, Dr. Parker had already studied Basham's records and examined him in connection with the aborted effort to drop his appeal.

[9] When the hearing resumed on December 3, 2012, the court made the same arrangements for Basham to participate: a hearing room was made available and an attorney associated with Basham's § 2255 counsel was stationed in the room to assist Basham. Telephonic communications were also provided. Just

After the competency issue was resolved, the court proceeded to hear testimony from five witnesses over a six-day period ending on Thursday, October 18, 2012. The parties and the court had previously agreed to adjourn the hearing at the conclusion of this testimony and resume the hearing on December 3, 2012, to hear from three additional witnesses who, for various reasons, were not available to testify in the first segment of the evidentiary hearing.

When the hearing resumed on December 3, 2012, the court heard two days of testimony from the additional witnesses. The court then heard argument from counsel. Upon the conclusion of the evidentiary hearing, the court took the matter under advisement.[10] This order serves to announce the court's ruling on all thirty-two claims for relief.

As noted above, the court determined that an evidentiary hearing was necessary because factual disputes were present in at least some of the thirty-two claims for relief asserted by Basham.

Although the court heard from eight witnesses, the testimony of those witnesses, for the most part, did not involve disputed factual matters. There were few factual issues presented amongst the thirty-two claims raised by Basham in his § 2255 petition. In large measure, the issues raised by Basham's petition involve conclusions of law.

Because of the predominance of legal questions in this case, the court has determined that it would serve no useful purpose, and would more likely be counterproductive, for this court to set out its factual findings separate and apart from its conclusions of law. A more

---

as he had done with the first portion of the evidentiary hearing, Basham elected not to participate.

[10] Subsequent to the evidentiary hearings, the court requested and received additional briefings on two issues. See ECF Nos. 1570, 1572.

practical means for the court to comply with the mandates of 28 U.S.C. § 2255 is for the

court to proceed through the claims asserted by Basham in the order in which they are raised

in the petition.  Where a factual issue is squarely presented by one of Basham's claims, the

court will resolve that factual dispute with a factual finding embedded within the discussion

of the claim at issue.  All other aspects of this court's order constitute this court's conclusions

of law.[11]

## § 2255 CLAIMS

### *Standard of Review for Ineffective Assistance of Counsel Claims*

The Supreme Court has held that to establish ineffective assistance a petitioner must

show both that his attorney's performance was objectively deficient and that such deficient

performance prejudiced his defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Specifically, the Supreme Court stated:

> A convicted defendant's claim that counsel's assistance was so defective as to
> require reversal of a conviction or . . . sentence has two components. First, the
> defendant must show that counsel's performance was deficient. This requires
> showing that counsel made errors so serious that counsel was not functioning
> as the "counsel" guaranteed the defendant by the Sixth Amendment. Second,
> the defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as to
> deprive the defendant of a fair trial, a trial whose result is reliable. Unless a
> defendant makes both showings, it cannot be said that the conviction or . . .
> sentence resulted from a breakdown in the adversary process that renders the
> result unreliable.

*Id*.  It is axiomatic that if the claim or claims that counsel failed to raise are devoid of legal

merit, a defendant suffers no prejudice and cannot establish a claim of ineffective assistance

---

[11]  Although the Fourth Circuit has never squarely addressed the issue, several other circuits have concluded that a separate listing of findings of facts followed by a separate listing of conclusions of law is not required. *See, e.g.*, *United States v. Perera*, 932 F.2d 973, 1991 WL 73709 (9th Cir. 1991) (unpublished).

of counsel. *Id*. In a case where a defendant enters a plea of guilty, the defendant in order to obtain § 2255 relief must show that (1) his or her counsel's representation fell below an objective standard of reasonableness demanded of attorneys in criminal cases; and (2) there is a reasonable probability that, but for counsel's errors, he or she would have proceeded to trial instead of pleading guilty. *See Hill v. Lockhart*, 474 U.S. 52, 56–59 (1985).

The defendant bears the burden of proof as to both prongs of the *Strickland* standard. First, the defendant must show that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688. Courts should be deferential in this inquiry, and have "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The defendant must therefore overcome the presumption that the representation "might be considered sound trial strategy." *Id*. (citation and internal quotation marks omitted).

Second, the defendant must demonstrate that counsel's inadequate performance prejudiced him. *Id*. at 687. Thus, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability, in turn, is defined as "a probability sufficient to undermine confidence in the outcome." *Id*. Additionally, courts may bypass the performance prong and proceed directly to the prejudice prong when it is easier to dispose of the case for lack of prejudice. *Id.* at 697.

<div align="center">

CLAIMS 1, 11, 12 &18:
ISSUES ARISING OUT OF BASHAM'S STATEMENT
TO SHERIFF HEWETT ABOUT "THE STRAP"

</div>

*Introduction*

These claims are all interrelated, and the court will therefore discuss them together. Claim 1 alleges that Basham was denied effective assistance of counsel when his then-lawyers (Littlejohn and Monckton) permitted him to speak with Sheriff Ronald Hewett during the November 28, 2002 search for Donovan's body outside their presence. During this conversation, Basham intimated to Sheriff Hewett about how Donovan was killed with the strap of a Liz Claiborne purse.

Claim 11 contends that the government engaged in misconduct when it failed to correct Sheriff Hewett's testimony about the strap that the government knew to be false in violation of the government's obligations under *Napue v. Illinois*, 360 U.S. 264 (1959).

Claim 12 faults Basham's appellate attorneys for failing to raise on appeal the issue of the government's alleged misconduct regarding Sheriff Hewett's testimony on the strap.

Claim 18 challenges Basham's trial counsel in terms of their cross-examination of Hewett and suggests that their cross-examination elicited damaging testimony from Hewett that had not been brought out on direct.

Claim 23, which also relates to the strap testimony, is discussed later in this order. That claim contends that Basham's due process rights were violated because the government presented a theory of the case that was inconsistent with the theory it presented at Fulks's trial, specifically in regard to which defendant used the strap to strangle Donovan.

The events leading up to, and the testimony concerning, Basham's statement to Hewett regarding the strap are discussed briefly in the introductory section of this order, but they merit more extended development here.

After the seventeen-day crime spree, Basham was arrested in Kentucky. There, he was provided with state-appointed counsel, and he was allowed to make statements to law enforcement regarding his involvement with Donovan's abduction and murder in South Carolina. As noted above, Basham, through counsel, had also informed investigators of his participation in the Samantha Burns murder. By this time, law enforcement authorities had also obtained a mirandized statement from Basham that he and Fulks abducted Donovan in the Walmart parking lot on November 14, 2002 and used her car as an escape vehicle. *See* Tr. 2/24/04, ECF No. 698 at 51–52, 57, 52, 80–81; Govt. Trial Brief, ECF No. 751 at 12–16. In other words, a strong case against Basham was beginning to coalesce even before the search for Donovan began and before Basham made the disputed statements to Sheriff Hewett.

Because it was possible that Donovan might still be alive, the FBI eventually transported Basham to South Carolina on Wednesday, November 27, 2002 and allowed him to participate in the following day's search for Donovan. A federal magistrate judge appointed Basham death penalty-qualified counsel, Littlejohn and Monckton. As indicated previously in this order, as soon as they were appointed, Littlejohn and Monckton were called into action, and they quickly concluded that because of the overwhelming evidence that had already been gathered against their client, the best way to avoid the death penalty was to allow Basham to help find Donovan, in the outside hope that she was still alive or, failing at that, to help find her remains so that her family could have some degree of closure.

From the outset, Assistant United States Attorney (AUSA) Rose Mary Parham made it clear to defense counsel that because of the strength of the government's case, any efforts by Basham to help with the search would have to be made with no promise of anything in return by the government. That is to say, there was no concession that the government would not seek the death penalty in return for Basham's assistance, nor was there any other type of reward suggested to Basham or his counsel. Faced with the stark reality that their client had essentially admitted his involvement in the abduction, rape, and murder of two women, Littlejohn and Monckton agreed to allow Basham to participate in the Thanksgiving Day search, hoping that Basham's cooperation with the government would yield some advantage to their client.

Early in the morning of Thanksgiving Day on November 28, 2002, Basham, Littlejohn, and Monckton joined at least six law enforcement officers and twenty volunteers in a search that centered around the Bee Tree Farms area of Brunswick County, North Carolina. On several occasions during the search, Basham, either speaking directly to law enforcement inside of the police van in which he was a passenger, or speaking through Littlejohn, his attorney, provided information regarding the search, which included a reference to the fact that Donovan was strangled with a Liz Claiborne purse strap and that locating the strap would enable the searchers to know they were at the right place.

At some point during the search, the van stopped and the participants got out to survey the area and attempt to locate the purse strap. During this stop, Basham walked away from Littlejohn and walked along with Sheriff Hewett. Although the two were never out of

Littlejohn's sight,[12] they apparently walked far enough away such that Littlejohn could not hear what was being said. According to Hewett's testimony at Basham's trial, while they were away from Littlejohn and Monckton, Basham became emotional and tears welled up in his eyes. Basham then demonstrated to Hewett how Alice Donovan had been strangled and how Basham had thrown the strap away in the woods.

Sometime during the early afternoon, law enforcement officers confronted Littlejohn and told him that they believed that Basham was not being truthful and that the search was to be called off. Littlejohn asked for an opportunity to discuss the issue with his client and returned to the officers with what he termed a "hypothetical" statement providing more detail about the murder of Donovan. It was this hypothetical statement that caused the court to disqualify Littlejohn and Monckton from further representation. At the time, it appeared to the court that the hypothetical statement might be admissible at trial against Basham. Ultimately, even though the court disqualified Littlejohn and Monckton, the court did not allow Littlejohn's hypothetical statement into evidence at Basham's trial. ECF No. 691 at 4–5.

One final statement Basham made during the search bears mention. At some point during the van ride, a deer ran in front of the vehicle and Basham spontaneously stated, with no prompting from law enforcement or Littlejohn, "You know I have never even killed a deer and here I have . . . ." At that point, Littlejohn put his hand on Basham's knee and cautioned him to stop speaking.

---

[12] Referring to testimony by Sheriff Hewett, Tr. 2/25/04, ECF No. 330 at 67, 83, Swerling at one point estimated this distance to be "25 or 30 feet," *id*. at 83. However, the court has performed an independent measurement and estimates it to be approximately forty-five feet.

Sheriff Hewett's testimony regarding Basham's statement about the strap is the primary focus of Claims 1, 11, 12, 18, and 23. Sheriff Hewett discussed the strap on four different occasions: on direct and on cross-examination at the *Jackson v. Denno* hearing, and on direct and cross-examination at Basham's trial.

*Hewett's Testimony at the Jackson v. Denno Hearing*

Hewett testified at the *Jackson v. Denno* hearing and, on direct examination, gave the following narrative of the interaction between himself and Basham at the wood line of the cemetery when the strap was discussed:

A.  I believe, we walked back down to the cemetery. Brandon Basham, he was shackled at his hands, belly chained around the waist, and shackled at his feet. He walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek. He showed me the length of the strap —

Q.  How did he do that?

A.  May I demonstrate?

Q.  Certainly.

A.  Like this. Because he couldn't pull his hands very — very far apart, he was shackled. He showed me the length of the strap. Says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods. He then demonstrated the manner in which he threw it in the woods.

Q.  Would you stand up and do that for the court so the record is complete as well?

A.  Yes, sir, I will. We were standing at the corner of the cemetery, Brandon Basham is chained. I said, "Branden, how did you do that?" And he said, "Like that. And I threw it over there."

Tr. 2/25/04, ECF No. 330 at 66–67.

On cross-examination at the *Jackson v. Denno* hearing, in response to questioning from defense counsel, Hewett returned to the subject of the strap:

Q.    I'm talking about the actual details of what actually happened.

A.    Yes, sir, he also did. "At the cemetery Basham told me personally, 'We pulled right in there and cut to the left behind the fence.'"[13]

Q.    Okay.

A.    "Basham described the Liz Claiborne 16 to 20-inch strap."

Q.    Okay.

A.    "And indicated by this motion that it was used to strangle Alice Donovan."

Q.    Okay. It wasn't said, it wasn't verbalized, it was just used in —

A.    Yes, sir.

Q.    Okay. And that is in your report?

A.    Yes, sir . . . .

*Id.* at 77–78.

*Hewett's Testimony at Basham's Trial*

Fulks's trial occurred first, and during that trial, Fulks's attorneys attempted to have the court admit Basham's "deer statement" because it would have suggested to the Fulks jury that Basham had essentially admitted being Alice Donovan's killer. In arguing against admitting the deer statement, AUSA Johnny Gasser pointed out the unfairness of admitting Basham's allegedly inculpatory deer statement without admitting all of the rest of his

---

[13]  The quotation marks appear in the court transcript because Hewett was reading from his notes.

statements implicating Fulks with the murder. In doing so, Gasser pointed out that Basham had told law enforcement authorities that, notwithstanding the deer statement, *Fulks* had strangled Donovan with the purse strap. Notably, all of this discussion occurred outside the presence of the Fulks jury.

The court ultimately agreed with the government and sustained the government's objection to the admission of Basham's statement regarding the deer. It struck the court in Fulks's trial as unfair to admit one statement by Basham (the deer statement, which arguably admitted complicity in killing Donovan), while disallowing Basham's several other statements to law enforcement officers indicating just the opposite, to wit: that Fulks had been the killer. Significantly, Hewett was not subpoenaed as a witness at Fulks's trial.

Four months later at Basham's trial, however, Hewett did testify. Hewett provided details regarding the organization of the search team after he received a call from FBI Agent Jeff Long who had been relaying information from both Basham and Richard Hughes, Basham's attorney in Kentucky. Hewett confirmed AUSA Parham's testimony that the government made no promises to Basham in return for Basham's cooperation in the search.

Hewett also testified as to several substantive matters that Basham discussed during the search. For example, at one point Basham and Littlejohn huddled together and whispered to each other. Following this conversation, Littlejohn indicated his agreement for Basham to make a statement to the officers. Following this conference, Basham told the officers, "You need to be looking for a strap. It is about this long." Basham then added, "It has 'Liz Claiborne' on the strap." Tr. 9/27/04, ECF No. 330 at 27–28. Additionally, Hewett testified that Basham said, "Back at the cemetery. You need to go back to the cemetery and look for

<div align="right">
29<br>
**JA 0205**
</div>

that strap." *Id*. He testified that Basham spread his shackled hands apart approximately sixteen to twenty inches to describe how long the strap was. When the group arrived back at the cemetery at the Bee Tree Farms area, Basham told the group to stop and indicated that in his opinion, they were at the right place. While at the cemetery, Basham stated, again in the presence of his attorney, that after dragging Donovan's body out of the car, he and Fulks pulled her into the woods and covered the body with leaves. *Id*. at 32.

Hewett then testified, on direct, regarding the now-hotly disputed subject of Basham's demonstration of how the strap was either used or thrown away following the murder. Because Hewett's precise testimony is critical to the issues under review, the court sets forth the testimony verbatim. Hewett's testimony in response to direct examination from AUSA Johnny Gasser was as follows:

> Q. And what did he describe to you on Thanksgiving Day, the location that you have just described to the jury, tell this jury what Brandon Basham described to you as to what happened to Alice Donovan.
>
> A. May I?
>
> Q. You can demonstrate, if he demonstrated.
>
> A. Brandon Basham had his hands like this once again. I have explained to you how he was shackled. *He took his hands together and did this (Indicating)*, "Then I threw it over there. Check in those trees right over there." Which, if you will look at how I am facing you, I am facing the semicircle. So, we walked to the area right here at the corner, and that is where he did this and did that. He couldn't throw very far because he was shackled. That is when he said, "Check over there." At that time, Sergeant Parker and Sergeant Sarvis, those were the two individuals that were with me, they began to look again, but that area had already been searched, and the strap was not to be found.

*Id*. at 39–40 (emphasis added).

Also on direct, Hewett testified as to the deer statement made by Basham in the van while the search was being conducted.[14]

Defense attorney Greg Harris cross-examined Sheriff Hewett. Armed with the notes Sheriff Hewett had made regarding the search, together with statements Sheriff Hewett made to FBI agents who interviewed him, Harris knew that there was nothing in the notes indicating that Basham was referring to himself as the person who actually strangled Donovan when Basham demonstrated with the strap. Because the testimony of Hewett regarding Basham's demonstration of how the strap was thrown could be somewhat damaging, Harris apparently attempted to confirm what the notes indicated. The colloquy went as follows:

> Q.    Now, at the cemetery, and I would like you to refer to your notes if that will help you.
>
> A.    Okay.
>
> Q.    There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A.    No, sir. He did not tell me he used the strap. *He demonstrated, though*.
>
> Q.    He demonstrated?
>
> A.    Yes, sir.
>
> Q.    Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A.    That is true because he didn't say. *He showed*.

---

[14] Although the court excluded the deer statement in Fulks's trial, the court admitted it in Basham's trial because under the Federal Rules of Evidence, it was an admission by a party opponent. *See* Fed.R.Evid. 801(d)(2)(a).

*Id*. at 53–54 (emphasis added).

During summation, AUSA Gasser sought to highlight Hewett's testimony regarding the strap as follows:

> Sheriff Hewett says he [Basham] didn't say "I killed Alice Donovan." Sheriff Hewett said to you in this courtroom in front of you, the jury, "No, he demonstrated it."
>
> * * *
>
> Ladies and Gentlemen, I wanted to finish with that because how would you go back in your jury room after listening to Sheriff Hewett and after seeing Sheriff Hewett demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and the government submits those two witnesses and that limited testimony, alone, seals the deal.

Tr. 9/29/04, ECF No. 330 at 81–82.

As can be seen from the above, Sheriff Hewett's testimony was consistently ambiguous. Hewett was clear, using the active voice, to say that Basham showed how he (Basham) threw the strap away. Hewett's testimony regarding the motion used to strangle Donovan was much less clear, usually involving the passive voice.[15] Moreover, on two of the four occasions that he was asked about the strap, Hewett actually initiated the idea of demonstrating (rather than describing) to the attorney who was examining him.

---

[15] Sheriff Hewett did not write a report of the events of that day, but rather was interviewed by Lt. Crocker of Brunswick County, who then prepared a report about the events. Even Lt. Crocker's report of his interview with Hewett was vague and used the passive voice in describing the purse strap. ("Basham indicated how the (victim's) pocket book strap *was* used."). Nowhere in Lt. Crocker's report does it state that Basham indicated how *he* killed Ms. Donovan. The report also states only that "Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery," and that Basham responded, "It is," in response to Hewett's question, "Is this where it happened?" Pet. Ex. 2, attached to Pet. at 00818. (Basham filed exhibits with his original § 2255 Petition and these exhibit numbers do not correspond to the petitioner's exhibit list from the § 2255 hearing. The court has attempted to differentiate these exhibits with the preceding cumbersome citation.)

In summary, Hewett addressed the interaction with Basham regarding the strap on four occasions. The first time, direct examination at the *Jackson v. Denno* hearing, Hewett referenced only Basham's motion made to show how the strap was thrown away. On cross-examination at that same hearing, Hewett included a cryptic reference to the motion that "was used to strangle Alice Donovan." On direct at trial, Hewett's reference was ambiguous ("he took his hands together and did this [indicating] 'then I threw it over there.'"). Finally, on cross-examination at trial, when Harris tried to pin Hewett down on the fact that his notes did not reflect that Basham referred to himself as the cause of Donovan's death when Basham demonstrated the strangling motion, Hewett seemed to interject the most damaging of his four statements. He suggested that although Basham did not *say* that he used a strangling motion to kill Donovan, "*he demonstrated though*." At the § 2255 evidentiary hearing, neither side was able to provide a specific reason why both the government and the defendant shied away from the opportunity to ask Hewett to be more specific.

It thus appears that Basham used his hands to demonstrate two motions to Hewett: (1) a motion describing the strangling; and (2) a motion describing the tossing of the strap into the woods. The tossing motion is not in dispute in these claims; both sides apparently agree that Basham was indicating that it was he who did the tossing of the strap. Moreover, it was essentially cumulative to the statement made earlier in the van with Littlejohn's advance approval, that locating a Liz Claiborne strap would help locate the body.

It is the other motion made by Basham—apparently depicting the strangling itself—that is the subject of Claims 1, 11, 12, 18, and 23. For ease of reference in the duration of this order, the court will refer to Hewett's testimony about the strangling motion

(i.e., the disputed part of Hewett's testimony) as "the strap" testimony.

On this ambiguous record, the court must delve into the interrelated issues presented in Claims 1, 11, 12, and 18.

<div align="center">

CLAIM 1:
BASHAM'S DEMONSTRATION TO SHERIFF HEWETT
</div>

In Claim 1, Basham contends that he was denied the effective assistance of counsel when his lawyers permitted him to speak with Sheriff Hewett outside of their presence and failed to advise Basham that his statements could be used against him.

At issue in this claim is the highly controversial strap statement Basham made to Hewett when the two of them, accompanied by two deputy sheriffs, wandered approximately forty-five feet away from Littlejohn during one of the searches at the cemetery. According to Basham, the admission he made to Hewett (which, viewed in the light most favorable to Basham for purposes of this motion, indicates that Basham admitted strangling Donovan) was the lynchpin of the government's case and was relied upon heavily in closing argument to convict Basham and secure the death penalty.

It should be noted at the outset that it was Littlejohn's understanding and intention that Basham was to provide "directional information only" during the search for Alice Donovan's body on Thanksgiving Day. Littlejohn and Monckton both testified at the § 2255 hearing that they were not aware of the fact that Basham had made the strap statement to Sheriff Hewett when he wandered off alone with Sheriff Hewett.[16]

---

[16] At the § 2255 hearing, Swerling could offer no explanation as to why Littlejohn and Monckton allowed Basham to venture away from them.

In opposing the ineffectiveness claim asserted in Claim 1, the government points out that prior to making the strap statement to Sheriff Hewett, Basham had been Mirandized at least four times.  As discussed in more detail below with respect to Claim 2, it appears that Basham received and acknowledged advice of his rights at least *five* times.   In any event, the government then asserts that, due to the unique circumstances surrounding Basham's involvement in the search, counsel had no obligation to "hold Basham's hand" during the eight-hour search.

In *Strickland*, the Supreme Court provided a "number of practical considerations [which] are important for . . . adjudicating a claim of actual ineffectiveness of counsel." *Strickland*, 466 U.S. at 696.  For example, the Court explained that although it "discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.  Consequently, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.*

As the Court explained in *Strickland*:

When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent that it reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.* at 695.

An analysis of the degree of prejudice which resulted from Basham's strap statement and Hewett's testimony of same should begin with a careful examination of the statement itself. For some reason, perplexing as it is to a court reviewing a cold record more than eight years after the fact, Hewett was coy in his description of his interaction with Basham in counsel's absence. The first time he was asked, Hewett only said that Basham showed him how he threw the strap into the woods. The next two times he was asked, Hewett's testimony was unclear regarding the strangling motion apparently demonstrated by Hewett in the courtroom.

On the fourth and final statement, when Harris questioned Hewett about whether the law enforcement notes revealed that Basham had *told* the officers that Basham used the strap to strangle Donovan, Hewett's response still was not as clear as it could have been. Hewett responded, "He didn't tell me he used the strap. He demonstrated, though." Had Hewett's testimony been slightly more forthcoming (e.g., "He demonstrated *how he did it*, though"), the import of the testimony would be much easier to gauge. As the record now stands, however, it is somewhat difficult to evaluate the degree of prejudice arising from the alleged constitutional error because the testimony is not as clear as it could have been.

Basham argues that prejudice is shown in Claim 1 by simply referring to portions of the closing arguments AUSA Gasser made in the guilt and penalty phases of Basham's trial. In the guilt phase, Gasser referred the jury both to Hewett's testimony and to the testimony of Clifford Jay, who testified that Basham told him, "We killed them." Gasser then told the jury that "those two witnesses and that limited testimony alone, seals the deal." Tr. 9/29/04,

ECF. No. 951 at 81–82.  In the penalty phase of the trial, Gasser once again referred to Hewett's strap testimony, but only as part of a wide-ranging discussion of all of the damaging evidence against Basham.  Tr. 11/1/04, ECF No. 971 at 57.  Significantly, at the penalty phase, Gasser did not suggest to the jury that the Hewett testimony "seal[ed] the deal."

Important for purposes of the claim under consideration, however, is the fact that immediately preceding the passage quoted above, Gasser—in referring to the statement about the strap—was faithful to the record, using the passive voice both times he referred to the strap being used to strangle Donovan.  *See* Tr. 9/29/04, ECF No. 951 at 81–82) (". . . after listening to Sheriff Hewett and after seeing Sheriff Hewett demonstrate how Brandon Basham demonstrated how Alice Donovan *was* strangled . . .") (emphasis added);  Tr. 11/1/04, ECF No. 971 at 57 ("He [Basham] is shackled, he describes a purse strap, and he demonstrates to Sheriff Hewett how Alice Donovan *was* strangled.") (emphasis added). Thus, to the extent there was an ambiguity in Sheriff Hewett's testimony about the strangling motion and what Basham said about it, Gasser did not take advantage of that ambiguity in his summation, simply indicating in summation following both the guilt and penalty phases, that Basham demonstrated how Donovan "was" strangled.

After carefully reviewing the entirety of the trial record in this case, the court concludes that whatever prejudice inured from the Sheriff Hewett strap testimony, is not sufficient to satisfy Basham's burden under the second prong of *Strickland.*  If Littlejohn had successfully prevented Basham from making the purse strap remark to Sheriff Hewett (thereby eliminating that testimony from the trial), the evidence against Basham would have still been overwhelming, as the Fourth Circuit Court of Appeals noted on three occasions in

the direct appeal.

Moreover, earlier in the search Basham had, of his own volition and with Littlejohn's express consent, told the officers that Donovan was strangled with a Liz Claiborne purse strap. At that moment, Basham was once again changing his story from previous versions describing how Donovan was killed and was also admitting he was at least present when she was killed. Basham also made an inculpatory statement, while Littlejohn was present, when Basham described how he and Fulks dragged the body into the woods and covered it with leaves.

Gasser's summation during the guilt phase that the Clifford Jay statement, coupled with Basham's strap statement to Hewett, "seals the deal" cannot be read to suggest that the government's entire case would rise or fall on those two items of evidence alone. Indeed, in his lengthy summation, Gasser canvassed the considerable trial record, going into detail about the many crimes Basham and Fulks committed during their seventeen-day crime spree.

It should also be noted that from the very beginning of jury selection, the government took the position that it was not necessary to prove who exactly committed the specific act that resulted in Donovan's death. Much of the questioning and debate during jury selection centered on the question of whether jurors could conscientiously follow the law in a case where the government was not able to prove with certainty which of the two defendants "struck the fatal blow." Moreover, as discussed elsewhere in this order (*see* Claims 16 and 23), the government argued to the jury that Basham and Fulks worked together "in unison" to commit their crimes, even going so far as to suggest that neither one could have succeeded without the other, and concluding that "[t]hey are equally culpable." Tr. 11/1/04, ECF No.

971 at 44.

Indeed, the Fourth Circuit Court of Appeals, on direct review of Fulks's conviction, stated:

> Viewed in the context of the entirety of both proceedings, the government's core theory was that Fulks and Basham were equally culpable in Donovan's murder and similarly deserving of the death penalty regardless of which one ended her life.

*Fulks*, 683 F.3d at 524.

*The Overwhelming Evidence Against Basham*

Finally, the government's case against Basham, viewed in its totality, was overwhelming. Basham and Fulks escaped from a jail facility in Kentucky and began a seventeen-day crime spree that spanned seven states from Michigan to South Carolina. During this time, they worked together and abducted, raped, and killed nineteen-year-old Samantha Burns in West Virginia, and three days later they abducted Alice Donovan in an episode depicted very clearly on the Walmart security videotape. Before raping and killing her, they forced Donovan to ride in the back seat of her own car in a sojourn into the State of North Carolina. Basham and Fulks disposed of both women's bodies in such a manner that Donovan's remains were not found until approximately six years after her murder, and Burns's remains have never been located.

Lest Basham's involvement in the murder of both women be questioned, it should be remembered that Basham told Clifford Jay, who had counseled Basham in school and remained a father figure to Basham "We killed them." Tr. 9/27/04, ECF No. 949 at 228–29. When being interviewed in Kentucky with counsel Richard Hughes at his side, Basham drew

a map for law enforcement interviewing him and indicated that the map showed where he

and Fulks had done "their thing."  Tr. 9/24/04, ECF No. 948 at 217.

In addition to these two women, several other individuals, including some who naively

sought to help Basham and Fulks, nearly suffered the same fate.  For example:

- Shortly after their escape, Basham and Fulks confronted James Hawkins in his home, convinced him that their car had broken down, and asked for a ride.  At some point during the ride, Basham and Fulks revealed their true intentions, then took Hawkins deep into the woods, and both Basham and Fulks participated in tying Hawkins to a tree where they left him overnight when the temperature was in the low 30 degrees. Fortunately, Hawkins was able to free himself fifteen hours later. Tr. 9/13/04, ECF No. 934 at 186–234; Tr. 9/14/04, ECF No. 936 at 11–25.

- On November 8, 2002, in Sturgis, Michigan, after Basham and Roddy, Severance's friend, had separated from Fulks and Severance (Fulks's girlfriend), two police officers began knocking on doors at the hotel where Basham and Roddy were staying. Basham opened his room door, saw the officers, and then closed the door and cocked his .22 caliber revolver that he had recently stolen.  Eventually, the officers left, and Basham made a comment to Roddy that "I was about to shoot me a mother-f***er cop, right.  I was going to blow the f***ing cop away." Tr. 9/15/04, ECF No. 936 at 180.

- The following day, with Basham and Fulks still separated, Basham met a group of teenagers in a parking lot of the local Kmart store and reported to Roddy that one of the teens had some money and that Basham wanted to kill him for it.  After purchasing sundries with stolen checks, Basham invited the teenagers back to the hotel room. Severance and Fulks arrived back at the hotel shortly thereafter, and the teenagers left before Basham could carry out his announced plan to kill the teenagers and steal from them.  *Id*. at 81–82.

- When attempting to steal firearms from the home of Conway, South Carolina resident Sam Jordan, Basham and Fulks encountered Carl Jordan (Sam's Father).  Basham and Fulks then pursued Carl Jordan and Fulks fired shots in Carl Jordan's direction.  Tr. 9/17/04, ECF No. 938 at 29–60.

- On the day he was apprehended, Basham had approached Deanna Francis's fifteen-year-old daughter at the Ashland Mall in Ashland, Kentucky, pointed a gun to the daughter's side of the car, and attempted to enter the car. Only after he observed that the young girl was talking on her cell phone did Basham back off and indicate that he had made a mistake. After Deanna Francis called the police, Ashland Police officer Matt Davis answered the dispatch, located Basham at the Ashland Mall, and began a foot chase. During the chase, Basham drew a gun, first fired a shot in the air, and then fired directly at Officer Davis. Tr. 9/27/04, ECF No. 949 at 246–270.

In addition to the foregoing victims and potential victims, the record at trial indicated numerous other citizens whose vehicles, license plates, firearms, pocket books, credit cards, checkbooks, and identities Basham and Fulks stole. Tr. 9/14/04, ECF No. 936 at 110–298; 9/15/04, ECF No. 937 at 10–159; Tr. 9/20/04, ECF No. 941 at 40–141; Tr. 9/21/04, ECF No. 19–84. In addition, Basham displayed an affinity for keeping belongings of his victims. For example, Donovan's knife was found in Basham's possession when he was arrested, Tr. 9/24/04, ECF No. 948 at 34–35 and he wore Burns's ring on a chain around his neck, Tr. 9/14/04, ECF No. 936 at 209.

When apprehended, Basham lied to authorities about his identity and then began giving a series of ever-changing stories about what happened to Donovan. First, Basham indicated to law enforcement that Donovan was still alive and was with Fulks. Tr. 9/24/04, ECF No. 948 at 148–49. Then he said that Fulks had dropped him off and had taken Donovan to a resort area where Fulks had killed her and left her. *Id*. at 177–79. Only later in the investigation did Basham reveal that he had been a participant in Donovan's abduction and murder, acknowledging, with the express consent of his attorney, that he had thrown into the woods the purse strap that was used to strangle Donovan (thereby revealing that he was

present at the time of the murder) and also that he and Fulks had dragged Donovan's body fifty feet off the roadway and had covered it with leaves.  Tr. 9/27/04, ECF. No. 949 at 32.

Basham's behavior during the trial did not serve him well.  In a case where "future dangerousness" to prison officials is one factor a jury may consider in deciding between the death penalty and life imprisonment, Basham, acting contrary to the advice of his attorneys, attempted to insist on his "right" to walk away from the trial, causing a scuffle that required a full complement of eight deputy marshals to subdue him.  Tr. 9/20/04, ECF No. 941 at 148–53.  In the penalty phase of the trial, the jury saw the videotape of this scuffle and also heard the audio tape of Basham shouting threats to the deputy marshals involved, minus the gratuitous expletives that the court redacted for Basham's benefit.[17]

Also relevant to the question of whether Basham could adapt satisfactorily to prison life if given a life sentence instead of the death penalty are Basham's own words to prison guards.  The jury heard the following during trial:  While Basham was incarcerated at Butner FCI, he told a nurse: "I am going to f*** you up the ass, Ms. Miosi. I am going to kill you, psych bitch."  Tr. 10/15/04, ECF No. 957 at 91.  He scuffled with officers at Butner, threatened correctional officer Lt. Ledford, and told officers: "I will show you mother f***ers how to cause pain. You don't know how to cause pain." *Id*. at 14.  He also bragged

---

[17]  This altercation was a direct result of the court's reversal of course in its attempt to assist Basham in paying attention and staying alert during the trial.  The court first promised the defendant smokeless tobacco (a substance undoubtedly unavailable to defendants serving life sentences in federal correctional institutions) and then told the defendant that although he would not be able to use that substance during the trial, it would substitute any number of other legal stimulants he desired.  Tr. 10/18/04, ECF No. 959 at 34–48.  After the scuffle, the court was provided with a note from the United States Marshal indicating that Basham had told another deputy marshal, prior to the scuffle, that he (Basham) did not care about having the smokeless tobacco, but rather he was attempting to aggravate Deputy Marshal Riley, an African-American. The court did not allow this racially-tinged aspect of the episode to be presented to the jury.

to prison personnel that a jury would never find him guilty, Tr. 10/14/04, ECF No. 956 at

206, and that "[t]he worst they can do is give me life."  Tr. 10/15/04, ECF No. 957 at 21.

Five of the events related above (the escape, in addition to the Samantha Burns, Carl

Jordan, James Hawkins, and Ashland Kentucky police officer episodes) were all listed on the

verdict form as nonstatutory aggravating factors, and as to all five factors, the jury found

"unanimously and beyond a reasonable doubt" that they occurred.  ECF No. 805 at 4.  All

of the remaining factual assertions above were essentially undisputed at trial, though they

were not the subject of special findings by the jury.

In explaining how courts should analyze the second *Strickland* prong, the Supreme

Court has provided the following helpful guidelines:

> In making this determination, a court hearing an ineffectiveness claim must
> consider the totality of the evidence before the judge or jury.  Some of the
> factual findings will have been unaffected by the errors, and factual findings
> that were affected will have been affected in different ways.  Some errors will
> have had a pervasive effect on the inferences to be drawn from the evidence,
> altering the entire evidentiary picture, and some will have had an isolated,
> trivial effect.  *Moreover, a verdict or conclusion only weakly supported by the
> record is more likely to have been affected by errors than one with
> overwhelming record support.*  Taking the unaffected findings as a given, and
> taking due account of the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant has met the burden of
> showing that the decision reached would reasonably likely have been different
> absent the errors.

*Strickland*, 467 U.S. at 695–96 (emphasis added).

Using the approach directed by the Supreme Court in *Strickland*, this court must

determine the effect, if any, of the tainted evidence upon the aggravating and mitigating

factors considered by the jury.  Had Littlejohn prevented Basham from talking to Sheriff

Hewett and thus demonstrating to Sheriff Hewett how Donovan was strangled with the Liz

Claiborne purse strap, then that portion of Hewett's testimony would not have been part of the trial record. What would have been left for the jury, however, was the issue of Basham's demonstration of the throwing motion[18] and other testimony indicating that Basham was present when Donovan was killed. For example, the jury would still have heard testimony about Basham and Fulks, together, dragging the body fifty feet off the roadway and covering it with leaves. They would have also heard Clifford Jay's testimony relaying how Basham told Jay, "We killed them." Significantly, elimination of the disputed portion of the strap statement would not have led the jury to the conclusion that Fulks was the one who strangled Donovan. Instead, the jury would have been left with an absence of testimony on the question of who did the strangling and a complete record of Basham and Fulks's seventeen-day cascade of misdeeds, which included two rapes and murders and at least five other attempted or potential murders.

The net effect of disallowing the disputed portion of the Hewett testimony about Basham's purse strap statement is problematic. Had the strap statement not occurred, none of the statutory or nonstatutory aggravating factors unanimously found by the jury would have changed. The only potential impact that a removal of the strap testimony from the case would have had relates to one of the nonstatutory mitigating factors. Specifically, Nonstatutory Mitigating Factor No. 1 read as follows: "Brandon Leon Basham played a lesser role than Chadrick Evan Fulks in the kidnapping and carjacking of Alice Donovan." None of the jurors found this factor to have been proven. But, as has already been noted,

---

[18] The throwing motion was directly related to the search for the body, and counsel cannot be faulted for allowing Basham to make that part of the demonstration because it was within the guidelines established for Basham's participation.

elimination of the strap statement would not have told the jury that Fulks was the one who strangled Donovan, thus assigning a lesser role to Basham. Elimination of the strap testimony would have left the jury with no evidence as to who *used* the strap, but all of the other evidence regarding Basham's presence at the time of death (tossing the strap; moving and covering the body; relating to law enforcement where Basham and Fulks did "their thing"; telling Clifford Jay "We killed them"; etc.) would have remained the same. It is not certain, then, that elimination of the strap statement would have caused the jurors to attribute more weight to nonstatutory mitigating factor one.

Additionally, there were no aggravating factors, statutory or nonstatutory, included on the verdict form under which the jury could have found that Basham was more culpable than Fulks. The reason there was no such factor was that the government maintained a consistent position throughout both cases that both defendants were equally culpable. Had the verdict form included such an aggravating factor, and had the jury found this factor to have been proved, Basham's argument in this § 2255 petition would be much stronger. As the record now stands, however, the only effect would have been as to Nonstatutory Mitigating Factor 1, and even as to that single factor the impact would have been less than significant.

On this record then, the court concludes that Basham has not satisfied the second prong of *Strickland.* Considering, as *Strickland* requires, the "totality of the evidence before the . . . jury," *id*. at 695, the elimination of the strap testimony would have potentially affected but one of the nonstatutory factors considered by the jury in making its death penalty decision. Although the court cannot conclude that the effect would have been "isolated" or

"trivial" as mentioned in *Strickland, id*. at 696, the effect was not substantial. Even more important is the "overwhelming record support," *id*., justifying the death penalty in this case. After carefully and thoroughly analyzing the strap testimony and its potential impact on the verdict in this case, the court is left with the firm conclusion that Basham has been unable to show that "the decision reached [by the jury] would reasonably likely have been different absent the error[]." *Id*.

As the Fourth Circuit remarked in the direct appeal of Basham's conviction, "the Supreme Court has observed that 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Basham*, 561 F.3d 339 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). Even if the court were to assume that counsel were deficient in allowing Basham to leave their sides during the search, the error, viewed in the light of the totality of the circumstances in this lengthy and complex trial, does not rise to the level of prejudice required by *Strickland*. Accordingly, the court finds no merit to Claim 1.

<div align="center">

CLAIM 11:
GOVERNMENT'S ALLEGED INCONSISTENT POSITIONS
REGARDING THE STRAP STATEMENT

</div>

In Claim 11, Basham contends that the government engaged in misconduct when it failed to "correct" Sheriff Hewett's trial testimony about the strap statement that the government knew to be false in violation of the government's obligations under *Napue v. Illinois*, 360 U.S. 264 (1959).

<div align="center">

*Procedural Default*

</div>

As an initial proposition, the government contends that this matter is not properly before this court because Basham did not raise this issue on appeal. And, as the government

points out, an error can be attacked on collateral review only if first challenged on direct review. *United States v. Harris*, 183 F.3d 313, 317 (4th Cir. 1999). Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a federal habeas proceeding only if the defendant can show both cause for and actual prejudice from the default, or that he is actually innocent. *Id*.

In response, Basham contends that his appellate counsel were constitutionally ineffective under the standard established in *Strickland* for failing to raise this issue on appeal, and that, for this reason, cause is established for the procedural default. *Williams v. French*, 146 F.3d 203, 215 (4th Cir. 1998). The court agrees with the government that Basham cannot show that ineffective assistance of appellate counsel was the cause for the procedural default, thus his claims of witness and prosecutorial misconduct asserted in Claim 11 should be dismissed.

It is well-settled that reviewing courts must afford appellate counsel "the presumption that he decided which issues were most likely to afford relief on appeal." *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (citation omitted). "Counsel is not obligated to raise all non-frivolous issues on appeal." *Id*. "Winnowing out weaker arguments and focusing on issues more likely to prevail is the hallmark of effective appellate advocacy." *Id*. (quoting *Smith v. Murphy*, 477 U.S. 527, 536 (1986)). Generally, only when ignored issues are clearly stronger than those that were presented on appeal will a presumption of effective assistance of counsel be overcome. *Id*.

As noted earlier, Basham's appellate counsel raised six issues.[19] Basham cannot show that the issues of alleged witness perjury and prosecutorial misconduct are "clearly stronger than the ones presented." This court has reviewed the six issues that were taken up on appeal and finds that they all were superior to the issue asserted in Claim 11. Basham enjoyed the services of ten appellate counsel, including eight who were working on this case from the firm of Jenner & Block. The fact that these fine attorneys were unsuccessful in the direct appeal in no way signifies that they did not chose the strongest issues to appeal. Accordingly, the court does not find ineffective assistance of counsel in terms of issues not raised in the direct appeal of Basham's conviction to be sufficient to support his cause and prejudice argument.

Even if the issue of alleged prosecutorial misconduct was properly before the court, it has no merit. Basham suggests that in Fulks's trial, the government took the position that Hewett's testimony was that it was *Fulks* who used the strap to strangle Donovan, whereas in Basham's trial, the government took the exact opposite position. Close examination of the relevant text of the transcripts of the two trials, however, reveals that this was not the situation.

*Napue* prohibits the government from using testimony known to be false in a criminal case. Here, it is argued that Sheriff Hewett's testimony regarding Basham's demonstration of how Basham allegedly used the strap to strangle Donovan was false and that the government knew it. Basham also argues that Hewett's reference to the strap was a central component of the prosecution's closing argument in Basham's trial. Because of this, Basham

---

[19] *See* note 6, *supra*.

argues that the government knowingly used false testimony to obtain a death sentence, because the testimony and argument was directly contradictory to the theory advanced by the government at co-defendant Fulks's trial. In other words, Basham argues that "the government knew that Sheriff Hewett's testimony during cross-examination (indicating that Mr. Basham had been the actual killer of Ms. Donovan) was false." Pet. at 55–56. Thus, Basham asserts that the government violated its obligations under *Napue*.

As support for the argument that the government took the position at Fulks's trial that Hewett said that Fulks strangled Donovan, Basham points to the argument made by AUSA Johnny Gasser *outside of the jury's presence* that *Basham* had said that Fulks strangled Donovan. Gasser's statement was made while the court was hearing argument on whether it should admit Basham's deer statement at Fulks's trial. Fulks's defense team, quite obviously, desired to use Basham's deer statement because of the inculpatory connotations it contained. In arguing that the deer statement, in isolation, should not be admitted, Gasser was merely reminding the court that, notwithstanding the fact that Basham had made the deer statement, Basham had on numerous occasions indicated that Fulks was the killer. Thus, Gasser was suggesting to the court that the rule of completeness as set out in Fed. R. Evid. 106 would have required that if Basham's deer statement were admitted in the Fulks trial, the remainder of Basham's statements (which squarely indicated that Fulks was the killer) should have been admitted at Fulks's trial as well. Gasser's reliance on the rule of completeness during debate over an evidentiary issue does not, by any means, require a finding that at the Fulks trial the government adopted  Basham's self-serving statement that Fulks was the killer.

In Claim 11, Basham also references an April 22, 2003 appearance before the grand jury by FBI Agent Jeff Long, the agent in charge of the Basham investigation. In an attempt to obtain a superseding indictment against Basham, Long testified that, during the search of the Bee Tree Farms area on November 28, 2002, "Basham indicated, among other things, that Chadrick Fulks strangled Alice Donovan by the use of a purse strap." Pet. at 54. Basham points out that Long's testimony before the grand jury was consistent with the FBI 302 report he prepared immediately after the events of November 28, 2002. In that 302 report, Long wrote: "After Fulks raped her, Fulks used a purse strap, which was approximately eighteen inches long, and strangled Donovan." Pet. Ex. 3, attached to Pet.

Long's 302 report was not introduced as an exhibit at Basham's trial and merely memorialized Basham's self-serving statement during the investigation. In no way does it reveal an inconsistent position or false testimony employed by the government at Basham's trial.

Based on the above, Claim 11 has no merit.

CLAIM 12:
FAILURE TO APPEAL MISCONDUCT ALLEGED IN CLAIM 11

In Claim 12, Basham contends that his appellate attorneys negligently failed to raise in his direct appeal the issue of the government's alleged misconduct under *Napue v. Illinois*, 360 U.S. 264 (1959), in his direct appeal. In its analysis of Claim 11, the court has determined that Basham's appellate counsel were not ineffective for failing to raise the government's alleged misconduct. For this reason, Claim 12 must fail as well.

CLAIM 18:

HARRIS'S CROSS-EXAMINATION OF SHERIFF HEWETT

In Claim 18, Basham contends that defense attorney Greg Harris elicited damaging evidence on his cross-examination of Hewett, at trial, without a "sound strategy." Basham argues that this falls well below the objective standard of reasonableness of defense attorneys who cross-examine and that counsel was ineffective under *Strickland*.

This claim presents yet another issue arising from Sheriff Hewett's ambiguous testimony about the strap statement. As noted in the introductory section, during both the *Jackson v. Denno* hearing, and during his direct examination at trial, Hewett was very clear that Basham described to Hewett how Basham had thrown the strap into the woods after it was used to strangle Donovan. Beyond that statement, however, Hewett's strap testimony was ambiguous, to say the least. The one thing that was evident, however, was that nothing in the law enforcement notes[20] suggest that Basham had indicated or demonstrated to Sheriff Hewett how *he* (Basham) used the strap to strangle Alice Donovan.

Thus, when he began his cross-examination of Hewett, Harris understandably did not want to leave an unclear record as to exactly what Sheriff Hewett's testimony was regarding what Basham said about the strap being used to kill Donovan. It should be remembered that up until this point, Hewett's only testimony regarding the strap, which came out on direct, was that Basham had demonstrated to Hewett how Basham threw the strap away, coupled with Hewett's cryptic statement ["He took his hands together and did this (Indicating)"].

---

[20] As previously mentioned, Sheriff Hewett did not author a police report. Rather, Lieutenant Crocker interviewed Hewett and made a report from that interview. At trial, Hewett apparently referred to his own personal notes while testifying.

51

Hewett did not explicitly state that Basham said which of the two defendants, Basham or Fulks, used the strap to actually kill Donovan.

Rather than asking Hewett to simply clarify his answer (a question to which Harris probably did *not* know the answer), he chose the safest route possible, seeking to have the Sheriff concede that the existing notes in the law enforcement file did not reveal a statement by Basham that *he* had used the strap to kill Donovan.[21]

Hewett responded with yet another ambiguous statement, telling Harris that Basham did not *say* he killed Donovan with the strap, but that "*he demonstrated though.*"  Tr. 9/27/04, ECF No. 949 at 53 (emphasis added).  Harris followed with essentially the same question, and after it appeared that Sheriff Hewett was not going to be shaken from his ambiguous testimony, Harris understandably moved on to other matters.

On this record, Harris cannot be faulted for his cross-examination strategy or the results thereof.  To begin with, contrary to what Basham now asserts, Harris did not ask a question to which he did not already know the answer.  Harris asked a leading question—permissible on cross-examination—designed to tie down Hewett as to what was revealed by the immutable notes in the police file, and Hewett gave a surprising, ambiguous response.  The court finds no fault with Harris asking the question, nor with Harris's decision to move onto other matters after Hewett did not agree with the leading question.

Furthermore, even if the court were to find that Basham's trial counsel was ineffective in his cross-examination, the court may dispose of this issue under the second prong of *Strickland*, because Basham showed no prejudice as a result of his counsel's alleged

---

[21] The full colloquy between Harris and Hewett is set out at 31–32, *supra*.

improper cross-examination. Under *Strickland*, it is unreasonable to suggest that jurors in this case, after viewing the mountain of evidence adduced against Basham,[22] would have viewed Hewett's ambiguous statement during cross-examination or counsel's failure to more vigorously cross-examine Hewett and an FBI agent, as the tipping point favoring the death sentence. The court finds no merit to Claim 18.[23]

<div align="center">

CLAIM 2:
THE *JACKSON V. DENNO* HEARING

</div>

Swerling and Harris moved to suppress most of the statements Basham made after being apprehended. In a motion filed on December 31, 2003 (ECF No. 228), Basham sought a hearing "to determine if the statements taken from him or attributable to him violate the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States."[24] Upon receipt of the motion, the court conducted a three-day hearing pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964), to determine the admissibility of certain statements Basham made following his capture and arrest as well as certain statements made by Littlejohn and

---

[22] See this court's summary of the overwhelming evidence produced by the government in this court's treatment of Claim 1, pages 39–46, *supra*.

[23] As part of Claim 18, Basham points out that defense counsel had in its possession, as part of discovery, an FBI "302" report prepared by FBI Agent Jeff Long. This report notes that Basham had a conversation with his attorney, Littlejohn, and that Littlejohn conveyed to law enforcement that "a purse strap was used by Fulks to strangle Donovan. Basham threw the purse strap out of the window of the BMW as they left the cemetery." Pet. Ex. 3, attached to Pet. Basham contends that counsel erred in failing to ask Agent Long any questions on cross-examination about the notation in his 302 report that Fulks, not Basham, had wielded the purse strap to kill Donovan. This argument has no merit. Agent Long's notes merely refer to Basham's self-serving version of what happened—one of several different versions Basham gave to law enforcement during the investigation.

[24] John Blume, counsel for Basham's co-defendant Fulks, actually filed this motion. There was in effect, however, a "deemer" order which deemed any motion filed by one defendant to be joined in by the other defendant unless the other defendant opted out. It was a common practice during the early stages of this litigation, before the court severed the defendants for trial, for one lawyer or the other lawyer to file a motion which the other defendant adopted.

Monckton, said to be attributable to Basham.  In Claim 2, Basham acknowledges that the motion to suppress was made, but he contends that his attorneys were constitutionally ineffective when they failed to "prepare for and/or effectively litigate" the *Jackson v. Denno* hearing.  For the reasons which follow, the court finds Claim 2 to be unavailing.

As an initial matter, although it is not clear from the pleadings, it appears that Basham's present counsel asserts a constitutional challenge to all of the statements made by or on behalf of Basham on which the court heard testimony at the *Jackson v. Denno* hearing.

*Post-Arrest Statements*

Basham made some of these statements after he was arrested and prior to the search for Donovan's remains.  In particular, these statements occurred during police and FBI interviews of Basham in Boyd County, Kentucky on November 17, 2002, the day he was arrested; on November 19–20, 2002; and on November 25, 2002.  Additionally, Richard Hughes, Basham's attorney at the time, made certain statements to FBI Agents Maley and Ciccarelli on November 26 and 27, 2002 with Basham's authorization and knowledge that the statements could be used against him.

*Day of Search Statements*

The remainder of Basham's statements occurred following the FBI's transfer of him to Florence, South Carolina, on November 27, 2002.  On November 28, 2002, Basham, along with attorneys Monckton and Littlejohn, participated in the search for Donovan's body in Brunswick County, North Carolina.  Basham made certain additional statements to law enforcement officers, both in a law enforcement van and at a cemetery.[25]  Most of these

---

[25]  These statements are discussed more fully above with respect to Claim 1.

statements were directional statements, authorized by counsel, indicating where the officers should go to attempt to locate Donovan's body. Also, while in the van, Basham authorized Littlejohn to advise the law enforcement officers that they should be looking for a Liz Claiborne purse strap and that if they located the strap, the officers would know that they were in the right place. Notably, however, after conferring with Basham, Littlejohn also made a series of statements to law enforcement related to details of the murder on a "hypothetical basis."[26] It was these hypothetical statements by Littlejohn that prompted the

---

[26] While Basham's statements generally focused on directions to the body and landmarks to aid the authorities in their search, Littlejohn's hypothetical statements went right to the heart of the crimes in this case. Littlejohn told law enforcement that, hypothetically speaking,

> The cemetery where [the search party was] currently located was in fact the cemetery where Basham and Fulks had stopped at. Donovan was not taken outside the vehicle but remained in the back seat of the BMW. Fulks raped Donovan in the back seat. Donovan was only wearing a top. After Fulks raped her, Fulks used a purse strap, which was approximately 18 inches long, and strangled Donovan. Fulks and Basham took Donovan out of the back seat and placed her in the trunk. Fulks also took Donovan's panties and threw them in the trunk. As Fulks drove the BMW out of the cemetery, Basham threw the purse strap out the window. Fulks drove around the area for what seemed to Basham to be as much as an hour. Fulks became concerned that if Donovan was still alive in the trunk, she may punch out the tail light or pull the wires out. Fulks found a dirt road in the area of what Basham believed was an animal park or some type of wildlife area. Basham recalled Fulks using the word "park" and ask[ing] Basham if the "park" would be okay. Basham agreed, and Fulks turned onto a wide, smooth dirt road. Fulks drove down the road for approximately five to ten minutes before coming to a stop in the road. As Basham was moving around outside the BMW, he stepped in a hole and cut his leg on a metal stake. At some point between leaving the cemetery and dumping Donovan's body, Fulks stabbed Donovan and slit her throat. Basham recalled Fulks taking the knife and placing it between Fulks'[s] thigh and [the] driver's seat of the BMW.
>
> Both Fulks and Basham dragged Donovan's body approximately fifty feet into the tree line. They covered her body with leaves, sticks and light brush. Shortly after leaving the area where they dumped Donovan's body, Fulks threw the knife out of the car window. Donovan's pants and panties were disposed of after leaving the area where they dumped her body. Basham did not know the location where the clothing could be found . . . .
>
> Basham recalled seeing a sign, described as being green with white writing, with the word "park" and or "animal" on it. The dirt road where Fulks and Basham dumped Donovan's body was located approximately fifteen feet past the "park" sign.

Govt. Trial Br. 19–20.

court to disqualify both Littlejohn and Monckton and appoint Swerling and Harris.[27]  Further detail regarding the content of all of the statements on which the court heard testimony is set forth in the government's pretrial brief in this case.  *See generally* ECF No. 751 at 10–20 (summarizing statements).

The *Jackson v. Denno* hearing in this case took place on February 24–26, 2004.  Before the hearing could begin, however, the court adjourned so that two medical professionals could examine Basham to assure the court that Basham was in fact competent to proceed with the hearing.  Upon receiving confirmation that Basham was competent, the court proceeded to hear testimony from the following witnesses, all of whom participated in some way in the interrogation of Basham after he was apprehended and detained in Kentucky, following his transfer to South Carolina, and during the search for Donovan's body in North Carolina: Captain William Todd Kelly, an officer with the Ashland Police Department in Kentucky; Robert Brunty, a policeman with the Ashland Police Department; Dan Mooney, a policeman with the Ashland Police Department; Special Agent Scott Vito, an FBI Agent with the Ashland, Kentucky FBI Office; Special Agent Patrick James Maley, an FBI Agent who was then assigned to the Louisville, Kentucky Division as Supervisor of the Covington Region; Agent Jeff Long, an FBI Agent who was then assigned to the Myrtle Beach resident agency; Sheriff Ronald E. Hewett, the then-Sheriff of Brunswick County, North Carolina; William H. Monckton and Cameron B. Littlejohn, the attorneys initially

---

[27]  The court's reasons for the disqualification are set forth in full in its order dated April 9, 2003, *see* ECF No. 69, but it suffices for purposes of discussion here to say that the court was concerned that if the government later sought to introduce Littlejohn's hypothetical statements, counsel would be conflicted because Littlejohn and Monckton would be both potential witnesses and counsel of record at the same time.

appointed to represent Basham upon Basham's arrival in South Carolina; and Rose Mary Parham, an Assistant United States Attorney from the Florence, South Carolina office. The court also heard stipulated statements from Lieutenant David Slone, an officer with the Ashland Police Department, and Richard Hughes, the attorney initially appointed to represent Basham in Kentucky. With the exception of the stipulated testimony, all of these witnesses testified in person.

With regard to all of Basham's statements (post arrest on the day of the search), some of which were exculpatory and some of which were inculpatory, the officers performing the questioning of Basham testified in detail regarding their efforts to properly apprise Basham of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The officers acknowledged that they were aware during the initial interview on November 17, 2002 that Basham had used cocaine and marijuana earlier that day. They also acknowledged that one initial interview of Basham on November 19, 2002 went into the early hours of the morning, beginning at 1:58 a.m. and terminating at 3:19 a.m. The officers explained that the reason for the late night and early morning questioning was that, at the time, law enforcement officials thought that Donovan might still be alive and that Basham could assist in her rescue. Notwithstanding the fact that Basham had admitted that he used controlled substances and the fact that one round of questioning lasted for approximately one hour into the early morning, all officers who testified indicated that Basham was coherent and alert.

They also testified that Basham appeared to understand his *Miranda* rights. *See, e.g.*, Tr. 2/24/04, ECF No. 698 at 9, 14, 17, 27, 34–35. In this regard, it is notable that Basham actually signed or initialed a written acknowledgment of being Mirandized on at least five

occasions.  By way of example, on one occasion when Basham stated "maybe I might need an attorney," all questioning by the officers stopped.  *Id*. at 33.  Thereafter, when Agent Vito was assigned to the case, Agent Vito (after conferring with his legal counsel) took additional statements from Basham.  Importantly, during each of the three interviews by Agent Vito, Basham read, acknowledged he understood, and signed or initialed an "advice of rights" form.  *Id.* at 47–48, 60–61, 76–77.

On another occasion during an interview, Barbara McGuire, an investigator with the Public Defender's Office for Boyd County, Kentucky, asked for an opportunity to speak with Basham, and the officers stopped questioning Basham for an hour and a half to allow McGuire (who was not an attorney) to speak with Basham.  Separate and apart from the advice of rights forms that the FBI had Basham sign, McGuire also had Basham sign a form indicating that he understood and was waiving his rights.  Tr. 10/11/12, ECF No. 1555 at 350–51.

Basham made more damaging statements during an interview with FBI Agent Maley, who had received a collect phone call from Basham indicating Basham's desire to once again speak with law enforcement.  At this time, attorney Richard Hughes had been appointed to represent Basham, and the subsequent interview was undertaken with Hughes's full consent.  Moreover, during this interview Basham once again read, acknowledged he understood, and signed an advice of rights form.  Tr. 2/24/04, ECF No. 698 at 94.

At the *Jackson v. Denno* hearing, Harris and Swerling cross-examined some, but not all, of these law enforcement witnesses regarding the circumstances surrounding Basham's statements to law enforcement.  On occasion, this court asked additional questions of the

officers in an effort to fully develop the record regarding the voluntariness of Basham's

statements. During the hearing, at appropriate intervals when the court had heard all of the

testimony relative to each statement, the government would proffer the statement as

admissible, and the court turned to Swerling and Harris for a response. With regard to the

first series of post-arrest statements by Basham, after Officer Mooney testified, Swerling

gave this response to the court:

> Judge, we have no evidence to present. Based on what we previously advised the court about Mr. Basham's, I think, limited intellectual ability and mental capacity, that the statements presented to the court for a ruling, under Rule 104, as to whether or not the totality of the circumstances he was given his warnings and whether or not he waived his warnings—waived his rights.

*Id.* at 40.

Swerling's response to later offers of statements by the government were equally

tepid. Following the testimony of Agent Vito, Swerling stated:

> No, Your Honor, we are not going to present any testimony. As previously stated, the matter has been presented to you for a ruling under Rule 104, as to whether or not he was advised of his rights and whether or not he waived those rights.

*Id*. at 57. After a second series of statements relayed by Agent Vito was introduced,

Swerling stated:

> Judge, there would be no evidence presented. Basically the same position we have had in the last statement, that we would ask you to make your threshold ruling under Rule 104 as to whether or not the statement is admissible, whether or not he got his rights, and whether or not he knowingly waived his rights.

*Id*. at 72.

Importantly, however, Swerling and Harris strenuously argued that the court should

exclude the damaging hypothetical statement Littlejohn made near the conclusion of the

search for Donovan. Whereas their responses to the motion to suppress regarding the earlier statements were admittedly facile, the debate about the admissibility of the hypothetical statement consumed over forty pages of transcript. Tr. 2/25/04, ECF No. 898 at 5–46.

Following the *Jackson v. Denno* hearing, the court denied the motion to suppress all of the statements Basham made and took under advisement the motion to suppress Littlejohn's hypothetical statements attributable to Basham. ECF No. 335. The court later granted the motion to suppress the hypothetical statements. *See* ECF No. 691 at 4–5. Thus, even though the court had taken the prudent course of action in disqualifying Littlejohn and Monckton, the disqualification ultimately proved to be unnecessary because the court, again acting out of an abundance of caution, disallowed the hypothetical statement in evidence.

Based on the above, Basham contends that his counsel did not properly prepare for or "effectively" litigate the *Jackson v. Denno* hearing. At the evidentiary hearing on the § 2255 motion, counsel for Basham advanced little argument that his attorneys did not *prepare* for the hearing. They instead focused most of their attention on the manner in which the *Jackson v. Denno* hearing was argued. In other words, conceding as he must, that a proper motion was filed, Basham is left with the argument that his attorneys did not try hard enough to have all of the incriminatory statements excluded.

Turning first to the statements Basham made, Swerling and Harris filed the proper motion and cross-examined the witnesses, vigorously at times when the occasion called for it. The fact that they did not say more by way of argument was undoubtedly occasioned by the fact that the officers' testimony had clearly and unequivocally demonstrated that Basham was properly Mirandized each and every time he was questioned prior to the Thanksgiving

Day search; no threats or promises were made to induce his statements; and that the statements were completely voluntary and not the product of any undue influence or other improper factor. Moreover, many of the statements at issue were made after Basham was represented by an attorney. Faced with this record, there is little that Swerling or Harris could have argued under the circumstances.

In this respect, the suppression hearing in Basham's case was quite similar to *Jackson v. Denno* hearings this court has conducted in other criminal cases. Frequently, defense attorneys file a motion to suppress in an effort to have the law enforcement officers who will be testifying at trial brought into the courtroom so that their testimony can be heard and the witnesses seen firsthand, and so that defense counsel can cross-examine these officers in an effort to conduct something in the nature of a discovery deposition.[28] In this court's experience, it is rare for a defendant to take the stand at a *Jackson v. Denno* hearing and attempt to elucidate the issues regarding the voluntariness of his statements. Thus, in most cases on this court's criminal docket, defense counsel are left in the unenviable position where Swerling and Harris found themselves. They filed a proper motion to suppress, put the government to its proof regarding the voluntariness of the statements and the question of whether their client was properly Mirandized, and, after unsuccessfully attempting to shake the law enforcement officers from their statements on cross-examination, had little left to say by way of argument.

---

[28] Indeed, this was one of Swerling and Harris's strategies at the *Jackson v. Denno* hearing in the present case. Tr. 10/11/12, ECF No.1555 at 356.

Still, it is important not to overlook trial counsel's efforts regarding the highly damaging hypothetical statements Littlejohn made. It was here that Swerling and Harris focused most of their firepower and here that they secured a partial victory at the *Jackson v. Denno* hearing, when they obtained a ruling excluding Littlejohn's statements. In selectively saving their strongest arguments for what was of critical importance, Swerling and Harris were perhaps mindful of an observation made by the late Francis Murgnahan of the Fourth Circuit Court of Appeals:

> Resourceful lawyers . . . often desire to be thorough and to overlook nothing in their commendable zeal to afford first class representation. Consequently in many cases they tend to excess as they inundate us with a plethora or arguments, some good and some not so good. Sometimes one wonders whether such lack of selectivity is not counterproductive, for a party raising a point of little merit exposes himself to the risk of excessive discount for a better point because of the company it keeps.

*United States v. Computer Sciences Corp*., 689 F.2d 1181, 1183 (4th Cir. 1982), overruled in part on other grounds by *Busby v. Crown Supply, Inc*., 896 F.2d 833 (4th Cir. 1990). It thus could have been that Basham's trial counsel recognized the futility of making a strong argument against the admissibility of Basham's statements based upon the record produced. It could have been counter-productive to advance strong arguments about constitutional violations where none have been shown. Swerling and Harris focused on what was important to the trial and succeeded. This court should not second guess their strategy at the *Jackson v. Denno* hearing with the 20/20 view of hindsight.

Moreover, this court, embarking upon a federal capital prosecution, was well aware of what lay before it when this case commenced. This court earnestly and conscientiously attempted to receive the testimony of the law enforcement officers regarding the

voluntariness of the statements and made its decision based upon the evidence produced at the *Jackson v. Denno* hearing.  The fact that Swerling and Harris may not have "tried harder" to suppress the damaging statements played no part in the court's ultimate decision to admit Basham's statements.

Nevertheless, the discussion in Claim 2 includes several arguments as to what Swerling and Harris should have done or said in an effort to keep the incriminatory statements out.  First, Basham asserts that "[u]pon information and belief, defense counsel were aware of . . . factors demonstrating the coercive nature of the interrogations . . . , including the denial of food and medicine."  Pet. at 24.  This allegation appears to be based on notes Swerling took during an interview with Basham, allegedly prior to the *Jackson v. Denno* hearing.  Tr. 10/11/12, ECF No. 1555 at 456–63.  Also, Basham argues that Swerling and Harris failed to fully develop his "documented history of intellectual, psychological, and emotional difficulties."  Pet. at 19.  Although counsel brought out both issues at the *Jackson v. Denno* hearing,[29] Basham contends that counsel could have more strenuously argued the issues in favor of his suppression motion.

However, Swerling's and Harris's testimony regarding their strategy at the *Jackson v. Denno* hearing somewhat undercuts Basham's arguments.  In particular, Swerling and Harris learned during their investigation that, with the exception of Littlejohn's hypothetical statements, it would be difficult to argue that many of Basham's statements to law

---

[29]  For example, during Harris's recross of Agent Vito, Harris asked Agent Vito a series of questions to determine whether medication was withheld from Basham.  Tr. 2/24/04, ECF No. 698 at 85–86. Also, Swerling represented to the court on at least two occasions that they were seeking a determination of voluntariness based in part on Basham's "mental history," "his low intellectual and intelligence capacity," and his "many, many commitments to different institutions."  *Id.* at 11–12.

enforcement were involuntary. Further, in view of the overwhelming evidence of their client's guilt, they quickly accepted that there would likely be a penalty phase of the trial. Therefore, Swerling and Harris decided to "embrace" most of Basham's statements to law enforcement in an effort to avert the death penalty. In Harris's words, their strategy was to "elicit as much information as we could from the officers to prove that Brandon Basham, from the moment that he was fished out of the river by law enforcement officers, began to attempt to assist law enforcement in the location of the body of Alice Donovan." Tr. 10/10/12, ECF No. 1553 at 275; *see also* Tr. 10/11/12, ECF No. 1555 at 355–56, 466–70; Tr. 10/15/12, ECF No. 1556 at 638–53. Said another way, counsel attempted to get the law enforcement officers to concede that Basham cooperated to the best of his ability so that they could argue this fact in mitigation.

Additionally, Swerling's and Harris's testimony indicates that although they considered the arguments advanced above, *see* Tr. 10/11/12, ECF No. 1555 at 349, 474, 478; Tr. 10/15/12, ECF No. 1556 at 655–56, they reasonably found the arguments to be either lacking in evidentiary support or unlikely to be successful. In particular, during their investigation to prepare for the *Jackson v. Denno* hearing, Swerling and Harris interviewed Basham's attorneys during the interrogations, Richard Hughes and Public Defender Hewlett, and the investigator for the Public Defender's Office, Barbara McGuire. Additionally, Swerling and Harris interviewed Basham's South Carolina attorneys, Monckton and Littlejohn. Importantly, none of these witnesses corroborated Basham's new allegations of coerced interrogation, and none indicated that Basham was incompetent during the interrogations. Tr. 10/11/12, ECF No. 1555 at 350–56, 475; Tr. 10/15/12, ECF No. 1556 at

647–50.    And, as developed at the *Jackson v. Denno* hearing, the testimony of law enforcement officers was consistent with Swerling and Harris's investigation.  *See, e.g.*, Tr. 02/24/04, ECF No. 698 at 65, 78 (Agent Vito testified that Basham received nourishment and breaks throughout the interviews).

The officers all testified that Basham repeatedly affirmed that he understood, read, and agreed to waive his rights and that he spoke coherently and appeared to understand the unfolding interrogation.  Indeed, as noted above, Basham arguably understood his right to counsel, as he at one point stated during questioning stated "maybe I might need an attorney."  Notably, the only evidence that law enforcement withheld food and/or medicine came from an interview in which Basham changed his story of his interrogations, which as Swerling pointed out, was not uncommon for Basham.[30]    *See* Tr. 10/11/12, ECF No.1555 at 457.  Therefore, it was not ineffective assistance of counsel for Swerling and Harris to adopt the strategy they did at the *Jackson v. Denno* hearing.

Still, Basham also contends that his attorneys labored under a fundamental misconception regarding trial procedure and constitutional law which caused them to pull their punches at the *Jackson v. Denno* hearing.  Basham suggests that by not vigorously arguing that Basham's statements were involuntary, Harris and Swerling thought they were preserving the opportunity to argue Basham's voluntary cooperation with law enforcement authorities as a mitigating factor at the penalty phase of the trial.  During the *Jackson v. Denno* hearing, government counsel suggested to the court that "they may be boxing

---

[30]  Basham's history of manipulation is detailed elsewhere in this order.  *See infra* at 97, 100, and 147.

themselves into a position that they can't claim later that he was attempting to assist law enforcement when he provided those statements." Tr. 2/24/04, ECF No. 896 at 8.

In response, this court suggested that the defendant's position of seeking to keep out the statements while at the same time maintaining his right to argue the voluntariness of his statements in mitigation could be a "two-edged sword," but then the court hastened to add that it was not ruling on the question of whether Basham would be allowed to take inconsistent positions regarding voluntariness. *Id.* at 8–9.

The court agrees with Basham's habeas counsel that a defendant does not have to waive one constitutional right in order to assert another. Basham could have argued the suppression motion and still used the statements of law enforcement as a mitigating factor at the sentencing phase. Thus, the government's suggestion that Basham could not have it both ways was unfortunate. However, after a full review of the entire transcript of the *Jackson v. Denno* hearing, this court is left with the firm conclusion that trial counsel provided effective assistance to Basham. Harris and Swerling concentrated their efforts on the most damaging of the statements at issue and obtained a favorable ruling thereon. Further, as discussed above, after acknowledging the weakness of any potential argument regarding voluntariness, counsel adopted a reasonable strategy to cross-examine law enforcement witnesses to obtain evidence of Basham's cooperation, thus potentially strengthening their case in mitigation.

Finally, Basham argues that his trial counsel should have moved to suppress the evidence obtained as a result of Sheriff Hewett's questioning of him outside the presence of counsel, including the verbal statements he made to Sheriff Hewett and the nonverbal

demonstrations he made of how the purse strap was used to strangle Donovan and how it was thrown in the nearby woods, as violative of the Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477 (1981).[31]  Basham did not raise this issue in his § 2255 petition, instead raising it for the first time during the evidentiary hearing on the petition.  *See* Tr. 10/11/12, ECF No. 1555 at 488–92.  Although the government objected to this issue as untimely, *see id.* at 491–92, the court found that the issue was properly before it as within the scope of Claim 2, *id.* at 492.  Because of this, the court provided the parties with the opportunity to brief the issue after the evidentiary hearing.  *See* ECF No. 1572.  Both Basham and the government submitted supplemental briefing, *see* ECF Nos. 1575, 1576, and thus the court now turns to the merits of the *Edwards* violation.[32]

In *Edwards*, the Court held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85.  Thus, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he

---

[31]  As an initial matter, the court notes that although trial counsel did not identify or argue the *Edwards* issue at the *Jackson v. Denno* hearing, Swerling did argue that this court should exclude everything that "was said during the course of the day outside the direction issue."  Tr. 02/25/04, ECF No. 898 at 8; *see also* Tr. 10/15/12, ECF No. 1556 at 651.  To the extent the questions Sheriff Hewett asked Basham were not directional, then, Swerling arguably did move to have the statements at issue excluded.  The government argues that the statements were directional, *see* ECF No. 1576 at 4–5, but there is some indication that Swerling viewed the statements as non-directional at the time, *see* Tr. 02/25/04, ECF No. 330 at 76–78.  In any event, as discussed in more detail below, it is not necessary to determine whether trial counsel in fact moved to suppress the statements to dispose of this argument.

[32]  The government renewed its objection to the timeliness of Basham's claim of ineffective assistance of counsel based on a failure to raise the *Edwards* issue in its supplemental brief.  *See* ECF No. 1575, at 1 n.1.

responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* at 484.  In *Minnick v. Mississippi*, 498 U.S. 146 (1990), the Court extended this holding, noting that the Fifth Amendment protection from reinitiation of questioning of an accused who has requested the assistance of counsel is not terminated or suspended once the suspect has consulted with an attorney; officials may not reinitiate interrogation without counsel present.  *Id.* at 153.

Basham and the government dispute whether an *Edwards* violation occurred in this case.  First, though, both parties agree that Basham had invoked his right to counsel.  Richard Hughes, who negotiated Basham's transfer to South Carolina, had been appointed to represent Basham in Kentucky.  And after Basham's transfer to South Carolina, Littlejohn and Monckton had been appointed to represent Basham the day before the Thanksgiving Day search.  Littlejohn and Monckton testified that they made clear to law enforcement that Basham was not to be interrogated except for questions asking for directional information regarding the location of Donovan's body.  *See, e.g.*, Tr. 2/25/04, ECF No. 330 at 112–14, 138, 140–41.

However, Basham and the government disagree on whether any improper questioning occurred and, assuming it did, whether it occurred outside the presence of counsel.  As Basham points out, and as recognized elsewhere in this Order, Sheriff Hewett offered several varying accounts of his encounter with Basham allegedly outside the presence of Littlejohn and Monckton.  From the record, though, it appears that Hewett asked Basham at least two questions during this encounter.

First, Hewett testified at the *Jackson v. Denno* hearing that, after Basham demonstrated the manner in which he threw the Liz Claiborne purse strap into the woods at the cemetery, he asked Basham, "Branden, how did you do that?" *Id.* at 66–67. According to Hewett, Basham responded, "Like that. And I threw it over there." *Id.* at 67. Second, Hewett testified that Basham stated something to the effect of "this is the place," apparently referring to the place at which Donovan was strangled. *Id.* at 83. Although Hewett did not testify to the question which elicited this response, according to Lieutenant Crocker's report, Hewett asked, "Is this where it happened"? Pet. Ex. 2, attached to Pet. at 00818. Crocker's report provides a slightly different version of Basham's response, stating that Basham replied, "Yes, this is it." *Id.*

The government argues that the first question ("How did you do that?") was directional in nature, as Basham, upon the advice of counsel, had already told the officers about the purse strap, *see* Tr. 12/04/12, ECF No. 1569 at 1256–57, and the manner in which Basham threw the strap may have indicated the distance into the woods the strap traveled, and thus its approximate location, *see id.* at 1257, 1330. Similarly, the second question ("Is this where it happened?") is at least arguably directional in nature, as the answer would be indicative of the general location of Donovan's body.

Even if the questions were directional, however, this argument misses the point: although Littlejohn and Monckton may have authorized law enforcement to ask directional questions of Basham, they did not give law enforcement authorization to do so outside of their presence. And *Edwards* and *Minnick* do not appear to contemplate that once counsel has authorized law enforcement to ask a specific type of question, law enforcement may then

do so when counsel is not present. Rather, the Court emphasized that counsel should be present for *any* questioning subsequent to the accused's invocation of his Fifth Amendment rights. *See Minnick*, 498 U.S. at 152. Thus, the more important issue is whether Sheriff Hewett asked the questions outside the presence of counsel.

The government argues that no *Edwards* violation occurred because counsel was "present" with Basham at all times during the Thanksgiving Day search. Basham's habeas counsel disagree, arguing that Monckton and Littlejohn were not present with Basham during the above-described encounter with Sheriff Hewett. In this regard, Hewett testified that when he asked the above-recited questions of Basham at the cemetery, Littlejohn and Monckton "were back at what I described earlier as the horseshoe circle, talking with other law enforcement officials, including Chief Hendrick of Conway." Tr. 2/25/04, ECF No. 330 at 67. According to Hewett, he and Basham were away from Littlejohn and Monckton by a distance approximately equal to the distance between his position in the witness stand and the "bush at the back of the courtroom."[33] *Id.* at 67, 83. Hewett testified that, while he was away with Basham, he could not hear the conversations of Littlejohn and Monckton with the other law enforcement officials. *Id.* Basham also notes that both Littlejohn and Monckton testified that they were unaware that Sheriff Hewett had walked off with their client without their permission. *See* Tr. 12/04/12, ECF No. 1569 at 1242–44 (Littlejohn); Tr. 10/09/12, ECF No. 1561 at 43 (Monckton). Still, the government points out that Littlejohn testified that, though Basham was not "always within [his] hearing" and "might have wandered off with Sheriff Hewett for a few moments," Basham "wasn't too far away from [him] at any

---

[33] As explained above, the court estimates this distance to be approximately forty-five feet.

time" and in any event was always within his sight.  Tr. 12/04/12, ECF No. 1569 at 1243–44, 1265–66.

Thus, it appears that during the Hewett/Basham encounter, although Basham's counsel were relatively near to him and could see Basham and Hewett, counsel could not hear the questions asked by Hewett or Basham's responses thereto.  In fact, the record suggests that Littlejohn and Monckton were preoccupied at that time, talking to other law enforcement.

At the evidentiary hearing on the § 2255 petition, Basham called Larry Hammond as an attorney and expert witness on the standard of care under *Strickland*.  *See* Tr. 10/16/12, ECF No. 1558 at 824 .  In testifying on the standard of care as to the permissible distance between a defendant and his attorney during a search for a body, Hammond used the analogy of an umbilical cord.  *See id.* at 843–44, 909–10.  More particularly, in Hammond's opinion, the distance between an attorney and his client should be "small enough so that there could not be conversations that you couldn't control . . . between the client and law enforcement." *Id.* at 910.  This is because, where a greater distance occurs, the lawyer can neither hear the questions law enforcement asks of his client nor communicate with his client regarding the client's response.  *Id.* at 910–12.  Likewise, Hammond posited that a defendant should not be away from his attorneys for any length of time during a search for a body.  *Id.* at 910.

Without adopting any specific standard, the court at least agrees with the proposition that, for counsel to be "present" within the meaning of *Edwards v. Arizona*, counsel must at least be able to hear the questions asked of the defendant and provide guidance to the defendant regarding a response.  Notably, Littlejohn and Monckton could not do either

71
**JA 0247**

during the encounter between Basham and Sheriff Hewett, despite being only a relatively short distance away. Accordingly, the court finds that they were not present when Hewett asked the above two questions of Basham within the context of *Edwards* and *Minnick*.

Because Basham invoked his right to counsel on the Thanksgiving Day search and because he was interrogated that day without counsel present, an *Edwards* violation occurred unless Basham (a) initiated further discussions with law enforcement; and (b) knowingly and intelligently waived the right he had invoked. *See Smith v. Illinois*, 469 U.S. 91, 94 (1984). The Court in *Edwards* recognized that where a defendant initiates contact with law enforcement, some type of verbal exchange will likely occur. *See Edwards*, 451 U.S. at 486 n.9. In such an event, the court should look to the totality of the circumstances to determine whether the defendant waived his right to counsel prior to making an incriminating statement. *Id.* As the Court explained:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence has occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Id.*

Upon reviewing the record and the totality of circumstances in this case, the court agrees with the government that the Basham/Hewett encounter at issue here is factually distinct from the *Edwards* decision. Basham was never told he had to speak with law enforcement; it appears he desired to do so. For example, Basham called Agent Maley from

jail and asked to speak with him. *See* Tr. 2/24/04, ECF No. 698 at 92–93, 101–02. Also, it is clear that Basham initiated the Thanksgiving Day search and desired for it to continue when law enforcement became frustrated with its lack of progress. *See* Tr. 2/25/04, ECF No. 898 at 3; Tr. 2/25/04, ECF No. 330 at 96, 102–05, 107, 116, 118, 144. Further, there is no indication in the record that Basham made his demonstration of how Donovan was strangled in response to Hewett's two questions recited earlier. Indeed, there is testimony that on several occasions Basham spoke out or volunteered statements during the Thanksgiving Day search. *See, e.g.*, Tr. 10/09/12, ECF No. 1561 at 37.

Additionally, Sheriff Hewett testified at trial that it was Basham who initiated the encounter with Sheriff Hewett when they walked to the wood line at the cemetery. In particular, when Hewett was asked to tell the jury what happened when the search party returned to the cemetery near Bee Tree Farms, he testified: "He, being Brandon Basham, wanted to walk over towards the wood line and to show the area where the strap was thrown."[34]    Tr. 09/27/04, ECF No. 949 at 37–39. Lieutenant Crocker's report is corroborative of this testimony, as it states: "Basham then walks to the left front edge of the cemetery (along with Sheriff Hewett and Conway Officers Sgt Parker and Sgt Sarvis. [sic] Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the

---

[34] Basham interprets Hewett's *Jackson v. Denno* hearing testimony as indicating that *Hewett* initiated the walk down to the wood line, but his testimony at that hearing is susceptible to more than one interpretation. In particular, when the prosecutor asked whether Hewett "want[ed] to know more information about the purse strap and how it was used and where it might be located," Hewett answered in the affirmative. Tr. 02/25/04 at 66, ECF No. 330. The prosecutor then stated: "Wanting that to occur, tell the judge what you did with Mr. Basham." *Id.* Hewett responded that he, Basham, "and the two Conway sergeants . . . we walked back down to the cemetery." *Id.* Although *the prosecutor* suggested that Hewett took some affirmative action with Basham, Hewett nowhere testified that he in fact initiated the walk down to the wood line. Indeed, his testimony can be read as consistent with his trial testimony—Basham wanted to walk to the wood line, and wanting to know more, Hewett walked with him.

cemetery." Pet. Ex. 2, attached to Pet. at 00818.

Based on the above, the court concludes that, although he had invoked the right to counsel, Basham reinitiated contact with law enforcement on several occasions. He initiated both the Thanksgiving Day search in general and the specific encounter during the day which led to the statements at issue. The court also finds that Basham knowingly and intelligently waived his Fifth Amendment rights. The atmosphere during the search was "cordial," *see* Tr. 2/25/04, ECF No. 330 at 60, 69–70, and, with the exception of the encounter with Sheriff Hewett, Basham was able to speak with counsel the entire day, *see id.* at 15. Importantly, although Basham did not actually receive the *Miranda* warnings on Thanksgiving Day, *see, e.g.*, *id.* at 39, 58, as explained above he had received and acknowledged advice of his rights numerous times in the several days prior and nonetheless continued to provide statements to law enforcement without hesitation or reservation.

Consequently, based on the totality of the circumstances as shown in the record in this case, the court concludes that no *Edwards* violation occurred. For at least this reason, then, trial counsel's performance was not deficient in failing to raise the issue on appeal or at the *Jackson v. Denno* hearing. Likewise, because the statements were properly admitted, Basham cannot have been prejudiced thereby.

However, even if the court had reached the opposite conclusion, i.e., that an *Edwards* violation did occur and that trial counsel's performance was deficient for failing to raise the issue to this court, the court finds that Basham still could not show the prejudice required under *Strickland*. This is because, even had this court excluded the statements at issue, the result in this case would not have been different for at least the reasons discussed above with

respect to Claim 1.  The evidence against Basham was overwhelming, and, as habeas counsel concedes, the jury was not required to find that Basham was Donovan's actual killer in order to sentence him to death.

For all of the reasons discussed above, the court finds that trial counsel's performance in preparing for and litigating the *Jackson v. Denno* hearing was not ineffective under *Strickland*.

<div align="center">

CLAIM 3:
JURY SELECTION ISSUES
</div>

In Claim 3, Basham asserts that the court violated his right to an impartial jury by erroneously excluding four potential jurors because of their concerns about the death penalty. At issue is the court's determination that jurors Kathy Roberts, Michael Williams, Rubina Kahn, and Susan Jackson were all disqualified by reason of their responses to the questions propounded to them by the court or by counsel.  Basham also faults his appellate counsel for failing to raise this issue on appeal.

Before discussing the factual and legal issues relating to Claim 3, the court should set out briefly the procedures followed and a somewhat unique aspect to the voir dire conducted in this case.  Several hundred jurors were randomly selected pursuant to the Jury Selection Plan for this district, divided into groups, and scheduled to appear at the courthouse on preselected days.  The grouping allowed approximately ten jurors to present themselves at the courthouse each day.

Along with the juror summons, prospective jurors were sent a detailed questionnaire to complete and return so that the questionnaires could be copied and disseminated to counsel

prior to the jurors' pre-determined voir dire date.  Because disclosing to the jurors that they were being considered for a capital murder case might cause the jurors to structure their answers so as to avoid jury service, the questionnaire mailed to the jurors' homes did not reveal the nature of the case to be tried.  On the day the jurors reported for service, a second questionnaire was administered, asking specific questions to seek the jurors' views on the death penalty.  These questionnaires were also copied and disseminated to counsel prior to questioning the jurors.

The jurors were then brought into the courtroom on an individual basis and the court asked a series of generic questions designed to ensure that each juror could be fair and open minded in a case that carried the death penalty as a potential punishment.  Often times, the court's lead-off questions involved responses that had been provided to the second questionnaire seeking the jurors' views on the death penalty.  After the court finished its examination, the court permitted the attorneys for both sides to engage in attorney conducted voir dire.  Occasionally, the court asked follow up questions to the questions posed by the attorneys.

The unique aspect of the voir dire concerns the fact that the attorneys persuaded the court to ask two non-traditional questions of the jurors.  The questions  were somewhat fact specific and resulted in the disqualification of a large number of jurors.  The government requested the court to ask the jurors if they would have any difficulty imposing the death penalty—assuming it was justified by the facts of the case—if the government was not able to prove which of the two defendants "struck the fatal blow," that is to say, which of the two defendants actually brought about the murder of Alice Donovan.

Basham's trial counsel, on the other hand, suggested that once the court had asked a sufficient number of questions to satisfy itself that each juror could be fair and impartial in a traditional death penalty case, that the court go further and ask the jurors whether—if it was shown in the evidence that the defendant had participated in not one, but two murders—that would be the "tipping point" which would cause the juror to always impose the death penalty at the conclusion of the case.

These two additional questions were proposed by the attorneys as a package. In other words, the government did not object to the court asking the defendant's "two murders" question and defense counsel did not object to the court asking the government's requested "fatal blow" question. Because both parties agreed to these two questions, the court went along with the request, but the procedure presented significant difficulties for the court. The questions were fact-specific and seemed to, in some respects, ask the jurors to render an advisory opinion as to what would they do based upon the facts of the case.

Nevertheless, the court acceded to the requests of counsel for both sides and asked the two fact-specific questions. As noted previously, asking these two questions resulted in the disqualification of a significant number of jurors. Some of the disqualified jurors said that although they could be fair and open-minded regarding the death penalty generally, if they were not certain who struck the fatal blow, they would not be able to impose the death penalty. Other jurors indicated that although they could be fair in a general sense, if it was revealed during the trial that the defendant had participated in two murders, the juror would always vote to invoke the death penalty.

After carefully reviewing the transcript of the voir dire relating to the four disputed jurors, the court determines that it was correct in its discretionary finding that all four of these prospective jurors harbored concerns about the death penalty that would substantially impair their ability to abide by the court's instructions and their oath as jurors. This court was in a position not only to judge the substance of the prospective jurors' answers on voir dire, but also to observe their demeanor and to assess their credibility. Faced with ambiguous and often contradictory answers from these venire members, this court validly exercised its discretion to remove these individuals for cause. Accordingly, appellate counsel had ample reason not to raise this issue in Basham's appeal.

In *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." As the Court put it in subsequent cases, "'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 419 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The prosecution "'may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the Court.'" *Id*. (quoting *Adams*, 448 U.S. at 45). Accordingly, a prospective juror in a capital case "must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to [render a verdict] without conscious distortion or bias." *Adams*, 448 U.S. at 46. The prosecution "does

not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." *Id*.

Whether a venire member's reservations concerning the death penalty amount to a "'substantial impairment' is perforce committed in the first instance to trial court discretion based upon the voir dire inquiry." *United States v. Tipton*, 90 F.3d 861, 880 (4th Cir. 1996). "[W]hat is being inquired into is a state of mind whose determination turns largely on assessments of demeanor and credibility, matters peculiarly within the province of trial judges . . . ." *Id.*

### *Cathy Roberts*

Cathy Roberts was excused for cause because her answers to the juror questionnaire and to voir dire questioning, although inconsistent at times, indicated that her opposition to the death penalty would substantially impair her ability to abide by her oath and the court's instructions.

On the supplemental juror questionnaire, Roberts indicated that the death penalty was used "too seldom" while affirming that she was "strongly opposed to the death penalty" and "would have a difficult time voting to impose it, regardless of the facts and law in the case." Tr. 8/30/04 , ECF No. 918 at 105–06. Roberts attributed this apparent inconsistency to her being "confused" or "nervous." *Id*. at 108. When the court asked her if she could put aside her personal beliefs and "follow the law as the judge announces," Roberts replied, "I believe I can." *Id*. at 109.

But when the court asked Roberts whether she could "consider the possibility of imposing the death penalty against someone, even if that person didn't strike the fatal blow

if it was supported by the facts and the law of the case," Roberts twice announced, "I'm not 100 percent sure if I could." *Id*. at 112–13. When the court rephrased the question, Roberts equivocated, "I don't know.  If it was my civic duty, I would. I mean, [if] selected I would follow the law." *Id*. at 113.  The court noted Roberts's "hesitancy" and "body language" and that she seemed "to have some difficulty with this idea[.]" *Id*. at 114. Roberts affirmed that was true "to a degree." *Id*.

In its voir dire, the government asked Roberts,  "[I]s it fair to say, ma'am, that given your pretty strong opposition to the death penalty in general, that as you sit there today you couldn't sentence somebody to die if they didn't actually take another person's life; isn't that true, Ms. Roberts?"  *Id*. at 125.  Roberts answered,  "Yeah, that's true."  *Id*.  Likewise, Roberts said that it was "a fair statement" that "in every single case, if life in prison without parole was one of the options, [she] would feel that that would be the appropriate sentence in every case where somebody didn't actually kill someone . . . ." *Id*. at 128.  Finally, she affirmed that although she "could give the death penalty under a certain set of circumstances, . . . [she] would draw the line when the person did not even kill someone . . . ." *Id*. at 128–29.

Viewed in their overall context, Roberts's statements indicated that her views on the death penalty would substantially impair her duties as a juror.  True, Roberts's answers were contradictory at times.  But jurors "cannot be expected invariably to express themselves carefully or even consistently.  Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984).  Thus, "where the prospective juror's response, as

captured in the transcripts, reflects some ambiguity in the state of mind of the juror, then the determination made by the trial court, based on its eyeing the juror, is presumed to be consistent with the applicable standard." *Maynard v. Dixon*, 943 F.2d 407, 415 (4th Cir. 1991). Despite her inconsistencies, Roberts "expressed reservations, never retracted, sufficient to warrant this court's determination that they would substantially impair [her] performance of duty to vote for the death penalty if the evidence and law so dictated." *Tipton*, 90 F.3d at 880.

### *Michael Williams*

As it did with Ms. Roberts, this court excused Michael Williams for cause based on contradictory answers he provided regarding his ability to render a fair verdict on the death penalty.

During voir dire from the court, Williams initially affirmed that he could decide the case "based solely on the evidence produced at trial and in the context of the rules of law . . . ." Tr. 09/07/04, ECF No. 1002 at 201–02. He agreed that he fell in the "middle category" of potential jurors who were not pre-committed to impose or reject the death penalty. *Id*. at 202–03. He likewise affirmed that he understood that someone could be eligible for the death penalty even if he did not personally strike the fatal blow. *Id*. at 206–07. When the court asked if there was any reason why he could not be fair and impartial, Williams answered, "I really am not sure about the death penalty part, but other than that, I could be fair." *Id*. at 207. Williams affirmed, however, that he could set aside his opinion on the death penalty and conscientiously follow the law as pronounced by the court. *Id*. at 207–08.

Upon questioning by government counsel, Williams articulated a different position. When asked what he had meant when he said he could be fair "except for the death penalty part," Williams explained, "I am not really sure I could do it. I guess after the judge explained the law, I would have to do it, what the law says to impose the death penalty." *Id*. at 217–18. He acknowledged that he had "some problems emotionally or personally because of some of [his] previously-held beliefs about the death penalty . . . ." *Id*. at 218. Williams stated that it was a "difficult situation" to sign one's name to a death penalty verdict "[b]ut the judge says you got to go by what the law says." *Id*.

Government counsel then explained to Williams that even if he found that the government had proved its case, he would not be required to impose the death penalty; he would still have to make a "personal judgment" about whether the death penalty was appropriate in the case. *Id*. at 220. Government counsel then asked Williams if he "could ever come out of that balancing test and decide that the death penalty is the appropriate sentence . . . ." *Id*. Williams answered: "I really am not sure." *Id*. Williams affirmed that the balancing process would be even more difficult if the defendant did not strike the fatal blow. *Id*. at 220–21. Government counsel then asked if Williams could "meaningful[ly] consider and have that balancing test come out in favor of the death penalty" in such a case. *Id*. at 221. "I don't think I would," Williams replied. *Id*.

To follow up, this court clarified that determining the sentence was not a "mathematical calculation" in which the jurors were required to impose the death penalty if the government proved certain facts. *Id*. at 222. The court emphasized that it needed to know whether Williams fell into an "extreme category" of jurors—whether he was "so

strongly opposed to the death penalty he couldn't vote for it under any circumstance . . . ."
*Id*. at 223.  Williams again answered, "I am really not sure, Your Honor. I guess I feel uncomfortable knowing I will be signing my name on something for somebody to die." *Id*. After hearing argument from the attorneys on whether Williams should be excused for cause, the court called for Williams to return to the courtroom and asked if his discomfort with signing a death verdict would "impede [his] ability to be fair to both sides . . . ." *Id*. at 230. Williams responded:

> I am really not sure, Your Honor.  In certain cases, in the Susan Smith[35] case, you know, to me, there is no doubt what she did to her two boys, she should have gotten the death penalty.  And maybe it is because kids were involved, I don't know.  But I feel, you know, I would have to be honest, I would still feel very, very uncomfortable signing the document saying the death penalty.

*Id*.  This court then excused Williams for cause.  *Id*.

Thus, at both the beginning and the end of voir dire, Williams expressed that he was "not sure" he could be impartial in light of his reluctance to hand down a verdict of death. He did state that he could follow the law as explained by the court. The totality of his answers, however, indicated that he initially thought he would be required to impose the death penalty in certain situations. Once it was explained to him that he would never be required to reach a death verdict but would instead have to make a personal judgment on the propriety of the sentence, Williams expressed uncertainty about whether he could ever impose the death penalty.

---

[35]  The Susan Smith case was a highly publicized South Carolina trial  involving a young mother who killed both of her infant children.

In light of these answers, this court did not abuse its discretion in finding that Williams's views on the death penalty would substantially impair his ability to follow his oath and the court's instructions.

*Rubina Khan*

When the court explained to venire member Rubina Khan that the court was looking for jurors who were not pre-committed to impose or reject the death penalty, Khan stated, "Well, I do strongly oppose it, but I guess I could be able to put aside my views."  Tr. 08/31/04, ECF No. 919  at 271.  When asked if she was "so strongly opposed" to the death penalty that she could never vote for it under any circumstances, Khan answered,  "No, I don't think I fall in that category."  *Id*.  Later, the court explained to Khan that, if the jury returned a verdict of death, all the jurors would have to sign their names to the verdict.  *Id*. at 275. Upon learning this, Khan stated, "I don't know if I would be too easy about that." *Id*. at 276.  Khan expressed a concern that she might be pressured into reaching a verdict with which she did not agree.  *Id*. at 276–77.

After momentarily excusing Khan and hearing argument from counsel, the court asked her some follow-up questions.  *Id*. at 279.  The court reiterated that if the jury decided upon the death penalty, all of the jurors (not just Khan) would have to sign their names to the verdict.  *Id*. at 280.  The court asked Khan if she "had some problems" with that requirement.  *Id*.  "I don't think I can vote for capital punishment, I don't think I can," Khan replied.  This court then excused her for cause.  *Id*.

Basham argues that the district court erred in dismissing Khan without giving defense counsel the opportunity to rehabilitate her.  Pet. at 33. Basham points to no authority

suggesting that a court must provide an opportunity to rehabilitate a potential juror who has given disqualifying answers. In fact, the Fourth Circuit has expressly declined to create such a rule. *Boggs v. Bair*, 892 F.2d 1193, 1201 (4th Cir. 1989) ("[W]e decline to introduce into the law the rule argued for by *Boggs* which would say that a trial judge has a constitutional duty to try to rehabilitate by his personal questioning any juror who has been shown to be disqualified . . . .").

Moreover, Basham can only speculate whether Khan, upon questioning from defense counsel, would have retracted her statement that she did not think she could vote for capital punishment. If the court had allowed defense counsel to ask rehabilitative questions, it presumably would have allowed the government to ask questions as well. The government's questions likely would not have been geared towards "rehabilitation" and may well have shown Khan's reservations to be even more pronounced.

In any event, even if the court had allowed rehabilitation by the defense, and even if Khan retracted her earlier statements, the court would be left with a venire member who had given contradictory responses. As it did with other potential jurors, the court would have been justified in excusing Khan in the face of such contradictions.

*Susan Jackson*

Susan Jackson stated in her written questionnaire that she was "strongly opposed to the death penalty and would have a difficult time voting for it, regardless of the facts and law in the case." Tr. 09/03/04, ECF No. 922 at 72. She also wrote, "Taking a life under any circumstances is reprehensible." *Id*. During voir dire, the district court asked Jackson whether she could "set those beliefs aside and conscientiously follow the law as announced

by the trial judge . . . ." *Id*. at 73.  Jackson replied, "I don't think I can, sir." *Id*.

After some discussion with the attorneys, the court called Jackson back in for further questioning. *Id*. at 74. At that time, Jackson informed the court that she "probably" should have checked the questionnaire box which indicated that she was "personally morally or religiously opposed to the death penalty and would never vote to impose it, regardless of the facts and law . . . ." *Id*. at 74–75. "After sleeping on it," Jackson concluded that she actually fell in the disqualifying category. *Id*. at 75. The court then disqualified her. *Id*.

Basham argues that the district court should have allowed defense counsel an opportunity to rehabilitate Jackson.  Pet. at 33.  But as explained above, there is no requirement that the court grant such an opportunity.  Jackson was forceful and direct in explaining that her opposition to the death penalty would hinder her ability to follow her oath and instructions.  In fact, the more she thought about it, the stronger her opinion became that she could never impose the death penalty, regardless of the circumstances.  There is no indication that additional questioning would have led Jackson to recant her position or, even if that occurred, that additional questioning would have satisfied the court that Jackson could be a fair and impartial juror.

*Failure to Raise the Disqualification Issue on Appeal*

In addition to challenging the court's decision on the four disputed jurors, Basham also challenges the decision of appellate counsel not to include the juror disqualification issue as one of those presented to the Court of Appeals in the direct appeal.

Any appellate challenge to their disqualification would have been weak.  Basham recognizes that "weeding out of weaker issues is widely recognized as one of the hallmarks

of effective appellate advocacy . . . ." Pet. at 36. Basham maintains, however, that the "weeding" principle "has little or no applicability in capital cases—for appellate counsel in a capital case has a duty to consider all potentially available claims . . . ." *Id*. at 36–37. He offers no support for this proposition. To be sure, it would be practically (if not theoretically) impossible for appellate counsel to include every conceivable issue in a capital appeal, even if there were no word or page limits. If perceived errors in the trial proceedings are not filtered by the merits of challenges to those errors, there will always be one more challenge to raise. Because an appellate challenge to the exclusion of the challenged jurors would have been without merit, appellate counsel was not deficient for declining to raise this issue.

For the same reason, Basham cannot demonstrate any prejudice. Even if his appellate lawyers had raised the issue, there is no reasonable probability that doing so would have changed the outcome of his appeal.

In sum, Basham cannot show that this court was not correct in disqualifying the four jurors, nor was counsel ineffective for not raising the issue on appeal. Claim 2 is without merit.

<div align="center">

CLAIMS 4, 5, 6 & 7:
BASHAM'S COMPETENCY

*Introduction*

</div>

Four of Basham's claims relate to his competency at the time of his trial. More specifically, Claim 4 alleges that Basham was tried and sentenced while legally incompetent, and Claims 5, 6, and 7 allege that his trial counsel, the court, and his appellate counsel, respectively, all violated Basham's rights by failing to raise the issue of competency at trial.

This court spent much of the § 2255 evidentiary hearing listening to testimony about Basham's competency. The court heard from Basham's initial team of attorneys (Littlejohn and Monckton) about their assessment of Basham's mental state. The court also heard from Basham's trial counsel (Swerling and Harris) about their impressions of Basham's competency and about the findings from numerous experts they retained to assess Basham's competency. Further, the court heard from two experts about Basham's competency at the time of his death penalty trial. In preparing this order, the court has also reviewed reports and testimony from experts who evaluated Basham before and during his trial. Needless to say, the court feels well-informed of both the lay impressions of Basham's mental state given by his attorneys, and the diagnostic impressions of Basham's competence given by the many experts who have evaluated Basham since this case began in 2002.

Littlejohn and Monckton filed a motion for a mental competency evaluation only a few weeks after Basham was arrested. *See* ECF No. 22. However, their motion provides little insight into the particular reasons for their request. Before the court was able to address the motion, Littlejohn and Monckton were disqualified from the case, and Swerling and Harris took over as Basham's defense attorneys.

Once they entered the case, Swerling and Harris retained numerous mental health experts to treat Basham and to assess his mental state, deciding it was better to have their own experts examine Basham rather than to go forward with the government-sponsored competency evaluation requested by Littlejohn and Monckton. Some of the experts Swerling and Harris relied upon included forensic psychiatrists Donna Schwartz-Watts and Donald

Morgan,[36] neuropsychiatrist Tora Brawley, and neurologist William Brannon.  Dr. Schwartz-Watts alone interviewed Basham forty times, spending a total of over 200 hours with him.  Neither Dr. Schwartz-Watts nor any other expert ever made a finding that Basham was incompetent and unable to go forward with the trial.

As examinations and evaluations by defense experts began, trial counsel requested that Basham be moved out of the Richland County Detention Center and transferred to Columbia Care Center, a secure facility with medical treatment capabilities.  Dr. Schwartz-Watts apparently approved the transfer believing that "Basham [needed to] be moved from the detention center to the Columbia Care Center for more appropriate treatment and monitoring."  ECF No. 95 at 2.  In response to the request, the government asked that Basham undergo a competency evaluation, a motion that trial counsel opposed.  ECF No. 99.  According to trial counsel's motion, Basham was competent, as "[w]ith the necessary therapy, Defendant Basham has been able to assist in his defense and to understand the gravity of the charges he faces."  *Id.* at 2.  At a hearing on Basham's motion to transfer to Columbia Care Center, trial counsel noted that Dr. Schwartz-Watts was examining Basham "for the purpose of establishing competency" and that a transfer to Columbia Care Center "would allow her to complete her evaluation and to make a determination so that she [could] properly advise [trial counsel] as to his competency and his ability to stand trial."  Tr. 6/18/03, ECF No. 260 at 3.  At the same hearing, the government made the following uncontradicted observations:

---

[36] An additional expert, Janet Vogelsang, worked with Basham's trial counsel to recreate and then convey to the jury a biopsychosocial assessment (or family background history assessment) of Basham.  See Tr. 10/11/12, ECF No. 1555 at 343–344; Tr. 10/15/12, ECF No. 1556 at 629.

> In [trial counsel's] response . . . it states that there is no current intention on their part to suggest that [Basham] is not competent to stand trial . . . . We have reviewed discovery pertaining to the Defendant. We have reviewed statements that he made. We have gotten correspondence that he sent to third parties and there is nothing there to suggest that he is not competent to stand trial.

*Id.* at 5.

Once trial counsel confirmed that they were not raising competency as an issue at that time, the government withdrew its request for a competency determination and agreed to have Basham transferred to Columbia Care Center. The court ordered that Basham be transferred to Columbia Care Center for thirty days. At trial counsel's request, the court subsequently permitted Basham's continued stay at Columbia Care Center for an additional month, until October 15, 2003.

As noted above, Dr. Schwartz-Watts interviewed Basham at least forty times, for a total of more than 200 hours. Tr. 10/27/04, ECF No. 968 at 114–17, 264. There is nothing to suggest that Dr. Schwartz-Watts found Basham to be incompetent. In fact, at the *Jackson v. Denno* hearing on February 24, 2004, the court interrupted the proceedings to allow Dr. Schwartz-Watts to examine Basham yet again, and she found him to be competent. Tr. 2/24/04, ECF No. 698 at 3.

On September 20, 2004, during the guilt phase of the trial, Basham became upset after the court told him that he could not have smokeless tobacco during trial. After that, Basham "refused to comply with the district court's instruction to take his seat" and "a tussle ensued in the courtroom between the defendant and the marshals." *Basham*, 561 F.3d at 333; Tr. 9/20/04, ECF No. 941 at 149–53. After the situation was under control and Basham was sent

to a holding cell, trial counsel asked for a continuance to allow Dr. Schwartz-Watts to examine Basham to determine his competency. *Id.* at 153–54. ("We would ask for a delay . . . . We have a doctor on the way . . . . We are concerned about the competency."). The court granted this delay. Dr. Schwartz-Watts examined Basham both that afternoon and the next morning. Immediately following the tussle, Dr. Schwartz-Watts met with Basham for "about 15 or 20 minutes" after which she testified that she had "concerns about his competency." *Id.* at 162. However, she noted that "with a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed." *Id.*

The next morning, at the start of court, Swerling announced that Basham was "competent this morning according to Dr. Watts." Tr. 9/21/04, ECF No. 942 at 6. Dr. Schwartz-Watts affirmed that she had "spent about 45 to 50 minutes with Mr. Basham" that morning and had determined that he was "back to his baseline this morning . . . [and] able to make decisions." *Id.* The court then asked counsel if they were "satisfied [that their client was] competent to go forward," and Swerling answered, "[t]here is no question about competency." *Id.* at 7.

A month later, Dr. Schwartz-Watts testified for two days at the mitigation phase of the trial. She testified extensively about Basham's mental state, including his conduct at trial, but she never hinted that Basham was incompetent. In fact, Dr. Schwartz-Watts testified that although Basham had major mental illnesses, "none of these illnesses affected his ability to distinguish right from wrong." Tr. 10/28/04, ECF No. 969 at 97. Dr. Schwartz-Watts further testified regarding Basham's altercation with the deputy marshals in the

courtroom, opining that it was "not at all" the result of a panic attack. *Id.* at 98.

CLAIM 4:
BASHAM'S COMPETENCY AT THE TIME OF HIS TRIAL

In Claim 4, Basham contends that he was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments. He claims that "at the time of trial, he lacked the 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" Pet. at 39 (citing *Dusky v. United States*, 362 U.S. 402 (1960)).

The government asserts that Claim 4 is procedurally barred and must be dismissed because it is a direct appeal issue and not an appropriate claim in a § 2255 motion. This court must disagree. The claim that Basham was incompetent during his trial is a type of claim known as a "substantive competency claim," and "this kind of claim 'is not subject to procedural default and must be considered on the merits.'" *Battle v. United States*, 419 F.3d 1292, 1298 (4th Cir. 2005) (quoting *Medina v. Singletary*, 59 F.3d 1095, 1106, 1111 (11th Cir. 1995)). As such, the court addresses the merits of this claim below.

The Fourth Circuit has expressed the burden of a § 2255 petitioner attempting to prove a substantive incompetency claim as follows:

> [A] petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his incompetency by a preponderance of the evidence. Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges. Likewise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial.

*Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) (quotations and citations omitted).

In this case, though the court must concede that some of Basham's behaviors at trial were bizarre, volatile, and irrational, this court does not believe that the evidence indicates that Basham was incompetent and thus unable to assist his trial counsel or to understand the charges against him.

*Altercation Between Basham*
*and United States Deputy Marshals on September 20, 2004*

Basham asserts that he was incompetent on September 20, 2004 during the courtroom altercation between himself and eight United States deputy marshals. As evidence of his incompetence, Basham offers the statements of his trial counsel and of Dr. Schwartz-Watts. Immediately after the altercation, Greg Harris expressed concern about Basham's competency, stating that Basham's actions "[l]ooked like someone who didn't have the ability to control the simple function of sitting down in a seat. That is why we have a concern about competence today." Tr. 9/20/04, ECF No. 941 at 157–58. As previously discussed, Dr. Schwartz-Watts also expressed her concerns about Basham's competency to the court.[37] Basham asserts "that, at the very least, on September 20, 2004, [he] was incompetent during his trial." Reply at 31. Of course, the jury was not present at the time of the altercation, and, out of an abundance of caution, the court adjourned for the day

---

[37] At argument on this motion, the government suggested that Dr. Schwartz-Watts's testimony was not clear as to whether she believed Basham was incompetent at the time of the altercation or whether she believed that he got worked up from the altercation and was incompetent as a result. She testified as follows:

> I do have concerns about his competency. It is my opinion right now that because of his mental defect that he can't assist his attorneys. Now, the problem with that and the good news probably is, his mental state fluctuates, and there is going to be times [sic] in this trial where he has competence fluctuation. With a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed.

Tr. 9/20/04, ECF No. 941 at 162.

thereafter. As such, the jury did not witness the scuffle as it was happening, nor did they see Basham again that day. However, the tussle was caught on videotape and audiotape, and the court allowed excerpts of those tapes to be played for the jury during the penalty phase of the trial.[38] Basham contends that "the Court deprived him of his right not to be tried while incompetent when it allowed the government to use his incompetence to its own advantage." Reply at 32.

Not believing that Basham's outburst was a sign of incompetency, the government argued that the scuffle was an attempt at manipulation on Basham's part. However, the court did not make a specific finding as to whether Basham was incompetent either during or after the altercation or whether he was merely manipulating the court. Rather, the court decided to adjourn for the day to "let everybody cool down" with the plan to bring Basham back the next day to "see how he does." Tr. 9/20/04, ECF No. 941 at 163. The next day Basham returned, and the trial resumed after Swerling assured the court that there was not an issue with Basham's competence.

There is some evidence that during the scuffle with the deputy marshals, Basham was not competent. For example, during the tussle and right before Basham was led out of the courtroom, Basham addressed one of the reasons that he had been refused smokeless tobacco,[39] saying "Judge, if I was going to spit, as mad as I am now, I would be spitting now.

---

[38] The court notes that the full audiotape of the altercation was not played for the jury. It was selectively redacted to include enough information so that the jury could understand the context of the fight but to exclude portions that were prejudicial. *See* Tr. 10/15/04, ECF No. 957 at 229–36.

[39] The United States Marshal advised the court against providing Basham with tobacco dip to keep him alert during trial. According to the Marshal, Basham had a history of flinging bodily fluids, and the deputy marshals were concerned that Basham might spit the dip at them. The court informed Basham that he would not be allowed to use dip during trial, citing the spitting hazard as a reason for its decision.

They just made that up." Tr. 9/20/04, ECF No. 941 at 153. Basham apparently had the presence of mind to make a last-ditch argument as to why he should have been allowed smokeless tobacco, even as he was being escorted out of the courtroom. Additionally, the government offered some evidence that Basham may have planned to act out in court. A United States Marshal testified that shortly before the altercation, when the Marshal and two other deputies were bringing Basham up from the holding cell, Basham announced, "I am not going to be up there for that long. I am coming back down here." *Id*. at 166.

The court is not bound by the testimony of Dr. Schwartz-Watts in making its determination as to Basham's competence at the time of the altercation during trial. Based on all of the evidence before this court—including Basham's own statements made prior to and during the altercation—this court does not believe that Basham was incompetent at the time of the courtroom scuffle. As such, Basham's constitutional rights were not violated when the government later showed both videotape and audiotape of the altercation to the jury during the penalty phase of his trial.

*Basham Improperly Medicated on October 26, 2004*

Basham claims that he was incompetent on October 26, 2004, during the penalty phase of his trial. The morning of October 26, the court learned that Basham was not given Seroquel, his antipsychotic medication, the night before at Richland County Detention Center where he was housed. Because Basham's medication was not properly administered, the court ordered him to take his medicine the morning of trial, and the court delayed the trial until 1 o'clock in the afternoon to allow the medicine to take effect. The court then gave Swerling and Harris an additional fifteen minutes to work with their client—even after the

95
**JA 0271**

trial was set to resume. But after those delays the government insisted that the trial continue. When the court ultimately decided to resume the trial over counsel's objections, the court expressed the need to balance any jury prejudice that would result from further delays—which the court surmised the jury would assume were Basham's fault—with any jury prejudice from going forward "with him appearing to be a little bit disheveled over there." Tr. 10/26/04, ECF No. 965 at 16.

Though Basham's trial attorneys stated that they were concerned with the appearance of their client, they presented no evidence that Basham was incompetent after taking his medicine. The record indicates that Basham was agitated when he arrived in court that morning and that he appeared sleepy during testimony that day, but those behaviors are consistent with the way Basham acted throughout trial.

In his § 2255 petition, Basham urges the court that the improper administration of psychiatric medication can render a defendant incompetent. *See United States v. Quintieri*, 306 F.3d 1217, 1233 (2d Cir. 2002). However, there is a lack of evidence that Basham was incompetent on that date (October 26, 2004). If there had been any indication that he was incompetent, the court would have sought the testimony of a doctor on Basham's competency, as this court did on other occasions. At an *ex parte* hearing before Basham took his medication, the court indicated that it was particularly cognizant of the possibility of a § 2255 action if Basham received the death penalty, conveying its understanding of the need for Basham to be not only competent, but also in a good state of mind for trial. Tr. 10/26/04, ECF No. 966 at 5 ("There is no doubt in my mind, if the defendant receives the death penalty, if he does, and if it is upheld on appeal, there will be a 2255 action challenging the

fact that he was not dispensed medicine properly and could not participate in his defense.").

*Basham's General Behavior at Trial*

Basham submits that throughout the trial there were occasions where his incompetence was evident, and Basham cites to the trial transcript to show numerous instances where his counsel or the court discussed Basham's behavior.

For example, Basham contends that he had trouble staying awake at some points during the trial.[40]  He also obsessed over dip[41] according to the trial notes and § 2255 hearing testimony of his trial attorneys.  Tr. 10/15/12, ECF No. 1556, at 588; Pet.'s Ex. 94.

As further evidence signifying incompetence at the time of trial, Basham cites to a specific occasion on October 22, 2004, when his condition deteriorated during the testimony of one of his former social workers, Penny Titzer.  The court excused the jury late in the afternoon, after a full week of trial when Basham's trial counsel requested a break for their client.  At that time, Basham expressed his frustration and stated "I'm out of emotions.  I

---

[40]  Though, at the § 2255 hearing, Basham introduced some evidence that he tried to sleep through trial, the weight of the evidence shows otherwise.  Harris and Swerling testified that they prevented him from trying to sleep and that the court also stopped Basham from sleeping.  Tr. 10/11/12, ECF No. 1555 at 293 ("I would think almost every occasion where we did see him sleeping we made that known to the court . . . ."); Tr. 10/15/12, ECF No. 1556 at 584 ("I don't recall that he was sleeping. There were a couple of occasions where, as the court just reported, that he would close his eyes . . . .").  During the trial, the court took upon itself the task of making sure Basham was alert and awake, providing coffee, caffeinated soft drinks, and smokeless tobacco (during breaks) to Basham.  The court noted the following:

> I became concerned that if the defendant slept through the proceedings, that six years from now, when all of the lawyers have moved on to other things, law clerks are all gone, one person left would be me still in this case.  There will be a suggestion from the defendant, if he is convicted and gets the death penalty, that he slept through his whole trial . . . .  I want to avoid that at all costs.

Tr. 10/15/04, ECF No. 957 at 224–25.

[41]  As discussed earlier, the court refused to allow Basham to have smokeless tobacco in the courtroom.  However, in an attempt to keep Basham alert, the court allowed Basham to have smokeless tobacco during the morning and afternoon breaks from trial.

don't even know how to express it." Tr. 10/22/04, ECF No. 963 at 213.[42]

Basham asserts that his poor behavior during trial indicated that he was incompetent at that time. However, this court believes that all of Basham's misbehavior at trial can be explained by the various mental diseases and defects that he has been diagnosed with—none of which render him incompetent.

For example, Basham has been diagnosed as having Attention Deficit Hyperactivity Disorder (ADHD) by a number of doctors since he was a child, which could explain his failure to pay attention during his trial. Dr. Richard L. Frierson, M.D., who evaluated Basham for purposes of the § 2255 evidentiary hearing, noted the following:

> He continues to display difficulty attending to tasks. Although he was able to focus on our five-hour evaluation, we had to take frequent breaks because he would be easily distracted. At times, he appeared not to pay attention to questions being asked and questions had to be repeated. He often avoids or is reluctant to engage in tasks that require sustained mental effort. This is also clearly evident in his appearances in the courtroom.

Govt's Ex. 251 at 13. Basham's expert for his § 2255 petition, Dr. Thomas Hyde, M.D., Ph.D., also recognized Basham's severe attention problems and explained that Basham's problems lead to anxiety, frustration, and confusion, which can manifest as angry emotional outbursts.

---

[42] During the § 2255 evidentiary hearing, habeas counsel proposed that Titzer's testimony was traumatic for Basham because he had had a sexual relationship with her when he was only fourteen or fifteen years old and she was his counselor. Habeas counsel then attempted to draw a connection between Basham's behavior on October 22, 2004 and the episode on October 26, 2004 when Basham arrived at the courthouse without having taken his medication. Habeas counsel stated that the October 26th incident occurred on the very next day that court was held, stating, incorrectly, that court was not held October 25th and suggesting an association between Basham's mental distress on Friday, October 22nd and his behavior on October 26th. However, habeas counsel was incorrect in their statement of the facts. Trial did go forward on October 25th, and Titzer finished her testimony without incident. Thus, the connection between the events of October 22nd and October 26th is more attenuated than habeas counsel led the court to believe at argument.

Despite diagnosing Basham with ADHD and a host of other mental issues,[43] Dr. Frierson ultimately concluded that there was insufficient evidence to suggest that Basham was incompetent at the time of trial.  Dr. Hyde, on the other hand, opined that "Basham is permanently incompetent on the basis of attention deficit disorder, bipolar disorder, and organic brain damage resulting from closed head injury, and polysubstance abuse (especially the toxic consequences of the inhalation of inorganic solvents)."  Pet.'s Ex. 103 at 11–12.

This court agrees with Dr. Frierson's impression and finds that the instances of poor behavior cited by Basham are not sufficient to show that Basham lacked sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding[44] at the time of his trial.

Basham has not shown by a preponderance of the evidence that he was incompetent at the time of his trial.  As such, Claim 4 is denied.

<div align="center">
CLAIM 5:<br>
TRIAL COUNSEL'S FAILURE TO RAISE<br>
INCOMPETENCE ISSUE AT TRIAL
</div>

In Claim 5, Basham alleges that his trial attorneys rendered ineffective assistance of

---

[43]  Dr. Frierson diagnosed Basham as having the following:  ADHD; cognitive disorder, not otherwise specified; malingering of psychotic symptoms; alcohol abuse; inhalant dependence, in full sustained remission; cannabis dependence, in a controlled environment; cocaine dependence, in a controlled environment; learning disorder, not otherwise specified, by history; antisocial personality disorder; and chronic back pain.

[44]  At the § 2255 evidentiary hearing, the court learned that one way Basham communicated with his trial counsel was through the use of notes.  In one note, he asked Swerling for the juror questionnaires and indicated that he wanted to have someone else look over the questionnaires with him so that he could give his opinion on the potential jurors.  Govt. Ex. 247.  In another note, his trial counsel (presumably, Swerling) asked Basham if he wanted his attorneys to concede his involvement in the Samantha Burns case.  Basham appears to have responded, "No, no."  *Id.*  These notes, among others, presented at the § 2255 evidentiary hearing show that there was communication going on between Basham and his trial counsel and that he was actively participating in his case.

counsel by failing to request that the trial court determine Basham's competency to stand trial.  Alternatively, they argue that trial counsel was ineffective for failing to request a delay in trial until such time that Basham became competent.

As previously mentioned, Swerling and Harris became Basham's trial counsel in April 2003, and, soon after, they had Basham transferred to Columbia Care Center to have Dr. Schwartz-Watts evaluate him.  In September 2003, Basham's trial counsel had his stay at Columbia Care extended on the advice of Dr. Schwartz-Watts.  According to Basham, the "record is devoid of any evidence that, between September 2003 and the commencement of Mr. Basham's trial in September 2004, defense counsel took any further steps to confirm Mr. Basham's competency to stand trial." Pet. at 51.  Basham further asserts that, even during trial, his trial counsel "failed to inform the Court of their concerns about Mr. Basham's competency, and took no steps to delay or terminate Mr. Basham's trial because of his incompetency." *Id.* at 52.

This court must disagree with the allegations made by Basham with regard to this ineffective assistance of counsel claim.  Rather than showing that trial counsel were inactive in their investigation of Basham's competency, the record reveals that Swerling and Harris were thorough in having Basham's competency assessed.

At the § 2255 evidentiary hearing, Swerling stated that he had experts evaluate Basham "several times,"  Tr. 10/15/12, ECF No. 1556 at 662, and those "experts were saying he was competent," *id*. at 659.  Moreover, to say that trial counsel failed to raise the issue of competency to the court is simply not true.  For example, trial counsel brought their concerns about Basham's competency to the court during the morning of the *Jackson v. Denno* hearing

on February 24, 2004.  Tr. 2/24/04, ECF No. 896 at 3 ("I think to be safe and prudent, somebody ought to look at him and see if he is okay and if he's competent to assist us today, and understands the nature of the proceedings and can assist us.").  Months later when Basham tussled with United States deputy marshals in the courtroom, trial counsel asked that Basham be evaluated.  Tr. 9/20/04, ECF No. 941 at 157–58.  Contrary to Basham's assertions, his trial counsel raised the issue of competency before the court multiple times, and each time that trial counsel questioned Basham's competency before the court, the court suspended the proceedings until Basham's own expert found him ready to go forward.

Though trial counsel clearly raised the issue of competency when they felt it was necessary, the government suggests that trial counsel had strategic reasons for not making a general claim that Basham was incompetent.  The government argues that Swerling and Harris did not want the government doctors to have unfettered access to Basham during the pretrial stages of the case.  Of course, the absence of any expert opinion that Basham was incompetent suffices to show why trial counsel did not raise the issue of competency.  However, at the 2255 evidentiary hearing trial counsel acknowledged that they were concerned about "the battery of tests that would be administered if the government got a hold of him."  Tr. 10/14/12, ECF 1555 at 358.  In other words, though Swerling and Harris were able to work with Basham in preparing his case, they certainly could not always control what he did and said, and they were concerned about what Basham might do or say while government doctors evaluated him.  Thus, trial counsel arguably had an additional reason not to claim that Basham was incompetent.

Basham takes issue with the government's argument and points out that "[c]ompetency to stand trial is not a 'defense;' it is a 'rudimentary' and 'fundamental' constitutional aspect of due process of law." Reply at 49 (quoting *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996)). The court agrees with Basham that competency is a constitutional requirement. However, in this case, where trial counsel's "own experts were saying he was competent[,] . . . there really would have been no logical reason to let the government pass on that issue . . . ." Tr. 10/15/12, ECF No. 1556 at 659.

Based on trial counsel's performance during Basham's trial and based on their testimony at the § 2255 hearing, this court concludes that Swerling and Harris were well-aware of their ongoing obligation to bring to the court's attention any concerns that they had about Basham's competency. In fulfilling that obligation, trial counsel decided that rather than assert a claim that Basham was incompetent with no evidence to support such claim, they would proceed in their representation of Basham and raise the issue of competency whenever they saw a genuine issue. At the § 2255 hearing, Swerling explained his position, stating:

> [T]he whole goal here was to save Brandon Basham's life, so there would be absolutely no reason at all for me not to pursue it if it was there, if somebody was saying it was or if anybody observed that he was incompetent. . . . Everybody thought he was competent.

Tr. 10/15/12, ECF No. 1556 at 676–77.

For purposes of this claim, the court is not to consider whether a court or some other attorney thinks that counsel should have raised the competency issue; the court must ask whether trial counsel was "unreasonable" in concluding that under the circumstances they

should not have raised such a defense.  This court cannot conclude that trial counsel's decision to not pursue a competency defense was unreasonable when there is no evidence that Basham failed to understand the proceedings or that he was unable to cooperate with counsel.  *See Robidoux v. O'Brien*, 643 F.3d 334, 340 (1st Cir. 2011).  Accordingly, this court cannot find ineffective assistance by trial counsel as to Claim 5.

CLAIM 6:
THE COURT'S OBLIGATION TO ENSURE COMPETENCY

In Claim 6, Basham argues that the court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether he was competent to stand trial, despite the fact that considerable evidence was presented to the court that he was, in fact, unable to assist properly in his defense.  Basham further claims that regardless of § 4241, the court was obligated under *Pate v. Robinson*, 383 U.S. 375 (1966), to conduct a competency evaluation in this case.

This challenge is unavailing and fails because:  (1) this is a direct appeal issue that Basham procedurally defaulted; (2) there was not reasonable cause to believe that Basham was incompetent; and (3) Basham's trial counsel resisted such an order for strategic reasons and affirmatively told the court that Basham was not incompetent.

A trial court is required to order a competency hearing when the court finds "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(a).  Similarly, a trial court's failure to inquire into

competency, *sua sponte*, where there is reason to doubt a defendant's competency, violates due process because it deprives the defendant of his right to a fair trial. *Drope v. Missouri*, 420 U.S. 162, 172 (1975); *Pate*, 383 U.S. at 385–86. But barring indicia of incompetence, due process does not require that a competency hearing be held. *Godinez v. Moran*, 509 U.S. 389, 402 n.13 (1993). Because evidence of a defendant's demeanor at trial is relevant in determining competency, a district court may determine informally whether reasonable cause exists by observing the defendant's demeanor and assessing his statements during colloquies and other interactions with the court. *United States v. Jones*, 642 F.3d 1151, 1161 (D.C. Cir. 2011); *United States v. Weathington*, 507 F.3d 1068, 1073 (7th Cir. 2007); *United States v. Grimes*, 173 F.3d 634, 636 (7th Cir. 1999). If the preliminary inquiry does not establish reasonable cause to believe the defendant is incompetent, a hearing is not mandatory. *United States v. Graves*, 98 F.3d 258, 261 (7th Cir. 1996).

Basham did not challenge the district court's failure to order a competency hearing pursuant to 18 U.S.C. § 4241 during trial. Moreover, Basham did not raise this issue on direct appeal but brings this challenge for the first time in this § 2255 proceeding. Alleged violations of 18 U.S.C. § 4241 are not cognizable under § 2255. *See United States v. Williams*, 819 F.2d 605, 607 (5th Cir. 1987). Claim 6 is a procedural competency claim, and because it was not raised on direct appeal, it has been waived. *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). If a defendant fails to raise an issue at trial or on direct appeal, he must show cause excusing the procedural default and actual prejudice resulting from the alleged error to prevail under § 2255. *United States v. Frady*, 456 U.S. 152, 167–68 (1982); *United States v. Dunham*, 767 F.2d 1395, 1397 (9th Cir. 1985).

Basham admits that, to the extent that this claim invokes 18 U.S.C. § 4241, it could be found to be procedurally defaulted. However, Basham contends that there is both "cause" and "prejudice" in this case that excuses the procedural default. Basham argues that his appellate counsel's ineffective assistance of counsel, which is the subject of Claim 7, is the "cause" for his failure to raise the § 4241 claim earlier. Basham further submits that he was prejudiced by his appellate counsel's failure to raise this claim. Additionally, Basham argues that even if a petitioner's § 4241 claim is barred, he may raise in a § 2255 proceeding that "closely related" claim, premised on *Pate*, that "the evidence before the trial court presented a 'bona fide doubt' as to his competency and therefore the court was required to hold a competency hearing before proceeding with trial . . . ." *Williams*, 819 F.2d at 607; *cf. Battle*, 419 F.3d at 1298 (finding *Pate* claims to be waived if not raised on direct appeal).

This court believes there was no cause or prejudice to excuse the procedural default in this case and that the instant claim is barred. However, out of an abundance of caution, the court discusses the merits of Basham's entire Claim 6, below.

Even if this claim were not defaulted, this court did not err or abuse its discretion in refusing to order a competency evaluation or hold an evidentiary hearing to determine Basham's competence to stand trial. As explained earlier, Basham's behavior, though strange, did not suggest that he was incompetent. Moreover, trial counsel and Dr. Schwartz-Watts informed the court at different times that Basham was competent. *See United States v. Clark*, 617 F.2d 180, 186 (9th Cir. 1980) (fact that defendant's attorney considered defendant competent to stand trial was significant evidence that defendant was competent). Furthermore, Basham's trial counsel affirmatively sought to prevent the court from ordering

a competency evaluation and hearing. *Hernandez*, 930 F.2d at 718 (trial counsel in best position to evaluate client's comprehension of the proceedings).

Basham argues that this court ignored facts raising a bona fide doubt as to his competency. He points to October 26, 2004 and asserts that the court, "because of scheduling concerns, elected to proceed despite Mr. Basham's obvious, erratic behavior and his attorney's expressed concern about his competency to proceed." Reply at 55–56. However, the record shows that Basham's trial counsel never told the court that they were concerned about their client's competency that day.

As discussed in Claim 4, after Basham received his medicine, Swerling and Harris expressed their concern that he would not be able to "sit in the courtroom and pay attention to the testimony, remain silent." *Id*. at 14. Additionally, Harris stated, "I just don't think that he is in a state, frame of mind to go forward today." *Id*. at 16. However, they expressed no concerns about Basham's competency though they had done so in the past when they recognized that issue. The record also shows that the court acknowledged that Basham looked "a little bit disheveled." *Id*. However, the court clearly did not see any evidence of incompetency, as it had repeatedly demonstrated its willingness to halt proceedings to ensure that Basham was competent.

Under such circumstances, the court cannot be faulted for failing to order a competency hearing, *sua sponte*. *See e.g.*, *Jermyn v. Horn*, 266 F.3d 257, 298 (3d Cir. 2001) (no competency hearing required "where there were no medical opinions on competency submitted to the trial court, no signs from trial counsel that the defendant's competence was in doubt in his view, and the defendant's behavior, while strange, was not sufficiently

indicative of [an] individual who was incapable of understanding the nature of the proceedings, communicating with counsel or assisting in his defense"). Accordingly, the trial court did not err in refusing to order a competency hearing, *sua sponte*.[45]

<div align="center">

CLAIM 7:
APPELLATE COUNSEL'S FAILURE TO RAISE
THE ISSUE OF BASHAM'S INCOMPETENCE ON APPEAL

</div>

In Basham's Claim 7, he asserts that his appellate attorneys negligently failed to raise on direct appeal both the issue of incompetency and the issue of the court's failure to fulfill its *sua sponte* obligation under 18 U.S.C. § 4241(a) to order a competency hearing.

The selection of which issues to present on appeal is, almost by its very nature, a strategic decision. *See Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000) ("[A]ppellate counsel is given significant latitude to develop a strategy that may omit meritorious claims in order to avoid burying issues in a legal jungle."); *Haynes v. United States*, 451 F. Supp. 2d 713, 722 (D. Md. 2006) ("Limiting the issues to the stronger or strongest ones while winnowing out the weaker is sound appellate strategy."). "Effective assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, and [the court] must accord counsel the presumption that he decided which issues were most likely to afford relief on appeal." *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008)

---

[45] Although not advanced by the government in its brief in the § 2255 proceeding, at trial the government introduced a thirty-nine foot long rope that Basham had improvised while staying at Columbia Care Center in pretrial incarceration. The government suggested that Basham intended to use the rope in an escape attempt. The rope was made out of bed sheets carefully torn into strips approximately one inch wide, which were then twisted into a filament using the crank handle on the bed in Basham's room. These filaments were then woven into a rope approximately three-fourths of an inch in diameter that closely resembled ropes available at traditional hardware stores. Tr. 10/12/04, ECF No. 954 at 242–57. The government stretched out the rope across the courtroom for cross-examination of defense witnesses who suggested that Basham's mental and physical limitations were significant impediments to impose a death sentence.

(alterations, quotations, and citations omitted). "Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy," and "counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims." *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (alterations, quotations, and citations omitted). Consequently, while it is conceivably possible to bring an ineffective assistance claim premised on an appellate counsel's failure to raise an issue, "it will be difficult." *Id.* (alterations and quotations omitted). "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Lawrence*, 517 F.3d at 709 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

No less than ten attorneys made up the appellate team that researched, wrote, and argued the claims presented in Basham's direct appeal to the Fourth Circuit. Tr.10/9/12, ECF No. 1561 at 88–89. Appellate counsel submitted a thorough and well-reasoned 164-page opening brief, which set forth six issues, and a subsequent 64-page brief. The appeal of Basham's trial and sentencing resulted in a lengthy opinion. *See Basham*, 561 F.3d 302 (4th Cir. 2009).

Basham asserts that appellate counsel rendered ineffective assistance of counsel when they "unreasonably chose to forego [competency claims] in favor of other, much weaker arguments . . . ." Reply at 57. Specifically, Basham believes that appellate counsel presented a weaker issue when they argued that the court should have allowed trial counsel

to present evidence from the Fulks trial—namely, evidence of Fulks's prior actions and of the government's description of Fulks at his trial. According to Basham, that argument is weaker than a stand-alone competency claim because the court deferred ruling on the admissibility of the Fulks trial evidence, and trial counsel never renewed their motion during trial. Thus, the trial court never issued a ruling on that issue, and the Fourth Circuit could not even review the objection for plain error. *Basham* 561 F.3d at 335.

It is disingenuous for Basham to imply that appellate counsel chose to forego a competency claim completely. It is clear from the evidence presented at the § 2255 hearing that appellate counsel considered including the competency issue in various ways in their appellate brief, and, ultimately, they decided that it was best to include the competency issue as part of the disqualification section of their brief regarding this court's disqualification of Littlejohn and Monckton. Additionally, appellate counsel's argument regarding the Fulks trial evidence was not raised as a stand-alone issue either. Rather, it was merely one argument made in the part of the appellate brief challenging a variety of evidentiary rulings made in the penalty phase of Basham's trial.

This court cannot find that appellate counsel rendered ineffective assistance to Basham. On the contrary, this case presents a textbook case of "[w]innowing out weaker arguments on appeal and focusing on those more likely to prevail." *Bell*, 236 F.3d at 164. It is clear from the evidence presented to this court that appellate counsel thoroughly considered the issue of competency and decided that it was best to include it in their brief as part of the disqualification issue. The court cannot fault appellate counsel for that strategic decision. In these circumstances, appellate counsel were not ineffective for failing to raise

competency as a stand-alone issue on appeal, and appellate counsel's decision to raise the issue elsewhere did not prejudice Basham.

CLAIM 8:
MEDICATIONS ADMINISTERED TO BASHAM
DURING THE TRIAL PROCEEDINGS

Claim 8 was withdrawn by Basham prior to the evidentiary hearing.

CLAIM 9:
TRIAL COUNSEL'S CONCESSIONS ON GUILT

As noted previously, the FDPA provides for a bifurcated trial proceeding. In phase I, the jury determines guilt or innocence. If the defendant is found guilty, the jury determines whether the death sentence or life imprisonment without parole is the appropriate punishment in phase II.

A capital defendant has three options regarding phase I: (a) plead not guilty and put the government to its proof on both guilt and the penalty to be imposed; (b) plead guilty and proceed straight to the penalty phase; or (c) concede that the defendant was present at the time of the crime and perhaps even participated in some way, but deny some essential elements of the crime such as the requisite mental state.

As noted previously, Basham's co-defendant, Chad Fulks, chose option (b) above and in the Fulks § 2255 proceeding, Fulks's post-conviction counsel argued that the strategy choice was a poor one. In Fulks's case, defense counsel offered a nationally recognized expert witness who testified that in a capital case, the defendant should *always* plead not guilty, thus requiring a guilt phase trial. The advantages of this approach, according to Fulks's trial counsel and expert witness, involve "front loading" all of the especially

110
**JA 0286**

damaging testimony regarding the commission of the crime, so that by the time the jury reaches the penalty phase (assuming the defendant is found guilty), the negative inferences from the sometimes gruesome testimony has dissipated in the minds of the jurors. It was also argued that by denying guilt the defendant may benefit—if one or more jurors are somewhat reluctant to find the defendant guilty, but acquiesce in a guilty verdict, those jurors may have some "residual doubt" that will cause them to hold out for a life sentence rather than the death penalty in the second phase. Indeed, two of Fulks's trial counsel have authored a law review article advocating approach (b) above in appropriate cases.[46]

In Basham's case, Swerling and Harris opted for a hybrid approach. That is to say, Basham pled not guilty to Count 1 (carjacking resulting in death) because, according to his attorneys, he lacked the requisite mental state to be guilty of a capital offense as charged in Count 1. In all other respects, Basham admitted his guilt. In other words, he admitted the capital offense charged in Count 2, together with the non-capital offenses charged in Counts 3 through 8. Basham's counsel signaled their intention in this regard during jury selection, suggesting to the jury that there would "probably" be a penalty phase to the trial for which they were being considered.

Then, prior to the opening statements at the guilt phase, Swerling asked for an audience with the court, ex parte, so that he could put on the record that the decision to admit

---

[46] "Sometimes the tension between contesting guilt and acknowledging responsibility can be bridged by partial defenses; a defendant may contest his mental state, or his role in a multi-defendant crime without necessarily incurring the jury's wrath when he "switches" to a focus on mitigation in the penalty phase. Likewise, a defense that acknowledges involvement in the killing but denies that the defendant was guilty of capital murder appears to escape this backlash, at least where the defense is plausible on the facts." John H. Blume, Sheri Lynn Johnson & Scott F. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 Hofstra L. Rev. 1035, 1044–45 (2008) (emphasis added).

all charges except the mental state requirement on Count 1 was a strategic one. Swerling related to the court that he had discussed the issue thoroughly with Basham, and that Basham's mental health expert concluded that "as a matter of strategy, we think this is the best approach." Tr. 9/13/04, ECF No. 934 at 2–3. After hearing Swerling's explanation, the court had a short colloquy with Basham to confirm that he agreed with counsel's strategy. After advising the court that he had discussed the issue thoroughly with Harris and Swerling, Basham agreed with the course of action proposed by his attorneys. *Id.* at 5.

In Claim 9, Basham challenges Swerling's strategic decision. He suggests that Swerling's ex parte explanation of his strategy with the court was "an attempt to immunize himself from a later claim of ineffective assistance of counsel." Pet. at 47. Basham contends that he received ineffective assistance of counsel within the meaning of the federal constitutional and statutory law when trial counsel conceded Basham's guilt to virtually all of the charges against him, including the capital offense of kidnapping resulting in death as charged in Count 2. In other words, without contesting the charge in Count 2, Basham admitted that he was death eligible. Basham argues that "no reasonable strategy justified the concessions made by counsel." Pet. at 49.

Basham argues that if his trial counsel had followed Fulks's approach of pleading guilty to all counts and proceeding directly to a penalty phase trial, "the jury would have at least been spared an approximately three-week trial involving the testimony of more than 90 witnesses." Pet. at 50. Further, Basham argues that defense counsel told the jurors that their client was guilty, but then necessarily implied that Basham was nevertheless going to require them to sit through weeks of trial "on what was actually a *fait accompli*." Pet. at 50.

According to Basham's argument, by conceding that Basham was guilty of kidnapping resulting in death, defense counsel acknowledged that their client was death-eligible. Basham contends that defense counsel risked incurring the jurors' ire by requiring a guilt phase trial that was technically unnecessary.

The court is constrained to reject these arguments. To begin with, if Basham had elected to proceed in the same fashion as Fulks and plead guilty to all counts, it would not have prevented the jury from hearing from the eighty-nine witnesses who testified in the guilt phase of the case. Instead, the jury would have had to hear the gruesome details of the seventeen-day crime spree even when considering the penalty to be imposed because the severity of the Basham and Fulks's conduct was necessarily a factor for the jury to consider in its decision.

Secondly, there was a reasonable basis on which Swerling elected to deny guilt on Count 1 only. The requisite mental states for Count 1 and Count 2 are different. Thus, there was a principled reason to admit guilt on Count 2, but not Count 1.[47]

Regarding the three options available to a capital defendant referenced earlier in this section, it is clear that there are different schools of thought, each of which has its vocal adherents in the criminal defense bar. Decisions such as these are quintessentially the type of strategy decisions that are best left to skilled trial counsel. It has already been noted in this order that Swerling is a highly experienced criminal defense lawyer, having tried more than 100 homicide cases, four of which involved the death penalty.

---

[47] Count 1 required a showing that *at the time of the carjacking* the defendant intended to cause death or serious bodily harm. Count 2 did not contain a similar intent requirement focusing on the precise moment of the kidnapping.

As the government observes in its response brief:

> In considering a Sixth Amendment ineffectiveness claim, a reviewing court does not "grade" the lawyer's trial performance; it examines only whether his conduct was reasonable under prevailing professional norms and in light of the circumstances. Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Carter v. Lee*, 283 F.3d 240, 248–49 (4th Cir. 2002) (quotations and citations omitted).

In *Florida v. Nixon*, 543 U.S. 175 (2004), the Supreme Court held that counsel has the authority to concede the defendant's guilt in the guilt/innocence phase of a death penalty trial even without receiving consent from the client. The Court's decision in *Nixon* turned, in part, on its assessment that skilled criminal defense lawyers sometimes employ the strategy of conceding guilt in capital trials. *Id*. at 191–92. The Court pointed out that renowned trial advocate Clarence Darrow employed this strategy. *Id*. at 192. If counsel has the authority to concede guilt in an appropriate case even without the client's consent, certainly counsel was not ineffective here. After thoroughly discussing the matter with Basham and his mental health expert, counsel made a strategic move that did not prolong the trial of the case. Furthermore, counsel's decision held out the hope that some type of residual doubt from a finding of guilt in Count 1 might work to Basham's benefit in the penalty phase conducted later. The court finds no error as to Claim 9.

## CLAIM 10:
### BASHAM'S REQUEST TO BE ABSENT FROM THE TRIAL

As noted in the section of this order discussing competency, both the guilt phase and

the penalty phase of this trial were punctuated by interruptions necessitated by Basham's needs and desires. On several occasions when Basham attempted to daydream or fall asleep, the court interrupted the proceedings to advise the defendant that he needed to be awake and alert so as to properly assist his attorneys in the trial of the case. On many occasions, the court offered short recesses, soft drinks, and other stimulants such as caffeinated beverages to help Basham remain alert.

Shortly after the beginning of the penalty phase of the trial, the court was informed, by way of Basham's counsel, that if the court would permit him to use smokeless tobacco or "dip" in the courtroom during trial, it would help keep the defendant awake and also calm his nerves. This request occurred late in the week, and the court thereupon indicated to Basham that the following Monday he would be allowed to have dip in the courtroom during the proceedings.

To this end, the court had its law clerk purchase a can of tobacco dip which was available for the start of proceedings the following Monday. Prior to the commencement of the trial, however, the court was informed by the United States Marshal that security concerns would not permit Basham to use dip during the trial. The Marshal explained that use of dip by a defendant in custody, with a history of altercations with prison guards, could be considered a "bio-hazard" because the defendant could spit an expectorant containing the dip into the faces of the guards who were assigned to accompany him. The court reluctantly accepted the Marshal's recommendation and then advised Basham that it would not be possible, after all, for him to receive the dip. The court did, however, offer Basham other stimulants such as caffeinated beverages. Tr. 9/20/04, ECF No. 941 at 3–4.

Basham was informed of this development following the lunch break on September 20, 2004, on the fifth day of testimony in the guilt phase of the trial.[48]  In response, Basham immediately informed the court, "I would like to go back downstairs, if I may.  I don't feel good."  Tr. 9/20/04, ECF No. 941 at 148.  The court then informed Basham that it was "not possible" for him to go back to the holding cell because he "need[ed] to be here to help your lawyers defend this case."  *Id.* at 149.

While the court dealt with an administrative matter, Basham apparently advised his attorney of his need to leave the courtroom because shortly before the jury was brought back into the courtroom, Swerling indicated that Basham's absence during trial would be "against my judgment, my wishes."  Tr. 9/20/04, ECF No. 941 at 149.  Basham continued to plead with the court, stating that all he was asking was to be able to go downstairs so he could lie down.  *Id.* at 149–50.  According to Basham, court officers then grabbed Basham, and a struggle ensued in the courtroom out of the jury's presence.  In actuality, the record should reflect that while the colloquy discussed above was ongoing, Basham was standing.

After the court made it clear that Basham would not be permitted to leave the courtroom, the court informed Basham that he should be seated so that the jury could be brought back into the courtroom.  *Id.* at 149.  After the court repeated its request for Basham to be seated two more times, *Id.* at 149–50, one of the United States deputy marshals assigned to provide security in the courtroom walked up behind Basham and placed his hands

---

[48]   After the lunch recess, the court read a note provided by the Marshal stating that Basham had told another deputy marshal that he did not actually care about having chewing tobacco, but that he just wanted to make Deputy Marshal Riley, an African-American, mad.  Basham then told of the alleged causes for his inability to get along with Deputy Marshal Riley.

on Basham's shoulders to require him to be seated.  Basham then turned and began a struggle with the deputy marshal, a struggle which was soon joined by seven other deputy marshals.  During the ensuing fracas, Basham shouted several obscenities at the deputy marshals who were attempting to subdue him.  Eventually, order was restored and the court adjourned the trial for the remainder of the day.

Later in the penalty phase of the trial, the government argued, successfully, that the video of Basham's struggle with the deputy marshals was relevant on the question of future dangerousness if the defendant were to be given a life sentence.  The court allowed the audio and video to be viewed by the jury, minus the audio portion of the tape which contained the obscenities shouted by Basham during the struggle.[49]

On this record, Basham argues that his constitutional rights were violated when the court refused to allow him to exit the courtroom as he requested.  Basham suggests that the prejudice resulting from the courtroom scuffle seen by the jury is unquestionable.  He argues that this court's refusal to permit him to leave and his attorney's failure to advocate on his behalf led to the jury seeing the videotape of the scuffle.

Although it is well-settled that the Sixth Amendment to the United States Constitution guarantees a defendant's right to be present in the courtroom during the trial of his case, *see Lewis v. United States*, 146 U.S. 370–72 (1892), Basham seeks to assert the opposite right—the right to absent oneself from a capital trial at his whim.  Although Basham cites to Rule 43 of the Federal Rules of Criminal Procedure to support his argument, this Rule may

---

[49]  The video, which was from the courtroom security camera, was government's exhibit 469(a) during the trial.  The redacted audio, which came from the court reporter's back-up audiotape, was government's trial exhibit 469(b).

actually require a capital defendant's presence in a capital case, at least during the sentencing proceeding. It appears to this court that it is unsettled whether a capital defendant can waive his presence at trial except when it is purposefully disruptive. *See Near v. Cunningham*, 313 F.2d 929, 931 (4th Cir. 1963); *United States v. Tipton*, 90 F.3d 861, 873–74 (4th Cir. 1996); *see also L'Abbe v. DiPaolo*, 311 F.3d 93, 97 (1st Cir. 2002) (observing that "the Supreme Court has never directly ruled on the issue of whether a criminal defendant can waive his right to presence in a capital case"). Because the law on this issue is so unclear, trial counsel cannot be faulted for insisting that Basham be present for his capital trial.

In short, trial counsel was not ineffective when they insisted that Basham be present in the courtroom. In this claim, Basham asks the court to take an inappropriate approach and employ 20/20 vision of hindsight in evaluating trial counsel's actions. There is no way that Swerling and Harris could have predicted that the courtroom scuffle would have ensued when the court refused to allow Basham to leave the courtroom.

Finally, it should be noted that when the court was planning the procedures relating to the § 2255 evidentiary hearing, Basham's § 2255 counsel strongly advocated Basham being brought from the federal death row in Terre Haute, Indiana to Columbia, South Carolina for purposes of assisting his attorneys in reviewing alleged legal errors for what is basically a settled trial record.[50] The court learned that to require Basham's presence would have necessitated five armed guards flying from Indiana to South Carolina, with attendant

---

[50] In a letter to the court prior to the hearing, counsel also informed the court that Basham "has repeatedly requested that he be allowed to be physically present for the hearing." Letter from Michael L. Burke to Judge Joseph F. Anderson, Jr. dated September 21, 2012, filed under seal, ECF No. 1537. Yet shortly after the hearing began, Basham stormed out of the room where the satellite transmission was arranged and made only one more brief appearance thereafter.

security concerns while Basham was housed locally.  In spite of this, § 2255 counsel continued to advance the argument that Basham needed to be present.  Ultimately, the court decided to use satellite conferencing with a separate confidential telephone line to § 2255 counsel as described earlier in this order.  If Basham's current counsel believe strongly that his presence was necessary at the § 2255 hearing, they cannot at the same time be heard to fault trial counsel for insisting that he be present at the trial where arguably Basham's involvement in the decision-making process was much more critical.

Claim 10 is therefore without merit.

<div align="center">

CLAIM 13:
THE FAILURE TO ARGUE TO THE JURY THAT BASHAM'S
STATEMENTS TO LAW ENFORCEMENT WERE INVOLUNTARY

</div>

In Claim 13, a claim very similar to Claim 2, Basham contends that his trial attorneys were ineffective for failing to argue to the jury that his post-arrest statements to law enforcement officers were involuntary.  Pet. at 57–58.

Claim 13 fails for the same reason Claim 2 fails. First, there is no evidence that Basham's statements were involuntary. The court has thoroughly discussed the testimony produced at the *Jackson v. Denno* hearing in its treatment of Claim 2, *supra.*  It would serve no useful purpose to repeat that information here.

Moreover, counsel's failure to argue to the jury that Basham's statements were involuntary was clearly reasonable in light of the fact that the court had already determined that the statements should be admitted and the fact that Basham's attorneys needed to preserve their ability to argue to the jury in mitigation that Basham had been cooperative with law enforcement.  Indeed, this was one of the few factual arguments available to Basham at

the penalty phase of his trial. To have earlier urged the jury to reject his statements as involuntary would have run the risk of alienating the jury and forfeiting what might have been the most persuasive mitigation argument available in the case. For these reasons, Claim 13 fails.

<div align="center">

CLAIM 14:
DEFENSE ATTORNEY JACK SWERLING'S
ALLEGED PERSONAL CONFLICT OF INTEREST

</div>

In 2002, the same year of the crimes at issue in this case, Jack Swerling, his wife, and his daughter were held at gunpoint and then tied up in their home by two masked men. One of the hostage-takers was Jimmy Causey, a former client of Swerling. Swerling began representing Basham in late April 2003. Less than one month later, the perpetrators were charged with the kidnapping of Swerling, his wife, and his daughter. Both Swerling and his wife testified about the home invasion and their abduction by the perpetrators. Apparently during Jimmy Causey's trial, Causey's attorneys intimated that Swerling's daughter was somehow secretly working with the perpetrators.

The jury reached its verdict in the case, finding Causey guilty, on February 12, 2004. Because Swerling's ire had been provoked when Causey's attorneys suggested that his daughter was in collaboration with the home invaders, Swerling became emotional immediately following the verdict when Causey refused to return to the courtroom to hear the verdict or to be sentenced. Causey's absence from the courtroom triggered an eruption from Mr. Swerling who arose, pointed his finger at the three public defenders in the case, and suggested that the defendant and his team of lawyers "ought to be embarrassed." Eventually, the trial judge prevented Swerling from saying anything further. Swerling later wrote a letter

to the judge and other court personnel to apologize for his actions.

As noted previously, the *Jackson v. Denno* suppression hearing in Basham's criminal case began in this court on February 24, 2004, a scant twelve days after the verdict in the Causey case.

On this record, Basham asserts that Swerling's "personal conflict of interest" rendered him ineffective in his representation of Basham and that Basham was prejudiced as a result.

At the conclusion of phase I of the evidentiary hearing in this case, the court invited counsel to comment briefly upon Claim 14. Specifically, the court inquired of Basham's § 2255 counsel (1) whether they contended that Swerling's unfortunate home abduction incident rendered him per se incapable of rendering effective assistance of counsel in *any* case involving allegations of abduction and potential homicide or (2) whether the gist of Claim 14 was that Swerling's experience colored his judgment and affected his mental processes to such an extent that he did not live up to the high standards he had established for himself in previous criminal cases. The court pointed out that if the answer to the court's inquiry was number (2) above, then the court would be right back to an analysis of whether Swerling's performance was effective under *Strickland.* In other words, if Swerling was not per se disqualified from handling all similar criminal cases, and if Basham is required to show that Swerling's performance was deficient in some respect, then Claim 14 adds nothing to the substance of this case. It might merely go to show the *reason behind* Swerling's alleged deficient practice, but it does not prove that his representation was below the standard established by *Strickland*. Counsel responded that they could not, in good conscience, argue that Swerling was per se disqualified from all similar cases, and that actual prejudice would,

therefore, have to be shown.  Because Claim 14 requires that Basham show Swerling's performance was deficient in some respect under *Strickland*, and because the court has found in other parts of this order that Swerling's performance did not fall below this level, Claim 14 must be denied.

<div align="center">

CLAIM 15:
EVIDENCE REGARDING THE KIDNAPPING
AND DEATH OF SAMANTHA BURNS

</div>

In Claim 15, Basham argues that his trial attorneys rendered ineffective assistance of counsel when they failed to properly object to the admission of unfairly prejudicial prior act evidence during the guilt phase of his trial.  He also contends that appellate counsel were similarly ineffective in failing to raise this issue on appeal.

At issue in Claim 15 is the fact that the court allowed, in the guilt phase of Basham's trial, evidence regarding the abduction, kidnapping, and murder of Samantha Burns on November 11, 2002, which occurred in West Virginia some three days before the abduction, rape, and murder of Alice Donovan in South Carolina.[51]

At a pretrial conference held on August 4, 2004, the government informed the court and defense counsel that it intended to offer evidence of the Samantha Burns murder during the guilt phase of Basham's trial, suggesting that the crimes against Burns were "intrinsic" to the Donovan case, and the evidence was therefore admissible under Rule 404(b) of the Federal Rules of Evidence.  Three weeks later at a subsequent pretrial hearing, defense counsel appeared to concede that the facts of the Burns crimes were, in fact, intrinsic to the

---

[51] The criminal acts against Samantha Burns were prosecuted in the District of West Virginia. Basham pled guilty and was sentenced to life imprisonment.

Donovan case. Trial counsel added, however, "I don't want the court to think the record is reflecting that we are waiving an objection." Tr. 8/25/04, ECF No. 916 at 114.

Early in the guilt phase of Basham's trial, the government began to present evidence of the crimes against Samantha Burns. Defense counsel did not object, and several witnesses, including several members of the Burns family, were called to testify about her disappearance. During this testimony, the court suggested that the testimony could be considered 404(b)-type testimony and asked defense counsel if they wished to have a limiting instruction suggesting that the evidence was being admitted for one of the limited purposes recognized in Rule 404(b). The government responded by once again suggesting that the Burns evidence was intrinsic to the crimes on trial, and defense counsel did not offer a position on whether Rule 404(b) applied or whether a cautionary instruction should be given. During this exchange, the court noted that, in its experience of twenty-six years on the trial court bench, it is rare for a defense attorney to request a Rule 404(b) cautionary instruction, apparently because the conventional wisdom is that such a cautionary instruction simply highlights the testimony for the jurors. In any event, defense counsel did not object to the evidence coming in, and never requested a Rule 404(b) instruction.[52]

At the outset, it should be noted that to the extent that Basham suggests in Claim 15 that evidence regarding Burns's death should not have been admitted at all, this claim has been foreclosed by the decision of the Fourth Circuit Court of Appeals in Basham's direct

_____

[52] It can thus be seen that the record was left unclear as to whether testimony regarding the Burns murder was admitted as being intrinsic to the crimes charged, or was admitted for one of the not-for-character purposes allowed under Rule 404(b). As indicated above, the government urged its admission as being intrinsic to the crime, and defense counsel never objected and did not respond to this court's suggestion that a Rule 404(b) limiting instruction be given. Thus, this court was not directly called upon to make a decision as to the basis on which the evidence was being admitted.

appeal of his conviction.

Specifically, in his direct appeal, Basham contended that this court committed error when it permitted "evidence that Basham and Fulks carjacked, kidnapped, and murdered Burns." *United States v. Basham*, 561 F.3d 302, 329 (4th Cir. 2009). Basham also contended that this court impermissibly let the government use this evidence in its closing argument not to prove intent under Rule 404(b), but to impermissibly prove criminal propensity. *Id*. As to the admission of this testimony, the Fourth Circuit stated:

> We find no error, let alone plain error, on this claim. The government referred to both incidents in its closing arguments during a list of incidents showing that Basham possessed "intent to harm and threat[en], and cause serious bodily harm and death."
>
> * * *
>
> A full examination of this closing argument . . . reveals that the government tied this evidence entirely to a discussion of Basham's intent. Accordingly, there was no error, let alone plain error in allowing the government's closing argument on this point.

*Id.* at 330.

Thus, to the extent Claim 15 can be read as challenging this court's admission of the testimony regarding the circumstances surrounding Burns's death, the Fourth Circuit Court of Appeals has already determined that the admission of this evidence was proper to show intent under Rule 404(b). More specifically, Basham's primary, if not sole, defense in this case was that at the time he and Fulks kidnapped Alice Donovan, he (Basham) did not have the requisite intent. Thus, the fact that Basham and Fulks had only a few days earlier committed similar acts of violence against another woman, using a similar modus operandi, was relevant to show intent.

In Claim 15, Basham also seems to allege a subordinate argument by suggesting that in allowing testimony regarding the Burns murder, the court improperly allowed "extended testimony" from Burns's family and friends which was not calculated to prove anything in the case, but rather was presented to engender sympathy from the jury. At the § 2255 evidentiary hearing, Basham's § 2255 counsel suggested, or at least implied, that this court improperly allowed "victim impact"-type evidence from emotional members of Burns's family. Close examination of the transcript of the testimony of these family members, however, reveals that this is not the case.

The prosecution team called Samantha Burns's aunt, her parents, her brother, and two friends during the guilt phase of the trial. All of these witnesses, in some way, had information pertaining to Burns's disappearance and her relationship with her family. Quite obviously, the government wanted to disabuse the jury of any notion that Burns was a renegade teenager who might have run away from home, eloped with a boyfriend, or disappeared for reasons of her own. Therefore, it was necessary for the government to provide for the jury the precise details relating to Burns's disappearance and also to develop the fact that she was a college student who lived at home and maintained a normal relationship with family members. Except for one question, discussed below, none of the testimony of these witnesses can be said to be "victim impact" evidence or evidence designed to elicit sympathy from the jury.

Melissa Jeffers, Burns's aunt, was with Burns on the night she disappeared from the Huntington Mall in West Virginia. In addition, Jeffers testified about a "very close relationship" between Burns and her extended family. Tr. 9/15/04, ECF No. 937 at 164.

125
**JA 0301**

Jeffers indicated that Burns was attending Marshall University and held a part-time job at J.C. Penney's at the Huntington Mall. She described the clothes that Burns was wearing on the night of her abduction.

Kandi Burns, Samantha's mother, described her daughter as "my very best friend." *Id.* at 171. She then testified about the comings and goings of her daughter and about her relationships with other teenagers in her circle of friends. She testified that if her daughter went out at night and found that she was going to be returning later than indicated, Samantha would always let her know. Kandi then testified about a cryptic telephone call from her daughter at approximately 9:45 p.m. on the night she was abducted. She said that her daughter spoke in an unusual way and that she told her daughter to stop and purchase a pack of cigarettes for her father on her way home. She testified that her daughter never returned home and then described the search efforts that were conducted in the days following her daughter's disappearance. In addition, Kandi testified about law enforcement authorities finding her daughter's burned automobile, and she testified as to some personal belongings of her daughter's that had been retrieved when Basham and Fulks were arrested.

Whitney Collins, a classmate of Burns's at Marshall University, who considered Burns to be "my best friend" testified that she had never heard Burns talk about wanting to run away from home. *Id*. at 252. She testified that Burns would always call her mother to let her know "where she was going to be and when she would be home." *Id*. She testified as to her interactions with Burns on November 10, 2002, the day before Burns was abducted, and indicated that she attempted to call Burns the following day, but her efforts to reach Burns were unsuccessful. She also testified as to her participation in the searches for Burns in the

weeks following her disappearance.

Kristen Pritchard, who also described Burns as "one of my best friends," *id*. at 258, testified that Burns was "very close with her family," that she was "very open with her family," and that Burns was "happy-go-lucky," id. at 259.  Specifically, Pritchard testified that she never heard Burns talk about wanting to leave her hometown. *Id*. at 260.  She also talked about her interactions with Burns on November 9, 2002, two days before her abduction.

Wesley Burns, Samantha's brother, testified that he and his sister got along well together and then described his sister selling candy as part of a school fundraiser on Veteran's Day weekend prior to her abduction.  He described a candy box that she used in this effort, a box which was later recovered when Basham and Fulks were arrested.  According to Wesley's testimony, he was asked to join his sister and aunt on the trip to Huntington Mall, but he declined.  He was the one who received the phone call from Burns at 9:30 p.m. on November 11 and passed the call along to his mother.  He indicated that Burns did not seem to be herself during the brief period of time he spoke with her on the phone.  Furthermore, he described his efforts in the search activity.

Finally, John Burns, Samantha Burns's father, testified about Burns's activity during the daylight hours of the Veteran's holiday on Monday, November 11, 2002.  That night, he had gone to bed before Samantha was scheduled to return home.  When he awoke early the next morning to go to work, he learned that his daughter had called in at 9:30 the previous evening and had not yet returned home.  He then described the decision that he and his wife made to call law enforcement in order to involve them in a search for their daughter.  He

described the search efforts by law enforcement, volunteers, and members of their church congregation. He discussed the contact he received from law enforcement, who had found his daughter's burned automobile, and he also identified the personal belongings of his daughter that were found in the possession of Basham and Fulks when they were arrested. John testified that he had told his children that if they ever found themselves in the situation where they were being robbed, that they should "give them the car, give them whatever, whatever they want, give it to them. Cooperate with them and just give them anything they want." *Id.* at 290. He further testified that his daughter was athletic and feisty. *Id.*

All of these witnesses gave information that was relevant to Basham's case. This court has read the testimony of all of the family and friend witnesses, and with the one exception noted below, finds that none of their testimony was designed to improperly appeal to the sympathy of the jurors.

There is one reference during the testimony of Kandi Burns, Samantha's mother, that the court has determined was improper. While on the stand and under direct examination, Kandi Burns was asked about the mobile home that the family resided in at the time of the abduction. She was also asked about the fact that she and her husband were personally constructing a new home for the family. This exchange then followed:

Q.    Do you, and John, and Wesley now live in that house?

A.    Yes.

Q.    Samantha never got to?

A.    No.

*Id.* at 172.

There was no objection at trial to this passage. It appears to this court that this question was improper and should not have been asked. The court finds the error to be harmless beyond a reasonable doubt, however. As indicated above, this court has carefully combed the transcript of the testimony of all of the family and friend witnesses and finds that this is the only improper appeal to sympathy of the jurors. It was but one statement in a trial that lasted for five weeks, and the court has no difficulty concluding that the error was harmless beyond a reasonable doubt. For all the foregoing reasons, the court finds that Claim 15 fails.

<div align="center">

CLAIM 16:
GOVERNMENT COMMENTS AT FULKS'S TRIAL

</div>

In Claim 16, Basham raises an issue occasioned by the court's granting of the joint motion by the defendants for separate trials.

Prior to trial, Basham's trial counsel filed a motion placing the government on notice that they intended to introduce "relevant factual assertions from the government's closing argument" in the Fulks case pursuant to Federal Rule of Evidence 801(d)(2)(D). Trial counsel wanted the Basham jury to hear that during the summation in the Fulks case, the government said that "he [Fulks] is the leader . . . Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." Tr. 6/24/04, ECF No. 739 at 66.

In response, the government suggested that the motion was premature. The government argued to the court that the motion should be held in abeyance and ruled upon only after the government had presented its case and Basham had identified which

government assertions, if any, were allegedly inconsistent.

The court agreed with the government, indicating that once the government's case was closed in the Basham trial, the court would "take a time out" and "see if the defense attorneys can show me in some way that the prosecutors have been inconsistent or taken contrary positions in this case from the first case."  Tr. 9/10/04,  ECF No. 1000 at 11.  Swerling agreed with this proposal responding, "Judge, that works for us." *Id*.

At the conclusion of the government's case in the penalty phase of Basham's trial, trial counsel never renewed the motion to admit selected portions of the government's argument from the Fulks trial.  Basham now contends that trial counsel were constitutionally ineffective for failing to reassert the issue at the appropriate time.  On direct appeal, Basham's appellate counsel argued that the court had abused its discretion by not admitting the government's statements about Basham being a puppet.  The Fourth Circuit held that Basham had waived that argument.  *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009).

Basham now contends that the jury's verdict would have been different had the government's statements during closing arguments in the Fulks trial been introduced at his own trial and that he at least would have preserved the issue for appellate review.

The court agrees with the government that there was no evidentiary basis for the court to admit into Basham's trial any of the government's closing argument from the Fulks trial, even under the liberal evidentiary standard applicable to the penalty phase of a capital case. As this court explained to the jury on several occasions,  what the lawyers say during closing argument is not evidence.  The trial attorneys are not under oath, do not have firsthand

knowledge of the facts, and are not subject to cross-examination.  For this reason, courts have allowed the submission of a party's prior jury argument if "the prior argument involves an assertion of fact, inconsistent with similar assertions in a subsequent trial."  *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir. 1984).  However, "speculation[s] of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses [in the opponent's] case, or invitations to a jury to draw certain inferences should not be admitted."  *Id*.

Even giving Basham the benefit of the doubt, and assuming that the government's "puppet" statement was an unambiguous admission of fact, it would have been inequitable to admit only isolated portions of the Fulks trial closing argument that were favorable to Basham.  Had the court admitted the "puppet" statement, this court probably would have also given the government the corresponding opportunity to admit portions of its closing argument, wherein the government indicated that Fulks and Basham were equally culpable of the charged crimes.

The court has determined in regard to Claim 23 that the government did not present contradictory theories at the two trials but presented a consistent theme of equal culpability between the two defendants.   On appeal from the denial of Fulks's § 2255 petition, the Fourth Circuit Court of Appeals determined that the government's "core theory" in both cases was that Fulks and Basham's culpability was equal.  The court said:

> Viewed in the context of the entirety of both proceedings, the government's core theory was that Fulks and Basham were equally culpable in Donovan's murder and similarly deserving of the death penalty, regardless of which one physically ended her life.  For example, the government told Fulks's jury that he and Basham "acted together as one in concert with one another . . . . They could not have done things that they did . . . without acting in unison." The story was the same at Basham's trial: "Their actions, their conduct, their

choices were made as a team.  Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks.  And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable."

*United States v. Fulks*, 683 F.3d 513, 524 (4th Cir. 2012) (internal citations omitted).

The court also observed that the quotations in its cited opinion were "only an example or two for illustrative purposes." *Id*. at 525.  Indeed, the court could have cited yet additional portions of the transcript from both cases to indicate that the government's theory was consistent.

Moreover, the Fourth Circuit stated that to the extent that there were "tangential inconsistencies relating to inferences drawn from the undisputed evidence," they were not so serious as to constitute a violation of due process.  *Id*.

Although the Fourth Circuit briefly summarized the gist of the government's argument in both trials, a fuller discussion of the statements made in the penalty phase of each trial bears mention here.

AUSA Johnny Gasser laid out this theme early in his closing argument at the Fulks trial:

On November 14th, 2002, if Chad Fulks and Brandon Basham had been alone, Alice Donovan would be alive today. Alice Donovan would be enjoying her daughters, and her grandchildren, and her great marriage with Barry. That is an absolute fact. Make no mistake about it. It required the actions and the conduct of both Chad Fulks and Brandon Basham.

The two of these men acted together as one in concert with one another. They were a two-man death squad. Two men, forming one team. They could not have done things that they did to Samantha [Burns], and they could not have done the things they did to Alice [Donovan] without acting in unison, without acting as one.

> The Government is not saying Chad Fulks is more culpable than Brandon Basham. And the Government is not saying that Brandon Basham is more culpable than Chad Fulks. They are equally culpable. Any objective view of the evidence and testimony that you saw, any reasonable juror looking at this objectively, not looking at it from the point of view of Chad Fulks, not looking at it from the point of view of Brandon Basham, if you look at it objectively, there is but one conclusion: These two men were acting together as one.  But for the conduct of Chad Fulks and but for the conduct of Brandon Basham, Alice Donovan and Samantha Burns would be alive today.

Fulks Tr. 06/29/04, ECF No. 739 at 24–25.

AUSA Gasser then emphasized that the jury did not have to make a finding as to which of the two men actually killed Alice Donovan, because that determination was impossible to make.

> There is one point that is very important.  This is a very important point, ladies and gentlemen.  For you jurors to sentence Chad Fulks to death, you do not, you do not have to find, beyond a reasonable doubt, that he actually killed Alice Donovan.  Judge Anderson is going to give you the charge on the law. And there is one thing he is not going to tell you.  He is not going to tell you, ladies and gentlemen of the jury, if you don't find that it was Chad Fulks's hand that killed Alice Donovan, then you can't sentence him to death.  You are not going to hear that from Judge Anderson. Because that is not the law.
>
> And there is a reason for that.  There is a reason why Congress has passed the Federal Death Penalty Statute.  And it is a situation involving brute violence. When two or more people combine together to kill, to take a human life, and they do so in an isolated area, and they leave no eyewitnesses, and the crime is not caught on videotape or camera, and the person does not confess, in those situations, it is impossible, it is impossible to determine, beyond a shadow of a doubt, who the actual killer is. It is impossible.
>
> ***
>
> The fact of the matter is, with no eyewitnesses, when the case isn't caught on videotape, and with no confession, it is, virtually, impossible to, with direct evidence, to prove who the killer is.  That is why the Government does not have to prove that. It is common sense. And it is justice.

*Id*. at 25–27.

Then, near the end of his closing argument at the Fulks trial, AUSA Gasser argued that both Fulks and Basham intentionally killed Alice Donovan.

> They needed each other to abduct Alice Donovan. They both carjacked her, both kidnaped her, both raped her. Do you honestly believe that, at one point in time, that the two of them were not going to act together? Circumstantial evidence, both of them, ladies and gentlemen, intentionally killed Alice Donovan, the Government submits to you.

*Id*. at 107.

Had this court admitted the government's single sentence regarding Fulks being the leader and Basham being a puppet, it is quite possible that the court would have admitted all of the language quoted above so that the government's "puppet" statement would not be given undue influence, given its relative position in the argument as a whole. In other words, it would be hard to single out one or a few sentences from the above-quoted paragraphs to balance out the "puppet" statement. Thus, the jury would have heard a long recitation of closing argument in the Fulks case, which essentially told them the same thing they would eventually hear in the summation of Basham's case: Basham and Fulks were equally culpable in Alice Donovan's death.

Perhaps more importantly, AUSA Gasser, in his summation in the guilt phase of the Basham trial, actually admitted that Fulks was the leader. Tr. 9/29/04, ECF No. 951 at 82. ("No question, Chad Fulks was the leader in many aspects of this seventeen-day spree . . . but there is also no question, the government submits, that Brandon Basham was a willing, eager, and reliable foot soldier.")

Gasser told the Fulks jury that Fulks was a leader and Basham was a puppet. In Basham's trial, Gasser told the jury that there was "no question" that Chad Fulks was the

leader and that Brandon Basham was a "foot soldier."   It can thus readily be seen that Gasser's statements to the two juries were not inconsistent.  In one, he referred to Basham as a "puppet," and in the second, he referred to Basham as a "foot soldier working for his 'leader,' Chad Fulks."

Additionally, it should be noted that several of the trial witnesses, including two of the government's own witnesses, candidly admitted that Fulks was the leader and Basham was the follower during their seventeen-day crime spree.  For example, Chris Schaffer, Chief Deputy of the Hopkins County Jail, testified regarding Fulks and Basham's escape from his facility in Kentucky.  On cross-examination in response to a direct question as to whether Basham was more of a follower or a leader, Schaffer replied, "Basham definitely didn't have leadership qualities, he was more of a follower."  Tr. 9/13/04, ECF No. 934 at 140.  In a similar vein, Dian Blair, Deputy Jailer at the Hopkins County Jail, was questioned on cross-examination as to whether Basham was "a leader or follower."  She responded, "I would say a follower."  *Id*. at 172.

When Sheriff Ronald Hewett was on the stand responding to direct examination by the government, he testified that on two occasions, Basham had told him that Fulks was the leader of the operation.  Tr. 9/13/04, ECF No. 934 at 31, 53.

Three defense witnesses all agreed that Basham was a follower.  Jewel Dickerson, a captain in the Hopkins County Jail, testified that Basham "was more of a follower than a leader."  Tr.10/25/04, ECF No. 967 at 125; Kathy Terrell, yet another employee of the Hopkins County Jail, testified that "Brandon has no leadership qualities . . . Brandon was a follower."  *Id*. at 176; Kelly Mullins, a social worker with the Charter Ridge Hospital in

Lexington, Kentucky, testified that Basham was "more of a follower."  Tr. 10/21/04, ECF No. 962 at 92.  Finally, Swerling actually used the puppet analogy in the concluding portion of his closing argument ("Chad Fulks used him like a puppet.").  Tr. 11/1/04, ECF No. 971 at 150.

For all the foregoing reasons, the court finds no error with regard to Claim 16.

## CLAIM 17:
## CROSS-EXAMINATION, IMPEACHMENT, AND ARGUMENT REGARDING THE CREDIBILITY OF CLIFFORD JAY

At trial, Clifford Jay, a teacher's aide who served as Basham's school counselor, and with whom Basham apparently remained close, testified on direct examination that, on Christmas Eve 2002, Basham called him from jail after being arrested for Alice Donovan's murder.  Jay testified that Basham told him that he was "in a lot of trouble."  Tr. 9/27/04, ECF No. 949 at 228.  Jay testified that he responded, "Did you do—I just want to know if you did what they say you did?"  *Id*.  According to Jay, Basham replied, "Yes sir, we killed them."  *Id*.  Upon being pressed by the government, Jay testified that he specifically remembered Basham using the word "them" because it struck Jay by "complete and utter surprise" because he had previously been aware only of the Alice Donovan case.  *Id*. at 228–29.

Jay also testified that he told Basham he needed to "cooperate with the authorities and tell them everything that they need to know about finding this body."  *Id*. at 232.  Jay then asked Basham, "Do you know where the bodies are?"  *Id*. at 232–33.  Jay testified that Basham had responded, "We tied her to a tree."  *Id*. at 233.  Jay acknowledged that he subsequently reported the conversation to someone in the Sheriff's Department in

Madisonville, Kentucky although he could not remember the officer's name.

On cross-examination, Swerling focused primarily on the question of whether Basham told Jay "we killed *them*" or "we killed *her*." *Id*. at 238–40. Jay remained firm in his insistence that the operative word was "them." *Id*. at 238. Swerling then refreshed Jay's memory about the person with whom he spoke from the Madisonville Sheriff's Department, and Jay acknowledged that it was David Morris. *Id*. at 239. Swerling also questioned Jay as to whether he had spoken with Detective Addison from the Myrtle Beach Police Department. *Id*. Jay confirmed that he had spoken with a Myrtle Beach police officer but could not recall his name. *Id*.

The government concluded its case-in-chief shortly after Jay's testimony, and the following day, the court heard oral argument on Basham's Rule 20 motion for judgment of acquittal. In opposing the motion, the government relied heavily upon Jay's testimony. In the ensuing colloquy, the court noted aloud that it wondered at the time if the jury would hear from the two law enforcement officers who might have heard a slightly different version of Basham's statement to Jay. Tr. 9/28/04, ECF No. 950 at 8. In addition, the court inquired as to whether there was a good faith basis for Swerling's asking the questions of Jay on cross-examination. *Id*.

In response to the court's inquiry, Swerling responded that he had a good faith belief for the question, indicating that the defense team had checked with both of the officers and confirmed that Jay never told them about Basham using the word "them" in his statement to Jay. *Id*. Swerling added, however, that he had opted not to present the officers at that stage of the trial but left open the possibility that he might present testimony from the officers at

Basham's penalty phase. *Id*. In furtherance of the court's question about the good faith belief for the cross-examination, Swerling averred that he and Harris had interviewed Jay and Jay had conveyed to them that Basham had said "We killed her." *Id*. at 9–10. Ultimately, Morris and Addison were not called to impeach Clifford Jay's testimony.

On this record, Basham argues that his counsel were constitutionally ineffective for not "effectively" cross-examining Jay, for failing to call Morris and Addison to impeach Jay, and in failing to adequately respond to the government's argument regarding Jay's testimony.

At the evidentiary hearing on the § 2255 petition, Swerling testified that he had contemplated calling Morris and Addison but decided that, on balance, the risk associated with calling these law enforcement officers outweighed any potential gain from their testimony. To begin with, according to Swerling, Morris and Addison would have been two witnesses who would remind the jury about Clifford Jay's damaging testimony. Moreover, it is not at all clear from the record before this court that Morris and Addison would have actually contradicted or impeached Jay's testimony. According to Swerling, the officers' notes associated with Morris's and Addison's involvement in the case did not specifically refer to whether Jay used the word "them" or "her" when repeating his conversation with Basham. Viewed in this light, the additional testimony from the two officers might have had minimal impeachment value for Basham and would have certainly served to remind the jury of the damaging phone call made by Basham to Jay.

Swerling also advanced a second theory as to why Jay was not strongly cross-examined or impeached. It is quite evident from the record that Jay enjoyed a long-standing, cordial relationship with Basham. He actually served as a father figure to Basham. Swerling

held out the hope that at some juncture during the trial, perhaps in the penalty phase, Jay could be used to help Basham evade the death penalty. According to Swerling, the risk that the two officers might not actually impeach Jay, the fact that their testimony would reiterate the damaging testimony already heard once, and the danger of alienating a potentially favorable witness all caused trial counsel to follow the course of conduct ultimately employed in this case.

The decision not to call particular defense witnesses is normally a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which "'[Courts] must afford . . . enormous deference.'" *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (quoting *United States v. Kozinski*, 16 F.3d 795, 813 (7th Cir. 1994)). In regard to a decision to call or not call a witness, "there is a presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" *Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 669 (1984)).

Regardless of whether Basham told Jay "we killed her" or "we killed them," continued cross-examination and impeachment testimony would have highlighted the fact that Basham was a full participant in the killing of at least one woman, if not two. This would have undercut the defense theory that Fulks was the leader and Basham was just a passive follower throughout their seventeen-day crime spree. Moreover, the officers would have also confirmed Basham's statement to Jay that "we tied her to a tree." This would further reinforce the teamwork employed by Basham and Fulks. As the government points out in its responsive memorandum, sometimes, the hallmark of effective advocacy is to know when

to "leave well enough alone." *United States v. Knox*, 287 F.3d 667, 671 (7th Cir. 2002).

In short, the failure to call the officers to testify clearly was not oversight; Swerling advised the court out of the jury's presence that as a strategic decision, the officers were not being called for impeachment purposes. Such a strategy choice in the context of the hard fought trial in this case withstands constitutional scrutiny.

Finally, it should also be remembered that when the telephone conversation began, Clifford Jay was aware of the disappearance of Alice Donovan, the South Carolina woman whose death formed the basis of this death penalty case. Even if Basham had told Jay "We killed her," Jay's testimony was a powerful weapon for the prosecution because it involved Basham's admission of the murder in question.

<div align="center">

CLAIM 19:
TRIAL COUNSEL'S INVESTIGATION AND
PRESENTATION OF MITIGATION EVIDENCE

</div>

In Claim 19, Basham complains that his trial counsel were constitutionally ineffective for failing to investigate, develop, and present powerful mitigating evidence at the penalty phase of his trial. Basham focuses on the areas of mental retardation and fetal alcohol spectrum disorder and alleges that trial counsel failed to investigate and develop mitigating evidence in those areas, and others, at the penalty phase.

"Although counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." *Green v. French*, 143 F.3d 865, 892 (4th Cir. 1998), abrogated on other grounds by *Williams v. Taylor*, 529 U.S. 362 (2000). "In the end, 'a particular decision not to investigate must be directly assessed for reasonableness in

all circumstances, applying a heavy measure of deference to counsel's judgments.'" *Tucker v. Ozmint*, 350 F.3d 433, 440 (4th Cir. 2003) (quoting *Wiggins v. Smith*, 539 U.S. 510 (2003)). "It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Meyer v. Branker*, 506 F.3d 358, 371 (4th Cir. 2007) (quoting *Strickland*, 466 U.S. at 690). "Where it is apparent from the evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749– 50 (7th Cir. 1997) (citing *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir. 1996)).

*Mental Retardation*

Basham claims that at the time of trial he had a full scale IQ of 68 and that "[t]ypically, a Full Scale IQ of 70 or lower fulfills the 'significant deficits in intellectual functioning' prong of a diagnosis of mental retardation." Pet. at 83. He complains that if trial counsel had retained and consulted with an expert on mental retardation, the expert would have been able to explain why Basham should be diagnosed as being mentally retarded, thus rendering him constitutionally ineligible for a death sentence. The problem with this argument is that there was no real evidence to suggest that Basham is mentally retarded. "[T]he touchstone of effective representation must be sound, evidence-based judgment." *Meyer*, 506 F.3d at 371.

**JA 0317**

In *Green v. Johnson*, 515 F.3d 290 (4th Cir. 2008), the Fourth Circuit found that a state supreme court's determination that a petitioner had not established his claim of mental retardation, in spite of the fact that one of the four intelligence tests he had taken resulted in a score of 55, was not unreasonable. *Id*. at 300. The state supreme court had noted that three of the scores were higher than 70 and that a person can fake a lower score but not a higher score. *Id*. The Fourth Circuit concluded that the court had properly applied the factors set forth in *Atkins v. Virginia*, 536 U.S. 304 (2002). *Id*. In *Atkins*, the Supreme Court found that the clinical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction, that became manifest before age 18. *Id*. at 318. It quoted the definition of mental retardation used by the American Association on Mental Retardation (AAMR):

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18.

*Atkins*, 536 U.S. at 308 n.3 (quoting MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992)). The Supreme Court also quoted a similar definition by the American Psychiatric Association:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years

(Criterion C).

*Id.* (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000)).  Thus, a showing of borderline or below-average intelligence alone does not constitute an adequate showing of mental retardation.  *United States v. Webster*, 421 F.3d 308, 313 (5th Cir. 2005).

Basham has failed to meet the requirements for showing mental retardation as set forth in *Atkins*: (1) significantly subaverage intellectual functioning (generally, a full scale IQ of less than 70); (2) limitations in adaptive functioning; (3) onset before age 18.  According to the IQ scores presented to this court, Basham did not suffer from "subaverage general intellectual functioning" prior to age 18.  For example, when Basham was "almost 18," his IQ was 89.  Tr. 10/26/04, ECF No. 965 at 66.  The only evidence offered by Basham to support his claim that he was mentally retarded at the time of trial is the result of one IQ test conducted shortly before trial, which indicated a full-scale IQ of 68.  *Id*. at 53.  The government points out that at that time, Basham had a strong motivation to make it appear that he had a low intelligence.

Basham asserts "on information and belief" that his trial counsel "ignored evidence that his earlier IQ testing had been skewed by seemingly well-meaning professionals to reflect a higher IQ so that Mr. Basham could be admitted to juvenile care facilities that set minimum IQs for patients."  Pet. at 84.  At the § 2255 evidentiary hearing, Harris admitted that in their investigation of Basham's background they learned that some of Basham's IQ scores may have been inflated.  Tr. 10/11/12, ECF No. 1555 at 307; *see also* Pet. Ex. 56. Harris also testified that any tests that were provided to trial counsel were also provided to

defense psychologist Dr. Tora Brawley for her evaluation. *Id.* At some point, trial counsel decided not to pursue the mental retardation route because they "didn't have an opinion to support it." *Id.* at 306. In his petition, Basham further asserts, "[u]pon information and belief, [that trial] counsel also failed to obtain the raw data associated with the earlier IQ tests to determine the validity of the administration and scoring of those tests." Pet. at 84. However, in his testimony, Swerling noted that as part of their trial strategy, trial counsel "virtually subpoenaed every medical record, every jail record, every school record that we could find . . . ." Tr. 10/15/12, ECF No. 1556 at 634. Indeed, Basham's own standard of care expert, Larry Hammond, noted that an "impressive amount of first level data appears to have been gathered here." Tr. 10/16/12, ECF No. 1558 at 857.

Additionally, Basham has failed to show that he has significant limitations in adaptive skills such as communication, self-care, and self-direction, that became manifest before age 18. There has never been any suggestion that Basham could not take care of his daily needs. Further, observation of his behavior prior to and during the commission of his crimes and during his trial show that Basham possessed communication and self-direction skills. For example, the Fourth Circuit, in addressing Basham's claim on appeal regarding the admissibility at the penalty phase of video of the courtroom scuffle, observed: "Basham's actions and manipulation during the episode . . . , coupled with the fact that he remained calm during the remainder of the trial once he was permitted to have his chewing tobacco during breaks, point to a manipulative individual." *United States v. Basham*, 561 F.3d 302, 333 (4th Cir. 2009).

In their brief, the government lists the various "skills" that Basham exhibited on his and Fulks's seventeen-day crime spree. After Basham and Fulks escaped from prison, Basham was the one who went to James Hawkins's door at night and convinced Hawkins to give him a ride to a non-existent broken-down vehicle, thus demonstrating an impressive ability to communicate persuasively with another person. When Basham stole checks from Robert Talsma's box of checkbooks, he did not take the checkbook from the top. Tr. 9/14/04, ECF No. 936 at 99. Rather, he stole a checkbook from the middle of the box—another example of Basham's reasoning ability. Margaret Moore's testimony of Basham's attempt to convince her to take him to the store to get gas or to allow him into her house to use the telephone revealed Basham's planning and communication skills. Tr. 9/17/04, ECF No. 938 at 86–87.

According to the government, Basham's actions clearly show that he operated at a level exceeding the ceiling abilities for mental retardation. Basham argues that the government focuses too much on his skills when his limitations are important for a mental retardation analysis. However, Basham fails to offer the particular limitations that he believes satisfy that prong of the test for mental retardation.

Basham further alleges that trial counsel were ineffective for failing to obtain an expert in mental retardation. Basham's standard of care expert, Hammond, concluded that Harris and Swerling's conduct "fell well below the standard of care" with respect to Claim 19, in particular. Tr. 10/16/12, ECF No. 1558 at 858. Hammond took issue with trial counsel's decision to rely on the opinion of psychologist Dr. Brawley as to whether Basham was mentally retarded. Hammond opined that of all of the trial experts, Dr. Brawley was the

closest to a mental retardation expert.  However, in Hammond's view, "I believe she would say, and maybe did say, that she's not a sufficiently specialized psychologist to really evaluate the entire collection of *Atkins*-related issues."  Tr. 10/17/12, ECF No. 1560 at 935–36.  On the contrary, at trial, Dr. Brawley felt confident enough with her knowledge of mental retardation to confirm that mental retardation was "not an issue here."  Tr. 10/26/04, ECF No. 965 at 53.

Not only did Dr. Brawley receive copious amounts of subpoenaed medical information from trial counsel, but she also did her own investigation of Basham, both interviewing people who had known him for a long time and sitting down with Basham to conduct a battery of tests.  Based on her interviews and testing, Dr. Brawley diagnosed Basham as having "dementia due to multiple etiologies," including head injuries and drug abuse.  Tr. 10/26/04, ECF No. 965 at 81, 85–88.  She did not find that Basham was mentally retarded, nor did she ask for another expert to assess Basham for that specific purpose. Defense counsel are not required to second-guess their experts' examinations or opinions. *Goines v. Angelone*, 52 F. Supp. 2d 638, 664 (E.D. Va. 1999) (citing *Pruett v. Thompson*, 996 F.2d 1560, 1573– 74 (4th Cir. 1993); *Poyner v. Murray*, 964 F.2d 1404, 1418 (4th Cir. 1992) (holding that there was no right to effective assistance of expert witnesses distinct from the right to effective assistance of counsel and the deficiencies in the performance of experts are not automatically imputed to the performance of counsel)).

To further combat the notion that a claim of mental retardation should have been pursued in this case, the government points the court to the opinion of Dr. Bruce Capehart, a staff psychiatrist at the Federal Medical Facility, who conducted a court-requested

evaluation of Basham. Dr. Capehart administered the Wechsler Adult Intelligence Scale-III, which indicated a full-scale IQ of 75. Basham scored in the average range when tested for his ability to demonstrate reasoning and knowledge about practical and social problems. Importantly, he scored in the range of possible malingering on a test designed to measure effort and motivation. Dr. Capehart opined, "Given Mr. Basham's questionable motivation and his current legal circumstances, the current results are considered a minimum estimate of his cognitive functioning and potential." Dr. Capehart pointed out that Basham had exhibited a high degree of variability over time. He noted that Basham's most recent evaluation was conducted in July 1999 (prior to his arrest on the current charges) and resulted in a full scale IQ in the average range, with scores on nine of the twelve sub-tests being in the average range.

This court cannot find that Swerling and Harris were ineffective for failing to pursue a claim of mental retardation in Basham's case. It is evident that trial counsel were diligent in recovering as many of Basham's records as possible. The entire defense team also took great pains to interview an incredible number of people that Basham had encountered over the course of his life. Using all of this information, Basham's trial experts concluded that there was no issue of mental retardation. Trial counsel relied on their experts' opinions and did not pursue a claim of mental retardation, and this court concludes that they did not fall below the standard of care in doing so.

In his petition, Basham points out that if he can now show that he is mentally retarded, then he cannot be executed. However, Basham has failed to submit sufficient evidence on any of the three prongs of *Atkins* to show that he is mentally retarded, and specifically that

147
**JA 0323**

the onset was before he turned eighteen.

*Fetal Alcohol Spectrum Disorder*

Basham argues that his trial counsel were ineffective for failing to pursue evidence of his exposure to drugs and alcohol *in utero* and to seek expert advice on the effects of this exposure. According to Basham, "an adequate investigation into this issue would have revealed compelling mitigating evidence," Pet. at 85, but Basham fails to explain how evidence of Fetal Alcohol Spectrum Disorder (FASD) would have caused the jury to reach a different conclusion.

"'[T]he reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation.'" *Byram v. Ozmint*, 339 F.3d 203, 210 (4th Cir. 2003) (quoting *McWee v. Weldon*, 283 F.3d 179, 188 (4th Cir. 2002)).

Although Basham alleges a "complete failure to pursue evidence of Mr. Basham's exposure to drugs and alcohol *in utero*," Pet. at 85, trial counsel's testimony at the § 2255 evidentiary hearing shows that was not the case. The court heard the following exchange regarding FASD during the government's cross-examination of Harris:

A.    . . . I believe Chad Fulks's team had presented evidence of that to the jury, so we were aware of it. And our experts just said it did not exist in our case.

Q.    So it was looked at?

A.    Oh, yes.

Q.    And, again, you relied upon your experts?

148
**JA 0324**

A.    Yes.

Q.    To determine that he didn't have it.

A.    Another reason is there was a lot of family history with Brandon that suggested that that might have been something that—might have had a factor in what he did and why he did it and how he lived his life.  It just unfortunately, once we did the testing, we didn't have it.

Tr. 10/11/12, ECF No. 1555 at 381.  The court cannot find ineffective assistance of trial counsel for failing to investigate and present evidence of FASD because trial counsel did investigate that possibility with negative results.

*Mitigation Investigation*

Basham reserved the right to assert additional types of mitigation evidence that he contents trial counsel should have investigated and presented to the court, but Basham never offered additional areas where he believes trial counsel's performance fell below the standard of care.  In its brief, the government provided an extensive recitation of the mitigation evidence that trial counsel turned up and presented to the jury.  Indeed, the mitigation evidence heard by the jury was exhaustive.  Accordingly, the court concludes that trial counsel were not ineffective in their investigation and presentation of mitigation evidence during the penalty phase of Basham's trial.

CLAIM 20:
FAILURE TO ASSEMBLE AND SUPERVISE
A COMPETENT CAPITAL DEFENSE TEAM

In general, Claim 20 alleges ineffective assistance of counsel based on Basham's trial counsel's failure to assemble a competent capital defense team and, in the alternative, their failure to adequately supervise the team that they assembled.  Basham contends that the team

that his trial counsel did assemble "was one riddled with personal problems, conflicts of interest, and ineffective performance." Pet. at 87. Further, he alleges that his trial counsel failed to recognize these issues and failed to manage their team. *Id*. As discussed in detail below, the evidence does not support these allegations—trial counsel's performance was neither deficient nor prejudicial. *See Strickland*, 466 U.S. at 687.

Claim 20 is premised on the alleged shortcomings of two members of Basham's trial defense team. The first of these is Carlisle McNair, a former officer of the Lexington County Sheriff's Department (LCSD) hired as the lead investigator for Basham's defense. The second is Paige Tarr, a mitigation specialist. Regarding both McNair and Tarr, Basham avers that his Sixth Amendment rights were violated when his trial counsel failed to identify and/or remedy certain of their personal and professional problems.

Before turning to the specific allegations against each of these team members, it is important to note the following general testimony regarding the scope of Basham's trial defense team and their efforts in this case. Trial counsel assembled a large defense team, which included approximately twenty-four members, *see* Tr. 10/11/12, ECF No. 1555 at 340–48, and investigators in three states—Kentucky, South Carolina, and West Virginia, *see* Tr. 10/15/12, ECF No. 1556 at 627. Harris testified that he and Swerling worked on Basham's case unceasingly after their appointment and that they closely interacted with each member of the team. For example, Harris stated that "[e]very day without question something was done on this case, something was managed in this case, someone was interviewed, discussions were had between myself and Jack and the team." Tr. 10/11/12, ECF No. 1555 at 348; *see* Tr. 10/15/12, ECF No. 1556 at 633. Further, Harris noted that

Swerling was an "[e]xtremely hands on" manager and that they reviewed memoranda from team members daily.  Tr. 10/11/12, ECF No. 1555 at 389–90; *see* Tr. 10/15/12, ECF No. 1556 at 632.  Importantly, trial counsel felt that they were given every resource they needed or desired to defend Basham.  *See* Tr. 10/11/12, ECF No. 1555 at 348.  And as a result of their efforts, Harris stated that he was confident that "we did not miss one week of Brandon Basham's life" during the investigation.  *Id*. at 385.  Especially in light of this testimony, the court is, at the outset, mindful of the "strong presumption" that trial counsel provided effective assistance to Basham.  *See Strickland*, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.")

*Carlisle McNair*

Basham identifies a litany of alleged deficiencies with investigator Carlisle McNair based on McNair's conduct both before and after he became a part of the defense team.  First, Basham argues that McNair was an unqualified investigator.  For example, McNair had not in fact "retired" from the LCSD, but rather had resigned after several instances of misconduct, including removing evidence and breaking the chain of custody, lying in an internal affairs investigation, violating the Fourth Amendment's search warrant requirement, and displaying obscene videos at work.  Correspondingly, Basham contends that trial counsel's selection of McNair prejudiced him.  Specifically, trial counsel allegedly could not call McNair as a witness because McNair could be impeached based on these instances of misconduct.

The court agrees with Basham that McNair's alleged workplace misconduct at the LCSD is both shocking and distasteful, but the court does not agree that Basham's trial counsel were ineffective for selecting McNair. Initially, the court notes that Swerling and Harris did not find out about this alleged misconduct until, at the earliest, right before trial. Tr. 10/10/12, ECF No. 1553 at 273; Tr. 10/15/12, ECF No. 1556 at 551–52. In any event, although the evidence of misconduct suggests that McNair broke a number of rules governing law enforcement officers, it does not necessarily mean that McNair was incapable of being an effective investigator on a death penalty defense team. Indeed, despite his alleged flaws as a law enforcement officer, it appears that McNair was quite good at finding difficult-to-locate witnesses. Tr. 10/10/12, ECF No. 1553 at 268; Tr. 10/11/12, ECF No. 1555 at 382–83. Also, Swerling testified that he hired McNair in other cases after Basham's trial. Tr. 10/15/12, ECF No. 1556 at 556.

Moreover, it does not appear that Basham was prejudiced by his trial counsel's selection of McNair. McNair did not testify at trial, and Basham nowhere identifies testimony that McNair would have been called as a witness to rebut. Indeed, Basham's trial counsel testified that there was never an instance at trial where they would have called McNair to rebut testimony from government witnesses but did not do so based on his background. Tr. 10/11/12, ECF No. 1555 at 409; Tr. 10/16/12, ECF No. 1558 at 761–62. Further, trial counsel did not believe that information regarding McNair's misconduct would have been admissible as impeachment evidence. Tr. 10/11/12, ECF No. 1555 at 409; Tr. 10/16/12, ECF No. 1558 at 762. Thus, the fear of McNair being impeached based on his background would not have prevented trial counsel from calling McNair as a witness had it

been necessary.

Next, Basham alleges that McNair was biased against him, both personally and professionally. According to Basham, McNair harbored a personal bias against him because McNair believed that Basham was a homosexual. In this regard, Basham states that McNair spent a "large part of his time" questioning witnesses about Basham's potential homosexual relationships. Basham also cites an email in which McNair, referring to a witness he intended to locate, states that he is planning to talk to "another homo friend of Branden's Can't wait [sic]." Basham bases his allegation of professional bias on McNair's "lengthy and recent law enforcement experience" prior to joining the defense team and an email to a potential law enforcement witness in which McNair stated, "I know I am working on the other side, but the 'FACTS DON'T CHANGE.' I am, and always will be, a 'cop' at heart." Reply at 129.

Although the court does not condone McNair's language regarding homosexuals, it does not appear to the court that McNair was personally biased against Basham. According to Swerling, in order to effectively represent Basham, he had to "find out as much as the prosecution kn[ew], and more." Tr. 10/11/12, ECF No. 1555 at 498; *see* Tr. 10/15/12, ECF No. 1556 at 554–55. Unless he pursued every line of inquiry and scrutinized "every aspect of Mr. Basham's background and his character," regardless of its apparent relevance at the time, Swerling explained that he would have been unable to make an informed decision regarding which issues were important for trial and which issues were not. Tr. 10/11/12, ECF No. 1555 at 499; Tr. 10/15/12, ECF No. 1556 at 555.

Swerling likely impressed this mind set upon McNair, his lead investigator and on whose investigative instincts Swerling had, at least to some extent, to rely. *See* Tr. 10/16/12, ECF No. 1558 at 758.  Thus, although Basham's trial counsel did not specifically identify Basham's sexuality as an issue, *see* Tr. 10/10/12, ECF No. 1553 at 272; Tr. 10/15/12, ECF No. 1556 at 534, in light of their overall strategy to know everything about Basham's life, the court cannot at this point say that it was unreasonable for McNair to spend time investigating Basham's sexuality or that it suggests Mr. McNair was personally biased against Basham.

Indeed, Swerling testified that at least some aspect of Basham's sexuality may have been a subject of investigation because the defense team received information that Basham "would trade sexual favors for drugs," and if true, Swerling "would have wanted to know about it" in preparing a defense.  Tr. 10/15/12, ECF No. 1556 at 534, 554.

Additionally, rather than being professionally biased against Basham, it appears to the court that McNair sought to leverage his past experience to gain information.  In particular, trial counsel testified that McNair was particularly good at interviewing law enforcement officers, and he often used his background in law enforcement to build a rapport with these potential witnesses.  *See* Tr. 10/10/12, ECF No. 1553 at 269–70.  According to Swerling, by letting a potential witness know that he would always be a "cop at heart," McNair could get more information out of them than any other investigator.  Tr. 10/15/12, ECF No. 1556 at 553.  It is not unreasonable for a former law enforcement officer-turned investigator to use his former credentials to gain favor with a current member of law enforcement and thereby obtain more or better information.  Moreover, it seems to the court that even "lengthy" prior

law enforcement experience should not preclude someone from being an investigator on a death penalty case. Therefore, the court gives very little weight to the allegations of bias against McNair.

Finally, Basham contends that McNair "directed an inordinate amount of time and resources towards irrelevant (and often prurient) matters at the expense of investigating issues that had direct and critical significance to the case against Mr. Basham." Reply at 127. More specifically, Basham first highlights McNair's apparent interest in Veronica Evans, Fulks's ex-wife. McNair spent a substantial amount of time interviewing Evans and her associates, and, according to Basham, McNair "seems to have been extremely focused on . . . the fact that she was a stripper . . . and the possibility that tapes existed that portrayed her performing sexual acts." *Id*. at 127–28. McNair apparently convinced an associate of Evans's to provide McNair a copy of one such videotape. *Id*. at 128. As a result of this focus on allegedly collateral and unimportant matters, Basham argues, McNair failed to properly interview several guards from the Federal Correctional Institution in Butner, North Carolina, where Basham was held pending trial.

Based on the testimony adduced at the evidentiary hearing on Basham's § 2255 petition, the court finds little merit in these allegations. First, in light of the stated strategy to learn everything about Basham's life—and therefore to determine the facts relevant to mitigation—the court cannot say that McNair should not have investigated Veronica Evans at all. Indeed, Swerling testified that this avenue of inquiry may have been an effort to gather information on Basham's co-defendant Fulks. *See* Tr. 10/16/12, ECF No. 1558 at 758. And even though McNair appears to have wasted some time and resources seeking a videotape

that was not important to the mitigation case against Basham, Tr. 10/10/12, ECF No. 1553 at 271–72, it does not appear that McNair spent an inordinate amount of time and resources doing so, or on any other irrelevant or prurient matters. McNair submitted weekly reports describing his work, Tr. 10/16/12, ECF No. 1558 at 756–57, and he was not ever seen to have been wasting time or resources, Tr. 10/11/12, ECF No. 1555 at 382–83; Tr. 10/16/12, ECF No. 1558 at 758. Thus, the time and/or resources he spent looking for the Evans video must have been a small amount of the approximately 4,400 hours he worked on Basham's case. *See* Tr. 10/16/12, ECF No. 1558 at 756. Indeed, as noted above, after the investigation was concluded, trial counsel felt confident their investigators did not miss "one week" of Basham's life. *See* Tr. 10/11/12, ECF No. 1555 at 385.

With regard to prejudice based on McNair's allegedly dilatory investigation, the allegation is not that McNair failed to interview the proper witnesses; indeed, McNair conducted approximately 200 witness interviews. Tr. 10/11/12, ECF No. 1555 at 383; Tr. 10/16/12, ECF No. 1558 at 755. Rather, the allegation is that McNair failed to get the proper information out of the witnesses. As an example, Basham emphasizes that his trial counsel were apparently taken by surprise when guards at the detention facility where Basham was detained testified that Basham had bragged he would not get the death penalty. Reply at 129–30. One of the guards, Eddie Ledford, testified that McNair only spent fifteen minutes interviewing him and that, had McNair asked whether Basham was boastful or bragging, Ledford would have told McNair so. *Id*. at 130.

Even assuming McNair had asked the right questions and uncovered this information earlier, however, it is not clear that trial counsel would have been able to stop Ledford from

156
**JA 0332**

testifying about Basham's bragging.  Notably, Basham's trial counsel did attempt to have the testimony excluded, but this court allowed Ledford to testify anyway.  Moreover, Basham has suggested nothing that McNair could have found that would have outweighed the overwhelming evidence of Basham's guilt in this case.  See discussion accompanying Claim 1, *supra*.

Based on the above, Basham has not shown that trial counsel were ineffective for selecting McNair as a member of the defense team.

### *Paige Tarr*

Basham's allegations that Paige Tarr was deficient are much fewer than his allegations against McNair.  In general, Basham contends that Tarr, the mitigation specialist, failed to perform the duties required of a qualified mitigation expert because she allegedly could not meet the substantial responsibility of her role. Reply at 131–32.  Basham notes, for example, that trial counsel had to bring in additional personnel to assist her.  *Id*. at 131. Correspondingly, Basham argues that trial counsel failed to supervise Tarr and "failed to take prompt remedial steps when her deficiencies came to their attention."  *Id.*

Initially, the court notes that it is somewhat contradictory to argue ineffective assistance of counsel based on counsel's selection of a team member who counsel had to bring in additional personnel to support, while also arguing ineffective assistance based on counsel's failure to supervise and remedy the alleged deficiencies of the exact same team member.  In other words, Swerling and Harris must have been supervising Tarr if they noticed she needed additional help.  Notably, between the two of them, Harris and Swerling spent 126 hours talking with Tarr in over 100 conversations.  *See* Tr. 10/16/12, ECF No.

1558 at 770–71.  And they certainly attempted to remedy this alleged deficiency in Tarr's productivity by bringing in Lisa Kimbrough to help.  *See id*. at 764.

Nonetheless, trial counsel was not ineffective for selecting Tarr as a mitigation specialist.  For example, Tarr had worked death penalty cases before, *id*. at 759, and she developed a special rapport with Basham's family, Tr. 10/10/12, ECF No. 1553 at 267–68.  Additionally, Tarr conducted approximately 70 interviews while spending approximately 1,800 hours working on the case.  Tr. 10/16/12, ECF No. 1558  at 763.  Thus, it appears that Tarr was a valuable member of Basham's defense team.

Correspondingly, trial counsel's inclusion of Tarr on the defense team did not prejudice Basham.  Although Tarr may have had trouble at one point completing her work in a timely fashion, she was not the only mitigation specialist.  In fact, trial counsel testified that everyone, not just Tarr and McNair, was a member of Brandon's mitigation team.  *See* Tr. 10/11/12, ECF No. 1555 at 382.  Notably, trial counsel conducted approximately sixty to seventy interviews themselves.  *See id.*; Tr. 10/16/12ECF, No. 1558  at 765.  Moreover, any issue with Tarr allegedly not being able to keep up with her duties did not affect the way that trial counsel prepared for or defended the case against Basham.  Tr. 10/11/12, ECF No. 1555 at 384; Tr. 10/16/12, ECF No. 1558 at 764–65.  According to Harris, they received Tarr's memoranda in time to adequately prepare for trial.  Tr. 10/11/12, ECF No. 1555 at 384.

Consequently, Basham has also failed to show that his trial counsel were ineffective for selecting Tarr as a member of his defense team.

CLAIM 21:
TRIFURCATION OF THE TRIAL

In Claim 21, Basham contends that his trial counsel were constitutionally ineffective for failing to request that the trial be trifurcated.  The Federal Death Penalty Act (FDPA), by its express terms, calls for bifurcation, providing for a guilt phase, followed by "a" separate sentencing hearing.  18 U.S.C. § 3593(b).  Basham contends that notwithstanding the statute, constitutional considerations require that the sentencing phase be split into two separate components: (1) an "eligibility" phase in which the jury would hear the government's evidence regarding the threshold intent factors and the statutory aggravating factors in determining whether Basham was eligible for the death penalty; and (2) a "penalty" or "selection" phase in which the jury would consider nonstatutory aggravating factors and all mitigating factors, and in which the jury would weigh the aggravating and mitigating factors in deciding whether to impose the death penalty.

This argument is grounded upon the assertion that a trifurcated trial was necessary to ensure that the jury was not swayed by evidence of nonstatutory aggravating factors (such as victim impact evidence) in deciding whether the government had first proven Basham's eligibility for the death penalty beyond a reasonable doubt.  In other words, Basham argues that a bifurcated trial violates a capital defendant's rights because it allows an improper spillover between proof of statutory and nonstatutory aggravating factors.

Federal appellate courts that have considered the issue have held that although the FDPA contemplates a single sentencing hearing, it does not prohibit a district court from bifurcating a sentencing hearing (and thus trifurcating the trial) to avoid confusion of the

159
**JA 0335**

issues before the jury.  *United States v. Bolden*, 545 F.3d 609, 618 (4th Cir. 2008);  *United States v. Fell*, 531 F.3d 197, 240, n.28 (2d Cir. 2008).  The appellate courts, however, have not held that trifurcation is mandatory and have left the matter to the discretion of the district courts.  *See Bolden*, 545 F.3d at 618–19.[53]

Basham points out that four district courts have employed trifurcation in the manner suggested in Claim 21.  *See, e.g., United States v. Natson*, 444 F. Supp. 2d 1296, 1309 (M.D. Ga. 2006); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1110–11 (N.D. Iowa  2005); *United States v. Mayhew*, 380 F. Supp. 2d 936, 955–57 (S.D. Ohio 2005); *cf. United States v. Jordan*, 357 F. Supp. 2d 889, 903–04 (E.D. Va.  2005).  All of these decisions involved cases that went to trial subsequent to Basham's criminal trial in 2004.  Basham points the court to no authority, and this court's independent research has found none, directly holding that trifurcation is mandatory in federal death penalty cases.[54]

This court's jury instructions and accompanying verdict form—which required the jury to engage in a sequential evaluation of the penalty phase—eliminated any potential confusion or prejudice regarding the sentencing process.  The court's jury instructions began

---

[53]  The Fourth Circuit Court of Appeals has held, in a habeas corpus review of a state death sentence, that a state capital defendant was not denied due process when the trial judge refused to bifurcate his sentencing hearing.  *Booth-El v. Nuth*, 288 F.3d 571 (4th Cir. 2002).  In *Booth-El,* the state court sentencing regime provided for a jury determination as to whether the defendant was a first degree principal before any evidence regarding aggravating and mitigating factors were presented.

[54]  Basham cites *Ring v. Arizona*, 536 U.S. 584 (2002), and suggests that the principle announced in *Ring* should compel trifurcation as a matter of Constitutional law in federal death penalty cases.  In *Ring*, the Supreme Court addressed an Arizona state sentencing regime in which, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determined the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.  The Court held that such an arrangement violated the Sixth Amendment right to trial by jury in capital prosecutions.  *Ring* can thus be seen as having no application to the case at bar.  Here, in accordance with the federal statutory mandate, the jury, not the court, determined whether life imprisonment or death was the appropriate punishment.

by outlining "the deliberative steps [the jury] should follow in considering both the offenses for which the death penalty is a possible punishment." Tr. 11/1/04, ECF No. 971 at 199. The court told the jury:

> First, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, that the Defendant was at least 18 years of age at the time of his offense.
>
> Second, you must consider whether the Government has proven beyond a reasonable doubt and to your unanimous agreement, one of four threshold intent factors.
>
> Third, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, the statutory aggravating factor alleged.
>
> Fourth, if you find these first three steps have been proved to your unanimous agreement, then you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, any nonstatutory aggravating factors identified by the Government.
>
> Fifth, you must consider whether any one or more of you individually find that the Defendant has proven any mitigating factor or factors by a preponderance of the evidence. You may find any mitigating factor by considering everything that you have learned during either phase of the trial, regardless of whether or not Mr. Basham's attorneys have asserted that factor.
>
> Sixth, all of you then must weigh the aggravating factors you have unanimously found to exist against any mitigating factor or factors any one of you individually found to exist, to determine the appropriate sentence.

*Id.* at 199–200. In this way, the district court indicated that the steps were sequential and that the jury had to first find Basham eligible for the death penalty (based on his age, the threshold intent factor, and the statutory aggravating factor) before they could even consider other aggravating factors and mitigating factors.

Moreover, this court further emphasized the sequential process in the jury charge. The court stated "[b]efore you may consider the imposition of the death penalty, you must first unanimously agree, beyond a reasonable doubt, that the defendant was eighteen years of age or older . . . [and] you must also find beyond a reasonable doubt that the defendant acted with one of the four potential mental states, called threshold intent factors . . . ." *Id*. at 203.  The court then emphasized,  "You must find one of these threshold intent factors . . . before you may continue your deliberations."  *Id*. at 206.  The court continued, "if and only if you unanimously find beyond a reasonable doubt that the defendant acted with one of the threshold intent factors . . . you must proceed to determine whether the government has proved beyond a reasonable doubt the existence of a statutory aggravating factor . . . ." *Id*. at 207.  "If you do not unanimously find that the government has proven the statutory aggravating factor," the court instructed, "you should so indicate . . . and no further deliberations will be necessary." *Id*. at 208.  This court thus made it plain that the jury could only proceed to the penalty or selection deliberations once the government had proven all of the eligibility requirements (age, threshold intent factor, and statutory aggravating factor). "Jurors are presumed to follow their instructions" and there is no indication in the record of this case that they did not do so here. *Bolden*, 545 F.3d at 619 (citing *Shannon v. United States*, 512 U.S. 573, 584–85 (1994)).

Finally, as the government points out in its opposition brief, the bifurcated trial proceeding had the potential to work in Basham's favor.  Just as there could have been spillover between the nonstatutory aggravating factors, such as victim impact statements, the jury might have also considered information regarding mitigating factors in deciding whether

Basham was death eligible.  Basham's trial attorneys submitted six statutory mitigating factors and thirty-one nonstatutory mitigating factors for the jury to consider.  Many of these proposed mitigating factors related to Basham's mental or emotional health in general or to his mental state at the time of the offenses.  The court instructed the jury that these factors were not relevant to whether Basham was *eligible* for the death penalty, and the jury was not to consider them until after they had made their eligibility determination.  But, to the extent the jury might have intentionally or unintentionally considered these factors in deciding eligibility, this process could have worked in Basham's favor.  Had Basham's attorneys successfully argued for trifurcation, the government might well be defending against a § 2255 claim that it was error to trifurcate the trial, suggesting that a bifurcated trial would have worked in Basham's favor because of the fact that mitigating factors would have been before the jury at the time they made their eligibility determination.  It can thus readily be seen that the decision of trial counsel not to request a trifurcated death penalty trial did not fall below the standard of care in this case.  As such, Claim 21 is denied.

CLAIM 22:
*BRADY* ISSUES

In Claim 22, Basham contends that the government violated his constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose material, exculpatory, or impeachment evidence to Basham that was necessary to his ability to prepare and present a defense.  In his § 2255 petition, Basham contends that the non-disclosed *Brady* evidence includes: (1) information concerning federal, state, and local investigations of Sheriff Ronald Hewett; (2) information concerning the government's post-verdict investigation of juror

misconduct in Basham's case; and (3) any agreements made by the government or a governmental agency with witnesses who testified. In responding to these allegations, the government suggests that they all lack factual support. Basham's reply brief merely recites that the investigation into the *Brady* claim is "on-going" and suggests that at that time the petitioner had nothing to add to his original claim.

This claim merits little discussion. To begin with, the investigation of Sheriff Hewett did not begin until December 2006, two full years after the conclusion of Basham's trial. As to the juror misconduct, this court conducted a total of nine hearings which were in the nature of discovery depositions, thus allowing full access to all information about the alleged juror misconduct. There is no showing that the government's own investigation, if there was one, revealed any exculpatory or impeachment information that should have been turned over to defense counsel. Finally, with regard to plea agreements and the like with government witnesses, the government made it plain throughout the duration of the case that no plea agreements or deals were made with any of the witnesses who testified. Claim 22 is, therefore, without merit.

<div align="center">

CLAIM 23:
THE GOVERNMENT'S ALLEGED INCONSISTENT
POSITIONS AT THE TWO TRIALS

</div>

In Claim 23, Basham argues that the government violated his right to due process by presenting a theory at his trial that was inconsistent with the theory it presented at co-defendant Fulks's trial. Basham claims that his trial counsel were constitutionally ineffective for failing to object to the government's use of inconsistent theories. Finally, Basham contends that he was denied effective assistance of appellate counsel when they failed to

raise this issue on appeal.  The court finds these arguments unpersuasive.

In his § 2255 petition, Basham contends that the government "took diametrically opposed positions" at the two trials, "manipulated the evidence," and "relied upon factually inconsistent and irreconcilable evidence at the two trials."  Pet. at 98–101.

Claim 23 is somewhat duplicative of Claims 11 and 16, both of which this court has already rejected.  Specifically, the court has determined that with regard to Sheriff Hewett's strap testimony, the government did not use false testimony at Basham's trial in violation of *Napue v. Illinois*.  In Claim 16, the court has determined that the government did not make inconsistent factual assertions at the two trials.  Claim 16 contains a lengthy recitation of the closing arguments made by the government in both trials, and those portions of the transcript need not be repeated here.  Suffice it to say that this court has combed the record in both Fulks and Basham's cases and finds no basis for a due process violation or ineffective assistance of counsel claim.  Indeed, in Fulks's § 2255 appeal, the Fourth Circuit Court of Appeals focused upon some of the same language this court has quoted herein, and the court determined that the government did not take inconsistent positions in the two trials.  *Fulks*, 683F.3d at 524; *see* discussion of Claim 16, *supra*.  For these reasons, the court finds no merit to Claim 23.

<div align="center">

CLAIM 24:
THE PROSECUTION'S "CAUSE AND EFFECT" ARGUMENT

</div>

In Claim 24, Basham contends that the prosecution violated his Eighth Amendment rights when it argued to the jury that a "causal nexus" was required between a mitigating factor and Alice Donovan's death.  Basham further argues that by failing to object to the

government's misconduct, trial counsel rendered ineffective assistance of counsel and that his appellate attorneys were similarly ineffective for failing to raise the issue on appeal.

At the outset, it should be noted that the identical argument was made to, and rejected by, this court in Fulks's § 2255 petition. After the court rejected the claim in the Fulks case, appellate counsel in the § 2255 proceeding did not include it among the issues raised on appeal.

Notwithstanding this fact, the court has considered this issue anew and finds no basis for disturbing its earlier decision that no error occurred by trial or appellate counsel.

During summation, the government argued as follows:

But generally what did their experts say? What is the most important thing they said? Brandon Basham knows right from wrong and there is no cause-and-effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking randomly of two innocent women. There is no cause and effect. It is not like you were born into an alcoholic family, you run the risk of being an alcoholic. There is no cause-and-effect of Brandon Basham's upbringing or any problems Brandon Basham has with the effect of him randomly targeting, and kidnapping, and killing two innocent women. Every single defense expert took that witness stand and acknowledged that because they had to. Because that is a fact. No cause and effects. There are thousands and thousands of kids and adults walking around this country . . . that grew up impoverished, much poorer than Brandon Basham, with physical disabilities he did not have. With significant, significant mental issues that don't kill, that don't carjack . . . [a]nd that is absolutely critical.

Tr. 11/1/04, ECF No. 971 at 85.

Later during the argument, the government stated:

What does Brandon Basham having a memory problem have to do with targeting Alice Donovan in the Wal-Mart parking lot, and kidnapping and carjacking her? What does a memory problem have anything to do with the facts and circumstances of this case as to what happened to Samantha Burns and what happened to Alice Donovan? What does a memory problem have to do with that, if you so find that he has a memory problem?

*Id*. at 86.

> Still later during the argument, the government argued as follows:

> [T]he Government's psychiatrist diagnosed [Mr. Basham] with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That is for you to decide. You know, deciding on who got it right on that issue clearly only goes to show what mitigation, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be . . . the facts speak for themselves . . . and one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong. No question whatever his issues are, there is no cause-and effect.

*Id*. at 89.

In addition to the above arguments, the government at trial cross-examined several mitigation witnesses about whether there was a "cause and effect" connection between Basham's history and deficits and the crimes of which he had been convicted. For example, social worker Jan Vogelsang was asked "So, because there is a volitional component [to an act of murder], you cannot take these factors and say that they caused Brandon Basham to carjack and kidnap Alice Donovan, you can't say that, can you?" Tr. 10/20/04, ECF No. 960 at 205–06. Pushing the issue further, counsel for the government later asked, "The other family members . . . who you indicated may have issues similar to Mr. Basham's did not go out and carjack and kidnap strangers?" *Id*. at 210.

Just as the court did in the Fulks case, the court concludes that there was no error because the government did not suggest, either during cross-examination or summation, that the jury was *required* to find a causal nexus between the mitigating evidence and the crime for the evidence to be considered by the jury in its sentencing decision. Moreover, this

167
**JA 0343**

court's instructions made sure the jury was aware that it could consider all mitigating evidence without regard to any nexus.

As the government points out in its responsive brief, habeas counsel has selectively edited one of the quotations from the trial in an effort to portray the government's nexus argument in an inaccurate light. Counsel quotes the AUSA as saying during summation:

> You know, deciding on who got it right on that issue clearly only goes to show what mitigation [the jury can consider].

Pet. at 110.

> The full quotation of the AUSA's statement, however, was as follows:

> You know, deciding on who got it right on that issue clearly goes to show what mitigation, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be.

Tr. 11/1/04, ECF No. 971 at 89.

The replacement of the phrase "what weight you will consider" with an incorrect bracketed paraphrase of "the jury can consider" is a mischaracterization of the argument. Moreover, this court's review of the entire record in this case leads to the conclusion that the government did in fact argue strenuously that no witness testified directly to a causal connection between mitigating factors and the murder. This is not the same thing as saying that the government argued that a causal nexus was required for a death sentence.

For example, at one point, the AUSA was explaining to the jury that they were the ones who would decide which expert witness to believe. The following then transpired:

> Defense experts opine that he has a self or induced, inhalant-induced psychosis. And that he has got dementia, memory loss. Dr. [Schwartz-]Watts, on the witness stand in response to Mr. Schools, acknowledged that those two problems don't explain his behavior. So, the Government's psychiatrist

168
**JA 0344**

diagnosed him with something that explained his behavior against Samantha Burns and Alice Donovan.   And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? *That is for you to decide*.   You know, deciding on who got it right on that issue clearly only goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be.  Regardless of all of the yelling, raising voices, and attacking someone for what school they went to, the facts speak for themselves, ladies and gentlemen.

And one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong.  No question, that whatever his issues are, there is no cause-and-effect.

*Id*. (emphasis added).

Basham relies primarily upon the Supreme Court case of *Tennard v. Dretke*, 542 U.S. 274 (2004), a case decided approximately four months before Basham's trial began.

Unlike the jury in *Tennard*, Basham's jury was not limited in their consideration of mitigating evidence. In addition to the statutory mitigating factors set forth in the FDPA, Basham's attorneys submitted thirty-one nonstatutory mitigating factors for the jury's consideration.  Tr. 11/1/04, ECF No. 971 at 223.  Basham's jury was required to consider each mitigating factor and to indicate the number of jurors, if any, who found each mitigating factor.  *Id*. at 221.

So unlike the Texas statutory scheme in *Tennard* that focused the jury's determination on just two issues, the jury here was specifically required to make findings on each of the thirty nonstatutory mitigating factors submitted on the verdict form. And unlike the prosecutor in *Tennard* who argued that the defendant's IQ was irrelevant to the special issues, the prosecutor in Basham's case never argued that Basham's mitigating evidence was irrelevant. To the contrary, the AUSA here explicitly noted to the jury that Basham's

psychiatric evidence was relevant because it "goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be." *Id*. at 89.

Additionally, as noted in the Fulks case, this court's instructions clearly informed the jury that they could consider any mitigating evidence regardless of any nexus to the crime.

The court never suggested that there had to be some nexus between mitigating evidence and the charged crimes before the jury could consider the mitigating evidence. To the contrary, the court explained that "[a] mitigating factor is not offered to justify or excuse a defendant's conduct." *Id*. at 219. The court instructed jurors they could consider any factor to be mitigating if the factor tended to suggest life in prison without parole and not death should be the appropriate sentence. *Id*. at 220. Moreover, the court instructed the jury that "there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list." *Id*. After listing the mitigating factors, the court emphasized to the jury: "The law does not limit your consideration of mitigating factors to those that are listed for you; therefore, if there are any mitigating factors not listed in these instructions, but which any juror finds to be established by a preponderance of the evidence, that juror is free to consider them in his or her sentencing decision." *Id*. at 227.

Moreover, the jury verdict revealed that the jury did, in fact, consider the mitigating evidence advanced by Basham. Of the statutory mitigating factors, six jurors found that Basham suffered from an impaired capacity (Statutory Factor No. 1) and one juror found that Basham committed the offense under severe mental or emotional disturbance (Statutory

Factor No. 5). Tr. 11/2/04, ECF No. 972 at 8. Of the nonstatutory mitigating factors, all twelve jurors found that Basham had a family history of mental illness (Nonstatutory Factor No. 2), that Basham grew up in a home filled with domestic violence (Nonstatutory Factor No. 7), that Basham's mother encouraged him to steal to support their drug habit (Nonstatutory Factor No. 13), and that Basham began using drugs at an early age (Nonstatutory Factor No. 14). *Id*. at 8–9. One or more jurors found ten other nonstatutory mitigating factors (Nonstatutory Factors 3, 4, 5, 6, 12, 15, 16, 19, 25, 26). *Id*. In order for the jurors not to have considered the numerous mitigating factors they found, they would have had to blatantly ignore the Court's verbal instructions and the written instructions.

Finally, it should be noted that the objection to the government's "causal nexus" argument is substantially similar to the defendant's objection to this court's "two-step" mitigation instruction. Like the nexus argument, the two-step jury instruction was also litigated in Fulks, but unlike the nexus argument, the two-step instruction was appealed. On appeal, the Fourth Circuit Court of Appeals found no error in this court's instruction regarding a two-step procedure and evaluating mitigating evidence. Although textually different, these two objections are similar in nature. The essence of each argument is that the jury was diverted from considering mitigating evidence advanced by the defendant. The Fourth Circuit's rejection of Fulks's challenge to the court's instructions on mitigation lends support to this court's decision in Basham's case that no error occurred with regard to the causal nexus argument.

CLAIM 25:
COURT'S INSTRUCTION ON MITIGATION

In Claim 25, Basham contends that this court's instructions to the jury regarding the statutory and nonstatutory mitigating factors were flawed.

The offending portion of the jury instruction read as follows:

As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a two-step process in determining whether any one or more of the mitigating factors have been proven.

Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, you must determine whether the factor is mitigating, as I have defined that term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

Tr. 11/1/04, ECF No. 971 at 220. A similar two-step instruction was given on the verdict form. ECF No. 805 at 5.

This precise argument was also raised by Fulks, Basham's co-defendant. This court denied relief in Fulks's § 2255 petition, and in a published decision, the United States Court of Appeals for the Fourth Circuit held that the jury charge assailed in Basham's Claim 25 was a proper statement of the law. *United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012). Because the Fourth Circuit Court of Appeals has already rejected an identical challenge to the precise language challenged in Basham's § 2255 petition, the court must deny relief on this Claim 25.

172
**JA 0348**

CLAIM 26:
COURT'S FAILURE TO GIVE REASONABLE DOUBT
INSTRUCTION REGARDING WEIGHING OF
AGGRAVATING AND MITIGATING FACTORS

In Claim 26, Basham contends that his death sentence is unconstitutional based on the court's failure to instruct the jury that it may only impose a death sentence if it finds that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. Additionally, Basham argues that to the extent the federal death penalty scheme allows a death sentence without such an instruction, it is unconstitutional. Further, Basham argues that he received ineffective assistance of trial and appellate counsel for their respective failures to request such an instruction at trial and on appeal.

More particularly, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court stated that "[o]ther than the fact of a prior conviction, any *fact* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490 (emphasis added). Then, in *Ring v. Arizona*, 536 U.S. 584 (2002), the Court held that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589. Thus, a jury must find any "aggravating circumstance" necessary for imposition of the death penalty beyond a reasonable doubt. *Id.* at 602.

The FDPA sets forth the relevant burdens of proof regarding the aggravating and mitigating factors which may be proved in a federal death penalty case. In particular, the FDPA states that:

173
**JA 0349**

> The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established *beyond a reasonable doubt*. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the information.

18 U.S.C. § 3593(c) (emphasis added). Additionally, the FDPA states that in weighing aggravating factors against mitigating factors to determine whether death is an appropriate sentence:

> The jury . . . shall consider whether all the aggravating factor or factors found to exist *sufficiently outweigh* all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone *are sufficient* to justify a sentence of death.

*Id.* § 3593(e) (emphasis added). The court's jury instructions in this case in no way deviated from these statutory requirements, and Basham does not contend otherwise.

Instead, Basham argues that the court's jury instructions deviated from the Constitution's requirements. In particular, according to Basham, the jury's weighing of aggravating factors against mitigating factors is a factual finding subject to the rules announced in *Apprendi* and *Ring* because it is an essential prerequisite to the death penalty. Basham cites scant authority in favor of this proposition, relying principally upon a panel opinion of the Sixth Circuit in *United States v. Gabrion*, 648 F.3d 307 (6th Cir. 2010), which held that "a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt."[55]

---

[55] Notably, however, the Sixth Circuit vacated this opinion and granted the government's petition for a rehearing *en banc* on November 17, 2011. Basham also cites the majority opinions of two state court cases and the dissenting opinions of two other state court cases. *See Evans v. State*, 886 A.2d 562, 578, 582–84 (Md. 2005) (Raker, Green, JJ. & Bell, C.J., dissenting); *Duest v. State*, 855 So. 2d 33, 53 & n.18 (Fla. 2003) (Anstead, C.J., dissenting); *State v. Whitfield*, 107 S.W.3d 253, 256–59 (Mo. 2003); *Woldt v. People*,

As an initial matter, the court notes that, regardless of its instructions to the jury in this case, the special verdict forms as to both Count 1 and Count 2 indicate that the jurors in fact applied the reasonable doubt standard to their weighing process. Specifically, both special verdict forms stated, "We, the jury, as to Brandon Leon Basham, *unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s)* so as to justify a sentence of death . . . . We, therefore, unanimously conclude that Brandon Leon Basham shall be sentenced to death." ECF No. 805 at 11; ECF No. 806 at 11 (emphasis added). Below this paragraph are the signatures of all twelve jurors.

For at least this reason, then, and even assuming Basham could show that his trial and appellate counsel's respective performance fell below the standard of reasonableness, Basham cannot satisfy the prejudice prong of *Strickland,* and Claim 26 must fail. Likewise, even if the Constitution requires such an instruction, Basham's sentence is not unconstitutional because the jurors in his case actually deliberated in accordance with the standard he now proposes. As explained below, however, the Constitution does not require this instruction and Basham's trial and appellate counsel provided him effective assistance.

Turning to the merits, virtually all federal courts of appeals to consider the issue disagree with Basham's argument. Specifically, at least the First, Fifth, Ninth, and Tenth Circuits have held that the weighing process is not a fact which the jury must find beyond a reasonable doubt. *See United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008) (citing *United States v. Barrett*, 496 F.3d 1079, 1107–08 (10th Cir. 2007)); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31–32 (1st

---

64 P.3d 256, 264–67 (Colo. 2003).

Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007).  As the Fifth Circuit explained, for example, when the jury considers whether the aggravating factors "sufficiently outweigh" the mitigating factors to "justify a sentence of death," it makes a "'highly subjective,' 'largely moral judgment.'"  *Fields*, 483 F.3d at 346 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985)).  Similarly, the First Circuit noted that the outcome of such a "process" is not "an objective truth susceptible to (further) proof by either party."  *Sampson*, 486 F.3d at 32.  Rather, the weighing process is "the lens through which the jury must focus the facts that it has found."  *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005).

Basham provides a number of arguments distinguishing these cases, as at the time his brief was filed the Fourth Circuit had not specifically addressed this issue.  Importantly, however, the Fourth Circuit recently did so in *United States v. Runyon*, 2013 WL 657784 (4th Cir. Feb. 25, 2013).  In *Runyon*, the court explained that the Supreme Court has never extended *Ring*'s requirement to the weighing process.  *Id.* at *33.  The Fourth Circuit discussed the cases cited in the above paragraph and stated that it found their reasoning "persuasive."  *Id.*  It thus decided to "join the broad consensus of authority."  *Id.* Accordingly, as it is in the First, Fifth, Ninth, and Tenth Circuits, the law in this circuit is now clear that the reasonable doubt standard does not apply to the weighing of aggravating factors.  *Id.*  In light of the *Runyon* holding, Basham's Claim 26 is without merit, and the court need not address his contrary arguments.

For the above reasons, the court's failure to provide an instruction that the jury must find, beyond a reasonable doubt, that the aggravating factors outweigh the mitigating factors

did not render Basham's death sentence unconstitutional. Likewise, the fact that the FDPA only requires jurors to find that the aggravating factor or factors found "sufficiently outweigh" the mitigating factor or factors found does not render the FDPA unconstitutional. Further, because the Constitution does not require weighing beyond a reasonable doubt, Basham's trial counsel did not fall below an objective standard of reasonableness under *Strickland* by failing to request such an instruction. Finally, Basham's appellate counsel appropriately did not pursue this issue on appeal because the issue lacked merit and similarly, counsel did not render ineffective assistance to Basham.

## CLAIM 27:
### JUROR WILSON'S JUROR QUESTIONNAIRE

During the last week of trial, the court instructed the jury to elect its foreperson. They selected Cynthia Wilson, a nurse from Spartanburg, South Carolina to serve as foreperson. The week after the death penalty verdict was announced and the jury was discharged, a Spartanburg television station called the United States Attorneys' Office to report a contact by someone purporting to be on the Basham jury inquiring as to why the Spartanburg area television station was not covering the trial. The United States Attorneys' Office promptly notified the court and defense counsel. Upon receipt of this information, the court cancelled an out-of-state vacation that had been planned for several months and began the first of what were to be nine separate evidentiary hearings on the question of juror misconduct by Wilson.

That misconduct is set out at length in this court's earlier orders and in the decision of the Fourth Circuit Court of Appeals in Basham's direct appeal. Suffice it to say that despite this court's forty-one warnings during the trial admonishing the jury not to discuss the case with anyone, it learned that Cynthia Wilson had contacted three Spartanburg-area

television stations to inquire as to why they had not covered the trial. Eventually, after gaining court approval to access all of Wilson's telephone records, defense counsel learned that Wilson had also contacted two newspapers in upstate South Carolina.

The court found Wilson to be in contempt of court, fined her nearly $3,000, and required her to perform 120 hours of community service. The court struggled with the question of whether the verdict should be disturbed because of Wilson's misconduct. Ultimately, for reasons set out in detail in the court's order of March 14, 2005, ECF No. 890, the court determined that a presumption of prejudice arose from Wilson's conduct but that the government had successfully rebutted the presumption and that the jury verdict should stand. The court's decision to deny Basham's motion for a new trial based upon Wilson's misconduct was affirmed by the Fourth Circuit Court of Appeals on the direct appeal, and the Supreme Court denied Basham's petition for a writ of certiorari.

Although the court ultimately denied the motion for a new trial by Basham's trial counsel, the court made it plain that Wilson's conduct was reprehensible and that she had perjured herself at the evidentiary hearings.[56]

In Claim 27, Basham contends based on a careful review of Wilson's sworn juror questionnaire submitted prior to her selection on the case, that she misrepresented two facts that trial counsel should have uncovered. Basham argues that this information was "readily available" to trial counsel at the time of the post-verdict proceedings and that counsel's

---

[56] In arguing Claim 27, Basham suggests that in many respects, the court accepted Wilson's testimony. Pet. at 127 ("The court accepted Wilson's excuse."); 129 ("The court's decision relied heavily upon its acceptance of Wilson's testimony.") To the contrary, the court rejected testimony by Wilson at almost every turn, indicating on several occasions during the colloquy that it had resolved the credibility question by accepting the television reporter's statement of what transpired.

failure to independently investigate this information constituted deficient performance that prejudiced Basham.

At issue in Claim 27 is juror questionnaire question 41, which read "Have you ever sued someone or been sued?" Wilson answered this question "No." In his § 2255 petition, Basham contends that this statement was false because she has been "sued" by the South Carolina Department of Revenue on two occasions, one resulting in a judgment against her of $615.18, entered in 1995, and the other judgment against her of $1,761.59, entered in 2000. With commendable candor, Basham's counsel conceded at the § 2255 evidentiary hearing that they have now learned that these state tax liens were filed administratively and that no lawsuit, as that term is commonly understood by laymen, ever occurred.

The other alleged misrepresentation by Wilson occurred during voir dire wherein she indicated that she had been a nurse for four years. Basham's habeas counsel have learned that Wilson did not receive her Registered Nurse's license until February 2002, so she had not, in fact, been working as a nurse for four years when she was selected to serve on the case in 2004.

The court is unpersuaded that these two relatively minor misstatements afford Basham any relief as to this claim. First, now that it has been clarified that the tax liens were filed administratively, the court finds that Wilson did not perjure herself in response to question 41 on the juror questionnaire. With regard to her statement that she had been a nurse for four years, as the government points out, it is quite possible that she worked in some type of nursing capacity before obtaining her Registered Nurse license, thereby rendering her statement that she had been a nurse for four years entirely true. Even if it was not accurate,

it is a misstatement as to a relatively inconsequential issue and would not have affected this court's decision at any time during the nine evidentiary hearings conducted on the matter. As indicated above, this court rejected Wilson's testimony in many respects, resolving the dispute between Wilson's testimony vis-a-vis that of the news reporter who called the government adversely to Wilson at every turn.

Basham argues that evidence of Wilson's additional untruthfulness would have done much to convince the court that Wilson was "not impartial and not competent to serve." Pet. at 132. To the contrary, the court finds that, even construed in the light most favorable to Basham, Wilson's failure to mention the administrative tax liens, coupled with a seeming misstatement of nursing experience, would have been of but minimal value to the court in deciding the very difficult issue before it regarding Wilson's misconduct in contacting the news media.

The juror questionnaire in this case was in two parts, encompassing a total of sixty-two questions, many with extensive sub-parts. The process of selecting the jury required nearly two weeks. Permitting a post hoc examination of the minutia of juror responses in an effort to uncover some misstatement, however slight, would make it virtually impossible to achieve finality in criminal litigation.

The court finds no merit to Claim 27.

## CLAIM 28:
### JUROR WILSON'S CONTINUED MISCONDUCT

In Claim 28, Basham alleges that newly discovered evidence further undermines the credibility of Juror Cynthia Wilson during her testimony at the hearing on Basham's motion for a new trial related primarily to the issue of whether the jury engaged in premature

180

deliberations.  Thus, Basham requests that this court vacate its previous order denying him a new trial.

As an initial matter, the government argues that Claim 28 fails on procedural grounds because it is, in essence, an untimely motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.  Under Rule 33, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty."  Although the jury found Basham guilty and sentenced him to death in 2004, the government notes that Basham did not file the instant motion until 2011, more than six years after the verdict.

Under § 2255, the grounds upon which a prisoner may move the court to vacate, set aside, or correct his sentence are "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  Although the § 2255 remedy is comprehensive, "it does not encompass all claimed errors in conviction and sentencing." *United States v. Addonizio*, 442 U.S. 178, 185 (1979).  Generally, "unless the claim alleges a lack of jurisdiction or a constitutional error, the scope of collateral attack has remained far more limited." *Id.*  Indeed, the "Court has held that an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

Notably, the Supreme Court has held that a claim of newly-discovered evidence alone is not cognizable in a petition seeking a writ of habeas corpus as relief from a state court judgment. *Herrera v. Collins*, 506 U.S. 390, 404 (1993).[57]  Rather, there must be "an independent constitutional violation occurring in the underlying state criminal proceeding" because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.* at 400.  A mere "claim that new evidence casts doubt, even grave doubt, on the correctness of a conviction is not a ground for relief on collateral attack." *Conley v. United States*, 323 F.3d 7, 14 (1st Cir. 2003) (en banc).

In this claim, Basham does not allege that this court was without jurisdiction to impose his sentence or that his sentence exceeded the maximum authorized by law.  Instead, Basham states that his § 2255 petition is based on alleged violations of the Constitution and laws of the United States, and because the § 2255 petition itself was filed within one year of the Supreme Court's denial of certiorari in his direct appeal, the petition—including Claim 28—is timely.  *See* Reply at 180.

The court agrees that Claim 28, by itself, is not cognizable under § 2255.  Rather, it is an evidence-based claim that does not allege an independent constitutional violation. *See, e.g.*, *United States v. Berry*, 624 F.3d 1031 (9th Cir. 2010) (finding prisoner's claim for a

---

[57]  Though the Supreme Court decided *Herrera* in the context of 28 U.S.C. § 2254, its holding should apply equally to a petition under § 2255. *See Davis v. United States*, 417 U.S. 333, 344 (1974) ("[Section] 2255 was intended to mirror § 2254 in operative effect."); *Hill v. United States*, 368 U.S. 424, 427 (1962) (stating that "it conclusively appears from the historic context in which § 2255 was enacted that the legislation was intended simply to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district court where the prisoner was confined").

new trial based on FBI agent's perjury conviction subsequent to prisoner's trial at which FBI agent testified not cognizable under § 2255 because it did not allege an independent constitutional violation); *see also Conley*, 323 F.3d at 13–16 (distinguishing, in a motion under § 2255 based on new evidence, between new evidence claims which simply cast doubt on the correctness of the conviction (not cognizable) and claims alleging an independent constitutional violation under *Brady v. Maryland*, 373 U.S. 83 (1963) (cognizable)).

In particular, the primary allegations of Claim 28 are that it has now been discovered that Wilson did not maintain her close friendships with the other jurors after the case was concluded and that Wilson continued to lie to authorities, failing to reveal to State Board of Nursing licensing authorities the discipline meted out by this court as a result of Wilson's contempt at trial. Pet. at 145–46. According to Basham, if the court had this information at its disposal while Basham's motion for a new trial was pending, the court may have found that premature deliberations occurred and ordered a new trial. Thus, Claim 28 relates to the effect that new evidence would have had on his trial, and it "therefore falls into the realm occupied by new trial motions under Rule 33." *Berry*, 624 F.3d at 1042.

Next, despite Basham's apparent argument to the contrary, Claim 28 does not become cognizable because it was filed along with other, independently cognizable claims in a timely § 2255 petition. In *Berry*, for example, the Ninth Circuit considered a prisoner's due process claims in his § 2255 motion on their merits. However, because the remainder of his § 2255 petition argued that new evidence "undermines confidence in his guilty verdict," the court of appeals found that portion to be a Rule 33 motion for a new trial. *Id.* at 1039, 1042. The court of appeals would have ordinarily found these "new-trial claims well out-of-time,

because he filed his § 2255 motion almost seven years after a Rule 33 motion was due," but in *Berry* the government waived its objection to the untimely claims. *Id.*

In this case, the government has not waived its objection to the timeliness of Claim 28, and thus this claim is procedurally defaulted and incognizable under this § 2255 petition.

Nevertheless, even if Claim 28 were properly before the court, it is unavailing. As noted previously, when evidence came to light that juror Cynthia Wilson had contacted a Spartanburg, South Carolina television station to inquire as to why the television was not covering the trial, the court began a series of nine post-verdict hearings during which Wilson testified on three occasions and all of the remaining jurors testified at least once. The court authorized Basham's defense counsel to subpoena Wilson's phone records in preparation for these hearings. The phone records revealed additional calls to other news media outlets, which prompted a motion for a new trial, which this court denied. The Fourth Circuit Court of Appeals affirmed the denial in Basham's direct appeal. *United States v. Basham*, 561 F.3d 302, 320 (4th Cir. 2009).

The phone records also revealed an extensive number of calls between Wilson and other jurors. During the various hearings the court conducted, Wilson suggested that these calls were of a personal nature, with the jurors conversing about matters of mutual interest. Wilson and all the other jurors steadfastly denied any premature deliberations. Claim 28, however, alleges new evidence that Wilson did not remain close with the other jurors following the trial. Also, this claim alleges that Wilson continued to lie after the trial by providing false statements on nursing license applications on several occasions.

Thus, Claim 28 is primarily an assertion that the jurors engaged in premature deliberations, as evidenced by the numerous phone calls, and that Wilson should not have been believed when she denied premature deliberations in her three post-verdict appearances on the witness stand. This newly discovered evidence, it is argued, further undermines Wilson's credibility and should yield a conclusion that the jury did, in fact, engage in premature deliberations.

There is another procedural obstacle to Claim 28 that must be addressed. Evidence Rule 606(b) declares a juror incompetent to testify "as to any matter or statement occurring during the course of the jury's deliberations . . . ." Several circuits have held that Rule 606(b) bars a juror from testifying about premature deliberations. *E.g., United States v. Logan*, 250 F.3d 350, 380–81 (6th Cir. 2001) (Rule prohibits post-verdict interrogation about internal jury influences, including premature deliberations); *United States v. Caldwell*, 83 F.3d 954, 956 (8th Cir. 1996) (Rule "generally precludes the testimony of any juror regarding intrajury communications," including alleged intrajury communications made during trial that they had "heard enough" and that "this is just a bunch of crap"); *United States v. Siegelman*, 561 F.3d 1215, 1240–42 (11th Cir. 2009) (district court did not abuse its discretion in concluding that the Rule barred it from questioning jurors about e-mails exchanged during trial).

Other circuits have held that, while a court may inquire about premature deliberations in some circumstances, jurors may not testify about any effect the premature deliberations had on their verdict. *E.g., United States v. Richards*, 241 F.3d 335, 343–44 (3rd Cir. 2001) (noting that although the district court could have inquired about premature deliberations

during trial, a post-verdict inquiry would violate the Rule because it would necessarily delve into the effect of premature deliberations on the verdict); *United States v. Morales*, 655 F.3d 608, 631 (7th Cir. 2011) ("Any inquiry as to bias arising from the alleged premature deliberations would run afoul of the Rule's clear proscription . . . .").

At least one circuit has taken a more open view, opining that the Rule 606(b) allows courts to delve into the content of premature deliberations. *United States v. Jadlowe*, 628 F.3d 1, 20 (1st Cir. 2010).

Faced with this split of authority, the court will err on the side of caution and assume that Rule 606(b) allows the court to receive testimony about premature deliberations but that it does not allow juror testimony concerning any effect the premature deliberations had on the verdict. Giving Basham the benefit of the doubt on this question, however, Claim 28 still lacks merit.

All of the new information referred to in Claim 28 relates only to the credibility of Wilson—the jury foreperson whose credibility is already questionable and whose testimony has already been rejected by this court. The other eleven jurors who participated in the return of the verdict all affirmed to the court that no premature deliberations occurred. Distilled to its essence then, Claim 28 is merely an assertion that new evidence has arisen suggesting that one of twelve jurors, whose credibility has already been undermined and whose testimony has already been rejected, in part, by this court, should not be believed when she testified that premature deliberations did not occur.

Wilson's ex-husband testified that Wilson did not remain friends with the jury after the verdict was returned and that it would be unlikely that his wife would have contacted

another juror about purchasing sod for her residence because he, in fact, did all of the yard work while the couple was living together.  His testimony is somewhat speculative and a weak attempt at impeachment.  It is certainly possible that Wilson did not continue to contact jurors after the trial because she may have been embarrassed by this court's sanctions against her.

The fact that Wilson, on several occasions after she was disciplined by this court, failed to reveal the sanctions to authorities when she was renewing her nursing license, is certainly damaging to her credibility, but it is also cumulative to the other damaging testimony regarding her credibility developed during the post-verdict juror misconduct evidentiary hearings.

For the foregoing reasons, the court finds no merit to Claim 28.

<div align="center">

CLAIM 29:
NEWLY DISCOVERED EVIDENCE REGARDING
THE CREDIBILITY OF SHERIFF RONALD HEWETT

</div>

In Claim 29, Basham argues that he is entitled to a new trial based on newly-discovered evidence which undermines the credibility of Sheriff Ronald Hewett, who testified on behalf of the government.  As in Claim 28, the government initially argues that Claim 29 is an untimely motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.  For the reasons discussed above with respect to Claim 28, the court agrees with the government.

Like Claim 28, Claim 29 is not cognizable under § 2255 by itself because it is an evidence-based claim that does not allege an independent constitutional violation.  In particular, Basham's core allegation in Claim 29 is that evidence that Sheriff Hewett pled

<div align="right">

187
**JA 0363**

</div>

guilty to corruption and obstruction of justice makes it "highly possible that Hewett fabricated his testimony when he claimed that Mr. Basham had demonstrated how he (Basham) had strangled Alice Donovan with the purse strap." Pet. at 149. Then, "[w]ithout Hewett's testimony, there is legitimate doubt as to whether the results of Basham's trial, especially the penalty phase, would have been different." *Id.* In other words, Basham is calling into doubt the overall weight of the evidence against him, and the "proper device for such a claim is Federal Rule of Criminal Procedure 33." *Berry*, 624 F.3d at 1038. Additionally, as explained above, Claim 29 does not become cognizable because it was filed along with other, independently cognizable claims in a timely petition under § 2255. For at least these reasons, then, Claim 29 must fail.

Notwithstanding the above, even if this claim were timely, the newly discovered impeachment evidence relating to Sheriff Hewett[58] is unrelated to Basham's case and does not serve as the basis for a new trial. As the government points out in its brief, the Fourth Circuit has recently expressed its reluctance to order retrials because of subsequently developed impeachment evidence. *See United States v. Robinson*, 627 F.3d 941, 948–49 (4th Cir. 2010) (finding that newly discovered impeachment evidence that police officers who investigated defendant and testified against him were engaged in unrelated misconduct did not warrant retrial on prosecution for drug trafficking and firearm offenses because

---

[58] Sheriff Hewett was sentenced to prison, followed by a term of supervised release and fine. As part of its prosecution of Hewett, the government obtained affidavits setting out allegations that Hewett was repeatedly intoxicated at crime scenes and sexually harassed female workers. The indictment charged that he used his office for his personal benefit, including obstruction of an investigation against a relative and misuse of public funds by forcing deputy sheriffs to perform manual labor at his house and to work on his political campaigns. There was also evidence that Sheriff Hewett engaged in threats and retaliation against those who testified against him and that he encouraged employees to be uncooperative with the investigation.

government's case did not rest entirely on uncorroborated testimony of the officers, and the officers' misconduct, while serious, did not relate to counts for which the defendant was convicted or to the truth-finding function of the proceedings).  In another case, the Fourth Circuit noted that newly discovered impeachment evidence would result in a new trial only in the narrowest of circumstances:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly untrustworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial.

*United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (quoting *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991)).  Here, the government's case clearly did not rest entirely on the uncorroborated testimony of Sheriff Hewett.  He was but one of eighty-nine witnesses who testified in Basham's guilt phase trial.  Moreover, as noted previously in this opinion, Basham is incorrect to assert that Hewett's testimony clearly and unequivocally told the jury that Basham admitted to Hewett that he was the one who strangled Alice Donovan.  Rather, Sheriff Hewett testified that Basham showed him how Donovan "was" strangled and how he (Basham) threw the strap into the woods.  This evidence cannot be said to be the lynchpin of the government's case against Basham.  Indeed, the Fourth Circuit Court of Appeals noted on three occasions in its opinion in the direct appeal of this case that the evidence against Basham was "overwhelming."  *Basham*, 561 F.3d at 328, 329, 330 ("The government presented an overwhelming case against Basham during the guilt phase"); ("overwhelming evidence against Basham"); ("overwhelming evidence against Basham").

Because the government's case against Basham did not rest exclusively on the uncorroborated testimony of Sheriff Hewett; because Sheriff Hewett's testimony was not the critical piece of evidence that showed to the jury that Basham "struck the fatal blow" that killed Donovan; and because the evidence against Basham at the guilt phase was overwhelming, as found by the Fourth Circuit Court of Appeals, Basham's claim of newly discovered evidence regarding Sheriff Hewett's conviction does not present a basis for relief in this case.

CLAIM 30:
FAILURE TO SURRENDER AND PROVIDE
REASONABLE ACCESS TO BASHAM'S TRIAL FILES

In Claim 30, Basham argues that his trial counsel, in particular Jack Swerling, rendered ineffective assistance when he failed to provide Basham's appellate counsel "all files produced in the course of representing Mr. Basham." Pet. at 140. Correspondingly, Basham argues that this failure "necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal." *Id*. More particularly, Basham alleges that Swerling repeatedly refused to "surrender or allow appellate counsel reasonable access to the thousands of trial-related documents known to be in his possession." *Id*. at 141. For example, Swerling allegedly forced appellate counsel to travel from Washington, D.C. to Columbia, South Carolina shortly before the opening brief was due in order to obtain necessary documents. *Id*. at 142. "Even after this trip, however, appellate counsel lacked most of the trial file in Mr. Basham's case." *Id*. Because of this, appellate counsel "may have erroneously omitted a viable claim," and therefore Basham contends that Mr. Swerling "compromised the underlying appeal to an unknowable extent." *Id*. at 141.

At the outset, the court notes that quite a few attorneys represented Basham during the process of his direct appeal to the Fourth Circuit, which lasted more than three years. The bulk of his allegations in Claim 30, however, appear to relate only to Timothy J. Sullivan and Melissa A. Meister, the final two attorneys the Fourth Circuit appointed Basham. To provide some context for this claim, it is important to consider the history of Basham's representation during the process of his direct appeal. After Basham filed his direct appeal on February 24, 2005, the Fourth Circuit initially appointed both of his trial attorneys (i.e., Swerling and Harris) as his appellate attorneys. The Fourth Circuit later relieved Swerling as appellate counsel and appointed Sullivan in his place. Harris, however, who undoubtedly had access to Basham's entire trial file, continued to represent Basham on appeal for more than two years until September 1, 2007. After relieving Harris, the Fourth Circuit appointed Meister on November 16, 2007. Notably, three partners and five associates at Meister's firm, Jenner & Block, assisted Meister in her efforts. *See* Tr. 10/09/12, ECF No. 1561 at 84–89. The team of Sullivan, Meister, and her colleagues at Jenner & Block prepared and ultimately filed the opening brief on May 13, 2008 and a reply brief on September 22, 2008. Meister then argued Basham's case before the Fourth Circuit on October 31, 2008.

With this history in mind, it is important to recognize that at least one of Basham's appellate attorneys had ready access to Basham's physical file for more than two years. Moreover, the final, ten-member team which prepared his appeal briefs had extensive resources and was probably as good as any that could be assembled. For these reasons, the court is again reminded of the strong presumption that Basham's trial and appellate attorneys rendered effective assistance of counsel. *See Strickland*, 466 U.S. at 689.

Turning to the merits of Basham's Claim 30, Basham repeatedly emphasizes that Swerling refused to surrender the physical trial file to appellate counsel. This is true. However, this does not mean that Swerling did not provide reasonable access to Basham's file to appellate counsel. It appears that appellate counsel obtained access to Basham's file shortly after each time they requested it. For example, Sullivan wrote to Swerling on January 14, 2008 requesting to meet with Swerling and requesting access to Basham's trial file. Tr. 10/16/12, ECF No. 1558 at 787. On January 29, 2008, Swerling met with Sullivan and indicated that Sullivan would have complete access to the file for inspection and copying. *See id.*; Tr. 10/09/12, ECF No. 1561 at 106. Also, Meister's first contact with Swerling was on March 26, 2008 when she spoke to him by phone and then followed up with an email requesting specific items from Basham's trial file. *See* Tr. 10/09/12, ECF No. 1561 at 99–104. Swerling was out of town, which apparently resulted in Meister making a number of subsequent communications to Swerling. *Id*. at 100–01; *see* Tr. 10/16/12, ECF No. 1558 at 789–90.

In any event, by April 1, 2008, Swerling told Meister that she could come down to his office and copy anything from the file that she wished; Meister did so on April 3, 2008. Tr. 10/09/12, ECF No. 1561 at 104. Thus, in both cases when appellate counsel wanted access, they were given it, and Swerling did not deny them access to any document requested. *See id.* at 105. Moreover, it appears that Swerling assisted appellate counsel through the month of May 2008 in preparing and filing the opening appeal brief. *See* Tr. 10/16/12, ECF No. 1558 at 797–98.

**JA 0368**

Therefore, although Swerling did not surrender the physical file to Sullivan and Meister, the court finds that Swerling's performance was not deficient because he provided both with reasonable access thereto. Likewise, because they had reasonable access to Basham's trial file, the court finds that Basham's appellate counsel also did not render deficient performance.

Undoubtedly appellate counsel's task would have been easier had they had the entire file in their possession. But just because they might not have had to work as hard with the file at hand does not mean that Basham's constitutional rights were violated in this case. As explained above, appellate counsel could obtain many documents from the court's docket, had access to the entire physical file, and were allowed to copy what they wished therefrom. Notably, Basham does not specifically identify any claim his appellate counsel failed to raise because of Swerling's failure to surrender Basham's file though Basham does suggest that some of the claims of ineffective assistance of appellate counsel in the instant motion identify claims which Basham's appellate counsel might have raised in his direct appeal. Pet. at 143–44. However, the court has found that appellate counsel were not ineffective in failing to raise the issues Basham identifies, and thus even if it were the case that appellate counsel did not raise these issues because they did not possess Basham's entire trial file, Basham cannot have been prejudiced thereby. *See* discussion of Claims 3, 7, 12, 15, and 23–26, *supra*.

More important, however, and leaving the speculation aside, Meister testified that the access she received was sufficient for Basham's direct appeal, even if dealing with Swerling made things more difficult. Tr. 10/09/12, ECF No. 1561 at 105. Likewise, Meister testified

that there were no claims appellate counsel could not have raised because of Swerling's behavior. *Id*. Therefore, even if Swerling's performance was deficient because he did not surrender the entire physical file to appellate counsel, the court finds that this failure did not prejudice Basham.

Based on the above, the court finds no merit to Claim 30. Neither Swerling, in failing to surrender Basham's trial file to appellate counsel, nor Basham's appellate counsel, in preparing and filing Basham's appeal, rendered ineffective assistance to Basham.

CLAIM 31:
THE SUFFICIENCY OF THE INDICTMENT

Claim 31 was withdrawn by Basham prior to the evidentiary hearing.

CLAIM 32:
CONSTITUTIONAL, STATUTORY, AND SUPERVISORY ISSUES
REGARDING THE DEATH PENALTY INSOFAR AS IT IS INVOKED
ON THE BASIS OF RACE AND GEOGRAPHY

Succinctly stated, Claim 32 asserts that the death penalty in the United States is not enforced equally in terms of race and geography. This court is asked to grant relief on this ground under the Constitution, federal statutes, and the court's supervisory authority. Basham points out that the federal death row currently consists of nineteen men, four of whom are white, thirteen black, one Hispanic, and one "other." It is argued that twelve of the nineteen defendants on federal death row have been sentenced in the South. Virginia and Texas have each contributed four defendants each. South Carolina has contributed two: Fulks and Basham.

As the court pointed out at the conclusion of phase I of the evidentiary hearing, it is abundantly clear that race played no part whatsoever in the decision to prosecute or the

handling of this case: both Basham and Fulks are Caucasian; both of the women who were raped and murdered were Caucasian; and all of the other victims or potential victims (James Hawkins, Robert Talsma, Sam Jordan, Deanna Frances and her fifteen-year-old daughter, Officer Matt Davis, and the Ohio State Trooper who were almost run over during Fulks's 130 mph high-speed chase) were all Caucasian as well. The government indicated as this action was commenced that this was the first federal case in which the United States Attorney sought the death penalty in South Carolina since the enactment of the death penalty statute in 1994. Accordingly, there is no basis for an assertion that race or geography played any part in the resolution of this case. The court concedes, of course, that Claim 32 has been properly raised, and if and when there is a change in the law by the Courts of Appeal, this claim is properly preserved for review.

<div align="center">

CLAIM 33:
CONSISTENCY OR PREDICTABILITY IN THE MANNER
IN WHICH THE FEDERAL COURTS HAVE IMPOSED
THE FEDERAL DEATH PENALTY

</div>

In Claim 33, Basham contends that there is no principled basis for distinguishing cases in which federal defendants received the death penalty from those in which the defendants did not receive the death penalty. According to Basham, this lack of a principled basis renders the death penalty in the federal courts unconstitutional as arbitrary and capricious.

Reasserting the suggestion made in Claim 32, Basham argues that the only basis for distinction between death and non-death verdicts are race and region of the country. Citing *Furman v. Georgia*, 408 U.S. 238 (1972) and *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), Basham argues that the FDPA is unconstitutional because it is not fairly and

consistently imposed.  Basham contends that the government must meet its burden of showing a legitimate distinction between cases where the death penalty is imposed and cases where it is not imposed.

In response, the government correctly points out that it is Basham, not the government, who must shoulder the burden of proof as to this issue.  Basham must show that his sentence violates the United States Constitution.  *See United States v. Taylor*, 635 F. Supp.2d 1243, 1246 (D.N.M. 2009).  In order to meet this burden, Basham must establish that "'no set of circumstances exists under which the Act would be valid.'"  *Id*. (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

The court concludes that Basham has not met his burden of proof of showing that the FDPA is unconstitutional because of its application.  The court notes, however, that Basham has properly raised this issue, and it is preserved for appeal in the event that there is a change in intervening law on the appellate level.

<div align="center">

CLAIM 34:
CUMULATIVE EFFECT OF ALLEGED ERRORS

</div>

In Claim 34, Basham argues that the cumulative effect of the errors involved in the guilt and penalty phases of his trial justifies a vacating of the conviction and sentence in this case.  He also suggests that if none of the claims presented in the petition individually justifies reversal, when considered cumulatively, these errors deny Basham his constitutional rights.  He argues that these constitutional errors "so infected the integrity of the proceedings that the errors cannot be deemed harmless."  Pet. at 164.

The cases Basham relies upon for this proposition involve disputes where courts determined actual constitutional error to have occurred.  In those cases, each error, standing alone, was not grounds for relief, but cumulatively, the errors complained of compelled the court to order a new trial.

As the Fourth Circuit said in Basham's direct appeal:

> Generally, . . . if a court determines that none of a defendant's claims warrant reversal individually, it will decline to employ the unusual remedy of reversing for cumulative error.  To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness.  When none of the individual rulings work any cognizable harm it necessarily follows that the cumulative error doctrine finds no foothold.

*Basham*, 561 F.3d at 330 (internal punctuation and citations omitted).

In this court's view, this case is not one where there were a number of constitutional errors or numerous instances of ineffective assistance of counsel.  Accordingly, the cumulative error doctrine does not afford any relief to Basham.

## CONCLUSION

Brandon Leon Basham received first-class representation from a team of highly skilled, motivated lawyers (one of whom had significant death penalty experience), together with innumerable investigators and experts who contributed to mounting a vigorous defense marshaling all the evidence available in the best light to the defendant.

Not counting several weeks of pretrial proceedings and an eight-day evidentiary hearing on his § 2255 petition, Basham's trial consumed nine weeks.  During the entire course of these proceedings, Basham has had the benefit of legal involvement by at least twenty-six attorneys, together with five medical experts, and an investigator, mitigation

specialist, and other court-provided resources.  The documentation in this case reveals an exhaustive effort to interview potential witnesses, to locate and interview experts, to evaluate their potential testimony, and to use those that would assist the defense team in its efforts to spare Mr. Basham's life.  The petition is therefore denied.

### *Certificate of Appealability*

On December 1, 2009, the rules governing §§ 2254 and 2255 cases in the United States District Courts were amended to require that the district court issue or deny a certificate of appealability when a final ruling on a post-conviction petition is issued.  *See* Rule 11(a) of the Rules governing  28 U.S.C. § 2254 and § 2255.  The court has reviewed its order and pursuant to Rule 11(a) of the Rules Governing § 2254 and § 2255 cases, issues a certificate of appealability as to all of the claims asserted in this case except for Claims 33 and 34.[59]

As to Claims 33 and 34, Basham has not made a substantial showing of a denial of a constitutional right, and therefore, a certificate of appealability is denied as to these claims only.  *See* 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

IT IS SO ORDERED.

*Joseph F. Anderson, Jr.*

June 5, 2013                                    Joseph F. Anderson, Jr.
Columbia, South Carolina              United States District Judge

---

[59]  As noted previously, Claims 8 and 31 were withdrawn.

198
**JA 0374**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR No.:  4:02-922-JFA |
| | ) | |
| v. | ) | ORDER ON MOTION |
| | ) | TO ALTER OR AMEND |
| BRANDON LEON BASHAM | ) | JUDGMENT |
| | ) | |
| _____ | ) | |

On June 5, 2013, this court entered a 198-page order denying defendant Brandon Leon Basham's motion for relief pursuant to 28 U.S.C. § 2255. Basham has timely filed a motion to alter or amend the judgment, suggesting that the court committed a clear error of law in two respects. More specifically, Basham contends that this court has misconstrued his arguments relating to Claims 11 and 15. After careful review, this court has determined that no error of law was committed and that the motion to alter or amend must be denied.

*Claim 11*
*Government's Alleged Inconsistent Positions*
*Regarding the Strap Statement*

Claim 11 deals with an issue that was extensively discussed in this court's June 5, 2013 order. This court discussed Claim 11 in conjunction with Claims 1, 12, and 18 because those four claims related to testimony by Sheriff Ronald Hewett regarding a demonstration by Basham of how a Liz Claiborne purse strap was used to strangle Alice Donovan. In discussing Claim 11, this court confused the issue by suggesting

1

**JA 0375**

that Basham was contending that the government took a position in his trial that was "inconsistent" with the position advanced by the government in the trial of Basham's co-defendant, Chadrick Fulks. As pointed out by Basham in his motion to reconsider, Claim 11 does not explicitly refer to inconsistent positions taken by the government—rather, in Claim 11 Basham contends that the government had an affirmative obligation—at Basham's trial—to correct testimony that it knew to or should have known to be false, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405 U.S. 150 (1972).

That having been said, however, it does not follow that this court was incorrect in finding that Basham's Claim 11 lacked merit.

First, in its June 5, 2013 order, this court found Claim 11 to be procedurally defaulted. Order at 47. ("The court agrees with the government that Basham cannot show that ineffective assistance of appellate counsel was the cause for the procedural default, thus Basham's claims of witness and prosecutorial misconduct asserted in Claim 11 should be dismissed.") In the motion to alter or amend, Basham does not address the procedural default issue. The court hereby affirms its finding that Claim 11 has been procedurally defaulted, but, out of an abundance of caution, the court will proceed to address the merits of this claim just as it did in the June 5, 2013 order.

Sheriff Hewett's testimony and the circumstances leading up to it are set forth in detail in this court's June 5, 2013 order. As that order points out, in the trial of

2

**JA 0376**

Basham's co-defendant, Chadrick Fulks, the government did not advance an argument to the court or to the jury that Basham was the one who used the strap to strangle Donovan. Rather, the government, at a hearing on an *evidentiary question outside the jury's presence*, pointed out the unfairness of admitting part, but not all, of Basham's statement about who strangled Donovan. The government did not vouch for the accuracy of Basham's statement; rather, it relied upon the rule of completeness[1] to argue that Basham's statement, taken out of context, would be unfair.

The court also noted, in its June 5, 2013 order, that FBI Agent Jeff Long testified before the Grand Jury regarding Basham's statement that Fulks strangled Alice Donovan, relaying what Basham had told investigating law enforcement officers about Donovan's murder. Though the government presented that testimony before the Grand Jury in an attempt to get a superseding indictment against Basham, the government did not in any way adopt this position as its theory of the case regarding who actually strangled Donovan. As the government observes in its response to Basham's motion to alter or amend, Basham has offered no evidence that Sheriff Hewett's testimony was perjured. Thus, Basham has failed to satisfy the threshold of the first prong of the Fourth Circuit's test for analyzing claims under

---

[1] *See* Fed. R. Evid. 106.

**JA 0377**

*Napue* and *Giglio*.[2]

In his motion to reconsider, Basham further contends that this court improperly limited the scope of *Napue*'s holding by requiring a showing that the government knowingly used false testimony and not considering the possibility that the government used testimony that it "should have known" to be false. As the government observes in its response, in Claim 11 of the original § 2255 petition Basham himself did not include the "should have known" language found in *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). Moreover, because the court has determined that Basham failed to satisfy the threshold requirement to show that the testimony of which he complains was false, no further analysis is required on the question of whether the government "should have known" that the testimony was false.

Finally, it should be noted that, though given the opportunity, the jurors did not find that Basham actually killed Donovan. Obviously, the jury did not need to find that Basham's hands killed Alice Donovan in order to find him deserving of the death penalty. As set out in detail in the June 5, 2013 order, the government's theory of the case, in both the trial of Basham and the trial of Fulks, was that the two defendants

---

[2] The Fourth Circuit Court of Appeals has announced a three-part test for analyzing claims under *Napue* and *Giglio*. In order to prevail on such a claim, Basham needed to demonstrate that: (1) the testimony was false; (2) the government knew that the testimony was false; and (3) there is a reasonable probability that the false testimony could have affected the verdict. *United States v. Roane*, 378 F.3d 382, 400 (4th Cir. 2004).

4

worked together to bring about Donovan's death.

<p align="center">*Claim 15*
*Evidence Regarding the Kidnapping and Death of Samantha Burns*</p>

Claim 15 relates to the testimony allowed during trial regarding the abduction, rape, and murder of Samantha Burns, a West Virginia teenager who was killed three days before Donovan. Basham is correct that Claim 15 is styled as a claim for ineffective assistance of counsel for trial counsel's failure to object to the admission of the Burns evidence. This court's treatment of the issue, beginning on page 122 of its June 5, 2013 order, correctly notes that "in Claim 15 Basham argues that his trial attorneys rendered ineffective assistance of counsel when they failed to properly object to the admission of [the Burns] testimony." However, Basham takes issue with the remainder of the court's discussion of Claim 15 because after pointing out that the Fourth Circuit Court of Appeals had already determined in the Fulks appeal that the Burns testimony was admissible, and after reciting testimony regarding Burns's death that this court allowed, the court observed that "none of this evidence was objected to." In Basham's view, that discussion indicates that the court improperly treated Claim 15 as a generic challenge to the admission of the Burns evidence, rather than a specific claim of ineffective assistance of counsel for failure to object.

However, Basham misconstrues the court's intent. By determining that this court's decision to admit the testimony regarding the Burns murder was proper, the

<p align="center">5</p>

<p align="right">**JA 0379**</p>

court simply meant to imply what it thought to be obvious: that any objection to the admissibility of such testimony would have been overruled. In doing so, this court was following the procedure of analyzing ineffective assistance of counsel claims authorized by the Supreme Court:

> In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Strickland v. Washington*, 466 U.S. 668, 697 (1984).

The Fourth Circuit Court of Appeals has already ruled in the appeal of Basham's co-defendant that evidence relating to the Burns murder was admissible under Federal Rule of Evidence 404(b), as it addressed the question of intent, which was a critical issue in this case. Thus, no prejudice resulted from any failure on the part of Basham's trial counsel to object to the Burns evidence.

Additionally, Swerling and Harris were not ineffective for failing to object to the Burns evidence for a second reason: Swerling and Harris had a strategic reason for allowing the admission of the Burns testimony in the guilt phase of Basham's trial. Their testimony at the § 2255 evidentiary hearing indicated that long before trial they concluded that the jury would probably find Basham guilty, thereby necessitating a penalty phase. For that reason, trial counsel followed the recognized practice of "front loading" the Burns testimony so as to minimize its impact on the

6

**JA 0380**

issue of the penalty—the critical issue in this case.  In other words, had Swerling and Harris successfully kept out the Burns murder testimony in the guilt phase, that testimony would surely have been admissible in the penalty phase, and would have been fresh in the minds of the jury as they deliberated on Basham's sentence.  Had Swerling and Harris successfully argued to keep the Burns testimony from the jury in the guilt phase, Basham would assuredly now be asserting that counsel was ineffective under *Strickland* because the jury would have heard the damaging testimony regarding Burns's death in the penalty phase, shortly before their deliberations began.  As this court has observed, a reviewing court should not "second guess" defense counsel's performance.  *Roach v. Martin*, 757 F.2d 1463, 1476 (4th Cir. 1985).  The decision to front load the Burns evidence in the guilt phase certainly falls within the wide range of reasonable, professional assistance.

Basham also challenges this court's observation that the Burns evidence was necessary to prove to the jury that the West Virginia teenager did not run away from home for reasons of her own.  Basham asserts that at trial, he never took the position that Burns was a runaway. But as the government points out, in Basham's trial there was never a formal stipulation or concession that Basham kidnapped and killed Burns or that Burns was dead.  Thus, Basham's assertion that the government did not have to prove that Burns's disappearance was involuntary is not correct.

**JA 0381**

8

For all the foregoing reasons, the petitioner's motion to alter or amend (ECF No. 1580) is denied.

IT IS SO ORDERED.

August 21, 2013                                  Joseph F. Anderson, Jr.
Columbia, South Carolina                         United States District Judge

**JA 0382**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-v-<br><br>BRANDON LEON BASHAM,<br><br>Defendant. | No. 4:02-992-JFA<br><br>**NOTICE OF APPEAL** |

Notice is hereby given that, Brandon Leon Basham, defendant named above, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the judgment entered by the Honorable Joseph F. Anderson, Jr., United States District Court Judge, on the 5th day of June, 2013, in this proceeding pursuant to 28 U.S.C. § 2255. Pursuant to Rules 4(a)(1)(B) and (a)(4)(A)(iv) of the Federal Rules of Appellate Procedure, this notice of appeal is timely filed within sixty (60) days of the district court's order denying Mr. Basham's Motion to Alter or Amend Judgment.

Respectfully submitted this 17th day of October, 2013.

<div style="text-align: right;">

s/Julia Grace Mimms
Julia Grace Mimms, Esquire
Attorney for Defendant
Law Office of Julia G. Mimms, P.A.
1001 Elizabeth Avenue, Suite 1A
Charlotte, North Carolina 28204
(704) 333-1301 Telephone

</div>

1

**JA 0383**

s/Michael L. Burke
Michael L. Burke (Arizona Bar No. 013173)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
850 West Adams, Suite 201
Phoenix, Arizona 85007
michael_burke@fd.org
sarah_stone@fd.org
Telephone: (602) 382-2818
Facsimile: (602) 889-3960

Attorneys for Defendant
Brandon Leon Basham

2

JA 0384

## Certificate of Service

I hereby certify that on October 17, 2013 a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this document through the Court's system.

Stephanie Bame
Legal Assistant
Capital Habeas Unit

JA 0385

FILED

DEC 1 1 2002

LARRY W. PROPES, CLERK
FLORENCE, SC

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> Plaintiff, ) <br> ) <br> ) <br> vs. ) <br> ) <br> BRANDEN L. BASHAM, ) <br> Defendant. ) <br> _____ ) | CASE NO.: 4: 02-992 <br><br> MOTION FOR DETERMINATION OFMENTAL COMPETENCY <br><br> 18 USC SECTION 4241 <br> FRCrP 12.2 (c) (1) (A) |

Now comes the Defendant, Branden L. Basham, through his undersigned counsel and respectfully requests that the Court issue an Order pursuant to Title 18, United States Code, Section § 4241, and Federal Rules of Criminal Procedure, 12.2 (c) (1) (A), requiring that the defendant be evaluated to determine his mental competency.

Counsel for the defendant, based upon the previous history of the defendant as related by family members and through other investigation, believe that it is necessary for the Court to order such evaluation to determine if the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

In making this motion, it is the understanding of defense counsel that no statement made by the defendant in the course of any examination ordered by the Court, no testimony by any psychiatric expert based upon the defendant's statements, and no other fruit of the defendant's statements may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding his mental condition as specified in Federal Rules of Criminal Procedure 12.2 (c) (4).

JA 0386

AND IT IS SO MOVED.

Cameron B. Littlejohn, Jr.
1720 Main Street, Suite 202
Columbia, SC 29201
(803) 799-1888 ~ (803) 799-5888
Federal ID No.: 2703


William H. Monckton, VI
1300 Professional Drive, Suite 102
Myrtle Beach, SC 29577
(843) 946-6556 ~ (843) 946-6996
Federal ID No.: 6647

December 10, 2002

JA 0387

# UNITED STATES DISTRICT COURT
## IN THE DISTRICT OF SOUTH CAROLINA
### FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CERTIFICATE OF SERVICE |
| v. | ) | CASE No.: 4: 02-922 |
| | ) | |
| BRANDEN BASHAM | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

I, Constance L. Jennings, being first duly sworn, says that she works with the attorney for the Defendant, with offices at 1720 Main Street, Suite 202, Columbia, South Carolina; that on the 11th day of December, 2002 she caused to be served, by hand delivery, Motion for Determination of Mental Competency, to the individual below named at his/her address, to wit:

United States Attorney's Office
Attn: Rose Mary Parham, Assistant U.S. Attorney
P.O. Box 1567
W. Evans Street Room 222
Florence, SC 29501

Constance L. Jennings
Administrative Assistant

Page 3

indictment in this case, and so I just instruct you that anything -- your deliberations concerning this matter should consider only those matters that occur in here today and not anything that may have occurred previously. You don't need to give any consideration to that at all.

MR. SCHOOLS: Do any Grand Jurors have questions about that?

(Negative response by the Grand Jurors.)

MR. SCHOOLS: Okay, with that, I'll begin reading the indictment. It is an eight-count indictment and also contains some special findings.

Count One of the indictment charges carjacking resulting in death and reads as follows: the Grand Jury charges that on or about November 14th, 2002, in the District of South Carolina and elsewhere, Chaddrick Evan Fulks and Brandon Leon Basham, with intent to cause death and serious bodily harm, by force, violence, and intimidation, did take from the person and presence of another, to wit: Alice Donovan, a motor vehicle that had been transported in interstate and foreign commerce, that is a 1994 BMW 318i, and Alice Donovan's death resulted, in violation of Title 18, United States Code, Section 2.

The elements of that first offense that the government must prove to establish probable cause that that offense has occurred are six -- there are six elements. We

---

PRESENTATION OF INDICTMENT

IN RE:     USA v. Brandon Basham
               Chaddrick Fulks

WITNESS:    Jeffrey Long

BEFORE:     GRAND JURY #5

DATE:       April 22, 2003

PRESENTED BY:  Mr. Scott N. Schools
               FIRST ASSISTANT UNITED STATES ATTORNEY
               Mr. Jonathan S. Gasser
               CHIEF, VIOLENT CRIMES DIVISION

---

Page 2

(1:59 p.m.)

MR. SCHOOLS: Mister Foreman, for the record, do we have a forum present?

FOREMAN: Yes we do.

MR. SCHOOLS: Ladies and gentlemen of the Grand Jury, my name is Scott Schools. I'm the First Assistant U.S. Attorney. I usually work out of our Columbia Office. With me here today in the Grand Jury is Johnny Gasser. He is the chairman of our violent crimes section, and we have a rather lengthy indictment to present for you this afternoon.

I have handed out to each of you copies of the indictment and I asked you to keep those face down. Now that we're on the record, you can turn those over. I want to go through the indictment with you, give you instructions concerning the law pertaining to this indictment, and then make sure that none of you have any questions before Mister Gasser calls the witness who will present to you the evidence pertaining to this indictment.

This is a superseding indictment. Of course, you don't need to be concerned about the fact that this is a superseding indictment. Your job here today is to consider only the evidence that's presented to you and not to worry about anything that may have occurred prior to today. This information has not previously been presented to this Grand Jury. This Grand Jury has not previously considered an

---

Page 4

must prove that the -- the taking of a motor vehicle that had been transported, shipped, or received in interstate or foreign commerce; three, from the person or presence of another; four, by force or intimidation; five, with the intent to cause death or serious harm; and six, the victim's death resulted. Those are the elements we've got to prove to establish that first charge.

MR. SCHOOLS: Does anybody have any questions about Count One before we proceed on to Count Two?

(Negative response by the Grand Jurors.)

MR. SCHOOLS: Let the record reflect that no Grand Jurors have questions and we'll proceed onto Count Two.

Count Two charges kidnapping resulting in death and reads as follows. The Grand Jury further charges, on or about November 14th, 2002, in the District of South Carolina an elsewhere, Chaddrick Evan Fulks and Brandon Leon Basham willfully and unlawfully did kidnap, abduct, and carry away Alice Donovan and did willfully transport Alice Donovan in interstate commerce from Conway, South Carolina to North Carolina, and did hold her for ransom, reward, and otherwise, and Alice Donovan's death resulted, in violation of Title 18, United States Code, Section 1201(a)(1) and Section 2.

The federal crime of interstate kidnapping has three distinct elements. The victim must be kidnapped, which in the traditional sense of the words means that she is taken

---

JA 0389

**Page 17**

Title 18, U.S. Code, Section 3591(a).

MR. SCHOOLS. B. Chaddrick Evan Fulks and Brandon Leon Basham intentionally killed Alice Donovan. Title 18, United States Code, Section 3591(a)(2)(A).

C. Chaddrick Evan Fulks and Brandon Leon Basham intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan. Title 18, United States Code, Section 3591(a)(2)(B).

D. Chaddrick Evan Fulks and Brandon Leon Basham intentionally participated in an act contemplating that the life of the person would be taken and intending that legal force would be used in connection with a person, other than one of the participants in the offense, and Alice Donovan died as a direct result of the act. Title 18, United States Code, Section 3591(a)(2)(C).

E. Chaddrick Evan Fulks and Brandon Leon Basham intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Alice Donovan died as a result -- as a direct result of the act. Title 18, United States Code, Section 3591(a)(2)(D).

F. The death of Alice Donovan and the injuries resulting in the death of Alice Donovan occurred during

**Page 18**

Chaddrick Evan Fulks and Brandon Leon Basham's commission and attempted commission of, and during their immediate flight from their commission of an offense under Title 18, United States Code, Section 1201, that is the kidnapping section that was referenced earlier. Title 18, United States Code, Section 3592(c)(1).

MR. SCHOOLS. G. Chaddrick Evan Fulks and Brandon Leon Basham committed the offense as consideration for the receipt and in the expectation of the receipt of something of pecuniary value. Title 18, United States Code, Section 3592(c)(8).

H. Chaddrick Evan Fulks and Brandon Leon Basham intentionally killed and attempted to kill more than one person in a single criminal episode. Title 18, United States Code, Section 3592(c)(16).

And the indictment is signed by the U.S. Attorney.

GRAND JUROR: Could you define criminal episode there?

MR. SCHOOLS: The -- I can define it. What I would like to do is have the agent present the testimony and then after the testimony is presented, define it in terms of the way the testimony is presented in this case, if that's okay.

GRAND JUROR: Okay.

MR. SCHOOLS: If you'll remind me at that point in

**Page 19**

time.

GRAND JUROR: What is the purpose of the special findings?

MR. SCHOOLS: For purposes of your deliberation today, I can't tell you that. The Department of Justice has been involved in the review of this indictment and they provided us with a lot of guidance in respect to how to present these indictments and what to -- what to charge. They have directed that we are not permitted to advise you what -- what the purpose of the special findings is. Suffice it to say they are findings that are necessary to present the charges that are alleged in this indictment and will have some relevance to the case as it proceeds forward, but apart from that, I can't be more specific. I'm sorry about that.

Are there any other questions about the indictment before we call the agent?

(Negative response by the Grand Jurors.)

(Mr. Schools left the room and returned with the agent.)

FOREMAN: Would you state your full name?

JEFFREY LONG being first duly sworn by the Foreman of the Grand Jury as a witness, testified before the Grand Jury as follows:

EXAMINATION BY MR. GASSER

Q: Agent Long, would you tell us please where you are currently employed?

**Page 20**

A: With the Federal Bureau of Investigation, assigned to the Myrtle Beach office.

Q: How long have you been with the FBI?

A: A little under six years.

Q: And generally, what types of crimes or which section are you assigned to with the FBI?

A: Violent Crime and Drug Squad.

Q: Did -- did you participate and, in fact, are you the lead FBI agent in South Carolina in the case involving the United States of America versus Chaddrick Fulks and Brandon Leon Basham?

A: Yes I am.

Q: Would you please just briefly provide the Grand Jurors a -- a general overview, starting with November the 4th, 2002, a general overview of what your investigation has revealed...

A: Okay.

Q: ...pertaining to criminal allegations that Brandon Basham and Chaddrick Fulks committed from November 4th, 2002, leading up to their arrests later on in November?

A: On November 4th of 2002, Chaddrick Fulks and Brandon Basham escaped from the Hopkins County Detention Center in Kentucky. They were -- they became fugitives at that point. We learned that after they escaped from the detention center, they met a Mister Hopkins, James Hopkins.

JA 0390

Page 21

They convinced him to give them a ride in his pickup truck, which he did. He took them around the area and ultimately they -- Basham pulled a knife on him and removed him from the truck, brought him into a rural section off the road, duct taped him to a tree, and left him there for a period of time until he was able to free himself.

A: They took his pickup truck -- when I say they, I'm talking about Chaddrick Fulks and Brandon Basham. They took his pickup truck into -- or -- after they dropped him off, they took the truck to a girlfriend's house where they met up with two females. They went to a residence in the immediate area and they stole firearms from a residence. After they stole the firearms, they left Indiana, traveled through -- down through West Virginia, ultimately into South Carolina and they arrived in Little River, South Carolina on November 12th.

On November 13th in South Carolina, they committed some petty crimes, bad checks, they had stolen some identifications from -- from cars in parking lots and went to some of the local stores in the Myrtle Beach area.

On the 13th -- the afternoon of the 13th, Chaddrick Fulks and Brandon Basham were seen in a rural part of Conway, South Carolina, in an area where they were identified by a couple of witnesses as looking suspicious in a -- in a small area of trailer homes.

Page 22

A: On the 14th, they went to Myrtle -- another motel in Myrtle Beach City where at a certain part of time in the afternoon, both Chaddrick Fulks and Brandon Basham drove to a rural area of Conway, South Carolina where they were involved in a residential burglary. During the burglary, the father of the victim of the burglary happened to see the van in the area of his son's house. It looked suspicious, he pulled his truck into the driveway and immediately a white male, believed to be Chaddrick Fulks, exited the house and started firing at the truck. The truck was hit several times with rounds, with bullets. He was not hit. He never got out of the truck. He backed up and started out of the area.

Fulks and Basham got into their vehicle and attempted to escape. They actually started chasing the pickup truck and as they drove around some dirt roads in the rural -- rural part of the county, they kind of reversed themselves and the victim began to chase Mister Basham and Mister Fulks, lost them ultimately in the area, police were called and that was the last of his involvement, the victim.

The -- Fulks and Basham dumped the van, the vehicle they were driving behind a residence in that same general area and went to a -- a residence, a female residence, knocked on the door, tried to convince the woman to give them a ride, she refused. They left her residence and went across the street where they picked -- where they stole a pickup

Page 23

truck. That pickup truck was driven back into the Conway area where they pulled into the Wal-Mart off of 501. They identified a victim, they wanted to get rid of the stolen pickup truck, they identified a victim, ultimately they carjacked and kidnapped that person. They got into her car, overpowered her, and now they had a BMW which was the victim's car.

A: During -- after the kidnapping and carjacking, they managed to get her identification, her ATM card. They used it in several different locations, both convenience stores and ATM machines at banks, trying to get money from her account.

She was driven to North Carolina, across the state line into Brunswick County. They stopped at a convenience store, bought some items, got gas in her car using her -- her debit card at the pump, and they continued north to a rural part of Brunswick County where the vehicle was seen at a deer camp by some hunters outside.

The car remained up in that area. They pulled into a cemetery. The victim, Ms. Donovan was sexually assaulted. They left the cemetery, they traveled back to South Carolina. We believe at some point in between there, Ms. Donovan was killed and her body was -- was dumped in a wooded area.

They returned back to the original motel that they had

Page 24

checked in on on the 14th, the morning of the 14th, got their belongings, said their goodbyes to the two females that they were traveling with and got into the stolen BMW and traveled out of South Carolina, ultimately through West Virginia up to Kentucky where Mister Basham was ultimately arrested by police in Kentucky.

A: Mister Fulks left after -- they split up in Kentucky, he left there, ultimately traveled back to Indiana. He disposed of the BMW in Indiana and then was arrested not far from his brother's residence in Indiana by -- by FBI and police.

That's kind of a summary overview of -- of what we're looking at.

Q: Okay, let's start from the beginning. On November the 4th, 2002, you indicated that both Mister Fulks and Mister Basham escaped from the Hopkins County jail?

A: Yes.

Q: And that is in what state?

A: Kentucky.

Q: And were you able to obtain records from the Kentucky State Police that verify that in fact it was Chaddrick Fulks and Brandon Basham that were institution-alized there at that facility and the two of them together escaped from that facility?

A: Yes.

JA 0391

**Page 25**

Q: Now the individual that was carjacked -- well you described -- what is the name of the person that was ultimately carjacked and kidnapped by Mister Basham and Mister Fulks...

A: James...

Q: ...immediately after their escape?

A: James Hawkins, H-A-W-K-I-N-S.

Q: And did that occur during the early morning hours of November the 5th, 2002?

A: Yes it did.

Q: And where exact -- was law enforcement, and including the FBI, able to obtain a written statement from Mister Hawkins?

A: Yes.

Q: Does Mister Hawkins in that written statement describe in detail the events, conversations, and conduct during this kidnapping and carjacking?

A: He does articulate from the minute that they contacted him at his residence and throughout the entire trip in the car location, it's a very good statement from Mister Hawkins explaining what happened.

Q: And was Mister Hawkins able to identify, through photographs, Chaddrick Fulks and Brandon Basham as the individuals that -- that kidnapped him and carjacked him?

A: Yes, he did.

**Page 26**

Q: How did Mister Hawkins indicate that one of the two defendants approached him? How did this all start?

A: A knock on the door, they asked Mister Hawkins for a ride. He agreed. At that point, it was just Mister Basham by himself. Mister Fulks was at the bottom of the driveway and he identified him, I believe, as his brother who was -- had a hurt leg and that he needed a ride as well, and that they needed to go to a location, and it just continued. Every time they got to a location, they came up with another story, well, they need to make a phone call, find out where this girl's supposed to be. They went to another location. This continued for a little while.

Q: Agent Long, have you yourself had the opportunity to see Mister Chaddrick Fulks and Mister Brandon Basham?

A: Yes, I have.

Q: And -- and can they be easily distinguished through hair color, as far as those people who may not know them by name or may know them personally?

A: Yes, they can.

Q: And would you describe that to the Grand Jury please?

A: Fulks is a little older. He has blonde hair. At the time it was a short, crew cut type style, and Mister Basham has jet black hair, very dark hair, and that was short at the time. That hair was short as well.

**Page 27**

Q: And they are both white males?

A: White males.

Q: And did Mister Hawkins -- was Mister Hawkins able to actually describe to law enforcement agents, even make reference to them by name once he knew -- had been provided with names and -- because of the difference of hair -- hair colors?

A: In his statement, he was specific enough to tell the agent who interviewed him that -- what Mister Basham said to him, what Mister Basham did to him, what was the interaction, and then he also was able to use Mister Fulks' name and explain what Fulks said, did, what he heard, specifically by name.

Q: And did Mister -- was Mister Hawkins amenable to providing what he perceived to be aid and assistance to Mister Basham when he knocked on his door?

A: Yes.

Q: And ultimately who produced the knife -- who did Mister Hawkins say produced a knife in this case while they were in his pickup truck?

A: Brandon Basham did.

Q: And where did Brandon Basham and Mister Fulks take Mister Hawkins?

A: Across -- into Indiana. I'm not sure if I know the exact town that he was taken to, but it was...

**Page 28**

Q: Well can -- describe the area they took him to in general.

A: Rural -- a rural part of Indiana. I'm not familiar with the state itself, but they were able to find an area where they felt that he would not be readily found when they went out there and, in fact, when they drove down this -- this road, they actually got the truck stuck in the mud, his truck. He was in the middle between Fulks driving and Basham in the passenger's seat.

Q: What happened when they got to this particular wooded area where he ultimately was left by Mister Basham and Mister Fulks?

A: He had been duct taped at the wrists prior to him coming out of the car. They had to remove the duct tape on his wrists in order for him to hug a tree. They found a tree in an area and they made Mister Hawkins basically hug the tree, sit down, wrap his legs around the tree, wrap his arms around the tree, and then they taped his wrists and they taped his ankles, so now he was basically in a position where he would be hugging the tree.

They -- Basham -- I believe it was Basham threw him a jacket. They -- oh, they also used a piece of electrical cord that they had found as part of the mechanism to secure him to the tree.

Q: Did Mister Hawkins indicate that Mister Fulks and

JA 0392

## Page 29

Mister Basham were both having conversation with him and both participating in this -- these acts of carjacking and kidnapping?

A: Yes.

Q: And approximately how long was Mister Hawkins duct taped to that particular tree before he was able to free himself?

A: I believe it was in the vicinity of about 18 hours. They also duct -- put a piece of duct tape across his mouth so he wouldn't be able to yell. He was able to ultimately get freed by continually working the tape and loosing himself up, and I believe it was right around 18 hours that it took for him to get help and flag down another vehicle to call 9-1-1.

Q: In what city or town in Indiana did Mister Fulks and Mister Basham take Mister Hawkins' pickup truck.

A: I was looking for that reference. I'll have to look on the statement just to -- I don't remem -- I don't recall the exact town.

Q: Are you familiar with a woman by the name of Tina Severance?

A: Yes I am.

Q: And was it the same town -- here you go.

(A document was handed to the agent.)

Q: See if that will refresh your memory.

## Page 30

A: Thank you.

Q: And the pickup truck ultimately was found in the same town with Ms. Tina Severance? Is that correct?

A: Oh, okay, yes. I thought you meant the -- the town that he was left at the tree.

Q: No. I'm talking about the...

A: Okay. The van was -- the -- or the stolen pickup truck was taken to Portage, Indiana.

Q: Okay. And was Mister Hawkins' pickup truck actually located and processed for evidentiary purposes in Portage, Indiana by law enforcement officials there?

A: Yes it was.

Q: And one of the items that was recovered from the front seat of the -- Mister Hawkins' pickup truck was what?

A: A knife.

Q: When Mis -- once Mister Basham and Mister Fulks got to Portage, Indiana, did they go to the residence of a woman by the name of Tina Severance?

A: Yes, they did.

Q: And would describe the rela -- what relationship was there between Mister Fulks and Ms. Severance?

A: It was a on and off boyfriend/girlfriend, sexual relationship.

Q: Did Ms. Severance at that time know Brandon Basham?

## Page 31

A: No, she didn't.

Q: So the first that she met Brandon Basham was the day that Chaddrick Fulks brought her to her residence?

A: Yes.

Q: Brought him to her residence.

A: Correct.

Q: Who was living with Ms. Tina Severance at that time?

A: A female named Andrea Roddy.

Q: Where did Ms. Roddy, Ms. Severance, Mister Basham and Mister Fulks, where did they travel to once leaving Portage, Indiana?

A: They went to a residence in the -- let's see. I believe the residence they traveled to was in Portage, not -- not all that far from -- from her residence, if that's the residence you're talking about.

Q: And who was that?

A: That's a -- a Mister Talsma, T-A-L-S-A-M -- S-M-A, I'm sorry.

Q: Would that have been in Michigan City, Indiana, right -- right near Portage, Indiana?

A: Yes, that's correct.

Q: And who is Mister Talsma? What relationship or what -- who of the group of four that I just previously mentioned did he know?

## Page 32

A: He was another former boyfriend of Tina Severance.

Q: And describe to the Grand Jurors what happened when Tina Severance and Ms. Roddy, Mister Fulks and Mister Basham when they went to Michigan City, Indiana?

A: The -- the reason they went up there was that Fulks and Basham had inquired about obtaining some firearms after they had escaped. Severance knew of the boy -- the former boyfriend, Talsma, who she knew that had some firearms at one point in his house, so they came up with a plan that they would go up to the residence and that she would lure him out for an early morning breakfast, she'd go into the house, make sure that the door -- and she was directed by Fulks and Basham to make sure the door -- the residence doors were open, and then they left, went to a diner for breakfast, and the girls -- I'm sorry, the girls did. Severance and Roddy and Talsma, Mister Talsma, went for breakfast, and while they were gone from the residence, Brandon Basham and Chaddrick Fulks went into the house and stole firearms.

Q: Did law enforcement, including the FBI, obtain written statements from -- or obtain a statement from Ms. Tina Severance?

A: Yes.

Q: Okay. Did you, yourself, have an opportunity to interview her on multiple occasions?

**Page 33**

A: Multiple times.

Q: And were statements also obtained from Ms. Angela Roddy?

A: Yes.

Q: And, of course, were statements obtained from Mister -- Mister Talsma himself?

A: Yes.

Q: Was an incident report -- were you -- did the FBI obtain a Michigan City, Indiana incident report reflecting that Mister Talsma's residence was, in fact, burglarized?

A: Yes.

Q: And firearms were, in fact, stolen?

A: Yes, they were.

Q: What -- what firearm -- what four handguns were stolen from Mister Talsma's residence?

A: An H&R .22 caliber 9-Shot Model 949 revolver, two Ruger .45 caliber single-action revolvers, described as being like a big cowboy, Clint Eastwood type of long barreled revolver, and a Llama Minimax .45 caliber semi-automatic pistol.

Q: And the Harrington and Richardson Model 949 .22 caliber 9-Shot revolver, that firearm was manufactured where?

A: Made in Gardner, Massachusetts.

Q: The Llama Model Minimax .45 caliber semi-automatic pistol, that firearm was manufactured where?

**Page 34**

A: In the country of Spain.

Q: And those two specific firearms, as well as several rifles and shotguns, did the FBI request and were you provided with an interstate nexus by the ATF in this case?

A: Yes, we were.

Q: Where did Ms. Severance and Ms. Roddy indicate that they traveled after stealing the firearms, after Mister Basham and Mister Fulks stole these four handguns from Mister Talsma's residence, where did they then travel?

A: They went up to Sturgis, Michigan and checked into a motel.

Q: And when they left Sturgis, Michigan, where did Ms. Severance and Ms. Roddy indicate they went after that?

A: Drove then to the State of Ohio and stayed at another motel there.

Q: And while in the State of Ohio, what certain items were obtained by Mister Basham and Mister Fulks, according to Ms. Severance?

A: You're talking about the clothing?

Q: Yes.

A: Some camouflage clothing. We learned that Mister Basham had gone to a Kmart and obtained what he described as hunting clothing, shirt, pants, boots, gloves, the kind of the -- ski mask type that you would use if you were a hunter in the woods, that type of clothing as well as a small zipper

**Page 35**

camouflage bag that Ms. Severance recalled seeing him come back to the motel with.

Q: And you previously indicated to the Grand Jury that -- that Mister Hawkins' truck was found by law enforcement eventually in Portage, Indiana. What vehicle were Mister Basham, Mister Fulks, Ms. Severance, and Ms. Roddy, what vehicle were they traveling in when they left Ms. Severance's residence and went to Mister Talsma's residence and then began this journey through several states?

A: They used Tina Severance's Ford Aerostar van.

Q: What color is that van?

A: It was a -- I believe it was green.

Q: Okay.

A: I don't remember the exact year. I've got it somewhere. But it was an older model, I think early 90s Ford Aerostar.

Q: And it belonged to who?

A: Tina Severance.

Q: And when they left the motel in Ohio, on or about November the 9th, what -- what state did they travel to?

A: They left Ohio and traveled to West Virginia.

Q: And on November the 11th, 2002, what hotel in Huntington, West Virginia, did the four individuals, previously named, check into?

A: The Hollywood Motel in Huntington, West Virginia.

**Page 36**

Q: And again, were you able to obtain this information from Ms. Severance?

A: Yes we were.

Q: And, in fact, has the FBI requested documentation and records from various hotels in several states in this matter?

A: Yes.

Q: Have you been able to obtain some of that information through Grand Jury subpoenas?

A: Whatever check-in cards that we could obtain from the hotels to show that a Tina Severance or somebody in that party had checked into a room on the dates that we would be looking for.

Q: And, in fact, were you able to obtain information that they -- Tina Severance did check into the Hollywood Hotel in Huntington, West Virginia on November the 11th, 2002?

A: Yes.

Q: Now, sometime between the hours of two o'clock and four o'clock, what did Ms. -- I'm sorry, on the evening, or sometime around the afternoon or early evening of November the 11th, 2002, did Mister Fulks and Mister Basham leave the motel?

A: Yes, they did.

Q: In West Virginia?

A: Yes.

JA 0394

**Page 37**

Q: By themselves?

A: The two of them were together, they left in her van.

Q: And Ms. Severance indicated that she and Ms. Roddy remained where?

A: At the motel room.

Q: And approximately what time did Ms. Severance indicate that Mister Basham and Mister Fulks returned?

A: Between two a.m. and four a.m., early morning hours.

Q: On what day then would that have been?

A: That would have been on the morning of the 12th.

Q: And then subsequently, later on that day, on November the 12th, 2002, did Mister Basham, Mister Fulks, Ms. Severance and Ms. Roddy check out of the Hollywood Hotel in Huntington, West Virginia?

A: Yes they did.

Q: And where did Ms. Severance say that they traveled to?

A: They drove on the road for -- described as many hours without stopping, arriving sometime around nine p.m. at night at the -- at a motel in Little River, South Carolina.

Q: And the name of the motel they arrived at in Little River, South Carolina?

A: The Lakeshore Motel.

**Page 38**

Q: And were you able to obtain records from the Lakeshore Motel here in Little River?

A: Yes.

Q: And they verify what Ms. Severance had -- had provided to law enforcement?

A: Yes they did.

Q: Now, on November the 13th, the day after they arrived at the Lakeshore Motel, what did Ms. Severance and Ms. Roddy indicate? What transpired? What did Mister Basham and Mister Fulks do during that day?

A: They had again left with the van. They kind of had a history, every time they went to any of the motels along the way, the girls would stay in the room and the boys would take the van and go off for hours at a time, doing whatever they would do and then they'd come back, late night, early morning hours, back to the motel and go to sleep. No different than on the 13th -- the morning of the 13th, they did the same thing. They left for awhile by themselves. At one point during the day they did come back, and then all four of them went out to Myrtle Beach were Ms. Severance said that they all four of them, they paired up, Basham and Roddy were posing as a couple and then Mister Fulks and Ms. Severance went as a couple, and they went to different stores trying to pass bad checks and use stolen credit cards to get merchandise in the Myrtle Beach area.

**Page 39**

Q: And did Ms. Severance and Ms. -- Ms. Severance indicate that Mister Basham and Mister Fulks actually stole two purses and the contents thereof?

A: Yes, and that's how they got the -- the stolen checks and the credit cards and the false -- the licenses that they would try to pose as. Whatever name was on the license, they would try to use that and all that identification.

Q: And were clothing items and alcoholic items also purchased by Mister Basham and Mister Fulks?

A: Yes.

Q: And these items were all taken back where? Where did they end up back again on the evening of November the 13th?

A: They went back to the Lakeshore Motel.

Q: And just to be clear again, were you able to obtain the registration card from the -- a copy of the registration card from the Lakeshore Motel?

A: Yes.

Q: As well as statements from Ms. Severance and Ms. Roddy?

A: Yes.

Q: Did they all indicate that the statements that -- again, it was Mister Basham, Mister Fulks, Ms. Severance and Ms. Roddy together in Little River, South Carolina?

**Page 40**

A: Correct.

Q: And the vehicle again that they drove to South Carolina in, was it the same vehicle that they left Portage, Indiana in?

A: Yes.

Q: That being the dark green -- or the green Ford minivan?

A: Yes.

Q: Now, on -- on November the 14th, did they check out of the Lakeshore Motel?

A: Yes they did.

Q: And where did they go when they checked out of the Lakeshore Motel?

A: They traveled south into Myrtle Beach City and located another motel to check into.

Q: And the name of that motel?

A: The Beachwalk Motel which is located at 17th Avenue South in Myrtle Beach.

Q: And did Ms. Severance use her name to check into that motel or did she use an alias?

A: She used an alias.

Q: And that alias' name was what?

A: Melissa Crawford.

Q: Were you able to obtain documentation and records from the manager of the Beachwalk Motel?

JA 0395

Page 41

A: Yes.

Q: And was Ms. Severance's statements to the FBI corroborated by a registration card in the name of Melissa Crawford?

A: Yes it was.

Q: And the exact room where she claimed that the four of them stayed?

A: Yes.

Q: And were they able -- were representatives or employees of the Beachwalk Motel at least able to corroborate the fact that there were two men and two women staying in the motel and the general descriptions?

A: Yes. They were able to do that.

Q: Now, did there come a time on November the 14th, after the -- Mister Basham, Mister Fulks, Ms. Severance and Ms. Roddy checked into the Beachwalk Motel, did there come a time when two of the individuals left the motel?

A: Yes.

Q: And who were those two individuals?

A: Fulks and Basham.

Q: And did you obtain that information again from Ms. Severance and Ms. Roddy?

A: Yes.

Q: And what car or vehicle did they leave in?

A: In her van. In her minivan.

Page 42

Q: Now, did they ultimately -- were you able to obtain information and evidence that Mister Basham and Mister Fulks went to the residence of Sam Jordan in Conway, South Carolina?

A: Yes.

Q: Prior to Mister Basham and Mister Fulks going to Mister Sam Jordan's residence, do you have evidence or statements from other individuals that place Mister -- the green minivan in another location in the Conway area.

A: Yes.

Q: And that location is referred -- commonly referred to as what?

A: Savannah Bluff.

Q: And would you tell the Grand Jurors what information you have placing the green minivan with occupants in it in Savannah Bluff?

A: The Savannah Bluff area is -- is right on the river in between Conway and Myrtle Beach off of 501. It's really one way in, one way out. There is a new motel there, a Best Western, and after that, it's residential, straight road in, with some homes, and then another road goes off to a circle with some trailers, and so it's an area where the -- we learned that the residents pretty much know every -- all the traffic that's coming and out of there, and on the 13th, they -- we had two residents, two women that were -- that

Page 43

lived there that saw this minivan with the two males parked in that area, driving down in there and then stopped. They thought it looked suspicious and one of the women was able to actually get the license tag of that minivan which ultimately was given to law enforcement.

And then, of course, we ran the tag and it came back to Tina Severance and that described the minivan that we knew that they had.

Q: Okay. Now one of the residents, I believe you indicated, saw the minivan on November the 13th...

A: Uh-huh (Affirmative).

Q: ...in the Savannah Bluff area, is that correct?

A: Yes.

Q: Now Ms. Tanya Richardson, was the FBI here in South Carolina able to obtain a -- a statement or an interview with this Ms. Tanya Richardson that also lived in the Savannah Bluff area?

A: Yes.

Q: And did she have an opportunity, on that same day, Thursday, November the 14th, between 12:20 and 12:30 to see the minivan again in the same location where her neighbor or friend had observed the minivan?

A: The same minivan, the same -- what she believed was the same two subjects.

Q: And this would have been approximately how many

Page 44

-- how long before Mister Basham and Mister Fulks burglarized Sam Jordan's residence?

A: About an hour, a little over an hour I guess.

Q: And did -- was Ms. -- did Ms. Richardson actually even record the license tag of the minivan that she observed?

A: She did.

Q: These two individuals that you claim that she says were acting suspiciously.

A: Yes.

Q: And did the license tag that she wrote down, were you able to check the Indiana Department of Motor Vehicle records...

A: Yes.

Q: ...of Ms. Tina Severance's green minivan?

A: Yes.

Q: Was it a match?

A: It was.

Q: And did she -- would you tell the Grand Jurors how she described the two individuals that were in the car?

A: The -- the common description that we were getting was that two white males, one with short blonde hair and one with short black hair, dark hair. The driver was the blonde haired -- we believe Mister Fulks and the -- the dark haired would have been Mister Basham in the passenger's seat.

Q: Now, the incident occurred at Mister Sam Jordan's

JA 0396

Page 45

residence. Were the FBI and law enforcement able to obtain a statement from Sam Jordan's father, Mister Carl Jordan?

A: Yes.

Q: Would you relay the information that Carl Jordan provided to law enforcement to the Grand Jurors please?

A: On -- on November 14th, about one-fifty in the afternoon, he was traveling in the Juniper Bay Road area of Conway, it's a rural section of town. He happened to be passing by his son, Sam Jordan's, residence, and noticed this green minivan parked at the residence, kind of to the side of -- of the -- of the house. He did not -- Mister Jordan, Carl Jordan, did not recognize the minivan at all and pulled in right behind it and as just about his truck came to a stop, initially one white male came out. Ultimately they both -- both males, Fulks and Basham came out of the front door of the house and immediately -- and both males immediately started firing at his pickup truck. One round blew out the back window of his truck and he basically ducked down and then put it in reverse and -- and backed up as soon as -- quick as he could from that driveway.

Ultimately, the two burglars, the two males, jumped in the van and began chasing Mister Jordan's truck, and, like I said before, at some point in the pursuit, it kind of reversed themselves and Mister Jordan started chasing the van a little bit to try to at least wait until the police got

Page 46

there, hopefully not lose it, and ultimately he -- he lost the van in that same general area of Juniper Bay, so he just backed up and then he waited for a police response to the area.

Q: This was at approximately one-fifty in the afternoon?

A: Yes.

Q: Did Mister Jordan indicate that either one of the burglars was wearing anything to disguise their face?

A: No.

Q: Was he able to get a good look at both these individuals?

A: Yes, he was.

Q: And did he clearly indicate to the -- to law enforcement that both men had handguns and both men were firing the handguns?

A: Both men had handguns and both were shooting at him.

Q: And was he ultimately, later, able to observe photographs or pictures of Mister Basham and Mister Fulks?

A: Yes.

Q: And has Mister Jordan, since this incident, during this investigation, indicated to law enforcement that he can identify Mister Basham and Mister Fulks...

A: That's...

Page 47

Q: ...as the individuals that were shooting at him at his son's residence?

A: He made that identification.

Q: The shotguns and rifles that were -- well, let me get back to that. As Mister Jordan was giving chase to Mister Basham and Mister Fulks in the green minivan, did he -- on occasion, did he ultimately lose sight of the minivan?

A: He did.

Q: Were you -- was the FBI able to get a statement from an individual by the name of Mark Cooper?

A: Yes.

Q: Would you describe the information Mister Cooper provided to law enforcement to the Grand Jurors?

A: Mister Cooper, on Juniper Bay, has a welding shop and generally in the same time from he recalled seeing a minivan, a green minivan, at a high rate of speed pull into the parking lot of his welding shop. He was able to get a description of the occupants in the van who he -- he basically described in terms that they were -- it looked like they were skinheads, blonde -- again, blonde short hair driver, dark haired short haired passenger. Described them as being in their early to mid-twenties.

After they made the turn, they went up a one-way road, up in that area, and then came back out of it. I believe he -- at one point he was going to go get a weapon himself

Page 48

because he didn't quite know what was going on, but ultimately knew that the police were -- were enroute to that area and -- and backed off and waited for police presence.

Q: Is this still in the Juniper Bay area of Conway?

A: Yes.

Q: Were you also able to obtain statements from Ms. Margaret Moore and Ms. Oleta Hyman?

A: Yes.

Q: Were they too residents, just down the road from Mister Cooper's place of business...

A: Yes.

Q: ...in the Juniper Bay area?

A: Same general area.

Q: Would you describe for the Grand Jurors what Ms. Moore and Ms. Hyman also had to say?

A: At -- Ms. Moore recalled a male subject coming to her door, banging on her door, and asking that they give -- I'm sorry, she give them a ride out of the area. I don't recall the exact -- what the problem was, but similar to what they did to Mister Hopkins, wanted her to give them a ride somewhere. She flat out refused and slammed the door. Thankfully.

She then obviously watched them and they ran across the street to a Ms. Oleta Hyman's residence. Ms. Hyman had a white pickup truck that was parked, generally speaking, in

Page 49

the front of her -- of her residence. The truck is used by an employee of hers who would come in, park his car, and then take the pickup truck, do the work around the area, and then ultimately park the car at the end of the day.

She stated that the key was in the truck, she left the key in the truck so her employee wouldn't have a problem in using it whenever he wanted to.

She saw the truck leave the area, didn't -- couldn't -- wasn't able to see exactly who was driving, just that the truck had -- had gone, and immediately checked to see if her employee's car was there, just to make sure that he hadn't had the truck. And when she found that he wasn't working, she notified police that her truck was stolen.

Q: Okay. And Ms. Hyman lives right across the street from Ms. Moore?

A: Yes.

Q: And Ms. Moore actually saw the two individuals running towards Ms. Hyman's residence where a white pickup truck was, is that correct?

A: That's correct.

Q: And Ms. Margaret Moore's residence is the residence that Mister Cooper saw the green minivan drive down to and the individuals actually get out of the van?

A: I'm sorry, which -- Mister...

Q: Mister Cooper. Mister Cooper indicated that it

Page 50

-- is it the same resi -- or in the same area of...

A: Same area, yes. Yeah.

Q: Margaret Moore's residence is in the same area where Mister Cooper had indicated that they -- the green van had traveled and the occupants had gotten out of the van.

A: Yes.

Q: Now ultimately, was Tina Severance's green minivan found in close vicinity to Ms. Margaret Moore's residence?

A: Yes, in a -- in a field.

Q: And was a search conducted of the -- of Ms. Severance's minivan?

A: Yes, it was.

Q: And were two shotguns and two rifles recovered from inside the minivan?

A: I believe it was two shotguns and three rifles, but yes, there were weapons recovered.

Q: Okay. And would you describe the two shotguns and three rifles to the Grand Jurors please?

A: A Remington 870 shotgun, a Marlin 882 .22 caliber rifle, a Remington Model 1100 12-gauge shotgun, a BPI Connecticut Valley Arms Magbolt 150 with a scope on it, and a Marlin Model 60 .22 caliber rifle with a scope on it.

Q: And Mister Sam Jordan was able to identify those three rifles and two shotguns as belonging to him?

Page 51

A: Yes.

Q: The Remington Model 870 12-gauge shotgun was manufactured where?

A: I believe it's Ilion, New York.

Q: The Marlin Model 882SS .22 caliber rifle was manufactured where?

A: North Haven, Connecticut.

Q: The Remington Model 1100 12-gauge shotgun was manufactured where?

A: Ilion, New York.

Q: The Marlin Model 60 .22 caliber rifle was manufactured where?

A: North Haven, Connecticut.

Q: And the Connecticut Valley Arms Model Magbolt 150 rifle was manufactured where?

A: Norcross, Georgia.

Q: So all of these three rifles and two shotguns were manufactured or traveled in interstate commerce outside the State of South Carolina, is that correct?

A: Yes they did.

Q: And ultimately into the State of South Carolina.

A: Yes.

Q: Now Ms. Oleta Hyman's white pickup truck, where did -- where did Mister Basham and Mister Fulks travel with Ms. Hyman's white pickup truck shortly after stealing it?

Page 52

A: To the Wal-Mart shopping center in Conway.

Q: And how do you know that?

A: We have a security video from the roof of the Wal-Mart showing the white pickup truck entering the parking lot.

Q: Would you describe to the Grand Jurors, please, what the videotape -- the Wal-Mart videotape depicts at approximately 2:37 p.m. on November the 14th, 2002?

A: It's a black and white film. You can see what appears to be a dark colored BMW pulling in towards the front. If you -- if you can picture the Wal-Mart looking out and the cameras up here shooting the entire parking lot, you can see the BMW pull what looks like right down the front, the big aisle where people would be crossing from the store to their cars, and it makes a left hand turn down one of the aisles towards the center of the store. And as the car makes a left hand turn down the aisle, you see a white pickup truck following very closely behind the BMW.

As the BMW goes what I would describe to be about halfway down the aisle before it looks like an open spot, the car turns to the right and pulls into the parking spot, and as the car is pulling into the parking spot, you see a -- the passenger side door open of the pickup truck and a subject running out from -- from the truck towards the car, the general area. It's not the most clearest tape, but you can

Page 53

see the figures, one figure exit the car and go towards the -- the BMW.

Q: Suffice it to say, you can't identify either Mister Basham or Mister Fulks, or anyone for that matter...

A: That's correct.

Q: ...on that videotape, can you?

A: No, you can't.

Q: Go ahead. I'm sorry.

A: The pickup truck continues down the aisle to the very end where the cars would be parked and then swings back around and comes back up, now traveling towards the Wal-Mart, the front of the store. It looks like the BMW turned right into a parking spot and went straight through. A lot of people like to, instead of backing up, they just drive right to the next site so they can just pull out when they leave, and that's what it looks like she did. It was a clear opening, so she went -- she pulled in and just traveled right across to the -- the next spot, and the pickup truck comes down the aisle and then would -- blocked her in, basically T-Boned to make it -- the letter "T" so that car could not leave that parking spot.

After what appears to be a few seconds, the pickup truck backs up allowing the BMW to pull out and you see the BMW pull out of the parking spot and then travel up the aisle away from the store. You see the back -- the pickup truck

Page 54

back up and then follow in behind the BMW. It goes towards the very front of the parking lot, closest to 501, and you really can't see exactly where they ultimately go from there on the videotape.

Q: And where was Ms. Oleta Hyman's white pickup truck recovered?

A: It was recovered in the front of the Wal-Mart parking lot, closest to the road, kind of by itself.

Q: And have you determined, through your investigation, that the BMW on the Wal-Mart videotape belonged to whom?

A: Alice Donovan.

Q: And do, in fact, the Department of Motor Vehicle records indicate that a blue BMW was registered to Ms. Donovan?

A: Yes.

Q: Now, subsequent to Mister Basham's arrest on November the 17th, 2002, was he Mirandized, provided his Constitutional rights on multiple occasions by law enforcement?

A: Yes he was.

Q: Including FBI agents?

A: Yes.

Q: Specifically -- and during that time period, did he give -- provide several statements to law enforcement

Page 55

officers, including during times with a lawyer being present with him?

A: He did.

Q: And just specifically, on November the 20th, 2002, did Mister Basham indicate to law enforcement officers who was the person that got out of the -- the pickup truck and went into the BMW at the Wal-Mart?

A: What Mister Basham said?

Q: Yeah, what did he say. Who -- who did he say was the person that got out of the pickup truck?

A: He was.

Q: And what was he armed with, did he claim?

A: A .22 caliber handgun.

Q: And ultimately, when Mister Fulks entered -- after Mister Fulks parked the pickup truck of Ms. Hyman, did Mister Fulks, according to Mister Basham, enter the BMW as well?

A: Yes.

Q: And what was he armed with?

A: A .45 caliber handgun.

Q: And again, was a .22 caliber revolver stolen from Mister Talsma's residence in Indiana?

A: Yes it was.

Q: And were three .45 caliber handguns stolen from Mister Talsma's residence in Indiana?

Page 56

A: Yes.

Q: Prior to Mister Fulks and Mister Basham entering the State of South Carolina?

A: Yes.

Q: What did Mister Fulks and Mister Basham do prior to leaving the State of South Carolina with Ms. Donovan in Ms. Donovan's BMW? What activity was attempted to be done or was done?

A: They went up to North Myrtle Beach and attempted to use her ATM card at a convenience store.

Q: And were you able, through bank records, to actually pinpoint the location of that specific convenience store?

A: Yes.

Q: And it was what store?

A: The Pantry.

Q: Did you check to see if there are any video cameras at The Pantry?

A: Yes.

Q: Were you able to obtain video camera of any of these transactions or attempted transactions?

A: Some of them we did have a video available, it wasn't real clear, and other ones there was no video that would help us. They didn't have a video on the ATM.

Q: Do you have any videos from any of the ATM

Page 57

machines that clearly depict either Mister Basham or Mister Fulks, or anyone for that matter using Ms. Donovan's face -- using Ms. Donovan's ATM card?

A: No.

Q: But do you have bank records indicating that it was her card that was, in fact, used at several locations, or attempted to be used in South Carolina that afternoon, after 2:37 p.m.?

A: Yes.

Q: Was the FBI and law enforcement able to obtain information that, in fact, Ms. Donovan's BMW, Mister -- and Mister Fulks, at least, left the State of North Carolina -- from the State of South Carolina and traveled to Shallotte, North Carolina?

A: Yes.

Q: And what physical evidence -- first of all, the physical evidence do you have that Ms. Donovan's blue BMW and Mister Fulks were clearly in Shallotte, North Carolina?

A: In Shallotte, there's an Amoco gas station right off -- right off the 17 North going towards Wilmington, and there is a -- that location has a multiple security camera system where we were able to get a video, a very clear, color video of the BMW outside the store, Mister Fulks inside the store buying three drinks and some stuff -- other things you couldn't see actually on the video, but you could see that --

Page 58

that he appeared to -- to -- or he bought what appeared to be three Mountain Dews, leaves the store, and you can see the vehicle pull in by the gas pumps and Mister Fulks is out of the car pumping gas into the BMW.

That, with -- with the ATM record transactions that her card was used to purchase the gas and to purchase the items in the store would be the evidence that we have.

Q: And how again, just so the Grand Jury's clear, how would you describe the quality of this color videotape of -- of Mister Fulks inside the convenience store as well as outside pumping gas?

A: It's clear and in color.

Q: Any doubt...

A: No doubt.

Q: ...it was Mister Fulks?

A: No doubt.

Q: And does there appear to be some activity through the back window of the BMW, some sort of activity in the back window on one of the videos?

A: There is an angle where the -- on one of the videos that's shooting down through the driver's side window of the front windshield, and there's a very short glimpse of what could be movement in the back seat, whether it's a hand or something during the time that Fulks is out of the car. Nobody's sitting in the -- in the front passenger seat.

Page 59

Q: And during the many statements that you -- law enforcement was able to obtain from Mister Brandon Basham subsequent to his arrest, does Mister Basham himself admit to being in the back seat and in the BMW at that location in Shallotte, North Carolina?

A: He does.

Q: And approximately what time was it that they -- that the BMW arrived at the Amoco convenience store service station in Shallotte, North Carolina?

A: Approximately 3:59 p.m. on the 14th.

Q: Did your investigation reveal that Ms. Alice Donovan owned and possessed a cell phone on November 14th, 2002?

A: Yes.

Q: Were you able to obtain cell phone records of SunCom, the company that Ms. Donovan had her cell phone contract with?

A: Yes.

Q: And at approximately 4:28 p.m., what -- what do the SunCom records reflect, that you were able to obtain?

A: Through the -- through the records, as well as -- as -- at the time, it was happening so fast that we were able to talk to a representative from SunCom that told us that at 4:28, there was a call placed from that cell phone which tripped a tower located in Brunswick County, North Carolina,

Page 60

up towards the Winnabow area which is north of Shallotte. The call was made to her residence, don't -- I don't recall exactly how long the call was, but it wasn't very long, and we were able to, through interviews of -- of the husband and the family, we were able to connect the fact that the call hit the tower, was to the residence, and if you want, I can go into the conversation.

Q: Well just -- just so the Grand Jury is clear, specific cell phone records indicate -- place Ms. -- or Ms. -- the cell phone of Ms. Donovan making a phone call in Brunswick County, North Carolina on a specific tower, is that correct?

A: Clearly she would be in North Carolina, in Brunswick County, in order to trip the tower that she tripped with the call was made to get the call to go back to -- to Horry County.

Q: And were you also able to obtain a statement and interview one of Ms. Donovan's daughters?

A: Yes.

Q: Did she verify that she received a call at their home in Galivants Ferry, South Carolina from her mom and her mom was on her cell phone?

A: She did.

Q: And what did she indicate her mother said at that time?

JA 0400

Page 61

A: Her mom said that she was running late, she was out shopping, and that she loved her.

Q: And again, through the written statement of Mister Brandon Basham, does he verify that they -- they forced Ms. Donovan to make the phone call at approximately 4:30 p.m. on November the 14th to -- back to her residence in Galivants Ferry?

A: Yes, it does.

Q: Now, through wit -- through your -- does your investigation indicate that other witnesses observed individuals matching the three -- the descriptions of Ms. Donovan, Mister Fulks, and Mister Basham driving a blue BMW subsequent to this 4:28 phone call?

A: Yes.

Q: Would you describe that information to the Grand Jurors please?

A: Somewhere in the time frame of 4:30 to 5:30 was not -- it was described as not being real dark yet, there were some -- some hunters at a deer camp up in Winnabow. The road, it's a hard road that goes off of seventeen like you were traveling to Wilmington, and if you took that road for several miles, you'd turn left on a dirt road and this dirt road goes up maybe a mile or so and it dead ends at this deer camp. You can't go -- unless you turn around before it, you have to turn around literally in the field right in front of

Page 62

the deer camp, because it -- the road ends there.

A: The hunters were on their porch having a little cookout when they saw a dark colored blue BMW pulling up the driveway -- up the roadway right in front of their camp. Witnesses thought it was very odd because it is a deer camp. Most of the vehicles up there are pickup trucks and to see this -- this BMW was what appeared to be out of place to them. It was driven by a male with short blonde hair and in the back seat was a male with dark short hair and a female sitting closely beside the male in the back seat.

Q: Does Mister Basham, in fact, in one of his statements to law enforcement officials, indicate that exact scenario did, in fact, occur?

A: Yes.

Q: That Chad Fulks was driving the BMW?

A: Yes.

Q: That he and Ms. Donovan were in the back seat of the BMW?

A: Yes.

Q: That they traveled down a dirt road and came upon a meadow where there was a shack or a small house with individuals on the front porch?

A: Correct.

Q: That they had to make a U-turn?

A: Uh-huh (Affirmative).

Page 63

Q: And drive by?

A: Yes.

Q: So Mister Basham, does he acknowledge in statements to law enforcement officials the very same scenario that these witnesses at Bee Tree Farm in Brunswick County, North Carolina provided to law enforcement officers?

A: He does.

Q: Is there a small family type cemetery, rural cemetery, near the Bee Tree Farm Hunt Club in that same general vicinity?

A: Yes.

Q: Were you able to obtain a statement from an individual with regard to something suspicious that occurred at that cemetery during that same time period?

A: Yes.

Q: And would you share that with the Grand Jurors?

A: There is a small, very small cemetery plot on -- as you would be traveling to the deer camp on the same dirt road I just explained to you, it would be on the right side. The witness saw the dark colored BMW pull straight in, right towards the fence of this cemetery. It doesn't -- there's not a long road that goes into the woods, you can't really hide too well, but he -- he saw this BMW parked there, face in, thought it was peculiar. They started -- he started getting on his radio talking to other people in the area

Page 64

about this BMW which had been seen a little bit earlier by the hunters at the deer camp, and the witness left the area of the cemetery, and before other people, other hunters that were up there, could come to the cemetery, the BMW was gone and they didn't know in what direction it went.

A: I think -- if I remember, he recalls seeing a brake light -- what caught his attention partly was a brake light came on the car and that's what made him look towards that cemetery and see, then he sees it's the dark colored BMW in there.

Q: Okay. And was that witness, or any of the witnesses at Bee Tree Farm, were they actually able to identify a photograph of the blue BMW, particularly the individual at the cemetery?

A: The....

Q: Or was it just the description about it?

A: I don't recall if a picture was shown of -- to that witness. I didn't talk to that witness. It could have been but I'm not sure whether it was done or not.

Q: And Ms. Donovan's BMW was manufactured in what country?

A: Germany.

Q: There's no question that the BMW in question traveled in foreign commerce?

A: Correct.

JA 0401

**Page 65**

Q: During your investigation, were you able to obtain a statement from Ms. Alice Donovan's husband, Barry Donovan?

A: Yes.

Q: And did he actually receive a phone call from his wife on the morning of November the 14th?

A: He did.

Q: And approximately what time was that, do you recall?

A: It was sometime around eleven, eleven-thirty, I believe.

Q: And what did Ms. Donovan tell her husband that she was planning on doing that afternoon?

A: She was going to do some shopping. That was her regular day off, and that she was going to go to Wal-Mart to do a little shopping.

Q: Are you familiar with the company, Precision Southeast?

A: Yes.

Q: Is that the company that both Mister Donovan and Ms. Donovan worked at?

A: Yes it is.

Q: Was Mister Donovan, in fact, working on the morning and afternoon of November the 14th, 2002?

A: Yes he was.

**Page 66**

Q: Was it Mrs. Donovan's day off?

A: It was.

Q: Was she supposed to work the next day, though, November the 15th?

A: She was.

Q: Did she ever show up for work the next day?

A: No, she didn't.

Q: Has she ever showed up since -- has she ever shown up for work since then?

A: No.

Q: How did Mrs. Dono -- how did Mister Donovan, as well as Mrs. Donovan's daughters describe her marital relationship in November of 2002?

A: It was without problems, a good family. Nothing that would -- would indicate there was any problems with her voluntarily leaving the family situation or going anywhere.

Q: Since the approximately 4:30 cell phone call between Ms. Alice Donovan in Brunswick County, North Carolina and her daughter in Galivants Ferry, has and family members, friends, co-workers, relatives, anyone heard from Alice Donovan since then?

A: No one has heard from her.

Q: Was there a further ATM activity involving Ms. Alice Donovan's bank card during the early morning hours of November the 15th, 2002?

**Page 67**

A: Yes.

Q: And where did that occur?

A: Raleigh, North Carolina.

Q: And were there three transactions?

A: Yes.

Q: And approximately $600 was removed, is that correct?

A: Yes.

Q: And were you able to get any videotape of who actually made those transactions?

A: Nothing to make an identification with, no.

Q: Agent Long, you've indicated to the Grand Jurors that you were able to obtain, subsequent to Mister Basham's arrest, several statements from him as a result of several interviews, is that correct?

A: Yes.

Q: In fact, on November the 25th of 2002, was he interviewed by FBI and law enforcement officials while he was still physically in the State of Kentucky?

A: Yes.

Q: And was his court appointed lawyer in Kentucky present during those interviews?

A: Yes, he was.

Q: But again, for cautionary purposes, was he again advised of his Constitutional rights even though his lawyer

**Page 68**

was present?

A: He was.

Q: Okay. And at that -- during that time period, without going into all of the specifics of the -- of the interview, during that time period, did Mister Basham indicate that Ms. Donovan's body or remains would be found in the State of South Carolina.

A: He did.

Q: In fact, what did Mister Basham and his lawyer attempt to do with agents there in Kentucky that was then relayed to agents in South Carolina?

A: We tried to -- since we were on the phone, back and forth, and they weren't familiar with exactly the location that -- that I would be, we tried to get maps, we tried to get descriptions of where he was talking about and ultimately we came to the conclusion that we were talking Savannah Bluff which we had talked about earlier as those two had been -- been seen back there by some witnesses.

So with the attorney's assistance, we got as clear a picture as we could about exactly what had happened and where Ms. Donovan's remains would be -- I'm sorry, not remains, but where she would be, because at the time, we were looking -- we were trying to rescue her, we were trying to find her based on...

Q: That was my next question. This would have been

JA 0402

**Page 69**

eleven days after her abduction, is that correct?

A: It was. However, you know, we weren't -- we weren't able to give up at that point yet because we weren't sure exactly how she would have been left, and so we were -- law enforcement response was -- was still looking for her. We believed that she was tied up to a tree similar to what Mister Hawkins had gone through, and so that -- that -- we were pressing to try to pinpoint the location, and ultimately we had a pretty major law enforcement response to that Savannah Bluff area. We had helicopters and dogs and law enforcement agents from all over, local and state, helping us in that area.

Q: So based on statements that were provided by Mister Basham on November the 25th, 2002, while he was in Kentucky in the presence of his lawyer, was an all out search effort conducted in the Savannah Bluff area of Conway, South Carolina?

A: Yes.

Q: And the results of that thorough search?

A: They were all negative. We didn't find any evidence at all that she was there.

Q: And subsequently, on Thanksgiving Day, November the 28th of 2002, were you -- did you, yourself, meet with Mister Basham? .

A: I did.

**Page 70**

Q: Was Mister Basham, November the 27th, the day before Thanksgiving, flown by the U.S. Marshals from Kentucky to Florence, South Carolina?

A: Yes.

Q: And when you and other law enforcement officers had an opportunity to meet with Mister Basham on Thanksgiving Day, were two court appointed South Carolina attorneys present with him?

A: Yes.

Q: And did Mister Basham -- was Mister Basham willing -- willing to attempt to, at least at that time, search or assist in the search for the remains of or the body of Alice Donovan?

A: Yes.

Q: And that search, based on Mister Basham's direction, took you to what state?

A: North Carolina.

Q: So on November the 28th, on Thanksgiving Day, Mister Basham was directing law enforcement officers to the State of North Carolina, is that correct?

A: That is correct.

Q: However, three days before, he was directing law enforcement officers searching for Ms. Donovan in what state?

A: South Carolina.

Q: Now, on Thanksgiving Day, through Mister Basham's

**Page 71**

direction, it took you to what part of North Carolina?

A: Winnabow.

Q: And what facility that you previously described to the Grand Jurors? What hunt club is there?

A: The Bee Tree Farm Hunting Club...

Q: So...

A: ...which is...

Q: ...the witnesses that you previously outlined their statements to the Grand Jurors, is that the same exact dirt road and the same exact area, at least vicinity, that Mister Basham, in essence, directed law enforcement to start the search for Alice Donovan on Thanksgiving Day?

A: It is.

Q: Now, based on -- based on information that was provided to law enforcement that day out there, through Mister Basham and his attorneys, was Ms. Donovan dead or alive?

A: She was dead.

Q: And Mister Basham -- Mister Basham's version of Ms. Donovan's death indicated who actually killed Mister Fulks, through Mister Basham's version of events?

A: Chaddrick Fulks.

Q: And did Mister Basham, through his various version of events provide different means or methods that Mister Fulks may have killed Ms. Donovan?

**Page 72**

A: Yes.

Q: And how were they?

A: Strangulation by a purse strap and then possibly a -- a throat slashing.

Q: And did Mister Basham indicate who sexually assaulted -- who raped Ms. Donovan there in -- on that rural dirt road by that cemetery that you previously described?

A: That Chaddrick Fulks raped her.

Q: During your search on November the 28th -- and -- and how exhaustive was that search in that -- in that area, that rural area of Brunswick County?

A: It was -- Thanksgiving morning, I want to say we searched for probably close to seven hours, six to seven hours in that area. It's a very rural part of Brunswick County.

Q: And was the sheriff of Brunswick County assisting, in fact, helping based on his familiarity with the search?

A: Yes.

Q: Were other law enforcement officers present as well?

A: Yes.

Q: And again, was Mister Basham's attorneys present?

A: They were.

Q: And throughout this several hour search over

JA 0403

**Page 73**

however number of rural roads and miles of Brunswick County, North Carolina, were you ever able to locate the remains of Alice Donovan?

A: No, we weren't.

Q: In fact, at one point, during one version of the statements that Mister Basham provided law enforcement, did he indicate that Ms. Basham's throat was cut, I believe you -- you stated?

A: Yes.

Q: And ultimately did Mister Basham also indicate that subsequent to Ms. Donovan's throat being slit that her body was placed in the trunk of the car?

A: Yes.

Q: Her car, the BMW?

A: Yes.

Q: I'm going to get you to describe to the Grand Jurors eventually how Ms. Donovan's car was located, but was her car eventually located in the State of Indiana?

A: It was.

Q: Was her car thoroughly processed for evidence by the forensic unit of the FBI?

A: Yes.

Q: And was the FBI able to obtain any physical evidence that there was any human blood in the trunk of the car?

**Page 74**

A: They determined that there -- there was no evidence that there was human blood in that -- the trunk of the car.

Q: Now, Mister Basham verified that they used the ATM card in North Carolina?

A: Yes.

Q: During the early morning hours of November the 15th?

A: Yes.

Q: And where does your investigation, through other witnesses as well, your investigation reveal that subsequent to the events that occurred in Brunswick County, North Carolina...

A: Uh-huh (Affirmative).

Q: ...with your witnesses at Bee Tree Farm, did they eventually return to South Carolina that evening of November the 14th?

A: Yes, they did.

Q: And how do you know that?

A: Tina Severance, Andrea Roddy confirmed that they returned to the motel room.

Q: Now, when -- did Tina Severance and Ms. Roddy indicate that they actually observed -- observed the car that they were traveling in when they returned to the motel, the Beachwalk Motel?

**Page 75**

A: No, neither one had any idea how they got back to the Beachwalk Motel, only that Tina was doing laundry outside and looked up and noticed Brandon Basham and Chaddrick Fulks walking up the flight of stairs towards the room.

Q: And did Ms. Severance indicated to you what happened when they -- when she actually had a conversation with Mister Basham and Mister Fulks inside the motel room?

A: She did.

Q: And what transpired inside the motel room?

A: Chad brought her into the bathroom of the motel room and explained to her that basically they were in trouble, that Chad was not sure if Brandon had killed anybody, based on the shooting at the -- at the residence in Conway, and so they would need to get out of there. Chad explained that they lost the van, the police have it, and that they were going to get their things and leave. And Ms. Rod -- Ms. Tina Severance stated that then she would go ahead and -- and report that her van was stolen, which she did the next morning with the Myrtle Beach Police Department.

Q: Did she describe -- did Ms. Severance describe the demeanor of Mister Basham and Mister Fulks at that time?

A: They were -- they were stressed. They were in a hurry to get out of there.

Q: And did Mister Basham and Mister Fulks, according to Ms. Severance, actually gather up all of their belongings,

**Page 76**

all of their clothing and everything they had there in the motel and leave the motel?

A: They did. Tina was doing laundry and she said that the laundry that she was doing hadn't dried yet and she was told to get whatever was in the dryer and get it upstairs and they put it in bags and quickly, whatever they had, and -- and then left the motel room.

Q: And again, they -- did Ms. Severance or Ms. Roddy actually see the vehicle that they left Myrtle Beach in?

A: She did not.

Q: After leaving Myrtle Beach, you previously testified about the -- Ms. Donovan's ATM card being used during the early morning hours of November the 15th in Raleigh, North Carolina, is that correct?

A: Yes.

Q: Where did your investigation -- what did your investigation tell you as to where they then traveled to, they meaning Mister Basham and Mister Fulks.

A: The -- the next confirmed contact we had with -- with them would be at approximately 8:58 that night. Her ATM card was -- was hit -- or hit the ATM machine at the NBSC on North Main Street -- I'm sorry, Main Street in North Myrtle Beach.

Q: Well that would have been on the evening of November the 14th, is that correct?

JA 0404

Page 77

A: Yes.

Q: Before leaving the State of South Carolina?

A: Yes.

Q: Before going to Raleigh, North Carolina and using her ATM machine?

A: Yes.

Q: When they left the State of South Carolina, did they travel to West Virginia again, back to the State of West Virginia?

A: Yes they did.

Q: And you were able to confirm that because of statements from what -- what young lady?

A: Beth McGuffin.

Q: And who is Ms. McGuffin?

A: She was a -- she became -- she was a friend of Chaddrick Fulks and he introduced her -- or he introduced Brandon Basham to her on the way down -- I'm sorry, on their way back up, and then Brandon became somewhat infatuated with her. It became a sexual relationship and -- though short, and they hadn't met before the introduction.

Q: Does Ms. McGuffin confirm through statements to West Virginia state authorities, as well as federal authorities in West Virginia that, in fact, Brandon Basham and Chad Fulks came to her residence in a blue BMW?

A: Yes, she does.

Page 78

Q: Subsequent to November 14th, 2002?

A: Yes.

Q: And, in fact, has Ms. McGuffin provided FBI agents in West Virginia with original letters that Mister Brandon Basham has written to her since he was incarcerated in Kentucky and South Carolina after his November 17th arrest?

A: Yes.

Q: Again, without going into the specifics, there are approximately four letters that -- that she has received, Ms. McGuffin received from Brandon Basham subsequent to his arrest, is that correct?

A: Correct.

Q: And does he, in fact, in his own handwriting -- written letters to his perceived girlfriend, Ms. McGuffin, make admissions to the crimes that he is accused of with regards to Ms. Donovan in South Carolina, both he and Mister Fulks?

A: He does.

Q: He makes admissions on his part and Mister Fulks.

A: Yes.

Q: Of course he casts the blame mostly on whom?

A: On Mister Fulks.

Q: And does the FBI have in their possession the actual letters that -- that Brandon Basham wrote to Ms. McGuffin?

Page 79

A: Yes.

Q: On November the 17th, 2002, Mister Fulks and Mister Basham, when they left Ms. McGuffin's residence in Huntington, West Virginia, they then drove to where, what town, on November 17th?

A: Ashland, Kentucky.

Q: And how close -- describe how close is Ashland, Kentucky to Huntington, West Virginia?

A: Its' -- I believe there's a bridge that connects basically both communities, it's right -- it's right at the state border of Kentucky and West Virginia.

Q: And tell the Grand Jurors what Mister Basham did on November the 17th, 2002, in Ashland, Kentucky?

A: They had gone to a -- a parking lot. Mister Basham -- I'm sorry, Mister Fulks had driven the BMW there and they ended up separating. Mister -- Mister Fulks didn't feel comfortable there in Kentucky and Mister Basham didn't know that this was going to happen, evidently, according to his statement, but they separated there. It appears that Mister Basham somewhat panicked and then attempted to carjack a -- a car with two ladies in it in the parking lot of the shopping center there.

About the same time he was trying to get -- go through this carjacking scenario, there was a police officer who basically saw what was going on and started to pursue Basham.

Page 80

During the pursuit, Basham fired several rounds at the police officer. He wasn't hit and ultimately he was captured in the Ohio River and placed into custody.

Q: And through Grand Jury subpoenas and through your investigation, did you work closely with the Ashland Police Department...

A: Yes.

Q: ...who investigated the events of November the 17th, 2002?

A: Yes.

Q: And the -- Ms. Andrea Frances and her daughter, Deanna Frances, were they the two victims of the attempted carjacking in the mall in Ashland, Kentucky?

A: Yes, they were.

Q: Officer Matthew Davis, was he the police officer that attempted to approach Mister Basham in the mall in Ashland, Kentucky?

A: Yes.

Q: Did Officer Davis actually have to exchange gunfire with Mister Basham?

A: He did.

Q: Were there other citizens in -- in and around the mall area in this particular strip mall in Ashland, Kentucky?

A: Yes.

Q: After Mister Basham was arrested and identified,

JA 0405

Page 81

in fact, was he not identified by Officer Davis as well as show up IDs by Ms. Andrea and Deanna Frances, there were identifications there at the scene with Mister Basham were there not? Are you aware of that?

A: I'm sorry, could you say that one more time?

Q: Was Mister Basham identified by Officer Davis there at the scene, after he was -- after his arrest, as the person that he exchanged gunfire with?

A: Yes, he was.

Q: Okay. And subsequent to Mister Basham's arrest near this location in Ashland, Kentucky, was a thorough search of the route that he took conducted by law enforcement officers...

A: Yes.

Q: ...before he jumped in the river? What was found in a train boxcar along the route that Mister Basham traveled before jumping in the river?

A: A .22 caliber revolver.

Q: Was it the very same H&R .22 caliber 9 Shot Model 949 revolver, the same serial number as that stolen by -- from Mister Talsma's residence in Portage, Indiana?

A: It was.

Q: Or I'm sorry, Michigan City, Indiana?

A: It was.

Q: Did Mister Basham provide an alias or a

Page 82

fictitious name to Ashland Police Department at that time?

A: He did.

Q: And it was the name Joshua Ritman?

A: Yes.

Q: Now, later on that day, on November the 17th, obviously without Mister Basham, did Mister Fulks travel back to Huntington, West Virginia and stay with Ms. McGuffin?

A: Yes, he did.

Q: And, in fact, did Ms. McGuffin provide information as to how she became aware that Mister Basham was arrested and charged with these events in Ashland, Kentucky?

A: I believe it was on the news.

Q: And she was with whom when she saw the news?

A: Mister Fulks.

Q: And on November the 19th, 2002, did Mister Fulks leave Ms. McGuffin's residence in Huntington, West Virginia and travel to Goshen, Indiana?

A: Yes, he did.

Q: And were you able to obtain statements from a -- the brother of Mister Chad Fulks, Mister Ronnie Fulks, did the FBI interview him?

A: Yes.

Q: Did he verify that, in fact, on November the 19th, 2002, his brother arrived at his residence in Goshen, Indiana?

Page 83

A: Yes.

Q: Driving...

A: The BMW.

Q: ...the later identified Alice Donovan's blue BMW?

A: Correct.

Q: Did he himself see the blue BMW?

A: He did.

Q: Did he, on the evening of the 19th of November, 2002, actually question his brother as a result of seeing a lot of this information that you've described to the Grand Jury on the national news?

A: Yes.

Q: And did Mister Chad Fulks make any admissions to his brother that the FBI later recorded in a statement from his brother, Ronnie Fulks?

A: Yes he did.

Q: Okay. Do you have a copy of the FBI 302 of Ronnie Fulks?

A: I do.

Q: On the bottom of page two, the last paragraph, third sentence? Do you see that where it says, "Chaddrick Fulks told Ronnie Fulks?"

A: Yes I do.

Q: Would you publish that to the jury -- the Grand Jurors please?

Page 84

A: "Chaddrick Fulks told Ronnie Fulks that he was in a lot of trouble and that he was scared."

Q: Continue.

A: "Ronnie Fulks told Chaddrick Fulks that he had a seen the story on the news. Ronnie Fulks then asked Chaddrick Fulks what car he was driving and Chaddrick Fulks smiled. Ronnie Fulks asked again, "Are you driving the same car," referring to the BMW on the television and Chaddrick Fulks replied yes, that it was parked a couple of blocks away.

Q: Okay. On the top -- the same paragraph, going along that same paragraph, do you see where it says, "Ronnie Fulks asked Chaddrick Fulks how he got the car." Do you see that?

A: Yes.

Q: And what was Chaddrick Fulks' response?

A: That he took if off a girl from Ohio or South Carolina.

Q: And then Chaddrick Fulks added -- quote?

A: The other boy got stupid. I think he was refer -- obviously he was referring to Basham, that he got captured, he got arrested.

Q: And what do you -- would Mis -- would Chaddrick Fulks go any further into the details of this carjacking, this stealing of the BMW with his brother?

JA 0406

Page 85

A: No, he did not.

Q: Did Ronnie Fulks act -- also give the police information as to what he and his girlfriend, Ronnie Fulks, and his brother Chad did with the blue BMW?

A: Yes.

Q: And describe that for the Grand Jurors?

A: That basically they had left the -- Ronnie helped him find a hiding spot for the BMW and they located a barn not too far away from the residence where the car was driven into. It was covered with a tarp and some hay and Fulks then returned -- Ronnie and Chad both returned back to the residence.

Q: And on November the 20th, 2002, was Chad Fulks arrested by law enforcement officers in Indiana?

A: Yes.

Q: Did he attempt to flee prior -- right prior to his arrest on foot?

A: He did. We had -- we had been surveilling the residence -- the relative's residence for awhile hoping that, you know, maybe he would come -- return back to the residence, and he was seen in a car, pursued by local law enforcement, and he bailed out of the car and was arrested after a short foot pursuit.

Q: And with the assistance of Ronnie Fulks, were you able to locate Alice Donovan's blue BMW where Chad Fulks had

Page 86

actually hidden it in a shed...

A: Yes.

Q: ...on a farm in Indiana?

A: Yes.

Q: No question that was Alice Donovan's blue BMW?

A: No question.

Q: And at that point in time, Brandon Basham was in custody in Kentucky, was he not?

A: Correct.

Q: Now, Agent Long, to be clear, during the statements that Brandon Basham provided law enforcement after he was Mirandized, including the statements that he provided in the presence of either his Kentucky lawyers or his South Carolina lawyers, he has Ms. Donovan being killed and raped, or raped and killed and body disposed of in what state?

A: North Carolina.

Q: And has all of the locations that Ms., as well as other locations that Mister Basham attempted to provide law enforcement, have they been thoroughly searched by law enforcement officers as well as private citizens' groups?

A: We maintained a pretty good presence in that area, law enforcement wise, and then we had weekend volunteers the family were able to obtain. We had some volunteer -- professional volunteer rescue squads with -- with dogs, cadaver dogs, trained to find human remains.

Page 87

There were pleas made to the hunters to give up a day of hunting and search the woods for remains. We had people following buzzards. We pretty much covered it as best we could.

Even though it is a huge area, the Brunswick County area is, we didn't have any other leads. By the time we -- we pulled out, law enforcement did, we felt comfortable that we had exhausted all the leads that we had.

Q: And so Ms. Donovan's remains or her body have not -- was not and have not been found in the State of North Carolina, is that correct?

A: That's correct.

Q: Now, the weather conditions during this time period, from the time that she, Ms. Donovan, was abducted and -- on November 14th, 2002, what were the -- had the weather conditions been like in Brunswick County, North Carolina, or in the Conway area of South Carolina?

A: Going back to the November...

Q: November 14th.

A: It was fairly cold nights, cool nights. We had some significant rain later on in the month that caused the water table, especially in the Savannah Bluff area to rise quite a bit, as well as Brunswick County. That's about all I can recall.

Q: And are you familiar with the concept of

Page 88

hypothermia?

A: Yes.

Q: And what is that?

A: Body temperature going down to a point where the human body loses consciousness.

Q: Is that the reason why law enforcement was concerned about attempting to locate Ms. Donovan's body if, in fact, she was not dead but simply tied to a tree, because of the weather conditions?

A: We felt every hour that had passed we were an hour less likely to find her alive, so we were going under the premise that we had very little time left to make a -- a recovery.

Q: Now, you previously described several statements that Mister Basham has provided to law enforcement officers after being Mirandized and including many statements in the presence of lawyers, is that correct? You've...

A: Yes, I have.

Q: ...outlined those for this Grand Jury?

A: Yes.

Q: Yesterday, in the presence of Mister Fulks' -- yesterday being April the 21st, 2002, in the presence of Mister Fulks' two appointed attorneys here in South Carolina, did you and an officer of the Conway Police Department have an opportunity to thoroughly interview Mister Chaddrick Fulks

Page 89

in Columbia, South Carolina?

A: I did.

Q: Did you and the other officer take thorough notes of that interview?

A: Yes.

Q: And again, so the -- the Grand Jury is clear, were both of Mister Fulks' attorneys present during that interview?

A: They were.

Q: Does Mister Fulks also claim that, as Mister Basham, that Ms. Donovan is, in fact, dead?

A: Yes.

Q: Again, not going into -- did that interview take several hours to conduct?

A: It did.

Q: Without going into all of the specifics of that interview, does Mister Fulks verify that he was present and participated in the carjacking and kidnapping of Alice Donovan on November the 14th, 2002?

A: He does.

Q: That took place at the Wal-Mart in Conway, South Carolina?

A: Yes.

Q: That they attempted to use ATM cards in South Carolina?

Page 90

A: Yes.

Q: And did, in fact, use that -- her ATM card and obtain money in South Carolina?

A: Yes.

Q: As well as North Carolina?

A: Uh-huh (Affirmative).

Q: Does he place himself at the BP station -- the Amoco station, I'm sorry, in Shallotte, North Carolina?

A: Yes.

Q: Does he place Mister Basham and the victim, Alice Donovan, in the back seat of the car when he's on the videotape?

A: Yes.

Q: Does he also indicate, again, in the presence of his lawyers during this statement, that they traveled to the, what he now knows to be the Bee Tree Farm area in Brunswick County, North Carolina?

A: Yes.

Q: Does he acknowledge seeing the hunters at the hunt club standing on the front porch as well?

A: Yes.

Q: Does he admit to driving Alice Donovan's blue BMW to the cemetery?

A: Yes he does.

Q: Does he make these admissions again in front of

Page 91

his -- in the presence of his two lawyers?

A: He does.

Q: Agent Long, would you tell these Grand Jurors what Mister Fulks told you yesterday in the presence of his two lawyers as to what happened to Ms. Donovan in that cemetery?

A: That they pulled in, Brandon Basham went around, made sure that all the clothes were removed from -- from Ms. Donovan. He performed oral sex on her and then had intercourse with her. When he was done, Mister Fulks went to the back seat and had intercourse with her. She remained naked in the back seat. About that time is when they were spotted by the -- the car -- the truck -- the witnesses that I told you about earlier, they saw the BMW and the brake light came on, and they knew that they had been seen, so they left the cemetery area, traveled around some roads. They didn't know where they were going and ultimately came back to South Carolina.

Q: So again, Mister Basham has Ms. Donovan being killed by Mister Fulks in North Carolina, is that correct? Mister Basham.

A: Yes, Mister Basham does.

Q: In statements after being Mirandized and at times in the presence of lawyers, is that correct?

A: Yes.

Page 92

Q: And Mister Basham admits to assisting Mister Fulks in disposing of Ms. Donovan's body in North Carolina, does he not?

A: Yes.

Q: After being Mirandized...

A: Yes.

Q: ...and on occasions in the presence of his lawyers. Is that correct?

A: That's correct.

Q: Now, Mister Fulks yesterday, who does he have killing Ms. Donovan?

A: Brandon Basham.

Q: And where does he claim Ms. Donovan was killed, what state?

A: South Carolina.

Q: In what county?

A: Horry County.

Q: Was he able to pinpoint an exact location?

A: He was able to give us a description to a road -- a dirt road in Horry County, not an exact, but -- but -- I haven't been out there yet, but it's -- it's -- generally speaking, the places that he's describing do exist in that area, off a dirt road, and that's where he's putting the -- the BMW and he's putting where -- where Ms. Donovan was ultimately taken into the woods.

JA 0408

Page 93

Q: And I believe he claims that Ms. Donovan was choked to death, is that correct? According to what Mister Basham tells him.

A: Yes, that she -- that she was taken out of the car by Brandon Basham at gunpoint and dragged into the woods -- or brought into the woods while Fulks remained inside the car and was gone for approximately 20 minutes when -- after Basham returned, got into the car and they left the area.

Q: From a characterization perspective, in all of the statements that Mister Basham has provided, post-Miranda, and on occasion in the presence of his lawyers, who does he claim was directing this crime spree after -- actually after the escape on November the 4th? Who did Mister Basham say was the leader and directed this crime spree?

A: That Chaddrick Fulks was -- was the leader and he was directing everything that was going on.

Q: Yesterday during your multiple hour interview with Mister Fulks in the presence of his two attorneys, who does Chaddrick Fulks say was leading this crime spree, including the death of Ms. Donovan?

A: Brandon Basham was -- was doing it.

Q: I take it, Agent Long, that despite not knowing a specific location, just based on some general -- general landmarks, will law enforcement at least attempt to organize search parties to try and locate, if in fact Ms. Donovan's

Page 94

body is here in the State of South Carolina?

A: We will -- we'll go out -- the core group of investigators will go out very shortly and try to piece together what we're getting and make a determination at that point what scope of -- of search we'll do, and then whether we can eliminate it as not being true or -- or whether we find some evidentiary -- some evidence out there yet to be determined.

Q: Okay. As you sit on that witness stand before the Grand Jurors here today, do you have any independent evidence that would corroborate the fact that Ms. Donovan was, in fact, killed in North Carolina? Corroborate Mister Basham that she was, in fact, killed in North Carolina?

A: No evidence at all to say that she was actually killed in North Carolina.

Q: And any evidence to say she was killed in South Carolina?

A: No evidence.

Q: Mister Basham -- have you seen, or has your investigation been able to obtain documents that indicate that Mister Brandon Basham has been convicted of multiple counts of forgery in another state, outside the State of South Carolina?

A: Yes.

Q: Has your investigation revealed that?

Page 95

A: Yes.

Q: In fact, was he serving time for the felony conviction of multiple counts of forgery at the Hopkins County Jail on November the 4th when he broke out of the jail? He had been convicted of those crimes.

A: He was convicted and serving his time at that detention facility.

Q: Okay. Mister Fulks, has your investigation been able to obtain a criminal history of Mister Fulks -- of his prior convictions as well?

A: Yes.

Q: And included in this criminal history of Mister Fulks, does it include felony convictions in federal court for transportation of stolen motor vehicle, aiding and abetting the burglary of a vehicle with intent to commit theft, aiding and abetting a theft of property, all federal convictions out of the Eastern District of Tennessee? Is that included in Mister Fulks' criminal history?

A: Yes, that's the federal -- those are the federal charges.

Q: You previously indicated to the Grand Jurors that Mister Basham and Mister Fulks generally were in their early twenties based on some descriptions that were provided. Do you recall that testimony?

A: Yes I do.

Page 96

Q: Was Mister Fulks -- his age is what, do you know? Do you need a document?

A: I know he was born -- he was born in 1977. I'd have to pull his exact date of birth, but he'd be about 25 in November, and Mister Basham was born in 1981 which would place him at 21 years old.

Q: Brandon Basham born September 14th, 1981? Is that correct?

A: September 14th, 1981, correct.

Q: That would have been -- he would have been 22 years old on November 14th of 2002? If my math is correct.

A: Yes.

Q: Chaddrick Fulks...

A: Twenty-one, I believe. He hadn't quite reached his 22nd birthday.

Q: Twenty-one, I'm sorry. Twenty-one. That's why I practice law. And Chad Fulks date of birth, May 16th, 1977, is that correct?

A: Yes that is. Twenty-five.

Q: Twenty-five.

MR. SCHOOLS. Before we find out whether any of the Grand Jurors have questions, I want to give you a few precautionary instructions and then answer the -- Mister -- the Foreman's question concerning the single criminal episode.

JA 0409

Page 97

MR. SCHOOLS. You've heard some testimony concerning the fact that both Mister Basham and Mister Fulks were arrested in connection with these offenses and that they were incarcerated and escaped prior to the -- prior to these offenses occurring. You obviously can consider those facts to the extent that they're relevant to this investigation. The fact that they were arrested is really only relevant to explain their whereabouts at the time in question. It is not relevant for your determination on probable cause whatsoever.

The fact that they were incarcerated prior to -- prior to the time that these offenses began are not relevant at all to the determination of probable cause. You've heard some testimony concerning their prior records or that they have felony convictions, that testimony is relevant to the charge of being felons in possession of firearms. That's all it's relevant to and that's all -- you can consider it for those purposes only. The fact that they have prior convictions should not be any evidence to you of their -- of whether there's probable cause to believe that these offenses occurred except to the extent that it goes to prove that one element of that one charge in Count Seven.

There was some testimony, I believe from Agent Long, that one of the witnesses described these two individuals as appearing to be skinheads. There is, however, no evidence that these individuals are members of a skinhead

Page 98

group. That was merely a descriptive term and you shouldn't attribute anything to that term other than the fact it -- it was a descriptive term used by one of the witnesses to describe what they looked like.

MR. SCHOOLS. And finally, you've heard some testimony that some of these events were -- appeared on the news, on various national news networks, or whatever. Some of you may have seen news stories or seen newspaper accounts of some of this. To the extent you've seen any of that, you should entirely disregard it and base your determination on probable cause based solely on what you've heard in here. The fact that the information may have appeared on the news is relevant only to explain the facts that followed as a result of individuals having seen news programs as Agent Long testified and is not relevant in any other way.

With respect to a single criminal episode, the finding or the special finding that relates to a single criminal episode is fairly new and there's not a lot of case law out there that actually interprets that, although there is some case law in other contexts that talks about what is a single criminal episode.

By definition, an episode would be more than one act, so you would infer that a single criminal episode would be an episode of criminal acts that would include more than one act. I would instruct you that in determining whether a

Page 99

series of acts are part of a single criminal episode, there's a number of things you can look at.

MR. SCHOOLS. First of all, were there intervening arrests between the criminal acts? Were there any intervening arrests between one criminal act and another that might be part of a criminal episode?

Are they close in time? Were there intervening periods of lack of criminal activity? Was there a time when a criminal act may have been committed and then a long period of time when another criminal act may have been committed? And that may indicate to you that multiple acts were not part of a criminal epi -- single criminal episode if there was long periods of time with a lack of criminal activity.

Is there identity of participants in the criminal acts, meaning is -- is it the same individuals involved in multiple criminal acts which are alleged to be part of a single criminal episode?

Are the offenses that are alleged to be part of a single criminal episode similar? Are they -- are they similar in nature?

And finally, do some of the criminal acts involved in what is alleged to be a single criminal episode actually further the commission of the prior acts or further the flight from those prior acts? Are they related in that way?

Those are some of the factors you can consider in

Page 100

determining whether multiple alleged criminal acts are part of a single criminal episode. Does that help explain it or does that confuse it?

MR. SCHOOLS. Any questions about any of those instructions before we find out whether any of you have any questions for Agent Long?

(Negative response by the Grand Jurors.)

MR. GASSER: Before any questions, I've just got a couple of more questions, some housekeeping matters.

Q: For the record, Agent Long, in your interview with Mister Fulks yesterday in the presence of his two attorneys, does he verify that when Brandon Basham exited the pickup truck in the Wal-Mart parking lot on November the 14th, that Mister Basham was, in fact, armed with a .22 caliber handgun?

A: Yes, he does.

Q: So does he indicate that Mister Basham actually accosted Ms. Donovan armed with the .22 caliber handgun?

A: Yes he does.

Q: And that the carjacking and kidnapping that began at that point, that Mister Basham, at least, was armed with a .22 caliber handgun?

A: Yes.

Q: And during the -- law enforcement's investigation, subsequent to November the 14th, was a duffel

## Page 101

bag located on the grounds near a wooded area of Ms. Margaret Moore's residence?

A: Yes.

Q: And just -- since we've been here quite a lengthy period of time, was Ms. Moore one of the residents in the Juniper Bay area where they approached, or at least one of them approached her residence and knocked on the door to try to get into her residence?

A: That's the same Margaret Moore, yes.

Q: Lived across from Ms. Hyman who owned the white pickup truck, is that correct?

A: That's correct.

Q: And inside the duffel bag were clothing items matching descriptions of items that Mister Basham and Mister Fulks had purchased found inside the duffel bag along with a Llama Minimax .45 caliber pistol?

A: Yes, that was located -- it was a small zipper bag and that is -- that weapon was located inside.

Q: Again, this is in close proximity to the Tina Severance's minivan that was abandoned by Mister Basham and Mister Fulks?

A: Yes.

Q: And is that the same Llama Minimax .45 caliber pistol serial number that was stolen from Mister Talsma's residence in Michigan City, Indiana, manufactured in Spain?

## Page 102

A: Yes it was.

MR. SCHOOLS: I would give you one other instruction. The offense that Mister Basham was convicted of in Kentucky is a -- classified by Kentucky as a Class E felony. It carries a maximum punishment of five years and a minimum punishment of one year.

Now, do any Grand Jurors have questions of Agent Long?

GRAND JUROR: There -- there is no body associated with Alice...

GRAND JUROR: Donovan.

GRAND JUROR: ...Donovan at this time. There's no body been located. Is that correct?

AGENT LONG: That's correct, yes sir.

MR. SCHOOLS: It appears that there's no further questions. In that event, we will adjourn for your deliberations. Thank you for your patience.

GRAND JUROR: I have a quick question for the -- I think it's probably for -- it's for Agent Long, but I'd like somebody to talk about these indictments that say resulting in death and the fact that we don't know the disposition of Ms. Donovan's -- we don't know where Ms. Donovan is, Alice Donovan. Is that a question that anyone here can speak to?

MR. SCHOOLS: There is law with respect to that. Do you want to go...

## Page 103

MR. GASSER: The law in federal jurisdictions across this country is -- actually mirrors virtually all of the State Supreme Courts and Appellate Courts that have had opportunities to resolve this issue and it's based on the common law, with the idea that killers should not be rewarded because they have successfully disposed of evidence, in this case the body. And that is is that the government is required to prove, by circumstantial evidence, no matter how slight, that, in fact, the person is dead. You can do that through statements, circumstantial evidence, a series of circumstantial evidence, that the person is, in fact, dead, the person's habit, the fact that the person -- where the person was living, where the person was working, when was the last time any family members have seen the person, when is the last time any type of business or financial transactions have occurred using the person's or involving the person's items; statements made by perpetrators; common sense. All of those factors can contribute to a circumstantial evidence finding that, in fact, the person is deceased.

GRAND JUROR: Appreciate it. That's all I have.

GRAND JUROR: Was Ms. Donovan's possessions and credit cards found?

AGENT LONG: I'm sorry.

GRAND JUROR: Was Ms. Donovan's debit card found?

AGENT LONG: No ma'am.

## Page 104

GRAND JUROR: None of her possessions at all found, other than the car?

AGENT LONG: We took -- the -- our evidence team took whatever we had when we recovered the BMW for forensic analysis, every little nook and cranny that was in that car, up to our FBI lab, but to my knowledge, nothing, no credit card, no identification, nothing that we can trace directly back to her was located in that car.

GRAND JUROR: But it was -- the debit card was never used after the...

AGENT LONG: The Raleigh, North Carolina...

GRAND JUROR: The Raleigh incident.

AGENT LONG: It was never used again.

GRAND JUROR: How about her cell phone? Did you recover that?

AGENT LONG: The cell phone was not recovered. I don't know if you want to...

MR. GASSER: Did Mister -- did Mister Fulks, in his statement, in the presence of his two lawyers yesterday, provide various -- according to his rendition of the facts, various general places where they disposed of Ms. Donovan's cell phone, clothing...

AGENT LONG: It was a -- shortly after where they -- where we're being told by Fulks that -- that Ms. Donovan was disposed of, Mister Basham threw a cell phone and some

Page 105

papers, credit cards, we're not sure exactly what it was, off a guard rail in the general vicinity, into the tree line, into the woods. We haven't confirmed that yet or not. And then Mister Fulks explains, as they went along, other items were disposed of in the parking lot trash containers and, you know, as far as her clothing and that kind of stuff goes, so we have not yet confirmed any of that yet, and we haven't recovered anything yet. That's based on a statement. But no, we don't know where her cell phone is.

GRAND JUROR: There's been no other activity on it?

AGENT LONG: Not the -- only one call at 4:28 and then there's been nothing since November 14th.

MR. GASSER: Did her husband an other family members attempt to call the phone number subsequently to November the 14th? Were efforts made by them to call the phone?

AGENT LONG: The husband was the first one to kind of realize that -- that his wife wasn't home and that, you know, it was getting late, and he started his own little bit of an investigation and started calling her cell phone, which our phone company told us there were hits on the phone but the phone was off. It was in a shutdown mode, or whatever the term was for it, so we're not sure. We think it was activated for the 4:28 phone call and then it was shut off

Page 106

and it was not used again.

MR. SCHOOLS: Okay. The Grand Jury is indicating no further questions. We will adjourn for you to deliberate.

(At this time the Grand Jury was left alone to deliberate.)

(The above was concluded at 4:11 p.m.)

STATE OF SOUTH CAROLINA )
                     )
COUNTY OF SUMTER       )

    I, BRUCE H. PEGGS, Certified Stenomask Reporter and Notary Public for the State of South Carolina at Large, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____    _____ (LS)
(Date)       BRUCE H. PEGGS, CVR-CM
            Certified Verbatim Reporter
My Commission Expires:
December 29, 2009

JA 0412

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

UNITED STATES OF AMERICA, ) CR. NO. 4:02-992
 ) COLUMBIA, SC
 VERSUS ) JUNE 18, 2003
 )
CHADRICK E. FULKS AND )
BRANDEN L. BASHAM )
  DEFENDANTS. )
 )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT COURT JUDGE
MOTIONS HEARING

APPEARANCES:
FOR THE GOVERNMENT: STROM THURMOND, SR., USA
 SCOTT SCHOOLS, AUSA
 JONATHAN S. GASSER, AUSA
 UNITED STATES ATTORNEY'S OFFICE
 1441 MAIN STREET, SUITE 500
 COLUMBIA, SC  29201

FOR THE DEFENDANT
CHADRICK E. FULKS: WILLIAM F. NETTLES, IV, AFPD
 FEDERAL PUBLIC DEFENDER'S OFFICE
 MCMILLAN FEDERAL BUILDING
 401 WEST EVANS STREET, ROOM 240
 FLORENCE, SC 29503

 JOHN H. BLUME, ESQ.
 BLUME AND WEYBLE
 P. O. BOX 11744
 COLUMBIA, SC  29211

BRANDEN L. BASHAM: JACK B. SWERLING, ESQ.
 1720 MAIN STREET, SUITE 301
 COLUMBIA, SC 29202

 GREGORY P. HARRIS, ESQ.
 1720 MAIN STREET, SUITE 301
 COLUMBIA, SC  29202

COURT REPORTER: DEBRA R. JERNIGAN, RPR, CRR
 UNITED STATES COURT REPORTER
 901 RICHLAND STREET
 COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

JA 0413

THE COURT: ALL RIGHT. THIS IS THE CASE OF UNITED STATES VERSUS BASHAM AND FULKS. WE FILED A NOTICE FOR STATUS AND MOTIONS TO BE SOLVED THIS WEEK. AND ALSO TO -- I WOULD LIKE TO HAVE AN EX PARTE DISCUSSION WITH THE LAWYERS ABOUT ATTORNEYS' FEES, AND COSTS, AND THINGS SUCH AS THAT. THE MOST PRESSING ISSUE IS THE DEFENDANT'S MOTION TO BE TRANSFERRED TO A HOSPITAL WHERE HE CAN BE TREATED. THIS IS MR. BASHAM'S MOTION. AND ALSO THE GOVERNMENT'S SOMEWHAT SIMILAR MOTION TO HAVE THE DEFENDANT EXAMINED AT A FEDERAL INSTITUTION.

I SUPPOSE I SHOULD CALL ON THE DEFENDANTS FIRST, THEIR MOTION CAME IN FIRST. MR. HARRIS, I READ YOUR MOTION AND AFFIDAVIT AND SO FORTH.

MR. HARRIS: JUDGE, WE HAVE AN AMENDMENT TO THAT MOTION REQUEST. WE ASK NOW THAT HE BE SEEN FOR A PERIOD OF SIX WEEKS AND HE STAY THERE FOR A PERIOD OF SIX WEEKS AFTER WHICH HE WILL BE RETURNED TO THE ALVIN S. GLENN DETENTION CENTER. I HAVE SPOKEN WITH THE GOVERNMENT, IN THE PROCESS OF POSSIBLY AGREEING ON A SITUATION WHERE THAT COULD HAPPEN. I DO NOT KNOW WHAT THEIR POSITION IS. I DON'T KNOW THAT THEY DISAGREE WITH THAT.

THE COURT: WELL, HOW MUCH TREATMENT HAS HE BEEN RECEIVING FROM HERE LOCALLY THUS FAR?

MR. HARRIS: NONE, YOUR HONOR.

THE COURT: DR. SCHWARTZ-WATTS HAS EXAMINED HIM?

JA 0414

MR. HARRIS: EXAMINED HIM FOR THE PURPOSE OF ESTABLISHING HIS COMPETENCY. NOT RENDERED AN OPINION AS TO HIS COMPETENCY AND CANNOT UNDER THE CIRCUMSTANCES. SHE IS HAVING PROBLEMS DOING THAT. A SIX WEEK TERM AT THE COLUMBIA CARE COMMUNITY CENTER WOULD ALLOW HER TO COMPLETE THAT EVALUATION AND TO MAKE A DETERMINATION SO THAT SHE CAN PROPERLY ADVISE US AS TO HIS COMPETENCY AND HIS ABILITY TO STAND TRIAL.

THE COURT: ALL RIGHT. WHAT IS THE GOVERNMENT'S POSITION, MR. SCHOOLS?

MR. SCHOOLS: YOUR HONOR, I SPOKE WITH DR. SCHWARTZ-WATTS WITH THE DEFENDANT'S PERMISSION JUST PRIOR TO THE HEARING. I THINK SHE ADVISED ME THAT SIX WEEKS WASN'T MAGIC, DO IT IN FOUR. LET ME EXPLAIN TO THE COURT WHY THE TWO WEEKS MAKES ANY DIFFERENCE.

I THINK THE COURT KNOWS THAT BOTH OF THESE DEFENDANTS WERE ON ESCAPE STATUS WHEN THEY COMMITTED THE OFFENSES WHICH BRINGS US HERE TODAY. AND SO WE DO HAVE SECURITY CONCERNS WITH RESPECT TO THEIR BEING HOUSED IN A MEDICAL FACILITY -- WITH MR. BASHAM BEING HOUSED IN A MEDICAL FACILITY INSTEAD OF DETENTION, THE OPPORTUNITY OF ESCAPE IS GREATER THERE THAN DETENTION CENTER.

SECOND OF ALL, AND I KNOW THIS ISN'T REALLY MY BATTLE TO FIGHT, SPECIFICALLY, BUT IT IS AN EXPENSIVE PLACE FOR THE MARSHALS TO KEEP A DEFENDANT. TO THE EXTENT WE CAN MINIMIZE

THAT ---

THE COURT: I AM QUITE AWARE IT IS VERY EXPENSIVE.

MR. SCHOOLS: RESOLVE THE EXPENSE ISSUE FOR TWO WEEK'S WORTH. I THINK REALLY, AT THIS POINT, BASED ON THE INFORMATION IN THE RECORD, THAT IT IS REALLY VERY HARD FOR ANY OF US TO MAKE AN ACCURATE DETERMINATION WHETHER THE TREATMENT HE IS REQUESTING IS SOMETHING HE REALLY NEEDS AT THIS POINT. OUT OF AN ABUNDANCE OF ACCOMMODATION, WE WOULD AGREE TO FOUR WEEKS WITH ONE OTHER CAVEAT.

WE TALKED TO MR. HARRIS AND MR. SWERLING ABOUT THIS, I THINK THEY ARE AGREEABLE ON THIS POINT, AND THAT IS THAT WE WANT TO MAKE SURE THAT THERE IS NOT ANY EXPRESS FINDING BY THE COURT OR ANY CONSIDERATION BY THE DEFENSE THAT WE ARE AGREEING THAT THE DEFENDANT IS IN A POSITION WHERE THIS PSYCHIATRIC CARE THAT HE IS CLAIMING IS NECESSARY.

WE REVIEWED DR. SCHWARTZ-WATTS' AFFIDAVIT, AND THAT IS THE ONLY INFORMATION WE HAVE AT THIS POINT. AND WHILE I UNDERSTAND THE ISSUES SHE RAISES, IT IS IMPOSSIBLE FOR US, BASED ON THAT RECORD, TO MAKE ANY ANALYSIS OF WHETHER THE ALLEGED SUICIDE ATTEMPT WAS SINCERE, IF IT WAS AN EFFORT TO GAIN ATTENTION, IF IT WAS AN EFFORT TO BE MOVED OUT OF THE DETENTION CENTER. MR. BASHAM HAD PREVIOUSLY BEEN HOUSED IN COLUMBIA CARE, IT IS POSSIBLE THAT HE WAS SEEKING TO CREATE AN EVENT THAT WOULD CAUSE HIM TO BE MOVED OUT OF THE DETENTION CENTER.

WITHOUT HAVING TO GET INTO ALL OF THAT, IF WE CAN REACH AN ACCOMMODATION THAT THEY CAN GO THERE FOR FOUR WEEKS, DR. SCHWARTZ-WATTS CAN COMPLETE HER EXAMINATION, AND THEN AT THAT POINT WE CAN PROCEED WITH OUR MOTION FOR A DETERMINATION OF MENTAL COMPETENCY IF IT IS NECESSARY.

AND I WANT TO MENTION THAT, SINCE I AM UP, IF IT IS OKAY WITH THE COURT, THE DEFENSE, IN THEIR RESPONSE, THEY FILED A RESPONSE TO THAT MOTION TODAY, IF I UNDERSTAND THEIR RESPONSE CORRECTLY, IT STATES THAT THERE IS NO CURRENT INTENTION ON THEIR PART TO SUGGEST THAT HE IS NOT COMPETENT TO STAND TRIAL, WHICH IS TECHNICALLY THE ONLY PART OF OUR MOTION WHICH IS RIGHT. IF THAT IS THE CASE AND THEY DON'T HAVE ANY INTENTION TO CONTEST HIS COMPETENCY TO STAND TRIAL OR SUGGEST HE IS NOT COMPETENT TO STAND TRIAL, THE ONLY EVIDENCE WE REALLY HAVE WITH RESPECT TO THAT IS DR. SCHWARTZ-WATTS' AFFIDAVIT. WE HAVE REVIEWED DISCOVERY PERTAINING TO THE DEFENDANT. WE HAVE REVIEWED STATEMENTS THAT HE MADE. WE HAVE GOTTEN CORRESPONDENCE THAT HE SENT TO THIRD PARTIES AND THERE IS NOTHING IN THERE TO SUGGEST THAT HE IS NOT COMPETENT TO STAND TRIAL. SO, OTHER THAN DR. SCHWARTZ-WATTS' AFFIDAVIT, WE HAD NOT MADE THAT MOTION BECAUSE AT THIS POINT WE DIDN'T HAVE INFORMATION SUFFICIENT TO MAKE IT.

THE RESPONSE INDICATES THAT THEY DON'T INTEND TO SUGGEST THAT HE IS NOT COMPETENT TO STAND TRIAL. IF THAT IS THE CASE, THEN I THINK OUR POSITION WITH RESPECT TO THE NEED FOR THAT

EXAMINATION WOULD CHANGE UNTIL SUCH TIME AS THEY INDICATE THAT THERE IS A CHANGE IN HIS STATUS. WE DO THINK ULTIMATELY, AND THIS IS IN OUR MOTION, AS WELL, THAT THERE WILL NEED TO BE NOTICE TO US THAT THEY INTEND TO PRESENT PSYCHIATRIC TESTIMONY AT SENTENCING, IF THERE IS A SENTENCING PHASE IN THIS CASE, AND ULTIMATELY THAT EXAMINATION IS GOING TO BE REQUIRED. I GUESS FROM ONE OF OUR PERSPECTIVES THIS IS IN SOME WAYS THERE IS NO HARM, NO FOUL. IF WE GO AHEAD AND GET IT DONE BECAUSE WE ARE WILLING TO HAVE IT DONE AND NOT SEE IT UNTIL SUCH TIME AS IT BECOMES NECESSARY FOR US TO SEE IT.

SO, I THINK THE BETTER PART OF WISDOM AND WHAT WE ARE OFFERING TO THE COURT IF THE DEFENSE IS ACCEPTABLE TO IT IS TO HAVE MR. BASHAM TRANSFERRED TO COLUMBIA CARE FOR A PERIOD OF FOUR WEEKS; FOR DR. SCHWARTZ-WATTS TO COMPLETE HER ASSESSMENT; AND THEN FOR US, AT THAT TIME, TO NOTIFY THE COURT. WE HOPE TO BE -- WE HOPE TO BE IN A DIFFERENT POSTURE IN THIS CASE IN APPROXIMATELY SIX TO EIGHT WEEKS WITH RESPECT TO OUR KNOWLEDGE WITH THE DEATH PENALTY ISSUE. A LOT OF THESE ISSUES WILL BECOME MORE RIPE AT THAT TIME.

THE COURT: THE PROPOSAL, AS I UNDERSTAND IT, IS 30 DAYS HERE AT THE -- WHAT IS THE NAME OF IT?

MR. SCHOOLS: COLUMBIA CARE CENTER.

THE COURT: COLUMBIA CARE CENTER. BE EVALUATED BY DR. SCHWARTZ-WATTS, FOLLOWED IMMEDIATELY BY A TRIP TO FEDERAL INSTITUTION FOR EVALUATION THERE?

MR. SCHOOLS: NO. SENT BACK TO THE DETENTION CENTER, ALVIN GLENN, AT THAT TIME. THEN OUR MOTION FOR MENTAL EVALUATION BECOMES MORE RIPE FROM OUR RECEIVING EITHER ADDITIONAL EVIDENCE OR NOTIFICATION.

THE COURT: I THOUGHT YOU WERE ASKING ME TO SEND HIM TO BOTH PLACES AT THIS TIME?

MR. SCHOOLS: NO.

THE COURT: YOU ARE CONCEDING TO A 30-DAY EXAMINATION HERE LOCALLY OR FOUR WEEK?

MR. SCHOOLS: WITH THE UNDERSTANDING FROM THE DEFENSE, I THINK THEY ARE AGREEABLE TO THIS. THERE IS NO PRESIDENTIAL VALUE WITH THIS AGREEMENT OR THE COURT ORDERING HIM TO GO THERE. THAT IS NOT ANY FINDING WITH RESPECT TO THE ISSUES UNDERLYING THEIR MOTION.

THE COURT: MR. HARRIS?

MR. HARRIS: THAT IS CORRECT.

MR. SCHOOLS: WE WOULD LIKE THAT TO BE PART OF THE ORDER.

MR. HARRIS: ABSOLUTELY.

THE COURT: ONE OF YOU ARE PREPARING AN ORDER?

MR. HARRIS: YES.

THE COURT: NEED AN ORDER CONTINUING THIS CASE PAST THE NEXT TERM OF COURT. OBVIOUSLY, THIS IS GROUNDS. DO YOU HAVE AN OBJECTION TO THAT?

MR. HARRIS: NO OBJECTION. WE CAN DO THAT.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FILED

SEP 2 6 2003

LARRY W. PROPES, CLERK
COLUMBIA, SC

| | | |
|---|---|---|
| United States of America, | ) | CR. No.: 4:02-992 |
| | ) | |
| v. | ) | |
| | ) | ORDER EXTENDING |
| Branden Leon Basham | ) | DEFENDANT'S CONFINEMENT |
| | ) | AT COLUMBIA CARE CENTER |
| | ) | |
| | ) | |

By previous order dated June 30, 2003, this court directed the U.S. Marshal Service to transport the defendant, Branden Leon Basham, from the local detention facility to Columbia Care Center for a period of thirty days so that he could undergo psychiatric evaluation. For whatever reason, a copy of the order directing the Marshal to transport the defendant was not received by Marshal. As a result, the defendant was not transported to the Columbia Care Center until August 19, 2003.[1]

On August 21, 2003, this court entered an order authorizing Dr. Donna Schwartz-Watts and Dr. Don Morgan to conduct psychological evaluations of the defendant during his incarceration at Columbia Care Center. The court also ordered, upon motion of the defendant, that no testing or evaluations be performed on the defendant by any employee and/or agent of Columbia Care Center during his incarceration at that facility.

Presently before the court is a motion of the defendant to extend his pretrial confinement at

---

[1] The court was unaware of the fact that the defendant had not been transported until it received a call from the United States Marshal. The Marshal informed the court that counsel for the defendant had arranged for alternative transportation of the defendant, unauthorized by the Marshal, to Columbia Care Center by a state law enforcement officer.

1

JA 0420

Columbia Care Center until October 15, 2003. The motion indicates that the defendant did not begin receiving his prescribed medications until the week of September 8, 2003, three weeks after his arrival at Columbia Care Center. The defendant claims that due to the delay in treatment, Dr. Schwartz-Watts has been unable to properly evaluate the defendant. Dr. Schwartz-Watts believes that the defendant's mental state will be conducive for her interviews during the week of September 29, 2003 and that her examination will be complete by October 15, 2003.

The request to extend the defendant's confinement at Columbia Care Center appears to be reasonable and the court will authorize the additional stay through October 15, 2003. The Marshal shall transport the defendant from Columbia Care Center to the Alvin S. Glen Detention Center on October 16, 2003.

The Clerk is requested to forward a copy of this order to David Cooper, the General Manager of Columbia Care Center at 7901 Farrow Road, Columbia, South Carolina, so that he will be apprised of the developments outlined in this order. The court would respectfully request that Mr. Cooper provide the court with a written report stating when the defendant began receiving his medication and explaining the reason for such delay, if there was any delay.

IT IS SO ORDERED.

Joseph F. Anderson, Jr.
United States District Judge

September 26, 2003
Columbia, South Carolina

2

JA 0421

No. 13-9

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

**JOINT APPENDIX AND INDEX**
**VOLUME 3**

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,          )          Cr. No. 4:02-992
                                   )
                                   )
VERSUS                             )          Columbia, S.C.
                                   )          February 24, 2004
CHADRICK E. FULKS and              )
BRANDEN L. BASHAM,                 )
                                   )
                                   )
          Defendants.              )
------------------------------)

EXCERPT OF MOTIONS HEARING
MORNING PROCEEDINGS
(EXCLUDING THE TESTIMONY OF DAVID HACKER AND SCOTT SMITH)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:          STROM THURMOND, JR., ESQ.
                            U.S. Attorney for South Carolina
                            SCOTT SCHOOLS, ESQ.
                            JONATHAN S. GASSER, ESQ.
                            Assistant U.S. Attorneys
                            1441 Main Street, Suite 500
                            Columbia, S.C.  29201

For the Defendant            JOHN H. BLUME, ESQ.
        Fulks:               KEIR M. WEYBLE, ESQ.
                            1247 Sumter Street, Suite 202
                            Columbia, S.C.  29201

                            SHERI LYNN JOHNSON, ESQ.
                            Cornell Law School
                            Myron Taylor Hall
                            Ithaca, NY  14853

                            WILLIAM F. NETTLES, ESQ.
                            Assistant Federal Public Defender
                            401 Evans Street, Room 240
                            Florence, S.C.  29503

(Appearances continued:)

For the Defendant          JACK B. SWERLING, ESQ.
        Basham:            1720 Main Street
                           Columbia, S.C.  29201

                           GREGORY P. HARRIS, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

Court Reporter:            Gary N. Smith, CM
                           901 Richland Street
                           Columbia, S.C.  29201
                           (803) 256-7743

                 STENOTYPE/COMPUTER-AIDED TRANSCRIPTION


* * * * * * * * * * * * * * * * * * * * * * * * * * * *

          (Defendant Basham not present)

          THE COURT:  All right, this is the case of United States versus Chadrick Evan Fulks and Branden Leon Basham.  I was told by counsel in chambers just a moment ago that Mr. Basham is not having a good day and might not be able to communicate and cooperate with his counsel.

          Mr. Swerling.

          MR. SWERLING:  Judge, Mr. Basham at this point, it appears to Mr. Harris and I, to be incoherent and not understanding the nature and purpose of the proceedings today. He had told us he thinks he's here for trial today.

          One of the things that we are going to be going through are the Jackson versus Denno issues, and I'm particularly concerned about that because of his inability maybe to assist us in that.

He says he doesn't feel good. Apparently there was some attempt last night by him to slash his wrists again, and that's why he's in restraints today. But he says he feels ill. I'm just concerned about proceeding with the Jackson v. Denno hearing specifically.

The other motions, many of them are just legal argument. But I think to be safe and prudent, somebody ought to look at him and see if he is okay and if he's competent to assist us today, and understands the nature of the proceedings and can assist us.

THE COURT: Could we go forward with the Jackson versus Denno on Mr. Fulks? Do you have witnesses here?

MR. SCHOOLS: They were going to be here a little later because we were planning on calling about seven or eight witnesses in regard to Mr. Basham first. But we can get them here. We could argue a few motions, and then we could put on the Jackson versus Denno hearings for Mr. Fulks, and hopefully have Mr. Basham examined. I don't know who is planning to do that examination.

Your Honor, Mr. Basham, based on my recent review of medical records from the Hopkins County Detention Center and the Regional Medical Center in Madisonville, Kentucky, has a history of failed suicide attempts, which clearly would indicate that he's seeking attention rather than attempting to do himself actual harm.

In respect to a particular suicide attempt in February of '01, when Mr. Basham got to the hospital, he wrote a note to the physicians indicating that he had faked a suicide attempt. He was intubated at the time, so they gave him a notepad asking him to write whatever it was he was trying to say. He wrote that he had faked the suicide attempt --

THE COURT: He wrote that he had faked the suicide attempt?

MR. SCHOOLS: Yes, sir. And then as soon as he was -- they took the tube out of his mouth, he got angry, began cussing at hospital personnel, and said he actually had tried to kill himself, but just because he had done that, that doesn't mean they needed to put a tube down his throat.

So, I think there's a lot of evidence that would indicate that Mr. Basham has manipulated his own medical situation for purposes of legal advantage or attention or whatever other advantage he sought to get out of it. So, the timing -- the timing of this alleged illness --

THE COURT: This hearing has been set for what, at least two months?

MR. SCHOOLS: Yes, sir. It was set -- I believe Your Honor held a hearing on January 20th in this case, and been set at least that long since then. And certainly it was noted at that time that Mr. Basham was going to be sent off to Butner, that he would be returning specifically for this hearing on the

24th.

He returned on Friday, as I understand it, and then yesterday apparently made some apparent attempt to kill himself.

So, I just think the evidence is sort of compelling that this is a pattern that Mr. Basham has engaged in. We have got witnesses here from Kentucky, from West Virginia -- let me think -- not West Virgina -- well, we have witnesses here from Kentucky, from Myrtle Beach, and from Brunswick County, North Carolina prepared to testify at this Jackson versus Denno hearing. Mr. Basham knows that, and I think that may very well motivate his illness today -- or alleged illness.

MR. SWERLING: Judge, I'm not making any representations other than the fact that what I find his condition to be. And there is no purpose for our -- no purpose on our part to go ahead and delay the proceedings.

I'm just bringing to the court's attention my concern and Mr. Harris' concern that he appears to be incoherent. I don't know that if that has anything to do with the suicide attempt, I just offer that to the court as a factual issue about what happened last night.

And there has been a history of suicide attempts. Some may have been as Mr. Schools suggested, but others have been apparently serious attempts. In fact, a couple while he's been here in the District of South Carolina.

So, I just want to make sure that he is competent to assist us in these proceedings and understands the nature of the proceedings, and that's my only purpose in bringing it to the court's attention.

THE COURT: Well, most of the testimony at a Jackson versus Denno hearing is from the people who took the statements about his condition.

Now, I assume he -- he might need to be available to give you commentary or advice on how to cross-examine or something such as that.

MR. SWERLING: To that extent, Judge, because the issue is going to be in these Jackson versus Denno hearings whether or not he was given his rights, whether or not he understood his rights, and whether or not there was a waiver of the rights.

THE COURT: All right. Do you intend to put him on the stand on any of these statements regarding --

MR. SWERLING: It was not our intention to do that. But, you know, of course, that could change, based upon what is presented. But it's not our intention to do that, to be frank with the court.

THE COURT: Well, has he ever been adjudicated incompetent at any time in the past?

MR. SWERLING: Let me think about that for a moment.

He has not been adjudicated incompetent to the best

of my recollection.  There have been situations where he has --
there have been notes made about his being sort of out of
touch, talking to himself, and things of that nature.  Which
one of the things he's doing right now, Mr. Harris overheard
him talking to himself.  But I don't believe there has been a
judicial determination ever.

MR. SCHOOLS:  And, Your Honor, not only has there not
been, the defendants have not indicated their intention to
offer such a position in this case.  They have not offered --
they have indicated they don't intend to offer psychiatric
testimony at the guilt phase of the case.

And with respect to the sentencing phase, they are
not suggesting that he is mentally retarded.  So, while they
intend to offer psychiatric testimony, it's not on the issue of
his competency to either understand the unlawfulness of his
conduct or his ability to assist his attorneys.

THE COURT:  Well, let me speak to the -- go ahead.

MR. SCHOOLS:  And I was just going to say, with
respect to the Jackson versus Denno hearing, Your Honor's
question raised a point that actually was raised in our
memorandum, and it may pertain to how we proceed here, because
I'm not exactly sure -- Mr. Swerling and I spoke about this
last night, I'm not exactly sure what his position is.

If his only position is that he needs to call the law
enforcement officers so that they have on the record whether

they did or did not Mirandize Mr. Basham and their assessment of whether he understood what was going on, and Mr. Basham doesn't intend to testify -- as Your Honor had noted, this hearing has been pending for a long time.  They have had access to Mr. Basham to talk about these statements.  We have provided discovery on these statements for a long period of time.

I think Your Honor could question Mr. Basham to determine whether there is really a legitimate need to have a physician examine him at this point.  But, again, part of my issue is, I don't know what the allegation is with respect to these statements.

They filed a very generic motion to dismiss.  And as we noted, if what they are suggesting is that the statements weren't voluntary, then they may be boxing themselves into a position that they can't claim later that he was attempting to assist law enforcement when he provided those statements.

And it would seem that Mr. Basham's appearance or his ability to assist in this hearing is directly relevant to that particular issue, which is what is in dispute.  If it's in dispute that he voluntarily waived his rights, and that's what we are here for, then I think maybe Mr. Basham's participation in this hearing is more important than not.  The only thing --

THE COURT:  Well, you do raise a good point, I hadn't thought about it.  It's a two edged sword to raise a voluntariness issue in a death penalty case, because if I hear

the testimony and determine the statements were voluntary, they come in.

MR. SCHOOLS: Yes, sir.

THE COURT: Then if he gets convicted and we move into the penalty phase -- I don't know, I never thought about it -- but I probably would disallow the defendants from trying to suggest to the jury that he should get some credit for his statements if he tried to keep them out.

That's not a ruling, I'm just saying that's something we have to think about, which makes it kind of more critical that they be allowed to talk with him to decide which way they are going to go on that.

MR. SCHOOLS: Well, Your Honor, they have had access to him since April of last year.

THE COURT: Right.

MR. SCHOOLS: And they have known these issues were coming. And, I mean, I would presume that before arriving here today, Mr. Harris and Mr. Swerling have met with Mr. Basham to discuss these issues and talk about what position they are going to take here.

THE COURT: All right, let me speak to the marshals. Mr. Bruton, have you been handling the defendant since he got in the building this morning?

THE DEPUTY MARSHAL: Just briefly.

THE COURT: Was it some of your associates that

brought him here from -- do you know?

THE DEPUTY MARSHAL: Yes, sir, I did, I brought him up.

THE COURT: All right, give us your name for the record.

THE DEPUTY MARSHAL: Deputy U.S. Marshal Ben Harrison.

THE COURT: All right, what can you tell me about the defendant's condition while you were transporting him?

THE DEPUTY MARSHAL: While we walked up from the cell block I had two conversations with him. He actually discussed what had happened in the jail over the last couple of days.

THE COURT: I know you are not an expert and you didn't come prepared to testify, but did he appear to be able to converse and understand what's happening?

THE DEPUTY MARSHAL: Yes, sir, he did.

THE COURT: Was there anybody else that dealt with him besides yourself?

THE DEPUTY MARSHAL: There was one that accompanied me up, but he is not in the courtroom right now.

THE COURT: Is he in the building?

THE DEPUTY MARSHAL: Yes, sir, he is.

THE COURT: Could y'all see if you could summon him, just for what it's worth.

MR. SWERLING: Judge, while we are waiting --

THE COURT: Go ahead, go ahead.

MR. SWERLING: While we are waiting for the other marshal, in response to what Mr. Schools said, Judge, there are nine or 10 statements that the government intends to try and offer. Because of Mr. Basham's history, his mental history, and his low intellectual and intelligence capacity, what we are asking the court to do is to make a threshold determination as to whether or not he was given his rights and whether or not he waived his rights.

THE COURT: All right.

MR. SWERLING: We are not necessarily contending that the statements were voluntary, but we think it is prudent to go ahead and make the determination under 104 that the statements are in fact admissible. We are not -- we do not intend, as I told you, to present testimony at this point, so I don't think we are making -- raising inconsistent positions.

THE COURT: Well, I didn't mean to suggest you were. All I meant to say was, that is a point that militates in favor of your being able to discuss with him what is happening today, even if he's not going to take the stand.

MR. SWERLING: Yes, sir.

THE COURT: Because it could have some collateral effect later. I'm not saying it would --

MR. SWERLING: I just wanted you to understand, as I told Mr. Schools, that we think it's prudent to go ahead and

have the court pass on the voluntariness of the statements without us necessarily arguing vigorously that they are not voluntary.

THE COURT: All right. All right.

MR. SWERLING: This is a unique situation, it's a death penalty case. He has had many, many commitments to different institutions, he has low intellectual capacity. And I just think the record ought to reflect whether or not the court thinks the statements are voluntary before they are admitted and played before the jury.

THE COURT: Well, while we are waiting on the other marshal -- is he on the way?

THE DEPUTY MARSHAL: Yes, sir, he is.

THE COURT: Mr. Swerling, you know, I'm not choosing up sides here, but it is very unfortunate that -- this case has been pending for over a year now. The government has subpoenaed people from distant states. This hearing has been set for quite some time, and we are ready to go.

I have a major trial starting next Monday that's going to take eight weeks of trial testimony. A hard fought case, two billion dollars at issue in a securities fraud case. And if we don't rule on these motions this week, I don't know when -- I will have to interrupt that trial to hear these motions, and when and if your client is able to assist. And the government has suggested that he might be feigning. I

don't know.

MR. SWERLING: Judge, I don't know.

THE COURT: I know my daughter took a course at -- my daughter is a third year medical student down at Emory. She took a -- she was a sociology major, and she told me about a famous study that was done, and she actually gave me the textbook that has it where they took 100 people who were perfectly sane, and said, "We want you to go be interviewed by doctors and see if you can fake them out and convince them that you are not competent." And about 90 percent of them succeeded.

The point being it's very easy to fake it. And I'm not saying I'm relying on that. If you want me to, I'll go back to my office, it's in my library. But I'm just saying, we could have a very difficult time ever trying this case if the day of the hearing your client gets a plastic fork, cuts his wrist, and then starts talking to himself.

MR. SWERLING: Judge, I understand, and I'm not making the representation, other than I'm just reporting to the court what I think --

THE COURT: Right, I understand. I'm not -- don't get me wrong, I'm not casting any aspersions. I'm just thinking out loud that -- when and how are we going to get this case moving along.

MR. SWERLING: As far as -- I would just feel more

comfortable at this point for future reference that somebody spoke with Mr. Basham who had some medical background. We could maybe get somebody over here fairly quickly, and then we could go on. I'm not --

THE COURT: Does the government have anyone you can suggest that could examine him here locally?

MR. SCHOOLS: Beg the court's indulgence one second.

MR. SWERLING: Judge, Mr. Harris is -- I mean, he -- basically what he's saying is that obviously one of the problems we have had, as the court knows, there's been some medication problems. And we think probably we ought to just check that also, make sure that the jail has gotten him back on the medication he's supposed to be on.

THE COURT: Right.

MR. SWERLING: Because the problems we have had over the last year have been when the medicines have not been regularly disbursed -- dispensed.

MR. SCHOOLS: Judge, we don't know her availability, but Dr. Pam Crawford is a forensic psychiatrist who Mr. Gasser has worked with on occasions.

Now, we had at one point, before we were aware that this case -- that the defendants were going to be sent to Butner, talked with Ms. Crawford about the possibility of being retained by the government as an expert, but that never happened. But she is someone who -- she's available to

potentially see --

THE COURT: Well, do you want to take a recess and see if you can contact her, and then y'all can see if y'all can contact y'all's expert?

MR. SWERLING: Dr. Watts. I'm sure we can contact her real quick.

THE COURT: What time will your people be here for the other hearings relating to Mr. Fulks?

MR. SCHOOLS: They are just at the Adam's Mark Hotel, I think, so we can get them here within 15 or 20 minutes.

THE COURT: Well, let's do this, let's take a recess, call the people at the Adam's Mark, bring them on over here, and we will start with the testimony on the Fulks' statements.

And meanwhile, y'all both see if you can get him examined sometime today. I mean, like by lunchtime if possible.

MR. SCHOOLS: Yes, sir.

THE COURT: Let's do that. Let's take a 20 minute recess.

(Short recess)

THE COURT: All right, are we ready to move forward on the Fulks' hearings?

MR. SCHOOLS: Yes, sir. And we were able to get in touch with Dr. Crawford. She indicated at the time I spoke to her, which was about 30 minutes ago, that she would -- it would

take her an hour to get here, so she should be here in about a half-hour.

THE COURT:  All right.  Now, what about your expert?

MR. SWERLING:  Your Honor, Dr. Donna Watts -- Schwartz-Watts, will be calling back.  And then Ms. Floyd is going to let me know and I'm going to run in there and get the phone call.  We have alerted her office, though.

THE COURT:  Well, I have asked them to take him downstairs to the holding cell downstairs.  Hopefully he can be interviewed here in the building.  There are four marshals who interacted with him this morning, two who brought him over and two who assisted him in the building.  And I would like for the doctors to be able to talk to those marshals as well, and I have asked -- they will to be available for interviews, if the doctors deem it necessary.

MR. SWERLING:  Judge, I can tell you this, that I did speak with the jail and he was given medication this morning, Seroquel, Zoloft and Concerta.  But he was also prescribed by Dr. Morgan, a -- Neurontin, which the jail indicated that when he came back from Butner, it was not on the sheet to give him.  But it was on the sheet to give him before he went to Butner, and Mr. Harris tells me that's an anti-psychotic medication.

THE COURT:  You mean, Butner wrote out a new sheet?

MR. SWERLING:  Gave him a sheet when he came back, only had the three meds on it --

THE COURT: You are saying Butner made out a new sheet of what medicine he needed?

MR. SWERLING: Apparently so. When he came back in on Friday, I just spoke with the --

THE COURT: Did they prescribe -- did the doctors up there make a determination he didn't need the medicine?

MR. SWERLING: Not that we are aware of. Because that was one of the things that Dr. Morgan had insisted on, that he be on the Neurontin. And when he went to Butner, he was on it and the jail was giving it to him, administering it as per the orders of Dr. Don Morgan.

THE COURT: All right.

MR. SWERLING: Your Honor, remember, we had that issue when he was at Just Care, and that's what Dr. Morgan put him on. So, that may be explaining something.

THE COURT: Well, all four marshals said he was fine up until three minutes before the hearing started. They said transporting him back from Butner, he was very lucid, fluent. This morning in the building, coming up the elevator, he had normal conversations.

We came out for the 9 o'clock hearing, he appeared to be fine. Went back in after the 9 o'clock hearing, took about 15 minutes, and only when they were bringing him back in for the 9:30 hearing did he start talking to himself and become -- and appear to be incoherent.

What that means, I don't know.  Maybe the medicine -- maybe the lack of medicine just happened to kick in right at the time the hearing was to begin, that's possible.

All right, well, we will just ask you all to be on standby.  And if and when the doctors get here, we will hear from them and make a determination.

MR. SWERLING:  Judge, could I just sit here and --

THE COURT:  You are certainly welcome to stay, yes, sir.

(Thereupon, following the testimony of David J. Hacker and Leonard Scott Smith, which has been previously transcribed, the following proceedings were had:)

THE COURT:  Mr. Thurmond, this statement apparently goes to show an intention to escape.  In other words, it shows a --

MR. THURMOND:  Yes, Your Honor.  And he escaped the next day, Your Honor.

THE COURT:  And what we are dealing with here is a so-called spontaneous utterance after being Mirandized, not in response to a question?

MR. THURMOND:  He had not been Mirandized, Your Honor, by this detective.  And, you know, on the contrary, this detective said, "I don't want to talk to you," and that's when Mr. Fulks made his statement.  So, it's the government's contention it's a spontaneous utterance.

THE COURT: Okay. The witness said that Mr. Fulks said he wanted to speak. And the agent said, "No, I can't talk to you, you have requested an attorney."

MR. THURMOND: Yes, sir, that's correct.

THE COURT: So, he recognized the Miranda even if Miranda hadn't been provided for?

MR. THURMOND: Yes, sir. And that was because several weeks prior to, he had attempted to interview Mr. Fulks on these charges, and Mr. Fulks invoked at that time.

THE COURT: Anything you want to say or present, Mr. Nettles, on this statement?

MR. NETTLES: Judge, in regard to this statement, based on the detective's testimony that he only recalled the gist of what was said, we take the position that that statement is too unreliable to introduce into a capital proceeding.

He never wrote it down, he never spoke to -- he never communicated that in writing to any other detective with the Kentucky state police. This matter was quickly investigated by that agency, and he in fact was part of the investigation for Mr. Hawkins. It just defies belief that this statement was not written down and that this jury would hear something so unreliable at this time, Judge.

THE COURT: Mr. Thurmond, anything in response?

MR. THURMOND: Your Honor, I think Mr. Nettles' argument goes to the weight of that evidence rather than its

admissibility, and I'm sure he would want to explore that on cross-examination.

THE COURT: You took the words right out of my mouth, that's what I was going to say. If he can't recall precisely what was said, that's certainly proper grounds for cross-examination at trial, but I think it goes to the weight and not the admissibility.

And the fact that he didn't memorialize it in writing, you know, you can explore all that in front of the jury. But based on what I have heard, I would deny the motion to suppress this statement. And if we get into a penalty phase, I will admit it before the jury.

What's next?

MR. SCHOOLS: Your Honor, that's it with respect to the Jackson versus Denno part of the hearing with respect to Mr. Fulks. There were -- Mr. Fulks spoke with law enforcement in the presence of his attorneys on April 21st of '03, and on September 8th of '03, but their motion specifically excluded those statements from their request to suppress statements, so we have not and don't intend to present any evidence with respect to those statements.

THE COURT: And the attorney was there at his side when he made those statements?

MR. SCHOOLS: Yes, sir.

MR. NETTLES: That's correct, Judge.

THE COURT: So, there is no effort to challenge those statements?

MR. NETTLES: No, sir.

MR. SCHOOLS: Your Honor, Dr. Crawford is here, so I don't know how you want to proceed at this point. There are some motions -- because of the court's procedure on the motion to adopt all motions, technically all pending motions are pending on behalf of Mr. Basham as well. So, I don't know that we can proceed.

THE COURT: There is nothing that is peculiarly unique to Mr. Fulks we could take up?

Mr. Nettles, are you aware of anything?

MR. NETTLES: No, sir, Judge.

MS. JOHNSON: No, Your Honor, there is nothing unique. But maybe it would be worth describing what it is we think we are going to do when the rest of the motions are done -- when the rest of the hearing is done, just to sort of see where we are.

THE COURT: Well, I don't want to do too much of that without Mr. Basham in here.

MS. JOHNSON: Okay.

THE COURT: I'm going to take up everything we can take up. I mean, there are a number of motions that have been pending for months and months and months, and we have been pointing to this series of hearings for a long time. And I

intended to hear and rule upon everything that I could, including the severance motion, the continuance motion, the idea of dual juries, and then all the other death penalty related motions that have been filed.

MS. JOHNSON: Yes, Your Honor. All I really meant to do was describe the order in which I thought we would proceed with those motions. But if you don't want to hear that until he's back --

THE COURT: Well, I just -- I don't want to, you know, create any procedural errors or discuss the substance of the case or even the procedure of the case when one defendant is not present.

MS. JOHNSON: Yes, Your Honor.

THE COURT: I wish we could, but I'm just reluctant to do that.

MR. SCHOOLS: Your Honor, there is one motion that defendant Fulks has filed that the defendant Basham does not join in, and that is the motion to admit polygraph evidence.

THE COURT: Right.

MR. SCHOOLS: The defendant Basham may in fact --

THE COURT: All right, well, let me say, I don't want anyone in this courtroom to disclose the polygraph results. We can discuss this motion without disclosing the results. And let me say -- let's get into that.

The Fourth Circuit has clearly ruled that even after

the Daubert decision, polygraph examinations are per se inadmissible.

Now, if we get to a penalty phase, the rules of evidence don't apply. And the briefs that I received did not address the question of whether the polygraph results might be admissible at the penalty stage.

So, I think what I need to do is deny the motion as it is presently written and invite the parties to brief that issue on the penalty phase, because the statute provides that -- y'all can sit down. I'm going to hear from you in a minute. Y'all can have a seat.

MS. JOHNSON: Your Honor, I believe it is briefed in the penalty phase as well. But I have to say, this is the one motion that lead counsel wished to argue himself, and so I'm reluctant to proceed on that unless you really insist.

THE COURT: All right. I can't even get into that one.

Mr. Blume's wife is having surgery right now, so he's not here. All right, is your doctor downstairs talking --

MR. SCHOOLS: She's right here. I don't know what the access situation is, Judge.

THE COURT: She's here, I'm sorry. Yes, ma'am, give us your name, please?

DR. CRAWFORD: Pam Crawford.

THE COURT: Ms. Crawford. I asked -- I appreciate

you coming over on short notice.

DR. CRAWFORD: Yes, Your Honor.

THE COURT: I assume you were working for the government in this case. One of the two defendants in this case came into court this morning apparently incoherent, talking to himself, and not able to communicate with his lawyers.

I conducted a very quick hearing and talked to the marshals who brought him here, who said he was fine up until the moment the hearing started.

I don't want to be cynical and assume that he's faking it, so to speak, and I thought it was important enough to get you in here to examine him. But I would like for you to examine him, and the four marshals who interacted with him prior to today's hearing.

DR. CRAWFORD: Yes, sir.

THE COURT: And then you can certainly talk to his lawyers, if you want to talk to them, to find out what you can about his behavior.

DR. CRAWFORD: Yes, sir.

THE COURT: And then their doctor is on her way over here as well to examine him. And then I might need to hear from both of you later today to make a determination as to whether we can go forward.

In a criminal case everything stops if the defendant

cannot be present. And if he's not competent, he can't be present, so we are -- we are deadlocked in this case until, you know, he's able to help his lawyers and understand what is going on.

DR. CRAWFORD: Your Honor, it would be very helpful if I could look at his medical records. The medical records would give me a base line to where he is. I know very little about the case. If there is any record or --

THE COURT: Mr. Swerling, what about -- this is the issue we talked about this morning.

MR. SWERLING: The recent -- his most recent records are from Butner --

THE COURT: Well, as we said this morning, you started subpoenaing records back last October. I think she's entitled to whatever you have up through today in terms of medical records.

And you have got plenty of paralegals and assistants that I have authorized the government to pay for who ought to be able to pull that up on short order. So, I'm going to require you to produce them for the doctor. All records you have in your possession -- medical records up until today.

MR. GASSER: Your Honor, I would also respectfully request, having worked with Dr. Crawford and Mr. Basham's -- Dr. Donna Schwartz-Watts, I know that given this issue that's before the court this morning, that they would also want --

probably have the access to interview the marshals that had an opportunity to observe him and communicate with him earlier this morning.

THE COURT: Well, I said that.

MR. GASSER: I'm sorry.

THE COURT: I want her to talk -- I have already told the marshals to not leave today, I want them to be available.

MR. GASSER: Okay.

THE COURT: And, Mr. Swerling, what was the medication precisely that did not come back on the sheet from Butner?

MR. SWERLING: Neurontin.

THE COURT: Can you spell that for me?

MR. SWERLING: N-e-u-r-o-n-t-i-n.

THE COURT: Say it again, n-e-u --

MR. HARRIS: N-e-u-r-o-n-t-i-n.

THE COURT: All right. And you say it was on his list of prescribed medicines --

MR. HARRIS: He had been taking four prescription medications for the past eight months.

THE COURT: Right.

MR. HARRIS: When he came back the Neurontin was not given to him, and it has not been given to him.

THE COURT: But Mr. Swerling said that the sheet that came back from Butner indicating his prescribed medicines did

not list it?

MR. HARRIS: I don't know why it wasn't, Judge, I just note the fact that he wasn't given that medicine.

THE COURT: Now, that's something different. Whether he wasn't given it is one thing. But I was told earlier that the sheet that came back from Butner told the doctor down here to give him three medicines, not including Neurontin. Now, is that not correct? Because I'm going to call Butner and find out why that happened.

MR. SWERLING: Judge, as I said before, I spoke with the people at the medical facility at the Alvin Glenn Detention Center, and they said when he came back on Friday only the three drugs I mentioned were on the sheet from Butner.

THE COURT: All right.

MR. SWERLING: But when he went up there, he was being given Neurontin.

THE COURT: All right.

MR. SWERLING: So, I do not know why it did not come back that way.

THE COURT: All right, Mr. Schools, what are we -- you want to take an early lunch break and --

MR. SCHOOLS: That's what I would propose, Your Honor.

THE COURT: How about Dr. Schwarts-Watts, what's --

MR. SWERLING: Judge, she's on her way.

THE COURT: She's on her way?

MR. SWERLING: Yes.

THE COURT: Okay.

MR. SWERLING: Judge, can we be present when they interview --

THE COURT: You can be present.

MR. SWERLING: Okay.

THE COURT: Yes, sir.

MR. SWERLING: And, Judge, what may be necessary, is if we go over to my office and review the records, because it's kind of bulky.

THE COURT: Come back at 2 o'clock?

MR. SCHOOLS: Okay.

THE COURT: Let's plan on coming back at 2 o'clock, unless one or both doctors tell me they cannot conclude their evaluation by then.

MR. SCHOOLS: We will be here.

THE COURT: That gives them almost three hours.

MR. SWERLING: Judge, I would assume -- or maybe not assume, but based on prior rulings by the court, that the government is not allowed to have access to these records until a later date. So, I assume anything that Dr. Crawford sees--

THE COURT: Dr. Crawford, whatever medical records you look at, don't share it with the government lawyers.

DR. CRAWFORD: All right.

THE COURT: Just use it for your own evaluation.

DR. CRAWFORD: Yes, Your Honor.

THE COURT: But I have required them to give you all the medical records they have subpoenaed, which might be quite a few, in case you need them.

DR. CRAWFORD: Thank you, Your Honor.

THE COURT: All right. Well, let's just recess until 2 o'clock. Let me just say in terms of the continuance motion, I think the fairest thing to do -- and Mr. Basham is not here, but this is just strictly stream of consciousness here -- I think I'm going to say the trial will not begin any sooner than three months after the government turns over its last forensic test. And that will give the defendants three full months to do any additional testing they need on the forensic.

And, I mean, that's not my final decision, that's just what I'm thinking about doing, which could very possibly push us into starting the trial the first week of the summer, which is not good when you have a six to eight week trial with -- the way I figure it, the summer is about 10 weeks long, so any given week, 10 percent of the jurors are going to have a vacation planned. And I don't know how to handle that. But just be thinking about it.

My thought was, if we have to bump the trial back a little bit and get into the summer, we could start drawing the jury in June, which would only require the jurors to come in

one day in the month of June, and then plan to kickoff the trial the Monday following the 4th of July.

And we could -- and by then the summer would be half over, so the jurors who took their vacations in May and June and early July would be available from July forward. I mean, I'm just thinking out loud.

MR. SCHOOLS: Your Honor, obviously I would like to be heard at length on that whole continuance issue. I think that --

THE COURT: All right.

MR. SCHOOLS: And I know now is not the time --

THE COURT: That's not my ruling, that's just my thought. I just think in fairness to the defendants they need three months to prepare on something as serious as this to meet any forensics that your people -- now, maybe you can convince me that the forensics don't really prove anything and you are not going to use hardly any of them. And, if so, we may stick to our April the 19th date.

Now, let me just tell you, I was in here all day yesterday on a pretrial conference on my securities fraud case. The plaintiffs estimate the case is going to take four weeks, the defendants estimate it's going to take eight weeks.

And we had about 25 defense lawyers in a case involving, as I said, $2 billion in provable stock losses, and two of the defendants have pled guilty in criminal court in New

York. So, arguably there's some culpability somewhere and some real big damages, which points to a hard fought trial. And it's four years old, it's a four year old case, and I have got to try it.

So, Mr. Schools, I'm saying, I may not be available April the 19th.

MR. SCHOOLS: Yes, sir. I think our compromise position, based on our inability to get forensic results finally here at this point, would be to push the case back until May 3rd, and we will make an argument why we think that accommodates --

THE COURT: We will talk about that when we get -- if we get Mr. Basham back.

MR. SCHOOLS: Yes, sir.

THE COURT: All right. Then we will be in recess until 2 o'clock.

MR. SCHOOLS: Thank you.

THE COURT: All right.

(Thereupon, the morning proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____        _____

s/ Gary N. Smith, CM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 4:02-992 |
| | ) | |
| | ) | |
| VERSUS | ) | Columbia, S.C. |
| | ) | February 24, 2004 |
| CHADRICK E. FULKS and | ) | |
| BRANDEN L. BASHAM, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------) | | |

EXCERPT OF MOTIONS HEARING
EVIDENTIARY HEARING - AFTERNOON PROCEEDINGS

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:          STROM THURMOND, JR., ESQ.
                             U.S. Attorney for South Carolina
                             SCOTT SCHOOLS, ESQ.
                             JONATHAN S. GASSER, ESQ.
                             Assistant U.S. Attorneys
                             1441 Main Street, Suite 500
                             Columbia, S.C.  29201

For the Defendant            JOHN H. BLUME, ESQ.
        Fulks:               KEIR M. WEYBLE, ESQ.
                             1247 Sumter Street, Suite 202
                             Columbia, S.C.  29201

                             SHERI LYNN JOHNSON, ESQ.
                             Cornell Law School
                             Myron Taylor Hall
                             Ithaca, NY  14853

                             WILLIAM F. NETTLES, ESQ.
                             Assistant Federal Public Defender
                             401 Evans Street, Room 240
                             Florence, S.C.  29503

(Appearances continued:)

For the Defendant Basham:  JACK B. SWERLING, ESQ.
1720 Main Street
Columbia, S.C.  29201

GREGORY P. HARRIS, ESQ.
1720 Main Street
Columbia, S.C.  29201

Court Reporter:  Gary N. Smith, CM
901 Richland Street
Columbia, S.C.  29201
(803) 256-7743

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

* * * * * * * * * * * * * * * * * * * * * * * * * * *

THE COURT:  Mr. Swerling, what can you tell us about the status of your client?

MR. SWERLING:  Judge, Dr. Donna Schwartz-Watts, who has been hired by the defense to evaluate Mr. Basham, who has been involved with him for some -- several -- many months, talked to him.  And so far as she is concerned he is competent.  She does not see any issue related to competency.

The issue was whether or not he had taken some -- too much medicine last night, medications, and that he was appearing to be drowsy.  And she was concerned about the blood levels of those drugs in him as to how they would affect him throughout the afternoon.

During the lunch hour, we went back to my office and she looked up the half life of the particular drugs that he ingested last night, and as I understand it, they are peaking

about now, and so we would expect it not to be a problem the rest of the day.

THE COURT: How did he get drugs in jail?

MR. SWERLING: Apparently through some other inmates, Judge. And we verified that there were some found in the cell and -- it was Tylenol, it was not any kind of controlled substance.

THE COURT: All right.

MR. SWERLING: But he took enough Tylenol to cause the problem, and possibly some -- but we are prepared to go forward.

THE COURT: All right. Dr. Schwartz-Watts, can you confirm that? You are of the opinion that Mr. Basham is prepared to go forward today and he can communicate with his attorneys and assist them if necessary?

DR. SCHWARTZ-WATTS: Yes, Your Honor. He's sleepy, but if -- it appears, as Mr. Swerling mentioned, he had also taken another medication called Remeron, which is for depression, that makes you sleepy. And Dr. Parker and I looked it up, it peaks at two hours. And he should be over that peak by now, and I suspect that as the afternoon goes on that he will become more awake.

THE COURT: All right.

DR. SCHWARTZ-WATTS: But he's just a little sleepy.

THE COURT: All right, thank you very much.

MR. SWERLING: Judge, at the end of the day there's another issue we would like to take up related to that, that it would not affect this --

THE COURT: All right, let me say, because of a meeting I have at the law school, we are going to have to adjourn at 4:15 today. The next two days can go as late as it takes, but we have got to stop at 4:15 today.

Which I apologize, I know you all have got people here from distant places, and it's just something I have no control over.

All right, Mr. Schools, are you ready for your next witness?

MR. SCHOOLS: Your Honor, our next statement would be one that we stipulated with respect to the testimony and what it would be. Mr. Swerling, Mr. Harris, and I met a week ago Monday to talk about these statements. And with respect to the first very brief statement, Mr. Swerling agreed that we didn't need to bring this witness to testify, but we agreed to what he would say.

And this is Lieutenant David Slone with the Ashland Police Department in Kentucky. Lieutenant Slone was on site when Mr. Basham was arrested.

And just to sort of very briefly set that stage, Your Honor, on November 17th of 2002, the evidence would indicate that Mr. Basham approached two women in the parking lot of a

mall in Ashland, Kentucky and displayed a firearm to them, in what we believe was another car-jacking attempt.

While he was making that attempt, one of the potential victims was on the telephone, and he apparently got scared by the fact that she was on the phone and didn't know who she was talking to.

That witness, that victim, or potential victim, then called 911, provided a description of Mr. Basham to law enforcement, and that description went out over the Ashland Police Department dispatch.

Officer Mack Davis was at that time located across the street from the mall, and he saw an individual matching the description he had heard over the radio, crossing the street right adjacent to his vehicle.

He then exited his car and began a foot pursuit with Mr. Basham, during which time Mr. Basham fired one shot in the air and then turned and fired a shot at Officer Davis. Officer Davis fired two shots at Mr. Basham, and then continued pursuit.

Mr. Basham then got beyond the railroad cars that were located in a rail yard. They are right adjacent to the Ohio River. There are some rail cars there, and Mr. Basham got behind those railroad cars, at which time Officer Davis realized that he couldn't go back behind the rail cars because he would be obviously a sitting duck for Mr. Basham.

He then pulled back and waited for assisting officers to arrive, and that happened.  Those officers waited for a time period, they really were just waiting for the suspect individual to reappear or to emerge.

Sometime later, about 45 minutes later, I believe, the officers spotted an individual walking back across the railroad tracks.  One of the officers announced over the radio that the officer crossing the tracks should identify himself.  When they got no response, they realized that the individual crossing the tracks was in fact Mr. Basham, their suspect.

At that time Lieutenant David Slone was the first one on the scene and he ordered Mr. Basham to get on the ground, and to put his hands behind his back.

In response to that, Mr. Basham said words to the effect of, "I don't know what you are arresting me for, I'm just walking across the tracks," indicating his lack of understanding of why he would be a person of interest to the Ashland Police Department.

And that is the initial statement that we would intend to offer through Officer Slone.  Mr. Basham's assertion that he didn't understand why he was being of concern to the Ashland police officer.

Obviously he had not been Mirandized at that point, but our position is he was not interrogated.  Officer Slone, Lieutenant Slone simply gave him a directive to get on the

ground. And at that time Mr. Basham feigned ignorance as to why he would be of interest to the Ashland Police Department, and that's the statement -- the first statement that we would intend to offer from Mr. Basham.

THE COURT: And you are making a proffer that if called, that is what Officer Slone would say?

MR. SCHOOLS: Yes, sir, by agreement with Mr. Swerling.

THE COURT: All right, Mr. Swerling, do you concede that is an accurate representation of what the officer would say if called?

MR. SWERLING: Yes, sir.

THE COURT: All right. So, this is your motion, I know the government has the burden of proof on voluntariness, but is there anything you want to say or present?

MR. SWERLING: With respect to that particular statement, we do not have any objections to that statement coming in.

THE COURT: All right.

MR. SWERLING: I don't think it would come within the purview of any Miranda warnings.

THE COURT: All right, without objection that statement will be admitted. What's next?

MR. THURMOND: Your Honor, the government calls captain Todd Kelley.

THE CLERK:  Mr. Kelley, please come forward to be sworn.  Place your left hand on the Bible and raise your right hand.  State your name for the record.

THE WITNESS:  William Todd Kelley.

THE CLERK:  Please spell your last name.

THE WITNESS:  K-e-l-l-e-y.

WILLIAM TODD KELLEY, SWORN

DIRECT EXAMINATION

BY MR. THURMOND:

Q.  Captain Kelley, where are you employed?

A.  City of Ashland, Kentucky Police Department.

Q.  About how long have you been there?

A.  16 and-a-half years.

Q.  Were you on duty on November 17th of 2002?

A.  No, I was not.

Q.  Did you have an occasion to respond to the railroad yard, however, in Ashland on that date?

A.  Yes, I did.

Q.  For what purpose?

A.  It was a call out in the evening time.  As a division commander of my patrol division I responded to the scene of an officer involved in a shooting incident.

Q.  And was the person believed to have shot at an officer arrested?

A.  Yes, sir.

Q.   And would you tell us who was arrested?

A.   He was later identified as Branden Leon Basham.

Q.   And approximately what time was this individual arrested?

A.   At 2111 hours.

Q.   Once Mr. Basham was in custody, was he advised of his constitutional rights?

A.   Yes, he was.

Q.   And where did that take place?

A.   Just south of the railroad tracks on an OfficeMax parking lot.

Q.   Do you recall what Mr. Basham was wearing at the time?

A.   He was wearing dark clothing, a black jacket, and dark pants.

Q.   And who advised him of his constitutional rights?

A.   I did.

Q.   And what time did you advise him?

A.   Shortly thereafter, within seconds.

Q.   And who else was present when you advised him?

A.   Sergeant Forest DeLong, Lieutenant David Slone, Patrolman Matt -- or excuse me, Matt Davis, Patrolman Rob Brunty and Patrolman Angel O'Pell.

Q.   Specifically what rights did you advise him of?

A.   Immediately informed him that he had the right to remain silent, anything that he would say would be used against him in court.  He had a right to talk with an attorney before we asked

him any questions, and that he had the ability to talk with an attorney during any questioning.

Also afforded him an opportunity to be appointed a court appointed attorney, and that if he decided to answer questions now without an attorney present, that he would be able to stop answering questions at any time.

Q.  Did you ask Mr. Basham if he understood these rights?

A.  Yes, I did.

Q.  And how did he respond?

A.  With a nod of the head yes, and verbally yes.

Q.  And was his speech coherent?

A.  Yes.

Q.  Did he appear to be under the influence of any alcohol or drugs at the time?

A.  No.

Q.  Did you attempt to question Mr. Basham?

A.  No, I did not.

Q.  Well, why not?

A.  In the outcome of the incident, it was not my responsibility to do so.

MR. THURMOND:  That's all the questions I have for you at this time.  Please answer any questions for Mr. Basham's attorneys.

MR. HARRIS:  Thank you, Judge.

CROSS EXAMINATION

BY MR. HARRIS:

Q.  Lieutenant Kelley, this was in November, correct?

A.  Yes, sir.

Q.  And this was in Ashland, Kentucky?

A.  Yes.

Q.  About what was the temperature that day?

A.  It was very cold, the exact temperature I do not know.

Q.  Below 40, wasn't it?

A.  I believe so.

Q.  And this was at -- I think you said 2111 hours, which is 9:11 in the evening, correct?

A.  Yes.

Q.  And my client, Mr. Basham, when you saw him had just exited the river?

A.  Yes.

Q.  Within a matter of minutes?

A.  Yes.

Q.  And was he dry or was he wet?

A.  He was wet.

Q.  Was there a dry part on his body?  Was anything on him dry?

A.  From the waist down he was wet.

Q.  Okay.  What was his physical condition when you first approached him?

A.  As far as I could tell, other than wet, he was able to move about, talk, walk.

Q.  Shivering?

A.  Not initially, no.

Q.  The fact of the matter is, sometime after that you had to take him to the hospital because you were concerned about hypothermia, weren't you?

A.  Yes.

Q.  So, he was cold, wasn't he?

A.  Yes.

Q.  It was a cold night, he's soaking wet, and you asked him certain questions?

A.  I did not, no.

Q.  Some people, after you Mirandized him, asked him certain questions?

A.  Yes.

Q.  Now, you say he was coherent?

A.  Yes.

Q.  And what do you mean by "coherent"?  Would you tell me exactly what you mean when you say someone is coherent?  What does that mean to you?

A.  I could hear him answering questions from the other officers.  He was able to speak, was nothing abnormal that I could hear.

Q.  Okay.  Was he cursing you?

A.  No.

Q.  Was he cursing anyone?

A.   I did not hear anything, no.

Q.   Did you hear him raise his voice at anyone?

A.   No.

Q.   Did you hear him in any way after he had -- after you had come into contact with him threaten anyone in any way?

A.   No.

Q.   Did you see him strike anyone?

A.   No.

Q.   Touch anyone?

A.   No.

Q.   Do anything whatsoever towards one of the officers in an attack mode, so to speak?

A.   No.

Q.   Now, you say that -- you looked -- you were asked whether or not he was on drugs, how can you tell?

A.   Just my visual observations.

Q.   Did you check into the pupils of his eyes and see if they were dilated?

A.   No, I did not.

Q.   Did you check to determine whether or not he, for instance, had dry -- cotton mouth?

A.   No.

Q.   Did you ask him if he had been taking drugs?

A.   I did not, no.

Q.   So, the statement that you made that he was not on drugs is

Q. solely based upon your observations of him by the river, sub-40 degree temperatures, 9 o'clock at night in November in Kentucky; is that correct?

A. Yes.

Q. Okay. How much time did you spend with him that evening?

A. I would say not less -- or not more than five minutes.

Q. Five minutes. Now, you say you gave him his Miranda warnings, can you tell me exactly what you said to him?

A. I advised him that he had the right to remain silent, anything that he would say would be used against him in court. He had the right to talk with an attorney before we asked him any questions, and have an attorney with him during any questioning.

He also had the right to obtain an attorney, court appointed. And that if he decided to answer any questions now without an attorney present, that he could stop answering questions at any time.

Q. Did you have an advice of rights form there with you on the scene that evening?

A. No, I did not.

Q. Okay. And when you read him those rights, did you read them just about as fast as you just read them to me?

A. I believe so.

Q. And what did he say to you after hearing what you just stated in court here?

A.   I asked him if he understood, and he said -- he acknowledged, nodding yes and "yes."

Q.   He nodded and stated "yes"?

A.   Yes.

Q.   And after that he was questioned, wasn't he?

A.   By other officers, yes.

Q.   But you were present, weren't you?

A.   Yes.

Q.   And they asked him about the discharge of the firearm at -- towards one of the officers that had been chasing him that evening, correct?

A.   Yes.

Q.   And he pretty much apologized, but he said, "I'm sorry, I was shooting up in the air."  Isn't that what he said?

A.   Not -- not with -- having any report, I don't know exactly what he said, but it was something along that lines, yes.

Q.   Your own recollection is you remember him apologizing that night to the officer?

A.   I don't believe he apologized.

Q.   Okay.  Now, the other statement that he made, did you memorialize any of those statements or anything that you heard in a written report?

A.   No.

Q.   So, nothing that you heard or nothing that you have testified to today has been memorialized in any type of report;

is that correct?

A.   That's correct.

Q.   It's all based on your best recollection?

A.   Yes.

THE COURT:  Any redirect?

MR. HARRIS:  That's all, Your Honor.

MR. THURMOND:  No, sir.

THE COURT:  Thank you, sir, you may step down.

THE WITNESS:  Thank you.

THE COURT:  All right.  Now, are we going to hear further testimony about this statement?

MR. THURMOND:  Yes, Your Honor.

THE COURT:  All right.  I didn't know if you wanted a ruling now or you have more testimony to go before we rule on this particular statement, because I haven't really heard what the statement said yet.

MR. THURMOND:  We rather proceed with the next couple of witnesses before we get into statements.

THE COURT:  All right.

MR. THURMOND:  Your Honor, the government calls Officer Robert Brunty.

THE CLERK:  Mr. Brunty, could you please come forward to be sworn over here?  State your name for the record.

THE WITNESS:  Robert Brunty.

THE CLERK:  Would you spell your last name?

THE WITNESS:  B-r-u-n-t-y.

ROBERT BRUNTY, SWORN

DIRECT EXAMINATION

BY MR. THURMOND:

Q.  Mr. Brunty, where are you employed?

A.  City of Ashland Police Department.

Q.  How long have you been there?

A.  Approximately over -- well, over three and-a-half years.

Q.  Were you on duty on November 17th of 2002?

A.  Yes, sir, I was.

Q.  Did you respond to the railroad yard in Ashland on that date?

A.  Yes, sir, I did.

Q.  For what purpose did you respond?

A.  To assist officers on a call involving a male subject that had attempted to get into a vehicle with two females.

Q.  And did you eventually participate in the arrest of Mr. Basham?

A.  Yes, sir, I did.

Q.  And was he advised of his constitutional rights?

A.  Yes, sir, he was.

Q.  By whom?

A.  Captain Kelley.

Q.  How far away from Captain Kelley and Mr. Basham were you when this advice of rights took place?

A. Less than 12 inches.

Q. And after Captain Kelley advised Mr. Basham of his rights, did you question him?

A. Yes, sir, I did.

Q. And then how much time elapsed between the time that Captain Kelley advised Mr. Basham of his rights and then when you began to ask him questions?

A. Just a matter of seconds.

Q. Now, did you threaten or coerce or promise Mr. Basham anything in return for answering your questions?

A. No, sir.

Q. To the best of your knowledge, were his answers freely and voluntarily provided to you?

A. Yes, sir.

Q. Did he appear to understand you?

A. Yes, sir.

Q. And did you understand him?

A. Yes, sir.

Q. Did he appear coherent?

A. Yes, sir.

Q. Well, what did you ask him?

A. I asked him repeatedly, "Where is the gun?"

Q. And what did he respond?

A. His initial response was he did not have a gun and that he did not know why we were arresting him.

Q.  And what if anything did you ask him next?

A.  During -- while searching him, I found a loaded magazine in his left rear pocket.  And when I pulled that out, he changed his story and he said that he had shot at the officer and -- to scare him away from him.

Q.  Did he tell you what he did with the handgun?

A.  He said he threw it in the river.

Q.  And did you ask him any further questions at that time?

A.  No, sir.

Q.  Where was Mr. Basham next taken?

A.  He was taken to King's Daughter Medical Center.

Q.  Did you have any further interaction with him that night?

A.  Yes, sir, I transported him to the Boyd County Detention Center.

Q.  Approximately what time was that?

A.  I believe it was 2311.

Q.  Now, were you working the next day?  That would be November 18th?

A.  Yes, sir, I was.

Q.  And what were you doing on the 18th?

A.  I was working with the Kentucky State Police and the FBI using the automatic -- the fingerprint machine in an attempt to identify the subject.

Q.  And what if anything did you determine?

A.  The subject that we had known as Josh Rittman was actually

Branden Basham, and apparently he was wanted for escape from lower Kentucky.

Q.  Mr. Brandon has had initially given law enforcement the name of John Rittman?

A.  Yes, sir.

MR. THURMOND:  Thank you, that's all I have for you at this time.

THE COURT:  Cross-examination.

MR. HARRIS:  Thank you, Judge.

CROSS EXAMINATION

BY MR. HARRIS:

Q.  Sergeant Brunty, you stated that Branden gave you answers freely and voluntarily?

A.  Yes, sir.

Q.  Voluntarily, right?

A.  Yes, sir.

Q.  You asked him questions and he answered?

A.  Yes, sir.

Q.  And for instance, he told you that he possessed a firearm. I know initially he didn't, but later he told you he possessed a firearm, didn't he?

A.  Yes.  He indicated that he had thrown it in the river, yes.

Q.  He was truthful about that to you, correct?

A.  Yes.

Q.  And he told you that he had shot it towards an officer?

A.   Yes.

Q.   He was truthful about that, wasn't he?

A.   Yes.

Q.   Did you observe whether or not he was -- a word that has been used today is -- coherent?  What were your observations about whether or not he understood what was going on around him?

A.   He was shaking his head that he understood when -- when Captain Kelley advised him of his rights, I remember he shook his head.  And then when I asked him where the gun was, you know, he -- when I asked him that, he replied at first though that he did not have one.  So, I knew that he was understanding that I was asking him questions.

Q.   Because he was answering?

A.   Yes, sir.

Q.   Truthfully?

A.   Not at first.

Q.   Not at first, but later truthfully, correct?

A.   To the best of my knowledge, yes.

Q.   Okay.  Now, you later took him to the hospital.  Were you part of the transport team to the hospital?

A.   Yes.  I rode the ambulance with the paramedics.

Q.   Did you question him in the ambulance?

A.   No, sir.

Q.   Did you speak with him at all in the ambulance?

A.   I don't remember speaking with him.

Q.   When he got to the hospital, did he receive treatment for potential hypothermia?

A.   They were treating him, yes.

Q.   And as they were treating him, was he being examined by law enforcement?

A.   No, sir, I was back in the back when the medical team was working with him.

Q.   After being treated at the hospital and while at the hospital, was he was examined by law enforcement?

A.   I'm not sure what you mean by "examined," sir.

Q.   Questioned?

A.   Detective Mooney spoke with him, yes, sir.

Q.   Okay.  Were you present when while at the hospital he said that he thought he might need to talk to a lawyer?

A.   I was in the room but I can't tell you that I heard that comment.  But -- but I was in the room, yes, but I was doing paperwork.

Q.   Did another law enforcement officer tell you while at the hospital that my client made the statement he might need to talk to a lawyer?

A.   It's my understanding that he said maybe he might need an attorney, yes, sir.

Q.   And that was the evening of November the 17th?

A.   Yes, sir.

Q.   That was before 12 o'clock the evening of November the 17th?

A.   Yes.  It was on the 17th, yes.

Q.   On the 17th.  And who was present?  Were there FBI agents there yet?

A.   No, sir, there was just --

Q.   Just local law enforcement?

A.   Just my -- yes, local law enforcement, and the hospital staff was in and out of the room.

Q.   Okay.  Who did you notify that night, or after that day, that my client had made the statement he thought he needed to talk to a lawyer?

A.   I didn't notify anybody of that.

Q.   You didn't tell anybody?

A.   No, sir.

Q.   Now, November the 18th, the following morning, did you speak with my client about anything?

A.   No, sir.

Q.   Did you have any further contact with him?

A.   No, sir.

         MR. HARRIS:  Thank you, that's all I have.

         THE COURT:  Any redirect, Mr. Thurmond?

         MR. THURMOND:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. THURMOND:

Q.   Officer Brunty, did you travel with Mr. Basham to the hospital?

A.   Yes, sir, in the back of the ambulance.

Q.   And do you know what time he arrived at the hospital?

A.   No, sir.

          MR. THURMOND:  Thank you.

          THE COURT:  All right, you may step down.

          Next witness.

          MR. THURMOND:  Your Honor, we have got one more witness with respect to some other statements, I don't know if you want to -- if you want us to argue the admissibility of these statements prior --

          THE COURT:  You are going to start another statement with the next witness?

          MR. THURMOND:  Yes, sir.

          THE COURT:  All right, well, let's talk about this one now.

          MR. THURMOND:  Yes, Your Honor.

          THE COURT:  All right, Mr. Harris, Mr. Swerling.

          MR. SWERLING:  Excuse me one minute, Your Honor.

          THE COURT:  Let the record reflect that all these witnesses are sequestered during this testimony -- is that correct?

          MR. THURMOND:  Yes, sir.

          THE COURT:  There's been no formal motion, but I

think it's a good idea, and I would like to put on the record they have been coming in the courtroom as they were called.

MR. SWERLING:  Yes, Your Honor.  Well, actually we discussed it before the hearing and everybody agreed to the sequestration.

THE COURT:  All right.

MR. SWERLING:  Judge, we don't have any evidence to present, and we would just ask the court to make a determination under Rule 104 as to whether or not the warnings were given and whether or not there was a knowing and intelligent waiver of those rights.

THE COURT:  Well, except for the cross-examination, I don't have anything to suggest that the proper waiver wasn't given.  So, based on the evidence that I have heard and after weighing the credibility and demeanor and so forth of the witnesses who testified, it's my determination that the defendant, Mr. Basham, was properly advised of his rights pursuant to the Miranda decision, and that any statement that he made thereafter was made with full knowledge of his rights under Miranda.

In view of the totality of the circumstances, I find that there was no problem with the overall voluntariness of the statement.  I am aware that he had been in the river in November in sub-40 degree temperatures, and he might have been uncomfortable and cold, but I do not think that alone is enough

to keep the statement out.

It's a matter for the jury to consider, and voluntariness will be an issue for the jury if the defendant wants it to be.  But for present purposes, I have determined that the statement was voluntary and given under -- after having been properly advised under Miranda.

Next witness.

MR. THURMOND:  Your Honor, the government calls Detective Dan Mooney.

THE CLERK:  Mr. Mooney, if you will please come forward to be sworn.  Place your left hand on the Bible and raise your right hand.  State your name for the record.

THE WITNESS:  Dan Mooney.

DAN MOONEY, SWORN

DIRECT EXAMINATION

BY MR. THURMOND:

Q.  Detective Mooney, where are you employed?

A.  The Ashland Kentucky Police Department.

Q.  How long have you been there?

A.  15 years.

Q.  And were you on duty on November the 17th of 2002?

A.  Yes, I was called to duty.

Q.  Did you have an opportunity to respond to the King's Daughter Medical Center that evening?

A.  Yes, that's correct.

Q.   Prior to responding to that location, did you have a chance to observe Mr. Basham at the scene of his arrest?

A.   Briefly.

Q.   And for what purpose did you go to the hospital?

A.   I was sent there by my lieutenant to interview the gentleman who had shot at one of our officers.

Q.   And what was the name of the person you were to interview?

A.   I was told to interview a Leon Rittman.

Q.   A Josh Leon Rittman?

A.   Yes.

Q.   And do you now know who Josh Rittman is?

A.   Yes, I do.

Q.   And who is he?

A.   Brandon Basham.

Q.   And approximately what time did you arrive at the hospital?

A.   The time I arrived at the hospital was 2148 hours.

Q.   And upon your arrival did you identify yourself to Mr. Basham?

A.   Yes, that's correct.

Q.   And did you ask him if he had been advised of his Miranda warning?

A.   Yes.

Q.   And did he acknowledge that he had been so advised?

A.   Yes.

Q.   What was his demeanor?

A.   His demeanor was fine considering I guess he just shot at a police officer.  He seemed to be okay to me.

Q.   Would you describe him physically?

A.   Physically.  When I was talking to him he was in a bed, they were trying to warm him up, and he was just sitting there talking and looking around.

Q.   For example, did his teeth appear to be chattering?

A.   Oh, no.

Q.   Was he shivering?

A.   No.

Q.   Was he covered up?

A.   Sometimes.  He would have the blanket and sheet down to his waist and then he would pull it up.  And he -- both.  Sometimes he would pull it up himself and back and forth.  It never would stay in any one spot.

Q.   Did he appear to understand you?

A.   Yes.

Q.   And could you understand him?

A.   Yes.

Q.   And when you spoke to him, was his speech coherent?

A.   Yes.

Q.   And did he appear to be under the influence of drugs or alcohol at the time?

A.   No.

Q.   Did you threaten or coerce him or promise him anything in

return for answering your questions?

A.   No.

Q.   And to the best of your knowledge were his answers freely and voluntarily provided to you?

A.   Yes.

Q.   Why don't you tell the court what you asked him and how he responded?

A.   All right.  I initially confirmed with him about the Miranda, which he said yes he had been advised, knew his rights, with a nod and a yes.  Then I started the -- or told him I wanted to ask him some questions about why he shot at one of our officers.

He first said that he did not shoot at the officer, then he said he tripped over a log and his gun went off.  He then went on to say that he only fired the gun in an attempt to get the officer to quit chasing him.  And he then said that he heard a shot behind him and thought the officer was shooting at him.

Q.   Did you ask him how old he was?

A.   Yes, I did.

Q.   And what answers did he provide?

A.   First he said he was 16.  He gave a series of dates of births, ages, nothing that seemed accurate.  He just kept changing his information.

Q.   And did you ask about any drug use?

A.   Yes, I did, I did ask him that after the variety of information that he had provided to me.  He said that he had used cocaine at approximately noon that day, and had smoked marijuana approximately 4 p.m. that day.

Q.   Did you attempt to determine where he was from?

A.   Yes, I did.  He told me he was from Richmond, Ohio.

Q.   And did you ask him further questions about where he was from?

A.   Yes, I did.  I was not familiar with it, I asked him for the closest largest city.  He said he didn't know.  I asked him for landmarks, what part of the state it was in.  He said he was not sure.  I asked him if he knew any towns that were close, and he told me Beckley -- or Beckley was the closest town he knew of.

I told him that the only Beckley I knew of was in West Virginia.  And he acknowledged that he knew -- or he had some friends in Beckley, West Virginia, and then he wouldn't talk about it any more.

Q.   What do you mean by, "He wouldn't talk about it any more"?

A.   He would just become silent and look away, just more or less ignore me.  He just didn't want to talk about it.  You could tell by his body actions.

Q.   Did he say, "I don't want to talk about that"?

A.   No, not specifically to that question.

Q.   Did you ask him about the weapon that was involved in the

shooting?

A.   Yes, I asked him about the weapon.  He said it was a two shot .22 caliber derringer that was approximately four inches long.  I asked him where -- where it was, and he said that once he was down on the river bank he started sliding, and he needed two hands to hold onto the bank, so he let the weapon go in the water.

Q.   And at some point did you return to your patrol vehicle?

A.   Yes, I did.  During one point of his treatment there, I went out to my vehicle and got a road atlas and brought it in, and asked that he show me where Richmond, Ohio was.

Q.   And did you continue to question him along that line, of where he was from?

A.   Yes, I did.  I asked him to point it out.  He looked at it, the atlas briefly, and told me that his -- he didn't have very good map reading skills and he couldn't find it.

Q.   Did he ever confirm to you where he was from?

A.   No, he told me that he wasn't really sure where he was from because he was homeless.

Q.   And what if anything did he tell you about his family?

A.   I asked him for a family contact so I could call and verify his information, and he said all his family was deceased.

Q.   Okay.  Did you ask why he came to Ashland?

A.   Yes, I did.  I asked why he came to Ashland, how he got to be there.  And he said he had come there with a male and female

friend to a place where his friend knew where they could party.  And once in Ashland they became lost and ended up down by the mall.  Said they had arrived in town at approximately 6 p.m. that evening.

Q.  And what if anything did Mr. Basham do as you continued down that line of questioning?

A.  Well, I asked him what had become of his friends that he was with, and he turned his head away from me and said that he did not want to give them up.  Which, my first impression was maybe they were wanted or something like that.

And I asked him what kind of vehicle they were driving, where they may have gone.  And he had looked away and he said that he didn't want to talk about that.  So -- and right after that he became very, very quiet.

Q.  What else did you ask him about the gun?

A.  I asked him where he had obtained the gun that he used. He -- I asked him where he had obtained it, where he got it from, and he would not talk about that either.  He would turn away, become silent.

Q.  And at some point did you attempt to reduce these statements to a recording?

A.  Yes, I did.  I produced a -- had a digital recorder in my pocket.  And I showed it to him and I asked him if he wanted to record a statement on his side of the story on what had happened.  And he said he did not want to give any recorded or

written statements.

Q.   And how many times did you attempt to use your tape recorder?

A.   I attempted twice.

Q.   What's the last thing that Mr. Basham said to you?

A.   The very last thing?  He had asked me for his clothes once or twice, and then at 2254 hours, as I recorded, he looked at me and said, "Maybe I might need an attorney."

Q.   "Maybe I might need an attorney"?

A.   Yes.

Q.   And did you ask him any more questions after that?

A.   No.

Q.   Why not?

A.   Because that was close to a gray area, and I didn't want to cross into it.

Q.   Whenever Mr. Basham would state, "I don't want to talk about that," in response to one of your questions, what would you do?

A.   I would move onto a different topic.

Q.   Now, the next day, let's go to November the -- late November the 18th, early on November the 19th, did you have an opportunity to meet with Special Agent Vito of the FBI?

A.   Yes, I did.

Q.   Specifically did you pass on to him a statement by Mr. Basham, "Maybe I might need an attorney"?

A.  Yes, I did.

MR. THURMOND:  Beg the court's indulgence.

Thank you, Detective Mooney, that's all the questions I have for you at this time.

THE COURT:  Mr. Harris.

CROSS EXAMINATION

BY MR. HARRIS:

Q.  Detective Mooney, how are you today?

A.  Fine, how are you, sir?

Q.  You were at the scene, weren't you, that night?

A.  Yes, I was -- we had a series of scenes down there, but I was in the area, yes.

Q.  And I think you were assigned by your superior officer to be a part of the team that went to the hospital to speak with Brandon or to stay -- monitor Brandon, correct?

A.  Yes.

Q.  And when you were -- prior to going to the hospital, did you determine whether or not he had been read his Miranda rights?

A.  Prior to going to the hospital?

Q.  Yes.

A.  Yes, I did.

Q.  Okay.  When you got to the hospital and you met with him, you were the lead -- at that point the lead officer on the scene, weren't you?

A.   Not the supervisor, but I was assigned, yes.

Q.   Assigned?

A.   Yes.

Q.   At the scene of the hospital?

A.   Uh-huh.

Q.   Did you Mirandize him?

A.   No.

Q.   You didn't go over his rights again with him?

A.   I just acknowledged through him that he had been read his rights and understood them.

Q.   Okay.  Did you -- and you also -- as a matter of fact your report reflects that when you got there, you spoke with someone and determined that Mr. Basham was being treated for hypothermia, correct?

A.   That's what I was told.

Q.   That's what you were told?

A.   Yes.

Q.   By hospital personnel?

A.   I honestly can't recall who said that.  Someone told me that in the hospital.

Q.   But there's no question that he was being treated for hypothermia that night, is there?  That's a fact, isn't it?

A.   I cannot say one way or the other, that's what I was told. I can't guarantee you that that's what he was being treated for.

Q.  When you started speaking with him while he was being treated while at the hospital, was he in any way combative to you?

A.  To me, no.

Q.  Was he -- did he curse you in any way?

A.  No.

Q.  Did he show you any disrespect?

A.  No.

Q.  And I know that you -- there are some things that he was telling you that you didn't believe, but the fact of the matter is, after a period of time he started admitting to several crimes, didn't he?  Drug use?

A.  He may have acknowledged when asked that question, but I don't know -- not a crime that we had charged him with.

Q.  Okay.  But nonetheless after you spoke with him for a period of time -- because you were with him over an hour that night, weren't you, at the hospital?

A.  Yes.

Q.  And you were questioning on and on as the hours went on, weren't you?

A.  Questioning was being interrupted by medical treatment, yes.

Q.  But nonetheless you were questioning him?

A.  Yes.

Q.  And he became -- you got more comfortable with him and he

got more comfortable with you?

A.  I was -- you could say he was comfortable with me, I think he had a good bond going there, but --

Q.  I understand.

A.  -- I can't say I was real comfortable with him.

Q.  Well, he was comfortable with you?

A.  Yes.

Q.  And it went from him lying about his age to being more truthful about his age?

A.  I can't recall an accurate date of birth that he gave.  I did not transport him and do the paperwork on him.

Q.  He had such a comfort level with you that he admitted using cocaine that day, didn't he?

A.  Yes, he did say that.

Q.  The day -- the statement you are testifying about, he admitted to you using cocaine that day, didn't he?

A.  He told me that, yes.

Q.  And the day that he gave the statement to you, he admitted to using marijuana that day, didn't he?

A.  He told me that, yes.

Q.  And nonetheless, he had told you about these other crimes, he has a comfort level with you, he also admits possessing the firearm, didn't he?

A.  A firearm.

Q.  A firearm.  Well, that's what your report says.

A.   Yes, he admitted having a firearm, yes.

Q.   And when you put a map in front of him -- and you have this in your statement, he admitted he didn't have any map reading skills, correct?

A.   Yes.

Q.   And you accepted that, didn't you?  You didn't have any reason to not believe that, did you?

A.   I just moved on because I could see it was a dead end issue.

Q.   Okay.  Now, the statement that he was homeless, did you follow up on that question, to determine whether or not that was true?

A.   No, I did not.

Q.   Now, the end of this interview, the time period that you had spent with him and you had -- it resulted in this report that you prepared -- he stated that he might need an attorney?

A.   Yes.

Q.   Who did you tell on down the line in your superior chain of command that Mr. Basham had told you that he may need an attorney?

A.   I believe that the supervisors that were there at the hospital, I told them because they would have had to know why the questioning ceased.

Q.   And who was that?

A.   That would have been Lieutenant Slone and I believe

Sergeant DeLong was still there.

Q.  And the best of your knowledge, even after he asserted that right, nonetheless the next day he continued to talk to law enforcement, didn't he?

A.  Not to me.

Q.  Not to you, but he continued to talk to law enforcement, didn't he?

A.  I cannot answer that.  I don't know for sure who he spoke to the next day.

MR. HARRIS:  Excuse me, Judge.

Nothing further, thank you.

EXAMINATION

BY THE COURT:

Q.  Let me ask you, Detective Mooney, it's my experience that traditionally one officer administers the Miranda warning and then proceeds to question the suspect.  Here Officer Kelley gave the warning and then Officer Brunty questioned him and then you came along and questioned him.  Was there any reason for this series of officers?

A.  The reason I believe is Captain Kelley had been in the environment down there where the physical custody was being taken of Mr. Basham.  He did it to protect anything that would have been said.

Officer Brunty, I'm not sure what questions that he asked him, but by the time he got to me, he was -- I guess you

would say we didn't have the environment there while he was being treated for his medical needs to actually stop and go through with a written Miranda.

But all I did was confirm that he was Mirandized.  I think the reason Captain Kelley did that was, it was something that needed to be done right now just in case.

THE COURT:  All right.  Any further questions?

MR. THURMOND:  No, Your Honor.

THE COURT:  Thank you, sir, you may step down.

Any other testimony on this evidence from the government -- this statement from the government?

MR. THURMOND:  No, Your Honor.

THE COURT:  All right, anything from the defendant?

MR. SWERLING:  Judge, we have no evidence to present. Based on what we previously advised the court about Mr. Basham's, I think, limited intellectual ability and mental capacity, that the statements presented to the court for a ruling, under Rule 104, as to whether or not under the totality of the circumstances he was given his warnings and whether or not he waived his warnings -- waived his rights.

THE COURT:  All right.  Well, we have a little bit of testimony for the first time about some marijuana use and cocaine use in the hospitalization.  What about it, Mr. Thurmond or -- anything you want to add by way of argument?

MR. THURMOND:  No, Your Honor.  We would just

maintain our position that Mr. Basham was properly Mirandized, that he did agree to speak with members of law enforcement, and that his statements were freely and voluntarily given.

THE COURT: All right. I'm going to allow the statements in. It's my finding after hearing the evidence and weighing the credibility of the witnesses who testified, that the defendant -- I'm sorry -- yes, that the defendant, Mr. Basham, was properly advised of his rights under Miranda, and that the statement that he gave as quoted by Officer -- Detective Mooney, was freely and voluntarily made.

I acknowledge he may have been under the lingering effects of cocaine and marijuana, he was hospitalized for possible hypothermia. Those are matters that the jury could consider in determining whether to believe the statement. But for purposes of today's hearing, I determine that the government has met its burden, and so the motion is denied.

MR. SWERLING: Judge, if I could just add one thing with respect to your ruling. The questions Mr. Harris was asking with respect to the marijuana and cocaine, were whether or not he had actually admitted to other crimes.

THE COURT: Oh, I'm sorry, I thought he admitted using it that day.

MR. SWERLING: Not necessarily that he was using it or that he was under the influence at that time.

THE COURT: All right. He just admitted it at other

times?

MR. SWERLING:  Correct.

THE COURT:  All right.  Well, I misunderstood the testimony then.

MR. SWERLING:  We are not contending that the statements were given under the influence.

THE COURT:  All right.  All right.

What's next?

MR. GASSER:  Judge, may the three officers from Ashland, Kentucky be released?

THE COURT:  Any objection?  All right, those officers can leave at this time.  Thank you very much.

MR. SCHOOLS:  We now call Special Agent Scott Vito.

THE CLERK:  Mr. Vito, would you please come forward to be sworn?  Place your left hand on the Bible and raise your right hand.  State your name for the record.

THE WITNESS:  Scott Vito.

THE CLERK:  All right, spell your last name.

THE WITNESS:  V as in Victor, i-t-o.

SCOTT VITO, SWORN

DIRECT EXAMINATION

BY MR. SCHOOLS:

Q.  Special Agent Vito, where do you work?

A.  I'm a special agent with the FBI in the Ashland, Kentucky resident agency.

Q.   How many other FBI agents are there in Ashland?

A.   There is one other besides myself.

Q.   How long have you been with the bureau?

A.   Eight and-a-half years.

Q.   Have you always been duty stationed in Ashland?

A.   No, sir, my first assignment was in Chicago.

Q.   Okay.  Were you duty stationed in Ashland in November of 2002?

A.   I was.

Q.   And at some point, Special Agent Vito, did you get involved in an investigation involving Branden Basham?

A.   Yes, I did.

Q.   And how did you first get involved in that investigation?

A.   I was called by another agent, I believe it was the Evansville, Indiana RA, who advised me that there was a subject in the Ashland jail who was the suspect in a possible kidnapping.

Q.   Okay.  And do know approximately what time of day or what date it was when you were notified about this potential suspect?

A.   I believe it was in the evening of the 18th.

Q.   November 18th?

A.   Yes, sir.

Q.   2002?

A.   Yes.

Q.  And who was the agent who contacted you from Evansville?

A.  I believe it was Marty -- I think his last name may be Williams.  I'm not real sure.

Q.  And other than him being a suspect there, what else did Agent Williams advise you regarding the suspect?

A.  He told me some basic information about the circumstances of Mr. Basham's arrest, the shootout involving the police in the Ashland area.  And that he had been fingerprinted in accordance with that arrest, and that the fingerprints had lead to his identification.

Q.  And did he -- did Agent Williams identify for you what crimes -- crime or crimes he believed Mr. Basham was a suspect in?

A.  The kidnapping of someone from South Carolina, as well as the assaults on the officer, attempted murder on the officer. And I believe there was another kidnapping as well involving his office in Indiana.

Q.  Did you know that at that time, do you know?

A.  I believe so.

Q.  Okay.

A.  I believe he gave me the basics of what he had.

Q.  In response to this phone call from Agent Williams, what did you do?

A.  I contacted my supervisor and headed to the Ashland area.

Q.  How far did you live from there?

A.   About 80 miles.

Q.   And you said you got a call from Agent Williams in the evening of the 18th?

A.   Yes, sir.  I'm not real sure about the time, but I believe it was night.

Q.   And did you go straight to Ashland that night?

A.   I did.

Q.   Now, why did you undertake to go that night instead of waiting till the next day?

A.   Well, it was a situation where there was some urgency to getting the information or to doing the investigation, because the lady from South Carolina, Ms. Donovan, was still missing.

Q.   Okay.  What time did you arrive in Ashland, if you know?

A.   It was approximately 11 p.m. to midnight, around that time frame.

Q.   What did you do when you got there?

A.   Went to the Ashland Police Department and spoke to some of the command staff of the Ashland PD, as well as some of the detectives involved in the investigation.

Q.   In particular did you speak with Detective Dan Mooney?

A.   I did.

Q.   And what did he tell you?

A.   He advised me of the particulars of their investigation, and that he had conducted an interview of Mr. Basham and that Mr. Basham had stated, "Maybe I need an attorney."  And at that

point he stopped questioning Mr. Basham.

Q.  He, being Detective Mooney, had stopped questioning him?

A.  Yes, sir.

Q.  Okay.  Because you obtained that information concerning what Mr. Basham said, what did you do?

A.  I contacted my command staff as well, SSRA Maley, and as well as my chief division counsel, who is stationed in Louisville.  He is our legal representative or person who gives legal information.

Q.  He is an FBI agent and a lawyer?

A.  Correct.

Q.  He was stationed in Louisville?

A.  He was.

Q.  And you called him for what purpose?

A.  To check on the legalities of re-interviewing Mr. Basham, contacting him again after he had made that statement.

Q.  And what were you advised?

A.  That him saying that maybe he needed an attorney was not a clear invocation of rights, and that we could approach him again as long as we provided him with Miranda again and he waived Miranda.

Q.  So, what did you do based on that advice from your chief division counsel?

A.  Myself and Trooper Stevens, with the Kentucky State Police, went to the Ashland Detention Center and spoke to Mr. Basham.

Q.   And what time -- what time of day was that?

A.   The interview actually started at 1:58 a.m. on the 19th of November.

Q.   Where were you within the Boyd County Detention Center?

A.   We were in an administrative office inside the detention center.

Q.   Was anybody else present other than yourself, Trooper Stevens, and Mr. Basham?

A.   No, sir.

Q.   When you approached Mr. Basham, what did you tell him?

A.   When I got to the detention center, I gave Mr. Basham an FD-395, which is an advice of rights form.  I asked him if he could read or write, and he stated that he could.  And I asked him if he would read the statement, the advice of rights form to me, which he did.

Q.   Let me show you what is marked as Government's Exhibit Number 1.  Do you recognize that document, Special Agent Vito?

A.   Yes, sir, this is the advice of rights form that I provided to Mr. Basham.

Q.   Now, you indicated that you asked Mr. Basham if he could read, and he said that he could?

A.   He did.

Q.   Did you do anything else to determine whether he would be capable of understanding the written advise of rights form?

A.   I asked him to read the form to me, and he did.  He was

responding to questions in a normal manner, he was -- in my opinion, nothing wrong with him.

Q.  Now, it was 1:58 in the morning, did Mr. Basham appear tired or was he alert?

A.  He was alert.  At 1:58 in the morning, I think we were all tired.  But he appeared alert, coherent, there didn't appear to be anything wrong with him.

Q.  And do you recall whether Mr. Basham was in the interviewing room when you got there, or was he brought to you after you arrived?

A.  I don't recall.

Q.  Okay.  But nonetheless, he was able to read the form and appeared alert and awake at the time you advised him of his rights?

A.  He did.

Q.  And did he agree to waive his rights --

A.  Yes, sir, he did.

Q.  -- and speak with you that night?

A.  He did.

Q.  Okay.  Was there any hesitation in his agreement to do so?

A.  No, sir.

Q.  And after -- did you ask him to sign the advice of rights form?

A.  I did.  And I advised him that we knew that he was Branden Basham and not Leon Rittman.

MR. SCHOOLS:  Your Honor, we offer Government's Exhibit Number 1 at this time.  The defense has also been provided copies of all these exhibits.

THE COURT:  Any objection?

MR. HARRIS:  No, sir.

THE COURT:  All right.

BY MR. SCHOOLS:

Q.  And so after Mr. Basham signed the advice of rights form that is Government's Exhibit Number 1, did you proceed to ask him a series of questions?

A.  Yes, sir, I did.

Q.  And for how long did you ask him questions?

A.  I believe it was a little over -- the first interview was a little over an hour.

Q.  During the course of the interview, did he -- was he able to respond to your questions?

A.  Yes, sir, he was.

Q.  Did his responses indicate to you that he understood the questions?

A.  He did.

Q.  At any time during the course of your conversation with him, did he appear hesitant or reluctant to answer questions?

A.  There was some hesitation on some questions that may be asked, but nothing other than what you normally expect in an interview.

Q.  And at any point during the course of the interview did Mr. Basham make any statement, equivocal or otherwise, requesting an attorney?

A.  No, sir, he did not.

Q.  And you said you spoke with him for approximately an hour that evening?

A.  Yes, sir.

Q.  What was the tone of the interview?  Were you combative?

A.  No, sir.  I -- very collegial, very cordial.  Very low key.

Q.  Based on your experience as an agent -- and you were a law enforcement officer before you were an agent, weren't you?

A.  Yes, sir.

Q.  Is that consistent with your interview style?

A.  Yes, sir, I'm not a confrontational person, I find it doesn't work most of the time.  If you treat people well, they will respond.

Q.  Trooper Stevens was with you, correct?

A.  He was.

Q.  Was this a tag team interview, or was one of you asking the questions and --

A.  Pretty much Trooper Stevens was involved because the state police had a case from where Mr. Basham escaped from.  I did the interview, pretty much all the questions.

Q.  So, there was no good-cop/bad-cop scene going on at the Boyd County Detention Center that night?

A.   No, sir.

Q.   At any point during the course of the interview, did you believe that Mr. Basham might not have been telling you the truth?

A.   Numerous times.

Q.   And did you confront him about that during the interview?

A.   Yes, sir, I did, toward the end of the interview.

Q.   When you confronted him, did you confront him aggressively or how would you have confronted him?

A.   No, sir, I just advised him that I believed that he was lying to me, and that the information he was telling me wasn't true.

Q.   Specifically with respect to the location of the victim, Alice Donovan, what did Mr. Basham tell you?

A.   Toward the end of the interview I asked Mr. Basham -- I told him that I didn't believe some of the things he had been telling me, and that I asked him specifically, "What about the lady in the BMW?"  And at that point he said -- he gave information on Ms. Donovan.

Q.   Now, prior to that point had he provided you a chronology of the events after his escape from Hopkins County Detention Center that did not include any information concerning the lady from Conway?

A.   That's correct.  He did not mention her until I mentioned her.

Q.   Okay.   And when you specifically asked him about that, what did he tell you?

A.   He told me that the -- Ms. Donovan was still in the BMW, that he had left Mr. Fulks with, in the WalMart parking lot.

Q.   Okay.   And was that approximately where that interview concluded?

A.   Yes, sir.

Q.   So, at the conclusion of that interview, you were under the impression, based on the statements that Mr. Basham made, that Alice Donovan was still alive and was still with Mr. Fulks?

A.   That was my impression, yes, sir.

        MR. SCHOOLS:   Your Honor, I don't have any further questions with respect to this statement.   Now, Agent Vito made some other statements -- took some other statements, I don't know if you want to have cross-examination on this statement and get to the second statement after that --

        THE COURT:   Let's do that.   Let's cross now, and take it one statement at a time.

        MR. SCHOOLS:   Okay.

                    CROSS EXAMINATION

BY MR. HARRIS:

Q.   Agent Vito, you show up at 2 o'clock in the morning and Branden is alert and coherent; is that correct?

A.   Yes, sir.

Q.   And he was alert and coherent all throughout this two hour

interview?

A.   He was.

Q.   Now, when you had showed up that night, did you tell him that he was under suspicion for kidnapping James Hawkins?

A.   For -- pardon, James Hawkins?

Q.   Yeah.

A.   The --

Q.   Did you tell him that?

A.   I tell you what my usual interview strategy is, is to tell the person that we are there to gather information and have the person tell me the story.

Q.   Okay.  Let me ask that question again.  Did you tell Branden Basham before you began the interview, after he said he might need a lawyer, that he was under suspicion for kidnapping James Hawkins?

A.   No, sir.

Q.   Did you tell Branden Basham before the two hour interview that he was under suspicion for attempted murder of a law enforcement agent?

A.   Specifically, I don't think so, no, sir.  Of course, he's there under those charges so --

Q.   I understand that, but I'm just wondering -- you are here to testify about the statement --

A.   Yes, sir.

Q.   -- I want to know what you told him, okay?  Did you tell

him he was under suspicion for car-jacking two females in an

Ashland, Kentucky parking lot?

A.   No, sir.

Q.   Unlawful weapons possession?

A.   No, sir.

Q.   Illegal drug use?

A.   No, sir.

Q.   Crossing state lines to kidnap people?

A.   No, sir.

Q.   Did you tell him he was under suspicion for any crime whatsoever?

A.   My usual approach in something like that, sir, is to tell him that we are investigating a crime and just get that information from that person.

Q.   So, the answer is you didn't tell him that he was under suspicion for any crimes?

A.   Well, he was under arrest, sir, I'm sure that he understood that he was under suspicion for a crime.

Q.   Now, the statements that he made to you were given without hesitation; is that correct?

A.   Yes, sir.

Q.   The statements he gave to you were fully answered questions?

A.   Pardon?

Q.   He fully answered all of your questions?

A.   I don't know if I would categorize it that way.

Q.   Maybe you don't believe that some of the answers were truthful, but he gave the answers to all your questions, didn't he?

A.   Yes, sir.

Q.   Now, the end of the interview was around, what, 3 o'clock, 4 o'clock in the morning, something like that?

A.   Yes, sir.  It was a little over an hour.  I can tell you the exact time if you would like.  3:19 a.m.

Q.   Okay.  And how did the interview end?  Did it end because he was tired, did it end because you were tired, did it end because you ran out of questions?  Can you give us some -- your impression of why the interview ended that evening?

A.   The -- basically because of the hour.  We were all tired, we had spoken to Mr. Basham and he was cooperative.  He had no hesitation about agreeing to talk to us the next day.

Q.   That's what I was getting at.  As you left the interview that night Branden -- what did he say to you about being with you the next day?

A.   Said it would be no problem.

Q.   Would meet with you, would answer your questions, continue to answer your questions; is that correct?

A.   Yes, sir.

Q.   And that happened, didn't it?

A.   It did.

Q.   And I'm not going to get into that statement, but in the interim, okay, after you left that night, what steps did you take to get Branden a lawyer for all these crimes that were being investigated?

A.   The main focus of my activity after I had spoke to Mr. Basham was to attempt to locate Ms. Donovan, who we believed to be in danger and in an area close enough to us to where our investigation would be able to focus on recovering Ms. Donovan.

Q.   I understand that.  When you got the information that he had asked for a lawyer, you immediately called the FBI headquarters, correct?

A.   I'm sorry, sir, he did not ask for a lawyer.

Q.   When you got information that he had stated that he may need a lawyer, you took time to call FBI headquarters, correct?

A.   Sir, I believe the statement was, "Maybe I need a lawyer," which --

Q.   What steps did you take to contact -- what did you do after you found out he made that statement?

A.   I contacted my chain of command, as well as my chief division counsel, who is an FBI agent as well as a lawyer.

Q.   So, you contacted your lawyer?

A.   Correct.

Q.   What steps -- again I'm going to ask you, what steps did you take to contact a lawyer for Mr. Basham?

A.   None.

MR. HARRIS:  Thank you, that's all I have.

THE COURT:  Redirect?

MR. SCHOOLS:  No, sir.

THE COURT:  All right.  Now, what specific statements are we talking about here?  Just everything that was said during the one hour interview?

MR. SCHOOLS:  That's correct, Your Honor.

THE COURT:  Most of which was exculpatory and allegedly incorrect, false?

MR. SCHOOLS:  Mr. Basham made some incriminating statements concerning his escape from prison, him having kidnapped Mr. Hawkins.  And then he made some statements concerning how they arrived in Kentucky.  And then Agent Vito asked him concerning about the woman in the BMW, and at that point he gave information that she was still in the vehicle with Mr. Fulks.

THE COURT:  All right.

MR. SCHOOLS:  He said he was aware of it, but that she was still in the car with Mr. Fulks.

THE COURT:  All right.  Anything from the defendant on this series of statements?

MR. SWERLING:  No, Your Honor, we are not going to present any testimony.  As previously stated, the matter has been presented to you for a ruling under Rule 104, as to whether or not he was advised of his rights and whether or not

he waived those rights.

THE COURT: All right. Well, we have a -- what you could argue to be an equivocal invocation of Miranda by the prior officer -- when he was being questioned by the prior officer. He said, "Maybe I need to talk to a lawyer, maybe I need to get an attorney."

MR. SWERLING: Yes. And we have looked at case law with respect to that, and it is certainly not a clear-cut statement. It's ambiguous, and the case law apparently is not in our favor on that, so we are not arguing that.

THE COURT: All right. Anything from the government?

MR. SCHOOLS: Your Honor, given Mr. Swerling's acknowledgement, I don't have anything further to add to that argument.

THE COURT: All right. Well, I find that the statements relayed by this witness were -- are admissible, I will deny the motion to suppress by the defendant. He had been Mirandized once and said something along the lines of, "Maybe I need an attorney," after answering some earlier questions.

The questioning immediately stopped. Then the FBI was brought in for this witness. The witness determined that this was an equivocal waiver -- I mean, an equivocal invocation of the Miranda right to an attorney, at best, and there was no legal impediment to going back for an attempted second interview.

The defendant was Mirandized again and a written Miranda form was executed.  The testimony indicates the defendant was alert and awake, and there is no other circumstances to suggest that it was not voluntary.  So, for all those reasons, the motion to suppress the statements given in this one hour interview is denied.

MR. SCHOOLS:  Thank you, Judge.

REDIRECT EXAMINATION

BY MR. SCHOOLS:

Q.  Agent Vito, I think on questioning from Mr. Harris you acknowledged that at the conclusion of the interview at about 3:19 in the morning of the 19th of November Mr. Basham indicated a willingness to speak with you further?

A.  Yes, sir.

Q.  And did you take him up on it?

A.  Yes, sir, we did.

Q.  When was that?

A.  The interview began at 9:45 a.m.

Q.  On the 19th still?

A.  Yes, sir.

Q.  So about six and-a-half hours later?

A.  Correct.

Q.  Okay.  And how did that interview start?  How did you -- was it again at the Boyd County Detention Center?

A.  Yes.  I was joined by Special Agent Carl Christianson, who

is our division polygraph operator.

Q.   Okay.   Where was Agent Christianson stationed?

A.   Louisville.

Q.   And so he had traveled from Louisville in the course of the evening to participate in this interview with you, and also potentially to conduct a polygraph exam?

A.   Yes, sir, he did.

Q.   Okay.   What precautions did you take if any at the beginning of the interview to assure that Mr. Basham understood his rights?

A.   We brought out the advice of rights forms that he had signed six hours earlier, advised him that these rights still were pertinent to the situation.   Showed him that it was the same form that he had signed earlier.   Asked him if he still understood those rights and he still wanted to talk to us, and he responded that he did.   And I asked him if he would initial the form underneath his signature indicating that he agreed to talk to us.

Q.   So, if we look at Government's Exhibit Number 1 again, underneath the signature of Mr. Basham, or indicated initials, "B. B. 11-19-02, 9:45 a.m.," whose handwriting is that?

A.   That would be Mr. Basham's.

Q.   So, you observed him initial that form and acknowledge once again that he understood his rights?

A.   I did.

Q.  Did he seem to have any hesitation about initialing that form again?

A.  Not at all.

Q.  And was there any hesitation with him speaking with you again on the morning -- 9:45 on the morning of the 19th?

A.  No, sir.

Q.  And did you proceed to ask him questions along with Agent Christianson during the course of that interview?

A.  Yes, sir, I did.  I basically took him from the beginning of the escape in Hopkinsville until the point where he was arrested, asking more details, and he was giving me more details.

Q.  Okay.  So, you indicated that your initial interview was more of a "tell me what happened" interview, and did you begin to probe and ask some more detailed questions during this interview?

A.  Yes, sir, I did.  At this point he -- I slowed him down and asked for more specific details, and he was more forthcoming with those details.

Q.  Now, again, you said Agent Christianson was there.  Were you conducting the interview or were both of you conducting the interview or how did that work?

A.  We would both ask questions, but I was the main person asking the questions.

Q.  And what was your demeanor during this course of the

interview?

A.   Pretty much as it always is, calm.

Q.   At any point during this interview, did you get confrontational with Mr. Basham?

A.   No, sir.

Q.   And were there points during this interview when you believed he was telling you things that weren't true?

A.   There were.

Q.   Did you and Agent Christianson start on a course of investigative action as a result of your belief that Mr. Basham wasn't telling you the truth?

A.   Yes, sir.  We continued to interview up to the point where he was arrested in Ashland.  And at that point we broke, and so Mr. Christianson conducted a polygraph examination.

Q.   Okay.  Without telling me the results of the polygraph exam, were the results of that polygraph exam that Mr. Basham was questioned further?

A.   Yes, sir, he was.

Q.   And after the polygraph exam, did he provide you information that was different from the information that he had provided you before the polygraph exam?

A.   He did.

Q.   Okay.  Now, you indicated that with respect to the initial interview at 1:58 in the morning on the 19th, your central focus, your central point of concern was to find out the

location of the South Carolina victim; is that right?

A.   Yes, sir.

Q.   Now, at that point on the morning of -- at 9:45 on the morning of the 19th, had that focused changed?

A.   No, sir, it was still the same.

Q.   And at this point, what was Mr. Basham telling you about the location of Alice Donovan's body or her -- or where she was?

A.   The -- Mr. Basham at this point was still saying that the -- Ms. Donovan was with Mr. Fulks.  Let's see.  No, sir, the second story that Mr. Basham told was that Fulks left the Myrtle Beach hotel area with Ms. Donovan, and when he came back with her -- or came back, she wasn't with him.

Q.   Did Mr. Basham give you any indication at that point what state she was in or what location she may have been left in?

A.   He drew a map, I believe, sir, if this is the correct interview.  The motel that he was referring to was in Myrtle Beach, South Carolina when he last saw Ms. Donovan, at this point.

Q.   Okay.  And did he draw you a map indicating what direction Fulks had left when he supposedly left with Ms. Donovan in the car?

A.   Yes, sir, he did.

Q.   And did that information come before or after he was administered the polygraph exam?

A.   That was after.

Q.   Now, those of us in law enforcement have heard about polygraph exams being used for investigative techniques and sometimes polygraphers becoming aggressive with someone they polygraphed.  Now, you weren't in the polygraph yourself, were you?

A.   I was not.

Q.   Was Agent Christianson or yourself aggressive with Mr. Basham after the polygraph exam?

A.   Not at all.  We were -- at that point some of the things he was telling us we felt weren't true.  You know, when he was giving his statement there were inconsistencies in his statement.  And at that point we would begin to say, you know, "We don't believe you are telling us the truth on that specific incident," and we continued from there.

Q.   When you would tell him that you didn't think he was telling you the truth, did you threaten him in any way or did you suggest that he was going to be in any kind of worse trouble if he didn't tell the truth, or something like that?

A.   No, sir.

Q.   Okay.  And in being -- his having been confronted with your opinion that he wasn't telling you the truth, he gave you some additional information that was different than the previously provided information?

A.   That's correct.

Q.   Okay.  At any point during the interview on -- that began at 9:45 on the 19th, did Mr. Basham indicate his desire to speak with an attorney?

A.   He did not.

Q.   At any time did he indicate reluctance to speak with you about the topics that you were discussing?

A.   Not at all.

Q.   Okay.  At any time did you threaten him with anything, promise him anything?

A.   No, sir, no threats or promises are ever made when we are doing these sorts of interviews.

Q.   Did you provide him nourishment?

A.   We did.  Breaks, cigarettes, soda, food, things of that nature.

Q.   And how long did the interview that began at 9:45 last?

A.   The interview was completed at 2:40 p.m.

Q.   And that was -- included somewhere in the way a polygraph exam being administered by Agent Christianson?

A.   Yes, sir.

          MR. SCHOOLS:  We have no further questions on that second statement, Your Honor.

          THE COURT:  All right, Mr. Harris.

          MR. SCHOOLS:  We would offer Government's Exhibit -- no, I'm sorry, Your Honor.

                    RECROSS EXAMINATION

BY MR. HARRIS:

Q.   Agent Vito, the second -- the next morning when you visited him at 9:45, he was still in the same location as the earlier visit, correct?

A.   Yes, sir.

Q.   Still at the Catlettsburg jail?

A.   Pardon?

Q.   In Catlettsburg, still the jail in Catlettsburg?

A.   Boyd County jail, yes, sir.

Q.   And the statement you made, he answered your questions again without hesitation?

A.   Yes, sir.

Q.   He was more forthcoming during this interview?

A.   He was.

Q.   The first interview he gave you, the way it's presented in your report, pretty much bullet points about what they had done?  For instance, they escaped from jail, they asked a man for a ride, they took over the truck and on?

A.   Yes, sir.

Q.   Is it fair statement to say that the second interview pretty much supplemented some of these areas?

A.   It was.

Q.   For instance, they escaped from jail, and he kind of describes for you in the second interview their escape from jail?

A.  Yes, sir.

Q.  He talks about they asked a man for a ride.  In the second interview he more completely explains to you who the man was, where they went, and their thoughts behind the kidnapping of James Hawkins?

A.  Correct.

Q.  And so on and so forth.  That's kind of the way the second interview went, correct?

A.  Yes, sir.

Q.  Now, the polygraph was administered after you had supplemented that first report and gotten what you believed to be some truthful information, as well as some not truthful information, correct?

A.  Yes, sir.

Q.  Now, at what point during the morning did Barbara McGuire show up?

A.  I don't believe that occurred during this interview, sir.

Q.  Okay.  Who is Barbara McGuire?

A.  I don't know Barbara McGuire.  I thought --

Q.  Isn't she the investigator for the public defender's office?

A.  No, I believe that's another name, but let me look.  Okay, B. McGuire.

Q.  Right.

A.  Yes, sir, that is not this interview.

Q.  Okay, that's the next interview?

A.  Yes, sir.

Q.  Okay.  At any time during this interview did Mr. Basham ask for a lawyer?

A.  No, sir.

Q.  At any time during this interview did he say he didn't want to answer a question?

A.  No, sir.

Q.  At any time during this interview did he not agree to supplement the earlier interview?

A.  No, sir, he was very cooperative.

Q.  Okay.  You gave him Cokes?

A.  Yes, sir.

Q.  You gave him cigarettes?

A.  We did.

Q.  Did you talk to him about anything other than this case, your investigation?  Personal matters, football games?

A.  Certainly.  Certainly.  I'm sure that we did.

Q.  So, you had a pleasant conversation with Mr. Basham?

A.  We did.

Q.  Was he in any way aggressive towards you during this interview?

A.  Not at all.

Q.  Were you aggressive towards him?

A.  Not at all.

Q.  And other than the whereabouts, the location of Ms. Donovan, is it a fair statement to say that a lot -- a great portion of this second interview was later determined to be truthful?

A.  More information than the original, yes, sir.

Q.  So, is it a fair statement -- it is a fair statement to say that as you became -- or as he became more comfortable with you, he became more honest with you?

A.  I think that's fair to say, yes, sir.

Q.  Now, there's a map you referred to -- during this interview you stated that he drew a map?

A.  Yes, sir.

Q.  Who gave him the pen for that map?

A.  I'm sure that I did.

Q.  Who gave him the piece of paper?

A.  Myself as well.

Q.  Did he tell you that he didn't want to draw any maps?

A.  No, sir.

Q.  Did he ever indicate to you that he didn't even want to talk about directions or locations or anything like that?

A.  No, sir.

Q.  He freely and voluntarily did what he could to -- what was the map of, can you tell us that?

A.  The direction that Mr. Fulks left when he left the motel room.

Q.   Okay.   What motel room?

A.   That they were staying in with the girls, as he referred to.

Q.   The girls in Ashland, Kentucky?

A.   In Myrtle Beach.

Q.   In Myrtle Beach?

A.   Yes.

Q.   He gave you the best that he could -- did he seem to be honest when trying to show you a map and drawing it?

A.   Certainly.

Q.   Did not seem to be deceiving you in any way when drawing that map, did he?

A.   I still had a lot of hesitation about the truthfulness of most of the answers he was giving, but he was more forthcoming with information.

Q.   Okay.  And after that map, that map was later used to locate specific areas?  And that map -- or even that early map you later determined to be at least a rough drawing, rendering, of what was actually the truthful location that the car was driven?

        MR. SCHOOLS:  I'm going to object to relevance --

A.   No, sir, this is not the correct map.

        MR. SCHOOLS:  -- his knowledge -- he wasn't the case agent on the case, he was not in South Carolina.  I don't know that he has knowledge about what was done with the particular

map.  And it's well outside the scope of our inquiry.

THE COURT:  I think -- if the witness doesn't know he can just say he doesn't know.  I will overrule the objection.

BY MR. HARRIS:

Q.  Was that map provided to other law enforcement agencies?

A.  This one was not.

Q.  Okay.

A.  This is just a direction from a motel -- oh, I'm sure it was.  At one point it was provided, yes, sir.

Q.  And do you know who it was provided to?

A.  No, sir.

Q.  But it was used, that map, the map that he drew for you during that second interview was used as a tool, an investigative tool, in this case?

A.  If you would categorize it with broad strokes, I would say yes, sir.

Q.  Okay, thank you.  How did the interview end?

A.  Cordially.

Q.  At 2:40?

A.  What time?  Yes, sir, 2:40.

Q.  Cordially?

A.  Yes, sir.

Q.  And when you left the interview, did you tell Mr. Basham that you would be returning to interview him again?

A.  I don't remember, but left that possibility open.

Q.   Okay.   The best that you can recall, how was it left open?  Was it you saying, "I will come back"?  Or was it him saying, "Please come back"?

A.   "We may need to talk to you again," or words to that effect.  And he said, "Sure," or words to that effect.

Q.   Did he have any hesitancy in you coming back and discussing this matter with him further?

A.   No, sir.

MR. HARRIS:  That's all I have.  Thank you.

THE COURT:  Any redirect?

MR. SCHOOLS:  Not on that statement, no, Your Honor.

THE COURT:  All right.  Anything from the defendant on this statement?

MR. SWERLING:  Judge, there would be no evidence presented.  Basically the same position we have had in the last statement, that we would ask you to make your threshold ruling under Rule 104 as to whether or not the statement is admissible, whether or not he got his rights, and whether or not he knowingly waived his rights.

THE COURT:  All right.  Same ruling.  I find he was properly advised of his rights pursuant to Miranda and properly waived those rights.  I find the statement to be voluntary under the totality of the circumstances.  The motion to suppress is denied.

How many statements do we have to try to get through,

Mr. Schools?  I'm not trying to rush you, I'm just trying to see how we stand.

MR. SCHOOLS:  We have got I think three witnesses after Mr. Vito, with three more statements.

THE COURT:  All right.  Are they all from out of town?

MR. SCHOOLS:  Yes, sir.  Agent Long is the case agent, he's one of the witnesses that we have.  And Pat Maley is another one, he's local now.  He wasn't at the time.

THE COURT:  So, they will be back tomorrow, those second two?

MR. SCHOOLS:  We can bring him back tomorrow if we need to, Judge.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. SCHOOLS:

Q.  Agent Vito, you concluded your interview on November 19th of 2002 at approximately 2:40 p.m.  After that, did you take any additional investigative steps during the course of the investigation?

A.  Oh, yes, sir, I'm sure that there were -- I was providing information as it was obtained from Mr. Basham to the other investigators that were working the case.  We did not have an active physical investigation in my territory, so there was nothing to investigate at that point.

Q.  So, there was an open FBI case in Kentucky, you were providing assistance to agents in other jurisdictions; is that right?

A.  I wouldn't say in Kentucky, not in my area.  I believe that the Hopkinsville area, the area where the escape occurred, there may have been a case on the escape or unlawful flight or something like that.

Q.  Okay.  For the record, Madisonville and Hopkins County, Kentucky are on the very western tip of Kentucky?

A.  Yes, sir.

Q.  And Ashland is on the eastern tip --

A.  Eastern tip.

Q.  -- just south of West Virginia, and at the West Virginia, Ohio, Kentucky kind of junction; is that correct?

A.  Correct.

Q.  Okay.  So, whatever was going on in western Kentucky, you were not part of?

A.  That's correct.

Q.  But you were providing information that you received from Mr. Basham to other law enforcement officers, both federal and state, who were involved in this investigation?

A.  Yes, sir.

Q.  Now, at this point, after the interview on the -- the second interview on the 19th, had you and Mr. Basham discussed at all the incidents in West Virginia?

A.   No, sir.

Q.   Okay.

A.   Not at all.

Q.   Did you again interview Mr. Basham on the next day, the 20th of November?

A.   If I may clarify, sir, the last interview, there was some mention of being in West Virginia, but not a specific incident in West Virginia.

Q.   Do you recall whether you asked Mr. Basham during that previous interview anything about any crimes that may have occurred in West Virginia?

A.   No, sir, I don't recall if I did.  I don't think that I did.

Q.   Did he tell you about anything?

A.   No, sir, he didn't mention any crimes.

Q.   Okay.  So, you next spoke with him again on November 20th; is that right?

A.   Yes, sir.

Q.   How did that come about?

A.   We wanted to attempt to get some more information, as well as clarify some information that he had already provided.  It was a follow-up interview from the information he had already given.

Q.   And who participated in this interview?

A.   Myself, Supervisory Special Agent Pat Maley, and a

Detective Scott Lawrence with the West Virginia State Police.

Q.  Were all three of you in the room during the entire course of this interview?

A.  In the beginning of the interview we all three were present.  Mr. Maley left at 11:20, and then returned at some point during the latter part of the interview.

Q.  How did the interview start?

A.  Mr. Basham was again advised of his Miranda rights, and shown the same form that had he signed and initialed on the previous occasions.

Q.  Let me show you what has been marked as Government's Exhibit Number 2, did you in fact advise him from a new form this time around?

A.  Yes, sir, I did.

Q.  Is Government's Exhibit Number 2 the form?

A.  It is.

MR. SCHOOLS:  Your Honor, we would offer Government's Exhibit 2 at this time.

MR. HARRIS:  No objection.

THE COURT:  Without objection.

BY MR. SCHOOLS:

Q.  Did you read Mr. Basham those rights, or did he read them, or how did that go?

A.  I provided them to him, he had already demonstrated the ability to read and write, and he read over the rights and

signed them.

Q. Did he have any hesitation in signing the waiver form?

A. No, sir.

Q. Subsequent to his signing the waiver form, did you and Agent Maley have a conversation with him?

A. We did.

Q. And did he respond to your questions willingly?

A. Absolutely.

Q. Was he coherent, did he answer questions, did he provide answers that were responsive to your questions?

A. He did.

Q. What was the tone of the interview?

A. Very cordial.

Q. So, Agent Maley is a new participant in this. Was he aggressive with Mr. Basham?

A. No, sir.

Q. Was anybody in the room aggressive with Mr. Basham?

A. No, sir.

Q. Where were you at the time?

A. We were in the same administrative office that we had used on the several other occasions.

Q. Okay. Now, at any time during this interview or prior interviews, did Mr. Basham complain to you concerning his health, or any other issues concerning his ability to understand what was going on in the Boyd County --

A.  No, sir.  No, sir.  I believe he had expressed some problems with ==sleeping,== but other than that, no, sir.

Q.  Did he ever indicate to you that he didn't understand what was going on or didn't understand your questions?

A.  Not at all.

Q.  And you had been with him, at least through the first two interviews, through the course of a little over an hour the first time and a little over almost five hours the second time, so a total of about six hours?

A.  Yes, sir.

Q.  How about the interview on the 20th, how long did that last?

A.  Began at 11:20 a.m. and concluded at 7 p.m.

Q.  So, about seven hours that day?

A.  About eight, yes, sir.

Q.  And was Mr. Basham provided nutrition and nourishment that day?

A.  He was.  Numerous breaks, lunch.

Q.  And he appeared fully willing to talk to you?

A.  Yes, sir, absolutely.

Q.  At this point did you begin to explore some new topics with Mr. Basham?

A.  Yes, sir, we did.

Q.  And specifically what did you explore?

A.  We again went more into detail.  The first interview was

bullet format, the second was exploring more the actions of Mr. Basham and Fulks, and the third we went into more detail of all.

Also Detective Lawrence, having case knowledge of the incident in West Virginia with Ms. Burns, those type of questions were brought up in this interview.

Q.  Okay.  Detective Lawrence you said was with the West Virginia State Police; is that correct?

A.  Yes, sir.

Q.  Okay.  And he was allowed to participate in an effort to try to determine information from Mr. Basham regarding the West Virginia incident?

A.  Yes, sir.

Q.  And what did Mr. Basham tell you about that?

A.  He advised -- I'll have to refer to my notes, I'm sorry.

He advised that they had been in West Virginia, that they had stayed with a -- I'm trying to find the spot -- with a woman in West Virginia that Mr. Fulks had known.

Q.  Do you recall whether that was before or after they had been in South Carolina?

A.  At the time, sir, it was unclear.  Mr. Basham expressed several times that he was not really sure what state he was in during his travels.  But the -- he was aware of the lady's name in South Carolina -- or West Virginia that they were staying with.

Q.  And did he provide any information concerning the disappearance of a West Virginia victim?

A.  No, sir.  He had mentioned earlier that -- in this interview that Fulks got a girl in West Virginia.  And we had queued on that again, and toward the end of the interview -- and he clarified and said that he was talking about getting -- Fulks getting a girl's credit cards.

Q.  Okay.  So, initially he said to you regarding West -- being in West Virginia, that Fulks had got a girl in West Virginia?

A.  Yes, sir.

Q.  And later he attempted to clarify that by saying that Fulks had gotten a girl's credit cards?

A.  That's correct.

Q.  Okay.  And that was during the interview on the 20th?

A.  Yes, sir.

Q.  And at that time did Mr. Basham provide some additional information or any different information concerning the South Carolina victim?

A.  Yes, sir, he did.

Q.  What did he tell you?

A.  He advised that -- at this point he had said that Mr. Fulks had given more information about what he had done with Ms. Donovan.

Q.  And what did he say?

A.  Actually he said that later that night, after Fulks had

already left with the woman, came back and talked to him.  He said that he had had sex with the woman and tied her up.

Q.  Okay.  And based on that information, did you communicate that to other law enforcement agents throughout this investigation, both -- I guess in South Carolina?

A.  Yes, sir.  And he also had given some information concerning the area where Fulks -- again, where Fulks had told him that he had left Ms. Donovan.

Q.  Okay.  And was that information specific enough to provide back to South Carolina for the execution of searches, if you know?

A.  Yes, sir, I believe it was.  We had -- there were several reference points in this, and there was also a hand drawn map that was done to Mr. Basham's specifications.

Q.  You indicated this interview lasted almost eight hours?

A.  Yes, sir.

Q.  At any point did Mr. Basham indicate fatigue or reluctance or any desire not to speak with agents any more, or did he request an attorney?

A.  No, sir, he did not.

            MR. SCHOOLS:  No further questions on that statement, Your Honor.

            THE COURT:  Mr. Harris.

                        RECROSS EXAMINATION

BY MR. HARRIS:

Q. Now, on the 20th when you arrived at 11 o'clock, this would have been the third interview of Mr. Basham that you were present -- that you took part in, correct?

A. Yes, sir.

Q. And by this time he had been under arrest for three days, since the 17th?

A. Yes, sir.

Q. Correct? And by this time he had been interviewed by law enforcement agents totaling as much as six hours?

A. Yes, sir.

Q. During this three day period, did anybody ever take him in front of a judge for a bond hearing?

A. I believe if I'm not mistaken, from the information that I got, that he had went to a bond hearing that day, the 20th.

Q. You are sure about that?

A. I don't know, sir, that he did or not, but I believe that's what happened.

Q. Okay. And Mr. Schools just talked about this interview lasting a long period of time. The fact of the matter is that the interview initially concluded at 5:04, didn't it?

A. There was a break, yes, sir.

Q. And there was a break because someone from the public defender's office, Barbara McGuire, came and asked you to stop asking questions, didn't she?

A. She came and asked to speak to her client.

Q.  She asked you to stop asking questions and allow her to talk to him by themselves, correct?

A.  Yes, sir.

Q.  And you did that?

A.  Yes, sir.

Q.  Now, do you have any independent knowledge of what Ms. McGuire advised Mr. Basham during that hour that she spent with him?

A.  I have no idea.  I was not --

Q.  You have no idea?

A.  I was not present, no, sir.

Q.  But you do know that the only reason that interview stopped on that day was because Ms. McGuire asked you to stop?

A.  Yes, sir.

Q.  And not Mr. Basham, correct?

A.  That's correct.

Q.  And after the hour that he spent with Ms. McGuire and she left the room, did you have a conversation with her regarding the continued questioning of Mr. Basham?

A.  Myself and Mr. Maley, I remember a conversation, yes, sir.

Q.  What did she tell you?

A.  That -- words to the effect of that she wasn't an attorney, that she was there gathering information for her attorney, who was the actual person who was representing Mr. Basham.

Q.  And she told you that Branden would continue to speak with

you, didn't she?

A.   Yes, sir.  I'm sure.

Q.   And he did continue to speak with you, didn't he?

A.   He did.

Q.   And he continued to supplement the interview, previous interviews?

A.   Yes, sir.

Q.   He continued to give you helpful information regarding your investigations, didn't he?

A.   He continued to give information, yes, sir.

Q.   And much of this information assisted your investigation, didn't it?

A.   The information was more detailed and provided more information to allow us to attempt to find Ms. Donovan, for instance.  But I don't believe that he was telling us the truth during these interviews.

Q.   Truthful or not, the information he was giving you on that third interview, after having met with someone from the lawyer's office in that area, that information was later used to investigate this case, wasn't it?

A.   The information was used to investigate the case, yes, sir.

Q.   Thank you.  Now, the interview concluded at 5:04, he met with someone from the public defender's office for approximately an hour and 15 minutes.  How long did the interview continue after 6:19 p.m.?

A.  We began again at 6:19 and then the interview concluded at 7 p.m.

Q.  Okay.  So, when Mr. Schools talks about an eight hour interview, this really was an eight hour interview, between you and my client, my client and someone from the public defender's office -- it was a long day, wasn't it?

A.  Yes, sir.

Q.  At any point during that time was he combative with you?

A.  Not at all.

Q.  At any time was he aggressive with you?

A.  No, sir.

Q.  At any time did he tell you that he didn't want to answer a question?

A.  No, sir.

Q.  He answered all your questions?

A.  He did.

Q.  He drew the maps where you wanted a map?

A.  He did.  The maps were drawn to his specifications.

Q.  His specifications?

A.  Mr. Maley drew the map.

Q.  At any time did he tell you that he wanted a lawyer?

A.  No, sir.

Q.  At any time did he tell you that he wanted medications?  At any time did he tell you that he wanted to make his emotional state better?

A.   I remember him talking about his emotional state, but, no, sir.

Q.   Let's talk about that.  You knew that he was on medications by this time, certainly.  He had told you he took medications, psychological medications, didn't he?

A.   There was at one point where Mr. Basham mentioned medications, and I don't remember if it was this interview or the interview with his attorney.  I remember him speaking to his attorney about medication.

Q.   And that's not in the report?

A.   No, sir.

Q.   Okay.  But clearly Ms. McGuire and Mr. Basham talked about medications that he needed -- did you take steps to get his medications corrected?

A.   The medications, or anything that an inmate would need for the course of his treatment, is provided by the jail.

Q.   Okay.  So, the answer is that you didn't take any steps to get his medications straight?

A.   No, sir.

Q.   Nonetheless, even though he didn't have his medications straight, he still nonetheless spoke with you about this case?

A.   Yes, sir.

Q.   He helped further your investigation?

A.   He provided information for the investigation, yes, sir.

Q.   He provided information that was used in the investigation,

correct?

A. Yes, sir. But I would -- if you are asking me my opinion, I would say that information that is not truthful isn't that helpful in an investigation.

Q. But much of the information he gave, whether it was untruthful or not, was used in the investigation --

A. Yes.

Q. -- correct?

A. That's correct.

MR. HARE: Thank you. That's all I have, thank you.

THE COURT: Any redirect?

MR. SCHOOLS: Briefly.

REDIRCT EXAMINATION

BY MR. SCHOOLS:

Q. After Ms. McGuire came in and had an opportunity to speak with Mr. Basham, did you and/or Agent Maley again advise Mr. Basham that he didn't need to answer any questions, and do that in the presence of Ms. McGuire?

A. We did.

Q. And it was subsequent to that that he agreed to continue answering questions without her present; is that right?

A. Yes, sir.

Q. And Mr. Harris was asking about a bond hearing. To your knowledge at this point were there any federal charges pending against Mr. Basham in Kentucky?

A.   To my knowledge, no, sir.

Q.   And do you know if there were federal charges pending anywhere against him at that time?

A.   And I should say when he says bond hearing, I don't know that it was a bond hearing or what type of hearing it was.  I believe he had a hearing this morning on the Wednesday, the 20th, but I don't know what type.

Q.   Okay.

A.   And I do not know if there was any federal charges on him at all.

MR. SCHOOLS:  Thank you, no further questions.

THE COURT:  Any argument by the defendants?

MR. HARRIS:  Nothing, Judge, thank you.

THE COURT:  All right, I find that the third interview, any statements made at the third interview were not taken in violation of Miranda and were not involuntary.  Under the totality of the circumstances test, another Miranda form was in fact executed, and the defendant was not coerced in any way, so the motion is denied.

Why don't we take a 10 minute recess before we get to the next witness?  All right, we will be in recess for 10 minutes.

MR. SCHOOLS:  Your Honor, we are done with Agent Vito, I believe, can he be excused?

THE COURT:  Any objection?

MR. SWERLING:  No, sir.

THE COURT:  All right, you are excused.  Thank you, sir.

THE WITNESS:  Thank you.

(Short recess)

THE COURT:  Please call your next witness.

THE CLERK:  Special Agent Maley, would you please come forward to be sworn?  Place your left hand on the Bible and raise your right hand.   Please state your name for the record.

THE WITNESS:  Patrick James Maley.

PATRICK JAMES MALEY, SWORN

DIRECT EXAMINATION

BY MR. SCHOOLS:

Q.  Special Agent Maley, you are employed with the FBI; is that correct?

A.  That is correct.

Q.  How long have you been with the bureau?

A.  21 years.

(Off record discussion)

BY MR. SCHOOLS:

Q.  How long have you been employed by the bureau?

A.  21 years.

Q.  And your current duty station is where?

A.  Assigned to the Columbia Division as assistant agent in

charge.

Q. How long have you been here?

A. Two months.

Q. Coincidentally, where were you previously located?

A. Prior to Columbia I was assigned to the Louisville division as supervisor of the Covington region.

Q. And were you physically located in Covington?

A. I was physically located in Covington and supervisor there for 10 years.

Q. How many agents were in Covington?

A. Eight agents in Covington.

Q. And two in Ashland?

A. Two in Ashland.

Q. Your title there was SSRA?  What is an SSRA?

A. Supervisory special resident agent.

Q. Were you in that position in November 2002?

A. I was.

Q. While you were in the position as the SSRA in Covington, did you have a chance to get involved in an investigation involving Branden Basham?

A. I did.

Q. How did you get involved?

A. On November 17th I was called at home between 11 and midnight by Agent Jeff Long, Myrtle Beach RA, and he advised me we had a Branden Basham, was in Boyd County Jail in Ashland,

Kentucky, and he was under arrest for shooting at a police officer in Ashland, and he was a suspect in a kidnapping matter.

Q.   In South Carolina?

A.   In South Carolina.

Q.   In response to this call from Agent Long, what did you do?

A.   I called up the agent in charge of the -- senior agent in Ashland RA, which was Scott Vito, and I dispatched him to the Boyd County jail.  He lived about an hour away.

I sat there on the phone, was at my house about an hour, talking to agents, getting as much background as possible.  And then I called Scott with all the background I had in order to do the interview as quick as possible, due to the urgency of the interview, because the victim woman was still missing.

Q.   Did you yourself get in a car and drive to Ashland?

A.   As soon as I had the background for Scott, I headed to Ashland, Kentucky.

Q.   How long a drive was that for you?

A.   Two and-a-half hours.

Q.   We previously heard some testimony about some statements that Mr. Basham had made -- one of which I think you participated in -- on November 20th of 2002.  Do you recall that statement?

A.   I do.

Q.  Okay.  And we have already dealt with the admissibility of that, so I want to jump ahead to November 25th of 2002.  Did you have an opportunity to meet with Mr. Basham on the 25th of November?

A.  I did.

Q.  And how did that come about?

A.  I was -- I was contacted by the Myrtle Beach RA, or possibly the female federal prosecutor in the case, to meet with Mr. Basham's attorney at the Boyd County Jail.  And at that point in time Mr. Basham's defense attorney had made arrangements with the federal prosecutor to allow his client to provide information on the location of the victim's body in South Carolina.

Q.  That was the purpose of your meeting with him on the 25th?

A.  That is correct.

Q.  Have you, prior to -- did you meet with Mr. Basham and Mr. Hughes?

A.  I did.

Q.  On that day, prior to that meeting, did you have any conversations with Mr. Hughes concerning the parameters of that conversation?

A.  Not prior to arriving.  Earlier that day -- the reason -- earlier that morning, I had come to work on that Monday and on my voice mail there was a message from Branden Basham, he had called me collect from jail.  I reported it to the local

Assistant United States Attorney, Bob McBride, and then I called his defense attorney and advised him that his client was unilaterally reaching out for me.

And then that must have stimulated some conversations between the defense attorney and the federal prosecutors, which ultimately led to them asking me and Scott Vito to come to the Boyd County Jail to debrief Mr. Basham in the presence of his attorney.

THE COURT:  Who was the attorney?  What was name of the attorney?

THE WITNESS:  Mr. Hughes.

BY MR. SCHOOLS:

Q.  Richard Hughes?

A.  Richard Hughes.

Let me correct that, I wasn't allowed to debrief him per se, Richard Hughes was going to provide the information to us.

Q.  In Mr. Basham's presence?

A.   In Mr. Basham's presence.

Q.  So, describe what happened when you arrived at the Boyd County Detention Center on the 25th?

A.   Again, time was urgent.  I left from Covington and I was about two and-a-half hours from the Boyd County Jail.  Scott Vito was in Louisville that day, he was farther away, so I got there first.  And when I got there I spoke to the defense

attorney.

And his instructions to me was that he had worked out with the federal authorities in South Carolina where he would provide directions to the body of Ms. Donovan. And that he was going -- he was going to provide it to me firsthand, as opposed to Mr. Basham telling us directly.

Q. That's what he explained to you at the beginning of the interview?

A. Yes.

Q. Nonetheless, did you advise Mr. Basham of his rights prior to commencing to receive information from him and Mr. Hughes?

A. I did. It was -- things were happening pretty fast and just in an abundance of caution I went ahead and advised Mr. Basham of his rights again in the presence of his attorney.

Q. Let me show you what has been marked as Government's Exhibit 3, is that the advice of rights form that you provided to Mr. Basham that day?

A. It is.

Q. And it is witnessed by you and I believe by Mr. Hughes, his attorney; is that correct?

A. That's correct.

MR. SCHOOLS: And, Your Honor, we would offer Government's Exhibit 3 at this time.

MR. HARRIS: No objection.

THE COURT: Without objection. Admitted.

BY MR. SCHOOLS:

Q.   So, after you arrived you advised Mr. Basham of his rights. What happened next?

A.   We were in a conference room and Mr. Hughes -- Mr. Hughes had been -- had debriefed his client before I got there and so he started telling the narrative of how to locate the body. And so for probably several hours he was providing information. I had -- I started a hand -- a handwritten map, and during that period of time he provided us information, and he would huddle with Mr. Basham on occasion.

On occasion, when it came to a right turn, left turn, dirt road, paved road, Mr. Basham would maybe have some discussions with "the turn right there" and would make that distinction of how to find the body.

Q.   When you say he would make the distinction or have a discussion with the attorney right there, would he be speaking so that you could hear him but his attorney was present?

A.   His attorney was I think very judicious in not having his client say anything more than limited information about directions, whether either houses -- because we were trying to get a full description of how to find -- how to find the body.

And again, during the contact, at the very beginning, I told Mr. Basham everything he says -- going to write down everything he says and use against him.  There are several comments in my written report where he made unilateral

statements that I wrote down.

Q.   At this point where was Mr. Basham, through Mr. Hughes, directing law enforcement to look for the South Carolina victim?

A.   Could you repeat that question?

Q.   Sure.  At this point, during this interview, where was Mr. Basham, through Mr. Hughes, directing law enforcement to look for the South Carolina victim?

A.   There was a starting point at a gas station, and from that frame of reference where Mr. Basham recalled certain events taking place, such as Mr. Fulks buying tape, we then proceeded in a narrative of trying to trace his steps to where they ultimately placed the body.

And it was just a cumulative rolling narrative of right turns, left turns, curves, dirt road, a few landmarks -- not many landmarks at all.  It was basically -- most of the driving with Mr. Fulks and Mr. Basham and the victim were on rural roads with very little landmarks and not very many houses around.

Q.   And you had participated in the November 20th, 2002 interview of Mr. Basham; is that right?

A.   In a very limited fashion.

Q.   Were you aware, based on your participation in that earlier interview, whether the location that was being identified on the 25th with respect to location of that victim was the same

as the location that was being provided on the 20th?

A.   It was different.

Q.   And this was information that was provided, again, through Mr. Hughes in the presence of Mr. Basham after you Mirandized Mr. Basham?

A.   On the 25th.

Q.   Now, the information that you got from Mr. Hughes, and with Mr. Basham present, did you forward that to law enforcement in North Carolina and South Carolina, to your office in Myrtle Beach?

A.   We did, we faxed it to the Myrtle Beach office.

Q.   How long do you think the interview took with Mr. Basham and Mr. Hughes?

A.   Two or three hours.

Q.   During the course of that interview was anybody else present other than the three of you?

A.   Not to my knowledge.

Q.   Okay.  Were you in any way confrontational during the interview?  Did you suggest to Mr. Basham you didn't believe him or anything of that nature?

A.   During the 25th, no, not at all.  I was essentially the note taker for his attorney to provide us information.

Q.   And again, that interview was confined -- based on communications that you had with both an Assistant U. S. Attorney in South Carolina and Mr. Hughes -- was confined to

the location of the body and not detailed as to how the events had transpired?

A.   Predominant information came from Mr. Hughes.  I was instructed to go there by either someone from the Myrtle Beach RA, and I believe I had a short conversation with a female federal prosecutor, but again, throughout all the interviews we had no promises made.

Q.   Okay.  Subsequent to this conversation with Mr. Hughes did you have additional conversations with Mr. Hughes about the West Virginia victim?

A.   I did.

Q.   And how did that come about?

A.   It was the day after the 25th, it was late at night, I either got called -- got called on my cell phone or got paged and spoke with Mr. Hughes at length on the phone, and Mr. Hughes had unilaterally reached out to me and he had -- was providing information on -- that he received from Mr. Basham on the possible location of the West Virginia victim's body.

Q.   Was that new information for you at that time?

A.   That was new information for me.  I was aware of that situation.  The West Virginia State Police were involved in our interviews of Mr. Basham, but I was not in-depth into that particular case nor was I aware of the geography of Huntington, West Virginia, which Mr. Hughes was describing to me.

Q.   What did Mr. Hughes say was his purpose in communicating

that information to you?

A.   I think Mr. Hughes' overriding involvement in this case was to prevent his client from getting the death penalty in this case.

Q.   So, he was attempting to assist law enforcement in locating a West Virginia victim?

A.   No doubt.

Q.   In hopes it might help his client?

A.   In some undetermined way.

Q.   During the conversation he had with you during the late evening hours of the 26th, did he actually relate information to you about the location of that victim?

A.   He did.   And I took notes.   And after a period of time I told him that I would call my counterpart in West Virginia, Joe Ciccarelli, and provide him that information and put those two people together, because Joe was the supervisor on that particular case and the information would be much more relevant and meaningful to Joe in a real time way, as opposed to myself in Covington, three hours from Huntington.

Q.   Did you -- you told Mr. Hughes you were going to do that?

A.   Yes.

Q.   And he said that was okay with him?

A.   He gave me all his numbers, his home numbers, his cell numbers, and I called Joe Ciccarelli and passed those numbers on to him and provided what information I had on to him at that

time.

Q.  Did you have any additional conversations with Mr. Hughes after that?

A.  I do not think so -- with one exception.  When I was preparing my report I was looking at my notes, looking at the map, and was locating the advice of rights form and I couldn't immediately find it.  And I knew this was an important matter and some day would have a hearing just like this, and I called him up while it was still fresh and said -- to see if he had it, see if he saw it anywhere.

He had not, and he wrote me a letter stating basically what had happened, that I advised his client of his rights and he was the witness.  And a short time after that telephone call I found my advice of rights in another folder.

Q.  The letter you received from Mr. Hughes confirmed that he had seen the document, that Mr. Basham had signed it, and then Mr. Hughes had witnessed it in your presence?

A.  Yes, that is correct.

Q.  And you subsequently found it?

A.  I found it within moments after getting that letter.

MR. SCHOOLS:  Your Honor, I don't have my further questions -- beg the court's indulgence.

BY MR. SCHOOLS:

Q.  Mr. Maley, at any time during the course of the interview with Mr. Basham and Mr. Hughes on the 25th, did you make any

promises to them or specifically advise them with respect --

there were any promises with respect to the resolution of this

case, or anything else?

A.   I always make it a habit in situations like this to say

that, you know, "I can't make any promises."  And in a case

like this we are truly at the very end, I was being instructed

to come in and take the notes with a federal prosecutor already

in the -- in process with the defense attorney.  There was --

Q.   Do you recall whether when you arrived at the Boyd County

Detention Center to speak with Mr. Hughes and Mr. Basham,

whether Mr. Hughes was on the phone with an agent in South

Carolina at that time?

A.   That is correct.

Q.   So, it was your understanding that Mr. Hughes was

communicating directly with a South Carolina agent when you

entered the room that day?

A.   That is correct.

       MR. SCHOOLS:  No further questions.

       THE COURT:  Cross-examination.

                    CROSS EXAMINATION

BY MR. HARRIS:

Q.   So, Mr. Basham calls you and says that he wants to speak

with you about the location of Ms. Donovan's body in your

investigation?

A.   That's not correct.  He left me a voice mail and it was a

collect call over the weekend to the FBI office in Covington. It was from him.

Q.   What did the message say?

A.   That he wanted me to make contact with him.

Q.   What did you think that he wanted to discuss with you?

A.   When we finished the interview on the 20th, we left the door open, "If you remember anything else, any other details --" we again go back to the urgency of the situation where the woman was missing.  We were not going to leave any stone unturned and so we left the door open with him.  And when he called and left that message, I assumed that he was calling to provide some more information.

Q.   Maybe I asked the question wrong.  You assumed, based on his contact to you, that he wanted to continue to provide you information, correct?

A.   He wanted me to get ahold of him, that is correct.

Q.   And when you got ahold of him, he provided additional information to you?

A.   Is this on the 25th?

Q.   Yes.

A.   Well, I didn't contact him directly.

Q.   Through his lawyer?

A.   I contacted his lawyer and told him his client was reaching out for me and that's why I -- that's where I left it.  Again, taking the high ground.  We are always available to obtain

information.

Q.   So, Richard Hughes sets up a meeting at the jail; is that correct?

A.   That is correct.

Q.   And who is present at this meeting?

A.   I was the first one on the scene, and Scott Vito arrived about 15 minutes later.

Q.   When you arrived, my client, Mr. Basham, and Mr. Hughes were on the phone discussing the investigation with the South Carolina and North Carolina authorities, weren't they?

A.   When I arrived, Mr. Hughes was on the phone with what I believed to be the Myrtle Beach RA and agent there.

Q.   And he was assisting them in the location of the body of Ms. Donovan, correct?

A.   I assume so, I'm not sure.  When I arrived that conversation ended rather quickly.

Q.   Did you discuss that conversation with Mr. Hughes?

A.   I did not.

Q.   You didn't ask Mr. Hughes, "What were you speaking with the South Carolina law enforcement about?"

A.   Let me back up.  As soon as he discontinued that phone call, we then discussed -- he in a kind of affirmative way said, "This is what we are going to do," and this is what he had worked out with the South Carolina authorities.

Q.   And what he said they worked out is that Mr. Basham was

going to assist law enforcement in the location of the body but

he was going to do it through an attorney; is that correct?

A.   That is correct.

Q.   And he proceeded to do that, didn't he?

A.   He did.

Q.   Now, at the beginning of your interview on the 25th with

Mr. Hughes, do you recall Mr. Hughes producing a tape recorder?

A.   He did.

Q.   And do you recall that Mr. Hughes, not you but Mr. Hughes,

on the tape recorder advised Mr. Basham of what his rights

were?

A.   I don't recall that.

Q.   Do you recall Mr. Hughes telling Mr. Basham that anything

that was said that day could be used against him and Mr. Basham

said, "I don't care, let's tell them where the body is"?  Do

you remember that?

A.   I do not recall specifically that conversation.

Q.   Do you remember something along --

A.   I remember the recorder being on, and I remember me with my

advice of rights, providing it to Mr. Basham and his attorney.

Q.   Okay.  And nothing -- nonetheless, after Mr. Hughes said

whatever he said and after you advised Mr. Basham of his

rights, they proceeded to give you a map that had been

previously prepared by Mr. Hughes and my client, right?

A.   That is correct.

Q.  And that map was a map of northern, or western -- the coastal area of North Carolina?

A.  It was a map using a service station as a point of reference.

Q.  The Amoco station?

A.  The Amoco.

Q.  And that map, I think, stated that they should travel toward -- they travel 20 miles and saw an animal park sign?

A.  It was much more roundabout than just 20 miles to the animal park sign.

Q.  They drove 20 miles and they turned and traveled five to 10 minutes; is that what they said?  Do you recall?

A.  I would have to get my notes out, but we, to the best of my ability and the best of Mr. Basham's ability, he was trying to articulate the path and the path was not a direct line from A to Z.  As a matter of fact, I can say Mr. Basham probably didn't know it was Amoco, he just knew a convenience store.

Q.  That's what I'm getting at.  To the best of his knowledge he was doing the best that he could to say where they traveled that day, he and Fulks, correct?

A.  Mr. Basham, I don't know about Mr. Fulks.

Q.  Mr. Basham was trying to account for, to the best of his ability, where he and Mr. Fulks traveled that day, correct?

A.  Yes, without a doubt.

Q.  And it involved numerous turns, didn't it?

A.  Correct.

Q.  Involved dirt roads, didn't it?

A.  Correct.

Q.  And it involved hard -- I think you called them hard gravel roads?

A.  Correct.

Q.  And black tops?

A.  Yes.

Q.  And animal park signs?

A.  That was one of the few specific landmarks that he could come up with.

Q.  And a cemetery?

A.  And a cemetery.

Q.  The fact of the matter is, after Mr. Basham provided you that information, law enforcement were able to find most of those landmarks, weren't they?

A.  I'm unaware of what happened in North Carolina.

Q.  So, you can't testify about what the results of Mr. Basham's providing the information was, but you do know he provided information, right?

A.  I do.

Q.  Was it freely and voluntarily provided?

A.  Yes.

Q.  At any point during this -- how long was this interview, four hours?

A.   I think it was only two or three hours.

Q.   Two or three hours.  At any point during this two or three hours, did Mr. Basham ever stop his attorney and say, "Wait a minute, don't tell them that"?

A.   No.

Q.   At any point did he say -- did he say, "I'm not going to answer that question"?

A.   No, I was not allowed to talk to him directly.

Q.   At any point did Mr. Hughes tell you that he would not answer a question put to him, on behalf of Mr. Basham?

A.   I don't recall him saying that specifically, but it was all geared toward the same direction.

Q.   They were cooperating?

A.   Correct.

Q.   They were trying to help law enforcement, weren't they?

A.   Correct.

Q.   Now, two days later, after that, let's talk about the -- talk about the end of that interview, the interview on the 25th, did you --

          THE COURT:  Mr. Harris.

          MR. HARRIS:  Yes, sir.

          THE COURT:  We have -- I have to break promptly at 4:15.  I'm not trying to rush you.

          MR. HARRIS:  I might have two more questions.

          THE COURT:  I'm not trying to rush you, it just

looked like to me you had a ways to go and I wasn't going to stop --

MR. HARRIS:  No, sir.

THE COURT:  Go ahead.

BY MR. HARRIS:

Q.  Did you at the end of that interview leave it on good terms with my client, with Mr. Basham, or on poor terms?

A.  I would say good terms.

Q.  And did you invite him to come back to you with additional information?

A.  I don't recall that specifically, but I certainly would have left the door open through his attorney, of course.

Q.  And that happened, didn't it?

A.  It did.

Q.  I mean -- and you offered for him to come back at a later date and he did so, didn't he?

A.  Correct.

Q.  Mr. Basham came, through his attorney, at a later date to give you additional information?

A.  Mr. Hughes called me with derived information that he had from Mr. Basham.

Q.  That happened on the 27th?

A.  It was the day after the 25th.  It was definitely the 26th, almost certainty late at night.  It was around 10 or 11 o'clock at night, maybe later.

Q.  Mr. Basham, through his attorney, continued to cooperate even after the interview on the 25th, correct?

A.  Correct.

Q.  And Mr. Basham was assisting law enforcement in their investigation in South Carolina, and assisting them in their attempt to find Ms. Donovan's body on the 25th?

A.  That is correct.

Q.  And on the 27th they called back and he was assisting law enforcement in their attempts to locate the body of Samantha Burns, correct?

A.  Later on the 26th I got a call from his attorney saying just what you said.

Q.  To assist law enforcement?

A.  To assist.

MR. HARRIS:  Thank you.  Thank you.

THE COURT:  Any redirect?

MR. SCHOOLS:  Very quickly, Your Honor.

REDIRECT EXAMINATION

BY MR. SCHOOLS:

Q.  Special Agent Maley, would it be fair to say that Mr. Basham appeared to be attempting to assist; is that right?

A.  He -- he appeared to be assisting.  And I think you would compare and contrast that with the statement -- a map he provided us on the 20th, which was with equal specificity, it appeared later on to be not true and correct, which -- which

during the 25th essentially he advised through his attorney that the map on the 20th was incorrect.

Q.  Is it fair to say the value of the assistance was dependent on his sincerity?

A.  I would say the value of his assistance would be -- would be based on the results.

MR. SCHOOLS:  No further questions.

THE COURT:  All right.  Anything further before we excuse the witness so he can go back?

All right, thank you, you may step down and you are excused.

Since I'm right at 4:15, why don't I hear any argument counsel wishes to make and rule on this one first thing tomorrow?  And can we start at 9 o'clock?

MR. SCHOOLS:  Yes, sir.

MR. SWERLING:  Judge, Mr. Monckton is coming in from Myrtle Beach but I can try to reach him.  He was due here about 9.

THE COURT:  To do what?

MR. SWERLING:  He's a witness tomorrow.

MR. SCHOOLS:  We have got some other witnesses to go forward with before Mr. Monckton that would be relevant to these statements.

MR. SWERLING:  That's fine, I was just trying to figure out what --

THE COURT: Let's start back at 9 o'clock. We lost some time today. Sorry about my schedule this afternoon. I will rule on this statement we just heard about.

And how much more testimony do you estimate we need to hear before getting to the motions?

MR. SCHOOLS: We have got two witnesses, Your Honor. I don't know whether Mr. Swerling has witnesses. He may call Mr. Monckton and Mr. Littlejohn.

THE COURT: I see Mr. Blume is back. Is your wife doing all right?

(Off record discussion)

THE COURT: Very good. Be in recess until 9 o'clock tomorrow morning.

(Thereupon, the proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * * *

I N D E X

| WITNESSES | DE | CE | RD | RC |
|---|---|---|---|---|
| WILLIAM TODD KELLEY | 8 | 11 | | |
| ROBERT BRUNTY | 17 | 20 | 24 | |
| DAN MOONEY (BY THE COURT - 39) | 26 | 34 | | |
| SCOTT VITO | 42 | 52 | 59 73 87 | 66 82 |
| PATRICK JAMES MALEY | 89 | 101 | 109 | |

GARY N. SMITH, CM
COLUMBIA, SC

JA 0563

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

Gary N. Smith, CM                    8-9-04
                                      Date

GARY N. SMITH, CM
COLUMBIA, SC

JA 0564

A_43371

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,               )        Cr. No. 4:02-992
                                        )
                                        )
VERSUS                                  )        Columbia, S.C.
                                        )        February 24, 2004
CHADRICK E. FULKS and                   )
BRANDEN L. BASHAM,                      )
                                        )
                                        )
            Defendants.                 )
-----------------------------------------)

EXCERPT OF MOTIONS HEARING
TESTIMONY OF DAVID J. HACKER AND LEONARD SCOTT SMITH


BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Appearances:

For the Government:            STROM THURMOND, JR., ESQ.
                               U.S. Attorney for South Carolina
                               SCOTT SCHOOLS, ESQ.
                               JONATHAN S. GASSER, ESQ.
                               Assistant U.S. Attorneys
                               1441 Main Street, Suite 500
                               Columbia, S.C.  29201

For the Defendant              JOHN H. BLUME, ESQ.
        Fulks:                 KEIR M. WEYBLE, ESQ.
                               1247 Sumter Street, Suite 202
                               Columbia, S.C.  29201

                               SHERI LYNN JOHNSON, ESQ.
                               Cornell Law School
                               Myron Taylor Hall
                               Ithaca, NY  14853

                               WILLIAM F. NETTLES, ESQ.
                               Assistant Federal Public Defender
                               401 Evans Street, Room 240
                               Florence, S.C.  29503


GARY N. SMITH, CM
COLUMBIA, SC

**JA 0565**

A_43232

(Appearances continued:)

For the Defendant            JACK B. SWERLING, ESQ.
         Basham:             1720 Main Street
                             Columbia, S.C.  29201

                             GREGORY P. HARRIS, ESQ.
                             1720 Main Street
                             Columbia, S.C.  29201

Court Reporter:              Gary N. Smith, CM
                             901 Richland Street
                             Columbia, S.C.  29201
                             (803) 256-7743

              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

          (Short recess)

          THE COURT:  All right, Mr. Gasser.

          MR. GASSER:  May it please the court, Your Honor.  To put the first witness the government intends on calling into context, should the case against Mr. Fulks reach the sentencing stage, part of the testimony on aggravation that the government would intend on introducing would be some prior bad act character evidence against Mr. Fulks.

          The government is getting ready to call Agent Dave Hacker, who is an FBI agent.  And to understand why the government is calling him, I would just proffer this for the court in terms of Mr. Fulks' attorneys, although they have received some of this documentation in discovery.

          On June the 18th, 2002, an employee with the state crime laboratory's car was broken into at the Mammoth Cave

National Park and some -- and that employee with the state crime lab had been to the FBI academy and had purchased some FBI academy shirts and a jacket. Those items were stolen.

On June the 19th, the next day, on an interstate in Kentucky, two individuals were riding in an RV, their car had broken down. As a Kentucky state trooper came and assisted them in radioing a tow truck, and then left on another assignment, those individuals -- a car pulled up, an individual pulled out of the car -- or got out of the car. Came forward, was wearing an FBI-type logo shirt and allegedly claimed to be an FBI agent, was asking about certain narcotics, ended up pulling out a semi-automatic pistol and robbing both of those individuals at gunpoint. That individual the government will contend was in fact Chad Fulks.

His wife at the time was in the car. She has given statements to law enforcement as well, indicating that she was present in the car, along with her three year old son, when they pulled over in front of an RV, and Chad came back with some marijuana and some cash.

Also, around that same time period, a tow truck driver had stopped to assist another vehicle, totally separate, Your Honor, and he was underneath that car getting ready to hook up his truck to that car, and an individual wearing an FBI logo shirt approached him, pulled a gun out on him, attempted to rob him. He attempted to take the gun away from the

GARY N. SMITH, CM
COLUMBIA, SC

A_43234

individual, and that individual fled.

So, that was an attempted armed robbery. And, again, he described the individual as wearing FBI-logo-type shirts, and has actually picked Mr. Fulks out of a photo lineup, and described the car.

So, given that context, the government is getting ready to call Agent David Hacker, who had an opportunity to meet with Mr. Fulks, to advise him of his rights, and to take a statement from Mr. Fulks, in which the government contends at least two important aspects of that statement are relative and relevant to those crimes which I have just outlined to the court.

THE COURT: And these were allegedly committed while he was on escape status?

MR. GASSER: No, sir. These were committed before he was incarcerated -- on the charges for which he was incarcerated on, for which he then escaped from the Hopkins County Detention Center.

THE COURT: All right. But he was never charged with these two episodes you just described?

MR. GASSER: I believe he was charged, but they are unadjudicated.

THE COURT: And this would go into the -- if we have a penalty phase, it would be other bad acts?

MR. GASSER: Other bad acts going to the character of

JA 0568

A_43235

Mr. Fulks.

THE COURT:  And the statement that he allegedly made relates to these two incidents that you just described?

MR. GASSER:  Yes, sir.

THE COURT:  All right.

MR. GASSER:  At this time the government would call Agent Dave Hacker.

THE CLERK:  Please come forward to be sworn.

Please place your left hand on the Bible and raise your right hand to be sworn.  Please state your name for the record.

THE WITNESS:  Special Agent David Joseph Hacker.

DAVID JOSEPH HACKER, SWORN

DIRECT EXAMINATION

BY MR. GASSER:

Q    Agent Hacker, sir, would you please tell us where you are employed, for the record?

A.   I'm employed as a special agent with the Federal Bureau of investigation at the Elizabethtown, Kentucky Resident Agency.

Q.   And how long have you been with the FBI?

A.   Approximately seven years.

Q.   Agent Hacker, I want to draw your attention to August the 27th of 2002, did you have an opportunity on that day to meet with the defendant, Chad Fulks?

A.   Yes, sir, I did.

JA 0569

A_43236

Q.   Would you describe to the court the circumstances surrounding your meeting with Mr. Fulks that day?

A.   Mr. Fulks was being held in the Hopkins County Detention Center.  And I received information that he had been arrested by the local police in connection with several burglaries and break-ins.  And they were currently searching his residence where he was residing.  And I was accompanied by Detective Jeff Wilson to interview him regarding this, and the incidents you described previous to my coming to the stand.

Q.   Detective Wilson is with what agency?

A.   The Kentucky State Police.

Q.   And why was the FBI investigating the particular matters for which I previously outlined to Judge Anderson?

A.   We were investigating this for an impersonation case, that he had represented himself as an FBI agent while he was robbing these folks, and attempting to rob this individual on the side of Interstate 65.

Q.   Where did you come into contact with Mr. Fulks?

A.   I came into contact with Mr. Fulks at the Hopkins County Detention Center.

Q.   Other than Investigator Wilson, was there anyone else present with you when you came into contact with him?

A.   No, sir, there was not.

Q.   And prior to actually questioning Mr. Fulks about your impersonation investigation, did you go over with him his

constitutional rights?

A. Yes, sir, I did.

Q. And did you use a particular document to do that with?

A. Yes, sir, I do.

Q. I show you what's been marked Government's Exhibit Number 4 for this particular hearing, do you recognize that document?

A. Yes, sir, I do.

Q. And what is Government's Exhibit 4?

A. That is the FD 395 advice of rights form.

Q. And whose signatures appear on Government's Exhibit Number 4?

A. My signature, Detective Jeff Wilson's signature, and Chad Fulks' signature.

THE COURT: Any objection to the document?

MR. NETTLES: No, sir.

THE COURT: Are you offering it into evidence?

MR. GASSER: Yes, sir, Your Honor.

BY MR. GASSER:

Q Agent Hacker, prior to questioning Mr. Fulks on August the 27th of 2002, would you please publish to the court the rights that you discussed with Mr. Fulks that day?

A. I read Mr. Fulks the -- his advice of rights forms. I read him the form verbatim, which reads, "Your rights. Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used

against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have your lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any question if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

"Waiver of your rights. I have read this statement of my rights and I understand that my rights are -- I understand what my rights are. At this time I'm willing to answer questions without a lawyer present."

Q. So, did you actually read those rights to Mr. Fulks as you just published them in the court here?

A. Yes, sir, I did.

Q. And what then did you also allow Mr. Fulks to do?

A. After determining that he could read, write, and understand the English language, I provided these for him to read himself.

Q. And were you present when Mr. Fulks appeared to be reading over the document?

A. Yes, sir, I did.

Q. And did Mr. Fulks sign this document, particularly the waiver of his constitutional rights aspect of it?

A. Yes, sir, he did.

Q. And did you witness that signature?

A. Yes, I did.

JA 0572

A_43239

Q.   And who else signed the document witnessing the fact that Mr. Fulks had signed Government's Exhibit 4?

A.   Detective Jeff Wilson with the Kentucky State Police.

Q.   Now, Agent Hacker, did you or Detective Wilson or anyone in your presence promise Mr. Fulks anything in exchange for answering any of your questions that day?

A.   No, sir, I did not.

Q.   Did you or did anyone threaten him in any manner?

A.   No, sir.

Q.   Any deals offered to Mr. Fulks?

A.   No, sir.

Q.   In your years of experience as a law enforcement officer, have you had occasion to come into contact with somebody who appeared to be under the influence of alcohol and/or drugs?

A.   Yes, sir, I have.

Q.   When you were in contact with Mr. Fulks on August the 27th, did he appear to be under the influence of any alcohol or drugs?

A.   No, sir, he did not.

Q.   Did he appear to understand who you were and why you were there?

A.   Yes, sir, he did.

Q.   Did you have any difficulty in conversing with him or understanding when he responded to you?

A.   No, sir, I did not.

JA 0573

A_43240

Q.   And did he in fact agree to waive his constitutional rights and answer some of your questions?

A.   Yes, sir, he did.

MR. GASSER:  Now, Your Honor, unless the defense has -- unless the defense has certain specific substantive questions, I don't know whether the court wants me to go through everything that this agent discussed with Mr. Fulks.  I don't know whether defense counsel wants to do that from a procedural perspective --

THE COURT:  Well, for today's hearing it's not important that you put on the record precisely what the defendant said.

MR. GASSER:  That's what the defendant's position is.

THE COURT:  All right.  Well, you didn't ask -- you know, in terms of a statement being admissible, you have got a Miranda issue.  And then over and above Miranda you have the general issue of voluntariness, which can get into things like his mental ability --

MR. GASSER:  Yes, sir, I understand.  I wasn't finished questioning him, I just wanted to make sure that I was going to get into the substantive --

THE COURT:  All right.  Mr. Nettles, do you see the need to go into the substance of what Mr. Fulks allegedly said during the interview?

MR. NETTLES:  Not today, Judge.

GARY N. SMITH, CM
COLUMBIA, SC

**JA 0574**

A_43241

THE COURT: All right.

BY MR. GASSER:

Q What specifically did you do to -- Agent Hacker, what did you specifically do to insure Mr. Fulks in fact understood the English language and could read and write?

A. I questioned him as to the level of education he had received. I questioned him whether he had -- whether he could understand, read, and write the English language, to which he acknowledged that he could read, write, and understand the English language.

Q. And after him waiving his rights and you questioning him as to his understanding of the English language, in your opinion did he voluntarily have this discussion with you and respond to your questions initially?

A. Yes, sir.

Q. And did there come a time period during the questioning and answer session that Mr. Fulks indicated that he did not want to answer any more questions?

A. Yes, sir. Shortly into the interview he advised that he wished to speak to an attorney before he answered any more questions.

Q. And when Mr. Fulks invoked his right to counsel, what did you do?

A. We immediately stopped questioning, and he was taken back into the jail. And we left the jail to continue with other

JA 0575

A_43242

interviews. "We" being myself and Detective Wilson.

Q. Prior to him invoking his right to remain silent, did anyone in your presence threaten Mr. Fulks in any manner?

A. No, sir.

Q. And did anyone make any promises with regards to anything that he was telling you that day?

A. No, sir.

Q. Prior to him -- prior to you terminating your questioning with him, had he at any time indicated to you that he did not want to answer your questions?

A. No, sir.

Q. Prior to that last portion that you just described to the court?

A. No, sir.

Q. Did he ever indicate to you during the questioning and answering session, prior to that invocation that you have just described to the court, did he ever mention anything about wanting a lawyer present?

A. No, sir.

MR. GASSER: Beg the court's indulgence. That's all I have, Your Honor.

THE COURT: All right, cross-examination.

CROSS EXAMINATION

BY MR. NETTLES:

Q. Agent Hacker, you have been with the FBI seven years now?

GARY N. SMITH, CM
COLUMBIA, SC

JA 0576

A_43243

A. Almost seven years. In April it will be seven years, sir.

Q. Okay. So, in November of -- I mean, August of 2002, roughly five and-a-half years? Five or five and-a-half years?

A. Approximately.

Q. Okay. You were advised of the existence of these cases by whom?

A. Advised by --

Q. You were advised of the existence of the cases on Interstate 65 in Kentucky by what agency?

A. I was contacted by our radio operator. I was -- at the time was at a training and was advised of the incidents where someone had represented themselves as an FBI agent, attempting to rob two individuals on the side of Interstate 65.

Q. And these incidents occurred on or about June the 19th, 2000; is that correct?

A. That is correct, sir.

Q. Okay. Prior to you interviewing Chad Fulks on August the 27th, 2002, did you undertake any investigation in the case?

A. I had contacted the state police and coordinated a meeting with Detective Jeff Wilson. And he had discussed the -- actually had given me the names of the two victims in this matter.

Q. Had you taken statements from those victims by that time too?

A. Not at that point, sir, no.

Q. Okay. Do you know if any statements had been taken of the victims at that time?

A. Not by myself. Possibly by the state police.

Q. Okay. And did you have anything to do with preparing any type of photo lineup at all?

MR. GASSER: Your Honor, I would object. The purpose of this particular hearing is for a Jackson v. Deno hearing and not any type of identification discovery or a fishing expedition.

MR. NETTLES: I just want to know what the FBI knew before he went in and talked to my client, I think that's important. What opinions he had developed by that time, Judge.

THE COURT: Well, we are not trying that case.

MR. NETTLES: I understand.

THE COURT: We are here today to determine whether the statement that was given was voluntary.

MR. NETTLES: I understand. I will move on.

THE COURT: All right.

BY MR. NETTLES:

Q. Agent, when you went to the Hopkins County jail on August the 27th, you went with Detective Jeff Wilson?

A. That is correct.

Q. Okay. And Mr. Fulks was already in custody?

A. Yes, sir.

Q. He had been charged with other offenses?

GARY N. SMITH, CM
COLUMBIA, SC

JA 0578

A_43245

A.   Yes, sir, he was.

Q.   Do you know whether or not he had invoked his right to counsel on those other offenses?

A.   It was my understanding that he had not invoked his right to counsel at that point.

Q.   And do you know if, prior to your questioning Mr. Fulks about the robbery offenses on I-65, any other police officer had questioned him about that?

A.   From what I understand, the arresting officers had initially questioned him and they had taken him to the jail after that.

Q.   And when he went to the jail and you went to the jail to see Mr. Fulks, where did you go in the jail?

A.   We went into a -- I guess what they would call a meeting area, where they had seats facing each other and where prisoners I would meet with, their attorneys, where they would meet with other law enforcement.

Q.   Could you describe the room?

A.   The room, a slender room approximately 10 feet wide by 30 feet long where they do the in-processing on one side of the room, and then the other side of the room are concrete benches with a concrete table between.  And you sit opposite of each other and you talk.

Q.   Okay.  And so inside the room, when Mr. Fulks got in, were you, Detective Wilson, and Mr. Fulks?

JA 0579

A_43246

A. And there were also -- they were processing other prisoners out of earshot, but off to what would be my left-hand side.

Q. How far away would that be?

A. Approximately 15 feet.

Q. Did you enter the room prior to Mr. Fulks?

A. Yes, sir, I was there prior --

Q. Was Mr. Fulks -- how was Mr. Fulks brought to the room?

A. He was wearing a prison jumpsuit and his -- neither his hands nor hands were cuffed at that point.

Q. Neither his hands nor feet were cuffed?

A. No.

Q. Okay. And approximately how long did it take for you to go over the advice of rights form with Mr. Fulks, if you know?

A. Approximately two minutes.

Q. Okay. Prior to going over the advice of rights form with Mr. Fulks, did you advise him of the specific nature of the charge that you were investigating?

A. Yes, sir.

Q. Okay. Prior to going over the form with Mr. Fulks, you stated you determined that his educational level was what grade?

A. The 11th grade, sir.

Q. Okay. And did you delve into his education any further, other than asking what level -- what grade level he had attained?

A.  No, sir, not at that point.

Q.  Did you ever ask him if he had any trouble in school?

A.  No, sir.

Q.  Did you ever ask him if he had any trouble reading?

A.  No, sir.

Q.  Okay.  So, other than his statement that he knew how to read, that's all you knew about his educational level, that and the 11th grade?

A.  Yes, sir.

Q.  Okay.  And other than the 11th grade, you don't know if he passed all those grades going to the 11th grade, do you?

A.  No, sir, I do not.

Q.  Okay.  And I believe Mr. Gasser asked you if any other officers or agents had promised Mr. Fulks anything in response to his answering questions on these charges.  Do you know that?

A.  I can only speak for myself and Detective Wilson as we sat there and spoke to him, that we did not promise him or guarantee him anything.

Q.  And did you not investigate whether anybody else had?

A.  No, sir, not to my knowledge.

        MR. NETTLES:  Thank you.  Excuse me, Court's indulgence.

        Thank you, nothing further.

        THE COURT:  Any redirect?

        MR. GASSER:  No, sir.

JA 0581

A_43248

THE COURT: Thank you, sir, you may step down.

Anything else on this statement?

MR. GASSER: No, sir.

THE COURT: Mr. Nettles, this is your motion to suppress, is there anything you want to say or any evidence you want to produce on this particular --

MR. NETTLES: We don't have any argument, Judge.

THE COURT: Beg your pardon?

MR. NETTLES: We are not going to offer any evidence, Judge, at this time.

THE COURT: All right. Well, what is the basis for keeping the statement out?

MR. NETTLES: Judge, we are not offering any basis to keep the statement out at this time.

THE COURT: All right. Well, based on the undisputed testimony that I heard, it appears to me that in regard to this particular interview by Agent Hacker, the Defendant Fulks was properly Mirandized. In other words, he was advised of his rights pursuant to the Miranda decision. That advice was memorialized in writing and signed by the witness, and witnessed, so I find no Miranda problem.

And over and above Miranda, I find no voluntariness problems, looking at the totality of the circumstances. So, the evidence will be admitted if we have a phase 2 on penalty. And, of course, the law is, the defendant can still challenge

JA 0582

A_43249

the voluntariness before the jury. But for present purposes, the statement will be admitted.

MR. GASSER: Thank you, Your Honor.

THE COURT: Let's move to the next one.

MR. THURMOND: Your Honor, the government calls Detective Scott Smith.

THE CLERK: Mr. Smith, please come forward to be sworn.

Please place your left hand on the Bible and raise your right hand. State your name for the record.

THE WITNESS: Detective Leonard Scott Smith.

LEONARD SCOTT SMITH, SWORN

THE COURT: Mr. Thurmond, you may proceed.

MR. THURMOND: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. THURMOND:

Q. Detective Smith, where are you employed?

A. With the Kentucky State Police.

Q. And how long have you been there?

A. I have been with the Kentucky State Police five years.

Q. During the summer of 2002, were you involved in an investigation of a Veronica Evans and Chad Fulks?

A. Yes, sir, I was.

Q. And for what reason?

A. It was in reference to a criminal abuse first, child, and

JA 0583

A_43250

also receiving stolen property over $300.

Q.   Now, during the course of your investigation, did you attempt to interview Mr. Fulks?

A.   Yes, sir, I did.

Q.   And when did that occur?

A.   That would have occurred on August the 27th of 2002.

Q.   And did he answer your questions when you interviewed him?

A.   No, sir, he did not.

Q.   Subsequently was an arrest warrant sought against Mr. Fulks on those charges?

A.   There was an arrest warrant sought on him in reference to the criminal abuse first degree.

Q.   And when was that warrant served?

A.   That warrant would have been served on him around September the 28th of 2002.

Q.   And was he eventually indicted on those charges?

A.   Yes, sir, he was.

Q.   And when was that indictment returned?

A.   The indictment was returned on October the 17th of 2002.

Q.   And did you have an opportunity to serve Mr. Fulks with an arrest warrant on an indictment, as well as a copy of the indictment itself?

A.   Yes, sir, I did.

Q.   Let me show you what's been marked for I.D. as Government's Numbers 5 and 6, and ask to you take a look at those.  Do you

JA 0584

A_43251

recognize them?

A. Yes, sir, I do.

Q. What are they?

A. Government's Exhibit Number 5 is the count 1 of criminal abuse first degree that was presented to the Todd County grand jury in Todd County, Kentucky. And the Government's Exhibit Number 6 is the warrant of arrest on an indictment for the criminal abuse first degree on Chadrick Fulks.

Q. Do you see your signature anywhere on Government's Exhibit Number 6?

A. Yes, I do. It's in the proof of service block at the bottom of the page.

MR. THURMOND: Your Honor, we would offer Government's 5 and 6 at this time.

THE COURT: Any objection?

MR. NETTLES: No, sir.

THE COURT: All right, you may proceed.

BY MR. THURMOND:

Q. When did you serve Mr. Fulks with that warrant?

A. November 3rd, 2002.

Q. And where did that occur?

A. At the Hopkins County Detention Center.

Q. Now, what if anything occurred when you presented him with those documents?

A. After I presented Mr. Fulks with the documents, along with

JA 0585

A_43252

a uniform citation, Mr. Fulks made a statement to me wishing to speak with me.

I advised Mr. Fulks that he had already requested an attorney, and that I was not allowed to speak with him at that time without his attorney present, due to these charges and the circumstances I would not be able to discuss them with him.

And Mr. Fulks then made a statement to me advising me that, "I can't let this happen." He had said that "They are going to hang me or kill me," or something to that effect. And he said, "I cannot let this happen," as I was walking out the door leaving.

Q. You did not attempt to further question him?

A. No, sir, I did not.

MR. THURMOND: Thank you. That's all the questions I have for you at this time.

THE COURT: Any cross-examination?

MR. NETTLES: Briefly, Judge.

CROSS EXAMINATION

BY MR. NETTLES:

Q. Mr. Fulks previously invoked his rights on August the 27th; is that correct?

A. Yes, sir, he did.

Q. And is it normal procedure for the investigating Kentucky state trooper to serve arrest warrants pursuant to indictment in Kentucky?

JA 0586

A_43253

A. Whenever we have had charges, investigations, to where we have not had an arrest warrant previously, I will serve an indictment, yes, sir.

Q. Okay. But in this particular case you testified that there had been an arrest warrant issued --

A. I had served an arrest warrant in reference to the criminal abuse first, I had not charged Mr. Fulks with the receiving stolen property over $300 yet.

Q. Okay. So, on September 28, after the arrest warrant for the criminal abuse first was issued, you served him with that one, correct?

A. Yes, sir.

Q. Okay. And then on November the 3rd, 2002, you served him with an arrest warrant pursuant to an indictment for criminal abuse first?

A. Yes, sir.

Q. So, this was a little out of your ordinary procedure; isn't that correct?

A. The reason why the indictment was served, I did the favor for the Todd County Sheriff's Department. Since I had to serve the indictment warrant for receiving stolen property, I went ahead and served this one at the same time as well.

Q. Okay. And when you served the warrant on him, where were you?

A. At the Hopkins County Detention Center.

Q.   Okay.   And whereabouts in the Hopkins County Detention Center --

A.   In front of the booking area.   The book windows inside the Hopkins County Detention Center.

Q.   Okay.   For the record, that was going to be my question, where was the location?   And who was there when you served the warrant?

A.   Mr. Fulks and myself.

Q.   Okay.   Were there any other individuals in the room?

A.   There -- behind the window there, the booking window, the clerks would have been there, the deputy jailers.

Q.   Okay.  And did they hear Mr. Fulks make any of these statements?

A.   No, sir, they did not.

Q.   Okay.   And did you report to them that Mr. Fulks made any of these statements?

A.   No, sir, I did not.

Q.   Okay.   Do you recall exactly verbatim what Mr. Fulks told you?

A.   No, sir, I do not.

Q.   Okay.   Did you write down at any time what Mr. Fulks told you?

A.   No, sir, I did not.

Q.   Okay.   And what is your best recollection of what Mr. Fulks told you?

JA 0588

A_43255

A.   My best recollection of what Mr. Fulks told me was that "They are looking to hang me or kill me with these charges, and I cannot let that happen."

Q.   Did Mr. Fulks tell you he was not guilty at that time?

A.   No, sir, he did not.

Q.   Mr. Fulks tell you he didn't do it?

A.   No, sir, he did not.

Q.   If he did, you didn't write it down?

A.   No, sir, I did not.

Q.   Okay.  And the next day Mr. Fulks escaped; is that correct?

A.   Yes, sir, it is.

Q.   Okay.  And you were involved in proceedings subsequent to the escape; isn't that correct?  An investigation subsequent to the escape?

A.   I was not involved with the investigation of the escape itself per se, I -- the next involvement I would have had would have been with the missing persons complaint involving Mr. Hawkins.

Q.   Correct.  And in regard to that investigation -- Mr. Hawkins went missing on November the 5th; isn't that correct?

A.   I believe it was November 6th.

Q.   November 6th.  Well, you were -- you went to Mr. Hawkins' house, correct?

A.   Yes, sir.

Q.   Did you at that time advise anybody with the Kentucky State

JA 0589

A_43256

Police, who was investigating the escape, of what Mr. Fulks had told you on November the 3rd?

A. As far as doing directly, I -- that would be in any written report, not that I can remember. I may have said -- made a general comment to one of the other officers there at the scene about what was said. But as far --

Q. What exactly would you have told him was said?

A. The same thing that I have just told you here today.

Q. Okay. So, on November the 6th, 2002, you didn't recall exactly what Mr. Fulks had told you?

A. Not to -- verbatim, no, sir.

Q. You just sort of remembered the general tenor of what he told you?

A. Yes, sir.

Q. Okay. And you at no time ever committed what Mr. Fulks told you to paper?

A. No, sir, I have not.

        MR. NETTLES:  Thank you.

        THE COURT:  Any redirect?

        MR. THURMOND:  Yes, Your Honor.

                REDIRECT EXAMINATION

BY MR. THURMOND:

Q. Detective Smith, is there any doubt in your mind that Mr. Fulks said, quote, "I can't let that happen," end quote?

A. No, sir, there is not.

GARY N. SMITH, CM
COLUMBIA, SC

**JA 0590**

A_43257

MR. THURMOND: Thank you. Your Honor, that's all I have.

RECROSS EXAMINATION

BY MR. NETTLES:

Q. Can you tell me verbatim, word-for-word, what Mr. Fulks told you that day?

A. Verbatim, no, sir, I cannot.

Q. Okay. So, all you remember is the gist?

A. Yes, sir.

Q. Okay. And so those words that you just spoke in response to Mr. Thurmond's question was based on a general recollection of what was said?

A. Yes, sir.

Q. Not exactly what was said?

A. No, sir, not exactly.

THE COURT: All right, any evidence by the defendant?

Thank you, sir, you may step down.

Any evidence by the defendant on this statement?

MR. NETTLES: No, sir.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

I N D E X

| WITNESSES | DE | CE | RD | RC |
|---|---|---|---|---|
| DAVID J. HACKER | 5 | 12 | | |
| LEONARD SCOTT SMITH | 19 | 22 | 26 | 27 |

GARY N. SMITH, CM
COLUMBIA, SC

JA 0591

A_43258

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____     _____
Gary N. Smith, CM                            8-9-04
                                                      Date

GARY N. SMITH, CM
COLUMBIA, SC

JA 0592

A_43259

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,          )          Cr. No. 4:02-992
                                   )
                                   )
                                   )
VERSUS                             )          Columbia, S.C.
                                   )          February 25, 2004
CHADRICK E. FULKS and              )
BRANDEN L. BASHAM,                 )
                                   )
                                   )
          Defendants.              )
-------------------------------)

MOTIONS HEARING
(EXCLUDING TESTIMONY OF JEFF LONG, RONALD HEWETT,
WILLIAM MONCKTON, CAMERON LITTLEJOHN, AND ROSEMARY PARHAM)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:          STROM THURMOND, JR., ESQ.
                             U.S. Attorney for South Carolina
                             SCOTT SCHOOLS, ESQ.
                             JONATHAN S. GASSER, ESQ.
                             Assistant U.S. Attorneys
                             1441 Main Street, Suite 500
                             Columbia, S.C.  29201

For the Defendant           JOHN H. BLUME, ESQ.
         Fulks:             KEIR M. WEYBLE, ESQ.
                             1247 Sumter Street, Suite 202
                             Columbia, S.C.  29201

                             SHERI LYNN JOHNSON, ESQ.
                             Cornell Law School
                             Myron Taylor Hall
                             Ithaca, NY  14853

                             WILLIAM F. NETTLES, ESQ.
                             Assistant Federal Public Defender
                             401 Evans Street, Room 240
                             Florence, S.C.  29503

GARY N. SMITH, CM
COLUMBIA, SC

JA 0593

(Appearances continued:)

For the Defendant          JACK B. SWERLING, ESQ.
        Basham:            1720 Main Street
                           Columbia, S.C.  29201

                           GREGORY P. HARRIS, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

Court Reporter:            Gary N. Smith, CM
                           901 Richland Street
                           Columbia, S.C.  29201
                           (803) 256-7743

                STENOTYPE/COMPUTER-AIDED TRANSCRIPTION


* * * * * * * * * * * * * * * * * * * * * * * * * *

        THE COURT:  All right, the last witness that we heard from yesterday was Agent Maley.  And we heard the testimony but I didn't hear any argument about the admissibility of the statements made to him.

        MR. SCHOOLS:  Your Honor, before we address argument on that issue, there is one more proffer that the government would make with respect to those statements that Agent Maley testified about yesterday.

        THE COURT:  All right.

        MR. SCHOOLS:  By agreement with counsel for Mr. Basham, we are not calling Mr. Hughes as a witness because we both agree on what Mr. Hughes would say if called as a witness.

        And what Mr. Hughes would say is that he met with Mr. Basham, that he explained to Mr. Basham the information that Mr. Hughes was going to be providing on Mr. Basham's behalf

could be used against Mr. Basham.

That he explained all that to Mr. Basham and Mr. Basham understood that, and that Mr. Basham authorized Mr. Hughes to make statements both to Agent Maley and to -- both to Agent Maley in regard to the South Carolina victim, and to Agent Maley -- and then the next day to Agent Joe Ciccarelli, an agent in West Virginia, regarding the location of the West Virginia victim.

And that he made those statements with his authorization and with Mr. Basham's understanding that those statements of the attorney could be used against him. So, that would be the substance of Mr. Hughes' testimony if he were called.

THE COURT: All right. Mr. Swerling, do you agree to the stipulation of his testimony?

MR. SWERLING: That's correct, Judge.

THE COURT: All right. Any argument on the statements we are on now?

MR. SWERLING: Judge, as previously stated, and for the reasons previously stated, we are asking Your Honor to go ahead and make a preliminary finding under Rule 104 as to the voluntariness of the statements.

THE COURT: All right. I find the statements to be voluntary and proper under the Miranda decision, and so I will deny the motion to suppress the statement made to Agent Maley.

I guess it was November the -- what was the date of this last statement we are talking about?

MR. SCHOOLS: The 25th --

THE COURT: The 25th.

MR. SCHOOLS: -- was the date of the statement regarding Alice Donovan, the 26th was the statement to Agent Maley concerning the West Virginia victim, and then the 27th, Mr. Hughes again spoke with Agent Ciccarelli regarding the location of the West Virginia victim.

THE COURT: All right. Well, all three episodes of statements are voluntary and proper under Miranda, the motion to suppress is denied.

Let me ask this, obviously we haven't been going into the substance of the statements, but just for my information, do some of these statements admit complicity in the crime charged here?

MR. SCHOOLS: Yes, sir, they -- you mean the statements that we talked about from the beginning?

THE COURT: Well, the ones we've gotten to more recently, I guess, primarily. Or any of the statements, do they admit -- could they be construed to admit guilt?

MR. SCHOOLS: They admit guilt with respect to kidnapping and car-jacking. At no point has Mr. Basham indicated that he was the instrument of death with respect to either of the victims.

THE COURT: Okay, that's just for my information. The subject matter of the statement doesn't bear on the suppression issue to any great extent, but I was just curious.

MR. SCHOOLS: Yes, sir.

(Thereupon, following the testimony of Jeff Long, Ronald Hewett, William Monckton, Cameron Littlejohn, and Rosemary Parham, which has been previously transcribed, the following proceedings were had:)

THE COURT: All right. I will be glad to hear from counsel. Mr. Swerling, this is your motion?

MR. SWERLING: Yes, sir. Judge, if I could just set out what parameters of what I think our objection is.

First of all, I don't think there's any dispute that Mr. Basham accompanied law enforcement voluntarily to go ahead and look for the body. So, as to the statements involving directions specifically of making right and making left -- "This looks familiar, that looks familiar," we don't contest the admission of those statements. Because I think it's clear from the record that that was the whole purpose of the trip.

And Mr. Littlejohn, I think, was clear that he felt that that information was certainly at least going to be used in one fashion or another in the case, although I think he did say that he did not think it would be used against Mr. Basham.

Now, we -- let me just start. There are two disputes

going on here, one is whether Mr. Monckton and Mr. Littlejohn actually heard from Ms. Parham that Columbia might do the right thing, and the discussions of the proffer, you have obviously a dispute. But I don't think that has to be controlling in this situation.

THE COURT: Well, what statements do you want to keep out then?

MR. SWERLING: Judge, I think the statements that need to come out, I think first of all the bright line is anything in the hypothetical. Because it is clear from all the evidence in the record, despite what the government would like to get in, that at no time was it ever represented to law enforcement that that was a statement of Branden Basham.

At no time did law enforcement ever tell Mr. Littlejohn or Mr. Monckton that they would use any information in that hypothetical against Mr. Basham to incriminate him in a court of law.

And at no time did Mr. Littlejohn or Mr. Monckton advise Mr. Basham that anything in a hypothetical that was being told to the agents would in fact be used against him in a court of law.

I think it's clear from the evidence in the record that the hypothetical was never meant to be a statement of what Branden Basham said. I think it's clear from Mr. Littlejohn's recitation to the court that it was never put in the form of a,

"This is what Branden Basham said," it was put in the form of a hypothetical for that exact purpose. And he never thought, nor did Mr. Monckton ever think that a hypothetical that was coming from the lawyers would in any way be used against Mr. Basham.

So, the question here is, they weren't told that, and they didn't tell Mr. Basham that. And there is no evidence in this record that that is in fact a statement by Branden Basham.

Now, the government may take the position that it is a statement of Branden Basham, but Mr. Basham could not make a voluntary or a knowing and intelligent and voluntary waiver of any rights he had unless his lawyers told him that; if he followed that line of thought, that they are taking the position that is his statement, although I don't think there is any evidence of that.

There is no evidence that they told Mr. Basham that by revealing that information to law enforcement it would be used against him. In fact, they said to the contrary, they did not tell Mr. Basham that.

Mr. Littlejohn went so far as to say that when he left the trailer he never talked to Mr. Basham about what the hypothetical was going to be that he was going to tell law enforcement. And he did not have any authority, there was no waiver of privilege for him to discuss with law enforcement anything that Branden Basham told him. And that's why it was couched in the term of a hypothetical, "What if this were the

case?"

So, I mean, I think the hypothetical situation and everything that took place after that clearly is inadmissible because no one ever made any statement here that -- by law enforcement or anyone else -- that that hypothetical would be admitted in evidence. No one ever told Mr. Basham that, so therefore there is no way that that could be a knowing and intelligent waiver of his rights.

And, furthermore, the last part of that is, that there is no evidence in this record from which this court could conclude that that was Branden Basham's statement. As a matter of fact, I just add to that, Mr. Monckton and Mr. Littlejohn both said that a lot of the information in the hypothetical was information they had learned from the sheriff and Ms. Parham, which she just testified she gave a lot of that information to them. And I believe that both of the attorneys testified to that also.

The other part of that issue is what was said during the course of the day outside the direction issue. Both lawyers have testified that it was their understanding that outside -- statements made outside of the directional issues to go ahead and get the location of the body were not statements that were going to be admitted against Mr. Basham. And that they never told him that any statements he made during the course of that day would be admitted against him with an

attempt to incriminate him.

Since they were never told that, they never could communicate that to Mr. Basham either. So, again, any statements that were being made by him could not be, again, knowing and voluntarily made because the lawyers did not believe that those statements were admissible, and therefore they did not tell Mr. Basham that they were admissible against him.

So, I think outside the issues dealing with directions, the statements made during the course of the day up to the hypothetical should be excluded for the same reasons, but clearly the statements also after the hypothetical or in the hypothetical should be excluded for the reasons stated.

Judge, obviously you know there are some cases that deal with this. There's a couple of other matters I would like to bring up with respect to that.

Another thing that has been discussed here is the fact that these were done during plea negotiations, what the lawyers thought were plea negotiations, in an effort to try and assist their client. So, you have what they consider were statements made during -- under Rule 11 and Rule 410.

None of the government agents ever spoke with Mr. Basham directly to advise him that anything he said could be used against him in a court of law. There is no clear and unambiguous admission of fact in that hypothetical, which is

what several of the cases refer to, because it was couched as a hypothetical.

And certainly, as we have known, there was no waiver of privilege. Mr. Littlejohn and Mr. Monckton both said that. Mr. Littlejohn put the government on notice at the beginning of the day that there was not going to be any questioning.

So, it was clear from both lawyers in their minds that at no time were they going to allow the defendant to be questioned because they did not -- that was not the purpose of the search, the issue that -- the purpose of it was to go ahead and search for the body.

They both testified that neither one of them had any authority to waive any privilege. They both testified that neither one of them had the authority to waive any confidentiality.

Now, there's also a discrepancy in the two statements, because some of the cases that I will refer to talk about the reliability of those statements. And I would just bring to the court's attention the one that I brought out on cross-examination, which again defy whether or not this could be any -- in any way construed as a statement of Mr. Basham.

The sheriff wrote down in his notes and so testified that, quote, "Fulks, after slitting the victim's throat in the woods, gave the knife to Branden Basham, who put the knife under his leg until Fulks told him to throw it out the window."

That does not square with what Mr. Long said was in the hypothetical, and that was, "At some point between leaving the cemetery and dumping Donovan's body, Fulks stabbed Donovan and slit the throat." It's two different statements. Two different locations where it happened.

So, both an experienced sheriff and an experienced FBI agent wrote down what the hypothetical -- wrote down the hypothetical in different versions. It's interesting to note that also the sheriff wrote down that it was a hypothetical. But Agent Long did not write down it was a hypothetical, but conceded on cross-examination that his statement would read differently had he put in the word "hypothetical." And he does remember it to be in the form of a hypothetical.

So, I think reliability of that statement becomes a question when a central fact in there is different from the sheriff and different from the agent. Therefore, there is no indicia of reliability, trustworthiness, or accuracy in the statement that the government seeks to use against Mr. Basham through this hypothetical made by Mr. Littlejohn.

Judge, just to briefly go over some of the law in the case. In the Fourth Circuit -- and these are in the briefs, so -- Your Honor remembers that there were some briefs filed early last year by both Mr. Monckton, Mr. Littlejohn, and there was one filed on behalf of Mr. Basham, and there was one filed on behalf of the government.

THE COURT: These are the disqualification briefs?

MR. SWERLING: Yes, sir.

THE COURT: Right.

MR. SWERLING: And all of those referred in general to a lot of the case law that Your Honor relied on before. But some of the cases are determinative as to whether or not statements made by a lawyer would be admissible against the client, and I just wanted to review those very briefly.

United States versus Martin, which is referred to in the briefs as a Fourth Circuit case. That was a prosecution for tax evasion. And the Fourth Circuit allowed in the statement by the lawyer, because the statement itself did not arise to any criminal liability and therefore they found that the lawyer had not exceeded the scope of his authority. That case dealt with the power of attorney.

In United States versus Gregory, a Fourth Circuit case from 1989, the court was willing to allow in statements on evidence on the ground that they were within the scope of the employment, because it was not suggested that the statement exposed the client or the lawyer to criminal liability.

The court in Gregory cited the Martin case, and said that the statement did not rise to the level of criminal responsibility and therefore the attorney had not exceeded his authority.

Here obviously the statements clearly expose Mr.

Basham to criminal liability, and they are therefore not made by an agent within the scope of their employment.

The government in their briefs referred to some of the New York cases, the Second Circuit cases. One was U.S. versus Valencia. That was a statement that -- this was a statement that a lawyer made that turned out to later be false in connection with a bond hearing for his client. And he stated that the client was innocent and did not know the woman in question.

The court went through a very careful analysis of impairing the Fifth Amendment privilege, when you start dealing with these types of situations where the government intends to use a statement made by the client through the lawyer.

And the court there said that they would not subject such statements to more -- a more expansive view of that which you find in an admission of a party opponent. In other words, they were not going to go beyond the rule of evidence to go ahead and allow these statements in.

They also rejected a simplistic approach. Here in this case they rejected the use of the statements because the statement was not in court, like in the McKeon case, which I will discuss in a moment. There were informal discussions. They found it to be a chilling threat to plea negotiations. They wanted to use the statement as an admission of guilt.

The court -- the Second Circuit said, "A court must

be sensitive to the competing interests.  You must look at the ability to retain services, uninhibited discussions between prosecutor and defense, and the risk of impairing the Fifth Amendment privilege."

So, here there was no error in refusing admission of the statement.  The court, also taking note that they recognized the dangerous precedent of admitting informal out of court statements.

In United States versus Arrington, here an attorney attempted to intimidate a prosecution witness by getting him to sign an affidavit.

The court again decided this was not a routine case, there was misconduct on the part of the attorney.  He secured an affidavit recanting testimony of a witness.  The attorney himself became a co-conspirator.

The case is not relevant here, although it's cited by the government, because in this situation the attorneys obviously were not becoming co-conspirators in this.  The reason they allowed it in that case was to impute knowledge to the lawyer, but not to the client.

And there was no effort to impute what the lawyer did to the client in that case, so the court allowed in the statement.  And the reason they allowed it in was because the lawyer was a potential co-conspirator.

McKeon was the case, Judge, which allowed in the --

a lawyer made a statement about his theory of defense in one case, there was a mistrial, or it had to be retried.  In the second case he took an inconsistent position in his opening statement, and the court allowed in the statement he had made in the first case.

The reason they did that is, they analogized that to a situation where a lawyer verifies pleadings.  He's taken a position in court, it's on the record, the lawyer is making the statement as an agent of the client.  And it basically came down to the same situation where a lawyer verifies something in a pleading, he is -- he is binding his client to that particular statement, and that's the reason they let it in there.

In United States versus Brandon, which the court -- the government refers to, in the Seventh Circuit, the court there said, "Attorney may be an agent of a client so long as important policies concerning effective assistance of counsel are preserved."

In this particular case they allowed in the evidence because the lawyer was not a criminal lawyer, and he was making statements in response to a subpoena which the court analogized -- I'm sorry, my mouth is getting dry.  They looked at it as if the lawyer was verifying pleadings, again, or submitting pleadings, responsive pleadings.

THE COURT:  The one thing I remember about all those

cases back when we heard the motion to disqualify was there was no case right on point with what happened here. And there was really a scarcity of cases.

MR. SWERLING: Judge, there are a scarcity of cases. And what I can tell the court from looking at it and researching the issue, is that the only time the courts ever let in these kind of statements -- and they are very rare situations when they let it in -- was number one, where a statement was made by a lawyer in court, for example, the opening statement, or the statement was made in response to a subpoena, or the statement was made with response to a power of attorney.

In the Fourth Circuit, the only time it's been let in is where there has been no criminal liability assessed against the client as a result of it.

THE COURT: This is just a unique set of facts here, and it may never happen again in 50 years.

MR. SWERLING: And that may be true, Judge. But what is critical here is, for Mr. Basham, where the cases seem to suggest -- and not -- I don't think they just seem to suggest, they talk a lot about the privilege, how you have to weigh the competing interests, public policy arguments, and about freezing or putting a freeze on plea negotiations, about giving -- like a chilling effect on lawyers discussing with the prosecution any attempts at plea bargaining.

All of these cases seem to indicate that you have to be very careful before you admit any kind of statement in evidence. They have to be --

THE COURT: Let me just say --

MR. SWERLING: And they always have to have some indicia of reliability.

THE COURT: Let me say this, throughout the hearing yesterday and today, we haven't really focused too much on the statements themselves, we just -- because that wasn't critical, it was the circumstances surrounding the making of the statements.

Here I think I need to know precisely what statement -- you said everything in the hypotheticals and everything contained in the discussion that day that went outside simple directions, but I'm not sure how much of that the government really wants to use. What specific statements do you want to keep out? Give me some examples.

MR. SWERLING: Well, I was going to put into evidence the blurb by the sheriff. But actually Mr. Gasser asked those questions of Mr. Littlejohn, so all of those statements that were made with respect to the hypothetical -- although Mr. -- Mr. Littlejohn says that may not be exactly the way it is, for the purposes of what -- for this hearing I would accept those as being true, so the court could have -- make that determination as to whether or not those statements should be

admissible.

I believe those are the statements that the government is trying to get in, and they would be in response to what Mr. Gasser was asking Mr. Littlejohn at the end. I would have no problem, if the government doesn't have a problem, putting in, for purposes of that record, the sheriff's summary of what happened that day.

MR. GASSER: Here you go (handing).

MR. SWERLING: And I just ask the government, is this what you would contend would come in from the hypothetical?

THE COURT: Let me ask this, how much of this -- I will come back to you, Mr. Swerling, I'm not going to try to cut you off -- how much does the government want to try to offer?

MR. SCHOOLS: All of it.

THE COURT: In the guilt phase?

MR. SCHOOLS: Yes, sir.

THE COURT: I mean, in the disqualification hearing I thought there was only a tangential possibility that these statements might be sought to be used by the government, and I still had to weigh that in the balance.

And I said, "Even though it's very remote that the government may want to use it, and if they want to use it, it's questionable whether it comes in, so in spite of that, of all of that, to be safe, I'm going to disqualify the attorneys."

In light of what we have here and what the government wants to use, the decision to disqualify the attorneys was a no-brainer. I don't know why I had a three day hearing on it. I mean, what's changed?

MR. SCHOOLS: One of the things that changed, Your Honor, and we took the position in our brief, that we weren't clear whether counsel who didn't have to confront the conflict issue would make the decision to try to keep this out, that they might take the position that it would come in.

So, one of the reasons we were -- we were kind of operating blind, because at that time Mr. Basham was in our opinion operating under conflicted counsel, although special counsel had been appointed, but they weren't going to make this decision. And we knew that at some point counsel for Mr. Basham, ultimately afforded, might want to contend that he was actually trying to help here.

THE COURT: All right. And you really --

MR. SCHOOLS: Now we are squarely confronted with their decision that's been made. Apparently that's not what was happening here, or they don't want to make that argument.

THE COURT: And the government is willing to run the risk of an ineffective assistance of counsel claim against those first two lawyers if there is a conviction in this case? Do you want to go forward -- charge straight ahead, put this in, and take your chances later on a 2255 on ineffective

assistance?

MR. SCHOOLS: Yes, sir. Your Honor, it's our position that Mr. Littlejohn and Mr. Monckton made what was a very -- a reasonable and calculated decision, a tactical choice, that at that moment in time Branden Basham's best chance for cooperating and basically in saving his life was on the line.

THE COURT: Because he knew about the video that the government already had?

MR. SCHOOLS: And they were confronted with the fact that Mr. Basham had previously lied, that he had previously --

THE COURT: Am I correct, they knew -- did they know the strength of the government's case at that time?

MR. SCHOOLS: They knew what Ms. Parham testified she had told them, which was everything that Mr. Hughes had advised. And I think Mr. Monckton testified he was aware that they had been seen on video.

THE COURT: Right, he did.

MR. SCHOOLS: So, I mean, I think that was a calculated decision. Mr. Hughes made the same decision in Kentucky. Mr. Hughes, when I spoke with him in Ashland, Kentucky two weeks ago, advised me that only twice in the history of his career has he allowed a defendant to provide information without protection of a proffer, and this was one of the times.

And the reason being, and he said that he fully explained this to Mr. Basham, was that that was his best legal course of action. After consulting with Mr. Basham, that was the best chance to try to mitigate the situation for Mr. Basham, even though Mr. Hughes was clear in his understanding from conversations with Ms. Parham, that all of that information was going to be used against him. Or for him, as the case may be.

THE COURT: All right, this is pretty important too, we need to take a break. Let's come back -- let's finish your argument after the break. Let's take a 15 minute recess and come back, and then I will hear from Mr. Swerling and from the government.

We will be in recess for 15 minutes.

(Short recess)

THE COURT: Mr. Swerling.

MR. SWERLING: Judge, just one more case I wanted to talk about in the Seventh Circuit, United States versus Harris. They let in a statement there of a lawyer, trying to get a witness to accept an identification of the defendant's brother as opposed to the defendant, and the witness would not go along with it.

The reason they allowed it in under -- in that case was that none of the confidential information -- or there was no confidential information being imputed to the defendant.

The lawyer was not relating any confidential communications. And there was no Fifth Amendment issue at all because, again, it was not being attributed to the defendant.

The court in the Seventh Circuit also made several statements that were made in the Second Circuit with respect to this, that there needs to be an exacting standard to avoid entrenching on other important policies.

And here, in that case, in the Harris case, there were no policies that were affected because there was no infringement of the attorney-client relationship. And that was basically what the Second Circuit said about policy concerns also.

So, Judge, in summary -- well, we have -- I have given you a copy of what the sheriff had for the record, and we ask that that be sealed, Judge.

The other thing, Mr. Gasser and I have also agreed that, just so you will have a point of reference, this is a part of a 302, Mr. Long's, which also addresses that portion of the statement that is purported to be the hypothetical.

THE COURT: At the disqualification hearing it was not as clear to me that there was such damaging information in this hypothetical. I mean, the whole case could stand to fall on this one page right here.

MR. SWERLING: Well, it can, Judge, and that's why it's extremely important.

THE COURT: I can understand why you would say, "Hypothetically speaking, and don't hold me to it, but you might want to go down to the stop sign at the end of the road and turn and go right 400 yards and take another left. Hypothetically now, we are just talking hypothetically."

I understand it, it makes sense then. But why do you say, "Hypothetically my client admits that Fulks slit the victim's throat? Hypothetically she was partially clothed. Hypothetically her pants were removed, but hypothetically her shirt was still on. Hypothetically her clothes were thrown in a dumpster." I mean, only lawyers could talk like that. That makes no sense to me.

MR. SWERLING: Well, Judge, let me say this, Mr. Littlejohn did not accept as true, and said that there were discrepancies. This is what the government intends to get in, so for purposes of this hearing we are submitting --

THE COURT: Well, I'm assuming that this statement summary is a summary of what was told by way of a hypothetical at some point or another; is that not --

MR. SWERLING: That's the sheriff's rendition of what was told, that's what the government intends to get in.

THE COURT: Right.

MR. SWERLING: So, for purposes of this hearing, that's what you need to see. We also gave you what Mr. Long said, and you can see there is a discrepancy between the two.

So, that goes, I submit, to the trustworthiness or the reliability in the court's determination.

THE COURT: And the Long statement is this other summary you have given me?

MR. SWERLING: Correct. But, Judge, the fact that it's couched in those terms, the way the sheriff -- accepting what the sheriff says, does not take it outside the realm of a hypothetical.

Mr. Littlejohn told this court that the hypothetical he related to the sheriff was not an adaptation or not a recitation of what Mr. Basham told him. It was -- in fact, most of the information came from sources -- for example, Ms. Parham, and what Mr. Monckton had learned from Mr. Long about the case. And he said that, he couldn't be any clearer than that.

THE COURT: Why doesn't a lawyer just say,"Ms. Parham told me so-and-so," why does he say hypothetically?

MR. SWERLING: Because, Judge, I would venture to say -- and frankly this is the first time I have ever run into it at all, ever, in 30 years.

I mean, we use hypotheticals all the time when we are talking to law enforcement to find out whether or not it's something they are interested in. I mean, that is just something that is done -- there's no proffer being made, it may -- you know, I like the federal system because, you know,

you talk about proffers. But the fact of the matter is, there are lawyers throughout this state and throughout this country who approach law enforcement in hypothetical fashion to see if they are interested, so --

THE COURT: All right. And I understand it. "And hypothetically my client might be able to put you onto the real big fish in this case, Mr. Prosecutor. And hypothetically he may have his address and cell phone number and license plate number, hypothetically. And maybe if we could talk, hypothetically, we could work a deal." I understand it there. But I don't understand, "Hypothetically so-and-so slit somebody's throat, hypothetically," you know.

MR. SWERLING: But, again, they are saying that there is information -- Mr. Littlejohn is saying that information he was presenting in the hypothetical was coming from information from other sources that had nothing to do with Branden Basham.

THE COURT: All right.

MR. SWERLING: I think that's the critical thing here. The only testimony in this record from Mr. Littlejohn is that that was not a statement of Branden Basham, that that was a compilation of issues or information he had that he was presenting to law enforcement in the from of a hypothetical that he never thought would be admitted into evidence.

And he was trying to assist law enforcement, but it was couched in terms of a hypothetical and it was not -- in

fact, he told the court on the witness stand that he didn't have authority to communicate that hypothetical to the officers, because he never presented that hypothetical to Mr. Basham. So, I mean, I think that's pretty strong.

Now, you know, a lawyer can act on behalf of a client, but the ultimate decision whether to go ahead and make an intelligent -- a knowing and intelligent decision to go ahead and speak is the defendant's.

And if the defendant is not advised that that information will be used against him, then how would you possibly have a knowing and intelligent waiver, when the lawyer himself believes that information is not admissible?

Just to summarize, Judge, the day started out with Mr. Littlejohn saying, "There is not going to be any question, this is a search for the body." The government never told the defendant or the lawyer that any statements could be used against him in a court of law to incriminate him.

The lawyer never told the defendant at any time during the day that anything he said, or was mentioned during the course of that day, would be used against him in an attempt to incriminate him.

Which even strengthens that even more, the fact that they didn't tell him, that is, that they didn't believe it. Neither lawyer believed that anything that was being said during the day outside directions or what was being said in

that hypothetical, was admissible.  We shouldn't hold Mr. Basham accountable for what his lawyers thought was not admissible.

THE COURT:  What about the idea -- and I do think it is undisputed that Ms. Parham -- the government, through Ms. Parham had clearly and unequivocally rejected a proffer arrangement.

MR. SWERLING:  They rejected a proffer and, you know, Mr. Monckton explained to the court that he did not think a proffer was necessary to go out during the course of the day and have Mr. Basham give these directions to where he was going.

He also felt like a proffer wasn't necessary to go ahead and reveal this hypothetical.  Neither did Mr. Littlejohn.  Both of these lawyers have both told you that they did not feel it was admissible.

So, if they didn't feel it was admissible, and they didn't tell Mr. Basham that it was admissible, how could we hold Mr. Basham accountable for a statement that -- first of all, it's questionable whether that was his statement at all. And second of all, that his lawyers didn't tell him about it being incriminating, and that it could be used against him.

No matter what we hold -- what we say about the lawyers' actions in the case, whether they were the right actions or the wrong actions, and I'm not passing on that, the

fact of the matter is they didn't think the statement was admissible, the statements -- they didn't think the hypothetical was admissible, and they didn't tell this poor guy as far as that is concerned.  So, how could he make -- how could he go ahead and make --

THE COURT:  If you are right, then it also represents another brick in the wall in the rights of criminal defendants. Not only do they have the right to an attorney, if it's a death penalty case, they get two attorneys, and one of them has to be learned in death penalty law.

And then you get over the Miranda problem because they have an attorney, and then the government rejects the proffer.  And the attorney makes a statement, and you still can't use those statements against them.  I mean, it's just another layer of protection for a defendant, if you are right. Do you see my point?

MR. SWERLING:  I do.

THE COURT:  Give them two lawyers, Miranda protections, reject a proffer, and then what the lawyer says is not usable.

MR. SWERLING:  Well, look at what the penalty involved though is.  I guess we have to have those protections in order -- but I think we can take this one step further. This is not just a statement that -- Mr. Littlejohn did not approach law enforcement and say, "This is what my client told

me." That is not what we have here.

What we have here is an ambiguous hypothetical about what information Mr. Basham provided vis-a-vis what information they already had. And both of these lawyers told you that most of the information contained in there is information they already had. So, I don't see how this individual can be held accountable for what his lawyers related in a hypothetical.

And again, just to continue to summarize, both of them told you they didn't have authority to waive the privilege. Both of them told you that they did not tell the defendant what was in the hypothetical -- they never told the defendant what was in the hypothetical or that it could be used. They didn't have authorization to use that hypothetical because it was not presented to Mr. Basham.

And the hypothetical, according to them, was not meant as a statement of the defendant. Mr. Littlejohn testified to that, that it clearly -- that was his purpose in couching it in terms of a hypothetical, that it was not meant to be a statement, and he was not presenting it as a statement of the defendant.

And again, Judge, just -- when you look at the liability, the two different statements or versions of what happened there, in looking at all the cases -- and I tell Your Honor, I have read almost every case I can find on this particular area -- there is no case where a court has allowed

into evidence an incriminating statement purportedly made by a lawyer that the defendant relayed to him in a court of law in such a situation where the lawyer goes to law enforcement and says, "This is what my client has told me," and then law enforcement is allowed to get that evidence into the record.

There is no case that specifically says that. In fact, the Fourth Circuit says, "If it rises to criminal liability, we don't let it in."

THE COURT: All right, let me turn the tables and ask you this question, suppose I agree with you and keep out this statement, then everything is off the table in terms of your client trying to help the authorities find the body, right?

MR. SWERLING: The hypothetical -- well, it depends on how you --

THE COURT: Well, I'm just asking, do you still want to try to get credit -- if he gets convicted, do you want to try to get credit for trying to help find the body at a penalty phase?

MR. SWERLING: What I think he is entitled to have is that that day he accompanied law enforcement officers in an effort, but it was unsuccessful. That doesn't interfere with the statements, that doesn't cross over. Because it's two different things. One is testimonial and one is the fact that he went ahead and accompanied them on going --

THE COURT: Well, I thought that the directions that

he gave were hypothetical also, but then --

MR. SWERLING: No, sir. No, sir. The directions were -- they asked him, "Does this look familiar?" It was either familiar, it was not familiar. Make a right turn, make a left turn. He assisted them during the course of the day, and we don't dispute those comments.

THE COURT: All right.

MR. SWERLING: Judge, taking that what I just said one step further, there has never been a case of a hypothetical, that I have seen in any case, that was allowed in against a client, would be imputed against a client to violate his Fifth Amendment privilege.

And I would say this, trying to make it as sweeping as I can, but to understand that I don't want to make it too sweeping, no court has ever let in any such kind of statement, whether it be a statement alone or a hypothetical, in the form of a hypothetical.

And, again, we have one difference here that other cases would not have either, is that this is not a statement of the defendant that the government is seeking to introduce, this is a statement that the lawyer made in a hypothetical, and we don't know what part of that Mr. Basham said and what part didn't he say.

THE COURT: All right, thank you, Mr. Swerling.

Who is going to speak for the government? Mr.

Schools?

MR. SCHOOLS:  Yes, sir.

THE COURT:  How much of this is cumulative?  I didn't hear a lot about the substance of these earlier statements that I have ruled to be admissible.  Is any of this information in this disputed hypothetical, is it cumulative?  Is it covered by some other earlier statement?

MR. SCHOOLS:  Very little of it is cumulative, Your Honor.  If you will recall, Mr. Basham was putting Alice Donovan's body at a location in South Carolina initially.  And then he started cooperating through Mr. Hughes, and once he started cooperating through Mr. Hughes, that conversation was at all times limited to the location of the body.

So, the mechanics of how she was killed, what was done with her, was not discussed until after he actually started moving law enforcement to this location in North Carolina to locate the body.

THE COURT:  Well, then how did Mr. Littlejohn say that a lot of the stuff in this sheriff's hypothetical came from Ms. Parham?  I thought Ms. Parham must have learned it from an earlier interview.

MR. SCHOOLS:  Ms. Parham, in her three different versions from Mr. Hughes and from law enforcement out in Kentucky, and had heard several versions, one of the versions that she had heard was that Mr. Fulks had gone back into the

woods to finish her off.

Now, there is some confusion to me with respect to Sheriff Hewett's statement versus Agent Long's statement, and Mr. Swerling pointed out that confusion with respect to Ms. Donovan being in the vehicle or in the trunk and would have been bleeding.

Sheriff Hewett's statement doesn't say that, but he does confirm that Mr. Fulks was concerned about her being in the trunk because he was afraid she would pull the taillights out. Which is the same thing that Agent Long said, and that Agent Long's recollection was that Mr. Fulks had slit her throat in the trunk to keep her from pulling the lights out, and then later they had dragged her into the woods.

So, there is some -- the verbiage that Agent -- that Sheriff Hewett uses and the verbiage that Agent Long uses are not completely the same. But most of this information, the fact that her pants were removed but her shirt was still on, that her clothes were thrown into a dumpster, that she was in the trunk, that he finished her off with a pocket knife, that she was dead when she was in the trunk, that's all new information. We don't -- we don't have independent sources to prove that.

Now, Mr. Hughes may have told Ms. Parham some of that, but we certainly don't intend to offer those statements through either Mr. Hughes or Ms. Parham, because those were

statements made through an attorney for the government. And under Rule 410 I think those were the kind of informal statements that are referred to in the -- I think the Valencia case. And also rule of evidence 410 talks about plea negotiations, that statements made to an attorney for the government are plea negotiations.

So, that information was communicated between the lawyers, but it was never communicated to an agent until Mr. Littlejohn -- it was never communicated to a law enforcement agent from Mr. Basham or his agent until Mr. Littlejohn gave the hypothetical.

Your Honor, when I was listening to the testimony from both defense counsel, Mr. Littlejohn and Mr. Monckton, honestly I felt like we had gone down a rabbit hole, because it just sounded like this should be so simple.

Based on the conversation that they had with Ms. Parham on the 27th, I don't know how it could have been any clearer to anybody that all of that information that was going to occur on the 28th was going to be admissible against Mr. Basham, whether it helped him or whether it hurt him.

And the most disturbing thing I think that I heard from Mr. Monckton was that having been told by Ms. Parham that there would be no proffer letter, he got a better deal. And there is just no way that the court can indulge the notion that defense counsel have exclusive and the sole right to determine

what information gets used against a client and what doesn't.

Now, I think --

THE COURT: All right. Suppose you are right, don't we have a major ineffective assistance of counsel problem?

MR. SCHOOLS: Again, Your Honor, I don't think that we do. Because despite the fact that Mr. Littlejohn and Mr. Monckton both testified that they did not get express authority from Mr. Basham to disclose that information, the fact is that from the moment Mr. Basham was arrested, he started providing consistently false information to law enforcement.

His course of conduct from the moment he was arrested -- and Your Honor heard testimony yesterday that the first thing he said to law enforcement was, "What did I do? Why do you want to arrest me?" He was in denial mode and he lied -- he told them his name was Josh Rittman.

Everything that Branden Basham did from the moment he was arrested until this very moment was to communicate information, much of which was false, to law enforcement. Under 801 (d) (2) (D), the rule of evidence which would govern the admissibility of these attorney statements, the statements aren't admissible because there is necessarily evidence that Mr. Basham communicated that statement to the agent, the statements are admissible because an agent speaks for his client.

And that is the law, that is what 801 (d) (2) (D)

says, that when an agent speaks on behalf of his client, those statements are admissible as admissions of the client.

On the 27th of November, Mr. Littlejohn and Mr. Monckton were appointed to represent Brandon Basham. They became his agents. And therefore, absent something else that would indicate that those statements are admissible, the statements that he made -- that they make on his behalf are effectively his statements, whether he communicated the information to them or not.

So, the hypothetical qualifier that they used, and what is admittedly on their part a unilateral attempt to gain a benefit for Mr. Basham, there was no dispute from either one of them that what they hoped was that law enforcement would take that information and continue the search. They hoped that law enforcement would rely on that information as true.

THE COURT: Well, you are talking about location information, sure, but this sheriff's summary doesn't deal with location at all.

MR. SCHOOLS: Right. Well, here's the problem. And I think the problem they confronted was, they were concerned that law enforcement believed that Mr. Basham was lying. And in order to, in their minds, garner good will for Mr. Basham, I think at that point, they needed to provide better information than he had previously provided.

And what they did was -- and it's sort of amazing

that we are here arguing, when you talk about ineffective assistance of counsel -- the statement is that "The other guy did it." So, in some ways it's amazing to me that we are arguing from defense counsel that they don't want that information to come before the court.

THE COURT: Is everything exculpatory in that sense, that Mr. Fulks did it?

MR. SCHOOLS: It's not exculpatory, Your Honor, because it's clear that Mr. Basham was present. But with respect to who was the actual instrument of Alice Donovan's death, Branden Basham, in those statements through his attorneys, said it was Chad Fulks.

So, if we get to a point -- you know, there could be situations -- and the reason -- it's only because of its inconsistency with the prior statements that the government even would want to offer this. If this were the only statement that were made, we wouldn't even want to offer it.

But what it establishes is a continuing pattern of deception from Branden Basham, and that's why we want to offer it. Because we don't believe that either of these defendants was solely responsible for the murder of Alice Donovan.

This was a joint effort from the moment they escaped until November 17th when Mr. Basham was arrested. We don't believe that statement from Mr. Fulks when he says that Branden Basham did it. And we don't believe the statement from Mr.

Basham when he says Chad Fulks did it, exclusively.

So, our intention, our effort, Your Honor, in this case is to establish that Branden Basham, on his own, after he was arrested, after he was outside the influence of Mr. Fulks, that his response to his arrest, his response to his having been arrested and charged with these crimes, was to continue to deceive law enforcement.

And if he uses his lawyers towards that end, he shouldn't be insulated by that fact. If that information was presented by his lawyers, on his behalf, and is false, then he should be held accountable for that. Because despite the fact that Mr. Littlejohn and Mr. Monckton mentioned that they got a lot of information from Rosemary Parham, it doesn't make one strain of sense that they would communicate that information to agents as a hypothetical.

That is just ludicrous to think that that was their intention, was to propose to law enforcement a scenario to see what they would think of it when that scenario came from the AUSA. I mean, that just doesn't make any sense at all.

The matter -- the truth is, Judge, and with respect to this authority issue, the lawyers were making an effort to assist their client, on the scene. Mr. Littlejohn's memorandum in which he points out that he was presented with a dilemma, and he had a choice of action, and he chose what I think a lot of lawyers would have chosen, and that was an effort to

continue the search for Alice Donovan, believing that it was what was in his client's best interest.

THE COURT: And it would have been had the search been productive.

MR. SCHOOLS: Absolutely. And had it been productive, then Mr. Littlejohn, or Mr. Swerling and Mr. Harris, would absolutely want that sentencing jury to know that Branden Basham had assisted in locating evidence. There is just no doubt about that.

THE COURT: And that would lend credence to his other statements that it was the other defendant who committed the murder.

MR. SCHOOLS: Exactly. And then their whole -- you know, "We are going to get on these issues of these tests later," and their whole point in wanting to --

THE COURT: On what?

MR. SCHOOLS: On the tests of all these forensic items. Their whole point is, they are looking for anything they can to corroborate the client's statement or to give their client some benefit of credibility based on forensic evidence that matches their story.

The same thing here. Had they found the purse strap in the cemetery where Branden Basham said it was, then finally they would have one piece of objective evidence that he was trying to tell the truth, that maybe he was taking them to a

location where that body was actually located.

Thorough searches were conducted of these areas and nothing was found. It's not just the forensics that disprove this evidence, it is the fact that thorough searches were conducted in these areas and Alice Donovan's remains were not found.

When Branden Basham said -- and we know that they were seen in this area. So it's just incomprehensible, Judge, that we are in a situation, as Your Honor has pointed out -- and Payne versus Tennessee is the case that talks about the way that the scales are weighted in favor of defendants.

An attorney and his client have the obligation to protect the privilege. The law disfavors privileges. And the problem -- the reason it is, is because when information like this gets into the public domain, what the defense counsel are asking us to do is to pretend that we don't know about it.

Well, you can't unring that bell. When they notified law enforcement that that's what happened, then they made a conscious decision to intend -- to attempt to assist Mr. Basham, with the knowledge --

THE COURT: What about Mr. Swerling's suggestion that speaking, quote-unquote, hypothetically is done all the time in a criminal arena?

MR. SCHOOLS: I don't know if it's done, it's not done -- it's done -- it may be done with lawyers and law

enforcement officers, but Michael O'Connell testified --

THE COURT:  To me it's the duplicate of a proffer.

MR. SCHOOLS:  When Michael O'Connell testified at the disqualification hearing, he's a former public defender in Charleston, I asked him, I said, "Now, Mr. O'Connell, you have represent a number of clients in federal court, haven't you?"

And he said, "Yes."

And I said, "And on occasion you have requested a proffer letter from the Assistant U. S. Attorney, haven't you?"

And he said, "Yes."

And I said, "And on occasion an Assistant U. S. Attorney has told you that they would not offer a proffer; isn't that right?"

And he said, "No, that has never happened."

And the point is, that you can -- if an attorney is speaking hypothetically with a police officer, on his own, without having been told by a prosecutor or an Assistant U. S. Attorney that, "We don't want any deals, we won't issue a proffer," then that's one scenario.

But, Judge, this was high stakes poker on the 27th. The reason we didn't want to issue a proffer is because we knew that we had -- even at that point we knew we had very strong evidence against Mr. Basham, and that Mr. Basham was already providing information without a proffer that could be used against him, and that's the scenario that we wanted to keep it

in.

We had a victim's family in Myrtle Beach that we were concerned with. We had a victim's family in West Virginia that we were concerned with. All of them wanted information about the body, but at the same time we were very concerned about preserving our ability to seek the death penalty against Branden Basham and to not offer him any deals. And we communicated that to defense counsel.

I don't know what else we can do. I mean, we did everything we could do. Ms. Parham testified, she told them she refused a proffer on three separate occasions. If that doesn't tell a defense lawyer that everything that happens on the 28th is going to be used against his client, I don't know what was.

THE COURT: Well, let me say, I had hoped to rule on this today, but I think I'm going to have to take it under advisement and even get a transcript of the testimony, because this is a very critical ruling.

MR. SCHOOLS: I do want to make one point about --

THE COURT: I didn't mean to cut you off, I'm just saying, I'm not going to rule on it today. And while we are on a break -- we have some 20-odd motions to hear. I have got to get back with my lawyers in a civil case all day Friday. Are we going to have time to finish all those motions today and tomorrow?

MR. SCHOOLS: Yes, sir.

THE COURT: All right.

MR. SCHOOLS: And the only other point I want to make about that statement -- I know you have heard us argue ad nauseam about it, and Your Honor understands the issues.

The statements were made, not including the hypotheticals -- what Branden Basham said during the course of the day, I think Mr. Littlejohn made clear that anything that had to do with directions it was obvious to him was going to be used for or against Mr. Basham as the case may be, so we think those statements are admissible.

In addition, despite the fact that Mr. Littlejohn and Mr. Monckton instructed law enforcement, "I'm not going to let you interview my client," they did. I mean, it's not as if they squirreled Branden Basham away and asked him questions throughout the course of the day and the attorneys didn't know it.

And I think their suggestion is that the fact that they said, "We are not going to let you interview our client," means that any questions that were non-directional or any information that was non-directional was again somehow protected.

Well, there is no -- after having been rejected a proffer, you can't say, "You can't ask my client questions," and then allow him to ask your client questions, and then when

he gives answers, pretend that that didn't happen, which is what they are asking with respect to anything that is non-directional. Directional, Mr. Littlejohn said, "That stuff we knew was admissible."

Spontaneous utterances, responses to law enforcement questions out there that occurred in the presence of his attorneys, when they had access -- when he had access to them and they could have said, "Don't answer that question," did say that on occasion, all of that stuff we would submit should be admissible, based on the understanding that there was no proffer and that everything that day was going to be admissible.

The hypothetical obviously raises different questions, and I have talked ad nauseam about that and I won't bore you any more about it.

But I just did want to make sure the court recognizes our position that there is -- that the hypothetical is one issue, and everything else that occurred before that, is another issue, and that we think is clearly admissible based on the testimony of Mr. Littlejohn.

THE COURT: All right. Well, I'm going to take it under advisement. Mr. Swerling, I'll give you a brief period for brief reply, I'm not going to rule now.

MR. SWERLING: No, I understand, Judge. And actually I just wanted to respond to two things.

First of all, Mr. Schools referred to Mr. Hughes having conversations. There is one difference, which has not been brought out to you, is the fact that when Mr. Hughes related conversations that he had with Mr. Basham, it was with the clear understanding that he -- that what he was relating to the government and what Mr. Basham was relating to the government would be used against him. Mr. Hughes did that.

And that statement has already been passed before Your Honor, and so it's two different things. Mr. Hughes followed the procedures and did advise Mr. Basham. Here, Mr. Littlejohn and Mr. Monckton did not.

The other thing, Judge, that I wanted to point out was that Mr. Littlejohn -- we keep referring to the fact that they wanted to benefit by it. But Mr. Littlejohn, in response to the questions, said that he did not expect the information in the hypothetical to be used either for Mr. Basham or against Mr. Basham. All he thought would be admissible would be the fact that the body was located and Mr. Basham helped.

It was not the evidence itself -- and I think there were a number of objections that Your Honor sustained when it was trying to be portrayed in another way. The fact of the matter is that he did not think that that information was admissible at all because is was a hypothetical, whether it helped Basham or hurt him.

And, Judge, just the last thing to leave you with --

and I, you know, without passing on it at all, 2255 just reeks and screams out in this situation. That if Mr. Basham is convicted, and I think it was referred to before, so I'm now referring to it again, I think it was referred back when you had the hearings on the motion to disqualify --

THE COURT: I raised it today.

MR. SWERLING: And it's been raised before that this is a situation that clearly could bring this case back to be tried a second time. Because this is very bad evidence, very incriminating evidence, if you accept that statement as being Mr. Basham's, which I suggest according to Mr. Littlejohn it was not his statement.

THE COURT: All right. Anything else on any statement? Any other evidence to offer on statements?

MR. SCHOOLS: No other evidence --

THE COURT: Have we concluded the Jackson versus Denno hearing, in other words?

MR. SCHOOLS: Yes, sir. I do -- there is one thing I forgot to mention to the court, and that was that not only did Mr. Littlejohn acknowledge that he knew that the statements -- directional statements would be admissible against Mr. Basham, but Mr. Basham knew it. He said that on three separate occasions.

THE COURT: All right. Well, let's try to get into a few of the motions this afternoon.

Mr. Blume, yesterday while you weren't here, we started to go into the motions regarding the polygraph results. The government did not brief the question of the admissibility of polygraph results if we have a phase 2. And I think what I would like to do is just request the government to brief that, and we will decide that sometime down the road. Can we do that?

MR. SCHOOLS: Yes, sir.

THE COURT: It's a fairly novel issue, because the rules of evidence technically don't apply in a phase 2 of a death penalty case.

MR. SCHOOLS: Yes, sir.

THE COURT: And all the Fourth Circuit cases have analyzed it under a traditional setting, whether the evidence rules apply, and Daubert applies and all that.

MR. SCHOOLS: Yes, sir.

THE COURT: All right. Let's talk about continuance and severance.

I said yesterday, I think in fairness to the defendants they need 90 days to prepare for trial after the government gets all its test results back. Mr. Schools, is that -- that's a problem from your side?

MR. SCHOOLS: Yes, sir.

THE COURT: All right.

MR. SCHOOLS: I would like to, if I could, put the

request for continuance in this case in sort of the context of the nation, instead of just in South Carolina, where we practice, I think, what is typically a fairly kind of a gentle brand of law.

The federal rules -- the federal statutes require that the government provide a witness list to the defendants in a capital case with the witnesses' addresses three days before trial. Federal Rule of Criminal Procedure 16 obligates the government to disclose statements to counsel after the witness testifies on direct. We have in this case --

THE COURT: Those are for all criminal cases, that's not just for the death penalty.

MR. SCHOOLS: Rule 16 is for all criminal cases. That rule with respect to witnesses' names and addresses is death penalty exclusive. But it says three days. I mean, that's the notice they are entitled to of who our witnesses will be at trial.

Despite the fact that those are what the rules allow, we have, Your Honor, provided essentially an open file discovery. And I hesitate to use that word because I don't want to create a legal obligation on us to disclose or turn over items that aren't -- that the defendants are not legally obligated to get.

But here we are, a year-and-half after this crime. In March of 2003, we provided the defendants with information

concerning this case, including an inventory of the evidence that was seized from the BMW, an inventory of the evidence that was seized from the van, an inventory of the evidence that was seized from Ms. Moore's yard, I believe -- beg the court's indulgence one second.

Yes, sir. An inventory of the evidence that was seized from Branden Basham, an inventory of the evidence that was seized from Chad Fulks. And those are the -- of all the physical evidence in the case, the evidence from those five sources are clearly the ones that are most relevant to the one issue that is really in dispute in this case, and that is whose hand actually killed the victims.

We provided them the notice of what that evidence was on March 10th of 2003. With respect to the lab -- to the van evidence, we notified them by providing the West Virginia state police report of what items had been sent to the lab on May 23rd of last year.

With respect to the BMW and the items seized from Mr. Fulks and Mr. Basham, we notified them on October 2nd of last year what items had been sent to the lab. And with respect to Ms. Moore's yard, we notified them on January 23rd of this year at the same time we notified them of the results of those tests minus fingerprints.

Out of all this evidence, the relevant serological evidence comes down to three bits of evidence only. There is

blood on the back of a jacket that Branden Basham was wearing when he was arrested. There is a tiny, tiny amount of a substance believed to be blood on a pair of pants that Chad Fulks -- that was seized from Mr. Fulks when he was arrested. And there was a semen stain on the back seat of Alice Donovan's car.

And it's those three pieces of evidence on which serological tests are ongoing to determine whether it can be matched to the DNA of either victim or of either of the perpetrators.

Now, the Speedy Trial Act, Your Honor, says that a case should be tried within 30 days, and 70 days of indictment. What Your Honor is proposing is to give these defendants at the time we provide this DNA evidence 20 days longer than the maximum time allowed by the Speedy Trial Act to conduct testing in this matter.

There are two affidavits filed in a memorandum I got yesterday from defense counsel, two affidavits from lawyers saying that that testing can't be done. There is no affidavit from a testing agency that says, "We can't do it in that amount of time." There is no affidavit from a lab or no affidavit even from counsel in this case that they don't think they could get it done in that time.

We are talking about, Your Honor, if we started this case in the first or second week of May, we would take at least

two weeks to pick a jury, if we are only drawing one. If we are drawing two we would take four weeks, which means that we won't start presenting evidence in the case until June, very likely, if we started in the middle of May.

If we started presenting evidence in June, the forensic evidence in our case would come towards the end of our presentation, which means it's very likely that it would be the second or third week in June before we ever called forensic experts to testify concerning these three bits of DNA.

With respect to Mr. Fulks, he's admitted to raping Alice Donovan in the back seat of her vehicle. So, if the semen stain in the back seat of her vehicle is his, all it does is confirm what he has previously admitted.

The other thing I want the court to consider is that these tests are science, not art. And the defendant's suggestion that they need to conduct DNA testing on a bit of blood that is determined to be Alice Donovan's blood or Samantha Burns' blood, and that they are going to get a different result has no support in reality. This is a scientific test.

You may recall the famous OJ Simpson case. The cross-examination of DNA experts in that case dealt with the way evidence was handled, not so much with the tests. DNA tests will either confirm or not that it was Alice Donovan.

It's not as if this is a matter that is subject to a

whole lot of interpretation, it is science. And the FBI results will be what they are. And particularly before we know what they are, it doesn't make any sense in the government's opinion to set a time frame within which all these tests might be conducted, because there's no indication, A, that they are damaging to either defendant, B, there is no real evidence that they can't get the stuff -- get the testing done before it becomes relevant at trial, which would be the middle of June, approximately two and-a-half to three months from now.

And finally, Your Honor, I know that we have briefed previously kind of in the dark the issue of whether other items need to be forensically tested, and whether they have the right to forensically test them.

Ultimately, Your Honor, if you order that they are allowed to test items, we are going to have to know what those items are because we have them, and we have to disclose them to defense counsel.

So, we would like the opportunity to address any particular item that the defendants want to have tested, and put it in context for Your Honor so you can determine whether they have made a particularized showing of need, such that you would authorize a hiring of experts for them to run down what is either --

THE COURT: So, you say that I should require them to publicly disclose to you precisely what they want to test and

why?

MR. SCHOOLS: I don't know that they need to give us the why, because the why may come in through consultation with their client.

THE COURT: All right.

MR. SCHOOLS: To that extent that would be privileged and we are not entitled to know that.

THE COURT: You want them to settle down and tell you what items they want to test on?

MR. SCHOOLS: Yes, sir, so we can at least let Your Honor know how that evidence may or may not fit within the disputed issue in this case, which is who is the actual killer.

So, the whole issue of this continuance, Your Honor, is just -- in the context of what we provided, what they have been able to do, Your Honor is aware of how many man hours the defendants have spent on the ground interviewing witnesses and how prepared they can be, how prepared they should be based on what they have done, and what Your Honor has paid them to do it, but this case has at every stage been primarily about these defendants.

And I understand it's a death penalty case, it needs to be. But we have also got victims' families out there who are waiting for resolution in this case. We have got jurors scheduled, and we have all talked about the problems that we are going to engage if we get into a summer trial.

If we were to start this case in the middle of May, we would most likely be done by the end of June or maybe the second week in July at the latest.  And at that point at least those jurors who had vacation plans may be able to schedule vacation plans while there is still some summer left.

THE COURT:  They are going to have them already scheduled when we draw the jury, don't you think?  I mean, if we run this trial substantially over the summer, we are going to really have to pick and choose who the jurors can be.

MR. SCHOOLS:  Yes, sir.  And that's a problem --

THE COURT:  I don't believe in forcing someone to forego their vacation to serve on a jury.

MR. SCHOOLS:  I agree with that, Your Honor, but that problem gets worse the longer we wait.

THE COURT:  Well, I'm just thinking out loud.  If we started the trial early August, for example, we could draw the jury in July, start in August, and by then 80 percent of the jurors will have had their vacation.

MR. SCHOOLS:  Well, one practical problem from the government's perspective on that is Mr. Thurmond's wife is supposed to have a baby on August 1st, so that does create a problem there.

But you are right.  But I think we accomplish that same thing by doing it earlier in the case.  By starting the case in the middle of May, we effectively take a month out of

the summer, whether we take it out of the front end, or the back end, if we start it in August.

But, you know, the notion that the defendants need all this time to conduct DNA testing on three pieces of evidence, if it's that. And I'm not even sure with respect to Mr. Fulks' pants that there will be a sufficient sample for it to be tested twice. They didn't -- there was so little of it they could not confirm the presence of blood. So, I don't know whether there will even be a sample that will be able to be tested on that.

THE COURT: Currently we are scheduled to begin April the 19th --

MR. SCHOOLS: Yes, sir.

THE COURT: -- with jury selection. That's the week of the dedication of the new building. I will necessarily be out-of-pocket Thursday and Friday of that week. I have got to be on programs, I have got dignitaries from all over that we have got to get provided for, so we would only get three days of jury selection in Monday through Wednesday. And then, you know, pick back up the following week with no problem.

MR. SCHOOLS: Our proposal --

THE COURT: Now, let me say that the civil case I'm in that starts next Monday, the plaintiffs' lawyers say it's going to take four weeks, the defendants' lawyers say it's going to take eight weeks.

I have never had yet a set of defense lawyers to give me a true prediction on how long a trial is going to be, they always overestimate. And so I don't think it's going to be eight weeks, but it may well be more than four weeks.

Coincidentally, I received a letter about two hours ago from the lawyers in Chicago for the lead defendant who say that as of today he has started talking incoherent and seems to be hallucinating and cannot communicate with his attorney. So, I have got to put out that fire tomorrow at 9 o'clock, so we won't start this hearing tomorrow until 9:30.

The next case has been pending four years as of March the 6th. So, I just want you to know what I'm up against --

MR. SCHOOLS: I understand, Your Honor. And I know Your Honor has got --

THE COURT: I'm just saying, it might be four weeks, but if we have defendants becoming incompetent at the last minute, it could take longer.

MR. SCHOOLS: And if you can't do it, you can't do it, and we understand that. But I guess my position is that the forensic part of this argument --

THE COURT: Let me say -- I don't know if you have got family members here, this case has been pending four years longer than this one. There are also three other class actions arising out of the same alleged fraud that I have put on the back burner to have to wait until after this case is tried.

So, it's not as though I'm giving the civil case big priority over the criminal case.

MR. SCHOOLS: We understand, Your Honor. What we would propose, if Your Honor were to start the case in the middle of May, say May 17th, we had represented to defense counsel, and they put in their memoranda that was filed yesterday, that our forensic folks in the lab have said that they will have the DNA results by the end of next week.

THE COURT: This is for the two blood swatches and the semen sample?

MR. SCHOOLS: Yes, sir. If we started on May 17th --

THE COURT: They will have it when, by the end of next week?

MR. SCHOOLS: Yes, sir. If we started the case --

THE COURT: Which is the end of February?

MR. SCHOOLS: March 5th is the date.

THE COURT: March, all right --

MR. SCHOOLS: If we get those results to them by next Friday, they would have -- if we started on May 17th, they would have two full months after they got seventy days, essentially the Speedy Trial Act time, after they get the forensic results to do whatever they need to with the evidence. We would try --

THE COURT: Is it possible to preserve some of the blood and some of the semen for them to do a separate test on

or not?

MR. SCHOOLS: I don't know that with respect to the small piece of blood on Mr. Fulks' clothes, because I'm not sure there's enough quantity. And I don't know this for sure, but when we spoke to Rhonda Craig at the DNA lab about the defendant's desire to do this, she didn't indicate that there wasn't enough sample to do it. But the evidence will be preserved and we would try to get it back and somehow arrange chain of custody issues so that they could do it.

But if be started in mid May, not only would they have 60 or 70 days from the time they get the results to the beginning of trial, they would have the 90 days you are looking at essentially by the time that evidence is ever presented in court.

And I understand they have got a lot to do, but they have also got four lawyers over here sitting here representing Mr. Fulks. They have got -- Mr. Harris and Mr. Basham have gotten, you know, whatever assistance I think they have asked for from the court. So, they are getting help. It's not as if they don't have people in the field to help them do this. And I just --

THE COURT: Let's talk about dual juries for just a minute. I have determined that if we do it, to be fair, we would need to build a platform down in courtroom number 1 so that the second jury could be elevated just like the first

jury, put blue carpet on it, and put some kind of curtain around it -- not build a permanent wall but some kind of curtain so that they are segregated and set apart up off the floor, like the first jury.

You suggested we put them on the floor and mix them in or something.  But if we do it, I wouldn't want -- I wouldn't want to mix and mingle jurors and I wouldn't want some of them sitting on the floor.

MR. SCHOOLS:  Yes, sir.

THE COURT:  So, start with that proposition.

MR. SCHOOLS:  We think -- and we have looked at courtroom 1 and we think that space would work for that. Now -- and here is our motivation for seeking to do that.  It's multiple fold.  It's to save the court time and to save the witnesses time, to save the victims the impact of having to testify two separate times, because they could testify in front of the same jury.

The only evidence that would distinguish -- that would be different in this case, when we tried them -- whether we tried it to one jury -- to two juries simultaneously or whether we tried Mr. Fulks and Mr. Basham -- we would try the same case up until the events of November 17th when Mr. Basham was arrested.

The evidence would be identical from November 4th -- was the day that they escaped -- until November 17th when Mr.

Basham was arrested.  And the 17th, the incidents of the 17th, Mr. Fulks is intricately tied into those events.

We would expect the evidence to show a woman named Heather Jo Jacobi had her vehicle broken into at the mall where Mr. Basham attempted to car-jack Deanna and Andrea Francis.

When Mr. Fulks was arrested, identification documents or credit cards, or some information relating to Heather Jo Jacobi was found in the BMW.  So, we can put Mr. Fulks at the scene in Ashland when Mr. Basham was attempting to car-jack Deanna and Andrea Francis.  So, from November 4th through November 17th, the evidence is identical.

Now, the question I think raised by defense counsel is, well what about cross-examination?  Should Mr. Basham's jury be exposed to cross-examination conducted by Mr. Fulks' lawyers?

And the only way that that impacts the case -- and it doesn't impact the case in the sense that it affects the issues that motivated Your Honor to sever the case to start with.  I'm sure in that situation, it may be through some witness, that Mr. Basham's lawyers will suggestion to a witness that Mr. Basham was a follower and Mr. Fulks' jury would hear that.

But they are going to hear that on direct.  We have talked to these witnesses, we all know what they are going to say.  So, the information -- that may be elicited more forcefully by counsel for one attorney or the other on cross --

is generally going to come out on direct.

So, there is not really an information issue, it's just sort of an atmospheric issue where the jury will know that these guys may be indicating that one or the other one is more culpable.

Your Honor said in your order that that was not a reason to sever these cases, that the reason to sever these cases is because of the Bruton issues associated with the statements.

So, given those parameters, given those facts, there is no disadvantage that flows to either attorney to which -- excuse me, to either defendant from which he's entitled to relief.

There may be issues that they don't like about it, but none of those issues are issues that motivated Your Honor to sever. And we understand it's a death penalty case and I know we have heard that over and over and over again, and I understand it's important that they get a fair trial.

But the issue concerning convenience to these victims and to the justice system in getting this case resolved in the most fair way is also important. And Your Honor said and the Supreme Court has said that a jury's ability to evaluate relative culpability is better when they are better able to see both stories.

Now, these juries wouldn't get that whole version,

they would get perhaps what would be a little spillover, based on cross-examination of non-statement witnesses, but they certainly would have a better ability to evaluate relative culpability if they get to see how these defendants are presenting their defenses.

And we believe the two jury system is not just a matter of convenience, it's a matter of justice. That these juries are more likely to get it right, to get to a just result if they are able to see as much of the case with respect to both defendants at the same time, with both defendants presenting defenses, than if they are not.

And it's not just our opinion, it's the Supreme Court's opinion. So, it's not just something we have come up -- we have dreamed up because we want to do this. Frankly, it is going to be logistically difficult and we recognize that. We wouldn't ask the court to do it if we didn't believe it was a mechanism for achieving justice in this case.

THE COURT: Would your side consent to Judge Currie drawing the jury if I'm still tied up in my civil case?

MR. SCHOOLS: Yes, sir. But that's our position on it, Judge.

THE COURT: All right. Let me hear from the defendants.

Mr. Blume, you haven't been heard from in a while.

MR. BLUME: Which is probably a good thing for

everybody.

Your Honor, I will talk about the continuance briefly and then Ms. Johnson will discuss the dual juries.

We submitted yesterday, I think, and this morning, declarations from six attorneys -- Judy Clarke, Heather McNally, Michael O'Connell, David Ruhnke, Dick Harpootlian, and Andy Savage -- basically supporting our position that no competent attorney in a capital case could get ready under these circumstances without having the forensic evidence.

And first, to respond to the government's position, "Well, you know, we have all these other interests that are at stake." And I submit that if that were the case, then they should have gotten the FBI going on this sooner. I mean, the FBI has had this evidence for more than a year, they haven't completed the testing. We were told they were going to have it completed by the first of February --

THE COURT: Do we need to see what those tests results are before I rule on the motion for continuance? If it turns out that it's nobody's blood in this case, some unknown person's blood on both the pants and the jacket, and somebody else's semen, for example -- you know, it might be a different, might be different than if it's a defendant's blood or a defendant's semen, wouldn't it? Shouldn't I wait until next week and see what the results are before ruling on this motion?

MR. BLUME: I don't think so because it's not as

if -- at some level it's gotten distilled to the fact that the only thing that anybody cares about is the DNA and the blood, and that's not the case. There is other evidence, there are fingerprints, there is other trace evidence, there are other items that we want to test, which we laid out a number of items in the sealed memorandum we filed --

THE COURT: What about their proposal that you have got to at least tell them what you want to test?

MR. BLUME: We have laid that out -- I don't have a problem with that.

THE COURT: You told me under -- you told me in camera what you want to test and you gave me some reasons, I can't say I follow all your reasons.

MR. BLUME: I might want to file -- I mean, modify the exact -- rather than just say, "Let's give them that pleading," there's some information in that pleading which I want to --

THE COURT: Well, that's what I was saying.

MR. BLUME: -- attack, but as far as saying what items -- now, I do disagree -- I mean, the government has said that we should only be able to test things, or that Mr. Fulks should only be able to test things if you make a showing -- that we make some showing under Ake. I don't think Ake is applicable to us under these circumstances. Ake is a funding issue. We have the funding to do the testing. I think for us

it's a matter of -- you know, can we lay out a plausible reason why the testing needs to be done. I think we have certainly done that. But it's not as if the DNA is the only thing we care about.

For example, even if the DNA -- the FBI were to come back and to say, "Well, this is one person or the other's," there still might be testing we want to do, more sophisticated DNA testing, other types, to see if possibly one or more of the other defendants' stuff is there -- we are not going to know that.

And also to suggest, "Well, okay, it doesn't really matter because all of this stuff is science and we will accept what the FBI says as the Gospel," you know, it's not the case. We are not going to do that.

There's certainly been enough instances of the FBI making mistakes, or FBI examiners engaging in misconduct, that it would be -- we would be falling below the Sixth Amendment right to counsel if we just said, "Okay, well, the FBI said it, good gosh, that must be how it is."

I think it's completely reasonable, as you suggested yesterday when I wasn't here, to tie the trial date to the completion of the testing. Number one, that gives the FBI incentives -- or the government incentive to get on the FBI to finish it.

I mean, we don't have any assurance it's going to be

done next week.  We were assured it was going to be done in February.  Maybe it will, maybe --

THE COURT:  Well, that's why I'm saying, I don't want to hear extended debate on this because I think I'm going to wait until the test results come in before I rule on the continuance requests.

MR. BLUME:  Well --

THE COURT:  I read the affidavits from all -- Ms. -- from Mr. Harpootlian and all the people you furnished.

MR. BLUME:  Well, that's basically our position.  It does have more --

THE COURT:  What about my suggestion that Judge Currie, if I'm tied up, Judge Currie be allowed to draw the jury whenever it is?  Do you have a problem with a different judge drawing the jury?  It's done fairly routinely in garden variety cases.

MR. BLUME:  To draw the jury and to be the judge -- we would ask the voir dire and -- the individual voir dire and that kind of thing in front of a different judge?

THE COURT:  I'm just asking.

MR. BLUME:  I haven't really thought about it in detail, but just off the top of my head, I don't see necessarily a problem with that.

THE COURT:  All right.  Now, what about dual juries?

MR. BLUME:  I will --

THE COURT: All right. Oh -- no, I think it is a good idea to require each defendant to give the government a list of what forensic evidence they want to test -- test, even though the government has not tested it. And we may set a deadline to produce that list -- no justification, just a list of what you want to test.

All right. Yes, ma'am?

MS. JOHNSON: I will trial to be quick.

Your Honor, in the most general way I think we have seen in the last two days one of the huge costs of dual juries. Counsel for the defendant, the defendant -- and of course it would be Mr. Fulks' jury -- have sat here for almost two days while -- with nothing to do.

You know, I think that that's -- it's at least obvious that that will happen with respect to the statements of each defendant. But I disagree with Mr. Schools that this will only occur with respect to those statements.

THE COURT: Well, if you try -- if you don't have a severance, oftentimes a jury sits there and hears evidence that doesn't relate to one defendant or the other. But what you are saying is, one jury will be just patting their feet, waiting -- killing time?

MS. JOHNSON: They will be tapping their feet just waiting. And that annoyance, which I think is not going to be one day, but as I would like to explain, I think there will be

far more bench conferences and disagreements about what cross-examination should be permitted.

I'm not talking about whether one jury can hear it or not hear it, I'm saying the government may want something to be talked about, one defendant may not want it, one defendant may say, "i don't think he's entitled to talk about whether or not there is -- he can issue an opinion about who was the leader," for example. There would be far more of those discussions, which particularly, given the setup there, a bench conference is going to be very difficult. So, the jury will have to be hauled out, probably told --

THE COURT: The bench conferences are over on this side, the microphone and all is over here, and the jury box is over here.

MS. JOHNSON: And they are sitting over there -- well, that would be better, although again, it's still worrisome if it's going to be at any length the juries will have to be removed. For those over there who are going to have to sit there, wondering what it is that is being discussed and why -- who has made the objection to what, those sort of things --

THE COURT: Well, the biggest focus of your memorandum was the fact that some of it is admitted against one defendant and vice versa. But all we are talking about is the statements that prompted the severance, and then the

aggravating and mitigating factors, right? Is there anything else that --

MS. JOHNSON: Oh, Your Honor, maybe I haven't been clear enough in my papers. I think that as a matter of reversible error, that's correct. But as a matter of the burden placed upon the jurors, there would be far more discussions about what ought to happen, with the jury having to go in and out, or at least waiting during those discussions, waiting during witnesses that are not relevant to each one.

So, the notion that huge amounts of time are going to be saved might be true for the government's attorneys, but it's not at all clear to me that it will be true for any of the court personnel, and certainly with respect to each jury.

It's far more burdensome to be sitting there with nothing to do, and then, as the government proposes in the penalty phase, for them to go home for a week or maybe two, to be on call, then come back, then go back, then come back -- for the jurors, this is far more burdensome.

And the real problem with that burden is that they are likely to take that out on the defendants, because they will think the defendants have made this happen.

If really we are going to proceed with dual juries, I would hope that Your Honor would instruct the juries that this procedure has taken place at the request of the government.

THE COURT: Well, now, it was the defendant's motion

for severance, actually, that started the ball rolling --

MS. JOHNSON: Yes, it was the defendant's motion for severance, but not to make these two juries occur at the same time.

The other thing which I think we have seen, which I want to say in as non-prejudicial way as I can, whether one thinks that Mr. Basham is greatly disturbed and has actually committed -- attempted to commit suicide on several occasions, or whether one thinks that he is malingering, this caused a huge disruption yesterday.

And to disrupt not only his jury, which might be necessary, but Mr. Fulks' jury, which would not be necessary, is very problematic. And moreover, if he engages in the conduct that he engaged in yesterday in the courtroom, speaking out loud, this is prejudicial to Mr. Fulks.

Also, I think I noticed when Mr. Basham came in that he had his wrists bandaged. What a jury -- what Mr. Fulks' jury might infer from that is highly prejudicial. If he prejudices himself, that's his own problem, if he prejudices Mr. Fulks, and we can anticipate that, that seems to me to be a different kind of issue.

And the other -- the last thing that I wanted to say quickly is that I think -- the notion of putting the jury in the box is a big improvement, I think that -- both in terms of giving them a feeling of being shielded and also of a sense of

responsibility that is entirely appropriate. That part you may well be able to fix, from what the government has said.

But the other part of the government's proposal that is very problematic is that Mr. Fulks' jury will hear all of the aggravation against him, and then will be sent home to stew on that aggravation, while the aggravation presented for Mr. Basham's jury takes place. And then after we have presented our --

THE COURT: Wait a minute, couldn't we -- would we have to do it that way, though?

MS. JOHNSON: Well, that's the way you --

THE COURT: Couldn't we send jury A home -- jury B home, keep jury A, and hear aggravating and mitigating against one defendant, and then bring the other jury back and hear aggravating and mitigating against the other defendant?

MS. JOHNSON: Well, Your Honor, I would think that would be, from our perspective, a far preferable scenario, but I think the reason the government has proposed it the way they do is they want to save the victims the -- opportunity not to present victim impact testimony twice.

In that case, if we do it the way you are suggesting, that would be much less prejudicial, but it would no longer be a savings for the victim, which is supposedly what motivates this, which sort of seems to me demonstrates why we are not going to save a lot of time or emotional costs, and we do so at

the risk of prejudicing --

THE COURT: You have made one argument that I just have to categorically reject, you said it's inevitable that the two juries will talk to each other, and one jury will tell the other jury what they heard that they weren't supposed to hear.

I just don't think I can engage in a supposition that the jury is going to misbehave. Because if we do that, am I supposed to also assume they are going to read the newspapers when I tell them not to read the newspapers or --

MS. JOHNSON: Not at all, Your Honor. If I said "inevitable," I apologize --

THE COURT: Maybe not inevitable --

MS. JOHNSON: -- I don't believe that's what I said. I think what happens, when you put the juries together, is you up the chances of something like that happening enormously --

THE COURT: You also said that while one jury was out they would necessarily conclude that some evidence was being admitted against one defendant that is not admissible against the other. Well, they wouldn't only conclude that, I would tell them that. I would tell them that's why they were going out, and we do that routinely, don't we? We --

MS. JOHNSON: Yes, Your Honor --

THE COURT: We tell a jury that is hearing two cases -- I mean, hearing -- I can say, "This is admissible against this defendant but not against this defendant." I

mean, they would have to compartmentalize it.

MS. JOHNSON: Yes, Your Honor.

THE COURT: Those two arguments I don't think are as persuasive as some of the other logistical arguments. Now, there is also a logistical argument that y'all don't know about, and that is, the area where the government proposes to put the second jury is the only free-standing space down there.

And when I was there Monday with the lawyers on my civil case, I realized that with a three-tier jury box, there is almost no space between the jury rail and the two counsel tables here.

And the lawyers are saying, are telling me, "We are going to have to make our opening statements and closing arguments sitting in somebody's lap." And I'm only going to have 12 jurors in that case so they are going to sit on the back two rows, so there will be a, you know, a distance from them. But I think the only good place to make opening statements and closing arguments is kind of on the corner here --

MS. JOHNSON: Yes, Your Honor, I went and looked at the courtroom --

THE COURT: And if we did dual juries, that could be a problem.

MS. JOHNSON: It's extremely tight and it's extremely difficult to sort of fit one's way in between what may well be

the government's table and the jury.  And I think also, you know, I think both Mr. Fulks and Mr. Basham would prefer to have their juries in the regular jury box.

THE COURT:  Well, I thought about that too.  I thought we would take turns.  Every other week, let one jury get the permanent seats, and then switch back and forth, so they don't get the impression one jury is more preferable to the other.  And I would just tell them, "To be fair we are going to rotate you back and forth."

MS. JOHNSON:  Well, Your Honor, I certainly prefer that than to having most of our jury always sitting over there. But I think this just illustrates that the logistical difficulties are -- these are the ones we anticipate right now, and in a case of this length and complexity, we are going to have far more.

And I'm not saying that the jurors will disobey your instructions and I'm not saying that inevitably when they are home for a week they will read the newspaper, but only that the odds of all those kinds of errors and taint increases, which then increases the odds that one will have to do not one trial but three trials, thereby ending any cost savings.

And the last thing I wanted to say quickly is, the language from the Supreme Court about preferring one jury is language about why we prefer to have one jury to avoid inconsistent verdicts.  That has no applicability to a dual

jury situation where there will be two juries who may or may not reach inconsistent verdicts, regardless of whether they sit together or not. Thank you.

THE COURT: All right. Anything briefly in reply?

MR. SCHOOLS: Just a couple of issues, Your Honor. With respect to the inconvenience of the jurors because they will be asked to go home for periods of time, if I were a juror on an eight week case, that would be a welcome break. I don't see that as an inconvenience.

THE COURT: That's what I thought about too, it would give them a chance to go home and balance their checkbook and mow the grass and do things they couldn't do while they were over here. It might -- it might not be as big a burden as we might think.

MR. SCHOOLS: Right. With respect to the arguments and the logistics, we would be arguing only to one jury at a time, so that jury would be in the actual jury box, which would, I think, alleviate a lot of the concerns about trying to argue to all 32 jurors, is what it would be. So, I think that would be an easier thing to work out.

With respect to the penalty phase -- and Ms. Johnson stated a concern that the jury would here the aggravation and go home. At least with respect to her client, what we would anticipate is that the aggravation evidence that would apply to both victims -- excuse me, to both defendants, which would be

the victim impact evidence and the evidence concerning the murder of Samantha Burns -- would be presented to both juries.

And then most likely it would be Mr. Basham's jury that would at that point go home. We would have additional aggravating evidence against Mr. Fulks. We don't have a lot of -- at this point don't have a lot of additional aggravating evidence against Mr. Basham, but we do have other crimes, evidence against Mr. Fulks which we would intend to present only to his jury.

Unlike the DNA situation, this is perhaps more art than science, to determine whether it is better for a defendant to have the jury hear all the mitigation evidence, to go home for two weeks -- excuse me, the aggravation evidence -- to go home for two weeks, to come back, separated in time from the aggravation evidence, to hear the mitigation evidence closer to the time when they are going to reach a resolution.

And so -- there is certainly an argument that that is a benefit to the defendant to have the mitigation evidence presented closer to the time when the decision is made, and a long way away from the aggravation evidence.

So, while I understand that argument on one side, it really works just as well on the other. So, I don't see that as a reason for not doing this, because it doesn't really --

THE COURT: All right, I need to hear from the other defendants as well.

MR. BLUME: Your Honor, after thinking about it, if I could make one other --

THE COURT: Let me just say, this happened last Monday, I would hear extensive debate on a motion in limine on one little itty-bitty piece of evidence, and I would go back and forth, back and forth, back and forth, and then I would start to announce my ruling, and a lawyer would stand up in the middle of the sentence and try to argue some more.

Or I would say, "This is too heavy duty to decide today, we are going to have to decide this Friday," and then lawyers would still want to stand up and argue some more. I'm not going to decide this today, so unless there is something major you want to tell me, I need to hear from the other lawyers.

MR. BLUME: Okay.

THE COURT: All right.

MR. HARRIS: Judge --

THE COURT: I'm sorry, I'm not going to decide this Friday -- I'm not going to decide this today, I'm going to wait and see when the test results come in, and then we will probably hear from you again, is what I'm saying.

MR. HARRIS: The only thing we would add as to the time, the government has said over the last couple of days, in the past, it's going to take them about a month to put up their case. First of all, if you try these cases together --

THE COURT: I thought they said it was going to take eight days --

MR. HARRIS: Whatever --

MS. SCHOOLS: Eight to 10 days.

MR. HARRIS: Eight to 10 days. If you try these cases together, they are going to get 20 more strikes, which theoretically could take up eight more days of just jury selection in and of itself.

THE COURT: All right.

MR. HARRIS: The next matter is all the objections. They are going to be jumping on us, we are going to be jumping on them, we are going to be objecting to their questions, they will be objecting to ours -- when I say "they" --

THE COURT: Questions that -- on jury selection?

MR. HARRIS: No, sir, during the trial itself. So that matters that will have to be taken up outside the presence of the jury, if you look at the amount of --

THE COURT: So, if we try the cases separately you won't have any standing to object to what is being asked in the other trial, and vice versa.

MR. HARE: Well, I can't imagine -- no, if we aren't in the same courtroom we won't, obviously we won't be objecting to anything, Your Honor. But If we are in the same courtroom, and I'm objecting to something John Blume is asking, and you have to send that jury out -- and I anticipate this happening

over and over and over again in this case -- that's another period of time that will be taking up a large amount of time that -- and create a problem that you don't have if you try these cases separately, one -- one from the other.

The greatest concern I have, however, is now that Mr. Schools has said that we are going to be the ones that get the break -- and we appreciate his offer that -- his belief that that is in our best interest.

But nonetheless, it's inconceivable to me that this jury, that our jury will not have a heightened sense of awareness of what is going on in their case, reading the newspaper every single day, following Chad Fulks and everything that he has ever done bad in his life, it is absolutely inconceivable to me that the jury that sits here and is selected over a period of two weeks and sits through eight days of horrific testimony, will not disassociate themselves completely from the trial and go home and mow their glass and go home and play with their kids and go home and go to the pool. I think they may do all those things, Judge, but it's also highly probable that they will go home and read the newspaper. And you just don't run into that problem from our perspective.

THE COURT: If I engage in that presumption, whoever goes to trial first, I'm going to have to assume the jury in the second case is going to have read the newspapers and not

tell me about it.

MR. HARRIS: We clear that up, Judge, in individual voir dire the second time around. We don't have that problem because you will question that jury -- you will question our jury, if we are allowed to go second, and every juror that comes in here that has read it, that has read --

THE COURT: If a juror is going to disobey my instructions not to read the newspapers, those same people are going to lie to me in a second trial about whether they have read newspapers or not.

MR. HARRIS: I know there is a presumption that juries will listen to everything that you say. I'm just saying that, as you pointed out, this is not the run of the mill drug case in federal court, this is not the run of the mill gun case in federal court, where they can go home at night, they can get up the next morning -- it's a three day trial and they don't have to listen to the radio, they don't have to read the newspapers. This case is going to be sensationalized by every newspaper, every TV station in South Carolina.

And while I do hope and I do have a genuine belief that jurors do listen to judges -- they have a great respect for the judge and his position and what he tells them to do -- I just don't think that in a case this big, of this magnitude, that your instructions -- you know, aren't -- to some extent they may not be followed by some of the jurors. That's a

concern that Mr. Basham has as the defendant whose jury is going to go home for three weeks or two weeks.

THE COURT: There's one point we haven't discussed and that is the idea that dual juries will minimize, if not eliminate entirely, the possibility of inconsistent verdicts. If we tried the cases sequentially, it is very possible that skillful lawyers in case number 1 can get an acquittal, and skillful lawyers in case number 2 can get an acquittal, and we have a situation where, at least from what Mr. Schools tells me -- I don't know, I haven't seen the first bit of evidence -- it's clear that one of the two defendants in this courtroom is guilty of murder. I mean, the government says they have a video of them driving off in a van, et cetera, et cetera. Now, I don't know, I don't know, that's just what Mr. Schools tells me.

MR. HARRIS: It would take extremely skillful lawyers for this case to result in two not guilty verdicts, Your Honor. I don't think that is a reasonable resolution to this particular case. We -- obviously, we still have to pick 12 jurors, we still have to present our defense, they have to present their case. But right now, looking at the evidence that I see, I don't think that's a reasonable resolution. I don't even think that's --

THE COURT: All right. Well, that's enough on the continuance and dual -- anything you want to say about dual

juries -- oh, you already have, I'm sorry.

Let's try to walk through a few of the motions if we can. And I'm just going to take them up in the order they are on my stack, this is no particular order.

Here is Mr. Fulks' motion to preclude the government from seeking the death penalty by lethal injunction. I don't understand the motion. This must have been filed in a copy cat of a motion from another jurisdiction, because we have two methods in South Carolina.

MS. JOHNSON: Yes, Your Honor, and there's certainly a lot of doubt about the constitutionality of electrocution. Virtually every state has changed from electrocution, faced with a challenge that it is an unconstitutional method.

So, if there are two unconstitutional methods available for the defendant to choose from, that is not permissible. However, Your Honor, I would rather not waste your time about this --

THE COURT: Well, my point is, you didn't make your motion directed towards the electrocution as well. I don't understand that.

MS. JOHNSON: But if the defendant doesn't make an election, he is executed by lethal injection, that's the South Carolina law --

THE COURT: All right.

MS. JOHNSON: -- and that's why I challenged that.

But I think given -- if Your Honor wants to hear argument on the merits, I'm glad to do that. But given the settled precedent, I think Your Honor will understand that, you know, we made this motion to preserve the issue for later.

THE COURT: Right. Well, I understand. And I -- don't get me wrong, I'm not faulting any defense lawyer for making a motion to protect the record in case there is a change in the law while this case is pending.

MS. JOHNSON: Thank you.

THE COURT: I certainly understand that. I'm going to deny the motion because current law would allow death by lethal injection, and so the motion is heard and respectfully denied.

All right, I think the next motion falls in the same category, the motion by the defendants to prohibit a death qualified jury. In other words, the idea that we should excuse from the jury panel any juror who says that they would be predisposed to impose the death penalty any time there is a murder.

MR. BLUME: I'm not sure this falls in quite the same category, Your Honor, just because most of the cases that the Supreme Court has been confronted with that permit death qualification --

THE COURT: I'm sorry, I stated it wrong. You want to not excuse jurors who say they could never impose a death

penalty.

MR. BLUME:  Correct.

THE COURT:  I stated the converse of that.

MR. BLUME:  But the difference is that when the Supreme Court has said in the past that states can excuse jurors whose beliefs about capital punishment would prevent or substantially impair their ability to follow the law, the states have been looking -- I mean, the Supreme Court has been looking at schemes and state systems which specifically allow for death qualification.

There is no requirement of death qualification.  For example, a state could have a system in which they say, you know, "Jurors who are opposed to the death penalty can serve in a capital case."  I mean, that's -- there is no constitutional requirement those people be excluded.

Our argument is more one of statutory construction, that if you look at the Federal Death Penalty Act, there is no provision for death qualification, there is nothing -- as there is, for example, in South Carolina.  There is a statutory qualification -- death qualification requirement is that the fact that there is no statutory provision doesn't indicate an intent -- a congressional intent to exclude jurors who are morally opposed to the death penalty.

So, since there is not one, then we would argue from the structure of the statute as a whole there is no provision

for it. It is not constitutionally required under the statute and therefore it should not be conducted.

THE COURT: Mr. Schools?

MR. SCHOOLS: Briefly, Your Honor. There are three Fourth Circuit cases, one from '98, one from 2000, one from 2003, all of which have affirmed district judges striking for cause jurors who have equivocally stated that they didn't think they could give a death penalty, not that they absolutely stated they could not.

So, I think it's clear all of those federal death penalty cases, it's clear that the Fourth Circuit certainly believes at this point that it is within Your Honor's authority to death qualify a juror, and to excuse jurors who effectively are telling the court they can't follow the law in the case, we would ask you to follow those precedents.

THE COURT: Anything from Mr. Basham's attorneys?

MR. SWERLING: No, sir. We take the same position as Mr. Blume.

THE COURT: All right. Well, I'm going to deny the motion to prohibit death qualification during jury selection. I think it's -- as has been said before, the defendants in a capital case are entitled to a fair trial, but the government is also entitled to a fair trial.

And I think that to grant this motion would be to impanel jurors who have indicated that they could not follow my

instructions on the law applicable to death penalty cases, and for that reason the motion is denied.

All right, the next -- and, again, I haven't arranged these in any order. I had hoped to have time to go back and collect my thoughts and set up some structure. But I'm just trying to get through as many as we can today, and maybe we will take up some of the more extensive motions tomorrow.

There is a motion by the defendants to permit attorney conducted voir dire, which I do intend to allow. The question, of course, is how much to allow. We tentatively outlined a procedure we are going to follow. We composed a comprehensive juror questionnaire of about eight or nine pages that has already been sent to -- how many jurors, Ms. Floyd?

THE CLERK: I believe over 800.

THE COURT: Over 800 jurors statewide. And included in that was a question about their vacation time, that asked all the way through August.

If this case were to be postponed until the fall, I still want to use that jury venire. I mean, that's our jury, that's who we are going to pull from. Now, we may have to submit another question about travel plans, et cetera, on into the fall. But when those questionnaires come back, y'all can go ahead and get them -- get copies and start looking through them. Because whenever we try the case, that's going to be the jury panel that we pull from.

And so we did a comprehensive questionnaire, then I proposed a short two-page follow-up questionnaire to be given to the jury on the day they report. I think we tentatively decided to summon maybe 20 per day, and put the 20 in the jury room where they will watch a recorded video from me explaining what the case is about.

We would go through the text of that video in advance and see if we could get agreement or settle it in some way. Then they would be given the two-page questionnaire, which they would fill out, sign. We would reproduce it very quickly, give it to counsel, and then bring the jurors in one at a time for an in person one-on-one voir dire.

I would go first and ask any questions I thought was appropriate based on responses to the big questionnaire and to the small questionnaire, and then I would permit counsel to do the same.

I spoke with a judge up in Chicago who is in his ninth month of a death penalty case. He told me it took them four weeks to draw the jury. They got through about six jurors per day. Now, that was in some case involving a prison gang murder in the super max prison, with all kind of threats against witnesses and everything. I think it's a pretty complex case in terms of multiple defendants and so forth.

But he said he put -- he didn't limit the attorneys by subject matter, he just put time limits on them.

What about that, Mr. Schools?

MR. SCHOOLS: Your Honor, we are okay with time limits. The one -- I think the main subject matter limitation we are concerned about is the use of hypotheticals to try to rehabilitate an individual who said, "I couldn't give the death penalty."

It's really not instructive for this -- for example, for defense counsel to say, "Well, what if they find Usama bin Laden and you get put on that jury, could put him to death?" Because this case isn't about Usama bin Laden. So, those type of questions, in an effort to --

THE COURT: Well, let's talk about rehabilitation. We are going to have some jurors who say, "A, I would impose the death penalty any time there is a murder." Or, "B, I could never impose the death penalty under any circumstances because of my beliefs."

Now, is the government content to kick both of those people off without any voir dire?

MR. SCHOOLS: Beg the court's indulgence.

THE COURT: You agree to give up the right to rehabilitate either one of those?

MR. SCHOOLS: Yes.

THE COURT: Mr. Blume, what about that?

MR. BLUME: I don't think we can agree to that. I mean, my experience has been that -- well, I mean, certainly we

can maybe think about it a bit, but my experience has been that many jurors who say those things on both sides, during more questioning actually are qualified.

But, I mean, I think it would depend. There might be some jurors where it's so clear that there might not be a need for voir dire, that it's so clear one way or the other, I mean, where you might not need it. But I think it's a little difficult at this point to say that any juror who comes out of the blocks and says something which appears to be disqualifying --

THE COURT: Well, you know, the way we asked the question in that follow-up questionnaire, and I got those from another case, it was a continuum, you know, strong feelings on down through -- strong feelings on the other end, and it might be dependent on where they circled on the continuum that we might need to follow up.

MR. BLUME: It might be, but --

THE COURT: In other words, I don't have -- do we have it handy? If someone said, "I could never under any circumstances in any type of crime vote to impose the death penalty," that's one thing. But if they answered the one just below that, "I'm generally predisposed not to impose the death penalty and would have a hard time doing so," that might be somebody we would try to rehabilitate. But not the one who answered the very extreme category.

Well, let's just -- I don't know that we need to skin this cat today. Let's just -- I'm going to allow attorney voir dire and impose some reasonable time limitation, and I may impose some subject matter limitation, I just don't know. The big debate I guess will be, did you have any other problems with subject matter besides rehabilitation?

MR. SCHOOLS: Beg the court's indulgence just one moment.

Not that I can think of right at this time, Your Honor.

THE COURT: In other words, if the defense lawyers want to ask, "What do you think about people who ride motorcycles?" Or, "Did you go see the movie about crucifixion that premiered here today?" You know, something just kind of open-ended --

MR. SCHOOLS: I think we can probably object to those at the time. And if we come into subject matters that become consistently problematic, you can rule at that time. But other than hypotheticals, I can't think of any broad subject that we would object to at this time.

THE COURT: Well, my law clerk just pulled the supplementary jury questionnaire, and it's question 5. And it has A through J, which is -- how many categories is that? That's 10 different categories stretching from one extreme to the other.

So, we might permit follow-up, depending upon where they come down on that continuum. And then I'll put some limitations on the time. And if we have any specific subject matter objections, we will take them up as we come to them.

So, I think I'm just going to ask the clerk to mark that motion granted, with the understanding we have got to draw some lines as to where you can go when the time comes.

I'm sorry, Mr. Swerling, I didn't mean to slight you.

MR. SWERLING: Mr. Blume and I were just talking. One of the problems with just automatically striking a juror, depending whether at the high end of that or the low end of that is, they are making those statements without knowing what the law is regarding aggravating and mitigating circumstances.

And oftentimes people who try death penalty cases find that after the law is explained to them, they may change or equivocate on what their beliefs are. And that's a problem.

THE COURT: All right. Mr. Swerling, what is your experience in state court in terms of how many jurors we can get through in a day's time? I might have asked you that before, I'm not sure.

MR. SWERLING: Well, I think we -- it kind of usually runs about 30 to 45 minutes per juror, I think is fair, 45. Between -- and if we go through -- well, we won't be going through three, it will be two lawyers. So, both sides, I would say 30 to 45 minutes.

THE COURT: Well, that's about six per day then, or maybe a little more.

MR. SWERLING: I was thinking three, but it's actually two sides because we won't be doing it together.

THE COURT: All right. Well, that motion is granted with the understanding we will have to revisit it, and put some clear guidelines as to what will be permitted.

All right, let's talk about selecting the jury panel in a racially discriminatory manner and quashing the jury venire. I think they have raised similar motion.

MS. JOHNSON: Your Honor, I think the motion as written is moot because we have moved to a statewide panel.

THE COURT: Right.

MS. JOHNSON: And we might -- after the venire is actually drawn, we might --

THE COURT: All right, the statewide panel resolved the old motion to quash venires, so that motion has been granted -- or moot, I guess we might say.

MS. JOHNSON: Either way, yes.

THE COURT: Either way. All right, moot. What about preclude the government from seeking the death penalty in a racially discriminatory manner?

This relates to Attorney General Ashcroft's decision to impose the death penalty. You cite some statistics that show that he generally -- at least statistically speaking, he's

more inclined to seek the death penalty when the victim is white.

MS. JOHNSON: Substantially more inclined, Your Honor, 40 percent more likely. Again, Your Honor, this might be like the lethal injection motion, it might be not worth my time to argue it, because the law is quite settled.

THE COURT: Right.

MS. JOHNSON: But I would just point out that it is not the same as McClesky simply because there is one decision maker, so the evidence that it might apply in a particular case is different here than it was in McClesky.

THE COURT: Right. Mr. Schools.

MR. SCHOOLS: The only thing I would add in addition to our brief, Your Honor, is that the attorney general attempts to make these decisions in a race blind way. We submit the protocol up to Washington, we actually don't identify the race of the --

THE COURT: I was going to ask you, is the victim's race identified?

MR. SCHOOLS: No, sir. Nor was the race of the defendants. So, that's sent up in a separate document to a part of the Department of Justice that keeps track of the statistics like Ms. Johnson is talking about. But that's --

THE COURT: But it's done on purpose, that the attorney general is not told the race of the parties and the

victim?

MR. SCHOOLS: That's correct. That's part of the procedure.

THE COURT: All right. Well, I think there's clear precedence on this, I would respectfully deny the motion. However, you have protected yourself in the event of a change of the law sometime down the road.

Because I'm not going to do written orders on these motions that we are doing today, the relatively short motions. I may do a written order on some of the other ones later on.

We have already discussed the polygraph. I'm going to wait and get an additional brief from the government on whether it might be in some way usable in a penalty phase.

The motion for the Jackson versus Denno hearing is granted. The clerk can mark that motion granted.

The government filed a proposal regarding dual juries that we have already discussed. I don't think it was a motion. Ms. Floyd, does it show up as a motion?

THE CLERK: No, sir. No, sir.

THE COURT: All right.

MR. SCHOOLS: Your Honor, we actually sent that by letter to Your Honor, notifying you --

THE COURT: Right, I know it. And then I asked for briefs.

MR. SCHOOLS: Have you filed -- have you asked for

that letter to be filed?  Because we would ask that it be filed in the event it hasn't been.

THE CLERK:  It has not been filed.

THE COURT:  Not been filed?

MR. SCHOOLS:  We would ask that the court consider it part of the clerk's file, if you could.  Just for the record, if we go to Richmond on that issue.

THE COURT:  All right.  All right, the motion for continuance is under advisement.  There is a motion by the government for reciprocal discovery, and I don't have a response to it.  I don't know if there is any opposition to it or not.  Two motions -- as to both defendants, I guess I should say.

MR. BLUME:  No, Your Honor, we will provide what the rules provide as required.

THE COURT:  So, you will provide that which the rules require?  It has not been done yet, Mr. Schools?

MR. SCHOOLS:  We haven't gotten anything from them, Judge.  But the one -- and I have spoken with Mr. Swerling about this, and I think I may have sent an e-mail to counsel for Mr. Fulks about this as well -- it's not particularly clear from the rules whether Rule 16 and 18 U.S. Code, Section 3500 apply to the sentencing phase evidence.

And while it's very possible that the defendants don't have any documents that they intend to offer in their

case in chief at guilt, I think it's more than likely that they will have a lot of documents that they will offer in the penalty phase, and that they are entitled -- they are obligated, if Rule 16 applies to the penalty phase, to provide us that stuff.

We are happy to provide discovery under Rule 16 that pertains to penalty phase evidence, if there is an agreement among counsel that it applies to both sides. If it doesn't apply, it doesn't apply, and then we will both operate under that rule. But we just need --

THE COURT: So, you don't have an open file policy on penalty phase matters?

MR. SCHOOLS: Well, we haven't held anything back at this point. But my concern is that there are a lot of documents that are being disclosed, that the defendants may want to offer medical records, school records, whatever, that they may want to offer in the mitigation part of the case.

And obviously we would like to get copies of those pursuant to Rule 16, if counsel is in agreement that it applies. If not, then we will all retool our thinking with respect to evidence --

THE COURT: All right. Mr. Blume, what about that?

MR. BLUME: Your Honor, I have a -- I don't know, maybe the e-mail went to Mr. Nettles, so I haven't really sort of thought through the penalty phase aspects of Rule 16. I

will be happy to try and do that overnight and give you, you know, a couple --

THE COURT: All right. Well, let's come back to that one. I don't want to leave that hanging after this week, let's come back to that one tomorrow.

What about it from Mr. Basham?

MR. SWERLING: Judge, it's fine. Mr. Schools and I did speak about that, and we -- I think we tentatively talked about trying to resolve that at some point in the near future. But I don't know that any of us have actually committed to the situation. Obviously, we think they should get the Rule 16 materials for the guilt phase of the trial, it's just the question about the punishment phase.

THE COURT: All right. Well, we will revisit that one tomorrow. There's a motion by the defendants to require the government to disclose their intent to use 404 (b) evidence. And the government's response says, "We will produce that, but not quite yet." How do we stand on that?

MR. SCHOOLS: Your Honor, it's our position that anything that happened between November 4th and November 20th is all intrinsic to the crime charged, that's the nature of the conspiracy charged in count 4 of the case. And so none of the evidence that occurred between those dates would be 404 (b) evidence.

Now, we are providing discovery with respect to all

of the information we intend to present for that time period. At this point I don't know of any evidence of acts occurring outside that time period that we intend to offer under 404 (b). If we develop that, we certainly will provide them notice.

We will probably provide them or we will provide them to the extent we identify evidence of acts not alleged in the conspiracy count, we will give a notice. But our position on that is, it's a protective order in the event that for some reason the Fourth Circuit were to find that that evidence was not intrinsic. But, you know, this is a crime spree that began on a finite date and ended on a finite date --

THE COURT: You say everything from the escape up to the arrest is intrinsic to the crime charged here?

MR. SCHOOLS: Yes, sir.

THE COURT: But you do have an open file policy as to the guilt phase on that crime spree?

MR. SCHOOLS: We are providing early discovery under the rules, yes, sir. I don't want to be semantic, but I have got a bad history with the words "open file," so I can --

THE COURT: Well, I don't need to use the words "open file policy."

MR. SCHOOLS: We are back in 1991.

THE COURT: All right.

MR. SCHOOLS: But we are providing early discovery of everything they are obligated -- everything we are obligated to

provide, and a lot more.

THE COURT: All right. But if you do develop what you consider to be 404 (b), you understand your obligation to timely disclose it to the other side?

MR. SCHOOLS: Under the penalty that you don't let it in evidence, yes, sir.

THE COURT: All right. Now, there's also a fallback motion for a bill of particulars. Anybody want to be heard on that?

MR. NETTLES: Judge, I think a lot of that goes to the motion to strike the agg's. But I think some of the information is, we don't have any information regarding victim impact, we don't have a victim impact statement. I think the government said they were going to give us that at some point. They haven't given us that --

THE COURT: All right. Can we just decide that this motion for a bill of particulars is moot, and take it up in a different context on some of these other motions on aggravating factors and so forth?

MR. NETTLES: I think we had better take it up --

THE COURT: All right. Any objection to that procedure?

MR. SWERLING: Well, Judge, when you say it's moot, you are just saying we'll just put it off and discuss --

THE COURT: Well, all right. All right, we will

leave it pending then. See, we had this computer docket, I have to explain why I don't rule on motions within a certain amount of time for the Fourth Circuit. And so we try to -- if we have disposed of them, we like to take them off. But we will leave that one down.

All right, the motion to allow allocution without cross-examination during the penalty phase. When I first read this, I thought this was a frivolous motion, but then I see there is a little bit of a rule -- I mean, a glimmer of a way to argue it, and that the rule on allocution doesn't make much sense if -- I'll hear from you if you want to. There is a Fourth Circuit case that --

MS. JOHNSON: Your Honor, that's their motion.

THE COURT: All right. Mr. Swerling, I give you an A for effort on this, but -- it's a very creative motion, but the Fourth Circuit I think decided it, and I don't think it was really dicta either, I think it was a holding of the case.

MR. SWERLING: Well, there is a case -- and I'm trying to find the motion right now -- but the way I read it it appeared to be dicta, but I'm not disagreeing with the court. I mean, it was resolved on other issues. But, yes, there is the case in the Fourth Circuit.

THE COURT: Barnette, I think it is.

MR. SCHOOLS: Yes, sir.

THE COURT: Is it Barnette? Right.

They reversed the death sentence for another reason, but they went ahead and said that Rule 32 does not require he be allowed the chance to allocute before the sentencing jury without cross-examination.

Technically it wasn't essential for the court's holding, so in that sense it was dicta. But I think they clearly said it's not required, and they -- isn't this where they said, "We follow the Hall case in another circuit that did squarely hold it"?

MR. SCHOOLS: That's correct.

MR. SWERLING: Judge, in Hall it said the district court may have discretion to admit the unsworn statement of remorse by the defendant, that's my recollection of what Hall said. I thought we were going to probably get to this tomorrow, so I just didn't go through it. But I thought Hall said it was a discretionary issue.

THE COURT: Mr. Swerling, I have got -- my law clerk pulled the Hall decision for me, and I think that circuit -- the Fifth Circuit clearly held, and they went through all the arguments, the constitutional arguments and the statutory arguments, and said, "There is no right to do it without cross-examination."

MR. SWERLING: Judge, if I could, I mean, this may be -- we would probably dispose of this in five minutes, I just need to read back over it. I didn't think we were going to get

to it today.

THE COURT: All right. Well, I would like not to hold too much over till tomorrow. Do you want to take a minute just to look at it?

MR. SWERLING: Yes, sir. I just need to get the government's motion.

THE COURT: Mr. Swerling, let me read you this from the Barnette case. This is quoting from page 820 of the Barnette case in the Fourth Circuit.

"A case directly on point is United States versus Hall --" blah, blah, blah "-- Fifth Circuit. In that case the point on appeal was whether or not the criminal defendant had a constitutional right to make an unsworn statement of remorse before the jury, which was not subject to cross-examination. The court held that he did not. And we follow that case, Hall 152 Fed 3d at 396. Neither are we of the opinion that Rule 32 has such a requirement."

MR. SWERLING: Judge, what I was looking at as far as Hall is at page -- I think it's page 393, where it was being cited that -- it rejected a per se right to make an unsworn statement of remorse to the jury not subject to cross-examination, but the court acknowledged that a district court may have discretion.

THE COURT: All right. So, you are saying I have the discretion if I want to --

MR. SWERLING: Yes, sir.

THE COURT: -- to allow it?

MR. SWERLING: There's no per se right --

THE COURT: There's no right to it, but I can allow it in my discretion.

MR. SWERLING: I just need to get my thoughts together, but it's in discretion -- and with respect to Mr. Basham, that may be critically important because of his low intellectual capacity.

THE COURT: Well, what type of allocution -- I mean, if he just wants to just say, "I'm very, very sorry, and I ask you not to give me the death penalty," that's one thing. But if he wants to start giving a lot of facts and details and, you know, contradicting evidence and all that, that might make it a whole different story, I don't know.

MR. SWERLING: We wouldn't think that he would be entitled to go in and just go ahead and make a statement about anything that he wanted to. I think it would have to be with some very severe limitations.

THE COURT: All right, let me just -- let me hold off. If it's a discretionary thing, I don't have to resolve it today.

MR. SWERLING: And we submit it is. We do concede that under the law, it is not a per se right.

THE COURT: All right. Well, I'm going to hold off

ruling on that.

It's 5:30, I think that's -- everything else is a fairly substantive -- I mean, lengthy motion. So, why don't we stop here and come back at 9:30. I told you I have got this problem with my civil defendant that I have got to take care of at 9 o'clock. And do you think we can get through the rest of the motions tomorrow, Mr. Schools?

MR. SCHOOLS: I would think so, yes, sir.

MR. SWERLING: Yes, sir.

THE COURT: Y'all think we can get through most of the motions tomorrow?

MS. JOHNSON: Yes, sir.

MR. BLUME: Absolutely. I think realistically I would say we would get through them in a couple of hours.

MR. SWERLING: We will probably finish by the lunch break, Your Honor.

THE COURT: All right. Well, let me just say, I'm not going to do a written order on the motions we dealt with today. I may -- on some of the motions tomorrow I may do a written order.

But I do think I should require the defendants to give the government a list of the exhibits -- tangible evidence, rather, that they think they need the right to test that the government has not tested. And I think -- why don't we say by -- what's today, Wednesday? Let's say by Wednesday

of next week.

Is that reasonable, Mr. Schools?

MR. SCHOOLS: Yes, sir.

THE COURT: All right.

MR. SCHOOLS: And could we have, I guess, just through next weekend to prepare -- the weekend after we get that information to prepare another brief just addressing our assessment of --

THE COURT: That will be fine. After you get the list, you can file a memorandum setting forth your position on what testing you agree to or don't agree to and why.

MR. SCHOOLS: And at that point hopefully we will also have the DNA report.

THE COURT: All right.

MR. SCHOOLS: Can I ask for guidance with respect to one issue for tomorrow? The motion on the constitutionality of the death penalty has about 78 different parts to it, most of which have been rejected by every court that has ever considered them.

THE COURT: Did you say 78?

MR. SCHOOLS: Not that many, it's a bunch.

THE COURT: All right, It's a lot of them, I know. And I read the whole memo.

MR. SCHOOLS: Yes, sir.

THE COURT: Both sides wrote good briefs on that.

MR. SCHOOLS: And I guess my question was, I can spend the night reading all those cases --

MR. BLUME: Your Honor, I think what Mr. Schools is getting at is, of the subparts in that motion, which ones do we intend to argue most extensively and which ones do we intend to rely on the pleadings; is that the --

MR. SCHOOLS: Yes.

MR. BLUME: -- essence of the request? What I intended to do was to argue primarily that the issue of the federal death penalty is unconstitutional because of the failure to apply the rules of evidence at the sentencing phase, or the Fell portion, that's up in the United States versus Fell. I may briefly touch on one or two of the others, but that's really the only one I intend spending any time on.

THE COURT: Wait a minute now, your primary challenge is the fact that the rules of evidence don't apply at the penalty phase?

MR. BLUME: At the sentencing phase, yes, Your Honor, which is the issue that is up in United States versus Fell.

THE COURT: All right. Well, let me just -- I read both briefs twice, both sides' brief twice. I don't think oral argument would help me decide that issue, but I will allow limited argument. But don't come prepared to devote a lot of time tomorrow on that particular motion, all right?

All right, thank you very much. We will see you at

9:30 tomorrow morning.

MR. SCHOOLS:  Thank you.

(Thereupon, the proceedings were recessed.)

* * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____        _____

s/ Gary N. Smith, CM

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

# JOINT APPENDIX AND INDEX
# VOLUME 4

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,           )        Cr. No. 4:02-992
                                    )
                                    )
VERSUS                              )        Columbia, S.C.
                                    )        February 25, 2004
CHADRICK E. FULKS and               )
BRANDEN L. BASHAM,                  )
                                    )
                                    )
        Defendants.                 )
------------------------------------)


EXCERPT OF MOTIONS HEARING
TESTIMONY OF JEFFREY LONG, RONALD HEWETT,
WILLIAM H. MONCKTON, CAMERON B. LITTLEJOHN, JR.,
AND ROSE MARY PARHAM
BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Appearances:

For the Government:          STROM THURMOND, JR., ESQ.
                             U.S. Attorney for South Carolina
                             SCOTT SCHOOLS, ESQ.
                             JONATHAN S. GASSER, ESQ.
                             Assistant U.S. Attorneys
                             1441 Main Street, Suite 500
                             Columbia, S.C.   29201

For the Defendant            JOHN H. BLUME, ESQ.
        Fulks:               KEIR M. WEYBLE, ESQ.
                             1247 Sumter Street, Suite 202
                             Columbia, S.C.   29201

                             SHERI LYNN JOHNSON, ESQ.
                             Cornell Law School
                             Myron Taylor Hall
                             Ithaca, NY   14853

                             WILLIAM F. NETTLES, ESQ.
                             Assistant Federal Public Defender
                             401 Evans Street, Room 240
                             Florence, S.C.   29503


GARY N. SMITH, CM
COLUMBIA, SC

(Appearances continued:)

For the Defendant         JACK B. SWERLING, ESQ.
      Basham:            1720 Main Street
                      Columbia, S.C.  29201

                      GREGORY P. HARRIS, ESQ.
                      1720 Main Street
                      Columbia, S.C.  29201

Court Reporter:         Gary N. Smith, CM
                      901 Richland Street
                      Columbia, S.C.  29201
                      (803) 256-7743

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THE COURT:  All right, what is next?

MR. GASSER:  Your Honor, at this time the government would call Agent Jeff Long.

THE CLERK:  Mr. Long, if you would come forward to be sworn.  Place you left hand on the Bible and raise your right hand, and state your name for the record.

THE WITNESS:  Jeffrey McClain Long.

JEFFREY LONG, SWORN

DIRECT EXAMINATION

BY MR. GASSER:

Q   Agent Long, where are you employed, sir?

A.  The Federal Bureau of Investigation, assigned to the Myrtle Beach resident agency.

Q.  How long have you been with the FBI?

A.  A few months short of seven years.

JA 0701

A_43373

Q. Tell us, please, how you became first involved in this particular matter.

A. From the very beginning when the case initially started out as a fugitive investigation, I became the point of contact for Indiana in looking for Mr. Basham and Mr. Fulks, who were believed to be in Myrtle Beach staying at a hotel. That was my initial involvement in the case.

Q. Were you subsequently assigned as the chief investigating officer with regards to the South Carolina matter involving Ms. Donovan?

A. Yes, I was.

Q. Now, did you become aware that Branden Basham was arrested in Ashland, Kentucky on November 17th?

A. Yes, I was.

Q. Did you maintain communication with both local, state, and federal authorities with regards to what Mr. Basham was saying?

A. Numerous, numerous phone calls to all the law enforcement agencies right after we found out that Mr. Basham was arrested, just trying to get as much information as we possibly could on identifying the location of Alice Donovan.

Q. So, were you aware that Agent Vito had an opportunity twice on November the 19th to advise Mr. Basham of his constitutional rights and interview him?

A. Yes, I did.

Q. Were you aware that Agent Vito and Agent Maley had the

JA 0702

A_43374

opportunity to do that on November the 20th?

A. Yes.

Q. Were you also -- did you participate in a conversation with Mr. Richard Hughes on November the 25th?

A. Yes, I did.

Q. Now, the chief investigating officer -- of course you were in the courtroom yesterday when Agent Maley testified; is that correct?

A. Yes, I was.

Q. Do you recall Agent Maley testifying that when he arrived on November the 25th at the Boyd County Detention Center, that upon entering the room that Mr. Hughes was in the room and Mr. Basham was in the room; do you recall that testimony?

A. Yes, I do.

Q. And do you recall Agent Maley testifying that when he also arrived an agent -- that Mr. Hughes was on his cell phone communicating with an agent in South Carolina?

A. Yes.

Q. Who was the agent that Mr. Hughes was talking to on the cell phone?

A. That was myself.

Q. And was Mr. Hughes -- were you aware that Mr. Basham was present in the room when Mr. Hughes was talking to you on the cell phone?

A. Yes.

JA 0703

A_43375

Q.   And would you tell the court what was the nature of that communication with Mr. Hughes?

A.   Mr. Hughes wanted to let me know that Mr. Basham wanted to cooperate with law enforcement in South Carolina in locating Alice.  And he was making me aware that at the time his client, Branden, wanted to cooperate and give information as to specifically the location of where Alice was.

Q.   And specifically did Mr. Hughes indicate that he was asking the FBI to do whatever it took to get Branden Basham physically to the State of South Carolina?

A.   Yes.

Q.   And were you then also -- did you have an opportunity after you got off the phone with Mr. Hughes and after Mr. Maley was able to have his discussions with Mr. Hughes, were you privy to that information?  Did you receive that information that Mr. Hughes was telling Agent Maley?

A.   Yes, after we -- after we ended the phone call, and it was based strictly on logistics, Mr. Hughes had to move to a different location in the jail.  He was on his cell phone.  He advised me that the agent, Agent Maley, had arrived at the jail and so we terminated the phone call with the understanding that Agent Maley would contact me at some point during the -- either after the interview or as the interview was going on to provide me with the specific locations that Branden was passing on to Mr. Hughes.

JA 0704

A_43376

Q.  At any time with your -- the phone conversation that you have just described on November the 25th with Mr. Hughes, at any time during that phone conversation did you promise Mr. Hughes anything in exchange for either the information he was providing, or that Branden would provide?

A.  I did not at all.  I didn't -- I knew that I, number one, wouldn't have the authority to.  I knew that AUSA Parham had been in contact, and she was handling the legal aspects of the correspondence.  But no promises were made to Mr. Hughes by myself.

Q.  Did you have another opportunity the next day on November the 26th, which I would have believed to have been Tuesday, November the 26th, did you have an opportunity to have a phone conversation with Mr. Hughes as well?

A.  I believe it was the 26th.

Q.  And did Mr. Hughes again indicate that Branden Basham's desire was to get to South Carolina, physically get to South Carolina, so that he could cooperate on the ground in searching for Ms. Donovan's body?

A.  Yes.  We had gone back and forth with directions, with maps being faxed to my office in Myrtle Beach from Mr. Hughes, in trying to pinpoint locations.  And so it was presented by Mr. Hughes that if we could get Branden up to the Carolinas, that if he was on the ground, he might be able to help better identify these locations.

JA 0705

A_43377

Q.  Were any promises or deals discussed with Mr. Hughes during that November 26th conversation?

A.  No.

Q.  And in fact, did you have to generate a particular document to Washington, to headquarters in Washington, when the idea was presented to you that Branden Basham may be going to be assisting law enforcement on the ground in South Carolina to generate a document?

A.  I had to get headquarters, FBI headquarter's approval, as well as Department of Justice approval to have Branden brought to me, as well as to bring him out and use him to help identify the area.

It's quite an extensive document that you have to get signed by several attorneys up in the Department of Justice to get the authority for me to get him, as well as getting the marshals service to get him on a plane and get him -- since we were still under a sense of urgency and we wanted to expedite this, we needed to get the marshals to get him on a plane and get him flown to Florence as soon as possible, to get him a magistrate, to get him counsel assigned here.  So, there was a whole bunch of logistics that we had to do and we only had a day or two to do it.

Q.  And specifically, in that particular document, did you even state in written form that there were no deals with regard to Mr. Basham's providing assistance on the ground in South

Carolina?

A.   Yes.

Q.   Then eventually on November 27th was Branden Basham brought to the State of South Carolina?

A.   He was.

Q.   Where was he housed?

A.   I believe it was Effingham.  I'm not positive.  But he was flown to Florence and spent the night, I believe it was, at the Florence County Detention Center.

Q.   And was he brought before a federal magistrate on the 27th, I believe?

A.   Yes.

Q.   And was he provided local counsel in South Carolina?

A.   Yes.

Q.   Billy Monckton and Cam Littlejohn, were those the two lawyers that were provided?

A.   That's correct.

Q.   And did you have an opportunity, you, yourself, have an opportunity to have any conversations with Mr. Littlejohn and/or Mr. Monckton?

A.   I did not talk to Mr. Littlejohn.  I knew that AUSA Parham had talked to one or both attorneys.  My recollection was, the only time I talked to Attorney Monckton was to work out the details of who was going to meet where and how we were going to get up to North Carolina.  So, I arranged with attorney

Monckton to meet me at my office and then we would go up.

Q. Who was charged with the responsibility of setting up the logistics for what was going to transpire on Thanksgiving day, November the 28th, who was in charge of that?

A. I was, as well as assistance from the Wilmington R A, which the location we were going to search is in their jurisdiction. So, I was in touch with them, as well as the Sheriff of Brunswick County.

Q. Based on your conversations with Mr. Richard Hughes on November the 25th and November the 26th, based on your conversations with Assistant U. S. Attorney Ms. Parham, who you have indicated was having discussions with Mr. Monckton and Mr. Littlejohn, what was your understanding as to what was going to take place on November the 28th?

A. That we had a known location we were going to start from, and that we were going to let Branden show us basically, by pointing out on the ground, the location of where Alice would be -- would be located.

Q. And at that time were there any deals with regard to Mr. Basham whatsoever?

A. No, sir, there were not.

Q. Any promises?

A. No promises.

Q. And was it your understanding that everything that transpired on the ground November 28th was fair game, could be

used against Mr. Basham?  Was that your understanding?

A.  Yes, sir.

Q.  Now, would you please tell the court -- would you set the stage as to what transpired first off on the morning of November the 28th with regard to Mr. Basham?

A.  We had two teams.  One team was going to go to the facility where Mr. Basham was located, pick him up in the van that we had rented.  The Conway police provided a van that we could use.  They went -- a group of agents and law enforcement went to Darlington to pick up Mr. Basham.

Myself and Attorney Monckton drove to Brunswick County.  I stopped at, I guess it's a recreation facility in Brunswick County, where we had all of the law enforcement people that were going to help us search located.  We had the State Bureau of Investigation, we had SLED, we had Brunswick County, we had agents from our Wilmington R A, our evidence response team standing by for instructions.

I met with them, I briefed them on what was going on and what knowledge we had.  And then I -- myself and Attorney Monckton drove to the Bee Tree Farm, which was going to be our starting point, which had been already agreed upon, and await the arrival of Mr. Basham, where we would start the search from.

Q.  Now, is there actually a building, a hunt club at this Bee Tree Farm location?

A.   Yes, there is.

Q.   And had the FBI and the Brunswick County Sheriff's Department identified witnesses that observed a BMW matching the description of Alice Donovan's, with individuals matching her description and the defendants' description?

A.   Yes.

Q.   Was that the reason why that was picked as the location?

A.   We had -- at one point we -- I faxed -- I received pictures from Sheriff Hewett, who he took digitally, or had a deputy take them digitally of the Bee Tree Farm, of areas around Brunswick County.

I e-mailed those to Attorney Hughes, who he had an opportunity to review with Mr. Basham.  And we all realized that the Bee Tree Farm -- which Branden had described as recalling seeing some subjects outside grilling on the grill, and that he knew that they had been seen by these witnesses.

We felt that that area right there, that Bee Tree Farm would be a good spot, because everybody knew that we all -- we knew that they were there, Branden knew he was there, and we had witnesses putting them there.  So that would be the first logically -- the logical spot to start from.

Q.   So, where did you physically first come into contact with the defendant, Branden Basham?

A.   At the Bee Tree farm.

Q.   And who was he in the presence of when you came into

contact with him?

A.   The van pulled up.  He was inside the van with Attorney Littlejohn, Attorney Monckton was with me, and there were two Conway police officers, as well as two agents from Columbia.

Q.   Did you actually exchange greetings with Mr. Basham?

A.   I did.

Q.   And was he provided necessities there at the hunt club?

A.   First thing he needed to do was hit the rest room.  I escorted him inside to the hunt club, where he used the bathroom, and I think he had a cigarette.

And then we decided what people would go in the van, and we set it up, and put Mr. Basham in the van with Attorney Littlejohn and Attorney Monckton, myself, Sheriff Hewett, and two uniformed police officers from Conway PD.

Q.   When you say "we decided," was attorney -- was Cam Littlejohn and Billy Monckton part of that decision making?

A.   Yes.

Q.   Was Cam Littlejohn and Billy Monckton present and able to provide their opinions and advice as to how these events of November the 28th would be choreographed?

A.   Yes.

Q.   And with the okay of attorneys Cam Littlejohn and Billy Monckton, y'all's decision was to allow whom to kind of take the lead with Mr. Basham that day?

A.   We didn't want to lead him in any direction.  We started at

the camp, we asked Branden, "Do you recognize the camp, the hunting camp, now that you are standing here?" And he said, yes, he did.

And so when we all got in the van, there is only one way out of that area, and that is down the dirt road from the starting point of the hunt club. We proceeded down that dirt road, and we just let Branden kind of lead us by looking at areas, houses, locations, in order to tell us, based on the directions that we had already been -- received from Mr. Hughes early on, "Show us where you are talking about, you know, lead us to where Alice is." And we let him do the pointing, if you will.

Q. Were you familiar with that area?

A. No.

Q. So, because you weren't familiar with that area, was there somebody that was familiar with the area in the van that kind of knew that particular area?

A. Sheriff Hewett -- we decided as a group that Sheriff Hewett would be the best person to sit in the passenger's seat of the van and be able to guide us as far as the roads go, help Branden if he needed it in showing locations, since I wasn't -- I had never been up there before.

Q. Going back to when you indicated you first met, first were introduced to Mr. Basham -- you have had the opportunity, you as law enforcement, to observe individuals that were under the

JA 0712

A_43384

influence of alcohol or drugs, have you not, Agent Long?

A. Yes, I have.

Q. Did Branden Basham appear to be under the influence of any alcohol and/or drugs?

A. No, he did not.

Q. Did you have any difficulty understanding him when he spoke to you?

A. None.

Q. Did he appear to have any difficulty understanding you when you spoke to him?

A. No, he didn't.

Q. Were you present when it was explained -- or was Mr. Basham present when you were having discussions, or Sheriff Hewett was having discussion with Mr. Littlejohn and Mr. Monckton as to what was going to go on that day? Was he present?

A. Yes.

Q. Was there any doubt in your mind that Mr. Basham knew why he was there at the Bee Tree Hunt Club, what his purpose was?

A. No doubt in my mind he knew why he was there.

Q. In fact, in the presence of Mr. Monckton and Mr. Littlejohn, as the van pulled out from Bee Tree Hunt Club, did Mr. Basham actually engage in communication and conversations with you and Sheriff Hewett in that van?

A. Yes.

Q. At any time that day on November the 28th, did Mr. Basham

JA 0713

A_43385

ever appear to not understand what was going on that day?

A.   No.

Q.   During the several hours that you were in the presence of Mr. Basham, was he in the presence of his two lawyers, Mr. Littlejohn and Mr. Monckton?

A.   Yes, one or both.

Q.   Did he have every opportunity at any time -- during the day, to consult with either Mr. Littlejohn or Mr. Monckton or both of them?

A.   Yes, he did.

Q.   At any time during that day while you were driving in the van, did Mr. Basham indicate to you that he did not want to participate in what was going on that day?

A.   No.

Q.   Did Mr. Monckton ever tell you, "Stop, no more discussions with my client"?

A.   No.

Q.   Did Mr. Littlejohn ever tell you, "Stop, no more discussions with my client"?

A.   No.

Q.   Did anyone make any promises to either Mr. Littlejohn or Mr. Monckton or Mr. Basham in your presence?

A.   No.

Q.   Did you?

A.   I did not.

Q. Did anyone threaten Mr. Basham in your presence?

A. Nobody did, no.

Q. Were any coercive tactics used against Mr. Basham in your presence?

A. None at all.

Q. Did Mr. Basham freely and voluntarily in your opinion provide information to you and/or Sheriff Hewett in the van that day?

A. The information was extremely limited, but yes, he did.

Q. Would he take you to certain locations out there in the Bee Tree Farm area, direct you to certain locations?

A. I don't know if he had the ability to actually direct, but he would -- if there was a question asked of him, or if he recognized something, he acknowledged whether he did or he didn't acknowledge -- or he didn't recognize it, landmarks, as we went along.

Q. For the court's edification, would you describe who was in the van and where they were seated?

A. The -- there was a Conway officer driving, I'm not sure if it was Sergeant Sarvis or Sergeant Parker, Sheriff Hewett was in the passenger's seat. Directly behind the driver was Branden. Directly -- or next to him, there were like captains chairs in the van, and to the right behind the passenger was Attorney Littlejohn.

And then in the back seat was a bench and Attorney

JA 0715

A_43387

Monckton was on the far left driver's side, either Parker or Sarvis was in the middle, and then I was on the right side on the bench seat in the back.

Q. So, which lawyer was sitting next to Mr. Basham?

A. Attorney Littlejohn.

Q. During this whole process, Mr. Littlejohn was at least this close to Mr. Basham inside the van?

A. Yes, sir.

Q. And did you have an opportunity to witness exchanges between Mr. Basham and Mr. Littlejohn?

A. Yes.

Q. In fact, I'm not going to get into all the substance of the entire communication -- of the entire conversations of what took place, but on one occasion do you recall a situation where Mr. Basham had a conversation with Mr. Littlejohn, and then discussed with y'all a purse strap?

A. At one point in the van, Branden was going to say something, he started to say something, and Attorney Littlejohn motioned to him to be quiet, put his hand out and just said, "Don't say anything." Or he didn't say that, but he motioned not to say anything.

They had -- their heads came together, the way I recall it, and there was some whispering, but I didn't hear what was being said. And then later on when we stopped at a location and got out of the van, information was passed to me

from Attorney Littlejohn as to what possibly that conversation was about. And that was about the purse strap.

Q. And did you take action with regard to that with some other agents with the FBI?

A. When it was told to me that Branden would recognize whether we were in the right location if he found a purse strap, myself and Sergeant Hewett contacted our search teams, some were located at the Bee Tree Farm in a standby mode, and asked them to come to a cemetery to start searching for a purse strap, to look around the area, look up into the trees on limbs and see if we could locate it, while we continued in the van to drive around the area.

Q. How would you describe the tone of the conversations that were transpiring inside of the van? How would you describe that?

A. It was calm. It was -- it was Thanksgiving day, it was -- I thought it was -- it wasn't stressful. We were just having an exchange. We were trying to find Alice as quick as we could. We all knew why we were there, and it was just to try to get the best result that we could, based on Branden's observations that day.

Q. Are you familiar with the phrase, of a tactic, good cop, bad cop? You are familiar with that phrase, are you not?

A. Yes.

Q. And was that going on in the presence of Mr. Monckton or

JA 0717

A_43389

Mr. Littlejohn with regards to Mr. Basham?

A. No.

Q. You indicated you were seated in the back?

A. Yes.

Q. Is it fair to say that Sheriff Hewett had more communication with Mr. Basham than you?

A. Yes.

Q. What were some of the questions that Sheriff Hewett or you were asking of Mr. Basham in the present of Mr. Monckton or Mr. Littlejohn?

A. He would -- he had some photographs. Like I said, he was showing the photographs, as well as saying -- he would turn -- he was seated and he was kind of turned to Branden. Branden would have been right here, close to the sheriff. And the sheriff would say, "Do you recognize that guard rail? Do you recognize that house?"

There were some unique landmarks and some housing structures that were out on the road, and he would ask Branden if he recognized any of these streets. We were supposed to be looking for a wide dirt or sandy road.

And so we would try to locate that and then we would ask -- or Sheriff Hewett would ask Branden, "Do you recognize the entrance to this road?" Questions like that were being asked.

Q. Questions such as, "Do you recognize anything? Do you see

JA 0718

A_43390

anything?  Which way?  Could this be it?"  Were those some of the questions that were being asked of him?

A.  Yes, sir.

Q.  And were all those questions being asked of him in the presence of Mr. Littlejohn and Mr. Monckton?

A.  Yes.

Q.  Now, did there come a time towards the end of the after -- or towards the end of mid afternoon as you were -- had been out there for several hours, that you and other law enforcement officers felt that Mr. Basham was not being truthful?

A.  Yes.

Q.  And approximately how long had you been out in the van in that rural part of Brunswick County, how many hours?

A.  Five and-a-half, six hours, I believe.

Q.  So, if you and other law enforcement officers felt that Mr. Basham wasn't being truthful with you, did you relay your thoughts and your opinions to Mr. Littlejohn and Mr. Monckton?

A.  Yes, I did.

Q.  Would you describe that scenario for the judge?

A.  We had been -- we had been to a cemetery initially, Branden did not recognize it.  We went back a second time, he still didn't recognize it.  And the cemetery was an area that we knew that they had been seen.

We had driven around and basically he didn't recognize anything the entire time that we drove for six hours.

JA 0719

A_43391

So, at the end of the day, we decided to stop one more time at the cemetery, which would have been a third time in the cemetery, and we felt a little frustrated that we had -- at least I did, that we had made all these arrangements to get Branden to the area and we were no closer to getting anywhere -- we were no closer to finding Alice than we were when we started.

So, we asked collectively -- Attorney Littlejohn and Attorney Monckton was standing there -- if we could get some answers to some questions that we had to Branden about exactly what had happened in the cemetery, in trying to help us better understand whether we were even anywhere closer.

We could use -- while we had him there, we could use him to help us -- you know, help direct him any further. Because at the end of the day we were ready to call it quits and send him back to the jail.

Q.  So, where physically -- where were you and the other law enforcement officers and Mr. Monckton and Mr. Littlejohn, physically, where were y'all?

A.  We were standing outside the van, Attorney Littlejohn, Attorney Monckton, myself, Chief Hendrick from Conway PD and two other agents were in a trace -- in a trail car behind the van and followed us the entire time, so we had a little meeting right there.

Q.  Were you at this cemetery?  You indicated you were

physically parked at this cemetery?

A. Yes.

Q. And where was Mr. Basham?

A. My recollection is, he remained seated in the van.

Q. Now, you had indicated to the court that you posed a series of questions, you or some other law enforcement officer in your presence, posed a series of questions to Mr. Littlejohn and Mr. Monckton that you wanted answered; is that correct?

A. Correct. Basically what we said was -- in a nutshell was that we didn't believe Branden, we didn't think he was telling us the truth. We thought basically it was a waste of time and that he had been lying.

And we wanted to see if we could get some answers while we were there -- because we were ready to call it a day -- to find out what exactly had happened in this cemetery, that he didn't recognize, was kind of the gist of what we wanted to know, what happened.

This purse strap that we heard about for the first time, was thrown out, why was that significant? Things like that, what we wanted to know.

Q. Now, just to set the stage here, there was a lot of information that Mr. Basham or Mr. Hughes had already told law enforcement officers; is that correct?

A. Correct. I had been the recipient of a whole bunch of information from the minute he was arrested, as far as, you

JA 0721

A_43393

know, information coming to me on, specifically, locations, what had happened, information he had provided to Attorney Hughes.

Q.   Let me be specific, you had already been provided information that Alice Donovan had been raped, correct?

A.   Yes.

Q.   And Alice Donovan had been killed, correct?

A.   Yes.

Q.   And did you want to know where she was raped?  Was that one of the questions you wanted to know?

A.   Correct.  We wanted to know if it happened in the cemetery, was it outside.  At one point we walked around in the woods, around the cemetery, and let Branden look around the area to see if he recognized anything.  He said he didn't.

We were assuming that if anything had happened to Alice, it would have been out of the car right there, and so we wanted to know what exactly happened to her and where.

Q.   Did you also want to know how she was killed?

A.   Yes.

Q.   And with what instrument?

A.   Yes.

Q.   And where that instrument may be?

A.   Yes.  We knew that -- we had heard that she had been cut, but that was all.  And so we wanted to know if we could get any more details to help us find any more evidence that we could

JA 0722

A_43394

use to locate her.

Q. After you posed those series of questions to Mr. Monckton and Mr. Littlejohn, and after you indicated to them that you felt that Mr. Basham wasn't being truthful, what did Mr. Monckton and Mr. Littlejohn do?

A. They went inside the van. They said -- they didn't acknowledge that they were going to do anything for us, they said -- we just went -- they said, "We'll be back," and they went inside the van. So, it was the two attorneys and Branden inside the van, and all the law enforcement stayed outside.

Q. And were you privy to anything that transpired, any communications between Mr. Basham and his lawyers, inside the van?

A. No, sir.

Q. Now, up until that point, Agent Long, had any promises been made to either the two lawyers or Mr. Basham that day?

A. No.

Q. Was it still your understanding that everything that was transpiring that day was fair game, would be admissible in court against Mr. Basham?

A. Yes, sir.

Q. What happened after Mr. Monckton and Mr. Littlejohn exited the van?

A. They came out, we were all standing there waiting to see what they were going to say. And Attorney Littlejohn basically

JA 0723

A_43395

prefaced his statements by saying, "hypothetically speaking, we are in the right spot," is how he started it. Meaning that, we are standing in the cemetery for the third time and we are getting acknowledgement for the first time that this is where Alice had been raped.

We were told that she had been raped in the back seat of the car, which we did not know prior to that statement. She had been taken back or she had been -- specifically, that Mr. Fulks had raped her and then used the purse strap and strangled Alice, which hence was the reason for the purse strap being around the scene, that Branden said he threw out of the car as they were leaving. Which would -- if he found it, would make sure we were in the right location.

Q. Let me, rather than going into all the specifics, after Mr. Littlejohn and Mr. Monckton had their conversation with Mr. Basham and Mr. Littlejohn gets out of the van and makes the comment, "hypothetically speaking," did he proceed to then describe to you how Alice Donovan was raped, where she was raped, how she was killed, what she was killed with, what happened to the instrument --

A. Yes.

Q. -- of death that was used to kill her? Is that some of the information that he provided to you?

A. That's correct.

Q. Now Agent Long, were you privy to any of the

JA 0724

A_43396

communications -- were you present when Assistant U.S. Attorney Rose Mary Parham, or any other prosecutor in the U.S. Attorney's Office, had discussions with Mr. Monckton and Mr. Littlejohn setting the legal ground rules the day before? Were you present during any of that?

A. I wasn't physically present, no.

Q. Were there any Assistant U.S. Attorneys on the ground, anyone representing the U.S. Attorney's Office on the ground in that cemetery when Cam Littlejohn got out of the van and said, "hypothetically speaking," was there anybody representing the United States Attorney's Office?

A. No, sir.

MR. GASSER: Beg the court's indulgence.

Thank you, Your Honor.

BY MR. GASSER:

Q Just one or two more questions, Agent Long.

Do you recall me asking you specifically about the incident involving the purse strap? You remember me asking you that about 10 minutes ago?

A. Yes, sir.

Q. And you -- my understanding is you indicated that Branden had a conversation with Mr. Littlejohn and then Mr. Littlejohn provided certain information to you and other law enforcement officers about this purse strap; was that your testimony?

A. Yes.

Q. Was Mr. Littlejohn and Mr. Monckton -- let me strike that.

As a result of that information that Mr. Littlejohn provided to you with regard to the purse strap, did you instruct other agents to go conduct a search for that purse strap?

A. Yes, we had --

Q. And did you do that then? I mean, in the van then?

A. We had been -- there were two cemeteries in the general area, we had been to the cemetery -- the first cemetery I will say that Branden didn't recognize the first time, nor for the second time.

Prior to going back the third time, at the end of the day, we were in a second cemetery, and my recollection was that's where the information was provided that we would know we were in the right area if Branden -- or if we could find a purse strap.

And so we, as law enforcement, knew that the first cemetery that Branden did not recognize was the cemetery they were seen in. But Branden didn't know that, and he was telling us that he didn't recognize anything in that cemetery.

So, myself and Sheriff Hewett contacted our search teams. And while we drove around Brunswick County and continued to look for the sandy road that Alice was supposed to be off of, our search teams independently went into that cemetery and walked around, searched the trees, searched the

area to try to find the purse strap.

Q. And how did your search team know to do that? Who asked them to do that?

A. We did. The people that were in the van that got the information, myself and Sheriff Hewett, independently notified--

Q. And you did that in the presence of Mr. Monckton and Mr. Littlejohn?

A. They knew we were doing it. I don't recall if they were right there when we made the phone calls, but they knew that we were going to send a team in to see if we could find it, to help expedite the whole search.

MR. GASSER: That's all I have, Your Honor, thank you.

THE COURT: Cross-examination.

CROSS EXAMINATION

BY MR. SWERLING:

Q. Mr. Long, how're you doing?

A. Fine, sir.

Q. As I understand it, you were not privy to any discussions that Ms. Parham had with either Mr. Monckton or Mr. Littlejohn; is that correct?

A. I knew that there had been discussions on the phone as soon as the two attorneys were appointed, but I wasn't physically there. All I was waiting for was confirmation that it was a go

JA 0727

A_43399

so I could start logistically planning that Thanksgiving morning, as far as how we get everybody to where we needed to go.

Q. But you weren't privy to what was said between Ms. Parham and Mr. Monckton and Mr. Littlejohn?

A. Correct.

Q. Okay. You just knew it was a go?

A. Yes. Or knew that Ms. Parham had talked to the attorneys and that everything was a go and for me to plan it.

Q. Okay. And you had no discussions with anybody else in the U.S. Attorney's Office with respect to the outline that you had followed during that day -- or the guidelines that you had followed that day?

A. The only -- I just knew from my conversations with Rose Mary that there would be no -- there was no proffer, there was no deal. And I knew as an agent that I didn't have the authority to do anything anyway. But that there was no proffer, no deal on the table, and that it was -- he was to cooperate and come out with us to find Alice.

Q. Okay. When you first met -- as I understand, did you drive up there with Mr. Monckton?

A. Yes, I did.

Q. Okay. When you were riding up there with him, did you and he discuss some of the facts as you knew them that had been relayed to you from West Virginia or Kentucky?

A. I recall the -- I recall the stress that he was under, he was telling me, because he hadn't been privy to the 302s since he had only been, I think, a day -- he was appointed the day before this search. So, he didn't have a whole bunch of information, and wanted to know when he was going to get the 302s, which would have to go through Rose Mary.

He was privy to a briefing that I gave to law enforcement prior to going to the Bee Tree Farm, where I kind of outlined a little bit about what we knew.

I don't remember if I had direct conversations as to all the facts while we drove up. I know we talked, but small talk, and I don't recall if I said exactly what we knew verbatim from A to Z.

Q. Well, not verbatim, but to the best of your recollection, you recall at least bringing him up to date in some respects as to what the investigation already revealed; is that correct?

A. Probably to some degree, not everything. I know I wouldn't have given him everything. But he also heard me brief the law enforcement officers as well before we went, so he did have some information as far as some of the facts.

Q. And that would have come not only from your conversation, but as you said, he was privy to the conversations you were having with law enforcement, to give them the background on the case?

A. Yes, sir.

Q. And he was present during that entire time also?

A. Yes, sir.

Q. All right. Was Mr. Littlejohn present also when you were giving a briefing to law enforcement as to --

A. No, sir, he wasn't.

Q. Okay. Did you have any conversations with Mr. Littlejohn as to the -- what you knew, or any information you had from other investigators and agents in the case?

A. I hadn't met Mr. Littlejohn until they arrived in the van with Branden up at the Bee Tree Farm that morning.

Q. All right. So, you knew that Mr. Basham was going to show you -- I think you said that "He was going to show us on the ground, and the purpose of going there that day was to see if he could locate Ms. Donovan's body;" is that right?

A. Yes, sir.

Q. And that was the purpose?

A. (Nods head in the affirmative).

Q. Okay. Now, as far as, when you said you were aware that no promises -- or could not -- or there was no proffer, did you understand what the full details of those discussions had been, or if there were any exceptions to any of that? Were you made privy or aware of any of that?

A. My understanding from day one was that there would be no proffers and that there be no deals.

Q. Okay.

A. And I was -- we had some discussions, as law enforcement would, as far as how we were going to proceed here once we knew Branden had been arrested. But it was crystal clear in my mind that there were no proffers, there weren't going to be any proffers, and there were no deals, period.

Q. Okay. But your understanding was that he was supposed to show you where the body was? I mean, it was not -- you weren't -- he was not going to be with you for the purpose of giving you a statement?

A. Correct.

Q. Okay. And again, from the time that you spoke with Ms. Parham, you don't know what other discussions took place with respect to any kind of promises or about any kind of -- what could be used from that day that you were searching?

A. Right, I wasn't privy to that.

Q. And there obviously was some purpose in Mr. Basham accompanying you and spending the day with you, correct?

A. I'm sorry, could you repeat --

Q. There was some purpose in doing all of this? The purpose was to see if you could locate the body?

A. Logistically it took a lot of work on our end to get him as quickly as we did, with the help from the marshals, to get him flown to South Carolina with a day's notice --

Q. Correct. But, I mean, again, the purpose was to see if you could find the body? That was what you understood the purpose

JA 0731

A_43403

of this whole day was supposed to be?

A. Yes.

Q. Okay. Now, when you met with Mr. Littlejohn or Mr. Monckton, wasn't there a discussion about the fact that they didn't want him to be interviewed or to be asked any questions? And wasn't that the guidelines under which you operated that day?

A. Correct. We didn't -- we weren't going to have an opportunity to, as you say, interview him. It was strictly, as I explained, asking him the questions like, "Do you recognize this?"

Q. Directions?

A. Directions, yes, sir.

Q. And that was the whole idea, is to see if he could establish and give some directions? "Turn left, turn right, this sign looks familiar, this area looks familiar"?

A. Yes, sir.

Q. And that was what you understood the scope of the day was to encompass and what the guidelines of the day were, correct?

A. Yes, sir.

Q. Okay. So, you start off with that understanding. And you said that you understood -- or that when you were explaining things to Mr. Monckton and Mr. Littlejohn, that Mr. Basham overheard those or did not overhear those discussions?

When you first got there and you were explaining to

JA 0732

A_43404

Mr. Basham -- I mean, I'm sorry, to Mr. Littlejohn and Mr. Monckton, what you hoped to accomplish that day, was Mr. Basham present or not present?

A. We -- we discussed -- I think -- well, my belief was that the attorneys already understood that. But my discussion was, "Okay, who is going to go in the van? Who is going to sit where?"

More or less there were some pictures that the sheriff had that he wanted to be able to show Branden, I believe. My recollection is that he showed them to one of the attorneys, I think it was lieutenant -- I mean, Attorney Littlejohn, if it was okay. We brought those in the van to show Branden as we proceeded along the area.

Going into it, we weren't really sure who was going to actually go in the van. And it was brought to my attention that Branden wanted to meet me and that I would be the person -- after we met, that I would be the person in the van. I was the only agent representative in the van. Those kind of things that we were coordinating with Branden standing there and the two attorneys.

Q. Okay. So, that's my question, he was standing there, and did he overhear these discussions that you were having with Littlejohn and Monckton?

A. I believe so.

Q. Okay. You don't know that though?

JA 0733

A_43405

A.   I don't.

Q.   Okay.  And, of course, he was there that day to cooperate with law enforcement?  That was the purpose of it, to help you find the body?  That was the purpose of it for him, to cooperate with law enforcement?

A.   That was the purpose, yes.

Q.   Now, you are aware of the fact from information you already had that he was not familiar with the area, correct?

A.   That --

Q.   That he had had no experience in the area other than this particular event?

A.   That was my belief, yes.

Q.   Okay.  And for the court's benefit, this is a -- the areas that you were driving in were rural roads, were they not?

A.   Yes, sir.

Q.   And what area was it?

A.   The Winnabow section of Brunswick County, south of Wilmington.

Q.   Many of those were dirt roads --

A.   Yes, sir.

Q.   -- without any landmarks?

A.   Some were very remote, others had houses on them.  But in between and around, and back and forth, between very remote areas, as well as populated.

Q.   So, there were a lot of miles covered in driving to see if

JA 0734

A_43406

whether or not any particular areas looked familiar or not?

A. Yes, sir.

Q. Okay. And at different points during the event you were -- he would either say, "Go this way, this way, this looks familiar, that does not look familiar," it was words like that, correct? We are not talking about directions.

A. Correct. The sheriff was trying to get him -- it was pretty clear to me after we stopped at this first cemetery and had Branden look out the window of the van and he didn't recognize it, and it was -- it was apparent to me at that point right there that we were in trouble as far as directions went.

Because he couldn't -- he didn't recognize that point, and then he wanted to take a left that didn't exist. And after that there was -- at least in my opinion, there was a little bit of a feeling that we may not get to where we need to go, based on him looking out of the van and not knowing which way to go.

So, at that point the sheriff really tried to focus him in on, you know, "Look around, do you recognize that guard rail? That house was unique, it was painted blue, do you recognize that?" In an attempt to try to get him on track, and we never really got over that hump.

Q. You took him to particular areas that you thought were familiar with -- based upon your investigation of the case to date, or other law enforcement agencies --

JA 0735

A_43407

A.   We knew that he had been seen at the -- at the deer camp, we knew he had been seen in the cemetery.

Q.   Correct.

A.   The car.  And so when he didn't recognize that, because we were going -- our plan was, "Okay, here is the cemetery, tell us where you went.  Because bad things happened in the cemetery, tell us where you went from there and where you -- where you disposed of Alice," was basically what we were looking to do.

Q.   I understand.  But in other words, you took him to the cemetery, he didn't direct you to the cemetery, correct?

A.   We went -- it was the only way out of that road.  We went by it, we stopped and said, "Do you recognize anything here?"

Q.   That's because you knew from the investigation that cemetery was relevant, correct?

A.   That's right.

Q.   That's what I'm saying, is he didn't direct you to the cemetery, you got him, you took him there?

A.   Well, again, we were very careful not to direct him.  We didn't want to give him ideas, we wanted him to tell us.

Q.   But that was the starting point, is what I'm saying.  There had to be a starting point somewhere?

A.   The deer camp was the starting point.  And as you leave, there is only one way out of that dirt road, and that's you have to go by the cemetery.

JA 0736

A_43408

And so we slowed down and, you know, asked him to look, "Do you recognize anything?" And he looked out at the cemetery and gave it a look. We didn't let him out of the van at that point. And he looked at it and he said, "Nope, that's not it, I don't recognize it."

Q. And I'm not suggesting that you suggested that to him, I'm saying, you just got to the cemetery because that's where you knew there had been people who had identified the vehicle --

A. Yes, sir, that's correct.

Q. -- that's all my point is.

A. Yes.

Q. Now, when you said that he didn't recognize anything and you started to worry about whether or not he was telling you everything, it could be one of two explanations, either he was being deceptive or, number two, it just didn't look familiar after all this period of time?

A. Correct.

Q. So, I mean, there are two interpretations?

A. Yes.

Q. Okay. And despite that, he continued to cooperate with you for the rest of the day, continued to give you directions, continued to tell you what looked familiar, what did not look familiar?

A. Yes, sir.

Q. In fact, you did, you went to that particular location on

three occasions --

A. Yes, sir.

Q. -- correct? How long were you together the whole day?

A. Seven hours, possibly. He was picked up early, early like 6 a.m., from the jail. I don't recall the exact time, but it was shortly after 9, I believe, that I met him. We got going, and I think we broke 3 or 4 in the afternoon.

Q. Okay. Now, when you were with Mr. Littlejohn and Mr. Monckton, did you tell them -- tell them what Mr. Basham was saying that day in any way could be used against him? Did you have that discussion with Mr. Monckton or Mr. Littlejohn?

A. No, sir.

Q. Did you tell Mr. Basham that anything he said that day could be used against him?

A. No, sir.

Q. So, you agree that there was no advice of rights given to the lawyers about using his statements from that day, or given to Mr. Basham?

A. Correct. I never had any one-on-one with Branden the entire day. And I assumed that the attorneys knew the parameters, the guidelines, based on their discussions with Attorney Parham. So, at no time did I reiterate or go into anything about rights or what could be used against them the entire day.

Q. But again, the purpose of going out there was to seek to

JA 0738

A_43410

locate the body and not to question him?

A. Yes, sir.

Q. Okay. Now, at some point basically you invited this hypothetical response? You asked Mr. Monckton and Mr. Littlejohn to go ahead and ask some questions, to find out some information, correct?

A. I think it was phrased that we wanted to ask Branden some questions, but we phrased it to the attorneys. I think our understanding, at least my understanding was, that I wasn't going to get an opportunity to talk to Branden in what you -- you know, in an interview type of environment. So, we asked the attorneys if we could get answers to these questions that we had --

Q. Okay.

A. -- at the end of the day.

Q. Now, Mr. Gasser was asking you questions -- well, you were asked a series of questions. But you didn't give them a series of questions you wanted answered, you just asked them to find out what happened? There wasn't a series of questions ever directed to Mr. Monckton --

A. Not specifically. Like we just kind of phrased it -- my recollection is it was basically phrased like, you know, we didn't think he was being truthful, we were somewhat frustrated that we weren't any closer, we didn't think he was telling us the truth, and that we needed to know the answers to what

JA 0739

A_43411

happened in the cemetery. You know, did it happen in the car or outside, and things of that nature.

But we weren't -- at least I wasn't looking at either attorney as saying, "I need you to ask him this question, I need you to ask him this question."

Q. That's the point, there was no series of questions?

A. It was just kind of a --

Q. "Help us out"?

A. We needed to know what happened, and these are the types of things we wanted the answers to.

Q. All right. There is no question that Mr. Littlejohn came back to you and presented a hypothetical?

A. No question.

Q. Okay. He didn't say, "This is the statement of Mr. Branden Basham"?

A. Correct.

Q. He said, "This is a hypothetical situation"?

A. Yes, sir.

Q. "Basically, suppose," or "hypothetically speaking"?

A. Hypothetically speaking.

Q. All right.

A. And then my recollection was that the first thing he said was that we were in fact at the right spot. And then it went from --

Q. And then it went on?

A.   Yes, sir.

Q.   When you asked him to go ahead and find out from Mr. Basham a little bit more detail, that was outside the scope of what you originally understood was going to happen that day?

A.   Yes.   If we had found -- if we had found Alice within a few hours, it probably wouldn't have ever come up.   We would have started --

Q.   I understand.   But clearly asking Mr. Basham questions you have already agreed was outside the scope of what you expected to happen that day?

A.   Yes.

Q.   Because you already knew that they were not going to allow that?

A.   Right.

Q.   Okay.   Now, when you asked them to find those -- that information out, did you tell them at that point that whatever they revealed to you would be in some way used against Mr. Basham?

A.   No.

Q.   Did you ever present that to Mr. Basham under this new scenario that was going to take place, that whatever he said in response to your question would be used against him?

A.   Never -- never had a conversation with Branden at all.

Q.   And as has been pointed out, there was no U.S. Attorney there that day?

A. That's correct.

Q. Okay. And so there was no one there for you to ask that day about how those statements would be used or not used?

A. No one for me to ask or for them --

Q. Right. No one for you to ask.

A. Correct.

Q. No one for them to ask. Because we have stepped into another area here. You agree with that, you were asking questions?

A. We did, we wanted to know what had happened. But, I mean, at least my understanding was that the attorneys understood they could have said, "Not happening, we are not going there and let's pack up and go."

Q. Which is what they previously had said?

A. And that's what we would have done, got back in the van and called it a day, and all gone home.

Q. That's what they previously said, correct, in those statements?

A. I think it was understood that we weren't going to have an opportunity to question Branden about what had happened.

Q. That's all I'm asking.

A. -- outside the parameters of the --

Q. And that's all I'm asking. So that when it turned around, this was a new thing that was happening now, you were asking him to ask him questions so that he could -- they could relay

JA 0742

A_43414

it to you?

A.   Right, we wanted to know what had happened.

Q.   Okay.  All right.  You did not hear anything in the van that was discussed between Mr. Littlejohn and Mr. Monckton and Mr. Basham?  That's what you have testified to?

A.   Yes.  I was outside the van -- to my knowledge there were no law enforcement near the van at that time.  There were just the two attorneys and --

Q.   So, therefore you could not say what they told Mr. Basham?

A.   I had no idea.

Q.   All right.  Your 302 does not reference the conversation was in a hypothetical, was that something you remembered later?

A.   I didn't put that term in my 302, but I -- I certainly remember the word "hypothetically" being used as those facts came --

Q.   Okay.

A.   -- came out.

Q.   Now, the information was given to you by Mr. Littlejohn or Mr. Monckton in the hypothetical, because you don't know if that was a hypothetical in the pure sense of the word that they were giving you, or it was some statement being made by Mr. Basham?

A.   Correct.

Q.   The way you have it written in the 302 is that this was a statement, that's the way you have it presented in the 302.

Because it doesn't use the word "hypothetical," if you understand what I'm saying?

A. Just provided the following information, colon, and it just kind of -- that paragraph after that on my 302, encompassed in that paragraph is information that was previously known, as well as information -- that's kind of like the story. That was information that was provided by Attorney Littlejohn, facts that we did not you know, in a hypothetical sense, as well as other information that we had already known about, based on Agent Maley's interview of Mr. Hughes that happened prior to this meeting. So, it was kind of an all encompassing thing.

Q. Okay. So, even though it says, "The attorneys met with Basham inside the van outside of law enforcement's presence and then provided the following information," and then there's a couple of paragraphs there about some factual statements, you agree that part of that was what you already knew about the investigation?

A. Yes, I do.

Q. And you don't know what part of that was attributable to Mr. Basham?

A. Well, I was --

Q. Or was a suggestion by the lawyers?

A. The way I would look at that would be the facts that I did not previously know. For instance, the fact that Alice was raped inside the car, that was a -- hypothetically, as it was

JA 0744

A_43416

presented, was a fact that was important to us as law enforcement to know.

Q. I understand that.

A. So, I did not know that previously in any correspondence that we had had with him. So, that would have been something that I would have assumed in a hypothetical sense came from Mr. Basham --

Q. Okay.

A. -- after they had that -- they must have asked him what happened in the car, and he told them, and then hypothetically gave it to me.

Q. That's what I'm saying. It's an assumption on your part that was a statement on his part and not something that was in the pure form of a hypothetical, correct?

A. I did not actually hear Branden say that to his attorneys, so it was presented in that hypothetical.

Q. And the paragraph would read a little different had it read, "And then provided the following hypothetical information"? You would be able to read that paragraph a little bit differently, which is what in fact really happened?

A. Going back, going back, if I had put "hypothetically," and then put the facts hypothetically and then put another paragraph that said, "But, you know, this is stuff I already knew," it might have been a little more clearer to somebody outside that wasn't there to read it.

Q.   Exactly.

A.   Going back and looking at it, but yes --

Q.   Going back and looking at it now, had the word "hypothetically" been used, it might have been taken in a different context, what you have actually written down there?

A.   If I had separated the hypothetical facts from the already known facts, it might have been a little clearer to somebody reading it, like yourself, that would be able to differentiate. I would agree to that.

Q.   Okay.  And one point of information I wanted to ask you about that you wrote down in this hypothetical, it's on page 127 --

A.   Yes.

Q.   -- first paragraph, the last sentence, the first paragraph, "At some point between leaving the cemetery and dumping the body, Donovan's body, Fulks stabbed Donovan and slit her throat."  That's what you wrote down, correct?

A.   Yes, I did.

Q.   Just so I'm clear and the record is clear, that part of the information that is in the hypothetical, the part of what you contend Littlejohn and Monckton told you in that hypothetical, it's all part of the same series?

A.   Yes.  We had had some information about a cutting and some other things happened, but that part, which at the time didn't make a lot of sense to me, based on our evidence that we were

JA 0746

A_43418

finding, however I wrote it as that was what was provided to me under that hypothetical --

Q. Correct.

A. -- as it was at the time. Though I could compare it to other things I already knew.

Q. And you did have some information about a stabbing or a cutting earlier than that?

A. Yes, I did.

MR. SWERLING: Okay, thank you.

MR. GASSER: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. GASSER:

Q Agent Long, when you started out in the van that day, was it your intention to you yourself sit down with Branden Basham and direct a series of questions to Branden Basham and get responses from him? Was that your intention?

A. No, it wasn't.

Q. But as the day developed, were questions posed to Branden Basham in the presence of Mr. Monckton and Mr. Littlejohn by you or by Sheriff Hewett? Were certain questions posed to Mr. Basham?

A. Yes.

Q. And did Mr. Basham have every opportunity, if he so desired, to have discussions with Mr. Monckton and Mr. Littlejohn in the van as to whether or not he should respond?

JA 0747

A_43419

Did he have that opportunity?

A. Yes. Everything that was said inside the context of the van would have been heard by either one or both attorneys. And in the case I described at one point where the attorney told Branden not to say anything, as that continued, my -- you know, I would assume that anything that was said was heard by the attorney, they could have made a decision inside the van whether they wanted him to answer it or not.

Q. And, in fact, didn't Mr. Basham at times consult and whisper and have a discussion with either Mr. Monckton and Mr. Littlejohn?

A. Mr. Littlejohn, yes.

Q. And then did Mr. Basham then, after having a discussion with his lawyers, continue to answer questions or respond to inquiries from either you or Sheriff Hewett?

A. Mostly from Sheriff Hewett, but, yes.

Q. All in the presence of his lawyers?

A. Yes.

Q. Now, at the end of the day when you were at the cemetery and you posed these series -- or you posed these questions, I mean, you did pose some questions to Mr. Littlejohn, didn't you?

A. We did.

Q. Whose decision was it to go into the van and have some sort of discussion with Mr. Basham? Who made that decision?

A. Attorney Littlejohn and Attorney Monckton.

Q. Did you force Mr. Littlejohn to go into that van?

A. No.

Q. Din anyone in your presence force Mr. Littlejohn to go into that van?

A. No.

Q. Whose choice was it to go into that van? Whose choice was it to make that tactical decision?

A. The two attorneys. Attorney Littlejohn and --

Q. Did you force -- bang on the van door and force Mr. Littlejohn and Mr. Monckton to come out?

A. No.

Q. Whose decision, whose choice was it to come out and to provide information to law enforcement officers? Whose choice was that?

A. Attorney Littlejohn and Attorney Monckton.

Q. Any promises, threats, coercion by you or anyone in your presence to Mr. Littlejohn?

A. No.

Q. To Mr. Monckton?

A. No.

Q. To Mr. Basham, that whole day?

A. No.

Q. Did anyone force Branden Basham to say anything in the presence of his lawyers that day?

A.   No, nobody did.

MR. GASSER:  That's all I have, Your Honor.

THE COURT:  All right.

MR. SWERLING:  No other --

THE COURT:  Now, the statements that were made during this November the 28th search were the subject of the extensive testimony at the motion to disqualify counsel.  And I thought at that time the government was not sure if they were going to try to use these statements.  Do I take it by this testimony that you do intend to use these statements?

MR. GASSER:  Yes, sir.

THE COURT:  In the penalty phase, if we get to a penalty phase?

MR. GASSER:  These statements will be used in the guilt phase, Your Honor.

THE COURT:  Guilt phase, all right.

Be glad to hear from defense counsel.

MR. GASSER:  Your Honor, I don't want to interrupt him, but I think we have another witness --

THE COURT:  All right.

MR. GASSER:  -- and it would be the same exact -- so, rather than having to argue twice -- Mr. Swerling, don't you agree it would be better just to go ahead and take Sheriff Hewett's testimony and --

THE COURT:  You may step down.  Call you next

JA 0750

A_43422

witness.

THE WITNESS  Thank you, sir.

MR. GASSER:  The government would call Sheriff Ronald Hewett.

THE COURT:  How long do you think he will be?

MR. GASSER:  He will be much briefer, Your Honor. Probably 15 or 20 minutes on direct.

THE COURT:  Okay.

THE CLERK:  Please place your left hand on the Bible and raise your right hand.  State your name for the record.

THE WITNESS:  Sheriff Ronald E. Hewett.

THE CLERK:  Spell your last name, please.

THE WITNESS:  H-e-w-e-t-t.

RONALD E. HEWETT, SWORN

DIRECT EXAMINATION

BY MR. GASSER:

Q.  Sheriff, would you tell us, please, where you are the sheriff of?

A.  I'm sheriff of Brunswick County, North Carolina.

Q.  And where is Brunswick County in relation to Horry County, South Carolina?

A.  It is just north.  Brunswick County is the most southeastern county in the State of North Carolina.

Q.  How long have you been the sheriff of Brunswick County?

A.  10 and-a-half years.

JA 0751

A_43423

Q. Totally how many years of law enforcement do you have?

A. 21 and-a-half.

Q. Sheriff, I'm going to briefly, just to put your testimony in context, briefly go over how the Brunswick County Sheriff's Department became involved in this matter. I believe that was on -- you learned of this particular case on Sunday night, November the 17th; is that correct?

A. That is correct.

Q. You were actually out of your county attending a law enforcement related meeting in another county in North Carolina?

A. Mitchell County, yes, sir.

Q. And the days after Sunday, November the 17th, on the 18th and the 19th and the 20th, did your department -- was your department actively involved in obtaining and/or sharing information with South Carolina authorities?

A. Yes, sir.

Q. And particularly did you on November the 20th hold a press conference and request assistance or information from members of the community in Brunswick County, relative to the disappearance of Alice Donovan?

A. I did.

Q. And was certain information provided to the Brunswick County Sheriff's Department relating to Bee Tree Farm, the Bee Tree Farm area of Brunswick County?

A.   Yes, sir.

Q.   By citizens?

A.   Yes, sir.

Q.   And starting on November the 21st, Thursday, November the 21st, were extensive searches then conducted in rural parts of Brunswick County attempting to locate Alice Donovan?

A.   Yes.

Q.   Now, on Monday, November the 25th, do you recall receiving a phone call from Agent Jeff Long with the FBI?

A.   I do.

Q.   You were in North Carolina, correct?

A.   Yes, sir.

Q.   And so the court understands, you were on the phone with Jeff Long?

A.   Yes.

Q.   And you were aware that Jeff Long was on the phone with a lawyer for Mr. Basham in Kentucky; were you aware of that?  In other words, he had two phones?

A.   Absolutely.

Q.   And did you record the information, the information that Jeff Long was getting from Attorney Mr. Hughes in Kentucky, and then it was passed on to you, did you then memorialize that information in a document?

A.   I did.  I pulled over to the side of the road.

Q.   And was that information relating to what Branden Basham

was saying as to the disappearance, or the probable or possible location of Alice Donovan in your county?

A.   That is exactly what the conversation was about.

Q.   Now, I want to draw your attention to November the 27th, Wednesday, the day before Thanksgiving.  Did you participate in a strategy meeting with other North Carolina officials relating to an event that was to occur the next day, on Thanksgiving Day?

A.   I did.

Q.   And what was that meeting all about?

A.   That meeting was with our district attorney, which will be the South Carolina equivalent of a solicitor, Rex Gore, Tim Flynn, who is the resident agent in charge of the Wilmington office of the FBI, and we did meet.

Q.   Now, Sheriff, were you yourself privy to any conversations that anybody with the U.S. Attorney's Office had with either Mr. Basham or his South Carolina lawyers?  Were you aware of any of those conversations, sir?

A.   No.

Q.   What was your understanding as to what was to take place on Thursday morning, Thanksgiving day, November the 28th, what was your understanding?

A.   It was my understanding at that time that Mr. Basham would come to Brunswick County, North Carolina to attempt to locate the body of Alice Donovan.  In the 27th meeting it was

JA 0754

A_43426

discussed, a strategy, on what to do if and when that incident did occur.

Q.   And on the morning of November the 28th, where did you first come into contact with the defendant, Branden Basham?

A.   I met at the intersection of U.S. 17 and Highway 211 and met the transport van.

Q.   And when you met the transport van, was Mr. Basham in the presence of at least one of his lawyers at that point?

A.   I did not get out of the vehicle other than to find out what they wanted to do at that time, Mr. Gasser.  And at that time they stated they wanted to return to the Amoco station in Shallotte.

Q.   And did you do that, did you go to the Amaco station?

A.   Yes, sir.

Q.   I believe that -- is that the same Amaco station where we have a videotape of Mr. Fulks in Ms. Donovan's -- or with Ms. Donovan's car?

A.   It is.

Q.   Subsequent to the Amaco station, where did the van carrying Mr. Basham and your vehicle, where did y'all go?

A.   We went to Bee Tree Farm in the Winnabow community in northern Brunswick County.

Q.   And is there a particular hunt club there?

A.   Bee Tree Farm.

Q.   Are you familiar with that area, Sheriff?

JA 0755

A_43427

A. I am.

Q. In fact, sir, are you personal friends with the people that own the --

A. I am.

Q. What happened when you got to the hunt club? Tell us, please, what happened.

A. When I got to the hunting club at that time was the first opportunity that I really had the opportunity to meet the people, the attorneys and Mr. Basham and Jeff Long, and two Conway police officers.

Q. So, were you introduced to a lawyer by the name of Cam Littlejohn and a lawyer by the name of Billy Monckton?

A. I met both of them at that time.

Q. Had you ever met them before?

A. Never.

Q. And, of course, you met Mr. Basham; is that correct?

A. Yes, I did.

Q. What decision was made as to how this search for Ms. Donovan's body physically was going to take place? What decision was made?

A. A decision was made that a local officer with knowledge of the area would be necessary to accompany the individuals that I previously have stated that were in the van. And it was agreed upon with -- by Mr. Littlejohn and Mr. Monckton that that would be their decision, that person would be me.

JA 0756

A_43428

Q. And did you find it necessary that you yourself had to advise Mr. Basham of any constitutional rights? Did you find that necessary at that point?

A. No, sir, I didn't.

Q. And tell us why.

A. Because both his attorneys were present and there, and they agreed that they wanted me in the vehicle to help then locate Alice Donovan.

Q. So, place the individuals in the van for the court. Would you do that, please?

A. I can. May I use my hands, Your Honor?

Q. Sure.

A. I was sitting in the front passenger seat of the transport van; a Conway, South Carolina police officer was driving. Directly behind me over to my left was Branden Basham.

Q. So, he would have been sitting behind the driver?

A. Correct. Directly to his right, Branden Basham's right, was Mr. Cam Littlejohn. In the back seat of the van was the other sergeant from Conway, Special Agent Jeff Long of the FBI, and Billy Monckton.

Q. I show you what's been marked Government's Exhibit 7 through 17, do you recognize those photographs, Sheriff?

A. I do.

Q. Did you utilize Government's Exhibits 7 through 17 in your discussions with Branden Basham and Cam Littlejohn on November

the 28th?

A.   I did.

MR. GASSER:   Your Honor, we would move those exhibits, for purposes of this hearing, into evidence.

MR. SWERLING:   No objection.

THE COURT:   Without objection admitted.

BY MS. GASSER:

Q.   Prior to utilizing those photographs in the van that day, did you show those photographs to Mr. Littlejohn?

A.   I showed them to Mr. Littlejohn and Mr. Monckton.

Q.   And was part of that reason so that they could give you the okay to go ahead and use those photographs in your discussions with their client?

A.   Yes, sir.

Q.   And, in fact, after Mr. Monckton and Mr. Littlejohn looked at Government's Exhibits 7 through 17, what did they tell you you could do with the photographs?

A.   They said that they were fine to use and I may show them to Mr. Basham.

Q.   Just in general would you describe for the court what transpired over the next several hours in the van, Sheriff? Not necessarily specifically what was said -- I might get to a few things -- but just in general?

A.   In general?

Q.   Yes, sir.

A.   In general, I developed a rapport where I would -- could speak with Mr. Basham, and the whole object of that day was to find Alice Donovan.  We left the hunting camp and we went in several areas of Brunswick County, in the northern parts of the county, attempting to locate Alice Donovan.

Q.   Now, during the entire time, the several hours that you were in the presence of Mr. Basham, did you or anyone in your presence promise Mr. Basham anything, Sheriff?

A.   Never.

Q.   Did you or anyone in your presence promise his lawyers anything?

A.   No.

Q.   Were any threats or any coercive tactics used against Mr. Basham or his lawyers by you or anyone in your presence?

A.   It was always cordial, and the answer is no.

Q.   Did you -- do you feel you developed a rapport with Mr. Basham?

A.   Yes.

Q.   Did you have any difficulty understanding him when he was -- when he was responding to your questions?

A.   No.  We turned face to face.  I looked at him and he answered my questions and he understood.

Q.   That was my next question.  Did it appear as if he was understanding you when you were asking him certain questions?

A.   Every question, yes.

A_43431

Q. In the van when you were asking him questions, how close was Mr. Littlejohn seated to Mr. Basham when you were asking him these questions?

A. 16 inches. The width of the -- from one seat to the other.

Q. And did you afford Mr. Basham the opportunity to have whatever discussions or consultations with either Mr. Littlejohn or Mr. Monckton inside the van? Did you allow that to happen?

A. Yes.

Q. In fact, did that happen several times in your presence?

A. It did.

Q. Just so the record is clear, I'm going to draw your attention to one incident. Do you recall when you were on the -- capital C, capital C -- CC Road, where there were several hunters lined up and down the road?

A. I remember that.

Q. Would you describe that, what occurred inside the van, to the court, please?

A. Yes, sir. We had turned -- we had turned onto CC Road traveling towards Columbus County to a small community known as Prosper. Along the road that day were several deer hunters. We turned the van around and went back towards Green Hill Road and Bee Tree Farm. While we were traveling back towards Bee Tree Farm, a doe, a female deer, ran in front of the van.

Q. Go ahead.

A_43432

A.   And at that point Branden Basham said, "You know, I could never kill a deer, and here I have --" and at that point -- would you like me to continue?

Q.   Certainly.

A.   At that point Mr. Littlejohn placed his left hand on his leg and moved his head in a left to right motion, and Branden Basham never finished the statement.

Q.   Let me -- let the record be absolutely clear, had anyone posed a question to Mr. Basham prior to him making the statement when he saw the deer, "You know, I could never kill a deer, and here I have --" or was that just a spontaneous statement by Mr. Basham?

A.   That was a spontaneous statement by Mr. Basham.  And up until that point, I had not noticed Mr. Littlejohn object to anything.

Q.   So, Mr. Littlejohn had an opportunity to keep his client from finishing that statement; is that your understanding?

A.   I saw it.  Yes, sir, that's what happened.

Q.   Every -- prior to that incident, everything leading up -- every statement that Mr. Basham had made, did Mr. Littlejohn have an opportunity to keep his client from making those statements?

A.   He did.

Q.   Subsequent to the incident involving the doe crossing the road, did Mr. Littlejohn have every opportunity to keep his

JA 0761

A_43433

client from making other statements to you?

A.   He did.

Q.   When Mr. Littlejohn tapped Branden Basham on the leg and shook his head, did you attempt to get more information about what Mr. Basham was going to say from him?

A.   I never mentioned it again.

Q.   Now, did there occur, after that incident, the statement that Mr. Basham made when the doe crossed the road, did there come another time when Mr. Basham wanted to consult with Mr. Littlejohn?

A.   Yes.

Q.   Would you describe that incident to the court?

A.   Yes.  We were in the van, and Branden motioned -- Branden Basham motioned for Mr. Littlejohn to come over.  And, of course, I was turned in the same manner that I'm demonstrating now on the stand, I was turned during the conversation, not wearing my seatbelt, listening to Branden, because we were trying to find Alice.

And Branden Basham asked Cam Littlejohn, "Should I tell them about --" and at that point they started whispering, and I couldn't understand any more other than, "Should I tell them about."  And then Cam Littlejohn said, "Go ahead, it will be okay."

Q.   And did you memorialize that and record that as well?

A.   Yes.

JA 0762

A_43434

Q. So, just so the record is clear on this, Mr. Basham wanted to whisper something to his lawyer, Mr. Littlejohn, correct? Correct?

A. Yeah, he did. Yes, sir.

Q. Ostensibly so you or other law enforcement people couldn't hear what he was saying?

A. Correct.

Q. And after having that whisper and conversation with his lawyer, did his lawyer orally tell Mr. Basham to "Go ahead and say what you want to say"?

A. Cam Littlejohn said, "Go ahead." He did.

Q. And I believe -- again, not getting into the full substance of what was said, isn't that the point in time when Mr. Basham starts talking about a leather strap that was used to kill Ms. Donovan with?

A. Yes, it was.

Q. You were with him for several hours in the van, were you not, with Mr. Basham and Mr. Littlejohn?

A. Correct.

Q. And suffice it to say, you must have posed several, multiple questions over those hours to Mr. Basham; is that a fair statement?

A. That is correct.

Q. Do you even know how many square miles you covered that day in the van with Mr. Basham? Could you even estimate?

A.   Maybe not square miles, but I know that we traveled well over 100 miles.

Q.   And did you continue to use Government's Exhibits 7 through 17 as informational sources with Mr. Basham, in the presence of Mr. Littlejohn and Mr. Monckton?

A.   Yes.

Q.   And did he actually respond and orally tell you certain things about not only the location but about what happened to Ms. Donovan?

A.   He did.

Q.   And did you memorialize what he told you in a written report?

A.   I did.

Q.   Now, drawing your attention to -- towards the latter part of the day on Thanksgiving day, did there come a time when law enforcement seemed to be frustrated with the information that Mr. Basham was providing to y'all that day?  Is that a fair statement?

A.   Yes.

Q.   And would you describe what occurred to the court at the end of the day with Mr. Basham at the cemetery near the hunt club?

A.   Yes, I would.  We pulled back into the cemetery at Bee Tree Farm, which has a U horseshoe circle that leads back to a cemetery.  At that time there was a conference with law

JA 0764

A_43436

enforcement officials who were there.

Q. You previously indicated to the court that you were having many discussions with Mr. Basham, to include a purse strap?

A. Yes.

Q. Do you recall that testimony?

A. I do.

Q. And did you want to know more information about that purse strap and how it was used and where it might be located?

A. I did.

Q. Wanting that to occur, tell the judge what you did with Mr. Basham.

A. Mr. Basham and myself and the two Conway sergeants, which was Sergeant Parker and Sarvis, I believe, we walked back down to the cemetery. Branden Basham, he was shackled at his hands, belly chained around the waist, and shackled at his feet. He walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek. He showed me the length of the strap --

Q. How did he do that?

A. May I demonstrate?

Q. Certainly.

A. Like this. Because he couldn't pull his hands very -- very far apart, he was shackled. He showed me the length of the strap. Says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods. He then demonstrated the manner in which he threw it in the woods.

Q. Would you stand up and do that for the court so the record is complete as well?

A. Yes, sir, I will. We were standing at the corner of the cemetery, Branden Basham is chained. I said, "Branden, how did you do that?" And he said, "Like that. And I threw it over there."

Q. Now, where were his lawyers when he was having this discussion with you at the cemetery?

A. Cam Littlejohn and Mr. Billy Monckton were back at what I described earlier as the horseshoe circle, talking with other law enforcement officials, including Chief Hendrick of Conway.

Q. And could you estimate, using this courtroom, the distance that you and Mr. Basham were with regards to where his lawyers were?

A. The bush at the back of the courtroom.

Q. The plant back there?

A. Yes, sir.

Q. And at any time did Mr. Monckton or Mr. Littlejohn not allow you to take their client over to the cemetery part to demonstrate this, as you just described to the court?

A. They had no opposition to that.

Q. Did there come a time also then after that that Mr. Basham was able to meet with his two lawyers in the van? Do you recall that?

A. Yes, sir. They went back to the van, the van we had

JA 0766

A_43438

traveled in all day. The two lawyers and Mr. Basham went into the van, the van door shut, and we all waited outside.

Q. Were you present when Agent Long and other FBI agents or other law enforcement authorities requested certain information from Mr. Littlejohn? Were you present then, Sheriff Hewett?

A. Was I present at the -- at that site when Mr. Littlejohn stepped back out of the van and wanted more information?

Q. Yes. Before that did you participate, did you ask of Mr. Littlejohn what it was that y'all wanted from Mr. Basham, or did you tell him that you weren't -- you didn't believe that he was telling the truth, or did you leave that to somebody else?

A. I never disputed Branden Basham's word of what he had told me. My sole job that day was to locate the body of Alice Donovan.

Q. So, were you then present when Mr. Littlejohn and Mr. Monckton came back outside the van after they had this conversation with their client?

A. I was.

Q. And suffice it to say, Mr. Littlejohn then told law enforcement, told y'all a, quote, "hypothetical;" is that a fair statement?

A. He did.

Q. He qualified what he was about to tell by saying "hypothetically speaking," something to that effect?

A. That's exactly what Mr. Littlejohn said.

JA 0767

A_43439

Q. And did you record in a document to the best of your recollection what Mr. Littlejohn told y'all out there at the cemetery, after he qualified as his "hypothetically speaking," did you record that in a document?

A. I did.

Q. Again, not getting into all the specifics, Mr. Littlejohn basically told you a scenario as to how Ms. Donovan was killed, where she was killed, where the body was, where the purse strap or the knife was; is that a fair statement, Sheriff?

A. That is accurate and fair, and it's true.

Q. And all this was from the words of Mr. Littlejohn, correct?

A. Yes.

Q. After he qualified it by saying "hypothetically speaking," correct?

A. Correct.

Q. After he had a conversation with his client in the van?

A. Correct.

Q. Now, did you or anyone in your presence force Mr. Littlejohn or Mr. Monckton to go into the van and have this conversation? Did you force them to do that?

A. Nothing happened forceful that day, it was -- everything was voluntary and cordial, and every one in the van was a gentleman.

Q. Were any promises or threats or coercive tactics used, either out there at the cemetery at the end of the day or any

time in your presence on Thanksgiving day, to either Mr. Basham or his lawyers?

A. No, sir.

MR. GASSER: Beg the court's indulgence.

That's all I have, Your Honor.

THE COURT: We have been going an hour and-a-half, let's take our mid morning recess at this point. We will take a 15 minute recess.

(Short recess)

THE COURT: All right.

MR. SWERLING: Go ahead?

THE COURT: Mr. Swerling, cross-examination.

MR. SWERLING: Thank you, Judge.

CROSS EXAMINATION

BY MR. SWERLING:

Q. I'm Jack Swerling, how are you?

A. Morning.

Q. Let me ask you a few things here. Did you have any discussions with anyone concerning what the scope of the activities that day were going to be? For example -- and let me just clarify that.

A. Yes.

Q. Did you have any discussions with Mr. Littlejohn or Mr. Monckton about what could be and what could not be used against Mr. Basham?

A. No, sir.

Q. Did you at any point advise Mr. Basham that anything he said could be used against him?

A. No, sir.

Q. Did you ever advise Mr. Littlejohn or Mr. Monckton anything could be used against him?

A. No, sir.

Q. Or against Mr. Basham, obviously. Okay. Okay, did you give either Mr. Littlejohn or Mr. Monckton any of the information that you had from other sources concerning what was known to law enforcement about the case?

A. By that, what are you meaning?

Q. Did you relate to them anything you knew about the case that you had gotten from other law enforcement agencies? Because, you understand, they had just gotten involved in the case.

A. Yes, sir, I did. There were certain clues, certain words that were important to the case. It seemed like a puzzle, but, yes.

Q. Okay. And what was that, for example?

A. Wild life, sanctuary, park, bucket truck.

Q. Basically landmarks?

A. Yes, sir.

Q. This area is a very rural area, am I correct?

A. Yes, sir.

JA 0770

A_43442

Q. Lot of dirt roads? Okay. It was your understanding that day the purpose of what was going to be that day -- in fact, why you went out on Thanksgiving day is to see whether or not you could find -- Mr. Basham could help you find Alice Donovan's body?

A. That's correct.

Q. It was not for the purpose of taking any statements from Mr. Basham?

A. My purpose was to find Alice Donovan.

Q. Okay. And again, there was no -- you were not seeking to take any statements from Mr. Basham?

A. My primary purpose was to find Alice Donovan.

Q. Does that mean that you were not going to take any statements?

A. My job, sir, was to try to find Alice Donovan.

Q. Did Mr. Littlejohn and Mr. Monckton tell you that they were not going to allow Mr. Basham to be interviewed or give a statement?

A. No, sir.

Q. They never told you that?

A. No, sir.

Q. Okay. You never -- did you ever attempt to take a statement from him?

A. Okay, sir, tell me exactly -- did I attempt to take a statement? We talked all day, and I want to be respectful, but

A_43443

I don't understand the question. We talked all day to find Alice Donovan.

Q. You said the purpose of the -- of the activities that day was to find Alice Donovan's body. What I was asking you was, were you aware that there was an agreement to not interview Mr. Basham that day, that Mr. Littlejohn and Mr. Monckton had said that?

A. No, sir.

Q. So, that was never said in your presence?

A. No, sir.

Q. Okay. And following in that line, at no time during the day, even when later on there was a hypothetical presented to you, did you tell Mr. Monckton or Mr. Littlejohn that what they related to you would be used against Mr. Basham?

A. We never discussed that.

Q. Okay. Do you know if any promises had been made, other than yours? I asked you about whether you had, do you know about any other promises?

A. Did I make any promise?

Q. No. Other than -- do you know of any promises that were made other than what you have said, that there were none?

A. Right.

Q. Okay.

A. I'm not aware of any, no, sir.

Q. Okay. That's what I'm asking you. You said that you did

JA 0772

A_43444

not make any promises, correct?

A. Correct.

Q. No agreements on your part. What I'm asking you is, are you aware whether there was another agreement with someone else?

A. It was my understanding from talking with Jeff Long and with our district attorney, Rex Gore, that no promises had been made.

Q. Okay. Was it also discussed as to whether statements that were made by Mr. Basham could be used against him?

A. In the van?

Q. Yes.

A. No, sir.

Q. You did not -- you did not believe that those statements could be used against him?

A. It was never discussed. Our main purpose, my sole purpose was to find Alice Donovan.

Q. I understand. Now, you described -- and I guess what I'm trying -- your statement does not indicate where the discussion broke up during the day about directions, whether something looked familiar, or make a right or make a left -- which was Mr. Basham's purpose out there that day, correct? Was to try to locate the area?

A. Correct.

Q. Okay. It does not distinguish between those directional

statements that he made and the hypothetical, where it ends -- stops and ends, okay? Do you understand what I'm saying?

A. No, sir, I don't. On a separate sheet of paper I put everything hypothetical, so I think it does distinguish.

Q. On a separate piece of paper?

A. Yes, sir.

Q. I was just going to ask you that.

A. Yes.

Q. But your initial report does not distinguish between what was said in the van and then what was later said as a hypothetical?

A. My report -- once again, ask me that question, I want to answer it --

Q. Your initial report --

A. Yes, sir.

Q. -- longer report --

A. Yes, sir.

Q. -- that's detailed --

A. Yes, sir.

Q. -- does not break somewhere as to what was said prior to the hypothetical or after the hypothetical?

A. No, it doesn't. "Hypothetically" was listed separately.

Q. Listed separately, okay. And during the course of the day -- just let me see if I understand what you were saying. Did you ask him questions --

A. All day.

Q. -- about the events that took place?

A. About the events?

Q. Yes.

A. Yes. An example of that is, when we went into a wooded area with Basham to help find the body.

Q. Okay.

A. He --

Q. What sort of questions did you ask him and what sort of statements did he give you about events -- and I'm not talking about directions -- about what happened out there?

A. About what happened out there?

Q. Right.

A. That the body was covered up with leaves.

Q. Okay.

A. That they had covered the body with leaves after pulling Ms. Donovan out the right side of the vehicle, both Fulks and Basham. Dragging distance, 50 feet, approximately, and that he had stepped in a hole --

Q. Mr. Basham?

A. Mr. Basham had stepped in what was called a -- he called a gopher hole, and in this gopher hole was a stake. I took it to be a wooden or a metal stake that he scraped his leg on. And in the conversation in the van, he reached down, chained and shackled, and pulled his leg up and he says, "Here, you see?"

GARY N. SMITH, CM
COLUMBIA, SC

JA 0775

A_43447

So, that sort of conversation was going on, sir, all throughout the day.

Q. Other than that, other than what you just testified to, was there any other descriptive information given you about what happened between Mr. Fulks, Mr. Basham, and Ms. Donovan?

A. Can I reflect on the notes I wrote?

Q. No question about it, go ahead.

A. Mr. Basham indicated, and I will have to continue, but the first thing I see, "Mr. Basham indicated that some signs and some locations looked familiar, and some signs and locations did not look familiar."

Q. Okay. Basically I would consider those directional information.

A. Yes, sir.

Q. Okay.

A. Okay.

Q. I'm talking about the actual details of what actually happened.

A. Yes, sir, he also did. "At the cemetery Basham told me personally, 'We pulled right in there and cut to the left behind the fence.'"

Q. Okay.

A. "Basham described the Liz Claiborne 16 to 20 inch strap."

Q. Okay.

A. "And indicated by this motion that it was used to strangle

Alice Donovan."

Q. Okay. It wasn't said, it wasn't verbalized, it was just used in --

A. Yes, sir.

Q. Okay. And that is in your report?

A. Yes, sir. The other things that I see, "He once again indicated about the stake that he had struck his leg with. He indicated that Chad, referring to Mr. Fulks, wanted to take her to a park. And Branden Basham agreed to that, to which Chad Fulks then stated to Basham, 'No, there will be too many people there.' Basham stated he remembered the park to the right and the green animal sign.

"Basham states shortly thereafter, 'Many of the roads that we went down looked very similar in that they did have pine trees on either side.' But he said, 'All of it looks familiar, but I think the trees were closer together,' referring to the night of the -- this event."

Q. Again, that would be directional, or whether or not an area is familiar or not. I'm again referring to the details of what happened between the three of them.

A. Yes, sir. And also Branden Basham did state in the van and while we are in the wooded area attempting to stop once on the Lewis Swamp Road, which is a dirt road off Green Hill Road, this was the second -- this was the first time I saw Branden become emotional, the second time was at the cemetery.

JA 0777

A_43449

But he said, "Stop here, stop here." And at that point that's when Branden Basham made the following statements, he states that, "After dragging -- that after they drug, being Fulks and Basham, drug her out the right-hand side of the car, they got back in the vehicle, did a turn around."

Once again, in my testimony or in my statement Branden specifically -- Branden Basham specifically stated at the cemetery, "This is the spot, this is the exact spot."

Q. Okay.

A. "And we are here, we are here." And, sir, any other thing -- you want me to continue? Just a couple of more things. But ended it up --

Q. What I'm primarily interested in is the information that he gave you prior to the hypothetical. Where does that end and where does the hypothetical start?

A. I can tell you exactly where it ends.

Q. Okay.

A. It ends where -- it ends when we are at the cemetery, as I demonstrated earlier for the judge. And we walked back up to the van, and Branden Basham got back in the van with Cam Littlejohn and Billy Monckton, at that point our search was over.

Q. Okay.

A. And everything from that point on was when Mr. Littlejohn stepped out of the van and said, "Hypothetically, if this

JA 0778

A_43450

happened, this is the way it happened."

Q. All right. In looking at your statement, it does not appear that there were any other statements made after what you just described prior to the hypothetical?

A. You are correct, sir.

Q. That's what I wanted to establish. Okay. Now that situation, when they went to the van -- well, when you walked back to the van, took place at what point in the day?

A. The end of the day, about 2:45 on Thanksgiving.

Q. And you had been out there about how long?

A. Since 8:30.

Q. Okay. And there had been several trips to that particular cemetery, correct?

A. We drove by it coming in, we drove past it on the way out, and then we stopped at the cemetery at 2:30, 2:35.

Q. Okay. And on one or two occasions he said he did not recognize the area, but on the last occasion he did?

A. Yes, sir.

Q. Is that correct?

A. That is correct.

Q. And that was a statement directly to you --

A. Yes.

Q. -- as I understand, some distance away from the lawyers?

A. Yes, sir.

Q. They were with Mr. Long?

A. They were, once again, as far as from here to the bush, standing there talking with Chief Sam Hendrick.

Q. 30 feet maybe or something like that? 25 to 30 feet?

A. Yes, sir.

Q. All right. Now, the conversations that you overheard, one involved the deer and then one involved a strap?

A. Yes, sir.

Q. And then somebody said, "Go ahead and tell them about it"?

A. Yes.

Q. Okay, now, there were some other points during the day where Mr. Basham was whispering to Mr. Littlejohn, correct?

A. Yes.

Q. And that obviously was trying to communicate with Mr. Littlejohn as his lawyer?

A. I didn't hear your last words.

Q. As his lawyer, that was his lawyer?

A. Right. Yes, sir.

Q. And you were seated in the vehicle -- how far were you from Mr. Long?

A. He was at the back of the van. So, we were from the front of the van to the back of the van.

Q. Okay.

A. Jeff Long was at the back.

Q. How many rows of seats were there?

A. Sir, there is the front seat, the front passenger's seat,

there was a seat directly behind -- a captain's chair directly behind me to my left, that was Basham's seat.

Littlejohn was directly behind me. You have got a small area where people can get in and out, and then a bench seat across the back where the second Conway officer and Agent Long and Billy Monckton sat. So, that was the length of a standard transport van, and I don't know how long they are.

Q. Okay.

A. It was just a standard van. It wasn't a really big one and it wasn't a mini van.

Q. Now, obviously from what you could determine, Mr. Basham was not familiar with the area, correct?

A. No, sir. I think that he was familiar with certain --

Q. Let me strike that.

A. Yes, sir.

Q. Familiar from the standpoint of having been there a number of times? Obviously he had said that they were there that night.

A. Sir, it appeared to me that certain signs, road signs, the hunting camp, he recognized.

Q. Okay.

A. Then there were things he did not recognize. So, was he as familiar as me or anyone that lived in the area? Absolutely not. He was turned around. But there were things that he specifically remembered.

JA 0781

A_43453

Q. There are things he remembered, he related that to you?

A. Yes, sir, he did.

Q. Now, at some point when you walked off, Mr. Littlejohn and Mr. Monckton were standing at the van, you said it was about the distance to the bush, 25 or 30 feet. Do you know what was being told to Mr. Monckton and Mr. Littlejohn at that point, what they were being asked?

A. I couldn't hear a thing, because I had Branden Basham with me, and the two officers for security. I was in full uniform that day, and I had no idea what Mr. Monckton, Chief Hendrick, Jeff Long, or anybody else was doing, I only know what happened at the cemetery.

Q. Okay. You are with him and he says, "This is -- this is the place"?

A. Yes, sir.

Q. Okay. And he said that before you ever got back to the van?

A. Yes, sir.

Q. He said that before he ever got in the van with Mr. Monckton and Mr. Littlejohn?

A. Yes, sir. Yes, sir.

Q. So, the purpose for which you were sent out that day, as to where Ms. Donovan -- where certain events took place had been accomplished at that point?

A. It had --

Q. He had knowledge that that was the area?

A. It had not, and it's still not accomplished, sir. We still haven't found Alice.

Q. I'm talking about as far as the particular area.

A. We had at that point decided that we had looked everywhere that we possibly knew where to look, with the clues that I have expressed to this court that we had. We were -- we had exhausted every effort to find Alice Donovan with Branden Basham's assistance.

Q. And you did a lot of driving?

A. We drove over 100 miles, just in that area.

Q. Now, when you got there and Mr. Littlejohn and Mr. Monckton were in the van, how long -- do you know whether or not -- they were in there? Could you give us an estimate of the time involved?

A. How long were they in where?

Q. In the van with Mr. Basham.

A. We -- we were in the van.

Q. So, you went in the van with --

A. All day, sir.

Q. No, I'm not talking -- I'm talking about at the end of the day --

A. Okay, I'm sorry.

Q. -- when they went in there to talk with Mr. Basham. As I understood it, they went in the van?

A.   They did, sir.

Q.   Okay.   Nobody from law enforcement was standing there to overhear the information?

A.   Five to 10 minutes.

Q.   Okay.

A.   The doors were shut.

Q.   The doors were shut.   Now, when they come out, clearly Mr. Littlejohn presents you with a hypothetical situation?

A.   Yes, sir.

Q.   He's not stating that it's true, he's just saying hypothetically?

A.   He specifically said, "hypothetically."

Q.   Okay.

A.   Like this, "hypothetically."

Q.   And "hypothetically" means exactly to you what it means, correct?   It is, "What if this situation took place?"

A.   And actually Mr. Littlejohn used the words "if this happened."

Q.   "If this happened"?

A.   "If this."

Q.   All right.   That's when you made this separate notation that we just referred to?

A.   Yes, sir.

Q.   It's separate --

A.   Yes, sir.

GARY N. SMITH, CM
COLUMBIA, SC

Q. Okay. Prior to Mr. Littlejohn and Mr. Monckton going into the van to talk with Mr. Basham, did you or anybody else in your presence advise them that whatever they came back and told law enforcement would be used against Mr. Basham?

A. It was never discussed.

Q. Okay. What about when they came out prior to Mr. Littlejohn saying, "This is a hypothetical," and said, "What if," did anybody say that "Whatever you tell us is going to be used or we are going to attempt to use against Mr. Basham"?

A. Sir, I can only from my heart and on my hand to God tell you, all I know is what I know. What -- Agent Long could get up here and say that conversation happened. I wasn't there, I didn't hear it.

Q. Understood. And I'm just asking to your knowledge, did anybody tell them that?

A. I didn't ever hear that, no, sir. No.

Q. Now, one of the things I wanted to ask you about, is you wrote in your notes that Fulks, after slitting the victim's throat in the woods, gave the knife to Basham. That's what the testimony -- or that's what you wrote down in your notes?

A. Yes, sir.

Q. And those were written on December 3rd, several days after --

A. Yes, sir.

Q. Okay.

JA 0785

A_43457

MR. SWERLING: Judge, that's all I have, thank you.

THE COURT: Redirect?

MR. GASSER: No, sir.

THE COURT: Thank you, sir, you may step down.

THE WITNESS: Thank you, sir.

MR. GASSER: May the sheriff be excused, Your Honor?

THE COURT: Yes, sir. You are excused. Any additional witness on this series of statements?

MR. GASSER: Nothing.

THE COURT: Anything from the defendant?

MR. SWERLING: Judge, we have Mr. Monckton here and Mr. Littlejohn, and what I would like to do is put them up as to the procedural aspects that took place that day, without waiving the privilege as to what Mr. Basham told them directly. And I think that would be -- since we are dealing with a Jackson versus Deno hearing, the actual substance of what Mr. Basham told them would not be relevant at this time.

THE COURT: Does the government have any problem with that, with it not being a waiver of the privilege?

MR. SCHOOLS: The only tricky part, Your Honor, is with respect to whether Mr. Monckton and Mr. Littlejohn were authorized by Mr. Basham -- by Mr. Basham to deliver the information to law enforcement at the end of the Thanksgiving day search that they in fact delivered.

Now, we would take the position that for this

hearing, they can discuss -- or Mr. Littlejohn and Mr. Monckton could testify with respect to that limited issue concerning their conversations with Mr. Basham without waiving privilege on the subject matter.

But it seems to me that the court is going to be faced -- confronted with either making a determination about the authorization based on the facts, the objective facts, or based on what Mr. Littlejohn and Mr. Monckton may say about what Mr. Basham told them, or they told him.

Now, maybe it wasn't discussed, I don't know, but it does seem to be a relevant area of inquiry that would be independent of the subject matter.

THE COURT: You know, about six or eight months ago I had a whole courtroom full of lawyers telling me I did not need to disqualify these attorneys. I think they were all as wrong as they could be, and in retrospect my decision to disqualify was eminently correct.

I'm not casting aspersions at y'all, I'm just saying, these professors from the law school and everybody told me there was no problem at all. And I was worried about painting myself into a corner on the very end of this case if we got to a penalty phase where there could be some remote possibility. But here we are on the government's case in chief on guilt, we are going to hear from these lawyers.

Well, what about what he just said, Mr. Swerling?

GARY N. SMITH, CM
COLUMBIA, SC

JA 0787

A_43459

MR. SWERLING: I'm not sure I understood --

THE COURT: Well, he might want to go into whether the lawyers had authority from the client to communicate with the investigators.

MR. SWERLING: I think that's fair, fair part of the cross-examination.

THE COURT: And that would not waive the privilege as to anything except that type conversation.

MR. SWERLING: Exactly.

THE COURT: Let's just make sure both sides understand the ground rules before we start.

MR. SCHOOLS: Yes, sir.

THE COURT: Are both sides satisfied with that?

MR. SWERLING: I'm satisfied with that, Judge.

THE COURT: Mr. Schools, you will ask on cross --

You will ask maybe what the lawyers admit telling the authorities, and then you might ask them about what their conversations were with Mr. Basham in terms of getting authority from him to make those statements.

MR. SCHOOLS: That's correct.

THE COURT: And that's as far as you will go.

MR. SCHOOLS: Yes, sir.

THE COURT: And you won't later claim that there was a waiver of the privilege for anything else?

MR. SCHOOLS: That's correct.

JA 0788

A_43460

THE COURT: All right.

MR. SWERLING: Judge --

THE COURT: I'm not sure there can be a limited waiver of a privilege, but if the government agrees to it, I'm happy with it.

MR. SCHOOLS: Well, there is one position that was in some of the briefs in connection with the disqualification. In those briefs there was a claim that the information that was fact related should be protected because of the privilege. Now, we don't --

THE COURT: Say that again now? What now?

MR. SCHOOLS: In the briefs that were filed in connection with the disqualification motion, several of the briefs argued that the information that was related to law enforcement was privileged.

Well, it's axiomatic that if it's disclosed to a third party, the privilege is gone. So, we don't intend to suggest that the statements that were made by Mr. Littlejohn to law enforcement are in fact privileged, we don't -- we don't agree with that.

What we agree with is that the conversation -- the substance of the conversation between Mr. Basham and Mr. Littlejohn and Mr. Monckton in the van is privileged. What we would intend to do, inferentially, is offer those facts to establish what we think a jury would find obvious, which is

that the information that Mr. Littlejohn and Mr. Monckton relayed to law enforcement came from Mr. Basham. So, I don't want to be in a position --

THE COURT: You want to preserve your circumstantial evidence case that Mr. Basham provided this information?

MR. SCHOOLS: Yes, sir. And I'm not --

THE COURT: Y'all don't have a problem with that, do you?

MR. SWERLING: No. I mean, I think they have a right to do that. I mean, if I understand what he's saying is, they are not giving that up --

THE COURT: Right.

MR. SWERLING: -- they just agree not to go into it now?

THE COURT: Right. Now, what about the gestures and the hand movement and all of Mr. Littlejohn when the deer incident arose, are we going to go into that?

MR. SCHOOLS: I don't think -- it's because of his right to remain silent and his attorney essentially giving him advice at that point to stop providing information, I don't think that we could get into that in front of the jury. I think we could have Mr. --

THE COURT: Well, the quotation about the deer is just not going to come out in the front of the jury?

MR. SCHOOLS: Well, I think the statement that, "Here

I couldn't kill a deer, and I have --" I think that part should come out. The fact that that sentence stopped because he was directed by his attorney to stop, I don't think that part should come out.

MR. SWERLING: Judge, we would have an evidentiary objection at that point as to that statement, because really it never was finished. But, I mean, I don't know that that is the purpose for today.

THE COURT: Right. Well, I'm just trying to cover all the bases --

MR. SWERLING: Yes, sir.

THE COURT: -- to make sure we don't trip up here. Y'all agree to disagree about that later --

MR. SWERLING: Okay. Yes, sir.

THE COURT: -- is that right?

MR. SCHOOLS: Yes, sir.

THE COURT: And do you intend to go into it today with Mr. Littlejohn?

MR. SWERLING: No, sir, that's not something I was intending -- Judge, just for your information, I think there are two different sets of circumstances here, one is what took place prior to the hypothetical being given, and then what took place after the hypothetical.

THE COURT: Right.

MR. SWERLING: That's why I tried to break it up so

the court would know and we would know exactly where one ends and the other begins.

THE COURT:  All right.  Well, do we have a clear understanding now?

MR. SCHOOLS:  Yes, sir.

MR. SWERLING:  Yes, sir.

THE COURT:  All right.

MR. SWERLING:  Your Honor, I would like to just tell them what the instructions are.

THE COURT:  All right.

THE CLERK:  Place your left hand on the Bible and raise your right hand and state your name for the record.

THE WITNESS:  William H. Monckton, VI.

WILLIAM H. MONCKTON, VI, SWORN

DIRECT EXAMINATION

BY MR. SWERLING:

Q.  Would you state your full name?

A.  William Henry Monckton, VI.

Q.  Mr. Monckton, you are a licensed attorney here in South Carolina?

A.  Yes, sir.

Q.  Just for the record, when were you admitted to the bar?

A.  Here in South Carolina, in 1992.

Q.  Going back to November of 2002, were you appointed to represent Branden Basham?

JA 0792

A_43464

A.   I was.

Q.   And do you remember what date you received that appointment?

A.   It would have been the day before Thanksgiving, I received a phone call from Magistrate Tom Rogers out of Florence.

Q.   That would have been November 26th?

A.   I think the 27th.

Q.   I'm sorry, you are right, the 27th.  Thanksgiving was on the 28th.  Okay.

     Had you met Mr. Basham at that point?

A.   No, I had not.

Q.   In fact, when was the first time you met Mr. Basham?

A.   I met Mr. Basham some time that afternoon on the 27th.

Q.   Did you have any discovery or was any discovery given to you?

A.   No, sir.

Q.   Okay.  Now, on that afternoon, what was your understanding of the objective of law enforcement on Thanksgiving day?

A.   To locate the body of Ms. Donovan.  I had -- when I arrived over there, I met briefly with Magistrate Rogers to inform me that Mr. Basham was going to be prosecuted here in South Carolina, he needed lawyers because it had the potential for being a death penalty case.

     He told me that Mr. Basham had apparently made his arrangements that he was going to help locate Ms. Donovan's

body, and Judge Rogers wanted Mr. Basham to have attorneys throughout that process.

Q. And did you speak with anyone else that day?

A. After I met with Magistrate Rogers, I went and met with Rose Mary Parham, who was the AUSA in Florence, and asked her basically what was going on.

Q. Okay. And did she give you any of the information, any information concerning the case that had been determined -- had been learned by law enforcement to that point?

A. She told me at that time that apparently Mr. Basham -- and basically gave me a brief time line. Mr. Basham, along with Mr. Fulks, had abducted a lady from a local Wal-Mart there in Conway, they were on videotape.

They had been seen in North Carolina, I remember, at a gas station in some kind of hunting camp at that time. That there were allegations that Ms. Donovan had been raped, strangled, that she was dumped somewhere in Brunswick County, I was told some 50 to 60 feet up a dirt road. And Mr. Fulks, fearing she may still be alive went into the woods and slashed her throat.

Q. Okay. That's the information that was presented to you prior to you meeting Mr. Basham?

A. That's right.

Q. Okay. Were there any discussions at that time as to what was hopeful from a defense lawyer's perspective for Mr. Basham

to accomplish on that day, Thanksgiving day?

A.  We had received -- the information received from Ms. Parham was that Mr. Basham had told his lawyer in -- I believe it was Kentucky, a Mr. Hughes, that he wanted to assist in locating the body of Ms. Donovan.  Apparently he had given them information that he knew where to go.  You know, obviously we spoke to him, if that was his intent --

Q.  Now, without going into what he said.

A.  Without going -- and that was his intent, was to go search.  This was late on Thursday afternoon, and we needed to know immediately because there was a good bit of logistics work that was going to be needed to be done.  So, Mr. Basham agreed to help with the search.

I contacted my family, cancelled all my plans for the next day.  And I know that -- I believe the FBI and Ms. Parham were going through a lot of quick work to get transport -- transport paperwork, because it was a good bit of a problem getting him transported to the marshals, to the FBI, to take him to North Carolina.

Q.  What did you hope that that search the following day would do for Mr. Basham?

A.  Obviously we hoped to find Ms. Donovan.

Q.  And do what with her?

A.  You know --

Q.  What benefit to Mr. Basham?

A.   You know, hopefully that the government would not pursue the death penalty against him.

Q.   Did you have any conversations with Ms. Parham about that?

A.   The conversations with Ms. Parham were, we asked her for a proffer letter, she told us she could not give a proffer letter.  You know, I remember, I believe a U.S. Marshal may have been in the office at that time.  Because they had gone through a lot of difficulty in getting him transported down to Florence the day before the holidays.  And they were like, "You know, we need you to help out."

        Ms. Parham just -- I distinctly remember her telling me, you know, "Help us find the body and Columbia is going to do the right thing."

Q.   And that's what your recollection is about the meeting?

A.   Yes.

Q.   And that's been consistently your position?

A.   Without a doubt.

Q.   Okay.  Now, the next day when you started the search, were you also aware that there had been some discussions in other districts about, what we would term, some benefit to Mr. Basham if this were to happen?  If he were to discover Ms. Donovan's body?

A.   I can't say at that time.  I know that a Mr. -- it was related to me through the U.S. Attorney's Office that there had been discussions with a Mr. Hughes in Kentucky, I believe.  But

I was not privy to those conversations at that time.

Q. Okay. All right. What time did you go to meet Mr. Basham on the morning of Thanksgiving?

A. I did not meet Mr. Basham. Mr. Littlejohn came from Columbia, they picked Mr. Basham up in Darlington County with law enforcement, and drove up to Brunswick County with him. I met Mr. Long -- Agent Long in Myrtle Beach, his office is right near my office. And I parked my car at his office and I rode up with Agent Long.

Q. Okay. But you went to meet Mr. Basham?

A. Yes, I -- about 9:30, I would say, sometime around then.

Q. On your way up there, did you have conversations with Mr. Long about what the government contended happened in the case or what they knew to that date happened in the case?

A. I don't have any notes of that meeting, but I know we talked in general about, you know, that we hoped to find Ms. Donovan's body. We talked about where she had been seen.

I think we talked a little bit about how actually the FBI got involved, because at some point in time there was maybe a jurisdictional dispute between Horry County and the City of Conway and the FBI getting involved.

You know, he kind of went through the facts, all the searching that had gone on. Because I think I had been out of town just prior to this happening, so I wasn't aware of everything that was going on at this time. Just generalities,

JA 0797

A_43469

I don't think we actually spoke in any detail on the ride up other than that.

Q.  Okay.  And when you got there, you and Mr. Littlejohn met?

A.  Mr. Littlejohn and I met once they brought him -- actually I met Branden for the first time that day at the hunting camp. I was there with, I don't know, 40 or 50 police officers and Agent Long with the search team.

Q.  Okay.  And did you and Mr. Littlejohn compare notes as far as what you both knew at that time?

A.  No, not at that time.

Q.  Not at that time.  Okay.  Now, at that point what was your understanding about the conversations that would take place that day by Mr. Basham in assisting law enforcement in locating Ms. Donovan's body?

A.  I -- I remember specifically telling the agent that they would not be allowed to interview Branden or interrogate him in any way during this day.

You know, my understanding was, we are up there at their request, helping them, you know.  I didn't anticipate anything being held against him in searching for the body of Ms. Donovan.

Q.  Okay.  So, it's your position that when you set out that day with Mr. Basham on the search, that nothing he said to law enforcement, either directly or through you, was going to be used against him?

A.   That's correct.

Q.   Would incriminate him?

A.   That's correct.

Q.   All right.  And if that was your belief, is that what you also told Mr. Basham?

A.   I did not have that conversation with Mr. Basham.  As I said, I believed Mr. Littlejohn had the majority of those conversations, due to the fact that he rode with him for approximately two and-a-half hours.

By the time they got to Brunswick County, North Carolina, we had been waiting approximately an hour and-a-half, and we immediately -- I jumped in the van, with Agent Long.  I think the only people that were allowed in the van were two police officers from Conway PD, Agent Long, Sheriff Hewett, and that was it.  And we immediately jumped in a van and took off looking.

Q.   Okay.  Is it fair to say that during the course of that day, did you tell Mr. Basham that anything he was saying to law enforcement could be used against him in a court of law or to incriminate him?

A.   I did not.

Q.   Okay.  Did he ever give you the authority to state anything to law enforcement that would incriminate him?

A.   He did not.

Q.   Now, you spent quite a bit of time together that day.  I'm

JA 0799

A_43471

not going to go through all the details of what happened, but it's fair to say that during the course of the day he -- there were numerous directions given -- "making a left, making a right, this looks familiar, this doesn't look familiar," I'm not referring to that kind of thing; but those kind of comments were made during the course of the day, correct?

A. Yes.

Q. To your recollection, did anybody in law enforcement attempt to interrogate him?

A. I wouldn't say in a specific manner. I know Sheriff Hewett, because he was riding in the front seat, would turn around and say -- ask questions like, "Does this look familiar? Do we need to turn here? What do you think about this?" Sheriff Hewett knew the area so well that he was constantly turning around asking Branden, "Do you remember seeing something like this or something like that?" But I can't be specific on what he said.

Q. With respect to what Sheriff Hewett was asking Mr. Basham and Mr. Basham was responding, was it your understanding that any of that information could be used against Mr. Basham, or to incriminate him?

A. I -- I can't say yes or no.

Q. Okay. Did you tell Mr. Basham that anything that he said to Sheriff Hewett in response to any questions would incriminate him?

A. No, I did not.

Q. Or that could incriminate him, where they would try to use it against him in a court of law?

A. No, I did not.

Q. Okay. All right, now, at some point also during the day, it came to a point where the search was almost over and law enforcement approached you and Mr. Littlejohn?

A. That's right, at the cemetery.

Q. Okay. And during that period of time, was there a suggestion made that the search basically was terminated but -- and they were not going to pursue it any further unless some questions could be answered -- or basically what happened, they wanted to know what happened?

A. Right. At that time I know it was Chief Hendrick, Sheriff Hewett, Agent Long, I believe, Clyde Merryman was there too.

And it had been revealed to us for the first time that there had been a search of an area outside of Conway called Savannah Bluff on information that Mr. Basham had provided them, and that they felt like that they were on a wild goose chase.

I specifically remember Mr. Merryman making comments that he was in the swamp in waders and it was cold and miserable. And they appeared very frustrated and were going to terminate the search at that time.

Q. And as a result of that, did you and Mr. Littlejohn go to

JA 0801

A_43473

talk with Mr. Basham?

A.   Yes.

Q.   Okay.   Now, let me back up one second.   When they said that to you, were you still under the impression that anything that Mr. Basham would relay through you or you would relay to law enforcement would be used against Mr. Basham to incriminate him in court?

A.   Anything relayed through us, no.

Q.   Okay.   And at that point also related to him -- if he answered any questions?

A.   If he had answered any questions at that time -- we were not letting them talk to him.

Q.   Okay.   So, he had not waived any privilege at that point?

A.   Not to my knowledge.

Q.   Okay.   And before you entered the van, did law enforcement change the rules?   Did they tell you that what Mr. Basham told them could be used against him in a court of law to incriminate him?

A.   No.

Q.   Did they tell you that?

A.   No.

Q.   When you went in and spoke with Mr. Basham, if you were not told that, did you tell Mr. Basham --

A.   I had no conversation with Mr. Basham --

Q.   -- about that?

JA 0802

A_43474

A. -- about waiving privilege or anything being held against him.

Q. Okay. So, he was not advised that whatever he said, either directly or through you, would be a waiver of the privilege or it might incriminate him?

A. That's correct.

Q. Is that correct? And in your presence did Mr. Littlejohn make any such statement?

A. In my presence, no.

Q. Okay. And when you -- whatever was discussed in the van, when you went out and talked back to law enforcement, as I understand it, that was related in terms of a hypothetical?

A. That's correct.

Q. Is that correct? At that point in time when you were relating the hypothetical, did you have any authority to waive any privilege?

A. I didn't relay the hypothetical, Mr. Littlejohn did. But, no.

Q. You did not have the authority? He never -- Mr. Basham did not give you authority to waive the privilege?

A. That's correct.

Q. Okay. Did Mr. Basham -- and, of course, we have already established he was not told that whatever he would relate or what you might relate or what Mr. Littlejohn might relate to law enforcement would incriminate him in any way?

JA 0803

A_43475

A.   That's correct.

Q.   Okay.  And it was clearly couched in terms of a hypothetical; is that correct?

A.   Yes.

Q.   And what does a hypothetical mean to you?

A.   Suppose, not true, guess.

Q.   What if?

A.   What if.

Q.   And what was your purpose in doing that?

A.   We felt like that day was going to be our best chance to find Ms. Donovan, and we did not want the search to end.

Q.   Did these discussions that you were having with law enforcement, did you consider those to be in some fashion a plea -- plea discussions?

A.   Yes, because I had been -- well, I had a conversation with Ms. Parham the day before, you know, had discussions with the agents that day, and I have had several discussions with West Virginia, all between say December 5th through November 27th.

Q.   Okay.  And did -- was a hypothetical given to law enforcement?

A.   Yes, it was.

Q.   Was Mr. Basham -- how far was Mr. Basham from where you were at the time that Mr. Littlejohn was presenting the hypothetical to law enforcement?

A.   I would say 25 to 50 feet.  He was sitting in a van smoking

JA 0804

A_43476

a cigarette with one of the police officers from Conway.

Q. Okay. Was he in a position to overhear what Mr. Littlejohn was telling law enforcement in the hypothetical?

A. No.

Q. At any time during the day, either before the hypothetical or after -- well, I mean, during the course of the day or right before the hypothetical was -- you went in the van, or the hypothetical was presented, did anybody in the government ever warn you in any way that they intended to reserve the right to use Mr. Basham's attempted cooperation against him?

A. No.

Q. Or any statements he might make?

A. No.

Q. Did you feel like his cooperation that day could only be used to help him?

A. That's what we were trying to do, yes, save his life, find Ms. Donovan.

MR. SWERLING: Excuse me one minute.

That's all I have, Judge.

THE COURT: Cross-examination.

CROSS EXAMINATION

BY MR. SCHOOLS:

Q. Mr. Monckton, in Mr. Littlejohn's brief that he filed in connection with the disqualification motion he said, and I will quote, "In light of the defendant's alleged lies, the

JA 0805

A_43477

government presented Basham's lawyers with a dilemma. Their client was being accused of making a false statement to a government agent, which is a well known felony.

"Further, to the extent a successful search held a glimmer of hope for generating some benefit for Basham, that hope was about to end. It was in this context that a hypothetical statement was made and labeled as such." Do you agree with that characterization?

A. That was in whose brief?

Q. Mr. Littlejohn's.

A. Can I see it, please?

Q. Sure.

A. I mean, I will agree with the spirit of it, I'm not going to agree with the verbiage. I mean, at that point in time they were getting ready to terminate the search, and we wanted to keep searching for Ms. Donovan.

Q. And so when Mr. Littlejohn related the hypothetical to law enforcement, his intent was that they would rely on that information to continue searching for Ms. Donovan?

A. That's correct. Because they had told us -- I believe it came from -- it may have been Jeff Long or it may have been Clyde Merryman talking about the Savannah Bluff search, that was the first time I had heard they had actually searched in the Horry County area.

Q. So, when Mr. Littlejohn provided the hypothetical to law

JA 0806

A_43478

Q. enforcement, what you and he both hoped was that that hypothetical would generate additional search efforts; is that right?

A. Yes.

Q. Okay. And undoubtedly you hoped that if those additional search efforts resulted in the discovery of Alice Donovan's body, either the U.S. Attorney's Office would agree to drop the death penalty or, in the very least, a jury considering Mr. Basham's punishment would know that he, through his attorneys, had provided information that led to the discovery of Alice Donovan's body, right?

A. My reason for going out there with him that day was based on the fact that after I met with AUSA Ms. Parham, she told me that if we found the body of Ms. Donovan, or found Ms. Donovan, that Columbia would do the right thing. And in the context of a death penalty case, that can only mean one thing.

Q. Dropping the death penalty?

A. Dropping the death penalty.

Q. You asked Ms. Parham on November 27th, after the arraignment of Mr. Basham, if the United States would issue a proffer letter to cover Mr. Basham's statements; isn't that right?

A. Either I did or Mr. Littlejohn did.

Q. Well, you were aware that that request was made of Ms. Parham?

A. Yes, and it was denied.

Q. But you were aware that Ms. Parham refused to issue a letter that would protect any statements that Mr. Basham made concerning these events, right?

A. For the purposes of a proffer.

Q. Right. So, you have been practicing in federal court for how long?

A. Six years.

Q. And you have represented a number of defendants in federal court; is that right?

A. Yes.

Q. And you've probably represented defendants wherein the government had agreed to issue a proffer letter; is that right?

A. I have.

Q. And you are aware that our standard proffer letter says that information provided by the defendant under the proffer will not be used directly against that defendant; isn't that right?

A. That's correct.

Q. And you are aware that there is generally a polygraph provision in there that says if the defendant fails to tell the truth during the course of the proffer, that anything he says during the course of the proffer can be used against him; isn't that right?

A. That's correct.

JA 0808

A_43480

Q. Okay. But yet after having been refused a proffer on the 27th, if I understood your testimony correctly, you are testifying that on the 28th those efforts were entirely a one-way street for Mr. Basham?

A. No, I -- what I'm saying is, I have never been involved -- proffer letters usually come after the fact. I have never been involved in a case where you are searching for a body in a situation like this where there's a possibility she may or may not still be alive.

And I took AUSA Parham's representation that, "Hey, Columbia -- you go out there and you do everything you can to find Ms. Donovan and Columbia is going to do the right thing."

Yes, I'm thinking that the best -- the only thing is good is going to come from me helping to find the body. Anything bad isn't going to hurt me, if I go first thing tomorrow morning to Brunswick County, North Carolina and search for Ms. Donovan.

Q. That assumes, doesn't it, that your client tells the truth?

A. That's correct.

Q. And if your client wasn't telling the truth and if the search efforts prove fruitless, did you believe at that time that you were going to get a pass on that, that Mr. Basham was going to get an entire pass? That he was going to be able to engage law enforcement in a frolicking detour on Thanksgiving day, and that if they all proved fruitless that it was going to

JA 0809

A_43481

be as if it never happened?

A. I don't think it proved fruitless.

Q. That wasn't my question.

A. No, but I --

Q. Was that your understanding?

A. That's my understanding.

Q. Your understanding was that if it proved fruitless, if he was taking law enforcement on a frolicking detour on the 28th, and what he told law enforcement in fact was wrong and was a provable lie, that nothing he said that day would be used against him?

A. To be honest, I never even considered that.

Q. Why did you ask Ms. Parham -- but you did ask Ms. Parham for a proffer, right?

A. I ask for a proffer in every criminal case.

Q. And the reason you ask for the proffer is because you were seeking some protection for the statements that Mr. Basham might make on Thanksgiving day, right?

A. For any statements he had made.

Q. But specifically, this is on the 27th, you understood that Mr. Basham had been transported from Kentucky to South Carolina specifically for the purpose of conducting this physical search for Alice Donovan's body, right?

A. That's correct.

Q. Okay. So, when you met with Ms. Parham on the 27th and you

JA 0810

A_43482

asked for a proffer letter, you were seeking -- your immediate concern was an effort to obtain protection for the statements he was going to make on the 28th, right?

A.    That's right.

Q.    And she said, "We are not offering you that protection," didn't she?

A.    She did.

Q.    Okay.   You stated in your testimony, I believe, that you or Mr. Littlejohn or both instructed law enforcement that they could not effectively interrogate Mr. Basham; is that correct?

A.    That's correct.   I believe I told Agent Long that.

Q.    And you were in the van as the Conway police officer drove and Sheriff Hewett was in the passenger seat and Mr. Basham was behind the driver and I think Mr. Littlejohn was behind Sheriff Hewett; is that what you recall?

A.    That's right.   I think I was in the very back sitting next to Agent Long.

Q.    And the journey, the travel of the van that day, in an effort to locate a place that Mr. Basham might be able to identify, occupied over 100 miles, didn't it?

A.    I can't say.   It was a long -- it was approximately six hours, I would say.

Q.    So, y'all were in the van for approximately six hours?

A.    That's correct.

Q.    And during the course of that day, Sheriff Hewett was

asking Mr. Basham questions concerning landmarks and concerning directions and things of that nature, correct?

A. That's correct.

Q. And despite your earlier request that no one ask Mr. Basham questions, Mr. Basham was in fact allowed to answer Sheriff Hewett's questions, wasn't he?

A. I didn't see how we would be able to do the search without doing that.

Q. Right. And neither Mr. Littlejohn nor yourself instructed Mr. Basham during the course of the six hour ride that he should stop answering questions, did you?

A. I didn't.

Q. And did you hear Mr. Littlejohn do it?

A. I don't know. I know that Mr. Littlejohn and Mr. Basham whispered on numerous occasions. At that time Mr. Littlejohn had established a rapport with Mr. Basham already. And I said, to make it simple, Mr. Littlejohn would be the one handling the discussions with Mr. Basham.

Q. But no one was threatening Mr. Basham inside the van, were they?

A. No, sir.

Q. Okay. It was a cordial experience for the six hours that y'all were in the van, wasn't it?

A. Yes.

Q. And Sheriff Hewett was asking Mr. Basham questions and he

JA 0812

A_43484

was freely responding in the presence of both you and Mr.
Littlejohn, correct?

A.   With regard to directions and landmarks, yes.

Q.   There's no dispute about that?

A.   Huh-uh.

Q.   Okay.  And during the course -- do you recall the incident where a deer crossed the road and Mr. Basham made a spontaneous comment about that deer?

A.   I remember the front of the van talking about a deer.  I mean, Mr. Long and I were kind of -- where we were in the van, we were sitting almost on top of each other.  I didn't see the deer, and I think we may have been talking.  I don't know what Mr. -- what exactly he said.

Q.   Okay.  And it was your testimony, I believe, that your understanding was that nothing that Branden said on Thanksgiving day could be used against him by the government; is that right?

A.   Well, I guess I want to -- I guess if Branden started making all kind of spontaneous utterances or whatever, obviously I think that would be held against him, but he didn't.

Q.   But it was your understanding that for whatever reason -- your understanding, the parameters of that day were that this was a day that could help Branden Basham but not hurt him?

A.   That's correct.

JA 0813

A_43485

Q. Yet you instructed law enforcement officers not to interrogate him, right?

A. That's correct.

Q. And isn't the reason you instructed law enforcement officers not to interrogate him is because you didn't want him to incriminate himself?

A. Well, no, I -- that's one thing. But also I had no idea what Branden had already told law enforcement. I had no idea what statements he had made. I had not even debriefed him yet, so I did not want him making any statements to them until I had had a chance to debrief him.

Q. Okay. At the time that y'all went on the Thanksgiving day search, had you ever spoken directly with Richard Hughes?

A. No, I had not.

Q. So, you don't know or are not privy to what conversations Mr. Hughes and Ms. Parham had?

A. No. The only information I had regarding statements about what Mr. Basham had said, or what information I had about the case, came from Ms. Parham or through Agent Long.

Q. And you don't know what Mr. Hughes had advised Mr. Basham concerning the use of statements provided by his attorney when Mr. Basham was in Kentucky?

A. No.

Q. Okay. But I think your testimony was that neither you nor Mr. Littlejohn really discussed that issue with Mr. Basham, the

Q. issue of the use of his statements on Thanksgiving day?

A. I know I did not.

Q. Okay. So, to the extent Mr. Basham had any understanding about that, it didn't come from you?

A. It did not.

Q. At the end of the day when law enforcement confronted yourself and Mr. Littlejohn concerning their belief that Mr. Basham was lying to them -- that's what they told you, right?

A. Right.

Q. Okay. And the basis for their belief that he was lying was that he had previously directed them to the Savannah Bluff area, and that search had proved fruitless. And now he was directing them to the Winnabow area and that search was fruitless, and they were concluding that he was essentially playing games?

A. I believe it was Chief Hendrick who made that statement, or something to that effect.

Q. And it was your belief that in effect Branden Basham's best chance for saving his life was at that very moment?

A. Well, if we were going to find Ms. Donovan, I thought the search needed to continue, yes.

Q. Okay. And it was important to you that the search continue, because you thought it was important for Mr. Basham, right?

A. That's correct.

JA 0815

A_43487

Q. But you didn't allow, despite your understanding about how the information could be used that day, you did not allow Mr. Basham to answer questions directly, correct?

A. That's correct.

Q. You spoke to Mr. Basham in the van, correct?

A. Yes.

Q. And then was it immediately after speaking with Mr. Basham in the van that you and Mr. Littlejohn exited and then related the hypothetical?

A. It was some time after that. I don't know if Mr. Littlejohn walked over there and spoke to the officers first and came back to the van, but it was within five minutes I would say.

Q. Okay. And you didn't feel as if you were exceeding your authority as Mr. Basham's lawyer when you related the hypothetical to law enforcement, did you?

A. I didn't relate the hypothetical.

Q. You didn't feel that Mr. Littlejohn was exceeding his authority when he related the hypothetical to law enforcement, did you?

A. I did not know what his hypothetical was going to be until after he said it.

Q. When he said it, was it your impression that Mr. Littlejohn just exceeded his authority as Mr. Basham's authority?

A. Under the statement of a hypothetical, no, I did not.

JA 0816

A_43488

Q. Okay, and --

MR. SCHOOLS: And Your Honor, I'm going to ask this question, and I will put Mr. Swerling on notice, he may object to it because it may be in contravention of our agreement.

BY MR. SCHOOLS:

Q. But did Mr. Basham desire that the search on Thanksgiving day continue?

A. Yes.

MR. SWERLING: I don't have any problem with that.

A. Yes.

BY MR. SCHOOLS:

Q. He did? And did he understand, after your meeting with him in the van, that you and/or Mr. Littlejohn were going to relate information to law enforcement to try to make that happen?

A. No, I don't believe -- I can't remember exactly. I know Mr. Littlejohn got into the van and started speaking with Basham -- Mr. Basham. To my knowledge, Mr. Littlejohn did not relay to Mr. Basham what he was going to say to law enforcement.

Because the first time I heard it was when he relayed it to the agents in the semi-circle that we were standing in. I don't know what Mr. Basham knew at that time.

Q. But you do know that Mr. Basham was desirous at that time of having the search continued?

A. By that time, I can't -- I can say yes, I know he got

JA 0817

A_43489

emotional in the van several times when we were driving around. I know as an attorney I was desirous of it continuing. I can't say what he was thinking.

Q. And as an attorney, as his agent at that time, you were making -- or Mr. Littlejohn was making representations to law enforcement that he was authorized to make and that he believed would benefit, or he hoped would benefit Mr. Basham?

A. I can't agree that Mr. Basham authorized him to make those statements to hurt him, if that's your question.

Q. My question was, Mr. Basham -- my question was, when Mr. Littlejohn made the statements, he was authorized to make them in the hopes that it would result in the continuation of a search and that would result in a benefit to Branden Basham?

MR. SWERLING: Judge, I think that gets into what we talked about, what he offered.

THE COURT: State your question again.

BY MR. SCHOOLS:

Q. When Mr. Littlejohn made the statements to law enforcement, he made them under the belief that he was authorized to make them, under the hope that the search would continue and that would result in a benefit to Branden Basham?

A. I can't speak to the belief of Mr. --

THE COURT: I will overrule the objection. Go ahead and answer the question.

A. I can't say what Mr. Littlejohn was thinking. I know that

JA 0818

A_43490

Mr. Basham had no idea what Mr. Littlejohn was going to say.

BY MR. SCHOOLS:

Q. If Mr. Basham -- if the information -- the hypothetical had been related to law enforcement and the search had continued and Alice Donovan's remains were recovered, okay, and Columbia, supervisors at the U.S. Attorney's Office in Columbia would not agree to let the death penalty off the table at that point, wouldn't you want Mr. Basham's jury to know that the information that his attorneys provided had directly led to the recovery of that body?

A. I don't know how we would have handled that, I mean, to be honest with you. But obviously at some point in time we would have wanted the jury to know that he assisted in the search, obviously.

Q. And you would have wanted them to know that the search was successful, right?

A. Without a doubt.

Q. And the way that it was set up that afternoon, the only way for them to know that, to know those details, would have been for the jury to know that the hypothetical that Mr. Littlejohn had related had in fact led to the discovery of Alice Donovan's remains? That's the way it was set up at that moment --

A. Well, one thing I want to clarify about the hypothetical. The hypothetical, as recorded in Mr. Long's 302 is incorrect, you know. So, when you say "hypothetical," are you talking

about the one in Lieutenant Crocker's report, or are you

talking about the one in Jeff Long's 302?

Q.  It doesn't matter.  I'm talking about its admissibility,

and its substance is of little consequence at this point.  But

my point is, if the hypothetical, as provided, had led to --

either version, had led to the discovery of Alice Donovan's

remains, y'all would have wanted the jury to know that?

A.  I don't -- obviously, yes, but I don't know how you are

going to introduce it through a lawyer.  You know, obviously --

if we had found the body, we obviously would have let Branden

be interviewed to corroborate whatever occurred that day.

          MR. SCHOOLS:  Beg the court's indulgence.

BY MR. SCHOOLS:

Q.  And Mr. Monckton, it was your testimony, again, that you

believed that statements made that day by Mr. Basham, or by you

on his behalf, could not be used against him to harm him?

A.  I don't think I made any statements on his behalf.

Q.  And it would be your testimony that anything that Mr.

Basham said or that Mr. Littlejohn made on his behalf could not

be used against Mr. Basham, to harm him?

A.  Obviously anything said by Mr. Littlejohn, if he had the

authorization from Basham to say them, you know -- I don't

understand your question, I guess that's what I'm saying.

Q.  When you were confronted by law enforcement -- I will

change and ask a different question.  When you were confronted

JA 0820

A_43492

by law enforcement about their belief that Mr. Basham was lying, you didn't allow Mr. Basham to be interviewed despite your belief that nothing he said that day was going to be used against him; is that correct?

A.   That's right, we did not allow him to be interviewed.

Q.   Okay.  So, rather than give law enforcement access to your protected client, you and Mr. Littlejohn met with him and then Mr. Littlejohn related the hypothetical?

A.   That's correct.

Q.   And it's your testimony that that happened despite the fact that your belief was that nothing that Mr. Basham said was going to be used against him that day?

A.   Also a point of clarification I want to make about the hypothetical --

Q.   Wait a minute, how about answering my question?

A.   That's correct, but I did not think it would be used against him.

Q.   But despite that fact, you and Mr. Littlejohn met with Mr. Basham rather than giving law enforcement access to Mr. Basham?

A.   Right.  Because we don't know what Basham had already told law enforcement.

Q.   Okay.  And this is -- I'm sorry --

A.   One thing I want to clear up about the hypothetical, you know, the assumption is made that that information came from Basham.  The majority of that hypothetical, that information in

JA 0821

A_43493

that hypothetical, came from Ms. Parham.

Q. Well, you stated I think when you were talking about the information that you had that I believe you said that Mr. Fulks had gone in the woods and finished off or stabbed Ms. Donovan, or something like that --

A. We had the fact she was abducted on videotape from the Wal-Mart, she was seen at the Amaco station, they had them on videotape there. We were told that they were seen at some hunting camp in the cemetery in the blue BMW. We were told that she apparently had been raped. We were told that she was strangled. We were told that her body was drug out into the woods, and that Mr. Fulks went back into the woods, thinking Ms. Donovan may still be alive, and slit her throat.

Q. So, what Mr. Littlejohn did was, he related a hypothetical to law enforcement that effectively said, "Well, what if this is what happened?" and then he stated to law enforcement what Rose Mary Parham had told him?

A. The majority of it, yes.

Q. And it's your testimony that he did that -- but he did that immediately after consulting with his client?

A. Yes. But he did not ask -- in my hearing range he did not ask Mr. Basham any details.

Q. But you don't know what he may have discussed with Mr. Basham --

A. I don't know what he may have said when he was up in the

van --

Q. -- before you got there that day? Okay.

MR. SCHOOLS: No further questions, Your Honor.

THE COURT: Let me ask a couple of questions first to be sure I understand.

EXAMINATION

BY THE COURT:

Q. Mr. Monckton --

A. Yes, sir.

Q. -- what is your understanding of the term "proffer" as used in the District of South Carolina in a criminal case?

A. A proffer, Judge, if I had a client that is going to be debriefed by law enforcement, interviewed, that proffer is in place to protect him against any future crimes or any statements he may make.

Q. All right. Is Mr. Schools right, though, that under the tradition and custom here that any statement made cannot be used against him, but if he lies it can be used against him? That's the point I'm trying to understand.

A. Under the verbiage of a proffer, yes. If he lies under a proffer, it can be held null and void --

Q. Let me just -- when I first became a judge, the term "proffer" in a criminal case was something I didn't understand. Because I was familiar with the word "proffer" in terms of evidence. If a judge sustains an objection, keeps the evidence

JA 0823

A_43495

out, the proponent can make a proffer of what that evidence would have been --

A. Right.

Q. -- for purposes of appeal. And then you look in the dictionary and proffer generally means just to offer?

A. That's right.

Q. And even if you look in Black's law dictionary, it says just to offer. And so I couldn't find any authority, so I had to ask the lawyers. And I just learned that in this district, at least, proffer has a very discernible, readily understood meaning among the bar; is that correct?

A. In criminal court I would say yes.

Q. And it means, "We are going to let our guy give a statement to the authorities with the clear understanding that whatever he says won't be used against him --"

A. That's right.

Q. -- "but if he lies to them, then all bets are off and it can be used against him"?

A. Yes, sir.

Q. I'm just asking --

A. Yes, sir.

Q. -- is that correct?

A. (Nods head in the affirmative).

Q. All right. Now, the situation here, as I understand the testimony, the government had expressly and clearly rejected a

JA 0824

A_43496

proffer, as we just discussed?

A.   That's right.

Q.   As we have defined it?

A.   They said, "We can't give you a proffer at this time."

Q.   All right.  So, then, when the situation evolved and we got to a situation where it was couched in terms of a hypothetical, coupled with the statement allegedly made by Ms. Parham that, "If the body is found, Columbia will do the right thing," Mr. Schools would say your client had a one-way street.

In other words, he had the ability to gain something if the body was found.  If the body wasn't found, nothing could be used against him.  So, in essence -- and I'm not trying to argue with you -- but if what you say is correct, he got better than a proffer; is that not correct?

A.   Well, I guess, Judge.  What I'm trying to explain is, we made it clear, if we weren't getting a proffer --

Q.   Right.

A.   -- they were not going to be allowed to interrogate him.

Q.   Right.

A.   Okay.  You know, "We are not getting a proffer, you can't talk to him."  And I made that clear to the agents.  But it gets to the point, you know, in this case, there is no way I can take him up there and look without some communication back and forth, directions -- "Yeah, that looks familiar, no, this doesn't look familiar."  You know, I don't see how you do that.

JA 0825

A_43497

And I guess that's been my concern in this case, is you've got to put us in those set of circumstances at that time. We are not in a lab experiment where everybody can Monday morning quarterback what's going on. We really felt like we were going to find her that day.

Q. Don't get me wrong --

A. No, I understand, I'm just --

Q. -- I'm not casting any aspersions on you or any other members of the defense team. I'm just trying to untangle what the ground rules were on that particular day, Thanksgiving day.

A. And as I understand it, I think the purpose for the -- they are saying the lie, is some kind of forensic evidence that should have been discovered in the vehicle. Blood should have been found in the car.

THE COURT: All right. That's all I had. Thank you, sir.

THE WITNESS: I'm sorry, Judge --

THE COURT: Mr. Swerling.

MR. SWERLING: Judge, I have a couple of other questions.

REDIRECT EXAMINATION

BY MR. SWERLING:

Q. Essentially the court asked you what I was going to ask you. Your understanding of a proffer was, a proffer was necessary if someone was going to be debriefed, that's the

JA 0826

A_43498

language you used?

A. That's correct.

Q. Okay. Did you believe a proffer was necessary on Thanksgiving day for Mr. Basham to go out and assist law enforcement in trying to locate Ms. Donovan's body?

A. No, I did not.

Q. Okay. And so that -- so, by not getting a proffer, did you still think that whatever he was doing to assist law enforcement -- and let's talk about it -- to assist law enforcement that day was still protected?

A. Yes, it's going to help. I mean, that's how I explained it to him, "This is going to help."

Q. And you told him that whatever he did the following day could help him?

A. That's right.

Q. And that you -- and you told him to go ahead and cooperate with law enforcement?

A. That's right.

Q. Because you thought it could help?

A. That's right.

Q. Okay. And it's clear from what your explanation was, is that from what was going on Thanksgiving day during the search and any statements that were being made, you did not think a proffer was necessary to protect those statements and to protect Mr. Basham from stating anything that would incriminate

JA 0827

A_43499

him?

A.   That's correct.

Q.   Did you ever explain to him a proffer?   Did you ever even go into a proffer with him?

A.   No, I did not.

Q.   Okay.   So, he would not have known any distinction between a proffer and what was going on on November 28th, Thanksgiving day, when he was trying to assist law enforcement?

A.   I very seriously doubt it.

Q.   Let me ask you about hypotheticals.   Are hypotheticals used by lawyers --

A.   Every day.

Q.   -- when speaking -- when talking to law enforcement?

A.   Every day.

Q.   Do you believe a hypothetical is a statement of fact from an individual that you are relating it on behalf of?

A.   No.

Q.   Okay.   What is the purpose of saying things in a hypothetical?

A.   You know, to give a prosecutor or law enforcement enough information to make a decision on how to handle a plea, how to handle an investigation, without incriminating your client.

Q.   Okay.   Do you believe that in the years you have been practicing law, do you believe that when you present a hypothetical to somebody in law enforcement that that

JA 0828

A_43500

hypothetical itself can be used against the person on whose behalf you are making the hypothetical?

A.  No.

Q.  And again, as you said, you had never told Mr. Basham that it could be used against him because you didn't believe it could be?

A.  That's right.  I did not have a conversation with Mr. Basham in any way, shape, or form concerning that fact.

MR. SWERLING:  That's all I have.

THE COURT:  Any redirect?  I'm sorry, I'm sorry, you have already had your cross-examination.  Do you want to follow up on anything that I brought out or Mr. Swerling brought out?

MR. SCHOOLS:  Something that Mr. Swerling brought out on redirect, yes, sir.

THE COURT:  All right.

RECROSS EXAMINATION

BY MR. SCHOOLS:

Q.  Mr. Monckton, Mr. Swerling I believe asked you about whether you believed that you didn't need a proffer for the Thanksgiving day search because Mr. Basham was not going to be interviewed; was that your testimony?

A.  That's right.

Q.  Well, when you spoke with Ms. Parham on the 27th, after Mr. Basham was arraigned, during the conversation when you were discussing the proffer, didn't y'all discuss the fact that Mr.

JA 0829

A_43501

Basham was going to be going out on Thursday in an effort to locate Alice Donovan's remains?

A. Yes. In fact, she even made -- helped make the arrangements by getting the transport order.

Q. And it was during this same conversation in the discussion about going out there on Thanksgiving day that you asked her for a proffer. And she said, "We are not going to give you one;" isn't that right?

A. We asked for a proffer, I think she had to step out to call Columbia. Called them, and came back in and said no.

MR. SCHOOLS: Okay. Nothing further.

THE COURT: Anything further?

MR. SWERLING: No, sir.

THE COURT: Thank you, you may step down.

THE WITNESS: Thank you, Judge.

THE COURT: Do you have another witness?

MR. SWERLING: Mr. Littlejohn, Your Honor.

THE COURT: How long do you think he will be?

MR. SWERLING: Direct, Your Honor, about 20 minutes.

THE COURT: Let's go ahead and try to get the direct in before lunch if we can.

MR. SWERLING: Okay.

THE COURT: I'm not trying to rush you, Mr. Swerling.

MR. SWERLING: No, I understand.

THE CLERK: Mr. Littlejohn, would you please come

JA 0830

A_43502

forward to be sworn?  Place your left hand on the Bible and raise your right hand.  State your name for the record.

THE WITNESS:  Cameron B. Littlejohn, Jr.

CAMERON B. LITTLEJOHN, JR., SWORN

THE COURT:  Hold on one second, Mr. Swerling.

MR. SWERLING:  Yes, sir.

THE COURT:  All right, you may proceed.

MR. SWERLING:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SWERLING:

Q.  Your name?

A.  Cameron B. Littlejohn, Jr.

Q.  Mr. Littlejohn, you are a lawyer licensed to practice in South Carolina?

A.  Yes, I am.

Q.  When were you admitted to the bar?

A.  November 11, 1975.

Q.  Okay.  And during your career you have -- you have engaged in the defense of defendants in state and federal court?

A.  Yes, I have.

Q.  And for a period of time you served as an Assistant United States Attorney in this district?

A.  For approximately seven years.

Q.  Okay.  Mr. Littlejohn, let me go to the events of the day before Thanksgiving.  Were you appointed that day by the court

to represent Mr. Basham?

A.   I was.   I received a call from Magistrate Judge Tom Rogers the -- that Wednesday morning.

Q.   And you agreed to accept the appointment, obviously?

A.   Yes, I did.

Q.   Okay.   When you accepted the appointment, did you have any -- or immediately thereafter, were you given any discovery in the case or any statements or any 302s?

A.   No.

Q.   Okay.   When did you first meet Mr. Basham?

A.   I met Mr. Basham late that Wednesday morning.   I believe that would have been November 27th, 2002.

Q.   The same day you were appointed?

A.   Yes.

Q.   Okay.   And were arrangements made on that day to have him assist law enforcement in searching for Ms. Donovan's body?

A.   That's correct.

Q.   Okay.   Did you have any discussions with anybody in law enforcement concerning the scope of that, the events of that day?

A.   Well, we -- Billy Monckton and I had discussions with Rose Mary Parham, the Assistant U.S. Attorney that was assigned to the case at that time.   Other than her, no, we didn't talk to any law enforcement personnel.

Q.   All right.   Did you and Mr. Monckton meet with her

together?

A. Yes.

Q. Okay.

A. Actually Billy met with her before I got there.

Q. Okay.

A. And he had met with her for some 20 to 30 minutes before my arrival.

Q. Okay. During the time that you were there, was any information related about what law enforcement already knew about the case or what they partly knew about the case that they chose to reveal?

A. Yes.

Q. Okay. What did you find out at that point from law enforcement, from Ms. Parham?

A. From Ms. Parham we learned that Mr. Basham had been interviewed by the FBI in West Virginia where he had been arrested, that there was a -- there was a series of interviews that lasted some 16 hours, I believe. And during the series of interviews Ms. Parham indicated that he had more or less confessed to being involved in the abduction and murder of Ms. Donovan.

Q. Were you given any other details at that point?

A. We were given a few details. I think Mr. Monckton covered most of that before I got in on the meeting with Ms. Parham.

Q. At some point did you and Mr. Monckton compare notes about

JA 0833

A_43505

what information you had?

A. Yes, we did. The information was very sketchy. Ms. Parham was going off of information that she received from the local FBI, who was getting their information from the FBI in West Virginia. And so it was not very detailed information at all.

Q. Okay. And as I understand it, he was brought there and you were appointed, and this all happened very fast. And there was an effort that was going to be made to assist law enforcement searching for her body?

A. It happened extremely fast, yes.

Q. It happened actually on Thanksgiving day, and a lot of people had to cancel their plans, obviously?

A. Correct.

Q. Okay. Now, you and Mr. Monckton participated in that search?

A. That's correct.

Q. When you were with Ms. Parham, did you discuss with her the benefit that could arise for Mr. Basham if he would cooperate?

A. Yes.

Q. And what was the understanding you had walking away from that meeting?

A. Well, it was in general terms, but the understanding was that if Branden would assist in finding Ms. Donovan's body, that Columbia would do the right thing, that it would assist him in our negotiations in hopefully avoiding the death

penalty.

Q. Did you consider this ongoing plea negotiations in an informal sense or in a formal sense?

A. In an informal sense, yes. It was.

Q. And so did you think that he could have some benefit from assisting law enforcement on that day?

A. Without a doubt. There were a number of benefits. It would help us in plea negotiations. If ultimately the case went to trial, that would be evidence that we could present on Branden's behalf. And thirdly, I mean, it was important to find Ms. Donovan. At that time I didn't know, but there was a ray of hope that she might be still alive. But it was very important to everybody.

Q. Did you discuss with Ms. Parham a proffer?

A. I don't recall us discussing that specifically because the plea negotiations -- it was so informal, and plus you had the situation where they just at the time -- I understood they had a confession from Branden and, you know, there really wasn't any need for a proffer at that time.

Q. Okay.

A. On their behalf.

Q. On their behalf?

A. Yes.

Q. So, on the 28th you drove up to Brunswick County, correct?

A. I left my house at 4:30 a.m. and met the FBI agents at the

JA 0835

A_43507

Darlington County Detention Center at 6 a.m.

Q. Okay. Based on the conversations you had with Ms. Parham -- and you don't remember whether or not it was specifically in reference to a proffer -- did you believe, or had the government told you, presented to you, that anything that Mr. Basham said that day could be used against him to incriminate him in a court of law?

A. Well, it was never said that -- no, it was never said, "Anything he says can be used against him." That was never specifically said.

Now, the fact that he was going to attempt to point out the location where Ms. Donovan's body was, obviously there was no way to keep that from being evidence later on, and hopefully it would be evidence in Branden's favor.

Q. Right. And you are talking about with respect to directions?

A. Directions.

Q. How to find --

A. Exactly.

Q. I'm talking about statements other than just simple directions. Did you believe that anything that was said, other than statements regarding simple directions, could be used against him?

A. No. And in fact, I told the two FBI agents that I met with initially at 6 o'clock in Darlington, which was, I believe, was

JA 0836

A_43508

Gary Bray and his wife Jan Bray, who are both special agents with the FBI, that I had not had enough time to be acquainted with the case, I had not had enough time to talk to Branden, that we were not going to give any kind of statement that day, that the only thing that we would be limited to was giving them directions as to where Ms. Donovan's body could be found.

Q.   Okay.  And in consideration of what you were going to do, in assisting in locating Ms. Donovan's body, or have Mr. Basham locate Ms. Donovan's body, did you believe that a formal proffer was necessary for that to protect what Mr. Basham was going to do that day?

A.   I --

Q.   Outside simple directions?  Let me clarify that.

A.   Well, we didn't plan on giving a statement anyway.  So, what I understood was, his directions would be something that could be brought against him later on, but he wasn't going to give any statements.

Q.   Not make any statements?

A.   Exactly.

Q.   Okay.  And not provide any details?

A.   Exactly.  Directions only.

Q.   Outside directions?

A.   Right.

Q.   Okay.  And did you encourage Mr. Basham to do that?

A.   Yes.

JA 0837

A_43509

Q. And you -- since you did not think that anything could be used against him outside of details, did you tell Mr. Basham that anything could be -- that he said outside of details could be used against him in a court of law?

A. Did I tell him that anything he said could be used against -- I don't know that I told him that specific language. But I told him that we were going to only be giving directions, that we weren't going to give any statements, and we would have to talk at a later time and determine whether it would be in his best interest to make any further statements.

Q. To make further statements?

A. Correct.

Q. But on that particular day, whether or not he gave statements outside of directions, you never told him that anything he said could be used against him?

A. I don't recall -- no, I don't recall saying that.

Q. You didn't believe anything could be used against him?

A. Correct.

Q. Okay.

A. And that's why I prefaced my remarks at 6 o'clock, before we start this entire venture, by telling them we were giving no statement.

Q. And that was clearly told to law enforcement, that no statement would be given?

A. There is no doubt about that.

JA 0838

A_43510

Q.   And they accepted the parameters and guidelines that you had set?

A.   Yes.

Q.   Okay.   Now, during the course of the day Mr. Basham did provide directions to them, whether a site looked familiar or unfamiliar, and that, you thought, was within the scope of your agreement; is that correct?

A.   That's correct.

Q.   Okay.   And you are not -- with respect to those directions, you cannot say one way or the other whether or not you believe that those were admissible against him; is that what I understand you to say?   The directions themselves.

A.   Mo, it was not -- it was my understanding that the directions would probably be used against him.

Q.   Would be, okay.

A.   But they could be used for him also.

Q.   Did you tell him -- I guess what I'm trying to find out is, did you tell him that the directions themselves could be used against him?

A.   Mr. Swerling, I can't recall whether I said -- I said that specifically to him.

Q.   All right.   But we do agree that statements, other than directions, you felt like were outside the course and scope and guidelines that you had set with law enforcement that day?

A.   Yes.   I did not intend on us giving any information other

JA 0839

A_43511

than directions.

Q. But during the course of the day certain statements were made prior to this hypothetical, correct?

A. Yes.

Q. And with respect to those statements that went outside the scope of directions -- for example, the purse strap --

A. Right.

Q. -- and the woods, some statements concerning the woods? Those were not directional statements; is that correct?

A. Well, the thing about the purse strap was that we were trying to assist them in giving them directions and honing in on the location where Ms. Donovan might be found.

Q. Okay.

A. So, from the standpoint of telling them about the purse strap, that was to try and assist in giving directions.

Q. Okay. Did you believe that that would be something that law enforcement could later use to incriminate Mr. Basham?

A. Mr. Swerling, I'm not sure. I mean, I relayed the information about the purse strap to Sheriff Hewett and to other agents.

Q. Did you have Mr. Basham's authority to do that?

A. Yes, I think so. Uh-huh.

Q. Okay. And there was -- I think Sheriff Hewett testified about -- that there was a statement about the body being taken to the woods somewhere; do you recall that statement?

JA 0840

A_43512

A.    A statement that came directly from Branden?

Q.    That's what he testified.

A.    I don't recall that statement.

Q.    Do you recall anything else being said, other than the purse strap, that you revealed or that Mr. Basham said in the car that would be something outside the scope of a direction?

A.    There were some things that Branden attempted to whisper to me during the course of our going down the road trying to find Ms. Donovan that -- I mean, there -- this was a very long day and we went hundreds of miles on the search, and so there were a lot of things that were said that were extraneous.  There were, you know, some things that were aimed toward trying to give directions.  As to your question about the woods, I don't quite understand --

Q.    If a statement had been made that she had been taken into the woods, I was asking you if you recall that statement?

A.    Mr. Swerling, not specifically in that -- I guess what I'm having a hard time -- in Branden's --

Q.    Whether you did or you didn't, that's all.

A.    Well, and Branden saying, "This is where we left her," I mean, we were talking about woods.  Because that's where Ms. Donovan was supposedly left, in the woods.

Q.    And again that was --

A.    So, that -- the woods came up all day.

Q.    That was directional as far as you were concerned?

A. Yes.

Q. What you thought was something that the government could use?

A. Yes, sir.

Q. Okay. And you conveyed that, as I understand that, to Mr. Basham?

A. That the directions would be --

Q. Yes.

A. I don't recall whether I specifically told him that, but I think that was -- it was understood. Because, I mean, that was the purpose of the whole trip.

Q. Okay. But you don't remember telling him, that's all I'm saying; is that correct?

A. I don't recall telling him specifically that.

Q. At some point now was it obvious to Mr. Basham -- this was an area, it was a rural area, country roads, correct?

A. Without a doubt.

Q. Okay. And you drove great distances, correct?

A. Yes.

Q. There were some things that looked familiar to him and other things that were not familiar to him?

A. Well -- yes. And some things that he thought were familiar were actually not familiar, because there was just such a sameness about the dirt roads and the pine trees and the woods. It just all kind of ran together after a while.

Q.   Okay.  At some point during the afternoon when you were sort of finishing up, did law enforcement approach you and say that, basically, "The search is over with, and unless we get some more information --"

A.   Yes, sir.

Q.   -- something -- words to that effect?

A.   Well, in essence they were saying Branden was not telling them the truth and they were calling off the search.

Q.   Okay.  And what did they ask you to do?

A.   Well, as I recall the conversation, I was -- I was pulled aside -- and I'm not sure whether Billy was in on all of this conversation or not.  The agents accused Branden of not -- of sending them on a wild goose chase.

And apparently -- I learned at that time that there was some direction he had given them to a place called Savannah Gardens or Savannah something, some area in Horry County that didn't pan out.  And one of the agents was very mad because he had been in the water up to his waist for a couple of days, and he was really mad.

But then the more important thing, they said that their forensic evidence that they -- their forensic examination they had done of Ms. Donovan's BMW did not corroborate what Branden had said, therefore he was lying.  Therefore, they were going to call off the search and they were going to end it right then.

Q. And that was that there was no blood found in the vehicle?

A. That was that there was no blood found in the vehicle.

Q. But that was something that had nothing to do with the conversations that you were having that day, that they were talking --

A. Correct. And as far as I remember, that was the first time that came up.

Q. Okay. So, that discussion didn't take place with law enforcement and Mr. Basham that day?

A. Up until that point, the thing about the no blood in the trunk had not come up.

Q. Okay. All right. So, what did they request that you do?

A. Well, it wasn't actually a request, it was -- it was, "We are calling off the search, that's it."

Q. Okay. So, what did you think about that? What did you --

A. Well, I knew that was Branden's only hope of possibly finding Ms. Donovan and hopefully helping himself. And so I had said, "Well, wait a minute, guys, let me -- you now, let me go see what the problem is."

So, I left the agents and Sheriff Hewett and I believe it's Chief Hendrick standing there at the cemetery area, and I went back to the van and had a discussion with Billy Monckton and Branden.

Q. Okay. Now, let me ask you this, based upon what had happened prior to that time and the type of questions that were

JA 0844

A_43516

being asked and the type of answers that were being given, they were asking for more details about actually what happened; isn't that about correct?

A. You are talking about at the point that I was confronted with Branden's lying?

Q. Yes.

A. Yeah, I would say that's a safe -- it was like, "He's lying to us, and unless you prove otherwise, we are calling this off."

Q. They were no looking for just directions, they wanted to know what had actually happened between Mr. Fulks, Mr. Basham, and Ms. Donovan?

A. Well, I was -- at that point, we had gotten off the directions only situation and we had gotten into the facts of what had actually happened.

Q. That's what I'm saying.

A. Yes.

Q. Okay. So, the guidelines or the parameters of what had been set out earlier in the day were changing, correct?

A. I guess you could say that, yes.

Q. Let me just, Your Honor, if I could, approach him.

You have seen this before, I believe, but this is, for example, the sheriff's report concerning the hypothetical that was presented.

A. Yes, I have seen this before.

Q. All right. So, the hypothetical that was presented was clearly in response to matters other than directions. They had to do with actually what happened during the course of the events when they were out there with Ms. Donovan; is that correct?

A. I would say yes. Yes, sir.

Q. Okay. Now, the reason I bring that up, to try to separate the two. At that time did law enforcement tell you that anything that you or Mr. Basham would tell them in connection with those questions and answers regarding the details of the events could be used against Mr. Basham in a court of law, or would be used against him to incriminate him?

A. No.

Q. Okay. And did you believe that any discussions you were having at that time would be matters or information that law enforcement could use against Mr. Basham in a court of law? Did you believe it would incriminate him?

A. Any conversations I had with agents?

Q. That you were having, that you would relay to the agents or that Mr. Basham would relay to the agents through you?

A. No, I did not. Because that's why I couched the whole scenario in terms of a hypothetical.

Q. Okay. So, my next question, logical question would be, did you tell Mr. Basham at that point that anything that he said at that point would be something that could incriminate him in a

court of law?

A.   No, because he wasn't going to say anything to the agents.

Q.   Okay.

A.   I was the one that was going to talk through a hypothetical.

Q.   Now, did you present him with a hypothetical or did you present it to law enforcement?

A.   I presented it to law enforcement.

Q.   Okay.  So, the hypothetical itself that was told to law enforcement was not presented to him first?

A.   That's correct.

Q.   Okay.

A.   Yes, sir.

Q.   So, he never authorized you to state the hypothetical?

A.   No.

Q.   Okay.  And you did not tell him that that hypothetical could hurt him in any way?

A.   No.

Q.   Because you didn't believe it could?

A.   That's correct.

Q.   All right.  And have you used hypotheticals before?

A.   Many, many times.

Q.   And the purpose of using a hypothetical is what?

A.   Well, you, in that scenario, as in other scenarios where you are talking to law enforcement, is you are trying to -- in

essence you are trying to negotiate something. You are trying to, you know, convince law enforcement that your guy is not as bad as they think he is. And so you use the hypothetical because you don't want your client to be talking to them directly at that point.

Q. And by presenting it in a hypothetical, you believe that's how you can accomplish that?

A. Yes. And I thought that was understood. Because I began that conversation by saying, "Okay, guys, let's say, hypothetically --"

Q. Hypothetically?

A. And then I went on to say "-- and I mean, hypothetically," because I remember specifically saying it twice to emphasize it.

Q. Okay. And you gave them a statement or hypothetical couched in your words?

A. Correct.

Q. Have you used -- you have used hypotheticals before. Has anybody ever taken a hypothetical that you have given and tried to use it against your client?

A. Never.

Q. Have you ever heard of a hypothetical being used against a client in your experience of 25-something years as a lawyer?

A. Not before this case, no.

Q. Okay. So, when you were speaking to law enforcement, there

JA 0848

A_43520

was no way that you believed that that hypothetical was something that would be used by law enforcement?

A. That is exactly correct.

Q. And they didn't tell you that? They didn't tell you they were going to try to either?

A. Right.

Q. Okay. And when I say "use it," I'm talking about in a court of law to incriminate Mr. Basham.

A. Correct.

Q. So, not only did you not understand and believe that that hypothetical would be used against Mr. Basham in any way, Mr. Basham would have never known that either because you didn't tell him that?

A. I never told him that.

Q. Okay. And you did give them a hypothetical?

A. Definitely it was a hypothetical.

MR. SWERLING: Okay. Excuse me one minute, Your Honor.

BY MR. SWERLING:

Q. When was the first time you became aware that the government was trying to use your hypothetical as a statement against your client?

A. Mr. Swerling, it would have been -- and I'm just guessing -- it would have been three or four weeks after that Mr. Schools called me and indicated there might be a problem

because of the statement that I had made on behalf of Branden. And at that time apparently he did not know that it was a hypothetical.

And I told Mr. Schools that it was a hypothetical. And he indicated -- his initial reaction was, he didn't think that would be a problem. And then later on we had a conversation, maybe a week and-a-half, two weeks later, something like that, and then he told me that he thought it was going to be a problem.

Q. Now, did any -- let me just ask you this in another way, and I probably did cover it already, but just to be sure. During the course of the events that you had meeting with law enforcement and Ms. Parham, and then meeting with law enforcement on Thanksgiving day, did anyone give you anything equivalent of Miranda rights, that what you said or what your client said could be used against him?

A. No.

Q. Did you give Mr. Basham any such type of warnings or anything that would have that information in it?

A. From the standpoint of his statements being used against him, no, I'm sure I didn't.

Q. All right. And did anybody in the government ever reserve the right to use whatever was being said during this attempt to help the government, reserve the right to use that against Mr. Basham?

JA 0850

A_43522

A.   Well, other than the directions?

Q.   The directions.

A.   Other than the directions --

Q.   Yes, I keep speaking of -- other than the directions, yes.

A.   No.

Q.   When you presented the hypothetical, was that a -- was it couched in terms of a statement, or was it couched in terms of a hypothetical, an ambiguous hypothetical?

A.   It was in terms of -- well, first off, I said it was -- twice I said this was a hypothetical.  And then I said, "Let's say it happened like this," and then I gave them some information.  And then later on I'm sure I said, "Let's say this happened," and then, you know, at the end it was "that that would account for why your forensic evidence says what it says."

Q.   One other question.  Did Mr. Basham, when you were in the van, ever authorize you to do any waiver of the attorney-client privilege?

A.   No.

Q.   Do you believe you ever did waive the attorney-client privilege?

A.   No.

Q.   Or not waive it -- did you ever -- do you think you ever went outside the attorney-client privilege and revealed something that you were not supposed to?

A. No. I mean, from the way I stated it as a hypothetical, no.

Q. That's what I'm saying.

A. No.

MR. SWERLING: Thank you.

THE COURT: Let's go ahead and break for lunch now. It's almost 12:45, let's break until 2 o'clock. We will come back and do cross-examination at 2 o'clock. We will be in recess.

(Lunch recess)

THE COURT: I apologize for the late start, we are trying to get all the technical bugs out of courtroom number 1 relative to the trial next week, and I had to have a meeting to try to deal with that issue, and I'm sorry we delayed you.

All right, I believe you were still examining the witness -- no, you had finished.

MR. SWERLING: I was done, Your Honor.

THE COURT: All right, cross-examination.

MR. GASSER: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. GASSER:

Q Good afternoon, Cam.

A. Good afternoon, Johnny.

Q. Let me start with Wednesday, November the 27th. You got called into the case by Judge Rogers; is that correct?

A. Correct.

Q. And the first contact that you had with anybody in authority, obviously other the judge, would have been Rose Mary Parham?

A. Correct.

Q. And when you contacted her, was that by phone, or did you actually go over to the federal courthouse there in Florence?

A. Mr. Gasser, I think -- I didn't contact -- I don't think I had any contact with Rose Mary until I got over to Florence that morning. Because I pretty well left directly from the house. Judge Rogers had called me at my home.

Q. And were you aware at that time that Billy Monckton had also been appointed?

A. Yes. Judge Rogers informed me of that.

Q. Now, you have been practicing law from 1975, I believe is what you indicated?

A. November 11th.

Q. And seven -- seven years you were an Assistant United States Attorney?

A. Seven years and three days.

Q. Okay. And it is fair to say that between you and Mr. Monckton, the conversations that were taking place with Ms. Parham that day, you were the lead attorney, if you will, for lack of a better description? I mean, you were kind of taking the lead?

JA 0853

A_43525

A.   That's -- it's hard to say.  Because Billy got there first and I really didn't -- I had never met Billy before.

Q.   Okay.

A.   But Billy got there first, and he had met with Rose Mary before I had gotten there, so he had more information than I did.  So, I can't say either one of us were really lead attorney or senior attorney or anything at that point in time.

Q.   But there is no question that when you got to Rose Mary's office, you and Billy and Rose Mary had a discussion about what was going to take place with Branden Basham the next day, on Thanksgiving day?

A.   Yes.

Q.   There is no question that Rose Mary Parham explained to you and Billy Monckton, she told you about the previous conversations that she had had with Mr. Hughes in Kentucky, correct?

A.   Yes.

Q.   In fact, that was the main -- or one of the main subject matters that you were discussing with Ms. Parham, was the fact that Branden Basham, according to his lawyer, Mr. Hughes, in Kentucky, wanted to come to South Carolina as quickly as possible so that he could go on the ground and help search for Ms. Donovan's body?

A.   Yes.

Q.   And Ms. Parham had indicated to you that that's what Mr.

JA 0854

A_43526

Hughes was telling her, correct?

A.   That's my recollection, yes, sir.

Q.   And Ms. Parham was wanting to make sure -- or one of the things she was going to want to make sure is, that Mr. Basham's decision or desire to assist law enforcement through Mr. Hughes was continuing when he got to South Carolina; is that a fair statement?

A.   I always tell my witnesses, "Make sure you understand the question before you answer it."

Q.   That --

A.   Do me again.

Q.   Let me rephrase it, I apologize.

A.   Thank you.

Q.   One of the things Ms. Parham wanted to make sure from you and Mr. Monckton, Mr. Basham's South Carolina lawyers, was that Mr. Basham's desire to search for Ms. Donovan's body was continuing, that when he got to South Carolina he still wanted to do that?

A.   Certainly.

Q.   Okay.  So, there was no question that you were told by Ms. Parham that it was Branden Basham, through his lawyer Mr. Hughes, it was Branden Basham who wanted to go on the ground and search for Ms. Donovan?

A.   That was my understanding, yes.

Q.   And also it was your understanding that Ms. Parham told you

that she told Mr. Hughes that there were no deals, no promises, and that the death penalty was still on the table; isn't that correct? That's what she told Mr. Hughes?

A. That was my understanding. Now, I don't -- what she told Mr. Hughes, I'm not sure.

Q. And she reiterated that to you and Mr. Monckton, that there were no deals, no promises for Mr. Basham's cooperation, and that the death penalty was still on the table?

A. There were no specific promises. We were told that if Branden did the right thing, then Columbia would do the right thing.

Q. Okay. Ms. Parham also told you that Branden had told Mr. Hughes where the body was. She told you that, it's one of the reasons why he was coming to South Carolina? The general location of where the body --

A. The general location, yes.

Q. And isn't it true that you and Mr. Monckton asked Ms. Parham what benefit would there be for Branden to cooperate? Do you remember asking then, "Well, what is the benefit for Branden to cooperate if there are no deals or no promises"?

A. That was the gist of the -- yeah, of the inquiry, right.

Q. And Ms. Parham responded by telling you, "Well, that's, you know, that's something that you might be able to possibly argue in mitigation. If it gets to be a sentencing phase, be a judge or a jury, that's something that you might argue in mitigation,

JA 0856

A_43528

that he cooperated." Do you remember her telling you that?

A. And it would be something -- yes, and it would be something that the U.S. Attorney's Office would consider in ultimately negotiating the outcome of the case.

Q. And she -- Ms. Parham also reminded you that Mr. Fulks also, Mr. Fulks was in Florence, and at one point in time he might decide to cooperate? Do you remember her talking about that as well?

A. Mr. Gasser, I don't recall that specifically. I don't dispute it.

Q. And there is no question that Ms. Parham told you that she had absolutely no authority to negotiate the death penalty, that that would come from higher up management in Columbia? There is no question she told you that?

A. Oh, there's no question. I mean, that was so early in the proceedings that -- she didn't represent that she had the authority to negotiate a plea in this case.

Q. So, one of the things that you wanted to do to insure -- after meeting with Ms. Parham, you needed to determine whether or not Mr. Branden Basham was willing, once he got to South Carolina, to assist law enforcement in the search for Ms. Donovan's remains, or her body?

A. True.

Q. And do you recall a conversation at the federal courthouse, in Florence, on the 27th, when Ms. Parham asked you, quote, "Is

JA 0857

A_43529

Basham still willing to help the agents locate the body?" And I believe your response was again, "Well, can we get anything for his cooperation?" Do you remember that, the gist of that conversation?

A. I don't remember those specific words, but that was the gist of the whole -- the whole conversation with Ms. Parham.

Q. And again, Ms. Parham indicated to you that, no, there was not going to be any kind of deals in exchange for his cooperation at that time?

A. At that time there were no deals, right.

Q. And I believe you and Mr. Monckton asked if you could get a proffer letter?

A. Mr. Gasser, I don't recall whether we -- whether we broached that subject or not.

Q. But you didn't get a proffer letter from -- Ms. Parham didn't offer you a proffer letter? You didn't get a proffer letter on the 27th?

A. Did not.

Q. And just so the record is clear, all of your conversations with Ms. Parham on the 27th really were dealing with what was going to happen the next day on the 28th, Thanksgiving day, if Branden Basham continued to want to cooperate and find the body, correct?

A. That was -- that was -- I can't say all of the conversation was about that. But, yes, I mean, we talked in general terms

about a lot of things, but that was the main thing we were talking about.

Q. And you, specifically you, told Ms. Parham that, at the federal courthouse in Florence on the 27th, you said, "Let me go talk to my client and I will try and get back in touch with you"? I mean, that was basically how that conversation ended, did it not?

A. Are you talking about the -- are you referring to the initial conversation? Because I met with Ms. Parham before I met Branden.

Q. Correct. And how -- when Ms. Parham did not provide you with a proffer letter, when Ms. Parham had indicated to you that the death penalty was still on the table and there were no deals, and that the only thing that could benefit your client is you could be able to argue later on possibly in mitigation, you obviously needed to go discuss all of that with your client, Mr. Basham?

A. Yes, I discussed -- I discussed what we were going to do with Mr. Basham, yes.

Q. And you told Ms. Parham that you would get back with her. Because, of course, if he decided to cooperate the next day, arrangements needed to be made by FBI, law enforcement, and that sort of thing?

A. I'm sure that's the way it happened.

Q. And later on in the afternoon on November the 27th, or

early evening, Ms. Parham received a phone call from you in her office in which you indicated that you will cooperate, meaning you and Branden Basham, and quote, "We will go help find the body"? Do you remember that phone call?

A. I don't doubt that happened, yes, sir.

Q. Okay. So, you initiated a phone call to Ms. Parham indicating, "I have had an opportunity to talk with my client, go ahead and make the arrangements for tomorrow, and we want to go help find the body"?

A. That's the way we left it on Wednesday the 27th, yes.

Q. Now, the next day, the next day -- well, let me just ask you this, Mr. Littlejohn, at that point in time in essence the government really was holding all of the cards but one, and that is -- I mean, the card that you held was whether or not you were going to allow Branden Basham to go in the van and search for Ms. Donovan's body. That was really the only card that you held; is that a fair statement?

A. I don't know that I would use that analogy. I mean, that was something that, you know, was in the mix of discussing the case with Ms. Parham, yes.

Q. You didn't have a proffer letter, correct?

A. That's correct.

Q. You were told that there were no deals?

A. At that time, yes.

Q. No promises could be made to you?

A.   At that time, yes.

Q.   The death penalty was still on the table?

A.   At that time, yes.

Q.   And that the most that Branden Basham could -- the best thing that he would have going for him would be if he cooperates, and useful information that benefits him comes out, and he could use that in some sort of mitigating factor; that's basically the card that you had, was it not?

A.   That was the approach we were using, yes.

Q.   And as a lawyer you had to advise -- I don't want to know what you -- but you had to advise your client, and you advised Mr. Basham about your conversations with Ms. Parham, did you not?

A.   After I spoke with Ms. Parham I spoke with Mr. Basham.

Q.   Okay.  And of course, you discussed it with Mr. Monckton?

A.   Yes.

Q.   So, it was not only your decision and Mr. Monckton's decision, but it was Branden Basham's decision as well to go on the ground in the Brunswick County area on Thanksgiving day to search for Ms. Donovan's body, that was his decision?

A.   Well, without going into any specifics of what was said, yeah, he -- that was -- that was what we understood we were going to do that day.

Q.   As a lawyer you wouldn't have -- I say any client, not just Mr. Basham -- if any client had made a decision not to go to

JA 0861

A_43533

Brunswick County, you wouldn't have forced a client to do that, would you?

A. Well, Mr. Gasser, there are certain things you can -- you can advise your client to do. But, I mean, obviously we -- we went up there with Branden, and Branden tried to point out where Ms. Donovan's body was.

Q. Okay. I believe on direct examination with Mr. Swerling you had indicated that you saw -- and correct me if I'm wrong, but I wrote it down -- you saw three potential benefits: one, it might end up helping you down the road in plea negotiations; two, that you might -- there would be evidence that you might be able to present on Branden Basham's behalf at a trial; and three, that it might help actually find Alice Donovan's remains?

A. Correct.

Q. So, one of the -- you knew, did you not, Mr. Littlejohn, that one of the benefits that you thought that might come out of the November 28th decision to have Branden Basham in the van searching for Ms. Donovan's body, is that any statements that were made or any evidence or information that was obtained might be able to benefit Branden Basham later on at a court proceeding?

A. The fact that he directed them to where the body was, yes, sir.

Q. And let me go get -- let me just get right into that so the

JA 0862

A_43534

record is clear on that.

It's your testimony that it wasn't a one-way, unilateral street, so to speak, that whatever came out, whether it helps him or hurts him, was admissible?

A. Insofar as the directions, yes.

Q. I just want to make the record clear on that. If you advised Branden, and Branden Basham voluntarily provided information with regards to directions and other information dealing with where certain evidence might be or where the body might be -- and he voluntarily provided that information to law enforcement in your presence?

A. Okay, I'm not sure -- I think I lost your question there.

Q. In your presence Branden Basham voluntarily provided information to law enforcement, as to where certain evidence or where Ms. Basham's body might be?

A. Yes.

Q. And it was your understanding and Branden Basham's understanding that whatever information he was providing could be used against him either to his benefit or to his detriment, depending on what happened there that day?

A. From the standpoint of his giving directions to where Ms. Donovan's body might be located, yes.

Q. There is no question that was your understanding?

A. Yes. Of course, we started that day by saying that we wouldn't be giving any statements other than the directions.

JA 0863

A_43535

Q. And there was no question that was Branden's understanding, because you talked to him about that?

A. I feel certain he understood that.

Q. In fact, I believe you indicated on direct examination clearly the fact that directions -- clearly the fact that directions that he made would be used against him, this could be used against him or for him, I believe was one of your responses to Mr. Swerling's questions? Do you recall that?

A. I believe that's what I said, yes, sir.

Q. And you encouraged Branden Basham to do just that, to provide information with regards to directions?

A. Yes.

Q. And I guess it's quite obvious that if your purpose out there was to try and help Branden Basham, then clearly it was your understanding and Branden Basham's understanding that whatever transpired out there would be admissible, either being offered by you or by the government, from a directions perspective?

A. From the directions perspective, yes.

Q. Now, you had indicated on direct examination that there was a situation involving information regarding a purse strap in relation to directions.

    In other words, information about a purse strap came out and, of course, you needed to direct or somebody needed to direct law enforcement where they might find that purse strap,

JA 0864

A_43536

that potential piece of evidence.  Do you recall that?

A.   Yeah, I recall that very well.

Q.   Okay.  And you indicated that you provided law enforcement with information relative to the purse strap, you provided that to law enforcement?

A.   Correct.  Because the situation was such that if the purse strap was found, then that would lead to a point where Branden was sure something had happened and would assist in directing law enforcement to Ms. Donovan's body.

Q.   And I believe there were many occasions that afternoon, during the several hours that you were in the van, that you would have consultations with Branden?  He would whisper something to you and you would whisper something back to him?

A.   Yes.

Q.   And part of that dealt with the purse strap issue, did it not?

A.   Mr. Gasser, I'm sure it did.

Q.   Okay.

A.   I mean, I couldn't dispute that, yes, sir.

Q.   And you even acknowledged on direct examination that you had his, meaning Branden Basham's authority, to tell law enforcement about the purse strap.  "I had his authority to do so"?

A.   From the standpoint of the purse strap, yes.

Q.   So, would it be fair to say that any statements that

JA 0865

A_43537

Branden Basham made in the van, in your presence, to law enforcement, concerning where the body was possibly located or where certain evidence was possibly located was fair game, it's admissible?

A. I would have to say that's a correct statement.

Q. And such things as where the body was, where the purse strap was, where the stake in the ground was that he cut his leg on, where certain signs were, animal signs, where the cemetery was, where the rape occurred, as far as location, all of that was information relative to directions because law enforcement wanted to know where that evidence may be or where those actions occurred, correct?

A. Well, you have thrown a couple of things in there that weren't really part of the directional process.

Q. Well --

A. The strap, the stake, yes, those were things that were used to assist in finding Ms. Donovan's body.

Q. Well, where the body was, clearly that's the whole purpose of why you are out there. So, any statements as to where the body might be when he is driving down the road, I mean, that's directional, is it not?

A. True. But you said where the rape happened and something else that I didn't -- I didn't quite catch all of your question there, but --

Q. The signs. You remember discussions about animal signs?

JA 0866

A_43538

A.   You said something about animal -- oh, the actual --

Q.   Yes, sir.

A.   -- road signs, yes.

Q.   And he was trying to lead you -- from a directional perspective, he was trying to lead law enforcement to a particular cemetery because that's where the rape occurred, do you recall that?

A.   Well, that's where some of the events occurred, yes.

Q.   Okay.

A.   He was using the cemetery as kind of a point in reference to where Ms. Donovan's body was.

Q.   And as a lawyer you know that -- I mean, as a lawyer you know that you did not have a proffer letter out there in your possession on November the 28th, correct?

A.   That's correct.

Q.   And so if Branden Basham would have blurted something out, spontaneously as a lawyer and as a trained lawyer, that would be admissible against him?

A.   It would depend -- I mean, it would depend on the specific circumstances.  I mean, if he was saying something to me, then argument could be made that that was a privileged communication and he spoke too loud.  And I was trying to avoid the whole situation, okay?

Q.   In fact, there were many occasions when he did speak to you and whisper to you, so that only the two of you could

understand each other, correct?

A.   Sure.

Q.   And there were other occasions when he was talking out loud the way I'm talking right now to you, or asking you questions?

A.   Nobody talks like you, Mr. Gasser.

Q.   He was -- he was -- maybe in a less tone.  But he was -- he was providing information in your presence to law enforcement?

A.   Certainly.  He was giving directions.  I mean, he would say, "This road looks familiar, or the tree lines look like it ought to be this distance from the road," or what have you.

Q.   And law enforcement gave you and Mr. Monckton -- any time that Mr. Basham wanted to have specific privileged or communication with you or Mr. Monckton, law enforcement allowed him to do that?

A.   That only happened a couple of times.  But, yes, I think certainly, they would have accommodated us.

Q.   In fact, one of the things the sheriff showed you at the beginning of these events, Sheriff Hewett showed you some photographs that he wanted to use in this questioning and answer session with Branden regarding directions, he showed you those photographs, correct?

A.   Right in the beginning of the search.

Q.   And you indicated it was fine, he could use those photographs in questioning your client with regard to directions?

A. Sure.

Q. Now, with regards to what happened at the end of the day, you went into -- you and Mr. Monckton went into the van and had a privileged communication with Mr. Basham; is that correct?

A. That's correct.

Q. And you did so after law enforcement had indicated to you that they felt that he was not being truthful, as a result of certain information that they already had, including certain forensic?

A. That's correct.

Q. When you had this conversation with Mr. Basham and you exited the van and provided a hypothetical to law enforcement, did you have authority from Mr. Basham to provide that information?

A. Specific authority? Mr. Gasser, I don't know if I can divulge my conversation with Mr. Basham at that time.

Q. I don't want you to.

A. I don't want to.

Q. I wanted to know whether or not after you had your conversation with Mr. Basham, after being told what law enforcement told you about their feelings and what their position was as to what had transpired that day, after that -- don't tell me what you discussed with Mr. Basham -- but after that, and you made the decision as Mr. Basham's lawyer to go out and provide this hypothetical scenario to law enforcement,

did you have Mr. Basham's authority to provide that

hypothetical to law enforcement?

A.   I don't know that I specifically asked him for authority to

do that, no.  Because I was presenting a hypothetical that I

didn't think would -- I didn't think it would be called into

question to the extent that it has been.

Q.   Well, let me ask, do you agree that -- and I'm going to --

Mr. Swerling showed you, I believe, one of the pages of Sheriff

Hewett's report, do you recall Mr. Swerling showing you that?

A.   Yes, sir.

Q.   And I'm just going to publish parts of it, and I'm just

going to ask you generally whether or not this is what you

recall hypothetically telling the sheriff.

          "That Fulks, after slitting the victim's throat in

the woods, gave the knife to Basham who put the knife under his

leg until Fulks told him to throw it out the car window, to

which he did.  That after she was strangled with the pocketbook

strap, she was put in the trunk of the car.  That she was raped

here and died here in the cemetery, she was put in the trunk

and taken to a dumping area."

          THE COURT:  Slow down a little bit, if you would, for

the court reporter.

          MR. GASSER:  I'm sorry, Your Honor.

BY MR. GASSER:

Q.   "She was partially clothed, that her pants were removed but

JA 0870

A_43542

her shirt was still on.  Her clothes were later thrown into a dumpster, that Fulks finished her off with Basham's pocket knife.  That she was dead when she was in the trunk.  We drove to an area and took her out of the trunk and dragged her into the woods, covered her with limbs and leaves."

Does any of that at least generally ring a bell as to what was part of your hypothetical that you provided to law enforcement?

A.  Generally, yes.  And it was, of course, a hypothetical.  And I don't know that I phrased it like that, but --

Q.  Let me ask --

A.  -- that's generally correct.

Q.  Let me ask you this, if law enforcement, after you provided that hypothetical, would have found forensic evidence in Ms. Donovan's car consistent with that hypothetical, you would have wanted Mr. Basham to get credit for that, would you not?

A.  Well, you are -- as I understood it, they had already found forensic evidence consistent with that, which was the absence of blood.

Q.  But if law enforcement would have found forensic evidence, blood on the knife, her clothes in the dumpster that Branden claimed that they were thrown in, her body underneath limbs and leaves, if law enforcement would have found forensic evidence that was consistent with the hypothetical that you provided law enforcement after having this discussion with your client in

the van, you and Mr. Monckton would have wanted -- either at a guilt stage or a penalty phase -- wanted Mr. Basham to get credit for that?

MR. SWERLING: Credit for what? Credit for the information or the discovery? What do you mean?

MR. GASSER: Both.

A. Okay. First off, I would have expected the government to present that evidence had this case gone to court, regardless of whether it would have been consistent with what the hypothetical was or not.

So, I don't know that I made that distinction, that the hypothetical was consistent with the forensic evidence, therefore it helped Branden. Because I would have expected that forensic evidence to come out in a very thorough presentation like the government was going to make.

BY MR. GASSER:

Q. I understand that. But you also -- you and Mr. Monckton also would have wanted a jury, particularly during the sentencing phase, you would have wanted a jury to know that the government never would have found that evidence without the assistance of your hypothetical?

MR. SWERLING: I again have to object. I think the question is the location, that's what Mr. Littlejohn has focused on. Mr. Gasser keeps talking about the evidence, but Mr. Littlejohn said -- certainly he wanted to have credit for

the location being discovered, but not the evidence.

THE COURT:  Do you want to rephrase the question?

BY MR. GASSER:

Q.  And I apologize if you are not understanding my question. But I understand that the whole purpose out there was to try and find the location of Alice Donovan's body, and you wanted him to get credit for that if he found the body, there is not question about that, correct?

A.  I think your -- yes, but your question seems to be my anticipation that my hypothetical was going to be introduced into evidence.  And I never thought it would be introduced into evidence so that it would be corroborated by the forensic evidence, or maybe I totally misunderstood your question.

Q.  My question is, and I apologize if you don't understand the question, but I think it's pretty -- the information that you provided in your hypothetical, if that scenario would have been forensically proven to be the truth, that scenario, that hypothetical scenario that you provided to law enforcement after meeting and having a discussion with your client Branden Basham, would you and Mr. Monckton have wanted Mr. Basham to have gotten credit for the fact that he provided that information to law enforcement?

MR. SWERLING:  Judge, he's already said several times that what he wanted him to get credit for was locating the body.  He said that the hypothetical, the information he gave

A_43545

in the hypothetical he never thought was going to be coming into evidence. I think that's clear.

THE COURT: I think he's done the best he can to try to answer your question.

MR. GASSER: Well, I just think it's an easy question to answer, it's either -- it's a yes or no. I mean, it's the heart of -- this is the heart of whether or not this court is going to have to decide whether or not the information that was provided in the hypothetical is also fair game. And so that's -- I mean, I think the -- I'm not talking about the location of the body, I'm done with that, I have moved on from that.

THE COURT: About whether he should get credit for the information, not to locate --

MR. GASSER: Yes, sir.

THE WITNESS: Okay. You are asking me if I anticipated him to get credit for the information that was in the hypothetical if it turned out to be proved true.

I never anticipated the hypothetical going anywhere beyond that cemetery lot in Brunswick County on that day.

BY MR. GASSER:

Q. So, it's your testimony that if in fact law enforcement would have found forensic evidence, based on the hypothetical that you provided, and that they would have found evidence that was consistent with Alice Donovan being killed, or any evidence

JA 0874

A_43546

being thrown out consistent with your hypothetical, you would not have expected any reward for either you or Mr. Monckton with regard to plea negotiations?

THE COURT: That's a fair question. Overrule the objection. Try to answer that if you can.

A. Mr. Gasser, I don't know that I thought it out that far. I mean, I was giving them a hypothetical, which I didn't expect to -- to go anywhere from there.

BY MR. GASSER:

Q. Why provide the hypothetical?

A. Why provide the hypothetical?

Q. Yes, sir.

A. Because they were accusing my client of lying, they were going to end the search right then and there because they didn't think he was telling the truth. I knew that was the only chance that Branden would have to participate in the search, and therefore I didn't want them to stop. Because if there was a chance he could find Ms. Donovan's body, I wanted him to avail himself of that opportunity.

Q. So, you provided the hypothetical in anticipation or because you wanted the search to continue, because in your mind you felt that that would at least give an opportunity to benefit Branden Basham?

A. Yes, sir.

MR. GASSER: Beg the court's indulgence.

Thank you, Your Honor, that's all I have.

THE COURT: Any redirect?

MR. SWERLING: Nothing further, Your Honor.

THE COURT: Thank you, sir, you may step down.

THE WITNESS: I'm excused?

THE COURT: You are excused.

Any additional witnesses from the defendant?

MR. SWERLING: No.

THE COURT: Anything in reply by the government?

MR. GASSER: Beg the court's indulgence.

MR. SCHOOLS: We don't have any further witnesses on this issue, Your Honor.

THE COURT: You don't intend to offer Ms. Parham to tell what she knows about this alleged promise?

MR. SCHOOLS: Your Honor, Ms. Parham disputes the notion that she said Columbia will do the right thing. But it's our position, it's set forth in our various memoranda on the disqualification issue, that that really has no relevance.

That even if she said that in conjunction with her refusal to issue a proffer statement, a proffer letter, I don't know how anybody could construe "Columbia will do the right thing if he found the body" to be some form of protection for the statements that were going to be made on the 28th. So, if it's an issue that's important to Your Honor to resolve --

THE COURT: It is important to me, really. It really

is.

MR. SCHOOLS: Okay, we'll call her.

MR. GASSER: We call Rose Mary Parham.

THE CLERK: Ms. Parham, please come forward to be sworn. Place your left hand on the Bible and raise your right hand. State your name for the record.

THE WITNESS: Rose Mary Parham.

ROSE MARY PARHAM, SWORN

DIRECT EXAMINATION

BY MR. GASSER:

Q   Ms. Parham, you are an Assistant U.S. Attorney?

A.   I am.

Q.   How long have you been with the U.S. Attorney's Office?

A.   Almost five years.

Q.   I want to draw your attention back to November of 2002. Would you just briefly tell the court how you became involved in the situation involving Branden Basham, Chadrick Fulks, and the Alice Donovan case?

A.   FBI Agent Clyde Merryman called me and told me that we had had a kidnapping, possible murder, out of the Myrtle Beach area. And I called Columbia, and I was the AUSA that was handling the case at the beginning.

Q.   Specifically I want to draw your attention to Monday, November the 25th, and Tuesday, November the 26th, were you aware that after Mr. -- well, first of all, let me ask you

JA 0877

A_43549

this.

Were you aware after Mr. Basham's arrest on November the 17th that he was providing information to law enforcement, both without counsel and with counsel? Were you aware of that, Ms. Parham?

A. Yes. The week before he came to South Carolina, I had received a call from his attorney, Richard Hughes, and spoke with him. Mark Moore was present in my office. And Mr. Hughes had talked about the possibility of Mr. Basham cooperating, and wanted to know what we could offer him. And I told him nothing.

And there was some discussion with Mark Moore and Dick Hughes about whether there would be a proffer. But ultimately we continued to call one another and told Mr. Hughes there would be no proffer, and that the death penalty would be on the table. And so then he said he would talk to his client.

I knew that Mr. Basham had given two different statements at that point. And on Monday or Tuesday, Mr. Hughes called me back and asked again if we could give him anything, and I said no. And then he said, well, he just wanted to get out of the jail there, and could we arrange for him to come to South Carolina. And I said yes.

And he said he thought that if we could arrange for him to come to South Carolina, his client would continue to debrief and try to find the body.

JA 0878

A_43550

Q. Richard Hughes, Mr. Basham's lawyer, told you that on the phone on either the 25th or the 26th of November?

A. That's right.

Q. When Mr. Hughes indicated to you that if you could get Mr. Basham out of Kentucky and to South Carolina, he would assist in attempting to locate the body, were there any deals with Mr. Hughes at that point?

A. No.

Q. Were there any promises at that point?

A. No, we told him there were none.

Q. Any conditions?

A. No.

Q. Any proffer letters faxed to him or sent to him?

A. No.

Q. And was the death penalty on or off the table?

A. It was on the table. Well, the only condition was that we get Mr. Basham on an airplane to South Carolina.

Q. Did you then do whatever -- did you instruct the FBI to do whatever it took to quickly get Mr. Basham from Kentucky to South Carolina?

A. Yes.

Q. What was your understanding, Ms. Parham, after you had these talks, these phone conversations with Mr. Hughes? What was your understanding, if nothing changed, what was going to happen when Branden Basham got to South Carolina?

A.   That he would continue cooperating.  But before he got on the plane, he started debriefing with Jeff Long on the telephone with Mr. Hughes present.

In fact, Mr. Hughes told me about knowing where the location of the West Virginia body was, and told me he would tell me the location once Mr. Basham got on the airplane.

And I asked him if he would go ahead and tell me that afternoon, because we were sure that we were getting Mr. Basham to South Carolina.  And so he went ahead and told me the location on the phone that afternoon before Mr. Basham got on the plane.

Q.   And where was that?

A.   It was -- he said that they placed her body in the water -- under the bridge between Gallipolis and Huntington, West Virginia.

Q.   And now you are talking about Samantha Burns?

A.   Right.  He also told me about knowing the location of the body here in South Carolina -- I mean, North Carolina.

Q.   Of Alice Donovan?

A.   Right.

Q.   So, despite the fact that it was your understanding that part of the reason why Branden Basham was being flown to South Carolina was to search for Ms. Donovan's body in North Carolina, did you know as a lawyer that once he got to South Carolina he was going to have to get two South Carolina

GARY N. SMITH, CM
COLUMBIA, SC

**JA 0880**

A_43552

attorneys?

A. Yes.

Q. And did you actually participate in his appearance before a magistrate, Federal Magistrate Judge Rogers?

A. Yes.

Q. And was that on the 27th, I believe the day before Thanksgiving?

A. It was on a Wednesday, I think.

Q. And who -- you were aware that Mr. Cam Littlejohn and Mr. Billy Monckton were appointed by Judge Rogers --

A. Yes.

Q. -- for Mr. Basham?

A. Yes.

Q. And were you present during those hearings as well?

A. Yes. The two of them came to my office before the hearing.

Q. Did you have an opportunity to meet with Mr. Monckton and Mr. Littlejohn?

A. Yes.

Q. Did you tell Mr. Monckton and Mr. Littlejohn all about the conversations that you had had with Mr. Basham's lawyer, Mr. Hughes, in Kentucky?

A. Yes.

Q. Did you make it totally clear about what you and Mr. Hughes had discussed with regards to what Mr. Basham was willing to do?

JA 0881

A_43553

A.   Yes, I told them everything that I knew about the case up to that point.   I even told them the facts of the three different statements that Mr. Basham had given to that point.

And I also told them that he had started drawing maps, but that Jeff Long wasn't able to operate on that, and that we had hoped when he got here he was going to physically take them to the body.

Q.   Now, did the situation with regard to deals or promises, did that change from the time Branden Basham was in Kentucky and had Mr. Hughes as his lawyer, did that ever change sometime between the 25th or 26th or 27th when you were discussing the situation with Mr. Littlejohn and Mr. Monckton?

A.   No.

Q.   Were there any deals with Mr. Monckton and Mr. Littlejohn?

A.   No.

Q.   Were there any promises?

A.   No.

Q.   Was the death penalty on or off the table?

A.   On the table.

Q.   And who requested a proffer letter?

A.   Well, I don't know which one of them first.   I told them about my conversations with Mr. Hughes, and I told them that Mr. Hughes asked for a proffer and we said no.   And so Billy Monckton said, "Well, what's our deal, Rosemary?" and kind of laughed.   And I said, "Well, it's the same deal."

JA 0882

A_43554

And he said, you know, "Why can't we have a proffer?" And I told him, because we didn't want any problems down the road making derivative use of anything, and we just weren't going to give him a proffer.

Q. Did you indicate to Mr. Littlejohn and Mr. Monckton that you and law enforcement wanted to take Mr. Basham up on his desire to search for Ms. Donovan's body?

A. Yes.

Q. And when Billy Monckton asked you, "Well, what benefit would it be to me or what benefit would it be to my client?" do you recall making some statement about "possibly in mitigation you could argue --" do you remember?

A. Yes.

Q. And would you explain that to the court?

A. Well, I just told them that it might be mitigating at sentencing if he had helped locate the body or any evidence.

Q. Did you remind Mr. Monckton and Mr. Littlejohn that the co-defendant was already in Florence, and that at any point he could decide to start cooperating?

A. Yes, they knew that. They also -- I told them about -- they also mentioned trying -- that they wanted to talk with Mr. Hughes.

Q. They didn't do that in your presence though, correct?

A. No.

Q. Did you make it clear to Mr. Monckton and Mr. Littlejohn

A_43555

that you, Assistant U. S. Attorney Rose Mary Parham, had absolutely no authority to plea bargain deal this case out?

A. Yes, I told them --

Q. That would come from where?

A. Columbia. I told them that even the press calls were going through Columbia.

Q. Now, you had an opportunity through these court proceedings to see affidavits filed by Mr. Littlejohn and Mr. Monckton; is that correct?

A. That's right.

Q. In fact, you filed one. The government attached an affidavit that you had sworn to in one of its motions; is that correct?

A. That's right.

Q. Ms. Parham, did you ever indicate to Mr. Monckton or Mr. Littlejohn something to the effect that if they were to assist in locating Ms. Donovan's body that, quote, "Columbia would do the right thing"?

A. No, I did not.

Q. Now, when you left -- or that meeting, the purpose of the meeting -- or one of the main purposes of the meeting with Mr. Littlejohn and Mr. Monckton was your desire to see if Mr. Basham was going to -- was willing to go on the ground in Brunswick County, North Carolina, the next day, on Thanksgiving day; is that a fair statement?

JA 0884

A_43556

A.   That's right.

Q.   And did you need to know that on Wednesday, obviously, so that you could get the ball rolling?

A.   Yes.  I continued to ask them after the hearing if their client wished to go out with law enforcement, because that had kind of been arranged with Mr. Hughes.  And they said they would have to talk to their client and they would get back with me.

Q.   Ms. Parham, was there any doubt in your mind that when Mr. Littlejohn indicated that he needed to go discuss all of this with his client, that at that point in time there were no deals, no promises, no proffer letter, no concessions whatsoever on behalf of the government?

A.   There is doubt about that.

Q.   And then later on in the afternoon of Wednesday, November the 27th of 2002, do you recall receiving a phone call from Mr. Littlejohn?

A.   I believe it was from Mr. Littlejohn.  I'm not sure whether it was Mr. Monckton or Mr. Littlejohn, but I believe it was Mr. Littlejohn.

Q.   And you were where when you received that call?

A.   Yes.

Q.   You were where?

A.   In my office.

Q.   And what did Mr. Basham's lawyer tell you?

A. That they wanted to cooperate, and that he would leave the next morning and help law enforcement locate the body.

Q. And did you pass that information on to FBI Agent Long so that they could start coordinating the efforts on the ground in North Carolina?

A. I did. And we were going to have to get some type of approval to get him out of marshal custody, and we had to spend a lot of time doing that.

Q. And so at that point in time, Ms. Parham, was it your understanding that whatever transpired on November the 28th was fair game, is that a -- did you understand that statement?

A. That's right.

Q. That was your understanding?

A. That's right.

Q. Did you make that clear to Mr. Littlejohn and Mr. Monckton?

A. Yes.

MR. GASSER: Beg the court's indulgence.

BY MR. GASSER:

Q Ms. Parham, are you familiar with the capital case unit in Washington, D.C.?

A. Yes.

Q. Are you familiar with the attorney general's review committee on capital cases?

A. Yes.

Q. Does the Columbia office even have the unilateral authority

A_43558

to take the death penalty off the table?

A.   No.

Q.   Not Mr. Thurmond?

A.   Right.

MR. GASSER:   That's all we have, Your Honor.

THE COURT:   Cross-examination.

MR. SWERLING:   Yes.

CROSS EXAMINATION

BY MR. SWERLING:

Q.   Hey, Rose Mary.

A.   Hey.

Q.   Of course, you knew that, that it was run from Washington, but you didn't communicate that to Mr. Littlejohn and Mr. Monckton?

A.   I don't believe I did.

Q.   Okay.   Let me just ask you a couple of questions.   I know your position is, you did not make that statement, okay.   You did tell them, though, what you knew from the prior statements that Mr. Basham had made, what information the government knew at that point?

A.   I did.

Q.   Okay.   Did you tell it to them when they were together?

A.   I did.

Q.   And you did say that it could be used in mitigation down the road if the body was discovered?

JA 0887

A_43559

A. Well, they asked me why would they want to cooperate, and I said it might be mitigating down the road.

Q. Might be mitigating?

A. Uh-huh.

Q. Okay. There was a discussion you said about the proffer, but when you went out -- when they went out the next day -- first of all, in him coming to South Carolina and then going out the next day, basically everybody was looking for a location as to where the body was?

A. That's right.

Q. Okay. And the purpose of them all meeting with the agents the next day, Mr. Littlejohn, Mr. Monckton, Branden Basham, meeting with law enforcement, was to go ahead and search for the body?

A. Yes.

Q. The purpose was not to go ahead and take any statements from Mr. Basham?

A. Well, I mean --

Q. Correct?

A. I didn't -- I thought that he would be showing them along the way where the body was.

Q. Right. But not to go ahead and take any statement? You weren't anticipating, outside the scope of him assisting them in finding the location, that he was going to be interviewed that day?

A. No. But I thought he would make statements about what they did, what they did along the way. I mean, I just -- that would be my assumption but, you know --

Q. Did Mr. Littlejohn and Mr. Monckton tell you that they did not want him interviewed that next day, that it was their purpose to not have him interviewed?

A. No.

Q. Are you aware of the fact that that's what they told the law enforcement officers?

A. No.

Q. Okay. But you didn't have any discussion with -- I guess what you are saying is, you didn't have any discussion with Mr. Littlejohn and Mr. Monckton outside the fact that he would be going the next day to assist them in a search?

A. That's right.

Q. There was no discussion, according to what I understand you are saying, as to what information Mr. Basham might provide?

A. Right.

Q. Or whether or not he would give a statement or answer questions to the agents; is that correct?

A. Right.

    MR. SWERLING: Excuse me one minute.

BY MR. SWERLING:

Q. I think it's pretty obvious, but you have no idea what was in Mr. Littlejohn's mind and Mr. Monckton's mind when they left

JA 0889

A_43561

the office?

A.  No.  But I know that I made it clear to them that they could not -- they asked for a proffer, not only before the hearing but after the hearing, and again on the telephone with me.  I mean, they asked for that three different times.  And so for them to think that anything was going to be protected, I can't imagine that they could possibly have thought that, because it was very clear.

Q.  And, of course, you don't know what they related to their client?

A.  No.

MR. SWERLING:  That's all I have.

THE COURT:  Anything further?

MR. GASSER:  No, sir, Your Honor.

THE COURT:  I don't have any questions.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  You may step down and you are excused.

Any more evidence on this particular statement at issue?

MR. SCHOOLS:  No, sir.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

JA 0890

A_43562

I N D E X

| WITNESSES | DE | CE | RD | RC |
|---|---|---|---|---|
| JEFFREY LONG | 5 | 31 | 51 | |
| RONALD HEWETT | 55 | 73 | | |
| WILLIAM H. MONCKTON (BY THE COURT - 126) | 96 | 109 | 130 | 133 |
| CAM B. LITTLEJOHN | 135 | 156 | | |
| ROSE MARY PARHAM | 181 | 191 | | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_Gary N. Smith_

Gary N. Smith  CM

3-1-04
Date

GARY N. SMITH, CM
COLUMBIA, SC

JA 0891

A_43563

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,      )        Cr. No. 4:02-992
                               )
                               )
VERSUS                         )        Columbia, S.C.
                               )        February 26, 2004
CHADRICK E. FULKS and          )
BRANDEN L. BASHAM,             )
                               )
                               )
        Defendants.            )
-------------------------------)

MOTIONS HEARING


BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Appearances:

For the Government:        STROM THURMOND, JR., ESQ.
                           U.S. Attorney for South Carolina
                           SCOTT SCHOOLS, ESQ.
                           JONATHAN S. GASSER, ESQ.
                           Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
                           Columbia, S.C.  29201

For the Defendant          JOHN H. BLUME, ESQ.
        Fulks:             KEIR M. WEYBLE, ESQ.
                           1247 Sumter Street, Suite 202
                           Columbia, S.C.  29201

                           SHERI LYNN JOHNSON, ESQ.
                           Cornell Law School
                           Myron Taylor Hall
                           Ithaca, NY  14853

                           WILLIAM F. NETTLES, ESQ.
                           Assistant Federal Public Defender
                           401 Evans Street, Room 240
                           Florence, S.C.  29503

GARY N. SMITH, CM
COLUMBIA, SC

JA 0892

(Appearances continued:)

For the Defendant          JACK B. SWERLING, ESQ.
        Basham:            1720 Main Street
                           Columbia, S.C.  29201

                           GREGORY P. HARRIS, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

Court Reporter:            Gary N. Smith, CM
                           901 Richland Street
                           Columbia, S.C.  29201
                           (803) 256-7743

              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION


* * * * * * * * * * * * * * * * * * * * * * * * * * *

THE COURT:  All right, before we begin let me just give you a little bit of information.  At 11:45 last night I received a telephone call to tell me that my securities fraud case had settled in full.

So, I no longer have that added -- I won't call it a distraction -- but I don't have that conflict that dictates my schedule in terms of trying this case.  And what I would like to do is, since I won't be in trial now is ask you to come back next week when those test results come in and let's decide the motion for continuance at that time.

Mr. Schools, now what day is that?

MR. SCHOOLS:  They promised them by the end of next week, so we would need to do that the week of the 8th, I think if we could, Your Honor.

THE COURT:  Well, they promised them to you by the

end of January, too.

MR. SCHOOLS:  Well, what they told us in January is they were going to do the best they could.

THE COURT:  All right.

MR SCHOOLS:  When we talked to her on the phone from -- I think we were in West Virginia about two weeks ago -- she said that she felt comfortable representing to us that she would absolutely have them by the end of the first week in March.

MR. GASSER:  Judge, just so the record is clear.  I say this, I was going to wait, I know you were rushing to get a lot of these motions heard yesterday afternoon.

But I know one of the times that Mr. Blume had indicated that about giving -- the court providing incentive for the government to get on the lab to get these test results, I tell you as an officer of the Court, Your Honor, that I have been -- I have been on the phone with these analysts since the -- actually before the first of the year.  I have even used I guess some sort of judicial license in explaining to them how much the court has been on our back, just trying to --

THE COURT:  I wanted you to be able to quote me.  I mean, I was trying to help you.

MR. GASSER:  Well, I have been.  And one of the things -- and I find it interesting -- one of the things that the analyst told me was that they are doing everything that

they can, but they have to -- their internal rules are that cases that are -- whose trial dates are before April the 19th -- and, of course, 50 percent of the work they do is federal work and 50 percent of the work is for state and local prosecutors.

And the cases that -- they only have a certain number of instruments that does the DNA --

THE COURT: All right.

MR. GASSER: -- so they have got to put these on certain instruments, they only have a certain number of instruments. And they are mandated to use these instruments for cases that have forensic work whose trial dates are before April the 19th, which leads me to believe there are federal prosecutors and state prosecutors and criminal defense lawyers and experts for criminal defense lawyers that are capable of dealing with this issue quicker than we are.

THE COURT: I understand that. And, of course, in a minute Mr. Blume is going to stand up and say, "But, Your Honor, you have got to understand this is a death penalty case." But I understand, I understand the constraints you are operating under, I'm not faulting anybody.

MR. GASSER: Thank you.

THE COURT: But I would like to suggest we come back on Monday the 8th, and hopefully the test results will be back and we will know whose blood, if any, it is and whose semen it is, and then we can try to decide on a trial date and try to

decide the dual jury issue. Any problem with that?

MR. NETTLES: Your Honor, I have one question. I would just like to know if on the end of the first week in March if there is going to be a report generated by the lab. I think there's been some discussion as to whether or not they are going to give us the results but not deliver a report until absolutely everything is done.

And when we inquire of experts, of course, they are going to want to see the report, and that's going to impact what they can tell us. So, we would like to have a report from the lab once these things are done. It doesn't help us -- it does help us to know the results, but the report is essential, Judge.

MR. SCHOOLS: Judge, the report -- the report has to be written and then vetted through various experts at the FBI before it can ever be issued by them. So, we don't expect to have a report -- we may be able to get a draft report, I don't think so, but we may be able to get a draft report on much of what has been done.

THE COURT: What is in the report that is not in the lab results?

MR. SCHOOLS: I don't know.

THE COURT: I mean, either it's defendant A's blood or defendant B's blood or blood that we cannot identify.

MR. SCHOOLS: That's right.

THE COURT: And then what would the report say over and above that?

MR. SCHOOLS: Nothing. I mean, they have seen the reports, they identify --

MR. NETTLES: I think the report would tell us what type of DNA analysis they used. We are certainly going to want to know that, or our experts are going to want to know that.

THE COURT: All right.

MR. NETTLES: They are going to want to know what their protocols are, they are going to want to know what their controls are, all of those type things. So, we are going to need that, Judge, before -- before our experts. So, it's not just having the results, we need a lot more information to give to our --

MR. SCHOOLS: I mean, the issue of whether they are entitled to the protocols is a whole separate issue, they are not entitled to all of that. If their experts need to take the test and -- they need to do the test, then we can debate all that later.

THE COURT: All right. Well, we are all groping in the dark here. Let's just wait -- let's come back on the 8th at 9:30.

MR. SWERLING: Judge, I have a problem with the 8th, because I'm supposed to be in a trial in Abbeville, a state grand jury trial, starting on Monday. Maybe if the court

might --

THE COURT: Well, Mr. Harris might just have to cover for you.

MR. SWERLING: Okay. I mean, that's fine.

THE COURT: I mean, this -- how old is that case in state court?

MR. SWERLING: All I -- well, it's not that old, but it's set for a date certain. Perhaps if, you know, your office would call Judge --

THE COURT: Well, I get requests from your office and other people all the time that, "I'm in a death penalty case, Judge Anderson, and you need to excuse me from this bank robbery trial," and I always defer to the death penalty case.

MR. SWERLING: What I'm trying to say, Judge --

THE COURT: I'm not trying to pull rank, but I'm just saying, I have a death penalty case now and I think it ought to be top priority.

MR. SWERLING: Judge, I don't have any problem with that. What I was suggesting maybe is your office could call Judge Johnson, if he had a problem with it, just to let him know or verify that it's a death penalty case.

THE COURT: In the episodes I have cited, the judges haven't called me, the lawyers have told me, "I have got a death penalty in Jasper County." And I say, "That's enough said, I defer to the death penalty." All right, we are going

to have the hearing at 9:0 on the 8th of March.

MR. BLUME: Judge, I don't have a problem with the date, if I could ask one question for clarification?

THE COURT: Let me just say, I'm not asking if anybody has a problem with the date, I'm telling you when the hearing is going to be conducted.

MR. BLUME: Okay, I'm sorry. It was just a point of inquiry about whether the date -- my only question was, and I only said that to indicate that that was not my problem, is everything is going to be done by then or just the DNA? There are other things ongoing, and that was my question.

MR. GASSER: Your Honor, the DNA is what's driving this. I can tell you right now from a trace perspective, as I indicated before, there is no -- that we do not have any clothing items of either one of the victims.

And so from a trace perspective, there is nothing relevant from a trace perspective. There is just -- when we don't have the victim's clothes, the only thing that would be relevant would be having the victim's clothing items from a trace -- if we knew that clothes that they had -- on some of the defendant's clothes, but there is just -- there is nothing relevant from a trace perspective.

THE COURT: All right.

MR. GASSER: And even that being said, they have been conducting a significant number of trace analysis simply

because it's there, simply because it was requested to be done.

And as far as fingerprints are concerned, we have already notified them that there are fingerprints of both Mr. Basham and Fulks of certain items in the car. We have also notified them that the results on more relevant items, like the knives that were found or any type of -- or a belt, something that could be used as an instrument of death, we have already told them that none of the -- neither Mr. Basham's or Mr. Fulks' fingerprints were found on any of the items that were collected that could be considered instruments of death.

Now, to the extent that more fingerprints are found on other items, it takes any fingerprint expert less than five minutes to look at a fingerprint to determine whether or not that is one person's fingerprint or not one person's fingerprint.

So, to the extent that they are using fingerprints as some sort of means to request a continuance, the government's position is that that is just not relevant.

THE COURT: All right. Well, let me just say this, I told my lawyers in the securities fraud case about halfway through the day Monday, I started keeping a log in the year 2000 of every case I tried. I have not yet had one case that we have meted up, brought into the jury and tried the case, without somebody trying to use a late exhibit or a late

witness. It just happens every time.

And so I started preaching that sermon -- and I especially want to say it in this case -- it's going to have to be something very unusual for me to let either side use something late in the game that hasn't been disclosed.

And so all I'm saying is, the government needs to cough up everything that you intend to use. And I think some of the requests they have been making are fairly reasonable in terms of the protocol and things such as that, but we can talk about all of that when we come back on the 8th.

Mr. Blume, I mean, that's all I can do is say, "Give them everything you can," and we will look at it on the 8th and see what's there.

MR. BLUME: I wasn't complaining, I was just -- my only question was, I know some things have been sent recently in the last few weeks, it was just merely a question was all, is everything -- is everything going to be done by the end of next week or not? It was really just a question more than -- it wasn't an attack, it wasn't --

THE COURT: Well, I thought you were standing up telling me about a conflict you had, why we couldn't do it on the 8th. And I'm just saying -- and I'll just repeat it -- I have been a judge 17 years, and I have at least once or twice a year scheduled something and a lawyer stand up and says, "Judge, I'm in a death penalty case and I need protection."

And I always say, "Be my guest. You don't need to say another word, the death penalty case takes priority." This is now a death penalty case that's 14 months old, it needs to take priority, is all I'm saying.

MR. BLUME: No, no, I agree with that, and I'm happy for you to hear it on the 8th. It was really just a question to the government, "Is everything going to be done by the end of next week or not," that was all --

THE COURT: Well, I'm going to get impatient myself. The government wanted me to try this case last November.

MR. SCHOOLS: Judge, if we had tried it last November, the FBI would have had the results when we needed them. And the problem there, we are all in, is that they operate based on trial schedules in a busy lab with limited instruments.

THE COURT: All right. All right, let's move forward now. Now, let me say, on the matter of the statements yesterday that I took under advisement, as I understand it, the objection is to the hypothetical statements giving details of the alleged murder? The objection does not relate to the directions that Mr. Basham gave to try to find the body; is that correct?

MR. SWERLING: That's correct, Judge.

THE COURT: All right.

MR. SWERLING: But during the day, if you will

recall, there was testimony concerning the government wishing to use statements other than just mere directions.

THE COURT: Right. Now, what about the spontaneous -- the testimony I heard about the spontaneous testimony or statement, "I have never killed a deer but I have -- I can't believe I have," dot, dot, dot?

MR. SWERLING: Well, I would object to that also.

THE COURT: All right, that's what I want to find out, what's the basis for that objection?

MR. SWERLING: Well, the basis of it first of all is it was never finished, so it's speculative as to what he was trying to say.

THE COURT: Well, it's circumstantial evidence, I mean, pretty -- all right, go ahead.

MR. SWERLING: Well, I'm just -- outside of the issues yesterday -- but it -- I know, because it is spontaneous, there was testimony that was spontaneous.

But, number one, it's speculative as to what it meant. And when you weigh that against the probative value, I think the prejudicial effect kicks in and outweighs the probative value, especially when you don't know what he was trying to say.

THE COURT: Well, I'm probably going to disagree with you on that. I mean, it wasn't couched in hypotheticals, he had been Mirandized, he had a lawyer there. It is

inconclusive, but it's pretty powerful evidence. They were out looking for a body, a deer runs across the road, and he says, "I have never killed a deer, but I can't believe I have --" unfinished sentence.

And so I'm asking the government, assuming that comes in, assuming the directions to find the body comes in, do you really want to take a chance on ineffective assistance of counsel to get all of these, quote-unquote, hypothetical statements in?

MR. SCHOOLS: Your Honor, yes. And ever since we have -- because we don't think that's a risk. And ever since we filed this motion, when we filed our motion for disqualification and when we talked about it yesterday, we think that competent counsel representing Mr. Basham today could very well want that statement in evidence. Because what it does is, it directs -- it names the actual killer as this defendant's co-defendant.

THE COURT: Right.

MR. SCHOOLS: Well, many lawyers might think, "I absolutely want that in front of the jury because I don't want my client to testify, I don't think my client is going to testify, but by doing this I can get my client's statement in that the co-defendant is the actual killer. And when I argue to the jury what Branden Basham's punishment could be, I want to make the argument that he's not the actual killer without

having to put him on the witness stand." Competent counsel could make that assessment. They are not, and that's fine.

THE COURT: All right.

MR. SCHOOLS: But on the same token, you are looking at an analysis of ineffective assistance of later down the line based on Mr. Littlejohn's communication of this information to law enforcement. It is more than plausible that he did exactly what 95 percent of the lawyers in his same shoes would have done, with the possible exception of some belief that that evidence shouldn't be used against him.

THE COURT: All right. Well, I didn't really want to -- or, Mr. Swerling, I didn't want to bog down on this. I'm going to take it under advisement.

MR. SWERLING: I wanted the record to reflect, we are not going to seek to introduce that. I just -- he said competent counsel could --

THE COURT: Right.

MR. SWERLING: -- these counsel are not going to --

THE COURT: You made a decision not to do that.

MR. SWERLING: Right. And I don't think -- I can't imagine that Cam Littlejohn ever would have even made that statement had he thought it was going to be admissible.

THE COURT: All right. All right, now, let me say there was testimony about what the word "hypothetical" means in legal circles. If either side wants to file a memorandum on

that or any affidavits on that, you may do so.

I'm not saying that you have to, but the testimony was -- well, I guess Mr. Swerling suggested that it's a commonly used term when lawyers are talking to prosecutors and want to say things that cannot be attributed later.  If either side wants to file an affidavit from other practitioners or something, you may do so.

MR. SWERLING:  Judge, I will do that, I will be glad to do that.  Will you give us some time to do that, to gather --

THE COURT:  I'm going to take it under advisement, I've got it under advisement.  10 days, 10 days be enough?

MR. SWERLING:  That will be fine.

THE COURT:  All right.

MR. SCHOOLS:  Your Honor, just a couple of points on that.  One, with respect to -- everything before the hypothetical, Mr. Littlejohn acknowledged that all of that stuff was provided for purposes of helping to locate the body. So everything that Mr. Basham said, other than that one spontaneous utterance we have talked about, everything that he said prior to the hypothetical was directional.

The line -- this line that apparently Mr. Swerling is trying to draw, and even that Mr. Littlejohn may have been trying to draw, concerning the subject matter of any statements made prior to the hypothetical and whether they are admissible

based on their subject matter, is absurd.

They had asked for a proffer, they didn't get it. But for the hypothetical, this is an easy question on the admission of that stuff. And I think Mr. Littlejohn acknowledged that virtually everything, with the exception of that spontaneous utterance that was said prior to the hypothetical, was said by Mr. Basham in response to questions, or a direction from law enforcement, in an effort to locate the body, and that's what that was all about.

THE COURT: Right.

MR. SCHOOLS: So, I don't know if there are other statements occurring before the hypothetical that Mr. Swerling is contending should not be admissible, because they were non-directional, but that's just -- that's just coming out of total thin air, the notion that that -- any statement he made prior to the hypothetical could not be admissible.

THE COURT: All right. Well, one thing that I'm still not clear on, when we were talking about earlier statements, before we got to the search on the Thanksgiving Day, the government kind of glossed over what the statements were because they weren't that important and I didn't hear the real substance. And I still don't know how much of this subject that was said hypothetically is cumulative to what was said in earlier statements.

MR. SCHOOLS: Not very much of it, Your Honor.

THE COURT: Not very much of it is cumulative?

MR. SCHOOLS: No, sir.

THE COURT: All right.

MR. SCHOOLS: The information, for example, how Ms. Donovan -- the extent to which she was clothed, that's all new. There was information concerning the -- how the ultimate injury occurred, that she was stabbed. There was some information that she had been cut.

And, again, Agent Long's version, and I think which is consistent in some ways with Agent -- with Sheriff Hewett's version, that she was actually cut in the trunk of the vehicle is important, and that stuff is not cumulative.

THE COURT: All right. Well, let me say, I would like for y'all to order a transcript of the testimony I heard, on at least this statement that I have taken under advisement, because I need to look at that testimony very carefully. All right?

Well, let's move on then to the motions.

MR. SWERLING: Judge, just to respond to that. As far as the hypothetical is concerned, I think just that they are making a statement that it's not cumulative, what's cumulative and what's not is not sufficient. My recollection is that the extent to which he described that she was cut and how she was cut and her rape, those are not cumulative. So, that's very damaging evidence in that last --

THE COURT: That's what I'm saying. Well, if it was cumulative to something that was said earlier, which was a clearer call about it being admissible, I would maybe keep it out because it was cumulative, is what I was trying to get at.

MR. SWERLING: Okay.

THE COURT: If it was cumulative to an earlier statement that didn't have this hypothetical aspect to it, I might say, "Well, you don't need it because it's cumulative." But apparently it's not too cumulative.

MR. SWERLING: I just don't know that they -- I don't know if they presented testimony as to what was cumulative or not. That's what I'm saying, the record --

THE COURT: Right, right. And see, I didn't hear -- y'all are much more deep in this case than I am, I didn't hear the substance of some of those earlier statements, the earlier interviews by the agents before this Thanksgiving Day search that I already ruled would be admissible.

All right. We were just going through the motions in no particular order. There's a motion by the defendant to preclude or limit victim impact evidence. The Supreme Court has kind of zigzagged on this in recent years.

Mr. Blume.

MR. BLUME: Yes, Your Honor. We understand that the Supreme Court has said that victim impact evidence is generally -- or is admissible in some forms and some

circumstances in capital cases. Well, actually what the Supreme Court held is that there is no per se constitutional bar to the admission of victim impact evidence.

The federal death penalty statute does allow for the admission of victim impact evidence, but it gives very little guidance as to the method or the form of proof or how that can be offered.

We have -- in our motion we have requested some notice and we have requested some procedures for the regulation of victim impact evidence. The government has responded, and has indicated that they intend to notify -- give us some type of notice.

I think really the rub here is -- or the issues that are in dispute between the parties is how much notice, when, and also having to do -- and also what type of -- sort of -- they have referred to as the preview, and I might not even necessarily quibble with that -- of the victim impact evidence.

We think we are entitled to notice of what these people are going to say, and certainly, you know, they are going to testify. Primarily because, one, just from my experience -- Mr. Swerling may have a different set of experiences -- but victim impact evidence is problematic on two fronts. It inevitably contains an amount of hearsay in it. It's just the way that people talk about it, or other material which is objectionable.

On the other hand, it is virtually impossible -- I mean, I have done it on one or two occasions, but it's extraordinarily difficult to object to the evidence in front of the jury.

THE COURT: I was looking -- let me interrupt. I thought in one of these motions you suggested that it be done on video, but I don't see it in this motion. Is that in a different motion on --

MR. BLUME: It is, it's in the victim impact motion. It's the last section of it.

THE COURT: All right.

MR. BLUME: Or that it be done in that regard. But regardless, we do contend that we are entitled to know what the evidence is going to be and to either hear it outside the presence of the jury or to have a written proffer of it.

The government's main objection --

THE COURT: Maybe the thing to do is, if we get to that point -- I don't like the idea of video -- but maybe at least have some type of hearing while the jury is away and try to set some guidelines and parameters as to what's proper.

MR. BLUME: The government is objecting to that -- I'm sure they will make it, but I just want to respond to it, it's in their pleadings -- that would give us, you know, an unfair preview of what the victim impact evidence was going to be, is what their pleading says, in that regard.

I don't think that's true in the sense that regardless of what these individuals say, the likelihood that we are going to cross-examine them about any -- normally, you don't want to give a preview because, you know, you don't want to give the other side how to plan their cross-examination.

Regardless of what it is, it's unlikely we are going to cross-examine them either at all, or in anything more than a perfunctory matter. I think what it would allow us to do is to lodge any objections that we might have to it, and have the court rule on it ahead of time, so we are not put in a position where we have to maybe waive some of the defendant's rights, because, you know, we are in the position of -- it's sort of uncomfortable when a victim is up there to say, "Your Honor, we object," and plead to have the jury taken out and do it -- so, that's really I think the nub of our contention here.

THE COURT: All right, and Mr. Basham joins in this motion?

MR. HARRIS: (Nods head in the affirmative).

THE COURT: All right, Mr. Schools.

MR. SCHOOLS: Judge, all of this presumes that we as government attorneys and prosecutors who are trying to get a death penalty verdict we can preserve on appeal in the Fourth Circuit, are going to attempt to offer evidence that walks close to this line.

The Fourth Circuit Court of Appeals has said they

have never seen a case where there is too much victim impact evidence. Well -- that's in U.S. versus Barnette. They have never seen the case that was reversed because too much victim impact evidence was put in the notice.

The reason they would really need notice of events that would be occurring during the aggravating phase of this case is so that they can prepare to cross-examine witnesses, to suggest that we can't police ourselves or -- if we don't police ourselves, we suffer the consequences of our failure to do that such that we are going to create a whole lot more work for the government, for the court, for everybody, so that we either have to bring the victims in here and let them testify before the guilt -- before the aggravating phase, or we have got to prepare some document setting forth, "This is precisely what Barry Donovan is going to say about how he misses his wife," is absurd.

I just can't -- Mr. Blume stands up and says, "I think we are entitled to this," but he hasn't mentioned a case that says they are entitled to it. And we as government prosecutors and officers of the court have every incentive in the world to try this case within the confines of the constitution and the law, and we intend to do that.

And to suggest that we have got to be -- preview every bit of evidence that we are going to offer so that he -- so the defense has the luxury of deciding whether or not they

object before the jury is here is just -- we are going to break down --

THE COURT: You don't have a problem with telling them who the victim impact witnesses will be, do you?

MR. SCHOOLS: No, sir.

THE COURT: Do you know that now? I don't guess you do.

MR. SCHOOLS: Well, I know primarily it's going to be Mr. Donovan, obviously, I think two of Ms. Donovan's sisters, and probably her daughters would testify in regard to victim impact. Now, that is just who I think it will be, and then it may change, but initially that is what our belief --

THE COURT: Just the immediate family?

MR. SCHOOLS: Yes. And a co-worker.

THE COURT: Immediate family and a co-worker?

MR. SCHOOLS: Yes.

THE COURT: And so you resist any suggestion that there should be a dry run, so to speak, or a video or a written prediction?

MR. SCHOOLS: It's just busy work, Judge. I mean, it's -- and to suggest -- you know, under Payne versus Tennessee when the argument was that victim impact testimony -- or testimony about the characteristics of the victim should not be admitted in evidence, what the Supreme Court says is, these tables are getting awfully far skewed in favor of defendants in

these cases.

And I believe, based on the nature of these crimes, Your Honor, that the court should certainly afford these defendants every legal and constitutional thing that they are entitled to. But for gosh sakes, no more. They don't deserve more protection than the law is entitled to -- than the law affords them.

And it's just unfathomable that because of the nature of the case all of a sudden the defense has the opportunity to preview all of our evidence and decide before we ever put it on whether to object or not. We don't do that in any proceeding, ever.

THE COURT: Well, I had one habeas case recently out of state court where there was an issue about victim impact, that the prosecutor in his closing argument invited the jury to compare the life of the victim, which was, you know, a good member of the community, et cetera, et cetera, with the life of the defendant, who was like a street person or something, and there was a little bit of problem with that. There was some law on that, in other words. You can't ask the jury to compare the lives of the two.

MR. SCHOOLS: We would never do that. I mean, Your Honor, we are reading every death penalty case there is out there, we are reading cases on closing arguments. We are just not -- we have no incentive to get a conviction that the Fourth

Circuit is going to kick.

There is no desire to do that at all, that's why we are providing all this discovery. That's why we are taking all the care we are doing in trying to make sure that they get every document that we have as soon as we can get it, so that this is a fair trial. We agree that they are entitled to that. But they are not entitled to better than that, and I think that is what they are asking for.

THE COURT: All right, Mr. Harris, Mr. Swerling, anything?

MR. SWERLING: No, sir.

THE COURT: Mr. Blume, anything in reply?

MR. BLUME: I would point out that it's not like what we are asking for here is completely unprecedented. I mean, there are other federal district court judges in other federal capital cases have required -- not every judge, but, I mean, there -- and there certainly is a discrepancy in what they -- some variation in what they have required.

The courts have required notice -- more detailed notice than just who the witnesses are in victim impact cases for the reason -- and it's not -- we're not asking them to put up every single witness in the sentencing phase, but, you know -- and I'm not suggesting necessarily that they are going to ask an improper question.

But I can just tell you it is a difficult area, it

is -- and these people are naturally -- I mean, you know, they are upset, they have suffered an incredible tragic loss in their lives, and they are going to want to talk about that, and the law requires that to a degree.

But I think some notice of what they are going to say is not burdensome, it's not unreasonable, and it is certainly within the court's discretion, and other courts have required it.

THE COURT:  Well, let me say this, it appears to me that this is one of those motions that I can better assess once we get into the trial and I get a feel for the case.  So, what I'm going to do, I'm going to deny the motion without prejudice.

And if we get to a penalty phase, we will have a little break in there, and I will decide based on what has happened up to that point whether we need some type of preview or advance showing or abbreviated presentation of what the victim impact evidence will be.

I think the government is right that the Supreme Court has indicated and the Fourth Circuit has indicated that it's not required.  But I'm going to deny it without prejudice I'm not slamming the door on it, but we will revisit it at the appropriate time.

Okay, we have the motion to strike and/or limit the aggregating factors.  Both defendants made essentially the same

motion.

MS. JOHNSON: Yes, Your Honor. We have made a number of objections to the aggravators. And as it turns out from the government's response, some of those objections may have arisen from a misunderstanding. That is, they list aggravators and then they list things under the aggravators, many of which are quite problematic.

And the government's response has suggested that these are not all aggravators, they are really only the statutory aggravators, future dangerousness and victim impact. And that is just fine, provided that the government does not expect Your Honor to instruct them on those subsets of aggravators.

What the response says is, "Well, you could explain to them that these separate things are not actually separate aggravators," but if you present them separately, read each one of them, the clear impression is to weight the scales making it appear to be 10 aggravators instead of three.

So, certainly it's not duplicative if Your Honor does not read those, they can argue each of the ways, themselves, that these aggravators are --

THE COURT: You just object to it being in the jury charge, in other words?

MS. JOHNSON: That's correct, Your Honor.

THE COURT: All right, now, what about that, Mr.

Schools?

MR. SCHOOLS: Well, it's a moving target, so this is the first time I have heard about it. But I think generally, Your Honor, what we are concerned about is that the evidence get in front of the jury with respect to the information that is set forth in the death penalty notice.

And our position is that it is evidence of aggravating -- three aggravating factors, three non-statutory aggravating factors. One is that they committed other uncharged acts during the course of these crimes, which would involve the shooting of Mr. Hawkins and the shooting of Carl Jordan and events like that that occurred in the 14-day two-week period that was part of the crime spree.

With respect to Mr. Fulks and Mr. Basham, future dangerousness is another non-statutory aggravating factor. We intend to offer evidence in Mr. Fulks' case, for example, that he abused a three year old boy.

We intend to offer evidence that he was involved in an armed robbery in the summer prior to his being incarcerated, and just prior to his escape in this case. So, we do intend to offer that evidence as reflected in our response to their motion and in the death penalty notice.

Now, it is true that our characterization in our response is that each of those individual acts is not in itself an aggravating factor, but it is evidence of the aggravating

factor under which it is listed in the notice.

So, I think generally we don't need you to instruct the jury -- we want the court to tell the jury that there are three non-statutory aggravating factors, and only three. And so whatever -- you know, I'm not sure exactly how Ms. Johnson wants you to charge the jury, but we are in agreement on that part.

THE COURT: Are you satisfied if I say there are three --

MS. JOHNSON: Yes, Your Honor.

THE COURT: -- charged non-statutory aggravating --

MS. JOHNSON: With respect to the claims, that they are duplicative. Now, we have some other matters that we want -- we objected to, for example, the statutory aggravator of murder for pecuniary gain.

THE COURT: All right. Well, let's get --

MS. JOHNSON: But with respect to that --

THE COURT: Have we got this resolved then, as long as I tell the jury there are three allegations of non-statutory aggravating factors, and then all these other things are subparts of those three?

MS. JOHNSON: Yes, Your Honor. I mean, I want to object to some of those -- whether the evidence with respect to some of those should come in, but I have no objection to the phrasing of them.

THE COURT: All right. Well, how are we going to mark this motion then on the non-statutory? Should I say it's moot because the parties have resolved it?

MS. JOHNSON: Well, the problem is that the motion has several parts to it.

THE COURT: All right, well, let's go on to the rest of it then.

MS. JOHNSON: Okay. If you would like me to address the statutory aggravator first?

THE COURT: All right.

MS. JOHNSON: Okay. The statutory aggravator, this is one of the two that is left, so we don't dispute the first one is murder for pecuniary gain. And there is no evidence in this case that the murder itself was committed for pecuniary gain.

Now, the position of the government is, you should wait and decide this until having heard the evidence. And if what Your Honor would like to do is postpone the decision until the end of the guilt phase, I guess we have no objection to that.

But we do have an objection to instructing the jury ahead of time that there is an aggravator being alleged of murder for pecuniary gain, when in fact we believe there is no evidence -- and they have claimed they have an open file -- there is no statements by anyone that the murder was so

motivated. And the two cases that resemble this, Bernard and Chanthadara look almost identical on these facts.

Now, perhaps they will have, you know, some snitch testimony that says that that was the -- I guess we cannot know that that is the case, but absent any such indication, there is no -- no reason to believe this murder was committed for the purpose of pecuniary gain. And so we don't think the jury should be -- they should be permitted to argue that to the jury, or that you should instruct them that before the penalty phase.

THE COURT: All right, I understand your motion.

What about that, Mr. Schools, this is not a murder for hire case. You say the stealing of the car and -- I mean, they could -- the defendant could steal someone's automobile and steal their credit card and steal their cell phone, and gain something of value without murdering the person. I mean, I'm not sure I agree with you that the two are tied together.

MR. SCHOOLS: Well, I think there are multiple interpretations of the evidence that the court will hear. And as a practical matter, all of the evidence on this factor will be presented in the guilt phase of the trial.

So, the court can rule on it post guilt phase without -- without fear that there is anything that is going to happen in the aggravating stage that would cause you to change your mind and therefore --

THE COURT: It's certainly admissible at the guilt phase.

MR. SCHOOLS: Yes, sir.

THE COURT: The alleged acts are admissible at the guilt phase.

MR. SCHOOLS: And, Your Honor, I think in our memorandum, we clearly distinguish Chanthadara and Bernard. And what's different about those cases is that the defendant did first of all maintain custody of the victim's vehicle after killing her.

And we know that they maintained custody for a relatively lengthy period of time. Mr. Fulks had that vehicle for six days after she was dead. And he needed a car, he didn't have a car, that's the only car he had. And his permanent possession of that car -- there is an interpretation of the evidence certainly that his permanent possession of that car was dependent on his killing Alice Donovan.

Second of all, they also used her ATM card after she was killed. They used her ATM while she was alive, but they also used it after she was killed. We also expect to present evidence from witnesses in West Virginia that Mr. Fulks attempted to sell that car in West Virginia after killing Alice Donovan. So, there is evidence that would suggest that the murder was motivated for his pecuniary gain.

And one thing that is different about this case

versus Chanthadara and Bernard is, these defendants were on escape status, so it's not as if they could go get a job.

So, when we say that they continued to use her ATM card or they tried to sell her car to obtain funds, they needed subsistence. They had to have money to continue their crime spree, and to continue their free existence, such as it was.

So, their position as escapees makes their motivation for these crimes entirely different from individuals who are not otherwise incarcerated.

And in both of those other cases, Chanthadara and Bernard, all of the pecuniary acts, to the extent there were any, and in Bernard there really -- there was an effort to get money that was unsuccessful, but then they burned the vehicle, they never had custody of the vehicle after killing the victims in that case.

So, it's clear that those cases are distinguishable. And what those cases don't say is that the pecuniary gain aggravator is limited to murder for hire cases. It says that in effect there might be circumstances in which a murder committed during a car-jacking or an armed robbery was for the purpose of --

THE COURT: I think this is one I'm going to have to take under advisement and go read these authorities. I have had a lot of stuff to read in the last three weeks, and this is pretty important. So, let me -- I'm going to take it under

advisement. Anything else you want to say?

MS. JOHNSON: Yes, Your Honor. I just say again that, you know, if you want to delay this until the end of the guilt phase, we don't have a problem with that so long as it isn't read to the jury before you make a decision about that.

MR. SCHOOLS: We would actually join in that request.

THE COURT: All right. Well, we will just defer this one until the guilt phase is over. And then if there is a verdict of guilty on phase one, I will have to decide this at that time.

MS. JOHNSON: And then I wanted to speak about the future dangerousness aggravator.

THE COURT: All right.

MS. JOHNSON: The government maintains that they are not limited to demonstrating future dangerousness in prison, but given Mr. Fulks' history of escape that they can also argue that he would be a danger outside of prison.

Your Honor, I think any understanding of the escape in that situation, a comparison of the federal facilities, really makes that truly a boogeyman. I don't believe that they are really claiming that there is a risk that Mr. Fulks is going to escape from federal custody, and to suggest to the jury that he will do so --

THE COURT: Isn't that a question for the jury to

decide, though? I mean, isn't that -- that's a good argument, but isn't that for the jury to sort out, whether they would be dangerous in federal prison in the future?

MS. JOHNSON: Well, certainly whether they can be dangerous in federal prison is a completely appropriate matter.

THE COURT: You are asking me to decide as a matter of law these two gentlemen cannot escape from a federal prison. I don't know if they can or not. I don't know.

MS. JOHNSON: I think that given that they will be in federal prison for the rest of their lives, it does inject an unnecessary matter.

Now, if Your Honor wants us to present a lot of testimony about the security in federal prison, I suppose that we could do that. But I think that really is injecting an issue that is really nothing more than a boogeyman. That was the first thing I wanted to say about that.

The second thing is that this list includes some problematic items. They wish to present evidence that Mr. Fulks escaped from a juvenile facility. Mr. Fulks did this when he was 15. It was not escape, he was walking back from school and failed to walk back to the juvenile facility and instead walked away. This is not the level of offense that is appropriately considered as an aggravator.

Similarly, they also list forgery and marijuana use as previous crimes that indicate future dangerousness. These

are just not of the level that the jury ought to be considering as weighing toward death.

And finally, the government also uses drug and alcohol use during the crime. And what I would like to point out is, that that use, the Supreme Court has been clear, is mitigating evidence, and one cannot convert something into an aggravator by simply calling it that.

Now, it's certainly true that one could also say that about mental retardation or child abuse, for that matter, that makes a person dangerous in the future. But that doesn't make it permissible to argue that that would be a basis for the jury to find that.

THE COURT: All right. Mr. Schools.

MR. SCHOOLS: Your Honor, of course, one of the differences with respect to that last argument is that people don't inflict themselves with mental retardation, people do inflict themselves or ingest alcohol or other substances on their own.

We expect the evidence to show that after the defendants had killed two people, Samantha Burns and Alice Donavan, they traveled back to Beth McGuffin -- to West Virginia, met up with Beth McGuffin, and bought a bunch of methamphetamine and cocaine and crack and smoked it.

Well, we think it's very relevant to the jury's assessment of their lack of remorse and their lack of

rehabilitative potential, that having killed two people that their level of remorse is to have a party.

So, I understand that under some circumstances, alcohol use might be mitigating, if the defendant is an alcoholic and the defendant commits crimes during the course of an alcohol binge or something like that, then they could argue it's mitigating.

But at the same time, there is no evidence that I'm aware of that these defendants are addicts. They had been in custody, both of them, for a period of time prior to their escape, during which presumably they didn't have access to narcotics, with the exception of the drugs that Mr. Basham used to hoard in prison.

But there really is a difference between suggesting that someone with an alcohol disease who commits acts of violence under the effects of that disease, that may be mitigating. Where in this instance, we have got evidence of defendants going to a party after they have killed two people, and that's just a total different thing.

It's lawyer arguing. I think they -- if they want to argue it's mitigating, they can. But it's our position that in fact evidences a lack of remorse and a lack of rehabilitative potential. It is certainly relevant to the issue of future dangerousness.

With respect to the prison issue. When Mr. Harris

and Mr. Swerling had in fact requested discovery with respect to the nature of the Federal Bureau of Prisons and the escape statistics and those types of things, when I contacted the Bureau of Prisons regarding their request in that regard, I was surprised to find out that they have a person who works for the Bureau of Prisons who deals with these discovery requests. Because that's what defendants do in death penalty cases, is they suggest to the jury that the defendant can't escape and that therefore this whole future dangerous issue is of no moment.

However, they do that by presenting evidence of that, and these defendants have that right. But that certainly doesn't accord them the right for us to not talk about future dangerousness. Because as Your Honor has noted, you won't make some sort of judicial notice assessment that they can never escape from prison.

Not only did the defendants escape -- I mean, they are on escape status now. So, it seems like even in a case where a defendant was on the street and committed crimes, that issue might -- that argument might be more pertinent than for defendants who were on escape status when they committed the very crimes for which the government is seeking the death penalty.

You know, it's an evidentiary matter. They get to present evidence that they can't escape and they can't -- and

we get to present evidence that they might escape or their sentence might be commuted. That's what the cases say, is that the jury should consider that future dangerousness element given all those parameters.

And in addition to the fact that Mr. Basham and Mr. Fulks are on escape status now, we intend or expect to be able to offer evidence that Mr. Basham had planned an escape when he was in Just Care after his arrest on this case.

So, we think escape -- the whole issue of escape is of such consequence in this case that to do anything other than analyze their future dangerousness in the context of the security in the federal prison and these defendants' desire and practice and penchant for escaping, would be to give the jury less than the whole picture.

I can't remember, was there any other issue --

THE COURT: I think you have covered it.

MR. SCHOOLS: Okay.

MS. JOHNSON: Escape from the juvenile facility?

MR. SCHOOLS: Correct. Again, Judge, that's -- if this were a case where the defendants were not on escape status when these crimes occurred, then I think a prior escape -- it could be argued that that prior escape, even if it was just a walkaway -- and we prosecute walkaways in the federal system. When someone is in a halfway house and they don't come back, we prosecute them as an escape.

And in the Fourth Circuit Court of Appeals, every escape is a violent crime, that's what they said. Whether it's a walkaway from a non-secure or a federal prison camp, or whether it's a breakout, escape is a violent crime.

So, in this case, despite the fact that the defendant's escape at the age of 15 was simply a walkaway, we think it's relevant to the future likelihood that he's going to comply with any terms of his confinement. Not only did he escape when he was 15, he was on supervised release -- federal supervised release when he was arrested on the charges that put him in the Hopkins County Detention Center.

This defendant, from the age of 15 to the age of 26, has demonstrated a complete and total utter disregard for the law, and we think the jury ought to know that.

THE COURT: All right, response?

MS. JOHNSON: Just two more things briefly, Your Honor. As I understood the point that they were planning to use about drugs and alcohol, they wished to use the fact that Mr. Fulks was using drugs and alcohol throughout the crime spree.

That's a different matter than whether they can use that he went to a party afterwards. And I think clearly the first is prohibited, and the second seems to me intimately tied with the first.

I wanted to actually ask the government if they

concede that now there is no evidence of post arrest deceitful conduct that would induce further pain on the victim's family with respect to Mr. Fulks. As I recall, there were -- at one time you were planning to introduce the statement, but you are not introducing that statement any more, so there would be no evidence of that aggravator or that factor with respect to Mr. Fulks.

MR. SCHOOLS: It would be our position that the statement that Mr. Fulks provided, both in April of 2003 and in September of 2003, were not truthful in important regards, and so -- and the reason being, Your Honor, we attempted to -- a very thorough search --

MS. JOHNSON: If I could interrupt, I'm not talking about that. I mean, I'm not disputing that you could introduce that. But you make a separate claim that the post arrest deceitful conduct imposed more pain on the victim's family by creating a hoax that the victim was alive. And I just think that's not relevant to Mr. Fulks, given the evidence that you are now planning to introduce; is that correct?

MR. SCHOOLS: We think it is relevant. And, Your Honor, if Mr. Fulks directed law enforcement to an area in April of 2003 indicating that that's where the body was going to be located -- the victims in this case have from the moment that Alice Donovan disappeared a huge stake in the ability to recover her remains and give her a proper burial.

We conducted a very thorough search of the area where Mr. Fulks directed law enforcement in April of 2003. The victims were aware that that search was being conducted, and I think that, evidenced by the fact that the search was unsuccessful, despite the fact it was very thorough, despite the fact that Mr. Nettles and Mr. Blume have had people on the ground out there searching themselves, I think that evidence is relevant to show the impact of this crime on the victims.

MS. JOHNSON: Well, Your Honor, I'm talking about the allegation, this is 3C, "Fulks engaged in a series of lies and deceit during law enforcement's initial efforts to locate Alice Donovan's body, which resulted in obstructing the search efforts and gave Alice Donovan's family a false sense of hope during a period of intense despair."

That's clearly not a applicable to something that occurred in April of 2003.

MR. SCHOOLS: Well, we think it's applicable, even though it was April. Although the way that's phrased, what we do intend to offer, Your Honor, and we have agreed not to offer statements from attorneys for Mr. Fulks in Indiana when he was first arrested, and an attorney was appointed to represent him up there, we don't intend to offer those statements.

And the information that led law enforcement to a search of what is now I think agreed by everyone to be not a location where Alice Donovan was located, we do intend to offer

the fact that Mr. Fulks' attorney did speak with law enforcement and as a result of his conversations with law enforcement, law enforcement conducted a search of a place that is absolutely the wrong place. So, I think there will be some evidence that Mr. Fulks or his agents directed attorneys -- directed law enforcement to the wrong place.

MS. JOHNSON: Well, Your Honor, we don't agree that that's the wrong place. But be that as it may --

THE COURT: Well, isn't that for the jury to decide?

MS. JOHNSON: Yes, Your Honor. But this is listed under victim impact, and the allegation here which describes initial conduct when she was believed to still be alive simply does not apply to statements made in April of 2003. And there is no evidence that they will present to the jury that anything Mr. Fulks did caused additional pain to the victim.

THE COURT: All right, I would like to take this under -- I think I need to do a written order on this rather than an oral order. I'm going to take it under advisement and we will get you a written order in fairly short order.

MS. JOHNSON: Thank you, Your Honor.

THE COURT: All right, does that cover this now?

MR. HARRIS: Judge, we had kind of a dog in that fight also.

THE COURT: All right.

MR. HARRIS: We have also filed a motion --

THE COURT: Are we finished with the Fulks' motion on this point? Have we covered all of your motion now?

MS. JOHNSON: Yes.

THE COURT: All right. Mr. Harris.

MR. HARRIS: Judge, I'm going to -- we have adopted obviously -- adopted everything that she has just gone over. There are some things we would like to add, and also we have a motion to strike death penalty notice. The government kind of missreads what we have -- the motion we have made.

We have made an Apprendi styled motion as to non-statutory aggravating factors.

THE COURT: All right.

MR. HARRIS: And let me say, the case law at this time does not favor this motion, however we wanted to file the motion to protect ourselves in the future.

THE COURT: No problem with that at all.

MR. HARRIS: Currently Apprendi applies to the statutory aggravating factors. What we have outlined to the court in our motion is that the non-statutory aggravating factors did not go to the grand jury. We believe that they should have, and we just wish to preserve that with you.

THE COURT: All right, that's preserved. And the co-defendants are deemed to have joined in that motion, and that motion is denied --

MR. HARRIS: Thank you, Judge.

THE COURT: -- on the aggravating factors going to the grand jury. All right.

MR. HARRIS: As to the limiting of the aggravating factors that they have -- or the factors they have alleged in the notice, the only thing that I would like to add is to participation in uncharged crime is -- first of all, the crime they alleged in the indictment is a kidnapping and a car-jacking resulting in a death.

The facts of that particular crime are about three days, take about three days of a 12 day conspiracy. Notwithstanding the manner in which the government has charged this case, we would ask that they be limited to facts relating directly to those crimes and to that death.

What they have alleged in the notice are other attempted murders of police officers, other attempted murders of citizens, other car-jackings of people in other states, North Carolina as well as South Carolina. And, Judge, the burden -- the obligation to rebut all of this evidence is just unimaginable.

And if you look at it starting from a 403 analysis, we believe that the government should be limited in what they present to the jury in this particular case, and that they should be limited only as to Ms. Donovan's -- the facts relating to Ms. Donovan's case.

The second problem we have is obviously all the

constitutional issues surrounding our right -- him being charged or uncharged, and all these allegations coming up in front of the jury.

We have -- they are going to be stating that these things happened, the kidnappings of James Hawkins. Mr. Hawkins may testify, he may not, I don't know what the situation will be. But it is uncharged conduct.

They have the right to charge him in another district, they have the right to charge him in Indiana or Kentucky. They have chosen not to do that. We ask that the facts of that particular case, for instance, be handled in Indiana or handled in Kentucky, but it shouldn't be handled in South Carolina, because it has absolutely nothing to do with this particular case.

Likewise, similarly with the allegations in, for instance, in Kentucky where our client got in a shootout, if you want to -- for lack of a better term -- with law enforcement. That has absolutely nothing to do with this case, the case that they are indicted for in South Carolina.

We would ask that all of the testimony -- and that is alleged as a non-statutory aggravating factor -- we ask that all of those crimes, all the evidence relating to those crimes be stricken.

Similarly, with conduct that occurred in North Carolina. There is conduct that occurred in North Carolina

relating to burglaries, to weapons possession, to assault on police officers. There is a -- you know, this is a law school, law exam, and criminal procedure worth of crimes that have absolutely nothing to do with the abduction of Ms. Donovan and have nothing to do with her car-jacking and the murder resulting thereof. And we would ask that all of those crimes be limited, the government not be allowed to go into those crimes.

And once again, not just for 403 analysis, because I think that is an incredibly -- I understand all evidence is prejudicial, it's supposed to be prejudicial. But there is absolutely no way that the prejudicial effect of those crimes and that evidence is -- any way outweighs the probative value of what happened, again, from the time that they were on videotape meeting Ms. Donovan until the time that they are using the credit cards in North Carolina, which obviously puts them with her credit cards, to the time that -- the subsequent time when they later confessed to those offenses.

So, as to the participation in uncharged crimes, there is a plethora of crimes, Your Honor, that we ask that you strike, that you not allow the government to go into. We believe that it is too prejudicial, we believe that we don't have the right to confront -- properly confront all of those crimes.

And once again, they are uncharged. They are crimes

for which they can be charged, they have the evidence. They can charge them in this jurisdiction for some crimes, they can charge them in another jurisdiction for other crimes.

THE COURT: All right, now, the defendant Fulks has a separate motion on uncharged crimes, right?

MS. JOHNSON: Yes, Your Honor. And we have not joined in that motion. Their motion is a broader motion to exclude all that previous -- and we haven't made that motion.

THE COURT: All right. All right, go ahead, Mr. Harris. Anything else?

MR. HARRIS: I believe that -- that's all I had as to uncharged crimes, as to the non-statutory aggravating factors of participation in uncharged crimes.

And I believe that we have taken up the victim impact evidence, you are going to defer ruling on that until that portion of the trial, Your Honor?

THE COURT: Right.

MR. HARRIS: But it's my understanding the government has conceded --

THE COURT: Well, I just said the victim impact thing is denied for now, I can get a better feel for it when the trial takes place. And we may have to look at it again. Denied without prejudice to refile.

MR. HARRIS: Okay, that's all we have as to that, Your Honor.

THE COURT: All right, Mr. Schools.

MR. SCHOOLS: The only thing I'm not exactly clear on is whether the defendant Basham is seeking exclusion of this evidence at the guilt phase, the penalty phase, or both. And if I could get clarification on that, I would be happy to respond.

MR. HARRIS: At this point this motion only goes to the penalty phase. We will object obviously to the guilt phase also.

THE COURT: All right.

MR. SCHOOLS: Your Honor, with respect to -- count 4 of this indictment is a conspiracy count and alleges all of the activity -- virtually all of the activities that occurred during the course of this crime spree, including the kidnapping of Mr. Hawkins, including the shooting of an Ashland, Kentucky police officer, and all of that is alleged and will come out during the guilt phase of the trial.

At the sentencing phase, the only violent act that Mr. Basham has committed that we are aware of at this time that we would intend to offer that is not actually part of that -- alleged in that conspiracy count, is the murder of Samantha Burns.

And clearly the murder of Samantha Burns occurs -- she was kidnapped three days prior to the kidnapping of Alice Donovan, so this entire crime spree, to suggest that it's not

related, is just a function in non-reality.

Because the reality is that everything they did from the time they escaped until the time Mr. Basham attempted to flee from law enforcement by shooting at a police officer -- and it's axiomatic that efforts at flight are evidence of consciousness of guilt.

So, to suggest that the fact that Mr. Basham flew -- attempted to flee from law enforcement to such an extent that he actually shot at a cop is not related to the crime for which he is charged here is just -- it doesn't -- it just doesn't comport with reality.

So, all of this -- all of the acts that occurred between November 4th and November 17th when Mr. Basham was arrested, Mr. Fulks acts after November 17th when he attempted to flee from -- when he successfully fled from Ohio state police on a high speed chase up there, all of that stuff is directly relevant to their guilt on the charges in this indictment. And so once that is presented, we can't unring that bell.

Now, with respect to the Samantha Burns' murder. It's clear, Judge, that in the Fourth Circuit Court of Appeals in U.S. versus Higgs at pages 322 through 323 tells, in December of last year, that uncharged acts could be admitted at trial.

Now, in fact, the Burns murder is charged, these

defendants are charged in West Virginia with killing Samantha Burns. So, it's not uncharged, it's simply unadjudicated. And the Fourth Circuit case of Higgs is clear that unadjudicated acts can be admitted at trial.

What the defendants want is, they want all of the good parts of the Supreme Court's rulings on evidence that should be admitted to make sure that there is an individualized consideration of each defendant with respect to the appropriate punishment, but one none of the bad stuff.

Well, what the Supreme Court precedence would indicate is that the jury is entitled to a broad picture. And in this case to suggest that a murder, kidnapping, and probable rape that occurred three days prior to the event in this case is not relevant to the jury's consideration of an appropriate punishment for this defendant simply flies in the face of common sense.

And so we believe that all of the evidence the government intends to present at the guilt phase and the Samantha Burns' evidence, which the government intends to present at the penalty phase, are all highly probative, highly relevant to this jury's determination of an appropriate punishment.

And Mr. Harris refers to 403. And if you are talking about the penalty phase, 403 doesn't apply. But there is 403 type analysis that is conducted, and the issue there is whether

the probative value of this evidence is outweighed by its prejudicial effect.

Well, we keep -- oftentimes the prejudicial effect term is used without reference to what it really means. And what it really means is that it's intended to incite the passions of a jury to irrationality. We are not there. I mean, this evidence is competent evidence of a crime that Mr. Basham participated in three days prior to the crime for which he faces the death penalty here.

So, it's highly probative, and while it's prejudicial in the sense that it may lessen the defendant's likelihood of successful outcome, it's not prejudicial in the sense that it incites the jury to some sort of irrational verdict.

MR. HARRIS: Briefly, Your Honor. The only thing I would say to that is that I agree that the charged and uncharged conduct relating to the offense is missing. Our position is, is that is not related to this offense. And Mr. Schools says that it is nonsensical that we would make this argument.

I submit that it's more -- it makes more sense that the only relation to similar conduct, if that's the way that they want to show this, the only relation is to put in front of the jury they did it once, and look at them, they did it again, which clearly is not admissible, Judge. That type of rationale is clearly not admissible.

And there actually is no relation.  Different states, different victims, different cars, different days, different everything.  There are a lot of things that make it different than this particular crime, Judge.

THE COURT:  All right.  We need to take a little recess right along here.  Let's take a 15 minutes recess and we will come back and take up this parallel motion from Mr. Fulks, and then the other motions.  We will be in recess.

(Short recess)

THE COURT:  They started closing down some schools, and that necessitated some behind the scenes work with some of the support personnel.

MR. SWERLING:  You say they were closed?

THE COURT:  They are, right.

All right, we have come to the motion by Mr. Fulks relating to unadjudicated offenses, it has three parts.  The government has agreed that the reasonable doubt standard is the standard, so that issue is resolved.

All right, be glad to hear from you on the other two.

MR. WEYBLE:  Your Honor, that's right, it does have three parts.  The first part, I think, which contends that unadjudicated prior bad acts are not admissible under the FDPA has been dealt with by the Fourth Circuit recently in Higgs --

THE COURT:  And I have no problem with you making the motion for the record --

MR. WEYBLE: Okay.

THE COURT: -- to protect you in case of a change of law.

MR. WEYBLE: Right, thank you.

THE COURT: So, what's left is the pretrial determination of admissibility?

MR. WEYBLE: Right. That's, I think, the one thing that does remain. And I don't think that compared to some of the other motions we are that far apart from the government. They do acknowledge that there needs to be a beyond a reasonable doubt standard.

And basically what we are requesting is some kind of a pretrial procedure to assess things like reliability, consistency with the Federal Death Penalty Act, statutory aggravators.

Those aggravators, it would be our position, and this has been found by other federal district courts in capital cases, the statutory aggravators do sort of set the tone and the base line that should be applied even to the non-statutory aggravators, and in this case the unadjudicated bad acts they have submitted in support of non-statutory aggravators.

And what we are really asking for here is some sort of a pretrial determination as to consistency with the base line set by the statutory aggravators. And I guess you could say relevance, reliability, and absence of too great of a risk

of introducing unnecessary complexity, opening up little mini trials on all these unadjudicated bad acts, that sort of thing.

Now, the government, if I read their response correctly, acknowledges that there does need to be a threshold reliability determination. But what they -- and some of it is a little bit I think open-ended, and maybe they will supply us with some more details here in a minute -- but they seem to suggest an oral proffer on behalf of the government, basically. As I understand it, they would come in and say, "We have the following witnesses who are going to establish the following facts."

Our concern with that is that if you accept the proposition that there does need to be a real reliability determination and a determination of all those other factors that I just mentioned and that are laid out in the written motion, then you have to get beyond simply an oral offer by the proponent of the evidence, because it's just not going to facilitate a real meaningful determination of the threshold questions.

So, I think that's really the main point of disagreement or the point that still remains open at this time. And --

THE COURT: So, you say an oral proffer is not sufficient?

MR. WEYBLE: Well, I don't think you can really -- I

don't think the court can make a meaningful determination of things like reliability -- especially reliability, and then some of the other factors that need to be considered just based on an oral description by the proponent of the evidence.

I mean, of course, it's going to be described in the terms that are most favorable, you know, sort of the rosiest picture of the evidence that the proponent wishes to get in. And that's just -- you know, there are other contexts where reliability determinations are made, and that's not how they are made.

They are made by actually putting people on the stand or producing documents or whatever it is, and allowing the court to actually get a look at what it is the proponent seeks to introduce.

And I think if we are going to accept the proposition that this threshold determination needs to be made, then we have to also accept that it has to be a meaningful one, otherwise it's not really -- it's not producing any benefit in terms of accuracy, fairness, or anything else.

THE COURT: All right. What about it, Mr. Schools?

MR. SCHOOLS: Your Honor, again, I think -- we would ask the court to keep in mind our extreme motivation in getting this right the first time around. Now, given that, I think if we --

THE COURT: What, say that again?

MR. SCHOOLS: Our extreme motivation in getting it right the first time --

THE COURT: Right.

MR. SCHOOLS: -- means that we don't offer evidence that is going to cause Your Honor to declare a mistrial or cause the Fourth Circuit to reverse the case after it's heard.

And I think it's unprecedented for the defendant to suggest that they are actually entitled to a preview of the evidence and presumably an ability to cross-examine witnesses before they are ever called in front of this jury.

What we would propose, Your Honor, and I will just give an example of what we might propose. With respect to the child abuse allegations that we intend to prove against Mr. Fulks, we would propose to tell the court that Mr. Fulks and his wife were under investigation for a property crime in Kentucky. That as a result of that investigation, they were both arrested.

As a result of their both being arrested, Veronica Evans, Mr. Fulks' wife at the time, her child was placed in foster care. The next day the foster parents were giving that child a bath and noticed bruising and a burn mark in his genital area.

That as a result of their disclosing that -- they disclosed that to law enforcement, law enforcement conducted an investigation. A Kentucky state trooper, Scott Smith, actually

who was here for this hearing, interviewed the child and the child advised him that daddy punched him down there. And Veronica Evans has also been interviewed, the defendant's wife, in regard to that allegation.

So, that would be the type of proffer we would intend to offer, so the court can at least determine that we have got a threshold amount of evidence. You know, clearly the defendants are going to dispute that, and clearly they are going to cross-examine the witnesses, as they do in every case, and clearly they are going to dispute that it ever happened.

But the issue is, based on that quantum of evidence, is it sufficiently reliable to put in front of this jury? And we think clearly it would be.

THE COURT: I don't see why an oral rendition like he just gave me isn't sufficient for me to make all the findings I need to decide whether it comes in or not.

MR. WEYBLE: Well, Your Honor, I think there is one thing that Ms. Johnson -- it sort of goes to an area that she was handling, what needs, I think, to say -- to address.

THE COURT: All right, do you want to address that, Ms. Johnson?

MS. JOHNSON: If that's all right. Your Honor, I think this proffer is itself a perfect example of why a proffer is not adequate, which is that Mr. Schools neglected to tell you that the child not only accused -- in fact, first accused

Daddy Dennis, the foster father. Dennis is also the name of his other -- his biological father. So, there are -- there are reasons to believe that this is not reliable at all.

And we would need an opportunity to explore those reasons in order for to you make a determination that this is not a more prejudicial allegation than the evidence is probative. And particular with regard to an allegation of child abuse, that's enormously prejudicial, given the facts that actually are involved in this case.

THE COURT: Whatever happened, were there any charges brought?

MR. SCHOOLS: Charges were pending. That's the warrant that Mr. Smith --

THE COURT: Oh, that's right.

MR. SCHOOLS: -- testified he served the day before they escaped.

THE COURT: That's right.

MR. SCHOOLS: Which, of course, we would also think the fact he escaped after being served with the warrant is evidence of his consciousness of guilt on that charge.

But our evidences is, Your Honor, that the child said, "Daddy Chad did this." But regardless, I mean, this is the point, they can stand up and say, "But, Judge, the evidence is going to show X, Y, and Z as well."

We have given them discovery. In fact, our records

reflect that they obtained the child abuse file from the Kentucky state police on or about October 2nd of 2003 based on Your Honor's order. So, they have had the evidence in fact longer than we have.

So, I don't know why we can't be lawyers and we can talk about why we think it's reliable and they can talk about why they think it's not reliable, without them actually previewing the evidence and having the opportunity to practice their cross-examinations on these witnesses, which is what would happen.

MS. JOHNSON: Your Honor, there is really not much question of previewing the evidence. In fact, there is documentary evidence about both -- the question is going to be the credibility of a three-year-old who has made conflicting allegations. And also, as I understand it, things sort of erupted at that time --

THE COURT: Well, the three-year-old won't be a witness here though, it will just be officers who investigated, telling me that at first he said it was this dad, then he said it was another dad.

MR. JOHNSON: Yes, Your Honor, and --

THE COURT: Well, I don't see why I can't just decide that based on an oral proffer from both sides.

MS. JOHNSON: Well, Your Honor, you could, but I think --

THE COURT: I mean, if they fly down the detective from whichever state it was, and he sits on the stand under oath and says the child first said, "A and then he said B," I don't know that that helps me decide the admissibility any better than it would be if each of you told me your competing versions of what you thought happened. I just --

MS. JOHNSON: Well, Your Honor, what we have is, of course, the report, and in fact social services has been unwilling to talk to us. So, one difference -- and I'm suspecting that they have been willing to talk to the government, though I don't know that -- but one difference would be that there are obvious questions that might be asked this person that might demonstrate other behavior of the child that would make this completely unreliable or might not.

Now, if you think that you can find it -- you can find it unreliable without such cross-examination, certainly we would not object to that. But I think it has a huge risk that we put this person up, who has to be flown down here anyway, and then in front of the jury it all explodes and then we have to say, "Oh, no, no, disregard this."

He's going to be here, the amount of time taken in going through that evidence ahead of time, a quick preview which you could clearly limit the scope of the cross-examination, that seems to me to be only a sensible step.

And as I said, I didn't want to take over his

argument, but with respect to this example, the example actually demonstrates why it is that we need to have more than just oral proffers.

THE COURT:  What I think I'm going to do is leave it at this.  I'm going to require an oral proffer of each episode that we are talking about of unadjudicated offenses.  And after hearing the proffer, if I decide that some type of showing is necessary, some type of evidentiary hearing, we will do it then, we will have it then.  But, again, I think this is something I can decide after I get into the case and get the flow of the case.

If we -- if there is a verdict in the guilt phase, I think it would be a good idea to take a couple of days off anyway.  I think in state court it's required; in federal court it's not required.  Isn't that correct?

MS. JOHNSON:  24 hours, Your Honor.

THE COURT:  It's required in state court, but not --

MR. GASSER:  24 hours.

THE COURT:  It's 24 hours required here?

MR. GASSER:  No, 24 hours in state court.

THE COURT:  That's what I thought.  But I think it would do everyone well to take two or three or four days off, and that would give us a period to receive this proffer and decide if I need to hear any evidence.

So, I guess the motion is denied without prejudice,

with the understanding that I will require an oral proffer. And if there is something that I think requires more of an evidentiary showing, I will order it at the appropriate time.

All right, now, what else on this motion?

MR. WEYBLE: Nothing else --

THE COURT: Reasonable doubt standard does apply, and I think that covers this motion then.

MR. WEYBLE: Your Honor, just to -- the reasonable doubt standard, correct, does apply, I think the government has acknowledged that, but I think it's also a little bit unclear of what their position is.

Our position would be that -- what it means to have the reasonable doubt standard apply is that the jury is going to have to find the elements of each of these unadjudicated offenses, basically find the person -- find the defendant guilty of these offenses before it can then turn around and apply them in determining whether future --

THE COURT: All right. Well, that will be a matter for the jury instructions, wouldn't it? I mean --

MR. WEYBLE: Right, it would. But I just wanted to make sure that --

THE COURT: All right. Well, we will take that up when we come to the jury instructions. All right, I think that covers that motion.

The only three I have left is the defendant's right

to test evidence, which we really already talked about, the discovery motion as to guilt and punishment, bad acts or crimes alleged in the indictment, and then the constitutional challenge.  That's all I have left.

On the right to test and inspect evidence, I have required the defendants to give the government a list of what they want to test by -- what did I say yesterday?

MR. SCHOOLS:  Wednesday.

THE COURT:  Wednesday of next week.

MR. SCHOOLS:  Yes, sir.

THE COURT:  And then we will be back Monday the following week, and we can revisit that issue at that time.  So, that motion is just under advisement.

Now, what about the discovery motion, the defendant Basham's motion for discovery as to guilt and punishment issues?

MR. SWERLING:  Judge, that's a multipart discovery motion, and there are a number of motions contained in there, which I can tell the court I think Mr. Schools and I pretty much agreed to resolve most of those.

THE COURT:  Right.

MR. SWERLING:  I can state for the court what our resolution is.

THE COURT:  All right, go ahead.

MR. SWERLING:  Just so the record is there.  Let me

get my notes.

Judge, the first motion is essentially a Rule 16 motion, another discovery request. The government tells me they, of course -- they have been furnishing information, they agreed to comply with that motion. Obviously one part of that motion deals with scientific reports and, of course, that is still an outstanding issue, we have to get the scientific reports.

THE COURT: Right.

MR. SWERLING: With respect to the identification procedures, for them to identify for us and allow us to challenge that. Mr. Schools and I have agreed, subject to the court's approval, that if there are any identification procedures, that we could take that up in voir dire when the witness is offered, rather than doing it pretrial.

THE COURT: Right.

MR. SWERLING: If that's all right with the court.

Another part of that motion which I needed to specifically address is the witnesses and informants. There are, as we understand it, some informants that have been housed with one or more of these defendants.

And the government said that they will identify those informants, they intend to identify them, and any other witnesses. But they want to go ahead and interview them first, but I think that Mr. Schools said that they would turn that

information over to us as soon as it was available.

MR. SCHOOLS: Your Honor, I disagree with the characterization that these people are informants. It implies that they have some relationship with the government, which they don't have. What they are, is they are people who were housed with these defendants during the course of their various incarcerations to whom the defendants allegedly made statements regarding these crimes.

THE COURT: So-called jailhouse snitch, in other words?

MR. SCHOOLS: They are just witnesses. I mean, they are not really informants.

THE COURT: Not informants. Well --

MR. SCHOOLS: We didn't send them in there, and we don't have an agreement with them.

THE COURT: You agree to turn over that information by when?

MR. SCHOOLS: They have not been interviewed yet, we will get it to them as soon as we know whether we intend to present it, but --

THE COURT: I'm just wondering if I shouldn't establish some deadlines, though. I just -- I don't want to come up a week before trial and still have this issue kicking around.

MR. SCHOOLS: We will do it well before trial, Judge.

I mean, Mr. -- Agent Bruning -- the FBI has assigned two agents to this case at this point. We asked Agent Bruning to locate those witnesses and have them interviewed. We would certainly hope --

THE COURT: Are they from other locations other than South Carolina?

MR. SCHOOLS: Yes, sir, because some of them were housed and then got shipped off to federal facilities and the like. So, they are not all here, but we are undertaking to get that done.

And as soon as we get it, we will disclose it. We are certainly not doing it in order to save it for later, and we just haven't had a chance to talk to them. But obviously it's our position that we need to talk to them first before the taint possibility with respect to somebody else talking to them.

THE COURT: Mr. Swerling, you are entitled to it, are you satisfied that the government is going to produce it?

MR. SWERLING: Judge, I'm satisfied with it. If we get closer to trial, if I think there's a problem, I don't mind bringing it --

THE COURT: If you think there's a problem, if it's getting close to trial and you need it by a certain time, let me know, and we will --

MR. SWERLING: I mean, I know they are acting in good

faith, so I don't have any problem --

THE COURT: Right. If they were -- you know, the people were right here in Columbia, I would tell them to have it to you by 10 days from now. But if they have been shipped off, it does require some tracking down to --

MR. SWERLING: Yes, sir, I understand. Judge, also with respect to that, there's going to be some Brady -- you know, we have outlined in our motion pretty extensively requests for Brady and Gigglio material --

THE COURT: Right.

MR. SWERLING: -- dealing not only with the case in general, but also specifically with any snitches or -- to me they are informants too.

THE COURT: All right.

MR. SWERLING: And, of course, their records and the records of any --

THE COURT: You are protected on that, you made that request.

MR. NETTLES: Judge, that's all I was going to say, that typically when you get a statement from a snitch witness, you need to get a copy of their rap sheet. We don't have the ability to get rap sheets, so I just request the government to provide a copy of their rap sheet --

THE COURT: Well, whoever you intend to use, you need to give them the rap sheet as well as the disclosure of what

they are going to say.

All right, what's next?

MR. SWERLING:  Judge, one part of it, we had asked about any rewards, and the government tells me there were no rewards.  There is one witness that got some remuneration or reimbursement for expenses, and so they have complied with that as far as we know.

The next motion was early production of the government's witness lists, and I believe that was addressed yesterday.  But the goal that Mr. Schools told me is at the end of March, assuming we keep on the same track of April 19th, they intend to get that to us by the end of March.  Hopefully that will be resolved on March 8th too, as far as actually the trial date, and we can get that straightened out too.

The next motion was the early production of Jencks material.  The government said they will comply with that and provide that to us as it comes in, and they have made substantial disclosures to us at this point.

Let's see, number 4 was a motion for pretrial production of statements of individuals not to be called as a witness.  It's my understanding the government would provide that to us in advance of trial, well enough in advance of trial.

MR. SCHOOLS:  Judge, I would like just for the record, again -- and I will say this over and over, just

because I'm concerned about issues that may arise later. And it's not because we certainly would intend to withhold any information to which these defendants are entitled, but if by oversight or some other reason we don't get the defendant some document that is later determined that they are actually legally entitled to, we intend to preserve our rights to argue that the laws regarding the time frame established in Rule 16 and 18 USC 3500 establish the defendant's legal right to discovery.

THE COURT: I understand. Okay, all right.

MR. SWERLING: Number 5 and 6 deal again with informants or snitches. And they are pretty detailed, but they are requesting specific information with respect to them again, and expect the government to comply with that. And, again, if there is some problem about that, we will come back to the court.

THE COURT: All right.

MR. SWERLING: Number 7 is about 404 (b) evidence. I think that was actually addressed already, that they will provide that to us.

Number 8 deals with co-conspirator hearsay. And Mr. Schools advised me that any co-conspirator hearsay is already in the discovery, so we accept that.

THE COURT: All right.

MR. SWERLING: Any residual hearsay, it's number 9

under Rule 807, and Mr. Schools advised me there is none.

As to our 10, number 10, rule 12 (b) (24) of disclosing information, that they -- that's subject to suppression.  The government informs me that there is none.

THE COURT:  All right.

MR. SWERLING:  Of course, also at 12.2, they did disclose obviously the statements, and we've taken that up already.

Number 11, a motion for discovery regarding eyewitness identification.  Again, it would be, we agree to take that up at trial, if that becomes an issue.

THE COURT:  All right.

MR. SCHOOLS:  Your Honor, if I could back up just one -- on the issue of evidence subject to suppression.  I think the position I expressed to Mr. Swerling was, these defendants were on escape status, I don't think they have an expectation of privacy in anything under those circumstances.  We obviously intend to offer a lot of physical evidence that they have been made aware of what it is, so --

THE COURT:  All right.

MR. SWERLING:  Well, I didn't -- okay, I understand what you are saying.  I was talking basically of issues that would be subject to a motion to suppress, Fourth Amendment issues.  And I would just ask the government to give us a list of what they intend to offer, what they contend would be --

they would be able to offer pursuant to any Fourth Amendment searches, if I misunderstood.

MR. SCHOOLS: Well, for example, we conducted a search of Tina Severance's van, but the defendants wouldn't have standing to contest that. We conducted a search of Alice Donovan's vehicle, they don't have standing to contest that.

MR. SWERLING: No, but Rule 12 talks about subject to suppression, I agree with that.

MR. SCHOOLS: If there is any -- they have been made aware of what evidence has been seized. If there is any evidence out there that they think was seized from a location to which their defendants -- in which their defendants have an expectation of privacy, they -- I mean, I don't know what that location is. So, I don't -- all of the physical evidence that has been seized has been disclosed. If they need to make a motion to -- and has the location of its seizure.

So, you know, with respect to what we are going to offer, we are probably going to offer about all of it. But I don't know that I need to provide them a list. If there's something specifically that they intend -- that they would like to suppress, then they can move to suppress it.

THE COURT: All right.

MR. SWERLING: Judge, if there's a problem, I will come back to the court. And I don't think there's going to be a problem about that.

Number 11, I'm withdrawing, about discovery from the co-defendant. I thought that was kind of a novel motion, but I'm going to withdraw it because it would be reciprocal.

THE COURT: All right, let me stop you right there. Both defendants have submitted subpoenas to get medical records from the other defendant.

MR. SWERLING: Yes, sir.

THE COURT: I just want that to be known.

MR. SWERLING: I know we have.

THE COURT: Well, it runs both ways.

MR. NETTLES: I don't think that I have, Judge.

THE COURT: I may be mistaken. I thought we had subpoenas going both ways.

MR. NETTLES: I have not.

THE COURT: Well, do you object to them having copies of your medical records? It concerns me, because those subpoenas came in ex parte, and they are normally, you know, ex parte from the government. But here, this case is as much the two defendants versus each other as it is versus the government.

MR. SWERLING: And I know, Judge, we have subpoenaed some jail records, and been subpoenaing some other -- some other records also.

THE COURT: Why don't y'all think that over and we can take that up when we come back on the 8th of March. And

just check, Mr. Nettles, and see if you have.

MR. NETTLES: Yes, sir, I will.

THE COURT: All right. All right, I just thought that needed to be -- I just didn't want anything to be secret between the two defendants here, if I could help it.

MR. NETTLES: Yes, sir.

THE COURT: All right.

MR. SWERLING: Okay, let's see, where am I. Number 13 is for a motion to preserve the rough notes, and I understand Mr. Schools said that they would.

Judge, the last one was -- number 14 was a motion for a bill of particulars. Judge, you agree -- yesterday I think you said you were going to hold that in abeyance, so would you just hold this one in abeyance also?

THE COURT: All right. I mean, what good would it do to hold in abeyance until trial? I mean, you need to know -- if you need more information about the allegations, you need them in advance of trial.

MR. SWERLING: Well, my understanding was you were going to address it at a later time. I didn't know if you wanted to do that now.

THE COURT: Well, did I hold it in abeyance or did I take it under advisement to rule on it?

MR. SWERLING: Well, I apologize, I'm not sure.

THE COURT: I'm not sure.

MR. SWERLING:  I know we had -- somebody made that motion yesterday and I --

THE COURT:  We didn't discuss it in any depth, I don't think.

MR. SWERLING:  No.

THE COURT:  Do y'all remember?

MR. NETTLES:  Excuse me, Judge, I'm sorry.

THE COURT:  What did I do on the motion for a bill of particulars by your client?

MR. NETTLES:  Well, the motion for bill of particulars has largely been taken over by the motion to strike or limit certain aggravating circumstances, Judge.

THE COURT:  That's what I thought.

Well, I will take it under advisement, but I do think I owe you a ruling on it sooner rather than later.

MR. SWERLING:  Well, then, Judge, let me just -- the bill of particulars that we are particularly interested in deal with the specific questions we have asked in the notice of intent to seek the death penalty.

And specifically it starts at paragraph -- well, it would be in the motion -- in the notice to seek the death penalty, it would be paragraph 3 and its subparts.

And in our motion it would be paragraphs 133 through 141, which deals with information about rehabilitative potential or lack of rehabilitative potential, violent acts

admitted by him, issues of escape, victim impact again, victim characteristics that they have alleged, lies and deceit on the part of him, and the family suffered something beyond the expected grief that one would suffer in a tragedy such as this.

So, I would ask the court to specifically look at that part of the motion for bill of particulars, because I don't know that that is disclosed in any other part of the materials that we have gotten, I don't think it is. And I don't know that that has been addressed specifically by any other motion.

So, with respect to that particularly, we would ask for the court to grant a bill of particulars as to paragraph 3 of the notice of intent to seek the death penalty. Roman numeral 3.

MR. NETTLES: Judge, while he's on that, there is one matter I think in the bill of particulars that -- in the motion that we made that was not addressed by the statutory aggravating circumstances. I just remembered it and I'm sorry I didn't bring it up yesterday.

The government has alleged that Mr. Fulks engaged in an intentional act to kill Ms. Donovan. The government has given us a lot of discovery, and I'm not giving them a hard time about the discovery they have given, however there is no information that supports the allegation that Mr. Fulks engaged in an intentional act killing Alice Donovan. This is one of

the statutory intent factors, I understand. There is just nothing there.

So, what we merely seek is a description of the act by which Mr. Fulks killed Alice Donovan. As I understand their argument, they are going to be agnostic about which one of the defendants did it. They in fact do not know, and they are going to present the evidence that way.

That being the case, I don't think it's appropriate for that potential aggravator -- or, I mean, that potential intent factor to be included within the -- within the notice of intent to seek the death penalty, or in the indictment, the superseding indictment, Judge. If they intend to keep it there, we just want fair notice so that we can attempt to rebut what the intentional act is.

THE COURT: All right. What about that, Mr. Schools?

MR. SCHOOLS: Your Honor, there is nothing that we have got that they haven't seen. So, if there's a lack of -- if in their perception there is a lack of evidence on that, it's not because of a lack of our providing it, it's because of the lack of its existence.

Our position is going to be that the intentional act was proved circumstantially, and in addition that Samantha Burns, having been killed previously during a car-jacking and kidnapping and car-jacking attempt, that when Mr. Fulks drove

Mr. Basham into the parking lot to pick up Alice Donovan, and that's an intentional act likely to lead to her death.

Now, we can argue about whether that's a legitimate intentional act and whether that should be submitted to the jury. But as far as who actually provided the fatal blow, I mean, we don't have any additional information about that. So --

THE COURT: All right, you got your answer.

MR. NETTLES: Well, yes, but the point is, Judge, there's an intent factor that goes to that. There may be other intent factors that cover the situation that the government intends to prove, but they have specifically alleged that Mr. Fulks intentionally killed Alice Donovan. And if there is no evidence of that, there is no evidence of that. And if there is no evidence of that, it just shouldn't be in the case.

MR. SCHOOLS: But there is no reason you can't hear the evidence and decide that at the time.

THE COURT: All right.

MR. SCHOOLS: There are two issues here, there's a notice issue and there's a --

THE COURT: I think that's a proof issue really. We will have to take that up at the motions stage.

All right, what's next?

MR. SWERLING: Judge, also with respect to the bill of particulars. The bill of particulars dealing with the

special findings, we would ask the court to take a look at those. They are multiple part questions. Rather than stating them here, we just ask the court to take a look at them. And just tell the court that we think that we are entitled to have those identified by the government so we could better prepare this case for trial.

Because these things do not bounce out at you from the discovery. And if the government has a theory in these special findings and in the notice of intent to seek the death penalty they intend to offer, then we would ask for them to have to disclose that.

MR. SCHOOLS: Judge, that's exactly what a bill of particulars does not require us to do, which is to provide our theory of prosecution. The bills of particulars are required in cases where there's essentially no discovery, in those districts where they comply with the rules of discovery strictly. They don't apply in cases where we have given the defendant every document we can get our hands on as soon as we can get it to them.

I mean, again, this is just another instance where what the defendants are seeking are our contentions and our positions and our arguments. They don't need the evidence, they have got the evidence.

And if they don't -- I don't think the case law requires that we respond with a bill of particulars that fits

it all into the puzzle for them. We just don't have to do that. That's not what the case law says.

We have cited case law in our memorandum in opposition to the defendant Fulks' motion for a bill of particulars. We think the Fourth Circuit would agree with our position on that, and ditto with respect to Mr. Swerling's position in an effort to create busy work. If they want a bill of particulars, and that's the way we are going to proceed, then we will stop providing discovery, except as required by the rules.

THE COURT: All right.

MR. SWERLING: Judge, just so you will understand. I'm not asking for their theory, I'm just asking for any evidence that they have that supports these allegations. And that's what the bill of particulars I drafted speaks to, the evidence itself.

The last one -- well, let me jump to number 16, we have already resolved the Bureau of Prisons issue. Mr. Schools and I have discussed that, and he's going to get us the information that the Bureau of Prisons generally provides.

We have had a whole detailed list of questions that we wanted answered, but it may be resolved in the package we get from the Bureau of Prisons. If it's not, if the court will allow us to come back with some specific requests?

THE COURT: All right.

MR. NETTLES: And, of course, Judge, pursuant to your previous order, we would join in that also, and also request copies of it.

THE COURT: Very good.

MR. SWERLING: Judge, the thing I guess that has to be resolved is -- and I don't know that anybody has actually had a clear understanding of this yet -- but the motion for discovery and inspection of information and evidence in aggravation or mitigation of punishment, if we get to the second stage of the trial.

And I think the government's position is they will give us what they have if we give them what we have. And that's your -- well, I'm not going to speak for Mr. Blume -- but, Judge, one of the things that we cannot give them because of the way the case has been structured already is any medical records that we intend to offer, because --

THE COURT: That's already covered.

MR. SWERLING: That's covered, and being sent to Butner, so we can't give to it them. But as far as other materials -- or actually there are other records going to Butner other than medical records. We are sending them anything that's relevant to the diagnosis. But so any of those records we cannot turn over. But I don't have any problem giving the government any other Rule 16 material.

THE COURT: You consent to reciprocal discovery on

those --

MR. SWERLING: With the exception of what we are going to be sending to Butner.

THE COURT: All right. What about that, Mr. Schools?

MR. SCHOOLS: Well, Judge, I mean, I understand he doesn't have to give us his medical records, but if he's intending to offer those at trial, and we are trying to reach an accommodation on discovery, I think he ought to give them to us at some reasonable time in advance of trial so that we have a chance to review them.

I mean, the other alternative --

THE COURT: I thought my order covered that, you get them at the same time you get the unsealing of the opinion from Butner, right?

MR. SCHOOLS: Well, it covers the opinions from Butner. The question is, what are our discovery obligations and what are we entitled to do? I mean, if we are going to play that way with respect to medical records, then let's play that way, and we'll do it too. That's just --

THE COURT: Right.

MR. SCHOOLS: What's going to happen is --

THE COURT: You will go strictly by the rules then --

MR. SCHOOLS: Yes, sir.

THE COURT: -- and turn over what you have to when

you have to.

MR. SCHOOLS: Yes, sir, because what's going to happen is, if the jury has reached verdicts on guilt in this case, is we are going to get -- Your Honor will provide to defense counsel the order -- the opinions of our experts, and then by Mr. Swerling's own admission, we are going to get inundated with medical records.

Now, we are undertaking to acquire some of that ourselves, but I don't know what they have got that we don't have. And we are looking at a --

THE COURT: You say under reciprocal discovery you are entitled to medical records in advance of the trial of the guilt phase?

MR. SCHOOLS: If they intend to offer those records in their case in chief --

THE COURT: At the guilt phase?

MR. SCHOOLS: At the penalty phase.

THE COURT: All right.

MR. SCHOOLS: If Rule 16 applies and we are entitled to that stuff. And what the case law says is that Rule 16 materials have to be provided within a reasonable time frame. Reasonable being interpreted as the time --

THE COURT: All right, Mr. Swerling, why shouldn't you have to give them these medical records prior to -- some time prior to the penalty phase trial?

MR. SWERLING: Judge, because the Rule 12 and the examination under Rule 12 contemplates that they don't get any of that information until there has been a finding of guilt. And then --

THE COURT: It contemplate the records or the opinions of the Butner medical --

MR. SWERLING: Well, the records themselves --

THE COURT: Rule 12 says they don't get any medical records?

MR. SWERLING: No. What I'm saying is, Rule 12 requires an examination. We are required to give the physicians at Butner the records that are relevant to the diagnosis.

THE COURT: All right.

MR. SWERLING: So, I'm saying that the records that we are turning over to them should come under the ambit of rule 12, and not be disclosed to them until the appropriate time that the opinion is going to come from Butner.

THE COURT: I don't think there is anything in rule 12 itself that says the records are protected.

MR. SWERLING: No, I'm --

THE COURT: It says the opinions are protected.

MR. SWERLING: Yes, I'm doing it under the umbrella of Rule 12. If the examination is being done and those records are being sent to Butner and Butner can't discuss it with the

government, their findings are what the records are, then I don't set how we should be able to turn over those records -- it seems to be circumventing exactly what we agreed to and what your order said back in January.

THE COURT: Mr. Schools.

MR. SCHOOLS: I guess it's the interplays between Rule 12 and Rule 16. If they don't intend to offer the -- I think the Rule 16 provision that give us access to those records is that the records that a defendant intends to offer in his case in chief, which is what the reciprocal discovery rule requires that they give us within a reasonable time frame.

THE COURT: Well, let me take this under advisement. I need to go back and look at the rules and look at cases to decide that. I'll take this matter under advisement.

MR. SWERLING: Yes. Judge, I would like to go ahead, also if the court is okay with it, go ahead and conduct some additional research in that issue too then. Because I thought we were going to agree to --

THE COURT: All right.

MR. SWERLING: Or I had an idea that --

THE COURT: Well, I will give you 10 days to file any additional brief on that point.

All right, anything else on the discovery motion?

MR. SWERLING: No, sir.

THE COURT: All right. Well, after the discovery

motion then, as I understand it, I have taken under advisement the bill of particulars issue and this issue we just discussed about medical records separate and apart from the Butner opinion.

And I'm going to get briefing within 10 days on that second point, and then I will do an order resolving those two issues. And I'm going to indicate that everything else has been resolved by agreement with each side understanding what the parameters of that agreement are.

MR. SCHOOLS: That's my understanding. And I think with respect to discovery for penalty phase issues, at least from Mr. Swerling, I think, and I are in agreement that Rule 16 applies to non-medical records. I don't know whether Mr. Fulks is in agreement with that or not.

THE COURT: What about that?

MR. BLUME: Well, I think that we are in agreement what the law is, we are in agreement that we are going to agree that Rule 16 applies. Is that the distinction?

MR. SCHOOLS: Either way. I mean, either we will agree that the law says it applies or we will agree --

MR. BLUME: I think with the exception of the medical records, yes, we are in agreement. I do want to clarify one point on that, just so -- in the research in the memoranda, I take it -- just to clarify that -- it's not the government's position that Rule 16 would require us to disclose records

which were provided under Rule 16, which were provided to the experts which form the basis of their opinion, but which will nevertheless not -- we will not seek to introduce during our case in chief?

MR. SCHOOLS: Well, I think they would be -- they would be obligated to disclose those records when the opinions are disclosed, but not -- if they are not intending to introduce them, then we are not entitled to preview them. It may be semantics, but that's the way I understand it is. If those records merely support the opinion and they are not going to be offered in evidence --

THE COURT: Rule 16 only addresses evidence intended to be introduced at trial.

MR. SCHOOLS: Right.

MR. BLUME: Then we are in agreement on that.

THE COURT: If you are only going to use them as backup for the opinion --

MR. BLUME: Your order covers that, that would be at some other time other than under the Rule 16. I just wanted to make sure we were clear on that distinction.

THE COURT: All right. Well, I will wait 10 days and get a brief on this, but I'm presently inclined to think that Rule 16 just would apply straight up. If you are going to put the records in to prove something apart from the opinion, I think probably they need to be produced. But if they just are

backup for the medical professionals to render their opinion, the earlier order covers it.

All right, so does that cover that motion now? All right.

MR. SWERLING: Judge, I'm sorry, I'm not trying to be -- Mr. Schools said that he thought Rule 16 applied to everything other than the medical records, that he would be --

MR. SCHOOLS: No, I said I thought that Mr. Swerling agreed to that part of it.

MR. SWERLING: Okay, so that --

MR. SCHOOLS: It applies on its face at the penalty phase. And I understand he doesn't agree that it applies to medical records, but that with respect to other types of evidence, if he's got, you know, middle school records that he intends to offer, I think he's entitled -- he's obligated to give us those things under --

MR. SWERLING: Oh, I agree with that.

THE COURT: All right.

MR. SWERLING: I agree with that. The issue is going to be the medical records, and I'm not sure what parameters we have established or if we have established any, and you are just going to wait to rule on that --

THE COURT: I thought you said you wanted to brief --

MR. SWERLING: Okay, we will go ahead and do that.

THE COURT: All right.

MR. SWERLING:  You wanted to say something though about -- Judge, because Mr. Harris and I thought about that, about the --

(Off record discussion)

MR. SWERLING:  Judge, we will just put it in the brief, because I --

THE COURT:  All right.

MR. SWERLING:  Mr. Harris has some concern about the order that was issued the other day for us to turn over records to Butner.  So, I just -- we need to get an understanding between us as to what he --

THE COURT:  Is that still not -- is that still unclear?

MR. SWERLING:  No, no, we are talking about your order is for us to turn it over to Butner.

THE COURT:  All right.

MR. SWERLING:  And Mr. Harris thinks that that may have some overlap here in this issue.  There might be some issue with respect to that, our turning it over --

THE COURT:  Well, the government is not going to get anything from Butner at first, it's going to be sealed.  So, whatever medical records go to Butner is not going to be transmitted to the government until it's -- unless and until it's unsealed.

MR. HARRIS:  Unless --

THE COURT: What Mr. Schools is saying is -- I think we are making this more complicated than it needs to be.

If y'all are going to use anything at the penalty phase, a piece of paper that's a medical record, whether it was used to form an opinion for the doctor or not, if you are going to introduce it in front of the jury, Rule 16 says you have to turn it over.

And Rule 12 does not trump Rule 16. If it's going to be evidence used to prove something other than the medical opinions, which probably not, but, I mean, that's what they want, I assume. Is that right, Mr. Schools?

MR. SCHOOLS: Yes, sir.

THE COURT: All right.

MR. SCHOOLS: Your Honor, with respect to that issue that Mr. Swerling just raised in regards to the order that you issued directing them to send records to Butner, which was an order that was not filed under seal, I think they filed their response under seal, I don't know why, and I don't know whether it should remain under seal. Your order wasn't under seal, their response to it was under seal.

THE COURT: Well, we had an ex parte hearing, but Mr. LeBlanc was here from the newspaper, and I asked if it needed to be ex parte and the lawyers agreed that it did not. So, I can just tell you there was some confusion about whether I required the defendant to submit medical records to Butner when

Mr. Basham went up there.

The warden wrote me and said, "I didn't get any medical records. I got some educational records, but no medical records."

So, I fired off a hot order to the defense lawyers asking them to explain why the records didn't go up there. We got the transcript of when we talked about it, and Mr. Swerling said essentially he didn't want to have to give records to the medical people at Butner until his medical people had had a chance to look at them.

And there was some discussion in the colloquy that implied that the defense lawyers were going to decide which records the doctors looked at and which ones they didn't need to see. And I quite clearly said, "I think that's proper, that the doctors need all the medical records. It's not up to the lawyers to decide what they see and what they don't see. The lawyers cannot filter out anything."

They agree with that. And then the question became, when did they need to turn them over. The defense lawyers said they didn't want the doctors at Butner to look at them before their experts had looked at them.

And I said I didn't see the reason for that position, because the doctors at Butner are not going to collaborate with their doctors, it's two independent investigations.

And so to make a long story short, I required them to

go ahead and send the records up there now, all that they had. If they get any more later, they have to furnish those as well. And I asked the people at Butner not to form an opinion or write a report until all the records are received. So that's kind of how we stand.

MR. SCHOOLS: Given that, Your Honor, what we would like is a copy of the defendant's response to your order, and the ability to order the transcript of the hearing that you just described.

Our purpose, of course, is the defendants have previously provided us notice of the opinions that they expected their experts to give. We think it's instructive that at that point their experts did not see medical records.

THE COURT: Well, see, I had a major problem with that too. And I even said that I might have to take a hard look at the vouchers where we are paying these doctors to form opinions based on no review of any medical records. I mean, I would not let that opinion in evidence, I don't think.

And so you have been furnished opinions of doctors?

MR. SCHOOLS: They had to provide us notice back in January of roughly what their doctors were going to testify about.

THE COURT: All right.

MR. SCHOOLS: And we think it's important when we are cross-examining their doctors that we are -- if the defendants

have represented -- and I think based on -- as I understand the description of the hearing, based on what I understand, they are representing their doctors had not yet seen medical records at that point, to the court. And if that's the case, we would like to know that, and we think --

THE COURT: All right, Mr. Swerling, what about that?

MR. SWERLING: Well, Judge, I think we filed our response in accordance with your order. And our response we believe was pursuant to your order and should -- and was done ex parte as the order was done. There was not -- the government was not a party to that.

THE COURT: Why should there be ex parte, is what I'm saying? Why should it be ex parte?

MR. SWERLING: Well, because we drafted the order understanding that it was going to be ex parte.

THE COURT: Well, you can't just agree on something being secret just because you agree to it. We fought that battle in South Carolina last year, and I strongly reject the proposition that things can be filed in court under seal just because the lawyers agreed to it. This is a public courthouse.

MR. SWERLING: No, I'm not saying we agreed to it. We filed it -- the order was sent to us, it was not sent to the government. They were not a party to the whole proceeding.

MR. SCHOOLS: We got a copy of that order.

THE COURT: I didn't file my order under seal.

MR. SWERLING: Okay, well, I didn't realize that.

THE COURT: All right. Well, their point is, you have given them opinions from your doctors, and at the same time indicated that the doctors have not yet examined the prior historical medical records, and they want to try to make a big deal about that, apparently.

MR. SWERLING: Well, I mean, they can make all the big deal they want, Judge. I mean, we gave them the notice that we were required to. Our physicians are now examining all the records --

THE COURT: It just goes back to what I said at the hearing Tuesday, and I know y'all think that I just kind of blew my stack, but I signed subpoenas back in October for 20 different medical facilities to turn over records. And it just is astounding to me with all the resources I have authorized, that the doctors have not looked at any of those records. I just do not understand that.

MR. SWERLING: Well, they have been doing consultations, they have been visiting Mr. Basham, they have been doing their own testing, all of which has been given to Butner. But the medical records, as we get them in, we are now sending them over to them from prior to November of --

THE COURT: But as we get them in -- I signed a subpoena last October, and if somebody has only given you records in February --

MR. SWERLING:  No, I --

THE COURT:  -- that were subpoenaed in October, you ought to let me know so I can put them in the hoosegow for not responding to the subpoena.

MR. SWERLING:  I'm not representing that.  We have been getting then in, some of them we have had to give you again in forthwith orders because they did not comply.  I mean, I can't stand here and give you an inventory of every one of them because there are multiple ones.

THE COURT:  All right, well, the issue that -- the precise issue that sparked this debate, Mr. Schools wants me to unseal the transcript of what was said Monday -- Tuesday, rather, and I guess y'all's response to my order requesting an explanation of why the records weren't produced.

Let me go back and look at that response and let me take that under advisement.  You don't have to have that information right away, Mr. Schools, we can talk about that again when we come back on the 8th.

MR. SCHOOLS:  Yes, sir.

THE COURT:  Let me just go back and let the dust settle a little bit and look at the order and look at your response and see if there's anything in it I think would be damaging -- unfairly damaging to your client.

MR. SWERLING:  Yes, sir.  And I just want to reiterate that the order that was issued for medical records

back in January said that we were supposed to give them 10 days after they were --

THE COURT: That was a misprint in that order. I mean, that would make no sense, because the transcript of the hearing clearly said you got to give the doctors at Butner whatever you give your doctors.

MR. SWERLING: Judge, I did get that, and it didn't say that we had to give it to them before we gave it to our physicians.

THE COURT: Well --

MR. SWERLING: I mean, I just want the court to understand, we did not intentionally try and work around this, we were working under the parameters of what was said in court and what the order was. I just don't want you to think that we were in any way trying to circumvent your order.

THE COURT: I didn't say that. I said there was confusion, but I thought I had cleared up the confusion that the records needed to be produced.

I mean, Mr. Swerling, we don't need to do a cat and mouse game here. Medical professionals who examine someone to render an opinion as to whether they are competent need to have that person's past medical records before they form that opinion. It's just that simple. It's just that simple.

MR. SWERLING: It became clear --

THE COURT: All right.

MR. SWERLING: We told you we are going to send them all, and we are.

THE COURT: All right. Well, let me just take this under advisement. We'll talk about this again on the 8th.

All right, the only thing left is the constitutional challenge to the death penalty. I have read the voluminous briefs that have been filed twice each. I think it was said yesterday that the principal point that the defendants want to argue is the proposition that the rules of evidence don't apply to the penalty phase. So, why don't we start with that one, and who wants to go first?

MR. BLUME: Your Honor, I mean, I was a little confused yesterday, I thought you didn't want to hear argument on this motion at all, but the --

THE COURT: Well, I don't have to. Most of these issues you raised are very well argued, very well researched, excellent briefs. But most of them have been ruled on by either the Fourth Circuit or other circuits adversely to you. And so I thought you said you did want to talk a little bit about this suggestion that hearsay can come in at sentencing.

MR. BLUME: But that's the only one I intended to mention this morning. But if Your Honor feels as if the issue is fully briefed and you understand --

THE COURT: Why don't I just take it under advisement and go back and read the briefs again, and then do a written

order.  Because it's pretty important, it needs to be memorialized for purposes of, you know, later appeals.  Do y'all want to be heard on the challenge?

MR. SCHOOLS:  No, sir.

THE COURT:  Mr. Harris, Mr. Swerling?

MR. SWERLING:  No, sir.

THE COURT:  All right.  Well, let me just take it under advisement then.  And there were unusually good briefs on both sides on this issue.

All right, what else?

MR. GASSER:  Your Honor, I spoke with Mr. Harris and Mr. Swerling on an issue involving the possibility of, either through a court order, getting known handwriting samples from Mr. Basham.

There are -- and the government may during the penalty phase of Mr. Basham's trial, may seek to introduce letters which the government believes were written by Mr. Basham to Ms. Beth McGuffin in which one interpretation of those letters implicates -- or implicate him in the Burns matter, as well as some other matters as well.

Also, Your Honor, pursuant to discovery, I know the defense attorneys were able to obtain this information on their own.  In the Hopkins County Detention Center there were records of both Mr. Fulks and Mr. Basham.  Included in the records of Mr. Basham were written requests to the nurse or physicians at

the detention facility in which one could argue is exculpatory, or at least benefits Mr. Basham, with regard to some mental incapacities.

What the government proposed to Mr. Basham's attorneys was that the government would be willing to stipulate that the handwriting on those particular documents is in fact that of Branden Basham, if we have reciprocity from Mr. Basham's attorneys that the handwriting on the letters that we have that he sent to -- or that allegedly that Branden Basham sent to Beth McGuffin was in fact his handwriting as well.

THE COURT:  The letters to who?

MR. GASSER:  To Beth McGuffin.

THE COURT:  And that would eliminate the need for an order for handwriting exemplars?

MR. GASSER:  That's right.  And, again, that's the only stipulation.  We understand that both sides may have arguments as to the admissibility of those particular documents, but just as to the authenticity of --

THE COURT:  You are offering a trade here, you won't contest that the written request to the nurse that helps show mental incapacity, the handwritten --

MR. GASSER:  Yes, sir.

THE COURT: -- if the defendant will agree that the letters to Beth McGuffin are also written by him?

MR. GASSER:  Yes, sir.

THE COURT:  It doesn't matter to me.

MR. HARRIS:  We agree to the handwriting, but subject to the admissibility of whether they are going to put them in at trial --

THE COURT:  Right.  But the admissibility is a whole different issue.

MR. HARRIS:  Right.

THE COURT:  But you are admitting that -- you are prepared to admit that those letters to McGuffin are written by the defendant?

MR. HARRIS:  Yes, sir.

THE COURT:  All right.  And y'all are prepared to concede that the letters to the nurse are written by the defendant?

MR. GASSER:  Yes, sir.

THE COURT:  Very good.  We end on a good note there.  Anything else?

MR. SWERLING:  Judge, I understand -- I have been advised there is another issue going to come up.  It's floated around for a week or two, but nothing has happened.  I understand the government is going to subpoena from me today for some letters that we are in possession of.

Let me just give you just a brief rundown.  What happened was, a couple of my investigators were in Indiana and went by to see Tina Severance, whose name you have heard during

the course of the proceedings. She had a relationship with Mr. Fulks.

They went by to speak with Ms. Severance about just a lot of things that she may know about the case, history and, et cetera. And she turned over to them -- gave them a pack -- or I guess a bag full of letters that she had received --

THE COURT: This is your investigators?

MR. SWERLING: Yes.

THE COURT: All right.

MR. SWERLING: -- that she received from Mr. Fulks while he was in jail. There are some letters I think that predate November of 2002, and then some subsequent to November 2002.

On that day the government called me, and I called Mr. Blume and told him what I was going to do. They both requested that I turn over the letters to them. And what I -- I told them that I didn't think I could do that, and I wanted the court at the appropriate time to go ahead and make that decision, as to which party I should turn them over to, or both.

I have them, they have been -- the integrity of them has been preserved, they are in the same bag. We have not removed anything from it. I would not tell the court -- we have looked at some of it, but I'm not going to turn it over to either party unless --

THE COURT: All right.

MR. SWERLING: -- until the court tells me to do it, because I don't think it's fair to Mr. Fulks and the government has --

THE COURT: Does the government object to both defendants getting copies of them?

MR. SCHOOLS: No, sir.

THE COURT: All right. Mr. Blume, do you object to the government getting copies of the Tina Severance letter written by -- written to Ms. Severance allegedly by your client?

MR. BLUME: Well, it's difficult to say because I have no idea what's in them.

THE COURT: All right.

MR. BLUME: I don't know that -- you know, that I can say one way or another without having any idea what's in them. I mean, there were some questions about, you know, these records and what was in -- told to Ms. Severance when she got them.

THE COURT: Well, they weren't produced pursuant to a search warrant or anything, they were just voluntarily given to your investigator?

MR. SWERLING: They voluntarily gave it to our investigators. And initially there was some question about whether or not somebody represented who they were working for.

I got an -- I was on the phone with Mr. Gasser that day, and we both called Ms. Severance, because I was upset and concerned that someone might have done something like that. So, Mr. Gasser and I -- I called her and then we got on a conference call with her. And I'm satisfied that she turned them over knowing who they were and who our two investigators were representing.

Is that your understanding, too?

MR. GASSER: That's my understanding. She also indicated that, you know, she turned them over to the people -- that she had absolutely no problem with the government or anybody taking a look at them.

MR. SWERLING: There was no misrepresentation -- I just want the --

THE COURT: Well, why don't you just sit tight on the subpoena, don't respond, and then I will give Mr. Blume a chance to write a brief as to why they shouldn't be turned over to both your client and the government.

MR. BLUME: I would just like I guess a chance to think about it. I hadn't really sort of thought through this for a minute, so I can think about it and either say -- I guess at that point I can come back and say I don't have any objection --

THE COURT: Well, let's take that up on the 8th when we come back, how about that? Can you get me a brief some time

next week on the issue?

MR. BLUME: I will submit a brief in the event that I object to disclosure. If I don't, I will just inform the U. S. Attorney and Mr. Swerling that I have no objection.

THE COURT: All right. Anything else?

MR. SCHOOLS: Nothing from the government.

MR. SWERLING: No, sir.

THE COURT: Well, we have taken a few things under advisement we are going to go back into on the 8th when y'all come back. But the principal question, of course, is the continuance and the trial date. If I bump the trial back just a little bit, is it reasonable to think that we can try this case over the summer with so many jurors having vacations? I suppose we could.

MR. SCHOOLS: Your Honor, I think if the trial was going to occupy the entire school break vacation, I think we would have a problem. But if we were to start this case in early May or the middle of May, I think we could be finished by July 4th -- the second week in July at the latest, and I think that that would not be problematic.

THE COURT: What if we started drawing a jury in June, pick the jury during the month of June, start the trial the week after the 4th of July, so that way at least half the jurors would have had their summer vacation? Because a lot of people take them in May and June.

MR. SCHOOLS:  I think, Your Honor, that's a --

THE COURT:  I'm not saying if you want to go that long --

MR. SCHOOLS:  No, I understand --

THE COURT:  -- but I mean, that would be feasible too, wouldn't it?

MR. SCHOOLS:  And the main problem we have with that, Your Honor, is that Mr. Thurmond's wife is supposed to have a baby on August 1st.

THE COURT:  Oh, I forgot about that.  Okay.  What about it, Mr. Swerling, you've had some long trials, is it feasible to do them over the summer?  I have had a seven week trial and we tried it in January and February, which is the best time in the world to try cases because nobody has vacations much then.  We didn't lose -- you know, we didn't lose hardly any jurors.

MR. SWERLING:  Right, Judge, I mean, I think we are getting 800 people in.  You know, if they can -- well enough in advance, they can make their arrangements.  Especially if the court let's them -- didn't you say yesterday you were going to go ahead and tell them that there might be a change in the date and to --

THE COURT:  Well, we didn't tell them --

MR. SWERLING:  -- know what their vacation plans are -- or that you were going to?

THE COURT: If we have to run on past August, I think the questionnaire asks them about travel plans and vacations through the month of August. If we can't try this case by the month of August, we may have to do another written one page questionnaire saying to tell us about any conflicts in the fall.

MR. NETTLES: Judge, I think that the way the school started now, they started the first week in August. And so July -- the last day of July really is the last day for people to take vacations, and they are back using the sales tax holiday and doing that kind of thing.

And not only that, traditionally, as Your Honor is aware, a lot of people in South Carolina who are blue collar workers take their vacation during the week of the 4th of July because that's when their --

THE COURT: Well, I said the week after that.

MR. NETTLES: Yes. And therefore I think if we started picking the jury in June and started in July, you would get rid of 80 percent of the hangups that would -- that people would have of vacations. So, I think that is eminently reasonable to do it like that.

THE COURT: All right, anything else?

MR. HARRIS: Yes, sir, one last matter. We would ask that Mr. Basham be housed in a different facility, ask that he go to Lexington. He's had some medication problems at Richland

that continue, which has resulted in at least, as the court is aware, two suicide attempts.

He has also had some conflicts with some of the people there, some of the inmates. We just found out there are inmates giving him medication to slow him down because he's -- he's -- for whatever reason, they are giving him medication there.

THE COURT: All right. And you wanted me to order him transfered to Lexington instead of Richland?

MR. HARRIS: Lexington County Detention Center, yes, sir.

THE COURT: All right, let me -- I can't order at this moment, but let me think about it. I may well try to do it in light of the problems we have had.

MR. HARRIS: Thank you, Judge.

THE COURT: I may well try to do it. I might just call the marshal and speak with him orally about it.

MR. BLUME: Judge, I do have one -- just to go back to an issue, it should just take a second.

I would think before -- I mean, as I understand it, the subpoena, the issue is for disclosure of these letters. And the letters as I understand it are letters that were written by Mr. Fulks to Ms. Severance; is that correct?

MR. SWERLING: That's correct.

MR. BLUME: I would think that since they are Mr.

Fulks' letters, before -- obviously I'm not asking at this point that I be delivered possession of them, but that Mr. Swerling allow me to read the letters. And then without like giving me copies, for that matter, allow me to read them, and then after that I can say -- you know, I think, make a more informed decision.

MR. SCHOOLS: Judge, I don't particularly care, but we are making a mountain out of this molehill. Because I can't imagine any theory under which a defendant who sent a letter to somebody else has any standing to object to her giving it to whoever she wants to give it to.

She gave it to Mr. Swerling, Mr. Swerling notified us. We, through the procedures available to the Department of Justice, got approval to issue a subpoena to Mr. Swerling to get what is clearly potentially evidence in this case. And what standing he could possibly have to object, I just don't see.

They want to go through this exercise, I don't particularly care, but I don't understand where we are going or why we are going there.

THE COURT: Well, I think I agree with you. But I was going to give Mr. Blume a chance to think about it and write me a brief if he wanted to. But now he says he wants to see them before he commits to a position.

MR. SCHOOLS: It doesn't make any difference to me,

he can do whatever he wants to, but I just don't see -- I mean, this issue just seems to be --

THE COURT: Well, then, let Mr. Blume look at them.

MR. SWERLING: Yes, sir.

THE COURT: But keep them all in intact now, don't pick and choose. He gets to see them all and to keep them all together.

MR. SWERLING: They are in a locked -- I just want to throw out one thing. We did not advise the government we got them, the government called me and said, "We heard you got them."

THE COURT: All right.

MR. SWERLING: I did not make that disclosure.

THE COURT: Okay. All right, thank you very much. We'll see you back at 9:30 on the 8th of March.

(Thereupon, the proceedings were adjourned.)

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____     _____
s/ Gary N. Smith, CM

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 5

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENC DIVISION

UNITED STATES OF AMERICA, )    CR. NO. 4:02-992
                          )    COLUMBIA, SC
                          )    JUNE 22, 2004
                          )
  VERSUS                  )
                          )
CHADRICK E. FULKS         )
      DEFENDANT.          )
                          )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XVI

APPEARANCES:
FOR THE GOVERNMENT:        STROM THURMOND, JR., USA
                           SCOTT SCHOOLS, AUSA
                           JONATHAN S. GASSER, AUSA
                           UNITED STATES ATTORNEY'S OFFICE
                           1441 MAIN STREET, SUITE 500
                           COLUMBIA, SC  29201
FOR THE DEFENDANT:
                           WILLIAM F. NETTLES, IV, AFPD
                           FEDERAL PUBLIC DEFENDER'S OFFICE
                           MCMILLAN FEDERAL BUILDING
                           401 WEST EVANS STREET, ROOM 240
                           FLORENCE, SC 29503

                           JOHN H. BLUME, III, ESQ.
                           BLUME AND WEYBLE
                           P. O. BOX 11744
                           COLUMBIA, SC  29211

                           SHERRI LYNN JOHNSON, ESQ.
                           1118 AUTUMN RIDGE LANE
                           ITHACA, NEW YORK 14850

COURT REPORTER:            DEBRA R. JERNIGAN, RPR, CRR
                           UNITED STATES COURT REPORTER
                           901 RICHLAND STREET
                           COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** *** ***

INDEX

**JA 1001**

HE WAS SAYING.

I JUST CAN'T IMAGINE HOW, IF THESE SHOES WERE ON BETTER FEET, THE GOVERNMENT WAS TRYING TO DO THIS, THIS WOULD BE SUCH AN EASY ISSUE FOR THE COURT. WHAT WE WOULD BE TRYING TO DO IS CREATE AN INFERENCE THAT IS NOT TRUE. AND MS. JOHNSON KEEPS SAYING THAT, WELL, THE GOVERNMENT SUGGESTED IT WAS INCRIMINATING, AND IT WAS. BUT YOU HAVE TO PUT ALL OF THAT IN THE CONTEXT. WE WOULD NEVER DREAM ABOUT SEEKING TO DO WHAT THEY ARE TRYING TO DO RIGHT NOW BECAUSE IT WOULDN'T, IT JUST WOULDN'T BE FAIR BECAUSE WE WOULD REALIZE THAT, WHILE THAT COMMENT MAY SPEAK TO SOME LEVEL OF CULPABILITY ON MR. BASHAM'S BEHALF, IT DOESN'T DO ANYTHING MORE THAN THAT. IT DOESN'T SAY HE KILLED HER, IT DOESN'T SAY THAT. IT WASN'T FEELING TERRIBLY ABOUT HAVING SOME OTHER ROLE IN THE OFFENSE. I MEAN, AFTER ALL, THE EVIDENCE IS CLEAR THAT MR. BASHAM IS THE ONE THAT CLIMBED IN ALICE DONOVAN'S CAR AT GUNPOINT, FORCED HER TO DRIVE OUT OF THAT PARKING LOT. HE COULD HAVE BEEN TALKING ABOUT THAT. HE COULD HAVE BEEN TALKING ABOUT ANYTHING. THE PROBLEM IS, THE DEFENDANT WANTS TO LIMIT TO THAT ONE SINGLE INFERENCE, WHICH IS TAKING IT OUT OF CONTEXT.

MS. JOHNSON: I WILL BE BRIEF. I WANT TO MAKE TWO FACTUAL POINTS. ONE OF WHICH IS THE RULE OF COMPLETENESS DOESN'T APPLY HERE. THIS IS THE ONLY THING THAT MR. BASHAM, HIMSELF, SAID. OTHER THINGS WERE SAID TO HIS LAWYERS HOURS SEPARATED IN TIME. AND THE SECOND --

THE COURT: OTHER THINGS WERE SAID WHAT?

JA 1002

062204.txt

MS. JOHNSON: BY HIS LAWYERS WHICH WERE IN THIS HYPOTHETICAL FORM AT ANOTHER TIME. THIS IS A SINGLE STATEMENT MADE IN THE CAR BY MR. BASHAM, AND IT IS INTERRUPTED. AND SO, THERE ISN'T ANY RULE OF COMPLETENESS ISSUE HERE.

THE SECOND THING I WANTED TO SAY IS THAT, WHILE YOU CAN SAY, YOU KNOW, THERE ARE OTHER THINGS SAID ABOUT MR. BASHAM, THERE IS A DEMONSTRATION THAT SOME THINGS WERE FALSE. THE CRUCIAL QUESTION IS NOT WHETHER SOME THINGS WERE FALSE. THE CRUCIAL QUESTION IS, DO WE KNOW WHO KILLED OR PARTICIPATED IN THE KILLING OF ALICE DONOVAN? AND WITH RESPECT TO THAT, THE STATEMENT, I HAVE NEVER KILLED A DEER AND NOW I HAVE, DOES NOT SUGGEST, NOW I HAVE KIDNAPED A WOMAN. IT SUGGESTS, NOW I HAVE KILLED A WOMAN.

NOW, A JURY MIGHT NOT DRAW THAT INFERENCE. THEY MIGHT DRAW AN INFERENCE OF, NOW I HAVE HELPED KILL A WOMAN. NOTHING SAID TO THE JURY THUS FAR HAS MADE IT CLEAR THAT MR. BASHAM HAS EVER SAID THAT HE PARTICIPATED IN THE KILLING OF THE WOMEN. AND THIS STATEMENT MAKES THAT CLEAR. AND IT DOES JUST ROUND OUT THE PICTURE, AS YOUR HONOR SAID EARLIER.

MR. GASSER: YOUR HONOR, JUST FACTUALLY, MS. JOHNSON IS INCORRECT. IF YOU RECALL THE JACKSON VERSUS DENNO HEARING, SHERIFF HEWITT WAS MY WITNESS. SHERIFF HEWITT TOOK THE WITNESS STAND AND TESTIFIED TO THIS COURT AT THE

255

COLLOQUY

SUPPRESSION HEARING. SHERIFF HEWITT TOOK DETAILED NOTES AND DESCRIBED THE STATEMENTS OF WHICH THE COURT HAS NOT RULED ON YET.

THE COURT: I THOUGHT THERE WERE SOME DIRECT STATEMENTS.

Page 222

**JA 1003**

MR. GASSER: TALKING ABOUT LEADING DOWN THE WAY, SHOWED PHOTOGRAPHS, TALKED ABOUT THE PURSE STRAP, TALKED ABOUT CHAD. HE DEMONSTRATED -- REMEMBER SHERIFF HEWITT DEMONSTRATING, BECAUSE HE WAS IN HANDSHACKLES, DEMONSTRATING HOW BRANDON BASHAM SAID THAT CHAD FULKS TOOK THE PURSE STRAP AND STRANGLED. SO, THIS WAS NOT THE ONLY STATEMENT THAT WAS PROVIDED BY BRANDON BASHAM TO LAW ENFORCEMENT. CERTAINLY, THE ONLY HYPOTHETICAL SITUATION OCCURRED AT THE END OF THE DAY WHEN THEY GOT BACK TO THE CEMETERY. ALL OF THE OTHER CONVERSATIONS WEREN'T COMING THROUGH MR. LITTLEJOHN OR MR. MONCKTON, THEY WERE COMING FROM THE MOUTH OF BRANDON BASHAM. AND HE WAS WHOLLY CONSISTENT IN ALL OF THOSE STATEMENTS THAT DAY THAT THE PERSON THAT ACTUALLY KILLED ALICE DONOVAN WAS CHAD FULKS.

MS. JOHNSON: YOUR HONOR, IF YOU WANT TO HEAR ANYTHING MORE OR NOT.

THE COURT: I WILL NOT ALLOW THE STATEMENT TO BE INTRODUCED. I JUST THINK IT IS IMPROPER UNDER THE BALANCING TEST ESTABLISHED BY THE STATUTE. I FIND THIS DANGER OF CONFUSING THE ISSUES SUBSTANTIALLY OUTWEIGHS ITS PROBATIVE

256

COLLOQUY

VALUE. IN ADDITION TO THE OTHER REASONS I HAVE INDICATED EARLIER.

THIS CASE IS BEING TRIED SEPARATELY ON THE DEFENDANT'S MOTION FOR SEVERANCE. WE HAVE TRIED TO DIVORCE THE STATEMENTS OF THE TWO DEFENDANTS FROM EACH OTHER. THE ONLY STATEMENTS I HAVE ALLOWED IN SO FAR ABOUT MR. BASHAM PUTTING THE BLAME ON MR. FULKS CAME FROM MR. FULKS'S LETTERS THAT HE WROTE HIMSELF, SO THERE IS NO CONFRONTATION CLAUSE PROBLEM THERE. AND I DON'T THINK THAT OPENS THE DOOR TO THIS

JA 1004

STATEMENT ABOUT KILLING A DEER.

I RESERVE THE RIGHT TO PUT ALL OF THIS IN A WRITTEN OPINION, IF I DEEM IT NECESSARY. BUT I WILL SUSTAIN THE GOVERNMENT'S OBJECTION TO THE REFERENCE BY MR. BASHAM TO KILLING A DEER AND DOT DOT DOT. IN OTHER WORDS, UNFINISHED SENTENCE.

WE STILL HAVE THE, STILL WAITING ON SOME INPUT FROM THE GOVERNMENT REGARDING JURY INSTRUCTIONS. JUST WHEN YOU GET TO IT. STILL WAITING TO HEAR ABOUT THE POLYGRAPH DECLARATIONS.

MR. SCHOOLS: YOUR HONOR, AGENT BRUNING SPOKE WITH JEFF NEWTON OF THE FBI TODAY. HE SAID MR. NEWTON IS SUBSTANTIALLY IN AGREEMENT WITH THE POLYGRAPHER OF THE DECLARATION OF MR. WILLIAMS, OF WHICH I HAD SOME CONCERN. WITH RESPECT TO THAT DECLARATION, WE DON'T HAVE ANY OBJECTION WITH THE COURT, SPECIFICALLY, WITHOUT CROSS-EXAMINATION.

THE COURT: SAY WHAT?

257

COLLOQUY

MR. SCHOOLS: WITH RESPECT TO THAT DECLARATION OF MR. WILLIAMS.

THE COURT: I AM NOT CONCERNED WITH JUST THAT ONE.

MR. SCHOOLS: I HAVEN'T SEEN ANY OTHER ONES.

THE COURT: I THOUGHT THERE WAS GOING TO BE DECLARATIONS ADDRESSING ALL THE ISSUES I WAS CONCERNED ABOUT?

MR. BLUME: IT DOES. THERE WERE THREE QUESTIONS. THE DECLARATION ADDRESSES THE THREE ISSUES.

MR. SCHOOLS: MAIN ISSUE I WAS CONCERNED EARLIER WAS THE DECLARATION THAT MEDICATION COULD BE DOSED OUT THROUGH THE QUESTIONING PROCESS AND THAT THE TEST WOULD STILL BE VALID. AGENT NEWTON, WITH THE FBI, AGREES WITH THAT STATEMENT IN PRINCIPLE. SO, WE DON'T, AND WE DON'T HAVE ANY BASIS TO

Page 224

**JA 1005**

CHALLENGE THE OTHER FACTUAL REPRESENTATIONS THAT THE POLYGRAPHERS MAKE ABOUT WHAT THEY ASKED HIM.

THE COURT: GO AHEAD AND HAND UP THE DECLARATION THEN.

MR. SCHOOLS: I HAVEN'T READ THE SECOND ONE.

THE COURT: YOU HAVEN'T READ THE SECOND ONE?

MR. SCHOOLS: I HAVEN'T READ THE SECOND ONE.

THE COURT: READ IT TONIGHT. I WILL TAKE IT UP FIRST THING IN THE MORNING. GET THOSE -- PUT THIS ISSUE TO BED ONE WAY OR THE OTHER.

ALL RIGHT. I STILL HAVE UNDER ADVISEMENT THE DEFENDANT'S MOTION TO STRIKE THE AGGRAVATING FACTOR OF PECUNIARY GAIN.

258
COLLOQUY

AND I STILL HAVE UNDER ADVISEMENT THE DEFENDANT'S MOTION FOR ACCESS TO MR. BASHAM'S MEDICAL RECORDS FROM BUTNER. THOSE RECORDS ARE SITTING IN A BOX IN MY OFFICE RIGHT NOW. PRETTY BIG BOX. MR. BLUME, I JUST DON'T THINK THAT THAT INFORMATION CAN BE SAID TO BE IN THE GOVERNMENT'S POSSESSION, WHEN THE GOVERNMENT INDIVIDUAL WHO HAD THOSE RECORDS ARE MEDICAL PERSONNEL WHO HAVE MADE AN INDEPENDENT EVALUATION, AND WHO HAVE HAD THEIR RECORDS AND REPORTS SEALED AND NOT AVAILABLE TO THE GOVERNMENT PROSECUTORS. I JUST DON'T THINK IT IS IN THE GOVERNMENT'S POSSESSION UNDER THOSE CIRCUMSTANCES.

MR. BLUME: WELL, AGAIN --

THE COURT: THAT IS ALL BRADY REQUIRES, RIGHT? EXCULPATORY MATERIAL IN THE GOVERNMENT'S POSSESSION HAS TO BE DISCLOSED. AND THEY DON'T, YOU KNOW, THEY CAN'T TELL IF THEY HAVE ANY EXCULPATORY BECAUSE THEY HAVEN'T SEEN IT. I HAVE POSSESSION OF IT IN-CAMERA, BUT I DON'T THINK IT WOULD BE PROPER FOR THE COURT TO GO THROUGH THOSE RECORDS AND DETERMINE

JA 1006

                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF SOUTH CAROLINA
                          FLORENCE DIVISION

UNITED STATES OF AMERICA,      )     CR. NO. 4:02-992
                               )     COLUMBIA, SC
                               )     AUGUST 4, 2004
                               )
      VERSUS                   )
                               )
BRANDON L. BASHAM,             )
          DEFENDANT.           )
_____)

           BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
             CHIEF UNITED STATES DISTRICT COURT JUDGE
                      PRETRIAL CONFERENCE

APPEARANCES:
FOR THE GOVERNMENT:            SCOTT SCHOOLS, FIRST AUSA
                               JONATHAN S. GASSER, AUSA
                               UNITED STATES ATTORNEY'S OFFICE
                               1441 MAIN STREET, SUITE 500
                               COLUMBIA, SC  29201

FOR THE DEFENDANT:             JACK SWERLING, ESQ.
                               1720 MAIN STREET
                               SUITE 301
                               COLUMBIA, SC  29201

                               GREG HARRIS,
                               1720 MAIN STREET
                               SUITE 301
                               COLUMBIA, SC  29201


COURT REPORTER:                DEBRA R. JERNIGAN, RPR, CRR
                               UNITED STATES COURT REPORTER
                               901 RICHLAND STREET
                               COLUMBIA, SC 29201



              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                     *** *** *** ***

JA 1007

THERE, BUT MR. LITTLEJOHN WENT THROUGH OF GETTING BACK IN THE VAN, SPEAKING WITH HIM, AND THERE WERE PEOPLE STANDING AROUND.

THE COURT: I DON'T REMEMBER MR. LITTLEJOHN SAYING HE HAD NO AUTHORITY TO MAKE THE STATEMENT. HE DIDN'T HAVE ANY -- DIDN'T HAVE THAT INFORMATION FROM HIS CLIENT, IS THAT WHAT HE SAID?

MR. SWERLING: I THINK IT WAS NO AUTHORITY. THAT IT DID NOT COME FROM. I DON'T RECALL HIM SAYING THAT INFORMATION CAME FROM MR. BASHAM EITHER. BUT I DON'T HAVE THE TRANSCRIPT IN FRONT OF ME. I HAVE IT BACK ON MY CONFERENCE TABLE. I READ IT WHEN IT CAME IN, BUT IT IS A LONG TIME AGO.

THE COURT: THIS IS NOT SOMETHING WE HAVE TO RESOLVE TODAY. I UNDERSTAND IT IS A CRITICAL ISSUE IN THE CASE. LET ME GO BACK AND DUST OFF THOSE FILES. I THINK YOU BRIEFED IT. LET ME DUST OFF THOSE BRIEFS AND LOOK AT THE TRANSCRIPT AGAIN AND WE WILL DECIDE THAT BEFORE JURY SELECTION.

MR. SWERLING: JUDGE, IF I RECALL, MOST OF THE CASES DEALT WITH REPRESENTATIONS MADE BY AN ATTORNEY IN COURT AND A LOT OF THE CASES --

THE COURT: I KNOW WE HAVE BEEN THROUGH THAT BACK WHEN WE HAD THE MOTION TO DISQUALIFY THE FIRST SET OF ATTORNEYS. I REMEMBER NOT A LOT OF CASE LAW ON IT, BUT CASES ARE OUT THERE FOR THE MOST PART DEALING WITH STATEMENTS MADE

IN COURT.

I HAVE ONE MATTER TO TAKE UP IN-CAMERA WITH THE DEFENSE LAWYERS, BUT BEFORE WE DO THAT, IS THERE ANYTHING ELSE THE GOVERNMENT WOULD LIKE TO BRING UP TODAY?

MR. SCHOOLS: YOUR HONOR, BASED ON THE COURT'S RULING IN THE FULKS'S CASE REGARDING THE PECUNIARY GAIN STATUTORY AGGRAVATING FACTOR, THE GOVERNMENT DOES NOT INTEND, WE WILL SUBMIT THE EVIDENCE, WE WILL NOT ARGUE THAT IS A SUFFICIENT AGGRAVATING FACTOR IN THE CASE.

THE COURT: YOU DON'T OBJECT TO THAT, DO YOU, MR. SWERLING?

MR. SWERLING: NO, SIR.

THE COURT: I THINK WE TOOK THAT OFF THE VIDEO SCRIPT, NOT SURE. IF IT IS ON THERE, IT WILL COME OUT. WHAT IS NEXT?

MR. SCHOOLS: WE HAVE SPOKEN TO MR. HARRIS AND MR. SWERLING THIS MORNING REGARDING THE APPLICABILITY OF RULE 16 AND WE WOULD, AGAIN, JUST REITERATE, BY AGREEMENT OF THE PARTIES, OBVIOUSLY RULE 16 APPLIES WITH RESPECT TO THE GUILT PHASE. AND WITH RESPECT TO THE PENALTY PHASE, RULE 12.2 COVERS THEIR DISCLOSURE -- REQUIREMENT OF DISCLOSURE OF MEDICAL RECORDS THEY INTEND TO OFFER, BUT THAT RULE 16 WOULD COVER ANY NONMEDICAL RECORDS THEY INTEND TO OFFER AND WOULD RELATE TO ANY EXPERT WITNESSES THEY INTEND TO CALL THAT WERE NOT MENTAL HEALTH EXPERTS. WE HAVE NOT GOTTEN ANYTHING FROM

THEM.

THE COURT: DO YOU NOT HAVE ANYTHING AT THIS TIME? YOU SAY UNDER RULE 16 YOU ARE ENTITLED TO ANYTHING TO BE USED AT THE GUILT PHASE IN TERMS OF MEDICAL RECORDS?

MR. SCHOOLS: IN THEIR CASE-IN-CHIEF.

THE COURT: CASE-IN-CHIEF.

MR. SCHOOLS: TO BE NOTIFIED OF ANY EXPERT WITNESSES THEY INTEND TO CALL, AND A SUMMARY OF THEIR PROPOSED TESTIMONY.

THE COURT: MR. SWERLING.

MR. SWERLING: JUDGE, WE HAVE NO PLANS TO OFFER MEDICAL TESTIMONY DURING THE GUILT PHASE.

THE COURT: DURING THE GUILT PHASE?

MR. SCHOOLS: AND, YOUR HONOR, I WASN'T SURE THAT WHEN YOU SPOKE THIS MORNING MR. SWERLING AND MR. HARRIS WERE PREPARED TO COMMIT ONE WAY OR THE OTHER ON THEIR DECISION ON THIS, BUT WE INTEND TO FILE A 404(B) NOTICE INTENDING TO OFFER THE EVIDENCE OF THE SAMANTHA BURNS'S MURDER DURING THE GUILT PHASE OF THIS CASE. WE DON'T THINK THAT 404(B) IS ACTUALLY APPLICABLE, THAT THE EVIDENCE IS INTRINSIC, THIS IS UNDER U.S. VERSUS CHIN. IF THE DEFENDANTS OBJECT TO THAT, I AM PUTTING THEM ON NOTICE NOW BY ORALLY, I WILL SEND A WRITTEN LETTER, AS WELL. BUT IF THEY INTEND TO OBJECT TO THAT, TO THE ADMISSIBILITY OF THAT EVIDENCE, WE WOULD NEED TO RESOLVE THAT.

THE COURT: ALL RIGHT. SO YOU SAY IT IS NOT EVEN 404(B), IT IS INTRINSIC?

MR. SCHOOLS: YES, SIR.

THE COURT: MR. SWERLING, WHAT ABOUT THAT?

MR. SWERLING: MR. SCHOOLS TOLD US ABOUT THAT THIS MORNING. WE WOULD LIKE AN OPPORTUNITY TO THINK ABOUT THAT. I UNDERSTAND WHAT THEIR POSITION IS. WE CERTAINLY CAN LET THEM KNOW AND LET THE COURT KNOW WHETHER WE OBJECT UNDER 404. TAKE THE POSITION WE DON'T THINK IT IS.

THE COURT: IF YOU OBJECT, THAT IS FINE. BUT I NEED SOME AUTHORITY FROM BOTH SIDES. JUST THE FACT THAT IT HURTS MY CLIENT OR IT HELPS THE GOVERNMENT'S CASE IS NOT PERSUASIVE. I NEED SOME AUTHORITY ON WHAT THE RULES PROVIDE AT A GUILT PHASE WHERE THE RULES OF EVIDENCE DO APPLY. IN OTHER WORDS, I GUESS THE BIG QUESTION IS, IS IT INTRINSIC TO THE CRIME CHARGED HERE?

MR. SCHOOLS: I THINK OUR OBLIGATION IS TO PUT THEM ON NOTICE THAT WE INTEND TO OFFER. IF THEY WANT TO FILE A MOTION IN LIMINE TO EXCLUDE IT, THEY CAN DO IT. WE HAVE TO RESPOND IN WRITING.

THE COURT: RIGHT. WHAT IS NEXT, MR. SCHOOLS?

MR. SCHOOLS: THE ONLY OTHER QUESTION I THINK WE HAVE, YOUR HONOR, WITH RESPECT TO THE MANNER IN WHICH THE JURY VENIRE IS GOING TO BE, THE JURY -- THE ULTIMATE JURY VENIRE WILL BE SELECTED OUT OF THE PANEL. THE LAST TRIAL WE

HAD PULLED A NUMBER OF JURORS WHO WE DIDN'T GET TO, NEVER SAW THE VIDEOTAPE, AND THEN WE GOT A LIST TODAY OF SOME ADDITIONAL JURORS WHO HAVE BEEN SENT QUESTIONNAIRES. THE ONLY THING WE ARE CURIOUS ABOUT, WHETHER ALL OF THOSE JURORS WILL BE THROWN BACK IN AND RE-SORTED, START WITH THE PREVIOUSLY SELECTED JURORS WHO DIDN'T SEE THE VIDEOTAPE?

THE COURT: START WITH THE PREVIOUSLY SELECTED JURORS WHO HAVE ALREADY ANSWERED THE QUESTIONNAIRES AND WORK THROUGH ALL OF THOSE. AND THEN WE THINK WE WILL HAVE ENOUGH TO QUALIFY A JURY WITH JUST THAT LEFTOVER GROUP. IN CASE WE DON'T, WE DREDGED UP SOME MORE NAMES. AND WE HAVE SENT QUESTIONNAIRES TO THEM.

MR. SCHOOLS: FOR EXAMPLE, I DON'T REMEMBER WHAT DAY JURORS WE GOT THROUGH. IF WE GOT THROUGH EIGHT DAYS OF JURORS, JURORS WHO WERE PULLED PREVIOUSLY TO BE CALLED ON DAY NINE WHO DIDN'T APPEAR WOULD ACTUALLY BE THE FIRST DAY OF JURORS IN THIS CASE?

THE COURT: RIGHT. BUT NO ONE WHO SAW THE VIDEO. IN OTHER WORDS, WE WERE GOING TO CUT IT OFF. WE WERE GOING TO CUT IT OFF WITH ANYONE WHO SAW THE VIDEO. REMEMBER, WE HAD A LITTLE TAG-ALONG GROUP OF THREE OR FOUR THAT WE DIDN'T GET TO AT THE LAST. WE CUT THEM LOOSE PERMANENTLY. AND SO WE WILL JUST START WITH THE NEXT GROUP THAT DID NOT SEE THE VIDEO, BUT DID ANSWER THE FULL QUESTIONNAIRE.

MR. SCHOOLS: OBVIOUSLY, JUST SO WE ARE SURE WE ARE

DEALING WITH THE RIGHT GROUP, IF WE COULD GET A LIST OF THAT FROM THE CLERK IT WOULD BE VERY BENEFICIAL TO US.

THE COURT:   A LIST OF WHO IS COMING IN?

THE CLERK:  WE HAD BEEN UNDER THE UNDERSTANDING THAT THE ONES THAT YOU DID NOT GET TO THAT WE ALREADY HAD ON THE LIST WOULD BE PUT BACK IN AND WE WOULD CREATE NEW LISTS,  BUT THAT IS NOT THE WAY IT IS SUPPOSED TO BE?

THE COURT:   WHY?  IS THERE A WAY TO DO IT? THE LISTS WERE RANDOMLY GENERATED THE FIRST TIME.

THE CLERK:  WE CAN GO THAT ROUTE.

THE COURT:   LIKE TO HAVE IT, IF WE CAN.  LESS WORK FOR EVERYBODY IF WE KEEP THOSE DAILY LISTS INTACT.

THE CLERK:  WE NEED TO ADD MORE DAILY LISTS FOR THE NEW JURY SELECTION.

THE COURT:  NEED TO WHAT?

THE CLERK:  ADD MORE DAILY LISTS.

THE COURT:   ADD MORE AT THE END?

THE CLERK:  I WANTED TO MAKE SURE I UNDERSTOOD.

THE COURT:   DO YOU AGREE?

MR. SCHOOLS:  YES, SIR.

THE COURT:   DO WE HAVE IT BY DAILY LIST OR HAVE IT IN NUMERICAL ORDER?  CHANGING THE NUMBER EACH DAY IT SEEMED LIKE.

THE CLERK:  WE HAD IT BY DAILY LIST.  WE HAD MINI PANELS OF 24.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,        )        Cr. No. 4:02-992
                                 )
                                 )
VERSUS                           )        Columbia, S.C.
                                 )        August 25, 2004
BRANDEN L. BASHAM,               )
                                 )
                                 )
          Defendant.             )
-------------------------------)

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:        SCOTT SCHOOLS, ESQ.
                           JONATHAN S. GASSER, ESQ.
                           JOHN DUANE, ESQ.
                           Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
                           Columbia, S.C.  29201

For the Defendant:         JACK B. SWERLING, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

                           GREGORY P. HARRIS, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

Court Reporter:            Gary N. Smith, CM
                           901 Richland Street
                           Columbia, S.C.  29201
                           (803) 256-7743

          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

manipulative character, and the fact that he was a leader and astute, very crafty and skillful at manipulating people and getting people to do what he wanted them to do.

And I think that's relevant, I think that would probably come out at the guilt phase. I'm sure the defense lawyers will bring out that it was Mr. Fulks who decided whose car to steal, and what cities to go to, and what people to go visit, and that's fair, I think that's proper. And I think on mitigation I may let in evidence about his manipulative nature under this residual exception.

But when we get to the fact of Mr. Fulks' violent past, and the fact that he was -- that he abused his girlfriends, I mean, I'm just -- I'm really struggling with that.

Mr. Harris, let's suppose the jury goes back there -- because you don't want the jury to know that Mr. Fulks got the death penalty. So, let's say the jury goes back there and they hear all this evidence that you want to come in against Mr. Fulks, and they say, "Okay, on a scale of 1 to 10 of meanness, Mr. Fulks was an 8. And the only ones ahead of him is the Oklahoma City bombers are a 9, and the World Trade Center bombers are a 10, and he's 8. Mr. Basham, on the other hand, is only a 3," okay?

What does that get you? They don't know what penalty Mr. Fulks got. I mean, if they say, "Well, anybody on a scale

of 6 or above ought to get the death penalty, and Mr. Basham is a 3," it would make some sense. But if they are not going to know what penalty was meted out to Mr. Fulks, why does evidence of his bad past, his violent past, have anything to do with this case in the penalty phase?

MR. HARRIS: It goes directly to our argument on the minor participation, Your Honor.

THE COURT: Well, that's why I say the manipulation might go to his minor participation, but the fact that somebody is a very violent -- habitually violent criminal --

MR. HARRIS: He has a history.

THE COURT: I mean, you could have a habitually violent criminal who only drove the getaway car in this offense, and so he's -- and so the habitually violent person is only a minor participant in this offense. Because when you talk about the participation, you focus on the crime charged here, not past violent acts that one defendant committed before the defendants even knew each other.

MR. HARRIS: But I think it enlightens the jury as to who more probably was the leader in those acts. And let me take one step further than we took earlier, Your Honor.

There is no -- absolutely nothing in the record that shows Mr. Basham ever involved himself in auto break-ins, the theft and use of ATM cards, armed robberies, threatening use of loaded handguns, any of the number -- you know, any of the

crimes that are intrinsic to this case. Nothing, nothing whatsoever.

So, what you are going to end up with is, the government putting up a case -- and certainly we will be able to say, "Chad Fulks was driving." But Chad Fulks will be driving and these break-ins will be occurring. Chad Fulks will be driving and these people will be taking handguns. Chad Fulks will be driving and these people will be stealing credit cards. Chad Fulks will be driving and Tina Severance and others will testify that Branden Basham was committing a number of these acts.

The jury needs to understand, and the law specifically allows for that jury to understand, who was, as they say, running the train, who was in charge of those crimes, because those crimes were all intrinsic to this case.

And a jury can't possibly know the complete and total depth of Mr. Fulks' control and domination and culpability regarding my client, unless they know that he had done it on prior occasions to other people.

Once they understand that he had done this on prior occasions to other people, then they will more fully understand that more than likely, that most probably, I believe to a moral certainty, they will know that this crime was a train that was being driven by Mr. Fulks -- this crime not just being, you know, step one, step two of the murder, of the assault on Ms.

Donovan, but from the escape all the way through.

And again, Your Honor, it goes -- directly goes to relative culpability, and their respective roles in this offense. And again, we insist that the focus on these crimes not being relevant, and his history of talking people into committing all these other crimes, the little crimes, I guess you call petty crimes of ATMs, the armed robberies, and those offenses are not relevant to a carjacking and a murder, maybe they are not, but they are certainly, they are certainly compelling when explained to a jury.

And putting in context this entire crime spree, explaining to a jury who is more culpable than -- which defendant is more culpable than the other -- which the law perfectly allows. The law encourages us to do our job to explain to the jury all facets of the case and who was more responsible.

Because as you just pointed out, if a jury determines Mr. Fulks is a 9, and they are all back there voting. "Okay, Mr. Fulks is a 9. Mr. Basham is a 3." And then they get your jury instruction on -- as to 3592, then they may say, "Well, that guy is twice as bad as Basham. That guy is clearly a leader."

And they may even say, "He would never have escaped had Mr. Fulks in the past not talked him into escaping." They may say, "You know, I believe Mr. Basham's statement." Or "I

believe that testimony that Mr. Fulks had a history of talking people in jail into doing his bidding. I don't think Mr. Basham would have escaped, I don't think he's smart enough to escape. I don't think he's smart enough to get outside the state of Kentucky.

"I don't think he's smart enough to thrive in an environment and obtain drugs, and all the things that the government is going to be able to prove, I don't think he is capable of doing these things, had it not been for somebody who had done them all over the course of his entire life."

And when they are judging somebody as a 9 and a 3, and then listen to that instruction, and there's one juror that says, "I don't think that Mr. Basham would have been involved in this thing had it not been for a more culpable, a more controlling, a more violent, a person with a larger history of doing these very same things, then I'm going to spare his life." That's why it's relevant. I can't imagine anything more relevant, Your Honor.

THE COURT: Well, what about what you and the other defense lawyers told me when we were talking about dual juries? Y'all clearly said, "The big reason we need to avoid dual juries is, when we get to the penalty phase we don't want all that dirt against Mr. Fulks being heard by our jury, so our jury is going to have to go home for a week."

And not only did you say it would inconvenience a

reason.

THE COURT: Well, I'm going to leave number 129 down. Now, they may -- this juror may, you know, pipe up again when we get to jury selection. But I'm going to leave number 129 down, over the government's objection.

MR. SWERLING: 118, Judge, is asking for a medical excuse, that they may have to have surgery. But I would just suggest that we find out whether or not that is what's going to happen or not. Obviously, if they are going to have surgery, we don't have any problem.

She has an appointment on August 30th, so on that day it wouldn't be a problem. But if she's not going to have surgery, and she probably would know that on August 30th or September 1st, then she could still serve on the jury.

THE COURT: Why don't we move her down to the second week also? Let's move this one down to that same date, September the 8th. And then we will see what -- you know, we should know the result by then.

What about that from the government?

MR. GASSER: We agree.

THE COURT: All right.

MR. SWERLING: Judge, 134 basically is asking to be postponed until after September 7th. We have no objection to that. That's the fourth from the back, I think.

THE COURT: You want to move them down to when?

MR. SWERLING:  Be the second week also.

MR. GASSER:  What number is that?

THE COURT:  134.

MR. SWERLING:  The 8th?

THE COURT:  All right, let's move this one to September the 8th also.

What else?

MR. SWERLING:  The rest of them, Judge, we have no objection.

THE COURT:  All right.  Well, I'm going to try to avoid dictating an order then.  I'm going to ask the jury clerk to move to the 8th for scheduling conflicts 134, 118, and 123. I'm going to deny the hardship excuse request for number 129, with the understanding that we will have to follow up when the juror gets here, and maybe they will give us more information that turns me around.  But for now number 129 is denied.

And then I will grant the hardship request with the consent of both sides for 133, 117, 119, 120, 125, 131, 132, 124, 121, 122, 127, 126, 128, 130, 135.  And then also the -- for lack of a better word -- the nut case juror who -- we don't have a number for this, but is there any objection to excusing this juror that the memo was written about?

MR. GASSER:  No objection.

MR. SWERLING:  No, sir, no objection.

THE COURT:  All right.  And just so the record is

clear, those numbers we have been referring to are not the juror numbers on the master list, they are numbers that the clerk has just assigned for purposes of excuse requests. We try to keep it blind, and I don't even know who they are. I don't know the names of the people. And we will get this information to the jury clerk, and move forward on that basis.

All right.

MR. SWERLING: Yes, sir.

THE COURT: Anything else?

MR. SWERLING: I'm sorry, go ahead.

THE COURT: That's all I had. Anything else?

MR. SWERLING: I wanted to revisit one thing. When we talked about at the beginning about the questions we would be asking the jurors concerning the one murder versus two murders, and the government's position is going to be that's intrinsic in the guilt phase of the trial, and therefore is admissible, we understand that we need to probably cover that, but I don't want the court to think the record is reflecting we are waiving an objection.

THE COURT: I understand, I understand that. But that is what creates the problem for me drafting the question, I don't know how to ask it. And it's a question I think your side wants to ask.

MR. SWERLING: I think we both --

THE COURT: I mean, you inherited it from the first

defendant, the first defendant wanted to have it asked. But as I said, that was when we were dealing with the penalty phase only. But I mean, if you don't want me to ask it at all, I won't.

MR. SWERLING: No, I mean, I think it has to be asked, because I think when you get to the penalty phase it's particularly going to be important --

THE COURT: Right.

MR. SWERLING: -- as to whether or not they can keep an open mind when there's two homicides.

But I just didn't want Your Honor to think that -- or the government to think that we were not objecting to the Samantha Burns' evidence coming in during the guilt phase.

THE COURT: You aren't waiving your right to make that objection.

MR. SWERLING: That's fine. So, with that in mind, I guess we could get together Monday morning. You said you might fax us something or e-mail us something that the court would propose to state to the jurors with respect to that?

THE COURT: I'm just trying to -- my reasons for wanting to go put it in writing is it just goes so much quicker if I could reduce it to writing. And I'm just thinking if there's not some middle ground in terms of on the supplemental questionnaire putting in my lead-in -- when we did it before, before I asked the question, I did a fairly extensive lead-in

to say, "Mr. Juror, Ms. Juror, what we are striving for in the jury selection process is to select a jury that is completely fair and open-minded, and that can listen to both sides of the case, the government's side of the case and the defendant's side of the case, and give both sides a fair trial.

"It is important that the jury remain open-minded for the duration of the trial, from the beginning first witness until the last closing argument, and not form an opinion or make up their mind until they have heard all of the evidence. Do you think you could adhere to this standard or would you be more inclined to form an opinion earlier?" And at least ask that question on paper.

Then when they come in here, they will have had that preaching already about you have got to stay open until the end. And then I could say, "Now, following up on that question that we asked you in writing, if and only if, this is only a possibility, but there may be evidence, and I don't know at this point because I don't know what the evidence is going to be, but there may be evidence that the defendant was -- might have been associated in some way with not only one kidnapping in which someone died, but a second kidnapping in which someone died.

"If you learned about that second kidnapping, would that one fact alone cause you to stop your analysis and form an opinion at that point, or could you continue and keep an open

mind until the end of the trial?"

At least they would have already had the lead-in given to them in writing. That might save us a little time, and it might help the juror understand if they have seen the lead-in part in writing at least. What about that, Mr. Schools?

MR. SCHOOLS: What I was thinking is possibly we could even put a little more information. I think what I -- what government's biggest concern is that they actually answer the question outside the presence of the lawyers.

THE COURT: Right.

MR. SCHOOLS: If you gave them some segment of your lead-in, and all they did was to initial it to indicate that they had read it, then when they came to the courtroom they would have all of that. And we know they would have read it, and we could lead in --

THE COURT: Do you say the lead-in could even be broader and talk about the two deaths and talk about the fatal blow issue --

MR. SCHOOLS: And just have then --

THE COURT: -- and have them -- initially they read all this, and then I say, "Now, on a follow-up on what you read --" that might be -- that might not be a bad idea.

MR. SWERLING: The answers will be given in open court, rather than --

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,       )      CR. NO. 4:02-992
                                )      COLUMBIA, SC
                                )      SEPTEMBER 7, 2004
                                )
     VERSUS                      )
                                )
BRANDON E. BASHAM,              )
          DEFENDANT.            )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY SELECTION
VOLUME VI

APPEARANCES:

FOR THE GOVERNMENT:              SCOTT SCHOOLS, FIRST AUSA
                                 JONATHAN S. GASSER, AUSA
                                 JOHN DUANE, AUSA
                                 UNITED STATES ATTORNEY'S OFFICE
                                 1441 MAIN STREET, SUITE 500
                                 COLUMBIA, SC  29201

FOR THE DEFENDANT:               JACK SWERLING, ESQ.
                                 1720 MAIN STREET
                                 SUITE 301
                                 COLUMBIA, SC  29201

                                 GREG HARRIS,
                                 1720 MAIN STREET
                                 SUITE 301
                                 COLUMBIA, SC  29201

COURT REPORTER:                  DEBRA R. JERNIGAN, RPR, CRR
                                 UNITED STATES COURT REPORTER
                                 901 RICHLAND STREET
                                 COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1026

TRIAL, THE GOVERNMENT IS ENTITLED TO A FAIR TRIAL. AND I WOULDN'T -- I COULDN'T PUT SOMEONE ON THIS JURY WHO WOULD HAVE A PROBLEM IN ANY RESPECT IMPOSING A DEATH PENALTY IF IT WAS APPROPRIATE. IN OTHER WORDS, AS I TOLD YOU AT THE BEGINNING, IT IS ALL RIGHT FOR PEOPLE TO HAVE BELIEFS ABOUT THE DEATH PENALTY. ONE WAY OR THE OTHER THEY HAVE TO KIND OF LEAVE THAT ALONE, COME IN THE COURTROOM AND BE OPEN-MINDED AND BE ABLE TO GO EITHER WAY, DEPENDING UPON HOW THE EVIDENCE PLAYS OUT.

AND SO I AM NOT, I AM JUST NOT SURE WHERE YOU FALL. YOU SEEMED TO INDICATE TO ME YOU THOUGHT YOU COULD PUT ASIDE YOUR OPINIONS THAT YOU HAVE -- THAT YOU HAVE EXPRESSED ON PAPER HERE AND FOLLOW THE LAW AND CONSIDER THE DEATH PENALTY, BUT THEN WHEN THE PROSECUTORS WERE QUESTIONING YOU, YOU SEEMED TO KIND OF BACK OFF OF THAT A LITTLE BIT, ESPECIALLY WHEN YOU LEARNED THAT IT WAS NOT A MECHANICAL PROCESS WHERE YOU JUST COUNT UP CERTAIN FACTORS AND GET A CERTAIN TOTAL AS TO THE DEATH PENALTY. IT IS NOT THAT SIMPLE. IT IS A WEIGHING PROCESS THAT EACH JUROR MUST WEIGH THE EVIDENCE PRO AND CON IN THE JUROR'S MIND AND THEN CAST A VOTE. AND IF IT IS UNANIMOUS FOR THE DEATH PENALTY, ALL 12 JURORS HAVE TO SIGN THAT VERDICT, COME BACK IN HERE AND ANNOUNCE THE VERDICT. AND IF IT IS FOR THE DEATH PENALTY, THE DEFENDANT CAN ASK TO HAVE THE ROLL CALLED AND EACH JUROR HAS TO SPEAK UP VERBALLY AND SAY IF THAT IS YOUR VERDICT. TELL ME IF YOU THINK YOU HAVE

DIFFICULTY BEING FAIR IN THE SITUATION I JUST DESCRIBED?

A.    I FEEL UNCOMFORTABLE HAVING TO SIGN MY NAME AND STAND UP.

Q.    DO YOU THINK IT WOULD IMPEDE YOUR ABILITY TO BE FAIR TO BOTH SIDES BASED ON WHAT YOU JUST SAID?

A.    I AM REALLY NOT SURE, YOUR HONOR.  IN CERTAIN CASES, IN THE SUSAN SMITH CASE, YOU KNOW, TO ME, THERE IS NO DOUBT WHAT SHE DID TO HER TWO BOYS, SHE SHOULD HAVE GOTTEN THE DEATH PENALTY.  AND MAYBE IT IS BECAUSE KIDS WERE INVOLVED, I DON'T KNOW.  BUT I FEEL, YOU KNOW, I WOULD HAVE TO BE HONEST, I WOULD STILL FEEL VERY, VERY UNCOMFORTABLE SIGNING THE DOCUMENT SAYING THE DEATH PENALTY.

THE COURT:   ALL RIGHT.  I WILL EXCUSE YOU FROM THIS CASE BASED UPON YOUR RESPONSE.  I DON'T MEAN TO IMPLY YOU ARE NOT A FAIR PERSON.  I WILL TAKE YOU OFF FROM CONSIDERATION OF THIS JURY BASED UPON YOUR RESPONSE THAT YOU -- IT WOULD BE VERY DIFFICULT OR UNCOMFORTABLE FOR YOU TO DO THAT.  THANK YOU SO MUCH FOR YOUR PARTICIPATION.

MR. HARRIS:  JUDGE, CAN WE CHECK ON OUR CLIENT, MR. BASHAM?

THE COURT:   LET'S TAKE A 15-MINUTE RECESS AT THIS POINT.

I EXCUSED THAT JUROR OVER THE DEFENDANT'S OBJECTION.

MR. SWERLING:  YES, SIR.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: I GOT THE WORD THE DEFENDANT WANTED TO DOZE OFF. THE MARSHALS WERE TRYING TO KEEP HIM AWAKE. I DO NOT WANT HIM TO BUILD UP A RECORD AT MY EXPENSE. THE GOVERNMENT HAS SPENT TOO MUCH MONEY ON THIS CASE TO HAVE SOMEBODY FLYSPECK IT TO SAY THE DEFENDANT SLEPT THROUGH THE TRIAL. HE WILL HAVE TO GUT IT OUT. I TOLD THE MARSHAL 20 MINUTES AGO TO HAVE HIM UP HERE.

(WHEREUPON, THE DEFENDANT ENTERED THE COURTROOM.)

THE COURT: MR. BASHAM, I WAS INFORMED BY THE MARSHALS YOU WERE DOZING OFF DOWNSTAIRS. I AM SORRY, I CANNOT DELAY THIS TRIAL ANY MORE. IT TOOK 25 MINUTES TO GET YOU UPSTAIRS. I SENT WORD 25 MINUTES AGO DOWNSTAIRS, YOU JUST GOT HERE. THIS CASE IS AN ENORMOUSLY EXPENSIVE CASE FOR THE TAXPAYERS AND GOVERNMENT. I RESPECT YOUR RIGHT TO A FAIR TRIAL. I WILL NOT ALLOW YOU TO DICTATE. THE FACT YOU GOT IN A FIGHT THIS WEEKEND -- FOR THE RECORD THAT IS YOUR 21ST SCUFFLE SINCE YOU HAVE BEEN IN CUSTODY. MAYBE ALL 21 OF THEM ARE NOT YOUR FAULT, MAYBE SOMEBODY STARTED ALL 21 OF THEM, THAT IS NOT BEFORE ME NOW. BUT WE WILL MOVE FORWARD. IF YOU WANT SOME COFFEE OR SOMETHING TO STAY AWAKE, I WILL GET IT FOR YOU. WE HAVE TO MOVE THIS CASE ALONG.

THE DEFENDANT: YES, SIR. IF I MAY, JUST FOR THE COURT'S RECORD, I SAID THAT THEY CAN GO AHEAD, THEY CAN DO, I AM GIVING ALL FREE PRIVILEGE TO DO WHAT --

THE COURT: MR. BASHAM, LET ME INTERRUPT YOU. I

HAVE BEEN A JUDGE 17 YEARS.   EVERYDAY I GET LETTERS FROM PEOPLE WHO GOT CONVICTED 10, 12,  15 YEARS AGO,  CLAIMING THINGS WENT WRONG AT THEIR TRIAL.  THEY GO TO THE PRISON, THEY LOOK AT THEIR RECORD.  I WILL NOT LET YOU RAISE GOING TO SLEEP AN ISSUE 10 TO 12 YEARS DOWN THE ROAD.  WE WILL MOVE FORWARD.  I AM NOT TRYING TO SCOLD YOU.   PLEASE DON'T GET IN ANY MORE FIGHTS.

THE DEFENDANT:  YES, SIR.

THE COURT:  ALL RIGHT.   NEXT IS DAVID STOVER.

MR. GASSER:  FOR THE RECORD, YOU CAN GO AHEAD AND GET MR. STOVER.  THE FOURTH PERSON DOWN IS LUTHER OWENS.  IF WE GET TO HIM THIS EVENING BEFORE YOU SEND HIM HOME, I BELIEVE, AS AN OFFICER OF THE COURT, WE WOULD NEED TO PUT SOMETHING ON THE RECORD IN WHICH THE DEFENSE MAY MOVE TO STRIKE HIM FOR CAUSE IN WHICH WE WOULD NOT BE ABLE TO CHALLENGE.

THE COURT:  SHARE IT WITH THE DEFENSE.  MAYBE THEY CAN AGREE TO IT.  YOU CAN PUT IT ON THE RECORD LATER.

VOIR DIRE EXAMINATION

(WHEREUPON, JUROR STOVER ENTERED THE COURTROOM.)

BY THE COURT:

Q.   GOOD MORNING, MR. STOVER.  YOUR NAME IS PRONOUNCED STOVER?

A.   YES, SIR.

Q.   MR. STOVER, WE NEED TO ASK YOU SOME ADDITIONAL QUESTIONS HERE ORALLY IN THE COURTROOM.   HAVE YOU SEEN

ANYTHING IN THE NEWS MEDIA RELATING TO THIS CASE THAT YOU CAN RECALL?

A.    NO, SIR.

Q.    WE THINK THE TRIAL WILL START MONDAY OF NEXT WEEK, WHICH IS THE 13TH OF SEPTEMBER, AND RUN ALL THE MONTH OF SEPTEMBER AND MOST OF THE MONTH OF OCTOBER, PROBABLY.   WE MIGHT HAVE A FEW INTERRUPTIONS IN OCTOBER WHERE WE WOULDN'T HOLD COURT A FEW DAYS.   WE WOULD GO MONDAY THROUGH FRIDAY, 9:30 TO 5:30 EACH DAY.   DO YOU LIVE MORE THAN 70 MILES FROM COLUMBIA?

A.    NO, SIR.

Q.    YOU LIVE IN LUGOFF.   YOU WOULD BE FREE TO GO HOME EACH DAY.

A.    YES, SIR.

Q.    ARE YOU AWARE OF ANY WORK-RELATED CONFLICTS OR ANY PERSONAL HARDSHIPS THAT WOULD MAKE YOU UNAVAILABLE FOR JURY SERVICE DURING THAT PERIOD OF TIME?

A.    NO, SIR.

Q.    AS YOU KNOW FROM THE VIDEO YOU SAW, MR. STOVER, THE GOVERNMENT HAS CHARGED THE DEFENDANT IN THIS CASE, BRANDON LEON BASHAM, WITH CARJACKING, RESULTING IN DEATH AND KIDNAPPING, RESULTING IN DEATH.   THE GOVERNMENT INTENDS TO ASK THE JURY TO IMPOSE THE DEATH PENALTY.   MR. BASHAM IS CHARGED ALONG WITH ANOTHER DEFENDANT, CHAD FULKS.   THE CASE AGAINST MR. FULKS IS BEING HANDLED SEPARATELY.   IT IS NOT

BEFORE US TODAY.

THE VICTIM IN THE CASE IS MS. ALICE DONOVAN. SHE LIVES IN THE MYRTLE BEACH AREA. SHE WAS ABDUCTED FROM A WAL-MART PARKING LOT IN NOVEMBER OF 2002, HER BODY HAS NEVER BEEN LOCATED. BY TELLING YOU ABOUT THE CHARGES AS I HAVE DONE, I DO NOT MEAN TO IMPLY THAT MR. BASHAM IS GUILTY OF ANYTHING. UNDER THE LAW, YOU ARE PRESUMED TO BE INNOCENT. THE ONLY WAY YOU CAN BE FOUND GUILTY IS FOR THE GOVERNMENT TO PROVE HIS GUILT BY COMPETENT EVIDENCE AND BEYOND A REASONABLE DOUBT. BECAUSE THE GOVERNMENT INTENDS TO ASK FOR THE DEATH PENALTY, THIS CASE WILL FOLLOW SOME UNUSUAL PROCEDURES THAT APPLY ONLY TO DEATH PENALTY CASES.

AS YOU MIGHT KNOW, IN MOST CRIMINAL CASES, THE JURY DECIDES IF THE DEFENDANT IS GUILTY. IF THE JURY DECIDES THE DEFENDANT IS GUILTY, IT IS THE JUDGE THAT DECIDES THE PENALTY OR PUNISHMENT.

DEATH PENALTY CASES ARE DIFFERENT. IN A DEATH PENALTY CASE, THE JURY DECIDES PUNISHMENT AS WELL AS GUILT OR INNOCENCE. AND SO THE PROCEDURE IS AS FOLLOWS: IN THE FIRST PART OF THE TRIAL, OR PHASE ONE, THE GOVERNMENT WOULD INTRODUCE EVIDENCE TO TRY TO CONVINCE THE JURY THAT THE DEFENDANT WAS GUILTY. THE DEFENDANT COULD ALSO OFFER EVIDENCE IF HE WANTED TO ON HIS OWN BEHALF. I WOULD THEN INSTRUCT THE JURY ON THE LAW. THE JURY WOULD THEN RETURN A VERDICT WHETHER THE DEFENDANT WAS GUILTY OR NOT GUILTY. IF THE JURY FINDS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,          )     CR. NO. 4:02-992
                                   )     COLUMBIA, SC
                                   )     SEPTEMBER 8, 2004
                                   )
        VERSUS                     )
                                   )
BRANDON L. BASHAM,                 )
            DEFENDANT.             )
_____    )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY SELECTION
VOLUME VII

APPEARANCES:

FOR THE GOVERNMENT:              SCOTT SCHOOLS, FIRST AUSA
                                 JONATHAN S. GASSER, AUSA
                                 JOHN DUANE, AUSA
                                 UNITED STATES ATTORNEY'S OFFICE
                                 1441 MAIN STREET, SUITE 500
                                 COLUMBIA, SC  29201

FOR THE DEFENDANT:               JACK SWERLING, ESQ.
                                 1720 MAIN STREET
                                 SUITE 301
                                 COLUMBIA, SC  29201

                                 GREG HARRIS,
                                 1720 MAIN STREET
                                 SUITE 301
                                 COLUMBIA, SC  29201

COURT REPORTER:                  DEBRA R. JERNIGAN, RPR, CRR
                                 UNITED STATES COURT REPORTER
                                 901 RICHLAND STREET
                                 COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

WAY OR THE OTHER. SO, I MEAN, THAT IS WHY I THINK HE IS MITIGATION IMPAIRED.

THE OTHER THING, JUDGE, IS THAT THE QUESTION I WAS TRYING TO ASK AT THE END IS NOT STAKING HIM RIGHT OUT WHAT HE WOULD DO IN THIS CASE, IT IS A BURDEN OF PROOF QUESTION. IN THE GUILT PHASE OF THE TRIAL, A JUROR CANNOT HOLD IT AGAINST SOMEONE FOR FAILING TO TESTIFY, THAT IS A PRINCIPLE OF LAW.

THE COURT: ARE YOU SAYING YOU WILL NOT PUT UP ANY MITIGATION EVIDENCE IN THIS CASE?

MR. SWERLING: NO, WHAT I AM SAYING, I THINK THIS IS A JUROR WHO IS MITIGATION-IMPAIRED. WHAT I WAS TRYING TO ESTABLISH WAS, BECAUSE I BELIEVE UNDER THE STATUTE I WOULD BE ENTITLED TO ASK IT, UNDER 3593(E)(E), THAT A JURY CAN STILL CONSIDER A LIFE SENTENCE EVEN IN THE ABSENCE OF AGGRAVATING FACT -- I'M SORRY, MITIGATING FACTOR. WHAT I WAS TRYING TO FIND IS, COULD YOU STILL CONSIDER A LIFE SENTENCE IN ABSENCE OF THE MITIGATING FACTORS?

THE COURT: WELL, BUT SEE, YOU ARE SETTING HIM UP TO FAIL. YOU ARE TELLING HIM ABOUT TWO MURDERS. YOU SAY, ASSUMING NOTHING GOING THE OTHER WAY, CAN YOU GIVE THE DEATH PENALTY? ANY JUROR WOULD SAY, YEAH, I PROBABLY COULD. THEY THINK THEY ARE BEING ASKED THE ULTIMATE QUESTION, TWO MURDERS, NOTHING IN MITIGATION, COULD YOU CONSIDER LIFE IN PRISON? THAT IS STAKING OUT THE JUROR.

MR. SWERLING: JUST SO THE RECORD IS CLEAR, THAT IS

BURDEN SHIFTING BECAUSE HE WOULD NOT CONSIDER THE LIFE SENTENCE UNLESS THE DEFENDANT CAME FORWARD.

THE COURT:    I HAVE LOOKED AT ALL OF HIS ANSWERS.  I THINK BASED ON THE TOTALITY OF THE RESPONSES HE HAS ANSWERED HONESTLY, SAID HE WOULD REMAIN OPEN.   I THINK HE WAS BEING ASKED HOW HE WOULD VOTE ON A HYPOTHETICAL AMOUNT OF FACTS. HE HASTENED TO RETREAT AND SAID, NO, I WOULD REMAIN OPEN AND CONSIDER EVERYTHING.   OVER THE DEFENDANT'S OBJECTION, I WOULD CONSIDER HIM AND LET HIM IN.

(WHEREUPON, JUROR CALDWELL ENTERED THE COURTROOM.)

THE COURT:   MR. CALDWELL, WE DON'T KNOW YET IF YOU HAVE BEEN SELECTED.  WE SHOULD KNOW BY FRIDAY OF THIS WEEK. I WILL GIVE YOU AN INSTRUCTION SHEET TO TAKE WITH YOU.  THIS PAPER GIVES YOU A TOLL-FREE NUMBER TO CALL AFTER 5:30 ON FRIDAY OF THIS WEEK.   YOU WILL HEAR A RECORDED VOICE TO TELL YOU IF YOU HAVE BEEN SELECTED.  IF SO, THE MESSAGE WILL TELL YOU WHEN AND WHERE TO REPORT.

THE SHEET HERE ALSO REMINDS YOU NOT TO DISCUSS THIS CASE WITH ANYONE, NOT TO INVESTIGATE THIS CASE IN ANY WAY,  OR ON YOUR OWN, OR NOT EXPOSE YOURSELF TO ANYTHING IN THE NEWS MEDIA TOUCHING ON THIS CASE.   I AM SURE I CAN COUNT ON YOU TO FOLLOW THOSE REQUESTS.   YOU ARE EXCUSED AT THIS TIME.

(WHEREUPON, JUROR CALDWELL EXITED THE COURTROOM.)

THE COURT:   NEXT IS JAMES QUATTLEBAUM.

MR. SWERLING:  JUDGE,  COULD YOU HOLD THE JUROR FOR A

**JA 1035**

SECOND? JUDGE, I AM TRYING TO DO THE BEST JOB I CAN. MR. BASHAM KEEPS SLEEPING.

THE COURT: IS HE GETTING SLEEPY AGAIN?

MR. SWERLING: APPARENTLY, HE JUST CAN'T KEEP HIS HEAD UP. I AM GETTING FRUSTRATED. I AM TRYING TO DO THE JOB HERE, I DON'T WANT THE JURY TO SEE HIM IN THIS FASHION.

THE COURT: GO GET HIM SOME MORE COFFEE OR SOFT DRINK IF HE WANTS ONE. LIKE I SAY, I AM SYMPATHETIC TO HIS MEDICAL CONDITION. AS FAR AS I KNOW, HE GETS PLENTY OF TIME TO SLEEP IN THE JAIL. I DON'T KNOW WHAT KIND OF MEDICINE HE IS ON, WHETHER IT MAKES HIM DROWSY. IF WE INTERRUPT THE TRIAL EVERY TIME HE WANTS TO TAKE A NAP, WE WILL BE AT CHRISTMAS. I TRIED TO BE AS LENIENT LAST WEEK AS I COULD WHEN HE HAD TO GO TO THE HOSPITAL. WOULD YOU BRING HIM IN A SMALL CUP?

ALL RIGHT. NEXT IS JAMES QUATTLEBAUM.

MR. SWERLING: THAT MY STATEMENT IS NOT A REFLECTION ABOUT THE COURT'S --

THE COURT: I UNDERSTAND.

(WHEREUPON, JUROR QUATTLEBAUM ENTERED THE COURTROOM.)

VOIR DIRE EXAMINATION

BY THE COURT:

Q. GOOD AFTERNOON, MR. QUATTLEBAUM.

A. GOOD AFTERNOON.

Q. WE WANTED TO FOLLOW-UP AND ASK YOU SOME ORAL QUESTIONS

IN THE COURTROOM.  FIRST, HAVE YOU READ OR SEEN ANYTHING IN THE NEWS MEDIA ABOUT THIS CASE THAT YOU CAN RECALL?

A.    NO, SIR.

Q.    THE TRIAL OF THIS CASE IS EXPECTED TO START NEXT MONDAY, AND THE CASE SHOULD RUN PRETTY MUCH THE MONTH OF SEPTEMBER AND OCTOBER, WHICH IS ABOUT SIX WEEKS; HALF OF SEPTEMBER AND ALMOST ALL OF OCTOBER.  WE WOULD GO MONDAY THROUGH FRIDAY OF EACH WEEK, BEGIN AT 9:30 AND ADJOURN BY 5:30 EACH DAY.  SINCE YOU LIVE MORE THAN 70 MILES FROM COLUMBIA, YOU COULD STAY IN A LOCAL HOTEL IF YOU WISH TO DO SO.  THE GOVERNMENT WOULD REIMBURSE YOU YOUR MOTEL EXPENSES. KNOWING THAT, ARE YOU AWARE OF ANY WORK-RELATED CONFLICTS OR PERSONAL HARDSHIPS THAT WOULD CAUSE YOU TO BE UNAVAILABLE FOR JURY SERVICE FOR THOSE WEEKS?

A.    I HAVE A BUSINESS TRIP PLANNED THE FIRST PART OF OCTOBER, I BELIEVE IT IS THE 8TH, 9TH.

Q.    IS THAT SOMETHING THAT CAN'T BE RESCHEDULED?

A.    NOT THAT I AM AWARE OF AT THIS POINT.

Q.    WHAT KIND OF TRIP IS IT?

A.    IT IS A VENDOR SHOW HERE IN COLUMBIA, AS WELL ALSO IN CHARLESTON.

Q.    IT IS WHAT KIND OF SHOW?

A.    I AM A DISTRIBUTOR, TECHNICAL DISTRIBUTOR.  WE ARE RUNNING SHOWS AND INVITED BUSINESS PARTNERS TO COME IN AND VIEW OUR TECHNOLOGY SHOWCASE AND WHATNOT.  RESERVATIONS HAVE

ALREADY BEEN THERE.

THE COURT: I HAVE EXCUSED OTHERS WHO HAD BUSINESS CONFLICTS, I WILL EXCUSE YOU FOR THAT REASON. YOU ARE EXCUSED. YOU MAY GO, AT THIS TIME.

(WHEREUPON, JUROR CALDWELL EXITED THE COURTROOM.)

THE COURT: ANYBODY WANT TO OBJECT TO THAT EXCUSE? I FELT I SHOULD BE CONSISTENT.

MR. GASSER: NO. AREN'T WE OFF ONE OF THOSE TWO DAYS?

MR. HARRIS: THE 9TH IS A SATURDAY.

THE CLERK: YES.

MR. HARRIS: HE IS ANOTHER JUROR, BASED ON HIS QUESTIONNAIRE, WE WOULD BE VERY INTERESTED IN QUESTIONING AS TO HIS CAPABILITY TO SIT ON THIS JURY.

THE COURT: HE IS A PRO-DEATH PENALTY JUROR.

MR. HARRIS: IF YOU LOOK AT HIS SUPPLEMENTAL QUESTIONNAIRE.

THE COURT: I CAN'T LOOK IF HE IS GOOD JUROR FOR THE GOVERNMENT OR DEFENSE. I NEED TO LOOK AT THE EXCUSE AND BE CONSISTENT. OTHERS HAVE HAD BUSINESS CONFLICTS THEY COULD NOT RESCHEDULE I EXCUSED. LET'S MOVE ON TO THE NEXT ONE. ELLIS ESHELMAN.

(WHEREUPON, JUROR ESHELMAN ENTERED THE COURTROOM.)

VOIR DIRE EXAMINATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,          )      CR. NO. 4:02-992
                                   )      COLUMBIA, SC
                                   )      SEPTEMBER 13, 2004
                                   )
      VERSUS                       )
                                   )
BRANDON L. BASHAM,                 )
            DEFENDANT.             )
_____      )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME I

APPEARANCES:

FOR THE GOVERNMENT:          SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             JOHN DUANE, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:           JACK SWERLING, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201

                             GREG HARRIS, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201


COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201


STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1039

BEEN RECEIVED. AT THAT TIME, I WILL BE AVAILABLE TO GIVE YOU COMPLETE AND FINAL INSTRUCTIONS, WHICH WILL BE MUCH MORE DETAILED THAN THESE PRELIMINARY INSTRUCTIONS, AND WHICH YOU MUST USE TO GUIDE YOU IN REACHING YOUR DECISIONS. THEN, AND ONLY THEN, WILL YOU BE FULLY PREPARED TO BEGIN YOUR DELIBERATIONS AND REACH YOUR VERDICT.

LADIES AND GENTLEMEN, LET ME CONCLUDE BY REMINDING YOU SOMETHING THAT I TOLD YOU WHEN YOU WERE SELECTED, AND THAT IS THAT JURY SERVICE IS HARD WORK, BUT IT IS ALSO A RARE PRIVILEGE. BY THE OATH THAT YOU HAVE TAKEN IN COURT THIS MORNING, YOU HAVE ALL BECOME ACTIVE PARTICIPANTS IN THE PUBLIC ADMINISTRATION OF JUSTICE. YOU ARE JUDGES OF THE FACTS IN THIS PARTICULAR CASE. I AM CONFIDENT THAT YOU WILL PAY CLOSE ATTENTION TO THE EVIDENCE AND GIVE BOTH PARTIES A FAIR TRIAL IN THIS CASE. THANK YOU FOR YOUR ATTENTION.

ANY OBJECTION BY THE GOVERNMENT TO THE COURT'S PRELIMINARY INSTRUCTIONS?

MR. SCHOOLS: NO, SIR.

THE COURT: ANY OBJECTION BY THE DEFENDANT?

MR. SWERLING: NO, SIR.

THE COURT: WHO WILL OPEN FOR THE GOVERNMENT?

MR. SCHOOLS: I WILL.

THE COURT: I WILL NOW INTRODUCE YOU TO MR. SCOTT SCHOOLS, FIRST ASSISTANT UNITED STATES ATTORNEY, WHO WILL DELIVER THE GOVERNMENT'S OPENING STATEMENT.

MR. SCHOOLS:  MAY IT PLEASE THE COURT.

THE COURT:   YES, SIR.

MR. SCHOOLS:  DEFENSE.

LADIES AND GENTLEMEN, GOOD MORNING.   AS THE JUDGE TOLD YOU, MY NAME IS SCOTT SCHOOLS.  I AM THE FIRST U. S. ATTORNEY HERE IN SOUTH CAROLINA.  WITH ME AT COUNSEL TABLE IS JOHN DUANE.  HE IS AN ASSISTANT U. S. ATTORNEY IN CHARLESTON.  AND JOHNNY GASSER, HEAD OF OUR VIOLENT PROSECUTION TEAM.  LET ME INTRODUCE YOU TO THESE TWO GUYS, JEFF BRUNING AND JEFF LONG. THEY ARE FBI AGENTS HERE IN SOUTH CAROLINA.  THEY ARE THE CASE AGENTS IN THIS CASE.   THEY HAVE BEEN THE ONES RESPONSIBLE FOR ASSEMBLING ALL OF THE EVIDENCE THAT WE WILL BE PRESENTING FOR YOU DURING THE COURSE OF THIS TRIAL.

LADIES AND GENTLEMEN, THIS IS LITERALLY A TRIAL ABOUT LIFE AND DEATH.   IN THAT CONTEXT, IT IS A CASE ABOUT CHOICES. AND ON NOVEMBER 14TH,  2002,  ALICE DONOVAN MADE THE SIMPLEST OF CHOICES.  SHE CHOSE TO GO SHOPPING AT THE WAL-MART IN CONWAY,  SOUTH CAROLINA.   THAT PURELY INNOCENT CHOICE COST HER HER LIFE.   IT COST HER HER LIFE BECAUSE, UNBEKNOWNST TO HER, BRANDON LEON BASHAM,  SEATED OVER THERE IN THE BLUE SHIRT, AND CHADRICK EVAN FULKS HAD BEEN BUSY MAKING THEIR OWN CHOICES.   AT 2:37 P.M. ON NOVEMBER 14,  2002,  THEY CHOSE ALICE,  44-YEAR-OLD WIFE OF BARRY DONOVAN,  ANGIE AND JENNIFER'S MOM,  GRANDMOTHER OF THREE.   CHOSE TO CARJACK HER; CHOSE TO KIDNAP HER; CHOSE TO KILL HER.   THEY WEREN'T MAD AT

HER.  THEY DIDN'T KNOW HER NAME.  DIDN'T EVEN KNOW HER FACE.

THE FIRST TIME THAT BRANDON BASHAM SAW ALICE DONOVAN IS WHEN

HE MOVED OUT OF THE STILL-MOVING WHITE PICKUP TRUCK AT THE

WAL-MART PARKING LOT, FORCED HIS WAY TO ALICE DONOVAN'S CAR,

FORCED HER TO DRIVE TO THE BACK OF WAL-MART PARKING LOT TO

MEET HER OTHER EXECUTIONER, HIS TEAMMATE, CHAD FULKS.

BUT YOU KNOW, LADIES AND GENTLEMEN, AS BAD AND SENSELESS

AND AS RANDOM AS THAT CRIME IS,  AS THE SAYING GOES,  YOU

AIN'T HEARD NOTHING YET.  DURING THE COURSE OF THE TRIAL TO

DETERMINE BRANDON BASHAM'S INNOCENCE,  YOUR FOCUS WILL BE

FOCUSED ON BRANDON BASHAM'S INTENTION WHEN HE CLIMBED INTO

ALICE DONOVAN'S CAR ON THAT DATE.  DID BRANDON BASHAM INTEND

THAT, BY THE TIME THEY WERE DONE, HE AND CHAD FULKS WOULD HAVE

CONFLICTED SERIOUS BODILY INJURY AND DEATH ON ALICE DONOVAN?

THE EVIDENCE WILL DEMONSTRATE FOR YOU, OVERWHELMINGLY,  LADIES

AND GENTLEMEN,  THAT HE DID.  BECAUSE,  YOU SEE,  ALICE

DONOVAN WAS NOT THE FIRST VICTIM OF THE TEAM OF FULKS AND

BASHAM.  AND PERHAPS THE MOST IMPORTANT THING FOR YOU TO KNOW

IN THIS CASE IS THAT, IF BRANDON BASHAM HAD HAD HIS WAY, SHE

WOULDN'T HAVE BEEN THE LAST.  BECAUSE,  YOU SEE,  ON NOVEMBER

11,  2002,  SAMANTHA BURNS MADE THE SIMPLEST OF CHOICES.  SHE

CHOSE TO GO SHOPPING AT THE MALL IN HUNTINGTON,  WEST

VIRGINIA.  AND THAT PURELY INNOCENT CHOICE COST HER HER LIFE.

IT COST HER HER LIFE BECAUSE, UNBEKNOWNST TO HER, BRANDON

BASHAM AND CHAD FULKS MADE CHOICES OF THEIR OWN.

JA 1042

AT 7:30 P.M. ON NOVEMBER 11, 2002, THEY CHOSE SAMANTHA. THEY CHOSE TO KIDNAP HER. THREE HOURS AND 15 MINUTES AFTER THEY KIDNAPPED HER, THEY FORCED HER TO MAKE A PHONE CALL TO HER MOTHER AND TELL HER THE CRUELEST LIE, THAT SHE WOULD BE HOME SOON. NINE HOURS AFTER THEY KIDNAPPED HER AND CARJACKED SAMANTHA BURNS, THEY CHOSE TO BURN HER CAR, THEN CHOSE TO KILL HER. THEY DIDN'T KNOW SAMANTHA, THEY WEREN'T MAD AT HER, DIDN'T KNOW HER FACE, DIDN'T KNOW HER NAME. FIRST TIME THEY MET SAMANTHA BURNS IS WHEN THEY PICKED HER AT RANDOM OUT OF THE PARKING LOT IN THE MALL IN HUNTINGTON, WEST VIRGINIA.

YOU KNOW WHAT ELSE? JUST THREE DAYS LATER ON NOVEMBER 17, 2002, ANDREA FRANCIS AND HER MOTHER MADE THE SAME CHOICE TO GO SHOPPING AT A MALL, THIS TIME IN ASHLAND, KENTUCKY. AND AT 7:20 P.M. ON NOVEMBER 17, 2002, BRANDON BASHAM CHOSE ANDREA FRANCIS. APPROACHED HER IN THE PARKING LOT. SHOWED HER HIS GUN AND TRIED TO GET IN HER CAR. HE NOTICED THAT ANDREA WAS ON A CELLPHONE, HE GOT SPOOKED AND WALKED AWAY. ANDREA'S MOTHER WAS WITH HER, DEANNA FRANCIS. SHE CALLED 9-1-1, PROVIDED A DESCRIPTION OF BRANDON BASHAM, HER ATTEMPTED CARJACKER. LOCAL POLICE CAME. BRANDON BASHAM WAS ARRESTED THAT NIGHT.

YOU SEE, LADIES AND GENTLEMEN, THE EVIDENCE WILL SHOW YOU THAT BRANDON BASHAM DIDN'T CHOOSE TO STOP CARJACKING, KIDNAPPING, AND KILLING WOMEN. HE WAS STOPPED. BRANDON

**JA 1043**

BASHAM INTENDED TO GET INTO ALICE DONOVAN'S CAR.  WHAT HAPPENED NEXT? THE EVIDENCE OF SAMANTHA BURNS'S DEATH WILL TELL YOU HE DID.  AFTER ALICE DONOVAN WAS DEAD, DID BRANDON BASHAM HAVE ANY REMORSE?  WAS HER DEATH OUTSIDE HIS PLANS?  THE EVIDENCE OF HIS ATTEMPT TO KIDNAP ANDREA FRANCIS WILL TELL YOU THAT IT WAS NOT.

LADIES AND GENTLEMEN, WEBSTER'S DICTIONARY DEFINES A TEAM AS "A GROUP ORGANIZED TO WORK TOGETHER."  THROUGHOUT OUR HISTORY, THERE HAVE BEEN TEAMS WHO HAVE ACCOMPLISHED INCREDIBLE THINGS.  THE 1980 MEN'S OLYMPIC HOCKEY TEAM WON THE GOLD MEDAL AGAINST ALL ODDS IN WHAT HAS BEEN CALLED THE MIRACLE ON ICE.  JUST THIS YEAR, THE UNIVERSITY OF CONNECTICUT WOMEN'S BASKETBALL TEAM WON THE NATIONAL CHAMPIONSHIP FOR AN UNPRECEDENTED THIRD YEAR IN A ROW.  AND IN A NONSPORTS-RELATED FIELD, IN 1975, TWO, 20-YEAR-OLD-SOMETHINGS NAMED BILL GATES AND PAUL ALLEN TEAMED UP TO FORM MICROSOFT CORPORATION AND CHANGED THE WAY THAT AMERICA COMPUTES.

SUCCESSFUL TEAMS HAVE TWO TRAITS IN COMMON.  THEY HAVE A SHARED GOAL AND THEY HAVE A COORDINATION OF ACTION.  YOU HAVE ALL HEARD THE EXPRESSION, "THERE IS NO I IN TEAM."  THAT EXPRESSION IS INTENDED TO CONVEY THAT IN TEAM ENDEAVORS, THE INDIVIDUAL DOESN'T SUCCEED WITHOUT A TEAM, AND THE TEAM DOESN'T SUCCEED WITHOUT THE INDIVIDUAL.  THE TEAMS COME TOGETHER BECAUSE INDIVIDUALS MAKE CHOICES.  MIKE ERUZIONE CHOSE HOCKEY; DIANA TAURASI CHOSE BASKETBALL; AND BILL GATES

CHOSE COMPUTERS.

ON NOVEMBER 4, 2002, LADIES AND GENTLEMEN, BRANDON BASHAM AND CHAD FULKS CHOSE EACH OTHER. AND THEN THE TEAM OF FULKS AND BASHAM CHOSE TO ESCAPE FROM THE PRISON THEY WERE IN, WHERE THEY BELONG, AND THEY CHOSE TO KIDNAP, CARJACK, BURGLARIZE, KIDNAP, CARJACK, KILL, BURGLARIZE, KIDNAP, CARJACK AND KILL AGAIN. AND THEN, AFTER ALL OF THAT, ON NOVEMBER 17, 2002, THE EVIDENCE WILL SHOW BRANDON BASHAM TRIED TO DO IT AGAIN. AND WHEN HIS EFFORTS WERE THWARTED, POLICE WERE PURSUING HIM, HE TRIED TO KILL A COP.

TO BE SURE, LADIES AND GENTLEMEN, CHAD FULKS AND BRANDON BASHAM PLAYED DIFFERENT ROLES ON THEIR TEAM, BUT THEIR PARTICIPATION, THEIR SUCCESS, SUCH AS IT WAS, WAS ENTIRELY DEPENDENT ON THEIR JOINT PARTICIPATION. BUT I AM NOT GOING TO ASK YOU TO TAKE MY WORD FOR IT BECAUSE WE ARE GOING TO PRESENT THE EVIDENCE TO PROVE IT. AND I NEED TO TELL YOU ABOUT IT, AND WE WILL NEED A MAP.

ON NOVEMBER 4, 2002, BRANDON BASHAM AND CHAD FULKS WERE CELLMATES AT THE HOPKINS COUNTY DETENTION CENTER IN MADISONVILLE, KENTUCKY. MADISONVILLE IS LOCATED IN THE WESTERN PART OF KENTUCKY. THAT IS THE COUNTY SEAT OF HOPKINS COUNTY. BRANDON BASHAM IS IN JAIL SERVING A FIVE-YEAR SENTENCE THAT HE HAD RECEIVED FOR FOUR COUNTS OF FORGERY -- EXCUSE ME, FIVE COUNTS OF FORGERY, 14 COUNTS OF CRIMINAL POSSESSION OF A FORGED INSTRUMENT, AND SECOND DEGREE ESCAPE.

CHAD FULKS WAS IN JAIL AWAITING SENTENCING ON FRAUDULENT CREDIT CARD CHARGES AND AWAITING TRIAL ON TWO OTHER SERIOUS CHARGES.   ON NOVEMBER 4,  2002, AT ABOUT 6:30 P.M.,  BRANDON BASHAM AND CHAD FULKS ASKED DIANA BLAIR,  JAILER OF THE JAIL, TO LET THEM IN THE RECREATION OF THE JAIL.   SHE DID.  AT 6:30 DIANA BLAIR WENT OFF TO ADMINISTER SOME MEDICINE TO SOME OTHER INMATES IN THE PRISON.   HOUR AND A HALF LATER,  DIANA BLAIR RETURNED TO THE JAIL IN ORDER TO CHECK AND RETURN TO THE RECREATION AREA IN ORDER TO CHECK ON FULKS AND BASHAM.   THEY WERE GONE.   YOU WILL HEAR,  LADIES AND GENTLEMEN,  THAT THEY USED A MAKESHIFT ROPE MADE OUT OF SHEETS AND TOWELS AND BLANKETS TO CLIMB UP TO THE ROOF OF THE RECREATION AREA, WHICH IS COVERED BY THE CHAIN-LINK MESH FENCE.   THEY PULLED THE MESH FENCING AWAY FROM THE ROOF,  USED THE SAME ROPE TO CLIMB OUT OF THE JAIL, AND THEY WERE GONE.   THEY SHED THEIR BLACK AND WHITE PRISON UNIFORMS AND WALKED SIX MILES TO HANSON, KENTUCKY.

WHEN THEY GOT TO HANSON,  KENTUCKY,  BRANDON BASHAM KNOCKED ON THE DOOR OF A FELLOW BY THE NAME OF JAMES HAWKINS. HE SAID, MR. HAWKINS -- HE DIDN'T KNOW HIS NAME.  HE SAID, I NEED A RIDE,  ME AND MY BROTHER, OUR CAR IS BROKEN DOWN. CAN YOU HELP US OUT?  JAMES HAWKINS AGREED TO GIVE BRANDON BASHAM AND HIS BROTHER A RIDE.   GOT IN MR. HAWKINS' TRUCK,  HE WAS DRIVING,  BRANDON BASHAM SEATED NEXT TO HIM,  CHAD FULKS SEATED NEXT TO MR. BASHAM IN THE FRONT BENCH SEAT OF THIS

**JA 1046**

PICKUP TRUCK. AS THEY DROVE, THE STORY CONTINUED TO CHANGE ABOUT WHERE THE CAR WAS AND WHERE THEY NEEDED TO GO. AND MR. HAWKINS ENDED UP DRIVING FULKS AND BASHAM ALL THE WAY TO EVANSVILLE, INDIANA, 42 MILES FROM HIS HOME.

WHEN THEY GOT THERE, FULKS TOLD HIM HE NEEDED TO USE A PAY PHONE. THEY STOPPED AT MCDONALD'S IN EVANSVILLE. FULKS USED THE PAY PHONE, GOT BACK IN THE CAR. WHEN HE DID, BRANDON BASHAM FLASHED A KNIFE AT JAMES HAWKINS AND SAID KEEP DRIVING. THEY DROVE A LITTLE WHILE. AFTER A WHILE, FULKS TOLD HAWKINS TO STOP. THEY STOPPED THE TRUCK, FULKS STARTED DRIVING, HAWKINS IN THE MIDDLE, BRANDON BASHAM WAS NOW IN THE PASSENGER SEAT. THEY DROVE NORTH ON HIGHWAY 41 THROUGH EVANSVILLE FOR A BRIEF PERIOD OF TIME, AND THEN FULKS TURNED RIGHT, DROVE THE TRUCK INTO A FIELD. AND HE AND BRANDON BASHAM TIED JAMES HAWKINS TO A TREE IN THE NOVEMBER COLD AND LEFT HIM THERE AND TOOK HIS TRUCK. MR. HAWKINS FREED HIMSELF 15 HOURS LATER.

CHAD FULKS DROVE MR. HAWKINS' TRUCK TO PORTAGE, INDIANA. THEY WENT TO PORTAGE, INDIANA BECAUSE CHAD FULKS HAD ACQUAINTANCES THERE. FULKS HAD BEEN IN PRISON AT THE WESTVILLE CORRECTIONAL INSTITUTION IN INDIANA FROM FEBRUARY 2000 UNTIL MARCH OF 2002. WHILE HE WAS THERE, HE BEFRIENDED A CORRECTIONAL OFFICER NAMED TINA SEVERANCE. TINA LIVED IN PORTAGE. TWO DAYS AFTER THEY ESCAPED, CHAD TURNED TO HER FOR HELP. ON NOVEMBER 6, 2002, BRANDON BASHAM KNOCKED ON TINA

JA 1047

SEVERANCE'S TRAILER DOOR. HER ROOMMATE, ANDREA RODDY, ANSWERED THE DOOR. AND WHEN SHE DID, SHE DIDN'T RECOGNIZE THE FELLOW STANDING THERE. SHE WENT BACK AND TOLD TINA A GUY WAS OUT HERE WITH DARK HAIR AND I DON'T RECOGNIZE HIM. TINA SAID TELL HIM TO GO AWAY. HE LEFT.

A SHORT TIME LATER, BRANDON BASHAM AND CHAD FULKS BOTH KNOCKED ON TINA SEVERANCE'S DOOR. ANDREA RODDY ANSWERED. SHE WENT BACK TO DESCRIBE TO TINA THE MAN STANDING THERE WHO HAD BLONDE HAIR AND BLUE EYES. TINA KNEW IT WAS CHAD FULKS, WAS THRILLED TO SEE HIM. THEY HAD A REUNION.

AT THAT POINT, FULKS, BASHAM, SEVERANCE, AND RODDY LEFT HER TRAILER AND WENT TO A MOTEL IN NORTHERN INDIANA TO SPEND THE NIGHT. ON THAT NIGHT, A VERY IMPORTANT THING HAPPENED. FULKS ASKED TINA SEVERANCE IF SHE KNEW WHERE THEY COULD GET SOME GUNS. AND TINA HAD A PLAN. SHE HAD BEEN IN PRISON WITH A FELLOW -- NOT IN PRISON, A CORRECTIONAL OFFICER WITH A FELLOW NAMED ROBERT TALSMA. SHE KNEW TALSMA HAD A GUN. THEY COOKED UP A PLAN ON THE MORNING OF NOVEMBER 8, 2002. TINA SEVERANCE AND ANDREA RODDY WENT TO ROBERT TALSMA'S HOUSE EARLY IN THE MORNING TO INVITE HIM TO BREAKFAST. TALSMA AGREED TO GO. TINA WAS IN THE BACK WITH TALSMA GETTING READY FOR BREAKFAST. ANDREA RODDY UNLOCKED THE FRONT DOOR AND BACK DOOR TO TALSMA'S HOUSE. THEY LEFT FOR BREAKFAST. WHILE THEY WERE GONE, CHAD FULKS AND BRANDON BASHAM WENT INTO TALSMA'S HOUSE AND STOLE FOUR FIREARMS, A CHECKBOOK, AND A RING.

NOVEMBER 8, LADIES AND GENTLEMEN, FOUR DAYS AFTER THEY ESCAPED FROM PRISON, CHAD FULKS AND BRANDON BASHAM WERE, AS THEY SAY, LOCKED AND LOADED.

TOGETHER WITH TINA AND ANDREA THEY SPENT A FEW MORE DAYS UP IN NORTHERN INDIANA BEFORE THEY TOOK THE SHOW ON THE ROAD. THEY HEADED NORTH TO WAVERLY, OHIO. THEY WENT TO A WAL-MART AND BRANDON BASHAM USED ROBERT TALSMA'S CHECKS TO BUY CAMOUFLAGE CLOTHING, THE KIND YOU HUNT IN. AFTER THEY LEFT WAVERLY, THEY WENT TO HUNTINGTON, WEST VIRGINIA. THEY CHECKED IN ON THE MORNING OF NOVEMBER 11 TO THE HOLLYWOOD MOTEL IN A LITTLE PLACE CALLED KENOVA, WEST VIRGINIA, WHICH IS RIGHT NEXT TO HUNTINGTON.

THAT AFTERNOON BEFORE SUNSET, BRANDON BASHAM AND CHAD FULKS PUT ON CAMOUFLAGE CLOTHING AND LEFT THE HOTEL ROOM, CAMOUFLAGED AND ARMED. THEY HEADED WHERE? TO THE MALL. THEY WEREN'T SEEN AGAIN UNTIL THAT MORNING AND CAME BACK TO THE HOTEL ROOM, THE CLOTHES WERE MUDDY, TOOK SHOWERS, AND WENT TO BED. SAMANTHA BURNS, THE 19-YEAR-OLD DAUGHTER OF JOHN AND KANDI BURNS, LIVED WITH HER FAMILY IN WEST HAMLIN, WEST VIRGINIA, TINY LITTLE TOWN. SHE WAS A STUDENT AT MARSHALL UNIVERSITY. SHE WORKED AT J. C. PENNEY'S AT THE MALL THERE IN HUNTINGTON. ON NOVEMBER 11TH, SHE AGREED TO MEET HER AUNT MISSY AT THE J. C. PENNEY STORE TO BUY CLOTHING FOR HER CHILDREN, MISSY'S CHILDREN, USING HER EMPLOYEE DISCOUNT. RECORDS FROM J. C. PENNEY'S REFLECT SAMANTHA MADE A PURCHASE.

MISSY JEFFERS WILL TELL YOU THAT SHE AND SAMANTHA THEN WENT TO THE CUSTOMER SERVICE AREA WHERE SAMANTHA PAID OFF HER STORE CREDIT CARD.

THEY LEFT THE STORE AT THE SAME TIME.  THEY WERE PARKED ON OPPOSITE SIDES OF THE STORE.  MISSY JEFFERS NEVER SAW SAMANTHA BURNS GET IN HER CAR.  A SURVEILLANCE VIDEO OF AN ATM AT THE UNITED BANK IN HUNTINGTON AT 8:12 P.M., CAPTURED A MAN WEARING A CAMOUFLAGE MASK USE AN ATM CARD. BANK RECORDS WILL REFLECT THAT THAT CARD WAS SAMANTHA BURNS'S CARD.  AT 9:46 P.M., KANDI BURNS, SAMANTHA'S MOM, GOT A CALL FROM SAMANTHA THREE HOURS AND FIFTEEN MINUTES AFTER SHE LEFT THE MALL SAYING, "MOM, I WILL BE HOME SOON."  AT 3:30 IN THE MORNING, A FELLOW NAMED MACK KILGORE HEARD AN EXPLOSION ON HANEY BRANCH ROAD ON WAYNE COUNTY, ABOUT 15 MINUTES OUT OF HUNTINGTON.  HE WENT OUT TO INVESTIGATE, CALLED 9-1-1, SAW A FIRE, THE LAVALETTE POLICE DEPARTMENT IN WEST VIRGINIA FOUND SAMANTHA BURNS'S CAR ON FIRE.  SAMANTHA HAS NEVER BEEN SEEN SINCE.

ON THE MORNING OF NOVEMBER 12TH, 2002, FULKS, BASHAM, SEVERANCE, AND RODDY CHECKED OUT OF THE HOLLYWOOD MOTEL AND HEADED SOUTH AGAIN.  THIS TIME THEY WENT TO LITTLE RIVER, SOUTH CAROLINA.  IN LITTLE RIVER, THEY CHECKED IN AT THE LAKE SHORE MOTEL.  OVER THE COURSE OF THE 12TH AND 13TH OF NOVEMBER, THEY SPENT TIME BREAKING INTO CARS, STEALING CREDIT CARDS, STEALING CHECKBOOKS, GOING SHOPPING WITH THE STUFF

THEY STOLE.

ON THE MORNING OF NOVEMBER 14TH, 2002, THEY CHECKED OUT OF LAKE SHORE, WENT SOUTH TO MYRTLE BEACH. THEY WENT TO BEACH WALK HOTEL AT ABOUT 11:30 IN THE MORNING. AT 1:50 P.M. ON NOVEMBER 14, 2002, CARL JORDAN DROVE UP TO HIS SON'S HOUSE IN CONWAY, SOUTH CAROLINA, AND OBSERVED AN UNEXPECTED GREEN MINIVAN, SAME GREEN MINIVAN THAT TINA SEVERANCE DRIVES, PARKED IN HIS SON'S DRIVEWAY. HE DIDN'T KNOW WHAT WAS GOING ON. HE STOPPED, PARKED IN FRONT OF THE GREEN VAN TO KEEP IT FROM LEAVING. AS HE SAT THERE WAITING, TWO MEN CAME RUNNING OUT OF HIS HOUSE, OUT OF HIS SON'S HOUSE. ONE WITH DARK HAIR, ONE WITH BLOND HAIR, BOTH OF THEM SHOOTING. THE BLOND-HAIR GUY SHOT OUT THE BACK WINDOW OF CARL JORDAN'S TRUCK AND THE BULLET LODGED IN THE ROOF. JORDAN TOOK OFF. THE TWO GUYS IN THE GREEN MINIVAN CHASED HIM. AFTER A WHILE, THE GREEN MINIVAN CHANGED COURSE. CARL JORDAN TURNED HIS TRUCK AROUND AND TRIED TO FOLLOW THE MINIVAN. LOST IT AT COOPERS METAL WORKS RIGHT IN CONWAY.

MIKE MARTINI SAW THE VAN COME DOWN THEIR DRIVEWAY. IT WAS ABANDONED IN A HOUSE ACROSS THE STREET. THAT SAME AFTERNOON, MARGARET MOORE, WHO LIVES JUST BLOCKS AWAY FROM COOPERS METAL WORKS, HAD A KNOCK ON HER DOOR. WHEN SHE WENT TO THE DOOR, THERE WAS A DARK-HAIRED GUY WHO ASKED HER FOR A RIDE. THERE WAS A BLOND GUY STANDING IN THE CARPORT. MS. MOORE, THANKFULLY TURNED DOWN THE INVITATION TO GIVE THEM A RIDE.

THE TWO GUYS WALKED ACROSS THE STREET TO OLEITA HYMAN'S HOUSE, A FRIEND OF MS. MOORE, A NEIGHBOR. ON THE AFTERNOON OF NOVEMBER 14, 2002, SHE SAW A WHITE WORK PICKUP TRUCK LEAVING HER YARD, A TRUCK THAT IS USED BY ONE OF HER EMPLOYEES, THE KEYS ARE ALWAYS IN IT. SHE WENT OUTSIDE TO CATCH -- TO SEE WHETHER THE EMPLOYEE'S CAR WAS IN THE YARD; IT WASN'T THERE. SHE REPORTED THE TRUCK STOLEN.

BARRY DONOVAN IS ALICE DONOVAN'S HUSBAND. HE SPOKE TO HER ON THE MORNING OF NOVEMBER 14, 2002, AND SHE TOLD HIM SHE WAS GOING SHOPPING AT WAL-MART THAT DAY. ALICE DONOVAN DRIVES A BLUE 1994 BMW 318 I. THE SURVEILLANCE VIDEO AT THE WAL-MART STORE IN CONWAY, SOUTH CAROLINA SHOWED AT 2:37 P.M., A BLUE SEDAN WAS FOLLOWED VERY CLOSELY BY A WHITE PICKUP TRUCK INTO THE PARKING LOT. WHEN THE BLUE SEDAN PULLS INTO A PARKING SPACE, THE WHITE TRUCK SLOWS DOWN, A WHITE MALE JUMPS OUT OF THE TRUCK, APPROACHES THE BLUE SEDAN. THE WHITE TRUCK THEN CIRCLES THE PARKING LOT, COMES BACK IN FRONT OF THE BLUE SEDAN, AND THEN BACKS UP AND THEN THE BLUE CAR PULLS OUT. FORTY-EIGHT SECONDS AFTER BRANDON BASHAM JUMPED OUT OF THE MOVING TRUCK, ALICE DONOVAN WAS DRIVING HER BLUE SEDAN OUT OF THAT PARKING LOT. IT TOOK 48 SECONDS FOR THEM TO CHOOSE ALICE.

THE FIRST THING ON THEIR MINDS AT THAT POINT WAS MONEY. AS THEY HEADED NORTH WITH ALICE DONOVAN IN HER OWN CAR, CHAD FULKS BEGAN USING ALICE DONOVAN'S ATM CARD AT VARIOUS

LOCATIONS. WHILE HE WAS AT STORES, VARIOUS LOCATIONS USING THE ATM CARD, BRANDON BASHAM KEPT A WATCH OVER ALICE DONOVAN IN HER OWN CAR TO KEEP HER CAPTIVE. AFTER USING ATM MACHINES JUST BEFORE 4:00 O'CLOCK, FULKS AND BASHAM STOPPED AT A GAS STATION IN SHALLOTTE, NORTH CAROLINA, JUST SOUTH OF THE NORTH CAROLINA AND SOUTH CAROLINA BORDER. AT SHALLOTTE THEY USED A GAS STATION AND FULKS WENT INSIDE TO BUY THREE MOUNTAIN DEWS AND SOME TAPE. WHILE HE WAS INSIDE, BRANDON BASHAM, IN BROAD DAYLIGHT, WAS SITTING IN THE BACK OF ALICE DONOVAN'S CAR, WITH ALICE, KEEPING HER THERE.

AT 4:26 P.M. THAT AFTERNOON, ANGIE WARNER, WHO IS ALICE'S DAUGHTER, GOT THAT SAME PHONE CALL FROM ALICE SAYING, "I HAVE GONE SHOPPING. I WILL BE HOME LATE." SHORTLY AFTER 4:30, LADIES AND GENTLEMEN, WITNESSES WHO WERE AT THE BEE FREE FARM HUNT CLUB, WHICH IS IN WINNABOW, NORTH CAROLINA JUST NORTH OF NORTH CAROLINA, SOUTH CAROLINA BORDER, SAW A BLUE SEDAN COME DOWN TOWARDS THE HUNT CLUB WITH THREE OCCUPANTS, TWO WHITE MALES AND A FEMALE. ONE OF THOSE SAME WITNESSES LATER SAW THAT BLUE SEDAN PARKED AT A TURN INTO A CEMETERY ON THE BEE TREE FARM ROAD, A ROAD THAT LEADS OFF A PAVED ROAD DOWN TO A HUNT CLUB DOWN TO BEE TREE FARM. ALICE DONOVAN HAS NEVER BEEN SEEN SINCE.

FULKS AND BASHAM RETURNED TO THE BEACH WALK MOTEL WHERE THEY FOUND TINA SEVERANCE, TOLD HER THEY LOST THE VAN AND THEY HAD TO LEAVE, HAD TO GET OUT, COULDN'T TAKE THE GIRLS WITH

**JA 1053**

THEM. THEY HEADED NORTH, AND THE RECORDS REFLECT THAT AT 8:53 P.M., ALICE DONOVAN'S ATM CARD WAS USED IN LITTLE RIVER, SOUTH CAROLINA; AT 8:58 P.M., HER CARD WAS USED IN NORTH MYRTLE BEACH, SOUTH CAROLINA; AND THEN, AT 20 MINUTES AFTER MIDNIGHT, HER CARD WAS USED THREE TIMES AT RALEIGH, NORTH CAROLINA. IT WAS USED AFTER MIDNIGHT BECAUSE THEY HAD EXHAUSTED ONE DAY'S WITHDRAWAL ON HER ATM CARD.

FULKS AND BASHAM THEN DROVE ALICE DONOVAN'S BMW BACK TO HUNTINGTON, WEST VIRGINIA WHERE THEY HOOKED UP WITH A GIRL NAMED BETH MCGUFFIN, WHO IS SOMEONE FULKS KNEW. THEY ARRIVED IN WEST VIRGINIA ON NOVEMBER 15TH. AND OVER THE COURSE OF THE NEXT THREE DAYS, THEY SPENT MOST OF THE TIME SMOKING CRACK. FULKS AND BASHAM HAVING KIDNAPPED, CARJACKED, AND KILLED TWO WOMEN WENT BACK TO HUNTINGTON, WEST VIRGINIA, TO PARTY ON.

ON THE EVENING OF NOVEMBER 15, 2002, THEY WENT OVER TO BETH MCGUFFIN'S HOUSE IN THE BLUE BMW. STILL HAD A GUN WITH THEM. AND THEN OVER THE COURSE OF SATURDAY AND SUNDAY, THE 16TH AND 17TH, THEY CONTINUED TO PARTY. ON THE 17TH OF NOVEMBER 2002, FULKS DROVE BASHAM TO ASHLAND, KENTUCKY, WHICH IS JUST ACROSS THE WEST VIRGINIA KENTUCKY BORDER. AT 7:20 P.M., BASHAM APPROACHED ANDREA FRANCIS. HE SHOWED HER A GUN AND TRIED TO GET IN HER CAR. SHE WAS ON A CELLPHONE, HE GOT SPOOKED, AND WALKED AWAY. AS HE WALKED AWAY, DEANNA FRANCIS CALLED THE POLICE AND GAVE A DESCRIPTION TO LOCAL POLICE.

ASHLAND POLICE OFFICER MATT DAVIS WAS PARKED ACROSS THE

STREET FROM THE MALL AT A TRAFFIC LIGHT. AS HE HEARD THE RADIO DISPATCH COME ACROSS DESCRIBING THE INDIVIDUAL WHO HAD ATTEMPTED TO APPROACH ANDREA FRANCIS IN THE PARKING LOT OF THE MALL, HE SAW SOMEONE MATCHING THAT DESCRIPTION WALKING ACROSS THE STREET FROM THE MALL. OFFICER DAVIS GOT OUT OF HIS CAR, CALLED TO THE SUSPECT, WHO THEN FLEW -- RAN. MATT DAVIS GOT OUT OF HIS CAR AND CHASED BRANDON BASHAM. AS BASHAM RAN AWAY FROM MATT DAVIS, HE PULLED OUT A GUN, FIRED ONE SHOT IN THE AIR, TURNED AROUND, LEVELLED THE GUN, AND SHOT HIM. IN THAT CASE, FORTUNATELY, THAT BULLET MISSED ITS MARK.

BASHAM WAS RUNNING TOWARD THE OHIO RIVER AND RAILROAD TRACKS. HE GOT BEHIND THE RAILCARS. DAVIS KNEW IF HE CLIMBED OVER, HE WOULD BE A SITTING DUCK. HE BACKED UP, CALLED FOR SUPPORT, AND WAITED. AT 9:11 P.M., THE OFFICERS, SECURING THE AREA AROUND, SAW A WHITE MALE WALKING ACROSS THE RAILROAD TRACKS. ONCE THEY CONFIRMED IT WAS NOT A POLICE OFFICER, THEY ARRESTED BRANDON BASHAM. FOUR DAYS LATER IN A RAILROAD CAR ON THAT SAME YARD, THE GUN WAS FOUND WHICH WAS USED TO SHOOT AT OFFICER MATT DAVIS; A GUN THAT WAS STOLEN FROM ROBERT TALSMA.

IN THE MEANTIME, LADIES AND GENTLEMEN, FULKS WENT BACK TO WEST VIRGINIA, WENT TO BETH MCGUFFIN'S HOUSE. FIRST HE HEADED NORTH. HIS FIRST STOP IN MARION, OHIO. IN MARION, OHIO, CHAD FULKS GOT IN A HIGH-SPEED CHASE WITH OHIO STATE TROOPERS. HE ALLUDED CAPTURE, BUT NOT AFTER ALMOST HITTING

AND KILLING A HIGHWAY TROOPER IN THAT HIGH-SPEED CHASE.  HE LEFT THERE AND WENT NORTH TO HIS BROTHER'S HOUSE IN GOSHEN, INDIANA.  HE ARRIVED ON THE AFTERNOON OF NOVEMBER 19, 2002.

ON THE MORNING OF NOVEMBER 20TH, 2002, CHAD FULKS TOOK ALICE DONOVAN'S BMW TO A BARN ON COUNTY ROAD 27, ELKHART COUNTY, IN GOSHEN.  WENT BACK TO HIS BROTHER'S HOUSE.  AT THIS POINT, GOSHEN, INDIANA POLICE HAD BEEN NOTIFIED TO SURVEIL, TO CHECK OUT RONNIE FULKS, CHAD FULKS'S BROTHER.  AS THEY WAITED THAT MORNING, RONNIE FULKS, CHAD FULKS, RONNIE'S GIRLFRIEND ANDREA, LEFT THE HOUSE.  A GOSHEN POLICE OFFICER SAW THEM.  ELKHART COUNTY POLICE OFFICERS FOLLOWED THE CAR HE WAS TRAVELLING IN.  HE JUMPED OUT, RAN INTO A FIELD PURSUED BY ELKHART COUNTY OFFICERS, WAS ARRESTED WITHOUT INCIDENT, AND IT WAS OVER.  SEVENTEEN DAYS, 2,275 MILES, THREE CARJACKINGS, THREE KIDNAPPINGS, TWO KILLINGS, TWO ATTEMPTED KILLINGS, ALL COMMITTED BY TWO TEAMMATES, CHAD FULKS AND BRANDON BASHAM, FOR FUN, FOR SPORT.

LADIES AND GENTLEMEN, BRANDON BASHAM GOT ARRESTED ON NOVEMBER 17, 2002.  HE MADE SOME MORE VERY TELLING CHOICES. YOU SEE, ON THAT DATE, LET'S SET THE STAGE.  BASHAM IS ARRESTED, HE IS IN CUSTODY, FULKS IS NO LONGER WITH HIM.  HE IS FACED WITH SOME OPTIONS.  ONE OPTION -- FIRST OPTION IS TO SAY NOTHING.  EVERY DEFENDANT HAS A CONSTITUTIONAL RIGHT TO SAY ABSOLUTELY NOTHING.  THE SECOND OPTION IS TO DEMONSTRATE THAT HE WAS NOT A WILLING PARTICIPANT OF CHAD FULKS'S TEAM BY

**JA 1056**

TELLING THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH. THE THIRD OPTION, LADIES AND GENTLEMEN, IS TO DEMONSTRATE THAT HE HAS NO REGRETS ABOUT WHAT HE HAS JUST BEEN PARTICIPATING IN. HE DOES THAT BY LYING, AND LYING, AND LYING. BRANDON BASHAM CHOSE TO LIE, DECEIVE, AND TO MANIPULATE.

THE FIRST TIME HE LIED, DECEIVED, MANIPULATED WAS IMMEDIATELY UPON HIS ARREST ON NOVEMBER 17, 2002. THE OFFICERS IN ASHLAND APPROACHED BRANDON BASHAM, PLACED HIM UNDER ARREST, HE IDENTIFIED HIMSELF AS JOSH RITTMAN. DIDN'T TELL THEM HIS REAL NAME, DESPITE THE FACT HE HAD JUST BEEN IN A CHASE AFTER ATTEMPTING TO CARJACK ANDREA FRANCIS, SHOOTING AT A POLICE OFFICER, HE FEIGNED IGNORANCE AS TO WHY HE WAS BEING ARRESTED. HE WAS PLACED IN CUSTODY. AND ABOUT 24 HOURS LATER, FBI, THROUGH FINGERPRINT ANALYSIS, HAD DETERMINED THAT JOSH RITTMAN WAS, IN FACT, BRANDON BASHAM. AND THEY WANTED TO FIND OUT WHAT HE KNEW ABOUT WHERE ALICE DONOVAN MIGHT BE BECAUSE NO ONE KNEW WHETHER SHE WAS DEAD OR ALIVE AT THAT POINT.

SO, SPECIAL AGENT SCOTT VITO WITH THE FBI WENT IN THE BOYD COUNTY DETENTION CENTER IN THE EARLY MORNING HOURS ON NOVEMBER 19, 2002, TO ASK, WHERE IS ALICE DONOVAN? BASHAM GAVE AN ACCOUNT OF THE TIME HE AND FULKS HAD SPENT DURING HIS ESCAPE. HE DIDN'T MENTION THAT --

MR. SWERLING: EXCUSE ME. MAY WE APPROACH ONE

SECOND, YOUR HONOR?

(WHEREUPON A BENCH CONFERENCE WAS HELD ON THE RECORD, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SWERLING: I'M SORRY TO INTERRUPT. I WANT TO MAKE SURE THAT ALL POSITIONS ARE PROTECTED WITH RESPECT TO THE STATEMENTS THAT MR. SCHOOLS IS GOING INTO RIGHT NOW. I JUST WANT TO MAKE SURE WE HAVE NO ISSUE ABOUT THAT. ALL RIGHT. THANK YOU.

THE COURT: SURE. SURE.

(WHEREUPON, THE FOLLOWING WAS HEARD IN OPEN COURT.)

MR. SCHOOLS: BRANDON BASHAM GAVE AN ACCOUNT OF WHERE HE AND CHAD FULKS HAD BEEN SINCE NOVEMBER 4, 2002, WHEN THEY ESCAPED. HE DIDN'T MENTION ALICE DONOVAN. SO, THE AGENT ASKED HIM, SPECIFICALLY, "DO YOU KNOW ANYTHING ABOUT A WOMAN FROM SOUTH CAROLINA?" HE SAID, "YEAH. WE TOOK HER OUT OF A PARKING LOT. SHE IS STILL WITH FULKS AND ARE HEADED TO ARIZONA." FALSE HOPE. SHE WAS ALREADY DEAD. THE NEXT MORNING AT 9:45 A.M., SPECIAL AGENT VITO WENT BACK TO INTERVIEW BASHAM. THEY WERE LEARNING THINGS ABOUT THE INVESTIGATION. THEY KNEW FULKS HAD BEEN SEEN IN ALICE DONOVAN'S CAR IN A HIGH-SPEED CHASE IN OHIO. THEY AGAIN ASKED BASHAM WHAT HE KNEW, HE AGAIN SAID THAT ALICE WAS STILL WITH FULKS. THEY CONFRONTED HIM AND SAID, WE DON'T THINK YOU ARE TELLING US THE TRUTH, AND HIS STORY CHANGED.

NOW, HE TOLD THE AGENTS THAT THEY HAD TAKEN ALICE DONOVAN

OUT OF A PARKING LOT, THAT CHAD FULKS HAD DROPPED HIM OFF AT A MOTEL, AND THAT CHAD HAD BEEN GONE FOR ABOUT AN HOUR. HE SAID WHEN FULKS CAME BACK, BASHAM SAID, "WHAT HAVE YOU DONE WITH THE WOMAN?" FULKS SAID, "DON'T WORRY ABOUT IT. IT IS OKAY." HE ASSUMED ALICE WAS DEAD. THAT WAS AT 9:15 FOR THE FIRST TIME. HE SAID WHEN THEY WERE IN WEST VIRGINIA, FULKS SAID -- FULKS LEFT. WHEN HE CAME BACK, HE SAID HE GOT A GIRL AND USED CREDIT CARDS.

ON NOVEMBER 20TH, 2002, THE AGENTS WANTED MORE INFORMATION ABOUT WHERE ALICE DONOVAN MIGHT BE, SO THEY WENT BACK TO TALK TO BRANDON BASHAM. BEFORE EACH ONE OF THESE INTERVIEWS, THEY ADVISED HIM OF HIS RIGHTS, TOLD HIM HE DIDN'T HAVE TO TALK, ADVISED HIM OF HIS RIGHT TO COUNSEL. ON NOVEMBER 20, 2002, HIS STORY CHANGED AGAIN. DURING THIS VERSION OF THE STORY, HE SAID THAT FULKS DROPPED HIM OFF AT THE HOTEL AND HE WAS GONE ABOUT AN HOUR. WHEN HE CAME BACK, HE TOLD BASHAM THAT HE HAD HAD SEX WITH THE WOMAN AND TIED HER TO A TREE. HE ALSO TOLD THE AGENTS, AT THAT POINT, THAT WHEN HE WAS TALKING ABOUT THE GIRL IN WEST VIRGINIA, HE DIDN'T MEAN FULKS HAD GOT THE GIRL, HE MEANT ONLY GOT THE CREDIT CARDS AND USED IT. DURING THIS CONVERSATION, BRANDON BASHAM WORKED WITH AGENTS TO DRAW A MAP. HE DREW A POND, AND A BOAT RAMP, AND A HOTEL, AND THE MAP GOT FAXED BY AGENTS TO OFFICERS IN CONWAY, SOUTH CAROLINA. THEY IMMEDIATELY RECOGNIZED THE MAP AS THE AREA CALLED THE SAVANNAH BLUFF. IT IS A RESIDENTIAL

AREA JUST A FEW MILES FROM CONWAY WAL-MART WHERE ALICE DONOVAN DISAPPEARED. AGENTS ASSEMBLED A SEARCH TEAM. THEY WERE HOPEFUL ALICE WAS STILL TIED TO A TREE IN THAT AREA. FOR THREE DAYS, AGENTS, SEARCH TEAMS, TRACKING DOGS, HELICOPTERS, SEARCHED THE SAVANNAH BLUFF AREA. THEY FOUND NOTHING. WHY? BECAUSE BRANDON BASHAM LIED ON NOVEMBER 25TH, 2002.

BRANDON BASHAM HAD AN ATTORNEY APPOINTED IN KENTUCKY TO REPRESENT HIM. ON THAT DAY, HE AND HIS LAWYER MET WITH AGENT SCOTT VITO ONCE AGAIN, AND NOW THE STORY WAS ALL DIFFERENT. NOT ONLY WAS ALICE DONOVAN NOT AT SAVANNAH BLUFF NEAR THE CONWAY WAL-MART, SHE WASN'T EVEN IN SOUTH CAROLINA. DURING THIS VERSION OF THE STORY, MR. BASHAM SAID THAT HE AND FULKS HAD TAKEN ALICE UP IN NORTH CAROLINA. THEY HAD STOPPED AT A CEMETERY WHERE THEY HAD DONE THEIR THING. THAT THEY HAD THEN DRIVEN ON SOME DIRT ROADS AND ALICE'S BODY WILL BE FOUND 25 FEET OFF OF THE ROAD WHERE HE DESCRIBED IT AS "DRAGGING DISTANCE" FROM THE PASSENGER SIDE OF THE VEHICLE COVERED WITH LEAVES AND STICKS.

LATER THAT NIGHT, LADIES AND GENTLEMEN, ON NOVEMBER 27TH, 2002, MR. HUGHES, BRANDON BASHAM'S KENTUCKY ATTORNEY, MET WITH BRANDON BASHAM. HE HAD GOTTEN AUTHORIZATION TO DISCLOSE SOME NEW INFORMATION TO LAW ENFORCEMENT AUTHORITIES IN WEST VIRGINIA. AND AT 1:30 IN THE MORNING ON NOVEMBER 27, 2002, MR. HUGHES CALLED SPECIAL AGENT PAT MALEY TO TELL HIM WHERE

SAMANTHA BURNS'S BODY WAS. THEY ROLLED IT DOWN AN EMBANKMENT INTO THE GUYANDOTTE RIVER. BRANDON BASHAM SAID FULKS GOT A CAR, USED CREDIT CARDS. NOW, THROUGH HIS ATTORNEY, NOW PROVIDED INFORMATION ABOUT WHERE THE BODY WAS LOCATED. ALSO ON NOVEMBER 27, 2002, LADIES AND GENTLEMEN, AND, BY THE WAY, IN WEST VIRGINIA, THEY SEARCHED THAT AREA OF THE GUYANDOTTE RIVER. THEY SEARCHED EVERYWHERE THERE WAS TO SEARCH IN HUNTINGTON BEACH. THEY DRAGGED THE OHIO RIVER. SAMANTHA BURNS'S BODY HAS NEVER BEEN FOUND.

ON NOVEMBER 27, 2002, BASHAM WAS TRANSPORTED TO SOUTH CAROLINA TO MAKE APPEARANCES ON FEDERAL CHARGES IN FLORENCE, SOUTH CAROLINA. HE WAS APPOINTED TWO LAWYERS. NOT THESE GUYS, TWO ATTORNEYS REPRESENTING HIM PREVIOUS. THEY AGREED ON THE 28TH OF NOVEMBER BRANDON BASHAM WOULD ACCOMPANY LAW ENFORCEMENT TO GO LOOK FOR ALICE DONOVAN'S REMAINS. THEY STARTED AT BEE TREE FARM HUNT CLUB. LAW ENFORCEMENT OFFICERS AND BRANDON BASHAM ALL CONVEYED -- CONVERGED AT THE HUNT CLUB. FIRST PLACE THEY WENT TO WAS THE CEMETERY WHERE THEY HAD BEEN SEEN PARKED. AT THAT POINT, AGENTS GOT THE FIRST INDICATION ABOUT WHAT WAS GOING TO HAPPEN THAT DAY BECAUSE BRANDON BASHAM SAID, "THIS IS THE WRONG PLACE." AND SO WHILE ANGIE, AND JEN, AND BARRY WERE SPENDING THE HOLIDAY HOPING FOR CLOSURE, BRANDON BASHAM LED LAW ENFORCEMENT ON A WILD GOOSE CHASE. EVIDENCE WILL SHOW, DESPITE MASSIVE SEARCHES IN BUNCOMBE COUNTY, NORTH CAROLINA, WHERE BRANDON BASHAM LED LAW

ENFORCEMENT ON SEARCHES, HER BODY HAS NEVER BEEN FOUND.

THERE YOU HAVE IT, LADIES AND GENTLEMEN.  AFTER A 14-DAY CRIME SPREE, TWO WOMEN KILLED, BRANDON BASHAM'S CHOICES THAT HE MADE AT THAT POINT WAS TO CONTINUE TO OBSTRUCT THE INVESTIGATION.  DO YOU NEED TO KNOW ANYTHING ELSE TO KNOW WHAT HIS INTENT WAS ON NOVEMBER 14, 2002?  THIS EVIDENCE, LADIES AND GENTLEMEN,  THESE CRIMES, ALL OF THIS EVIDENCE OF THESE HORRIFIC ACTS,  THE ONE CONCLUSION IS THAT BRANDON BASHAM AND CHAD FULKS PLANNED THESE CRIMES TOGETHER, EXECUTED THEM TOGETHER, AND THEY PREPARED FOR THEM TOGETHER.  FOR THESE CRIMES,  THEY DESERVE THE DEATH PENALTY.

WHAT CRIMES AM I TALKING ABOUT? I WILL MOVE ALONG REAL QUICK NOW, LADIES AND GENTLEMEN,  TO TALK TO YOU BRIEFLY ABOUT THE CHARGES THAT EXIST IN THIS CASE.  AS THE JUDGE TOLD YOU, THE FIRST CHARGE IN THE INDICTMENT IS CARJACKING, RESULTING IN DEATH.  THE ELEMENTS OF THAT CRIME ARE, THE DEFENDANT TAKES A MOTOR VEHICLE; ALICE DONOVAN'S CAR.

THE MOTOR VEHICLE HAS BEEN TRANSPORTED, SHIPPED, OR RECEIVED IN INTERSTATE OR FOREIGN COMMERCE.  WE WILL STIPULATE AND AGREE THAT HER CAR WAS MANUFACTURED IN GERMANY AND BROUGHT HERE, SO IT WAS TRAVELLING IN COMMERCE.

TAKES THE MOTOR VEHICLE FROM THE PERSON OR PRESENCE OF ANOTHER INDIVIDUAL, ALICE DONOVAN.

THE TAKING WAS DONE, OR ATTEMPTED BY FORCE AND VIOLENCE, OR BY INTIMIDATION.  AGENT NEAL WILL TELL YOU OF BRANDON

BASHAM'S KNOWLEDGE.  HE HAD A GUN WHEN HE GOT IN ALICE DONOVAN CAR ON THE 13TH.

THE DEFENDANT INTENDS TO CAUSE DEATH OR BODILY HARM.  AND DEATH RESULTS.

I SUSPECT, LADIES AND GENTLEMEN, THIS FIFTH ELEMENT, THE DEFENDANT INTENDS TO CAUSE DEATH OR SERIOUS BODILY HARM, IS THE ONE THAT WILL BE CONTESTED IN THIS TRIAL.  LADIES AND GENTLEMEN, EVIDENCE WILL SHOW YOU BRANDON BASHAM INTENDED ON THE 14TH OF NOVEMBER 2002, AND ON THE 17TH HE TRIED TO DO IT AGAIN.  THERE IS NOT GOING TO BE ANY DOUBT ABOUT HIS INTENT.

THE SECOND CHARGE IS KIDNAPPING, RESULTING IN DEATH.  THE DEFENDANT UNLAWFULLY SEIZED, CONFINED, INVEIGLED, DECOYED, KIDNAPPED, ABDUCTED, OR CARRIED AWAY THE VICTIM.  FANCY WORDS FOR KIDNAPPED ALICE DONOVAN.  HE DID SO.

HE HELD HER FOR RANSOM, OR REWARD, OR OTHERWISE.  AND THE LAW SAYS "OTHERWISE,"  MEANS FOR ANY REASON THAT WAS OF BENEFIT TO THE DEFENDANTS.  IN THIS CASE, HER CAR,  ATM CARD, GOD KNOWS WHAT ELSE.

THE DEFENDANT WILLFULLY TRANSPORTED THE VICTIM IN INTERSTATE COMMERCE.  THE EVIDENCE WILL SHOW THEY TOOK ALICE DONOVAN FROM CONWAY, SOUTH CAROLINA INTO NORTH CAROLINA, AND DEATH RESULTED.  ALICE DONOVAN NO LONGER LIVES.

INTERSTATE TRANSPORTATION OF A STOLEN MOTOR VEHICLE HAS THREE ELEMENTS.  THE DEFENDANT TRANSPORTED OR CAUSED TO BE TRANSPORTED A STOLEN VEHICLE; ALICE DONOVAN'S CAR.

KNEW OR HAD REASON TO KNOW THAT THE VEHICLE WAS STOLEN; HE STOLE IT.

THE DEFENDANT TRANSPORTED THE VEHICLE IN INTERSTATE COMMERCE; TOOK THE CAR FROM SOUTH CAROLINA TO NORTH CAROLINA.

COUNT FOUR CHARGES GENERAL CONSPIRACY. JUST A LITTLE BIT OF INFORMATION ABOUT WHAT A CONSPIRACY IS. CONSPIRACY IS AN AGREEMENT TO COMMIT A CRIME. UNDER FEDERAL LAW, WHEN SOMEONE AGREES TO COMMIT A CRIME, THEY TAKE AT LEAST ONE STEP IN FURTHERANCE OF THAT AGREEMENT, THEN THAT AGREEMENT, ITSELF, IS A SEPARATE CRIME. FOR EXAMPLE, HE IS CHARGED IN COUNT 1 WITH CARJACKING, RESULTING IN DEATH. THAT IS WHAT WE CALL A SUBSTANTIVE OFFENSE. IT IS AN ACTUAL COMMISSION OF THE CRIME. THE CONSPIRACY IS THE AGREEMENT TO COMMIT THE CRIME. UNDER FEDERAL LAW, BOTH THE AGREEMENT TO COMMIT THE CRIME AND THE COMMISSION OF THE CRIME, BOTH OFFENSES.

IN COUNT 4, HE AND CHAD FULKS ARE CHARGED WITH CONSPIRACY TO CARJACK, RESULTING IN DEATH; KIDNAPPING, RESULTING IN DEATH; INTERSTATE TRANSPORTATION OF STOLEN MOTOR VEHICLE; POSSESSION OF FIREARM BY FELON; AND, POSSESSION OF STOLEN FIREARMS. THE ELEMENTS OF THAT OFFENSE ARE THAT THEY AGREED. THAT THERE WAS AN AGREEMENT BETWEEN TWO OR MORE PERSONS TO VIOLATE FEDERAL LAW, THE CHARGES THAT I HAVE TALKED WITH YOU ABOUT. THE DEFENDANT CLEARLY KNEW OF THE CONSPIRACY. HE KNOWINGLY AND VOLUNTARILY BECAME A PART OF THE CONSPIRACY. AND AT LEAST ONE OVERT ACT WAS PERFORMED IN FURTHERANCE OF THE

CONSPIRACY.

AT THE END OF THIS CASE, YOU WILL HAVE THE INDICTMENT BACK IN THE JURY ROOM WITH YOU.  WHAT YOU WILL SEE IS CONSPIRACY LISTS A NUMBER OF OVERT ACTS, INCLUDING THE KIDNAPPING OF MR. HAWKINS,  THE DRIVING TO PORTAGE,  INDIANA,  OTHER EVENTS THAT OCCURRED THROUGHOUT THE COURSE OF THIS CRIME SPREE.  THOSE ARE THE FACTS THAT FURTHER THE CONSPIRACY, THE GOVERNMENT ALLEGES.  YOU WILL BE INSTRUCTED THAT YOU ONLY HAVE TO FIND THAT THEY COMMITTED ONE OF THEM.  BUT,  LADIES AND GENTLEMEN, I SUGGEST THAT AFTER YOU HAVE HEARD THE EVIDENCE, YOU WILL FIND THEY COMMITTED ALL OF THEM.

COUNT FIVE IS ALSO A CONSPIRACY CHARGE.  IT IS A SEPARATE VIOLATION.  IT IS A SPECIFIC CONSPIRACY TO USE FIREARMS DURING CRIMES OF VIOLENCE.  SO, LADIES AND GENTLEMEN, THE ELEMENTS ARE:  THERE IS AN AGREEMENT BETWEEN TWO OR MORE PERSONS TO USE,  CARRY FIREARMS DURING AND IN RELATION TO A CRIME OF VIOLENCE.  I SUGGEST TO YOU,  LADIES AND GENTLEMEN, TWO ESCAPEES STEAL GUNS FOUR DAYS AFTER THEIR ESCAPE, WHAT DO THEY THINK THEY ARE GOING TO DO WITH THEM? DEFENDANT KNEW OF THE CONSPIRACY.  THE DEFENDANT KNOWINGLY AND VOLUNTARILY BECAME A PART OF THAT CONSPIRACY.

COUNT SIX CHARGES THE SUBSTANTIVE VIOLATION, USING FIREARMS DURING AND IN RELATION TO A CRIME OF VIOLENCE.  THE DEFENDANT KNEW HE CARRIED, POSSESSED A FIREARM.  THAT IS THE FIREARM MR. BASHAM HAD WHEN HE GOT IN ALICE DONOVAN'S CAR.

**JA 1065**

REASONABLE DOUBT. THE DEFENSE OBJECTIVE IS TO ADVOCATE FOR THEIR CLIENT. THAT IS OUR ROLE. THAT IS THE ROLE WE ARE CHARGED WITH UNDER THE CANNONS OF ETHICS, TO ADVOCATE FOR OUR CLIENT'S POSITION. WE INTEND TO DO THAT.

YOUR ROLE IS TO DECIDE THE FACTS. AND YOUR ROLE IS TO SIT BETWEEN THE GOVERNMENT AND THE PEOPLE AND THE CITIZENS WHO ARE ACCUSED OF CRIMES AND ACT AS A BUFFER, TO TEST THE GOVERNMENT'S EVIDENCE, TO DISCUSS THE GOVERNMENT'S EVIDENCE, AND THEN RENDER A VERDICT AT THE END OF THE CASE.

NOW, THE OATH THAT YOU TOOK REQUIRES YOU TO LISTEN TO THE EVIDENCE, WEIGH THE EVIDENCE, AND APPLY THE JUDGE'S INSTRUCTIONS ON THE LAW TO THAT EVIDENCE, AND RENDER A FAIR AND TRUE VERDICT. IF, AT THE END OF THE CASE, YOU BELIEVE THAT THE GOVERNMENT HAS SUSTAINED ITS BURDEN BEYOND A REASONABLE DOUBT, THEN YOU HAVE AN OBLIGATION TO GO AHEAD AND SAY SO AND FIND THE DEFENDANT GUILTY OF ONE OR MORE CHARGES THAT YOU THINK THEY SUSTAINED THEIR BURDEN ON. ON THE OTHER HAND, IF YOU DO NOT THINK THAT THEY HAVE SUSTAINED THEIR BURDEN AS TO ANY ONE OR MORE CHARGES, THEN THE OATH THAT YOU TOOK REQUIRES YOU, AS BEING A BUFFER BETWEEN THE GOVERNMENT AND THE CITIZENS OF THIS STATE, TO SAY SO AND FIND HIM NOT GUILTY AS TO THOSE COUNTS.

WE WENT THROUGH A TWO-WEEK JURY SELECTION PROCESS, AND WE INTERVIEWED WELL OVER 90 JURORS. IT WAS NOT A LOTTERY, BUT YOU WON. YOU ARE THE FOLKS, AS I SAID BEFORE, WHO THE

COURT, THE PROSECUTION, AND THE DEFENSE FELT COULD BE THE JURORS THAT COULD DECIDE THIS CASE ON BEHALF OF THE PEOPLE OF SOUTH CAROLINA. WE ALL FELT THAT YOU WERE THE PEOPLE THAT COULD WEIGH THE EVIDENCE, LISTEN TO THE COURT'S INSTRUCTIONS ON THE LAW, AND MAKE THE APPROPRIATE DECISIONS THAT NEED TO BE MADE IN THIS CASE. THOSE OF YOU WHO ARE SITTING HERE ARE THOSE PEOPLE, OUT OF ALL OF THE PEOPLE THAT WERE QUESTIONED, WHO ALL OF US AGREE ON WOULD BE THE MOST FAIR, IMPARTIAL JURY THAT WE COULD HAVE IN THIS CASE.

NOW, MR. BASHAM IS CHARGED WITH SOME VERY SERIOUS CRIMES. AND I AM NOT GOING TO STAND HERE AND TELL YOU THAT HE DID NOTHING. THE STORY YOU WILL HEAR OVER THE NEXT TWO WEEKS OR SO IS A HORRIBLE STORY. IT IS HORRIBLE. AND I AM GOING TO BE THE FIRST ONE TO TELL YOU THAT. MR. SCHOOLS IS NOT THE ONLY ONE THAT IS GOING TO HAVE TO TELL YOU THAT, JACK SWERLING IS GOING TO TELL YOU THAT. YOU WILL HEAR EVIDENCE OF MULTIPLE AMOUNTS OF CRIMINAL ACTS, SOME THAT WILL SHOCK YOU. MANY THAT WILL SHOCK YOU. SOME THAT ARE PROBABLY MORE WHAT YOU WOULD BE USED TO HEARING AS FAR AS CRIMINAL OFFENSES, BUT THE FACT OF THE MATTER IS, THAT WHAT YOU WILL HEAR THAT OCCURRED DURING THIS PERIOD OF TIME IN NOVEMBER OF 2002, IS A HORRIBLE SERIES OF EVENTS.

DURING THAT PERIOD OF TIME, CHAD FULKS AND BRANDON BASHAM COMMITTED A NUMBER OF THESE ACTS THAT I HAVE REFERRED TO. THEIR ACTIONS DURING THAT PERIOD AFFECTED MANY LIVES. FROM

THE ESCAPE FROM THE PRISON IN HOPKINS COUNTY, TO THE DEFENDANT'S ARREST IN ASHLAND, KENTUCKY, AND TO CHAD FULKS'S ARREST THAT YOU HAVE HEARD ABOUT. THESE DESPICABLE ACTS THAT THE TWO OF THEM PARTICIPATED IN, THESE HORRIBLE ACTS THAT YOU WILL HEAR, INCLUDED BREAK-INS, THEFTS, FRAUD, POSSESSION OF WEAPONS, SHOOTING WEAPONS, AND, YES, THE DESPICABLE ACT OF ABDUCTIONS. AND YOU WILL HEAR ABOUT THOSE, AS WELL.

WHAT HAPPENED TO ALICE DONOVAN ON NOVEMBER 14, 2002 IS A NIGHTMARE. IT IS A NIGHTMARE OF GROSS PROPORTIONS. IT IS THE WORST FEAR THAT MOST PEOPLE HAVE, WHETHER YOU BE A SPOUSE, A WIFE, A HUSBAND, A FATHER, A SON, OR DAUGHTER, OR BROTHER. IT IS THE THING THAT PEOPLE THINK ABOUT WHEN THEY SEND THEIR CHILDREN OUT AT NIGHT. IT IS THE THING THEY THINK ABOUT WHEN THEIR SPOUSE IS OUT. AND IT IS THE WORST FEAR, I SUBMIT, THAT MOST PEOPLE WOULD HAVE.

AS A FATHER AND AS A HUSBAND, I CAN UNDERSTAND, MAYBE NOT EXACTLY FEEL, BUT I CAN UNDERSTAND WHAT THE DONOVAN FAMILY HAS GONE THROUGH AND THE BURNS FAMILY HAS GONE THROUGH. YOU WILL HEAR TESTIMONY OVER THE NEXT COUPLE OF WEEKS ABOUT THAT AND EVEN AFTER THAT. BUT I CAN CERTAINLY UNDERSTAND THE IMPACT THAT IT HAD ON THEIR LIVES. AND FOR THAT I AM DEEPLY SORRY. MY HEART GOES OUT TO THE FAMILIES.

I ALSO WANT TO SAY MY HEART GOES OUT TO THE FAMILY OF SAMANTHA BURNS FOR WHAT HAPPENED TO HER. AND YOU WILL HEAR TESTIMONY ABOUT THAT, EXCEPT THAT WITH THE CASE OF SAMANTHA

BURNS, YES, IT IS A HORRIBLE ACT, DESPICABLE ACTS, AND YOU WILL HAVE TO DECIDE SOME OF THOSE IN DECIDING THE CASE LATER ON AS FAR AS WHAT THE PUNISHMENT IS IF WE GET THAT FAR. IF YOU RECALL FROM WHAT THE JUDGE TOLD YOU, THOSE ARE NOT CHARGES IN THIS INDICTMENT. SO, WITH RESPECT TO THE FACTS OF THAT CASE, I AM GOING TO WAIT TO SEE WHAT THE GOVERNMENT BRINGS OUT BECAUSE THEY CAN BRING THAT ISSUE OUT UNDER SOME EVIDENTIARY ISSUES OR RULES THAT WE HAVE. BUT REMEMBER THAT THAT IS NOT A PART OF THIS INDICTMENT. THAT IS NOT A CHARGE THAT YOU WILL HAVE TO DECIDE AT THIS TIME IN THE CASE TO RESOLVE THOSE ISSUES AS TO WHETHER OR NOT THERE WAS A KIDNAPPING, OR AN ABDUCTION, OR A CARJACKING OF SAMANTHA BURNS. BUT WHAT I WILL AGREE WITH WITH MR. SCHOOLS IS THAT, WHEN YOU HEAR ABOUT THAT, IT WILL SHOCK YOU. AND IT WILL BE HORRIBLE. AND THE ACTS WERE DESPICABLE.

I WOULD LIKE TO TELL YOU FOR A FEW MOMENTS WHAT IS NOT IN CONTROVERSY. I WOULD LIKE TO GO AHEAD AND TELL YOU THAT RIGHT NOW, UP FRONT, AT THE BEGINNING OF THIS CASE. IT IS NOT GOING TO BE IN CONTROVERSY AS TO WHETHER OR NOT BRANDON BASHAM AND CHAD FULKS ESCAPED FROM THE HOPKINS COUNTY JAIL ON NOVEMBER 4, 2002. THEY DID. I WILL ASK YOU, WITH RESPECT TO THOSE ACTS, TO LOOK AT THE EVIDENCE IN THE CASE, HEAR THE EVIDENCE, WEIGH THE EVIDENCE AS TO WHO WAS THE INDIVIDUAL WHO HAD NOT ONLY THE INTELLECTUAL CAPACITY, BUT THE MOTIVE TO WANT TO ESCAPE. I SUBMIT TO YOU, YOU WILL FIND OUT IT IS

CHAD FULKS AND NOT BRANDON BASHAM.

I WILL ALSO TELL YOU THAT WHAT IS NOT IN CONTROVERSY IS THAT MR. FULKS AND MR. BASHAM KIDNAPPED JAMES HAWKINS ON NOVEMBER 5TH, 2002, AND TIED HIM TO A TREE. THAT ALSO WILL NOT BE IN DISPUTE.

THESE ARE OVERT ACTS, PART OF THE CONSPIRACY. I ASK YOU, AGAIN, WHILE YOU HEAR THAT EVIDENCE, TO LISTEN TO WHO WAS IN CONTROL; WHO MADE THE COMMANDS; WHO MADE THE ORDERS; WHO MADE THE DECISIONS; WHO HAD THE CAPACITY, THE FUNCTIONING, AND THE DESIRE TO GO AHEAD AND DO WHAT WAS DONE ON THAT PARTICULAR OCCASION. I SUBMIT TO YOU, AGAIN, THAT THAT WOULD BE CHAD FULKS.

ON NOVEMBER 7, 2002, IT IS NOT GOING TO BE IN CONTROVERSY AS TO WHETHER OR NOT BRANDON BASHAM AND CHAD FULKS WENT TO TINA SEVERANCE'S HOUSE. THAT WILL NOT BE IN CONTROVERSY. NOR WILL IT BE IN CONTROVERSY AS TO WHETHER OR NOT CHAD FULKS MADE PLANS ALONG WITH TINA SEVERANCE TO GO AHEAD AND BREAK IN TO ROBERT TALSMA'S HOUSE AND STEAL WEAPONS. AND, IN FACT, HE AND BRANDON BASHAM DID BREAK IN TO THAT HOUSE AND DID STEAL WEAPONS. THAT WILL NOT BE IN CONTROVERSY. BUT I WILL ASK YOU, WITH RESPECT TO THE EVIDENCE THAT YOU HEAR IN THAT PART OF THE CASE TO, AGAIN, LOOK, NUMBER ONE, AT WHO KNEW TO GO TO TINA SEVERANCE'S HOUSE? WHO HAD THE CONTACT AND THE RELATIONSHIP WITH TINA SEVERANCE? WHO KNEW ABOUT ROBERT TALSMA AND THE FACT THAT

ROBERT TALSMA HAD WEAPONS? WHO ASKED FOR THE WEAPONS? WHO, AGAIN, WAS THE ONE IN CONTROL? WHO WAS THE ONE THAT MADE THE COMMAND DECISIONS? YOU WILL HEAR TESTIMONY THAT CHAD FULKS WAS THE ONE THAT DROVE THERE. YOU WILL HEAR TESTIMONY THROUGHOUT THIS CASE THAT IN EVERY DIRECTION THEY WENT, IT WAS EITHER CHAD FULKS OR SOME OTHER INDIVIDUAL DRIVING BECAUSE BRANDON BASHAM DOES NOT KNOW HOW TO DRIVE. AND DID NOT DRIVE IN ANY ONE OF THESE PARTICULAR LOCATIONS THAT THEY WENT TO.

WHAT IS ALSO NOT GOING TO BE IN CONTROVERSY IS OVER THE NEXT SEVERAL DAYS, THE PARTIES STOLE, AND I MEAN "PARTIES," I AM TALKING ABOUT BRANDON BASHAM AND CHAD FULKS, STOLE PURSES, CHECKS, AND CREDIT CARDS. THEY BOUGHT MULTIPLE ITEMS OF MERCHANDISE. SOME OF THAT MERCHANDISE WAS KEPT, SOME OF THAT MERCHANDISE WAS USED, AND SOME OF THAT MERCHANDISE WAS RETURNED FOR CASH SO THAT THEY WOULD HAVE MONEY TO CONTINUE ON THEIR WAY FROM POINT TO POINT.

WITH CHAD FULKS MAKING THE DECISIONS AND BEING IN CONTROL OF THE VEHICLE, ALONG WITH BRANDON BASHAM AND TINA SEVERANCE AND ANDREA RODDY, THE PARTIES DROVE TO MULTIPLE LOCATIONS THAT YOU HAVE ALREADY SEEN ON THAT MAP. EACH ONE OF THE LOCATIONS THAT YOU SAW ON THE MAP AND THAT YOU WILL HEAR TESTIMONY ABOUT IS A LOCATION THAT CHAD FULKS HAD SOME RELATIONSHIP WITH. IN EACH PLACE HE EITHER HAD A FRIEND LIVING THERE, OR RELATIVE LIVING THERE, OR HE HAD LIVED THERE. BRANDON BASHAM, AS I HAVE TOLD YOU, HAD NEVER BEEN

OUT OF THE STATE OF KENTUCKY WITH THE EXCEPTION OF THAT ONE TIME WHEN HE WAS IN THE HOSPITAL.  SO,  ALL OF THE CONTACTS, ALL OF THE PLACES THEY WENT WERE AT CHAD FULKS'S CHOOSING AND CHAD FULKS'S DIRECTION, WITH CHAD FULKS GIVING THE ORDERS.

AT EVERY STOP WHERE THEY WENT AND EVERY MOTEL THEY WENT INTO,  IT WAS CHAD FULKS WHO MADE THE DECISION TO GO INTO THOSE MOTELS AND MAKE THOSE STOPS AND WHEN TO LEAVE.  ALL OF THAT WAS DONE BY CHAD FULKS BECAUSE CHAD FULKS IS A VERY MANIPULATIVE AND CUNNING INDIVIDUAL.  AT VIRTUALLY EVERY STOP,  AS I SAID,  THERE WAS SOME CONNECTION WITH CHAD FULKS. AND WHEN HE WENT TO HUNTINGTON, WEST VIRGINIA, AND YOU HEAR TESTIMONY ABOUT HUNTINGTON,  WEST VIRGINIA,  IN ADDITION TO THE OTHER PLACES THAT WE HAVE ALREADY TALKED ABOUT,  MR. SCHOOLS TALKED ABOUT,  CHAD FULKS HAD CONNECTIONS THERE,  TOO. HE LIVED THERE.  HE KNEW PEOPLE THERE.  HE HAD FREQUENTED THE MALL WHERE SAMANTHA BURNS WAS ABDUCTED.  AND HE ALSO KNEW THE LOCATION WHERE THE VEHICLE WAS BURNED.  BRANDON BASHAM KNEW NOTHING ABOUT THE GEOGRAPHICAL AREA THAT THEY WERE IN IN HUNTINGTON,  WEST VIRGINIA OR KENOVA.  HE KNEW NOTHING ABOUT IT,  HAD NEVER BEEN THERE BEFORE.

ON NOVEMBER 14TH,  AS THE GOVERNMENT HAS TOLD YOU,  THE PARTIES HAD ARRIVED IN SOUTH CAROLINA AFTER LEAVING WEST VIRGINIA.  THERE WILL BE NO ISSUE AND NOTHING WILL BE IN DISPUTE THAT, ON THAT DATE, BRANDON BASHAM AND CHAD FULKS BROKE INTO THE RESIDENCE OF SAM JORDAN IN CONWAY,  SOUTH

**JA 1072**

CAROLINA. IT WILL NOT BE IN DISPUTE THAT, OUT OF THAT RESIDENCE, THEY STOLE VARIOUS WEAPONS. IT WILL NOT BE IN DISPUTE THAT, AS THEY LEFT THAT RESIDENCE AND CARL JORDAN CONFRONTED THEM, THAT THERE HAD BEEN SHOTS FIRED. AGAIN, LISTEN TO THE EVIDENCE THAT YOU HEAR. PLEASE ANALYZE IT, PLEASE SCRUTINIZE IT, AGAIN, TO SEE WHO WAS IN CONTROL, WHO MADE THE DECISIONS, WHO WAS THE LEADER, AND WHO WAS A FOLLOWER. SEE WHETHER OR NOT IT WAS CHAD FULKS WHO HAD THE CAPACITY AND, IN FACT, DID MAKE THOSE DECISIONS, OR WHETHER IT WAS BRANDON BASHAM.

IT ALSO IS NOT IN CONTROVERSY ON THAT DATE ON NOVEMBER 14, 2002, THAT FULKS AND BASHAM STOLE A FORD 150 PICKUP TRUCK. WHAT ALSO IS NOT GOING TO BE AT ISSUE IN THIS CASE IS THE ABDUCTION OF ALICE DONOVAN ON NOVEMBER 14, 2002, AT THE WAL-MART IN CONWAY, SOUTH CAROLINA. ALICE DONOVAN WAS KIDNAPPED AND TAKEN FROM THAT WAL-MART AND BRANDON BASHAM AND CHAD FULKS PARTICIPATED IN THAT DESPICABLE ACT. THAT WILL NOT BE IN CONTROVERSY.

WHAT IS IN CONTROVERSY AND WHAT IS AT ISSUE IS THE ISSUE RELATED TO THE CARJACKING. WITH THE KIDNAPPING, THE ABDUCTION ITSELF SATISFIES THE ELEMENTS, THE MAIN ELEMENTS OF THE KIDNAPPING STATUTE THAT A PERSON WAS ABDUCTED AND HELD. THAT SATISFIES THE KIDNAPPING STATUTE. THE CARJACKING STATUTE, HOWEVER, REQUIRES THAT, WHEN THE VEHICLE IS TAKEN, THE PERSON HAD THE INTENT TO EITHER COMMIT SERIOUS BODILY HARM

TO THE INDIVIDUAL IN THE CAR OR TO KILL THAT PERSON.  BRANDON BASHAM MAINTAINS, AND HE MAINTAINS TO THIS DAY, THAT WHEN ALICE DONOVAN WAS ABDUCTED, THERE WAS NO INTENT ON HIS PART, NO THOUGHT,  HE DID NOT GIVE ANY THOUGHT AT ALL TO THE FACT THAT SHE WOULD BE HARMED OR KILLED.  SO THAT WOULD BE THE ISSUE IN CONTROVERSY FOR YOU.  NOT MANY OF THESE OTHER ISSUES IN THE INDICTMENT.

NOW,  THAT ISSUE ABOUT THE CARJACKING IS ALSO A PART OF COUNT 4,  THE CONSPIRACY,  BECAUSE IT IS A CONSPIRACY, NOT ONLY TO KIDNAP, BUT TO CARJACK.  IN COUNT 6, THE WEAPON THAT IS USED IN THE COMMISSION OF A VIOLENT CRIME IN COUNT 1,  THE CARJACKING STATUTE,  IS PART OF THAT.  BUT AS TO THE OTHER CHARGES AND COUNTS IN THE INDICTMENT,  THERE BEING EIGHT COUNTS,  AS TO SEVEN OF THOSE COUNTS,  MANY OF THOSE ISSUES ARE NOT GOING TO BE IN CONTROVERSY FOR YOU.  AND YOUR DECISION WITH RESPECT TO THOSE COUNTS WILL BE RELATIVELY EASY.

WITH RESPECT TO THE CARJACKING AND HOW THE CARJACKING AFFECTS COUNTS 4,  5, AND 6,  THAT WOULD BE DECISIONS THAT YOU WILL HAVE TO MAKE WITH RESPECT TO THIS CHARGE.

GOING ON FROM THAT TIME, I WANT TO TELL YOU THIS.  THERE IS NO CONTROVERSY AS TO WHETHER OR NOT MS. DONOVAN'S ATM CARD WAS USED.  IT WAS USED BY CHAD FULKS.  BRANDON BASHAM DID NOT KNOW HOW TO USE AN ATM CARD OR A CALLING CARD,  YOU WILL HEAR EVIDENCE OF THAT.

IT IS ALSO NOT IN CONTROVERSY THAT, WITH RESPECT TO MR.

FULKS, HE DROVE AND RETURNED TO FAMILIAR TERRITORY, HUNTINGTON, WEST VIRGINIA, AFTER THE ABDUCTION OF ALICE DONOVAN. IT ALSO WILL NOT BE IN CONTROVERSY, AS ON NOVEMBER 17 WITH HIM DRIVING, HIM MAKING, AGAIN, THE DECISIONS WHERE TO GO AND WHEN TO GO, THEY LEFT HUNTINGTON, WEST VIRGINIA, WENT TO ASHLAND, KENTUCKY, WHERE MR. BASHAM WAS ARRESTED. MR. BASHAM DID HAVE A CONFRONTATION, DID HAVE A MEETING WITH ANDREA AND DEANNA FRANCIS, YOU WILL HEAR TESTIMONY ABOUT THAT. AND IT WILL NOT BE IN CONTROVERSY AS TO WHETHER OR NOT WHEN A POLICE OFFICER ARRIVED ON THE SCENE IN HIS ATTEMPT TO ARREST MR. BASHAM THERE WERE SHOTS FIRED. THAT IS NOT IN CONTROVERSY, AS WELL. AGAIN, THESE ARE SOME OF THE DESPICABLE AND HORRIBLE ACTS THAT WERE COMMITTED DURING THIS TIME.

IT ALSO WON'T BE DISPUTED THAT, AFTER MR. FULKS LEFT AT THAT TIME ASHLAND, KENTUCKY, HE WAS LATER ARRESTED, A COUPLE OF DAYS LATER, AFTER HE WAS APPREHENDED BY THE POLICE ON NOVEMBER 20TH, 2002.

BASED ON WHAT I TOLD YOU, IT SHOULD BE FAIRLY APPARENT AT THIS POINT THAT WE WILL, MORE THAN LIKELY, WITH ALL PROBABILITY, HAVE A SECOND TRIAL IN THIS CASE. WE WILL, MORE THAN LIKELY, PROCEED INTO THAT SENTENCING PHASE THAT WE SPENT SO MUCH TIME TALKING TO YOU ABOUT OVER THE LAST COUPLE OF WEEKS DURING JURY SELECTION. AND NOW YOU CAN SEE WHY WE SPENT SO MUCH TIME IN EXPLAINING TO YOU THE ISSUES RELATED TO

PUNISHMENT AND OPINIONS REGARDING THE DEATH PENALTY.  AS YOU WILL REMEMBER WHEN YOU WERE QUESTIONED BY ME AND MR. HARRIS, WE ASKED ALL OF YOU, PLEASE UNDERSTAND AT THAT POINT WE WERE TALKING ABOUT PUNISHMENT IN THE CASE BECAUSE THERE WILL NOT BE ANOTHER JURY SELECTION PROCESS.  YOUR OPINIONS REGARDING THE DEATH PENALTY WERE IMPORTANT FOR US TO DETERMINE AT THAT TIME BECAUSE THERE WOULD BE NO OTHER TIME TO GO AHEAD AND EXPLORE THOSE ISSUES WITH YOU.  AND I AM NOT GOING TO GO INTO THE PROCEDURES THAT WILL BE FOLLOWED IN THAT CASE, SHOULD WE GET THERE.  BUT, AS I SUBMIT TO YOU,  IT IS APPARENT THAT WE WILL.

EACH OF YOU COMMITTED, AND PROMISED, AND SWORE UNDER OATH TO ALL OF US THAT YOU HAD AN OPEN MIND AS TO WHAT THE PUNISHMENT WOULD BE.  THAT NONE OF YOU WERE PREDISPOSED ONE WAY OR THE OTHER.  THAT NONE OF YOU FELT THAT THAT DEATH SENTENCE WAS AUTOMATICALLY WARRANTED.  THAT NONE OF YOU FELT A LIFE SENTENCE WAS AUTOMATICALLY WARRANTED.  THAT YOU WOULD BE WILLING TO WEIGH THE AGGRAVATING AND MITIGATING FACTORS AND CONSIDER WHAT THE APPROPRIATE PUNISHMENT OUGHT TO BE.  YOU WERE EVEN ASKED THOSE QUESTIONS WITH RESPECT TO NOT ONE,  BUT POTENTIALLY TWO HOMICIDES.

SO NOW THAT YOU SEE WHERE WE ARE IN THIS CASE,  NOW THAT YOU WILL SEE AS TO THE ISSUES IN THIS CASE,  IT IS PROBABLY APPARENT TO YOU THAT YOU WILL ALSO SEE AND ARE SEEING THAT WE WILL PROBABLY GET TO THAT STAGE OF THE TRIAL WHEN THOSE

DECISIONS WILL HAVE TO BE MADE.

OBVIOUSLY, ONE OF THE THINGS THAT WE WILL ARGUE LATER --

MR. SCHOOLS: I OBJECT TO THIS, YOUR HONOR.

THE COURT: MR. SWERLING, I PREFER YOU TO NOT GO INTO MATTERS THAT WILL BE GONE INTO IN PENALTY PHASE.

MR. SWERLING: MR. SCHOOLS SAID HE THOUGHT THEY SHOULD PAY FOR THEIR LIFE. I WAS GOING TO SAY I WOULD THINK THEY OUGHT TO CONSIDER A LIFE SENTENCE.

THE COURT: YOU MAY GO INTO THAT.

MR. SWERLING: MR. SCHOOLS TOLD YOU IN HIS OPENING STATEMENT THAT HE THOUGHT YOU SHOULD COME BACK WITH A SENTENCE OF DEATH. WE SUBMIT TO YOU, AT THIS POINT IN THE TRIAL, THAT YOUR VOTE, YOUR SENTENCE AT THAT TIME SHOULD BE A LIFE SENTENCE.

AS WE GO THROUGH THIS PROCESS, I ASK EACH OF YOU TO LISTEN TO EACH WITNESS. LISTEN TO THE DIRECT EXAMINATION THAT IS CONDUCTED OF EACH WITNESS AND THE CROSS-EXAMINATION CONDUCTED OF EACH WITNESS. I ASK YOU TO CONSIDER OF THE TWO PEOPLE, THE TEAM THAT MR. SCHOOLS TALKED ABOUT, WHETHER OR NOT BRANDON BASHAM COULD EVER BE A MEMBER OF THE TEAM THAT HE OUTLINED. WHETHER OR NOT BRANDON BASHAM HAD EVEN THE INTELLECTUAL FUNCTIONING TO BE A MEMBER OF SUCH A TEAM. BRANDON BASHAM, IN HIS WHOLE LIFE, WAS NEVER A MEMBER OF ANY TEAM. LOOK THROUGH THE EVIDENCE AND SCRUTINIZE THE EVIDENCE AND DECIDE, WHO IS THE OLDER AND WISER INDIVIDUAL? WHO IS THE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,      )      CR. NO. 4:02-992
                               )      COLUMBIA, SC
                               )      SEPTEMBER 14, 2004
                               )
     VERSUS                    )
                               )
BRANDON L. BASHAM,             )
          DEFENDANT.           )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME II

APPEARANCES:

FOR THE GOVERNMENT:            SCOTT SCHOOLS, FIRST AUSA
                               JONATHAN S. GASSER, AUSA
                               JOHN DUANE, AUSA
                               UNITED STATES ATTORNEY'S OFFICE
                               1441 MAIN STREET, SUITE 500
                               COLUMBIA, SC  29201

FOR THE DEFENDANT:             JACK SWERLING, ESQ.
                               1720 MAIN STREET
                               SUITE 301
                               COLUMBIA, SC  29201

                               GREG HARRIS, ESQ.
                               1720 MAIN STREET
                               SUITE 301
                               COLUMBIA, SC  29201

COURT REPORTER:                DEBRA R. JERNIGAN, RPR, CRR
                               UNITED STATES COURT REPORTER
                               901 RICHLAND STREET
                               COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1078

A.   YES, HAS CALLED AND TALKED TO THEM, IT IS A MISDEMEANOR.  WHEN I AM ABLE TO, I CAN TAKE CARE OF THAT.

Q.   NOBODY WITH THE FBI OR U. S. ATTORNEY'S OFFICE HAS PROMISED YOU ANYTHING WITH REGARD TO THAT 30 DAY OR $200 FINE, THAT IS WHAT I AM TRYING TO GET AT.

A.   NO.

Q.   DURING THIS TIME PERIOD,  DID MR. FULKS EVER INDICATE TO YOU THAT HE WAS AFRAID OF MR. BASHAM?

A.   NO.

Q.   DID MR. BASHAM EVER INDICATE TO YOU THAT HE WAS AFRAID OF MR. FULKS?

A.   NO.

Q.   GENERALLY,  HOW DID THE TWO OF THEM GET ALONG?

A.   LIKE TWO PEAS IN A POD.  I DIDN'T EVER SEE THEM FIGHTING.  THE ONLY ONE TIME THAT I ONLY SEEN BRANDON ANGRY OR UPSET WAS WHEN CHAD HAD HIT HIM IN THE MOUTH FOR THE THINGS HE HAD SAID TO ME, I GUESS.

Q.   FOR THE THINGS WHO HAD SAID?

A.   THAT BRANDON HAD SAID TO ME DURING THE TRIP WHEN HE WAS SINGING,  MAKING THE INSINUATIONS.  WHEN CHAD HAD SENT ME IN TO PAY FOR THE ROOM, HE HAD PUNCHED BRANDON IN HIS MOUTH. THAT IS THE STORY CHAD GAVE ME, THAT HE HAD PUNCHED BRANDON IN HIS MOUTH, AND I WAS NEVER TO BE ALONE WITH HIM, AND I WAS NEVER TO BE NEXT TO HIM, OR BY MYSELF.

MR. SWERLING:  JUDGE,  I HAVE TO OBJECT TO THAT.

HEARSAY.

MR. GASSER: SHE IS EXPLAINING WHY. SHE IS EXPLAINING WHY MR. FULKS PUNCHED MR. BASHAM IN THE MOUTH. I AM SURE THE DEFENSE WILL GET INTO THAT.

MR. SWERLING: I AM NOT. THAT IS HEARSAY, AT THIS POINT.

MR. GASSER: SHE IS EXPLAINING WHY MR. FULKS PUNCHED MR. BASHAM IN THE MOUTH.

MR. SWERLING: CAN I TALK TO MR. GASSER FOR A MOMENT TO FIND OUT?

(WHEREUPON, MR. SWERLING AND MR. GASSER HAD A DISCUSSION OFF THE RECORD.)

MR. SWERLING: I WITHDRAW THE OBJECTION.

MR. GASSER: THANK YOU, MR. SWERLING.

BY MR. GASSER:

Q. DID YOU SEE MR. BASHAM AFTER MR. FULKS HAD PUNCHED HIM IN THE MOUTH?

A. YEAH. WHEN I CAME TO THE DOOR, HE WAS ALL PUFFED UP AND ANGRY. HE WAS ON THE FLOOR DOING SOME PUSH-UPS, AND I GUESS TRYING TO PUT HIS ANGER IN A DIFFERENT SPOT.

Q. WAS ANY BLOOD DRAWN?

A. NO.

Q. TEETH KNOCKED OUT?

A. NO.

Q. AFTER THAT EVENT OCCURRED, DID MR. BASHAM AND MR. FULKS

CONTINUE TO HANG OUT TOGETHER?

A.    THEY WERE ALWAYS TALKING AMONGST THEMSELVES.

Q.    DRINK TOGETHER?

A.    DRINK TOGETHER,  SMOKE TOGETHER, EAT TOGETHER, WHATEVER.

Q.    WHEN YOU SAW THEM WHEN YOU GOT TO PORTAGE, INDIANA, THEY SPENT THE TWO NIGHTS AT THE SANDS MOTEL,  DID THEY SEEM TO GET ALONG TOGETHER?

A.    SEEMED TO GET ALONG VERY WELL.

Q.    WHEN THEY WERE TOGETHER ON SATURDAY EVENING ON NOVEMBER 9TH BEFORE THEY DROVE TO WAVERLY AND PIKETON WHEN BRANDON WAS PARTYING WITH CHAD AND HIS BROTHERS,  WERE THEY GETTING ALONG TOGETHER?

A.    YES.   I NEVER SEEN THEM HAVE A PROBLEM.  I MEAN, EVEN WHEN CHAD WAS ANGRY AT THE POINT AFTER I HAD TOLD HIM WHAT HAD HAPPENED IN STURGIS,  MICHIGAN,  BRANDON HAD BEEN ASKING AND CHAD HAD SNAPPED BACK AT HIM AND ASKED HIM WHY HE DID THAT, THEY STILL NEVER.   I NEVER SEEN THE TWO OF THEM GET MAD.

Q.    THE EVENTS YOU DESCRIBED WHERE MR. FULKS WOULD GET ANGRY OR MAD AT MR. BASHAM,  WOULD IT LAST VERY LONG?

A.    NO.

Q.    WHEN MR. BASHAM WOULD GET ANGRY OR MAD AT MR. FULKS, WOULD IT LAST VERY LONG?

A.    NO.

Q.    I WILL SHOW YOU SOME PHOTOGRAPHS.  THE FIRST IS

GOVERNMENT'S EXHIBIT 77. WE ARE ALMOST THROUGH, MS. SEVERANCE. GOVERNMENT'S EXHIBIT 77. WERE YOU SHOWN SOME PHOTOGRAPHS OF YOUR VAN AFTER LAW ENFORCEMENT WAS ABLE TO SEIZE YOUR VAN, WERE YOU SHOWN THESE PHOTOGRAPHS?

A. YES.

Q. I WILL SHOW YOU, I HAVE ALREADY SHOWN YOU SOME OF THE CAMOUFLAGE BOOTS AND BOXES THAT YOU IDENTIFIED; IS THAT CORRECT?

A. YES.

Q. WHAT IS THAT RIGHT THERE?

A. GAS CAN. IT IS A GAS CAN THAT I HAD PURCHASED TO GET KEROSENE.

Q. GOVERNMENT'S EXHIBIT 222-Q, DO YOU RECOGNIZE THAT?

A. YES.

Q. IS THAT THE SAME GAS CAN THAT IS DEPICTED IN GOVERNMENT'S EXHIBIT 77 IN THE PHOTOGRAPH?

A. YES, IT IS.

Q. WAS THAT IN THE BACK OF YOUR VAN WHEN MR. BASHAM AND MR. FULKS LEFT THE HOLLYWOOD MOTEL ON MONDAY, NOVEMBER 11TH, DRESSED OUT IN CAMOUFLAGE? WAS THAT IN THE BACK OF YOUR VAN?

A. YEAH. SHOULD HAVE BEEN IN MY VAN FROM DAY ONE.

Q. LET ME SHOW YOU GOVERNMENT'S EXHIBIT NUMBER 79. WHAT IS THAT ITEM?

A. BINOCULARS.

Q. WHAT IS THAT ITEM?

A.    THAT IS A CORRECTIONAL OFFICER'S GUN BELT.

Q.    WHOSE WAS THAT?

A.    I BELIEVE THAT WAS MINE.

Q.    FROM WHEN YOU WORKED AT WESTVILLE CORRECTIONAL INSTITUTE?

A.    YEAH.

Q.    SHOWING YOU 222-NN.   DO YOU RECOGNIZE THAT?

A.    THAT IS ROBERT TALSMA'S.   IT HAS A GUN CASE ON IT.

Q.    BECAUSE MR. TALSMA WAS A TRANSPORT?

A.    RIGHT.   HE WAS A TRANSPORTING OFFICER.

Q.    SO, WHAT IS DEPICTED IN GOVERNMENT'S EXHIBIT NUMBER 79, DID YOU TAKE MR. TALSMA'S BELT WHEN YOU WERE IN THE HOUSE?

A.    NO,  I DID NOT.

Q.    GOVERNMENT'S EXHIBIT NUMBER 80.   DID YOU STILL HAVE SOME OF YOUR INDIANA DEPARTMENT OF CORRECTION UNIFORMS WHEN YOU WERE TRAVELLING IN THE VAN WITH MR. BASHAM AND MR. FULKS IN THE VAN?

A.    I HAD ALL OF MY UNIFORMS IN TWO BAGS BECAUSE THEY WERE SUPPOSED TO BE RETURNED THAT MONDAY PRIOR OR AFTER.  THEY WERE ALL TO BE RETURNED.  AND BECAUSE OF THE EVENTS THAT UNFOLDED, I DID NOT RETURN THEM.

Q.    GOVERNMENT'S EXHIBIT NUMBER 165.  DO YOU RECOGNIZE THIS BLACK LEATHER COAT?

A.    YES,  I DO.

Q.    WHOSE IS THIS?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
    )    COLUMBIA, SC
    )    SEPTEMBER 15, 2004
    )
    VERSUS    )
    )
BRANDON L. BASHAM,    )
    DEFENDANT.    )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME III

APPEARANCES:

FOR THE GOVERNMENT:    SCOTT SCHOOLS, FIRST AUSA
    JONATHAN S. GASSER, AUSA
    JOHN DUANE, AUSA
    UNITED STATES ATTORNEY'S OFFICE
    1441 MAIN STREET, SUITE 500
    COLUMBIA, SC  29201

FOR THE DEFENDANT:    JACK SWERLING, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

    GREG HARRIS, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

COURT REPORTER:    DEBRA R. JERNIGAN, RPR, CRR
    UNITED STATES COURT REPORTER
    901 RICHLAND STREET
    COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

THE CASE.  HAVE A NICE LUNCH, WE WILL SEE YOU AT TWO.

(WHEREUPON, A LUNCH RECESS WAS HELD.)

THE COURT:   BRING THE JURY IN.

MR.  SCHOOLS:  YOUR HONOR,  MAY WE APPROACH?

(WHEREUPON, A BENCH CONFERENCE WAS HELD OFF THE RECORD.)

THE COURT:   I WAS TOLD AT SIDE BAR THERE ARE THREE WITNESSES IN THE COURTROOM.  THE DEFENSE HAS AGREED FOR THESE THREE WITNESSES TO BE IN THE COURTROOM, AT THIS TIME.

THE COURT:   CALL YOUR NEXT WITNESS.

MR.  SCHOOLS:  GOVERNMENT CALLS MELISSA JEFFERS.

MELISSA JEFFERS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. SCHOOLS:

Q.    YOUR NAME IS MELISSA JEFFERS; IS THAT RIGHT?

A.    YES.

Q.    MOST PEOPLE CALL YOU MISSY,  DON'T THEY?

A.    YES.

Q.    MS. JEFFERS, WHERE DO YOU LIVE?

A.    WEST HAMLIN,  WEST VIRGINIA.

Q.    WHERE IS WEST HAMLIN, WEST VIRGINIA?

A.    ABOUT 20 MILES SOUTH OF HUNTINGTON, WEST VIRGINIA.

Q.    WHAT KIND OF TOWN IS WEST HAMLIN?

A.    IT IS A VERY SMALL TOWN.

Q.    HOW LONG HAVE YOU LIVED THERE?

A.   ALL MY LIFE.

Q.   DO YOU KNOW ABOUT HOW MANY PEOPLE LIVE IN WEST HAMLIN?

A.   APPROXIMATELY 1,500 TO 2,000.

Q.   PEOPLE?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   YOU SAID YOU HAVE LIVED THERE YOUR WHOLE LIFE?

A.   YES.

Q.   HOW LONG HAS THAT BEEN?

A.   THIRTY-THREE YEARS.

Q.   WHAT DO YOU DO THERE,  MS. JEFFERS?

A.   WHAT DO I DO THERE?

Q.   YES, MA'AM.  WHAT DO YOU DO FOR A LIVING?

A.   DENTAL ASSISTANT IN HUNTINGTON,  WEST VIRGINIA.

Q.   WHAT KIND OF JOBS DO OTHER PEOPLE HAVE IN WEST HAMLIN, DO THEY ALL WORK IN THAT AREA?

A.   HUNTINGTON AND WEST CHARLESTON, WHICH IS ABOUT 20 MINUTES AWAY.

Q.   YOU SAY 20 MINUTES MAYBE?

A.   YEAH.

Q.   TWENTY (20) MILES?

A.   YES.

Q.   ARE YOU MARRIED, MS. JEFFERS?

A.   YES.

Q.   DO YOU HAVE CHILDREN?

A.   I HAVE TWO GIRLS.

Q.      HOW OLD ARE THEY?

A.      SEVEN AND THREE.

Q.      SEVEN AND THREE?

A.      UH-HUH (AFFIRMATIVE RESPONSE).

Q.      ARE YOU  -- DO YOU HAVE BROTHERS AND SISTERS?

A.      YES.

Q.      WHO ARE YOUR BROTHERS AND SISTERS?

A.      BARRY IS 48; TAMMY IS 44; AND KANDI IS 38; RODDY, WHO IS 34; AND THEN THERE IS ME.

Q.      THIS IS FIVE OF OF YOU ALTOGETHER?

A.      YES.

Q.      DO ALL OF YOU STILL LIVE IN WEST HAMLIN OR CLOSE TO IT?

A.      ALL BUT ONE, THAT IS BARRY.

Q.      WHERE DOES HE LIVE?

A.      RIGHT OUTSIDE OF CHARLESTON, WEST VIRGINIA.

Q.      DID YOU ALL GROW UP THERE IN THAT SAME CITY?

A.      YES.

Q.      HOW ABOUT YOUR MOM AND DAD, ARE THEY STILL ALIVE?

A.      YES,  THEY ARE.

Q.      YOUR MOM IS KIND OF SICK,  ISN'T SHE?

A.      YES.

Q.      WHAT KIND OF FAMILY DO YOU HAVE?  ARE YOU A CLOSE-KNIT FAMILY?  DO YOU GET TOGETHER ON A REGULAR BASIS?

A.      WE HAVE SUNDAY GATHERINGS AT MOM AND DAD'S HOUSE.  WE EAT DINNER, AND SOCIALIZE, AND DO A LITTLE CATCH-UP.

Q.    SPEND TIME TOGETHER AS A FAMILY?

A.    YES.

Q.    NOW, YOU MENTIONED KANDI IS YOUR SISTER, RIGHT?

A.    YES.

Q.    WHAT IS KANDI'S LAST NAME?

A.    BURNS.

Q.    DOES KANDI HAVE CHILDREN?

A.    SHE HAD TWO.

Q.    WHO ARE HER CHILDREN?

A.    SAMANTHA BURNS AND WESLEY.

Q.    SO, YOU ARE SAMANTHA'S AUNT?

A.    YES.

Q.    THE SUNDAY GATHERINGS YOU TALKED ABOUT AT YOUR MOTHER'S HOUSE, KANDI, AND SAMANTHA, AND WESLEY -- WHAT IS KANDI'S HUSBAND'S NAME?

A.    JOHN.

Q.    DO THEY COME TO THE SUNDAY GATHERING ON A REGULAR BASIS?

A.    YES.

Q.    DID THEY DO THAT BEFORE SAMANTHA DISAPPEARED?

A.    YES.

Q.    MS. JEFFERS, I WANT TO ASK YOU ABOUT YOUR RELATIONSHIP WITH SAMANTHA. SHE WAS YOUR NIECE; IS THAT RIGHT?

A.    CORRECT.

Q.    WHAT KIND OF RELATIONSHIP DID YOU AND SAMANTHA HAVE?

A.   WE HAD A VERY CLOSE RELATIONSHIP.   LIKE I SAID, WE ALWAYS SAW EACH OTHER ON SUNDAY.  OCCASIONALLY, THROUGHOUT THE WEEK,  WE OCCASIONALLY SHOPPED.   AND WHEN SHE WAS IN HIGH SCHOOL, SHE ALWAYS HAD ME FIXING HER HAIR AND MAKEUP FOR  HER COMPETITIONS AND GETTING HER READY FOR THAT.

Q.   WOULD YOU DESCRIBE YOUR RELATIONSHIP WITH HER AS A CLOSE ONE?

A.   YES.

Q.   SOUNDS LIKE YOU ARE A FAIRLY TYPICAL, SMALL TOWN FAMILY.  IS THAT A FAIR CHARACTERIZATION?

A.   YES.

Q.   DO YOU KNOW IN NOVEMBER OF 2002,  WHAT KINDS OF THINGS SAMANTHA WAS INTO AT THAT TIME?

A.   SHE WAS ATTENDING MARSHALL UNIVERSITY.   SHE WAS IN THE PHYSICAL THERAPIST ASSISTANT PROGRAM.   SHE HELD A JOB AT J. C. PENNEY'S AT THE HUNTINGTON MALL.   AND SHE -- THEY WERE BUILDING A HOUSE,  HER PARENTS WERE, AT THE TIME, AND SHE WAS PARTICIPATING IN THAT,  AS WELL.

Q.   I WANT TO TAKE YOU BACK NOW,  MS. JEFFERS, TO NOVEMBER 11,  2002.  DO YOU RECALL THAT DAY?

A.   YES.

Q.   COULD YOU JUST KIND OF WALK THE LADIES AND GENTLEMEN OF THE JURY THROUGH WHAT HAPPENED THAT DAY?

A.   I ASKED SAMANTHA TO MEET ME AT THE HUNTINGTON MALL AT 6:00 O'CLOCK THAT EVENING.   AND SHE WAS WAITING FOR ME

UPSTAIRS IN THE LITTLE GIRL'S DEPARTMENT.  I HAD PARKED OUT FRONT.  AND WE HAD PICKED OUT SOME OUTFITS FOR MY TWO LITTLE GIRLS.  AND WE WENT UP TO PAY FOR THEM, AND SHE SAID, PUT THEM ON MY PENNY'S CREDIT CARD BECAUSE WE WILL GET AN EXTRA DISCOUNT.

Q.    DOES SHE WORK THERE?

A.    YES,  SHE DOES.  I SAID, OKAY.  SHE SAID, THEN WE CAN GO DOWNSTAIRS AND PAY WHAT WE PUT ON.  SO,  WE DID THAT.  AND THEN WE WENT DOWNSTAIRS AT THE CATALOG DEPARTMENT.  AND WE PAID THAT AMOUNT OFF.  AND WE WALKED UP TOWARDS THE SALON OF PENNY'S A LITTLE BIT,  AND SHE HAD PURCHASED A LITTLE POWDER CANVAS SHOULDER BAG.  AND SHE GOT THAT OUT OF ONE OF THE BIGGER BAGS AND PUT IT IN THE SMALLER BAG SO SHE COULD TAKE IT WITH HER.  AND SHE SAID,  WELL,  I AM GOING TO GO.  I SAID WHERE ARE YOU GOING? SHE SAID I AM GOING TO GO HOME.  I TOLD HER TO BE CAREFUL.

Q.    TAKE YOUR TIME,  MS. JEFFERS.  YOU TOLD HER TO BE CAREFUL?

A.    YES.

Q.    MS. JEFFERS,  WHERE WERE YOU AND SAMANTHA PARKED? WERE YOU PARKED CLOSE TO EACH OTHER?

A.    NO.   SHE WAS PARKED BEHIND PENNEY'S, THE BACK OF IT.  THERE IS AN ENTRANCE WHERE MOST EMPLOYEES DO PARK AND SHOPPERS.  I WAS PARKED IN THE FRONT OF PENNEY'S.

Q.    DID YOU SEE SAMANTHA GET IN HER CAR,  MS. JEFFERS?

A.    NO.

Q.    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT NUMBER 83.   DO YOU RECOGNIZE WHAT IS PICTURED THERE?

A.    YES.

Q.    WHAT IS THAT?

A.    THAT IS THE HUNTINGTON MALL.

Q.    THAT IS THE HUNTINGTON MALL?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    IS THIS THE J. C. PENNEY'S STORE RIGHT HERE PICTURED IN THE MIDDLE OF GOVERNMENT'S EXHIBIT 83?

A.    YES.

Q.    AND THAT IS THE J. C. PENNEY'S STORE THAT YOU MET SAMANTHA IN ON NOVEMBER 11, 2002?

A.    YES.

Q.    NOW, COULD YOU JUST POINT WITH YOUR FINGER AND MAKE AN X, MS. JEFFERS, ABOUT WHERE YOU WERE PARKED AND WHERE SAMANTHA WAS PARKED?

A.    I WAS PARKED RIGHT HERE; SAMANTHA WOULD HAVE BEEN PARKED UP HERE SOMEWHERE (INDICATING).

Q.    SO, WHEN YOU AND HER PARTED COMPANY IN THE STORE, YOU WENT ONE DIRECTION AND SHE WENT THE OTHER DIRECTION?

A.    YES.

Q.    AND YOU TOLD HER TO BE CAREFUL?

A.    YES.

Q.    AND THAT IS THE LAST TIME YOU HAVE SEEN HER?

TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. SCHOOLS:

Q.    YOU ARE KANDI BURNS, RIGHT?

A.    YES.

Q.    MS. BURNS, YOU HAVE BEEN HERE THROUGH THE DURATION OF THIS TRIAL TO THIS POINT; IS THAT TRUE?

A.    YES, I HAVE.

Q.    YOU WERE SAMANTHA BURNS'S MOTHER?

A.    YES.

Q.    YOU STILL LIVE THERE IN WEST HAMLIN, MS. BURNS?

A.    YES.

Q.    YOU HAVE LIVED THERE YOUR WHOLE LIFE, AS WELL?

A.    YES, SIR.

Q.    YOU JUST HEARD MISSY JEFFERS TESTIFY. THAT WAS YOUR SISTER; IS THAT RIGHT?

A.    YES, SHE IS.

Q.    WHAT DO YOU DO IN WEST HAMLIN, WEST VIRGINIA, MS. BURNS?

A.    WE RESIDE THERE. I WORK IN CHARLESTON, WEST VIRGINIA.

Q.    WHAT DO YOU DO IN CHARLESTON?

A.    I WORK FOR AMERICAN WATER COMPANY. WE CLOSE OUT THE DAILY WATERS GENERATED FOR THE SERVICEMEN AND THEN FOR THE STATE.

Q.    AMERICAN WATER COMPANY?

A. YES, AMERICAN WATER.

Q. WHAT KIND OF HOURS DO YOU WORK?

A. FIVE A.M. TO ONE P.M.

Q. HOW FAR IS CHARLESTON FROM WEST HAMLIN?

A. IT IS APPROXIMATELY 50 MILES; ABOUT AN HOUR'S DRIVE.

Q. SO, WHAT TIME DO YOU HAVE TO LEAVE WEST HAMLIN TO GET TO CHARLESTON TO BE AT WORK BY 5:00 O'CLOCK IN THE MORNING?

A. I HAVE TO GET UP AT 3:30 AND LEAVE BY FOUR TO GET THERE BY FIVE.

Q. ARE YOU MARRIED?

A. YES.

Q. WHAT IS YOUR HUSBAND'S NAME?

A. JOHN.

Q. WHAT DOES JOHN DO?

A. HE DRIVES TRUCKS FOR A TRUCKING COMPANY.

Q. DO YOU HAVE CHILDREN?

A. YES.

Q. HOW MANY CHILDREN DO YOU HAVE?

A. TWO.

Q. WHAT ARE THEIR NAMES?

A. SAMANTHA AND WESLEY.

Q. COULD YOU TELL US, MS. BURNS, WHAT WAS SAMANTHA'S BIRTHDAY?

A. NOVEMBER 23, 1983.

Q. SHE WOULD BE 21 YEARS OLD TODAY?

A.    YES.

Q.    COULD YOU DESCRIBE FOR THE LADIES AND GENTLEMEN OF THE JURY WHAT KIND OF RELATIONSHIP YOU HAD WITH SAMANTHA?

A.    SHE WAS MY VERY BEST FRIEND.   WE WOULD SHOP.   WE JUST HUNG OUT TOGETHER AND EVERYTHING.   WE WERE JUST REALLY CLOSE.

Q.    DID SHE STILL LIVE AT HOME?

A.    YES.

Q.    BUT SHE WAS GOING TO MARSHALL; AT THE TIME?

A.    YES,  SHE WAS ATTENDING MARSHALL.

Q.    MISSY MENTIONED THAT YOU WERE BUILDING A HOUSE BACK IN NOVEMBER OF 2002.   WHERE WERE Y'ALL LIVING, AT THAT TIME, WHILE YOU WERE BUILDING THE HOUSE?

A.    WE LIVED IN OUR TRAILER, APPROXIMATELY MAYBE TWO MILES AWAY FROM THIS SITE OF THE HOUSE BEING BUILT.

Q.    HOW LONG HAD YOU LIVED IN THAT TRAILER?

A.    FOR NINETEEN YEARS.

Q.    IS THAT FOR AS LONG AS YOU AND JOHN HAD BEEN MARRIED?

A.    YES,  AT THAT TIME.

Q.    WERE YOU FAMILIAR WITH SAMANTHA'S FRIENDS?

A.    YES.

Q.    DID YOU KNOW ABOUT WHAT SAMANTHA WAS INTO, AND WHO SHE WAS HANGING OUT WITH, AND WHAT SHE WAS DOING WITH HER TIME?

A.    I WOULD SAY 90 PERCENT OF THE TIME,  YEAH.

Q.    SOME KIDS WHO ARE THAT AGE TELL THEIR PARENTS A WHOLE LOT OF WHAT IS GOING ON,  SOME KIDS TELL THEIR PARENTS VERY

LITTLE ABOUT IT.

A.    SAMANTHA TOLD MORE THAN THE OTHERS.

Q.    THAT IS WHAT --

A.    SAMANTHA TOLD ME MORE THAN THE OTHERS.

Q.    YOU SAID YOU HAD A PRETTY GOOD FEEL OF WHAT WAS GOING ON IN SAMANTHA'S LIFE BACK IN NOVEMBER OF 2002?

A.    YES.

Q.    WAS SHE A HAPPY PERSON, MS. BURNS?

A.    YES, SHE WAS.

Q.    WHAT KIND OF THINGS MADE HER HAPPY?

A.    SHE LIKED THE FAMILY. WE MOSTLY DONE FAMILY THINGS. GO TO MOM'S ON SUNDAY, SHE LIKED TO DO THAT. AND HANGING OUT WITH HER FRIENDS.

Q.    TELL US ABOUT THE HOUSE YOU WERE BUILDING. IS THAT SOMETHING THAT YOU, AS A FAMILY, WERE PUTTING A LOT OF TIME IN YOURSELVES, OR IS THAT A HOUSE YOU WERE WATCHING BEING BUILT?

A.    NO, WE JUST HAD THE HOUSE SUBBED BY CONTRACTORS. WE FINISHED IT OURSELVES, FAMILIES, AND FRIENDS.

Q.    DO YOU, AND JOHN, AND WESLEY NOW LIVE IN THAT HOUSE?

A.    YES.

Q.    SAMANTHA NEVER GOT TO?

A.    NO.

Q.    DID YOU, MS. BURNS, HAVE CONVERSATIONS WITH SAMANTHA ABOUT HER FUTURE AND WHAT KIND OF PLANS SHE HAD?

A.    YES.

Q.    AND WHAT KIND OF PLANS DID SAMANTHA HAVE?

A.    SHE WANTED TO FINISH COLLEGE, FIND HER A JOB, KIND OF SETTLE IN WITH THAT. SHE WANTED TO MEET SOMEBODY THAT SHE, YOU KNOW, COULD SETTLE DOWN WITH ONE DAY, AND SHE WANTED TO HAVE KIDS BY THE TIME SHE WAS 25 YEARS OLD.

Q.    HOW DO YOU KNOW THAT?

A.    SHE TOLD ME NOVEMBER 11TH, THE DAY WE WENT SHOPPING.

Q.    SO, YOU HAD HAD A CONVERSATION WITH HER THAT DAY AND SHE EXPRESSED TO YOU THOSE WERE HER PLANS FOR THE FUTURE?

A.    YES.

Q.    MS. BURNS, I WANT TO TALK ABOUT NOVEMBER 11TH, 2002, BUT I WANT TO GO BACK A FEW DAYS TO START WITH, FRIDAY, WHICH WOULD HAVE BEEN THE 8TH OF NOVEMBER. DO YOU RECALL THAT DAY?

A.    YES.

Q.    WHAT WAS SAMANTHA UP TO THAT DAY, OR WHAT DO YOU REMEMBER ABOUT NOVEMBER 8TH ON FRIDAY?

A.    HER AND HER FRIEND WHITNEY WERE GOING TO GO TO THE HUNTINGTON MALL TO SEE THE MOVIE 8-MILE, AND THEY WERE GOING TO MEET SOME GUYS THERE. THEY WENT TO THE MOVIES, THEN THEY CAME BACK HOME THAT NIGHT.

Q.    DID YOU HEAR FROM SAMANTHA THAT NIGHT?

A.    YEAH, SHE CAME HOME.

Q.    DID SHE CALL YOU AND LET YOU KNOW WHERE SHE WAS BEFORE SHE CAME HOME?

A.    NOT THAT EVENING, I DON'T THINK SHE DID.

Q.    WAS IT TYPICAL FOR SAMANTHA TO LET YOU KNOW WHERE SHE WAS AND WHAT SHE WAS DOING MOST OF THE TIME?

A.    YEAH.  IF SHE WAS GOING TO BE LATE, SHE WOULD LET ME KNOW.  IF SHE WAS GOING TO BE SOMEWHERE ELSE THAN WHAT SHE TOLD ME, SHE WOULD LET ME KNOW WHILE SHE WAS OUT.

Q.    DID YOU KNOW THE NAME  -- WHO WAS SHE WITH THAT NIGHT AT THE MOVIE,  DO YOU REMEMBER?

A.    HER FRIEND?

Q.    YES.

A.    WHITNEY COLLINS.

Q.    DID THEY MEET A COUPLE OF GUYS?

A.    YES.

Q.    DO YOU REMEMBER THEIR NAMES?

A.    BRAD FULKS AND THE OTHER NAME WAS DANIEL.

Q.    YOU ARE AWARE BRAD FULKS WAS NO RELATION TO CHAD FULKS?

A.    CORRECT.

Q.    DID WHITNEY COME BACK TO YOUR HOUSE WITH SAMANTHA THAT NIGHT?

A.    YEAH,  WHITNEY STAYED WITH US.

Q.    WHAT DID YOU DO ON THE 9TH ON THAT SATURDAY?

A.    SATURDAY?

Q.    THE DAY --

A.    SATURDAY.   JOHN AND I GOT UP TO GO WORK ON THE HOUSE. I TOLD SAMANTHA TO GET UP BECAUSE WE HAD SIX MONTHS TO FINISH

BUILDING OUR HOUSE, WE WERE GETTING TO THE DEADLINE. AND SHE WANTED TO PAINT HER ROOM A COLOR THAT TOOK LIKE FOUR OR FIVE COATS TO COVER UP THE WALLS. SO, I TOLD HER SHE HAD TO COME ON DOWN AND FINISH PAINTING HER ROOM. AND SHE SAID OKAY. SO THEN HER DAD WENT ON DOWN AND STARTED BUILDING ON THE HOUSE. AND SHE WAS THERE BEFORE NOON.

Q. DID SHE SPEND MOST OF THE DAY THERE WITH Y'ALL?

A. YES.

Q. DO YOU REMEMBER WHAT HAPPENED THAT NIGHT, IF ANYTHING?

A. NO. WE STAYED THERE FOR A LONG TIME, YOU KNOW, WORKING ON THE HOUSE.

Q. HOW ABOUT SUNDAY, THE 10TH?

A. WE WENT TO CHURCH. THEY WERE HAVING A VETERAN'S DAY FOR THE VETERANS. WE WENT TO MOM'S. MOM HAD CHICKEN AND DUMPLINGS THAT DAY. THAT IS SAMANTHA'S FAVORITE FOOD. SAT UP THERE AND ATE, WASHED DISHES, SAT AROUND AND TALKED, AND WE WENT TO THE MALL AGAIN SHOPPING FOR SOME MORE STUFF FOR THE HOUSE. AND WE CAME HOME THAT DAY.

Q. AT THAT POINT IN THE LIVES OF THE BURNS'S FAMILY, WAS GETTING UP AND GOING TO CHURCH, AND GOING TO YOUR MOM'S, AND THEN WORKING ON THE HOUSE PRETTY MUCH THE STANDARD SUNDAY PROCEDURE?

A. RIGHT.

Q. AND YOU DID THE SAME THING THAT SUNDAY?

A. WE DO THAT EVERY SUNDAY.

Q. AND DID YOU KEEP A CHART, YOU INDICATED BEFORE, YOU KEPT A CHART YOURSELF, A COMPUTER CHART TO DETERMINE WHETHER OR NOT YOU HAD RECEIVED EITHER MONEY OR THE CANDY BACK; IS THAT CORRECT?

A. YES.

Q. DID YOU EVER RECEIVE EITHER THE MONEY OR CANDY FROM SAMANTHA BURNS?

A. NO, SIR.

MR. GASSER: THAT IS ALL I HAVE, YOUR HONOR.

THE COURT: CROSS-EXAMINATION.

MR. HARRIS: NO QUESTIONS.

THE COURT: THANK YOU. YOU MAY STEP DOWN. NEXT WITNESS, PLEASE.

MR. DUANE: THE GOVERNMENT NEXT CALLS WHITNEY COLLINS.

WHITNEY COLLINS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. DUANE:

Q. GOOD AFTERNOON, MS. COLLINS, HOW ARE YOU?

A. OKAY.

Q. MS. COLLINS, WHERE DO YOU LIVE?

A. IN BRANCHLAND, WEST VIRGINIA.

Q. BRANCHLAND, WEST VIRGINIA?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q.   PULL THAT MICROPHONE A LITTLE CLOSER TO YOU SO ALL THE MEMBERS OF THE JURY CAN HEAR YOUR VOICE.   YOU LIVE IN BRANCHLAND, WEST VIRGINIA?

A.   YES.

Q.   HOW FAR IS THAT FROM HUNTINGTON, WEST VIRGINIA?

A.   ABOUT HALF AN HOUR.

Q.   YOU HEARD OF A TOWN CALLED WEST HAMLIN, WEST VIRGINIA?

A.   YES.

Q.   HOW FAR IS THAT FROM WHERE YOU LIVE?

A.   JUST MAYBE FIVE MINUTES.

Q.   BRANCHLAND AND WEST HAMLIN, ARE THEY LARGE COMMUNITIES?

A.   NO.

Q.   VERY SMALL? HOW MANY DO YOU SAY LIVE IN BRANCHLAND?

A.   ONE THOUSAND TO 2,000.

Q.   HOW ABOUT WEST HAMLIN?

A.   ABOUT THE SAME.

Q.   ARE YOU IN SCHOOL RIGHT NOW?

A.   YES.

Q.   WHERE DO YOU GO TO SCHOOL?

A.   MARSHALL UNIVERSITY.

Q.   HOW LONG HAVE YOU BEEN AT MARSHALL?

A.   THIS IS MY SECOND YEAR.

Q.   YOU ARE 19 YEARS OLD?

A.   YES.

Q.   YOU ARE ALSO WORKING?

A.   NO.

Q.   YOU ARE A FULL-TIME STUDENT?

A.   YES.

Q.   WHAT ARE YOU STUDYING TO DO AT MARSHALL?

A.   I AM IN COMMUNICATION DISORDERS.

Q.   NOVEMBER OF 2002, WERE YOU IN SCHOOL THEN?

A.   YES.

Q.   WHERE DID YOU GO TO SCHOOL?

A.   GUYAN VALLEY HIGH SCHOOL.

Q.   GUYAN VALLEY HIGH SCHOOL?

A.   YES.

Q.   IS THAT IN BRANCHLAND?

A.   YES.

Q.   IS THAT IN THE BRANCHLAND, WEST HAMLIN AREA?

A.   YES.

Q.   MS. COLLINS, HOW DO YOU KNOW SAMANTHA BURNS?

A.   SHE WAS MY BEST FRIEND.  I HAD BEEN THROUGHOUT HIGH SCHOOL AND BEEN IN THE BAND WITH HER.

Q.   WE HAVE BEEN REFERRING TO MS. BURNS THIS WAY AS SAMANTHA, BUT WHAT DID YOU KNOW HER AS?

A.   SAM.

Q.   MS. COLLINS, TAKE AS LONG AS YOU NEED.

A.   GO AHEAD.

Q.   HOW LONG HAD YOU'LL BEEN BEST FRIENDS?

A.   FOR A COUPLE OF YEARS.

Q.    AND HOW LONG DID YOU KNOW SAM?

A.    I HAVE KNOWN HER FOR ABOUT EIGHT OR NINE YEARS.

Q.    WERE YOU AND SAM THE SAME AGE?

A.    NO,  SHE WAS TWO YEARS OLDER THAN ME.

Q.    SO, SHE WAS AT MARSHALL UNIVERSITY WHILE YOU WERE STILL AT GUYAN VALLEY HIGH SCHOOL?

A.    YES.

Q.    WHAT WAS SAM STUDYING AT MARSHALL UNIVERSITY?

A.    PHYSICAL THERAPY.

Q.    DID SHE WANT TO BE A PHYSICAL THERAPIST IN THE WEST HAMLIN, BRANCHLAND AREA WHEN SHE FINISHED?

A.    SHE WANTED TO WORK IN HAMLIN, WHICH IS ABOUT 15 MINUTES FROM WHERE WE LIVED.

Q.    WHAT ALL DID YOU AND SAMANTHA LIKE TO DO TOGETHER?

A.    DRIVE AROUND,  HANG OUT WITH FRIENDS,  PARTY,  THE NORMAL THINGS THAT TEENAGERS DO.

Q.    DID Y'ALL LIKE TO TALK ABOUT GUYS?

A.    YEAH.

Q.    IN NOVEMBER OF 2002,  WHERE WAS SAMANTHA WORKING?

A.    J. C. PENNEY'S.

Q.    WHAT DID SHE DO THERE?

A.    SHE WORKED THE REGISTER IN THE MEN'S DEPARTMENT.

Q.    YOU SAID SHE LIVED IN WEST HAMLIN?

A.    YES.

Q.    WHO DID SHE LIVE WITH IN WEST HAMLIN?

A. HER FAMILY. HER MOM, DAD, BROTHER, WESLEY.

Q. HER BROTHER, WESLEY, IS HE YOUNGER OR OLDER THAN SAMANTHA?

A. HE IS YOUNGER.

Q. HOW MUCH YOUNGER IS HE?

A. MAYBE THREE OR FOUR YEARS.

Q. DID YOU KNOW HER FAMILY FAIRLY WELL?

A. YES.

Q. WAS SAMANTHA CLOSE WITH HER FAMILY?

A. YES, THEY ARE ALL REALLY CLOSE.

Q. HOW CLOSE WAS SHE AND HER MOTHER?

A. THEY WERE LIKE BEST FRIENDS.

Q. AND SHE HAD LIVED AT HOME WITH HER MOM AND DAD HER ENTIRE LIFE?

A. YES.

Q. AND SHE WAS ABOUT 19 IN NOVEMBER OF 2002?

A. YES.

Q. SHE COULD HAVE LIVED IN AN APARTMENT IF SHE HAD WANTED TO, WHY DIDN'T SHE DO THAT?

A. BECAUSE SHE DIDN'T HAVE ANY REASON TO.

Q. SHE LIKED LIVING AT HOME WITH HER MOM AND DAD?

A. YES.

Q. IN NOVEMBER OF 2002, WERE SAMANTHA'S PARENTS BUILDING A HOUSE?

A. YES.

Q.    WAS SHE EXCITED ABOUT THAT?

A.    YEAH, SHE WAS REALLY EXCITED.

Q.    WHY WAS SHE SO EXCITED ABOUT THAT?

A.    BECAUSE SHE GOT TO HELP HER MOM AND DAD DECORATE THEIR HOUSE AND DECORATE HER ROOM.

Q.    SHE WAS GOING TO PICK OUT THE COLORS FOR HER ROOM?

A.    YES.

Q.    MS. COLLINS, DID SAM EVER TALK TO YOU EVER ABOUT WANTING TO RUN AWAY FROM HOME?

A.    NO.

Q.    WHAT OTHER PLANS DID SAM TELL YOU ABOUT THAT SHE HAD FOR THE FUTURE?

A.    SHE JUST WANTED TO GET OUT OF COLLEGE, YOU KNOW, AND START HER LIFE AS AN ADULT.

Q.    WOULD SHE TELL HER MOM PRETTY MUCH EVERYTHING GOING ON IN HER LIFE?

A.    YES.

Q.    WAS THAT TYPICAL FOR YOU AND YOUR GROUP OF FRIENDS, OR WAS THAT FAIRLY UNUSUAL?

A.    THAT WAS PRETTY UNUSUAL.

Q.    IN FACT, WHENEVER SHE WOULD GO OUT WITH YOU AND YOUR FRIENDS, WOULD SHE ALWAYS MAKE SURE TO CALL HER MOTHER TO LET HER KNOW WHERE SHE WAS GOING TO BE AND WHEN SHE WOULD BE HOME?

A.    YES.

Q.    I WANT TO DRAW YOUR ATTENTION TO FRIDAY, NOVEMBER 8TH

OF 2002.   DID YOU SEE SAMANTHA ON THAT DAY?

A.   YES.

Q.   HOW DID  -- WHEN DID YOU SEE HER?

A.   SHE CAME TO MY HOUSE AND PICKED ME UP.   WE WENT TO THE MALL IN HUNTINGTON TO WATCH 8-MILE WITH MY BOYFRIEND AT THE TIME, DANIEL, AND HIS FRIEND BRAD.

Q.   DID YOU MAKE A STOP AT THE J. C. PENNEY'S THAT NIGHT?

A.   YES.   SHE HAD TO MAKE A PAYMENT FOR HER MOM.

Q.   DID YOU DO THAT FOR HER?  DID SHE DO IT, OR DO YOU REMEMBER?

A.   SHE PULLED UP TO THE BACK DOOR, AND I RAN IN AND PAID IT, SO THAT WAY SHE WOULDN'T HAVE TO PARK AND WE BOTH HAVE TO GO IN.

Q.   YOU WENT AND SAW THE MOVIE 8-MILE?

A.   YEAH.

Q.   WITH YOUR BOYFRIEND AND A GUY NAMED BRAD?

A.   YEAH.

Q.   WHAT DID YOU DO AFTER THE MOVIE?

A.   WE WENT TO BRAD'S APARTMENT,  THE COURTYARD APARTMENTS. IT IS LIKE RIGHT BESIDE MARSHALL UNIVERSITY.

Q.   AND WERE THEY HAVING A PARTY THERE?

A.   YES.

Q.   AND AFTER THE PARTY, WHERE DID YOU AND SAMANTHA GO?

A.   WE WENT BACK TO HER HOUSE.

Q.   YOU CAME BACK KIND OF LATE OR EARLY THE NEXT MORNING?

A.    IT WAS PROBABLY ABOUT 3:30, 4:00 O'CLOCK IN THE MORNING WHEN WE GOT TO SAM'S HOUSE.

Q.    DID YOU SPEND THE NIGHT IN HER HOUSE?

A.    YES.

Q.    DID YOU STAY THERE THE NEXT DAY?

A.    NO,  MY DAD CAME AND PICKED ME UP ABOUT 11:00 O'CLOCK THE NEXT MORNING.

Q.    AND THAT WOULD BE SATURDAY, NOVEMBER 9TH?

A.    YES.

Q.    DID YOU SEE SAMANTHA ON SATURDAY, NOVEMBER 9TH, AFTER YOUR DAD PICKED YOU UP?

A.    NO.

Q.    DID YOU SPEAK WITH HER?

A.    YES,  I TALKED TO HER ON THE PHONE.

Q.    WHAT DID Y'ALL TALK ABOUT?

A.    I WAS GOING TO A PARTY WITH MY FRIEND KRISTEN AT HER BOYFRIEND'S HOUSE IN MILTON, AND I ASKED HER IF SHE WANTED TO GO AND SHE SAID,  NO,  THAT SHE WAS TIRED, SHE DIDN'T REALLY FEEL LIKE GOING.  SHE DIDN'T FEEL VERY WELL THAT NIGHT.

A.    NO.

Q.    DID YOU SEE HER THE NEXT DAY, WHICH WOULD BE SUNDAY, NOVEMBER 10TH?

A.    YES.

Q.    WHEN DID YOU SEE HER ON SUNDAY?

A.    IT WAS LATER ON THAT NIGHT SHE CAME AND PICKED ME UP

LOOK.

Q. WAS THERE ANY EVIDENCE RELATING TO SAMANTHA BURNS FOUND IN THOSE SEARCHES?

A. NO.

MR. DUANE: MS. COLLINS, THANK YOU VERY MUCH.

THE COURT: ANY CROSS-EXAMINATION?

MR. HARRIS: NO, SIR.

THE COURT: THANK YOU, YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

MR. DUANE: GOVERNMENT NEXT CALLS KRISTEN PRITCHARD.

KRISTEN PRITCHARD, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. DUANE:

Q. GOOD AFTERNOON, MS. PRITCHARD, HOW ARE YOU?

A. I'M FINE.

Q. WHERE DO YOU LIVE?

A. I LIVE IN WEST HAMLIN, WEST VIRGINIA.

Q. THAT IS NEAR HUNTINGTON, WEST VIRGINIA, ALSO BRANCHLAND?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. WHAT DO YOU DO IN THE WEST HAMLIN AREA?

A. I RESIDE WITH MY FAMILY.

Q. ARE YOU IN SCHOOL RIGHT NOW?

A. YES, I AM.

Q.   WHERE DO YOU GO TO SCHOOL?

A.   I GO TO MARSHALL UNIVERSITY.

Q.   WHAT YEAR ARE YOU AT MARSHALL?

A.   I AM IN MY FIRST YEAR RESPIRATORY THERAPY COURSE THERE NOW.   I JUST STARTED THIS YEAR.

Q.   ARE YOU ALSO WORKING?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   WHERE DO YOU WORK?

A.   OUTBACK STEAKHOUSE IN BARBOURSVILLE.

Q.   BACK IN NOVEMBER OF 2002, WERE YOU STILL AT MARSHALL UNIVERSITY?

A.   YES, I WAS.

Q.   I ASSUME YOU WERE A FRESHMAN AT MARSHALL AT THAT POINT?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   HOW DID YOU KNOW SAMANTHA BURNS?

A.   SHE WAS ONE OF MY BEST FRIENDS.   SHE WAS A MAJORETTE AND I WAS INVOLVED IN DANCE TEAMS, SO WE DID THAT TOGETHER. WE BOTH PLAYED VARSITY SOFTBALL TOGETHER.

Q.   WAS THAT IN HIGH SCHOOL?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   WHERE DID Y'ALL BOTH GO TO SCHOOL?

A.   GUYAN VALLEY.

Q.   AND SAMANTHA AND YOU, WERE Y'ALL THE SAME AGE?

A.   NO, SHE WAS A YEAR OLDER THAN ME.

Q.   SHE WOULD HAVE BEEN A SENIOR IN HIGH SCHOOL WHEN YOU

WERE A JUNIOR?

A. YES.

Q. WHAT WERE SOME OF THE THINGS THAT YOU AND SAMANTHA ENJOYED DOING TOGETHER?

A. DRIVING AROUND, DOING THINGS AROUND THE HOME, GOING SHOPPING, NORMAL TEENAGE THINGS.

Q. HOW OFTEN WOULD YOU TALK OR SEE EACH OTHER?

A. IF NOT EVERY DAY, EVERY OTHER DAY.

Q. AND DID YOU KNOW HER FAMILY, AS WELL?

A. YES, VERY WELL.

Q. WAS SHE VERY CLOSE WITH HER FAMILY?

A. YES.

Q. HOW CLOSE WAS SHE WITH HER MOTHER, AND HER FATHER, AND HER BROTHER, WESLEY?

A. PROBABLY AS CLOSE AS YOU CAN GET.

Q. MUCH CLOSER THAN SOME OF YOUR OTHER FRIENDS WITH THEIR PARENTS?

A. YEAH. SHE WAS VERY OPEN WITH HER FAMILY.

Q. WHAT WAS SAMANTHA'S PERSONALITY LIKE?

A. HAPPY GO LUCKY, JUST ALWAYS WANTING TO HAVE A GOOD TIME NO MATTER WHAT SITUATION WE WERE IN. YOU KNOW, DRIVING AROUND, HANGING OUT AT HER HOUSE, WE ALWAYS HAD A GOOD TIME TOGETHER.

Q. SHE WAS GENERALLY A VERY HAPPY PERSON?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. SHE WAS VERY -- WAS SHE ENJOYABLE TO BE AROUND?

A. YES, VERY MUCH SO.

Q. DID SHE EVER TALK ABOUT WANTING TO RUN AWAY?

A. NO.

Q. DID SHE EVER TALK ABOUT EVER WANTING TO LEAVE THE WEST HAMLIN, BRANCHLAND AREA?

A. NO.

Q. SO, YOU KNEW HER ABOUT AS WELL AS ANYBODY --

A. YES.

Q. -- IN HER LIFE?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. WOULD SHE EVER WANT TO LEAVE THE WEST HAMLIN, BRANCHLAND AREAS WITH STRANGERS VOLUNTARILY?

A. NO.

Q. LET ME DRAW YOUR ATTENTION TO SATURDAY, NOVEMBER 9TH. DID YOU SEE SAMANTHA THAT DAY?

A. YES, I DID.

Q. TELL THE JURY HOW YOU AND SAMANTHA SAW EACH OTHER THAT DAY.

A. I WAS AT A HAIR SALON, IT IS CALLED KIM'S ELECTRIC BEACH, FIXING MY HAIR. I WORKED THERE DURING HIGH SCHOOL. SHE STOPPED BY, SHE SAW MY CAR PARKED OUT FRONT. SHE STOPPED BY TO SAY HELLO. I ASKED HER IF SHE WANTED TO ATTEND A PARTY THAT NIGHT MY BOYFRIEND, AT THE TIME, WAS HAVING. SHE TOLD ME NO, SHE WASN'T FEELING VERY WELL, AND THAT WESLEY WAS

WAITING IN THE CAR. SHE JUST WANTED TO STOP AND SAY HEY AND SEE WHAT I HAVE BEEN INTO AND THEN SHE JUST LEFT. SHE SAID GOOD-BYE AND LEFT.

Q. THAT WAS THE KIND OF PERSON SHE WAS, SHE WOULD STOP AND SAY HELLO IF SHE KNEW YOU WERE SOMEWHERE?

A. YES.

Q. SATURDAY, NOVEMBER 9, 2002, IS THAT THE LAST TIME YOU EVER SAW SAMANTHA BURNS?

A. YES, IT WAS.

MR. DUANE: THANK YOU, MS. PRITCHARD.

THE COURT: CROSS-EXAMINATION.

MR. HARRIS: NO QUESTIONS.

THE COURT: YOU MAY STEP DOWN.

MR. SCHOOLS: KYLE JOLLIFF. WE ARE CALLING HIM OUT OF SEQUENCE BECAUSE OF A SCHEDULING CONFLICT FOR THE COURT AND JURY.

KYLE JOLLIFF, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. SCHOOLS:

Q. YOUR NAME IS KYLE JOLLIFF; IS THAT RIGHT?

A. YES, SIR.

Q. WHO DO YOU WORK FOR?

A. I WORK FOR HORRY COUNTY POLICE DEPARTMENT.

Q. HOW LONG HAVE YOU WORKED THERE?

DIRECT EXAM

BY MR. GASSER:

Q.    WESLEY, HOW OLD ARE YOU?

A.    SIXTEEN.

Q.    WHAT YEAR ARE YOU IN HIGH SCHOOL?

A.    JUNIOR.

Q.    WHAT HIGH SCHOOL DO YOU GO TO?

A.    GUYAN VALLEY.

Q.    YOU ARE THE SON OF JOHN AND KANDI BURNS?

A.    YES.

Q.    SAMANTHA WAS YOUR SISTER?

A.    YES.

Q.    BACK IN NOVEMBER OF 2002, YOU WERE LIVING AT HOME WITH YOUR PARENTS AND YOUR SISTER?

A.    YES.

Q.    YOU WERE BUILDING A HOUSE?

A.    YES.

Q.    DID YOU GET ALONG WITH SAMANTHA?

A.    YES, VERY WELL.

Q.    IS THAT SOMEWHAT UNUSUAL?  DO YOU HAVE FRIENDS WHO HAVE SISTERS WHO DON'T NECESSARILY GET ALONG WITH THEM?

A.    THAT IS UNUSUAL.

Q.    YOU GOT ALONG WITH SAMANTHA?

A.    YEAH.

Q.    WHEN YOU NEED A RIDE SOMEWHERE, WOULD SAMANTHA GIVE YOU

A RIDE?

A.    YEAH.

Q.    DID SHE HAVE ANY PROBLEMS AT TIMES WITH YOU HANGING OUT WITH HER, EVEN WITH HER FRIENDS?

A.    NO.

Q.    I WANT TO DRAW YOUR ATTENTION, WESLEY, BACK TO THE VETERAN'S DAY WEEKEND, NOVEMBER 9TH AND 10TH, AND THEN MONDAY THE 11TH OF 2002.   DO YOU RECALL YOUR SISTER BEING INVOLVED IN RAISING MONEY FOR A PARTICULAR CHARITABLE EVENT?

A.    YES.

Q.    AND WHAT DO YOU RECALL ABOUT THAT?

A.    SHE WAS SELLING CANDY.

Q.    HOW DO YOU KNOW THAT?

A.    BECAUSE I ATE SOME.

Q.    YOU ATE SOME OF IT?

A.    YES.

Q.    WHERE WOULD SHE KEEP THE CANDY BOX, WESLEY?

A.    WHEN SHE GOT IT, SHE KEPT IT AROUND THE HOUSE TRYING TO SELL IT TO NEIGHBORS AND FAMILY.   SHE HAD IT WITH HER BECAUSE SHE HAD TO TURN IT IN.

Q.    SHE HAD TO TAKE IT FROM THE HOUSE TO WHERE?

A.    SHE HAD TO PUT IT IN HER CAR, SHE HAD TO TURN IT INTO SCHOOL.

Q.    SO SHE HAD TO TURN IT IN TO SCHOOL?   SHE HAD TO CARRY IT TO SCHOOL IN HER CAR?

**JA 1113**

A.    YES.

Q.    SO, YOU HAD AN OPPORTUNITY WHEN, PRIOR TO HER MAKING THE DECISION THAT SHE EVENTUALLY HAD TO TURN THE CANDY BOX AND MONEY IN, YOU HAD AN OPPORTUNITY TO SEE THAT CANDY BOX SITTING AROUND THE HOUSE?

A.    YES.

Q.    ACTUALLY, GO REMOVE SOME OF THE CANDY?

A.    YEAH.  I WOULD TRY TO SMEAK AND GET SOME,  SHE WOULD ALWAYS CATCH ME.

Q.    I WOULD LIKE TO SHOW YOU WHAT IS MARKED AS 222-KK.  DO YOU RECOGNIZE THAT CANDY BOX,  WESLEY?

A.    YES,  I DO.

Q.    IS THIS THE BOX OR LOOK LIKE THE BOX THAT SAMANTHA HAD AT THE HOUSE?

A.    YES.

Q.    AND 222-RR AND 222-MM?

A.    YES.

Q.    LOOKS LIKE CANDY PACKAGES THAT BELONG TO THE BOX?

A.    HAS THE BLUE WRAPPING OR BLUE COAT.

Q.    BLUE LINE THAT SAYS IT IS A DOLLAR?

A.    YEAH.

Q.    NOW,  YOU DIDN'T HAVE TO GO TO SCHOOL ON MONDAY BECAUSE IT WAS A HOLIDAY,  WAS IT NOT?

A.    NO,  I DIDN'T ATTEND SCHOOL.

Q.    WHAT DID YOU DO THAT DAY?

A.    PROBABLY SLEPT MOST OF THE DAY.   PLAYED LATER ON THAT EVENING.  I WAS SHOOTING BALL WITH MY FRIENDS.

Q.    WHEN YOU SAY "SHOOTING BALL,"  BASKETBALL?

A.    YES.

Q.    DO YOU PLAY HIGH SCHOOL BASKETBALL?

A.    YES.

Q.    DID YOU THEN?

A.    YES.

Q.    CURRENTLY, YOU HAVE AN UPCOMING SEASON TO START?

A.    YES.

Q.    AND WHAT DID SAMANTHA DO THAT DAY,  DO YOU KNOW?

A.    THIS IS MONDAY?

Q.    THIS IS MONDAY.

A.    I THINK THEY WENT SHOPPING.  I THINK I REMEMBER HER CALLING ME AT MY FRIEND'S HOUSE ASKING ME IF I WANTED TO GO TO THE MALL WITH HER.

Q.    WHO CALLED YOU AT YOUR FRIEND'S HOUSE AND ASKED YOU IF THEY WANTED TO GO TO THE MALL?

A.    SAM.

Q.    WHEN YOU TALK ABOUT GOING TO THE MALL, WHAT TOWN IS THE MALL IN?

A.    BARBOURSVILLE, HUNTINGTON.

Q.    SO, IS IT REFERRED TO AS THE BARBOURSVILLE MALL?

A.    YEAH,  IT IS REFERRED TO, BUT MOST PEOPLE JUST CALL IT THE HUNTINGTON MALL.  IT IS IN BARBOURSVILLE.

EVERY WHICH WAY YOU COULD THINK.

Q. ON FOOT, ON FOUR-WHEELERS, PEOPLE ON HORSES, IS THAT WHAT YOU SAID?

A. YES.

Q. AND DID YOU DISCOVER ANYTHING?

A. NOTHING.

Q. HAVE YOU HEARD FROM YOUR SISTER SINCE YOU TALKED TO HER AT 9:46, MONDAY, NOVEMBER 11TH?

A. NO.

MR. GASSER: THAT IS ALL WE HAVE, YOUR HONOR.

THE COURT: ANY CROSS-EXAMINATION?

MR. HARRIS: NO, SIR.

THE COURT: THANK YOU, SIR. YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

MR. GASSER: GOVERNMENT CALLS JOHN BURNS.

JOHN BURNS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. GASSER:

Q. MR. BURNS, HOW ARE YOU SIR?

A. DOING ALL RIGHT.

Q. HOW OLD ARE YOU?

A. FORTY-TWO.

Q. WHERE WERE YOU BORN AND RAISED, MR. BURNS?

A. WEST HAMLIN, WEST VIRGINIA.

Q.    LIVED THERE YOUR WHOLE LIFE IN THAT AREA?

A.    YES,  I HAVE.

Q.    MARRIED TO KANDI?

A.    YEAH.

Q.    HOW LONG HAVE YOU AND KANDI BEEN MARRIED?

A.    GOING ON 22 YEARS.

Q.    HAVE TWO CHILDREN TOGETHER?

A.    YES.

Q.    SAMANTHA, YOUR DAUGHTER?

A.    YEAH.

Q.    WESLEY, YOUR SON?

A.    YES.

Q.    IF SAMANTHA WERE ALIVE TODAY, SHE WOULD BE HOW OLD?

A.    TWENTY-ONE (21).

Q.    WHERE DO YOU WORK, MR. BURNS?

A.    WORK WITH TRI-STATE EXPRESS IN WEST VIRGINIA.

Q.    WHAT DO YOU DO WITH THAT COMPANY?

A.    DRIVE A TRUCK.

Q.    HOW LONG HAVE YOU BEEN DRIVING A TRUCK?

A.    GOING ON 21 YEARS.

Q.    DO YOU DO LONG-DISTANCE DRIVING?

A.    NOT NO MORE,  NOT AFTER WHAT HAPPENED TO SAMANTHA,  NO.

Q.    SO, NOW YOU DRIVE A TRUCK WHERE, JUST WITHIN THE STATE OF WEST VIRGINIA?

A.    YEAH, LOCAL.  HOME EVERY DAY.

Q.    BACK IN NOVEMBER OF 2002, YOU DROVE LONG DISTANCES?

A.    YES.

Q.    MR. BURNS,  IN NOVEMBER OF 2002,  HOW TALL WAS SAMANTHA?

A.    ABOUT FIVE-TWO,  FIVE-THREE,  MAYBE.

Q.    HOW MUCH DID SHE WEIGH?

A.    MAYBE 105,  110 POUNDS.

Q.    WE HAVE HEARD THAT SAMANTHA WAS NOT ONLY A MAJORETTE IN THE BAND IN HIGH SCHOOL, BUT SHE ALSO PLAYED VARSITY SOFTBALL; IS THAT CORRECT?

A.    YES,  SHE DID.

Q.    WOULD YOU DESCRIBE HER AS BEING AN ATHLETIC YOUNG GIRL?

A.    REAL ATHLETIC.

Q.    AND HER PERSONALITY,  WAS SHE FEISTY?

A.    YOU BET.  A HUNDRED AND 10 PERCENT.

Q.    I WANT TO DRAW YOUR ATTENTION TO MONDAY NIGHT, NOVEMBER 11TH.  WE HAVE HEARD,  MR. BURNS,  THAT YOU WERE BUSY ALL WEEKEND LONG WORKING ON THE HOME THAT YOU WERE BUILDING FOR YOUR FAMILY; IS THAT CORRECT?

A.    YES.

Q.    DURING THAT TIME PERIOD, OTHER THAN WORKING AND OBVIOUSLY TAKING CARE OF YOUR FAMILY, YOUR PASSION AND ALL OF YOUR TIME WENT INTO WHAT DURING THAT TIME PERIOD OF NOVEMBER 2002?

A.    AT THAT TIME, WORKING ON THE HOUSE.

Q. AND ON MONDAY, VETERAN'S DAY, NOVEMBER 11TH, DID YOU WORK THAT DAY, OR WERE YOU WORKING ON THE HOUSE?

A. I WORKED ON THE HOUSE ALL WEEKEND.

Q. AND WE HAVE HEARD THE EVENTS OF FRIDAY NIGHT, SATURDAY, SATURDAY NIGHT, SUNDAY. WAS THAT JUST ANOTHER NORMAL THREE-DAY WEEKEND IN THE BURNS'S FAMILY HOUSEHOLD?

A. PRETTY MUCH SO, YEAH.

Q. ON THAT MONDAY, THE 11TH, YOUR WIFE AND SAMANTHA WENT SHOPPING DURING THE DAY; IS THAT CORRECT?

A. YES.

Q. DID YOU KNOW THAT SAMANTHA WAS GOING TO BE MEETING MISSY AT BARBOURSVILLE OR HUNTINGTON MALL IN BARBOURSVILLE?

A. YES, I DID.

Q. WHERE WERE YOU -- WHEN IS THE LAST TIME YOU SAW SAMANTHA THAT DAY?

A. HER AND HER MOTHER HAD WENT SHOPPING EARLIER THAT DAY, SO I THINK WE WAS AROUND THE HOUSE WORKING. AND BEFORE SHE LEFT TO GO TO THE HUNTINGTON MALL, I THINK SHE WAS THERE AT THE HOUSE WHERE WE WAS WORKING, BUILDING THE NEW HOUSE.

Q. DID YOU HAVE TO GO SOMEWHERE ON BUSINESS REAL EARLY THE FOLLOWING MORNING, TUESDAY MORNING, NOVEMBER 12TH?

A. YEAH, I HAD TO LEAVE ABOUT 1:30 IN THE MORNING. I WAS THE ONLY LOAD GOING TO ATLANTA, GEORGIA. I HAD TO UNLOAD IN ATLANTA TUESDAY MORNING.

Q. AND SO ON MONDAY EVENING, DID YOU CALL IT AN EARLY

AFTERNOON OR EARLY EVENING WORKING ON THE NEW HOME?

A. YEAH, ME AND KANDI PROBABLY GOT HOME ABOUT 8:00, 8:30, 9:00 O'CLOCK.

Q. WHAT DID YOU DO?

A. I WENT STRAIGHT TO BED BECAUSE I HAD TO GET UP SO EARLY.

Q. WHEN YOU GOT HOME AT 8:00, 8:30, HAD SAMANTHA GOTTEN BACK FROM THE MALL?

A. NO.

Q. SO, WHEN YOU WENT TO BED, SAMANTHA WASN'T HOME?

A. NO.

Q. WHEN WAS IT YOU WERE TOLD BY KANDI THAT SAMANTHA HAD NOT ARRIVED HOME WHEN SHE WAS SUPPOSED TO?

A. I GOT UP ABOUT 1:00 O'CLOCK IN THE MORNING AND MY WIFE TOLD ME THAT, YOU KNOW, SISSY HADN'T MADE IT HOME YET. AND, YOU KNOW, I ASKED HER, I SAID, HAVE YOU CALLED HER? HAD SHE HEARD FROM HER? SHE SAID, YEAH, SHE CALLED ABOUT 9:30, 9:45, SOMETHING IN THAT TIME FRAME AND SAID SHE WAS ON HER WAY HOME, YOU KNOW, AND SHE WOULD BE HOME. SHE HADN'T MADE IT.

Q. WHAT WAS YOUR RESPONSE TO THAT?

A. WELL, NOW I AUTOMATICALLY, YOU KNOW, I WONDER IF SHE ASKED KANDI, IS SHE STAYING WITH SOMEBODY LIKE WHITNEY OR KRISTEN OR SOMEBODY LIKE THAT, ONE OF HER FRIENDS. IF SHE WAS DOING THAT, SHE WOULD HAVE CALLED. YOU AUTOMATICALLY GET WORRIED. I MEAN, IT WASN'T LIKE HER TO DO THAT.

Q.    THAT WAS MY NEXT LINE OF QUESTIONING, MR. BURNS.  WAS IT EXTREMELY UNUSUAL FOR HER TO HAVE NOT COME HOME AND NOT CALLED?

A.    SHE WOULD HAVE CALLED.  I MEAN, IF SHE WASN'T GOING TO BE HOME, SHE WAS GOING TO CALL.

Q.    PARTICULARLY, WHEN YOUR WIFE DID TELL YOU ABOUT THE PHONE CONVERSATION SHE HAD WITH SAMANTHA AT 9:45 WHEN SAMANTHA WAS PLANNING ON STOPPING AND GETTING YOU SOME CIGARETTES?

A.    RIGHT.  THAT MADE IT EVEN MORE FUNNY.  I MEAN, SHE WOULD HAVE CALLED, YOU KNOW WHAT I AM SAYING?  THAT WAS HIGHLY UNUSUAL.

Q.    DID YOU FULFILL YOUR RESPONSIBILITY AND DRIVE THAT LOAD DOWN TO ATLANTA?

A.    YES, I DID.

Q.    AS YOU WERE DRIVING DOWN TO ATLANTA, DID YOU HAVE A CELLPHONE TO STAY IN COMMUNICATION WITH YOUR WIFE?

A.    I CALLED MY WIFE ABOUT 3:30 BECAUSE THAT IS THE TIME SHE NORMALLY GETS UP TO SEE IF SAMANTHA HAD MADE IT HOME; SHE HADN'T MADE IT HOME.  I CALLED HER BACK AT WORK, PROBABLY A LITTLE AFTER 5:00 O'CLOCK IN THE MORNING BECAUSE THAT IS -- SHE LEAVES THE HOUSE ABOUT 4:00 O'CLOCK, DRIVE ABOUT AN HOUR TO WORK.  AT 5:00 O'CLOCK, MAYBE FIFTEEN OF FIVE, SHE HADN'T HEARD FROM SAMANTHA EITHER, IN WHICH I HAD BEEN TRYING TO CALL HER TOO.

FROM THAT POINT -- FROM THE TIME I LEFT THE HOUSE, FROM

THAT POINT ON I HAD TRIED TO CALL HER DURING ALL OF THAT TIME ON MY CELLPHONE.  I MEAN, AS SOON AS YOU DIAL, IT WOULD GO STRAIGHT INTO VOICE MAIL EVERY TIME YOU WOULD DIAL IT.

Q.    WHILE YOU WERE EITHER IN ROUTE TO ATLANTA OR GOTTEN DOWN TO ATLANTA, AND DURING YOUR CONVERSATIONS WITH YOUR WIFE, KANDI, DID YOU AND KANDI MAKE A DECISION THAT YOU NEEDED TO GO AHEAD AND INFORM LAW ENFORCEMENT?

A.    YES.

Q.    WHAT DID YOU AND KANDI DECIDE ABOUT THAT?

A.    I TALKED WITH HER AT WORK, PROBABLY, I AM GUESSING ABOUT 8:00 O'CLOCK, SOMEWHERE IN THAT TIME FRAME.  I ASKED HER WHAT SHE WAS GOING TO DO.  SHE SAID SHE WAS GOING TO LEAVE WORK.  AND I TOLD HER TO GET IN TOUCH WITH MY FATHER WHEN SHE GOT HOME AND FOR HER AND MY FATHER TO GO DOWN TO THE POLICE DETACHMENT AND, YOU KNOW, SEE WHAT THERE IS TO SAY ABOUT IT.  BECAUSE, YOU KNOW, IT WASN'T RIGHT FOR HER TO BE HOME -- IT WASN'T RIGHT FOR HER NOT TO BE HOME.  IT WASN'T LIKE SAMANTHA.  WE COULDN'T FIND HER ANYWHERE.  AT THAT TIME, I STARTED MAKING ARRANGEMENTS WITH MY COMPANY.  IN OTHER WORDS, I TOLD THEM, ONCE I DELIVERED MY LOAD, THAT I WOULD HAVE TO GO BACK HOME.  IN OTHER WORDS, I WOULD HAVE TO PARK THE TRUCK AT THE TERMINAL AND RENT A CAR AND GO HOME, AND FOR HOW LONG I DIDN'T KNOW.  I TOLD THEM UNTIL I FOUND MY DAUGHTER.

Q.    DID YOU DO THAT?

A.    YES, I DID.

HUNTINGTON, WEST VIRGINIA AREA, BEING A SMALL AREA, SMALL TOWN, WEST HAMLIN, WEST VIRGINIA?

A.   YES, IT WAS.

Q.   WAS SAMANTHA'S FACE PLASTERED ALL OVER NEWSPAPER AND TV?

A.   NEWSPAPER AND TV EVERY DAY.  IT WAS A PHENOMENAL THING.

Q.   MR. BURNS, ANY INFORMATION WHATSOEVER THAT CAME IN, DID YOU ACT UPON IT?

A.   YEAH, WE DID.

Q.   NOW, DID THERE COME A TIME, MR. BURNS, SEVERAL WEEKS AFTER YOUR DAUGHTER DISAPPEARED THAT YOU HAD TO GIVE UP HOPE THAT SAM WOULD BE FOUND ALIVE?

A.   YEAH.

Q.   WAS THAT WHEN YOU WERE PROVIDED INFORMATION IN EARLY DECEMBER BY THE WEST VIRGINIA STATE POLICE AND THE FBI?

A.   YES.

Q.   YOU KNEW OR WERE YOU TOLD THAT THAT INFORMATION WAS ACTUALLY COMING THROUGH BRANDON BASHAM'S LAWYER IN KENTUCKY?

A.   YES, WE WAS.

Q.   AND AFTER THE WEST VIRGINIA STATE POLICE AND THE FBI TOLD YOU WHAT MR. BASHAM'S LAWYER IN KENTUCKY TOLD THEM, DO YOU KNOW, IN YOUR HEART, AT THAT POINT IN TIME, THAT YOUR DAUGHTER WAS DEAD?

A.   YEAH.

**JA 1123**

Q.    DID YOU STILL STOP LOOKING FOR HER BODY?

A.    NO.

Q.    DID YOU STILL USE THE METHODS AND THE PEOPLE THAT YOU PREVIOUSLY DESCRIBED TO THIS JURY, DID YOU STILL CONTINUE TO SEARCH FOR SAMANTHA'S REMAINS IN ORDER TO BRING HER HOME?

A.    IF WE GET A TIP, YES, WE DO.  I MEAN, AT THIS POINT YOU WANT TO, BUT YOU DON'T HAVE THE TIME.  I MEAN, IF YOU KNOW WHERE TO LOOK, IF YOU GET A TIP, YES.  BUT AS FAR AS GOING OUT AND JUST RANDOM SEARCHES, AT THIS TIME, NO.

Q.    MR. BURNS, AS A FATHER, DID YOU, WHEN SAMANTHA WAS GROWING UP, WHEN SHE WAS GETTING INTO HER TEEN YEARS, KNOWING SHE WOULD BE OUT AND ABOUT WITH FRIENDS, DID YOU SIT HER DOWN AS A DAD AND EXPLAIN TO HER WHAT POSSIBLY TO DO IN A SITUATION WHERE SHE FOUND HERSELF IN TROUBLE?  DID YOU DO THAT AS A FATHER?

A.    YES, BOTH MY KIDS.

Q.    WHAT DID YOU TELL THEM?

A.    I TOLD THEM, IF A SITUATION LIKE THAT EVER HAPPENED TO THEM, TO GIVE THEM THE CAR, GIVE THEM WHATEVER, WHATEVER THEY WANT, GIVE IT TO THEM.  COOPERATE WITH THEM AND JUST GIVE THEM ANYTHING THEY WANT.

Q.    AND YOU HAVE PREVIOUSLY TESTIFIED THAT YOUR DAUGHTER WAS, ALTHOUGH FIVE FOOT THREE, ALTHOUGH A HUNDRED AND FIVE POUNDS, SHE WAS ATHLETIC AND SHE WAS FEISTY?

A.    YES.

**JA 1124**

Q. WAS SAMANTHA A HEALTHY 19-YEAR-OLD ON NOVEMBER 11, 2002?

A. YES, SHE WAS.

MR. GASSER: THANK YOU, MR. BURNS.

THE COURT: ANY CROSS-EXAMINATION?

MR. HARRIS: NO, SIR.

THE COURT: ALL RIGHT. THANK YOU, SIR. YOU MAY STEP DOWN.

IS THAT THE EIGHTH WITNESS?

MR. GASSER: YES, SIR.

THE COURT: ALL RIGHT. MEMBERS OF THE JURY, WE ARE GOING TO ADJOURN COURT, AT THIS TIME. TOMORROW IS A DAY WE WILL SKIP OVER. OF COURSE, WE WILL RESUME AT 9:00 O'CLOCK ON FRIDAY OF THIS WEEK. HAVE A NICE BREAK FROM THE TRIAL. DON'T DISCUSS THE CASE WITH ANYONE. DON'T EXPOSE YOURSELF TO ANYTHING IN THE NEWS MEDIA. IF YOU WILL LEAVE YOUR NOTEBOOKS IN THE JURY ROOM, WE WILL MAKE SURE THEY ARE LOCKED UP WHILE YOU ARE GONE. SEE YOU BACK ON FRIDAY AT 9:00 O'CLOCK.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: I HAD ONE QUESTION BEFORE WE ADJOURN. THE DEFENDANT HAS -- THE JURY HAS HEARD ABOUT THE SAMANTHA BURNS'S INCIDENT. DOES THE DEFENDANT WANT ANY CAUTIONARY INSTRUCTION, ANY 404(B)-TYPE INSTRUCTION, OPPORTUNITY, COMMON SCHEME AND PLAN? YOU DON'T HAVE TO TELL ME NOW, YOU

CAN THINK ABOUT IT OVERNIGHT.  I NEED TO OFFER THAT INSTRUCTION, IF YOU WANTED IT.  THE GOVERNMENT WILL SAY IT IS ALL INTRINSIC OF THE CRIME.  THERE IS NO CAUTIONARY INSTRUCTION NEEDED, RIGHT?

MR. SCHOOLS:  THAT'S RIGHT.

THE COURT:  EXPOUND ON THAT A LITTLE BIT.  INTRINSIC TO WHAT CRIME NOW?  THERE ARE EIGHT DIFFERENT COUNTS.

MR. SCHOOLS:  INTRINSIC TO ALL OF THE CRIMES. CERTAINLY INTRINSIC TO THE CONSPIRACY COUNT, WHICH SPANS THE TIME FROM THE TIME OF THE ESCAPE TO THE TIME OF MR. BASHAM AND MR. FULKS'S ARREST.  WE ALSO THINK IT IS BECAUSE IT IS INTRINSIC TO CONSPIRACY.  THE OTHER ALLEGED CRIMES OCCURRED WITHIN THE COURSE OF THE CONSPIRACY.  WE THINK IT IS INTRINSIC TO ALL OF THAT.  CERTAINLY PUTS ALL OF THE EVIDENCE IN CONTEXT.

THE COURT:  WAIT A MINUTE NOW.  LET'S THINK ABOUT IT.  THE CONSPIRACY TO CARJACKING AND KIDNAPPING MS. DONOVAN, YOU ARE SAYING IT OCCURRED -- THAT THEY FORMULATED THE PLAN TO DO THAT UP IN WEST VIRGINIA?

MR. SCHOOLS:  MULTIOBJECTIVE CONSPIRACY.  ONE OF ITS OBJECTS TO STEAL FIREARMS, HAVE IN POSSESSION FIREARMS BY FELONS, TO TRANSPORT A VEHICLE ACROSS STATE LINES, CARJACK AND KIDNAP MS. DONOVAN.  WE THINK AT THE VERY LEAST THE CONSPIRACY TO HAVE FIREARMS BEGAN THE NIGHT MR. FULKS APPROACHED MS. SEVERANCE AND GOT ACQUISITION OF THE FIREARMS.

THE COURT:   I WILL FIND OUT WHAT THE DEFENDANTS WANT TOMORROW.   MOST OF THE TIME THE DEFENDANT DOESN'T WANT A CAUTIONARY INSTRUCTION,  IT SOMETIMES HONES IT IN FOR THE JURY,  MAKES IT WORSE.   WE WILL SEE WHAT THE DEFENDANT WANTS TOMORROW AND THEN DECIDE.   ANYTHING ELSE YOU WANT WHILE YOU ARE HERE?

MR. SCHOOLS:  NO, SIR.

THE COURT:   MR. SWERLING?

MR. SWERLING:  NO,  YOUR HONOR.

THE COURT:   ALL RIGHT.   SEE YOU 9:00 O'CLOCK FRIDAY. WE WILL BE IN RECESS.

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____          _____

S/DEBRA R. JERNIGAN, RPR, CRR          DATE

**JA 1127**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,      )      CR. NO. 4:02-992
                               )      COLUMBIA, SC
                               )      SEPTEMBER 17, 2004
                               )
     VERSUS                    )
                               )
BRANDON L. BASHAM,             )
          DEFENDANT.           )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME IV

APPEARANCES:

FOR THE GOVERNMENT:            SCOTT SCHOOLS, FIRST AUSA
                              JONATHAN S. GASSER, AUSA
                              JOHN DUANE, AUSA
                              UNITED STATES ATTORNEY'S OFFICE
                              1441 MAIN STREET, SUITE 500
                              COLUMBIA, SC  29201

FOR THE DEFENDANT:            JACK SWERLING, ESQ.
                              1720 MAIN STREET
                              SUITE 301
                              COLUMBIA, SC  29201

                              GREG HARRIS, ESQ.
                              1720 MAIN STREET
                              SUITE 301
                              COLUMBIA, SC  29201

COURT REPORTER:               DEBRA R. JERNIGAN, RPR, CRR
                              UNITED STATES COURT REPORTER
                              901 RICHLAND STREET
                              COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1128

THE COURT:   ARE BOTH SIDES READY TO PROCEED?

MR. SWERLING:  FOR THE RECORD, YOU LEFT OFF ON WEDNESDAY ABOUT A LIMITING INSTRUCTION.   WE ARE NOT LOOKING FOR A LIMITING INSTRUCTION UNTIL POSSIBLY YOUR FINAL CHARGE. WE WILL DISCUSS IT AT THAT TIME.   NOT NOW.

THE COURT:   VERY GOOD.   PLEASE BRING IN THE JURY.

MR. GASSER:   THE GOVERNMENT CALLS HELEN COOK.

HELEN COOK, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. GASSER:

Q.    GOOD MORNING, MS. COOK.

A.    GOOD MORNING.

Q.    MS. COOK,  TELL THE JURY WHERE YOU LIVE.

A.    IN CONWAY, SOUTH CAROLINA.

Q.    WHERE, SPECIFICALLY?

A.    1324 WACCAMAW LAKE.

Q.    WHAT HIGHWAY IS THAT SUBDIVISION,  IF YOU WILL,  OFF OF?

A.    501.

Q.    HIGHWAY 501?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    HOW OLD ARE YOU,  MS. COOK?

A.    FORTY.

Q.    ARE YOU MARRIED?

A.    NO.

Q.    DO YOU HAVE ANY CHILDREN?

A.    I HAVE THREE.

Q.    AND DO YOUR THREE CHILDREN LIVE WITH YOU?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    HOW OLD ARE YOUR CHILDREN?

A.    FOURTEEN (14),  11, AND 5.

Q.    AND WHAT ARE YOU CURRENTLY DOING?

A.    FULL-TIME STUDENT AT HORRY GEORGETOWN TECHNICAL COLLEGE.

Q.    WHAT ARE YOUR AREAS OF STUDY?

A.    NURSING AND CRIMINAL JUSTICE.

Q.    MS. COOK,  I WANT TO DRAW YOUR ATTENTION BACK TO WEDNESDAY, NOVEMBER 13TH OF 2002.   WERE YOU AT HOME THAT DAY?

A.    YES, SIR.

Q.    WERE YOU TAKING CLASSES DURING THAT TIME PERIOD?

A.    NO,  I HADN'T STARTED YET.

Q.    YOUR CHILDREN WOULD HAVE BEEN IN SCHOOL THAT DAY?

A.    EXCEPT FOR THE YOUNGEST.

Q.    IS THERE A SPECIFIC ROUTINE THAT YOU HAVE TO DO EVERY AFTERNOON WHEN YOUR KIDS ARE IN SCHOOL SOME TIME AROUND 2:30?

A.    I GO PICK MY KIDS UP FROM SCHOOL.

Q.    JUST PRIOR TO THAT,  DID YOU HAVE AN OCCASION TO OBSERVE A VEHICLE IN THE VICINITY OF YOUR HOME RIGHT BEFORE LEAVING TO PICK UP YOUR CHILDREN FROM SCHOOL?

**JA 1130**

A.   YES, I DID

Q.   APPROXIMATELY, WHAT TIME WOULD THAT HAVE BEEN?

A.   BETWEEN TWO, 2:05, 2:10.

Q.   CAN YOU DESCRIBE THE VEHICLE FOR US?

A.   GREEN FORD AEROSTAR VAN.

Q.   I AM GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT 57.   YOU HAVE SEEN THIS PHOTOGRAPH BEFORE, HAVE YOU NOT, MS. COOK?

A.   YES.

Q.   DO YOU RECOGNIZE THE VEHICLE IN GOVERNMENT'S EXHIBIT 57?

A.   YES, I DO.

Q.   IS THAT THE VAN THAT YOU SAW?

A.   YES.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT 97.   YOU HAD AN OPPORTUNITY TO SEE THIS AERIAL PHOTOGRAPH BEFORE, AS WELL, HAVE YOU NOT, MS. COOK?

A.   YES, I DID.

Q.   DO YOU RECOGNIZE THE AREAS DEPICTED IN THIS PHOTOGRAPH?

A.   YES, SIR.

Q.   WHAT ROAD IS THAT RIGHT THERE (INDICATING)?

A.   THAT IS 501.

Q.   THIS BODY OF WATER RIGHT HERE (INDICATING)?

A.   LAKE BUSBEE OR WACCAMAW RIVER.

Q.   WHAT IS THIS AREA I JUST CIRCLED THERE (INDICATING)?

Q.    DO YOU OWN SOME PROPERTY THAT YOUR SONS LIVE ON?

A.    WELL, MY DADDY OWNS IT, YEAH.  IT IS FARMLAND.

Q.    IT IS FARMLAND?

A.    YES.

Q.    WHERE IS THAT, SPECIFICALLY, IN CONWAY?

A.    OUT WEST ON 378, ANTIOCH ROAD, FORT TAYLOR ROAD, AND THEN SUNRISE DRIVE.  LIVE ON THE EDGE OF THE SWAMP THERE.  IT IS FARMLAND.

Q.    YOU DESCRIBE THIS AS FARMLAND, SO, OBVIOUSLY, THERE ARE FIELDS, RIGHT?

A.    YES.

Q.    ANY BODIES OF WATER ON THAT PROPERTY?

A.    I GOT A FISH POND ON IT.

Q.    IN NOVEMBER OF 2002, HOW MANY HOMES WERE ON YOUR -- ON THAT PARTICULAR PIECE OF PROPERTY?

A.    TWO MOBILE HOMES AND A HOUSE.

Q.    MR. JORDAN, I WANT TO DRAW YOUR ATTENTION TO THURSDAY AFTERNOON, NOVEMBER 14TH.  WERE YOU WORKING THAT DAY?

A.    RIGHT.

Q.    AND ON OCCASION DURING THE WORKDAY, DO YOU DRIVE ON YOUR PROPERTY AND CHECK IT OUT ON A PRETTY ROUTINE BASIS?

A.    RIGHT.

Q.    HOW MANY TIMES A DAY?

A.    SOMETIMES I GO TWO, THREE TIMES A DAY.

Q.    ONE OF THE REASONS YOU GO, YOU LIKE TO DO WHAT?

A.    I LIKE TO GO TO THE POND, FEED THE FISH, MESS AROUND.

Q.    DID YOU DO THAT ON THURSDAY AFTERNOON?

A.    RIGHT.

Q.    NOVEMBER 14TH?

A.    RIGHT.

Q.    AND TELL US, SIR, THAT DAY, DO YOU REMEMBER SEEING A VEHICLE ON YOUR SON'S PROPERTY?

A.    RIGHT.

Q.    WHAT KIND OF VEHICLE WAS IT?

A.    AEROSTAR FORD GREEN MINIVAN.

Q.    HAD YOU EVER SEEN THAT MINIVAN BEFORE?

A.    NO, SIR.

Q.    APPROXIMATELY, WHAT TIME OF DAY WAS IT?

A.    IT WAS ABOUT 2:00 O'CLOCK.

Q.    AND WHERE WAS THE MINIVAN WHEN YOU SAW IT, SPECIFICALLY?

A.    WELL, I COME IN AND THE FIRST PLACE YOU GET TO IS A HOUSE AND THE ROAD BEARS BACK TO THE LEFT, AND I ALWAYS GO TO THE RIGHT TO GO TO THE POND.  SO, WHEN I GOT THERE, I SAW THE FRONT OF THE MINIVAN WAS BEHIND THE TRAILER.  I COULD SEE THE FRONT STICKING OUT.  I THOUGHT SAM'S WIFE MIGHT HAVE ORDERED A TELEVISION.  STILL, I DIDN'T TURN TOWARD THE POND, I WENT TO CHECK IT OUT.  I WAS DRIVING UP, I DIDN'T KNOW WHAT WAS GOING ON.  I DROVE BY.  THE VAN'S SLIDING DOOR ON THE PASSENGER SIDE WAS OPEN.  THE FIRST GUN I SEEN LAYING IN IT

**JA 1133**

WAS MINE. THEY HAD EIGHT OR NINE GUNS, I CAN'T REMEMBER HOW MANY GUNS. I KNOW THE FIRST ONE I SAW WAS MINE. AND THE REASON IT WAS OVER THERE, MY HOUSE HAD BURNT TWO OR THREE YEARS BEFORE, AND THE BOY JUST GOT MY WHOLE GUN CABINET AND GUNS. OTHERWISE, THE GUN WAS AT SAM'S HOUSE.

SO, THEN I TURNED AROUND AND I PULLED IN FRONT OF HIM AND BLOCKED HIM. WELL, I DIDN'T SEE HIM. THE BACK DOOR WAS OPEN. I SAT THERE IN FRONT OF THE VAN, MAYBE 10, 20, 30, SECONDS AND CHADRICK FULKS FINALLY COME OUT THE BACK DOOR. I SAID, "HOLD IT BUDDY, I GOT YOU." BUT HE GAVE NO RESPONSE. WALKED RIGHT ON AND GOT IN THE VAN. AND HE CRANKED UP. HE CAME RUNNING TOWARD ME LIKE HE WAS GOING TO RAM ME. OF COURSE, I WAS SITTING LIKE THIS (INDICATING). HE COMES TOWARD ME, I SCRUNCHED UP LIKE THIS (INDICATING), HE STOPPED. AND I REALLY COULD TOUCH THE HOOD. AND AT THE SAME TIME, I HEARD A GUN SHOOTING IN FRONT OF ME. SO I LOOKED AND BASHAM HAD COME OUT OF THE FRONT OF THE TRAILER. HE HAD BACKED BEHIND IT, I DIDN'T KNOW IT, COME RUNNING DOWN THE FRONT OF THE TRAILER, COME TO THE END OF THE TRAILER. HE WAS STANDING AT THE FRONT OF MY TRUCK, AND HE WAS SHOOTING. WHEN HE DID, I SCRUNCHED ON DOWN AND CHADRICK FULKS SHOT THE WINDOW RIGHT BEHIND MY HEAD, AND I TOOK OFF.

Q. LET ME SHOW YOU WHAT HAS BEEN MARKED GOVERNMENT'S EXHIBIT 99, MR. JORDAN. DO YOU RECOGNIZE THAT PHOTOGRAPH, SIR?

A.    YES, SIR.

Q.    THAT IS THE FRONT OF WHOSE MOBILE HOME?

A.    SAM'S.

Q.    GOVERNMENT'S EXHIBIT 100?

A.    THAT IS THE FARM.

Q.    THAT IS YOUR FARM?

A.    RIGHT.    BOTH OF THEM HAS GOT BIG DOUBLE-WIDE MOBILE HOME NOW WHICH YOU CAN SEE IN THAT PICTURE THERE.

Q.    THAT IS MY NEXT QUESTION.    THE PHOTOGRAPH,  GO BACK TO 99,  TONYA.  THANK YOU.   THIS PICTURE WAS TAKEN SOME TIME IN NOVEMBER OF 2002?

A.    THAT IS THE MOBILE HOME THEY HAD.

Q.    THIS IS THE ONE IT HAPPENED AT?

A.    RIGHT.

Q.    GOING TO GOVERNMENT'S EXHIBIT 100, IN PREPARATION FOR FULKS'S AND BASHAM'S TRIALS,  YOU UNDERSTAND AERIAL PHOTOGRAPHS WERE TAKEN OF YOUR PROPERTY?

A.    YES.

Q.    THIS MOBILE HOME I JUST POINTED TO,  WHOSE HOME IS THAT NOW?

A.    SAM'S.

Q.    IS THAT A DIFFERENT MOBILE HOME THAN WHAT WAS ON THE PROPERTY IN NOVEMBER OF 2002?

A.    DIFFERENT MOBILE HOME.

Q.    WANTED TO CLARIFY THAT FOR THE JURY.   WHERE IT SITS

AND THE LAYOUT OF YOUR PROPERTY, THAT IS THE SAME, IS IT NOT?

A. RIGHT. IT IS JUST BIGGER. A LOT BIGGER HOME.

Q. SO, WHAT IS THIS ROAD RIGHT HERE?

A. THAT IS A ROAD COMING IN THERE.

Q. COMING IN AND OUT OF YOUR PROPERTY?

A. RIGHT.

Q. AND SO, MR. JORDAN, YOU KNOW YOU CAN TOUCH THAT SCREEN WITH YOUR FINGER AND JUST --

A. RIGHT.

Q. SHOW THE ROUTE THAT YOU TOOK. WOULD YOU DO THAT FOR THE JURY, PLEASE? SHOW THEM WHEN YOU CAME TO CHECK ON YOUR PROPERTY THAT DAY.

A. WHEN I CAME IN RIGHT HERE, SEE, RIGHT HERE ON MY FINGER, THAT GOES BACK TO THE POND. THE POND, YOU CAN'T SEE IT. BUT INSTEAD OF TURNING THERE, I WENT STRAIGHT ON IN.

Q. WHEN YOU GET TO RIGHT WHERE THAT ARROW IS RIGHT WHERE YOU POINTED, YOU LOOK OFF TO YOUR RIGHT, WHAT DO YOU SEE?

A. THAT IS WHEN I SAW THE GUNS.

Q. WHERE WERE THE GUNS?

A. IN THE VAN.

Q. AND HOW WAS THE VAN PARKED?

A. IT WAS UP -- IT WAS SITTING BACK BEHIND THE TRAILER.

Q. FACING WHERE?

A. FACING THAT GREENHOUSE, WHAT IS LEFT OF IT.

Q. YOU USE THE TERM "GREENHOUSE," WHAT DID I JUST CIRCLE?

A.    WHO LIVES WITH ME?

Q.    YES, MA'AM.   WHO LIVES IN YOUR RESIDENCE WITH YOU?

A.    MY MOTHER AND MY GRANDDAUGHTER.

Q.    WHAT IS YOUR GRANDDAUGHTER'S NAME?

A.    BRITTANY.

Q.    IS BRITTANY SITTING IN THE BACK OF THE COURTROOM RIGHT NOW?

A.    YES,  SHE IS.

Q.    IN NOVEMBER OF 2002,  WHO WAS LIVING WITH YOU AT YOUR RESIDENCE IN NOVEMBER OF 2002?

A.    MY MOTHER WAS LIVING,  BRITTANY WAS IN SCHOOL.

Q.    I WANT TO DRAW YOUR ATTENTION, SPECIFICALLY, TO NOVEMBER 14TH,  2002.   DO YOU RECALL RECEIVING A KNOCK AT YOUR DOOR THAT DAY?

A.    YES,  I DO.

Q.    TELL THE MEMBERS OF THE JURY WHO KNOCKED AT YOUR DOOR OR WHAT TOOK PLACE.

A.    I HAD A KNOCK AT THE DOOR AND I OPENED THE DOOR TO TWO YOUNG MEN STANDING THERE ON THE STEPS.   DO I NEED TO IDENTIFY THEM?

Q.    WHAT DID THE TWO MEN LOOK LIKE?

A.    ONE HAD DARK HAIR AND WAS SHORT; THE OTHER ONE WAS A LITTLE LARGER WITH LIGHT-COLORED HAIR.

Q.    AND YOU SAID THEY CAME TO WHICH DOOR OF YOUR HOME?

A.    TO THE BACK DOOR.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 119.    WHAT IS THIS A PHOTOGRAPH OF,  MS. MOORE?

A.    THAT IS THE BACK DOOR.  THAT IS UNDER THE CARPORT.

Q.    YOU SAY TWO MEN CAME AND KNOCKED ON THE DOOR?

A.    YES.

Q.    IF YOU COULD TOUCH THE SCREEN,  MS. MOORE,  AND DEMONSTRATE FOR THE JURY WHERE EACH OF THE MEN WERE STANDING WHEN THEY CAME TO YOUR DOOR.

A.    (WITNESS COMPLIES.)

Q.    WHICH ONE WAS STANDING ON THE UPPER STEP THAT YOU POINTED OUT THERE?

A.    THE SMALLER ONE.

Q.    WITH THE DARK HAIR?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    AND THE LARGER ONE WITH THE BLOND HAIR, WHERE WAS HE STANDING?

A.    HE WAS STANDING LOWER.  AS WE TALKED, HE BACKED UP AWAY FROM THE STEP.

Q.    WHO DID YOU ACTUALLY SPEAK WITH?

A.    I SPOKE WITH THE YOUNG MAN WITH DARK HAIR.

Q.    AND WHAT DID HE ASK YOU?

A.    HE ASKED ME IF I COULD TAKE HIM TO THE STORE BECAUSE HIS CAR WAS BROKEN DOWN.  AND IN THE SAME SENTENCE, HE SAID IT IS OUT OF GAS.  I TOLD HIM I COULDN'T TAKE HIM BECAUSE I HAD TO GO TO SCHOOL TO PICK UP THE GRANDDAUGHTER.  SO,  HE

PROCEEDED TO ASK QUESTIONS. HE WANTED TO COME IN AND USE THE TELEPHONE.

Q.    WHAT DID YOU TELL HIM?

A.    I SAID, NO, I COULDN'T DO THAT. HE WANTED TO USE THE PHONE UNDER THE CARPORT AND I TOLD HIM I COULDN'T DO THAT EITHER. I ASKED HIM TO GO ACROSS THE STREET TO THE NEIGHBOR'S HOUSE BECAUSE THEY HAVE A PHONE OUTSIDE. AND I KNEW THE SON WOULD BE OUTSIDE WITH THE FARM EQUIPMENT AND MAYBE HE COULD HELP HIM OR MAYBE TAKE HIM TO THE STORE.

Q.    THIS ENTIRE CONVERSATION TOOK PLACE WITH WHICH OF THE TWO INDIVIDUALS?

A.    THIS WAS WITH THE DARK-HAIRED ONE.

Q.    AFTER YOU TOLD HIM TO GO ACROSS THE STREET, WHAT DID THE DARK-HAIRED GUY ASK YOU?

A.    HE ASKED ME WHAT HIS NAME WAS ACROSS THE STREET, AND I TOLD HIM CHRIS. HE SAID, WHAT IS HIS LAST NAME? AND I TOLD HIM HYMAN. HE SAID, "OH, CHRIS HYMAN," LIKE AN ACQUAINTANCE.

Q.    MS. MOORE, DO YOU RECALL ABOUT WHAT TIME OF DAY THIS CONVERSATION TOOK PLACE AND THE KNOCK ON YOUR DOOR TOOK PLACE?

A.    CLOSE TO 2:00 O'CLOCK.

Q.    AND HOW DO YOU KNOW IT WAS CLOSE TO 2:00 O'CLOCK?

A.    I WATCH A SOAP OPERA THAT ENDS AT 2:00 O'CLOCK. THE ONLY THING I SEE ON TV.

Q.    WHICH SOAP OPERA IS THAT?

A.    BOLD AND BEAUTIFUL. AND IT HAD JUST ENDED.

Q. NOW, AFTER YOU TOLD THE DARK GENTLEMAN TO GO ACROSS THE STREET, WHAT DID YOU OBSERVE TAKE PLACE?

A. I DIDN'T UNDERSTAND YOUR LAST --

Q. WHAT DID THEY DO AFTER YOU TOLD THEM TO GO ACROSS THE STREET?

A. THEY WALKED AWAY. WE HAVE A VERY LONG DRIVEWAY, SO THEY WALKED OUT, DOWN THE DRIVEWAY. AND I THOUGHT HE HAD GONE ON TO THE NEIGHBOR'S HOUSE.

Q. WHERE DID YOU GO?

A. I WENT TO THE WINDOWS IN THE FRONT OF MY HOUSE TO SEE WHAT THEY WERE DOING OR WHERE THEY HAD GONE.

Q. LET ME NEXT SHOW YOU GOVERNMENT'S EXHIBIT 119. WHAT IS THIS A PHOTOGRAPH OF, MS. MOORE?

A. THAT IS MY DRIVEWAY LEAVING THE HOUSE GOING OUT TOWARD LUNDY SHORTCUT ROAD.

Q. IS THIS THE VIEW YOU HAD ON NOVEMBER 14TH, OUT THE FRONT WINDOWS OF YOUR HOUSE TO THE FRONT YARD?

A. YES, IT IS.

Q. YOU SAID THE TWO GENTLEMEN WALKED THIS WAY UP YOUR DRIVEWAY?

A. YES.

Q. WHAT DID YOU OBSERVE THE TWO GUYS DO?

A. THEY WERE STANDING BEHIND THE TREE AS A CAR PASSED ON LUNDY SHORTCUT ROAD.

Q. LUNDY SHORTCUT ROAD --

A.    IS THERE (INDICATING).

Q.    IS THAT IT RIGHT THERE?

A.    YES.

Q.    YOU SAY A CAR PASSED ON LUNDY SHORTCUT ROAD?

A.    YES.

Q.    WHAT DID YOU OBSERVE THE TWO GUYS DO?

A.    THE TWO GUYS WERE STANDING BEHIND THE TREE UNTIL THE CAR PASSED.

Q.    CAN YOU POINT OUT WHICH TREE IN THIS PHOTOGRAPH?

A.    (WITNESS COMPLIES.)

Q.    I'M SORRY, EXHIBIT NUMBER 120.  WHAT DID THEY DO AFTER THEY HID BEHIND A TREE?

A.    THE CAR PASSED AND THEY CAME FROM BEHIND THE TREE, STOOD IN THE DRIVEWAY, AND TALKED JUST FOR A BRIEF SECOND, MINUTE, WHATEVER.  AND BOTH OF THEM RAN BACK TOWARDS THE HOUSE.  THEY WERE NOT WALKING, THEY WERE RUNNING.

Q.    WHEN YOU SEE THESE TWO GENTLEMEN, AFTER YOU HAD THE CONVERSATION WITH THEM, RUNNING BACK TOWARD YOUR HOUSE, MS. MOORE, WHAT WERE YOU THINKING AT THAT POINT?

A.    IT SCARED ME, I DIDN'T KNOW WHAT TO DO.  SO, I RAN BACK AND CALLED 9-1-1.

Q.    YOU CALLED 9-1-1?

A.    I DID.

Q.    DID YOU SEE EITHER OF THE GENTLEMEN AFTER THAT?

A.    YEAH, I SAW THE OTHER YOUNG MAN CAME TO THE DOOR, THE

SAME BACK DOOR, AND KNOCKED.

Q.   NOW, THE OTHER YOUNG MAN THAT KNOCKED THE SECOND TIME, DID HE HAVE BLOND HAIR OR DARK HAIR?

A.   NO, HE HAD BLOND HAIR.

Q.   HE KNOCKED ON YOUR DOOR?

A.   HE KNOCKED ON THE DOOR.  I DID NOT ANSWER.  I WAS ON THE PHONE, AND I COULD SEE HIM THROUGH THE WINDOW BESIDE THE DOOR.  AND I DIDN'T ANSWER, SO HE KNOCKED AGAIN.  I STILL DIDN'T ANSWER.  SO, HE LEFT.  HE WENT DOWN OFF OF THE LITTLE PORCH.

Q.   LET ME SHOW YOU GOVERNMENT'S NUMBER 119 ONCE AGAIN. YOU SAW THE BLOND-HAIRED GENTLEMAN KNOCKING ON YOUR DOOR THE SECOND TIME?

A.   YES, I DID.

Q.   HOW COULD YOU SEE HIM?

A.   THROUGH THE WINDOW BESIDE THE DOOR.

Q.   IS THAT THIS PARTICULAR WINDOW?

A.   YES.

Q.   WHEN THE DARK-HAIRED GENTLEMAN AND THE BLOND-HAIRED GENTLEMAN CAME TO YOUR DOOR THE FIRST TIME, DID YOU HAVE AN OPPORTUNITY TO OBSERVE THEIR DEMEANORS?

A.   THE DARK-HAIRED ONE I TALKED WITH WAS NERVOUS IN OUR CONVERSATION.  IT WAS NOT -- HE SEEMED TO BE UPSET, BUT HE COULD CARRY ON A CONVERSATION, BUT I KNEW HE WAS REALLY NERVOUS.

Q.    MS. HYMAN,  IS YOUR FARM A WORKING FARM?

A.    YES,  IT IS.

Q.    WHAT ARE SOME OF THE PRODUCTS AND ITEMS THAT ARE PRODUCED AT YOUR FARM?

A.    TOBACCO,  SOY BEANS,  FARM,  GARDEN.

Q.    AND HOW LONG HAVE YOU OWNED THIS FARM?

A.    ABOUT 49 YEARS.

Q.    AND ARE YOU -- DO YOU LIVE ALONE?

A.    YES.

Q.    IS YOUR HUSBAND DECEASED?

A.    YES.

Q.    AND WERE YOU HOME ON NOVEMBER 14TH OF 2002?

A.    YES.

Q.    WHO WAS -- WAS THERE ANYONE ELSE IN YOUR HOME WITH YOU THAT DAY?

A.    NO.

Q.    MS. HYMAN,  WHAT VEHICLES DID YOU OWN IN NOVEMBER OF 2002?

A.    EIGHTY-FIVE ('85) FORD PICKUP,  A BIG FORD TWO-TON FARM TRUCK, AND A CADILLAC CAR.

Q.    THE '85 FORD PICKUP, WHAT COLOR WAS IT?

A.    WHITE.

Q.    AND IS THERE A LOCATION ON YOUR PROPERTY WHERE THAT VEHICLE WAS NORMALLY PARKED?

A.    UNDER THE EQUIPMENT SHED RIGHT OUT BEHIND THE HOUSE.

Q.   LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 123.   MS. HYMAN,  WHAT IS THAT?

A.   WELL,  THAT LOOKS LIKE THE HOUSE.

Q.   THAT IS YOUR HOME?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   AND THIS BUILDING HERE, IS THIS THE SHED THAT YOU DESCRIBED?

A.   THAT IS THE EQUIPMENT SHED BEHIND THE HOUSE.

Q.   YOUR FORD PICKUP TRUCK,  WHO NORMALLY USED THAT PARTICULAR CAR OR TRUCK?

A.   ANYBODY THAT IS HELPING ME ON THE FARM THAT IS DOING FARM WORK AROUND AND ABOUT ON THE FARM.

Q.   IS THAT CAR NORMALLY LOCKED OR UNLOCKED?

A.   NOT IN THE DAYTIME, WE USE IT.

Q.   IT IS NORMALLY UNLOCKED IN THE DAYTIME?

A.   YEAH.

Q.   AND HOW ABOUT THE IGNITION KEYS, ARE THEY USUALLY IN THE TRUCK?

A.   USUALLY LEFT IN IT IN THE DAYTIME.  I MIGHT DRIVE IT, GET OUT, THE NEXT ONE USE IT FOR SOME OTHER PURPOSE GETS IN IT, USES IT.   IT IS USED OFF AND ON BY DIFFERENT PEOPLE ALL DAY.

Q.   LET ME SHOW YOU GOVERNMENT'S EXHIBIT 126.   IS THIS THE WHITE FORD PICKUP THAT YOU HAVE DESCRIBED?

A.   YES.

Q. AND GOVERNMENT'S 127, WHAT IS THIS A PICTURE OF?

A. THAT IS THE INSIDE OF IT.

Q. THAT IS THE INSIDE OF YOUR WHITE TRUCK?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. MS. HYMAN, WAS YOUR TRUCK PARKED UNDER YOUR SHED ON NOVEMBER 14TH, 2002?

A. YES.

Q. AND YOU STATED THAT YOU WERE HOME ON THAT DAY?

A. YES.

Q. CAN YOU TELL THE JURY WHAT HAPPENED ON THAT DAY THAT YOU RECALL?

A. WELL, I HAD JUST GOTTEN A TELEPHONE CALL FROM MY SON THAT, YOU KNOW, ABOUT ACTIVITIES WERE GOING ON AROUND THE COMMUNITY. AND I HAD LOOKED FOR THE GUY THAT FARMS WITH ME. AND HIS OWN PERSONAL TRUCK WAS GONE AND MINE WAS UNDER THE SHED. SO, I KNEW HE WAS GOING TO USE IT THAT AFTERNOON. AND WHEN I WENT IN THE HOUSE AND SAT DOWN, AND BY THE TIME I SAT DOWN, I COULD SEE OUT MY BACK PATIO DOORS, AND I SEEN MY TRUCK GO BY, IT HAD BEEN TAKEN FROM UNDER THE SHED.

Q. WAS THAT UNUSUAL?

A. WELL, NOT USUALLY, NOT REALLY, BECAUSE I THOUGHT IT WAS THE GUY HAD COME BACK AND GOT IT.

Q. WHO WORKED FOR YOU? THE GUY WHO WORKS FOR YOU, YOU THOUGHT HE HAD COME TO GET THE TRUCK?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. WHAT DID YOU DO AFTER SEEING THE WHITE TRUCK GO BY?

A. I WANTED TO TELL HIM SOMETHING, SO I GOT UP AND WENT TO THE FRONT DOOR ON THE FRONT OF THE HOUSE AND OPENED THE DOOR WHERE HE COULD SEE ME. AND HE USUALLY WILL STOP IF HE SEES ME, YOU KNOW, TELL ME WHAT HE IS DOING, OR LET ME TELL HIM WHAT I WANT HIM TO DO. I NOTICED THAT THERE WERE TWO MEN IN THE TRUCK AND NOT ONE, AND IT WAS NOT THE GUY WHO WORKED FOR ME. SO, I KNEW THEN IT WAS NOT HIM WHO HAD THE TRUCK.

Q. COULD YOU SEE EITHER OF THE TWO MEN WHAT THEY LOOKED LIKE?

A. NOT TO KNOW, YOU KNOW, TO DISTINGUISH WHO THEY WERE, WHAT THEY LOOKED LIKE, NO.

Q. COULD YOU TELL ANYTHING ABOUT THEIR HAIR COLOR?

A. SHORT, AND THE ONE DRIVING LOOKED MAYBE TALLER THAN THE ONE ON THE OTHER SIDE. BUT IT WAS GOING REAL SLOW, AND IT WENT ON PAST THE HOUSE.

Q. AND YOU SAID THAT WHEN THE TRUCK LEFT YOUR HOUSE, WHICH DIRECTION DID IT TRAVEL ON LUNDY SHORTCUT ROAD, OR DID IT TAKE A LEFT OR A RIGHT OUT OF YOUR DRIVEWAY?

A. TOOK A LEFT.

Q. TOOK A LEFT OUT OF YOUR DRIVEWAY?

A. YES.

Q. LET ME SHOW YOU GOVERNMENT'S EXHIBIT 124. IS THIS A CLOSE-UP SHOT OF YOUR HOUSE?

A. YES.

Q. AND IS THIS THE SHED WHERE THE TRUCK WOULD HAVE BEEN PARKED?

A. YES.

Q. MS. HYMAN, LET ME ALSO SHOW YOU GOVERNMENT'S EXHIBIT 125. WHAT IS THIS A PHOTOGRAPH OF, MA'AM?

A. THE DOORS YOU SEE THAT GO OUT ON THE PATIO YOU CAN LOOK NEXT TO THE SHED.

Q. THESE DOORS RIGHT HERE?

A. YES.

Q. ON NOVEMBER 14TH, WHERE WERE YOU SITTING?

A. CAN I POINT?

Q. YES, MA'AM, JUST TOUCH THE SCREEN.

A. OKAY. THIS OVER HERE IS THE WALL THAT GOES OPPOSITE THE DOORS, AND I WAS ON THE OPPOSITE WALL, JUST WHERE ALL OF THIS WAS TO WATCH THE TV OR SEE OUT THE DOORS.

Q. LET ME SHOW YOU AGAIN GOVERNMENT'S EXHIBIT 118, MS. HYMAN. I'M SORRY, GOVERNMENT'S 123. AGAIN, THIS IS YOUR HOUSE?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. AND THIS IS LUNDY SHORTCUT ROAD?

A. YES.

Q. WHICH WAY DID YOU SAY THE TRUCK WENT ON LUNDY SHORTCUT ROAD? DID IT GO OUT OF YOUR DRIVEWAY AND GO LEFT OR RIGHT?

A. IT CAME IN, IT BACKED OUT NEXT TO MY HOUSE AND/OR RATHER IT COME OUT, I SEEN IT COMING OUT OF THE DRIVE. I

ASSUME IT BACKED OUT OF MY HOUSE AND COME OUT THE DRIVE. THERE ARE TWO DRIVES AT MY HOUSE.  IT COME OUT THE FARTHEST AWAY FROM THE HOUSE.

Q.    SO, THE TRUCK WENT THIS DIRECTION ON LUNDY SHORTCUT ROAD?

A.    UH-HUH (AFFIRMATIVE RESPONSE),  YES.

Q.    MS. HYMAN,  HOW FAR FROM YOUR HOUSE IS THE WAL-MART IN CONWAY,  SOUTH CAROLINA?

A.    I WOULD SAY EIGHT TO TEN MILES.

Q.    NOW,  AFTER YOU SAW THESE TWO GENTLEMEN TAKE YOUR TRUCK, WHAT DID YOU DO?

A.    WELL,  LIKE I SAID,  I CALLED MY SON AND GOT OUT AND GOT IN MY CAR.  NOW THERE COME THE COUNTY POLICE SITTING UP ON THE ROAD ACROSS FROM MY HOUSE.

Q.    YOU TOLD THE COUNTY POLICE ABOUT YOUR TRUCK?

A.    YES.

Q.    WHEN DID YOU GET YOUR TRUCK BACK?

A.    ABOUT A WEEK AND A HALF LATER.

Q.    DO YOU KNOW WHERE IT WAS FOUND?

A.    AT THE WAL-MART SHOPPING CENTER IN CONWAY.

Q.    YOUR TRUCK, WHEN YOU GOT IT BACK,  WAS THERE ANYTHING OF VALUE THAT WAS DIFFERENT FROM WHEN YOU RECALL HAVING IT LAST?

A.    BOTH DOORS WERE DUSTY WHERE THEY HAD DUSTED FOR FINGERPRINTS IT LOOKED LIKE.

Q.    LAW ENFORCEMENT HAD DUSTED FOR FINGERPRINTS ON YOUR TRUCK?

A.    YES.

        MR. DUANE:  BEG THE COURT'S INDULGENCE.  MS. HYMAN, THANK YOU VERY MUCH.

        THE COURT:   ANY CROSS-EXAMINATION?

        MR. HARRIS:  NO, SIR,  THANK YOU.

        THE COURT:   THANK YOU,  MS. HYMAN.  YOU MAY STEP DOWN.

        MR. SCHOOLS:  CALL CHRIS BOWEN.

        CHRIS BOWEN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

                    DIRECT EXAM

BY MR. SCHOOLS:

Q.    GOOD MORNING,  MR. BOWEN.  HOW ARE YOU DOING?

A.    FINE.

Q.    GOOD.   YOUR NAME IS CHRIS BOWEN; IS THAT RIGHT?

A.    YES.

Q.    MR. BOWEN, WHERE DO YOU LIVE?

A.    507 UNIVERSITY FOREST DRIVE,  CONWAY,  SOUTH CAROLINA.

Q.    WHAT DO YOU DO THERE?

A.    I WORK CONSTRUCTION.

Q.    HOW LONG HAVE YOU BEEN WORKING CONSTRUCTION?

A.    ABOUT A YEAR AND A HALF.

Q.    WHAT DID YOU DO BEFORE YOU STARTED WORKING

CONSTRUCTION?

A.    I WAS EMPLOYED WITH WAL-MART.

Q.    WHAT DID YOU DO WITH WAL-MART?

A.    SECURITY.

Q.    WHAT DOES A SECURITY REPRESENTATIVE FOR WAL-MART DO? WHAT ARE YOUR JOB RESPONSIBILITIES?

A.    I WAS MAINLY RESPONSIBLE FOR THEFT, INTERNAL/EXTERNAL THEFT OF WAL-MART.

Q.    IS THERE  -- YOU WERE WORKING FOR WAL-MART IN CONWAY?

A.    I'M SORRY?

Q.    WERE YOU WORKING FOR WAL-MART IN CONWAY?

A.    YES, SIR.

Q.    IS THERE MORE THAN ONE WAL-MART IN THAT AREA?

A.    YES, SIR.    THERE WAS THREE THAT I WORKED AT.

Q.    SO, THE CONWAY WAL-MART WAS JUST ONE OF THE STORES THAT YOU WERE RESPONSIBLE FOR SECURITY AT?

A.    YES.

Q.    AND AS THE PERSON RESPONSIBLE FOR SECURITY AT WAL-MART, WHAT TYPES OF THINGS WERE YOU SUPPOSED TO BE DOING?

A.    WE HAD SURVEILLANCE CAMERAS THAT I WAS RESPONSIBLE FOR KEEPING TRACK OF AND MONITORING.  AND ALSO MY MAIN JOB WAS TO WALK THE FLOOR OF THE STORE AND WATCH FOR ANY TYPE OF THEFT.

Q.    SO, YOU WOULD WORK IN THE VARIOUS STORES, WOULD ALSO MAINTAIN THE SECURITY SURVEILLANCE SYSTEM IN EACH OF THE STORES?

**JA 1150**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
    )    COLUMBIA, SC
    )    SEPTEMBER 20, 2004
    )
    VERSUS    )
    )
BRANDON L. BASHAM,    )
    DEFENDANT.    )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME V

APPEARANCES:

FOR THE GOVERNMENT:    SCOTT SCHOOLS, FIRST AUSA
    JONATHAN S. GASSER, AUSA
    JOHN DUANE, AUSA
    UNITED STATES ATTORNEY'S OFFICE
    1441 MAIN STREET, SUITE 500
    COLUMBIA, SC  29201

FOR THE DEFENDANT:    JACK SWERLING, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

    GREG HARRIS, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

COURT REPORTER:    DEBRA R. JERNIGAN, RPR, CRR
    UNITED STATES COURT REPORTER
    901 RICHLAND STREET
    COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

Q.    AND DO YOU REMEMBER -- DID CHAD FULKS PROVIDE YOU WITH SOMETHING IN ORDER TO GET THE HOTEL ROOM?

A.    YES, HE DID.

Q.    WHAT WAS IT?

A.    AN ID THAT BELONGED TO AMY WARD.

Q.    I WILL SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 192.  MS. MCGUFFIN, DO YOU RECOGNIZE THAT?

A.    YES, I DO.

Q.    IS THAT THE ID MR. FULKS PROVIDED YOU? YOU SAID IT WAS AMY WARD, CORRECT?

A.    YES

Q.    THAT IS THE DRIVER'S LICENSE OF WHO?

A.    AMY WARD.

Q.    WERE YOU SUCCESSFUL IN GETTING THE HOTEL ROOM FOR MR. FULKS?

A.    NO.

Q.    WAS MR. BASHAM WITH YOU AND MR. FULKS WHEN HE ASKED YOU TO DO THIS?

A.    YES.

THE COURT:   MR. GASSER, WE NEED TO BREAK SOMEWHERE ALONG IN HERE.

MR. GASSER:  THIS IS A GOOD TIME, YOUR HONOR.

THE COURT:   MEMBERS OF THE JURY, LET'S TAKE A 15-MINUTE RECESS.  PLEASE GO TO YOUR JURY ROOM.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF

THE TRIAL JURY.)

MR. SWERLING: YOUR HONOR.

THE COURT: I'M SORRY. I THOUGHT SOMEBODY CALLED ME. I LOOKED AROUND. YOU DIDN'T SAY ANYTHING. I WAS WORRIED ABOUT THE JURY.

MR. SWERLING: I WAS WONDERING, SINCE HE IS ON BREAK, IF I STAY WITH HIM, COULD WE EXPERIMENT WITH THAT AND SEE IF IT WORKS? IF I JUST STAY WITH HIM?

THE COURT: STAY WITH HIM WHERE?

MR. SWERLING: RIGHT HERE. I WON'T TAKE A BREAK. I WILL JUST SIT WITH HIM HERE.

THE DEFENDANT: PLEASE.

THE COURT: WE GOT A LONG WAYS TO GO IN THE TRIAL. I MEAN, ESPECIALLY IF WE HAVE A PENALTY PHASE. THE GUM IS NOT SUFFICIENT?

MR. SWERLING: HE HAD TO TAKE IT OUT OF HIS MOUTH. HE DIDN'T LIKE IT.

THE MARSHAL: YOUR HONOR, WE OPPOSE THAT. WE DON'T AGREE TO HIM USING THE DIP. WE BELIEVE HE NEEDED THE NICOTINE, WE ALLOWED THE NICOTINE.

THE COURT: MR. SWERLING, I NEED A WRITTEN REPORT FROM A DOCTOR EXPLAINING WHY THIS IS NECESSARY. DR. SCHWARTZ-WATTS SUGGESTED IT LAST WEEK. I DIDN'T THINK, AT THE TIME, ABOUT THE ADVERSE, YOU KNOW, INDICATIONS OF IT. IF YOU, DURING THE BREAK, CALL HER, GET HER TO GIVE ME A

WRITTEN REPORT JUSTIFYING WHY IT IS NECESSARY.

MR. BASHAM, LAST WEEK WHEN I TOLD YOU THAT WE COULD GET THAT FOR YOU, I DID NOT KNOW THAT YOU HAD TWO INCIDENTS ON YOUR RECORD WHERE YOU HAD THROWN BODILY FLUIDS ON GUARDS.

THE DEFENDANT: YES, SIR.

THE COURT: AND THAT IS A PROBLEM.

THE DEFENDANT: IT WAS NOT BODILY FLUID. IT WAS MILK. IT WAS BETWEEN OFFICERS. ONE OF THE OFFICERS THAT JUMPED ON ME. REMEMBER? HE WAS IN MY FACE. AND, LIKE I SAID, I MEAN, AS TO BODILY FLUIDS, I MEAN, I COULD SPIT, YOU KNOW, OR ANYTHING LIKE THAT IF THAT WAS THE PROBLEM. I HAVEN'T DONE THAT. AND, I MEAN, I AM REALLY STRESSED. I GIVE YOU MY WORD, YOUR HONOR. I GAVE MY WORD TO YOU ABOUT THE BELT. I HAVEN'T TRIED TO FIGHT. I HAVEN'T DONE NOTHING, YOU KNOW, OF THIS SORT, SIR.

IF I MAY, I ASK YOU. I BEG OF YOU, OF THE COURT, TO LET ME DO THAT. IT WILL HELP ME WITH MY STRESS.

THE COURT: LAST FRIDAY THERE WERE TWO ISSUES: YOUR STRESS, THAT YOU WERE ALMOST HAVING A PANIC ATTACK, SUPPOSEDLY, AND THEN, YOU WERE SLEEPY. TO ME, THOSE ARE TWO DIFFERENT THINGS.

THE DEFENDANT: IT IS A STIMULANT. HELPS ME TO STAY AWAKE. MOTIVATION.

THE COURT: WON'T IT INCREASE YOUR STRESS LEVEL?

THE DEFENDANT: NO, IT LOWERS IT. THE NICOTINE

LOWERS IT. MAKES YOU CALM. ALSO KEEPS ME KIND OF, YOU KNOW, MOTIVATED. GIVES ME SOMETHING TO LOOK FORWARD TO. LIKE YOU SAID, YOU PROMISED MONDAY. I WAS LOOKING FORWARD TO IT THIS MORNING.

THE COURT: I WAS GOING TO GET IT TO YOU UNTIL I FOUND OUT YOU HAD A HISTORY OF THROWING THINGS. WHETHER IT WAS MILK OR NOT, THE MARSHAL SAYS IT IS NOT MILK.

THE DEFENDANT: I NEVER SPIT ON THE MARSHALS. WITH THAT (INDICATING), THE SAME THING. I COULD SIT AND SPIT, YOU KNOW. I HAVEN'T DONE IT AND I WON'T DO IT. I MEAN, I AM NOT THAT TYPE. I GIVE YOU MY WORD. THAT IS THE GOD-HONEST TRUTH.

THE SNUFF IS SOMETHING I LOOK FORWARD TO TO BE ABLE TO FOCUS, GIVE ME SOMETHING TO LOOK FORWARD TO. LIKE HE SAYS, IT IS LIKE A BEHAVIOR THING, YOU KNOW. I HAD IT WHEN I WAS IN THE HOSPITAL, BEHAVIOR PROGRAM, YOU GET SNUFF. THAT IS THE WAY I HAVE BEEN ALL MY LIFE. IT IS. WHY WOULD I SPOIL SOMETHING THAT I LOOK FORWARD TO, YOU KNOW, BY SPITTING IT? WHY WOULD I SPIT ANYWAY? I COULD SPIT --

THE COURT: LET'S GO BACK. WE STARTED DOWN THIS ROAD LAST FRIDAY WHEN YOU WERE HAVING TROUBLE STAYING AWAKE.

THE DEFENDANT: YES, SIR.

THE COURT: I THOUGHT THE NICOTINE WOULD HELP YOU STAY AWAKE. NOW WE HAVE EVOLVED TO YOUR ANXIETY AND NERVOUS CONDITION. I THOUGHT YOU WERE TAKING MEDICINE FOR THAT.

THE DEFENDANT: YES, SIR. I DO.

THE COURT: I DON'T WANT TO BE AN ARMCHAIR DOCTOR TO PRESCRIBE SOMETHING ALONG THE LINES OF NICOTINE FOR YOUR NERVOUS CONDITION IF YOU ARE TAKING MEDICINE ALREADY. IF IT IS A MATTER OF KEEPING YOU AWAKE, THERE ARE OTHER WAYS TO GET CAFFEINE IN YOU: COFFEE, MOUNTAIN DEW, OR SOMETHING LIKE THAT. LET ME THINK ABOUT IT DURING THE BREAK. I WILL TAKE IT UNDER ADVISEMENT.

(WHEREUPON, A SHORT RECESS WAS HELD.)

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: I AM INFORMED ONE JUROR NEEDS TO LEAVE A LITTLE EARLY TOMORROW. WE WILL ADJOURN AT 4:30 TOMORROW. YOU PLAN AROUND THAT. I DON'T LIKE THAT. I DON'T WANT TO MAKE A PATTERN OF IT. WE WILL PLAN ON STOPPING AT 4:30 TOMORROW.

THE COURT: PLEASE CONTINUE.

BY MR. GASSER:

Q. MS. MCGUFFIN, I BELIEVE PRIOR TO OUR MORNING BREAK YOU HAD JUST IDENTIFIED AN IDENTIFICATION OF AMY WARD, WHICH WAS THE IDENTIFICATION YOU ATTEMPTED TO USE TO GET A MOTEL ROOM AT THE REQUEST OF MR. FULKS.

A. YES.

Q. THAT SATURDAY NIGHT, WHEN YOU, AND MR. FULKS, AND MR. BASHAM WERE DRIVING AROUND TRYING TO GET THIS HOTEL ROOM IN

JA 1156

THE COURT:  OVER THE LUNCH BREAK, I RECEIVED A MEMO THAT SAID:

"FRIDAY, SEPTEMBER 17, 2004, AT
APPROXIMATELY 6:30 P.M.  MR. BASHAM
MADE THE STATEMENT, HE IS 'GLAD HE
CAN DIP/CHEW TOBACCO IN COURT.
DEPUTY RILEY WOULD MAKE IT GOOD.'
DEPUTY BRIAN AND ETHERIDGE TOLD HIM
'NOT TO HOLD HIS BREATH BECAUSE THE
ISSUE WAS STILL BEING DEBATED.' AND
HE STATED THAT HE COULD 'CARE LESS
IF HE GOT TO DO IT OR NOT, AS LONG
AS IT MADE DEPUTY U.S. MARSHAL KEVIN
RILEY MAD.'"

THEN THE MARSHAL TELLS ME, IF THE DEFENDANT COMES IN WITH A MEDICAL STATEMENT, THEY WANT TO HAVE A CHANCE TO GET THEIR DOCTOR, THE MARSHAL'S DOCTOR, TO GIVE A MEDICAL STATEMENT IN OPPOSITION.

THE DEFENDANT:  JUDGE, IF I MAY.  THIS IS JUST OUTSTANDING.  I MEAN, IT IS PRETTY OBVIOUS.  THERE IS A MARSHAL HERE THAT I DO NOT GET ALONG WITH.  I TRY TO GET ALONG WITH HIM.  YOU KNOW, I TRY MY BEST TO DO THE THINGS YOU ASK, YOU KNOW.

THE COURT:  MR. BASHAM, DID YOU TELL THE MARSHALS LAST FRIDAY AT 6:30 THAT YOU DIDN'T CARE WHETHER YOU GOT IT AS

LONG AS YOU WERE ABLE TO MAKE THEM MAD?

THE DEFENDANT:  NO, SIR, I DID NOT.  THIS IS WHAT I DID SAY.  THIS IS EXACTLY WHAT I SAID.  I SAID -- OFFICER RILEY SAID I WOULD NOT RECEIVE NO DIP BECAUSE OF -- I WAS SAYING THAT I WANTED TO WEAR THESE SHOES THAT I HAVE BEEN WEARING BACK AND FORTH TO KEEP MY FEET WARM IN THE HOLDING CELL AT THE JAIL.  NOT TAKE THESE OFF AND HAVE TO WEAR THE SANDALS.  HE SAID, "SINCE YOU DON'T WANT TO FOLLOW THE RULES, THAT IS IT.  YOU DON'T GET THE DIP."  I SAID, "SIR"  -- I DIDN'T SAY, "SIR."  I SAID, "TELL YOU WHAT.  YOU KNOW WHAT? I DON'T KNOW WHAT YOUR PROBLEM IS WITH ME.  I DON'T KNOW WHAT IT IS, BUT I COULD CARE LESS WHAT YOUR PROBLEM IS."  I SAID, "IF YOU GOT A PROBLEM WITH ME, THEN MAYBE YOU NEED TO BE EXCUSED FROM THIS CASE."

MR. HARRIS:  CAN WE TAKE THIS UP OUTSIDE THE PRESENCE OF THE WITNESS?

THE COURT:  ALL RIGHT.  ALL RIGHT.  YOU CAN STEP OUTSIDE, PLEASE.

THE DEFENDANT:  JUST TO KEEP IT UP --

THE COURT:  WAIT A MINUTE, MR. BASHAM.

(WHEREUPON, THE WITNESS WAS EXCUSED FROM THE COURTROOM.)

THE COURT:  GO AHEAD.

THE DEFENDANT:  JUST TO GO AHEAD AND END IT OFF, LET ME SAY THIS.  THIS ONE MARSHAL, RILEY, HE IS LIKE, NO MATTER WHAT, YOU KNOW.  LIKE I TOLD HIM, LIKE I HAVE ASKED HIM,

YOU KNOW, "I SHOW YOU RESPECT, YOU KNOW, ALL I ASK YOU TO DO IS TO SHOW ME RESPECT BACK." HIS RESPONSE TO THAT HAS ALWAYS BEEN IS, "I DON'T OWE YOU NOTHING. I WILL GIVE YOU NOTHING. I DON'T OWE YOU RESPECT. I AM THE LAW. YOU DO WHAT I SAY." AND I AM LIKE, I UNDERSTAND THAT. BUT, YOU KNOW, THERE IS A MUTUAL, YOU KNOW. I MEAN, I HAVEN'T CAUSED THEM NO MAJOR PROBLEMS. I HAVE NOT CAUSED ANY PROBLEM HERE. WHAT IS THE DIFFERENCE IN THE --

THE COURT: MR. BASHAM, YOU ARE NOT ADDING ANYTHING TO THE DISCUSSION HERE. THE QUESTION AT HAND --

THE DEFENDANT: SPITTING.

THE COURT: -- IS SHOULD I AUTHORIZE THE DEFENDANT TO USE DIP DURING THE TRIAL, TO EITHER KEEP HIM AWAKE OR TO CALM HIS NERVES? IT IS MY DETERMINATION THAT A CRIMINAL DEFENDANT DOES NOT HAVE A RIGHT TO HAVE A TOBACCO PRODUCT TO CALM HIS NERVES. IF HE IS UNDER MEDICATION, MEDICATION CAN BE USED TO CALM NERVES IN A MUCH BETTER FASHION. SO, I AM NOT GOING TO ALLOW THE USE OF DIP TO HELP CALM MR. BASHAM'S NERVES.

IF HE HAS A PROBLEM STAYING AWAKE, AS HE DID FRIDAY, WE WILL SEE ABOUT SOME PRODUCTS WITH CAFFEINE. THAT IS MY RULING. THANK YOU VERY MUCH. PLEASE BRING IN THE JURY.

THE DEFENDANT: I WOULD LIKE TO GO BACK DOWNSTAIRS, IF I MAY. GO BACK. I DON'T FEEL GOOD.

THE COURT: MR. BASHAM, THAT IS NOT POSSIBLE.

THE DEFENDANT: NOT POSSIBLE?

THE COURT: NO, SIR. THAT IS NOT POSSIBLE. YOU NEED TO BE HERE TO HELP YOUR LAWYERS DEFEND THIS CASE.

THE DEFENDANT: THIS CASE IS, I MEAN --

THE COURT: BE SEATED, PLEASE. LET'S BRING IN THE JURY.

MR. SCHOOLS: YOUR HONOR, MS. WARNER IS HERE. I DON'T KNOW IF YOU WANT TO ADDRESS THAT ISSUE.

THE COURT: MS. WARNER, WHEN THE JURY COMES IN, TAKE A GOOD LOOK AT THEM AND SEE IF YOU CAN IDENTIFY THE JUROR THAT WAS IN THE ELEVATOR THAT YOU HEARD MAKE A COMMENT ABOUT THE TESTIMONY ABOUT MR. HAWKINS. AT THE NEXT BREAK, WE WILL SCHEDULE IT.

MR. SCHOOLS: YOUR HONOR, THE ONLY ISSUE, MS. WARNER HAS A CHILD SHE NEEDS TO PICK UP BY SIX.

MR. SWERLING: JUDGE, HE IS NOT GOING TO BE HERE. IT WILL BE A PROBLEM. IT IS AGAINST MY JUDGMENT, MY WISHES.

THE COURT: I WILL NOT LET HIM LEAVE HERE. HE WILL STAY RIGHT HERE. BRING IN THE JURY. BE SEATED, PLEASE. BRING IN THE JURY.

THE DEFENDANT: WE ARE GOING TO HAVE AN ISSUE. I ASKED TO GO DOWNSTAIRS SO I CAN LAY DOWN. THAT IS ALL I ASKED. IT IS NOT BECAUSE --

THE MARSHAL: YOUR HONOR, WE HAVE AN ISSUE.

THE DEFENDANT: YOU ARE RIGHT WE GOT AN ISSUE.

THE COURT: MARSHALS, BE SEATED. MR. BASHAM, BE SEATED. BRING IN THE JURY.

THE DEFENDANT: I AM ASKING YOU IF I CAN GO OUT. I ASKED YOU IF I COULD GO DOWNSTAIRS, RIGHT?

THE COURT: HOLD UP JUST A MINUTE (INDICATING TO CSO OFFICER).

THE DEFENDANT: DON'T GRAB ME, OKAY? DON'T GRAB ME. DO YOU UNDERSTAND WHAT I AM SAYING?

THE COURT: MR. BASHAM.

THE DEFENDANT: OKAY THEN. LET ME GO. LET ME GO, LIKE I SAID.

YOU MOTHER FUCKERS. ALL I ASKED IS TO GO DOWNSTAIRS.
(WHEREUPON, A TUSSLE ENSUED IN THE COURTROOM BETWEEN THE DEFENDANT AND THE MARSHALS.)

THE MARSHAL: YOU ARE RESISTING. SOMEBODY GRAB HIS ARMS, I WILL GRAB HIS LEGS. GRAB A LIMB. THERE YOU GO. BRING YOUR ARM UP. I GOT THE LEGS. ONE OF YOU GRAB AN ARM.
MR. BASHAM, STOP RESISTING. SHOW US YOUR ARMS. GET THE CUFFS. MOVE YOUR LEGS. I GOT IT. GIVE US YOUR ARM. GIVE US YOUR ARM. GIVE US YOUR ARM. YOUR OTHER ARM. LET ME HAVE YOUR OTHER ARM.

THE DEFENDANT: FUCK YOU.

THE MARSHAL: YOUR OTHER ARM. STOP RESISTING.

THE DEFENDANT: YOU WILL NEVER GET ME IN THIS COURTROOM AGAIN. LET ME UP. YOU LET ME UP ALL RIGHT,

DIDN'T YOU? HA-HA. PUSSY BOYS. TWISTING MY HANDS UP. WHAT DID I TELL YOU? QUIT PUSHING MY HANDS UP. QUIT PUSHING MY MOTHER-FUCKER HANDS.

THE MARSHAL: WE HAVE TO PUT YOUR HANDS UP, DO YOU UNDERSTAND, MR. BASHAM?

PUT HIM ON THE GROUND.

THE DEFENDANT: IF YOU WOULDN'T PUSH. I WASN'T RESISTING. HOW CAN I RESIST WHEN YOU HAVE MY HANDS UP?

THE MARSHAL: MR. BASHAM, STOP RESISTING.

THE DEFENDANT: YOU MOTHER FUCKERS ARE TRYING TO HURT MY HANDS.

THE MARSHAL: GET THE LEG IRONS.

THE DEFENDANT: IF YOU WOULDN'T BE PUSHING MY ARMS UP, I WOULDN'T HAVE FUCKING TOLD YOU TO QUIT DOING IT. I WAS GOING TO WALK.

THE MARSHAL: MR. BASHAM, STOP RESISTING.

THE DEFENDANT: YOU DO FUCKING WHAT YOU WANT TO DO. GO AHEAD, HURT ME. I DON'T GIVE A DAMN.

THE MARSHAL: WE DON'T WANT TO HURT YOU.

THE DEFENDANT: THAT IS WHAT YOU ARE DOING. I TOLD YOU I WANT TO GO DOWNSTAIRS. THAT IS EXACTLY WHERE I AM GOING TO STAY. FUCK YOU.

THE MARSHAL: THERE ARE SOME AT THE BOTTOM OF THE ELEVATOR AT THE SALLY PORT.

THE DEFENDANT: THE FUCKING JUDGE LIED TO ME. HE

PROMISED ME IF I WAS RIGHT, I HAVE BEEN GOOD. HE PROMISED. HE GAVE ME HIS WORD. HE LIED TO ME. HE DIDN'T SAY ANYTHING ABOUT NEEDING TO APPROVE IT. IF I HAD RESPECT FOR SOMETHING, IF I BE GOOD, LIKE I AM ALWAYS, I EXPECT SOMEBODY TO DO WHAT THEY SAY. THAT IS BULLSHIT. SO --

THE MARSHAL: JUST RELAX.

THE DEFENDANT: I DON'T CARE ABOUT NONE OF THIS, MAN. HURT ME WHEN WE COME TO COURT. I CAN'T TAKE IT, MAN. YOU DO WHATEVER YOU WANT TO DO. I AIN'T -- YOU WILL NEVER GET ME BACK IN THIS COURTROOM AGAIN. SHUT UP, MAN. DON'T EVEN TALK TO ME. I DON'T WANT TO HEAR NOTHING YOU GOT TO SAY. IT IS ALL BECAUSE THAT RILEY IS BLACK. IT IS RACISM IS ALL IT WAS. RILEY IS MESSING ME UP THE WHOLE TIME EVER SINCE HE STARTED WORKING HERE. I NEVER SAID NO SUCH THING TO RILEY, AND HE KNOWS IT.

QUIT PUSHING DOWN ON MY FACE, MAN. TAKE YOUR HANDS OFF MY FACE AND I WILL RELAX. AND ANOTHER THING. YOU TALKING ABOUT SPITTING. IF I WAS GOING TO SPIT, I WOULD BE SPITTING NOW. I DON'T SPIT. MAN, FUCK THIS. MAN. THAT WAS JUST AN EXCUSE. DON'T PUT MY HANDS BEHIND MY BACK. IF HE PUSHES MY HANDS UP, WE ARE GOING TO GO AGAIN. I DON'T CARE IF WE GO A HUNDRED TIMES. DO NOT PUSH MY HANDS UP LIKE HE DID. I DON'T CARE. I DON'T CARE IF YOU ARE MARSHALS. DON'T PUSH MY ARMS UP. ALL RIGHT. I DON'T CARE ABOUT HOLLERING. ALL RIGHT. ALL RIGHT. THAT WILL WORK. JUST WATCH. LET ME

ALONE. GIVE ME A CHANCE.

AND YOU, JUDGE, IF I WAS GOING TO SPIT, AS MAD AS I AM NOW, I WOULD BE SPITTING NOW. THEY JUST MADE THAT UP.

(WHEREUPON, THE DEFENDANT WAS LED OUT OF THE COURTROOM BY THE MARSHALS.)

THE COURT: LET'S LET THEM GET HIM DOWNSTAIRS ON THE MONITOR BEFORE WE PROCEED.

MR. HARRIS: YES, SIR.

THE COURT: HOW LONG WILL IT TAKE THEM TO GET HIM TO THE CELL?

THE MARSHAL: PROBABLY ABOUT FIVE MINUTES.

THE COURT: LET'S WAIT UNTIL HE GETS ON THE MONITOR DOWNSTAIRS.

MR. HARRIS: I WOULD LIKE, BEFORE THE JURY COMES IN, TO HAVE A MATTER --

THE COURT: I AM INFORMED THAT MR. BASHAM IS NOW DOWNSTAIRS IN THE HOLDING CELL. HAS REALTIME AUDIO AND VIDEO MONITOR.

MR. HARRIS: WE WOULD ASK FOR A DELAY IN THE HEARING. WE HAVE A DOCTOR ON THE WAY, WHICH IS, APPROXIMATELY, THREE BLOCKS AWAY. MR. SWERLING AND I HAVE OBSERVED, OBVIOUSLY, WHAT EVERYONE HAS OBSERVED IN THE COURTROOM. WE ARE CONCERNED ABOUT THE COMPETENCY. THAT IS OUR FIRST CONCERN. OUR SECOND CONCERN IS PROCEEDING IN HIS ABSENCE. THESE ARE, AS YOU KNOW, COURT PROCEEDINGS OF BRANDON BASHAM. AND MR.

SWERLING IS EITHER GOING TO HAVE TO BE DOWNSTAIRS EXPLAINING WHAT IS GOING ON, I AM, WHOEVER IS NOT DOING THE EXAMINATION. PRIMARY CONCERN THOUGH, AT THIS POINT, IS COMPETENCY. WE HAVE SOMEONE COMING TO SEE HIM, AT THIS TIME. WE ASK FOR A BREAK IN THE AFTERNOON TO MAKE --

THE COURT: YOU ARE TALKING ABOUT ADJOURNING COURT NOW OR STOPPING UNTIL THE DOCTOR GETS HERE?

MR. HARRIS: LET SOME EVALUATION BE DONE TO DETERMINE WHETHER OR NOT HE IS COMPETENT TO CONTINUE THE TRIAL.

THE COURT: WHAT IS THE GOVERNMENT'S POSITION?

MR. SCHOOLS: YOUR HONOR, OUR POSITION, FRANKLY, IS THE DEFENDANT JUST NOW, FRANKLY, DID WHAT HE HAS BEEN DOING ALL HIS LIFE. YOUR HONOR HAS NOT BEEN PRIVY TO THE MEDICAL RECORDS I HAVE BEEN. THE WORD "MANIPULATIVE" APPEARS IN THEM OVER AND OVER AGAIN, FIRST APPEARING IN AUGUST 1ST OF 1990 WHEN HE WAS NINE YEARS OLD, NOT QUITE NINE YEARS OLD. AND APPEARING THROUGHOUT HIS MEDICAL RECORDS. EVERY MEDICAL RECORD YOU LOOK AT WITH RESPECT TO HIM IS THAT HE IS MANIPULATIVE. WHEN HE DOESN'T GET WHAT HE WANTS, THIS IS THE REACTION YOU GET. NO DIAGNOSIS THAT HE IS PSYCHOTIC, OR NEUROTIC, OR SCHIZOPHRENIC, OR IN SOME WAY MENTALLY INCOMPETENT. HE IS SPOILED. AND, FRANKLY, YOUR HONOR, EVERY TIME THIS HAPPENS WITH THIS DEFENDANT THROUGHOUT THE HISTORY OF HIS MEDICATION, THROUGHOUT THE HISTORY OF HIS HOSPITALIZATION AND HIS TREATMENT, HE ACTS OUT. HE GETS

**JA 1165**

VIOLENT, HE GETS TAKEN TO THE FLOOR. THAT EPISODE WENT ABOUT TEN MINUTES. THEN HE WANTS TO BE EVERYBODY'S FRIEND AGAIN UNTIL HE DOES IT AGAIN TWO DAYS LATER.

YOUR HONOR, APPARENTLY, IN THE ABSENCE OF THE GOVERNMENT PRIOR TO TODAY SUGGESTED TO THE DEFENDANT THAT YOU WOULD LET HIM DIP DURING COURT TODAY. IT IS CERTAINLY --

THE COURT: PUT IT ON THE RECORD. DR. SCHWARTZ-WATTS SAID THAT SHE PROPOSED IF WE GET HIM SOME NICOTINE IT WOULD KEEP HIM AWAKE. AT LEAST THAT IS WHAT I RECALL HER SAYING. AND I FOUND OUT THAT HE WANTED TO USE SOME KIND OF DIP, AND I TOLD HIM THAT IF HE COULD STAY AWAKE TODAY, I WOULD REWARD HIM. IF HE STAYED AWAKE TODAY, I WOULD CONSIDER THE POSSIBILITY OF GIVING HIM DIP ON MONDAY. WELL, 5:30 LAST FRIDAY THE MARSHAL CAME TO SEE ME AND HE HAS A HISTORY OF THROWING BODILY FLUIDS ON GUARDS AT THE JAIL. THEY STRONGLY OBJECTED TO HIM HAVING ANYTHING THAT HE HAD A CUP TO SPIT INTO THAT HE COULD, ALLEGEDLY, THROW. THAT IS WHY I WENT BACK ON MY WORD THIS MORNING. I DIDN'T KNOW FRIDAY WHEN I PROMISED IT TO HIM HE HAS THIS HISTORY.

I HAVE ALWAYS TRIED TO DEFER TO THE WISHES OF THE MARSHAL ON SECURITY. THEY ARE THE ONES WHO HAVE TO HAVE IT THROWN IN THEIR FACE IF SOMETHING GOES WRONG. NOW YOU KNOW WHAT HAPPENED FRIDAY.

MR. SCHOOLS: I GUESS THE GOVERNMENT EXPRESSED SOME CONCERN ABOUT BEING ABSENT FROM THOSE HEARINGS ON FRIDAY.

MAYBE THIS IS ONE OF THE REASONS, I THINK ONE THE COURT DOESN'T HAVE THAT WE HAVE, IS THE PERSPECTIVE OF THIS HISTORY. IF YOU TELL MR. BASHAM YOU WILL GIVE HIM DIP TO HELP HIM STAY AWAKE IN THE AFTERNOON, HE WILL FALL ASLEEP IN THE AFTERNOON. THAT IS WHAT WILL HAPPEN. IF YOU TELL HIM AT THAT POINT YOU WON'T GIVE IT TO HIM, THIS IS WHAT WILL HAPPEN. IT IS SURE AS SUNSHINE, JUDGE. IT HAS HAPPENED OVER, AND OVER, AND OVER AGAIN THROUGHOUT HIS HISTORY. IT IS OUR POSITION HE DOESN'T NEED DIP TO STAY AWAKE. HE IS MANIPULATING.

THE COURT: IT EVOLVED AT SOME POINT IN THE DISCUSSION IT HELPED CALM HIS NERVES RATHER THAN KEEP HIM AWAKE, WHICH IS A SOMEWHAT DIFFERENT, ALMOST CONTRADICTORY PURPOSE ALMOST.

MR. SCHOOLS: YOUR HONOR, HE IS ON EVERY KIND OF MEDICATION KNOWN TO MAN TO CALM HIS NERVES. DR. SCHWARTZ-WATTS -- IT IS UNFATHOMABLE TO ME THAT A MEDICAL DOCTOR WOULD TELL YOUR HONOR IN THE COURTROOM, GIVEN THE NUMBER OF DRUGS THAT HE IS ON, THAT HE HAS GOT TO HAVE DIP TO CALM HIS NERVES. I MEAN, THAT IS OUTRAGEOUS. IF THAT IS HER TESTIMONY, IF SHE SHOWS UP TODAY, I HAVE READ THE LETTER SHE HAS PROVIDED YOUR HONOR, I UNDERSTAND THAT IS HER POSITION, BUT I THINK WE ARE JUST SO FAR REMOVED FROM THE REALM OF REALITIES, IN SOME RESPECTS, THAT THIS DEFENDANT HAS MANIPULATED EVERYBODY IN THE SYSTEM SO HE CAN GET WHAT HE WANTS, WHICH IS DIP. I THINK THAT IS WHAT THIS IS ALL ABOUT.

NOW, ADMITTEDLY MR. SWERLING AND MR. HARRIS KNOW HIM BETTER. I REALLY --

THE COURT: DO YOU HAVE YOUR DOCTOR ON THE WAY?

MR. SWERLING: YES, SIR. ALSO, JUST SO THE RECORD IS CLEAR, I WAS THE ONE THAT SUGGESTED DIP ON FRIDAY AS A POSSIBILITY BECAUSE I KNOW HIS HISTORY WITH THAT TYPE OF THING. IT DOES CALM HIM DOWN, IT DOES KEEP HIM --

THE COURT: YOU BROUGHT IT UP INSTEAD OF DR. SCHWARTZ-WATTS?

MR. SWERLING: YES, SIR.

THE COURT: DIDN'T I ASK HER ABOUT IT? I THOUGHT I HAD A DIALOGUE WITH HER ABOUT IT. MAYBE I DIDN'T.

MR. SWERLING: JUDGE, I JUST RECALL AFTER SHE GOT FINISHED WITH HER COLLOQUY WITH YOU, I SUGGESTED, BUT THAT WAS BASED UPON WHAT I UNDERSTAND IS IN THE RECORD ABOUT HIS DESIRE FOR TOBACCO, AND HOW IT CALMS HIM DOWN, AND ALSO STIMULATES HIM, AS WELL, TO KEEP HIM AWAKE. THAT IS WHERE THAT CAME FROM. I DON'T KNOW, IN ALL FAIRNESS TO DR. WATTS, I DON'T THINK SHE SUGGESTED DIP.

MR. HARRIS: TO RESPOND TO MR. SCHOOLS, TO GET BACK ON THIS ISSUE ABOUT WHETHER OR NOT THIS IS MANIPULATION OR WHETHER HE IS COMPETENT, WHAT I JUST SAW IN THE COURTROOM DIDN'T LOOK LIKE ANY ATTEMPT TO MANIPULATE ANYTHING I HAD EVER SEEN. LOOKED LIKE SOMEONE WHO DIDN'T HAVE THE ABILITY TO CONTROL THE SIMPLE FUNCTION OF SITTING DOWN IN A SEAT. THAT

IS WHY WE HAVE A CONCERN ABOUT THE COMPETENCE TODAY, THE 20TH OF SEPTEMBER.

THE COURT: WELL, LET'S PUT ON THE RECORD, THE COURT REPORTER TOOK DOWN PRETTY MUCH EVERYTHING THAT WAS SAID DURING THE SCUFFLE. IT LASTED BETWEEN SEVEN AND EIGHT MINUTES. I THINK, FOR THE RECORD, WE SHOULD SAY INITIALLY SIX OFFICERS TRYING TO SUBDUE HIM, IN THE END IT WAS EIGHT OFFICERS. TOOK EIGHT OFFICERS TO SUBDUE HIM AND GET HIM OUT OF THE COURTROOM WHERE THEY TOOK HIM DOWNSTAIRS TO THE HOLDING CELL THAT HAS A MONITOR WHERE HE CAN VIEW THESE PROCEEDINGS LIVE AND IN REALTIME.

LET'S TAKE A SHORT RECESS UNTIL YOUR DOCTOR GETS HERE. I AM NOT CONSENTING TO CONTINUE THE CASE OR DELAY THE TRIAL NECESSARILY. I DO WANT TO HEAR WHAT THE DOCTOR HAS TO SAY. WHO WILL THIS BE?

MR. HARRIS: DR. WATTS.

THE COURT: DR. SCHWARTZ-WATTS?

MR. HARRIS: ONLY ONE LOCAL.

THE COURT: ANY WAY WE CAN HANDLE THE JUROR QUESTION? IF WE BRING THE JURY IN NOW, THE DEFENDANT WON'T BE AT COUNSEL TABLE.

MR. SWERLING: WHICH IS THE CONCERN I HAVE HAD AT THE BEGINNING WHEN THIS KIND OF THING HAS HAPPENED, HIM NOT BEING HERE.

THE COURT: SHE DROVE ALL THE WAY HERE FROM MYRTLE

BEACH BECAUSE I TOLD HER TO BE HERE.  SHE HAS TO GO PICK UP THE CHILD.  WE CAN'T BRING IN THE JURY BECAUSE YOUR CLIENT IS NOT HERE?

MR. SWERLING:  BRING THEM IN.

THE COURT:  I AM GOING TO BRING THEM IN.  WE HAVE ABOUT A HALF-HOUR DELAY.  THE JURY WILL SEE THAT THE COUNSEL TABLE DOES NOT HAVE A DEFENDANT.  THEY WILL PROBABLY KNOW IT WAS SOMETHING WITH THE DEFENDANT THAT CAUSED THE DELAY IS WHAT I AM SAYING.  MAY ATTRIBUTE SOME THOUGHT TO YOUR CLIENT FOR THE DELAY.

THE COURT:  WHAT TIME DOES SHE HAVE TO GET AWAY BY?

MR. SCHOOLS:  THREE THIRTY (3:30) AT THE LATEST.

MAY I PUT ONE THING ON THE RECORD, SINCE THE CAT IS OUT OF THE BAG ABOUT WHAT HAPPENED ON FRIDAY?  WE MOVE TO UNSEAL THAT PORTION OF THE HEARING ON FRIDAY IN WHICH DR. WATTS TESTIFIED OR SPOKE.

THE COURT:  I DON'T THINK IT WAS ANYTHING OF ATTORNEY-CLIENT NATURE THAT WAS REVEALED.  MR. SWERLING, CAN YOU GIVE US A REASON WHY THE GOVERNMENT CAN'T HAVE ACCESS TO IT?

MR. SWERLING:  YOUR HONOR, I CONSIDERED IT IN-CAMERA PROCEEDING WITH THE COURT EX PARTE.

THE COURT:  THE GOVERNMENT HAS AN INTEREST IN A SPEEDY TRIAL.  THE GOVERNMENT HAS EXPENDED ENORMOUS AMOUNTS OF MONEY IN THIS CASE, TRIED IT TWICE, BROUGHT 124 WITNESSES

DOWN FOR THE SECOND TIME. LOOKINA AT A FURTHER DELAY IN THIS CASE. THE GOVERNMENT IS ENTITLED TO SEE WHAT WAS THERE. I DON'T RECALL ANYTHING SAID TO ME ON THE RECORD HERE FRIDAY THAT WOULD BE IN ANY WAY BENEFICIAL TO THE GOVERNMENT ON THE CASE-IN-CHIEF, THE UNDERLYING CASE.

MR. SCHOOLS: YOUR HONOR, THE OTHER POINT, FROM THE GOVERNMENT'S PERSPECTIVE, IT IS WHAT I SAID BEFORE, DR. SCHWARTZ-WATTS IS A WITNESS IN THIS CASE. SO, IF SHE IS EXPRESSING OPINIONS ABOUT THE FACT THAT WHAT THE DEFENDANT REALLY NEEDS TO TAKE CARE OF HIS PROBLEMS IS DIP, THEN I THINK THAT IS INFORMATION THAT THE GOVERNMENT OUGHT TO BE ENTITLED TO. IT MAY BE SOMETHING WE WOULD CROSS-EXAMINE HER ABOUT OR NOT, BUT NONETHELESS, IT CERTAINLY SEEMS AS IF IT WOULD IMPACT ON WHAT HER TESTIMONY MIGHT BE AND HOW HER OPINIONS MIGHT AFFECT --

THE COURT: LET ME GO BACK AND LOOK AT WHAT WAS SAID ON FRIDAY. I CAN LOOK AT IT PRETTY QUICKLY. I WILL SEE IF THERE IS ANYTHING THAT SHOULDN'T BE DISCLOSED.

LET'S TAKE A 20-MINUTE RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: ALL RIGHT I AM INFORMED THAT DR. SCHWARTZ-WATTS HAS EXAMINED THE DEFENDANT, AND WE ARE GOING TO HAVE A COMMUNICATION EX PARTE; IS THAT RIGHT?

MR. HARRIS: YES.

THE COURT: ANY OBJECTION?

MR. SCHOOLS:  WE OBJECT TO THE EX PARTE PART.

THE COURT:   DOES IT RELATE TO HIS COMPETENCY TO STAND TRIAL, DR. WATTS?

MR. SCHOOLS:  WHAT WOULD BE THE BASIS FOR EX PARTE?

MR. SWERLING:  JUDGE, AT THIS POINT, OUR POSITION IS THE GOVERNMENT IS NOT ENTITLED TO ANY OF THIS MEDICAL INFORMATION UNTIL THERE IS A FINDING OF GUILT, THEN WE GO INTO THE PENALTY PHASE.

THE COURT:   THAT IS NORMALLY THE CASE.

MR. SCHOOLS:  THAT DEALS WITH MEDICAL OPINIONS THAT OUR DOCTORS HAVE RENDERED AND HIS DOCTORS HAVE RENDERED AS DIAGNOSIS TO BE RENDERED DURING THE PENALTY PHASE OF THE CASE. IF WE ARE GOING TO HAVE A DELAY,  LITIGATE ISSUES THAT WILL PERTAIN TO THE NEXT 20 MINUTES, I DON'T KNOW HOW WE CAN'T BE PRIVY TO THAT.

THE COURT:   THIS IS SUCH AN IMPORTANT DECISION.  I MEAN,  WE ARE TALKING ABOUT STOPPING THE CASE IN ITS TRACKS THAT HAS A LOT OF TIME AND EFFORT INVOLVED IN IT THUS FAR. THIS IS A SECOND TRIAL,  124 WITNESSES COMING FROM DISTANT STATES,  17 MORE JURORS GIVING UP THEIR TIME TO SERVE ON THE JURY, NOT TO MENTION ALL OF THE EFFORTS THAT GO IN THE TRIAL. I WOULD RATHER THE DOCTOR TELL ME WHAT SHE KNOWS ABOUT HIS COMPETENCY IN FRONT OF THE GOVERNMENT.

DR. WATTS, WILL YOU TELL ME.

DR. SCHWARTZ-WATTS:   HELLO, AGAIN.   I SAW MR.

BASHAM THIS AFTERNOON, PROBABLY FOR ABOUT 15 OR 20 MINUTES. AT THIS TIME, I HAVE A NUMBER OF ISSUES. NUMBER ONE, HE NEEDS MEDICAL ATTENTION. HE HAS SPECIFICALLY -- I AM VERY CONCERNED ABOUT -- LOOKS LIKE HE HAS A FRACTURED THIRD METACARPAL, HIS THIRD KNUCKLE. I DON'T KNOW IF THOSE INJURIES WERE SELF-INFLICTED OR FROM THE CIRCUMSTANCES IN THE COURTROOM.

SECONDLY, I DO HAVE CONCERNS ABOUT HIS COMPETENCY. IT IS MY OPINION RIGHT NOW THAT BECAUSE OF HIS MENTAL DEFECT THAT HE CAN'T ASSIST HIS ATTORNEYS. NOW, THE PROBLEM WITH THAT AND THE GOOD NEWS PROBABLY IS, HIS MENTAL STATE FLUCTUATES, AND THERE IS GOING TO BE TIMES IN THIS TRIAL WHERE HE HAS COMPETENCE FLUCTUATION. WITH A LITTLE TIME, PERHAPS BY TOMORROW, THERE WOULD BE NO REASON THAT I CAN FORESEE THAT HE WOULDN'T BE CALM ENOUGH THAT WE CAN PROCEED.

THE COURT: HE IS ASKING ME REPEATEDLY FOR PERMISSION TO BE ABSENT FROM THE COURTROOM AND TO VIEW THE PROCEEDINGS DOWNSTAIRS. UNTIL WE MOVED IN THIS BUILDING, WE DIDN'T HAVE THE CAPABILITY OF DOING THAT. WE NOW HAVE THAT CAPABILITY. THE LAW IS, IF HE IS FREELY AND VOLUNTARILY, KNOWINGLY AND INTELLIGENTLY, WAIVES HIS RIGHT TO BE PRESENT IN THE COURTROOM, HE CAN BE DOWNSTAIRS. I AM ABOUT READY TO GIVE HIM HIS RIGHT, IF THAT IS WHAT HE WANTS. HIS LAWYERS OBJECT TO THAT.

DR. SCHWARTZ-WATTS: YES, SIR. I THINK THE PROBLEM

JA 1173

IS, I'M NOT SURE THAT IS WHAT HE REALLY WANTS. HE IS REACTING TO SITUATIONS THAT IS IN HIS LIMITED CAPACITY AT THIS POINT. YOU CAN ASK HIM A NUMBER OF THINGS RIGHT NOW, I DON'T THINK HE CAN HOLD ON TO A DECISION, HE IS QUITE IMPULSIVE.  I DON'T KNOW HOW KNOWINGLY AND INTELLIGENT THAT WOULD BE.  HIS WISH THIS AFTERNOON WITH THE MENTAL STATE HE IS IN IS TO NOT TO RETURN TO THE COURTROOM.

THE COURT:  YOU WERE HERE FRIDAY.  I THINK I USED THE WORD "PROMISE" TO GET HIM DIP TO HELP HIM STAY AWAKE.  I DIDN'T KNOW, AT THE TIME, HE HAD A HISTORY OF THROWING BODILY FLUID ON GUARDS.  INCLUDING ONE, THEY BELIEVED ONE WHICH WAS THOUGHT TO BE SEMEN.  HE MASTURBATES IN HIS CELL.  IN THE FACE OF THAT, I HAD TO GO ALONG WITH THE MARSHAL'S REQUEST NOT TO GIVE HIM A CUP TO SPIT INTO THAT HE COULD THEN THROW AT PEOPLE.  I HAVE ALWAYS DEFERRED TO THE REQUEST OF THE MARSHAL WHEN IT COMES TO MATTERS OF SECURITY.  THAT IS WHY HE DIDN'T GET ANY DIP TODAY.

I THINK THE THING TO DO IS JUST ADJOURN TODAY, LET EVERYBODY COOL DOWN AND BRING HIM UP HERE TOMORROW AND SEE HOW HE DOES.

DR. SCHWARTZ-WATTS:  IF THE COURT WOULD LIKE, I WILL BE HERE FIRST THING IN THE MORNING OR WHENEVER YOU WANT ME HERE.

THE COURT:  IF WE HAVE THAT OPINION, I THINK THE GOVERNMENT HAS THE RIGHT TO REBUTTAL OPINION.  MR. SCHOOLS,

DO YOU WANT -- WHAT IS YOUR POSITION? DO YOU WANT TO -- I GUESS YOU WANT TO MOVE FORWARD WITH THE TRIAL IN THE DEFENDANT'S ABSENCE?

MR. SCHOOLS: GIVE ME A MINUTE, JUDGE.

THE COURT: I DON'T WANT TO TRY THIS CASE TWICE IF WE CAN POSSIBLY AVOID IT.

MR. HARRIS: JUDGE, WHILE THEY ARE DISCUSSING THAT, WE CONTEST THIS WHOLE ISSUE REGARDING SEMEN. WE ABSOLUTELY DENY THAT. AND I JUST DON'T WANT ON RECORD THAT THAT IS AN ABSOLUTE FACT. MR. BASHAM --

THE COURT: I DON'T THINK THEY SAID IT WAS SEMEN, THEY SAID A SUBSTANCE COULD WELL BE SEMEN. HE MIGHT SAY IT WAS MILK, THE GUARD SAID IT COULD BE SEMEN. I DON'T KNOW. WE WILL PROBABLY KNOW --

MR. HARRIS: AGAIN. THE ONLY REASON I BROUGHT IT UP, YOU BROUGHT -- MADE THE COMMENT THAT IT WAS SEMEN. REPORT WE HAVE IS MILK CONTAINER, WHITE MILKY SUBSTANCE.

THE COURT: REGARDLESS OF WHAT SUBSTANCE IT WAS, THE GUARD DIDN'T NEED IT THROWN ON HIM BY A PRISONER.

MR. HARRIS: I KNOW.

THE COURT: I DON'T CARE IF IT IS PLAIN WATER, IT SHOULDN'T BE THROWN ON HIM.

MR. HARRIS: I UNDERSTAND THAT, JUDGE. I WANTED TO MAKE SURE THE COURT WAS INFORMED THAT IS NOT AN ACCUSATION WE ADMIT.

THE COURT: OKAY.

MR. SCHOOLS: YOUR HONOR, FOR THE COURT'S INFORMATION, I WAS INFORMED BY DEPUTY U.S. MARSHAL THOMAS O'NEILL THAT BEFORE MR. BASHAM CAME UP THIS AFTERNOON, AS THEY WERE BRINGING HIM UP, HE SAID TO THE MARSHALS, "I AM NOT GOING TO BE HERE LONG." I TELL THE COURT THAT ONLY BECAUSE I THINK IT SUPPORTS THE POSITION THAT WE TOOK EARLIER, THAT IS PLANNED MANIPULATION AND NOT MENTAL INCOMPETENCE.

AS A PRACTICAL MATTER AT THIS STAGE, THE ONLY MEDICAL OPINION THAT IS IN THE RECORD IS DR. SCHWARTZ-WATTS'S. WE ARE NOT PREPARED TO BRING THE DOCTOR RIGHT NOW TO DO ANY SORT OF EVALUATION OF HIM. I AM NOT SURE THAT A DOCTOR WHO IS LOCAL WHO HAS NO BACKGROUND ON MR. BASHAM, WHO HAS MEDICAL RECORDS, ET CETERA, CAN PROVIDE A COMPETENT OPINION. I THINK, AT THIS STAGE, THE GOVERNMENT WOULD CONSENT TO THE DEFENDANT'S REQUEST THAT WE ADJOURN ACCORDING -- CONSISTENT WITH DR. SCHWARTZ-WATTS'S TESTIMONY. WE DON'T LIKE IT, WE THINK IT IS MANIPULATION. THE PATTERN IS NOT SUFFICIENT ENOUGH FOR THE RECORD TO REFLECT THAT WE SHOULD GO FORWARD AT THIS TIME.

THE COURT: I WOULD LIKE TO GET THE MARSHAL UP HERE, GET IT UNDER OATH WHAT YOU JUST TOLD ME.

MR. SCHOOLS: RIGHT HERE.

THE COURT: COME AROUND.

DR. SCHWARTZ-WATTS: YOUR HONOR, WOULD YOU LIKE ME

UP HERE STILL?

THE COURT: NO.

MR. SCHOOLS: BEN HARASETH.

THE COURT: BE SWORN FIRST.

BEN HARASETH, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

EXAM

BY THE COURT:

Q. DEPUTY HARASETH, TELL ME WHAT HAPPENED WHEN YOU BROUGHT THE DEFENDANT UP TO COURT THIS MORNING.

A. WE WERE BRINGING MR. BASHAM UP AFTER LUNCH. MYSELF, AND OUR TWO CONTRACT GUARDS ALSO PRESENT IN THE COURTROOM. WE WERE BRINGING HIM UP, HE WAS TIRED. HE MADE SOME STATEMENTS ABOUT US NOT CARING ABOUT WHAT HE SAYS OR HOW HE FEELS. I DIDN'T RESPOND TO THESE BECAUSE I KNEW THE MOOD THAT HE WAS IN. WE WERE UP IN THE -- COMING UP IN THE ELEVATOR. HE MADE A COMMENT ABOUT, TRYING TO RECALL HIS WORDS. HE MADE A COMMENT ABOUT HE WAS GOING TO BE COMING BACK DOWN TO THE CELL BLOCK. AND I ASKED HIM WHAT HE MEANT BY COMING BACK DOWN TO THE CELL BLOCK. HE SAID, "I AM NOT GOING TO BE UP THERE FOR THAT LONG. I AM COMING BACK DOWN HERE." AND I BELIEVE THAT WAS THE EXTENT OF THAT CONVERSATION.

THE COURT: ALL RIGHT. ANY OF THE LAWYERS WANT TO QUESTION THIS DEPUTY?

MR. SWERLING: NO. BUT I WOULD LIKE TO MAKE A STATEMENT.

THE COURT: ALL RIGHT.

MR. SWERLING: NO QUESTIONS.

THE COURT: YES, SIR.

MR. SWERLING: JUDGE, THIS MORNING WHEN WE HAD THAT DISCUSSION ABOUT THE DIP AND I TOLD HIM THAT WE HAD GONE AND ASKED DR. WATTS TO WRITE THE LETTER THAT THE COURT TALKED ABOUT, AND HE SAID, WELL, CAN YOU DEAL WITH THAT BEFORE I COME BACK UP FOR THE LUNCH BREAK, AFTER THE LUNCH BREAK? I SAID, NO, BECAUSE ACTUALLY IT IS GOING TO HAVE TO BE DEALT WITH IN COURT. AND SO HE WAS, AT THAT POINT, THE SITUATION WAS THAT HE WANTED TO STAY DOWNSTAIRS. HE WANTED TO KNOW BEFORE HE CAME UP TO COURT WHETHER THAT WAS GOING TO BE THE CASE OR NOT, HE WAS GOING TO BE ALLOWED TO HAVE IT AFTER YOU SAW THE LETTER. AND HE STARTED GETTING ANXIOUS. AND HE CAME UPSTAIRS AND, OF COURSE, YOU SAW WHAT HAPPENED WHILE HE WAS SITTING HERE. THAT IS ONE OF THE REASONS WHY I REQUESTED THE COURT ALLOW HIM TO LEAVE THE COURTROOM BECAUSE I COULD SEE WHAT WAS DEVELOPING. HE DOESN'T PROCESS THAT. THAT IS -- I THINK THAT IS WHAT DR. WATTS IS TRYING TO TALK ABOUT. HE DOESN'T PROCESS THAT SORT OF INFORMATION AFTER HE WAS TOLD HE COULD HAVE IT, NOW HE CAN'T HAVE IT. SO, THAT IS WHAT HAPPENED.

BUT THAT WHOLE DISCUSSION HE HAD ON THE WAY UP HERE WAS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,   )   CR. NO. 4:02-992
   )   COLUMBIA, SC
   )   SEPTEMBER 21, 2004
   )
   VERSUS   )
   )
BRANDON L. BASHAM,   )
     DEFENDANT.   )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME VI

APPEARANCES:

FOR THE GOVERNMENT:      SCOTT SCHOOLS, FIRST AUSA
      JONATHAN S. GASSER, AUSA
      JOHN DUANE, AUSA
      UNITED STATES ATTORNEY'S OFFICE
      1441 MAIN STREET, SUITE 500
      COLUMBIA, SC  29201

FOR THE DEFENDANT:      JACK SWERLING, ESQ.
      1720 MAIN STREET
      SUITE 301
      COLUMBIA, SC  29201

      GREG HARRIS, ESQ.
      1720 MAIN STREET
      SUITE 301
      COLUMBIA, SC  29201

COURT REPORTER:      DEBRA R. JERNIGAN, RPR, CRR
      UNITED STATES COURT REPORTER
      901 RICHLAND STREET
      COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1179

EXHIBITS

159 AERIAL PHOTO OF ASHLAND MALL AREA 142

160 PHOTO OF ASHLAND MALL AND TRAFFIC LIGHT

    WHERE DAVIS STOPPED 156

161 PHOTO LOOKING FROM PARKING LOT TO FIELD

    WHERE BASHAM SHOT 157

162 PHOTO LOOKING FROM FIELD TO MALL WHERE

    BASHAM SHOT 157

163 FOUR FOUNDS .22 AMMUNITION 246

164 GOLD NECKLACE 212

168 STAINLESS MAPLE KNIFE 219

169 TWO PHOTOS OF BETH MCGUFFIN 220

170 SMALL SILVER PIPE 219

171 PAPERS WITH ADDRESS AND PHONE NUMBERS 220

172 FIFTY-TWO DOLLARS IN U. S. CURRENCY 220

173 BLACK BOOTS 221

174A PHOTO OF TRUCK HIT BY BASHAM'S BULLETS 163

174B CLOSE UP OF TRUCK 164

174C CLOSE UP OF DAMAGE OF TRUCK 164

174D LICENSE PLATE OF TRUCK DAMAGED 239

174E PHOTO OF TRUCK DAMAGED, PAINT CHIP #1 239

174F PHOTO OF TRUCK DAMANGED, PAINT CHIP #2 240

175 HANDWRITTED DIAGRAM OF SCENE 250

176 PHOTO OF BASHMAN IN HOSPITAL 212

177 PHOTO OF RING ON BASHAM'S FINGER 212

EXHIBITS CONTINUED

178A PHOTO OF TRAIN CARS ON TRACK                    268

178B CLOSEUP PHOTO OF TRAIN CARS                     268

178C PHOTO OF INTERIOR OF TRAIN CAR                  269

178D PHOTO OF GUN AT BOTTOM OF TRAIN CAR             269

179 DIAGRAM SHOWING BULLET PLACEMENT IN

    REVOLVER                                       270

290 BROWN JERSEY GLOVES                              269

418 BOYD COUNTY SE911 - CALL NO. DETAILL            214

419 PHOTO OF TRUCK AND CAR IN OFFICE MAX

    PARKING LOT                                    236

420 PHOTO OF SERIAL NUMBER ON FIREARM               270

422 PHOTO OF BOX CAR OF TRAIN                        268

423 YARD CHECK AT ASHLAND WORKS                     266

THE COURT: DO WE HAVE A REPORT ON THE DEFENDANT'S CONDITION?

MR. SWERLING: HE IS COMPETENT THIS MORNING ACCORDING TO DR. WATTS.

THE COURT: DR. WATTS, COME AROUND AND GIVE ME A REPORT ON THE DEFENDANT'S CONDITION.

DR. SCHWARTZ-WATTS: GOOD MORNING, YOUR HONOR. I SPENT ABOUT 45 TO 50 MINUTES WITH MR. BASHAM. HE IS BACK TO HIS BASELINE THIS MORNING. HE IS ABLE, AT THE PRESENT TIME, HE IS CALM, HE IS ABLE TO MAKE DECISIONS. WE PROCESSED SOME OF THE EVENTS THAT HAPPENED YESTERDAY IN THE COURTROOM, AND HE IS BACK TO HIS BASELINE.

THE COURT: DID YOU TELL ME LAST WEEK IT WOULD HELP IF WE TOOK MORE FREQUENT BREAKS, THAT IT WOULD HELP HIS SITUATION?

DR. SCHWARTZ-WATTS: IN THE AFTERNOON TIME. HE IS FINE IN THE MORNING TIME. HE IS ON MEDICATION PERHAPS MORE IN THE AFTERNOON.

THE COURT: I THOUGHT THAT CAUSED HIM TO HAVE MORE INTERACTION WITH THE MARSHALS, THEY TAKE HIM DOWNSTAIRS AND BRING HIM UP?

DR. SCHWARTZ-WATTS: PERHAPS A BREAK IN THE COURTROOM FOR A FEW MINUTES, THAT MAY BE CORRECT.

THE COURT: IN OTHER WORDS, WE TAKE A BREAK AND TAKE THE JURY OUT, LEAVE HIM HERE IN THE COURTROOM?

DR. SCHWARTZ-WATTS: YES, SIR. MAYBE PERHAPS GET A GLASS OF WATER, STAND UP, TAKE A STRETCH.

THE COURT: MR. SWERLING.

MR. SWERLING: YES, SIR.

THE COURT: YOU ARE SATISFIED YOUR CLIENT IS COMPETENT TO GO FORWARD?

MR. SWERLING: YES, SIR. JUDGE, I NEED TO SPEAK WITH MR. HARRIS AND DR. WATTS, ONE SECOND.

THE COURT: ALL RIGHT.

MR. SWERLING: JUDGE, THERE IS NO QUESTION ABOUT COMPETENCY. BUT I HAVE AN ISSUE I NEED TO ADDRESS WITH THE COURT. AND I WOULD LIKE THE GOVERNMENT EXCUSED.

THE COURT: LET ME ASK --

MR. SWERLING: THIS IS BETWEEN ATTORNEY AND CLIENT.

THE COURT: YOU ARE ABSOLUTELY CERTAIN IT IS ATTORNEY-CLIENT RELATED?

MR. SWERLING: YES, SIR. AT THIS POINT, IT IS.

MR. SCHOOLS: THERE ARE TWO MATTERS I NEED TO BRING TO THE COURT'S ATTENTION. EITHER NOW --

THE COURT: GO AHEAD.

MR. SCHOOLS: I WANT TO PUT THE COURT ON NOTICE. LAST NIGHT I BEGAN LOOKING AT THE LAW ABOUT THE DEFENDANT'S RIGHT TO BE IN THE COURTROOM IF HE IS DISRUPTIVE. FEDERAL RULE OF CRIMINAL PROCEDURE THAT DEALS WITH IT, RULE 43.

THE COURT: WE RESEARCHED.

MR. SCHOOLS:  ILLINOIS VERSUS ALLEN ESTABLISHES A PRECEDENT, IF THE COURT DEEMED IT APPROPRIATE, HE COULD BE BOUND AND GAGGED IN THE COURTROOM.  I WANTED TO BRING THOSE TO THE COURT'S ATTENTION.  AND ALSO YESTERDAY WE HAD SOME DISCUSSION WITH RESPECT TO THE COURT'S UNSEALING PORTIONS OF FRIDAY'S PROCEEDING,  PARTICULARLY THE STATEMENTS THAT DR. SCHWARTZ-WATTS MADE DURING THE COURSE OF THE PROCEEDINGS. YOUR CLERK DELIVERED TO ME TWO OR THREE PAGES FROM THE FRIDAY EXCHANGE, WHICH INCLUDED ONLY AN EXCHANGE BETWEEN YOURSELF AND MR. SWERLING.  DR. SCHWARTZ-WATTS COMMENTS WERE NOT IN IT. WE WOULD LIKE TO RENEW OUR REQUEST.

THE COURT:  DR. SCHWARTZ-WATTS SAID SOME THINGS IN HER REPORT THAT RELATED TO INTERACTIONS BETWEEN THE DEFENDANT AND HIS LAWYERS.  I HAD SOME CONCERNS ABOUT THAT BEING DISCLOSED.

MR. SCHOOLS:  WE REQUEST THAT THOSE MATTERS BE REDACTED.

THE COURT:  I WILL TAKE A LOOK AT REDACTING.  WE MIGHT BE ABLE TO REDACT IT JUST TO GIVE YOU HER OPINION ON HIS MEDICAL SITUATION.

MR. SCHOOLS:  FRANKLY,  YOUR HONOR,  I DON'T HAVE ANY DESIRE, OBVIOUSLY, TO INVADE THE PROVINCE OF ATTORNEY-CLIENT PRIVILEGE BETWEEN MR. BASHAM AND HIS LAWYERS. DR. SCHWARTZ-WATTS IS A WITNESS.  EVEN IF YOU DISCLOSE IT, AT THE TIME OF THE GUILT PHASE, IF THERE IS A PENALTY PHASE, THAT

IS FINE WITH THE GOVERNMENT.    WE THINK IT IS RELEVANT TO --

THE COURT:    WE WILL TAKE A LOOK AT IT.    EVERYONE EXCEPT THE DEFENSE TEAM PLEASE STEP OUTSIDE FOR A MOMENT WHILE I TAKE UP A MATTER.

MR. GASSER:    BEFORE THE JURY COMES BACK BEFORE THE CROSS-EXAMINATION OF THE NEXT FOUR WITNESSES FROM WEST VIRGINIA, I WANTED TO CLARIFY THE BOUNDARIES OF CROSS-EXAMINATION WITH REGARDS TO MR. FULKS'S PRIOR HISTORY, HIS PRIOR BAD ACTS, AND PRIOR MANIPULATION.    I WANT A CLARIFICATION POINT.

THE COURT:    ALL RIGHT.    VERY GOOD.

(WHEREUPON, AN EX PARTE HEARING WAS HELD.)

(WHEREUPON, THE EX PARTE PROCEEDING CONCLUDED.)

THE COURT:    ALL RIGHT WE WILL HAVE A MOMENTARY DELAY BEFORE WE CAN TAKE UP THE JURY.    TAKE UP A FEW PROCEDURAL ISSUES.    THE CLERK TELLS ME IT IS INEVITABLE THE JURY WILL ASK HER WHAT HAPPENED TO THE JUROR YESTERDAY.    I DON'T THINK IT IS WRONG, ONE JUROR WAS OVERHEARD MAKING A COMMENT ABOUT THE TESTIMONY AND I EXCUSED HIM FOR THAT.    WHAT IS THE PROBLEM WITH THAT?

MR. HARRIS:    NO PROBLEM, YOUR HONOR.

THE COURT:    THE ONLY NEGATIVE INFERENCE I COULD THINK OF IS IF SOME JUROR WANTS TO GET OFF THE CASE,  NOT SERVE -- NOT BE HERE THE WHOLE TIME,  THEY COULD DO THE SAME THING TO GET OFF.    THAT IS THE ONE FEAR I WOULD HAVE.

Q. SO, YOU SAID THAT YOU CONFIRMED WITH THE PERSON YOU KNEW AS MR. RITTMAN IF HE UNDERSTOOD HIS RIGHTS, AND HE VERBALLY TOLD YOU, AFTER FIRST NODDING HIS HEAD, VERBALLY TOLD YOU HE DID UNDERSTAND HIS RIGHTS?

A. THAT'S CORRECT.

Q. WHAT DID YOU DO, AT THAT POINT?

A. AT THAT POINT IN TIME, I ASKED HIM IF HE WOULD LIKE TO MAKE A STATEMENT AS TO WHY HE HAD FIRED A WEAPON AT ONE OF OUR OFFICERS.

Q. WHAT DID HE SAY?

A. HE SAID HE DID NOT FIRE A WEAPON AT ONE OF OUR OFFICERS. HIS GUN HAD WENT OFF AS HE WAS RUNNING, HE STUMBLED OVER A LOG.

Q. DID YOU CONTINUE TO PERSIST IN QUESTIONING WITH REGARD TO THAT SUBJECT?

A. YES.

Q. THEN WHAT HAPPENED?

A. HE THEN CHANGED HIS STORY. HE HAD ONLY FIRED THE SHOTS AND ATTEMPTED TO GET THE OFFICER TO QUIT CHASING HIM.

Q. THE INITIAL STORY WAS TRIPPED OVER A LOG. AND THEN THAT STORY CHANGED AND HE SAID HE HAD FIRED AT THE OFFICER TO TRY TO GET HIM TO QUIT CHASING HIM?

A. YES.

Q. WHAT HAPPENED NEXT?

A. AS WE CONTINUED TO TALK, IT THEN WENT INTO THE FACT

THAT THE OFFICER FIRED AT HIM FIRST, THEN HE JUST RETURNED FIRE.

Q.    SO, WHAT DID YOU DO IN RESPONSE TO THAT INFORMATION?

A.    AT THAT POINT, I HAD ALREADY BEEN TOLD HE HAD GIVEN AN ARRAY OF INFORMATION, DATE OF BIRTH INFORMATION, THAT KIND OF STUFF. I STARTED GETTING INTO THAT TOPIC.

Q.    WHAT DID HE TELL YOU ABOUT HIS BACKGROUND?

A.    HE, AT FIRST, TOLD ME HE WAS 16. AND THEN HE PROVIDED A COUPLE OF DATE OF BIRTHS THAT RANGED ANYWHERE FROM 23 TO 16. AT THAT POINT IN TIME, I SEARCHED OUT MORE INFORMATION FROM HIM. I THOUGHT, WELL, WHAT WE COULD DO IS JUST FIND OUT WHERE HE IS FROM, AND THAT TYPE OF THING, AND TAKE DIFFERENT ANGLES TO FIND OUT WHO HE WAS.

Q.    SO, DID YOU ASK HIM ABOUT SOME OF HIS BACKGROUND?

A.    YES, I DID.

Q.    WHAT DID HE TELL YOU?

A.    I ASKED HIM WHERE HE WAS FROM. HE TOLD ME HE WAS FROM RICHMOND, OHIO. I TOLD HIM I WASN'T FAMILIAR WITH THAT. AND HE INSISTED THAT IS WHERE HE WAS FROM. I INQUIRED ABOUT A LARGE CITY OR SOMETHING THAT IT MAY BE CLOSE TO. HE ADVISED HE DIDN'T KNOW ANY LARGE CITIES.

Q.    DID YOU ASK HIM ANY INFORMATION ABOUT HIS FAMILY OR RELATIVES?

A.    I ASKED HIM IF HE HAD ANY FAMILY WE COULD MAKE CONTACT WITH THAT COULD VALIDATE HIS INFORMATION HE WAS PROVIDING. HE

SAID ALL OF HIS FAMILY WAS DECEASED.

Q.    NOW, AT THIS POINT, DO YOU CONTINUE TO TRY TO CONFIRM THE INFORMATION HE IS PROVIDING YOU REGARDING HIS BACKGROUND?

A.    YES, SIR.  AT ONE POINT, THERE WAS A MEDICAL PERSON THAT COME IN TO DO SOME WORK WITH HIM.  AND I WENT OUT TO MY POLICE VEHICLE AND OBTAINED A ROAD ATLAS AND BROUGHT IT BACK IN.

Q.    YOU MENTIONED THE MEDICAL PERSONNEL, DETECTIVE MOONEY.  WHAT KIND OF CONDITION WAS THE SUSPECT IN OR MR. RITTMAN IN AT THE TIME YOU INTERVIEWED HIM?

A.    HE SEEMED FINE TO ME, AT THE TIME.  HE WAS SITTING SOMEWHAT UPRIGHT IN BED, HE HAD A BLANKET -- MAYBE A BLANKET AND SHEET OVER HIM, HE WOULD PULL IT UP, PULL IT DOWN, JUST KIND OF LOOK AROUND.  I HAD ALREADY CHECKED FOR SEVERE-LIKE GUNSHOT WOUNDS TO SEE IF HE HAD BEEN HIT, BUT I DIDN'T SEE ANY INJURIES LIKE THAT.

Q.    BASED ON YOUR INTERACTION WITH HIM, DID HE APPEAR TO UNDERSTAND YOUR QUESTIONS?

A.    YES, HE DID.

Q.    DID HE COMMUNICATE WITH YOU OPENLY AND FREELY?

A.    YES, HE DID.

Q.    THE MEDICAL TREATMENT, DID YOU SEE MEDICAL TREATMENT ADMINISTERED WHILE YOU WERE THERE?

A.    THE ONLY THING THAT I SAW WAS JUST HIM LAYING THERE WITH A SHEET ON AND OFF, MAYBE A BLANKET HE WOULD TAKE IT ON

AND OFF, UP AND DOWN, TO HERE AND THEN DOWN. I AM NOT SURE WHAT THE NURSE OR THE MEDICAL STAFF DID WHEN THEY CAME IN WHEN HE WAS WITH THEM. THAT IS WHEN I WENT TO GO GET THE ROAD ATLAS.

Q. WAS HE EXHIBITING ANY SIGNS TO YOU THAT HE WAS COLD, OR HYPOTHERMIC, OR ANYTHING LIKE THAT?

A. NO, NOT TO ME.

Q. AT THE POINT WHEN YOU WENT TO GET THE ROAD ATLAS OUT OF YOUR CAR, HAD HE PROVIDED ANY ADDITIONAL INFORMATION OTHER THAN WHAT YOU HAVE ADVISED THE JURY UP TO THIS POINT?

A. WELL, DURING HIS CONVERSATION WITH ME, DURING ALL OF THE DIFFERENT ANSWERS THAT I WAS GETTING, I ASKED HIM IF HE WAS UNDER THE INFLUENCE OF ANYTHING THAT MAY HAVE BEEN SWAYING HIS ANSWERS ONE WAY OR THE OTHER.

Q. WHEN YOU MEAN "INFLUENCE OF ANYTHING," DO YOU MEAN ALCOHOL OR DRUGS?

A. CORRECT.

Q. AND WHAT DID HE TELL YOU?

A. HE ADVISED THAT HE HAD USED COCAINE AT NOON ON THAT DAY AND HAD SMOKED MARIJUANA AT, APPROXIMATELY, FOUR P.M. THAT DAY.

Q. AND WHAT TIME WAS IT, APPROXIMATELY, WHEN YOU WERE INTERVIEWING HIM IN THE HOSPITAL, IF YOU REMEMBER?

A. I BELIEVE I ARRIVED AT THE HOSPITAL AT 9:48 P.M., SO ALMOST 10:00 O'CLOCK AT NIGHT.

Q.    SO, BASED ON HIS ASSERTION TO YOU, THE LAST TIME HE HAD USED ANY DRUGS WOULD HAVE BEEN FIVE HOURS AND 48 MINUTES PRIOR TO YOUR ARRIVAL AT THE HOSPITAL?

A.    RIGHT.

Q.    DETECTIVE MOONEY, DURING THE COURSE OF YOUR EMPLOYMENT AS A DETECTIVE WITH THE ASHLAND POLICE DEPARTMENT, HAD YOU BECOME FAMILIAR WITH THE EFFECTS OF COCAINE AND MARIJUANA ON INDIVIDUALS?

A.    YES, SIR.

Q.    BASED ON YOUR EXPERIENCE, FIVE HOURS AND 48 MINUTES AFTER HE HAD USED MARIJUANA AND, WOULD HE STILL BE UNDER THE INFLUENCE OF MARIJUANA AND?

A.    I WOULD SAY, NO.  IT VARIES WITH DIFFERENT PEOPLE. THAT IS A LONG TIME FOR MARIJUANA.

Q.    WITH RESPECT TO THE COCAINE HE USED AT NOON, WOULD HE BE UNDER THE INFLUENCE OF COCAINE AFTER 9 HOURS AND 48 MINUTES OF USING COCAINE?

A.    NO.

Q.    ANY OTHER INFORMATION HE PROVIDED TO YOU PRIOR TO THE TIME YOU WENT OUT TO GET THE ATLAS?

A.    NOT THAT I RECALL.  WE HAD BRIEFLY DISCUSSED RICHMOND, OHIO, BUT I THINK WE DISCUSSED THAT MORE ONCE WE GOT BACK IN.

Q.    LET'S GO TO THAT POINT.  YOU WENT OUT TO YOUR CAR AND YOU GOT THE ATLAS?

A.    YES.

Q.    WHAT HAPPENED WHEN YOU GOT BACK IN MR. RITTMAN'S ROOM?

A.    PRESENTED THE ATLAS TO HIM, OPENED IT UP TO THE STATE OF OHIO, AND ASKED HIM TO SHOW ME RICHMOND, OHIO.

Q.    WHAT DID HE DO?

A.    HE BRIEFLY LOOKED AT THE MAP AND SAID HE DIDN'T HAVE ANY MAP READING SKILLS.

Q.    HE COULDN'T IDENTIFY HIS ALLEGED HOMETOWN FOR YOU?

A.    THAT'S CORRECT.

Q.    WHAT HAPPENED NEXT?

A.    THEN I WENT BACK TO THE BACK OF THE ATLAS AND LOOKED, AND I COULD NOT FIND A RICHMOND, OHIO IN THE BACK OF THE LISTINGS OF IT.

Q.    BASED ON HIS INABILITY TO LOCATE RICHMOND, OHIO, ON THE MAP, AND YOUR INABILITY TO LOCATE IT AS WELL, DID YOU CONTINUE TO PURSUE QUESTIONING REGARDING HIS BACKGROUND AND WHERE HE WAS FROM?

A.    AT THAT POINT IN TIME, THE OTHER OFFICER AND I HAD ASKED ABOUT HIS FAMILY. HE CLOSED THAT OFF BY SAYING THEY WERE DECEASED. AT THAT POINT, I KNEW I NEEDED TO MOVE ON TO ANOTHER TOPIC.

Q.    WHAT TOPIC DID YOU MOVE ON TO?

A.    THE WEAPON.

Q.    WHAT DID YOU ASK HIM ABOUT THE WEAPON?

A.    I ASKED HIM WHAT IT WAS AND WHAT HAD BECOME OF THE GUN HE USED TO FIRE AT OFFICER DAVIS.

HAS ALL OF THE CHEMICAL MAKEUP NEEDED ONCE IT IS FIRED TO SHOW UP ON A GUNSHOT RESIDUE KIT.

Q. OKAY. NOW, THE WAY THE REVOLVER OPERATES, DETECTIVE MOONEY, IS THAT WHEN THE TRIGGER IS PULLED, THE CYLINDER TURNS, AND THE HAMMER STRIKES THE NEXT BULLET IN LINE, DOESN'T IT?

A. CORRECT.

Q. SO, ISN'T IT INCONSISTENT THAT BULLET THREE WOULD BE BEHIND THE HAMMER AND UNFIRED?

A. CORRECT.

Q. WHAT DOES THAT TELL YOU?

A. THAT TELLS ME THAT THIS ONE HAD BEEN FIRED, THIS ONE HAD BEEN FIRED, AND THIS ONE HERE IT WAS LIKE ANTICIPATION OF FIRE.

Q. MEANING WHAT?

A. IF THE WEAPON WOULD HAVE BEEN COCKED BACK AND THEN NOT FIRED, AND SOMEONE HAD LET THE HAMMER EASY ON DOWN ON THE ROUND TO DECOCK IT, THAT IS HOW IT WOUND UP THERE.

Q. IF YOU TOOK GOVERNMENT'S EXHIBIT 50, PULL THE HAMMER BACK, YOU CAN'T PUT IT ON THIS GUN BECAUSE OF THE TRIGGER LOCK, THE CYLINDER WILL TURN?

A. YES.

Q. THEN THE HAMMER COULD STAY BACK, THE BULLET BACK; IS THAT CORRECT?

A. CORRECT.

JA 1192

Q.   IF YOU RELEASE THE HAMMER, THE HAMMER WOULD BE IN THE PLACE OF A BULLET THAT HAD NOT BEEN FIRED?

A.   CORRECT.

THE COURT:   MR. SCHOOLS, UNLESS YOU ARE VERY CLOSE TO FINISHING, WE HAVE TO STOP.

MR. SCHOOLS:   I AM VERY CLOSE.   IN FACT, I MAY BE. THAT IS MY LAST QUESTION, YOUR HONOR.

THE COURT:   CROSS-EXAMINATION?

MR. SWERLING:   JUDGE, I HAVE A COUPLE OF QUESTIONS.

THE COURT:   I DON'T WANT TO RUSH YOU.

                    CROSS EXAM

BY MR. SWERLING:

Q.   DETECTIVE MOONEY, I HAVE A COUPLE OF QUESTIONS. MY NAME IS JACK SWERLING.

A.   YES.

Q.   LAST ISSUE YOU WERE TALKING ABOUT, ABOUT THE FIRED CHAMBERS, THAT WAS THE HAMMER WAS DOWN ON AN UNFIRED BULLET, WAS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   THAT MEANS IF SOMEONE HAD CONTEMPLATED SHOOTING, THEY MADE A CONSCIOUS DECISION NOT TO SHOOT; IS THAT CORRECT?

A.   IT COULD MEAN THAT, YES.

Q.   THAT IS WHAT YOU ARE SAYING, THAT IT HAD BEEN COCKED BACK, BUT THEN THE HAMMER HAD TO BE RELEASED AND COME BACK ON THAT BULLET WITHOUT FIRING?

**JA 1193**

A.    IT WOULD HAVE TO BE SET DOWN GENTLY UPON IT.

Q.    SET DOWN.  SO, IN OTHER WORDS, SOMEONE MADE THE DECISION NOT TO FIRE THAT BULLET IF THEY HAD COCKED THE GUN AND THEN NOT FIRED, THEY MADE A DECISION NOT TO FIRE THE BULLET?

A.    YES.

Q.    CORRECT? SECOND OF ALL, WANTED TO ASK YOU ABOUT THIS. WHEN YOU WERE TALKING TO MR. BASHAM ABOUT THE MAP, IT IS MY UNDERSTANDING HE TOLD YOU HE HAD NO MAP READING SKILLS, COULD NOT LOOK AT A MAP?

A.    CORRECT.

Q.    THE OTHER THING I WANTED TO ASK YOU IS THIS.  WHEN YOU WERE TALKING TO MR. BASHAM, ALTHOUGH YOU MOVED TO DIFFERENT AREAS, HE WAS NEVER AGGRESSIVE OR COMBATIVE WITH YOU; ISN'T THAT TRUE?

A.    HE WAS NOT COMBATIVE WITH ME, NO.

        MR. SWERLING:  THANK YOU, NO FURTHER QUESTIONS.

        MR. SCHOOLS:  NO REDIRECT.

        THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN. MEMBERS OF THE JURY, THAT WILL DO IT FOR TODAY.  RESUME AT 9:00 O'CLOCK TOMORROW.  I HAVE THE LETTER I MENTIONED TO YOU EARLIER.  MS. FLOYD WILL GIVE THEM OUT TO YOU IN THE JURY ROOM IN A MOMENT.  DON'T DISCUSS THIS CASE.  HAVE A NICE EVENING.  SEE YOU TOMORROW MORNING AT 9:00 O'CLOCK.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF

THE TRIAL JURY.)

THE COURT: MR. HARRIS, YOU SAID YOU MIGHT WANT TO PUT SOMETHING ELSE ON THE RECORD ABOUT THE COMMENT THAT WAS MADE.

MR. HARRIS: ABOUT WHAT?

THE COURT: ABOUT THE COMMENT THAT WAS MADE.

MR. HARRIS: NO, SIR, I THINK YOU COVERED IT.

THE COURT: ANYTHING FURTHER?

MR. SWERLING: AGAINST MY ADVICE, MR. BASHAM WOULD LIKE TO ADDRESS THE COURT.

THE COURT: ALL RIGHT. MR. BASHAM.

THE DEFENDANT: I WOULD LIKE TO ADDRESS -- HOW DO YOU PUT IT? THE ACTUALIZATIONS -- WHAT IS IT CALLED, JACK? HELP ME OUT NOW. WHAT WAS ACCUSED OF ME. THE ACCUSATIONS OF ME THROWING BODILY FLUIDS, OF SPITTING, OR AFRAID THAT I WAS GOING TO SPIT OR THROW BODILY FLUID ON SOMEONE. RIGHT. THAT IS WHY THAT THE MARSHALS PREFERRED THAT I WOULD NOT HAVE THE DIP. I HAVE THE GUM. RIGHT HERE. I COULD. I COULD HAVE EASILY DONE THE SAME THING WITH FOOD. I CHEW. I COULD EASILY CLUMP UP AND SPIT. THEY GIVE ME MEDICINE. I COULD SPIT IT IN THE FACE. I GO TO THE BATHROOM, I COULD DO ANYTHING OF THAT SORT. SO, THAT IS IRRELEVANT. THAT WAS JUST A TACTIC FOR THEM TO GET BACK AT ME, I FEEL, AS TO SAYING ON THE WAY BACK TO THE JAIL, WELL, YOU WON'T HAVE YOUR DIP LIKE YOU WERE SUPPOSED TO GET, YOU KNOW. YOU THINK

YOU ARE SMART, OR YOU THINK YOU GET SPECIAL PRIVILEGES.  I DON'T THINK I GET SPECIAL PRIVILEGES,  SIR.  I JUST USE IT.  IT HELPS ME TO COPE, AND TO BE ABLE TO STAY AWAKE.  AND IT IS ALSO TO, LIKE THE DOCTOR SAID,  IT IS A BEHAVIORAL PROGRAM. LIKE, WHEN I WAS IN THE HOSPITALS,  AS A KID.  THE WHOLE TIME. ANY FACILITY,  THERE IS ALWAYS PROGRAMS.  YOU WORK YOUR WAY UP ON PROGRAMS.  YOU UNDERSTAND WHAT I AM SAYING?  SO,  IT IS LIKE SOMETHING FOR ME TO LOOK FORWARD TO FOR WHEN I GET HERE TO SAY,  YEAH,  OKAY, I GOT SOMETHING GOOD.  LOOK FORWARD TO. AND ALSO KEEP MY MIND OFF OF THE STRESS OF LOOKING AT THE JURORS.  SO,  THAT IS ALL I WANTED TO BRING TO THE COURT. YOU KNOW.

THE COURT:  STOP.  ONE THING THAT CONCERNED ME YESTERDAY, THAT SO MUCH HAPPENED YESTERDAY.  BUT MR. SWERLING TOLD ME THAT THE DANGER OF YOU THROWING THE LIQUID WOULDN'T BE A PROBLEM BECAUSE YOU INTENDED TO SWALLOW.

THE DEFENDANT:  THAT'S CORRECT.

THE COURT:  I CHECKED ON THE BREAK.  I DON'T KNOW MUCH ABOUT DIP, BUT FROM WHAT I HAVE LEARNED IS THAT IT IS ABSORBED THROUGH THE LINING OF THE MOUTH WHEN YOU PUT IT IN YOUR MOUTH.  WHEN YOU SWALLOW IT, YOU GET AN INTENSE DOSE OF IT.  I WAS AFRAID OF THE FACT I WAS GIVING YOU SOMETHING THAT YOU WOULD SWALLOW AND HAVE A BAD REACTION TO THAT.  I HAD A PROBLEM WITH THAT,  ALSO.  YOU HAVE NICOTINE GUM, RIGHT?

THE DEFENDANT:  THIS HERE.  I HAVE TO SPIT IT.  IT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
    )    COLUMBIA, SC
    )    SEPTEMBER 23, 2004
    )
    VERSUS    )
    )
BRANDON L. BASHAM,    )
    DEFENDANT.    )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME VIII

APPEARANCES:

FOR THE GOVERNMENT:    SCOTT SCHOOLS, FIRST AUSA
    JONATHAN S. GASSER, AUSA
    JOHN DUANE, AUSA
    UNITED STATES ATTORNEY'S OFFICE
    1441 MAIN STREET, SUITE 500
    COLUMBIA, SC  29201

FOR THE DEFENDANT:    JACK SWERLING, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

    GREG HARRIS, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

COURT REPORTER:    DEBRA R. JERNIGAN, RPR, CRR
    UNITED STATES COURT REPORTER
    901 RICHLAND STREET
    COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1197

Q.    ONE PHONE CALL CONNECTED WAS 37 SECONDS?

A.    YES.

Q.    ON THAT PHONE CALL, MR. FULKS -- WE CONCLUDE IT WAS MR. FULKS, BASED ON YOUR INVESTIGATION OF PUTTING THIS PUZZLE TOGETHER, HE ASKED IF MS. WARD COULD MEET HIM, DIDN'T HE?

A.    HE WANTED AMY WARD TO -- ASKED DONNA WARD, TOLD HER THAT HE WANTED TO SET UP THE JOB INTERVIEW, WANTED TO MEET THAT NIGHT.

Q.    DIDN'T HE SAY WHAT TIME?

A.    YEAH, AROUND 10:30.

Q.    DID HE SAY WHERE?

A.    YES, AT A HARDWARE STORE.

Q.    SO, STARTING WITH NOVEMBER 11TH, MS. BURNS IS MISSING, ON NOVEMBER 14TH, MS. DONOVAN IS MISSING, AND ON NOVEMBER 17TH, AFTER BRANDON BASHAM IS IN CUSTODY OR BEING TAKEN INTO CUSTODY BY THE ASHLAND POLICE, CHAD FULKS IS MAKING ANOTHER PHONE CALL TO ANOTHER WOMAN TRYING TO ARRANGE A MEETING THAT EVENING AT 10:30; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    AND HE IS BY HIMSELF, AS FAR AS LAW ENFORCEMENT KNOWS, AT THAT TIME?

A.    YES.

Q.    AND HE HAS HAD POSSESSION OF THAT ID SINCE IT WAS TAKEN ON NOVEMBER 10TH. WHAT I AM ASKING YOU IS, THAT IS BASED ON THE FACT THAT HE WAS THE ONE TO GIVE IT TO BETH MCGUFFIN?

A.    RIGHT.   I DON'T KNOW IF HE HAD EXCLUSIVE POSSESSION. HE HAD IT ON HIS POSSESSION AT THE TIME HE WAS ARRESTED, HE GAVE IT TO BETH MCGUFFIN, AS WELL.

Q.    ALL PHONE CALLS WERE PHONE CALLS YOU WERE ABLE TO IDENTIFY AS A RESULT OF THE CALLS TO THE WARD RESIDENCE, THE CELLPHONE, OR IN CHAD FULKS'S ADDRESS BOOK OR PAPERS THAT CHAD FULKS'S HAD?

A.    YEAH,  THREE PHONE CALLS ON MY SPREADSHEET I DIDN'T IDENTIFY.  BUT OUTSIDE OF THOSE, AND THE CALLS TO THE WARD RESIDENCE,  ALL THE REST WERE IDENTIFIED AS COMING FROM CHAD FULKS.

Q.    NO INDICATION THAT BRANDON BASHAM WAS CONNECTED WITH ANY OF THOSE PHONE CALLS BY ANY NUMBERS THAT BRANDON BASHAM MAY HAVE BEEN FAMILIAR WITH OR YOU ARE FAMILIAR WITH THAT BRANDON BASHAM MAY HAVE KNOWN?

A.    THAT'S CORRECT.

       MR.  SWERLING:  THAT IS ALL I HAVE,  YOUR HONOR.

       THE COURT:   ANY REDIRECT?

                    REDIRECT EXAM

BY MR. SCHOOLS:

Q.    AGENT BRUNING,  MR. BASHAM, AT THE TIME THESE PHONE CALLS WERE MADE, WAS LOCATED SOMEWHERE ALONG THE BANKS OF THE OHIO RIVER AFTER APPROACHING ANDREA FRANCIS IN THE PARKING LOT OF THE ASHLAND MALL; IS THAT CORRECT?

A.    THAT'S CORRECT.   THE WHOLE 9-1-1 INCIDENT ORIGINATED

FROM MR. BASHAM APPROACHING ANDREA FRANCIS IN THE PARKING LOT IN ASHLAND, KENTUCKY, AND THEN HER SUBSEQUENTLY CALLING 9-1-1.

Q.    DO YOU HAVE  -- ARE YOU AWARE OF ANY INFORMATION THAT WOULD INDICATE THAT AFTER MR. BASHAM WAS FIRST SPOTTED BY THE ASHLAND POLICE AT 7:21 OR 7:25 ON THE EVENING OF NOVEMBER 17TH, 2002, WAS THERE ANY INFORMATION AFTER THAT POINT THAT MR. FULKS ATTEMPTED TO CARJACK ANYBODY?

A.    NO.

        MR. SCHOOLS:  NO FURTHER QUESTIONS.

        THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

        MR. GASSER:  THE GOVERNMENT CALLS JERRY BECKETT.

        JERRY BECKETT, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

                    DIRECT EXAM

BY MR. GASSER:

Q.    GOOD MORNING, MR. BECKETT.

A.    GOOD MORNING.

Q.    TELL US, SIR, WHERE DO YOU LIVE?

A.    I LIVE IN BARBOURSVILLE, WEST VIRGINIA.

Q.    WHAT DO YOU DO FOR A LIVING?

A.    I'M A FIREFIGHTER WITH THE CITY OF HUNTINGTON FIRE DEPARTMENT IN HUNTINGTON, WEST VIRGINIA.

Q.    HOW LONG HAVE YOU BEEN A FIREFIGHTER WITH THE CITY OF

HUNTINGTON?

A.    BEEN DEPUTY CHIEF -- BEEN WITH THE HUNTINGTON FIRE DEPARTMENT IN EXCESS OF 25 YEARS.   BEEN DEPUTY CHIEF FOR SIX YEARS.

Q.    WHAT ARE YOUR DUTIES AND RESPONSIBILITIES AS A DEPUTY CHIEF?

A.    I AM RESPONSIBLE FOR MANNING A 26-PERSON SHIFT, AND ALSO SERVE AS THE SHIFT COMMANDER.   I ANSWER ALL STRUCTURE FIRE ALARMS AND ANY OTHER ALARM THAT MAY COME IN DURING MY SHIFT THAT WOULD NEED MY DIRECT SUPERVISION AS THE SHIFT SUPERVISOR.

Q.    DO YOUR DUTIES AND RESPONSIBILITIES, AND THROUGH YOUR 25 YEARS EXPERIENCE,  DO YOU HAVE SPECIAL TRAINING IN THE AREA OF SEARCH AND RESCUE?

A.    YES.   I HAVE GOT A DIVERSE BACKGROUND OF SEARCH AND RESCUE,  CONFINED SPACE,  AUTO EXTRACATION RESCUE,  WATER RESCUE RECOVERY, AS WELL.

Q.    DID YOU ASSIST THE WEST VIRGINIA STATE POLICE,  THE FBI, AND OTHER LAW ENFORCEMENT, AS WELL AS OTHER AGENCIES IN THE HUNTINGTON, WEST VIRGINIA, AREA WITH REGARDS TO THE SAMANTHA BURNS'S CASE?

A.    YES,  I DID.

Q.    I WANT TO SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 235.   DO YOU RECOGNIZE THIS PHOTOGRAPH?

A.    YES.   THIS IS A PICTURE OF WHERE THE GUYANDOTTE RIVER

EMPTIES INTO THE OHIO RIVER.

Q. THIS RIVER RIGHT HERE IS WHAT?

A. GUYANDOTTE RIVER.

Q. THIS RIVER IS WHAT?

A. OHIO RIVER.

Q. THIS RIVER IS WHAT, PORTIONS OF HUNTINGTON, WEST VIRGINIA?

A. YES. ON RIGHT IS THE GUYANDOTTE AND LEFT IS HUNTINGTON PROPER. IT IS ALL WITHIN THE CITY LIMITS OF HUNTINGTON.

Q. SPECIFICALLY, IN LATE NOVEMBER OF 2002, WERE YOU AND YOUR CREW CALLED UPON TO ASSIST IN A SEARCH AND RESCUE OR SEARCH AND RECOVERY EFFORTS ALONG THE GUYANDOTTE AND OHIO RIVER?

A. YES, IT WAS IN THE LATTER PART OF NOVEMBER WE WERE NOTIFIED BY AGENT CICCARELLI WITH THE FBI.

Q. ARE YOU FAMILIAR WITH THE SPECIAL METALS PLANT THAT SITS ALONG THE GUYANDOTTE RIVER?

A. YES, I AM.

Q. CAN YOU ACTUALLY SEE THAT IN THIS PICTURE, OR IS IT FARTHER UP?

A. IT IS FARTHER UP THAN THAT, I BELIEVE.

Q. AND WHAT ASSISTANCE DID YOU PROVIDE IN LATE NOVEMBER TO LAW ENFORCEMENT WITH REGARD TO SEARCHING IN AND AROUND THE SPECIAL METALS PLANT OF THE GUYANDOTTE RIVER?

A. AS I SAID, SPECIAL AGENT CICCARELLI, AND I THINK

SERGEANT ARNOLD FROM STATE POLICE MET WITH ME, SAID THEY HAD SOME INFORMATION THAT WE NEEDED TO SEARCH AROUND THE SPECIAL METALS PLANT.  AND IN THE PROCESS, WE ALSO SEARCHED AROUND ALL OF THESE BRIDGES AND BRIDGE PIERS THAT ALSO APPEAR IN THE PHOTOGRAPH.

Q.    DESCRIBE FOR THE JURY,  PLEASE,  FIRST OF ALL, WITH REGARD TO THE GUYANDOTTE,  DESCRIBE THE CURRENT OF THE GUYANDOTTE.

A.    NORMAL POOL OF GUYANDOTTE, IT IS NOT A REAL SWIFT RIVER.  IT HAS SEVERAL TWISTS AND TURNS IN IT.  THE CURRENT IS NOT REAL SWIFT.  BUT WHERE THE, IF I MIGHT POINT TO THE SCREEN,  WHERE THE GUYANDOTTE EMPTIES INTO THE OHIO RIGHT IN HERE, IF THE WATER IS UP ANY AT ALL, NORMAL PULL, THE CURRENT RIGHT IN HERE WHERE IT GOES INTO THE OHIO RIVER, IS PRETTY SWIFT MOST OF THE TIME.

Q.    IN AND AROUND THE HUNTINGTON AREA, SPECIFICALLY ALONG THE GUYANDOTTE AND OHIO, WHAT EFFECT DOES THUNDERSTORMS AND RAIN HAVE ON THOSE RIVERS?

A.     THE GUYANDOTTE HAS A LOT OF TRIBUTARIES THAT EMPTY INTO -- A LOT OF STREAMS AND RIVERS THAT EMPTY INTO THE OHIO RIVER.  IF WE GET RAIN, IT GOES UP PRETTY QUICKLY.  IF NOT, IT CAN GO DOWN.  IT IS GREATLY INFLUENCED BY THE WATERSHED AROUND IT.

Q.    SPECIFICALLY, WHEN YOU WERE ASKED TO ASSIST LAW ENFORCEMENT AND YOU HAVE BEEN GIVEN A, SAY, HYPOTHETICAL

SITUATION WHERE A BODY IS IN THE GUYANDOTTE RIVER, WHAT EXACTLY ARE YOU AND YOUR CREW POTENTIALLY LOOKING FOR?

A.    WE LOOK FOR AREAS WHERE A BODY MAY HANG UP.  I BELIEVE THAT MS. BURNS WENT MISSING ON --

Q.    THE 11TH.

A.    NOVEMBER 11TH.  I BELIEVE IT WAS -- WE DIDN'T GET THE CALL TO START SEARCHING FOR SOME TWO WEEKS LATER.  SO, WE WANTED TO LOOK AT DEBRIS PILES, BRUSH PILES AROUND THE BRIDGE PIERS.  WE WALKED THE BANKS BECAUSE THE WATER HAD BEEN UP A COUPLE OF TIMES FROM THE TIME SHE WENT MISSING UNTIL WE STARTED SEARCHING FOR HER.  AND SO WE WALKED THE BANKS TO MAKE SURE THAT THERE WASN'T ANYTHING THERE.  AND SO, WE WERE HOPING, IF SHE WERE INDEED IN THE WATER, SHE HAD GOTTEN HUNG UP ON SOMETHING.

Q.    AND WHEN YOU WERE ACTUALLY SEARCHING IN THE WATER ITSELF OR ON TOP OF THE SURFACE OF THE WATER, WHAT SPECIALIZED EQUIPMENT DO YOU USE?

A.    WE HAVE GOT SEVERAL THINGS.  WE HAVE UNDERWATER CAMERA THAT IS ON A TELESCOPING POLE.  GUYANDOTTE RIVER IS, APPROXIMATELY, 12-FEET DEEP WITH NORMAL PULL.  WE HAVE A SMALL UNDERWATER CAMERA THAT ATTACHES TO A TELESCOPING POLE.  IT HAS VIDEO FEEDBACK TO A MONITOR ON OUR BOAT, SO THE PERSON OPERATING THE CAMERA CAN ACTUALLY VIEW THE MONITOR AS I AM LOOKING AT THIS MONITOR NOW.  WE CAN SEE THE BOTTOM OF THE RIVER, DEPENDING UPON THE CLARITY OF THE WATER, WHICH THAT

DAY, WHEN WE FIRST STARTED SEARCHING IN NOVEMBER, THE WATER WAS PRETTY CLEAR, SO WE COULD SEE FOUR TO FIVE FEET WITH THE CAMERA.   IT IS VERY DETAILED.

Q.    I BELIEVE NOVEMBER 27TH,  SOME 16 DAYS AFTER SAMANTHA BURNS WENT MISSING, THAT WAS THE FIRST DAY YOU STARTED A THREE-DAY SEARCH?

A.    I BELIEVE THAT IS CORRECT. WE ALSO USED -- WE HAVE SOME ON OUR BOAT THAT ARE,  IT IS NOT NEARLY AS EFFECTIVE AS THE CAMERA,  WE USE IT IN CONJUNCTION WITH THE CAMERA.  WE CAN TURN THE SONAR ON, WE CAN PICK UP LARGE OBJECTS ON THE BOTTOM OF THE RIVER, AND WHENEVER WE DO DETECT ONE OF THOSE, WE WOULD HONE IN ON IT WITH OUR CAMERA AND SEARCH THAT.  WE ALSO HAVE A BRAILLE,  TRIANGULAR SHAPE PIECE OF METAL WITH CHAINS HANGING DOWN FROM IT THAT HAS LARGE TREBLE HOOKS ON IT, THAT WE USE. WE DROPPED IT FROM THE BOW OF THE BOAT WITH A ROPE,  DROP IT DOWN TO THE BOTTOM OF THE RIVER, AND BACK THE BOAT UP SLOWLY DRAGGING THIS BRAILLE ALONG THE BOTTOM HOPING TO HOOK INTO, IF THERE IS A BODY THERE,  WE HOPE TO HOOK INTO IT.

Q.    THE PEOPLE THAT ARE USING THIS BRAILLE THAT YOU HAVE DESCRIBED,  DO THEY HAVE SPECIALIZED TRAINING IN DISTINGUISHING BETWEEN SAY A HUMAN BODY AS OPPOSED TO A LOG OR SOME OTHER PARTICULAR OBJECT?

A.    NOT SO MUCH TRAINING AS WITH EXPERIENCE.   THAT IS ABOUT THE ONLY WAY YOU CAN TRAIN WITH THIS IS BY ACTUALLY

USING IT. THE PERSONNEL THAT I USED ON THE BOAT FOR THIS SEARCH ARE EXPERIENCED. THEY HAVE RECOVERED BODIES BEFORE, SO THEY CAN DISTINGUISH BETWEEN A BODY AND, SAY, A LOG OR A BRUSH PILE.

Q. IN THIS TYPE OF SEARCH, ARE YOU FAMILIAR WITH THE TERM "GRID PATTERN" OR "GRID SEARCH"?

A. YES. WE GRID OFF THE RIVER IN SECTIONS SO THAT WE CAN SEARCH IT MORE THOROUGHLY. WE USE GPS SYSTEM TO HELP US COORDINATE WHERE THESE GRIDS ARE. WE CAN ALSO USE LANDMARKS ON THE BANK TO MARK WHERE WE SEARCH SO THAT WE DON'T DOUBLE SEARCH AN AREA AND MAYBE MISS ANOTHER AREA.

Q. WHAT ARE EDDIES?

A. AN EDDIE IS A PLACE IN THE RIVER. WE WALK THE BANKS AND LOOK AT THE PATTERN OF THE CURRENT IN THE RIVER. A LOT OF TIMES AN EDDIE WILL BE ON THE DOWNRIVER-SIDE OF A BRIDGE PIER OR BRUSH PILE. IT IS WHERE THERE WILL BE A LARGE CIRCULAR MOTION IN THE RIVER, YOU CAN SEE DEBRIS FLOATING IN A CIRCULAR PATTERN IN THE RIVER. WE ESPECIALLY CHECK THOSE BECAUSE IF THE BODY GOT INTO AN EDDIE, THEY ARE GOING TO PRETTY MUCH STAY IN THAT AREA RIGHT THERE AND NOT BE IN THE MAIN CURRENT. AND WE FIND THOSE, BOTH ON THE BOAT AND FROM THE BANK, WE CAN LOOK AT THE RIVER AND FIND THOSE.

Q. LET ME SHOW YOU WHAT HAS BEEN MARKED GOVERNMENT'S EXHIBIT 335.

Q. WOULD YOU PLEASE DESCRIBE THIS PHOTOGRAPH TO THE JURY?

A.     THIS IS OUR RESCUE RECOVERY BOAT, CAROLINA SKIFF, THAT WE USE.  THE GENTLEMAN IN THE CAMOUFLAGE PANTS, I BELIEVE, IS AN FBI AGENT; THE TWO IN THE JUMPSUITS ARE FIREFIGHTERS ON ONE OF MY SHIFTS.

YOU WILL SEE, IF YOU WILL LOOK,  I WILL TRY TO POINT IT OUT,  THIS IS THE TELESCOPING POLE THAT GOES DOWN INTO THE RIVER WITH THE UNDERWATER CAMERA ON IT.  THE MONITOR IS SITTING ON THE BOW OF THE BOAT.  THAT IS WHAT THE GENTLEMAN -- ONE OF THE GENTLEMEN IN THE ORANGE SHIRT IS DOING IS LOOKING AT THE MONITOR.

Q.     THIS GENTLEMAN RIGHT HERE?

A.     YES.

Q.     I NOTICE THAT, AND THE JURY CAN SEE FOR THEMSELVES, THAT THE WARM WEATHER  -- THE COLD WEATHER CLOTHING THAT THE THREE GENTLEMEN ARE WEARING.  IS THIS PHOTOGRAPH AN ACTUAL PHOTOGRAPH OF THE SEARCH FOR SAMANTHA BURNS'S BODY?

A.     YES,  IT IS.  THIS WAS IN NOVEMBER.  IT WAS VERY COLD THEN, SO THEY HAD TO WEAR THIS CLOTHING.

Q.     SHOWING YOU GOVERNMENT'S  -- THIS IS THE GUYANDOTTE RIVER,  IS IT NOT?

A.     YES,  IT IS.

Q.     SHOWING YOU GOVERNMENT'S 336. WHAT DOES THAT PICTURE DEPICT?

A.     IT IS A MORE DETAILED PICTURE OF THE TELESCOPING POLE WITH THE CAMERA AT THE END OF IT.  THE FBI AGENT IS NOW

LOOKING AT THE MONITOR AS THEY PROBE DOWN INTO THE WATER.

Q.    GOVERNMENT'S EXHIBIT 337.    THAT IS SOMEWHAT HAZY, BUT AGAIN, IS THAT THE GUYANDOTTE RIVER?

A.    THAT IS LOOKING UPRIVER TOWARDS THE SPECIAL METALS PLANT.    I AM NOT SURE WHICH BRIDGE THAT IS,  BUT THERE ARE THREE OR FOUR BRIDGES ALONG.

Q.    SO, WHERE THE GUYANDOTTE MEETS THE OHIO WOULD BE TO THE BACK OF WHOEVER IS TAKING THIS PHOTOGRAPH?

A.    YES.

Q.    AND WHAT ARE THESE THINGS I AM POINTING TO RIGHT HERE?

A.    THOSE ARE THE BRIDGE PIERS.    THAT IS WHERE I WAS TELLING YOU BEFORE, WE CAN SOMETIMES -- THERE WILL BE AN EDDIE THERE,  THE DEBRIS WILL ACCUMULATE IN THERE,  WE SEARCHED THESE VERY HEAVILY.

Q.    WHAT HAPPENS WHEN YOU ARE  -- YOU HAD MENTIONED SOMETHING BEFORE ABOUT THE CURRENT OF THE GUYANDOTTE VERSUS THE CURRENT OF THE OHIO RIVER.    WOULD YOU EXPLAIN TO THE JURY THE DISTINCTION BETWEEN THE TWO?

A.    YES.    AS I SAID BEFORE, THE GUYANDOTTE IS ONLY AROUND AN AVERAGE OF 12-FEET DEEP WHEN IT IS AT NORMAL PULL.    THE OHIO IS ABOUT 25-FEET DEEP IN THE MAIN PART OF THE CHANNEL, THAT IS JUST AN AVERAGE.    THE CURRENT IN THE OHIO IS MUCH STRONGER,  BUT WHEN WATER COMES UP, THE CURRENT IS MUCH FASTER IN THE GUYANDOTTE.

NOT LONG AGO, I HAD A CALL THAT THERE WAS A LARGE

UNDERGROUND GASOLINE STORAGE TANK THAT HAD WASHED OUT DURING ONE OF OUR FLOODS AND WAS COMING DOWN THE GUYAN RIVER. THE PEOPLE WERE CONCERNED THAT IT WAS GOING TO HIT ONE OF THE BRIDGE PIERS. SO, WITH THE ASSISTANCE OF THE HUNTINGTON POLICE DEPARTMENT, WE SHUT DOWN ALL OF THESE BRIDGES COMING DOWN THROUGH HERE. WE SPOTTED THIS FUEL TANK COMING DOWN THE RIVER. AS I SAY, IT IS A LARGE, UNDERGROUND FUEL TANK. IT MISSED ALL OF THE BRIDGES. WHEN IT GOT TO THE MOUTH OF THE GUYANDOTTE RIVER, IT SHOT OUT ALMOST TO THE MIDDLE OF THE OHIO. SO, IT WAS ALMOST LIKE PULLING A BATHTUB PLUG IN THE SWIFTNESS THAT IT PULLED IT OUT THERE IN THE CURRENT OF THE OHIO AND THEN IT WAS GONE.

Q. WHAT HAPPENS TO A BODY, PARTICULARLY IN COLD WATER WHEN IT IS PLACED --

MR. HARRIS: MAY WE APPROACH BRIEFLY, YOUR HONOR?

THE COURT: YES, SIR.

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. HARRIS: JUDGE, LOOKING AT WHERE I THINK HE IS GOING WITH THIS, THE ONLY THING WE HAVE ON THE RECORD IS THIS GENTLEMAN HAS SPECIAL TRAINING IN SEARCH AND RESCUE. WHAT I ANTICIPATE HIM RESPONDING TO IS THE EFFECTS OF A BODY, BASED ON THE TEMPERATURE OF WATER AND AMBIENT TEMPERATURE OF THE AIR, THOSE THINGS AFFECT THE DECOMPOSITION OF A BODY GOING INTO SOME QUITE GRAPHIC DETAIL OF ABOUT WHAT HAPPENS TO A

BODY.   I DON'T THINK HE HAS LAID A FOUNDATION FOR THIS GENTLEMAN TO GIVE AN EXPERT OPINION REGARDING THE DECOMPOSITION OF A BODY.   OBVIOUSLY, WHAT HE HAS SEEN OR WHAT HE DID THAT DAY, WHAT THEY WERE LOOKING FOR,  THAT IS ONE THING.   FOR HIM TO GO INTO GRAPHIC DETAIL ABOUT WHAT HAPPENS, I THINK, CALLS FOR EXPERT TESTIMONY.  I DO NOT THINK HE IS QUALIFIED.

MR. GASSER:  I DON'T BELIEVE IT CALLS FOR EXPERT TESTIMONY.   WHEN I ASKED HIM HOW MANY BODIES HE SEARCHED FOR, EXPLAINS WHY BOTH TOP AND BOTTOM SEARCH, THAT IS ALWAYS EXPLAINING.   FOR THE JURY TO UNDERSTAND, HE WILL EXPLAIN, TO THE JURY, IN COLD WATER, TYPICALLY, A BODY GOES DOWN.   AND --

THE COURT:   THE RULE ON EXPERT TESTIMONY SAYS THAT SOMEONE CAN BE QUALIFIED TO GIVE AN OPINION BY TRAINING OR EXPERIENCE.

MR. GASSER:  YES, SIR.

THE COURT:  THEY DON'T HAVE TO HAVE A DEGREE OR CERTIFICATE ON THEIR WALL, SO TO SPEAK.   CAN YOU LAY A FOUNDATION?

MR. GASSER:  I WILL ASK HIM A FEW MORE QUESTIONS. IF HE IS CHALLENGING THIS MAN'S 25-YEAR EXPERIENCE OF SEARCHING --

THE COURT:   I THINK I WOULD ALLOW THE FACT THAT THE BODY COULD GO TO THE BOTTOM.   I WILL ALLOW HIM TO TESTIFY TO THAT, BASED ON HIS EXPERIENCE.   I THINK YOU NEED TO LAY A

**JA 1210**

FOUNDATION.

MR. GASSER: OKAY.

THE COURT: YOU DON'T WANT THE GRAPHIC DETAILS.

MR. HARRIS: NO.

THE COURT: COURT REPORTER CAN'T HEAR. WHAT YOU OBJECT TO ARE THE GRAPHIC DETAILS OF THE BODY DECOMPOSING AND GOING TO THE BOTTOM, IS THAT IT?

MR. HARRIS: YES.

THE COURT: HOW MUCH WILL YOU GO INTO IT?

MR. GASSER: IN COLD WATER, A BODY DOESN'T DECOMPOSE.

THE COURT: WHATEVER HE IS GOING TO SAY ABOUT WHY IT GOES TO THE BOTTOM?

MR. GASSER: HE WILL TALK ABOUT -- MY NOTES ARE BACK THERE, BUT HE IS GOING TO TALK ABOUT -- YOUR HONOR, I WOULD ASK YOU TO LOOK AT THE TESTIMONY PREVIOUSLY. HE IS NOT DESCRIBING DECOMPOSITION, HE IS SAYING THE TEMPERATURE OF THE BODY AFFECTS DECOMPOSITION.

THE COURT: LEAD HIM AND SAY, BASED ON YOUR EXPERIENCE, ISN'T IT TRUE COLD WATER CAN CAUSE A BODY TO GO TO THE BOTTOM?

MR. GASSER: I AM FINE WITH THAT.

THE COURT: STAY AWAY FROM THE WORD "DECOMPOSITION."

MR. GASSER: THAT IS OKAY FOR US UP HERE. YOU WANT ME TO LEAD HIM?

THE COURT: LEAD HIM.

MR. GASSER:  WANT ME TO TELL HIM NOT TO USE THE WORD DECOMPOSITION?

THE COURT:   I THINK IT LOOKS BAD IN FRONT OF THE JURY FOR A LAWYER TO WALK OVER --

MR. HARRIS:  HE IS A SMART GUY.   HE WON'T HAVE A PROBLEM IF YOU LEAD HIM THROUGH.

THE COURT:   ISN'T IT TRUE, IN COLD WATER A BODY CAN GO TO THE BOTTOM?

MR. GASSER:  OKAY.

(WHEREUPON, THE BENCH CONFERENCE CONCLUDED.)

THE COURT:   PLEASE CONTINUE.

MR. GASSER:  THANK YOU.

BY MR. GASSER:

Q.   MR. BECKETT,  LET ME ASK YOU THIS.   ISN'T IT TRUE THAT, PARTICULARLY IN COLD WATER, AS A RESULT OF VARIOUS FACTORS THAT WE DON'T NEED TO DISCUSS,  BUT THE VARIOUS FACTORS IN COLD WATER, A BODY,  IT IS NOT UNUSUAL FOR A BODY TO SINK TO THE BOTTOM OF THE RIVER?

A.   THAT'S CORRECT.

Q.   AND AS A RESULT OF THE POSSIBILITY THAT MS. BURNS MAY HAVE SUNK TO THE BOTTOM OF THE GUYANDOTTE RIVER, IS THAT THE REASON WHY YOU EMPLOYED THAT GRID SEARCH TECHNIQUE, NOT JUST LOOKING AT THE SURFACE OF THE RIVER, BUT ALSO ON THE FLOOR OF THE RIVER?

A.   YES,  IT IS.   WE TREAT A SEARCH DIFFERENTLY IN HOT

WEATHER THAN WE DO IN COLD WEATHER BECAUSE OF THE RATE OF DECOMPOSITION OF THE BODY.

Q.    IN YOUR EXPERIENCE,  HOW MANY, OVER THE LAST 25 YEARS, HOW MANY RIVER SEARCHES, EITHER GUYANDOTTE OR OHIO,  HOW MANY RIVER SEARCHES HAVE YOU BEEN A PART OF FOR BODIES?

A.    SEARCHES OR ACTUAL RECOVERIES?

Q.    SEARCHES.

A.    SEARCHES,  PROBABLY SOMEWHERE BETWEEN 25 AND 50, PROBABLY, SEARCHES.

Q.    AND HAVE YOU RECOVERED  -- WHEN YOU HAVE RECEIVED INFORMATION THAT A BODY -- SOMEBODY HAS FALLEN INTO THE RIVER OFF OF A BOAT OR JUMPED IN THE RIVER, BEEN SWIMMING, OR WHATEVER,  ANY TYPE OF SITUATION WHERE A BODY GOES INTO THE RIVER, HAVE YOU RECOVERED ALL OF THE BODIES?

A.    NO,  WE HAVEN'T.

Q.    EXPLAIN THAT TO THE JURY WHY THAT MIGHT BE, IN THIS LOCATION,  THIS PARTICULAR LOCATION OF THE HUNTINGTON, WEST VIRGINIA AREA.

A.    IF I MAY GIVE AN EXAMPLE.  WE HAVE A LOT OF BARGE TRAFFIC ON THE OHIO RIVER.  THERE ARE SEVERAL COAL-LOADING FACILITIES,  ASPHALT PLANTS,  DIFFERENT THINGS ALONG THE OHIO RIVER.  SO,  WE HAVE A LOT OF BARGE TRAFFIC.   THE CURRENT IS VERY SWIFT.

ABOUT SIX OR SEVEN YEARS AGO, WE HAD TWO INDIVIDUALS WHO WERE STEALING WIRE FROM ONE OF THE BARGES.  THEY PUT IT ONTO A

SMALL JOHN BOAT. THEY GOT TO THE MIDDLE OF THE OHIO RIVER, THE JON BOAT STARTED TO SINK. ONE OF THE GENTLEMEN SWAM TO SHORE, THE OTHER ONE DIDN'T. THIS WAS IN THE MIDDLE OF THE NIGHT. FIRST THING THE VERY NEXT MORNING, WE STARTED SEARCH OPERATIONS, AND WE NEVER FOUND THIS INDIVIDUAL. ALTHOUGH WE KNEW THAT HE WENT DOWN IN THE OHIO RIVER, WE NEVER FOUND HIM.

Q. AND IS IT YOUR EXPERIENCE, DO YOU NORMALLY -- WHETHER YOU DO FIND THE BODY, DO YOU NORMALLY FIND IT RIGHT AWAY OR DOES IT TAKE TIME?

A. IT TAKES SOME TIME. AS I SAID BEFORE, A BODY WILL SINK TO THE BOTTOM -- MOST GENERALLY, A BODY WILL SINK TO THE BOTTOM OF THE RIVER. AS IT DECOMPOSES, IT WILL POSSIBLY FLOAT UP MAYBE TWO OR THREE FEET FROM THE BOTTOM AND STAY THERE A DAY OR TWO. AND THEN, AS THE GASSES BUILD UP IN THE BODY, IT COMES UP HIGHER. THREE OR FOUR DAYS IN THE SUMMERTIME, IT USUALLY SURFACES IF IT IS NOT HUNG UP ON SOMETHING.

Q. IN YOUR 25 TO 50 SEARCHES FOR BODIES, IN YOUR EXPERIENCE, HAVE YOU EVER RECOVERED A BODY LITERALLY MONTHS AND MONTHS AFTER IT HAS GONE IN THE WATER?

A. YES, WE HAVE. WE HAVE DONE THAT BEFORE. WE HAD TWO BACK IN MAY. WE HAD TWO TEENAGERS WHO SKIPPED SCHOOL, WENT INTO THE OHIO RIVER SWIMMING. WE FOUND THEM EIGHT MILES DOWNRIVER AT A COAL-LOADING FACILITY. THE COAL COMPANY HAPPENED TO BE MOVING SOME BARGES ALONG THE BANK, THIS WAS SIX

DAYS LATER. ONE OF THE BOYS FLOATED TO THE TOP, AND TWO DAYS LATER, WE FOUND THE OTHER ONE IN THE SAME AREA. AS I SAY, THIS WAS ABOUT SIX OR EIGHT MILES DOWNSTREAM FROM WHERE THEY WENT IN. AND WE PROBABLY WOULDN'T HAVE FOUND THEM THEN HAD THEY NOT BEEN MOVING THOSE BARGES.

Q. YOU MENTIONED MOVING THOSE BARGES. EXPLAIN FOR THOSE JURORS WHO AREN'T FAMILIAR WITH THAT PART OF THE COUNTRY, WHAT DO YOU MEAN BY "BARGE" OR "BARGE TRAFFIC" ALONG THE OHIO?

A. THE OHIO RIVER IS -- THE HUNTINGTON AREA IS THE LARGEST INLAND RIVER PORT ON THE OHIO RIVER IN THE EASTERN PART OF THE UNITED STATES. IT ENCOMPASSES MUCH MORE THAN THE CITY LIMITS OF HUNTINGTON, NATURALLY. BUT WE HAVE, IN OUR IMMEDIATE AREA, WE HAVE TWO SETS OF LOCKS AND DAMS. THESE BARGES ARE VERY LARGE. THEY HAUL EVERYTHING, AS I SAID, FROM SAND AND GRAVEL FOR ASPHALT PLANTS TO COAL FROM COAL MINES.

BARGES ARE VERY LARGE. THEY HAVE TO LOCK IN AND OUT OF THESE LOCKS AND DAMS. LOCKS AND DAMS WERE BUILT FOR FLOOD CONTROL IN OUR AREA; ONE EAST OF HUNTINGTON, ONE WEST OF HUNTINGTON. AS THESE BARGES COME DOWN THE OHIO RIVER, THE RIVER LEVEL CHANGES BECAUSE OF FLOOD CONTROL, SO THEY HAVE TO FLOAT THESE BARGES AND TOTES INTO THESE LOCKS. THEY EITHER RAISE OR LOWER THE WATER LEVEL IN THESE LOCKS, AND THEN THEY LET THEM OUT ON THE OTHER SIDE TO THAT LEVEL. SO, WE HAVE A TREMENDOUS AMOUNT OF BARGE TRAFFIC.

Q. SO, ON NOVEMBER 27TH, AND 28TH, AND 29TH OF 2002,

AFTER RECEIVING INFORMATION FROM LAW ENFORCEMENT ABOUT, GENERALLY, WHERE TO LOOK FOR SAMANTHA BURNS'S BODY, WHAT WERE THE TWO THINGS THAT -- THE TWO POSSIBILITIES WITH REGARD TO LOCATING HER BODY IN THE GUYANDOTTE RIVER?

A. I PRETTY MUCH KNEW FROM PAST EXPERIENCE THAT SINCE THE RIVER HAD COME UP AND DOWN A COUPLE OF TIMES FROM THE TIME SHE WAS REPORTED MISSING UNTIL IT WAS TOLD TO US WHERE SHE MAY BE, THE RIVER LEVEL HAD CHANGED, THE CURRENT HAD CHANGED SO, IN MY OWN OPINION, I FIGURED THAT THE ONLY WAY THAT SHE WAS STILL GOING TO BE IN THE GUYANDOTTE RIVER AND NOT IN THE OHIO RIVER WAS IF SHE WERE HUNG UP ON SOMETHING UNDER THE SURFACE OF THE WATER OR SHE HAD BEEN WEIGHTED DOWN. AND THAT IS WHY WE SEARCHED SO EXTENSIVELY AROUND THE BRIDGE PIERS, THE BRUSH PILES, THE ROOT SYSTEMS OF THE TREES, AND ALL THAT.

Q. AND IF HER BODY WAS NOT HUNG UP ON SOMETHING OR WEIGHTED DOWN, IN YOUR OPINION, WOULD SHE HAVE HIT THAT, THEN HIT THE OHIO RIVER?

A. YES. ONCE YOU HIT THE OHIO RIVER, IT IS A VERY LARGE BODY OF WATER. IT IS PROBABLY THREE-HUNDRED YARDS WIDE. AS I SAY, THERE IS PLENTY OF FACILITIES ALONG THE RIVER WHERE SHE COULD BE HUNG UP IN BARGES. WE HAVE BARGES THAT ARE PARTIALLY SUNK ON THE BANKS. IF SHE GOT HUNG UP UNDER ONE OF THOSE, UNLESS THEY MOVE THOSE BARGES FOR SOME REASON, THE CHANCES OF FINDING HER WERE SLIM.

Q. AND HOW WOULD YOU DESCRIBE, I HAVE SHOWED YOU THOSE

PHOTOGRAPHS AND THE JURY SAW THROUGH THAT LAST PHOTOGRAPH WITH THE BRIDGES AND WAS ABLE TO SEE THE WIDTH OF THE GUYANDOTTE AND THE BANKS OF THE GUYANDOTTE RIVER AS WELL, HOW WOULD YOU DESCRIBE THE SEARCHES THAT WENT ON ON NOVEMBER 27TH, 28TH, AND 29TH?

A.    I DON'T KNOW HOW WE COULD HAVE DONE ANY MORE.  WE SEARCHED THE BANKS ON FOOT WITH THE ASSISTANCE OF THE FBI, THE STATE POLICE, OTHER FIREFIGHTERS, THE LOCAL POLICE.  WE WERE ASSISTED BY THE COAST GUARD AND THE DEPARTMENT OF NATURAL RESOURCES WHO ALSO HAD BOATS IN THE WATER.  AS I SAID, WE USED ALL RESOURCES THAT WE HAD.  ON TOP OF THAT, WE NOTIFIED -- WE GOT TWO MARINAS IN THE HUNTINGTON AREA, WE NOTIFIED THOSE MARINAS FOR THE PLEASURE BOATERS TO BE ON THE LOOKOUT FOR ANYTHING.  WE ALSO NOTIFIED THE TOW COMPANIES WHERE THE BARGE LANDS TO BE ON THE LOOKOUT FOR ANYTHING.  I DON'T KNOW HOW WE COULD HAVE DONE ANY MORE.

Q.    SO, THE TUG BOAT, AND TOW BOAT, AND BARGE OPERATORS IN THE GREATER HUNTINGTON AREA ALONG THE OHIO RIVER AND GUYANDOTTE WERE ALL NOTIFIED?

A.    YES, THEY WERE.

Q.    PLEASURE BOAT, LEISURE BOAT OWNERS AS WELL?

A.    YES, THEY WERE.

Q.    I KNOW YOU HAVE DISCUSSED THE SEARCHING OF THE GUYANDOTTE RIVER, BUT ALSO DID YOU GO OUT AND SEARCH THE OHIO RIVER, AS WELL?

A.     YES, WE DID.   WE SEARCHED PROBABLY EIGHT TO 10 MILES DOWNSTREAM.   WE ALSO HAD THE PEOPLE THAT WORKED THE LOCKS AND DAMS DOWNSTREAM ON THE LOOKOUT.   SO YES, WE SEARCHED, AFTER WE EXHAUSTED EVERYTHING IN THE GUYANDOTTE RIVER, WE STARTED SEARCHING THE OHIO RIVER.

Q.     AFTER RECEIVING THE INFORMATION FROM LAW ENFORCEMENT IN NOVEMBER OF 2002 AND CONDUCTING THE SEARCHES THAT YOU HAVE JUST DESCRIBED TO THE JURY, DID YOU ALSO, AFTER RECEIVING INFORMATION FROM LAW ENFORCEMENT IN SEPTEMBER OF 2003, ALMOST TEN MONTHS AFTER MS. BURNS WAS MISSING, AFTER RECEIVING FURTHER INFORMATION, DID YOU, AGAIN, SEARCH THE GUYANDOTTE RIVER?

A.     YES.   AGAIN, I WAS IN CONTACT WITH AGENT CICCARELLI FROM THE FBI.   THEY BROUGHT IN SOME FBI DIVERS FROM OUT OF TOWN.   WE TOOK THEM OUT.   TWO OF THE MEMBERS OF MY CREW WERE THE ORIGINAL MEMBERS THAT HAD SEARCHED IN NOVEMBER THE PREVIOUS YEAR, SO THEY WERE VERY FAMILIAR WITH WHERE THEY HAD SEARCHED TEN MONTHS EARLIER.   AND THEY TOOK THE FBI DIVERS OUT, SHOWED THEM WHERE THEY HAD SEARCHED, AND SO THE FBI DIVERS CHECKED THOSE AREAS.

Q.     IN YOUR 25 YEARS OF EXPERIENCE, MR. BECKETT, AS A SEARCH AND RECOVERY OR SEARCH AND RESCUE OPERATOR PURSUANT TO YOUR DUTIES WITH THE HUNTINGTON FIRE DEPARTMENT, IN YOUR OPINION, ARE THE CHANCES OF RECOVERING A BODY ENHANCED OR ARE THEY GREATER WHEN YOU RECEIVE INFORMATION IN A TIMELY FASHION?

A.    THE EARLIER WE CAN GET IN THE WATER AND START TO SEARCH, WE HAVE A MUCH BETTER CHANCE.   AS I SAID BEFORE, WHEN TWO WEEKS GO BY AND THE WATER LEVEL CHANGES TWO TIMES IN THAT PERIOD OF TIME,  THE CHANCES GO DOWN GREATLY.

MR. GASSER:  BEG THE COURT'S INDULGENCE.

BY MR. GASSER:

Q.    JUST TO BE CLEAR, LET ME AGAIN SHOW YOU GOVERNMENT'S EXHIBIT 235.   THIS IS THE OHIO RIVER, IT IS ABOUT 300-YARDS WIDE.   YOU HAVE ALREADY IDENTIFIED THIS AS BEING THE MOUTH OF WHERE THE GUYANDOTTE MEETS THE OHIO?

A.    YES.

Q.    THE SEARCHES YOU DESCRIBED,  DID IT INCLUDE ALONG THE BANKS HERE OF THE GUYANDOTTE?

A.    IT DID ON BOTH SIDES,  BOTH BANKS.

Q.    ON BOTH SIDES.   OF COURSE, THIS AERIAL PHOTOGRAPH IS LIMITED, TO SOME EXTENT?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    DID YOU CONTINUE BEYOND WHAT THE PHOTOGRAPH DEPICTS?

A.    YES.  WE WENT MUCH FARTHER UP RIVER THAN WHAT THE PHOTOGRAPH SHOWS.

Q.    AND NOT JUST THE BANKS, BUT ALSO THE MIDDLE OF THE RIVER,  AS WELL?

A.    YES,  ANY BRUSH PILES,  BRIDGE PIERS,  OR ANY OTHER OBSTRUCTIONS WHERE WE THOUGHT MAYBE A BODY COULD HANG UP.

MR. GASSER:  THANK YOU,  MR. BECKETT.  I APPRECIATE

IT.

THE COURT:    CROSS-EXAMINATION.

CROSS EXAM

BY MR. HARRIS:

Q.    GOOD MORNING, MR. BECKETT.  MY NAME IS GREG HARRIS.

A.    GOOD MORNING.

Q.    THE 40TH STREET MARINA, CAN YOU TELL US WHERE THAT IS, PLEASE?

A.    THIS IS THE 31ST STREET BRIDGE THAT CROSSES THE OHIO RIVER, SO THE 40TH STREET MARINA IS UP HERE IN THIS AREA.

Q.    AND WHAT IS THAT AREA THAT I HAVE JUST PLACED AN ARROW ON?

A.    THAT IS THE GUYANDOTTE BOAT RAMP.

Q.    THE GUYANDOTTE BOAT RAMP IS THE BOAT RAMP THAT EVERYONE USES TO GET INTO THE OHIO FROM THE GUYANDOTTE?

A.    YES, IT IS.

Q.    IT IS A VERY WIDE AREA?

A.    IT IS.  I WOULDN'T SAY "VERY WIDE," BUT IT IS BIG ENOUGH TO LAUNCH BOATS FROM, YES.

Q.    BIG ENOUGH TO GET A BIG BOAT IN?

A.    YES.

Q.    AND EVERY NOW AND THEN, I THINK YOU ARE AWARE, THAT THAT IS A PLACE AT NIGHTTIME SOME PEOPLE GO, DRINK BEER?

A.    YES, IT IS.

Q.    CONGREGATE?

A.   YES.

Q.   AND ANYONE FAMILIAR WITH HUNTINGTON WOULD KNOW ABOUT THAT PUBLIC BOAT RAMP, MOST LIKELY?

A.   YES.

Q.   THAT IS A FAIR STATEMENT?

A.   YES.

Q.   AND, AGAIN, THE CURRENT, APPROXIMATELY HERE AND HERE, PICKS UP AS YOU GO FARTHER INTO THE CENTER; IS THAT RIGHT?

A.   YES.   WHEN THE RIVER IS AT NORMAL PULL.

Q.   WHEN IT IS AT NORMAL.   ALL RIGHT.   NOW, THE AREA HERE, IS THAT THE FLOOD WALL?

A.   I BELIEVE THAT IT IS.

Q.   THAT IS THE GUYANDOTTE FLOOD WALL?

A.   YES.

Q.   AND, AGAIN, THIS WHOLE AREA, SOMEONE FAMILIAR WITH HUNTINGTON WOULD KNOW WHERE THE FLOOD WALL WAS AND WHERE THE BOAT RAMP WAS?

A.   YES.

        MR. HARRIS:  THANK YOU, SIR.

        THE COURT:  THANK YOU.  ANY REDIRECT?

        MR. GASSER:  NO, SIR.

        THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

        MR. SCHOOLS:  CALL SPECIAL AGENT JIM HARPER.

                JIM HARPER, HAVING BEEN FIRST DULY SWORN,

**JA 1221**

A.   SHE PROVIDED US WITH FOUR LETTERS.

Q.   NOW, SERGEANT ARNOLD, PRIOR TO MONDAY, NOVEMBER 25TH, WHEN MS. MCGUFFIN SHOWS UP AND PROVIDES YOU WITH THIS LETTER, HAD YOU OR ANY LAW ENFORCEMENT OFFICER, IN YOUR PRESENCE, INSTRUCTED MS. MCGUFFIN TO WRITE BRANDON BASHAM?

A.   NO, SIR.

Q.   DID YOU PROVIDE HER WITH ANY QUESTIONS?

A.   NO, SIR.

Q.   WHEN SHE PROVIDED YOU WITH THE FIRST LETTER, DID YOU ATTEMPT TO GET HER TO ASK SPECIFIC QUESTIONS IF SHE DECIDED TO WRITE MR. BASHAM?

A.   NO, SIR.

Q.   SO, WAS THERE ANY PARTNERSHIP, IF YOU WILL, ANY PARTNERSHIP BETWEEN THE WEST VIRGINIA STATE POLICE, THE FBI, AND BETH MCGUFFIN?

A.   NO, SIR.

Q.   ON WEDNESDAY, NOVEMBER 27TH OF 2002, WERE YOU PROVIDED INFORMATION FROM SPECIAL AGENT JOE CICCARELLI WITH THE FBI THAT HE HAD RECEIVED FROM MR. BASHAM'S LAWYER IN KENTUCKY, A MR. HUGHES?

A.   YES.

Q.   AS A RESULT OF YOU RECEIVING THE INFORMATION FROM THE FBI, WHO HAD RECEIVED IT FROM MR. BASHAM'S LAWYER, MR. HUGHES, DID YOU -- WAS A DECISION MADE TO SEARCH CERTAIN AREAS OF THE GUYANDOTTE RIVER?

A.    YES, SIR, IT WAS.

Q.    DO YOU KNOW -- OBVIOUSLY, YOU KNOW MR. JERRY BECKETT?

A.    YES.

Q.    AND DID YOU OBTAIN HIS ASSISTANCE IN SEARCHING THE GUYANDOTTE RIVER?

A.    YES, I DID.

Q.    DID THE WEST VIRGINIA STATE POLICE PARTICIPATE IN SEARCHES OVER THE NEXT FEW DAYS?

A.    YES.

Q.    THE JURY HAS ALREADY BEEN TOLD THOSE SEARCHES DID NOT DEVELOP ANY BODY OR ANY EVIDENCE RELATING TO SAMANTHA BURNS; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    THE GOVERNMENT'S BOX 222-KK, WERE YOU PRIVY AND DID YOU ALSO RECEIVE INFORMATION THAT SPECIAL AGENT JIM HARPER HAD RECEIVED FROM THE BURNS'S FAMILY THAT SAMANTHA, AT THE TIME OF HER DISAPPEARANCE, HAD A CANDY BOX AND WAS SELLING FUND-RAISING CANDY FROM HER CAR?

A.    I AM NOT SURE WHAT YOU ARE ASKING. I ACTUALLY CONTACTED AND CONFIRMED THAT SHE WAS SELLING BOX CANDY.

Q.    YOU CONTACTED THE BURNS FAMILY?

A.    YES, SIR.

Q.    WERE YOU ASSURED SOMEBODY DOWN IN SOUTH CAROLINA WAS GOING TO GO TO THE VAN AND ACTUALLY, PHYSICALLY RETRIEVE THAT BOX?

**JA 1223**

A.   YES, SIR,  THAT'S CORRECT.

Q.   SERGEANT ARNOLD,  LET ME JUMP FORWARD TO DECEMBER 4TH OF 2002.   YOU GOT INVOLVED IN THIS INVESTIGATION ON TUESDAY, NOVEMBER 12TH,  2002; IS THAT CORRECT?

A.   THAT'S CORRECT.

Q.   AND SPENT THE NEXT THREE TO FOUR  -- THREE WEEKS ATTEMPTING TO LOCATE THE BODY OF SAMANTHA BURNS?

A.   YES, SIR,  PRETTY MUCH NONSTOP.

Q.   RUNNING DOWN ALL LEADS?

A.   YES, SIR.

Q.   BASED ON ALL OF THE INFORMATION THAT THE WEST VIRGINIA STATE POLICE HAD,  INCLUDING STATEMENTS THAT WERE BEING PROVIDED BY MR. BASHAM OR MR. BASHAM'S ATTORNEY IN KENTUCKY, WAS THE DECISION MADE BY YOU, AND YOUR COLLEAGUES, AND YOUR AGENCY, AS WELL AS THE FBI, TO INFORM THE BURNS'S FAMILY OF SOMETHING?

A.   YES, SIR.

Q.   WHAT WAS THAT?

A.   WE WENT TO -- MYSELF, AND AGENT CICCARELLI, AND CAPTAIN STICK FROM THE STATE POLICE, SIMPLY BECAUSE HE IS A COUSIN, I THINK, WE ALL WENT TO THE JOHN AND KANDI BURNS'S RESIDENCE AND MADE THEM AWARE OF WHERE WE WERE AT ON THE INVESTIGATION. LET THEM KNOW, BASICALLY, THIS IS MORE OF A RECOVERY-TYPE INVESTIGATION.

Q.   BASED ON THE INFORMATION THAT YOU HAD, DID YOU INFORM

THE BURNS THAT SAMANTHA WAS DEAD?

A.    YES.

Q.    AND THAT HER BODY WAS PROBABLY IN THE WATER SOMEWHERE?

A.    YES.

Q.    DID YOU ASSURE THEM THAT THE SEARCHES WOULD CONTINUE?

A.    YES.

Q.    DID THEY?

A.    YES,  THEY DID.

Q.    WERE YOU PART OF THE COORDINATION AND THE SEARCH EFFORTS ON THURSDAY, DECEMBER 5TH, UTILIZING THE COAST GUARD ON THE OHIO RIVER?

A.    YES, SIR.

Q.    AS WELL AS ON FRIDAY, DECEMBER 6TH, AGAIN, USING THE COAST GUARD?

A.    THAT'S CORRECT.

Q.    AND DID ANYTHING OF EVIDENTIARY VALUE -- WAS ANYTHING OF EVIDENTIARY VALUE FOUND ON THOSE TWO PARTICULAR DAYS?

A.    NO, SIR.

Q.    JUMPING FORWARD TO SEPTEMBER 8TH,  2003,  SOME TEN MONTHS AFTER THE DISAPPEARANCE AND DEATH OF SAMANTHA BURNS, DID YOU HAVE AN OPPORTUNITY TO WITNESS AN INTERVIEW THAT THE FBI CONDUCTED WITH CHADRICK FULKS?

A.    YES, SIR.

Q.    WHERE DID THAT INTERVIEW TAKE PLACE?

A.    AT THE U.S. MARSHAL'S BUILDING IN CHARLESTON,  WEST

VIRGINIA.

Q.   AT THE TIME, WAS MR. FULKS'S LAWYER, WEST VIRGINIA LAWYER, AND SOUTH CAROLINA LAWYER PRESENT WITH HIM WHEN THE FBI INTERVIEWED MR. FULKS?

A.   YES, SIR.

Q.   AS A RESULT OF THE INFORMATION YOU RECEIVED FROM MR. FULKS DURING THAT INTERVIEW, LATER ON IN SEPTEMBER OF 2003, WERE FURTHER SEARCHES ALONG THE OHIO RIVER CONDUCTED?

A.   YES, SIR.

Q.   WAS A SPECIAL FBI DIVE TEAM BROUGHT IN?

A.   YES, SIR, THEY WERE.

Q.   WHAT WERE THE RESULTS OF THOSE SPECIFIC SEARCHES?

A.   EVERYTHING WAS NEGATIVE.

Q.   SERGEANT ARNOLD, AS YOU SIT HERE TODAY, SEPTEMBER 23RD, 2004, IN THIS SOUTH CAROLINA COURTROOM, DO YOU HAVE, AS CHIEF INVESTIGATING OFFICER, DO YOU HAVE ANY IDEA HOW SAMANTHA BURNS WAS KILLED?

A.   NO, SIR.

Q.   OR WHERE HER REMAINS ARE, IF THEY EVEN EXIST TODAY?

A.   NO, SIR.

MR. GASSER:  THANK YOU, YOUR HONOR.  THAT IS ALL I HAVE.

THE COURT:   CROSS-EXAMINATION.

MR. HARRIS:  THANK YOU, JUDGE.

CROSS EXAM

BY MR. HARRIS:

Q.    GOOD MORNING, SERGEANT ARNOLD.

A.    GOOD MORNING.

Q.    JUST BRIEFLY.  YOU FOUND OUT, AT SOME POINT DURING THE INVESTIGATION, YOU TESTIFIED THAT MR. CHADRICK FULKS HAD SUBSTANTIAL TIES TO THIS COMMUNITY?

A.    THAT'S CORRECT.

Q.    AND I AM GUESSING, AS THE LEAD AGENT IN WEST VIRGINIA, YOU ENDEAVORED TO DETERMINE THE EXTENT OF THOSE CONTACTS?

A.    THAT'S CORRECT.

Q.    AND I AM GUESSING HIS FAMILY HAD GROWN UP THERE?

A.    CORRECT.

Q.    HE STILL HAD FAMILY LIVING IN THE AREA?

A.    THAT'S CORRECT.

Q.    AND YOU ALSO -- WERE YOU ABLE TO DETERMINE THAT HE HAD, IN FACT, BEEN MARRIED ON TWO OCCASIONS IN CATLETTSBURG?

A.    YES, SIR.

Q.    THERE ARE TWO MARRIAGE CERTIFICATES IN CATLETTSBURG. SO, WE UNDERSTAND, CATLETTSBURG IS A SMALL TOWN ON THE OHIO RIVER BETWEEN HUNTINGTON AND ASHLAND?

A.    NEVER BEEN THERE, BUT I BELIEVE THAT IS WHERE IT IS.

Q.    OKAY.  NOW, THE OTHER CONTACTS THAT YOU ATTEMPTED TO ESTABLISH, I WOULD IMAGINE IS TO DETERMINE WHETHER OR NOT MR. FULKS HAD, IN FACT, BEEN TO THE OLD HOLLYWOOD MOTEL BEFORE?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,     )     CR. NO. 4:02-992
                              )     COLUMBIA, SC
                              )     SEPTEMBER 24, 2004
                              )
      VERSUS                  )
                              )
BRANDON L. BASHAM,            )
          DEFENDANT.          )
_____     )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME IX

APPEARANCES:

FOR THE GOVERNMENT:          SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             JOHN DUANE, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:           JACK SWERLING, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201

                             GREG HARRIS, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1228

LAB BECAUSE YOU DETECTED BLOOD ON THEM?

A.    THE SPECIMEN Q5, WHICH WAS THE LEATHER COAT, THERE WERE SEVERAL STAINS ON THAT COAT THAT TESTED POSITIVE FOR THE PRESUMPTIVE BLOOD TEST I WAS TALKING TO YOU EARLIER ABOUT. AND THREE OF THE STAINS FROM THAT JACKET WERE COLLECTED AND FORWARDED TO THE DNA EXAMINER.

Q.    SO, YOU DON'T SEND THEM THE COAT?

A.    NO.  WE MADE OUR COLLECTIONS, THE SEROLOGY BIOLOGIST COLLECTED THE STAINS ON A SWAB, AND THOSE SWABS WERE FORWARDED FOR DNA ANALYSIS.

Q.    THE OTHER ITEMS THAT WERE IDENTIFIED WERE TESTED, BUT NONE OF THOSE ITEMS WERE SENT TO DNA FOR FURTHER TESTING; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    LET ME SHOW YOU, MS. CERVOS, WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 165.  I BELIEVE YOU LOOKED AT THIS ITEM OVER THE BREAK.  CAN YOU CONFIRM THAT GOVERNMENT'S EXHIBIT 165 IS A BLACK LEATHER COAT THAT TESTED PRESUMPTIVE POSITIVE FOR BLOOD?  I BELIEVE YOU TOOK THREE OF THOSE SWABS AND FORWARDED THEM TO DNA?

A.    THAT'S CORRECT.

Q.    CAN YOU COME OFF THE WITNESS STAND, PLEASE, AND SHOW THE JURY WHERE THE SWABBINGS YOU TOOK OFF FOR TESTING ARE LOCATED?

A.    (WITNESS COMPLIES.)  THE STAINS THAT WERE COLLECTED

FROM THE JACKET ARE -- WOULD BE, THIS IS Q-5, SO IT WOULD BE Q-5.1, WHICH WOULD BE THE STAIN FROM STAIN ONE, A COLLECTION WAS MADE OF A PORTION OF THAT, THE STAIN WAS COLLECTED; Q-5.2, THE STAIN HERE IN THE SHOULDER AREA, AS WELL AS A PORTION OF THE STAIN WAS REMOVED FROM Q-5.5, WHICH WOULD BE STAIN FIVE HERE IN THE HOOD AREA.

Q. AN AREA FROM THE BACK OF THE HOOD, AN AREA FROM THE RIGHT SHOULDER, AND AN AREA FROM INSIDE THE HOOD?

A. INSIDE, THAT'S CORRECT.

Q. THANK YOU. PLEASE TAKE YOUR SEAT.

A. (WITNESS COMPLIES.)

Q. IS THERE A REASON, MS. CERVOS, THAT YOU DIDN'T CONDUCT CONFIRMATORY TESTS ON THOSE ITEMS TO ASSURE YOURSELF THAT THEY WERE, IN FACT, BLOOD?

A. ONE OF THOSE STAINS, Q-5.5 THE ONE FROM INSIDE THE HOOD AREA, IT GAVE US A WEAK POSITIVE RESULT. SO, THAT STAIN WAS WEAK IN NATURE, AND SO WE WOULDN'T HAVE ATTEMPTED TO CONFIRM THE PRESENCE OF BLOOD BECAUSE THAT WOULD HAVE MEANT THAT WE WOULD HAVE CONSUMED MORE SAMPLE AND WE DON'T WANT TO DO THAT IF WE KNOW THAT THAT COULD POSSIBLY GO FOR DNA ANALYSIS.

THE OTHER TWO STAINS, THEY WEREN'T -- THEY GAVE US A POSITIVE RESULT; HOWEVER, WITH THE NATURE OF THE ITEM AND THE COLORING OF THE STAIN, WE DETERMINED THAT IT WAS BEST NOT TO -- THAT THE QUANTITY OF THE STAIN WAS NOT SUFFICIENT ENOUGH

FOR US TO THEN DO FURTHER TESTING FOR BLOOD.

Q. LET ME NOW DIRECT YOUR ATTENTION TO A GROUP OF ITEMS YOU RECEIVED AS HAVING BEEN RECOVERED FROM CHADRICK FULKS AT THE TIME OF HIS ARREST. THOSE WOULD BE ITEMS REFLECTED, AGAIN, ON YOUR REPORT. IF YOU COULD, TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT THOSE ITEMS WERE.

A. THE ITEMS RECOVERED FROM CHADRICK FULKS WAS Q-23, A LEATHER SHOE; Q-24, THE LEFT LEATHER SHOE; THE OTHER ONE WAS THE RIGHT LEATHER SHOE; Q-25, A PULLOVER SWEATSHIRT; Q-26, A POLO SWEATSHIRT ZIPPER; Q-27, POLYESTER PANTS; Q-27.1, WHICH IS A NICKEL THAT WAS RECOVERED FROM THE PACKAGING OF THE PANTS; Q-28 BLUE JEANS; Q-28.1, WHICH WAS A NECKLACE THAT WAS ALSO RECOVERED FROM INSIDE THE PACKAGING OF THE JEANS; Q-29, BOXER PANTS; Q-29.1, WHICH WAS A PENNY THAT WAS ALSO FOUND IN THAT PACKAGING; Q-30, TAN STRIPE SHIRT; Q-31, AND 32, SOCKS; AND, Q-33, WHICH WERE A PAIR OF UNDERPANTS OR UNDERWEAR.

Q. DID YOU ALSO EXAMINE THOSE ITEMS, MS. CERVOS, AND TRY TO DETERMINE WHETHER THERE WAS ANY BODILY FLUIDS PRESENT ON ANY OF THOSE ITEMS?

A. YES, I DID.

Q. WHAT DID YOU DETERMINE?

A. THOSE ITEMS WERE NEGATIVE. HOWEVER, THERE WAS ONE ITEM, Q-29, WHICH WAS THE PAIR OF PANTS, DID GIVE US A STAINED AREA THAT TESTED POSITIVE FOR THE PRESUMPTIVE TEST FOR BLOOD.

Q. LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT

191. DO YOU RECOGNIZE WHAT IS IN GOVERNMENT'S 191?

A. YES, BY THE Q NUMBER AND LABORATORY NUMBER.

Q. DOES THIS APPEAR TO BE THE TAN BOXER PANTS THAT WERE PRESUMPTIVELY POSITIVE FOR BLOOD?

A. YES.

Q. WHAT CAN YOU TELL US, IF ANYTHING, MS. CERVOS, ABOUT THE QUANTITY AND SIZE THAT YOU OBSERVED THAT TESTED POSITIVE?

A. THE STAINED AREA, IT WAS A VERY FAINT STAINED AREA IN THE UPPER HIP AREA.

Q. DID YOU CONDUCT A CONFIRMATORY TEST ON GOVERNMENT'S EXHIBIT 191 TO DETERMINE WHETHER THE PRESENCE OF BLOOD COULD BE CONFIRMED?

A. NO, WE DID NOT. WE STOPPED AFTER THE PRESUMPTIVE TEST. IT WAS A POSITIVE RESULT AND THE NATURE OF THE STAIN WAS WEAK IN COLORING AND, AGAIN, ULTIMATELY WE WANT TO REMAIN -- SAVE AS MUCH SAMPLING AS POSSIBLE FOR DNA ANALYSIS. SO THE QUANTITY WASN'T SUFFICIENT ENOUGH FOR US TO TAKE SAMPLING TO CONFIRM THE PRESENCE OF BLOOD.

Q. MS. CERVOS, DOES WASHING CLOTHES IN A STANDARD WASHING MACHINE WITH STANDARD DETERGENT GENERALLY ELIMINATE BODILY FLUIDS FROM THOSE CLOTHES?

A. THAT VARIES. IT DEPENDS. THERE ARE MANY THINGS THAT HAPPEN WHEN YOU WASH. AND THE REASON WHY THAT DEPENDS, THAT IS A POSSIBILITY, DEPENDS ON THE TEMPERATURE OF THE WATER, HOW VIGOROUS THE WASHING MACHINE WILL, YOU KNOW, WASH THE

CLOTHES, THE TYPE OF DETERGENT THAT YOU USE. IT IS A POSSIBILITY TO WASH OUT A BODY FLUID. BUT, THEN AGAIN, THERE IS A POSSIBILITY THAT THAT WOULDN'T HAPPEN WHEN YOU WASHED CLOTHING.

Q. LET ME ASK YOU ABOUT ANY OTHER RESULTS WITH RESPECT TO THE ITEMS THAT WERE RECOVERED FROM MR. FULKS. WERE THERE ANY OTHER RESULTS OTHER THAN THAT ONE TAN JOE BOXER PANTS THAT WAS POSITIVE?

A. AS FAR AS MY RESULTS?

Q. WITH RESPECT TO THE ITEMS RECOVERED FROM MR. FULKS.

A. THE OTHER ITEMS WERE NEGATIVE FOR BLOOD.

Q. AND, FINALLY, MS. CERVOS, I WANT TO DIRECT YOUR ATTENTION TO A NUMBER OF ITEMS THAT WERE SUBMITTED TO YOU ON JANUARY 28TH OF 2004, AS HAVING BEEN RECOVERED, I BELIEVE, FROM MS. DONOVAN'S BMW.

A. WOULD YOU LIKE ME TO STATE ALL THE ITEMS WE RECEIVED FROM THE BMW?

Q. ITEMS BEGINNING Q-12 -- I'M SORRY, I JUMPED AHEAD OF YOU, YOU ARE RIGHT. THE ITEMS RECOVERED FROM MS. DONOVAN'S BMW, IT IS A LONG LIST OF ITEMS; IS THAT CORRECT?

A. YES.

Q. YOU TESTED ITEMS, I BELIEVE, THE ONLY ITEMS YOU TESTED, I BELIEVE, WERE A PAIR OF GLOVES -- I WILL LIST THEM: PAIR OF GLOVES; POCKET KNIFE; A ROLL OF MASKING TAPE; A WHITE TOWEL; AND THEN A CUTTING FROM THE MIDDLE REAR SEAT; IS

MR. SCHOOLS: YOUR HONOR.

THE COURT: I WILL ALLOW IT AS FAR AS IT SHOWS WHAT HE DID TO WHAT HE HEARD.

MR. SCHOOLS: THANK YOU, YOUR HONOR.

THE WITNESS: MY CBC TOLD ME, BASED ON THE FACT THAT WAS A STATEMENT MR. BASHAM HAD MADE, IT WOULD BE APPROPRIATE FOR ME TO ATTEMPT TO RECONTACT HIM. ASSUMING THAT I FIRST PROVIDED HIM HIS MIRANDA RIGHTS AGAIN AND THAT HE WAIVED THOSE RIGHTS AND HE AGREED TO TALK TO ME, IT WOULD BE ALL RIGHT FOR ME TO DO SO.

BY MR. SCHOOLS:

Q. WHAT IS THE NAME OF YOUR COUNSEL?

A. DAVID BYAR.

Q. HE IS AN ATTORNEY?

A. YES.

Q. AS RESULT OF THE ADVICE YOU GOT FROM DAVID BYAR, WHAT DID YOU DO?

A. I GATHERED INFORMATION AT THE POLICE DEPARTMENT ON WHAT HAD HAPPENED PRIOR TO THAT. AND I TALKED TO PAT MALEY, MY SUPERVISOR. AND IT WAS DETERMINED THAT THE NATURE OF THE CRIME, THE FACT THAT THERE MAY BE A VICTIM STILL OUT THERE, THAT WE NEEDED TO MOVE QUICKLY. SO, IT WAS DECIDED I WOULD GO AHEAD AND DO AN INTERVIEW OF MR. BASHAM BEFORE ANOTHER AGENT COULD GET THERE.

Q. SO, DID YOU GO TO THE BOYD COUNTY DETENTION CENTER?

**JA 1234**

A.    YES, SIR, I DID.   MYSELF AND A DETECTIVE WITH THE STATE POLICE TROOPER WHO WAS PRESENT DURING THE BRIEFING THAT WE HAD AT THE ASHLAND POLICE DEPARTMENT WENT TO DO THE INTERVIEW.

Q.    WHY WAS HE THERE?

A.    HE WAS WORKING, I BELIEVE, AS A REPRESENTATIVE OF THE STATE POLICE INVOLVED IN THE INVESTIGATION OF THE ESCAPE FROM THE COUNTY JAIL THAT MR. BASHAM WAS IN.

Q.    WHAT HAPPENED WHEN YOU GOT TO THE BOYD COUNTY DETENTION CENTER?

A.    I SPOKE TO THE PERSONNEL AT THE JAIL, TALKED TO THEM ABOUT DOING AN INTERVIEW.   THEY PROVIDED ME A SPACE TO DO THE INTERVIEW.   MYSELF AND TROOPER STEVENS WENT TO THAT SPACE AND THEY BROUGHT MR. BASHAM TO ME.

Q.    WHAT WAS THE DATE THAT YOU GOT THE PHONE CALL FROM AGENT WILLIAMS?

A.    IT WAS THE 18TH OF NOVEMBER.

Q.    WHEN DID YOU GET TO THE BOYD COUNTY DETENTION CENTER?

A.    THE 19TH ABOUT 1:00 O'CLOCK IN THE MORNING.

Q.    YOU SAID JAIL PERSONNEL PROVIDED YOU A SPACE TO CONDUCT THE INTERVIEW?

A.    YES, SIR.

Q.    DID YOU GO TO THAT SPACE?

A.    I DID.

Q.    DO YOU RECALL WHETHER -- WAS MR. BASHAM THERE WHEN YOU

GOT THERE?

A. I DON'T -- NO, SIR, THEY BROUGHT HIM TO ME. HE WAS IN HIS CELL.

Q. WHEN HE ARRIVED -- WE WILL CALL IT THE INTERVIEW ROOM FROM THIS POINT FORWARD FOR REFERENCE -- WHEN HE GOT TO THE INTERVIEW ROOM, WHAT WAS HIS CONDITION?

A. HE WAS FINE. HE HAD BEEN SLEEPING, AND HE SPOKE TO ME AS NORMAL.

Q. SO, WHAT DID YOU DO WHEN YOU FIRST MET WITH MR. BASHAM?

A. WHEN I FIRST MET WITH MR. BASHAM, I PROVIDED HIM WITH FT395, WHICH IS OUR ADVICE OF RIGHTS FORM. I ASKED HIM IF HE COULD READ AND WRITE, HE SAID THAT HE COULD. AND I ASKED HIM TO READ THE FORM TO ME AS HE WAS GOING OVER IT HIMSELF JUST TO MAKE SURE THAT HE COULD READ AND WRITE.

Q. LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 428, AGENT VITO. DO YOU RECOGNIZE WHAT IS MARKED AS GOVERNMENT'S 428?

A. YES, I DO.

Q. WHAT IS GOVERNMENT'S EXHIBIT 428?

A. IT IS THE WAIVER OF RIGHTS FORM AND ADVICE OF RIGHTS FORM THAT I PROVIDED TO MR. BASHAM.

Q. ON NOVEMBER 19TH OF 2002, AT APPROXIMATELY 1:58 IN THE MORNING?

A. YES, SIR.

MR. SCHOOLS: WE OFFER GOVERNMENT'S 428 AT THIS TIME.

THE COURT: ANY OBJECTION?

MR. HARRIS: NO OBJECTION.

BY MR. SCHOOLS:

Q. YOU MADE REFERENCE TO A FORM NUMBER, I BELIEVE, WHEN YOU WERE DISCUSSING THIS DOCUMENT, IT IS A FT395?

A. YES, SIR.

Q. THAT IS A NUMBER ASSOCIATED WITH THIS FORM?

A. NUMBER ASSOCIATED WITH THE FORM.

Q. YOU ASKED -- WAS MR. BASHAM ABLE TO READ THIS FORM TO YOU?

A. YES, SIR, HE DID.

Q. DID HE -- WERE YOU COMFORTABLE THAT HE UNDERSTOOD THE RIGHTS THAT ARE REFLECTED ON GOVERNMENT'S EXHIBIT 428?

A. YES, SIR. HE DID UNDERSTAND THEM.

Q. DID HE AGREE TO WAIVE HIS RIGHTS AND SPEAK WITH YOU, AT THAT TIME?

A. HE DID.

Q. AND DID HE SIGN GOVERNMENT'S EXHIBIT 428 THAT EVENING IN YOUR PRESENCE, IN THE PRESENCE OF TROOPER STEVENS?

A. YES, SIR, HE DID.

Q. SUBSEQUENT TO OBTAINING THIS RIGHTS WAIVER, AGENT VITO, LET ME ASK YOU A GENERAL QUESTION ABOUT THE CONDUCT OF THIS INTERVIEW. YOU WERE PRETTY NEW TO THIS WHOLE SITUATION?

A. YES.

Q. DOES YOUR NEWNESS TO THE SITUATION IMPACT HOW YOU

CONDUCT AN INTERVIEW OF AN INDIVIDUAL IN THESE CIRCUMSTANCES?

A.    THE BASIC INTERVIEW, IN A SITUATION LIKE THIS, WOULD BE TO GATHER AS MUCH INFORMATION AS YOU CAN BECAUSE I DIDN'T HAVE ALL OF THE DETAILS OF THE KIDNAPPING.  BARELY HAD JUST A TELEPHONE BRIEFING, BASICALLY, OF WHAT WAS GOING ON IN SOUTH CAROLINA.   AS WELL AS WHAT HAD OCCURRED EARLIER IN KENTUCKY. MY BASIC APPROACH IN THIS SITUATION WOULD BE TO JUST ASK OPEN-ENDED QUESTIONS.

Q.    THE JURORS MAY HAVE SEEN TELEVISION PROGRAMS WITH CONFRONTATIONAL LAW ENFORCEMENT INTERVIEWS.   WERE YOU INTENDING ON, IN THE EARLY MORNING HOURS OF NOVEMBER 19TH, TO CONDUCT SUCH AN INTERVIEW?

A.    NO, SIR.   THAT ISN'T MY STYLE.   I FIND IT DOESN'T WORK, BASICALLY.   YOU TALK TO PEOPLE, TREAT THEM WELL, AND YOU USUALLY GET RESPONSES.

Q.    SO, WHAT WAS YOUR INQUIRY ON THE EARLY MORNING HOURS OF NOVEMBER 19TH,  2002?

A.    I WANTED TO GATHER INFORMATION CONCERNING THE KIDNAPPING OF MS. DONOVAN AND WHERE SHE WOULD BE.  AND IF WE COULD GET INFORMATION THAT MAY POSSIBLY SAVE HER.

Q.    DID YOU AT THE BEGINNING OF THE INTERVIEW TELL MR. BASHAM SPECIFICALLY WHAT INFORMATION YOU WERE LOOKING FOR?

A.    NO, SIR.

Q.    WHAT DID YOU DO?

A.    TOLD HIM WE WERE HERE CONDUCTING AN INVESTIGATION.  IN

JA 1238

THE BEGINNING TOLD HIM HIS FINGERPRINTS HAD IDENTIFIED HIM AS BRANDON BASHAM. ORIGINALLY BEEN BOOKED IN THE JAIL UNDER AN ALIAS NAME, LEON RITTMAN I BELIEVE IT WAS.

Q. AND SO, WHAT HAPPENED AFTER YOU ADVISED MR. BASHAM OF HIS RIGHTS? YOU EXPLAINED TO HIM WHY YOU WERE THERE, HE AGREED TO TALK TO YOU, WHAT DID HE TELL YOU?

A. YES, SIR. IN THE FIRST INTERVIEW, MR. BASHAM WENT OVER WHAT HAD OCCURRED WHEN HE BROKE OUT OF JAIL, BASICALLY. HE TOLD ME THAT -- WOULD YOU LIKE ME TO GO THROUGH THE 302'S?

Q. SURE.

A. HE TOLD ME THEY ESCAPED FROM JAIL, THEY WALKED AROUND FOR A WHILE AND ATTEMPTED TO GET CLOTHING. THEY ASKED A MAN FOR A RIDE TO A GAS STATION.

Q. LET ME STOP YOU RIGHT THERE. WHO IS "THEY"?

A. WHEN HE IS SPEAKING OF "THEY," HE IS TALKING ABOUT HIMSELF AND CHAD FULKS, THE PERSON HE ESCAPED FROM JAIL WITH.

Q. HE AND MR. FULKS WENT TO A HOUSE, SAW A MAN, ASKED FOR A RIDE TO A GAS STATION, WHAT DID HE TELL YOU NEXT?

A. YES, SIR. FULKS HAD A KNIFE, AT THAT POINT, WHILE THEY WERE IN THE CAR WITH THE MAN THAT THEY HAD GOT A RIDE FROM. FULKS KEPT TELLING BASHAM TO USE THE KNIFE TO TAKE OVER THE CAR. TO USE THE KNIFE AND THREATEN THE MAN TO TAKE OVER THE CAR. BASHAM SAID THAT FULKS KEPT TELLING HIM TO DO THAT. HE FINALLY AGREED AND TOOK THE KNIFE AND THREATENED THE MAN AND TOLD HIM TO CONTINUE TO DRIVE. MR. BASHAM WASN'T REALLY

GOING ON TO KNOW THE NATURE OF THE CONVERSATION.   AND BESIDES THAT, I DON'T --

THE COURT:  I UNDERSTAND WHAT YOU ARE SAYING.   I THINK IT IS NECESSARY TO PUT IN CONTEXT WHAT HAPPENED WHEN AND WHY HE KEPT ASKING FOR MORE INFORMATION.   I THINK MAYBE I SHOULD GIVE THE JURY A CAUTIONARY INSTRUCTION THAT ORDINARILY I DO NOT LET ONE WITNESS COMMENT UPON THE TRUTHFULNESS OF ANOTHER ONE.   IN THIS CASE, I AM LETTING THE AGENT EXPRESS -- SAY WHAT HIS OPINION WAS BECAUSE IT EXPLAINS WHY IT LED TO FURTHER QUESTIONING.

MR. SCHOOLS:  I HAVE NO PROBLEM WITH THAT.

THE COURT:   THE JURY HAS TO DECIDE IF THE DEFENDANT IS CREDIBLE OR NOT.

MR. SWERLING:  ONE OTHER CONCERN I HAVE IS, THE CLOSER THEY GET TO MS. DONOVAN AND MS. BURNS, THAT IF HE CONTINUES TO STATE THAT HE DOESN'T BELIEVE MR. BASHAM,  THEN HE --

THE COURT:   HOW MUCH MORE ARE WE GOING TO HEAR OF THIS?

MR. SCHOOLS:  THE ONLY TIME I WOULD INTEND TO ELICIT THIS IS IF HE ACTUALLY CONFRONTED MR. BASHAM WITH HIS BELIEF HE DIDN'T BELIEVE HIM.   THAT PUTS IT IN CONTEXT.  IF HE IS SITTING THERE SAYING, I DON'T BELIEVE THE STORY ABOUT, TELLING MR. BASHAM THAT, I DON'T THINK THAT IS RELEVANT.  I DON'T INTEND TO ELICIT IT.   TO THE EXTENT HE CONFRONTS MR. BASHAM,

WE THINK IT IS RELEVANT.

THE COURT:  I UNDERSTAND YOUR CONCERN.  I WOULD BE, TOO, IF I WERE THE DEFENSE LAWYER.  I REALLY DO THINK IT IS NECESSARY FOR THE JURY TO UNDERSTAND THE FLOW OF THE QUESTIONING AND WHY THE AGENT KEPT PROBING HIM, AND SO FORTH. I WILL GIVE A CAUTIONARY INSTRUCTION.

MR. SWERLING:  YOU HAVE MY OBJECTION THROUGHOUT.

THE COURT:   YOU ARE PROTECTED.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED.)

THE COURT:   MEMBERS OF THE JURY, LET ME GIVE YOU A SPECIAL INSTRUCTION, AT THIS POINT.  ORDINARILY, ONE WITNESS IN A CASE IS NOT ALLOWED TO TESTIFY AS TO WHETHER HE BELIEVES WHAT SOMEONE ELSE SAYS.  THAT IS FOR THE JURY TO DETERMINE.

IN THIS CASE, YOU JUST HEARD ONE OF THE FBI AGENTS SAY HE WAS QUESTIONING THE DEFENDANT AND HE DIDN'T BELIEVE SOMETHING BECAUSE IT DIDN'T MATCH UP, AND SO HE WENT FURTHER.  I AM ALLOWING THE TESTIMONY OF THIS AGENT THAT HE DIDN'T BELIEVE SOME OF WHAT WAS BEING SAID,  ONLY INSOFAR AS IT MIGHT EXPLAIN WHY THE AGENT ASKED ADDITIONAL QUESTIONS.  AND THE FACT THAT THIS PARTICULAR WITNESS MIGHT NOT HAVE BELIEVED THIS STATEMENT SHOULD NOT AFFECT YOUR DETERMINATION OF WHETHER YOU BELIEVE THE STATEMENT OR NOT, THAT IS FOR YOU TO DECIDE.  BUT YOU MUST DECIDE THAT BASED ON ALL OF THE TESTIMONY THAT YOU HEAR IN THIS CASE.

YOU MAY PROCEED.

MR. SCHOOLS: THANK YOU.

BY MR. SCHOOLS:

Q. AGENT VITO, MR. BASHAM HAD PROVIDED YOU A TIME LINE DURING WHICH HE HAD NOT MENTIONED ANYTHING ABOUT THE CASE THAT YOU WERE TRYING TO PURSUE, IN FACT, THE MISSING PERSON IN SOUTH CAROLINA?

A. YES, SIR.

Q. SO, WHAT DID YOU DO?

A. I ASKED HIM -- TOLD HIM I DIDN'T BELIEVE WHAT HE TOLD ME. I POINTED OUT SEVERAL INCONSISTENCIES IN HIS STORY AND ASKED HIM, WHAT ABOUT THE WOMAN IN THE BMW?

Q. WHEN YOU ASKED HIM, SPECIFICALLY, ABOUT THE WOMAN IN THE BMW, WHAT DID HE TELL YOU?

A. HE TOLD ME THAT HE WAS AWARE OF WHAT I WAS TALKING ABOUT, AND THAT THE LAST TIME HE HAD SEEN THE WOMAN IN THE BMW WAS WHEN SHE WAS IN THE CAR WITH CHAD FULKS RIGHT BEFORE THE ASHLAND INCIDENT. BASHAM ADVISED THE WOMAN WAS STILL WITH FULKS, AND THAT BASHAM BELIEVED THAT FULKS WAS GOING BACK TO SOUTH CAROLINA TO GET THE GIRLS THAT THEY HAD LEFT IN THE MOTEL, THE TWO GIRLS THEY WERE TRAVELLING WITH.

Q. NOW, BASED ON YOUR INTERVIEW WITH MR. BASHAM, AT THAT TIME, WAS IT YOUR UNDERSTANDING THAT THE WOMAN WHO WAS STILL IN THE CAR WITH MR. FULKS WAS ALIVE?

A. YES, SIR.

Q. MR. BASHAM SAID THAT MR. FULKS AND THE WOMAN WERE GOING

BACK TO SOUTH CAROLINA TO PICK UP THE GIRLS WHO HE HAD REFERENCED EARLIER WHO THEY HAD PICKED UP ALONG THE WAY?

A.    THAT'S CORRECT.

Q.    WHAT DID HE TELL YOU NEXT?

A.    HE SAID THAT HE AND FULKS WERE IN A WAL-MART PARKING LOT AND SAW THE WOMAN IN THE BMW.   HE WAS NOT SURE WHAT STATE HE WAS IN, AT THE TIME.   THEY GOT UP TO HER VEHICLE AND GOT INTO THE CAR WITH THE WOMAN AND TOLD HER TO DRIVE.   FULKS, BASHAM, AND THE WOMAN THEN DROVE TO A GAS STATION IN THE BMW. BASHAM SAID THAT THEIR PLAN WAS TO TAKE THE VEHICLE, TIE UP THE WOMAN LIKE THEY HAD DONE PREVIOUSLY WITH THE MAN IN INDIANA, AND PUT HER OUT IN THE WOODS.   AFTER THEY GOT GAS, BASHAM WENT INTO THE GAS STATION,  GOT CIGARETTES, AND CAME BACK OUT.   THE WOMAN WAS STILL IN THE CAR WITH THEM.   BASHAM SAID THAT HE KEPT TELLING HER THAT IT WOULD BE ALL RIGHT.

Q.    WHEN YOU SAY THE WOMAN WAS STILL IN THE CAR WITH HIM, THAT IS WHEN BASHAM WENT INTO THE GAS STATION TO GET CIGARETTES?

A.    YES.

Q.    WHAT DID HE TELL YOU NEXT?

A.    HE SAID HE THEN WENT TO SLEEP. WHEN HE WOKE UP, HE, FULKS, AND THE WOMAN GOT FOOD.   BASHAM SAID THAT THEY FED THE WOMAN,  TOOK CARE OF HER,  WERE NOT GOING TO HURT HER. BASHAM AND FULKS ARGUED ABOUT TYING THE WOMAN'S HANDS WITH TAPE.   BASHAM SAID THAT HE DID NOT WANT TO TIE HER UP.   HE

SAID THAT FULKS BECAME ANGRY ABOUT THIS AND STOPPED THE BMW IN THE MIDDLE OF THE ROAD AND THREATENED TO LEAVE BASHAM IF HE DIDN'T TAPE THE WOMAN'S HANDS.  FULKS EVENTUALLY TAPED THE WOMAN'S HANDS AND GOT THE CAR IN DRIVE.

Q.    LET ME STOP YOU THERE FOR A COUPLE OTHER QUESTIONS. MR. BASHAM TOLD YOU THAT THEY FED THE WOMAN AND TOOK CARE OF HER AND THEY WERE NOT GOING TO HURT HER?

A.    YES.

Q.    THAT IS WHAT HE IS TELLING YOU THE EARLY MORNING HOURS OF NOVEMBER 19TH?

A.    YES.

Q.    AGENT VITO, WE WILL TALK ABOUT THIS LATER.  YOU WERE ALSO PRESENT AT THE INTERVIEW OF NOVEMBER 25TH, 2002, SIX DAYS LATER, WHEN MR. BASHAM WAS INTERVIEWED BY MR. MALEY AND YOURSELF IN THE PRESENCE OF HIS ATTORNEY, MR. HUGHES?

A.    YES, SIR, I WAS.

Q.    YOU ARE AWARE, AT THAT TIME, MR. BASHAM PROVIDED INFORMATION CONCERNING LOCATION?

        MR. SWERLING:  I HAVE TO OBJECT TO THE LEADING NATURE OF THE QUESTIONS.

        THE COURT:  YOU ARE LEADING, MR. SCHOOLS.

BY MR. SCHOOLS:

Q.    WHAT DID MR. BASHAM TELL YOU ON NOVEMBER 25TH, 2002, ABOUT ALICE DONOVAN AND HER CONDITION?

A.    HE PROVIDED INFORMATION THROUGH HIS ATTORNEY ABOUT THE

LOCATION OF HER BODY.

Q.    WAS SHE ALIVE OR DEAD, AT THAT TIME?

A.    DEAD.

Q.    AT THIS NOVEMBER 19TH STATEMENT, WAS MS. DONOVAN SUPPOSED TO BE ALIVE OR DEAD?

A.    HE IMPLIED TO ME THAT SHE WAS ALIVE.  HE STATED THAT SHE WAS WITH FULKS AND HE WAS NOT GOING TO HURT HER.

Q.    MR. BASHAM SAID TO YOU THAT MR. FULKS WANTED HIM TO TAPE THE WOMAN'S HANDS, BUT THAT HE REFUSED; IS THAT RIGHT?

A.    YES.

Q.    SO, BASED ON THAT COMMENT, MR. BASHAM WAS TELLING YOU THAT --

MR. SWERLING:  THAT IS LEADING.

MR. SCHOOLS:  I HAVEN'T FINISHED THE QUESTION.

BY MR. SCHOOLS:

Q.    WHAT WAS MR. BASHAM TELLING YOU ABOUT THE RELATIONSHIP BETWEEN HIM AND MR. FULKS WITH THAT STATEMENT?

A.    HE WAS EXPLAINING HIMSELF AS PROTECTOR.  HE WAS TRYING TO LOOK OUT FOR HER SAFETY.  AND MR. FULKS WAS THE ONE THAT WAS WANTING TO TIE HER UP.

Q.    AND WAS MR. BASHAM -- DID HE INDICATE WHETHER OR NOT HE HAD TO SUCCUMB TO MR. FULKS'S WISHES AND TIE HER HANDS UP?

A.    YES, HE DID.

Q.    WHAT DID HE SAY?

A.    AT THIS POINT, HE HAD SAID THAT FULKS, EVENTUALLY,

**JA 1245**

WOULD BE BACK LATER TO TALK TO HIM. I STATED THAT WOULD BE FINE.

Q. WHY DID YOU STOP?

A. I FELT IT WAS IMPORTANT THAT WE GET THE INFORMATION THAT MR. BASHAM HAD PROVIDED OUT TO THE INVESTIGATING OFFICERS THAT WERE WORKING THE KIDNAPPING, THAT THEY FIND THIS INFORMATION OUT.

Q. FOR WHAT PURPOSE?

A. TO TRY TO, HOPEFULLY, FIND MS. DONOVAN BEFORE SHE WAS INJURED.

Q. HOW DID YOU DO THAT?

A. AFTER THE INTERVIEW, I WENT BACK TO THE POLICE DEPARTMENT WHERE MY SUPERVISOR, AGENT MALEY, HAD ARRIVED AND WE CONDUCTED A MEETING THERE, PROVIDED INFORMATION TO THE INVESTIGATING OFFICERS, AND OTHER LOCATIONS.

Q. OKAY. AND JUST TO BE CLEAR, AT THE CONCLUSION OF THE INTERVIEW IN THE MORNING HOURS OF NOVEMBER 19TH, WHERE DID YOU BELIEVE ALICE DONOVAN WAS?

A. THAT SHE WAS WITH CHAD FULKS.

Q. WHEN DID YOU NEXT INTERVIEW MR. BASHAM?

A. IT WAS THAT SAME MORNING, LATER ON, APPROXIMATELY 9:45 THAT MORNING.

Q. LET ME ASK YOU ONE OTHER QUESTION. AT THE TIME YOU FIRST INTERVIEWED MR. BASHAM ON THE MORNING HOURS OF NOVEMBER 19TH, DID YOU HAVE ANY INFORMATION REGARDING A MISSING PERSON

**JA 1246**

IN WEST VIRGINIA?

A. NO, SIR, I DON'T BELIEVE THAT I DID. I BELIEVE THERE HAD BEEN SOME MENTION OF IT. I MAY HAVE HEARD ABOUT IT ON THE NEWS, BUT I DIDN'T HAVE VERY MANY DETAILS AT ALL.

Q. AT THE CONCLUSION OF THE INTERVIEW WITH MR. BASHAM, DID YOU HAVE ANY INFORMATION REGARDING THAT?

A. NO, SIR.

Q. WHAT HAPPENED -- WHAT DID YOU DO NEXT AFTER NOTIFYING LAW ENFORCEMENT ABOUT THE SUBSTANCE OF MR. BASHAM'S INTERVIEW?

A. WE WENT BACK TO THE JAIL AT ABOUT 9:45 THE NEXT MORNING TO CONDUCT ANOTHER INTERVIEW.

Q. OKAY. WHY DID YOU GO BACK?

A. THE INTERVIEW WE HAD DONE EARLIER PROVIDED BASIC DETAILS, BUT I HAD MORE QUESTIONS CONCERNING WHAT HAD HAPPENED. AND I WANTED TO ROUND OUT THE DETAILS OF THE INCIDENT.

Q. AT THAT POINT, HAD YOU HEARD ANYTHING ABOUT MR. FULKS'S WHEREABOUTS?

A. AT THAT POINT, I DO NOT BELIEVE THAT I HAD.

Q. SO, WHAT HAPPENED? DID YOU GO BACK TO THE BOYD COUNTY DETENTION CENTER ON THE MORNING OF NOVEMBER 19TH?

A. WE DID.

Q. WHAT TIME?

A. NINE FORTY-FIVE. IT WAS AROUND 9:00 O'CLOCK. STARTED THE INTERVIEW AT 9:45.

Q.    ANYONE WITH YOU ON THIS OCCASION?

A.    SPECIAL AGENT CARL CHRISTENSON WAS WITH ME.

Q.    HE IS ANOTHER FBI AGENT?

A.    YES, SIR.

Q.    IS IT TYPICAL TO HAVE TWO AGENTS OR TWO INDIVIDUALS CONDUCTING AN INTERVIEW SUCH AS THE ONES YOU HAVE BEEN CONDUCTING?

A.    YES.

Q.    WHY WOULD YOU DO THAT?

A.    BE MORE THAN ONE PERSON THAT WOULD HAVE A RECOLLECTION OF WHAT WAS SAID THERE.  WOULD BE SECURITY ISSUES,  THINGS LIKE THAT.

Q.    DURING THE COURSE OF THE FIRST INTERVIEW IN THE MORNING HOURS OF THE 19TH, THE 1:58 A.M. INTERVIEW, AT ANY POINT DID YOU GET HOSTILE WITH MR. BASHAM?

A.    NO, SIR.

Q.    WHAT WAS YOUR DEMEANOR THROUGHOUT THE COURSE OF THAT INTERVIEW?

A.    CALM.

Q.    YOU DID CONFRONT HIM ON A COUPLE OF OCCASIONS, BUT NOT AGGRESSIVELY?

A.    NO.  I JUST TOLD HIM, BASICALLY, I DIDN'T BELIEVE WHAT HE WAS TELLING ME.

Q.    WHEN YOU WENT BACK ON THE MORNING OF NOVEMBER 19TH AT 9:45,  AGAIN, WHAT WAS YOUR PURPOSE?

A.   TO ROUND OUT WHAT HAD HAPPENED,  GET MORE DETAILS, AND TO ATTEMPT TO FIND MS. DONOVAN AND GATHER INFORMATION CONCERNING THE CRIME.

Q.   WHAT HAPPENED WHEN YOU GOT THERE?

A.   WE WENT BACK THROUGH THE INITIAL ESCAPE.   HE PROVIDED SOME DIFFERENT DETAILS.  WOULD YOU LIKE ME TO GO THROUGH THEM IN DETAIL?

Q.   WHAT ABOUT -- DID YOU DO ANYTHING TO ASSURE MR. BASHAM UNDERSTOOD HIS RIGHTS AGAIN?

A.   YES, WE DID.   WE SHOWED HIM THE ORIGINAL  FT35 FORM, ADVICE AND RIGHTS FORM, AND ASKED HIM IF HE UNDERSTOOD THEM. HE SAID, YES.   ASKED HIM IF HE WOULD LIKE TO TALK TO US.  HE SAID HE WOULD.   HE DIDN'T REQUEST AN ATTORNEY, AND I ASKED HIM TO INITIAL THE FORM UNDERNEATH HIS SIGNATURE,  SAME SIGNATURE THAT HE HAD SIGNED EARLIER.

Q.   LET ME SHOW YOU, AGAIN, WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 428.

A.   YES, SIR.  THAT IS THE FORM.

Q.   DO THOSE APPEAR TO BE -- THOSE APPEAR TO BE MR. BASHAM'S INITIALS AND THE DATE AND TIME 9:45 A.M. LOCATED AT THE BOTTOM OF 428?

A.   YES.

Q.   AFTER MR. BASHAM AGREED TO SPEAK WITH YOU ON THIS OCCASION, WHAT OCCURRED?

A.   WE WENT BACK OVER WHAT HAPPENED DURING THE ESCAPE.

PROVIDED ADDITIONAL DETAILS OF WHERE HE WENT, WHAT HE HAD WITH HIM. WOULD YOU LIKE ME TO GO THROUGH THOSE IN DETAIL?

Q. YES.

A. HE STATED AFTER HE ESCAPED FROM THE JAIL, HE AND FULKS WAS RUNNING FROM THE AREA. AS THEY WERE DOING SO, THEY WERE STRIPPING THEIR CLOTHES OFF. THEY WENT TO A BUS WHICH WAS LOCATED NEAR THE JAIL. AND BY THIS I TOOK IT TO MEAN THAT THE BUS WAS MORE OF A STORAGE-TYPE BUILDING, NOT SOMETHING THAT ACTUALLY WAS MOVING, THAT BELONGED TO A FRIEND OF HIS, JOE JONES. THEY GOT SOME CLOTHES FROM THE BUS WHILE THEY WERE THERE. FULKS GOT A KNIFE AND BASHAM GOT A SCREWDRIVER WHILE THEY WERE THERE.

THEY WALKED AROUND PEE-WEE LAKE TO HANSEN, KENTUCKY. FULKS TOLD BASHAM TO GO UP TO A HOUSE AND KNOCK ON THE DOOR AND ASK FOR A RIDE. BASHAM AGREED, AND HE DID, TOLD THE MAN THAT CAME TO THE DOOR A STORY ABOUT THEIR CAR BREAKING DOWN AND ASKED FOR A RIDE BACK TO THE CAR. THE MAN AT THE HOUSE AGREED TO GIVE THEM A RIDE AND HE STATED FULKS KNEW WHICH WAY TO GO. WENT UP KENTUCKY HIGHWAY 41 NORTH.

Q. MR. BASHAM GAVE YOU THAT INFORMATION, WENT UP KENTUCKY HIGHWAY 41 NORTH?

A. YES. THE MAN DROVE THEM ALL THE WAY TO EVANSVILLE, INDIANA, WENT ACROSS A BRIDGE. AFTER THEY WENT ACROSS, THEY TURNED AROUND. FULKS TOLD BASHAM TO TAKE THE KNIFE AND TELL HIM TO CONTINUE DRIVING. BASHAM STATED THE BLUE TRUCK THEY

**JA 1250**

WERE IN WAS ALMOST OUT OF GAS.  THEY STOPPED, FULKS USED THE PHONE.  WHEN FULKS GOT BACK IN THE TRUCK, HE HAD WRITTEN A NOTE THAT HE GAVE TO BASHAM.

Q.    WHO HAD WRITTEN A NOTE?

A.    FULKS HAD WRITTEN A NOTE THAT HE GAVE TO BRANDON BASHAM.

Q.    WHAT DID THE NOTE, SUPPOSEDLY, SAY?

A.    THE NOTE SAID, "PULL THE KNIFE ON THE MAN."

Q.    IS THAT CONSISTENT WITH THE EVENTS THAT HE DESCRIBED PREVIOUSLY?

A.    FAIRLY CONSISTENT.  JUST MORE DETAIL.

Q.    HE, AT THIS TIME, SAID THE COMMUNICATION TO PULL THE KNIFE ON THE MAN WAS BY A NOTE?

A.    YES.

Q.    WHAT ELSE DID HE TELL YOU?

A.    BASHAM FINALLY AGREED, GOT THE KNIFE AND SHOWED IT TO THE MAN AND TOLD HIM TO KEEP GOING.  FULKS GOT IN THE DRIVER'S SEAT OF THE VEHICLE AND TOLD BASHAM TO TAPE UP THE MAN'S HANDS.  BASHAM DID SO, BUT WAS CONCERNED ABOUT THE MAN'S CIRCULATION.

Q.    WHAT DID HE TELL YOU NEXT?

A.    THEY STOPPED AT A GAS STORE.  AFTER THEY GOT GAS, FULKS PULLED UP INTO A FIELD.  BASHAM STATED THAT FULKS SEEMED TO BE TRYING TO GET THE TRUCK STUCK IN THE MUD.  WHY, I DON'T KNOW.  FULKS DID THAT FOR ABOUT 15 MINUTES.  AND THEN

Q.    MR. BASHAM TELLS YOU HE FELT HE WAS MISTREATED BY THE POLICE?

A.    YES.

Q.    BECAUSE HE WAS COLD?

A.    YES.

Q.    WHAT HAPPENED NEXT?

A.    WHEN THEY GOT TO THE JAIL, THE POLICE OFFICER TOLD HIM ABOUT A BEATING THAT OCCURRED AT THE JAIL AND TRIED TO GET BASHAM TO TELL HIM HIS REAL NAME.

Q.    DID BASHAM TELL YOU WHETHER HE TOLD ANYBODY HIS REAL NAME AT THAT POINT OR NOT?

A.    HE DIDN'T TELL ME, AT THAT POINT.  HE WAS BOOKED IN UNDER AN ALIAS NAME.

Q.    OKAY.  WHAT DID HE TELL YOU NEXT?

A.    HE SAYS HE AND FULKS WERE SEPARATED WHEN THEY WERE IN MICHIGAN.  THEY TALKED TO SOME OTHER PEOPLE THERE.  BASHAM STATED THEY THEN -- THEY WENT FROM THE JAIL TO EVANSVILLE, INDIANA, AND THEN TO MICHIGAN.  BASHAM AND FULKS WENT TO A GUY'S HOUSE ABOUT AN HOUR FROM MICHIGAN AND GOT SOME DOPE.

Q.    WHAT DID YOU UNDERSTAND HIM TO MEAN BY "DOPE"?

A.    NARCOTICS, MARIJUANA, SOME SORT OF INTOXICATING SUBSTANCE.

Q.    DID HE SPECIFY?

A.    HE DID NOT.  BASHAM BELIEVES FULKS ACTUALLY ROBBED THE DOPE DEALER.  HE WENT IN THE HOUSE WITHOUT ANY MONEY AND CAME

BACK OUT WITH MONEY AND DOPE.  BASHAM ALSO USED ANOTHER CELLPHONE THAT FULKS GOT OUT OF A PURSE.  FULKS GOT UPSET AT HIM FOR DOING SO.

IN RESPONSE TO A QUESTION ABOUT HAVING GAS COVERED CLOTHING, BASHAM STATED THAT HE AND FULKS WOULD FREQUENTLY ASK PEOPLE FOR GAS AND OCCASIONALLY SPILL GAS ON THEMSELVES.

Q.    WAS THAT A QUESTION FROM YOURSELF YOU ASKED?

A.    YES.

Q.    WHY DID YOU ASK THAT?

A.    I BELIEVE, AT THIS POINT, I HAD MORE INFORMATION CONCERNING MS. BURNS AND THE FACTS.

Q.    NOW, AT THIS POINT, IS THAT SORT OF THE END OF THE SEQUENCE OF EVENTS -- THE VERSION OF THE EVENTS MR. BASHAM RELAYED TO YOU ON THE SECOND INTERVIEW ON THE MORNING OF THE 19TH?

A.    YES.

Q.    AT THIS POINT, WHERE DO YOU BELIEVE MS. DONOVAN TO BE?

A.    AT THIS POINT, I STILL BELIEVE MS. DONOVAN TO BE WITH MR. FULKS.

Q.    IN WHAT CONDITION?

A.    ALIVE.

Q.    DO YOU HAVE ANY INFORMATION, AT THAT POINT, REGARDING SAMANTHA BURNS?

A.    FROM MR. BASHAM, NO, NOT AT ALL.

Q.    DO YOU HAVE ANY  -- ARE YOU INTENDING TO RELAY THE

**JA 1253**

INFORMATION THAT YOU HAVE TO OTHER LAW ENFORCEMENT?

A.    YES.

Q.    AND, AGAIN, FOR WHAT PURPOSE?

A.    TO ASSIST IN THEIR INVESTIGATION.

THE COURT:   MR. SCHOOLS.

BY MR. SCHOOLS:

Q.    AGENT VITO,  DURING THE COURSE OF THESE INTERVIEWS, DID YOU AND THE OTHER INTERVIEWING AGENTS PROVIDE MR. BASHAM NECESSITIES?

A.    WE DID.  WE TOOK BREAKS, PROVIDED HIM CIGARETTE BREAKS, SODA, FOOD.

Q.    AT ANY TIME DURING THESE INTERVIEWS DID HE ASK THE INTERVIEW TO STOP?

A.    NO.

Q.    HE CONTINUED TO PROVIDE INFORMATION?

A.    HE DID.

Q.    AT THIS POINT, DURING THE INTERVIEW ON NOVEMBER 19TH, THE ONE THAT STARTED AT 9:45, WAS THERE A BREAK IN THE INTERVIEWING PROCESS?

A.    THERE WAS A BREAK.

Q.    SUBSEQUENT TO THAT BREAK IN THE INTERVIEWING PROCESS, WHAT HAPPENED?

A.    WHEN WE CAME BACK FROM THE BREAK?

Q.    LET ME ASK YOU A MORE SPECIFIC QUESTION.  SUBSEQUENT TO THE BREAK IN THE INTERVIEW, DID YOU, AGAIN, CONFRONT MR.

**JA 1254**

Q. BASHAM WITH YOUR BELIEF THAT HE WASN'T TELLING THE TRUTH?

A. YES, SIR, I DID.

Q. AND IN RESPONSE TO YOUR CONFRONTING HIM IN THAT WAY, WHAT DID HE DO?

A. HE PROVIDED OTHER DETAILS AND MORE DETAILS ABOUT WHAT HE HAD SAID EARLIER.

Q. THE STORY CHANGES AGAIN?

A. THE STORY CHANGES AGAIN.

Q. WHAT WAS IT THIS TIME?

A. HE WENT ON TO SAY FULKS USED A BANK CARD CREDIT CARD FROM SOUTH CAROLINA WHILE SHE WAS STILL IN THE CAR WITH THEM. THEN WENT BACK TO THE MOTEL AND FULKS DROPPED BASHAM OFF IN FRONT OF THE MOTEL CLOSE TO THE ONE THAT THE GIRLS WAS STAYING AT. THIS MOTEL WAS THREE DOWN FROM THAT MOTEL WHERE THE GIRLS WERE. FULKS THEN TOLD BASHAM THAT HE WAS GOING TO TAKE THE WOMAN OUT AND TIE HER UP. BASHAM STATED THAT HE ASKED FULKS WHAT WE WAS GOING TO DO WITH HER AND FULKS TOLD HIM NOT TO WORRY ABOUT IT. FULKS TOLD HIM THAT HE WOULD KILL HIS FAMILY IF HE TOLD ANYONE, MEANING BASHAM'S FAMILY, IF HE TOLD ANYONE.

AFTER ABOUT AN HOUR, FULKS RETURNED AND BASHAM GOT IN THE BMW. BASHAM ASKED FULKS WHAT HAD HAPPENED, AND HE TOLD HIM NOT TO WORRY ABOUT IT, THAT IT WAS OVER. BASHAM STATED THAT HE BELIEVED THAT THE WOMAN WAS DEAD, AT THIS POINT.

Q. IS THAT THE FIRST TIME THAT MR. BASHAM HAD EVER

INDICATED TO YOU THAT HE THOUGHT THE SOUTH CAROLINA WOMAN WAS DEAD?

A.    THAT IS THE FIRST TIME HE HAD EVER INDICATED THAT HE THOUGHT SHE WAS DEAD, AND THE FIRST TIME HE HAD EVER MENTIONED THIS PARTICULAR ASPECT OF THE STORY.

Q.    AND BASED ON WHAT HE IS DESCRIBING TO YOU, WHERE DID YOU BELIEVE MR. BASHAM WAS AT THE TIME ALICE DONOVAN WAS KILLED?

A.    STANDING IN A PARKING LOT IN THE MOTEL AREA IN SOUTH CAROLINA.

Q.    AND BASED ON THAT FACT, DID MR. BASHAM INDICATE WHETHER OR NOT HE HAD ANY INFORMATION CONCERNING THE LOCATION OF MS. DONOVAN'S REMAINS?

A.    NOT AT THIS POINT.

Q.    AGENT VITO, DID MR. BASHAM INDICATE WHETHER ANYONE WAS WITH HIM WHEN HE WAS STANDING IN THE PARKING LOT WHEN MR. FULKS, ALLEGEDLY, TOOK THE SOUTH CAROLINA VICTIM TO WHEREVER HE WAS TAKING HER?

A.    HE DIDN'T SAY.

Q.    HE DIDN'T SAY?

A.    HE DIDN'T SAY.

Q.    WAS IT YOUR BELIEF HE WAS ALONE?

A.    I DON'T REMEMBER IF I THOUGHT THAT HE WAS STANDING IN THE PARKING LOT OR THAT HE ACTUALLY WALKED BACK TO THE MOTEL WHERE THE GIRLS WERE. I DON'T REMEMBER THAT ASPECT OF IT.

Q.   BUT IN THIS VERSION OF THE EVENTS, NONETHELESS, MR. FULKS LEFT AND HE WAS NOT WITH HIM?

A.   THAT'S CORRECT.

Q.   WHAT DID HE TELL YOU HAPPENED NEXT?

A.   HE AND FULKS LEFT THE MYRTLE BEACH AREA AND WENT TO A WOMAN'S HOUSE THAT FULKS KNEW.  HE SAID THAT -- BASHAM SAID THAT HE WENT TO BETH MCGUFFIN'S HOUSE AND STAYED FOR ABOUT THREE DAYS.  BASHAM SAID THAT MCGUFFIN DIDN'T EVEN KNOW HIS, MEANING BASHAM, REAL NAME.  SHE THOUGHT HIS NAME WAS TOMMY. THEY STAYED WITH HER, SMOKED DOPE, AND, AT THIS POINT, FULKS SAID THEY HAD TO GET A CAR.  BASHAM AND FULKS WENT TO THE ASHLAND, KENTUCKY WAL-MART TO TRY TO GET THEM A CAR.

Q.   NOW, AT THIS POINT, AGENT VITO, IS THAT THE FIRST TIME THAT MR. BASHAM STATED THAT THAT IS WHY THEY WENT TO THE MALL?

A.   YES, SIR.

Q.   PREVIOUSLY HE HAD MENTIONED THAT HE HAD ASKED SOMEONE FOR DIRECTIONS AND SHOWED A FIREARM; IS THAT RIGHT?

A.   YES.

Q.   DID YOU UNDERSTAND DURING THOSE PREVIOUS CONVERSATIONS THAT THAT IS WHAT HE WAS TRYING TO DO?

A.   IT WAS  -- IT WAS MY BELIEF THAT THAT IS WHAT HE WAS DOING FROM THE BEGINNING.  IT WAS THE FIRST TIME HE HAD EVER SAID THAT, IMPLIED, ACTUALLY, HIMSELF THAT THAT IS WHAT HE WAS DOING, AT THIS POINT.

A.    DURING THAT DAY.   WE ALSO CONDUCTED AN INTERVIEW THE NEXT DAY.

Q.    THE NEXT DAY WOULD HAVE BEEN NOVEMBER 20TH; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    NOW, AGENT VITO, JUST FOR SOME CLARIFICATION.   YOU ARE MAKING REFERENCE TO A DOCUMENT WHEN YOU TESTIFY; IS THAT RIGHT?

A.    YES.

Q.    WHAT IS IT?

A.    FD32.

Q.    WHAT IS IT?

A.    SUMMARY REPORT OF INTERVIEW AFTER WE CONDUCT AN INTERVIEW.

Q.    WHAT IS THE PROCEDURE FOR PREPARING A SUMMARY REPORT OF THIS INTERVIEW?

A.    THE PERSON YOU ARE INTERVIEWING, YOU TAKE NOTES CONCERNING THE INTERVIEW.   IT IS NOT MEANT TO BE A VERBATIM TRANSCRIPT.   IT IS MEANT TO SUMMARIZE WHAT THE PERSON SAID.

Q.    THE INTERVIEW YOU DESCRIBED ON THE 19TH WAS A FIVE-HOUR INTERVIEW?

A.    YES.

Q.    REPORTED INTERVIEW IS NOT VERBATIM?

A.    NO.

Q.    AGENT VITO, YOU ARE SUMMARIZING INFORMATION THAT YOU

RECEIVED DURING THE COURSE OF THE FIVE-HOUR INTERVIEW?

A. YES, SIR, I AM.

Q. AND BASED ON YOUR HAVING BEEN THERE, IS THE SUMMARY YOU PROVIDED TO THIS JURY ACCURATE?

A. YES, SIR, IT IS.

Q. AND THE PURPOSE OF THE 302 IS WHAT?

A. TO MEMORIALIZE WHAT WAS SAID BY THE PERSON YOU ARE INTERVIEWING.

Q. WHEN DID YOU PREPARE THE 302 THAT WAS SUMMARIZED OF THE NOVEMBER 19TH INTERVIEW?

A. THE NOVEMBER 19TH INTERVIEW WAS DICTATED ON THE 22ND.

Q. THREE DAYS LATER?

A. TYPED ON THE 22ND, YES, SIR.

Q. LET'S NOW GO TO THE NOVEMBER 20TH INTERVIEW. COULD YOU TELL US HOW THAT CAME ABOUT?

A. YES, SIR. AGAIN, WENT BACK TO THE JAIL TO SPEAK TO MR. BASHAM AGAIN. HE EXPRESSED THAT HE WOULD CONTINUE TO COOPERATE AND HE WOULD TALK TO US FROM THE PREVIOUS INTERVIEW. AND WENT BACK THERE IN THE TIME PERIOD TO ASK SOME MORE DETAILED QUESTIONS.

Q. WHO WAS WITH YOU, ON THIS OCCASION?

A. IN THE BEGINNING, SPECIAL AGENT MALEY WAS WITH ME IN THIS INVESTIGATION. AN INVESTIGATOR WITH THE WEST VIRGINIA STATE POLICE CAME IN ABOUT 20 MINUTES AFTER WE STARTED, DETECTIVE SCOTT LAWRENCE FROM WEST VIRGINIA STATE POLICE.

Q.    NOW, AT THIS POINT, AGENT VITO, YOU CONDUCTED A LENGTHY INTERVIEW, TWO INTERVIEWS WITH MR. BASHAM.  ONE THAT LASTED ABOUT AN HOUR AND 20 MINUTES IN THE EARLY MORNING HOURS OF THE 19TH; IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    THE SECOND ONE WAS ABOUT FIVE HOURS?

A.    YES, SIR.

Q.    NOW YOU ARE GOING BACK FOR MORE INFORMATION.  WHY ARE YOU DOING THAT?

A.    TO ROUND OUT THE INVESTIGATION.  AGAIN, IT WAS MY FIRM BELIEF THAT THERE WAS MORE INFORMATION OUT THERE TO GATHER. ALSO, THIS INTERVIEW INVOLVED A DETECTIVE WITH THE WEST VIRGINIA STATE POLICE, WHO WOULD HAVE MORE DETAILED INFORMATION CONCERNING THE DISAPPEARANCE OF SAMANTHA BURNS THAT I WOULDN'T KNOW TO ASK QUESTIONS OF.

Q.    AND AT THAT POINT, PRIOR TO THE INTERVIEW ON THE 20TH, WHAT INFORMATION DID MR. BASHAM PROVIDE REGARDING SAMANTHA BURNS OR A WEST VIRGINIA VICTIM, IF ANY?

A.    OTHER THAN HIS STATEMENT THAT HE BELIEVED MR. FULKS HAD GOT A GIRL AND USED HER CREDIT CARDS IN WEST VIRGINIA.

Q.    OKAY.  WHEN YOU GOT  -- DID YOU GO BACK TO THE BOYD COUNTY DETENTION CENTER ON THE 20TH?

A.    YES.

Q.    DID YOU THEN ADVISE MR. BASHAM OF HIS RIGHTS?

A.    WE DID.  HE WAIVED HIS RIGHTS AND AGREED TO TALK TO US

AGAIN.

Q.    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 429.

A.    YES, SIR.  THAT IS THE FORM.

Q.    GOVERNMENT'S EXHIBIT 429 IS THE ADVICE OF RIGHTS FORM SIGNED BY BRANDON BASHAM ON NOVEMBER 20TH AT 10:59 A.M.; IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    DID YOU, AGAIN, ASK MR. BASHAM TO GO FROM START TO FINISH WITH RESPECT TO WHAT HAPPENED WHEN MR. FULKS AND HE -- FROM THE TIME HE AND MR. FULKS ESCAPED UNTIL THE TIME HE WAS ARRESTED?

A.    YES, SIR, I DID.

Q.    DID MR. BASHAM PROVIDE YOU SOME ADDITIONAL AND DIFFERENT INFORMATION DURING THE COURSE OF THE NOVEMBER 20TH INTERVIEW?

A.    HE DID.

Q.    WHAT DID HE TELL YOU?

A.    AGAIN,  THE INITIAL INFORMATION CONCERNING THE ESCAPE, THEY BROKE OUT.  THE NEW INFORMATION WAS THAT BASHAM AGREED TO ESCAPE,  IT WAS FULKS'S IDEA TO ESCAPE,  HE PRESSURED HIM. TOLD HIM HE HAD MONEY, IF THEY ESCAPED, HE COULD USE IT. BASHAM AGREED TO DO THE ESCAPE ON THE DAY OF THE ESCAPE.  HE TOOK AN EXTRA DOSE OF HIS MEDICATION AND GOT HIGH AND THEN ESCAPED FROM THE JAIL.

Q.    NOW, AT THAT POINT, AGENT VITO, HAD MR. BASHAM GIVEN YOU INFORMATION ABOUT MEDICATIONS HE HAD TOOK?

A.    NO.

Q.    WHAT MEDICATION DID YOU UNDERSTAND HIM TO BE TALKING ABOUT WHEN HE MADE THAT COMMENT ON THE 20TH THAT HE TOOK AN EXTRA DOSE OF HIS MEDICATION, AND GOT HIGH, AND THEY ESCAPED FROM THE JAIL?

A.    I WASN'T SURE.

Q.    WHAT WAS THE PRESSURE THAT HE CLAIMED MR. FULKS HAD PUT ON HIM TO TRY TO GET HIM TO ESCAPE?

A.    THAT HE HAD JUST PRESSURED HIM.

Q.    WHAT WAS THE PROMISE OR WHAT WAS HE EXPECTING MR. FULKS TO GET HIM WHEN HE GOT OUT OF JAIL?

A.    PROVIDE HIM MONEY.  HE SAID HE HAD MONEY, THEY COULD USE IT IF THEY GOT OUT OF JAIL.

Q.    AND THEN, GENERALLY, DOES MR. BASHAM, AGAIN, DESCRIBE FAIRLY CONSISTENTLY THE KIDNAPPING OF THE MAN IN KENTUCKY?

A.    YES, SIR.

Q.    THEN HE PROVIDES SOME ADDITIONAL INFORMATION ABOUT GUNS; IS THAT RIGHT?

A.    YES, SIR.

Q.    WHAT DOES HE SAY ABOUT WHERE HE AND MR. FULKS GOT GUNS? AFTER THEY KIDNAPPED MR. HAWKINS, THEY GOT SOME GUNS, WHERE DID THEY GET THEM?

A.    OKAY.  BASHAM AND FULKS WENT TO A HOUSE WHERE THEY MET

A.    YES.

Q.    WHAT DOES HE SAY ON NOVEMBER 20TH, 2002 REGARDING THE WOMAN IN SOUTH CAROLINA?

A.    HE SAID THAT WHEN THEY GOT THE WOMAN IN THE BMW IN SOUTH CAROLINA THAT SHE DIDN'T RESIST THEM AT ALL.  FULKS GOT IN THE BMW, STUCK HIS GUN TO ONE SIDE AND TOLD HER TO DRIVE. BASHAM STATED HIS GUN WAS STILL IN HIS COAT POCKET.

Q.    HE WAS IN THE CAR, THOUGH?

A.    YES, SIR.

Q.    FULKS?

A.    FULKS MADE THE WOMAN MAKE A PHONE CALL, USED HER ATM CARD AT A GAS STATION.

Q.    BASHAM TOLD YOU THAT FULKS CRAWLED IN THE CAR AND HELD THE GUN TO THE WOMAN?

A.    YES, SIR.

Q.    BASHAM SAID HIS GUN WAS STILL IN HIS COAT POCKET.  WHAT DID HE TELL YOU NEXT?

A.    HE SAID LATER THAT NIGHT, AFTER FULKS HAD ALREADY LEFT WITH THE WOMAN AND CAME BACK AND GOT HIM FROM THE MOTEL AREA WHERE HE HAD LEFT HIM, FULKS STARTED TALKING ABOUT WHAT HE HAD DONE TO THE WOMAN.  FULKS TOLD HIM THAT HE HAD SEX WITH THE WOMAN AND TIED HER UP.

Q.    AGENT VITO, WITH RESPECT TO -- YOU HAVE NEVER SEEN THE VIDEO FROM THE WAL-MART STORE, HAVE YOU?

A.    NO, SIR.

Q.    SO, YOU DON'T KNOW WHAT IT DEPICTS ABOUT WHO IS GETTING OUT OF WHAT TRUCK AND INTO WHAT CAR?

A.    NO, SIR.

Q.    WHAT MR. BASHAM IS RELATING TO YOU ON NOVEMBER 20TH, MR. FULKS GOT IN THE CAR AND PUT THE THE GUN TO THE WOMAN'S SIDE?

A.    YES.

Q.    HE IS ADVISING YOU, AT THIS POINT, THAT MR. FULKS PROVIDED SOME ADDITIONAL INFORMATION WHEN HE, ALLEGEDLY, CAME BACK AFTER TAKING THE WOMAN, AFTER DROPPING MR. BASHAM AT THE HOTELS THAT ARE PICTURED IN THAT MAP?

A.    YES.

Q.    WHAT DOES MR. BASHAM SAY MR. FULKS TOLD HIM AFTER LEAVING WITH THE WOMAN AND COMING BACK WITHOUT HER?

A.    HE SAID FULKS TOLD HER HE HAD HAD SEX WITH THE WOMAN AND THAT HE HAD TIED HER UP.   HE ALSO SAID THAT FULKS SAID THAT HE LEFT THE WOMAN IN AN AREA NEAR WHERE THEY HAD LEFT THE VAN.   LEFT HER IN SOME SORT OF RESORT AREA.

Q.    LET ME ASK YOU SOME SPECIFICS ABOUT THIS INTERVIEW ON THE 20TH.  HOW LONG WAS THIS INTERVIEW?

A.    IT STARTED AT APPROXIMATELY ELEVEN IN THE MORNING AND ENDED AT SEVEN P.M.

Q.    WAS SPECIAL AGENT MALEY, YOUR SUPERVISOR AT THE TIME, PRESENT FOR THE ENTIRE INTERVIEW?

A.    NOT THE ENTIRE INTERVIEW.   HE WAS THERE AT THE

BEGINNING, LEFT IN THE MIDDLE, AND CAME BACK TOWARD THE END.

Q. WHEN HE CAME BACK TOWARD THE END OF THE INTERVIEW, IS THAT THE POINT MR. BASHAM, FOR THE FIRST TIME, BEGAN PROVIDING INFORMATION ABOUT WHERE ALICE DONOVAN MIGHT BE?

A. AROUND THAT TIME, YES.

Q. DID AGENT MALEY BRING MR. BASHAM SOME THINGS THAT MR. BASHAM HAD INDICATED HE NEEDED?

A. YES, SIR, HE DID.

Q. WHAT DID HE GET HIM?

A. BROUGHT HIM SOME CLOTHING ITEMS, UNDERWEAR, SOCKS, AS WELL AS SOME MCDONALD'S FOOD.

Q. SO, WHEN MR. MALEY ARRIVED BACK AT THE BOYD COUNTY DETENTION CENTER WITH MCDONALD'S, UNDERWEAR, AND SOCKS, MR. BASHAM, FOR THE FIRST TIME, GAVE SOME INFORMATION THAT HE HAD NOT GIVEN PREVIOUSLY; IS THAT RIGHT?

A. YES.

Q. WHAT WAS THE INFORMATION THAT MR. BASHAM GAVE, AT THIS POINT ON NOVEMBER 20TH, LATE IN THE DAY, LATE IN THE AFTERNOON REGARDING WHAT HE KNEW ABOUT WHERE ALICE DONOVAN MIGHT BE AND WHAT HER CONDITION WAS?

A. HE STATED THAT FULKS HAD SEX WITH THE WOMAN, TIED HER UP. HE TOLD HIM HE HAD LEFT HER IN A RESORT AREA WHERE THEY HAD LEFT THE VAN. HE DESCRIBED IT AS BEING NEXT TO A BOAT RAMP ON A LAKE WITH A FENCE AROUND IT AND IN A SWAMPY AREA. THE AREA WAS BY A ROAD AND BASHAM SAID THAT THERE WAS A BIG

**JA 1265**

SIGN THAT SAID "HOTEL" OR "INN" ON IT.   HE STATED THAT THE DUCT TAPE THEY USED TO TIE UP THE WOMAN THAT WAS IN THE BMW WAS SILVER-COLORED TAPE.

Q.    AT THAT POINT, DID MR. BASHAM ACTUALLY ASSIST AGENT MALEY IN DRAWING A MAP OF THE AREA THAT HE WAS DESCRIBING?

A.    YES, SIR,  HE DID.

Q.    AGENT VITO,  HAVE YOU EVER BEEN TO CONWAY,  SOUTH CAROLINA, PRIOR TO NOVEMBER 20TH,  2002?

A.    I AM SURE I HAVE BEEN THROUGH ON THE WAY TO MYRTLE BEACH,  BUT I DON'T THINK I EVER STOPPED.

Q.    HOW ABOUT AGENT MALEY, DO YOU KNOW IF HE HAD EVER BEEN THERE?

A.    I THINK THAT IS ABOUT THE SAME, GOING THROUGH ON THE WAY TO MYRTLE BEACH,  BUT NEVER STOPPING.

Q.    HAVE YOU EVER HEARD OF OR SEEN AN AREA CALLED SAVANNAH BLUFF?

A.    I HAVE HEARD OF IT AT THIS POINT, NOT BEFORE.

Q.    HEARD OF IT DURING THE COURSE OF INVESTIGATION?

A.    YES.

Q.    IN NOVEMBER 2002, YOU HAD NO IDEA WHAT SAVANNAH BLUFF WAS?

A.    NO.

Q.    OR WHAT IT LOOKED LIKE?

A.    NO.

Q.    HAVE YOU SEEN A PHOTO OF IT?

A.    I HADN'T, AT THAT POINT.

Q.    DO YOU KNOW IF AGENT MALEY HAD?

A.    I DON'T THINK HE HAD.

MR. SCHOOLS:  YOUR HONOR,  I BELIEVE I NEGLECTED TO OFFER 429, ADVICE OF RIGHTS.

MR. SWERLING:  MAY WE APPROACH ONE MOMENT?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SWERLING:  JUDGE, BASICALLY, I SHOULD BE SAYING NO FURTHER OBJECTION.  OBVIOUSLY, WE HAD A JACKSON V DENNO. THESE DOCUMENTS ARE COMING IN, NO FURTHER OBJECTION ON THE WAIVER OF RIGHTS FORM.

MR. SCHOOLS:  JUDGE,  I HAVE A CONTINUING CONCERN OF THE DEFENDANT'S EFFORTS TO PRESERVE JACKSON VERSUS DENNO ISSUES WHILE CONTENDING THE DEFENDANT IS ASSISTING LAW ENFORCEMENT.  I DON'T THINK YOU CAN HAVE IT BOTH WAYS. EITHER STATEMENTS ARE VOLUNTARY, OR THEY AREN'T.  IF THEY ARE CONTINUING TO SAY THEY ARE VOLUNTARY,  HE CAN'T CONTINUE ON SAYING ASSISTING LAW ENFORCEMENT.

THE COURT:  WE CAN DECIDE THAT LATER.  IT IS A MATTER THAT CAN BE ARGUED.

MR. SCHOOLS:  MAY BE A MATTER TO BE WORKED OUT ON CROSS,  AS WELL.

THE COURT:  AS I UNDERSTAND IT, A PROPERLY FILED MOTION IN LIMINE THAT IS RULED UPON AT TRIAL PRESERVES FOR

**JA 1267**

DOWN AS DEATH AS GREATER INCLUDED OFFENSE. IN OTHER WORDS, SHE PUT FOR THE JURY, HAS THE GOVERNMENT PROVED THE DEFENDANT GUILTY OF KIDNAPPING, THE ELEMENTS OF WHICH ARE 1, 2, AND 3? THEN, IF THE ANSWER TO ALL THREE OF THOSE ARE YES, THE NEXT QUESTION IS, HAS THE GOVERNMENT PROVED THAT DEATH RESULTED? WHICH WOULD THEN TAKE US INTO A PENALTY PHASE. SO, I HADN'T REALLY THOUGHT ABOUT IT, BUT I THINK THAT IS THE WAY IT OUGHT TO BE. IT WOULD GIVE THE JURY A VEHICLE FOR FINDING THE DEFENDANT GUILTY OF A LESSER INCLUDED IF THEY THINK THAT DEATH DID NOT RESULT. AND UNLESS SOMEBODY CAN GIVE ME GOOD REASON NOT TO, I THINK I NEED TO FOLLOW UP WITH WHAT JUDGE BRINKEMA DID. DO YOU UNDERSTAND WHAT I AM SAYING?

MR. SWERLING: YES. I HAD A CHANCE TO READ THAT CASE AND MR. HISKER IS SUPPOSED TO BE GIVING US MORE INFORMATION. HE IS IS SUPPOSED TO BE HERE BY NOW.

THE COURT: I AM ABOUT READY TO GIVE YOU A COPY OF THE FIRST DRAFT OF THE CHARGE. IF YOU CAN GET ME YOUR REQUEST BEFORE WE ADJOURN TODAY, I WILL INCORPORATE WHAT YOU GIVE ME. IT MAY BE I ALREADY HAVE MOST OF WHAT YOU WANT. IF HE GETS HERE, WE ARE IN HERE WITH THE JURY, JUST HAVE YOUR ASSOCIATE WALK AROUND AND GIVE IT TO MY LAW CLERK WILL BE THE BEST PART. LET'S TAKE A 15-MINUTE RECESS.

MR. SCHOOLS: ONE POINT ABOUT YOUR CHARGE. I THINK THAT SAME REASONING WOULD APPLY TO CARJACKING.

THE COURT: I NEGLECTED TO SAY THAT I THINK IT

WOULD.

MR. SCHOOLS:  ALL RIGHT.

THE COURT:  ALL RIGHT.  LET'S BE IN RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:  PLEASE BRING IN THE JURY.

PLEASE CONTINUE, MR. SCHOOLS.

BY MR. SCHOOLS:

Q.   AGENT VITO, I HAD ASKED YOU TO LOOK AT GOVERNMENT'S 333.  THAT WAS THE MAP THAT AGENT MALEY DREW DURING THE NOVEMBER 20TH INTERVIEW, DO YOU RECALL THAT?

A.   YES.

Q.   I BELIEVE LAST EVENING I SHOWED YOU A PICTURE, ACTUALLY IN EVIDENCE, GOVERNMENT'S EXHIBIT 338.  LET ME SHOW YOU THOSE EXHIBITS SIDE BY SIDE.  AGAIN, YOU RECOGNIZE THE MAP ON THE LEFT IS THE MAP AGENT MALEY DREW ON THE INTERVIEW OF THE 20TH?

A.   I DO.

Q.   THIS AREA HERE (INDICATING), PREVIOUS TESTIMONY IS IDENTIFIED AS SAVANNAH BLUFF.  HAD YOU OR AGENT MALEY EVER SEEN THAT PLACE OR THAT PICTURE BEFORE THE INTERVIEW ON NOVEMBER 20TH?

A.   NO.

Q.   DID MR. BASHAM SUPPLY AN ADDITIONAL MAP OF 333?

A.   YES.

Q.   LET ME SHOW YOU WHAT IS NOT IN EVIDENCE, WHICH IS 431. DO YOU RECOGNIZE THAT?

A.    YES.

Q.    IS THAT AN EXTENSION OF THE MAP THAT MR. BASHAM DREW ON NOVEMBER 20TH?

A.    IT IS.

      MR. SCHOOLS:  YOUR HONOR,  AT THIS POINT, WE OFFER GOVERNMENT'S 431.

      MR. SWERLING:  NO FURTHER OBJECTION,  NO, SIR.

BY MR. SCHOOLS:

Q.    LET ME ASK YOU, IF YOU COULD, AGENT MALEY,  EXPLAIN WHAT MR. BASHAM IS ATTEMPTING TO DRAW THERE, BASED ON HIS EXPLANATION.

A.    HE WAS DRAWING A CONTINUATION OF THE MAP.  THE MAP THAT AGENT MALEY DREW, HE HELD THIS PIECE OF PAPER UP TO THAT MAP TO SHOW THAT THAT WAS A CONTINUATION OF THE ROAD THAT MR. MALEY HAD DRAWN.

Q.    WHAT IS THIS,  DO YOU REMEMBER?

A.    THAT IS A CUL-DE-SAC THAT HE WAS DESCRIBING,  MORE HOUSES.

Q.    WHAT IS THIS THING?

A.    I BELIEVE THAT IS A DOCK.

Q.    SO, IS THERE WATER INSIDE THERE?

A.    YES, SIR.

Q.    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT NUMBER 97.  HAVE YOU EVER SEEN THAT PICTURE BEFORE, AGENT VITO?

A.    NO, SIR.

Q.    DO YOU KNOW ANYTHING ABOUT THAT PART OF SOUTH CAROLINA?

A.    NO, SIR.

Q.    HAVE YOU EVER SEEN IT BEFORE?

A.    NO.

Q.    TO YOUR KNOWLEDGE, HAD AGENT MALEY EVER SEEN IT BEFORE?

A.    NO, SIR.

Q.    AND THAT MAP THAT HE DREW ON NOVEMBER 20TH, 2002, WAS INTENDED TO SHOW WHAT?

A.    WHERE THE LOCATION WAS THAT MR. FULKS HAD LEFT -- SAID THAT HE HAD LEFT MS. DONOVAN.

Q.    NOW, I BELIEVE YOU SAID THAT MR. BASHAM SAID THAT MR. FULKS HAD TIED HER UP?

A.    YES.

Q.    SO, AT THAT POINT, AGENT VITO, WHAT IS YOUR ASSESSMENT OF WHETHER MS. DONOVAN WAS ALIVE OR DEAD AT THE TIME THAT SHE WAS TIED UP BY MR. FULKS?

A.    ALIVE.

Q.    DID YOU PROVIDE THE INFORMATION THAT MR. BASHAM WAS PROVIDING TO YOU, ON NOVEMBER 20TH, TO OTHER LAW ENFORCEMENT?

A.    YES, SIR, WE DID.

Q.    DURING THAT INTERVIEW ON THE 20TH, WAS THERE A POINT IN TIME WHEN AN INVESTIGATOR CAME TO SEE MR. BASHAM?

A.    YES, SIR, THERE WAS.

Q.    WHO WAS SHE?

A.    HER NAME WAS BRENDA.  I BELIEVE BRENDA MCGUIRE.

Q.    MAYBE BARBARA?

A.    BARBARA,  YES, SIR.

Q.    WHO DID MS. MCGUIRE WORK FOR?

A.    WORKED FOR THE PUBLIC DEFENDER'S OFFICE IN BOYD COUNTY, KENTUCKY.

Q.    WAS SHE ALLOWED TO MEET WITH MR. BASHAM?

A.    YES, SIR,  SHE WAS.

Q.    WAS ANYBODY WITH THEM WHEN THEY WERE MEETING TOGETHER?

A.    NO, SIR.

Q.    SUBSEQUENT TO HIS MEETING WITH MS. MCGUIRE,  DID HE AGREE TO PROVIDE -- CONTINUE THE INTERVIEW THAT HAD BEGUN THAT MORNING?

A.    HE DID.

Q.    WHAT ELSE, AFTER PROVIDING THE MAPS WE IDENTIFIED INDICATING MS. DONOVAN OR THE VICTIM WAS TIED TO A TREE THERE, WHAT OTHER INFORMATION DID MR. BASHAM PROVIDE AFTER MS. MCGUIRE LEFT?

A.    AFTER SHE LEFT, MR. BASHAM STATED THAT THE WOMAN IN THE BMW WAS WEARING JEANS,  UNKNOWN TYPE SHIRT,  UNKNOWN TYPE OF UNDERWEAR.  BASHAM ADVISED THAT FULKS TOLD HIM THAT HE WAS WORRIED BECAUSE HE HAD EJACULATED IN THE WOMAN.  BASHAM SAID THAT FULKS TOLD HIM THAT THE WOMAN DIDN'T RESIST HIM.  SHE JUST SAID,  JUST DO IT AND GO.  FULKS TOLD HIM THAT SHE WAS GOOD.

Q.   GO AHEAD, SAY WHAT HE SAID.

A.   "GOOD PUSSY.  YOU COULD HAVE HAD SOME."  BASHAM STATED THAT HE TOLD FULKS THAT HE DIDN'T WANT TO DO THAT.  HE ADVISED THE ONLY TIME HE TOUCHED THE WOMAN WAS TO CHECK ON HER HANDS AFTER SHE WAS TAPED IN THE CAR.

Q.   THE EVENTS HE IS DESCRIBING HERE ABOUT WHAT THE VICTIM WAS WEARING, WHAT MR. FULKS SAID, WERE IN THE CONTEXT OF A STORY OR A VERSION OF EVENTS WHERE MS. DONOVAN WAS LOCATED AT THIS POINT WHERE?

A.   AT THE DRAWING HE HAD MADE.

Q.   WHAT DID MR. BASHAM, DURING THIS INTERVIEW, TELL YOU HAPPENED AFTER MR. FULKS ALLEGEDLY RETURNED AFTER HAVING LEFT MS. DONOVAN AT THE LOCATION DEPICTED IN GOVERNMENT'S EXHIBIT 97?

A.   WOULD YOU LIKE ME TO GO THROUGH IT AGAIN?

Q.   NO,  WHAT HAPPENED?

A.   AFTER THAT?

Q.   YES.

A.   I ASKED SOME FOLLOW-UP CLARIFICATION QUESTIONS CONCERNING -- AND HE STATED THAT HE BELIEVED THEY PICKED UP FULKS'S GIRLFRIEND, TINA, AND THE OTHER GIRL IN PORTAGE, INDIANA.  AND THAT THEY ALSO -- BASHAM ALSO CLARIFIED, WHEN HE SAID FULKS GOT A GIRL IN WEST VIRGINIA IN AN EARLIER INTERVIEW, HE WAS TALKING ABOUT FULKS GETTING A GIRL'S CREDIT CARDS, NOT ACTUALLY GETTING A GIRL.

Q.    SO, BACKED OFF HIS PREVIOUS STATEMENT THAT MR. FULKS HAD GOTTEN A GIRL?

A.    YES.

Q.    SO, AT THIS POINT, AGENT VITO, WHAT INFORMATION DID YOU HAVE REGARDING THE WHEREABOUTS OF SAMANTHA BURNS THAT YOU COULD PASS ON TO LAW ENFORCEMENT AND THE FAMILIES?

A.    NOTHING.

Q.    AND WHAT INFORMATION DID YOU HAVE REGARDING THE LOCATION, THE WHEREABOUTS OF ALICE DONOVAN THAT YOU COULD PROVIDE TO LAW ENFORCEMENT AND THE FAMILIES?

A.    THE MAP LOCATION AND WHAT MR. BASHAM TOLD ME THAT MR. FULKS HAD TOLD HIM.

Q.    AND WHAT CONDITION DID YOU BELIEVE MS. DONOVAN WOULD HAVE BEEN IN, AT THAT TIME?

A.    ALIVE.

Q.    DID YOU PROVIDE THAT INFORMATION TO LAW ENFORCEMENT OFFICERS IN THE RELEVANT INVESTIGATING JURISDICTIONS?

A.    YES, SIR, I DID.

Q.    WEST VIRGINIA AND SOUTH CAROLINA?

A.    CORRECT.

Q.    IS THAT THE SUBSTANCE OF THE INFORMATION YOU OBTAINED FROM MR. BASHAM ON NOVEMBER 20TH, 2002?

A.    IT IS.

Q.    AGENT VITO, DID YOU HAVE ONE MORE OCCASION TO MEET WITH, OR INTERVIEW, OR HAVE A MEETING WITH MR. BASHAM AND

**JA 1274**

OTHERS?

A.    YES, SIR, I DID

Q.    WHEN DID THAT HAPPEN?

A.    ON THE 25TH OF NOVEMBER.

Q.    HOW DID THAT COME ABOUT?

A.    MY SUPERVISOR, AGENT MALEY, HAD RECEIVED A PHONE CALL FROM MR. HUGHES, WHICH WAS MR. BASHAM'S ATTORNEY.  AND THIS WAS RELAYED TO ME FROM MR. MALEY, IT APPEARED THAT HUGHES WAS GOING TO PROVIDE DETAILS TO THE DIRECTION OF THE BODY OF ALICE DONOVAN.

Q.    WAS IT YOUR UNDERSTANDING THAT THE INTERVIEW THAT WAS GOING TO BE CONDUCTED ON THE 25TH WAS DIFFERENT THAN THE INTERVIEWS YOU HAD PREVIOUSLY CONDUCTED WITH MR. BASHAM?

A.    YES.

Q.    HOW WAS IT DIFFERENT?

A.    THAT HE WAS PROVIDING DETAILS ON WHERE MS. DONOVAN'S BODY WAS LOCATED.

Q.    AND ONLY THAT?

A.    YES, SIR.

Q.    DID YOU MEET WITH MR. HUGHES,  MR. BASHAM, AND AGENT MALEY ON THE 25TH OF NOVEMBER 2002?

A.    YES, SIR,  I DID.

Q.    WERE YOU PRESENT FOR THE ENTIRE MEETING, AS FAR AS YOU ARE AWARE?

A.    NO, SIR.  I ARRIVED, APPROXIMATELY, 15 MINUTES AFTER

JA 1275

AGENT MALEY HAD GOT THERE.

Q.    AGENT MALEY ARRIVED FOR THE MEETING, WAS THERE FOR THE DURATION?

A.    YES, SIR.

Q.    DURING THE COURSE OF THAT MEETING, AGENT VITO, DID MR. BASHAM, HIMSELF, MAKE VARIOUS COMMENTS CONCERNING THE LOCATIONS OF ALICE DONOVAN'S BODY OR OTHER EVENTS?

A.    YES, SIR, HE DID.

Q.    AND DID MR. HUGHES PROVIDE INFORMATION, AS WELL?

A.    YES.

Q.    AT THIS POINT, DID YOU HAVE AN UNDERSTANDING OF WHERE MR. BASHAM WAS NOW INDICATING ALICE DONOVAN'S BODY WOULD BE?

A.    YES, SIR.  THEY DID A SKETCH.  MR. MALEY HAD STARTED THE SKETCH AND WAS DOING A SKETCH FROM THE DIRECTIONS THAT WAS BEING GIVEN FROM MR. HUGHES AND MR. BASHAM.

Q.    AND DID YOU KNOW WHAT STATE OR WHAT LOCATION MR. BASHAM AND MR. HUGHES WERE DESCRIBING WHEN THEY DREW THE MAP?

A.    I BELIEVE THAT IT WAS INDICATED THAT ONE OF THE REFERENCE POINTS WAS AN AMOCO STATION IN SHALLOTTE, NORTH CAROLINA.

Q.    PREVIOUSLY, WHEN MR. BASHAM HAD DRAWN THE MAP THAT WE LOOKED AT WHICH WAS GOVERNMENT'S EXHIBIT 333, DID HE TELL YOU, AT THAT POINT, WHAT STATE HE BELIEVED THAT LOCATION WAS IN?

A.    NO, SIR.

Q.   ONLY THAT HE BELIEVED THAT IS WHERE MR. FULKS HAD TOLD HIM HE HAD TIED MS. DONOVAN TO A TREE?

A.   YES, SIR.

Q.   AND THE AMOCO, THERE WAS A GAS STATION ON THE MAP DRAWN?

A.   YES.

Q.   WERE OTHER AGENTS PARTICIPATING IN THAT MEETING IN SOME WAY?

A.   WE WERE SPEAKING TO AGENTS FROM SOUTH CAROLINA, RELAYING THE INFORMATION AS WE RECEIVED IT FROM MR. BASHAM ABOUT WHERE MS. DONOVAN'S BODY WAS.

Q.   AND AS YOU WERE RELAYING INFORMATION TO THEM, WERE THEY ALSO PROVIDING INFORMATION BACK TO YOU TO TRY TO ASSIST IN COMING UP WITH LANDMARKS?

A.   I BELIEVE THERE WAS SOME GIVE AND TAKE. I AM NOT SURE EXACTLY WHAT.

Q.   AT THAT POINT, AGENT VITO, WHAT WERE YOU AWARE OF WITH RESPECT TO WHAT INFORMATION HAD BEEN DISCOVERED IN SOUTH CAROLINA REGARDING MR. FULKS AND MR. BASHAM HAVING BEEN SEEN?

A.   HAVING BEEN SEEN?

Q.   IN THE VICTIM'S VEHICLE, IF ANY? YOU MAY NOT HAVE KNOWN.

A.   I BELIEVE, AT THAT POINT, I KNEW THAT THERE WAS A VIDEOTAPE OF THE ACTUAL ABDUCTION, KIDNAPPING. I AM NOT SURE. IT WOULD BE HARD FOR ME TO SAY WHAT ELSE I KNEW, AT

JA 1277

THAT POINT.

Q. YOU DON'T RECALL KNOWING ANYTHING ELSE, AT THAT POINT?

A. NO, SIR.

Q. IT WASN'T YOUR INVESTIGATION, YOU HAD CONDUCTED INTERVIEWS, BUT THAT WAS PRETTY MUCH YOUR ROLE?

A. I HAD CONDUCTED INTERVIEWS OF MR. BASHAM PRETTY MUCH ONLY. WE DIDN'T HAVE ANY ACTUAL CRIME THAT OCCURRED IN OUR JURISDICTION OTHER THAN THE ASHLAND INCIDENT.

Q. DURING THE COURSE OF THE -- HOW LONG WAS THAT MEETING BETWEEN YOURSELF, MR. HUGHES, MR. BASHAM, AND AGENT MALEY?

A. AT, APPROXIMATELY, FOUR P.M. IS WHEN IT STARTED AND APPROXIMATELY SEVEN P.M. WHEN WE ENDED.

Q. ABOUT THREE HOURS?

A. YES, SIR.

Q. WHERE DID THAT MEETING BEGIN OR AT LEAST WHERE WAS THE MEETING TAKING PLACE WHEN YOU ARRIVED?

A. THEY WERE IN WHAT IS KNOWN AS THE BOOKING ROOM OF THE JAIL. IT IS WHERE THEY RUN THE BREATHALYZER FOR PEOPLE WHO ARE ARRESTED FOR DUI AND TAKE FINGERPRINTS. KIND OF AN INTAKE AREA.

Q. HOW WAS THE INFORMATION BEING COMMUNICATED BACK TO AGENTS IN SOUTH CAROLINA?

A. BY PHONE.

Q. WHO WAS DOING THAT?

A. AGENT MALEY.

**JA 1278**

Q. AND WAS THERE A PHONE LINE SITTING ON THE TABLE THAT WAS OPEN SO THAT AGENTS IN SOUTH CAROLINA COULD HEAR THE ENTIRE CONVERSATION?

A. NO, NOT AT ALL.

Q. HOW DID IT WORK, LOGISTICALLY?

A. WE WOULD GATHER INFORMATION AS THEY WERE -- AS MR. MALEY AND MYSELF WERE GATHERING INFORMATION, MR. MALEY WAS PUTTING THAT INFORMATION ON A MAP. THERE WOULD BE BREAKS WHERE HE WOULD CALL SOUTH CAROLINA AND TALK TO SOUTH CAROLINA. I, MYSELF, SPOKE TO SOUTH CAROLINA SEVERAL TIMES, I AM SURE. AND WE WOULD GIVE THAT INFORMATION TO THEM THEN.

Q. AND DID THE INTERVIEW TAKE PLACE IN ONE ROOM?

A. IT WAS IN ONE ROOM FOR THE MAJORITY OF THE TIME, THEN WE MOVED TO ANOTHER ROOM, SO TWO ROOMS. AND THERE WERE SOME BREAKS IN BETWEEN WHERE WE GO OUT TO THE SALLY PORT, WHICH IS A GARAGE-LIKE STRUCTURE WHERE THEY BRING PRISONERS IN WHERE HE COULD SMOKE.

Q. SO, THOSE BREAKS WERE FOR THE PURPOSE OF ALLOWING MR. BASHAM TO SMOKE CIGARETTES?

A. YES, SIR.

Q. MR. HUGHES WAS PRESENT, AGENT MALEY WAS PRESENT, AND YOU WERE PRESENT?

A. YES, SIR.

Q. DURING THE COURSE OF THE INTERVIEW ON THE 25TH, AGENT VITO, DO YOU RECALL A STATEMENT BEING MADE BY MR. BASHAM,

HIMSELF, IN THE BREATHALYZER ROOM AT THE BOYD COUNTY DETENTION CENTER?

A. YES, SIR, I DO.

Q. WHAT DO YOU REMEMBER?

A. AS HE WAS SPEAKING IN THE ROOM, HE MADE A COMMENT THAT "THAT IS WHERE THEY DID THEIR THING."

Q. WHAT -- WHERE WAS THE PLACE THAT HE WAS TALKING ABOUT?

A. THIS WAS A CEMETERY. SMALL, RUN-DOWN CEMETERY, WHICH WAS INDICATED ON THE MAP, AND HE WAS SPEAKING, AND HE SAID, "THAT IS WHERE THEY DID THEIR THING."

Q. WHERE DO YOU REMEMBER THAT YOU WERE WHEN THAT HAPPENED, AND WHO WAS PRESENT, AND HOW DO YOU REMEMBER THAT COMMENT BEING MADE?

A. THE COMMENT WAS MADE -- THERE IS A COUNTER IN THE BOOKING ROOM. THEY WERE WORKING ON THE MAP ON THE COUNTER. THAT IS REALLY THE ONLY WRITING SURFACE IN THE ROOM. MR. HUGHES WAS STANDING BESIDE MR. BASHAM, AND MR. MALEY WAS STANDING BESIDE MR. BASHAM. AND THEY WERE WORKING ON THE MAP. AND MR. BASHAM TURNED AND SAID THAT, AT THAT POINT.

Q. SAID IT IN WHOSE DIRECTION?

A. IN MR. HUGHES' DIRECTION.

Q. HIS COMMENT AGAIN IS WHAT?

A. "THAT IS WHERE THEY DID THEIR THING."

Q. DO YOU RECALL HAVING ANY REACTION TO THAT?

A. I RECALL LOOKING AT MR. MALEY AND HIM LOOKING AT ME,

AND I FELT THAT WAS VERY SIGNIFICANT.

Q. WHY?

A. IT INDICATED THAT HE HAD DONE SOMETHING, "THEIR THING."

Q. AND DO YOU REMEMBER REACTING AND LOOKING AT AGENT MALEY, AT THE TIME?

A. YES.

Q. NOW, WE HAD TALKED ABOUT THE PREPARATION OF AN FBI 302 AND WHAT THAT PROCESS IS. IF THERE IS MORE THAN ONE AGENT PARTICIPATING IN AN INTERVIEW, HOW IS A 302 GENERATED? WHAT IS THE PROCESS?

A. THERE WILL USUALLY BE ONE PERSON THAT WILL EITHER TYPE THE 302 OR DICTATE THE 302. ONCE THE 302 IS COMPLETED, IT WILL GO TO THE OTHER PERSON THAT IS PRESENT FOR THEIR COMMENTS. AND WHEN THEY BOTH AGREE THAT THAT IS WHAT WAS SAID, THEN IT IS SENT UP TO THE SUPERVISOR TO BE SIGNED.

Q. ARE YOU FAMILIAR WITH THE 302 THAT WAS GENERATED SUBSEQUENT TO THE INTERVIEW ON NOVEMBER 25TH OF 2002 THAT YOU HAD BEEN DISCUSSING?

A. YES, I AM.

Q. DID YOU DRAFT IT?

A. NO, SIR, I DID NOT.

Q. DID YOU HAVE A CHANCE TO REVIEW IT BEFORE IT WAS FINALIZED?

A. I DID.

**JA 1281**

Q.    WHO DRAFTED IT?

A.    AGENT MALEY.

Q.    DO YOU KNOW, APPROXIMATELY, WHEN IT WAS DRAFTED?

A.    DICTATION DATE IS DECEMBER 2ND.

Q.    SO, A WEEK AFTER THE INTERVIEW ON THE 25TH?

A.    YES.

Q.    AND DOES THE 302 THAT MEMORIALIZES OR SUMMARIZES THE CONVERSATION OF NOVEMBER 25TH, 2002, MAKE REFERENCE TO THAT STATEMENT?

A.    YES, SIR, IT DOES.

Q.    AND YOU WOULD HAVE REVIEWED THAT 302 PRIOR TO IT BEING FINALIZED BACK IN DECEMBER?

A.    I DID.

Q.    DO YOU RECALL, IN PARTICULAR, AGENT VITO, ANY OTHER STATEMENTS THAT MR. BASHAM SAID THAT YOU REMEMBER BEING SIGNIFICANT, AT THAT TIME?

A.    YES, SIR, THERE WAS.

Q.    WHAT WAS THAT?

A.    WE HAD MOVED INTO THE OTHER ROOM AND HE MADE A COMMENT CONCERNING THAT THE BODY WAS DRAGGING DISTANCE OFF OF THE ROAD.

Q.    WHY WAS THAT SIGNIFICANT TO YOU?

A.    IT INDICATED SHE WAS DEAD WHEN THEY MOVED HER, PHYSICALLY INCAPACITATED WHEN THEY MOVED HER. THEY HAD MOVED HER, THEY HAD DRAGGED HER TO THAT LOCATION.

Q. AND, GENERALLY, AGENT MALEY WILL TESTIFY AND CAN GET INTO THE DETAILS OF THE DIRECTIONS THAT WERE PROVIDED ON THE 25TH, BUT, GENERALLY, AGENT VITO, WHAT KIND OF AREA DID MR. BASHAM, AT THAT POINT, DESCRIBE MS. DONOVAN AS BEING LOCATED IN?

A. A COMPLETELY DIFFERENT AREA THAN WHERE HE DESCRIBED BEFORE.

Q. AND THE DRAGGING DISTANCE YOU REFER TO, SHE WAS DRAGGING DISTANCE FROM WHERE?

A. FROM THE ROAD INTO THE WOODS.

Q. YOU HAVE REVIEWED THE 302 THAT AGENT MALEY PROVIDED WHICH CONTAINED -- AGENT MALEY DRAFTED, WHICH CONTAINS OTHER DETAILS OF THAT INTERVIEW?

A. CORRECT.

Q. BASED ON YOUR REVIEW OF AGENT MALEY'S INTERVIEW, DOES IT ACCURATELY SET FORTH THE SUMMARY OF THE INTERVIEW?

A. IT DOES.

MR. SCHOOLS: BEG THE COURT'S INDULGENCE.

BY MR. SCHOOLS:

Q. AGENT VITO, YOU PARTICIPATED IN FOUR SEPARATE INTERVIEWS OF MR. BASHAM?

A. YES, SIR.

Q. DID HE APPEAR TO UNDERSTAND DURING THE INTERVIEWS WHAT YOU WERE ASKING?

A. HE DID.

**JA 1283**

Q.    DID YOU HAVE ANY PROBLEM COMMUNICATING WITH MR. BASHAM?

A.    NOT AT ALL.

Q.    DID YOU UNDERSTAND THE RESPONSES THAT HE GAVE YOU?

A.    CLEARLY.

Q.    AT ANY POINT DURING ANY OF THESE INTERVIEWS,  AGENT VITO,  DID YOU BECOME AGGRESSIVE, OR THREATENING, OR ANY OTHER SUCH THING WITH MR. BASHAM?

A.    NOT AT ALL.

Q.    AT ANY POINT DURING ANY OF THESE INTERVIEWS, DID YOU MAKE ANY PROMISES TO MR. BASHAM ABOUT WHAT BENEFIT HE WOULD DERIVE FROM PROVIDING INFORMATION TO LAW ENFORCEMENT OR HE MIGHT DERIVE?

A.    NOT AT ALL.

Q.    WHY WOULDN'T YOU HAVE DONE THAT?

A.    THAT IS NOT PERMISSIBLE FOR AN INVESTIGATING AGENCY TO MAKE PROMISES OF THAT SORT.

Q.    WHY NOT?

A.    IT IS NOT IN OUR PURVIEW TO DO THAT.  THAT IS THE U. S. ATTORNEY AND THE COURT'S DECISION.  THAT IS NOT SOMETHING THAT WE DO.

Q.    AT ANY POINT DURING ANY OF THESE INTERVIEWS,  DID YOU THREATEN MR. BASHAM IN ANY WAY AT ALL?

A.    NOT AT ALL.

Q.    IN YOUR PRESENCE, DID ANYBODY ELSE DO THAT?

A.    NO, SIR.

JA 1284

Q. AND WITH RESPECT TO THE INTERVIEW ON THE 25TH, HIS ATTORNEY WAS PRESENT?

A. YES, SIR.

Q. AND WITH RESPECT TO EACH ONE OF THESE INTERVIEWS, MR. BASHAM WAS FULLY ADVISED OF HIS CONSTITUTIONAL RIGHTS PRIOR TO BEING INTERVIEWED?

A. HE WAS.

Q. AND HE PROVIDED THE INFORMATION HE PROVIDED TO YOU, AS FAR AS YOU CAN TELL, OF HIS OWN FREE WILL?

A. HE DID.

MR. SCHOOLS: NO FURTHER QUESTIONS, YOUR HONOR. THANK YOU.

THE COURT: CROSS-EXAMINATION.

CROSS EXAM

BY MR. SWERLING:

Q. HELLO, MR. VITO. HOW ARE YOU?

A. GOOD, SIR.

Q. MR. VITO, YOU SPENT A LOT OF TIME OR PART OF YOUR TRAINING IN INTERVIEW TECHNIQUE, WOULDN'T THAT BE A FAIR STATEMENT?

A. YES, SIR.

Q. THERE IS A CERTAIN ART TO DEVELOPING AN INTERVIEW WITH A PERSON, CORRECT?

A. CORRECT.

Q. AND IT WOULD NOT BE UNUSUAL FOR YOU, IN YOUR EXPERIENCE

JA 1285

AS AN AGENT WITH THE FBI, TO HAVE A STATEMENT EVOLVE OVER A PERIOD OF TIME, CORRECT?

A.    CORRECT.

Q.    I MEAN, THAT IS ONE OF THE THINGS YOU ARE TRAINED FOR?

A.    CERTAINLY.

Q.    TO GO AHEAD AND DEVELOP THAT STATEMENT OVER A PERIOD OF TIME, WHETHER IT IS ONE INTERVIEW, TWO INTERVIEWS, OR FOUR INTERVIEWS, CORRECT?

A.    YES, SIR.

Q.    THAT IS WHY YOU GO BACK?

A.    YES, SIR.

Q.    SO, YOU ARE NOT TELLING THE JURY THAT THIS WAS A SITUATION THAT YOU HAD NEVER EXPERIENCED BEFORE, WHERE SOMEONE STARTS DEVELOPING AND SUPPLEMENTING THINGS AS TIME GOES ON, CORRECT?

A.    THIS SITUATION, IN PARTICULAR, WAS MUCH LIKE ANY OTHERS. SOME PEOPLE PROVIDE INFORMATION TRUTHFULLY IN THE BEGINNING, EVERYTHING OUT AT ONCE, OTHERS DON'T.

Q.    CORRECT. THAT IS WHAT YOU ARE TELLING THE JURY?

A.    YES.

Q.    NOW, BASICALLY, YOU STAYED WITH IT AND YOU WENT AHEAD AND DID FOUR INTERVIEWS TO TRY AND GET AS MUCH INFORMATION AS YOU COULD, CORRECT?

A.    YES, SIR.

Q.    NOW, ON THE 19TH WHEN YOU WENT THERE, AND IT WAS 1:58

IN THE MORNING, I MEAN, OBVIOUSLY, YOU WERE TIRED?

A.    YES, SIR.

Q.    THE INTERVIEW WENT UNTIL ABOUT 3:19 IN THE MORNING. YOU THOUGHT IT WAS IMPORTANT TO GET THERE THAT EVENING?

A.    CORRECT.

Q.    MR. BASHAM, WHEN YOU GOT THERE, CAME IN AND YOU ADVISED HIM OF HIS RIGHTS?

A.    YES, SIR.

Q.    AS I UNDERSTAND IT, YOU TOLD HIM HE HAD A RIGHT TO AN ATTORNEY, CORRECT?

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

Q.    YOU TOLD HIM ANYTHING HE SAID COULD AND WOULD BE USED AGAINST HIM IN A COURT OF LAW?

A.    I PROVIDED THE ADVICE OF RIGHTS FORM.

Q.    WHICH, ESSENTIALLY, SAYS THAT OR SUMMARIZES THAT?

A.    YES, SIR.

Q.    AND EVEN TELLS THEM A LAWYER CAN BE APPOINTED FOR THEM?

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

Q.    YOU ASKED HIM WHETHER OR NOT HE ACTUALLY WAIVED THOSE RIGHTS, CORRECT?

A.    YES.

Q.    YOU WERE SATISFIED HE UNDERSTOOD THE RIGHTS, AND HE SIGNED THE WAIVER FORM, CORRECT?

A.    YES, SIR.

Q.    SO, IN OTHER WORDS, HE KNEW HE HAD A RIGHT TO A

**JA 1287**

LAWYER; HE KNEW HE HAD A RIGHT NOT TO SAY ANYTHING, BUT, NEVERTHELESS, HE DECIDED TO SPEAK WITH YOU THAT EVENING -- OR THAT MORNING, CORRECT?

A. CORRECT.

Q. NOW, MR. BASHAM DID NOT RESIST YOU IN ANY WAY AS FAR AS HE WASN'T COMBATIVE, OR ARROGANT, OR BELLIGERENT IN ANY WAY, WAS HE?

A. NO, SIR.

Q. AS A MATTER OF FACT, ON THE FOUR INTERVIEWS YOU HAD, HE WASN'T LIKE THAT AT ALL, WAS HE?

A. NOT AT ALL.

Q. HIS BEHAVIOR WAS APPROPRIATE?

A. YES, SIR.

Q. HE LISTENED TO YOUR QUESTIONS?

A. HE DID.

Q. HE SHOWED YOU DUE RESPECT?

A. YES, SIR.

Q. YOU MAY NOT HAVE ALWAYS LIKED THE ANSWER THAT YOU GOT OR THOUGHT IT WAS THE RIGHT ANSWER, BUT AS FAR AS HIS DEMEANOR WITH YOU, AND HIS ATTITUDE, AND HIS WAY HE RESPONDED TO YOU, HE DEALT WITH YOU WITH RESPECT AND DID NOT TRY AND STOP ANY OF THESE INTERVIEWS, AS A MATTER OF FACT; ISN'T THAT TRUE?

A. CORRECT.

Q. NOW, WE TALKED A LITTLE BIT ABOUT WHAT WAS DEVELOPED

ON THE MORNING OF NOVEMBER 19TH, 2002. IT HAS BEEN STATED SEVERAL TIMES THAT HE DIDN'T MENTION ANYTHING ABOUT MS. DONOVAN OR THE SITUATION IN WEST VIRGINIA. BUT IN ALL FAIRNESS, YOU NEVER ASKED HIM ABOUT EITHER ONE OF THOSE THINGS EITHER, DID YOU?

A. NO, SIR, I DIDN'T.

Q. YOU NEVER TOLD HIM -- FIRST OF ALL, YOU DIDN'T EVEN KNOW ABOUT WEST VIRGINIA, AT THAT POINT?

A. RIGHT.

Q. SO, TO MAKE THE POINT HE DIDN'T MAKE ANY COMMENT ABOUT WEST VIRGINIA IS SORT OF MEANINGLESS BECAUSE YOU DIDN'T EVEN ASK HIM ABOUT THAT? YOU DIDN'T KNOW ABOUT IT?

A. ARE YOU ASKING MY OPINION?

Q. PARDON?

A. ARE YOU ASKING MY OPINION.

Q. I'M NOT ASKING YOUR OPINION. I SAID, YOU DIDN'T KNOW ABOUT IT, YOU DIDN'T ASK HIM ABOUT IT?

A. I DIDN'T ASK HIM THAT, SPECIFICALLY.

Q. SO WHEN HE -- YOU ASKED HIM, AND I GUESS WHAT I AM TRYING TO SAY IS THIS, UNDER WHAT PRETENSE WERE YOU THERE? WHAT WAS THE REASON YOU WERE THERE? WHAT DID YOU TELL HIM?

A. THAT WE WERE CONDUCTING AN INVESTIGATION.

Q. ABOUT?

A. THAT IS PRETTY MUCH IT.

Q. I MEAN, SO IF YOU SIT DOWN WITH SOMEONE AND SAY, I AM

Q.    CONDUCTING AN INVESTIGATION, DON'T YOU THINK YOU DO HAVE TO FOCUS ON SOMETHING, OR ASK THEM ABOUT SOMETHING THAT HAPPENED IN NEW JERSEY, TORONTO, OR OTTAWA? YOU MUST HAVE FOCUSED ON SOMETHING.

A.    OF COURSE, HE WAS IN JAIL, AT THE TIME.

Q.    RIGHT.

A.    AND I DIDN'T -- I SAID WE ARE HERE TO CONDUCT AN INVESTIGATION. WE KNOW YOUR REAL IDENTITY IS BRANDON BASHAM, AND COULD YOU TELL ME WHAT HAPPENED.

Q.    WHAT HAPPENED IN ASHLAND?

A.    IN GENERAL. AND HE, FROM THAT POINT, STARTED FROM THE BEGINNING.

Q.    SO, YOU MUST HAVE, IN ORDER FOR HIM TO START FROM THE BEGINNING, YOU MUST HAVE ASKED HIM TO START FROM THE BEGINNING, IT JUST MAKES SENSE?

A.    CERTAINLY.

Q.    SO, HE STARTED WITH YOU AT 1:58. NOW, YOU DIDN'T TELL HIM, AT THAT POINT, HE WAS CHARGED WITH -- HE HAD BEEN CHARGED WITH SHOOTING AT THE OFFICER, CORRECT?

A.    I WASN'T REALLY SURE WHAT HE WAS CHARGED WITH. I AM SURE HE WAS CHARGED WITH THE SHOOTING OF THE OFFICER. I DIDN'T REVIEW THE CHARGES, PER SE.

Q.    YOU DON'T EVEN KNOW WHAT CHARGES HE HAD WHEN YOU WALKED INTO THE JAIL?

A.    KNEW THAT HE WAS CHARGED WITH THE ASHLAND INCIDENT. I

AND HE TOLD YOU THE TYPE OF GUN HE GOT; ISN'T THAT TRUE?

A.    AT SOME POINT.

Q.    A .22.    THAT WAS BEFORE HE WAS CONFRONTED WITH THE FACT THAT THAT IS THE TYPE OF GUN HE HAD?

A.    I BELIEVE THAT COMES LATER,  YES, SIR.

Q.    LOOK ON PAGE 5 OF THE 302.

A.    OKAY.  YES, SIR.

Q.    HE ALSO TOLD YOU THAT MR. FULKS HAD A .45?

A.    CORRECT.

Q.    DO YOU KNOW NOW THAT THOSE ARE THE TWO WEAPONS THAT THEY HAD?

A.    TO THE BEST OF MY MEMORY, I BELIEVE THE .22 WAS COVERED.

Q.    BUT NOT, AT THAT TIME?

A.    NO.

Q.    SO, HE WAS GIVING YOU INFORMATION THAT, NUMBER ONE, YOU DIDN'T EVEN KNOW ABOUT, AND, NUMBER TWO, HE CERTAINLY DIDN'T KNOW YOU KNEW ABOUT, YOU HAD NOT CONFRONTED HIM ABOUT THAT; ISN'T THAT TRUE?

A.    CORRECT.

Q.    HE GOES ON FURTHER AND ADMITS TO ANOTHER CRIME THAT YOU DIDN'T EVEN ASK HIM ABOUT; ISN'T THAT TRUE?

A.    TRUE.

Q.    HE TALKS TO YOU ABOUT THE BREAK-IN OF A PERSON'S HOUSE, WHERE THEY BROKE INTO A TRAILER AND FULKS SHOT AT THE

Q. INDIVIDUAL; ISN'T THAT TRUE?

A. YES, SIR.

Q. SO, WITHOUT ANY PROMPTING, WITHOUT EVEN TELLING HIM YOU KNEW ABOUT IT OR ANYBODY KNEW ABOUT IT, HE GIVES UP TO YOU THE FACT THAT HE AND FULKS COMMITTED ANOTHER CRIME, WHICH INVOLVED A BURGLARY, AND THAT THEY HAD STOLEN SOME GUNS, CORRECT?

A. YES, SIR.

Q. AND THAT MR. FULKS WAS SHOOTING AT THE INDIVIDUAL?

A. YES, SIR.

Q. LET ME ASK YOU, DURING THE INTERVIEWS THAT YOU HAD WITH HIM, YOU GAVE HIM BREAKS FOR CIGARETTES?

A. YES, SIR.

Q. I KNOW THIS MAY SOUND LIKE A FUNNY QUESTION, BUT HOW OFTEN DID YOU DO THAT?

A. WHENEVER HE ASKED, PRETTY MUCH.

Q. DO YOU REMEMBER ABOUT HOW MANY TIMES HE TOLD YOU HE NEEDED A CIGARETTE AND WANTED TO GO OUT AND HAVE A SMOKE?

A. ONCE AN HOUR, EVERY OTHER HOUR, EVERY HOUR. DEPENDING UPON HIS REQUEST.

Q. IT WAS AN ONGOING REQUEST OVER THE FOUR INTERVIEWS YOU HAD THAT HE WANTED TOBACCO?

A. HE DID.

Q. ACTUALLY, THAT WAS PROBABLY THE MAIN THING HE WAS ASKING FOR; ISN'T THAT TRUE?

A.    I BELIEVE SO.

Q.    RATHER THAN REFRESHMENTS OR ANYTHING ELSE, TOBACCO?

A.    YES, SIR.

Q.    MOVING ON TO THE NEXT MORNING, ABOUT SIX OR SEVEN HOURS LATER, YOU COME BACK AND MR. BASHAM IS JUST -- HE IS GLAD TO TALK TO YOU AGAIN, CORRECT?

A.    YES.

Q.    YOU HAD READVISED HIM OF HIS RIGHTS. TOLD HIM AGAIN HE HAS A RIGHT TO A LAWYER, ONE COULD BE APPOINTED FOR HIM. TOLD HIM, AGAIN, THAT THE INFORMATION HE IS GIVING YOU COULD INCRIMINATE HIM. YOU TOLD HIM AGAIN THAT YOU ARE NOT GOING TO QUESTION HIM UNLESS HE WAIVES HIS RIGHTS, CORRECT?

A.    YES.

Q.    SO, AGAIN, HE WAIVES HIS RIGHTS TO TALK TO YOU?

A.    CORRECT.

Q.    AND, AT THIS POINT, WAS IT -- DID YOU CONDUCT THIS INTERVIEW AS A NARRATIVE FROM HIM, OR WAS IT QUESTION AND ANSWER TYPE INTERVIEW?

A.    THIS ONE WAS MORE QUESTION AND ANSWER.

Q.    AS YOU SAID, A LITTLE BIT MORE FORTHCOMING THIS TIME ABOUT DETAILS?

A.    YES.

Q.    THAT IS ONE OF THE THINGS YOU ARE HOPING FOR, THAT PEOPLE, AS YOU GET A COMFORT FACTOR WITH THEM, THEY GET A COMFORT FACTOR WITH YOU, THEY ARE A LITTLE BIT MORE

**JA 1293**

FORTHCOMING WITH DETAILS?

A.    ADDITIONAL DETAILS WERE DEVELOPED.   AND INFORMATION WAS -- HE GAVE US INFORMATION THAT WHAT HE TOLD US ABOUT SOME OF THESE BEFORE WERE NOT TRUE.   SO, WE ARE DEVELOPING MORE INFORMATION.

Q.    ALL OF THAT IS REALLY IN THE NATURE OF DETAILS?

A.    YES, SIR.

Q.    I WANT TO JUST HIGHLIGHT SOME OF THOSE THINGS,  AS WELL.   AGAIN,  HIS ATTITUDE AND DEMEANOR WERE FINE?

A.    YES, SIR.

Q.    AND FROM WHAT I UNDERSTAND, YOU TALKED TO HIM JUST LIKE YOU ARE TALKING TO US AND THE JURY RIGHT NOW,  RIGHT?

A.    RIGHT.

Q.    IT WAS NOT A CONFRONTATIONAL SITUATION?

A.    NO, SIR.

Q.    HE WAS NOT CONFRONTATIONAL WITH YOU?

A.    NO.

Q.    AT NO TIME DID HE ASK FOR A LAWYER?

A.    NO, SIR.

Q.    NO TIME DID HE WANT TO STOP QUESTIONING?

A.    NO, SIR.

Q.    AT NO TIME DID HE ASK YOU ABOUT, LIKE, TO REDEFINE FOR HIM THAT HE DIDN'T UNDERSTAND THAT IT WOULD BE INCRIMINATING TO HIM?

A.    I AM SURE HE ASKED ME QUESTIONS ABOUT -- TO CLARIFY

SOMETHING I HAD SAID, BUT NOTHING LIKE THAT, NO, SIR.

Q. NOW, IN THIS PARTICULAR INTERVIEW, YOU HAD STILL NOT DIRECTLY ASKED HIM ANYTHING ABOUT ANY ABDUCTION IN WEST VIRGINIA; ISN'T THAT TRUE?

A. AT THE BEGINNING OF THE SECOND INTERVIEW, NO, SIR.

Q. IN FACT, YOU WERE NOT AWARE THAT THERE MIGHT EVEN BE ANY CONNECTION, AT THAT POINT, AS I UNDERSTOOD YOUR TESTIMONY?

A. CORRECT.

Q. YOU KNEW MAYBE ABOUT IT FROM THE MEDIA, BUT YOU WERE NOT AWARE OF ANY KIND OF CONNECTION HERE?

A. YES, SIR.

Q. SO, HE GOES BACK AND IT LOOKS LIKE Y'ALL START TALKING, AGAIN, ABOUT THE SITUATION AFTER HE ESCAPED FROM JAIL?

A. CORRECT.

Q. HE REAFFIRMED FULKS HAD A KNIFE. REAFFIRMED THIS SITUATION ABOUT GIVING THE KNIFE TO BASHAM OR TELLING BASHAM TO TAKE THE KNIFE AND TELLING THE MAN TO CONTINUE DRIVING HOLDING THE KNIFE TO HIM, CORRECT?

A. YES.

Q. HE DESCRIBES TO YOU THAT FULKS GOT BEHIND THE DRIVER'S -- GOT BEHIND THE WHEEL AND STARTED DRIVING THE VEHICLE?

A. AT SOME POINT.

Q. NOW, IN THIS PARTICULAR SITUATION, HE TELLS YOU THAT FULKS HAD GIVEN HIM A NOTE AND TOLD HIM TO DO IT, WHAT I JUST

TOLD YOU NOW, RIGHT, PULL THE KNIFE ON THE MAN?

A.   YES, SIR.

Q.   AND HE DID THAT AS A RESULT OF WHAT FULKS TOLD HIM TO DO; IS THAT CORRECT?

A.   CORRECT.

Q.   NOW, I WANTED TO ASK YOU ABOUT THIS SITUATION. HE SAID HE TAPED THE MAN'S HANDS UP AT FULKS'S DIRECTION, BUT HE WAS CONCERNED FOR THE MAN'S CIRCULATION; IS THAT RIGHT?

A.   YES, SIR.

Q.   SO, HE MENTIONED THAT TO YOU AND ASKED ABOUT SOMETHING ELSE LATER ABOUT THAT, BUT HE TOLD YOU ABOUT THAT WITH RESPECT TO MR. HAWKINS, THE MAN WHO HAD BEEN ABDUCTED?

A.   TRUE.

Q.   NO REASON TO DOUBT THAT, IS THERE?

A.   I HAVE NO REASON. HE TOLD ME SEVERAL THINGS THAT WEREN'T TRUE.

Q.   THAT WE KNOW?

A.   YES, SIR.

Q.   HE DID TELL YOU THAT THE MAN WAS TAPED TO THE TREE, AND HE SAID THAT BASHAM ARGUED WITH FULKS BECAUSE HE DIDN'T WANT TO TIE THE MAN TO THE TREE; ISN'T THAT TRUE?

A.   YES, SIR.

Q.   HE ALSO TOLD YOU THAT BASHAM GAVE HIM HIS JACKET? THAT IS THE FIRST TIME HE TOLD YOU ABOUT THAT ONE?

A.   YES, SIR.

Q.    HE HADN'T TOLD YOU ABOUT THAT ONE BEFORE.    HE GAVE IT TO HIM BECAUSE HE WANTED TO KEEP HIM WARM?

A.    THAT WAS MY IMPRESSION.

Q.    AND ON THIS OCCASION, HE ALSO SAID THAT THEY WENT -- HE WENT AND CUT THE SEAT OF THE COVER OFF TO PUT IT OVER THE MAN; IS THAT CORRECT?

A.    YES, SIR.

Q.    AND THEN HE TAPED THE MAN TO THE TREE, BUT FULKS TAPED THE MAN TO THE TREE TIGHTER?

A.    FULKS THEN TAPED THE MAN TO THE TREE TIGHTER AND TIED HIS HANDS WITH A CORD, TAPED HIS FEET, AS WELL.

Q.    BUT THE TIGHTER PART IS WHAT MR. FULKS DID?

A.    YES, SIR.

Q.    THAT IS WHAT BASHAM TOLD YOU?

A.    YES, SIR.

Q.    THEN HE TOLD YOU FULKS GRABBED A HAMMER AND HE WAS WORRIED THAT HE WAS GOING TO HIT MR. HAWKINS WITH IT, AND THEY ARGUED ABOUT IT.  AS A RESULT OF THAT, HE DID NOT HIT HIM WITH THE HAMMER; ISN'T THAT TRUE?

A.    CORRECT, YES, SIR.

Q.    NOW, AT THIS POINT, HE IDENTIFIES THE PERSON WHOSE HOME THEY WENT TO, WOMAN NAMED TINA?

A.    YES, SIR.

Q.    AND HE TELLS YOU ABOUT TINA AND THE OTHER WOMAN, HEAVY-SET WOMAN; IS THAT CORRECT?

**JA 1297**

A.    CORRECT.

Q.    HE TELLS YOU ABOUT GOING TO THE MOTEL, AND FOR A PERIOD OF TIME FULKS AND TINA WERE NOT AT THE MOTEL?

A.    CORRECT.

Q.    HE ALSO TOLD YOU THAT FULKS ASKED ME IF I HAD EVER SEEN THE OCEAN, AND THAT IS WHERE THEY ARE GOING; IS THAT CORRECT?

A.    YES, SIR.

Q.    HE ALSO TOLD YOU FULKS WOULD STEAL PURSES IF THEY TRAVELLED.  HE ALSO SAID THEY DID ARRIVE IN SOUTH CAROLINA. HE TOLD YOU THEY WENT TO THE BEACH IN SOUTH CAROLINA?

A.    YES, SIR.

Q.    NOW, AGAIN, HE DISCUSSES WITH YOU ABOUT GOING TO A TRAILER AND BREAKING INTO THE TRAILER WITH SCREWDRIVERS AND STEALING THE GUNS.  SO, HE DISCUSSES THAT PARTICULAR SITUATION WITH YOU EVEN FURTHER, CORRECT?

A.    YES, SIR.

Q.    BUT HE DOESN'T -- STILL DOESN'T KNOW THAT YOU KNOW ABOUT IT, AND, IN FACT, YOU MAY NOT EVEN KNOW ABOUT IT, AT THAT PARTICULAR POINT IN TIME?

A.    DON'T KNOW THAT I DID, AT THAT POINT IN TIME.

Q.    AND HE TOLD YOU SOME OF THE SITUATION OF WHAT HAPPENED. THAT SOMEONE CAME DOWN THE ROAD, BLOCKED THEM IN, THE INDIVIDUAL, FULKS STARTED SHOOTING AT HIM, AND FULKS WAS CHASING THE GUY, AND BASHAM TOLD HIM IT WAS DUMB TO CHASE THE TRUCK, THAT IS WHAT HE SAID?

A.    YES.

Q.    THAT IS WHAT HE TOLD YOU?

A.    YES.

Q.    HE TOLD YOU THEY PULLED THE VAN IN THE WOODS, YOU DIDN'T KNOW THAT, DID YOU?

A.    NO.

Q.    YOU DIDN'T ASK HIM THAT PARTICULAR QUESTION?

A.    NO, SIR.

Q.    AND SO, HE TOLD YOU THEY ABANDONED THE VAN AND GOT ANOTHER VEHICLE, THEY STOLE A VEHICLE?

A.    CORRECT.

Q.    SO, HE ADMITTED TO ANOTHER CRIME THAT YOU HAD NOT CONFRONTED HIM ABOUT?

A.    YES, SIR.

Q.    THAT WAS A VEHICLE THAT THEY STOLE FROM A WOMAN; IS THAT CORRECT?

A.    THEY ATTEMPTED -- THE TRUCK THEY FOUND THE KEYS IN?

Q.    YES.

A.    YES.

Q.    HE DOES GO BACK INTO WHETHER IT IS -- YOU DON'T KNOW IF THIS IS NARRATIVE OR QUESTIONS, AT THIS POINT.   IT IS IN NARRATIVE?

A.    IT IS GIVE AND TAKE, AT THIS POINT.

Q.    GIVE AND TAKE.   AT THIS POINT, HE ADMITTED THAT THEY JUMPED IN THE CAR WITH MS. DONOVAN AT THE WAL-MART?

A.    YES, SIR.

Q.    HE ADMITTED THAT HE HAD A .22 PISTOL, AND HE ADMITTED THAT CHAD FULKS HAD A .45 CALIBER PISTOL?

A.    RIGHT.

Q.    HE ALSO ADMITTED THEY USED THE WOMAN'S CREDIT CARDS; ISN'T THAT TRUE?

A.    YES.

Q.    BUT FULKS, ACTUALLY, IS THE ONE USING THE CREDIT CARDS?

A.    I BELIEVE THAT IS TRUE, AT THIS POINT.

Q.    I'M SORRY?

A.    I BELIEVE THAT IS TRUE, AT THIS POINT.

Q.    HE TELLS YOU THAT, AT SOME POINT, THEY TAPE THE WOMAN'S HANDS.   HE DID NOT WANT TO TAPE THE WOMAN'S HANDS, AND FULKS GOT MAD AT HIM.   THAT IS SORT OF A REPEAT OF WHAT HAPPENED BEFORE, RIGHT?

A.    YES.

Q.    BUT THIS TIME HE TELLS YOU FULKS GETS REALLY ANGRY ABOUT IT, STOPPED THE CAR IN THE MIDDLE OF THE ROAD, AND TAPES HER HANDS, HIMSELF?

A.    YES.

Q.    NOW, BASHAM, AGAIN, THIS IS WITHOUT ANY SPECIFIC QUESTIONS OR ANY KNOWLEDGE ABOUT ANY OF THE DETAILS OF THE CASE, TELLS YOU THAT HE WAS  -- HE TRIED TO LOOSEN THE TAPE ON THE WOMAN'S HANDS SO THAT SHE COULD SMOKE A CIGARETTE; IS THAT CORRECT?

A.   YES.

Q.   SORT OF LIKE WHAT HE SAID ABOUT MR. HAWKINS, CORRECT? WANTED TO LOOSEN THE TAPE ON HIS HANDS BECAUSE HE WAS CONCERNED ABOUT THE CIRCULATION?

A.   CORRECT.

Q.   AND HE TOLD YOU THAT FULKS WENT AHEAD AND GOT THE CREDIT CARD AND USED IT, BUT MAXED THE CARD OUT?

A.   ALSO CORRECT.

Q.   IS THAT TRUE?

A.   YES, SIR.

Q.   NOW, YOU HAD NOT TOLD HIM, AT THIS POINT, THAT THE WOMAN, MS. DONOVAN, HAD MADE ANY PHONE CALLS; ISN'T THAT TRUE?

A.   NO, SIR.

Q.   AND HE VOLUNTEERED THAT TO YOU WITHOUT ANY PROBLEM?

A.   YES, SIR.

Q.   AND HE TOLD YOU THAT FULKS WAS THE ONE THAT TOLD HER TO DO THAT?

A.   CORRECT.

Q.   AGAIN, THE SITUATION -- HE GOES BACK TO THE SITUATION IN ASHLAND WHEN HE WALKED UP AND SAW THE TWO WOMEN, ABOUT PULLING THE GUN OUT OF HIS COAT, CORRECT?

A.   YES.

Q.   YOU HAD NOT CONFRONTED HIM ABOUT THAT, BUT YET HE VOLUNTEERED THAT AGAIN AND WENT INTO A LITTLE MORE DETAIL

ABOUT THAT PARTICULAR INCIDENT, CORRECT?

A.    YES, SIR.

Q.    HE ALSO DISCUSSED WITH YOU, AGAIN, WITHOUT ANY PROMPTING OR WITHOUT ANY FURTHER QUESTIONS, THE CRIME COMMITTED WITH RESPECT TO THE OFFICER WHO WAS CHASING HIM AND SHOOTING HIM?

A.    AGAIN, AT THIS POINT, THERE WERE QUESTIONS.  IT WAS BACK AND FORTH.  IT WASN'T A NARRATIVE.

Q.    LITTLE BIT MORE DETAIL WAS GIVEN BUT, ESSENTIALLY, IT WAS NOT CHANGING.   IT WAS THE SAME STORY HE TOLD YOU BEFORE ABOUT THE OFFICER?

A.    YES.

Q.    AS FAR AS THE WOMAN HE TALKED TO IN THE MALL, TWO WOMEN HE TALKED TO IN THE PARKING LOT OF THE MALL, HE HAD ALREADY TOLD YOU ABOUT THE FACT THAT HE HAD SHOWN THE GUN --

A.    I BELIEVE THAT --

Q.    -- EARLIER IN THE STATEMENT?

A.    THE FIRST PART WAS HE HAD SHOWN THE GUN; SECOND TIME HE HAD SHOWN THE GUN.  SO, AT THIS POINT, IT IS TWO TIMES SHOWING THE GUN.

Q.    HE STARTS TELLING YOU HERE ABOUT FULKS ROBBING SOME DRUG DEALERS, RIGHT, BECAUSE FULKS HAS UNEXPLAINED MONEY?

A.    YES, SIR.

Q.    HE SAYS THAT ON SEVERAL OCCASIONS THROUGHOUT THESE INTERVIEWS THAT YOU HAVE?

OR NOT OR HE DIDN'T KNOW WHETHER OR NOT THERE WAS ANY AMMO. IS THAT REFLECTED SOMEWHERE IN THE 302?

A.    I BELIEVE SO.

Q.    I MAY HAVE JUST OVERLOOKED IT.   IS IT IN THIS PARTICULAR ONE?

A.    I DON'T KNOW.  I WILL HAVE TO LOOK.   I SAW IT WHEN WE WENT THROUGH THE FIRST TIME.   I CAN CONTINUE LOOKING.

Q.    WHAT YOU ARE REALLY SAYING IS,  THAT IS MY POINT,  HE MAY HAVE SAID HE DIDN'T KNOW WHETHER HE DID, HE DIDN'T SAY HE DID NOT?

A.    CORRECT.

Q.    DID HE GIVE YOU ANY PHYSICAL DESCRIPTION OF MR. FULKS?

A.    NO.

Q.    HE DID TELL YOU THAT FULKS ACTED NORMAL AFTER HE DROPPED THE WOMAN OFF,  CORRECT?  THAT WAS HIS OBSERVATION OF MR. FULKS AFTERWARDS?

A.    AT WHAT POINT ARE YOU ON?

Q.    PAGE 6 OF THE 302.

A.    YES.

Q.    HE ADMITTED TO YOU, WITHOUT ANY INFORMATION BEING GIVEN TO HIM, THAT THE WOMAN WAS WITH THEM FOR SIX OR SEVEN HOURS?

A.    CORRECT.

Q.    HE ALSO TOLD YOU THAT THE ORIGINAL PLAN WAS TO TAKE THE WOMAN OUT AND TIE HER UP,  CORRECT?

A.    YES, SIR.

Q.    THAT IS WHAT THEY DID WITH MR. HAWKINS, CORRECT?

A.    CORRECT.

Q.    HE ALSO TOLD YOU, THIS IS ONE OF THOSE SITUATIONS WHERE HE SAID THAT FULKS RIPPED OFF A DRUG DEALER IN HUNTINGTON, CORRECT?

A.    YES, SIR.

Q.    RIPPING OFF CAN BE ONE OR TWO THINGS IN THAT BUSINESS. EITHER YOU TOOK THE DOPE OR YOU TOOK THE MONEY?

A.    YES, SIR.

Q.    HE DOESN'T SAY THAT HE WAS THERE ON THAT PARTICULAR TIME?

A.    NO, SIR.

Q.    NOW, THIS SITUATION BASHAM SAID WHILE THEY WERE IN WEST VIRGINIA, FULKS HAD GOTTEN THE GIRL AND USED HER CREDIT CARD.  APPARENTLY, LATER ON, HE CLARIFIED THAT AND SAID -- DIDN'T MEAN TO IMPLICATE THAT FULKS DID ANYTHING TO A GIRL, THAT IS WHAT YOU SAID, HE CORRECTED THAT LATER?

A.    YES, SIR.

Q.    WHEN HE MADE THAT COMMENT, DID YOU ASK HIM ANY QUESTIONS ABOUT THAT? DID YOU FOLLOW UP WITH THAT?

A.    I BELIEVE, AT THAT POINT, THE WEST VIRGINIA STATE TROOPER WAS WITH ME IN THE INTERVIEW, AND THOSE WERE QUESTIONS THAT WERE BEING ASKED.

Q.    IT DOESN'T APPEAR THERE ARE ANY SPECIFIC QUESTIONS EVER ASKED ABOUT THE WOMAN WHO WAS ABDUCTED IN WEST VIRGINIA. OR

**JA 1304**

ACTUALLY THERE WAS NO COMMENT ABOUT A WOMAN BEING ABDUCTED. IT WAS THAT BASHAM SAID, WHILE THEY WERE IN WEST VIRGINIA STAYING IN A MOTEL OR HOTEL, FULKS LEFT, AND WHEN HE CAME BACK, HE SAID THAT HE HAD A GIRL -- GOT A GIRL AND USED HER CREDIT CARDS. NO FOLLOW-UP THAT APPEARS IN THE 302 AS TO ANY QUESTIONS CONCERNING THAT INCIDENT.

A. CORRECT. THAT WAS TOWARD THE END OF THE INTERVIEW.

Q. AND HE STILL -- HE HAD HIS CIGARETTES DURING THAT PERIOD OF TIME, TOO?

A. YES.

Q. NOW, ON THE 20TH, YOU COME BACK AND YOU ARE WITH SPECIAL AGENT MALEY AND DETECTIVE LAWRENCE, CORRECT?

A. CORRECT.

Q. AND, AGAIN, HE WAS GIVEN HIS RIGHTS, CORRECT?

A. YES, SIR.

Q. AGAIN, ADVISED OF ALL OF THE THINGS WE HAVE ALREADY TALKED ABOUT, ABOUT THE RIGHT TO REMAIN SILENT; THAT HE COULD HAVE A LAWYER; THAT ANYTHING SAID WOULD AND COULD BE USED AGAINST HIM, CORRECT?

A. PROVIDED HIM THE FORM, YES, SIR.

Q. AT THAT POINT, HE WAIVED HIS RIGHTS?

A. YES.

Q. SAID HE WOULD TALK TO YOU?

A. YES.

Q. SAME DEMEANOR, ATTITUDE HE HAD BEFORE?

A.    YES.

Q.    THREE AGENTS IN THE ROOM, AT THIS POINT?

A.    AGENT MALEY WAS THERE IN THE BEGINNING, AND MYSELF. WHEN DETECTIVE LAWRENCE CAME,  AGENT MALEY LEFT.

Q.    GOT A FEW MORE LITTLE DETAILS I WANT TO GO OVER WITH YOU.   WITH RESPECT TO THE ESCAPE IN HOPKINSVILLE, HE SAID FULKS CAME UP WITH THE IDEA AND CONVINCED HIM TO DO IT BECAUSE FULKS HAD TOLD HIM HE HAD MONEY; ISN'T THAT TRUE?

A.    YES.

Q.    HE ALSO TOLD YOU, AT THAT POINT, HE TOOK AN EXTRA DOSE OF MEDICINE?

A.    CORRECT.

Q.    DID YOU FOLLOW UP WITH THAT TO FIND OUT WHAT KIND OF MEDICINE HE WAS TALKING ABOUT?

A.    NO, SIR.

Q.    EVERYTHING ELSE CONCERNING THAT INCIDENT WAS PRETTY CONSISTENT WITH WHAT HE HAD SAID BEFORE THE HAWKINS INCIDENT, CORRECT?

A.    CORRECT.

Q.    HE GOES INTO A LITTLE BIT MORE NOW ABOUT FULKS AND THE GIRLS GOING AND GETTING SOME GUNS?

A.    YES, SIR.

Q.    THAT IS NOT STATED IN ANY PREVIOUS INTERVIEW; ISN'T THAT TRUE?

A.    THEY DO TEND TO RUN TOGETHER.   I BELIEVE THERE WAS

SOME MENTION EARLIER OF THEM HAVING GUNS.

Q.    HAVING GUNS?

A.    YES, SIR.    BUT NOT WHERE THEY OBTAINED THEM.

Q.    NOW, FULKS AND THE GIRLS WENT AND GOT THE GUNS?

A.    YES, SIR.

Q.    AND HE TOLD YOU THAT THEY WERE DRIVING TWO VEHICLES?

A.    CORRECT.

Q.    NOW, HE ALSO, AT THIS POINT, ADMITTED TO ANOTHER CRIME, THAT HE WAS THE ONE ACTUALLY CASHING THE CHECKS?

A.    YES, SIR.

Q.    YOU DIDN'T TELL HIM YOU KNEW ABOUT THAT OR ASKED HIM ABOUT THAT?

A.    NO.

Q.    HE ALSO, AGAIN, TOLD YOU ABOUT THE FACT THAT, WELL, HE TOLD YOU THAT HE WAS UNAWARE MANY TIMES OF WHAT STATE THEY WERE IN?

A.    THAT'S CORRECT.

Q.    AND HE TOLD YOU ABOUT THE FACT THAT THE VAN HAD TO BE FIXED, THEY HAD TO STOP, GO AHEAD AND GET THE VAN FIXED, YOU DIDN'T HAVE THAT INFORMATION BEFORE?

A.    CORRECT.

Q.    HE ALSO TOLD YOU THAT FULKS AND TINA WERE GONE FOR QUITE A WHILE, AND WHEN THEY CAME BACK, HE HAD MET THREE TEENAGERS, THREE TEENAGE BOYS, AND TAKEN THEM BACK TO THE MOTEL?

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 6

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,   )   CR. NO. 4:02-992
                            )   COLUMBIA, SC
                            )   SEPTEMBER 27, 2004
                            )
     VERSUS                 )
                            )
BRANDON L.  BASHAM,         )
          DEFENDANT.        )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME X

APPEARANCES:

FOR THE GOVERNMENT:            SCOTT SCHOOLS, FIRST AUSA
                              JONATHAN S. GASSER, AUSA
                              JOHN DUANE, AUSA
                              UNITED STATES ATTORNEY'S OFFICE
                              1441 MAIN STREET, SUITE 500
                              COLUMBIA, SC  29201

FOR THE DEFENDANT:            JACK SWERLING, ESQ.
                              1720 MAIN STREET
                              SUITE 301
                              COLUMBIA, SC  29201

                              GREG HARRIS, ESQ.
                              1720 MAIN STREET
                              SUITE 301
                              COLUMBIA, SC  29201

COURT REPORTER:               DEBRA R. JERNIGAN, RPR, CRR
                              UNITED STATES COURT REPORTER
                              901 RICHLAND STREET
                              COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1308

THE COURT:  BOTH SIDES READY TO PROCEED?

MR. HARRIS:  YES, SIR.

MR. SCHOOLS:  YES, SIR.

THE COURT:  PLEASE BRING IN THE JURY.

PLEASE CALL YOUR NEXT WITNESS.

MR. GASSER: THANK YOU, YOUR HONOR.  THE GOVERNMENT WOULD CALL RONALD HEWETT.

RONALD HEWETT, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

MR. GASSER:  GOOD MORNING, LADIES AND GENTLEMEN.

DIRECT EXAM

BY MR. GASSER:

Q.    GOOD MORNING, SHERIFF HEWETT.  TELL US, SIR, WHERE ARE YOU EMPLOYED?

A.    I'M EMPLOYED WITH THE BRUNSWICK COUNTY SHERIFF'S OFFICE IN BOLIVIA, NORTH CAROLINA.

Q.    YOU ARE AN ELECTED SHERIFF?

A.    YES, SIR.

Q.    HOW LONG HAVE YOU BEEN SHERIFF OF BRUNSWICK COUNTY?

A.    ALMOST 11 YEARS.

Q.    AND HOW LONG HAVE YOU BEEN AN EMPLOYEE OF BRUNSWICK COUNTY SHERIFF'S OFFICE?

A.    TWENTY-TWO (22) YEARS.

Q.    IS THAT THE TOTAL SUM OF YOUR EXPERIENCE OF YEARS IN LAW ENFORCEMENT?

A. YES.

Q. ARE YOU MARRIED?

A. YES.

Q. HOW MANY CHILDREN DO YOU HAVE?

A. TWO.

Q. HOW OLD ARE YOUR CHILDREN?

A. SIXTEEN (16) AND 18.

Q. SHERIFF, WERE YOU BORN AND RAISED IN BRUNSWICK COUNTY?

A. BORN IN NEW HANOVER COUNTY BECAUSE IT ACTUALLY HAD THE CLOSEST HOSPITAL, AND BROUGHT QUICKLY BACK ACROSS THE LINE TO BRUNSWICK COUNTY, WHERE I SPENT MY ENTIRE LIFE.

Q. WHAT IS THE COUNTY SEAT OF BRUNSWICK?

A. LITTLE PLACE KNOWN AS BOLIVIA, LOCATED IN THE CENTER OF THE COUNTY.

Q. AND I BELIEVE THERE ARE SOME OCEAN OR BEACH RESORTS IN BRUNSWICK COUNTY, ARE THERE NOT?

A. YES, THERE ARE.

Q. NAME SOME OF THEM TO ORIENT THE JURY.

A. WE HAVE THE MOST SOUTHERN BEACH IS SUNSET BEACH; OCEAN ISLE BEACH; HOLDEN BEACH; AND WE HAVE CASWELL; AND, OAK ISLAND.

Q. BRUNSWICK COUNTY, IS IT THE COUNTY THAT WHEN YOU ARE IN HORRY COUNTY AND YOU ARE ON HIGHWAY 17, YOU CROSS OVER IN THE STATE OF NORTH CAROLINA YOU ARE IN WHAT COUNTY?

A. YOU ARE IN BRUNSWICK COUNTY.

Q.    SHERIFF, I WANT TO DRAW YOUR ATTENTION TO SUNDAY EVENING, NOVEMBER 17TH, 2002.   WHERE WERE YOU WHEN YOU FIRST LEARNED THAT THE CONWAY POLICE DEPARTMENT WAS CONTACTING YOUR DEPARTMENT WITH REGARD TO A POSSIBLE ABDUCTION THAT HAD COMMENCED IN HORRY COUNTY AND MAY HAVE TRAVELLED INTO YOUR COUNTY?

A.    I WAS IN THE LITTLE MOUNTAIN COUNTY KNOWN AS MITCHELL COUNTY IN A TOWN CALLED SPRUCE PINE.   AND I WAS THERE WITH THE NORTH CAROLINA SHERIFF'S TRAINING AND STANDARDS COMMISSION.   WE HOLD HEARINGS ACROSS THE STATE WHEN THERE IS EVIDENCE OF OFFICER MISCONDUCT AND WE HEAR THOSE QUARTERLY. AND I SIT ON THAT COMMISSION.

Q.    AS A RESULT OF RECEIVING THAT INFORMATION, DID YOU PROVIDE CERTAIN INSTRUCTION TO YOUR CHIEF DEPUTY?

A.    I DID.

Q.    AND AS SUNDAY EVENING PROGRESSED ON INTO MONDAY, NOVEMBER 18TH, AND ON INTO TUESDAY, NOVEMBER 19TH, WERE YOU RECEIVING INFORMATION WITH REGARD TO CERTAIN EVIDENCE THAT WAS BEING GATHERED BY YOUR DEPARTMENT, AS WELL AS THE CONWAY POLICE DEPARTMENT?

A.    YES, SIR.

Q.    AS A RESULT OF THE INFORMATION THAT YOU WERE RECEIVING ON WEDNESDAY, NOVEMBER 20TH, DID YOU MAKE A DECISION WITH REGARD TO THE PUBLIC IN BRUNSWICK COUNTY?

A.    YES.   AT THAT TIME, I REALIZED THAT LAW ENFORCEMENT,

ALONE, HAD BEEN LOOKING SINCE SUNDAY IN OUR COUNTY FOR ALICE DONOVAN, AND THAT WAS INEFFECTIVE.  I THOUGHT THE MOST POSITIVE THING WE COULD DO IS TO GET THE PUBLIC'S HELP AND SEE WHAT THEY HAD SEEN AROUND THE 14TH OF NOVEMBER.

Q.    AND, APPROXIMATELY, WHAT TIME WAS THAT PRESS CONFERENCE HELD ON WEDNESDAY, NOVEMBER 20TH?

A.    HELD AT THREE P.M.

Q.    DID BOTH THE TV,  THE RADIO, AND THE PRINT NEWSPAPER MEDIA COVER THAT PRESS CONFERENCE?

A.    YES, SIR,  THEY WERE ALL THERE.

Q.    LATE THAT WEDNESDAY EVENING,  DID YOU RECEIVE A PHONE CALL FROM A CITIZEN OF BRUNSWICK COUNTY?

A.    I DID, MR. WILBUR RABON.

Q.    WOULD YOU BRIEFLY DESCRIBE THE CONTENT OF THAT CONVERSATION?

A.    I SURE WILL.  I RECEIVED A CALL THAT NIGHT FROM MR. RABON.  MR. RABON HAS JUST BEEN A LIFETIME PERSONAL FRIEND OF MINE, AND WE BOTH ENJOY HUNTING.  AND HE OWNS A FARM OR HUNTING CAMP KNOWN AS BEE TREE FARMS.  AND HE TOLD ME THAT ON THE 14TH,  THAT FOUR INDIVIDUALS WERE AT THE HUNTING CAMP THAT EVENING AND THEY WERE COOKING OUT, AND THEY THOUGHT THEY HAD SEEN THE BMW AND MS. DONOVAN.

Q.    AS A RESULT OF RECEIVING THAT INFORMATION,  DID THE NEXT MORNING, NOVEMBER 21ST,  THURSDAY, NOVEMBER 21ST,  DID YOU DIRECT YOUR DEPARTMENT, AS WELL AS OTHER AGENCIES, TO

BEGIN A SEARCH OF THE BEE TREE FARM AREA IN BRUNSWICK COUNTY?

A.    YES,  WE DID.  WE HAD A MASSIVE LAND AND AIR SEARCH.

Q.    YOUR LIEUTENANT DAVE CROCKER HAS ALREADY TESTIFIED WITH REGARD TO THOSE FACTS, SO I WON'T GET INTO THOSE FACTS WITH YOU,  SHERIFF.   AND LET ME -- LET ME JUMP FORWARD TO MONDAY, NOVEMBER 25TH.   DID YOU HAVE AN OPPORTUNITY TO RECEIVE A PHONE CALL FROM AGENT JEFF LONG WITH THE MYRTLE BEACH FBI?

A.    I DID.

Q.    WHAT WAS THE PURPOSE OF THAT PHONE CALL?

A.    IT WAS THE 25TH AT FOUR AND I WAS DRIVING DOWN THE ROAD.  THE PHONE RANG.  I PULLED OVER AND IT WAS AGENT LONG. AND HE HAD POSSIBLE DIRECTIONS TO WHERE I MIGHT BE ABLE TO FIND ALICE DONOVAN.

Q.    HOW MANY TIMES DO YOU THINK YOU SPOKE WITH AGENT LONG ON THE PHONE THAT DAY?

A.    TWO OR THREE.

Q.    AND JUST, GENERALLY, NOT THE SPECIFICS,  GENERALLY, WHAT WAS AGENT LONG TRYING TO DESCRIBE TO YOU?  IN OTHER WORDS,  WAS HE TRYING TO DESCRIBE LANDMARKS TO YOU?

A.    YES.   AGENT LONG WAS, BASICALLY, GIVING ME CERTAIN LANDMARKS AND ASKING ME DID THEY MEAN ANYTHING TO ME.   SOME OF THOSE LANDMARKS DID AND SOME OF THEM DIDN'T.   AND DURING THE CONVERSATION I ALSO GOT -- I HAD TWO PHONES.   I ALSO GOT MR. WILBUR RABON FROM BEE TREE FARM ON THE OTHER PHONE, AND WE WERE ABLE TO TRY TO ANGULATE WHERE THIS POINT MIGHT BE THAT

WAS BEING EXPLAINED.

Q. AFTER HAVING THOSE CONVERSATIONS THAT YOU HAVE JUST DESCRIBED WITH AGENT LONG WITH THE FBI, AND WITH MR. RABON OF BEE TREE FARM HUNT CLUB THE FOLLOWING DAY, NOVEMBER 26TH, WERE CERTAIN PHOTOGRAPHS TAKEN THAT DAY?

A. YES, SIR.

Q. AND, GENERALLY, WHAT PHOTOGRAPHS WERE TAKEN?

A. THOSE PHOTOGRAPHS THAT WERE TAKEN WERE PHOTOGRAPHS OF LANDMARKS TRAVELLING ON U.S. HIGHWAY 17, WHICH IS THE MAIN HIGHWAY TRAVELLED THROUGH OUR COUNTY FROM DODGE CITY AMOCO, TRAVELLING NORTH TO BEE TREE FARM, AND BEE TREE FARM, IN PARTICULAR.

Q. WERE THOSE PHOTOGRAPHS THEN SENT TO AGENT LONG WITH THE FBI?

A. BOTH BY E-MAIL AND MAILED.

Q. THE FOLLOWING DAY THEN, ON WEDNESDAY, NOVEMBER 27TH, DID YOU LEARN, SHERIFF HEWETT, THAT MR. BASHAM WAS GOING TO BE FLOWN FROM KENTUCKY TO THE STATE OF SOUTH CAROLINA THAT WEDNESDAY?

A. I DID.

Q. AND WHAT ELSE -- WHAT WAS THE PLAN WEDNESDAY EVENING? WHAT WERE Y'ALL PLANNING TO TAKE PLACE THE FOLLOWING MORNING, THURSDAY, THANKSGIVING DAY, THE 28TH?

A. THAT AFTERNOON, MYSELF, MY PERSONNEL, KEY STAFF THAT WOULD BE INVOLVED IN THE SEARCH, OUR DISTRICT ATTORNEY, GREG

SCORE, AND OUR RESIDENT AGENT IN CHARGE OF THE FBI, HE IS OUT OF THE WILMINGTON OFFICE, TIM FLYNN, WE MET IN OUR OFFICE TO DISCUSS THAT STRATEGY FOR THE FOLLOWING DAY.

Q. AND THE STRATEGY INVOLVED WHAT, AS FAR AS WHO WAS GOING TO BE BROUGHT TO BRUNSWICK COUNTY, NORTH CAROLINA?

A. THAT STRATEGY INVOLVED THE KNOWLEDGE, AT THAT TIME, THAT BRANDON BASHAM WOULD BE BROUGHT TO BRUNSWICK COUNTY, NORTH CAROLINA TO ASSIST IN THE LOCATION OF MS. DONOVAN.

Q. WAS IT YOUR UNDERSTANDING, SHERIFF HEWETT, THAT THERE WERE NO DEALS ON THE TABLE FOR MR. BASHAM?

A. THAT IS WHAT I WAS TOLD.

Q. YOU, YOURSELF, DID NOT OFFER MR. BASHAM OR ANY OF HIS LAWYERS ANY DEALS, DID YOU?

A. NO, SIR.

Q. DID YOU OFFER MR. BASHAM OR ANY OF HIS LAWYERS OR REPRESENTATIVES ANY PROMISES, WHATSOEVER, FOR HIM TO BE BROUGHT INTO YOUR COUNTY TO SEARCH FOR THE BODY OF ALICE DONOVAN?

A. NO PROMISES WERE MADE.

Q. THANKSGIVING DAY, NOVEMBER 28TH, 2002, FIRST, WHERE DID YOU GO THAT MORNING, SHERIFF?

A. WELL, THE FIRST THING I DID WAS TO MEET THE VAN, WHICH BRANDON BASHAM WAS IN AT U.S. HIGHWAY 17 AND NC 211. AT THAT TIME, I ASSUMED THAT WE WOULD TRAVEL DIRECTLY TO BEE TREE FARM, THE AREA THAT I DESCRIBED TO YOU EARLIER, BUT WE DID

NOT. WE TRAVELLED SOUTH ON 17 TO DODGE CITY AMOCO.

Q. WHEN YOU MET UP WITH THE VAN, WHAT AGENCY -- WHAT LAW ENFORCEMENT AGENCY WAS RESPONSIBLE FOR THE VAN, THE DRIVER, THAT SORT OF THING?

A. THAT WAS THE CONWAY POLICE DEPARTMENT HERE IN SOUTH CAROLINA.

Q. AND WAS MR. -- WHEN YOU FIRST MET AT THIS ESTABLISHMENT AT U.S. 17 AND 211, WAS MR. BASHAM IN THE VAN?

A. AT THAT TIME, I WALKED UP TO THE WINDOW OF THE VAN TO SPEAK TO THE DRIVER. AND, AT THAT TIME, I CAN ONLY ASSUME HE WAS, BECAUSE WHEN WE GOT TO DODGE CITY AMOCO, HE GOT OUT, AT THAT TIME. SO, HE HAD TO BE IN THE VAN, BUT I DIDN'T HAVE ANY CONTACT WITH HIM, AT THAT POINT.

Q. NOW, WHEN YOU REFER TO THE DODGE CITY AMOCO, IS THAT THE SAME AMOCO THAT THE JURY HAS SEEN EVIDENCE FROM A VIDEOTAPE, THE SAME ONE?

A. THAT IS THE SAME AMOCO STATION.

Q. WHAT HAPPENED WHEN YOU GOT TO THE AMOCO STATION?

A. I STEPPED OUT OF MY VEHICLE, SHOOK HANDS WITH CHIEF HENDRIX FROM CONWAY. I SAW, AT THAT TIME, THE FIRST TIME I HAD EVER SEEN BRANDON BASHAM. I SEEN BRANDON, WHO WAS CHAINED AND SHACKLED GO INSIDE, I ASSUMED, TO USE THE REST ROOM.

Q. DID MR. BASHAM HAVE ONE OF HIS LAWYERS, AT THAT TIME, WITH HIM?

A. YES, SIR.

Q. NOW, SHERIFF HEWETT, JUST SO THE JURY UNDERSTANDS, I AM GOING TO BE ASKING YOU QUESTIONS ABOUT BRANDON BASHAM'S LAWYERS OR YOUR INTERACTIONS WITH HIS LAWYERS THAT DAY. SO THE JURY IS CLEAR, MR. SWERLING AND MR. HARRIS WERE NOT BRANDON BASHAM'S LAWYERS ON NOVEMBER 28TH, 2002, CORRECT?

A. THEY WERE NOT.

Q. WERE YOU INTRODUCED TO A MR. LITTLEJOHN?

A. CAM LITTLEJOHN.

Q. WAS HE THE INDIVIDUAL THAT WAS IN THE VAN WHEN YOU WERE AT THE DODGE AMOCO STATION?

A. MR. GASSER, I BELIEVE HE WAS. TO CLARIFY THIS FOR A JURY, FORMAL INTRODUCTIONS WERE NOT MADE UNTIL WE GOT BACK TO THE BEE TREE FARM AREA. SO, I HONESTLY, ON THE BIBLE, COULD NOT SWEAR IT WAS CAM OR IT WAS BILLY MONCKTON.

Q. SUFFICE IT TO SAY, DID YOU ENGAGE MR. BASHAM OR HIS LAWYERS THEN IN ANY TYPE OF CONVERSATION AT THE AMOCO STATION?

A. WE NEVER SPOKE.

Q. APPROXIMATELY, HOW LONG DID Y'ALL STAY THERE?

A. LONG ENOUGH FOR MR. BASHAM TO USE THE REST ROOM, AND I ASSUME THEY GOT A DRINK, MAYBE A SOFT DRINK, GET BACK IN THE VAN TO GO; FIVE MINUTES.

Q. SO, WHEN YOU LEFT THE AMOCO STATION, WERE YOU IN YOUR OWN CAR?

A. YES.

Q. WHO LED THE WAY UP HIGHWAY 17 AND, EVENTUALLY, TO THE

**JA 1317**

WINNABOW AREA OF BRUNSWICK COUNTY?

A.    I DID.

Q.    DID THE VAN FOLLOW?

A.    THEY DID.

Q.    AND WHERE DID YOU GO IN THE WINNABOW SECTION OF BRUNSWICK COUNTY?  WHERE, SPECIFICALLY, DID YOU DRIVE?

A.    WE DROVE DIRECTLY TO BEE TREE FARMS.

Q.    WHERE ON BEE TREE FARMS?

A.    WE DROVE TO THE HUNTING CAMP.

Q.    WHAT HAPPENED WHEN YOU ARRIVED AT THE HUNT CAMP?

A.    WHEN WE ARRIVED AT THE HUNTING CAMP, WE ALL STEPPED OUT OF THE VEHICLE:  BRANDON BASHAM,  HIS ATTORNEYS, AND THE CONWAY POLICE OFFICERS, AT THAT TIME, GOT OUT OF THEIR VEHICLE, AND AGENT LONG WAS THERE.   AND FORMAL INTRODUCTIONS WERE MADE WHERE WE SPOKE,  SHOOK HANDS,  AND SPOKE WITH EACH OTHER.

Q.    SO, YOU MET MR. LITTLEJOHN FOR THE FIRST TIME, AT THAT POINT?

A.    YES, SIR.

Q.    HAD YOU MET AGENT JEFF LONG WITH THE FBI?  HAD YOU EVER MET HIM BEFORE?

A.    YES.

Q.    AND WHAT ABOUT CHIEF HENDRIX WITH THE CONWAY POLICE DEPARTMENT?

A.    YES.

Q.    YOU HAVE MET HIM BEFORE.   NOW,  WERE YOU INTRODUCED TO BRANDON BASHAM,  AS WELL?

A.    I WAS.

Q.    JUST FOR THE RECORD, DO YOU RECOGNIZE MR. BASHAM HERE IN THE COURTROOM?

A.    BRANDON BASHAM IS SITTING RIGHT THERE NEXT TO MR. SWERLING.

Q.    WHAT DECISION WAS MADE AT THE HUNT CLUB AS TO WHAT WAS GOING TO GO ON THAT MORNING AND THAT AFTERNOON?

A.    THAT DISCUSSION INVOLVED THE FACT THAT THE OFFICERS FROM CONWAY,  MR. LONG, AND EVERYONE THAT WAS THERE DIDN'T HAVE A GENERAL KNOWLEDGE OF THE BEE TREE FARM AREA.   AND EVERYONE IN THE VAN CONCLUDED IT WOULD BE BEST IF WE HAD SOMEONE WHO WAS FAMILIAR WITH THE AREA THAT KNEW WHERE WE WERE GOING.  AND EVERYONE IN THE VAN,  INCLUDING MR. MONCKTON, AND MR. LITTLEJOHN, AND AGENT LONG STATED THAT THEY FELT, SINCE I KNEW THE AREA BEST, I HAD HUNTED IT, FOR ME TO RIDE WITH THEM, AND I DID.

Q.    IS IT SAFE TO SAY YOU WERE GOING TO BE THE GUIDE, FOR LACK OF A BETTER TERM?

A.    THAT'S CORRECT.

Q.    WHO WAS SUPPOSED TO BE DESCRIBING THE LANDMARKS?  WHO WAS SUPPOSED TO BE DOING THAT?

A.    BRANDON BASHAM.

Q.    DID MR. LITTLEJOHN AND MR. MONCKTON, THE TWO LAWYERS,

**JA 1319**

DID THEY AGREE FOR YOU TO BE THE GUIDE?

A.    THEY BOTH DID.

Q.    SO, WHAT VEHICLE DID YOU THEN GET INTO?

A.    I THEN GOT INTO THE VAN, THE CONWAY VAN, THE VAN WE DESCRIBED AS THE CONWAY VAN.

Q.    SHERIFF, MY ARTISTIC CAPABILITIES ARE SOMEWHAT LIMITED.  IF THIS IS THE VAN, SHAPED LIKE A TRIANGLE, IS THE FRONT OF THE VAN -- WHO WAS DRIVING THE VAN?

A.    AT THIS TIME -- MAY I TOUCH?

Q.    YOU CAN TOUCH THE SCREEN, GO AHEAD.

A.    A CONWAY SERGEANT WAS DRIVING THE VAN FROM THIS LOCATION.

Q.    WHERE WERE YOU SITTING?

A.    SITTING IN THE PASSENGER SIDE OF THE FRONT OF THE VAN RIGHT HERE.

Q.    YOU ARE RIGHT THERE; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    WHAT TYPE OF SEATS ARE THERE IN THIS VAN?

A.    BUCKET SEATS.

Q.    DO THEY HAVE THE CAPABILITY TO SWIVEL?

A.    I SWIVELED IN THEM.

Q.    PUT AN X WHERE BRANDON BASHAM WAS.

A.    THAT IS BRANDON BASHAM (INDICATING).

Q.    WHERE WAS MR. LITTLEJOHN?

A.    HE IS GOING TO BECOME ANOTHER ONE.

Q.    DOES THIS VAN HAVE A THIRD SEAT?

A.    IT DOES, ACROSS THE BACK.

Q.    SO, IT IS A BENCH SEAT?

A.    YES, SIR.

Q.    KIND OF LIKE THAT (INDICATING)?

A.    YES, SIR.

Q.    WHO WAS SEATED IN THE BENCH SEAT IN THE BACK?

A.    THERE WERE TWO SERGEANTS FROM CONWAY.  ONE WAS DRIVING, SERGEANT SARVIS, AND SERGEANT PARKER.  ONE WAS HERE, BILLY MONCKTON AND SPECIAL AGENT JEFF LONG.  AND THAT WAS THE CONSISTENCE OF THE VAN AND ITS PASSENGERS.

Q.    SO, X ON THIS SCREEN, X MARKS BRANDON BASHAM; IS THAT RIGHT?

A.    THAT'S RIGHT.

Q.    ONE OF HIS LAWYERS SEATED THERE IN THE BACK BENCH?

A.    YEAH.  YES, SIR.

Q.    HIS OTHER LAWYER WAS SEATED NEXT TO HIM?

A.    YES, SIR.

Q.    DID YOU HAVE ANYTHING TO ASSIST YOU, ANY TYPE OF DOCUMENTS TO ASSIST YOU IN YOUR CONVERSATIONS WITH MR. BASHAM, IN THE PRESENCE OF HIS LAWYERS?

A.    I DID.  THEY WERE THE PHOTOGRAPHS THAT WE DESCRIBED EARLIER THAT WERE TAKEN THAT MIGHT BE PHYSICAL LANDMARKS AS A PLACE TO START.  WE NEEDED A PLACE TO START.

Q.    BEFORE YOU STARTED USING THOSE PHOTOGRAPHS IN YOUR

DISCUSSIONS WITH MR. BASHAM, DID YOU ALLOW MR. MONCKTON AND MR. LITTLEJOHN TO LOOK AT THOSE PHOTOGRAPHS?

A. I DID. AND BOTH MR. MONCKTON AND MR. LITTLEJOHN AGREED THAT THEY THOUGHT THAT THAT WAS A GREAT IDEA, AS FAR AS US KNOWING WHERE WE COULD GO, AND WHERE WE COULD START, AND ANYTHING THAT BASHAM MAY RECOGNIZE.

Q. SHERIFF HEWETT, DID YOU, AND LIEUTENANT CROCKER, AT SOME POINT, MEMORIALIZE THE EVENTS OF THAT DAY IN A WRITTEN DOCUMENT?

A. WE DID.

Q. THE PHOTOGRAPHS THAT YOU USED, SO THAT ANYONE THAT WOULD READ YOUR REPORT, DID YOU NUMBER THE PHOTOGRAPHS THAT YOU USED?

A. I DID.

Q. NOW, YOU UNDERSTAND, WE HAVE GOT EXHIBIT NUMBERS NOW ON THOSE PHOTOGRAPHS?

A. YES, SIR.

Q. I WANT TO SHOW YOU THE FIRST, THREE PHOTOGRAPHS, NUMBERED 1, 2, AND 3 IN YOUR REPORT. LET ME SHOW THEM TO YOU, SEPARATELY. FIRST OF ALL, GOVERNMENT'S EXHIBIT 433. WOULD YOU DESCRIBE WHAT GOVERNMENT'S 433 IS, PLEASE?

A. THAT IS THE -- THAT IS THE SIGN THAT IS OUT FRONT BEE TREE FARM AND THE FARM THAT MR. RABON OWNS. THAT IS THE HUNTING FARM SIGN.

MR. GASSER: I'M SORRY.

MR. HARRIS:  NO OBJECTION.

MR. GASSER:  WE HAVE GOVERNMENT'S 433 THROUGH 443, 11 PHOTOGRAPHS WE WOULD OFFER INTO EVIDENCE, I BELIEVE, WITH NO OBJECTION.

THE COURT:  WITHOUT OBJECTION YOU MAY PROCEED.

BY MR. GASSER:

Q.    THAT IS THE BEE TREE FARM HUNT CLUB SIGN?

A.    THAT IS IT.

Q.    WHEN YOU SHOWED MR. BASHAM THIS SIGN, WHAT WAS HIS RESPONSE?

A.    MR. BASHAM TOLD ME THAT HE DOESN'T REMEMBER THE SIGN, BUT HE REMEMBERED THE HUNTING CAMP.

Q.    SHOWING YOU GOVERNMENT'S 434.  WAS THAT ANOTHER PHOTOGRAPH, I BELIEVE, YOUR PHOTOGRAPH NUMBER 2 OF THE ROAD LEADING UP TO THE HUNT CAMP?

A.    THAT IS RIGHT.  IF YOU WILL LOOK OVER TO THE LEFT-HAND CORNER, YOU WILL SEE EXACTLY WHAT YOU SAW BLOWN UP, THAT IS THE BEE TREE FARM SIGN.

Q.    GOVERNMENT'S EXHIBIT 435, IS THAT ANOTHER PHOTOGRAPH THAT YOU SHOWED TO MR. BASHAM IN AN ATTEMPT TO STIR HIS MEMORY?

A.    IT IS.

Q.    NOW, YOU STATED THAT HE DOESN'T REMEMBER THE SIGN, BUT HE REMEMBERED THE HUNT CLUB; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT, FIRST OF ALL, 436, WAS THIS PHOTOGRAPH ALSO SHOWN TO MR. BASHAM?

A.    IT WAS.

Q.    AND THERE IN THE LEFT SIDE OF GOVERNMENT'S 436, WHAT IS THAT BUILDING?

A.    THAT IS THE HUNTING CAMP, AND THAT IS THE LOCATION THAT BRANDON BASHAM SAID, WITHOUT A DOUBT, HE REMEMBERED.

Q.    ANOTHER PHOTOGRAPH THAT WAS SHOWN TO MR. BASHAM, GOVERNMENT'S EXHIBIT 437. WHEN YOU SHOWED MR. BASHAM THAT PHOTOGRAPH, WHAT WAS HIS RESPONSE?

A.    THAT HE REMEMBERED THE HUNTING CAMP.

Q.    WHAT WAS IT ABOUT THE HUNTING CAMP THAT HE REMEMBERED?

A.    HE REMEMBERED DRIVING UP AND SEEING SOME MEN ON THE PORCH.

Q.    WHEN YOU FIRST GOT IN THE VAN, SHERIFF, DID YOU IMMEDIATELY START SHOWING HIM THE PHOTOGRAPHS?

A.    AS SOON AS IT WAS APPROVED BY MR. MONCKTON, MR. LITTLEJOHN, IMMEDIATELY.

Q.    WHERE DID Y'ALL GO WHEN YOU WERE DRIVING DOWN BEE TREE FARM ROAD, THE JURY HAS HEARD A LOT ABOUT THAT ROAD, THAT DIRT ROAD, BEE TREE FARM ROAD, WHEN YOU ARE DRIVING DOWN THE ROAD AND YOU ARE DISCUSSING AND USING THESE PHOTOGRAPHS, WHERE WAS IT THE VAN TRAVELLED?

A.    WE TRAVELLED DOWN THAT ROAD, BEE TREE FARM ROAD TO GREEN HILL ROAD.  WE TOOK A LEFT, AND FROM THERE WE DROVE ALL

MORNING AND INTO THE EVENING AROUND THE BEE TREE FARM WINNABOW AREA. SO, NUMEROUS PLACES WE WENT TRYING TO FIND SOMETHING THAT WAS FAMILIAR.

Q. NOW, SHERIFF HEWETT, WERE YOU AWARE OF THE INFORMATION THAT MR. PURDUE HAD PROVIDED TO YOUR AGENCIES ABOUT THE CEMETERY, WERE YOU AWARE OF IT?

A. I WAS AWARE OF IT.

Q. DID YOU TELL MR. BASHAM THAT INFORMATION, OR IS THAT SOMETHING YOU WANTED TO KEEP CLOSE TO YOUR VEST?

A. I DIDN'T TELL MR. BASHAM ANYTHING ABOUT WHAT MR. PERDUE TOLD ME.

Q. SO ARMED WITH THE INFORMATION MR. PURDUE HAD PROVIDED TO THE BRUNSWICK COUNTY SHERIFF'S DEPARTMENT CONCERNING SEEING THAT BMW AT THE CEMETERY, DID YOU SHOW MR. BASHAM A SERIES OF PHOTOGRAPHS?

A. I DID.

Q. SHOWING YOU GOVERNMENT'S EXHIBIT NUMBER 438. WAS THIS ONE OF THE PHOTOGRAPHS THAT YOU SHOWED MR. BASHAM?

A. THAT IS. THAT IS THE FRONT VIEW OF THE CEMETERY FROM THE HORSESHOE CIRCLE.

Q. IS THIS THE CEMETERY JUST OFF BEE TREE FARM ROAD?

A. IT IS.

Q. AND THEN GOVERNMENT'S EXHIBIT NUMBER 439, JUST A CLOSER-UP VIEW?

A. THAT'S IT.

Q.    AND THEN GOVERNMENT'S EXHIBIT NUMBER 440?

A.    THAT IS IT DETAILED.

Q.    ALL THREE OF THESE PHOTOGRAPHS THAT I JUST SHOWED YOU, 438, 439, 440, WERE THEY ALL SHOWN TO MR. BASHAM IN THE PRESENCE OF HIS LAWYER?

A.    THEY WERE.

Q.    WHAT WAS MR. BASHAM'S RESPONSE WHEN YOU SHOWED HIM THESE THREE PICTURES OF THE CEMETERY THERE ON BEE TREE FARM ROAD?

A.    HE SAID HE BELIEVED THAT WAS IT, BUT HE REMEMBERED A BROKEN-DOWN FENCE.  IN THE PHOTOGRAPHS, YOU CAN'T REALLY TELL A LOT ABOUT THAT.  WHEN WE TRAVELLED BACK TO THE CEMETERY, THEN HE SAID HE WAS CERTAIN THAT WAS IT.  IN THE PHOTOGRAPH, YOU CAN'T REALLY SEE THE BROKEN-DOWN FENCE.  THAT SEEMED TO SOMEHOW BE A STUMBLING POINT FOR BRANDON BASHAM.

Q.    WHEN YOU SAID YOU TRAVELLED BACK, WOULD THAT HAVE BEEN LATER ON IN THE AFTERNOON?

A.    LATER ON IN THE AFTERNOON.

Q.    WHEN YOU WERE INITIALLY SHOWING HIM GOVERNMENT'S EXHIBITS 438, 439, 440, WAS HE CERTAIN?

A.    IT DIDN'T SEEM TO MEAN A LOT TO HIM UNTIL WE GOT BACK LATER ON THAT AFTERNOON.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 147, JUST TO REFRESH THE JURY'S MEMORY.  GOVERNMENT'S EXHIBIT 438, 439, AND 440, THE PHOTOGRAPHS I JUST PUT UP ON THE OVERHEAD

PROJECTION, THE CEMETERY IN 438, 439, AND 440, IS THAT DEPICTED IN GOVERNMENT'S EXHIBIT 147?

A.    IT CERTAINLY LOOKS LIKE IT.  THERE IS THE HORSESHOE CIRCLE COMING OFF BEE TREE FARM ROAD WITH A LITTLE PATH LEADING UP TO THE CLEARING.

Q.    SO, THAT IS THE CEMETERY THAT YOU ARE TALKING ABOUT?

A.    YES, SIR.

Q.    I BELIEVE IF YOU LOOK CLOSE ENOUGH THROUGH THESE TREES, YOU CAN SEE THE DIRT ROAD, BEE TREE FARM ROAD; IS THAT CORRECT?

A.    THAT'S RIGHT.

Q.    AND, AGAIN, JUST TO REFRESH THE JURY'S MEMORY, LET ME SHOW YOU GOVERNMENT'S EXHIBIT 150.  DO YOU RECOGNIZE THE HUNT CLUB THERE IN GOVERNMENT'S EXHIBIT 150?

A.    I DO.  THAT IS BEE TREE FARM.

Q.    THIS WOULD BE BEE TREE FARM ROAD?

A.    GOING BACK OUT TO GREEN HILL.

Q.    GREEN HILL RIGHT THERE?

A.    YES, SIR.

Q.    SHERIFF, AFTER SHOWING MR. BASHAM THE PICTURES OF THE CEMETERY AND HIM RESPONDING IN THE WAY YOU JUST DESCRIBED TO THE JURY, WHERE DID Y'ALL GO?  TELL THE JURY SOME OF THE AREAS THAT YOU ALL WENT THAT MORNING AND EARLY ON THAT AFTERNOON.

A.    WE WENT TO SEVERAL LOCATIONS OFF GREEN HILL ROAD.  WE TRAVELLED BACK OUT TOWARD 17, WHICH I EXPLAINED TO Y'ALL THAT

IS THE BUSINESS AREA. THE CLOSER WE SEEMED TO GET BACK OUT TO 17, THE MORE THAT BRANDON BASHAM STATED, I DON'T REMEMBER ANY OF THIS. AND AS WE WERE GOING DOWN THE ROAD, THERE WERE SOME RESIDENCES AND HE SAYS, I REMEMBER THAT, AND THERE WERE SOME PLACES HE DIDN'T REMEMBER. AND WE TRAVELLED DOWN MANY ROADS, WE TRAVELLED DOWN A DIRT ROAD KNOWN AS THE C. C. ROAD. WE TRAVELLED AS FAR AS COLUMBUS COUNTY, TURNED AROUND IN A LITTLE COMMUNITY CALLED PROSPER, AND HEADED BACK OUT.

Q. CAN YOU EVEN ESTIMATE THE NUMBER OF MILES THAT THANKSGIVING DAY IN THAT VAN YOU TRAVELLED WITH MR. BASHAM IN THE PRESENCE OF HIS LAWYERS?

A. OVER A HUNDRED. I KNOW THAT WE HAD TO STOP AND GET GAS.

Q. NOW, YOU MENTIONED THIS C. C. ROAD. WHAT DO YOU MEAN BY "C. C. ROAD"?

A. C. C. ROAD IS SPELLED JUST THAT, C PERIOD, C PERIOD, AND IT IS A DIRT ROAD, AND A STATE-MAINTAINED ROAD. HAS SOME GRAVEL ON IT, PRETTY WELL KEPT UP. AND IT IS A ROAD THAT IS ON THE PERIMETER OF THE BEE TREE FARM HUNTING CLUB, SOMETIMES KNOWN AS TOWN CREEK HUNTING CLUB. SO, IT IS A STATE ROAD THAT LEADS FROM BRUNSWICK OVER TO COLUMBUS COUNTY, A LITTLE TOWN OF PROSPER. A LITTLE COMMUNITY, WE CALL IT A TOWN.

Q. WHERE IS THIS C. C. ROAD IN RELATION TO GREEN HILL ROAD THAT YOU DESCRIBED TO THE JURY?

A. YOU TAKE GREEN HILL AS FAR AS YOU CAN, AND COMING OUT

OF THE HUNTING CAMP, YOU TAKE A LEFT.  AND YOU WILL GO TO A VERY SHARP CURVE.  AND AT THAT VERY SHARP CURVE TO THE LEFT, THE C. C. ROAD TURNS OFF TO THE LEFT IN THAT CURVE.

Q.    ABOUT HOW FAR IS THAT FROM THE HUNT CLUB DEPICTED IN GOVERNMENT'S EXHIBIT 150?

A.    THREE-AND-A-HALF MILES.

Q.    WHEN YOU WERE ON THIS C. C. ROAD APPROXIMATELY THREE-AND-A-HALF MILES FROM THE HUNT CLUB ON THAT THANKSGIVING DAY, DO YOU RECALL SEEING SOME HUNTERS WALKING UP AND -- WALKING ALONGSIDE THE ROAD?

A.    THERE WERE HUNTERS.

Q.    AND THIS WAS DEER SEASON, WAS IT NOT?

A.    IT WAS.

Q.    AND DID YOU SEE ANY DEER?

A.    YES, WE DID.  I SAW A FEMALE DEER, A DOE.

Q.    WHERE DID YOU SEE THIS DOE?

A.    THE DOE CAME OUT OF THE WOODS OVER TO THE LEFT-HAND SIDE OF THE VAN AND STOOD THERE.

Q.    WHEN THE DOE JUMPED OUT OF THE WOODS ONTO THE ROADWAY, DO YOU RECALL MR. BASHAM MAKING A STATEMENT?

A.    I DO.

Q.    WHAT DID MR. BASHAM SAY WHEN HE SAW THIS DOE?

A.    BRANDON BASHAM SAID, "YOU KNOW, I NEVER COULD KILL A DEER AND HERE I HAVE" --

Q.    YOU STOPPED.  DID HE STOP?

**JA 1329**

A.   I DID STOP.   HE STOPPED TALKING AT THAT TIME, ALSO.

Q.   WHAT MADE HIM STOP?

A.   CAM LITTLEJOHN, GOING BACK TO WHERE HE WAS SITTING, HE WAS THE ATTORNEY DIRECTLY BEHIND ME, I WAS TURNED IN MY SEAT TALKING TO BRANDON BASHAM.   CAM LITTLEJOHN TOOK HIS HANDS AND REACHED OVER AND TOUCHED HIM AND HE LOOKED AT BASHAM AND HE NODDED HIS HEAD FROM LEFT TO RIGHT.   AND, AT THAT TIME, BRANDON BASHAM NEVER COMPLETED THE SENTENCE.

Q.   SO, "YOU KNOW, I NEVER COULD KILL A DEER, AND NOW I HAVE," THAT IS WHEN MR. LITTLEJOHN TOUCHED BASHAM?

A.   YES.

Q.   THIS ALL OCCURRED IN YOUR PRESENCE?

A.   YES, SIR.

Q.   SHERIFF HEWETT, I WANT YOU TO STOP ME WHEN YOU WERE AS CLOSE TO BRANDON BASHAM AS YOU WERE WHEN HE MADE THE STATEMENT, "I NEVER COULD KILL A DEER AND HERE I HAVE NOW," POSITION ME AS CLOSE TO YOU AS MR. BASHAM WAS TO YOU IN THAT VAN.

A.   OKAY.

Q.   (PROSECUTOR APPROACHES WITNESS.)

A.   I COULD HAVE REACHED BACK AND TOUCHED HIM.

Q.   THAT IS HOW CLOSE YOU WERE?

A.   YES, SIR.

Q.   WHEN YOU WERE DISCUSSING THE PHOTOGRAPHS OR HAVING DIRECTIONAL CONVERSATIONS WITH MR. BASHAM, WERE YOU SEATED

Q.    LOOKING STRAIGHT AHEAD THROUGH THE FRONT WINDSHIELD?

A.    NO, SIR.

Q.    HOW WERE YOU SEATED?

A.    I HAD TURNED  -- I HAD TURNED ALL THE WAY AROUND.  IF I MAY SHOW.  I HAD TURNED ALL THE WAY SO I COULD LOOK DIRECTLY AT BASHAM WHEN I WAS SPEAKING TO HIM.  I DIDN'T HAVE MY SEAT BELT ON.

Q.    DO YOU RECALL, AT ONE POINT IN TIME, AS Y'ALL WERE DRIVING IN THIS WINNABOW AREA DOWN DIRT ROADS,  MR. BASHAM MOTIONING TO HIS LAWYER AND WANTING TO SPEAK TO HIS LAWYER?

A.    I DO REMEMBER THAT.

Q.    WOULD YOU DESCRIBE THOSE EVENTS TO THE JURY,  PLEASE?

A.    I SURE WILL.  BRANDON BASHAM LEANED OVER TO CAM LITTLEJOHN AND SAID, "SHOULD I TELL THEM ABOUT,"  AND, AT THAT POINT, MOUTH TO EARS.  BRANDON BASHAM'S MOUTH WENT DIRECTLY TO CAM LITTLEJOHN'S EARS,  I COULD NOT HEAR WHAT HE SAID AFTER THAT.  THE FIRST THING HE SAID WAS, "SHOULD I TELL THEM ABOUT"?  AND CAM LITTLEJOHN LOOKED BACK AT BRANDON BASHAM, AND LOOKED AT ME,  HE SAID,  YEAH,  GO AHEAD.

Q.    THROUGHOUT THESE DAYS,  SHERIFF HEWETT,  OR THROUGHOUT THIS DAY,  WAS MR. BASHAM ALLOWED TO TALK TO HIS LAWYERS ANY TIME HE WANTED TO?

A.    YES.

Q.    DID YOU PROMISE MR. BASHAM ANYTHING THAT DAY IN THE VAN?

A.     NOTHING.

Q.     DID YOU PROMISE HIS LAWYER ANYTHING?

A.     NO, SIR.

Q.     WERE YOU AWARE,  YOU MAY NOT HAVE BEEN,  WERE YOU AWARE OF ANY DISCUSSIONS THAT MR. LITTLEJOHN AND MR. MONCKTON WAS HAVING WITH REPRESENTATIVES OF THE U. S. ATTORNEY'S OFFICE PRIOR TO THE EVENTS OF THAT DAY?

A.     I HAVE NEVER MET THEM BEFORE AND DID NOT KNOW.

Q.     AFTER MR. BASHAM AND MR. LITTLEJOHN HAD THEIR CONVERSATION, AND MR. LITTLEJOHN TOLD MR. BASHAM TO GO AHEAD, IT WILL BE OKAY, WHAT DID MR. BASHAM EITHER TELL YOU OR DESCRIBE TO YOU?

A.     OKAY.   AT THIS POINT, IT WOULD PROBABLY BE VERY IMPORTANT FOR ME TO BE ABLE TO SHOW AND TELL WHAT HE SAID TO ME.

Q.     THAT WILL BE FINE.

A.     IF I MAY.   BRANDON BASHAM WAS SHACKLED, AND HE WAS CUFFED TO HIS BELT, WE CALL IT A BELLYCHAIN.   THE BELLYCHAIN IS SIMPLY A CHAIN THAT GOES AROUND THE WAIST.   THE RIGHT HAND IS HANDCUFFED AND THE LEFT HAND IS HANDCUFFED.   THAT IS VIEWED AS A RESTRAINT DEVICE SO THAT NO ONE GETS HURT AND IT LESSENS THE CHANCE FOR BRANDON BASHAM TO ESCAPE.   HE WAS ALSO SHACKLED.   AFTER MR. LITTLEJOHN SAID GO AHEAD,  HE SAID, "HE" BEING BRANDON BASHAM SAID,  "YOU NEED TO BE LOOKING FOR A STRAP.   IT IS ABOUT THIS LONG."   AND HE SAID, "IT HAS LIZ

CLAIBORNE ON THE STRAP." HE SAYS, "BACK AT THE CEMETERY YOU NEED TO GO BACK TO THE CEMETERY AND LOOK FOR THAT STRAP."

Q. YOU JUST HAD YOUR FINGERS POINTED OUT LIKE THIS, DID MR. BASHAM HAVE HIS FINGERS LIKE THAT?

A. THAT IS EXACTLY HOW HE HAD HIS HANDS.

Q. APPROXIMATELY, HOW MANY INCHES DID YOU THINK HE WAS DESCRIBING THIS PURSE STRAP WAS?

A. HE COULDN'T HAVE GOT HIS HANDS MUCH OVER 16 TO 20 INCHES.

Q. WHERE DID HE SAY YOU NEED TO BE LOOKING FOR THIS LIZ CLAIBORNE PURSE STRAP?

A. AT THE BEE TREE FARM CEMETERY.

Q. AS A RESULT OF RECEIVING THAT INFORMATION FROM MR. BASHAM IN THE PRESENCE OF HIS TWO LAWYERS, WHAT DID YOU, AS THE SHERIFF, WHAT DID YOU DO INSTRUCTION-WISE?

A. I RADIOED MY GROUND TEAM BECAUSE I HAD CELL PHONES AND RADIOS. I RADIOED THEM, TOLD THEM THE INFORMATION WE HAD, DIRECTED THEM TO GO BACK TO THE CEMETERY AND CONDUCT A PHYSICAL SEARCH OF THAT AREA FOR THE STRAP.

Q. WAS THAT DONE?

A. THAT WAS DONE.

Q. AND AS YOU WERE -- PRIOR TO GETTING TO THE CEMETERY YOURSELF, BACK TO THE CEMETERY LATER ON THAT AFTERNOON, DID ANYONE EVER RADIO BACK TO YOU THAT THEY HAD FOUND ANY TYPE OF PURSE STRAP, BE IT LIZ CLAIBORNE OR ANY OTHER BRAND NAME?

A. NO. IN FACT, THE MESSAGE WAS WE HAVE NOT FOUND THEM.

Q. DO YOU RECALL TRAVELLING ON LEWIS SWAMP ROAD OFF GREEN HILL ROAD THAT AFTERNOON?

A. YES.

Q. WHERE IS, APPROXIMATELY, LEWIS SWAMP ROAD? HOW FAR AWAY IS THAT FROM THE HUNT CLUB?

A. IT IS ABOUT A MILE AND A HALF OR TWO MILES. IT IS NOT AS FAR AS THE C. C. ROAD. AND EXITING BEE TREE FARM TO GET TO LEWIS SWAMP, YOU NEED TO TURN RIGHT.

Q. DO YOU RECALL MR. BASHAM MAKING A STATEMENT WHEN YOU WERE ON LEWIS SWAMP ROAD OFF OF GREEN HILL ROAD THAT DAY?

A. I DO.

Q. WHAT WAS THAT?

A. BRANDON BASHAM STATED THAT THIS ROAD REALLY LOOKED LIKE THE ROAD THAT HE REMEMBERED.

Q. AND DID HIS DEMEANOR CHANGE WHEN HE MADE THAT STATEMENT?

A. YES, IT DID. AND WE GOT TO A POINT WHERE HE TOLD HIS ATTORNEY AND ME, HE SAID, "RIGHT HERE, STOP."

Q. HOW DID HIS DEMEANOR CHANGE PHYSICALLY? WHAT DID YOU OBSERVE?

A. I NOTICED HIS LIPS TO TREMBLE, HIS EYES WELLED UP WITH TEARS, AND HE BECAME, OBVIOUSLY, EMOTIONAL.

Q. SHERIFF HEWETT, YOU PREVIOUSLY DESCRIBED TO THE JURY YOU MEMORIALIZED THE EVENTS OF THAT DAY IN A WRITTEN REPORT.

THESE SPECIFIC --

A.    I DID.

Q.    THESE SPECIFIC STATEMENTS AND DEMONSTRATIONS THAT YOU HAVE ALREADY DESCRIBED TO THE JURY, AND WHICH I WILL ASK YOU FURTHER QUESTIONS ABOUT, DID YOU INCLUDE THOSE IN YOUR REPORT?

A.    YES.

Q.    ON MULTIPLE OCCASIONS THAT DAY, DID YOU SEE MR. BASHAM IN AN EMOTIONAL STATE?

A.    TWO TIMES.

Q.    DID YOU PUT THAT IN THE REPORT?

A.    I DID.

Q.    WHY?

A.    BECAUSE THAT IS THE TRUTH.  THAT IS WHAT HAPPENED.

Q.    SO, WHEN HIS LIPS STARTED TREMBLING, HE BECAME EMOTIONAL ON LEWIS SWAMP ROAD, DID YOU STOP THE VAN?

A.    I STOPPED THE VAN.  HE SAID, "STOP."  HE SAID, "THIS IS WHERE YOU NEED TO STOP."

Q.    AND DID YOU LOCATE SOME OBJECT IN THE WOODS OR NEAR WHERE THE VAN WAS STOPPED?

A.    THERE WAS A MARKER ON THE SIDE OF THE ROAD AND IT PROVED NOT TO BE WHAT BRANDON WAS LOOKING FOR, BUT HE DID CONTINUE WITH INFORMATION.

Q.    WHAT DID MR. BASHAM SAY, THAT IT WAS CLOSE, BUT IT WASN'T IT?  WAS IT SOMETHING TO DO WITH THE TREES?  DO YOU

REMEMBER?

A.    YES, SIR.   HE SAYS THAT THE TREES GOT CLOSER TOGETHER, THE ROAD NARROWED OUT FROM THE PINE TREES,  IT WAS GETTING CLOSER AND CLOSER, AND THIS WAS THE SPOT THAT HE REMEMBERED.

Q.    WHO DID MR. BASHAM SAY WAS DRIVING THE BMW THAT DAY?

A.    MR. FULKS.

Q.    AND WHO DID MR. BASHAM SAY WAS THE LEADER?  WHO DID HE SAY WAS THE LEADER?

A.    HE SAID THAT CHAD FULKS WAS THE DRIVER AND THE LEADER.

Q.    WAS THERE SOMETHING ELSE,  ANOTHER LANDMARK THAT MR. BASHAM MENTIONED TO YOU THAT HE WAS SEARCHING FOR?

A.    YES.   HE WAS LOOKING FOR A WHAT HE CALLED A GOPHER HOLE.   NOW,  WE DON'T HAVE GOPHERS,  BUT HE SAID THAT WHEN HE STEPPED OUT OF THE VEHICLE, THAT HE STEPPED INTO A GOPHER HOLE.   IN THE GOPHER HOLE WAS A STAKE, S-T-A-K-E, AND THIS STAKE HAD CUT HIS LEG.   AND IN THE VAN,  BRANDON BASHAM, WHO THROUGHOUT THE DAY WE HAD A RAPPORT, HE REACHED OUT,  PULLED UP HIS SHACKLED LEG, AND SHOWED WHERE HE HAD SCRAPED HIS LEG ON THE STAKE.  HE SAID THAT IS WHAT I HIT ON THE GOPHER HOLE.

Q.    DID YOU ACTUALLY SEE A SCRAPE WHEN HE PULLED HIS PANT LEG UP?

A.    I DID.

Q.    HE DID THAT IN THE VAN?

A.    HE DID.

Q.    DID YOU STOP ON THE SIDE OF THE ROAD AND SEARCH FOR

THIS GOPHER HOLE OR STAKE?

A.    WE DID.

Q.    WAS MR. BASHAM ALLOWED OUT OF THE VAN WHEN THAT HAPPENED?

A.    HE WAS.

Q.    WHAT, IF ANYTHING, DID MR. BASHAM STATE AGAIN IN THE PRESENCE OF HIS LAWYER WITH REGARD TO WHAT THEY DID WITH ALICE DONOVAN'S BODY?

A.    HE STATED, SPECIFICALLY, AFTER DRAGGING HER OUT, THAT THEY PULLED HER INTO THE WOODS.

Q.    WHAT DID THEY DO AFTER THEY DRAGGED HER OUT OF THE CAR?

A.    COVERED THE BODY WITH LEAVES AND WHAT HE DESCRIBED AS LIMBS.

Q.    NOW, YOU REMEMBER HIM MENTIONING SOMETHING ABOUT A PARK?

A.    YES, I DO.

Q.    WHAT WAS THAT ALL ABOUT?

A.    BRANDON BASHAM STATED THAT FULKS AND HE HAD DRIVEN BY A PARK AND THAT CHAD, CHADRICK FULKS, HAD ORIGINALLY STATED THAT WOULD BE A GOOD PLACE. AND THAT THEY, AT THAT POINT, FULKS SAYS, NO, TOO MANY PEOPLE. AND THEY CHANGED THEIR MIND ABOUT THE PARK.

Q.    WAS THERE A PARTICULAR SIGN THAT HE RECALLED?

A.    YES. HE SPOKE ABOUT A SIGN KNOWN AS WHAT HE SAID ANIMAL PARK.

**JA 1337**

Q.    SHERIFF HEWETT, WHEN MR. BASHAM WAS OUTSIDE OF THE VAN AND AFTER HE HAD SHOWED YOU WHERE HIS LEG WAS CUT FROM THIS STAKE, DID HE INDICATE TO YOU THAT IT WAS BOTH HE AND MR. FULKS THAT DRAGGED ALICE DONOVAN'S BODY OUT OF THE CAR AND INTO THE WOODS?

A.    HE TOLD ME, SPECIFICALLY, JUST EXACTLY THAT.

Q.    THAT NOT BEING THE PLACE THAT YOU JUST DESCRIBED TO THE JURY, DID YOU GET BACK INTO THE VAN AND GO BACK TOWARDS --

A.    WE DID. WE WALKED IN THE WOODED AREA. AND AGENT LONG, MYSELF, CONWAY OFFICERS, EVERYONE THERE DID OUR BEST AT THAT LOCATION TO FIND MS. DONOVAN, AND SHE WAS NOT THERE. AND AFTER A PERIOD OF TIME, WE REALIZED WE HAD SEARCHED THAT AREA AS GOOD AS WE POSSIBLY COULD AND WE NEEDED TO TRY TO MOVE ON AND GET DONE WHAT WE COULD GET DONE, DONE.

Q.    AGAIN, WHILE YOU WERE OUT IN THE WOODS WITH MR. BASHAM AND HE WAS ATTEMPTING TO ASSIST YOU IN FINDING WHERE HE AND MR. FULKS HAD DRAGGED MS. DONOVAN'S BODY, DID YOU NOTICE SOMETHING ABOUT HIS EYES?

A.    WHEN WE WERE THERE AT THE PLACE WHERE HE SAID THE STAKE WAS?

Q.    YES, SIR.

A.    YES, SIR.

Q.    WHAT WAS THAT?

A.    THAT IS THE FIRST TIME I SAW BRANDON BASHAM BECOME EMOTIONAL.

Q.    DID HE PROVIDE A DISTANCE AS FAR AS HOW FAR OFF THE ROAD MS. DONOVAN'S BODY SHOULD BE?

A.    YES, SIR,  HE DID.

Q.    WHAT WAS THAT?

A.    HE SAID IT WAS DRAGGING DISTANCE.

Q.    SHOWING YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT 441,  I BELIEVE YOUR DESIGNATED NUMBER 9 IN YOUR REPORT.  WAS BRANDON BASHAM SHOWN THIS PHOTOGRAPH?

A.    YES, SIR.  THAT IS ONE OF THE PHOTOGRAPHS THAT HE SAID, "I REMEMBER THAT DISTINCTLY."

Q.    WHAT IS THIS A PICTURE OF?

A.    THAT IS WHERE GREEN HILL ROAD TURNS OFF OF CHERRY TREE ROAD.  THAT IS GREEN HILL ROAD, THAT IS THE BEGINNING OF THE CURVE.

Q.    SO,  THIS ROAD RIGHT HERE IS WHAT?

A.    I BELIEVE THAT TO BE CHERRY TREE.

Q.    AND THIS ROAD RIGHT HERE?

A.    GREEN HILL.

Q.    IF YOU WERE TO TRAVEL THAT WAY ON GREEN HILL ROAD, WOULD YOU EVENTUALLY COME TO THE INTERSECTION OF GREEN HILL AND BEE TREE FARM ROAD?

A.    IT IS ON THE LEFT.

Q.    HOW FAR IS THIS INTERSECTION RIGHT HERE FROM THE INTERSECTION THAT YOU PREVIOUSLY DESCRIBED TO THE JURY ON GOVERNMENT'S EXHIBIT 150 OF GREEN HILL ROAD AND BEE TREE FARM

**JA 1339**

ROAD?

A.    EIGHT MILES.

Q.    SO, MR. BASHAM INDICATED HE RECALLED THAT PARTICULAR INTERSECTION, GOVERNMENT'S EXHIBIT 441?

A.    YES, SIR.

Q.    WHEN HE INDICATED HE RECALLED THAT INTERSECTION, WERE YOU CONFIDENT, SHERIFF, YOU WERE IN THE RIGHT OR THE GENERAL AREA, ACCORDING TO MR. BASHAM?

A.    ACCORDING TO MR. BASHAM'S STATEMENTS, I FELT THAT WE WERE IN THE RIGHT AREA.

Q.    AS YOU WERE DRIVING IN THE VAN THAT DAY, DID YOU ALSO HAVE AN OPPORTUNITY TO SHOW MR. BASHAM GOVERNMENT'S EXHIBIT NUMBER 442?

A.    I DID.

Q.    AND GOVERNMENT'S EXHIBIT NUMBER 443?

A.    I DID.

Q.    GOVERNMENT'S EXHIBIT 442 AND 443, WHAT IS THAT BUSINESS ESTABLISHMENT?

A.    OKAY. MR. GASSER, I BELIEVE IF YOU WILL GO BACK TO THE PREVIOUS, PLEASE. THAT IS THE DODGE CITY AMOCO, 17TH STREET GRILL.

Q.    IS THIS THE -- THIS IS THE AMOCO STATION. THE JURY HAS SEEN THE VIDEOTAPE OF MR. FULKS WALKING IN THE STORE AND PUMPING THE GAS?

A.    THAT'S CORRECT.

**JA 1340**

Q.    IS THIS THE AMOCO STATION THAT YOU MET UP WITH PRIOR TO GOING TO BEE TREE FARM HUNT CLUB?

A.    THAT IS.   THAT IS THE STATION.

Q.    WHEN YOU SHOWED MR. BASHAM GOVERNMENT'S EXHIBIT 442 AND GOVERNMENT'S EXHIBIT 443,  WHAT DID HE SAY ABOUT THIS PARTICULAR ESTABLISHMENT?

A.    OKAY.   HE STATED THAT THE DODGE CITY AMOCO PHOTOGRAPH WAS THE PLACE WHERE CHAD HAD PAID FOR THE GAS, AND I WAS SITTING IN THE BACK WITH HER,  REFERRING TO MS. DONOVAN.

Q.    SO,  MR. BASHAM ACKNOWLEDGES THAT HE WAS IN THE BACK SEAT WITH THE VICTIM IN THIS CASE WHEN MR. FULKS WAS GETTING GAS AND GOING INTO THE STORE?

A.    HE DID.

Q.    NOW,  THAT AFTERNOON,  DID YOU CONTINUE TO CHECK NUMEROUS SIDE ROADS,  PAVED ROADS,  DIRT ROADS WITH MR. BASHAM IN THE VAN?

A.    WE DID.

Q.    GOVERNOR'S ROAD AND FUNSTON ROADS, ARE THOSE ROADS IN BRUNSWICK COUNTY?

A.    THEY ARE.

Q.    WERE THEY CHECKED THAT DAY?

A.    THEY WERE.

Q.    DID MR. BASHAM RECOGNIZE ANYTHING ON THOSE TWO PARTICULAR ROADS?

A.    HE DID NOT SEEM AS CERTAIN ABOUT ANY OF THAT.   WE

TRAVELLED EXTENSIVELY THAT AFTERNOON, BUT THE PLACES THAT BRANDON BASHAM FELT MOST CONFIDENT THAT HE HAD BEEN WERE ON THE GREEN HILL ROAD AREA, BEE TREE FARM.

Q. AS A RESULT OF THAT CONFIDENCE THAT YOU HAVE JUST DESCRIBED TO THE JURY, AT THE END OF THE DAY, WAS THE DECISION MADE TO GO BACK TO A PARTICULAR LOCATION?

A. YES, SIR, IT WAS.

Q. AND WHERE DID Y'ALL DECIDE TO TAKE MR. BASHAM BACK TO?

A. WE WENT BACK TO THE CEMETERY, BEE TREE FARM CEMETERY.

Q. SHOWING YOU GOVERNMENT'S EXHIBIT 147, AGAIN. YOU WENT BACK TO THIS CEMETERY RIGHT HERE?

A. THAT'S CORRECT.

Q. AND WHERE DID THE VAN PARK -- USING GOVERNMENT'S EXHIBIT 147, IF YOU CAN, WHERE DID THE VAN PARK WHEN YOU GOT BACK TO THE CEMETERY?

A. I WILL SHOW EXACTLY WHERE IT PARKED. IT TURNED IN AND THE VAN PULLED RIGHT HERE -- NEED TO GET MORE, RIGHT HERE.

Q. OBVIOUSLY, THERE WERE OTHER TRAIL VEHICLES THAT DAY, WERE THERE NOT, WITH OTHER LAW ENFORCEMENT OFFICIALS?

A. CORRECT. AND THEY ALSO FILLED UP THE SEMICIRCLE AT THAT TIME.

Q. SO, THIS SEMICIRCLE WAS KIND OF FILLED UP WITH CARS AND PEOPLE?

A. YES, SIR, PUTTING THE VAN RIGHT HERE.

Q. DID YOU GET OUT OF THE VAN?

A.    I DID.

Q.    AND DID MR. BASHAM GET OUT OF THE VAN?

A.    HE DID.

Q.    TELL THE JURY WHAT HAPPENED WHEN YOU AND MR. BASHAM GOT BACK TO THE CEMETERY THAT HE HAD PREVIOUSLY INDICATED TO YOU THAT AFTERNOON WHERE THIS LIZ CLAIBORNE PURSE STRAP WOULD BE?

A.    HE, BEING BRANDON BASHAM, WANTED TO WALK OVER TOWARDS THE WOODLINE AND TO SHOW THE AREA WHERE THE STRAP WAS THROWN.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 439, MIGHT BE ABLE TO ASSIST YOU WITH THE JURY.  IF YOU COULD DEMONSTRATE ON GOVERNMENT'S 439 WHAT YOU MEAN BY HE WALKED OVER TO THE WOODLINE.

A.    IF YOU WILL NOTICE DIRECTLY WHERE I HAVE MY FINGER NOW, THAT IS THE GATE THAT LEADS INTO THE CEMETERY.  RIGHT HERE, IF YOU WILL NOTICE ONE LITTLE POST, THAT IS THE BROKEN DOWN FENCE THAT HAD BEEN DESCRIBED EARLIER.  AND, AT THAT POINT, AS WE WALKED BACK, THAT WAS WHEN BRANDON BASHAM TOLD ME THAT THEY HAD PULLED THE CAR IN HERE.

Q.    NOW, AGAIN, UP TO THIS POINT, HAD YOU PROVIDED EITHER MR. BASHAM, OR MR. LITTLEJOHN, OR MR. MONCKTON ANY INFORMATION THAT YOU HAD GOTTEN FROM RONALD PURDUE APPROXIMATELY ONE WEEK BEFORE THAT?

A.    NO, SIR, WE HAD NOT DISCUSSED IT.

Q.    SO, MR. BASHAM INDICATES THAT THEY PULLED THE BMW INTO THIS SECTION RIGHT HERE; IS THAT CORRECT?

A.     RIGHT THERE, YES, SIR.

Q.     TELL US, PLEASE, THEN, WHAT HE SAYS HAPPENED?

A.     AT THAT TIME, THAT WAS THE -- THAT WAS THE SECOND TIME THAT BRANDON BASHAM, IN MY PRESENCE, STARTED TO BREATHE HEAVIER, HIS LIPS QUIVERED, HIS EYES WELLED UP WITH TEARS. AND, AT THAT TIME, HE CONTINUED TO TALK.

Q.     AND WHAT DID HE DESCRIBE TO YOU ON THANKSGIVING DAY, THE LOCATION THAT YOU HAVE JUST DESCRIBED TO THE JURY, TELL THIS JURY WHAT BRANDON BASHAM DESCRIBED TO YOU AS TO WHAT HAPPENED TO ALICE DONOVAN.

A.     MAY I.

Q.     YOU CAN DEMONSTRATE, IF HE DEMONSTRATED.

A.     BRANDON BASHAM HAD HIS HANDS LIKE THIS ONCE AGAIN. I HAVE EXPLAINED TO YOU HOW HE WAS SHACKLED. HE TOOK HIS HANDS TOGETHER AND DID THIS (INDICATING), "THEN I THREW IT OVER THERE. CHECK IN THOSE TREES RIGHT OVER THERE." WHICH, IF YOU WILL LOOK AT HOW I AM FACING YOU, I AM FACING THE SEMICIRCLE. SO, WE WALKED TO THE AREA RIGHT HERE AT THE CORNER, AND THAT IS WHERE HE DID THIS AND DID THAT. HE COULDN'T THROW VERY FAR BECAUSE HE WAS SHACKLED. THAT IS WHEN HE SAID, "CHECK OVER THERE." AT THAT TIME, SERGEANT PARKER AND SERGEANT SARVIS, THOSE WERE THE TWO INDIVIDUALS THAT WERE WITH ME, THEY BEGAN TO LOOK AGAIN, BUT THAT AREA HAD ALREADY BEEN SEARCHED, AND THE STRAP WAS NOT TO BE FOUND.

Q.     WHEN MR. BASHAM DEMONSTRATED TO YOU WHAT WAS DONE WITH

THAT PURSE STRAP AND THAT HE THREW IT OVER THERE, WAS HIS BACK TO THE CEMETERY, THE PLOT ITSELF?

A.    YES, HE WAS FACING ME.

Q.    SO, HE WOULD HAVE BEEN FACING THE TURNAROUND?

A.    RIGHT.

Q.    CEMETERY WOULD HAVE BEEN BEHIND HIM?

A.    RIGHT.

Q.    WAS A THOROUGH SEARCH OF THAT WOODLINE ALL AROUND THE CEMETERY, BELOW THE CEMETERY, WAS THAT DONE THAT DAY, SHERIFF?

A.    THAT WAS DONE THAT DAY, THOROUGH SEARCH.

Q.    WAS ANY TYPE OF LEATHER STRAP OR ANYTHING CONSISTENT WITH A LEATHER STRAP FOUND?

A.    WE HAVE NOT FOUND IT TO TODAY.

Q.    DID YOU SPECIFICALLY LOOK MR. BASHAM IN THE EYE AND ASK HIM, "IS THIS WHERE IT HAPPENED"? DID YOU DO THAT, SHERIFF?

A.    I DID.

Q.    WHAT WAS MR. BASHAM'S RESPONSE?

A.    HE SAID, "THIS IS IT. IT IS."

MR. GASSER: THANK YOU, YOUR HONOR. JUST A COUPLE MORE QUESTIONS, SHERIFF.

BY MR. GASSER:

Q.    SHERIFF HEWETT, IN 22 YEARS OF LAW ENFORCEMENT, HAVE YOU HAD THE OPPORTUNITY TO BE AROUND INDIVIDUALS THAT HAVE BEEN UNDER THE INFLUENCE OF ALCOHOL OR UNDER THE INFLUENCE OF

DRUG AND HAVE BEEN DIFFICULT TO UNDERSTAND?

A.    I HAVE.

Q.    WHEN YOU WERE WITH MR. BASHAM THAT MORNING AND THAT DAY ON THANKSGIVING OF 2002, DID YOU HAVE ANY DIFFICULTY UNDERSTANDING MR. BASHAM?

A.    NONE WHATSOEVER.

Q.    WAS HE SPEAKING COHERENTLY TO YOU?

A.    HE WAS.

Q.    DID HE APPEAR TO UNDERSTAND WHAT QUESTIONS YOU WERE ASKING OF HIM?

A.    HE DID.

Q.    HOW LONG DID THIS SEARCH THAT YOU HAVE JUST DESCRIBED TO THE JURY OVER THE LAST 45 TO 50 MINUTES, HOW LONG DID IT LAST THAT DAY?

A.    IT LASTED FROM 8:30 IN THE MORNING, THAT IS ABOUT THE TIME WE HOOKED UP, UNTIL ABOUT THREE IN THE AFTERNOON. OUR DEALING TOGETHER, OUR DEALING WITH MR. BASHAM, IT CONCLUDED THERE AT THE CEMETERY, THAT WAS THE END OF THE DAY.

Q.    DURING THAT ENTIRE TIME THAT YOU WERE IN THE PRESENCE OF MR. BASHAM, WAS MR. BASHAM AFFORDED EVERY OPPORTUNITY TO TALK TO BOTH MR. LITTLEJOHN AND MR. MONCKTON?

A.    HE WAS.

Q.    WERE ANY PROMISES MADE TO MR. BASHAM, OR MR. MONCKTON, OR MR. LITTLEJOHN?

A.    NO.

Q.    DID ANYONE THREATEN MR. BASHAM, IN YOUR PRESENCE?

A.    NO, SIR.

Q.    WERE YOU CORDIAL WITH MR. BASHAM?

A.    YES.   WE FORMED A RAPPORT.   I PLACED THAT ON MY REPORT.   HE WASN'T ANY PROBLEM THAT DAY, AND HE WAS POLITE. HE ANSWERED THE QUESTIONS, AND HE WAS NO PROBLEM.

Q.    OBVIOUSLY THAT DAY AND THE DAYS SUBSEQUENT TO NOVEMBER 28TH, 2002, SEARCHES CONTINUED FOR MS. DONOVAN'S BODY, CORRECT?

A.    YES, SIR.

Q.    HAS ANY PIECE OF THE REMAINS OF ALICE DONOVAN OR ANY EVIDENCE RELATING TO ALICE DONOVAN BEEN FOUND IN BRUNSWICK COUNTY, NORTH CAROLINA?

A.    NO.

        MR. GASSER:  THAT IS ALL I HAVE, YOUR HONOR.

        THE COURT:  CROSS-EXAMINATION.

        MR. HARRIS:  THANK YOU.

                        CROSS EXAM

BY MR. HARRIS:

Q.    SHERIFF, BEFORE WE BEGIN, I NOTICED WHEN YOU WERE TESTIFYING, DISCUSSING THIS CASE WITH MR. GASSER, YOU WERE REFERRING TO NOTES.   CAN I APPROACH YOU AND JUST TAKE A LOOK AND SEE, MAKE SURE YOU AND I ARE LOOKING AT THE SAME THING?

A.    YES, SIR.

        MR. HARRIS:  MAY I APPROACH, YOUR HONOR?

THE COURT:   SURE.

THE WITNESS:   MR. HARRIS, I HAVE THEM NUMBERED, SO KEEP THEM IN THAT ORDER FOR ME.

BY MR. HARRIS:

Q.    THANK YOU.

I WANT TO ALSO HAND YOU AND SEE IF YOU CAN IDENTIFY,  DO YOU KNOW WHOSE NOTES ARE THESE?

A.    THAT APPEARS TO BE THE WRITING OF LIEUTENANT DAVID CROCKER.

Q.    OKAY.   LIEUTENANT CROCKER WAS ALSO AT THE SCENE THAT DAY,  CORRECT?

A.    YES, SIR.

Q.    LIEUTENANT CROCKER IS ALSO THE GENTLEMAN, I BELIEVE, BASED ON THE WAY I LOOK AT YOUR INTERVIEW, THAT INTERVIEWED YOU?

A.    YES, SIR.

Q.    AND DURING THE INTERVIEW PROCESS,  YOU TELL HIM WHAT YOU OBSERVED AND HE REDUCES THAT INTO INTERVIEW FORM, CORRECT?

A.    THAT'S RIGHT.

Q.    YOU DIDN'T DO A STATEMENT YOURSELF,  SOMEONE DID A STATEMENT FROM YOU WITH THE ANTICIPATION THAT YOU MAY POTENTIALLY BE A WITNESS IN THIS CASE?

A.    RIGHT.   WE SAT DOWN AND WENT THROUGH IT STEP BY STEP WHAT HAPPENED THAT DAY.

Q.    FAIR ENOUGH.   SO NOW I KNOW WHAT YOU HAVE IN FRONT OF YOU.   YOU ARE FREE,  OBVIOUSLY, AS YOU HAVE WITH MR. GASSER, TO REFER TO THOSE ANY TIME,  FAIR ENOUGH?

A.    FAIR ENOUGH.

Q.    SHERIFF, WE HAVE HEARD A LOT OF TESTIMONY ABOUT THAT DAY.   AND LIEUTENANT CROCKER HAS ALREADY TESTIFIED ABOUT THE RURAL NATURE OF THAT AREA AND ABOUT THE SIZE THAT WE HAVE TALKED ABOUT.   IF YOU COULD PULL UP EXHIBIT 140,  PLEASE  -- 147,  PLEASE.  I THINK THAT IS 150.   I WOULD LIKE TO USE THAT AS A STARTING POINT OF OUR DISCUSSION THIS MORNING.   YOUR TESTIMONY IS, ON NUMEROUS OCCASIONS, HAS BEEN YOU TRAVELLED OVER A HUNDRED MILES THAT DAY WITH MR. BASHAM?

A.    YES, SIR.

Q.    IT WAS A MASSIVE SEARCH?

A.    IT WAS.

Q.    IT INVOLVED NUMEROUS LAW ENFORCEMENT AGENCIES?

A.    IT DID.

Q.    AND IT INVOLVED TRAVELLING DOWN BLACKTOP ROADS?

A.    BLACKTOP ROADS.

Q.    FOUR-LANE HIGHWAYS?

A.    YES, SIR.

Q.    TWO-LANE HIGHWAYS?

A.    THAT'S CORRECT.

Q.    IT INVOLVED TRAVELLING DOWN GRAVEL ROADS?

A.    THAT'S CORRECT.

Q.    TWO-LANE GRAVEL ROADS AND ONE-LANE GRAVEL ROADS?

A.    BOTH.

Q.    IT INVOLVED TRAVELLING DOWN DIRT ROADS?

A.    IT DID.

Q.    TWO-LANE DIRT ROADS AND ONE-LANE DIRT ROADS?

A.    ONE.

Q.    THAT IS BEE TREE.  IT INVOLVED SIDE ROADS, I BELIEVE YOU TESTIFIED?

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

Q.    IT INVOLVED TRAVELLING DOWN JUST ANYWHERE IN THAT AREA, THE AREA WE ARE LOOKING AT THAT COULD POSSIBLY DETERMINE WHERE THE REMAINS OF MS. DONOVAN WERE?

A.    CORRECT.

Q.    THAT WAS THE PURPOSE ON THIS PARTICULAR DAY.  BY THE 28TH, LET'S BE CLEAR ABOUT THIS, THE SINGULAR PURPOSE OF EVERYONE THERE IN TERMS OF LAW ENFORCEMENT WAS TO LOCATE REMAINS; ISN'T THAT CORRECT?

A.    THAT IS CORRECT.

Q.    THE ONLY PURPOSE?

A.    WE, AT THAT POINT, KNEW THAT ALICE DONOVAN COULD NOT BE ALIVE.

Q.    YES, SIR.  SO, THAT WAS THE ONLY PURPOSE?

A.    YES, SIR.

Q.    IT INVOLVED TRAVEL INTO OTHER COUNTIES, COLUMBUS COUNTY?

A.    YES, WE WENT TO THE LINE AND TURNED AROUND.  ACTUAL SEARCHES, NO, MR. HARRIS, BUT WE TRAVELLED THERE AND TURNED AROUND.

Q.    AND ON THIS PHOTOGRAPH, CAN YOU TELL US IN TERMS OF WHAT WE ARE LOOKING AT HERE ON 150 THE OUTER REACHES OF THE SEARCH ON THIS PHOTOGRAPH?

A.    THE OUTER REACHES OF THE SEARCH ON THAT PHOTOGRAPH ARE NOT EVEN IN SITE, MR. HARRIS, IT IS SO MUCH BIGGER.  I WENT OUTSIDE THE PERIMETERS OF THAT.

Q.    YOU WENT PAST THAT ARROW?

A.    I WENT PAST THE ENTIRE  -- THE ENTIRE VIEW THAT YOU HAVE DOES NOT ENCOMPASS OUR SEARCH.

Q.    THE SEARCH INVOLVED MORE THAN WHAT WE SEE ON GOVERNMENT'S 150?

A.    YES, SIR.  THAT IS JUST A SMALL PORTION.

Q.    THAT WAS MASSIVE AND IT WAS SUBSTANTIAL, YOU WILL AGREE?

A.    YES, SIR.

Q.    AND THERE ARE SEVERAL OTHER STATEMENTS, YOU WERE WITH MR. BASHAM THE ENTIRE TIME; IS THAT CORRECT?

A.    I WAS.

Q.    AND IT INVOLVED OTHER THAN SIDE ROADS, GRAVEL ROADS, AND SWAMP ROADS?

A.    IT DID.

Q.    AND IT INVOLVED TRAVEL OVER NUMEROUS BODIES OF WATER,

CREEKS?

A.   YES.

Q.   SWAMPS?

A.   IT DID.

Q.   AND, AGAIN, YOU WERE WITH MR. BASHAM THE ENTIRE TIME, AND CERTAINLY YOUR TESTIMONY TODAY IS NOT LIMITED TO EVERYTHING HE SAID TO YOU, CORRECT?

A.   NO, SIR.

Q.   MATTER OF FACT, ON NUMEROUS OCCASIONS DURING THIS DAY, HE COMMENTED ON THE FACT MANY OF THE ROADS LOOKED VERY SIMILAR?

A.   HE TOLD EVERYONE IN THE VAN THAT.

Q.   HE TOLD EVERYONE IN THE VAN.  HE COMMENTED SEVERAL TIMES DURING THE SIX HOURS YOU WERE TOGETHER ON THESE MANY ROADS, OVER HUNDREDS OF MILES, THAT MANY OF THE PINE TREES, THEY ALL STARTED LOOKING THE SAME?

A.   IT DID.

Q.   COMMENTED TO YOU DURING THE SIX HOURS THAT YOU WERE TOGETHER THAT ALL OF THIS LOOKS FAMILIAR, EVERYTHING JUST KIND OF LOOKS THE SAME AT SOME POINT, DIDN'T HE MAKE THAT COMMENT?

A.   HE DID.

Q.   EVERYONE, INCLUDING MR. BASHAM, BECAME FRUSTRATED AT SOME POINT DURING THE DAY, ISN'T THAT A FAIR STATEMENT?

A.   I DIDN'T BECOME FRUSTRATED.  I HONESTLY DIDN'T.

THERE WERE AGENTS AT THE VAN THAT APPEARED TO BE FRUSTRATED, BUT, AT THAT POINT, I DIDN'T HAVE ANY REASON TO BE FRUSTRATED AT BRANDON BASHAM BECAUSE HE HAD ONLY TRIED TO ASSIST IN FINDING THE BODY OF ALICE DONOVAN, AND HE HAD BEEN RESPECTFUL TO ME. I WASN'T FRUSTRATED. I WANTED TO FIND ALICE DONOVAN, BUT I WASN'T FRUSTRATED OR ANGRY.

Q. AGAIN, THAT WAS LAW ENFORCEMENT'S SINGULAR PURPOSE. MR. BASHAM BECAME FRUSTRATED, THOUGH, ISN'T THAT A FAIR STATEMENT? THE FACT THAT THE ROADS LOOKED THE SAME, THE PINE TREES ALL LOOKED THE SAME, EVERYTHING LOOKED THE SAME, THAT HE WAS LOOKING AT THE SAME THING OVER AND OVER AGAIN, HE DEMONSTRATED FRUSTRATION OVER THAT TO YOU, DIDN'T HE, SHERIFF?

A. HE STATED THAT EVERYTHING LOOKED ALIKE. AND HIS WORDS WERE, TO THE BEST OF MY RECOLLECTION, WELL, SIR, I AM TRYING TO HELP YOU, BUT EVERYTHING LOOKS ALIKE. NOW, THAT WAS AS MUCH FRUSTRATION AS I HEARD, IF THAT CAN BE DESCRIBED AS FRUSTRATION.

Q. DO YOU ALSO REMEMBER HIM SAYING, QUOTE, I BELIEVE THIS IS A QUOTE FROM YOU, "ALL OF IT LOOKS FAMILIAR"?

A. YES, SIR.

Q. DO YOU REMEMBER HIM SAYING, "I AM TRYING, SIR"? ON ANOTHER OCCASION, A DIFFERENT OCCASION AND A TOTALLY SEPARATE AREA OF THE SEARCH, "I AM TRYING, SIR, BUT ALL THE ROADS, THE PINE TREES, AND DIRT LOOK ALIKE"?

**JA 1353**

A.   HE SAID THAT.

Q.   DO YOU REMEMBER HIM SAYING ON A DIFFERENT OCCASION, AGAIN, DURING THE SEARCH, DURING THE SIX HOURS, "MANY OF THE ROADS THAT WE WENT DOWN," WHEN HE SAID "WE," MEANING HE AND MR. FULKS, "LOOKED VERY SIMILAR"?

A.   THAT IS EXACTLY WHAT HE SAID.

Q.   DO YOU REMEMBER HIM SAYING, SPECIFICALLY, ABOUT A QUOTE THAT YOU MENTIONED EARLIER THAT, "WE DID WHATEVER CHAD WANTED TO DO"?

A.   HE SAID THAT.

Q.   THAT WAS IN REFERENCE TO DRIVING DOWN THE ROADS OR WHATEVER ROAD WAS SELECTED, CORRECT?

A.   THAT'S RIGHT.

Q.   WHERE SOMEONE STOPPED, CORRECT?

A.   YES, SIR.

Q.   WHEN SOMEBODY WAS READY TO GO FROM THERE, CORRECT?

A.   THAT'S RIGHT.

Q.   NOW, OTHER THAN THE SIX-HOUR PERIOD WHERE YOU WERE DRIVING DOWN THESE ROADS, IT WASN'T ALL DRIVING, IT WAS POINTS WHERE YOU WOULD STOP, HAVE A CIGARETTE BREAK OR COCA-COLA BREAK, AND EVERYBODY WOULD KIND OF GET TOGETHER AND SAY, WHERE ARE WE GOING NEXT, IS THAT A FAIR STATEMENT?

A.   THAT IS A FAIR STATEMENT.

Q.   HE WAS, DURING THESE PERIODS, EARLIER GIVEN PHOTOGRAPHS?

**JA 1354**

A.    THAT'S RIGHT.

Q.    THE PHOTOGRAPHS MR. GASSER HAS PLACED INTO EVIDENCE -- THE GOVERNMENT HAS PLACED INTO EVIDENCE AND THE JURY HAS LOOKED AT,  THERE WAS NO PURPOSE OF EVASION IN LOOKING AT THOSE PHOTOGRAPHS AND TELLING YOU, I HAVE BEEN THERE BEFORE; ISN'T THAT CORRECT?

A.    YOU ARE ASKING ME WAS MR. BASHAM TRYING TO BE EVASIVE OR NOT TELL ME THE TRUTH?

Q.    ABOUT THAT CEMETERY.

A.    HE,  I FEEL LIKE,  FROM LOOKING AT THE PHOTOGRAPHS, THAT HE STATED WHICH ONES HE REMEMBERED AND WHICH ONES HE DID NOT.

Q.    HE TOLD YOU THAT HE HAD BEEN TO THE CEMETERY,  CORRECT?

A.    HE DID.

Q.    HE DIDN'T KNOW SOMEBODY HAD SEEN HIM THERE ALREADY?

A.    NOT TO MY KNOWLEDGE.  WE NEVER DISCUSSED IT.

Q.    AND THE ROAD,  THE INTERSECTION OF GREEN HILL AND I THINK CHERRY,  WAS IT CHERRY?

A.    YES, SIR.

Q.    WITHOUT ANY EVASION AT ALL,  HE TOLD YOU UPON SEEING THAT PHOTOGRAPH,  HE RECOGNIZED THAT,  CORRECT?

A.    HE DID.

Q.    AND HE BROUGHT UP, WITHOUT ANY PROMPTING FROM YOU,  ANY PRODDING FROM LAW ENFORCEMENT,  ANY SUGGESTION FROM LAW ENFORCEMENT,  HE BROUGHT UP A SIGN ABOUT AN ANIMAL PARK,

SANCTUARY, ANIMAL PARK OR SOMETHING ALONG THOSE LINES, DIDN'T HE?

A.   HE DID.

Q.   IN THAT IMMEDIATE AREA, AREN'T THERE ANIMAL SANCTUARIES?

A.   THE GREEN SWAMP HAS ANIMAL SANCTUARIES, SOME THAT SAY VARIOUS SANCTUARY. THERE ARE DESIGNS THAT ARE CONSISTENT WITH ANIMAL PARK, NOT ONE I HAVE FOUND THAT SAYS ANIMAL PARK. SOME SAY DEER CROSSING.

Q.   NUMEROUS SIGNS DEALING WITH WILDLIFE?

A.   YES.

Q.   NUMEROUS SIGNS IN THE AREA THAT WAS SEARCHED THAT SAY WILDLIFE?

A.   YES, SIR.

Q.   HE ALSO IDENTIFIED FOR YOU THE AMOCO STATION?

A.   HE DID.

Q.   AND, AGAIN, THAT WAS WITHOUT ANY PROMPTING FROM LAW ENFORCEMENT?

A.   THAT'S RIGHT.

Q.   HE IDENTIFIED THAT AS THE PLACE WHERE MR. FULKS HAD GONE IN AND HE HAD STAYED IN THE CAR?

A.   THAT IS WHAT I AM TOLD.

Q.   HE DIDN'T KNOW THAT EARLIER LIEUTENANT CROCKER AND ANOTHER SOMEONE WHO WORKS WITH YOU, HE DID NOT KNOW THEY HAD GONE IN AND OBTAINED A VIDEOTAPE, DID HE?

A.    I CAN ONLY TELL YOU I DIDN'T TELL HIM.

Q.    YOU DIDN'T TELL HIM?

A.    I DIDN'T TELL HIM.   I DIDN'T,  NO.

Q.    DURING THE DAY,  DURING THE SIX HOURS THAT YOU WERE TOGETHER, THERE WERE NUMEROUS BREAKS.  AND DURING THE DAY, INCLUDING THE BREAKS,  INCLUDING THE TIME THAT YOU WERE RIDING DOWN THESE ROADS,  YOU OBSERVED HIM ON AT LEAST THREE OCCASIONS BECOME EMOTIONAL?

A.    TWO.

Q.    TWO OCCASIONS.  AND I BELIEVE YOUR TESTIMONY WAS HE WAS SHAKING?

A.    HE WAS SHAKING.

Q.    TEARED UP?

A.    HE DID.

Q.    AND BECAME EMOTIONAL?

A.    HE DID.

Q.    BASED ON WHAT YOU HAVE  -- WHAT WE HAVE TALKED ABOUT, HIS COMMENTS EVERYTHING LOOKS THE SAME,  HIS FRUSTRATION HE WAS FEELING, YOU NOTICED HIM TO BE AT NUMEROUS TIMES DURING THE DAY CONFUSED; ISN'T THAT A FAIR STATEMENT? CONFUSED WITH HIS SURROUNDINGS?

A.    YES, THAT IS FAIR.

Q.    YOU ALSO NOTICED HIM DURING POINTS OF TIME OF THE DAY, BASED ON STATEMENTS HE MADE TO YOU, HE WAS UPSET WITH CHAD FULKS,  WASN'T HE? HE MADE COMMENTS THAT CHAD HAD CREATED THIS

PROBLEM FOR HIM, AT LEAST PARTIALLY, DIDN'T HE?

A.    THE ONLY THING THAT I CAN STATE, HONESTLY, THAT I REMEMBER BRANDON BASHAM TELLING ME WAS THAT CHADRICK FULKS WAS DRIVING AND WE DID WHAT CHADRICK FULKS WANTED TO DO.  HE WAS THE LEADER.

Q.    HE WAS THE LEADER.  AND HE EXHIBITED FRUSTRATION WITH AN UNSUCCESSFUL DAY WHEN YOU DECIDED TO CALL THE DAY OFF SOME TIME NEAR THE END OF THE DAY, HE WAS FRUSTRATED THAT NOTHING HAD HAPPENED, IS THAT A FAIR STATEMENT?

A.    HE WAS EMOTIONAL.

Q.    HE WAS EMOTIONAL?

A.    FRUSTRATED I AM THINKING ANGER -- I DIDN'T SEE ANY ANGER.  I JUST SAW BRANDON BASHAM EMOTIONAL AT THE CEMETERY.

Q.    NOW, AT THE CEMETERY, AND I WOULD LIKE YOU TO REFER TO YOUR NOTES IF THAT WILL HELP YOU.

A.    OKAY.

Q.    THERE IS NOTHING IN YOUR NOTES, NOR IS THERE ANYTHING IN LIEUTENANT CROCKER'S NOTES THAT INDICATE THAT BRANDON BASHAM TOLD YOU THAT HE USED THE STRAP, IS THERE?

A.    NO, SIR.  HE DID NOT TELL ME HE USED THE STRAP.  HE DEMONSTRATED, THOUGH.

Q.    HE DEMONSTRATED?

A.    YES, SIR.

Q.    YOUR NOTES, NOR LIEUTENANT CROCKER'S NOTES SAY THAT HE DID THAT; ISN'T THAT TRUE?

A.    THAT IS TRUE BECAUSE HE DIDN'T SAY.   HE SHOWED.

Q.    NOW,  DID YOU GO  -- LET ME REPHRASE THIS.   DURING THE SIX HOURS THAT YOU WERE OUT THERE,  ISN'T IT A FAIR STATEMENT TO SAY THAT IT IS APPROXIMATELY  -- YOU TELL ME,  HOW FAR IS IT FROM THE AMOCO ON HIGHWAY 17 UNTIL YOU TURN OFF ON GREEN HILL ROAD?

A.    TWENTY-SEVEN (27) MILES.

Q.    TWENTY-SEVEN (27) MILES.  WHAT IS THE SPEED LIMIT ON THAT ROAD?

A.    FIFTY-FIVE.

Q.    SO, YOU WOULD THINK THAT IT WOULD TAKE,  30 MINUTES, 20 TO 30 MINUTES TO GET TO THAT INTERSECTION?

A.    THAT IS FAIR.

Q.    THAT IS A FAIR ESTIMATE.   AND FROM THAT TURNOFF TO THE BEE TREE EXIT IS WHAT,  ABOUT SEVEN MILES?

A.    SEVEN TO TEN MILES.

Q.    AND THE SPEED LIMIT ON THAT ROAD IS WHAT,  SHERIFF?

A.    THE SPEED LIMIT WOULD BE FIFTY-FIVE,  BUT YOU CAN'T DRIVE FIFTY-FIVE FOR VERY LONG BECAUSE OF THE CURVES.

Q.    WHAT IS YOUR BEST GUESSTIMATE OF THE TIME LAPSE FROM WHEN YOU EXIT ONTO GREEN HILL UNTIL YOU ARRIVE AT BEE TREE ENTRANCE?

A.    OKAY.   TWENTY  -- YOU TALKING FROM GREEN HILL, ONCE WE MAKE THAT INTERSECTION AT CHERRY TREE?

Q.    WE HAVE ESTABLISHED 20 MINUTES TO 30 MINUTES FROM THE

AMOCO TO GREEN HILL.

A.    EIGHT MINUTES.

Q.    EIGHT MINUTES TO GREEN HILL TO BEE TREE.    HOW FAR IS GREEN HILL TO THE EXIT OFF OF BEE TREE?

A.    TWO MILES.

Q.    ARE YOU SURE IT ISN'T ONE MILE? HAVE YOU MEASURED IT?

A.    I HAVEN'T MEASURED IT.    I AM TELLING YOU.

Q.    THE BEST OF YOUR RECOLLECTION, WOULD YOU DISPUTE CLOSER TO ONE MILE THAN TWO MILE?

A.    NO.

Q.    AND THAT IS A DIRT ROAD,  BEE TREE, THE ENTIRE BEE TREE ROAD IS A DIRT ROAD?

A.    YES.

Q.    AND THE ENTIRE BEE TREE IS A ONE-LANE DIRT ROAD WITH JUST TWO LANES?

A.    YES.

Q.    ON BEE TREE ROAD, IS IT POSSIBLE TO LEAVE THE HUNT CLUB AND THEN CIRCLE AROUND ON BEE TREE ROAD, OR IS IT A STRAIGHT SHOT OUT TO GREEN TREE?

A.    ONE WAY IN,  ONE WAY OUT.

Q.    ON BEE TREE ROAD?

A.    THAT'S RIGHT.

Q.    SO, YOU CAN'T LEAVE THE HUNT CLUB AND CIRCLE AROUND?

A.    YOU CANNOT.

Q.    YOU HAVE TO DRIVE THAT MILE TO GREEN HILL.    AFTER YOU

EXIT GREEN HILL TO THE INTERSECTION AT CHERRY, WHAT IS THE DISTANCE? FROM GREEN HILL, GREEN HILL MEETS BEE TREE, TO WHERE GREEN HILL MEETS CHERRY, WHAT IS THAT DISTANCE?

A. SEVEN MILES, ESTIMATE.

Q. IN BETWEEN THAT SEVEN MILES, IS THERE AN EGRESS ONTO INTERNATIONAL PAPER PROPERTY THERE?

A. THERE ARE MANY ROADS, MR. HARRIS, TOO MANY ROADS. THERE IS NOT AN EGRESS, THERE ARE SEVERAL EGRESSES.

Q. THAT IS MY POINT. THERE ARE A LOT OF WAYS TO GET TO INTERNATIONAL PAPER PROPERTY FROM BEE TREE?

A. RIGHT.

Q. ONCE YOU LEAVE THE ROAD AT BEE TREE, THE DIRT ROAD AT BEE TREE, IF YOU TAKE A LEFT, ANY NUMBER OF ROADS TAKE YOU TO INTERNATIONAL PAPER, CORRECT?

A. CORRECT.

Q. WHERE YOU CAN CIRCLE ON DIRT ROADS FOREVER, AND EVER, AND EVER?

A. THAT'S RIGHT.

MR. HARRIS: SHERIFF, THANK YOU FOR YOUR TIME.

THE COURT: REDIRECT.

MR. GASSER: WE HAVE NO MORE QUESTIONS FOR MR. HEWETT.

THE COURT: LET'S GO AHEAD AND START THE NEXT WITNESS.

MR. SCHOOLS: CALL PAT MALEY.

A.    YES.   IT WAS AN INTERACTIVE PROCESS OF INFORMATION BACK AND FORTH TRYING TO MAKE A MORE EXACT LOCATION AS TO WHERE ALICE DONOVAN CAN BE.

Q.    HOW LONG WERE YOU WITH BRANDON BASHAM ON THE AFTERNOON OF THE 20TH, DO YOU REMEMBER?

A.    PROBABLY UNTIL AROUND SEVEN.

Q.    THE PRIMARY TASK YOU UNDERTOOK DURING YOUR TIME THERE, THESE DIRECTIONAL -- THIS DIRECTIONAL INFORMATION AND COMMUNICATIONS BACK AND FORTH TO SOUTH CAROLINA; IS THAT RIGHT?

A.    THAT'S RIGHT.

Q.    ANY OTHER INFORMATION HE RELAYED TO YOU REGARDING THAT LOCATION THAT WE HAVEN'T DISCUSSED?

A.    NOT ON THE 20TH.

Q.    NOW, YOU DID -- DID YOU HAVE ANY OTHER PARTICIPATION IN THE -- DIRECT PARTICIPATION IN THE INVESTIGATION AFTER THE 20TH?

A.    I DID.

Q.    WHEN WAS THAT?

A.    ON THE MORNING OF NOVEMBER 25TH WAS A MONDAY.  I CAME TO THE COVINGTON RESIDENT AGENCY.  I CHECKED MY VOICE MAIL.  I HAD A MESSAGE FROM BRANDON BASHAM THAT HE MADE AND LEFT ON MY VOICE MAIL.

Q.    WHAT DID MR. BASHAM WANT?

A.    HE IDENTIFIED HIMSELF.  HE SAID HE WANTED TO TALK OR

SOMETHING TO THAT EFFECT.

Q. WHAT DID YOU DO IN RESPONSE TO RECEIVING MR. BASHAM ON YOUR VOICE MAIL? HOW WOULD HE HAVE KNOWN YOUR PHONE NUMBER, BY THE WAY?

A. I WOULD HAVE LEFT IT WITH HIM.

Q. DURING THE MEETING ON THE 20TH?

A. CORRECT.

Q. WHAT DID YOU DO AFTER YOU GOT A PHONE CALL FROM MR. BASHAM ON THE MORNING OF THE 25TH OR A MESSAGE?

A. I KNEW MR. BASHAM WAS A REPRESENTED PARTY. I NOTIFIED THE UNITED STATES ATTORNEY'S OFFICE THAT THIS SUBJECT MADE CONTACT WITH ME, AND THEN I THEN MADE CONTACT WITH HIS DEFENSE ATTORNEY, MR. HUGHES, IN ASHLAND JUST TO NOTIFY HIM THAT BRANDON HAD LEFT A MESSAGE FOR ME AND THAT HE WANTED TO TALK. I MADE MYSELF AVAILABLE AT ANY TIME, ANYWHERE TO TALK TO MR. BASHAM BECAUSE ALICE DONOVAN WAS STILL UNACCOUNTED FOR.

Q. YOU MENTIONED THAT YOU KNEW MR. BASHAM WAS A REPRESENTED PARTY, SO YOU CONTACTED HIS ATTORNEY RATHER THAN GOING TO MR. BASHAM DIRECTLY?

A. THAT'S CORRECT.

Q. WHY IS THAT?

A. IT IS FBI PROPER POLICY.

Q. THAT YOU DON'T SPEAK DIRECTLY?

A. DON'T SPEAK DIRECTLY TO THE SUBJECT IF HE IS REPRESENTED.

Q.    YOU CALLED HIS ATTORNEY?

A.    CORRECT.

Q.    WHAT HAPPENED  -- WHO WAS HIS ATTORNEY?

A.    RICHARD HUGHES OF ASHLAND, KENTUCKY.

Q.    WHAT HAPPENED AFTER YOU CALLED MR. HUGHES?

A.    AFTER THAT,  I PROBABLY NOTIFIED MYRTLE BEACH,  I DON'T RECALL EXACTLY, BUT I WENT ABOUT BUSINESS BECAUSE ALL I COULD DO IS MAKE MYSELF AVAILABLE FOR THE FBI TO GO TALK TO BRANDON IF HE WISHES TO TALK TO US.   MAYBE AROUND ONE OR 1:30 ON THAT DAY THERE WAS A FLURRY OF CALLS.  I WAS AT MY HOUSE/OFFICE IN COVINGTON.  MYRTLE BEACH RA, POSSIBLY A FEMALE PROSECUTOR FROM THE STATE OF SOUTH CAROLINA.   I WAS NOTIFIED THAT THE U. S. ATTORNEY'S OFFICE IN SOUTH CAROLINA HAD MADE ARRANGEMENTS WITH RICHARD HUGHES FOR HIS CLIENT TO PROVIDE INFORMATION ON THE LOCATION OF THE SUBJECT'S BODY AND TO GET TO ASHLAND -- BOYD COUNTY JAIL, AND DEBRIEF BRANDON BASHAM AS TO THE LOCATION OF ALICE DONOVAN'S BODY.

Q.    SO, YOU UNDERSTOOD THAT THIS WAS GOING TO BE A LIMITED EXCHANGE?

A.    CORRECT.

Q.    WHAT DID YOU DO IN RESPONSE TO THE REQUEST THAT YOU GO SPEAK WITH MR. BASHAM,  MR. HUGHES, OR BOTH?

A.    I DIALED UP SCOTT VITO ON THE CELLPHONE.  IT JUST SO HAPPENED HE WAS IN LOUISVILLE, HEADQUARTER CITY, THAT DAY, WHICH PUT HIM THREE HOURS FROM ASHLAND.   I TOLD HIM TO HEAD

IN THAT DIRECTION. AGAIN, SCOTT VITO WAS THE ONLY AGENT IN THE ASHLAND RESIDENT AGENCY THAT HAD BEEN PART OF THIS CASE. I TOLD HIM I WOULD HEAD UP THERE, AS WELL. WE BOTH HEADED IN THAT DIRECTION AS QUICKLY AS WE COULD.

Q. WHO GOT THERE FIRST?

A. I GOT THERE FIRST AT, APPROXIMATELY, 4:00 O'CLOCK ON NOVEMBER 25TH.

Q. WHEN YOU SAY "WE GOT THERE," WHERE DID YOU GET TO?

A. TO THE BOYD COUNTY JAIL IN CATLETTSBURG, KENTUCKY.

Q. WHAT HAPPENED WHEN YOU GOT THERE?

A. AS I ENTERED THE JAIL, THE ATTORNEY, RICHARD HUGHES, WAS ON A CELLPHONE, AND I BELIEVE HE WAS TALKING TO AN AGENT IN MYRTLE BEACH. AS SOON AS I ENTERED THE JAIL, HE DISCONTINUED THAT PHONE CALL AND WE ARRANGED FOR HIMSELF, MYSELF, AND BRANDON BASHAM TO GET INTO A MORE PRIVATE ROOM. IT WASN'T A WHOLE LOT OF PRIVATE ROOMS AT THE SMALL COUNTY JAIL.

Q. SO, WHERE DID YOU GO?

A. WE WENT TO, I BELIEVE IT WAS THE LEGAL LIBRARY, IF YOU CAN CALL IT THAT. JUST A REAL SMALL LITTLE ROOM. DIDN'T EVEN HAVE ENOUGH CHAIRS TO SIT DOWN. WE STOOD UP. AT THAT POINT IN TIME, MR. HUGHES, AGAIN, ADVISED THAT HE HAD HAD ARRANGEMENTS WITH THE U. S. ATTORNEY'S OFFICE IN SOUTH CAROLINA TO ALLOW HIS CLIENT TO PROVIDE DIRECTIONS TO THE BODY, BUT HE DIDN'T WANT HIS CLIENT TO TALK ABOUT ANYTHING

ELSE OTHER THAN DIRECTIONS TO THE BODY.  OF COURSE, THE ANSWER IS, YES,  WE WILL RECEIVE WHATEVER INFORMATION YOU WANT.  I WAS ALSO VERY HESITANT DUE TO THE FAST-MOVING CIRCUMSTANCES.  AND WHENEVER I INTERVIEW SOMEBODY IN JAIL, I WANT TO BE SURE IT IS VERY CLEAR TO THEM THAT WHATEVER THEY SAY CAN BE USED AGAINST THEM.  SO, OUT OF AN ABUNDANCE OF CAUTION, I READ HIM HIS RIGHTS.  HE ACKNOWLEDGED BY SIGNING THE FORM.  BECAUSE SCOTT VITO HAD NOT ARRIVED YET, AND THERE WAS NO OTHER LAW ENFORCEMENT AROUND, AND THE ATTORNEY IN THE SAME ROOM WITH ME,  I HAD MR. HUGHES WITNESS THE ADVICE OF RIGHTS FORM.

Q.    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S 430. DO YOU RECOGNIZE THAT?

A.    I DO.

Q.    IS THAT THE ADVICE OF RIGHTS FORM THAT MR. BASHAM HAS EXECUTED IN YOURS AND MR. HUGHES' PRESENCE ON NOVEMBER 25TH, 2002?

A.    THAT'S CORRECT.

MR. SCHOOLS:  YOUR HONOR,  WE OFFER GOVERNMENT'S 430, AT THIS TIME.

THE COURT:  ANY OBJECTION? WELL, CONSISTENT WITH MY EARLIER RULING, I WILL ALLOW IT.

BY MR. SCHOOLS:

Q.    I BELIEVE YOU SAID THAT IS YOUR SIGNATURE FIRST AND MR. HUGHES' SIGNATURE BELOW YOURS WITNESSING MR. BASHAM'S

**JA 1366**

SIGNATURE OVER ON THE RIGHT-HAND SIDE OF GOVERNMENT'S 430; IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    AND WHAT TIME IS THAT ADVICE OF RIGHTS EXECUTED, AGENT MALEY?

A.    IT WAS READ AT 4:05.   IT MIGHT SAY 4:20.   IT LOOKS LIKE 4:20.

Q.    NOW,  AFTER YOU READ MR. BASHAM HIS RIGHTS AND MR. HUGHES WITNESSED IT,  WHAT HAPPENED AFTER THAT? WHAT TYPE OF INTERVIEW DID YOU CONDUCT AT THAT POINT,  IF YOU CALL IT AN INTERVIEW?

A.    IT WAS A VERY HECTIC THREE HOURS BECAUSE, BY THE TIME I GOT THERE,  MYRTLE BEACH FEDERAL AND STATE LAW ENFORCEMENT, I GUESS, WERE STANDING READY TO DO A SEARCH FOR ALICE DONOVAN. AND SO, OVER THE NEXT THREE HOURS,  I WAS WORKING PRIMARILY THROUGH MR. HUGHES WHO WAS,  IF YOU WOULD, A MOUTHPIECE FOR THE INFORMATION TO US.   ALTHOUGH DURING THIS PERIOD OF TIME BRANDON BASHAM WAS ALLOWED THROUGH MR. HUGHES TO PROVIDE SOME ADDITIONAL INFORMATION DIRECT, BUT IT WAS ALWAYS -- HE TRIED TO NARROW IT ALONG THE LINES OF RIGHT TURN,  LEFT TURN, LANDMARKS.   AND SO,  WE WENT THROUGH THE PROCESS OF GETTING INFORMATION FROM HIM TO FIND THE EXACT LOCATION OF ALICE DONOVAN.

AND WHAT WE USED AS A BASELINE TO TRY TO COME UP WITH THIS INFORMATION WAS JUST KIND OF A STICK DIAGRAM THAT WAS PROVIDED

BY MR. HUGHES. AND WE STARTED WITH A KNOWN LOCATION. AND WHEN I GOT THERE, IT WAS EXPLAINED TO ME BY MR. HUGHES, WHO ALREADY HAD PREVIOUS DISCUSSION WITH THE MYRTLE BEACH RA, THAT THERE WAS AN AMOCO STATION THAT WAS KNOWN BOTH TO MR. HUGHES, AS WELL AS TO THE INVESTIGATION IN MYRTLE BEACH, THAT HAD BEEN CONFIRMED WHERE THE VICTIM'S BMW EITHER WAS AT OR HAD MADE SOME SORT OF CREDIT CARD PURCHASE. I WAS UNAWARE OF THAT INFORMATION, BUT IT WAS TOLD TO ME BY MR. HUGHES.

WE ALL AGREE THIS IS THE STARTING POINT. NOW, LET'S DRAW A MAP TO THE BODY. THAT IS WHERE WE HAD A STICK DIAGRAM FROM THE AMOCO STATION MAKING MANY TURNS TO WHERE THE BODY WAS. THE DIFFICULT PART WAS GETTING A LEVEL OF SPECIFICITY FROM MR. BASHAM TRANSLATED BY MR. HUGHES TO US SO THAT WE COULD TAKE -- WE COULD GET AS MUCH DETAIL AS WE COULD TO HELP THE PEOPLE ON THE GROUND OF NORTH CAROLINA OR SOUTH CAROLINA FIND THE BODY.

Q. LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S 424, AGENT MALEY -- MAYBE 427. 427. DO YOU RECOGNIZE WHAT IS PICTURED THERE?

A. I DO.

Q. IS THAT THE MAP YOU REFERENCED THAT WAS BEING USED DURING THE COURSE OF THE NOVEMBER 25TH INTERVIEW?

A. THAT IS THE MAP WITH MY HANDWRITTEN NOTES AS WE WENT ALONG.

Q. NOW, SO THE NOTES, SUCH THAT ARE RIGHT THERE, THOSE ARE YOUR NOTES?

A.    RIGHT.

Q.    WHEN YOU FIRST ARRIVED, WHAT DID THAT MAP LOOK LIKE?

A.    IT HAD "AMOCO" WRITTEN ON IT.  IT WAS A STICK DIAGRAM.

Q.    THE ROADS THAT ARE DEPICTED ON GOVERNMENT'S 427, WERE THEY ON THAT MAP?

A.    YES.

Q.    WHAT DID YOU, AND MR. HUGHES, AND MR. BASHAM TRY TO DO ON THE 25TH IN REFERENCE TO THIS MAP?

A.    GET EVERY CONCEIVABLE DETAIL STARTING AT THE AMOCO AND ENDING WHERE THE BODY WAS IN ORDER TO PROVIDE DIRECTION TO LAW ENFORCEMENT IN NORTH OR SOUTH CAROLINA TO FIND THE BODY, WHICH WAS, AGAIN, A VERY ITERATIVE PROCESS.  MR. BASHAM WAS NOT THE MOST ARTICULATE IN GIVING US DIRECTIONS, AND HE HAD TO PROVIDE INFORMATION TO MR. HUGHES, WHO PROVIDED IT TO US,  THE CLARIFICATIONS, QUESTIONS TO MR. HUGHES, TO MR. BASHAM.  WE WOULD GO THROUGH THE CYCLE.  AS WE WERE GOING THROUGH THE CYCLE, ON THE PHONE WITH MYRTLE BEACH TELLING THEM WHAT WE KNOW,  WHERE WE ARE AT,  VARIOUS LANDMARKS.  AND THEN, OF COURSE, THEY WOULD ASK US QUESTIONS, PROBATIVE QUESTIONS THAT WE WOULD THEN GO THROUGH MR. HUGHES, AND THEN GO THROUGH BRANDON.

AND THEN, ALL THE WHILE INSIDE THE JAIL, WE WERE MOVING AROUND THE DIFFERENT ROOMS BECAUSE WE REALLY COULDN'T OCCUPY ANY ONE ROOM BECAUSE OF OTHER PRISONER ACTIVITY.  OUR IDEAL LOCATION WOULD BE THE ADMINISTRATIVE OFFICE, WHICH WAS A

COUPLE OF DESKS. DURING THAT PERIOD OF TIME, THEY HAD TO RUN A JAIL. THEY WOULD RUN US OUT OF THERE, THEY WOULD USE THAT OFFICE, GO OUT TO THE BREATHALYZER ROOM, HAVE THE INTERVIEW THERE. IF MR. BASHAM NEEDED TO SMOKE, GO OUT TO THE SALLY PORT AREA, A CONTROLLED ROOM. A POLICE CAR COMES IN, SEALS THEM UP, THERE IS NO ESCAPE ISSUE. HE WOULD SMOKE OUT THERE, TALK THERE, GO BACK TO THE BREATHALYZER. FREE UP THE ADMINISTRATIVE OFFICE, WE WOULD GO IN THERE AND TALK.

Q. WAS MR. HUGHES IN HIS PRESENCE AT ANY TIME YOU WERE ASKING HIM QUESTIONS ABOUT THIS CASE?

A. WITHOUT A DOUBT, HE WAS PRESENT. THERE WERE OCCASIONS WHEN MR. BASHAM WAS SMOKING OUT AT THE SALLY PORT AREA AND WE MAY HAVE BEEN WITH HIM, AND MR. BASHAM WOULD ATTEMPT TO TALK TO US, AND I WOULD TELL HIM TO STOP TALKING UNLESS HIS ATTORNEY IS PRESENT.

Q. BUT THERE WAS A WHOLE LOT GOING ON THAT DAY?

A. THERE WAS A LOT OF PHONE ACTIVITY. A LOT. I GUESS THE MOST FRUSTRATING PART WAS GETTING THE LEVEL OF DETAIL FROM MR. BASHAM THAT COULD PROVIDE US LANDMARKS, AND THEY WERE FEW AND FAR BETWEEN THAT REALLY HAD A LOT OF SPECIFICITY THAT PEOPLE ON THE GROUND COULD ACTUALLY IDENTIFY AND GUIDE THEM TO THE BODY.

Q. DURING THE COURSE OF THE INTERVIEW OR THE MEETING, DID YOU OVERHEAR OR DID YOU HEAR MR. BASHAM MAKE A NUMBER OF COMMENTS DIRECTLY, OR EITHER TO YOU, OR TO MR. HUGHES IN YOUR

PRESENCE?

A.    HE MADE TWO COMMENTS THAT WERE STARTLING.    AGAIN, MR. HUGHES WAS VERY PROTECTIVE OF HIM AS FAR AS TRYING TO CONTROL HIM.    THEY WOULD HUDDLE AND HE WOULD PROVIDE US INFORMATION. BUT WHEN THEY TALKED ABOUT BEING IN THE OLD RUN-DOWN CEMETERY, THAT IS WHERE HE MADE THE COMMENT WHERE THEY DID, QUOTE, THEIR THING, QUOTE.

Q.    DO YOU RECALL WHERE YOU AND  -- WE HAD MENTIONED AGENT VITO, DID HE ARRIVE SOMEWHERE AFTER THIS MEETING BEGAN?

A.    YES.

Q.    HOW FAR AFTER THE MEETING BEGAN DID MR. VITO ARRIVE?

A.    ABOUT 15 MINUTES.

Q.    WAS HE PRESENT WHEN THIS COMMENT YOU JUST REFERENCED ABOUT THIS BEING "THEIR THING," WAS HE PRESENT?

A.    HE WAS PRESENT THE WHOLE TIME.

Q.    WHERE WERE YOU LOCATED WHEN THIS COMMENT WAS MADE?

A.    THIS PARTICULAR COMMENT, I'M NOT SURE EXACTLY WHERE I WAS.    THE NEXT ONE WHERE HE MADE A COMMENT OF DRAGGING DISTANCE, WE WERE AT THE ADMINISTRATIVE OFFICE FOR SURE.

Q.    WHEN MR. BASHAM MADE THE STATEMENT ABOUT THIS IS WHERE THEY DID THEIR THING, WHO WAS PRESENT?

A.    SCOTT VITO.

Q.    WHO ELSE?

A.    I ASSUME HIS ATTORNEY WAS THERE, AS WELL.

Q.    THE SECOND COMMENT ABOUT DRAGGING DISTANCE?

A.    THE SAME.

Q.    TELL THE JURY ABOUT THAT.   WHERE WERE YOU?   HOW DID THAT COME ABOUT?

A.    SECOND COMMENT WAS WE SPENT -- AS YOU GET THROUGH THIS MAP, ABOUT HALFWAY THROUGH IT YOU COME TO A POINT WHERE, ACCORDING TO MR. BASHAM, DROVE UP ON A HOUSE AND THERE WERE MEN OUT THERE GRILLING.   THAT BECAME IMPORTANT.   IT APPEARED THE PEOPLE IN MYRTLE BEACH KNEW OF THAT LOCATION.   WE SPENT A CONSIDERABLE AMOUNT OF TIME ON THAT LOCATION TO WHERE THE BODY WAS, WHICH WAS REALLY, WHEN YOU REALLY GET DOWN TO IT, IT IS NOT MAYBE BUT A MINUTE'S WORTH OF DESCRIPTIONS, OF WHICH WE SPENT MANY, MANY HOURS GOING OVER THOSE DETAILS TRYING TO GET ANYTHING WE COULD.   AND MR. BASHAM REALLY WAS, OTHER THAN THE MOST GENERAL GUIDANCE, WITH THE PARTICULAR EXCEPTION OF THIS ONE SIGN THAT SAID ANIMAL PARK, ANIMAL FOREST, ANIMAL SOMETHING, THAT WAS THE ONLY HARD LANDMARK THAT HE RECALLED ON THAT DAY.   WHEN WE GOT DOWN TO WHERE THE BODY WAS ACTUALLY LEFT IN THE WOODS, THERE WAS A LOT OF DISCUSSION HOW FAR OFF THE ROAD IT WAS, AND HE MADE THE STATEMENT OF IT WAS "DRAGGING DISTANCE."

Q.    WHERE WERE YOU AT THE TIME HE MADE THAT COMMENT?

A.    DEFINITELY ADMINISTRATIVE OFFICE.   BOTH OF THESE COMMENTS -- TO BACK UP A LITTLE BIT.   EVERYTHING WE GOT WE WERE FEEDING TO MYRTLE BEACH.   AND I THINK ONE OF THE FRUSTRATIONS ON THE OTHER SIDE, YOU KNOW, WE WOULD TELL THEM

ABOUT THIS, YOU KNOW, THE COMMENT, THEY WOULD WANT MORE DETAILS. WHAT ABOUT THIS? WE WERE SAYING, LOOK, WE DON'T HAVE THE AUTHORITY TO PROBE MR. BASHAM. WE CAN ONLY BE, YOU KNOW, THE PEOPLE THERE THAT LISTEN FOR THE STORY.

Q. AGENT MALEY, YOU PREPARED, I BELIEVE, A 302, REPORTED INTERVIEW OF THIS INTERVIEW?

A. THAT'S CORRECT.

Q. WHEN DID YOU PREPARE IT?

A. DECEMBER 2, 2002.

Q. DID YOU SHARE THAT INFORMATION OR THAT DRAFT 302 WITH ANYONE PRIOR TO FINALIZING IT?

A. WITHOUT A DOUBT, SCOTT VITO. I WOULD HAVE -- FBI, IF WE BOTH WITNESSED AN INTERVIEW, ONE PERSON WOULD DRAFT THE REPORT AND SEND IT TO THE OTHER PERSON, THEY WOULD VERIFY ALL OF THE FACTS. ANYTHING WE CAN RESOLVE, WE RESOLVE.

Q. THE TWO COMMENTS YOU JUST DISCUSSED, SPECIFICALLY, THAT MR. BASHAM HAD MADE, ONE REFERENCING "THEIR THING," THE OTHER REFERENCING "DRAGGING DISTANCE," ARE THEY BOTH REFLECTED IN YOUR 302?

A. THEY ARE.

Q. YOUR TERMS ARE, IN FACT, IN QUOTES WITHIN YOUR 302?

A. IN QUOTES.

Q. WHY ARE THOSE WORDS IN QUOTES?

A. BECAUSE DURING THE THREE-HOUR INTERVIEW OF GETTING DIRECTIONS, THESE WERE THE TWO SPIKE POINTS THAT REALLY

STARTLED US. AND THEY WERE -- I THINK ME AND SCOTT TALKED ABOUT THEM MANY TIMES, ESPECIALLY THE FIRST ONE, WHAT DOES IT MEAN, AND THE INTENT, AND CERTAINLY WE WOULD BE SPECULATING ON THAT.

Q. ANY DOUBT IN YOUR MIND, AGENT MALEY, THAT MR. BASHAM MADE THOSE STATEMENTS?

A. NO DOUBT IN MY MIND, OR I WOULDN'T HAVE QUOTED THEM. CONTRAST THAT WITH ANIMAL PARK SIGN. WHEN I GOT -- WE NEVER COULD NAIL HIM DOWN ON WHETHER IT WAS ANIMAL PARK OR ANIMAL FOREST, SO WE, AGAIN, WE WERE TRYING TO BE AS SPECIFIC AS WE COULD. AND THE AMOUNT OF TIMES THAT WE WENT OVER THIS INFORMATION, WHICH IS ABOUT THREE OR FOUR MINUTES' WORTH OF DIRECTION WAS THREE HOURS.

Q. THE MEETING TOOK ABOUT THREE HOURS?

A. ABOUT THREE HOURS.

Q. AGENT VITO -- EXCUSE ME, AGENT MALEY. KEPT CALLING HIM MALEY, TOO. DID YOU, THE NEXT DAY, RECEIVE SOME ADDITIONAL INFORMATION FROM MR. HUGHES, THE NEXT DAY BEING NOVEMBER 26, 2002?

A. IT WAS LATE ON THE 26TH IF NOT AFTER MIDNIGHT ON THE 27TH. IT WAS IN THAT WINDOW OF TIME. I WAS AT MY RESIDENCE. I EITHER GOT A PAGE, OR A CELLPHONE CALL, OR CALL PATCHED THROUGH TO MY HOUSE. I DEFINITELY GOT A CALL FROM MR. HUGHES THAT NIGHT.

Q. WHAT WAS THE PURPOSE OF MR. HUGHES' CALL?

HEWETT, AND I ASKED HIM IF HE COULD TAKE SOME DIGITAL
PHOTOGRAPHS OF THE AREA AROUND THE BEE TREE FARM, AND
DIFFERENT INTERSECTIONS, AND DIFFERENT HOUSES, AND LANDMARKS
IN THE AREA, AND E-MAIL THEM TO ME, AND THEN I WOULD E-MAIL
THEM TO MR. HUGHES.  SO, THAT IS WHAT WE DID.

Q.     AND THEN, EVENTUALLY, ON WEDNESDAY, NOVEMBER 27TH,
2002,  WAS A DECISION MADE TO BRING OR FLY BRANDON BASHAM FROM
KENTUCKY TO THE STATE OF SOUTH CAROLINA?

A.     YES, IT WAS.

Q.     WHAT WAS YOUR UNDERSTANDING, WITH REGARDS TO DEALING
WITH MR. HUGHES,  WHAT WAS YOUR UNDERSTANDING THAT MR. BASHAM
WANTED TO ATTEMPT TO DO WITH LAW ENFORCEMENT WHEN HE GOT TO
SOUTH CAROLINA.

A.     IT WAS MY UNDERSTANDING THAT MR. BASHAM WANTED TO COME
TO SOUTH CAROLINA AND ACTUALLY SHOW US INSTEAD OF GOING BACK
AND FORTH ON A PHONE.  IF HE CAME TO SOUTH CAROLINA, HE WOULD
BETTER BE ABLE TO SHOW US EXACTLY WHAT HE WAS TALKING ABOUT
AND BRING US TO THE LOCATION OF WHERE MS. DONOVAN'S BODY WOULD
BE.

Q.     ARE YOU AWARE ON THAT WEDNESDAY, NOVEMBER 27TH,  MR.
BASHAM WAS FLOWN FROM KENTUCKY TO SOUTH CAROLINA?

A.     YES.

Q.     THAT AFTERNOON, WAS BRANDON BASHAM PRESENT IN A FEDERAL
MAGISTRATE'S COURT IN FLORENCE, SOUTH CAROLINA, BEFORE A
FEDERAL JUDGE?

**JA 1375**

A.    YES, HE WAS.

Q.    FEDERAL MAGISTRATE JUDGE?

A.    YES.

Q.    WAS HE PROVIDED TWO DEFENSE LAWYERS AT THAT HEARING ON WEDNESDAY, NOVEMBER 27TH?

A.    YES, HE WAS.

Q.    WAS THERE A DECISION MADE THEN TO PUT MR. BASHAM ON THE GROUND UP IN BRUNSWICK COUNTY, NORTH CAROLINA, ON THANKSGIVING DAY, THAT NEXT THURSDAY?

A.    YES, IT WAS.

Q.    DID YOU PARTICIPATE IN COORDINATING THOSE EFFORTS?

A.    YES, I DID.

Q.    WHO IN THE U. S. ATTORNEY'S OFFICE WERE YOU DEALING WITH ON THIS MATTER?

A.    ASSISTANT U. S. ATTORNEY ROSEMARY PARHAM WAS MY POINT OF CONTACT IN FLORENCE.

Q.    MS. PARHAM IS AN AUSA, UNITED STATES ASSISTANT ATTORNEY, IN THE U.S. ATTORNEY'S OFFICE IN FLORENCE?

A.    YES.

Q.    CAM LITTLEJOHN AND JOHN MONCKTON WERE THE TWO ATTORNEYS APPOINTED BY JUDGE ROGERS?

A.    YES.

Q.    WHAT WAS YOUR UNDERSTANDING, IF ANY, OF ANY DEALS BETWEEN THE GOVERNMENT, U. S. ATTORNEY'S OFFICE, MR. BASHAM, AND HIS ATTORNEYS?

A.    ABSOLUTELY NO DEALS BETWEEN ANY OF THE PARTIES.    IT WAS SIMPLY BRANDON REQUESTED TO COME UP TO SOUTH CAROLINA AND SHOW US WHERE WE COULD FIND MS. DONOVAN'S BODY.

Q.    WAS IT YOUR UNDERSTANDING THAT WHATEVER OCCURRED THE NEXT DAY, THANKSGIVING DAY, ANYTHING THAT WAS SAID, ANY DEMONSTRATIONS THAT WERE MADE WOULD BE FAIR GAME, COULD BE USED AGAINST MR. BASHAM?

A.    THAT WAS MY BELIEF, YES.

Q.    YOUR PLAN ON THANKSGIVING DAY, NOVEMBER 28TH, 2002, WAS WHAT, AGENT LONG?

A.    THE PLAN WAS TO MEET BRANDON UP AT THE BEE TREE FARM HOUSE, DEER CAMP, AND START FROM THERE.    THAT WAS A KNOWN POINT.    WE KNEW, OR I KNEW THAT BRANDON RECOGNIZED IT.    WE KNEW HE WAS SEEN THERE.    AND SO, WE WERE GOING TO START FROM THERE AND THEN LET HIM LEAD US, BASED ON THESE DIRECTIONS THAT I HAD BEEN OBTAINING THROUGH PHONE CALLS WITH MR. HUGHES, LET HIM LEAD US TO WHERE THE DIRT ROAD WAS WHERE MS. DONOVAN COULD BE FOUND.

Q.    NOW, APPROXIMATELY, HOW FAR IS IT FROM THE CONWAY WAL-MART TO SAY THE CAROLINA FIRST BANK THAT THE JURY HAS HEARD INFORMATION THAT MS. DONOVAN'S ATM CARD WAS USED IN THE MACHINE, SEEN A VIDEO THERE IN LITTLE RIVER ON HIGHWAY 17, ABOUT HOW FAR IS THAT?

A.    I THINK IT IS ABOUT 15 MILES, MAYBE.

Q.    AND THEN, AT OUR REQUEST, DID YOU ACTUALLY DRIVE THE

DISTANCE FROM THE CAROLINA FIRST BANK THERE ON HIGHWAY 17 ALMOST DIAGONALLY ACROSS FROM THE LAKE SHORE MOTEL, DID YOU DRIVE FROM THERE TO THE DODGE AMOCO STATION IN SHALLOTTE, NORTH CAROLINA?

A.    YES.

Q.    HOW MANY AUTO MILES WAS THAT?

A.    I BELIEVE IT WAS 14 MILES.

Q.    THEN FROM THE SHALLOTTE AMOCO GAS STATION UP HIGHWAY 17 UP TO GREEN HILL ROAD, THE TURNOFF IS APPROXIMATELY HOW MANY MILES?

A.    ABOUT 20 MILES.

Q.    I BELIEVE WE HEARD FROM THAT POINT TO BEE TREE FARM ROAD IS ABOUT EIGHT MILES; IS THAT CORRECT?

A.    THAT WOULD BE CORRECT, YES.

Q.    THE JURY HAS HEARD TESTIMONY AND SEEN MULTIPLE TIMES THE CEMETERY RIGHT THERE OFF OF BEE TREE FARM ROAD. HOW FAR EXACTLY IS IT FROM THE HUNT CLUB, THE BUILDING ITSELF, TO THE CEMETERY THERE ON BEE TREE FARM ROAD?

A.    EXACTLY NINE-TENTHS OF A MILE.

Q.    NOW, ON THURSDAY MORNING, NOVEMBER 28TH, WHAT WAS YOUR MEANS OF TRANSPORTATION THAT MORNING? HOW WERE YOU GETTING AROUND?

A.    I DROVE MY OWN GOVERNMENT CAR FROM MY OFFICE IN MYRTLE BEACH DIRECTLY TO BRUNSWICK COUNTY.

Q.    AND WHEN IS THE FIRST TIME YOU MET UP WITH SHERIFF

HEWETT?

A.    FIRST TIME I MET WITH SHERIFF HEWETT WAS WHEN HE ARRIVED AT THE BEE TREE FARM.

Q.    SO, YOU DID NOT ACTUALLY GO TO THAT INTERSECTION ON HIGHWAY 17 THAT THE SHERIFF PREVIOUSLY DESCRIBED?

A.    CORRECT.  I DID NOT GO TO THAT INTERSECTION.  I DID MAKE A STOP AT A KIND OF A RECREATION AREA.  WE HAD LAW ENFORCEMENT STANDING BY, AND FROM THERE I WENT DIRECTLY TO THE BEE TREE FARM.

Q.    WHICH THEN MY NEXT QUESTION IS, YOU DIDN'T GO TO THE AMOCO STATION, EITHER?

A.    NO, SIR.

Q.    WHEN YOU GOT TO THE BEE TREE FARM HUNT CLUB, DID YOU GO TO THE PHYSICAL BUILDING, ITSELF?

A.    YES, I DID.

Q.    AND WAS MR. BASHAM PRESENT THERE, OR DID YOU HAVE TO WAIT ON THE VAN TO GET THERE?

A.    I MIGHT HAVE WAITED, I DON'T KNOW, TEN MINUTES OR SO, UNTIL THE VAN ARRIVED.

Q.    AND WHEN THE VAN ARRIVED, DID YOU WANT TO MEET MR. BASHAM YOURSELF?

A.    YES, I DID.

Q.    AND WERE INTRODUCTIONS MADE?

A.    YES, THEY WERE.

Q.    I BELIEVE MR. LITTLEJOHN, ONE OF HIS LAWYERS, WAS

Q.    NOW, MR. BASHAM, THROUGH MR. HUGHES, ALSO SAID WHEN THEY LEFT THE DEER PARK, THEY DROVE FOR ABOUT 20 MINUTES BEFORE THEY GOT OUT ON HARDTOP, CORRECT?

A.    YES, SIR.

Q.    NOW, THE ROAD FROM THE DEER PARK TO THE HARDTOP OR TO ONE OF THE HARDTOPS IN THAT AREA IS WHAT, ABOUT, NINE-TENTHS OF A MILE? WE HAVE ALREADY ESTABLISHED THAT?

A.    NINE-TENTHS TO THE CEMETERY, MAYBE A COUPLE MORE TENTHS TO THE INTERSECTION OF THAT FIRST HARD ROAD.

Q.    SO, IF THE INFORMATION THAT WAS BEING RELAYED THROUGH MR. BASHAM, TO MR. HUGHES, TO YOU, IT WAS 20 MINUTES FROM LEAVING THE DEER PARK BEFORE THEY GOT BACK TO THE BLACKTOP. THERE WAS OBVIOUSLY SOME OTHER TURN, SOME OTHER AREA THEY WERE GOING TO, CERTAINLY WOULDN'T TAKE 20 MINUTES TO GO NINE-TENTHS OF A MILE, CORRECT?

A.    IF YOU WERE UP THERE AND YOU HAD FAMILIARITY WITH IT, WHICH I HADN'T AT THE TIME, YES, YOU WOULD KNOW RIGHT OFF THE BAT THAT THAT IS AN IMPOSSIBILITY. BUT LIKE I SAID, I WASN'T FAMILIAR ENOUGH TO SAY TO MR. HUGHES, THAT IS NOT TRUE. IT CAN'T BE. HE IS FORGETTING A TURN OR SOMETHING. THAT IS WHAT PROMPTED ME TO CALL THE SHERIFF TO SEE IF WE COULD GET AN EXPERT WHEN HE STARTED WITH HIS DIRECTIONS.

Q.    NOW, FROM WHAT YOU KNEW, THERE WERE NO DEALS WITH MR. BASHAM. SO ANYTHING HE WAS TELLING YOU THROUGH MR. HUGHES, I WANT TO MAKE THAT CLEAR, WAS INFORMATION THAT COULD BE USED

Q. AGAINST HIM?

A. NO QUESTION ABOUT THAT.

Q. AS FAR AS YOU KNEW, AS FAR AS YOU WERE CONCERNED, THAT WAS THE CASE?

A. CORRECT.

Q. NOW, HE GETS DOWN TO SOUTH CAROLINA AND YOU MAKE ARRANGEMENTS TO GO OUT THERE ON THE 28TH?

A. YES, SIR.

Q. AND THE INFORMATION, BASED ON WHAT HE HAD GIVEN YOU THROUGH MR. HUGHES, HE HAD OBVIOUSLY IDENTIFIED SEVERAL LANDMARKS THAT YOU ALL HAD FOUND CREDIBLE, CORRECT?

A. CORRECT, THAT WE COULD ESTABLISH THAT AN INDEPENDENT WITNESS HAD SEEN HIM OR THEM AT THOSE LOCATIONS, SO THAT WE CORROBORATE THAT PART OF IT, YES.

Q. AND AS WE SAID, HE DID NOT KNOW THAT YOU KNEW THAT WHEN HE GAVE THAT INFORMATION?

A. I DON'T BELIEVE SO, NO.

Q. AS FAR AS YOU KNOW?

A. AS FAR AS I KNOW.

Q. HE WAS GIVING IT TO YOU THROUGH MR. HUGHES, YOU WERE GETTING IT, CORRECT?

A. I COULD ONLY SAY THAT I DID NOT PROVIDE ANY OF THAT INFORMATION TO MR. HUGHES.

Q. YOU ARE NOT AWARE OF --

A. I DON'T KNOW IF MR. HUGHES HAD SPOKEN TO ANYONE ELSE

THAT HE MIGHT HAVE GOTTEN INFORMATION FROM.

Q.    YOU AREN'T AWARE OF IT, ARE YOU?

A.    I WASN'T AWARE OF IT.

Q.    NOW, ON THE 28TH WHEN YOU WENT UP THERE, AGAIN, THE SAME SITUATION EXISTED, THAT ANYTHING HE DID OR SAID DURING THAT DAY COULD BE USED AGAINST HIM?

A.    I BELIEVE EVERYBODY UNDERSTOOD THAT, YES.

Q.    THERE WAS NO PROTECTION BEING AFFORDED HIM FOR WHAT HE WAS SAYING OR DOING?

A.    CORRECT.

Q.    CORRECT.  AND YOU WERE CLEAR ABOUT THAT?

A.    I BELIEVE SO.

Q.    NOW, DURING THAT DAY WHILE YOU WERE OUT THERE, IT IS TRUE, IS IT NOT, THAT THERE WERE CERTAIN THINGS THAT WERE SHOWN TO MR. BASHAM.  FOR EXAMPLE, CERTAIN PHOTOGRAPHS THAT WERE SHOWN TO HIM THAT HE SAID WERE FAMILIAR, CORRECT?

A.    YES, SIR.

Q.    LIKE AS TO LOCATIONS.  THERE WERE CERTAIN PHOTOGRAPHS HE WAS SHOWN THAT HE SAID WERE NOT FAMILIAR, CORRECT?

A.    ARE YOU REFERRING TO WHEN HE FIRST SAW THEM WITH MR. HUGHES OR WHEN HE SAW THEM AGAIN?

Q.    I AM TALKING NOW ABOUT ON THE 28TH.

A.    OKAY.

Q.    WELL, GO BACK TO THE 25TH FIRST.  ON THE 25TH, CLEARLY, HE DID NOT SAY HE RECOGNIZED EVERYTHING, CORRECT?

A.    CORRECT.

Q.    YOU SAID SOME LOOKED FAMILIAR, SOME DID NOT?

A.    CORRECT.

Q.    SO, HE WASN'T BUYING IN A HUNDRED PERCENT TO ANYTHING YOU WERE JUST SENDING UP THERE, CORRECT?

A.    JUST ASKED MR. HUGHES TO SHOW HIM THE PHOTOGRAPHS AND REPORT BACK TO ME ON ANYTHING HE RECOGNIZED. AGAIN, HELP FACILITATE THESE DIRECTIONS THAT WE WERE GETTING.

Q.    FOR EXAMPLE, BEE TREE FARMS. YOU HAD A SIGN FOR BEE TREE FARMS, BUT MR. BASHAM, EVEN THOUGH YOU KNEW HE HAD BEEN THERE AND HE HAD SAID HE HAD BEEN THERE, HE DIDN'T TELL YOU HE RECOGNIZED THAT SIGN, CORRECT? IN FACT, HE SAID HE DIDN'T RECOGNIZE THAT SIGN?

A.    THAT'S CORRECT.

Q.    THAT CONTINUED ON THE 28TH WHEN HE WAS SHOWN CERTAIN THINGS WHEN YOU FIRST GOT THERE?

A.    YES. WE STARTED -- WE GOT IN A VAN, AND AS WE STARTED OUT, SHERIFF HEWETT SHOWED SOME OF THE PHOTOGRAPHS TO HIM.

Q.    RIGHT. BECAUSE SHERIFF HEWETT WAS FAMILIAR WITH THAT AREA?

A.    CORRECT.

Q.    NOW, YOU SPENT SEVERAL HOURS OUT THERE THAT DAY?

A.    YES, SIR.

Q.    AND YOU WOULD AGREE, AT BEST, THAT IS A MAZE BACK THERE, HUNDREDS OF MILES OF ROADS, DIRT ROADS?

A.    THERE ARE A LOT OF DIRT ROADS.

Q.    A LOT OF DIRT ROADS.   AND A LOT OF TREES?

A.    YES, SIR.

Q.    AND YOU COULD RIDE FOR QUITE A LONG DISTANCE BEFORE YOU SAW ANY LANDMARK OTHER THAN A DIRT ROAD AND A TREE?

A.    THERE WERE SOME ROADS THAT WERE RURAL, BUT, USUALLY, WE CAME ACROSS A HOUSE OR SOMETHING,  SOME LIVING AREA.   I MEAN, IT WASN'T LIKE WE TRAVELLED FOR HOURS OUT IN THE WILDERNESS. THERE WERE ROADS, AND HOUSES, AND CABINS, AND THINGS LIKE THAT ALONG THE WAY.

Q.    THERE ARE ALSO STRETCHES OF ROADS THAT WERE JUST PLAIN DIRT ROADS WITH NOTHING ON THEM?

A.    CORRECT,  THERE WERE.

Q.    AND AT THE END OF THE DAY,  I MEAN,  IT IS FAIR TO SAY THAT NOBODY REALLY KNEW WHERE THEY WERE OR WHERE THEY HAD REALLY BEEN; ISN'T THAT TRUE? I MEAN,  THAT HAS BEEN SAID, HASN'T IT, PEOPLE WHO HAD BEEN THERE THE FIRST TIME?  I AM NOT TALKING ABOUT SHERIFF HEWETT?

A.    I WAS GOING TO SAY SHERIFF HEWETT KNEW.

Q.    PEOPLE WHO HAD BEEN THERE THE FIRST TIME,  THEY DIDN'T REALLY KNOW WHERE THEY WERE OR WHERE THEY HAD BEEN; ISN'T THAT TRUE?

A.    CORRECT, TO SOME DEGREE,  YES.

Q.    THAT WAS A BRIGHT,  SUNNY DAY?

A.    YES,  IT WAS.

**JA 1384**

Q.    AND THIS PHONE NUMBER, YOU UNDERSTAND, SUBPOENA WAS SERVED ON AT&T TO GET CERTAIN RECORDS FROM THE PHONE NUMBER THAT YOU AND YOUR MOM WERE USING BACK IN DECEMBER OF 2002, DO YOU UNDERSTAND THAT NOW?

A.    YES, SIR, I DO.

Q.    THE NUMBER I HAVE CIRCLED ON GOVERNMENT'S 444 IS WHOSE NUMBER?

A.    MY NUMBER. MY MOM'S NUMBER. HOME TELEPHONE NUMBER.

Q.    AGAIN, SHOWING YOU PAGE TWO OF GOVERNMENT'S EXHIBIT 444, DO YOU SEE THIS ENTRY THAT I HAVE NOW CIRCLED ON DECEMBER 24TH, 2002, DO YOU SEE THAT?

A.    YES, SIR, I DO.

Q.    NOW, THAT WOULD HAVE BEEN AT 12:40 IN THE AFTERNOON ON CHRISTMAS EVE; IS THAT CORRECT?

A.    YES, SIR, THAT IS CORRECT.

Q.    WHOSE NUMBER IS THAT 270 NUMBER?

A.    THE 270 NUMBER IS MY MOM'S HOME PHONE NUMBER.

Q.    270-383-5259?

A.    YES, SIR. THAT PHONE IS LISTED IN MY NAME, IT IS IN MY MOTHER'S HOME, IT IS HER HOME.

Q.    DO YOU SEE WHERE IT HAS UNDER THE COLUMN THAT SAYS ORIGINATING NUMBER, CORRECT, THAT COLUMN SAYS ORIGINATING NUMBER?

A.    YES, SIR.

Q.    SO, UNDER THE COLUMN OF ORIGINATING NUMBER, WOULD YOU

PLEASE PUBLISH INTO THE RECORD THAT NUMBER RIGHT THERE?  DO YOU SEE IT, 803?

A.    YES, SIR.

Q.    IS THAT 803-935-0117?

A.    YES, SIR, THAT IS CORRECT.

Q.    ON DECEMBER 24TH, 2002, AT, APPROXIMATELY, 12:40 IN THE AFTERNOON, YOUR MOTHER, YOURS AND YOUR MOTHER'S PHONE NUMBER, OR YOUR PHONE IN YOUR HOME IN EARLINGTON, KENTUCKY, THERE WAS A CALL, COLLECT CALL PLACED TO YOUR HOME PHONE FROM THE ORIGINATING NUMBER AT 803-935-0117; IS THAT CORRECT?

A.    YES, THAT'S CORRECT.

Q.    IT IS YOUR TESTIMONY THAT CALL WAS PLACED BY BRANDON BASHAM?

A.    YES, SIR.

MR. GASSER:  THE GOVERNMENT WOULD STIPULATE THAT 803-935-0117 IS A PHONE THAT IS AT JUST CARE OR COLUMBIA CARE HERE IN THE CITY OF COLUMBIA.  THE GOVERNMENT AND DEFENSE STIPULATE.

THE COURT:  IS THAT A CORRECT STATEMENT OF THE STIPULATION?

MR. SWERLING:  YES, SIR.

THE COURT:  ALL RIGHT.

MR. GASSER:

Q.    WHEN YOU GOT ON THE PHONE, MR. JAY  -- BEG THE COURT'S INDULGENCE, I'M SORRY.

MR. GASSER: YOUR HONOR, THE GOVERNMENT AND DEFENSE COUNSEL FOR MR. BASHAM WOULD ALSO STIPULATE AND AGREE THAT COLUMBIA CARE WAS THE FACILITY THAT BRANDON BASHAM WAS BEING HOUSED AT ON DECEMBER 24TH, 2002.

MR. SWERLING: THAT'S CORRECT.

BY MR. GASSER:

Q. MR. JAY, YOU PREVIOUSLY INDICATED TO THE JURY THAT IN DECEMBER OF 2002 YOU WERE AWARE THAT MR. BASHAM HAD BEEN CHARGED WITH OFFENSES RELATED TO A WOMAN IN SOUTH CAROLINA NAMED ALICE DONOVAN; IS THAT CORRECT?

A. YES, SIR, THAT IS CORRECT.

Q. SO, WHEN YOU GOT ON THE PHONE, WHICH ONE OF THE -- DESCRIBE FOR THE JURY THE CONVERSATION YOU HAD WITH MR. BRANDON BASHAM.

A. I SPECIFICALLY REMEMBER WHEN I GOT THE PHONE HE SAID TO ME, "HELLO, MR. C. J., THIS IS BRANDON." AND I SAID, "HELLO, BRANDON." I SAID, "HOW ARE YOU"? AND HE SAID, "NOT SO GOOD." HE SAID, "YOU KNOW, I AM IN A LOT OF TROUBLE." AND I SAID, "YES, I HEARD." THERE WAS PROBABLY A FIVE, SIX-SECOND PAUSE WHERE I WAS SORT OF LIKE REALLY ELATED EVEN FROM THE PHONE CALL, BUT BEING SAD ALSO. I ASKED HIM AFTER THAT FIVE, SIX SECOND, "DID YOU DO -- I JUST WANT TO KNOW IF YOU DID WHAT THEY SAID YOU DID"? AND HE SAID, "YES, SIR. WE KILLED THEM." AND THEN I SPECIFICALLY REMEMBER HIM SAYING "THEM," BECAUSE IT STRUCK ME BY COMPLETE AND UTTER SURPRISE

BECAUSE I HAD SEEN THE NAME ALICE DONOVAN, AND I KNEW THE REPORT HAD -- THE PAPER HAD TOLD REPORTS OF ONE FEMALE, BUT IN HIS CONVERSATION HE SAID THAT "WE KILLED THEM." I THINK I MUST HAVE WAITED AROUND PROBABLY ABOUT 30 SECONDS. I DON'T THINK A MINUTE WENT BY. I AM TRYING TO THINK. I NEED TO CALL SOMEONE. AND I DID. AND I CALLED THE MADISONVILLE POLICE DEPARTMENT, TALKED TO THE SHERIFF'S DEPARTMENT, AND I REPORTED THIS.

Q. WHEN YOU SAY YOU WAITED ABOUT 30 SECONDS TO A MINUTE, YOU MEAN AT THE CONCLUSION OF YOUR PHONE CALL WITH MR. BASHAM?

A. YES, SIR. AT THE CONCLUSION OF THE PHONE CALL, YES, SIR.

Q. THERE WERE SOME OTHER THINGS, SOME OTHER CONVERSATION THAT TOOK PLACE BETWEEN YOU AND MR. BASHAM, WAS THERE NOT?

A. YES, SIR, THERE WAS.

Q. WHEN YOU FIRST GOT ON THE PHONE AND YOU ASKED MR. BASHAM HOW HE WAS DOING AND HE SAID NOT SO GOOD, DID HE TELL YOU WHAT WAS FACING HIM?

A. I DON'T REMEMBER, SPECIFICALLY, IF HE TOLD ME OR NOT. I REMEMBER THE CONVERSATION GOING AS, NOT DOING SO GOOD, AND THEN I GET TO THE POINT WHERE I ASK HIM, I SAID, WELL, DID YOU DO WHAT THEY SAID YOU DID? HE SAID, YES, SIR. WE KILLED THEM.

Q. DID HE INDICATE TO YOU THAT HE WAS POSSIBLY FACING THE DEATH PENALTY, DO YOU REMEMBER THAT?

JA 1388

A.    IT MAY HAVE BEEN.   IT IS VAGUE, IN MY MIND, THAT PART. BUT I DO KNOW, AS THE CONVERSATION CONTINUED, I WENT ON TO SAY TO HIM, I SAID, "WELL, BRANDON, YOU KNOW, THIS IS NOT THE END OF IT."  AND I WENT ON TO TELL HIM THE STORY IN THE BIBLE OF A MAN AND SPECIFICALLY THE WAY I SAID IT, I SAID, DO YOU  -- THERE WAS A STORY OF A MAN WHO HAD 99 SHEEP AND HE KILLED ONE MAN'S EWE LAMB.   AND THIS MAN, THE PROPHET NATHAN WENT TO DAVID AND HE TOLD KING DAVID OF THIS.   AND KING DAVID SAID TO HIM, IF I KNEW WHO DID THIS, I WOULD PUNISH THEM, AND HE WENT ON, AND HE WENT ON.   AND THEN NATHAN, THE PROPHET SAID TO HIM, WELL IT WAS YOU, KING DAVID.   I SAID, YOU SEE, DAVID, AND I WENT ON TO TELL HIM THE STORY THAT DAVID HAD A WOMAN'S HUSBAND PUT ON THE FRONT LINE, HE ARRIVED AND HAD HIM KILLED SO HE COULD HAVE HER.   I SAID, EVEN THOUGH DAVID COMMITTED THOSE OFFENSES THAT WERE AGAINST GOD, I SAID GOD FORGAVE HIM.  I SAID, HE WILL FORGIVE YOU, TOO, BRANDON.

Q.    THIS BIBLICAL STORY YOU SHARED WITH BRANDON BASHAM ON THE PHONE?

A.    YES, SIR.

Q.    I AM NOT TRYING TO PRY, MR. JAY, BUT ARE YOU A BORN-AGAIN CHRISTIAN?

A.    YES, SIR, I AM.

Q.    DO YOU SHARE YOUR FAITH WITH PEOPLE THAT YOU KNOW, YOUR FRIENDS, AND OTHER PEOPLE THAT YOU KNOW?

A.    YES, SIR.   AND EVEN PEOPLE I DON'T KNOW WELL.

Q.    DID YOU SHARE IT WITH MR. BASHAM ON THE PHONE WHEN YOU WERE HAVING THIS CONVERSATION WHEN HE CALLED YOU?

A.    YES, I DID.

Q.    DID YOU ASK MR. BASHAM IF HE WAS SAVED?

A.    YES, I DID.

Q.    WHAT WAS HIS RESPONSE?

A.    HE SAID, YES, SIR.  I WANTED TO BE SURE.  I SAID, HAVE YOU ACCEPTED JESUS CHRIST AS YOUR PERSONAL SAVIOR? AND HE SAID, YES.

Q.    THIS CONVERSATION THAT YOU WERE HAVING WITH MR. BASHAM THAT DAY, DID YOU HAVE ANY DIFFICULTY IN UNDERSTANDING HIM, MR. JAY?

A.    NO, SIR, NOT AT ALL.

Q.    DID HE APPEAR TO BE COHERENT TO YOU?

A.    YES, SIR, VERY COHERENT.

Q.    AS HIS COUNSELOR FOR THREE TO FOUR YEARS, WERE YOU SURPRISED THAT HE HAD REACHED OUT TO YOU ON CHRISTMAS EVE?

A.    NO, SIR, NOT REALLY.  IF I MAY ELABORATE, IF I CAN, I DEALT WITH HIM AND KEPT HIM PROBABLY AS MUCH AS HIS PARENTS. BECAUSE WHEN I HAD HIM IN SCHOOL, I OFTENTIMES HAD TO DISCIPLINE HIM IN SOME WAY OR THE OTHER.

Q.    AND HE, KIND OF BY DISCIPLINING HIM, HE KIND OF LOOKED UP TO YOU; IS THAT CORRECT?

A.    YES, SIR, HE DID.

Q.    NOW, YOU PREVIOUSLY INDICATED TO THE JURY THAT WHEN

A.    OFFICE MAX.

Q.    THAT IS IS AN OFFICE MAX?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    AND THIS BUILDING HERE THAT I HAVE CIRCLED?

A.    FAZOLI'S.

Q.    FAZOLI'S, KIND OF AN ITALIAN RESTAURANT-TYPE PLACE?

A.    YES.

Q.    THERE IS A STRUCTURE NEXT TO IT?

A.    TEXAS ROADHOUSE.

Q.    TEXAS ROADHOUSE RESTAURANT?

A.    YES.

Q.    YOU SAID THE MOVIE LET OUT AROUND SEVEN, SEVEN-THIRTY. WHERE DID YOU AND YOUR MOTHER GO AFTER THE MOVIE LET OUT?

A.    WENT TO THE WAL-MART ACROSS THE STREET.

Q.    DID YOU WALK ACROSS THE STREET TO THE WAL-MART, OR HOW DID YOU GET THERE?

A.    WE DROVE.

Q.    WHAT KIND OF CAR DOES YOUR MOTHER HAVE?

A.    TOYOTA COROLLA.

Q.    TOYOTA COROLLA.  TWO-DOOR CAR OR FOUR-DOOR CAR?

A.    FOUR DOOR.

Q.    WHEN YOU GOT TO THE WAL-MART,  WHAT DID YOU DO ONCE YOU ARRIVED AT THE WAL-MART?

A.    WE WENT INTO THE WAL-MART.

Q.    WENT INSIDE THE WAL-MART?

A.    YES.

Q.    HOW LONG WERE YOU IN THE WAL-MART?

A.    AROUND 30, 45 MINUTES.

Q.    AFTER YOU CAME OUT OF THE WAL-MART, WHAT DID YOUR MOTHER DO WHEN YOU FIRST CAME OUT OF THE WAL-MART?

A.    SHE STOPPED TO GET A DRINK.

Q.    SHE STOPPED TO GET A DRINK?

A.    YES.

Q.    WHAT DID YOU DO, AT THAT POINT?

A.    I TOOK THE KEYS AND WALKED A LITTLE BIT AHEAD OF HER TALKING ON MY CELLPHONE.

Q.    YOU WERE TALKING ON YOUR CELLPHONE?

A.    YES.

Q.    AFTER YOU STARTED WALKING TOWARDS THE CAR WITH THE KEYS, WHAT DID YOU DO NEXT?

A.    I UNLOCKED THE DOOR AND SAT DOWN.

Q.    WHEN YOU SAID YOU UNLOCKED THE DOOR AND SAT DOWN, WHICH DOOR ARE YOU REFERRING TO?

A.    THE PASSENGER SIDE.

Q.    IS THAT THE FRONT PASSENGER SIDE?

A.    YES.

Q.    AT THIS POINT, ARE YOU STILL TALKING ON THE CELLPHONE?

A.    YES.

Q.    TELL THE JURY WHAT YOU SAW AFTER YOU SAT DOWN IN THE PASSENGER SEAT WHILE YOU WERE STILL TALKING ON THE CELLPHONE?

A.   I SAT DOWN AND A MAN APPROACHED ME ASKING FOR DIRECTIONS TO, I BELIEVE, GREENVILLE, KENTUCKY.   I TOLD HIM I WASN'T GOOD WITH DIRECTIONS.  THEN MY MOTHER CAME UP AND SHE ALSO SAID THAT WE WEREN'T GOOD WITH DIRECTIONS.   AND HE PROCEEDED TO GET IN THE CAR TO WHERE MY DOOR IS AND WAS ALMOST ON MY LAP.   SHE KEPT SAYING WE DIDN'T KNOW WHERE IT WAS,  HE STILL KEPT GOING CLOSER AND CLOSER TO THE DOOR JAM.

Q.   WHEN THE MAN FIRST APPROACHED,  WHICH DIRECTION DID HE COME FROM IN RELATION TO WHERE YOU WERE SITTING IN THE PASSENGER AREA OF THE CAR?

A.   IN THE FRONT.

Q.   DID YOU NOTICE ANYTHING ABOUT WHAT HE WAS CARRYING?

A.   A GUN.

Q.   HE HAD A GUN?

A.   YES.

Q.   AND WHAT DID HE LOOK LIKE?

A.   HE WAS ABOUT FIVE-NINE,  FIVE-TEN,  SHORT DARK HAIR, DARK PANTS,  A LEATHER-LOOKING COAT.

Q.   DID YOU NOTICE ANYTHING ABOUT -- ANYTHING ELSE ABOUT HIS FACIAL FEATURES OR ANYTHING?

A.   HE HAD REAL CROOKED TEETH.

Q.   REAL CROOKED TEETH?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   SO, THE RECORD IS STRAIGHT, DO YOU SEE THE MAN IN THE COURTROOM WHO APPROACHED YOU IN THE CAR AND HAD A GUN IN HIS

HAND?

A.    YES.

Q.    CAN YOU IDENTIFY HIM FOR THE JURY?

A.    HE IS OVER THERE IN THE NAVY BLUE SHIRT.

Q.    NAVY BLUE SHIRT SITTING AT THE DEFENSE TABLE?

A.    YES.

Q.    AT THE TIME, YOU DIDN'T KNOW THIS MAN'S NAME, DID YOU?

A.    NO.

Q.    YOU NOW KNOW WHAT HIS NAME IS?

A.    YES.

Q.    THAT IS BRANDON BASHAM?

A.    YES.

Q.    AS MR. BASHAM APPROACHED YOU, YOU SAID HE WAS WEARING A LEATHER COAT?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT NUMBER 165.  DOES THIS LOOK LIKE THE COAT THAT MR. BASHAM WAS WEARING?

A.    YES.

Q.    NOW, WHEN YOU SAT DOWN IN THE PASSENGER AREA OF -- THE FRONT PASSENGER AREA, WAS YOUR DOOR STILL OPEN, AT THAT POINT?

A.    YES.

Q.    AND THE CELLPHONE THAT YOU ARE TALKING ON, WHICH -- WHICH HAND DO YOU HAVE THAT IN?

A.    IN THE RIGHT HAND.

**JA 1394**

Q.    IN YOUR RIGHT HAND.  SO IT WOULD BE ON YOUR RIGHT EAR?

A.    YES.

Q.    AND WHAT DID MR. BASHAM DO, OR WHAT DID YOU OBSERVE MR. BASHAM DO AS HE APPROACHED YOU IN THE DOOR JAM AREA OF THE CAR?

A.    I SAW THE GUN WENT INTO MY SIDE.

Q.    THE GUN WAS POINTED WHERE?

A.    TO MY LOWER SIDE.

Q.    CAN YOU DESCRIBE THE GUN?

A.    YES,  IT WAS A BLACK GUN WITH A LONG BARREL.

Q.    LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT NUMBER 50.  DOES THIS LOOK LIKE THE GUN THAT MR. BASHAM HAD POINTED AT YOUR SIDE?

A.    YES.

Q.    IF YOU COULD,  MS. FRANCIS,  I WOULD ASK YOU TO STAND UP AND SHOW THE JURY HOW MR. BASHAM WAS HOLDING THE GUN.

A.    (WITNESS COMPLIES.)  IT WAS LIKE THIS,  ONE SIDE OF HIS COAT OVERLAPPING IT.

Q.    IT WAS POINTED WHERE?

A.    AT MY SIDE.

Q.    AND TELL THE JURY JUST HOW CLOSE MR. BASHAM POINTED THE BARREL OF THAT GUN AT YOUR SIDE.

A.    ABOUT ONE OR TWO INCHES.

Q.    ABOUT ONE OR TWO INCHES FROM YOUR SIDE?

A.    YES.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
    )    COLUMBIA, SC
    )    SEPTEMBER 29, 2004
    )
    VERSUS    )
    )
BRANDON L. BASHAM,    )
    DEFENDANT.    )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XII

APPEARANCES:

FOR THE GOVERNMENT:    SCOTT SCHOOLS, FIRST AUSA
    JONATHAN S. GASSER, AUSA
    JOHN DUANE, AUSA
    UNITED STATES ATTORNEY'S OFFICE
    1441 MAIN STREET, SUITE 500
    COLUMBIA, SC  29201

FOR THE DEFENDANT:    JACK SWERLING, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

    GREG HARRIS, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

COURT REPORTER:    DEBRA R. JERNIGAN, RPR, CRR
    UNITED STATES COURT REPORTER
    901 RICHLAND STREET
    COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1396

SURE TO FILE WITH THE CLERK HARD COPIES, PAPER COPIES OF YOUR REQUESTS TO CHARGE SO THAT A PROPER RECORD CAN BE PRESERVED IF I DECLINE TO GIVE SOMETHING THAT SOMEBODY REQUESTED.

MR. SWERLING: IT HAS BEEN.

THE COURT: ANYTHING ELSE BEFORE WE BRING IN THE JURY?

MR. SWERLING: YOUR HONOR, BEFORE WE HAVE TO ARGUE, MAY I SEE THE ACTUAL WAY THE DEATH RESULTING CHARGES ARE WRITTEN NOW ON THE CARJACKING AND KIDNAPPING? BECAUSE YOU SAID YOU WERE GOING TO ADAPT ONE TO THE OTHER. I THOUGHT WE WERE GOING TO GET AN EMAIL OR SOMETHING LAST NIGHT, BUT WE DID NOT. I DIDN'T GET IT, ANYWAY.

THE COURT: I GAVE HARD COPIES. IT WASN'T ANY NEED TO EMAIL. YOU GOT A PAPER COPY YESTERDAY OF WHAT WE DID. WHAT IS YOUR QUESTION NOW?

MR. SWERLING: DEATH RESULTING. AS I UNDERSTAND, YOU WERE GOING TO GIVE THE ALTERNATE VERSION OF COUNT 2, WHICH WAS FROM DRAFT 2. AND THEN YOU WERE GOING TO ALSO ADAPT THAT LANGUAGE OVER TO THE CARJACKING.

THE COURT: RIGHT. SO, IN OTHER WORDS, THE CARJACKING, DEATH RESULTING, IS GOING TO BE EXACTLY THE SAME AS THE KIDNAPPING, DEATH RESULTING?

MR. SWERLING: YES.

THE COURT: I WILL GIVE YOU, I HAVE BEEN WAITING TO RUN A FINAL HARD COPY TO GIVE YOU UNTIL WE MAKE THESE CHANGES

HERE THIS MORNING. SO, YOU WILL HAVE A HARD COPY IN ABOUT 20 MINUTES.

MR. SWERLING: I WANTED TO BE SURE.

THE COURT: THE DEATH RESULTING PAGE WILL BE IDENTICAL FOR THE FIRST AND SECOND COUNTS. OF COURSE, THE FIRST COUNT HAS THAT INTENT FACTOR UP FRONT AND THE ELEMENTS UP FRONT, AS WELL. ANYTHING ELSE?

MR. SWERLING: THE RECORD CLEARLY REFLECTS THAT WE ARE SAYING INTENT SHOULD BE AS TO BOTH DEATH RESULTING AS TO CARJACKING AND KIDNAPPING BECAUSE THEY ARE ELEMENTS.

THE COURT: ALL RIGHT. VERY GOOD. PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: MEMBERS OF THE JURY, AT THIS TIME, THE ATTORNEYS WILL BE PERMITTED TO MAKE THEIR CLOSING ARGUMENT. AS I TOLD YOU SEVERAL TIMES, THE GOVERNMENT IN THIS CASE HAS THE BURDEN OF PROOF, AND UNDER THE RULES THAT OPERATE THIS COURT, THE PARTY THAT HAS THE BURDEN OF PROOF GETS TO GO FIRST AND LAST IN THE ARGUMENT. YOU WILL HEAR FIRST FROM MR. GASSER ON BEHALF OF THE GOVERNMENT IN HIS CLOSING ARGUMENT. THEN YOU WILL HEAR FROM MR. SWERLING ON BEHALF OF THE DEFENDANT. AND THEN ONCE MR. SWERLING FINISHES, YOU WILL HEAR ONCE AGAIN FROM MR. GASSER FOR HIS REPLY OR REBUTTAL AS HE MAY RESPOND TO ANY NEW MATTER BROUGHT OUT BY MR. SWERLING

IN HIS ARGUMENT.

THE ARGUMENT WILL PROBABLY CONSUME MOST OF THE MORNING. WE WILL TAKE A BREAK AT THE APPROPRIATE TIME TO LET YOU REST AND TAKE LUNCH. AND I WILL GIVE YOU MY JURY INSTRUCTIONS AFTER LUNCH.

CLOSING ARGUMENT IS A TIME WHERE THE ATTORNEYS GET TO SPEAK TO YOU AND ATTEMPT TO SUMMARIZE AND INTERPRET THE EVIDENCE THAT YOU HEARD. BUT REMEMBER WHAT I TOLD YOU AS THE TRIAL BEGAN, WHAT THE LAWYERS SAY IS NOT EVIDENCE. IF YOUR MEMORY OF THE EVIDENCE DIFFERS FROM WHAT THE LAWYERS SAY, YOU MUST BASE YOUR DECISION ON WHAT YOU REMEMBER.

NOW, WITH THAT, THE COURT RECOGNIZES MR. JOHNNY GASSER, ASSISTANT UNITED STATES ATTORNEY, FOR HIS CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES.

MR. GASSER: THANK YOU, YOUR HONOR, MAY IT PLEASE THE COURT.

THE COURT: YES, SIR.

MR. GASSER: GOOD MORNING, LADIES AND GENTLEMEN. WE HAVE REACHED THAT STAGE OF THE TRIAL, AS JUDGE ANDERSON HAS EXPLAINED TO YOU, WHICH IS KNOWN AS CLOSING ARGUMENTS. IT IS WHEN THE LAWYERS HAVE AN OPPORTUNITY TO COME BEFORE YOU JURORS AND TO ARGUE THEIR CASE. ON THE OUTSET, LET ME DO THIS. I THINK I SPEAK ON -- I KNOW I SPEAK ON BEHALF OF THE GOVERNMENT, MYSELF, MR. SCHOOLS, MR. DUANE, AND I KNOW I SPEAK ON BEHALF OF MR. SWERLING AND MR. HARRIS, AS WELL, I

WANT TO THANK YOU FOR THE ATTENTION YOU HAVE PAID OVER THE LAST TWO-AND-A-HALF WEEKS. AT TIMES, THE TESTIMONY WAS LONG AND DRAWN OUT, ALTHOUGH ALL 16 OF YOU WERE PAYING ATTENTION. YOU MAY HAVE NOTICED AT TIMES WHEN I AM NOT DIRECTLY EXAMINING A WITNESS, I AM SITTING AT THE TABLE. ONE THING WE WANT TO BE SURE AS LAWYERS IS THAT THE JURORS ARE PAYING ATTENTION. THE JURORS ARE GIVING US A FAIR SHAKE. YOU HAVE DONE THAT, AND I THANK YOU FOR THAT.

YOU JURORS REPRESENT A CROSS SECTION OF THIS STATE. YOU JURORS COME FROM AIKEN, YORK, OCONEE, AND ORANGEBURG COUNTIES. YOU ARE FROM LANCASTER, AND LEXINGTON, AND CHEROKEE, AND SPARTANBURG COUNTIES. YOU ARE FROM RICHLAND, AND CHARLESTON, AND KERSHAW COUNTIES. YOU COME TOGETHER AS CITIZENS OF SOUTH CAROLINA WITH ONE CHARGE, WITH ONE GOAL, WITH ONE DUTY. AND THAT IS TO DO JUSTICE IN THE MATTER OF THE UNITED STATES OF AMERICA VERSUS BRANDON BASHAM.

FOR MOST OF YOU, IF NOT ALL OF YOU, YOU HAVE SEEN AND HEARD THINGS IN THIS COURTROOM OVER THE LAST TWO-AND-A-HALF WEEKS THAT YOU ARE NOT ACCUSTOMED TO. BAD LANGUAGE, TERRIBLE ACTS OF VIOLENCE, AND THE PAIN AND SUFFERING THAT THE CRIME VICTIMS AND FAMILY MEMBERS THAT ARE LEFT BEHIND. YOU SEE, FOR THE LAST TWO-AND-A-HALF WEEKS, LADIES AND GENTLEMEN, THROUGH 89 WITNESSES THAT TOOK THE STAND, THROUGH THE HUNDREDS OF EXHIBITS THAT WERE INTRODUCED BY THE GOVERNMENT, WE HAVE NOT ONLY PROVIDED YOU JURORS A WINDOW

INTO THE DARK AND MALICIOUS HEARTS OF BRANDON BASHAM AND CHAD FULKS, WE HAVE LITERALLY, IN THIS COURTROOM, GIVEN YOU A FRONT ROW SEAT.

MR. SCHOOLS TOLD YOU JURORS IN HIS OPENING STATEMENT TWO-AND-A-HALF WEEKS AGO THAT THIS CASE WAS ABOUT CHOICES. THE CHOICES THAT BRANDON BASHAM MADE NOVEMBER 2002. BRANDON BASHAM CHOSE TO ESCAPE FROM HOPKINS COUNTY DETENTION CENTER ON NOVEMBER 4, 2002. BRANDON BASHAM CHOSE TO PARTICIPATE IN THE KIDNAPPING AND CARJACKING OF JAMES HAWKINS. HE CHOSE TO BURGLARIZE ROBERT TALSMA'S RESIDENCE. HE CHOSE TO ARM HIMSELF WITH FIREARMS. HE CHOSE TO PURCHASE THAT CAMOUFLAGE CLOTHING IN PIKETON, OHIO. THOSE WERE BRANDON BASHAM'S CHOICES. BRANDON BASHAM AND CHAD FULKS TOGETHER CHOSE SAMANTHA BURNS, THE 19-YEAR-OLD MARSHALL UNIVERSITY STUDENT IN HUNTINGTON, WEST VIRGINIA. BRANDON BASHAM CHOSE TO PARTICIPATE IN THE KIDNAPPING, AND THE CARJACKING, AND THE KILLING, AND THE BODY DISPOSAL OF THAT 19-YEAR-OLD GIRL. THOSE WERE BRANDON BASHAM CHOICES. BRANDON BASHAM CHOSE, LADIES AND GENTLEMEN, TO PARTICIPATE IN THE SHOOTING INCIDENT INVOLVING CARL JORDAN. AND ON NOVEMBER 14TH, 2002, BRANDON BASHAM AND CHAD FULKS, TOGETHER, THEY CHOSE ALICE DONOVAN, A 44-YEAR-OLD WIFE, MOTHER, AND GRANDMOTHER. BRANDON BASHAM CHOSE TO KIDNAP ALICE DONOVAN. BRANDON BASHAM CHOSE TO CARJACK ALICE DONOVAN. BRANDON BASHAM CHOSE TO ROB ALICE DONOVAN. AND BRANDON BASHAM CHOSE TO KILL ALICE DONOVAN.

BRANDON BASHAM AND CHAD FULKS'S CHOICES. AND THEY CHOSE TO GET RID OF ALICE DONOVAN'S BODY. THOSE WERE BRANDON BASHAM'S CHOICES IN NOVEMBER OF 2002. AND AFTER THAT, BRANDON BASHAM CHOSE TO TRY TO KILL A POLICE OFFICER IN ASHLAND, KENTUCKY.

TIME AFTER TIME, OPPORTUNITY AFTER OPPORTUNITY IN NOVEMBER OF 2002, BRANDON BASHAM WAS FACED WITH CHOICES. CHOICES THAT HE, ALONE, HAD TO MAKE. AND WHEN IT CAME TO SAMANTHA BURNS AND ALICE DONOVAN, BRANDON BASHAM CHOSE DEATH. THAT WAS HIS CHOICE.

AND, LADIES AND GENTLEMEN, WHAT THIS CASE IS ALL ABOUT, IS HOLDING BRANDON BASHAM ACCOUNTABLE FOR THE CHOICES HE MADE IN SOUTH CAROLINA IN NOVEMBER OF 2002. IT IS HOLDING BRANDON BASHAM RESPONSIBLE FOR HIS CONDUCT. AS JUDGE ANDERSON TOLD ALL OF YOU IN THE VIDEO THAT YOU, EACH AND EVERY ONE OF YOU SAW WHEN YOU CAME TO THIS COURTHOUSE, AS JUDGE ANDERSON TOLD YOU AS EACH AND EVERY ONE OF YOU TOOK THE WITNESS STAND DURING THE VOIR DIRE PROCESS, HE TOLD YOU THAT BRANDON BASHAM AND CHAD FULKS WERE BOTH INDICTED. IT WAS A JOINT INDICTMENT. JUDGE ANDERSON TOLD YOU THAT BOTH CHAD FULKS AND BRANDON BASHAM ARE CHARGED IN THIS EIGHT-COUNT INDICTMENT. JUDGE ANDERSON TOLD YOU THAT THE GOVERNMENT IS SEEKING THE DEATH PENALTY AGAINST BOTH BRANDON BASHAM AND CHAD FULKS. THE GOVERNMENT SUBMITS TO YOU THAT BOTH BRANDON BASHAM AND CHAD FULKS ARE GUILTY OF THE CRIMES CHARGED. AND THE GOVERNMENT SUBMITS TO YOU THAT BOTH BRANDON BASHAM AND CHAD FULKS DESERVE

TO DIE.

YOUR CHARGE, AS A MATTER OF LAW, JUDGE ANDERSON SEVERED THESE CASES. YOUR SOLE RESPONSIBILITY AT THIS JUNCTURE, AT THIS STAGE, IS TO DETERMINE WHETHER OR NOT BRANDON BASHAM IS GUILTY OF THE EIGHT COUNTS IN THAT INDICTMENT. THAT IS SOLELY YOUR RESPONSIBILITY, AT THIS STAGE.

LADIES AND GENTLEMEN, I AM GOING TO SPEND THE MAJORITY OF MY TIME SPEAKING TO YOU THIS MORNING GOING OVER THE 17 DAYS OF MAYHEM CAUSED BY MR. BASHAM AND MR. FULKS IN NOVEMBER 2002. FROM THE TIME THAT THEY TOGETHER ESCAPED FROM THE HOPKINS COUNTY DETENTION CENTER ON NOVEMBER 4TH, THROUGH THE TIME THAT MR. BASHAM WAS ARRESTED IN ASHLAND, KENTUCKY, ON NOVEMBER 17TH, AND ON UP UNTIL THE TIME THAT MR. FULKS WAS ARRESTED IN INDIANA ON NOVEMBER 20TH AND ALICE DONOVAN'S VEHICLE WAS RECOVERED, SEVENTEEN DAYS OF CARNAGE IS WHAT I AM GOING TO SPEAK TO YOU ABOUT.

I AM THEN GOING TO TALK TO YOU ABOUT FIVE BASIC LEGAL DOCTRINES THAT YOU WILL HEAR ABOUT WHEN JUDGE ANDERSON INSTRUCTS YOU, AND YOU WILL HAVE WITH YOU IN YOUR JURY ROOM. I WILL TOUCH ON FIVE VERY IMPORTANT LEGAL DOCUMENTS, I WILL BRIEFLY DISCUSS THOSE WITH YOU. I AM GOING TO WALK YOU THROUGH QUICKLY OR AS QUICK AS I CAN EACH OF THE ELEMENTS OF THE EIGHT COUNTS OF THE INDICTMENT.

I AM THEN GOING TO FINISH UP MY CLOSING ARGUMENT WITH SPEAKING TO YOU ABOUT THE INTENT ELEMENT. WHEN IT COMES TO

THE CARJACKING INDICTMENT, AS THE JUDGE WILL TELL YOU, THERE IS NO INTENT ELEMENT IN KIDNAPPING, RESULTING IN DEATH.  THE GOVERNMENT DOESN'T HAVE TO PROVE A GENERAL INTENT OR SPECIFIC INTENT WHEN IT COMES TO THE KIDNAPPING, RESULTING IN DEATH.  THE GOVERNMENT DOES HAVE TO PROVE AN INTENT FACTOR.

I WILL FINISH MY CLOSING ARGUMENT IN TALKING ABOUT THIS INTENT FACTOR AND THE STATE OF MIND OF BRANDON BASHAM ON NOVEMBER 14TH, 2002.  BEFORE I GET TO THOSE 17 DAYS IN NOVEMBER, LET ME MAKE ONE THING PERFECTLY CLEAR.  THE GOVERNMENT SUBMITS TO YOU, LADIES AND GENTLEMEN, IF BRANDON BASHAM WAS ALONE, OR IF CHAD FULKS WERE ALONE ON NOVEMBER 11TH, 2002 AND NOVEMBER 14TH, 2002, SAMANTHA BURNS AND ALICE DONOVAN WOULD BE ALIVE TODAY.  THINK ABOUT IT.  DURING THOSE EVENTS, DURING THOSE EVENTS, BRANDON BASHAM AND CHAD FULKS WERE ACTING TOGETHER IN UNISON AS A TEAM, A DEATH SQUAD, IF YOU WILL.  THE TWO OF THEM, TOGETHER, AIDING AND ABETTING EACH OTHER WHEN THEY KIDNAPPED AND CARJACKED SAMANTHA BURNS, WHEN THEY KIDNAPPED, AND CARJACKED, AND KILLED ALICE DONOVAN.  THE TWO OF THEM.

THE GOVERNMENT DOES NOT HAVE TO PROVE, AND MORE IMPORTANTLY, YOU JURORS DO NOT HAVE TO FIND WHO, SPECIFICALLY, KILLED ALICE DONOVAN IN ORDER TO CONVICT BRANDON BASHAM OF CARJACKING, RESULTING IN DEATH OR KIDNAPPING, RESULTING IN DEATH.  WE DON'T HAVE TO PROVE DEFINITIVELY THAT BRANDON BASHAM KILLED ALICE DONOVAN.  WE DON'T HAVE TO PROVE

DEFINITIVELY THAT CHAD FULKS, ALONE, KILLED ALICE DONOVAN. WE DON'T HAVE TO PROVE DEFINITIVELY, THE TWO OF THEM, ALTHOUGH I SUBMIT TO YOU THE EVIDENCE SHOWS THEY ACTED TOGETHER AND KILLED ALICE DONOVAN, BUT WE DON'T HAVE TO PROVE THAT. THERE IS A REASON FOR THAT. WHEN TWO OR MORE PEOPLE DECIDE TO COMMIT VIOLENT ACTS AGAINST INNOCENT PEOPLE, THEY DECIDE TO KILL INNOCENT PEOPLE AND LEAVING NO WITNESSES, AND THAT IS NOT CAPTURED ON VIDEOTAPE, IT WOULD BE AN IMPOSSIBLE BURDEN FOR THE GOVERNMENT TO PROVE WHEN TWO OR MORE ARE INVOLVED IN A KILLING OF AN INNOCENT PERSON WITH NO WITNESSES. THE CITIZENS WOULD NOT FALL FOR THAT, NEITHER HAS CONGRESS, AND NEITHER HAS THE RULES OF LAW.

THE GOVERNMENT IS NOT SAYING THAT BRANDON BASHAM IS MORE CULPABLE THAN CHAD FULKS. AND THE GOVERNMENT IS NOT SAYING THAT CHAD FULKS IS MORE CULPABLE THAN BRANDON BASHAM. THE GOVERNMENT SUBMITS TO YOU, LADIES AND GENTLEMEN, BASED ON ALL OF THE EVIDENCE AND TESTIMONY THAT YOU HEARD, FROM THE ESCAPE THROUGH THE APPREHENSION, THAT ANY REASONABLE, AND RATIONAL, AND OBJECTIVE JUROR OR PERSON, LOOKING AT THE ACTIONS AND CONDUCT AS A WHOLE, LOOKING AT THE ACTIONS AND CONDUCT OF CHAD AND BRANDON AS A WHOLE, CAN COME TO ONLY ONE CONCLUSION, BUT FOR THE ACTIONS OF BRANDON BASHAM, ALICE DONOVAN WOULD BE ALIVE TODAY. BUT FOR THE ACTIONS OF CHAD FULKS, ALICE DONOVAN WOULD BE ALIVE TODAY. THE TWO OF THEM ARE RESPONSIBLE FOR THE DEATH OF ALICE DONOVAN. AND YOUR

CHARGE, I SUBMIT TO YOU TODAY, IS TO HOLD BRANDON BASHAM RESPONSIBLE AND ACCOUNTABLE.

MONDAY, NOVEMBER 4TH, 2002, THE HOPKINS COUNTY DETENTION CENTER, WHAT ARE THE FACTS?  AT, APPROXIMATELY, 6:30 THAT EVENING, BRANDON BASHAM, FOR THE SECOND TIME THAT DAY, APPROACHES DIAN BLAIR, THE CORRECTIONAL OFFICER FOR THE SECOND TIME, IF YOU RECALL.  HE ASKS IF HE AND CHAD, HIS FRIEND CHAD FULKS, CAN GO OUT IN THE REC AREA.  MS. BLAIR SIGNS TWO OF THEM ALONE, THEY ARE TOGETHER, BRANDON BASHAM AND CHAD FULKS, AND BRANDON BASHAM IS DOING THE TALKING.

NOW, LADIES AND GENTLEMEN, YOU HAVE GOT IN THE JURY ROOM, GOVERNMENT'S EXHIBIT 17, WHICH ARE STANDARD-ISSUE PANTS AND A SHIRT.  WHY DID THE GOVERNMENT INTRODUCE THESE EXHIBITS? YOU RECALL MS. BLAIR'S TESTIMONY, THAT BRANDON BASHAM HAD A BLANKET DRAPED OVER HIS SHOULDER.  OF COURSE, THAT BLANKET WAS FOUND ON THE GYMNASIUM FLOOR AFTER THEY ESCAPED.  HAD A WATER BOTTLE AND SHAMPOO BOTTLE WITH THEM. SHE DIDN'T SEE ANYTHING ELSE, OBVIOUSLY, OUT OF THE ORDINARY, OR SHE WOULDN'T HAVE LET THEM OUT THERE.

WHAT WASN'T FOUND IN THAT GYMNASIUM FLOOR?  THINK ABOUT HOW MUCH TIME IT WOULD HAVE TAKEN FOR BRANDON BASHAM AND CHAD FULKS TO TAKE THOSE BED SHEETS, AND THE BLANKETS THAT THE ROPE WAS MADE OUT OF THAT YOU HEARD TESTIMONY FROM CHRIS SCHAFFER, THE ROPE THAT THEY LOST, THAT LAW ENFORCEMENT LOST, BUT YOU HEARD A DESCRIPTION, THINK HOW MUCH TIME IT WOULD TAKE TO CUT

AND RIP, THE FIBERS ON THE GROUND. NONE OF THAT WAS FOUND. THE GOVERNMENT SUBMITS TO YOU THERE IS ONLY ONE LOGICAL CONCLUSION. MR. BASHAM AND MR. FULKS, TO HAVE A ROPE LONG ENOUGH TO GET DOWN, TO HAVE A ROPE LONG ENOUGH, HAD TO HAVE CUT THOSE STRIPS AND SOMEHOW EITHER TIED THEM AROUND THEIR LEGS, TIED THEM AROUND THEIR WAIST THAT YOU WOULD NOT BE ABLE TO SEE WITH THOSE BAGGY CLOTHES BECAUSE WE KNOW SEVERAL FACTS. WE KNOW THEY USED THE ROPE, A PIECED-TOGETHER ROPE WITH BLANKETS AND SHEETS. WE KNOW THEY WEREN'T HOLDING THEM IN THEIR HANDS WHEN THEY WENT OUT TO THE GYMNASIUM. THE GOVERNMENT SUBMITS THAT IS THE ONLY LOGICAL CONCLUSION ON HOW THEY DID THAT.

WHAT ELSE DO WE KNOW? WE KNOW THAT BRANDON BASHAM AND CHAD FULKS HAD AN OPPORTUNITY TO SEE HOW LONG MS. BLAIR, WHEN SHE WENT ON HER MED RUNS, HOW LONG SHE WOULD TAKE. THEY WERE ABLE TO WATCH HER. THEY KNEW THAT SHE WAS A LITTLE MORE PERSONABLE THAN THE OTHER OFFICERS, SHE WOULD TAKE A LOT MORE TIME WITH THE INMATES, SO THEY KNEW WHEN DIAN BLAIR WAS DOING HER MEDS, THAT WAS THE TIME TO GET OUT THERE AND THAT WAS THE TIME TO GO.

WHAT ELSE DO WE KNOW? LET ME SHOW YOU THESE EXHIBITS. GOVERNMENT'S EXHIBIT 4, THAT IS THE CORNER THAT THEY GOT OUT. AND YOU REMEMBER IT IS ABOUT EIGHT FEET FROM THE GROUND TO THAT LEDGE. LADIES AND GENTLEMEN, ONE PERSON COULDN'T HAVE GOTTEN UP ON THAT ROOF. IMPOSSIBLE. TWO PEOPLE WERE

REQUIRED. ONE PERSON NEEDED TO GET A BOOST, ONE PERSON COULDN'T JUMP UP ONTO THAT ROOF, IT IS TOO HIGH. TWO PEOPLE WERE REQUIRED. ONE TO GIVE A BOOST, AND ONE TO GO UP TO ANCHOR THAT ROPE, AND FOR THE PERSON ON THAT ROOF, SLATE ROOF, THEN HELPED THE OTHER PERSON UP WITH THE USE OF THAT ROPE. IT IS PHYSICALLY IMPOSSIBLE FOR ONE PERSON TO HAVE ESCAPED FROM THAT FACILITY BY HIMSELF.

LOOK AT THE NEXT PICTURE. THIS WAS THE AREA UP HERE IN THE CORNER WHERE THEY PULL THAT FENCING OUT, AND THEN THEY TIED THAT ROPE ON THAT POLE RIGHT THERE IN THE MIDDLE. AND THEY USED THAT ROPE, THE TWO OF THEM, TOGETHER, TO CLIMB DOWN. LADIES AND GENTLEMEN, THIS ESCAPE REQUIRED PLANNING, IT REQUIRED DECEPTION. THEY HAD TO DECEIVE MS. BLAIR WITH THE ROPE UNDER THEIR CLOTHES, THE GOVERNMENT SUBMITS TO YOU, AND MOST IMPORTANTLY, IT REQUIRED TEAMWORK. BRANDON BASHAM AND CHAD FULKS TOGETHER.

THE STATE OF MIND. WHAT WAS THE STATE OF MIND OF THESE TWO INDIVIDUALS? THERE IS NO QUESTION ABOUT IT. THERE IS ABSOLUTELY NO QUESTION THAT CHAD FULKS HAD MORE TO LOSE. THERE IS NO QUESTION ABOUT IT. CHAD FULKS HAD MORE TO LOSE IN THE DECISION. THE PLAN TO ESCAPE, THE GOVERNMENT SUBMITS TO YOU, WAS CHAD FULKS, HE HAD MORE TO LOSE. HE TOLD THAT IN HIS LETTERS TO TINA SEVERANCE, AND THE GOVERNMENT SUBMITTED THAT EVIDENCE. WE PROVIDED THAT EVIDENCE TO YOU. HE WAS LOOKING AT ALMOST 60 YEARS. CHAD FULKS HAD MORE TO LOSE THAN

JA 1408

BRANDON BASHAM.

BUT DOES THAT MEAN THAT BRANDON BASHAM HAD NO MOTIVATION AT ALL? NO. BRANDON BASHAM HAD DONE A COUPLE OF YEARS OF A FIVE-YEAR SENTENCE. AND EVEN THOUGH HE MIGHT HAVE BEEN, HE MIGHT HAVE BEEN ELIGIBLE FOR PAROLE IN A FEW MONTHS, WHAT DO WE ALSO KNOW? WE KNOW ON OCTOBER 22ND, BRANDON BASHAM WAS INDICTED BY THE HOPKINS COUNTY GRAND JURY ON A CONTRABAND CHARGE THAT CARRIED FIVE YEARS CONSECUTIVE TO THE TIME HE WAS DOING, AND ON FELONY ENHANCEMENT THAT CARRIED FIVE YEARS CONSECUTIVE TO THAT. WE KNOW THAT ON OCTOBER 30TH, BRANDON BASHAM WAS BROUGHT INTO A COURTROOM IN HOPKINS COUNTY, KENTUCKY FOR HIS ARRAIGNMENT.

YOU HEARD FROM MR. SCHAFFER. THE CHARGES ARE PUBLISHED. THE JUDGE TELLS MR. BASHAM HOW MUCH TIME HE IS FACING. ON OCTOBER 30TH, MR. BASHAM IS TOLD HE IS FACING UP TO TEN MORE YEARS CONSECUTIVE TO THE TIME HE IS SERVING. FIVE DAYS LATER, HE IS OVER THE WALL WITH CHAD FULKS.

NOW, ONE MIGHT TRY AND CLAIM THAT THIS HOPKINS COUNTY DETENTION FACILITY IS SOME KIND OF JOKE OPERATION, SOME KIND OF MICKEY MOUSE OPERATION. WHAT DID YOU HEAR FROM MR. SCHAFFER? IN FACT, AS HE WAS SITTING IN THAT WITNESS BOX, THE HOPKINS COUNTY DETENTION CENTER HAS BEEN OPERATING FOR FOUR YEARS, TWO PEOPLE HAVE ESCAPED FROM THAT FACILITY. TWO PEOPLE HAD THE PLANNING, AND THE DECEPTION, AND THE ABILITY TO ESCAPE. BRANDON BASHAM AND CHAD FULKS. AND MR. LANTRIP,

THE JAILER NOT HERE, MR. SCHAFFER SPOKE TO HIM. MR. LANTRIP IS THE JAILER FOR 17 YEARS. OF ALL THE SECURED FACILITIES, OF ALL OF THE SECURED FACILITIES IN KENTUCKY, ONLY TWO PEOPLE HAVE ESCAPED, BRANDON BASHAM AND CHAD FULKS. THEY ESCAPED, AND THEY ARE ON THE RUN IN HOPKINS COUNTY WHERE BRANDON BASHAM WAS BORN AND RAISED.

BRANDON BASHAM AND CHAD FULKS EVADE POLICE UNITS. BRANDON BASHAM AND CHAD FULKS EVADE THE TRACKING DOGS. AND THEY GO TO A BUS. THE BUS BRANDON BASHAM KNOWS, THAT BRANDON BASHAM KNOWS THEY CAN GET CLOTHES. THEY CHANGE OUT OF THEIR CLOTHES, THEY GET INTO CIVILIAN CLOTHES, THAT IS BRANDON BASHAM'S BUS. HE KNOWS ABOUT IT, NOT MR. FULKS. BRANDON BASHAM. AND BRANDON BASHAM ARMS HIMSELF, THE GOVERNMENT SUBMITS TO YOU, BRANDON BASHAM ARMS HIMSELF WITH GOVERNMENT'S EXHIBIT 31.

TUESDAY, NOVEMBER 5TH, 2002, WHO IS THE PERSON THAT APPROACHES MR. HAWKINS' HOUSE ALONE? BRANDON BASHAM. WHO IS THE PERSON THAT KNOCKS ON THAT DOOR AND TELLS MR. HAWKINS THAT HIS CAR IS BROKEN DOWN? WHO IS THE PERSON THAT IS HOLDING ONTO THAT CLOTHING ALL BUNDLED UP? WHO IS THE PERSON THAT IS FICTITIOUSLY MAKING THOSE PHONE CALLS? WHO IS THE PERSON WHO HE HANGS UP THE PHONE ASKS MR. HAWKINS IF HE CAN GIVE HIM A RIDE TO THE PANTRY GAS STATION? WHO IS DOING THOSE THINGS? WHO IS DECEIVING MR. HAWKINS? AND HE WAS GOOD AT IT. YOU REMEMBER, MR. HAWKINS, HE BELIEVED HIM. HE BELIEVED THIS

YOUNG MAN WAS IN TROUBLE, AND HE WAS WILLING TO HELP.  BUT WHO WAS DOING THAT? BRANDON BASHAM.  CHAD FULKS WASN'T IN THAT KITCHEN.  CHAD FULKS WASN'T TELLING BRANDON BASHAM WHAT TO DO IN THAT KITCHEN.  BRANDON BASHAM WAS TELLING AND ASKING MR. HAWKINS THOSE THINGS.  WHO IS THE ONE THAT ASKS MR. HAWKINS TO STOP AND PICK UP HIS BROTHER? WHO? WHO IS THE ONE THAT ASKS MR. HAWKINS TO DRIVE  -- TAKE A LEFT DOWN THE DRIVEWAY AND NOT GO RIGHT TO GO TO THE GAS STATION?  WHO IS DOING ALL THE TALKING INITIALLY.

WHO IS THE ONE, AS THEY ARE DRIVING,  LADIES AND GENTLEMEN,  WHO IS THE ONE THAT PULLS OUT THE KNIFE? WHO INTRODUCES A DEADLY WEAPON IN THAT TRUCK? BRANDON BASHAM. WHO IS THE ONE, WHEN MR. HAWKINS IS GETTING READY TO TAKE A LEFT TURN AFTER THEY LEFT THAT MCDONALD'S AFTER THE PHONE CALL,  WHO IS THE ONE WHO INTRODUCES THE KNIFE AND SAYS, DRIVE STRAIGHT?  WHO IS THE ONE THAT ELEVATES THE SITUATION TO A DEADLY OR ALMOST DEADLY CONFRONTATION.  MR. BRANDON BASHAM. THERE IS NO QUESTION ABOUT IT,  THAT ONCE THAT OCCURRED,  THAT CHAD FULKS, ALMOST LIKE A TAG TEAM,  THAT CHAD FULKS THEN TOOK CONTROL.

CHAD FULKS TELLS HAWKINS TO PULL OVER IN THE WHIRLPOOL PARKING LOT.  CHAD FULKS GETS BEHIND THE WHEEL OF THE TRUCK. NO QUESTION ABOUT IT, CHAD FULKS TAKES CONTROL OF THE SITUATION FROM THE POINT THAT THEY ARE AT THE WHIRLPOOL PLANT TO THE POINT WHERE HE AND MR. BASHAM LEAVE MR. HAWKINS IN THE

WOODS. BUT, LADIES AND GENTLEMEN, THE EVIDENCE IS CLEAR, AGAIN, IT WAS A TWO-MAN TEAM. IT TOOK TWO, BOTH OF THEM. IT TOOK BRANDON BASHAM TO APPROACH MR. HAWKINS, IT TOOK BRANDON BASHAM TO DECEIVE MR. HAWKINS, IT TOOK BRANDON BASHAM TO ELEVATE THE THREAT LEVEL BY PULLING OUT THIS DEADLY WEAPON. MAKE NO MISTAKE ABOUT IT, LADIES AND GENTLEMEN, IT TOOK BOTH OF THEM.

NOW, CLEARLY, CLEARLY, CHAD FULKS WAS MORE AGGRESSIVE THAT NIGHT. I WILL GET TO THAT IN A MOMENT. AFTER THIS CARJACKING OCCURRED, IT WAS BRANDON BASHAM'S CHOICE TO PULL THIS KNIFE OUT. THAT IS WHY I ASKED MR. HAWKINS, DID YOU HEAR CHAD FULKS TELL BRANDON BASHAM TO PULL THIS KNIFE OUT? NO. WAS CHAD FULKS DOING ANY OF THE TALKING? NO. BRANDON BASHAM MADE THE CHOICE TO PULL THIS KNIFE OUT ON HIS OWN. HE MADE THE CHOICE TO TELL HAWKINS TO KEEP DRIVING ON HIS OWN. AND HE MADE ANOTHER CHOICE THAT NIGHT. DO YOU KNOW, BASED ON THE TESTIMONY OF MR. HAWKINS THAT ENTIRE NIGHT, THERE WAS ONLY, BETWEEN CHAD FULKS AND BRANDON BASHAM, ONCE THIS CARJACKING COMMENCED, CHAD FULKS WAS NEVER ALONE WITH MR. HAWKINS. NEVER. THE ONLY ONE OF THE TWO DEFENDANTS THAT WAS ALONE WITH MR. HAWKINS AFTER THE CARJACKING COMMENCED WAS BRANDON BASHAM. WHEN THEY PULLED INTO THAT GAS STATION, WHEN CHAD FULKS LEAVES MR. HAWKINS' TRUCK, HE IS IN THAT SERVICE STATION FOR A PERIOD OF TIME. HE IS HAVING TO PAY FOR THE GAS. AND DURING THAT TIME PERIOD, I ASKED MR. HAWKINS, WHY

DIDN'T YOU JUST LEAVE? IT IS JUST YOU AND MR. BASHAM? BECAUSE HE WAS AFRAID HE WAS GOING TO GET STABBED. YOU RECALL IT BECAUSE BRANDON BASHAM HAD A DEATH GRIP, MR. HAWKINS' WORDS, ON THIS KNIFE.

SO, LADIES AND GENTLEMEN, WHEN CHAD FULKS WAS IN THAT GAS STATION, BRANDON BASHAM HAD AN OPPORTUNITY TO MAKE MORE CHOICES. HE, ALONE, HE, ALONE, WAS KEEPING MR. HAWKINS FROM HIS FREEDOM IN THE CAB OF THAT TRUCK. AND HE, ALONE, CHOSE TO CONTINUE THAT CARJACKING AND TO CONTINUE THAT KIDNAPPING WHEN HIS COHORT WASN'T ANYWHERE NEAR THE TRUCK, BUT WAS INSIDE THE SERVICE STATION. THOSE WERE THE CHOICES THAT BRANDON BASHAM WAS MAKING. WAS CHAD FULKS MORE AGGRESSIVE, WAS HE CUSSING? YES. WAS HE ORDERING BRANDON TO TIE THAT TAPE TIGHTER? YES. WAS HE ORDERING MR. HAWKINS TO PUT HIS HANDS AND ARMS AROUND THAT TREE? YES. HE WAS MORE AGGRESSIVE.

LET ME NIP THIS WHOLE ISSUE ON AGGRESSIVENESS RIGHT NOW UP FRONT. LET'S JUST DEAL WITH IT RIGHT NOW. LADIES AND GENTLEMEN, WE PRESENTED YOU, THE GOVERNMENT, EVIDENCE OF THE ACTIONS AND THE CONDUCT OF BOTH BRANDON BASHAM AND CHAD FULKS OVER THIS 17-DAY PERIOD. WE WANTED YOU JURORS TO GET THE TOTAL PICTURE, TO SEE THE CONDUCT OF BOTH OF THESE GENTLEMEN. WERE THERE TIMES DURING THIS CRIME SPREE THAT CHAD FULKS WAS MORE AGGRESSIVE THAN BRANDON BASHAM? ABSOLUTELY. HE WAS MORE AGGRESSIVE THAN BRANDON BASHAM FROM THE WHIRLPOOL INCIDENT ON.

CHAD FULKS WAS MORE AGGRESSIVE THAN BRANDON BASHAM WHEN HE TRIED TO SHOOT CARL JORDAN IN THE HEAD. AND CHAD FULKS WAS MORE AGGRESSIVE THAN BRANDON BASHAM WHEN HE POINTED THAT GUN AT TINA SEVERANCE'S HEAD AT THE LAKE SHORE MOTEL.

BUT IS THE EVIDENCE AND TESTIMONY JUST CHECKERED WITH INCONSISTENCIES THROUGHOUT THIS 17-DAY CRIME SPREE IN WHICH BRANDON BASHAM WAS MORE AGGRESSIVE THAN CHAD FULKS? MULTIPLE TIMES. ABSOLUTELY, MULTIPLE TIMES. BRANDON BASHAM WAS MORE AGGRESSIVE THAN CHAD FULKS WHEN HE PULLED THAT KNIFE ON HAWKINS. BRANDON BASHAM WAS MORE AGGRESSIVE WHEN HE WAS HOLDING HAWKINS WITH THAT KNIFE WHILE FULKS WAS IN THE GAS STATION. BRANDON BASHAM WAS MORE AGGRESSIVE THAN CHAD FULKS WHEN HE THREATENED TO KILL THOSE TWO COPS IN STURGIS, MICHIGAN. BRANDON BASHAM WAS MORE AGGRESSIVE WHEN HE THREATENED TO KILL BETH MCGUFFIN'S FATHER. BRANDON BASHAM WAS MORE AGGRESSIVE THAN CHAD FULKS TO SHOOT STACY WORKMAN'S BOYFRIEND IF HE CAME IN THE HOUSE. BRANDON BASHAM WAS MORE AGGRESSIVE WHEN HE ENTERED ALICE DONOVAN'S CAR ARMED WITH A GUN. HE WAS MORE AGGRESSIVE WHEN HE TRIED TO KILL OFFICER MATT DAVIS, FATHER OF TWO. CHAD FULKS WAS MORE AGGRESSIVE THAN BRANDON BASHAM AT TIMES, AND BRANDON BASHAM WAS MORE AGGRESSIVE THAN CHAD FULKS AT TIMES. THAT IS NOT THE POINT.

TWO OF THEM. STATE OF MIND, ACTING VIOLENTLY, THREATENING, INTENT TO HARM, INTENT TO KILL, BOTH OF THEM TOGETHER ACTING AS A TEAM.

WEDNESDAY, NOVEMBER 6TH, THEY DRIVE. NO QUESTION, CHAD FULKS IS LEADING THIS TRAIN. CHAD FULKS IS DRIVING. BRANDON BASHAM DOESN'T EVEN KNOW HOW TO DRIVE. CHAD FULKS IS LEADING THIS TRAIN. CHAD FULKS IS MAKING THE DECISION WHERE TO GO, THEY ARE GOING NORTH, NORTHERN INDIANA, WHERE CHAD FULKS'S GIRLFRIEND IS TINA SEVERANCE. THEY ARRIVE IN PORTAGE, INDIANA. THEY GET A HOTEL ROOM. THEY GET DRUNK WEDNESDAY NIGHT.

THURSDAY, NOVEMBER 7TH, WHAT DO WE KNOW HAPPENED THAT DAY? WE KNOW TINA AND ANDREA CAME BACK. CHAD FULKS AND BRANDON BASHAM HAD ALTERED THEIR APPEARANCE. YOU REMEMBER THE PHOTOGRAPHS OF WHAT THEIR HAIR LOOKED LIKE. THOSE ARE THE BOOKING REPORTS OF THE HOPKINS COUNTY DETENTION CENTER. AGAIN, WHAT DID THEIR HAIR LOOK LIKE THAT THURSDAY NIGHT WHEN TINA SEVERANCE AND ANDREA RODDY GOT BACK TO THE MOTEL? BRANDON BASHAM ALTERED HIS APPEARANCE. CHAD FULKS ALTERED HIS APPEARANCE. AGAIN, TWO OF THEM MAKING THE SAME CHOICE. THEY ARE ON THE RUN, THEY ARE ESCAPEES.

NOW, CHAD FULKS, NO QUESTION, HE IS THE ONE THAT CONFRONTS TINA SEVERANCE AND SAYS WE NEED GUNS, WE NEED GUNS FOR PROTECTION. WE. OF COURSE, BRANDON BASHAM DIDN'T OBJECT. YOU HEARD THE TESTIMONY. HE WAS PARTICIPATING IN THE PLANNING. THERE WERE TIMES IN THAT HOTEL ROOM WHEN BRANDON AND CHAD WOULD GO OFF IN THE CORNER AND WHISPER TO EACH OTHER. NO QUESTION, CHAD FULKS BROUGHT UP THE IDEA OF

GETTING GUNS.  NO QUESTION, CHAD FULKS CONFRONTED TINA SEVERANCE AND ASKED HER ABOUT HER FRIEND ROBERT TALSMA. LET'S BURGLARIZE ROBERT TALSMA'S HOUSE.  LADIES AND GENTLEMEN,  THERE IS NO QUESTION AT ALL, THEY APPROACHED ANDREA RODDY.  SHE WAS THE ONE THAT WAS GOING TO HAVE TO UNLOCK THE DOOR WHEN TINA SEVERANCE GOT MR. TALSMA'S ATTENTION AWAY.  AND WHO WAS THE LAST ONE? WHO CLOSED THE DEAL WITH ANDREA RODDY?  DO YOU REMEMBER THAT TESTIMONY? WHO DID ANDREA RODDY SAY CAME UP TO HER LAST,  HELD HER,  SAID PLEASE,  DO IT FOR ME,  GAVE HER A KISS ON THE LIPS,  SAID DON'T WORRY ABOUT IT, I WILL WIPE YOUR FINGERPRINTS OFF THE DOOR?  WHO? BRANDON BASHAM.  HE WAS EVERY BIT INVOLVED IN THE CONSPIRACY TO BURGLARIZE ROBERT TALSMA'S HOUSE.

ON FRIDAY, THEY DID JUST THAT, BURGLARIZED ROBERT TALSMA'S HOUSE.  BRANDON BASHAM AND CHAD FULKS, BOTH DRESSED OUT IN TINA SEVERANCE'S UNIFORM.  THAT MUST HAVE BEEN A SIGHT AS BIG AS SHE WAS.  THEY DRESSED OUT IN A SECURITY-TYPE UNIFORM SO IF ANYBODY LOOKED OUT NOBODY WOULD QUESTION.  THAT IS THE PLANNING,  THE THOUGHT PROCESS GOING ON IN CHAD FULKS AND BRANDON BASHAM'S MIND.

WHAT WERE THE END RESULTS?  THEY GOT THEMSELVES FOUR GUNS, THIS .22 REVOLVER,  THIS .45 REVOLVER, THEY STOLE ANOTHER .45 REVOLVER JUST LIKE THIS, AND THIS.45 SEMIAUTOMATIC.  SO,  AT THAT POINT IN TIME,  BRANDON BASHAM AND CHAD FULKS ARE ARMED AND DANGEROUS, IN MICHIGAN CITY,  INDIANA,  FOUR DAYS AFTER

THEY HAVE ESCAPED FROM THE HOPKINS COUNTY DETENTION CENTER.

THEY LEAVE MICHIGAN CITY.  DESTINATION, CHAD FULKS'S BROTHER, GOSHEN, INDIANA.  CHAD FULKS IS MAKING THE DECISION.  CHAD FULKS IS DRIVING THE VAN.  TINA SEVERANCE IS DRIVING THE JEEP.  AND BRANDON BASHAM IS RIGHT THERE WITH HIS BUDDY, RIGHT THERE WITH HIS FRIEND IN THE PASSENGER SEAT.  AND THEY GO TO GOSHEN.  AND THEY ACTUALLY GO TO STURGIS, MICHIGAN, WHICH IS RIGHT OVER THE BORDER FROM INDIANA TO MICHIGAN.  YOU REMEMBER THEY ARE CHECKING INTO THE WOOD MOTEL, WE HAVE ALL OF THOSE RECORDS.

FRIDAY NIGHT THEY CHECK INTO WOOD MOTEL.  WHAT HAPPENS THAT FRIDAY NIGHT?  CHAD FULKS AND TINA SEVERANCE LEAVE BRANDON BASHAM ALONE WITH ANDREA RODDY.  AT THAT POINT IN TIME, ALL NIGHT, ALL FRIDAY NIGHT, ALL OF A SATURDAY MORNING, BRANDON BASHAM IS MAKING HIS OWN DECISIONS.  HE IS MAKING HIS OWN CHOICES.  TINA SEVERANCE AND CHAD, THEY ARE GOING, HOOKING UP WITH CHAD'S BROTHER.  THEY ARE SMOKING THEIR METH AND DRINKING AT CHAD'S BROTHER'S HOUSE ALONE.  BRANDON BASHAM AND ANDREA RODDY, ALONE, AWAY FROM CHAD FULKS AT THE WOOD MOTEL IN STURGIS, MICHIGAN.

NOW, DO YOU REMEMBER WHAT ELSE BRANDON BASHAM STOLE OUT OF ROBERT TALSMA'S HOUSE?  HE TOOK A RING, HE TOOK A BUNCH OF ROBERT TALSMA'S CHECKS.  HE WAS SMART NOT TO TAKE THE CHECKS OFF THE TOP, HE WENT TO THE MIDDLE, THE BACK.  THAT IS HOW STREET SMART BRANDON BASHAM IS. HE DIDN'T GRAB THE CHECKS OFF

THE TOP. HE WROTE A CHECK, YOU HAVE THE CHECK, TO PIZZA HUT TO GET PIZZA FOR HIM AND ANDREA RODDY. WHAT HAPPENED THAT NIGHT, LADIES AND GENTLEMEN, IN THAT MOTEL ROOM, THE STATE OF MIND OF BRANDON BASHAM IN THIS CRIME SPREE? STATE OF MIND OF BRANDON BASHAM ON NOVEMBER 14TH? YOU RECALL THEIR TESTIMONY. THEY ARE EATING THEIR PIZZA IN THE HOTEL ROOM. BRANDON BASHAM HEARS A NOISE, GETS STARTLED, LOOKS OUT A WINDOW. HE SEES TWO STURGIS, MICHIGAN POLICE OFFICERS. HE SEES TWO STURGIS, MICHIGAN POLICE OFFICERS KNOCKING ON A DOOR DOWN THE HALL. WHAT DOES HE DO? HE GETS DOWN ON THAT FLOOR, HE ARMS HIMSELF, AND HE COCKS HIS GUN. HE IS LOCKED AND LOADED, LADIES AND GENTLEMEN. WHAT DOES HE TELL ANDREA RODDY? WHAT DOES HE TELL ANDREA RODDY? I AM NOT GOING TO GET CAUGHT. IF I HAVE TO, I WILL SHOOT THE COPS. IF YOU HEAR SHOOTING, GET ON THE FLOOR. THAT IS THE STATE OF MIND OF BRANDON BASHAM.

AND THE NEXT DAY, WHEN TINA SEVERANCE AND DEWAYNE FULKS COME OVER, AND BRANDON BASHAM IS TELLING TINA SEVERANCE ABOUT IT, TELLING TINA SEVERANCE ABOUT WHAT HAPPENED, DO YOU REMEMBER TINA SEVERANCE'S TESTIMONY? I WILL SHOW IT TO YOU. I DON'T KNOW, ONE OF THE THINGS WE DO WHEN WE WALK OVER TO THE CORNER HERE, WHEN THE COURT REPORTER IS TAKING DOWN THE TESTIMONY, WE ARE GETTING IT REAL-TIME. WHEN I AM TALKING, WHEN ANYONE IS TALKING, WE CAN LOOK AT IT. YOU REMEMBER, TINA SEVERANCE TOLD YOU BRANDON BASHAM SAID. YOU HEARD FROM 89 WITNESSES. MY QUESTION, MS. SEVERANCE, YOU DO NEED TO

USE THE EXACT LANGUAGE THAT YOU HEARD MR. BASHAM USE WHENEVER YOU FIRST GOT THERE.  YOU SAID HE WAS FREAKING OUT. WHATEVER TYPE OF LANGUAGE HE WAS USING, YOU NEED TO BE SPECIFIC FOR THE RECORD.  TINA SEVERANCE ANSWERED ON THAT WITNESS STAND, HE WAS CUSSING AND HE WAS SAYING LIKE, I THOUGHT Y'ALL HAD GOT CAUGHT.  I WAS ABOUT TO SHOOT ME A MOTHER-FUCKER COP, RIGHT.  I WAS GOING TO BLOW THE FUCKING COP AWAY.  IF HE HAD KNOCKED ON THE DOOR, I WOULD HAVE SHOT HIM.  I WOULD HAVE BLOWN HIS FUCKING HEAD OFF RIGHT THERE. I HAD JUST NOTICED THE BOYS WERE JUST STANDING THERE. THEY SEEMED TO HAVE THEIR OWN STUFF AND I WAS LIKE, WHO IS THIS. LADIES AND GENTLEMEN, THOSE AREN'T MY WORDS.  THOSE AREN'T TINA SEVERANCE'S WORDS.  THOSE ARE THAT MAN'S WORDS.  ON FRIDAY NIGHT, NOVEMBER 8TH, WHEN THEY SEE TWO STURGIS, MICHIGAN COPS.  AND YOU WANT TO KNOW WHAT THE REALITY OF IT IS, LADIES AND GENTLEMEN, WHEN IT COMES TO BRANDON BASHAM'S STATE OF MIND? THERE ARE TWO POLICE OFFICERS IN STURGIS, MICHIGAN.  WE DON'T KNOW THEIR NAMES.  WE DON'T KNOW IF THEY ARE MEN OR WOMEN.  WE DON'T KNOW WHAT RACE THEY ARE, NATIONALITY THEY ARE, WE KNOW THIS BECAUSE OF WHAT BRANDON BASHAM SAID, WE KNOW TWO POLICE OFFICERS ARE ALIVE TODAY BECAUSE THEY DIDN'T KNOCK ON A DOOR.  BECAUSE WE KNOW, ACCORDING TO BRANDON BASHAM, WHAT HE WOULD HAVE DONE TO THOSE TWO COPS.  HE WOULD HAVE KILLED THEM.  HE DIDN'T WANT TO GET CAUGHT.  AND YET, BRANDON BASHAM WANTS YOU TO BELIEVE THAT

AFTER CARJACKING ALICE DONOVAN AND HER SEEING HIS FACE, HE WAS GOING TO LITERALLY LET HER GO AND GO TO THE AUTHORITIES SO THAT SHE COULD IDENTIFY HIM. THAT IS WHAT BRANDON BASHAM WANTS YOU JURORS TO BELIEVE. HE WAS WILLING TO KILL TWO COPS NOT TO GET CAUGHT. WHAT DIFFERENCE DID ALICE DONOVAN MAKE?

SATURDAY, NOVEMBER 9TH. AGAIN, BRANDON BASHAM ALONE IN THIS MOTEL ROOM. ALONE WITH ANDREA RODDY, MAKING HIS OWN CHOICES, HE CHOSE TO GO TO K-MART. HE CHOSE TO TAKE HIS GUN WITH HIM, THE GUN HE WAS ARMED WITH, ACCORDING TO ALL OF THE WITNESSES THROUGHOUT THIS ENTIRE CRIME SPREE. YOU DIDN'T HEAR THE WITNESSES SAY THEY SAW CHAD FULKS CONSTANTLY ARMED WITH A GUN. BRANDON BASHAM WAS CONSTANTLY ARMED. HE TOOK THIS GUN TO K-MART. HE CHOSE TO FORGE CHECKS, GO THROUGH ALL OF THAT PROCESS. YOU REMEMBER THE OTHER TESTIMONY FROM ANDREA RODDY. HOOKED UP WITH TEENAGERS IN STURGIS, MICHIGAN. SAW ONE OF THEM WITH A WAD OF CASH. TRYING TO GET THESE TEENAGERS TO DRIVE HE AND ANDREA TO AN INDIAN RESERVATION. HE TELLS ANDREA RODDY IF HE GETS THE CHANCE, HE WILL KILL THAT BOY. HE WILL KILL THAT BOY. THOSE AREN'T MY WORDS. THOSE AREN'T ANDREA RODDY'S WORDS. THOSE AREN'T CHAD FULKS'S WORDS. HE IS WILLING TO KILL THE TWO COPS, AND HE IS WILLING TO KILL SOME TEENAGER HE DOESN'T EVEN KNOW IN STURGIS, MICHIGAN BECAUSE IT SUITS BRANDON BASHAM.

NOW, LATER ON THAT DAY, DEWAYNE FULKS AND TINA SEVERANCE COME TO THE MOTEL. THEY ALL CARRY THIS SHOW ON TO RONNIE

FULKS'S HOUSE. AND WHAT DOES CHAD, BRANDON BASHAM, AND TINA DO? THEY ARE SMOKING METH THAT SATURDAY NIGHT, SATURDAY AFTERNOON, SMOKING DOPE, AND THEY ARE DRINKING. THEY ARE HAVING A GOOD TIME. AT NO POINT IN TIME DO YOU HEAR ANY EVIDENCE OR ANY TESTIMONY THAT ANYBODY IS THREATENING BRANDON BASHAM. ANYBODY. ALL OF THE EVIDENCE YOU HEARD, LADIES AND GENTLEMEN, IS THAT HE IS HAVING A GOOD TIME.

SUNDAY, NOVEMBER 10TH, 2002. SOME TIME SATURDAY NIGHT, THEY LEAVE GOSHEN, INDIANA. NOW THEY ARE TRAVELLING SOUTHEAST. THEY WIND UP IN PIKETON, OHIO. END UP AT THE TOWN AND COUNTRY HOTEL IN PIKETON, OHIO, ON SUNDAY, NOVEMBER 8TH. THEY TAKE THE WOMEN AND GO TO A WAL-MART RIGHT THERE IN WAVERLY. PULL UP TO THE BLUE PICKUP TRUCK, AMY WARD'S BLUE PICKUP TRUCK. CHAD FULKS PULLS OPEN THE WINDOW, GRABS AMY WARD'S PURSE, HAS A CELLPHONE. HANDS IT TO HIS PARTNER, MR. BASHAM, RIFLES THROUGH THE PURSE. AGAIN, CHAD FULKS DOING ONE THING, BRANDON BASHAM DOING ANOTHER THING AS A TEAM. CONSISTENCY. THEY END UP DROPPING THE WOMEN OFF AT THE HOTEL TOWN AND COUNTRY. THE WOMEN INDICATE WHEN THEY GOT BACK TO THE HOTEL ROOM, CHAD FULKS AND BRANDON BASHAM -- BRANDON BASHAM HAD BEEN SHOPPING. I WENT OVER WITH YOU GOVERNMENT'S EXHIBIT 53, A SERIES OF CHECKS, IF YOU REMEMBER, STIPULATED TO AT THAT WAL-MART IN WAVERLY. HUNDREDS AND HUNDREDS OF DOLLARS OF SHOPPING THAT BRANDON BASHAM WAS DOING AT THAT WAL-MART. STIPULATED IN HIS HANDWRITING. BRANDON BASHAM IS MAKING THE

CHOICE TO BUY ALL OF THIS. HE BOUGHT TWO BOOTS THAT ARE NINE AND A HALF, HIS SHOE SIZE. CHAD FULKS'S SHOE SIZE IS TEN AND A HALF. HE BOUGHT ONE PAIR OF PANTS. ONE PAIR OF PANTS WOULDN'T FIT CHAD FULKS, CAMOUFLAGE PANTS. THESE WERE BRANDON BASHAM'S CHOICES HE WAS MAKING. BUYING ALL OF THIS CAMOUFLAGE CLOTHING HE WAS BUYING, BUYING TWO SETS OF EVERYTHING, ONE FOR HIM AND ONE FOR HIS FRIEND CHAD FULKS.

SUNDAY NIGHT, NOVEMBER 20TH, AFTER BRANDON BASHAM AND CHAD FULKS WENT SHOPPING, THEY WENT TO BED THAT NIGHT. THEY WENT TO SLEEP AT TOWN AND COUNTRY MOTEL IN PIKETON, OHIO. AND 60 MILES AWAY IN HUNTINGTON, WEST VIRGINIA, A 19-YEAR-OLD GIRL, SAMANTHA BURNS, SHE WENT TO BED THAT NIGHT, TOO. SHE WENT TO BED IN THE HOME SHE LIVED IN WITH HER MOM, DAD, AND LITTLE BROTHER. WHEN SHE LAID HER HEAD ON HER PILLOW THAT NIGHT, SHE HAD NO IDEA THAT IT WOULD BE THE LAST NIGHT THAT SHE EVER SPENT ON THIS EARTH.

MONDAY, NOVEMBER 11, 2002, THEY GET UP. CHAD FULKS MAKES THE DECISION, I AM GOING HOME. LET'S GET IN THE CAR. HOME FOR CHAD FULKS IS HUNTINGTON, WEST VIRGINIA. AND EVERYBODY GETS IN THE CAR. EVERYBODY IS A WILLING PARTICIPANT. THEY DRIVE ON TO HUNTINGTON. THEY ACTUALLY GO TO KENOVA, NEXT TO HUNTINGTON, CHECK INTO HOLLYWOOD MOTEL, SPENT TIME THERE BEFORE WITH ONE OF HIS WIVES. NO QUESTION, CHAD FULKS IS MAKING THE DECISION OF WHERE TO GO, WHAT MOTEL TO GET, NO QUESTION HIS BUDDY, HIS FRIEND BRANDON BASHAM IS

TAGGING ALONG. LATE THAT AFTERNOON, LATE THAT AFTERNOON, CHAD FULKS AND BRANDON BASHAM HAD MORE CHOICES TO MAKE. CAMOUFLAGE CLOTHING. HERE IT IS, MONDAY NIGHT, NOVEMBER 11TH, LATE IN THE AFTERNOON IN A HOTEL ROOM IN HUNTINGTON, WEST VIRGINIA, CHAD FULKS AND BRANDON BASHAM ARE CHOOSING TO DECK OUT IN CAMOUFLAGE PANTS, CAMOUFLAGE SHIRTS, CAMOUFLAGE SKI MASKS IN CAMOUFLAGE BOOTIES. LADIES AND GENTLEMEN, THE MILITARY USES CAMOUFLAGE CLOTHING TO ASSIST THEM IN WARTIME. HUNTERS USE CAMOUFLAGE CLOTHING. LEGAL, LAWFUL HUNTERS TO GIVE THEM AN EDGE. WHAT WAS BRANDON BASHAM AND CHAD FULKS THINKING? THEY WERE HUNTING THAT NIGHT, ALL RIGHT. ONLY AFTER A DIFFERENT PREY. WHY WOULD BRANDON BASHAM PUT ALL OF THIS CAMOUFLAGE CLOTHING ON IF HE DIDN'T HAVE EVIL INTENTION IN MIND? THEY LEAVE CHAD FULKS, TELL TINA SEVERANCE THEY ARE GOING TO A MALL.

THE TIME LINE INVOLVING SAMANTHA BURNS, WHAT DO WE KNOW ABOUT THE TIME LINE? WE KNOW 6:30, SAMANTHA BURNS IS CHECKING OUT OF J. C. PENNEY'S WITH HER AUNT MISSY JEFFERS BUYING CLOTHING. SAMANTHA BURNS IS DEAD TODAY. BECAUSE SHE MADE THE CHOICE TO GO TO A J. C. PENNEY'S THAT SHE WORKED AT TO GIVE HER AUNT A DISCOUNT FOR HER NIECES. THAT SIMPLEST OF CHOICE SEALED HER FATE. DO YOU KNOW WHO WAS WAITING THERE? DO YOU KNOW WHO SHE CONFRONTED? SHE CONFRONTED BRANDON BASHAM AND CHAD FULKS. DECKED OUT IN CAMOUFLAGE CLOTHING, IN HUNTING CLOTHING, AT 6:30 P.M., SHE LEAVES THE MALL. MISSY

JEFFERS SAYS, BYE, SAMANTHA, BE CAREFUL. BE CAREFUL. WHAT ELSE DO WE KNOW? WE KNOW THAT AT 8:12, LADIES AND GENTLEMEN, AS HAS BEEN STIPULATED TO, WE KNOW AT 8:12 CHAD FULKS, OBVIOUSLY THAT IS NOT A VAN, CHAD FULKS IS IN SAMANTHA BURNS'S CAR AT 8:12, ALMOST TWO HOURS AFTER SAMANTHA BURNS LEAVES THE MALL ALONE, CHAD FULKS IS IN HER CAR, IS ATTEMPTING TO ACCESS HER ATM MACHINE. THAT IS CHAD FULKS IN HIS BOONEY HAT AND SKI MASK. I SAID 8:12. WE KNOW AT 9:46 THERE IS A PHONE CALL BY THE CELL RECORDS. SAMANTHA BURNS CALLING HOME AT 9:46. FIRST SPEAKS TO HER BROTHER, THEN TALKS TO HER MOTHER. PHONE CALL DIDN'T LAST BUT A MINUTE. WE ALSO KNOW THIS, BASED ON TRAVIS KING, THE CELLPHONE ENGINEER THAT WAS CALLED, WE KNOW THAT SHE WAS TRAVELLING. WE KNOW THAT THAT PHONE CALL INITIATED FROM ONE CELL TOWER, IF YOU REMEMBER, AND THEN WAS THROWN OFF TO ANOTHER CELL TOWER BASED ON WHERE THAT CAR WAS TRAVELLING. SO, IT HIT OFF OF TWO CELL TOWERS, WHICH MEANS SHE WASN'T STABLE. SHE WASN'T STATIONARY. SHE HAD TO BE MOVING. I WILL GET TO WHY THAT IS IMPORTANT. WE KNOW THAT AT ABOUT 3:15, MATT KILGORE UP ON GERMAN BRIDGE ROAD, UP ON THAT ISOLATED DARK MOUNTAIN, TEN MILES FROM HUNTINGTON, ISOLATED DARK MOUNTAIN HEARS AN EXPLOSION. WHEN HE EVENTUALLY GOES TO CHECK, WE KNOW SAMANTHA BURNS'S CAR IS TOTALLY ENGULFED WITH FIRE. WE KNOW SOME TIME BEFORE SUNUP ON NOVEMBER 12TH, SOME TIME BEFORE SUNUP ON NOVEMBER 12TH, CHAD FULKS AND BRANDON BASHAM ARE RETURNING TO

THE HOLLYWOOD MOTEL TOGETHER.

LADIES AND GENTLEMEN, THERE ARE TWO THINGS THAT ARE NOT AT ISSUE. THERE IS NOT AN ISSUE, SAMANTHA BURNS WAS KIDNAPPED, CARJACKED, AND KILLED. AND SAMANTHA BURNS'S BODY, AFTER SHE WAS KILLED, WAS EITHER DUMPED IN THE GUYANDOTTE OR THE OHIO RIVER. DEFENSE COUNSEL DOESN'T EVEN ARGUE THAT. NO QUESTION ABOUT THAT.

SO, WHAT IS THE PHYSICAL EVIDENCE THAT IMPLICATES BRANDON BASHAM? AND WHY IS THIS IMPORTANT? WHAT DOES THIS HAVE TO DO WITH ALICE DONOVAN AND THE INDICTMENT? THE JUDGE, IF YOU RECALL, HE TALKED TO EACH AND EVERY ONE OF YOU TRYING TO EXPLAIN TO EACH AND EVERY ONE OF YOU IN VOIR DIRE WHERE EVIDENCE OF SIMILAR CRIME CAN BE USED IN A CRIME IN WHICH MR. BASHAM IS BEING CHARGED WITH. THE TESTIMONY AND EVIDENCE SUBMITTED TO YOU ON SAMANTHA BURNS AS TO THE SIMILAR NATURE, IT GOES TO SHOW YOU CAN USE THAT, YOU JURORS, IT GOES TO SHOW BRANDON BASHAM'S INTENT AND HIS MOTIVE, THE PLAN, THE COMMON SCHEME WITH CHAD FULKS ON NOVEMBER 14TH OF ALICE DONOVAN. THAT IS HOW YOU ARE ALLOWED TO USE THAT EVIDENCE. THE FACT THAT A PERSON WAS INVOLVED IN A SIMILAR CRIME ON A PRIOR DAY, IN THIS CASE THREE DAYS BEFORE, IT GOES TO SHOW BRANDON BASHAM'S INTENT, KNOWLEDGE, GOAL, HIS STATE OF MIND, HIS PLANNING, HIS AIDING AND ABETTING, HIS PARTICIPATION IN THE ALICE DONOVAN MATTER. THAT IS HOW YOU CAN USE IT AT THIS JUNCTURE, THE SAMANTHA BURNS'S EVIDENCE.

SO, WHAT PHYSICAL EVIDENCE DO WE HAVE? WE HAVE THE CANDY BOX, LADIES AND GENTLEMEN. FIRST PIECE OF PHYSICAL EVIDENCE, CANDY BOX. ANDREA AND TINA SAID, WHEN THEY WALKED OUT, WHEN THEY WENT TO LEAVE THE HOLLYWOOD MOTEL, THEY HAD NEVER SEEN THIS CANDY BOX BEFORE. WHEN THEY PULLED IN THE HOLLYWOOD MOTEL THAT AFTERNOON ON MONDAY 11TH, THAT CANDY BOX WAS NOT IN THE VAN. WHEN THEY WENT TO LEAVE ON THE 12TH, IT WAS. WE HAVE THE CANDY BOX. WE HAVE EVERY SINGLE ONE OF SAMANTHA BURNS'S FAMILY MEMBERS SAYING THIS WAS SAMANTHA BURNS'S CANDY BOX. THIS WAS THE CANDY SHE WAS SELLING FOR THAT CHARITY. LAST TIME WE SAW IT, IT WAS IN HER CAR. THIS IS SAMANTHA BURNS'S. WE GOT FINGERPRINTS, YOU REMEMBER THAT THE ITEMS THAT WERE REMOVED FROM THIS CANDY BOX, 11 FINGERPRINTS OF BRANDON BASHAM, 11 OF HIS FINGERPRINTS ON ITEMS THAT WERE INSIDE THIS CANDY BOX THAT WERE COLLECTED. ONE FINGERPRINT OF CHAD FULKS. WE HAVE STATEMENTS OF BRANDON BASHAM, AND TINA SEVERANCE, AND ANDREA RODDY. HE TELLS TINA SEVERANCE AND ANDREA RODDY, THEY TOOK THAT CANDY BOX OFF OF A GIRL, AND WE GOT THE STATEMENTS OF CHAD FULKS TELLING ANDREA RODDY, THEY GOT THE CANDY BOX WHEN THEY GOT ONE OF THE PURSES FROM ONE OF THE CARS.

WHAT OTHER PHYSICAL EVIDENCE DO YOU HAVE? YOU GOT THE RING. GOVERNMENT'S EXHIBIT 253-F, I BELIEVE. 253-F. NOW, THIS RING RIGHT HERE, IF YOU RECALL THE TESTIMONY OF KANDI BURNS, OBVIOUSLY THE RING HAS NEVER BEEN FOUND. SHE

WENT AND FOUND OUT WHERE SAMANTHA'S EX-FIANCEE HAD PURCHASED THE ENGAGEMENT RING, AND SHE WENT TO THAT JEWELER AND THAT JEWELER WAS ABLE TO FIND ANOTHER JEWELER AROUND THE UNITED STATES WITH THE EXACT SAME RING BECAUSE OF ITS UNIQUENESS, THE HEARTS AND THE DIAMONDS.  SO, THAT IS AN EXACT DUPLICATE OF A RING THAT SAMANTHA BURNS WAS WEARING.  YOU HAVE TINA SEVERANCE, WHO LOOKED AT THAT RING, AND YOU HAVE GOT BETH MCGUFFIN, WHO LOOKED AT THAT RING, CAME IN THE COURTROOM AND SAID, THAT IS THE RING.  TINA SEVERANCE SAID, THAT IS THE RING BRANDON BASHAM HAD AROUND HIS NECK ON HIS NECKLACE.  BETH MCGUFFIN SAID, THAT IS THE RING HE GAVE ME.  I SLIPPED IT UNDER MY PILLOW, NEVER SAW IT AGAIN.  GOT THE WORDS OF BRANDON BASHAM TO ANDREA RODDY, HE TOOK THE RING FROM A GIRL'S CAR.

WHAT OTHER PHYSICAL EVIDENCE?  THE PICTURE I SHOWED YOU, 8:12.  YOU HAVE EVIDENCE, LADIES AND GENTLEMEN THAT THE STIPULATION, THAT IS CHAD FULKS AND BRANDON BASHAM LEFT TOGETHER, AND THAT CHAD FULKS AND BRANDON BASHAM LEFT TOGETHER IN CAMOUFLAGE CLOTHING, AND CHAD FULKS AND BRANDON BASHAM RETURNED.  BUT, LADIES AND GENTLEMEN, YOU DON'T SEE ANYBODY ELSE IN THAT CAR.  WHERE IS SAMANTHA BURNS? THAT IS CHAD FULKS AT HER ATM MACHINE.  WHO IS SECURING SAMANTHA BURNS? WHO IS DENYING SAMANTHA BURNS HER FREEDOM? WHO IS MAKING SURE SAMANTHA BURNS DOESN'T SCREAM OUT AND YELL OUT? THAT IS CHAD FULKS AT THAT ATM MACHINE.  WHERE IS BRANDON BASHAM? WHO IS

WITH SAMANTHA BURNS? WHO IS HOLDING HER?

WHAT OTHER PHYSICAL EVIDENCE DO YOU HAVE? DO YOU REMEMBER TINA SEVERANCE TESTIMONY AT THE LAKE SHORE MOTEL THE DAY BEFORE ALICE DONOVAN DISAPPEARED? SHE WAS IN THE MOTEL ROOM LOOKING THROUGH SHOPPING BAGS, ALL KINDS OF CREDIT CARDS AND ID'S, TOO. THE PROCEEDS OF BRANDON BASHAM AND CHAD FULKS'S CAR BREAK-INS, PURSE STEALING IN SEVEN STATES, LOOKED FOR SOMETHING WITH SIMILAR COLOR HAIR, LOOKED AT DRIVER'S LICENSE WITH SIMILAR COLOR HAIR, THAT GIRL'S NAME WAS SAMANTHA. WHEN SHE SAW THAT FLIER LATER ON AFTER THAT, SHE REMEMBERED THAT ID SHE WAS LOOKING AT LATER ON WAS SAMANTHA BURNS. THE ID CHAD FULKS RIPS FROM HER AND DISPOSES SOMEHOW.

WHAT EVIDENCE IS THERE THAT BRANDON BASHAM WAS WHOLLY AND WITH REGARD HAD INTENT WITH SAMANTHA BURNS, AND HAD INTENT WITH ALICE DONOVAN? WHAT EVIDENCE DO WE HAVE WITH INTENT OF SAMANTHA BURNS? FIRST, THIS IS ABSOLUTELY CRITICAL. IT IS WHAT WE REFER TO AS THE TWO-DRIVER FACT. LADIES AND GENTLEMEN, THERE WERE ONLY THREE PEOPLE INVOLVED IN THE KIDNAPPING AND ABDUCTION OF SAMANTHA BURNS: CHAD FULKS, BRANDON BASHAM, AND SAMANTHA BURNS. AND YOU REMEMBER ONLY TWO OF THOSE THREE PEOPLE COULD DRIVE. CHAD FULKS AND SAMANTHA BURNS. NOT ONLY DID THE GOVERNMENT ASK EACH AND EVERY WITNESS, HOW MANY TIMES DID THE DEFENSE LAWYERS ASK EACH WITNESS THEY CROSS-EXAMINED, BRANDON BASHAM COULDN'T DRIVE, BRANDON BASHAM COULDN'T DRIVE, BRANDON BASHAM DIDN'T

KNOW HOW TO DRIVE. THEY STIPULATED IN WEST VIRGINIA CHAD WAS DRIVING THE VAN AND IN SOUTH CAROLINA CHAD WAS DRIVING THE BMW. LOOK AT THIS MAP. YOU WONDERED, WHEN SO MANY WITNESSES WERE REFERRING TO THIS MAP, WHAT DOES THIS HAVE TO DO WITH ANYTHING? I AM SURE MANY OF YOU ARE WONDERING THAT. OVER ON THE RIGHT-HAND CORNER IS BARBOURSVILLE MALL, THAT IS J. C. PENNEY'S. THAT IS WHERE SAMANTHA BURNS WAS AT 6:30. LADIES AND GENTLEMEN, BARBOURSVILLE MALL IS TEN MILES TO KENOVA OR CEREDO, THAT IS 20 MILES FROM HUNTINGTON. CHAD FULKS IS DRIVING THE VAN. WHO IS DRIVING THE CAR? WHO IS THE ONLY PERSON WITH SAMANTHA BURNS? WHO IS HOLDING SAMANTHA BURNS? WHO IS KIDNAPPING SAMANTHA BURNS? WHO IS ABDUCTING SAMANTHA BURNS? IT IS, YOU KNOW, SOMETIMES LAWYERS ARGUE OVER FACTS. IT IS PHYSICALLY IMPOSSIBLE FOR CHAD FULKS TO DRIVE THE VAN AND SAMANTHA BURNS'S CAR AT THE SAME TIME. THAT IS SILLY. IF CHAD FULKS IS DRIVING THE VAN, BRANDON BASHAM DOESN'T KNOW HOW TO DRIVE, WHO IS DRIVING THE CAR IN THAT LOCATION?

NOW, IT IS ALSO SILLY TO SUGGEST THAT BRANDON IS IN THE VAN WITH CHAD AND SAMANTHA, WITH NOBODY POINTING A GUN AT HER, WITH NOBODY FORCING HER, NOBODY INTIMIDATING HER. SHE IS JUST GOING TO FOLLOW THESE TWO GUYS, DECKED OUT IN TURKEY MASK AND CAMOUFLAGE CLOTHING WILL DRIVE TO THE ATM, NOT DRIVE TO A CONVENIENCE STORE, NOT DRIVE TO A POLICE STATION, NOT CALL SOMEBODY ON HER CELLPHONE. THERE IS ONLY ONE

CONCLUSION.   FOR THOSE 20 MILES, FROM BARBOURSVILLE TO THE ATM MACHINE,  BRANDON BASHAM AND BRANDON BASHAM, ALONE, IS KIDNAPPING, ALONE, SAMANTHA BURNS.   BRANDON BASHAM AND BRANDON BASHAM, ALONE, IS CARJACKING SAMANTHA BURNS.   FOR THAT 20 MILES, HE IS MAKING HIS PLAN,  HIS DECISIONS, AND IT INVOLVES THE LIFE OF SAMANTHA BURNS.  IT IS NOT ONLY AT THE ATM MACHINE, IT WAS AT 8:12.

AT 9:46, HER CELLPHONE IS PINGING OFF THE TWO CELL TOWERS. THAT IS 30 MILES.   LADIES AND GENTLEMEN, WHO IS MAKING SAMANTHA BURNS MAKE THAT CELLPHONE CALL? IF CHAD FULKS IS DRIVING THE VAN, THERE IS ONLY ONE PERSON IN SAMANTHA BURNS'S CAR POINTING THAT GUN AT HER KEEPING HER AWAY FROM HER FREEDOM.

AND MOST IMPORTANTLY, LOOK AT WHERE LAVALETTE IS,  ANOTHER TEN MILES.   UP ON TOP OF THAT MOUNTAIN.   LADIES AND GENTLEMEN,  THEY BURNED SAMANTHA BURNS'S CAR THERE.   IT WAS FOUND THERE.   THERE IS NO QUESTION CHAD FULKS PICKED OUT THAT SITE.   LET'S LOOK AT THAT SITE.   THERE IS NO QUESTION CHAD FULKS PICKED OUT THAT SITE.   BEEN THERE BEFORE WITH AMBER FOWLER.  HAD A CAR BROKEN DOWN THERE BEFORE WITH AMBER FOWLER. NO DOUBT ABOUT IT.   BUT, LADIES AND GENTLEMEN,  THEY HAD TO DRIVE AWAY FROM THAT SITE.   IT IS ON TOP OF A MOUNTAIN IN THE MIDDLE OF NOWHERE.  THEY WILL NOT BURN SOME CAR AND START WALKING DOWN THE ROAD.   THAT COMES TO JUST ONE CONCLUSION. IF CHAD FULKS HAD TO DRIVE THE VAN UP THERE,  SAMANTHA BURNS

**JA 1430**

HAD TO DRIVE HER CAR. THAT IS WHY WE KNOW SHE WAS ALIVE FOR AT LEAST NINE HOURS. BRANDON BASHAM COULDN'T DRIVE. THE DEFENSE LAWYERS HAVE ACKNOWLEDGED THAT THROUGH EVERY WITNESS. SHE HAD TO BE ALIVE TO DRIVE HER CAR WHERE HER CAR WAS BURNED BECAUSE CHAD HAD TO DRIVE THE VAN. AND, LADIES AND GENTLEMEN, IF SHE WAS KILLED AT THAT LOCATION, WE DON'T KNOW WHETHER SHE WAS KILLED THERE AND THEN DRIVEN AND DUMPED IN THE RIVER OR KILLED RIGHT BEFORE THEY DUMPED HER IN THE RIVER. LADIES AND GENTLEMEN, IF SAMANTHA BURNS WAS KILLED UP ON TOP OF THAT DARK AND ISOLATED MOUNTAIN, THEN THE FACT OF THE MATTER IS, THAT BRANDON BASHAM AND BRANDON BASHAM, ALONE, FORCED THAT 19-YEAR-OLD GIRL TO DRIVE TO HER EXECUTION BECAUSE CHAD FULKS WAS DRIVING THE VAN.

AND YOU SEE THE CAR, LOOK AT THIS CAR. LOOK WHAT THEY DID TO THIS CAR. TOTALLY ENGULFED. TOTALLY ENGULFED, LADIES AND GENTLEMEN. WHY? WHAT IS IT WHEN YOU BURN A CAR? YOU DON'T HAVE EVIDENCE. YOU DON'T HAVE FORENSIC EVIDENCE. WHAT WERE BRANDON BASHAM AND CHAD FULKS CONCERNED ABOUT? WERE THEY CONCERNED ABOUT FINGERPRINTS? WERE THEY CONCERNED ABOUT HAIR? WERE THEY CONCERNED ABOUT BLOOD? WERE THEY CONCERNED ABOUT SEMEN? WHAT WERE CHAD FULKS AND BRANDON BASHAM CONCERNED ABOUT THEY NEEDED TO DO THAT TO HER CAR? WHAT WERE THEY CONCERNED ABOUT?

WHAT OTHER EVIDENCE, LADIES AND GENTLEMEN, AS TO BRANDON BASHAM AND CHAD FULKS'S INTENT? MUD. THERE IS MUD ON BOTH

SIDES OF THE CAR. YOU RECALL THE TESTIMONY OF LEATHERMAN. MUD ON PASSENGER'S SIDE AND MUD ON DRIVER'S SIDE. MUD ON BOTH SIDES OF THE CAR, LADIES AND GENTLEMEN. ALSO THE TESTIMONY OF TINA AND ANDREA WHEN THEY GOT BACK TO THE MOTEL ROOM THAT NIGHT, THERE WAS MUD ON BRANDON BASHAM'S SHOES, CHAD FULKS'S BOOTS, MUD ON BRANDON BASHAM CLOTHES, AND CHAD FULKS. MUD ON PASSENGER AND DRIVER, ALL OVER THEIR CLOTHES.

WHAT ELSE? THE TESTIMONY OF MR. HUGHES. THE BODY WAS DUMPED IN THE RIVER. THAT CAME FROM BRANDON BASHAM'S LAWYER IN KENTUCKY. THE BODY WAS DUMPED IN THE RIVER. WHAT IS BY THE RIVER? MUD. MUD ON BOTH SIDES. MUD ON BOTH CLOTHING. AND WHAT DOES THAT TELL YOU? THAT BOTH BRANDON BASHAM AND CHAD FULKS WERE INVOLVED IN DUMPING SAMANTHA BURNS'S BODY IN A RIVER. AND ASK YOURSELVES WHAT POSSIBLY COULD BRANDON BASHAM AND CHAD FULKS HAVE DONE TO SAMANTHA BURNS'S BODY? WHAT COULD THEY HAVE DONE TO HER BODY THAT THEY WANTED TO DUMP HER IN THAT RIVER TO MAKE SURE NO ONE EVER, EVER FOUND HER AGAIN? WHAT DID THESE TWO MEN DO TO THAT LITTLE GIRL? BUT HE DIDN'T HAVE ANY INTENT ON NOVEMBER 14TH TO HURT ANYBODY. HE WOULD NEVER DO SUCH A THING.

FINALLY, FOR NINE-AND-A-HALF HOURS, THE GOVERNMENT SUBMITS TO YOU, NINE-AND-A-HALF HOURS, THEY KEPT HER ALIVE BECAUSE SHE HAD TO DRIVE. LADIES AND GENTLEMEN, THEY WERE DISGUISED. THEY WERE DISGUISED. SAMANTHA BURNS COULD NEVER HAVE COME INTO A COURTROOM AND IDENTIFIED THEM. THEY KILLED

SAMANTHA BURNS, AND THEY WERE DISGUISED. THEN WEREN'T DISGUISED WHEN THEY ABDUCTED ALICE DONOVAN. THEY DID WHAT THEY DID TO SAMANTHA BURNS. THERE IS NO TELLING WHAT THEY DID TO HER FOR NINE-AND-A-HALF HOURS. THEY KILLED HER, AND THEY WERE DISGUISED.

NOVEMBER 12TH, TUESDAY, EARLY THAT MORNING SOME TIME BEFORE SUNUP, CHAD FULKS AND BRANDON BASHAM ARRIVE BACK AT THE HOLLYWOOD MOTEL. BRANDON BASHAM GETS IN THERE, HE TAKES HIS CLOTHES OFF. RUNS IN, TAKES HIS CLOTHES OFF, DIRTY, MUDDY CLOTHES, TAKES A NICE LONG HOT SHOWER, PUTS ON BEDCLOTHES, CLIMBS IN BED WITH ANDREA RODDY. CHAD FULKS GETS TO THE HOTEL ROOM, MAKES HIMSELF A SANDWICH, GETS HIMSELF A SODA, WAITS FOR HIS BUDDY TO GET OUT OF THE SHOWER, HE TAKES A LONG, HOT SHOWER, PUTS ON HIS BEDCLOTHES, AND CLIMBS IN BED. BRANDON BASHAM AND CHAD FULKS GO TO SLEEP. JUST ANOTHER NIGHT ON THE TOWN FOR THESE TWO MEN, THESE TWO FRIENDS.

THEY GET UP THE NEXT MORNING, LEAVE HUNTINGTON, WEST VIRGINIA. DESTINATION, ACCORDING TO CHAD FULKS, WE ARE GOING TO THE BEACH. GOING TO THE BEACH. BRANDON BASHAM WILLINGLY ARRIVES WITH HIM. ARRIVES AT LAKE SHORE MOTEL.

WEDNESDAY, NOVEMBER 13TH, 2002. THESE TWO GENTLEMEN GET UP AND THEY LEAVE TINA AND ANDREA AT LAKE SHORE MOTEL. WHERE DO WE KNOW THEY WENT? BETWEEN TWO AND 2:30, HELEN COOK, WHO TOOK THE WITNESS STAND, THEY WENT TO SAVANNAH BLUFF. SHE WAS GETTING READY TO GO PICK HER CHILDREN UP FROM SCHOOL.

WEDNESDAY, NOVEMBER 13TH, BRANDON BASHAM AND CHAD FULKS, TWO ESCAPEES FROM KENTUCKY, ARE DRIVING AROUND THE ROADS, STREETS OF SOUTH CAROLINA LOOKING FOR TROUBLE, AND THEY FOUND IT. THEY SURE DID FIND IT THAT NEXT DAY. BUT ON THAT WEDNESDAY, LADIES AND GENTLEMEN, THAT VAN IS IN THE SAVANNAH BLUFF AREA. LATER ON THAT DAY, GO BREAKING INTO CARS AND STEALING PURSES. GET INTO THE HOTEL ROOM, TINA WAS LOOKING THROUGH THE BAG OF ID'S I TOLD YOU ABOUT BEFORE. THE FOUR OF THEM DECIDE TO GO SHOPPING, GO TO A BUNCH OF OUTLET MALLS IN MYRTLE BEACH, BUNCH OF DEPARTMENT STORES. CHAD IS USING THE CREDIT CARDS, HE IS THE CREDIT CARD FRAUD GUY, BRANDON IS FORGING CHECKS. THEY ARE BUYING CLOTHES. ON THE WAY BACK, THEY STOP OFF AT FOOD LION. THEY STOP OFF AT FOOD LION, BUY WINE, GO BACK TO THE MOTEL ROOM.

THIS IS IMPORTANT, LADIES AND GENTLEMEN. IF YOU WANT TO DELVE INTO THE MIND OF BRANDON BASHAM, IF YOU WANT TO LOOK INTO HIS SOUL, WHAT DOES HE DO THAT WEDNESDAY NIGHT? WHEN HE GETS BACK TO THE MOTEL ROOM, THEY GOT THE WINE, GOT THE BOOZE, HE GOES OUT, FINDS SOMEBODY IN THE HOTEL TO SELL HIM SOME DOPE. HE BUYS SOME DOPE FOR HE AND HIS FRIEND CHAD AND HIS LADY FRIENDS. THAT WEDNESDAY NIGHT, BRANDON BASHAM AND CHAD FULKS, THEY DRINK WINE, THEY SMOKE DOPE, AND THEY PLAY CARDS. LESS THAN 48 HOURS AFTER KIDNAPPING, ABDUCTING, DOING WHO KNOWS WHAT TO 19-YEAR-OLD SAMANTHA BURNS, KILLING HER AND DUMPING THAT GIRL'S BODY IN THE RIVER, BRANDON BASHAM

IS DRINKING WINE, AND SMOKING DOPE, AND PLAYING CARDS BECAUSE HE IS AT THE BEACH. AND HE IS HAVING FUN. THEY EITHER PASS OUT OR GO TO BED THAT NIGHT. AND SOME 20 OR 25 MILES AWAY, ALICE DONOVAN, 44-YEARS-OLD, SHE IS GOING TO BED THAT NIGHT WITH HER HUSBAND OF TEN YEARS, BARRY. GOING TO BED THAT NIGHT, KNOWING HER TWO DAUGHTERS ARE LIVING WITH HER, HER GRANDSON ANTHONY. KNOWING THE NEXT DAY IS HER DAY OFF AND HAVING NO IDEA OF THE HORROR THAT AWAITS HER AND THE NAMES OF BRANDON BASHAM AND CHAD FULKS.

THURSDAY, NOVEMBER 14TH, 2002, ALICE DONOVAN'S LAST DAY ON THIS EARTH. HOW DOES IT START FOR BRANDON BASHAM AND CHAD FULKS? THEY GET UP, DESTINATION BEACH WALK MOTEL. THEY LEAVE LAKE SHORE IN LITTLE RIVER, GO DOWN TO MYRTLE BEACH. THEY CHECK IN, WE KNOW SOMEWHERE AROUND 12, 12:30 BECAUSE OF TONYA RICHARD'S TESTIMONY. THEY ARE SCOPING AGAIN, IN HORRY COUNTY LOOKING FOR TROUBLE. TONYA HAD HEARD ABOUT THE GREEN VAN, SHE PULLS UP, SHE IS LOOKING, SHE SEES THE BLOND-HAIRED GUY DRIVING, AND THE DARK-HAIRED GUY, SHE SEES THE DARK-HAIRED GUY REACHING FOR SOMETHING, AND THE BLOND-HAIRED GUY KEEPING HIM FROM GRABBING WHATEVER HE IS GOING TO GRAB. GETS BEHIND THEM, TAKES DOWN INDIANA LICENSE PLATE THAT MATCHES TINA SEVERANCE.

THE ATTEMPTED SHOOTING OF CARL JORDAN. NO QUESTION ABOUT IT, CARL JORDAN ARRIVES BETWEEN 1:45 AND 2:00 O'CLOCK AT HIS SON SAM JORDAN'S RESIDENCE. NO QUESTION, CHAD FULKS WALKS

OUT THE BACK DOOR, HE IS NOT ARMED, AT THAT TIME, GETS INTO THE DRIVER SEAT OF THE VAN. THERE IS NO QUESTION THAT SHORTLY THEREAFTER, BRANDON BASHAM COMES RUNNING AROUND THE FRONT SHOOTING. YOU HAVE TO PUT YOURSELF IN CARL JORDAN'S PERSPECTIVE. HE HEARS GUNSHOTS, SEES SOMEONE POINTING IN THE GENERAL DIRECTION. HE IS CRUNCHING DOWN. HE MAY NOW KNOW THAT BRANDON BASHAM HAD A BETTER OPPORTUNITY TO SHOOT HIM. AT THAT TIME, HE SEES BRANDON BASHAM RUNNING AROUND THE CORNER SHOOTING AT HIM. NO QUESTION, CHAD FULKS SHOOTS OUT THAT BACK WINDOW WITHIN A FOOT OF HIS HEAD. NO QUESTION ABOUT IT. NO QUESTION, AS MR. JORDAN IS DRIVING AWAY, SHOTS ARE BEING FIRED. DON'T KNOW IF THEY ARE COMING FROM THE PASSENGER SIDE OR DRIVER SIDE. SHOTS ARE BEING FIRED AT HIM. NO QUESTION ABOUT IT, LADIES AND GENTLEMEN, INSIDE THE VAN WERE ITEMS THAT THEY WERE GETTING READY TO STEAL. ONCE YOU PICK SOMETHING UP AND MOVE IT OF SOMEBODY ELSE'S POSSESSION, THAT IS ENOUGH EVIDENCE FOR POSSESSION. I WILL GET TO THAT IN A MOMENT, BUT WE ALSO KNOW THE GUNS, THOSE RIFLES AND SHOTGUNS, WERE SAM JORDAN'S. BOTH BRANDON BASHAM AND CHAD FULKS ARE FELONS IN POSSESSION, THEY POSSESSED THOSE, NO MATTER HOW LONG IT WAS, THEY DID POSSESS THEM JOINTLY FOR A PERIOD OF TIME THAT DAY. THEY ARE AFTER MORE GUNS, MORE SHOTGUNS AND MORE RIFLES IS WHAT BRANDON BASHAM AND CHAD FULKS ARE AFTER. SO, WHAT WERE THEY DOING? YOU GOT TO REMEMBER, AGAIN, THIS WAS A TWO-MAN TEAM THAT DAY. IT WAS BRANDON BASHAM AND CHAD FULKS

BURGLARIZING SAM JORDAN'S HOUSE.  IT WAS BRANDON BASHAM AND CHAD FULKS LOOKING THROUGH SAM JORDAN'S WIFE'S DRAWERS, HER MOST PERSONAL POSSESSIONS, HER JEWELRY, OR HER CLOTHES.  IT WAS BRANDON BASHAM AND CHAD FULKS GOING INTO SAM JORDAN'S LITTLE BOYS' ROOMS, RUMMAGING THROUGH HIS CHILDRENS' STUFF. BRANDON BASHAM AND CHAD FULKS DOING THAT IN BROAD DAYLIGHT IN HORRY COUNTY, SOUTH CAROLINA, ARMED AND DANGEROUS.

THEY LEAVE CARL JORDAN'S.  LOOK AT THIS AERIAL PHOTOGRAPH. THEY LEAVE CARL JORDAN'S DRIVING REAL FAST, IN THAT VAN. COOPER METAL IS ON THE RIGHT.  THEY ARE DRIVING SO FAST, THEY ARE DRIVING SO FAST THAT CHAD FULKS ALMOST HITS AND KILLS BILLY MARTINI.  WHAT DOES BILLY MARTINI, WHEN THAT VAN MAKES THAT THREE-POINT TURN AND SLOWS DOWN AND BILLY MARTINI IS A COUPLE FEET AWAY AND HE HAS THE OPPORTUNITY TO LOOK INTO THAT WINDSHIELD, WHAT DOES HE SEE? HE SEES CHAD FULKS, THE GUY WITH THE BLOND HAIR DRIVING, AND HE SEES THE GUY NEXT TO HIM REACHING FOR SOMETHING, AND THE GUY IN THE BLOND HAIR TRYING TO KEEP HIS HAND DOWN, TRYING TO KEEP THE GUY WITH THE SHORT BRUNETTE HAIR, HE IS REACHING FOR SOMETHING. WHEN THEY ARE DOING THAT THREE-POINT TURN THERE AT COOPER METALS, WHAT DO YOU THINK BRANDON BASHAM IS REACHING FOR? YOU THINK HE IS REACHING FOR A CAMERA?  DO YOU THINK HE IS GOING TO TAKE A SNAPSHOT? THEY ARE ARMED AND DANGEROUS, LADIES AND GENTLEMEN.

AND THEN THEY GET THAT VAN STUCK AT THE WILLIAMSON RESIDENCE.  THEY CROSS THIS FIELD YOU SEE OVER HERE ON THE

LEFT-HAND SIDE, MORE RESIDENCES, THAT TREELINE BACK THERE IS WHERE THIS CAMOUFLAGE BAG EVENTUALLY WAS FOUND, THIS BAG THAT EVERYBODY SAID WHENEVER THEY SAW ANYBODY HOLDING THIS BAG IT WAS IN BRANDON BASHAM'S POSSESSION. THE BAG THAT GUN WAS FOUND IN WAS ALWAYS IN BRANDON BASHAM'S POSSESSION. THEY DUMPED THAT BAG, AND BRANDON BASHAM APPROACHES MS. MOORE. BRANDON BASHAM, JUST LIKE THE JAMES HAWKINS. BRANDON BASHAM IS DOING THE TALKING. BRANDON BASHAM IS DOING THE DECEIVING. BRANDON BASHAM IS DOING THE LYING. CHAD FULKS STANDING A FEW FEET BEHIND HIM. THEY BELIEVE MS. MOORE, ACTING ALL SUSPICIOUS YOU RECALL THAT TESTIMONY, I WON'T GO OVER IT. YOU RECALL THAT TESTIMONY. THEY CROSS THE STREET TO GO TO OUIDA HYMAN, STEAL A OUIDA HYMAN TRUCK, IT HAS THE KEYS OF IT. THE ABDUCTION OF ALICE DONOVAN. NO QUESTION ONE OF THE INTENTIONS OF CHAD FULKS AND BRANDON BASHAM IS WHEN THEY GOT THAT WHITE PICKUP TRUCK, WANTED NEW WHEELS. ONLY ONE OF THEIR INTENTIONS. NOBODY WAS CHASING THEM AT THAT POINT. I MEAN, THEY HAD TO ASSUME, THE GOVERNMENT SUBMITS, THAT YOU KNOW MS. MOORE SAW THEM, MS. HYMAN SAW THEM, THEY WANT TO GET RID OF THE CAR, NO ONE IS CHASING THEM. MS. HYMAN SAID THE WAL-MART IS 10 TO 11 MILES AWAY. CHAD FULKS AND BRANDON BASHAM HAD 10 OR 11 MILES TO THINK ABOUT WHERE THEY WOULD GET THEIR NEXT CAR. YOU SAW THAT WAL-MART. YOU HAVE BEEN TO WAL-MART BEFORE IN THE MIDDLE OF THE AFTERNOON. YOU KNOW HOW CROWDED THEY ARE. THINK OF THE OPTIONS THEY MUST HAVE HAD.

IF ALL THEY WANTED WAS A CAR, JUST STEALING A CAR WAS THE ONLY THING, IF THEY DIDN'T WANT PURSES, AND IF THEIR INTENTIONS WEREN'T MORE DEVIANT WHEN IT CAME TO SNATCHING WOMEN, WHY DIDN'T THEY JUST BUMRUSH MS. MOORE? SHE IS STANDING THERE IN THE OPEN. SOME 70-PLUS-YEAR-OLD WOMAN STANDING THERE WITH AN OPEN STORM DOOR, CAR WAS IN THE CARPORT. IT WOULD HAVE BEEN AWAY FROM EVERYBODY. IF ALL THEY WANTED WAS A CAR, WHY NOT BUMRUSH MS. MOORE? IF ALL THEY WANTED WAS A CAR, WHY NOT KNOCK ON MS. HYMAN'S RESIDENCE, SEE SHE IS ELDERLY, BUMRUSH HER. THE GOVERNMENT SUBMITS THEIR INTENT WAS MORE DEVIANT THAN THAT. IT WASN'T JUST A CAR. WHY DIDN'T THEY APPROACH AN ELDERLY MAN IN THE WAL-MART PARKING LOT? APPROACH SOMEBODY THAT WAS NOT IN GOOD SHAPE OR WOULDN'T BE ABLE TO FIGHT BACK, SOME MAN OR SOME YOUNG TEENAGE BOY? WHY DID THEY TARGET ANOTHER WOMAN? THE GOVERNMENT SUBMITS TO YOU THEY TARGETED ALICE DONOVAN BECAUSE SHE WAS A FEMALE, BECAUSE SHE WAS RELATIVELY YOUNG, AND THEY COULD SEE THAT ON THAT BROAD DAYLIGHT AND BECAUSE SHE WAS ALONE.

AND, LADIES AND GENTLEMEN, MAKE NO MISTAKE ABOUT IT, IT TOOK THE ACTIONS OF CHAD FULKS AND THE ACTIONS OF BRANDON BASHAM TO CARRY OUT THAT KIDNAPPING, TO CARRY OUT THAT CARJACKING. NOW, WHAT HAPPENS? THE VIDEO. WATCH THIS VIDEO VERY BRIEFLY. HERE IS THE PICKUP OF ALICE. THERE IS ALICE PULLING IN. THERE IS BRANDON GETTING OUT RIGHT THERE.

EVERYONE AGREES CHAD FULKS IS DRIVING. EVERYBODY. LADIES AND GENTLEMEN, CHAD FULKS HAD CHOICES THAT DAY. CHAD FULKS CHOSE TO DRIVE THAT PICKUP TRUCK, AND CHAD FULKS CHOSE TO DRIVE THAT PICKUP TRUCK BEHIND ALICE DONOVAN'S BMW. BUT GUESS WHAT? BRANDON BASHAM HAD HIS OWN CHOICES THAT AFTERNOON. BRANDON BASHAM CHOSE TO JUMP OUT OF THAT TRUCK BEFORE IT WAS EVEN STOPPED. NOBODY FORCED HIM TO DO THAT. BRANDON BASHAM CHOSE ALICE DONOVAN. HE DIDN'T KNOW WHAT HER NAME WAS. HIS CHOICE. HE CHOSE TO JUMP OUT AND RUN UP TO THAT CAR. AND THIS IS FAST TIME, YOU REMEMBER ALL OF THE TESTIMONY WHEN MR. SCHOOLS WAS PUTTING THIS IN, FROM THE TIME THAT BRANDON BASHAM JUMPS OUT OF THAT PICKUP TRUCK, TO THE TIME THAT ALICE DONOVAN'S CAR PULLS OUT AND HEADS TO THE BACK OF THAT PARKING LOT, 46 SECONDS. GIVE THEM SIX SECONDS TO JUMP IN ALICE DONOVAN'S CAR. LET'S JUST GIVE THEM -- LET'S GIVE BRANDON BASHAM SIX SECONDS. CHOICES. ON NOVEMBER 14TH, 2002, BETWEEN 2:30 AND 3:00 O'CLOCK, IN THE WAL-MART PARKING LOT IN HORRY COUNTY, BRANDON BASHAM HAD CHOICES AND BRANDON BASHAM ALONE. HE WAS ALONE WITH ALICE DONOVAN. HE WAS ALONE WITH HER ARMED. AND FOR 46 -- 40 SECONDS BRANDON BASHAM HAD CHOICES TO MAKE. IT WAS HIS CHOICE TO POINT THIS GUN AT ALICE DONOVAN. HIS CHOICE TO ORDER ALICE DONOVAN TO THE BACK OF THAT PARKING LOT. CHAD FULKS -- BRANDON BASHAM IS IN THIS BMW. CHAD FULKS IS IN ANOTHER VEHICLE. THOSE CHOICES THAT WERE MADE WITH ALICE DONOVAN IN THAT BMW WERE BRANDON BASHAM'S

CHOICES AND HIS CHOICES ALONE.  HIS CHOICE.  AND HE MADE IT. HE INITIATED THAT CARJACKING AND HE INITIATED THAT KIDNAPPING, AND HE, ALONE, WAS IN THAT BMW.  HIS CHOICE.  THEY DRIVE THE BMW, ORDER ALICE DONOVAN TO DRIVE TO THE BACK PARKING LOT. CHAD FULKS DROPS OFF THE PICKUP TRUCK, GETS IN THE CAR.

WHAT HAPPENS AFTER SHE IS ABDUCTED? WHAT HAPPENS, LADIES AND GENTLEMEN? WELL, THEY GO TO ATM MACHINES.  NO QUESTION, CHAD FULKS IS DRIVING, NO QUESTION.  WHO IS IN THE BACK SEAT WITH ALICE DONOVAN? THINK ABOUT THIS.  BUT FOR THE ACTIONS OF BRANDON BASHAM AND CHAD FULKS, THEY NEVER COULD HAVE DONE THIS.  IF THERE WAS NOBODY IN THE BACK SEAT HOLDING ALICE DONOVAN HOSTAGE IN THE BACK SEAT OF HER BMW AND CHAD FULKS IS DRIVING THE CAR, SHE GETS OUT OF THE CAR.  SHE GETS OUT OF THE CAR.  WHERE DO THEY GO? THEY GO TO THE PANTRY ON HIGHWAY 90.  WHO GOES INSIDE THE PANTRY ON HIGHWAY 90? BRANDON BASHAM? NOT BRANDON BASHAM.  CHAD FULKS.  EVERYBODY AGREES WITH THAT, AS WELL.  GO TO THE PANTRY ON HIGHWAY 90 IN BROAD DAYLIGHT ON THURSDAY, NOVEMBER 2ND, THEY PARK THAT CAR, ALICE DONOVAN'S BMW, SO WHEN CHAD FULKS IS INSIDE THAT PANTRY TRYING TO ACCESS ALICE DONOVAN'S ATM CARD, WHEN HE IS IN THAT PANTRY ALONE, YOU SAW HOW LONG HE IS IN THAT PANTRY, WHO IS IN THE CAR WITH ALICE DONOVAN? WHO IS MAKING CHOICES? WHO IS HOLDING ALICE DONOVAN AT GUNPOINT? THIS IS BROAD DAYLIGHT. DON'T YOU THINK IF ALICE DONOVAN COULD HAVE SCREAMED OUT FOR HELP, DON'T YOU THINK ALL OF THE PEOPLE, THEY WOULD ALL BE

WALKING IN AND OUT OF PANTRY'S ALL DAY LONG, MIDDLE OF THE AFTERNOON, HIGHWAY 90, DON'T YOU THINK IF SHE COULD HAVE SCREAMED OUT FOR HELP, SHE WOULD? DON'T YOU THINK IF SHE COULD HAVE LEFT THAT CAR, SHE WOULD? THE ONLY PERSON MAKING CHOICES OF ALICE DONOVAN'S FREEDOM WHEN CHAD FULKS IS IN THAT PANTRY IS BRANDON BASHAM, BRANDON BASHAM ALONE.

IT DOESN'T STOP THERE. THEY LEAVE THAT PANTRY. CHAD FULKS IS UNSUCCESSFUL. THEY GO TO CAROLINA FIRST, DIAGONAL TO LAKE SHORE MOTEL ON HIGHWAY 17. MANY OF YOU JURORS KNOW HOW BUSY THAT IS IN LITTLE RIVER, YOU SAW THE VIDEO. CHAD FULKS WALKS UP TO THE DRIVE-THROUGH, STANDING AT THE ATM. WHO IS IN THE CAR WITH ALICE DONOVAN? ALICE DONOVAN ISN'T WALKING AWAY, ISN'T SCREAMING. WHO IS KEEPING ALICE DONOVAN FROM HER FREEDOM? WHO IS MAKING CHOICES TO MAKE SURE THAT ALICE DONOVAN'S FATE IS SEALED? KIDNAPPING AND CARJACKING ARE CONTINUOUS OFFENSES.

LADIES AND GENTLEMEN, THERE IS NO EVIDENCE, AT ANY TIME, ON NOVEMBER 14TH THAT CHAD FULKS WAS EVER ALONE WITH ALICE DONOVAN. AND YET YOU HAVE SEEN, WE HAVE SHOWN YOU THE PHOTOGRAPHS AND THE PICTURES. NOT ONCE, NOT TWICE, NOT THREE TIMES, BECAUSE I AM GETTING READY FOR THE FOURTH TIME BRANDON BASHAM WAS ALONE IN THE WAL-MART PARKING LOT WITH ALICE DONOVAN, ALONE WITH ALICE DONOVAN AT THE PANTRY ON HIGHWAY 90, ALONE WITH ALICE DONOVAN AT CAROLINA FIRST.

IT GETS BETTER THAN THAT, LADIES AND GENTLEMEN. THEY

LEAVE, GO TO THE AMOCO IN SHALLOTTE, NORTH CAROLINA, THE DODGE AMOCO. NO QUESTION, CHAD FULKS PULLS UP, HE WAS DRIVING, NO QUESTION ABOUT IT. YOU HAVE SEEN THAT VIDEO, LADIES AND GENTLEMEN. YOU REMEMBER HOW LONG CHAD FULKS WAS IN THAT CONVENIENT STORE? TWO MINUTES AND 45 SECONDS. CHAD FULKS WALKS IN, AND YOU SAW WHERE THAT CAR WAS PARKED, TWO MINUTES AND 45 SECONDS IN BROAD DAYLIGHT WITH ALL OF THOSE PEOPLE COMING AND GOING, AND ALICE DONOVAN IS IN THE BACK SEAT OF HER BMW WITH BRANDON BASHAM. AT THAT POINT IN TIME, LADIES AND GENTLEMEN, BRANDON BASHAM'S WILLFUL CONDUCT IS THAT HE IS HOLDING ALICE DONOVAN HOSTAGE, BECAUSE IF HE WASN'T HOLDING HER HOSTAGE, SHE COULD GET OUT OF HER CAR AND COULD WALK INTO THE CONVENIENT STORE WHERE THERE ARE DOZENS AND DOZENS OF PEOPLE TO PROTECT HER. FOR TWO MINUTES 45 SECONDS, BRANDON BASHAM IS MAKING CHOICES. TWO MINUTES 45 SECONDS, BRANDON BASHAM CONTINUES TO CHOOSE DEATH FOR ALICE DONOVAN. FOUR TIMES BRANDON BASHAM IS ALONE WITH ALICE DONOVAN. FOUR TIMES. HE HAS CHOICES TO MAKE.

THEY LEAVE THE BEE TREE FARM -- I'M SORRY, LEAVE THE DODGE AMOCO AND DRIVE TO BEE TREE FARMS. WHAT EVIDENCE DO WE HAVE OF BEE TREE FARMS? LET ME GET BACK TO DODGE AMOCO. LET ME SHOW YOU THIS STILL PHOTOGRAPH. THERE IS CHAD FULKS CALM, COOL, LOOK AT HIM, PUMPING GAS WITH HIS HAND IN HIS POCKET LIKE HE IS GETTING READY TO GO TAILGATE FOR A FOOTBALL GAME. WHAT DO YOU NOT SEE? YOU HAVE AN OPEN VIEW OF THE DRIVER'S

SEAT AND PASSENGER SEAT. BRANDON BASHAM IN THE BACK SEAT OF THAT CAR WHILE CHAD FULKS IS CASUALLY PUMPING GAS, BRANDON BASHAM IS MAKING SURE ALICE DONOVAN IS NOT TALKING, IS NOT SCREAMING, IS NOT RESISTING.

WHAT ELSE, LADIES AND GENTLEMEN? REMEMBER THIS DUCT TAPE, GOVERNMENT'S 23-B. DUCT TAPE FOUND IN ALICE DONOVAN'S CAR UP IN INDIANA. SIX, SIX FINGERPRINTS OF BRANDON BASHAM TAKEN OFF THAT DUCT TAPE THAT WAS FOUND IN ALICE DONOVAN'S CAR. SIX OF HIS FINGERPRINTS. BEE TREE FARM. THEY GO TO BEE TREE FARM, NO QUESTION CHAD FULKS IS DRIVING. IF IT WAS CHAD FULKS, CHAD FULKS, ALONE, ANY TIME HE SLOWS DOWN, ALICE DONOVAN IS SLIPPING OUT OF THE CAR. EVEN IF SHE INJURES HERSELF GOING 5, 10-MILES PER HOUR IN A TURN, NO PERSON, NO WOMAN IN THE BACK SEAT OF THE CAR WITH PERPETRATOR DRIVING, IS NOT GOING TO JUMP OUT. BRANDON BASHAM IS NOT DRIVING AGAIN, TWO OF THEM, TOOK TWO OF THEM TO GET THEM TO THE ISOLATED AREA. CHAD FULKS TO DRIVE, BRANDON BASHAM TO MAKE SURE SHE DIDN'T GET AWAY. BOTH OF THEM TOGETHER ACTING AS A TEAM.

BEFORE THEY GET TO THE HUNT CLUB, AROUND 4:30 THEY FORCE ALICE DONOVAN TO MAKE A PHONE CALL TO CALL HOME. THE GOVERNMENT SUBMITS THERE ARE TWO REASONS: ONE, THEY WANT MORE TIME IN ORDER TO FLEE SOUTH CAROLINA, IN ORDER TO CONTINUE THEIR ESCAPE, IF YOU WILL. AND THE OTHER, THE GOVERNMENT SUBMITS, BECAUSE THEY WANTED MORE TIME TO DO

WHATEVER THEY DID TO ALICE DONOVAN OR, ACCORDING TO BRANDON BASHAM'S OWN WORDS, TO DO THEIR THING.  NOT MY WORDS, BRANDON BASHAM'S WORDS.  AT THE CEMETERY, THEY DO THEIR THING.  YOU REMEMBER DAVID HALL'S TESTIMONY, ONE OF THE MEN BARBECUING AT THE HUNT CLUB.  THEY DID THE THREE-POINT TURN, BLOND-HAIR GUY DRIVING, WOMAN IN THE MIDDLE, THERE WASN'T A PERSON SITTING BEHIND THE PASSENGER SEAT, THERE WAS A PERSON SITTING BEHIND THE DRIVER SEAT, SO THAT WOMAN WAS SCRUNCHED UP.  SEEING THOSE PEOPLE, HE MADE SURE HE WAS UP CLOSE AND PERSONAL WITH ALICE DONOVAN SO SHE COULDN'T DO ANYTHING, SHE COULDN'T MAKE SOME SORT OF HAND SIGNAL.  THE ONLY ONE IN THE BACK SEAT WITH ALICE DONOVAN AND BRANDON BASHAM AT THE BEE TREE FARMS.

WHAT WAS HIS INTENT, LADIES AND GENTLEMEN?  LET ME PUT THIS IN PERSPECTIVE.  LET ME PUT BRANDON BASHAM'S INTENT IN PERSPECTIVE.  BRANDON BASHAM WAS AN ESCAPEE WHO WAS WANTED BY THE LAW.  BRANDON BASHAM BURGLARIZED TALSMA'S HOME. KIDNAPPED AND CARJACKED JAMES HAWKINS.  INVOLVED HIMSELF WITH THE CARJACKING, KIDNAPPING, KILLING, BODY DISPOSAL OF SAMANTHA BURNS.  JUST INVOLVED IN A SHOOTING BURGLARY INCIDENT IN SOUTH CAROLINA.  BRANDON BASHAM HAD JUST KIDNAPPED AND CARJACKED A WOMAN WEARING NO DISGUISES.  DO ANY OF YOU THINK THAT FOR ONE MINUTE, THE TIME BRANDON BASHAM IS SITTING IN THE CAR, AS THE TIME THE CARJACKING AND KIDNAPPING IS CONTINUING, DO YOU THINK FOR ANY MINUTE, THAT BRANDON BASHAM OR CHAD FULKS IS GOING TO LET ALICE DONOVAN GO?  IS

GOING TO SET HER FREE? GOING TO ALLOW ALICE DONOVAN, WHO IS THAT CLOSE TO BRANDON BASHAM, SPENT HOURS WITH BRANDON BASHAM TO BE ABLE TO GO TO A SKETCH ARTIST, COME INTO A COURT OF LAW IN SOUTH CAROLINA IN FRONT OF A SOUTH CAROLINA JURY AND SAY, THAT MAN, BRANDON BASHAM, CARJACKED ME, THAT MAN, BRANDON BASHAM, KIDNAPPED ME? DO YOU THINK FOR ONE MINUTE BRANDON BASHAM WOULD ALLOW ALICE DONOVAN TO DO THAT?

WHAT WAS HIS STATE OF MIND AFTER HE KILLED ALICE AND DISPOSED OF HER BODY? YOU KNOW THE STATE OF MIND. HIS LAWYER, RICHARD HUGHES, IN KENTUCKY TOOK THE STAND. HIS LAWYER IN KENTUCKY TOLD YOU WHAT HIS STATE OF MIND WAS. AFTER DRAGGING ALICE DONOVAN OUT OF THE WOODS SOMEWHERE AND AFTER DUMPING LEAVES AND LIMBS ON ALICE DONOVAN SOMEWHERE, BRANDON BASHAM GOT BACK IN THE CAR, HE SMOKED HIMSELF SOME DOPE, HE DRANK HIMSELF SOME ALCOHOL, HE GOT HIGH ON THE TRIP BACK TO THE BEACH. THAT IS WHAT HIS STATE OF MIND WAS.

THEY GET BACK TO THE MOTEL. LADIES AND GENTLEMEN, CHAD FULKS HAD AN OPPORTUNITY TO TELL TINA SEVERANCE. THEY WERE IN THE BATHROOM TOGETHER. HE LIES. BRANDON BASHAM HAD AN OPPORTUNITY TO TELL ANDREA RODDY WHEN CHAD AND TINA ARE IN THE BATHROOM, AND HE LIES. THEY LEAVE. DESTINATION WEST VIRGINIA, AND THEY ARE IN ALICE DONOVAN'S BLUE BMW, GOVERNMENT'S EXHIBIT 152. THEY ARRIVE, AROUND RALEIGH, CHAD FULKS ACCESSES ALICE DONOVAN'S CARD TO GET $600 OUT. HE IS WEARING THIS BLACK JACKET, WHICH JUST GOES TO SHOW YOU, THE

JACKET BRANDON BASHAM WAS ARRESTED IN, TINA SEVERANCE'S ACTUALLY, THE JACKET CHAD FULKS IS WEARING, THEY ARE SUCH CLOSE FRIENDS THEY ARE SWAPPING CLOTHES WITH ONE ANOTHER. THAT IS THE COAT STIPULATED TO THAT CHAD FULKS IS THE ONE GETTING THAT MONEY OUT OF THE ATM MACHINE IN RALEIGH, NORTH CAROLINA. WEARING THAT COAT, THE COAT BRANDON BASHAM WAS ARRESTED IN IN ASHLAND, KENTUCKY.

THEY ARRIVE AT BETH MCGUFFIN'S HOUSE ON FRIDAY, NOVEMBER 15TH. BRANDON BASHAM ARMED STILL WITH HIS GUN, ACCORDING TO BETH MCGUFFIN. BRANDON BASHAM AND CHAD FULKS, THE FIRST THING THEY WANT TO DO WHEN THEY GET THERE IS WASH THEIR CLOTHES. THEY WON'T LET HER WASH THEIR CLOTHES. THEY WASH THEIR OWN CLOTHES. WHAT ARE CHAD FULKS AND BRANDON BASHAM'S DESIRES? DRUGS, ALCOHOL, AND SEX. THAT IS WHAT IS ON THE MIND OF CHAD FULKS AND BRANDON BASHAM.

WHAT WAS THEIR DEMEANOR LIKE THAT FRIDAY NIGHT, THAT WHOLE WEEKEND, DO YOU REMEMBER? BETH AND STACY WORKMAN'S TESTIMONY, THE TWO OF THEM. WHAT WAS BRANDON BASHAM DOING? HE WAS LAUGHING, JOKING AROUND, HE WAS HAVING A GOOD TIME. THE TWO OF THEM WERE EXCITED ABOUT GOING TO A BIKE RALLY IN ARIZONA. THEY WERE ACTING LIKE THEY WERE BEST FRIENDS, TALKING GUY STUFF. CHAD FULKS WAS TRYING TO GET BETH TO GET STACY TO BE INTERESTED IN HIM. THEN HE WAS TRYING TO GET WOMEN, ASK PEOPLE TO GO OUT TO A BAR AND GET WOMEN. ANTHONY CREMEANS' TESTIMONY. BRANDON HAD HIS WOMAN. HE HAD BETH.

THEY WANT TO BELIEVE SOMEHOW WHEN BRANDON BASHAM AND CHAD FULKS WERE LEAVING, BRANDON DIDN'T WANT TO LEAVE. HE WAS SCARED ON THAT SUNDAY GOING TO ASHLAND. THAT IS WHY HE DIDN'T WANT TO LEAVE. LADIES AND GENTLEMEN, THAT WHOLE WEEKEND, BRANDON BASHAM WAS GETTING HIS DRUGS PAID FOR, GOT AS MUCH DRUGS AS HE CAN SMOKE AND USE, GOT HIS BOOZE PAID FOR, BEEN TO JAIL FOR A COUPLE OF YEARS, SPENT TIME WITH ANDREA RODDY, HAVING SEX WITH BETH MCGUFFIN. IN HIS MIND, LADIES AND GENTLEMEN, THAT IS BRANDON BASHAM'S SPRING BREAK. HE GOT HIS DRUGS, HIS BOOZE, AND HIS WOMEN. HE IS NOT AFRAID OF ANYONE. THE ONLY EVIDENCE OF BEING AFRAID IS AFTER HE WAS ARRESTED, AFTER HE WAS CHARGED, AFTER HE IS FACING THESE CHARGES.

THAT SATURDAY, DRIVING THE CAR, NO QUESTION CHAD FULKS IS TRYING TO SELL THE CAR AND THIS GUN, NO DOUBT ABOUT IT. ALSO NO QUESTION, LADIES AND GENTLEMEN, THAT BETH MCGUFFIN IS DRIVING ALICE DONOVAN'S BMW. SHE IS IN THAT CAR ALONE WITH CHAD FULKS WHEN THEY GO TO GET FOOD -- WITH BRANDON BASHAM WHEN THEY GO TO GET FOOD. BRANDON DOESN'T SAY ANYTHING TO HER. HE DOES SAY WHEN A COP COMES UP, PULL OVER, PULL OVER ON THE SIDE OF THE ROAD. REALLY SCARED AND AFRAID, HAD HARDLY NOTHING TO DO WITH THESE TWO WOMEN. HE IS LOOKING FOR POLICE, LOOKING FOR HELP IF HE IS AFRAID OF CHAD FULKS. IF HE IS IN FEAR OF HIS LIFE. HE HAD NOTHING WHATSOEVER TO DO WITH SAMANTHA BURNS AND ALICE DONOVAN. HE WANTS THAT POLICE

OFFICER.  HE NEVER MENTIONS ANYTHING ABOUT BEING AFRAID. HE IS JUST PARTYING AND HAVING A GOOD TIME.  AND THAT NIGHT THEY GO, REMEMBER,  CHAD FULKS AND BRANDON BASHAM TELL BETH,  LET'S GO BY THE MALL IN BARBOURSVILLE.  LET'S GO BY THE J. C. PENNEY'S, WE LEFT A BAG OF CLOTHING THERE.  DON'T FIND THE BAG OF CLOTHING.  THEN WATCHING THE NEWS THAT NIGHT, REMEMBER SAMANTHA BURNS'S STORY COMES ON THAT NIGHT ON THE 11:00 O'CLOCK NEWS.  BOTH CHAD FULKS AND BRANDON BASHAM SITTING AT THE EDGE OF THEIR SEAT WATCHING THAT NEWS STORY AND CHAD FULKS MAKES SOME FLIPPANT COMMENT THAT SHE IS DEAD.  OF COURSE, BRANDON BASHAM IS GIVING BETH MCGUFFIN SAMANTHA BURNS'S RING THAT DAY,  THAT SATURDAY.

SUNDAY, NOVEMBER 17TH,  ATTEMPTED CARJACKING AND KIDNAPPING OF THEN 15-YEAR-OLD ANDREA FRANCIS.  ANDREA SAYS SHE GOES TO THE MOVIE WITH HER MOTHER THAT NIGHT OR THAT AFTERNOON.  WHAT DO WE KNOW? WE KNOW BRANDON BASHAM, ALONE, IS WALKING THROUGH THAT WAL-MART PARKING LOT.  AND WE KNOW CHAD FULKS IS TROLLING SOMEWHERE NEAR IN ALICE DONOVAN'S BMW. WHAT IS THE PLAN? THE GOVERNMENT SUBMITS TO YOU, THE PLAN IS THE SAME THING AS IT WAS WITH SAMANTHA BURNS,  AND THE SAME THING WITH ALICE DONOVAN.  BRANDON BASHAM ON FOOT IN THE PARKING LOT OF A MALL LOOKING FOR A WOMAN ALONE, WHILE CHAD FULKS STAYS BEHIND.  IT IS THE SAME PLAN.  AND YOU HEARD IT. YOU HEARD IT THROUGH THE WORDS OF ANDREA FRANCIS WHEN SHE TOOK THAT WITNESS STAND.  THEY WEREN'T LOOKING FOR SOME ELDERLY

WOMAN. THEY WEREN'T LOOKING FOR SOME OLD MAN THAT THEY COULD EASILY MANIPULATE, EASILY SUBDUE. BRANDON BASHAM SAW ANDREA FRANCIS, THAT 15-YEAR-OLD GIRL. HE SAW HER, AND HE WANTED HER, THE GOVERNMENT SUBMITS. AND HE APPROACHED HER ALONE. ALONE. AND HE PULLED THIS GUN OUT ALONE. AND HE WALKED UP, AGAIN, TRYING TO USE DECEPTION JUST LIKE HE USED WITH MR. HAWKINS AND JUST LIKE BRANDON BASHAM USED WITH MS. MOORE. HE TRIED TO USE DECEPTION WITH HER AND ASKED FOR DIRECTIONS. AND SHE IS ON THE CELLPHONE. HE DOESN'T KNOW THAT HER MOTHER IS TEN FEET AWAY. LOOKING AT THE FRONT OF THE CAR, HE IS SEEING THE LONE FEMALE TRYING TO ENTER A CAR, AND HE POUNCES.

HE IS IN THAT DOOR JAM AND HE TAKES THIS GUN, HE STICKS IT WITHIN AN INCH OF THE SIDE OF THE CHEST OF THAT 15-YEAR-OLD GIRL. AND HE IS TRYING TO GET IN. HE IS TRYING TO JUMP ON HER LAP, NOT ONCE, NOT JUST TWICE, HE IS REPEATEDLY TRYING TO FORCE HIMSELF INTO ANDREA FRANCIS'S CAR. AND THANK GOD HE DOES NOT SUCCEED BECAUSE MS. FRANCIS APPROACHES. AND NOW HE IS STUPID. TWO PEOPLE, NOT ONE. YOUNG GIRL ON THE CELLPHONE, HE DOESN'T KNOW WHAT IS HAPPENING. HE IS CALM AND COOL ENOUGH TO WALK AWAY. HE DON'T RUN AWAY, HE WALKS AWAY HEADING TOWARDS THE RIVER, HEADING TOWARDS THE MOVIE THEATER, LOOKING FOR HIS FRIEND, LOOKING FOR HIS PARTNER.

THE ATTEMPTED KILLING OF OFFICE DAVIS. OFFICER DAVIS' 9-1-1 CALL FROM MS. FRANCIS COMES IN, OFFICER DAVIS HAPPENS TO BE RIGHT THERE. HE SEES THE SUSPECT, BASED ON THE

DESCRIPTION. HE PULLS UP. HE ASKED BRANDON BASHAM, HOLD ON A MINUTE, I NEED TO TALK TO YOU. BRANDON BASHAM TAKES OFF. HE IS RUNNING TOWARD THE RAILROAD CARS, RUNNING TOWARD THE RIVER. OFFICER DAVIS IS GIVING CHASE. WHAT DOES BRANDON BASHAM DO, THE SLY AND CAGEY BRANDON BASHAM? DO YOU REMEMBER THE OFFICER'S TESTIMONY? HE IS RUNNING, BUT HE FEELS, HE GETS A SENSE BRANDON BASHAM IS KIND OF SLOWING DOWN, KIND OF LURING HIM IN, KIND OF CLOSING THAT DISTANCE. AND BRANDON BASHAM, HE FIRES ONE TIME IN THE AIR. AND WHEN THE OFFICER CONTINUES HIS PURSUIT, WHAT CHOICE DOES BRANDON BASHAM MAKE? WHO DOESN'T WANT TO GET CAUGHT? HE TURNS, HE LEVELS THAT GUN AT THAT POLICE OFFICER, AND HE SHOOTS AT HIM.

NOW, THE FACT THAT BRANDON BASHAM FORTUNATELY MISSED DOESN'T MEAN YOU SHOULD GIVE HIM SOME SORT OF BREAK ON HIS INTENT. HIS INTENT WAS TO KILL THAT OFFICER. HE WASN'T GOING TO LET ANYBODY, ALICE DONOVAN, OR OFFICER DAVIS, OR ANYBODY PUT HIM AWAY. AND HE RUNS TO THOSE RAILROAD CARS. YOU REMEMBER WHAT HE SAID. REMEMBER WHEN THIS GUN WAS FOUND BECAUSE HE WAS ARRESTED? AND IMMEDIATELY, WHAT ARE YOU DOING? WHY ARE YOU ARRESTING ME? I DIDN'T DO NOTHING. THAT IS WHAT JOSH RITTMAN IS SAYING, A/K/A TOMMY BLAKE, REALLY KNOWN AS BRANDON BASHAM. THEY FOUND THIS GUN. WHEN THEY LOOK FOR THE CHAMBER, MANY OF YOU, FOR THOSE OF YOU WHO UNDERSTAND GUNS MAYBE IT WILL HELP SOME OF THE OTHER JURORS OUT IN THIS REGARD, YOU REMEMBER THAT TESTIMONY, WHEN YOU

FIRE A REVOLVER LIKE THIS AND THE HAMMER COMES BACK THE WAY IT IS NOW, IF YOU WERE TO OPEN UP THAT CHAMBER, THERE SHOULD BE A SPENT SHELL CASING WHERE THE HAMMER HIT THE FIRING PIN. WHEN THEY FOUND THIS GUN, THERE WAS A LIVE ROUND. ONLY ONE WAY THAT COULD HAPPEN, AND THAT IS BRANDON BASHAM COCKED THAT GUN. THE GOVERNMENT SUBMITS TO YOU, HE WAS LYING IN WAIT. IF ONE OF THOSE OFFICERS -- IF OFFICER DAVIS WERE TO CONTINUE TO CHASE OR SOME OFFICER COME LOOK FOR HIM, HAVING SET UP THAT PERIMETER, WAITED HIM OUT, HE HAD COCKED THAT GUN AND WAS LYING IN WAIT. HE SLOWLY PUT THAT THING BACK, PUT THE HAMMER BACK, THAT IS WHY IT WAS FOUND THE WAY IT WAS. HE IS LYING ABOUT THE GUN. HE SAYS HE THREW THE GUN IN THE RIVER. WHY? WHAT DID BRANDON BASHAM DO WITH THIS GUN? HE LIED TO THE POLICE HE THREW IT IN THE RIVER WHEN WE ALL KNOW HE THREW IT IN THE BOXCAR. WHY WAS IT BRANDON BASHAM DIDN'T WANT THE COPS TO FIND THIS GUN OR THESE TWO BODIES? WHY DID HE DO THAT? WHY IS HE LYING ABOUT IT?

THE AMY WARD SITUATION. THERE IS NO QUESTION THAT NIGHT, LADIES AND GENTLEMEN, AMY WARD, THAT NIGHT, LADIES AND GENTLEMEN, AFTER BRANDON BASHAM IS ARRESTED, CHAD FULKS, CHAD FULKS CALLS AMY WARD. CHAD FULKS IS TRYING TO LURE AMY WARD. HE CALLS AMY WARD'S MOTHER BASED ON -- HE HAD AMY WARD'S CELLPHONE, GIVING THE MOTHER'S CELLPHONE AND RESIDENT LINE. THERE IS NO QUESTION THAT CHAD FULKS WAS TRYING TO LURE AMY WARD, AS STUPID AS IT SOUNDED, CALLING UP A HIGH SCHOOL

GIRL ON A SUNDAY NIGHT TELLING HER MOM TO MEET HIM FOR A JOB INTERVIEW AT A HARDWARE STORE AT TEN AT NIGHT. STUPID. THE POINT IS HE WAS TRYING TO LURE AMY WARD THAT NIGHT. THE IMPORTANT POINT IS HE FAILED. HE FAILED. HE WAS UNSUCCESSFUL. DO YOU KNOW WHY? BECAUSE THE TEAM, TEAM BASHAM AND FULKS, THEY HAD BEEN SEPARATED. THEY HAD BEEN DISBANDED. THAT TEAM EXISTED NO MORE. IT EXISTED NO MORE. BRANDON BASHAM WAS ARRESTED. HE WAS IN CUSTODY -- REALLY, AT THE TIME HE WAS TRYING TO DO THIS, HE WAS HIDING OUT BY THE OHIO RIVER, BUT EVENTUALLY HE WAS IN CUSTODY. NO QUESTION. JUST AS BRANDON BASHAM'S INTENT WITH ANDREA FRANCIS.

ASK YOURSELVES THIS QUESTION, WHAT DO YOU THINK BRANDON BASHAM AND CHAD FULKS WOULD HAVE DONE IF THEY WOULD HAVE GOTTEN THAT GIRL IN HER CAR? LET HER GO? THEY DIDN'T LET SAMANTHA BURNS GO. THEY DIDN'T LET ALICE DONOVAN GO. WHAT DO YOU THINK BRANDON BASHAM AND CHAD FULKS WOULD HAVE DONE TO 15-YEAR-OLD ANDREA FRANCIS? BRANDON BASHAM DIDN'T INTEND TO HURT ANYONE. BRANDON BASHAM DIDN'T INTEND TO KILL ANYONE. BRANDON BASHAM IS AFRAID OF CHAD FULKS.

THE END OF THAT DAY, THAT SUNDAY NIGHT -- I AM ALMOST DONE WITH THE FACTS, AND, AS I INDICATED, THAT IS THE MAJORITY OF MY CLOSING. THAT SUNDAY NIGHT, BRANDON, JOSH RITTMAN, IS IN A HOSPITAL IN ASHLAND, KENTUCKY, AND HE IS LYING. HE IS LYING ABOUT HIS NAME. HE IS LYING ABOUT WHERE HE LIVES. HE IS LYING ABOUT HIS PARENTS BEING DECEASED. HE IS LYING ABOUT

EVERYTHING. AND CHAD FULKS IS DRIVING BACK. HE DRIVES BACK TO BETH MCGUFFIN'S, AND HE IS LYING. CHAD FULKS IS ALONE WITH BETH MCGUFFIN. LYING TO HER ABOUT WHAT HAPPENED AT ASHLAND MALL, WITH EVERY OPPORTUNITY TO TELL BETH MCGUFFIN HE IS AFRAID OF BRANDON BASHAM. BRANDON BASHAM IS IN A HOSPITAL IN ASHLAND, KENTUCKY, LYING TO THE POLICE OFFICERS, HAVING THE OPPORTUNITY TO TELL THEM HOW HE IS AFRAID OF CHAD FULKS. THESE BUDDIES, THESE PALS, THESE FRIENDS, THEY ARE SEPARATED, THEIR PLAYBOOK, THEY ARE PLAYING THE GAME IN TWO SEPARATE LOCATIONS.

MONDAY, NOVEMBER 18TH, CHAD FULKS GETS IN A HIGH-SPEED CHASE WITH THE TROOPERS IN OHIO AND ALMOST KILLS A TROOPER, TROOPER MALO. AND THAT SAME MONDAY, LAW ENFORCEMENT AUTHORITIES IN KENTUCKY COME TO FIND OUT THE TRUE IDENTITY OF JOSH RITTMAN; IT IS THE DEFENDANT, BRANDON BASHAM.

TUESDAY, NOVEMBER 19TH, CHAD FULKS IS ARRIVING IN GOSHEN, INDIANA, AT HIS BOTHER RONNIE'S HOUSE IN ALICE DONOVAN'S BMW. THAT TUESDAY, BRANDON BASHAM IS BEGINNING A SERIES OF LIES AND DECEITS WITH THE FBI DURING INTERVIEWS THAT DAY.

WEDNESDAY, CHAD FULKS IS ARRESTED OUTSIDE OF GOSHEN, INDIANA WITHOUT INCIDENT. ALICE DONOVAN'S BMW IS FOUND IN THAT BARN SILO AND THAT FIELD, AND BRANDON BASHAM IS CONTINUING TO MANIPULATE LAW ENFORCEMENT.

SEVENTEEN DAYS, LADIES AND GENTLEMEN. SEVENTEEN DAYS IN NOVEMBER OF 2002, SEVENTEEN DAYS OF CARNAGE. TWO MURDERS,

TWO ATTEMPTED MURDERS, THREE KIDNAPINGS, THREE CARJACKINGS, AN ATTEMPTED KIDNAPPING AND CARJACKING OF A 15-YEAR-OLD GIRL COMMITTED BY BRANDON BASHAM AND CHAD FULKS TOGETHER AS A TEAM IN UNISON. TWO DEAD WOMEN AND COUNTLESS NUMBER OF LIVES RUINED FOREVER BECAUSE OF THE ACTIONS, AND THE CONDUCT, AND THE CHOICES OF BRANDON BASHAM.

LADIES AND GENTLEMEN, LET ME TALK TO YOU BRIEFLY ABOUT THESE LEGAL MATTERS. FIRST, FIVE LEGAL PRINCIPLES. CONSTRUCTIVE POSSESSION YOU WILL HEAR ABOUT. YOU CAN ACTUALLY POSSESS SOMETHING LIKE WHEN YOU ARE ACTUALLY HOLDING IT AND YOU CAN CONSTRUCTIVELY POSSESS SOMETHING. MEANING IF -- YOU CAN CONSTRUCTIVELY POSSESS SOMETHING BY EXERCISING DOMINION AND CONTROL OVER IT. TO THE EXTENT ALL OF THESE GUNS ARE STOLEN, THE GOVERNMENT SUBMITS THAT CHAD FULKS AND BRANDON BASHAM, AT TIMES THEY ACTUALLY POSSESSED THE GUNS, BUT MORE IMPORTANTLY, THEY JOINTLY AND CONSTRUCTIVELY POSSESSED ALL OF THE FIREARMS BECAUSE THEY WERE TOGETHER THE WHOLE TIME.

AN EXAMPLE, SOME OF YOU WERE DRIVING TO THE COURTHOUSE, YOU MIGHT HAVE HAD A CUP OF COFFEE. WHEN THAT CUP OF COFFEE WAS IN YOUR CONSOLE, IF YOU HAD BEEN PULLED OVER BY THE POLICE FOR A SPEEDING TICKET, THAT CUP OF COFFEE IN YOUR HAND, YOU WOULD BE IN ACTUAL POSSESSION. IF YOUR PURSE WAS IN THE CONSOLE OR IN THE FLOORBOARD OF YOUR CAR, YOU ARE NOT IN ACTUAL POSSESSION, YOU ARE CONSTRUCTIVELY, YOU EXERCISE DOMINION AND CONTROL. BRANDON BASHAM AND CHAD FULKS ACTING

TOGETHER, AIDED AND ABETTED, POSSESSED ALL THESE FIREARMS TOGETHER.

CONSPIRACY IN THE LAW. YOU KNOW WHAT CONSPIRACY IS. AGREEMENT. TWO OR MORE PEOPLE AGREE TO COMMIT A CRIME. IT IS A PLAN, AN AGREEMENT. UNDER TWO CONSPIRACY INDICTMENTS BACK THERE, THE GOVERNMENT ALLEGES THAT CHAD FULKS AND BRANDON BASHAM, FROM NOVEMBER 4TH TO NOVEMBER 20TH, CONSPIRED OVER MANY THINGS.

YOU WILL HAVE A CHARGE OF OVERT ACTS. ALL WE HAVE TO PROVE IS BRANDON BASHAM AND CHAD FULKS AGREED TO COMMIT A SERIES OF CRIMES. THE GOVERNMENT HAS TO PROVE ONE OVERT ACT. ONE ACT ON BEHALF OF BRANDON BASHAM IN FURTHERANCE OF THAT AGREEMENT, LADIES AND GENTLEMEN. WE PRESENTED TO YOU LITERALLY HUNDREDS. PICK ONE.

AIDING AND ABETTING. PROBABLY HEARD THAT ON TELEVISION TOO. AIDING AND ABETTING. UNDER THE LAW, WHEN TWO OR MORE PEOPLE COMBINE TOGETHER, AGREE TO COMMIT A CRIME AND THEY ARE PRESENT, AIDING EACH OTHER AND ABETTING EACH OTHER IN UNLAWFUL ACTS, EVERYBODY, ALL AIDERS AND ABETTORS ARE GUILTY AFTER ALL OF THE ACTS COMMITTED BY THE CRIMINALS.

PERFECT EXAMPLE, I THINK JUDGE ANDERSON USED THIS WHEN YOU FIRST CAME TO THE JURY TRIAL IN THE WRITTEN MATERIAL OR THE VIDEO THAT YOU SAW. THREE PEOPLE GO TO ROB A BANK, LADIES AND GENTLEMEN. ONE IS DRIVING THE CAR AND KEEPING THE ENGINE RUNNING, HE DOESN'T EVEN HAVE A GUN. THE OTHER GETS OUT,

KIND OF STANDS AT THE DOOR BEING A LOOK-OUT, KEEPING PEOPLE FROM LEAVING. ONE WITH A GUN WALKS UP TO THE TELLER AND ROBS HER. ALL THREE ARE GUILTY OF ARMED BANK ROBBERY. THEY ARE ALL AIDING AND ABETTING EACH OTHER. THEY ALL HAVE CERTAIN ROLES TO PLAY. IF THAT ROBBER SHOOTS AND KILLS THAT CLERK, UNDER THE APPROPRIATE CIRCUMSTANCES, ALL THREE ARE GUILTY OF MURDER. AIDING AND ABETTING.

SIMILAR ACT EVIDENCE. THAT IS WHY I TOLD YOU ABOUT THE SAMANTHA BURNS AND ANDREA FRANCIS. SIMILAR ACT EVIDENCE GOES TO BRANDON BASHAM'S INTENT, HIS STATE OF MIND, HIS KNOWLEDGE OF THE PLAN ON NOVEMBER 14TH WITH ALICE DONOVAN.

DIRECT AND CIRCUMSTANTIAL EVIDENCE. JUDGE WILL CHARGE AND DEFINE THOSE. DIRECT EVIDENCE, LADIES AND GENTLEMEN, IS WHEN A WITNESS SEES SOMETHING AND COMES INTO COURT OR HEARS SOMETHING AND COMES INTO COURT AND TESTIFIES ABOUT IT OR DOES SOMETHING WITH A PIECE OF EVIDENCE, THAT IS DIRECT EVIDENCE. IT IS EVIDENCE PERCEIVED THROUGH THE SENSES, SIGHT, HEARING, YOU ARE DOING SOMETHING.

CIRCUMSTANTIAL EVIDENCE, LADIES AND GENTLEMEN, IS WHEN YOU CAN TAKE CERTAIN FACTS, CERTAIN FACTS ARE PRESENTED AND JURORS ARE ALLOWED TO DRAW REASONABLE CONCLUSIONS. FOR EXAMPLE, THE BULKY CLOTHES, THE FACT THERE WAS A ROPE. NO DIRECT EVIDENCE, NO ONE SAW A ROPE UNDER BRANDON BASHAM OR A ROPE UNDER CHAD FULKS, YOU CAN TAKE CIRCUMSTANTIAL EVIDENCE THAT THEY WENT OUTSIDE, THEY WERE ALONE, THE CIRCUMSTANTIAL

EVIDENCE THEY WERE WEARING BULKY CLOTHES, CIRCUMSTANTIAL EVIDENCE THAT THERE WAS A ROPE THAT WAS USED, AND YOU CAN CONCLUDE, CIRCUMSTANTIALLY, THAT THEY WERE HIDING THAT ROPE. THAT IS AN EXAMPLE OF CIRCUMSTANTIAL EVIDENCE IS TAKING CERTAIN FACTS AND REACHING A CONCLUSION.

ELEMENTS OF THE CRIME. BEFORE I GET TO COUNT 1, I WILL NOT GO THROUGH EVER EVERY SINGLE ELEMENT, I WILL FOCUS ON CARJACKING AND KIDNAPPING, BECAUSE, IF YOU RECALL, WE AGREE WITH MR. SWERLING IN THE OPENING STATEMENT, THE CARJACK INTENT FACTOR IS REALLY AT ISSUE HERE.

BEFORE I DO THAT, YOU ARE GOING TO HAVE EIGHT ELEMENTS BACK THERE, LADIES AND GENTLEMEN. EIGHT ELEMENTS -- I'M SORRY, 8 COUNTS. YOU WILL HAVE MULTIPLE ELEMENTS ON EACH COUNT. I KNOW AT FIRST YOU WILL THINK IT IS OVERWHELMING. YOU HAVE HEARD FROM THESE WITNESSES, ALL THE EXHIBITS, HOW DO YOU GO ABOUT THIS PROCESS? LET ME SUGGEST TO YOU SOMETHING. YOU CAN DO IT BY HOWEVER MEANS YOU DECIDE. LET ME SUGGEST SOMETHING BY WAY OF ILLUSTRATION. EVERY SUMMER, MY WIFE AND MY FAMILY, WE GO TO THE BEACH. EVERY SUMMER, THAT IS OUR SUMMER VACATION. ABOUT TWO WEEKS OUT, MY WIFE HAS A LIST. HAS A LIST OF STUFF SHE WANTS TO TAKE FOR HERSELF, LIST FOR THE TEN-YEAR-OLD, LIST FOR EIGHT-YEAR-OLD DAUGHTER, LIST FOR FIVE-YEAR-OLD SON, HAS A LIST FOR EVERYBODY IN THE FAMILY, HAS A CATCHALL LIST. SHE GOES DOWN THE LIST, CHECKS IT OFF ONCE SHE ASSURES HERSELF HE SHE HAS

EACH AND EVERY ITEM. ONE THING TO SUGGEST, IS GO THROUGH THE ELEMENTS, CHECK IT OFF WHEN YOU THINK THAT THE GOVERNMENT HAS PROVEN EACH ELEMENT BEYOND A REASONABLE DOUBT. I MEAN NO DISRESPECT, YOU JURORS CHOOSE THE WAY YOU WOULD LIKE TO DO IT.

CARJACKING. DEFENDANT TOOK A MOTOR VEHICLE, STIPULATED THAT THAT CAR WAS MADE IN GERMANY, TRANSPORTED IN INTERSTATE COMMERCE. NO QUESTION, BRANDON BASHAM TOOK THE MOTOR VEHICLE, NO QUESTION HE WAS USING FORCE, VIOLENCE, OR INTIMIDATION. WHILE TAKING THE MOTOR VEHICLE, THE DEFENDANT INTENDED TO CAUSE DEATH OR SERIOUS BODILY HARM, AND DEATH RESULTED. I WILL COME BACK TO THIS. NO QUESTION, DEATH RESULTED. THE KEY ELEMENT IS THAT FOURTH ONE, THE INTENT ONE.

GO TO KIDNAPPING. THE DEFENDANT UNLAWFULLY, KNOWINGLY, AND WILLFULLY ABDUCTED AND CARRIED AWAY ALICE DONOVAN. LADIES AND GENTLEMEN, NO QUESTION ABOUT THAT. YOU SAW THE VIDEO. HE JUMPED OUT OF THAT TRUCK AND UNLAWFULLY, KNOWINGLY, KIDNAPPED AND ABDUCTED AND CARRIED ALICE DONOVAN AWAY. KIDNAPPING IS A CONTINUING CRIME. HE DID IT AS A PRINCIPLE. MEANS HE DID IT AS PRIMARY AIDER. HE DID IT AS AN AIDER AND ABETTER. CHAD AND BRANDON WERE AIDER AND ABETTER AND PRINCIPLE. ALICE DONOVAN, NO QUESTION, WAS TRANSPORTED ACROSS STATE LINES, THE TELEPHONE CALL TO HER HOME. THE DEFENDANT HELD ALICE DONOVAN FOR RANSOM, OR REWARD, OR ANY OTHER REASON. THE KEY BEING FOR ANY OTHER REASON.

OBVIOUS, NO EVIDENCE OF RANSOM OR REWARD. FOR WHATEVER REASON, THEY HELD HER. THEY HELD HER. THEY HELD HER TO ASSAULT HER, THEY HELD HER TO KILL HER, THEY HELD HER TO GET AWAY. THEY JUST HELD HER UNLAWFULLY FOR ANY REASON.

THOSE THREE ELEMENTS, LADIES AND GENTLEMEN, AND DEATH RESULTED. NO QUESTION, DEATH RESULTED IN ALICE DONOVAN.

WHAT IS THE ISSUE WITH THE KIDNAPPING? YOU NOTICE THERE IS NO INTENT FACTOR. THE GOVERNMENT DOESN'T HAVE TO PROVE THAT BRANDON BASHAM INTENDED ALICE DONOVAN TO BE HARMED OR BE KILLED. THERE IS NO INTENT FACTOR WITH THE KIDNAPPING AS THERE IS WITH THE CARJACKING. THERE IS NO INTENT FACTOR. THE GOVERNMENT MERELY HAS TO PROVE THAT, AS A RESULT OF BRANDON BASHAM'S WILLFUL CONDUCT, THAT AS A RESULT OF HIS WILLFUL CONDUCT, THE GOVERNMENT SUBMITS HIS WILLFUL CONDUCT IN JUMPING IN THAT CAR, HIS WILLFUL CONDUCT IN PARTICIPATING IN THE ABDUCTION, HIS WILLFUL CONDUCT IN ASSISTING IN TRANSPORTING HER ACROSS STATE LINES, HIS WILLFUL CONDUCT IN HOLDING HER IN THE BACK SEAT OF THE CAR, HIS WILLFUL CONDUCT IN HOLDING HER EACH AND EVERY TIME SHE HAD A CHANCE TO ESCAPE, EVERY TIME CHAD FULKS WAS GETTING HER MONEY. AS A RESULT OF HIS WILLFUL CONDUCT, DEATH RESULTED.

WELL, LADIES AND GENTLEMEN, IF BRANDON BASHAM WOULDN'T HAVE GOTTEN IN THAT CAR, IF BRANDON BASHAM WOULDN'T HAVE HELD HER, IF BRANDON BASHAM WOULDN'T HAVE BEEN A PART OF THIS, ALICE DONOVAN WOULD BE ALIVE TODAY. SHE WOULD BE ALIVE

TODAY.   AND THAT SUGGESTION THAT HE HAD NOTHING TO DO WITH HER, THE GOVERNMENT SUBMITS,  I WILL FINISH UP, THE EVIDENCE IS CLEAR, THAT HE PARTICIPATED DIRECTLY IN HER DEATH.

THE COURT:   MR. GASSER, IF YOU COULD, SLOW DOWN A LITTLE BIT.   I WILL NOT CALL TIME ON YOU.   I WILL NOT SIT YOU DOWN.  TAKE ALL THE TIME YOU NEED.  IF YOU COULD, SLOW DOWN JUST A LITTLE BIT.

MR. GASSER:  I APOLOGIZE TO THE COURT REPORTER. THANK YOU,  YOUR HONOR.

MR. GASSER:  LADIES AND GENTLEMEN,  I WANT TO THANK YOU.   I AM TRYING TO GET IN AS MUCH AS POSSIBLE AS A REPRESENTATIVE OF THE PROSECUTION.   TRYING TO GET AS MUCH FACTS IN AND EXPLAIN AS MUCH LAW.

LET ME EXPLAIN THIS.   I HAVE BEEN TALKING AWHILE, AND EVERY ONE OF YOU HAVE BEEN PAYING ATTENTION.  I REALLY APPRECIATE THAT.   I AM TOWARDS THE END OF MY CLOSING ARGUMENT.  IF YOU WILL JUST BEAR WITH ME FOR A WHILE,  I WOULD APPRECIATE IT.

THE CARJACKING, THE INTENT FACTOR.   AGAIN,  I WILL NOT GO THROUGH ALL OF THOSE ELEMENTS,  COUNT 3,  COUNT 4,   COUNT 5, COUNT 6,  COUNT 7,  COUNT 8.   YOU HEARD THE EVIDENCE AND TESTIMONY.   YOU WILL HAVE THEM BACK THERE.   IT IS THE GOVERNMENT'S POSITION THAT THE EVIDENCE IS OVERWHELMING.  HE IS GUILTY OF THOSE CONSPIRACIES,  AIDING, ABETTING, TRANSPORTING ALICE IN THAT MOTOR VEHICLE ACROSS STATE LINES.

CLEARLY, THE MOST IMPORTANT, KIDNAPPING AND CARJACKING. THE KEY TO THIS INTENT FACTOR IS CARJACKING.

THE FOURTH ELEMENT THE GOVERNMENT MUST PROVE, BEYOND A REASONABLE DOUBT, THAT THE DEFENDANT ACTED WITH INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM. WHAT DOES THAT MEAN? TO ESTABLISH THIS ELEMENT, THE GOVERNMENT MUST PROVE THAT, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OVER THE VEHICLE, THE DEFENDANT POSSESSED THE INTENT TO SERIOUSLY HARM OR KILL ALICE DONOVAN. THE GOVERNMENT MAY ALSO MEET ITS BURDEN AS TO THE INTENT ELEMENT BY PROVING, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OF THE VEHICLE, THAT THE DEFENDANT POSSESSED THE INTENT TO SERIOUSLY HARM OR KILL ALICE DONOVAN, IF NECESSARY, TO STEAL THE CAR. FURTHER, THE GOVERNMENT NEED NOT PROVE, THE GOVERNMENT NEED NOT PROVE THAT THE DEFENDANT ACTUALLY INTENDED TO CAUSE THE HARM, IT IS SUFFICIENT THAT THE DEFENDANT WAS CONDITIONALLY PREPARED TO ACT IF ALICE DONOVAN FAILED TO RELINQUISH THE CAR. EVIDENCE THAT THE DEFENDANT INTENDED TO FRIGHTEN ALICE DONOVAN IS NOT SUFFICIENT BY ITSELF TO PROVE AN END TO HARM OR KILL. IT IS, HOWEVER, ONE OF THE FACTS YOU MAY CONSIDER IN DETERMINING WHETHER THE GOVERNMENT HAS MET ITS BURDEN.

THE KEY PHRASE THERE, LADIES AND GENTLEMEN, NOW, AGAIN, THIS IS, THE GOVERNMENT SUBMITS TO YOU, I AM GOING TO GET TO THEM, FINISH WITH THE EVIDENCE, THAT CLEARLY SHOWS BRANDON BASHAM, HIMSELF, PARTICIPATED IN THE KILLING OF ALICE DONOVAN.

EVEN IF YOU FIND, IF YOUR TAKE ON THE EVIDENCE IS THAT HE HAD NOTHING TO DO WITH THE ACTUAL KILLING, IF YOU ACTUALLY BELIEVE THAT CHAD FULKS ACTUALLY KILLED ALICE DONOVAN AND BRANDON BASHAM HAD NOTHING TO DO WITH IT, HE IS STILL GUILTY OF CARJACKING, RESULTING IN DEATH. IF YOU FIND THAT THE DEFENDANT WAS CONDITIONALLY PREPARED TO ACT TO TAKE THAT CAR, WHAT IS THE BEST EVIDENCE? WHO PROVIDES YOU THE BEST EVIDENCE AS TO BRANDON BASHAM'S INTENT WHEN HE ENTERED ALICE DONOVAN'S BMW? YOU HAVE TO REMEMBER CHAD FULKS ISN'T THE ONE THAT ENTERED THAT BMW FIRST. BRANDON BASHAM DID. CHAD FULKS WASN'T THE ONE THAT FORCED ALICE DONOVAN TO DRIVE TO THE BACK OF THE WAL-MART PARKING LOT. BRANDON BASHAM WAS. WHAT WAS HIS INTENT? WHAT IS THE BEST EVIDENCE. THE GOVERNMENT SUBMITS TO YOU THAT THE BEST EVIDENCE COMES FROM ALICE DONOVAN. ALICE DONOVAN PROVIDES YOU JURORS THE BEST EVIDENCE. ALICE DONOVAN PROVIDES YOU AS TO WHAT SHE DID AND AS TO WHAT SHE DIDN'T DO.

LADIES AND GENTLEMEN, IF ALICE DONOVAN -- IF BRANDON BASHAM WASN'T CONVINCING WHEN HE ENTERED THAT BMW, ARMED WITH THIS GUN, IF HE WASN'T CONVINCING, IF ALICE DONOVAN DIDN'T THINK SHE WAS GOING TO SUFFER DEATH OR SERIOUS BODILY HARM, WHY DID SHE DRIVE THAT BMW TO THE BACK OF THAT PARKING LOT SO CHAD FULKS COULD GET IN THE CAR? IF SHE WASN'T CONVINCED THAT HE WAS PRESENTLY PREPARED TO KILL HER OR CAUSE SERIOUS BODILY HARM, SHE WOULD HAVE GOTTEN OUT OF THAT CAR, LAUGHED IN HIS

FACE, WALKED IN THE WAL-MART, AND GONE CHRISTMAS SHOPPING FOR HER GRANDCHILDREN, WHICH WAS HER PLAN.

THE BEST EVIDENCE, LADIES AND GENTLEMEN, IS BEFORE YOUR EYES ON THAT VIDEO. IT IS WHAT ALICE DONOVAN DID, IT IS WHAT ALICE DONOVAN DIDN'T DO. TO SHOW THAT CLEARLY, BRANDON BASHAM, CLEARLY BRANDON BASHAM IS PREPARED TO USE THAT FORM, BUT THERE IS AN ABUNDANCE OF OTHER EVIDENCE.

WHAT EVIDENCE DO YOU HAVE? LADIES AND GENTLEMEN, YOU HAVE GOT ALICE DONOVAN SANDWICHED IN BETWEEN SAMANTHA BURNS AND ANDREA FRANCIS. SIMILARITIES ARE UNBELIEVABLE. YOU GOT BRANDON BASHAM PARTICIPATING, GOING TO A MALL JUST LIKE WITH ALICE DONOVAN, WITH SAMANTHA BURNS, ABDUCTING A LONE FEMALE, KILLING HER, AND DISPOSING OF HER BODY THREE DAYS BEFORE ALICE DONOVAN. AND THREE DAYS AFTER ALICE DONOVAN, YOU GOT BRANDON BASHAM GOING TO A MALL, PICKING OUT AN ISOLATED FEMALE AND TRYING TO CARJACK AND KIDNAP HER. SO, THREE DAYS BEFORE AND THREE DAYS AFTER ALICE DONOVAN, YOU GOT BRANDON BASHAM ACTING WITH THE SAME, SIMILAR INTENT WITH THE SAME, SIMILAR MOTIVATION. SAMANTHA BURNS IS DEAD. ANDREA FRANCIS, THEY WEREN'T ABLE TO GET HER.

WHAT OTHER EVIDENCE? YOU HAVE HIS GENERAL INTENT. HIS GENERAL INTENT. ALL OF THE EVIDENCE AND TESTIMONY THAT YOU HEARD. THERE ARE EIGHT DIFFERENT INCIDENTS OF HIS INTENT TO HARM, AND THREAT, AND CAUSE SERIOUS BODILY HARM AND DEATH. EIGHT. ONE, HE ARMS HIMSELF WITH FIREARMS AFTER HE ESCAPES.

TWO, HE THREATENS JAMES HAWKINS WITH A KNIFE. THREE, HE IS INVOLVED IN THE THREAT OF TWO POLICE OFFICERS IN STURGIS, MICHIGAN, THREATENS TO KILL TWO POLICE OFFICERS. FOUR, THREATENS TO KILL TEENAGERS IN STURGIS, MICHIGAN. FIVE, HE INVOLVES HIMSELF WITH THE CARL JORDAN SHOOTING INCIDENT. SIX, HE THREATENS TO KILL BETH MCGUFFIN'S BROTHER IF HE RIPS HIM OFF WITH DOPE. SEVEN, HE THREATENS TO SHOOT STACY WORKMAN'S BOYFRIEND IF HE CAUSES ANY TROUBLE. EIGHT, HE ATTEMPTS TO KILL OFFICER MATT DAVIS. EIGHT INCIDENTS TO CAUSE SERIOUS BODILY HARM OR DEATH.

YOU HAVE THE WORDS AND LIES. THIS IS WHAT I WILL FINISH WITH. I WILL FINISH WITH THE STATEMENTS OF BRANDON BASHAM. YOU HAVE THE LIES TELLING THE FBI ON NOVEMBER 19TH AND 20TH. HOW CAN YOU JURORS USE THAT? THE GOVERNMENT SUGGESTS IT REPRESENTS CONSCIOUSNESS OF GUILT. WHAT DO I MEAN BY THAT? BRANDON BASHAM IS LYING, AND LYING, AND LYING, AND DECEIVING FOR A REASON. HE IS IN UP TO HIS EYEBALLS. 1:58 A.M., AGENT VITO ADVISED BRANDON BASHAM OF HIS RIGHTS. BRANDON BASHAM TALKS. WHAT ARE THE THREE POINTS? WHAT ARE THE THREE MAJOR THINGS HE SAYS? FIRST OF ALL, HE DOESN'T MENTION GOING TO SOUTH CAROLINA, DOESN'T MENTION A WOMAN BY THE NAME OF ALICE DONOVAN, DOESN'T MENTION ANYTHING ABOUT A BMW. SECOND, HE TELLS AGENT VITO SHE WAS ALIVE, IN HER BMW WITH CHAD FULKS WHEN HE GOT ARRESTED AT THE ASHLAND MALL. HE HAS ALICE DONOVAN ALIVE IN KENTUCKY IN HER CAR. THIRD, AND MOST

IMPORTANTLY, HE TELLS AGENT VITO, HE DOESN'T THINK CHAD FULKS IS CAPABLE OF HARMING ALICE DONOVAN. DO YOU REMEMBER THAT? IT IS IN THE TRANSCRIPT. THAT FIRST STATEMENT. HE DOESN'T THINK CHAD FULKS IS CAPABLE OF HARMING ALICE DONOVAN. HE THINKS HE IS GOING TO TAKE HER TO ARIZONA. THEY LET HIM SLEEP. THEY GIVE HIM WHATEVER HE WANTS.

THEY COME BACK, REINTERVIEW HIM LATER ON THE 19TH. FOUR POINTS I WANT TO MAKE ABOUT THAT INTERVIEW. FIRST, HE ACKNOWLEDGES HE WAS INVOLVED IN THE CARJACKING AND KIDNAPPING OF ALICE DONOVAN. HE MINIMIZES HIS ROLE. HE MINIMIZES HIS ROLE IN THE ESCAPE. MINIMIZES HIS ROLE WITH THE ENTIRE CONDUCT IN THE INTERVIEW OF AGENT VITO. SECOND, HE IS STILL MAINTAINING THAT ALICE DONOVAN IS ALIVE IN ASHLAND, KENTUCKY, AT THE ASHLAND MALL WITH CHAD FULKS. LATER ON, DURING THAT SECOND INTERVIEW, HE CHANGES HIS STORY. YOU REMEMBER THE STORY HE COMES UP WITH? HE SAYS THAT AFTER TAKING ALICE DONOVAN TO NORTH CAROLINA, AFTER DOING THEIR THING WITH HER, THEY DRIVE ALICE DONOVAN ALIVE ALL THE WAY BACK TO MYRTLE BEACH. WITH ALL OF THOSE STREET LIGHTS AND ALL OF THOSE STORES, DRIVING DOWN MAJOR THOROUGHFARES OF MYRTLE BEACH, CHAD FULKS, ALICE DONOVAN ALIVE, AND BRANDON BASHAM. DROP BRANDON BASHAM OFF THREE BLOCKS FROM THE LAKE SHORE MOTEL. CHAD FULKS LEAVES. SHORT TIME LATER, CHAD FULKS COMES BACK. CHAD FULKS SAYS HE TIED HER TO A TREE. CHAD FULKS SAYS DON'T WORRY ABOUT IT, I HAVE TAKEN CARE OF EVERYTHING. ACCORDING

TO BRANDON BASHAM, CHAD FULKS THREATENS HIM AND HIS FAMILY. OH, BY THE WAY, ALSO HE THEN SAYS TO AGENT VITO, CHAD TOOK A WOMAN FROM WEST VIRGINIA. THE NEXT DAY, HE IS ADVISED OF HIS RIGHTS AGAIN. ALLOWED TO SEE PUBLIC DEFENDER INVESTIGATOR. THEY AREN'T HIDING HIM IN A HOLE.

WHAT ARE THE FOUR POINTS I WANT TO MAKE ABOUT THAT INTERVIEW? HE SAID IN THAT INTERVIEW HE HAD NOTHING TO DO WITH BURGLARIZING ROBERT TALSMA'S HOUSE AND STEALING HIS GUNS. WHY IS THAT IMPORTANT? DURING THAT INTERVIEW, HE STAYED BACK AT THE MOTEL WHILE CHAD FULKS AND HIS COHORTS BROKE IN THAT HOUSE AND STOLE THOSE FIREARMS. LADIES AND GENTLEMEN, ASK YOURSELF THESE QUESTIONS ON THE WAY BACK TO THE JURY ROOM. IF BRANDON BASHAM IS WILLING TO LIE ABOUT INVOLVEMENT IN A PROPERTY CRIME, DO YOU THINK HE IS GOING TO TELL THE TRUTH ABOUT THE KIDNAPPING, AND CARJACKING, AND THE RAPE, AND THE MURDER OF A 44-YEAR-OLD SOUTH CAROLINA WOMAN IF HE IS WILLING TO LIE ABOUT HIS ROLE IN A PROPERTY CRIME?

WHAT ELSE DOES HE SAY DURING THAT NOVEMBER 20TH INTERVIEW? HE CLAIMS THAT CHAD FULKS TOLD HIM THAT HE TIED ALICE DONOVAN UP TO A TREE. THAT HE RAPED ALICE DONOVAN AND TIED HER TO A TREE, AND HE DESCRIBES THE AREA. AND BRANDON BASHAM TELLS LAW ENFORCEMENT HE HAS BEEN TO THAT AREA BEFORE. HE COULD TELL YOU WHAT IT IS. OF COURSE, THE AREA WE NOW KNOW IS THE SAVANNAH BLUFF AREA. I WILL GET TO THAT. BUT HE LEAVES THE INFERENCE THAT CHAD FULKS IS TELLING HIM, HE RAPED ALICE

DONOVAN, TIED ALICE DONOVAN TO A TREE, AND SHE IS ALIVE IS THE INFERENCE HE IS LEAVING. HE THEN BACKS OFF THE WEST VIRGINIA SITUATION AND HE SAYS, BY THE WAY, CHAD FULKS DIDN'T GET A WOMAN FROM WEST VIRGINIA, HE GOT SOME CREDIT CARDS.

LASTLY, MOST IMPORTANT, THAT DAY HE DRAWS A MAP. REMEMBER, AGENT MALEY TESTIFIED THAT BRANDON BASHAM GETS AGENT MALEY TO DRAW A MAP, IS DISCUSSING LANDMARKS. LET ME SHOW YOU WHAT HE DRAWS. HE IS DISCUSSING LANDMARKS, LADIES AND GENTLEMEN. HE IS DRAWING A MAP. THIS OVER HERE ON THE RIGHT-HAND SIDE, GOVERNMENT'S EXHIBIT 333, THIS IS THE MAP THAT AGENT MALEY HAS DRAWN BASED ON BRANDON BASHAM TELLING HIM. NOW, WE KNOW BRANDON BASHAM HAS BEEN THERE, HE WAS THERE ON WEDNESDAY, HELEN COOK SAW HIM, THERE ON THURSDAY, TONYA RICHARDSON SAW HIM. DON'T KNOW HOW LONG HE WAS THERE. THOSE WOMEN ONLY SAW HIM FOR A BRIEF PERIOD OF TIME. WE KNOW BRANDON BASHAM WAS ALL OVER THIS AREA. LOOK AT THAT. DETAILED. THAT IS THE TWO HIGHWAYS, THE ROAD COMING AROUND HERE, THE LAKE, THE BOAT RAMP, THE MOTEL. AND THEN THERE IS THE OTHER TURNAROUND MR. SCHOOLS SHOWED, AS WELL. THAT SHOWS THAT AREA WITH THE CUL-DE-SAC KIND OF WITH THE POND.

WHY IS THAT IMPORTANT? I DON'T KNOW IF ANY OF YOU JURORS CAUGHT THIS, BUT THIS IS CRITICAL. ON NOVEMBER 20TH, WHEN LAW ENFORCEMENT ARE BEING TOLD BY BRANDON THEY STILL MIGHT BE ABLE TO FIND HER ALIVE, BRANDON IS TELLING LAW ENFORCEMENT CHAD TOLD HIM HE TIED HER UP, LEFT HER ALIVE. FIVE DAYS

LATER ON THE 20TH, THROUGH BRANDON BASHAM AND MR. HUGHES, HIS LAWYER, THAT THAT IS ALL A LIE. THAT BRANDON, ON THE 20TH, WAS LYING INTENTIONALLY BECAUSE FIVE DAYS LATER, HIM AND HIS LAWYER WITH AGENT MALEY ARE SAYING, ALICE DONOVAN IS 70 MILES AWAY UP IN NORTH CAROLINA. AND BRANDON BASHAM IS SAYING HE KNOWS WHERE HER BODY IS BECAUSE I WAS THERE WHEN THE BODY WAS DISPOSED OF. LADIES AND GENTLEMEN, ON NOVEMBER 20TH, BRANDON BASHAM IS INTENTIONALLY DECEIVING AND LYING TO LAW ENFORCEMENT WHEN HE SAYS, I WAS WITH CHAD, HE JUST TOLD ME SHE IS OVER IN THIS AREA, AND THEN FIVE DAYS LATER, OH, I WAS WITH CHAD, WE ARE 70 MILES AWAY. WHY? WHAT IS GOING THROUGH THE MIND OF BRANDON BASHAM? WHAT DID BRANDON BASHAM DO TO ALICE DONOVAN THAT HE DIDN'T WANT LAW ENFORCEMENT TO FIND HER BODY ON NOVEMBER 20TH? THIS MAP IS FAXED UP TO CHAD FULKS. CHAD FULKS IS UP IN INDIANA. HIS LAWYER SHOWS HIM THIS MAP, HE IS GOING ALONG WITH HIS BUDDY, HIS PAL, HIS PARTNER BECAUSE HE IS TELLING THEM, OH, YEAH, THAT IS WHERE HER BODY WOULD BE. IN TWO DIFFERENT STATES, TWO DIFFERENT FBI AGENTS, AND THE SAME MAP DRAWN, THE INSTRUCTIONS OF BRANDON BASHAM, PARTNERS TOGETHER, ARE INTENTIONALLY LYING AND DECEIVING LAW ENFORCEMENT WHEN LAW ENFORCEMENT ARE HOPING TO FIND ALICE DONOVAN ALIVE. WHY?

THE DIRECT STATEMENTS. THE DIRECT STATEMENTS, AND THEN I AM DONE. ON NOVEMBER 25TH, AGENT MALEY AND AGENT VITO MEET WITH BRANDON BASHAM. THEY MEET WITH BRANDON BASHAM AND HIS

LAWYER. WHAT ARE THE TWO SIGNIFICANT THINGS THAT BRANDON BASHAM SAYS? BRANDON BASHAM IDENTIFIED THAT CEMETERY, THE PICTURE OF THE CEMETERY THAT I SHOWED MR. PERDUE. MR. PERDUE, YOU REMEMBER, MR. PERDUE SAW THAT BMW DRIVE BY. IT CAME BACK AGAIN TOWARDS GREEN HILL, AND THEN HE IS STILL WORKING ON HIS DEER STAND. HE GOT A CALL ON THE RADIO FROM HIS DAD TO HELP WITH THE DOGS 20 OR 30 MINUTES LATER. TWENTY OR 30 MINUTES LATER, HE IS DRIVING DOWN GOING TOWARD GREEN HILL ROAD. HIS FATHER-IN-LAW CALLS HIM, SAYS THE DOGS ARE BACK UP BY THE FARM, THE HUNT CLUB. HE PULLS AROUND IN THAT TURNAROUND, THE CEMETERY, YOU HAVE SEEN THE PHOTOGRAPH. WHY IS THAT IMPORTANT? HE SEES THAT BMW PULL RIGHT UP TO THAT CEMETERY, RIGHT UP INTO THAT CEMETERY. CLOSE-UP SHOT OF IT AS WELL. AND EVEN CLOSER THAN THAT. RIGHT THERE. I WILL KEEP THIS PICTURE ON HERE AND TALK ABOUT SHERIFF HEWITT IN A MOMENT. HE SEES IT PULLED RIGHT UP THERE BY THAT GATE. NEVER SEEN THAT BLUE BMW BEFORE NOVEMBER 14TH, NEVER SEEN IT AGAIN. HE KNOWS SOMEBODY IS IN IT. HE SEES THE TAILLIGHT ON.

LADIES AND GENTLEMEN, WHAT IS IMPORTANT ABOUT THAT? BRANDON BASHAM AND CHAD FULKS, THEY HAD 20 TO 30 MINUTES TO DO THEIR THING WITH ALICE AND TO KILL HER. IT DON'T TAKE LONG TO KILL SOMEONE. THEY HAD 20 TO 30 MINUTES FROM THE TIME THAT BMW PULLED PAST MR. PERDUE ON THAT DEER STAND, 20 TO 30 MINUTES BEFORE HE SAW IT PARKED UP THERE BY THAT GATE. TWENTY TO 30 MINUTES.

WHAT ELSE DID AGENT MALEY AND AGENT VITO HEAR FROM BRANDON BASHAM? ALICE DONOVAN WAS WITHIN DRAGGING DISTANCE OFF THE ROAD COVERED WITH LIMBS AND LEAVES.

THANKSGIVING DAY, NOVEMBER 28TH, 2002. THANKSGIVING DAY. I WILL NOT GO OVER THE WHOLE THING. I JUST WANT TO TALK TO YOU ABOUT TWO POINTS. TWO SALIENT POINTS. YOU REMEMBER THE SHERIFF THAT TOOK THAT WITNESS STAND. YOU REMEMBER SHERIFF HEWITT. HE WAS REFERRING TO HIS NOTES SO HE COULD BE EXACT TO YOU JURORS. THE NOTES HE MEMORIALIZED SHORTLY AFTER THE EVENTS OF THAT DAY. YOU REMEMBER HOW FAIR SHERIFF HEWETT WAS. HE WROTE DOWN THERE ANY TIME BRANDON BASHAM TREMBLED OR GOT EMOTIONAL. AS A POLICE OFFICER, HE LOOKED AT HIS NOTES, PUT IT DOWN WHETHER IT HELPED BRANDON BASHAM OR HURT HIM. DRIVING DOWN THAT C. C. ROAD NEAR BEE TREE FARMS AND THOSE HUNTERS ARE WALKING DOWN AND THAT DOE JUMPS OUT ON THE BACK OF THE ROAD, DO YOU REMEMBER THAT? DO YOU REMEMBER WHAT BRANDON BASHAM'S COMMENTS WERE? HE SEES THAT DOE AND HE SAYS TO HIMSELF, SPONTANEOUSLY, "HERE I COULDN'T EVEN KILL A DEER, AND I HAVE," AND HIS LAWYER, MR. LITTLEJOHN STOPS HIM. "HERE, I COULDN'T EVEN KILL A DEER, AND HERE I HAVE" -- WHAT DO YOU THINK HE IS THINKING ABOUT? HERE I HAVE SMOKED A JOINT? HERE I HAVE STOLEN A CAR?

AND LATER ON, AT THE END OF THAT DAY WHEN THEY GET TO THAT CEMETERY, HE IS PULLED OUT OF THAT VAN AND HE IS IN SHACKLES. WHAT DOES HE TELL THE SHERIFF? HE TELLS THE SHERIFF THAT IT

WAS RIGHT THERE BY THAT GATE. HE TELLS -- HE NOT ONLY TELLS, HE DEMONSTRATES. HE DEMONSTRATES FOR THAT SHERIFF A LIZ CLAIBORNE PURSE STRAP WAS USED TO KILL ALICE DONOVAN. THEN WHAT DOES HE SAY? I THREW IT IN THE WOODLINE. MR. SWERLING ASKS SHERIFF HEWITT SAYS HE DIDN'T SAY I KILLED ALICE DONOVAN. SHERIFF HEWITT SAID TO YOU IN THIS COURTROOM IN FRONT OF YOU, THE JURY, NO, HE DEMONSTRATED IT.

CLIFFORD JAY, CHRISTMAS EVE. CLIFFORD JAY WAS FORMER SCHOOL COUNSELOR AND AID FOR BRANDON BASHAM FOR THREE TO FOUR YEARS. CLIFFORD JAY WAS SOMEONE BRANDON BASHAM LOOKED UP TO AND RESPECTED. MORE IMPORTANTLY, CLIFFORD JAY IS SOMEBODY THAT BRANDON BASHAM REACHED OUT TO. CLIFFORD JAY DIDN'T CALL BRANDON BASHAM IN COLUMBIA. BRANDON BASHAM CALLED CLIFFORD JAY ON CHRISTMAS EVE. HE IS AT HOME WITH HIS MAMA. WHAT DOES THIS MAN TELL HIM? BRANDON SAYS, MR. C. J., I AM IN A LOT OF TROUBLE. I AM IN A LOT OF TROUBLE. MR. C. J., I MAY BE FACING THE DEATH PENALTY. CLIFFORD JAY TELLS HIM, WHEN YOU ARE SAVED, TALKS ABOUT A RELIGIOUS STORY, DAVID AND URIAH, HE TALKS TO HIM ABOUT IT. WHAT IS CRITICAL ABOUT THIS? AT THAT POINT IN TIME, BRANDON BASHAM IS ONLY CHARGED WITH ALICE DONOVAN. THE MADISON MESSENGER IS ONLY TALKING ABOUT BRANDON BEING CHARGED WITH CHAD FULKS IN THE KIDNAPPING, CARJACKING AND DEATH OF ALICE DONOVAN, THE WOMAN FROM SOUTH CAROLINA. CLIFFORD JAY, IN HIS MIND, ONLY BELIEVES THAT BRANDON BASHAM HAS BEEN CHARGED WITH THIS ONE DEATH, THIS ONE

WOMAN.   AND CLIFFORD JAY HAS TO KNOW, HE HAS TO KNOW IN HIS OWN HEART,  BRANDON, DID YOU DO WHAT THEY SAY YOU DID,  WHAT THEY SAY YOU DID? AND WHAT WAS BRANDON BASHAM'S RESPONSE? YES, SIR,  MR. C. J.,  WE KILLED THEM.   IT SHOCKED HIM BECAUSE HE SAID "WE."  CLIFFORD JAY WANTED TO BELIEVE IN ALL OF HIS MIND AND HEART THAT BRANDON WOULDN'T HAVE BEEN INVOLVED IN THIS, HIS FORMER STUDENT.   "WE KILLED THEM."   THAT WAS THE SHOCKER.   HE DIDN'T KNOW.   ANY REASONABLE PERSON, MR. JAY, HE DIDN'T KNOW AT THAT POINT IN TIME, HE DOESN'T KNOW IF IT IS TWO OR 20 WOMEN THAT WERE KILLED.   AND HE IMMEDIATELY DOES, EVEN THOUGH HE LIKES BRANDON BASHAM,  EVEN THOUGH THIS IS HIS FORMER STUDENT,  CLIFFORD JAY REACHES INTO HIS HEART AND REACHES OUT TO LAW ENFORCEMENT.  HE SATISFIES HIS CIVIC DUTY AND PROVIDES THIS INFORMATION TO LAW ENFORCEMENT.   "WE KILLED THEM."

AND THEN CLIFFORD JAY TALKS TO HIM ABOUT BEING A MAN.   DO YOU REMEMBER THAT? YOU NEED TO STAND UP AND BE A MAN.   YOU NEED TO FACE WHAT YOU DID.   YOU NEED TO HELP THEM FIND HER. AND HE SAID,  WELL, ALL THE TREES LOOK ALIKE.   WE TIED HER, MEANING ALICE DONOVAN, THAT IS WHO HE IS TALKING ABOUT.   WE TIED HER TO A TREE.

LADIES AND GENTLEMEN,  I WANTED TO FINISH WITH THAT BECAUSE HOW WOULD YOU GO BACK IN YOUR JURY ROOM AFTER LISTENING TO SHERIFF HEWITT AND AFTER SEEING SHERIFF HEWITT DEMONSTRATE HOW BRANDON BASHAM DEMONSTRATED HOW ALICE DONOVAN

WAS STRANGLED, HOW DO YOU LISTEN TO CLIFFORD JAY WHEN BRANDON BASHAM TOLD YOU JURORS THROUGH CLIFFORD JAY, WE KILLED THEM AND FIND HIM NOT GUILTY OF CARJACKING, RESULTING IN DEATH? AND FIND HIM NOT GUILTY OF KIDNAPPING, RESULTING IN DEATH? I HAVE BEEN UP HERE FOR TWO HOURS, AND THE GOVERNMENT SUBMITS THOSE TWO WITNESSES AND THAT LIMITED TESTIMONY, ALONE, SEALS THE DEAL. "WE KILLED THEM."

NO QUESTION, CHAD FULKS WAS THE LEADER IN MANY ASPECTS OF THIS 17-DAY SPREE. WHERE THEY WERE GOING, THERE IS NO QUESTION ABOUT THAT, LADIES AND GENTLEMEN. BUT THERE IS ALSO NO QUESTION, THE GOVERNMENT SUBMITS, THAT BRANDON BASHAM WAS A WILLING, EAGER, AND RELIABLE FOOT SOLDIER. HE WAS EAGER TO PLEASE HIS FRIEND. AND HE WAS WILLING TO PARTICIPATE AND MAKE CHOICES. YOU KNOW WHO SUMMED IT UP? WHEN TINA SEVERANCE WAS ON THAT WITNESS STAND, I THINK IT WAS IN REDIRECT, SOME INNOCUOUS QUESTION ABOUT HOW THEY WERE GETTING ALONG. DO YOU REMEMBER WHAT TINA SEVERANCE SAID SPONTANEOUSLY? LIKE TWO PEAS IN A POD. THEY WERE ALWAYS TOGETHER HAVING A GOOD TIME. THAT IS BRANDON BASHAM AND CHAD FULKS IN NOVEMBER 2002. LIKE TWO PEAS IN A POD. BRANDON BASHAM COULD NOT HAVE CARJACKED, KIDNAPPED, AND KILLED ALICE DONOVAN WITHOUT CHAD FULKS; CHAD FULKS COULD NOT HAVE CARJACKED, KIDNAPPED, AND KILLED ALICE DONOVAN WITHOUT BRANDON BASHAM.

AS A U. S. ATTORNEY, AS A CITIZEN OF THE UNITED STATES,

**JA 1474**

AND AS A RESIDENT OF SOUTH CAROLINA, I ASK YOU, I ASK YOU, BASED ON THE EVIDENCE YOU HAVE HEARD AND THE LAW YOU ARE ABOUT TO HEAR, HOLD BRANDON BASHAM RESPONSIBLE FOR HIS ACTIONS. HOLD BRANDON BASHAM ACCOUNTABLE FOR THE CHOICES HE MADE. YOU CAN DO THAT, LADIES AND GENTLEMEN, BY REACHING A VERDICT, A VERDICT THAT SPEAKS THE TRUTH. AND THE TRUTH IS THAT BRANDON BASHAM KIDNAPPED, CARJACKED, AND KILLED ALICE DONOVAN. THAT IS THE TRUTH. AND WHEN YOU FIND HIM GUILTY, IT WILL BE JUSTICE. AND JUSTICE, LADIES AND GENTLEMEN, TODAY, IN THIS COURTROOM, IS WHAT EACH AND EVERY ONE OF YOU ARE ALL ABOUT.

THE COURT: THANK YOU, MR. GASSER. MEMBERS OF THE JURY, LET'S TAKE A 15-MINUTE RECESS, THEN WE WILL COME BACK AND HEAR MR. SWERLING'S CLOSING ARGUMENT.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: MR. SWERLING, AT THE BEGINNING OF THE BREAK, WE GAVE YOU A FINAL COPY OF THE CHARGE. I WANTED TO MAKE SURE YOU HAD ENOUGH TIME TO LOOK AT THE CHANGE. THE CLERK SAID SHE WILL PUT YOUR TIME IN AT 90 MINUTES. THAT IS TO PACE YOURSELF. YOU TAKE AS LONG AS YOU NEED.

MR. SWERLING: I APPRECIATE THAT. I WOULD RATHER NOT DO THAT.

THE COURT: I HAVE THE JURY INSTRUCTIONS TO GIVE TO THE JURORS. I SPOKE WITH EACH SIDE THAT THE VERSION GOING TO THE JURY BE IN THE SAME FORMAT, THAT IS HAVING A TITLE ON

EACH PAGE, WHICH IS A TOPIC ON EACH PAGE, WITH SOME PAGE BREAKS. I UNDERSTAND THERE WAS NO OBJECTION, MR. SCHOOLS?

MR. SCHOOLS: YES, SIR.

THE COURT: MR. SWERLING?

MR. SWERLING: YES, SIR.

THE COURT: READY TO PROCEED?

MR. SWERLING: YES, SIR.

THE COURT: PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: ALL RIGHT. AT THIS TIME, THE COURT RECOGNIZES MR. JACK SWERLING, ONE OF THE ATTORNEYS FOR THE DEFENDANT, FOR HIS CLOSING ARGUMENT.

MR. SWERLING: PLEASE THE COURT. GENTLEMEN. GOOD MORNING, LADIES AND GENTLEMEN. I WANTED TO MAKE SURE IT WAS STILL MORNING. I WANT TO ECHO MY GOOD FRIEND, MR. GASSER, WHAT HE TOLD YOU, AND THAT IS THAT OVER THE LAST FEW WEEKS, WE HAVE BEEN WATCHING YOU. I AM SURE YOU HAVE BEEN WATCHING US A LITTLE BIT, TOO. TO SEE YOUR REACTIONS AND TO SEE IF YOU ARE LISTENING TO CERTAIN OF THE EVIDENCE AND REVIEWING THE EVIDENCE THAT IS ON THE SCREEN. WE FELT VERY COMFORTABLE THROUGHOUT THE TRIAL THAT AT NO POINT DID ANY OF THE JURORS JUST DECIDE THAT THEY WEREN'T GOING TO LISTEN ANYMORE. AND THAT THEY WANTED TO HEAR ALL OF THE EVIDENCE, THEY WANTED TO HEAR ALL OF THE TESTIMONY, THEY WANTED TO SEE ALL OF THE

EXHIBITS. THEY WANTED TO HEAR WHAT THE LAWYERS HAD TO SAY, AND WHAT THE JUDGE HAD TO SAY ABOUT THE CHARGE OF THE LAW BEFORE THEY MADE UP THEIR MIND. AND, AS I SAID, WE ARE SATISFIED WITH THAT. AND I WOULD ECHO WHAT I SAID IN MY OPENING STATEMENT, THAT WE ARE SATISFIED, WE HAVE BEEN SATISFIED ALL ALONG, AND STILL ARE, THAT THE JURY THAT WE HAVE SEATED IN THAT BOX IS THE BEST JURY THAT WE COULD SEAT TO DECIDE THE ISSUES IN THIS CASE BETWEEN THE UNITED STATES AND BRANDON BASHAM.

NOW, A COUPLE OF THINGS I WANT TO TELL YOU ABOUT BEFORE I EVEN GET STARTED. NUMBER ONE, I TOLD YOU, I THINK, AT THE BEGINNING OF THE CASE, I AM NOT VERY GOOD WITH THESE VISUALS. AND I CANNOT -- WILL NOT STAND HERE, AS MR. GASSER DID, AND DELIVER MY CLOSING REMARKS USING THOSE VISUALS, BUT I WILL REFER TO SOME NOTES. THERE IS QUITE A BIT OF INFORMATION TO COVER THAT YOU HAVE HEARD OVER THE LAST ALMOST TEN DAYS OF COURT TIME. SO, FORGIVE ME FOR REFERRING TO NOTES, BUT I WANT TO MAKE SURE THAT I COVER WHAT I THINK IS IMPORTANT IN THE CASE FOR YOU TO CONSIDER.

THE SECOND THING IS, I MAY ONCE IN A WHILE HAVE TO TAKE SOME WATER. I AM TAKING SOME MEDICINE THAT DRIES OUT MY MOUTH. EVERY ONCE IN A WHILE, I HAVE TO GO AHEAD AND TAKE WATER. IF YOU SEE ME STOP FOR A MOMENT, THAT IS WHAT THE REASON IS.

AT THE BEGINNING OF THIS CASE, I TOLD YOU THERE WERE

GOING TO BE CERTAIN ISSUES THAT WERE REALLY NOT IN CONTENTION. I TOLD YOU THAT YOU WOULD HEAR EVIDENCE OVER THE COURSE OF THE TRIAL THAT A LOT OF IT WAS NOT GOING TO REALLY BE IN DISPUTE. I WILL REVIEW THAT AGAIN, WHAT I TOLD YOU AT THE BEGINNING OF THE CASE.

WHAT I DID TELL YOU A LITTLE BIT ABOUT AT THE BEGINNING OF THE CASE, ALSO, SOME CHARACTERISTICS ABOUT MR. BASHAM. WHERE HE WAS FROM, THE FACT THAT HE WAS IN SPECIAL-ED CLASS, THE FACT THAT HE WAS BEHIND IN HIS GRADE LEVEL, AND THAT HAS BEEN BORNE OUT IN THE TESTIMONY BY MR. SCHAFFER, MR. JAY, AND A NUMBER OF OTHER PEOPLE. I ALSO TOLD YOU THAT HE SUFFERED FROM ADHD, AMONG OTHER THINGS, WHICH IS ATTENTION DEFICIT DISORDER. THERE ARE VARYING DEGREES OF THAT, HYPERACTIVITY, I TOLD YOU THAT. I BELIEVE THAT HAS BEEN BORNE OUT BY THE TESTIMONY IN THE CASE.

I ALSO TOLD YOU, AT THE BEGINNING OF THE CASE, THAT THERE WERE QUITE A FEW THINGS THAT WE WANTED YOU TO HEAR ABOUT CHAD FULKS. AND I WANTED YOU TO HEAR THOSE THINGS ABOUT CHAD FULKS SO THAT YOU COULD DETERMINE, IN YOUR MIND, OVER THIS PERIOD OF TIME, FROM THE MOMENT THAT THEY BROKE OUT OF JAIL OR WHEN THAT PLAN WAS MADE TO BREAK OUT OF JAIL, UNTIL THE MOMENT THAT EACH OF THEM WERE ARRESTED, WHO WAS IN ABSOLUTE CONTROL OF THIS SITUATION? WHO WAS THE ONE THAT WAS THE CAPABLE ONE OF PLANNING THINGS? WHO IS THE ONE THAT WAS IN COMMAND? WHO WAS THE ONE GIVING ORDERS? WHO WAS THE ONE IN

CONTROL? AND I THINK THAT, FROM THE EVIDENCE, I SUBMIT TO YOU, THERE SHOULD BE NO DOUBT IN YOUR MIND AS TO WHO WAS IN CONTROL IN THIS THING. WHO WAS THE LEADER OF THIS TWOSOME? WHO WAS THE FOLLOWER?

YOU MAY SAY, WHY IS THAT IMPORTANT? IT IS IMPORTANT BECAUSE THE GOVERNMENT KEEPS TALKING ABOUT MAKING CHOICES. AND I WILL SUBMIT TO YOU THAT MR. BASHAM MADE SOME VERY POOR CHOICES, VERY DISASTROUS CHOICES OVER THE PERIOD OF TIME FROM THE TIME THAT THEY ESCAPED FROM THE JAIL UNTIL THE TIME HE WAS ARRESTED. BUT I WANT YOU OR WOULD ASK YOU TO CONSIDER THOSE CHOICES IN LIGHT OF HIS BACKGROUND, SOME OF THE CHARACTERISTICS ABOUT HIM, SOME OF HIS QUALITIES, OR VIS-A-VIS CHAD FULKS AND THINGS YOU HEARD ABOUT HIM. BECAUSE THERE ARE SOME THINGS HERE THAT WHEN YOU LOOK AT THEM, AND WHEN YOU MEASURE THEM, AND WHEN YOU CONSIDER THEM, AND YOU WEIGH THEM, I AM GOING TO ASK YOU, AT THE CONCLUSION OF ALL OF THIS, TO DECIDE WHO REALLY WAS THE PERSON WHO HAD THE PROPENSITY FOR VIOLENCE. WHO WAS THE ONE THAT, FROM THE VERY BEGINNING, WAS THE ONE WHO HAD THE VIOLENT NATURE? WHO WAS THE ONE FROM THE VERY BEGINNING WAS THE MANIPULATIVE INDIVIDUAL? WHO WAS THE ONE FROM THE VERY BEGINNING WHO IS THE EVIL PERSON? WHO IS THE ONE THAT HAD EVERYTHING TO GAIN? WHO WAS THE MOST LIKELY TO GO AHEAD AND HURT SOMEBODY? WHO IS THE ONE TO BE IN CONTROL? WHO IS THE ONE TO COMMAND? WHO IS THE ONE TO BE AFRAID OF? WHO IS THE ONE THAT SOMEONE SHOULD BE AFRAID

OF, HAVE REASON TO FEAR? AND, I THINK, I SUBMIT TO YOU, NOT THAT I THINK, I SUBMIT TO YOU THAT THOSE ISSUES SHOULD BE IMPORTANT IN WEIGHING SOME RELATIVE ISSUES IN THIS CASE. AGAIN, NOT BECAUSE MR. BASHAM DIDN'T JOIN ALONG, DIDN'T HAVE THE FREE WILL TO JOIN ALONG, BUT WHAT DID MR. BASHAM AGREE TO JOIN ALONG IN? THAT IS SOMETHING THAT I SUBMIT TO YOU WILL BE IMPORTANT. AND YOU CAN LOOK AT SOME OF THE FACTS IN THE CASE. YOU CAN LOOK AT SOME OF THE OTHER CRIMES THAT THE GOVERNMENT IS REFERRING TO.

AS THE JUDGE WILL TELL YOU IN THE LAW, YOU WILL HAVE THE WRITTEN INSTRUCTIONS, BY THE WAY, I THINK THE JUDGE MAY HAVE ALREADY TOLD YOU THAT, BUT THESE OTHER SIMILAR ACTS THAT THE GOVERNMENT HAS PROVEN IN THE CASE AND SOUGHT TO PROVE AND IS ASKING YOU TO RELY ON, THOSE SIMILAR ACTS CAN BE USED TO PROVE OR DISPROVE MOTIVE, OPPORTUNITY, INTENT, PURPOSE -- NOT OPPORTUNITY, MOTIVE, INTENT, PURPOSE. THOSE ARE THINGS THAT YOU CAN USE THOSE SIMILAR ACTS TO SHOW WHETHER OR NOT MR. BASHAM HAD THE INTENT TO DO SOMETHING OR HE DIDN'T HAVE THE INTENT. AND I WILL EXPLAIN WHAT I AM SAYING IN A FEW MOMENTS, BUT WHAT I WANT, WHAT I WOULD LIKE YOU TO UNDERSTAND, AT THIS POINT, IS TO UNDERSTAND THAT THOSE SIMILAR ACTS THE GOVERNMENT HAS A WAY THAT THEY WOULD LIKE YOU TO LOOK AT THEM. AND WE SUBMIT THAT THERE IS A WAY THAT THOSE CAN BE LOOKED AT, NOT AGAINST MR. BASHAM, BUT FAVORABLY TOWARD MR. BASHAM AS TO SOME OF THE ACTIONS THAT HE TOOK. AND AS TO WHY

HE DID NOT HAVE THE INTENT AS TO CERTAIN OTHER CRIMES THAT ARE CHARGED IN THIS INDICTMENT.

NOW, AT THE BEGINNING OF THE CASE I ALSO TOLD YOU, I MADE NO -- I DID NOT HIDE BEHIND OR STAND BEHIND THAT THIS WAS NOT A GRUESOME CASE. I THINK I TOLD YOU RIGHT UP FRONT THAT YOU WERE GOING TO BE HEARING SOME VERY HORRIBLE THINGS. YOU WERE GOING TO BE HEARING FACTS THAT AFFECTED A LOT OF DIFFERENT PEOPLE IN THE MOST DIFFICULT WAY THAT MOST OF US COULD NEVER CONCEIVE OF. YOU WOULD HEAR THINGS YOU WERE NOT USED TO HEARING. YOU MAY READ ABOUT IT IN THE NEWSPAPER, BUT IT IS STILL SOMETHING IN PRINT. IT IS A LOT DIFFERENT THAN WHEN YOU EXPERIENCE IT AS BEING A VICTIM OF A CRIME OR LISTENING TO THE EVIDENCE AS A JURY. YOU HAVE HAD TO HEAR AND YOU WILL HEAR OVER THE NEXT COUPLE OF WEEKS SOME VERY HORRIBLE DETAILS, SOME VERY HORRIBLE STORIES. I AM NOT ASKING YOU TO PUT THOSE OUT OF YOUR MIND. THAT IS A FACT THAT I HAVE, FROM THE VERY BEGINNING OF THE CASE, CONCEDED YOU WILL HEAR.

I HAVE ALSO CONCEDED FROM THE BEGINNING OF THE CASE THAT BRANDON BASHAM PARTICIPATED IN A GOOD MANY OF THOSE CRIMES. I REVIEWED THOSE WITH YOU IN THE BEGINNING, I WILL REVIEW THEM WITH YOU NOW SO THAT YOU WILL UNDERSTAND, AGAIN, THAT I CAN REITERATE WHAT IS IN CONTENTION AND WHAT IS NOT IN CONTENTION. MY PURPOSE RIGHT NOW IS TO REMIND YOU THAT THAT WAS OUR POSITION AT THE BEGINNING OF THE TRIAL, AND THAT IS

THE POSITION WE HAVE NOW. WE HAVE NOT CHANGED OUR POSITION AT ALL. THERE ARE CRIMES THAT MR. BASHAM COMMITTED, AND THERE ARE CRIMES THAT MR. BASHAM SHOULD PAY THE PENALTY FOR. THAT IS SOMETHING THAT IS NOT AN ISSUE IN THIS CASE. HE DESERVES TO BE PUNISHED FOR THE CRIMES THAT HE COMMITTED. I SUBMIT TO YOU, HOWEVER, THAT HE SHOULD NOT BE FOUND GUILTY OF THOSE CRIMES WHICH HE DID NOT COMMIT AND WHICH THE GOVERNMENT HAS NOT PROVEN.

NOW, AT THE BEGINNING OF THE CASE, I TOLD YOU THERE WAS NO QUESTION ABOUT THE ESCAPE. THAT WAS NOT IN ISSUE. BRANDON BASHAM WAS A WILLING PARTICIPANT IN THE ESCAPE OUT OF THE HOPKINS COUNTY JAIL. BRANDON BASHAM WAS A WILLING PARTICIPANT IN THE CASE DEALING WITH MR. HAWKINS, JAMES HAWKINS. I TOLD YOU THAT FROM THE BEGINNING, AS WELL. AND MR. HAWKINS' SITUATION IS ONE OF THOSE CRIMES THAT THE GOVERNMENT HAS PROVEN IN THIS CASE, WHICH IS NOT CHARGED IN THE INDICTMENT, BUT IT IS ONE OF THOSE CRIMES THAT I AM GOING TO ASK YOU TO LOOK AT AS TO NOT ONLY WHAT MR. BASHAM DID, BUT WHAT HE DID NOT DO IN SHOWING HIS INTENT.

I TOLD YOU ABOUT THE BREAK-IN. WE WOULD NOT ARGUE ABOUT THE BREAK-IN AT ROBERT TALSMA'S HOUSE. I TOLD YOU WE WERE NOT DISPUTING ANY OF THE THEFTS THAT TOOK PLACE AT ANY OF THE VEHICLES. THAT IS FROM HIS HOUSE, OR VEHICLES, THE PURSES TAKEN, ATM CARDS, MONEY, ALL OF THOSE THINGS WERE CONCEDED. ANY OF THE FRAUDS COMMITTED ALONG THE WAY IN CONNECTION WITH

ANY OF THOSE ITEMS.

I TOLD YOU ABOUT THERE WAS NOT GOING TO BE AN ISSUE ABOUT POSSESSING THE WEAPONS.  THERE IS NO QUESTION THAT MR. BASHAM, AS WELL AS MR. FULKS, POSSESSED THE WEAPONS THAT THE GOVERNMENT SAID THEY POSSESSED.  NOT ONLY FROM MR. TALSMA'S HOUSE, BUT ALSO FROM SAM JORDAN'S HOUSE.  THAT IS NOT IN DISPUTE EITHER.  WE ARE NOT ARGUING ABOUT THAT.

I TOLD YOU AT THE BEGINNING WE HAD NO CONTENTION, NOT TAKING ANY ISSUE WITH THE FACT THAT A BURGLARY WAS COMMITTED AT SAM JORDAN'S HOUSE AND THAT THOSE GUNS WERE BEING STOLEN. THERE WAS NO QUESTION ABOUT THE FACT THAT THERE WAS A CONFRONTATION WITH CARL JORDAN.  AND YOU ARE NOT GOING TO HAVE A PROBLEM UNDERSTANDING WHAT HAPPENED IN THAT SITUATION EITHER.  THERE WAS NO QUESTION.  BRANDON BASHAM WAS THERE. BRANDON BASHAM PARTICIPATED.  BUT THAT IS ANOTHER ONE OF THE CASES, A SITUATION WHERE THE GOVERNMENT IS ASKING YOU TO INFER AS A SIMILAR ACT TO LOOK AT THE INTENT OF MR. BASHAM AS IT RELATES TO WHAT HE IS CHARGED WITH IN THE INDICTMENT.  WE SUBMIT THAT IS ONE OF THOSE ISSUES THAT YOU ALSO CAN LOOK AT THAT SHOWS THAT MR. BASHAM DID NOT HAVE THE INTENT AS TO THE CRIMES CHARGED IN THE INDICTMENT.

WE ALSO TOLD YOU THERE WAS NOT GOING TO BE ANY DISPUTE ABOUT MS. HYMAN'S TRUCK BEING STOLEN.

ALSO TOLD YOU THERE WAS NO QUESTION ABOUT THE ABDUCTION OF ALICE DONOVAN.  SAID THAT RIGHT UP FRONT.  THERE WAS NO

QUESTION THAT MS. DONOVAN WAS ABDUCTED.

WHAT WE SAID AT THE BEGINNING OF THE CASE, IF YOU WILL REMEMBER WHAT I SAID WAS, THAT MR. BASHAM PARTICIPATED IN HER ABDUCTION. MR. BASHAM PARTICIPATED IN TAKING HER CAR. THE DIFFERENCE IN WHAT THE GOVERNMENT CONTENDS AND WHAT WE CONTEND IS THAT MR. BASHAM DID NOT HAVE THE INTENT TO HURT OR THE INTENT TO KILL ALICE DONOVAN.

NOW, AS TO THE CARJACKING STATUTE, THAT IS AN ELEMENT OF THE OFFENSE. IN ORDER TO BE GUILTY OF CARJACKING IN COUNT 1, YOU ACTUALLY HAVE TO HAVE THE INTENT WHEN YOU TAKE THE CAR OF KILLING OR SERIOUSLY INJURING THE PERSON OR BEING PREPARED TO, IF THE PERSON DOES NOT RELINQUISH THE VEHICLE. WE SUBMIT TO YOU THAT THE CARJACKING CASE IS IN ISSUE, A SITUATION WE STILL CONTEND THAT THE GOVERNMENT HAS NOT PROVEN THAT BRANDON BASHAM HAD THE INTENT TO HURT OR KILL ALICE DONOVAN WHEN SHE WAS ABDUCTED, ALTHOUGH SHE WAS ABDUCTED.

AS TO THE KIDNAPPING STATUTE, THE JUDGE WILL INSTRUCT YOU THAT YOU CAN FIND MR. BASHAM GUILTY OF THE KIDNAPPING, WHICH IS CONCEDED. WHAT WE CONTEND IS IN ISSUE IS WHETHER OR NOT MR. BASHAM INTENDED THE RESULT, AND THAT WAS HER DEATH. SO, THOSE ARE SOME OF THE THINGS IN ISSUE THAT WE HAVE IN THIS CASE. AND THAT IS STILL AN ISSUE. AND, AGAIN, WHILE THE GOVERNMENT CONTENDS THAT THERE ARE CERTAIN FACTS THAT LEAD TO IT TO SHOW INTENT ON THE PART OF MR. BASHAM AS TO THOSE CRIMES, WE SUBMIT THERE ARE CERTAIN THINGS IN THIS CASE THAT

SHOW HE DID NOT HAVE THE INTENT TO HURT, HARM, OR KILL MS. DONOVAN.

WE ALSO TOLD YOU AT THE BEGINNING OF THE CASE THERE WOULD BE NO QUESTION ABOUT THE CONFRONTATION HE HAD WITH MS. FRANCIS AND HER MOTHER. THERE IS NO QUESTION ABOUT IT. NO DOUBT ABOUT IT.

WE ALSO TOLD YOU THERE WOULD BE NO ISSUE ABOUT WHETHER OR NOT MR. BASHAM FIRED A WEAPON IN THE DIRECTION OF OFFICER DAVIS IN ASHLAND, KENTUCKY.

SO, FROM THE BEGINNING, THOSE THINGS HAVE ALL BEEN CONCEDED TO YOU. WHAT IS IN ISSUE? THE MAIN THING IN ISSUE, AS TO THIS INDICTMENT IN THE CASE, IS WHETHER OR NOT BRANDON BASHAM INTENDED THE RESULT, INTENDED TO HURT ALICE DONOVAN, OR INTENDED TO KILL ALICE DONOVAN, OR KNEW THAT THAT WAS GOING TO HAPPEN.

NOW, OVERALL I TOLD YOU AT THE BEGINNING OF THE CASE, AS WELL, THAT CHAD FULKS, YOU WOULD FIND OUT, WAS THE INDIVIDUAL THAT DROVE DURING THIS ENTIRE PERIOD OF TIME THAT THEY WERE ON THE ROAD. THAT, AT ALL TIMES, CHAD FULKS WAS THE ONE THAT MADE THE DECISIONS. THAT EVERY LOCATION THEY STOPPED, EVERY PLACE THEY WENT, CHAD FULKS HAD A CONNECTION WITH THAT AREA, THAT CHAD FULKS WAS FAMILIAR WITH THAT AREA.

I ALSO TOLD YOU, AT THE BEGINNING, THAT CHAD FULKS DECIDED WHERE TO STOP, WHERE TO STAY, WHERE TO LEAVE, WHAT TO BUY, WHEN TO GO, AND WHERE THEY WERE GOING TO GO AFTERWARDS. I

ALSO TOLD YOU THAT YOU WOULD SEE EVIDENCE THAT HE WAS THE LEADER AND MR. BASHAM WAS THE FOLLOWER. THAT CHAD FULKS HAD THE DECISION-MAKING CAPACITY AND MR. BASHAM DID NOT HAVE THAT KIND OF DECISION-MAKING CAPACITY. I TOLD WHO YOU WAS THE OLDER AND WHO WAS THE WISER, THE SMARTER. AND I THINK THAT EVIDENCE WAS BORNE OUT. WHO IS THE DOMINATING INDIVIDUAL IN THIS GROUP? WHO IS THE MORE CUNNING? WHO HAD MORE CONTROL? WHO HELD THE MONEY? IN EACH OF THOSE SITUATIONS I OUTLINED IN THE BEGINNING OF THE CASE, JUST, AGAIN REFERRING BACK TO WHAT I TOLD YOU AT THE BEGINNING OF THE CASE, I SUBMIT TO YOU THAT EVIDENCE HAS BEEN BORNE OUT IN THE TESTIMONY BY THE NUMEROUS WITNESSES THAT YOU HAVE HEARD. I SUBMIT THAT NOTHING I TOLD YOU IN MY OPENING OF THIS CASE IN ANY WAY IS ANY DIFFERENT THAN IT WAS AT THAT TIME THAN IT IS NOW. AND NOW, AS A MATTER OF FACT, YOU NOW HAVE EVIDENCE OF EACH OF THOSE THINGS THAT I TOLD YOU ABOUT.

NOW, YOU ARE GOING TO HAVE A VERDICT FORM IN THIS CASE. I WANTED TO TELL YOU A COUPLE OF THINGS, COUPLE OF PRINCIPLES OF LAW THAT ARE GOING TO BE IMPORTANT IN THIS CASE, WE ARE GOING TO ASK YOU TO RELY ON. I WILL NOT GO THROUGH ALL OF THE ELEMENTS MR. GASSER DID. HE WENT THROUGH THE ELEMENTS WITH YOU. NOT A LOT OF DISPUTE AS TO WHAT THE ELEMENTS ARE OF THESE DIFFERENT CRIMES. AS I TOLD YOU, THE JUDGE WILL GIVE YOU A WRITTEN CHARGE AFTER HE GIVES YOU THE ORAL CHARGE SO YOU CAN FOLLOW WHAT THE ELEMENTS OF THESE CRIMES ARE.

THE ELEMENTS BASICALLY ARE THIS, WHAT DOES THE GOVERNMENT HAVE TO PROVE TO MAKE OUT THAT CRIME? WHETHER IT IS TWO ELEMENTS, OR THREE ELEMENTS, OR FOUR ELEMENTS, THE GOVERNMENT HAS TO MEET EACH ONE OF THOSE ELEMENTS AND PROVE THOSE, BEYOND A REASONABLE DOUBT, FOR THE JURY TO MAKE A FINDING OF GUILT. SO, YOU DON'T HAVE TO WRITE THESE DOWN. THE JUDGE WILL TELL YOU IT, HE WILL ALSO GIVE YOU A WRITTEN INSTRUCTION AND YOU CAN REFER TO IT. SO, I WILL NOT THROW SOMETHING UP ON A SCREEN OR SHOW YOU SOME CHARTS WHICH WOULD SHOW THOSE ELEMENTS.

THERE ARE A COUPLE OF PRINCIPLES THAT I WANTED TO DISCUSS WITH YOU, ONE OF THEM IS, AS I TOLD YOU ABOUT, THE SIMILAR ACT EVIDENCE. THE JUDGE WILL TELL YOU ABOUT HOW YOU CAN USE SIMILAR ACT EVIDENCE, OTHER CRIMES THAT THE GOVERNMENT CONTENDS MR. BASHAM COMMITTED. AND, AS I SAID, AS THE GOVERNMENT IS SAYING, YOU CAN USE THOSE OTHER CRIMES TO SHOW INTENT. WE SAY YOU CAN USE THOSE OTHER CRIMES TO DISPROVE INTENT. I WILL REVIEW THAT WITH YOU.

ANOTHER PRINCIPLE I WANTED TO TALK TO YOU ABOUT AS TO EACH COUNT, COUNT 1 AND 2, THE JUDGE IS GOING TO TELL YOU ABOUT WHAT THE DEATH RESULTING, THE DEFINITION OF DEATH RESULTING IS. NOW, COUNT 1. THE GOVERNMENT IS GOING TO HAVE TO PROVE THAT, AT THE TIME MR. BASHAM ENTERED THE VEHICLE, HE HAD THE INTENT TO HARM, OR THE INTENT TO KILL, OR WAS PREPARED TO DO SO. THEN THE GOVERNMENT CONTENDS THAT DEATH RESULTED AS A

RESULT OF THAT CARJACKING.  AS TO THE KIDNAPPING CHARGE,  THE GOVERNMENT HAS CLAIMED THAT THERE WAS AN ABDUCTION,  WHICH WE CONCEDE.  BUT THAT ALSO DEATH RESULTED FROM THAT KIDNAPPING.  THE JUDGE WILL READ YOU WHAT THE LAW IS AND WHAT THE DEFINITION OF DEATH RESULTING IS, AND I AM JUST GOING TO KIND OF SUMMARIZE IT FOR YOU VERY BRIEFLY.

THE JUDGE WILL TELL YOU THAT YOU WILL HAVE TO CONSIDER WHETHER OR NOT ALICE DONOVAN'S DEATH RESULTED FROM HER BEING CARJACKED.  IN ORDER FOR ALICE DONOVAN'S DEATH TO RESULT FROM HER BEING CARJACKED,  HER DEATH MUST HAVE RESULTED FROM THE WILLFUL AND INTENTIONAL CONDUCT OF THE DEFENDANT,  BRANDON LEON BASHAM, OR THE WILLFUL AND INTENTIONAL CONDUCT OF CHAD FULKS,  THE CODEFENDANT.

THERE ARE TWO WAYS THE GOVERNMENT CAN PROVE THAT.  ONE IS THEY CAN PROVE THAT BRANDON BASHAM, HIMSELF, COMMITTED THE ACT.  THE OTHER WAY -- THAT WOULD MAKE HIM A PRINCIPLE.  THE OTHER WAY THE GOVERNMENT CAN DO THAT IS TO PROVE THAT BRANDON BASHAM WAS AN AIDER OR ABETTER, AND THE JUDGE WILL EXPLAIN THAT TO YOU,  AS WELL.  IF YOU ARE AN AIDER OR ABETTER, YOU ARE JUST AS RESPONSIBLE AS THE PERSON WHO COMMITTED THE ACT.  THE JUDGE WILL ALSO EXPLAIN TO YOU WHAT AIDING AND ABETTING IS.

AS TO THE KIDNAPPING, THE DEFINITION IS GOING TO BE THE SAME, WHAT THE GOVERNMENT HAS TO PROVE IN ORDER TO SHOW THAT DEATH RESULTED FROM EACH ONE OF THOSE CRIMES.  SO, I AM NOT

JA 1488

GOING TO REPEAT IT AGAIN, BUT IT IS GOING TO BE, BASICALLY, THE SAME, THAT IT HAS TO HAVE RESULTED FROM THE WILLFUL AND INTENTIONAL CONDUCT OF BRANDON LEON BASHAM OR CHAD FULKS AIDED AND ABETTED BY BRANDON LEON BASHAM.

NOW, WHAT DOES AIDING AND ABETTING MEAN? THE JUDGE WILL GIVE YOU A DEFINITION OF THIS, YOU WILL HAVE IT IN WRITING SO YOU CAN REVIEW DURING YOUR DELIBERATIONS. BUT AIDING AND ABETTING IS A COMPLICATED PRINCIPLE OF LAW. BUT IF YOU ASSIST, YOU ARE AIDING AND ABETTING, YOU ARE ASSISTING OR IN SOME WAY FURTHERRING WHAT THE OTHER DEFENDANT IS DOING, IN THIS CASE, CHAD FULKS, YOU DO IT AT CERTAIN STAGES OF THE CRIME, THE ONGOING CRIME, THEN YOU CAN BE GUILTY OF THE CRIME OF AIDING AND ABETTING, WHICH MAKES YOU RESPONSIBLE AS THE PRINCIPLE. YOU WILL HAVE A MORE COMPLETE DEFINITION OF IT. BUT THE JUDGE WILL TELL YOU, WITH RESPECT TO THE AIDING AND ABETTING, WHETHER OR NOT YOU CAN FIND BRANDON BASHAM RESPONSIBLE AS AN AIDER AND ABETTER, IS THAT TO BE CONVICTED OF AIDING AND ABETTING, PARTICIPATION IN EVERY CRITICAL STAGE IN THE ILLEGAL VENTURE IS NOT REQUIRED. YOU DON'T HAVE TO PARTICIPATE IN EVERY STAGE TO BE AN AIDER AND ABETTER. BUT PARTICIPATION AT SOME STAGE ACCOMPANIED BY KNOWLEDGE OF THE RESULT AND THE INTENT TO BRING ABOUT THAT RESULT COULD MAKE YOU RESPONSIBLE AS AN AIDER AND ABETTER.

THE CRITICAL LANGUAGE THAT WE ARE ASKING YOU TO FOCUS ON WITH RESPECT TO AIDING AND ABETTING IS THAT, EVEN IF YOU FIND

THAT BRANDON BASHAM AIDED AND ABETTED CHAD FULKS, DID HE MEET THE DEFINITION, AND DOES HE MEET THE DEFINITION OF AN AIDER AND ABETTER AS SOMEONE WHO HAD THE KNOWLEDGE OF THE RESULT OR AN INTENT, OR AN INTENT TO BRING ABOUT THE RESULT?

SO, WE STILL SUBMIT THAT IN ORDER -- EVEN IF YOU FIND THAT BRANDON BASHAM IS AN AIDER AND ABETTER AT DIFFERENT STAGES ALONG THE WAY IN CONCERNING THESE CRIMES AND THIS INDICTMENT, THAT IF BRANDON BASHAM DID NOT KNOW, DID NOT HAVE KNOWLEDGE OF THE INTENT OR THE RESULT TO BRING ABOUT THE RESULT -- I'M SORRY, HE DID NOT HAVE KNOWLEDGE OF THE RESULT OR THE INTENT TO BRING ABOUT THE RESULT, THEN HE SHOULD NOT BE HELD RESPONSIBLE FOR THE DEATH RESULTING FROM THOSE CRIMES.

NOW, SO WHERE ARE WE? CARJACKING, WE SUBMIT TO YOU, REQUIRES THE INTENT TO SHOW THAT HE WAS EITHER INTENDING TO HARM HER, OR INTENDING TO KILL HER, OR WAS PREPARED TO DO SO IF SHE DIDN'T RELINQUISH THE VEHICLE. WE SUBMIT TO YOU THAT THE GOVERNMENT HAS NOT MET ITS BURDEN SHOWING THAT THAT WAS BRANDON BASHAM 'S INTENT. HOWEVER, IF YOU FIND THAT THAT WAS BRANDON BASHAM'S INTENT, YOU STILL MUST MAKE THE DECISION ABOUT WHETHER OR NOT DEATH RESULTED FROM THAT CONDUCT. AND WHETHER OR NOT BRANDON BASHAM SHOULD BE HELD RESPONSIBLE AS THE PERSON WHO BROUGHT ABOUT THE DEATH OR WHETHER OR NOT HE AIDED AND ABETTED CHAD FULKS IN BRINGING ABOUT THE DEATH AS MAKING HIM RESPONSIBLE. THAT WOULD BE THE DEFINITION I JUST GAVE YOU.

WITH RESPECT TO THE KIDNAPPING, KIDNAPPING DOES NOT REQUIRE THAT INTENT WHEN YOU ENTER THE VEHICLE, AND WHEN YOU ABDUCT A PERSON, TO HAVE THAT INTENT TO HARM, OR SERIOUSLY INJURE, OR CAUSE DEATH TO THE INDIVIDUAL, DOES NOT REQUIRE THAT AT ALL. THAT IS NOT ONE OF THE ELEMENTS OF THE KIDNAPPING CRIME. WE HAVE CONCEDED THAT A KIDNAPPING TOOK PLACE. OUR DISPUTE IS TO WHETHER OR NOT THE GOVERNMENT HAS PROVED THAT DEATH RESULTED FROM THAT KIDNAPPING. THAT BRANDON BASHAM IS NOT PROVEN TO BE THE PRINCIPLE IN THAT SITUATION, THE ONE THAT ACTUALLY BROUGHT ABOUT THE DEATH, OR THAT HE BROUGHT ABOUT THE RESULT OF DEATH. AND, NUMBER TWO, THAT HE WAS NOT AN AIDER AND ABETTER, AS DEFINED BY THE LAW, IN BRINGING ABOUT MS. DONOVAN'S DEATH.

NOW, AS TO THE OTHER COUNTS IN THE INDICTMENT, I JUST WANT TO REVIEW THESE WITH YOU VERY QUICKLY SO THAT YOU CAN SEE WHAT IS IN CONTENTION. THERE IS NO QUESTION AS TO COUNT 3. THE GOVERNMENT PROVED THAT BRANDON LEON BASHAM TRANSPORTED THE VEHICLE ACROSS STATE LINES, INTERSTATE TRANSPORTATION OF STOLEN VEHICLE.

AS TO COUNT 4, AS WE SAID AT THE BEGINNING OF THE CASE, THIS IS A CONSPIRACY. IT CHARGES A CONSPIRACY TO CARJACK, RESULTING IN DEATH; A CONSPIRACY TO KIDNAP, RESULTING IN DEATH; TRANSPORTATION IN INTERSTATE COMMERCE OF THE STOLEN VEHICLE; POSSESSION OF A FIREARM BY A CONVICTED FELON; AND, POSSESSION OF A STOLEN FIREARM. YOU WILL HAVE AN OPTION OF

FINDING MR. BASHAM GUILTY OR NOT GUILTY OF THAT CONSPIRACY.

NOW, YOU DON'T HAVE TO FIND HIM GUILTY OF ALL OF THE CRIMES THE GOVERNMENT HAS ALLEGED IN FINDING THAT CONSPIRACY TO FIND HIM GUILTY OF THAT CONSPIRACY. IT IS ALL A PARTNERSHIP IN CRIME. TWO PEOPLE SET OUT TO COMMIT A CRIME, AGREE TO COMMIT THE CRIME, GUILTY OF CONSPIRACY. WHAT WE DO SAY, IT COMES BACK TO WHAT I JUST SAID BEFORE, THERE IS AN ISSUE ABOUT WHETHER OR NOT BRANDON BASHAM COMMITTED THE CARJACKING AS DEFINED BY THE LAW. THERE IS AN ISSUE AS TO WHETHER OR NOT BRANDON BASHAM, WE SUBMIT, COMMITTED A CARJACKING, RESULTING IN DEATH, EVEN IF YOU BELIEVE HE COMMITTED THE CARJACKING. THAT WOULD BE A DECISION YOU WILL HAVE TO MAKE WHEN YOU DECIDE COUNT 4.

ANOTHER DECISION YOU WILL HAVE TO MAKE IS WHETHER OR NOT THE CONSPIRACY INCLUDED THE KIDNAPPING, RESULTING IN DEATH. YOU COULD FIND THAT THE CONSPIRACY DID INVOLVE THE KIDNAPPING, BUT WE SUBMIT IT DID NOT INVOLVE THE KIDNAPPING, RESULTING IN DEATH, AS I HAVE DEFINED THAT TO YOU.

COUNT 3, YES, IT IS ONE OF THE MATTERS THAT THE GOVERNMENT HAS ALLEGED IN THAT CONSPIRACY, TRANSPORTING IN INTERSTATE COMMERCE A MOTOR VEHICLE.

COUNT 6 IS USING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE. NOW, IF YOU FIND MR. BASHAM GUILTY OF COUNTS 1 AND 2, THAT, BASICALLY, SATISFIES THAT PARTICULAR COUNT, THAT IS, USING A FIREARM DURING AND IN RELATION TO A

CRIME OF VIOLENCE.  BUT AS WE, AGAIN, SUBMIT CARJACKING REALLY WAS NOT ONE OF THE CRIMES THAT WAS COMMITTED IN THIS CASE BECAUSE OF THAT LACK OF INTENT ON THE PART OF MR. BASHAM. KIDNAPPING STILL WOULD BE.

AS FAR AS COUNT 7, FELON IN POSSESSION OF A FIREARM. YES, HE WAS A FELON IN POSSESSION OF A FIREARM.

AND COUNT 8, WAS HE IN POSSESSION OF STOLEN FIREARMS? YES, HE WAS.  THERE IS NOT ANY ISSUE HERE ABOUT WHETHER YOU HAVE TO FIND CONSTRUCTIVE OR ACTUAL POSSESSION OF THE WEAPONS IN THIS CASE.  I AM STANDING HERE, TELLING YOU THAT MR. BASHAM POSSESSED THE WEAPONS THAT WERE TAKEN OUT OF MR. TALSMA'S HOUSE, AND HE ALSO POSSESSED WEAPONS TAKEN OUT OF SAM JORDAN'S HOUSE.  YOU WON'T HAVE TO MAKE ANY DECISION AS TO THOSE COUNTS EITHER.

COUNT 5 IS CONSPIRACY TO USE AND CARRY FIREARMS IN RELATION TO AND POSSESS FIREARMS IN FURTHERANCE OF A CRIME OF VIOLENCE.  IN OTHER WORDS, THE GOVERNMENT HAS ALLEGED ANOTHER CONSPIRACY, BUT THE CONSPIRACY IN THIS CASE, IN THIS COUNT, IS IN RELATIONSHIP TO POSSESS FIREARMS IN THE CRIME OF VIOLENCE AND FURTHER YOUR CRIME OF VIOLENCE.  I HAVE ALREADY SPOKEN TO YOU ABOUT WHAT OUR POSITION IS WITH RESPECT TO THE CARJACKING, AND WHAT OUR POSITION IS WITH RESPECT TO THE KIDNAPPING.

AS TO COUNT 6, USE OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE. AGAIN, THAT IS GOING TO BE SOMETHING

THAT YOU, DEPENDING UPON WHAT YOUR FINDINGS ARE AS TO COUNT 1 AND COUNT 2, THEN YOUR DECISION ON COUNT 6 WILL BE RELATIVELY EASY.

AS TO COUNT 7, FELON IN POSSESSION, THEN THE FINDING, OBVIOUSLY, SHOULD BE GUILTY IN THAT SITUATION.

AND, IN COUNT 8, POSSESSION OF STOLEN FIREARM, ALSO IN THAT COUNT, YOUR DECISION SHOULD BE GUILTY. AND THERE IS NO DISPUTE ABOUT THAT. SO, THOSE ARE THE EIGHT COUNTS IN THE INDICTMENT.

NOW, AS FAR AS WHETHER OR NOT THE GOVERNMENT HAS PROVEN THE CARJACKING AND THE KIDNAPPING, RESULTING IN DEATH, AS WELL AS THE CONSPIRACIES THAT INVOLVE THOSE TWO PARTICULAR COUNTS, I WOULD LIKE TO REVIEW WITH YOU SOME TESTIMONY THAT YOU HEARD OVER THE LAST COUPLE OF DAYS. MR. GASSER DID AN EXCELLENT JOB OF VIEWING THE TESTIMONY IN A LIGHT MOST FAVORABLE TO THE GOVERNMENT, WHICH IS WHAT HE IS SUPPOSED TO DO. I AM TRYING TO PRESENT TO YOU SOME FACTORS THAT WE WOULD LIKE YOU TO CONSIDER IN DECIDING THESE VERY WEIGHTY ISSUES BEFORE YOU. I AM GOING TO GO AHEAD, AND INSTEAD OF DOING IT DAY-BY-DAY BASIS, I WOULD LIKE TO REVIEW WITH YOU SOME OF THE WITNESSES AS THEY APPEARED IN ORDER SO THAT WE CAN SEE THEM IN CONTEXT, AND YOU CAN REMEMBER THEM AS THEY WERE PRESENTED TO YOU, AND THEN WE WILL GO BACK AND MAYBE DO A LITTLE SUMMARY OF WHAT SOME OF THESE WITNESSES SAID OR WHAT THEIR TESTIMONY CUMULATIVELY SHOWS.

THE FIRST WITNESS THAT YOU HEARD FROM IS CHRIS SCHAFFER. WHAT I SUBMIT TO YOU IS IMPORTANT FROM CHRIS SCHAFFER, MAJOR SCHAFFER'S REMARKS AND TESTIMONY. WITH RESPECT TO THE ESCAPE OF NOVEMBER 4TH, HE KNEW BRANDON BASHAM FAIRLY WELL. HE KNEW ABOUT HIS BACKGROUND. HE SPENT TIME DEALING WITH MR. BASHAM ON A DAY-TO-DAY BASIS OVER A SUBSTANTIAL PERIOD OF TIME. HE TOLD YOU THAT MR. BASHAM RESPECTED HIM AND THAT HE TRIED TO DO WHATEVER HE COULD FOR MR. BASHAM IN RETURN. HE TOLD YOU THAT WHEN HE DEALT WITH MR. BASHAM, HIS INTELLECTUAL FUNCTIONING, HE HAD TO DEAL WITH HIM LIKE HE WAS A CHILD. HE DEALT WITH HIM AS A FATHER WOULD DEAL WITH A CHILD. WITH BRANDON BASHAM, THAT IS, BASICALLY, HOW YOU HAVE TO DEAL WITH HIM, AS A SIX, SEVEN, OR EIGHT YEAR OLD.

HE ALSO TOLD YOU ABOUT CHAD FULKS. THAT CHAD FULKS WAS SOMEONE YOU HAD TO WORRY ABOUT. CHAD FULKS WAS SMART. CHAD FULKS WAS QUIET. BUT HE WAS SOMEBODY THAT YOU SHOULD BE CONCERNED ABOUT. HE ALSO TOLD YOU THAT BRANDON BASHAM -- FROM HIS KNOWLEDGE OF BRANDON BASHAM, HAD ABSOLUTELY NO PLANNING SKILLS WHATSOEVER. I SUBMIT THAT YOU CAN TAKE FROM THAT THAT BRANDON BASHAM COULD NOT HAVE PUT TOGETHER THE SCHEME TO GO AHEAD AND ESCAPE FROM THE JAIL.

HE ALSO TOLD YOU THAT BRANDON BASHAM, WHENEVER HE ACTED OUT, HURT HIMSELF MORE THAN HE HURT ANYONE ELSE. THAT ANYTHING THAT BRANDON BASHAM DID WAS MORE IN THE WAY OF RESISTANCE RATHER THAN AGGRESSION TOWARDS SOMEONE. AND I

SUBMIT TO YOU, THAT IS AN IMPORTANT FACTOR. BECAUSE HERE YOU HAVE AN INDIVIDUAL THAT, ACCORDING TO MR. SCHAFFER -- MAJOR SCHAFFER, WHO RAN THE JAIL, WAS ONE OF THE INDIVIDUALS WHO RAN THE JAIL, BASICALLY TOLD YOU THAT MR. BASHAM'S CONDUCT WAS THAT OF RESISTING RATHER THAN BEING AN AGGRESSOR. AND THAT IS IMPORTANT AS TO MR. BASHAM'S CONDUCT LATER ON.

HE ALSO TALKED TO YOU ABOUT THE FACT THAT MR. BASHAM WAS BEING TREATED BY A PSYCHIATRIST AND WAS ON MEDICATION, WHICH LED TO MR. BASHAM'S CHARGE, POSSESSION OF CONTRABAND. IF YOU WILL REMEMBER WHAT HE DISCUSSED WITH YOU, WHAT HE BROUGHT OUT FROM THE WITNESS STAND WAS THAT THE CONTRABAND THAT MR. BASHAM HAD IN HIS CELL AND THAT HE WAS CHARGED WITH AT THE END OF OCTOBER WAS ONE CONSERVED PILL. NOW, MR. BASHAM WAS TAKING CONCERTA. IT WASN'T THAT THAT WAS AN UNAUTHORIZED PRESCRIPTION BECAUSE HE WAS TAKING CONCERTA, IT WAS UNAUTHORIZED TO BE IN HIS CELL, AT THAT TIME. HE IS SUPPOSED TO BE TAKING THAT MEDICINE. HE IS NOT SUPPOSED TO RETAIN THE PILL. THE CRIME HE HAD COMMITTED WAS ACTUALLY RETAINING ONE OF THE PILLS THAT HE HAD A PRESCRIPTION FOR. NOW, YES, HE WAS LOOKING AT SOME ADDITIONAL TIME, BUT I SUBMIT TO YOU THAT MR. BASHAM, EVEN THOUGH HE WAS LOOKING AT SOME ADDITIONAL TIME, THE FACT THAT HE HAD ONE PILL IN HIS POSSESSION, WHICH WAS A PRESCRIPTION THAT HE WAS ALLOWED TO TAKE, I SUBMIT TO YOU THAT AS MAJOR SCHAFFER CONCEDED, THERE IS NO WAY REALLY TO TELL HOW THAT WOULD HAVE REALLY ADDED TO HIS SENTENCE, IF

ANY.   BUT WHAT MAJOR SCHAFFER ALSO TOLD YOU WAS THAT MR. BASHAM WAS SOMEONE WHO WOULD HAVE PROBABLY BEEN RELEASED WITHOUT THAT.   BEEN RELEASED WITHIN A FEW MONTHS.

SO,  WHAT IS THE MOTIVE FOR BRANDON BASHAM TO LEAVE THAT JAIL? WHAT IS THE MOTIVE, EXCEPT THAT CHAD FULKS WAS THE INDIVIDUAL WHO TOOK A HOLD OF MR. BASHAM AND LED HIM ASTRAY OUT OF THAT JAIL, AND STARTED THIS TREK ACROSS THE DIFFERENT STATES THAT WOUND UP IN SOUTH CAROLINA, AND THEN WOUND UP BACK IN WEST VIRGINIA, AND THEIR ARREST IN WEST VIRGINIA, AND INDIANA.   CHAD FULKS WAS THE INDIVIDUAL WHO WAS PLANNING THAT ESCAPE.   CHAD FULKS WAS THE CUNNING,  MANIPULATIVE INDIVIDUAL.   HE WAS THE ONE THAT HAD THE PLANNING SKILLS. AND,  BY THE WAY, WHAT MR. GASSER SAID ABOUT THE FACT THERE WERE ONLY TWO ESCAPES IN THE 17-YEAR HISTORY,  I REMIND YOU THAT MAJOR SCHAFFER SAID THIS, THAT NO ONE KNEW,  NO ONE KNEW THAT THAT FENCE AT THE TOP OF THE YARD HAD BEEN CUT OFF AT THE BOTTOM,  HAD BEEN SNIPPED AT THE BOTTOM SO THAT ALL YOU HAD TO DO WAS OPEN UP A FENCE LIKE THIS, IT WOULD EASILY JUST OPEN UP.   NO ONE KNEW.   THE OFFICERS IN THE JAIL DIDN'T KNOW IT. THE ADMINISTRATOR IN THE JAIL DIDN'T KNOW IT.   THERE IS NO WAY THAT THE INMATES WOULD KNOW IT BECAUSE THEY COULDN'T GET UP THERE.   THAT DAY, WHEN BRANDON BASHAM AND CHAD FULKS GOT UP TO THE TOP AND THEY SAW THAT THAT FENCE COULD EASILY BE OPENED, WAS THE FIRST TIME THAT ANYBODY REALLY BECAME AWARE OF IT.   AND IT WAS FIXED RIGHT AFTER THAT BECAUSE THE CONTRACTOR

WENT, YOU REMEMBER THE TESTIMONY, CUT OFF THE BOTTOM OF THE FENCE ALLOWING THAT TO HAPPEN. SO, THE REASON THERE MAY BE, THE ONLY REASON THERE MIGHT BE AN ESCAPE IN THAT 17 YEARS, CHAD FULKS AND BRANDON BASHAM WERE THE TWO THAT ESCAPED, IS BECAUSE THEY FOUND, WITHOUT ANY KNOWLEDGE ON THEIR PART THAT IT WAS GOING TO BE THAT WAY, THAT THAT FENCE HAD BEEN CUT.

NOW, THAT DOESN'T MAKE THE CONTRACTOR RESPONSIBLE, BUT WHAT I AM SUBMITTING TO YOU IS THAT IT SHOWS WHY THEY WERE ABLE TO ESCAPE THAT DAY AND POSSIBLY WHY THERE HAD NOT BEEN ANY OTHER ESCAPES IN THE LAST 17 YEARS BECAUSE YOU DIDN'T HAVE THAT SITUATION. THE JAIL WAS RELATIVELY NEW. IT HAD BEEN OPENED JUST A SHORT PERIOD OF TIME.

THE OTHER THING IS THIS, AS FAR AS THE PLANNING OF IT, MAJOR SCHAFFER TOLD YOU AND DIAN BLAIR TOLD YOU THAT CHAD FULKS HAD BEEN CUTTING OUT THE ADDRESSES ON THE ENVELOPES. NOW, WHAT WAS HE DOING, LADIES AND GENTLEMEN? THERE WAS AN INDIVIDUAL WHO WAS PLANNING, WHO HAD SKILLS, AND PLANNING. AND HE KNEW THAT THOSE ENVELOPES WOULD BE IN HIS CELL WHEN THEY DISCOVERED HE WAS GONE. HE DID NOT WANT ANY WAY FOR ANYBODY TO TRACK ANY OF THE PEOPLE HE KNEW AFTER HE ESCAPED TO FIND OUT WHERE HE MAY BE. TO FIND OUT WHERE HE MIGHT BE. SO, HE CUT OFF THE ENVELOPES, THE RETURN ADDRESSES ON THOSE ENVELOPES, SO THAT NO ONE COULD FIND OUT WHERE HE CAME FROM OR WHERE HE WAS GOING, WHAT HIS CONTACTS WERE, PEOPLE HE KNEW.

NOW, YOU DIDN'T HAVE THAT SITUATION WITH BRANDON BASHAM'S

CELL OR HIS PERSONAL EFFECTS. MAJOR SCHAFFER AND DIAN BLAIR BOTH TESTIFIED THAT THEY FOUND NOTHING IN BRANDON BASHAM'S EFFECTS THAT WOULD INDICATE HE WAS PLANNING AN ESCAPE. I WOULD ALSO REMIND YOU THAT WHAT MAJOR SCHAFFER SAID WAS THAT THE PERSON WHO VISITED CHAD FULKS ON A COUPLE OF OCCASIONS WAS TINA SEVERANCE. TINA SEVERANCE BEING THE INDIVIDUAL YOU HEARD FROM ON THE WITNESS STAND, WHO ALSO ACCOMPANIED CHAD FULKS AND BRANDON BASHAM DURING THE DAYS THAT THEY WERE GOING FROM STATE TO STATE, EVENTUALLY WINDING UP IN SOUTH CAROLINA.

SO, THE END RESULT OF WHAT MAJOR SCHAFFER TESTIFIED TO SUPPORTED WHAT WE SAID IN THE OPENING STATEMENT. THAT CHAD FULKS IS THE MORE CUNNING, CONNIVING, MANIPULATIVE INDIVIDUAL. BRANDON BASHAM IS NO PLANNER AT ALL, DOES NOT HAVE THE SKILLS TO PLAN, LOW INTELLECTUAL FUNCTIONING, AND, BASICALLY, FOLLOWED CHAD FULKS OUT OF THAT JAIL.

NOW, THE BIGGEST PIECE OF EVIDENCE WITH RESPECT TO THAT, HOWEVER, IS THE MOTIVE THAT DIFFERENT PEOPLE HAVE. AS I SAID, BRANDON BASHAM DID NOT HAVE A REAL MOTIVE TO LEAVE THAT JAIL, BECAUSE, NUMBER ONE, HE WOULD HAVE EITHER BEEN OUT SOON, OR HE DID NOT KNOW WHAT HIS TIME WAS GOING TO BE FOR THAT ONE PILL. BUT CHAD FULKS DID. CHAD FULKS KNEW THAT HE WAS IN JAIL ALREADY FOR SOME SERIOUS STUFF HE WAS GOING TO GET FIVE YEARS FOR. CHAD FULKS IS ALREADY ON STATE PROBATION AND FEDERAL PROBATION. REMEMBER, HE HAD THAT PROBATION FROM THE BURGLARY WHEN HE GOT OUT OF THE JAIL THAT TINA SEVERANCE

WORKED AT. BRANDON BASHAM WAS IN JAIL FOR CHECKS AND ESCAPE OUT OF THE COURTHOUSE, CAUGHT A BLOCK AWAY IN HIS BLACK AND WHITE JUMPSUIT IN A TRASH CAN. THAT WAS THE SOPHISTICATION OF HIS ESCAPE ATTEMPT OUT OF THE COURTHOUSE. WALKED AWAY, WAS FOUND IN A PRISON UNIFORM IN A TRASH CAN A BLOCK AWAY. BUT ON NOVEMBER 3RD OF 2002, CHAD FULKS WAS SERVED WITH A WARRANT FOR AGGRAVATED CHILD ABUSE.

NOW, HE HAD ALREADY WRITTEN TINA SEVERANCE A LETTER SAYING I CAN'T DO THE TIME. THAT WAS EVEN BEFORE NOVEMBER 3RD WHEN HE WAS BEING OFFERED FIVE YEARS. AFTER NOVEMBER 3RD, HE REALIZED THAT HE WAS LOOKING AT 60 YEARS. SO, IF HE COULDN'T DO THE TIME WHEN HE WAS LOOKING AT FIVE YEARS, WHAT DO YOU THINK HIS MOTIVE WAS? WHAT DO YOU THINK HIS STATE OF MIND WAS AT THE TIME HE FOUND OUT THAT HE IS NOW LOOKING AT 60 YEARS AFTER NOVEMBER 3RD? LO AND BEHOLD, WHAT HAPPENS THE DAY AFTER NOVEMBER 3RD? THEY ESCAPE FROM THE HOPKINS COUNTY JAIL. THE DAY AFTER MAJOR SCHAFFER SAID THAT THAT WARRANT WAS SERVED AGAINST HIM, I BELIEVE IT WAS THE DAY BEFORE THAT ON NOVEMBER 3RD. THE MOTIVE, THE OPPORTUNITY, THE INCLINATION TO DO SO, THE PLANNING SKILLS WERE CHAD FULKS, NOT BRANDON BASHAM.

DIAN BLAIR WAS THE NEXT WITNESS. SHE BASICALLY SUPPORTED WHAT MAJOR SCHAFFER TOLD YOU. ONE OF THE THINGS THAT I RECALL HER SAYING, AND I SUBMIT TO YOU, YOU WILL RECALL HER SAYING, TOO, WAS THAT BRANDON BASHAM WAS A FOLLOWER. SHE

ALSO SAID SHE DEALT WITH HIM ON A CHILDLIKE LEVEL ABOUT A 12-YEAR-OLD, THAT THAT WAS HIS INTELLECTUAL FUNCTIONS. SHE TREATED HIM LIKE A CHILD, THAT HE WAS RESPECTFUL TO HER. AND SHE NEVER HAD A PROBLEM WITH HIM. BUT THAT CHAD FULKS, WHEN SHE LOOKED AT CHAD FULKS, HE HAD DEVIOUS EYES. SO, YOU HAVE A CONTRAST THERE AGAIN BETWEEN BRANDON BASHAM AND CHAD FULKS FROM TWO PEOPLE RIGHT NOW WHO ARE IN THE CORRECTION SYSTEM. DIAN BLAIR, BASICALLY VERIFYING WHAT MAJOR SCHAFFER TOLD US.

I WILL SKIP ALONG SOME OF THE WITNESSES THERE UNTIL WE GET TO JAMES HAWKINS. SOME OF THOSE WITNESSES REALLY DON'T ADD ANYTHING TO THE PARTICULAR CRIMES THAT ARE CHARGED IN THIS INDICTMENT. I AM NOT GOING TO SPEND TIME GOING OVER THINGS THAT REALLY DON'T ADD ANYTHING TO THIS FOR YOUR CONSIDERATION.

JAMES HAWKINS IS, I SUBMIT TO YOU, A CRITICAL DEPARTURE HERE. A CRITICAL POINT IN THIS CASE. I SUBMIT TO YOU NOW WHAT I BELIEVE YOU SHOULD BE LOOKING AT CONCERNING MR. HAWKINS, AND I WILL TIE IT UP LATER AS TO WHY I THINK MR. HAWKINS IS, AGAIN, IMPORTANT. THERE IS NO QUESTION, BRANDON BASHAM WAS THE ONE THAT WENT UP TO JAMES HAWKINS' HOUSE. NO QUESTION AT ALL. BRANDON BASHAM WENT IN, ASKED HIM IF HE COULD MAKE A PHONE CALL, ASKED HIM IF HE COULD TAKE HIM FOR A RIDE, HIS BROTHER WAS DOWN AT THE BOTTOM OF THE DRIVEWAY, HIS BROTHER IS HURT, ALL OF THAT IS BRANDON BASHAM.

NOW, WHAT I SUBMIT TO YOU IS THAT CHAD FULKS IS THE ONE

THAT PUT HIM UP TO IT, BUT HE DID IT. THERE IS NO QUESTION ABOUT IT. HE WENT UP, AND HE DID IT. HE WENT UP TO THE VEHICLE, CHAD FULKS GOT IN THE VEHICLE, AND THEY SET OFF. AND YOU HEARD A LOT OF TESTIMONY ABOUT WHERE THEY WERE GOING. THEY TOLD MR. HAWKINS ON ONE OCCASION WHERE THE VEHICLE WAS, ANOTHER OCCASION THE VEHICLE WAS SOMEWHERE ELSE, THAT THEY WERE GOING TO MAKE A PHONE CALL AND HAVE SOMEONE COME AND MEET THEM, OR THAT THEY NEEDED MONEY. ALL OF THAT STUFF HAPPENED. WE DO NOT DISPUTE ANY OF THAT CONVERSATION THAT TOOK PLACE IN THAT CAR THAT NIGHT.

BUT AT SOME POINT, LADIES AND GENTLEMEN, MR. BASHAM DID PULL A KNIFE ON MR. HAWKINS. MR. BASHAM TOLD YOU LATER THROUGH A STATEMENT THAT ONE OF THE OFFICERS READ INTO THE RECORD OR SUMMARIZED INTO THE RECORD, THAT HE DID THAT AT THE INSISTENCE OF CHAD FULKS. BUT WHAT IS CRITICAL ABOUT THAT? ALL THROUGHOUT THIS EVENT WITH JAMES HAWKINS, MR. BASHAM KEPT ASSURING JAMES HAWKINS THAT WE ARE NOT GOING TO HURT YOU. WE ARE NOT KILLERS, WE ARE NOT MURDERERS, I AM NOT GOING TO HURT YOU. AND YOU KNOW WHAT? HE DIDN'T. AND THAT IS A SIGNIFICANT FACTOR THAT I WOULD LIKE YOU TO CONSIDER, AND ONE THAT THE GOVERNMENT WANTS TO GLOSS OVER. MR. BASHAM DID PULL A KNIFE. WE SUBMIT IT WAS DONE AT MR. FULKS'S DIRECTION BECAUSE MR. FULKS WAS PUTTING ALL OF THIS TOGETHER AT THE LAST MINUTE. AND WHAT SUPPORTS THAT? AT SOME POINT, MR. HAWKINS RELINQUISHED THE CAR TO CHAD FULKS, AND THEN EVERYTHING

CHANGED. ACCORDING TO MR. HAWKINS, YOU RECALL THE TESTIMONY, WHO WAS IN CONTROL? CHAD FULKS. WHO WAS THE MEANER ONE, THE AGGRESSIVE ONE? CHAD FULKS. WHO WAS GIVING ORDERS? CHAD FULKS. WHO GOT ANGRY? CHAD FULKS. WHO CURSED? CHAD FULKS. DID BRANDON BASHAM DO ANY OF THOSE THINGS? NO. NOW, WAS MR. HAWKINS AFRAID OF MR. BASHAM, AT THAT POINT? HE SHOULD HAVE BEEN. NO QUESTION ABOUT IT, HE HAD A KNIFE. HE WAS HOLDING A KNIFE. AND WE ARE NOT HIDING BEHIND THAT SAYING THAT THAT DID NOT EXIST OR MR. HAWKINS SHOULD NOT HAVE BEEN AFRAID. BUT MR. BASHAM TRIED TO ASSURE HIM THAT NOTHING WOULD HAPPEN. ACCORDING TO MR. HAWKINS, BASHAM WAS JUST FOLLOWING WHAT CHAD FULKS TOLD HIM. BASHAM, AT SOME POINT, ARGUED WITH FULKS ABOUT DOING CERTAIN THINGS OR NOT DOING CERTAIN THINGS. AT CERTAIN TIMES, MR. HAWKINS TOLD YOU THAT CHAD FULKS GOT ANGRY, BUT BRANDON BASHAM NEVER GOT ANGRY AT MR. HAWKINS. BRANDON BASHAM NEVER RAISED HIS VOICE TO MR. HAWKINS AT ALL. ALL OF THAT WAS BEING DONE BY CHAD FULKS. THE ENTIRE ORCHESTRATION OF WHERE THEY WERE GOING TO GO, THE FACT THEY WERE GOING TO TIE HIM UP, THE FACT THEY WERE GOING TO LEAVE HIM OUT IN THAT FIELD WAS ALL ORCHESTRATED BY CHAD FULKS, AND BRANDON BASHAM WENT ALONG. NOW, BRANDON BASHAM WENT ALONG, BUT HE PROTESTED. THAT IS WHAT I WANT TO TALK TO YOU ABOUT, AS WELL.

DURING THIS PERIOD OF TIME THAT MR. HAWKINS WAS IN THE VEHICLE AND MR. BASHAM WAS IN THE VEHICLE, I WILL CONCEDE,

AGAIN, THAT MR. BASHAM WAS HOLDING MR. HAWKINS IN THE VEHICLE. THAT IS NOT SOMETHING IN DISPUTE. HE HAD THE OPPORTUNITY DURING THAT PERIOD OF TIME TO LET HIM GO. HE DID IT. HE MADE A BAD CHOICE. BUT HE TAPED MR. HAWKINS' HANDS AT MR. FULKS'S INSTRUCTIONS. IF YOU REMEMBER WHAT HE SAID, HE TAPED THEM LOOSELY. EVEN THOUGH HE TAPED THEM LOOSELY, HE WAS CONCERNED ABOUT MR. HAWKINS, THE CIRCULATION IN HIS HANDS. AND HE KEPT FIDDLING WITH THE TAPE. HE KEPT ASKING HIM WHETHER OR NOT IT WAS TOO TIGHT ON HIM.

NOW, LADIES AND GENTLEMEN, SOMEONE WHO IS CONCERNED ABOUT AN INDIVIDUAL LIKE HE WAS ABOUT MR. HAWKINS, EVEN THOUGH HE HAS GOT HIM THERE, IS THAT THE KIND OF INDIVIDUAL THAT YOU WOULD LATER ON BELIEVE WOULD BE CAPABLE AND WOULD, IN FACT, KILL SOMEBODY? I SUBMIT TO YOU, IT IS NOT. MR. BASHAM WAS CONCERNED ABOUT HOW COLD IT WAS. IF YOU REMEMBER RIGHT, MR. HAWKINS TESTIFIED ABOUT HOW HE KEPT RUBBING HIS HANDS BECAUSE IT WAS COLD OUTSIDE.

WHEN MR. FULKS MADE THE DECISION -- LET ME BACK UP. WHEN MR. FULKS CAME OUT OF THE GAS STATION AND HE FOUND OUT THAT MR. BASHAM HAD TOLD MR. HAWKINS OR ADMITTED THAT THEY WERE THE ESCAPEES FROM HAWKINS COUNTY, REMEMBER WHAT MR. HAWKINS' TESTIMONY WAS? THAT CHAD FULKS GOT ANGRY. CHAD FULKS SAID, YOU HAVEN'T DONE ANYTHING RIGHT ALL DAY LONG. HE WAS THE ONE THAT GOT UPSET. AND HE WAS THE ONE THAT MR. HAWKINS SAID LOOKED AT BRANDON BASHAM LIKE HE WANTED TO STAB BRANDON

BASHAM. NOW, THAT IS THE GOVERNMENT'S WITNESSES TELLING YOU ALL OF THIS. WHEN THE VEHICLE WOULDN'T WORK, HE COULDN'T PUT IT IN FOUR-WHEEL DRIVE, HE CURSED AT MR. HAWKINS. BRANDON BASHAM NEVER DID, MR. HAWKINS TOLD YOU THAT. MR. HAWKINS TOLD YOU THAT ALL THROUGHOUT THIS OCCASION AFTER HE TOOK CONTROL OF THE VEHICLE, FULKS WAS BARKING ORDERS. FULKS WAS THE ONE WHO IS LOOKING AND ASKING FOR GUNS AND MONEY. MR. HAWKINS TOLD YOU UNDER EXAMINATION THAT ALL OF THE DECISIONS WERE MADE BY MR. FULKS. THAT HE NEVER HEARD BRANDON BASHAM SAY WHAT TO DO.

HE ALSO TOLD YOU THAT THE TONE IN MR. FULKS'S VOICE WAS MUCH DIFFERENT THAN MR. BASHAM'S VOICE. HE ALSO TOLD YOU THAT AT VARIOUS POINTS HE WOULD GET MAD, BUT BRANDON BASHAM DID NOT GET MAD. WHEN THE DECISION WAS MADE TO LEAVE HIM OUT IN THE FIELD, MR. HAWKINS TOLD YOU THAT BRANDON BASHAM OBJECTED TO LEAVING HIM OUT IN THE FIELD BECAUSE IT WAS SO COLD OUTSIDE. HE DID NOT WANT TO LEAVE HIM OUT IN THE FIELD. MR. FULKS MADE THE DECISION HE WAS GOING TO LEAVE HIM OUT IN THE FIELD, AND MR. BASHAM SUCCUMBED TO THAT. THAT IS NOT MR. BASHAM SAYING, THAT IS MR. HAWKINS SAYING THAT BRANDON DID NOT WANT TO LEAVE HIM OUT IN THAT FIELD BECAUSE IT WAS TOO COLD AND BECAUSE OF THE WAY HE WAS DRESSED. WHEN FULKS TOLD HIM TO GET OUT OF THE VEHICLE AND GO AGAINST THE TREE AND FOR BRANDON TO TIE HIM UP AGAINST THE TREE, BRANDON, ACCORDING TO MR. HAWKINS, AGAIN PROTESTED FOR LEAVING HIM OUT THERE AND

SITTING HIM IN THAT UNCOMFORTABLE POSITION.  IF YOU RECALL, MR. HAWKINS SAID THAT WHEN BRANDON TAPED HIM UP ACCORDING TO MR. FULKS INSTRUCTIONS, HE TAPED HIM LOOSE.  MR. FULKS TOOK OVER.  MR. FULKS TIGHTENED THE TAPE.  NOT ONLY DID HE TIGHTEN THE TAPE, BUT HE CUT A CORD AND TIED MR. HAWKINS TO THE TREE, AS WELL.  ONE OF THE SIGNIFICANT POINTS, OR ONE OF THE SIGNIFICANT EVENTS THAT TOOK PLACE, IS THAT AT SOME POINT MR. HAWKINS TOLD YOU THAT HE OVERHEARD A CONVERSATION.  HE OVERHEARD FULKS SAY, YOU DO WHAT YOU WANT.  AND, OF COURSE, MR. HAWKINS' INTERPRETATION WAS THAT WAS GOING TO BE A REAL SERIOUS MOMENT.  THAT WAS GOING TO BE THE COMPELLING MOMENT, THE MOMENT HE WAS MOST CONCERNED ABOUT.  HE HEARD BRANDON BASHAM SAYING, AND HE TAILED OFF, I DON'T WANT TO.

NOW, WHAT DO YOU THINK WAS GOING ON, AT THAT POINT? BRANDON BASHAM LATER TOLD ONE OF THE AGENTS THAT MR. FULKS WAS TRYING TO GET A HAMMER.  MR. FULKS WAS CLEARLY THE ONE THAT SAID, DO WHAT YOU WANT TO, AND BRANDON SAID, I DON'T WANT TO.

ALL OF THOSE EVENTS THAT TOOK PLACE THAT NIGHT OUT IN THAT FIELD, ALL OF THE EVENTS THAT TOOK PLACE FROM THE TIME THAT CHAD FULKS TOOK OVER THAT VEHICLE WERE ALL BEING DIRECTED AND ORDERED BY CHAD FULKS.  MR. BASHAM, WHENEVER HE COULD, ASSURED MR. HAWKINS THAT HE WAS NOT GOING TO BE HURT, AND HE WAS NOT HURT.  AT ALL TIMES, HE WAS CONCERNED ABOUT HIS COMFORT, HE WAS CONCERNED ABOUT HOW COLD IT WAS, HE WAS CONCERNED ABOUT LEAVING HIM OUT THERE.  NOT MR. FULKS,

THOUGH. MR. FULKS WAS THE ONE MAKING THE DECISION TO DO ALL OF THAT.

NOW, YOU MAY THINK THAT THIS IS SILLY AND THE GOVERNMENT MAY ARGUE THAT IT IS SILLY, BUT BRANDON BASHAM FELT SO BAD ABOUT DOING WHAT HE HAD TO DO, YOU REMEMBER, HE TOLD MR. HAWKINS, I FEEL BAD ABOUT WHAT WE ARE DOING. I AM GOING TO GIVE YOU THIS RING. NOW, THE GOVERNMENT MAY GLOSS OVER THAT, THEY MAY NOT PAY ANY PARTICULAR SIGNIFICANCE TO IT, BUT I SUBMIT TO YOU IT IS OF GREAT SIGNIFICANCE. BECAUSE THE INDIVIDUAL WHO IS PROTESTING LEAVING THIS GENTLEMAN OUT THERE, LET ALONE NOT HURTING HIM, WAS GIVING HIM A RING FOR THE TROUBLE THAT HE WAS CAUSING HIM. I SUBMIT TO YOU, THAT IS SOMETHING FOR YOU TO CONSIDER AS TO WHETHER, LATER ON DOWN THE ROAD WHEN WE ARE DEALING WITH THE SITUATION THAT TOOK PLACE IN SOUTH CAROLINA AND THE OTHER EVENTS, WHETHER OR NOT MR. BASHAM IS THE INDIVIDUAL WHO COULD HAVE POSSIBLY HURT ANYBODY. HE PROTESTED LEAVING MR. HAWKINS IN THE FIELD, AND HE LEFT HIM UNHARMED, AND HE LEFT HIM SOMETHING BECAUSE HE FELT BAD ABOUT WHAT HE WAS DOING.

THE OTHER THING SIGNIFICANT ABOUT THAT, MR. HAWKINS SAID MR. BASHAM CAME OVER TO HIM AND ASKED HIM IF HE COULD BREATHE. NOT MR. FULKS. HE DIDN'T COME OVER TO HIM, HE DIDN'T REALLY CARE WHAT HAPPENED TO HIM. HE SAID, I DON'T CARE WHAT YOU DO, IT IS YOUR CALL. MR. BASHAM WAS THE ONE THAT WENT OVER TO MR. HAWKINS TO MAKE SURE THAT HE WAS AS COMFORTABLE AS HE

COULD MAKE HIM AND ASKED HIM IF HE COULD BREATHE. MR. BASHAM WAS THE ONE THAT GAVE HIM HIS COAT SO THAT IT WOULD TRY TO KEEP HIM, AT LEAST TO SOME DEGREE, WARM, WHICH BECAME AN AWFUL NIGHT, A TERRIBLE EVENT FOR MR. HAWKINS, IN MR. HAWKINS' LIFE.

I AM NOT IN ANY WAY MINIMIZING MR. BASHAM'S ROLE IN ANY WAY. WHAT I AM SAYING IS MR. BASHAM'S ACTS THAT NIGHT ARE CONSISTENT WITH SOMEONE WHO IS NOT OUT TO HURT ANYBODY, CERTAINLY NOT OUT TO KILL ANYBODY. HE LEFT A WITNESS. THE GOVERNMENT IS TALKING ABOUT HE WAS NOT GOING TO LEAVE ANY WITNESSES. DO YOU THINK HE WOULD LEAVE ANY WITNESSES? HE LEFT THE MAN TIED TO A TREE IN THAT FIELD WITHOUT HURTING HIM. IN FACT, TRYING TO MAKE HIM AS COMFORTABLE AS HE POSSIBLY COULD. SO, THE ANSWER IS, YES, MR. BASHAM COULD LEAVE SOMEONE, EVEN AFTER THESE AWFUL CRIMES HAVE BEEN COMMITTED, HE COULD LEAVE SOMEONE WITHOUT HURTING THEM OR WITHOUT KILLING THEM BECAUSE HE DID.

NOW WE GET TO TINA SEVERANCE. TINA SEVERANCE IS THE INDIVIDUAL, IF YOU REMEMBER, WHO WAS CHAD FULKS'S, AS THEY CALL EACH OTHER, HUSBAND AND WIFE. SHE MET HIM WHEN HE WAS IN JAIL IN WESTVILLE AND MR. FULKS TURNED ON HIS CHARM. AND OVER A PERIOD OF TIME, HE MANIPULATED, HE WAS CONNIVING, HE DID WHAT HE COULD TO GET MS. SEVERANCE IN A POSITION WHERE WHEN HE GOT OUT HE WOULD HAVE SOME PLACE TO GO. AND FOR THAT PERIOD OF TIME, THEY WROTE EACH OTHER, THEY WROTE UNDER

ASSUMED NAMES, SHE WROTE UNDER ASSUMED NAMES. HE MADE HER ALL SORTS OF PROMISES. HE TOLD HER ABOUT HOW HE HAD A SON AND HE WAS TALKING TO HIS SON ABOUT HER AND ABOUT HER DAUGHTER. AND WE FIND OUT FROM HER THAT THE SON THAT HE IS TALKING ABOUT HAD DIED BEFORE THAT. BUT THE PROOF IS IN THE PUDDING ABOUT WHETHER OR NOT HE IS CONNIVING AND MANIPULATIVE, BECAUSE HE GOT OUT OF JAIL AFTER MS. SEVERANCE WAITED FOR HIM ALL THAT PERIOD OF TIME WHILE HE WAS STILL IN JAIL AND SHE WAS OUT, NOT EVEN WORKING ANYMORE AT THE JAIL. WHEN HE GETS OUT, HE GOES AND STAYS THREE WEEKS WITH MS. SEVERANCE. PLEDGES THAT HE HAS FOUND THE LORD, THEY ARE GOING TO GO AHEAD AND JOIN A CHURCH, THEY ARE GOING TO LIVE A GREAT LIFE. THREE WEEKS LATER, HE TAKES UP WITH A STRIPPER, VERONICA EVANS. THREE WEEKS LATER, THIS GREAT LOVE THAT HE HAD THAT HE PROFESSED FOR TINA SEVERANCE AND CONVINCED HER, THIS WOMAN WHO HAD NO SELF-ESTEEM, NO CONFIDENCE, HE CONVINCED HER THAT SHE WAS BEAUTIFUL, HE CARED ABOUT HER, THAT HE WAS GOING TO COME TO HER WHEN HE GOT OUT. HE DUMPED HER WITHIN THREE WEEKS. NOT ONLY DID HE DUMP HER WITHIN THREE WEEKS, BUT WITHIN ANOTHER COUPLE OF WEEKS HE GETS MARRIED TO VERONICA EVANS.

WHAT HE DOES, WHICH IS INTERESTING TO SHOW YOU THE KIND OF INDIVIDUAL HE IS, MANIPULATIVE KIND OF INDIVIDUAL HE IS, CUNNING KIND OF INDIVIDUAL HE IS, THE EVIL KIND OF INDIVIDUAL HE IS, IS THAT HE KEEPS TINA SEVERANCE ON THE HOOK. CONSTANTLY THROUGHOUT THIS PERIOD OF TIME. HE WILL LEAVE

VERONICA EVANS, GO TO SEE TINA SEVERANCE. CALLS TINA SEVERANCE, STAYS IN TOUCH WITH HER. WHEN HE GETS STABBED BY VERONICA EVANS, WHO DOES HE CALL? TINA SEVERANCE. SHE RUNS DOWN THERE. WHEN SHE GOES TO HIS HOUSE ONE DAY AND FINDS OUT HE IS MARRIED, MARRIED A COUPLE OF WEEKS AFTER MEETING VERONICA EVANS, SHE TAKES HIM BACK. HE KEEPS RETURNING TO TINA SEVERANCE BECAUSE HE KNOWS HOW WEAK SHE IS, LACKS SELF-ESTEEM. HE CAN GET HER TO DO ANYTHING HE WANTS HER TO DO, SHE LOVES HIM, WILL BE WITH HIM. THAT IS AN INDIVIDUAL WHO IS ABUSIVE TO WOMEN. USING ANYBODY AROUND HIM, ANYBODY THAT CARES ABOUT HIM, ANYBODY THAT PUTS ANY FAITH IN HIM, HE USES THEM. AND HE USED TINA SEVERANCE. AND SHE TOLD YOU THAT FROM THE WITNESS STAND.

HE EVEN USED TINA SEVERANCE AFTER HE WAS IN JAIL. IF YOU REMEMBER, HE WAS WRITING TINA SEVERANCE UP UNTIL ABOUT A YEAR AND A HALF AGO. AND ONE OF THE THINGS HE ASKED HER TO DO, CONVINCED HER TO DO, THIS IS HOW MUCH SHE CARED FOR HIM, TO LIE ON BRANDON BASHAM AND SAY THAT BRANDON BASHAM PULLED A GUN ON HER. HE GOT HER TO DO THAT. AFTER ALL THAT. AFTER ALL THAT HE DID. AFTER ALL OF THE EVENTS THAT TOOK PLACE IN THIS CASE, HE WAS ABLE TO STILL CONVINCE THIS YOUNG LADY WHO CARED ABOUT HIM TO GO AHEAD AND TELL THE FBI THAT BRANDON BASHAM WAS THE ONE THAT PULLED THE GUN ON HER WHEN WE ALL KNOW AND WHEN SHE ADMITTED, AS WE KNOW, ON THE STAND, IN FACT LONG BEFORE SHE WAS ON THE STAND, THAT THAT WAS SOMETHING THAT CHAD FULKS

WANTED HER TO SAY. BECAUSE HE WANTED TO PAINT BRANDON BASHAM IN AS UNFAVORABLE A LIGHT AS HE COULD AND PAINT HIMSELF IN AS FAVORABLE A LIGHT AS HE COULD. BECAUSE HE KNEW THAT SOME DAY HE WAS GOING TO HAVE TO FACE A JURY, AS WELL.

SO, THINK ABOUT WHAT CHAD FULKS DOES ALL OF THIS TIME, EVERYTHING HE DOES IS CALCULATING. EVERYTHING HE DOES IS SOME PART OF A PLAN. EVERYTHING HE IS DOING AT ALL TIMES, HE IS THINKING AHEAD. HE IS CONSIDERING HIS OPTIONS.

NOT SO WITH THAT INDIVIDUAL OVER THERE, BRANDON BASHAM. BECAUSE YOU HAVEN'T HEARD ANY TESTIMONY LIKE THAT. YES, YOU HAVE HEARD BAD TESTIMONY ABOUT THINGS HE HAS DONE. BUT YOU HAVEN'T HEARD ANY TESTIMONY ABOUT HIS BEING MANIPULATIVE, AND CUNNING, AND PLANNING, AND THINKING AHEAD, PUTTING TOGETHER ALL OF THE PIECES OF THIS PUZZLE. THERE IS ONLY ONE PERSON CAPABLE OF DOING THAT, IT IS CHAD FULKS. ONLY ONE PERSON CAPABLE OF CARRYING OUT THAT VIOLENCE, AND THAT IS CHAD FULKS.

NOW, TINA SEVERANCE TOOK YOU THROUGH WHAT HAPPENED OVER THE DAYS THAT THEY WERE TOGETHER. AND JUST QUICKLY, GOING THROUGH THIS, THEY WENT TO ROBERT TALSMA'S HOUSE, TOOK THE WEAPONS. WHOSE IDEA WAS IT? IT WAS CHAD FULKS'S IDEA. WHO SAID THEY NEEDED WEAPONS? CHAD FULKS SAID, I NEED WEAPONS. YES, BRANDON BASHAM PARTICIPATED IN IT. THERE IS NO QUESTION ABOUT IT. TOLD YOU THAT UP FRONT AT THE BEGINNING OF THIS CASE. HE DECIDED WHERE THEY WOULD MEET AFTER THAT

BURGLARY AT ROBERT TALSMA'S HOUSE.  THEY WENT TO THE SANDS MOTEL.

NOW,  ALL THROUGHOUT THIS, I WILL NOT SAY IT BUT THIS ONE TIME,  ALL THROUGHOUT ALL THE DIFFERENT MOTELS THEY WENT TO, ALL THE MONEY THAT WAS SPENT OVER THE NEXT SEVERAL DAYS,  ALL THE DECISIONS WERE MADE BY CHAD FULKS AS TO WHERE TO GO,  THE DECISION WAS MADE BY CHAD FULKS WHERE TO STAY,  THE DECISION WAS MADE BY CHAD FULKS WHEN TO LEAVE,  AND THE DECISION WAS MADE BY CHAD FULKS WHERE TO GO NEXT.  TINA SEVERANCE TOLD YOU THAT AND ANDREA RODDY TOLD YOU THAT. CHAD FULKS WAS THE ONE HOLDING ON TO THE MONEY.  HE GOT TO DECIDE WHAT THEY ATE, AND WHEN THEY ATE, AND GAVE THEM THE MONEY TO GO AHEAD AND EAT. HE WAS IN COMPLETE CONTROL AND IN COMPLETE COMMAND THE ENTIRE TIME FROM THE MOMENT, I SAY LONGER THAN THAT,  BUT AT LEAST FROM THE MOMENT FROM WHAT YOU HAVE HEARD FROM TINA SEVERANCE AND ANDREA RODDY WHEN THEY GOT INVOLVED IN THIS.  NO MATTER WHAT YOU BELIEVE ABOUT FROM BEFORE.  NO QUESTION FROM THOSE TWO YOUNG LADIES,  WHO WAS IN CONTROL,  WHO WAS THE DOMINANT ONE,  WHO WAS THE LEADER, AND WHO WAS THE FOLLOWER.  WHO WAS THE ONE WHO HAD A STRONG PERSONALITY,  MANIPULATIVE PERSONALITY,  SMOOTH TALKER?  IT WAS ALL CHAD FULKS.  WHO MADE ALL OF THE DECISIONS? CHAD FULKS.  THOSE YOUNG LADIES AGREED WITH THAT AND,  BASICALLY,  AS I SAID,  SUPPORTED WHAT WE SAID IN OUR OPENING STATEMENT.

THERE WERE SEVERAL MOTELS THAT THEY STOPPED AT.  AS TO

EACH ONE OF THOSE LOCATIONS, LADIES AND GENTLEMEN, EACH PLACE THAT THEY STOPPED DURING THIS SEVERAL DAY PERIOD, CHAD FULKS HAD CONNECTIONS WITH THOSE AREAS. FROM THE TIME THAT THEY WENT TO STURGIS, MICHIGAN, THAT IS WHERE HIS BROTHER AND HIS FATHER LIVED. THEY WENT TO PIKETON, OHIO, AND HE HAD CONTACTS THERE. HE HAD FAMILY THERE. FRIENDS THERE. HE GREW UP IN THAT AREA. TO KENOVA, WEST VIRGINIA, AT THE HOLLYWOOD MOTEL, HE LIVED THERE, GREW UP THERE. THE FACT HE HAD BEEN AT THAT HOLLYWOOD MOTEL BEFORE, YOU HEARD TESTIMONY ABOUT THAT. HE WAS VERY FAMILIAR WITH THE HUNTINGTON, ASHLAND, KENOVA, CATLETTSBURG AREA OF WEST VIRGINIA AND KENTUCKY. AND WE WILL GO INTO SOME OF THOSE OTHER DETAILS IN A LITTLE BIT. BUT HE WAS THE ONE FAMILIAR WITH EACH ONE OF THESE LOCATIONS. HE WAS THE ONE THAT HAD CONTACTS IN EACH ONE OF THESE LOCATIONS. AND HE WAS THE ONE THAT MADE THE DECISION TO GO TO EACH ONE OF THESE LOCATIONS.

YOU HEARD NOT JUST ONE CONTACT OR ONE REASON TO GO TO ANY ONE OF THESE PARTICULAR TOWNS, BUT YOU HEARD MULTIPLE. THERE WERE MANY PEOPLE THAT HE WAS CONNECTED WITH IN EACH ONE OF THESE LOCATIONS. EVEN TO THE POINT WHEN WE GET TO SOUTH CAROLINA WHERE I THINK THE BEACH WALK MOTEL IS THE PLACE WHERE WE SHOWED THROUGH THE TESTIMONY HE HAD STAYED AT BEFORE. AND JEFF LONG TOLD YOU THAT HIS INVESTIGATION REVEALED THAT CHAD FULKS HAD LIVED IN THE HORRY COUNTY AREA FOR SOME PERIOD OF TIME, NOT TOO LONG BEFORE THESE EVENTS.

JA 1513

WHAT IS SIGNIFICANT ABOUT IT, LADIES AND GENTLEMEN, NOT ONLY IS CHAD FULKS FAMILIAR WITH THE HORRY COUNTY AREA, BUT THE AREA WHERE MS. HYMAN, MR. JORDAN, AND MS. MOORE LIVED ALL WAS WITHIN A HALF MILE OF WHERE CHAD FULKS LIVED. AND THAT IS SIGNIFICANT, AS WELL.

NOW, BRANDON BASHAM, ON THE OTHER HAND, LADIES AND GENTLEMEN, HAD NEVER BEEN OUT. THERE IS NO EVIDENCE THAT HE HAD EVER BEEN OUT OF THE STATE OF KENTUCKY WITH THE EXCEPTION OF WHAT I TOLD YOU IN THE OPENING STATEMENT WHEN HE WENT TO A HOSPITAL IN CINCINNATI, OHIO, ON ONE OCCASION. HE HAD HAD NO CONTACT WITH PIKETON, OHIO, STURGIS, MICHIGAN, KENOVA, WEST VIRGINIA, ASHLAND, KENTUCKY, SOUTH CAROLINA, HE HAD NEVER EVEN BEEN TO THE BEACH BEFORE. THESE WERE ALL CHAD FULKS, NOT BRANDON BASHAM. SO, EVERYTHING THAT WE SAID IN OPENING STATEMENT, WHAT I CONTINUE TO SAY TO YOU ABOUT WHO WAS DIRECTING, WHO WAS COMMANDING, WHO WAS ORDERING IS ALL CHAD FULKS. BRANDON BASHAM HAD NO IDEA WHERE HE WAS HALF THE TIME, AS HE TOLD THE OFFICERS, THE LAW ENFORCEMENT OFFICERS. HE DIDN'T EVEN KNOW WHAT STATE HE WAS IN AT THE TIME BECAUSE HE, HIMSELF, DID NOT KNOW ANY OF THOSE AREAS.

NOW, TINA SEVERANCE, THERE WAS TESTIMONY FROM HER AND THERE WAS ALSO TESTIMONY FROM ANDREA RODDY ABOUT WHAT HAPPENED AT THE WOOD MOTEL. AND MR. GASSER HAS ALLUDED TO IT, I NEED TO RESPOND TO IT. THERE IS NO QUESTION, I AM LOOKING FOR THE LITTLE CLOCK IF YOU ARE WONDERING WHY I AM OVER THERE, I

CAN'T SEE IT FROM HERE.   THERE IS NO QUESTION THAT, AS MR. GASSER SAID,  ANDREA RODDY TESTIFIED THERE WAS AN OFFICER LOOKING IN THE MOTEL.

THERE IS NO QUESTION THAT SOME KIDS WERE BROUGHT TO THE MOTEL BY BRANDON BASHAM.  THE COMMENTS CONCERNING THOSE OFFICERS,  LADIES AND GENTLEMEN,  I WOULD SUGGEST TO YOU IS THAT IS BRANDON BASHAM PUFFING.  I DON'T THINK THERE IS ANY OTHER WAY, I SUBMIT TO YOU, THAT YOU CAN LOOK AT IT BECAUSE OF THE OTHER EVENTS THAT TOOK PLACE DURING THE COURSE OF THIS TRIP THAT THEY TOOK.  I SUBMIT TO YOU THAT HE NEVER WOULD HAVE GONE AHEAD.  HE WAS JUST TALKING TO ANDREA RODDY WHEN HE SAID THAT.  AND IT IS JUST AS ANDREA RODDY SAID,  WITH RESPECT TO THOSE BOYS,  HE HAD TALKED BIG ABOUT MAYBE TRYING TO ROB THE BOYS,  TALKED BIG ABOUT MAYBE SELLING THE BOYS SOME DOPE.

IN THE END, WHAT DID HE WIND UP DOING?  SMOKING MARIJUANA WITH THOSE BOYS.  THOSE BOYS WERE GOING TO TAKE HIM SOMEWHERE.  HE WASN'T GOING TO HURT THEM.  IF HE WAS GOING TO TAKE THE DOPE AND SELL IT,  HE COULD HAVE.  JUST BECAUSE ANDREA RODDY SAID THIS IS WHAT BRANDON BASHAM WAS DOING, OR THIS IS WHAT HE WAS INTENDING TO DO, OR WHAT HE SAID TO DO, DOESN'T MEAN HE DID DO IT.

WITH RESPECT TO THE OFFICERS,  NOBODY WAS SHOT AND,  NUMBER TWO,  WITH RESPECT TO THE BOYS,  NOBODY WAS HURT OR ROBBED. IF YOU REMEMBER, THEY WERE LAUGHING AND SMOKING SOME DOPE.

NOW, THAT IS ANOTHER FACTOR I WOULD LIKE YOU TO CONSIDER HERE. BRANDON BASHAM IS AN ESCAPEE FROM THE HOPKINS COUNTY JAIL. HE GOES TO THE STORE WITH ANDREA RODDY, AND WHILE HE IS STANDING IN THE STORE, THE GUN DROPS OUT OF HIS PANTS. NOW, THAT JUST TELLS YOU THE LEVEL OF SOPHISTICATION OF THIS GUY. NUMBER ONE, HE IS AN ESCAPEE FROM THE HOPKINS COUNTY JAIL, WALKING AROUND BROAD DAYLIGHT GOING INTO A STORE; NUMBER TWO, HE IS CARRYING A GUN ON HIM AND IT DROPS OUT OF HIS PANTS. THESE KIDS ARE OVER THERE, AND THEY SEE IT. THAT IS BRANDON BASHAM'S SOPHISTICATION. THAT IS HIS LEVEL OF PLANNING, THINKING AHEAD. YOU ALSO HEARD TESTIMONY ALL THROUGHOUT, I DON'T THINK THERE IS ANY DISPUTE ABOUT IT, THAT CHAD FULKS IS THE ONE THAT DROVE THE VEHICLE.

YOU ALSO HEARD WHEN THEY WERE AT THE WOOD MOTEL WHEN TINA SEVERANCE CAME BACK, SHE WAS MAD AT BRANDON BASHAM. SHE WAS ANGRY THAT HE HAD BROUGHT THOSE KIDS IN THERE. SHE TOLD CHAD FULKS, AND CHAD FULKS WAS THE ONE THAT GOT ANGRY. BRANDON DIDN'T EVEN KNOW WHAT HE HAD DONE. HE DIDN'T UNDERSTAND WHY IT WAS BAD WHAT HE HAD DONE BRINGING THOSE KIDS TO THE MOTEL. HE DIDN'T UNDERSTAND THAT THOSE KIDS COULD BE WITNESSES AGAINST HIM AS AN ESCAPEE FROM THE HOPKINS COUNTY JAIL. HE WANTED THE KIDS. HE WANTED TO BE WITH THE KIDS. HE WANTED TO SMOKE SOME DOPE WITH THE KIDS. HE BROUGHT THEM BACK TO THE ROOM WITHOUT THINKING OF THE CONSEQUENCES OF IT. THE DECISION, AT THAT POINT, WAS MADE BY CHAD TO LEAVE.

NOW, I THINK IT WAS IN PIKETON, OHIO, WHICH IS A SIGNIFICANT EVENT THAT TOOK PLACE THAT DAY, NOVEMBER 10TH. THAT IS THE DAY AMY WARD'S IDENTIFICATION WAS STOLEN BY CHAD FULKS. YOU REMEMBER, WHO DIDN'T WANT TO STAY AT THE COMFORT INN BECAUSE YOU HAD TO WALK THROUGH THE LOBBY? WHO MADE THAT DECISION? CHAD FULKS, NOT BRANDON BASHAM.

I DON'T KNOW IF IT WAS PIKETON, OHIO, I CAN'T REMEMBER RIGHT NOW WHICH TOWN IT WAS, REMEMBER WHAT ANDREA RODDY TESTIFIED TO? ANDREA RODDY SAID THAT BRANDON WAS ASLEEP. DURING THE CONVERSATION SHE WAS HAVING WITH TINA SEVERANCE AND CHAD FULKS WHILE BRANDON WAS ASLEEP, THERE WAS A CONVERSATION ABOUT HER GOING OUT AND SELLING HERSELF, BASICALLY, TO MAKE SOME MONEY SO THAT THEY COULD HAVE SOME MONEY TO CONTINUE ON THEIR JOURNEY. SHE TOLD YOU THAT. SHE WAS EMBARRASSED ABOUT IT. SHE TOLD YOU, SHE ADMITTED IT. SHE DIDN'T DENY IT WHEN ASKED THE QUESTION ABOUT IT. WHAT IS SIGNIFICANT ABOUT THAT? WHAT IS SIGNIFICANT ABOUT IT, LADIES AND GENTLEMEN, IS THAT CHAD FULKS WAS WILLING TO LET HER DO THAT. THAT IS THE KIND OF CHARACTER AND INDIVIDUAL THAT WAS LEADING THIS GROUP.

THE OTHER THING THAT IS SIGNIFICANT ABOUT IT IS THIS, IS THAT BRANDON BASHAM, WHEN HE WOKE UP, ACCORDING TO ANDREA RODDY, WAS EXTREMELY UPSET ABOUT IT AND DID NOT WANT HER TO DO IT. THAT TELLS YOU THE KIND OF INDIVIDUAL THAT BRANDON BASHAM IS. EVEN SOMETHING AS BASIC AS THAT, HE CARED ABOUT

THIS WOMAN. HE HAD ONLY KNOWN HER A COUPLE OF DAYS. HE DID NOT WANT HER TO DO THAT. CHAD FULKS WAS WILLING TO LET HER DO IT. TINA SEVERANCE IS WILLING TO LET HER DO IT, BUT BRANDON BASHAM, WHEN HE GOT UP AND HE FOUND OUT ABOUT IT, WAS UPSET AND ANGRY ABOUT THE FACT THAT THAT WAS EVEN DISCUSSED, OR THAT SHE WOULD CONSIDER IT, OR THAT IT WAS EVEN SUGGESTED.

NOW, TINA SEVERANCE TOLD YOU ABOUT WHEN THEY WERE IN KENOVA, WEST VIRGINIA, AND THE FACT THAT BRANDON BASHAM AND CHAD FULKS LEFT THE MOTEL THAT NIGHT OR THAT DAY. THEY LEFT IN THE CAMOUFLAGE CLOTHING. LADIES AND GENTLEMEN, THEY WERE GONE TOGETHER. THEY LEFT TOGETHER, AND THEY CAME BACK TOGETHER. AND THERE IS NO QUESTION ABOUT IT, THERE IS A CANDY BOX THAT THEY HAD THE NEXT DAY. THERE IS NO QUESTION ABOUT IT, THERE IS A RING THAT BELONGED TO SAMANTHA BURNS THAT BRANDON BASHAM HAD THE NEXT DAY. AND THERE IS NO QUESTION ABOUT IT THAT BRANDON BASHAM AND CHAD FULKS HAD MUD ON THEIR CLOTHES AND THERE WAS SOME MUD IN THE VEHICLE. AND THERE IS NO QUESTION ABOUT IT THAT LATER ON BRANDON BASHAM TOLD HIS LAWYER, RICHARD HUGHES, TO TELL THEM, POLICE AND FAMILY, FOR WHATEVER BENEFIT IT WOULD BE, THOSE ARE THE WORDS THAT WERE USED, WHERE SAMANTHA BURNS'S BODY WAS.

TINA SEVERANCE TOLD YOU WHEN THEY CAME BACK, I BELIEVE SHE WAS THE ONE THAT SAID THAT CHAD OR BRANDON WENT IN THE SHOWER FIRST. I BELIEVE ANDREA RODDY IS THE ONE THAT SAID -- NO, I'M SORRY, ANDREA RODDY SAID CHAD WENT IN THE SHOWER FIRST

AND BRANDON CAME IN AND LAID NEXT TO HER. I THINK TINA SEVERANCE HAD IT THE OTHER WAY AROUND. WHAT IS SIGNIFICANT ABOUT THAT IN CONNECTION WITH THE EVIDENCE IN THE CASE? THE SIGNIFICANCE OF THAT IS THIS. THERE IS EVIDENCE HERE THAT THAT CAR, SAMANTHA BURNS'S CAR, WAS BURNED. NO QUESTION ABOUT IT, IT WAS BURNED. YOU HAVE SEEN THE EVIDENCE OF IT, SEEN THE PICTURES OF IT, SEEN WHERE IT WAS. ANDREA RODDY TESTIFIED THAT SHE WAS VERY SENSITIVE TO THE SMELL OF GASOLINE AND BURNT HAIR. SHE SAID SHE KNEW WHAT ALL OF THAT STUFF SMELLED LIKE. SHE TESTIFIED WHEN BRANDON BASHAM CAME INTO THE ROOM, LAID DOWN ON THE BED NEXT TO HER WHILE CHAD FULKS WENT IN THE SHOWER, SHE DID NOT SMELL ANY GASOLINE, AND SHE DIDN'T SMELL ANY BURNED HAIR.

NOW, I ASK YOU TO CONSIDER THAT WHEN YOU WEIGH WHETHER OR NOT BRANDON BASHAM HAD ANY INTENT THERE TO HURT OR IS EVEN INVOLVED IN HURTING SAMANTHA BURNS, OR KILLING SAMANTHA BURNS. ALL OF THOSE OTHER FACTORS ARE THERE. ALL OF THOSE OTHER FACTORS ARE CONCEDED. NOT GOING TO DISPUTE THOSE WITH YOU. ALL OF THOSE OTHER FACTORS I HAVE ALLUDED TO HAVE BEEN PROVEN IN THIS CASE. ALSO CONSIDER THAT BRANDON BASHAM DID NOT HAVE THE SMELL OF GASOLINE ON HIM, DID NOT HAVE THE SMELL OF BURNT HAIR. ANDREA RODDY IS THE ONE THAT TOLD YOU ABOUT THAT.

COMING BACK TO TINA SEVERANCE. REMEMBER WHAT TINA SEVERANCE SAID AFTER THEY LEFT WEST VIRGINIA? THEY WERE RIDING ALONG AND SHE GOT INTO A DISPUTE WITH CHAD FULKS -- I MEAN

WITH BRANDON BASHAM. AND CHAD FULKS TOLD HER TO SHUT UP AFTER A PERIOD OF TIME. HE GOT UPSET WITH HER. HE TOLD HER TO SHUT UP, AND HE TOLD BRANDON BASHAM TO SHUT UP. THEY WERE PICKING AT EACH OTHER. NOW, ALTHOUGH BRANDON BASHAM SAID SOME THINGS TO TINA SEVERANCE THAT TINA SEVERANCE DIDN'T LIKE, THE FACT OF THE MATTER IS, THE GOVERNMENT ASKED TINA SEVERANCE WHETHER BRANDON BASHAM EVER THREATENED HER. SHE SAID, NO. WHEN CHAD FULKS SAID TO SHUT UP, THEY BOTH SHUT UP. AS YOU HAVE ALREADY FOUND OUT, NOBODY ARGUED WITH CHAD FULKS. TINA SEVERANCE ALSO TOLD YOU THAT CHAD FULKS PUNCHED BRANDON BASHAM IN THE MOUTH WHEN SHE WENT INTO THE MOTEL. YOU NEVER HEARD ANY EVIDENCE OF BRANDON BASHAM PUNCHING CHAD FULKS, OR TELLING CHAD FULKS WHAT TO DO, OR COMMANDING, OR DIRECTING CHAD FULKS. AS A MATTER OF FACT, WHEN TINA SEVERANCE SAID TO CHAD FULKS, LET'S LEAVE HERE, LET'S LEAVE THEM HERE, MEANING ANDREA AND BRANDON BASHAM, CHAD FULKS REFUSED TO DO THAT BECAUSE HE SAID, IF YOU REMEMBER CORRECTLY, BRANDON BASHAM IS STUPID. HE DIDN'T WANT TO LEAVE BRANDON BASHAM. BECAUSE BRANDON BASHAM WAS STUPID. THAT IS ALL CHAD FULKS LOOKED AT AS FAR AS BRANDON BASHAM WAS DIFFERENT, THE FACT THAT HE WAS STUPID. AND HE WOULD DO WHATEVER CHAD FULKS WANTED HIM TO DO. RUN AND GET PURSES, CASHING CHECKS, WHATEVER IT IS HE WANTED HIM TO DO.

YOU WILL ALSO REMEMBER THAT WHEN THE GOVERNMENT ASKED TINA WHETHER OR NOT BRANDON EVER THREATENED HER DIRECTLY, SHE

SAID, NO, BUT CHAD FULKS DID. AND IF YOU REMEMBER THE EVENT IN THE MOTEL ROOM THAT NIGHT AND SHE MADE SOME INNOCENT COMMENT ABOUT SOMEONE ON TV, CHAD FULKS WENT NUTS. HE SNAPPED. AND HE JUMPED UP, PULLED THE GUN ON HER, POINTED IT AT HER HEAD, AIMED AT HER HEAD. THAT IS CHAD FULKS, LADIES AND GENTLEMEN.

I JUST LOOKED AT MY NOTES. TINA SEVERANCE ALSO TOLD YOU THAT WHEN BRANDON -- WHEN CHAD FULKS CAME BACK TO THE ROOM IN KENOVA, HE HAD CHANGED CLOTHES. AND ANDREA RODDY TOLD YOU, AND I MAY HAVE IT REVERSED, WHEN HE CAME BACK TO THE ROOM AT THE BEACH WALK MOTEL, HE HAD ALSO CHANGED CLOTHES. NOW, I DON'T KNOW WHICH ONE SAID WHICH AS TO WHICH MOTEL, BUT THE FACT OF THE MATTER IS THAT BOTH GIRLS TESTIFIED ON THE DAY IN QUESTION IN WEST VIRGINIA, THE DAY IN QUESTION WITH RESPECT TO ALICE DONOVAN'S DISAPPEARANCE, CHAD FULKS CHANGED CLOTHES BOTH OF THOSE DAYS. HE DID NOT COME BACK TO WEST VIRGINIA WITH THE SAME CLOTHES AS WHEN HE LEFT. AND IN SOUTH CAROLINA, THE DAY MS. DONOVAN WAS ABDUCTED, HE WAS WEARING, IF I REMEMBER, A TOMMY HILFIGER OUTFIT. AND WHEN HE LEFT THAT DAY OR WHEN HE CAME BACK AND HE WAS LEAVING FOR THE LAST TIME, HE HAD ON THE JOE BOXER OUTFIT. THAT IS SIGNIFICANT, TOO. BRANDON BASHAM WASN'T CHANGING CLOTHES. WHAT WAS CHAD FULKS TRYING TO HIDE? WHY WAS HE CHANGING CLOTHES ON BOTH OF THOSE OCCASIONS?

TINA SEVERANCE ALSO TOLD YOU THAT CHAD FULKS WAS WAGING A

WAR WITH GOD.   NOW, WHAT DO YOU THINK SHE MEANT BY THAT? THE ANGER THAT HE HAD,  THE BITTERNESS THAT HE HAD,  THE TYPE OF ATTITUDE HE HAD TOWARD PEOPLE AND TOWARD EVENTS? HE WAS RAGING A WAR WITH GOD.   CHAD FULKS ALSO WAS THE INDIVIDUAL WHO, WHEN TINA SEVERANCE PICKED UP SAMANTHA BURNS'S ID,  HE GRABBED IT AND HE THREW IT AWAY.   CHAD FULKS WAS ALSO THE INDIVIDUAL THAT GAVE HER A FALSE IDENTIFICATION TO CHECK INTO THE BEACH WALK MOTEL.   NOT BRANDON BASHAM.   AT NO TIME WAS BRANDON BASHAM DOING ANY OF THAT.

ANDREA RODDY WAS A LOT SHORTER OF A WITNESS THAN TINA SEVERANCE,  BUT SHE BASICALLY SAID THIS TO YOU ABOUT BRANDON BASHAM.   HE HAD A VERY LOW INTELLECTUAL CAPACITY.   IN FACT, SHE SAID HE WAS STUPID.   FULKS WAS FAR MORE INTELLECTUAL. FULKS WAS FAR MORE DOMINANT.   BRANDON WAS MORE PASSIVE. THAT CHAD WAS IN CHARGE,  THAT HE WAS IN COMMAND.   THAT NO ONE DISPUTED CHAD.   THAT MR. BASHAM IS NOT A MEAN INDIVIDUAL. THAT SHE THOUGHT HE WAS TOO STUPID TO BE ON HIS OWN.   THE EXAMPLE SHE USED,  SHE SAID THE PROOF IS IN THE PUDDING, A FEW MINUTES AFTER CHAD FULKS DROPPED BRANDON OFF IN ASHLAND TO GO GET THE OTHER VEHICLE, HE WAS CAUGHT BY THE POLICE.   THAT WAS HOW SHE ILLUSTRATED HOW STUPID BRANDON BASHAM WAS.   SHE IS THE ONE THAT SAID CHAD SHOWERED FIRST AND BRANDON CAME IN AND LAID NEXT TO HER.   SHE SUPPORTED EVERYTHING WE SAID ABOUT THE DIFFERENT RELATIVE PERSONALITIES BETWEEN BRANDON BASHAM AND CHAD FULKS.   SHE ALSO TOLD YOU THAT HE DID NOT HAVE THE

MENTAL CAPACITY TO DO ANY PLANNING, TO DO ANY LEADING. THAT WAS ANDREA RODDY.

WHAT IS SIGNIFICANT ABOUT ANDREA RODDY? SHE SUPPORTED EVERYTHING TINA SEVERANCE SAID ABOUT CHAD FULKS'S PERSONALITY, HIS LEADERSHIP ROLES, HIS DOMINATING PERSONALITY, HIS CONTROL. SHE SUPPORTED EVERYTHING THAT TINA SEVERANCE SAID AND EVERYTHING THAT TINA SEVERANCE SAID ABOUT BRANDON BASHAM. SHE WAS STILL IN TOUCH WITH CHAD FULKS. SO, HER TESTIMONY WAS EXTREMELY CREDIBLE BECAUSE SHE IS NOT TRYING TO GET IN THERE AND HURT BRANDON BASHAM AND TRY AND PAINT CHAD FULKS ONE WAY AND PAINT BRANDON BASHAM ANOTHER WAY. EVEN THOUGH, IF I RECALL CORRECTLY, AS EARLY -- AS LATE AS SUNDAY WHEN THE TRIAL STARTED, CHAD FULKS HAD TRIED TO GET IN TOUCH WITH HER. WAS ON THE PHONE TRYING TO GET IN TOUCH WITH HER. AND YET, SHE COMES INTO THE COURTROOM AND BASICALLY SUPPORTS, POINT FOR POINT, EVERYTHING WE CONTENDED ABOUT CHAD FULKS'S PERSONALITY AND BRANDON BASHAM'S PERSONALITY, AND THE EVENTS THAT TOOK PLACE DURING THAT PERIOD OF TIME, AND OVER THOSE DAYS WHEN THEY WERE TRAVELLING.

NOW, I WANT TO GO BACK FOR A MOMENT TO WEST VIRGINIA. ONE OF THE OTHER FACTORS I WOULD LIKE FOR YOU TO CONSIDER WITH RESPECT TO THE BURNS'S ABDUCTION, IS THAT THE AREA WHERE THE CAR WAS BURNED IS AN AREA THAT THE GOVERNMENT OFFERED PROOF OF THAT CHAD FULKS HAD BEEN THERE BEFORE. YOU HEARD TESTIMONY ABOUT THAT. OF HIS FAMILIARITY, NOT ONLY WITH THE

HUNTINGTON/ASHLAND AREAS, THAT WHOLE AREA THERE, THAT AREA THERE, EVEN THAT ROAD. THAT WAS SOMETHING THAT CHAD FULKS WAS FAMILIAR WITH AND HAD BEEN THERE BEFORE.

LET ME TALK ABOUT SOME OF THE EVENTS IN SOUTH CAROLINA FOR A MOMENT. AS I TOLD YOU, THERE IS NOTHING IN DISPUTE ABOUT THE SAM JORDAN SITUATION. THEY DID GO IN THERE. THEY DID TRY TO STEAL SOME THINGS. THEY BURGLARIZED THE TRAILER. THEY TOOK THE WEAPONS. BUT CARL JORDAN AND SAM JORDAN'S SITUATION IS SOMETHING ELSE THAT I WOULD ASK YOU TO CONSIDER AS ONE OF THOSE THINGS, NOT ONLY THE GOVERNMENT WOULD SEEK TO TRY TO PROVE INTENT, WE SUBMIT TO YOU DISPROVES INTENT.

WHEN CARL JORDAN COMES UP ON THE VEHICLE THAT IS BEING DRIVEN BY CHAD FULKS AND HE BLOCKS IT IN, HE SEES BRANDON BASHAM COMING AROUND THE FRONT. HE SEES CHAD FULKS COMING OUT OF THE BACK. WHAT DID HE TELL YOU ABOUT CHAD FULKS? THAT CHAD FULKS JUMPED IN THE VEHICLE, HE THOUGHT HE WAS GOING TO RAM HIM. THAT WAS HIS FIRST FEAR, AT THAT POINT. HE ALSO TOLD YOU THAT THE SHOT THAT WAS FIRED THAT BROKE THE GLASS IN THE BACK OF THE VEHICLE WAS FIRED BY CHAD FULKS. ACTUALLY, HE TOLD YOU THAT THE LAWS OF PHYSICAL SCIENCE COULD ONLY BE THAT CHAD FULKS WAS THE ONE THAT FIRED THAT SHOT THAT BROKE THE BACK WINDOW.

NOW, WHAT DID HE TELL YOU ABOUT BRANDON BASHAM? AND THIS IS ONE OF THOSE SITUATIONS, AGAIN, LIKE JAMES HAWKINS. WHEN MR. JORDAN WAS ON THE STAND, I ASKED HIM -- LET ME BACK UP.

THE GOVERNMENT ASKED, WERE YOU AFRAID WHEN YOU SAW BRANDON BASHAM FIRE SOMETHING? YES, HE WAS. LADIES AND GENTLEMEN, THERE IS NO QUESTION, OF COURSE HE WAS AFRAID, HE WAS SCARED. HE THOUGHT BRANDON BASHAM WAS FIRING AT HIM, AS WELL. HE THOUGHT CHAD FULKS WAS FIRING AT HIM. NO ONE IS DISPUTING THE FACT THAT CARL JORDAN SHOULD HAVE BEEN AFRAID. NO ONE IS DISPUTING THE FACT THAT THE WEAPONS WERE FIRED AND THE HOME HAD BEEN BURGLARIZED. BUT WHAT DID HE FIND OUT AFTERWARDS? WHEN HE WAS ON THE STAND, I ASKED HIM TO POINT TO WHERE THE GREENHOUSE WAS WHICH, IF YOU REMEMBER, WAS WHERE THE BULLETS WERE FOUND OR WHERE THE SHOTS WERE FIRED BECAUSE THEY COULD TELL FROM THE AWNING THAT THE SHOTS HAD BEEN FIRED INTO THE AWNING. AND I ASKED HIM TO POINT TO WHERE THE GREENHOUSE WAS. HE POINTED OVER THERE. HE WAS SITTING IN THE STAND, HE POINTED OVER TO THAT WALL.

NOW, LADIES AND GENTLEMEN WHAT DOES THAT MEAN? WELL, IT MEANS THIS. BRANDON BASHAM IS SUPPOSED TO BE THE KILLER IN THIS CASE. EITHER HE KILLED OR HE AIDED AND ABETTED IN KILLING ALICE DONOVAN AND SAMANTHA BURNS. HE HAS ALREADY LET JAMES HAWKINS LIVE IN THE FIELD. KEPT HIM COMFORTABLE, AS MUCH AS HE COULD. CONCERNED ABOUT CIRCULATION, WARMTH, HEALTH, DIDN'T WANT TO LEAVE HIM THERE. THEN WHEN CARL JORDAN IS IN THE VEHICLE, BRANDON BASHAM IS SEVERAL FEET AWAY FROM HIM AND COULD HAVE EASILY KILLED HIM, COULD HAVE EASILY SHOT HIM, COULD HAVE SHOT RIGHT THROUGH THE WINDSHIELD OF

THAT VEHICLE. WHERE DOES BRANDON BASHAM FIRE? OVER THERE, IN THIS DIRECTION. NOT THIS DIRECTION WHERE THE VEHICLE IS, BUT IN THAT DIRECTION. NOW, WHAT DOES THAT TELL YOU? BRANDON BASHAM IS NOT TRYING TO HIT CARL JORDAN. BRANDON BASHAM HAD NO INTENT TO HIT CARL JORDAN. THE LAST THING BRANDON BASHAM WANTED TO DO IN ANY WAY WAS TO HURT CARL JORDAN. THAT IS WHY HE FIRED AWAY FROM HIM. THERE IS NO OTHER EXPLANATION. THE GOVERNMENT MAY WANT TO GLOSS OVER THAT, BUT THERE IS NO OTHER EXPLANATION FOR HIS FIRING IN A DIRECTION COMPLETELY AWAY FROM CARL JORDAN. TWO SHOTS. AND NOT FIRING DIRECTLY AT CARL JORDAN EXCEPT FOR THIS, HE DID NOT WANT TO SHOOT CARL JORDAN. THAT IS THE TYPE OF INDIVIDUAL HE IS.

THAT IS NOT THE TYPE OF INDIVIDUAL THAT CHAD FULKS WAS BECAUSE HE TRIED TO. HE TRIED TO KILL CARL JORDAN. WHEN THEY LEFT AND THEY WERE DRIVING, IF YOU REMEMBER, AROUND COOPERS METAL WORKS, BILLY MARTINI, NOW, HE SAID THAT CHAD FULKS TRIED TO RUN HIM OVER. CHAD FULKS WAS DRIVING. HE SAID THAT HE SAW BRANDON BASHAM REACHING FOR SOMETHING, HE SAW THE OTHER INDIVIDUAL HOLDING HIS HAND DOWN, TRYING TO STOP HIM. BUT WE DON'T KNOW WHAT IT WAS. BUT I DO REMEMBER ONE THING, AND I ASK YOU TO REMEMBER, IS HE SAID THAT THE PASSENGER WAS THE ONE THAT LOOKED NERVOUS, NOT THE DRIVER. THE DRIVER IS TRYING TO RUN HIM DOWN AND KILL HIM. THE PASSENGER IS THE ONE THAT LOOKED NERVOUS. THE GOVERNMENT WANTS YOU TO SPECULATE AS TO WHAT BRANDON BASHAM MIGHT HAVE

**JA 1526**

BEEN REACHING FOR OR WHAT BRANDON BASHAM MIGHT HAVE BEEN DOING. BRANDON BASHAM MIGHT HAVE BEEN DUCKING.

MARGARET MOORE. I WANT YOU TO REMEMBER THIS ABOUT THAT PARTICULAR SITUATION AFTER THEY WENT TO MARGARET MOORE'S HOUSE. BRANDON BASHAM WENT UP TO THE DOOR, THERE IS NO QUESTION. AND WHEN SHE SAID, NO, NOT GOING TO LET YOU USE THE PHONE, NOT GOING TO TAKE YOU FOR A RIDE, BRANDON BASHAM LEFT. BRANDON BASHAM WAS NOT TRYING TO HURT MARGARET MOORE. BRANDON BASHAM WALKED AWAY FROM THE DOOR. WHO CAME BACK AND TRIED TO GET IN THE HOUSE? WHO TRIED TO GET MS. MOORE TO COME BACK OUT, BUT COULDN'T? THAT WAS CHAD FULKS. YES, THEY WENT AHEAD AND THEY DID STEAL MS. HYMAN'S VEHICLE. THAT IS THE VEHICLE THEY HAD WHEN THEY WENT TO THE MALL.

LADIES AND GENTLEMEN, THE EVENTS THAT TOOK PLACE AT THE MALL, AND THE EVENTS THAT TOOK PLACE IN WEST VIRGINIA ARE VERY TRAGIC SITUATIONS. CANNOT HIDE BEHIND THOSE. NOT TRYING TO HIDE BEHIND THEM. THEY DID HAPPEN. AT THE WAL-MART IN SOUTH CAROLINA, THERE IS NO QUESTION THAT BRANDON BASHAM LEFT THE VEHICLE AND GOT IN THE VEHICLE WITH ALICE DONOVAN. THERE IS NO QUESTION ABOUT THAT, THAT HE LEFT THE VEHICLE, THE TRUCK THERE AT THE WAL-MART, CHAD FULKS GOT IN THE BMW. MR. GASSER IS EXACTLY CORRECT. THERE WERE SEVERAL OCCASIONS WHEN THEY WERE DRIVING ALONG THE ROAD AND CHAD FULKS WAS STOPPING TO USE THE ATMS THAT BRANDON BASHAM WAS ALONE WITH ALICE DONOVAN. THERE IS NO QUESTION ABOUT THAT. I DON'T DISPUTE

THAT WITH THE GOVERNMENT IN ANY WAY WHATSOEVER.  THAT HE HAD THE OPPORTUNITY, IF HE WANTED, TO LET ALICE DONOVAN GO.  BUT I SUBMIT TO YOU THAT BRANDON BASHAM, HAVING ALREADY HAD THE EXPERIENCE WITH CHAD FULKS ABOUT JAMES HAWKINS, IT WAS NOT HIS UNDERSTANDING, IT WAS NOT HIS INTENT TO HURT OR KILL ALICE DONOVAN.  THAT MAY HAVE BEEN CHAD FULKS'S INTENT FROM THE VERY BEGINNING, BUT IT WAS NOT BRANDON BASHAM'S INTENT TO GO AHEAD AND DO THAT FROM THE VERY BEGINNING OR AT ANY TIME ALONG THE WAY.  BUT, YES, DID HE HOLD HER? DID HE HAVE THE OPPORTUNITY TO LET HER GO? YES, HE DID.  NOT GOING TO DISPUTE THAT WITH YOU.  I AM NOT GOING TO STAND UP HERE AND TELL YOU THAT.

CHAD FULKS DID USE ALL OF THOSE ATM MACHINES.  HE WAS THE ONE THAT HAD THE ABILITY TO GO AHEAD AND DO THAT.  DO YOU REMEMBER EARLIER THERE WAS TESTIMONY THAT BRANDON BASHAM DIDN'T EVEN HAVE THE ABILITY TO USE AN ATM CARD OR EVEN USE A CALLING CARD.  AND THEY MADE THEIR WAY UP NORTH, UP TO NORTH CAROLINA.

AND, YES, IT IS JUST NO WAY FOR ANY OF US TO RECREATE IN OUR MINDS THE FEAR THAT ALICE DONOVAN HAD.  THERE IS NO WAY FOR ANY OF US IN OUR MINDS TO UNDERSTAND WHAT HER FAMILY WENT THROUGH.  WE MAY THINK WE CAN UNDERSTAND IT, SINCE WE DIDN'T GO THROUGH IT, WE CAN NEVER POSSIBLY FEEL IT.  IT IS AN AWFUL SITUATION.  AND AS I TOLD YOU, THERE IS NO QUESTION THAT BRANDON BASHAM PARTICIPATED IN THAT KIDNAPPING.  THE

QUESTION IS, DID HE BRING ABOUT HER DEATH? DID HE CAUSE THE DEATH? DID HIS ACTIONS RESULT IN HER DEATH? DID HE HAVE THE INTENT WHEN HE WENT IN THE VEHICLE TO HURT HER OR CAUSE HER DEATH? AND WE SUBMIT, NO. WHEN THEY WENT UP TO SHALLOTTE, NORTH CAROLINA, AMOCO STATION, BRANDON BASHAM HAD ANOTHER OPPORTUNITY TO GET OUT OF THE VEHICLE, RUN AWAY, HE DID NOT. WHEN THEY TOOK A COUPLE MORE STOPS, WENT A COUPLE MORE DIFFERENT PLACES, HE HAD THE OPPORTUNITY AGAIN, TO LEAVE, TO GO AWAY, TO LET HER GO, BUT HE DID NOT. HE MADE THOSE CHOICES. AND, LADIES AND GENTLEMEN, AS I TOLD YOU, HE OUGHT TO BE HELD ACCOUNTABLE FOR THE CHOICES HE MADE, BUT NOT FOR THE CHOICES THAT CHAD FULKS MADE. THAT IS THE DIFFERENCE.

RATHER THAN GOING THROUGH THE DETAILS OF THAT, I WANT TO GO BACK AND LOOK AT THE EVENTS THAT TOOK PLACE UP IN NORTH CAROLINA THROUGH WHAT MR. BASHAM WAS TELLING THE OFFICERS LATER ON. AND I WILL.

WHEN MR. BASHAM AND MR. FULKS EVENTUALLY STARTED BACK TOWARDS WEST VIRGINIA, YOU REMEMBER THERE WAS AN ATM USED IN RALEIGH. WE KNOW MR. FULKS WAS THE ONE THAT USED THAT ATM. WE ALSO KNOW, IF I RECALL CORRECTLY, HE WAS WEARING THE LEATHER JACKET. MR. BASHAM TOLD THE LAW ENFORCEMENT THAT THAT IS WHAT MR. FULKS DID WHEN HE WENT TO THE ATM TO DISGUISE HIMSELF, HE PULLED UP THE HOOD SO HE WOULD THINK THAT THE CAMERA WOULD NOT SHOW HIM. WHEN HE GOT TO WEST VIRGINIA, THEY WENT TO BETH MCGUFFIN'S. THEY SPENT A FEW DAYS WITH

BETH MCGUFFIN. WHAT IS SIGNIFICANT ABOUT THAT IS THAT BETH MCGUFFIN KNEW AND STACY KNEW CHAD FULKS FROM EARLIER DAYS. THEY ALSO SUPPORTED WHAT TINA SEVERANCE AND ANDREA RODDY TOLD YOU ABOUT CHAD FULKS, HE WAS A SMOOTH OPERATOR, A BIG TALKER. HE WAS IN CONTROL, HE WAS DOMINATING. ALL OF THAT WAS SUPPORTED AGAIN BY THE TWO OF THEM. EVERYTHING THAT TINA SEVERANCE AND ANDREA RODDY TOLD YOU. HE WAS THE ONE DOLING OUT THE MONEY. HE WAS THE ONE BUYING THE DRUGS, DOLING OUT THE MONEY. HE WAS THE ONE MAKING CONTACT WITH THE DRUG DEALERS IN THAT AREA, AND BRINGING DRUGS BACK, AND TELLING EVERYBODY HOW MUCH THEY COULD HAVE. HE WAS THE ONE THAT WAS CONTROLLING THE MONEY HE HAD SPENT. WHEN BRANDON BASHAM WANTED TO TAKE BETH MCGUFFIN TO BUY SOMETHING AT THE MALL, THEY HAD TO ASK HIM FOR MONEY. YOU HAVE HEARD TESTIMONY FROM HER BROTHER AND A FRIEND. THEY TOLD YOU THE SAME THING ABOUT CHAD FULKS. ABOUT HOW SMOOTH AN OPERATOR HE WAS, WHAT A BIG TALKER HE WAS. HOW HE TALKED ABOUT BIG MONEY. HE MANIPULATED PEOPLE AND LIED TO PEOPLE. HE WAS TRYING TO TRADE THE GUN, TRADE AND SELL THE CAR. LIED ABOUT HOW HE GOT THE CAR, LIED ABOUT THE GUN. HE WAS THE INDIVIDUAL WHO WAS DOING ALL OF THIS.

NOW, YOU DID HEAR SOME TESTIMONY ABOUT BRANDON BASHAM MAKING SOME THREATS ABOUT HER BROTHER AND ABOUT THE FRIEND, BUT, AGAIN, LADIES AND GENTLEMEN, THERE IS NOTHING TO INDICATE THAT HE WAS DOING THAT OTHER THAN PUFFING. TALKING

BIG.   HE WAS DOING THAT TO IMPRESS BETH MCGUFFIN,  SOMEONE HE JUST MET,  SOMEONE HE WAS SPENDING THE WEEKEND WITH, SOMEONE HE WAS HAVING SEXUAL RELATIONS WITH.

BETH MCGUFFIN ALSO TOLD YOU THAT BRANDON WAS A TAG-ALONG TO CHAD.   CHAD WAS THE ONE THAT HAD THE BRAINS.   BRANDON HAD A PASSIVE PERSONALITY EXCEPT FOR THOSE COMMENTS.   I AM NOT DISPUTING SHE SAID THE COMMENTS OR SHE SAID HE MADE THE COMMENTS.   I AM SUGGESTING YOU NEED TO LOOK AT THEM IN THE CONTEXT IN WHICH THEY WERE MADE.   SHE SAID OVER THAT WEEKEND, JUST AS CHAD HAD DONE BEFORE,  CHAD CONTROLLED EVERYTHING. REMEMBER SHE SAID WHEN CHAD HAD TAKEN HER  -- USED HER IN THE PAST,  ASKED HER TO DRIVE HIM TO A PLACE, AND THEN I THINK IT WAS IN INDIANA, AND THEN HE JUST DUMPED HER ON THE SIDE OF THE ROAD?   THAT WAS CHAD FULKS.   SHE HAD TO FIND HER WAY BACK. SHE WAS HOLDING A GRUDGE AGAINST HIM UNTIL HE SHOWED UP AGAIN.

SHE ALSO TOLD YOU THAT CHAD WAS THE ONE FAMILIAR WITH THAT AREA.   AND CHAD WAS FAMILIAR WITH THE GUYANDOTTE FLOOD WALL, THAT IS WHERE HE WENT TO BUY DRUGS.   THAT IS A SIGNIFICANT ISSUE WHICH WE WILL TALK ABOUT IN A MOMENT.   SHE ALSO TOLD YOU THAT CHAD HAD A BAG FULL OF MONEY.   SHE ALSO TOLD YOU THAT CHAD DID NOT WANT HER BROTHER TO SEE HIM WITH HER BECAUSE THE BROTHER DID NOT LIKE CHAD.   SHE TOLD YOU CHAD WAS BOSSY. SHE TOLD YOU THAT SHE TOLD BRANDON TO STAND UP TO CHAD.   SHE SAID THAT CHAD HAD GOTTEN JEALOUS OF THE FACT THAT SHE AND BRANDON HAD STRUCK UP A RELATIONSHIP.   SHE ALSO TOLD YOU A

COUPLE OF OTHER THINGS THAT ARE SIGNIFICANT, LADIES AND GENTLEMEN.

AFTER BRANDON GOT CAUGHT, YOU REMEMBER, THERE WERE SOME LETTERS, THEY ARE IN EVIDENCE. THERE WERE SEVERAL LETTERS THAT WERE WRITTEN BETWEEN BRANDON BASHAM, WITHIN A FEW DAYS AFTER HE GOT ARRESTED, TO BETH MCGUFFIN. THOSE LETTERS ARE SIGNIFICANT BECAUSE BRANDON BASHAM DID NOT KNOW, AT THAT TIME, THAT BETH MCGUFFIN WAS TURNING THOSE LETTERS OVER TO LAW ENFORCEMENT. WHAT HE WAS WRITING IN THOSE LETTERS, I SUBMIT TO YOU, WERE TRUE. BECAUSE HE HAD NO REASON, AT THAT POINT, TO THINK THAT SHE WAS TURNING THEM OVER TO LAW ENFORCEMENT, NO REASON TO GO AHEAD AND TRY TO SHADE THE TRUTH. READ THOSE LETTERS. TAKE A MOMENT TO READ THOSE THREE LETTERS. IN THOSE LETTERS, NOT KNOWING SHE WAS TURNING THEM OVER TO LAW ENFORCEMENT, HE SAID, I DIDN'T HURT THAT GIRL. I WOULDN'T HURT THAT GIRL. IN ONE OF THE LETTERS HE SAID THAT CHAD, IF I REMEMBER CORRECTLY, CHAD WENT OFF THE DEEP END. CHAD HURT HER. I DIDN'T DO ANYTHING TO HURT HER. BUT I WAS WITH CHAD. TOLD HER IN ONE OF THE LETTERS HE WAS GOING TO TRY TO MAKE IT BETTER. A COUPLE OF DAYS LATER, HE STARTED TALKING TO LAW ENFORCEMENT.

WHAT IS SIGNIFICANT ABOUT THAT, IS NOT ONLY DOES BETH MCGUFFIN CORROBORATE WHAT EVERYBODY ELSE SAID ABOUT CHAD FULKS, SHE HAD KNOWN HIM A LONG TIME, STACY WORKMAN CORROBORATES EVERYTHING YOU HEARD ABOUT CHAD FULKS, LARRY

TOMBLIN AND ANTHONY CREMEANS, THEY CORROBORATE WHAT YOU HEARD ABOUT CHAD FULKS. THEY TELL YOU THE OBSERVATIONS THEY HAD ABOUT BRANDON, WHICH IS CONSISTENT WITH EVERYBODY ELSE. YOU ALSO HAVE THE LETTERS THAT BRANDON IS WRITING, NOT KNOWING THAT LAW ENFORCEMENT IS GETTING THEM. YOU CAN TAKE A LOOK AT THOSE LETTERS AND YOU DECIDE WHETHER BRANDON BASHAM WAS TELLING THE TRUTH IN THOSE LETTERS. AND WHETHER OR NOT HE HAD A REASON TO SHADE THE TRUTH, AT THAT POINT, OR WAS HE TELLING BETH MCGUFFIN EXACTLY WHAT HAPPENED, THAT CHAD WENT OFF THE DEEP END?

LADIES AND GENTLEMEN, SHORTLY AFTER THEY LEFT BETH MCGUFFIN'S HOUSE, I DON'T REMEMBER EXACTLY HOW LONG IT WAS, THEY WENT TO THE ASHLAND MALL THERE AT ASHLAND AND THEY RAN INTO MS. FRANCIS AND HER DAUGHTER, BRANDON DID. CHAD FULKS WAS THERE, THERE IS NO QUESTION THAT HE DROPPED HIM OFF. YOU REMEMBER CORRECTLY, MS. FRANCIS TESTIFIED AND HER DAUGHTER TESTIFIED, THERE WAS A REFERENCE MADE TO WHEN BASHAM WALKED UP TO THE CAR ABOUT DID THEY KNOW WHERE GREENVILLE WAS OR SOMETHING TO THAT EFFECT. WELL, THERE IS A TOWN RIGHT NORTH, I GUESS, NORTHWEST OF THE AREA HERE WHERE THE PIN IS AT, WHICH IS CALLED GREENUP, I DON'T KNOW HOW YOU EXACTLY PRONOUNCE IT, OF KENTUCKY. NOW, MAYBE THAT IS WHAT HE WAS SAYING WHEN BRANDON WAS ASKING IF THEY KNEW DIRECTIONS TO GREENVILLE, BUT THE FACT OF THE MATTER IS THIS. WHO WOULD HAVE KNOWN THAT EXCEPT CHAD FULKS? HE IS THE ONLY ONE WHO

WOULD HAVE KNOWN THAT, I SUBMIT TO YOU. CHAD FULKS HAD SAID WE NEED TO GET ANOTHER CAR, WE NEED TO GET RID OF THE CAR WE HAVE, AND KNOWING THAT BRANDON BASHAM WOULD GO AHEAD AND GET THE CAR, KNOWING THAT BRANDON BASHAM COULDN'T DRIVE, HE SENT BRANDON BASHAM OUT TO GO AHEAD AND GET ANOTHER CAR. NOW, THE TESTIMONY IS, BY MS. FRANCIS AND HER DAUGHTER, THAT THE DAUGHTER WAS WALKING OUT TO THE VEHICLE, SHE WAS TALKING ON THE PHONE, SHE WAS STARTING TO GET IN THE VEHICLE, SHE OBSERVED MR. BASHAM WALKING TOWARD HER, AND SHE OBSERVED THE GUN. MS. FRANCIS, SHE OBSERVED THE SAME THING. SHE OBSERVED THE GUN. BOTH OF THEM HEARD BRANDON BASHAM ASKING FOR DIRECTIONS, AND BOTH OF THEM DISSUADED MR. BASHAM, TOLD HIM THEY DIDN'T KNOW, TOLD HIM TO GO INSIDE AND GET DIRECTIONS FROM INSIDE. BOTH OF THEM TOLD YOU THAT BRANDON BASHAM TRIED TO CONTINUE TO GET INTO THE CAR.

NOW, BRANDON BASHAM KNEW SHE HAD BEEN ON THE PHONE BECAUSE SHE WAS WALKING WITH THE PHONE. BUT WHAT HAPPENED? AT SOME POINT, FOR SOME REASON, LADIES AND GENTLEMEN, BRANDON BASHAM MADE A CONSCIOUS DECISION NOT TO ENTER THAT VEHICLE, NOT TO FORCE HIS WAY INTO THE VEHICLE. NOT TO FORCE THE WOMEN TO DRIVE AWAY. NOT TO FORCE THE WOMEN OUT OF THE VEHICLE AND TAKE THE CAR OR LET CHAD TAKE THE CAR, WHATEVER THE PLAN WAS. AT SOME POINT, FOR WHATEVER REASON, HE DECIDED TO WALK AWAY FROM THAT VEHICLE. NOW, THE REASON THAT IS SIGNIFICANT, THAT IS ONE OF THE OTHER SITUATIONS I AM

TALKING ABOUT WHERE YOU HAVE SIMILAR ACTS THAT THE GOVERNMENT ALLEGES AND THEY WANT YOU TO DRAW ONE INFERENCE FROM IT AS FAR AS THE INTENT.  WE ASK YOU TO DRAW ANOTHER INFERENCE FROM IT. BRANDON BASHAM, AT SOME POINT, DECIDED THAT HE WAS NOT GOING TO PURSUE THAT AND STARTED BACKING AWAY FROM THE CAR.  AND HE REALIZED THAT HE HAD FRIGHTENED MOTHER AND DAUGHTER.  HE REALIZED THAT THEY WERE SCARED.  AND HE KEPT APOLOGIZING OVER AND OVER AGAIN, ACCORDING TO THE TESTIMONY, FOR FRIGHTENING THEM AND SCARING THEM.

NOW, LADIES AND GENTLEMEN, THAT IS, AGAIN, ONE OF THOSE SITUATIONS THAT I ASK YOU TO LOOK AT, AS TO WHETHER OR NOT BRANDON BASHAM HAD THE INTENT TO HURT ANYBODY, LET ALONE KILL THEM.  BECAUSE, AT THAT OPPORTUNITY, WHEN HE WAS AT THAT MALL, AND HAD THE OPPORTUNITY TO GET IN THAT CAR AND TELL THEM TO DRIVE AWAY OR GET OUT OF THE VEHICLE, WHATEVER IT WAS THAT HE WAS GOING TO DO, WHATEVER THE PLAN WAS, HE STARTED BACKING AWAY FROM THE CAR, APOLOGIZED FOR GETTING THEM UPSET. I SUBMIT TO YOU, THAT IS NOT AN INDIVIDUAL WHO IS OUT TO HURT SOMEONE OR OUT TO KILL SOMEONE.  BECAUSE HE COULD HAVE DONE IT AGAIN.  THAT WOULD HAVE BEEN A TERRIBLE THING, NO QUESTION ABOUT IT, WHAT HAPPENED TO THEM IS A TERRIBLE THING. THEY BOTH HAVE TO LIVE WITH THAT.  BUT THE FACT OF THE MATTER IS THAT BRANDON BASHAM BACKED AWAY FROM THAT AND APOLOGIZED.

MATT DAVIS TRIED TO ARREST HIM WHEN HE ANSWERED THE CALL. NOW, LADIES AND GENTLEMEN, WITH RESPECT TO THAT SITUATION,

I WOULD LIKE YOU TO CONSIDER THIS.  THERE IS NO QUESTION, EVERYBODY AGREES, THAT THE FIRST SHOT THAT BRANDON BASHAM FIRED WAS UP IN THE AIR.  NO QUESTION ABOUT IT.  EVERYBODY AGREES FROM THE PHYSICAL EVIDENCE, FROM WHAT MR. DAVIS SAID, THE SECOND SHOT WAS FIRED TOWARD THE OFFICER.  NOW, THANK GOD HE WAS NOT HIT.  NOW, THE OFFICER RETURNED TWO SHOTS. IF YOU WILL RECALL CORRECTLY, HE COULD NOT HIT MR. BASHAM, SO HE DECIDED NOT TO FIRE.  NOW, THE GOVERNMENT BROUGHT OUT EVIDENCE ABOUT THE FACT THAT THERE WAS A ROUND UNDER THE HAMMER THAT HAD NOT BEEN FIRED, HAD IT BEEN FIRED IT WOULD HAVE BEEN MOVED ON THE CYLINDER, IT WOULD HAVE TURNED, YOU WOULD HAVE HAD A FIRED BULLET.  BUT THE FACT THAT THERE WAS STILL A LIVE ROUND THERE UNDER THE HAMMER INDICATED THAT, AT SOME POINT, THAT GUN HAD BEEN COCKED AND WAS READY TO BE FIRED, BUT HAD BEEN RELEASED BACK AND NOT FIRED.

NOW, MR. GASSER SAID WHAT HE WANTED YOU TO THINK THAT MR. BASHAM WAS LYING IN WAIT AND WAITING FOR AN OFFICER TO COME AND SHOOT HIM.  HE HAD THE GUN COCKED, PREPARED TO SHOOT. WELL, I WOULD SUGGEST THAT THERE IS ANOTHER INFERENCE THAT COULD BE DRAWN FROM THAT, AS WELL.  THAT MR. BASHAM MAY HAVE COCKED THE GUN, BUT, AGAIN, DECIDED ON HIS OWN NOT TO FIRE THE GUN THE THIRD TIME.  NOT LYING IN WAIT, JUST NOT TO FIRE THE GUN AT MR. DAVIS ANYMORE AND JUST TAKE OFF RUNNING, DITCHING THE GUN, AND JUMPING IN THE RIVER.  THE GOVERNMENT HAS ONE INFERENCE THEY ASK YOU TO DRAW; WE ASK YOU TO DRAW

ANOTHER INFERENCE  BASED ON THIS MAN'S CONDUCT.  BASED ON THE CONDUCT WITH MR. HAWKINS,  BASED ON THE CONDUCT WITH THE FRANCISES,  BASED ON HIS CONDUCT WITH CARL JORDAN.

WHEN BRANDON BASHAM WAS ARRESTED,  HE STARTED DISCUSSING, I BELIEVE THE FIRST AGENT WAS AGENT VITO,  WAS THE FIRST AGENT TO COME SEE HIM,  CAME TO SEE HIM ON THE MORNING OF THE 19TH. LADIES AND GENTLEMEN, AGENT VITO TOLD YOU THAT, AS AN FBI AGENT, HE IS TRAINED TO GO AHEAD AND SIT DOWN WITH THE SUSPECTS ON MULTIPLE OCCASIONS,  IF NECESSARY,  TO DRAW OUT INFORMATION.  BECAUSE IT IS NOT UNUSUAL THAT PEOPLE WHO SIT DOWN AND GIVE STATEMENTS TO THE POLICE DO NOT TELL ALL THE FIRST TIME THEY SIT DOWN.  THAT IT DOES REQUIRE, ON SOME OCCASIONS, SEVERAL DIFFERENT INTERVIEWS.  THAT IS THE SITUATION, THAT IS FROM MR. VITO'S OWN MOUTH, THAT IS WHY HE WAS PREPARED TO GO BACK ON SEVERAL DIFFERENT OCCASIONS.

NOW,  THE GOVERNMENT WANTS YOU TO DRAW FROM THAT THAT BRANDON BASHAM WAS LYING.  HE WASN'T TELLING THE TRUTH. WELL, THAT IS TRUE.  THERE WERE SOME THINGS HE WAS TELLING THE TRUTH ABOUT AND THERE WERE SOME OTHER THINGS HE WASN'T TELLING THE TRUTH ABOUT.  BUT, I SUBMIT TO YOU, THAT BY SITTING DOWN AND TALKING WITH THE FBI, AND FROM THE FBI'S OWN MOUTH,  FROM HIS OWN VERSION OF THE EVENTS, THAT IS NOT AN UNUSUAL THING, THAT IS WHY WE SIT DOWN WITH PEOPLE ON SEVERAL DIFFERENT OCCASIONS.  MR. VITO TOLD YOU HE WAS PREPARED TO GO SIT WITH HIM THAT MORNING, COME BACK THE NEXT MORNING, AND GO

AHEAD AND DRAW OUT THIS INFORMATION.  AND THAT IS WHAT HE DID.

WHAT IS SIGNIFICANT ABOUT THAT, THOUGH, THAT I WOULD LIKE YOU TO CONSIDER?  MR. BASHAM WAS EXPLAINED HIS RIGHTS. HE WAS EXPLAINED HE COULD HAVE A LAWYER, HAVE ONE APPOINTED FOR HIM IF HE COULDN'T AFFORD ONE.  EVERYTHING HE SAID WOULD BE USED AGAINST HIM.  HE DECIDED TO SPEAK WITH AGENT VITO WITHOUT A LAWYER.  THERE WAS NOTHING ON THE TABLE, NO OFFERS, NO DEALS BEING MADE.  HE DECIDED TO SPEAK WITH AGENT VITO WITHOUT A LAWYER.  AND WHAT HE TOLD HIM ON THAT FIRST OCCASION, HE TALKED ABOUT THE ESCAPE.  BY THE WAY, LET ME PUT IN IT CONTEXT FOR A MINUTE.  AGENT VITO SAID HE JUST WALKED IN THERE AND WANTED HIM TO TELL, TELL THEM WHAT HE KNEW.  ACCORDING TO AGENT VITO, HE NEVER TOLD HIM WHAT IT WAS HE WANTED TO SPEAK ABOUT, WHICH DOESN'T MAKE A WHOLE LOT OF SENSE.  BUT THE FACT OF THE MATTER IS, HE DID SIT DOWN, HE DID TALK WITH HIM.  I AM GOING TO RUN THROUGH THESE QUICKLY WITH YOU.

ON THE 19TH, THE MORNING OF THE 19TH, HE DID TALK ABOUT THE ESCAPE.  HE DID TALK ABOUT MR. HAWKINS.  HE TALKED ABOUT THE RING AND TAPING HIM TO A TREE.  HE MENTIONED ABOUT THE WOMEN, TINA AND ANDREA.  HE TALKED ABOUT STEALING PURSES.  HE TALKED ABOUT THE MOTELS THAT THEY HAD GONE TO.  HE TALKED ABOUT MS. FRANCIS AND HER DAUGHTER.  HE TALKED ABOUT FIRING AT THE OFFICER.  HE TALKED ABOUT THE FACT THAT HE HAD

WEAPONS.  WHEN MR. VITO ASKED HIM, SPECIFICALLY, ABOUT A WOMAN IN A BMW,  HE ADMITTED THAT HE KNEW ABOUT THE WOMAN IN THE BMW, BUT HE LIED ABOUT WHERE SHE WAS, SAYING THAT SHE WAS STILL IN ASHLAND AT THE MALL THE LAST TIME HE SAW HER, BUT HE ADMITTED THE ABDUCTION.  HE THOUGHT IT WAS GOING TO BE JUST LIKE THE HAWKINS' ABDUCTION, THAT IS WHAT HE TOLD THE AGENT. HE SAID THAT HE DID NOT WANT TO TIE HER UP.  HE SAID THAT FULKS GOT MAD AND DID IT HIMSELF.  HE TOLD YOU OR HE TOLD THE AGENT THAT FULKS WANTED HER TO CALL HOME,  WHICH IS SUPPORTED BY THE EVIDENCE.  AND HE TOLD MR. VITO ABOUT CARL JORDAN.

NOW,  IN THAT INTERVIEW, THAT FIRST INTERVIEW,  HE ADMITS TO AN AWFUL LOT OF CRIMES, NOT ASKING FOR COUNSEL,  WITHOUT HAVING ANY KIND OF DEALS.  HE ADMITS TO A LOT OF CRIMES. MR. VITO COMES BACK THE NEXT MORNING WITH MR. CHRISTIAN SENN. THEY AGAIN DISCUSS SOME THINGS.  I WILL BULLET POINT THESE WITH YOU.  TALKED ABOUT MR. HAWKINS AGAIN.  TALKED ABOUT MR. FULKS GIVING HIM THE KNIFE, TELLING HIM TO PULL IT ON MR. HAWKINS.  TOLD HIM ABOUT TAPING HIS HANDS AND BEING CONCERNED ABOUT HIS CIRCULATION.  TOLD YOU THAT HE ARGUED WITH FULKS ABOUT TYING HIM UP.  THAT HE WAS COLD,  HE WAS AFRAID HE WAS GOING TO BE COLD.  HE GAVE HIM THE RING.  ALL OF THAT IS SUPPORTED BY MR. HAWKINS.  HE SAID THAT FULKS GRABBED UP THE HAMMER, THEY ARGUED ABOUT IT.

HE TOLD MR. VITO ABOUT THE PURSES BEING STOLEN.  HE TOLD MR. VITO ABOUT CARL JORDAN AGAIN.  HE TALKED ABOUT

MS. DONOVAN'S ABDUCTION AGAIN. HE DID NOT WANT TO TAPE HER, DOES THAT SOUND FAMILIAR? THAT IS EXACTLY THE SAME SITUATION WITH MR. HAWKINS. MR. HAWKINS CAME IN AND TOLD YOU THAT. THAT IS WHAT MR. BASHAM HAD SAID. HE LOOSENED THE TAPE ON MS. DONOVAN'S HANDS, DOES THAT SOUND FAMILIAR? THAT IS EXACTLY WHAT HAPPENED WITH MR. HAWKINS. MR. HAWKINS CAME IN AND VERIFIED THAT FOR YOU. THAT FULKS USED THE CREDIT CARDS. HE TALKED ABOUT THE ASHLAND SITUATION AGAIN IN THE MALL. HE TALKED ABOUT MS. FRANCIS AND HER DAUGHTER. TALKED ABOUT THE POLICE OFFICER. AND ON THE MORNING OF NOVEMBER 19TH, HE TOLD YOU THAT HE BELIEVED MS. DONOVAN WAS DEAD. TOLD THE OFFICER THAT -- I'M SORRY, SPECIAL AGENT VITO, AND SPECIAL AGENT CHRISTIAN SENN. IT WAS HIS BELIEF, UPON CHAD FULKS COMING BACK TO THE MOTEL, AND TALKING TO HIM, MS. DONOVAN, HE BELIEVED SHE WAS DEAD.

THE GOVERNMENT WENT THROUGH A WHOLE LOT OF OTHER THINGS OF WHAT WAS GOING ON, HE WOULDN'T TELL THEM. HE WAS LEADING THEM ON FALSE HOPES. HE TOLD THEM ON THE 19TH, HE TOLD THEM THAT HE BELIEVED SHE WAS DEAD. HE TOLD AGENT VITO THAT FULKS HAD DROPPED HIM OFF. FULKS SAID HE WOULD KILL HIS FAMILY. HE TOLD THEM ABOUT BETH MCGUFFIN, MENTIONED HER NAME. TOLD THEM ON MANY OCCASIONS ABOUT FULKS RIPPING OFF ONE DRUG DEALER, OR ANOTHER IN ORDER TO GET MONEY. HE MAY NOT HAVE TOLD EVERYTHING ABOUT WHAT HAPPENED WITH MS. DONOVAN. AGAIN, OVER, AND OVER, AND OVER AGAIN HE IS ADMITTING PARTICIPATION

IN VERY, VERY SERIOUS CRIMES. AND THE AGENTS ARE DEVELOPING THE STORY WITH RESPECT TO WHAT HAPPENED TO MS. DONOVAN. AGAIN, HE WAS TOLD HE HAD A RIGHT TO A LAWYER. HE DIDN'T INVOKE HIS RIGHT TO HAVE A LAWYER. HE KNEW THERE WAS NO DEALS ON THE TABLE.

ON NOVEMBER 20TH, MR. MALEY AND MR. VITO CAME BACK AND SPOKE WITH HIM, AGAIN. THIS IS THE SITUATION WHERE BARBARA MCGUIRE FROM THE PUBLIC DEFENDER'S OFFICE, CAME IN AND TALKED TO MR. BASHAM FOR AN HOUR. BOTH BEFORE AND AFTER MS. MCGUIRE CAME IN AND TALKED TO BRANDON BASHAM AND OBVIOUSLY WOULD HAVE TOLD HIM NOT TO TALK WITH THE OFFICERS, BRANDON BASHAM MADE THE DECISION WITHOUT ANY DEALS BEING ON THE TABLE TO TALK TO THE OFFICERS, TO GIVE THEM INFORMATION, TO CONTINUE TALKING WITH THEM, NOT TO ASK FOR A LAWYER, KNOWING THAT WHATEVER HE WAS TELLING THEM COULD BE USED AGAINST HIM.

HE TOLD THEM ON THAT DAY IT WAS HIS IDEA TO DO THE BURGLARIES. HE TOLD THEM ABOUT THE ABDUCTION OF MS. DONOVAN. HE TOLD THEM THAT WHEN FULKS CAME BACK, HE WAS WORRIED BECAUSE HE HAD HAD SEX WITH THE WOMAN. AND HE WAS WORRIED BECAUSE HE EJACULATED. HE ALSO SAID THAT MR. FULKS TOLD HIM THAT HE COULD HAVE DONE THAT, AS WELL. HE SAID HE DID NOT WANT TO DO THAT.

NOW, THE GOVERNMENT CAN ARGUE ALL THEY WANT TO ABOUT WHAT HAPPENED OUT THERE. BUT I WILL SUGGEST THIS TO YOU. OUT OF BRANDON BASHAM'S OWN MOUTH ON NOVEMBER 20TH, HE TOLD SPECIAL

AGENT VITO AND SPECIAL AGENT CHRISTIAN SENN THAT CHAD FULKS HAD SAID HE HAD SEX WITH THE WOMAN AND HE WAS WORRIED ABOUT IT BECAUSE HE HAD EJACULATED.   GUESS WHAT? AFTER A VERY EXTENSIVE SEARCH AND SENDING HUNDREDS OF ITEMS OFF TO THE FBI LABORATORIES,  WHOSE SEMEN WAS IDENTIFIED ON THE BACK SEAT OF THE BMW? AND WHOSE SEMEN ONLY? CHAD FULKS.   THERE IS NO EVIDENCE THAT BRANDON BASHAM EVER DID ANYTHING LIKE THAT WITH ALICE DONOVAN.   AND MR. HARRIS ASKED A LOT OF QUESTIONS OF THOSE FOLKS FROM WASHINGTON,  THE LABS, ABOUT WHAT EVIDENCE THEY PURSUED,  WHAT THINGS DID THEY TEST, WHAT DID THEY LOOK AT.   AND THE ONLY THING THAT THEY WERE ABLE TO COME UP WITH IN ALL THE THINGS THEY SEARCHED,  ALL OF THE THINGS THEY TESTED,  WAS SEMEN ON THE BACK SEAT THAT BELONGED, WITHOUT QUESTION, TO CHAD FULKS.   THERE WAS NO CONNECTION,  NO BLOOD, NO SEMEN TO BRANDON BASHAM.

YES,  THERE WERE SOME FINGERPRINTS.   YES,  THERE WAS A HAIR.   BUT THERE WAS NO INDICATION OF ANY BLOOD OR ANY SEMEN. AS A MATTER OF FACT, THE ONLY BLOOD THAT WAS FOUND AT ALL WAS ON THE LEATHER JACKET THAT BELONGED TO BRANDON AND IT WAS HIS BLOOD AND,  SPECIFICALLY,  ALICE DONOVAN'S DNA WAS RULED OUT, THAT IT WASN'T HERS.  THAT IS THE EVIDENCE,  THE FORENSIC EVIDENCE IN THE CASE.

NOW,  COMING CLOSE TO THE END.   I APPRECIATE YOUR ENDURING WITH ME.   IT IS A LOT MORE INFORMATION THAN I THOUGHT ABOUT WHEN I STARTED TALKING TO YOU HOW MUCH

INFORMATION THERE REALLY IS THAT NEEDS TO BE ADDRESSED, I APOLOGIZE.

ON NOVEMBER 25TH, HE SITS DOWN WITH RICHARD HUGHES, VERY EXPERIENCED CRIMINAL LAWYER OUT OF KENTUCKY. HE IS APPOINTED TO REPRESENT HIM. AND MR. HUGHES TALKS WITH MR. BASHAM. THEY MAKE AN ARRANGEMENT TO SIT DOWN WITH THE FBI AT THE JAIL. NOW, YOU REMEMBER AGENT MALEY TESTIFIED HE LEFT HIM ON THE 20TH,, HE DIDN'T SPEAK WITH MR. HUGHES UNTIL THE 25TH. THERE WAS A WHOLE FIVE DAYS THERE WHEN MR. BASHAM DIDN'T DO ANYTHING. THE FACT OF THE MATTER IS THAT AGENT MALEY DID TELL YOU THAT MR. BASHAM DID LEAVE A MESSAGE AT HIS OFFICE. HE DID NOT KNOW WHEN THE MESSAGE HAD BEEN LEFT AT HIS OFFICE. LADIES AND GENTLEMEN, IT COULD HAVE BEEN LEFT THE VERY NEXT DAY ON THE 21ST. IT WAS OBVIOUS THAT MR. BASHAM WAS TRYING TO CONTINUE AND ASSIST THEM. WE ARE NOT STANDING HERE TELLING YOU HE WAS TELLING THE WHOLE TRUTH; HE WASN'T TELLING THE TRUTH. HE WAS TELLING THE TRUTH ABOUT SOME THINGS AND NOT THE TRUTH ABOUT OTHERS. HE DID TRY TO GET IN TOUCH WITH MR. MALEY. ON THE 25TH, THEY DID GET BACK TOGETHER.

THEY HAD AN ARRANGEMENT WORKED OUT. MR. BASHAM WOULD SIT IN THE JAIL, MR. HUGHES WOULD BE THERE, HE WOULD ADVISE HIM OF HIS RIGHT, HIS LAWYER TELLING THE CLIENT ABOUT HIS RIGHTS, THAT HE DIDN'T HAVE TO TALK, THAT ANYTHING HE SAID WOULD BE USED AGAINST HIM, THE FBI REITERATED THAT. DESPITE KNOWING THAT, DESPITE KNOWING THAT THERE WERE NO DEALS ON THE TABLE,

NO CONSIDERATION BEING GIVEN, MR. HUGHES, IF YOU REMEMBER RIGHT, HAD TALKED TO THE U. S. ATTORNEY DOWN HERE IN SOUTH CAROLINA, DESPITE THAT, MR. BASHAM DECIDED TO TALK WITH THE AGENTS IN SOUTH CAROLINA.

NOW, WE ARGUED ABOUT WHETHER OR NOT HE WAS TALKING DIRECTLY TO THE AGENT IN SOUTH CAROLINA. LADIES AND GENTLEMEN, HE WAS TALKING TO THE AGENTS IN SOUTH CAROLINA THROUGH MR. HUGHES. THAT IS WHAT HE WAS DOING. THE AGENTS IN KENTUCKY WERE TALKING WITH HIM. IF THEY HAD A QUESTION, THEY ASKED A QUESTION. MR. HARRIS, WHEN HE WAS TALKING TO MR. MALEY, BROUGHT THAT OUT.

BUT WHAT DO WE KNOW FROM THAT CONVERSATION? WE KNOW FROM MR. LONG THAT MR. BASHAM, HE WASN'T GIVING MR. BASHAM ANY INFORMATION. WE KNOW MR. BASHAM WAS GIVING HIM INFORMATION THAT MR. BASHAM COULD NOT HAVE KNOWN ABOUT UNLESS HE HAD BEEN THERE. NOW, THE GOVERNMENT MINIMIZES HIS EFFORTS. I WANT TO TALK TO YOU ABOUT THAT IN A MINUTE. THE GOVERNMENT SAID HE GAVE THEM A MAP OF THE SAVANNAH BLUFF, LED THEM ON AN AREA DOWN THERE. IF YOU REMEMBER RIGHT, HE DREW A MAP, VERY SOPHISTICATED MAP. I THINK IT WAS RODNEY SESSIONS LOOKED AT THE MAP RECOGNIZED THE SAVANNAH BLUFF AREA. HE SENT IT DOWN TO SOUTH CAROLINA. BRANDON BASHAM, HIMSELF, DIDN'T DRAW THE MAP. I WANT TO MAKE THAT VERY CLEAR. BUT RODNEY SESSIONS SAID HE THOUGHT HE RECOGNIZED THAT AREA. BUT NOTWITHSTANDING THAT, ON THE 25TH, BRANDON BASHAM IS VERY FORTHCOMING.

NOW, IF BRANDON BASHAM WAS TRYING TO STILL LEAD THE POLICE ON A WILD GOOSE CHASE, THEN WHY WAS HE DIRECTING THEM TO A LOCATION THAT HE HAD NO IDEA THEY KNEW ABOUT? REMEMBER, AT THE TIME, ON THE 25TH, HE HAD NO IDEA THAT THEY KNEW ABOUT THAT LOCATION, THAT HIS CAR HAD BEEN SPOTTED. HE WAS TELLING ABOUT SOMETHING HE WAS NOT AWARE THAT THEY WERE AWARE OF. SO, WHAT THE GOVERNMENT IS SAYING TO YOU IS THAT MR. BASHAM WAS LEADING LAW ENFORCEMENT ON A WILD GOOSE CHASE IN THAT AREA. BUT HE WAS TAKING THEM TO AN AREA THAT HE DID NOT KNOW THEY KNEW HE HAD BEEN AT. BE NO REASON TO TELL LAW ENFORCEMENT ABOUT AN AREA IF THAT IS WHERE SOMETHING HAPPENED THAT HE DID NOT KNOW THEY KNEW ABOUT. NONE OF WHICH MAKES ANY SENSE. HE IS DIRECTING THEM TO THAT LOCATION. IF HE IS LEADING THEM ON A WILD GOOSE CHASE, AND I SUBMIT TO YOU THAT BRANDON BASHAM WAS NOT LEADING THEM ON A WILD GOOSE CHASE, I SUBMIT TO YOU THAT SOMETHING DID HAPPEN THERE, SOMETHING WAS THERE, IT JUST WASN'T FOUND. WHETHER IT WAS EVIDENCE OR WHETHER OR NOT IT WAS MS. DONOVAN'S BODY, THERE IS NO QUESTION THAT BRANDON BASHAM AND CHAD FULKS HAD BEEN THERE. THERE IS NO QUESTION THAT MS. DONOVAN HAD BEEN THERE. AND IF BRANDON BASHAM WAS TRYING TO LEAD THEM ON THIS WILD GOOSE CHASE, WHY DID HE DIRECT THEM TO THE ONE LOCATION WHERE THEY COULD POSSIBLY FIND PHYSICAL EVIDENCE IN THE CASE? THAT MAKES NO SENSE. ABSOLUTELY MAKES NO SENSE AT ALL.

NOW, WHEN BRANDON BASHAM GOT ON THE PHONE, HE TOLD THEM

ABOUT THE GAS STATION. HE TOLD THEM IT WAS A NEW GAS STATION, POSSIBLY BP, TURNED OUT TO BE AMOCO. HE DESCRIBED THE PUMP, DESCRIBED THE LOCATION, HE DID NOT KNOW THAT THE POLICE KNEW ABOUT THE AMOCO STATION. HE DESCRIBED A BANK BEING NEAR THERE. HE TALKED ABOUT THE ATM MACHINE. HE TALKED THROUGH MR. HUGHES THE FACT THAT YOU HAVE THE ATM RECEIPTS, IF YOU HAVE THE ATM RECEIPTS, YOU CAN LOCATE EXACTLY WHERE WE WERE. HE DIDN'T KNOW THAT THEY KNEW THAT ALREADY.

HE STARTS DESCRIBING THE ROUTE THEY TOOK WHEN THEY LEFT THE AMOCO STATION. AND IT WAS SOMETHING LIKE THIS. GREEN HILL ROAD. THEY WENT TO GREEN HILL ROAD, WHICH IS ABOUT 20 MINUTES AWAY. WENT TO BEE TREE ROAD, WENT TO THE CEMETERY. NOW, LET ME BRIEFLY TOUCH ON EACH ONE OF THOSE POINTS. FIRST OF ALL, BRANDON BASHAM GAVE THEM PRECISE DIRECTIONS. HIS TIMES WERE CORRECT, THE LOCATIONS WERE CORRECT, THE TURNS, AS BEST HE COULD, WERE CORRECT. HE DESCRIBED THE BEE TREE FARMS. HE DIDN'T KNOW WHAT THE NAME OF IT WAS, BUT HE DESCRIBED THE LOCATION. AND HOW DID HE DESCRIBE IT? HE DROVE IN THERE, THERE WERE THREE MEN THERE, WE WERE AT A DEAD END, THEY WERE BARBECUING, WE TURNED AROUND AND WENT BACK OUT.

NOW, LADIES AND GENTLEMEN, BRANDON BASHAM DIDN'T KNOW THAT THOSE MEN HAD ALREADY REPORTED THE FACT THAT THEY HAD SEEN THAT VEHICLE THERE THAT DAY. IF HE WAS LEADING THE POLICE ON A WILD GOOSE CHASE, HE WOULD HAVE HAD TO HAVE BEEN

ABSOLUTELY STUPID, MORE STUPID THAN ANYBODY SAID HE WAS TO GO AHEAD AND TAKE THEM TO THAT ONE PLACE. HE WAS TRYING TO HELP. HE WAS TRYING TO HELP. HE ALSO DESCRIBED THE CEMETERY. HE DID NOT KNOW THAT THEY ALREADY KNEW ABOUT A CEMETERY. HE EVEN SAID THAT THERE WERE TWO MEN AT THE CEMETERY HAD SPOOKED HIM. HE DID NOT KNOW THAT RONALD PERDUE HAD ALREADY TOLD THEM ABOUT THAT. THEY HAD SEEN THE CAR THERE. BRANDON BASHAM GAVE THE POLICE INFORMATION ABOUT THE LOCATIONS, ABOUT THE DIRECTIONS, ABOUT THE TIME IT TOOK BETWEEN DIFFERENT PLACES AND PINPOINTED IT EXACTLY WITHOUT ANY HELP FROM LAW ENFORCEMENT. HE GAVE UP THE LOCATION, AS BEST HE COULD, ON NOVEMBER 25TH. AND ALL OF THAT, ALL OF THAT IS VERIFIED BY LAW ENFORCEMENT, THROUGH MR. LONG, SHERIFF HEWITT, FROM MR. CROCKER, FROM MR. MALEY, FROM MR. VITO. THAT WAS THE INFORMATION GIVEN TO LAW ENFORCEMENT BY BRANDON BASHAM ON THE 25TH. BRANDON BASHAM EVEN SAID ON THAT OCCASION, IF I GET DOWN THERE, MAYBE I CAN LOCATE IT.

SHORTLY AFTER THAT INTERVIEW, ONE MORE THING THAT HE BROUGHT OUT, HE TALKED ABOUT THE ANIMAL SIGN. HE REMEMBERS AN ANIMAL SIGN. LADIES AND GENTLEMEN, YOU HAVE HEARD TESTIMONY, ALL SORTS OF REFUGES THERE, ALL SORTS OF RESERVES, ALL SORTS OF LOCATIONS DEAL WITH ANIMALS. IT IS VERY POSSIBLE THERE ARE SIGNS ALL THROUGHOUT THAT AREA. YOU ALSO HEARD THAT THERE IS A MAZE IN THERE. NUMEROUS ROADS, HUNDREDS OF MILES OF DIRT ROADS. WHEN BRANDON BASHAM AND MR.

HUGHES BROKE UP THAT EVENING, YOU REMEMBER MR. HUGHES TOLD YOU, YOU HEARD IT FROM MR. MALEY, THAT BRANDON BASHAM SAID, FOR WHATEVER THE BENEFIT IS, I WANT YOU TO CALL THE FAMILY OR CALL LAW ENFORCEMENT AND TELL THEM ABOUT MS. BURNS, WHERE HER BODY IS LOCATED. FOR WHATEVER BENEFIT IT IS.

NOW, LADIES AND GENTLEMEN, THAT IS REACHING OUT. IT MAY NOT BE SOMETHING THAT LAW ENFORCEMENT PLACES A WHOLE LOT OF SIGNIFICANCE ON RIGHT NOW, IT IS SIGNIFICANT THAT MR. BASHAM DID REACH OUT AND TRY TO DO THAT. IF YOU REMEMBER CORRECTLY, MR. HUGHES SAID WHEN HE WAS TELLING MR. MALEY ABOUT THAT, HE HAD THE LOCATION WRONG. HE HAD SUGGESTED IT WAS SOME OTHER TOWN UP RIVER BECAUSE MR. BASHAM WASN'T QUITE SURE OF THE PRONUNCIATION. BUT A COUPLE OF DAYS LATER WHEN HE SPOKE WITH MR. CICCARELLI, AND HE WENT OUT AND DROVE THE AREA HIMSELF, HE REALIZED THE AREA MR. BASHAM WAS TALKING ABOUT WAS RIGHT WHERE THE CONVERGENCE OF THE GUYANDOTTE AND THE OHIO RIVER WERE. THAT HE REDIRECTED MR. CICCARELLI IN HIS SEARCH. HE WASN'T BEING MISLED BY MR. BASHAM, IT WAS MR. HUGHES THAT MADE THE MISTAKE.

NOW, I SAID THERE WAS A SIGNIFICANCE ABOUT THAT GUYANDOTTE AREA, GUYANDOTTE BOAT RAMP. WHO KNEW ABOUT THAT AREA? WHO HAD GONE TO BUY DRUGS IN THAT AREA WHEN HE WAS VISITING BETH MCGUFFIN? CHAD FULKS. HE KNEW THAT AREA. SEVERAL MONTHS LATER, IN 2003, CHAD FULKS STARTS DIRECTING PEOPLE IN THAT AREA. WHEN MR. BASHAM COMES DOWN HERE ON THE

28TH, AND I AM GETTING TO THE END, HE COMES DOWN HERE, HE IS APPOINTED TWO MORE LAWYERS, MR. MONCKTON AND MR. LITTLEJOHN. AND HE CONTINUES ON THE PATH THAT HE HAD STARTED BACK ON THE 19TH, BACK ON THE 20TH, STARTING TO GIVE LITTLE BITS OF INFORMATION AS TIME WENT ON.  AGAIN, ON THE 25TH WHEN HE WAS GIVING THE INFORMATION TO LAW ENFORCEMENT OVER THE PHONE THROUGH MR. HUGHES.  GIVING THE INFORMATION TO GIVE TO MR. HUGHES TO GIVE TO MR. MALEY ABOUT MS. BURNS.  WHEN HE COMES DOWN HERE, HE DECIDES TO TAKE LAW ENFORCEMENT UP TO THE AREA IN NORTH CAROLINA THINKING THAT HE COULD MAYBE HELP LAW ENFORCEMENT.

NOW, AT THAT POINT, LADIES AND GENTLEMEN, I WANT TO REFRESH WHAT WE KNOW.  THIS ATM CARD WAS USED AT THE AMOCO STATION.  ALREADY HAD VIDEO SHOWING CHAD FULKS IN THERE. ALREADY HAD THE PHONE CALL THAT WAS MADE, I THINK, AT 4:26. WE KNOW THE ATM'S WERE USED SOMEWHERE BETWEEN 3:30, 4:30 IN THAT AREA.  THE CELL TOWER AT 4:26.  THAT INFORMATION IS ALREADY KNOWN.  MR. DRIGGERS HAD ALREADY IDENTIFIED THE FACT THEY HAD BEEN AT BEE TREE FARMS; MR. PERDUE HAD IDENTIFIED THE FACT THEY HAD BEEN TO THE CEMETERY; MR. BASHAM HAD IDENTIFIED THE DIFFERENT DISTANCES IN THE ROAD THAT THEY TOOK.  MR. BASHAM HAD TWO MORE LAWYERS, AND WITHOUT ANY KIND OF DEAL ON THE TABLE, NO CONSIDERATION WHATSOEVER, HE TAKES LAW ENFORCEMENT UP IN THAT AREA AND TRIES TO FIND THE LOCATION.

A COUPLE OF THINGS I WOULD LIKE YOU TO CONSIDER.  MR.

LONG SAID THAT HE THOUGHT EVERYTHING WAS GOING FINE UNTIL THEY REALIZED THAT ONE OF THE TURNS THAT MR. BASHAM SAID THEY COULDN'T FIND, THEY COULDN'T FIND IMMEDIATELY, MR. BASHAM SAID WHEN WE CAME OUT OF BEE TREE FARMS WE WENT ON A DIRT ROAD FOR ABOUT 20 MINUTES.  IF YOU WENT ON BEE TREE FARMS, YOU COULDN'T GO ON A DIRT ROAD FOR 20 MINUTES, THERE HAD TO BE A LEFT TURN SOMEWHERE.  THERE WERE A NUMBER OF LEFT TURNS ONCE YOU GOT BACK ON THE BLACKTOP, ALL OF WHICH LED TO INTERNATIONAL PAPER PROPERTY.  LADIES AND GENTLEMEN, THAT AREA IS JUST, LITERALLY, HUNDREDS AND HUNDREDS OF MILES OF DIRT ROADS.  THEY ALL LOOK THE SAME, ALL HAVE THE SAME TREES, ALL HAVE THE SAME TYPE ROAD, MAYBE A HOUSE HERE OR BUILDING HERE.  ESSENTIALLY, IT IS A MAZE.  THAT IS HOW IT WAS DESCRIBED.  WHEN MR. BASHAM WAS OUT THERE THAT DAY, I REMIND YOU OF THIS, AS MR. LONG SAID, IT WAS BRIGHT AND SUNNY. WHAT TIME WAS MR. BASHAM, WHAT TIME WAS MR. FULKS AND MS. DONOVAN UP IN THAT AREA? WE KNOW THAT THE PHONE CALL WAS MADE AROUND 4:26.  WE KNOW THAT FROM THAT AREA OF THAT PHONE CALL, IT IS AT LEAST 20 OR 30 MINUTES TO BEE TREE FARMS.  WE ARE TALKING ABOUT FIVE OR AFTER 5:00 O'CLOCK IN NOVEMBER. LADIES AND GENTLEMEN, DUSK IS HAPPENING AROUND THAT TIME.  IT IS GETTING DARK OR IS DARK.

SO, THE GOVERNMENT, AT THIS POINT, IS SAYING TO MR. BASHAM, YOU DIDN'T TRY AND HELP, YOU LED US ON A WILD GOOSE CHASE UP IN THAT AREA.  WHEN MR. BASHAM HAD NEVER BEEN IN

THAT AREA BEFORE, EXCEPT WHEN HE HAD BEEN WITH MR. FULKS AND MS. DONOVAN. IT IS OBVIOUS HE HAD BEEN THERE. IT IS IN THE EVENING HE WAS THERE. ALL THE ROADS LOOK THE SAME, ALL THE TREES LOOK THE SAME. AND LAW ENFORCEMENT IS OUT THERE ON NOVEMBER WHEN THEY WENT OUT THERE ON THEIR SEARCH, BRIGHT AND SUNNY DAY, THEY CAN'T FIND THE ROADS. HOW WAS BRANDON BASHAM SUPPOSED TO LOCATE THOSE ROADS? IT IS JUST NOT REALISTIC. HE TRIED, BUT IT IS NOT REALISTIC.

SHERIFF HEWITT, MR. GASSER ADDRESSED ABOUT BRANDON LEON BASHAM'S RESPONSES ON THE ROAD, SOME EMOTIONAL. I SUBMIT TO YOU, IF NOTHING HAPPENED ON THAT ROAD, HE WOULDN'T BE EMOTIONAL. HE SAID TO YOU ABOUT WHEN THE DEER RAN OUT. BRANDON BASHAM SAID, THERE GOES A DEER, I COULDN'T HURT A DEER AND LOOK WHAT I HAVE -- HE DIDN'T FINISH THE SENTENCE. THE LAWYER WOULDN'T LET HIM FINISH THE SENTENCE. WE DON'T KNOW WHAT HE WOULD HAVE SAID. HERE I HAVE BEEN CHARGED? HERE I AM ACCUSED? THE GOVERNMENT WANTS YOU TO DRAW AN INFERENCE IN THEIR FAVOR, WANT YOU TO DO, ASK YOU TO DO THAT, THAT HE WAS SAYING SOMETHING BEYOND THAT. HERE I HAVE DONE SOMETHING TO ALICE DONOVAN, I DON'T KNOW WHAT HE WAS GOING TO SAY. NEITHER DOES THE GOVERNMENT. BUT WE DO KNOW THIS, THAT BRANDON BASHAM WAS SAYING I COULDN'T EVEN HURT A DEER AND HERE I HAVE, WHICH INDICATES TO ME, I SUGGEST TO YOU, THAT MAYBE HE WASN'T GOING TO SAY WHAT THE GOVERNMENT WANTS YOU TO THINK HE WAS GOING TO SAY.

THE OTHER THING THAT WAS TALKED ABOUT OUT THERE WAS THE STRAP. LADIES AND GENTLEMEN, IF BRANDON BASHAM WASN'T TRYING TO HELP THEM, WE ALREADY KNOW HE HAD TAKEN THEM TO THE AREA ON THE 25TH, TOOK THEM PHYSICALLY TO THE AREA ON THE 28TH, IF HE WASN'T TRYING TO HELP, WHY WOULD HE HAVE TOLD THEM ABOUT THE STRAP? HE WAS TRYING TO HELP. THAT IS WHY HE WAS TELLING THEM ABOUT THE STRAP. BUT BY TELLING THEM ABOUT THE STRAP AND SHOWING THEM HOW THE STRAP WAS USED, THE GOVERNMENT IS AUTOMATICALLY ASKING YOU TO CONSIDER THAT BRANDON BASHAM WAS THE ONE THAT DID THE ACT WITH THE STRAP. THAT IS WHAT THEY ARE ASKING, AT THE CONCLUSION, THEY ARE ASKING YOU TO DRAW. ALL OF THE TERRIBLE THINGS THAT MR. BASHAM AND MR. FULKS MAY HAVE DONE TO MS. DONOVAN OUT THERE. THE FACT OF THE MATTER IS, FROM THE OTHER EVIDENCE YOU HAVE HEARD IN THE CASE, IT IS MORE LIKELY THAT CHAD FULKS WAS THE ONE THAT DID THE STRANGULATION WITH THE STRAP, IF THAT IS WHAT HAPPENED. THE FACT OF THE MATTER IS, THAT JUST BECAUSE BRANDON BASHAM SHOWED THEM WHAT HAPPENED, HE DIDN'T SAY, I DID IT. HE JUST SHOWED THEM WHAT HAPPENED. BY DOING THAT, THE GOVERNMENT WANTS YOU TO AUTOMATICALLY DRAW THE INFERENCE THAT HE WAS SAYING HE DID IT. WHEN MORE THAN LIKELY IT WAS CHAD FULKS DOING IT.

I KNOW YOU WANT TO GET TO LUNCH, AND I DO, TOO. TWO MORE THINGS BEFORE I GO. BRANDON BASHAM WAS IN CUSTODY ON THE 17TH. HE DID SOME TERRIBLE THINGS ON THAT DAY, AS WELL AS

SOME TERRIBLE THINGS BEFORE THAT. CHAD FULKS WAS STILL ON THE RUN. ON THE 18TH, CHAD FULKS CHANGED LICENSE PLATES ON THE VEHICLE FROM WHEN HE LEFT WEST VIRGINIA. HE WAS STILL DOING WHAT HE HAD DONE BEFORE BRANDON GOT ARRESTED. ON THE 19TH, WHEN HE WAS APPREHENDED IN INDIANA, HE HAD CHANGED THE VEHICLE LICENSE AGAIN, IF I RECALL CORRECTLY. TWO DIFFERENT LICENSE PLATES ON THE VEHICLE. SO, HE WAS CONTINUING THAT TYPE ACTIVITY.

ON THE 18TH, WHEN TROOPER MALO TRIED TO MAKE A STOP ON HIM, WHAT DID HE TRY TO DO? HE TRIED TO KILL A HIGHWAY PATROLMAN. HE TRIED TO RUN HIM DOWN. BUT ONE OF THE OTHER THINGS THAT I ASK YOU TO CONSIDER, WHEN YOU WEIGH EVERYTHING HERE AS TO WHO HAD THE INTENT TO HURT, WHO HAD THE INTENT TO KILL? THAT WAS THE SITUATION WITH AMY WARD. THAT LICENSE, HER ID HAD BEEN STOLEN ON THE 10TH, NEAR PIKETON, OHIO BY CHAD FULKS. AFTER BRANDON BASHAM HAS BEEN ARRESTED AND CHAD FULKS IS ON HIS WAY TO WHO KNOWS WHERE, OBVIOUSLY, TO GO SEE HIS BROTHER, AND DUMP THE CAR, AND GET HIS BROTHER TO LIE WITH HIM FOR A WHILE, HE HAS STILL GOT THAT THIRST. HE HAS GOT THAT DESIRE. HE IS STILL GOING TO TRY TO LURE ANOTHER YOUNG LADY INTO HIS WEB. AND HE CALLS FROM THE NUMBERS HE GOT OFF THE PHONE OR THE ID, AND HE CALLS AND SPEAKS TO MS. WARD AND SAID, YOUR DAUGHTER HAS AN APPOINTMENT WITH US FOR A JOB INTERVIEW AT 10:30.

NOW, FOLKS, THAT IS A SIGNIFICANT EVENT. IT IS A

SIGNIFICANT EVENT BECAUSE BASHAM IS GONE, FULKS IS STILL ON THE RUN. BUT WHILE HE IS ON THE RUN, HE HAS STILL GOT THE THIRST FOR ANOTHER WOMAN. AND HE HAS STILL GOT THE THIRST TO LURE HER OUT AND DO WHATEVER HE WAS GOING TO DO LONG AFTER BRANDON BASHAM WAS IN CUSTODY. NOW, I SUGGEST TO YOU, PLEASE WEIGH THAT TO SEE WHO IT WAS, WHO IS THE INDIVIDUAL WHO HAD THE THIRST. WHO WAS THE INDIVIDUAL WHO WAS LOOKING TO HURT? WHO WAS THE INDIVIDUAL LOOKING TO KILL? I WOULD SUGGEST TO YOU THAT IT IS STILL CHAD FULKS. AND EVEN AFTER HIS BUDDY IS GONE, HE IS STILL TRYING TO GET ANOTHER YOUNG LADY.

LADIES AND GENTLEMEN, THANK YOU FOR YOUR PATIENCE. I APOLOGIZE FOR HAVING TO HAVE TRIED TO COVER ALL THIS. THE GOVERNMENT GETS TO COME UP AGAIN, PROBABLY AFTER LUNCH. THEY GET TO REFUTE A LOT THAT I GET TO SAY. THERE IS AN AWFUL LOT OF EVIDENCE TO COVER, OTHER LOT OF INFORMATION TO COVER. IT TOOK A LITTLE LONGER THAN I THOUGHT IT WOULD. I APPRECIATE YOUR ATTENTION. I HAVE GONE OVER WITH YOU THE DIFFERENT VERDICTS THAT COULD PROBABLY BE BROUGHT IN THIS CASE. JUST LIKE MR. GASSER SAID, ALL WE CAN ASK OF YOU TODAY IS JUSTICE. IT IS NOT A GAME. IT IS NOT A CONTEST BETWEEN THE GOVERNMENT LAWYERS AND ME AND MR. HARRIS ABOUT WHO IS GOING TO WIN AND WHO IS GOING TO LOSE. THE ISSUE IS, CAN JUSTICE BE DONE? THAT IS WHAT YOU ARE HERE FOR. WE BELIEVE THAT MANY OF THESE CRIMES HAVE BEEN PROVEN, BUT WE SUBMIT TO YOU THAT, WITH RESPECT TO THE CARJACKING, THERE WAS NO INTENT TO HURT OR HARM

**JA 1554**

MS. DONOVAN WHEN THE CAR WAS TAKEN. THERE WAS NO INTENT ON THE PART OF MR. BASHAM, AT ANY TIME, TO HURT MS. DONOVAN IN THE KIDNAPPING.

WE ASK YOU FOR A JUST VERDICT.

THANK YOU.

THE COURT: THANK YOU, MR. SWERLING. MR. GASSER, I AM GOING TO BREAK FOR LUNCH NOW. CAN YOU GIVE ME SOME PREVIEW OF HOW LONG YOUR REBUTTAL ARGUMENT WILL TAKE?

MR. GASSER: I BELIEVE BREAKING FOR LUNCH, ALLOWING ME TO ARRANGE MY THOUGHTS, I KNOW EVERYBODY IS READY, I WILL TRY TO GET IT IN IN 30 MINUTES.

THE COURT: MEMBERS OF THE JURY, LET'S GO AHEAD AND BREAK FOR LUNCH, AT THIS TIME. BREAK FOR AN HOUR AND 15 MINUTES. WHEN YOU COME BACK, YOU WILL HEAR THE GOVERNMENT'S REPLY ARGUMENT AND MY INSTRUCTIONS ON THE LAW. I ANTICIPATE YOU WILL GET THE CASE TO BEGIN YOUR DELIBERATIONS BETWEEN FIVE AND SIX TODAY. YOU WILL NEED TO THINK OVER LUNCH TO SEE HOW YOU WOULD LIKE TO PROCEED. STAY UNTIL FIVE, 6:00 O'CLOCK, WORK LATER TODAY THAN NORMAL WHILE EVERYTHING IS FRESH IN YOUR MIND, WE WILL DO THAT. IF YOU WOULD PREFER TO GO HOME AND COME BACK TOMORROW AND START FRESH TOMORROW, WE WILL DO THAT. IT WILL BE TOTALLY UP TO THE JURY AS TO HOW LATE WE STAY TODAY. GIVE THAT SOME THOUGHT. I WILL ASK YOU YOUR RESPONSE WHEN WE GET BACK. HAVE A NICE LUNCH. STILL CAN'T DISCUSS THE CASE, IT IS NOT OVER YET, WE STILL HAVE ARGUMENT TO GO,

HAVE LEGAL INSTRUCTIONS TO GO. HAVE A NICE LUNCH. SEE YOU BACK AT 3:15.

MR. SWERLING: JUDGE, I AM SORRY, I WENT OVER.

THE COURT: IT WAS MY HOPE WE COULD GET ALL THE ARGUMENT IN SO THE GOVERNMENT WOULDN'T GET THE JURY FRESH SO AS NOT TO GIVE EITHER SIDE AN ADVANTAGE. I FELT WE NEEDED TO BREAK.

MR. SWERLING: NO, REALLY. MISCALCULATION ON HOW MUCH HAD TO BE COVERED.

THE COURT: ALL RIGHT. WE WILL BE IN RECESS.

(WHEREUPON, A LUNCH RECESS WAS HELD.)

THE COURT: AS I WAS WALKING DOWN THE SIDEWALK AT LUNCH, ONE OF THE JURORS APPROACHED AND ASKED ME, IF THEY DELIBERATE TONIGHT, AND IF WE NEED A PENALTY PHASE, DO WE START TOMORROW? I DON'T KNOW WHAT TO DO. I DON'T WANT TO DO ANYTHING TO SUGGEST A QUICK VERDICT OR ANY PRESSURE. I GUESS THEY WANT ME TO ANSWER THEIR QUESTION. BEFORE I ANSWER THEIR QUESTION, I CAN TELL THEM THERE IS A LITTLE INTERIM PERIOD WHERE WE HAVE TO BRING IN WITNESSES, SO WE COULDN'T START TOMORROW, WITHOUT EXPRESSING ANY OPINION ON WHICH VERDICT THEY SHOULD REACH. HOW DOES THAT SOUND?

MR. HARRIS: THAT IS FINE WITH US.

MR. SCHOOLS: THAT IS FINE.

THE COURT: IN TERMS OF OBJECTIONS TO THE JURY CHARGE, BOTH SIDES HAVE HANDED UP WRITTEN VERSIONS OF WHAT

THEY HAVE ASKED TO BE CHARGED.  TO THE EXTENT I DO NOT CHARGE ANYTHING THAT IS IN WRITING AND SUBMITTED AND FILED WITH THE CLERK, YOU ARE PROTECTED ON APPEAL.  IF THERE IS ANYTHING ELSE YOU WANT TO PUT ON THE RECORD IN TERMS OF THE OBJECTIONS TO THE CHARGE, YOU NEED TO DO SO AFTER WE CHARGE THE JURY.  BE THINKING ABOUT THAT SO WE DON'T WASTE A LOT OF TIME WITH IT. I WANT YOU TO BE ABLE TO DISCUSS THE OBJECTIONS ONCE THE JURY GOES OUT.  ALL RIGHT.  PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  MEMBERS OF THE JURY, BEFORE HEARING FROM MR. GASSER, OVER THE LUNCH BREAK ONE OF THE JURORS ASKED ME A SCHEDULING ISSUE WHICH WAS, IF THE JURY ELECTS TO STAY TONIGHT AND DELIBERATE, AND IF THE JURY REACHES A VERDICT THAT REQUIRES US TO GO INTO A PENALTY PHASE, WOULD WE START THE PENALTY PHASE TOMORROW MORNING? WELL, MY ANSWER TO THAT IS, NO.  IN ANY CASE SUCH AS THIS, IF THE JURY REACHES A VERDICT WHICH REQUIRES A PENALTY PHASE, NECESSARILY THE LAWYERS HAVE TO GET THEIR WITNESSES READY AND BRING THEM TO THE COURTHOUSE, AND THAT CANNOT BE DONE IN SHORT ORDER.  SO, THERE WOULD NECESSARILY BE A PERIOD OF DELAY BETWEEN THE FIRST AND SECOND PHASE.

NOW, HAVING SAID THAT, I WANT TO EMPHASIZE THAT NOTHING I SAY OR DO ABOUT THE PROCEDURES WE FOLLOW IS INTENDED TO SUGGEST TO YOU WHAT YOUR VERDICT SHOULD BE OR WHEN YOU SHOULD

REACH A VERDICT. AND I AM GOING TO LEAVE IT UP TO THE JURY TO DECIDE WHEN, IF YOU WANT TO STAY LATE TODAY OR START FRESH TOMORROW, AND BEGIN YOUR DELIBERATIONS TOMORROW. I DON'T WANT TO DO ANYTHING TO SUGGEST THAT I AM TRYING TO FORCE A VERDICT TONIGHT. IT IS UP TO YOU. ALL RIGHT.

AT THIS TIME, THE COURT RECOGNIZES MR. GASSER FOR HIS REPLY ARGUMENT ON BEHALF OF THE GOVERNMENT.

MR. GASSER: THANK YOU, YOUR HONOR. GOOD AFTERNOON, LADIES AND GENTLEMEN. WE HAVE NOW REACHED THAT STAGE OF THE TRIAL, AS THE JUDGE HAS INDICATED TO YOU, WHICH IS KNOWN AS REPLY ARGUMENT. THE REASON THE GOVERNMENT GETS TO GO FIRST, AND THE GOVERNMENT GETS TO GO LAST, AS YOU RECALL, YOU WILL BE CHARGED HERE ON THESE VERY BASIC PRINCIPLES OF OUR CRIMINAL LAW. THE PROSECUTION HAS THE BURDEN OF PROVING ANY CRIMINAL DEFENDANT GUILTY BEYOND A REASONABLE DOUBT. THAT, AS EACH AND EVERY ONE OF YOU KNOW, A CRIMINAL DEFENDANT HAS NO BURDEN. MR. BASHAM HAS NO BURDEN; HIS LAWYERS HAVE NO BURDEN, SO THAT IS THE REASON WHY THE GOVERNMENT GETS TO GO FIRST TO LAY OUT OUR CLOSING ARGUMENT. AND THEN THE GOVERNMENT GETS TO REPLY TO THE POSITIONS OR TO THE ARGUMENTS OF DEFENSE COUNSEL BECAUSE THE DEFENDANT HAS NO BURDEN. THE BURDEN RESTS SOLELY ON THE GOVERNMENT, ON THE PROSECUTION. AND, IN THIS CASE, ON THE UNITED STATES GOVERNMENT.

BECAUSE WE HAD THAT LUNCH HOUR, I WAS ABLE TO COLLECT MY THOUGHTS AND MY NOTES, AS YOU KNOW, NOT KNOWING WHAT MR.

SWERLING WAS GOING TO SAY, AND AS THE JUDGE INDICATED TO YOU, THE REPLY ARGUMENT NEEDS TO BE LIMITED TO REPLYING TO WHAT THE DEFENSE COUNSEL TOLD YOU JURORS IN CLOSING ARGUMENT. THAT IS WHAT I AM GOING TO FOCUS ON. I AM GOING TO FOCUS ON SOME OF THE POINTS THAT MR. SWERLING MENTIONED TO YOU DURING HIS CLOSING ARGUMENT TO YOU PRIOR TO THE LUNCH HOUR.

I WANT TO MAKE ONE THING CLEAR, LADIES AND GENTLEMEN, OF WHAT THE GOVERNMENT'S POSITION IS WITH REGARD TO THE TESTIMONY AND EVIDENCE YOU SAW. AND I HOPE IT WAS CLEAR TO YOU, DURING THE LAST TWO-AND-A-HALF WEEKS, THE GOVERNMENT PRESENTED TO YOU EVIDENCE AND TESTIMONY THROUGH THOSE 89 WITNESSES AS TO THE ACTIONS, AND THE CONDUCT, AND THE STATEMENTS, AND THE THREATS OF NOT ONLY MR. BASHAM, BUT ALSO MR. FULKS. IF YOU RECALL, WE SPENT A SIGNIFICANT AMOUNT OF TIME THROUGH MANY OF THOSE WITNESSES, MS. SEVERANCE, MS. RODDY, MR. JORDAN. THE GOVERNMENT PRESENTED YOU THE WHOLE PICTURE. WE PRESENTED TO YOU EVIDENCE OF WHAT MR. FULKS WAS DOING AND SAYING, AND WHAT MR. BASHAM WAS SAYING AND DOING DURING THE 17-DAY PERIOD.

NOW, OBVIOUSLY, IN MR. SWERLING'S CLOSING ARGUMENTS, HE FOCUSED HIS CLOSING ARGUMENT ON THE ACTIONS AND CONDUCT OF CHAD FULKS. HE WAS FOCUSING ON THE ACTIONS AND CONDUCT OF CHAD FULKS FOR OBVIOUS REASONS. IF YOU WERE THE JURY IN MR. FULKS'S CASE, OBVIOUSLY, MR. FULKS'S LAWYERS WOULD BE FOCUSING ON THE ACTIONS AND THE CONDUCT OF BRANDON BASHAM. IT IS AN ADVERSARIAL PROCESS. WHAT WE WOULD ASK YOU TO DO WHEN

YOU GO BACK TO YOUR JURY ROOM IS TO FOCUS ON THE ACTIONS, AND CONDUCT, AND WORDS OF BOTH MR. BASHAM AND MR. FULKS TO PUT IT IN ITS PROPER CONTEXT. BUT BECAUSE THIS IS MR. BASHAM'S TRIAL, REMEMBER ALL OF THOSE TIMES THAT HE WAS THREATENING, THAT HE WAS AGGRESSIVE, AND ALL OF THOSE TIMES, MOST IMPORTANTLY, WHEN HE WAS ALONE WITH ALL OF THE VICTIMS IN THIS CASE.

MR. SWERLING I KNOW, HIS INTENT WAS NOT AS SUCH, BUT HE TWICE INDICATED TO THE FACT THAT THE GOVERNMENT WANTS YOU TO GLOSS OVER MATTERS. NOW, MR. SWERLING INDICATED TO YOU, MY GOOD FRIEND MR. GASSER, AND WE ARE FRIENDS, AND THAT IS ONE REASON WHY I KNOW HE MEANT NO ILL WILL THERE. SOME PEOPLE WOULD THINK, GLOSS OVER THAT, THE GOVERNMENT IS TRYING TO HIDE SOMETHING FROM YOU. THE GOVERNMENT WANTS TO QUICKLY THROW SOMETHING BY YOU SO YOU WON'T FOCUS YOUR ATTENTION ON IT. LET ME BE CLEAR ON THAT LADIES AND GENTLEMEN, THE GOVERNMENT DID NOT TRY TO GLOSS OVER ANYTHING.

WE PRESENTED CARL JORDAN. WE TALKED ABOUT WHAT CHAD FULKS DID WITH CARL JORDAN. WE PRESENTED JAMES HAWKINS AND TALKED ABOUT WHAT BRANDON BASHAM DID TO HIM, INITIALLY, AND WHAT CHAD FULKS DID TO HIM. I HOPE YOU ACCEPT ALL OF THE TESTIMONY FROM ALL OF THE WITNESSES IN THIS CASE AND ACCEPT THE FACT THAT THE GOVERNMENT DID NOT TRY TO GLOSS OVER ANYTHING FOR YOU JURORS. WE PRESENTED YOU THE WHOLE PICTURE, THE WHOLE PICTURE OF BRANDON BASHAM, AND THE WHOLE PICTURE OF

CHAD FULKS SO YOU JURORS CAN DECIDE, FOR YOURSELVES, THE ROLES EACH OF THESE TWO INDIVIDUALS PLAYED, AND WHETHER OR NOT BRANDON BASHAM IS GUILTY OF THE CRIMES FOR WHICH HE HAS BEEN CHARGED WITH.

AND JUST RECALL, LADIES AND GENTLEMEN, OF ALL THE FOCUS OF ATTENTION THAT YOU HEARD FOR OVER TWO HOURS ON CHADRICK FULKS. JUST REMEMBER THIS, WITH REGARD TO JAMES HAWKINS, CHAD FULKS WAS NEVER ALONE WITH JAMES HAWKINS. BRANDON BASHAM WAS. CHAD FULKS WAS NEVER ALONE, BASED ON THE EVIDENCE, WITH SAMANTHA BURNS. BRANDON BASHAM WAS ALONE WITH SAMANTHA BURNS FOR MILES, AND MILES, AND MILES. CHAD FULKS WAS NEVER ALONE WITH SAMANTHA BURNS. CHAD FULKS WAS NEVER ALONE WITH ALICE DONOVAN. BRANDON BASHAM WAS ALONE WITH ALICE DONOVAN ON MULTIPLE PERIODS OF TIME. CHAD FULKS WAS NEVER ALONE WITH ANDREA FRANCIS. IT WAS BRANDON BASHAM THAT APPROACHED HER AND STUCK THAT GUN IN HER SIDE. THE ONLY TIME THAT CHAD FULKS WAS WITH ANY OF THOSE VICTIMS THAT I HAVE JUST MENTIONED, HE WAS WITH BRANDON BASHAM, BUT ON MULTIPLE OCCASIONS, BRANDON BASHAM WAS ALONE WITH THOSE VICTIMS MAKING HIS DECISIONS ON HIS OWN, AND MAKING HIS CHOICES ON HIS OWN WITHOUT CHAD FULKS TELLING HIM WHAT TO DO BECAUSE CHAD FULKS WASN'T EVEN PRESENT. HE WAS SOMEWHERE AWAY.

MR. SWERLING INDICATED TO YOU EARLY ON IN HIS CLOSING, WHO WAS THE PERSON THAT HAD THE PROPENSITY FOR VIOLENCE, FOR MANIPULATION. WHO WAS EVIL? WHO WAS MOST LIKELY TO HURT

SOMEBODY? WELL, LADIES AND GENTLEMEN, BASED ON THE EVIDENCE AND TESTIMONY THAT YOU HAVE SEEN, AND THE CONDUCT OF BOTH OF THESE MEN, ISN'T THE ANSWER TO THAT QUESTION BOTH OF THEM? ISN'T THE ANSWER TO THAT QUESTION THAT BOTH BRANDON BASHAM AND CHAD FULKS WERE MANIPULATIVE, WERE DECEIVING PEOPLE? ISN'T THE ANSWER TO THAT QUESTION THAT BOTH BRANDON BASHAM AND CHAD FULKS WERE THREATENING PEOPLE? WERE ACTING EVIL? ISN'T THAT THE MOST REASONABLE ANSWER TO THAT QUESTION, BASED ON THE TOTALITY OF THE CIRCUMSTANCES, AND BASED UPON THE TOTALITY OF THE TESTIMONY THAT YOU HEARD? THAT BOTH OF THESE INDIVIDUALS, ACTING TOGETHER AND SOMETIMES ACTING INDIVIDUALLY, HAD THE CAPACITY FOR VIOLENCE DURING THE 17-DAY PERIOD?

HE INDICATED, MR. SWERLING DID, IT WAS A GRUESOME AND HORRIBLE THING. AND HE ACKNOWLEDGED, LIKE HE DID IN HIS OPENING STATEMENT, THAT MR. BASHAM IS GUILTY. HE IS GUILTY OF ALL OF THESE SETS OF CRIMES, THE ESCAPE, THE CHECK FRAUDS, AND THE BURGLARIES, AND THE POSSESSIONS OF THE WEAPONS.

LADIES AND GENTLEMEN, THE GOVERNMENT SUBMITS TO YOU WHAT MR. BASHAM IS TRYING TO DO IS OFTEN REFERRED TO IN THE LAWS AS THE GENTLE ART OF CONFESSING ERROR. WHAT THAT MEANS IS, AT TIMES WHEN WE, AS PEOPLE, HUMANS, WE CONFESS OUR SMALL FAULTS TO HIDE OUR LARGER FAULTS. AND IN THE CONTEXT OF WHAT THE GOVERNMENT SUBMITS TO YOU WHAT MR. BASHAM IS DOING, WHAT HE WAS DOING WITH LAW ENFORCEMENT WHEN GIVING HIS STATEMENTS, HE

IS ADMITTING, YES, THEY ARE SERIOUS CRIMES IN AND OF THEMSELVES. WHEN IT COMES TO COMPARING THOSE BURGLARIES, CREDIT CARD FRAUDS, CHECK FRAUD, POSSESSING OF WEAPONS, CARJACKING, RESULTING IN DEATH, KIDNAPPING, RESULTING IN DEATH, KILLING TWO WOMEN, THOSE OTHER CRIMES PALE IN COMPARISON BECAUSE YOU JURORS KNOW IT DOESN'T GET ANY LARGER. IT DOESN'T GET ANY MORE IMPORTANT. IT DOESN'T GET ANY MORE HEINOUS THAN KIDNAPPING, CARJACKING, KILLING A WOMAN. AND SO, TO THE EXTENT OF WHAT MR. BASHAM WAS TRYING TO DO, IS ADMIT THESE LITTLE FAULTS, BUT NOT ADMIT TO THE BIG PICTURE, DESPITE ALL OF THE EVIDENCE THAT WAS PRESENTED TO YOU.

THIS IS CARJACKING WITH INTENT FACTOR. IT IS INTERESTING, YOU WILL HAVE IT IN YOUR CHARGE THAT, AT THE TIME THAT THE CARJACKING COMMENCED, THAT BRANDON BASHAM HAD THE INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM. I WILL NOT GO OVER THAT AGAIN. I HAVE TOLD YOU ALICE DONOVAN IS THE BEST EVIDENCE OF WHAT SHE DID AND DIDN'T DO. YOU ARE REASONABLE PEOPLE. BUT I FIND IT INTERESTING THAT, AT THE TIME THE CARJACKING COMMENCED, CHAD FULKS WAS NOT EVEN IN THE CAR. CHAD FULKS WAS IN THE TRUCK. AT THE TIME THE CARJACKING COMMENCED, THE ONLY PERSON IN THE CAR, THE ONLY PERSON WHOSE INTENT ALICE DONOVAN COULD HAVE BEEN EVALUATING WAS BRANDON BASHAM'S.

WITH REGARD TO THE KIDNAPPING STATUTE, LET ME BE PERFECTLY CLEAR ON THIS. YOU WILL HAVE IT WRITTEN DOWN IN

YOUR JURY INSTRUCTIONS. YOU WILL NOTICE THAT THE GOVERNMENT HAS TO PROVE THAT INTENT FACTOR AS ONE OF THE ELEMENTS IN THE CARJACKING. THE GOVERNMENT DOES NOT HAVE TO PROVE AN INTENT FACTOR WITH KIDNAPPING, RESULTING IN DEATH. THE GOVERNMENT DOES NOT HAVE TO PROVE THAT EITHER CHAD FULKS OR BRANDON BASHAM, WITH REGARDS TO THE KIDNAPPING, RESULTING IN DEATH, INTENDED THAT ALICE DONOVAN SUFFER SERIOUS BODILY HARM, INTENDED FOR ALICE DONOVAN TO DIE. THERE IS NO INTENT FACTOR, AS A MATTER OF LAW. NONE.

THE GOVERNMENT HAS TO PROVE, LADIES AND GENTLEMEN, THE THREE ELEMENTS OF KIDNAPPING. THE GOVERNMENT HAS TO PROVE THAT DEATH RESULTED AS A RESULT OF THE WILLFUL, INTENTIONAL CONDUCT OF BRANDON BASHAM. THE WILLFUL, INTENTIONAL CONDUCT OF THE KIDNAPPING. THE GOVERNMENT SUBMITS TO YOU, WHEN YOU FIND THAT BRANDON BASHAM, HIS WILLFUL AND INTENTIONAL CONDUCT IS GETTING IN THE CAR IN THE FIRST PLACE; HIS WILLFUL AND INTENTIONAL CONDUCT IS POINTING THE GUN AT MS. DONOVAN; HIS WILLFUL AND INTENTIONAL CONDUCT IS ORDERING HER TO THE BACK OF THE PARKING LOT; HIS WILLFUL AND INTENTIONAL CONDUCT IS HOLDING ONTO HER AND SECURING HER AT GUNPOINT WHEN CHAD FULKS IS USING HER ATM CARD; HIS WILLFUL, INTENTIONAL CONDUCT IS WHEN HE IS SITTING BACK IN THE BACK SEAT OF THE CAR AS THEY ARE DRIVING TO BEE TREE FARMS. CHAD FULKS'S WILLFUL AND INTENTIONAL CONDUCT IS DRIVING THE CAR. YOU SEE, WHEN IT COMES TO THE KIDNAPPING, CHAD FULKS IS EXERCISING WILLFUL

INTENTIONAL CONDUCT BY DRIVING THE CAR, AND BRANDON BASHAM IS EXERCISING WILLFUL, INTENTIONAL CONDUCT BY HOLDING THE GUN ON HER AND SECURING HER. BOTH OF THEM.

DEATH HAS TO RESULT -- DEATH AS A RESULT OF THE WILLFUL AND INTENTIONAL CONDUCT. WELL, LADIES AND GENTLEMEN, EVEN IF YOU DON'T BELIEVE THAT BRANDON BASHAM, HIMSELF, KILLED ALICE DONOVAN, EVEN IF YOU DISREGARD SHERIFF HEWITT AND DISREGARD MR. JAY, THE OWN WORDS, HIS OWN WORDS AND THE CONDUCT OF BRANDON BASHAM, IF BRANDON BASHAM HADN'T BEEN IN THE CAR, IF BRANDON BASHAM HADN'T KEPT THE GUN ON HER, IF BRANDON BASHAM HADN'T HELD THE GUN ON HER IN THE CAR AS CHAD FULKS DROVE TO BEE TREE FARM OR WHEREVER THEY WENT, ALICE DONOVAN WOULD BE ALIVE TODAY. HIS WILLFUL, INTENTIONAL CONDUCT THAT RESULTED IN THE DEATH OF ALICE DONOVAN IS THE KIDNAPPING ITSELF.

THE GOVERNMENT DOES NOT HAVE TO PROVE THAT HE INTENDED THAT SHE DIE OR SUFFER SERIOUS BODILY HARM. AND THE JUDGE WON'T TELL YOU THAT. WHEN IT COMES TO THE KIDNAPPING, DESPITE ALL OF THE EVIDENCE, DESPITE ALL OF THE EVIDENCE, THE GOVERNMENT SUBMITS THAT YOU SAW ABOUT HIS INTENT THAT DAY AND HIS OWN WORDS, WE KILLED THEM, WE DON'T EVEN HAVE TO PROVE THAT FOR THE KIDNAPPING CHARGE.

CONCERNING SPECIFIC WITNESSES, QUICKLY, THE FOUR SPECIFIC WITNESSES THAT MR. SWERLING TALKED TO YOU ABOUT. CHRIS SCHAFFER, DIAN BLAIR, JAMES HAWKINS, AND TINA

SEVERANCE. CHRIS SCHAFFER TALKED ABOUT -- YEAH, HE TALKED ABOUT BRANDON BASHAM. HE DID MENTION ABOUT CHAD FULKS. HE SAID CHAD FULKS WAS VERY QUIET AND THAT IS SOMEONE YOU HAD TO BE CONCERNED ABOUT. THAT IS WHAT HE SAID AS A JAILER, HE WAS VERY QUIET, SOMEBODY YOU ALWAYS GOT TO BE CONCERNED ABOUT. WHAT ELSE DID CHRIS SCHAFFER SAY ABOUT BRANDON BASHAM? THIS IS IN THE RECORD DURING CROSS-EXAMINATION. THIS ISN'T DIRECT EXAMINATION, THIS ISN'T THE GOVERNMENT PROSECUTOR ASKING, THIS IS MR. SWERLING ASKING MR. SCHAFFER, WHAT DID MR. SCHAFFER HAVE TO SAY ABOUT BRANDON BASHAM? HE HAS GOT A LOT OF STREET-SMARTS. COMMON SENSE. HE IS A MOUTHY INDIVIDUAL AND HE IS NONCOMPLIANT. HE ATTEMPTS TO JUSTIFY HIS ACTIONS. HE HAS THE ABILITY TO REASON. BRANDON BASHAM WAS MANIPULATIVE. BRANDON BASHAM HAD BEEN AGGRESSIVE WITH OTHERS. BOTH BRANDON BASHAM AND CHAD FULKS HAD A REASON TO ESCAPE. THAT IS WHAT CHRIS SCHAFFER TOLD YOU IN CROSS-EXAMINATION ABOUT BRANDON BASHAM.

DIAN BLAIR, SHE TESTIFIED ABOUT BRANDON BASHAM. BRANDON BASHAM WAS MISCHIEVOUS AND COCKY. THAT IS A DIRECT QUOTE FROM DIAN BLAIR. MISCHIEVOUS AND COCKY.

WITH REGARD TO THE JAMES HAWKINS INCIDENT THAT MR. SWERLING DISCUSSED WITH YOU, YOU KNOW, BRANDON BASHAM WAS REASSURING TO MR. HAWKINS. NO QUESTION ABOUT THAT. AT ONE POINT IN TIME, HE IS HOLDING A KNIFE ON HIM WITH A DEATH GRIP AND THEN HE IS REASSURING. ANOTHER INFERENCE, LADIES AND

GENTLEMEN, IS THAT BRANDON BASHAM IS UNPREDICTABLE. AT ONE POINT IN TIME HE IS HOLDING THAT KNIFE IN A DEATH GRIP, THEN HE IS REASSURING. AT ONE POINT IN TIME HE IS STICKING THE GUN IN THE SIDE OF ANDREA FRANCIS, THEN HE IS SAYING, MY BAD.

WHAT ELSE DID MR. SWERLING TALK TO YOU ABOUT? I NEED TO CLEAR UP SOME POINTS ON THIS HAWKINS MATTER THAT IS IN THE RECORD. HE SAID ONE OF THE THINGS THE GOVERNMENT WANTS YOU TO GLOSS OVER IS THAT BRANDON BASHAM DID NOT HURT MR. HAWKINS. CHAD FULKS DIDN'T HURT HIM EITHER. CHAD FULKS DIDN'T HIT HIM UPSIDE THE HEAD. BRANDON BASHAM DIDN'T STAB MR. HAWKINS, DIDN'T SHOOT MR. HAWKINS, DIDN'T TAKE THAT AX THAT WAS IN THE CAR AND HIT MR. HAWKINS, NEITHER DID CHAD FULKS. NEITHER ONE OF THEM. HE GOT INJURED BECAUSE OF THE TAPING OF HIS HANDS. BUT AS FAR AS PHYSICALLY DIRECTLY HURTING HIM, BRANDON BASHAM, IF YOU ARE GOING TO REWARD BRANDON BASHAM FOR NOT HURTING MR. HAWKINS, CHAD FULKS DIDN'T HURT HIM EITHER. IF THAT IS WHAT YOU SELECT TO DO.

WITH REGARD TO THE FACT THAT MR. HAWKINS SAID THAT BRANDON BASHAM DIDN'T WANT TO LEAVE HIM OUT IN THE FIELD. THAT IS NOT WHAT MR. HAWKINS SAID. HE SAID THAT BRANDON BASHAM WAS CONCERNED ABOUT THE CLOTHES THAT HE WAS WEARING. MR. HAWKINS NEVER SAID THAT BRANDON BASHAM DIDN'T WANT TO LEAVE HIM IN THE FIELD. HE NEVER TESTIFIED TO THAT. WHAT HE INDICATED IS THAT BRANDON BASHAM, IN HIS PRESENCE, SAID SOMETHING ABOUT, WE CAN'T LEAVE HIM OUT HERE LIKE THIS. NOT, WE CAN'T LEAVE HIM

OUT HERE. AND WHEN BRANDON BASHAM SAID, WE CAN'T LEAVE HIM OUT HERE LIKE THIS, WHAT DID CHAD FULKS TELL BRANDON BASHAM TO DO? CHAD FULKS TOLD BRANDON BASHAM, TOLD HIM TO GIVE HIM HIS COAT. HE GAVE HIM HIS COAT. CHAD FULKS WENT INTO THE TRUCK AND CUT THE SEAT LINER OUT. PUT THE SEAT LINER AROUND MR. HAWKINS. DON'T GET ME WRONG. I DON'T WANT YOU TO THINK THAT CHAD FULKS AND BRANDON BASHAM ARE GOOD GUYS. BUT TO THE EXTENT THAT YOU TRY AND SPIN THIS TESTIMONY THAT BRANDON BASHAM IS THIS BOY SCOUT TRYING TO HELP OUT MR. HAWKINS IS INACCURATE.

WHAT IS CRITICAL ABOUT MR. HAWKINS' TESTIMONY? MR. SWERLING MENTIONED ABOUT THE FACT THAT CHAD FULKS LEFT IT UP TO BRANDON BASHAM. DO YOU REMEMBER THAT? AND MR. HAWKINS TESTIFIED TO THAT. CHAD FULKS LEFT IT UP TO BRANDON BASHAM. WELL, LADIES AND GENTLEMEN, MR. HAWKINS IS ALIVE. MR. SWERLING, OVER, AND OVER, AND OVER AGAIN, AND BOTH MR. SWERLING AND MR. HARRIS IN CROSS-EXAMINATIONS, TRYING TO PERSUADE YOU OF THE CONSISTENCY OF CHAD FULKS AND BRANDON BASHAM THROUGHOUT THIS WHOLE ENDEAVOR. WHO WAS GIVING THE ORDERS? WHO WAS DOING WHAT? THE CONSISTENCY. WELL, LADIES AND GENTLEMEN, LET'S BE CONSISTENT. BE CONSISTENT BACK IN THAT JURY ROOM. CHAD FULKS LEFT IT UP TO BRANDON BASHAM WHEN JAMES HAWKINS WAS THERE AND BRANDON BASHAM CHOSE NOT TO KILL MR. HAWKINS. AND CHAD FULKS CHOSE NOT TO KILL MR. HAWKINS. WELL, IF CHAD FULKS IS CONSISTENT, THEN DOESN'T CONSISTENCY

SAY THAT HE WOULD HAVE LEFT IT UP TO BRANDON BASHAM WITH SAMANTHA BURNS, AND THAT HE WOULD HAVE LEFT IT UP TO BRANDON BASHAM WITH ALICE DONOVAN? THEY WANT YOU TO THINK THAT CHAD FULKS IS CONSISTENT WHEN IT HURTS CHAD FULKS OR HELPS BRANDON BASHAM, BUT NOT WHEN IT HURTS BRANDON BASHAM. IF CHAD FULKS IS CONSISTENT, THEN HE LEFT UP THE LIFE AND DEATH OF SAMANTHA BURNS AND ALICE DONOVAN TO BRANDON BASHAM, JUST LIKE HE DID WITH JAMES HAWKINS. BACK TO THE FACT DEFENSE, BRANDON BASHAM LEFT A WITNESS THAT COULD IDENTIFY HIM, SO DID CHAD FULKS. CHAD FULKS IS A MAN. THEY DIDN'T DO ANYTHING TO MR. HAWKINS OTHER THAN TIE HIM TO A TREE. TO REWARD BRANDON BASHAM FOR LEAVING HIM ALIVE, I GUESS WE HAVE TO REWARD CHAD FULKS FOR IT, IF THAT IS WHAT YOU THINK OF IT, FOR REWARDING THESE TWO GENTLEMEN.

TINA SEVERANCE. TINA SEVERANCE, SHE AGREED THAT CHAD FULKS WAS CONNIVING AND MANIPULATIVE. SHE ALSO SAID THAT IN THE TIME SHE SPENT WITH BRANDON BASHAM, HE WAS MANIPULATIVE, AS WELL. HE USED TINA SEVERANCE JUST AS CHAD FULKS DID, JUST AS BRANDON BASHAM USED POOR ANDREA RODDY DURING THE TIME HE SPENT WITH HER. MR. SWERLING SAID THAT CHAD FULKS WANTS TO PAINT BRANDON BASHAM IN AN UNFAVORABLE LIGHT. NO QUESTION ABOUT THAT. BRANDON BASHAM WANTS TO PAINT CHAD FULKS IN AN UNFAVORABLE LIGHT, AS WELL, WHEN HE IS TALKING TO THE FBI AGENTS. YOU CAN'T HAVE IT ONE WAY. YOU GOT TO LOOK AT IT BOTH WAYS.

HOLDING ON TO THE MONEY. WHO IS HOLDING ON TO THE MONEY? HOW MANY TIMES DID WE HEAR THAT QUESTION IN CROSS-EXAMINATION? HOW MANY TIMES DID WE HEAR WHO IS HOLDING ONTO THE MONEY AND HE TALKED ABOUT IT AGAIN? BUT WE KNOW THAT WHEN CHAD FULKS IS ARRESTED, HE HAS GOT A HUNDRED BUCKS ON HIM. WHEN BRANDON BASHAM IS ARRESTED, OFFICER BRUNTY SAID HE HAS GOT 53 BUCKS ON HIM. CHAD HAS GOT A HUNDRED DOLLARS ON HIM, BRANDON HAS GOT $53 ON HIM. WHAT DOES THAT PROVE?

BRANDON HAS GOT SOMETHING ELSE ON HIM WHEN HE IS ARRESTED. IN HIS POCKET, HE HAS HIS TROPHY FROM ALICE DONOVAN. HE HAS THE POCKET KNIFE THAT BARRY DONOVAN GAVE HIS WIFE. JUST LIKE BRANDON BASHAM'S TROPHY WITH SAMANTHA BURNS WAS HER DIAMOND RING. THIS WAS HIS TROPHY WITH REGARD TO ALICE DONOVAN, AND THIS WAS PULLED OUT OF BRANDON BASHAM'S POCKET ALONGSIDE THE OHIO RIVER THERE BY THE ASHLAND POLICE DEPARTMENT.

WHO WAS MAKING ALL OF THE DECISIONS? CHAD FULKS WAS MAKING THE MAJORITY OF THE DECISIONS WHEN IT CAME TO TRAVELLING, OR WHERE THEY WILL STAY, OR WHO WOULD BUY THE DRUGS. YOU REMEMBER HOW MANY TIMES ON REDIRECT I STOOD UP, STANDING AT THAT TABLE, AND ASKED TINA SEVERANCE, WHO WAS DOING THIS? WHO WAS DOING THAT? WHO WAS DOING THAT? I GOT HER TO RUN DOWN A LITANY OF ALL THE THINGS, THE DECISIONS AND CHOICES BRANDON BASHAM MADE. I DID THAT WITH TINA SEVERANCE. I DID IT STANDING AT THE TABLE WITH MS. RODDY, WITH MS. MCGUFFIN. I WILL NOT GO OVER IT AGAIN. I ASK YOU TO RECALL IT.

CERTAINLY, CHAD FULKS MADE A SIGNIFICANT NUMBER OF DECISIONS ON WHERE THEY WERE GOING; MR. BASHAM WAS MAKING HIS OWN DECISIONS AS WELL, LADIES AND GENTLEMEN. I AM SURE YOU WILL REMEMBER THAT STURGIS, MICHIGAN, THE COCKING OF THE GUN. IN A WAY, YOU KNOW, WHAT ELSE CAN MR. SWERLING SAY OTHER THAN PUFFING? THE FACTS SPEAK FOR THEMSELVES. SO, WHENEVER BRANDON BASHAM IS THREATENING TO KILL SOMEBODY OR IS THREATENING PEOPLE, IT IS PUFFING, YOU ARE NOT TO TAKE IT SERIOUS. BUT WHEN CHAD FULKS IS THREATENING PEOPLE AND ACTING VIOLENT, YOU ARE TO TAKE THAT SERIOUS. IS THAT REASONABLE? IS THAT REASONABLE FOR A JURY TO DO? THE LEVEL OF SOPHISTICATION WHEN HE IS TALKING ABOUT BRANDON BASHAM DROPPING THAT GUN, THE GUN FALLING THROUGH HIS PANTS, THAT IS THE LEVEL OF SOPHISTICATION OF BRANDON BASHAM. CHAD FULKS CALLING AMY WARD'S MOTHER ON THE PHONE. THAT WAS A BRILLIANT PLAN. CHAD FULKS, THE HIGH SCHOOL DROPOUT, AS WELL. DON'T GET ME WRONG. I AM NOT STICKING UP FOR CHAD FULKS. FAR FROM IT. REMEMBER, THE GOVERNMENT BELIEVES BOTH CHAD FULKS AND BRANDON BASHAM SHOULD DIE FOR THE CHOICES THEY MADE ON NOVEMBER 14TH. I AM TRYING TO PUT ALL OF THIS IN CONTEXT FOR YOU, LADIES AND GENTLEMEN, FOR YOUR DISCUSSIONS BACK IN YOUR JURY ROOM. AND I AM ALMOST DONE.

MR. SWERLING MENTIONED THE FACT THAT MR. BASHAM TOLD WHERE SAMANTHA BURNS'S BODY WAS ON NOVEMBER 27TH. LET'S BE VERY CLEAR. IF YOU RECALL THAT TESTIMONY, IT WAS LIMITED

INFORMATION. THROUGH HIS LAWYER, HE WOULD TELL 16 DAYS AFTER THE FACT, AFTER SAMANTHA BURNS WAS ABDUCTED, AND KIDNAPPED, AND CARJACKED, AND KILLED, AND AFTER ALL OF THAT TIME THAT MR. BASHAM WAS SPENDING WITH HER ON NOVEMBER 11TH ALONE IN HER CAR AS HE WAS FORCING HER TO FOLLOW CHAD FULKS IN THAT VAN, 16 DAYS LATER, THROUGH HIS LAWYER, HE PROVIDES LIMITED INFORMATION THAT THEY DUMPED HER IN A RIVER. I AM SURE JOHN AND KANDI BURNS APPRECIATE THAT.

CONCERNING SHALLOTTE. THEY GOT BACK TO THE HOLLYWOOD MOTEL. ANDREA RODDY SAYS SHE THINKS SHE REMEMBERS CHAD FULKS SHOWERING FIRST. TINA SEVERANCE SAID SHE IS CERTAIN THAT BRANDON BASHAM SHOWERED FIRST BECAUSE CHAD FULKS SAT DOWN TO ENJOY HIS LATE DINNER OR EARLY BREAKFAST. REMEMBER, HE ATE THE SANDWICH, HE POPPED A SODA, BUT WHAT DID BOTH OF THEM TESTIFY TO? IF YOU RECALL, TINA SEVERANCE AND ANDREA RODDY, NEITHER CHAD FULKS OR BRANDON BASHAM SMELLED LIKE GASOLINE. SO, THEY DIDN'T POUR GAS. SO, THEY DIDN'T GET GASOLINE ON THEMSELVES WHEN THEY DOUSED SAMANTHA BURNS'S CAR. WHAT DOES THAT PROVE?

CHAD FULKS PUNCHED BRANDON BASHAM ONE TIME IN THE MOUTH IN SOUTH CAROLINA. DIDN'T DRAW BLOOD. WENT INTO THE ROOM, DID A BUNCH OF PUSH-UPS. THAT IS THE EXTENT OF THE THREATS BETWEEN CHAD FULKS AND BRANDON BASHAM.

YOU REMEMBER CHAD FULKS, NO QUESTION ABOUT IT, MR. SWERLING BROUGHT IT UP, BRANDON BASHAM IS SO STUPID. WE

BROUGHT THAT UP THROUGH MS. SEVERANCE. BRANDON BASHAM IS SO STUPID HE WILL DO ANYTHING. WHAT ABOUT BRANDON BASHAM'S CHARACTERIZATION OF CHAD FULKS? BRANDON BASHAM TELLING AGENT VITO, CHAD FULKS IS SO DUMB HE WAS CHASING CARL JORDAN, I HAD TO TELL HIM TO TURN AROUND. CHAD FULKS IS SO DUMB, HE HAD TO TELL HIM TO QUIT CHASING CARL JORDAN. AND THEN ON THE ONE HAND HE WANTS YOU TO BELIEVE THAT HE IS SO STUPID, BRANDON BASHAM, THAT HE CAN'T THINK, CAN'T WALK AND CHEW GUM AT THE SAME TIME WHEN IT COMES TO KILLING PEOPLE, BUT THEN MR. SWERLING TALKS ABOUT THE DETAILS THAT HE GAVE OF EVERYWHERE HE WENT. HOW DETAILED HE WAS DOWN TO THE MINUTE, DOWN TO THE MILES. YOU CAN'T HAVE IT BOTH WAYS.

BRANDON BASHAM IS STREET-SMART AND EVERY ONE OF YOU JURORS KNOW WHAT THAT MEANS. HE IS STREET-SMART, VERY CAGEY. HE IS NOT BOOK-SMART. LET ME TELL YOU SOMETHING, LADIES AND GENTLEMEN, BRANDON BASHAM AND CHAD FULKS, THEY ARE NOT CHARGED WITH CONSPIRACY TO TAKE A MATH TEST. THEY ARE CHARGED WITH CONSPIRACY TO COMMIT THE WORST TYPES OF CRIMES KNOWN TO MEN, KILLING INNOCENT PEOPLE.

HOW STUPID BRANDON BASHAM IS, WHEN WITHIN A FEW MINUTES AFTER ANDREA FRANCIS, HE IS CAUGHT BY THE POLICE. WELL, YOU KNOW WHAT? THAT WAS A BRILLIANT MOVE ON CHAD FULKS'S PART TO DRIVE BACK TO HIS BROTHER'S HOUSE IN GOSHEN, INDIANA IN ALICE DONOVAN'S BMW. WHERE DO YOU THINK THE FIRST PLACE PEOPLE IN LAW ENFORCEMENT WILL LOOK FOR PEOPLE WHO ARE ON THE RUN?

FAMILY MEMBERS. BOY, THAT WAS A BRILLIANT MOVE ON CHAD FULKS'S PART, TO TAKE ALICE DONOVAN, THE VICTIM'S CAR. THAT IS WHAT A CONNIVER AND BRILLIANT MAN CHAD FULKS IS ALL ABOUT.

FORTUNATELY, FOR THE FAMILIES OF ALICE DONOVAN, AND SAMANTHA BURNS, OR MR. HAWKINS, FOR ALL THE PEOPLE THAT WERE VICTIMIZED, FORTUNATELY, WE DON'T CATCH THE SMART ONES.

THE LETTERS FROM MS. MCGUFFIN, THIS IS CRITICAL. THIS IS CRITICAL. THEY WOULD HAVE YOU BELIEVE THAT HE DOESN'T KNOW SHE WILL BE TURNING THEM OVER SO YOU HAVE TO BELIEVE THEM. THINK ABOUT IT. HE HAS ALL THIS AFFECTION FOR THIS WOMAN. DO YOU THINK BRANDON BASHAM OR ANYONE IS GOING TO BE WRITING LETTERS TO THE WOMAN HE IS SAYING HE IS IN LOVE WITH, THE WOMAN WHO HE IS HOPING WILL WRITE HIM BACK, THE WOMAN HE IS HOPING WILL COME SEE HIM WHILE HE IS IN PRISON OR INCARCERATED? THE WOMAN HE IS TELLING HE LOVES, WOULD LOVE TO SPEND THE REST OF HIS LIFE WITH? THE WOMAN HE IS ASKING TO STAND BY HIM, DO YOU THINK FOR ONE MINUTE CHAD, WHEN SHE ASKS DID YOU RAPE THOSE WOMEN, KILL THOSE WOMEN, DO YOU THINK ONE MINUTE HE WILL SAY, YEAH BETH, I RAPED HER, HAD HER FOR NINE HOURS, KILLED HER, DUMPED HER IN THE RIVER, WILL YOU COME SEE ME IN SOUTH CAROLINA? I AM NOT TRYING TO BE FLIPPANT. THAT IS RIDICULOUS. OF COURSE, HE WILL NOT BE MAKING ANY ADMISSIONS TO RAPING, OR KILLING, OR CARJACKING, OR DUMPING SAMANTHA BURNS OR ALICE DONOVAN IN THE LETTERS THAT HE IS WRITING TO A WOMAN THAT HE WANTS TO MAINTAIN HIS AFFECTION.

THAT IS JUST BASIC THIRD GRADE COMMON SENSE.

BUT WHAT ADMISSIONS DOES HE MAKE? HE DOES MAKE THE ADMISSIONS TO SHERIFF HEWITT, AND HE DOES REACH OUT AND CALL AND ADMITS THE ADMISSIONS TO C. J., TO CLIFFORD JAY, "WE KILLED THEM." THERE IS NO AFFECTION -- THAT TYPE OF AFFECTION. HE IS NOT EXPECTING SHERIFF HEWITT OR CLIFFORD JAY TO COME SEE HIM IN PRISON, OR TO WRITE HIM, OR TO BE AFFECTIONATE TOWARDS HIM.

COUPLE MORE POINTS. THE ASHLAND MALL. BRANDON BASHAM, FOR SOME REASON, MADE THE DECISION, FOR WHATEVER REASON, NOT TO SHOOT ANDREA FRANCIS. A FEW MINUTES LATER, HE IS MAKING THE DECISION, FOR WHATEVER REASON, TO TRY AND KILL OFFICER DAVIS. YOU SAW THE FACTS. YOU SAW THE FACTS. UNPREDICTABLE. THE GOVERNMENT SUBMITS TO YOU, UNPREDICTABLE EQUALS DANGEROUS GIVEN THE ACTIONS AND CONDUCT THAT YOU HAVE SEEN OVER THESE 14 DAYS. THE ACTIONS OF BRANDON BASHAM. THE STATEMENTS TO THE FBI. MR. SWERLING SAID IT IS NOT UNUSUAL FOR AN INDIVIDUAL TO LIE TO THE FBI. NO DOUBT ABOUT IT. WHAT IS CRITICAL, HE IS LYING ABOUT THE MOST IMPORTANT FACTS ON THE 19TH AND 20TH, WHETHER ALICE DONOVAN IS ALIVE OR DEAD. IS THERE ANY MORE CRITICAL FACT FOR LAW ENFORCEMENT OR HER FAMILY, IS SHE ALIVE OR DEAD? DO YOU THINK ANYBODY CARES, AT THAT POINT IN TIME, WHOSE IDEA IT WAS TO BURGLARIZE ROBERT TALSMA, WHO HAD A FELON IN POSSESSION, WHO HAD THE CHECK CHARGE? DO YOU THINK THEY CARED IF THERE WAS A WINDOW, A

WINDOW OF OPPORTUNITY TO BE ALIVE? WINDOW OF OPPORTUNITY FOR ALICE DONOVAN'S FAMILY AND LAW ENFORCEMENT? THE MOST IMPORTANT THING HE IS SAYING, SHE IS ALIVE IN KENTUCKY, SHE IS TIED TO A TREE. THEN SHE IS ALIVE IN SAVANNAH BLUFF.

MOST IMPORTANTLY, LADIES AND GENTLEMEN, MAYBE I DIDN'T MAKE MYSELF CLEAR ENOUGH. I HOPE YOU HEARD IT CLEAR FROM THE WITNESSES. ON NOVEMBER 20TH, HE IS TELLING THEM THAT CHAD FULKS TOLD ME HE DID SUCH-AND-SUCH. IN OTHER WORDS, THE CONTEXT HE IS PUTTING IT IN IS THAT HE WASN'T PRESENT. CHAD FULKS TOLD ME HE DID SUCH-AND-SUCH AND TIED HER TO A TREE, THEN THEY DO THE MAP. BUT FIVE DAYS LATER, HE IS ACKNOWLEDGING THAT WHAT HE SAID THERE ON THE 20TH, HE IS ACKNOWLEDGING, AND HIS LAWYER IS ACKNOWLEDGING, HE WAS LYING. BECAUSE ON THE 25TH HE SAYS, I AM PRESENT, AND HE IS GIVING ALL OF THOSE DETAILS THAT MR. SWERLING DESCRIBED. THAT IS WHAT IS SIGNIFICANT.

NOW, LADIES AND GENTLEMEN, HOW CAN YOU TELL WHEN HE IS LYING AND WHEN HE IS TELLING THE TRUTH? HE ACKNOWLEDGED THAT HE WAS INTENTIONALLY MISLEADING AND DECEIVING LAW ENFORCEMENT DURING THE WINDOW OF OPPORTUNITY THAT ALICE DONOVAN MAY HAVE BEEN ALIVE BY PLACING HER OVER THERE IN SAVANNAH BLUFF. AND THEN FIVE DAYS LATER HE IS CLAIMING I WAS WITH CHAD FULKS, THAT IS WHAT IS CRITICAL. WHO KNOWS? WHO KNOWS WHETHER HE IS TELLING THE TRUTH ON THE 19TH OR 20?TH. TELLING THE TRUTH OR LYING ON NOVEMBER 25TH? TELLING THE TRUTH OR LYING ON

THANKSGIVING DAY? HE MANIPULATED AND DECEIVED. HOW CAN YOU EVER BELIEVE BRANDON BASHAM?

THEY THOROUGHLY SEARCHED THE BEE TREE FARM AREA. THOROUGHLY SEARCHED IT. AND BEYOND OTHER AREAS OF BRUNSWICK COUNTY. THEY THOROUGHLY SEARCHED, AFTER THE INTERVIEWS WITH CHAD FULKS, THOSE AREAS BACK AT HORRY COUNTY OFF OF HIGHWAY 90. YOU CAN'T BELIEVE BRANDON BASHAM AND YOU CAN'T BELIEVE CHAD FULKS. AND BOTH OF THEM HAVE REASONS FROM THE GOVERNMENT AND FROM LAW ENFORCEMENT NOT TO FIND THAT WOMAN'S BODY.

AND MR. SWERLING, THERE IS NO QUESTION, THE ONLY SEMEN STAIN ON THE BACK OF HER CAR WAS DNA MATCHED UP TO CHAD FULKS. MR. SCHOOLS GOT THAT SEROLOGIST TO EXPLAIN HOW THAT COULD HAPPEN. IF ANOTHER PERSON RAPED ALICE DONOVAN, DIDN'T EJACULATE, YOU WOULDN'T HAVE DNA. ANOTHER PERSON RAPED HER, EJACULATED ON ANOTHER ARTICLE OF CLOTHING OR SOMEWHERE BUT THE CAR, YOU WOULDN'T HAVE ANY DNA. THE BEST EVIDENCE IS THE BODY SO THEY CAN DO SWABS FROM THE VAGINAL WALL OR THE PANTIES THAT SHE MAY HAVE BEEN WEARING AFTER SHE GOT RAPED. BRANDON BASHAM AND CHAD FULKS MADE SURE THERE WOULD BE NO SWABBINGS. THEY MADE SURE THERE WOULD BE NO BODIES. THEY MADE SURE THERE ARE NO PANTIES. BRANDON BASHAM MADE SURE OF THAT. THEY HAD HER SIX TO SEVEN HOURS. THEY HAD SAMANTHA BURNS FOR NINE HOURS.

CHAD FULKS STILL HAS THAT THIRST, THAT DESIRE WHEN HE WAS

MAKING THOSE CALLS TO AMY WARD. THE GOVERNMENT TOTALLY AGREES. WE AGREE WITH MR. SWERLING. AND IT IS THE SAME THIRST AND DESIRE THAT BRANDON BASHAM HAD WHEN HE APPROACHED ANDREA FRANCIS WITH THAT GUN TRYING TO GET IN HER CAR. THIRST AND DESIRE WAS EMANATING, NOT ONLY FROM CHAD FULKS, BUT BRANDON BASHAM.

LASTLY, BRANDON BASHAM KNEW ALL OF THOSE PLACES, BEE TREE FARM, KNEW TO GIVE THE DETAILS BECAUSE HE HAD BEEN THERE. THAT IS HOW HE KNEW TO GIVE THE DETAILS IN SAVANNAH BLUFF. BUT JUST BECAUSE HE KNEW OF THE DETAILS AND THE LANDMARKS DOESN'T MEAN THAT IS WHERE THEY KILLED ALICE DONOVAN OR THAT IS WHERE HER BODY IS.

LADIES AND GENTLEMEN, WE DON'T KNOW WHERE ALICE DONOVAN'S REMAINS ARE. WE SIMPLY DON'T KNOW. BUT CHAD FULKS AND BRANDON BASHAM AREN'T THE PEOPLE TO GIVE RELIABLE INFORMATION IN THAT REGARD, GIVEN THEIR TRACK RECORD OF BELIEVABILITY AND TRUTHFULNESS.

THANK YOU, AGAIN, FOR YOUR TIME. THE JUDGE IS GOING TO INSTRUCT YOU ON THE LAW NOW. I AM NOT SURE HOW LONG HIS INSTRUCTION WILL BE, BE ABOUT 45 MINUTES. IT WILL GO BETTER BECAUSE YOU WILL HAVE THE INSTRUCTION WITH YOU SO YOU CAN FOLLOW ALONG. I RESPECTFULLY REQUEST THAT YOU GIVE JUDGE ANDERSON THE SAME ATTENTION THAT YOU HAVE GIVEN ME THIS MORNING, THAT YOU GAVE MR. SWERLING, THAT YOU GAVE ALL OF THESE WITNESSES, AND THAT YOU JUST GAVE ME THIS AFTERNOON

AFTER YOUR LUNCH BREAK.

AND, AGAIN, I SINCERELY APPRECIATE THAT AND ASK YOU TO LISTEN TO THAT LAW, LADIES AND GENTLEMEN. GO BACK THERE, THE 12 OF YOU JURORS WHO HAVE BEEN SELECTED TO DECIDE THIS CASE, GIVE DUE DILIGENCE TO ALL OF THE TESTIMONY. GIVE DUE DILIGENCE TO THE LAW THAT YOU SWORE TO UPHOLD. AND COME BACK WITH A VERDICT THAT YOU CAN BE PROUD OF IN YOUR HEART AND IN YOUR MIND. THAT YOU KNOW BOTH INDIVIDUALLY AND COLLECTIVELY IS THE TRUTH. THAT IS ALL ANY OF US ASKS. WE ASK FOR THE TRUTH. AND THE GOVERNMENT SUBMITS TO YOU THAT THE TRUTH IS THAT BRANDON BASHAM IS GUILTY AS CHARGED.

THE COURT: THANK YOU, MR. GASSER. LADIES AND GENTLEMEN, I WILL NEED YOUR UNDIVIDED ATTENTION WHEN I INSTRUCT YOU ON THE LAW. WE WILL TAKE A SHORT BREAK, KEEP IT TO TEN MINUTES. YOU WILL HAVE A WRITTEN COPY OF MY INSTRUCTIONS TO FOLLOW ALONG WITH IF YOU CHOOSE TO DO SO. YOU CAN FLIP THROUGH THE PAGES ALONG WITH ME OR SIT THERE AND LISTEN TO THE ORAL VERSION. I WOULD ASK THAT YOU DON'T FLIP AHEAD OF ME, DON'T GET AHEAD OF ME ON YOUR CHARGE.

PLEASE STEP INTO YOUR ROOM AND WHEN YOU COME OUT, IF YOU WILL GIVE US SOME INDICATION OF WHAT YOU WANT TO DO. MY INSTRUCTION WILL TAKE AN HOUR, HOUR AND 10 MINUTES, 20 MINUTES, THEREABOUT. SO, THAT MEANS YOU SHOULD GET THE CASE AROUND 5:30 TO BEGIN YOUR DELIBERATION. SO, GO TO YOUR JURY ROOM. WE WILL TAKE A TEN-MINUTE RECESS.

DEFENDANT IS GUILTY OF THE OFFENSE OF CARJACKING AS I WILL DEFINE THAT OFFENSE FOR YOU.  IF YOU FIND THE DEFENDANT GUILTY OF THE OFFENSE,  YOU MUST THEN DETERMINE WHETHER ALICE DONOVAN IS DEAD AND WHETHER HER DEATH RESULTED FROM THIS CARJACKING.  IF,  ON THE OTHER HAND,  YOU FIND THAT THE DEFENDANT IS NOT GUILTY OF THE OFFENSE OF CARJACKING,  YOU, OBVIOUSLY,  ARE NOT REQUIRED TO MAKE ANY FURTHER FINDINGS WITH RESPECT TO COUNT ONE OF THE INDICTMENT.

SECTION 2119 OF TITLE 18 OF THE UNITED STATES CODE PROVIDES, IN PART, THAT:

"WHOEVER, WITH THE INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM TAKES A MOTOR VEHICLE THAT HAS BEEN TRANSPORTED,  SHIPPED,  OR RECEIVED IN INTERSTATE OR FOREIGN COMMERCE FROM THE PERSON OR PRESENCE OF ANOTHER BY FORCE AND VIOLATION OR BY INTIMIDATION OR ATTEMPTS TO DO SO..."

SHALL BE GUILTY OF AN OFFENSE AGAINST THE UNITED STATES.

IN ORDER FOR YOU TO FIND THE DEFENDANT GUILTY OF THIS CHARGE,  COUNT ONE,  THE GOVERNMENT MUST PROVE FOUR ELEMENTS BEYOND A REASONABLE DOUBT.

NUMBER ONE,  THE DEFENDANT TOOK A MOTOR VEHICLE FROM THE PERSON OR PRESENCE OF ANOTHER.

JA 1580

NUMBER TWO, THE MOTOR VEHICLE HAD BEEN TRANSPORTED, SHIPPED, OR RECEIVED IN INTERSTATE OR FOREIGN COMMERCE.

NUMBER THREE, THE TAKING WAS DONE OR ATTEMPTED BY FORCE AND VIOLENCE OR BY INTIMIDATION.

AND, NUMBER FOUR, WHILE TAKING THE MOTOR VEHICLE, THE DEFENDANT INTENDED TO CAUSE DEATH OR SERIOUS BODILY HARM.

THE FIRST ELEMENT THE GOVERNMENT MUST ESTABLISH BEYOND A REASONABLE DOUBT IS THAT THE DEFENDANT TOOK A MOTOR VEHICLE FROM THE PERSON OR PRESENCE OF ANOTHER.

TO TAKE A MOTOR VEHICLE MEANS TO ACQUIRE POSSESSION OR CONTROL OF THE VEHICLE FOR A PERIOD OF TIME. THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEFENDANT INTENDED TO PERMANENTLY DEPRIVE THE OWNER OF POSSESSION OF THE VEHICLE. ALSO, THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE VICTIM WAS FORCED TO LEAVE THE VEHICLE, AS LONG AS IT PROVES THAT THE DEFENDANT HAD CONTROL OF THE SITUATION.

TO PROVE THAT THE DEFENDANT TOOK THE VEHICLE FROM THE PERSON OR PRESENCE OF ANOTHER, THE GOVERNMENT MUST PROVE THAT THE VICTIM WAS SUFFICIENTLY WITHIN REACH, INSPECTION, OR OBSERVATION OF THE VEHICLE, AND THAT SHE COULD HAVE RETAINED POSSESSION OF IT IF NOT OVERCOME BY VIOLENCE OR PREVENTED BY FEAR.

THE SECOND ELEMENT THAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT IS THAT THE MOTOR VEHICLE HAD PREVIOUSLY BEEN TRANSPORTED, SHIPPED, OR RECEIVED IN INTERSTATE OR FOREIGN

COMMERCE. THIS REQUIRES THE GOVERNMENT TO PROVE THAT, AT SOME TIME IN THE PAST, THE VEHICLE HAD BEEN SHIPPED, DRIVEN, OR TRANSPORTED BETWEEN ONE STATE AND ANOTHER, OR BETWEEN THE UNITED STATES AND A FOREIGN COUNTRY.

IT IS NOT NECESSARY THAT THE GOVERNMENT PROVE THAT THE DEFENDANT HAD ANY INVOLVEMENT IN THE INTERSTATE SHIPPING, DRIVING, OR TRANSPORTATION, OR THAT THE DEFENDANT KNEW THAT THE VEHICLE HAD PREVIOUSLY BEEN SHIPPED, DRIVEN, OR TRANSPORTED IN INTERSTATE OR FOREIGN COMMERCE.

THE THIRD ELEMENT THAT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT IS THAT THE DEFENDANT TOOK THE VEHICLE FROM THE VICTIM BY USING FORCE AND VIOLENCE OR BY ACTING IN AN INTIMIDATING MANNER.

THE GOVERNMENT CAN MEET ITS BURDEN ON THIS ELEMENT EITHER BY PROVING THE DEFENDANT USED FORCE AND VIOLENCE OR THAT THE DEFENDANT ACTED IN AN INTIMIDATING MANNER. THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEFENDANT USED FORCE AND VIOLENCE IF IT PROVED THAT THE DEFENDANT ACTED IN AN INTIMIDATING MANNER.

THE PHRASE "INTIMIDATING MANNER" MEANS THAT THE DEFENDANT DID OR SAID SOMETHING THAT WOULD MAKE AN ORDINARY, REASONABLE PERSON FEAR BODILY HARM. YOUR FOCUS SHOULD BE ON THE DEFENDANT'S BEHAVIOR. THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEFENDANT'S BEHAVIOR CAUSED OR COULD HAVE CAUSED GREAT TERROR OR PANIC, BUT IT MUST SHOW THAT AN ORDINARY

PERSON WOULD HAVE FEARED BODILY HARM BECAUSE OF THE DEFENDANT'S BEHAVIOR. THE GOVERNMENT ALSO DOES NOT HAVE TO PROVE THAT THE DEFENDANT MADE EXPLICIT THREATS OF BODILY HARM. IF YOU FIND THAT THE DEFENDANT CONFRONTED THE VICTIM IN SUCH A WAY THAT IT WOULD REASONABLY CREATE A FEAR OF BODILY HARM, THAT IS SUFFICIENT.

THE FOURTH ELEMENT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT IS THAT THE DEFENDANT ACTED WITH INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM.

TO ESTABLISH THIS ELEMENT, THE GOVERNMENT MUST PROVE THAT, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OVER THE VEHICLE, THE DEFENDANT POSSESSED INTENT TO SERIOUSLY KILL -- EXCUSE ME, SERIOUSLY HARM OR KILL THE VICTIM.

THE GOVERNMENT MAY ALSO MEET ITS BURDEN AS TO THE INTENT ELEMENT BY PROVING, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OF THE VEHICLE, THAT THE DEFENDANT POSSESSED THE INTENT TO SERIOUSLY HARM OR KILL THE VICTIM, IF NECESSARY, TO STEAL THE CAR. THE GOVERNMENT NEED NOT PROVE THAT THE DEFENDANT ACTUALLY INTENDED TO CAUSE THE HARM; IT IS SUFFICIENT THAT THE DEFENDANT WAS CONDITIONALLY PREPARED TO ACT IF THE VICTIM FAILED TO RELINQUISH THE CAR.

EVIDENCE THAT THE DEFENDANT INTENDED TO FRIGHTEN THE VICTIM IS NOT SUFFICIENT BY ITSELF TO PROVE AN INTENT TO HARM OR KILL. IT IS, HOWEVER, ONE OF THE FACTS YOU MAY CONSIDER IN DETERMINING WHETHER THE GOVERNMENT HAS MET ITS BURDEN.

IF YOU DETERMINE THAT THE DEFENDANT, BRANDON LEON BASHAM, IS GUILTY OF THE OFFENSE OF CARJACKING AS I HAVE JUST DEFINED IN THESE INSTRUCTIONS, YOU MUST DELIBERATE FURTHER TO DETERMINE, A, WHETHER ALICE DONOVAN IS DEAD, AND, IF SO, B, WHETHER HER DEATH RESULTED FROM HER BEING CARJACKED. IN ORDER FOR ALICE DONOVAN'S DEATH TO RESULT FROM HER BEING CARJACKED, HER DEATH MUST HAVE RESULTED FROM THE WILLFUL AND INTENTIONAL CONDUCT OF THE DEFENDANT, BRANDON LEON BASHAM, OR THE WILLFUL AND INTENTIONAL CONDUCT OF THE CODEFENDANT, CHADRICK EVAN FULKS, AIDED AND ABETTED BY THE DEFENDANT, BRANDON LEON BASHAM. I WILL EXPLAIN THE CONCEPT OF AIDING AND ABETTING TO YOU LATER IN THESE INSTRUCTIONS.

THE GOVERNMENT ADMITTEDLY HAS NOT PRODUCED ALICE DONOVAN'S BODY. YOU ARE INSTRUCTED THAT THE GOVERNMENT IS NOT REQUIRED TO PRODUCE PHYSICAL EVIDENCE OF DEATH IN ORDER TO PROVE DEATH. AS WITH ANY OTHER FACT AT ISSUE, WHETHER ALICE DONOVAN IS DEAD MAY BE PROVED BY EITHER CIRCUMSTANTIAL OR DIRECT EVIDENCE. YOU ARE TO CONSIDER ALL OF THE EVIDENCE PRESENTED TO YOU DURING THE TRIAL IN MAKING THAT DETERMINATION. AS ALWAYS, THE STANDARD TO WHICH THE GOVERNMENT IS HELD IS PROOF BEYOND A REASONABLE DOUBT.

FOR PURPOSES OF DETERMINING WHETHER ALICE DONOVAN DIED AS A RESULT OF THE CARJACKING, I CHARGE YOU THAT THE COMMISSION OF A CARJACKING CONTINUES AT LEAST WHILE THE CARJACKER MAINTAINS CONTROL OVER THE VICTIM AND HER VEHICLE.

THEREFORE, THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEATH OCCURRED DURING THE ACTUAL CARJACKING. THE REQUIREMENT THAT DEATH RESULTED IS SATISFIED IF THE GOVERNMENT PROVES THAT THE DEFENDANT CAUSED SUCH DEATH AT ANY POINT DURING THE DEFENDANT'S RETENTION OR POSSESSION OF THE VEHICLE.

COUNT TWO. COUNT TWO OF THE INDICTMENT CHARGES THAT ON OR ABOUT THE 14TH DAY OF NOVEMBER 2002, IN THE DISTRICT OF SOUTH CAROLINA AND ELSEWHERE, CHADRICK EVAN FULKS AND BRANDON LEON BASHAM, WILLFULLY AND UNLAWFULLY DID KIDNAP, ABDUCT, AND CARRY AWAY ALICE DONOVAN, AND DID WILLFULLY TRANSPORT ALICE DONOVAN IN INTERSTATE COMMERCE FROM CONWAY, SOUTH CAROLINA TO NORTH CAROLINA, AND DID HOLD HER FOR RANSOM, REWARD, OR OTHERWISE, AND ALICE DONOVAN'S DEATH RESULTED.

YOU MUST MAKE TWO FINDINGS WITH REGARD TO COUNT TWO OF THE INDICTMENT. FIRST, YOU MUST DETERMINE WHETHER THE DEFENDANT IS GUILTY OF THE OFFENSE OF KIDNAPPING, AS I WILL DEFINE THAT OFFENSE FOR YOU. IF YOU FIND THE DEFENDANT GUILTY OF THE OFFENSE, YOU MUST THEN DETERMINE WHETHER ALICE DONOVAN IS DEAD AND WHETHER HER DEATH RESULTED FROM THIS KIDNAPPING. IF, ON THE OTHER HAND, YOU FIND THAT THE DEFENDANT IS NOT GUILTY OF THE OFFENSE OF KIDNAPPING, YOU OBVIOUSLY ARE NOT REQUIRED TO MAKE ANY FURTHER FINDINGS WITH RESPECT TO COUNT TWO.

SECTION 1201 OF TITLE 18 OF THE UNITED STATES CODE PROVIDES IN PERTINENT PART THAT:

**JA 1585**

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

---

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

---

## JOINT APPENDIX AND INDEX
## VOLUME 7

---

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,　　　)　　CR. NO. 4:02-992
　　　　　　　　　　　　　　　　)　　COLUMBIA, SC
　　　　　　　　　　　　　　　　)　　SEPTEMBER 30, 2004
　　　　　　　　　　　　　　　　)
　　　　VERSUS　　　　　　　　　)
　　　　　　　　　　　　　　　　)
BRANDON L. BASHAM,　　　　　　　)
　　　　　　DEFENDANT.　　　　　)
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XIII

APPEARANCES:

FOR THE GOVERNMENT:　　　　　SCOTT SCHOOLS, FIRST AUSA
　　　　　　　　　　　　　　　JONATHAN S. GASSER, AUSA
　　　　　　　　　　　　　　　JOHN DUANE, AUSA
　　　　　　　　　　　　　　　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　　　　　1441 MAIN STREET, SUITE 500
　　　　　　　　　　　　　　　COLUMBIA, SC　29201

FOR THE DEFENDANT:　　　　　　JACK SWERLING, ESQ.
　　　　　　　　　　　　　　　1720 MAIN STREET
　　　　　　　　　　　　　　　SUITE 301
　　　　　　　　　　　　　　　COLUMBIA, SC　29201

　　　　　　　　　　　　　　　GREG HARRIS, ESQ.
　　　　　　　　　　　　　　　1720 MAIN STREET
　　　　　　　　　　　　　　　SUITE 301
　　　　　　　　　　　　　　　COLUMBIA, SC　29201

COURT REPORTER:　　　　　　　　DEBRA R. JERNIGAN, RPR, CRR
　　　　　　　　　　　　　　　UNITED STATES COURT REPORTER
　　　　　　　　　　　　　　　901 RICHLAND STREET
　　　　　　　　　　　　　　　COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

THE COURT: GOOD MORNING. I HAD MY LAW CLERK PUT THE REVISED JURY CHARGE ON YOUR DESKS WITH THE TWO PAGES WITH SUBSTANTIVE CHANGES -- CHANGES, NOT SUBSTANTIVE CHANGES, PAGES 19 AND 54. ANY PROBLEM FROM THE GOVERNMENT WITH WHAT IS ON THE PAPER?

MR. SCHOOLS: NO, SIR.

THE COURT: I UNDERSTAND YOU OBJECTED TO THE CHANGE ON PAGE 19. DO YOU BELIEVE I HAVE CORRECTLY STATED WHAT I ANNOUNCED THE LAW TO BE?

MR. HARRIS: YES, SIR.

THE COURT: AND THEN PAGE 54, JUST CLEANED UP THE ISSUE OF WHO DECIDES THE PENALTY PHASE, DEPENDING UPON WHAT THE VERDICT IS. ANY NEED FOR ME TO GO BACK OVER THE BOTTOM OF PAGE 19, READ THAT PART TO THEM? MR. SCHOOLS? I COULD SAY THAT THE BOTTOM OF PAGE 19 HAS BEEN CLARIFIED, IT IS NOT DIFFERENT FROM WHAT THEY HEARD YESTERDAY, IT HAS JUST BEEN CLARIFIED.

MR. SCHOOLS: THAT IS FINE.

THE COURT: AND READ IT TO THEM.

MR. SWERLING: THAT IS MY UNDERSTANDING, YOU WOULD READ THE WHOLE PAGE TO THEM, 19.

THE COURT: I WILL READ THE WHOLE PAGE TO THEM.

MR. SCHOOLS: I'M SORRY?

THE COURT: MR. SWERLING SAYS HE WANTS THE WHOLE PAGE READ, NOT JUST THE LAST PARAGRAPH.

MR. SCHOOLS: WHICHEVER IS FINE WITH US.

MR. SWERLING: THE LAST PARAGRAPH IS FINE. I THOUGHT YESTERDAY YOU HAD SAID THIS.

THE COURT: I DON'T WANT TO GIVE UNDO EMPHASIS TO ANY PART OF THE CHARGE.

MR. SWERLING: LET'S JUST READ THE PAGE THEN.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: GOOD MORNING, MEMBERS OF THE JURY. WE HAVE GIVEN YOU YOUR JURY INSTRUCTIONS BACK TO YOU. IF YOU WILL TURN TO PAGE 19 WITH ME. GO STRAIGHT TO PAGE 19. AFTER YOU LEFT LAST NIGHT, I REVISED PAGE 19 JUST EVER SO SLIGHTLY. DIDN'T REALLY CHANGE ANYTHING, IT JUST MADE SOME LANGUAGE CLEARER. JUST FOR THE RECORD, I WILL READ ALL OF PAGE 19 AND THE NEXT PAGE TO YOU, PAGE 20. UNDERSTANDING I AM NOT TELLING YOU ANYTHING DIFFERENT THAN WHAT I TOLD YOU YESTERDAY, I AM JUST EXPLAINING IN A LITTLE CLEARER LANGUAGE.

THIS RELATES TO COUNT 1, THE ISSUE OF DEATH RESULTING, WHICH IS AN ISSUE YOU MIGHT OR MIGHT NOT HAVE TO REACH, DEPENDING UPON WHETHER YOU FIND THE CARJACKING WAS PROVEN.

IF YOU DETERMINE THAT THE DEFENDANT, BRANDON LEON BASHAM, IS GUILTY OF THE OFFENSE OF CARJACKING AS DEFINED IN THESE INSTRUCTIONS, YOU MUST DELIBERATE FURTHER TO DETERMINE, A, WHETHER ALICE DONOVAN IS DEAD, AND, IF SO, B, WHETHER HER DEATH RESULTED FROM HER BEING CARJACKED. IN ORDER FOR ALICE

DONOVAN'S DEATH TO RESULT FROM HER BEING CARJACKED, HER DEATH MUST HAVE RESULTED FROM THE WILLFUL AND INTENTIONAL CONDUCT OF THE DEFENDANT, BRANDON LEON BASHAM, OR THE WILLFUL AND INTENTIONAL CONDUCT OF THE CODEFENDANT, CHADRICK EVAN FULKS, AIDED AND ABETTED BY THE DEFENDANT, BRANDON LEON BASHAM. I WILL EXPLAIN THE CONCEPT OF AIDING AND ABETTING LATER IN THESE INSTRUCTIONS.

THE GOVERNMENT ADMITTEDLY HAS NOT PRODUCED ALICE DONOVAN'S BODY. YOU ARE INSTRUCTED THAT THE GOVERNMENT IS NOT REQUIRED TO PRODUCE PHYSICAL EVIDENCE OF DEATH IN ORDER TO PROVE DEATH. AS WITH ANY OTHER FACT AT ISSUE, WHETHER ALICE DONOVAN IS DEAD MAY BE PROVED BY EITHER CIRCUMSTANTIAL OR DIRECT EVIDENCE. YOU ARE TO CONSIDER ALL OF THE EVIDENCE PRESENTED TO YOU DURING THE TRIAL IN MAKING THAT DETERMINATION. AS ALWAYS, THE STANDARD TO WHICH THE GOVERNMENT IS HELD IS PROOF BEYOND A REASONABLE DOUBT.

FOR PURPOSES OF DETERMINING WHETHER ALICE DONOVAN DIED AS A RESULT OF THE CARJACKING, I CHARGE YOU THAT THE COMMISSION OF A CARJACKING CONTINUES AT LEAST WHILE THE CARJACKER MAINTAINS CONTROL OVER THE VICTIM AND HER VEHICLE.

THEREFORE, THE GOVERNMENT DOES NOT HAVE TO PROVE THAT THE DEATH OCCURRED DURING THE ACTUAL CARJACKING. IN OTHER WORDS, THE REQUIREMENT THAT DEATH RESULTED IS SATISFIED IF THE GOVERNMENT PROVES THAT ALICE DONOVAN DIED AS A RESULT OF THE WILLFUL AND INTENTIONAL CONDUCT OF BRANDON BASHAM AND THE

CONDUCT OCCURRED AT ANY POINT DURING THE DEFENDANT'S RETENTION OR POSSESSION OF THE VEHICLE. SIMILARLY, THE REQUIREMENT THAT DEATH RESULTD IS SATISFIED IF THE GOVERNMENT PROVES THAT ALICE DONOVAN DIED AS A RESULT OF THE WILLFUL AND INTENTIONAL CONDUCT OF CHADRICK FULKS, AIDED AND ABETTED BY BRANDON BASHAM, AND THE CONDUCT OCCURRED AT ANY POINT DURING THE DEFENDANT'S RETENTION OR POSSESSION OF THE VEHICLE.

WITH THAT, MY INSTRUCTION IS NOW COMPLETE. YOU MAY KEEP THE COPY YOU HAVE BEEN GIVEN. CLIP IT IN YOUR NOTEBOOK, IF YOU DESIRE TO. ONCE AGAIN, THE FOUR ALTERNATES WILL NEED TO GO DOWN THE HALL TO THE OTHER JURY ROOM WHERE WE WILL JUST KEEP YOU IN CASE WE NEED YOU. IN JUST A MOMENT THE MARSHAL IS GOING TO COME IN, HE IS GOING TO GIVE YOU THE INDICTMENT, WHICH IS THE DOCUMENT WITH THE RED BACKING. REMEMBER THE OVERT ACTS ALLEGED ARE SET OUT ON THE PAGES OF THE INDICTMENT I INDICATED EARLIER. AND THEN THE ORIGINAL VERDICT FORM IS THE DOCUMENT WITH THE BLUE JACKET THAT YOU WILL USE TO RECORD YOUR VERDICT.

YOU WILL ALSO HAVE BROUGHT IN ALL OF THE EXHIBITS. I NEED JUST A MOMENT FOR THE ATTORNEYS TO AGREE ON THE RECORD HERE THAT WE HAVE ALL OF THE EXHIBITS PROPERLY READY TO GO INTO THE JURY. IT MIGHT TAKE TEN OR 15 MINUTES TO GET ALL OF THESE EXHIBITS IN. YOU SHOULDN'T START YOUR DELIBERATIONS UNTIL EVERYTHING IS BROUGHT TO YOU. YOU NEED TO HAVE THESE TWO DOCUMENTS AND ALL EXHIBITS, AND WHEN THEY HAVE ALL BEEN

BROUGHT IN, THE MARSHAL WILL TELL YOU THAT YOU MAY BEGIN YOUR DELIBERATIONS.

MR. SCHOOLS: MAY WE APPROACH, JUDGE?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SCHOOLS: JUDGE, ON PAGE 40, YOU ADDED IN THE STIPULATIONS WERE ALSO EVIDENCE.

THE COURT: RIGHT. YOU WANT ME TO TELL THEM THAT?

MR. SCHOOLS: YES, SIR.

THE COURT: ALL RIGHT.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED.)

THE COURT: ONE MORE THING, LADIES AND GENTLEMEN, LOOK AT PAGE 4. THIS IS AN ADDITION THAT I SHOULD HAVE MENTIONED EARLIER. ON PAGE 4, THE VERY FIRST SENTENCE SAYS OR READS, AS STATED EARLIER, YOU MUST CONSIDER ONLY THE EVIDENCE THAT I HAVE ADMITTED IN THE CASE. THE TERM "EVIDENCE" INCLUDES THE TESTIMONY OF WITNESSES, THE EXHIBITS ADMITTED INTO THE RECORD, AND ANY STIPULATIONS AGREED TO BY THE PARTIES. WHEN I INSTRUCTED YOU YESTERDAY, I DID NOT MAKE REFERENCE TO THE STIPULATIONS. THE STIPULATIONS ARE EVIDENCE, AS WELL.

SO, WITH THAT, MY INSTRUCTIONS ARE NOW COMPLETE. THE FOUR ALTERNATES NEED TO GO DOWN TO THE OTHER JURY ROOM. THE 12 REGULAR JURORS NEED TO GO TO THIS JURY ROOM. DO NOT BEGIN YOUR DELIBERATIONS UNTIL ALL OF THIS MATERIAL IS BROUGHT INTO

YOU AND THE MARSHAL TELLS YOU THAT YOU MAY BEGIN.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: ALL RIGHT. I UNDERSTAND WE HAVE SOME OBJECTION AS TO THE PACKAGING OF THE EXHIBITS.

MR. HARRIS: YES, SIR. WE WORKED IT OUT, THOUGH, JUDGE. THERE ARE SOME EXHIBITS THAT WERE PACKAGED IN A MANNER THAT THEY IDENTIFIED THINGS THAT DID NOT COME INTO EVIDENCE, I WILL GIVE YOU A GOOD EXAMPLE. A BOOT MARKED AS GOVERNMENT'S EXHIBIT 222-H WAS IDENTIFIED ON THE PACKAGING AS RIGHT CAMO BOOT WITH FIBER AND HAIR AND MUD. FIBER AND HAIR AND MUD DIDN'T COME INTO EVIDENCE. WE WERE OBJECTING. WE HAVE WORKED IT OUT WITH MR. GASSER, AND MR. SCHOOLS, AND MR. DUANE THAT THE PACKAGING WILL NOT GO BACK. WE WILL RE-MARK, IN THIS SPECIFIC INSTANCE, THE BOOT WITH 222-H, AND IT WILL GO BACK TO THE JURY IN THAT MANNER.

THE COURT: ANYTHING ELSE LIKE THAT NEEDS TO BE DONE?

MR. HARRIS: NO. WE ARE GETTING IT DONE RIGHT NOW JUDGE. IT SHOULD BE DONE AT THE SAME TIME.

THE COURT: YOU MEAN MORE THAN JUST A BOOT THAT NEEDS TO BE RE-MARKED?

MR. HARRIS: ABOUT TEN ITEMS.

THE COURT: MIGHTY LATE IN THE DAY TO BE DOING THAT. JURY CAN'T START DELIBERATIONS UNTIL THIS IS DONE. JUST FOR

THE RECORD, LET'S'S GO THROUGH WHAT NEEDS TO BE RE-MARKED.

MR. HARRIS:  THERE IS A 222-Q.

THE COURT:  I WILL TAKE A RECESS.  HAVE A WRITTEN LIST TO PUT ON THE RECORD OF THE CHANGES THAT HAVE BEEN MADE. ALL OF THESE EXHIBITS CAME IN WITHOUT OBJECTION.  THE JURY IS GOING TO WONDER WHAT IN THE WORLD IS GOING ON.  JUST MARK IT AND LET ME KNOW WHEN YOU ARE READY TO RESUME.  WE WILL BE IN RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:  ALL RIGHT.  DO WE HAVE EVERYTHING RE-MARKED AND READY TO GO TO THE JURY,  MR. SCHOOLS?

MR. SCHOOLS:  ALL WE DID WAS REMOVE LABELS FROM THREE DIFFERENT EXHIBITS,  NUMBER 94,  NUMBER 222-H, AND NUMBER 222-D.  WE DID HAVE TO RE-MARK,  TAKE THE LABELS OFF THE BAG.

THE COURT:  THAT CURED THE PROBLEM?

MR. SCHOOLS:  YES, SIR.

THE COURT:  MR. HARRIS, YOU ARE SATISFIED THAT THAT TAKES CARE OF THE PROBLEMS?  SO I UNDERSTAND,  THE LABELS REFERRED TO OTHER EVIDENCE NOT INTRODUCED THAT HAS BEEN CORRECTED, NOW WE CAN SEND THE EXHIBITS IN?

MR. SCHOOLS:  THAT IS TRUE OF ONE OF THE LABELS,  ONE REFERENCED THE LABEL OF THE VEHICLE WHERE THE EVIDENCE WAS RETRIEVED.  MR. HARRIS DIDN'T WANT THAT.

THE COURT:  WE CAN SEND THE EVIDENCE IN AND TELL THEM TO BEGIN THEIR DELIBERATIONS.  WHAT DID WE DO IN TERMS

OF LAST TIME HAVING SOME MARSHALS HELP US DELIVER? ANY OBJECTION TO SEVERAL COURTROOM SECURITY OFFICERS ASSISTING MS. FLOYD TAKING IN ALL OF THE EXHIBITS?

MR. HARRIS: NO, SIR.

MR. SCHOOLS: NO, SIR.

THE COURT: WON'T BE ANY LAW ENFORCEMENT ASSOCIATED WITH THE CASE, BE COURTROOM SECURITY OFFICERS. IF YOU WANT TO GO BACK TO YOUR OFFICES, YOU MAY. JUST STAY ON -- WHY DON'T I ASK YOU TO STAY HERE FOR MAYBE 15 MINUTES AFTER THEY BEGIN JUST SO WE DON'T GET A QUICK QUESTION. SOMETIMES A QUICK QUESTION COMES IN. IF WE DON'T HEAR ANYTHING, LET'S JUST STAY HERE UNTIL 15 MINUTES AFTER THE EXHIBITS GOES IN. ONCE THAT 15-MINUTE TIME PASSES, YOU CAN GO BACK TO YOUR OFFICE AND BE ON STANDBY. BE HERE ON CALL WITHIN A 15-MINUTE TURNAROUND, HOW ABOUT THAT? BE AVAILABLE TO BE HERE WITHIN 15 MINUTES. MAKE SURE MS. FLOYD HAS A GOOD NUMBER FOR WHERE YOU WILL BE.

MAKE IT CLEAR, MS. FLOYD WILL NOT SEND THE ROUNDS OF AMMUNITION BACK WITH THE EXHIBITS. THEY WILL STAY OUT.

MR. SWERLING: WE UNDERSTAND.

THE COURT: VERY GOOD. WE WILL BE IN RECESS. THANK YOU.

(WHEREUPON, THE JURY BEGAN DELIBERATING AT 9:41.)

(WHEREUPON, AT 1:00, THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT: THE JURY HAS SENT IN TWO NOTES. THE

FIRST ONE CAME IN AT 11:50. I HAD MY SECRETARY FAX IT TO BOTH SIDES. IT READS AS FOLLOWS:

"NEED CLARIFICATION ON COUNT 1, ELEMENT 5. DOES THE INTENT TO CAUSE BODILY HARM OR DEATH INCLUDE ONLY THE INITIAL ACT OF TAKING THE CAR OR THE ENTIRE TIME THE CAR (SIC) WAS IN POSSESSION OF THE CAR?"

I THINK THAT IS CLEARLY IN THE INSTRUCTION, BUT APPARENTLY THEY DON'T UNDERSTAND IT. WHAT IS THE GOVERNMENT'S POSITION?

MR. SCHOOLS: YOUR HONOR CHARGED THEM THAT THE CARJACKING LASTS AS LONG THEY HAVE POSSESSION OF BOTH THE VEHICLE AND THE VICTIM. I THINK THE INTENT OCCURS ANY TIME DURING THE COURSE OF THE CARJACKING. IT WOULD MAKE NO SENSE TO HAVE A CHARGE OF THE CARJACKING LAST ONE PERIOD OF DURATION WITH RESPECT TO WHETHER IT CAUSED DEATH AND ANOTHER TIME PERIOD WITH RESPECT TO INTENT.

THE COURT: IT IS SOMEWHAT CONFUSING BECAUSE IT REFERS TO ELEMENT FIVE, AND THERE IS NO ELEMENT FIVE. IT SEEMS TO ME THEY ARE TALKING ABOUT THE INTENT FACTOR REQUIRED FOR THE STRAIGHT-UP CARJACKING BECAUSE THEY USE THE LANGUAGE "BODILY HARM OR DEATH." AND THAT IS LANGUAGE THAT APPEARS IN THE CARJACKING COMPONENT, NOT THE ENHANCEMENT FOR DEATH RESULTS.

MR. SCHOOLS: YES, SIR. BUT WE THINK -- I THINK IT

IS ANSWERED IN YOUR CHARGE, TOO. I THINK THE ANSWER TO THE QUESTION --

THE COURT: YES. I THINK THE STRAIGHT-UP ANSWER IS YES.

MR. SCHOOLS: WELL, IT IS AN EITHER/OR QUESTION. THE ANSWER IS THE ENTIRE TIME THE CAR WAS IN POSSESSION OF THE DEFENDANTS -- THE CAR AND THE VICTIM WERE IN THE POSSESSION OF THE DEFENDANT.

THE COURT: I THINK I CAN JUST SAY I CAN ANSWER THIS QUESTION BY REREADING TO YOU FROM PAGE 18 OF THE CHARGE.

MR. SCHOOLS: THERE IS A DURATIONAL PROBLEM THAT IS ANSWERED ON A DIFFERENT PAGE, JUDGE, I THINK.

MR. SWERLING: NOT PART OF THE CARJACKING, PART OF THE KIDNAPPING STATUTE. UNDER DEATH RESULTING.

THE COURT: WELL, REALLY, TO ANSWER THE QUESTION, IF YOU LOOK AT PAGE 18, AND YOU LOOK AT THE STATUTE, THE STATUTE REQUIRES THAT THE INTENT EXIST AT THE MOMENT THE DEFENDANT COMMANDED OR TOOK CONTROL OF THE VEHICLE.

MR. SWERLING: CORRECT. IT IS DIFFERENT THAN KIDNAPPING, WHICH IS OVER THE TIME THEY HAVE IT. IT HAS TO EXIST AT THE TIME, IS OUR POSITION.

MR. SCHOOLS: BUT YOU CHARGED THEM ON PAGE 19, THAT COMMISSION OF A CARJACKING CONTINUES AT LEAST WHILE THE CARJACKER MAINTAINS CONTROL OVER THE VICTIM AND THE VEHICLE.

THE COURT: BUT THAT IS ON THE DEATH RESULTING PART.

MR. SCHOOLS: THAT IS MY POINT. I DON'T THINK IT MAKES ANY SENSE TO SUGGEST THAT THE DURATION OF THE CARJACKING, THE INTENT ELEMENT -- SUPPOSE, FOR EXAMPLE, A DEFENDANT KIDNAPS OR CARJACKS A VICTIM. THEY ARE DRIVING OVER AN HOUR AND THEN HE DECIDES, YOU KNOW, I THINK I NEED TO KILL THIS PERSON. AND THEN HE KILLS THEM. IS THAT NOT A CARJACKING? THAT IS A PREPOSTEROUS RESULT. CONGRESS CANNOT HAVE INTENDED THAT IF YOUR INTENT, WHATEVER YOU DID WITH THE VICTIM DEVELOPS DURING THE COURSE OF A CARJACKING BEFORE YOU RELINQUISH CUSTODY OF THE VICTIM THAT THAT IS NOT --

THE COURT: THERE AGAIN, THAT LANGUAGE WAS DIRECTLY FROM A PATTERN CHARGE BOOK. IT IS NOT SOMETHING I CONSTRUCTED FROM WHOLECLOTH MYSELF. WE TOOK THOSE WORDS STRAIGHT OUT. THE STATUTE SAYS, "WHOEVER, WITH THE INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM, TAKES A MOTOR VEHICLE." YOU SAY THE TAKING IS DEEMED A CONTINUING OFFENSE.

MR. SCHOOLS: THAT IS WHAT YOU TELL THEM ON PAGE 19. I DON'T KNOW HOW YOU CAN HAVE A CARJACKING THAT LASTS FOR THREE HOURS FOR THE PURPOSE OF ONE ELEMENT AND FIVE SECONDS FOR PURPOSE OF THE OTHER.

THE COURT: ONLY IN THE LAW COULD SOMEBODY MAKE THAT ARGUMENT. THAT THE INTENT IS ONE THING FOR ONE ISSUE AND ANOTHER THING FOR ANOTHER ISSUE.

MR. SCHOOLS: I THINK AMONG THE TENETS OF STATUTORY CONSTRUCTION IS YOU TRY NOT TO REACH AN ABSURD RESULT, AND I

THINK THAT WOULD BE ABSURD TO SUGGEST THAT THAT STATUTE IS NOT VIOLATED BY SOMEONE WHO KIDNAPS SOMEONE WITHOUT THE SPECIFIC INTENT TO DO BODILY HARM, KEEPS CUSTODY OF THE PERSON WITH THEIR CAR, AND THEN JUST PRIOR TO DECIDES, WELL, I THINK I WANT TO KEEP THE CAR PERMANENTLY AND KILLS THE VICTIM AND TAKES OFF.

THE COURT: MR. SWERLING, WHAT ABOUT THAT?

MR. SWERLING: JUDGE, THERE IS A DIFFERENCE. IN THE CHARGE ITSELF REGARDING COUNT 1, DEFINITION OF COUNT 1, I THINK THE COURT IS CORRECT THAT THE INTENT TO DO SERIOUS BODILY HARM TO CAUSE DEATH HAS TO BE AT THE TIME THE CARJACKING TOOK PLACE. THERE IS ALSO THE CONDITIONAL INTENT FACTOR WE TALKED ABOUT THAT YOU HAD TO BE -- IF YOU WERE PREPARED TO CAUSE DEATH OR SERIOUS BODILY HARM, IF THE PERSON DID NOT RELINQUISH THE CAR. THAT IS PART OF YOUR CHARGE.

IF YOU GO TO THE DEATH RESULTING PART OF THE CHARGE, WHAT I THINK IS THAT THAT MEANS IS THAT IF SOME TIME DURING A CARJACKING IF YOU HAD THE INTENT TO DO SERIOUS BODILY HARM, AND DURING THE CARJACKING YOU FORMULATED AN INTENT TO KILL, THEN THAT IS WHAT -- THAT IS HOW I READ YOUR DEFINITION OF DEATH RESULTING OR CARJACKING RESULTING IN DEATH. THAT YOU INITIALLY MAYBE HAD AN INTENT TO DO SERIOUS BODILY HARM, BUT IT DEVELOPED INTO AN INTENT TO KILL SO THAT THAT PART OF IT WOULD BE A CONTINUING CRIME.

MR. SCHOOLS: YOUR HONOR.

MR. SWERLING: THE STATUTE ITSELF CLEARLY SAYS, AT THE TIME.

THE COURT: I AM LOOKING FOR THE LANGUAGE THAT SAYS THAT THE -- IT TALKS ABOUT CONDITIONAL INTENT, AND I CAN'T FIND IT.

MR. SWERLING: IT IS THE SECOND SENTENCE. THE GOVERNMENT MAY ALSO MEET ITS BURDEN BY PROVING AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OF THE CAR, THAT HE POSSESSED THE INTENT TO SERIOUSLY KILL OR HARM THE VICTIM IF NECESSARY TO STEAL THE CAR. IN OTHER WORDS, IF THEY DIDN'T GIVE UP THE CAR. THEN YOU HAD THE THIRD SENTENCE, WHICH IS WHAT WE OBJECTED TO.

THE COURT: ALL RIGHT.

MR. SCHOOLS: MR. SWERLING JUST ADDED ANOTHER ELEMENT TO THIS OFFENSE AGAIN. HE SAID THE INTENT TO KILL HAS TO DEVELOP SOME TIME, THERE IS NO INTENT TO KILL ELEMENT IN CARJACKING. WE DISCUSSED THAT AD NAUSEAM WITH RESPECT TO THE DEATH RESULTING PART. THE INTENT TO DO SERIOUS BODILY INJURY OR DEATH ARE WHAT THE ELEMENTS SAY. I THINK THIS IS A PROBLEM WE GOT INTO BECAUSE, IN EFFECT, WHEN WE GOT TO DEATH RESULTING LANGUAGE, WE CHANGED COURSE FROM WHAT THE STATUTE SAYS. I BELIEVE THAT THE, AT THE MOMENT LANGUAGE, CONTEMPLATES A MOMENTARY CARJACKING. WHERE, IN THE TRADITIONAL SENSE, WHERE SOMEONE GOES INTO A PARKING LOT, STICKS A GUN TO SOMEONE'S HEAD, TAKES THE CAR, AND LEAVES THE

VICTIM IN THE PARKING LOT.

IT MAKES NO SENSE TO SUGGEST THAT WHEN THEY KEEP THE VICTIM WITH THE CAR FOR A PERIOD OF TIME, DURING THE COURSE OF THAT TIME PERIOD DEVELOPS THE INTENT TO SERIOUSLY INJURE OR KILL THAT THAT INTENT DOESN'T SATISFY THAT ELEMENT.  THAT IS JUST LUDICROUS.

THE COURT:  I THINK I AGREE WITH YOU.  I AM JUST STRUGGLING WITH --  MR. SWERLING, CARJACKING IS A CONTINUING OFFENSE IF THEY TAKE THE OWNER OF THE CAR WITH THEM.

MR. SWERLING:  THAT'S CORRECT, JUDGE.  BUT THE DIFFERENCE IS THAT IN THE CARJACKING STATUTE, CONGRESS MADE THE INTENT TO DO SERIOUS BODILY HARM OR CAUSE DEATH AT THE MOMENT YOU TAKE THE CAR.  IF IT DOES NOT EXIST AT THE MOMENT YOU TAKE THE CAR, THEN IT IS NOT CARJACKING.  THAT IS CLEARLY WHAT THE STATUTE SAYS, AND THAT IS WHAT THE CHARGE SAYS. NOW, THE ONLY ELABORATION ON THAT IS --

THE COURT:  THE CHARGE ALSO SAYS, CARJACKING IS A CONTINUOUS OFFENSE WHILE THE CARJACKER MAINTAINS CONTROL OF THE VEHICLE.

MR. SCHOOLS:  AND THE VICTIM.

THE COURT:  PAGE 19.  "I CHARGE YOU THAT THE COMMISSION OF A CARJACKING CONTINUES AT LEAST WHILE THE CARJACKER MAINTAINS CONTROL OF THE VICTIM AND THE VEHICLE."

MR. SWERLING:  THAT IS PART OF THE DEATH RESULTING CHARGE, NOT THE DEFINITION OF THE STATUTE.  THAT IS WHY I SAY

JA 1600

YOU HAVE TO READ IT. WHAT THE DEATH RESULTING MEANS THAT, AT SOME POINT, YOU FORMULATED AN INTENT CHANGES, THEN IT MAKES SENSE THAT UNDER THE DEFINITION OF DEATH RESULTING IN, THAT IT IS A CONTINUING CRIME. BUT NOT THE DEFINITION OF THE STATUTE ITSELF.

MR. SCHOOLS: THERE IS NO WAY THAT IS WHAT CONGRESS INTENDED WHEN THEY DEVELOPED THAT STATUTE. THAT IS UNFATHOMABLE THAT CONGRESS WOULD HAVE CONCLUDED, BELIEVED THAT IN A CARJACKING CASE, WHERE A CARJACKING TAKES PLACE, NOT IN THE TRADITIONAL WAY, BUT WHERE THE VICTIM IS LEFT IN THE CONTROL OF THE DEFENDANT FOR A PERIOD OF TIME, THAT IF HE DIDN'T INTEND TO SERIOUSLY INJURE OR KILL AT THE MOMENT HE GOT CUSTODY OF BOTH THE VICTIM AND THE CAR, THAT THAT IS NOT A FEDERAL OFFENSE. I MEAN THAT IS NO WAY THAT IS WHAT THEY INTENDED. I DON'T THINK THAT IS WHAT THE STATUTE SAYS. AND THE CASES THAT INTERPRET THE DURATION OF A CARJACKING ARE COMMONSENSE CASES THAT INDICATE THAT THAT IS WHAT THE STATUTE INTENDED TO COVER.

MR. SWERLING: I DON'T THINK YOU CAN GO BACK AND REDEFINE SOMETHING THAT HAS ALREADY BEEN DEFINED TO THEM AS PART OF THE CARJACKING STATUTE.

THE COURT: I GUESS WHAT I AM SAYING IS, TO SOME EXTENT, THE CHARGE, WHICH THIS OBJECTION WAS NEVER LODGED BY EITHER SIDE, BUT THE CHARGE IS SOMEWHAT INTERNALLY INCONSISTENT IN THAT THE -- WITH THE INTENT FACTOR ON THE

BASIC OFFENSE OF CARJACKING, IT SEEMS TO FOCUS ON THE MOMENT THE CAR IS TAKEN. WHEREAS, ON THE DEATH RESULTS ISSUE, WHERE INTENT ONCE AGAIN COMES INTO PLAY, I TELL THEM THAT CARJACKING IS CONTINUOUS AND THAT THE INTENT REQUIREMENT OR THAT THE CAUSE DEATH REQUIREMENT, DEATH RESULTS REQUIREMENT, I SHOULD SAY, CAN ARISE AT ANY TIME DURING THE COURSE OF THE CARJACKING, AS LONG AS THE DEFENDANT HAD THE VICTIM IN THE CAR. SO, I MEAN, THE TWO IDEAS ARE BUTTING HEADS WITH EACH OTHER WITHIN THE CHARGE.

MR. SCHOOLS: I DON'T HAVE A CASE AT MY FINGERTIP, JUDGE, I THINK IF YOU LOOK AT THE CASES WHERE THIS AT MOMENT LANGUAGE DEVELOPS THEY WOULD BE TRADITIONAL-TYPE CARJACKINGS, NOT CARJACKINGS WHERE --

THE COURT: LOGICALLY, THAT MAKES SENSE TO ME. I AM JUST NOT SURE. MAYBE WE OUGHT TO TAKE A QUICK RECESS AND LET'S JUST DO A LITTLE BIT OF RESEARCH. LET'S DO THAT. YOU NEED SOME TIME TO GET THE VIDEO BACK OVER HERE ANYWAY?

MR. SCHOOLS: NO, IT JUST GOT HERE. THERE IS A FIRST CIRCUIT CASE, I DON'T HAVE A NAME OF IT, I AM TRYING TO FIND IT, WHERE THE CONCURRING OPINION ADDRESSES THIS ISSUE AND SAYS ESSENTIALLY THE SAME THING WE ARE ARGUING. I AM TRYING TO FIND THE CITE.

THE COURT: LET'S TAKE A 15-MINUTE RECESS. THE JURY ALSO WANTED DEFINITION OF INTENT. I DON'T KNOW THAT THAT WORD NEEDS DEFINING, BUT WE DID LOOK UP BLACK'S LAW

DICTIONARY THAT SAYS, "INTENT MEANS DESIGN, RESOLVE, OR DETERMINATION WITH WHICH A PERSON ACTS. BEING A STATE OF MIND, IT IS RARELY SUSCEPTIBLE OF DIRECT PROOF, BUT MUST ORDINARILY BE INFERRED FROM THE FACTS." I SUPPOSE THAT IS THE BEST I CAN DO TO ANSWER THAT QUESTION. ANY PROBLEM FROM THE GOVERNMENT WITH THAT DEFINITION BEING GIVEN?

MR. SCHOOLS: NO, SIR.

MR. HARRIS: WE OBJECT.

THE COURT: YOU OBJECT TO IT?

MR. HARRIS: YES, SIR.

THE COURT: YOU WANT ME TO JUST SAY INTENT MEANS INTENT?

MR. HARRIS: YES, SIR.

THE COURT: I MEAN, THE JURY HAS ASKED ME A QUESTION.

MR. HARRIS: IT IS NOT IN THE CHARGE, JUDGE. TO SUPPLEMENT THE CHARGE, AT THIS TIME, WE OBJECT TO ANY SUPPLEMENTING OF THE CHARGE.

MR. SCHOOLS: I AM CURIOUS IF THERE IS A LEGAL BASIS.

THE COURT: SOME THINGS LIKE REASONABLE DOUBT THE FOURTH CIRCUIT HAS SAID I SHOULD NOT DEFINE. IF THEY ASK ME FOR A DEFINITION, I SHOULD DECLINE.

MR. HARRIS: YOUR INSTRUCTION SUGGESTS -- WHAT YOU JUST READ SUGGESTS THAT, FROM MR. BASHAM'S ACTIONS, GETTING INTO A CAR WITH A GUN, THEY COULD INFER HE HAD THE ACT. AND

WE WOULD -- WE DO NOT BELIEVE THAT THAT IS A SUPPLEMENTING OF THE RECORD.

THE COURT: IT IS A QUESTION THAT WE HAVE DETERMINED IS NOT DEFINED PRESENTLY IN THE CHARGE AND THEY HAVE ASKED TO HAVE IT DEFINED, AND THERE IS A LEGAL DEFINITION OF IT. LET ME THINK ABOUT IT.

THE THIRD THING THEY WANTED WAS TO SEE THE VIDEO AGAIN. NOW, I DON'T KNOW -- IF WE JUST PLAY IT FROM BEGINNING TO END, MR. SCHOOLS, WITHOUT SOMEONE TO QUEUE IT UP TO THE RELEVANT PORTION, THEY WILL NOT KNOW WHAT THEY ARE LOOKING AT, WILL THEY?

MR. SCHOOLS: I CAN DO THAT.

THE COURT: DON'T YOU THINK YOU WILL NEED -- IF THEY WANT TO SEE THE ACTUAL ABDUCTION, YOU WILL HAVE TO FORWARD TO IT THE PROPER PLACE AND THEN PLAY IT FROM THAT POINT FORWARD, RIGHT?

MR. SCHOOLS: THAT IS NOT A PROBLEM.

THE COURT: ANY PROBLEM WITH DOING THAT, OR DOES THE DEFENDANT WANT TO PLAY THE WHOLE TAPE?

MR. SCHOOLS: THE ONLY PART WE HAVE OFFERED IS A FAIRLY SHORT SEGMENT THAT INCLUDES THE CARJACKING. THE TAPE ITSELF IS AN HOUR BEFORE THE EVENT.

THE COURT: YOU ARE SATISFIED JUST TO PLAY THE TAPE THAT IS IN EVIDENCE WITH NO ARRANGEMENT, NO LINING IT UP AT A SPECIFIC POINT?

MR. SCHOOLS: YES, SIR. THE ONLY THING THAT I WOULD MENTION IS THAT THERE IS ACTUALLY TWO VERSIONS OF IT IN EVIDENCE. THERE IS ONE VERSION THAT IS A THREE-PANEL VERSION THAT SHOWS THE DATE AND TIME. AND THERE IS ANOTHER VERSION WITH JUST THE ONE PANEL THAT SHOWS JUST THE CARJACKING. THAT ONE-PANEL VERSION IS ACTUALLY CLEARER THAN THE THREE-PANEL VERSION.

MR. HARRIS: WE ARE FINE IN SENDING BACK TO THEM THE ONE-PANEL VERSION. WE AGREE WITH MR. SCHOOLS, THAT IS A CLEARER VERSION OF WHAT THEY ARE ASKING FOR.

THE COURT: BOTH SIDES AGREE -- WE CAN'T SEND IT BACK, WE HAVE TO DO IT OUT HERE. WE DON'T HAVE VIDEO EQUIPMENT IN THE ROOM. BOTH SIDES AGREE TO PLAY BACK THE ONE-PANEL VERSION?

MR. HARRIS: ONE SUGGESTION I WILL MAKE, YOUR HONOR. I DON'T KNOW IF THEY WANT TO STOP AND START IT. I DON'T KNOW IF THEY WANT TO DISCUSS IT. I DON'T KNOW WHAT THEIR PREROGATIVE IS. I WOULD SUGGEST THAT WE GIVE THEM THE ABILITY TO WATCH IT OUTSIDE OF OUR PRESENCE, IF THAT IS WHAT THEY WANT TO DO, TO DISCUSS THAT VIDEOTAPE. AND TO DO THAT MAY INVOLVE US LEAVING THE COURTROOM, ALLOWING THEM ACCESS TO THE MACHINES, AND COURTROOM STAFF PLAYING THE VIDEOTAPE AT THEIR INSTRUCTIONS.

THE COURT: WHY DON'T I SEND IN A QUESTION AND ASK THEM IF THEY WANT TO DO IT AND FIND OUT?

MR. HARRIS:  YES, SIR.

THE COURT:  JUST POINTED OUT TO ME, IF THEY TALK ABOUT THE TAPE IN HERE,  IT IS PIPED ALL OVER THIS BUILDING. WE CAN'T LET THEM DELIBERATE.

MR. HARRIS:  I DIDN'T REALIZE THAT.

THE COURT:  I DIDN'T THINK ABOUT THAT EITHER.  I WILL SCRATCH OUT THE QUESTION I STARTED TO ASK THEN.

MS. FLOYD SAYS SHE CAN MUTE IT.  THERE WILL HAVE TO BE AT LEAST ONE TECHNICIAN HERE TO PLAY THE TAPE WHO WILL HEAR THE DELIBERATIONS.

MR. HARRIS:  I DON'T MIND THE YOUNG LADY FROM THE GOVERNMENT'S OFFICE RUNNING THE TAPE, COMING IN FOR PURPOSES OF OPERATING THE MACHINERY.

MR. SCHOOLS:  MS. FLOYD HAS INDICATED THAT  -- NEVER MIND.

THE COURT:  MY QUESTION SAYS, DO YOU WANT TO VIEW THE VIDEOTAPE WITH NO ONE ELSE IN THE COURTROOM EXCEPT THE OPERATOR WHERE YOU CAN DISCUSS THE CASE OR IS IT PERMISSIBLE FOR ALL PARTIES TO BE IN HERE WHILE YOU WATCH THE VIDEO?  TAKE THIS TO THEM, PLEASE.

MR. HARRIS:  IF I MAY ADDRESS THE ISSUE THAT WE WILL RESEARCH DURING THE BREAK,  BRIEFLY.

THE COURT:  GO AHEAD.

MR. HARRIS:  THE ONLY POINT I WOULD LIKE TO SAY BEFORE WE TAKE A BREAK AND GET AWAY FROM THAT,  YOUR HONOR, IT

SEEMS TO ME THAT THE GOVERNMENT, WITH A STRICT STATUTORY INTERPRETATION, TOOK THE POSITION WITH COUNT TWO, OVER OUR STRENUOUS OBJECTION, THAT THE DEATH RESULTING REQUIRING SCIENTER DID NOT -- WAS NOT APPLICABLE AND THE JUDGE ALLOWED THEM, BASED ON THE WAY THE STATUTE WAS DRAFTED, ALLOWED THAT LANGUAGE NOT TO GO BACK TO THE JURY.

IN COUNT ONE, CLEARLY CONGRESS DRAFTED AN INTENT REQUIREMENT.

NOW WHAT IT SEEMS LIKE IS HAPPENING IS, REGARDLESS OF WHAT CONGRESS'S INTENT WAS, WE ARE IN THE PROCESS NOW OF WATERING DOWN THE INTENT -- THE INTENT PORTION OF THAT STATUTE. IT JUST SEEMS INCONSISTENT TO ME, YOUR HONOR.

THE COURT: WELL, I UNDERSTAND. BUT I GUESS MY CONCERN IS, AS MR. SCHOOLS SAID, IF YOU ARE RIGHT, SOMEONE WHO CARJACKS AND TAKES A HOSTAGE, AND TEN MINUTES OUT OF THE PARKING LOT KILLS THAT HOSTAGE IN FRONT OF A DOZEN EYE WITNESSES, IS NOT GUILTY OF KIDNAPPING. WHEREAS, SOMEONE WHO -- DIDN'T HAVE THE REQUISITE INTENT, IN OTHER WORDS. BUT SOMEONE WHO TAKES A HOSTAGE -- SOMEONE WHO TAKES A CAR AND NO HOSTAGE IS GUILTY OF CARJACKING. THAT JUST SEEMS SOMEWHAT INCONGRUOUS TO ME.

MR. HARRIS: IT SEEMS TO ME IN YOUR HYPOTHETICAL, JUDGE, IT WOULD BE A QUESTION OF FACT FOR THE JURY. THE HYPOTHETICAL YOU HAVE JUST GIVEN US, THAT MR. SCHOOLS HAS GIVEN YOU, WOULD BE A QUESTION OF FACT. THAT WOULD BE

SOMETHING THAT BOTH SIDES WOULD BE ARGUING ABOUT. EVEN IN THOSE HYPOTHETICALS, THEY WOULD BE DISCUSSING INTENT. SO, I DON'T KNOW THAT WE ARE THAT FAR OFF. I DON'T KNOW THAT IT IS THAT OUTRAGEOUS TO BELIEVE THAT CONGRESS INTENDED FOR THE STATUTE --

THE COURT: THIS IS TOO IMPORTANT AN ISSUE TO RULE ON IN A VACUUM. I WANT TO DO SOME RESEARCH AND SEE IF THERE ARE ANY CASES OUT THERE. MR. SCHOOLS, YOU SAY YOU THINK YOU HAVE SOME AUTHORITY SOMEWHERE?

MR. SCHOOLS: THERE IS A CONCURRING OPINION IN A FIRST CIRCUIT CASE, JUDGE, I AM TRYING TO FIND THE NAME OF THE CASE.

THE COURT: LET'S TAKE A 15-MINUTE RECESS WHILE BOTH SIDES CAN DO SOME RESEARCH.

MR. SWERLING: JUDGE, MR. BASHAM HAS ASKED ME TO ASK YOU WHETHER OR NOT HE CAN HAVE A LITTLE BREAK BACK THERE.

THE DEFENDANT: I HAVEN'T HAD ONE TODAY.

THE COURT: LET'S TALK ABOUT THAT. THE MARSHAL TELLS ME THAT A VALIUM PILL SHOWED UP IN THE DETENTION CENTER LAST NIGHT IN THE POSSESSION OF ANOTHER INMATE. THEY HAD IT EVALUATED, IT APPEARS TO BE MR. BASHAM'S VALIUM PILL BECAUSE NOBODY ELSE IN THE FACILITY IS ADMINISTERED VALIUM RIGHT NOW. IT LOOKS AS THOUGH, ARGUABLY, I MEAN, IF THIS REPORT IS TO BE BELIEVED, HE HAS BEEN PASSING OFF HIS VALIUM AND NOT TAKING IT.

THE DEFENDANT: IF YOU COULD REPEAT THAT.

COURT OFFICER: YOUR HONOR, I BELIEVE IT WAS SUNDAY.

THE COURT: SUNDAY, A VALIUM PILL SHOWED UP IN THE POSSESSION OF ANOTHER INMATE AT THE DETENTION CENTER WHERE MR. BASHAM IS BEING HELD.

THE DEFENDANT: OH, THAT UM. IT CAN BE EXPLAINED. I WOULD LIKE TO TALK.

THE COURT: YOU TALK ABOUT IT, WE WILL TAKE IT UP WHEN WE COME BACK. I DON'T WANT TO HAVE A BREAK YET.

THE DEFENDANT: GIVE ME ONE SECOND, IT IS VERY SIMPLE.

THE COURT: THE JURY SAYS THEY WOULD LIKE TO WATCH THE VIDEO ALONE. SO LET'S GO AHEAD AND CLEAR THE COURTROOM. HAVE YOUR VIDEOGRAPHER QUEUE IT UP TO THE RIGHT PLACE AND PLAY IT FOR THE JURY, WHILE EVERYONE ELSE IS OUTSIDE THE ROOM. THEN HAVE THE VIDEOGRAPHER NOTIFY THE MARSHAL. ANY PROBLEM WITH THE MARSHAL STAYING IN HERE WHILE IT IS BEING VIEWED?

MR. SCHOOLS: NO, SIR.

MR. SWERLING: NO, SIR.

THE COURT: THERE WILL BE TWO PEOPLE, MR. PRIEST AND THE VIDEOGRAPHER, AND EVERYONE ELSE CAN LEAVE. MR. PRIEST, ONCE IT IS PLAYED, IF YOU WILL TAKE THE JURY BACK IN THE ROOM AND THEN ADVISE THE PEOPLE IN THE HALL THEY CAN RETURN.

LET'S TAKE A 20-MINUTE RECESS. BOTH SIDES ARE INVITED TO GIVE ME SOME AUTHORITY ON THIS OTHER ISSUE.

(WHEREUPON, AT 1:25 THE VIDEOTAPE WAS PLAYED FOR THE JURY.)

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: PLEASE BE SEATED. LET ME JUST SHARE WITH YOU WHAT OUR RESEARCH HAS TURNED UP AND THEN I WILL HEAR FROM COUNSEL. I WANT YOU TO KNOW WHAT CASES I AM AWARE OF. TO BEGIN WITH, WE CONSTRUCTED OUR CHARGE DRAWING VERBATIM FROM THE PATTERN CHARGE BOOK ENTITLED MODERN FEDERAL JURY INSTRUCTIONS, WHICH FOCUSES THE JURY'S ATTENTION ON THE INTENT OF THE DEFENDANT AS IT EXISTED AT THE PRECISE MOMENT OF TAKING THE CAR. TRIED TO LOOK UP THE DEFINITION OF CARJACKING, COULDN'T FIND ONE IN THE DICTIONARY, BUT I DID GET BUREAU OF JUSTICE, U.S. JUSTICE DEPARTMENT'S STATISTICAL REPORT ON CARJACKING THAT GAVE A DEFINITION OF CARJACKING AS FOLLOWS: "CARJACKING IS THE COMPLETED OR ATTEMPTED THEFT IN WHICH A MOTOR VEHICLE IS TAKEN BY FORCE OR THREAT OF FORCE. IT DIFFERS FROM OTHER MOTOR VEHICLE THEFT, WHICH DOES NOT INCLUDE INCIDENTS IN WHICH THE OFFENDER USED FORCE OR THREATS OF FORCE TO OBTAIN THE VEHICLE." THAT IS THE SECONDARY SOURCE, OBVIOUSLY, AS IS THE PATTERN JURY INSTRUCTION.

BUT MOVING BEYOND THAT, CLEARLY THE PREDOMINANT CASE IS THE HOLLOWAY CASE OUT OF THE SUPREME COURT, WHICH IS A 1999 SUPREME COURT CASE REPORTED AT 526 U.S. 1. HOLLOWAY RESOLVED THE SPLIT IN THE CIRCUITS AS TO WHETHER THE INTENT -- WHETHER THE INTIMIDATION AND THREAT HAD TO BE CONDITIONAL OR ABSOLUTE. THE NINTH CIRCUIT HAD SAID A CONDITIONAL THREAT WAS NOT

SUFFICIENT UNDER THE STATUTE. A NUMBER OF OTHER CIRCUITS HAVE GONE THE OTHER WAY; THE SUPREME COURT SIDED WITH THE MAJORITY AND SAID A CONDITIONAL THREAT WAS SUFFICIENT. BUT IN DOING SO, THE SUPREME COURT SAID ON PAGE 970 -- I'M SORRY, PAGE 8, RATHER:

"THE STATUTE'S MENS REA COMPONENT THUS MODIFIES THE ACT OF TAKING THE MOTOR VEHICLE. IT DIRECTS THE FACTFINDER'S ATTENTION TO THE DEFENDANT'S STATE OF MIND AT THE PRECISE MOMENT HE DEMANDED OR TOOK CONTROL OVER THE CAR 'BY FORCE AND VIOLENCE OR BY INTIMIDATION.'"

SEVERAL CIRCUITS HAVE MORE OR LESS FOLLOWED THE HOLLOWAY DECISION AND, AT LEAST, QUOTED FROM APPROVAL WITH THAT LANGUAGE I JUST QUOTED.

THE THIRD CIRCUIT IN THE CASE OF U.S. VERSUS AUGUSTIN, A-U-G-U-S-T-I-N, REPORTED AT 376 F3D 135, IT IS A 2004 DECISION:

"AS THE SUPREME COURT EMPHASIZED IN HOLLOWAY AND AS WE RECOGNIZED IN APPLEWHAITE, A CARJACKER'S INTENT IS ASSESSED 'AT THE MOMENT HE DEMANDED OR TOOK CONTROL OVER THE DRIVER'S AUTOMOBILE.'"

ALSO, THE TENTH CIRCUIT IN UNITED STATES VERSUS BROWN, 200 F3D 700, A 1999 DECISION, SAID:

"THE SUPREME COURT RECENTLY ADDRESSED THE NECESSARY INTENT FOR CARJACKING CONVICTION UNDER SECTION 2119. IT DIRECTS THE FACTFINDER'S ATTENTION TO THE DEFENDANT'S STATE OF MIND AT THE PRECISE MOMENT HE DEMANDED OR TOOK CONTROL OVER THE CAR BY FORCE AND VIOLENCE OR BY INTIMIDATION. IF THE DEFENDANT HAS THE PRESCRIBED STATE OF MIND AT THAT MOMENT, THE DEFENDANT'S SCIENTER ELEMENT IS SATISFIED."

THE FIRST CIRCUIT IN UNITED STATES VERSUS ROSARIO-DIAZ, 202 F3D 54, THE COURT SAID:

"BEFORE DIRECTLY ADDRESSING THE SUFFICIENCY OF THE FACTUAL EVIDENCE IN THIS CASE, WE WOULD NOTE THAT CARJACKING IS A SPECIALIZED OFFENSE, REQUIRING A SPECIFIC CRIMINAL ACT AND A NARROW *MENS REA*. RATHER THAN CRIMINALIZING ANY OFFENSE THAT INVOLVES A VEHICLE, CONGRESS CHOSE IN SECTION 2119 TO CREATE FEDERAL

CRIME ONLY WHERE THE VEHICLE IS TAKEN BY FORCE AND VIOLENCE OR BY INTIMIDATION. AS THE SUPREME COURT HELD LAST TERM IN HOLLOWAY, THE MENTAL STATE REQUIRED BY THE STATUTE IS MEASURED AT THE MOMENT THE DEFENDANT DEMANDS OR TAKES CONTROL OF THE VEHICLE."

THEN THE EIGHTH CIRCUIT, UNITED STATES VERSUS WRIGHT, 246 F3D 1123, A 2001 DECISION JUST -- IT QUOTES THE SAME QUOTATION FROM HOLLOWAY I HAVE READ SEVERAL TIMES NOW.

"THE INTENT REQUIREMENT IS SATISFIED WHEN THE GOVERNMENT PROVES THAT AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OVER THE AUTOMOBILE"...

AND SO FORTH.

NOW, THE GOVERNMENT CITES THE FIRST CIRCUIT CASE, UNITED STATES VERSUS LEBRON-CEPEDA, 324 F3D 852. IN THAT CASE, THE MAJORITY CITES WITH APPROVAL FROM HOLLOWAY AND SAYS:

"THE INTENT REQUIREMENT IS SATISFIED IF THE GOVERNMENT PROVES THAT AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OVER THE DRIVER'S AUTOMOBILE, THE DEFENDANT POSSESSED THE INTENT SERIOUSLY TO HARM OR KILL

THE DRIVER."

THERE WAS A CONCURRING DECISION BY JUDGE HOWARD, IN WHICH HE EXPRESSES HIS OPINION THAT CARJACKING IS A CONTINUOUS OFFENSE AND THAT THE INTENT CAN BE FORMED AT ANY TIME WHILE POSSESSION OF THE CAR IS RETAINED. BUT HE ACKNOWLEDGES IN HIS CONCURRENCE THAT THE GOVERNMENT CONCEDED IN THE CASE THAT THE INTENT ISSUE HAD TO BE FOCUSED AT THE TIME OF THE TAKING. SO, HE ARGUED FOR AN EXPANSION OF THE LAW BEYOND WHAT THE GOVERNMENT HAD EVEN CONCEDED IN THAT CASE.

THE GOVERNMENT ALSO HANDED UP TO ME THE SIXTH CIRCUIT DECISION OF UNITED STATES VERSUS CLINE, THAT IS REPORTED AT 362 F3D 343, IT IS A 2004 DECISION. IT ACKNOWLEDGED THAT CARJACKING IS A DURATIONAL OFFENSE OR A CONTINUOUS OFFENSE. AND DEALT WITH THE NOT UNSUBSTANTIAL PROBLEM OF DELINEATING THE PRECISE TEMPORAL LIMITS OF THE CRIMES OF CARJACKING, BUT IT FOCUSES ON WHEN THE SERIOUS BODILY INJURY CAN OCCUR. AND SAID IT CAN OCCUR SUBSEQUENT TO THE TAKING.

SO, AT LEAST ON THE SURFACE, AT LEAST IT LOOKS TO ME, AS THOUGH THE INTENT IS AT THE MOMENT OF TAKING.

MR. SCHOOLS.

MR. SCHOOLS: JUDGE, I THINK WHAT THE COURT IS CONSIDERING HERE IS THE SAME PROBLEM WE HAD WITH THE CHARGE IN WILLS, AND THAT IS USING LANGUAGE IN ONE CASE TO RESOLVE AN ISSUE WHICH IS NOT BEFORE THE COURT. NONE OF THOSE CASES THAT YOU CITED INVOLVED CARJACKING WHERE THERE IS A KIDNAPPING

AS WELL. SO, THE CARJACKING, ARGUABLY, CONCERNS OVER A CASE OF TIME -- OVER A PERIOD OF TIME, TO MY KNOWLEDGE. THEREFORE, YOU TAKE LANGUAGE OUT OF A CASE THAT DOESN'T RESOLVE AN ISSUE THAT WE ARE CONSIDERING TO RESOLVE IT, THEN --

THE COURT: I UNDERSTAND YOUR ARGUMENT. BUT THINK THROUGH THIS WITH ME. IN THE TYPICAL CASE WHERE THE DEFENDANT POINTS A GUN AND SAYS, GIVE ME THE KEYS OR I WILL SHOOT YOU, TAKES THE KEYS AND DRIVES OFF WITH NO HOSTAGE, NO VICTIM, THERE IS NEVER ANOTHER OCCASION TO FORM THE INTENT EXCEPT RIGHT THEN.

MR. SCHOOLS: THAT IS MY POINT.

THE COURT: WHY DOES THE COURT SAY YOU HAVE TO FOCUS ON IT THEN? IT IS ALMOST SELF-EVIDENT.

MR. SCHOOLS: BECAUSE IT DOESN'T MATTER WHAT HAPPENS AFTER THE VICTIM AND THE CAR ARE SEPARATED.

THE COURT: NEVER BE A WAY TO FORM AN INTENT LATER IF YOU DIDN'T TAKE THE OWNER OF THE CAR WITH YOU.

MR. SCHOOLS: THE CASES THAT REALLY TALK ABOUT HOW LONG A CARJACKING LASTS COME OUT THE OTHER WAY. WE COULD CITE CASE AFTER CASE, THE CASES AND THE CHARGE YOU GAVE THE JURY WITH RESPECT TO HOW LONG THE CARJACKING LASTS COME OUT THE OTHER WAY.

THERE IS, I DID FIND ONE, ADMITTEDLY IT IS, FOR WHAT IT IS WORTH, UNPUBLISHED DISTRICT COURT OPINION THAT RELIES ON

THE CONCURRENCE OF LEBRON-CEPEDA. IT IS 2003 WL21362798, OUT OF THE EASTERN DISTRICT OF PENNSYLVANIA. AND, JUDGE, ONE OF THE PROBLEMS WITH THIS WHOLE AREA IS THIS. IF THE COURT CHARGES WHAT WE BELIEVE IS NOT HELD BY THOSE OTHER CASES BECAUSE THE ISSUE WASN'T BEFORE THEM, AND YOU CHARGE THAT THE MOMENT AT TIME IS THE REQUIREMENT, AND THIS JURY ACQUITS BRANDON BASHAM, THERE IS NO REMEDY. I MEAN, THERE IS NONE.

THE COURT: YOU CAN'T APPEAL MY JURY CHARGE INSTRUCTION?

MR. SCHOOLS: WE CANNOT. AND SO, THAT IS THE END OF THE LINE. I KNOW, JUDGE, IT IS A BIG ISSUE, I UNDERSTAND.

THE COURT: YOU MEAN, THE GOVERNMENT CANNOT TAKE AN APPEAL? I KNOW THE GOVERNMENT CANNOT APPEAL ON A FINDING OF THE JURY. EVEN IF I IMPROPERLY INSTRUCTED ON THE JURY?

MR. SCHOOLS: IF MR. BASHAM IS ACQUITTED ON COUNT TWO, WE CANNOT RETRY HIM.

THE COURT: YOU MEAN COUNT ONE.

MR. SCHOOLS: COUNTY ONE. THAT IS WHAT THE HOLLOWAY OPINION HAS SAID, IT IS THE CONCURENCE BY JUDGE HOWARD -- EXCUSE ME, NOT HOLLOWAY, LEBRON-CEPEDA SAYS THAT, JUDGE HOWARD WRITES, "I AM WRITING THIS OPINION BECAUSE I THINK THIS IS A PROBLEM AND DISTRICT JUDGES DON'T HAVE ANY GUIDANCE." AND IF THE DEFENDANT IS ACQUITTED BASED ON THIS OTHER CHARGE, THE GOVERNMENT HAS NO REMEDY." AND THAT IS THE PROBLEM. AND, JUDGE, I THINK, FOR THE COURT, FOR THIS COURT, TO SAY BASED

ON CASES THAT DO NOT SQUARELY ADDRESS THIS ISSUE THAT CONGRESS INTENDED, AND JUST AS AN EXAMPLE, LET'S LOOK BACK AT HOLLOWAY. WHAT THE ISSUE OF HOLLOWAY DID DECIDE IS THIS WHOLE CONDITIONAL INTENT ISSUE. YOU CAN'T GLEAN THAT OUT OF A STATUTE. YOU CAN'T READ THE STATUTE TO SAY THAT THE INTENT SHOULD BE CONDITIONAL, IT DOESN'T SAY THAT. WHAT THE SUPREME COURT DID WHAT IT HAS TO DO, WHICH IS TO SAY, WHAT MUST CONGRESS AMEND HERE? THEY CANNOT AMEND THAT IF A DEFENDANT TAKES THE CAR WITHOUT INTENDING TO KILL THE VICTIM, REGARDLESS OF WHETHER THE VICTIM RELINQUISHES THE CAR, THAT THAT IS THE ONLY CRIME THAT CONGRESS WAS INTENDING TO ADDRESS.

SIMILARLY, IN THIS CASE, IN THESE CIRCUMSTANCES, CONGRESS CANNOT HAVE INTENDED FOR A DEFENDANT WHO MAINTAINS CONTROL OF THE VICTIM OF A CARJACKING FOR A PERIOD OF TIME AND LATER DEVELOPS THE INTENT TO KILL HER AND DOES, HAS NOT VIOLATED THAT STATUTE. IT IS JUST UNFATHOMABLE.

AND I UNDERSTAND YOUR HONOR'S DESIRE TO RULE IN A WAY THAT IS CONSISTENT WITH PRIOR COURT HEARINGS, PRIOR COURT RULINGS, THAT IS WHAT YOU ARE SUPPOSED TO DO. BUT IN THIS CASE, IN THIS INSTANCE, JUDGE, WHAT MAY VERY WELL HAPPEN IS A MISCARRIAGE OF JUSTICE THAT HAS NO SOLUTION IN THE COURT OF APPEALS. AND I DON'T KNOW HOW TO STATE IT ANY STRONGER, JUDGE. I THINK -- WE MADE OUR ARGUMENT. I DON'T KNOW HOW ELSE TO PHRASE IT.

THE COURT: LET ME HEAR FROM DEFENDANT.

MR. HARRIS: LET ME FIRST SAY THAT I DON'T KNOW THAT THAT SHOULD BE A FACTOR WHETHER OR NOT THEY HAVE A RIGHT TO APPEAL OR WHETHER THEY CAN APPEAL, JUDGE. WE ARE HERE TO DETERMINE WHAT THE APPROPRIATE JURY CHARGE IS. FOR THE GOVERNMENT NOW TO COME IN AND SAY THAT THEY ARE NOT GOING TO HAVE A REMEDY, I DON'T KNOW THAT IT SHOULD HAVE ANY BEARING ON YOUR DECISION. QUITE FRANKLY, THEY DO HAVE A REMEDY. THERE IS COUNT TWO OF THIS INDICTMENT. THE JURY HAS THE RIGHT, IN THAT COUNT, NOT TO CONCERN ITSELF, FOR LACK OF A BETTER TERM, USING THE GOVERNMENT'S RATIONALE, ABOUT WHAT THEIR REMEDY IS, THEY DON'T HAVE TO CONCERN THEMSELVES --

THE COURT: ARE YOU ARGUING THAT CONGRESS FILLED THAT GAP BY PASSING THE KIDNAPPING STATUTE WITH NO INTENT?

MR. HARRIS: YES, ABSOLUTELY. SO THEY DO HAVE A REMEDY. AND, AGAIN, I DON'T KNOW THAT THAT SHOULD BE OF THE COURT'S CONCERN.

THE COURT: WHAT WOULD YOU SAY THEN IF I TELL THE JURY THAT ON COUNT ONE THE INTENT HAS TO FOCUS AT THE TIME OF TAKING, BUT, MEMBERS OF THE JURY, JUST TO BE SURE THERE IS NO CONFUSION, I WOULD JUST REMIND YOU THAT ON COUNT TWO THERE IS NO SIMILAR INTENT REQUIREMENT AT THE TIME OF THE KIDNAPPING.

MR. HARRIS: WE WOULD STRONGLY OBJECT TO THAT, YOUR HONOR. ABSOLUTELY, STRONGLY OBJECT. THAT IS A COMMENT ON AN ISSUE THEY HAVE NOT RAISED WITH THIS COURT. IF THEY HAVE A QUESTION AT A LATER TIME REGARDING THE INTENT FACTOR OR LACK

THEREOF OF ON QUESTION 2, AND THEY FORMULATE THAT QUESTION, JUST AS THEY HAVE THIS QUESTION, WE WOULDN'T HAVE A PROBLEM WITH THE COURT COMMENTING ON IT. BUT TO HIGHLIGHT -- TO TELL THAT JURY WHAT THE ATTORNEYS FOR THE GOVERNMENT JUST ASKED YOU TO DO, TELL THEM WHAT THEIR REMEDY IS IF THEY DON'T --

THE COURT: THEY DIDN'T ASK ME TO DO THAT. I JUST ASKED YOU IF CONGRESS DIDN'T PLUG THE HOLE BY PASSING THE KIDNAPPING STATUTE, AND YOU SAID THEY DID.

MR. HARRIS: YES, SIR.

THE COURT: I WAS JUST THINKING ABOUT IT BEING BALANCED THAT MAYBE I SHOULD TELL THEM ABOUT COUNT TWO.

MR. HARRIS: I APOLOGIZE TO THE COURT. I JUST REALLY DON'T UNDERSTAND THE RELEVANCE OF THEM NOT HAVING A REMEDY, WHEN ACTUALLY THEY DO, AND CONGRESS HAS PLUGGED THAT HOLE.

THE ONLY THING I WOULD SAY ABOUT THIS ISSUE, YOUR HONOR, IS HOLLOWAY IS CRYSTAL CLEAR. IT COULD NOT BE MORE CLEAR THAT, AND AS THE COURT HAS POINTED OUT, THE STATUTE'S *MENS REA* COMPONENT THUS MODIFIES THE ACT OF TAKING. AND IT FOCUSES THE FACTFINDER'S ATTENTION TO THE DEFENDANT'S STATE OF MIND AT THE EXACT MOMENT HE TOOK OVER THE CAR. THAT IS THE SINGULAR ISSUE IN THE CASE. THAT IS THE ISSUE THIS JURY SHOULD BE INSTRUCTED ON. THAT IS THE RESPONSE TO THEIR QUESTION AND THE LETTER THEY GAVE TO US AT 12:00 O'CLOCK. THAT IS THE ONLY

RESPONSE.

THE COURT:   MR. SCHOOLS.

MR. SCHOOLS:  JUDGE,  THE HOLLOWAY CASE INVOLVED THREE INSTANTANEOUS CARJACKINGS.

THE COURT:   WITH NO HOSTAGES.

MR. SCHOOLS:  WITH NO HOSTAGES.  THAT IS WHAT THEY WERE.   AND THE ONLY ISSUE BEFORE THAT COURT WAS NOT THE MOMENT,  THAT ISSUE OF WHEN THE INTENT --

THE COURT:   IT IS MORE OR LESS DICTA IN THE HOLLOWAY DECISION.

MR. SCHOOLS:  IT ABSOLUTELY IS.

THE COURT:   IT WASN'T THE PRECISE ISSUE DECIDED, IT WAS A COMMENT.

MR. SCHOOLS:  AND I THINK THE COURTS WHO HAVE CITED THAT ISSUE -- THAT CASE, HAVE CITED IT NOT FOR THE PROPOSITION OF THE TIMING OF THE INTENT, BUT FOR THE CONDITIONAL NATURE OF IT.   AND BECAUSE THAT IS WHAT IT DECIDED.   IT DIDN'T DECIDE ANYTHING ELSE.   IT CAN'T.   BECAUSE THE ISSUE WASN'T BEFORE IT.   SO,  FOR MR. HARRIS TO SAY THAT IS THE PRECISE HOLDING OF HOLLOWAY, THAT IS NOT THE HOLDING OF HOLLOWAY.   THAT ISSUE IS NOT BEFORE THE HOLLOWAY COURT.

THE COURT:  I GUESS I WAS SHOWING MY IGNORANCE OF APPELLATE PROCEDURE.   BUT I WAS JUST THINKING IF I -- LET'S JUST ASSUME HYPOTHETICALLY, I DON'T KNOW WHAT THE JURY MIGHT DO, BUT IF THEY FOUND THE DEFENDANT GUILTY OF COUNT TWO AND

THE DEFENDANT TOOK APPEAL AND NOT GUILTY OF COUNT ONE AND I CHARGE THE JURY WHAT THE DEFENDANT WANTS ME TO CHARGE ON COUNT ONE, YOU COULDN'T TAKE A CROSS-APPEAL ON THE ACQUITTAL ON COUNT ONE?

MR. SCHOOLS:  NO, SIR.

THE COURT:  IT IS DEAD FOREVER?

MR. SCHOOLS:  IN FACT, IN THE LEBRON-CEPEDA OPINION, JUDGE HOWARD WROTE, "UNDER APPELLANT'S READING OF HOLLOWAY, AN ACQUITTAL, PARENS, NOT SUBJECT TO APPELLATE REVIEW, CLOSE PARENS, WOULD BE MANDATED IN SUCH A SITUATION." HE IS TALKING ABOUT A SITUATION JUST LIKE THIS, WHERE IT IS ARGUABLE IN ANY WAY THE DEFENDANT'S INTENT TO COMMIT THE SERIOUS BODILY INJURY OR KILL DEVELOPED AFTER THAT PRECISE MOMENT IN TIME WHEN HE DEMANDED THE CAR.

SO, JUDGE,  I UNDERSTAND  -- I JUST THINK IT IS DANGEROUS FOR A DISTRICT COURT TO BASE, AND I THINK IT IS WHAT WE DID IN WILLS,  TOO, WE CHARGED LANGUAGE OUT OF WILLS THAT WAS A HOLDING THAT WAS NOT BEFORE THAT COURT.  I AM NOT TRYING TO REVISIT THAT.  I AM JUST SAYING, IT IS A DANGER IN USING LANGUAGE TO RESOLVE ONE ISSUE TO RESOLVE A SECOND ISSUE THAT IS NOT BEFORE THE COURT THAT REFERS TO THE FIRST LANGUAGE.

THE COURT:  HOLD ON ONE SECOND.  LET ME VENTILATE ONE OTHER IDEA.  THE ANNOTATION FROM MODERN FEDERAL JURY INSTRUCTIONS SAYS THAT, AS TO THIS LANGUAGE THAT WE HAVE BEEN FOCUSING ON, THE INTENT REQUIREMENT,  WHOEVER WITH THE INTENT

TO CAUSE BODILY INJURY OR DEATH TAKES A MOTOR VEHICLE, THE ANNOTATION SAYS:

"THAT STATUTORY LANGUAGE ESTABLISHING THIS ELEMENT WAS THE RESULT OF A DRAFTING ERROR. IT WAS ORIGINALLY INTENDED TO APPLY ONLY IN CAPITAL CASES WHEN DEATH RESULTED, BUT THE ERROR REPLACED LANGUAGE IN THE OFFENSE PROVISION INSTEAD."

WHICH, TO ME, SAYS CONGRESS ACCIDENTALLY STUCK THE INTENT REQUIREMENT UP THERE IN THE TAKING PART WHEN THEY MEANT TO PUT IT DOWN IN THE DEATH RESULTING PART. I DON'T KNOW IF I QUITE UNDERSTAND IT. IT MIGHT HELP US EXPLAIN WHY WE HAVE THIS DILEMMA HERE.

MR. GASSER: YOUR HONOR, LET ME GIVE TO THE COURT THIS HYPOTHETICAL.

THE COURT: HOLD IT ONE SECOND.

MR. GASSER, GIVE IT YOUR BEST SHOT.

MR. GASSER: DEFENDANT X IS IN A MALL. DEFENDANT X SHOPLIFTS. DEFENDANT X IS CAUGHT SHOPLIFTING. SECURITY GUARDS CHASE DEFENDANT X OUT OF THAT MALL. DEFENDANT X NEEDS A WAY OUT OF THE MALL. DEFENDANT X HAS A GUN. DEFENDANT X SEES SOME 16-YEAR-OLD GIRL GETTING INTO HER CAR. DEFENDANT X USES THAT GUN TO CARJACK THAT WOMAN, THAT 16-YEAR-OLD GIRL. CLEARLY, THE INTENT IS TO GET AWAY FROM THE PEOPLE THAT ARE

CHASING HIM. THERE IS NO INTENT TO KILL HER.

THE COURT: HE JUST WANTS THE CAR.

MR. GASSER: HE JUST WANTS THE CAR, BUT HE NEEDS HER, TOO. SHE DRIVES HIM AWAY FROM THE MALL. AND DURING THE COURSE OF THAT CONDUCT HE DEVELOPS DEVIANT INTENTIONS. HE RAPES HER. HE REALIZES THAT HE CAN'T LET HER GO BECAUSE SHE CAN IDENTIFY HIM. HE TAKES HER INTO THE WOODS AND HE SHOOTS HER THREE TIMES IN THE BACK OF THE HEAD. DOES ANYBODY ACTUALLY BELIEVE THAT CONGRESS DID NOT INTEND, AND THAT IS A STATE THAT DOESN'T HAVE THE DEATH PENALTY, ONE OF THE 12 STATES THAT DOESN'T HAVE A DEATH PENALTY, AND THEY DECIDE TO TAKE THAT CASE FEDERALLY, DOES ANYBODY ACTUALLY BELIEVE, DO YOU THINK A MAJORITY OF THE JUDGES IN RICHMOND OR WASHINGTON WOULD BELIEVE THAT THAT PERSON IS NOT ONLY NOT GUILTY OF CARJACKING, RESULTING IN DEATH, BUT UNDER THE DEFENSE'S INTERPRETATION, THAT PERSON IS NOT GUILTY OF CARJACKING? WHO COULD POSSIBLY BELIEVE THAT IS WHAT CONGRESS'S INTENT WAS?

THE COURT: WELL, I UNDERSTAND. BUT WE CAN'T LOSE SIGHT OF THE FACT THAT THE KIDNAPPING STATUTE COULD COME ALONG AND PLUG THAT HOLE, THOUGH. KIDNAPPING STATUTE HAS NO COMPARABLE INTENT REQUIREMENT.

MR. GASSER: YOUR HONOR, HE DOESN'T TAKE HER ACROSS STATE LINES. HE DOESN'T TAKE HER ACROSS STATE LINES, THERE IS NO FEDERAL JURISDICTION. CONGRESS PASSED THE CARJACKING STATUTE. AND IF YOU LOOK AT THE LEGISLATIVE HISTORY IN 1994

WHEN CONGRESS PASSED THAT STATUTE, WHEN PRESIDENT CLINTON SIGNED IT, THE LEGISLATIVE HISTORY IS CLEAR THAT CARJACKING HAD BECOME SUCH A GRAVE CONCERN THAT THE CONGRESS AND PRESIDENT CLINTON FELT THAT IT SHOULD BE EVERY CARJACKING IN THE UNITED STATES, IF SO WARRANTED, COULD BE PROSECUTED BOTH IN STATE COURT AND FEDERAL COURT.

THE COURT: I GUESS MY CONCERN IS, I WAS A STRICT INSTRUCTIONEST YESTERDAY WHEN WE WERE LOOKING AT COUNT 2. AND I AGREED WITH THE GOVERNMENT THAT I SHOULDN'T READ IN AN INTENT REQUIREMENT. WHY SHOULDN'T I BE A STRICT INSTRUCTIONIST TODAY AS TO COUNT ONE?

MR. SCHOOLS: I DON'T THINK WE WERE A STRICT INSTRUCTIONIST WITH RESPECT TO COUNTS ONE OR TWO. THEY SAY DEATH RESULTS. WE ADDED IN LANGUAGE THAT AS A RESULT OF THE WILLFUL, INTENTIONAL CONDUCT OF THE DEFENDANT. YOU HAVE CHARGED --

THE COURT: THE CASE THAT YOU CITED, MR. SCHOOLS, THIS FIRST CIRCUIT CASE --

MR. SCHOOLS: WE UNDERSTAND IT DOESN'T ADDRESS THE ISSUE.

THE COURT: WELL, NO. LEBRON-CEPEDA DID INVOLVE TAKING TWO HOSTAGES. THEY WERE BOTH POLICE OFFICERS. THEY LATER FOUND OUT THEY WERE POLICE OFFICERS, THEY KILLED ONE AND THREW HIS BODY AND THE OTHER ONE OUT. SO, THIS IS ONE CASE WHERE THERE WAS A HOSTAGE TAKEN AND THE MAJORITY SAID,

YOU FOCUS AT THE TIME OF TAKING.

MR. SCHOOLS:  BUT WHAT THE CONCURRENCE SAYS --

THE COURT:  I KNOW IT WASN'T A HOLDING, BUT THEY STILL QUOTED THAT LANGUAGE.

MR. SCHOOLS:  THEY SAID THAT THE EVIDENCE WAS SUFFICIENT TO ESTABLISH THE INTENT AT THAT POINT, SO WE WON'T HAVE TO GO TO THAT NEXT LEVEL.  AND WHILE WE THINK THE EVIDENCE IS SUFFICIENT TO FORM --  TO SATISFY OUR BURDEN ON THAT POINT, OBVIOUSLY, OR, APPARENTLY, THE JURY MAY BE HAVING SOME QUESTION ABOUT THAT.  SO, YOU KNOW, THE ISSUE IS SQUARELY PRESENTED HERE AS IT HAS NOT BEEN IN ANY CASE OTHER THAN, IF I CAN, I BELIEVE THE DISTRICT COURT OPINION I CITED, JUDGE, SAYS:

"IN U.S. VERSUS LEBRON-CEPEDA, JUDGE HOWARD WROTE A CONCURRING OPINION SOLELY TO ADDRESS THE VERY ISSUE OF THE LENGTH OR DEFINITION OF TAKING WHEN THERE IS AN EXTENDED CARJACKING INVOLVING THE CONTINUED PRESENCE OF THE VICTIM.  THE COURT FINDS JUDGE HOWARD'S REASONING AND INTERPRETATION OF HOLLOWAY BOTH PERSUASIVE AND THOROUGH, AND THUS ADOPTS MUCH OF IT HERE."

THE COURT:  CAN YOU GIVE ME A COPY OF THAT?  LET ME

JUST SAY. MS. FLOYD, WOULD YOU WALK IN AND TELL THE JURY THAT WE HAVE NOT IGNORED THEIR OTHER QUESTION AND HAVEN'T FORGOTTEN ABOUT IT, WE ARE STILL WORKING ON IT? I DON'T WANT THEM TO REACH SOME VERDICT WHILE WE ARE OUT HERE DEBATING WHAT THE ANSWER IS.

THIS IS AN UNPUBLISHED DECISION OUT OF PENNSYLVANIA?

MR. SCHOOLS: YES. THE LANGUAGE I CITED IS ON ABOUT THE FOURTH, FIFTH PAGE.

THE COURT: WHAT IS THE PERPLEXING THING ABOUT HERE, THE GOVERNMENT'S EVIDENCE IS NO STRONGER OR WEAKER ON INTENT AT THE TIME OF TAKING OR AT ANY TIME DURING THE WHOLE PERIOD THAT MS. DONOVAN WAS HELD. I DON'T SEE A BASIS FOR THE JURY MAKING ANY DISTINCTION, BUT WE STILL HAVE TO ANSWER THEIR QUESTION ONE WAY OR THE OTHER.

MR. SCHOOLS: I THINK, JUDGE, THERE IS AN ARGUMENT THAT THE JURY IS PERCEIVING THIS CASE SORT OF AS MR. GASSER'S ANALOGY WAS. THAT IS IF THE TAKING OF THE CAR WAS THE THING THAT THEY ARE CONCERNED AT THE VERY MOMENT WHEN BRANDON BASHAM JUMPED OUT OF THAT TRUCK, THEN THINGS CHANGED LATER.

THE COURT: CIRCUMSTANTIALLY, THAT THINGS CHANGED LATER.

MR. SCHOOLS: YES, SIR.

MR. HARRIS: JUDGE, IF I MAY, THAT IS WHAT MR. SWERLING ARGUED IN CLOSING BASED ON THIS CHARGE. THAT IS WHAT MR. SWERLING ARGUED, BASED ON THE CHARGE THAT YOU GAVE

THE JURY YESTERDAY, JUDGE.

THE COURT: THAT THOUGHT DID OCCUR TO ME. WE ARE NOT TALKING ABOUT --

MR. HARRIS: NOT TALKING ABOUT AMBIGUOUS POINT.

THE COURT: -- AMBIGUOUS POINT. WE ARE TALKING ABOUT CHANGING WHAT I TOLD THEM THE FIRST GO-ROUND, ESSENTIALLY.

MR. HARRIS: YES, SIR. AND GETTING BACK TO MR. SWERLING'S ARGUMENT, HE MADE THE ARGUMENT THAT, AT THE TIME OF THE TAKING, THERE WAS NO INTENT. AND HE MADE THAT ARGUMENT, BASED IN A LARGE PART, ON WHAT WE KNEW THIS COURT WAS GOING TO CHARGE THE JURY, SOME CITING IN CLOSE PROXIMITY TO HIS CLOSING ARGUMENT.

MR. GASSER: NO, SIR. HE MADE THE ARGUMENT FROM HIS OPENING STATEMENT THROUGHOUT THE CLOSING ARGUMENT THAT BRANDON BASHAM NEVER HAD THE INTENT. NEVER. NOT AT THE TIME OF TAKING. MR. SWERLING, FROM HIS OPENING STATEMENT THROUGHOUT HIS ENTIRE CLOSING ARGUMENT SAID, BRANDON BASHAM HAD NO INTENT TO CAUSE SERIOUS BODILY HARM OR DEATH THROUGHOUT THE ENTIRE PROCEEDINGS, HE NEVER DEVELOPED IT. THAT IS WHAT MR. SWERLING'S ARGUMENT WAS.

THE COURT: ANYTHING FURTHER?

MR. SCHOOLS: I WOULD LIKE TO RAISE ONE OTHER PROCEDURAL ISSUE, JUDGE. THE ONLY WAY THAT WE CAN THINK THIS ISSUE GETS PRESERVED FOR APPEAL FOR PURPOSES OF THE

GOVERNMENT'S ABILITY TO PROTEST ABERRANT RULING, IS IF THE COURT CHARGES THE JURY IN ACCORDANCE WITH THE LANGUAGE FROM THE LEBRON-CEPEDA CONCURRENCE, THEN CONSIDER IT ON A MOTION FOR A NEW TRIAL IF THE DEFENDANT IS CONVICTED WHETHER THAT WAS CORRECT OR NOT. IF YOU GRANT THE DEFENDANT A NEW TRIAL BASED ON A DECISION THAT YOUR CHARGE IS INCORRECT, WE COULD DO THAT. I OFFER THAT FOR ANY VALUE IT MAY HAVE.

THE COURT: WELL, NEEDLESS TO SAY, THIS IS THE TOUGHEST CALL THAT HAS COME ALONG IN THE LONG HISTORY OF THIS CASE. I AM GOING TO LEAVE THE CHARGE AS IT IS. I AM GOING TO TELL THE JURY THE INTENT MUST BE FOCUSED AT THE TIME OF THE TAKING.

MY REASONS ARE, NUMBER ONE, THE CHARGE, TO DO OTHERWISE, WOULD BE TO CHANGE THE CHARGE THAT WAS GIVEN. IT WOULDN'T BE AN AMPLIFICATION OR CLARIFICATION, IT WOULD BE AN OUTRIGHT CHANGE. AND I WOULD BE, IN ESSENCE, CHANGING MY CHARGE AFTER THE CASE HAS BEEN TRIED AND ARGUED. AND I THINK THAT MIGHT RAISE GRAVE DUE PROCESS ISSUES AND POSSIBLY RESULT IN A REVERSAL. I WOULD NOTE THAT THE LANGUAGE -- THE PERTINENT LANGUAGE WE HAVE BEEN FOCUSING ON HAS BEEN IN THE CHARGE FROM THE VERY FIRST EDITION THAT WAS HANDED OUT LAST WEEK, AND IT IS CONTAINED IN THE PATTERN CHARGE BOOK THAT I MENTIONED EARLIER, IT IS LANGUAGE THAT TAKEN FROM THE SUPREME COURT DECISION IN HOLLOWAY EVEN THOUGH IT WAS NOT THE HOLDING OF HOLLOWAY, IT IS VERY SPECIFIC LANGUAGE THAT HAS BEEN QUOTED

WITH APPROVAL BY SEVERAL CIRCUITS. I JUST THINK THAT TO CHANGE THE FOCUS OF THAT ISSUE AT THIS POINT WOULD BE -- I DON'T LIKE IT. IN MY HEART, I THINK KIDNAPPING AND CARJACKING ARE BOTH CONTINUOUS OFFENSES AND THAT IS WHAT I HAVE TOLD THE JURY IN TERMS OF THE DEATH RESULTING ISSUE. BUT I HAVE TO FOCUS ON THE PRECISE LANGUAGE OF THE STATUTE. I INDICATED EARLIER THAT THE ANNOTATIONS IN THE PATTERN CHARGE BOOK SUGGEST THAT THIS WAS A DRAFTING ERROR BY CONGRESS, WHICH I THINK I COULD PROBABLY AGREE WITH. I THINK IT WOULD HAVE BEEN MUCH BETTER IF THEY HAD PUT THIS IN THE DEATH RESULTING PARAGRAPH RATHER THAN IN THE INTRODUCTORY PARAGRAPH. IT WOULD HAVE MADE A LOT MORE SENSE IF THEY HAD DONE THAT AND WE MAY HAVE STRUCTURED THE CHARGE DIFFERENTLY FROM THE BEGINNING.

BUT I THINK TO CHANGE NOW AFTER THE CASE HAS BEEN ARGUED WOULD BE A DUE PROCESS VIOLATION. I HAVE CITED THE CASES ALREADY, IT WILL DO NO GOOD TO CITE THEM AGAIN. I WOULD NOTE THE FIRST CIRCUIT CASE THE GOVERNMENT RELIES ON THAT HAS JUDGE HOWARD'S CONCURRENCE IS A CASE WHERE TWO HOSTAGES WERE TAKEN. SO, THIS IS A CASE WHERE THE MAJORITY OF THE COURT FACED A SITUATION WHERE THE CARJACKING CONTINUED THROUGH THE TAKING OF A HOSTAGE, AND THE COURT FOUND THERE SUFFICIENT EVIDENCE TO FIND THAT THE REQUISITE INTENT WAS MADE AT THE TIME OF THE TAKING, SO THEY DIDN'T HAVE TO REALLY ANSWER THE QUESTION PRESENTED HERE. BUT IT WAS A CASE WHERE, IF THE MAJORITY HAD WANTED TO JUST SAY CARJACKING IS CONTINUOUS, AND

THE INTENT CAN BE FORMED AT ANY TIME, THIS CASE WAS TAILOR-MADE FOR THEM TO DO THAT.

SO, I WILL JUST ANSWER THE JURY'S QUESTION. I WILL -- I THINK WHAT I AM GOING TO SAY IS THAT I AM ANSWERING THEIR QUESTION AS TO COUNT ONE ONLY, WHICH IS THE ONLY COUNT THEY ASKED ME ABOUT. AND WHAT I AM SAYING HERE DOES NOT APPLY TO COUNT TWO OR ANY OF THE OTHER COUNTS.

MR. SCHOOLS: JUDGE, WHAT WE WOULD ASK, YOU JUST READ YOUR ENTIRE INSTRUCTION WITH RESPECT TO THE FOURTH ELEMENT AND THE RESULTING.

THE COURT: I THINK THAT IS THE SAFE THING TO DO. I WILL SAY, YOUR QUESTION IS ANSWERED IN MY JURY CHARGE WHICH READS AS FOLLOWS, AND THEN READ IT TO THEM.

MR. SCHOOLS: BECAUSE OF THE CONFUSION IN THE QUESTION, BECAUSE THEY REFER TO ELEMENT FIVE, I STILL DON'T KNOW IF THEY ARE TALKING ABOUT THE FOURTH ELEMENT OR RESULTING LANGUAGE, WE WOULD ASK THAT YOU READ THE LANGUAGE REGARDING THE FOURTH ELEMENT AND THEN READ THE DEATH RESULTING LANGUAGE.

THE COURT: I WILL DO THAT. OVER THE DEFENDANT'S OBJECTION, I WILL GIVE THIS BLACK'S LAW DICTIONARY OF INTENT.

MR. HARRIS: JUDGE, WE ALSO WANT TO CLARIFY SOMETHING. WE OBJECT TO THE COURT GOING FURTHER THAN THEY ASKED AND GOING INTO THE DEATH RESULTING PORTION.

THE COURT: WELL, THEY MENTION COUNT -- ELEMENT FIVE, AND THERE IS NO ELEMENT FIVE, UNLESS YOU COUNT THE DEATH

RESULTING AS AN ELEMENT.

MR. HARRIS: I WOULD ASK THAT YOU CLARIFY THAT WITH THEM BEFORE YOU GO INTO THAT WITH THEM, YOUR HONOR.

THE COURT: ALL RIGHT. BRING IN THE JURY.

MR. HARRIS: WE ALSO OBJECT TO ANY REFERENCE TO ANY OTHER COUNTS ALSO. THANK YOU.

THE COURT: I AM TRYING TO ANSWER THE QUESTION THE JURY HAS PUT TO ME.

THE COURT: MR. SCHOOLS, YOU WANT ME TO READ THE ENTIRE CHARGE ON COUNT ONE?

MR. SCHOOLS: NO, NO. JUST THE FOURTH ELEMENT LANGUAGE ON PAGE 18 AND THE DEATH RESULTING LANGUAGE ON PAGES 19 AND 20.

THE DEFENDANT: EXCUSE ME, YOUR HONOR.

THE COURT: YES, SIR.

THE DEFENDANT: IF I MAY. I WOULD LIKE TO, I GUESS I CAN SAY, AGAINST MY --

THE COURT: HOLD THEM UP JUST A SECOND.

THE DEFENDANT: I GUESS I CAN SAY AGAINST MY LAWYER -- MY COUNSEL'S ADVICE, BUT I WOULD LIKE TO SAY, AS OF THE ACCUSATIONS THAT SEEM, LIKE, JUST KEEP, YOU KNOWK, IT SEEMS, LIKE, YOU KNOW, IT IS LIKE STONES KEEP BEING THROWED (SIC) AT ME, THROWED (SIC) AT ME, THROWED (SIC) AT ME, YOU KNOW, TO RELINQUISH, YOU KNOW WHAT I AM SAYING, WHAT I HAVE DONE IS KEPT MY WORD UP TO YOU. YOU KNOW, I GAVE YOU MY WORD. I

WILL BE ON MY BEST BEHAVIOR. I WILL NOT, YOU KNOW, DISUSE OR DISOBEY YOUR DIRECT ORDER.

THE COURT: WE ARE ABOUT READY FOR OUR AFTERNOON BREAK. YOU WILL GET YOUR DIP DURING THE AFTERNOON BREAK LIKE I SAID. WE WILL TAKE IT IN JUST A MINUTE, AS SOON AS WE BRING THE JURY.

THE DEFENDANT: THE ONLY THING I WAS GOING TO STATE IS I DIDN'T APPRECIATE BEING ACCUSED OF MY MEDICATION BECAUSE THERE IS INCIDENT REPORTS, IF YOU READ IT, AND THE NURSE IS -- WHEN I WAS -- WHEN I GO OUT ON REC, I AM HANDCUFFED BEHIND THE BACK. I WILL MAKE THIS REAL SHORT. I AM HANDCUFFED IN THE BACK ON THE REC FIELD. AND THE NURSE COMES IN AT 1:00 O'CLOCK WITH MY MEDICATION IN A LITTLE PAPER THING. AND THE OFFICERS, THEY DON'T TAKE IT TO YOUR ROOM, BUT THEY DON'T WANT TO TAKE THE HANDCUFFS OFF. SHE POURS IT IN THE POCKET. WHEN I GO TO THE SHOWER, I GET IN THE SHOWER, AND I TAKE MY SHIRT OFF, NOT THINKING, AND MY MEDS GO EVERYWHERE. SO, I GET THEM ALL UP. THERE IS THIS CRAZY GUY. HE IS NOT CRAZY, HE IS JUST ON SUICIDE. MY BUDDY OVER THERE I AM IN REC WITH. AND THERE IS A SUICIDE GUY, RIGHT HERE, AND I GOT ALL MY MEDS EXCEPT, LIKE, ONE OR TWO OF THEM. I AM HOLLERING FOR THE OFFICER, MR. MCBRIDE, TO COME OVER. WHEN HE COMES OVER, HE SEES THE SUICIDE GUY REACH DOWN AND PICK SOMETHING UP, WHICH WAS MY MEDICATION.

THE COURT: MR. BASHAM, LET ME SAY. I DON'T KNOW

IF YOU ARE DOING YOUR CASE ANY GOOD. I WILL LET YOU HAVE YOUR DIP AND A BREAK IN JUST A MINUTE. ALL I SAID WAS, THE MARSHAL HAD REPORTED TO ME. I DIDN'T MAKE ANY ACCUSATIONS. I REPORTED WHAT HAD BEEN TOLD TO ME, THAT SOMEONE IN THE JAIL WHERE YOU ARE HOUSED, HAD AN UNAUTHORIZED VALIUM PILL. AND THAT YOU ARE THE ONLY OTHER INMATE WHO WAS SUPPOSED TO HAVE THAT, WHO HAS A PRESCRIPTION OF VALIUM. CIRCUMSTANTIALLY, IT LOOKED LIKE IT CAME FROM YOU. WHETHER YOU GAVE IT TO HIM, WHETHER HE TOOK IT FROM YOU, I DON'T KNOW.

THE DEFENDANT: EXACTLY. I WANTED YOU TO KNOW THAT MY WORD TO YOU IS BOND. I RESPECT THAT.

THE COURT: ALL RIGHT.

THE DEFENDANT: THANK YOU.

THE COURT: PLEASE BRING IN THE JURY.

(WHEREUPON, AT 3:02, THE JURY ENTERED OPEN COURT AND THE FOLLOWING WAS HEARD.)

THE COURT: MADAME FOREMAN, MEMBERS OF THE JURY. I HAVE YOUR NOTE YOU SENT OUT BEFORE LUNCH, WHICH ASKS TWO QUESTIONS. I AM GOING TO ANSWER THE SECOND QUESTION FIRST. YOU SAID:

"WE WOULD LIKE FOR YOU TO LEGALLY DEFINE INTENT."

I WOULD RESPOND BY SAYING THAT:

"INTENT IS DESIGN, RESOLVE OR DETERMINATION WITH WHICH A PERSON

ACTS. BEING A STATE OF MIND, INTENT IS RARELY ACCEPTABLE OF DIRECT PROOF, BUT MUST ORDINARILY BE INFERRED FROM THE FACTS."

YOUR SECOND QUESTION WAS:

"NEED CLARIFICATION ON COUNT ONE, ELEMENT FIVE. DOES THE INTENT TO CAUSE BODILY HARM OR DEATH INCLUDE ONLY THE INITIAL ACT OF TAKING THE CAR OR THE ENTIRE TIME THE CAR WAS IN POSSESSION OF THE CAR?"

I THINK YOU MEANT TO SAY, THE DEFENDANT WAS IN POSSESSION OF THE CAR. NOW, TO RESPOND, I AM GOING TO RECHARGE YOU FROM ELEMENTS OF THE OFFENSE THAT I GAVE YOU EARLIER. I TOLD YOU THAT AS TO COUNT ONE, THE FOURTH ELEMENT, NOT THE FIFTH ELEMENT, THE FOURTH ELEMENT WAS, WHILE TAKING THE MOTOR VEHICLE, THE DEFENDANT INTENDED TO CAUSE DEATH OR SERIOUS BODILY HARM. AND I WENT FURTHER A PAGE OR TWO LATER AND SAID THE FOURTH ELEMENT THE GOVERNMENT MUST PROVE BEYOND A REASONABLE DOUBT IS THAT THE DEFENDANT ACTED WITH INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM. TO ESTABLISH THIS ELEMENT, THE GOVERNMENT MUST PROVE THAT, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OVER THE VEHICLE, THE DEFENDANT POSSESSED INTENT TO SERIOUSLY HARM OR KILL THE VICTIM. THE GOVERNMENT MAY ALSO MEET ITS BURDEN AS TO THE

INTENT ELEMENT BY PROVING THAT, AT THE MOMENT THE DEFENDANT DEMANDED OR TOOK CONTROL OF THE VEHICLE, THAT THE DEFENDANT POSSESSED THE INTENT TO SERIOUSLY HARM OR KILL THE VICTIM, IF NECESSARY, TO STEAL THE CAR. THE GOVERNMENT DOES NOT -- GOVERNMENT NEED NOT PROVE THAT THE DEFENDANT INTENDED TO CAUSE THE HARM, IT IS SUFFICIENT THAT THE DEFENDANT WAS CONDITIONALLY PREPARED TO ACT IF THE VICTIM FAILED TO RELINQUISH THE CAR.

NOW, I ALSO INSTRUCTED YOU ON THE DEATH RESULTING COMPONENT. AND IT IS NOT CLEAR TO ME FROM YOUR QUESTION BECAUSE YOU REFER TO ELEMENT FIVE. BUT THE ELEMENT THAT I JUST DESCRIBED WAS ELEMENT FOUR. IN THE EVENT YOU WERE REFERRING TO THE DEATH RESULTING COMPONENT, WHICH IS REALLY THE FIFTH THING IN THE SEQUENCE, I WILL RECHARGE YOU ON THAT, AS WELL.

IF YOU DETERMINE THAT THE DEFENDANT, BRANDON LEON BASHAM, IS GUILTY OF THE OFFENSE OF CARJACKING AS DEFINED IN THESE INSTRUCTIONS, YOU MUST DELIBERATE FURTHER TO DETERMINE, A, WHETHER ALICE DONOVAN IS DEAD, AND, IF SO, B, WHETHER HER DEATH RESULTED FROM HER BEING CARJACKED. IN ORDER FOR ALICE DONOVAN'S DEATH TO RESULT FROM HER BEING CARJACKED, HER DEATH MUST HAVE RESULTED FROM THE WILLFUL AND INTENTIONAL CONDUCT OF THE DEFENDANT, BRANDON LEON BASHAM, OR THE WILLFUL AND INTENTIONAL CONDUCT OF THE CODEFENDANT, CHADRICK EVAN FULKS, AIDED AND ABETTED BY THE DEFENDANT BRANDON LEON BASHAM. I

WILL EXPLAIN THE CONCEPT OF AIDING AND ABETTING TO YOU LATER IN THESE INSTRUCTIONS.

THE GOVERNMENT ADMITTEDLY HAS NOT PRODUCED ALICE DONOVAN'S BODY. YOU ARE INSTRUCTED THAT THE GOVERNMENT IS NOT REQUIRED TO PRODUCE PHYSICAL EVIDENCE OF DEATH IN ORDER TO PROVE DEATH. AS WITH ANY OTHER FACT AT ISSUE, WHETHER ALICE DONOVAN IS DEAD MAY BE PROVED BY EITHER CIRCUMSTANTIAL OR DIRECT EVIDENCE. YOU ARE TO CONSIDER ALL OF THE EVIDENCE PRESENTED TO YOU DURING THE TRIAL IN MAKING THAT DETERMINATION. AS ALWAYS, THE STANDARD TO WHICH THE GOVERNMENT IS HELD IS PROOF BEYOND A REASONABLE DOUBT.

FOR PURPOSES OF DETERMINING WHETHER ALICE DONOVAN DIED AS A RESULT OF THE CARJACKINGS, I CHARGE YOU THAT THE COMMISSION OF A CARJACKING CONTINUES AT LEAST WHILE THE CARJACKER MAINTAINS CONTROL OVER THE VICTIM AND HER VEHICLE.

THEREFORE, THE GOVERNMENT DOES NOT HAVE TO PROVE THAT DEATH OCCURRED DURING THE ACTUAL CARJACKING. IN OTHER WORDS, THE REQUIREMENT THAT DEATH RESULTED IS SATISFIED IF THE GOVERNMENT PROVES THAT ALICE DONOVAN DIED AS A RESULT OF THE WILLFUL AND INTENTIONAL CONDUCT OF BRANDON BASHAM AND THE CONDUCT OCCURRED AT ANY POINT DURING THE DEFENDANT'S RETENTION OR POSSESSION OF THE VEHICLE. SIMILARLY, THE REQUIREMENT THAT DEATH RESULTED IS SATISFIED IF THE GOVERNMENT PROVES THAT ALICE DONOVAN DIED AS A RESULT OF THE WILLFUL AND INTENTIONAL CONDUCT OF CHADRICK FULKS, AIDED AND ABETTED BY BRANDON

BASHAM, AND THE CONDUCT OCCURRED AT ANY POINT DURING THE DEFENDANT'S RETENTION OR POSSESSION OF THE VEHICLE.

NOW, THAT ANSWERS THE QUESTIONS THAT YOU HAVE PUT TO ME. IT WAS A LITTLE BIT CONFUSING BECAUSE YOU REFERRED TO ELEMENT FIVE, SO I REINSTRUCTED YOU ON ELEMENT FOUR, WHICH IS THE INTENT REQUIREMENT. AND THEN I REINSTRUCTED YOU ON THE DEATH RESULTING REQUIREMENT, WHICH IS THE FIFTH ISSUE THAT YOU MIGHT OR MIGHT NOT HAVE TO REACH IN COUNT ONE.

I HAVE ONLY ANSWERED THE QUESTION AS TO COUNT ONE BECAUSE THAT IS THE ONLY COUNT RATHER THAT YOU HAVE INQUIRED ABOUT. THE INSTRUCTIONS I HAVE GIVEN TO YOU APPLY ONLY TO COUNT ONE. THE OTHER INSTRUCTIONS ARE IN YOUR WRITTEN INSTRUCTIONS AS TO THE REMAINING COUNTS. I WOULD ASK YOU, AT THIS TIME, TO RETURN TO YOUR JURY ROOM AND RESUME YOUR DELIBERATIONS.

(WHEREUPON, AT 3:08 THE JURY RESUMED DELIBERATING.)

THE COURT: MS. FLOYD, LET'S LET THE ALTERNATES GO OUT FOR A FRESH AIR BREAK IF THEY HAVE NOT ALREADY.

ALL RIGHT. ANYBODY WANT TO PUT ANY OBJECTIONS ON THE RECORD?

MR. HARRIS: YES, SIR, WE WOULD.

THE COURT: MR. HARRIS.

MR. HARRIS: WE TAKE EXCEPTION TO THE COURT GOING FURTHER WITH THE INSTRUCTION AS TO I THINK WHAT THE COURT THOUGHT WAS THE FIFTH ELEMENT, FIFTH DETERMINATION, DEATH RESULTING. IT WAS OUR UNDERSTANDING BEFORE THE JURY CAME

BACK, THE COURT WAS GOING TO ASK THEM IF THEY NEEDED FOR HIM TO GO FURTHER, IF THEY NEEDED THE COURT TO GO FURTHER, OR WHETHER OR NOT THEY HAD, IN FACT, MEANT THE FOURTH ELEMENT OF COUNT ONE. CLEARLY, THE LETTER IDENTIFIES THE FOURTH ELEMENT OF COUNT ONE. TO GO FURTHER, WE THINK, WAS FARTHER -- WAS MORE THAN THEY ASKED FOR.

THE COURT: ANY OBJECTION BY THE GOVERNMENT?

MR. SCHOOLS: NO OBJECTION. ONLY IN THE COURTROOM CAN SOMEONE SAY A NOTE THAT REFERS TO ELEMENT FIVE, CLEARLY REFERS TO ELEMENT FOUR. BUT, NONETHELESS, WE HAVE NO FURTHER EXCEPTIONS OR FURTHER ARGUMENT, JUDGE.

THE COURT: ALL RIGHT. I GUESS I CAN LET YOU GO BACK TO YOUR OFFICES AGAIN. BE ON 15-MINUTE TURNAROUND IF WE GET ANOTHER QUESTION AGAIN. ALL RIGHT. WE WILL BE IN RECESS.

(WHEREUPON, A RECESS WAS HELD.)

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD.)

MR. SWERLING: JUDGE, MAY WE APPROACH?

THE COURT: YES.

MR. SWERLING: WE WERE JUST TALKING. ONCE THE JURY PUBLISHES THE VERDICT, WE HAVE NOT TALKED ABOUT SCHEDULING. I DON'T KNOW WHAT YOU WANT TO SAY ABOUT SCHEDULING.

THE COURT: SEE WHAT THE VERDICT IS FIRST.

MR. HARRIS: OUT OF AN ABUNDANCE OF CAUTION, I NEED TO RENEW RULE 29 MOTION AT THE CONCLUSION OF OUR CASE. I

DON'T THINK YOU HAVE TO. I WANT TO DO THAT BEFORE THE VERDICT.

THE COURT: YOU WANT TO DO IT RIGHT HERE?

MR. HARRIS: RENEW RULE 29 MOTION GAVE AT THE CONCLUSION OF GOVERNMENT'S CASE. ELECTED NOT TO PUT UP ANY EVIDENCE, ASK FOR JUDGMENT OF ACQUITTAL ON ALL CHARGES.

THE COURT: FOR THE REASONS I STATED EARLIER AT THE EARLIER MOTIONS, IT IS DENIED.

ON SCHEDULING, THE BUTNER REPORT IS STILL IN THE PROCESS. I COULDN'T BELIEVE IT.

MR. HARRIS: HOW CAN THAT BE?

MR. SWERLING: OH, MY.

THE COURT: THE MAN STAYED UP UNTIL 4:30 THIS MORNING WORKING ON IT. HAVE IT EITHER TODAY OR TOMORROW MORNING. BUT IT MIGHT BE TOMORROW MORNING BEFORE YOU GET YOUR HANDS ON IT. AND THE PROCEDURE IS, AS I RECALL IT, IF YOU ARE ANNOUNCING THE INTENTION TO GO FORWARD WITH NO HEALTH ISSUES, YOU GET TO SEE IT. AFTER YOU SEE IT, YOU TELL US WHETHER YOU REAFFIRM. IF YOU DO REAFFIRM, THEN THE GOVERNMENT GETS TO SEE IT.

MR. SWERLING: WE HAVE ESSENTIALLY TOLD THEM THE FIRST PART OF IT TODAY.

MR. HARRIS: THERE ARE TWO REPORTS IN THIS CASE, THOUGH, JUDGE.

THE COURT: WHY IS THAT?

MR. HARRIS: THERE WAS A REPORT THAT WAS SEALED PRIOR TO THE MMPI, AND THEN THERE WAS A REPORT PREPARED BASED ON THE MMPI THAT WAS GIVEN BY THE COURT.

THE COURT: THAT IS WHAT HAD ME CONFUSED. LET'S GET THE VERDICT AND TALK ABOUT THIS LATER.

THE COURT: OKAY. ANY OBJECTION TO PUTTING THE ALTERNATES BACK IN THE BOX WITH THE JURY? I THINK THEY SHOULD BE HERE. AND I DON'T WANT TO PUT THEM IN THE AUDIENCE.

MR. SWERLING: I DON'T HAVE ANY OBJECTION TO IT.

THE COURT: I AM INFORMED THAT THE JURY HAS REACHED ITS VERDICT. IF YOU WILL BRING IN THE REGULAR JURORS AND ALSO THE ALTERNATES, THE LAWYERS HAVE AGREED THAT THE ALTERNATES MAY RESUME THEIR SEATS IN THE JURY BOX WITH THE REGULAR JURORS.

MR. SWERLING: JUDGE, DO YOU WANT US TO STAND ON THE VERDICT?

THE COURT: MY PRACTICE HAS NOT BEEN TO REQUIRE. YOU CERTAINLY MAY DO SO IF YOU THINK YOU SHOULD IN FRONT OF THE JURY, YOU MAY. DO YOU WANT ME TO REQUEST THE DEFENDANT TO RISE?

MR. SWERLING: YES, I THINK IT IS MORE FORMAL. YES, SIR.

(WHEREUPON, AT 3:34, THE JURY ENTERED OPEN COURT AND THE FOLLOWING WAS HEARD.)

THE COURT: LET THE RECORD REFLECT WE NOW HAVE ALL

12 MEMBERS OF THE JURY IMPANELED IN THE JURY BOX AND THE FOUR ALTERNATES WHO HAVE REJOINED THE JURY.

MADAME FORELADY, HAS THE JURY UNANIMOUSLY REACHED A VERDICT IN THIS CASE?

THE JUROR:   YES, SIR.

THE COURT:   WOULD YOU HAND THE VERDICT FORM TO THE SECURITY OFFICER, PLEASE?

THE VERDICT FORM APPEARS TO BE REGULAR ON ITS FACE.  THE CLERK MAY PUBLISH THE VERDICT.   WOULD THE DEFENDANT PLEASE RISE FOR THE PUBLISHING OF THE VERDICT?

THE CLERK:   MAY IT PLEASE THE COURT.  THE UNITED STATES OF AMERICA VERSUS BRANDON LEON BASHAM, CRIMINAL NUMBER 4:02-992.   VERDICT.   WE, THE JURY, FOLLOWING DUE DELIBERATIONS IN THE ABOVE MATTER, UNANIMOUSLY RETURN THE FOLLOWING VERDICT IN THE ABOVE-REFERENCED CASE.

AS TO COUNT ONE, CARJACKING.  WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

SPECIAL INTERROGATORY.   IF YOU FOUND BRANDON LEON BASHAM GUILTY ON COUNT ONE, HAS THE GOVERNMENT PROVED BEYOND A REASONABLE DOUBT THAT ALICE DONOVAN DIED AS A RESULT OF BEING CARJACKED?

YES.

AS TO COUNT TWO, KIDNAPPING.   WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

SPECIAL INTERROGATORY.   IF YOU FOUND BRANDON LEON BASHAM

GUILTY ON COUNT TWO, HAS THE GOVERNMENT PROVED BEYOND A REASONABLE DOUBT THAT ALICE DONOVAN DIED AS A RESULT OF BEING KIDNAPED?

YES.

AS TO COUNT THREE (INTERSTATE TRANSPORTATION OF STOLEN MOTOR VEHICLE), WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

AS TO COUNT FOUR (CONSPIRACY TO CARJACK, RESULTING IN DEATH, KIDNAP, RESULTING IN DEATH, TRANSPORT A STOLEN MOTOR VEHICLE IN INTERSTATE COMMERCE, POSSESS FIREARMS BY A CONVICTED FELON, AND POSSESS STOLEN FIREARMS), WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

IF YOU FOUND THE DEFENDANT GUILTY OF COUNT FOUR, PLEASE INDICATE WHICH SUBSTANTIVE COUNT OR COUNTS YOU FOUND THE DEFENDANT CONSPIRED TO VIOLATE.

COUNT ONE, CARJACKING, RESULTING IN DEATH.

COUNT TWO, KIDNAPPING, RESULTING IN DEATH.

COUNT THREE, TRANSPORTING A STOLEN MOTOR VEHICLE IN INTERSTATE COMMERCE.

COUNT SEVEN, POSSESSION OF FIREARMS BY A CONVICTED FELON.

COUNT EIGHT, POSSESSION OF STOLEN FIREARMS.

AS TO COUNT FIVE (CONSPIRACY TO USE AND CARRY FIREARMS DURING AND IN RELATION TO AND TO POSSESS FIREARMS IN THE FURTHERANCE OF A CRIME OF VIOLENCE), WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

AS TO COUNT SIX (USE OF FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE), WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

AS TO COUNT SEVEN (FELON IN POSSESSION OF A FIREARM), WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

AS TO COUNT EIGHT (POSSESSION OF STOLEN FIREARMS), WE FIND THE DEFENDANT, BRANDON LEON BASHAM, GUILTY.

SO SAY WE ALL, THIS 30TH DAY OF SEPTEMBER 2004, SIGNED BY THE FOREPERSON, CYNTHIA WILSON.

IF THIS IS YOUR VERDICT, SO SAY ALL OF YOU.

THE COURT: PLEASE BE SEATED. MEMBERS OF THE JURY, I WOULD LIKE FOR MS. FLOYD TO CALL THE ROLL JUST TO CONFIRM THIS IS YOUR VERDICT. YOU WILL RESPOND IF THIS IS YOUR VERDICT AS YOUR NAME IS CALLED. MS. FLOYD.

THE CLERK: AS YOUR NAME IS CALLED, PLEASE RESPOND:

Q. TONY HOLBROOK?

A. YES.

Q. SHELDA RICHARDSON?

A. YES.

Q. DAVID STOVER?

A. YES.

Q. CYNTHIA WILSON?

A. YES.

Q. SHANNON BURNETT?

A. YES.

**JA 1643**

Q.    JOYCE HARTSOE?

A.    YES.

Q.    GREG PRICE?

A.    YES.

Q.    JUNE ROBERTSON?

A.    YES.

Q.    MARCUS HOLSTON?

A.    YES.

Q.    WENDY DOBY?

A.    YES.

Q.    ALLEN JENNINGS?

A.    YES.

Q.    AND SUSANNE HENSON?

A.    YES.

THE COURT:    MADAME FOREMAN, AND MEMBERS OF THE JURY, BY YOUR VERDICT,  IT WILL BE NECESSARY FOR US TO MOVE INTO A PENALTY PHASE OF THIS TRIAL.  THE FOUR ALTERNATES WHO HAVE BEEN PATIENTLY WAITING ARE NOW REJOINED WITH YOUR COLLEAGUES AND YOU ARE NOW ONCE AGAIN PART OF THIS JURY.  BEFORE EXCUSING YOU FOR THE DAY, I WOULD LIKE FOR YOU TO GO BACK TO YOUR JURY ROOM FOR JUST A MOMENT SO I CAN DISCUSS SCHEDULING MATTERS WITH THE LAWYERS.  WHEN WE BRING YOU BACK OUT, WE WILL TELL YOU WHAT OUR SCHEDULE LOOKS LIKE.

ONCE AGAIN NOW,  YOU DELIBERATED AND YOU HAVE REACHED A VERDICT.  BUT AS WE START THIS NEW PHASE,  PENALTY PHASE,  WE

ESSENTIALLY START OVER IN TERMS OF THE REQUIREMENT THAT YOU NOT DISCUSS THIS CASE. THERE WILL BE A DIFFERENT ISSUE BEFORE YOU. THE ISSUE WILL BE, OF COURSE, THE APPROPRIATE PENALTY TO BE HANDED OUT ON COUNT ONE AND COUNT TWO. YOU WILL HEAR EVIDENCE FROM BOTH THE GOVERNMENT AND THE DEFENDANT ON THAT POINT. AND SO WHAT I AM SAYING IS, YOU MUST RESET THE CLOCK BACK TO ZERO, IN OTHER WORDS, IN YOUR MIND, ON THIS NEW ISSUE. SO, FROM THIS POINT FORWARD, YOU MAY NOT DISCUSS THIS CASE WITH ANYONE, EVEN YOUR FELLOW JURORS. YOU MAY NOT PERMIT ANYONE TO DISCUSS IT WITH YOU OR IN YOUR PRESENCE. YOU MAY NOT EXPOSE YOURSELF TO ANYTHING IN THE NEWS MEDIA TOUCHING ON THIS CASE. THAT INCLUDES DISCUSSING THE CASE WITH YOUR FELLOW JURORS. PLEASE GO TO YOUR JURY ROOM FOR JUST A SECOND WHILE I DISCUSS THE SCHEDULING ISSUE WITH THE ATTORNEYS.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: AS I UNDERSTAND IT, THE AGREEMENT THAT HAD BEEN WORKED OUT WAS THAT WE WOULD TAKE A ONE-WEEK HIATUS FROM THE TRIAL TO ALLOW THE ATTORNEYS TO PREPARE FOR THE MEDICAL EVIDENCE THAT MIGHT BE COMING IN. MR. SWERLING, CAN YOU, AT THIS TIME, REAFFIRM YOUR INTENTION TO USE MENTAL HEALTH EVIDENCE IN THE PENALTY PHASE?

MR. SWERLING: YES, YOUR HONOR, WE REAFFIRM.

THE COURT: THAT MEANS THE NEXT STEP IS THE

DEFENDANT WILL BE ENTITLED TO SEE THE GOVERNMENT'S FORENSIC REPORT OR MEDICAL REPORT, MENTAL REPORT, I SHOULD SAY, PREPARED BY BUTNER. I WAS SHOCKED YESTERDAY TO LEARN THAT THAT REPORT IS STILL FORTHCOMING.

MR. HARRIS, I BELIEVE YOU WERE CORRECT IN WHAT YOU SAID AT SIDEBAR. THERE WAS A PRELIMINARY REPORT ISSUED. BUT WHEN THE ISSUE OF THE MMPI CAME UP, I, OVER YOUR OBJECTION, REQUIRED THE DEFENDANT TO SUBMIT TO AN MMPI, WITH THE UNDERSTANDING THAT A SUPPLEMENTAL REPORT WOULD BE COMPLETE. AND I THINK IT IS THAT SUPPLEMENTAL REPORT THAT WE ARE WORKING ON. BECAUSE I WAS UNDER THE UNDERSTANDING THE REPORT WAS ALREADY IN. OBVIOUSLY, I WAS THINKING ABOUT THE FIRST REPORT, NOT THE SUPPLEMENTAL REPORT. I HAD SOME VERY CHOICE WORDS TO SAY TO THE PHYSICIAN AT BUTNER LATE YESTERDAY. HE TOLD ME THIS MORNING THAT HE STAYED UP UNTIL 4:30 THIS MORNING WORKING ON THE REPORT. HOPEFULLY, WE WILL HAVE IT EITHER TODAY OR TOMORROW MORNING.

SO, ASSUMING WE GET IT TOMORROW MORNING, HOW LONG DO YOU WANT TO TAKE OFF BEFORE WE RESUME?

MR. SWERLING: JUDGE, THAT WOULD MAKE IT NEXT FRIDAY, PER OUR AGREEMENT. I SPOKE WITH MR. SCHOOLS. OF COURSE, THEY WON'T WANT TO START ON FRIDAY WITH MONDAY BEING A HOLIDAY. I WAS GOING TO SUGGEST BECAUSE OF THE MATTER AND THE MATERIAL WE WOULD HAVE TO GO THROUGH, SORT OF PUT THAT PART OF THE TRIAL ON HOLD UNTIL WE FINISH THIS PART, THAT MAYBE

COME BACK ON THE 12TH, IF THAT IS ALL RIGHT WITH THE COURT.

THE COURT: LET ME JUST TELL YOU, ON TUESDAY THE 13TH, I HAVE TWO -- WEDNESDAY, THE 13TH, I HAVE TWO CLASS ACTION SETTLEMENT HEARINGS THAT WERE SET BACK IN MARCH. THE REASON THEY WERE SET SO FAR IS, THEY WERE GIANT CLASS ACTION SETTLEMENTS, FOR WHICH PUBLICATIONS HAD TO BE MADE IN THE WALL STREET JOURNAL AND OTHER PAPERS TO NOTIFY THE CLASS OF THE SETTLEMENT AND GIVE POTENTIAL CLASS MEMBERS THE OPPORTUNITY TO OBJECT TO THE SETTLEMENT. ORDINARILY, I CAN MOVE A CIVIL HEARING, BUT WHEN IT HAS BEEN PUBLISHED IN WALL STREET JOURNAL TO 20,000 PEOPLE, I CAN'T CHANGE IT. AND, ACTUALLY, THERE WERE TWO CASES, TWO RELATED CASES. WE SET ONE AT TEN A.M. AND ONE AT TWO P.M.

WHAT I WOULD LIKE TO DO IS, AND I THOUGHT THAT MAYBE WE COULD JUST TAKE A QUICK RECESS, LET ME HEAR THE SETTLEMENT WITH NO OBJECTIONS AND APPROVE IT, YOU KNOW, A SHORT RECESS IN THE MORNING, SHORT RECESS IN THE AFTERNOON. THERE IS ONE OBJECTION THAT HAS BEEN FILED BY A CODEFENDANT IN A RELATED CASE, SO I HAVE GOT TO SPEND A LITTLE BIT OF TIME ON THAT OBJECTION. WHAT I WAS GOING TO DO WAS MOVE THE 10:00 O'CLOCK HEARING DOWN TO 1:30, SO WE WILL MEET FROM 1:30 TO 2:30 OF THAT WEDNESDAY.

SO, MY POINT IS, THE SECOND DAY OF THE TRIAL TAKE A LATE LUNCH BREAK, IT MIGHT BE LONGER THAN NORMAL SO I CAN GET THAT IN. I WOULDN'T DO IT IF IT WAS ANYTHING BUT A CLASS ACTION

THAT I CAN'T CHANGE.

SO, WITH THAT, IF WE START TUESDAY, WE WILL LOSE A LITTLE BIT OF TIME WEDNESDAY. WHAT ARE WE LOOKING AT IN TERMS OF DAYS FOR TRIAL?

MR. SCHOOLS: WE COULD DEFINITELY FINISH OUR PORTION OF THE PENALTY PHASE THAT WEEK, EVEN IF WE LOSE SOME TIME WEDNESDAY. WE ARE LOOKING AT THREE-AND-A-HALF DAYS OF TESTIMONY, AT THE MOST. AND THEN IF WE WERE TO CALL DR. CAPEHART, HE WOULD BE A REBUTTAL WITNESS. WE WOULD NEED TIME AFTER THE DEFENDANT'S CASE TO DO THAT. BUT I THINK OUR PRIMARY CASE-IN-CHIEF ON THE PENALTY PHASE WILL TAKE THREE AND NO MORE THAN FOUR DAYS.

THE COURT: AND REBUTTAL OR REPLY WOULD TAKE WHAT, NO MORE THAN A DAY, POSSIBLY?

MR. SCHOOLS: I HAVEN'T SEEN THE REPORT. IT IS HARD FOR ME TO SAY. I DON'T THINK IT WOULD TAKE -- NO MORE THAN A DAY.

THE COURT: MR. SWERLING, I DON'T WANT TO -- I AM NOT GOING TO ASK YOU HOW LONG YOUR CASE IS GOING TO TAKE.

MR. SWERLING: IT IS NOT A SURPRISE, WE HAVE TOLD THE GOVERNMENT, WE EXPECT IT WILL TAKE SEVERAL DAYS. I WOULD ANTICIPATE FOUR OR FIVE DAYS, MAY DRAG ON ANOTHER DAY, BUT THAT IS THE BEST GUESSTIMATE I CAN PUT. A LOT OF IT IS MEDICAL.

THE COURT: YOU KNOW, WE QUALIFIED A JURY THAT

COULD GIVE US THE FULL MONTH OF SEPTEMBER AND OCTOBER. I THINK IF WE GO PAST THE END OF OCTOBER WE COULD RUN INTO SOME PROBLEMS AND LOSE SOME JURORS. HOLD ON FOR A SECOND.

ALL RIGHT. WITH YOUR PREDICTIONS, WE CAN STILL DO IT AND END BY THE END OF OCTOBER IF WE START ON TUESDAY THE 12TH. IT IS CRITICAL WE NOT RUN OUT OF WITNESSES AND CUT A DAY SHORT. YOU DID A GOOD JOB OF NOT RUNNING OUT. I DON'T THINK WE HAD TO HAVE A SHORT DAY ANY AT ALL DURING THE FIRST PHASE. IT IS CRITICAL YOU HAVE EVERYBODY HERE. WE WILL LOSE A LITTLE BIT OF TIME ON THE 13TH, MY LAW CLERK TOLD ME WE WERE ABLE TO MOVE THAT MORNING HEARING DOWN AT THE 13TH. ANY OBJECTORS COME IN AT 10:00 O'CLOCK, HAVE A NOTE ON THE DOOR TO COME BACK AT 1:30. MIGHT LOSE A LITTLE BIT OF TIME ON THE 13TH. HAVE FULL DAYS.

THE CONFERENCE I AM SUPPOSED TO GO TO, I AM ON THE PROGRAM. CANCELED ANOTHER PROGRAM AT THE FIRST PART OF THE TRIAL. WHAT I THINK I WILL DO IS GO DOWN MONDAY AND COME BACK TUESDAY, DO MY PART, AND COME BACK AND ONLY LOSE TWO DAYS, 18TH AND 19TH. AND SO IF WE DO THAT, THAT WILL STILL GIVE US 12 FULL DAYS TO THE END OF THE MONTH TO FINISH THE TRIAL. I WOULD LIKE TO TELL THE JURY NOW SO THEY WILL KNOW WHAT THE SCHEDULE LOOKS LIKE.

(WHEREUPON THE JURY ENTERED THE COURTROOM.)

THE COURT: MADAME FORELADY, AND MEMBERS OF THE JURY, I CAN NOW TELL YOU WHAT OUR SCHEDULE IS LIKE. IT WILL

BE NECESSARY FOR US TO TAKE A HIATUS IN THIS TRIAL. THERE IS SOME EVIDENCE THAT HAS NOW BECOME AVAILABLE THAT THE LAWYERS HAVE TO HAVE AN OPPORTUNITY TO STUDY. AND FOR SOME REASONS I WON'T GO INTO, WE CANNOT START UNTIL THE 12TH OF OCTOBER, TUESDAY. THAT IS THE TUESDAY FOLLOWING COLUMBUS DAY. AND SO YOU ARE GOING TO HAVE OFF, YOU KNOW, ALMOST TWO WEEKS, ABOUT A WEEK AND A HALF, I WOULD SAY. WE WILL START ON THE 12TH AND WE WILL PLAN ON WORKING LONG, FULL DAYS JUST AS WE HAVE UP UNTIL NOW. WE WILL BE OFF ON THE 18TH AND 19TH, MONDAY AND TUESDAY. OTHER THAN THAT, WE WILL BE HERE ALL DAY EVERY DAY MONDAY THROUGH FRIDAY, FROM THE 12TH TO THE END OF OCTOBER. WE THINK WE WILL FINISH THE CASE BY THE END OF OCTOBER. WE WILL HAVE, IF WE START ON THE 12TH AND WE LOSE THE 18TH AND 19TH, THAT GIVES US 12 DAYS OF TRIAL. WE ARE FAIRLY CONFIDENT WE CAN FINISH THE CASE AND GET IT TO YOU FOR DELIBERATION BY THE 29TH ON FRIDAY.

LET ME EXCUSE YOU AT THIS TIME WITH A STRONG REMINDER THAT YOU MAY NOT DISCUSS THIS CASE WITH ANYONE OR PERMIT ANYONE TO DISCUSS IT WITH YOU OR IN YOUR PRESENCE. YOU MUST NOT DO ANY RESEARCH OR INVESTIGATION ABOUT THIS CASE. YOU MUST NOT EXPOSE YOURSELF TO ANYTHING IN THE NEWS MEDIA TOUCHING ON THIS CASE.

WHEN YOU COME BACK, THE PROCEDURE WILL BE SIMILAR IN THAT THE GOVERNMENT WILL GO FIRST. THE GOVERNMENT WILL INTRODUCE EVIDENCE THAT IT BELIEVES SUPPORTS THE IMPOSITION OF THE DEATH

PENALTY ON COUNT 1 AND COUNT 2.  AS I TOLD YOU ON THE VIDEO THAT YOU SAW DURING JURY SELECTION,  THE GOVERNMENT MUST FIRST PROVE THAT THE DEFENDANT ACTED WITH ONE -- WITH AT LEAST ONE OF FOUR DIFFERENT MENTAL STATES, AND THE GOVERNMENT MUST PROVE AT LEAST ONE STATUTORY AGGRAVATING FACTOR THAT IT BELIEVES WILL SUPPORT THE DEATH PENALTY.

WHEN THE GOVERNMENT FINISHES, THE DEFENDANT WILL HAVE THE OPPORTUNITY TO PRODUCE HIS EVIDENCE.  THE DEFENDANT'S EVIDENCE IS NORMALLY REFERRED TO AS MITIGATING FACTORS OR MITIGATING EVIDENCE.  MITIGATING EVIDENCE IS EVIDENCE THAT THE DEFENDANT BELIEVES WOULD JUSTIFY A SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE RATHER THAN SENTENCE OF DEATH.  I WILL GIVE YOU DETAILED INSTRUCTIONS BEFORE WE BEGIN THE PENALTY PHASE.  AND THEN I WILL GIVE YOU EVEN MORE DETAILED INSTRUCTIONS AT THE END OF THE PENALTY PHASE THAT YOU MUST FOLLOW AS YOU GO ABOUT REACHING YOUR DECISION.  WE THINK WE CAN DO IT IN 12 DAYS STARTING ON THE 12TH ON TUESDAY,  START AT 10:00 O'CLOCK. THERE WON'T BE A NEED FOR YOU TO CALL THE CODE-A-PHONE BECAUSE THAT IS A DAY CERTAIN  -- I'M SORRY,  9:00 O'CLOCK.   THERE IS NO NEED FOR YOU TO CALL THE 800 CODE-A-PHONE NUMBER,  WE ARE GOING TO START AT 9:00 O'CLOCK ON THE 12TH.  AND WE HAVE YOUR ADDRESSES.  I MAY WRITE YOU A LETTER SENT TO YOUR HOME ADDRESS GIVING YOU THE TRIAL SCHEDULE THAT YOU CAN USE FOR YOUR EMPLOYMENT, AND YOUR SPOUSE, OR YOUR GIRLFRIEND, BOYFRIEND TO TELL THEM WHERE YOU ARE.  ALL RIGHT.  THANK YOU

VERY MUCH. WE WILL EXCUSE YOU, AT THIS TIME. SEE YOU BACK AT 9:00 O'CLOCK ON OCTOBER 12TH.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: I REFERRED TO THIS INCIDENT REPORT ABOUT THE VALIUM SHOWING UP IN THE JAIL. I AM GOING TO JUST FILE THIS AND ASK THE CLERK TO PROVIDE A COPY TO BOTH SIDES AS I HAVE DONE WITH THE OTHER INCIDENT REPORTS THAT HAVE BEEN PROVIDED TO ME.

MR. SWERLING, MR. HARRIS, AS SOON AS THAT REPORT COMES IN FROM BUTNER, WE WILL GET IT TO YOU THE VERY MINUTE THAT IT HITS OUR OFFICE.

MR. HARRIS: YOUR HONOR, WE WANT THE REPORT CURRENTLY UNDER SEAL. MEETING TOMORROW MORNING WITH SOME OF OUR PEOPLE.

THE COURT: LET ME BE SURE. I THINK THAT IS CERTAINLY PROPER. LET ME JUST TALK WITH DR. CAPEHART ON HOW WE STAND ON IT AND WHEN WE WILL GET THE OTHER ONE. I WILL NOT LET HIM -- I THINK YOU ARE ENTITLED TO SEE THE FIRST ONE NO MATTER WHAT. I DON'T KNOW IF HE HAS ANY REASON WHY YOU SHOULDN'T LOOK AT THEM ALL AT THE SAME TIME. YOU WILL SEE THE FIRST ONE REGARDLESS, ONE WAY OR THE OTHER.

ANYTHING FURTHER FROM THE GOVERNMENT?

MR. SCHOOLS: NO, SIR.

THE COURT: ANYTHING FURTHER FROM THE DEFENDANT?

MR. HARRIS: MR. BASHAM WOULD LIKE TO ADDRESS THE COURT.

THE DEFENDANT: YES, MR. YOUR HONOR. I WOULD LIKE TO SAY I THANK YOU FOR YOUR PATIENCE AND UNDERSTANDING AND TRUST IN ME AND THE THINGS YOU HAVE DONE TO HELP ME THROUGHOUT THIS TRIAL. AND I JUST WANTED TO LET YOU KNOW.

THE COURT: I AM NOT TRYING TO HELP EITHER SIDE. I AM TRYING TO PRESIDE OVER THE TRIAL AS REQUIRED BY THE RULES OF EVIDENCE AND THE RULES OF PROCEDURE. AND IF I RULE ONE WAY OR THE OTHER, WHETHER ONE SIDE LIKES IT OR NOT, I RULE ON THE LAW.

THE DEFENDANT: I PRETTY MUCH TRUST YOU, YOU TRUST ME AS I TOLD YOU. THANK YOU.

THE COURT: ALL RIGHT. THANK YOU.

ANY OBJECTION TO THE GOVERNMENT OR LAW ENFORCEMENT RETAIN POSSESSION OF ALL OF THE EXHIBITS THAT ARE INTRODUCED IN THIS CASE?

MR. SWERLING: NONE ON BEHALF OF US.

MR. SCHOOLS: YOUR HONOR, LOGISTICALLY, WOULD THE COURT HAVE ANY OBJECTION TO LEAVING THEM LOCKED IN THE JURY ROOM?

THE COURT: THAT MAKES SENSE TO ME.

MR. SCHOOLS: WE CAN RETRIEVE THE FIREARMS, IF YOU LIKE.

THE COURT: RETRIEVE THE FIREARMS AND AMMUNITION AND

LEAVE EVERYTHING ELSE LOCKED IN THE JURY ROOM.   VERY GOOD.

THANK YOU VERY MUCH.   WE WILL BE IN RECESS.


                 *** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

                    CERTIFICATE OF REPORTER

     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.


_____          _____

S/DEBRA R. JERNIGAN, RPR, CRR              DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
                            )    COLUMBIA, SC
                            )    OCTOBER 12, 2004
                            )

    VERSUS                    )
                            )

BRANDON L. BASHAM,        )
      DEFENDANT.      )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL
VOLUME XV

APPEARANCES:

FOR THE GOVERNMENT:          SCOTT SCHOOLS, FIRST AUSA
                           JONATHAN S. GASSER, AUSA
                           JOHN DUANE, AUSA
                           UNITED STATES ATTORNEY'S OFFICE
                           1441 MAIN STREET, SUITE 500
                           COLUMBIA, SC  29201

FOR THE DEFENDANT:           JACK SWERLING, ESQ.
                           1720 MAIN STREET
                           SUITE 301
                           COLUMBIA, SC  29201

                           GREG HARRIS, ESQ.
                           1720 MAIN STREET
                           SUITE 301
                           COLUMBIA, SC  29201

COURT REPORTER:             DEBRA R. JERNIGAN, RPR, CRR
                           UNITED STATES COURT REPORTER
                           901 RICHLAND STREET
                           COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1655

AGAINST THEM.  HE BANGS HIS OWN HEAD AGAINST THE WALL.  HE HAS TO BE PHYSICALLY RESTRAINED AND MOVED BACK TO HIS CELL. FROM THAT POINT FORWARD UNTIL HE RETURNED TO SOUTH CAROLINA ON AUGUST 3RD, 2004, BRANDON BASHAM WAS ANGRY IN THE PRISON.  AND YOU WILL HEAR ABOUT INCIDENTS THAT OCCURRED DURING THAT TIME FRAME.

YOU WILL ALSO HEAR ABOUT A PARTICULAR NURSE WHO WAS THE SUBJECT OF OR THE VICTIM OF MUCH OF MR. BASHAM'S SEXUAL DEVIANCY WHILE HE WAS IN PRISON UP THERE.  FEBRUARY 2004 WHEN HE WENT UP THERE THE FIRST TIME,  LESS THAN A YEAR AGO,  MR. BASHAM WAS IN A CELL THAT HAD A SOLID DOOR ON IT.  THERE WAS A SMALL SOLID WINDOW ON THE LEFT SIDE,  AND A SMALL SOLID WINDOW ON THE RIGHT SIDE.  IN THE MIDDLE OF THE DOOR IS A TRAP DOOR OPENING THAT CAN BE OPENED TO SLIDE IN A FOOD TRAY OR ANY MEDICINES HE MIGHT NEED.  MR. BASHAM DOESN'T LIKE FOR THAT FOOD SLOT TO BE CLOSED. HE HAS,  WHEN BRANDON BASHAM WANTS SOMETHING,  HE TRIES TO GET IT.  SO,  HE HAD SHOVED SOME PAPER IN THE FOOD SLOT TO TRY TO KEEP IT OPEN, WHICH CREATES A PROBLEM IN THE PRISON BECAUSE HE CAN SHOUT OUT AND TRY TO TALK TO THE OTHER PRISONERS,  HARASS THE GUARDS, AND DO WHATEVER HE WANTS TO FROM INSIDE THE CELL.

THE NURSE WAS TRYING TO REMOVE THE PAPER FROM THE FOOD TRAP DOOR TO TRY TO CLOSE IT AND BRANDON BASHAM'S REACTION WAS TO MASTURBATE UNTIL HE EJACULATED THROUGH THE FOOD SLOT DOOR. THAT IS THE GUY SITTING OVER THERE.  HE AIN'T SORRY.  HE

AIN'T REHABILITATED. HE COULDN'T CARE LESS.

THAT WASN'T IT, LADIES AND GENTLEMEN. IN JULY, AFTER THE INCIDENT WHERE HE HAD GOTTEN INVOLVED WITH THE GUARDS, HE WAS STILL ANGRY. HE WAS ANGRY FOR THAT ENTIRE TIME. AT ONE POINT, THIS SAME NURSE WENT TO TALK TO MR. BASHAM ABOUT AN INCIDENT WHERE HE HAD -- THE WAY THE PHONE WORKS THERE, THEY PUT IT THROUGH THE TRAP DOOR TO MAKE A CALL. HE DIDN'T WANT TO GIVE IT BACK. THE NURSE GOES TO TALK TO HIM ABOUT THE INCIDENT. HE TELLS HER IN NO UNCERTAIN TERMS HE DOESN'T HAVE TO LISTEN TO HER AND HE THREATENS TO SODOMIZE HER. JULY 27TH, 2004, THAT IS THE BRANDON BASHAM SEATED RIGHT THERE. SODOMY. THAT NURSE'S NAME IS JENNIFER MIOSI. SHE WILL TELL YOU WHAT IT WAS LIKE TO BE IN A PRISON WITH BRANDON BASHAM.

THERE IS MORE. YOU ARE GOING TO HEAR TESTIMONY FROM TWO U.S. MARSHALS ABOUT INCIDENTS THAT OCCURRED DURING THIS TRIAL. YOU SEE, LADIES AND GENTLEMEN, THE FIRST ONE OCCURRED WHILE WE WERE SELECTING THE JURY IN THIS CASE. THERE WAS A TIME WHEN MR. BASHAM CAME INTO THE COURTROOM AND HE WAS CLAIMING TO BE IN THE MIDDLE OF SOME SORT OF PANIC DISORDER, APPARENTLY HE DIDN'T WANT TO BE IN COURT THAT DAY. SO, THE JUDGE DIRECTED THE MARSHALS TO TAKE HIM TO THE HOSPITAL, WHICH WAS DONE. HE WAS PREDICTABLY TREATED AND RELEASED. AS HE IS WALKING BACK TO THE TRANSPORT VAN, MR. BASHAM SEES SOMETHING ON THE GROUND HE WANTS. SINCE HE WANTS IT, HE TRIES TO GET IT. HE BENDS OVER TO TRY TO GET IT. THE MARSHALS DON'T SEE

WHAT IT IS, THEY INSTRUCT HIM TO STAND UP, HE REFUSES. WHATEVER HE HAS GRABBED, HE SHOVES IT IN HIS SOCK. THEY TRY TO GET IT FROM THE SOCK. HE BECOMES RESISTANT, SWINGING BACK AND FORTH, GET HIM AGAINST THE VAN, EVENTUALLY TAKE HIM TO THE GROUND TO GET HIM UNDER CONTROL. GOT HIM ON -- GOT HIM OFF THE GROUND, PUT HIM IN THE VAN. WHAT WAS IN HIS SOCK? A CIGARETTE BUTT. IT IS ALL IT TOOK FOR BRANDON BASHAM TO EXPLODE WAS A CIGARETTE BUTT. HE WANTED IT, HE WAS GOING TO TRY AND GET IT.

THE LAST INCIDENT, LADIES AND GENTLEMEN, OCCURRED IN THIS COURTROOM ON SEPTEMBER 20TH OF THIS TRIAL. YOU SEE, MR. BASHAM HAD RELATED TO THE JUDGE HE WAS HAVING SOME PROBLEMS STAYING AWAKE FOR HIS DEATH PENALTY TRIAL. I AM NOT KIDDING YOU, FOLKS. AND SO, HE HAD TOLD THE JUDGE, HEY, YOU KNOW, JUDGE, IF I CAN JUST GET A LITTLE CHEWING TOBACCO TO HAVE DURING TRIAL, THAT WILL REALLY HELP ME STAY AWAKE. THAT WAS ON FRIDAY, SEPTEMBER 17TH. ON MONDAY, SEPTEMBER 20TH, HE WAS ADVISED, MR. BASHAM, THE MARSHALS HAVE SOME CONCERNS WITH THAT, I DON'T THINK WE WILL MAKE THAT HAPPEN. THAT AFTERNOON, MR. BASHAM CAME TO THE COURTROOM AFTER TELLING ONE OF THE MARSHAL DEPUTIES, I AM NOT GOING TO BE HERE LONG. AND WHEN HE IS ADVISED HE IS NOT GOING TO GET HIS CHEWING TOBACCO, HE WAS THEN DIRECTED BY THE JUDGE TO SIT DOWN. HE REFUSED. THE MARSHAL'S DEPUTIES WENT TO PLACE THEIR HANDS ON HIM TO SIT HIM DOWN IN HIS CHAIR, HE RESISTED, HE BEGAN YELLING AND

CUSSING. IT TOOK EIGHT MEN, SIX U.S. MARSHALS AND TWO FBI AGENTS TO GET BRANDON BASHAM UNDER CONTROL RIGHT OVER THERE.

HE WASN'T DONE, LADIES AND GENTLEMEN. BECAUSE HE GOT UP, THEY WERE TRYING TO TAKE HIM OUT OF THE COURTROOM THROUGH THAT DOOR. AS HE GOT UP, PER PROCEDURE, HE WAS HANDCUFFED THEY WERE RAISING HIS HANDS BEHIND HIM. HE DIDN'T LIKE THAT EITHER. SO, THEN HE BEGAN CUSSING, AND YELLING, AND SCREAMING, AND HE HAD TO BE TAKEN DOWN AGAIN RIGHT OVER THERE. OVER DIP. OVER DIP. AND, LADIES AND GENTLEMEN, WHAT IS EVEN MORE AMAZING, IS YOU WILL FIND OUT THAT THE NEXT DAY, SEPTEMBER 21ST, TUESDAY OF THE SECOND WEEK OF THIS TRIAL, THE JUDGE ALLOWED MR. BASHAM TO HAVE SOME DIP DURING THE BREAK IN THE AFTERNOON. AND HE HAS BEEN COMPLIANT EVER SINCE.

SO, YOU SEE, LADIES AND GENTLEMEN, YOU ARE GOING TO HEAR TESTIMONY FROM PSYCHIATRIC WITNESSES WHO TALK ABOUT THESE GREAT MENTAL PROBLEMS THAT BRANDON BASHAM CLAIMS TO HAVE, AND PURPORTS TO HAVE, AND HIS CONDUCT IN THIS TRIAL HAS BEEN CONTROLLED BY HIM BASED ON THE PROMISE OF DIP IN THE AFTERNOON, CHEWING TOBACCO. THAT IS THE BRANDON BASHAM THAT IS ON TRIAL HERE.

NOW, LADIES AND GENTLEMEN, THAT WILL, ESSENTIALLY, BE THE GOVERNMENT'S EVIDENCE WITH ONE EXCEPTION, WHICH I WILL TALK WITH YOU ABOUT LATER.

AFTER YOU HEAR THE GOVERNMENT'S EVIDENCE, YOU WILL HEAR THE DEFENDANT'S EXPERTS TESTIFY ABOUT MR. BASHAM'S CHILDHOOD

AND MENTAL CONDITION. WE DON'T KNOW EXACTLY WHAT THAT TESTIMONY WILL BE. THEY DON'T HAVE TO TELL US, AND SO WE KNOW VERY LITTLE. WE HAVE PARAGRAPH SUMMARIES OF WHAT HIS EXPERTS MIGHT SAY.

I SUSPECT YOU ARE GOING TO HEAR THAT MR. BASHAM HAD AN UNPLEASANT CHILDHOOD. HE HAD A MOTHER WHO DIDN'T DISCIPLINE HIM CONSISTENTLY AND OFTENTIMES MADE EXCUSES FOR HIS ERRATIC BEHAVIOR, AND A FATHER WHO DIDN'T DISCIPLINE HIM AT ALL. YOU ARE GOING TO HEAR THAT HE WAS, AT A VERY EARLY AGE, VERY AGGRESSIVE, VERY DISRUPTIVE, AND VERY MUCH A PROBLEM CHILD. AND YOU ARE GOING TO LEARN THAT HE BEGAN USING DRUGS AT A VERY YOUNG AGE, PERHAPS BEFORE HE WAS TEN EVEN, BUT YOU WILL ALSO HEAR THROUGH MEDICAL REPORTS THAT HIS OWN SELF-REPORT OF WHEN HE STARTED USING DRUGS AND HOW MUCH HE USED IS REALLY NOT CONSISTENT AND HAS TO BE EXAGGERATED.

YOU WILL ALSO HEAR, LADIES AND GENTLEMEN, THAT WHEN BRANDON BASHAM WAS 14 YEARS OLD, 9 YEARS AGO, 14 YEARS OLD, HIS BEHAVIOR HAD GOTTEN HIM COMMITTED TO THE KENTUCKY -- IT IS CALLED THE CABINET FOR FAMILIES AND CHILDREN, WHICH IS SORT OF LIKE THE DSS HERE. AND HE WAS PLACED IN A METHODIST HOME IN AUGUST OF 1995, I BELIEVE IT WAS. HE WAS 14 YEARS OLD -- EXCUSE ME, '96, HE WAS 14 YEARS OLD. AND FROM THAT POINT THROUGH MOST OF HIS ADOLESCENCE, PEOPLE WERE TRYING TO HELP BRANDON BASHAM. HE WAS IN TREATMENT FACILITY AFTER TREATMENT FACILITY AFTER TREATMENT FACILITY. WHAT YOU WILL HEAR

AND JEN; HUSBAND BARRY; AND, SISTER JUDY EZELL. THEY WILL TELL YOU ABOUT THE RELATIONS WITH HER SIBLINGS AND THE EXPERIENCES THEY SHARED TOGETHER.

LADIES AND GENTLEMEN, THIS CASE WILL BE -- THIS PART OF THE CASE YOU WILL HEAR A LOT OF EVIDENCE ABOUT BRANDON BASHAM. I WANT YOU TO REMEMBER, HOWEVER, THAT THOSE TWO PEOPLE PICTURED THERE, ALICE DONOVAN ON THE LEFT AND SAMANTHA BURNS ON THE RIGHT, WERE ALSO WHAT THIS CASE IS ABOUT. AS YOU LISTEN TO THE EVIDENCE IN THIS CASE, I WILL ASK YOU TO KEEP IN MIND THE CRIMES THAT BRANDON BASHAM HAS BEEN FOUND GUILTY OF, THE LIVES THAT HE SHATTERED, THE HOME THAT HE HAS WRECKED, THE CHOICES THAT HE HAS MADE.

WHEN I SIT DOWN, MR. BASHAM'S ATTORNEY WILL STAND UP AND ASK YOU TO LET HIM MAKE ONE LAST CHOICE. HE WANTS TO CHOOSE HIS PUNISHMENT. LADIES AND GENTLEMEN, YOU WILL CONDUCT A WEIGHING PROCESS IN THIS CASE AND THE JUDGE HAS TOLD YOU THAT YOU WILL DO THAT, AND YOU WILL HEAR ABOUT MR. BASHAM'S ROUGH CHILDHOOD, AND YOU WILL HEAR ABOUT COMPETING OPINIONS ABOUT WHETHER HE HAS A MENTAL DISTURBANCE OR JUST A PERSONALITY DISORDER.

YOU WILL HAVE TO WEIGH ALL OF THAT BUT, YOU KNOW, THERE ARE SOME THINGS THAT PERHAPS YOU CAN LOOK AT AND SAY, IT IS AN EXCUSE, IT FORGIVES IT, IT MODERATES IT. BUT NOT THESE CRIMES. NOT THE RANDOM KILLING OF TWO INNOCENT, PURELY INNOCENT WOMEN, THREE DAYS PART. THE ATTEMPTED -- THIRD

ATTEMPT ON NOVEMBER 17TH, AND THEN THE RESPONSE OF TRYING TO KILL A COP. THAT IS THE GUY THAT IS GOING TO ASK YOU TO LET HIM CHOOSE HIS PUNISHMENT.

ALICE DONOVAN DIDN'T DO ONE THING TO BRANDON BASHAM. SAMANTHA BURNS DIDN'T DO ONE THING TO BRANDON BASHAM. ONE THING THAT YOU WILL NOT HEAR FROM ANY EXPERT IN THIS CASE, NONE, THEY WILL NOT TELL YOU THAT BRANDON BASHAM DOES NOT HAVE THE CAPACITY TO DETERMINE RIGHT FROM WRONG.

ON NOVEMBER 14TH, 2002, BRANDON BASHAM CHOSE WRONG. FOR ALICE DONOVAN, THAT MEANT CHOOSING HER DEATH. AND, LADIES AND GENTLEMEN, HE DESERVES NO BETTER CHOICE FROM YOU. THANK YOU VERY MUCH.

THE COURT: MEMBERS OF THE JURY, LET'S TAKE A 15-MINUTE RECESS. PLEASE GO TO YOUR JURY ROOM, AT THIS TIME.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: THE COURT RECOGNIZES MR. GREG HARRIS FOR HIS OPENING STATEMENT ON BEHALF OF MR. BASHAM.

MR. HARRIS: PLEASE THE COURT. GOOD MORNING. WHY? WHY WOULD SOMEONE CHOOSE TO BREAK OUT OF JAIL MONTHS AWAY FROM RELEASE? WHY WOULD SOMEONE CHOOSE TO KIDNAP AT KNIFE POINT SOMEONE THAT WAS JUST TRYING TO HELP THEM, A GOOD SAMARITAN? WHY WOULD SOMEONE CHOOSE TO BREAK INTO CARS, TO BREAK INTO HOMES TO STEAL GUNS, TO STEAL MONEY? WHY WOULD SOMEONE CHOOSE IN THE MIDDLE OF A BEAUTIFUL NOVEMBER DAY, TO CARJACK SOMEONE WHO IS CHRISTMAS SHOPPING? WHY WOULD SOMEONE MAKE THOSE

CHOICES? WHY WOULD SOMEONE CHOOSE TO STAND BY AND WATCH AS SOMEONE IS KILLED AND NOT DO ANYTHING ABOUT IT? WHY WOULD SOMEONE CHOOSE AFTER THAT TO GO PARTY ON, TO USE DRUGS, TO HAVE A RELATIONSHIP WITH ANOTHER FEMALE? WHY WOULD SOMEONE MAKE THAT CHOICE? WHY WOULD SOMEONE CHOOSE ON ANOTHER BEAUTIFUL AFTERNOON TO ATTEMPT TO CARJACK A MOTHER AND HER BEAUTIFUL DAUGHTER WHO HAVE JUST LEFT THE MOVIES? HOW COULD SOMEONE MAKE THAT CHOICE? WHY WOULD SOMEONE CHOOSE TO POINT A FIREARM AT A LAW ENFORCEMENT OFFICER AND TO SHOOT? WHY WOULD SOMEONE, AFTER HAVING BEEN CHARGED, AND ARRESTED, AND CONFRONTED WITH DEATH PENALTY OFFENSES, SLEEP IN HIS TRIAL AND DURING HIS JURY SELECTION? WHY WOULD SOMEONE ARGUE WITH HIS LAWYERS DURING THE TRIAL? WHY WOULD SOMEONE SIT AT THE TABLE BEHIND ME AND SEEM COMPLETELY AND TOTALLY DISINTERESTED WITH THE GOINGS ON IN THE COURTROOM, WITH THE EVIDENCE THAT YOU HAVE HEARD OVER THE LAST MONTH AND A HALF, SEEMINGLY NO EFFECT? I DON'T UNDERSTAND HOW SOMEONE CAN MAKE THOSE CHOICES. I CANNOT FATHOM HOW SOMEONE WOULD MAKE THOSE CHOICES. I AM SURE THAT DURING THE PAST MONTH AND A HALF, EACH AND EVERY ONE OF YOU HAS HAD THAT SAME THOUGHT.

BEFORE MR. SCHOOLS AND MR. GASSER DISCUSS CHOICES WITH YOU, BEFORE WE GOT TO THIS PHASE, BEFORE YOU DELIBERATED, I AM CERTAIN THAT EACH OF YOU THOUGHT, HOW COULD HE MAKE THAT CHOICE?

WE SEE SOMEONE SLEEPING IN A COURTROOM DURING HIS DEATH

PENALTY TRIAL, AND WE LOGICALLY CONCLUDE THAT HE IS UNINTERESTED. AND THAT IS A VERY RATIONAL DECISION. WE SEE SOMEONE ARGUING WITH HIS LAWYERS AND WE THINK TO OURSELVES, HOW CAN HE CHOOSE TO ARGUE WITH THE SAME -- WITH THE ONLY PEOPLE THAT ARE TRYING TO SAVE HIS LIFE? THE PEOPLE THAT STAND BETWEEN HIM AND THE DEATH PENALTY. WE SEE AND WE HEAR TESTIMONY OF DESPICABLE ACTS, OF RANDOM ACTS OF VIOLENCE. AND WE THINK, HOW COULD HE CHOOSE TO MAKE THOSE DECISIONS? AND WE LOGICALLY CONCLUDE THAT HE MUST BE EVIL BECAUSE HE MADE THOSE CHOICES. AND, AGAIN, THAT IS A LOGICAL CONCLUSION. ON EACH OF THESE OCCASIONS, UPON HEARING ALL OF THIS TESTIMONY AND UPON OBSERVING WHAT YOU HAVE OBSERVED OVER THE LAST MONTH AND A HALF IN THE COURTROOM, I AM CERTAIN THAT EVERY ONE OF US SAID I WOULD NEVER HAVE MADE THAT DECISION. I WOULD NEVER HAVE MADE THAT CHOICE. I WOULD NEVER HAVE DONE THAT. I WOULD NEVER HAVE SAID THAT. WE PROCESSED WHAT WE SAW. WE PROCESSED WHAT WE HEARD. AND EACH AND EVERY ONE OF US, ON EVERY SINGLE OCCASION, THOUGHT TO OURSELVES, THAT IS NOT A LOGICAL CHOICE. THAT IS AN IRRATIONAL CHOICE. IT DOESN'T MAKE SENSE.

NOW, I AGREE WITH THE GOVERNMENT ON ONE THING. I AGREE THAT THIS TRIAL, FROM THE VERY BEGINNING, HAS BEEN ABOUT CHOICES. THIS PHASE OF THE TRIAL, I BELIEVE, HOWEVER, IS THE CHANCE FOR US TO FOCUS, COLLECTIVELY, ALL OF US, TO FOCUS ON NOT WHAT HAPPENED. THERE IS NOTHING THAT CAN BE

**JA 1664**

DONE ABOUT THAT. BUT TO FOCUS ON WHY THOSE CHOICES WERE MADE.

BRANDON BASHAM IS DIFFERENT THAN ALL OF US. HE IS A LOT DIFFERENT THAN ALL OF US. HIS BRAIN WORKS DIFFERENTLY THAN OURS. IT SIMPLY DOES NOT WORK AS CLEARLY. HE DOES NOT PROCESS INFORMATION. THINGS THAT ARE WRONG WITH BRANDON ONLY AN EXPERT CAN EXPLAIN. ONLY THE DOCTORS THAT HAVE MADE IT THEIR LIFE'S WORK TO UNDERSTAND HOW THE BRAIN WORKS. WE CAN'T POSSIBLY, I CAN'T POSSIBLY, JACK SWERLING CAN'T POSSIBLY, EVEN THE GOVERNMENT LAWYERS CAN'T POSSIBLY EXPLAIN THESE THINGS TO YOU WITHOUT PRESENTING TO YOU DOCTORS, WHO HAVE HAD THE OPPORTUNITY TO LOOK AT HIM, TO QUESTION HIM, TO TEST HIM. WHEN I AM SICK, WHEN MY WIFE IS SICK, WHEN MY THREE LITTLE GIRLS ARE SICK, WHEN THEIR DOG, BUDDY, IS SICK, WE GO TO THE DOCTOR. WE KNOW WHEN OUR ARM HURTS, OUR BACK HURTS, OUR HIP HURTS, BUT WE HAVE NO IDEA WHAT IS WRONG WITH US. WE JUST KNOW THAT WE ARE SICK.

THAT IS WHAT WE HAVE DONE WITH BRANDON. WE HAVE SOUGHT OUT THE BEST MEDICAL CARE THAT WE COULD FIND IN THIS AREA, AND THEY HAVE DIAGNOSED HIM, THEY HAVE POKED HIM, AND THEY HAVE PRODDED HIM, AND THEY HAVE COME TO A CONCLUSION ABOUT HOW HIS BRAIN WORKS AND WHY IT ACTUALLY DOES NOT WORK. BECAUSE IN MATTERS RELATING TO THE BRAIN, ONLY AN EXPERT COULD POSSIBLY KNOW WHY SOMEONE MAKES CHOICES OR, BETTER YET, HOW SOMEONE MAKES CHOICES.

THESE PHYSICIANS, MR. SCHOOLS DID NOT GO INTO VERY DETAIL, THE FACT OF THE MATTER IS, THESE PHYSICIANS HAVE BEEN PROVIDED WITH RECORDS DATING BACK TO BRANDON'S BIRTH, AGE ONE. WHAT YOU WILL HEAR IS THAT THEIR OPINIONS ARE BASED ON A LIFETIME OF TREATMENT IN MENTAL FACILITIES, AT MENTAL HEALTHCARE FACILITIES, INPATIENT AND OUTPATIENT. BRANDON HAS SEEN, BEFORE THE AGE OF 20, 40 DOCTORS TO TRY TO FIGURE OUT WHAT IS WRONG WITH HIS BRAIN. BEFORE THE AGE OF 20, BRANDON HAD BEEN PLACED IN OVER 50 TREATMENT PLANS BY THESE DOCTORS. BEFORE THE AGE OF 20, BRANDON HAD BEEN PRESCRIBED OVER A HUNDRED DIFFERENT TYPES OF MEDICATIONS. A HUNDRED BEFORE THE AGE OF 20.

BEFORE THE AGE OF 20, HE HAD BEEN PRESCRIBED, LEGALLY, AND HAD INGESTED OVER 10,000 PILLS. NOW, THE RECORDS THAT YOU WILL HAVE PROVIDED TO YOU THROUGH THE EXPERTS ARE NOT RECORDS THAT WE HAVE JUST CREATED IN THE LAST YEAR AND A HALF. THEY ARE NOT RECORDS THAT WE BRING TO YOU BECAUSE THIS IS A DEATH PENALTY CASE. THESE ARE RECORDS, AGAIN, THAT TAKE YOU BACK TO EXPLAIN TO YOU, COLLECTIVELY, AGAIN, THAT THESE CHOICES THAT HE HAS MADE ARE NOT CHOICES FROM A BRAIN THAT WORKS AS OURS, BUT FROM A BRAIN THAT HAS BEEN PROBLEMATIC ALL OF HIS LIFE.

NOW, BEFORE WE BOG DOWN TOO MUCH IN THE MEDICAL ASPECT OF THIS, LET ME TELL YOU THAT BRANDON BASHAM HAS AN IQ BETWEEN 68 AND 63. THAT IQ PLACES HIM IN THE ONE TO THIRD PERCENT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,   )   CR. NO. 4:02-992
   )   COLUMBIA, SC
   )   OCTOBER 13, 2004
   )
   VERSUS   )
   )
BRANDON L. BASHAM,   )
   DEFENDANT.   )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XVI

APPEARANCES:
FOR THE GOVERNMENT:   SCOTT SCHOOLS, FIRST AUSA
   JONATHAN S. GASSER, AUSA
   JOHN DUANE, AUSA
   UNITED STATES ATTORNEY'S OFFICE
   1441 MAIN STREET, SUITE 500
   COLUMBIA, SC  29201

FOR THE DEFENDANT:   JACK SWERLING, ESQ.
   1720 MAIN STREET
   SUITE 301
   COLUMBIA, SC  29201

   GREG HARRIS, ESQ.
   1720 MAIN STREET
   SUITE 301
   COLUMBIA, SC  29201

COURT REPORTER:   DEBRA R. JERNIGAN, RPR, CRR
   UNITED STATES COURT REPORTER
   901 RICHLAND STREET
   COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1667

YOU SPENT WITH MR. BASHAM WERE GENERALLY EVENING -- EVENINGS WHEN PILLS WERE DISPENSED DURING THE THIRD SHIFT, IS THAT A FAIR STATEMENT? IS THAT WHEN YOU WERE WORKING?

A. ON MONDAYS, I DO THREE TO ELEVEN. ON SATURDAY NIGHTS, I DID ELEVEN TO SEVEN

Q. ELEVEN TO SEVEN. ON JANUARY 19TH, I BELIEVE THIS OCCURRED AT 8:30 IN THE EVENING?

A. OKAY. SO, WAS THAT A MONDAY?

Q. I AM NOT SURE WHAT DAY OF THE WEEK IT WAS. I AM JUST LOOKING AT THE REPORT AND WHEN IT WAS FILED. WE HAVE NEVER MET, HAVE WE?

A. UN-HUH (NEGATIVE RESPONSE).

Q. AND IT IS MY UNDERSTANDING, THAT THIS WAS SOMETHING THAT HAPPENED ON MORE THAN ONE OCCASION?

A. CORRECT.

Q. IT IS ALSO MY UNDERSTANDING WHEN YOU WERE DISPENSING PILLS, THAT WHEN YOU APPROACHED, THE JURY HAS SEEN, WHEN YOU APPROACHED MR. BASHAM'S JAIL CELL, THAT HE WOULD STOP AND CORRECT HIMSELF?

A. NOT RIGHT AWAY.

Q. NOT RIGHT AWAY?

A. NOT ON EVERY OCCASION.

Q. NOT ON EVERY OCCASION. DID YOU CONFRONT HIM, MS. SEVERUD, WITH WHAT HE WAS DOING?

A. YES.

Q.   WHEN YOU WOULD CONFRONT HIM, WHAT WOULD GENERALLY HAPPEN?

A.   CORRECT HIMSELF.

Q.   THOSE ARE THE OCCASIONS WHEN HE WOULD CORRECT HIMSELF?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   I ASSUME BY "STOPPING," BY "CORRECTING" HIMSELF, HE WOULD STOP?

A.   UH-HUH (AFFIRMATIVE RESPONSE).

Q.   AND THEN YOU WOULD RESUME OR PROCEED TO GIVE HIM HIS MEDICATION?

A.   YES, SIR.

Q.   NOW, DID YOU -- WHEN DID YOU STOP WORKING AT ALVIN S. GLENN?

A.   I HAVEN'T.  I STILL HAVE, LIKE I SAID, I STILL HAVE MY KEYS, MY CARD, EVERYTHING.  I JUST HAVE NOT WORKED.  I AM NOT ACTIVE AT THE MOMENT.

Q.   YOU WILL CONTINUE TO WORK AT ALVIN S. GLENN IF CALLED UPON?

A.   UH-HUH (AFFIRMATIVE RESPONSE).  AS LONG AS I CAN PHYSICALLY CONTINUE TO DO THAT.

          MR. HARRIS:  THANK YOU VERY MUCH.

          THE COURT:  ANY REDIRECT?

          MR. GASSER:  NO, SIR.

          THE COURT:  ALL RIGHT.  THANK YOU.  YOU MAY STEP DOWN.  LET'S TAKE A VERY BRIEF AFTERNOON RECESS.  LET'S HOLD

IT TO TEN MINUTES, IF WE COULD.   PLEASE GO TO YOUR JURY ROOM FOR A TEN-MINUTE RECESS.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

MR. SCHOOLS:  WE NEED A RULING ON THE VIDEOTAPE.  WE MAY HAVE A COMPROMISE.

THE COURT:   I JUST SAW IT ON THE LAST BREAK.   I DON'T KNOW THE DEFENDANT'S POSITION.  WHAT IS THE COMPROMISE?

MR. SCHOOLS:  THEY WOULD AGREE THE AUDIO COULD BE USED WITH THE TRANSCRIPT,  THE OFFICIAL TRANSCRIPT OF THE PROCEEDING.  WE WOULD AGREE NOT TO USE THE VIDEO.   I DON'T KNOW WHETHER THAT IS AGREEABLE OR NOT.   THERE MAY BE A PORTION OF THE AUDIO THAT THEY WOULD WANT REDACTED.

THE COURT:   DISPENSE WITH VIDEO ALTOGETHER AND PLAY A REDACTED VERSUS OF THE AUDIO?

MR. SCHOOLS:  YES, SIR.   THE PROBLEM WITH THE VIDEO, IT SEEMS, IF THERE IS ONE, IT SHOWS THE LAWYERS AND THEIR REACTIONS, AND THAT KIND OF STUFF.   THAT MAY BE,  IT IS NOT REALLY EVIDENCE, AND IT MAY BE IN SOME WAYS PREJUDICIAL TO MR. BASHAM.   THE AUDIO --

THE COURT:  I DIDN'T SEE THE WHOLE VIDEO.   I SAW ABOUT TWO-THIRDS.   LET ME LOOK AT THE VIDEO TONIGHT AND LISTEN TO THE AUDIO TONIGHT AND TALK ABOUT IT FIRST THING IN THE MORNING.

MR. HARRIS:  WE KNOW THE PART ABOUT CUSSING THE

JUDGE.   WE DEFINITELY DON'T WANT THAT IN ONE WAY OR THE OTHER.

THE COURT:  I DON'T REMEMBER HIM -- I THOUGHT HE SAID I DIDN'T KEEP MY WORD.   I DON'T REMEMBER HIM BEING DISRESPECTFUL.   I THINK WE CAN PROBABLY TAKE THAT.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:   ALL RIGHT.   BRING IN THE JURY,  PLEASE.

MR. GASSER:  THE GOVERNMENT CALLS ADRIANE GILLESPIE.

ADRIANE GILLESPIE, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR.  GASSER:

Q.    GOOD AFTERNOON,  MS. GILLESPIE.

A.    GOOD AFTERNOON.

Q.    MS. GILLESPIE,  HOW OLD ARE YOU,  MA'AM?

A.    TWENTY-NINE (29).

Q.    WHERE WERE YOU BORN AND RAISED?

A.    BENNETTSVILLE, SOUTH CAROLINA IN MARLBORO COUNTY.

Q.    WHERE ARE YOU EMPLOYED,  MA'AM?

A.    EMPLOYED AT RICHLAND COUNTY DETENTION CENTER AS A NURSE, NURSE IN MEDICAL.

Q.    HOW LONG HAVE YOU BEEN AT RICHLAND COUNTY DETENTION CENTER?

A.    SIX-AND-A-HALF MONTHS.

Q.    CURRENTLY EXPECTING,  ARE YOU NOT?

A.    YES, I AM.

Q.    CONGRATULATIONS.

A.    THANK YOU.

Q.    AS A RESULT OF YOUR DUTIES AT RICHLAND COUNTY DETENTION CENTER, MS. GILLESPIE, HAVE YOU HAD, ON OCCASION, TO HAVE CONTACT WITH THE DEFENDANT IN THIS CASE, BRANDON BASHAM?

A.    YES, I HAVE.

Q.    SO, AT TIMES, DO YOU DISTRIBUTE MEDS, OR ARE YOU RESPONSIBLE FOR THE DISTRIBUTION OF MEDICATION AT THE ZOOLOO DORM AT THE DETENTION FACILITY?

A.    YES, I AM.

Q.    I BELIEVE YOU STARTED WORKING IN APRIL OF THIS YEAR?

A.    YES, SIR, THAT IS CORRECT, PHS.

Q.    WHAT IS THE PRISON HEALTH SERVICES? WHAT IS PHS?

A.    IT IS A PRIVATE COMPANY THAT CONTRACTS NURSES TO GIVE CARE TO THE INMATES AT THE FACILITY.

Q.    AT THE ALVIN S. GLENN DETENTION CENTER?

A.    YES, SIR.

Q.    WHEN YOU FIRST STARTED WORKING IN APRIL OF THIS YEAR, 2004, AT THE DETENTION FACILITY, DID CERTAIN PROBLEMS DEVELOP WHEN YOU WERE DISTRIBUTING MEDICATION TO MR. BASHAM?

A.    YES, SIR, THEY DID.

Q.    WOULD YOU DESCRIBE THOSE, PLEASE?

A.    UPON ME ENTERING THE ZOOLOO DORM, MR. BASHAM WOULD COME TO HIS FLAP AND PROCEED TO FONDLE HIMSELF.

Q.    COULD YOU SHOW THE LADIES AND GENTLEMEN OF THE JURY
WHAT YOU MEAN BY HE RAISED HIS HAND IN AN ATTACK MANNER?

A.    YES, SIR.    AS WE APPROACHED HIM,  HE BACKED UP LIKE HE
WAS GETTING HIS LEVERAGE AGAINST THE WALL, AND HIS HANDS WENT
UP (INDICATING),  LIKE HE WAS IN AN ATTACKING MANNER.    AT
THAT TIME, WE SECURED HIS HANDS AND TOOK HIM DOWN TO THE BED
AND GOT HIM RESTRAINED.

Q.    OKAY.    DID THAT TAKE A LITTLE EFFORT?

A.    YES, SIR,  IT SURE DID.

Q.    HOW MANY?  YOU SAID THERE WERE FIVE?

A.    THERE WERE FIVE OF US,  YES, SIR.

Q.    HOW MANY -- HOW LONG DID IT TAKE Y'ALL TO GET MR.
BASHAM RESTRAINED?

A.    AT LEASE TWO OR THREE MINUTES.

Q.    WHEN YOU SAY "GOT HIM RESTRAINED," YOU GOT HIM IN CUFFS
AND LEG IRONS?

A.    CUFFS AND LEG IRON.

Q.    WAS, BASED ON YOUR OBSERVATIONS,  SERGEANT SMITH,  DID
YOU SEE ANY INJURIES TO MR. BASHAM AS A RESULT OF THAT
INCIDENT?

A.    NO, SIR.    THE ONLY INJURY HE HAD, HE HAD A LITTLE
SCRAPE ON HIS NOSE,  WHICH I ALSO,  AT THAT TIME,  ONCE WE GOT
HIM RESTRAINED, GOT HIM OUT OF THE CELL,  I SENT HIM
IMMEDIATELY UP TO MEDICAL FOR FURTHER OBSERVATION.

Q.    DO YOU KNOW WHAT HAPPENED AFTER THAT?

**JA 1673**

A. YES, SIR. AFTER THAT, HE WAS COMPLAINING THAT HIS ARM WAS HURT. SO, MEDICAL TAKE HIM OUT. THEY ALSO SAID THEY WERE GOING TO SEND HIM OUT TO THE HOSPITAL FOR FURTHER OBSERVATION AND X-RAYS. AT THAT TIME, I CONTACTED THE MARSHALS, MARSHAL RILEY, AND TOLD THEM, INFORMED THEM THAT MR. BASHAM WOULD BE GOING TO PALMETTO RICHLAND MEMORIAL HOSPITAL. HE SAID HE WOULD MEET US UP THERE. SO, I SENT TWO OF MY OFFICERS WITH HIM, AND MR. RILEY MET HIM UP THERE AT THE HOSPITAL. HE ALSO OBSERVED THE INJURY. AND I SAID IT WAS JUST A LITTLE SCRAPE ON THE NOSE.

Q. DID YOU GET A CHANCE TO SEE MR. BASHAM WHEN HE CAME BACK FROM BEING TREATED?

A. YES, SIR, I DID.

Q. LATER, A DAY OR TWO LATER, DID YOU SEE HIM AGAIN?

A. YES, SIR. I WAS OFF FOR TWO DAYS. HE COME BACK FROM COURT -- HE WAS COMING FROM COURT THAT DAY WHEN WE WERE CHANGING SHIFTS. AT THAT TIME, HE WAS ALL BLACK AND BLUE. HIS EYE WAS BLACKENED AND, YOU KNOW, I WAS LIKE, YOU KNOW, WHERE DID THIS COME FROM? I DIDN'T KNOW HOW THAT HAPPENED. IT WASN'T THERE BEFORE I -- THE TWO DAYS I WAS GONE.

THE COURT: MR. SCHOOLS, IT IS RIGHT AT 5:00 O'CLOCK NOW. UNLESS YOU ARE REAL CLOSE TO FINISHING.

THE COURT: I AM REAL CLOSE. BEG THE COURT'S INDULGENCE.

MR. SCHOOLS: THAT IS ALL I HAVE THEN, JUDGE.

JA 1674

THE COURT: ALL RIGHT. WE WILL DO THE CROSS-EXAMINATION TOMORROW. MEMBERS OF THE JURY, WE WILL STOP A LITTLE BIT EARLY TODAY. ALSO, I TOLD YOU WE WOULDN'T HAVE ANY MORE INTERRUPTIONS, WELL, I WAS WRONG. I HAVE A ROSTER MEETING TOMORROW MORNING AT 9:00 O'CLOCK FOR MY UPCOMING TERM OF COURT WHERE I HAVE 15 OR 20 LAWYERS HERE TO GO THROUGH THE LIST OF CASES TO BE TRIED. IT WILL TAKE ABOUT 20 MINUTES. I WILL ASK YOU TO COME IN AT 9:30 TOMORROW INSTEAD OF 9:00 O'CLOCK. PLEASE REMEMBER 9:30, NOT 9:00 O'CLOCK. I DON'T WANT ANYBODY TO GET HERE TOO EARLY AND HAVE TO WAIT. DON'T DISCUSS THE CASE. HAVE A NICE EVENING. SEE YOU BACK AT 9:30 TOMORROW.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: BEFORE TOMORROW MORNING, I WILL WATCH THE VIDEO AND LISTEN TO THE AUDIO.

HAVE THE DEFENSE ATTORNEYS SEEN AND HEARD BOTH OF THESE?

MR. HARRIS: NOT HEARD THE AUDIO. BEEN PROVIDED TO US. I HAVE SEEN THE VIDEO. WE WERE PROVIDED TRANSCRIPTS THIS MORNING, I THINK. I GOT THEM THIS MORNING. I HAVE NOT REVIEWED THEM.

THE COURT: WHAT IS YOUR POSITION ON ANY OF THIS COMING IN AS OPPOSED TO TESTIMONY?

MR. HARRIS: WE NEED TO READ AND REVIEW THE TRANSCRIPT BEFORE WE CAN DETERMINE.

**JA 1675**

THE COURT:   THE PROBLEM WHERE THE DEFENDANT WAS SOMEWHAT, WHATEVER, DISRESPECTFUL TO THE COURT.   AND ALSO, HE MADE SOME RACIAL SLURS IN THERE.   YOU NEED TO LOOK AT BOTH OF THOSE.

MR. SCHOOLS:   OUR POSITION WOULD BE, WE DON'T HAVE ANY OBJECTION TO REDACTING THOSE TWO PORTIONS OF THE AUDIO. WE DO THINK IT IS CRITICAL FOR THE JURY TO HEAR THAT INCIDENT TO UNDERSTAND WHAT HAPPENED.   IT IS REAL IMPORTANT.   THE TESTIMONY IS THE SECOND BEST EVIDENCE, THEN WE PREFER THE BEST.

THE COURT:   THANK YOU.   BE IN RECESS UNTIL 9:30.

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____          _____
S/DEBRA R. JERNIGAN, RPR, CRR                 DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,      )      CR. NO. 4:02-992
                               )      COLUMBIA, SC
                               )      OCTOBER 14, 2004
                               )
     VERSUS                    )
                               )
BRANDON L. BASHAM,             )
          DEFENDANT.           )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XVII


APPEARANCES:

FOR THE GOVERNMENT:          SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             JOHN DUANE, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:           JACK SWERLING, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201

                             GREG HARRIS, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201


COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201



STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

THE COURT:   BOTH SIDES READY?

MR. SCHOOLS:   COUPLE OF LEGAL ISSUES TO BRING UP. THE FIRST ONE RELATES TO THE COURTROOM VIDEOS, THE WHOLE SCENE.  DESPITE OUR BEST EFFORTS, WE DO NOT HAVE AN AGREEMENT ON THAT.

THE COURT:   I AM SORRY, I DIDN'T HEAR THAT.

MR. SCHOOLS:   DESPITE OUR BEST EFFORTS, WE DON'T HAVE AN AGREEMENT.

THE COURT:   ON WHAT?

MR. SCHOOLS:   ADMISSIBILITY OF TAPE OR AUDIOTAPE. GIVEN OUR POSITION, IT IS ALL ADMISSIBLE.   THE ONLY THING WE AGREE ON, AT THIS POINT, IS THAT MR. BASHAM'S COMMENTS CONCERNING DEPUTY RILEY, WHICH ARE RACE RELATED.

THE COURT:   ALSO REFERENCE ON THE AUDIO TO ME TELLING THE VICTIM'S DAUGHTER WHO MADE A COMMENT.  THAT NEEDS TO COME OUT,  TOO.

MR. SCHOOLS:   WE HAVE TAKEN THAT OUT.

THE COURT:   THE DEFENSE OBJECT TO AUDIO AND VIDEO?

MR. HARRIS:   EVERYTHING.

THE COURT:   HOW ABOUT TESTIMONY?

MR. HARRIS:   EVERYTHING.

THE COURT:   LET'S TAKE THAT UP OVER LUNCH.   WHEN WILL YOU GET TO THAT?

MR. SCHOOLS:   IT WILL BE THIS AFTERNOON.

ALSO, JUDGE, IF I COULD,  I WOULD LIKE TO HAND UP A SERIES

OF PORTIONS OF THE TRANSCRIPT THAT ARE CERTIFIED. THESE TRANSCRIPTS ARE HIGHLIGHTED IN THE MANNER THAT WE WOULD PROPOSE TO REDACT THEM. THE HIGHLIGHTED PORTIONS ARE THE ONES WE WOULD INTEND TO TAKE OUT. WE INTEND TO HAVE THESE READ THIS AFTERNOON, AS WELL, AS PART OF THE WHOLE DIP SEQUENCE OF EVENTS.

THE COURT: TRANSCRIPT OF WHAT?

MR. SCHOOLS: SIR?

THE COURT: TRANSCRIPT OF WHAT?

MR. SCHOOLS: MAINLY, TRANSCRIPT OF EXCHANGES BETWEEN THE COURT AND THE DEFENDANT OR HIS ATTORNEY REFERRING TO DIP. THEY ARE SHORT AND PERTAIN TO THAT ONE ISSUE.

THE COURT: PARTIAL TRANSCRIPT OF THIS TRIAL?

MR. SCHOOLS: YES, SIR.

THE COURT: STATUTE SAYS THE JURY CAN HAVE A COPY OF THE TRANSCRIPT OF THE GUILT PHASE. I THOUGHT THAT WAS THE WHOLE TRANSCRIPT.

MR. SCHOOLS: WE WOULDN'T PROPOSE THESE GO TO THE JURY. WE WOULD PROPOSE THESE TO BE READ TO THE JURY. THESE WOULD HAVE OCCURRED OUTSIDE OF THE PRESENCE OF THE JURY.

THE COURT: WE NEED TO BREAK FOR LUNCH AT 12:30. WHAT IS THE DEFENDANT'S POSITION ON THE TRANSCRIPT COLLOQUY?

MR. HARRIS: WE OBJECT TO EVERYTHING SAID OUTSIDE THE PRESENCE OF THE JURY. WE BRIEFLY LOOKED THROUGH IT THIS MORNING. THEY SENT US AN E-MAIL, DID NOT HAVE IT. WE HAVE

IT, WE WILL REVIEW IT.

THE COURT: THE COURTROOM SCUFFLE, OBVIOUSLY, MIGHT GO TO SHOW DISRESPECT FOR AUTHORITY AND LOW ABILITY FOR REHABILITATION. WHAT DOES ONGOING --

MR. SCHOOLS: PUTS THE COURTROOM SHUFFLE IN CONTEXT. I THINK THAT IS WHAT IT IS ALL ABOUT. I THINK IT IS IMPORTANT FOR THE JURY TO KNOW THAT, YOU KNOW, ONE OF OUR THEORIES ABOUT MR. BASHAM'S MENTAL STATE IS THAT HE IS PURELY MANIPULATIVE, ALL OF HIS ACTING OUT AND AGGRESSIVENESS IS FOR THE PURPOSE PURELY OF SECURING SOME BENEFIT, SOME ADVANTAGE THAT HE WANTS. AND I THINK THIS WAS A PERFECT EXAMPLE. THAT IS WHAT WE WANT TO USE IT FOR. WE THINK MR. BASHAM WAS TOLD ON MONDAY HE COULDN'T HAVE DIP, HE ACTED OUT, HE CONTINUED TO HAVE A PROBLEM IN COURT, AND ON TUESDAY, HE GOT DIP. I MEAN, THAT IS THE -- AND CONTINUED AFTER THAT POINT TO PURSUE THAT ISSUE.

THE OTHER THING IS WE THINK IT IS RELEVANT THAT HIS BEHAVIOR HAS BEEN CONTROLLED BY THE PROMISE OF DIP BECAUSE I SUSPECT HIS EXPERT WILL TESTIFY THAT HE DOESN'T HAVE CONTROL OF HIS BEHAVIOR. IT IS ALL RELEVANT TO SHOW HIS MENTAL PROCESSES AND THE WAY IN WHICH HE MANEUVERS HIS ISSUES THROUGHOUT THIS.

MR. HARRIS: I KNOW TO ARGUE THIS LATER, TO FOCUS YOU ON WHAT OUR CONCERN IS IS EXACTLY WHAT MR. SCHOOLS JUST SAID. HE MANIPULATED YOU. THAT IS THEIR CONTENTION. YOU ARE THE

ONLY PERSON IN THIS ENTIRE EQUATION, ACCORDING TO THE GOVERNMENT, THAT GOT MANIPULATED. IT WASN'T THE MARSHALS, IT WASN'T ME, IT WASN'T THE GOVERNMENT. THAT IS OUR PROBLEM WITH THIS ENTIRE TRANSCRIPT AND THE ENTIRE LINE OF QUESTIONING. THAT PUTS US IN A POSITION, A TENABLE POSITION. I DON'T KNOW HOW WE POSSIBLY RESPOND TO THAT.

THE COURT: IF YOU WANT TO SAY I DIDN'T KEEP MY WORD, IT WON'T HURT MY FEELINGS. IF YOU WANT TO SAY HIS ACTIONS WERE JUSTIFIED BECAUSE I GOT HIS EXPECTATIONS --

MR. HARRIS: THE LAST THING WE WANT TO DO IS PIT YOU AGAINST OUR CLIENT. YOU ARE THE ONLY PERSON IN THIS COURTROOM WITH 100 PERCENT IMPUNITY.

THE COURT: LET ME THINK ABOUT IT. WE WILL HEAR ABOUT IT OVER LUNCH ARGUMENTS.

MR. SCHOOLS: ONE OTHER ISSUE TO ADDRESS AT THE BREAK, WON'T COME UP BEFORE THE BREAK. FRANCIS ELWOOD, EMPLOYEE OF BUTNER MEDICAL CENTER, IN RESPONSE TO A SUBPOENA TO US GAVE US SIX PHONE CONVERSATIONS THAT WERE RECORDED BETWEEN THE DEFENDANT AND HIS FAMILY MEMBERS. WE INTEND, THROUGH MR. ELWOOD, TO PLAY ONE OF THEM. AND ITS RELEVANCE IS THAT IT OCCURRED THE DAY BEFORE THE INCIDENT AT BUTNER WHEN MR. BASHAM'S SISTER AND FATHER ARRIVED, HIS SISTER DIDN'T HAVE IDENTIFICATION WITH HER, SO SHE WAS UNABLE TO SEE MR. BASHAM THAT DAY. AND IT RESULTED IN HIM BECOMING ESCALATED AND GETTING INTO A FIGHT WITH THE GUARDS AT BUTNER.

THE CONVERSATION THAT WE WANT TO PLAY OCCURRED THE NIGHT BEFORE BETWEEN MR. BASHAM AND HIS MOTHER.  DURING THAT CONVERSATION, MR. BASHAM WAS INSTRUCTING HIS MOTHER TO TELL HIS SISTER TO BRING IN A $20 BILL ROLLED UP AS A RING SO THAT SHE COULD GIVE IT TO MR. BASHAM SO HE COULD PRESUMABLY SMUGGLE IT BACK INTO THE PRISON BECAUSE HE OWED IT TO SOMEBODY.  IT IS A THREE-MINUTE CONVERSATION THAT WE INTEND TO PLAY.

MR. HARRIS HAS ADVISED US HE WANTS TO PLAY THE OTHER CONVERSATIONS.  OUR POSITION IS, WE WOULD INTEND TO AUTHENTICATE THOSE CONVERSATIONS THROUGH THAT WITNESS, BUT HE IS NOT THE PROPER WITNESS FOR THOSE CONVERSATIONS TO BE PLAYED IN BECAUSE THEY DON'T PERTAIN TO THE ISSUE THAT GAVE RISE TO THE INCIDENT ON THE 23RD.  SO, ESSENTIALLY, WHAT WE WOULD BE OBJECTING TO, AT THIS POINT, IS THE TIMING OF IT.  IF THE DEFENDANTS WANT TO PLAY THOSE CONVERSATIONS IN THEIR CASE, WE MAY HAVE AN OBJECTION, BUT IT WILL BE A DIFFERENT ONE.  IT MAY BE A HEARSAY OBJECTION WHEREIN THE DEFENDANT SHOULD NOT BE ABLE TO OFFER HIS OWN SELF-SERVING HEARSAY STATEMENTS IN HIS DEFENSE FOR THE SAME REASONS HE CAN'T ALLOCUTE WITHOUT CROSS-EXAMINATION.  DIFFERENT ISSUE.  BUT OUR CONCERN IS, DOES THE DEFENDANT GET TO PLAY THOSE TAPES THROUGH A WITNESS DESPITE THE FACT HE RECORDED THE CONVERSATION, THE SUBJECT MATTER OF THOSE OTHER CONVERSATIONS ARE OUTSIDE THE SCOPE OF HIS DIRECT?

THE COURT:  THAT IS WHAT I DIDN'T UNDERSTAND.  THIS

WITNESS CAN JUST AUTHENTICATE THE ONE CONVERSATION. HE CAN PUT IN IT CONTEXT. HE IS NOT THE ONE WHO MADE THE RECORDING.

MR. SCHOOLS: HE DID MAKE THE RECORDING. THE SYSTEM MADE THE RECORDING THAT PARTICULAR CONVERSATION HE MONITORED LIVE. HE COULD AUTHENTICATE THE SIX CONVERSATIONS.

THE COURT: THEY CAN ALL BE AUTHENTICATED TECHNICAL SENSE, BUT THEY DON'T COME IN UNDER THE RULE OF COMPLETENESS, IN OTHER WORDS.

MR. SCHOOLS: THAT'S RIGHT.

THE COURT: THEY COME IN AT ALL IN THE DEFENDANT'S CASE IF THEY CAN MAKE SOME BASIS FOR IT.

MR. SCHOOLS: THAT IS OUR POSITION.

THE COURT: MR. HARRIS.

MR. HARRIS: WE DISAGREE WITH THAT AND THE TAPE THAT WAS MADE BEFORE THE CONVERSATION THEY INTEND TO PUT IN. I THINK THE TAPE BEFORE -- FIRST OF ALL, WE AGREE HE CAN AUTHENTICATE THE TAPE, WE CAN PLAY SOME IN OUR CASE. THE TAPE BEFORE PUTS IN CONTEXT CONVERSATION WITH HIS MOTHER. NO WAY TO TELL THE ENTIRE STORY ABOUT HIS MOTHER, WHY SHE IS COMING, WHO SHE IS, UNLESS YOU PLAY THE TAPE THAT IMMEDIATELY PRECEDES THAT.

THE COURT: IF MR. SCHOOLS'S TAPE TRULY DOES CONTAIN A CONVERSATION WHERE THE DEFENDANT TOLD HIS MOTHER TO SMUGGLE IN A CONTRABAND, I CAN'T SEE HOW ANY OF THE TAPE COULD EXPLAIN THAT AWAY, MITIGATED OR ANYTHING ELSE.

Q.    DIDN'T SPIT ON ANYONE?

A.    NO, SIR.

Q.    AND AT 10:00 O'CLOCK THAT NIGHT, AFTER THE FIGHT, AFTER THE SKIRMISH, AFTER HE WAS TAKEN DOWN, I THINK, BY THESE GUARDS, YOU TOOK HIM DIRECTLY TO MEDICAL?

A.    YES, SIR.

Q.    AND WHEN HE GOT TO MEDICAL, NOT MR. BASHAM, THE MEDICAL STAFF, REFERRED HIM TO RICHLAND COUNTY? WHEN I SAY "RICHLAND COUNTY," I MEAN THE HOSPITAL.

A.    YES, SIR.

Q.    THE MEDICAL STAFF, NOT MR. BASHAM, NOT YOU, NOT OFFICER KIRKLAND, THE MEDICAL STAFF MADE THAT DETERMINATION, BASED ON THE INJURIES THEY OBSERVED, CORRECT?

A.    YEAH, IT WAS THEIR DETERMINATION, YEAH.

Q.    AND HE WAS LOCKED DOWN TIGHT IN MANACLES AND HANDCUFFS, CORRECT?

A.    YES, SIR.

Q.    TRANSPORTED TO THE HOSPITAL WHERE DEPUTY RILEY, I BELIEVE THE GENTLEMAN WHO HAS BEEN IN THE COURTROOM MOST OF THIS WEEK, WAS WAITING FOR HIM?

A.    YES, SIR.

Q.    AT NO TIME WAS HE FREE FROM THE SHACKLES, FEET LEG IRONS, WAS HE?

A.    NO, SIR.

Q.    AT NO TIME WAS HE EVER IN A POSITION TO HARM ANYONE AT

THE HOSPITAL, WAS HE?

A.    NO, SIR.

Q.    AND HE WAS AT THE HOSPITAL, AND AT THE HOSPITAL HE RECEIVED X-RAYS?

A.    YES, SIR.

MR. SCHOOLS:  YOUR HONOR, I DON'T BELIEVE MR. SMITH -- OFFICER SMITH WAS AT THE HOSPITAL.  I DON'T OBJECT TO THE SUBSTANCE OF THE TESTIMONY, I DON'T BELIEVE HE IS THE RIGHT WITNESS.  MR. RILEY WILL TESTIFY LATER.  HE CAN GET INTO IT.

MR. HARRIS:  IF HE KNOWS OF HIS OWN KNOWLEDGE.

MR. SCHOOLS:  HE NEEDS TO ESTABLISH THAT.

THE COURT:   OF HIS OWN KNOWLEDGE.

BY MR. HARRIS:

Q.    TO YOUR OWN KNOWLEDGE, YOU KNOW HE HAD X-RAYS?

MR. SCHOOLS:  I OBJECT.  HE NEEDS TO ASK IF HE IS PRESENT, TO ASK OF HIS OWN KNOWLEDGE, IF HE HEARD IT FROM THERE.

MR. HARRIS:  IF THERE IS A WITNESS THAT WILL ESTABLISH THAT LATER ON, I WILL MOVE ON.

THE COURT:   ARE YOU GOING TO CALL SOMEONE WHO WAS AT THE HOSPITAL?

MR. SCHOOLS:  YES, SIR.

THE COURT:   LET'S MOVE ON.

BY MR. HARRIS:

Q.    NOW, AGAIN, NO ONE WAS INJURED FROM THE STAFF?

MR. SCHOOLS:  ASKED AND ANSWERED, JUDGE. ARGUMENTATIVE.

MR. HARRIS:  I THINK I CAN ASK WHETHER ANYONE'S EYES WERE GOUGED.  THERE ARE ANY NUMBER OF QUESTIONS.

THE COURT:  GO AHEAD.

BY MR. HARRIS:

Q.    WERE ANYONE'S EYES GOUGED?

MR. SCHOOLS:  HE STATED NO ONE WAS INJURED.  IF HE WAS INJURED, HIS EYES WERE GOUGED.  HE IS MAKING ARGUMENT.

THE COURT:  YOU ASKED A BROAD QUESTION COVERING ALL INJURIES.

MR. HARRIS:  I WAS LOOKING AT MY NOTES AND WAS ASKING, FORGOT TO ASK IF ANYONE'S EYES WERE GOUGED.

THE COURT:  HE SAID, NO, LET'S MOVE ON.

BY MR. HARRIS:

Q.    SERGEANT SMITH, HAVE YOU, IN THE PAST, IN SPEAKING WITH LAW ENFORCEMENT, SPEAKING WITH OUR OFFICE INDICATED THAT YOU PERSONALLY, ON OCCASION, HAVE BEEN ABLE TO TALK MR. BASHAM DOWN WHEN HE GOT UPSET; ISN'T THAT TRUE? YOU HAVE WORKED WITH HIM AND TALKED TO HIM, YOU HAVE BEEN ABLE TO TALK HIM DOWN?

A.    ON SOME OCCASION, YES, SIR.

Q.    HE HAS GOOD DAYS AND HE HAS BAD DAYS, DOESN'T HE?

A.    YES, SIR.

Q.    AND ON THESE TWO OCCASIONS, YOU JUST COULDN'T TALK HIM DOWN, AND THAT IS WHY THE RESULTANT SCUFFLE?

A.    YES, SIR.  HE DID NOT COMPLY.

MR. HARRIS:  THANK YOU.

THE COURT:   ANY REDIRECT?

REDIRECT EXAM

BY MR. SCHOOLS:

Q.    SERGEANT SMITH,  IF AN INMATE HAS COMPLAINTS OF INJURIES, WHAT IS THE POLICY THE JAIL FOLLOWS?

A.    SIR, IF AN INMATE HAS A COMPLAINT OF INJURY,  WE NOTIFY MEDICAL, AND THEN WE IMMEDIATELY GET THAT DETAINEE UP TO MEDICAL, SO THEY CAN MAKE THE OBSERVATION OF WHETHER THEY ARE GOING TO SERVICE HIM THERE OR SEND HIM OUT.

Q.    WERE YOU PRESENT WHEN MR. BASHAM CAME BACK FROM THE HOSPITAL THAT NIGHT?

A.    YES, SIR.   I WAS PRESENT.

Q.    DID YOU SEE HIM?

A.    YES, SIR.  I WAS IN MY OFFICE WHEN HE GOT BACK.

Q.    WHAT INJURIES,  IF ANY,  DID YOU OBSERVE TO HIS FACE WHEN HE GOT BACK FROM THE HOSPITAL?

A.    NO MORE THAN THE SAME LITTLE SCRATCH THAT HE HAD ON HIS NOSE THAT I STATED YESTERDAY.

MR. SCHOOLS:  THANK YOU,  MR. SMITH.

MR. HARRIS:  FOLLOW UP.

RECROSS EXAM

BY MR. HARRIS:

Q.    YOU SAW HIM THE NEXT DAY,  THOUGH,  AFTER THAT?

A.    I SAW HIM TWO DAYS AFTER -- LATER, AFTER I CAME BACK TO WORK.  I WAS OFF FOR TWO DAYS.

Q.    YOU DIDN'T SEE HIM IN THE INTERIM.  BY THAT TIME, HOW DID HIS EYE LOOK?

A.    AT THAT TIME, HIS EYE WAS BLACK, THE TWO DAYS WHEN I CAME BACK TO WORK.

MR. HARRIS:  THANK YOU.

THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

MR. GASSER:  GOVERNMENT CALLS JAMES SMITH.

JAMES SMITH, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. GASSER:

Q.    GOOD MORNING, MR. SMITH.

A.    GOOD MORNING.

MR. GASSER:  GOOD MORNING, LADIES AND GENTLEMEN.

BY MR. GASSER:

Q.    MR. SMITH, WOULD YOU TELL US, SIR, WHERE YOU ARE EMPLOYED?

A.    ALVIN S. GLENN DETENTION CENTER.

Q.    HOW LONG HAVE YOU BEEN AT THE ALVIN S. GLENN DETENTION CENTER?

A.    ABOUT A YEAR AND A HALF, GOING ON TWO.

Q.    DID YOU WORK IN SECURITY PRIOR TO JOINING THE STAFF AT

THE ALVIN S. GLENN DETENTION CENTER?

A.    I WAS A SECURITY OFFICER BEFORE I BECAME AN ALVIN S. GLENN DETENTION OFFICER.

Q.    WHERE WERE YOU BORN AND RAISED, SIR?

A.    AIKEN COUNTY.

Q.    OFFICER SMITH, WHAT ARE YOUR DUTIES AND RESPONSIBILITIES AT THE DETENTION FACILITY?

A.    PERTAIN TO SECURITY OF MAINLY I WORK MAX, LIKE, ALWAYS, SECURING INMATES.

Q.    DOES THAT INCLUDE BEING A SECURITY OFFICER, CORRECTIONAL OFFICER, AT TIMES, IN THE ZOOLOO DORM?

A.    YES, SIR.

Q.    AND IN THAT CONTEXT, DID YOU ALSO HAVE OPPORTUNITIES TO COME INTO CONTACT WITH THE DEFENDANT IN THIS CASE, BRANDON BASHAM?

A.    ON MANY OCCASIONS.

Q.    I AM GOING TO TALK TO YOU ABOUT SEVERAL OF THOSE OCCASIONS, OFFICER SMITH.  THE FIRST ONE BEING ON DECEMBER 31, OF 2003.  AN INCIDENT THE JURY HAS ALREADY HEARD ABOUT WHEN FRANCIS KIRKLAND, A FELLOW CORRECTIONAL OFFICER, IS HE NOT?

A.    YES, SIR.

Q.    I WANT TO TALK TO YOU ABOUT YOUR ROLE IN THAT PARTICULAR INCIDENT THAT THE JURY HAS HEARD SOME FACTS ABOUT. WHICH SHIFT WERE YOU WORKING THAT DAY, DO YOU REMEMBER?

A.    A P.M.   THAT IS NIGHT SHIFT.

Q.    AND WERE YOU PRESENT WHEN OFFICER KIRKLAND HAD SHAKEN DOWN MR. BASHAM'S CELL AND FOUND THIS EXTRA TOWEL, WERE YOU PRESENT DURING THAT PORTION OF IT, OR DID YOUR INVOLVEMENT COME LATER?

A.    I WAS PRESENT.  I BELIEVE I WAS STANDING AT THE DOOR AT THE TIME.  BECAUSE WHILE ONE OFFICER DOES THE SHAKEDOWN, ONE OFFICER HAS TO STAND RIGHT BESIDE THE INMATE AND OBSERVE.

Q.    AND, OF COURSE, HAVING EXTRA TOWELS IN A CELL IS VIOLATION OF POLICY; IS IT NOT?

A.    YES, SIR.

Q.    MR. BASHAM, HIMSELF, WAS OUTSIDE OF HIS CELL, WAS HE NOT?

A.    YES, SIR.

Q.    WOULD YOU DESCRIBE THE EVENTS THAT YOU OBSERVED BETWEEN MR. BASHAM AND OFFICER KIRKLAND TO THE JURY, PLEASE?

A.    BASHAM WAS TALKING THE WAY HE NORMALLY TALKS TO THE OFFICER TRYING TO GET HIM NOT TO TAKE THE ITEM.  KIRKLAND SAID HE WAS GOING TO TAKE THEM, EXPLAINING WHY HE WAS GOING TO TAKE THEM.  THEY HAD PROCEEDED TO WALK AWAY.  I THOUGHT THE SITUATION WAS OVER, AND SO I WENT BACK TO THE OFFICER DESK.  KIRKLAND KEPT -- BASHAM KEPT ON FOLLOWING AFTER KIRKLAND.  AND THEN HE HAD WENT AROUND THE CORNER, AND THE NEXT THING YOU KNOW, I HEARD LOUD TALKING FROM OFFICER KIRKLAND.  AND I HAD NOTICED BASHAM HAD PROCEEDED TO WALK, I

GUESS, CLOSER AND CLOSER TO OFFICER KIRKLAND. AND THEN I HAD WENT AROUND THE CORNER, THAT IS WHEN I SAW THE PUSHING AND SHOVING.

Q. YOU INDICATED TO THE JURY THAT YOUR FIRST -- YOUR INITIAL OBSERVATIONS ACTUALLY WAS SOMETHING THAT YOU HEARD; IS THAT CORRECT?

A. YES, SIR.

Q. WHEN YOU USED THE PHRASE, BASHAM WAS TALKING OR MAKING THE NORMAL DEMANDS OR TALKING THE NORMAL WAY THAT HE DOES, YOU NEED TO, SO THE RECORD IS COMPLETE, TO PUT THIS IN PROPER CONTEXT TO THE JURY, TELL THEM EXACTLY WHAT YOU MEAN BY WHAT HE WAS SAYING TO OFFICER KIRKLAND.

A. RAN FROM CURSING, FROM -- YOU WANT ME TO USE THE SAME CONTEXT?

Q. USE THE SAME WORDS THAT MR. BASHAM USED.

A. "GODDAMN IT. THAT IS MY MOTHER-FUCKING TOWEL. I HAD THIS THE WHOLE MOTHER-FUCKING TIME. YOU AIN'T GOING TO TAKE MY MOTHER-FUCKING TOWEL." AND THAT WAS PRETTY MUCH THAT CONVERSATION, UNTIL PUSHING AND SHOVING, HE WAS A "PUSSY BOY." AND OFFICER KIRKLAND SAID, "YOU NEED TO BACK UP BASHAM." "YOU AIN'T GOING TO DO A MOTHER-FUCKING THING." KEPT PURSUING. THE WHOLE TIME I WAS LOOKING AROUND THE CORNER, IT GOT LOUDER AND LOUDER. I HAD PEOPLE AROUND THE CORNER. THAT IS WHEN I WENT OVER THERE, AND THAT IS WHEN IT HAD STARTED RIGHT THERE.

FRIDAY OR THAT THURSDAY I SAID, LOOK, GO AHEAD AND TAKE THE REPORT WITH YOU TO BUTNER, YOU DON'T HAVE TO WAIT UNTIL WE TURN IT OVER, AND HERE IS OUR 17 VOLUMES, EVERY DOCUMENT WE GOT, I JUST ASSUMED THAT IS THE WAY WE WERE PLAYING THE RULES. NOW, I AM NOT ATTACKING THEM. THEY ARE ENTITLED TO STICK BY THE RULE.

THE COURT: HAVE HAD VIGOROUS DEBATE. I HAVEN'T UNDERSTOOD EITHER SIDE TO IMPUGN THE INTEGRITY OF EITHER SIDE. IT IS PURE ADVOCACY HERE.

OVER THE DEFENDANT'S STRONG OBJECTION, I AM GOING TO ALLOW THE TESTIMONY OF THIS WITNESS ABOUT ALLEGED STATEMENTS MADE BY THE DEFENDANT THAT HE WAS MANIPULATING HIS MEDICAL STATUS TO AVOID THE DEATH PENALTY. I DO NOT FIND THAT RULE 16 REQUIRES ANY TYPE OF SPECIFIC NOTICE BE GIVEN. AND AFTER CONDUCTING THE BALANCING TEST REQUIRED BY SECTION 3593(C), I DO NOT FIND THAT THE PROBATIVE VALUE IS OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE. IT IS CERTAINLY VERY PREJUDICIAL. I DO NOT THINK IT IS UNFAIRLY PREJUDICIAL.

I DO THINK IT IS REBUTTAL TESTIMONY, HOWEVER. TO SOME EXTENT, THE GOVERNMENT IS GOING TO BE ALLOWED TO ATTACK THE DEFENDANT'S POSITION BEFORE IT EVEN GETS HERE TO THE JURY. IF THE DEFENDANT WANTS TO INSIST ON IT, I CAN REQUIRE THAT IT BE DONE ON REBUTTAL. MR. GASSER SAYS IT WILL BE MORE HARMFUL TO DO IT LATER. IF THE GOVERNMENT IS PREPARED TO GO FORWARD WITH IT, UNLESS THE DEFENSE WANTS TO MAKE THE GOVERNMENT WAIT.

MR. SWERLING:  I THINK THE OBVIOUS ANSWER IS, IF YOU ARE GOING TO LET IT IN SUBJECT TO OUR OBJECTION, WE WOULD RATHER HAVE IT COME IN.

THE COURT:  ALL RIGHT.  VERY GOOD.  ON THE MATTER WE STILL NEED TO DISCUSS ABOUT THE COURTROOM SCUFFLE. JUST SO YOU WILL KNOW, FROM THE VERY BEGINNING WHEN I FIRST LEARNED THIS MIGHT BE AN ISSUE IN TERMS OF EVIDENCE GOING TO THE JURY, I HAVE BEEN CONCERNED ABOUT THE FACT THAT I WAS INVOLVED IN IT SOMEHOW.  AND I DON'T KNOW HOW TO HANDLE THAT.  I WOULD LIKE FOR THE PARTIES TO THINK ABOUT SIMPLY SANITIZING IT TO THE EXTENT WE DON'T ALLOW IN THE VIDEO,  DON'T ALLOW IN THE AUDIO, DON'T ALLOW IN THE TRANSCRIPT.  LET THE FBI CASE AGENT THAT HAS BEEN HERE FOR THE WHOLE TRIAL,  TESTIFY AS TO WHAT HAPPENED IN TERMS OF THE SCUFFLE, HOW MANY OFFICERS WERE REQUIRED, AND SO FORTH.  AND GIVE A LITTLE BIT OF DETAILS ABOUT THE ISSUE RELATING TO THE DIP AND MAYBE HOW MANY DIFFERENT TIMES WE HAD A CONVERSATION ABOUT IT IN AN EFFORT TO ACCOMMODATE THE DEFENDANT.  AND SANITIZE IT AND KIND OF LEAVE ME OUT OF IT, TO THAT EXTENT.  NOT ASKING EITHER SIDE TO AGREE TO IT,  ASKING YOU TO THINK ABOUT IT.  WE WILL DEBATE IT LATER.

ALL RIGHT.  LET'S MOVE FORWARD.  PLEASE BRING IN THE JURY.

MR. HARRIS:  THIS OBJECTION FOLLOWS ALL OF THE WITNESSES?

THE COURT: OBJECTION CARRIES FORWARD. YOU HAVE A STANDING OBJECTION TO ALL THAT TYPE TESTIMONY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: PLEASE CONTINUE.

MR. GASSER: THANK YOU, YOUR HONOR.

BY MR. GASSER:

Q. MR. LEDFORD, OR LIEUTENANT LEDFORD, I BELIEVE WHEN WE BROKE FOR THE AFTERNOON RECESS, IT WAS TOWARDS THE END OF YOUR TESTIMONY. I WAS ASKING YOU ABOUT IF YOU HAD OPPORTUNITIES TO OBSERVE AND OVERHEAR MR. BASHAM WHEN HE GOT BACK TO BUTNER THE SECOND TIME IN MID JULY OF 2004, AND ALSO WHEN HE WAS SPECIFICALLY LEAVING ON AUGUST 3, 2004. YOU SAID YOU HAD PLENTY OF OPPORTUNITIES TO SEE AND OBSERVE HIM?

A. YES.

Q. DID, ON NUMEROUS OCCASIONS, MR. BASHAM MAKE SOME BRAGGADOCIOS COMMENT ABOUT WHAT HE THOUGHT A JURY MIGHT OR MIGHT NOT DO WITH HIS DEATH PENALTY TRIAL?

A. YES.

Q. WHAT DID HE SAY?

A. ON SEVERAL OCCASIONS, MR. BASHAM MADE REMARKS STATING THE FACT THAT HE WOULD NEVER GET THE DEATH PENALTY. THAT HE WOULD SEE ME BACK HERE AT FMC BUTNER AGAIN. THAT HE WOULD GET OFF ON THIS ONE. THEY WOULD NEVER FIND HIM GUILTY OF WHAT HE DID.

**JA 1694**

Q.    IS THAT PART OF THE THREATENING COMMENTS THAT YOU HAVE DESCRIBED TO THE JURY?

A.    THREATENING AND EVERYDAY CONVERSATION.   I DEALT WITH MR. BASHAM ON A DAILY BASIS, MONDAY THROUGH FRIDAY,  POSSIBLY WEEKENDS,  ALSO.

Q.    AND WHEN HE WAS DISCHARGED ON AUGUST 3RD, 2004 OF THIS YEAR, THAT IS THE LAST TIME YOU HAVE ACTUALLY BEEN IN HIS PRESENCE BEFORE TODAY; IS THAT CORRECT?

A.    THAT'S CORRECT.

        MR. GASSER:  THAT IS ALL WE HAVE, YOUR HONOR.

        THE COURT:   CROSS-EXAMINATION.

                    CROSS EXAM

BY MR. SWERLING:

Q.    HOW ARE YOU DOING,  MR. LEDFORD?

A.    GREAT TODAY,  SIR.

Q.    I WILL FOLLOW UP ON A FEW QUESTIONS MR. GASSER ASKED YOU ABOUT.   FIRST OF ALL,  ON THE SITUATION DEALING WITH JULY 23RD.

A.    YES, SIR.

Q.    MR. BASHAM HAD BEEN UP THERE ABOUT TWO WEEKS BY THAT TIME,  TWO,  TWO-AND-A-HALF WEEKS OR SO,  CORRECT?

A.    YES, SIR.

Q.    HE GOT UP THERE SOMETHING LIKE THE 9TH?

A.    GOT THERE JULY 13TH.

Q.    THE 13TH?

A.    ABOUT TEN DAYS HE WAS THERE.

Q.    YOU KNEW BASHAM FROM BEFORE WHEN HE WAS UP THERE IN JANUARY?

A.    I HAD BRIEF DEALINGS WITH MR. BASHAM.

Q.    HE WAS THERE FOR 30 DAYS, AT THAT TIME?

A.    I DON'T RECALL HOW LONG HE WAS THERE ON THE PRIOR STAY.

Q.    THERE WERE NO SUCH INSTANCES LIKE THIS ON THAT PRIOR STAY?

A.    MR. BASHAM WAS INVOLVED IN SEVERAL INCIDENTS PRIOR TO THAT WHERE HE MASTURBATED AND STUFF LIKE THAT.

Q.    I SAID SUCH AS THIS, SCUFFLES, FIGHTS, THESE KINDS OF THINGS?

A.    I BELIEVE SO.

Q.    ARE YOU AWARE -- DO YOU HAVE ANY REPORTS?

A.    I DON'T.

Q.    SO, ALL YOU ARE PREPARED TO DO IS TO TESTIFY ABOUT WHAT YOU KNOW AFTER JULY 13TH?

A.    CORRECT.

Q.    AND NOBODY WAS ASKED TO BRING ANY REPORTS DOWN OR ANY -- ARE ANY OF THE PEOPLE OUT THERE GOING TO TESTIFY ABOUT A FIGHT OR A SCUFFLE PRIOR TO JULY 13TH?

A.    I AM NOT AWARE OF WHAT THEY WILL TESTIFY TO, SIR.

Q.    DO YOU KNOW IF ANY INCIDENT REPORTS HAVE BEEN PREPARED ABOUT A FIGHT OR SCUFFLE PRIOR TO JULY 13TH?

A.    I AM AWARE OF ONE REPORT WHERE HE INFLICTED --

CONVERSE ABOUT MR. BASHAM AT ALL.

Q.    WHEN IN THE PRESENCE OF AGENT LONG THIS LAST TIME WE MET WITH YOU LAST WEEK, WERE YOU ASKED A SPECIFIC QUESTION ABOUT WHAT KIND OF BRAGGING AND BOASTING, IN GENERAL, DID BRANDON BASHAM DO? DO YOU REMEMBER ME ASKING THAT QUESTION?

A.    YES, SIR.

Q.    IS THAT WHEN YOU PROVIDED THE INFORMATION THAT YOU JUST TESTIFIED TO THIS JURY ABOUT?

A.    YES.

Q.    IF MR. SWERLING WAS WILLING TO MEET WITH YOU, WOULD YOU HAVE ANSWERED ANY OF HIS QUESTIONS?

A.    YES.

Q.    WHEN DID YOU MEET WITH MR. HARRIS?

A.    I NEVER MET WITH MR. HARRIS. ONLY ON PASSING WHEN HE CAME TO ASSIST DR. CAPEHART IN HIS INTERVIEWS.

Q.    IF MR. HARRIS WAS WILLING TO MEET WITH YOU, WOULD YOU HAVE PROVIDED MR. HARRIS WITH ANY INFORMATION OR ANY ANSWERS THAT MR. HARRIS INQUIRED OF YOU?

A.    YES, SIR.

        MR. SWERLING:  I NEVER SAID EITHER I OR MR. HARRIS INTERVIEWED HIM.  FORMER CHIEF OF POLICE OF LEXINGTON --

        MR. GASSER:  HE IS ATTACKING THIS WITNESS'S CREDIBILITY.

        THE COURT:  I WILL ALLOW IT.  MAKE IT CLEAR WHO.

BY MR. GASSER:

Q.    THE POINT I WAS TRYING TO MAKE, WERE YOU WILLING TO ANSWER ANY QUESTION OF ANY INDIVIDUAL WHO IS SITTING IN THIS COURTROOM RIGHT NOW BEFORE THIS JURY?

A.    YES, SIR.

Q.    MR. SWERLING DID INDICATE HE DID SEND ONE OF HIS INVESTIGATORS, MR. CARLISLE MCNAIR?

A.    YES, SIR.

Q.    HOW MANY QUESTIONS DID MR. MCNAIR ASK OF YOU, IF YOU RECALL?

A.    APPROXIMATELY 11.

Q.    ELEVEN QUESTIONS.  HOW LONG DID THIS INTERVIEW TAKE?

A.    FIFTEEN MINUTES.

Q.    FIFTEEN MINUTES?

A.    THAT IS APPROXIMATE.

Q.    DID MR. MCNAIR ASK YOU, SPECIFICALLY, THE SAME QUESTION THE GOVERNMENT ASKED YOU?  DID HE ASK YOU ABOUT WHETHER OR NOT BRANDON BASHAM WAS KNOWN TO BOAST AND BRAG THE SECOND TIME WHEN HE GOT BACK FROM BUTNER?  DID HE ASK YOU THAT QUESTION?

A.    NO, SIR.

Q.    WOULD YOU HAVE TOLD HIM AND RESPONDED TO HIM THE SAME WAY YOU RESPONDED TO GOVERNMENT OFFICIALS AND THE SAME WAY YOU RESPONDED TODAY IN FRONT OF THIS JURY?

A.    YES, SIR.

MR. GASSER:  THAT IS ALL I HAVE.

**JA 1698**

MR. SWERLING:  YOUR HONOR, MAY I ASK ONE QUESTION?

RECROSS EXAM

BY MR. SWERLING:

Q.    THE FIRST TIME YOU EVER TOLD ANYBODY ABOUT THIS WAS LAST WEEK?

A.    YES, SIR.

MR. SWERLING:  THANK YOU.

THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN. MEMBERS OF THE JURY, I HAVE A MATTER I HAVE TO TAKE UP WITH THE LAWYERS, SO I WILL EXCUSE YOU AT THIS TIME.  I WILL ASK YOU TO BE BACK AT 9:00 O'CLOCK TOMORROW MORNING.  WE WILL PICK UP WITH THE TESTIMONY TOMORROW MORNING AT 9:00 O'CLOCK. IF IT SEEMS TO BE GOING SLOW, I WILL TELL YOU.  SEE YOU TOMORROW MORNING AT 9:00 O'CLOCK.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT:  LET'S TALK ABOUT WHAT IS ADMISSIBLE IN TERMS OF THE COURTROOM SCUFFLE.  MR. GASSER.

MR. GASSER:  MR. SCHOOLS WILL HANDLE IT.

THE COURT:  WHAT DO YOU WANT TO USE? THE TRANSCRIPT OF EVERYTHING AND AN AUDIO AND THE VIDEO?

MR. SCHOOLS:  YES, SIR.

THE COURT:  JUST FOR THE RECORD, THE AUDIO IS THE MARSHAL'S AUDIO.  THE VIDEO IS THE MARSHAL'S VIDEO TAKEN DOWN, JUST THE EPISODE ISSUE.  AUDIO IS MS. JERNIGAN'S COURT

REPORTING TAPE OF WHAT HAPPENED?

MR. SCHOOLS: YES, SIR.

THE COURT: I HAVEN'T VIEWED THE VIDEO IN ITS ENTIRETY BECAUSE I SAW MOST OF IT. I LISTENED TO MOST OF THE SIGNIFICANT PORTION OF THE AUDIO. THE AUDIO IS VERY HARD TO FOLLOW.

MR. SCHOOLS: IT IS MUCH EASIER TO FOLLOW, JUDGE, IF YOU ARE ACTUALLY LOOKING AT THE TRANSCRIPT.

THE COURT: THAT IS ALWAYS THE CASE. THAT IS SURREPTITIOUSLY MADE TAPES. THE TRANSCRIPTS HELP SO MUCH.

MR. SCHOOLS: WE WERE ALSO ABLE TO MANIPULATE ON THE COMPUTER THE EQUALIZER ON IT TO MAKE IT SOMEWHAT BETTER HEARING.

IF I COULD, JUST TO LET THE COURT HAVE OUR POSITION ON WHY WE THINK IT IS IMPORTANT. THERE HAS BEEN TESTIMONY REGARDING A NUMBER OF INCIDENTS, THE SEVERITY OF DEBATE THROUGH EXAMINATION, CROSS-EXAMINATION. WE HAVE HEARD SOME OF THE LANGUAGE THAT MR. BASHAM HAS USED. AND PERHAPS ONE WITNESS GOT ABOUT AS HALF AS EXCITED AS MR. BASHAM DURING THE INCIDENT. IT IS VERY HARD FOR THE JURY TO HAVE A CONCEPT OF WHAT IS GOING ON IN A PRISON SETTING, AND THE EXCITEMENT LEVEL, AND THE ATTENTION LEVEL TO THE EXTENT TO WHICH MR. BASHAM IS AGGRESSIVE DURING THE COURSE OF ONE OF THOSE INCIDENTS. WE THINK IN THIS INCIDENT IN THIS COURTROOM WHERE MR. BASHAM IS SUBJECT OF THE MOST SCRUTINY OF ANY OF THESE

INCIDENTS, HIS WILLINGNESS TO ESCALATE THE LEVEL HE ESCALATED IT TO IS IMPORTANT TO THE JURY'S ASSESSMENT OF THE CREDIBILITY OF THE WITNESSES THAT HAVE TESTIFIED. CREDIBILITY WITH RESPECT TO THEIR DETERMINATION OF WHOSE CHARACTERIZATION OF THOSE EVENTS IS MORE CORRECT. OUR CHARACTERIZATION, THEY WERE SOMEWHAT VIOLENT; THE DEFENSE'S CHARACTERIZATION, THEY WERE FAIRLY JAIL-TYPICAL. I THINK IT IS IMPORTANT FOR THE JURY TO HAVE A FIRSTHAND VIEW OR FIRSTHAND HEARING, REALLY, OF WHAT ONE OF THOSE INCIDENTS IS LIKE.

AT THE TIME THAT EVENT OCCURRED, I AM TRYING TO REMEMBER, WE HAD FILED A TRIAL BRIEF IN WHICH WE HAD NOTIFIED DEFENSE COUNSEL, AND PRESUMABLY THEY HAD NOTIFIED THEIR CLIENT, THAT WE INTENDED TO CALL WITNESSES FROM THE FACILITIES TO TESTIFY ABOUT THOSE INCIDENTS. WE HAD PROVIDED THE INCIDENT REPORTS, AS WELL. I AM CONFIDENT THE DEFENSE ATTORNEYS HAVE SUBPOENAED THOSE REPORTS THEMSELVES. THERE IS NO QUESTION THIS WAS THE SUBJECT OF -- THAT THIS WOULD BE A SUBJECT OF CONTENTION AT THIS STAGE OF THE CASE. KNOWING ALL OF THAT, MR. BASHAM DID WHAT HE DID. AND IT SEEMS TO THE GOVERNMENT THAT THERE IS A -- AND WE TALKED ABOUT THIS IN THE LAST TRIAL -- THERE IS AN EXTENT TO WHICH THE COURT AND THE SYSTEM IS UNDER NO OBLIGATION TO SAVE MR. BASHAM FROM HIMSELF.

THE COURT: WELL, YOU KNOW, IF I HAD TO DO IT ALL OVER, WHEN THE ISSUE FIRST CAME UP, I WOULD HAVE SAID THAT IS THE DOCTOR'S PROBLEM, NOT MY PROBLEM. I AUTHORIZED HIM TO

HAVE GOOD DOCTORS.  THEY KNOW HOW TO PRESCRIBE WHATEVER MEDICATION TO KEEP HIM AWAKE OR CALM HIM DOWN.  I WANDERED INTO IT,  GAVE HIM A CUP OF COFFEE, NOT JUST A CUP OF COFFEE BUT A BIG CUP OF COFFEE.  IT WAS LIKE A TAR BABY ONCE I GOT IN IT.

MR. SCHOOLS:  I UNDERSTAND,  YOUR HONOR.  BUT I THINK THE POINT IS THAT IT IS HIS REACTION TO IT.  THAT IS WHAT HAPPENED ON MONDAY, HE GOT TOLD "NO."  SINCE MR. BASHAM WAS 14 YEARS OLD, AND BEFORE, WHEN HE GOT TOLD "NO," HE ESCALATES, HE GETS EXCITED AND ACTS OUT.  THE FACT THAT YOUR HONOR BEING THE ONE THAT TOLD HIM "NO,"  I THINK IT IS TOTALLY UNFAIR TO GIVE MR. BASHAM THE BENEFIT OF HIS OWN MANIPULATION. HE GOT YOU,  NO OFFENSE INTENDED,  HE DID EXACTLY WHAT HE WANTED TO DO.  YOU CAN SEE, FROM OUR PERSPECTIVE, WE COULD SEE THE LOOK IN HIS EYES AS SOON AS HE GOT COFFEE THAT FIRST DAY, HE WAS GOING TO HEAD DOWN THIS ROAD.  HE ABSOLUTELY WAS GOING TO DO IT.  AND YOUR HONOR WILL NOTICE FROM THE RECORD AND THE INCIDENTS THAT WE HAVE SUBMITTED,  THAT ONCE HE GOT DOWN ON IT,  THAT WASN'T GOOD ENOUGH.  HE WANTED TO KEEP GOING DOWN ON IT.  INITIALLY, IT WAS TO STAY AWAKE IN THE AFTERNOON.  THEN IT WAS, I NEED A LITTLE DIP BREAK IN THE MORNING.  CAN I TRADE MY DIP BREAK AT LUNCH FOR A DIP BREAK IN THE MORNING?  THAT HAS BEEN HIS MAJOR FOCUS OF THIS TRIAL. I SUBMIT TO THE COURT, I THINK A LEGITIMATE ARGUMENT FOR US TO SAY,  IT WAS THE FIRST TIME HE WAS HANDED A CUP OF COFFEE,  AT

THAT TIME, IN HIS MIND, IT CLICKED, I WILL GET DIP OUT OF THIS.

PART OF THE PROBLEM -- I SHOULDN'T SAY "PROBLEM," THERE WAS A TIME AT WHICH I HAD ASKED, YOU ASKED THE GOVERNMENT'S POSITION ON THIS, AND AT ONE POINT, I PROVIDED IT. MUCH OF THIS WAS DONE WITHOUT OUR INPUT. SO NOW IT IS ALMOST AS IF WE ARE SUFFERING THE CONSEQUENCES OF THINGS THAT OCCURRED WITHOUT US HAVING ANY INPUT. IF THE CONSEQUENCES ARE MR. BASHAM GETS TO SAY, WELL, BECAUSE, YOUR HONOR YOU TOLD ME ON FRIDAY I COULD HAVE DIP AND MONDAY YOU SAID I CAN'T, I GET TO DO THIS. I GET TO TELL THE COURT AND MY LAWYERS AND EVERYBODY ELSE, I DON'T WANT TO BE UP HERE ANYMORE. I DON'T WANT TO PLAY BY THOSE RULES. AND THAT IS CRITICAL EVIDENCE FOR THIS JURY TO UNDERSTAND THE WAY MR. BASHAM OPERATES, THE WAY HIS MIND WORKS, AND THE WAY EVERY WITNESS ON THAT WITNESS STAND TESTIFIED ABOUT HOW HE REACTS. FOR BETTER OR WORSE, HE KNEW WHAT WAS COMING FROM THE WITNESSES. HE KNEW WHAT THE DRILL WAS.

THE DEFENSE ATTORNEYS, AND, FRANKLY, I HAVE SAID THIS BEFORE, EVERYTHING CUTS BOTH WAYS. I THINK THE DEFENSE ATTORNEYS COULD VALIDLY ARGUE, SHOULD NOT SAY VALIDLY, TAKE THE POSITION WITH THEIR EXPERTS THAT MR. BASHAM DID KNOW THE CONSEQUENCES OF THAT BEHAVIOR AND COULDN'T STOP HIMSELF. SO, IT IS NOT AS IF --

THE COURT: TWO-EDGED SWORD, IN OTHER WORDS.

MR. SCHOOLS: YES, EVERYTHING IS. I THINK TO SOME EXTENT, EXCEPT TO THE EXTENT, AND I UNDERSTAND THE COURT'S CONCERN ABOUT THE COURT BEING INVOLVED, BUT DOES MR. BASHAM JUST GET TO TREAT THE COURT IN ANY WAY HE WANTS TO KNOWING WITH IMPUNITY, WELL, THE JURY WILL NEVER KNOW ABOUT THAT BECAUSE HE IS THE JUDGE AND THERE ARE PROBLEMS THERE? THAT IS NOT -- I DON'T THINK HE GETS TO DO THAT. WHILE I UNDERSTAND THERE ARE SOME ISSUES ASSOCIATED WITH YOUR HONOR'S INVOLVEMENT IN IT, MR. BASHAM DOES WHAT HE DOES. AND AT SOME POINT, THIS PROCESS IS FOR THIS JURY TO ASSESS, WHAT IS THE TRUTH? AND WE HAVE GOT, BECAUSE HE CHOSE TO DO WHAT HE DID IN THIS COURTROOM, WE HAVE GOT SOME PRETTY POWERFUL EVIDENCE ABOUT WHAT THE TRUTH IS ABOUT HOW HE ACTS. I THINK TO KEEP IT FROM THIS JURY WOULD BE TO RISK THE POSSIBILITY WITH THE JURY THAT THEY WOULD BE LEFT WITH AN INACCURATE IMPRESSION OF THIS INDIVIDUAL WHOSE LIFE THEY ARE GOING TO DETERMINE WHETHER HE SHOULD LIVE OR DIE. IN THIS INSTANCE, WE THINK, OBVIOUSLY, THE JURY'S LIKELINESS INTERPRETATION, IF THERE IS ONE, AS A RESULT OF EXCLUDING THIS EVIDENCE, IS THAT THEY DETERMINE THAT HE IS LESS OF A RISK TO SOCIETY THAN HE, IN FACT, IS. AN INCIDENT THAT OCCURS DURING THE COURSE OF THE DEATH PENALTY TRIAL, IN FRONT OF THE COURT, SEEMS TO BE AS GOOD AS IT GETS, AS FAR AS EVIDENCE GOES, ABOUT WHETHER HE CAN OR CANNOT BE CONTROLLED IN A CONTROLLED SETTING. AND WE JUST THINK IT IS EXTRAORDINARILY RELEVANT.

WHILE WE UNDERSTAND THERE ARE SOME ISSUES, WE DON'T THINK THEY ARE UNFAIR ISSUES BECAUSE THIS IS A PROBLEM, THIS IS A DILEMMA OF HIS OWN MAKING.

THE COURT: LET ME STOP A MOMENT AND INTERJECT A LITTLE SIDE ISSUE. YOU LEFT IN THE TRANSCRIPT YOU HANDED UP THE PART WHERE THE DEFENDANT SAID HE WANTED TO GO AHEAD AND GET THE DEATH PENALTY.

MR. SCHOOLS: I THOUGHT I HIGHLIGHTED THAT. I DON'T WANT TO OFFER THAT.

THE COURT: I DIDN'T THINK IT WAS. ON THE COPY WE RECEIVED, IT WAS NOT HIGHLIGHTED.

MR. SCHOOLS: I INTENDED TO DO THAT, JUDGE. I UNDERSTAND THERE ARE ISSUES THERE. I INTEND TO REDACT THAT. I APOLOGIZE.

THE COURT: MR. HARRIS.

MR. HARRIS: JUDGE, I THINK THIS ENTIRE PROBLEM CAN BE SUMMED UP IN THREE WORDS THAT MR. SCHOOLS JUST SAID. "HE GOT YOU. HE GOT YOU." WE WILL HEAR THAT IN CLOSING ARGUMENT. WE ARE GOING TO HEAR THAT IN CLOSING ARGUMENT. NOT JUST THAT, BUT WHAT THEY PROVIDED TO THE COURT, THE TRANSCRIPTS, THEY ALSO NOTED ARE HE GOT HIS LAWYERS. BECAUSE WHAT THEY HAVE OFFERED TO YOU IS NOT JUST COLLOQUY BETWEEN YOU AND MR. BASHAM, BUT ME AND MR. SWERLING ASKING YOU, FOR INSTANCE, TO CHANGE THE DIP FROM BREAKFAST TO LUNCH, FROM LUNCH TO DINNER. AND I GUARANTEE YOU, IT IS GOING TO

**JA 1705**

BE, "HE GOT YOU, THE JUDGE." AND IT IS GOING TO BE, "HE GOT THEM, THE LAWYERS." AND THERE IS ABSOLUTELY NO WAY IN THE WORLD THAT AN EXPERT COULD COME FROM ANYWHERE ON THIS EARTH AND CLEAR THAT UP. IT IS KIND OF LIKE WATCHING A LITTLE LEAGUE BASKETBALL GAME WHERE YOU ARE PULLING FOR ONE SIDE. YOU REALLY MAY NOT HAVE A STAKE IN IT, YOU ARE PULLING FOR ONE SIDE. THE REFEREE GOES UP AND SOMEBODY SAYS, DID YOU STEP OUT OF BOUND? YOU SAW THE KID STEPS OUT OF BOUND AND YOU WATCH HIM MANIPULATE THE REFEREE. YOU ARE NOT GOING TO PULL FOR THAT TEAM. YOU ARE NOT GOING TO PULL FOR THAT TEAM. AND THAT IS WHAT THEY WANT YOU TO DO. THAT IS WHAT THEY ARE GOING TO SUGGEST TO THIS JURY, IN CLOSING ARGUMENT, THAT HE MANIPULATED THE REFEREE TO HIS ADVANTAGE. THEY CAME OUT AND SAID THAT. "HE GOT YOU." I CAN'T IMAGINE ANYTHING MORE PREJUDICIAL THAN ALLOWING THEM THAT EVIDENCE. I DON'T CARE IF IT IS VIDEOTAPE. I DON'T CARE HOW IT HAPPENED. I DON'T CARE WHO CAUSED IT.

THE COURT: WELL, I AM JUST LOOKING FOR WAYS TO TRY TO SOMEHOW STREAMLINE IT AND LEAVE ME OUT OF IT. ONE WAY TO DO IT IS, IF YOU LOOK BACK AT IT, WHAT ULTIMATELY PROVOKED THE ALTERCATION WAS MR. BASHAM'S REQUEST TO GO DOWNSTAIRS, WHICH Y'ALL OPPOSED AND I OPPOSED. I SAID, NO, THAT IS NOT POSSIBLE. HE SAID, "NOT POSSIBLE?" I SAID, "NOT POSSIBLE. PLEASE HAVE A SEAT. BRING IN THE JURY." THAT IS WHEN IT WENT DOWN FROM THERE. SO, THE SCUFFLE COULD BE ADDRESSED IN TERMS

OF JUST REFUSING TO BE HERE IN THE COURTROOM, LEAVING OUT ALL OF THE STUFF ABOUT THE DIP.

MR. HARRIS: WE STILL LEAVE ANY 3593 ANALYSIS, YOUR HONOR. WHAT YOU END UP WITH IS --

THE COURT: I MEAN, THAT GETS ME OUT OF IT. THAT TAKES THE PROMISE OF THE DIP OUT OF IT.

MR. HARRIS: THE PROBLEM IS THIS. THE PROBLEM WE SEE IS THAT THE HEART OF THIS MATTER, IF YOU LOOK AT WHAT MR. BASHAM SAYS THEREAFTER, IT IS, "HE LIED TO ME." AND I UNDERSTAND THAT THE GOVERNMENT IS AGREEING TO REDACT THAT. "I PROMISED HIM I WOULD BE GOOD. HE PROMISED ME."

THE COURT: WE MIGHT HAVE TO REDACT IT FURTHER. I AM NOT SAYING THAT IS WHAT I OUGHT TO DO. I AM THINKING OUT LOUD. IS THAT ONE WAY WE CAN HALFWAY CLEAN IT UP? THAT TAKES ME OUT OF THE EQUATION. HE ASKS TO GO DOWNSTAIRS, AND I SAID, "NO. THE RULES REQUIRE YOU TO BE HERE, AND YOUR LAWYERS WANT YOU TO BE HERE, AND YOU HAVE GOT TO STAY HERE." HE REFUSED TO SIT DOWN. THE MARSHALS TRIED TO SIT HIM DOWN. THAT IS WHAT REALLY PRECIPITATED IT WHEN YOU STEP BACK AND LOOK AT IT.

MR. HARRIS: I UNDERSTAND THAT, JUDGE. THEN IT TAKES OUT OF CONTEXT WHY HE DID WHAT HE DID. THE FACT OF THE MATTER IS --

THE COURT: MR. HARRIS, YOU ARE ASKING THAT HE BE GIVEN LIFE IN PRISON. FOR THE REST OF HIS LIFE, HE IS GOING

**JA 1707**

TO BE GIVEN A LOT OF DIRECTIVES FROM PEOPLE IN AUTHORITY ABOVE HIM.  HE WILL HAVE TO GO BY THOSE DIRECTIVES.   THE FACT THAT HE REFUSED TO GO BY A REASONABLE DIRECTIVE IS CERTAINLY RELEVANT IN THIS CASE.   I MEAN,  IT IS JUST THAT SIMPLE.  SO, I DON'T THINK YOU CAN BLOW IT OFF SAYING IT DOESN'T PROVE ANYTHING, IT IS TOO PREJUDICIAL.   IT IS PRETTY PROBATIVE OF HIS ABILITY TO CONFORM HIS BEHAVIOR TO THE REQUIREMENTS THAT WILL BE COMPLIED OF HIM.

MR. HARRIS:  I AM NOT TRYING TO MINIMIZE OR BLOW IT OFF.   I AM JUST SUGGESTING THE PRIMARY REASON THAT HE SAYS HE IS HAVING THE PROBLEM THAT RESULTS IN THAT VIDEOTAPE AND THAT AUDIOTAPE IS A PROMISE THAT HE HAD MADE WITH THE COURT ON FRIDAY THAT HE HAD KEPT.   IT GOT CHANGED ON MONDAY MORNING. IT GOT ACCELERATED MONDAY AFTERNOON WITH THE RULING.   AND I AGREE THAT IT BEGAN WITH THE TOUCHING OF THE GUARD.   AND IT BEGINS WITH,  WE HAVE A PROBLEM,  THE LANGUAGE,  THE LANGUAGE WE HAVE A PROBLEM.   AND THE MARSHAL SAYING, WE HAVE A PROBLEM.   I CAN SEE,  QUITE FRANKLY,  IF IT IS GOING TO COME IN, THAT IS MOST LIKELY THE MOST LOGICAL PLACE FOR IT TO COME IN; HOWEVER,  IT IS OUR POSITION THAT THAT TAKES OUT OF CONTEXT WHY MR. BASHAM ACTED THE WAY THAT MR. BASHAM DID. WHILE I AM NOT MAKING EXCUSES FOR WHAT HE DID --

THE COURT:   THAT IS WHAT I AM SAYING.   YOU SAY, WELL,  THE JURY NEEDS TO KNOW WHY HE DID WHAT HE DID.  THE REASON WHY THEN IS THE DIP.   I THOUGHT YOU WANTED TO KEEP OUT

THE FACT THAT I PROMISED HIM DIP AND THEN HAD TO BACK UP WHEN THE MARSHALS TOLD ME I SHOULDN'T.

MR. HARRIS: HE WOULD NEVER HAVE BEEN TOUCHED. HE WOULD NEVER HAVE WANTED TO GO DOWNSTAIRS. HE NEVER WOULD HAVE CREATED THAT VIDEOTAPE, WHICH HE CREATED, IF IT HADN'T BEEN FOR THE DIP. SO, TO TAKE THAT OUT OF THE EQUATION, LEAVES THE JURY -- IT MEANS IT LEAVES HIM -- HE DID IT FOR NO APPARENT REASON.

THE COURT: JUST HANG ON. A LOT OF THESE WITNESSES WHO HAVE TESTIFIED THUS FAR, THE DEFENSE TEAM HAS DONE A GOOD JOB OF CROSS-EXAMINATION IN BRINGING OUT THE IDEA OF WHAT HAPPENED IS NOT ALL THAT UNUSUAL IN PRISON SETTINGS. THAT MANY PRISONERS ARE DISRUPTIVE, AND COMBATIVE, AND ABUSIVE, AND HOSTILE, AND MEAN-SPIRITED, AND PROFANE, AND EVERYTHING ELSE. THIS WAS JUST KIND OF RUN OF THE MILL. WELL, I HAVE BEEN A JUDGE 17 YEARS. I HAVE NEVER HAD A SCUFFLE BREAK OUT IN THE COURTROOM BEFORE THIS TRIAL. THIS ELEVATES IT ABOVE WHAT NORMALLY GOES ON IN PRISON. THIS IS A COURTROOM SETTING, AND I HAVE, ACTUALLY, IF YOU REMEMBER, DURING JURY SELECTION, NOT WARNED THE DEFENDANT, BUT JUST IN A NICE WAY ASKED HIM NOT TO GET IN ANY MORE SCUFFLES WITH THE GUARDS. I TOLD HIM IT WAS NOT IN HIS BEST INTEREST TO DO THAT. SO, I TRIED IN A NICE, GENTLE WAY TO PLEAD WITH HIM NOT TO MAKE IT ANY WORSE THAN IT ALREADY WAS.

MR. HARRIS: JUDGE, ALL HE WANTED TO DO WAS GO

**JA 1709**

DOWNSTAIRS. THAT WAS MY SECOND POINT OF WHAT I WAS GETTING TO, AND I WILL MOVE ON. ALL HE WANTED TO DO WAS GO DOWNSTAIRS. THE RECORD IS CLEAR. MR. SWERLING WAS REQUESTING -- HE HAD ASKED HE BE ALLOWED TO GO DOWNSTAIRS, WE HAD A PROBLEM WITH HIM GOING DOWNSTAIRS, HE COULDN'T ASSIST US.

THE COURT: I THINK THAT WAS CERTAINLY THE RIGHT DECISION FOR THE DEFENSE LAWYERS. YOU NEED A DEFENDANT HERE, IF FOR NO OTHER REASON, TO HAVE THE RIGHT EFFECT ON THE JURY JUST SEEING HIM SITTING HERE. HAVE A DEFENDANT WHO IS NOT HERE LOOKS TERRIBLE IN THE EYES OF THE JURY. SO, CERTAINLY, THE RIGHT THING, FROM A TRIAL STRATEGY PERSPECTIVE, IS TO HAVE HIM HERE. THAT IS WHY I WANT HIM HERE.

TELL ME, AGAIN, WE GO BACK. THE RULE REQUIRES A SHOWING OF UNFAIR PREJUDICE. CERTAINLY PREJUDICIAL, I WILL GRANT YOU THAT. I THINK THE QUESTION I HAVE IN TERMS OF WHETHER IT IS UNFAIR IS WHETHER THE FACT THAT I WAS INVOLVED IN IT. THE JUDGE IS A REAL AUTHORITY FIGURE WITH MOST JURORS. THEY VIEW Y'ALL AS PARTISANS OUT THERE. THE JURY ALIGNS ITSELF WITH ME. THEY THINK THEY ARE IN THIS THING WITH ME IN A SEARCH OF THE TRUTH. YOU HAVE YOUR PARTISAN ISSUES. THE FACT THAT I CONTRIBUTED TO AN EVENT THAT OCCURRED, THAT IS WHAT CONCERNS ME.

MR. HARRIS: I GAVE A POOR ANALOGY. THAT IS WHAT I MEANT BY MY BASKETBALL HYPOTHETICAL. YOU ARE THE REFEREE.

YOU ARE THE ONE PERSON THE CROWD IS LOOKING TO. AND IF THERE IS ANY HINT WHATSOEVER THAT HE HAS TRIED TO GET YOU OR THAT HE GOT YOU, JUDGE, THAT IS SOMETHING THAT WE CANNOT POSSIBLY WITH ANY EXPERT RESPOND TO. THE PROBLEM BETWEEN HE AND THE MARSHAL, BETWEEN HE AND THE JAILER, OR PROBLEM BETWEEN HE AND MR. SWERLING, OR IF THE VIDEOTAPE STARTED WITH HIM PUNCHING JACK OR HIM PUNCHING ME, I MEAN, THAT IS FAIR GAME. MATTER OF FACT, IF THEY HAD THE VIDEOTAPE AT BUTNER, IF THEY HAD THE VIDEOTAPE AT ALVIN GLENN WHERE HE HAD A PROBLEM BECAUSE OF A BAG, WHERE HE HAD A PROBLEM BECAUSE OF A TOWEL, WHERE HE HAD A PROBLEM BECAUSE OF COINS AND CONTRABAND, I COULD UNDERSTAND THAT. BUT THIS WAS A PROBLEM WITH THE COURT. NOT WITH THE COURT DIRECTLY, BUT WITH A PROMISE BETWEEN HE AND THE COURT ON THAT FRIDAY BEFORE WE BROKE FOR THE AFTERNOON. THAT IS THE HEART. THAT IS THE VERY HEART.

THE COURT: I AM WONDERING IF WE CAN'T SANITIZE IT SOMEHOW AND SAY THE MARSHAL TOLD HIM HE COULDN'T HAVE DIP. HE WAS TOLD HE COULD HAVE DIP. DON'T SAY WHO TOLD HIM THAT, THEN SAY THE MARSHALS DETERMINED, FOR SECURITY REASONS, HE COULDN'T HAVE IT, WHICH REALLY THE REASON I ACTED WAS ON RECOMMENDATION OF THE MARSHAL.

MR. HARRIS: THAT GIVES THE GOVERNMENT EXACTLY WHAT IT WANTS. IT IS NOT THE TRUTH. IT GIVES THE GOVERNMENT --

THE COURT: TAKES ME OUT OF IT.

MR. HARRIS: BUT ALL THEN THEY ARE ARGUING, JUDGE,

IS THAT IS ONE MORE FEDERAL AGENCY THAT HE CAN'T GET ALONG WITH. AND IT IS NOT THE TRUTH.

THE COURT: MR. SCHOOLS.

MR. SCHOOLS: YOUR HONOR, TWO POINTS WITH RESPECT TO THE PREJUDICE. FIRST OF ALL, IT SEEMS THAT MR. HARRIS DID, I THINK, SOMETHING THAT YOU HAVE ACCUSED US OF DOING, HE KIND OF SWITCHED ISSUES ON YOU, WHICH IS WHAT WE WILL ARGUE TO THE JURY, WHICH IS A SEPARATE ISSUE. WE ARE TALKING ABOUT ADMISSIBILITY OF THE EVIDENCE, AT THIS POINT.

YOUR HONOR MADE A PROMISE TO MR. BASHAM ON FRIDAY. YOU GOT ADDITIONAL INFORMATION ON MONDAY. YOU SAID WE NEED TO THINK ABOUT THIS SOME MORE.

THE COURT: I GAVE HIM SOME NICOTINE GUM.

MR. SCHOOLS: NICOTINE GUM, AND HE REACTED. FROM OUR PERSPECTIVE, THAT IS AS MUCH AS THE JURY NEEDS TO KNOW TO PUT THE WHOLE THING IN CONTEXT. THAT INCIDENT THAT HE REACTED TO THE FACT THAT YOU TOLD HIM ON MONDAY YOU RECEIVED SOME SECURITY CONCERNS FROM -- YOU TOLD HIM ON FRIDAY, YOU RECEIVED SOME SECURITY CONCERNS FROM THE MARSHAL ON MONDAY, AND YOU SAID WE NEED TO THINK ABOUT IT SOME MORE. LET'S TRY NICOTINE GUM, AND THAT IS WHEN HE WENT OFF. IT SEEMS TO ME THAT, UNDER THAT FACTUAL SCENARIO, WE DON'T NEED TO ARGUE BASED ON THAT HE MANIPULATED YOU, ALTHOUGH, DEPENDING ON WHAT HAPPENS ON THEIR SIDE WITH THE CROSS-EXAMINATION AND THAT STUFF, THAT MAY BE THE CASE.

THE OTHER POINT IS, THEY GOT DR. SCHWARTZ-WATTS, WHO IS THEIR WITNESS, IN THE MIDDLE OF THIS THING. THEY BROUGHT HER IN HERE, THEY GOT A LETTER FROM HER SUGGESTING TO YOU THAT NICOTINE WOULD NOT CONTRAINDICATE. IT IS INCONCEIVABLE TO ME, ON CROSS-EXAMINATION, WE WILL NOT QUESTION HER ABOUT THE FACT THAT HIS BEHAVIOR DURING THE TRIAL WAS REGULATED BY DIP. AND I THINK IT IS A PURELY -- THAT IS A 100 PERCENT VALID BASIS FOR CROSS-EXAMINATION.

THE COURT: SHE DIDN'T RECOMMEND IT. I MISSPOKE WHEN I SAID SHE RECOMMENDED IT. SHE DIDN'T. SHE DID LATER GIVE ME A LETTER THAT SAID SHE DIDN'T SEE ANY HARM IN GIVING IT TO HIM.

MR. SCHOOLS: SHE IS GOING TO TESTIFY, I ASSUME SHE IS GOING TO TESTIFY, WITH THE CONDITIONS THAT SHE CLAIMS HE SUFFERS FROM MAKES THESE KINDS OF ACTIONS UNAVOIDABLE. THAT HE CAN'T PROCESS THE INFORMATION AND, THEREFORE, HE REACTS. WELL, HE HAS BEEN PROCESSING PRETTY WELL KNOWING HE WILL HAVE DIP IN THE MORNING AND DIP IN THE AFTERNOON. AND I THINK THOSE FACTS ARE PURELY APPROPRIATE FOR CROSS-EXAMINATION OF A DOCTOR WHO IS GOING TO TESTIFY THAT HE NEEDS MULTIPLE, MULTIPLE DRUGS TO KEEP HIM EVEN ON A BASELINE, WHICH IS WHAT I SUSPECT WE ARE GOING TO HEAR. MY UNDERSTANDING IS THAT THE DEFENDANT RECEIVED VALIUM AT LUNCHTIME RIGHT BEFORE THAT INCIDENT. SO, OUR POSITION IS THAT NARCOTICS DON'T WORK BECAUSE HIS CONDITION IS NOT BIOLOGIC, IT IS PURPOSEFUL.

THAT IS A GOOD EXAMPLE.

THE ONLY REASON I AM TALKING ABOUT THIS IS, WHEN YOU ANALYZE THE ENTIRE PREJUDICE ISSUE, YOU NEED TO LOOK AT WHAT IS COMING DOWN THE ROAD ANYWAY TO DECIDE WHETHER THE ADMISSION OF THE EVIDENCE AT THIS POINT IS PREJUDICIAL.

COUPLE OF OTHER POINTS. FIRST, IF THIS INCIDENT HAD HAPPENED OUTSIDE THAT DOOR (INDICATING), THERE WOULD BE NO QUESTION IT IS ADMISSIBLE. AND SO, THE DEFENDANT IS GOING TO GET THE BENEFIT OF BEING TEN FEET AWAY FROM WHERE IT WOULD HAVE HAPPENED. THERE WOULD BE NO QUESTION TO ITS ADMISSIBILITY.

THE OTHER POINT IS THAT MR. BASHAM'S REACTION TO BEING TOLD NO AND THE IDENTITY OF THE PERSON TELLING NO IS EXTREMELY IMPORTANT. JUDGE, THIS IS A CASE ABOUT CHOICES. AND ON THAT DATE, IT IS NOT MR. BASHAM'S ATTORNEYS' FAULTS. THEY WERE DOING EVERYTHING THEY COULD TO KEEP HIM FROM RAISING THIS ISSUE EVERY TIME HE RAISED IT. SO, BRANDON BASHAM, ON HIS OWN, DECIDED HE HAS GOT TO STAND UP AND TALK TO YOU ABOUT DIP ON MONDAY. AND HE DID IT. HE MADE THAT CHOICE AGAINST THE ADVICE OF HIS LAWYERS. AND NOW HIS LAWYERS ARE ASKING YOU, AND I UNDERSTAND, I WOULD DO IT, TOO, IF I WERE IN THEIR SHOES, THEY ARE SAYING, DON'T HOLD HIM TO IT. HE GETS HOISTED ON HIS OWN. HE KNEW WHAT WAS GOING ON, HE MADE A CHOICE. AND NOW HE IS, THE LAWYERS ARE SAYING, BUT, JUDGE, THAT CHOICE WAS SO BAD, THE JURY CAN'T KNOW ABOUT IT. WELL,

DOES THAT MAKE SENSE? I DON'T THINK IT DOES. IT IS LIKE -- THEY DON'T WANT IT IN BECAUSE IT IS SO RELEVANT. I MEAN, I JUST THINK THAT, BASED ON THE WAY IT HAPPENED, THAT WE CAN, I THINK THEY WILL BE ABLE TO, THEY SHOULD BE ABLE TO ASK DR. SCHWARTZ-WATTS ABOUT THAT INCIDENT. SHE WILL SAY HE THOUGHT HE WAS GETTING IT ON FRIDAY, WHEN HE DIDN'T GET IT ON MONDAY, HE REACTED, THAT IS BRANDON BASHAM. THAT IS WHAT WAS GOING TO HAPPEN.

YOUR HONOR, YOU DON'T NEED TO BE CRITICIZED OR EVEN ANALYZED FOR THE DECISION YOU MADE. THE FACT IS, YOU MADE A DECISION ONE DAY, YOU GOT MORE INFORMATION, YOU CHANGED YOUR MIND. AND SHE WILL TESTIFY, I AM SURE, AND COULD TESTIFY, AND I THINK PROBABLY WILL SAY, YOU KNOW, JUDGE ANDERSON WAS NOT AWARE OF ANY OF THIS HISTORY. AND HE WAS -- HE JUST MADE A DECISION BASED ON THE INFORMATION AVAILABLE TO HIM. SO, SHE CAN TESTIFY THAT THAT IS WHAT THAT WAS. THAT WAS A BRANDON BASHAM BEING BRANDON BASHAM AS A RESULT OF A MENTAL ILLNESS FOR WHICH HE SUFFERS.

BUT I THINK KIND OF LIKE A FREE SPEECH ARGUMENT, JUDGE. THE ARGUMENT -- THE BEST RESPONSE TO A SPEECH YOU DON'T LIKE IS NOT TO SHUT UP THE SPEECH, IT IS MORE SPEECH. AND I THINK THAT IS WHAT WE THINK HERE. THE RESPONSE TO EVIDENCE THAT IS EXTREMELY RELEVANT IS TO CHALLENGE THE EVIDENCE. I THINK MR. SWERLING JUST DID THAT EXACT SAME THING WITH LIEUTENANT LEDFORD. I THINK THAT THAT IS THE WAY THAT THIS WORKS. I

THINK THEY OUGHT TO BE ABLE TO CHALLENGE OR USE THE EVIDENCE. I DON'T MEAN CHALLENGE IT, WE ARE GOING TO SUGGEST IT IS A CHOICE HE MADE. THEY WILL SUGGEST HE DOESN'T HAVE CHOICES BECAUSE OF A MENTAL HEALTH CONDITION. THAT IS WHAT THIS CASE IS ALL ABOUT. TO KEEP IT OUT AND NOT LET US TALK ABOUT IT JUST TOTALLY KEEPS WHAT IS PROBABLY THE BEST EVIDENCE WE HAVE FROM THIS JURY ABOUT HOW MR. BASHAM REACTS WHEN BEING TOLD "NO."

THE COURT: WHAT ABOUT THE SUGGESTION I POSED BEFORE THE BREAK THAT WE KEEP OUT THE AUDIO, AND VIDEO, AND THE TRANSCRIPT AND JUST LET THE INTERPRETER TESTIFY.

MR. SCHOOLS: WE THINK THAT THE AUDIO IS CRITICAL SO THE JURY UNDERSTANDS HOW HE REACTS. THE VIDEO -- WE WOULD LIKE TO GET THE VIDEO IN. BUT THE VIDEO LOOKS --

THE COURT: IT WOULD HAVE TO BE PLAYED SEPARATE, THEY DON'T MATCH UP, DIFFERENT SPEED.

MR. SCHOOLS: THEY DON'T MATCH UP. IF WE NEED TO REDACT, OBVIOUSLY, WE HAVE CONCEDED WE WOULD NEED TO REDACT THE PORTION WHERE MR. BASHAM ACCUSES MR. RILEY OF BEING A RACIST. AND IF THE COURT --

THE COURT: STOP RIGHT THERE. THAT STATEMENT CAME OUT ABOUT RACIAL SLURS FROM ONE OF THE WITNESSES TODAY. I CAN'T REMEMBER HIS NAME. AND I GAVE A CAUTIONARY INSTRUCTION, BUT THE MORE I THINK ABOUT IT, I THINK I TOLD YOU IN THE FIRST TRIAL, I TRIED A MURDER-FOR-HIRE CASE A FEW

YEARS AGO. IT WAS ON THE EXCHANGE OF THE MONEY TO PAY THE HIT MAN. THE DEFENDANT MADE SOME RACIAL SLURS ON A SURREPTITIOUS TAPE. BEFORE THE TAPE WAS TO BE PLAYED, THEY ASKED TO DELETE THE RACIAL SLURS ON THE TAPE. IT WAS TOO LATE TO DO IT. I SAID, IT IS TOO LATE. ON TOP OF THAT, IF A PERSON CHOOSES TO USE RACIAL SLURS AND YOU START CLEANING UP HIS LANGUAGE, THEN WHAT DO YOU DO IF HE MAKES A GENDER-RELATED SLUR OR A RELIGIOUS-RELATED SLUR, OR A SOUTHERN RACIAL ETHNIC SLUR OR SOMETHING, CRITICIZE SOUTHERNERS. WHERE DO YOU STOP? IN OTHER WORDS, I DIDN'T HAVE TOO MUCH SYMPATHY FOR THE DEFENDANT. BUT I DID GIVE A VERY STRONG CAUTIONARY INSTRUCTION ABOUT THE RACIAL SLURS. IT WAS THE PRINCE CASE. WELL, ON APPEAL, MR. SWERLING, YOU WERE IN THAT.

MR. SWERLING: YES, SIR.

THE COURT: ON APPEAL, THE FOURTH CIRCUIT SAID THERE SHOULD HAVE BEEN A REDACTION. IT WAS ERROR TO LET IT IN, BUT HARMLESS ERROR. SO, SINCE THAT TIME, I HAVE ALWAYS BEEN VERY CAREFUL WHEN THE ISSUE OF RACIAL SLURS COMES UP. BUT THE MORE I STEP BACK AND LOOK AT IT IN THE CONTEXT OF THIS TRIAL, THE FACT THE DEFENDANT'S ABILITY TO CONFORM HIS BEHAVIOR TO THE NORMS OF PRISON LIFE IS ONE OF THE ISSUES BEFORE THE JURY RIGHT NOW. THE FACT THAT HE MAKES RACIAL SLURS TO AFRICAN-AMERICANS, WHO ARE CERTAINLY AMONG THOSE IN THE PRISON POPULATION EMPLOYEES, I AM SURE A NUMBER OF AFRICAN-AMERICANS IN ANY PRISON, PROBABLY, I AM NOT SURE IT

WAS ERROR TO LET IT IN. I AM NOT SURE THE CAUTIONARY INSTRUCTION WAS REQUIRED, IS WHAT I AM SAYING. THE GOVERNMENT APPEARS TO BE READY TO STAY AWAY FROM IT, RIGHT?

MR. SCHOOLS: YES, SIR. WE ARE. AND I THINK, YOU KNOW, A COUPLE OF THINGS. FIRST OF ALL --

THE COURT: IT CAME OUT IN THE FULKS TRIAL IN TERMS OF ONE OF THE FORMER WIFES ACCUSING MR. FULKS OF MAKING RACIAL SLUR ABOUT HER BEING INFATUATED WITH A BLACK PERSON ON A WORKOUT VIDEO.

MR. SCHOOLS: YES, SIR.

THE COURT: AGAIN, THAT WAS A LITTLE MORE INDIRECT. BUT YOU AGREED TO STAY AWAY FROM IT IN THAT TRIAL, AS WELL.

MR. SCHOOLS: WE DID.

THE COURT: I HAD THAT THOUGHT AFTER YOU LEFT SIDEBAR. I AM NOT SURE I HAD TO GIVE A CAUTIONARY INSTRUCTION. BUT ANYWAY, THAT IS DIVERGED OF WHAT WE ARE TALKING ABOUT HERE NOW. IN FUTURE REFERENCE, THE GOVERNMENT WILL STAY AWAY FROM RACIAL ISSUES.

MR. GASSER: SINCE YOU BROUGHT IT UP, TO MAKE SURE THE RECORD IS COMPLETE, THE COURT REPORTER WON'T PUT IN THE FACT THAT VIRTUALLY EVERY SINGLE GUARD AND EVERY NURSE, EXCEPT FOR ONE, THAT WAS EMPLOYED AT ALVIN S. GLENN DETENTION FACILITY, WERE AFRICAN AMERICAN. NOW THE RECORD DOES REFLECT THAT.

I WAS MENTIONING TO SEVERAL OF MY COLLEAGUES AND OTHER

**JA 1718**

SPECTATORS IN THE COURTROOM BECAUSE, AS YOU KNOW, THAT RESPONSE WAS NONRESPONSIVE TO MY QUESTION. AND WHEN ALL OF THESE WITNESSES, PARTICULARLY THE GUARDS TESTIFIED, THESE AFRICAN-AMERICAN GUARDS WERE TESTIFYING, THEY SAID HE WAS CUSSING ME, CUSSING ME, CALLING ME NAMES. I THINK SOMETIMES THOSE OF US IN THE LAW SOMEHOW WE FUMBLE REALITY. I MEAN TO SUGGEST, PARTICULARLY TO THE THREE AFRICAN AMERICANS ON THE JURY, THAT WHEN YOU GOT ALL OF THOSE NUMBER OF AFRICAN-AMERICAN GUARDS TAKING THE WITNESS STAND, HE IS CURSING ME, HE IS CALLING ME NAMES, SOME OF THE MEMBERS OF THE JURY AREN'T THINKING IN THEIR HEADS THAT HE IS USING RACIAL EPITHETS. I MEAN, IT DEFIES, I MEAN, JUST ABSOLUTELY DEFIES REALITY. I UNDERSTAND WHAT THE RULES ARE, THAT IS WHY WE INSTRUCTED EVERYBODY.

ALSO IN OUR INTERVIEWS WITH THE BUTNER PEOPLE THAT WE HAVE TOLD THEM TO NOT GET INVOLVED IN IS THAT MR. BASHAM HAS INSTIGATED, AND GOTTEN IN FIGHTS, AND USED RACIAL SLURS WITH OTHER AFRICAN-AMERICAN INMATES AT BUTNER. TALKED WITH THEM ABOUT THAT. INDICATED TO THEM THEY CAN'T GO THERE.

THE COURT: I APPRECIATE THE GOVERNMENT'S CONCESSION TO GO THERE. TAKES A STICKY ISSUE OUT OF THIS CASE.

MR. SCHOOLS, YOU WERE TELLING ME WHY THE SANITIZED VERSION FROM YOUR CASE AGENT WOULDN'T DO.

MR. SCHOOLS: IT WOULDN'T BE ACCURATE. TAKING THE THIRD BEST EVIDENCE. WE GOT VIDEO, WE GOT AUDIO, WE GOT

VISUAL OBSERVATIONS. I DON'T THINK THE PREJUDICIAL EFFECT OF THIS INCIDENT IS -- WE CAN, IF WE CAN TAKE YOUR HONOR OUT OF AT LEAST TO THE EXTENT THERE IS NO BLAME INVOLVED, WE COULD AGREE NOT TO ARGUE THAT HE GOT YOU. ALTHOUGH --

THE COURT: WHY DO YOU NEED ALL OF THOSE REPEATED REQUESTS TO DO IT OVER LUNCH, AFTER LUNCH, IN THE MORNING? I MEAN --

MR. SCHOOLS: YOUR HONOR, I TRIED TO REACH AN ACCOMMODATION ON THIS ISSUE WITH MR. HARRIS AND MR. SWERLING. I WAS TOLD, NO THANKS. WE WANT NONE OF IT IN. I AM TAKING THE POSITION THAT I HAVE GOT TO PROVE IT TO THE FULL EXTENT I CAN. I THINK ALL OF THOSE DOCUMENTS SET THE CHAIN FOR WHAT HAPPENED AND, I DON'T KNOW, YOU KNOW, MAYBE MS. SCHWARTZ-WATTS, I DON'T KNOW WHAT SHE KNOWS ABOUT WHAT MR. BASHAM IS DOING IN COURT, OR WHETHER HE IS GETTING DIP, AND ALL OF THESE THINGS. OUR POSITION WAS, YOU KNOW, WE TRIED TO REACH AN ACCOMMODATION ON IT, GIVEN NO ACCOMMODATION, GET THE WHOLE STORY OUT SO THAT IT IS COMPLETE. I DON'T KNOW HOW ELSE TO ARGUE IT.

THE COURT: CAN I PLAY THAT DVD ON MY DVD PLAYER AT HOME? IT WILL PLAY ON A REGULAR DVD PLAYER?

MR. SCHOOLS: IF YOU HAVE A COMPUTER.

THE COURT: I DIDN'T GET TO THE END OF EITHER ONE OF THEM TODAY. I WANT TO TAKE IT HOME AND LOOK AT IT WHEN I AM RESTED, RELAXED, SEE IT VERY CALMLY, AND SEE WHAT YOU CAN

HEAR AND SEE WHAT YOU CAN SEE.  I WILL LOOK AT IT ONE MORE
TIME.

MR. SCHOOLS:  DVD HOOKED IN YOUR TELEVISION?

THE COURT:  YES.

MR. SCHOOLS:  I DON'T THINK SO, JUST YOUR COMPUTER.

MR. HARRIS:  COULD I JUST BRIEFLY, EVER SO QUICKLY,
TO RESPOND?  TO PUT THINGS IN THEIR PROPER ORDER --

THE COURT:  HOLD ON A SECOND.  GO AHEAD.

MR. HARRIS:  THE PROBLEM WAS NOT -- THE PROBLEM
DIDN'T CHANGE MONDAY MORNING WHEN WE CAME TO COURT.  THE
PROBLEM WAS COMPOUNDED BY ERRONEOUS INFORMATION GIVEN TO YOU
BY THE MARSHAL SERVICE REGARDING BODILY FLUIDS.  THAT IS WHAT
THE RECORD IS CLEAR ON.  YOU WERE GIVEN A REPORT THAT HAD --
THAT YOU READ HAVING TO DO WITH MILK.  I THINK YOU HAVE NOW
HEARD THE TESTIMONY.

THE COURT:  I SAID I HAD BEEN TOLD HE THREW BODILY
FLUIDS.  IT SAID MILK.  I THOUGHT THE REPORT SAID HE THREW
MILK AND THEN SOMETHING ELSE.

MR. HARRIS:  MILK WITH SOME DISCOLORATION IN IT.
AND QUITE FRANKLY, THERE IS NO, I DON'T KNOW IF THAT IS THE
TESTIMONY WE HEARD ON THE STAND TODAY, I DON'T KNOW EXACTLY
WHAT THAT WAS.  BUT CERTAINLY THERE HAS BEEN NO TESTIMONY
FROM ANYBODY, ANALYSIS OR ANYTHING OTHER THAN DISCOLORATION,
THAT THERE IS ANY EVIDENCE THAT BODILY FLUID WAS EVER
INVOLVED.  NO SPITTING.  NO ONE, AT LEAST AT ALVIN S. GLENN,

WHICH IS WHAT YOU WERE GIVEN,  THERE IS NOTHING REGARDING BODILY FLUIDS.   YOU MADE A TENTATIVE CHANGE IN RULING OR CHANGED YOUR MIND THAT MORNING BASED ON A REPORT THAT IS FOR A LARGE PART ERRONEOUS.

THE COURT:   LET ME, IN MY DEFENSE,  I HAVE ALWAYS TRIED TO DEFER TO THE WISHES OF THE MARSHAL ON SECURITY MATTERS.   THEY WANTED ME TO PUT YOUR CLIENT IN A STUN BELT THE FIRST DAY OF JURY SELECTION.

MR. HARRIS:  YES, SIR.

THE COURT:   I MEAN, NOT JUST ONE TIME DID THEY ASK ME, THEY ASKED ME REPEATEDLY.   THEY SENT THE MARSHAL INTO MY OFFICE TO TALK ABOUT IT.   THEY SENT THE CHIEF DEPUTY TO TALK ABOUT IT.   I REBUFFED THEM ON THAT.   I DON'T WANT TO PUT ON THE STUN BELT.  IF HE ACTS OUT, I DON'T WANT A BAD SITUATION IN FRONT OF THE JURY.   THAT ISSUE IS ONE I DISAGREED WITH THE MARSHAL.   THEN I GAVE HIM COFFEE DURING JURY SELECTION IN A BIG PLASTIC MUG.   THE MARSHAL CAME TO SEE ME ABOUT THAT. YOU SHOULDN'T HAVE GIVEN HIM THE COFFEE, HE COULD HAVE THROWN THAT,  HURT SOMEBODY.   DIDN'T CONCERN ME THAT MUCH.   IT WAS A VERY LIGHT-WEIGHT MUG.  I WENT AGAINST THE MARSHAL ON THAT. WITH THE DIP, I ULTIMATELY CAVED IN AND GAVE HIM DIP OVER THE OPPOSITION OF THE MARSHAL.   ONE OF THE RARE CASES I HAVE BENT OVER BACKWARD TO TRY TO WORK WITH THE DEFENDANT TO DO WHAT HE NEEDS TO DO TO GET THROUGH THE TRIAL.

MR. HARRIS:  WE ARE ABSOLUTELY NOT FAULTING ANYTHING

YOU HAVE DONE, JUDGE. MATTER OF FACT, I FEEL CERTAIN THERE IS A GOOD CHANCE WE WOULDN'T HAVE MADE IT THROUGH THE PROCESS AS SMOOTH AS WE HAD IF YOU HADN'T MADE THE RULING ON THE DIP. CERTAINLY NOT FAULTING ANYTHING THE COURT HAS DONE IN TERMS OF ACCOMMODATING OUR CLIENT.

THE PROBLEM THAT WE ARE FOCUSING ON, THOUGH, WHAT I THINK THE FOCUS NEEDS TO BE ON IS THAT FRIDAY AFTERNOON WHEN EXPECTATIONS OF MR. BASHAM, YOU ARE GOING TO HAVE TO HEAR THE TESTIMONY FROM THEIR WITNESSES REGARDING ANYWHERE FROM IQ TO HIS WHAT HE BELIEVES TO BE RIGHT AND WRONG, HIS RIGHT AND WRONG VALUE SYSTEM. AND HIS ACCEPTING YOUR PROMISE BECAUSE THAT IS WHAT IT SAYS IN THE RECORD. JUDGE, IT SAYS YOUR PROMISE IF HE NOT DO ANYTHING, THAT HE WILL HAVE IT.

THE COURT: I MEAN, BUT I AM NOT SURE HOW MUCH WEIGHT THAT IS ENTITLED TO. THERE MAY BE SITUATIONS IN PRISON WHERE HE IS PROMISED SOMETHING THAT CAN'T BE DELIVERED FOR SOME REASON.

MR. HARRIS: I UNDERSTAND.

THE COURT: MIGHT BE TOLD HE IS GOING TO A BIGGER CELL OR MORE COMFORTABLE CELL, AND THEN SOMETHING HAPPENS AND HE DOESN'T GET TO GO THERE.

MR. HARRIS: THAT IS WHY I AM SUGGESTING, IF THE MARSHALS HAD MADE THAT PROMISE, IT WOULD BE DIFFERENT. THAT IS MY POINT, JUDGE. IF THE MARSHALS HAD MADE THAT PROMISE, I WOULDN'T BE ARGUING THIS. I WOULD BE ARGUING FOR MY

**JA 1723**

CLIENT. AND I WOULD BE SAYING, JUST AS DID I WITH HIM WHEN I FOUND OUT ABOUT ALVIN S. GLENN, AND I WOULD SAY TO HIM, JUST AS DID I WHEN I HEARD ABOUT BUTNER, I WOULD SAY TO HIM, JUST AS I DID, YOU KNOW, ON ANY OTHER NUMBER OF SKIRMISHES, WHY DID YOU DO THAT? THAT WOULD BE MY POINT. IT IS JUST SO DIFFERENT WHEN IT IS FROM THE COURT.

THE COURT: ALL RIGHT.

MR. GASSER: MR. SCHOOLS IS STILL HANDLING THIS ISSUE. SINCE JAMES SMITH IS MY ISSUE, THE MARSHALS HAVE NO ONE TO SPEAK FOR THEM. I FEEL I AM OBLIGATED TO SPEAK ON THE U.S. MARSHALS, GIVEN THE FACT MR. HARRIS HAS. I AM SURE MR. SMITH TOLD THE U.S. MARSHAL THE SAME THING HE TOLD US. IF YOU RECALL, ONE OF THE LAST INSTANCES HE TALKED ABOUT, MR. BASHAM SPIT CORN FLAKES ON HIM. HE THEN HAD A MILK CARTON. WE INTERVIEWED MR. SMITH. HE TOLD THE MARSHALS THE SAME THING PRIOR TO US INTERVIEWING HIM. IT WASN'T JUST MILK, THERE WAS OTHER, IT WAS A THICK SUBSTANCE CONSISTENT WITH SEMEN. AND THAT ALSO, THAT NOT ONLY MR. BASHAM, BUT A NUMBER OF OTHER GUARDS DOWN THERE, IT IS NOT UNUSUAL FOR INMATES TO MIX URINE, SEMEN, AND MILK AND THROW IT ON EACH OTHER. AND SO, THAT IS WHAT JAMES SMITH INDICATED TO US. OBVIOUSLY, FROM A BURDEN OF PROOF PERSPECTIVE BEYOND A REASONABLE DOUBT AND FROM A RELEVANCY AND WHETHER OR NOT THAT WAS PROVABLE, WE DIDN'T EVEN TRY TO GO THERE BECAUSE THERE IS NO WAY IN THE WORLD OF IT NOT BEING TESTED. THAT IS NOT THE BURDEN OR STANDARD THE U.S.

MARSHALS HAVE TO DEAL WITH WHEN PROVIDING YOU INFORMATION AS TO WHETHER OR NOT MR. BASHAM HAS THROWN BODILY FLUIDS.   THE GUARDS BELIEVED,  BASED ON -- THEY ARE NOT GOING TO SIT THERE AND SMELL THE PANT LEGS OF THE GUARD THAT HE THREW THE LIQUID ON.   IT WASN'T MILK.   IT WAS A CONSISTENT SUBSTANCE, CONSISTENT WITH SPERM THAT WAS MIXED IN WITH THE MILK. CONSISTENT WITH MILK, THAT IS WHAT HE TOLD US,  TOLD THE U.S. MARSHALS.

IT IS THE GOVERNMENT'S POSITION,  ON BEHALF OF THE U. S. MARSHALS,  THE FACT HE HAD BEEN THROWING BODILY FLUIDS WAS NOT ERRONEOUS.  I WANTED TO PUT THAT ON THE RECORD.

MR. SCHOOLS:  I HAVE ONE MORE POINT,  YOUR HONOR.  I THINK YOUR HONOR HAS MADE THIS POINT, BUT LIFE IS TOUGH IN A PRISON.   A LOT OF PEOPLE WILL BE TELLING HIM "NO."   A LOT OF PEOPLE WILL BE TELLING HIM "NO" AFTER THEY TELL HIM "YES."   I THINK THE WAY HE REACTS TO THAT, REGARDLESS OF WHO IT IS TELLING HIM, IS VERY,  VERY RELEVANT TO HOW HE IS GOING TO BE IN PRISON.  AND WHEN THE DEFENDANTS ARE GOING TO STAND AND SUGGEST,  CALL A WITNESS, APPARENTLY, TO SUGGEST THAT HE IS GOING TO ADAPT WELL TO PRISON LIFE, OR WHAT HIS LIFE WILL BE LIKE AT THE BUREAU OF PRISONS,  I THINK THE FACT THAT,  EVEN IN THIS SETTING, IN A COURTROOM, WHERE HE KNOWS THE DAMAGE THAT MIGHT BE DONE TO HIS CASE BY REACTING IN THE WAY THAT HE REACTED, HE DID IT ANYWAY BECAUSE HE DIDN'T GET WHAT HE WANTED,  IS EXTRAORDINARILY RELEVANT.   AND I THINK --

THE COURT: BOTH SIDES ARE KIND OF DODGING THE ISSUE. MY CONCERN IS, MAYBE I DIDN'T MAKE IT CLEAR. I HAVE LEARNED THROUGH EXPERIENCE THE JURY EQUATES ITSELF WITH ME. THEY THINK THAT WE WORK TOGETHER AND WE ARE THE ONE PEOPLE -- ONE BODY IN THIS COURTROOM THAT IS DISINTERESTED AND DOESN'T HAVE AN AGENDA, DOESN'T HAVE A CLIENT. AND THE FACT THAT I AM THE ONE THAT MADE THIS STATEMENT OR PROMISE, IF YOU WANT TO CALL IT THAT, AND THEN HAD TO BACK UP ON IT, I AM JUST CONCERNED THAT MIGHT GET OVER INTO THE UNFAIR PREJUDICE ISSUE OF THE JURY AND THEY MIGHT SAY, WELL, YOU KNOW, THE JUDGE, OUR SURROGATE, WAS REBUFFED, WAS DISRESPECTED. THAT IS MY CONCERN.

MR. SCHOOLS: YOUR HONOR, HE BROUGHT THAT PROBLEM.

THE COURT: I UNDERSTAND THAT. I UNDERSTAND THAT. THAT IS WHY I WAS ASKING IF WE COULD JUST START IT WHEN HE REQUESTED TO GO DOWNSTAIRS. AND, OF COURSE, I AM THE ONE WHO TOLD HIM "NO" THERE. BUT IT WAS AT THE REQUEST OF HIS DEFENSE ATTORNEYS, AS WELL. I SAID, "NO, YOU CAN'T GO DOWNSTAIRS." SO, HE WAS TOLD "NO." BUT IT IS UNRELATED TO ANY PRE-EXISTING PROMISE THAT HAD TO BE RENEGED ON. AND IT WENT DOWNHILL FROM THERE.

MR. SCHOOLS: JUDGE, THE GOVERNMENT WOULDN'T PARTICULARLY HAVE A PROBLEM WITH DOING THAT. HERE IS THE ISSUE. I THINK MR. -- I UNDERSTAND MR. HARRIS'S POINT IS IT LOOKS LIKE HE IS REACTING TO SOMETHING LESS THAN WHAT HE IS

REACTING TO. IT IS A BALANCE.

THE COURT: IT CUTS BOTH WAYS.

MR. SCHOOLS: WHICH IS WHY I SUGGESTED THAT, IF WE SANITIZE IT JUST TO THE SIMPLE FACTS ON FRIDAY, BASED ON THE INFORMATION YOU HAD AVAILABLE, AT THAT TIME, YOU TOLD THE DEFENDANT THAT YOU WOULD GIVE HIM DIP. ON MONDAY, YOU HAD RECEIVED SOME ADDITIONAL INFORMATION FROM THE U.S. MARSHALS. YOU WITHHELD YOUR DECISION, AT THAT POINT, OF GIVING DIP. AFTER LUNCH, YOU ADVISED HIM OF THAT PROBLEM, AND THEN HE WANTED TO GO DOWNSTAIRS, AND YOU WOULDN'T LET HIM.

THE COURT: HOW DO YOU PROPOSE TO PUT THAT IN FRONT OF THE JURY UNLESS IT IS THROUGH SOME WITNESS WHO OBSERVED IT?

MR. SCHOOLS: WE CAN DO IT THROUGH AN AGENT, IF WE HAVE TO, OR I GUESS DEPUTY MARSHAL HARASETH.

THE COURT: I DON'T THINK I SHOULD TELL THE JURY ANYTHING. I DON'T THINK I SHOULD WADE INTO THIS AS A WITNESS. I AM GOING TO TRY TO SANITIZE IT OR STREAMLINE IT, AS YOU SUGGESTED. NO WAY TO EDIT THE TRANSCRIPT TO DO THAT. HAVE TO BE A WITNESS RELATING TO IT TO LEAD INTO IT.

MR. SCHOOLS: I BELIEVE DEPUTY MARSHAL HARASETH WAS HERE FOR ALL OF IT. I BELIEVE SPECIAL AGENT LONG AND BRUNING WERE BOTH HERE. WE COULD DO IT THAT WAY. I THINK THAT GIVES THE DEFENDANT THE OPPORTUNITY TO MAKE THE POINT WITH HIS EXPERT AND WITH THIS JURY THAT IT WAS THE, IF YOU COMPLY, YOU WILL GET X, AND THEN HE COMPLIED AND HE DIDN'T GET X THAT

CAUSED HIM TO ESCALATE.  AND REALLY TAKES ANY CRITICISM ON THE COURT'S DECISION AWAY, I THINK, BY SUGGESTING THAT IT WAS SIMPLY BASED ON ADDITIONAL INFORMATION, WHICH IT, IN FACT, WAS.

THE COURT:  YOU STILL PLANNING TO FINISH TOMORROW?

MR. SCHOOLS:  WE THINK SO, JUDGE.  I UNDERSTAND WE GOT TO STOP BY FOUR O'CLOCK.

THE COURT:  I GOT A MESSAGE A JUROR HAS A DINNER HE HAS TO GO TO.  HAS TO LEAVE HOME BY 5:30.

MR. SCHOOLS:  IT MIGHT BE BENEFICIAL IF WE ARE GETTING CLOSE TO TAKE AN HOUR LUNCH BREAK INSTEAD OF HOUR AND A HALF JUST SO WE CAN GET DOWN TO FINISH AT FOUR.  WE HAVE GOT THREE FAIRLY SHORT WITNESSES.  MS. MIOSI MAY BE A LITTLE LONGER.

THE COURT:  ANYTHING MAGIC ABOUT YOU FINISHING TOMORROW?  NEED AN HOUR OR TWO TO FINISH, ANY REASON TO NOT FINISH TOMORROW?

MR. SCHOOLS:  MS. EZELL IS COMING IN TO TESTIFY FROM COLORADO TOMORROW.

THE COURT:  COULD YOU CALL HER FIRST?

MR. SCHOOLS:  WE COULD CALL HER BEFORE THE END OF THE DAY BEFORE WE FINISH.

THE COURT:  ALL RIGHT.

THE COURT:  I CAN'T PROMISE YOU WE WILL BREAK FOR A SHORT LUNCH BREAK TOMORROW.  I DON'T KNOW.

MR. HARRIS: MS. EZELL IS THE ONE MATTER STILL PENDING BEFORE THE COURT ON THE LETTER.

THE COURT: RIGHT.

MR. HARRIS: THE WITNESS WITH THE LETTER.

MR. SCHOOLS: FRANKLY, LOOKING AT THE SCHEDULE, JUDGE, I DON'T THINK WE WILL FINISH TOMORROW.

THE COURT: THE ONLY REASON I ASKED, IF YOU NEED TO KNOW RIGHT AWAY TO KNOW HOW TO EDIT THE TAPE TO KNOW HOW I WILL REQUIRE YOU TO EDIT IT.

MR. SCHOOLS: MS. JONES CAN DO IT ON THE FLY.

THE COURT: YOU CAN DO IT HERE?

MR. SCHOOLS: YES.

THE COURT: GO TO THE QUIET OF MY HOME TONIGHT, LISTEN TO THE -- WATCH THE TAPE AND LISTEN TO THE AUDIO AND LOOK AT THE TRANSCRIPTS. SEE YOU AT 9:00 O'CLOCK TOMORROW.

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____          _____
S/DEBRA R. JERNIGAN, RPR, CRR                      DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
    )    COLUMBIA, SC
    )    OCTOBER 15, 2004
    )
    VERSUS    )
    )
BRANDON L. BASHAM,    )
    DEFENDANT.    )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XVIII


APPEARANCES:
FOR THE GOVERNMENT:    SCOTT SCHOOLS, FIRST AUSA
    JONATHAN S. GASSER, AUSA
    JOHN DUANE, AUSA
    UNITED STATES ATTORNEY'S OFFICE
    1441 MAIN STREET, SUITE 500
    COLUMBIA, SC  29201

FOR THE DEFENDANT:    JACK SWERLING, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201

    GREG HARRIS, ESQ.
    1720 MAIN STREET
    SUITE 301
    COLUMBIA, SC  29201


COURT REPORTER:    DEBRA R. JERNIGAN, RPR, CRR
    UNITED STATES COURT REPORTER
    901 RICHLAND STREET
    COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

Q. HOW MANY TIMES WAS MR. BASHAM TOLD TO CHANGE CLOTHES OR TO UNDERGO THE STRIP SEARCH?

A. HE WAS ASKED AT LEAST SEVEN OR EIGHT TIMES.

Q. AFTER MR. BASHAM CONTINUED TO REFUSE -- AT THIS POINT, IS MR. BASHAM -- HOW WAS HE RESTRAINED, AT THIS POINT?

A. THERE WERE NO RESTRAINTS, AT THIS POINT.

Q. AFTER HE REFUSED TO CHANGE CLOTHES, ACCORDING TO THE BUTNER REGULATIONS, WHAT DECISION WAS MADE BY LIEUTENANT LEDFORD?

A. LIEUTENANT LEDFORD THEN DECIDED TO WAIT UNTIL WE GOT BACK TO HIS HOUSING UNIT IN 1-E, AND THEN WE WOULD DO THE VISUAL SEARCH THERE BECAUSE IT WAS A BIGGER AREA AND HE WOULD BE PUT IN A HOLDING CELL. SO, HE JUST DECIDED -- HE GOT TIRED OF ARGUING WITH HIM, AND HE TOLD HIM WE WILL WAIT UNTIL WE GET BACK DOWN THERE. JUST PUT ON HANDCUFFS, WE WILL ESCORT YOU BACK TO THE HOUSING UNIT. MR. BASHAM COMPLIED TO THE HANDCUFFS.

Q. THE HANDCUFFS WERE THEN PLACED ON MR. BASHAM?

A. CORRECT.

Q. WHAT TOOK PLACE AFTER THE HANDCUFFS WERE PLACED ON MR. BASHAM?

A. I GRABBED ONE ARM, LIEUTENANT LEDFORD GRABBED HIS OTHER ARM TO ESCORT HIM BACK. WE TOOK ABOUT TWO STEPS, THEN HE YANKED AWAY FROM LIEUTENANT LEDFORD, AND SAID, "FUCK THAT. I AIN'T GOING NOWHERE."

Q.    WHEN MR. BASHAM YANKED AWAY FROM LIEUTENANT LEDFORD, HOW WAS MR. BASHAM FACING, AT THAT POINT?

A.    THEY WERE DIRECTLY FACING EACH OTHER.   PULLED THIS WAY, THEN THEY WERE FACE-TO-FACE LIKE THIS (INDICATING).

Q.    AT THIS POINT,  MR. BASHAM IS FACE-TO-FACE --

A.    WITH LIEUTENANT LEDFORD.

Q.    -- WITH LIEUTENANT LEDFORD, AFTER HAVING PULLED AWAY FROM HIM?

A.    CORRECT.

Q.    AFTER HE PULLED AWAY FROM LIEUTENANT LEDFORD, WAS IT A LIGHT PULL, OR HOW DID HE DID IT?

A.    LIKE THIS (INDICATING).   SO, HARD SPIN HIS BODY AROUND, MAKE HIM FACE-TO-FACE.

Q.    ONCE YOU SAW MR. BASHAM DO THAT, AND YOU SAW HIM FACE-TO-FACE WITH LIEUTENANT LEDFORD,  WHAT WAS YOUR CONCERN?

A.    MY CONCERN WAS HE MIGHT SPIT IN HIS FACE OR HEAD BUTT HIM, SO I TOOK HIM TO THE GROUND.

Q.    SO, YOU TOOK MR. BASHAM TO THE GROUND?

A.    CORRECT.

Q.    TELL THE JURY WHAT HAPPENED, AT THAT POINT.

A.    AT THAT POINT, A STRUGGLE BEGAN, AND HE BEGAN CURSING SAYING,  "YOU MOTHER FUCKERS DON'T KNOW HOW TO CAUSE PAIN. GET THE FUCK OFF OF ME.   YOU DON'T HAVE NO BUSINESS PUTTING YOUR HANDS ON ME."   IT WENT ON, I WOULD SAY, TWO MINUTES.  WE PUT LEG IRONS ON HIM TO GET FULL CONTROL OF HIS BODY.   WE

DECIDED TO PICK HIM UP THINKING THAT NOW HE HAS HANDCUFFS AND LEG IRONS ON THAT HE WOULD JUST GO ALONG PEACEFULLY NOW BECAUSE HE KNEW THERE WAS REALLY NOTHING HE COULD DO.  ALL OF HIS LIMBS WERE CONFINED.

Q.    AT THIS POINT, MR. BASHAM'S HANDS ARE CUFFED BEHIND HIS BACK?

A.    CORRECT.

Q.    WEARING LEG IRONS?

A.    CORRECT.

Q.    BROUGHT BACK TO HIS FEET?

A.    YES.

Q.    TELL THE JURY WHAT HAPPENED AFTER MR. BASHAM WAS BROUGHT TO HIS FEET.

A.    WE THEN TRIED TO ESCORT HIM TO HIS HOUSING UNIT.  TOOK ABOUT TWO MORE STEPS.  HE PULLED AWAY AGAIN.  THERE IS A CONCRETE WALL ON THE RIGHT-HAND SIDE.  HE WENT TO THE WALL, STARTED BANGING HIS HEAD ON THE WALL.  "I WILL SHOW YOU MOTHER FUCKERS HOW TO CAUSE PAIN.  YOU DON'T KNOW HOW TO CAUSE PAIN."

Q.    HE STARTED BANGING HIS HEAD ON THE WALL, AT THAT POINT?

A.    CORRECT.

Q.    MR. ANDERSON, YOU HAVE HAD QUITE A BIT OF TRAINING IN YOUR EXPERIENCE WITH INMATES WHILE YOU HAVE BEEN WORKING IN THE FEDERAL SYSTEM?

A.    YES,  I HAVE.

Q.    AT THIS POINT, WHAT IS THE GOAL  -- WHAT IS YOUR GOAL, AS A CORRECTIONS OFFICER, IN THIS CASE WITH MR. BASHAM'S CONDUCT?

A.    ONCE HE STARTED BANGING HIS HEAD, TO KEEP HIM CALM SO THAT HE DIDN'T HURT HIMSELF AND ALSO NOT HURT US.

Q.    TO NOT HURT THE OFFICERS OR HIMSELF?

A.    CORRECT.

Q.    AT THAT POINT,  WHEN HE IS BANGING HIS HEAD ON THE WALL,  WHAT DO YOU THEN DO, AT THAT POINT?

A.    WE PLACE HIM BACK ON THE FLOOR, AND WE CALL FOR ASSISTANCE AND A STRETCHER.

Q.    DID ANYONE ARRIVE AT THE ROOM, AT THAT POINT?

A.    YES,  HIS DOCTOR, DR. CAPEHART ARRIVED.

Q.    DR. CAPEHART ARRIVES IN THE ROOM.  WHAT HAPPENS AFTER THAT?

A.    DR. CAPEHART BEGINS TO TALK TO HIM, TRIES TO GET HIM TO CALM DOWN.  HE HAS NO SUCCESS.  HE IS STILL YELLING, "FUCK THIS.  FUCK THAT.  I AM GOING TO GET LIEUTENANT LEDFORD.  I AM GOING TO GET HIM."

Q.    SPECIFICALLY, WHAT THREATS IS MR. BASHAM MAKING DIRECTED AT LIEUTENANT LEDFORD?

A.    "I WILL FUCK YOU UP.  I WILL HURT YOU.  I WILL HURT YOU.  IT IS ALL RIGHT.   THERE WILL BE ANOTHER CHANCE I CAN GET YOU."

Q.    HE IS ON THE GROUND, AT THIS POINT?

A.    THAT IS CORRECT.  HE IS STILL ON THE GROUND.

Q.    OTHER THAN YOU AND LIEUTENANT LEDFORD, WHO ARE THE OTHER CORRECTION OFFICERS TRYING TO CONTROL MR. BASHAM, AT THIS POINT?

A.    OFFICER COUNCIL AND OFFICER ROBINSON.

Q.    THE STRETCHER, AT SOME POINT, ARRIVES?

A.    YES.  THE STRETCHER ARRIVED.  OTHER STAFF ARRIVED.  WE THEN PICK MR. BASHAM UP, PLACE HIM ON THE STRETCHER, AND THEN BEGIN WALKING HIM TOWARD HIS HOUSING UNIT.

Q.    WHILE MR. BASHAM IS ON THE STRETCHER, IS HE COMPLYING?

A.    NO.  HE IS TRYING TO GET OFF THE STRETCHER, CAUSING THE STRETCHER TO SWERVE,  TRYING TO PUSH IT IN A STRAIGHT LINE. STILL TRYING TO GET AT LIEUTENANT LEDFORD.

Q.    SPECIFICALLY,  IF YOU CAN RECALL, WHAT IS HE SAYING TO LIEUTENANT LEDFORD THAT YOU ARE HEARING?

A.    "YOU BROKE MY NOSE,  YOU FAT MOTHER FUCKER.  YOU BROKE MY NOSE.  I AM GOING TO GET YOU,  I AM GOING TO GET YOU."

Q.    AT THAT POINT, HE IS ON THE STRETCHER?

A.    YES.

Q.    AT SOME POINT, IS HE BROUGHT BACK TO 1-E, HIS HOUSING UNIT?

A.    AT SOME TIME, WE GET HIM BACK AT THE HOUSING UNIT.

Q.    HOW FAR IS IT IN DISTANCE FROM THE VISUAL ROOM TO 1-E?

A.    I SAY BETWEEN 120,  150 YARDS.

Q.    THIS ENTIRE TRIP,  TELL THE JURY WHAT IS GOING ON THIS

ENTIRE TRIP BACK TO THE ROOM?

A.    WE ARE STRUGGLING.  WE ARE HAVING TO STOP ABOUT EVERY 20 YARDS BECAUSE HE IS STILL FIGHTING.   WE ARE TRYING TO GET THE STRAPS ON HIS STRETCHER AROUND HIM SO WE CAN SECURE HIM SO WE CAN PUSH HIM.  HE IS STRUGGLING.  HE IS NOT LETTING US DO IT.   WE ARE HAVING TO STOP EVERY 10 OR 20 YARDS, YOU KNOW, TO TRY TO GET HIM TO CALM DOWN,  CALM DOWN.

Q.    WHEN YOU REACH MR. BASHAM'S CELL IN UNIT 1-E,  WHAT HAPPENS, AT THAT POINT?

A.    HIS DOCTOR ORDERS MEDICATION FOR HIM.  WE CUT HIS JUMPSUIT OPEN, HE IS GIVEN TWO SHOTS IN THE HIP TO CALM DOWN.

Q.    AT THAT POINT, IS MR. BASHAM STILL MAKING THREATS TO ANYONE?

A.    HE IS STILL THREATENING LIEUTENANT LEDFORD.

Q.    SPECIFICALLY, WHAT IS HE SAYING ABOUT LIEUTENANT LEDFORD?

A.    HE IS GOING TO FUCK HIM UP.  GOING TO HURT HIM.

Q.    NOW,  PRIOR TO THIS EVENT ON JULY 23RD, 2004,  HAVE YOU EVER MET MR. BASHAM?

A.    NO,  NEVER.

Q.    DID YOU HAVE ANY IDEA WHO MR. BASHAM WAS?

A.    I DIDN'T KNOW WHO HE WAS.

Q.    MR. ANDERSON,  SPECIFICALLY,  PRIOR TO YOUR ARRIVAL IN THE VISUAL SEARCH ROOM, DID YOU HAVE ANY IDEA OF ANYTHING ON THAT DATE THAT HAD TAKEN PLACE PRIOR TO THAT?

AT ME.   HE WAS USING VERY LITTLE EYE CONTACT. HE WOULD GO FROM THE TOP OF MY HEAD THE WHOLE WAY DOWN TO MY FEET AND THEN BACK AGAIN.   HE WAS GIVING ME THE ONCE-OVER,  OVER, AND OVER, AND OVER AGAIN.

Q.    AND WHAT WAS THE LOOK ON HIS FACE?

A.    IT WAS A SMIRK.

Q.    IN FACT,  WHAT DID YOU DO WHEN YOU NOTICED, AS YOU SAID, HE WAS LEERING AT YOU?

A.    I IMMEDIATELY REDIRECTED HIM AND EXPLAINED TO HIM THAT THIS WAS INAPPROPRIATE BEHAVIOR FOR ANYONE.   THAT WHEN HE ADDRESSED ME OR SPOKE TO ME, HE NEEDED TO LOOK ME IN THE EYE AND IF HE WAS NOT CAPABLE OF THAT,  THEN WE WERE NOT GOING TO HAVE ANY VERBAL INTERACTIONS UNTIL HE WAS.

Q.    THE NEXT DAY, JULY 27TH, OF THIS YEAR,  WERE YOU CALLED TO MR. BASHAM'S CELL TO DE-ESCALATE A SITUATION INVOLVING A TELEPHONE?

A.    YES,  I WAS.

Q.    WOULD YOU PLEASE DESCRIBE THAT TO THE JURY?

A.    AGAIN, I WAS IN THE NURSE'S STATION AND HEARD YELLING. WHEN I STEPPED INTO THE HALLWAY,  I NOTED THAT MR. BASHAM'S FOOD SLOT WAS OPEN.   HE HAD BEEN TALKING ON THE PHONE EARLIER.   AND HE HAD THE PORTION OF THE PHONE WITH THE HANDSET AND THE CORD INSIDE THE CELL, AND HE WAS REFUSING TO GIVE IT UP.   HE WAS MAKING THREATS TO USE IT TO BASH PEOPLE'S HEADS IN,  TO BREAK THEIR HANDS.   HE WAS EXTREMELY ANGRY.

Q.    WHO ELSE WAS PRESENT, DO YOU REMEMBER?

A.    OFFICER ALLEN.

Q.    BRONNER ALLEN?

A.    YES, SIR.

Q.    HE IS A CORRECTIONAL OFFICER, AS WELL, AT BUTNER?

A.    YES, HE IS.

Q.    WHEN MR. BASHAM WAS YELLING, WERE YOU OR MR. ALLEN -- WERE YOU YELLING AT HIM AS WELL, OR WERE YOU USING A DIFFERENT TONE OF VOICE?

A.    I WAS USING A DIFFERENT TONE OF VOICE TRYING TO REDIRECT MR. BASHAM, TRYING TO, ESSENTIALLY, FIND OUT WHAT WAS PUSHING HIS BUTTONS, WHAT WAS HE REALLY UPSET ABOUT, TRYING TO GET TO THE BOTTOM OF IT.  EXPLAINING THAT IF HE HAD AN ISSUE, THIS WAS NOT THE APPROPRIATE WAY TO GO ABOUT IT. THAT THERE WERE BETTER WAYS TO DO THAT.  COULD HE PLEASE TELL ME WHAT WAS GOING ON.

Q.    AND WHAT WAS HIS RESPONSE WHEN YOU WERE TRYING TO GET HIM TO CALM DOWN?

A.    HE SAID, "I DON'T HAVE TO LISTEN TO ANYTHING YOU SAY, PSYCH BITCH."

Q.    THAT WAS MR. BASHAM'S RESPONSE?

A.    YES, SIR.

Q.    AND WAS HE JUST STANDING STILL?

A.    NO, HE WAS PACING, STANDING UP, SQUATTING, JUMPING UP AND DOWN, STANDING AT THE WINDOW OF THE CELL, A LOT OF

HAND GESTURES.

Q.    MS. MIOSI, DID MR. BASHAM THEN THREATEN YOU, MA'AM?

A.    YES, SIR, HE DID.

Q.    AND YOU NEED TO USE THE EXACT LANGUAGE THAT MR. BASHAM USED.  TELL THIS JURY WHAT MR. BASHAM SAID HE WOULD DO TO YOU.

A.    HE SAID, "I AM GOING TO FUCK YOU UP THE ASS, MS. MIOSI. I AM GOING TO KILL YOU, PSYCH BITCH."

Q.    THAT IS WHAT BRANDON BASHAM SAID TO YOU ON JULY 27TH, 2004?

A.    YES, IT IS.

Q.    DID YOU RECORD THAT IN AN INCIDENT REPORT, MS. MIOSI?

A.    YES, I DID.

Q.    EVEN AFTER HIM SAYING THAT TO YOU, DID YOU STILL ATTEMPT TO DE-ESCALATE THE SITUATION, MA'AM?

A.    YES, I DID.  I BELIEVE I MADE ANOTHER COMMENT THAT THAT WAS COMPLETELY INAPPROPRIATE, AND THEN I WALKED AWAY, AND WENT TO THE NURSE'S STATION.

Q.    THREE DAYS LATER, ON JULY 30TH, 2004, AGAIN, DID ANOTHER INCIDENT OCCUR WHEN YOU WENT TO PROVIDE MR. BASHAM WITH HIS MEDICATION?

A.    YES, SIR, IT DID.

Q.    WOULD YOU DESCRIBE THE EVENTS OF THAT DAY, MS. MIOSI?

A.    UH-HUH (AFFIRMATIVE RESPONSE).  HE WAS IN A CELL THAT WAS -- HE WAS NOT ON SUICIDE WATCH, HE WAS IN AN OBSERVATION

CELL WHERE THE ENTIRE PORTION OF ONE OF THE WALLS IS GLASS FROM THE WAIST UP, SO THAT I COULD ACTUALLY COME INSIDE THE OBSERVATION AREA AND JUST BE ON THE OTHER SIDE OF THE GLASS WHERE I HAD A WHOLE VIEW OF MR. BASHAM'S CELL FROM INSIDE THE OBSERVATION AREA.  COMMONLY, STAFF WILL STEP INTO THE OBSERVATION AREA TO SPEAK TO THE PATIENT BECAUSE IT IS A LITTLE MORE PRIVATE.  YOU ARE NOT HAVING TO STAND OUT IN THE HALLWAY AND SCREAM THROUGH THE DOOR.

Q.    AND DID YOU HAVE TO GO BACK AND GET MORE MEDICATION FOR HIM AND THEN RETURN, DO YOU REMEMBER THAT?

A.    ACTUALLY, I DIDN'T GET HIM MEDICATION.  WHAT I DID WAS, I WAS HAVING A DISCUSSION WITH HIM.  HE HAD CALLED ME TO HIS CELL STATING THAT HE WAS VERY ANXIOUS, VERY AGITATED. HE WASN'T GOING TO BE ABLE TO MAKE IT THROUGH THE DAY.  HE NEEDED ME TO CALL HIS DOCTOR, AND HE ASKED FOR ATIVAN.

Q.    DID YOU RETURN TO HIS CELL?

A.    YES.  AFTER I SPOKE TO HIS PSYCHIATRIST ON THE TELEPHONE, I RETURNED TO MR. BASHAM'S CELL AND CONVEYED THE ANSWER TO HIM.

Q.    TELL THE JURY WHAT MR. BASHAM DID WHEN YOU GOT BACK TO THE CELL IN REGARD TO THE FOOD TRAY SLOT?

A.    MR. BASHAM, WHEN I CAME BACK TO THE CELL TO GIVE HIM THE MEDICATION, MR. BASHAM HAD HIS BOXERS ON.  AND WHEN I APPROACHED THE DOOR, IT IS VERY COMMON TO LOOK TO SEE THAT YOU CAN SEE BOTH OF THE INMATE'S HANDS FOR SECURITY PURPOSES

BEFORE YOU OPEN THE FOOD SLOT BOX.  THEY MAY HAVE SOME SORT OF WEAPON IN THEIR HAND, THEY MAY HAVE A CUPFUL OF FLUID. SO, IT IS IMPORTANT TO BE ABLE TO SEE THEM.  HE WAS STANDING MAYBE TWO FEET FROM THE DOOR.  PRIOR TO ME APPROACHING IT TO UNLOCK THE FOOD SLOT WHEN I SAID, "SHOW ME YOUR HANDS, MR. BASHAM," HE LIFTED HIS HANDS UP LIKE THIS (INDICATING) AND SHOWED ME HIS HANDS.  I WAS ALL RIGHT WITH THAT.  WHEN I STEPPED TO THE DOOR, I OPENED THE FOOD SLOT, IT CAME OPEN, AND MR. BASHAM PROCEEDED TO PUSH HIS GENITALS INTO THE FOOD SLOT AREA SO THAT I NOTED THAT HE HAD AN ERECTION AND, YES, HE DID HAVE HIS BOXERS AND T-SHIRT ON, BUT HIS GENITALS WERE STICKING OUT THROUGH THE BOXERS.

Q.    YOU HAD PREVIOUSLY INDICATED IN YOUR YEAR AND A HALF ON THE PSYCHIATRIC UNIT FLOOR THAT NO OTHER INMATE OTHER THAN MR. BASHAM HAD EJACULATED TOWARD YOU?

A.    THIS IS TRUE.

Q.    HAD ANY OTHER INMATE EVER STUCK HIS GENITALS THROUGH THE FOOD SLOT DOOR TOWARDS YOU?

A.    NO, SIR.

Q.    HAD ANY OTHER INMATE EVER THREATENED TO SODOMIZE YOU?

A.    NO.

Q.    AUGUST 2ND, 2004, AS PART OF YOUR DUTIES AND RESPONSIBILITIES THAT YOU PREVIOUSLY DESCRIBED TO THE JURY, DID YOU HAVE AN OPPORTUNITY, THAT DAY, TO HAVE A DISCUSSION WITH MR. BASHAM EDUCATING HIM ON HIS COPING SKILLS ABOUT

TESTIMONY UP UNTIL FOUR. COME BACK ON THE RECORD AT 4:15, 4:30. OR START NOW AND LET THE JURY GO?

MR. SCHOOLS: IF YOU COULD JUST LET THE JURY KNOW THERE ARE SOME LEGAL RULINGS THAT ARE PENDING THAT WE NEED RULINGS ON BEFORE WE CAN CALL FURTHER WITNESSES SO THEY DON'T THINK WE HAVE DROPPED THE BALL, WE WOULD APPRECIATE IT.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT: THERE ARE SOME LEGAL MATTERS AND RULINGS I NEED TO RULE ON BEFORE THEY CALL ANOTHER WITNESS. WE PLANNED ON DOING THAT AT 4:00 O'CLOCK BEFORE YOU LEFT. IT LOOKS LIKE I NEED TO MAKE THOSE RULINGS NOW BEFORE WE CAN PROCEED. WHAT THAT MEANS, WE WILL ADJOURN COURT FOR THE DAY, AS FAR AS YOU ARE CONCERNED, AND ASK YOU TO BE BACK AT 9:00 CLOCK MONDAY. STILL APPEAR TO BE RIGHT ON SCHEDULE WITH THIS CASE. DON'T FEAR THAT WE ARE GETTING BEHIND.

ALL OF THE PARTIES ASSOCIATED WITH THIS TRIAL APPRECIATE THE HARD WORK AND THE DUE ATTENTION YOU HAVE GIVEN TO ALL OF THE TESTIMONY THUS FAR, AND I AM SURE YOU WILL CONTINUE TO GIVE THROUGHOUT THE REST OF THIS TRIAL. HAVE A NICE WEEKEND. DON'T DISCUSS THE CASE. WE WILL SEE YOU MONDAY 9:00 O'CLOCK.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: LET ME SAY, I HAVE GIVEN YOU A STREAMLINE, TRIMMED DOWN EDITION OF THE TRANSCRIPT. I AM NOT

WEDDED TO IT BY ANY MEANS. IT HAS A VERY SHORT PAGE WHERE THE DIP IS DISCUSSED AND THE MARSHAL SPEAKS UP AND SAYS WE OPPOSE THE DIP, WHICH MAKES IT CLEAR THAT IT IS THE MARSHAL'S DECISION TO DISALLOW THE DIP, NOT MY DECISION. THEN WE JUMP OVER JUST BEFORE THE ALTERCATION BEGINS, WHERE I SAY, I MAKE THE DETERMINATION, NO RIGHT TO HAVE DIP, HANDLED WITH MEDICATION, HAVE A SEAT, BRING THE JURY OUT. SCUFFLE TAKES PLACE. REDACTED FROM THE SCUFFLE ARE RACIAL SLURS, THE PARAGRAPH WHERE THE DEFENDANT SAYS I BROKE MY PROMISE TO HIM. SEEMS TO ME, IF WE JUST GIVE THAT TO THE JURY, NUMBER ONE, IT REMOVES ME FROM THE CONTROVERSY. REMOVES THE COURT FROM THE CONTROVERSY. IT IS THE DETERMINATION -- IT GIVES THE IMPRESSION THAT THE MARSHAL MADE THE DETERMINATION ABOUT THE DIP COMING IN. IT LEAVES IN THERE THE FAILURE OF GETTING THE DIP IS THE REASON THE DEFENDANT GOT IN THE ALTERCATION, NOT THE REFUSAL OF LETTING HIM GO DOWNSTAIRS. IT WAS BOTH REASONS I THINK THAT HE BECAME UPSET. AND, TO ME, THAT SEEMS LIKE A FAIR WAY TO HANDLE IT IN TERMS OF ALLOWING THE JURY TO SHOW HE DID SHOW DISRESPECT FOR AUTHORITY IN A VERY SOLEMN OCCASION, VERY SOLEMN PROCEEDING, BUT YET TRIES TO LEAVE ME OUT OF IT SO THE JURY WON'T HOLD IT AGAINST HIM THAT HE HAS BEEN DISRESPECTFUL TO ME.

THINK ABOUT THAT, AND LET'S TAKE A RECESS. I AM SUPPOSED TO MEET SOMEONE ON AN EMPLOYEE GRIEVANCE AT 4:00 O'CLOCK. SHE IS FROM GREENVILLE. HOPEFULLY, SHE WILL BE HERE EARLY, AND I

CAN FINISH ABOUT 4:00 O'CLOCK, COME BACK DOWN HERE AT 4:00 O'CLOCK. THEN WE WILL GO BACK ON THE RECORD, HEAR MORE ABOUT YOUR THOUGHTS ON BOTH. ALL RIGHT. WE WILL BE IN RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: ALL RIGHT. LET ME HEAR FROM THE GOVERNMENT ON WHAT I HANDED OUT BEFORE THE BREAK.

MR. SCHOOLS: YOUR HONOR, MY UNDERSTANDING, FOR CLARIFICATION, ARE YOU PROPOSING THE VIDEO BE SHOWN AS REFLECTED FROM THE TAPE?

THE COURT: WE HAVE TO DECIDE IF THE VIDEO AUDIO GETS PLAYED OR THE TRANSCRIPT. REGARDLESS, WHAT ABOUT THIS SUBJECT MATTER?

MR. SCHOOLS: SUBJECT MATTER IS FINE. WE WOULD PREFER THAT IT START WITH THE DEFENDANT'S COMMENTS PRECEDING WHERE YOU HAD IT STARTED.

THE COURT: ON WHICH ONE, PAGE 86?

MR. SCHOOLS: PAGE 46.

THE COURT: YOU WANT TO START BACK WITH THE DEFENDANT'S SOLILOQUY?

MR. SCHOOLS: YES, SIR.

THE COURT: WHERE DO YOU WANT TO START?

MR. SCHOOLS: SAME PAGE. I THINK OUR RECORDING STARTS BEFORE THAT.

THE COURT: YOU REQUEST WE ADD THAT PARAGRAPH THAT BEGINS ON LINE FIVE?

MR. SCHOOLS:  YES.

THE COURT:   HE SAYS HE AND MARSHAL RILEY HAVE SOME DIFFICULTY ABOUT SHOWING RESPECT.

MR. SCHOOLS:  THE MAIN REASON, TO OFFER IT, CANDIDLY, OBVIOUSLY, DEPUTY RILEY WOULD DISPUTE THAT THAT IS WHAT TOOK PLACE.

THE COURT:   WHAT IS THE DEFENDANT'S POSITION ON THE SUBJECT MATTER? WE WILL GET TO IN A MINUTE HOW THEY SEE IT, TRANSCRIPT ALONE,  TRANSCRIPT AND AUDIO,  VIDEO, OR ANY COMBINATION THEREOF.

MR. HARRIS:  WE HAVE NOT CHANGED OUR OPINION OR OUR BELIEF ON THE SUBJECT MATTER.

THE COURT:   YOU OBJECT TO ALL OF IT COMING IN. ASSUME, I WILL LET SOMETHING IN.   IF I LET IN JUST WHAT I HAVE MARKED HERE,  DO YOU SUGGEST THAT ANY OTHER PARTS NEED TO COME IN,  AS WELL? I GUESS THAT IS MY QUESTION.

MR. HARRIS:  NO,  WE SUGGEST SOME OF THE PARTS THAT YOU HAVE MARKED NOT COME IN.

THE COURT:   ALL RIGHT.  YOU WANT TO DELETE SOME THINGS FURTHER?

MR. HARRIS:  YES, SIR.

THE COURT:   YOU DON'T THINK ANYTHING ELSE NEEDS TO BE ADDED FROM WHAT I PUT DOWN FOR COMPLETION SAKE?

MR. HARRIS:  NO, SIR.

THE COURT:   TELL ME WHAT YOU NEED TO BE DELETED.

MR. HARRIS: WE CAN GO THROUGH THIS LINE BY LINE. ANY REFERENCE MR. BASHAM IS ADDRESSING THE COURT DIRECTLY WE THINK SHOULD BE DELETED.

THE COURT: ANYTIME HE IS TALKING TO ME?

MR. SCHOOLS: IS THERE A BASIS? I KNOW THAT IS WHAT THEY WOULD LIKE, BUT WHY? HE IS RUNNING HIS OWN MOUTH.

THE COURT: WHAT IS THE BASIS?

MR. HARRIS: IT IS A CONVERSATION BETWEEN THE JUDGE AND THE DEFENDANT. AND THERE ARE, IF YOU LISTEN TO THE TAPE, ESPECIALLY, IT SEEMS TO BE A TOTAL LACK OF RESPECT FOR THE COURT IN THE MANNER IN WHICH HE ADDRESSES, THE TONE HE IS USING. AND, CERTAINLY, IF YOU ARE GOING TO PLAY THE VIDEO.

THE COURT: I DIDN'T THINK THERE WAS MUCH OF HIM TALKING TO ME ONCE THE SCUFFLE STARTED, IS IT?

MR. HARRIS: LOOK AT 146. YOU PROPOSE TO START WITH MR. BASHAM NOT ADDING TO THE DISCUSSION. HE SAYS SPITTING. YOU SPEAK WITH HIM AGAIN, PLEASE BRING IN THE JURY, 147. "I WOULD LIKE TO GO BACK, IF I MIGHT. I DON'T FEEL GOOD." YOU STATED THAT WAS NOT POSSIBLE. HIS RESPONSE WAS, "IT IS NOT POSSIBLE?" LIKE HOW.

THE COURT: I REMEMBER THERE WAS A LITTLE INFLECTION IN HIS VOICE.

MR. HARRIS: YEAH. YOU MAKE ANOTHER COMMENT, "NO, SIR THAT IS NOT POSSIBLE." THE TONE IN YOUR VOICE IS STERN, AS IT SHOULD BE, YOUR HONOR. BUT, NONETHELESS.

THE COURT: I THINK I RAISED MY VOICE SOMEWHERE ALONG IN THERE. MAYBE NOT THERE. I THINK WHEN I SAID "SIT DOWN," I RAISED IT THERE.

MR. HARRIS: WHAT I AM GETTING TO IS THE TONE OF YOUR VOICE IS CHANGING AS THE CONVERSATION BETWEEN YOU AND MR. BASHAM ESCALATES TO THE POINT WHERE HE DID IN FACT.

THE COURT: AS MR. SCHOOLS SAYS, WHAT IS THE BASIS OF KEEPING IT OUT? THE GOVERNMENT WILL SAY, IF THE DEFENDANT CANNOT CONTROL HIS BEHAVIOR IN A COURTROOM SETTING, WHERE HE CANNOT SHOW RESPECT TO THE JUDGE, WHERE HE WILL MAKE VERY IMPORTANT DECISIONS IN THIS CASE, THEN HE IS CERTAINLY NOT GOING TO SHOW RESPECT AND HONOR THE REQUEST OF A LOW-LEVEL CORRECTIONAL OFFICER.

MR. HARRIS: BASICALLY, OVERLY PREJUDICIAL. THAT IS THE BASIS. THE FACT THAT HE IS SPEAKING WITH YOU WITHOUT THE PROPER COURTROOM DECORUM, WITHOUT PROPER RESPECT. THE FACT THAT THE COURT ITSELF HAS TO RAISE ITS VOICE TO A DEFENDANT WHO IS ADDRESSING THE COURT, I BELIEVE, IN AND OF ITSELF, IS OVERLY PREJUDICIAL.

THE COURT: MR. SCHOOLS.

MR. SCHOOLS: I MEAN, MR. HARRIS IS ADVOCATING A RULE THAT SAYS CRIMINAL DEFENDANTS CAN SHOW DISRESPECT TO THE COURT WITH IMMUNITY. THAT IS WHAT HE IS SUGGESTING. THAT IS LUDICROUS. THEY HAVE STOOD UP ON WITNESS AFTER WITNESS WITH DEPUTY RILEY, IN PARTICULAR, TO SUGGEST THAT BECAUSE YOU

ORDERED HIM TAKEN TO THE HOSPITAL THAT THAT GAVE IT SOME SIGNIFICANCE OR SOME REALITY TO THAT ON THE 3RD, TO THE EVENTS ON THE 3RD. THE DEFENDANT HAS SHOWN DISRESPECT TO THE COURT. YOUR HONOR HAS STATED BETTER THAN I COULD HOW IT IS SO PECULIARLY RELEVANT IN THIS CASE TO SUGGEST THAT A CRIMINAL DEFENDANT CAN ADDRESS THE COURT IN ANY TONE, IN ANY FASHION, WITH ANY LANGUAGE HE WANTS TO, WITH THE COMFORT, ACCORDING TO THIS THEORY, THAT IT WOULD NEVER BE USED AGAINST HIM IS RIDICULOUS. I DON'T THINK THAT IT MAKES ANY SENSE IF THE EVIDENCE, IF THERE WAS, YOU KNOW, IN SOME WAYS, JUDGE, IF YOU WERE GOING TO SENTENCE HIM AND NOT THE JURY SENTENCING, ONE WOULD ARGUE AND WOULD REQUIRE THAT YOU BE RECUSED. BUT IN THIS CASE, YOU ARE NOT DOING THAT, THE JURY IS DOING IT. SO, I THINK HIS ABILITY TO RESPOND TO RESPECT AND BE DIRECTED BY AUTHORITY IS DIRECTLY RELEVANT TO HIS ABILITY TO CONFORM TO PRISON LIFE. AND IT IS --

THE COURT: I TOLD MY LAW CLERK OVER LUNCH, YOU WILL NOT FIND ANYTHING IN A LAW BOOK. IT HAS NEVER COME UP BEFORE WHERE THE DEFENDANT GOT IN A SCUFFLE DURING A DEATH PENALTY AND THE GOVERNMENT INTENDS TO USE IT IN THE PENALTY PHASE. I DOUBT IT IS OUT THERE.

MR. SCHOOLS: WE HAVE LOOKED.

THE COURT: IN A TRADITIONAL CRIMINAL CASE WHERE THE JUDGE IMPOSES THE SENTENCE, IF THE DEFENDANT IS UNRULY OR DISRESPECTFUL AT SENTENCING, IS THAT SOMETHING THE COURT CAN

CONSIDER, THE SENTENCING PARTY CAN CONSIDER?

MR. SCHOOLS: THE SENTENCING GUIDELINES SAYS YOU CAN CONSIDER EVERYTHING: BACKGROUND, CHARACTER, EVERYTHING OF THE DEFENDANT IN IMPOSING A SENTENCE. IF A CRIMINAL DEFENDANT, DURING A JUDICIAL SENTENCING PROCEEDING, SHOWS DISRESPECT TO THE COURT, THEN I THINK THE COURT CAN CONSIDER THAT IN DETERMINING WHAT THE APPROPRIATE PUNISHMENT IS.

THE COURT: IN TERMS OF IT BEING A LACK OF REMORSE, GENERALLY?

MR. SCHOOLS: I WOULD IMAGINE, I HAVEN'T LOOKED. I WOULDN'T BE SURPRISED IF THERE WERE NOT AN UPWARD DEPARTURE WHERE DISRESPECT OF THE COURT AND DISRESPECT OF THE LAW WOULD WARRANT UPWARD DEPARTURE. YOU, AS THE SENTENCER, AND EVEN 3593, I THINK, CONTEMPLATES THAT ALL INFORMATION THAT MIGHT BE RELEVANT IS TO COME IN. SO THE REAL ANSWER IS IT COULD. CERTAINLY, IT IS RELEVANT. YOU STATED THE RELEVANCY OF IT. THE ISSUE IS, IS IT UNFAIRLY PREJUDICIAL. I THINK, AS YOU SAID YESTERDAY, IT IS NECESSARY TO FOCUS ON THAT WORD "UNFAIR." I THINK IT WOULD BE UNFAIR IF MR. BASHAM WERE NOT THE AUTHOR OF HIS OWN DILEMMA, WHICH IS WHAT HE PRECISELY NOW IS. WHAT WOULD BE UNFAIR IS TO GIVE HIM THE BENEFIT OF THIS SUPPOSED PREJUDICE BECAUSE HE BROUGHT IT OUT. THAT IS HANDICAPPING THE GOVERNMENT AND KEEPING INFORMATION FROM THIS JURY THAT WOULD BE DIRECTLY RELEVANT TO WHAT IS THE MOST IMPORTANT DECISION THEY CAN MAKE IN A COURTROOM.

THE COURT: ALL RIGHT. MR. SWERLING.

MR. SWERLING: JUDGE, THIS OBVIOUSLY IS A VERY UNIQUE SITUATION, AND I THINK THAT IS WHY YOU ARE NOT GOING TO FIND CASE LAW, AND THAT IS WHY WE WERE ASKING YOU TO CONSIDER AND WEIGH THIS UNDER THE UNFAIR PREJUDICE STANDARD. IT IS UNIQUE BECAUSE THE SITUATION WOULD NOT HAVE BEEN CREATED HAD IT NOT BEEN FOR WHAT HAPPENED THE FRIDAY BEFORE WHERE, UNFORTUNATELY, I SUGGESTED SOME METHOD TO KEEP HIM CALM, BASED UPON WHAT I PERCEIVED FROM SOME OF HIS PAST RECORDS INDICATED, HIS NEED AND DESIRE FOR NICOTINE. I ONLY DID IT BECAUSE I THOUGHT IT WOULD MAKE THE TRIAL EASIER TO TRY, IT WOULD KEEP HIM CALM, AND IT HAS. I MEAN, FOR ALL PRACTICAL PURPOSES, SINCE HE HAS BEEN USING THAT DIP, WE HAVEN'T HAD ANY REAL PROBLEM, BEEN SOME VERBAL STUFF, BUT NOTHING COMING -- RISING TO THE LEVEL OF WHAT HAPPENED WITH THE CIGARETTE THAT HAPPENED.

THE COURT: HE IS STILL GETTING IT ON HIS AFTERNOON BREAK?

MR. SWERLING: YES.

THE COURT: OR BOTH?

MR. SWERLING: MORNING AND AFTERNOON.

THE COURT: THAT IS ONE THING I NEGLECTED EARLIER. REDACTING AS I DID ASKING FOR ALL SUBSEQUENT PASSAGES WHERE YOU ASKED FOR IT DURING LUNCH, IT GIVES THE JURY THE IDEA THAT HE GOT HIS WAY, GETTING DIP. I THOUGHT THAT WAS THE END OF

IT, TOO.

MR. SCHOOLS: JUST TO BE CLEAR, I HOPE, I AM SORRY TO INTERRUPT, I WANT TO MAKE SURE I AM NOT WAIVING ANYTHING. WE STILL INTEND TO GET IN WITH THE EXPERTS IF THEY TESTIFY.

THE COURT: YOU WANT IT TO COME IN THROUGH TESTIMONY OF OBSERVER WITNESSES OR SOMETHING?

MR. SCHOOLS: FOR HIS EXPERTS. I MEAN, PERHAPS, OR OUR EXPERTS TO TALK ABOUT, YOU KNOW, WE HAVE NOW AGREED THE ENTIRE TRIAL PROCEEDING CAN BE DISCLOSED TO THE EXPERTS. I THINK I WILL BE ABLE TO POTENTIALLY CROSS-EXAMINE HIS EXPERTS ABOUT THOSE SUBSEQUENT MANIPULATIONS OR --

THE COURT: YOU WANT TO GET INTO THE FACT THAT HE DID GET DIP EVENTUALLY?

MR. SCHOOLS: YES, SIR. WE DON'T NEED TO DO IT RIGHT NOW. BUT I THINK IT IS COMING. I SAY THAT FOR PURPOSE OF MAKING THE PREJUDICE ANALYSIS.

MR. SWERLING: JUDGE, THAT EVEN STRENGTHENS THE SITUATION WE ARE TALKING ABOUT. HAD IT NOT BEEN -- MR. BASHAM'S REACTION THAT DAY WAS NOT OUT OF DISRESPECT FOR THE COURT, BUT WHAT HE THOUGHT WAS A BREACH BETWEEN HE AND THE COURT AS TO WHAT HAPPENED ON THE FRIDAY BEFORE, THAT HE WAS GOING TO GET SOMETHING THAT, IN HIS MIND, THAT WAS PROMISED TO HIM. AND WHEN IT WAS NOT GOING TO BE FORTHCOMING, YOUR HONOR, YOU WERE VERY GENEROUS ABOUT IT, WHEN IT WAS NOT FORTHCOMING, HE WANTED TO GET -- HE JUST GOT VERY UPSET. AND

BASED ON THAT, WHAT HE PERCEIVED AS THAT TRUST BETWEEN YOU AND HE, SO HE GOT STARTED GETTING AGITATED AND ESCALATED, OF COURSE. YOU HAVE HEARD TESTIMONY ABOUT THAT, HOW HE DOES GET THAT WAY. AND, IF YOUR HONOR REMEMBERS, WHAT I TRIED TO DO IS TRIED TO GET HIM OUT OF THE COURTROOM, BECAUSE I WAS STANDING NEXT TO HIM AND I COULD SEE WHAT WAS HAPPENING. AND YOUR HONOR RIGHTFULLY HAD TO TELL HIM TO SIT DOWN, BUT THAT IT HAD ALREADY ESCALATED TO A POINT WHERE WE WEREN'T GOING TO BE ABLE TO CONTROL THE SITUATION, AND I HAD SEEN THAT.

AND I THINK WHAT ACTUALLY PRECIPITATED THE REAL STRUGGLE IS, WHEN HE WOULDN'T SIT DOWN, THE MARSHALS PUT THEIR HANDS ON HIM, AND THEN IT ALL BROKE LOOSE. SO, WHAT I SUGGEST TO YOU IS, IT IS JUST A VERY UNIQUE SITUATION THAT CAME ABOUT AS A RESULT OF CIRCUMSTANCES THAT WOULD PROBABLY NEVER BE REPEATED ANYWHERE ELSE. BUT IT DID HAPPEN. LIKE I SAID, I REGRET EVEN SUGGESTING IT, BUT WE ARE WHERE WE ARE.

THE COURT: ACTUALLY, LIKE I SAID THE OTHER DAY, IF I HAD TO DO IT OVER, I WOULDN'T HAVE DONE IT. I JUST REALIZED AS I HAVE SAT HERE, I HAVEN'T REIMBURSED MY LAW CLERK FOR THE MONEY SHE SPENT TO BUY IT. I'M PROBABLY THE ONLY JUDGE THAT BOUGHT THE DEFENDANT MATERIALS DURING THE GAME.

MR. SWERLING: YOU BOUGHT NICOTINE GUM. I BOUGHT IT THAT WEEKEND. YOU ARE RIGHT. IT IS VERY EXPENSIVE. THE DIP IS NOT QUITE AS EXPENSIVE JUDGE.

JUDGE, BECAUSE IT IS A DEATH PENALTY CASE, UNIQUE

SITUATION, THE JURY WILL MAKE THE DECISION BETWEEN LIFE AND DEATH IN THIS CASE. THE GOVERNMENT HAS HAD SOME SIGNIFICANT EVIDENCE ALREADY GO IN FRONT OF THE JURY, AND IF MR. BASHAM'S CONDUCT IN THE COURTROOM WHILE THE JURY WAS OUT COMES IN BEFORE THIS JURY, I THINK THAT IS AN UNFAIR PREJUDICE BASED UPON UNIQUE CIRCUMSTANCES WHICH REALLY IS INFLAMMATORY.

THE COURT: THE POINT TO BE MADE, THOUGH, I THINK IN PRISON HE WILL HAVE SITUATIONS WHERE HE IS TOLD "NO." HE MIGHT, YOU KNOW, MIGHT BE PROMISED A BIGGER CELL ONE DAY AND FOR SOME REASON, IT DOESN'T WORK OUT, HE HAS TO STAY IN HIS CELL AGAIN. IF HE CAN'T HANDLE BEING TOLD "NO," YOU KNOW, IN PRISON, IT IS ALWAYS A QUESTION OF WHO STARTED IT OR WHO WAS -- WHO HAD A PRE-EXISTING AGENDA OR SOMETHING BETWEEN THE GUARDS AND THE PRISONER. HERE, I HAVEN'T DONE ANYTHING TO THE DEFENDANT TO GIVE HIM ANY REASON TO BE DISRESPECTFUL TO THE COURT. LIKE I SAID, I TRIED TO WORK WITH HIM EVERY WAY I COULD. THE GOVERNMENT WILL SAY, WELL, THAT JUST SHOWS, EVEN IN A SITUATION WHERE THE OTHER PARTY DOESN'T HAVE ANY PRE-EXISTING ANIMOSITY LIKE A PRISON GUARD MIGHT, HE DOES NOT RESPECT AUTHORITY. THAT IS THEIR ARGUMENT. I KNOW IT IS PREJUDICIAL, IT CERTAINLY IS. I JUST DON'T KNOW IF IT IS UNFAIRLY PREJUDICIAL.

MR. SWERLING: JUDGE, THEY HAVE A LOT OF EVIDENCE IN ALREADY FROM WHICH THEY CAN ARGUE THAT HE RESISTS AUTHORITY. BUT YOUR HONOR'S AUTHORITY IS A MUCH MORE SIGNIFICANT

SITUATION. AND, ESPECIALLY, AS IT OCCURRED DURING THE DEATH PENALTY TRIAL WHILE THE JURY WAS OUT, THAT IS WHAT GIVES ME SOME CONCERN. AND, AGAIN, I DON'T THINK MR. BASHAM WAS TRYING TO DISRESPECT THE COURT'S AUTHORITY. I THINK HE JUST DEALT WITH THE SITUATION BASED UPON WHAT I HAVE ALREADY SAID. NO NEED TO REPEAT IT. BUT BECAUSE IT IS SUCH A UNIQUE SITUATION, BECAUSE WE ARE INVOLVED IN A DEATH PENALTY CASE AND THE CHANCES OF PREJUDICE ARE SO GREAT THAT THAT COULD INJECT SOME ARBITRARY, CAPRICIOUS FACTOR BEFORE THE JURY, WE ARE JUST ASKING THE COURT TO EXCLUDE IT.

MR. GASSER: YOUR HONOR, IN CONJUNCTION WITH MR. SCHOOLS'S ARGUMENT, I AM NOT GOING TO REHASH THAT ARGUMENT. ONE OF THE MAJOR ISSUES IN THIS CASE THAT WE ARE GETTING READY TO GET INTO WHEN THE GOVERNMENT RESTS IS THE BATTLE OF EXPERTS. THE DEFENSE WILL PUT UP A SERIES OF EXPERTS THAT ARE GOING TO SAY THAT HE HAS ALL OF THESE PROBLEMS AND HE NEEDS ALL OF THIS MEDICATION BECAUSE OF ALL OF THESE MENTAL HEALTH ISSUES. WE ARE GOING TO CALL IN REPLY AT LEAST DR. CAPEHART, ONE EXPERT WHO WOULD OPINE IF, HYPOTHETICALLY SPEAKING, IF HE GETS LIFE IN PRISON, SENT TO BUTNER, ONE OF THE FIRST THINGS DR. CAPEHART WILL DO IS TAKE HIM OFF OF HIS MEDICATION. THAT WILL, I WILL SUBMIT TO THE COURT, IF NOT THE MOST, BUT ONE OF THE TOP TWO OR THREE MOST IMPORTANT ISSUES BETWEEN THE EXPERTS. AND THIS EVENT IS, YOU DON'T GET A BETTER PIECE OF EVIDENCE THAN THIS EVENT. THIS EVENT,

IN THE GOVERNMENT'S EYES, CLEARLY INDICATES THAT MR. BASHAM, HE IS MEDICATED, HE IS MEDICATED, HE ASKS FOR DIP. HE DOESN'T CONTROL HIMSELF WHEN HE IS MEDICATED AND HAS THIS OUTBURST. HE GETS HIS DIP, AND HE CONTROLS HIMSELF. IT IS THE GOVERNMENT'S POSITION THAT YOU COULD THROW AWAY ALL OF HIS MEDICATION AS LONG AS HE GETS WHAT HE WANTS AND HE GETS HIS DIP. AND THIS EXAMPLE OR WHAT HAPPENED IN THIS COURTROOM IS A PERFECT EXAMPLE OF THAT. IT WILL SUPPORT -- IN THE GOVERNMENT'S VIEW, WE WILL BE ABLE TO USE IT IN CROSS-EXAMINING THE DEFENSE EXPERTS TO MAKE OUR POINT, AND IT WILL BOLSTER THE GOVERNMENT'S EXPERT TO MAKE HIS POINT. AND THIS IS THE PERFECT, PRIME EXAMPLE THAT AN EVENT LIKE THIS CAN OCCUR, AND HIS CONDUCT OCCURRED RIGHT HERE IN THIS COURTROOM. IT IS NOT SIMPLY WHAT MR. SCHOOLS WAS SAYING, IT IS RELEVANT FOR -- IT GOES TO THE HEART OF WHAT THE BATTLE OF THE EXPERTS IS IN THIS CASE.

MR. SCHOOLS: ALONG THOSE LINES, JUDGE, YOU KNOW, WE THOUGHT THE ISSUE WAS NICOTINE. IT BECAME CLEAR THAT WAS REALLY NOT THE ISSUE. YOU GAVE HIM NICOTINE GUM. HE HAD ACCESS TO NICOTINE. THAT CALMED HIM DOWN. IT WAS THE FACT HE GOT WHAT HE WANTED. WE SHOULD BE ABLE TO ARGUE TO THE JURY, WE WILL ARGUE WITH EXPERTS AND EVERYONE ELSE. HE HAS AN ABSOLUTE SPASM. IF FOR SOME REASON THE LAWYER WALKS IN THERE AS SOON AS THE BREAK, STARTS TO START DIPPING, IT IS NOT BECAUSE OF NICOTINE TO CALM HIM DOWN, HE IS ON SEROQUEL,

NEURONTIN, ZOLOFT, AND EVERY OTHER DRUG -- VALIUM, EVERY OTHER DRUG YOU CAN NAME TO DO THAT FOR HIM.  I DON'T THINK NICOTINE IS WHAT IS SENDING HIM OVER THE EDGE WITH CALMNESS. IT IS THE FACT HE GOT WHAT HE WANTED.

MR. SWERLING:  WHEN YOU GET A CHANCE --

THE COURT:   I WILL HEAR FROM YOU.

MR. SWERLING.

MR. SWERLING:  WANTED TO ADD ONE THING AND NOT BELABOR IT.  THE PROBLEM THAT I SEE IS THAT IF IT ALL DOESN'T COME IN,  WHICH WE THINK IS REALLY PREJUDICIAL AND WOULD RISE TO AN UNFAIR PREJUDICE AND BE INFLAMMATORY,  IF IT ALL DOESN'T COME IN, THERE IS NO WAY TO EXPLAIN WHAT GOT MR. BASHAM SO UPSET.  THAT IS WHAT REALLY CONCERNS ME.  BECAUSE,  TO TAKE IT OUT OF CONTEXT --

THE COURT:  I UNDERSTAND THAT.  BUT I TRIED TO, IN THE EDIT I GAVE YOU, I TRIED TO LEAVE IN THE IDEA THAT HE DIDN'T GET HIS DIP BASED ON THE MARSHAL'S RECOMMENDATION. AND THEN, WHEN HE DIDN'T GET HIS DIP,  DIDN'T GET TO GO DOWNSTAIRS, THAT IS WHEN THE SCUFFLE ENSUED.  TRIED TO LEAVE ENOUGH IN THAT THIS JURY GOT A FLAVOR.  ARE YOU SAYING I NEED TO LET MORE IN THAN WHAT I HAVE LEFT IN?

MR. SWERLING:  IT IS THE COLLOQUY BETWEEN HIM AND THE COURT.  THE SITUATION BETWEEN HIM AND THE COURT.  IF IT ALL DOESN'T COME IN,  IF WE ARE NOT EVER GOING TO BE ABLE TO EXPLAIN OR OFFER ANY EXPLANATION AS TO WHY MR. BASHAM'S

CONDUCT DEVELOPED THE WAY IT DID, WHY HE WOULDN'T SIT DOWN, AND THAT IS THE PROBLEM. I CERTAINLY DON'T WANT IT ALL TO COME IN. IT IS NO WAY TO EXPLAIN THIS SITUATION. THAT IS WHY I THINK IT IS SUCH A UNIQUE DILEMMA.

THE COURT: THE FIRST QUESTION WAS THAT I ASKED, DOES THE DEFENDANT INSIST MORE NEEDS TO COME IN FOR COMPLETENESS? I THOUGHT YOU SAID, "NO."

MR. SWERLING: WHAT I AM TRYING TO DO IS EXPLAIN WHY WE THINK IT IS SO PREJUDICIAL, BECAUSE WE CAN'T AGREE TO DELETE THE REFERENCES TO THE COURT BECAUSE THERE IS NO WAY TO REALLY EXPLAIN THIS SITUATION. WHAT IT WOULD LOOK LIKE IS MR. BASHAM DIDN'T -- DID NOT GET HIS WAY FROM THE MARSHAL, JUST DENIED THE DIP AND THAT HE REACTED IN THE WAY HE DID. AND WE ALL KNOW THAT IS NOT REALLY THE CASE. THAT WAS NOT THE SITUATION. IT WAS NOT JUST A SIMPLE REJECTION THAT HE COULD NOT HAVE IT FROM THE MARSHAL. AND THAT IS THE PICTURE WE HAVE TO FRAME IN FRONT OF THE JURY. NO ONE WOULD EVER BE ABLE TO EXPLAIN IT.

THE COURT: YOU WANT TO ADD SOME PARTS THAT REFER TO THE PROMISE BEING MADE OR THE REFERENCE BEING MADE THAT HE GET IT?

MR. SCHOOLS: THAT IS WHAT WE HAD SUGGESTED EARLIER, JUDGE. WE HAVE ENOUGH OF THE OTHER, EITHER BY TRANSCRIPT OR TESTIMONY. ON FRIDAY, THE 17TH, YOU PROMISED MR. BASHAM DIP; ON MONDAY, THE 20TH, YOU RECEIVED SOME INFORMATION FROM THE

MARSHALS THAT CAUSED YOU TO CHANGE YOUR MIND, YOU CHANGED IT,
HE WENT NUTS.

THE COURT:  ALL RIGHT.  HERE IT IS ON PAGE 6 OF THE
TRANSCRIPT.

"THE COURT:  MR. BASHAM, WE ARE
ALMOST TO THE END OF THE DAY TODAY.
IF YOU CAN SIT THERE AND STAY AWAKE
TODAY, WE WILL HAVE CHEWING TOBACCO
MONDAY WHEN WE COME BACK.  WORK
WITH US, STAY AWAKE TODAY, WE WILL
HAVE CHEWING TOBACCO FIRST THING
MONDAY MORNING.  DO YOU HAVE A
FAVORITE BRAND?
THE DEFENDANT:  KODIAK WINTER GREEN.
IT IS A DIP.  IT HELPS ME STAY
CALM.  YEAH, IT WOULD REALLY HELP
TO STAY AWAKE.
THE COURT:  THANK YOU FOR THAT
SUGGESTION."
ARE YOU SUGGESTING THAT OUGHT TO COME IN, AS WELL?

MR. SCHOOLS:  THAT IS FINE WITH US.  AS FAR AS NOT
HAVING ANY WAY TO EXPLAIN IT, THEY HAVE TWO WAYS TO EXPLAIN
IT.  NUMBER ONE, MR. BASHAM COULD TAKE THE WITNESS STAND AND
EXPLAIN IT HIMSELF.  OR HAVE DR. SCHWARTZ-WATTS, OR
DR. BRAWLEY, OR DR. MORGAN, OR DR. BRANNON, OR IN WHATEVER

DOTOR THEY WANT TO DO IT, TAKE THE WITNESS STAND AND SAY HE ESCALATED IN THE COURTROOM, HE DIDN'T PROCESS THE INFORMATION ABOUT BEING REFUSED THE DIP. THERE IS A WAY TO DO THESE THINGS. VERY SIMPLE AND LEGITIMATE WAY FOR THEM TO RESPOND TO ALL OF THIS.

THE REMEDIES FOR SOMETHING LIKE THIS IS NOT TO KEEP IT OUT, GET IT IN, LET THEM EXPLAIN IT.

THE COURT: ON PAGE 6, BACK UP TO WHERE I SAID -- MR. SWERLING SAID, IF I COULD MAKE A UNUSUAL REQUEST, MAKE AN UNUSUAL REQUEST. IN BRANDON'S BACKGROUND, HE GETS DIP. DO YOU HAVE THE AUDIO?

MR. SCHOOLS: THE ONLY THING WE HAVE IS THE AUDIO.

THE COURT: YOU WANT TO GET THE AUDIO OF WHATEVER I LET IN? DO YOU WANT THE AUDIO OF EVERYTHING, AS WELL?

MR. SCHOOLS: WE WILL READ IT. THERE IS SOME EVIDENTIARY VALUE TO THE AUDIO WITH RESPECT TO THE FIGHT. WITH RESPECT TO THE PRIOR CONVERSATIONS BETWEEN THE COURT, IT IS REALLY JUST THE SECOND OF IT WE WEREN'T IN HERE, WE DON'T KNOW ABOUT THE TONE.

THE COURT: NORMAL CONVERSATION. I HAVE DETERMINED I WILL ALLOW IN WHAT I MARKED, PLUS PAGE 6 AND 7 OF THE SEPTEMBER 17TH HEARING WHERE MR. SWERLING ASKED FOR THE DIP, AND I SAID I WOULD GIVE HIM THE DIP, AND I MAKE A PROMISE HE WILL HAVE THE DIP. THAT PUTS IT IN CONTEXT. WHEN WE COME BACK, THE MARSHAL SAYS HE OPPOSES IT. I SAY HE CAN'T HAVE

IT. ASSUMING THAT WILL COME IN, ONE WAY OR THE OTHER, WOULD THE DEFENDANT PREFER WE DO IT JUST BY WAY OF TRANSCRIPT WITH NO AUDIO AND NO VIDEO, TO ELIMINATE THE RAISED VOICES FROM ME TO THE DEFENDANT AND FROM THE DEFENDANT BACK TO ME? I THINK I COULD ONLY DO THAT IF THAT IS THE DEFENDANT'S REQUEST BECAUSE THE TRANSCRIPT IS REALLY NOT EVIDENCE. EVIDENCE WOULD BE THE VIDEO, AND AUDIO, AND EYE WITNESS TESTIMONY. BUT IN AN EFFORT TO AVOID PREJUDICE TO THE DEFENDANT FROM THE RAISED VOICES, I AM JUST ASKING IF YOU COULD LIVE WITH PUBLISHING THE DEPOSITION AND DISPENSING WITH BOTH AUDIO AND VIDEO.

MR. HARRIS: YES, SIR. BUT WE STILL HAVE AN ISSUE WITH RELEVANT PORTIONS OF THE TRANSCRIPT. I DON'T KNOW THAT YOU REALLY RULED ON THE RELEVANT PORTIONS. THERE IS ONE WE DIDN'T GET TO.

THE COURT: WHEN WE FIRST CAME OUT, I SAID, I GAVE YOU WHAT I PROPOSED TO READ, DO YOU WANT TO ADD TO IT? YOU SAID, "NO." AND THEN I, JUST A MINUTE AGO, I SAID I WOULD ADD 6 AND 7 FROM THE 17TH HEARING, BUT I HAVE SAID --

MR. HARRIS: I WANT TO TAKE SOME OUT. I WAS IN THE PROCESS OF EXPLAINING WHAT PORTIONS.

THE COURT: YOU WANT SOMETHING DELETED FROM WHAT I MARKED? ALL RIGHT.

MR. HARRIS: I UNDERSTAND THE COURT'S RULING.

THE COURT: LET'S'S TALK ABOUT DELETIONS LATER. LET ME FIND OUT IF WE WILL USE VIDEO AND AUDIO OR NOT. YOU

WANT TO THINK ABOUT IT AND TALK TO YOUR CLIENT?

MR. HARRIS: DO NOT WANT VIDEO AND AUDIO.

THE COURT: DO NOT.

MR. HARRIS: DO NOT.

THE COURT: WHAT ABOUT THAT, FROM THE GOVERNMENT?

MR. SCHOOLS: WE WANT IT ALL.

THE COURT: I KNOW YOU WANT IT ALL.

MR. SCHOOLS: JUDGE, THE AUDIO IS CRITICAL. FRANKLY, THE VIDEO, IF I WAS IN THEIR SHOES, I WOULD WANT THE VIDEO ON, IT DOESN'T LOOK THAT BAD. THE AUDIO IS CRITICAL. HERE WHEN MR. BASHAM SHOUTS TO THE MARSHALS, DON'T GRAB ME, IT IS -- YOU CAN'T RECREATE THAT. IT IS THE ABSOLUTE BEST EVIDENCE OF WHAT WAS GOING ON AT THAT VERY MOMENT IN THIS COURTROOM. AND I JUST CANNOT IMAGINE WHY A CRIMINAL DEFENDANT IS ALLOWED TO MAKE THE CHOICE THAT HE MADE AND NOT HAVE TO SUFFER THE CONSEQUENCES OF IT BECAUSE THE DEFENDANTS DON'T LIKE IT. WELL, MR. HARRIS AND MR. SWERLING ARE ABSOLUTELY DOING THEIR JOB. I DON'T HAVE ANY PROBLEM WITH THEIR POSITION, BUT THEY ARE NEVER GOING TO AGREE, JUDGE. IT HURTS THEIR CLIENT. IT IS NOT BECAUSE IT IS UNFAIR, IT IS BECAUSE IT IS SO FAIR, SO RELEVANT, SO CRITICAL SO THE JURY IS UNDERSTANDING WHO THAT MAN IS OVER THERE THAT THEY HAVE TO SENTENCE.

THE COURT: MR. SCHOOLS --

MR. SCHOOLS: I WANT TO RAISE ONE OTHER ARGUMENT WITH

RESPECT TO THE PREJUDICE ARGUMENT. YOU MAY RECALL MR. HARRIS'S OPENING HE SAID WHY BRANDON BASHAM MADE CERTAIN DECISIONS, WHY HE WOULD SLEEP DURING THE GUILT PHASE, WHY HE WOULD ACT OUT WHEN IT IS IN HIS BEST INTEREST NOT TO. WHEN THEY ARGUE IT IS A PREJUDICIAL EVENT, IT WOULD SEEM, TO THE GOVERNMENT, IF THEY ARE CORRECT ABOUT THE DEFENDANT'S DIAGNOSIS, THAT THIS IS THE BEST EVIDENCE OF THAT, TOO. SO, I DON'T UNDERSTAND HOW IT IS THAT THE DEFENDANTS HAVE DECIDED THEY PREFER TO NOT HAVE IT THAN HAVE IT, THE EVIDENCE THAT COULD BE CLEARLY ARGUED BOTH WAYS TO THIS JURY, CLEARLY USED BY THEIR EXPERTS TO SUGGEST THAT AT NO POINT DID MR. BASHAM HAVE A HIGHER INCENTIVE TO BEHAVE THAN IN HERE IN FRONT OF YOU, EXCEPT PERHAPS IN HERE IN FRONT OF THE JURY. IN HERE IN FRONT OF YOU WOULD PROBABLY BE THE NUMBER TWO SPOT WHERE HE SHOULD BE HEADED. HE CLEARLY INTENSIFIED. IF HE HAS ANY UNDERSTANDING AT ALL OF WHAT HE IS FACING AND HOW THINGS IMPACT HIM, THEN HE WOULDN'T HAVE DONE THAT. THAT IS THE WAY TO ADDRESS THAT EVIDENCE. TO KEEP IT OUT BECAUSE THEY CLAIM IT IS TOO PREJUDICIAL IS JUST GIVING THEM A BENEFIT THAT REALLY HAS NO BASIS IN LAW. THAT IS WHY I ARGUE THE PREJUDICE PART, NOT BECAUSE THEY GET TO MAKE THE CHOICE THEY MAKE, I DON'T FAULT THEM FOR IT. I SAY, WHEN THE FOURTH CIRCUIT COURT OF APPEALS OR WHOEVER IT IS IS LOOKING AT PREJUDICE ANALYSIS, IT SEEMS TO THE GOVERNMENT ONE THING THAT SHOULD BE CONSIDERED IS, WHAT IS THE DEFENDANT ARGUING TO THE JURY? HE

IS ARGUING HE CAN'T CONTROL HIS IMPULSES.  SO NOW, HE DOESN'T CONTROL HIS IMPULSES, THEY DON'T WANT THE JURY TO HEAR ABOUT THAT.  IT DOESN'T MAKE ANY SENSE.  CLEARLY, IT IS NOT PREJUDICIAL IN THAT SENSE.  IT SOUNDS BAD, BUT, YOU KNOW, THEIR EXPERT WILL TESTIFY, I AM SURE, IF YOUR HONOR LETS IN ANY PORTION OF THIS, THAT THAT IS A PERFECT EXAMPLE OF HIS INABILITY TO CONTROL HIS IMPULSES.

THE COURT:  ALL RIGHT.  WELL, LET ME JUST SAY, FOR PURPOSES OF MAKING A COMPLETE RECORD IN CASE AN APPEAL IS TAKEN, IF ONE IS TAKEN, I AM SURE THIS IS ONE ON APPEAL.  I NEED TO GO BACK AND RECITE WHAT HAPPENED TO GET US TO THIS POINT.  IT WAS AT SOME POINT ABOUT MIDWAY THROUGH THE JURY SELECTION PROCESS, I THINK, THAT I NOTICED THAT MR. BASHAM WAS PUTTING HIS ARMS DOWN ON THE TABLE, AND LEANING FORWARD, AND I COULDN'T TELL IF HE WAS DOZING OFF, OR RESTING, OR WHAT. AT THE NEXT BREAK, MR. SWERLING VOICED HIS CONCERN, MAYBE MR. HARRIS, THAT THE DEFENDANT APPEARED TO BE NODDING OFF AND NOT PARTICIPATING.  JURY SELECTION IS NOT QUITE AS CRITICAL AS THE TRIAL.  IT IS STILL A CRITICAL STAGE OF THE PROCEEDINGS.  I BECAME CONCERNED THAT IF THE DEFENDANT SLEPT THROUGH THE PROCEEDINGS, THAT SIX YEARS FROM NOW, WHEN ALL OF THE LAWYERS HAVE MOVED ON TO OTHER THINGS, LAW CLERKS ARE ALL GONE, ONE PERSON LEFT WOULD BE ME STILL IN THIS CASE.  THERE WILL BE A SUGGESTION FROM THE DEFENDANT, IF HE IS CONVICTED AND GETS THE DEATH PENALTY, THAT HE SLEPT THROUGH HIS WHOLE

TRIAL. AN ACCUSATION WOULD BE THE MARSHAL GAVE HIM A DOUBLE DOSE OF HIS MEDICATION TO MAKE HIM DROWSY. I WANTED TO AVOID THAT AT ALL COSTS. I HAD A VESTED INTEREST IN KEEPING THE DEFENDANT AWAKE. I SUGGESTED WE PROVIDE HIM SOME COFFEE TO KEEP HIM AWAKE. TO THAT END, I HAD MY LAW CLERK GO BACK TO MY OFFICE AND GET COFFEE THAT WE HAD TO MAKE. IT WAS MID-AFTERNOON, I THINK, WE HAD TO MAKE A FRESH POT OF COFFEE. BROUGHT HIM OUT A LARGE CUP OF COFFEE. MY LAW CLERK HAND-DELIVERED IT TO THE DEFENDANT JUST OUT OF A DESIRE TO KEEP HIM AWAKE AND KEEP THE TRIAL MOVING FORWARD.

AT THE END OF THE DAY, I WAS TOLD BY THE MARSHALS I SHOULDN'T HAVE DONE THAT, THAT THE CUP CONSTITUTED A POTENTIAL WEAPON. I THINK IT WAS A VERY LIGHT PLASTIC CUP. IN ANY EVENT, THE MARSHAL DID NOT LIKE THE FACT I HAD GIVEN HIM COFFEE.

WE MOVED FORWARD, AND WE GOT INTO THE TRIAL. AND, AT SOME POINT, HE APPEARED TO BE DOZING AGAIN, AND THAT IS WHEN WE GOT INTO THE QUESTION ABOUT DIP. AND DR. SCHWARTZ-WATTS WAS BROUGHT IN, SHE DIDN'T RECOMMEND IT, I MISTAKENLY EARLIER SAID SHE HAD RECOMMENDED IT, IT WAS NOT, IT WAS MR. SWERLING WHO FIRST RAISED THE ISSUE. I JUMPED RIGHT ON IT. I SAID, IF THAT IS WHAT IT TAKES TO KEEP THE DEFENDANT AWAKE AND ACTIVE IN THESE PROCEEDINGS, IT IS THE THING TO DO. NOT A VERY INTRUSIVE THING, NOT A VERY EXPENSIVE THING. I DIDN'T SEE ANY DANGER ASSOCIATED WITH IT. I SAID ON FRIDAY, BEFORE

WE ADJOURNED ON THAT PARTICULAR DAY, IF THE DEFENDANT WOULD BEHAVE AND STAY WITH US, I WOULD GET HIM DIP ON MONDAY. I USED THE WORD "PROMISE." AGAIN, OUT OF A DESIRE TO KEEP THE TRIAL MOVING FORWARD, TO AVOID ANY DISRUPTIONS AND TO KEEP THE DEFENDANT IN A STABLE STATE OF MIND -- I THINK I SKIPPED OVER. I BELIEVE SOMEWHERE ALONG IN THERE THERE WAS A REQUEST BY THE DEFENDANT TO GO DOWNSTAIRS AND WATCH THE PROCEEDINGS ON VIDEO. I REJECTED THAT AT SOME POINT ALONG THE WAY.

WHEN I CAME BACK ON THE FOLLOWING MONDAY, THE MARSHAL INFORMED ME THE DIP CONSTITUTED A HAZARDOUS PRODUCT. THAT HE COULD SPIT IN THE CUP, AND, ACCORDING TO THE MARSHAL, THAT SPIT WOULD CONSTITUTE A VILE HAZARD. IT WAS REPORTED TO ME THAT THE DEFENDANT HAD ON AT LEAST ONE OCCASION THROWN A LIQUID AT A GUARD IN THE PRISON THAT MIGHT HAVE BEEN SEMEN OR SOME OTHER DANGEROUS SUBSTANCE. ACTING ON THAT INFORMATION, I HAD TO RENEGE ON MY PROMISE TO THE DEFENDANT TO GIVE HIM DIP. AND THAT ALL OCCURRED ON THE -- WHAT WAS THE DATE OF THE ALTERCATION?

MR. SCHOOLS: THE 20TH.

THE COURT: THE 20TH OF SEPTEMBER. WHAT HAPPENED IN THE RECORD, IT HAS BEEN HOTLY DEBATED ABOUT WHAT SHOULD BE DONE IN TERMS OF HOW MUCH OF IT IS DISCLOSED TO THE JURY. AND, OF COURSE, I HAVE BEEN AWARE THAT THIS WAS GOING TO BE AN ISSUE FOR QUITE SOME TIME. I HAVE GIVEN IT A GOOD DEAL OF THOUGHT. I DID NOT HAVE ACCESS TO THE ACTUAL TRANSCRIPT

UNTIL A COUPLE OF DAYS AGO, BUT I HAVE TAKEN A NIGHT TO LOOK AT IT. IT IS MY DETERMINATION, AFTER HEARING FULLY FROM BOTH SIDES, THAT THIS IS AN EPISODE THAT IS FAIR TO LET THE JURY BE INFORMED ABOUT. AS MR. SCHOOLS POINTS OUT, IN SOME WAY IT IS CONSISTENT WITH THE DEFENDANT'S DEFENSE IN THIS CASE IN TERMS OF HIS MEDICAL-TYPE DEFENSE. BUT FOR THE GOVERNMENT'S PURPOSES, THE REASON THE GOVERNMENT WANTS TO INTRODUCE IT IS TO SHOW THAT THE DEFENDANT, ACCORDING TO THE GOVERNMENT, CANNOT CONTROL HIS IMPULSES, AND CANNOT FATHOM BEING TOLD "NO" TO ANYTHING, IS USED TO GETTING HIS WAY. I DON'T HAVE ANY OPINION ABOUT THAT. THAT IS FOR THE JURY TO DECIDE.

BUT I DO DETERMINE THAT THE RELEVANT EVENTS ABOUT LEADING UP TO THE COURTROOM ALTERCATION ON THE 20TH ARE RELEVANT AND ADMISSIBLE IN THIS CASE. AND AFTER MUCH THOUGHT AND REFLECTION, HAVE DETERMINED THE PROBATIVE VALUE IS NOT OUTWEIGHED BY THE PREJUDICE, OR CONFUSION, OR MISLEADING OF THE JURY.

I PROPOSE WE READ PAGES 6 AND 7 OF THE SEPTEMBER 17TH TRANSCRIPT, WHICH IS A FAIRLY BRIEF DISCUSSION OF A PROMISE TO GIVE HIM DIP AFTER MR. SWERLING REQUESTS IT. AND THEN MOVE FORWARD TO THE TRANSCRIPT OF THE 20TH, STARTING ON PAGE 86, LINE 19, WHERE MR. SWERLING TELLS ME THAT THE NICOTINE GUM DID NOT WORK, AND THE MARSHAL SPEAKS UP AND SAYS HE OPPOSES THE DIP. THAT MAKES IT CLEAR TO THE JURY THAT THE MARSHAL, NOT THE COURT, IS THE REASON FOR THE REFUSAL OF THE DIP. THEN

SKIP OVER TO PAGE 146, STARTING AT LINE 17, GOING THROUGH THE END OF THE ALTERCATION, WHICH APPEARS ON PAGE 152, LINE 12. IT IS MY INTENTION THAT MUCH OF THE PROCEEDINGS SHOULD BE DISCLOSED TO THE JURY BY WAY OF TESTIMONY AND PUBLISHING OF THE VIDEO AND AUDIO. AND CONSISTENT WITH MY PRACTICE IN OTHER CRIMINAL CASES, I WILL ALLOW THE TRANSCRIPT TO BE DISTRIBUTED TO THE JURY TO USE AS AN AID IN THE UNDERSTANDING OF THE AUDIO. I WILL DO SO WITH A CAUTIONARY INSTRUCTION THAT IT IS THE AUDIOTAPE ITSELF THAT CONSTITUTES THE EVIDENCE. AND IF THE JURY'S INTERPRETATION OF THE AUDIO IS IN ANY WAY DIFFERENT FROM THE TRANSCRIPT, THE JURY MUST DISREGARD THE TRANSCRIPT AND DECIDE THE ISSUES BASED ON THE AUDIO ITSELF.

WHICH THEN CAUSES ME, MR. SCHOOLS, TO THINK THAT THERE IS A PROBLEM IN IT IF YOU DON'T HAVE THE RECORDING OF THE OTHER TESTIMONY, BECAUSE THE TRANSCRIPT IS REALLY NOT EVIDENCE.

MR. SCHOOLS: TRANSCRIPTS ARE CERTIFIED. I THINK THEY ARE ACTUAL.

THE COURT: WELL, TRANSCRIPTS --

MR. SCHOOLS: COMPETENT TO PROVE WHAT HAPPENED IN THE COURTROOM, I BELIEVE.

THE COURT: ASSUMING I WILL LET IT IN. DO YOU WANT TO FORCE THE GOVERNMENT TO GO BACK AND GET THE AUDIO OF THESE PRELIMINARY REMARKS WHERE NO VOICES WERE MADE, OR ARE YOU SATISFIED TO GO WITH THE TRANSCRIPT?

MR. HARRIS: WELL, JUDGE, IT JUST DEPENDS. WE

STILL HAVE A LOT OF MATTERS WITHIN THIS PART.

THE COURT:    WE WILL GET TO THAT IN JUST A MINUTE.

MR. HARRIS:  I ONLY SAY, I DON'T KNOW HOW WE WILL CUT OUT AUDIO OR PORTIONS IF YOU ARE INCLINED TO DO THAT.   IF YOU ARE JUST TALKING ABOUT THE TRANSCRIPT, THOUGH, I DON'T KNOW IF WE WOULD FORCE THE GOVERNMENT TO GO BACK AND REDO IT.   I BELIEVE MS. JERNIGAN --

THE COURT:   THE TRANSCRIPT OF THE SCUFFLE IS THERE, BUT YOU DON'T WANT THE GOVERNMENT TO GO GET THE AUDIO,  IF THE AUDIO OF THE SCUFFLE HAS BEEN DELIVERED TO THE PARTIES.   YOU DON'T WANT THE GOVERNMENT TO DIG UP AUDIOS OF THIS PRELIMINARY Q AND A.

MR. HARRIS:  NO.  WE HAVE LOOKED AT THE TRANSCRIPTS, WE HAVE LISTENED TO THE TAPES, AND THEY ARE FAIRLY ACCURATE.

THE COURT:   LET'S GO THROUGH.  YOU TELL ME WHAT NEEDS TO BE DELETED FROM THE PAGES I HAVE DESIGNATED.

MR. HARRIS:  ASK YOU TO LOOK AT PAGE 146 AND DELETE.

THE COURT:   START ON THE 17TH ON PAGES 6 AND 7. THEN YOU SAY, GO TO PAGE 146.  THAT IS THE BEGINNING OF THE SCUFFLE.

MR. HARRIS:  NO COLLOQUY BETWEEN YOU AND MR. BASHAM.

THE COURT:   RIGHT.   JUST BEFORE THE SCUFFLE. MR. HARRIS DOES NOT WANT ANYTHING DELETED ON THE 17TH, PAGE 146.

MR. HARRIS:  "MR. BASHAM, YOU ARE NOT ADDING ANYTHING

TO THE DISCUSSION HERE. THE QUESTION AT HAND" --

THE COURT: I WAS GOING TO START WITH, "THE QUESTION AT HAND." SKIP OVER "SPITTING."

MR. HARRIS: I WOULD LIKE TO BEGIN WITH, "THE COURT: THE ISSUE" -- I ASK THAT LINE 16 THROUGH 18 BE DELETED.

THE COURT: I THINK WE SHOULD SAY, THE QUESTION AT HAND IS, SHOULD I AUTHORIZE THE DEFENDANT TO USE DIP? IF THE TECHNICIAN CAN START IT THERE AND SOMEHOW SKIP OVER THE WORD "SPITTING," THE INTERRUPTION OF SPITTING, IF THAT IS POSSIBLE. SO, THAT IS HOW WE START.

ALL RIGHT. WHAT IS NEXT?

MR. HARRIS: PAGE 146, LINES 6 AND 7, "WHAT IS THE BASIS?" THE COURT IS ADDRESSING MR. BASHAM, "THAT IS NOT POSSIBLE, MR. BASHAM." HE QUESTIONS THE COURT'S AUTHORITY BY STATING "NOT POSSIBLE?"

THE COURT: WHY IS THAT NOT ADMISSIBLE?

MR. HARRIS: UNDULY PREJUDICED, OVERLY PREJUDICIAL. HE HAS QUESTIONED THE COURT'S AUTHORITY.

MR. SCHOOLS: WE DISAGREE. WE THINK THAT IS THE POINT.

THE COURT: I DISAGREE. I DO NOT THINK IT IS UNDULY PREJUDICIAL TO THE EXTENT IT OUTWEIGHS THE PROBATIVE VALUE. I DENY THAT REQUEST TO DELETE THAT PASSAGE.

MR. HARRIS: PAGE 149, LINE 4 WHERE THE COURT SAYS AGAIN, "BE SEATED, PLEASE. BRING IN THE JURY."

THE COURT: YOU WANT TO JUST DELETE THAT PART? IS THAT WHERE I USE STRONG LANGUAGE?

MR. HARRIS: THE TAPE REFLECTS -- WE WILL BE OBJECTING TO A SERIES OF BRINGING IN THE JURY, "BRING IN THE JURY," BECAUSE THE INFLECTION IN THE COURT'S VOICE GROWS MORE STERN WITH EACH INSTRUCTION TO OUR CLIENT. AT THIS POINT, IT IS REALLY JUST A DISCUSSION BETWEEN THE COURT AND MR. BASHAM.

THE COURT: WHAT IS THE GOVERNMENT'S POSITION?

MR. SCHOOLS: FRANKLY, I THINK THE TONE IN WHICH YOUR HONOR IS SPEAKING WITH THE DEFENDANT IS CONTINUED NONCOMPLIANCE, AND THAT IS IMPORTANT. I THINK THE JURY SHOULD HEAR IT. PUTS THIS WHOLE SITUATION IN CONTEXT. OBVIOUSLY, EVIDENCE THAT THE SITUATION ESCALATED, ESCALATED INTO A VIOLENT EPISODE. I THINK THAT IS PART OF IT. I DON'T KNOW WHY THAT IS ANY MORE PREJUDICIAL. IT IS NOT UNFAIRLY PREJUDICIAL. AGAIN, I UNDERSTAND WHY THEY WANT IT IN, BUT THAT IS WHAT HAPPENED, JUDGE. I THINK THE JURY OUGHT TO HAVE THAT ENTIRE EPISODE, UNLESS, YOU KNOW, IF THE DEFENDANT, WE HAVE DONE THIS, IN THIS INSTANCE EVEN, WE HAVE TAKEN OUT RACIAL STUFF. WE HAVE TAKEN OUT WHEN HE MAKES A SPECIFIC DEROGATORY COMMENT ABOUT YOUR HONOR. I AM NOT SURE WE HAVE TO DO THAT, THAT WE SHOULD CONCEDE TO THAT.

THE COURT: YOU HAVE CONCEDED THOSE ISSUES, YOU ARE RIGHT.

MR. SCHOOLS: WITH RESPECT TO HIS TONE TO THE COURT,

I THINK THAT IS GOING TOO FAR.  IS THAT NOT THE KIND OF THING, INSIGHT THE JURY NEEDS TO GIVE A RATIONAL JUDGMENT IN THIS CASE?

THE COURT:  IF I TAKE OUT THE REQUEST TO BE SEATED, BRING IN THE JURY, IT TAKES IT OUT OF CONTEXT OF WHAT HAPPENED.

MR. HARRIS:  LINE 7,  THE DEFENDANT'S RESPONSE, "WE ARE GOING TO HAVE AN ISSUE."  WITH REGARDS TO WHAT WAS GOING ON, THAT HE WAS DIRECTLY ADDRESSING THE COURTS.  IT IS OVERLY PREJUDICIAL JUDGE.

THE COURT:  YOU WANT THE JURY TO JUST ASSUME THE ONLY REASON THE ALTERCATION OCCURRED WAS THE FAILURE TO GET THE DIP, NOT THE FAILURE TO LET HIM GO DOWNSTAIRS?

MR. HARRIS:  IF YOU LOOK, THE WAY WE HAVE REQUESTED IT, "BRING IN THE JURY," THE NEXT LINE OF MR. BASHAM, "I ASKED TO GO DOWN THERE SO I COULD LAY DOWN.  THAT IS ALL I ASKED. IT IS NOT BECAUSE" -- WE ASK THE PREAMBLE TO THAT BE OMITTED, "WE ARE GOING TO HAVE AN ISSUE."  WE,  BEING YOU AND MR. BASHAM, WILL BE AN INFERENCE TO BE DRAWN FROM THAT BY THE JURY.

THE COURT:  I DENY THAT REQUEST,  AS WELL.

MR. HARRIS:  LINE 11 AND 12.

THE COURT:  I THINK THAT IS WHERE I RAISED MY VOICE.

MR. HARRIS:  "MR. BASHAM, BE SEATED.  BRING IN THE JURY."  WE STATED EARLIER WE WOULD OBJECT TO ANY INFLECTION,

CHANGES BY THE COURT IN ITS DISCUSSION.

THE COURT: I WILL DENY THAT REQUEST. I WILL SAY THE AUDIOTAPES NEED TO BE MADE PART OF THE RECORD FOR APPEAL SO THE COURT OF APPEALS CAN HEAR THE VOICE INFLECTION, IF THAT IS AN ISSUE. IF THE COURT OF APPEALS BELIEVES IT IS IMPROPER, THEY CAN SO INDICATE, AND WE CAN TRY THE CASE AGAIN.

MS. JERNIGAN, CAN YOU BE SURE TO DO THAT, PRESERVE A COPY OF YOUR AUDIOTAPE?

MR. HARRIS: LINES 13 AND 14, BOTH SENTENCES, "I AM ASKING IF I CAN GO OUT. I ASKED YOU IF I COULD GO DOWNSTAIRS, RIGHT?" WE ASK THAT THAT BE --

THE COURT: I WOULD DENY THAT REQUEST, AS WELL.

MR. HARRIS: NEXT SENTENCE, LINE 15. THE COURT SAYS, "HOLD UP A MINUTE." I UNDERSTAND THAT THE COURT AT THIS POINT WAS SPEAKING, AT THAT POINT, WITH THE MARSHAL CSO, AND HE WAS ASKED, INSTRUCTING THEM TO HOLD UP THE JURY. BUT IT COMES ACROSS ON THE TAPE AND TRANSCRIPT THAT YOU ARE REFERRING TO MR. BASHAM.

THE COURT: I WILL AGREE WITH YOU THERE. I WILL TAKE THAT SENTENCE OUT.

MR. SCHOOLS: WE CAN TELL THE JURY THAT, JUDGE. I MEAN, MS. JONES IS GOOD, BUT THE SMALLER CLIPPINGS YOU TRY TO GET OUT OF THIS THING, THE HARDER IT GETS. THAT IS SORT OF A NONISSUE.

THE COURT: MS. JONES, SEE IF YOU CAN TAKE IT OUT

OVER THE WEEKEND.  IF YOU CAN'T, I WILL HAVE TO EXPLAIN TO THE JURY I WASN'T TALKING TO MR. BASHAM WHEN I SAID "HOLD UP" THEN.

MR. HARRIS:  LINE 18, THE TONE IN WHICH YOU STATE "MR. BASHAM."  THAT IS ONE WORD OR ONE NAME.

THE COURT:  I THINK I WAS TRYING TO BEGIN A SENTENCE, AND THEN EVERYTHING DETERIORATED FROM THERE.

MR. HARRIS:  THE TONE AGAIN, YOUR HONOR, THE TONE OF VOICE IS THIS IS A DIRECT CONVERSATION BETWEEN THE COURT AND MR. BASHAM.  AND WE BELIEVE THE TONE OF THE COURT IS UNFAIRLY PREJUDICIAL.

THE COURT:  I WILL DENY THAT REQUEST, AS WELL.

MR. HARRIS:  LEADS US TO LINE 21.  AGAIN, IN CONTEXT OF THIS TRANSCRIPT, YOUR HONOR, THIS IS A DISCUSSION BETWEEN YOU AND MY CLIENT.  AS SOON AS THE FIGHT STOPS, HE USES THE WORD, "YOU MOTHER FUCKERS.  ALL I ASKED IS TO GO DOWNSTAIRS." NOW, I BELIEVE THE COURT IS INCLUDED IN THAT "YOU."  THAT IS THE ONLY INTERPRETATION THAT ANYBODY CAN TAKE FROM A TRANSCRIPT WHERE YOU ARE THE ONLY PERSON HE HAS BEEN ASKING TO GO DOWNSTAIRS.  I CAN'T POSSIBLY UNDERSTAND HOW THAT WOULD NOT BE UNDULY PREJUDICIAL.

THE COURT:  WE JUST HAVE A PHILOSOPHICAL DISAGREEMENT.  I THINK THE GOVERNMENT IS CORRECT IN SHOWING DISRESPECT FOR AUTHORITY IN THE COURTROOM IS AN ISSUE THAT BEARS ON HIS FUTURE DANGEROUSNESS, AND HIS ADAPTABILITY TO

PRISON LIFE, AND THAT SORT OF THING. I OVERRULE THAT REQUEST.

MR. HARRIS: YOUR HONOR, THE REST OF THE TRANSCRIPT IS A FIGHT, WITH THE EXCEPTION -- WITH NO REFERENCES TO YOU. OBVIOUSLY, WE OBJECT TO ANY CURSING THAT MR. BASHAM DID DURING THE FIGHT. I CAN RUN THROUGH THE SPECIFICS, IF YOU LIKE.

THE COURT: I WILL DENY THOSE REQUESTS I WOULD NOTE ON PAGE 151 I PROPOSE TO DELETE THE PARTS IN BRACKETS, PARTIAL TWO PARAGRAPHS.

MR. HARRIS: I ASSUMED THAT THOSE WERE --

THE COURT: WHERE MR. BASHAM SAYS I LIED TO HIM AND USED SOME PROFANITY. AND THEN ON LINES 19 THROUGH 22 WHERE HE IS REFERRING TO MR. RILEY, THE FACT THAT HE IS A BLACK OFFICER. I PROPOSE TO DELETE BOTH OF THOSE. IF THE GOVERNMENT WANTS TO OBJECT TO THOSE DELETIONS, I UNDERSTAND.

MR. SCHOOLS: ASK THAT YOU DELETE ONLY TWO SENTENCES, IT IS ALL BECAUSE THAT RILEY IS BLACK. IT IS RACISM IS ALL IT WAS. THAT IS ALL ABOUT RILEY AND RACIAL COMMENT. I THINK THROUGHOUT THE COURSE OF THE TRIAL, MR. BASHAM'S BRAGGADOCIOS COMMENTS TO THE MARSHAL ABOUT HIM WANTING TO GET DIP TO MAKE MR. RILEY MAD WILL COME OUT THROUGH SOME WITNESS. I THINK THAT PART OF --

THE COURT: I WILL STICK WITH MY DECISION AND DELETE LINE 19 THROUGH 22 OVER THE GOVERNMENT'S OBJECTION.

MR. HARRIS: FINALLY, 152, LINE 9, MR. BASHAM BEGINS THAT SENTENCE, AND YOU, JUDGE, DIRECT REFERENCE TO THE JUDGE, IN A MANNER UNWELCOMING TO THE COURT. WE WOULD ASK -- WE WOULD SUGGEST, AGAIN, THAT IS UNDULY AND OVERLY --

THE COURT: I REMEMBER HE SAID THAT. "JUDGE, PAY ATTENTION. IF I WAS GOING TO SPIT, I WOULD BE DOING IT RIGHT NOW."

MR. HARRIS: HE STOPPED, CAME AROUND.

MR. SCHOOLS: I THINK REALLY THAT IS A CRITICAL PART OF THIS WHOLE EPISODE, YOUR HONOR. BECAUSE IT SHOWS, I THINK, AS I SAID IN MY OPENING STATEMENT, EVEN DURING THE MIDST OF THIS ESCALATION, HE IS RATIONAL ENOUGH TO BE ABLE TO POINT OUT TO YOU THAT HE IS STILL ENGAGING IN A BEHAVIOR THAT SHOULD AUTHORIZE YOU TO GIVE HIM DIP.

THE COURT: I WILL LEAVE THAT IN OVER THE DEFENDANT'S OBJECTION.

THAT IS MY RULING. I KNOW BOTH SIDES ARE DISAPPOINTED. I AM SURE THE DEFENDANT IS MORE DISAPPOINTED THAN THE GOVERNMENT. THAT IS MY BEST EFFORT TO DO WHAT I THINK THE LAW REQUIRES IN THIS CASE. SO, IF THE GOVERNMENT COULD MAKE THOSE DELETIONS AND HAVE THAT QUEUED UP, READY TO GO ON MONDAY.

MR. SCHOOLS, HOW DOES IT LOOK FOR YOU FINISHING YOUR CASE NOW?

MR. SCHOOLS: LUNCHTIME MONDAY.

THE COURT: MR. HARRIS, IF YOU COULD HAVE SOME WITNESSES HERE ON MONDAY AFTER LUNCH TO GET US THROUGH THE AFTERNOON.

MR. HARRIS: YES, SIR.

THE COURT: ALL RIGHT. ANYTHING ELSE?

MR. SCHOOLS: YES, SIR. I HATE TO HAVE TO RAISE THIS.

MR. SWERLING: JUDGE, COULD YOU INDULGE US ONE MOMENT? WE WERE TRYING TO KEEP UP. I WOULD LIKE TO EXPLAIN TO HIM EXACTLY WHAT IS GOING TO COME IN.

THE COURT: GO AHEAD. GO AHEAD. TAKE YOUR TIME.

(WHEREUPON, THERE WAS A SHORT PAUSE IN THE RECORD.)

THE COURT: LET'S GO BACK ON THE RECORD. IT IS VERY LATE ON THE DAY ON FRIDAY. MR. SCHOOLS HAS TWO THINGS TO TAKE UP. I DON'T KNOW IF WE HAVE TO DECIDE TODAY OR NOT.

MR. SCHOOLS: THE TWO MATTERS I WANT TO RAISE ARE, FIRST OF ALL, THE DEFENSE, AS I UNDERSTAND IT, HAVE HIRED THE EXPERT WITNESSES WHO WILL TESTIFY FOR THEM NEXT WEEK. THE FEES, I UNDERSTAND IN TALKING WITH MR. SWERLING, HAVE BEEN SUBMITTED TO THE COURT AND APPROVED. WE BELIEVE THAT EVIDENCE OF THE EXPERT WITNESS' FEES IS RELEVANT THROUGH BIAS AND MOTIVATION TO TESTIFY IN A PARTICULAR FASHION, AND WE WOULD MAKE A REQUEST TO GET THAT INFORMATION.

THE COURT: THE AMOUNT OF THE FEES?

MR. SCHOOLS: YES, SIR. WHAT WE WOULD LIKE IS THE

FEE AGREEMENT, WHICH WOULD ESTABLISH AN HOURLY RATE.  WE DON'T CARE, PARTICULARLY, I MEAN, OBVIOUSLY LIKE TO HAVE AS MUCH AS POSSIBLE.  THE MAIN THING WE WANT TO KNOW IS WHAT THE BOTTOM LINE IS.

THE COURT:  I HAVE NEVER HAD THAT REQUEST COME UP BEFORE.  OF COURSE, I HAVE NEVER HAD A PENALTY PHASE TRIAL BEFORE.

WHAT ABOUT THAT, MR. SWERLING, MR. HARRIS?

MR. SWERLING:  WE HAVE TO, OBVIOUSLY, OBJECT TO THAT BECAUSE I THINK THAT THE JURY -- FIRST OF ALL, I DON'T THINK IT IS RELEVANT TO ANYTHING.  THE GOVERNMENT CAN BRING OUT THE FACT THAT THE EXPERTS, THAT THE DEFENDANT IS INDIGENT AND THE GOVERNMENT IS PAYING FOR THE EXPERTS.

THE COURT:  THEY ARE GETTING PAID.

MR. SWERLING:  YES, SIR.

THE COURT:  YOU DON'T HAVE A PROBLEM WITH THE JURY LEARNING THEY ARE GOING TO PAY?

MR. SWERLING:  I DON'T THINK I CAN MAKE AN ARGUMENT ABOUT BEING PAID, BUT THE RATE AMOUNT.

THE COURT:  YOUR PEOPLE DON'T GET PAID, THEY DRAW A SALARY?

MR. SCHOOLS:  THAT'S CORRECT.

THE COURT:  ISN'T THAT A PROBLEM OF COMPARING APPLES AND ORANGES?  THE DEFENDANT DOESN'T HAVE A CHANCE TO DO THE SAME THING AS YOUR WITNESSES EXCEPT ASK THEM WHETHER THEY ARE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,     )     CR. NO. 4:02-992
                                )     COLUMBIA, SC
                                )     OCTOBER 18, 2004
                                )
    VERSUS                  )
                                )
BRANDON L. BASHAM,         )
      DEFENDANT.       )
_____ )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XIX

APPEARANCES:

FOR THE GOVERNMENT:          SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             JOHN DUANE, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:           JACK SWERLING, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201

                             GREG HARRIS, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1778

Q.    ODDLY ENOUGH, SINCE HE HAS GOTTEN DIP A FEW WEEKS AGO, THINGS HAVE GONE SMOOTHER FOR YOU, HAVEN'T THEY?

A.    YES.  NO MORE ARGUMENT ABOUT THE DIP.  YES, SIR, THAT IS TRUE.

Q.    THANK YOU VERY MUCH.

THE COURT:  ANY REDIRECT?

MR. DUANE:  NO.

THE COURT:  THANK YOU.  YOU MAY STEP DOWN.  CALL YOUR NEXT WITNESS.

MR. SCHOOLS:  WE CALL DEPUTY BEN HARASETH.

BEN HARASETH, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. SCHOOLS:

Q.    GOOD MORNING DEPUTY HARASETH, HOW ARE YOU?

A.    I AM GOOD.

Q.    YOUR LAST NAME IS HARASETH, H-A-R-A-S-E-T-H?

A.    YES, HARASETH.

Q.    HARASETH.  DEPUTY HARASETH, HOW LONG HAVE YOU WORKED FOR THE U.S. MARSHAL'S SERVICE?

A.    TWO YEARS.

Q.    WHAT DO YOU DO FOR THE U.S. MARSHALS?

A.    I'M A DEPUTY MARSHAL.  I AM ASSIGNED TO THE GENERAL OPERATIONS, SAME AS DEPUTY RILEY, DEPUTY O'BRIEN.  RIGHT NOW, I AM TASKED WITH THE -- I AM THE DEPUTY IN CHARGE OF THE

BASHAM TRIAL DETAIL, ALONG WITH DEPUTY KEVIN RILEY.

Q.    HOW LONG HAVE YOU BEEN WITH THE MARSHAL SERVICE?

A.    TWO YEARS.

Q.    WHAT DID YOU DO BEFORE JOINING THE MARSHAL SERVICE?

A.    I WAS A DEPUTY SHERIFF WITH LEWIS AND CLARK SHERIFF'S OFFICE IN HELENA, MONTANA, FOR FIVE-AND-A-HALF YEARS.  BEFORE THAT, I WAS A S. MARINE FOR FOUR YEARS.

Q.    WHAT MADE YOUR DECISION TO COME TO SOUTH CAROLINA FROM MONTANA?

A.    THE U.S. MARSHAL SERVICE, WHEN I FIRST STARTED, I WENT FROM MONTANA TO FLORIDA.  I WAS FIRST BASED IN JACKSONVILLE, FLORIDA AS A DEPUTY U.S. MARSHAL.  I MOVED UP, TOOK A PROMOTION, AND MOVED UP TO SOUTH CAROLINA.

Q.    NOW, YOU MENTIONED, I THINK, DEPUTY HARASETH, THAT YOU HAD BEEN -- YOU AND DEPUTY RILEY ARE IN CHARGE OF COORDINATING ISSUES PERTAINING TO THIS TRIAL; IS THAT RIGHT?

A.    YES, SIR.

Q.    AND AS A RESULT OF THAT, YOU HAVE BEEN IN ATTENDANCE FOR MUCH OF THESE TRIAL PROCEEDINGS; IS THAT CORRECT?

A.    YES, I HAVE.

Q.    DID YOU BECOME AWARE, DEPUTY HARASETH -- LET ME BACK YOU UP.  WHEN WE TALK ABOUT THE TRIAL PROCEEDINGS, DID THAT INCLUDE THE JURY SELECTION IN THIS CASE?

A.    YES.

Q.    SO, WERE YOU AND/OR DEPUTY RILEY INVOLVED IN THIS

CASE, IN THIS TRIAL, FROM THE MOMENT OF JURY SELECTION, WHICH BEGAN BACK IN LATE AUGUST UP UNTIL ITS CONCLUSION?

A.    YES.

Q.    I WANT TO SPECIFICALLY ASK YOU ABOUT SEPTEMBER 3RD NOW, DEPUTY HARASETH.  DO YOU RECALL THAT DATE?

A.    I DO.

Q.    AND WHEN DEPUTY RILEY HAS PREVIOUSLY DESCRIBED TO THE JURY THAT HIS -- ONE OF HIS ROLES IS IN MAKING SURE THAT MR. BASHAM IS TRANSPORTED TO COURT, DO YOU PLAY A ROLE IN HIS TRANSPORTATION, AS WELL?

A.    YES, I DO.

Q.    AND WHAT IS THAT?

A.    RIGHT NOW, DEPUTY RILEY IS IN CHARGE OF THE MORNING AND THE EVENING TRANSPORTS.  BUT ON THE THIRD, I PARTICIPATED IN THE TRANSPORT WHEN WE TOOK MR. BASHAM TO THE HOSPITAL.

Q.    PRIOR TO THAT, HAD YOU HAD CONTACT WITH MR. BASHAM THAT MORNING?

A.    NO, I DID NOT.

Q.    SO, YOUR FIRST CONTACT WITH MR. BASHAM WAS ACTUALLY IN THE COURTROOM ON THE DAY OF SEPTEMBER 3RD?

A.    ACTUALLY, IT WAS DOWNSTAIRS IN THE MARSHAL'S AREA.  I WAS NOT IN THE COURTROOM WHEN HE WAS -- WHEN HE WAS SAYING HE WAS FEELING SICK AND THE DETERMINATION TO GO TO THE HOSPITAL WAS MADE.

Q.    WHEN JUDGE ANDERSON DIRECTED THE U.S. MARSHAL SERVICE

TO TAKE MR. BASHAM TO THE HOSPITAL, YOU WERE NOT IN THE COURTROOM?

A.    I WAS NOT IN THE COURTROOM.

Q.    HAD NOT SEEN MR. BASHAM, AT THAT POINT?

A.    NO, I HAD NOT.

Q.    YOU SAW HIM FIRST WHERE?

A.    I SAW HIM DOWN IN OUR AREA.  THEN WE, DEPUTY RILEY, AND CORPORAL HUGHES WITH HIGHWAY PATROL IS OUR CONTRACT, TRANSPORTED HIM IN A TRANSPORT VAN.  I FOLLOWED ALONG WITH ANGELA LANG WHO WORKS FOR ALVIN S. GLENN, CONTRACT GUARD, WE FOLLOWED THEM IN THE FOLLOW CAR.

Q.    WHAT CONDITION WAS MR. BASHAM IN WHEN YOU FIRST SAW HIM DOWNSTAIRS?

A.    HE WAS BREATHING HEAVY, AND HE WAS COUGHING A LITTLE BIT.  THAT WAS IT.

Q.    AND HE UNDERSTOOD THAT Y'ALL WERE GOING TO TAKE HIM TO THE HOSPITAL AT THE DIRECTION OF THE JUDGE?

A.    YES, HE DID.

Q.    SO, YOU SAID YOU WERE IN THE TRANSPORT VEHICLE OR THE FOLLOW VEHICLE?

A.    I WAS IN THE FOLLOW VEHICLE.

Q.    DID YOU HAVE ANY CONTACT WITH MR. BASHAM DURING THE TRANSPORTATION?

A.    I DID NOT.

Q.    WHAT HAPPENED WHEN YOU GOT TO THE HOSPITAL?

**JA 1782**

A.   WE GOT OUT OF THE VEHICLE, WE ESCORTED HIM IN THE EMERGENCY ROOM, THE EMERGENCY ROOM WAS ALREADY CONTACTED, THEY TOOK US STRAIGHT TO A ROOM, AND WE WAITED THERE.  HE WAS EXAMINED BY BOTH THE NURSE AND DOCTOR.

Q.   DO YOU RECALL WHO IT WAS THAT ESCORTED MR. BASHAM IN THE EMERGENCY ROOM?

A.   IT WAS THE FOUR OF US.  I DON'T RECALL WHO PHYSICALLY ESCORTED HIM, BUT IT WAS THE FOUR OF US ESCORTING.

Q.   WHAT WAS MR. BASHAM'S CONDITION, AT THAT POINT, AFTER YOU ARRIVED AT THE HOSPITAL, AS YOU WALKED INTO THE EMERGENCY ROOM?

A.   HE SLOWLY GOT BETTER.  HE WAS BREATHING HEAVY WHILE HE WAS SITTING DOWN.  HE WAS COMPLAINING ABOUT HAVING BLOOD IN OR SPITTING UP BLOOD, COUGHING UP BLOOD, AND BLOOD IN HIS STOOLS.

Q.   AND WAS MR. BASHAM TREATED AT PALMETTO RICHLAND HOSPITAL FOR HIS COMPLAINT?

A.   HE WAS.  THE DOCTOR EXAMINED HIM.  HE WAS PUT ON OXYGEN BY NASAL CALIBRATION.  IT IS A DEVISE THAT GOES IN THE NOSE THAT DELIVERS OXYGEN.  AND HE WAS LATER, ABOUT HALFWAY THROUGH THE VISIT, HE WAS GIVEN A VALIUM AND ALSO INSPECTED BY THE DOCTOR.  AN X-RAY WAS TAKEN AND ALSO A RECTAL EXAM.

Q.   WAS HE RELEASED?

A.   HE WAS.

Q.   WHAT WAS HIS CONDITION DURING THE COURSE OF THE

TREATMENT?

A. HE GOT BETTER QUICKLY. EVEN PRIOR TO BEING GIVEN -- PRIOR TO THE VALIUM, HE WAS LAUGHING, JOKING, TALKING. THE DOCTOR FELT IT WAS PROBABLY AN ANXIETY ATTACK JUST FROM THE STRESSES OF THE PROCEEDINGS.

Q. DO YOU RECALL HOW THE SUBJECT OF VALIUM WAS RAISED?

A. HE ASKED FOR IT. HE SAID HE NORMALLY HAS IT. HE WANTED THE ACTUAL VALIUM, THE ACTUAL NAME BRAND. HE FELT IT WAS BETTER THAN THE GENERIC. HE USUALLY GETS THE GENERIC AROUND LUNCHTIME. THE MEDICAL STAFF GAVE HIM A DOSE OF VALIUM. AND WE MADE SURE TO ASK BECAUSE WE KNEW HE GOT THE SAME KIND OF MEDICATION AT LUNCHTIME. THEY CANCELED THAT MEDICATION WE WOULD HAVE GIVEN HIM AT LUNCH.

Q. AFTER MR. BASHAM CALMED DOWN, DID YOU AND THE OTHERS, DEPUTY RILEY AND THE OTHER CONTRACT GUARDS, UNDERTAKE TO TAKE MR. BASHAM BACK TO THE TRANSPORT VEHICLE?

A. YES, WE DID.

Q. WHAT HAPPENED THEN?

A. WE WERE DISCHARGED ABOUT 11:00 O'CLOCK. WE WERE WALKING OUT OF THE HOSPITAL, WALKING TO WHERE THE INCIDENT TOOK PLACE. THERE IS A SMALL PARKING GARAGE AT THE HOSPITAL. THE PARKING GARAGE IS FOR NOTHING BUT AMBULANCES AND POLICE CARS. THEY TAKE THE PATIENTS INSIDE AND THEN THE AMBULANCE IS -- THE AMBULANCE CREWS CLEAN UP THEIR AMBULANCE IN THE PARKING GARAGE. THIS IS WHERE WE PARKED THE TRANSPORT VAN

AND FOLLOW VEHICLE. WHEN WE WERE DISCHARGED, THIS IS WHERE WE CAME OUT OF. WE WERE ABOUT HALFWAY BETWEEN THE DOOR AND THE VAN, ABOUT 30 FEET FROM THE VAN, WHEN MR. BASHAM BENT DOWN. GUARD HUGHES AND MYSELF WERE BOTH ESCORTING HIM. I WAS ON HIS LEFT SIDE, HE WAS ON HIS RIGHT SIDE, DEPUTY RILEY AND GUARD LANG WERE WALKING IN FRONT OF US. MR. BASHAM BENT DOWN, CROUCHED DOWN. I ASKED HIM WHAT HE WAS DOING. HE SAID HE WAS ADJUSTING HIS LEG IRON. I INSTRUCTED HIM TO CONTINUE GOING TO THE VAN AND WE WOULD ADJUST IT THERE. DUE TO SECURITY REASONS, WE DO NOT WANT TO -- SOMEONE THAT HAS THE HISTORY, AND THE CHARGES THAT HE IS FACING, WE DON'T WANT TO GIVE HIM ANY OPPORTUNITY -- WE TRY TO WHEN WE GO FROM POINT A TO POINT B, WE TRY TO MAKE SURE WE DO IT QUICKLY. I TOLD HIM HE WOULD HAVE THE OPPORTUNITY TO FIX HIS LEG IRONS WHEN WE GOT TO THE VAN.

HE REFUSED TO STAND UP, AND I NOTICED HE WAS PICKING UP A YELLOW OBJECT OFF THE GROUND. HE PALMED IT WHERE THE FINGERS WERE OPEN, BUT STILL GRIPPING IT WITH THE PALM OF HIS HAND. I TOLD HIM I SAW HE PICKED SOMETHING UP, HE NEEDED TO THROW IT DOWN. HE MADE A MOTION LIKE HE THREW IT DOWN TO THE RIGHT. IMMEDIATELY, HIS HAND WENT TO THE LEFT INSIDE ANKLE AND HE MADE A MOTION LIKE HE WAS PUTTING SOMETHING IN HIS SOCK. AT THAT POINT, WE STOOD HIM UP.

Q. AT THAT POINT, DID YOU KNOW WHAT THE OBJECT WAS?

A. I DID NOT. IT CONCERNED ME BECAUSE, OF COURSE, IT IS A

HOSPITAL, AND AMBULANCES CLEAN UP, THEY BRUSH OUT THE VEHICLES, AND HOSPITALS HAVE ALL KINDS OF ITEMS, OF COURSE, THAT WE DON'T WANT MR. BASHAM TO GET, SUCH AS SCALPEL BLADES, NEEDLES, AND ALL KINDS OF OTHER ITEMS.

Q.    MR. BASHAM BENT DOWN, FAKED LIKE HE THREW SOMETHING, AND PUT IT IN HIS SOCK.  WHAT HAPPENED NEXT?

A.    AT THAT POINT, WE STOOD HIM UP, AND HE RESISTED US STANDING HIM UP.  HE GAVE OFFICERS TRYING TO STAND HIM UP, MOVE HIM TO THE VAN, HE WAS ACTIVELY RESISTING US, PUSHING AGAINST US, TURNING TOWARD US, NOT WANTING US TO DIRECT WHERE HE WOULD GO.  I REACHED IN HIS SOCK AND PULLED OUT THE ITEM. IT WAS A HALF-SMOKED CIGARETTE.  AT THAT POINT, MR. BASHAM WAS STILL RESISTING.  WE WERE STILL TRYING TO GET HIM TO THE VAN.

Q.    WHAT WAS HIS LEVEL OF AGITATION, AT THAT POINT?

A.    HE WAS YELLING, HE WAS SWEARING.  HE WAS SAYING THINGS LIKE, "GET YOUR FUCKING HANDS OFF OF ME.  YOU DON'T NEED TO PUT YOUR HANDS ON ME.  YOU DON'T NEED TO FUCKING PUSH ME. LET GO OF ME."  HE WAS TRYING TO TURN, HE WAS TRYING -- WE WERE TRYING TO WALK HIM TOWARD THE VAN.  HE WAS TRYING TO PUSH US BACK AWAY FROM THE VAN.  WE FINALLY GOT HIM TO THE VAN. DEPUTY RILEY CAME UP AND WAS ON THE RIGHT SIDE OF MR. BASHAM, AND I WAS ON THE LEFT SIDE.

Q.    NOW, I THINK YOU SAID EARLIER, DEPUTY HARASETH, THAT MR. BASHAM HAD JUST RECEIVED A TEN MILLIGRAM DOSE OF VALIUM IN

THE HOSPITAL'S EMERGENCY ROOM, RIGHT?

A. YES, THAT'S CORRECT.

Q. SO, HE IS RESISTING, YOU RETRIEVE THE CIGARETTE, YOU ARE TRYING TO GET HIM TO THE VAN. WHAT HAPPENS NEXT?

A. WE FINALLY -- IT TAKES A MINUTE OR TWO TO FINALLY GET HIM TO THE VAN. WE HAD TO PRESS HIM UP BESIDE THE VAN TO CONTROL HIM. KEPT PUSHING AGAINST IT, TURNED HIM AROUND. HE WAS STILL YELLING AND SCREAMING, AT THAT TIME. WE WEREN'T ABLE TO OPEN. IT WAS A MINIVAN, SLIDING DOOR. WE WEREN'T ABLE TO OPEN THE SLIDING SIDE DOOR BECAUSE OF HIS RESISTANCE. WE PUT HIM ON THE GROUND. I HELD HIM ON THE GROUND WHILE DEPUTY RILEY OPENED THE DOOR. WE HAD A TALK WITH HIM FOR A FEW SECONDS, AND THEN HE AGREED TO STOP RESISTING AND GET INTO THE VAN.

Q. DID HE DO THAT?

A. HE DID.

Q. HE DID. HOW LONG, DEPUTY HARASETH, DO YOU THINK IT WAS THAT YOU AND DEPUTY RILEY WERE INVOLVED IN TRYING TO GET MR. BASHAM IN THE VAN ONCE HE REACHED FOR THE CIGARETTE?

A. REPEAT THE QUESTION ONE MORE TIME.

Q. HOW LONG DO YOU THINK IT WAS THAT YOU AND DEPUTY RILEY WERE TRYING TO GET MR. BASHAM IN THE VAN, ONCE HE REACHED FOR THE CIGARETTE?

A. IT IS HARD TO GAUGE TIME WHEN YOU ARE ACTIVE LIKE THAT. I WOULD SAY ANYWHERE FROM TWO TO SIX MINUTES.

Q.    MR. BASHAM WAS FULLY RESTRAINED, AT THAT TIME?

A.    FULLY RESTRAINED WITH LEG IRONS AND A BELLY CHAIN, HANDCUFFS IN FRONT OF HIS BODY, AND THE SECURITY BOX WITH A LOCK.

Q.    BUT NONETHELESS, IT TOOK TWO TO SIX MINUTES FOR Y'ALL TO GET HIM IN THE VAN?

A.    YES.

Q.    WHAT WAS HIS CONDITION? DID YOU RIDE IN THE VAN WITH HIM BACK TO THE COURTHOUSE?

A.    I DID NOT.

Q.    WHAT WAS HIS CONDITION WHEN YOU GOT BACK TO THE COURTHOUSE?

A.    THEY PULLED IN TO THE SALLY PORT. THE SALLY PORT IS A GARAGE FOR PRISONERS. ALL JAILS AND JAIL BLOCKS HAVE SALLY PORTS. ALL TRANSPORT VANS PULL INSIDE, HAS A GARAGE DOOR LIKE A NORMAL GARAGE. WE PULLED IN THE SALLY PORT. I WALKED IN. I HAD PARKED MY CAR AND WALKED IN. AND WHEN MR. BASHAM GOT OUT OF THE VAN, HE WAS VERY HAPPY, HE WAS LAUGHING, HE WAS JOKING. HE SAID HE HAD NO PROBLEM WITH ME OR ANY OF THE OTHER DEPUTIES.

WE HAVE TO TAKE AN ELEVATOR UPSTAIRS TO THE MAIN CELL BLOCK. IN THE ELEVATOR HE WAS FINE AND HAPPY. WHEN WE FINALLY GOT TO THE CELLBLOCK, THEN HE ASKED THE QUESTION IF WE WERE GOING TO TELL THE JUDGE ABOUT THIS INCIDENT.

Q.    WHAT DID YOU ADVISE HIM?

A.    WE TOLD HIM, YES, WE WERE.

Q.    NOW, AT THAT POINT, JURY SELECTION HAD BEEN SUSPENDED PENDING RESOLUTION OF THIS ISSUE?

A.    YES.

Q.    WAS IT RESUMED THAT AFTERNOON?

A.    I'M SORRY, WHAT?

Q.    WAS IT RESUMED THAT AFTERNOON, DO YOU RECALL?

A.    I DON'T RECALL IF IT WAS RESUMED THAT AFTERNOON. IT WAS RIGHT AROUND LUNCHTIME WHEN EVERYTHING TIMELY ENDED UP.

Q.    DO YOU RECALL WHETHER, ONCE YOU GOT BACK HERE, MR. BASHAM WAS ASKING FOR HIS LUNCHTIME VALIUM?

A.    YES. HE DID ASK ME FOR IT. I DIDN'T INSTRUCT HIM THAT HE -- THAT WE WERE INSTRUCTED BY HOSPITAL STAFF THAT HE HAD ALREADY GOTTEN IT.

Q.    ANY OTHER PROBLEMS WITH MR. BASHAM THAT DAY ON THE 3RD?

A.    NO.

Q.    NOW, DEPUTY HARASETH, I WANT TO FAST FORWARD NOW TO AROUND SEPTEMBER 17TH OF 2004. DID YOU BECOME AWARE, DEPUTY HARASETH, THAT THE DEFENDANT, THROUGH HIS ATTORNEYS, HAD MADE A REQUEST OF THE JUDGE THAT HE BE ALLOWED TO CHEW TOBACCO DURING THIS TRIAL?

A.    YES, I DID.

Q.    WERE YOU PRESENT WHEN THAT REQUEST WAS MADE?

A.    YES, I WAS.

      THE COURT:  MR. SCHOOLS, LET ME JUMP IN. I THINK I

MIGHT WANT TO GIVE A LITTLE CAUTIONARY INSTRUCTION, AT THIS POINT.

MEMBERS OF THE JURY, YOU REMEMBER AT THE BEGINNING OF BOTH THE GUILT PHASE AND PENALTY PHASE FOR THIS TRIAL, I TOLD YOU THAT THE ROLES THAT WE PERFORM ARE AS FOLLOWS: I AM SUPPOSED TO DETERMINE THE LAW THAT APPLIES TO THE CASE IN TERMS OF EVIDENTIARY RULINGS, AND WHAT COMES IN EVIDENCE, AND WHAT IS KEPT OUT OF EVIDENCE, AND ALSO EXPLAINING TO YOU THE LAW THAT YOU MUST FOLLOW AND APPLY IN DECIDING THIS CASE.

SO, I AM THE LAWGIVER, SO TO SPEAK. I DETERMINE WHAT THE LAW IS. YOU, ON THE OTHER HAND, ARE THE FACT FINDERS. YOU DETERMINE WHAT THE DISPUTED FACTS ARE. YOU HEAR THE DIFFERENT VERSIONS OF WHAT HAPPENED, AND YOU DECIDE WHAT THE FACTS ARE. THAT IS THE TRADITIONAL ROLE OF A JURY IN ANY CRIMINAL CASE.

NOW WE ARE IN A PENALTY PHASE HERE TODAY. YOUR ROLES ARE A LITTLE BIT DIFFERENT IN THE DECISION YOU MUST MAKE, BUT STILL YOU MUST RESOLVE CERTAIN DISPUTED FACTS. I TOLD YOU IN BOTH PRELIMINARY INSTRUCTIONS OF BOTH PHASES, I HAVE NO OPINION, WHATSOEVER, AS TO WHAT YOUR DECISION SHOULD BE. I DON'T HAVE ANY OPINION WHAT THE DISPUTED FACTS ARE. I DON'T HAVE ANY OPINION AS TO WHAT DECISIONS SHOULD BE RENDERED BY THE JURY. THAT IS WHAT JURIES ARE FOR.

YOU ARE ABOUT TO BEGIN HEARING SOME TESTIMONY THAT WILL IN SOME WAY INDIRECTLY RELATE ME, RELATE TO ME, IN TERMS OF SOME RULINGS AND DECISIONS I MADE IN THE CASE WHILE YOU WERE NOT IN

THE COURTROOM. I SAY THAT ONLY TO REEMPHASIZE THAT I HAVE NO OPINION, WHATSOEVER, WHAT YOUR DECISION SHOULD BE. I WANT TO MAKE THAT CLEAR. YOU WILL HEAR MY NAME MENTIONED A FEW TIMES IN THE TESTIMONY YOU ARE ABOUT TO HEAR.

YOU MAY PROCEED.

MR. SCHOOLS: THANK YOU, YOUR HONOR.

BY MR. SCHOOLS:

Q. DEPUTY HARASETH, I THINK YOU WERE SAYING THAT YOU BECAME AWARE ON SEPTEMBER 17TH, 2004, THAT THE DEFENDANT, THROUGH HIS ATTORNEYS, HAD REQUESTED THAT THE COURT ALLOW MR. BASHAM TO CHEW TOBACCO OR USE DIP DURING TRIAL; IS THAT CORRECT?

A. YES, THAT IS CORRECT.

Q. AND, DEPUTY HARASETH, WHAT IS DIP?

A. DIP IS CHEWING TOBACCO, USUALLY IN A CAN, YOU PUT IN BETWEEN YOUR GUMS AND YOUR LIP. IT GIVES YOU NICOTINE JUST AS THE SAME AS CHEWING TOBACCO OR REGULAR CIGARETTES.

Q. DOES IT REQUIRE FOR SOMEONE TO SPIT IN A CUP IN ORDER TO AVOID SWALLOWING THE TOBACCO JUICES?

A. YES.

Q. NOW, LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 472, FOR IDENTIFICATION ONLY. DOES THAT APPEAR TO BE A PORTION OF THE TRANSCRIPT ON SEPTEMBER 17TH, 2004, WHEN THE JUDGE ORDERED OR INDICATED HIS INTENTION TO ALLOW MR. BASHAM TO HAVE DIP?

A.    YES, IT DOES.

MR. SCHOOLS:  YOUR HONOR, I PROPOSE TO PUBLISH THAT, AT THIS TIME.

THE COURT:  ALL RIGHT.

BY MR. SCHOOLS:

Q.    IF YOU WOULD FOLLOW ALONG WITH ME, DEPUTY HARASETH. IT BEGINS WITH MR. SWERLING SPEAKING TO THE JUDGE SAYING:

"JUDGE, IF I COULD MAKE AN UNUSUAL REQUEST AND LET YOU DECIDE.  ONE OF THE THINGS IN BRANDON'S BACKGROUND IS HE  -- ONE OF THE THINGS THAT CALMS HIM DOWN IS NICOTINE, OKAY. WELL, NOT NECESSARILY SMOKING, BUT HE HAS, IN THE PAST, TAKEN, I GUESS, THEY CALL IT DIP.  KEEPS A LITTLE PIECE OF NICOTINE.

THE COURT: CHEWING TOBACCO? I HAVE NO PROBLEM AT ALL WITH CHEWING TOBACCO IF THAT KEEPS HIM AWAKE.

MR. SWERLING:  THAT WILL SOLVE IT. HISTORILY, THAT IS ONE OF THE ISSUES.

THE COURT:  MR. BASHAM, HOW ABOUT THAT?  CAN WE HELP YOU WITH THAT?

THE DEFENDANT: YEAH,  THAT WILL

HELP A LOT. IMMENSELY. MR. SWERLING SAYS IT IS A STIMULANT, YOUR HONOR.

THE COURT: MR. BASHAM, WE ARE ALMOST TO THE END OF THE DAY TODAY. IF YOU CAN SIT THERE AND STAY AWAKE TODAY, WE WILL HAVE YOU SOME CHEWING TOBACCO ON MONDAY WHEN WE COME BACK, I PROMISE YOU. WORK WITH US, STAY AWAKE TODAY. WE WILL HAVE CHEWING TOBACCO FIRST THING MONDAY.

THE DEFENDANT: YES, SIR.

THE COURT: DO YOU HAVE A FAVORITE BRAND?

THE DEFENDANT: KODIAK WINTERGREEN. IT IS A DIP. IT HELPS YOU STAY CALM. YEAH, IT WOULD REALLY HELP TO STAY AWAKE.

THE COURT: THANK YOU FOR THAT SUGGESTION.

Q. DO YOU RECALL THAT OCCURRING, DEPUTY HARASETH?

A. I DO.

Q. SUBSEQUENT TO THAT, DEPUTY HARASETH, DID THE U.S. MARSHAL SERVICE HAVE SOME CONCERNS ABOUT THAT REQUEST?

A.   YES, WE DID.

Q.   AND WHAT WERE THOSE CONCERNS?

MR. SWERLING:  YOUR HONOR, CAN WE APPROACH ONE MOMENT TO CLARIFY SOMETHING?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SWERLING:  JUDGE, I WANT TO CLARIFY SOMETHING ABOUT THE MARSHAL'S REASON FOR NOT WANTING THE DIP.  I THINK IT WAS NEVER REALLY ACTUALLY PROVEN THAT HE THREW SOMETHING THAT WAS SO OFFENSIVE.

THE COURT:  DISPUTED.

MR. SWERLING:  IT WAS DISPUTED.  I DON'T THINK THERE IS ANY PROOF, REALLY, OF WHAT IT WAS.  SO, I OBJECT TO THEM BRINGING IN THE ISSUE AS TO WHY THE MARSHAL THOUGHT SOME BODILY FLUID OR SOMETHING.  I THINK THAT WOULD BE UNFAIRLY PREJUDICE.

THE COURT:  ALREADY HEARD ABOUT THE EPISODE THAT ALLEGEDLY ELIMINATED THE DEFENDANT TO HAVE DIP.  THE JURY HAS ALREADY HEARD THAT?

MR. SCHOOLS:  YES, SIR.

MR. SWERLING:  NOT THE REASONS WHY THE MARSHAL WAS OBJECTING.

MR. SCHOOLS:  IF HE OBJECTS TO THE -- THE INCIDENTS THAT ARE ALREADY IN EVIDENCE, I DON'T MIND LEADING HIM

THROUGH AND JUST SAYING, WAS YOUR CONCERN THAT, AMONG OTHERS, THAT MR. BASHAM WOULD POTENTIALLY SPIT BODILY FLUID IF A DEFENDANT WAS INCLINED TO DO SO?

THE COURT:  DON'T REFER TO THE PRIOR INCIDENT AT ALL.

MR. SCHOOLS:  YES.

THE COURT:  THAT IS A GOOD WAY TO HANDLE IT.  LET'S DO THAT.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

BY MR. SCHOOLS:

Q.    YOU INDICATED THE U.S. MARSHALS DID HAVE SOME CONCERN WITH THE DEFENDANT'S REQUEST ON THE 17TH; IS THAT RIGHT?

A.    YES, SIR, WE DID.

Q.    WASN'T THAT CONCERN PRIMARILY, DEPUTY HARASETH, THE USE OF TOBACCO PRODUCT, SUCH AS DIP, WOULD REQUIRE THE DEFENDANT TO SPIT INTO A CUP AND THEREBY ACCUMULATE A BODILY FLUID THAT COULD BE THROWN IF A DEFENDANT WAS SO INCLINED TO DO THAT?

A.    YES, THAT'S CORRECT.

Q.    DID YOU OR SOMEONE ELSE WITHIN THE MARSHAL SERVICE COMMUNICATE THAT CONCERN TO JUDGE ANDERSON?

A.    YES.

Q.    AND THEN, WERE YOU PRESENT IN THE COURTROOM ON MONDAY -- JUST FOR THE RECORD, SEPTEMBER 17TH, 2004 WAS A FRIDAY;

IS THAT RIGHT?

A.    YES.

Q.    AND SO, WERE YOU PRESENT IN THE COURTROOM ON MONDAY, SEPTEMBER 20TH, 2004, WHEN THE COURT AND MR. BASHAM, AND HIS COUNSEL, AGAIN, HAD A CONVERSATION ABOUT WHETHER THE COURT COULD ALLOW MR. BASHAM TO HAVE DIP?

A.    YES.

Q.    DO YOU RECALL, AGENT HARASETH, THE COURT ADVISING MR. BASHAM THAT HE WANTED TO EXPIREMENT WITH NICOTINE GUM BEFORE GIVING HIM DIP REGARDING THE MARSHAL'S CONCERNS?

A.    YES.

Q.    WHEN JUDGE ANDERSON ULTIMATELY COMMUNICATED TO MR. BASHAM THAT HE WOULD NOT GET DIP ON SEPTEMBER 20TH OF 2004, WERE YOU PRESENT?

A.    YES, I WAS.

Q.    WHAT WAS MR. BASHAM'S REACTION?

A.    HE BECAME VERY ANGRY.  HE IMMEDIATELY, AS SOON AS THE JUDGE ORDERED THAT HE WASN'T GOING TO HAVE IT, I BELIEVE HIS NEXT STATEMENT WAS HE WANTED TO GO BACK DOWN TO THE CELL BLOCK.

Q.    LET ME INTERRUPT YOU THERE.

A.    YES, SIR.

Q.    WHAT DOES THAT MEAN, GO BACK DOWN TO THE CELLBLOCK?

A.    HE WANTED TO LEAVE THE COURTROOM AND GO -- WE HAVE WITHIN THIS BUILDING, WE HAVE A CELLBLOCK, WE HAVE DIFFERENT

HOLDING CELLS.  HE IMMEDIATELY SAID HE WANTED TO GO BACK DOWN TO THE CELLBLOCK.  HE DIDN'T WANT TO BE IN COURT ANYMORE. THAT CELLBLOCK IS DOWNSTAIRS.

Q.    IS THERE A WAY THEY CAN ACTUALLY SEE AND HEAR WHAT IS GOING ON IN THE COURTROOM?

A.    THEY HAVE JACKS,  HAVE A CART THAT HAS TV AND SPEAKERS. IT IS HOOKED UP, IT IS WIRED WITHIN THE COURTROOM.  YOU HOOK UP THIS TV ON THIS CART TO THE JACKS ON THE WALLS, AND FROM INSIDE,  FROM INSIDE THE CELLBLOCK, THEY CAN WATCH AND LISTEN TO WHAT IS GOING ON IN THE COURTROOM SO THEY DON'T MISS ANYTHING.

Q.    AND IF I REMEMBER CORRECTLY,  DEPUTY HARASETH,  THIS INCIDENT YOU ARE DESCRIBING OCCURRED SHORTLY AFTER THE LUNCH BREAK ON MONDAY SEPTEMBER 20TH; IS THAT RIGHT?

A.    YES.  WE HAD LUNCH.  WE CAME BACK AT ABOUT 2:00 O'CLOCK.  WE DISCUSSED A COUPLE OF MATTERS, TO INCLUDE THIS ONE, AND IT WAS ROUGHLY AROUND 2:10 OR 2:15.

Q.    AT THAT TIME, WAS IT STILL THE MARSHAL'S PROTOCOL, BASED ON MR. BASHAM'S REQUEST, THAT HE RECEIVE A VALIUM AT LUNCHTIME?

A.    YES.

Q.    SO,  MR. BASHAM FIRST INDICATED -- THE TRIAL WAS SCHEDULED TO GO FORWARD THAT AFTERNOON,  WAS IT NOT?

A.    YES,  IT WAS.

Q.    WHEN MR. BASHAM FIRST INDICATED HE WANTED TO GO BACK

DOWNSTAIRS, THEN WHAT HAPPENED?

A. THE JUDGE SPOKE WITH HIS ATTORNEYS. HIS ATTORNEYS EXPRESSED HOW THEY WANTED HIM TO BE HERE. MR. BASHAM CONTINUED TO SAY HOW HE DID NOT WANT TO BE HERE, HE WANTED TO BE IN THIS CELLBLOCK. MR. BASHAM WAS THEN ORDERED -- MR. BASHAM WAS STANDING UP BECAUSE HE WAS ADDRESSING THE COURT. MR. BASHAM WAS THEN TOLD BY THE JUDGE TO SIT DOWN.

Q. DID MR. BASHAM COMPLY?

A. HE DID NOT.

Q. WHAT HAPPENED, AT THAT POINT?

A. MR. BASHAM DID NOT SIT DOWN. JUDGE ANDERSON INSTRUCTED HIM, ORDERED HIM ANYWHERE FROM A TOTAL OF TWO TO FOUR TIMES TO SIT DOWN. I THINK THE FINAL TIME JUDGE ANDERSON RAISED HIS NORMAL TALKING TONE OF VOICE TO A HIGHER LEVEL AND ORDERED HIM TO SIT DOWN.

Q. NOW, THE SAME TIME, WAS THE JUDGE ADVISING THE COURT SECURITY OFFICER TO BRING THE JURY IN?

A. YES, HE WAS.

Q. SO, WHEN MR. BASHAM REFUSED TO COMPLY WITH THE JUDGE'S DIRECTIONS TO SIT DOWN, WHAT HAPPENED?

A. AT THAT POINT, I TOLD HIM TO SIT DOWN. I WAS STANDING ON MR. BASHAM'S RIGHT SIDE. WE HAD ANOTHER CONTRACT GUARD THAT WAS FROM ALVIN S. GLENN DETENTION CENTER, SERGEANT NATHAN PERRYMAN. GUARD PERRYMAN WAS STANDING ON HIS LEFT SIDE. I INSTRUCTED HIM TO SIT DOWN. HE REFUSED. THEN WE

TRIED TO SIT HIM DOWN.  HE ORIGINALLY SAT DOWN.  I DON'T THINK HE WAS READY FOR US TO SIT HIM DOWN.  AS SOON AS HE HIT THE CHAIR, HE IMMEDIATELY STOOD UP AGAIN.

Q.    AND THEN WHAT HAPPENED?

A.    FROM THAT POINT, HE STARTED TO YELL.  WE WAS MADDER THAN BEFORE.  AND, AT THAT TIME, WE HAD TO RESTRAIN HIS ARMS TO PREVENT HIM FROM MOVING IN A DIRECTION WE DIDN'T WANT HIM TO MOVE, GOING SOMEWHERE ELSE IN THE COURTROOM, STRIKING US, ANY OF THE ABOVE.

Q.    OKAY.  SO, WHAT DID, IN ORDER TO RESTRAIN HIM, DID YOU AND/OR SOME OF THE OTHER DEPUTIES HAVE TO ACTUALLY PUT YOUR HANDS ON MR. BASHAM?

A.    WE DID.  GUARD PERRYMAN AND MYSELF WERE THE FIRST ONES.  AND THEN A COUPLE OTHER DEPUTIES, DEPUTY CRANFORD AND DEPUTY O'BRIEN MOVED IN TO ASSIST.  AND THE STRUGGLE CONTINUED THERE.  HE WAS TRYING TO TURN TOWARDS US, PUSH AWAY FROM US.  HE WAS TRYING TO -- HE WAS ACTIVELY RESISTING BY TRYING TO  -- WE WERE TRYING TO CONTROL HIS ARMS, AND HE WAS TRYING TO FORCE HIMSELF OUT OF OUR CONTROL.

Q.    WHERE ARE YOU, AT THIS POINT?

A.    WE ARE STANDING JUST ABOUT RIGHT IN THE AREA OF WHERE MR. BASHAM'S CHAIR IS, RIGHT BEHIND THE DEFENSE TABLE, RIGHT ON THE RIGHT SIDE OF DEPUTY O'BRIEN, AND ON THIS SIDE OF THAT BIG TELEVISION SCREEN.

Q.    WHAT IS MR. BASHAM'S AGITATION LEVEL, AT THAT POINT?

A.    HE CONTINUES TO FIGHT AGAINST US.    I THINK THERE WAS ABOUT FOUR OF US TRYING TO RESTRAIN HIM, TRYING TO PUSH AWAY, TRYING TO WALK AWAY, TURN US AWAY.   HE WAS YELLING AND SWEARING AT BOTH THE DEPUTIES AND ALSO THE JUDGE.

Q.    DEPUTY HARASETH, HOW MANY DEPUTIES AND/OR FBI AGENTS WERE INVOLVED IN TRYING TO GET MR. BASHAM RESTRAINED, AT THIS TIME?

A.    THERE WERE FOUR OF US STANDING UP WITH HIM. WE COULD NOT CONTROL HIM WHILE HE WAS IN A STANDING POSITION.   THEN WE DECIDED TO PLACE HIM ON THE GROUND.   WE PLACED HIM ON THE FLOOR DIRECTLY BEHIND THE DEFENSE TABLE.   FBI AGENTS BRUNING AND LONG CAME TO ASSIST US.   THERE WERE SIX OF US, TOTAL, AT THAT TIME.   HE HAD PULLED HIS ARMS INTO HIM, AND HE HAD GONE WHERE HIS STOMACH WAS DOWN TOWARDS THE FLOOR, SO HIS ARMS WERE PINNED IN BETWEEN THE FLOOR AND HIS BODY.   HE WAS REFUSING TO BRING THEM OUT.

Q.    YOU, AND THE OTHER DEPUTIES, AND THE FBI AGENTS WERE TRYING TO GET HIM HANDCUFFED?

A.    WE WERE TRYING TO GET HIM HANDCUFFED.   WE WERE TELLING HIM TO STOP RESISTING, TO COOPERATE.   HE CONTINUED TO SWEAR AT US, YELL AT US IN THE COURT.   FINALLY, DEPUTY CRANFORD, THE WAY WE WERE ABLE TO GET HIS HANDS UP FROM UNDERNEATH HIM, DEPUTY CRANFORD STABILIZED HIS HEAD ON THE FLOOR, AND I APPLIED PRESSURE TO A PRESSURE POINT, WHICH CAUSED PAIN, WHICH CAUSED HIS ARMS TO COME OUT.

Q. SO, MR. BASHAM WAS ORIGINALLY LYING ON THE GROUND WITH HIS ARMS UNDERNEATH HIM REFUSING TO LET YOU AND THE OTHER DEPUTIES AND AGENTS PULL HIS ARMS OUT SO HE COULD BE HANDCUFFED?

A. YES, THAT IS CORRECT.

Q. YOU APPLIED PRESSURE WHERE?

A. I APPLIED PRESSURE IN WHAT IS CALLED THE MANDIBULAR ANGLE, A PRESSURE POINT RIGHT BELOW THE EAR. I THINK YOU HAVE HEARD IT A FEW TIMES IN THIS TESTIMONY. IT WORKS REALLY WELL. APPLIED PRESSURE, HE BROUGHT HIS HANDS OUT. SOMEBODY TOLD ME HE WAS BRINGING HIS HANDS OUT, SO I STOPPED APPLYING PRESSURE AND WE WERE ABLE TO HANDCUFF HIM THEN.

Q. THEN WHAT HAPPENED?

A. WE STOOD HIM UP. I WALKED AWAY FROM THE GROUP. I WAS -- I HAD STOOD IN FRONT OF THE BENCH FOR JUST A MOMENT IN CASE JUDGE ANDERSON HAD ANY DIRECTIVES. HE DID NOT. I THEN WENT TO THIS DOOR RIGHT OVER HERE THAT LEADS INTO THE SECURED AREA, LEADS TO OUR CELLBLOCK DOWNSTAIRS VIA ELEVATOR (INDICATING). AND THE GROUP ESCORTED MR. BASHAM AROUND THE DEFENSE TABLE. AND IN BETWEEN THE DEFENSE TABLE AND THIS WALL, HE BECAME AGITATED THE WAY DEPUTY O'BRIEN AND FBI SPECIAL AGENT LONG WERE BEHIND HIM ESCORTING HIM. HE DIDN'T LIKE THE WAY THAT HIS ARMS WERE BEING RESTRAINED.

Q. HE WAS -- WHERE WERE HIS HANDS CUFFED?

A. HIS HANDS WERE CUFFED BEHIND HIS BACK. AND THEY HAD A

HOLD OF ONE-HALF OF EACH ARM.

Q.    WHAT WERE THEY DOING TO HIM THAT HE DIDN'T LIKE?

A.    THEY WERE SECURING HIS ARMS SO THEY COULDN'T MOVE AROUND.   AND HE SAID THAT THEY WERE LIFTING HIS ARMS UP,  HE DIDN'T LIKE THAT,  HE CONTINUED TO SWEAR.

Q.    LIKE THIS (INDICATING)?

A.    YES.

Q.    AND, DEPUTY HARASETH,  HAVE YOU RECEIVED TRAINING IN THE USE OF FORCE?

A.    YES,  I HAVE.

Q.    AND IS THERE A REASON FOR LIFTING UP A PERSON'S ARMS WHO IS IN THE SITUATION MR. BASHAM WAS IN, AT THAT TIME?

A.    YES.

Q.    WHAT IS THAT?

A.    WHAT THEY CAN DO IS,  IF YOU LIFT THEM UP SLIGHTLY LIKE THAT, IT DOESN'T CAUSE PAIN THE WAY IT IS, BUT WHAT IT DOES IS IT THROWS THE PERSON OFF BALANCE SO HE CAN'T PUSH AGAINST YOU. HE WILL BE MORE EASILY DIRECTED TO WHERE YOU NEED TO MAKE HIM WALK.

Q.    YOU ARE BASICALLY JUST TRYING TO GET HIM OUT OF THE COURTROOM, AT THIS POINT?

A.    YES, WE WERE.   WE WERE WALKING STRAIGHT TO THE DOOR THAT LEADS TO THE SECURE AREA.

Q.    WHAT WAS MR. BASHAM SAYING ABOUT THE AGENT AND THE DEPUTY PUSHING HIS ARMS UP?

**JA 1802**

A.    HE WAS SAYING, I DON'T REMEMBER HIS WORDS EXACTLY. BUT TO PARAPHRASE, GET YOUR HANDS OFF OF ME, STOP PUSHING MY HANDS UP. AND I DON'T RECALL WHAT ELSE HE WAS SAYING, AT THAT POINT.

Q.    SO, WHAT HAPPENED AT THAT POINT?

A.    AT THAT POINT, HE THEN STARTED TO ACTIVELY RESIST AGAIN. THERE IS A SMALL TABLE WITH SOME WHITE SEE-THROUGH BOXES BETWEEN THAT AND THE DEFENSE TABLE. FBI SPECIAL AGENT LONG, AND DEPUTY O'BRIEN, AND A COUPLE OF THE OTHER DEPUTIES WERE TRYING TO CONTROL HIM. HE WAS PUSHING AGAINST WHERE HE WANTED TO GO. HE WAS TRYING TO TURN TOWARD THE DEPUTIES, AND WE WEREN'T ABLE TO CONTROL HIM AGAIN IN AN UPRIGHT POSITION.

Q.    SO, WHAT DID YOU DO?

A.    WE, AGAIN, PLACED HIM ON THE GROUND. THE POSITION WHERE IT WAS IS ACTUALLY RIGHT IN BETWEEN THE JUDGE'S BENCH AND AGAINST THIS DOOR.

Q.    SOMEWHERE, AGENT, RIGHT HERE (INDICATING)?

A.    YES, RIGHT THERE.

Q.    NOW, YOU SAID YOU WEREN'T ABLE TO CONTROL HIM, SO YOU TOOK HIM DOWN. AT THAT POINT, WHO WAS TRYING TO CONTROL HIM?

A.    I BELIEVE IT WAS AT LEAST FOUR DEPUTY MARSHALS AND THE TWO FBI AGENTS THAT ARE PRESENT.

Q.    AND SO, MR. BASHAM WAS ONCE AGAIN PLACED ON THE GROUND. THEN WHAT DID YOU DO?

A.    AT THAT POINT, WE SECURED HIM ON THE GROUND SO HE

COULDN'T MOVE.  I STABILIZED HIS HEAD ON THE FLOOR.  WE CONTINUED TO TALK TO HIM.  WE HAD ANOTHER DEPUTY, DEPUTY MIKE ETHERIDGE, HAD ARRIVED UP A LITTLE LATER.  WE HAD SENT HIM BACK DOWN TO THE MARSHAL'S AREA TO GET SOME LEG RESTRAINTS FOR FURTHER RESTRAINING HIM SO HE WOULDN'T BE ABLE TO ACTIVELY RESIST AS MUCH AS HE HAD.  AND THEN WE MAINTAINED CONTROL WHILE HE WAS ON THE GROUND.  WE WERE TRYING TO TALK TO HIM, TELL HIM TO RELAX, CALM DOWN, STOP RESISTING.  HE CONTINUED TO YELL, AND SCREAM, AND SWEAR, AND CALL US NAMES.

Q.    WERE YOU, AND THE OTHER DEPUTIES, AND THE AGENTS ABLE TO GET THE LEG IRONS ON MR. BASHAM?

A.    WE WERE.

Q.    THEN WHAT HAPPENED?

A.    WE STOOD HIM UP ONCE MORE, AND THEN WE MOVED HIM INTO A SECURE AREA, AND THEN DOWN INTO THE CELLBLOCK.

Q.    NOW, DEPUTY HARASETH, THE JURY CAN SEE CAMERAS IN THIS COURTROOM. DOES THE U.S. MARSHAL'S SERVICE ACTIVELY RECORD VIDEO RECORDINGS OF WHAT IS GOING ON IN HERE?

A.    WE HAVE VIDEO RECORDING CAPABILITIES, BUT I AM NOT ONE OF THE TECH GUYS.  I DON'T KNOW WHEN IT IS ON OR WHAT TRIGGERS IT, OR IF IT IS ON ALL THE TIME OR HOW IT WORKS, EXACTLY.

Q.    NEVERTHELESS, YOU ARE AWARE THE INCIDENT YOU ARE DESCRIBING WAS CAPTURED BY VIDEO CAMERA IN THIS COURTROOM?

A.    YES.

Q.    YOU HAVE ACTUALLY SEEN THE VIDEO RECORDING OF THE INCIDENT?

A.    YES.

Q.    IS IT IN REALTIME SPEED?

A.    IT IS A LITTLE FASTER.   SOME OF THE RECORDING SYSTEMS, LIKE YOU WOULD SEE ON A CONVENIENT STORE CAMERA,  SOMETIMES PEOPLE ARE MOVING A LITTLE FASTER BECAUSE -- HOW EVER THE SYSTEM IS CONFIGURED TO RECORD.   WHEN I WATCHED THIS VIDEO, IT WAS A LITTLE FASTER THAN REALTIME.

Q.    AND JUST SO THE JURY, WHEN THEY SEE IT,  KNOWS WHERE TO LOOK,  THE ORIGINAL TAKEDOWN YOU DESCRIBED WAS APPROXIMATELY RIGHT HERE (INDICATING); IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    THE SECOND TAKEDOWN YOU DESCRIBED WAS APPROXIMATELY RIGHT HERE (INDICATING)?

A.    YES,  THAT'S CORRECT.

MR. SCHOOLS:  YOUR HONOR,  WE WOULD PROPOSE TO PLAY, AT THIS TIME, GOVERNMENT'S EXHIBIT 469-B.

THE COURT:   CONSISTENT WITH MY EARLIER RULING, YOU MAY DO SO.

MR. SCHOOLS:  I WOULD LIKE TO BEG THE COURT'S INDULGENCE ON ONE POINT TO MAKE SURE WE ARE TECHNICALLY CORRECT, BASED ON YOUR EARLIER RULING.

THANK YOU FOR THE TIME,  YOUR HONOR.  I BELIEVE WE ARE READY TO GO.

MR. HARRIS:  JUDGE, ONE MOMENT.  MAY WE APPROACH?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. HARRIS:  ON FRIDAY, OUR SCREENS WENT DOWN.  I DON'T KNOW THAT THERE IS ANYTHING WE REALLY NEEDED TO SEE ON IT FRIDAY THAT WASN'T SO IMPORTANT THAT TODAY --

MR. SCHOOLS:  HAVE THE BIG SCREEN RIGHT BEHIND HIM.

MR. HARRIS:  TURN AROUND AND WATCH IT THERE?  AT SOME POINT DURING THE DAY, I GUESS WHEN TAKING A BREAK, GET IT FIXED.

THE COURT:  WOULD YOU CALL SYSTEMS AND TELL THEM THE DEFENSE'S MONITOR IS NOT WORKING AND IT NEEDS TO BE FIXED ASAP?

MR. HARRIS:  WE WILL WATCH IT ON THE SCREEN.

THE COURT:  TELL THEM IT IS A DEATH PENALTY TRIAL, DON'T WANT TO TRY IT TWICE,  COME UP DURING OUR MORNING BREAK IF AT ALL HUMANLY POSSIBLE.  TELL THEM TO COME LOOK AT IT ANYWAY, EVEN IF IT IS --  ALL RIGHT.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT:  YOU MAY PROCEED.

(WHEREUPON, THE VIDEO OF 469-B WAS PLAYED TO THE JURY.)

BY MR. SCHOOLS:

Q.    AT THAT POINT, DEPUTY HARASETH,  MR. BASHAM IS UNDER

CONTROL. YOU, AND THE OTHER DEPUTIES, AND AGENTS ARE UNDERTAKING TO TAKE HIM OUT OF THE COURTROOM?

A. YES. AS YOU CAN SEE WHERE THE GROUP IS, I AM THE ONE AT THE TOP OF THE SCREEN. I HAVE WALKED TO THE LEFT SIDE OF THE SCREEN.

Q. THAT IS YOU THERE (INDICATING)?

A. IF YOU CONTINUE PLAYING, I WALKED TOWARD THE DOOR THERE.

Q. AT THAT POINT, YOU ARE WAITING FOR SOMEONE TO COME BACK WITH LEG IRONS, AT THAT POINT, CORRECT?

A. THAT'S CORRECT.

Q. DURING THAT TIME, DEPUTY HARASETH, IS MR. BASHAM CONTINUING TO SCREAM, YELL, AND RESIST?

A. YES.

Q. DEPUTY HARASETH, ARE YOU ALSO AWARE THAT MS. JERNIGAN, THE COURT REPORTER, HAS A TAPE RECORDER THAT RECORDED THE AUDIO THAT WAS GOING ON IN THESE PROCEEDINGS?

A. YES, I DO.

Q. HAVE YOU HEARD THE AUDIO THAT WAS RECORDED BY MS. JERNIGAN DURING THE INCIDENT THAT THE JURY JUST OBSERVED IN GOVERNMENT'S EXHIBIT 469-B?

A. YES, SIR, I HEARD THE VIDEO.

Q. ARE YOU LIKEWISE AWARE MS. JERNIGAN TRANSCRIBED THE BEST SHE COULD THE PROCEEDINGS OF WHAT WAS GOING ON, AT THIS TIME?

A.    YES.

MR. SCHOOLS:  YOUR HONOR, AT THIS TIME, WE PROPOSE TO PLAY GOVERNMENT'S EXHIBIT 469-A, WHICH WILL SCROLL THE TRANSCRIPT ON THE SCREEN, ALONG WITH THE AUDIO RECORDING PROVIDED BY MS. JERNIGAN.

THE COURT:  WELL, I AM NOT SURE IF YOU HAVE ASKED HIM IF THE AUDIO ACCURATELY DEPICTS.

BY MR. SCHOOLS:

Q.    YOU HAVE LISTENED TO THE AUDIO, AGENT HARASETH?

A.    I HAVE.

Q.    DOES THE AUDIO ACCURATELY DEPICT WHAT WAS GOING ON IN THE COURTROOM THROUGH THE SEQUENCE OF EVENTS WE OBSERVED WHEN WE WATCHED GOVERNMENT'S EXHIBIT 469-B?

A.    YES, IT DOES.

THE COURT:  ALL RIGHT.  CONSISTENT WITH MY EARLIER RULING, YOU MAY PLAY THE AUDIO.

(WHEREUPON, GOVERNMENT'S 469-A WAS PLAYED FOR THE JURY.)

THE COURT:  MR. SCHOOLS, LET ME GIVE A CAUTIONARY INSTRUCTION ABOUT THE TRANSCRIPT.  LADIES AND GENTLEMEN, YOU JUST HEARD AN AUDIO RECORDING OF THE PROCEEDINGS IN THE COURTROOM.  YOU SAW A TRANSCRIPT DISPLAYED IN THE COURTROOM. THE TRANSCRIPT PURPORTS TO SET OUT THE ORAL CONVERSATIONS OF WHAT WAS HEARD ON THE TAPE.  IT ALSO PURPORTS TO IDENTIFY THE SPEAKERS WHO ENGAGED IN THE CONVERSATION.  THE TAPE ITSELF HAS BEEN ADMITTED INTO EVIDENCE.  THE TRANSCRIPT IS NOT

EVIDENCE. I HAVE PERMITTED ITS USE IN THIS TRIAL FOR THE LIMITED AND SECONDARY PURPOSE OF AIDING YOU IN FOLLOWING THE CONTENT OF THE CONVERSATION AS YOU LISTENED TO THE TAPE RECORDING. I SPECIFICALLY INSTRUCT YOU THAT WHETHER THE TRANSCRIPT CORRECTLY OR INCORRECTLY REFLECTS THE CONTENT OF THE CONVERSATION OR THE IDENTITY OF THE SPEAKERS IS ENTIRELY FOR YOU TO DETERMINE, BASED UPON YOUR OWN EVALUATION OF THE TESTIMONY THAT YOU HEARD CONCERNING THE PREPARATION OF THE TRANSCRIPT AND THE IDENTIFICATION OF THE SPEAKERS, AND FROM YOUR OWN EXAMINATION OF THE TRANSCRIPT IN RELATION TO YOUR HEARING THE TAPE. THE TAPE ITSELF IS THE PRIMARY EVIDENCE TO ITS CONTENTS. IF YOU SHOULD DETERMINE THAT THE TRANSCRIPT IS IN ANY RESPECT INCORRECT OR UNRELIABLE, YOU SHOULD DISREGARD THE TRANSCRIPT TO THAT EXTENT. YOU MAY PROCEED.

MR. SCHOOLS: THANK YOU, YOUR HONOR.

BY MR. SCHOOLS:

Q. DEPUTY HARASETH, YOU HEARD DURING THE COURSE OF THOSE EVENTS TOWARDS THE END MR. BASHAM INFORMING WHOEVER WAS LISTENING THAT IF HE WAS GOING TO SPIT, HE WAS SO MAD HE WOULD BE SPITTING NOW; IS THAT CORRECT? DO YOU REMEMBER THAT PART?

A. YES.

Q. NOW, THE NEXT DAY, SEPTEMBER 21ST OF 2004, DO YOU RECALL THE DEFENDANT, AGAIN, ADDRESSING WITH THE COURT THE ISSUE OF WHETHER HE COULD DIP?

A.    I THINK HE WAS STILL TOUCHING ON IT, TRYING TO GET IT ALLOWED.

Q.    AND THERE WAS A DIRECTION BY THE COURT, I BELIEVE, ON THE AFTERNOON OF THE 21ST THAT MR. BASHAM COULD, IN FACT, DIP DURING THE AFTERNOON RECESS?

A.    YES, THAT'S CORRECT.

Q.    AND THEN, SUBSEQUENTLY, MR. BASHAM AGAIN REQUESTED THAT HE BE ABLE TO DIP ALSO IN THE MORNING RECESS, CORRECT?

A.    ACTUALLY, IT STARTED OUT AS AFTERNOON DIP, THEN IT CHANGED TO LUNCHTIME AND AFTERNOON, BUT IT WAS HARD, IT WAS HARDER FOR US TO MANAGE LUNCHTIME BECAUSE IT INTERFERED WITH THE MARSHALS AND ALSO THE DEFENSE ATTORNEYS. SO THEN, JUDGE ANDERSON ORDERED MORNING DIP AND AN AFTERNOON DIP BREAK.

Q.    AND SINCE MR. BASHAM HAS HAD ACCESS TO THE DIP, THERE HAS BEEN NO OTHER INCIDENT LIKE THE ONE WE HAVE OBSERVED; IS THAT RIGHT?

A.    NOTHING PHYSICAL.

MR. SCHOOLS:  DEPUTY HARASETH, THANK YOU.

THE COURT:   MR. SWERLING, YOU MAY CROSS-EXAMINE.

MR. SWERLING:  THANK YOU.

MR. SWERLING:  GOOD MORNING, LADIES AND GENTLEMEN.

CROSS EXAM

BY MR. SWERLING:

Q.    GOOD MORNING, DEPUTY HARASETH. HOW ARE YOU?

A.    GOOD.

Q.    FEEL LIKE WE HAVE BEEN OLD FRIENDS, YOU HAVE BEEN SITTING BEHIND ME FOR WEEKS.   WE APPRECIATE ALL OF YOUR EFFORTS.

LET ME JUST ASK YOU A FEW QUESTIONS ABOUT THE INCIDENT, OKAY?

A.    YES.

Q.    YOU HAVE BEEN INVOLVED WITH THIS SINCE THE DAY WE FIRST STARTED SELECTING THE JURY, CORRECT?

A.    I HAVE.

Q.    AND YOU ARE AWARE OF THE FACT THAT BEFORE BRANDON IS BROUGHT HERE IN THE MORNING, HE IS TAKING MEDICINE?

A.    YES, HE DOES TAKE MORNING MEDICINE.

Q.    AND DURING LUNCHTIME, YOU OR SOMEBODY IN THE MARSHAL'S OFFICE ADMINISTERS THE MEDICINE HE IS SUPPOSED TO GET IN THE AFTERNOON?

A.    YES.

Q.    SINCE THE TRIAL STARTED, YOU HAVE HAD A LOT OF OPPORTUNITY TO OBSERVE MR. BASHAM.   AND YOU ACTUALLY SIT RIGHT BEHIND US MOST OF THE TIME?

A.    YES, THAT'S CORRECT.

Q.    DURING THIS PERIOD OF TIME, IS IT FAIR TO SAY THAT A LOT OF TIMES, EVEN DURING JURY SELECTION AS WELL AS THE TRIAL, THAT MR. BASHAM ACTS IN A HYPER WAY?

A.    I'M SORRY, HE IS WHAT?

Q.    HYPER?

A.    YES.

Q.    FIDGETY?

A.    YES.

Q.    AND SEEMS, IS IT FAIR TO SAY, YOU WOULD NOTICE THAT HE GETS DISTRACTED EASY?

A.    YES, HE DOES.

Q.    AS A MATTER OF FACT, SOMETIMES YOU ARE SITTING SO CLOSE TO US THAT YOU SEE WHILE WE ARE DISCUSSING SOME IMPORTANT LEGAL ISSUES WITH THE COURT OR SOME WITNESS ON THE STAND, MR. BASHAM IS TRYING TO GET OUR ATTENTION ABOUT UNRELATED MATTERS?

A.    YES, THAT'S CORRECT.

Q.    SO, THAT HAS BEEN SOMETHING THAT HAS BEEN CONSISTENT SINCE THE VERY FIRST DAY, CORRECT?

A.    YES, IT IS, OFF AND ON.  SOME DAYS, YES, SOME DAYS, NO.

Q.    SOME DAYS A LITTLE MORE, SOME DAYS A LITTLE WORSE, SOME DAYS NOT AT ALL?

A.    YES, THAT IS CORRECT.

Q.    ONE OF THE PROBLEMS THAT DEVELOPED DURING THE JURY SELECTION AND THEN IN THE TRIAL SEPTEMBER 17TH, WAS THAT IN THE AFTERNOON, AFTER HE GETS HIS LUNCH MEDICINE, AFTER HIS LUNCH, GENERALLY, HE JUST WANTS TO SLEEP DOWNSTAIRS, CORRECT?

A.    YES.  THAT IS PRETTY NORMAL.

**JA 1812**

Q.    AND FROM YOUR OBSERVATIONS, HE GETS DROWSY IN THE AFTERNOON, ONE REASON OR ANOTHER, WHETHER IT IS THE MEDICINE OR WHATEVER IT IS, HE GETS DROWSY. OR AT THAT TIME HE WAS GETTING DROWSY, DURING JURY SELECTION UP UNTIL THE 17TH?

A.    DURING JURY SELECTION, YES, SIR.

Q.    ONE OF THE CONCERNS THAT I HAD AND MR. HARRIS HAD WAS THAT THERE WERE A COUPLE OF TIMES IN THIS VERY IMPORTANT TRIAL HE APPEARED TO NOT BE ABLE TO STAY AWAKE, CORRECT?

MR. SCHOOLS:  YOUR HONOR, CAN WE APPROACH.

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SCHOOLS:  MR. SWERLING JUST ASKED DEPUTY HARASETH WHAT MR. SWERLING'S AND MR. HARRIS' INTENTIONS WERE.  I AM NOT SURE THAT IS A PROPER LINE OF QUESTIONING.  I DON'T UNDERSTAND THE LINE OF QUESTIONING.  I UNDERSTAND IT IS THE NATURE OF OFFERING COURTROOM TESTIMONY.  IT EXCEEDED THE SCOPE OF HIS DIRECT, FOR STARTERS.  IT IS IMPOSSIBLE FOR THIS JURY TO THINK THAT MR. SWERLING IS ASKING THESE QUESTIONS FROM FIRSTHAND EXPERIENCE AS A WITNESS TO THESE MATTERS.  I THINK IT IS IMPROPER.

MR. SWERLING:  IF I WAS PHRASING IT THAT WAY, THAT WAS NOT MY INTENT.  I WAS LAYING THE GROUNDWORK AS TO WHY I ASKED THE COURT TO ALLOW HIM TO HAVE THE DIP.

THE COURT:  ARE YOU GOING TO GO ANY FURTHER WITH IT?

MR. SWERLING:  NO, I WANTED TO ASK HIM, IS IT ME WHO RAISED THE ISSUE IN THE FIRST PLACE?

MR. SCHOOLS:  I DON'T HAVE A PROBLEM WITH THAT, HIM ASKING ABOUT WHAT HIS CONCERNS WERE.

MR. SWERLING:  WHAT I WAS TRYING TO SAY WAS THAT WAS MY CONCERN THAT I EXPRESSED IN OPEN COURT,  NOT SOMETHING THAT WAS --

THE COURT:   IT IS AN UNDISPUTED MATTER, REALLY.

MR. HARRIS:  IF I CAN ALSO BE HEARD.  IN THE COURTROOM, ON THE RECORD, WHEN WE VOICED THESE CONCERNS.

THE COURT:  ALL RIGHT.  GO AHEAD.

MR. SWERLING:  JUDGE,  I WANT TO MAKE SURE, I WANTED TO ASK,  DID YOU TRY COFFEE FIRST?  DID WE TRY THE NICOTINE? I WANT TO SAY, DID I SUGGEST? I DIDN'T WANT IT TO BE HIS IDEA THAT HE INITIATED IT.

THE COURT:  OKAY.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

BY MR. SWERLING:

Q.    THERE WERE A COUPLE OF OCCASIONS WHERE, IN THE COURTROOM, THERE WAS AN EXPRESSION BY EITHER MR. HARRIS OR I ABOUT MR. BASHAM'S APPARENTLY BEING DROWSY AND SLEEPING AT INAPPROPRIATE TIMES?

A.    YES.

Q.    NOW,  DO YOU REMEMBER THE FIRST THING -- THE FIRST TIME

Q. IT WAS RAISED, THE COURT WAS VERY KIND TO SUGGEST THAT MAYBE HE GET A DASH OF CAFFEINE IN THE AFTERNOON TO MAYBE KEEP HIM AWAKE. AND THERE WERE A COUPLE OF DAYS WHERE COFFEE WAS GIVEN TO MR. BASHAM FOR THAT EFFORT?

A. YES, EITHER COFFEE OR SODA.

Q. SODA, LIKE A COKE?

A. UH-HUH (AFFIRMATIVE RESPONSE).

Q. IT BECAME APPARENT -- NOT APPARENT, FOR ONE REASON OR ANOTHER, WE STATED THAT THAT DID NOT APPEAR TO BE WORKING, CORRECT? WE STATED IT DID NOT APPEAR TO BE WORKING?

A. I DON'T RECALL YOU STATING THAT.

Q. AT SOME POINT, WAS THERE A REQUEST MADE OR THE COURT AND THE DEFENSE HAD A COLLOQUY ABOUT POSSIBLY GETTING HIM SOME NICOTINE GUM?

A. YES. NICOTINE, YES.

Q. I THINK SOME NICOTINE GUM WAS PROVIDED TO MR. BASHAM. BUT IF YOU REMEMBER, OR DO YOU REMEMBER, IT WAS VERY DISTASTEFUL?

A. YES. HE DIDN'T LIKE IT. IT WASN'T IN HIS MOUTH.

Q. SO, ON THE 17TH, TAKE IT UP TO THE 17TH, ON THE 17TH, IS IT FAIR TO SAY THAT THE FIRST -- THE REQUEST FOR THE DIP WAS MADE BY ME?

A. YES, I THINK IT WAS.

Q. AS A RESULT OF MY KNOWLEDGE OF HIS RECORDS, THAT I KNEW THAT NICOTINE WAS VERY IMPORTANT TO HIM?

A.    I THINK FROM A DOCTOR, YES.

Q.    NOW, LET ME GO BACK A MINUTE. I WANTED TO BRING IT UP TO THAT TIME. BUT ON THE DAY THAT YOU WENT TO THE HOSPITAL --

A.    YES, SIR.

Q.    -- AS I UNDERSTAND IT, THE DOCTOR SAID THAT HE BELIEVED THAT THERE WAS AN ANXIETY ATTACK?

A.    YES, THAT IS WHAT SHE TOLD US.

Q.    THAT HE WAS UNDER A LOT OF STRESS, OR HE HAD EXPRESSED THAT HE WAS UNDER A LOT OF STRESS?

A.    THAT COULD HAVE BEEN THE RESULT OF WHAT COULD HAVE BROUGHT ON THE ANXIETY ATTACK.

Q.    THE PROCEEDINGS?

A.    YES.

Q.    WHILE HE WAS IN THE HOSPITAL, THERE WAS NO PROBLEM; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    HOW LONG WERE YOU AT THE HOSPITAL?

A.    I AM SORRY, MEDICAL PROBLEMS?

Q.    YES. WHILE YOU WERE AT THE HOSPITAL, WERE THERE ANY PROBLEMS WITH MR. BASHAM?

A.    NO. THE ONLY PROBLEM WAS THEY WANTED TO GIVE HIM A RECTAL EXAM, AND HE CHANGED HIS STORIES TO LESSEN HIS SYMPTOMS.

Q.    OKAY.

A.    HE WAS IN A SENSE, IT APPEARED, HE WAS TRYING TO TALK HIS WAY OUT OF A RECTAL EXAM.   HE DIDN'T LIKE THAT IDEA. THE DOCTOR TOLD HIM IT WAS A NECESSITY.   THEY TALKED BACK AND FORTH A LITTLE BIT, AND THEN HE DECIDED TO ALLOW THE DOCTOR TO GIVE HIM A RECTAL EXAM.

Q.    WHEN HE WAS THERE IN THE EMERGENCY ROOM, IT WAS DONE IN THE EMERGENCY ROOM, RIGHT?

A.    YES, IT WAS.

Q.    HOW LONG WERE YOU IN THE EMERGENCY ROOM?

A.    I BELIEVE, IF I CAN FIGURE MY TIME LINE CORRECTLY, JUDGE ANDERSON ORDERED US TO TAKE HIM ABOUT 9:15.   WE LEFT THERE AND GOT THERE APPROXIMATELY 9:45 TO TEN, AND I BELIEVE WE WERE DISCHARGED ABOUT 11:00 O'CLOCK.

Q.    SO, ON THE WAY OVER, MR. BASHAM HAD ON LEG RESTRAINTS?

A.    YES.  HE WAS FULLY RESTRAINED.

Q.    AND WHEN YOU RETRAINED HIM, IS HE JUST WEARING HANDCUFFS OR WHAT I REFER TO AS A BELLY CHAIN?

A.    IT WAS A BELLY CHAIN, AND THE HANDCUFFS WERE IN FRONT OF HIM.

Q.    OKAY.   AND THAT IS HOW HE WAS TRANSPORTED OVER TO THE EMERGENCY ROOM, CORRECT?

A.    YES.

Q.    THERE WAS NO PROBLEMS WITH MR. BASHAM PHYSICALLY GOING OVER TO THE EMERGENCY ROOM, CORRECT?

A.   NO.   I WAS IN THE FOLLOW CAR.  SO,  THERE WAS NO PROBLEM WHEN I WAS AROUND HIM WHEN HE WAS LOADED INTO THE VAN AND ALSO WHEN WE WALKED INTO THE EMERGENCY ROOM.

Q.   WHEN HE WAS IN THE EMERGENCY ROOM, WERE HIS RESTRAINTS TAKEN OFF,  ANY OF THE RESTRAINTS TAKEN OFF?

A.   NO,  THEY WERE NOT.

Q.   HE WAS TREATED AND EXAMINED WITH THE RESTRAINTS ON?

A.   YES,  HE WAS.

Q.   AND THERE WERE NO PHYSICAL INCIDENTS INSIDE THE EMERGENCY ROOM,  CORRECT, DURING THAT PERIOD OF TIME THAT YOU WERE THERE?

A.   NO THERE WAS NOT.

Q.   SO, THE INCIDENT THAT YOU ARE REFERRING TO HAPPENED ON THE WAY BACK TO THE VAN AFTER YOU HAD BEEN OVER THERE, AND HE HAD BEEN TREATED SUCCESSFULLY, AND YOU WERE ON YOUR WAY BACK?

A.   YES,  THAT'S CORRECT.

Q.   AND THE SITUATION,  AS I UNDERSTOOD,  WAS THAT ON THE WAY BACK, HE BENT DOWN TO PICK SOMETHING UP?

A.   HE BENT DOWN TO WHAT HE TOLD US WAS TO ADJUST HIS LEG IRONS, THEN WE CAUGHT HIM PICKING SOMETHING UP.

Q.   AND THEN YOU -- THERE WAS SOME DIRECTION OF, STAND UP, GIVE IT TO YOU.  AND THEN YOU EVENTUALLY WENT INTO HIS SOCK TO GET IT,  CORRECT?

A.   ACTUALLY,  IT WAS STAND UP,  AND WE TOLD HIM TO DROP IT.  AND THEN HE REFUSED TO STAND UP.  THEN WE HAD TO FORCE

**JA 1818**

HIM TO STAND UP. AT THAT POINT, HE HAD PUT IT IN HIS SOCK.

Q. DID YOU RETRIEVE IT FROM HIS SOCK?

A. I DID.

Q. AND IT WAS A BUTT, RIGHT, OR SOMETHING?

A. IT WAS ABOUT A HALF-SMOKED CIGARETTE.

Q. HALF-SMOKED CIGARETTE HE HAD FOUND ON THE ASPHALT OR IN THE PARKING LOT, CORRECT?

A. YES.

Q. SO, THAT FOR HIM, I MEAN, THAT WAS THE FOCUS OF WHAT THIS WAS ALL ABOUT FOR HIM, CORRECT?

A. YES, IT APPEARED SO.

Q. IT WAS NOT ANY PROBLEM WITH YOU OR ANY OF THE OTHER MARSHALS. I MEAN, THAT WAS THE ISSUE WAS THE TOBACCO. HE DIDN'T WANT TO GIVE IT UP AT FIRST?

A. NO. HE DIDN'T WANT TO DO WHAT HE WAS TOLD. HE DIDN'T WANT TO DO WHAT WE WERE TELLING HIM.

Q. IT WAS TOBACCO. HE DIDN'T WANT TO GIVE IT UP, BASICALLY, ISN'T THAT ESSENTIALLY WHAT IT CAME DOWN TO? HE DIDN'T WANT TO TELL YOU WHAT HE HAD?

A. THAT IS NOT WHAT MADE HIM MAD. WHAT MADE HIM MAD IS US TELLING HIM TO MOVE TO THE VAN. AND HE DIDN'T WANT TO DO WHAT WE WERE TELLING HIM TO DO.

Q. HAD YOU ALREADY RETRIEVED THE TOBACCO, AT THAT POINT?

A. I DID AS WE WERE STANDING HIM UP. HE WAS ACTUALLY, I BELIEVE, FULLY UPRIGHT WHEN I REACHED IN HIS SOCK.

Q.    HE GOT UPSET ABOUT THAT, FIRST OF ALL, TRUE?

A.    NO.    I THINK HE WAS MORE UPSET ABOUT STANDING UP.

Q.    IT, BASICALLY, THE REPORT SAID SOMETHING ABOUT BASHAM SHOWED RESISTANCE BY TIGHTENING HIS BODY, NOT ALLOWING YOU TO FULLY RAISE IN AN UPRIGHT POSITION?

A.    YES, THAT'S CORRECT.

Q.    AND HE WAS COMING -- BUT THAT IS THE POINT WHEN HE HAD THE TOBACCO STILL IN HIS SOCK?

A.    YES.

Q.    THAT IS WHAT I WAS BASICALLY TRYING TO ASK, OKAY. AND SO, THE RESISTANCE STARTED WHEN YOU DIRECTED HIM TO THE VAN?

A.    THE RESISTANCE STARTED WHEN HE WAS CROUCHING.

Q.    CROUCHING AND NOT STANDING UP, AND THEN GOING?

A.    AND CONTINUED ALL THE WAY TO US PLACING HIM ON THE GROUND RIGHT NEXT TO THE VAN.

Q.    OKAY.    AND THERE IS NO QUESTION THERE WAS AN ESCALATION IN HIS AGITATION AND HIS ANGER, CORRECT?

A.    THERE WAS AN ESCALATION, YES, SIR.

Q.    HE STARTED YELLING VERBALLY, YELLING AT YOU?

A.    HE WAS YELLING AT US, HE WAS VERBAL TOWARDS US RIGHT FROM THE BEGINNING, BUT, YES, HIS AGITATION GREW AS WE GOT CLOSER TO THE VAN.

Q.    AND HE WAS, ESSENTIALLY, THE STRUGGLE WAS TAKING PLACE BECAUSE HE WAS RESISTING, CORRECT?

A.    YES.

Q.    RESISTING YOUR EFFORTS TO GET HIM TO THE VAN?

A.    YES,  THAT IS CORRECT.

Q.    AND WHEN YOU GOT TO THE VAN, THERE WAS A STRUGGLE TO TRY TO GET HIM INTO THE VAN,  CORRECT?

A.    STRUGGLE FOR US?

Q.    RESISTED?

A.    COULDN'T CONTROL HIM ENOUGH TO EVEN OPEN THE VAN DOOR UP TO GET HIM IN THE VAN, THAT IS WHY WE HAD TO PUT HIM IN THE GROUND TO GET HIM UNDER CONTROL TO PLACE HIM IN THE VAN.

Q.    AT SOME POINT IN THE SITUATION, HE EVENTUALLY CALMED DOWN AND HE COMPLIED IN GETTING IN THE VAN?

A.    YES,  THAT'S CORRECT.

Q.    SO, HE ESCALATED, AND DE-ESCALATED, AND COMPLIED WITH WHAT YOUR DIRECTIONS WERE,  CORRECT?

A.    AT THE EVENT,  YES.

Q.    BUT HIS -- WHAT I UNDERSTOOD, AND FROM WHAT YOU ARE TESTIFYING TO IN YOUR REPORT IS, THAT IT WAS BASICALLY A PROBLEM OF HIS RESISTANCE DURING THIS PERIOD OF TIME, CORRECT?

A.    YES.

Q.    HE WASN'T SPITTING AT YOU OR ANY OF THE OTHER MARSHALS, CORRECT?

A.    NO, THAT IS WHY WE -- THAT IS WHAT A LOT OF THE RESISTANCE WAS.  HE WAS TRYING TO TURN TOWARDS US.   OF

COURSE, THERE IS ALWAYS A POTENTIAL FOR US, THAT IS WHY WE WERE MAKING HIM FACE AWAY FROM US.  NO,  HE DID NOT ACTUALLY SPIT AT US.

Q.   HE DIDN'T SPIT,  HE DIDN'T BITE,  HE WASN'T TRYING TO GOUGE YOU, OR ANYTHING LIKE THAT.  HE WAS, BASICALLY, RIGID AND JUST WOULDN'T -- HE WAS RESISTANT,  CORRECT?

A.   YES,  THAT'S CORRECT. AND PUSHING AWAY.  HE WAS TRYING TO MOVE TO PLACES THAT -- AWAY FROM WHERE WE WANTED HIM TO GO.

Q.   BUT, ESSENTIALLY, STILL RESISTANCE, ON HIS PART, AS OPPOSED TO TRYING TO GET TO YOU,  CORRECT?

A.   YES,  THAT'S CORRECT.

Q.   WHEN YOU GOT BACK TO THE COURTHOUSE,  MY UNDERSTANDING IS THAT HIS BEHAVIOR WAS FINE AND HE WAS COMPLETELY COMPLIANT AND IN GOOD SPIRITS?

A.   YES,  THAT'S CORRECT.

A.   I BELIEVE THOSE ARE THE WORDS I EVEN USED.

Q.   THERE WAS NO OTHER SITUATION, AT THAT TIME, AFTER THAT, CORRECT?

A.   NO.

Q.   AS A RESULT --

A.   FOR THAT MOMENT,  NO.

Q.   NOW,  LET ME JUST GO TO THE SITUATION THAT TOOK PLACE IN THE COURTROOM.  SO,  WE ALREADY KNOW, WE TOOK IT TO THE POINT ON SEPTEMBER 17TH WHERE I ASKED FOR THE COURT'S PERMISSION TO ALLOW HIM TO HAVE DIP,  CORRECT?

A. YES.

Q. AND, FRANKLY, FROM THE CONVERSATION, I DIDN'T EVEN KNOW WHAT DIP WAS, WE FOUND OUT WHAT IT WAS. I KNOW WHAT CHEWING TOBACCO IS; I DIDN'T KNOW WHAT DIP WAS.

A. YES.

Q. AT FIRST, WHEN WE FIRST HAD THE DIALOGUE WITH THE COURT, THE COURT SAID HE DIDN'T SEE ANY PROBLEM WITH IT. THE COURT SAID THE COURT DIDN'T HAVE ANY PROBLEM WITH THAT, CORRECT?

A. THAT IS WHAT IT APPEARS IN THE TRANSCRIPT, YES.

Q. AND WE EVEN TALKED ABOUT WHAT KIND OF BRAND HE LIKED. AND IF HE STAYED AWAKE AND ALERT THAT FRIDAY AFTERNOON, THEN ON MONDAY HE WOULD BE ABLE TO HAVE THE DIP?

A. YES, THAT'S CORRECT.

Q. AND ON MONDAY, WE CAME IN AND HAD ACTUALLY HAD A CAN OF DIP, CORRECT?

A. YES.

Q. AND THE AGREEMENT WAS, OR THE JUDGE'S ORDER TO US WAS THAT, IF HE WAS GOING TO ALLOW IT, HE WANTED ONE OF US, EITHER MR. HARRIS, OR I, OR SOME MEMBER OF THE DEFENSE TO BE WITH MR. BASHAM WHEN HE HAD THE DIP DURING -- FIRST STARTED AT THE AFTERNOON BREAK, AND THEN LATER TO THE MORNING BREAK, CORRECT?

A. WHAT DATE ARE YOU REFERRING TO?

Q. IT PROBABLY WOULD HAVE BEEN THE 21ST, THE 20TH OR THE

21ST, THAT IS HOW THE PARAMETERS WERE ESTABLISHED, WE WOULD HAVE TO BE WITH MR. BASHAM?

A.    YOU ARE SAYING THIS CONVERSATION TOOK PLACE AFTER THE INCIDENT IN THE COURTROOM?

Q.    YES.

A.    I DON'T REMEMBER THE DAY.  BUT IT TOOK PLACE AFTER HE WAS DENIED.

Q.    ON THE 20TH, HE WAS TOLD  -- THE JUDGE TOLD MR. BASHAM THAT HE HAD DECIDED NOT TO ALLOW THE DIP,  CORRECT?

A.    YES.

Q.    THE MARSHAL OBJECTED TO IT?

A.    YES.

Q.    IT IS ON THE TAPE.

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    ALL RIGHT.   NOW,  AT THAT POINT,  MR. BASHAM,  THE VERBAL PART OF THE START OF THE SITUATION, HE JUST WANTED TO GO DOWNSTAIRS?

A.    CORRECT.

Q.    THE JURY WAS NOT IN THE ROOM.   WE WERE ACTUALLY ON A BREAK?

A.    COMING BACK FROM LUNCH.

Q.    COMING BACK FROM LUNCH.   SO, THE JURY WAS NOT HERE, AND THE COLLOQUY BETWEEN THE COURT, AND MR. BASHAM, AND MR. HARRIS, AND MYSELF ABOUT NOT HAVING THE DIP,  DESPITE WHAT HAD BEEN SAID ON FRIDAY,  TOOK PLACE WITHOUT THE JURY,

OUTSIDE THE JURY'S PRESENCE?

A.    THAT'S CORRECT.

Q.    AND IT IS FAIR TO SAY THAT MR. BASHAM GOT UPSET, AT THAT POINT, CORRECT?

A.    YES.

Q.    AND HE STARTED GETTING MORE AGITATED?

A.    YES.

Q.    AND HE BASICALLY SAID, AS YOU CAN SEE FROM THE TRANSCRIPT, THAT HE THOUGHT THAT THAT HAD BEEN SOMETHING HE HAD BEEN PROMISED, CORRECT?

A.    YES.

Q.    AND SO, HIS AGITATION ESCALATED, CORRECT?

A.    YES.

Q.    AND WHAT HE WANTED TO DO, I MEAN THE LONG AND SHORT OF WHAT HE WANTED TO DO WAS, LEAVE THE COURTROOM, CORRECT? HE WANTED TO GO DOWNSTAIRS?

A.    YES.

Q.    NOW, AT SOME POINT DURING JURY SELECTION, YOU REMEMBER THERE HAD BEEN A DISCUSSION ABOUT HE COULD GO DOWNSTAIRS IF HE HAD THESE CONTINUED PROBLEMS ABOUT SLEEPING, AND HE COULD WATCH THE PROCEEDINGS ON THE AUDIO/VIDEO HOOKUP YOU HAVE IN THAT ROOM DOWNSTAIRS?

A.    PRIOR TO THE 20TH?

Q.    PRIOR TO THE 20TH.

A.    YES.

JA 1825

Q. SOME TIME IN THE PAST, WE HAD DISCUSSED THAT POSSIBILITY. I OBJECTED TO IT. I DIDN'T WANT HIM LEAVING THE COURTROOM. I OBJECTED TO IT.

A. YES.

Q. ON THIS PARTICULAR DAY, I DIDN'T WANT HIM LEAVING THE COURTROOM, GOING DOWNSTAIRS.

A. CORRECT.

Q. WHEN I SAW HOW AGITATED HE WAS GETTING, I, AT THAT POINT SAID, CAN WE HAVE HIM LEAVE THE COURTROOM, AT THIS TIME? DO YOU REMEMBER THAT?

A. YES. I BELIEVE YOU WERE ON THE TAPE BRIEFLY.

MR. SCHOOLS: CAN WE APPROACH?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SCHOOLS: I AM OBJECTING TO MR. SWERLING TESTIFYING. HE SAID I WANTED THIS, WANTED THAT. PERHAPS MR. HARRIS SHOULD HAVE DONE THIS WITNESS OR JUST USED THE TRANSCRIPT. THIS DEPUTY TESTIFIED ABOUT WHAT MR. SWERLING HAD DONE BASED ON THE TRIAL AND THE EVENTS.

THE COURT: VERY BRIEF REFERENCE IN THE TRANSCRIPT OF GOING DOWNSTAIRS. I AM CONCERNED THAT YOU ARE GETTING INTO YOUR MENTAL IMPRESSION OF IT.

MR. SWERLING: I APOLOGIZE. NOT TRYING TO ASK HIM ABOUT ANYTHING OTHER THAN WHAT HAPPENED IN THE COURTROOM.

NOT TRYING TO GET INTO ANYTHING SUBJECTIVE.  IF I AM, THAT IS NOT MY FOCUS.

THE COURT:  IT IS NOT REALLY IN DISPUTE, IS IT, MR. SCHOOLS? MR. SWERLING WAS TRYING TO DE-ESCALATE THE SITUATION.

MR. SCHOOLS:  THE WHYS, WHEREFORS, WHOSE INTENTIONS ARE, WHAT IS IN DISPUTE, NOT MR. SWERLING'S NECESSARILY.  IT IS OUR POSITION THAT THE DEFENDANT MANIPULATED THIS WHOLE SITUATION AND SO --

THE COURT:  BUT THAT DOESN'T GO TO MR. SWERLING.

MR. SWERLING:  I AM NOT VOUCHING FOR IT.  I AM SAYING WHAT HAPPENED IN COURT.

MR. SCHOOLS:  THERE IS --

THE COURT:  I OVERRULE THE OBJECTION FOR NOW.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

BY MR. SWERLING:

Q.   RIGHT BEFORE THE JUDGE STARTED, HIS VOICE BECAME MORE STERN ABOUT SITTING DOWN.  THERE HAD BEEN THE DISCUSSION ON THE RECORD WHEN I SAID, CAN WE TAKE A BREAK, CORRECT?

A.   YES.  I RECALL THAT.  YES, THE DIALOGUE.

Q.   AND BY THAT TIME THINGS HAD GOTTEN AGITATED.  MR. BASHAM IS ALREADY AGITATED, CORRECT?

A.   YES.

Q.   HE WAS STANDING UP NEXT TO ME.  AND THAT IS WHEN I

Q. SAID, CAN WE TAKE A BREAK?

A. YES.

Q. OF COURSE, THE COURT HAD THE RIGHT AND SAID TO MR. BASHAM, SIT DOWN, CORRECT?

A. YES, THAT'S CORRECT.

Q. WHEN MR. BASHAM DID NOT SIT DOWN, THAT IS WHEN THE MARSHALS PHYSICALLY TOOK A HOLD OR TRIED TO GET MR. BASHAM TO SIT DOWN?

A. AFTER JUDGE ANDERSON HAD TOLD HIM, ANYWHERE FROM TWO TO FOUR TIMES, AND THEN I ALSO TOLD HIM AFTER, THAT IS WHEN WE TRIED TO SIT HIM DOWN.

Q. CORRECT. I MEAN, WHAT I AM SAYING, TRIED TO SIT HIM DOWN. NO DISPUTE HE WAS TOLD TO SIT DOWN SEVERAL TIMES. BUT IT WAS ACTUALLY HE WAS -- YOU OR SOMEBODY ELSE PUT YOUR HAND ON HIM TO TRY TO GET HIM TO SIT DOWN?

A. YES, WE DID.

Q. THAT IS WHEN THE TRANSCRIPT IS PRETTY APPARENT AS TO WHAT WAS GOING ON. HE WAS SAYING, KEEP YOUR HANDS OFF OF ME, CORRECT?

A. YES.

Q. AND AS IT DEVELOPED, WHEN HE WAS TAKEN TO THE GROUND, YOU ARE HEARD TO SAY SEVERAL TIMES, I BELIEVE IT IS YOU, TO STOP RESISTING?

A. YES. I THINK THERE WERE A LOT OF US TELLING HIM AND IT WAS, I THINK THE AUDIO HAD DIFFICULTY PICKING UP OVER

THERE BECAUSE MR. BASHAM WAS FULLY ENCASED BY THE DEPUTIES AROUND HIM, AS YOU CAN SEE ON THE VIDEO. BUT I SAID NUMEROUS TIMES, AND I THINK A COUPLE OF THE OTHER DEPUTIES HAD SAID IT NUMEROUS TIMES, AS WELL.

Q. SO, SEVERAL PEOPLE WERE ACTUALLY SAYING, STOP RESISTING?

A. YES.

Q. WHAT YOU WERE TRYING TO DO, AT THAT POINT, WAS TO GET THE HANDCUFFS ON HIM, CORRECT?

A. YES.

Q. AM I CORRECT, YOU TELL ME, WAS HIS HANDS UNDER HIS CHEST WHEN HE WAS LAYING ON THE GROUND?

A. HE HAD PULLED THEM IN. HE HAD PULLED THEM IN STANDING UP, AND HE WAS REFUSING TO BRING HIS HANDS AROUND HIS BACK.

Q. RIGHT.

A. IN STANDING POSITION.

Q. HE WASN'T USING HIS HANDS TO STRIKE ANY OF YOU, THAT IS MY POINT.

A. NO, HE DIDN'T HAVE THE OPPORTUNITY TO.

Q. THEY WERE UNDER HIM. THAT IS WHY PEOPLE KEPT SAYING, STOP RESISTING, YOU WERE TRYING TO GET HIS ARMS OUT FROM UNDER HIM SO YOU COULD RESTRAIN HIM?

A. YES.

Q. THERE WERE A COUPLE OF CONVERSATIONS, LET ME WALK OUT, COUPLE OF REFERENCES TO THAT, AND GET YOUR HANDS OFF OF ME,

**JA 1829**

THE VULGARITIES THAT WERE SAID?

A. YES.

Q. HE FINALLY WAS BROUGHT UNDER CONTROL, AND THEN THERE WAS THE OTHER INCIDENT AT THE DOOR WHERE HE WAS TAKEN DOWN TO THE GROUND AGAIN?

A. YES.

Q. AGAIN, IT WAS BASICALLY A QUESTION OF RESISTANCE, CORRECT?

A. YES.

Q. WHEN YOU GOT HIM IN THE BACK, YOU, EVENTUALLY, THINGS QUIETED DOWN?

A. YES. I STAYED, I DIDN'T TRAVEL WITH HIM DOWN, BUT FROM WHAT I UNDERSTAND, YES.

Q. EVENTUALLY, QUIETED DOWN. DURING THE INCIDENT, HE KEEPS REFERRING TO THE FACT, SEE, IF I WANTED TO SPIT, I COULD SPIT NOW, SOMETHING LIKE THAT. THE FACT IS, HE DID NOT SPIT, CORRECT?

A. YES, THAT'S CORRECT.

Q. HE DIDN'T BITE ANYBODY?

A. NO.

Q. HE DIDN'T GOUGE ANYBODY?

A. NO.

Q. HE DIDN'T INFLICT ANY INJURIES ON ANYBODY?

A. NO.

Q. THERE WAS A -- THE SCENE WAS A MESS, BUT, ESSENTIALLY,

Q. Y'ALL CONTROLLED HIM AND GOT HIM OUT OF THE COURTROOM?

A. YES.

Q. NOW, AS WE SAID, WITHIN A DAY OR TWO, AN EXPERIMENT WAS TRIED WITH THE DIP TO SEE IF IT WOULD REACT THE WAY WE SAID IT WOULD TO KEEP HIM AWAKE IN THE AFTERNOON?

A. I DON'T RECALL THE EXPERIMENT, BUT I RECALL IT STARTING.

Q. I USED THE ORDER "EXPERIMENT."

A. YES.

Q. THERE WAS A TIME IN THE AFTERNOON, THEN IN THE MORNING, AND THEN TWO BREAKS.

A. YES.

Q. EITHER MR. HARRIS OR I GO BACK WITH HIM AND STAY WITH HIM FOR PART OF THE BREAK WHILE HE IS ABLE TO PUT THE DIP IN HIS MOUTH?

A. YES.

Q. AND SINCE THE 20TH OR AROUND THE 21ST, I GUESS IT WAS, HE HAS BEEN DOING THAT, AND SOME OTHER MEMBERS FROM THE DEFENSE HAS BEEN GOING IN THERE WITH HIM?

A. YES, THAT'S CORRECT.

Q. AND THERE HAS BEEN NO STRUGGLE SUCH AS EITHER ONE OF THESE INCIDENTS SINCE THAT TIME; IS THAT CORRECT?

A. NO. NO PHYSICAL ALTERCATION.

Q. THANK YOU.

MR. BASHAM STILL SOMETIMES VOCALIZE THINGS, BUT NO

PHYSICAL PROBLEMS?

A.    YES.

MR. SWERLING:  EXCUSE ME, ONE MINUTE.

BY MR. SWERLING:

Q.    I WANT TO MAKE SURE HIS REASONS, ON A DAY-TO-DAY BASIS, ARE SORT OF INCONSISTENT, HIS DISTRACTIBILITY, IRRITABILITY, HYPERNESS, THE DISTRACTION?

A.    INCONSISTENT IN VARIES?

Q.    VARIES, YES?

A.    IT VARIES.

Q.    SOMETIMES IT SORT OF -- HE ACTS CHILDLIKE SOMETIMES?

A.    NO.

Q.    IN HIS DEMANDS?

A.    I DON'T THINK IT IS CHILDLIKE.  I THINK IT IS MORE IMPULSIVE, BUT NOT CHILDLIKE.

Q.    SO, HE ACTS VERY IMPULSIVE?

A.    AT TIMES, YES.

Q.    AND, AGAIN, IT IS NOT ALWAYS A CONSISTENT PATTERN, IT IS INCONSISTENT, IT GOES FROM DAY TO DAY?

A.    SOME DAYS, IT IS IMPULSIVE; SOME DAYS, IT IS PLANNING AND CALCULATING.  IT REALLY VARIES.

MR. SWERLING: ALL RIGHT.  FINE.  THANK YOU VERY MUCH.

THE COURT:  REDIRECT.

REDIRECT EXAM

BY MR. SCHOOLS:

Q. DEPUTY HARASETH, MR. SWERLING JUST FINISHED BY ASKING YOU SOME QUESTIONS ABOUT WHETHER MR. BASHAM'S BEHAVIOR WAS VARIED THROUGHOUT THE COURSE OF THE PROCEEDINGS. YOU SAID SOME DAYS IT IS IMPULSIVE, AND SOME DAYS IT IS PLANNING, AND THAT TYPE OF THING, CORRECT?

A. THAT'S CORRECT.

Q. DESPITE THAT VARIATION, AS FAR AS YOU ARE CONCERNED, THE MEDICATIONS HE IS RECEIVING ARE THE SAME THROUGHOUT THIS TRIAL?

A. THAT'S CORRECT.

Q. MR. SWERLING ASKED YOU ABOUT THE MEDICATION HE GETS AT LUNCH, IT PUTS HIM TO SLEEP. THE U.S. MARSHAL DIDN'T DECIDE TO GIVE HIM THAT MEDICINE.

A. NO.

Q. WHO DECIDED TO GIVE MR. BASHAM THAT MEDICINE?

A. HIS DOCTORS.

Q. HIS DOCTORS DID THAT WHAT YOU SAID?

A. I DON'T KNOW IF HE HAS ONE DOCTOR OR TWO DOCTORS. THE DOCTOR THAT PRESCRIBED THE MEDICATION FOR HIM.

Q. IT IS NOT YOUR CALL?

A. NO, IT IS NOT. WE JUST DELIVER THE PILLS.

Q. YOU WOULDN'T IMAGINE, DEPUTY HARASETH, THAT HIS DOCTORS WOULD BE GIVING HIM MEDICATION IF IT WAS GOING TO MAKE HIM SLEEPY IN THE AFTERNOON DURING THE COURSE OF A DEATH

**JA 1833**

PENALTY TRIAL --

MR. SWERLING: OBJECTION, YOUR HONOR. HE WOULD NOT KNOW THAT. THAT IS JUST SPECULATING. OBVIOUSLY, NO INTENTION TO DO THAT.

THE COURT: I THINK THAT DOES CALL FOR SPECULATION. I WILL SUSTAIN THE OBJECTION.

BY MR. SCHOOLS:

Q. BUT, NONETHELESS, THE MEDICATIONS THAT MR. BASHAM WAS PRESCRIBED THAT HE HAS BEEN TAKING THAT MR. SWERLING SAID MAKE HIM SLEEPY IN THE AFTERNOONS, ARE THE SAME ONES HE WAS TAKING BEFORE THE INCIDENT THAT WE OBSERVED; IS THAT CORRECT?

A. THAT'S CORRECT. WE KEEP A LOG. ALSO, I HAVE THE MEDICAL STAFF FROM ALVIN S. GLENN DETENTION CENTER CALL ME WHEN HE REFUSES OR THEY CATCH HIM NOT TAKING HIS MEDICINE. HE HAS NOT REFUSED ANY, ACCORDING TO OUR LOG, THAT HE TAKES AT LUNCHTIME. AND I THINK THERE WAS ONE INCIDENT WHERE HE DIDN'T TAKE HIS MED AND THAT WAS, I THINK, WITHIN THE FIRST ONE TO THREE DAYS OF JURY SELECTION HE DIDN'T TAKE A MORNING MED. IT MIGHT HAVE BEEN THE VERY FIRST DAY. BUT OTHER THAN THAT, HE HAS TAKEN THEM CONSISTENTLY.

Q. MR. SWERLING ASKED YOU ABOUT THE FIRST TIME THAT MR. BASHAM EXPRESSED BEING SLEEPY IN THE AFTERNOON. JUDGE ANDERSON GAVE HIM A CUP OF COFFEE, CORRECT? DO YOU REMEMBER THAT?

A. YES, THAT'S CORRECT.

**JA 1834**

Q.    WERE YOU PRESENT THAT DAY?

A.    I WAS.

Q.    IT WAS A GIANT CUP OF COFFEE, TOO, WASN'T IT?

A.    IT WAS GIANT CUP OF COFFEE.

Q.    AND THE MARSHAL HAD CONCERN WITH HIM HAVING HOT COFFEE AT THE TABLE, TOO?

A.    WHEN I SAW IT COME OUT, THE COFFEE WAS STEAMING.  OUR JOB IS SECURING THE COURTROOM.  WE ARE NOT ONLY CONCERNED ABOUT HIM THROWING EITHER TOBACCO SPIT OR THE HOT COFFEE ON US, BUT A MEMBER OF THE COURT, PROSECUTORS, EVEN THE DEFENSE TEAM, AS WELL.

Q.    AND SO, AFTER THAT, THE COURT STARTED EXPERIMENTING WITH SOFT DRINKS?

A.    YES.

Q.    THAT DIDN'T WORK, ACCORDING TO MR. BASHAM?

A.    BOTH COFFEE AND SOFT DRINKS.

Q.    AND THEN THE COURT GAVE HIM NICOTINE GUM?

A.    YES.

Q.    NOW, AS I UNDERSTAND IT, THE ACTIVE INGREDIENT IN CHEWING TOBACCO OR DIP IS NICOTINE?

A.    THAT IS THE WAY I UNDERSTAND IT.

Q.    THE JUSTIFICATION OF GIVING MR. BASHAM NICOTINE WAS TO TRY TO KEEP HIM AWAKE?

A.    YES.

Q.    BUT NICOTINE GUM DIDN'T WORK?

A.    NO.

Q.    SO, MR. BASHAM INSISTED, THROUGH HIS ATTORNEYS, THAT HE GET ACTUALLY DIP?

A.    YES.

Q.    MR. SWERLING ASKED YOU QUESTIONS ABOUT HIS REQUEST FOR NICOTINE. HE ADVISED THE JUDGE, AND THE TRANSCRIPT REFLECTED, THAT NICOTINE HAD BEEN VERY IMPORTANT IN HIS PAST. DO YOU RECALL THOSE QUESTIONS?

A.    YES.

Q.    MR. BASHAM HAS BEEN HOUSED AT THE RICHLAND COUNTY DETENTION CENTER FOR MOST OF THE LAST YEAR AND A HALF; IS THAT RIGHT?

A.    YES.

Q.    DO THEY LET YOU SMOKE AND USE TOBACCO PRODUCTS THERE?

A.    NO.

Q.    DO YOU KNOW IF THEY ALLOW YOU TO USE -- TO SMOKE OR USE TOBACCO PRODUCTS AT THE FEDERAL MEDICAL CENTER IN BUTNER?

A.    I DON'T THINK THEY DO.

Q.    SO, MR. BASHAM COULD NOT, AS OF SEPTEMBER 20TH, 2004, HAVE HAD ACTIVE ADDICTION TO NICOTINE?

A.    YES.

Q.    MR. SWERLING ALSO ASKED YOU ABOUT THE POINT IN WHICH MR. BASHAM EXPRESSED THAT HE WANTED TO GO TO THE COURTROOM, LEAVE THE COURTROOM, WHICH WAS AFTER THE JUDGE ADVISED HIM THAT HE WAS NOT GOING TO ALLOW THAT; DO YOU RECALL THAT

QUESTION?

A.    YES, I DO.

Q.    HAD MR. BASHAM INDICATED TO YOU PRIOR TO ENTERING THE COURTROOM THAT HE DIDN'T INTEND ON STAYING IN THE COURTROOM THAT LONG THAT DAY?

A.    YES.

Q.    WHAT DID HE SAY?

A.    TRAVELLING FROM THE CELLBLOCK TO THE ELEVATOR, IT WAS MYSELF, GUARD LANG, AND GUARD HUGHES.  HE HAD MENTIONED WE DIDN'T CARE ABOUT HIS FEELINGS AND HE WASN'T GOING TO BE UP IN COURT THAT LONG.  I ASKED HIM WHAT HE MEANT BY THAT.  HE SAID OH, I WILL BE COMING DOWN HERE.  THAT IS A PARAPHRASE, GENERALLY, OF WHAT THE CONVERSATION WAS.

Q.    AND THAT WAS WHAT MR. BASHAM SAID OUTSIDE THE COURTROOM BEFORE THAT INCIDENT EVER OCCURRED?

A.    YES, COMING UP FROM, I THINK, IT WAS FROM LUNCHTIME.

        MR. SCHOOLS:  THANK YOU.

        THE COURT:  THANK YOU, SIR.  YOU MAY STEP DOWN.  PLEASE CALL YOUR NEXT WITNESS.

        MR. GASSER:  YOUR HONOR, I BELIEVE THE COURT INDICATED YOU WANTED TO TAKE A BREAK BEFORE WE STARTED CALLING VICTIM IMPACT.

        THE COURT:  MEMBERS OF THE JURY, LET'S TAKE OUR MORNING RECESS, AT THIS TIME.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF

**JA 1837**

A. FOURTEEN.

Q. AT THE TIME OF YOUR MOTHER'S DEATH, YOU WERE ACTUALLY LIVING -- YOU WERE ACTUALLY LIVING IN THE SAME HOME WITH HER AND BARRY, CORRECT?

A. YES.

Q. AND YOUR SISTER, JENNIFER, WAS LIVING THERE, AS WELL?

A. YES.

Q. WITH ANTHONY?

A. YES.

Q. JENNIFER, SHE MOVED TO SOUTH CAROLINA IN AUGUST OF 2002; IS THAT CORRECT?

A. YES.

Q. DID SHE MOVE RIGHT IN WITH YOUR MOM AND BARRY?

A. YES.

Q. AND WHO ELSE MOVED IN WITH YOUR MOM AND BARRY WITH JENNIFER?

A. ANTHONY.

Q. SO, DID YOUR MOTHER, THE THREE MONTHS THAT ANTHONY WAS LIVING IN THE SAME HOME UNDER THE SAME ROOF, DID YOU WATCH YOUR MOM DEVELOP A PERSONAL RELATIONSHIP WITH HER GRANDSON, ANTHONY?

A. YES.

Q. ANGIE, WHAT DID ANTHONY AND YOUR CHILDREN, HOW DID THEY REFER TO ALICE?

A. THEY CALLED HER MEE-MAW.

Q.    MEE-MAW?

A.    YES.

Q.    WHEN YOU FIRST MOVED DOWN TO SOUTH CAROLINA IN 1999, WHO DID YOU GO LIVE WITH?

A.    MY MOTHER.

Q.    ONCE CHLOE WAS BORN,  DID YOU GET A PLACE ON YOUR OWN?

A.    YES.   ME, AND MY GIRLS, AND THEIR FATHER FOUND OUR OWN PLACE TO LIVE.

Q.    WAS IT STILL IN THE GENERAL AREA WHERE ALICE AND BARRY LIVED?

A.    YEAH.  IT WAS FIVE MINUTES AWAY.  I DIDN'T WANT TO LIVE TOO FAR FROM MY MOM.

Q.    IN NOVEMBER OF 2002, WHEN YOUR MOM WAS KILLED,  HOW OLD WAS AMBER?

A.    FOUR.

Q.    SO, ANTHONY WOULD HAVE BEEN FOUR,  AS WELL?

A.    YES.

Q.    AND CHLOE WAS MUCH YOUNGER; IS THAT CORRECT?

A.    SHE WAS THREE.

Q.    THREE.   TELL US SOME OF THE THINGS THAT YOUR MOM WOULD DO WITH AMBER AND CHLOE.

A.    SHE WOULD SWIM IN THE POOL WITH THEM.   SHE WOULD WALK AROUND THE YARD AND SHOW THEM DIFFERENT PLANTS, AND INSECTS, AND BUGS, AND BIRDS.   SHE WOULD READ MAGAZINES AND READ BOOKS WITH THEM.   SHE WOULD HAVE CONVERSATIONS WITH THEM.   WE

WOULD LAY IN THE SUN TOGETHER, ME, AND THE GIRLS, AND MY
MOTHER.

Q.   YOU MENTIONED FLOWERS AND GARDENING.  DID ALICE, YOUR
MOM, ENJOY GARDENING?

A.   YES.

Q.   WAS THAT ONE OF HER HOBBIES OR PASTIMES?

A.   IT WAS HER PASSION.

Q.   GARDENING WAS HER PASSION?

A.   YES.

Q.   DID SHE BELONG TO ANY BOOK CLUBS OR MAGAZINE CLUBS?

A.   SHE HAD A BUNCH OF MAGAZINES ON THE OUTDOORS, AND
FLOWERS, AND BIRDS, WAYS TO DECORATE YOUR HOUSE, CRAFTS.

Q.   DID YOUR MOM WANT TO INSTILL THE SAME PASSION OF
FLOWERS AND OUTDOOR GARDENING IN ANTHONY AND CHLOE THAT SHE
HAD?

A.   YES.

Q.   ANGIE, WHAT ABOUT YOUR RELATIONSHIP WITH YOUR MOM.
WOULD YOU DESCRIBE THAT FOR US, PLEASE?

A.   SHE WASN'T JUST MY MOTHER, SHE WAS MY BEST FRIEND.

Q.   WHAT DO YOU MEAN BY THAT?

A.   I WOULD TELL HER EVERYTHING.  SHE KNEW EVERYTHING
ABOUT ME AND MY LIFE.  AND SHE WOULD DO THE SAME WITH ME.

Q.   YOUR MOM'S RELATIONSHIP, AT THE TIME, WITH BARRY, HOW
WOULD YOU DESCRIBE THAT?

A.   IT WAS VERY GOOD.  SHE LOVED HIM WITH HER LIFE.  MORE

THAN HER OWN.

Q.    YOU WATCHED YOUR MOM SURVIVE AN ABUSIVE RELATIONSHIP WITH YOUR FATHER, DID YOU NOT, ANGIE?

A.    YES, I DID.

Q.    AND THEN YOU SAW HER FALL IN LOVE AGAIN WITH BARRY AND START A WHOLE NEW LIFE OVER AGAIN; IS THAT TRUE?

A.    YES, I DID.

Q.    WAS ALICE DONOVAN HAPPY IN NOVEMBER OF 2002?

A.    YES, SHE WAS.

Q.    WAS SHE IN LOVE?

A.    YES SHE WAS, FOR THE FIRST TIME IN HER LIFE.

Q.    ON NOVEMBER 14TH, 2002, YOU PREVIOUSLY, YOU AND BARRY, PREVIOUSLY INDICATED THAT IT WAS YOU, AND YOUR SISTER, AND JENNIFER, AND ANTHONY, AND BARRY LIVING WITH YOUR MOM IN THE HOME THERE IN GALLIVANTS FERRY; IS THAT CORRECT?

A.    YES.

Q.    DESPITE THE FACT THAT YOUR TWO CHILDREN, AT THE TIME, BECAUSE YOU HAVE SINCE HAD YOUR THIRD CHILD; IS THAT TRUE?

A.    RIGHT.

Q.    YOUR TWO CHILDREN, AMBER AND CHLOE, WERE NOT PHYSICALLY UNDER THE SAME ROOF WITH YOU, DID YOU AND YOUR MOM STILL SEE A LOT OF YOUR DAUGHTERS?

A.    YES, SHE DID.

Q.    HOW OFTEN WOULD SHE SEE YOUR CHILDREN?

A.    COUPLE OF TIMES A WEEK, SOMETIMES THREE TIMES A WEEK.

Q.    YOU HAVE DESCRIBED YOUR RELATIONSHIP WITH YOUR MOM. WERE YOU ABLE TO OBSERVE JENNIFER'S RELATIONSHIP WITH YOUR MOM, AS WELL, YOUR BEING SISTERS AND SO CLOSE IN AGE?

A.    YES.

Q.    HOW WOULD YOU DESCRIBE THAT?

A.    THEY WERE VERY CLOSE.  THEY WERE BEST FRIENDS, TOO. MY MOTHER WAS BEST FRIENDS WITH BOTH OF US AND TREATED US EACH EQUAL.

Q.    DO YOU HAVE A CLOSE RELATIONSHIP WITH YOUR YOUNGER SISTER?

A.    YES.  WE ARE BEST FRIENDS.

Q.    DO YOU RECALL TESTIFYING EARLIER, IN FRONT OF THIS JURY, DURING THE GUILT PHASE ABOUT THE PHONE CALL?  YOU ARE THE ONE THAT ANSWERED THE PHONE AT APPROXIMATELY 4:30 ON NOVEMBER 14TH AND TALKED TO YOUR MOM; DO YOU REMEMBER THAT?

A.    YES.

Q.    DO YOU RECALL TELLING THE JURY ONE OF THE LAST THINGS THAT YOUR MOM SAID WAS, "I LOVE YOU," AND YOU SAID, "I LOVE YOU, TOO," DO YOU REMEMBER THAT?

A.    YES.

Q.    IN TRYING TO THINK BACK AND KNOWING NOW WHAT YOU KNOW HAPPENED HAPPENED, HAVE YOU TRIED TO THINK BACK AND REFLECT ON YOUR MOM'S DEMEANOR ON THE ENDING OF THAT PHONE CALL?

A.    HER DEMEANOR?

Q.    SOMETHING ABOUT NOW KNOWING WHAT HAPPENED, HAVE YOU

REFLECTED BACK ON HOW SHE FINISHED THAT PHONE CALL AND WHAT YOU HAVE THOUGHT ABOUT THAT?

A.    SHE DOESN'T USUALLY SAY SHE LOVES ME ON THE TELEPHONE TO ME.

Q.    YOU BLAMED YOURSELF THINKING YOU SHOULD HAVE KNOWN SOMETHING WAS UP, IS THAT HOW YOU REFLECT UPON THAT?

A.    YES.

Q.    IS THAT ONE OF THE THINGS THAT YOU PERSONALLY HAVE HAD TO DEAL WITH AS A RESULT OF YOUR MOTHER'S DEATH?

A.    YES.   THAT WAS ONE.

Q.    EMOTIONALLY AND PHYSICALLY, ANGIE, WHAT HAS YOUR MOTHER'S DEATH AND HOW SHE DIED, HOW HAS THAT IMPACTED YOU? TELL THIS JURY WHAT YOU HAVE HAD TO DEAL WITH.

A.    THE PAIN IS SO OVERWHELMING.   THE PAIN OF LOSING HER THE WAY WE DID THAT I USED TO TAKE 100 MILLIGRAMS OF ZOLOFT AND CLONIDINE THAT WAS PRESCRIBED BY MY DOCTOR.   I CAME OFF MEDICATION.  I SELF-MEDICATE MYSELF WITH ALCOHOL EVERY DAY TO NUMB MYSELF.

Q.    ARE YOU CURRENTLY ON MEDICATION?

A.    I AM NOT TAKING MY MEDICATION NOW, NO.

Q.    ANGIE, THOSE FIRST FEW NIGHTS, FRIDAY NIGHT, NOVEMBER 15TH, SATURDAY NIGHT, THE 16TH, SUNDAY NIGHT, THE 17TH, WHAT WAS IT LIKE TRYING TO GO TO SLEEP AT NIGHT NOT KNOWING WHERE YOUR MOTHER WAS OR WHAT PROBABLY COULD HAVE HAPPENED TO HER?

A. DURING THE DAY, I WOULD THINK ABOUT IT, AND I WOULD CRY, AND I WOULD SCREAM, AND I WOULD YELL, AND I WOULD THROW THINGS. AND THEN COME NIGHTTIME, I WOULD HAVE TO GET DRUNK TO GO TO BED.

Q. WERE YOU MADE AWARE OF THE INFORMATION THAT WAS BEING PROVIDED BY MR. BASHAM AND CONFIRMED BY MR. FULKS UP IN INDIANA WHERE HE WAS ARRESTED ABOUT THE INFORMATION MR. BASHAM WAS PROVIDING THAT YOUR MOM MIGHT STILL BE ALIVE TIED TO A TREE IN THE SAVANNAH BLUFF AREA IN HORRY COUNTY ON THE 20TH AND 21ST, WERE YOU MADE AWARE OF THAT?

A. YES.

Q. WHEN YOU WERE PROVIDED THAT INFORMATION, DID THAT GIVE YOU HOPE, ANGIE?

A. AT FIRST, YEAH.

Q. LATER, WHEN IT BECAME EVIDENT THAT ALL OF THAT WAS A LIE, HOW DID THAT IMPACT ON YOU?

A. IT WAS DEVASTATING.

Q. IN WHAT WAY?

A. IT WAS A ROLLER COASTER. ONE MINUTE, YOU ARE SO HAPPY THERE IS A CHANCE THAT SHE WOULD BE FOUND, SHE WOULD COME HOME. AND THEN, IN THE SAME BREATH, YOU WOULD FIND OUT THAT IT IS A LIE. YOU COME DOWN ABOUT AS HIGH AS YOU WENT UP.

Q. ANGIE, YOU HAVE NO IDEA WHERE YOUR MOTHER'S REMAINS ARE, DO YOU?

A.    NO.

Q.    NOT BEING ABLE TO PROVIDE A PROPER BURIAL FOR YOUR MOM, HOW HAS THAT IMPACTED YOU, ANGIE, AND YOUR FAMILY?

A.    AT FIRST, IT WAS VERY HARD.  YOU KNOW, I WANTED HER BODY TO BURIED FOR MY OWN SELFISHNESS.  BUT THEN, AFTER A WHILE, IT WAS, YOU KNOW, TO GIVE HER A PROPER BURIAL.  IT HAS BEEN TWO YEARS, AND YOU JUST KIND OF LEARN TO LIVE WITH THAT.  THERE ISN'T GOING TO BE A BURIAL, OR A FUNERAL, OR ANYTHING.  THAT DOESN'T BOTHER ME SO MUCH NOW.  WHAT BOTHERS ME NOW AND HURTS THE MOST IS THAT MY CHILDREN DON'T GET TO HAVE A FUTURE WITH HER.  THAT IS WHERE IT HURTS THE MOST.

Q.    YOUR MOM WAS A CAT LOVER, WASN'T SHE?

A.    YES.

Q.    YOU INDICATED TO THE JURY SHE HAD HOW MANY CATS LIVING WITH HER?

A.    SIX.

Q.    AND BIRDS, SHE LOVED BIRDS, TOO?

A.    YES.

Q.    DID SHE AND BARRY HAVE BIRDFEEDERS ALL AROUND THE BACK PORTION OF THE HOUSE, THE DECK, THE TREES, AND THOSE SORTS OF THINGS?

A.    YES.

Q.    IF YOU COULD IDENTIFY THE MOST UNIQUE PERSONALITY TRAIT THAT YOU REMEMBER MOST ABOUT ALICE, WHAT WOULD THAT BE?

A.    SHE WAS SPUNKY, AND SHE HAD A GLOW ABOUT HER.  SHE HAD

A LAUGH.  SHE HAD A BELLY LAUGH.  SHE WAS JUST SO SPUNKY.

Q.    ANGIE, YOU RECALL IN THE GUILT PHASE OF THIS TRIAL I ASKED YOU ABOUT YOUR MOM'S PERSONALITY,  WHETHER YOU THOUGHT SHE WAS FEISTY; DO YOU REMEMBER THAT?

A.    YES.

Q.    YOU INDICATED THAT ALICE DONOVAN WAS A FEISTY WOMAN, BASED ON WHAT SHE HAD TO OVERCOME; DO YOU RECALL THAT TESTIMONY?

A.    YES.

Q.    BASED ON ALL OF YOUR OBSERVATIONS OF YOUR MOM AND YOUR LIFE TOGETHER WITH YOUR MOTHER,  AND KNOWING HER HABITS, AND HER ROUTINE, AND HER SCHEDULE,  IF SHE THOUGHT THINGS WERE GOING BAD FOR HER IN FRONT OF HER ATTACKERS,  WOULD SHE HAVE FOUGHT BACK?

MR. SWERLING:  YOUR HONOR, I OBJECT TO THAT.  MAY WE APPROACH?

THE COURT:   ALL RIGHT.

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SWERLING:  JUDGE, I OBJECT TO THAT KIND OF QUESTION.  FIRST OF ALL, SHE DOES NOT KNOW WHAT WAS ON HER MOTHER'S MIND,  WHAT WAS GOING ON.  IT IS INFLAMMATORY, CREATES UNDUE PREJUDICE.   I OBJECT.   THAT IS AN UNFAIR QUESTION.

**JA 1846**

MR. GASSER:  I LAID THE GROUNDWORK.  I KNOW THE RULES DON'T APPLY,  BUT UNDER FEDERAL RULE 406, WHICH IS THE, I BELIEVE, THE HABIT, THAT IS WHY I TOOK SO MUCH PAINSTAKING TIME TO LAY THE FOUNDATION.

THE COURT:  I AM TRYING TO THINK HOW THAT RELATES TO THE SENTENCING PHASE.

MR. GASSER:  IT GOES TO THE IMPACT OF HER ON THIS CRIME.

THE COURT:  SHE FOUGHT BACK BEFORE SHE WAS KILLED?

MR. GASSER:  SHE IS NOT ONE OF THESE PASSIVE INDIVIDUALS,  SHE WOULD HAVE FOUGHT BACK.  THAT,  GIVEN THE TOTALITY OF THE EVIDENCE THAT HAS BEEN ADMITTED IN FRONT OF THIS JURY,  HIS TEMPER,  HIS ANGER GOES TO THE IMPACT OF ALICE DONOVAN.  WE CAN'T CALL ALICE DONOVAN.

THE COURT:  I AM TRYING TO THINK IT OUT.  THE FACT THAT SHE IS THE TYPE PERSON THROUGH HABIT AND SO FORTH WOULD FIGHT BACK AGAINST AN ATTACKER MEANT HER DEATH WAS MORE VIOLENT THAN IT OTHERWISE WOULD HAVE BEEN?

MR. GASSER:  WHAT IT MEANS IS, UNDER THE LAW,  WE ARE ALLOWED TO PRESENT TESTIMONY AS TO IMPACT ON THE VICTIM HERSELF.  WE CAN'T DO THAT BY CALLING THE VICTIM.  SO, THE ONLY WAY WE CAN DO THAT IS BY CALLING,  IF THERE ARE CIRCUMSTANCES OF THE CRIME.  THE WAY THAT IS NORMALLY DONE IS YOU,  IN DEATH PENALTY CASES,  IS THAT YOU PRESENT THE PHOTOGRAPHS OF THE CRIME SCENE AND PHOTOGRAPHS OF THE AUTOPSY.

MR. SWERLING KNOWS ALL OF THAT. IT IS BOTH ADMITTED IN STATE AND FEDERAL COURTS.

THE COURT: LET'S SAY YOU HAD SOME FORENSICS TO GO ON. THE FORENSICS SHOWED A STRUGGLE OCCURRED BEFORE THE DEATH OCCURRED. YOU SAY THAT IS ADMISSIBLE AT THE PENALTY PHASE TO SHOW THAT THE DEATH WAS MORE EGREGIOUS AND MORE VIOLENT?

MR. GASSER: IN EVERY STATE AND EVERY FEDERAL CIRCUIT, YOU GET BIG, COLOR, GLOSSY PHOTOGRAPHS OF WOUNDS OF THE VICTIM ON THE AUTOPSY TABLE, OF THE VICTIM AT THE CRIME SCENE, ITSELF, AND BECAUSE THE DEFENDANT IN THIS CASE, ALONG WITH HIS CODEFENDANT DISPOSED OF THE BODY IN SUCH A WAY, WE CAN'T PRESENT THAT.

THE COURT: I AM NOT ARGUING. I AM THINKING, IF YOU HAD THOSE GLOSSY PHOTOGRAPHS, HAD ONE WITH 15 STAB WOUNDS IN THEM, WHETHER THEY FOUGHT BACK OR DIDN'T FIGHT BACK, STILL HAVE 15 STAB WOUNDS. I WONDER IF FIGHTING MAKES A DIFFERENCE.

MR. GASSER: MAYBE I AM NOT ARTICULATING MYSELF WELL, YOUR HONOR. I APOLOGIZE. THE REASON WE THINK IT IS RELEVANT IN THIS CASE IS BECAUSE OF THE DEFENDANT'S DISPOSING OF THE BODY. NORMALLY, THE IMPACT OF THE CRIME ITSELF ON THE VICTIM IS BROUGHT IN THROUGH FORENSIC OFFICERS AND PATHOLOGISTS. BECAUSE OF THE DEFENDANT'S OWN ACTIONS, WE DON'T HAVE THAT.

THE COURT: I AM GOING TO OVERRULE THE OBJECTION,

**JA 1848**

BUT JUST ONE QUESTION, ONE ANSWER IS ALL YOU CAN DO. JUST BASED ON HABIT, THAT IS IT.

MR. SWERLING: MY UNDERSTANDING IS SHE WILL EXPRESS HER OPINION THAT SHE THOUGHT HER MOTHER WOULD HAVE FOUGHT.

MR. GASSER: THAT IS HER PERSONALITY.

THE COURT: I WILL ALLOW IT.

MR. SWERLING: THAT IS WHAT WE ARE OBJECTING TO.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

BY MR. GASSER:

Q. AGAIN, ANGIE, BASED ON ALL OF THE FACTORS AND THE TESTIMONY THAT YOU HAVE PREVIOUSLY PROVIDED TO THIS JURY, BOTH DURING THE GUILT PHASE AND IN RESPONSE TO SOME OF MY QUESTIONS EARLIER, IN YOUR OPINION, KNOWING YOUR MOTHER THE WAY YOU KNEW HER, AT THE END -- IF SHE WAS FACED WITH A SITUATION OF VIOLENCE, IN YOUR OPINION, WOULD YOUR MOTHER HAVE ATTEMPTED TO FIGHT BACK?

A. YES.

Q. YOU HAVE INDICATED THAT ANTHONY, YOUR NEPHEW, WAS FOUR YEARS OLD AT THE TIME THAT ALICE WAS KILLED; IS THAT CORRECT?

A. YES.

Q. AND THAT YOU, SINCE YOU WERE LIVING WITH YOUR SISTER, JEN, AND ANTHONY, YOU WERE ABLE TO OBSERVE THE RELATIONSHIP THAT DEVELOPED BETWEEN ALICE AND ANTHONY; IS THAT CORRECT?

A.    YES.

Q.    RECENTLY, WITHIN THE LAST FEW MONTHS, DID ANTHONY ASK FOR A SPECIFIC PRESENT?

A.    HE ASKED MY SISTER FOR AN "ELESCOPE" FOR HIS BIRTHDAY.

Q.    AN "ELESCOPE"?

A.    "ELESCOPE."

Q.    YOU TOOK THAT TO MEAN?

A.    IT IS ACTUALLY TELESCOPE, BUT HE COULDN'T SAY TELESCOPE.

Q.    WHY DID HE WANT AN ELESCOPE OR TELESCOPE?

A.    MY SISTER AND ANTHONY WERE SITTING ON THE PORCH. THEY WERE LOOKING AT THE STARS. AND HE SAW A STAR, AND HE SAID THAT THAT WAS MEE-MAW LOOKING DOWN ON HIM. AND HE WANTED AN ELESCOPE TO LOOK AT THE STARS.

Q.    SO, HE WANTED AN ELESCOPE TO DO WHAT?

A.    AN ELESCOPE TO LOOK AT HIS MEE-MAW.

Q.    HOW DOES ANTHONY EXPRESS OR HOW DOES HE ATTEMPT TO COMMUNICATE WITH HIS MEE-MAW?

A.    HE DRAWS PICTURES.

Q.    WHAT DO YOU MEAN HE DRAWS PICTURES? WHAT KIND OF PICTURES DOES HE DRAW?

A.    HE DREW A PICTURE OF MEE-MAW FISHING IN HEAVEN, AND HE DREW A PICTURE OF MEE-MAW WITH GOD. AND HE DREW A PICTURE OF MEE-MAW'S CATS. JUST PICTURES OF MEE-MAW.

Q.    WHAT ABOUT YOUR DAUGHTER, AMBER, AND CHLOE, I KNOW

AMBER WAS A YEAR OLDER. HOW HAS YOUR MOTHER, THEIR GRANDMOTHER'S DEATH IMPACTED YOUR CHILDREN THAT YOU HAVE SEEN?

A. THEY KNOW THAT, YOU KNOW, SHE IS IN HEAVEN. IT HAS AN IMPACT ON THEM BECAUSE IT HAS SUCH AN IMPACT ON ME AND THE WAY THAT I CAN'T BE THEIR MOTHER, BE THERE FOR THEM LIKE I WANT TO BE BECAUSE I AM SO CONSUMED WITH MY MOTHER'S PASSING ON.

Q. I AM GOING TO SHOW YOU A SERIES OF PHOTOGRAPHS, ANGIE. FIRST, I WANT TO SHOW YOU, GIVE THE JURY SOME SNAPSHOT OF YOUR MOM, AND YOU, AND YOUR SISTER. LET ME SHOW YOU GOVERNMENT'S EXHIBIT 371. WHAT IS THIS A PICTURE OF?

A. THAT IS MY MOTHER AND AMBER ON HER FIRST BIRTHDAY.

Q. WHOSE KITCHEN IS THAT?

A. THAT WOULD BE MINE.

Q. THAT WOULD HAVE BEEN IN MAY OF 1999?

A. YES.

Q. GOVERNMENT'S EXHIBIT 407. THAT IS THE SAME DAY, ISN'T IT?

A. YES.

Q. GOVERNMENT'S EXHIBIT 373. THAT IS A PICTURE OF YOUR MOM WITH HER NEXT DOOR NEIGHBOR'S CHILD; IS THAT CORRECT?

A. YES.

Q. GOVERNMENT'S EXHIBIT 374, IS THAT YOUR MOM WITH THE NEXT DOOR NEIGHBOR'S CHILD, FEEDING THE CHILD?

A. YES.

Q.    WAS YOUR MOTHER GOOD WITH CHILDREN,  INFANTS,  AND BABIES?

A.    YES.

Q.    WAS IT UNUSUAL FOR HER TO BE AROUND OTHER PEOPLE'S INFANTS AND BABIES?

A.    NO.

Q.    GOVERNMENT'S EXHIBIT 372.   THAT IS YOUR NIECE BRANDY?

A.    HER NIECE, BRANDY.

Q.    HER NIECE, BRANDY.  I'M SORRY.   GOVERNMENT'S EXHIBIT 375, WHAT IS THIS A PICTURE OF?

A.    THAT WOULD BE CHRISTMAS WITH ANTHONY,  AMBER,  AND CHLOE.

Q.    THERE IS YOUR NEPHEW, ANTHONY,  CORRECT?

A.    YES.

Q.    THAT IS AMBER?

A.    YES.

Q.    AND THAT IS CHLOE?

A.    YES.

Q.    THIS IS THE DAY AFTER CHRISTMAS IN 1999?

A.    YEAH.

Q.    AND ANOTHER PICTURE THAT DAY,  376.   THIS IS ALICE AND HER THREE GRANDCHILDREN,  CORRECT?

A.    YES.

Q.    LET ME SHOW YOU GOVERNMENT'S EXHIBIT 379.   THIS IS YOU, AND YOUR SISTER, AND YOUR MOM SOME TIME IN THE EARLY

NINETIES?

A. YES.

Q. YOU ARE TEENAGERS?

A. YES.

Q. 378, WHAT IS THIS A PICTURE OF?

A. JEN AND MY MOM DANCING.

Q. AND THIS WAS IN 1997 WHEN YOUR MOM WAS DOWN IN SOUTH CAROLINA?

A. YES. THAT WAS MY 21ST BIRTHDAY.

Q. SO, YOU WERE VISITING?

A. YEAH. IT WAS MY BIRTHDAY PRESENT THAT YEAR.

Q. GOVERNMENT'S EXHIBIT 377.

A. THEY WERE SINGING AND DANCING.

Q. GOVERNMENT'S EXHIBIT 380. THAT IS YOU, JEN, AND YOUR MOM; IS THAT CORRECT?

A. YEAH.

Q. GOVERNMENT'S EXHIBIT 381. THIS IS DOWN AT LIBERTY STATION AT MYRTLE BEACH?

A. YES.

Q. DO YOU REMEMBER WHAT OCCASION THIS WAS IN 1997?

A. THAT WAS MY 21ST BIRTHDAY.

Q. GOVERNMENT'S 382.

A. JENNIFER'S GRADUATION.

Q. FROM HIGH SCHOOL?

A. YES.

Q.    GOVERNMENT'S 392?

A.    THAT WAS HER BIRTHDAY WITH HER HALF-SISTER CAROLYN AND HER SISTER GLORIA.

Q.    AND GLORIA IS ON THE FAR LEFT, LOOKING AT THE PHOTOGRAPH?

A.    YES.

Q.    LASTLY, ANGIE, WHAT IS THE ONE THING YOU MISS THE MOST ABOUT YOUR MOM NOT BEING WITH YOU ALIVE TODAY?

A.    THE THING I MISS THE MOST IS BEING ABLE TO PICK UP THE PHONE AND CALL HER WHEN I HAVE A PROBLEM OR HER HOLDING ME AND HUGGING ME AND SAYING EVERYTHING IS GOING TO BE ALL RIGHT.

        MR. GASSER:  THAT IS ALL WE WOULD HAVE, YOUR HONOR.

        THE COURT:   ANY CROSS-EXAMINATION?

        MR. SWERLING:  NO, YOUR HONOR.

        THE COURT:   THANK YOU.  YOU MAY STEP DOWN.  PLEASE CALL YOUR NEXT WITNESS.

        MR. GASSER:  THE GOVERNMENT CALLS BARRY DONOVAN.

                BARRY DONOVAN, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

                        DIRECT EXAM

BY MR. GASSER:

Q.    BARRY, OBVIOUSLY, YOU TWO TESTIFIED BEFORE THIS JURY DURING THE GUILT PHASE OF THIS PROCEEDING.  I AM NOT GOING TO GO OVER ALL OF WHAT YOUR PRIOR TESTIMONY WAS, BUT JUST TO PROVIDE THE JURY WITH SOME -- TO FRESHEN THE JURY'S MIND, I

WANT TO ASK YOU A COUPLE OF BACKGROUND QUESTIONS AGAIN. THAT IS, YOU ARE 54 YEARS OLD?

A. THAT'S CORRECT.

Q. YOU WERE BORN AND RAISED IN SPRINGFIELD, MASSACHUSETTS?

A. YES.

Q. NOW, CURRENTLY, YOU ARE A SELF-EMPLOYED ENGINEER?

A. THAT'S CORRECT.

Q. WHEN YOU FIRST MET ALICE, SHE WAS MARRIED, CORRECT?

A. YES.

Q. AND THAT WOULD HAVE BEEN WHERE?

A. THAT WOULD HAVE BEEN IN DOVER, NEW HAMPSHIRE.

Q. WHAT HAPPENED BETWEEN ALICE AND HER FIRST HUSBAND, HOW DID THAT MARRIAGE END?

A. HE BECAME SEXUALLY VIOLENT AND ONE DAY, I GUESS, CAME HOME DRUNK, AND SHE SAID THAT THAT WAS THE LAST TIME THAT THAT WAS EVER GOING TO HAPPEN TO HER, AND SHE LEFT HIM.

Q. YOU CAME TO KNOW ALICE AFTER SHE LEFT HIM?

A. YES.

Q. WITH YOU WORKING TOGETHER, YOU DEVELOPED A FRIENDSHIP WITH ALICE?

A. YES.

Q. WORKING TOGETHER, YOU DEVELOPED A FRIENDSHIP?

A. WE HAD A FRIENDSHIP BEFORE FROM WORKING WITH EACH OTHER. AFTER SHE LEFT HER HUSBAND, IT DEVELOPED INTO MORE

THAN THAT.

Q.    SO, YOU MET ANGIE AND JEN RIGHT WHEN YOU FIRST STARTED DEVELOPING THIS RELATIONSHIP WITH ALICE?

A.    YES.

Q.    AND YOU INDICATED FROM A PREVIOUS MARRIAGE YOU HAVE A DAUGHTER, TOO; IS THAT CORRECT?

A.    YES.

Q.    NOW, OBVIOUSLY, THAT RELATIONSHIP BLOSSOMED?

A.    (WITNESS NODS HEAD AFFIRMATIVELY.)

Q.    YOU PREVIOUSLY STATED YOU MARRIED -- LIVED TOGETHER FOR A WHILE UP IN THE NEW ENGLAND PART OF THE COUNTRY?

A.    YES.

Q.    I WON'T ASK YOU TO GO BACK INTO THE SPECIFICS AS TO HOW YOU CAME DOWN TO SOUTH CAROLINA, BUT IT WAS A JOB TRANSFER WHERE YOU WERE LAID OFF, YOU WERE LOOKING FOR WORK DOWN HERE, AND YOU FOUND IT IN SOUTH CAROLINA?

A.    YES.

Q.    YOU THEN MOVED YOURSELF, MOVED TO SOUTH CAROLINA, I BELIEVE YOU TESTIFIED BEFORE, IN MARCH OF 1997?

A.    THAT'S CORRECT.

Q.    AND ALICE FOLLOWED YOU DOWN IN JUNE?

A.    YES.

Q.    AND SHORTLY THEREAFTER, ALICE DECIDED TO GO BACK TO WORK AND GOT A JOB AT PRECISION SOUTHEAST?

A.    RIGHT.

Q.   YOU HAD MENTIONED VERY BRIEFLY DURING YOUR TESTIMONY IN THE GUILT PHASE ABOUT THE HOUSE THAT YOU AND ALICE HAD JUST BUILT.   I WANT YOU TO EXPAND ON THAT IN THIS PHASE,  BARRY. TELL THIS JURY ABOUT THIS HOME THAT YOU AND ALICE DESIGNED AND BUILT TOGETHER.

A.   WELL,  WE HAD BEEN -- WE SOLD OUR PROPERTY UP IN MAINE, AND WE PROBABLY SPENT THREE OR FOUR MONTHS LOOKING AROUND FOR PROPERTY TO BUY.   AND WE FOUND A FOUR-ACRE PLOT BY ACCIDENT. ON SATURDAY MORNING,  I WENT BACK, GOT ALICE TO WALK THE PROPERTY LINES WITH ME.   WE DECIDED THAT IS WHAT WE WANTED. WE MADE A BID ON IT, AND IT WAS ACCEPTED.   WE SPENT A LONG TIME LOOKING THROUGH HOUSE PLANS.   ALICE WANTED SOMETHING VICTORIAN, SO WE FOUND SOMETHING WE SETTLED ON AND WENT TO THE BANK,  GOT A LOAN,  AND WE DECIDED WE WERE GOING TO BUILD IT OURSELVES.  OVER A PERIOD OF A YEAR AND NINE MONTHS, WE BUILT THE HOUSE OURSELVES.   WE COMPLETED IT IN SEPTEMBER OF 2002 -- I'M SORRY,  2001.

Q.   I BELIEVE YOU COMPLETED IT A WEEK BEFORE 9-11; IS THAT RIGHT?

A.   YES.

Q.   SO,  WHERE WERE YOU AND ALICE LIVING WHEN YOU WERE BUILDING THIS DREAM HOME OF YEARS?

A.   JUST ACROSS THE HIGHWAY RENTING A HOME.

Q.   AND IT TOOK THE TWO OF YOU, DURING YOUR FREE TIME,  IN THE EVENING AND WEEKEND AND TIME AWAY FROM WORK, A YEAR AND

NINE MONTHS?

A.    A YEAR AND NINE MONTHS.

Q.    EVEN THOUGH YOU MOVED IN 9-11-2001, WERE THERE STILL MANY PLANS AND PROJECTS IN AND AROUND THE HOUSE THAT YOU TWO CONTEMPLATED?

A.    YES.  THE INSIDE WASN'T REALLY FINISHED OTHER THAN DRYWALL AND TRIM AROUND DOORS AND WINDOWS.  WE HADN'T DECIDED ON THE COLOR, OR WALLPAPER, OR ANYTHING.  THERE WAS VERY LITTLE LANDSCAPING DONE, GRASS GROWING IN THE YARD, WHERE WE WANTED TO PLANT TREES AND FLOWERS AROUND THE HOUSE, WHICH NEVER GOT DONE.

Q.    HOW IMPORTANT WAS THIS HOUSE TO ALICE?

A.    IT WAS VERY IMPORTANT TO ALICE.

Q.    COULD YOU EVEN ESTIMATE THE NUMBER OF HOURS SPENT PLANNING AND PREPARING FOR AND THEN WORKING ON HER HOME?

A.    SHE WAS CONSTANTLY OUTSIDE DOING THINGS AROUND THE HOUSE, DOING THINGS INSIDE THE HOUSE, READING THE BOOKS ON DECORATING OR LANDSCAPING.  SHE BELONGED TO THREE OR FOUR DIFFERENT BOOK CLUBS ON THOSE SUBJECTS.

Q.    YOU STATED ALICE WAS 44 YEARS OLD WHEN SHE WAS KILLED?

A.    CORRECT.

Q.    HOW ACTIVE A WOMAN WAS ALICE?

A.    SHE WAS VERY ACTIVE.  SHE WAS ALWAYS GOING.  ALWAYS MOVING AROUND DOING SOMETHING.

Q.    WHAT WERE SOME OF HER ENJOYMENTS, SOME OF HER HOBBIES

AND PLEASURES?

A.    SHE WAS ALWAYS FEEDING BIRDS.   CONSTANTLY FEEDING BIRDFEEDERS, HUMMINGBIRD FEEDERS.   SHE HAD FLOWERS OUT IN THE BACK.   SHE HAD BUILT A BRICK WELL AROUND THE TREE AND PLANTED IT WITH ALL DIFFERENT TYPES OF VINES AND FLOWERS.

Q.    HOW IMPORTANT WAS IT TO ALICE WHEN ANGIE MADE THE DECISION, PREGNANT WITH CHLOE, TO MOVE WITH AMBER IN 1999 TO SOUTH CAROLINA?

A.    SHE WAS VERY HAPPY.

Q.    WHY WAS THAT?

A.    BECAUSE SHE MISSED HER CHILDREN.   SHE REALLY GOT ALONG WITH ANGIE WELL, AND SHE WANTED TO KEEP AN EYE ON HER AND HELP HER THROUGH HER LIFE.

Q.    DID YOU WITNESS AND OBSERVE YOUR WIFE EVEN FURTHER OR DEVELOP FURTHER HER RELATIONSHIP WITH HER DAUGHTER STARTING IN 1999 UNTIL NOVEMBER OF 2002?

A.    YES.

Q.    AND WITH HER GRANDCHILDREN, AS WELL, AMBER AND CHLOE?

A.    YES.   ANGIE WAS A LITTLE BIT OLDER.  SHE HAD LIVED WITH HER.  SHE HAD HER OWN CHILDREN.  SHE UNDERSTOOD MORE ABOUT WHAT HER MOTHER HAD BEEN TELLING HER ALL OF THOSE YEARS.

Q.    HOW ECSTATIC WAS ALICE WHEN SHE GOT THE CALL FROM JENNY IN 2002 SAYING SHE, TOO, WAS MOVING TO SOUTH CAROLINA WITH ANTHONY?

A.    SHE WAS JUST AS HAPPY TO HAVE ANTHONY AND JENNY COME

DOWN AS SHE WAS WITH ANGIE AND HER CHILDREN.

Q.    SOME PEOPLE WHEN THEY GET TO BE -- THEIR CHILDREN ARE RAISED AND YOU AND ALICE HAD JUST BUILT THIS NEW HOME TOGETHER, THE TWO OF YOU, AND ALL OF A SUDDEN THERE IS JENNIFER AND A FOUR-YEAR-OLD LITTLE BOY, THAT MAY BOTHER SOME PEOPLE.  DID THAT BOTHER ALICE?

A.    I WOULDN'T SAY IT BOTHERED HER.  SHE WAS HAPPY TO DO IT.  OBVIOUSLY, IN THAT SITUATION, YOU ARE GOING TO HAVE SOME CONFRONTATIONS EVERY NOW AND THEN.  WE WERE HAPPY TO DO IT.

Q.    ALICE HAD HER TWO DAUGHTERS IN THE HOUSE WITH HER AGAIN?

A.    YES.

Q.    AND ONE OF HER GRANDCHILDREN?

A.    RIGHT.

Q.    BARRY, HOW WOULD YOU DESCRIBE YOUR MARRIAGE AND YOUR RELATIONSHIP WITH ALICE FROM NOVEMBER OF 2002?

A.    TO ME, IT WAS A BEAUTIFUL RELATIONSHIP.  ALICE AND I WERE VERY, VERY CLOSE.  WE DID EVERYTHING TOGETHER.  WE MADE OUR PLANS SO THAT WE COULD -- WE PLANNED OUR ACTIVITIES SO WE COULD DO THINGS TOGETHER AND BE TOGETHER.  SHE WAS MY BEST FRIEND.  SHE WAS MY PARTNER.  WE COMPLEMENTED EACH OTHER.  ALL OF MY AIMS AND ALL OF MY CONCERNS WERE AIMED TOWARD HER COMFORT.

Q.    YOU INDICATED SHE SHARED WITH YOU, AS A FRIEND, THEN EVEN CLOSER, HER ABUSIVE RELATIONSHIP WITH HER HUSBAND.  YOU

HAVE STATED THAT TO THIS JURY.

A.    YES.

Q.    YOU THEN MARRIED ALICE AND HAD ALMOST TEN YEARS TOGETHER.  IN YOUR MIND, DO YOU THINK SHE OVERCAME THOSE OBSTACLES AND THOSE DIFFICULTIES?

A.    ABSOLUTELY.

Q.    IN NOVEMBER OF 2002, WAS ALICE DONOVAN HAPPY WITH HER LIFE?

A.    I BELIEVE SHE WAS THE HAPPIEST SHE HAD EVER BEEN.

Q.    BARRY, YOU HAVE ALREADY TESTIFIED TO THIS JURY AS TO WHAT HAPPENED, AND WHAT YOU DID ON NOVEMBER 14TH, AND SEVERAL DAYS THEREAFTER.  I WON'T GET YOU TO REPEAT THAT SINCE THAT HAS BEEN INCORPORATED INTO THE RECORD.  BUT I DO NEED TO ASK YOU A COUPLE -- GO BACK TO THAT TIME PERIOD.  WERE YOU, YOURSELF, KEPT ABREAST BY LAW ENFORCEMENT OFFICERS OF WHAT WAS GOING ON ON NOVEMBER 17TH, 18TH, 19TH, DURING THE EARLY DAYS AFTER ALICE'S DISAPPEARANCE?

A.    YES.

Q.    SPECIFICALLY, DID CONWAY CITY CHIEF HENDRIX INFORM YOU OF THE SEARCHES THAT WERE PLANNED FOR THE SAVANNAH BLUFF AREA ON WEDNESDAY, THE 20TH OF NOVEMBER, THURSDAY, THE 21ST, AND FRIDAY, THE 22ND?

A.    YES.

Q.    WERE YOU MADE AWARE OF THOSE SEARCHES?

A.    YES.

Q.    WAS IT INDICATED TO YOU THAT THAT INFORMATION WAS BEING RELAYED BY THE DEFENDANT IN THIS CASE, BRANDON BASHAM?

A.    YES.  THAT WAS MY UNDERSTANDING, YES.

Q.    WHEN YOU LEARNED THAT MR. BASHAM WAS CLAIMING THAT ALICE DONOVAN MAY -- YOUR WIFE MIGHT BE ALIVE TIED TO A TREE IN THE SAVANNAH BLUFF AREA, DID THAT GIVE YOU HOPE?

A.    ABSOLUTELY.

Q.    LATER ON, WHEN YOU LEARNED THAT THAT INFORMATION THAT BRANDON BASHAM HAD GIVEN AND THAT HAD BEEN CONFIRMED BY CHAD FULKS, AS WELL, WAS THE FABRICATION OF A LIE, WHAT IMPACT DID THAT HAVE ON YOU?

A.    I WAS VERY ANGRY, VERY FRUSTRATED.  AS ANGIE SAID, IT WAS UP AND DOWN.  WE THOUGHT, YOU KNOW, WE THOUGHT IT WAS GOING TO BE ALL OVER, THEY WOULD FIND HER, AND THEN YOU GET THE ROPE PULLED OUT FROM UNDER YOU.

Q.    BARRY, YOU DON'T KNOW HOW YOUR WIFE DIED, DO YOU?

A.    NO.

Q.    YOU DON'T KNOW WHERE YOUR WIFE'S REMAINS ARE OR WHAT IS LEFT OF HER?  YOU DON'T KNOW WHERE SHE IS, DO YOU?

A.    NO.

Q.    THIS MAY BE DIFFICULT, CAN YOU TELL US, IN YOUR OWN WORDS, HOW DOES THAT MAKE YOU FEEL NOT KNOWING HOW SHE DIED, NOT KNOWING WHERE SHE IS?

A.    IT IS KIND OF AN EMPTINESS AND FRUSTRATION.

Q.    HOW HAVE YOU TRIED TO DEAL WITH IT?

A.    IT IS JUST SOMETHING THAT YOU HAVE TO ACCEPT.    IT IS NOT SOMETHING I CAN CHANGE.  I HAVE TO DEAL WITH IT AND TRY TO MOVE ON.   AND MAKE A LIFE OVER IT.

Q.    WHAT WERE ALICE'S FEELINGS ABOUT THE STATE OF SOUTH CAROLINA,  ABOUT LIVING HERE?

A.    SHE LOVED IT HERE.

Q.    DO YOU THINK SHE EVER CONTEMPLATED LEAVING OUR STATE?

A.    SHE TOLD ME THAT, EVEN IF SHE DIED, SHE DIDN'T WANT TO BE BURIED BACK IN NEW ENGLAND,  SHE WANTED TO BE BURIED HERE.

Q.    I WANT TO SHOW YOU A SERIES OF PHOTOGRAPHS,  AS WELL, BARRY.   STARTING WITH GOVERNMENT'S EXHIBIT 384.   OBVIOUSLY, THAT IS DECEMBER 11,  1992,  YOUR WEDDING DAY,  CORRECT?

A.    CORRECT.

Q.    GOVERNMENT'S 383,  THAT IS ALICE PUTTING YOUR WEDDING RING ON YOUR HAND?

A.    YES.

Q.    GOVERNMENT'S 386,  WHAT IS THIS A PICTURE OF?

A.    THIS IS --  I DON'T KNOW WHAT YEAR IT IS.  IT WAS THANKSGIVING WITH SOME FRIEND OF OURS FROM BEAUFORT.

Q.    WAS THIS YOUR HOME YOU WERE LIVING IN, AT THAT TIME?

A.    THIS IS WHERE WE WERE BEFORE WE BUILT THE HOUSE,  YES.

Q.    THERE IS BARRY WITH A CIGARETTE AND AN ADULT BEVERAGE, I SEE.

A.    YES.

Q.    HOLDING COURT?

A.    IT IS A CIGAR.

Q.    GOVERNMENT'S EXHIBIT 385.   I SEE A CHRISTMAS TREE IN THE BACKGROUND.  I TAKE IT SOME TIME AROUND CHRISTMAS?

A.    THIS WAS CHRISTMAS AT THE SAME FRIENDS IN BEAUFORT THAT WERE IN THE PREVIOUS PHOTOGRAPH.

Q.    GOVERNMENT'S EXHIBIT 370.

A.    ALICE WASHING HER CAR.

Q.    THAT IS ALICE'S BMW?

A.    UH-HUH (AFFIRMATIVE RESPONSE).

Q.    HOW METICULOUS WAS SHE ABOUT HER CAR?

A.    VERY.

Q.    GOVERNMENT'S EXHIBIT 393.   WHAT IS THIS A PICTURE OF?

A.    ALICE HAMMERING NAILS ON THE HOUSE.

Q.    THE HOUSE YOU BUILT TOGETHER?

A.    YES.

Q.    395, THIS IS THE BACK PART OF THE HOUSE?

A.    YES.   AND ALICE'S FIRST EXPERIENCE WITH A NAIL GUN.

Q.    AND 389?

A.    THAT IS MYSELF, AND A FRIEND, AND ALICE PUTTING IN A SLIDING GLASS DOOR.

Q.    AND 394?

A.    THAT IS ALICE ON THE PLANT SHELF IN THE GREAT ROOM.

Q.    DID YOUR WIFE SHOW A LOT OF PRIDE IN THAT HOUSE?

A.    YES.

Q.    388.   TELL THE JURY THE MEANING OR THE SIGNIFICANCE OF

THAT STREET SIGN.

A. IT IS THE FIRST THREE LETTERS OF ALICE'S NAME AND THE FIRST THREE OF MINE. IT IS WHAT WE DECIDED TO NAME THE ROAD WE WERE ON.

Q. ALIBAR AVENUE?

A. YES.

Q. IS THE NAME OF THE ROAD YOU WERE ON?

A. YES.

Q. THE SAME HOUSE YOU LIVE IN TODAY?

A. YES.

Q. AND 391, YOUR WIFE, ALICE DONOVAN?

A. YES.

Q. BARRY, THESE PHOTOGRAPHS THAT I HAVE GONE OVER WITH YOU AND ANGIE PROVIDES A SNAPSHOT OF ALICE DONOVAN FOR THIS JURY. WHAT KIND OF PERSON WAS ALICE DONOVAN, YOUR WIFE?

A. SHE WAS KIND, SHE WAS COURAGEOUS, SHE WAS FUNNY, OPEN-MINDED, PHILOSOPHICAL, LOVED MUSIC, LOVED NATURE, LOVED HER CHILDREN. AND SHE WOULD HELP ANYBODY SHE COULD.

Q. I WILL FINISH BY ASKING YOU THE SAME QUESTION I ASKED ANGIE. WHAT IS THE ONE THING, I KNOW ONE MAY BE LIMITED, ONE OR TWO THINGS, TODAY, AS YOU SIT IN THAT WITNESS BOX, IN OCTOBER OF 2004, THAT YOU MISS THE MOST ABOUT YOUR WIFE?

A. I THINK IT WOULD HAVE TO BE HER SENSE OF HUMOR.

Q. WHAT DO YOU MEAN BY THAT?

A. HER STYLE AND MY STYLE DEALING WITH PEOPLE IS THE SAME.

WE LIKE TO DEAL WITH PEOPLE USING HUMOR.  THAT IS WHAT SHE DID.   SHE COULD GET ANYBODY TO CHEER UP OR LAUGH.

MR. GASSER:  THAT IS ALL WE HAVE,  YOUR HONOR.

THE COURT:   ANY CROSS-EXAMINATION?

MR. SWERLING:  NO.

THE COURT:   THANK YOU,  SIR.  YOU MAY STEP DOWN. MEMBERS OF THE JURY,  LET'S TAKE OUR AFTERNOON RECESS, AT THIS TIME.   PLEASE GO TO YOUR JURY ROOM.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:   PLEASE CALL YOUR NEXT WITNESS.

MR. SCHOOLS:  WE CALL JUDY EZELL.

JUDY EZELL, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. SCHOOLS:

Q.    GOOD AFTERNOON,  MS. EZELL.  HOW ARE YOU?

A.    I'M FINE,  THANK YOU.

Q.    MS. EZELL,  YOU ARE ALICE DONOVAN'S SISTER; IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    AND SO,  I GUESS YOU HAVE KNOWN ALICE LONGER THAN ANYONE WHO HAS TESTIFIED UP TO THIS POINT; IS THAT RIGHT?

A.    YES.

Q.    I WANT TO ASK YOU A FEW QUESTIONS ABOUT SOME HISTORICAL INFORMATION,  FIRST.   HOW MANY SIBLINGS DID ALICE HAVE?

A.   FIVE GIRLS AND ONE BOY; SO, SHE HAD FOUR SISTERS AND ONE BROTHER.

Q.   AND ARE YOU ALL FULL BROTHERS AND SISTERS?

A.   NO, WE ARE HALF BROTHERS AND SISTERS.  THE THREE OLDEST ONES ARE FULL SISTERS:  ALICE, GLORIA, AND I ARE FULL SISTERS.  SALLY, CAROL, AND LEO ARE FULL SIBLINGS TO EACH OTHER, BUT THEY ARE HALF SIBLINGS TO THE THREE OF US.

Q.   AND WHERE DOES ALICE FALL IN THE ORDER? WHO WAS BORN FIRST?

A.   SHE IS THE THIRD BORN.

Q.   WHO WAS FIRST?

A.   I AM.

Q.   WHO CAME AFTER YOU?

A.   GLORIA.

Q.   HOW ABOUT WITH THE HALF SIBLINGS?

A.   ALL RIGHT.  THEN THERE WOULD BE SALLY, CAROL, AND THEN LEO.

Q.   WHERE DO YOU LIVE, MS. EZELL?

A.   I LIVE IN COLORADO.

Q.   DO YOU HAVE CHILDREN?

A.   I HAVE CHILDREN.  I HAVE THREE CHILDREN; TWO BOYS AND A GIRL.  I HAVE A DOZEN GRANDCHILDREN.

Q.   ARE YOU MARRIED STILL?

A.   YES.

Q.   HOW LONG HAVE YOU LIVED IN COLORADO?

A. OH, I WOULD SAY ROUGHLY 20 YEARS.

Q. YOU MENTIONED THAT YOU, AND ALICE, AND GLORIA HAVE SOME HALF SIBLINGS, WHICH MEANS YOUR FOLKS WERE DIVORCED AT SOME POINT; IS THAT RIGHT?

A. MY MOTHER MARRIED MY FATHER, DIVORCED HIM, MARRIED A MAN NAMED LEO, AND THEN AFTER ABOUT EIGHT YEARS MARRIED A MAN NAMED DON.

Q. DID YOU, AND GLORIA, AND ALICE ALL LIVE WITH YOUR MOM THE WHOLE TIME YOU WERE GROWING UP?

A. NO. OUR EARLIEST YEARS WERE SPENT, SOME OF US IN FOSTER CARE, AND I SPENT TIME WITH MY GRANDMOTHER.

Q. HOW OLD WERE YOU WHEN YOU, AND ALICE, AND GLORIA WERE AWAY FROM YOUR MOM?

A. I THINK I WAS ABOUT THREE, THREE AND A HALF. AND THEN ALICE WAS AN INFANT AND GLORIA WAS ONLY 11 MONTHS OLDER. SO, ALICE WOULD HAVE BEEN ABOUT SIX MONTHS OLD.

Q. YOU SAID "Y'ALL," GLORIA AND ALICE WENT INTO FOSTER CARE FOR A WHILE, AND YOU STAYED WITH YOUR GRANDMOTHER?

A. IT WAS FOR ABOUT A YEAR AND A HALF TO TWO YEARS OR SO.

Q. WHY WAS THAT?

A. BECAUSE MY FIRST FATHER WAS ABUSIVE, ALCOHOL PROBLEM. AND THEN SHE TRIED TO WORK, AND SHE FOUND A NEW HUSBAND. AND SHE REMARRIED AND JOINED US ALL BACK TOGETHER AS A FAMILY.

Q. HOW LONG WERE Y'ALL AWAY FROM HER?

A. EXCUSE ME, I AM SORRY?

Q.    HOW LONG WERE Y'ALL AWAY FROM HER?

A.    ABOUT TWO YEARS, ROUGHLY.

Q.    WHEN YOU MOVED BACK, SHE HAD REMARRIED?

A.    YES.

Q.    WHAT WAS HER HUSBAND'S NAME?

A.    LEO.

Q.    I BELIEVE SHE AND LEO HAD HAD YOUR OLDEST HALF SIBLING, AT THAT POINT, WHEN YOU ALL MOVED BACK IN; IS THAT RIGHT?

A.    YES.

Q.    THAT WAS,  REMIND ME,  WHICH ONE?

A.    SALLY.

Q.    AT THAT POINT, YOU MOVED BACK IN WITH YOUR MOM AND HER HUSBAND,  THE THREE OF YOU,  GLORIA,  ALICE,  YOURSELF,  AND SALLY?

Q.    DID YOU GROW UP IN THAT HOUSEHOLD?

A.    I STAYED THERE UNTIL I WAS 15.

Q.    AS I UNDERSTAND IT,  MS. EZELL,  THE TIME THAT YOU WERE THERE,  YOUR MOM WAS MARRIED TO LEO WAS SORT OF A TURBULENT TIME IN YOUR HOUSEHOLD?

A.    IT WAS A TURBULENT TIME,  YES.

Q.    SIGNIFICANT CONFLICT BETWEEN YOUR PARENTS, AND YOU, AND ALICE, AND THE OTHERS?

A.    WE WERE BOTH PHYSICALLY BATTERED AND SEXUALLY ABUSED.

Q.    WERE YOU CARED FOR IN A PRACTICAL SENSE? I MEAN,  DID YOU GO TO SCHOOL?

**JA 1869**

A.   I CAN'T FIND FAULT WITH HER.   SHE DID A MARVELOUS JOB WITH THAT MANY CHILDREN.   SHE KEPT A CLEAN HOME,   SHE KEPT US ALL WELL FED, MADE OUR CLOTHES,   EVEN OUR EASTER CLOTHES.   SO, SHE DID A REAL GOOD JOB THAT WAY.

Q.   HOW ABOUT GOING TO SCHOOL.   DID YOU GO TO SCHOOL?

A.   VERY CLEAN.   EVERY DAY.   ALL THE TIME WE HAD TO DO HOMEWORK.

Q.   AND WHERE WERE YOU ALL, AT THIS TIME? WHERE WERE YOU LIVING?

A.   IN A TOWN CALLED KINGSTON,   NEW HAMPSHIRE.

Q.   IS THAT WHERE YOU AND ALICE WERE BORN?

A.   NO.   WE WERE BORN IN MASSACHUSETTS.   AND WHEN MOM BROUGHT US INTO THE HOME FROM THE FOSTER CARE,   WE MOVED INTO NEW HAMPSHIRE.

Q.   NOW,   I THINK YOU MENTIONED YOU LEFT THE HOME AT A FAIRLY YOUNG AGE; IS THAT CORRECT?

A.   I LEFT HOME AT 15.   MOM HAD REMARRIED, AND I HAD HAD AN ARGUMENT WITH MY STEPDAD, SO I HAD LEFT.   ALICE HAD PROBLEMS WITH HIM,  TOO.

Q.   WHERE DID YOU GO WHEN YOU LEFT?

A.   I GOT MARRIED.

Q.   WHERE DID YOU LIVE, AT THAT POINT?

A.   DOVER,  DELAWARE.

Q.   AND ALICE LEFT THAT SAME HOME AT A FAIRLY YOUNG AGE HERSELF?

A.    YES.    I WOULD SAY, ROUGHLY, FOUR YEARS LATER.

Q.    WHERE DID SHE GO WHEN SHE LEFT?

A.    HALLERHILL, MASSACHUSETTS.    HALLERHILL, MASSACHUSETTS SHE HAD MET GEORGE WARNER.

Q.    THAT WAS HER FIRST HUSBAND?

A.    YES.

Q.    DID THEY GET MARRIED WHEN ALICE WAS PRETTY YOUNG, TOO?

A.    YES.

Q.    HOW FAR WERE SHE AND GEORGE LIVING FROM WHERE YOU AND YOUR HUSBAND WERE?

A.    OH, A COUPLE OF BLOCKS.

Q.    DID YOU SEE EACH OTHER REGULARLY?

A.    WE SURE DID.

Q.    WHAT KIND OF RELATIONSHIP WAS ALICE IN WITH HER FIRST HUSBAND, AT THAT TIME?

A.    IT WAS A BAD RELATIONSHIP.

Q.    WHAT WAS BAD ABOUT IT?

A.    WELL, IT DIDN'T START THAT WAY.    HE DRANK A LOT.    HE WAS A DRUG USER.    HE BECAME PHYSICALLY VIOLENT WITH HER.    I WITNESSED BEATINGS.

Q.    NOW, DID YOU SEE ALICE AND GEORGE REGULARLY DURING THAT TIME FRAME?

A.    OH, YEAH, BECAUSE WE ALWAYS LIVED RIGHT NEAR EACH OTHER.    SO, I WOULD SEE THEM FOUR TIMES A WEEK, SOMETIMES MORE.

Q.    WHAT KIND OF A RELATIONSHIP DID YOU AND ALICE HAVE BACK THEN?

A.    CLOSE.   I MEAN,  WHEN SHE HAD ANGIE, I WAS THERE IN THE DELIVERY ROOM.  WHEN SHE HAD JENNY, I WAS THERE IN THE DELIVERY ROOM.   I TOOK CARE OF THE GIRLS THE FIRST YEARS OF THEIR LIFE DAILY.

Q.    WHAT KIND OF IMPACT DID IT HAVE ON ALICE WHEN SHE HAD CHILDREN?

A.    OH, SHE LOVED HER CHILDREN.   SHE HAS A BEAUTIFUL PICTURE ALBUM OF ANGIE.   I THINK SHE TOOK PICTURES EVERY DAY. THE KIDS WERE IMMACULATE.   THEY WERE WELL FED.   ANGIE WAS A PORK CHOP.

Q.    NOW,  DURING THIS TIME WHEN THE KIDS WERE YOUNG AND YOU WERE LIVING CLOSE TO EACH OTHER, WAS IT STILL A ROUGH TIME FOR ALICE, AS A RESULT OF HER RELATIONSHIP WITH GEORGE,  OR WAS IT GOOD FOR HER, AT THIS TIME?

A.    SHE JUST DIDN'T HAVE A GOOD RELATIONSHIP WITH GEORGE, I THINK,  PROBABLY FROM THE FIRST YEAR.   AFTER THE FIRST YEAR, IT STARTED GETTING ROCKY.

Q.    AND DID THERE COME A TIME LATER ON,  HOWEVER, WHEN IT KIND OF GOT BETTER FOR A LITTLE WHILE?

A.    YES,  IT DID.

Q.    WHEN WAS THAT?

A.    WE HAD BEEN AWAY FOR A FEW YEARS, WE RETURNED, SO I WOULD SAY FOR A PERIOD OF ABOUT FOUR YEARS.   MY HUSBAND AND

GEORGE WORKED TOGETHER IN THE SAME FACTORY.  AND MY HUSBAND KIND OF LAID DOWN THE LAW TO GEORGE, GET RIGHT OR GET GONE. GEORGE GOT RIGHT.  FOR THE FIRST TIME IN THEIR LIVES, THEY WERE MAKING GOOD MONEY.  THEY BOUGHT THEIR FIRST HOME; THEY BOUGHT THEIR FIRST NEW CAR; GOT THEIR FIRST CREDIT CARDS; PAID OFF ALL OF THEIR BAD DEBTS; AND THINGS BEGAN TO RUN RELATIVELY SMOOTHLY FOR THEM.  AT ONE POINT IN TIME, ALICE HAD SAID THAT SHE HAD FALLEN IN LOVE WITH HIM ALL OVER AGAIN.  IT WAS JUST A SHORT TIME, BUT IT WAS THERE.

Q.    WHAT HAPPENED TO CHANGE?

A.    HE WENT BACK TO THE DRUGS.  HE WENT BACK TO DRINKING. HE WENT BACK DOWNHILL.  HE GOT LAID OFF HIS JOB.

Q.    WERE YOU AND YOUR HUSBAND STILL AROUND WHILE ALL OF THAT WAS GOING ON?

A.    WE HAD JUST LEFT.

Q.    WHERE DID YOU GO?

A.    WE LEFT NEW HAMPSHIRE IN 1987.  WE WENT BACK TO COLORADO.

Q.    DURING THE TIME YOU HAD MOVED BACK TO COLORADO AND ALICE'S RELATIONSHIP WITH GEORGE WAS GOING DOWNHILL, DID YOU CONTINUE TO KEEP IN TOUCH WITH HER?

A.    YES.

Q.    HOW DID YOU COMMUNICATE?

A.    MOSTLY THROUGH LETTERS.  I WOULD GO DOWNTOWN AND CALL HER ON THE PHONE, AND SHE WOULD CALL ME BACK BECAUSE I DIDN'T

HAVE THE MONEY TO PAY FOR A PAY PHONE.  I WOULD STAND OUT THERE FOR FOUR OR FIVE HOURS IN THE FREEZING COLD AND TALK TO HER ON THE PHONE.

Q.    DID YOU BECOME AWARE THAT ALICE WAS CONCERNED ABOUT HER RELATIONSHIP WITH GEORGE?

A.    YES.

Q.    DID THERE COME A TIME WHEN ALICE FINALLY DECIDED SHE WAS GOING TO LEAVE?

A.    YES.

Q.    WHAT DID YOU THINK ABOUT THAT?

A.    I WAS PRETTY SHOCKED BECAUSE THOSE FEW YEARS THAT HE HAD BEEN SO GOOD,  HE WAS VERY,  VERY GOOD.  AND I WAS JUST BROKEN HEARTED THAT HE HAD GONE SO BACK DOWNHILL FROM WHERE HE WAS WHEN HE FIRST STARTED.

Q.    SHORTLY AFTER SHE TOLD YOU SHE WAS GOING TO LEAVE GEORGE,  DID YOU START HEARING ABOUT A GUY NAMED BARRY DONOVAN?

A.    OH, YES.

Q.    WHAT DID SHE THINK ABOUT BARRY?

A.    SHE THOUGHT HE WAS GOD.  SHE LOVED HIM TO PIECES.  SHE WANTED SO MUCH FOR US TO GET TOGETHER,  MEET,  TALK ON THE PHONE.  I TALKED TO BARRY A FEW TIMES ON THE PHONE.  SHE FELT LIKE WE HAD A LOT IN COMMON AND THAT I COULD FORM A GOOD SOLID RELATIONSHIP WITH HER AND HER HUSBAND.  THAT WAS VERY IMPORTANT TO HER.

**JA 1874**

Q.   AND DID YOU CONTINUE TO HAVE TELEPHONE CONTACT?  WERE YOU STILL IN COLORADO, AT THIS TIME?

A.   YES.

Q.   AND ALICE?

A.   THAT IS WHEN I FIRST TALKED WITH BARRY WAS ON THE PHONE WHEN I WAS IN COLORADO.

Q.   WHERE WERE ALICE AND BARRY, AT THAT TIME?

A.   BOY, THAT WAS A WHILE AGO.  I THINK THEY MIGHT HAVE BEEN IN DOVER.  I THINK SHE WAS TALKING ABOUT MOVING TO MAINE, I AM NOT SURE.

Q.   YOU FOUND OUT AT SOME POINT THAT ALICE AND BARRY DECIDED TO GET MARRIED?

A.   YES.

Q.   YOU DESCRIBED A RELATIONSHIP BETWEEN YOU AND ALICE.  WAS THE RELATIONSHIP BETWEEN THE TWO OF YOU, PERHAPS BETWEEN YOU AND YOUR OTHER SIBLINGS DIFFERENT THAN HER OTHER SIBLINGS?

A.   YES, IT WAS.  BECAUSE BOTH OF US HAD ENDURED, NOT THAT THE OTHER GIRLS DIDN'T GET THEIR SHARE OF SOME OF THE ABUSE, BUT HER AND I REALLY GOT ABUSED, BATTERED, ABUSED.  AND SO, AS WE GREW UP, WE BOTH HAD THAT DESIRE TO LEAVE HOME EARLY.  SHE SPENT A LOT OF TIME LIVING WITH ME.  AND WE HAD A MUTUAL UNDERSTANDING OF WHAT THAT WAS.  WE WERE THE, I GUESS, THE LEAST FAVORITE, I DON'T KNOW HOW YOU PUT IT.  BUT WE WERE THE ONES THAT GOT IT.  I THINK SHE GOT IT WORSE THAN I DID.

Q.    AND A BOND DEVELOPED AS A RESULT?

A.    YES.

Q.    NOW, IN THE EARLY NINETIES, 1992, I BELIEVE IT WAS, ALICE MARRIED BARRY?

A.    YEAH, IT WOULD HAVE TO BE.  I THINK IT WOULD BE.

Q.    AND THEN YOU REMEMBER SHE AND BARRY DECIDED TO MOVE TO SOUTH CAROLINA, DO YOU RECALL THAT?

A.    YES.

Q.    WHAT DID YOU THINK ABOUT THAT?

A.    I WAS SURPRISED.  I DIDN'T THINK SHE WOULD EVER LEAVE THE NORTH.  BUT THEY WERE REAL HAPPY ABOUT MOVING DOWN.  HE HAD A NEW JOB, AND NEXT THING I KNEW THEY HAD A PIECE OF LAND, AND THE NEXT THING I KNEW THEY WERE BUILDING A HOUSE.

Q.    AND DID YOU KEEP IN TOUCH WITH ALICE AND BARRY AFTER THEY MOVED TO SOUTH CAROLINA?

A.    YES, I DID.

Q.    HOW WOULD YOU AND ALICE KEEP IN TOUCH, AT THAT POINT?

A.    WELL, WE CONTINUED TO TALK ON THE PHONE, BUT SHE FLEW ME DOWN, SHE WOULD BUY THE PLANE TICKET, HAVE ME FLY DOWN, SPEND A COUPLE OF WEEKS WITH HER.  THAT BECAME ALMOST A YEARLY THING.

Q.    AND WHAT WOULD YOU AND ALICE DO TOGETHER WHEN YOU WERE DOWN HERE ON THESE VISITS?

A.    WE WENT TO THE BEACH.  SHE TOOK ME OUT TO EAT.  WE WENT SHOPPING AT VICTORIA'S SECRET.  SOMETIMES WE JUST SAT

HOME AND JUST SAT ON THE FRONT PORCH, HAD THOSE WOODEN, BEAUTIFUL ROCKING CHAIRS. WE WOULD SIT THERE ALL NIGHT LONG WITH THE CITRONELLA CANDLES BURNING, WRAPPED IN BLANKETS, JUST TALKING, AND TALKING, AND TALKING. THAT IS WHAT WE DID.

Q. MS. EZELL, DO YOU REMEMBER THE LAST TIME YOU SAW ALICE?

A. THE LAST TIME I SAW ALICE WAS AT THE AIRPORT. THE LAST TIME I SAW ALICE DURING THAT TIME WAS FOR A VISIT DOWN HERE. WE SAT IN THAT RESTAURANT, AND SHE JUST KEPT CUDDLING ME AND PLAYING WITH MY HAIR AND SAYING, WHERE DID YOU GET ALL OF THAT HAIR? SHE WAS USED TO ME HAVING VERY SHORT HAIR. IT WAS SUCH AN INTIMATE TIME.

Q. WHEN WAS THAT?

A. IT WAS THE YEAR BEFORE SHE DIED, 2001.

Q. HOW LONG HAD YOU BEEN DOWN HERE VISITING WITH ALICE WHEN SHE TOOK YOU TO THE AIRPORT?

A. DOWN HERE, TWO WEEKS.

Q. DID YOU CONTINUE TO TALK WITH ALICE ON THE PHONE AFTER THAT?

A. YES. WE TALKED A LOT ON THE PHONE. I FINALLY GOT TWO PHONE LINES SO SHE DIDN'T HAVE TO FIGHT THROUGH AND FIGHT WITH MY COMPUTER. WE TALKED AT LEAST ONCE A WEEK, ONCE EVERY OTHER WEEK. SOMETIMES TWICE A WEEK. BUT EVERY TIME WE DID, IT WAS FOR A LENGTHY AMOUNT OF TIME.

Q. WHAT TYPES OF THINGS WOULD YOU AND ALICE TALK ABOUT?

A. WE TALKED ABOUT GARDENING. SHE WOULD TELL ME THE PLANS

SHE HAD FOR THE HOME.  SHE WAS DEBATING ON HOW SHE WANTED TO DECORATE IT.  BARRY TALKED ABOUT THE WELL.  I WAS THE ONE SHE CALLED ON TO FIND OUT HOW TO MIX THE SOIL BECAUSE WE SHARED GARDENING.  WE TALKED ABOUT THE POSSIBILITY OF PUTTING A POND IN HER YARD.  WE TALKED ABOUT MY DAUGHTER LORI AND HER SINGING.  LORI HAD COME DOWN TO VISIT WITH HER A COUPLE OF MONTHS BEFORE SHE DIED IN SEPTEMBER.  WE TALKED ABOUT HER SINGING, AND MUSIC, AND I DON'T THINK THERE WAS A TOPIC UNDER THE SUN WE DIDN'T DISCUSS.

Q.    YOU REMEMBER, SPECIFICALLY, THAT CONVERSATION YOU HAD WITH ALICE ABOUT LORI IN SEPTEMBER?

A.    YES.  MY DAUGHTER LORI AND I HAD HAD SOME CONFLICT. AND SHE JUST -- ALICE KEPT INSISTING TO ME THAT LORI NEEDED A MOTHER.  SHE SAID SHE NEEDS YOU TO BE HER MOTHER.  I WAS TRYING TO BE A GOOD MOTHER AND NOT BUTT INTO HER BUSINESS. SHE SAYS YOU NEED HER.  YOU NEED TO SPEND SOME MORE TIME DRAWING CLOSE TO HER.  AND THAT IS WHAT I HAVE DONE.

Q.    DO YOU RECALL THE LAST TIME YOU SPOKE WITH ALICE?

A.    IT WAS THE SAME CONVERSATION THE THREE TIMES I SPOKE WITH HER.

Q.    AND SHE WAS, YOUR DAUGHTER LORI HAD BEEN VISITING WITH ALICE AND HAD BEEN SINGING KARAOKE?

A.    YES.  LORI IS A WONDERFUL SINGER.

Q.    AND ALICE WAS --

A.    RIGHTEOUS BROTHERS, UNCHAINED MELODY.

Q.    ALICE WAS PROUD OF LORI'S TALENT?

A.    SHE HADN'T SEEN LORI SINCE A TEENAGER.  ALL OF A SUDDEN, AN ADULT SHOWED UP, AND ALL OF A SUDDEN BRAND NEW --

Q.    SHE WANTED TO TALK WITH YOU ABOUT YOUR RELATIONSHIP WITH YOUR DAUGHTER?

A.    YES.

Q.    MS. EZELL, DO YOU RECALL IN NOVEMBER OF 2002 GETTING CALLED REGARDING ALICE?

MR. HARRIS:  YOUR HONOR, MAY WE APPROACH, BRIEFLY?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. HARRIS:  THIS IS THE WITNESS WITH THE LETTER. THE TRANSCRIPT I HAVE BEEN FOLLOWING IS GETTING CLOSE TO THE INTRODUCTION OF THE LETTER.  I THOUGHT IT WAS A GOOD BREAKING POINT FOR THIS MATTER.  I STILL DON'T KNOW IF THEY INTEND TO GO INTO IT IN LETTER FORM OR AS CONVERSATION AS WE HAD REQUESTED.

MR. SCHOOLS:  CONVERSATION FORM WOULD BE A LIE.  IT WASN'T A CONVERSATION.

THE COURT:   I OVERRULED THE OBJECTION.

MR. HARRIS:  I WANTED TO MAKE SURE THE WAY WE LEFT IT, YOUR HONOR, YOU HAD RULED ON THE LETTER.  IN THE ALTERNATIVE, I HAD REQUESTED IT BE OFFERED AS A CONVERSATION. I BELIEVE YOU HAD ASKED US TO RENEW THIS MATTER AT THE

APPROPRIATE TIME.

THE COURT:  I THINK THAT WOULD BE  -- I JUST DON'T THINK THAT WOULD BE PROPER.  I OVERRULE THE OBJECTION.

MR. HARRIS:  OKAY.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

BY MR. SCHOOLS:

Q.    MS. EZELL,  I BELIEVE I HAD ASKED YOU IF YOU REMEMBERED GETTING CONTACTED IN NOVEMBER BY ANGIE ABOUT ALICE?

A.    YES,  I DID.  IT WAS EARLY IN THE MORNING AND I ANSWERED THE PHONE.

Q.    YOU WERE IN COLORADO?

A.    YES.  AND IT WAS ANGIE WANTING TO KNOW IF I HAD SEEN HER MOTHER.  I WAS PUZZLED, WHY WOULD I SEE HER MOTHER?  SHE SAID SHE DIDN'T COME HOME LAST NIGHT.  I SAID, WHAT DO YOU MEAN SHE DIDN'T COME HOME LAST NIGHT?  SHE SAID,  SHE DIDN'T COME HOME FROM SHOPPING.  I SAID,  HAVE YOU HEARD FROM HER? WELL, THEN SHE TOLD ME ABOUT A PHONE CALL SHE HAD RECEIVED FROM HER MOTHER, AND SAID THAT SHE WAS GOING TO BE LATE,  SHE WAS OUT CHRISTMAS SHOPPING.  AND THAT WAS AN UNUSUAL THING FOR ALICE THAT EARLY IN THE SEASON.  I ASKED ANGIE SOME MORE. WHAT ELSE DID SHE SAY? WHAT DID SHE SOUND LIKE? SHE SAID, WELL,  SHE TOLD ME SHE LOVED ME AND SHE WAS GOING TO BE LATE, AND WE HAVEN'T SEEN HER.  AND SO,  I THOUGHT,  WELL,  I DON'T THINK SHE IS MAKING A SURPRISE VISIT OUT BECAUSE SHE WOULD

HAVE SAID SOMETHING.  SHE WOULD KNOW TO PLAN THAT WITH US.
SO, I CHECKED AROUND THE FAMILY, AND NOBODY ELSE HAD SEEN OR
HEARD FROM HER.

Q.   SO, WHAT DID YOU DO?

A.   I GOT ON THE INTERNET AND STARTED POSTING ON MY
FAVORITE BULLETIN BOARD AND PEOPLE STARTED SUGGESTING THINGS
THAT WE SHOULD DO.

Q.   LIKE WHAT?

A.   LIKE CONTACTING POLICE, LIKE MAKING POSTERS.  THEY
STARTED CONTACTING OTHER INTERNET SERVICES FOR TRUCKERS,
BECAUSE THEY GET AROUND AND THEY CHECK THOSE SERVICES, TO
START KEEPING AN EYE ON THE CARS.  OH, IT WAS JUST A FLOOD.

Q.   WHAT WAS GOING THROUGH YOUR HEAD, MS. EZELL?

A.   PANIC.  I WAS PANICKED, I WAS SCARED, CONFUSED.
DIDN'T KNOW WHAT WAS GOING ON.

LATER THAT NIGHT, SALLY E-MAILED ME AN ARTICLE THAT SHE
HAD SEEN ABOUT A COUPLE OF GUYS THAT ESCAPED FROM PRISON.  I
DIDN'T BELIEVE THAT THEY DID THAT.  I DIDN'T THINK -- I
THOUGHT IT WAS TOO MUCH OF A COINCIDENCE.  AND THEN WE FOUND
OUT THAT THAT WAS THE CASE.

Q.   OVER THE COURSE OF THE NEXT COUPLE OF DAYS AFTER YOU
ORIGINALLY GOT CALLED FROM ANGIE, DID YOU STAY OUT IN
COLORADO AND TRY TO DO WHAT YOU COULD FROM OUT THERE TO SEE
WHAT YOU COULD DO TO HELP?

A.   I DID WHAT I COULD FROM COLORADO, AND THEN I EVENTUALLY

GOT CALLED DOWN TO SOUTH CAROLINA. I WAS THERE, I THINK, BY WEDNESDAY.

Q. OF THE FOLLOWING WEEK, ABOUT FOUR OR FIVE DAYS LATER?

A. RIGHT. THE DAY THEY FOUND THE CAR AND THEY WERE PUTTING THAT ON THE NEWS WAS THE DAY I WAS GOING ON DOWN.

Q. WHAT DID YOU DO WHEN YOU GOT TO SOUTH CAROLINA? WHAT WAS GOING ON?

A. WELL, BY THEN, SHE HAD BEEN GONE SEVERAL DAYS, AND WE WERE ALL IN A PANIC BECAUSE WE KNEW THAT, YOU KNOW, YOU CAN'T LIVE OUT IN THE WOODS FOR MUCH MORE THAN A WEEK WITHOUT WATER. IT HAD BEEN ALMOST THAT. IT HAD BEEN COLD. WE THOUGHT SHE WAS STILL ALIVE SOMEWHERE, TIED TO A TREE, WE DIDN'T KNOW. AND WE WERE WAITING FOR THEM TO FIND HER.

Q. WERE YOU MADE AWARE THAT INFORMATION HAD BEEN PROVIDED BY MR. BASHAM THAT MS. DONOVAN, YOUR SISTER, WAS TIED TO A TREE IN MYRTLE BEACH?

A. YES.

Q. HOW DID YOU REACT TO RECEIVING THAT INFORMATION?

A. IT WAS A VERY DIFFICULT THING TO THINK WITH HER BEING OUT THERE LIKE THAT. IT WAS FRIGHTENING. IT IS HARD TO EVEN EXPLAIN IT BECAUSE YOU JUST BLANK. YOU JUST GET CAUGHT UP IN THAT MOMENT, AND IT DOESN'T STOP.

Q. WHAT HAPPENED OVER THE COURSE OF THE NEXT SEVERAL DAYS, MS. EZELL, AFTER YOU CAME TO SOUTH CAROLINA AND THE SEARCHES WERE GOING ON FOR YOUR SISTER?

A.   WE GRIEVED A LOT AND CRIED A LOT.   ANGIE AND I WENT OUT LOOKING OURSELVES, BY OURSELVES.   WE WAITED BY THE PHONE.   WE TALKED WITH PEOPLE THAT WERE JUST HEARING WHAT WAS GOING ON.  PEOPLE BACK HOME,  FRIENDS,  ALICE'S FRIENDS WOULD CALL.   WE DEALT WITH THOSE.   THEY COULDN'T BELIEVE WHAT HAD HAPPENED.   HAD THEY HEARD THE TRUTH? WAS IT A LIE,  WAS IT A RUMOR,  WHAT WAS GOING ON?   IT WAS A VERY CONFUSING TIME.

Q.   AND, ULTIMATELY, YOU WERE MADE AWARE THAT YOUR SISTER WAS NOT ALIVE,  RIGHT?

A.   WELL,  THAT WAS JUST THE NATURAL ASSUMPTION AFTER A WEEK.

Q.   OKAY.   NOW,  MS. EZELL,  YOU HAVE KNOWN ALICE LONGER THAN ANYBODY WHO HAS TESTIFIED,  MAYBE LONGER THAN ANYBODY ON THE PLANET EXCEPT YOUR MOTHER.   WHAT KIND OF PERSON WAS SHE IN NOVEMBER OF 2002?  WHAT WERE ALICE'S DREAMS AND ASPIRATIONS, AT THAT TIME?

A.   HER DREAMS WERE TO BE FINANCIALLY SECURE ENOUGH THAT SHE COULD LEAVE HER JOB AND WORK ON HER HOME, AND BUILD HER POOL, AND FILL HER YARD WITH FLOWERS.   SHE TALKED ABOUT WANTING TO PUT GREENHOUSES,  STARTING HER OWN BUSINESS.   SHE WANTED TO SPEND TIME WITH HER GRANDCHILDREN.   SHE WANTED TO ENJOY HER FAMILY.   SHE JUST HAD DREAMS OF ALL KINDS OF THINGS.

Q.   IS YOUR MOTHER STILL ALIVE?

A.   YES,  SHE IS.

JA 1883

Q.    DO YOU STAY IN TOUCH WITH YOUR MOM?

A.    I HAVEN'T SPOKEN WITH MY MOM SINCE LAST DECEMBER.

Q.    WHY NOT?

A.    BECAUSE THIS WHOLE EVENT HAS FRACTURED MY FAMILY.   WE DON'T EVEN TALK.   WE COULDN'T SUPPORT EACH OTHER.   WE WERE BROKEN.

Q.    PERSONALLY, MS. EZELL, CAN YOU DESCRIBE THE IMPACT THAT ALICE'S DEATH HAS HAD ON YOU?

A.    I WENT FROM BEING A PEOPLE PERSON TO NOT WANTING TO BE AROUND PEOPLE AT ALL.   I WENT FROM HAVING MOUNTAINS OF PATIENCE TO HAVING NOTHING; TO HAVING A SHORT TEMPER AND A TERRIBLE MOUTH.   I CAN'T THINK.   I CAN'T REMEMBER.   I CAN'T WORK.  MY SISTERS CAN'T TALK WITH US.   I CAN'T TALK WITH THEM.   I HAVE WATCHED ANGIE AND JENNY GO DOWN THE TUBES. GIRLS THAT CAME DOWN TO BE WITH THEIR MOM.   THEY DRINK, THEY HARDLY CAN FUNCTION.   I HAVE WATCHED THE CHILDREN LOOK AROUND AND WONDER WHAT IS GOING ON.   I MET WITH ANGIE'S CHILDREN BACK IN MAY, AND THEY BOTH STOOD THERE AND LOOKED AT ME IN AWE, QUESTION MARKS ON THEIR FACE.   WHERE HAVE I SEEN YOU BEFORE, KIND OF LOOK.   THE LITTLE ONE LOOKED AT ME AND SAID -- CHLOE  SAID, YOU LOOK LIKE MEE-MAW.   CHLOE WAS THREE YEARS OLD WHEN MEE-MAW DIED.   IT IS TWO YEARS LATER, AND SHE REMEMBERS MEE-MAW'S FACE.

Q.    MS. EZELL, I AM GOING TO TAKE YOU BACK. WE HAD TALKED ABOUT SOMETIMES YOU AND ALICE SUFFERED TOGETHER AND SOME

DIFFICULT TIMES WITH YOUR MOM'S SECOND HUSBAND. DID THERE COME A TIME, MS. EZELL, WHEN YOU WROTE A LETTER TO HIM, YOUR MOM'S EX-HUSBAND, AT THAT POINT, ADDRESSING SOME OF THE THINGS THAT HAD GONE ON WHILE YOU AND ALICE WERE YOUNG?

A. YES. I HAD COME TO A POINT IN MY LIFE WHERE I NEEDED TO DO SOME HEALING, WHICH MEANT CONFRONTING MY ABUSER. AND SO, I WROTE A LETTER TO LEO. I ADDRESSED SOME OF THE THINGS THAT HE HAD DONE TO ALICE AND I.

Q. DID YOU SEND A COPY OF THAT LETTER TO ALICE?

A. YES, I DID.

Q. AS A RESULT OF THAT, MS. EZELL, DID YOU RECEIVE A LETTER BACK FROM ALICE ADDRESSING THE LETTER YOU HAD SENT TO LEO?

A. YES.

Q. AND YOU HAVE GOT THE ORIGINAL OF THAT LETTER WITH YOU ON THE WITNESS STAND, DO YOU NOT?

A. YES, I DO.

MR. SCHOOLS: YOUR HONOR, WE MARKED A COPY OF GOVERNMENT'S EXHIBIT 409. WE OFFER IT OVER PREVIOUSLY STATED OBJECTIONS.

THE COURT: CONSISTENT WITH MY EARLIER RULING, YOU MAY ADMIT THIS DOCUMENT.

BY MR. SCHOOLS:

Q. THE LETTER YOU GOT FROM YOUR SISTER, MS. EZELL, WHEN WAS THAT WRITTEN?

A.   1991.

Q.   THIS WAS IN RESPONSE TO A LETTER YOU HAD WRITTEN TO YOUR MOTHER'S SECOND HUSBAND, LEO?

A.   YES.

Q.   MS. EZELL, WOULD YOU PLEASE READ THAT LETTER FOR THE JURY?

A.

"DEAR JUDY.  THE LETTER YOU WROTE
AND SENT TO LEO WAS SO POWERFUL,
YOU MUST BE ON AN EMOTIONAL HIGH.
I KNOW I AM.  THANK YOU FOR
INCLUDING ME.  I CRIED WHEN I READ
IT OVER AND OVER AGAIN.  WE ARE
HEALING.  JUDY, I WISH YOU WERE
HERE.  I JUST WANT TO HUG YOU AND
HOLD YOU.  I MISS YOU SO MUCH.
I CALLED MOM AND READ THE LETTER TO
HER.  SHE FELT GOOD ABOUT IT, AS
WELL.  SHE DID EXPRESS HER FEELINGS
ABOUT HOW LEO, SR., MAY TREAT LEO,
JR., AFTER HE, LEO, SR., READS IT.
I GUESS WE CAN ONLY WAIT.  THAT WAS
A LETTER THAT NEEDED TO BE WRITTEN
AND SENT, AND YOU CAN BET SOME DAY
HE WILL RECEIVE MY LETTER TO HIM.

SO MUCH HEALING HAS BEEN GOING ON IN MY LIFE FOR THE LAST YEAR AND A HALF. BEFORE MOM LEFT, SHE STOPPED IN TO SAY BYE. WITHOUT GOING INTO DETAILS -- I WOULD GET WRITER'S CRAMPS AND IT'S MIDNIGHT AND I HAVE TO GET UP FOR WORK AT 4:00 A.M., BUT THE OUTCOME WAS SO HEALING. MY FURY AND ANGER THAT I CARRIED FOR HER HAS BEEN LIFTED, AND I FEEL LOVE IN MY HEART FOR HER, AND I ACCEPT HER FOR HERSELF, NOT SOMEONE I WANTED HER TO BE. I WILL BE THAT MOTHER TO MY INNER CHILD. DO YOU KNOW HER NAME IS ALICE, AND SHE IS A SPECIAL PERSON? SHE IS CARING, BEAUTIFUL, SENSITIVE, COMPASSIONATE, GENTLE, HURT, SCARED, SOMEWHAT ANGRY, AND WITH THE LOVE OF GOD, WE WILL FEEL WHOLESOME.

IN ORDER FOR ME TO CONTINUE ON THIS PATH, I HAVE MADE YET ANOTHER MAJOR DECISION IN MY LIFE. GEORGE AND I ARE GETTING DIVORCED. I CANNOT AND

WILL NOT LIVE WITH HIS ABUSE. TO MAKE A LONG STORY SHORT, HA-HA, HE GOT VERY SEXUALLY VIOLENT WITH ME. HE ALSO THREATENED TO KILL ME WHEN HE WAS DONE. THIS WAS IN JULY AND, OF COURSE, HE WAS DRUNK, AND THIS IS NOT THE FIRST TIME HE HAS DONE THAT. AS I LAID THERE CRYING WAITING TO SEE WHAT HE WOULD DO NEXT, I MADE A PROMISE TO MYSELF, AND THAT WAS IT WOULD BE THE LAST TIME HE WOULD EVER HURT ME AGAIN, WHETHER HE KILLED ME OR WHETHER I SURVIVED. WELL, I'M HERE TO WRITE ABOUT IT. I DO NOT DESERVE TO BE ABUSED IN ANY WAY, SHAPE, OR FORM. I WON'T BE BY ANY MAN AGAIN. HE IS GONE IN HALLERHILL WITH GEORGE, SR. I AM MOVING TO DOVER IN AN APARTMENT WITH THE KIDS AND A ROOMMATE ON NOVEMBER 3, AND WE FILED BANKRUPTCY. JUDY, FOR THE FIRST TIME IN MY LIFE, I HAVE TAKEN BACK WHAT WAS TAKEN FROM ME AS A SMALL CHILD. I AM IN CONTROL OF MY LIFE, AND THAT

IS A GREAT, POWERFUL FEELING. AND IF I FAIL, I WILL HAVE MYSELF TO BLAME. I KNOW I WON'T FAIL FOR I FEEL SO CONFIDENT AND DETERMINED TO BE WHOLE. I AM LOOKING FORWARD TO LIFE; HOWEVER, I KNOW THIS WILL BE LOTS OF HARD WORK WITH GOOD AND BAD DAYS. I CAN DO IT. AND THE MOST REWARDING PLEASURE OF ALL IS SEEING MY CHILDREN CHANGE WITH ME. THEY ARE NOT TOO HAPPY ABOUT DAD AND MOM GETTING A DIVORCE, BUT, IN TIME, THEY WILL HEAL WITH MY HELP, AND WE WILL BE HAPPY. MY ONLY REGRET IS WAITING SO LONG TO COME TO THIS DECISION, BUT AS THEY SAY, BETTER LATE THAN NEVER. I WILL DROP A LINE WHEN I GET SETTLED. I LOVE YOU JUDY, ALICE."

Q. MS. EZELL, IN NOVEMBER OF 2002, BASED ON YOUR CONVERSATIONS AND OBSERVATIONS OF ALICE, HAD SHE ATTAINED THE LIFE SHE WAS HOPEFUL OF OBTAINING WHEN SHE WROTE THIS LETTER?

A. YES.

Q. IN NOVEMBER OF 2002, WAS ALICE HOPEFUL?

A. YES.

Q.    WHAT TYPE OF LIFE DID ALICE HAVE FOR HERSELF, AT THAT POINT?

A.    THE KIND OF LIFE SHE WANTED FOR HERSELF WAS THE KIND OF LIFE SHE GOT.  IT WAS FILLED WITH LOVE.  SHE HAD HER CHILDREN,  SHE HAD HER GRANDCHILDREN, SHE HAD A HOME,  SHE HAD A HUSBAND.  SHE HAD A HUSBAND THAT LOVED HER.  SHE HAD HER HOUSE SURROUNDED WITH LOVE.

MR. SCHOOLS:  THANK YOU,  MS. EZELL.

THE COURT:   ANY CROSS-EXAMINATION?

MR. SWERLING:  NO,  YOUR HONOR.

THE COURT:   THANK YOU.  YOU MAY STEP DOWN.  ANYTHING FURTHER FROM THE GOVERNMENT?

MR. SCHOOLS:  YOUR HONOR,  ONCE AGAIN, SUBJECT TO CONFIRMATION THAT THE VARIOUS EXHIBITS HAVE BEEN OFFERED AND ADMITTED, THE GOVERNMENT RESTS ITS CASE, JUDGE.

THE COURT:   MEMBERS OF THE JURY,  YOU JUST HEARD MR. SCHOOLS SAY THE GOVERNMENT HAS RESTED ITS CASE IN THE PENALTY PHASE OF THIS TRIAL.  EARLY THIS MORNING, WE DECIDED RATHER THAN START THE DEFENSE CASE NOW, WE WOULD BRING YOU BACK AND START FRESH TOMORROW.  THERE ARE A FEW LITTLE LEGAL MATTERS I NEED TO TAKE UP WITH THE LAWYERS.  WE WILL STAY HERE NOW AND TAKE THAT UP AFTER WE EXCUSE YOU.  WHEN YOU COME BACK TOMORROW, YOU WILL BE HEARING FROM THE DEFENSE WITNESSES.  PLEASE REMEMBER WHAT I TOLD YOU EARLIER, YOU NEED TO KEEP AN OPEN MIND.  YOU MAY NOT REACH A DECISION IN THIS CASE UNTIL

EVERYTHING HAS BEEN RECEIVED BY YOU. DON'T DISCUSS THE CASE. HAVE A NICE EVENING. SEE YOU TOMORROW AT 9:00 O'CLOCK.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: ALL RIGHT. ANYTHING FURTHER BEFORE WE ADJOURN? DO YOU WANT ME TO CONDUCT A COLLOQUY WITH THE DEFENDANT ABOUT HIS RIGHT TO TAKE THE STAND IN THE PENALTY PHASE?

MR. SWERLING: CAN YOU DO THAT IN THE MORNING? I WANT TO DISCUSS A COUPLE OF THINGS WITH HIM.

THE COURT: ALL RIGHT. WE CAN DO THAT. WE WILL BE IN RECESS. SEE YOU AT 9:00 O'CLOCK IN THE MORNING.

*** END OF REQUESTED TRANSCRIPT ***
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
CERTIFICATE OF REPORTER
   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____        _____
S/DEBRA R. JERNIGAN, RPR, CRR          DATE

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 8

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,      )      CR. NO. 4:02-992
                               )      COLUMBIA, SC
                               )      OCTOBER 19, 2004
                               )
      VERSUS                   )
                               )
BRANDON L. BASHAM,             )
            DEFENDANT.         )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XX


APPEARANCES:
FOR THE GOVERNMENT:            SCOTT SCHOOLS, FIRST AUSA
                              JONATHAN S. GASSER, AUSA
                              JOHN DUANE, AUSA
                              UNITED STATES ATTORNEY'S OFFICE
                              1441 MAIN STREET, SUITE 500
                              COLUMBIA, SC  29201

FOR THE DEFENDANT:            JACK SWERLING, ESQ.
                              1720 MAIN STREET
                              SUITE 301
                              COLUMBIA, SC  29201

                              GREG HARRIS, ESQ.
                              1720 MAIN STREET
                              SUITE 301
                              COLUMBIA, SC  29201


COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                              UNITED STATES COURT REPORTER
                              901 RICHLAND STREET
                              COLUMBIA, SC 29201




STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1892

HOUSTON, PERHAPS, WHO WARNED KATHY IN ONE OF HER VISITS THAT THIS MIGHT NOT BE A SAFE SITUATION; THIS MIGHT NOT BE A GOOD IDEA FOR BRANDON; AND, THAT SHE SHOULD KEEP AN EYE ON THIS SITUATION. SO, YOU HAVE THESE PEOPLE, AWARE THAT A MINOR, 12 YEARS OLD, IS TROUBLED, BRANDON IS TURNED OVER, AND NO ONE IS DOING ANYTHING ABOUT IT.

Q.    WHAT WE HAVE SEEN SO FAR WITH THIS CHART, SCROLLING TO THE AGE OF 13, OBVIOUSLY, THERE CAME A TIME WHEN SOMEONE DETERMINED THAT THERE WAS AN EXTREME NEED TO FIND OUT WHAT WAS WRONG WITH BRANDON'S BRAIN, WHY HE WAS HAVING SO MANY BEHAVIORAL PROBLEMS; ISN'T THAT CORRECT?

A.    YES.

Q.    AND I BELIEVE THAT HE BEGAN INITIALLY BEING SEEN ON AN OUTPATIENT BASIS; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    NOW, COULD YOU DESCRIBE FOR US THE INITIAL CONTACTS WITH SOME OF THESE PSYCHOLOGICAL CLINICS, SOME OF THE PSYCHIATRISTS, SOME OF THE PSYCHOLOGISTS?

A.    THERE IS ACTUALLY ONE MORE SUBSTANTIATED REPORT THAT I JUST WANTED TO POINT OUT, IF I COULD, THEN I WILL GO GET OUT OF THIS AREA. IT IS GOING TO BE -- LET ME GIVE YOU THE DATE. I'M SORRY. I DON'T HAVE IT. IT IS WHEN HE IS FIFTEEN YEARS OLD, AND I BELIEVE HE WAS AT CHARTER OF EVANSVILLE, I THINK.

Q.    WHILE WE ARE DOING THIS, AS WE SCROLL, THE GREEN DENOTES WHAT?

A.     GROUP HOME HE WAS IN, THE METHODIST HOME IN VERSAILLES, KENTUCKY.

Q.     SENT THERE BY WHO?

A.     SENT THERE BY THE CABINET FOR FAMILIES AND CHILDREN, THE STATE OF KENTUCKY.

Q.     BY THE STATE OF KENTUCKY?

A.     YES.   I THINK WE ARE GETTING CLOSE.   ADMITTED TO CHARTERS OF EVANSVILLE IN 1997.

Q.     TELL US ABOUT IT.

A.     SUPPOSED TO BE ANOTHER YELLOW FLAG WHEN HE WAS 15. WHEN HE WAS AT CHARTER OF EVANSVILLE,  HE REPORTED HE HAD BEEN SEXUALLY ABUSED BY A MAN NAMED EDDIE.   THIS WAS ANOTHER SITUATION WHERE THE FAMILY ALLOWED HIM TO KIND OF RUN LOOSE. BY THIS TIME, HE IS IN THE STREETS,  JUST STAYING WITH VARIOUS PEOPLE,  SOMETIMES STAYING AT HOME,  AND HE CLAIMED TO HAVE BEEN SEXUALLY MOLESTED BY A MAN NAMED EDDIE, AND THAT WAS INVESTIGATED BY THE CABINET FOR FAMILIES AND CHILDREN, AND IT WAS SUBSTANTIATED.   NOTHING HAPPENED BECAUSE HIS PARENTS, AGAIN,  REFUSED TO PROSECUTE ON HIS BEHALF.

Q.     SO,  ON THAT OCCASION,  AN INVESTIGATION WAS DONE,  LAW ENFORCEMENT WAS INVOLVED,  AND HIS CLAIMS OF SEXUAL ASSAULT BY SOMEONE BY THE NAME OF EDDIE WAS SUBSTANTIATED?

A.     YES.

Q.     IT WASN'T FOLLOWED THROUGH BECAUSE HIS PARENTS DIDN'T WANT IT FOLLOWED UP ON?

A.    YES.

Q.    ARE YOU AWARE OF WHAT THEIR SPECIFIC COMMENT WAS WITH REGARD TO THE PROSECUTION OF SOMEONE NAMED EDDIE?

A.    THEY JUST DIDN'T WANT TO UPSET THE NEIGHBORHOOD.

Q.    NOW, I GOT A LITTLE AHEAD OF YOU.  IF YOU WOULD, PLEASE, DISCUSS WITH US SOME OF THE INITIAL CONTACTS WITH THE PSYCHOLOGICAL EVALUATORS, THE PROFESSIONALS, THE PSYCHOLOGISTS, THE PSYCHIATRISTS?

A.    WELL, IF YOU GO BACK TO AROUND THE AGE OF SEVEN, YOU WILL SEE THAT HE BEGINS TO BE EVALUATED AND TESTED AT TROVER CLINIC, PENNYROYAL HEALTH CENTER.  PSYCHOEDUCATIONAL TESTING, PSYCHIATRIC EVALUATIONS, PSYCHOLOGICAL TESTING. THERE IS PSYCHOSOCIAL HISTORIES TAKEN ON HIM.  AND HE IS BEING EVALUATED TO SEE WHAT IS WRONG, WHY HE BEHAVES THE WAY HE DOES.

HIS FATHER DOES TAKE HIM OCCASIONALLY.  DURING THIS PERIOD OF TIME, HE IS OFTEN TAKEN TO THESE EVALUATIONS BY HIS TEACHER OR BY MS. MCGAW, WHO IS ALSO A TEACHER, BUT ALSO HIS BIG SISTER FROM THE BIG BROTHER/BIG SISTER PROGRAM.  IN ORDER TO GET HIM THERE AS REGULARLY AS POSSIBLE, AND IN ORDER TO GET HIM ON THE MEDICATIONS AND TRY TO KEEP HIM ON THE MEDICATIONS, THE TEACHERS HAVE TO BE INVOLVED WITH BRANDON BECAUSE THERE ARE SO MANY PROBLEMS WITH HIS MOM NOT WANTING HIM TO BE ON MEDICATION OR NOT GIVING IT TO HIM CONSISTENTLY.

Q.    AT AN EARLY AGE, HE BEGINS GETTING MEDICATIONS FOR

PSYCHOLOGICAL PROBLEMS?

A.    YES.

Q.    DIFFERENT MEDICATIONS, BUT HE IS, IN FACT, GETTING MEDICATIONS?

A.    YES.

Q.    WAS THERE ANY CONTINUITY OF CARE IN TERMS OF GETTING THE MEDICATIONS AT HOME?

A.    NO.  IN FACT, HIS MOTHER WAS ON PROLIXIN, WHICH IS A VERY HEAVY MEDICATION FOR PSYCHOLOGICAL PROBLEMS.  INSTEAD OF GIVING HIM HIS MEDICINE FOR HYPERACTIVITY DISORDER, SHE WOULD GIVE HIM HER PROLIXIN.  AGAIN, NOT COMPLYING WITH THE DOCTOR, BEING RESISTANT TO TREATMENT, RESISTANT TO GETTING THE KIND OF SERVICES THAT THE CHILD NEEDS, SO HE WAS NOT GIVEN MEDICATIONS REGULARLY.  AT SOME POINT, THE MEDICATIONS WENT TO THE SCHOOL.  WHEN THE SCHOOL WAS ADMINISTERING THE MEDICATIONS, THERE WAS SOME IMPROVEMENT.

Q.    WE HAVE THUMBED THROUGH THE BLUE FLAGS.  THE JURY HAS SEEN THEM.  YOU WILL TESTIFY ABOUT THEM LATER.  YOU HAVE TESTIFIED ABOUT THE PSYCHIATRIC TREATMENT, THE OUTPATIENT TREATMENT.  WAS THERE A TIME IN HIS LIFE THAT HE FINALLY HAD TO BE HOSPITALIZED?

A.    HE HAD TO BE HOSPITALIZED WHEN HE WAS TEN YEARS OLD.

Q.    IT IS MY UNDERSTANDING HIS FIRST HOSPITALIZATION WAS IN RIVENDELL; IS THAT CORRECT?

A.    YES.

Q.    IS THAT WHERE WE ARE AT, SEPTEMBER 17, 1991?

A.    YES, WHEN HE IS TEN.

Q.    NOW, WHY WAS BRANDON ADMITTED TO RIVENDELL AT THE AGE OF TEN?

A.    WELL, HIS BEHAVIOR HAD JUST GOTTEN WORSE AND WORSE. HE WAS MORE AND MORE OUT OF CONTROL. HE WAS BEING TREATED FOR ADHD, BUT NOT GETTING HIS MEDICATIONS REGULARLY. HIS HOME LIFE HAD NOT CHANGED. IT WAS THE SAME AS IT HAD BEEN WHEN HE LEFT TO START SCHOOL WHEN HE WAS SIX YEARS OLD. AND SO, IT WAS JUST GETTING MORE AND MORE DIFFICULT FOR THE TEACHERS TO CONTROL HIM. EVEN THOUGH HE WAS IN SPECIAL EDUCATION, EVEN THOUGH HE WAS IN THE EPD CLASSES, THEY WERE JUST HAVING A GREAT DEAL OF DIFFICULTY WITH HIM.

Q.    WERE YOU PROVIDED WITH THE RECORDS FROM HIS INPATIENT TREATMENT AT RIVENDELL?

A.    YES.

Q.    AND WHAT DID YOU LEARN FROM -- LEARN ABOUT MR. BASHAM'S STAY AT RIVENDELL?

A.    WELL, I THOUGHT THAT HIS STAY AT RIVENDELL, WHEN HE WAS TEN YEARS OLD, WAS REALLY PREDICTIVE OF WHAT WAS TO COME FOR HIM. I FELT THAT THE DOCTORS AT RIVENDELL, SPECIFICALLY DR. LITTLETON, COULD SEE WHEN HE TREATED BRANDON WHAT WAS TO COME OF HIM IF SOME CHANGES WERE NOT MADE IN THE FAMILY. I SAW HIS STAY, AND DR. LITTLETON'S REPORT IS A REAL INDICATOR OF WHAT WAS GOING TO HAPPEN IN HIS FUTURE, AND IT TURNED OUT

TO BE QUITE ACCURATE.

Q.    SO, DR. LITTLETON PREVIEWED, FORESAW WHAT WAS GOING TO HAPPEN IF NOTHING HAPPENED TO THIS CHILD?

A.    RIGHT.

Q.    IF HE WASN'T TAKEN CARE OF?

A.    THAT'S RIGHT.

Q.    SO, WHILE AT RIVENDELL, WERE THE TYPICAL PSYCHOLOGICAL AND PSYCHIATRIC EVALUATIONS DONE OF BRANDON?

A.    THEY WERE.   THEY DID THE MEDICAL REVIEW, THE MEDICAL HISTORY, THE PSYCHIATRIC, THE PSYCHIATRIC EVALUATION.   THEY DID TESTING, AND THEY DID THE PSYCHOSOCIAL ASSESSMENT.

Q.    AND THE PSYCHOSOCIAL ASSESSMENT IS KIND OF WHAT YOU HAVE DONE, THEY JUST DID IT IN A QUICKER VERSION; IS THAT CORRECT?

A.    THAT IS CORRECT.   AND SOMETIMES YOU WILL SEE IN INSTITUTIONS THAT CALL IT A PSYCHOSOCIAL ASSESSMENT.   IT IS VERY, VERY DIFFICULT IN AN INSTITUTION, IN AN AGENCY, IN A PRIVATE SETTING TO DO THE KIND OF EXTENSIVE BACKGROUND CHECK THAT YOU CAN DO, YOU KNOW, IF YOU ARE IN OTHER TYPES OF SETTINGS, MAINLY BECAUSE OF CASELOADS AND BUDGETARY CONCERNS; HOWEVER, THERE ARE METHODS FOR MODIFYING THE PSYCHOSOCIAL ASSESSMENT AND GATHERING EXTENSIVE AMOUNTS OF INFORMATION IN SPITE OF THE FACT THAT YOU ARE SORT OF, YOU KNOW, STUCK IN AN OFFICE SOMEWHERE.

AND SO, WHAT I SAW, I THINK, IN THESE SETTINGS THAT HE

WAS IN IS THAT THEY GATHERED THE SOCIAL HISTORY, BUT IT WAS SOMEWHAT LIMITED IN THAT THEY DID NOT MODIFY THE PSYCHOSOCIAL ASSESSMENT, GATHER MORE INFORMATION.

Q.    WERE YOU ABLE TO LOOK AT THE PSYCHOSOCIAL ASSESSMENT AT RIVENDELL?

A.    YES.

Q.    AND WHAT DID YOU GLEAN FROM THEIR ASSESSMENT?

A.    THEY BASICALLY INTERVIEWED KATHY, JIMMY, AND BRANDON UPON ADMISSION.  AND WHAT THEY LEARNED ABOUT THE BACKGROUND WAS THAT BRANDON WAS HYPERACTIVE AND HAD SLEEP PROBLEMS, THAT HE HAD PROBLEMS AT SCHOOL, THAT HE CURSED A LOT, AND THAT HE WOULD FIGHT.

THIS IS WHAT THEY LEARNED FROM THEIR SOCIAL HISTORY FROM THE FAMILY:  THEY LEARNED THAT MOM ENCOURAGES BRANDON'S BEHAVIOR.  FOR EXAMPLE, BY TELLING HIM TO CUSS OUT ROY GROVES WHEN HE REPORTED SEXUAL ABUSE.  AND THEY LEARNED THAT THE PARENTS DENIED THE SEXUAL ABUSE.  THAT THEY DID NOT BELIEVE -- AT LEAST THEY TOLD THE PEOPLE AT RIVENDELL THAT THEY DIDN'T BELIEVE HE WAS SEXUALLY ABUSED.  THEY LEARNED THAT KATHY HAD A HISTORY OF ANXIETY, CHRONIC DEPRESSION, TEMPER OUTBURSTS, AND A MISERABLE CHILDHOOD.  THEY LEARNED THAT BRANDON USED SOLVENTS, AND THAT WAS CORRECT.  HE STARTED OUT VERY YOUNG SNIFFING GASOLINE AND PROGRESSING TO SNIFFING SPRAY PAINT.

IT WAS THEIR OPINION, BASED ON THEIR PSYCHOSOCIAL

ASSESSMENT, THAT HE WAS SEEKING STRUCTURING CONSISTENCY AND, FINALLY, THAT THE PARENTS DON'T TAKE EDUCATION SERIOUSLY.

Q.    DID YOU HAVE ACCESS TO THEIR EVALUATION?

A.    YES.

Q.    AND WHAT DID YOU FIND? WHAT DID YOU DETERMINE, BASED ON THEIR EVALUATION?

A.    WELL, THE EVALUATION DONE BY DR. LITTLETON REGARDING BRANDON AND, AGAIN, I THINK DR. LITTLETON REALLY SORT OF SAW BRANDON'S SITUATION AND SAW IN HIS FUTURE.  DR. LITTLETON COMMENTED THAT HE WAS CULTURALLY DEPRIVED AND KNEW NOTHING ABOUT THE WORKINGS OF THE WORLD.  THAT THE FAMILY'S DYSFUNCTION WAS A SERIOUS IMPEDIMENT TO HIM GETTING BETTER OR CHANGING.  THAT THERE ARE TIMES WHEN BRANDON CANNOT CONTROL HIMSELF.  AND THAT HIS MOTHER WAS REFUSING ALL MEDICATIONS DURING THE STAY THERE, AND THAT THAT WAS A PROBLEM.

DR. LITTLETON ALSO, NOT HAVING A LOT OF INFORMATION, DETERMINED THAT BRANDON PROBABLY HAD NOT BEEN SEXUALLY ABUSED BY ROY GROVES.

Q.    DID YOU ALSO FIND OUT OR MAKE ANY FINDINGS ABOUT THE FAMILY ITSELF, BASED ON THE RIVENDELL EVALUATION?

A.    WELL, HE JUST BASICALLY SAID THAT THE FAMILY WAS DYSFUNCTIONAL.  THAT HE HAD COME FROM A VERY NEGATIVE FAMILY ENVIRONMENT.  THE PARENTS ARE ENCOURAGING NEGATIVE CONDUCT, THEY HAVE A LOW FRUSTRATION TOLERANCE, POOR PLANNING SKILLS, HE HAS A LACK OF INSIGHT, MATURITY, INSECURITY, POOR

SELF-CONCEPT, LIMITED CAPACITY TO RECOGNIZE CONSEQUENCES OF HIS BEHAVIOR, AND LIMITED JUDGMENT.

HE ALSO NOTED PROMINENT CONFLICT IN THE HOME ENVIRONMENT. A CONFUSED AND DISSATISFIED CHILD, A CHILD WHO HAD FEELINGS OF REJECTION AND ASSOCIATED ANXIETY. HE FELT SMART, BUT NOT VERY WELL LIKED BY HIS PEERS. THAT HE WAS NERVOUS AND WORRIED OVER CAUSING PROBLEMS IN HIS FAMILY. THAT HE HAD PROBLEMS WITH MANY PERSONAL RELATIONSHIPS, ANXIETY, AND SELF IMAGE. THIS WAS HIS PROFILE OF THE FAMILY.

Q.    THIS IS BRANDON BASHAM AT AGE TEN?

A.    YES.

Q.    NOW, WHAT DID YOU LEARN FROM THE FINAL CONCLUSIONS OF THE DOCTORS, PSYCHIATRISTS, THE EXPERTS AT RIVENDELL?

A.    THEY CONTINUED TO DIAGNOSE HIM AS ATTENTION DEFICIT DISORDER WITH INTERMITTENT EXPLOSIVE DISORDER, OPPOSITIONAL DEFIANT DISORDER, AND SEIZURE DISORDER PER EEG. HE WAS GIVEN AN EEG WHILE HE WAS THERE, AND IT WAS FOUND TO BE ABNORMAL. AND SO, AT THAT TIME, THEY THOUGHT HE MIGHT POSSIBLY HAVE A SEIZURE DISORDER. AND I DON'T KNOW IF THEY KNEW THIS, BUT THERE WAS SOME SEIZURE HISTORY IN THE FAMILY.

Q.    WHAT IS AN EEG, MS. VOGELSANG?

A.    ELECTROENCEPHALOGRAPH.

Q.    IT LOOKED AT THE BRAIN?

A.    YES.

Q.    ABNORMAL EEG?

A.    YES.

Q.    THEY MADE FINDINGS AT AGE TEN THAT THERE WERE ABNORMALITIES IN BRANDON'S BRAIN?

A.    YES.    THEN, FINALLY, THE FAMILY WAS NOTED TO BE DYSFUNCTIONAL.    PART OF BRANDON'S BEHAVIORAL DISORDER, DEFIANCE,  MISBEHAVIOR DISORDERS,  DEFIANT,  DISRESPECTFUL. THEY MADE A NOTE THAT THE TEACHERS NOTED THAT BRANDON WANDERED OFF INSIDE AT TIMES,  DIDN'T RESPOND.  THEY MAY HAVE NOTED THAT BECAUSE THE EEG CAME BACK ABNORMAL.

Q.    DID THE HOSPITAL OFFER ANY MEDICATIONS TO ALTER BRANDON'S BEHAVIOR?

A.    YES,  THEY DID.

Q.    WHY DIDN'T THEY GIVE HIM THOSE MEDICATIONS?

A.    HIS MOTHER WOULD NOT ALLOW HIM TO TAKE THEM.

Q.    NOW,  IF YOU LOOK AT THE CHART,  PLEASE GO FORWARD. IF YOU LOOK AT THIS,  OCTOBER 2ND,  1991,  DID THE HOSPITAL DISCHARGE BRANDON BASHAM?

A.    NO.

Q.    THEY WANTED TO CONTINUE TO LOOK AT HIM AND TRY TO TREAT HIM,  RIGHT?

A.    YES.

Q.    WHY DID BRANDON BASHAM LEAVE?

A.    HIS MOTHER TOOK HIM OUT AGAINST MEDICAL ADVICE.   SHE DID NOT WANT THEM TO DO ANY MORE.   SHE DIDN'T WANT HIM TO HAVE THE TEGRETOL, WHICH THEY WANTED TO EXPERIMENT WITH TO SEE

IF POSSIBLY HE HAD SEIZURES, SEE IF THIS WOULD CHANGE HIS BEHAVIOR.

Q. DID SHE ALLOW HIM TO HAVE MEDICATIONS FOR WHAT SHE PERCEIVED TO BE HIS PROBLEMS?

A. SHE ADMITTED THAT SHE WAS GIVING HIM HER PROLIXIN. IT IS A DRUG OFTEN PRESCRIBED FOR SCHIZOPHRENIA.

Q. NOW, IN THE END, AFTER BRANDON HAS BEEN THERE, THEY HAVE LOOKED AT HIM, THEY HAVE TESTED HIM, TESTED HIS BRAIN, ASKED HIM QUESTIONS, EVEN THOUGH HIS MOTHER DRAGS HIM OUT BEFORE THEY ARE OVER, DID THEY DO A FINAL EVALUATION?

A. YES.

Q. AND WHAT DID THE HOSPITAL IN THAT EVALUATION SAY ABOUT BRANDON'S FAMILY?

A. THEY SAID THAT THIS WAS A FAMILY THAT WAS OVERENMESHED.

Q. THAT MEANS ABSOLUTELY NOTHING TO ME. CAN YOU TELL US, FROM A CLINICAL SOCIAL WORKER RESPECT, WHAT DOES THE WORD "OVERENMESHED" MEAN?

A. WELL, EARLIER, WHEN I DESCRIBED THE KIND OF FAMILY THAT CREATES AN ENVIRONMENT IN THE HOME THAT MAKES IT EASY FOR CHILDREN TO LEARN AND TO GET THROUGH THE DEVELOPMENTAL STAGES, ONE OF THE MOST IMPORTANT PIECES OF DEVELOPMENT IS LEARNING HOW TO BREAK AWAY FROM YOUR FAMILY PARENTS. HOW TO GET YOUR OWN IDENTITY. IN "OVERENMESHED" FAMILIES, PARENTS DISCOURAGE THAT INDEPENDENCE. THEY REWARD BAD BEHAVIOR, AND IT IS KIND OF A BARTER OR TRADING SYSTEM. IF YOU STAY CLOSE

A. THERE MAY HAVE BEEN.

Q. A CONDUCT DISORDER AND AN INTERMITTENT EXPLOSIVE DISORDER?

A. DISORDER, YES.

Q. AND ALSO ON THAT DATE, AUGUST 2ND, 1996, MR. BASHAM RECEIVED A SLEEP DEPRIVED EEG AND WAS COMPLETED AND READ AS WITHIN NORMAL LIMITS?

A. IT WAS READ WITHIN THE NORMAL LIMITS, YES.

Q. AND THAT WAS CONTRADICTED BY THE EEG THAT HAD BEEN CONDUCTED FIVE YEARS PREVIOUSLY?

A. YES.

Q. NOW, YOU ARE AWARE FROM READING THE RECORDS, THAT MR. BASHAM HAS HAD A NUMBER OF NORMAL EEG'S AND EVEN A NORMAL MRI SINCE THAT EEG THAT WAS DONE WHEN HE WAS TEN?

A. THAT IS CORRECT.

Q. MR. BASHAM, AT THE TIME, WAS IN -- AT THE TIME OF THESE INCIDENTS, THE AUGUST 2ND DIAGNOSES, WAS AT THE METHODIST HOME. AND THEN HE ACTUALLY JUST BECAME SO VIOLENT AT THE METHODIST HOME AND SO UNCONTROLLABLE, THEY SENT HIM TO STONER CREEK?

A. YES.

Q. THAT WAS INTENDED TO BE A TEMPORARY CHANGE IN ENVIRONMENT HOPING TO IMPROVE HIS SITUATION?

A. THAT IS CORRECT.

Q. HE WAS ADMITTED THERE ON AUGUST 7TH OF 1996. AND WHEN

JA 1904

HE WAS ASKED IF HE COULD ANSWER A FEW QUESTIONS, HE SAID, "I AIN'T TALKING. FUCK YOU"?

A.    YES.

Q.    THEN, ON AUGUST 7TH OF 1996, DURING A MULTIDISCIPLINARY ASSESSMENT AND TREATMENT PLAN, MR. BASHAM DENIED ANY FORM OF PHYSICAL ABUSE, SEXUAL ABUSE, OR NEGLECT?

A.    HE DID THAT ON SEVERAL OCCASIONS, YES.

Q.    IT IS ALSO NOTED HE CONTINUES TO BLAME OTHERS FOR HIS BEHAVIOR?

A.    EVEN THOUGH HE TESTED AS BEING FULL OF SELF BLAME, HE ALSO HAD BEEN SEEN, AT SOME POINT I THINK, TO HAVE SOME BORDERLINE FEATURES WHICH CERTAINLY IS CONSISTENT WITH BLAMING OTHERS.

Q.    AND ON AUGUST 11TH OF '96 WHILE AT STONER CREEK, HE WAS IN A GROUP. AND THE PROGRESS NOTE REFLECTS HE TEASED A PEER ABOUT KNOWING NOTHING ABOUT SEX. THE PEER WAS DEALING WITH SEXUAL ABUSE ISSUES. "THE PATIENT HAS GENERALLY BEEN DISRUPTIVE WITH PEERS, MIMICS THE WAY HIS FRIENDS TALK IN ORDER TO DRAW ATTENTION TO HIMSELF"?

A.    ABSOLUTELY. THAT IS CONSISTENT WITH HIS BEHAVIOR.

Q.    ON AUGUST 14TH OF '96, IT IS NOTED, WHILE STILL AT STONER CREEK, HE IS TAKING ZOLOFT, HIS COMPLAINTS OF SIDE EFFECTS SEEM EXAGGERATED, AND ATTENTION-SEEKING?

A.    THAT IS CORRECT.

Q.    ON HIS DISCHARGE FROM STONER CREEK, HE WAS DIAGNOSED

WITH INTERMITTENT EXPLOSIVE DISORDER, CONDUCT DISORDER, PROBABLE ADHD ON AUGUST 19TH OF '96?

A.    YES.    AND I THINK A LOT OF WHAT YOU ARE SEEING, TOO, WITH WHAT YOU ARE READING IS EXACTLY WHAT DR. LITTLETON PREDICTED MANY YEARS EARLIER IN RIVENDELL.

Q.    THAT DIAGNOSIS ON AUGUST 19TH OF 1996, THAT ONE IS ACTUALLY REFLECTED ON YOUR CHART ON THE BLUE, RIGHT THERE?

A.    YES, THAT IS CORRECT.

Q.    BUT TO BE FAIR, IT SAYS "PROBABLE ADHD" ON THE RECORD AND NOT ADHD?

A.    I AM SORRY.    I SUBMITTED WHAT I WANTED TO BE PUT ON HERE.    IF IT SAYS "PROBABLE," I AM SURE YOU ARE CORRECT.

Q.    WHEN HE WAS DISCHARGED -- AT THAT POINT, WHEN HE WAS DISCHARGED, THERE IS ANOTHER DIAGNOSIS THAT REFLECTS BIPOLAR DISORDER, WHICH IS AN ENTIRELY DIFFERENT MENTAL DISORDER THAN ANY OF THE ONES WE HAVE BEEN TALKING ABOUT BEFORE?

A.    THAT IS CORRECT.

Q.    AND BIPOLAR DISORDER IS TREATED WITH LITHIUM?

A.    IT IS.

Q.    HE WAS PRESCRIBED LITHIUM WHEN HE LEFT STONER CREEK ON AUGUST 19TH OF 1996?

A.    YES.

Q.    AND OVER THE COURSE OF THE NEXT SEVERAL DAYS AT THE METHODIST HOME, HE CONTINUED TO DEMONSTRATE EXPLOSIVE BEHAVIOR, PUNCHED AND KICKED INDIVIDUALS IN THE HOME, AND,

BASICALLY, DID NOT RESPOND TO LITHIUM, AT LEAST TO THE EXTENT HE WAS TAKING IT?

A.     THAT IS CORRECT.  IN RESPONSE TO YOUR QUESTION ABOUT ADHD AND BIPOLAR BEING COMPLETELY SEPARATE DISORDERS, IT IS ALSO TRUE THAT IF YOU LOOK AT CHILDREN WHO HAVE BEEN DIAGNOSED WITH ADHD AND YOU GO ON A SPECTRUM OR A RANGE OF TIME, BIPOLAR IS THE DIAGNOSIS THEY ARE MORE TYPICALLY GIVEN WHEN THEY ARE ADULTS.  HE IS 15 HERE.  SINCE THE TIME HE WAS BEING TREATED, THERE HAS BEEN A LOT MORE RESEARCH ON BIPOLAR DISORDER IN CHILDREN.  AND SO,  IT IS -- THEY MAY HAVE BEEN TRYING LITHIUM WITH HIM TO SEE IF HE WOULD RESPOND BECAUSE IT IS SO CLOSELY RELATED TO CHILDHOOD ADHD AS IT CHANGES WITH TIME.

Q.     AND ON SEPTEMBER 27TH OF '96,  YOU HAVE A NOTE REFLECTED THERE THAT SAYS, "INCREASED DOSAGE OF LITHIUM." AND THAT MEDICAL REPORT ALSO REFLECTS THERE ARE AT LEAST 12 INCIDENT REPORTS PRIMARILY ADDRESSING THE ISSUE OF "SAFE PHYSICAL MANAGEMENT" SINCE HE GOT BACK ON AUGUST 19TH OF '96 AND WHILE HE STARTED TAKING LITHIUM?

A.     I AM SO SORRY TO ASK YOU TO REPEAT THAT QUESTION.

Q.     OKAY.  YOU GOT ON YOUR CHART, ON SEPTEMBER 27TH,  96 --

A.     UH-HUH (AFFIRMATIVE RESPONSE).

Q.     -- THE DOSAGE OF LITHIUM WAS INCREASED.

A.     YES.

Q.     AND AMONG THE REASONS IT WAS INCREASED IS BECAUSE, AT

THE TIME HE HAD RETURNED TO THE METHODIST HOME ON AUGUST 19, 1996, HE WAS TAKING LITHIUM, THERE WERE 12 INCIDENT REPORTS, PRIMARILY ADDRESSING SAFE PHYSICAL MANAGEMENT?

A.    YES.

Q.    THOSE CONTINUED AFTER LITHIUM WAS INCREASED?

A.    YES.

Q.    NOW, IF WE GO TO NOVEMBER 2ND, 1996. THERE IS A GAP BETWEEN NOVEMBER 2ND, 1996 AND DECEMBER 4, 1996. AND IT IS DURING THAT GAP THAT HE WAS AT THE CHILDREN'S PSYCHIATRIC HOSPITAL OF KENTUCKY?

A.    IS THAT NOVEMBER 2ND?

Q.    YES.

A.    I'M SORRY, CAN YOU ASK THAT QUESTION AGAIN?

Q.    SURE. DURING THE GAP BETWEEN NOVEMBER 2ND OF 1996 AND DECEMBER 4TH OF 1996 WAS WHEN MR. BASHAM WAS AT THE CHILDREN'S PSYCHIATRIC HOSPITAL OF NORTHERN KENTUCKY?

A.    NOW, I HAVE THE DATES AT CHILDREN'S PSYCHIATRIC FROM 11-6-96 UNTIL 11-20-96.

Q.    THAT WAS AN INARTFUL QUESTION. MY ONLY POINT IS, IT OCCURRED BETWEEN THAT TIME FRAME?

A.    YES.

Q.    THERE IS NOTHING ON YOUR CHART TO REFLECT TO SHOW ANY DIAGNOSES THAT WERE GIVEN TO MR. BASHAM WHILE HE WAS AT THAT HOSPITAL?

A.    WHILE HE WAS AT CHILDREN'S PSYCHIATRIC?

**JA 1908**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
                             )    COLUMBIA, SC
                             )    OCTOBER 22, 2004
                             )
    VERSUS                   )
                             )
BRANDON L. BASHAM,           )
        DEFENDANT.           )
_____    )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XXIII


APPEARANCES:

FOR THE GOVERNMENT:          SCOTT SCHOOLS, FIRST AUSA
                             JONATHAN S. GASSER, AUSA
                             JOHN DUANE, AUSA
                             UNITED STATES ATTORNEY'S OFFICE
                             1441 MAIN STREET, SUITE 500
                             COLUMBIA, SC  29201

FOR THE DEFENDANT:           JACK SWERLING, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201

                             GREG HARRIS, ESQ.
                             1720 MAIN STREET
                             SUITE 301
                             COLUMBIA, SC  29201


COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
                             UNITED STATES COURT REPORTER
                             901 RICHLAND STREET
                             COLUMBIA, SC 29201



STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1909

SETTINGS, SOME STUDENTS REVEALED THINGS THAT HAD OCCURRED TO THEM IN THE PAST, AND IT WAS ON APRIL 14TH.

Q.    DO YOU HAVE A BATE STAMP NUMBER?

A.    BATES STAMP IS 12444.    I MET WITH BRANDON AT 8:30 THAT NIGHT.    I SAT IN, ACTUALLY, WITH THE GROUP,  THE ACTUAL SOCIAL WORKER GROUP THAT THEY HAD THAT EVENING, AND I COULD TELL BRANDON, AT THE TIME,  HE WAS CLENCHING HIS FIST.  HE WAS SITTING THERE.  HE HAS THIS MUSCLE ABOUT THE SIDE OF HIS JAW, YOU CAN SEE IT FLEXING BACK AND FORTH.   I COULD TELL, BUT HE WAS NOT ATTENTION-SEEKING,  HE WAS NOT HYPER,  HE WAS NOT IMPULSIVE,  HE WAS NOT SHARING.   HE JUST SAT THERE THE WHOLE TIME, JUST CONTINUED TO CLENCH HIS FIST AND SIT BACK.

WHEN GROUP WAS OVER, HE DIDN'T SAY A WORD.   HE DID NOT SHARE.   AND HE WENT BACK TO HIS ROOM.   SO, I ASKED HIM,  YOU KNOW,  CAN I MEET WITH YOU? AND HE SAID,  SURE.   AND I SAID, I NOTICED THAT YOU WERE OBVIOUSLY UPSET ABOUT SOMETHING THAT HAD OCCURRED IN THE GROUP.   AND SO, WHAT THAT STAMP IS THERE, IT SAYS,  IN MY PARAPHRASING, I DIDN'T LOOK AT THE ACTUAL PAGE,  BUT BRANDON WAS HAVING FLASHBACKS AFTER A PEER WHO WAS IN THE GROUP, WAS DISCUSSING HIS OWN SEXUAL ABUSE AND PHYSICAL ABUSE.  AND BRANDON COULD NOT BELIEVE HOW A YOUNGER BOY WAS 10 YEARS OLD,  COULD DEAL BETTER WITH SEXUAL ABUSE AND PHYSICAL ABUSE THAN BRANDON, HIMSELF.   BRANDON STATED IT WAS EASIER TO GET ANGRY THAN TO DEAL WITH MORE ISSUES.   IT WAS BECAUSE I SAID WE NEED TO DEAL WITH THIS.   WE HAD TO.   HE WAS ANGRY

ABOUT IT. I SAID WE NEED TO TALK ABOUT IT. SO, THAT IS WHEN WE HAD ALREADY DEVELOPED THAT TRUST AND THAT HEALTHY, MUTUAL RESPECT RELATIONSHIP.

AND HE SHARED WITH ME THAT -- BUT HE DID NOT SAY UNTIL -- THAT WAS ON APRIL 14TH, AND IT WASN'T APRIL 14TH THAT EVENING. AND I HAVE, ON THAT SAME PAGE, 12444, AT 10:00 O'CLOCK, HE WAS PHYSICALLY TAKEN TO THE GROUND. ON THE 14TH, ALSO, HE HAD THERAPY, NOT A HOME VISIT, BUT THERAPEUTIC VISIT TO GO TO THE DENTIST WITH HIS FATHER. HE HAD NOT BEEN TO THE DENTIST SINCE, WHATEVER, NOVEMBER OF '91, AND THIS, OF COURSE, WAS APRIL OF '97. AND HE WAS COMPLAINING OF SOME DENTAL PAIN, AND WE GOT HIM AN APPOINTMENT AT THE DENTIST. SO APRIL 15TH -- ON APRIL 15TH, THAT NEXT NIGHT, WHICH IS STAMP DATED OR WHATEVER YOU CALL IT --

Q. BATES STAMP.

A. BATES STAMP.

Q. THAT IS THE NUMBER ON THE BOTTOM OF THE PAGE.

A. IT IS 12448. AT 8:30 THAT EVENING, APRIL 15, I MET AGAIN WITH BRANDON ONE-ON-ONE AND HE WAS SAYING HOW HE WAS CONTINUING TO HAVE FLASHBACKS. HOW HE HAD BEEN TOUCHED BY A NEIGHBOR MAN WITH THE SAME NAME OF THE PEER THAT DISCLOSED IT ON THE 14TH. HE WAS RECALLING THAT AND SAYING THE NEIGHBOR MAN HAD THE SAME NAME AS THE PEER AND HE WASN'T REALIZING THAT HE WAS ACTING OUT BECAUSE HE DOESN'T -- HE WAS ACTING OUT IN ANGER. AND HE ALSO DIDN'T REMEMBER THE MAN'S LAST NAME WHEN I

ASKED HIM, YOU KNOW, WHAT WAS THE MAN'S LAST NAME. HIS FIRST NAME WAS EDDIE. SO WAS THE PATIENT THAT WAS ALSO ON THE UNIT THAT HAD DISCLOSED THE DAY PRIOR.

SO, THAT NIGHT, I DISCUSSED WITH BRANDON BECAUSE HE WANTED TO TOTALLY SHUT DOWN. I HAD A CONTRACT WITH HIM THAT HE WAS NOT GOING TO HARM HIMSELF AND THAT HE WAS GOING TO ASK STAFF MENTAL HEALTH COUNSELORS OR A NURSE TO TALK WITH HIM ONE-ON-ONE IF HE STARTED TO FEEL THAT HE JUST COULDN'T HANDLE IT. THERE AGAIN, NOT HAVING THAT POWER OF CONTROL OVER HIS EMOTIONS AND WHAT HAD OCCURRED PRIOR TO THEN.

THE COURT: YOUR COLLEAGUE SAYS WE NEED A RECESS. LET'S TAKE ABOUT A 10-MINUTE RECESS. PLEASE GO TO YOUR JURY ROOM.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: ALL RIGHT. HOW DO WE STAND, MR. HARRIS?

MR. HARRIS: WE DON'T STAND WELL AT ALL. THIS IS DIFFICULT TESTIMONY. IT IS LATE IN THE AFTERNOON, FRIDAY. HISTORICALLY, WHEN HE HAS BEEN IN THE FACILITY OR IN THE COURT IT HAS BEEN BAD, AND MR. BASHAM HAS PROGRESSIVELY WORSENED HIS CONDITION OVER THE COURSE OF THE AFTERNOON. WE WOULD ASK FOR A RECESS FOR THE EVENING.

THE COURT: WELL, ONLY 45 MINUTES AWAY FROM THE NORMAL ADJOURNMENT TIME ANYWAY. IT WILL PUT US THAT MUCH

FURTHER BEHIND.  IS IT THE TESTIMONY HE HAS BEEN HEARING, OR WHAT IS CAUSING THE PROBLEM?

MR. HARRIS:  THE TESTIMONY.

THE DEFENDANT:  I AM TRYING, JACK.  I CAN'T TAKE IT.  I CANNOT.  I'M READY.

THE COURT:  WHAT IS THE GOVERNMENT'S POSITION TO ADJOURN EARLY?

MR. SCHOOLS:  IT IS FINE, JUDGE.

THE COURT:  YOU AGREE TO IT?

MR. SCHOOLS:  WHATEVER THEY WANT.

THE DEFENDANT:  I DO, TOO.  I DON'T CARE.  I CAN'T TAKE IT NO MORE.

THE COURT:  MR. BASHAM, WE WILL GO AHEAD AND RECESS.

THE DEFENDANT:  I'M SORRY, MAN.  I'M OUT OF EMOTIONS.  I DON'T EVEN KNOW HOW TO EXPRESS IT.

THE COURT:  ALL RIGHT.  PLEASE BRING IN THE JURY.

THE DEFENDANT:  I WANT TO SEE MY FAMILY, MAN.

MR. SWERLING:  BEFORE THE JURY COMES IN, MAY HE BE TAKEN OUT?

THE COURT:  YEAH, GO AHEAD AND TAKE HIM OUT.

THE DEFENDANT:  YEAH, TAKE ME OUT AFTER IT IS OVER.

MR. SWERLING:  CAN YOU SIT THERE?

THE DEFENDANT:  YEAH.

MR. SWERLING:  I WAS ANTICIPATING A PROBLEM.

THE DEFENDANT:  I AIN'T TRYING.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: MEMBERS OF THE JURY, WE ARE GOING TO GO AHEAD AND ADJOURN COURT FOR THE DAY. LET YOU GO HOME FOR THE WEEKEND. ASK YOU TO BE BACK AT 9:00 O'CLOCK MONDAY MORNING AND PICK UP IN THE MIDDLE OF THIS WITNESS'S TESTIMONY AT 9:00 A.M. ON MONDAY. DON'T DISCUSS THE CASE WITH ANYONE. HAVE A NICE AND SAFE WEEKEND. SEE YOU BACK MONDAY AT 9:00 O'CLOCK.

(WHEREUPON, THE JURY WAS EXCUSED.)

THE COURT: I HAVE BEEN INFORMED BY COURT PERSONNEL WE ARE LOOKING AT SEVEN MORE FACT WITNESSES, THREE EXPERT WITNESSES FROM THE DEFENSE, THREE EXPERTS FROM DEFENDANT, AND TWO FROM GOVERNMENT.

MR. SCHOOLS: THERE IS A SECOND EXPERT, IT WILL BE A PRISON EXPERT.

THE COURT: I AM THINKING HOW WE WILL PLAY OUT NEXT WEEK. HAVE JURY TRIAL CONFERENCE AND JURY SELECTION SET FOR THE FIRST MONDAY OF NOVEMBER. I MEAN, SORT OF MISSED THE BOAT ON PREDICTING HOW WE WOULD GO THIS WEEK, APPARENTLY. HAS IT GONE SLOWER THAN YOU ANTICIPATED?

MR. HARRIS: THESE WITNESSES TODAY AND YESTERDAY HAVE TAKEN TWICE AS LONG AS WE THOUGHT, BOTH ON OUR PART AND THE CROSS-EXAMINATION. I CAN TELL YOU THAT WE HAVE A MORNING'S WORTH OF HOPKINS COUNTY JAILERS. I HAVE BEEN THROUGH WITH THEM THEIR TESTIMONY OVER BACKWARDS AND FORWARD, THAT WILL BE

THE MORNING. FOR THE AFTERNOON, WE HAVE APPROXIMATELY FIVE RICHLAND COUNTY WITNESSES, DETENTION FACILITY WITNESSES. THEN WE WILL BE INTO THE EXPERTS.

THE COURT: EXPERTS AREN'T GOING TO BE SHORT, I AM SURE.

MR. HARRIS: I THINK THERE IS ONE EXPERT THAT WILL TAKE A VERY LONG TIME. I DON'T KNOW HOW LONG, IT IS MR. SWERLING'S WITNESS. I THINK I HAVE AN EXPERT THAT WILL TAKE LESS THAN AN HOUR, AN EXPERT THAT WILL TAKE LESS THAN AN HOUR AND FIFTEEN MINUTES.

MR. SWERLING: JUDGE, I AM ANTICIPATING THE BASIC PART OF IT NEXT WEEK. FIRST PART OF THE WEEK WILL BE DR. SCHWARTZ-WATTS, DR. BRAWLEY, AND DR. CAPEHART. THOSE WILL BE THE EXPERTS.

THE COURT: OKAY.

MR. SWERLING: I APOLOGIZE. WE DIDN'T REALIZE THE TIME.

THE COURT: NO APOLOGY NECESSARY. I NEED A HANDLE ON NEXT WEEK TO SEE IF I NEED TO CANCEL SOME COURT NEXT WEEK.

*** END OF REQUESTED TRANSCRIPT ***

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____        _____

S/DEBRA R. JERNIGAN, RPR, CRR                DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA, ) CR. NO. 4:02-992
 ) COLUMBIA, SC
 ) OCTOBER 26, 2004
 )
  VERSUS )
 )
BRANDON L. BASHAM, )
   DEFENDANT. )
_____ )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XXV


APPEARANCES:
FOR THE GOVERNMENT:  SCOTT SCHOOLS, FIRST AUSA
  JONATHAN S. GASSER, AUSA
  JOHN DUANE, AUSA
  UNITED STATES ATTORNEY'S OFFICE
  1441 MAIN STREET, SUITE 500
  COLUMBIA, SC  29201

FOR THE DEFENDANT:  JACK SWERLING, ESQ.
  1720 MAIN STREET
  SUITE 301
  COLUMBIA, SC  29201

  GREG HARRIS, ESQ.
  1720 MAIN STREET
  SUITE 301
  COLUMBIA, SC  29201


COURT REPORTER:  DEBRA R. JERNIGAN, RPR, CRR
  UNITED STATES COURT REPORTER
  901 RICHLAND STREET
  COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1916

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: BEFORE THE JURY COMES IN, I WANT TO ASK YOU TO THINK JUST A MINUTE ABOUT MITIGATING FACTORS. THE DEFENDANT HANDED UP A TOTAL OF 70-ODD MITIGATING FACTORS THAT I HAVE PARED DOWN TO A MORE MANAGEABLE LIST. AND I THINK I HAVE ALREADY TOLD YOU THAT THE LAST 20 OR THEREABOUT, I THINK, ARE ALL SUBSUMED WITHIN THE IDEA OF MINOR PARTICIPATION. I WILL PROBABLY DISPENSE WITH ALL OF THOSE THAT ARE COVERED UNDER THE STATUTORY MITIGATING FACTOR. I WENT TO GROUP THEM IN GROUPS SO AS TO HAVE A SMALLER NUMBER.

AND, AT FIRST, I THOUGHT THAT WAS A GOOD IDEA. AND, FOR EXAMPLE, JUST TO GIVE YOU ONE EXAMPLE THAT COMES TO MIND, THERE WAS ONE REQUEST THAT BRANDON'S PARENTS DID NOT APPRECIATE THE NEEDS OF A SPECIAL EDUCATION CHILD. AND ANOTHER ONE SAID BRANDON'S PARENTS DID NOT GO TO VISITS AND COUNSELING SESSIONS WHEN HE WAS INSTITUTIONALIZED. I TRIED TO MERGE THOSE TOGETHER BECAUSE, TO ME, THEY WERE SORT OF ONE IN THE SAME THING.

BUT OTHER THINGS THAT I MERGED TOGETHER, I AM NOT SO SURE IF IT WAS THE PROPER THING TO DO. FOR EXAMPLE, THERE WERE THREE SEPARATE REQUESTS ALONG THE FOLLOWING LINES. NUMBER ONE, BRANDON COMMITTED THE OFFENSES AT ISSUE WHILE HE WAS OFF OF HIS PRESCRIBED MEDICATION. NUMBER TWO, BRANDON COMMITTED THE ISSUES AT QUESTION WHILE AT THE COERCION OF CHAD FULKS.

NUMBER THREE, BRANDON COMMITTED THE ISSUES WHILE ON ILLEGAL DRUGS, AND CONTRABAND, CRACK COCAINE, OR SOMETHING. WELL, I MERGED ALL THREE OF THOSE. BUT I AM WORRIED THAT THOSE ARE REALLY INDEPENDENT MITIGATING FACTORS, POTENTIALLY. AND IF I MERGE THEM INTO ONE NUMBERED PARAGRAPH, A JUROR MIGHT FIND THAT TWO OF THE THREE HAVE BEEN PROVEN, BUT BECAUSE IT WAS NOT THREE OUT OF THREE, THAT THAT FACTOR HADN'T BEEN PROVEN. SO, THE GOVERNMENT NEEDS TO BE THINKING ABOUT WHY I SHOULDN'T GO BACK AND BRING THOSE OUT AGAIN, IF YOU SEE WHAT I AM SAYING. THAT IS MY CONCERN.

NOW, I DID LOOK AT SOME OTHER CHARGES TO JURIES OTHER JUDGES HAVE GIVEN TO OTHER JURIES IN DEATH PENALTY CASES. FOR THE MOST PART, THE LIST IS MUCH, MUCH SMALLER THAN WHAT WE HAVE HERE AND WHAT WE HAD IN FULKS. IT OCCURRED TO ME THE REASON FOR THAT IS THE DEFENDANT, IN THOSE CASES, DIDN'T HAVE TESTIMONY TO SUPPORT THIS LONG LAUNDRY LIST IN THEIR BACKGROUND. THAT IS MY THOUGHTS. YOU BE THINKING ABOUT IT. WE WILL BE TAKING IT UP AT THE APPROPRIATE TIME.

MR. HARRIS: DID THE MARSHAL GET A CHANCE TO SPEAK TO YOU THIS MORNING, BEN HARASETH?

THE COURT: NO.

MR. HARRIS: WHEN WE ARRIVED TO THE COURTHOUSE THIS MORNING, WE WERE INFORMED BY OUR CLIENT HE WAS NOT GIVEN HIS SEROQUEL. I ASKED THE MARSHAL SERVICE TO CONTACT THE JAIL TO CONFIRM HE HADN'T BEEN GIVEN HIS MEDICATION. THAT IS HIS

ANTIPSYCHOTIC DRUG. THE JAIL CONFIRMED THEY MADE A MISTAKE. THERE WAS A NEW NURSE ON DUTY. MR. BASHAM WAS NOT GIVEN HIS MEDICATION FOR TODAY. WE HAVE SOME OF THE MEDICATION AT THE OFFICE. MR. BASHAM IS IN A VERY AGITATED STATE THIS MORNING. I BELIEVE IT IS BECAUSE HE HASN'T HAD HIS MEDICATION. I DON'T KNOW IF MS. TARR HAS IT WITH HER. SHE HAS IT WITH HER. WE ASK THAT MR. BASHAM BE ALLOWED TO TAKE HIS SEROQUEL.

THE COURT: I HAVE NO PROBLEM WITH THAT. ANY PROBLEM FROM THE GOVERNMENT?

MR. SCHOOLS: NO.

THE DEFENDANT: MAYBE IF I COULD TALK FOR MYSELF ONE SECOND, PLEASE.

THE COURT: I WILL GET YOU THE MEDICINE. ARE YOU CONFIRMING THAT RCDC DID NOT GIVE HIM HIS MEDICINE?

COURT OFFICER: HE MISSED A SEROQUEL DOSE LAST NIGHT ON THE PART OF A MISTAKE OF THE JAIL.

MR. HARRIS: WE ARE ASKING FOR AN HOUR FOR THE MEDICINE TO TAKE EFFECT.

THE COURT: I WAS ABOUT TO TELL YOU --

THE DEFENDANT: COULD YOU PLEASE LET ME SAY SOMETHING? I TRIED TO TALK TO JACK.

THE COURT: MR. BASHAM, THERE IS NOTHING TO SAY.

THE DEFENDANT: I AM NOT AGITATED.

THE COURT: LET ME ASK YOU. DO YOU THINK IF I GIVE YOU THE MEDICINE RIGHT NOW, WE CAN GO AHEAD AND START THE

TRIAL THIS MORNING AND LET IT TAKE EFFECT GRADUALLY?

THE DEFENDANT: NO, SIR. I CAN START THE TRIAL RIGHT NOW LIKE I AM. I DON'T NEED THE MEDICATION.

THE COURT: TAKE YOUR MEDICINE RIGHT NOW.

THE DEFENDANT: THAT IS -- I WOULD LIKE TO ASK THE GOVERNMENT, THIS IS MY REQUEST. YOU KNOW HOW YOU ASK THE GOVERNMENT TO LEAVE WHILE WE TALK TO THE JUDGE BY OURSELVES? THAT IS WHAT I WAS TRYING TO TELL JACK.

MR. HARRIS: YOUR HONOR, CAN WE HAVE AN EX PARTE CONFERENCE WITH THE COURT REGARDING MEDICATION?

THE DEFENDANT: AND OTHER THINGS.

THE COURT: TAKE THE MEDICATION NOW AND THEN DISCUSS IT.

THE DEFENDANT: I CAN'T STAY AWAKE. I THINK IT IS NIGHTTIME. THAT IS NOT WHY I AM AGITATED. IT IS, BUT IT IS BECAUSE OF THINGS THAT HAPPEN AT THE JAIL. NOBODY WILL LISTEN TO ME.

THE COURT: YOU DON'T WANT TO TAKE THE MEDICATION BECAUSE IT MAKES YOU DROWSY, IT IS TAKEN AT NIGHT?

MR. HARRIS: I'M NOT SURE THE SEROQUEL MAKES HIM TIRED.

THE COURT: PARDON?

MR. HARRIS: I DON'T THINK SEROQUEL HAS THAT EFFECT ON HIM. I DON'T KNOW. I AM NOT A DOCTOR. I CAN'T SAY.

THE COURT: WHAT IS THE GOVERNMENT'S POSITION?

MR. SCHOOLS: YOUR HONOR, OUR POSITION, UNFORTUNATELY, IS THAT THEY HAVE A TEAM OF DOCTORS THAT HAVE BEEN HIRED TO ADDRESS MR. BASHAM'S MEDICINE NEEDS. THEY NEED SOMEONE HERE TO BE HERE TO SEE IF HE IS COMPETENT TO GO FORWARD BEFORE WE PROCEED WITH THE TRIAL.

THE COURT: WE WILL BREAK FOR LUNCH AT 11:00 O'CLOCK UNTIL 1:00 O'CLOCK. IF WE DON'T START SOON, WE WILL GET IN ABOUT A THIRD OF THE DAY'S TESTIMONY TODAY. I CAN TELL YOU, THE JURY IS NOT HAPPY. THEY EXPECT TO BE DELIBERATING IN THIS CASE TODAY. YOU CAN SAY IT WAS MY FAULT FOR THE CASE BEING ON SCHEDULE. I WENT ON WHAT THE DEFENSE LAWYERS TOLD ME THEY COULD PUT THEIR CASE UP AND DOWN IN A WEEK. AND AS IT TURNS OUT, THAT PREDICTION WAS WOEFULLY INADEQUATE BECAUSE THE DEFENDANT COULDN'T HAVE EVEN PUT UP ITS CASE, EVEN WITHOUT CROSS EXAMINATION, IN A WEEK. SO, IT WAS JUST A MISPREDICTION THERE. BUT THERE IS NOTHING ANYBODY CAN DO ABOUT IT.

MR. SCHOOLS: WE ALSO HAVE A FEW LEGAL ISSUES I THINK WE NEED TO ADDRESS, AT SOME POINT, AT LEAST BEFORE DR. SCHWARTZ-WATTS' TESTIMONY.

THE COURT: MAYBE WE CAN USE THIS MORNING TO TAKE UP LEGAL MATTERS.

MR. HARRIS: MR. SCHOOLS ALSO NOTIFIED ME THERE IS SOME ISSUE REGARDING JIM AIKEN'S TESTIMONY THAT WE CAN ALSO TAKE UP THIS MORNING.

THE COURT: DO YOU WANT ME TO LET THE JURY GO UNTIL

1:00 O'CLOCK?

MR. HARRIS:  THAT WOULD BE OUR REQUEST, YOUR HONOR.

MR. SCHOOLS:  YES, SIR.

MR. HARRIS:  YES, SIR.

MR. GASSER:  THAT IS THE PROPER THING TO DO.  WE MIGHT AS WELL GO AHEAD AND DISCUSS SCHEDULING BECAUSE THE COURT INDICATED TO THE JURY -- YOU CAN TELL IT IS QUITE OBVIOUS THE BODY LANGUAGE OF THE JURY OF THE COURSE OF THE TESTIMONY OF VARIOUS WITNESSES YESTERDAY THAT SOME OF THEM APPEAR TO BE SOMEWHAT AGITATED AND RESTLESS.  IT IS THE GOVERNMENT'S POSITION THAT WE NEED TO GO AHEAD AND DISCUSS SCHEDULING, PARTICULARLY SINCE THE JURY THOUGHT, AT THE VERY LEAST, SINCE THAT THEY WERE GOING TO BE FINISHED WITH THIS CASE IN OCTOBER.  YOU HAVE A HALLOWEEN WEEKEND COMING UP. SOME OF THESE JURORS HAVE CHILDREN.  THEY ARE, A LOT OF TIMES, HAVING KIDS MYSELF, KNOWING THAT THERE ARE PLANS ON HALLOWEEN, ELECTION ON TUESDAY, MIGHT BE SOME SORT OF ANXIETY ABOUT WHEN THEY ARE GOING TO BE ABLE TO VOTE.  I JUST THINK WE NEED TO LET THEM GO AHEAD AND KNOW TODAY WHAT OUR SCHEDULE IS.

THE COURT:  I WAS GOING TO DO THAT.

MR. SCHOOLS:  THE OTHER ISSUE --

THE COURT:  CAN WE DO THAT AFTER LUNCH WHEN THEY COME BACK WHEN WE KNOW A LITTLE BIT BETTER HOW WE STAND? OR DO YOU PROPOSE I TELL THEM THIS MORNING?

MR. SCHOOLS: YOUR HONOR, PART OF THE PROBLEM, WE KIND OF NEED TO KNOW BECAUSE WE HAVE GOT TWO WITNESSES, ONE IN NORTH CAROLINA AND ONE IN FLORIDA, WHO MAY NEED TO BE HERE FOR REPLY.

THE COURT: I UNDERSTAND. I AM SAYING, DO YOU WANT ME TO BRING IN THE JURY NOW AND TELL THEM TO HIT THE ROAD, COME BACK AT 1:00 O'CLOCK, AND BY THE WAY, WE ARE GOING TO GO ON TO NEXT WEEK. OR CAN I WAIT UNTIL THIS AFTERNOON TO TELL THEM ABOUT NEXT WEEK WHEN WE KNOW A LITTLE MORE PRECISELY WHAT IT LOOKS LIKE WE WILL BE DOING.

MR. GASSER: YOUR HONOR, I THINK, I THINK WE NEED TO GO AHEAD AND LET THEM KNOW THAT THERE ARE UNANTICIPATED MATTERS THAT NEED TO BE DEALT WITH. WE WILL DEAL WITH THEM THIS MORNING. WE ARE GOING TO HIT THE ROAD RUNNING AT 1:00 O'CLOCK THIS AFTERNOON. THEY NEED TO USE THIS TIME, AS WELL, IF THEY NEED TO MAKE ANY ARRANGEMENTS IN THEIR SCHEDULES AND APPEASE THEM THAT THEY WILL -- THIS WILL NOT INTERFERE WITH THEIR RIGHT.

THE COURT: TELL THEM WE WILL BE GOING INTO NEXT WEEK. WE DON'T KNOW HOW FAR INTO THE WEEK WE WILL GO. WE WILL MAKE ARRANGEMENTS FOR THEM TO VOTE BY HAVING A SOMEWHAT SHORTER DAY ON TUESDAY.

MR. GASSER: YES, SIR.

THE COURT: I THOUGHT ABOUT THE IDEA OF TRYING TO DO THE LEGWORK FOR THEM TO GET THEM ALL ABSENTEE BALLOTS, BUT

THERE IS A TIME REQUIREMENT THAT HAS TO BE MET, AND IT IS NOT FEASIBLE, AT THIS POINT.

MR. GASSER: I AM ASSUMING WE ARE NOT -- AND THE GOVERNMENT HAS NO OBJECTION, CONSIDERING THE REASONS FOR PARTICIPANTS IN THIS PROCESS, THAT WE NOT WORK ON FRIDAY, GIVEN WHAT HAS BEEN DISCUSSED.

THE COURT: WELL, I WAS GOING TO SUGGEST WE MIGHT WANT TO COME IN FRIDAY ABOUT 3:00 O'CLOCK. MY LAW CLERKS HAVE LAW CLERK TRAINING FOR NEW LAW CLERKS UP UNTIL 3:00 O'CLOCK ON FRIDAY, BUT I WAS THINKING WE COULD USE THE LAST PART OF THE AFTERNOON ON FRIDAY TO GO OVER THE JURY INSTRUCTIONS AND ALL. MAYBE WE CAN DO THAT TODAY, POSSIBLY. LET'S GO AHEAD AND BRING THE JURY OUT AND PUT THEM ON THEIR WAY, AND THEN WE WILL DECIDE HOW TO PROCEED. PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: MEMBERS OF THE JURY, I NEED TO GIVE YOU SOME NEWS THAT YOU MIGHT NOT BE HAPPY TO HEAR. WE WILL NOT BE ABLE TO GO FORWARD THIS MORNING WITH THIS TRIAL. WE ARE GOING TO HAVE TO START ABOUT 1:00 O'CLOCK TODAY. AND I AM GOING TO HAVE TO EXCUSE YOU, AND ASK YOU TO DO WHATEVER YOU NEED TO DO TO KILL SOME TIME UNTIL 1:00 O'CLOCK.

WE MAY ALSO NOT TRY THIS CASE AT ALL ON FRIDAY, DEPENDING UPON HOW THINGS PLAY OUT. ALL THAT MEANS, WE ARE GOING TO BE

RUNNING INTO NEXT WEEK WITH THIS TRIAL. I KNOW THAT WE TOLD YOU WHEN YOU WERE SELECTED THAT WE EXPECTED TO FINISH IT DURING THE MONTH OF OCTOBER, AND I TOLD YOU LAST WEEK THAT WE APPEARED TO BE ON SCHEDULE. BUT THERE ARE CERTAIN ISSUES THAT HAVE COME UP, LEGAL ISSUES AND OTHER MATTERS, SOME UNRELATED TO THIS CASE ALTOGETHER, THAT WILL PREVENT US FROM GOING FORWARD THIS MORNING AND PROBABLY ON FRIDAY, AS WELL.

I WANT TO HASTEN TO ADD THAT IT IS NOT THE FAULT OF THE DEFENDANT, IT IS NOT THE FAULT OF THE GOVERNMENT. AND EVEN THOUGH THIS IS DISAPPOINTING NEWS TO YOU, I DON'T WANT YOU TO HOLD IT AGAINST EITHER PARTY TO THIS CASE. WE HAVE ALL WORKED TOO HARD TRYING THIS CASE IN AN EFFORT TO BE COMPLETELY FAIR AND IMPARTIAL TO BOTH SIDES FOR YOU TO ATTACH SOME NEGATIVE INFERENCE TO THE FACT THAT YOU WILL HAVE TO BE BROUGHT BACK NEXT WEEK.

ALL I CAN TELL YOU IS, WHILE YOU ARE GONE, WE WILL BE IN HERE WORKING VERY HARD TO TRY TO RESOLVE THESE MATTERS SO THAT WHEN YOU COME BACK, WE WON'T HAVE ANY UNDUE DELAYS.

IF ANY OF YOU NEED A LETTER FROM ME FOR YOUR EMPLOYER TO VERIFY YOU WILL BE BACK NEXT WEEK, I WILL BE HAPPY TO PROVIDE THAT. IN FACT, I WILL GO AHEAD AND DO IT AND GIVE YOU ALL ONE JUST IN CASE YOU NEED IT.

I DON'T KNOW HOW MUCH INTO NEXT WEEK WE WILL GO. TUESDAY IS ELECTION DAY, OF COURSE, AND I DON'T WANT TO DEPRIVE ANYONE OF THE OPPORTUNITY TO VOTE. THAT MEANS WE MAY NEED TO

TAKE A LITTLE BIT OF A SHORT DAY ON TUESDAY AND ADJOURN IN ENOUGH TIME FOR YOU TO GET HOME TO VOTE, IF YOU CHOOSE TO DO SO. I SERIOUSLY EXPLORED THE POSSIBILITY OF GETTING ABSENTEE BALLOTS FOR ALL OF YOU BY HAVING SOMEONE GO AROUND TO ALL OF YOUR COUNTIES AND GET THE APPLICATION, AND SO FORTH, BUT THERE IS AN ADVANCE DEADLINE REQUIREMENT THAT COULD NOT BE MET. SO, ABSENTEE BALLOTS ARE NOT AN OPTION HERE.

I CAN TELL BY THE LOOKS ON YOUR FACES, YOU ARE NOT HAPPY TO HEAR THIS NEWS. I AM NOT HAPPY GIVING IT TO YOU. ALL I CAN SAY IS THAT WE HAVE ALL BEEN WORKING VERY HARD TO KEEP THIS CASE MOVING ALONG, KEEP IT ON SCHEDULE. IF YOU WILL JUST BEAR WITH US, AND UNDERSTAND, AND INDULGE US TO TAKE CARE OF THESE OTHER MATTERS, WE WILL PICK BACK UP AT 1:00 O'CLOCK. IF ANY OF YOU CAN USE THIS TIME THIS MORNING TO KIND OF PLAN YOUR PERSONAL AFFAIRS NEXT WEEK, OR IF YOU NEED A TELEPHONE OR SOMETHING, WE CAN CERTAINLY MAKE THAT AVAILABLE TO YOU WHERE YOU CAN MAKE SOME LONG DISTANCE PHONE CALLS FROM HERE IN THE BUILDING. IF YOU NEED TO DO THAT, LET MS. FLOYD KNOW, AND SHE WILL ACCOMMODATE YOU. WITH THAT, I WILL EXCUSE YOU AND ASK YOU TO BE BACK AT 1:00 O'CLOCK. THANK YOU VERY MUCH.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: DOES THE DEFENDANT STILL WANT AN EX PARTE MEETING WITH THE COURT?

MR. HARRIS: YES, SIR.

THE DEFENDANT: YES, SIR.

THE COURT: LET ME ASK EVERYONE ELSE TO STEP OUT. LET ME SEE WHAT THE MATTER RELATES TO.

(WHEREUPON, AN EX PARTE HEARING WAS HELD ON BEHALF OF THE DEFENDANT.)

(WHEREUPON, THE EX PARTE HEARING WAS CONCLUDED ON BEHALF OF THE DEFENDANT.)

(WHEREUPON, A LUNCH RECESS WAS HELD.)

MR. SWERLING: JUDGE, IF WE CAN GET 15 MINUTES, WE WILL BE OKAY.

THE COURT: WE WILL BE IN RECESS FOR 15 MINUTES, THEN.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: BOTH SIDES READY TO PROCEED?

MR. HARRIS: MY OBSERVATION OF MR. BASHAM IS THAT HE IS NOT GOING TO BE ABLE TO SIT IN THE COURTROOM AND PAY ATTENTION TO THE TESTIMONY, REMAIN SILENT. AND I AM CONCERNED THAT HE WILL -- THAT THIS JURY WILL NOT LOOK FAVORABLY UPON THE WAY HE IS APPEARING TO ME TO BE ACTING THIS AFTERNOON.

THE COURT: MR. SCHOOLS.

MR. SCHOOLS: OUR POSITION IS, WE NEED TO GO, JUDGE. WE HAVE REARRANGED EVERYBODY'S SCHEDULE TO ACCOMMODATE MR. BASHAM'S FEELINGS FROM MOMENT TO MOMENT. I THINK WE HAVE DONE THAT ENOUGH. I THINK WE NOW ARE TO THE POINT WHERE HE

THOUGHT HE WOULD GET THIS IF HE DID THIS BY HABIT. SO, IF WE ARE THERE, I THINK WE SHOULD BRING THE JURY. AT SOME POINT, HE IS GOING TO HAVE TO SUFFER THE CONSEQUENCES OF HIS OWN BEHAVIOR. AND THIS IS AS GOOD A TIME TO START NOW AS ANY.

THE COURT: WELL, I AGREE WITH EVERYTHING YOU SAID, EXCEPT THE FAILURE TO TAKE THE MEDICINE WAS NOT REALLY HIS FAULT.

MR. SCHOOLS: ONCE AGAIN, JUDGE, IF IT IS A MEDICAL PROBLEM, DR. SCHWARTZ-WATTS SHOULD BE HERE TO TESTIFY ABOUT IT. I MEAN, THAT IS WHY THEY ARE PAYING ALL OF THESE DOCTORS ALL OF THIS MONEY TO TREAT HIM. I DON'T KNOW WHERE SHE IS, BUT SHE IS NOT HERE. SO NOW, WE GO TO MR. HARRIS TO OPINE ABOUT WHETHER HIS OWN CLIENT IS COMPETENT OR NOT, RATHER THAN HAVE A DOCTOR HERE WHO MIGHT ACTUALLY KNOW.

THE COURT: MR. HARRIS, I HAVE TRIED TO BEND OVER BACKWARDS TO DO EVERYTHING POSSIBLE TO KEEP THE DEFENDANT ON AN EVEN KEEL AND A GOOD FRAME OF MIND, AND ESPECIALLY SO THAT HE WON'T SHOW OUT IN FRONT OF THE JURY. BUT THE JURY IS REALLY WORN OUT. THEY HAVE SENT SIGNALS INDIRECTLY TO ME. THEY REALLY WANT TO SEE THIS CASE MOVE ALONG. I THINK THERE IS A DANGER TO BE BALANCED AGAINST WHAT YOU SAY. THESE CONTINUED DELAYS ARE GOING TO BE HELD AGAINST THE DEFENDANT, I THINK. I THINK THE JURY WILL FIGURE OUT THAT IT IS THE DEFENDANT THAT IS CAUSING THESE DELAYS. SO, I THINK I HAVE GOT TO WEIGH IN THE BALANCE OF THAT ASPECT OF IT, VERSUS THE

DANGER OF GOING FORWARD WITH HIM APPEARING TO BE A LITTLE BIT DISHEVELED OVER THERE.

MR. HARRIS: JUDGE, I AGREE WITH ALL OF THOSE THINGS. THOSE ARE DANGERS THAT WE HAD WEIGHED. AND I WILL POINT OUT THAT AS I AM ADDRESSING THE COURT RIGHT NOW, THE RECORD SHOULD REFLECT THAT MY CLIENT IS DISCUSSING OVER MY SHOULDER, LOUD ENOUGH THAT I CAN HEAR, AND CERTAINLY LOUD ENOUGH FOR THE JURY COULD HEAR, HAVING DISCUSSIONS WITH MR. SWERLING ABOUT THE FACT THAT HE WILL BE GOOD. THE FACT THAT HE IS AUDIBLY SAYING, "I WILL BE GOOD," THAT IS THE KIND OF --

THE COURT: HAVE YOU THOUGHT ABOUT GETTING DR. SCHWARTZ-WATTS OVER HERE?

MR. HARRIS: SHE IS AT THE OFFICE RIGHT NOW. I CERTAINLY CAN'T COMMENT AS TO WHAT MEDICAL PROBLEMS HE MAY BE HAVING. I DO KNOW THIS. HE APPEARS TO THE MARSHAL'S SERVICE, FROM CONVERSATIONS I HAVE HAD WITH THEM, HE APPEARS WITH MR. SWERLING IN CONVERSATIONS THAT I HAVE HAD WITH HIM, HE APPEARS IN FRONT OF ME TO BE OVERMEDICATED FROM SOMETHING THAT HE HAS TAKEN. I THINK, QUITE POSSIBLY, THIS IS THE WAY HE LOOKS EVERY NIGHT WHEN HE TAKES HIS SEROQUEL. I JUST DON'T THINK THAT HE IS IN A STATE, FRAME OF MIND TO GO FORWARD TODAY.

THE COURT: HOW MANY DELAYS HAVE WE HAD IN THIS TRIAL BECAUSE OF THE DEFENDANT'S BEHAVIOR PROBLEM? WE HAVE HAD AT LEAST THREE OR FOUR, HAVEN'T WE?

MR. SCHOOLS: YES, SIR. THIS WILL BE THE THIRD ONE IN THREE DAYS. WE HAD A DELAY FRIDAY AFTERNOON, WE HAD A DELAY THIS MORNING, NOW, WE ARE HAVING A DELAY THIS AFTERNOON.

THE COURT: I JUST THINK WE NEED TO GO FORWARD, MR. HARRIS, I'M SORRY.

LET ME SAY. I WILL GIVE EACH OF YOU TODAY BEFORE YOU LEAVE A NEW VERSION OF THE JURY INSTRUCTIONS. IT WILL BE REDLINED SHOWING THE CHANGES THAT HAVE BEEN MADE SINCE THE LAST VERSION YOU RECEIVED. IT WILL HAVE AN EXTRA WIDE MARGIN ON THE RIGHT-HAND SIDE. WHAT I WOULD LIKE TO PROPOSE, IN AN EFFORT TO CONSERVE TIME, IS THAT YOU LOOK OVER THE JURY CHARGE OR HAVE SOMEONE WHO IS WORKING ON IT LOOK OVER IT. AND MARK IT UP AND GIVE ME BACK A MARKED-UP COPY SHOWING YOUR OBJECTIONS, YOUR REQUESTED ADDITIONS, YOUR REQUESTED DELETIONS, BY MARKING ON WHAT I GIVE YOU AND SENDING ME BACK A COPY OF WHAT YOU HAVE MARKED UP. THAT IS NOT TO SAY WE WON'T DISCUSS IT HERE IN THE COURTROOM. BUT IT WILL GIVE ME AN ADVANCE NOTICE OF WHAT THE PROBLEM AREAS ARE GOING TO BE. AND IF THERE ARE ANY TECHNICAL THINGS THAT CAN BE CLEARED UP SIMPLY WITHOUT DISCUSSION, I CAN GO AHEAD AND TAKE CARE OF THOSE, AND THAT WILL HELP US MOVE ALONG A LITTLE MORE EXPEDITIOUSLY.

ALL RIGHT. PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE

TRIAL JURY.)

THE COURT:   PLEASE CALL YOUR NEXT WITNESS.

MR. HARRIS:  CALL DR. TORA BRAWLEY.

GOOD AFTERNOON.

TORA BRAWLEY, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. HARRIS:

Q.    GOOD AFTERNOON,  DR. BRAWLEY.

A.    GOOD AFTERNOON.

Q.    WOULD YOU PLEASE INTRODUCE YOURSELF TO THE JURY?

A.    I'M TORA BRAWLEY, A NEUROPSYCHOLOGIST.

Q.    WHERE DO YOU LIVE?

A.    COLUMBIA, SOUTH CAROLINA.

Q.    ARE YOU MARRIED?

A.    I AM.

Q.    DO YOU HAVE A CHILD?

A.    I HAVE A TWO-AND-A-HALF YEAR OLD.

Q.    WHAT DO YOU DO FOR A LIVING?

A.    I AM A CLINICAL NEUROPSYCHOLOGIST.

Q.    DR. BRAWLEY, WHAT IS A CLINICAL NEUROPSYCHOLOGIST?

A.    A CLINICAL NEUROPSYCHOLOGIST IS A PSYCHOLOGIST WHO HAS HAD SPECIALIZED TRAINING IN THE AREA OF BRAIN BEHAVIOR RELATIONSHIPS.   BASICALLY, IN THE FIELD OF WHAT IS CALLED NEUROPSYCHOLOGY.

Q. DOCTOR, WHAT IS NEUROPSYCHOLOGY?

A. NEUROPSYCHOLOGY IS A FIELD THAT, BASICALLY, CAME INTO BEING IN THE EARLY 1900'S AFTER WORLD WAR I AND WORLD WAR II, WHEN VETERANS WERE COMING HOME AND THEY WERE HAVING UNUSUAL SYMPTOMS BECAUSE OF THEIR INJURIES. THEY WERE HAVING CHANGES IN SPEECH, MEMORY, THOSE TYPES OF THINGS. SO, DOCTORS AND RESEARCHERS STARTED LOOKING AT BRAIN BEHAVIOR AND THE RELATIONSHIPS, AND HOW TO ASSESS WHAT PARTS OF THE BRAIN WERE WORKING AND WHAT PARTS WEREN'T.

Q. HOW LONG HAVE YOU BEEN A NEUROPSYCHOLOGIST?

A. I HAVE BEEN WORKING IN THE FIELD FOR 17 YEARS SINCE I WAS A GRADUATE STUDENT. AND HAVE BEEN LICENSED TO PRACTICE INDEPENDENTLY FOR 11 YEARS.

Q. HOW DO YOU COME TO BE A NEUROPSYCHOLOGIST? WHERE DO YOU GO TO COLLEGE? THINGS LIKE THAT.

A. I WENT TO THE UNIVERSITY OF TEXAS IN AUSTIN. GOT MY UNDERGRADUATE DEGREE WITH A MAJOR IN PREMED AND PSYCHOLOGY, AND A MINOR IN SOCIOLOGY.

Q. DID YOU, AFTER GOING TO SCHOOL IN TEXAS, DID YOU ATTEND GRADUATE SCHOOL?

A. I DID. I ATTENDED GRADUATE SCHOOL AT CALIFORNIA SCHOOL OF PROFESSIONAL PSYCHOLOGY. OBTAINED MY MASTER'S DEGREE AND MY PHD THERE IN CLINICAL PSYCHOLOGY, WITH AN EMPHASIS -- A PROFICIENCY CERTIFICATE IN THE AREA OF NEUROPSYCHOLOGY, WHICH REQUIRED ADDITIONAL TRAINING IN THAT

AREA AND THAT I DO MY DISSERTATION IN THAT AREA.

Q.    WHAT TYPE OF TRAINING DID YOU DO AFTER YOU RECEIVED YOUR EDUCATION?

A.    AFTER I COMPLETED MY DIDACTIC COURSE WORK AND PRACTICUMS --

Q.    WHAT IS DIDACTIC COURSE WORK?

A.    JUST COURSES.  THINGS LIKE NEURO ANATOMY.  ALL OF THE COURSE WORK THAT YOU HAVE TO DO IN GRADUATE SCHOOL.  AND DURING THAT TIME, YOU ALSO HAVE TO DO PLACEMENTS.  I HAD A PLACEMENT AT A REHAB HOSPITAL, HAD A PLACEMENT AT AN AIR FORCE CLINIC, A VARIETY OF DIFFERENT PRACTICAL EXPERIENCE THAT IS NOT JUST CLASSROOM WORK.  AND AFTER I COMPLETED THAT, YOU HAVE TO APPLY FOR A PREDOCTORAL INTERNSHIP.  AND SO, I APPLIED AROUND THE COUNTRY AND WAS ACCEPTED TO BAYLOR COLLEGE OF MEDICINE IN HOUSTON, TEXAS IN THE DEPARTMENT OF PSYCHIATRY.  AND COMPLETED MY PREDOCTORAL INTERNSHIP THERE, IT IS A YEAR LONG.  DID SIX MONTHS, WORKED WITH CHILDREN; SIX MONTHS, WORKED WITH ADULTS.  AGAIN, IN A VARIETY OF SETTINGS.

Q.    UPON LEAVING BAYLOR UNIVERSITY SCHOOL OF MEDICINE, WHAT TYPE OF WORK EXPERIENCE DID YOU ENTER INTO?

A.    WELL, ALSO, AS FAR AS TRAINING, I HAD A POSTDOCTORAL TRAINING FELLOWSHIP AT DUKE UNIVERSITY MEDICAL CENTER IN DURHAM, NORTH CAROLINA.  MY FIRST JOB AFTER INTERNSHIP WAS AT BAYLOR COLLEGE OF MEDICINE, AGAIN, IN HOUSTON, BUT WITH THE DEPARTMENT OF NEUROLOGY.  AFTER I FINISHED MY INTERNSHIP,

**JA 1933**

RESULTS IN RESIDUAL DEFICITS?

A.    YES.

Q.    SUBSTANCE ABUSE.

A.    SAME THING.    IT IS JUST GOING TO COMPOUND THESE THINGS, ALL SNOWBALL, AND GO DOWNHILL.

Q.    COPING SKILLS?

A.    IT IS KIND OF LINKED TO SOCIOECONOMIC STATUS.    BUT IT LOOKS AT SOMEONE'S COPING SKILLS,  AND THEIR ABILITY TO DEAL WITH DIFFICULTIES, THE INTERNAL RESOURCES THEY HAVE THAT LEAD TO PERMANENT PROBLEMS.

Q.    HIS IMPULSIVITY WHICH YOU SAW IN HIS RECORDS, HIS ABILITY NOT TO COMMUNICATE, HIS SOCIALIZATION SKILLS HE DOES NOT HAVE, ARE THOSE RISK FACTORS UNDER THIS CATEGORY?

A.    HE HAS LITTLE TO NO COPING SKILLS.

Q.    POSTTRAUMATIC STRESS DISORDER?

A.    STUDIES HAVE ALSO SHOWN THAT PATIENTS WHO DEVELOP POSTTRAUMATIC STRESS DISORDER, THAT IS ANOTHER RISK FACTOR FOR PERMANENT BRAIN DAMAGE.

Q.    IS THAT A RISK FACTOR IN THIS CASE?

A.    YES.

Q.    HIS SUPPORT SYSTEM?

A.    SUPPORT SYSTEM.    THERE IS GOING TO BE BETTER RECOVERY FOR PEOPLE WHO HAVE IT INTACT.    AND A GOOD SUPPORT SYSTEM, STUDIES HAVE SHOWN, THAT ALSO SETS ANOTHER RISK FACTOR IF YOU DO NOT HAVE A GOOD SUPPORT SYSTEM, IT PUTS YOU AT RISK.

Q.    SLOW DOWN, DOCTOR.

SUPPORT SYSTEM: MOM, DAD, FRIENDS?

A.    YES.

Q.    UNCLES?

A.    YES

Q.    AUNTS?

A.    YES.

Q.    TEACHERS?

A.    YES

Q.    DID YOU INVESTIGATE BRANDON'S SUPPORT SYSTEM?

A.    YES, I DID.

Q.    DOES HE HAVE ANY SUPPORT SYSTEM?

A.    VERY LITTLE.  THE SCHOOL SYSTEM WAS, DEPENDING ON THE TEACHER, BUT THAT WAS ONE AREA WHERE HE GOT SOME SUPPORT, BUT THAT IS NOT ENOUGH BY ITSELF.

Q.    DO YOU HAVE, TO A DEGREE OF MEDICAL CERTAINTY, AN OPINION AS TO WHETHER BRANDON'S BRAIN WILL BE BETTER?

A.    I DO.

Q.    WHAT IS THAT OPINION?

A.    I FEEL LIKE  -- I BELIEVE THAT MY DIAGNOSIS IS DEMENTIA.  I BELIEVE THESE DEFICITS ARE PERMANENT, THEY ARE NOT GOING TO GET BETTER.  THEY HAVEN'T GOTTEN BETTER IN THE YEAR THAT I EVALUATED HIM.  YOU ARE GOING TO SEE RECOVERY BECAUSE OF THESE THINGS, YOU ARE GOING TO SEE MOST RECOVERY WITHIN A YEAR PERIOD.  NOT SEEING THAT WITH MR. BASHAM.  I

DON'T THINK HE IS GOING TO IMPROVE.  AND I THINK THAT THE DEMENTIA IMPAIRS HIS ABILITY TO FUNCTION NORMALLY.

Q.    WAS HE SUFFERING FROM DEMENTIA IN MAY OF 2003, WHEN YOU TESTED HIM?

A.    YES.

Q.    WAS HE SUFFERING FROM DEMENTIA IN AUGUST OF 2004, WHEN YOU TESTED HIM?

A.    YES.

Q.    WILL HE GET BETTER?

A.    NO.

MR. HARRIS:  INDULGE ME ONE MOMENT, YOUR HONOR. DR. BRAWLEY, WILL YOU ANSWER ANY QUESTIONS THAT MR. GASSER HAS, PLEASE?

THE WITNESS:  YES.

THE COURT:  MR. GASSER, WE CAN GO AHEAD AND START. WE WILL NEED TO BREAK SOMEWHERE IN YOUR CROSS EXAMINATION UNLESS YOU WOULD LIKE TO TAKE A BREAK NOW.

MR. GASSER:  I WILL LEAVE IT UP TO THE JURY.

THE COURT:  WOULD YOU LIKE TO TAKE A RECESS? LET'S TAKE A 10-MINUTE RECESS.  THAT WAY, WE MIGHT NOT HAVE TO INTERRUPT THE CROSS-EXAMINATION.

(WHEREUPON, A SHORT RECESS WAS HELD.)

MR. SWERLING:  BEFORE YOU BRING IN THE JURY.  MR. BASHAM --  I JUST NEED TO PUT THIS ON THE RECORD TO BRING IT TO THE COURT'S ATTENTION.  MR. BASHAM IS SLURRING HIS WORDS.

HE SEEMS TO BE GROGGY AND JUST OUT OF IT.  THAT IS FOR LACK OF A BETTER WORD.  HE WAS ==SLEEPING== WHEN MR. HARRIS WAS DOING THE DIRECT EXAMINATION OF DR. BRAWLEY.  I JUST THINK THE RECORD NEEDS TO REFLECT THAT, JUDGE.  I UNDERSTAND THAT IN THE PAST HE HAS CAUSED DELAYS, BUT I THINK THAT THIS PARTICULAR SITUATION IS NOT HIS FAULT.  HIS MEDICINE, I THINK, IS TAKING EFFECT ON HIM THAT HE NORMALLY HAD AT NIGHT WHEN HE WOULD GO TO SLEEP.

THE COURT:  WHAT THE MARSHAL JUST READ TO ME, THE DOCTOR PRESCRIBED IT BE GIVEN IN THE MORNING.  THAT IS WHAT MADE ME DECIDE TO GO AHEAD.  ISN'T THAT WHAT I WAS TOLD BY MR. HARASETH EARLIER?

THE DEFENDANT:  IT IS CHANGED.

THE COURT:  EVEN THOUGH THEY HAVE BEEN GIVING IT TO HIM AT NIGHT, AS A MATTER OF FACT, THE PRESCRIPTION CALLS FOR IT TO BE GIVEN IN THE MORNING.

THE DEFENDANT:  WELL --

THE COURT:  I THINK MR. SCHOOLS IS RIGHT.  MAYBE I NEED TO BE HEARING FROM A DOCTOR ABOUT THESE MATTERS.  CAN DR. SCHWARTZ-WATTS ADDRESS IT TOMORROW WHEN SHE COMES?

MR. SWERLING:  YES.  I CAN TRY TO GET IN TOUCH WITH DR. MORGAN.  HE LIVES UP IN CHESNEE.  I CAN TRY TO GET HIM DOWN HERE.  HE IS REALLY THE TREATING PHYSICIAN.

THE COURT:  HOW LONG DO YOU THINK YOUR CROSS-EXAMINATION OF THIS WITNESS WILL TAKE, MR. GASSER?

MR. GASSER:  I WOULD LIKE TO GET IT DONE -- I ANTICIPATE, SHE IS ACTUALLY GOING TO ANSWER MY QUESTIONS, SO I TOLD MR. SWERLING I WOULD LIKE TO GET IT DONE IN ABOUT AN HOUR.

THE COURT:  DO YOU ANTICIPATE MUCH REDIRECT?

MR. HARRIS:  NO, SIR.

THE COURT:  YOU PLAN ON PUTTING DR. SCHWARTZ-WATTS UP TOMORROW, SHE WILL BE YOUR FINAL WITNESS?

MR. SWERLING:  WE HAVE MR. AIKEN.

THE COURT:  RIGHT, PRISON EXPERT.

MR. SWERLING:  YES, SIR.  I THINK THE WAY IT IS LOOKING, WE CERTAINLY WOULD HAVE THURSDAY MORNING.

THE COURT:  FINISH THURSDAY MORNING?

MR. SWERLING:  YES, THAT IS MY OPINION.  WE ARE CUTTING --

THE COURT:  WELL, ALL I AM GOING TO SAY IS, IN THE PAST, IN THIS CASE AND THE OTHER CASE, THE LAWYERS ASKED ME TO START FRESH IN THE MORNING, START A NEW DAY WHEN WE ARGUE AND CHARGE.  WE MIGHT NOT HAVE THAT LUXURY HERE.  WE MIGHT FINISH THE TESTIMONY AT 10:30, AND BEGIN THE CLOSING ARGUMENTS AT 11:00 O'CLOCK.

MR. GASSER:  ON MONDAY?

THE COURT:  WHENEVER WE FINISH.

MR. GASSER:  THE GOVERNMENT HAS NO OBJECTION TO THAT.

THE COURT:  WHAT IS THE GOVERNMENT'S POSITION ON

ADJOURNING NOW BECAUSE OF THE DEFENDANT'S POSITION?

MR. SCHOOLS: DON'T WANT TO. I MEAN, DR. SCHWARTZ-WATTS, ACCORDING TO THE DEFENSE COUNSEL, IS THREE BLOCKS AWAY. AND THIS PROBLEM HAS BEEN ONGOING FOR THE WHOLE AFTERNOON, AND SHE IS STILL NOT HERE. HE IS AWAKE. I THINK WE NEED TO GO FORWARD.

THE COURT: I THINK WE NEED TO AT LEAST MAKE AN EFFORT TO GO FORWARD. I UNDERSTAND YOUR REQUEST, MR. SWERLING, BUT I JUST RESPECTFULLY DISAGREE.

MR. SWERLING: OKAY, YOUR HONOR. I JUST WANTED TO PUT IT ON THE RECORD.

THE COURT: IF HE NEEDS HELP IN TERMS OF COFFEE OR SOMETHING WITH CAFFEINE TO KEEP HIM AWAKE, WE WILL CERTAINLY HELP YOU WITH THAT. NO PROBLEM THERE.

MR. SCHOOLS: FOR THE RECORD, YOUR HONOR, THIS IS EXPERT TESTIMONY ABOUT WHICH I DON'T THINK MR. BASHAM WILL BE CONTRIBUTING MEANINGFUL QUESTIONS TO THE DEFENSE COUNSEL ABOUT WHAT THEY SHOULD ASK HER.

MR. SWERLING: JUDGE, I WANT YOU TO UNDERSTAND, THE REASON WE DIDN'T CALL DR. WATTS IS BECAUSE THE LAST TIME WE BROUGHT HER IN HERE, THE GOVERNMENT MADE AN ISSUE ABOUT THE FACT THAT SHE IS NOT HIS TREATING PHYSICIAN AND THEY WANTED TO ASK HER QUESTIONS ABOUT IT. I AM CAUGHT BETWEEN A ROCK AND A HARD PLACE.

THE COURT: I UNDERSTAND. ALL RIGHT. BRING IN THE

JURY, PLEASE.

MR. SCHOOLS: YOUR HONOR, I WILL HAND UP THE RULE 16 DISCLOSURE ON MR. AIKEN.

THE COURT: THAT IS WHAT I ASKED FOR?

MR. SCHOOLS: YES, SIR.

THE COURT: BRING IN THE JURY.

MR. SWERLING: DO YOU WANT TO ADDRESS IT NOW, JUDGE, OR IN THE MORNING?

THE COURT: WE WILL TAKE IT UP LATER.

MR. HARRIS: WE ADDRESSED EARLIER THERE MAY BE AN ISSUE WITH BRANDON'S FAMILY SEEING HIM TONIGHT.

THE COURT: I WILL INSTRUCT THE MARSHAL LET HIM SEE HIS FAMILY DOWNSTAIRS IN THE VISITATION ROOM IN THIS BUILDING. THAT IS A FAIR REQUEST. ANYTHING LIKE THAT THAT CAN GIVE HIM SOME EMOTIONAL SUPPORT TO PROP HIM UP TO HELP HIM GET THROUGH THIS TRIAL, I AM IN FAVOR OF IT.

MR. HARRIS: THANK YOU, JUDGE. WE WILL HAVE THEM HERE BY 5:30 THIS AFTERNOON.

THE COURT: BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: YOU MAY CROSS-EXAMINE THE WITNESS.

MR. GASSER: THANK YOU, YOUR HONOR.

CROSS EXAM

MR. GASSER:

Q.    GOOD AFTERNOON, DR. BRAWLEY.

A.    GOOD AFTERNOON.

Q.    MR. HARRIS HAD ASKED YOU WHETHER -- OR YOU HAD TESTIFIED TO THE JURY ABOUT YOU GAVE AN OUTLINE OF ALL OF THE DIFFERENT TYPE OF CLINICAL INFORMATION AND RECORDS OF INSTITUTIONS AND FACILITIES THAT YOU USED TO PREPARE, NOT ONLY TO COME TO COURT AND TO TESTIFY, BUT ALSO TO REACH YOUR DIAGNOSIS AND YOUR OPINIONS; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    DO YOU RECALL YOU RAN DOWN A LIST OF EMOTIONAL, EDUCATIONAL, AND ATTENTION ISSUES THAT WERE PRESENT IN ALL OF THE RECORDS THAT YOU REVIEWED FROM THE TIME THAT BRANDON BASHAM WAS SEVEN OR EIGHT YEARS OLD, ALL THE WAY THROUGH THE TIME EVEN PAST HIS INCARCERATION IN THE HOPKINS COUNTY DETENTION CENTER; IS THAT CORRECT?

A.    THOSE WERE THE SEVEN REPORTS THAT WERE PUT INTO EVIDENCE.

Q.    YOU HAVE ACTUALLY REVIEWED MORE DOCUMENTS THAN THAT, HAVE YOU NOT?

A.    I HAVE.  BUT I HAVE RELIED PRIMARILY ON THOSE DOCUMENTS.

Q.    AND DO YOU RECALL MR. HARRIS ASKING YOU, THERE WAS CONSISTENCY IN HIS EMOTIONAL PROBLEMS, AND A CONSISTENCY IN HIS EDUCATIONAL ISSUES AND ATTENTION ISSUES THROUGHOUT HIS SCHOOLING FROM THE TIME HE WAS SEVEN, ALL THE WAY UP UNTIL THE

**JA 1941**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,　　　)　　CR. NO. 4:02-992
　　　　　　　　　　　　　　　　)　　COLUMBIA, SC
　　　　　　　　　　　　　　　　)　　OCTOBER 27, 2004
　　　　　　　　　　　　　　　　)
　　　VERSUS　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
BRANDON L. BASHAM,　　　　　　　)
　　　　　DEFENDANT.　　　　　　 )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XXVI


APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | SCOTT SCHOOLS, FIRST AUSA |
| | JONATHAN S. GASSER, AUSA |
| | JOHN DUANE, AUSA |
| | UNITED STATES ATTORNEY'S OFFICE |
| | 1441 MAIN STREET, SUITE 500 |
| | COLUMBIA, SC  29201 |
| | |
| FOR THE DEFENDANT: | JACK SWERLING, ESQ. |
| | 1720 MAIN STREET |
| | SUITE 301 |
| | COLUMBIA, SC  29201 |
| | |
| | GREG HARRIS, ESQ. |
| | 1720 MAIN STREET |
| | SUITE 301 |
| | COLUMBIA, SC  29201 |
| | |
| COURT REPORTER: | DEBRA R. JERNIGAN, RPR, CRR |
| | UNITED STATES COURT REPORTER |
| | 901 RICHLAND STREET |
| | COLUMBIA, SC 29201 |

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 1942

Q.    SO, IT IS PART OF YOUR EMPLOYMENT, PART OF YOUR INCOME IS TO COME INTO COURTROOMS LIKE THIS, CASES LIKE THIS, AND TESTIFY THAT CRIMINAL DEFENDANTS CAN BE HOUSED SECURELY?

A.    NO, SIR.

Q.    IT IS NOT A PART OF YOUR EMPLOYMENT?

A.    NO.   WHAT I DO IS GIVE THEM AN OBJECTIVE OPINION.  I DON'T TAKE EVERY CASE, AND SOME LAWYERS DON'T WANT ME TO COME TO THE COURTROOM.

Q.    FAIR ENOUGH.   THESE DO?

A.    YES, SIR.

MR. SCHOOLS:  THANK YOU.   BEG THE COURT'S INDULGENCE.  NO FURTHER QUESTIONS.

MR. HARRIS:  BRIEFLY, YOUR HONOR.

THE COURT:   ALL RIGHT, MR. HARRIS.

REDIRECT EXAM

BY MR. HARRIS:

Q.    MR. AIKEN, WERE YOU -- REMEMBER THE QUESTION MR. SCHOOLS WAS TALKING WITH YOU ABOUT, THE ADEQUACY OF THE BUREAU OF PRISONS, THEIR ABILITY TO MONITOR PHONE CALLS?

A.    YES, SIR.

Q.    BUTNER IS A PRETTY BIG FACILITY, ISN'T IT?

A.    YES, SIR.

Q.    AND YOU LISTENED TO A TAPE WHERE THE BUTNER INTELLIGENCE PICKED UP ON A PHONE CALL BETWEEN MR. BASHAM ASKING FOR $20?

A.   WRAP $20 IN THE FORM OF A RING AND BRING IT IN.

Q.   THAT WAS A PRETTY ADEQUATE SUPERVISION, WASN'T IT?

A.   VERY ADEQUATE, ESPECIALLY WHEN YOU LOOK AT THE LENGTH OF TIME MR. BASHAM WAS ASSIGNED TO THAT FACILITY AND UNDER THE CIRCUMSTANCES IN WHICH HE WAS ASSIGNED.

Q.   NOW, MR. SCHOOLS ALSO ASKED YOU ABOUT THE BUREAU OF PRISONS INMATE WORKING PROGRAMS.

A.   YES, SIR.

Q.   ISN'T IT A FACT, BY VIRTUE OF THE FACT THEY ARE WORKING, MEANS THEY ARE COMPLYING?

A.   YES, SIR.

Q.   YOU DON'T WORK UNLESS YOU ARE COMPLIANT?

A.   THAT'S CORRECT.

Q.   BY VIRTUE OF THE FACT THEY HAVE OPEN ACCESS, THEY MUST BE COMPLIANT?

A.   YES, SIR.

Q.   BY VIRTUE OF THE FACT THEY HAVE PRIVILEGES, THEY MUST BE COMPLIANT?

A.   YES, SIR.

Q.   BECAUSE ALL OF THOSE THINGS ARE BASED ON COMPLIANCE?

A.   THAT IS CORRECT.

Q.   AND MR. SCHOOLS ASKED YOU, FINALLY, ABOUT GOOD TIME?

A.   YES, SIR.

Q.   I THINK GOOD TIME HE ASKED YOU ABOUT WAS 54 DAYS A YEAR THAT PEOPLE GET OFF THEIR SENTENCES?

**JA 1944**

A.   THAT'S CORRECT, SIR.

Q.   LET'S BE PERFECTLY CLEAR ABOUT SOMETHING.   DOES GOOD TIME APPLY IN BRANDON BASHAM'S CASE?

A.   NO, SIR.

Q.   WILL HE EVER GET OUT OF JAIL?

A.   THE ONLY WAY HE GETS OUT OF JAIL IS HE IS DEAD.

MR. HARRIS:   THAT IS ALL I HAVE, YOUR HONOR.

THE COURT:   THANK YOU, SIR.   YOU MAY STEP DOWN. PLEASE CALL YOUR NEXT WITNESS.

MR. SWERLING:   CALL DR. DONNA SCHWARTZ-WATTS.

DONNA SCHWARTZ-WATTS, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. SWERLING:

Q.   GOOD MORNING, DR. WATTS.

A.   GOOD MORNING.

Q.   WOULD YOU INTRODUCE YOURSELF TO THE JURY?

A.   SURE.   I AM DONNA SCHWARTZ-WATTS.   I AM A FORENSIC PSYCHIATRIST HERE IN COLUMBIA.

Q.   AND, DR. WATTS, LET ME GO THROUGH A LITTLE BIT OF YOUR BACKGROUND WITH YOU, OKAY?

A.   SURE.

Q.   SO THE JURY CAN GET TO KNOW YOU A LITTLE BIT BETTER, WHAT IS YOUR PRESENT TITLE, DID YOU SAY?

A.   WELL, I HAVE WORKED AT THE MEDICAL SCHOOL HERE IN

COLUMBIA, SO I HAVE TWO TITLES.  I AM -- SERVICE TITLE WAS CALLED DIRECTOR OF FORENSIC SERVICES.  AND THEN MY ACADEMIC TITLE, I AM ASSOCIATE PROFESSOR OF PSYCHIATRY.

Q.    WITH RESPECT TO THOSE TWO, WHAT ARE YOUR JOB DUTIES? WHAT DO YOU DO?

A.    I HAVE A LOT OF THINGS I HAVE TO DO, BUT BASICALLY, FIRST OF ALL, I HAVE TO TREAT PATIENTS.  I DO THAT PROBABLY ABOUT THREE DAYS A WEEK.  I ALSO, BECAUSE IT IS AN ACADEMIC INSTITUTION, I HAVE TO DO RESEARCH,  SO I ALSO HAVE TO WRITE PAPERS,  PUBLISH PAPERS,  PRESENT PAPERS, AND THAT SORT OF THING.  THE THIRD THING I HAVE TO DO IS TEACH BECAUSE IT IS A TRAINING PROGRAM, SO I TEACH RESIDENTS IN CHILD PSYCHIATRY, RESIDENTS IN FORENSIC PSYCHIATRY,  GENERAL RESIDENTS,  MEDICAL STUDENTS, AND EVEN HAVE SOME HIGH SCHOOL STUDENTS THAT COME TO WORK WITH ME AND SOME COLLEGE STUDENTS.  LAST BUT NOT LEAST, I ALSO PERFORM FORENSIC EVALUATIONS FOR LAWYERS,  JUDGES, DIFFERENT COURTS.

Q.    WOULD YOU EXPLAIN TO THE JURY WHAT FORENSICS -- THE FORENSIC SERVICES PART OF YOUR JOB ACTUALLY ENTAILS?

A.    SURE.

Q.    WHAT IS THE DIFFERENCE BETWEEN PSYCHIATRY AND FORENSIC PSYCHIATRY.

A.    FORENSIC PSYCHIATRY IS A SUBSPECIALTY OF MEDICINE, SUBSPECIALTY OF PSYCHIATRY.  SO,  LIKE CARDIOLOGY IS A SUBSPECIALTY OF INTERNAL MEDICINE,  FORENSIC PSYCHIATRY IS A

SUBSPECIALTY OF PSYCHIATRY. AND WHAT THAT REQUIRES, YOU HAVE TO GO TO MEDICAL SCHOOL. I HAD TO COMPLETE FOUR YEARS OF GENERAL PSYCHIATRIC TRAINING. AND THEN, TO BE A FORENSIC PSYCHIATRIST, YOU HAVE TO SPEND ANOTHER YEAR AFTER YOUR RESIDENCY. SO, THAT WOULD HAVE BEEN FIVE YEARS OF TRAINING. YOU SPECIALIZE IN AREAS WHERE PSYCHIATRY INTERACTS WITH THE LAW. SO, ANY TIME A LEGAL OFFICIAL, WHETHER IT IS A JUDGE OR PERHAPS IT IS A LAWYER, IF ANYONE HAS A QUESTION ABOUT SOMEBODY'S MENTAL STATE, HOW THEY THINK, HOW THEY FEEL, HOW THEY ACT, AND IT RELATES TO SOME KIND OF LEGAL ISSUE, THAT WOULD BE AN AREA WHERE A FORENSIC PSYCHIATRIST WOULD BE CONSULTED.

Q. SO, ESSENTIALLY, THE WORD, THE CORE WORD THERE IS LEGAL ISSUES?

A. CORRECT.

Q. PSYCHIATRY AND LEGAL ISSUES?

A. CORRECT.

Q. AND THAT DIFFERS FROM A GENERAL PSYCHIATRIST IN WHAT WAY?

A. WELL, WHEN WE WORK, AGAIN, THERE IS USUALLY A LEGAL ISSUE AT HAND. SOMEBODY WOULD WANT AN EXPERT OPINION ABOUT A PERSON'S MENTAL STATE. IT IS A VERY SPECIALIZED AREA. IT IS SPECIALIZED TRAINING, COMPARED TO GENERAL PSYCHIATRY. WE RELY ON RECORDS, COLLATERAL INFORMATION, AND THEN WE HAVE TO KNOW A LITTLE BIT ABOUT THE LAW. WE ARE CERTAINLY NOT CLOSE

TO BEING A LAWYER, BUT WE HAVE TO KNOW A LITTLE BIT ABOUT THE LAW TO ANSWER THE QUESTION THAT EITHER THE COURT OR ATTORNEY HAS.

Q. ALL RIGHT. NOW, YOU SAID YOU TREATED PATIENTS. HOW MANY PATIENTS DO YOU TREAT A WEEK?

A. RIGHT NOW -- WELL, IN THE LAST COUPLE OF WEEKS, NOT ANY BECAUSE WE HAVE BEEN GETTING READY FOR THIS CASE, BUT, USUALLY, 70 A WEEK. BECAUSE WE ARE AT THE MEDICAL SCHOOL, WE HAVE A NUMBER OF CONTRACTS.

I SPEND ONE DAY A WEEK TREATING CHILDREN AT THE DEPARTMENT OF JUVENILE JUSTICE. DJJ IS A FACILITY HERE WHERE CHILDREN ARE ADJUDICATED, AND THEY HAVE LEGAL CHARGES. I HAVE BEEN DOING THAT ABOUT TEN YEARS. I GO ONE DAY A WEEK AND TREAT ADOLESCENTS THERE. WHEN I DO THAT CLINICAL, I SEE ABOUT 20 KIDS A DAY.

ONE DAY A WEEK, I WORK AT THE DEPARTMENT OF CORRECTIONS AT OUR PRISON HERE IN COLUMBIA. THERE, I WORK AT A MENTAL HOSPITAL. WE HAVE AN ACUTE FACILITY THERE WHERE I TREAT INMATES. I ALSO, WHEN I WORK THERE, THAT DAY OF THE WEEK I ALSO SEE INMATES THAT ARE IN SUPER MAX. THAT IS THE MOST SECURE SETTING, AND I HAVE TO SEE THEM PERHAPS BECAUSE THERE IS SOME PSYCHIATRIC ISSUE.

THEN ANOTHER DAY A WEEK, I GO TO WHAT SOUTH CAROLINA HAS IS A SEXUALLY VIOLENT PREDATOR PROGRAM. AND WHAT THAT IS, THAT IS A HOSPITAL RUN BY THE DEPARTMENT OF MENTAL HEALTH THAT

HOUSES PEOPLE THAT HAVE SEXUAL DISORDERS. THEY HAVE BEEN PRIORLY CONVICTED OF SEXUAL CRIMES, AND THEY ARE SENT TO THAT UNIT FOR TREATMENT. I SPEND ONE DAY A WEEK, AGAIN, I SEE ABOUT 20 PATIENTS THAT DAY AS WELL.

THEN, I ALSO HAVE A PRIVATE PRACTICE. AND IN MY PRIVATE PRACTICE, I SEE SOME PEOPLE THAT DON'T HAVE ANY KIND OF LEGAL ISSUE AT ALL, I JUST SEE REGULAR PATIENTS. BUT THEN I ALSO SEE A NUMBER OF PATIENTS THAT MIGHT HAVE INTERACTION WITH THE LEGAL SYSTEM. I TREAT SOME POLICE OFFICERS. I HAVE SOME NURSES, SOME PHYSICIANS IN MY PRACTICE, A LOT OF PATIENTS UNDER WORKER'S COMPENSATION. SO, SOME OF THEM HAVE LEGAL ISSUES, AND SOME DON'T.

Q. A FEW LAWYERS?

A. A FEW LAWYERS.

Q. DO YOU HAVE TIME FOR A FAMILY?

A. YES, I DO, ABSOLUTELY.

Q. AND WHAT DOES YOUR FAMILY CONSIST OF?

A. WELL, WHAT I DO IS I WORK. MY SON IS NINE YEARS OLD, SO WHEN HE GOES TO SCHOOL IN THE MORNING, I WORK. USUALLY WHEN HE GETS OFF AT 2:50, I AM THERE TO PICK HIM UP. EVERY ONCE IN AWHILE, WE HAVE COURT AND I HAVE TO WORK A LITTLE BIT LONGER. I AM USUALLY PRETTY GOOD ABOUT GETTING HOME AT NIGHT. I HAVE A STEPDAUGHTER 14 AND A SON THAT IS 9.

Q. YOU ARE EMPLOYED BY THE MEDICAL SCHOOL?

A. YES. I WORK FULL TIME THERE, SO I AM ON SALARY, SO I

WILL WORK FOR THEM AND HAVE ALL OF THESE CONTRACTS, AND THEY GET THE MONEY, AND THEN I GET PAID.

Q.    YOU SAID YOU GO OUT TO THE DEPARTMENT OF JUVENILE JUSTICE QUITE FREQUENTLY.   GIVE THE JURY AN IDEA, ARE THERE A LOT OF PEOPLE OUT THERE WITH ADHD?

A.    YES, YES.   DEPARTMENT OF JUVENILE JUSTICE, THE MEDICAL SCHOOL HAS A WHOLE CONTRACT.   WE DO ALL OF THE MEDICAL CARE THERE, ALL OF THE DENTAL CARE THERE, AND ALL OF THE PSYCHIATRIC CARE THERE.   SO, I HAVE ACTUALLY BEEN IN CHARGE OF THE PSYCHIATRIC CARE WE GIVE THERE FOR A NUMBER OF YEARS.   WE HAVE TO PERFORM THE EVALUATIONS FOR THE FAMILY COURT JUDGES, SO THERE IS ONE PART OF DJJ WHERE CHILDREN WILL GO IF THEY HAVE BEEN CHARGED BUT HAVEN'T BEEN COMMITTED YET. SO, WE WOULD DO THE EVALUATIONS THERE.   THEY HAVE A DETENTION CENTER THERE BEFORE THE CHILDREN ARE EVEN SENT TO THE JUDGE THAT WE COVER.   AND THEN THEY HAVE THREE CAMPS WHERE, AFTER CHILDREN HAVE BEEN COMMITTED, THAT THEY RECEIVE TREATMENT.

WHERE I PRESENTLY WORK -- I HAVE WORKED IN ALL OF THOSE AREAS.   I WORK AT CAMPUS WHERE THE CHILDREN HAVE ALREADY BEEN COMMITTED.   I HAVE A CAMPUS OF ABOUT 120 KIDS IN THE CAMPUS RIGHT NOW THAT I TREAT, AND MOST OF THEM ARE FOR ATTENTION DEFICIT DISORDER.   PROBABLY, OUT OF THE 20 KIDS I SEE A WEEK, PROBABLY 14 OF THEM HAVE ATTENTION DEFICIT DISORDER.

Q.    SO, OVER THE YEARS, SO, YOU HAVE HAD A LOT OF EXPERIENCE WITH ADHD?

A.   YES.

Q.   AND WE ARE GOING TO GET INTO THIS A LITTLE BIT MORE LATER, BUT ADHD IS ACTUALLY A COMBINATION OF WHAT, AT ONE TIME, WERE TWO SEPARATE DISORDERS, ATTENTION DEFICIT DISORDER AND HYPERACTIVE DISORDER?

A.   THAT'S CORRECT.

Q.   NOW, THAT DIAGNOSIS IS COMBINED?

A.   CORRECT.   IT IS ATTENTION DEFICIT HYPERACTIVITY DISORDER.   IN THE OLD DAYS, IT WAS ADD; IT IS NOW ADHD.   THE HYPERACTIVITY DISORDER IS CONSIDERED IN THE TERM.

Q.   LET ME ASK YOU, WHILE WE ARE TALKING ABOUT THAT.   IS ADHD -- WE HEAR A LOT ABOUT ADHD AMONG CHILDREN IN SCHOOL. ARE THERE DIFFERENT DEGREES OF ADHD?

A.   YES.

Q.   ARE THEY MEASURED MILD, MODERATE, SEVERE?

A.   YES.

Q.   JUST LIKE IN ANY OTHER KIND OF ILLNESS?

A.   YES.

Q.   WOULD BRANDON BASHAM HAVE BEEN IN A FACILITY SUCH AS DJJ WHERE YOU ARE AND WHERE YOU WORK?

A.   YES.

Q.   NOW, IN YOUR -- YOU TREAT INMATES, AND UNDER WHAT CONDITIONS DO YOU TREAT THOSE INMATES?

A.   AGAIN, SOUTH CAROLINA DEPARTMENT OF CORRECTIONS IS ACTUALLY DIFFERENT THAN ANYWHERE IN THE COUNTRY.   THEY HAD

THEIR OWN PSYCHIATRIC HOSPITAL WITHIN THE PRISON. MOST OTHER STATES, THEY WILL SEND THEIR PSYCHIATRIC PATIENTS OVER TO A LOCAL SECURE HOSPITAL WHERE THEY RECEIVE TREATMENT. SOUTH CAROLINA IS THE ONLY MODEL WHERE THE PSYCHIATRIC HOSPITAL IS ACTUALLY WITHIN THE DEPARTMENT OF CORRECTIONS, AND IT IS RUN BY EITHER CONTRACT OFFICERS FROM THE DEPARTMENT OF CORRECTIONS, BUT THE STAFF IS ACTUALLY EMPLOYED BY THE DEPARTMENT OF CORRECTIONS. SO, THERE IS AN 89-BED UNIT IN COLUMBIA, IT IS ON THE KIRKLAND CAMPUS, IT IS CALLED THE GILLIAM PSYCHIATRIC HOSPITAL. I WORK AT THAT HOSPITAL.

THEN, WE ALSO HAVE IN COLUMBIA, WHICH IS RECENT, THERE IS A 450-BED UNIT, AND IT IS CALLED A TRANSITIONAL CARE UNIT. AND WHAT THAT MEANS IS THAT IS PEOPLE WITH MENTAL ILLNESS THAT ARE KIND OF LIKE IN A DAY PROGRAM. THEY SLEEP THERE, BUT ACTUALLY THERE ARE SOME NURSES THERE, CASE MANAGERS THERE.

FINALLY, WE HAVE SUPER-MAX POPULATION IN COLUMBIA AT KIRKLAND AS WELL. WHAT THEY HAVE DONE IS, THE DEPARTMENT OF CORRECTIONS HAVE TRIED TO LOCALIZE MOST OF THE MENTALLY ILL PEOPLE HERE IN COLUMBIA. THAT IS WHERE ALL OF THE DOCTORS ARE. RIGHT NOW, PROBABLY ABOUT 420, 440 MENTALLY ILL THAT ARE ACTUALLY ON THAT CAMPUS.

Q. YOU SAID YOU ALSO HAD SOME EXPERIENCE WITH SEXUAL VIOLATORS. IS THERE A SEXUAL PREDATOR PROGRAM?

A. YES.

Q. COULD YOU EXPLAIN THAT, LIKE WHAT YOUR EXPERIENCE IS

IN THAT AREA?

A.    SURE.    IN SOUTH CAROLINA, WE GOT A LAW IN 1998 WHICH MANY OTHER STATES HAVE IN THE UNITED STATES NOW,  AS WELL. AND, BASICALLY, WHAT THAT LAW WAS,  IT TAKES PEOPLE THAT HAVE BEEN CONFINED WITHIN THE DEPARTMENT OF CORRECTIONS THAT HAD CERTAIN KINDS OF CHARGES THAT WERE SEXUAL IN NATURE, WHAT HAPPENS IS, AFTER THEY FINISH THEIR PRISON SENTENCE,  THEY GO BEFORE A COMMITTEE.   AND IF THE COMMITTEE THINKS THAT THEY ARE A DANGER TO REOFFEND WHEN THEY GET OUT,  THEY WILL HURT OTHER CHILDREN OR COMMIT OTHER SEXUAL OFFENSES, THEY ARE IDENTIFIED,  THEY ARE EVALUATED, AND IF THEY ARE DEEMED TO LIKELY BE A DANGER, THEY ARE COMMITTED INTO THIS PROGRAM FOR TREATMENT.   SO, I HAVE DONE A COUPLE OF THINGS WITH THAT LAW.

ACTUALLY, I WAS THE PERSON PERFORMING THESE EVALUATIONS FOR THE COURT FOR ABOUT THREE YEARS WHERE I ACTUALLY WOULD -- I DIDN'T TREAT THE COMMITTEES, BUT I ACTUALLY EVALUATED THEM FOR THE COURT.   I STARTED IN ABOUT JULY OF THIS LAST YEAR,  I BEGAN TREATING THEM BECAUSE THEY DON'T HAVE A LOT OF PSYCHIATRISTS OVER THERE RIGHT NOW THAT HAVE EXPERIENCE TREATING PEOPLE WITH THESE DISORDERS. SO,  I AM ACTUALLY OVER THERE TREATING THE PATIENTS NOW, SO I DON'T DO THE COURT WORK AT THIS POINT.

Q.    YOU MENTIONED YOUR HUSBAND,  WAS HE PREVIOUSLY IN LAW ENFORCEMENT,  AS WELL?

A.    YES.   HE USED TO BE A RICHLAND COUNTY SHERIFF'S

DEPARTMENT DEPUTY.

Q. NOW, YOU PERFORM FORENSIC EVALUATIONS?

A. YES.

Q. WOULD YOU EXPLAIN WHAT A FORENSIC EXAMINATION IS OR EVALUATION?

A. SURE. IT IS PRETTY SIMILAR TO JUST A REGULAR MEDICAL EVALUATION, BUT THERE ARE A FEW THINGS DIFFERENT. PSYCHIATRISTS ARE DOCTORS, AND SO WE PRETTY MUCH FOLLOW THE SAME METHODOLOGIES THAT YOUR INTERNIST WOULD OR YOUR FAMILY PRACTICE DOCTOR WOULD. THEN FORENSICS HAS A LITTLE SPIN ON IT. WHAT WE GENERALLY DO, SOMEONE COMES, EITHER THERE IS A REFERRAL, THE ONLY DIFFERENCE COMPARED TO GENERAL PSYCHIATRY IS THE REFERRAL IS USUALLY FROM SOME KIND OF LEGAL AGENCY.

Q. FOR EXAMPLE.

A. LAWYERS, JUDGES, COURTS, FEDERAL COURTS, FAMILY COURTS, PRIVATE ATTORNEYS THAT PERHAPS SOMEONE IS SUING SOMEONE OVER SOME KIND OF CIVIL ISSUE, SO IT COULD BE ANYWHERE IN THE LEGAL ARENA. HOSPITALS, THERE IS LOTS OF DIFFERENT REFERRAL SOURCES.

WE WOULD USUALLY BE RETAINED. THERE IS A LITTLE BIT OF A DIFFERENCE. NORMALLY, IF A PATIENT WERE TO COME INTO MY OFFICE AND I WAS PERFORMING AN EVALUATION OF THEM, I WOULD HAVE A DUTY TO TREAT THAT PERSON. IN THE CASES WHERE YOU PERFORM FORENSIC EVALUATIONS, THERE IS NO DUTY TO TREAT SOMEONE. YOU ARE EVALUATING THEM, SO USUALLY YOU WILL BE

SEEING THEM TO ANSWER A VERY SPECIFIC QUESTION THAT A LEGAL OFFICIAL MAY HAVE.   BUT IT IS A SIMILAR PROCESS.   YOU TRY TO COLLECT INFORMATION ABOUT THAT PERSON.   YOU EVALUATE THAT PERSON.   AND THEN YOU ORDER ANY TESTS,  IF YOU NEED TESTING DONE TO CONFIRM AN OPINION OR NOT.   AND THEN YOU MAKE A DIAGNOSIS.   AND DEPENDING UPON WHAT THE LEGAL ISSUE IS, YOU ANSWER THE LEGAL QUESTION.

Q.    YOU SAID YOU HAVE DONE THAT FOR A NUMBER OF DIFFERENT AGENCIES AS WELL AS ATTORNEYS; IS THAT CORRECT?

A.    YES.  WITH THE ATTORNEY GENERAL'S OFFICE, I ALSO HAVE A NUMBER OF CONTRACTS.  ONE IS WHERE I WORK WITH THE ATTORNEY GENERAL'S OFFICE.  THERE MAY BE AN IMPAIRED ATTORNEY, AND I HAVE WORKED WITH THEM OVER THE YEARS,  PERHAPS EVALUATING AN ATTORNEY THAT HAS BEEN IMPAIRED.   I ALSO DO THAT FOR THE MEDICAL BOARD.   IF THERE IS AN IMPAIRED PHYSICIAN,  A LOT OF TIMES,  I MIGHT HAVE A REFERRAL FROM THEM TO ANSWER A LEGAL QUESTION.

THE COURT:   DR. SCHWARTZ-WATTS, LET ME JUMP IN. YOU AND I TALK VERY RAPIDLY, AND WE NEED TO MAKE AN ACCURATE RECORD.   IF YOU WOULD MAKE A CONSCIOUS EFFORT TO SLOW DOWN, I WOULD APPRECIATE IT.

BY MR. SWERLING:

Q.    HAVE YOU ALSO GAINED SOME EXPERIENCE IN DEATH PENALTY CASES?

A.    YES.

Q.   AND HAVE YOU BEEN CONSULTED IN DEATH PENALTY CASES TO DO FORENSIC EXAMINATIONS?

A.   YES.

Q.   AS WELL AS HELPING ATTORNEYS, OR SOLICITORS, OR OTHER PROSECUTORS PREPARE CASES?

A.   YES.

Q.   HOW MANY DEATH PENALTY CASES HAVE YOU BEEN INVOLVED IN?

A.   I WAS DOING THAT IN THE OTHER OFFICE,  52.

Q.   HOW MANY HAVE YOU EVER ACTUALLY TESTIFIED IN?

A.   AROUND 15.

Q.   ARE THERE ANY PENDING?

A.   YES.   I BELIEVE ABOUT 15 PENDING, AT THIS POINT.

Q.   WILL YOU TESTIFY IN ALL OF THOSE?

A.   NO.

Q.   OTHER THAN TESTIFYING IN THOSE CASES, WHAT SORT OF SERVICES CAN YOU PROVIDE TO PEOPLE WHO ASK YOU FOR YOUR SERVICES IN THOSE KINDS OF CASES?

A.   IN DEATH PENALTY CASES?

Q.   YES.

A.   SURE.   SOMETIMES YOU MIGHT BE A CONSULTANT.   THERE HAVE BEEN TIMES WHERE I WAS HIRED PERHAPS TO DEVELOP CROSS-EXAMINATION QUESTIONS FOR AN EXPERT.   MAYBE PERHAPS RETAINED -- THERE HAVE BEEN TIMES I HAVE BEEN RETAINED TO TREAT SOMEBODY WHILE SOMEONE ELSE GIVES THE EVALUATION. THERE ARE DIFFERENT CIRCUMSTANCES.

**JA 1956**

Q.    WHY WOULD IT HAPPEN THAT SOMEONE WOULD ASK YOUR SERVICE TO DO FORENSIC EVALUATION AND YOU WIND UP NOT TESTIFYING?

A.    EITHER THE LAWYER, FOR SOME REASON, DOESN'T WANT ME TO TESTIFY,  PERHAPS MY OPINION ISN'T HELPFUL TO THEM. SOMETIMES I JUST FLAT OUT TELL THEM I CAN'T HELP THEM.

Q.    HOW DO YOU GET PAID FOR YOUR SERVICES?

A.    I AM ON SALARY.  I GET PAID, UNFORTUNATELY, THE SAME RATE WHETHER I AM HERE OR NOT.  I BILL OUT, THE UNIVERSITY BILLS FOR MY SERVICES, AND I'M ON SALARY.

Q.    AND HAVE YOU BEEN RETAINED BY JUDGES IN THE DISTRICT COURT HERE?

A.    YES.

Q.    TO DO CERTAIN COURT-ORDERED EXAMINATIONS?

A.    YES.

Q.    HAVE YOU BEEN CONSULTED AND RETAINED BY THE UNITED STATES ATTORNEY'S OFFICE IN THE DISTRICT OF SOUTH CAROLINA?

A.    YES,  I HAVE.

Q.    HAVE YOU BEEN RETAINED BY ME IN THE PAST?

A.    YES.

Q.    AS A MATTER OF FACT,  HAVE YOU EVER TESTIFIED OR HELPED THE U. S. ATTORNEY'S OFFICE IN A CASE WHERE I WAS THE OPPOSING COUNSEL?

A.    OH, YES, I DID.

Q.    DOCTOR,  I HAVE ASKED YOU TO DO A NUMBER OF FORENSIC EVALUATIONS FOR ME --

A.    YES.

Q.    -- HAVE I NOT? AND OUT OF THE MANY FORENSIC EVALUATIONS YOU HAVE DONE, HOW MANY TIMES HAVE YOU TESTIFIED?

A.    THAT YOU HAVE ASKED ME TO EVALUATE SOMETHING, ONLY ONE OTHER CASE.

Q.    NOW, IN ADDITION TO TREATING PATIENTS, YOU SAID YOU ALSO TEACH. WOULD YOU ELABORATE ON THAT A LITTLE BIT?

A.    SURE. AGAIN, BECAUSE THE UNIVERSITY IS A TRAINING PROGRAM, ONE DAY A WEEK I HAVE CHILD PSYCHIATRY RESIDENTS WORK WITH ME. AND WHAT THAT IS, AFTER YOU FINISH YOUR RESIDENCY IN PSYCHIATRY, CHILD RESIDENTS SPEND AN ADDITIONAL TWO YEARS STUDYING CHILDREN. ONE DAY A WEEK, THE CHILD RESIDENTS WILL GO WITH ME TO DJJ TO TEACH THE CHILDREN.

I ALSO HAVE FORENSIC RESIDENTS. THE FORENSIC RESIDENT PROGRAM IS A YEAR LONG. SIX MONTHS OUT OF THE YEAR, THE FORENSIC RESIDENTS ROTATE WITH ME.

THEN, IN THE SUMMERTIME, I WILL HAVE A MEDICAL STUDENT WORK WITH ME. I HAVE TO GIVE LECTURES TO THE RESIDENTS, TO THE MEDICAL STUDENTS.

Q.    IN ADDITION TO TEACHING, DO YOU ALSO GIVE LECTURES ON VARIOUS TOPICS THROUGHOUT THE STATE AND NATIONALLY?

A.    YES.

Q.    WOULD YOU ELABORATE ON THAT?

A.    OH, GOSH, I HAVE SPOKEN ON STALKING, NATIONALLY; SEXUALLY VIOLENT PREDATORS, NATIONALLY. I PRESENTED A

**JA 1958**

RESEARCH STUDY I DID ON THE DEATH PENALTY TWO YEARS AGO -- NO, ACTUALLY LAST YEAR, I BELIEVE IT WAS IN TEXAS. I HAVE LECTURED ALL OVER THE STATE FOR THE MEDICAL SCHOOL, SOME OF THE MENTAL HEALTH CENTERS, TO THE DEPARTMENT OF JUVENILE JUSTICE.

Q. THIS PAST WEEKEND, WERE YOU SUPPOSED TO BE A PRESENTER AT A NATIONAL CONFERENCE?

A. YES.

Q. RELATED TO THESE ISSUES?

A. YES. I WAS ON A PANEL -- I WAS SUPPOSED TO BE ON A PANEL IN ARIZONA WHERE WE WERE TALKING ABOUT SUBSPECIALTIES IN FORENSICS PSYCHIATRY.

Q. YOU SAID YOU ALSO DO SOME RESEARCH AND PUBLISH. COULD YOU TELL US WHAT YOU HAVE PUBLISHED AND IN WHAT AREA?

A. SURE. I PUBLISHED RESEARCH IN THE AREA OF PRETRIAL DETAINEES WITH HIV. I HAVE PUBLISHED IN THE AREAS OF STALKING, THAT HAS BEEN ONE OF MY MAIN AREAS OF RESEARCH, I HAVE PUBLISHED A NUMBER OF PAPERS IN THAT AREA. I ACTUALLY PUBLISHED -- I WAS ONE OF THE FORENSIC PSYCHIATRISTS PICKED TO BE ON A COMMITTEE WHERE WE ACTUALLY PUBLISHED PRACTICE GUIDELINES FOR FORENSIC PSYCHIATRY. AND PRESENTLY, I'M WORKING ON A NUMBER OF STUDIES. I'M WRITING A CHAPTER IN A CORRECTIONAL PSYCHIATRY HANDBOOK. I AM WORKING ON A NUMBER OF OTHER -- I HAVE A DEATH PENALTY STUDY RIGHT NOW THAT I AM WORKING ON, AND A NUMBER OF OTHERS.

Q.   THE CONFERENCE YOU WERE SUPPOSED TO ATTEND LAST WEEKEND, WHO ELSE WAS ON THAT PANEL?

A.   THIS WAS A PANEL -- DR. PARK DIETZ, WHO IS VERY WELL KNOWN AROUND THE COUNTRY; AND DR. JEFF METZNER, WHO IS A CORRECTIONAL PSYCHIATRIST IN COLORADO, AND THEN A DR. EZRA GRIFFITH, WHO IS A WONDERFUL PSYCHIATRIST AT YALE.

Q.   THESE ARE WELL KNOWN NATIONALLY?

A.   YES.

Q.   YOU ARE ONE OF THE FOUR?

A.   YES.

Q.   DID YOU HAVE TO DO A VIDEO PRESENTATION?

A.   YES, I FILMED FROM HOME.  IT WASN'T VERY PROFESSIONAL, BUT AT LEAST I GAVE MY TALK, SO I WAS THERE IN VIDEOTAPE.

Q.   DO YOU TEACH LAWYERS, BOTH PROSECUTION AND DEFENSE, IN ANY LEGAL EDUCATION FORUMS?

A.   YES.

Q.   HAVE YOU PREPARED MATERIALS FOR THE NATIONAL ADVOCACY CENTER?

A.   YES.

Q.   AND THAT IS A TRAINING CENTER IN COLUMBIA WE ARE FORTUNATE ENOUGH TO HAVE, WHICH TRAINS U.S. PROSECUTORS FROM ALL OVER THE COUNTRY?

A.   THAT IS CORRECT.  IT IS CALLED THE NAC.  WHAT I HAVE DONE THERE, I HAVE WRITTEN SOME OF THE CASE MATERIAL THAT IS

USED IN THEIR TRAINING, AND I SERVE AS A MOCK EXPERT IN THEIR TRIALS.

Q. WHAT AFFILIATIONS DO YOU HAVE WITH WHAT ORGANIZATIONS?

A. WELL, TWO NOW. THERE USED TO BE A LOT, BUT NOW TWO. I AM TOO BUSY. THERE ARE TWO. ONE IS THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY. AND WHAT THAT IS, THAT IS THE ORGANIZATION THAT BOARD CERTIFIES, I DON'T KNOW IF YOU HAVE HEARD OF YOUR DOCTOR BEING BOARD CERTIFIED IN MEDICINE. THIS IS A BOARD CERTIFICATION UNIT FOR ALL PSYCHIATRISTS AND NEUROLOGISTS. I HAVE TWO FUNCTIONS THERE. I SERVE AS BOARD EXAMINER. AND WHAT THAT IS, IN PSYCHIATRY YOU HAVE TO TAKE A WRITTEN TEST. AND IF YOU PASS YOUR WRITTEN TEST, YOU HAVE TO GO ON AND BE EVALUATED BY A PSYCHIATRIST. AND THIS TEST, WHAT IT HAS, YOU HAVE TO INTERVIEW A PATIENT IN FRONT OF SOME DOCTORS. YOU HAVE TO WATCH A VIDEOTAPE AND ANSWER THOSE QUESTIONS. SO, I AM ONE OF THE BOARD EXAMINERS. SO, FOUR TIMES A YEAR, I WILL GO TO VARIOUS PARTS OF THE COUNTRY AND EXAMINE THE CANDIDATES WHILE THEY INTERVIEW THE PATIENTS. SO, I DO THAT, WHICH IS FUN, BUSY.

AND THEN THE OTHER JOB I HAVE IN FORENSIC PSYCHIATRY, WE HAVE BOARD CERTIFICATION. AND WHAT THE FORENSIC BOARDS ARE, YOU JUST HAVE TO TAKE A WRITTEN TEST. AND I AM ACTUALLY ON THE COMMITTEE THAT WRITES THE TEST QUESTIONS FOR THE FORENSIC RECERTIFICATION UNIT. SO, WE MEET ONCE A YEAR. WE MAKE THOSE TEST QUESTIONS.

Q.    THAT IS FOR CANDIDATES SEEKING BOARD CERTIFICATION IN FORENSIC PSYCHIATRY?

A.    THAT'S CORRECT.

Q.    THROUGHOUT THE COUNTRY?

A.    YES.   AND THEN THE OTHER ORGANIZATION I AM VERY INVOLVED IN IS CALLED AAPL.   WHAT AAPL IS IS THE AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW.   THAT IS BASICALLY ALL FORENSIC PSYCHIATRISTS IN THE COUNTRY AND ACTUALLY IN CANADA, AS WELL.   THAT IS THE MEETING I WAS SUPPOSED TO GO TO LAST WEEK.   BUT, BASICALLY, I HAVE SERVED AS A COUNSELOR THERE, WHICH MEANS I HAVE BEEN ON THE EXECUTIVE COMMITTEE AND WE HAVE MADE SOME DECISIONS FOR THE ORGANIZATION.   BUT ALSO IN CHARGE OF A COMMITTEE THAT GIVES SCHOLARSHIPS TO YOUNG FORENSIC DOCTORS.   I HAVE BEEN DOING THAT FOR ABOUT FIVE YEARS NOW.

Q.    AND YOU, IN FACT, HAVE GOTTEN ONE OF THOSE SCHOLARSHIPS, ALSO, HAVE YOU NOT?

A.    THAT IS HOW I GOT IN FORENSICS, PROBABLY, WHEN I WAS -- IN 1992 -- '90 TO '93, I WAS GIVEN THAT SCHOLARSHIP.   THAT IS KIND OF HOW I GOT INVOLVED IN THE FIELD.

Q.    DR. WATTS, YOU HAD SAID SOMETHING ABOUT GENERAL PSYCHIATRY AND THEN THERE IS FORENSIC PSYCHIATRY, ARE YOU BOARD CERTIFIED IN BOTH?

A.    YES.

Q.    WHAT DOES ONE HAVE TO DO TO GO AHEAD AND BE BOARD CERTIFIED IN FORENSIC PSYCHIATRY AS OPPOSED TO GENERAL

PSYCHIATRY?

A. AFTER YOU FINISH YOUR FOUR YEARS OF RESIDENCY TRAINING IN GENERAL PSYCHIATRY, FORENSIC PSYCHIATRY MEANS YOU HAVE TO SPEND ANOTHER YEAR IN TRAINING. IT HAS TO BE A PROGRAM THAT IS APPROVED. PROGRAMS HAVE TO GO THROUGH REVIEWS. THERE IS AN ORGANIZATION THAT MAKES SURE THAT THEY ARE TEACHING THE RIGHT THINGS, SO YOU HAVE TO FINISH A YEAR IN AN ACCREDITED PROGRAM. AFTER YOU FINISH THAT YEAR, YOU ARE ELIGIBLE TO TAKE YOUR BOARDS, AND THEN YOU TAKE THEM AND HOPEFULLY PASS.

Q. AND THAT IS A CERTIFICATION PROCESS, BASICALLY, IS WHAT IT IS?

A. YES.

Q. LET'S TALK ABOUT JUST YOUR, BRIEFLY, YOUR PRIOR TRAINING AND WORK.

A. OKAY.

Q. GIVE US AN IDEA OF WHAT YOUR PRIOR TRAINING AND WORK IS.

A. SURE. I HAVE BEEN AT THE MEDICAL SCHOOL AROUND SINCE '96 OR '97. I HAD TWO JOBS THERE. MY FIRST JOB, I WAS ACTUALLY THE TRAINING DIRECTOR FOR THE FORENSIC PROGRAM. I DID THAT FOR A FEW YEARS. AND THEN I GOT PROMOTED TO DIRECTOR OF FORENSIC SERVICES, SO I DO A LITTLE BIT OF DIFFERENT WORK THERE NOW. BEFORE THAT, I WORKED AT THE DEPARTMENT OF MENTAL HEALTH HERE IN COLUMBIA FOR A NUMBER OF YEARS, AND I HAD A NUMBER OF JOBS THERE. FOR THE FIRST FEW

YEARS, I PERFORMED COURT EVALUATIONS FOR THE STATE. AND THERE WOULD USUALLY BE, FOR COURT-ORDERED EVALUATIONS, WHERE A CERTAIN JUDGE MIGHT BE ASKING FOR AN OPINION WHETHER SOMEONE WAS COMPETENT, WHETHER THEY UNDERSTOOD WHAT WAS GOING ON, OR PERHAPS IT WAS SOME LEGAL ISSUE RELATED TO CRIMINAL CHARGES.

AND THEN AFTER THAT, I WORKED OVER IN SOUTH CAROLINA'S INSANITY UNIT. THAT IS WHERE PEOPLE ARE FOUND NOT GUILTY BY REASON OF INSANITY IN THE STATE. I WORKED THERE A NUMBER OF YEARS TREATING THOSE PATIENTS.

Q.    NOW, YOU WENT TO MEDICAL SCHOOL WHERE?

A.    HERE IN COLUMBIA.

Q.    WHAT YEAR DID YOU GRADUATE?

A.    1989.

Q.    DID YOU RECEIVE ANY AWARDS WHEN YOU WERE IN MEDICAL SCHOOL?

A.    YES.

Q.    WHAT WERE THEY?

A.    NEUROLOGY AWARD.

Q.    WHO IS RESPONSIBLE FOR GIVING YOU THAT AWARD?

A.    DR. BRANNON.

Q.    THE ONE THAT TESTIFIED IN COURT YESTERDAY?

A.    YES.

Q.    WEDNESDAY, I GUESS -- TUESDAY. YOU WERE HIS STUDENT?

A.    YES. STILL AM.

Q.    WHERE DID YOU GO TO COLLEGE?

A.   I WENT TO UNDER-GRAD AT FURMAN UNIVERSITY IN GREENVILLE, SOUTH CAROLINA.

Q.   WHEN DID YOU GRADUATE?

A.   1985.

Q.   DID YOU GROW UP HERE IN COLUMBIA?

A.   I SURE DID.

Q.   WHAT HIGH SCHOOL?

A.   LOWER RICHLAND.  IF YOU ARE FROM COLUMBIA, ON THE LOWER EAST SIDE.

Q.   TELL THE JURY HOW MANY TIMES YOU HAVE BEEN QUALIFIED AS A FORENSIC EXPERT IN SOUTH CAROLINA?

A.   SOMEWHERE BETWEEN -- OVER 500.  BUT I JUST TOP AT OVER 500, I DON'T KNOW.

Q.   IS THAT ALL LEVELS OF COURT, ALL TYPES OF COURT AND ADMINISTRATIVE-TYPE HEARINGS?

A.   YES.

        MR. SWERLING:  YOUR HONOR, I OFFER DR. SCHWARTZ-WATTS AS AN EXPERT IN THE FIELD OF FORENSIC PSYCHIATRY.

        MR. SCHOOLS:  NO OBJECTION.

        THE COURT:   ALL RIGHT.   YOU MAY PROCEED.

BY MR. SWERLING:

Q.   ALL RIGHT.  DR. WATTS, FIRST OF ALL, LET ME JUST ASK YOU, ARE YOU A REAL DOCTOR?

A.   YES.  FORENSIC PSYCHIATRY, WE HAVE MEDICAL DEGREES, WE HAVE MD'S.   WE HAVE TO GO TO MEDICAL SCHOOL, DO ROTATION,

PRACTICE MEDICINE.

Q.    PSYCHIATRY IS A SPECIALTY OF SOMEONE WHO ALREADY HAS A MEDICAL DEGREE?

A.    YES.

Q.    WHAT DOES A FORENSIC PSYCHIATRIST DO?

A.    AGAIN, AS WE TALKED ABOUT, ANYWHERE WHERE A LEGAL AND A PSYCHIATRIC QUESTION INTERRELATES.  WE ANSWER QUESTIONS ABOUT SOMEBODY'S MENTAL STATE AS IT RELATES TO A LEGAL ISSUE.

Q.    DID YOU PERFORM AN EVALUATION ON BRANDON BASHAM AT MY REQUEST AND MR. HARRIS'S REQUEST?

A.    YES.

Q.    AS A MATTER OF FACT,  YOU WERE ACTUALLY ASKED TO PARTICIPATE BY THE COUNSEL THAT WAS IN THE CASE BEFORE US?

A.    CORRECT.

Q.    NOW, WHAT DID YOU DO TO GO AHEAD AND GET READY FOR YOUR EVALUATION AND IN PREPARATION OF YOUR EVALUATION?

A.    WELL,  AT THE TIME I WAS FIRST CALLED BY THE OTHER COUNSEL,  IT WAS SHORTLY AFTER THE TIME MR. BASHAM HAD BEEN CHARGED AND WAS IN SOUTH CAROLINA. HE WAS DETAINED.  SO, I SAW MR. BASHAM EARLY ON IN JANUARY AND FEBRUARY OF 2003.  IN PREPARATION, I DID NUMEROUS INTERVIEWS OF MR. BASHAM.  AND THEN, AS TIME WENT ON, YOUR TEAM,  THE LEGAL TEAM, WAS ABLE TO GATHER INFORMATION I NEEDED,  MEDICAL RECORDS.  AS YOU CAN IMAGINE, LOTS OF RECORDS IN THE DISCOVERY,  ALL OF THE DOCUMENTS, AND SO THOSE WERE KIND OF, I DON'T KNOW, WHAT IS

THE WORD, THEY WERE COMING IN OVER TIME.

Q. IS RECORD REVIEW IMPORTANT?

A. ABSOLUTELY.

Q. HAVE YOU REVIEWED AN EXTENSIVE AMOUNT OF MEDICAL RECORDS IN THIS CASE?

A. I HAVE REVIEWED MORE MEDICAL RECORDS IN THIS CASE THAN I EVER HAVE ON ANY OTHER CASE, PERIOD.

Q. NOW, DID YOU ALSO CONSULT WITH OTHER PHYSICIANS?

A. YES. WHAT I DID, I SAW MR. BASHAM ON A NUMBER OF OCCASIONS. AND AS I WAS BEGINNING TO UNDERSTAND A LITTLE BIT ABOUT HIS MENTAL STATE, I NEEDED SOME CONSULTATIONS. I HAD TO HAVE SOME MEDICAL QUESTIONS ANSWERED FOR ME SO THAT I COULD UNDERSTAND HIS DIAGNOSIS. SO, I CONSULTED WITH DR. BRANNON, A NEUROLOGIST, BECAUSE I TRUST HIM. I ALSO CONSULTED WITH DR. TORA BRAWLEY, WHO IS A NEUROPSYCHOLOGIST.

Q. IS IT IMPORTANT FOR A PSYCHIATRIST DOING WHAT YOU DO TO INTERVIEW PEOPLE WHO KNOW MR. BASHAM?

A. ABSOLUTELY.

Q. WE WILL GET INTO THAT IN A FEW MINUTES. I WILL ASK YOU ABOUT YOUR METHODOLOGY LATER. BUT WERE YOU ABLE TO GIVE BRANDON BASHAM A DIAGNOSIS?

A. YES.

Q. WE WILL COME TO THAT POINT, ALSO. BUT AS A REVIEW OF ALL OF THESE THINGS THAT YOU ARE TALKING ABOUT, THE CONSULTATIONS, AND THE REVIEW OF RECORDS, YOU DID ULTIMATELY

COME UP WITH A DIAGNOSIS?

A.    ABSOLUTELY.

Q.    WOULD YOU TELL THE JURY THE SCOPE OF YOUR REVIEW?  WHAT YOU ACTUALLY REVIEWED?

A.    SURE.  THIS ONE I HAVE TO HAVE A CHEAT SHEET FOR. BASICALLY,  OFF THE TOP OF MY HEAD, I MAY HAVE TO REFER TO THOSE DOCUMENTS.   I INTERVIEWED ALL OF THE DISCOVERY IN THE CODEFENDANT'S CASE.   THE GOVERNMENT HAD PROVIDED MR. SWERLING'S OFFICE,  GOSH,  I THINK ABOUT 13,  14 NOTEBOOKS, A NUMBER OF NOTEBOOKS, I REVIEWED THOSE.   I REVIEWED ALL OF THE DISCOVERY IN MR. BASHAM'S CASE, WHICH WAS ABOUT 13 BIG, BLACK NOTEBOOKS FULL.

Q.    WHEN YOU TALK ABOUT "DISCOVERY," THE JURY MAY NOT KNOW EXACTLY WHAT DISCOVERY IS.   COULD YOU TELL THE JURY WHAT DISCOVERY ENCOMPASSES?

A.    SURE.   IT WOULD HAVE BEEN NOTES PERHAPS FROM INVESTIGATIONS,  FROM INTERVIEWS THAT THE LEGAL OFFICIALS CONDUCTED.   IT WOULD HAVE BEEN THE HISTORY ABOUT PRIOR CHARGES,  INCIDENT REPORTS RELATING TO THE PRESENT CHARGE. INTERVIEWS WITH VICTIMS IN THIS CASE, AS WELL.   BUT IT WOULD HAVE BEEN SOME OF THE LEGAL DOCUMENTS THEY NEEDED TO PROSECUTE OR DEFEND THE CASE.

Q.    DO YOU RECALL IF THERE WERE APPROXIMATELY 13,000 PAGES, SOMEWHERE IN THAT AREA?

A.    YES.  IT SEEMED LIKE MORE,  BUT IT WAS AROUND THERE.

**JA 1968**

Q.   TWELVE (12) TO 13,000.   ALSO YOU REVIEWED WHAT ELSE, MEDICAL RECORDS?

A.   MR. BASHAM, AGAIN, I THINK HE HAD OVER 20 VOLUMES OF MEDICAL RECORDS.   AND THOSE INCLUDED MEDICAL RECORDS FROM HIS GENERAL DOCTOR WHEN HE WAS LITTLE AT THE TROVER CLINIC.   THEY WOULD HAVE BEEN ALL OF HIS MENTAL HEALTH CENTER RECORDS, BOTH INPATIENT AND OUTPATIENT.   ALSO WOULD HAVE REVIEWED WHEN HE WAS IN A JUVENILE FACILITY, SO I HAD THE PSYCHIATRIC AND MEDICAL RECORDS FROM THAT COMMITTMENT.   HE WAS IN VARIOUS GROUP HOMES AND TREATMENT CENTERS, AND I HAD THOSE RECORDS, AS WELL.   HE WAS IN PSYCHIATRIC HOSPITALS, AND I HAD THOSE RECORDS.   HE ALSO RECEIVED OUTPATIENT TREATMENT AT LOCAL MENTAL HEALTH CENTER AND, I HAD THOSE RECORDS, AS WELL.

Q.   DO YOU RECALL IF THERE WERE APPROXIMATELY 14,000 PAGES THERE?

A.   YES.

Q.   SO, CONSERVATIVELY, YOU REVIEWED ABOUT 25,000 PAGES OF THOSE MATERIALS BETWEEN WHAT THE GOVERNMENT HAD AND WHAT WE PROVIDED?

A.   YES.

Q.   AND IS THAT THE MOST THAT YOU HAVE EVER READ THROUGH FOR PURPOSES OF EVALUATION?

A.   YES.

Q.   HAVE YOU ALSO SEEN VARIOUS TRANSCRIPTS?

A.   YES, I HAVE.   I HAVE READ SOME TRANSCRIPTS FROM THE

GUILT PHASE OF THIS VERY TRIAL, AND ALSO SOME TRANSCRIPTS FROM RECENT TESTIMONIES.

Q.    DO YOU REMEMBER  -- DID YOU READ THE TRANSCRIPT OF THE TESTIMONY OF MR. HAWKINS,  MS. MCGUFFIN,  MS. SEVERANCE, AND MS. RODDY?

A.    YES.

Q.    DID YOU ALSO HAVE AVAILABLE TO YOU A REPORT FROM BUTNER?

A.    YES,  I DID.   MR. BASHAM, AS A PART OF THIS EVALUATION, WAS SENT TO NORTH CAROLINA FOR A PERIOD OF EVALUATION.  AND THE PSYCHIATRIST, DR. CAPEHART, PROVIDED A VERY LENGTHY REPORT.   I THINK IT WAS ABOUT 120 PAGES, AND I HAVE READ THAT,  AS WELL.

Q.    DID YOU ALSO HAVE AVAILABLE TO YOU CERTAIN TAPES, AUDIO AND VIDEOTAPES?

A.    YES.

Q.    DID YOU ALSO READ ANY OF THE TRANSCRIPTS FROM THE FIRST PHASE OF THE PENALTY PHASE OF THIS TRIAL?

A.    YES,  I HAVE.

Q.    WHAT HAS BEEN PROVIDED UP TO LIKE MONDAY OR TUESDAY?

A.    YES.   ALL I HAVE HAD A CHANCE TO READ, AT THIS POINT, I BELIEVE, IS MS. VOGELSANG,  SOME OF HER TESTIMONY.  AND I THINK THAT WOULD BE ABOUT IT.

Q.    NOW,  WHY DO YOU THINK IT WAS ALSO IMPORTANT TO REVIEW MR. FULKS OR MATTERS RELATING TO MR. FULKS?

A.   WELL, BECAUSE, IN MY OPINION, MR. BASHAM -- YOU CAN'T UNDERSTAND MR. BASHAM WITHOUT UNDERSTANDING HIS RELATIONSHIP WITH HIS CODEFENDANT.   SO, I WANT TO LEARN AS MUCH ABOUT MR. FULKS AS I COULD.

Q.   NOW, TELL THE JURY, WHO DID YOU CONFER WITH AND WHY?

A.   IN TERMS OF MR. FULKS OR THE ENTIRE CASE?

Q.   NO.   THE ENTIRE CASE.

A.   SURE.   A NUMBER OF PEOPLE.   AGAIN, DR. BRANNON, WHO IS A NEUROLOGIST.  AND I ASKED DR. BRANNON TO PLEASE SEE MR. BASHAM FOR ME BECAUSE I HAD SOME CONCERNS I THOUGHT HE WAS BRAIN DAMAGED.  I ASKED DR. BRANNON TO SEE HIM.  I ALSO ASKED AND CONFERRED WITH DR. TORA BRAWLEY.  SHE IS A NEUROPSYCHOLOGIST.  I SAID I WAS CONCERNED HE HAD BRAIN DAMAGE AND ASKED HER TO PERFORM SOME TESTS AND ASSESS HIM.  I SPOKE WITH DR. DONALD MORGAN.  DR. DONALD MORGAN IS A FORENSIC PSYCHIATRIST IN TOWN.  HE TRAINED ME, AND I CONSULTED WITH DR. MORGAN.  HE HAS BEEN TREATING MR. BASHAM SINCE ABOUT MAY OF 2003, MAY OR JUNE OF 2003, SO I CONSULTED WITH DR. MORGAN ON A NUMBER OF OCCASIONS.

I HAVE WORKED WITH VARIOUS PEOPLE ON YOUR TEAM.  MR. SWERLING HAS A NUMBER OF INVESTIGATORS THAT I WOULD ASK QUESTIONS ABOUT.  HE ALSO HAS MITIGATION SPECIALISTS, AND THEIR JOB IS TO GATHER INFORMATION.  I SPOKE WITH THEM.  I SPOKE WITH MS. VOGELSANG, WHO IS A SOCIAL WORKER, WHO CONDUCTED A LOT OF SOCIAL HISTORY IN THIS CASE.

JA 1971

Q.     NOW, YOU SAID IT WAS IMPORTANT TO TALK TO PEOPLE WHO KNEW BRANDON BASHAM, CORRECT?

A.     YES.

Q.     HAVE YOU CONDUCTED EXTENSIVE INTERVIEWS WITH RESPECT TO THOSE KINDS OF PEOPLE WHO KNEW HIM FROM VARIOUS POINTS IN HIS LIFE?

A.     YES.

Q.     WOULD YOU RELATE THAT TO THE JURY?

A.     YES, I DO NEED A CHEAT SHEET FOR THAT, THAT IS A LOT. I SPOKE WITH, OF COURSE, MR. BASHAM'S FAMILY.  I HAVE SPOKEN -- I HAVE SEEN MS. BASHAM, KATHY BASHAM, BRANDON'S MOTHER ON TWO OCCASIONS.  AND I HAVE SPOKEN WITH HER BY TELEPHONE ON TWO DIFFERENT OCCASIONS.  I HAVE SEEN MR. BASHAM'S FATHER.

Q.     DO YOU KNOW WHERE SHE IS RIGHT NOW?

A.     YES.

Q.     WHERE IS SHE?

A.     MS. BASHAM IS IN THE INTENSIVE CARE UNIT AT BAPTIST HOSPITAL HERE.

Q.     SHE IS IN TOWN, BUT SHE WAS ADMITTED TO THE HOSPITAL OVER THE WEEKEND?

A.     YES, SHE IS.  I SPOKE TO HER TWO TIMES LAST WEEK WHILE SHE WAS IN TOWN AT THE HOTEL.  MY UNDERSTANDING IS, OVER THE WEEKEND, SHE GOT QUITE ILL.  SHE IS IN ICU AT BAPTIST.

Q.     TALKED TO HER A NUMBER OF TIMES, ALSO SEEN HER MEDICAL

RECORDS?

A.    YES.  I HAVE REVIEWED HER MEDICAL RECORDS EXTENSIVELY.

Q.    DO YOU KNOW WHAT IS WRONG WITH HER?

A.    YES.

Q.    WHAT IS IT?

A.    MS. BASHAM HAS A NUMBER OF ILLNESSES.  PROBABLY THE ONE THAT IS THE MOST PERTINENT RIGHT NOW, HAS A HORRIBLE DISEASE, EMPHYSEMA.  BEEN ON OXYGEN A NUMBER OF YEARS.  SHE HAD SOME PROBLEMS BREATHING.  SHE HAS BEEN INTUBATED, I THINK, ABOUT THREE DAYS.  TRIED TO TAKE HER OFF THE BREATHING TUBE YESTERDAY, BUT THEY COULDN'T.  AND PRESENTLY SHE IS IN KIDNEY FAILURE.

Q.    THAT IS LUNG DISEASE.  THAT IS THAT PART OF IT COMING FROM SMOKING?

A.    YES.  SHE, AND I ALSO BELIEVE THE DAUGHTER, CHARLOTTE MORRIS, THEY BOTH HAVE A HISTORY OF LUNG DISEASE.  IT IS CALLED COPD FOR EMPHYSEMA.  MS. BASHAM HAS HAD HOSPITALIZATIONS IN THE PAST FOR THAT, AS WELL.  SHE WOULD GET PNEUMONIA, STAY IN THE HOSPITAL, GET STABILIZED, RETURN HOME.  THIS TIME, SHE IS A TAD BIT SICKER THAN IN THE PAST.

Q.    IF SOMEONE SMOKES NONFILTERED-TYPE CIGARETTES OR OTHER DRUGS, DOES THAT HASTEN UP LUNG DISEASE?

A.    YES.  UNFORTUNATELY, IT DOES.  PEOPLE THAT SMOKE MARIJUANA OR CRACK, THEY DON'T HAVE FILTERS.  CIGARETTES, EVEN THOUGH THEY ARE DANGEROUS, THEY HAVE FILTERS.  WHAT

THOSE FILTERS DO IS THEY BLOCK OUT PARTICLES THAT CAN LODGE IN YOUR LUNG.  BUT WHEN PEOPLE USE CRACK OR OTHER TYPES OF DRUGS,  DRUGS DON'T HAVE FILTERS,  AND THE LUNGS ARE MUCH MORE EXPOSED TO TOXINS THAN CIGARETTES.

Q.    I ASKED YOU BEFORE ABOUT MEDICAL RECORDS.  DID YOU ALSO REVIEW MEDICAL RECORDS ABOUT OTHER PEOPLE OTHER THAN BRANDON BASHAM?

A.    YES.

Q.    WHO?

A.    MS. BASHAM, KATHY BASHAM; MR. JIMMY BASHAM, WHO IS MR. BRANDON BASHAM'S FATHER; CHARLOTTE BASHAM MORRIS, WHO IS MR. BASHAM'S SISTER.  AND I ALSO REVIEWED THE RECORDS OF MR. TOMMY BASHAM,  WHICH IS JIMMY BASHAM'S NEPHEW, AND SOME OF KATHY BASHAM'S GREAT AUNTS AND UNCLE,  ADA ENGLAND AND CLAUDE BLAKE. THEIR GREAT AUNT AND UNCLE ON HER SIDE THAT HAD MENTAL ILLNESS.

Q.    ALL RIGHT.  BACK TO THE PEOPLE YOU WERE INTERVIEWING. YOU SAID JIMMY,  DAD,  KATHY,  THE MOM?

A.    YES.  I HAVE SEEN MS. BASHAM IN PERSON,  AGAIN,  TWO TIMES.  MR. BASHAM, I HAVE SEEN IN PERSON THREE TIMES. CHARLOTTE MORRIS, I HAVE SEEN THREE TIMES IN PERSON.  I INTERVIEWED IN PERSON CHARLOTTE'S COMMON-LAW HUSBAND, MARK PHEBUS.  I HAVE INTERVIEWED IN PERSON TOMMY BASHAM, WHO IS MR. BASHAM'S, I WANT TO SAY, UNCLE, BUT HE IS THE NEPHEW OF HIS FATHER.  I HAVE INTERVIEWED PAUL ARISON WHO IS ONE OF THE

POLICE OFFICERS IN HOPKINS COUNTY DETENTION CENTER, OFFICER PAUL ARISON. INTERVIEWED DR. LAWRENCE SEUSS, WHO IS A PSYCHIATRIST WHO WORKED WITH MR. BASHAM. I INTERVIEWED CHRIS SCHAFFER, A FINE OFFICER UP IN HOPKINS. I INTERVIEWED PENNY TITZER. SHE IS A SOCIAL WORKER WHO TREATED BRANDON WHILE IN CHARTER HOSPITAL. I SPOKE IN PERSON WITH DR. LUNSFORD, I BELIEVE HIS FIRST NAME IS RICHARD. I AM SORRY IF I DON'T HAVE THAT CORRECT. DR. LUNSFORD IS A PSYCHIATRIST THAT TREATED MR. BASHAM WHILE IN WESTERN STATE HOSPITAL IN KENTUCKY. ACTUALLY, WENT OUT TO THE STATE HOSPITAL AND MET DR. LUNSFORD. I ALSO SPOKE WITH PAULA HALCOMB, WHO WAS A PSYCHOLOGIST THAT WORKED WITH DR. LUNSFORD AND TREATED MR. BASHAM AT THE HOSPITAL. I SPOKE WITH RONALD PERDUE WHO WAS THE GENTLEMAN WHO LIVED IN WINNABOW, NORTH CAROLINA NEAR THE BEE TREE FARMS. SPOKEN WITH ANDREA RODDY BY TELEPHONE. SPOKEN WITH MOLLY MCGALL, WHO WAS MR. BASHAM'S TEACHER, I THINK, IN ELEMENTARY SCHOOL IN ANTON; HER AND HER HUSBAND WERE BIG BROTHER AND BIG SISTER TO BASHAM. SPOKE WITH OFFICER DIAN BLAIR, WHO WAS THE POLICE OFFICER WORKING ON THE EVENING THAT MR. BASHAM AND MR. FULKS ESCAPED. I HAVE SPOKEN WITH RENEE CHISM. MS. RENEE CHISM IS A NURSE OUT AT RICHLAND COUNTY DETENTION CENTER THAT IS RESPONSIBLE FOR ADMINISTERING MR. BASHAM'S MEDICINE. I SPOKE WITH WALLY CARLOS, ALSO WITH THE RICHLAND COUNTY DETENTION CENTER. AND WALLY IS A PARAMEDIC THAT WORKS THERE AT THE LOCAL DETENTION CENTER. I HAVE

SPOKEN AT JUST CARE WITH A FEW OFFICERS. SERGEANT DRESCHER, I HAVE KNOWN FOR A LONG TIME, JUST THROUGH ADMITTING PATIENTS TO THE HOSPITAL. LIEUTENANT GALLO, WHO IS ALSO A CORRECTIONAL OFFICER THERE. SPOKEN WITH A NUMBER OF DOCTORS BY PHONE. DR. CHERYL BREVARD, SHE TREATED MR. BASHAM WHEN HE WAS A PATIENT AT THE METHODIST HOME. DR. WALKER, A PSYCHIATRIST THAT TREATED MR. BASHAM WHEN HE WAS IN THE DEPARTMENT OF JUVENILE JUSTICE. I HAVE SPOKEN WITH DR. ELEANOR BYRD, WHO IS FORENSIC PSYCHIATRIST HERE IN TOWN. SHE TREATED MR. BASHAM WHILE HE WAS AT THE RICHLAND COUNTY DETENTION CENTER. SHE HAS A CONTRACT THERE WHERE SHE WORKS AND SEES THE INMATES. SPOKEN WITH DORI BRANSON, BY TELEPHONE. SHE WORKED AT CHARTER. SHE WAS A MENTAL HEALTH SPECIALIST AT THE CHARTER HOSPITAL. I HAVE SPOKE WITH SOME OFFICERS FROM RICHLAND COUNTY DETENTION CENTER. MY MAIN SOURCE OF INFORMATION WAS OFFICER MACK. HE IS USUALLY WHO I GO TO IF I NEEDED INFORMATION. I HAVE SPOKEN WITH DR. DEWEY SANDERS. DR. SANDERS WAS THE TREATMENT DIRECTOR OF THE METHODIST HOME WHEN BRANDON WAS ABOUT 14. I THINK THAT COVERS IT.

Q. QUITE A FEW PEOPLE.

A. YES.

Q. DID YOU EVER HEAR FROM DR. BRUCE CAPEHART, THE PSYCHIATRIST AT BUTNER?

A. NO.

Q. WERE YOU AVAILABLE TO SPEAK WITH HIM IF HE WANTED TO

CONSULT WITH YOU?

A.   SURE.

Q.   WERE THERE SOME OTHER PEOPLE THAT YOU TRIED TO TALK TO BUT WERE UNABLE TO?

A.   YES.   I WANTED TO SPEAK WITH CHAD FULKS.  AND ON A NUMBER OF OCCASIONS, I CONTACTED HIS ATTORNEY ASKING PERMISSION,  PERHAPS THAT WE COULD ARRANGE SOME KIND OF INTERVIEW WHERE I COULD ASK HIM SOME VERY SPECIFIC QUESTIONS. I SPOKE TO THAT ATTORNEY A NUMBER OF TIMES.   I ASKED FOR A LETTER IN WRITING TO SAY THAT I WAS DENIED ACCESS TO MR. FULKS, AND I HAVE NOT HEARD BACK FROM THEM,  NOR DID I GET A LETTER.

I TRIED TO --

MR. SCHOOLS:  YOUR HONOR,  CAN WE APPROACH ONE MINUTE?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SCHOOLS:  JUDGE, I DON'T KNOW WHERE ALL OF THIS STUFF WITH MR. FULKS IS GOING.

THE COURT:   MY EARS PERKED UP.   I WAS EXPECTING AN OBJECTION.   IF SHE TALKED WITH MR. FULKS, THAT DOESN'T HAVE ANYTHING TO DO WITH THIS CASE AT ALL.

MR. SWERLING:  SHE ISN'T GOING INTO ANYTHING WITH MR. FULKS'S INVOLVEMENT IN THE CRIME OR ANY HISTORY RELATED TO MR.

FULKS. LATER ON, I WOULD PROBABLY LIKE TO ASK HER SOME QUESTIONS ABOUT MR. FULKS, ABOUT HIS MENTAL CAPACITY THAT SHE LEARNED FROM THE RECORDS, AND THE OBSERVATIONS SHE MADE ABOUT HIM WITHOUT GOING INTO ANY OF THE VIOLENT STUFF THAT YOU SAID WAS INADMISSIBLE.

THE COURT: MENTAL CAPACITY IS THE SAME AS PRIOR BAD ACT, IT IS NOT RELEVANT TO THIS CASE. WILL YOU GET TO IT BEFORE LUNCH?

MR. SWERLING: NO, SIR. THIS IS THE ONLY RECORD -- SHE DID TRY TO TALK WITH THEM. THAT IS WHAT SHE --

THE COURT: HOW LONG BEFORE YOU CAN GET TO THAT?

MR. SWERLING: IT WILL BE A WHILE.

THE COURT: LET'S GO ON TO 12:15, 12:30. WE WILL TAKE IT UP OVER LUNCH.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

BY MR. SWERLING:

Q. DID YOU ALSO TRY AND INTERVIEW MR. HAWKINS, MS. MCGUFFIN, AND TINA SEVERANCE?

A. YES.

Q. OVER WHAT PERIOD OF TIME HAVE YOU CONDUCTED YOUR EVALUATION?

A. I SAW MR. BASHAM, INITIALLY, IN JANUARY OF 2003. THE LAST TIME I SAW HIM, I BELIEVE, WAS ABOUT SEPTEMBER, THE END OF LAST MONTH, EARLY IN -- THE MONTHS HAVE ROLLED ON. I

HAVE SEEN HIM A FEW MONTHS, THIS MONTH, AS WELL. EVERY TIME I SEE MR. BASHAM, I AM CONDUCTING PART OF THE EVALUATION. BUT I HAVE SEEN HIM OVER ABOUT A YEAR-AND-A-HALF PERIOD OF TIME.

Q. DID YOU ACTUALLY SEE HIM EARLIER THAN THE OTHER EXPERT IN THE CASE?

A. YES.

Q. HAVE YOU SEEN HIM IN DIFFERENT SETTINGS?

A. YES.

Q. WHAT WERE THOSE? WHY IS THAT IMPORTANT?

A. SURE. IT IS ALWAYS IMPORTANT, ANY INFORMATION YOU CAN GET IS ALWAYS HELPFUL. BUT IN DIFFERENT SETTINGS THERE ARE, OF COURSE, DIFFERENT SITUATIONS GOING ON, SO THAT IS ALWAYS HELPFUL. FOR EXAMPLE, I SAW MR. BASHAM THE MAJORITY OF THE TIME AT RICHLAND COUNTY DETENTION CENTER. THERE ARE THINGS YOU HAVE TO KEEP IN MIND WHILE AT THE DETENTION CENTER COMPARED TO OTHER PLACES. IT IS NOISY, LOTS OF DISTRACTIONS IN THE DORM WHERE MR. BASHAM STAYS. USUALLY, BY THE TIME MR. BASHAM HAD COME TO SEE ME FOR AN EVALUATION, HE WOULD HAVE GOTTEN IN A FEW ARGUMENTS WITH SOME OF THE CORRECTION OFFICERS. MANY TIMES IN THAT SITUATION, HE WAS UPSET WHEN HE ENTERED THE INTERVIEW ROOM WHEN I CONDUCTED MY EVALUATION.

ALSO SAW HIM AT THE JUST CARE HOSPITAL. THAT IS A HOSPITAL HERE IN COLUMBIA. IT IS A SECURE FACILITY WHERE INMATES ARE HOUSED FOR MEDICAL TREATMENT, AND THERE IS ALSO A

PSYCHIATRIC UNIT THERE. NOW, AT JUST CARE HOSPITAL, THE SETTING IS A LITTLE BIT DIFFERENT. THE INTERVIEW ROOMS ARE SEPARATE. THEY ARE DOWNSTAIRS, SO THAT THE NOISE LEVEL IS MUCH LOWER. ALSO, THE CORRECTION OFFICERS THAT WOULD ESCORT HIM, HE WOULD ENTER THE INTERVIEW ROOM IN A LITTLE BIT BETTER FRAME OF MIND, BETTER MOOD.

AND THEN FINALLY, I HAVE SEEN HIM A NUMBER OF TIMES HERE IN THE COURTHOUSE. THOSE OCCASIONS HE HAS BEEN UPSET AND I HAVE BEEN CALLED TO SEE HIM FOR A CERTAIN REASON. IN THESE SITUATIONS, HE IS USUALLY UPSET ABOUT SOMETHING. THE INTERVIEW ROOMS ARE A LITTLE BIT DIFFERENT. THE ACOUSTICS ARE NOT VERY GOOD. IF SOMEONE IS NEXT DOOR, YOU CAN HEAR A MUFFLED CONVERSATION THROUGH THE WALL. SO, BASICALLY, THE DIFFERENT INTERVIEW SITES, IF YOU ARE LOOKING AT THE PHYSICAL SETTING, WHAT KIND OF STATE IS HE IN WHEN HE ENTERS THE ROOM. HOW MANY DISTRACTIONS ARE GOING ON WHILE YOU ARE TRYING TO CONDUCT THE INTERVIEW. IT IS HELPFUL BECAUSE YOU CAN SEE DIFFERENT THINGS ABOUT HOW HE FUNCTIONS.

Q. IN EACH ONE OF THOSE, JUST CARE, RICHLAND COUNTY DETENTION CENTER, AND THE COURT, DID YOU MAKE DIFFERENT OBSERVATIONS OF HIM THAT WERE DIFFERENT THAN ONE OF THE OTHERS?

A. YES.

Q. COULD YOU ELABORATE?

A. YES. IT WAS ALWAYS EASIER TO CONDUCT AN INTERVIEW

WITH MR. BASHAM WHEN HE WAS IN JUST CARE. THAT WAS ONE OF THE BETTER SETTINGS FOR HIM. THE RICHLAND COUNTY DETENTION CENTER, AGAIN, IT WAS VERY NOISY, AND HE WAS USUALLY UPSET. AFTER A WHILE, AFTER SPENDING SOME TIME WITH HIM, YOU COULD CONDUCT PART OF THE INTERVIEW. AT THE COURTHOUSE, I HAVEN'T BEEN FORTUNATE, HE HAS BEEN UPSET, IT HAS BEEN DIFFICULT TO CONDUCT AN ASSESSMENT UNDER THOSE CIRCUMSTANCES.

Q. HAVE YOU SEEN HIM ON AND OFF MEDICINE?

A. YES.

Q. IS THAT IMPORTANT, AS WELL?

A. YES.

Q. AND WHY?

A. FOR INSTANCE, WHEN I SAW MR. BASHAM IN JANUARY AND FEBRUARY OF 2003, HE WAS ONLY ON AN ANTIDEPRESSANT MEDICATION. SO, THE WAY HE THOUGHT, THE WAY HE FELT, THE WAY HE ACTED WAS VERY DIFFERENT THAN ON TIMES WHEN HE IS ON MEDICATION RIGHT NOW. YOU LEARN DIFFERENT THINGS ABOUT HOW MEDICATIONS AFFECT HIS MENTAL STATE. AND YOU SEE DIFFERENT THINGS THAT YOU MIGHT NOT SEE WHEN HE IS NOT MEDICATED.

Q. FOR EXAMPLE, CONCERTA, IS THAT ONE OF THE MEDICINES HE IS ON?

A. YES.

Q. WHAT IS THE DIFFERENCE WHEN HE IS ON CONCERTA AND OFF CONCERTA?

A. I NEED TO BACK UP AND SAY, ORIGINALLY, WHEN I MET MR.

BASHAM, I WASN'T A FAN OF HIM BEING ON CONCERTA. CONCERTA IS A MEDICINE YOU USE FOR ATTENTION DEFICIT DISORDER. IT HAS A NUMBER OF PROBLEMS ASSOCIATED WITH IT. WHAT I WAS MOST CONCERNED ABOUT EARLIER ON WITH MR. BASHAM IS WHEN I FIRST SAW HIM, IT WAS VERY APPARENT HE WAS HALLUCINATING. YOU WOULD ASK MR. BASHAM A QUESTION, HE WOULD MUMBLE TO HIMSELF, AND THEN HE WOULD TRY TO ANSWER YOUR QUESTION. WHAT I NOTICED WHEN HE IS ON THE MEDICINE CONCERTA, HE DOESN'T DO THAT. HE IS ACTUALLY ABLE TO PAY ATTENTION AND FOCUS. SO, I HAVE NOTICED THAT WHEN HE IS ON THAT MEDICATION, HE IS A LITTLE BIT ABLE TO FOLLOW YOUR QUESTIONS AND ANSWER.

Q. ALSO ON A DRUG CALLED NEURONTIN?

A. YES, NEURONTIN.

Q. WHAT IS THE SIGNIFICANCE OF THAT?

A. NEURONTIN IS ACTUALLY A MEDICATION THAT IS KIND OF USED NOW MORE FOR MANAGING BACK PAIN, PAIN THAT IS INDUCED BY THE BODY'S NERVES. IT IS ALSO USED IN PSYCHIATRY AS A MOOD STABILIZER. AND THERE WAS A BIG CHANGE IN MR. BASHAM, IN MY OPINION, IN HOW HE FUNCTIONED, WHEN HE WAS AT JUST CARE HOSPITAL THE SECOND OCCASION. HE WAS PLACED ON THE MEDICATION NEURONTIN, WHICH I DIDN'T KNOW AT THE TIME, BUT WHEN I SAW HIM THAT SEPTEMBER, THAT WAS ACTUALLY THE BEST I HAD EVER SEEN HIM. AND THAT WAS MEDICATION HE HAD BEEN PLACED ON, AT THAT TIME.

Q. IS HE STILL ON IT?

A.   YES, AS FAR AS I KNOW, HE IS.   I TALKED WITH A NURSE WHITE LAST WEEK AT THE DETENTION CENTER TO GET A LIST OF HIS MEDICATIONS, AND HE IS STILL ON THAT MEDICATION.

Q.   IS CONCERTA LIKE RITALIN?

A.   YES.   IT IS A FORM OF RITALIN THAT LASTS ALL DAY LONG, SO YOU ONLY HAVE TO GIVE IT ONCE.

Q.   IS RITALIN A STANDARD MEDICATION FOR PEOPLE WHO HAVE ADHD?

A.   YES,  IT IS

Q.   YOU ALSO VISITED A NUMBER OF LOCATIONS IN PREPARATION FOR THIS CASE, DID YOU NOT?

A.   YES.

Q.   CAN YOU TELL THE JURY WHERE YOU TRAVELLED TO, PERSONALLY?

A.   SURE.   I WENT TO THE HOPKINS COUNTY DETENTION CENTER WHERE MR. BASHAM ESCAPED.  AND MAJOR SCHAFFER WAS KIND ENOUGH TO TAKE ME ON A TOUR OF THAT FACILITY.   I ACTUALLY SAW THE ROOM WHERE MR. BASHAM AND MR. FULKS WERE HOUSED.   MAJOR SCHAFFER TOOK ME OUT INTO THE COURTYARD AND WENT THROUGH THE ESCAPE WITH ME, AND SHOWED ME THE FENCE, AND THAT SORT OF THING.  OF COURSE, IT HAS BEEN REPAIRED.

I ALSO WENT TO THE JUST CARE FACILITY HERE IN COLUMBIA WHERE MR. BASHAM WAS HOUSED ON TWO OCCASIONS, AND TOOK A TOUR OF THAT.  SERGEANT DRESCHER TOOK ME THROUGH THE AREA WHERE HE HAD ATTEMPTED ESCAPE.   I SAW THE ROOM THAT HE WAS STAYING IN.

I SAW THE SCREEN THAT WOULD HAVE BEEN CUT.  I WENT OUTSIDE WITH SERGEANT DRESCHER, AND HE WALKED ME AROUND THAT FACILITY.

I ALSO WENT TO THE WESTERN STATE HOSPITAL IN KENTUCKY AND I DON'T REMEMBER THE TOWN OF KENTUCKY, BUT IT WAS -- I WENT TO THE STATE HOSPITAL THERE.  I SAW THE YARD WHERE MR. BASHAM WALKED OFF FROM.  AGAIN, I SPOKE WITH THE DOCTORS THERE.

I WENT TO WINNABOW, NORTH CAROLINA.  ONE OF THE INVESTIGATORS HERE TOOK ME, AND I WENT TO THE BEE TREE FARM. I WENT TO SOME OF THE GRAVEYARDS WHERE PERHAPS THE SITE OF THE CRIME WAS.  WENT TO MR. PERDUE'S HOME.  ALSO, WHILE I WAS ON THAT TRIP, I WENT TO THE WAL-MART IN CONWAY.  MR. MCNAIR, WHO IS AN INVESTIGATOR, TOOK ME TO SOME OF THE PLACES THAT WE KNEW MR. BASHAM AND MR. FULKS WERE THAT DAY.  I SAW THE HOME OF THE HYMANS.  I SAW THE HOME OF THE MOORES.  I WENT TO MR. CARL JORDAN'S HOME.  I SAW HIS RESIDENCE.  HE WASN'T THERE, I TALKED TO A NEIGHBOR, BUT NOT HIM.  I WENT TO SOME OF THE ATM'S WHERE SUPPOSEDLY MR. BASHAM AND MR. FULKS HAD ATTEMPTED TO GET MONEY.

I ALSO SAW THE LAKE SHORE MOTEL IN LITTLE RIVER WHERE THEY HAD STAYED FOR A FEW DAYS.

I HAVE ALSO BEEN TO MR. AND MRS. BASHAM'S HOME IN KENTUCKY WHERE MR. BASHAM LIVED.  AND I HAVE ALSO BEEN TO HIS SISTER AND HER FIANCEE MARK PHEBUS' HOME IN KENTUCKY, AS WELL.

Q.   WE TALKED BEFORE ABOUT METHODOLOGY. DO YOU HAVE A SPECIFIC METHODOLOGY THAT YOU USED IN THIS CASE?

A.    SURE.

Q.    WHAT WAS IT?

A.    SAME AS ANY OTHER DOCTOR.   YOU EVALUATE SOMEONE AND YOU TRY TO COLLECT HISTORY ON THEM.   AND THE WAY YOU COLLECT A HISTORY ON SOMEBODY IS BY THEIR OWN WORDS.  AND THEN IN OTHER OCCASIONS, YOU MAY NEED OBSERVATIONS OF OTHER PEOPLE OR OLD MEDICAL RECORDS,  ANY KIND OF TREATMENT RECORDS.   THEN, AFTER REVIEWING THE RECORDS AND PERFORMING AN EVALUATION, YOU MAKE CONSULTATIONS.  IF YOU HAVE MEDICAL QUESTIONS OR PSYCHIATRIC QUESTIONS THAT YOU NEED ANSWERED,  YOU ASK FOR CONSULTANTS, AND THEY PERFORM WHAT TESTS THEY DEEM THE PERSON NEEDS.   THEN YOU RENDER A DIAGNOSIS.  AND THE ONLY DIFFERENCE HERE IS, AFTER RENDERING A DIAGNOSIS, YOU WOULD MAKE A TREATMENT PLAN,  AND I HAVE NOT DONE THAT IN THIS CASE.  BUT THAT IS THE NORMAL METHODOLOGY THAT ALL PHYSICIANS FOLLOW. YOU OBTAIN A HISTORY,  YOU DO YOUR EXAM.

AND PART OF THE PSYCHIATRIC EVALUATION,  WE HAVE THE EQUIVALENT TO A MEDICAL DOCTOR'S PHYSICAL EXAM.   IN PSYCHIATRY, WE HAVE WHAT IS CALLED THE MENTAL STATUS EXAM. THAT IS WHERE WE ACTUALLY LOOK AT HOW YOU THINK, FEEL, AND ACT, AND THERE ARE SOME TESTS WE RUN OURSELVES.   SO, THE SAME THING, PERFORMED AN EXAM, MADE A DIAGNOSIS.

Q.    AS A PART OF THAT METHODOLOGY, DO YOU NORMALLY DO AN EMPLOYMENT HISTORY?

A.    FOR CERTAIN SITUATIONS.

Q.    DID YOU DO ONE IN THIS CASE?

A.    NO.   THAT IS THE ONLY AREA I DIDN'T GET INTO WITH MR. BASHAM BECAUSE HE HAS BEEN ON DISABILITY.   NOT BEEN EMPLOYED OTHER THAN HE WORKED FOR HIS FATHER AS A MECHANIC FOR A SHORT PERIOD OF TIME.   I DON'T HAVE ANY HISTORY THAT HE HAS EVER BEEN GAINFULLY EMPLOYED.   I KNOW HE HAS BEEN ON DISABILITY OR SOCIAL SECURITY SINCE THE AGE OF TEN.

Q.    SINCE THE AGE OF TEN?

A.    YES.

Q.    DID YOU DO A DEVELOPMENTAL HISTORY?

A.    YES.

Q.    HOW DID YOU ORGANIZE THAT?

A.    WHAT A DEVELOPMENTAL HISTORY IS, BASICALLY, YOU ARE LOOKING AT THE YEARS OF DEVELOPMENT FROM THE TIME THAT MR. BASHAM WAS IN HIS MOTHER'S WOMB, UNTIL HE BECAME A YOUNG ADULT.   WHAT A DEVELOPMENTAL HISTORY IS, YOU ARE LOOKING FOR THINGS THAT ARE SIGNIFICANT JUST IN GENERAL.   WERE THERE PERIODS OF ABSENCE FROM HIS FAMILY?  DID HE HAVE BAD MEDICAL ILLNESSES?   WHAT WERE THE THINGS THAT WERE HAPPENING TO HIM DURING THOSE FIRST -- I WENT UP TO 12 YEARS IN THIS CASE, THOSE FIRST 12 YEARS OF LIFE THAT WERE IMPORTANT IN HIS DEVELOPMENT.

Q.    NOW,  DID YOU MAKE ANY OBSERVATIONS ABOUT THE EARLY AGES OF PREGNANCY OF MS. BASHAM AND DELIVERY OF BRANDON BASHAM?

A.    YES.

Q.    WHAT DID YOU OBSERVE?

A.    WELL, THERE ARE A NUMBER OF THINGS THAT I DEVELOPED. FIRST OF ALL, MS. BASHAM DID TELL ME THAT SHE USED DRUGS DURING THE PREGNANCY WITH BRANDON.  SHE ADMITTED TO MARIJUANA USE.  WE, OF COURSE, KNOW SHE HAD SMOKED CIGARETTES.  I VERY SPECIFICALLY ASKED HER IF SHE HAD DONE OTHER DRUGS.  SHE TOLD ME, NO.  I DID FIND OUT THROUGH OTHER SOURCES, TOMMY BASHAM, THAT HE INDEED WITNESSED, AT LEAST HE TOLD ME HE WITNESSED HER USING OTHER VARIOUS DRUGS WHEN SHE WAS PREGNANT WITH MR. BASHAM, INCLUDING WHAT HE CALLED BROWN SUGAR, WHICH IS PCP, WHICH IS A VERY DANGEROUS DRUG, COCAINE, AND SPEED.

Q.    WHY IS THAT SIGNIFICANT?

A.    WELL, IT IS VERY SIGNIFICANT BECAUSE THERE IS A WHOLE BRANCH OF MEDICINE, I WAS TELLING MR. SWERLING, CALLED EMBRYOLOGY.  WE KNOW THAT PREGNANCY IS DIVIDED INTO TRIMESTERS.  ESPECIALLY THE FIRST TRIMESTER OF PREGNANCY, THAT IS A TIME WHEN ALL OF THE ORGANS ARE DEVELOPING, YOUR HEART, YOUR BRAIN, YOUR EYES, AND THAT SORT OF THING.  SO, ANY KINDS OF DRUGS, AND SOMETIMES EVEN PRESCRIBED DRUGS, THEY CAN AFFECT THE DEVELOPMENT OF A CHILD'S BRAIN AND THAT SORT OF THING.  SO, ANY KIND OF DRUG EXPOSURE WHILE A WOMAN IS PREGNANT IS ALWAYS SOMETHING THAT NEEDS TO BE TAKEN INTO CONSIDERATION.

WE ARE LEARNING A LOT ABOUT DRUGS AND THEIR EFFECTS ON A

BABY. THE PROBLEM IN MEDICINE IS, WE CAN'T DO STUDIES ON PEOPLE. WE CAN'T TAKE MOMS THAT ARE PREGNANT AND SAY, OKAY, YOU TEN SMOKE CRACK AND YOU TEN DON'T, AND WE WILL COMPARE HOW YOUR BABIES COME OUT. SO A LOT OF WHAT WE LEARN IN MEDICINE ABOUT THE EXPOSURE OF BABIES TO DRUGS DEPENDS UPON, YOU KNOW, WHAT THE OUTCOMES ARE. BUT WE DO KNOW, FOR EXAMPLE, THAT BABIES THAT ARE EXPOSED TO COCAINE ARE INCREDIBLY HYPERACTIVE. THEY DO HAVE A HISTORY OF ATTENTION DEFICIT PROBLEMS AS THEY GROW UP. WE CLEARLY KNOW THAT NICOTINE, WHEN BABIES ARE EXPOSED TO NICOTINE IN UTERO, THAT THEY COME OUT SMALLER BIRTH SIZE, THAT IS ALSO ASSOCIATED WITH ATTENTION DEFICIT DISORDER. SO, WE KNOW WHAT SOME EFFECTS DRUGS HAVE ON THE DEVELOPING BABY.

Q. IN YOUR REVIEW OF THE MEDICAL, WE CALL IT COLLATERAL; IS THAT CORRECT? COLLATERAL, IS THAT WHAT YOU CALL IT?

A. YES.

Q. IN YOUR REVIEW OF THE COLLATERAL THAT WAS PROVIDED TO YOU IN THE CASE, WAS KATHY BASHAM'S DENIAL ABOUT DRUG USE CONSISTENT WITH WHAT YOU FOUND IN THE COLLATERAL?

A. YES. UNFORTUNATELY, I FOUND SOME INDICATIONS OF RECORDS WHERE MR. BASHAM WAS IN MEDICAL FACILITIES OR PSYCHIATRIC FACILITIES AND THEY ASKED MS. BASHAM IF SHE HAD USED DRUGS DURING PREGNANCY, AND THERE IS A RECORD THAT INDICATES THAT SHE DENIED SHE USED ANY DRUGS WHILE SHE WAS PREGNANT WITH MR. BASHAM.

Q.    DID YOU FIND HER TO BE A RELIABLE REPORTER?

A.    NO.  AND FOR LOTS OF DIFFERENT REASONS, NOT ONLY BECAUSE SHE WAS TRYING TO WITHHOLD THINGS, BUT NO, SHE WASN'T VERY RELIABLE.  MS. BASHAM ALSO HAS SEVERE MENTAL ILLNESS.

          MR. SCHOOLS:  MAY WE APPROACH, YOUR HONOR?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

          MR. SCHOOLS:  I DON'T KNOW HOW MUCH MORE OF THIS MR. SWERLING INTENDS TO DO WITH RESPECT TO THE TYPE OF TESTIMONY SHE JUST GAVE REGARDING MS. BASHAM'S DRUG USE.  WHAT SHE SAID WAS THAT MS. BASHAM, AS REPORTED BY ONE WITNESS, TO HAVE USED CERTAIN TYPES OF DRUGS.  THEN SHE EXTRAPOLATED SAYING THAT PEOPLE WHO USE CRACK COCAINE WHEN THEY ARE PREGNANT HAVE CERTAIN RISK FACTORS FOR ADHD AND THE LIKE.  FIRST OF ALL, THERE IS NO TESTIMONY THAT KATHY BASHAM USED CRACK WHILE SHE WAS PREGNANT.  SECOND OF ALL, I DON'T BELIEVE, BASED UNDER THE RULE 16 DISCLOSURE, THAT DR. SCHWARTZ-WATTS IS GOING TO OPINE THAT MR. BASHAM'S BRAIN INJURY WAS A RESULT OF HER MOTHER'S CRACK USE, IF IT EXISTED, WHILE SHE WAS PREGNANT.  I OBJECT STRENUOUSLY TO THAT KIND OF BROAD BRUSH TESTIMONY.  IT IS NOT REALLY RELEVANT UNLESS IT IS CONNECTED TO THIS DEFENDANT TO ESTABLISH SOME MEDICAL CONDITION THAT HE CURRENTLY SUFFERS.

MR. SWERLING: IT IS ALL PART OF THE PRESENTATION WE HAVE BEEN MAKING. ALL OF THE WITNESSES HAVE BEEN TESTIFYING ABOUT HER DRUG USE. THIS IS JUST DEVELOPMENTAL HISTORY. I MEAN, HIS MOTHER IS A DRUG ADDICT.

THE COURT: TESTIFYING ABOUT DRUG USE IS ONE THING, BUT DRAWING AN OPINION ON SECONDHAND ACCOUNTS OF DRUG USE IS WHAT THE GOVERNMENT OBJECTS TO, I THINK.

MR. SCHOOLS: ON MULTIPLE GROUNDS. FIRST OF ALL, WE TOLD -- WE GOT A PARAGRAPH AND A HALF THAT SAYS SHE WILL TESTIFY HE HAS DEMENTIA. NOW, ADMITTEDLY, IT SAYS SHE WILL TESTIFY ABOUT HIS SOCIAL HISTORY. I THINK THE TESTIMONY THAT INDIVIDUALS SUFFER ADHD BECAUSE THEIR PARENTS USE CRACK WHILE THEY ARE PREGNANT IS AN OPINION, IT IS NOT REFLECTED UNDER RULE 16.

SECOND OF ALL, UNLESS IT IS AN OPINION THAT SHE HAS ABOUT THIS DEFENDANT, BASED ON HER REVIEW OF THE RECORDS, IT IS IRRELEVANT. THE FACT THAT HIS MOTHER MAY HAVE USED IT, IF SHE WANTS TO REPORT THAT, I THINK IT IS CUMULATIVE BECAUSE MS. VOGELSANG HAS ALREADY TESTIFIED WITH RESPECT TO THE SOCIAL HISTORY, I THINK THAT IS WHY THEY CALLED HER. I DON'T OBJECT NECESSARILY TO IF SHE WANTS TO SAY, I TALKED TO SOMEBODY WHO SAID SHE USED CRACK WHEN SHE WAS PREGNANT. WHAT I OBJECT TO IS HER ALLUDING TO A POSSIBLE CONNECTION BETWEEN THAT AND SOME CONDITION WITH MR. BASHAM -- SHE IS GOING TO SAY MR. BASHAM HAS WITHOUT SAYING THAT IT EXISTS. YOU CAN DO AN MRI, YOU

CAN DO CAT SCANS, YOU CAN DO ALL TYPES OF THINGS.

THE COURT: I THINK THE ANSWER IS, SHE HAS TO BE ABLE TO TESTIFY TO A REASONABLE DEGREE OF MEDICAL CERTAINTY THAT SUCH-AND-SUCH A RESULT WOULD FOLLOW FROM SUCH-AND-SUCH --

MR. SCHOOLS: THAT IT DID IN THIS CASE, NOT THAT IT COULD. THE FACT THAT IT COULD IS IRRELEVANT.

MR. SWERLING: THAT IS NOT WHAT I AM ASKING. I AM NOT GOING TO ASK HER FOR AN OPINION.

MR. SCHOOLS: YOU ALREADY DID THAT.

MR. SWERLING: WELL, SHE OFFERED AN OPINION. WHAT I ASKED HER WAS, DID SHE DO A DEVELOPMENTAL HISTORY. AND PART OF THE DEVELOPMENTAL HISTORY, WHICH THE GOVERNMENT WAS PUT ON NOTICE OF, IS THE FACT THAT HIS MOTHER IS A DRUG ADDICT AND SHE STILL IS. I MEAN, SHE IS DYING.

THE COURT: THAT HAS BEEN ESTABLISHED.

MR. SCHOOLS: DIFFERENT ISSUE. DIFFERENT ISSUE FOR HER TO TESTIFY ABOUT HISTORY. TO TESTIFY THAT PEOPLE WHOSE MOTHERS USED CRACK HAVE ADHD. THAT IS AN ENTIRELY DIFFERENT ISSUE.

THE COURT: DO YOU INTEND TO GO FURTHER INTO THAT THAN WHAT YOU HAVE ALREADY SAID?

MR. SWERLING: NO, BUT I DO THINK THAT HER DRUG USE WILL RECUR FROM TIME TO TIME DURING HER TESTIMONY, AND ALSO BRANDON BASHAM'S DRUG USE.

MR. SCHOOLS: I THINK THE JURY --

**JA 1991**

MR. SWERLING:  IT IS DEVELOPMENTAL, IT IS FAMILY HISTORY.

MR. SCHOOLS:  I DON'T HAVE A PROBLEM WITH THAT.  I THINK THE JURY SHOULD BE INSTRUCTED TO DISREGARD ANY TESTIMONY THAT DR. SCHWARTZ-WATTS GAVE REGARDING A CONNECTION BETWEEN CRACK USE IN-UTERO BY THE MOTHER AND ADHD BECAUSE THERE IS NO EVIDENCE THAT THIS DEFENDANT SUFFERS FROM ADHD BECAUSE HIS MOTHER USED CRACK.

MR. SWERLING:  I DON'T THINK SHE SAID THAT.

MR. SCHOOLS:  IT IS IRRELEVANT, THAT IS MY POINT.

THE COURT:  I THINK THAT IS WITHIN HER AREA OF EXPERTISE, I AM JUST NOT SURE THAT SHE STATED IT WITH ENOUGH CERTAINTY TO BE ADMISSIBLE.

MR. SCHOOLS:  IT IS IRRELEVANT.

MR. SWERLING:  I DON'T THINK --

COURT REPORTER:  WAIT.

THE COURT:  WAIT JUST A MINUTE.  Y'ALL DON'T TALK AT THE SAME TIME.  LISTEN, I AM GOING TO OVERRULE THE OBJECTION FOR NOW.  WE WILL TAKE IT ONE QUESTION AT A TIME.  I DO HAVE SOME CONCERN,  BUT I AM GOING TO OVERRULE IT FOR NOW.

MR. SCHOOLS:  I UNDERSTAND THAT.  HERE IS THE PROBLEM WITH THE ONE QUESTION AT A TIME.  HER ANSWER WAS NOT RESPONSIVE TO HIS QUESTION.  SO,  UNLESS THE WITNESS IS INSTRUCTED NOT TO OFFER OPINIONS THAT ARE NOT REFLECTED IN THE RULE 16 DISCLOSURE, I HAVE NO WAY OF KEEPING THAT CAT FROM

GETTING OUT OF THE BAG.

THE COURT:  I UNDERSTAND.  I MIGHT HAVE TO TELL THE JURY TO DISREGARD SOMETHING IF IT IS A NONRESPONSIVE ANSWER. YOU CAN OBJECT FROM YOUR SEAT, IF YOU WANT TO.  YOU DON'T HAVE TO REQUEST A SIDEBAR.

MR. SWERLING:  DURING THE BREAK, I WILL MAKE SURE THAT THAT DOESN'T HAPPEN AGAIN BECAUSE THAT WAS NOT THE QUESTION.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT:  ALL RIGHT, YOU MAY PROCEED.

BY MR. SWERLING:

Q.  WE WERE TALKING ABOUT DEVELOPMENTAL HISTORY, DR. WATTS.  IS THERE EVIDENCE IN THE DEVELOPMENTAL HISTORY ABOUT MS. BASHAM'S ATTITUDE TOWARD PRENATAL CARE?

A.  YES.  THERE IS ONE OCCASION I REVIEWED A MEDICAL NOTE WHERE SHE WAS PREGNANT WITH MR. BASHAM AND HER OB/GYN WAS TRYING TO DISCUSS SOME ISSUES WITH HER.  HE DESCRIBED HER AS HAVING A VERY NEGATIVE ATTITUDE TOWARD PRENATAL CARE.

Q.  ANY OTHER INSTANCES THAT YOU CAN THINK OF WHERE THAT WOULD BE EVIDENT?

A.  YES.  WELL, EARLY ON, AFTER MR. BASHAM WAS BORN, I FOUND, AGAIN, IN LOOKING THROUGH HIS MEDICAL RECORDS, THAT WHEN HE WAS 14 MONTHS OF AGE, HE WAS ALREADY BEHIND IN HIS IMMUNIZATIONS.  SO, THERE IS EVIDENCE THAT SHE WASN'T KEEPING

UP WITH SOME OF THE MINOR MEDICAL CARE THAT HE NEEDED.

Q.    ALSO EVIDENCE OF ANY SUICIDE ATTEMPT OF MS. BASHAM EARLY ON IN BRANDON'S LIFE?

A.    YES, THAT IS VERY SIGNIFICANT.   WHEN MR. BASHAM WAS FOUR YEARS OF AGE,  MS. BASHAM,  KATHY BASHAM, WAS HOSPITALIZED FOR A SUICIDE ATTEMPT.   SHE HAD OVERDOSED.  I LOOKED THROUGH THOSE RECORDS, AND HER CHIEF COMPLAINT WAS, I WANT TO GET OUT OF THIS WORLD.   BUT IT WAS SIGNIFICANT FOR TWO THINGS.   NUMBER ONE,  THERE WAS A PERIOD OF TIME BEFORE THIS OVERDOSE WHERE SHE OBVIOUSLY WASN'T FEELING WELL AND WAS SICK.   THAT COULD AFFECT PARENTING ABILITIES.   MORE IMPORTANTLY, THAT WAS A PERIOD OF TIME,  MR. BASHAM, AS A SMALL CHILD, WAS SEPARATED FROM HIS MOM.   IN AND OF ITSELF, IT MAY NOT SEEM SIGNIFICANT.   OVER A PERIOD OF TIME, AS YOU LOOK AT THE THINGS GOING ON IN HIS LIFE, IT IS SIGNIFICANT.

Q.    ALSO EVIDENCE YOU FOUND IN THE RECORDS ABOUT BRANDON SUSTAINING HEAD INJURIES?

A.    DURING HIS DEVELOPMENTAL YEARS, THERE WAS A LOT OF DIFFERENT CASES WHERE THERE WERE MINOR INJURIES TO THE HEAD, SOME MORE SERIOUS IN NATURE.   HIS MOTHER, MR. BASHAM, AND SOME OF THE MEDICAL RECORDS REFLECT THAT AROUND THE AGE SOMEWHERE FIVE OR SIX, SOME OF THEM ARE CONTRADICTING,  SOME AS LATE AS SEVEN, THAT HE WAS SITTING IN A TREE.   THAT HE FELL BACKWARDS AND FELL ON A RAILROAD TIE.   THERE IS DIFFERENT REFERENCES,  SOME SAY FOUR FEET,  SAME SAY SIX FEET,  BUT HE

FELL FROM A HEIGHT, HIT HIS HEAD. HE STATES THAT, AND HIS MOTHER STATED THAT SHE SHAVED HIS HAIR AROUND THE AREA, PUT VASELINE ON IT, AND MR. BASHAM REPORTS THAT HE DID NOT LOSE CONSCIOUSNESS, BUT HE WAS DAZED AFTERWARDS. HE CERTAINLY HAD NO REAL MEMORY UNTIL HE WAS IN HIS HOME BEING TAKEN CARE OF OF THAT INCIDENT.

Q.    DR. WATTS, WAS THERE EVIDENCE THAT BRANDON HAD BEEN PHYSICALLY ABUSED AT AN EARLY AGE?

A.    YES.

Q.    NOW, I AM GOING TO SHOW YOU, ON THE SCREEN HAS POPPED UP SEVERAL EXHIBITS, 174 THROUGH 176-A, AND THEN 176-B, SHOW YOU IN SEQUENCE AND 177. WOULD YOU COMMENT ON THOSE AS THEY APPEAR ON THE SCREEN?

A.    YES. AND THE JURY HAS THAT AS WELL?

THE CLERK: NO.

THE COURT: ARE YOU ADMITTING?

MR. SWERLING: YES.

MR. SCHOOLS: NO OBJECTION TO 174.

THE COURT: ALL RIGHT. WITHOUT OBJECTION.

THE WITNESS: THIS IS A COMMONWEALTH OF KENTUCKY CABINET FOR HUMAN RESOURCES DEPARTMENT FOR SOCIAL SERVICES EVALUATION. AND THIS WOULD BE DATED 11-12-86.

BY MR. SWERLING:

Q.    AND WHAT DOES IT REFLECT?

A.    THAT THE PRINCIPAL OF MR. BASHAM'S SCHOOL, BRANDON

WOULD HAVE BEEN AGES FIVE OR SIX IT SAYS ON THERE, THAT HE TOLD HIS TEACHER THAT HE HAD BEEN WHIPPED WITH A COAT HANGER.

Q.    NEXT, 175.

A.    WOW, I DIDN'T KNOW I NEEDED GLASSES.  THIS IS ENTITLED "KATHY BASHAM,  CHILD PROTECTION INVESTIGATION."  THIS WAS CONDUCTED NOVEMBER 12TH,  1986.

Q.    WHAT DOES THAT REFLECT?

A.    BASICALLY, THAT THERE WAS A FINDING OF PHYSICAL ABUSE. AND THAT MS. BASHAM HAD ADMITTED THAT SHE WHIPPED BRANDON BASHAM WITH A COAT HANGER WHEN HE WAS FIVE YEARS OF AGE.

Q.    IS THAT EQUIVALENT OF LIKE THE DEPARTMENT OF SOCIAL SERVICES HERE?

A.    YES.  IT WOULD BE A SIMILAR AGENCY.

Q.    THIS IS 176-A.  175 WAS UP THERE.

MR. SWERLING:  YOUR HONOR, THERE IS NO OBJECTION.

THE CLERK:  MR. SCHOOLS SAID NO OBJECTION TO 174. ARE YOU OBJECTING TO THE SERIES?

MR. SCHOOLS:  I DON'T HAVE ANY OBJECTION ANYMORE.

THE COURT:  ALL RIGHT.  WITHOUT OBJECTION, WHAT ARE THE NUMBERS?

MR. SWERLING:  174 THROUGH 6-A, AND 176-B, AND 177.

BY MR. SWERLING:

Q.    THIS IS 176-B.  IS THIS THE PAGE TWO OF THAT REPORT?

A.    YES, TO THE END.  THIS REPORT IS SUBSTANTIATED, HOWEVER,  NO CPS CASE WILL BE OPEN, AT THIS TIME.  MEANING,

THAT THE SOCIALWORKER, MS. NICHOLS, WENT IN AND SHE FOUND THAT THERE WAS AN EPISODE OF PHYSICAL ABUSE.

Q.    OKAY.  177.   WHAT DOES THAT REFLECT?

A.    THIS IS THE CABINET FOR HUMAN RESOURCES, COMMONWEALTH OF KENTUCKY, DEPARTMENT FOR SOCIAL SERVICES REPORT DATED 11-12-86.   AND THE NATURE AND EXTENT OF ABUSE COMMENTS ARE, "THE SOURCE REPORTS BRANDON WAS WHIPPED BY HIS MOTHER WITH A COAT HANGER ON HIS LEGS AND BUTTOCKS."

Q.    IN ADDITION TO THAT KIND OF ABUSE, BY THE WAY, DID YOU SEE OTHER EVIDENCE OF ABUSE IN THE RECORDS THAT YOU WERE PROVIDED?

A.    OH, YES.

Q.    THIS IS AN EXAMPLE?

A.    CORRECT.  THIS WAS ONE THAT WAS ACTUALLY REPORTED AND FOUNDED, YES.

Q.    IN ADDITION TO BEING ABUSED HIMSELF, DID HE WITNESS ABUSE, FROM YOUR REVIEW OF THE RECORDS?

A.    YES, HE DID.

Q.    COULD YOU ELABORATE?

A.    YES, AT A VERY YOUNG AGE, HE WITNESSED HIS SISTER, CHARLOTTE BASHAM, AT THE TIME, BEING PHYSICALLY ABUSED BY HER MOTHER.  IT WAS AN INCIDENT, THEY WERE GOING TO SCHOOL. MS. BASHAM REPORTED THAT CHARLOTTE WAS PLAYING IN PUDDLES. SHE TOOK CHARLOTTE'S HEAD AND WAS BANGING IT AGAINST THE BRICK WALL.  HAD SCISSORS THREATENING TO CUT MS. BASHAM'S HAIR,

CHARLOTTE BASHAM'S HAIR.

Q.    IS THERE ANYTHING SIGNIFICANT GOING ON IN BRANDON'S LIFE AROUND THE AGE OF SEVEN?

A.    YES.  WELL, THERE IS LOTS OF THINGS.  HIS HISTORY IS LOADED.  THAT IS ALSO THE AGE THAT HE STARTS GETTING TREATMENT FOR ATTENTION DEFICIT DISORDER.  HE GOES TO TROVER CLINIC, AND HE IS PLACED ON MEDICATIONS, AT THAT TIME.

Q.    WHAT ARE SOME OF THE DIFFICULTIES PSYCHIATRISTS HAVE IN TREATING AND DIAGNOSING ADHD?

A.    WELL,  IT IS REALLY A PROBLEM THE YOUNGER YOU ARE.  AS YOU CAN IMAGINE, LITTLE CHILDREN, WHEN THEY ARE HAVING PROBLEMS, THEY DON'T HAVE -- THEIR BRAINS AREN'T DEVELOPED TO THE POINT WHERE THEY CAN TELL US WHAT IS WRONG WITH THEM. JUST LIKE LITTLE BABIES,  WHEN THEY ARE YOUNG, ALL THEY CAN DO IS CRY WHEN THEIR DIAPERS ARE WET OR THEY ARE HUNGRY.  WHAT HAPPENS WITH BEHAVIOR IN CHILDREN,  IT IS CALLED LATENCY-AGED CHILDREN THAT ARE DEVELOPING IS THAT THEY DON'T HAVE A LOT OF WAYS TO EXPLAIN WHEN SOMETHING IS WRONG.  SO, A LOT OF TIMES WHEN YOU SEE BEHAVIOR OF A CHILD THAT IS BEING HYPERACTIVE, RUNNING AROUND LIKE A MOTOR IS IN THE BACK OF THE HEAD, THAT CAN BE FROM DIFFERENT CAUSES.  CHILDREN THAT HAVE ANXIETY CAN PRESENT IN A VERY SIMILAR WAY.  THEY MIGHT BE VERY HYPERACTIVE.  THEY MIGHT BE COMPLAINING OF BELLYACHES, AND STOMACHACHES, AND NOT WANTING TO GO TO SCHOOL.  SO THE PROBLEM IS THE BEHAVIORS THAT YOU SEE A LOT OF TIMES AT THAT AGE, THEY

COULD BE THE RESULT FROM LOTS OF DIFFERENT THINGS. YOU KNOW, WE HAVE TO LOOK AT THE BEHAVIOR AND THEN GO BACKWARDS.

Q. DOCTOR, WAS ANYTHING, FROM THE SCHOOL RECORDS THAT YOU OBSERVED AROUND THIS TIME, THAT SHOWED THE PARENTS WERE ALREADY SPLIT UP?

A. YES. MR. BASHAM HAD AN EVALUATION THE SECOND TIME HE REPEATED FIRST GRADE. IN LOOKING AT THOSE RECORDS, THERE WAS A BRIEF HISTORY COMPLETED. AND THE PERSON CONDUCTING THAT EVALUATION NOTED THAT HIS PARENTS WERE SPLIT UP. SO, AT THIS POINT, HE HAD ALREADY WITNESSED SOME ABUSE, HE HAD BEEN ABUSED, AND HIS MOTHER HAD BEEN IN THE HOSPITAL FOR A PERIOD OF TIME, AND NOW THEY HAD SPLIT UP WHILE HE WAS ALREADY IN FIRST GRADE.

Q. SPEAKING OF HEAD INJURIES BEFORE, WAS THERE A SITUATION AROUND THIS TIME WHERE HE HIT HIMSELF OR HE GOT HIT WITH AN IRON BAR --

A. YES.

Q. -- NOT BY THE PARENTS?

A. NO. THERE WAS ANOTHER INVESTIGATION BY CHILD PROTECTIVE SERVICES BECAUSE HE WAS EVIDENTLY PLAYING WITH AN IRON BAR AND IT FELL AND HIT HIM IN THE FACE. HE HAD A BRUISED EYE, AND THAT SORT OF THING. HE WAS EVALUATED FOR IT, BUT HE DID HAVE SOME FACIAL TRAUMA.

Q. DID BRANDON WITNESS ANY DOMESTIC VIOLENCE BETWEEN HIS PARENTS?

A.    YES, HE DID.

MR. SCHOOLS:  YOUR HONOR, I WILL OBJECT TO THIS TESTIMONY AS CUMULATIVE.  WE HAVE ALREADY HAD A SOCIAL WORKER HISTORIAN TESTIFY REGARDING ALL OF THIS.  AND IF DR. SCHWARTZ-WATTS BASED HER OPINION ON IT, I THINK IT WOULD BE APPROPRIATE FOR HER TO SAY THAT SHE BASED IT ON THE SOCIAL HISTORY.  I DON'T SEE ANY VALUE IN GOING THROUGH ALL OF THIS FROM THE TIME HE WAS SEVEN UNTIL THE TIME HE WAS 22 AGAIN.

THE COURT:  MR. SWERLING,  IT IS -- THE JURY HAS HEARD A LOT OF TESTIMONY.

MR. SWERLING:  YES, SIR.  I AM TRYING TO HIGHLIGHT SOME OF THE THINGS THAT WERE IMPORTANT TO DR. WATTS.

THE COURT:  I WILL LET YOU HIGHLIGHT.  AS LONG AS YOU JUST HIGHLIGHT AND YOU WON'T BE CUMULATIVE.

BY MR. SWERLING:

Q.    DID HE WITNESS ABUSE?

A.    YES.

MR. SWERLING:  I WILL OFFER EXHIBIT 209.  IS THERE ANY OBJECTION?

MR. SCHOOLS:  YOUR HONOR,  I HATE TO BE DIFFICULT, BUT MAYBE IF WE COULD BREAK.

THE COURT:  LET'S DO THAT.  LET'S BREAK FOR LUNCH, AT THIS TIME.  MEMBERS OF THE JURY, I WILL ASK YOU TO BE BACK AT 2:00 O'CLOCK.  DON'T DISCUSS THE CASE.  HAVE A NICE LUNCH. WE WILL SEE YOU AT 2 P.M.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT:   I WOULD LIKE TO ASK THE PARTIES TO COME BACK TEN MINUTES TO TWO.  IF WE CAN COME BACK TEN MINUTES EARLY AND TAKE UP THESE EVIDENTIARY MATTERS THAT I HAVE TAKEN UNDER ADVISEMENT.  I GUESS PRIMARILY IS THE QUESTION ABOUT HER OPINION SHE MIGHT RENDER ON MR. FULKS IN SOME RESPECT.  I DON'T KNOW WHAT THAT MIGHT BE, BUT I DO THINK WE NEED TO TALK ABOUT THAT.  AND THEN MAYBE ANYTHING SHE MIGHT HAVE DONE TO RELY ON DR. BRANNON'S REPORT, I DON'T KNOW.

LET'S COME BACK AT TEN MINUTES TO TWO TO TAKE THOSE UP.  I WILL HEAR FROM COUNSEL THEN.

MS. FLOYD JUST SUGGESTED YOU TRY TO AGREE ON EXHIBITS, IF YOU CAN.   TELL US WHICH ONES COME IN WITHOUT OBJECTION.

MR. SCHOOLS:  I CAN DO THAT.   I HAD BEEN THROUGH ALL OF THESE BEFORE, AND I LEFT THE LIST AT MY OFFICE.  I APOLOGIZE.  IT IS MY FAULT.

THE COURT:  WE WILL BE IN RECESS THEN UNTIL 1:50.

(WHEREUPON, A LUNCH RECESS WAS HELD.)

THE COURT:   ALL RIGHT.   MR. SWERLING, AT THE SIDEBAR WHILE DR. SCHWARTZ-WATTS WAS ON THE STAND, SHE WAS ALLOWED TO TESTIFY THAT SHE ATTEMPTED TO INTERVIEW THE CODEFENDANT MR. FULKS.   THE FULKS DEFENSE ATTORNEYS REFUSED TO LET HER INTERVIEW HIM.   AND THEN YOU SEEMED TO INDICATE THAT THERE WAS GOING TO BE SOME MORE TESTIMONY FORTHCOMING

ABOUT MR. FULKS IN SOME RESPECTS FROM THAT WITNESS. I GUESS MR. SCHOOLS'S OBJECTION WAS ON RELEVANCY GROUNDS. SO, HOW IS THAT TESTIMONY RELEVANT?

MR. SWERLING: JUDGE, SHE IS GOING TO SAY THAT BRANDON BASHAM, BECAUSE OF HIS INTELLECTUAL CAPABILITY AND HIS DEPENDENCY ON OTHER PEOPLE, WOULD NORMALLY -- OR CHAD FULKS WITH HIS PERSONALITY AND HIS BACKGROUND, THAT SHE HAS BEEN ABLE TO GLEAN FROM THE RECORDS, AS FAR AS INTELLECTUAL FUNCTIONING AND PERSONALITY, IS THE TYPE OF PERSON THAT BRANDON BASHAM WOULD BOND WITH. AND THAT HISTORICALLY HE HAS BEEN THE TYPE OF PERSON HE HAS BONDED WITH. NOT GOING INTO ANY OF CHAD FULKS'S CONDUCT, BUT IT DOES --

THE COURT: I WONDER -- I THOUGHT IT WAS A CARDINAL PRINCIPLE OF PSYCHOLOGY -- PSYCHIATRY, RATHER, THAT YOU HAD TO ACTUALLY EXAMINE SOMEONE YOURSELF PERSONALLY BEFORE YOU COULD OPINE ON THEIR CONDITION OR MENTAL STATUS.

MR. SWERLING: SHE HAS REVIEWED A LOT OF RECORDS.

THE COURT: I KNOW. BUT SHE DIDN'T INTERVIEW HIM PERSONALLY. I THINK THAT HAS COME UP IN SOME OTHER TRIALS I HAVE HAD WHERE SOMEONE ATTEMPTS TO PSYCHOANALYZE SOMEONE THEY HAVE NEVER MET. I THINK MOST MEDICAL PROFESSIONALS SAY THAT IT IS AN INVALID ANALYSIS IF YOU HAVEN'T PERSONALLY SPOKEN TO THE PERSON AND INTERVIEWED THEM. I MAY BE WRONG. MAYBE YOU CAN CONVINCE ME, BUT I AM A LITTLE BIT CONCERNED ABOUT THAT.

MR. SWERLING: MAYBE IF WE ASK DR. WATTS.

THE COURT: MR. SCHOOLS, WHAT IS THE GOVERNMENT'S POSITION?

MR. SCHOOLS: YOUR HONOR, MAY I HAVE ONE MINUTE TO READ WHAT MR. SWERLING SAID?

THE COURT: ALL RIGHT.

MR. SCHOOLS: I DON'T KNOW THAT I OBJECT TO IT. I DO THINK THAT IF WE ARE GOING DOWN THAT PATH, I WANT TO BE UPFRONT, THAT I THINK IF THAT QUESTION IS ASKED, THEN IT OPENS UP A PANDORA'S BOX IN A LOT OF WAYS. FOR EXAMPLE, DID DR. SCHWARTZ-WATTS REVIEW CHAD FULKS'S STATEMENTS? SHE INDICATED SHE TRIED TO TALK TO HIM, BUT MR. FULKS MADE STATEMENTS CONCERNING THESE EVENTS, AND THEY WERE PROVIDED TO DEFENSE COUNSEL. IT OPENS UP A QUESTION WHETHER SHE REVIEWED THE MEDICAL TESTIMONY FROM MR. FULKS'S TRIAL. WAS SHE AWARE THAT MR. FULKS TESTIFIED OR AN EXPERT TESTIFIED THAT HIS IQ WAS 75, I BELIEVE IT WAS. THAT HE HAD FETAL ALCOHOL SYNDROME, THAT HIS PARENTS SMOKED MARIJUANA IN THE HOUSE.

THE COURT: RIGHT. WELL, I CERTAINLY THINK IT WOULD OPEN UP THAT TYPE OF CROSS-EXAMINATION.

MR. SCHOOLS: APART FROM THAT, I DON'T NECESSARILY OBJECT TO HIM GOING THERE. IF WE ARE GOING THERE, THAT IS WHERE IT IS GOING.

THE COURT: WELL, I THINK IT IS PROPER THEN. I WILL ALLOW IT. I WILL ALLOW THE CROSS-EXAMINATION.

ALL RIGHT. WHAT ELSE CAN WE DISCUSS WHILE THE JURY IS NOT

HERE? SOME ISSUE ABOUT DR. SCHWARTZ-WATTS HAVING ACCESS TO THE REPORT RENDERED BY DR. BRANNON.  I'M NOT SURE IT IS AN ISSUE, BUT I THOUGHT WE LEFT THAT KIND OF UP IN THE AIR.

MR. SCHOOLS:  MR. HARRIS HAS PROVIDED ME THAT REPORT THIS MORNING.

THE COURT:  ALL RIGHT.

MR. SCHOOLS:  THE OTHER ISSUE WE TALKED ABOUT, JUDGE, AT SIDEBAR WAS WITH RESPECT TO OPINIONS THAT DR. SCHWARTZ-WATTS WAS OFFERING, GENERALLY, ABOUT THE IMPACT OF CERTAIN THINGS ON PEOPLE,  SPECIFICALLY WITH RESPECT TO CRACK USE OR DRUG USE IN UTERO WHEN SHE IS NOT GOING TO OFFER THAT OPINION THAT MR. BASHAM'S CONDITIONS ARE CAUSED BY THAT. MAYBE SHE WILL SAY THAT,  I DON'T KNOW.  BUT IF SHE IS NOT GOING TO SAY THAT,  I THINK ANY GENERAL OPINION LIKE THAT IS IRRELEVANT.

MR. SWERLING:  JUDGE, PART OF HER DIAGNOSIS, AS THE GOVERNMENT KNOWS, IS DEMENTIA.  SHE IS GOING TO TESTIFY THAT ANY OF THE CONDITIONS THAT SHE FOUND, WHICH HAVE BEEN DISCLOSED TO THE GOVERNMENT,  IT IS IMPORTANT TO ASSESS WHAT THE MOTHER HAS HAD,  WHAT SHE HAS INGESTED, WHAT KIND OF DRUGS SHE HAD DURING THE PREGNANCY.

THE COURT:  I THINK IT IS A PROPER AREA OF INQUIRY, BUT IT JUST HAS TO BE WITH SOME DEGREE OF CERTAINTY, YOU KNOW, MEDICAL CERTAINTY THAT IT IS AN OPINION.  I WILL OVERRULE THE OBJECTION.  AS I SAID EARLIER, WE WILL HAVE TO TAKE IT A

QUESTION AT A TIME.

ALL RIGHT.   ANYTHING ELSE?

MR. SCHOOLS:  YOUR HONOR, I DON'T KNOW  -- I DON'T KNOW ALL OF WHAT MR. SWERLING INTENDS TO ELICIT FROM DR. SCHWARTZ-WATTS.  I AM CONCERNED ABOUT THE ULTIMATE QUESTION ISSUE.  I THINK THE ISSUE OF RELATIVE CULPABILITY IS AN ULTIMATE ISSUE QUESTION IN THIS CASE FOR THE JURY TO RESOLVE, AND IT WOULD BE A MITIGATING FACTOR.  WHAT MR. SWERLING SAID WAS THAT MR. FULKS WAS THE KIND OF PERSON THAT BRANDON BASHAM WOULD BOND WITH, BASED ON THE DOCUMENTS SHE HAD REVIEWED.  I DON'T REALLY THINK THAT IS AN ULTIMATE ISSUE ANSWER.  BUT IF HE WERE TO ASK HER --

THE COURT:   WHO WAS THE LEADER AND WHO WAS THE FOLLOWER?

MR. SCHOOLS:  YES, SIR.

THE COURT:   I THINK THAT MIGHT BE GOING A LITTLE TOO FAR, MR. SWERLING, IF YOU TRY TO GO THAT FAR.

MR. SWERLING:  I UNDERSTAND.

THE COURT:   CERTAINLY THAT SHE CAN TALK ABOUT BONDING GENERALLY AND THEIR RELATIONSHIP.

MR. SWERLING:  IT IS BASICALLY HIS SUSCEPTIBILITY, THAT IS THE PURPOSE OF THE INQUIRY.

THE COURT:   NOW THAT WE HAVE THIS TIME, WHAT DOES OUR SCHEDULE LOOK LIKE NOW? YOU PREDICTED YESTERDAY THAT THIS WITNESS WOULD BE ON THE STAND A FULL DAY.  IF THAT IS TRUE,

YOU WOULD FINISH TOMORROW AT LUNCHTIME, RIGHT? YOU WILL BE FINISHED TOMORROW MIDMORNING.

MR. SWERLING: I WILL FINISH BEFORE THAT. AND THEN WHAT I ANTICIPATE, THE GOVERNMENT WOULD TAKE THE REST OF THE DAY. THAT IS WHY I THOUGHT WE COULD PROBABLY --

THE COURT: IS IT POSSIBLE YOU COULD GET YOUR CASE UP TOMORROW?

MR. SCHOOLS: YES. FROM OUR PERSPECTIVE, YES. IT WOULD SOMEWHAT BE DEPENDENT ON THE LENGTH OF THE CROSS-EXAMINATION OF DR. CAPEHART.

THE COURT: ALL RIGHT. LET'S JUST MOVE AHEAD. BUT LIKE I SAID YESTERDAY, WE MAY WELL BE IN A SITUATION WHERE WE HAVE TO COME BACK MONDAY TO FINISH UP A COUPLE OF HOURS OF TESTIMONY. IF THAT HAPPENS, I THINK YOU NEED TO BE PREPARED TO MOVE ON INTO ARGUMENT AND CHARGE THAT DAY, RATHER THAN COME BACK TUESDAY AND START FRESH. I THINK THE JURY WOULD EXPECT THAT, I REALLY DO.

ALL RIGHT. ANYTHING FURTHER?

MR. SWERLING: JUDGE, I AM WAITING FOR MY --

THE COURT: COCOUNSEL?

MR. SWERLING: WELL, NOT MY COCOUNSEL, MY MITIGATION PERSON. SHE HAS GOT MY COMPUTER, GOT MY NOTES, AND HOPEFULLY SHE HAS NOT BEEN ABDUCTED.

THE COURT: ALL RIGHT.

MR. SWERLING: READY, YOUR HONOR.

THE COURT:   ALL RIGHT.  BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

BY MR. SWERLING:

Q.   DR. WATTS,  I AM GOING TO JUST ASK YOU ABOUT THIS INCIDENT WITHOUT PUTTING UP AN EXHIBIT.   WAS THERE ANY EVIDENCE -- I THINK I ASKED YOU WHETHER OR NOT BRANDON HAD WITNESSED ANY DOMESTIC VIOLENCE AND HAD ACTUALLY GOTTEN HURT HIMSELF DURING THAT DOMESTIC VIOLENCE?

A.   YES.

Q.   CAN YOU TELL US ABOUT THAT?

A.   YES.   THERE WAS A REPORT TO THE CHILD PROTECTIVE SERVICES THAT MR. AND MRS. BASHAM HAD BEEN IN A PHYSICAL ALTERCATION.  AND THAT WHEN MR. BRANDON BASHAM WAS A SMALLER CHILD, HE ATTEMPTED TO GET IN BETWEEN THEM AND HE WAS KICKED IN THE STOMACH BY MR. BASHAM DURING THAT ALTERCATION.

Q.   AT THIS PERIOD OF TIME, THERE WERE ALSO SOME INDICATIONS THAT HE HAD TAKEN SOME FALLS AND ACTUALLY HAD SOME HEAD INJURIES,  AS WELL, WHICH ARE IMPORTANT TO YOU IN YOUR ASSESSMENT?

A.   YES.   WE HAD TALKED ABOUT THAT.  JUST THE ONE THAT THERE IS QUESTIONABLE HOW SEVERE IT WAS,  BUT THERE WAS DEFINITELY THE ONE REPORT VERIFIED BY FATHER,  MOTHER,  MR. BASHAM, AND SOME MEDICAL RECORDS THAT HE HAD TAKEN A FALL, BETWEEN FOUR TO SIX FEET OUT OF A TREE,  HEAD HIT A RAILROAD

TIE. AND THEN THERE WERE JUST MINOR ONES. THERE WAS AN EPISODE WHERE HE FELL OFF OF HIS BIKE AND GOT STITCHES IN HIS CHIN; THE IRON BAR HIT HIM IN THE FACE; SO, SOME MINOR FACIAL TRAUMAS.

Q. WERE THERE ALSO, AT THIS STAGE OF DEVELOPMENT, WAS THERE EVIDENCE OF SEXUAL ABUSE COMMITTED ON MR. BASHAM?

A. YES.

Q. COULD YOU RELATE THAT TO THE JURY, AS FAR AS IT WAS IMPORTANT TO YOU IN YOUR ULTIMATE DIAGNOSIS?

A. YES. WE KNOW JUST THROUGH REVIEWING A LOT OF THE PSYCHIATRIC RECORDS, THERE HAVE BEEN VARIOUS REPORTS, SOME OF THEM ARE NOT ALWAYS CONSISTENT WHEN LOOKING THROUGHOUT THE RECORDS, BUT THERE IS CLEARLY A REPORT THAT AROUND THE TIME MR. BASHAM WAS LATENCY AGE, MEANING LIKE FROM AGES 8 TO 12, WHEN YOU ARE IN ELEMENTARY SCHOOL YEARS, THAT HE REPORTED THAT THERE WAS A HOMELESS MAN THAT WAS TAKEN IN BY HIS FATHER. AND LATER THE RECORDS REFLECT THE MAN'S NAME WAS J. R. MR. BASHAM REPORTED THAT HE WAS SODOMIZED BY THIS MAN.

Q. I WILL SHOW YOU AN EXHIBIT 211-D. I WILL SHOW YOU AN EXHIBIT, WE WILL JUST MOVE FORWARD, 211-D AND 211-E.

MR. SWERLING: YOUR HONOR, I WILL JUST DO IT THIS WAY. I THINK THESE ARE WITHOUT OBJECTION.

MR. SCHOOLS: THAT'S CORRECT, YOUR HONOR.

THE COURT: WITHOUT OBJECTION.

BY MR. SWERLING:

Q.    DOCTOR, LOOKING AT 211-D, CAN YOU IDENTIFY THAT DOCUMENT?

A.    YES.  THIS IS ANOTHER COMMONWEALTH DEPARTMENT OF SOCIAL SERVICES REPORT FOR SUSPECTED ABUSE OR NEGLECT.

Q.    WHO WAS THE PERPETRATOR IN THAT SITUATION?

A.    THIS IS ACTUALLY ANOTHER CASE.  THIS IS -- THE PERPETRATOR IN THIS CASE IS ROY GROVES.

Q.    DO YOU KNOW WHAT HAPPENED TO MR. GROVES LATER ON?

A.    YES.

Q.    WHAT HAPPENED TO HIM?

A.    IN THIS INCIDENT, MR. GROVES ALLEGEDLY PINCHED MR. BASHAM'S GENITALS.  THIS REPORT WAS IN RESPONSE TO THAT.  IT WAS LATER LEARNED THAT MR. GROVES WAS CONVICTED FOR MOLESTING MULTIPLE CHILDREN.

Q.    WHAT I HAD REFERRED TO BEFORE AS 211, YOU WERE REFERRING TO THE OTHER SITUATION, LET ME SHOW YOU THIS.  SEE IF THAT IS THE SITUATION YOU WERE TALKING ABOUT COMPLAINING OF SEXUAL ABUSE AT THE AGE OF TEN.

A.    YES.  THIS IS ANOTHER REPORT OF THE CHILD PROTECTIVE INVESTIGATION.  THIS IS THE ACTUAL INVESTIGATION.  AND THE SOURCE REPORTS THAT IT STATES:

        "BRANDON STATED THAT ROY GROVES

        PINCHED HIS PENIS THROUGH HIS

        CLOTHING WHILE HE WAS VISITING HIS

        HOME."

AT THAT TIME, THE CHILD PROTECTIVE SERVICES OPINION WAS, THE REPORT OF SEXUAL ABUSE COULD NOT BE SUBSTANTIATED. THEY WERE UNABLE TO LOCATE MR. GROVES.

Q.    MR. GROVES WAS CONVICTED ON AN UNRELATED ACT LATER ON AND WENT TO PRISON?

A.    YES.

Q.    NOW, DURING THIS PERIOD OF TIME, DID YOU FIND EVIDENCE THAT MOM AND DAD WERE HAVING MARITAL DIFFICULTIES AND WERE SEPARATING FROM TIME TO TIME?

A.    SAME THING. THEIR RELATIONSHIP IS BEST CHARACTERIZED AS ON AGAIN, OFF AGAIN. THERE WERE PERIODS WHILE MR. BASHAM, IN THE FIRST 12 YEARS OF HIS LIFE, WHERE THEY WERE CLEARLY ON AND OFF.

Q.    DID YOU FIND EVIDENCE THAT MR. BASHAM -- I WILL SHOW YOU EXHIBIT 98-A AND B. THIS DOCUMENT HERE IS A TWO-PAGE DOCUMENT. WHAT DOES THIS SIGNIFY?

A.    THIS IS ANOTHER INVESTIGATION BY CPS. THIS ONE IS OF MR. JIMMY BASHAM.

Q.    WHAT DOES IT INDICATE?

A.    IT INDICATES THAT MR. BRANDON BASHAM -- THERE WAS A CONCERN THAT HE WAS OUT RIDING HIS BIKE AT LATE HOURS OF THE NIGHT FAR AWAY FROM HOME. AND THAT HE WAS BEING RAISED BY A CARETAKER NAMED JIM HILL.

Q.    WHO IS JIMMY HILL?

A.    HE WAS A NEIGHBOR.

Q.   DID YOU FIND OUT ANYTHING ABOUT JIMMY HILL, WOULD YOU TELL THE JURY?

A.   YES.  AT THE TIME, BRANDON BASHAM WAS 11, MR. HILL WOULD HAVE BEEN ABOUT 20.  HE WAS DESCRIBED IN THESE PAPERS AS MENTALLY HANDICAPPED, MR. HILL WAS.

Q.   MR. BASHAM, AT THAT AGE, WAS BEING TAKEN CARE OF BY SOMEONE WHO IS MENTALLY HANDICAPPED?

A.   YES.

Q.   THAT WAS ALSO REPORTED TO THE CABINET, DEPARTMENT OF SOCIAL SERVICES; IS THAT CORRECT?

A.   YES.

Q.   AND WAS THAT FOUNDED? WAS THAT SUBSTANTIATED THAT HE WAS WITH MR. HILL?

A.   YES.

Q.   AND WITH THE PARENT'S PERMISSION?

A.   CORRECT.

Q.   IN LOOKING AT HIS DEVELOPMENTAL HISTORY, DID YOU FIND EVIDENCE THAT, AT THIS AGE, BRANDON BASHAM HAD ALREADY BEEN TAKING DRUGS, CERTAIN DRUGS, COULD YOU EXPLAIN THAT TO THE JURY?

A.   YES.  LATER ON, WHEN DISCUSSING THE PSYCHIATRIC HISTORY, AT THE AGE OF TEN, HE WAS PLACED IN THE RIVENDELL INPATIENT TREATMENT CENTER.  IN THOSE REPORTS, IT VERIFIES THAT MR. BASHAM AND HIS SISTER, CHARLOTTE, HAD BEEN HUFFING GAS.  HE WOULD HAVE BEEN TEN YEARS OF AGE AT THE TIME.  SO

THERE WAS CLEARLY ALREADY REPORTS HE WAS INHALING SUBSTANCES.

Q.    WHAT IS THE SIGNIFICANCE OF HUFFING GAS? WHAT DOES THAT TELL YOU?

A.    INHALANTS IS PROBABLY ONE OF THE WORST DRUGS YOU CAN DO BECAUSE THEY CAUSE BRAIN DAMAGE.   THEY ARE ASSOCIATED WITH LOTS OF BRAIN INJURY.  THE OTHER PROBLEM IS INHALANTS ARE LEGAL, SO YOU CAN PURCHASE THEM QUITE EASILY AND THEY ARE READILY AVAILABLE.   IT IS A FREQUENT DRUG ABUSE BY YOUNGER CHILDREN BECAUSE PEOPLE HAVE LAWN MOWERS,  YOU HAVE ACCESS TO PAINT CANS,  HAVE SPRAY PAINT, AND THOSE SORTS OF THINGS.   IT IS COMMONLY ABUSED IF A CHILD THAT AGE IS GOING TO USE DRUGS. IT IS A SERIOUS DRUG,  THOUGH.

Q.    DID YOU FIND EVIDENCE HE HAD ALSO, IN THESE MASSIVE RECORDS,  DID YOU FIND OUT HE HAD ALSO BEEN TAKING OTHER DRUGS BY THIS AGE?

A.    YES. MARIJUANA, DRINKING,  YES,  MANY,  MANY DIFFERENT DRUGS,  LSD,  I BELIEVE.   HE HAD ALREADY BEGUN EXPERIMENTING WITH A NUMBER OF DRUGS BY THIS AGE.

Q.    OKAY.   DID YOU STOP THE DEVELOPMENTAL HISTORY AT A CERTAIN AGE?

A.    YES.

Q.    WHAT AGE IS THAT?

A.    TWELVE.

Q.    WHY IS THAT?

A.    WELL, THAT IS THE END OF LATENCY AGE.  THIS WAS

PROBABLY MORE OF MY PERSONAL EXPERIENCE, WHEN YOU ARE AN ADOLESCENT, ANYTHING GOES. YOU ARE GETTING HORMONES, YOU ARE TRYING TO GROW UP, SO THAT IS A TUMULTUOUS TIME ANYWAY. BUT USUALLY, THE FIRST 12 YEARS OF YOUR LIFE, YOUR BRAIN IS DEVELOPING, YOU ARE LEARNING SOCIALIZATION, THOSE SORTS OF THINGS. SO, I STOPPED BECAUSE THAT IS THE END OF LATENCY AGE.

Q. DR. WATTS, WHAT AFFECT ON THE DEVELOPMENT OF A CHILD DOES THE MARIJUANA, AND NICOTINE, AND OTHER DRUGS HE WAS TAKING HAVE?

A. THAT MR. BASHAM WAS USING?

Q. YES.

A. WELL, NICOTINE AND MARIJUANA, ALL OF THOSE DRUGS CERTAINLY ARE GOING TO AFFECT HOW YOU DO IN SCHOOL. THEY WILL AFFECT YOUR ABILITY TO GET ALONG WITH OTHER PEOPLE, AND THEY ARE AFFECTING YOUR BRAIN WHILE IT IS DEVELOPING.

Q. WHAT KIND OF AFFECT DOES REPEATED TRAUMA AND ADHD HAVE ON DEVELOPMENT?

A. THOSE WERE A LITTLE BIT MORE WORRISOME. WHEN YOU LOOK AT DEVELOPMENTAL HISTORY, YOU ARE LOOKING AT THE PERSON'S BRAIN, WHAT IS GOING ON WITH THEIR BRAIN DURING THE FIRST 12 YEARS OF LIFE. YOU ARE LOOKING AT THEIR EMOTIONS. YOU ARE LOOKING AT THEIR ABILITY TO SOCIALIZE WITH OTHERS. THE ATTENTION DEFICIT DISORDER AND SOME OF THE OTHER THINGS, THEY AFFECT HIS BRAIN DEVELOPMENT. THE TOOLS THAT HE WILL BE ABLE TO USE TO THINK AND INTERACT IN SOCIETY. SO, IT IS VERY

IMPORTANT.

Q. WHAT EVIDENCE OR WHAT EFFECTS DOES ABUSE TO ONE -- TO A PERSON AND WITNESSING ABUSE HAVE ON DEVELOPMENT?

A. A NUMBER OF THINGS. IF YOU TAKE CHILDREN THAT HAVE BEEN SEXUALLY ABUSED, THERE IS ALL KINDS OF SEQUELLA THAT GO WITH THAT. BUT IN THE LONG TERM, IT AFFECTS YOUR ABILITY IN RELATIONSHIPS. IT AFFECTS YOUR ABILITY TO TRUST. THAT IS EMOTIONAL DAMAGE THAT HE WILL BE AFFECTED WITH AROUND THAT PERIOD OF TIME, THAT ALSO CARRIES INTO ADULTHOOD.

Q. HOW WOULD YOU CHARACTERIZE HIS DEVELOPMENTAL HISTORY, AFTER ASSESSING ALL OF THE INFORMATION AND MATERIAL YOU SAW IN THE COLLATERAL?

A. IN MY OPINION, IT IS ONE OF THE WORST DEVELOPMENTAL HISTORIES I HAVE SEEN. AND NOT BECAUSE ANY ONE THING IS SO BAD, IT IS JUST THE FREQUENCY AND HOW MANY DIFFERENT THINGS ARE GOING ON WITH HIM DURING THOSE FIRST FEW YEARS OF LIFE. HE HAS SEPARATIONS FROM HIS MOTHER, HE HAS A MENTALLY ILL MOTHER, HE HAS SURGERY, HE HAS MINOR HEAD INJURIES, HE HAS ATTENTION DEFICIT DISORDER, HE IS USING DRUGS, HE IS WITNESSING ABUSE, IT IS JUST A NUMBER OF THINGS THAT ARE GOING ON. ALMOST EVERY YEAR, IF YOU LOOK AT HIS FIRST FEW YEARS, THERE IS SOMETHING MAJOR THAT HAPPENED -- IF ONE OF THOSE THINGS HAPPENED TO A CHILD, YOU WOULD EXPECT SOME SEQUELLA FROM THAT. SO, IT IS JUST THE AMOUNT OF THEM AND THE FREQUENCY OF THEM. NOT THAT ANY ONE THING, THE SEXUAL

**JA 2014**

ABUSE IS CERTAINLY HORRIBLE, BUT IF YOU TAKE ALL OF THOSE THINGS IN COMBINATION, THEY ARE ALL VERY SIGNIFICANT.

Q. THIS IS ONE PART OF YOUR ASSESSMENT; IS THAT CORRECT?

A. CORRECT.

Q. DOES ANYONE HAVE ANY CONTROL OVER THEIR DEVELOPMENTAL HISTORY BETWEEN BIRTH AND 12 YEARS OF AGE?

A. NO. HE CAN'T CONTROL HOW HIS PARENTS RAISED HIM. HE CAN'T CONTROL, YOU KNOW, THE GENETICS THAT HE WAS BORN WITH. HE CAN'T CONTROL HIS MOTHER'S BEHAVIOR IN THE WOMB, AND THOSE SORTS OF THINGS. AS HE GETS OLDER, HE HAS SOME CAPACITY TO MAKE CHOICES, BUT NOT WHILE HIS BRAIN IS DEVELOPING. HE DOESN'T HAVE THE EQUIPMENT OR TOOLS TO BE ABLE TO ACCEPT RESPONSIBILITY FOR THAT.

Q. NOW, YOU ALSO DEVELOPED A FAMILY HISTORY AS PART OF YOUR ASSESSMENT; IS THAT CORRECT?

A. YES.

Q. WHAT IS THE SIGNIFICANCE OF THE FAMILY HISTORY, ESPECIALLY IN AN EVALUATION LIKE YOU ARE DOING?

A. WELL, FAMILY HISTORY IS REALLY IMPORTANT JUST LIKE IT IS IN MEDICINE. IF YOU HAVE A HISTORY OF HEART DISEASE, AND HIGH CHOLESTEROL, AND HIGH BLOOD PRESSURE, AND YOU ARE SMOKING, THAT FAMILY HISTORY IS REALLY GOING TO COME INTO PLAY IN TERMS OF DETERMINING YOUR RISK FOR A HEART ATTACK. SO, IN PSYCHIATRY, WE DO THE SAME THING. IF YOU HAVE A CERTAIN -- A FAMILY HISTORY OF CERTAIN MENTAL ILLNESSES, WE KNOW THAT THEY

HAVE A GENETIC COMPONENT TO THEM. SO, IT IS IMPORTANT TO KNOW WHAT WAS GOING ON THROUGH MR. BASHAM'S MOM'S SIDE OF THE FAMILY AND HIS FATHER'S SIDE, SO THAT WE CAN DETERMINE WHAT INFLUENCES GENETICALLY HE WOULD HAVE.

Q.    LET ME ASK YOU THIS. IF SOMEONE HAS A HISTORY OF MENTAL ILLNESS IN THEIR FAMILY, ARE THEY PREDISPOSED TO GENETICALLY BE AFFECTED BY THAT ILLNESS, AS WELL?

A.    YES, THEY ARE.

Q.    WE KNOW THAT TODAY?

A.    YES, WE DO. WE ARE REALLY GOOD WITH SOME ILLNESSES. FOR EXAMPLE, IF YOU HAVE BIPOLAR DISORDER, AND YOU COME FROM THE AMISH POPULATION, WE KNOW IT IS CHROMOSOME ELEVEN. WE ARE MAKING A LOT OF ADVANCES IN PSYCHIATRY. WE ARE LEARNING A LOT ABOUT WHAT IS GENETIC AND WHAT COMES FROM THE ENVIRONMENT. SO, THERE ARE MANY ILLNESSES THAT THEY CLEARLY HAVE A GENETIC COMPONENT TO THEM. MAJOR DEPRESSION IS DEFINITELY HEREDITARY, IN A SENSE. PANIC DISORDER, SOME OF THE ANXIETY DISORDERS RUN IN FAMILIES. EVEN ATTENTION DEFICIT, THERE ARE STUDIES THAT INDICATE THAT SIBLINGS, BROTHERS AND SISTERS, HAVE A HIGHER RATE OF ATTENTION DEFICIT IF ONE OF THE OTHER CHILDREN DOES. AND, CLEARLY, ALSO WITH THOUGHT DISORDERS. THOSE ARE CALLED PSYCHOSIS, WHERE YOU HAVE PROBLEMS WITH THE CONTENT OF YOUR THOUGHTS. THOSE WERE ALSO, THERE IS AN INHERITED COMPONENT.

Q.    DID YOU REVIEW KATHY BASHAM'S MEDICAL RECORD?

A.    YES.

Q.    THEY WERE MADE AVAILABLE TO YOU?

A.    YES.

Q.    WOULD YOU TELL THE JURY WHAT WAS SIGNIFICANT ABOUT HER MEDICAL RECORDS INSOFAR AS YOUR ASSESSMENT IS CONCERNED?

A.    MS. BASHAM HAS A VERY LONG HISTORY OF TREATMENT FOR A PSYCHOTIC ILLNESS.   HER DIAGNOSIS OVER THE YEARS HAS BEEN MAJOR DEPRESSION WITH PSYCHOTIC FEATURES.   WHAT THAT MEANS IS THAT SHE HAS A DEPRESSION SO BAD THAT ONE OF THE COMPLICATIONS FROM A DEPRESSION IS YOU HEAR THINGS OR YOU BELIEVE THINGS THAT AREN'T TRUE.   AND HER RECORDS CLEARLY IDENTIFY THAT SHE HAS A FIXED-FALSE BELIEF AT TIMES THAT HER FOOD IS POISONED. AND THE RECORDS REFLECT THAT SHE HEARS VOICES THAT TELL HER NOT TO EAT.   SO, THERE HAVE BEEN PERIODS WHERE SHE HAS --

      MR. SCHOOLS:  YOUR HONOR, I HATE TO INTERRUPT.   I THINK IT WOULD BE ENLIGHTENING FOR DR. SCHWARTZ-WATTS, WHILE SHE IS TESTIFYING, TO TESTIFY ABOUT WHEN THIS DEVELOPED AND WHEN SHE HAD IT.

      THE COURT:   I THINK THAT IS A REASONABLE REQUEST.

BY MR. SWERLING:

Q.    LAY A FOUNDATION.   WHAT DID YOU LOOK AT?   WHAT THE HISTORY WAS FOR THE PERIODS OF TIME.

A.    SHE HAD RECORDS, I BELIEVE IT WAS EITHER FROM, I'M SORRY, MR. SCHOOLS,  IT IS PENNYROYAL OR TROVER CLINIC, AND THEY WERE AROUND 1990.   THESE WERE EARLIER ON RECORDS FROM

MENTAL HEALTH WHERE SHE WAS TREATED BY VARIOUS PSYCHIATRISTS, INCLUDING A DR. SADIQ AND, I BELIEVE, A DR. PASQUIN.

Q.    GO AHEAD.

A.    WELL, IT IS CLEAR THAT SHE HAD A HISTORY OF HEARING VOICES IN THE PAST, AND SHE HAD SOME STRANGE IDEAS WHEN SHE WAS SICK ABOUT HER FOOD. AND SHE CLEARLY RELATES THE HISTORY, AND SHE HAS TO ME, AS WELL, THAT SHE HAS HEARD THOSE VOICES UP TO A YEAR AGO. THAT SHE HAS EVEN HAD HALLUCINATIONS PERSISTING WELL INTO HER MIDLIFE. AND THAT SHE HAS BEEN ON MEDICATIONS FOR THOSE VOICES, AS WELL.

Q.    DO YOU KNOW WHAT PARTICULAR DIAGNOSIS SHE CARRIED AT VARIOUS POINTS?

A.    YES, MAJOR DEPRESSION WITH PSYCHOTIC FEATURES.

Q.    DID YOU ALSO HAVE ACCESS TO HER MILITARY RECORDS?

A.    YES.

Q.    WHAT DID THEY REVEAL TO YOU?

A.    WELL, THE MILITARY RECORDS WERE A LITTLE FAR FOR ME BECAUSE BACK, I BELIEVE IN THE SIXTIES OR SEVENTIES WHENEVER SHE WAS IN THE MILITARY, WE HAD A DIFFERENT DIAGNOSTIC SYSTEM THAT WE USED. I THINK THEY CALLED HER IMMATURE PERSONALITY DISORDER. BASICALLY, SHE WAS DEPARTED FROM THE MILITARY BECAUSE SHE WAS HAVING PROBLEMS ADAPTING.

Q.    SO, SHE HAD GONE INTO THE MILITARY AS A YOUNG WOMAN AND WAS DISCHARGED?

A.    CORRECT.

Q.    FOR THOSE REASONS?

A.    YES.

Q.    ARE YOU FAMILIAR WITH THE TYPES OF MEDICINES THAT MS. BASHAM IS ON NOW?

A.    YES.

Q.    COULD YOU TELL THE JURY WHAT THOSE ARE?

A.    YES.   WELL, KEEPING IN MIND THIS WAS BEFORE SHE WAS IN THE HOSPITAL,  THIS WAS EARLY LAST WEEK WHEN I HAD SPOKEN WITH HER.   SHE IS ON A MEDICATION CALLED PROLIXIN.

Q.    DOES SHE HAVE A HISTORY OF BEING ON THAT MEDICINE?

A.    SHE HAS BEEN ON PROLIXIN FOR A NUMBER OF YEARS.

Q.    WHAT IS PROLIXIN?

A.    PROLIXIN IS AN ANTIPSYCHOTIC MEDICATION THAT IS USED TO CONTROL ONE'S THINKING AND IF ONE IS HEARING VOICES,  IT IS FOR VOICES.   SHE IS ON THAT THREE TIMES A DAY.   SHE IS ALSO ON A MEDICATION CALLED PHENERGAN.   PHENERGAN IS USUALLY USED FOR NAUSEA,  BUT SHE USES, SHE SAYS, TO KEEP HER CALM AND SEDATED DURING THE DAY AND TO HELP HER SLEEP AT NIGHT.   AT THE TIME, THE ONLY OTHER MEDICINE SHE WAS ON,  A BREATH INHALER CALLED SINGULAIR.

Q.    HAS SHE EVER BEEN ON SEROQUEL?

A.    YES, SHE HAS.   SHE WAS RECENTLY ON SEROQUEL AND REPORTS SHE STOPPED BECAUSE SHE BEGAN HAVING NIGHTMARES.   BUT WHEN I FIRST MET MS. BASHAM IN FEBRUARY OF 2003, SHE WAS ON THAT MEDICATION -- OR 2003 OR 2004,  SHE WAS ON THAT

MEDICATION.

Q.    IS THAT A MEDICATION SHE AND BRANDON SHARE IN COMMON?

A.    YES.

Q.    HE IS ON THAT, TOO?

A.    YES, HE IS ON THAT MEDICINE.

Q.    YOU SAID SHE HAD A THOUGHT DISORDER?

A.    YES.

Q.    WHAT IS THE SIGNIFICANCE OF THAT?

A.    AGAIN, THAT IS ONE OF THE ILLNESSES WE LOOK AT THAT CAN BE INHERITED.  FOR EXAMPLE, JUST THE GENERAL --

Q.    THAT PARTICULAR DISORDER IS ONE OF THE ONES THAT COULD BE GENETIC?

A.    YES.  IF YOU HAVE PSYCHOSIS IN A PARENT, YOU HAVE LIKE A SEVEN PERCENT CHANCE OF HAVING IT IN YOUR CHILD.  AND IF IT COMES FROM BOTH PARENTS, YOU HAVE UP TO A 14 PERCENT CHANCE.  IT IS SMALL, BUT IS STILL, WHEN COMPARED WITH OTHER CHILDREN THAT DON'T HAVE PARENTS WITH THOSE KINDS OF ILLNESSES, IT IS SIGNIFICANT.

Q.    DID YOU ALSO GET A HISTORY FROM CHARLOTTE BASHAM, AS WELL AS HER MEDICAL RECORDS?

A.    YES.

Q.    AND WOULD YOU TELL THE JURY WHAT YOU FOUND SIGNIFICANT IN THOSE?

A.    TWO THINGS.  I BELIEVE IT IS FOR TROVER MEDICAL RECORDS, WHEN SHE IS ABOUT FIVE YEARS OF AGE, SHE WAS

EVALUATED AND DIAGNOSED WITH BEING HYPERACTIVE, TOO. IN FACT, THE DOCTOR CALLED IT "BUSY LITTLE GIRL SYNDROME." SO, SHE HAD A HISTORY OF ATTENTION DEFICIT.

AND THEN INTO ADULTHOOD, SHE HAS BEEN TREATED FOR DEPRESSION AND ANXIETY. SHE WAS ON THE MEDICATION EFFEXOR, WHICH IS A DEPRESSION MEDICINE, BUT IT IS ALSO USED TO TREAT PEOPLE WITH DEPRESSION AND ANXIETY.

Q.    YOU DID HAVE A PERSONAL INTERVIEW WITH HER?

A.    YES.

Q.    THERE ARE ALSO SOME OTHER PEOPLE IN THAT FAMILY YOU GOT MEDICAL RECORDS FROM, A FAMILY HISTORY, ONE OF THEM WAS TOMMY BASHAM THAT YOU MENTIONED BEFORE?

A.    YES.

Q.    WHAT DID YOU FIND SIGNIFICANT IN TOMMY BASHAM'S RECORDS?

A.    WELL, WHAT IS SIGNIFICANT IN MR. TOMMY BASHAM, THIS WOULD BE FROM BRANDON BASHAM'S FATHER'S SIDE OF THE FAMILY. SO, WE ALREADY KNOW ON THE MOM'S SIDE THAT SHE HAS THE HISTORY OF ILLNESS. MR. TOMMY BASHAM IS BRANDON'S FATHER JIMMY BASHAM'S NEPHEW. AND TOMMY BASHAM HAS A HISTORY OF MAJOR DEPRESSION WITH PSYCHOTIC FEATURES.

Q.    AS FAR AS THAT HISTORY, THAT IS IMPORTANT IN LOOKING AT BRANDON BASHAM; IS THAT CORRECT?

A.    YES, IT IS VERY IMPORTANT. BECAUSE NOW WE KNOW NOT ONLY DOES HE HAVE A HISTORY OF MENTAL ILLNESS ON HIS MOM'S

SIDE, BUT ALSO ON HIS FATHER'S SIDE OF THE FAMILY.

Q.    WHAT IS THE TERM, IS IT CALLED GENETIC FRONTLOADING?

A.    PRELOADING.  GENETIC PRELOADING.

Q.    PRELOADING.  I DON'T KNOW WHY I THOUGHT, I GUESS THAT IS MY FRONTAL LOBE.  WHAT IS THAT? TELL US WHAT THAT IS.

A.    IT IS THE SAME THING, IT IS JUST KNOWING WHAT ILLNESSES RUN IN FAMILIES, AND THERE ARE SOME THAT, FOR EXAMPLE, DIABETES, ADULT-ONSET DIABETES.  THAT IS CLEARLY A FAMILIAL TRAIT.  SO, THOSE ARE THINGS THAT YOU LOOK FOR.  SO, WE KNOW THAT HIS CHANCES OF DEVELOPING A MOOD DISORDER WITH PSYCHOTIC FEATURES OR EVEN A FORM OF PSYCHOSIS WERE HIGHER WHEN COMPARED WITH SOMEBODY ELSE THAT DOESN'T HAVE PARENTS WITH THOSE KINDS OF ILLNESSES.  IT DOESN'T MEAN IT WILL HAPPEN OR NOT, BUT HE CLEARLY HAS HIGHER RISK FOR THOSE ILLNESSES.

Q.    YOU ALSO RECEIVED RECORDS ON ADA ENGLAND AND CLAUDE BLAKE; IS THAT CORRECT?

A.    CORRECT.

Q.    WOULD YOU TELL THE JURY A LITTLE BIT ABOUT THOSE AND HOW THOSE FIT INTO YOUR EVALUATION?

A.    ADA ENGLAND AND CLAUDE BLAKE ARE KATHY BASHAM'S GREAT AUNT AND UNCLE.  ADA ENGLAND, IT IS CLEAR IN REVIEWING HER RECORDS, THAT SHE HAD WHAT IS CALLED THE POSTPARTUM PSYCHOSIS. SHE HAD A BABY, AND SEVEN MONTHS AFTER THE BABY WAS BORN, SHE WAS COMMITTED TO A MENTAL HOSPITAL.  AND THINGS LIKE SHE WAS, SHE WAS RUNNING AROUND NUDE, SHE WASN'T ABLE TO TAKE CARE OF

HER CHILDREN. SHE WAS OBVIOUSLY QUITE ILL. THEN CLAUDE BLAKE, WHO WAS HER BROTHER, I BELIEVE, IF I AM CORRECT, BUT KATHY BASHAM'S GREAT UNCLE, HE ACTUALLY HAD SCHIZOPHRENIA. HE HAD BEEN TO THE WAR, CAME BACK FROM THE WAR, AND HAD A LONG HISTORY OF TREATMENT FOR SCHIZOPHRENIA WHERE HE HAD BELIEFS THAT HIS WIFE WAS POISONING HIM. HE HAD BELIEFS THAT HE WAS BEING ASSAULTED IN THE COMMUNITY, AND THAT SORT OF THING. AND HE WAS HOSPITALIZED FOR QUITE SOME TIME.

Q. NOW, HOW WOULD YOU CHARACTERIZE THE FAMILY OF BRANDON BASHAM ON BOTH SIDES, MATERNAL AND PATERNAL?

A. WELL, THERE IS CERTAINLY A GENETIC LOADING FOR MENTAL ILLNESS.

Q. NOW, DOES ONE HAVE CONTROL OF THEIR FAMILY HISTORY?

A. NOT AT ALL. UNFORTUNATELY, NONE OF US DO, ESPECIALLY WHEN YOU ARE LOOKING AT RISK OF HEART ATTACKS AND THOSE SORT OF THINGS. WE CAN'T CONTROL WHAT OUR ANCESTORS DID. WE ARE BORN WITH THOSE RISKS.

Q. DID YOU ALSO MAKE, IN YOUR ASSESSMENT AND EVALUATION, DID YOU CONSIDER THE SCHOOL HISTORY?

A. YES.

Q. COULD YOU TALK TO US A LITTLE BIT ABOUT HIS EARLY SCHOOL HISTORY, AS FAR AS YOU CAN, THAT YOU GOT FROM THE RECORDS?

A. SURE. HIS SCHOOL HISTORY WAS A LITTLE DIFFICULT BECAUSE HE WENT TO A LOT OF SCHOOLS AND HE REPEATED SOME

**JA 2023**

GRADES.

MR. SCHOOLS: YOUR HONOR, I THINK WE HAVE BEEN THROUGH THIS ABOUT THREE TIMES ALREADY. WE HAD SCHOOL TEACHERS TESTIFY.

MR. SWERLING: JUDGE, SHE IS JUST HIGHLIGHTING.

THE COURT: ALL RIGHT. LET'S MOVE ON.

MR. SWERLING: JUDGE, FOR YOUR INFORMATION, SHE IS JUST HIGHLIGHTING THINGS THAT WERE IMPORTANT TO HER.

THE COURT: ALL RIGHT. GO AHEAD.

THE WITNESS: YES, HE HAS A HISTORY OF, I BELIEVE, OF REPEATING FIRST AND FIFTH GRADE. AND THE MAIN THING THAT I WOULD CHARACTERIZE THE SCHOOL HISTORY BY IS HE HAD A NUMBER OF EVALUATIONS TO LOOK FOR LEARNING DISABILITIES AND THOSE SORTS OF THINGS. SO, IT WAS CHARACTERIZED BY, I THINK HE GOT IN TROUBLE A LOT WITH TEACHERS, HE HAD HIS ATTENTION DEFICIT DISORDER, HE REPEATED SOME GRADES, AND HE HAD LEARNING DISABILITIES.

BY MR. SWERLING:

Q. IS THERE ANYTHING SIGNIFICANT IN THE OBSERVATIONS THAT WERE MADE ABOUT HIS BEHAVIOR?

A. YES.

Q. WOULD YOU ELABORATE?

A. AGAIN, THAT HE WAS A VERY HYPERACTIVE CHILD. HE PROBABLY WOULD HAVE BEEN A TEACHER'S NIGHTMARE TO TEACH BECAUSE HIS ENERGY LEVEL WAS SO HIGH AND HE WAS VERY

JA 2024

DISTRACTIBLE.  HE WAS VERY INATTENTIVE.  AND I WOULD IMAGINE, BEEN QUITE HARD TO TEACH.

Q.    NOW,  YOU ALSO REVIEWED SEVERAL OF THE PSYCHOEDUCATIONAL TESTING REPORTS THAT WERE DONE FOR BRANDON BASHAM?

A.    YES.

Q.    FROM YOUR PERSPECTIVE,  FROM YOUR EVALUATION, WHAT WAS SIGNIFICANT ABOUT THOSE?

A.    WELL, THE MAIN ONE THAT WAS SIGNIFICANT IS THAT AT THE AGE OF EIGHT, THIS WOULD HAVE BEEN THE SECOND TIME,  IF I REMEMBER CORRECTLY, THAT HE WOULD HAVE HAD AN EVALUATION.  HE HAD AN EVALUATION IN FIRST GRADE TO LOOK FOR LEARNING DISABILITIES, THEN SIX MONTHS LATER, HAD ANOTHER EVALUATION BECAUSE THEY WERE CONCERNED THAT THE TESTING THEY HAD GIVEN IN FIRST GRADE MAY HAVE NOT PICKED UP SOME OF THOSE LEARNING DISABILITIES.  AND IN THAT SECOND SET OF TESTING, IT ALREADY BEGAN TO SHOW VERY EARLY ON THAT HE HAD PROBLEMS WITH VISUAL MEMORY AND, I BELIEVE, IT WAS VERBAL MEMORY.  BUT THERE WERE EARLY ON EARLY SIGNS THAT THERE WAS SOME DIFFICULTIES WITH SOME OF HIS MEMORIES.

Q.    IN 1995 -- IS THAT THE 1995 TEST RESULTS THAT YOU ARE REFERRING TO?

A.    I HAVE TO GET MY CHEAT SHEET.

Q.    OKAY.

A.    I NEED TO BACKTRACK.  IT WAS VISUAL MEMORY AND VISUAL

**JA 2025**

AUDITORY MEMORY. IT WOULD HAVE BEEN IN SECOND GRADE. I AM SORRY, MR. SWERLING, I DON'T HAVE A DATE ON THAT. I THINK IT MAY HAVE BEEN EARLIER, IN 1995 HE WOULD HAVE BEEN 14, SO THIS WOULD HAVE BEEN EARLIER, YES.

Q. NOW, HE HAD -- THERE WAS ANOTHER TEST THAT WAS DONE, DR. BRAWLEY TALKED ABOUT IT YESTERDAY, WHICH SHOWED A DROP IN HIS FULL SCALE IQ; IS THAT CORRECT?

A. YES. I AM VERY AWARE OF THAT. THAT IS THE TESTING THAT WAS DONE BY WENDY WATTS, I BELIEVE, WHEN HE WAS IN THE ANTON SCHOOL. HE HAD A SIGNIFICANT DROP IN IQ.

Q. AS FAR AS YOUR ASSESSMENT IS CONCERNED, WHAT IS SIGNIFICANT ABOUT THAT?

A. WELL, IT IS ALWAYS A CONCERN WHEN YOU HAVE A CHILD THAT IS LEARNING DISABLED, YOU EXPECT SOME PARTS OF THEIR IQ TO DECREASE BECAUSE OTHER CHILDREN BEING EDUCATED AND THEY ARE LEARNING MORE AND THAT PERSON IS NOT ABLE TO LEARN THOSE THINGS. BUT THIS WAS SIGNIFICANT BECAUSE THE OTHER PART OF HIS IQ, THE PERFORMANCE IQ, ALSO DROPPED. SO, THAT IS A RED FLAG. IT IS A SIGN THAT THERE MIGHT BE SOMETHING GOING ON IN THE BRAIN.

Q. NOW, DID YOU READ THE HOPKINS COUNTY SCHOOL DISTRICT REPORTS?

A. YES.

Q. AND BRANDON'S BEHAVIOR IN THOSE CLASSES, WHAT WAS SIGNIFICANT ABOUT THAT THAT YOU TOOK INTO CONSIDERATION?

A.    AGAIN, IF I CAN, HE JUST HAD A HISTORY. IT WAS VERY HARD FOR HIM TO PAY ATTENTION, HE HAD DIFFICULTY LEARNING. HE WAS FOUND TO BE -- WHAT THEY WOULD DO IN THE SCHOOL EVALUATION IS THE PSYCHOLOGIST OR WHOEVER THE CREDENTIALS OF THE PERSON TESTING HIM, THEY WOULD COME IN, THE NORMAL ROUTINE IS TO WATCH THE PERSON IN CLASS AND YOU TAKE NOTES. AND WHAT IS SIGNIFICANT IN ALL OF THESE EVALUATIONS IS HE IS OFF TASK. I BELIEVE IN THIS SPECIFIC TEST, HE WAS OFF TASK 77 PERCENT OF THE TIME. WHAT THAT MEANT IS THAT THE PSYCHOLOGIST IS WATCHING HIS BEHAVIOR, THEY ARE CHECKING IS HE DOING WHAT THE TEACHER'S ASKING HIM. AND THE MOST NOTICEABLE THING IS THAT HE WAS NOT ABLE TO PAY ATTENTION DURING THREE QUARTERS OF THE CLASS TIME.

Q.    WHAT MEDICINES WAS HE ON, AT THAT TIME, DURING THE SCHOOL?

A.    SHOULD HAVE BEEN RITALIN.

Q.    DOES RITALIN ABSOLUTELY CONTROL THE ADHD BEHAVIOR?

A.    IT DEPENDS. THE DOSES CHANGE OVER TIME. IT DEPENDS HOW OFTEN IT IS GIVEN. IT DEPENDS IF YOU ARE TAKING IT. SO, IT CAN CERTAINLY CONTROL SOME OF THOSE BEHAVIORS. BUT THERE ARE MANY CHILDREN THAT NEED OTHER MEDICINES IN ADDITION TO THE RITALIN, AS WELL.

Q.    NOW, DO YOU REMEMBER SOME TESTING THAT WAS DONE BY DR. ROGER LAIRD?

A.    YES.

Q.    THERE WAS SOME EDUCATIONAL TESTING, AS WELL?

A.    YES.

Q.    COULD YOU -- IT WAS ACTUALLY DONE FOR A REQUEST TO GO AHEAD AND HAVE HOMEBOUND TEACHING; IS THAT CORRECT?

A.    YES.

Q.    WHAT WAS SIGNIFICANT ABOUT DR. LAIRD'S TEST?

A.    WELL,  I THINK WHAT WAS MOST SIGNIFICANT ABOUT DR. LAIRD IS THAT HE RECOMMENDED BRANDON BASHAM GO INTO TREATMENT, AND THAT THIS TREATMENT LAST FOR AT LEAST TWO YEARS.   AND SO, WHAT WAS SIGNIFICANT TO ME WERE HIS RECOMMENDATIONS.

Q.    NOW,  SO AT AGE 14, THEY ARE RECOMMENDING HE GO INTO AT LEAST A TWO-YEAR TREATMENT PROGRAM; IS THAT CORRECT?

A.    CORRECT.

Q.    HAD HE ALREADY HAD, AT THIS POINT, NUMEROUS EVALUATIONS?

A.    YES.

Q.    WAS HE ALREADY USING DRUGS, AT THIS POINT?

A.    YES.

Q.    WAS HE ALREADY  -- WAS THERE EVIDENCE HE WAS ALREADY NEGLECTED, AT THIS POINT?

A.    YES.

Q.    WAS THERE EVIDENCE THAT HE WAS LIVING IN DIFFERENT ENVIRONMENTS, AT THIS TIME?

A.    YES.

Q.    AND HE WAS BEING -- WAS HE BEING TREATED FOR ADHD, AS FAR AS THE RECORDS ARE CONCERNED?

A.    YES.   AT POINTS.   YES.   SOME TIME DURING ELEMENTARY SCHOOL, HE WAS ON THIS MEDICATION.

Q.    NOW,  DID HE HAVE ANY POSITIVE INFLUENCES WHEN HE WAS IN THE SCHOOL SYSTEM?

A.    I THINK SO.

Q.    WOULD YOU ELABORATE?

A.    YES.   THERE ARE TWO, JUST IN LOOKING AT THE RECORDS. I THINK MOLLY MCGALL, WHO WAS ONE OF HIS ELEMENTARY SCHOOL TEACHERS, AND LATER BECAME HIS BIG SISTER, WAS CLEARLY,  I THINK, WENT OVER AND BEYOND ANY DUTY OF A TEACHER.   I THINK THERE WAS ANOTHER TEACHER SPECIFICALLY I REMEMBER NAMED MONTE MEFFORD.   MS. MEFFORD WENT SO FAR AS TO TAKE MR. BASHAM TO DOCTOR APPOINTMENTS, SHE MADE HIS DOCTOR APPOINTMENTS, AND SHE EVEN TRIED TO GET HIM HOSPITALIZEED IN A PSYCHIATRIC FACILITY FOR SOME CARE.

Q.    DID YOU SPEAK TO MOLLY MCGALL?  IS SHE ONE OF THE PEOPLE YOU SPOKE TO?

A.    YES. SHE WAS VERY KIND.  SHE SPOKE TO ME BY TELEPHONE. SHE IS A WONDERFUL LADY.

Q.    DR. WATTS, OF ALL THE RECORDS YOU HAD AVAILABLE,  WERE YOU ABLE TO DETERMINE WHAT APPEARS TO BE THE HIGHEST GRADE THAT BRANDON BASHAM WAS ABLE TO GET INTO?

A.    YES.  I SPECIFICALLY TRIED TO FIND THAT BECAUSE I

WASN'T EVER SURE MYSELF.  AND I FOUND ONE RECORD FROM WARREN COUNTY SCHOOLS THAT SHOWED HE WAS IN THE 9TH GRADE.  THAT WAS THE HIGHEST THAT I SAW.

Q.    DO YOU HAVE ANY INFORMATION FROM THE RECORDS AS TO WHETHER OR NOT HE ATTEMPTED TO GET HIS GED?

A.    YES.

Q.    WHAT INFORMATION DO YOU HAVE?

A.    WELL, MY INFORMATION COMES DIRECTLY FROM OFFICER ARISON, WHO IS THE OFFICER IN CHARGE OF EDUCATION AT THE HOPKINS COUNTY DETENTION CENTER.

Q.    AND YOU PERSONALLY INTERVIEWED HIM, RIGHT?

A.    YES.

Q.    WHAT WAS SIGNIFICANT ABOUT WHAT HE TOLD YOU AND ABOUT THE PROGRAM THERE AS IT RELATES TO BRANDON, OBVIOUSLY?

A.    HE WAS IN CHARGE OF TEACHING THE GED CLASS.  AND HE TOLD ME THAT HE HAS A SCREENING TEST THAT YOU HAVE TO BE ABLE TO PASS TO BE ABLE TO TAKE THE CLASS TO STUDY, AND THAT MR. BASHAM COULDN'T EVEN PASS THE SCREENING TEST.

Q.    DID HE, DESPITE THAT HE WAS NOT ABLE TO PASS THE SCREENING TEST, DID THE RECORDS REVEAL, DID MR. ARISON TELL YOU THAT HE CONTINUED TO COME TO CLASS?

A.    OH, YES.  AND MR. ARISON CONTINUED TO TRY TO TEACH HIM, TOO, YES.  HE WASN'T GOING TO GIVE UP.  AND HE REPORTED TO ME THAT MR. BASHAM WAS INTERESTED IN ATTENDING AND WAS TRYING TO LEARN.

Q.    NOW, HOW WOULD YOU CHARACTERIZE THIS SCHOOL HISTORY? THE JURY HAS HEARD ABOUT IT, AND THE HIGHLIGHTS THAT YOU JUST MENTIONED.

A.    WELL, I THINK, AGAIN, HE WAS VERY HYPERACTIVE, HE HAD LEARNING DISABILITIES, HE HAD A HORRIBLE ENVIRONMENT, HE WAS DIFFICULT TO TEACH, AND HAD A FEW REALLY GOOD TEACHERS.

Q.    NOW, YOU DID A PERSONAL PSYCHIATRIC HISTORY ON BRANDON BASHAM, AS WELL, LOOKING IN THROUGH HIS OWN PERSONAL HISTORY; IS THAT CORRECT?

A.    YES.

Q.    DID YOU REVIEW THE RECORDS FROM RIVENDELL HOSPITAL?

A.    YES.

Q.    DO YOU RECALL WHAT WAS SIGNIFICANT THAT YOU RECALL ABOUT THAT?

A.    YES.

Q.    WOULD YOU RELATE THAT TO THE JURY?

A.    SURE. HE WAS SEEN BY A DR. LITTLETON. AND HE WAS ADMITTED FOR EXPLOSIVE BEHAVIORS, SUSPECTED INHALANT ABUSE. DURING THAT HOSPITALIZATION, HE HAD QUITE AN EXTENSIVE WORKUP. HE WAS FOUND TO HAVE A NUMBER OF THINGS. MR. BASHAM HAD WHAT IS CALLED AN EEG. DR. BRANNON PROBABLY TALKED TO YOU ABOUT THAT, THAT IS A BRAIN WAVE STUDY. IT CAME BACK ABNORMAL, WHICH WAS SIGNIFICANT, AT THAT POINT IN TIME, FOR MR. BASHAM BEING TEN YEARS OF AGE.

Q.    THE DIAGNOSIS, AT THAT TIME, YOU SAID, WAS INTERMITTENT

EXPLOSIVE DISORDER?

A.    CORRECT.

Q.    WHAT KIND OF DIAGNOSIS IS THAT?

A.    INTERMITTENT EXPLOSIVE DISORDER, IN PSYCHIATRY, WE HAVE A TEXTBOOK.   AND THERE ARE ALL DIFFERENT KINDS OF MENTAL DISORDERS.   AN INTERMITTENT EXPLOSIVE DISORDER IS CLASSIFIED AS WHAT IS CALLED AN IMPULSE CONTROL DISORDER.   IT IS A DISORDER OF IMPULSE.  BASICALLY, WHAT THAT ILLNESS CONSISTS OF IS HAVING OUTBURSTS OF AGGRESSIVE BEHAVIOR THAT ARE REALLY OUT OF PROPORTION TO ANY KIND OF PROVOCATION AT ALL.   SO, FOR EXAMPLE, THAT WOULD BE LIKE IF YOU HIT YOUR ELBOW AND YOU HIT YOUR FUNNY BONE, THAT YOU MIGHT EXPLODE,  YOU KNOW, YOU WOULD EXPECT PAIN OR A LITTLE BIT OF AN EMOTIONAL OUTBURST, BUT NOT AN EXPLOSION OF BEHAVIOR.   AND WHAT IS SIGNIFICANT IS THAT ILLNESS IS ASSOCIATED WITH ABNORMAL EEG'S WITH BAD BRAINS.

Q.    IN PSYCHIATRY, YOU LOOK AT THINGS THAT ARE VOLITIONAL AND NOT VOLITIONAL?

A.    YES.

Q.    VOLITIONAL BEING THAT YOU HAVE A CHOICE?

A.    CORRECT.

Q.    OR CONTROL.

A.    CORRECT.

Q.    AND NONVOLITIONAL BEING CANNOT?

A.    CORRECT.

Q.    IS THAT A SIMPLIFIED WAY OF SAYING IT?

A.    YES.

Q.    INTERMITTENT EXPLOSIVE DISORDER, WHERE DOES THAT FIT IN?

A.    THAT IS A DISORDER OF IMPULSE CONTROL THAT YOU CAN'T CONTROL.  THAT WOULD BE, THE WAY I DESCRIBE IT FOR COURTS ALL OF THE TIME, IT IS LIKE HAVING AN ITCH.  IF YOU ARE ITCHY, YOU CAN'T HELP THAT YOU ITCH.  YOU CAN HELP WHETHER YOU SCRATCH IT OR NOT, BUT YOU CAN'T HELP THE FACT THAT YOU ARE ITCHY.

Q.    SO, AS EARLY AS 1991, HE WAS DIAGNOSISED WITH THIS TYPE OF DISORDER?

A.    YES,  TEN YEARS.

Q.    NOW, HE WAS HOSPITALIZED IN THAT SITUATION,  WAS HE NOT?

A.    YES.

Q.    THERE IS ALSO SOME RECORDS FROM PENNYROYAL; IS THAT CORRECT?

A.    YES.

Q.    YOU ALSO OBSERVED SOME RECORDS FROM PENNYROYAL.  AND DID HE RECEIVE TREATMENT AT PENNYROYAL AS WELL?

A.    YES.

Q.    NOW, YOU ARE ALSO FAMILIAR WITH THE RECORDS FROM THE METHODIST HOME?

A.    YES.  VERY FAMILIAR.

Q.    I BELIEVE YOU HAVE SPOKEN TO DR. RIVARD, WHO IS AT THE

METHODIST HOME?

A.    YES.

Q.    AS WELL AS DEWEY SANDERS?

A.    YES.

Q.    YOU HAD PERSONAL INTERVIEWS WITH THEM?

A.    YES.

Q.    YOU HAD THEIR RECORDS WITH YOU WHEN YOU INTERVIEWED THEM?

A.    YES.

Q.    WOULD YOU TELL THE JURY WHAT WAS SIGNIFICANT ABOUT THE STAY AT THE METHODIST HOME?

A.    YES.  I SPOKE WITH DR. RIVARD, AND SHE IS A PSYCHIATRIST IN KENTUCKY.  AND SHE WAS IN THE METHODIST HOME AS A CONTRACT PSYCHIATRIST.  AND SHE WOULD GO OVER, BASICALLY, AND RUN CLINICS, SIMILAR TO WHAT I DO AT DJJ OR THE PRISON. YOU DON'T WORK FOR THAT FACILITY, BUT YOU COME IN ONCE A WEEK AND TREAT PATIENTS THERE.

AND SHE HAD FOLLOWED MR. BASHAM WHILE HE WAS THERE AT THE METHODIST HOME.  BASICALLY, IN LOOKING AT HIS RECORDS AND IN TALKING WITH DR. RIVARD, AND TALKING WITH DR. SANDERS, IT WAS VERY CLEAR TO ME THAT MR. BASHAM HAD NOT BEEN TREATED, ALTHOUGH HE WAS SEEN A NUMBER OF TIMES, AND DR. RIVARD WOULD BEGIN TO START A MEDICATION, HE WOULD BE -- BRANDON BASHAM WOULD LEAVE THE HOME AND HAVE TO GO TO A HOSPITAL AND COME BACK.  SO, IF YOU LOOK AT THE RECORDS, HE WAS NEVER TREATED

FOR ATTENTION DEFICIT DISORDER THE ENTIRE TIME THAT HE WAS THERE.

Q.   THE ENTIRE TIME HE WAS AT THE METHODIST HOME, HE WAS NOT TREATED?

A.   CORRECT.  THE MOST HE GOT, THERE WAS TWO DAYS OF A MEDICATION CALLED IMIPRAMINE.  IMIPRAMINE IS AN OLD ANTIDEPRESSANT THAT IS VERY HELPFUL ALSO IN TREATING ATTENTION DEFICIT DISORDER.  HE HAD THREE DAYS WORTH OF THAT MEDICINE, DR. RIVARD STARTED IT, BUT THEN MR. BASHAM WAS TRANSFERRED TO ANOTHER HOSPITAL.

Q.   WHAT IS THE SIGNIFICANCE OF SOMEONE WHO HAS ADHD NOT HAVING A DRUG THAT, FOR EXAMPLE,  RITALIN OR IMIPRAMINE, I CAN'T SAY IT.   I AM NOT EVEN GOING TO TRY IT.  WHAT IS THE SIGNIFICANCE OF IT?

A.   WELL, AS YOU CAN IMAGINE, SOMEONE WITH A LOT OF ENERGY, A LOT MORE THAN A NORMAL KID HAS, WITH A MOTOR TICKING ALL DAY LONG, IN AN ENVIRONMENT UNMEDICATED, HE IS GOING TO BE QUITE A HANDFUL.  LOTS OF ENERGY,  LOTS OF DISTRACTIBILITY,  LOTS OF IMPULSIVE BEHAVIORS.

Q.   YOU ALSO SPOKE WITH DR. SANDERS?

A.   YES.

Q.   HE WAS THE TREATMENT DIRECTOR AT THAT FACILITY?

A.   CORRECT.  HE WORKED THERE.

Q.   WHAT COMMENTS DID HE MAKE TO YOU ABOUT BRANDON BASHAM THAT WERE SIGNIFICANT TO YOU?

JA 2035

A.    HE SAID THAT IN HIS NORMAL REPORTS,  HE DESCRIBED MR. BASHAM AS BEING UNABLE TO CONTROL HIMSELF.  HE STATES HE DIDN'T REALIZE THIS UNTIL MR. BASHAM WAS SENT OVER TO THE HOSPITAL.  HIS REMARKS TO ME THAT BRANDON BASHAM,  THE MAIN REINFORCEMENT -- WHEN CHILDREN HAVE DIFFICULTY CONTROLLING THEIR BEHAVIOR,  WE TRY TO USE WHAT IS CALLED POSITIVE REINFORCEMENT,  YOU REWARD THEM.  SOMETIMES REWARD WORKS BETTER THAN PUNISHING.  AND DR. SANDERS STATES THAT HE FIGURED OUT VERY EARLY ON THAT THE WAY TO REWARD MR. BASHAM WAS WITH FOOD.  WHEN HE REALIZED THAT BRANDON BASHAM COULDN'T HOLD IT TOGETHER FOR SIX HOURS A DAY TO BE ABLE TO GO TO THE CAFETERIA, THAT HE KNEW THIS WAS NOT SOMETHING BRANDON BASHAM COULD CONTROL.

THE EXAMPLE HE GAVE ME THAT IS IF YOU HAD CAFETERIA PRIVILEGES IN THE METHODIST HOME, YOU COULD EAT ALL YOU WANTED.  IF YOU WERE BAD, AND YOU WEREN'T ALLOWED TO GO TO THE CAFETERIA THAT DAY, YOUR FOOD WOULD COME BACK IN A STYROFOAM TRAY.  THAT WOULD UPSET MR. BASHAM VERY GREATLY WHEN HE WASN'T ABLE TO GET HIS FOOD.  SO, DR. SANDERS REPORTED THAT FOOD WAS A VERY STRONG MOTIVATOR FOR MR. BASHAM, IN THE FACT HE COULDN'T EVEN HOLD IT TOGETHER THROUGH A DAY WITH A PROMISE OF A GREAT MEAL LET HIM KNOW THAT HE HAD HORRIBLE DIFFICULTY CONTROLLING HIS IMPULSES.

Q.    YOU SAID HE SAID HE DIDN'T THINK MR. BASHAM HAD ANY CONTROL OVER HIS BEHAVIOR; IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    DID HE MAKE ANY STATEMENT TO YOU ABOUT WHETHER OR NOT HE HAD EVER -- THAT WAS SOMETHING NORMAL HE HAD SEEN, OR NOT?

A.    HE SAID HE WAS SURPRISED HE WROTE THAT BECAUSE HE DOESN'T NORMALLY WRITE THAT SORT OF THING.  AND, ACTUALLY, HE WAS ABLE TO HAVE A MEMORY OF MR. BASHAM AFTER ALL OF THESE YEARS.

Q.    NOW, WHEN YOU ASKED HIM IF BRANDON WAS MANIPULATIVE --

A.    YES.

Q.    -- WHAT WAS HIS REPLY TO THAT?

A.    HIS REPLY TO THAT WAS HE IS MANIPULATED.

Q.    WHAT DOES THAT MEAN?

A.    THAT IT WAS EASY TO PUSH HIS BUTTONS AND GET HIM UPSET.

Q.    GOING BACK TO DR. RIVARD FOR A MOMENT.  WHAT DID DR. RIVARD SAY ABOUT BRANDON'S INTELLECTUAL FUNCTIONING THAT WAS SIGNIFICANT TO YOU?

A.    SHE CONSIDERED THAT HE HAD VERY LOW INTELLECTUAL FUNCTIONING.

Q.    DID SHE SEE HIM AS PARANOID?

A.    YES.  THIS WASN'T IN HER REPORT, THAT IS WHY I ASKED HER ABOUT THAT, SPECIFICALLY.  SHE STATES THAT SHE REMEMBERS, THE WAY SHE DESCRIBED MR. BASHAM IS THAT HE ALWAYS TOOK A PARANOID STANCE IN A ROOM.  AND WHAT SHE MEANT BY THAT IS THAT WHEN HE ENTERED A ROOM,  SHE STATED THAT HE WOULD ALWAYS CHECK THE LOCKS, AND THE WINDOWS, AND HE WAS ALWAYS IN A PLACE WHERE

HIS BACK WOULD BE TO THE WALL SO HE COULD SEE AROUND HIM.

Q.    DID SHE DISCUSS WITH YOU, DR. RIVARD, HIS ATTACHMENT TO OTHER PEOPLE?

A.    YES.

Q.    WHAT DID SHE SAY?

A.    HER REMARKS, SHE WONDERED IF BRANDON HAD A PROBLEM WITH ATTACHMENT BECAUSE SHE STATES THAT SHE FELT LIKE THE STAFF WAS ALWAYS MUCH MORE ATTACHED TO MR. BASHAM THAN HE WAS TO THEM. THAT IT WAS HARD TO GET HIM TO TRUST.

Q.    DR. WATTS, YOU SPOKE WITH A NUMBER OF PSYCHIATRISTS IN THE STATE OF KENTUCKY, AS WELL AS PSYCHOLOGISTS, PEOPLE AFFILIATED WITH THE HOSPITALS THERE.  WHAT WAS THEIR ASSESSMENT, AS FAR AS IT WAS IMPORTANT TO YOU, ABOUT THE STATUS OF MENTAL HEALTH TREATMENT IN THE STATE OF KENTUCKY?

A.    I SPOKE WITH DR. SUESS, WHO IS A PSYCHIATRIST THAT WORKS IN THE DETENTION CENTER.  HE IS ALSO A CHILD PSYCHIATRIST BY TRAINING.  I SPOKE WITH DR. RIVARD ABOUT THIS. AND THEIR REPLY IS, IT IS VERY DIFFICULT TO GET INPATIENT MENTAL HEALTH TREATMENT, ESPECIALLY IN THE AREA WHERE THEY ARE.  AND THE REASON FOR THAT IS, WHEN SOMEONE IS COMMITTED INTO A HOSPITAL, THERE HAS TO BE A THREAT OF VIOLENCE.  AND BOTH OF THEIR REMARKS TO ME WERE THAT IT IS VERY DIFFICULT IN THE PROBATE COURTS THERE IN KENTUCKY TO GET SOMEBODY CIVILLY COMMITTED.  SO, A LOT OF PEOPLE TRY AND TRY TO GET PEOPLE IN THE HOSPITAL, BUT UNLESS THEY HAVE COMMITTED AN ACT OF

VIOLENCE, THEY USUALLY WON'T GET ADMITTED THERE.

Q.     AND WHAT IS THE SIGNIFICANCE THEY TOLD YOU OF THE NUMBER OF INSTITUTIONS THAT BRANDON WENT TO?

A.     WELL, WHAT IS SIGNIFICANT, THEY DIDN'T TELL ME THAT, BUT MY OPINION IS, WHAT IS SIGNIFICANT ABOUT THE NUMBER OF INSTITUTIONS, THERE IS A LOT THAT YOU CAN GO TO AND SO THE CONTINUITY OF CARE IS NOT VERY GOOD.

Q.     YOU SAY THE CONTINUITY OF CARE?

A.     CORRECT.

Q.     WHAT DOES THAT MEAN?

A.     WELL, IF YOU ARE IN, AT LEAST IN COLUMBIA, FOR EXAMPLE, IF YOU GET ADMITTED TO THE PSYCHIATRIC HOSPITAL AND IT IS A STATE FACILITY, YOU GO TO BRYAN PSYCHIATRIC HOSPITAL. EVERY TIME YOU GET COMMITTED, UNLESS YOU HAVE PRIVATE INSURANCE, YOU GO BACK TO BRYAN PSYCHIATRIC HOSPITAL. SO, AT LEAST THAT HOSPITAL IS GOING TO HAVE A NUMBER OF RECORDS ON YOU FOR OVER THE YEARS.

WHEREAS THE PROGRAM THERE IN KENTUCKY, THERE IS A LOT OF DIFFERENT HOSPITALS YOU CAN GET COMMITTED TO. SO, YOU MIGHT HAVE BEEN COMMITTED TO ONE HOSPITAL ONE WEEK, AND IF YOU WERE TO BE COMMITTED FOR TREATMENT AT A LATER TIME, IT MIGHT BE A TOTALLY DIFFERENT HOSPITAL.

Q.     THE FACT THAT SOMEONE MIGHT HAVE GONE TO TEN DIFFERENT INSTITUTIONS, HOSPITALS, TREATMENT CENTERS, IS THAT A SIGNIFICANT FACTOR?

A.   SURE.

Q.   WHEN YOU WERE TALKING TO DR. RIVARD, DID SHE GIVE YOU A DIAGNOSIS AND TELL YOU ANYTHING ABOUT COGNITIVE FUNCTION ON BRANDON?

A.   NO.   WHAT WAS OF CONCERN TO ME IS THAT I NOTICED SHE HAD REPORTED SOME SYMPTOMS THAT INDICATED COGNITIVE DYSFUNCTION IN BRANDON BASHAM.

Q.   WHAT DID SHE SAY?  IS THIS IN A REPORT?

A.   YES.   YES.

Q.   GO AHEAD.  WHAT DID SHE SAY ABOUT THAT?

A.   IN ONE OF HER DOCUMENTS, AND I AM SORRY, I WOULD NEED THAT EXHIBIT,  BUT SHE CLEARLY INDICATES THAT HE HAS PROBLEMS WITH HIS MEMORY.

Q.   I HAVE DOCUMENT 236-A.   LET ME GET YOU TO LOOK AT THIS DOCUMENT,  236-A.   ON PAGE 2,  DOES SHE REFER TO HIS CONCENTRATION AS BEING IMPAIRED IN RANDOM NATURE OF RESPONSES?

A.   YES.  WOULD YOU LIKE ME TO READ THAT?

Q.    IT IS 236-B,  ISN'T IT?  YES.   GO AHEAD.

A.

          "HIS CONCENTRATION SEEMED IMPAIRED
          BY THE RAMBLING NATURE OF HIS
          RESPONSES AND HIS LACK OF ATTENTION
          TO DETAILS.   HE ALSO SEEMED TO HAVE
          MINOR -- SOME MINOR GAPS IN HIS
          COGNITIVE FUNCTION.   FOR EXAMPLE,

AT ONE POINT IN TIME, HE ASKED ME

HOW MANY MONTHS WERE IN A YEAR,

WHICH IS A FACT THAT MOST

14-YEAR-OLDS WOULD KNOW WITHOUT ANY

DIFFICULTY.  HE ADMITTED TO SOME

MEMORY GAPS AND BELIEVED IT WAS

SECONDARY TO SOME OF HIS DRUG USE."

Q.    NOW, WHAT IS SIGNIFICANT ABOUT THAT IN YOUR ASSESSMENT, WITH YOUR OVERALL ASSESSMENT OF THIS SITUATION?  AND IF THERE IS ANYTHING ELSE IN THE REPORT, PLEASE REFER TO THAT, AS WELL?

A.    SURE.  WHAT IS SIGNIFICANT AGAIN,  AT THE AGE OF 14, IT IS NOT NORMAL TO HAVE MEMORY GAPS.  THAT IS NOT NORMAL AT ALL. AND WHAT WAS SIGNIFICANT,  I DIDN'T SEE ANYWHERE IN DR. RIVARD'S TREATMENT WHERE THAT WAS EVER ADDRESSED.

Q.    WHAT ABOUT THE COGNITIVE FUNCTION,  SHE HAD SOME --

A.    UNDER COGNITIVE TESTING, SHE REPORTS "COGNITIVE TESTING WAS DONE ON A SUPERFICIAL LEVEL."  I AM NOT QUITE SURE WHAT THAT MEANS.

"HE COULD RECALL HIS DATE OF BIRTH

WITHOUT DIFFICULTY.  HE SPELLED

ROLLED, FORWARD, AND BACKWARD

WITHOUT DIFFICULTY."

WOULD YOU LIKE ME TO CONTINUE READING?

Q.    ONLY THE PART THAT YOU FIND IS SIGNIFICANT.

A.    THE POINT IS, HIS MEMORY WAS NEVER TESTED.   THERE IS

FORMAL TESTING THAT PSYCHIATRISTS DO ON MENTAL STATUS EXAMINATIONS WHEN WE ARE CHECKING COGNITION, AND THOSE TESTS WERE NOT DONE.

Q.    SO, YOUR REVIEW OF THE METHODIST HOME RECORDS INDICATE THAT THESE MATTERS WERE NOT ADDRESSED?

A.    YES.

Q.    BUT THEY SHOW UP AT THIS EARLY AGE?

A.    THEY WERE REPORTED, THAT'S CORRECT, BUT NOT ASSESSED.

Q.    SHOULD DR. RIVARD, AT THAT TIME, TESTED HIS MEMORY?

A.    YES.

Q.    WOULD THAT HAVE BEEN AN IMPORTANT THING TO DO?

A.    YES.

Q.    NORMALLY, WHEN A PSYCHIATRIST OR A PSYCHOLOGIST INTERVIEWS SOMEONE, THEY GET A HISTORY; IS THAT CORRECT?

A.    CORRECT.

Q.    UNDER THE SECTION REGARDING HABITS, DID SHE OBTAIN ANY HISTORY OF INHALANT ABUSE, ALTHOUGH THERE HAD BEEN A HISTORY OF INHALANT ABUSE BEFORE?

A.    NO.   SHE REPORTED SOME DRUGS THAT MR. BASHAM DID REPORT TO HER USING, ALCOHOL, MARIJUANA, CRANK, BUT THERE IS NO MENTION IN HERE THAT THERE WAS ANY -- HE WAS ABUSING INHALANTS, AT THAT TIME.

Q.    DID THE HISTORY THAT SHE GOT, DID SHE GET ANY QUESTIONS OR ASK ANY QUESTIONS CONCERNING SEXUAL ABUSE OR INCLUDE ANYTHING IN THAT REPORT?

A.    NO.    AND I ASKED HER ABOUT THAT, AND SHE HAD NO RECALL THAT HE HAD EVER BEEN ABUSED.

Q.    DID SHE EVER PUT ANYTHING IN THAT REPORT ABOUT PHYSICAL ABUSE?

A.    NO.

Q.    LET ME ASK YOU, DR. WATTS.  A PERSON'S MEDICAL RECORDS FOLLOW THEM FROM PLACE TO PLACE; ISN'T THAT RIGHT?

A.    NO, THAT IS NOT CORRECT.  MEDICAL RECORDS, YOU HAVE TO REQUEST THEM.  YOU ARE A PATIENT, YOU COME TO A DOCTOR'S OFFICE, YOU HAVE TO REQUEST THOSE MEDICAL RECORDS.  SO, THEY DON'T AUTOMATICALLY FOLLOW YOU.

Q.    IT WOULD HAVE BEEN INCUMBENT UPON WHATEVER INSTITUTION HE WENT INTO TO GET THE RECORDS FROM THE PRIOR INSTITUTION TO FIND OUT WHAT HAD ALREADY BEEN REPORTED; IS THAT CORRECT?

A.    YES.

Q.    SO, THERE IS NOTHING IN THERE ABOUT ANY KIND OF ABUSE, WHETHER IT IS TO HIM OR ANYTHING THAT HE MIGHT HAVE OBSERVED?

A.    NO.

Q.    IN REVIEWING THIS DATA, DID SHE PRESCRIBE ANY MEDICATIONS FOR HIM?

A.    ON THAT OCCASION, NO.  BUT EVENTUALLY, SHE DID, I BELIEVE, ON THE SECOND TIME THAT MR. BASHAM SAW HER, SHE DID BEGIN THE IMIPRAMINE. ON THE FIRST EVALUATION OF HIM, SHE DID NOT.

Q.    THAT WAS SEVERAL WEEKS LATER?

**JA 2043**

A.    THAT IS CORRECT.

Q.    DID SHE LATER ADDRESS THAT?  DR. RIVARD WAS ON A CONTRACT BASIS WITH THE METHODIST HOME; IS THAT CORRECT

A.    YES.

Q.    DID SHE GO THERE EVERY WEEK, OR WAS SHE THERE ONCE OR TWICE A WEEK?

A.    SHE USUALLY WOULD GO ONCE A WEEK.

Q.    DID SHE SEE BRANDON EVERY WEEK?

A.    NO.

Q.    WHAT WERE SOME OF THE SPANS THAT TOOK PLACE BETWEEN THE TIME THAT SHE WOULD SEE HIM?

A.    AFTER HER INITIAL EVALUATION, SHE SCHEDULED HIM TO COME BACK IN FOUR WEEKS, BUT HE RETURNED IN 20 DAYS.  AND THEN THE OTHER OCCASION SHE SAW HIM, I BELIEVE, IT WAS THE FOLLOW-UP WITHIN EIGHT WEEKS.

Q.    THERE WERE A NUMBER OF INSTANCES REPORTED WHILE HE WAS AT THE METHODIST HOME ABOUT HIS BEHAVIOR.  DID THAT COINCIDE WITH HIM NOT HAVING ANY MEDICATION?

A.    CERTAINLY, FOR THE FIRST 21 DAYS.  THERE IS A LETTER DR. SANDERS WROTE TO THE HOSPITAL WHEN BRANDON BASHAM WAS TRANSFERRED THERE AND STATED, I BELIEVE, HE HAD GONE 22 WRITE-UPS IN THE FIRST FEW DAYS, IN THE FIRST FEW WEEKS HE WAS THERE, WHICH WAS A LARGE NUMBER.

Q.    BUT HE WAS NOT ON ANY OF THE MEDICATION FOR THE ADHD?

A.    NO.

Q.    OR THE IMPULSIVITY?

A.    NO.

Q.    IS THAT CORRECT?

A.    CORRECT.

Q.    AT SOME POINT, BRANDON WENT TO STONER CREEK --

A.    YES.

Q.    -- FROM THE METHODIST HOME,  RIGHT?

A.    CORRECT.

Q.    DID STONER CREEK GIVE HIM A DIAGNOSIS OF BIPOLAR DISORDER?

A.    YES.

Q.    AND A MOST RECENT EPISODE,  HYPOMANIC?

A.    YES.

Q.    WHAT DOES THAT MEAN?

A.    BIPOLAR DISORDER IS A DISORDER OF MOOD, AND IT IS A DISORDER OF WHERE YOUR HIGHS ARE TOO HIGH, AND YOUR LOWS ARE TOO LOW.   AND WHAT HYPOMANIC MEANS THAT THERE WAS A PERIOD FOR A WEEK OF TIME THAT MR. BASHAM'S ENERGY LEVEL WAS VERY HIGH,  HIS SPEECH WAS FAST, AND THAT HE HAD SOME PROBLEMS WITH JUDGMENT,  NOT SEVERE PROBLEMS WITH JUDGMENT, BUT SOME IMPAIRED JUDGMENT.

Q.    NOW,  THIS PSYCHIATRIST WAS DR. CARDONA?

A.    YES.

Q.    IT APPEARS DR. CARDONA'S DIAGNOSIS AND DR. RIVARD'S DIAGNOSIS ARE DIFFERENT?

A.    THAT'S CORRECT.

Q.    COULD YOU EXPLAIN THAT TO THE JURY?

A.    DR. CARDONA, AGAIN, WOULD HAVE SEEN MR. BASHAM ON THE INPATIENT FACILITY, AND THIS WAS IN A CHILDREN'S HOSPITAL, AND HE DIAGNOSED A MOOD DISORDER.  WHEREAS DR. RIVARD'S DIAGNOSIS WAS MORE AN IMPULSE CONTROL DISORDER.

Q.    NOW, WHEN HE WAS AT STONER CREEK, DID HE MAKE A REVELATION ABOUT SOME SEXUAL ABUSE WHEN HE WAS SIX YEARS OF AGE?

A.    NOT IN THE FIRST HOSPITALIZATION, BUT THE SECOND ONE, YES, HE DID.

Q.    HE WENT TO STONER CREEK TWICE?

A.    THAT'S CORRECT.

Q.    FROM METHODIST?

A.    CORRECT.

Q.    WHAT HAPPENED ON THAT SECOND OCCASION?

A.    HE WAS ADMITTED BRIEFLY TO THE HOSPITAL AT STONER CREEK THE FIRST TIME, THEN SENT BACK TO METHODIST HOME, AND THEN READMITTED.  IN THE SECOND HOSPITALIZATION, I BELIEVE IT WAS, HE HAD ACTUALLY WITNESSED SOME ABUSE IN THE METHODIST HOME AND HAD REPORTED THAT.

Q.    HE REPORTED SEEING SOME ABUSE?

A.    THAT'S CORRECT.

Q.    AND THAT WAS SUBSTANTIATED?

A.    YES,  IT WAS.

Q. IN THE DISCLOSURE THAT HE MADE AT STONER CREEK, FROM THE RECORDS IT APPEARS THAT IS 27-A AND B. DR. WATTS, CAN YOU SEE THAT ON THE SCREEN?

A. YES. THIS ONE I CAN.

Q. OKAY. IF YOU CAN JUST CIRCLE THE PORTION THAT IS RELEVANT TO YOU. JUST TAKE YOUR FINGER, THAT'S RIGHT.

A. (WITNESS COMPLIES.)

Q. CAN YOU ENHANCE THAT?

THIS WAS THE DISCLOSURE OF SEXUAL ABUSE?

A. YES. ACTUALLY, MR. SWERLING, THIS WAS, I THINK, FROM HIS FIRST HOSPITALIZATION THAT HE DISCLOSED TO A SOCIAL WORKER THAT HE HAD BEEN ABUSED.

Q. WHAT WAS SIGNIFICANT ABOUT THE WAY IT WAS REPORTED?

A. THIS IS THE FIRST OF TWO PAGES. IT STATES:

"PATIENT REPORTED THAT HE WAS SEXUALLY ABUSED SIX YEARS AGO BY A MAN THAT WAS STAYING AT HIS GRANDMOTHER'S TRAILER FOR TWO TO THREE WEEKS. PATIENT WAS WALKING TO THE STORE WITH THIS MAN WHEN THIS MAN ABUSED HIM."

AND THEN IT ENDS AT "PATIENT INDICATED." I BELIEVE, THERE IS ANOTHER PAGE OF THAT NOTE.

Q. GO TO THE NEXT PAGE. THIS WOULD BE 27-B. IF YOU WOULD GO AHEAD:

A.

"THE MAN'S FIRST MAN NAME WAS TWO

INITIALS.  PATIENT DOES NOT

REMEMBER THE MAN'S NAME OR WHO HE

WAS.  HE WAS VERY GUARDED

THROUGHOUT THE DISCUSSION BECAUSE HE

DOES NOT WANT ANYTHING WRITTEN IN

HIS PERMANENT RECORD.  HE DOES NOT

WANT PEOPLE DISCUSSING THAT HE WAS

SEXUALLY ABUSED.  AT ONE POINT, HE

TORE UP THE SOCIAL WORKER'S NOTES

BECAUSE HE DOES NOT WANT IT

REPORTED.  HE INDICATES HE WILL

DENY SEXUAL ABUSE IF ANYONE ASKS AND

REFUSES TO GIVE DETAILS REGARDING

THE" --

I CAN'T READ THE LAST LINE, IT IS BLOCKED OUT.  BUT BASICALLY, HE REFUSES TO GIVE DETAILS REGARDING THE NATURE OF THE ABUSE.

Q.  NOW,  LET ME ASK YOU THIS.  IS THAT A NORMAL REACTION AFTER A DISCLOSURE OF SEXUAL ABUSE?

A.  ACTUALLY, FOR A 14-YEAR-OLD, IT MOST CERTAINLY IS. FOR ANYONE TO HAVE TO ADMIT TO SEXUAL ABUSE IS NEVER A COMFORTABLE PERIOD.  BUT THE PARANOIA THAT THE SOCIAL WORKER WRITES, AND THE CONCERN THAT HE HAS FOR HIS CONFIDENTIALITY IS

JA 2048

ABSOLUTELY CONSISTENT WITH THAT KIND OF REPORT.

Q.   WHEN HE WAS DISCHARGED, WAS HE DISCHARGED ON ANYTHING TREATING HIM FOR ADHD?

A.   NO.   HE WAS DISCHARGED ON LITHIUM, WHICH IS A MOOD STABILIZER, WHICH IS A TREATMENT FOR BIPOLAR DISORDER, BUT NOTHING FOR ATTENTION DEFICIT DISORDER.

Q.   NOW, LET ME JUST ASK YOU THIS.   IS THERE ANY RELATIONSHIP OR CORRELATION BETWEEN BIPOLAR DISORDER AND ADHD?

A.   YES.

Q.   COULD YOU TELL THE JURY WHAT THAT IS?

A.   SURE.   EACH -- THE WAY I CAN DESCRIBE IT, IN PSYCHIATRY AND IN ALL MEDICINE, YOU HAVE WHAT IS CALLED A DIFFERENTIAL DIAGNOSIS.   FOR EXAMPLE, IF YOU HAVE ACUTE ABDOMINAL PAIN, THE DIFFERENTIAL MIGHT BE APPENDICITIS, IT COULD BE DIVERTICULITIS.   SO, YOU HAVE TO RULE THINGS IN, AND YOU HAVE TO RULE THINGS OUT.   WELL, ATTENTION DEFICIT DISORDER IN CHILDREN AND BIPOLAR DISORDER, THERE ARE DIFFERENTIALS FOR EACH OTHER, BECAUSE THEY CAN EASILY BE CONFUSED WITH ONE ANOTHER.   IF YOU CAN IMAGINE, IF YOU HAVE A CHILD WITH ATTENTION DEFICIT HYPERACTIVITY DISORDER, THAT IS RUNNING AROUND A ROOM, THAT CAN'T SIT STILL, THAT COULD VERY EASILY LOOK LIKE SOMEONE THAT HAS A MOOD DISORDER WITH TOO MANY HIGHS, A MANIC PHASE WHERE THEY CAN'T SIT STILL OR THEY ARE TALKING A LOT.   SO, THE CLINICAL PICTURES ARE VERY SIMILAR.

Q.    I WILL SHOW YOU EXHIBIT NUMBER 244, I THINK, WITHOUT OBJECTION.  THIS IS THE DISCHARGE SUMMARY FROM -- COULD YOU ENHANCE THAT? WHAT DOES THAT SAY?

A.    THIS WAS A NOTE THAT REFERS TO THE PROGRESS THROUGH HOSPITALIZATION.  AND IT STATES:

          "PATIENT IS DEMONSTRATING INCREASED

           IMPULSE CONTROL AND DECREASED

           HYPERACTIVITY.  DEMONSTRATING NO

           AGGRESSIVE OR THREATENING BEHAVIOR.

           PATIENT ABLE TO VERBALIZE THOUGHTS

           AND FEELING STRESSORS IN A

           NONAGGRESSIVE MANNER."

Q.    ENHANCE THAT.  I WANT A QUESTION ON THAT, ON 244. WHAT WAS THE DISCHARGE DIAGNOSIS?

A.    OH, I SEE.  THE GREEN THING IS STILL UP ON THE SCREEN. IT IS "INTERMITTENT EXPLOSIVE DISORDER, CONDUCT DISORDER, AND PROBABLE ATTENTION DEFICIT HYPERACTIVITY DISORDER."

Q.    THAT IS WHAT YOU HAD REFERRED TO BEFORE, INTERMITTENT EXPLOSIVE DISORDER BEING A NONVOLITIONAL CONDITION, CORRECT?

A.    CORRECT.

Q.    RIGHT ABOVE THAT, IF I COULD, IF YOU TELL THE JURY, WHAT DRUG HE IS ON.

A.    LITHIUM.

Q.    NOW, IS THIS THE SAME DIAGNOSIS THAT DR. CARDONA GAVE?

A.    NO.  AND THAT IS WHAT CAUSED ME CONCERN.

DR. CARDONA, WHO IS A PSYCHIATRIST THAT DICTATED THE DISCHARGE SUMMARY, DISCHARGED BRANDON BASHAM WITH A DIAGNOSIS OF BIPOLAR DISORDER, MOST RECENT EPISODE HYPOMANIC. SO, THIS FORM THAT WAS FILLED OUT, DOES NOT MATCH THE DOCTOR'S DIAGNOSIS.

Q. AND THAT IS, I MEAN, HOW DO YOU EXPLAIN THAT?

A. OH, VERY EASILY. IT HAS HAPPENED TO ME. WHEN YOU WORK IN A HOSPITAL AND YOU HAVE DISCHARGE INSTRUCTIONS, PERHAPS THE SUMMARY WASN'T DICTATED YET. IT LOOKS HERE THAT ONE OF THE NURSES THAT WORKED IN THAT HOSPITAL FILLED THAT OUT. SO, IT IS A COMMON MISTAKE. THE DICTATION FROM THE DOCTOR PROBABLY WASN'T BACK YET.

Q. NOW, WHEN HE CAME BACK INTO METHODIST, DID DR. RIVARD INCORRECTLY LIST THE DISCHARGE DIAGNOSIS?

A. THAT'S CORRECT. SHE REFERRED TO THOSE DISCHARGE DIAGNOSES IN HER NEXT VISIT WITH MR. BASHAM, YES.

Q. AND WHAT DID SHE DIAGNOSE, ANOTHER ADHD AND CONDUCT DISORDER?

A. YES. THAT'S CORRECT. AND CONTINUED HIS LITHIUM.

Q. SHE STILL HAD NOT PRESCRIBED ANYTHING TO TREAT THE ADHD?

A. THAT'S CORRECT.

Q. DID SHE SEE BRANDON ONE MONTH LATER AND ADJUST THE LITHIUM?

A. YES.

Q. WHAT DOES LITHIUM TREAT?

A.    LITHIUM, AGAIN, IT IS A SALT.  AND IT IS USED FOR THE TREATMENT OF BIPOLAR DISORDER.  IT IS A WONDERFUL MOOD STABILIZER.  THE PROBLEM WITH LITHIUM IS IT HAS A THERAPEUTIC WINDOW THAT YOU HAVE TO DRAW BLOOD WHEN SOMEBODY IS ON LITHIUM.  AND IT HAS TO BE WITHIN A CERTAIN LEVEL.  AND MR. BASHAM'S LITHIUM, WHILE HE WAS AT THE METHODIST HOME FOR THAT MONTH PRIOR, THE LEVEL WAS VERY LOW.  PROBABLY HELPED HIM A LITTLE BIT, BUT HE CERTAINLY WASN'T GETTING THE FULL BENEFITS OF THAT MEDICATION.

Q.    NOW, DID SHE CHANGE HER DIAGNOSIS DURING THE COURSE OF THIS STAY?

A.    YES.

Q.    WHAT WAS THE DIAGNOSIS CHANGES THAT SHE MADE?

A.    WHEN SHE SAW HIM AND INCREASED HIS LITHIUM TO GET A THERAPEUTIC LEVEL, AT THAT TIME SHE HAD THE SAME DIAGNOSIS AS DR. CARDONA,  THE BIPOLAR DISORDER.

Q.    BIPOLAR DISORDER.  COULD YOU JUST GIVE A VERY BRIEF DEFINITION OF WHAT BIPOLAR DISORDER IS?

A.    YES, AGAIN, IT IS A MOOD DISORDER.  AND IT MEANS THAT YOU HAVE PERIODS WHERE YOUR MOODS ARE TOO HIGH, AND PERIODS WHERE YOUR MOODS ARE TOO LOW.  IN CHILDREN, YOU TEND TO SEE MORE OF THE HIGHS, WHERE YOU HAVE LOTS OF ENERGY,  YOU TALK FAST, YOUR SPEECH IS VERY RAPID.  SO IT IS A PERIOD AND IT LASTS FOR ABOUT A WEEK.  SO, IT IS A PROMINENT MOOD LEVEL OF UPS AND DOWNS THAT ARE TOO HIGH AND TOO LOW.

Q. AND YOU SAID THERE IS SOME RELATIONSHIP BETWEEN ADHD AND BIPOLAR?

A. YES. ESPECIALLY WITH CHILDREN, THEY ALMOST HAVE THE SAME SYMPTOMS.

Q. BRANDON WENT BACK TO STONER CREEK; IS THAT CORRECT?

A. YES.

Q. HE WAS ADMITTED AGAIN AFTER A FOLLOW-UP WITH DR. RIVARD?

A. YES.

Q. NOW, GOING BACK TO THE METHODIST HOME FOR A MOMENT, HE IS COMING FROM THE METHODIST HOME BACK TO STONER CREEK, WHAT IS GOING ON AT THE METHODIST HOME, AT THAT POINT, IF YOU CAN RECALL?

A. YES. WELL, HE SAW DR. RIVARD, BUT WE KNOW NOW, WHEN HE WAS READMITTED TO STONER CREEK, HE WAS WITNESSING SOME SEXUAL ABUSE THAT WAS GOING ON IN THE DORM WHERE HE STAYED IN THIS GROUP HOME.

Q. HOW WOULD THAT AFFECT HIM?

A. AGAIN, IT IS TRAUMATIC. IT IS ANOTHER EPISODE WHERE YOU ARE TRAUMATIZED.

Q. HE IS STILL NOT GETTING ANY TREATMENT FOR HIS ADHD?

A. NO.

Q. WHEN HE WAS DISCHARGED FROM STONER CREEK, AT THAT TIME, WHAT DID DR. CARDONA DIAGNOSE HIM WITH, AT THAT TIME?

A. WELL, HE CONTINUED TO DIAGNOSE HIM WITH A BIPOLAR

DISORDER, BUT THEN ADDED THE DIAGNOSIS OF POSTTRAUMATIC STRESS DISORDER.

Q. DID HE PUT IN HIS DISCHARGE SUMMARY THAT HE SAW A HYPOMANIC EPISODE?

A. YES.

Q. DID DR. CARDONA NOTE THAT HE DID NOT APPROVE OF BRANDON GOING BACK TO THE METHODIST HOME?

A. THAT'S CORRECT. THERE IS A NOTE IN THE CHART WHERE THE DISCHARGE PLAN MAY HAVE INCLUDED MR. BASHAM GOING BACK TO THAT HOME, AND DR. CARDONA DID NOT APPROVE OF THAT. SO, THEY ARRANGED TRANSFER FOR HIM TO ANOTHER FACILITY BECAUSE THEY DID NOT WANT HIM BACK IN A HOME WHERE HE HAD WITNESSED ABUSE.

Q. HOW WOULD YOU DESCRIBE HIS TREATMENT AT THE METHODIST HOME?

A. INCOMPLETE. I THINK THERE WERE A LOT OF GOOD PEOPLE THAT WORKED THERE, DON'T GET ME WRONG, I THINK THERE WERE A LOT OF VERY GOOD CARING CLINICIANS, BUT IN TERMS OF THE MEDICAL MANAGEMENT, INCOMPLETE.

Q. HE WAS THEN TRANSFERRED TO ANOTHER HOSPITAL, THAT WAS THE CHILDREN'S PSYCHIATRIC HOSPITAL; IS THAT CORRECT?

A. YES.

Q. DID DR. GILLINGHAM TREAT HIM WITH ANY MEDICATIONS WHILE HE WAS THERE?

A. NONE AT ALL.

Q. HOW WOULD YOU CHARACTERIZE THE EVALUATION THAT

Q. DR. GILLINGHAM GAVE?

A. I WOULD SAY IT WAS QUITE BEHAVIOR ORIENTED, AND THERE WERE A LOT OF THINGS MISSING.

Q. WAS THERE A COMPLETE HISTORY THAT A PSYCHIATRIST SHOULD HAVE TAKEN?

A. NO.

Q. DID HE PERFORM A MENTAL HEALTH EVALUATION OR MENTAL STATUS EXAMINATION?

A. NO.

Q. DIDN'T YOU SAY THAT WAS PART OF THE -- AN ESSENTIAL PART OF AN EXAM, A MENTAL EXAM?

A. YEAH. THE MENTAL STATUS EXAMINATION IS SIMILAR TO THE PHYSICAL EXAM THAT YOUR FAMILY PRACTITIONER OR YOUR INTERNS PERFORM.

Q. WOULD A CHILD WITH NO MEDICINE FOR ADHD HAVE THE KIND OF CONDUCT EXHIBITED BY BRANDON BASHAM AT THE METHODIST HOME?

A. YES.

Q. DID DR. GILLINGHAM EVER GIVE HIM ANY MEDICATIONS?

A. NOT THAT I AM AWARE OF.

Q. WHERE DID DR. GILLINGHAM DISCHARGE BRANDON BASHAM BACK TO?

A. BACK TO THE METHODIST HOME.

Q. HE WAS ONLY THERE FOR A VERY BRIEF PERIOD OF TIME; IS THAT CORRECT?

A. CORRECT.

Q.    WHEN HE CAME BACK, HE ALSO CAME BACK TO THE CARE OF DR. RIVARD AGAIN?

A.    YES.

Q.    HOW DOES SHE CHARACTERIZE BRANDON'S BEHAVIOR OFF OF MEDICATION?

A.    SHE DESCRIBED IT AS A "HONEYMOON PERIOD."

Q.    WHAT DOES THAT MEAN?

A.    WHAT THAT MEANS IS, WHENEVER A CHILD, FOR EXAMPLE, IF A CHILD WERE TO COME TO YOUR HOUSE TO VISIT, THEY ARE GOING TO BE ON VERY GOOD BEHAVIOR FOR A FEW DAYS.  THEN, AFTER YOU GET TO KNOW THAT CHILD, THE NOVELTY OF BEING BACK IN A NEW ENVIRONMENT OR BEING AROUND PEOPLE THAT YOU ARE FAMILIAR WITH, WOULD WEAR OFF, AND THE OLD BEHAVIORS WOULD COME BACK.

Q.    WHEN DOES DR. RIVARD SAY SHE WILL SEE HIM AGAIN?

A.    EIGHT WEEKS.

Q.    IS THAT NORMAL, IS THAT ACCURATE CARE?

A.    THAT IS WAY TOO LONG.

Q.    EIGHT WEEKS?

A.    YES.

Q.    AND IN THE INTERIM, HE IS TRANSFERRED, AGAIN, TO ANOTHER INSTITUTION, CHARTER RIDGE; IS THAT CORRECT?

A.    YES.

Q.    AND HE WAS TREATED AT CHARTER RIDGE BY ONE OF THE DOCTORS THERE, THERE WAS A DOCTOR NAMED DR. AUG, A-U-G; IS THAT CORRECT?

A.    YES.

Q.    COULD YOU TELL THE JURY ABOUT DR. AUG IN HIS REPORT, THAT IS 252-A AND B.   WHAT DOES DR. AUG SAY ABOUT BRANDON BASHAM'S DIAGNOSIS?

A.    HE AGAIN DIAGNOSED HIM WITH A FORM OF BIPOLAR DISORDER, KNOWN AS ATYPICAL BIPOLAR DISORDER OR BIPOLAR DISORDER NOT OTHERWISE SPECIFIED.

Q.    SO, THAT DISORDER IS PRETTY MUCH FOLLOWING HIM NOW THROUGH THREE INSTITUTIONS; IS THAT CORRECT,  BIPOLAR DISORDER?

A.    YES -- WELL,  ACTUALLY, I THINK THROUGH TWO.   YES, THE STONER CREEK,  DR. CARDONA THERE, AND THEN DR. RIVARD FOR A BRIEF PERIOD OF TIME, AND NOW WITH DR. AUG,  YES.

Q.    NOW, THAT SHOWS THE DIAGNOSIS RIGHT THERE; IS THAT CORRECT?

A.    YES.

Q.    DID HE PRESCRIBE ANY MEDICINES FOR BRANDON BASHAM, DR. AUG?

A.    I AM --

Q.    DEPAKOTE --  I DON'T KNOW WHAT PAGE IT IS ON.   THERE IS NO REASON TO SHOW ALL FOUR PAGES.   DEPAKOTE,  RISPERIDONE, AND LUVOX?

A.    YES.

Q.    WHAT ARE THE SIGNIFICANCE OF THOSE MEDICATIONS?

A.    RISPERIDONE IS AN ANTIPSYCHOTIC MEDICATION; LUVOX IS AN

ANTIDEPRESSANT; AND, DEPAKOTE IS ANOTHER MOOD STABILIZER. IT IS VERY COMMON IN BIPOLAR DISORDER TO EITHER USE LITHIUM OR DEPAKOTE. DEPAKOTE IS ACTUALLY USED FOR SEIZURES. BUT IN PSYCHIATRY, WE USE IT TO STABILIZE MOOD SWINGS. IT IS A VERY EFFECTIVE AGENT.

Q. DR. AUG RECOMMENDED HE GO TO CHARTER OF EVANSVILLE?

A. CORRECT.

Q. THAT IS THE INSTITUTION IN INDIANA THAT HAD A CONTRACT WITH THE STATE OF KENTUCKY?

A. YES.

Q. AND DID YOU REVIEW THE RECORDS THERE?

A. YES.

Q. ALMOST 2,000 PAGES OF MATERIAL?

A. YES, I DID.

Q. FROM YOUR PERSPECTIVE, WHAT WAS THE STANDARD OF CARE, THE TYPE OF CARE GIVEN TO BRANDON BASHAM?

A. WELL, I THINK IT IS A DOUBLE-EDGED SWORD AT CHARTER OF EVANSVILLE. I THINK HE CLEARLY HAD SOME CLINICIANS THERE THAT TRIED TO WORK WITH HIM, THAT TRIED TO DEAL WITH HIM IN ISSUES OF SEXUAL ABUSE. SO, I THINK ON THE ONE HAND HE GOT SOME VERY GOOD TREATMENT. IN TERMS OF HIS PSYCHIATRIC TREATMENT, I WOULD NOT CHARACTERIZE IT AS THAT.

Q. NOW, DR. LAIRD HAD RECOMMENDED SOME TIME BEFORE THAT HE SPEND UP TO TWO YEARS IN SOME INSTITUTION; IS THAT CORRECT?

A. THAT'S CORRECT.

Q.    AND HOW LONG DID HE STAY AT CHARTER OF EVANSVILLE?

A.    NINE MONTHS.    THIS IS A RESIDENTIAL CARE.    THIS IS A HOSPITAL THAT IS USED TO LONG LENGTHS OF STAY.    THAT IS THE WAY THESE SYSTEMS ARE SET UP.    SO, NINE MONTHS IS QUITE A SHORT TIME IN ONE OF THESE FACILITIES.

Q.    DURING THE NINE MONTHS THAT BRANDON BASHAM WAS AT CHARTER OF EVANSVILLE, DID DR. WEBBER EVER GIVE HIM ANY MEDICATION TO TREAT HIS ADHD?

A.    NO.

Q.    SO,  AGAIN,  JUST WHAT DOES THAT INDICATE IS GOING TO HAPPEN TO BRANDON BASHAM DURING THAT PERIOD OF TIME?

A.    HE IS GOING TO BE VERY DIFFICULT TO TREAT AND CONTROL.

Q.    AND DO THE RECORDS FROM -- DO THE RECORDS FROM CHARTER OF EVANSVILLE, ARE THEY CONSISTENT WITH SOMEONE WHO IS NOT BEING TREATED FOR HIS ADHD?

A.    YES.

Q.    DO YOU KNOW WHY DR.  -- LET ME ASK YOU THIS.  DO THE RECORDS REFLECT WHY DR. WEBBER DID NOT PUT HIM ON ANY MEDICATION FOR ADHD?

A.    WELL,  YES.  I FOUND THIS OUT JUST THROUGH LOOKING AT THE RECORDS.    MR. BASHAM IS ACTUALLY ON MEDICATION FOR ATTENTION DEFICIT DISORDER WITH DR. AUG.  DR. AUG DID NOT WRITE THE MEDICATIONS IN THE DISCHARGE SUMMARY.    MR. BASHAM WAS RECEIVING TWO MEDICINES:  ONE CALLED CLONIDINE AND ONE CALLED TENEX.    AND ACTUALLY IN MEDICINE,  THESE ARE MEDICINES

FOR BLOOD PRESSURE, BUT THEY ARE ALSO USED IN PSYCHIATRY TO TREAT ATTENTION DEFICIT DISORDER. YOU CAN ADD THESE MEDICATIONS TO RITALIN OR GIVE THEM ALONE. SO, ACTUALLY, BY THE TIME MR. BASHAM GOT TRANSFERRED TO CHARTER OF EVANSVILLE, THERE IS NO RECORD THAT HE WAS EVEN RECEIVING THEM, WHEN HE, IN FACT, WAS ALSO RECEIVING THEM AT CHARTER RIDGE. SO, HE ACTUALLY HAD BEEN ON MEDICATIONS THAT WEREN'T CONTINUED UPON HIS ADMISSION TO CHARTER OF EVANSVILLE.

Q. NOW, GOVERNMENT'S 486 IS A HARD DOCUMENT THAT IS IN. THAT IS DR. WEBBER'S DISCHARGE SUMMARY. DO YOU RECALL THAT DOCUMENT?

A. YES.

Q. DOES DR. WEBBER EVER INDICATE HE TREATED BRANDON BASHAM FOR ANY SEXUAL ABUSE OR FAMILY-RELATED ISSUES?

A. NO.

Q. DID ANY OF THE DIAGNOSES HE GAVE HIM HAVE ANYTHING TO DO WITH SEXUAL ABUSE AT ALL?

A. NO. HE DIAGNOSED --

Q. IN CASE YOU NEED TO REFER.

A. HE DIAGNOSED HIM WITH DYSTHYMIA, WHICH IS A LONG-TERM DEPRESSION, THAT IS A CHRONIC DEPRESSION. AND ALSO A CONDUCT DISORDER, WHICH IS A BEHAVIOR PROBLEM.

Q. DID ANY OF THE DIAGNOSES IN THAT REPORT, GOVERNMENT'S EXHIBIT 486, REFLECT THE DIAGNOSIS OF ADHD?

A. NO.

Q.    AS FAR AS YOU KNOW, EVEN THE GOVERNMENT'S PHYSICIAN AT BUTNER AGREES HE HAS ADHD?

A.    YES, I DO.

Q.    DID ANY OF THE DIAGNOSES INCLUDE ANY SUBSTANCE ABUSE?

A.    NO.

Q.    AND DOES DR. CAPEHART, AS FAR AS YOU KNOW FROM READING THE REPORT, ALSO AGREES WITH THAT?

A.    YES, HE DOES.

Q.    A HISTORY OF SUBSTANCE ABUSE?

A.    YES.

Q.    DID ANY OF THE DIAGNOSES ADDRESS THE DIFFICULTIES HE HAS IN LEARNING, WHICH EVEN THE GOVERNMENT AGREES TO?  WHEN I SAY "THE GOVERNMENT," I AM TALKING ABOUT THE DOCTOR AT BUTNER.

A.    DR. WEBBER'S DISCHARGE DIAGNOSIS DON'T REFLECT THAT.

Q.    DID DR. WEBBER EVER ADDRESS THE ISSUE OF SELF-MUTILATION?

A.    NO.

Q.    IS THERE EVIDENCE IN THE CHARTER OF EVANSVILLE RECORDS OF SELF-MUTILATION?

A.    YES.

Q.    WHAT DOES THAT INDICATE TO YOU, SELF-MUTILATION, FROM WHAT YOU VIEWED IN THE RECORDS?

A.    WELL, SELF-MUTILATION IS A SYMPTOM THAT YOU SEE IN PEOPLE THAT HAVE BEEN ABUSED.  IT IS NOT A WELCOME BEHAVIOR

AND IT IS VERY DIFFICULT TO TREAT. BUT IT IS VERY COMMON IN PEOPLE THAT HAVE BEEN ABUSED, THAT SELF-MUTILATION IS THE WAY THAT THEY DEAL WITH -- ONE OF THE COMPLICATIONS OF DEALING WITH ABUSE.

Q. NOW, ON PAGE 13609, THE BATES STAMP NUMBER, THERE IS A REFERENCE THERE BY DR. WEBBER THAT "BRANDON BASHAM IS A POWER-BASED INDIVIDUAL." DO YOU SEE WHERE I AM TALKING ABOUT?

A. YES.

Q. WHAT DOES THAT TERM REFER TO? HAVE YOU EVER HEARD THAT TERM?

A. I HAVE NO CLUE. I HAVE NOT HEARD OF THAT TERM.

Q. IS THAT A PSYCHIATRIC TERM?

A. NO. I DON'T -- I DON'T KNOW WHAT THAT MEANS.

Q. IN THAT SUMMARY BY DR. WEBBER, DOES HE ALSO INDICATE WHAT MS. BASHAM'S ATTITUDE WAS ABOUT GETTING BRANDON HOME?

A. YES.

Q. WHAT IS THAT?

A. IT STATES:

"SHE WAS NOT GOING TO PULL FROM THE PROGRAM, BUT SHE IS QUITE CONCERNED THAT PATIENT BE HOME IN FOUR MONTHS OR THE SOCIAL SECURITY CHECK WILL STOP AND CANNOT BEGIN AGAIN FOR A YEAR."

AND BACK AT THE SAME TIME, THERE IS ANOTHER NOTE CONFIRMING SOME OF WHAT I HAVE STATED ABOUT THE FEW CHANGES.

Q.    NOW, DID YOU ALSO WHEN YOU WERE REVIEWING CHARTER OF EVANSVILLE, DID YOU FIND EVIDENCE THAT THE REPORT OF SEXUAL ABUSE HAD BEEN MADE, AND AT THE INSISTENCE OF THE MOTHER IT WAS NOT PURSUED?

A.    YES.

Q.    WHAT EFFECT WOULD THAT HAVE ON BRANDON BASHAM, KNOWING ALL YOU KNOW ALREADY?

A.    YOU NEVER WANT A CHILD TO BE ABUSED, BUT WE DO KNOW THAT THERE ARE PLENTY OF CHILDREN THAT HAVE BEEN ABUSED.  AND YOU LOOK AT THINGS THAT MAKE THEIR -- BEING ADAPTIVE TO ABUSE BETTER,  YOU LOOK AT WHAT THINGS MAKE YOUR ADAPTATION TO ABUSE WORSE.  A LACK OF PARENTAL SUPPORT DEFINITELY WORSENS YOUR RESPONSE TO IT.

Q.    DR. WATTS,  IN THAT REPORT, GOVERNMENT'S 486,  DOES DR. WEBBER EVEN DO A FAMILY HISTORY?

A.    NO.  WELL,  THERE IS ONE, BUT IT DOESN'T HAVE FAMILY HISTORY IN IT.  THERE IS A SECTION THAT SAYS "FAMILY HISTORY," BUT IT TALKS ABOUT -- A LITTLE BIT ABOUT ABUSE AND SOME DRUGS, BUT IT DOESN'T SAY ANYTHING ABOUT WHAT MENTAL ILLNESSES RUN IN THE FAMILY.

Q.    JUST BRIEFLY MENTIONS THOSE,  BUT NOTHING IN THE REPORT THAT SHOWS ANY TREATMENT FOR THOSE; IS THAT RIGHT?

A.    NO.  AND, ACTUALLY, UNDER FAMILY HISTORY, THAT SHOULD

BE WHAT ILLNESSES RUN IN YOUR FAMILY, WHO HAS WHAT.  AND THERE IS NO MENTION OF ANY FAMILY MEMBERS IN THERE.

Q.   I AM GOING TO SHOW YOU GOVERNMENT'S 483 AND GOVERNMENT'S 484, WHICH ARE TWO REPORTS WRITTEN BY THE STAFF AT CHARTER OF EVANSVILLE,  ONE BY CHRISTINA PINKSTON AND ONE BY MICHAEL EATMON.

A.   YES.

Q.   DO EITHER ONE OF THOSE REPORTS BY THOSE PEOPLE INDICATE ANY TREATMENT WHATSOEVER FOR ADHD OR THE SEXUAL ABUSE ISSUES?

A.   NO.   MR. EATMON RECOMMENDS SUBSTANCE ABUSE TREATMENT.

Q.   HE RECOMMENDS IT, BUT NOTHING INDICATES THAT HE GOT IT?

A.   NO. AND HE RECOMMENDS WHEN SCHOOL STARTS THAT HE HAVE NO SKIPS OR FIGHTS.

MS. PINKSTON DOESN'T  -- THERE IS NO INDICATION OF ANY TREATMENT.

Q.   SO,  THOSE REPORTS,  INCLUDING DR. WEBBER'S, DON'T SEEM TO ADDRESS SOME OF THE ISSUES THAT SHOULD HAVE BEEN ADDRESSED; IS THAT CORRECT?

A.   CORRECT.   THE REPORT OF MS. PINKSTON IS JUST BASICALLY A LIST OF WHEN HE WAS SECLUDED, WHEN HE WAS RESTRAINED, AND SOME OF THE BEHAVIORAL PROBLEMS DEMONSTRATED THERE.

Q.   AND CHARTER OF EVANSVILLE IS WHERE PENNY TITZER, WHO THE JURY HEARD FROM, WAS WORKING WITH BRANDON ON THESE ISSUES; IS THAT CORRECT?

A.   YES.

Q.    AND YOU READ ALL OF THOSE RECORDS; IS THAT CORRECT?

A.    YES.

Q.    NOW, DURING THE COURSE OF TREATMENT WITH DR. WEBBER, WERE THERE OCCASIONS WHEN HIS MEDICINES WERE STOPPED?

A.    YES.

Q.    COULD YOU FIND ANY DOCUMENTATION IN THE RECORDS AS TO WHY HE WOULD STOP?

A.    NO.    IN LOOKING AT THE COURSE OF THE MEDICATIONS AND WHICH ONES WERE STOPPED, SOMEHOW THERE WAS A MISTAKE, AND MR. BASHAM WASN'T PLACED ON THE TENEX AND THE CLONIDINE.   BUT THE NURSE WHO WORKED AT CHARTER RIDGE, SHE HAD IT ON THE MAR,  SO IT WAS CLEAR THAT MR. BASHAM HAD RECEIVED THE MEDICATIONS. AND THE "MAR," IT IS BASICALLY THE MEDICAL RECORDS, IT SHOWS WHEN A NURSE ADMINISTERS A MEDICINE, SHE HAS TO SIGN IT.   THE MAR WENT OVER, BUT THERE IS NO EVIDENCE THAT HE EVER RECEIVED THOSE TWO MEDICINES UPON ADMISSION.   THEN SHORTLY AFTER HE WAS THERE,  DR. WEBBER REDUCED HIS RISPERIDONE DOSE, WHICH IS THE MEDICINE FOR PSYCHOSIS,  AND SOMETIMES THAT IS USED FOR BEHAVIOR.  IT IS USED TO TRY TO SEDATE AND CONTROL CHILDREN, AS WELL.   THAT WAS TAPERED SLOWLY; EVENTUALLY, THAT WAS STOPPED.   HIS DEPAKOTE WAS STOPPED NEXT AND THERE WAS NO NOTE.   AND, EVENTUALLY, HIS LUVOX WAS STOPPED.   THERE WAS A NOTE THERE THAT IT MAY HAVE BEEN DUE TO SOME SIDE EFFECTS. BUT I COULDN'T FIND ANYTHING IN THE CHART AT ALL TO INDICATE WHY THE OTHER MEDICATIONS HAD BEEN STOPPED.

Q.    DID DR. WEBBER PRESCRIBE ANY MEDICINES FOR BRANDON WHILE HE WAS THERE?

A.    YES,  HE DID.

Q.    WAS THAT PROZAC AND PAXIL?

A.    YES.  HE PUT HIM ON PROZAC, AND I COULDN'T FIND A REASON WHY,  BUT PROZAC IS VERY SIMILAR,  IT IS IN THE SAME CLASS OF MEDICINES AS LUVOX.  AND IT APPEARS THAT IN JULY, DR. WEBBER PRESCRIBED MR. BASHAM SOME PROZAC.

THEN, IT LOOKS LIKE A FEW DAYS LATER, THE PROZAC WAS STOPPED, AND HE WAS PLACED ON PAXIL, WHICH IS ALSO A MEDICINE IN THAT SAME CLASS.  IT IS CALLED A SEROTONIN REUPTAKE INHIBITOR.  SO, PROZAC, AND LUVOX, AND PAXIL, THOSE ARE ALL VERY SIMILAR MEDICATIONS.  AND SO, THERE WAS A TRIAL IN JULY WHERE IT LOOKS LIKE DR. WEBBER PRESCRIBED THOSE MEDICINES.

Q.    LET ME ASK YOU SOMETHING.  DID HE ACTUALLY PRESCRIBE MEDICATIONS THAT WOULD HAVE MADE HIS ADHD SYMPTOMS OR MANIFEST THEM EVEN WORSE?

A.    YES.

Q.    WHAT WERE THOSE?

A.    EVIDENTLY, MR. BASHAM HAS A LONG HISTORY OF ALL KINDS OF ALLERGIES.  HE GETS SOME HIVES, WE CALL THEM UTICARIA IN MEDICINE,  BUT HE HAS HAD A LONG HISTORY OF ALLERGIC REACTIONS.  SO, THERE WERE A NUMBER OF TIMES IN THAT HOSPITALIZATION WHERE MR. BASHAM WAS ACTUALLY PRESCRIBED PREDNISONE OR WHAT IS CALLED MEDROL DOSE-PACKS.  AND

PREDNISONE HAS, EVEN WITHOUT UNDERLYING ATTENTION DEFICIT DISORDER, THAT IS A VERY STRONG, POWERFUL MEDICINE, A WONDERFUL MEDICINE TO FIGHT INFLAMMATION FROM POISON IVY AND THOSE SORTS OF THINGS, BUT IT ALSO HAS ITS SHARE OF SIDE EFFECTS.

Q.    THERE WAS AN EXTENSIVE COLLATERAL FROM CHARTER OF EVANSVILLE, OKAY.  YOU HAVE ALREADY SAID THAT HE WAS NOT TREATED IN ANY WAY AT ALL FOR THE ADHD.

A.    CORRECT.

Q.    IS THAT RIGHT,  NO MEDICINES, WHATSOEVER?

A.    CORRECT.

Q.    WHAT WERE SOME OF THE BEHAVIORS THAT YOU NOTICED IN THE RECORDS THAT WOULD BE CONSISTENT WITH SOMEBODY LIKE BRANDON BASHAM NOT GETTING THE MEDICINE FOR HIS ADHD?

A.    I HAVE THE ONE THAT ALWAYS STANDS OUT IN MY MIND,  I KIND OF CHUCKLE, IT IS PROBABLY NOT FUNNY, BUT I COULD JUST SEE IT.   THERE IS ONE WHERE HE IS EVIDENTLY IN SCHOOL.  AND IF YOU BEHAVE IN SCHOOL, YOU DON'T GET EXTRA TIME ADDED TO YOUR DAY.  BUT IF YOU GET IN TROUBLE IN SCHOOL OVER THERE, YOU GET EXTRA TIME ADDED TO YOUR DAY.

SO, THIS WAS A NOTE THAT SAID HE HAD FOUR WRITE-UPS IN SCHOOL, AND SO FOR EACH WRITE-UP, HE WAS GOING TO GET AN EXTRA 15 MINUTES.   SO,  THE FIRST WRITE-UP WAS FOR THROWING AN AIRPLANE, PAPER AIRPLANE.  THE NEXT ONE THAT HE WAS SUPPOSED TO BE IN A TIME-OUT ROOM AND HE KEPT PEEKING AROUND THE HALL

OF THE TIME-OUT ROOM, LOOKING DOWN THE VESTIBULE. THE NEXT ONE WAS FOR CRAWLING ON THE FLOOR AND GETTING A MAGAZINE. I GUESS HE CRAWLED DOWN THE HALLWAY TO GET A MAGAZINE. AND I AM TRYING TO REMEMBER WHAT THE LAST ONE WAS FOR, BUT THEY WERE, BASICALLY, FOR VERY INATTENTIVE, PLAYFUL, IMPULSIVE THINGS THAT, AGAIN, THOSE ARE VERY COMMON BEHAVIORS YOU SEE IN ATTENTION DEFICIT DISORDER.

Q.    SO EVERYTHING YOU SAW THERE WAS CONSISTENT WITH HIS NOT GETTING THE MEDICATION FOR THE ADHD?

A.    YES.

Q.    NOW, FROM THERE HE WENT TO CHARTER; IS THAT CORRECT?

A.    YES.

Q.    I'M SORRY --

A.    CARDINAL TREATMENT SYSTEM.

Q.    AFTER CHARTER, HE WENT TO CARDINAL TREATMENT CENTER?

A.    YES.

Q.    WE HAVE HEARD FROM SEVERAL PEOPLE LAST WEEK WHO WORKED AT CARDINAL TREATMENT CENTER. MR. STRINGFIELD. THE DOCTOR THAT TREATED HIM THERE WAS A DR. STOCKER?

A.    YES.

Q.    AND DID DR. STOCKER PRESCRIBE ANY MEDICATIONS, THOUGH, WHEN BRANDON BASHAM GOT THERE?

A.    YES, HE DID.

Q.    WHAT WERE THEY?

A.    HE IMMEDIATELY BEGAN TREATING HIM FOR ATTENTION DEFICIT

DISORDER. HE STARTED WITH RITALIN, AND THEN LATER HE ADDED OTHER MEDICATIONS.

Q. NOW, DID DR. STOCKER ALSO PRESCRIBE SOME OTHER MEDICATIONS AFTER HE DID THE EVALUATION?

A. YES, HE DID.

Q. WHAT DID HE PUT HIM ON?

A. WHAT WAS SIGNIFICANT TO ME IS HE STARTED MR. BASHAM BACK ON DEPAKOTE, WHICH IS A MOOD STABILIZER. BUT IN HIS NOTE, HE INDICATES THAT -- HIS NOTE STATES THAT MR. BASHAM WAS PICKING AT HIS PANTS. AND WHAT THAT MEANS IN PSYCHIATRY TERMS, THAT IS A MOVEMENT, THAT IS AN ODD MOVEMENT THAT IS NOT ASSOCIATED WITH ATTENTION DEFICIT DISORDER. THAT IS CALLED AN AUTOMATISM, WHERE THERE IS LIKE A PICKING, AND HE STARTED HIM ON A MOOD STABILIZER. BUT THAT IS ALSO A MEDICATION USED FOR SEIZURE. SO, THAT WAS AN OBSERVATION THAT THERE WAS SOMETHING DIFFERENT IN HIS BEHAVIOR GOING ON. THAT WAS A RED FLAG, TO ME.

Q. DOCTOR, I WANT TO SHOW YOU -- EXCUSE ME ONE MINUTE, YOUR HONOR. DOCTOR, I WILL SHOW YOU EXHIBIT 300 AND ASK YOU WHAT THE SIGNIFICANCE THERE IS.

MR. SCHOOLS: NO OBJECTION.

THE COURT: ALL RIGHT. WITHOUT OBJECTION.

BY MR. SWERLING:

Q. THIS IS JANUARY 5TH '97 -- I'M SORRY, NOVEMBER 5TH '97. WOULD YOU READ THAT IN THE DOCTOR'S HANDWRITING.

A.    YES.   HIS IS BETTER THAN MINE.

"SOME PICKING AT PANTS NOTED, BUT

DOESN'T -- NO TICS OR FOCAL

NEUROLOGICAL SIGNS NOTED.   WILL ADD

DEPAKOTE."

Q.    WHAT IS THE SIGNIFICANCE OF THE PICKING?

A.    AGAIN,  THE PICKING IS SOMETHING THAT THAT IS MORE A FUNCTION OF THE BRAIN, THAT IS NOT A NERVOUS HABIT.   THAT IS NOT SOMETHING -- IT IS A PICKING, LIKE AS IF YOU HAD A BUG ON YOU.   THAT IS A SIGN PSYCHIATRICALLY AND NEUROLOGICALLY THAT MEANS THAT THAT IS SOMETHING PROBABLY COMING FROM THE BRAIN AND NOT A NERVOUS HABIT.

WHAT HE MEANT BY "NO TICS,"  THERE ARE MANY CHILDREN, YOU HAVE PROBABLY SEEN GROWNUPS WITH TICS WHERE THEY MIGHT BLINK THEIR EYES VERY TIGHTLY OR YOU CAN NOTICE PEOPLE WITH VOCAL TICS,  THEY MIGHT COUGH, THAT IS USUALLY A SIGN OF A NEUROLOGICAL DISORDER.   HE IS POINTING OUT THERE THAT DIDN'T SEEM TO BE THE CAUSE OF THAT KIND OF BEHAVIOR.

THE OTHER AREA THERE WHERE HE SAYS NO FOCAL NEUROLOGICAL SIGNS, THAT WOULD BE SOMETHING THAT WOULD MAKE HIM THINK HE HAD A TUMOR OR SOMETHING GOING ON WHERE IT WOULD BE A LOCALIZED KIND OF FINDING.   SO AGAIN,  THAT WAS HIS SPRING THAT HE WAS LOOKING FOR SOMETHING NEUROLOGICAL,  BUT HE CERTAINLY DIDN'T SEE A TIC, SO HE TREATED HIM FOR SUSPECTED ORGANICITY THERE.

Q. DR. WATTS, WHILE HE WAS AT CARDINAL, HE WENT AWOL; IS THAT CORRECT?

A. YES.

Q. DID THAT COINCIDE WITH ANYTHING THAT YOU FELT SIGNIFICANT?

A. YES.

Q. WHAT WAS IT?

A. WELL, WHILE HE WAS AWOL, I BELIEVE IT WAS HIS COUSIN THAT WAS BEATEN TO DEATH. HE HAD A DEATH IN THE FAMILY.

Q. HE WAS ACCEPTED BACK IN CARDINAL, BUT LEFT SHORTLY THEREAFTER AND WAS PUT IN ANOTHER HOSPITAL; IS THAT CORRECT?

A. YES.

Q. CHARTER OF LOUISVILLE?

A. YES.

Q. AND THERE ARE SEVERAL REPORTS OF PHYSICIANS THERE. AND I WANT TO ASK YOU ABOUT AN ADMISSION EXAMINATION DONE BY A DR. ASUMENDI ON JANUARY 24, 1998.

A. YES.

Q. I THINK I AM PRONOUNCING HIS NAME CORRECTLY. WHAT WAS NOTEWORTHY ABOUT THAT MENTAL STATUS EXAMINATION? THAT IS 306. I WILL HAND YOU A HARD COPY.

A. IT IS ON THE SCREEN.

Q. I WANTED TO GIVE YOU ONE IF YOU NEEDED IT.

A. ACTUALLY, I WILL TAKE ONE. IT IS STILL VERY HARD FOR ME TO READ. THE HARD COPY WOULD BE NICE.

Q.   YOU CAN JUST GO AHEAD AND JUST HIGHLIGHT THE AREA THAT YOU WOULD LIKE TO MAGNIFY.

A.   WELL, THERE ARE A LOT OF THINGS THAT ARE SIGNFICANT  IN THIS CHIEF COMPLAINT AREA.  THERE WAS AN EPISODE THAT HE TRIED TO HURT HIMSELF.   IT STATES:

        "I TOOK THE BOTTOM OF A PLASTIC
        MEDICINE CUP AND BROKE IT, AND
        CARVED ON MY LEFT WRIST.   THE
        PATIENT HAD INTENT TO HURT SELF AND
        DIE BECAUSE HE IS TIRED OF BEING
        LOCKED UP."

Q.   DID HE MENTION ANYTHING ABOUT FLIGHT OF IDEAS, TANGENTIALITY, AND TROUBLED CONCENTRATION?

A.   YES.  ON PAGE THREE,  THE THIRD PAGE OF HIS HISTORY THERE, UNDER "MENTAL STATUS EXAMINATION," WHICH IS AGAIN THE EQUIVALENT OF THE PHYSICIAN'S PHYSICAL EXAM, HE HAD A NUMBER OF ABNORMAL FINDINGS.

Q.   TELL THE JURY WHAT THE SIGNIFICANCE OF THOSE WERE INSOFAR AS YOUR ASSESSMENT IS CONCERNED?

A.   SURE.  THE FIRST THING IS -- IT IS LABELED EXHIBIT 306-C, IT IS UNDER "MENTAL STATUS EXAMINATION."  THE FIRST THING THAT IS IMPORTANT THERE,  IT SAYS "HIS SPEECH IS RAPID AND HE IS HYPERVIGILANT."  RAPID SPEECH, AGAIN, CAN BE A SIGN OF ANXIETY, IT CAN MEAN YOU ARE NERVOUS, OR IF YOU -- THE DOCTORS BEFORE THAT DIAGNOSED HIM WITH BIPOLAR DISORDER, THAT

CAN BE A SYMPTOM OF A REVVED-UP MOOD.

HE IS HYPERVIGILANT. THAT MEANS THAT HE IS LOOKING AROUND, HE IS SCREENING THE AREA AROUND HIM, THAT HE IS, AGAIN, YOU CAN SEE THAT IN ABUSE, OR THAT CAN COME WITH BEING PARANOID THAT HE IS LOOKING AROUND. HE IS WATCHING WHAT IS GOING ON IN HIS ENVIRONMENT.

"MOOD IS DEPRESSED AND AGITATED." RESTRICTED SPECTRUM OF AFFECT JUST MEANS THAT HE IS JUST NOT SHOWING A LOT OF EMOTION, AT THAT POINT.

"FLIGHT OF IDEAS" WAS NOTED. WHAT THAT MEANS, THAT IS WHAT IS CALLED A THOUGHT PROCESS. THAT IS ABNORMAL. FLIGHT OF IDEAS MEANS THAT HE GOES FROM ONE THOUGHT TO ANOTHER. THEY ARE CONNECTED, BUT, FOR EXAMPLE, IF YOU ASK HIM -- I WILL TRY TO GIVE YOU A GOOD EXAMPLE -- IS IT RAINING OUTSIDE? YES, IT IS RAINING, AND THE SUN WAS OUT. AND YESTERDAY WHEN THE SUN WAS OUT, I PULLED MY FLOWERS, THEN THAT WEED IN THE FLOWERBED MADE ME CALL THE WEED EATER. SO, BASICALLY, IT IS VERY DIFFICULT TO GET AN ANSWER TO A QUESTION BECAUSE YOU GO FROM ONE IDEA TO THE OTHER, ALTHOUGH YOU CAN SEE WHERE THE IDEAS ARE COMING FROM.

TANGENTIALITY ALSO MEANS THAT YOU NEVER REALLY GET BACK TO ANSWERING THE QUESTION, BECAUSE BY THE TIME YOU FINISH WHEN YOU WERE TALKING ABOUT THE RAIN, YOU MIGHT END UP AT A GROCERY STORE, AND YOU NEVER REALLY GET BACK TO ANSWERING WHAT THE QUESTION WAS ABOUT THE RAIN.

IT SAYS "MEMORY IS INTACT, BUT THERE IS SOME TROUBLE WITH CONCENTRATION."

Q. WHAT IS THAT SIGNIFICANT OF, ARE THERE SOME ABNORMALITIES OF THOUGHT AND MOOD?

A. YES, THERE CLEARLY ARE.

Q. WHAT IS THE SIGNIFICANCE OF THAT, AS FAR AS THE EVALUATION YOU ARE MAKING?

A. WELL, THEY DIAGNOSE HIM HERE, AND IT DOESN'T SAY IT HERE IN THIS RECORD, BUT THERE IS CERTAINLY EVIDENCE I KNOW IN OTHER RECORDS IN HIS HOSPITALIZATION, THAT THE IMPRESSION IS MAJOR DEPRESSION WITH PSYCHOTIC FEATURES. SO, THE DIAGNOSIS, AT THAT POINT, IS THAT THERE MAY BE A COMPLICATED DEPRESSION.

Q. AND THAT PARTICULAR DIAGNOSIS IS SIGNIFICANT IN WHAT WAY?

A. WOW, FOR LOTS OF REASONS. IT IS THE DIAGNOSIS HIS MOM HAD. THE DIAGNOSIS TOMMY BASHAM HAS HAD. AND IT IS THE FIRST TIME IN HIS RECORD THAT HE IS DIAGNOSED WITH SOMETHING WITH PSYCHOTIC FEATURES.

Q. AND DR. WATTS, JUST FOR THE JURY'S EDIFICATION, WHAT DOES SOMETHING WITH PSYCHOTIC FEATURES INDICATE?

A. THERE IS, BASICALLY, IN PSYCHIATRY THERE ARE ALL KINDS OF MENTAL DISORDERS. THERE ARE DISORDERS OF BEHAVIOR, THERE ARE DISORDERS OF MOOD, THERE ARE DISORDERS OF THOUGHT, THERE ARE DISORDERS OF ANXIETY. BUT WHAT A MAJOR DEPRESSION WITH

PSYCHOTIC FEATURES, PSYCHOTIC MEANS IT IS A THOUGHT DISORDER, MEANING THAT YOUR THOUGHTS AREN'T RATIONAL. PEOPLE WITH THOUGHT DISORDERS MIGHT BELIEVE THINGS OTHER PEOPLE DON'T BELIEVE, EVEN WHEN WE KNOW IT IS NOT TRUE. OR, THEY MAY HAVE THE EXPERIENCE OF HEARING VOICES. SO, BEING OUT OF TOUCH WITH REALITY. BUT THE TWO THINGS THAT YOU LOOK FOR IN A THOUGHT DISORDER ARE THE PRESENCE OF BELIEFS THAT ARE NOT TRUE AND THE PRESENCE OF HALLUCINATIONS.

Q. DOCTOR, AFTER HE LEFT THIS INSTITUTION, DID HE GO BACK TO PENNYROYAL?

A. YES.

Q. AND PENNYROYAL IS WHERE HE IS AN OUTPATIENT-TYPE OF FACILITY; IS THAT CORRECT?

A. CORRECT. THAT WOULD BE LIKE THE LOCAL MENTAL HEALTH CENTER.

Q. AND THE PHYSICIAN THAT SEES HIM THERE IS DR. SADIQ?

A. YES.

Q. AND DR. SADIQ, DID HE GIVE HIM AN ORDER OF THORAZINE?

A. YES. AND ACTUALLY, DR. SADIQ DID NOT EVEN SEE HIM. AS FAR AS I COULD TELL, HE WAS EVALUATED AND IT APPEARED, IN LOOKING AT THE RECORDS, THAT THAT MEDICATION WAS CALLED IN FOR MR. BASHAM. BUT HE WAS PLACED ON THORAZINE, WHICH IS AN ANTIPSYCHOTIC. IT IS ANOTHER MEDICINE FOR VOICES, AND DEPAKOTE, WHICH WAS A MOOD STABILIZER.

Q. NOW, WAS THERE AN EVALUATION WRITTEN UP BY NURSE

ALTMAN?

A.    YES.   THAT IS VERY COMMON, BY THE WAY, IN MENTAL HEALTH.   WHAT HAPPENS IS, AND I HAVE CERTAINLY WORKED IN MENTAL HEALTH CENTERS IN MY TRAINING,  YOU HAVE SOMEONE THAT IS ON STAFF,  USUALLY A NURSE, OR A SOCIAL WORKER, OR A PSYCHOLOGIST WHO WILL ACTUALLY DO A HISTORY OF THE PATIENT, SO THAT BY THE TIME THE PATIENT COMES TO SEE THE PSYCHIATRIST, THE PSYCHIATRIST JUST HAS TO DO A MEDICATION CHECK.   THAT WAY, IT IS A LOT MORE EFFICIENT, THE PSYCHIATRIST CAN SEE A LOT MORE PATIENTS, SO YOU CAN GET MORE PEOPLE TREATED.   SO, THAT IS THE SAME PROCESS WE USE HERE IN SOUTH CAROLINA.  SO, HE WAS SEEN AND EVALUATED BY THE NURSE, ON THIS OCCASSION, BEFORE HE WOULD HAVE FOLLOWED UP WITH THE DOCTOR.

Q.    NOW,  WAS THERE ANY EVIDENCE OF A FOLLOW-UP?

A.    NO.   THE NURSE, I BELIEVE HER NAME IS MS. ALTMAN, HAD SCHEDULED A FOLLOW-UP APPOINTMENT, BUT I SAW NOWHERE IN THE RECORDS THAT MR. BASHAM EVER CAME BACK OR THAT HIS MEDICATIONS WERE EVER CONTINUED.

Q.    NOW,  THIS IMPAIRMENT WITH MEMORY AND CONCENTRATION, IS THAT ALSO IMPORTANT THAT WAS WRITTEN IN THAT REPORT IN YOUR ASSESSMENT AS FAR AS BRANDON BASHAM IS CONCERNED,  YOUR ULTIMATE DIAGNOSIS?

A.    YES.  IN THAT REPORT, THE NURSE NOTES, AS WELL, THAT THERE WERE SOME PROBLEMS -- THAT HE REPORTS PROBLEMS WITH HIS MEMORY.   SO, AGAIN, THIS IS ANOTHER INSTANCE YOU HAVE AT THE

**JA 2076**

AGE OF EIGHT AND SOME OF THE SCHOOL PROBLEMS YOU HAVE WHEN HE IS AT METHODIST HOME WITH DR. RIVARD, YOU HAVE HERE AGAIN AT ONE OF THE OTHER HOSPITALS, I BELIEVE IT WAS -- I'M SORRY, ONE OF THE STONER CREEK HOSPITALS, AND NOW HERE AGAIN IN THE MENTAL HEALTH CENTER.

Q. DID YOU FIND ANY EVIDENCE THAT BRANDON BASHAM WAS TREATED BETWEEN FEBRUARY 1998 AND JUNE OF 1999?

A. NO. AND I STAND CORRECTED, BUT I LOOKED. I CAN'T FIND ANY RECORD OF THAT AT ALL IN REVIEWING ALL OF THOSE DOCUMENTS.

Q. NOW, DID HE -- DID THERE COME A TIME IN 1999 THAT HE WENT TO A FACILITY CALLED RICE AUDUBON?

A. YES.

Q. HE SAW DR. WALKER?

A. YES.

Q. WOULD YOU TELL THE JURY WHAT WAS SIGNIFICANT ABOUT THAT HOSPITALIZATION?

A. YES. I TALKED WITH DR. WALKER, AND HE IS, FOR 22 YEARS, HE HAS WORKED IN AN INSTITUTION SIMILAR TO DEPARTMENT OF JUVENILE JUSTICE, WHICH WE HAVE HERE IN TOWN. SO, HE HAS DEALT WITH, HE HAS HAD 22 YEARS OF EXPERIENCE OF DEALING WITH YOUTH THAT ARE INCARCERATED AT SOME LEVEL FOR VARIOUS OFFENSES. AND HE TREATED MR. BASHAM WHILE HE WAS THERE. AND THE THINGS THAT WERE SIGNIFICANT, DR. WALKER TOLD ME THAT MR. BASHAM WAS THE MOST HYPERACTIVE CHILD HE HAD EVER SEEN IN

HIS CAREER AS A PSYCHIATRIST AND HE REMEMBERED HIM WELL.

Q.    MOST HYPER?

A.    HE SAID HE HAD A VERY SMALL OFFICE.  HE EVEN WENT AT LENGTHS, I THINK IT WAS 8 BY 8, AND HE SAID THAT THE ENTIRE INTERVIEW, MR. BASHAM WAS 16 AT THE TIME,  HE WAS PULLING OUT THE MEDICAL GLOVES,  HE WAS WALKING ACROSS, LOOKING AT THE EAR OTOSCOPES, AND THAT HE COULDN'T EVEN GET HIM TO SIT DOWN LONG ENOUGH TO COMPLETE AN EVALUATION OF HIM AND THAT HE WAS INCREDIBLY HYPERACTIVE.

Q.    WAS THERE ANYTHING SIGNIFICANT IN HIS MENTAL EXAMINATION?

A.    YES.

Q.    TELL THE JURY WHAT THAT WAS.

A.    WELL,  THE THINGS THAT I REMEMBER, AND, AGAIN, I WILL BE GLAD IF YOU WANT TO REFRESH MY MEMORY, BUT SOME OF THE THINGS THAT I REMEMBER BEING SIGNIFICANT IS DR. WALKER HAD DOCUMENTED SEXUAL ABUSE IN THE CHART WITH MR. BASHAM, BUT HE DIDN'T RECALL THAT,  HE DIDN'T REMEMBER TREATING HIM FOR THAT. DR. WALKER DID NOT HAVE ANY HISTORY THAT MR. BASHAM HAD ABUSED INHALANTS, AND I ASKED HIM ABOUT THAT, AND HE WAS VERY SURPRISED TO KNOW THAT, AND DID NOT HAVE THAT HISTORY.

Q.    DID HE GIVE HIM AN EXAMINATION ABOUT RECALLING NUMBERS OR ITEMS?

A.    YES.

Q.    AND DID HE ALSO GIVE HIM AN EXAMINATION OF -- COGNITIVE

EXAMINATION ABOUT NAMING SOME RIVERS IN THE WORLD?

A.    YES.

Q.    AND ALSO AN EXAMINATION RECALLING RECENT EVENTS?

A.    YES.

Q.    TELL THE JURY WHAT THOSE ARE, THAT KIND OF TESTING.

A.    SURE.  IN THE MENTAL STATUS EXAMINATION,  WHICH IS THE EQUIVALENT OF OUR PHYSICAL, WE DO LOTS OF THINGS.  THERE IS ONE PART THAT IS CALLED THE COGNITIVE EXAM.  AND WHAT WE ARE DOING IN THERE IS WE ARE LOOKING AT HOW IS YOUR BRAIN WORKING.  SO WE WILL ASSESS THINGS LIKE YOUR LANGUAGE,  YOUR ABILITY TO REMEMBER THINGS,  YOUR KNOWLEDGE,  YOUR INTELLIGENCE,  WHETHER YOU ARE ORIENTED OR NOT.  AND SO, IN THOSE TESTS, THOSE COGNITIVE TESTS, MR. BASHAM FAILED MANY OF THOSE WHEN LOOKING AT BRAIN FUNCTION.

Q.    PARDON?

A.    WHEN LOOKING AT BRAIN FUNCTION, MR. BASHAM FAILED MANY OF THOSE TESTS.

Q.    THAT IS AT THIS STAGE OF HIS LIFE?

A.    CORRECT.

Q.    IT IS ANOTHER SITUATION?

A.    CORRECT.

Q.    WAS HE EVENTUALLY TRANSFERRED TO CARITAS PEACE CENTER?

A.    YES,  HE WAS.

Q.    THIS WAS DURING HIS STAY AT RICE AUDUBON?

A.    YES.

Q.    WAS A PSYCHOSOCIAL ASSESSMENT DONE AT CARITAS?

A.    YES.

Q.    BY CHRIS CHANEY?

A.    YES.

THE COURT:  MR. SWERLING, THIS IS A GOOD TIME FOR A RECESS ALONG HERE.

MR. SWERLING:  THAT IS FINE.

THE COURT:  LET'S TAKE A 15-MINUTE RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:  PLEASE CONTINUE.

BY MR. SWERLING:

Q.    DR. WATTS, WHEN WE LEFT OFF, WE WERE TALKING ABOUT MR. BASHAM BEING AT CARITAS.  WHEN HE WAS THERE, DID THE RECORDS REFLECT HE WAS HAVING FLASHBACKS OF CHILDHOOD ABUSE?

A.    YES.

Q.    SEXUAL ABUSE?

A.    YES.

Q.    HE WAS THERE UP TO THREE DAYS, I BELIEVE?

A.    CORRECT.

Q.    WAS HE DIAGNOSED, AT THAT TIME, WITH ANOTHER -- WITH MAJOR DEPRESSION AND OPPOSITIONAL DEFIANT DISORDER?

A.    YES.

Q.    AND ADHD?

A.    YES.

Q.    NOW, AFTER HE LEFT CARITAS -- AFTER HE LEFT RICE AND

CARITAS, HE WAS AT PENNYROYAL AGAIN?

A. YES.

Q. HE WAS SEEN BY A PSYCHOLOGIST NAMED DR. LAUNA HOUSTON?

A. YES.

Q. AND HE WAS ALSO GIVEN A PSYCHIATRIC EVALUATION BY A DR. DELAROCHA --

A. YES.

Q. -- IS THAT CORRECT? ANYTHING SIGNIFICANT ABOUT THE EVALUATION DONE BY DR. DELAROCHA AS FAR AS HIS DIAGNOSIS?

A. YES.

Q. WHAT IS IT?

A. AGAIN, I THINK IT WAS AN INCOMPLETE EVALUATION. HE DIDN'T HAVE ACCESS TO A LOT OF THE RECORDS FROM MR. BASHAM'S PRIOR HOSPITALIZATIONS, AND PRIOR TREATMENT, AND THE OPINIONS OF THE OTHER DOCTORS WHO HAD SEEN HIM OVER TIME.

Q. AND DID HE ALSO SEE AT PENNYROYAL, DR. SADIQ?

A. DR. SADIQ WAS THE DOCTOR THAT HAD PHONED IN THE PRESCRIPTIONS FOR HIM EARLIER. AND, YES, HE DID LATER COME SEE HIM.

Q. NOW, DR. SADIQ PRESCRIBED SEROQUEL?

A. YES.

Q. WHICH HE IS STILL ON TODAY, CORRECT?

A. CORRECT.

Q. AND ALSO PAXIL?

A. YES.

Q.    WHICH HE STILL TAKES; IS THAT CORRECT?

A.    CORRECT.

Q.    DID DR. SADIQ'S ASSESSMENT MATCH HIS DIAGNOSIS?

A.    NO.

Q.    HIS TREATMENT MATCHED HIS DIAGNOSIS, IS WHAT I MEAN TO SAY.

A.    NO, NOT AT ALL.

Q.    TELL ME ABOUT THAT.

A.    AGAIN, THE MEDICATION SEROQUEL IS AN ANTIPSYCHOTIC MEDICATION, THAT IS MEDICINE FOR VOICES OR BELIEFS THAT AREN'T TRUE.  AND THE OTHER MEDICATION, I BELIEVE, HE HAD HIM ON DEPAKOTE -- NO, PAXIL.  PAXIL IS FOR ANXIETY OR DEPRESSION, AND  NONE OF THOSE DIAGNOSES MATCHED THOSE MEDICATIONS.

Q.    SO, HE HAD HIM ON AN ANTIPSYCHOTIC MEDICATION, YET HE IS NOT DIAGNOSING HIM WITH A PSYCHOTIC ILLNESS; IS THAT CORRECT?

A.    CORRECT.

Q.    NOW, YOU ALSO WENT TO WESTERN STATE YOU SAID?

A.    YES.

Q.    AND MET WITH DR. LUNSFORD AND PAULA HALCOMB; IS THAT RIGHT?

A.    YES.

Q.    WOULD YOU TELL THE JURY IF THERE IS ANYTHING SIGNIFICANT ABOUT BRANDON'S STAY THERE, AS FAR AS YOUR ASSESSMENT IS CONCERNED?

A.    AGAIN, DR. LUNSFORD WAS A VERY PLEASANT, VERY PLEASANT PSYCHIATRIST. WESTERN STATE HOSPITAL WOULD BE THE SIMILAR HOSPITAL TO THE BULL STREET HERE IN COLUMBIA, SOUTH CAROLINA, THE SOUTH CAROLINA STATE HOSPITAL. IN THE WESTERN STATE HOSPITAL, THE POPULATION THERE ARE GOING TO BE WHAT IS CALLED CHRONICALLY MENTALLY ILL PEOPLE. THOSE ARE PEOPLE WHO REQUIRE LONG PERIODS OF HOSPITALIZATIONS. BUT IT ALSO HAS AN ACUTE UNIT, SIMILAR TO BRYAN HOSPITAL HERE IN COLUMBIA, IF ANYBODY IS FROM THAT AREA OF TOWN, OR PATRICK HARRIS WHICH WOULD BE IN THE UPSTATE. SO, THERE ARE SOME ACUTE PSYCHIATRIC FACILITIES IN OUR STATE. BUT WESTERN IS A COMBINATION OF BOTH OF THOSE STATES.

WHAT IS SIGNIFICANT THERE IS THAT THERE WERE, THROUGHOUT THE HOSPITALIZATION, THERE WERE REMARKS ABOUT FLASHBACKS AND ANXIETY. AND AT ONE POINT DURING THE HOSPITALIZATION, MR. BASHAM WAS SEEN BY A DR. PASQUIN, WHO CHANGED HIS DIAGNOSIS TO PSYCHOSIS.

Q.    WHAT IS THE SIGNIFICANCE OF THAT?

A.    AGAIN, THIS IS ANOTHER DOCTOR, YOU HAVE THE DOCTORS AT TEN BROECK, DR. ASUMENDI AND DR. SIDDIQUI, AND NOW YOU HAVE A DR. PASQUIN, THESE DOCTORS ARE COMMENTING THAT THERE IS SOMETHING PSYCHOTIC GOING ON WITH MR. BASHAM.

Q.    AND THAT WAS SIGNIFICANT IN YOUR ASSESSMENT, THE EVALUATION YOU WERE MAKING?

A.    YES.

Q.    NOW, DID BRANDON BASHAM ALSO GET TREATMENT AT THE HOPKINS COUNTY JAIL?

A.    YES, HE DID.

Q.    DID YOU MEET AND TALK WITH A DOCTOR NAMED LAWRENCE SUESS?

A.    YES.

Q.    WHAT DO YOU RECALL ABOUT HIS EVALUATION AT THE HOPKINS COUNTY JAIL?

A.    WELL, THERE WERE A NUMBER OF THINGS THAT ARE VERY SIGNIFICANT.  DR. SUESS IS VERY BRIGHT.  I SPENT A LOT OF TIME TALKING ABOUT THE DIFFICULTIES DELIVERING MENTAL HEALTHCARE IN THAT AREA OF KENTUCKY.  HE STATES THAT MENTAL HEALTH THERE IS VERY BELOW THE STANDARDS OF THE NEARBY CITIES WHICH HAVE UNIVERSITIES.  IT APPEARS, WITH TALKING TO DR. SUESS, HE WOULD GO OUT TO THE DETENTION CENTER AND SEE PATIENTS THERE.  AND THE RECORDS EVEN REFLECT THAT HE ACTUALLY WOULD DELIVER SAMPLES OF MEDICATIONS TO THE DETENTION CENTER. SO, FOR EXAMPLE, WHEN MR. BASHAM IS ON SEROQUEL, THAT IS A VERY EXPENSIVE MEDICATION, DR. SUESS WOULD ACTUALLY BRING SAMPLES OVER TO THE DETENTION CENTER TO MAKE SURE THAT HIS PATIENTS, IF HE PRESCRIBED THEM A MEDICATION, THAT THEY WERE ABLE TO GET IT.

BUT VERY EARLY ON, DR. SUESS'S FIRST EVALUATION, HE DIAGNOSED MR. BASHAM WITH THE CONDITION KNOWN AS SCHIZOAFFECTIVE DISORDER.  AND I KNOW THAT IS A LOT OF WORDS,

BUT IT BASICALLY MEANS IT IS A THOUGHT AND A MOOD DISORDER. IT IS A FANCY NAME WE GIVE IN PSYCHIATRY, BUT IT IS A MOOD AND A THOUGHT DISORDER AT THE SAME TIME.

Q.   I WILL PUT 322  UP ON THE SCREEN, IF I CAN.

A.   I CAN'T PROMISE I WILL BE ABLE TO READ IT, BUT I WILL TRY.

Q.   322-B, OKAY.  BRING THAT UP A LITTLE BIT,  PLEASE. TELL THE JURY WHAT IS SIGNIFICANT ABOUT DR. SUESS'S EVALUATION.

A.   YES.  IF YOU LOOK UP IN THE AREA WHERE IT SAYS "THOUGHT CONTENT,"  AGAIN, THAT IS OUR MENTAL STATUS EVALUATION.   DR. SUESS NOTES THAT THERE IS "POSITIVE AUDITORY HALLUCINATIONS." WHAT THAT MEANS IS THAT HIS REPORT IS THAT MR. BASHAM IS EXPERIENCING VOICES, AND THAT IS ACKNOWLEDGMENT OF THAT.   AND THEN HIS DIAGNOSIS, "SCHIZOAFFECTIVE DISORDER," WOULD ALSO BE A REFLECTION OF THAT.

Q.   THIS PREDATES THIS CASE.   I MEAN, THIS IS BACK IN THE HOPKINS COUNTY JAIL.   THIS IS FEBRUARY OF '01?

A.   CORRECT.

Q.   IS THAT CORRECT?

A.   YES.

Q.   I THINK YOU WERE SAYING, BEFORE I INTERRUPTED YOU, YOU WERE TALKING ABOUT TELLING THE JURY WHAT SCHIZOAFFECTIVE DISORDER IS.

A.   YES.  AGAIN, IT IS A COMBINATION OF A MOOD AND A

THOUGHT DISORDER AT THE SAME TIME.  IT IS A LITTLE BIT DIFFERENT, IF YOU HAVE MAJOR DEPRESSION WITH PSYCHOTIC FEATURES.  THAT MEANS YOU HAD A MOOD DISORDER AND THEN YOU HAD A COMPLICATION WHERE YOU GOT PSYCHOTIC.  SCHIZOAFFECTIVE DISORDER MEANS THAT YOU HAVE BOTH AT THE SAME TIME, AND ONE IS NOT A COMPLICATION OF THE OTHER.  SO, YOU HAVE TWO THINGS GOING ON AT ONCE.

Q.    THIS IS NOT THE FIRST TIME HE HAS BEEN GIVEN A DIAGNOSIS WITH A PSYCHOTIC CONDITION, IS IT?

A.    NO,  THIS IS THE THIRD TIME.

Q.    AND THEY HAVE ALL -- ALL OF THOSE OCCASIONS HAVE PREDATED HIS INVOLVEMENT IN THIS CASE --

A.    CORRECT.

Q.    -- IS THAT CORRECT? DR. ASUMENDI AND DR. SIDDIQUI, AS WELL?

A.    YES.

Q.    WHAT DID DR. SUESS DO?

A.    HE PUT HIM ON SEROQUEL, WHICH HE REMAINS ON TODAY.

Q.    AND DID DR. SUESS CONTINUE TO SEE BRANDON BASHAM, BOTH IN HIS OFFICE AND AT THE JAIL?

A.    YES.

Q.    WHILE HE WAS BACK IN THE HOPKINS COUNTY JAIL AFTER SEPTEMBER 16TH OF 2001,  WAS HIS MEDICINE CHANGED FROM SEROQUEL TO NAVANE?

A.    NAVANE.

Q.    WHAT IS THAT?

A.    IT IS ANOTHER ANTIPSYCHOTIC MEDICINE.   IT IS NOT AS NEW.  SEROQUEL IS MUCH NEWER, AND IT IS A LOT MORE MILD TO TAKE.  NAVANE IS ONE OF THE OLDER MEDICINES, AND IT HAS A LITTLE BIT MORE SIDE EFFECTS.

Q.    DID DR. SUESS EVER PRESCRIBE ATIVAN AND HALDOL?

A.    YES, HE DID.

Q.    WHAT WERE THOSE FOR?  WHAT ARE THOSE MEDICINES USED FOR?

A.    WELL, THE MANNER IN WHICH THEY WERE APPLIED, THAT IS FOR SHORT-TERM MANAGEMENT OF A PSYCHOTIC INDIVIDUAL.

    FOR EXAMPLE, IN THE HOSPITAL WHERE I WORK, IF I WERE TO HAVE ONE OF THE INMATES THAT WAS HALLUCINATING AND BANGING HIS HEAD ON A WALL,  OR PERHAPS HARMING HIMSELF,  THOSE ARE INJECTABLE MEDICATIONS YOU GIVE IN A SHOT THAT HAVE A PRETTY RAPID ONSET.  SO, IT IS A WAY TO KIND OF CALM SOMEONE DOWN OVER A QUICKER PERIOD OF TIME.

Q.    NOW, OCTOBER 1ST,  2001,  DID BRANDON BASHAM REPORT HALLUCINATIONS AND DREAMS?

A.    YES.

Q.    WHAT MEDICINE DID DR. SUESS PLACE HIM ON?

A.    I BELIEVE, I DON'T HAVE THAT RECORD, BUT IT WOULD HAVE BEEN THE STELAZINE OR NAVANE.

Q.    ANOTHER ANTIPSYCHOTIC MEDICATION?

A.    YES.

JA 2087

Q.    I WILL SHOW YOU 330.

THE CLERK:  THERE IS AN OBJECTION TO 330.

MR. SWERLING:  IS THERE AN OBJECTION?

THE COURT:   ANY OBJECTION?

MR. SCHOOLS:  I DO OBJECT TO THIS ONE,  YOUR HONOR.

THE COURT:   ALL RIGHT.  WITHOUT OBJECTION.

MR. SCHOOLS:  I DO OBJECT,  YOUR HONOR.

THE COURT:  I THOUGHT YOU SAID YOU DO NOT.  I'M SORRY, I DIDN'T HEAR YOU.

MR. SWERLING:  HE DID OBJECT.

BY MR. SWERLING:

Q.    DR. WATTS, IN THE CHART YOU GOT FROM HOPKINS COUNTY, DID YOU SEE A LETTER FROM NURSE LINKS?

MR. SCHOOLS:  I WITHDRAW THAT,  YOUR HONOR.

THE COURT:   IT IS WITHOUT OBJECTION.

BY MR. SWERLING:

Q.    THIS IS A LETTER TO NURSE LINKS, ARE YOU FAMILIAR WITH THIS LETTER?

A.    YES.

Q.    IT IS ONLY ONE PAGE.   IT IS KIND OF HARD TO READ, BUT WOULD YOU TELL THE JURY WHAT THE ESSENCE OF THAT LETTER IS?

A.    YES.   MR. BASHAM IS WRITING ONE OF THE NURSES THERE AT THE DETENTION CENTER TELLING HER THAT HE IS FRIGHTENED.  HE THINKS THEY ARE TRYING TO KILL HIM.   HE HAS FOUND STUFF LIKE ROTTING -- RAT POISONING IN HIS FOOD TRAY AND IT MAKES HIM

SICK.  HE STATES THEY ARE TRYING TO TRICK HIM.  THEY ARE NOT HUMAN,  THEY ARE SOMETHING ELSE.  AND HE IS TELLING HER NOT TO EAT ANY OF THE FOOD FROM THEM.  AND I THINK ME AND YOU ARE THE ONLY COOL HUMANS IN THIS PLACE.  HE BASICALLY HAS FEARS THAT HIS FOOD IS BEING POISONED, AND HE IS ADVISING THIS NURSE NOT TO EAT THE FOOD.

Q.  HE IS INCARCERATED,  CERTAINLY PRIOR TO THIS CASE EVER COMING ABOUT?

A.  RIGHT.

Q.  ON 332,  DID DR. SUESS -- EXHIBIT 332, DR. SUESS, MARCH 27TH, DID HE ALSO DO ANOTHER EVALUATION OF BRANDON BASHAM?

A.  YES.

Q.  I WILL PUT 332 ON THE SCREEN.

THE CLERK:  ANY OBJECTION?

MR. SWERLING:  NO.

BY MR. SWERLING:

Q.  STARTING AT THE TOP,  "HIS RECENT AND REMOTE MEMORY IS SLOW.  IMMEDIATE RETENTION RECALL IS INTACT."  AND THEN HE HAS AN ASSESSMENT.  COULD YOU TELL US THE SIGNIFICANCE OF THAT?

A.  YES.  THAT IS THE FIRST TIME DR. SUESS HAS EVER NOTED ANY IMPAIRMENT IN HIS MEMORY.  SO, AGAIN, FOR ME, THAT IS ANOTHER RED FLAG,  IT IS ANOTHER PSYCHIATRIST OR MENTAL HEALTH CLINICIAN NOTING MEMORY IMPAIRMENT IN MR. BASHAM.

Q.  THIS IS MARCH OF '02?

A.    CORRECT.

Q.    EIGHT MONTHS BEFORE HE ESCAPED, CORRECT?

A.    YES.

Q.    NOW, HE CONTINUES CONCERTA AND PRESCRIBES RISPERIDONE?

A.    YES.  AND THAT IS A TYPOGRAPHICAL ERROR.  IT IS NOT 10 MILLIGRAMS A DAY OF RISPERIDONE, THAT IS 1 MILLIGRAM, TWICE A DAY; TEN MILLIGRAMS TWICE A DAY WOULD DEFINITELY BE AN OVERDOSE.

Q.    DID DR. SUESS DO ANYTHING TO DEAL WITH THE MEMORY IMPAIRMENT?

A.    NO.

Q.    NOW, DOCTOR, YOU HAVE ALSO REVIEWED THE RECORDS FROM JUST CARE, WHICH IS A FACILITY HERE IN COLUMBIA; IS THAT CORRECT?

A.    YES.

Q.    HAD BRANDON BEEN ON ANTIPSYCHOTIC MEDICATIONS BEFORE HIS ESCAPE IN HOPKINSVILLE?

A.    YES.

Q.    AND DID JUST CARE HAVE THOSE RECORDS?

A.    YES.

Q.    WHAT WERE THE CIRCUMSTANCES OF HIS ADMISSION TO JUST CARE IN DECEMBER OF 2002?

A.    NOW, KEEP IN MIND, THIS WAS BEFORE I HAD SEEN MR. BASHAM.  THIS WOULD HAVE BEEN ABOUT A MONTH PRIOR TO THE TIME THAT I SAW HIM.  BUT FROM READING THE RECORDS AT JUST CARE,

IT APPEARS HE WAS DEPRESSED.  AND SOMEHOW, FROM SOME DETENTION CENTER HERE IN SOUTH CAROLINA, ARRIVED AT THAT HOSPITAL.  AND THAT WAS CLEARLY PRIOR TO THE TIME I HAD SEEN HIM.  BUT I DID SEE HIM IN JANUARY OF THAT YEAR WHILE HE WAS IN THAT HOSPITAL.

Q.    THAT IS WHEN YOU STARTED TO SEE HIM; IS THAT CORRECT?

A.    YES.

Q.    DID HE GET RETURNED TO THE RICHLAND COUNTY DETENTION CENTER?

A.    YES.

Q.    AND YOU SAID YOU TALKED WITH DR. ELIN BERG, WHO IS HERE IN COLUMBIA?

A.    YES.

Q.    SHE HAS A CONTRACT WITH THE RICHLAND COUNTY DETENTION CENTER?

A.    YES.  SHE IS A FORENSIC AND CHILD PSYCHIATRIST WHO WORKS OUT AT THE -- SHE GOES OUT TO THE LOCAL DETENTION CENTER HERE, SIMILAR TO DR. SUESS, AND PRESCRIBES MEDICATIONS FOR THE DETAINEES.

Q.    DID YOU SPEAK WITH HER --

A.    YES.

Q.    -- ABOUT BRANDON'S CONDITION?

A.    YES.

Q.    WHAT DID SHE TELL YOU?

A.    WELL, ACTUALLY, I CALLED HER.  I WAS CONCERNED BECAUSE I HAD SEEN -- I HAD SEEN MR. BASHAM ON TWO OCCASIONS.

I WENT DOWN TO THE DETENTION CENTER TO SEE HIM, AND ONE OF THE ROUTINES WHEN I GO IN TO EVALUATE SOMEONE IN THE DETENTION CENTER IS I DROP BY THE NURSE'S STATION AND SEE WHAT MEDICATIONS THEY WERE ON. AND, OF COURSE, KEEP IN MIND, I DIDN'T HAVE THE RECORDS AT THIS TIME EITHER. AND I WAS VERY CONCERNED THAT MR. BASHAM WAS ON CONCERTA, WHICH IS THE MEDICATION FOR ATTENTION DEFICIT DISORDER. AND I JUST -- I TOLD HER THAT WHEN I HAD INITIALLY SEEN MR. BASHAM IN JANUARY, THAT I NOTICED THAT HE APPEARED TO BE PSYCHOTIC.

AND NORMALLY, CONCERTA IS NOT A MEDICATION THAT YOU GIVE SOMEONE WHO IS PSYCHOTIC, BECAUSE THAT CAN MAKE PSYCHOSIS WORSE. SO, I JUST ALERTED HER THAT ONE OF MY EARLY FINDINGS THAT I CONSIDERED THAT HE MIGHT BE PSYCHOTIC, AND SHE MIGHT WANT TO CONSIDER WHETHER HE SHOULD TAKE THAT MEDICATION OR NOT. SO, I ACTUALLY APPROACHED HER ABOUT THAT BECAUSE I WAS CONCERNED ABOUT HIS MANAGEMENT.

Q. WHAT DID YOU RESOLVE?

A. WELL, SHE STOPPED IT BRIEFLY, BUT THEN, EVIDENTLY LATER, MR. BASHAM'S ATTORNEY SOMEHOW HAD A CONFERENCE WITH HER AND SHE HAD RESTARTED IT, WHICH WAS OKAY WITH ME, AT THAT POINT, BECAUSE I KNEW A LITTLE BIT MORE ABOUT MR. BASHAM. I HAD EVALUATED HIM A FEW TIMES IN BETWEEN SINCE THEN.

Q. DID THERE COME A TIME WHEN YOU ASKED OR RECOMMENDED THAT BRANDON BASHAM GET A SEPARATE PHYSICIAN PSYCHIATRIST TO TREAT HIM DOWN AT THE RICHLAND COUNTY JAIL?

A.    YES.

Q.    AND IS THAT AS A RESULT OF DR. BERG, SINCE SHE HAD A CONTRACT WITH RICHLAND COUNTY, WAS NOT ONLY SEEING BRANDON BASHAM, BUT AS WELL AS HIS CODEFENDANT?

A.    THAT IS CORRECT.  SHE WAS TREATING BOTH INDIVIDUALS AT THE SAME TIME.  IF  -- SOMETIMES, AS A DOCTOR, YOU HAVE TO DO THINGS THAT YOU DON'T WANT TO DO, BUT IF THERE IS ANOTHER OPTION, AND IF YOU ARE ARE IN A SITUATION WHERE YOU DON'T HAVE TO TREAT BOTH CODEFENDANTS, THAT WOULD BE OPTIMAL.

Q.    AND WAS THAT WHEN YOU GOT IN TOUCH WITH DR. DON MORGAN OR HAD US GET IN TOUCH WITH DR. DON MORGAN?

A.    THAT'S CORRECT.

Q.    AND DON MORGAN WAS THE CHIEF OF FORENSIC SERVICES FOR WILLIAM S. HALL FOR SOME PERIOD OF TIME?

A.    YES,  HE WAS.

Q.    DID HE SEE HIM AT JUST CARE AND AT RICHLAND COUNTY DETENTION CENTER?

A.    YES.  MY UNDERSTANDING IS HE CONTINUES TO TREAT HIM, AT THIS POINT.

Q.    DO YOU REMEMBER ANY SIGNIFICANT FINDINGS HE HAD WHEN HE FIRST SAW BRANDON ABOUT HIS ANXIETY AND HIS CONCERNS ABOUT WHEN THE CELL FLAP WAS CLOSED, WAS THAT OF SOME PARTICULAR IMPORTANCE TO YOU?

A.    YES.  ONE OF THE MAINSTAYS OF DR. MORGAN'S TREATMENT HAS BEEN HIS OPINION THAT MR. BASHAM HAS A SEVERE ANXIETY

DISORDER THAT RESULTS FROM HIS SEXUAL ABUSE, AND THAT IT IS ALSO A COMPONENT OF PANIC. AND THAT WHEN MR. BASHAM IS IN SITUATIONS WHERE HE IS ENCLOSED, HE GETS PANIC SYPMTOMS.

AND ONE OF DR. MORGAN'S EARLIER ORDERS WERE -- IN THE DETENTION CENTER, IT IS A VERY SMALL ROOM WITH A DOOR THAT IS SHUT. THERE IS A THING CALLED A FLAP, WHICH ALLOWS MOVEMENT OF AIR INTO THAT ROOM. AND WHENEVER MR. BASHAM IS IN A SETTING WHERE THE FLAP IS CLOSED, HE BECOMES QUITE ANXIOUS AND DEVELOPS, IN DR. MORGAN'S OPINION, PANIC ATTACKS. AND SO VERY EARLY ON, DR. MORGAN HAD WRITTEN A LETTER TO THE DETENTION CENTER STAFF THAT THEY KEEP HIS FLAP OPEN.

Q. THE COURSE OF TREATMENT THAT DR. MORGAN HAS PURSUED, WHAT HAS THAT BEEN?

A. HE HAS PLACED MR. BASHAM ON A NUMBER OF MEDICATIONS. MR. BASHAM IS ON THE SEROQUEL, WHICH HE HAD BEEN PRESCRIBED EARLIER, THAT IS AN ANTIPSYCHOTIC. MR. BASHAM IS ON CONCERTA, WHICH IS FOR THE ATTENTION DEFICIT DISORDER. MR. BASHAM IS ON THE NEURONTIN, WHICH I MENTIONED EARLIER. THAT IS A MEDICATION THAT WE USE SOMETIMES FOR BACK PAINS, FOR PAINS THAT COME FROM THE NERVOUS SYSTEM, BUT IT IS ALSO USED IN PSYCHIATRY FOR MOOD STABILITY. HE IS ALSO ON PAXIL FOR ANXIETY, AND MAINLY FOR ANXIETY SYMPTOMS.

HE IS ON FOR THIS TRIAL, DR. MORGAN ADDED SOME OTHER MEDICATIONS, VALIUM. THAT IS FOR ANXIETY, AS WELL. AND DR. MORGAN ALSO ADDED RITALIN FOR MR. BASHAM DURING THIS

TRIAL, WHICH I BELIEVE HE STILL CONTINUES TO TAKE AROUND LUNCHTIME EACH DAY.

Q. WHEN YOU FIRST WENT DOWN THERE TO SEE BRANDON BASHAM AT THE FACILITIES TO DO THE EVALUATION, WERE YOU ABLE TO DO AN EVALUATION?

A. AT JUST CARE WHEN I SAW MR. BASHAM IN JANUARY OF 2003, I WAS ABLE TO DO PART OF AN EVALUATION. BUT ONCE HE WAS DISCHARGED TO THE RICHLAND COUNTY DETENTION CENTER, OVER THOSE PERIODS OF MONTHS, ESPECIALLY IN THE SUMMER MONTHS OF JUNE AND JULY OF 2003, IT WAS VERY DIFFICULT TO EVALUATE MR. BASHAM.

Q. I WILL SHOW YOU EXHIBIT 341. I DON'T BELIEVE THERE IS ANY OBJECTION.

THE COURT: ANY OBJECTION?

MR. SCHOOLS: NO, SIR.

THE COURT: WITHOUT OBJECTION.

BY MR. SWERLING:

Q. ARE THESE THE NOTES OF DR. MORGAN FROM JUST CARE?

A. YES.

MR. SCHOOLS: YOUR HONOR, ONLY CORRECTION I WOULD ASK, DR. MORGAN IS MR. BASHAM'S TREATING PHYSICIAN AND DOES NOT WORK AT JUST CARE. I UNDERSTAND AT THAT TIME FRAME HE WAS THERE.

MR. SWERLING: HE DOES NOT WORK THERE, HE WAS SEEING HIM AS TREATING PHYSICIAN.

THE COURT: YOU MAKE THAT CONCESSION?

MR. SWERLING: YES. HE WAS NOT -- YEAH, DEFINITELY NOT.

BY MR. SWERLING:

Q. WHAT WAS SIGNIFICANT OF THE FINDINGS ON SEPTEMBER 9TH AND SEPTEMBER 10TH?

A. TWO THINGS. FIRST OF ALL, IF YOU LOOK ON THE NOTE OF SEPTEMBER 9TH, HE MENTIONS THAT THERE IS NO PANIC ATTACKS. HE IS NOT ON THE MEDICATION CONCERTA, WHICH WAS THE MEDICATION HE HAD BEEN GETTING AT THE DETENTION CENTER PRIOR TO GOING TO JUST CARE. DR. MORGAN DIAGNOSED HIM WITH AN ORGANIC MOOD DISORDER WITH PSYCHOSIS, ATTENTION DEFICIT DISORDER, PANIC DISORDER, AND POLYSUBSTANCE ABUSE. AT THAT POINT, HE HAD INCREASED HIS ANTIPSYCHOTIC MEDICATION SEROQUEL AND PUT HIM ON ZOLOFT, WHICH WAS A SIMILAR MEDICINE TO PAXIL. HE RECEIVED THE ZOLOFT BEFORE DR. MORGAN PLACED HIM ON THE PAXIL LATER.

THE SECOND NOTE TO ME IS MUCH MORE OMINOUS. IT IS DATED SEPTEMBER 10TH. AND, TO ME, WHAT IS VERY IMPORTANT THERE IS THAT IT STATES, STILL HAVING VOICES COMMENTING ON HIS BEHAVIOR. AND THAT IS A NOTE IN PSYCHIATRY THAT SAYS THOSE ARE LEGITIMATE AUDITORY HALLUCINATIONS. MANY PEOPLE CAN SAY THAT THEY HEAR VOICES, AND WHEN YOU ASK THEM WHAT IS THE NATURE OF THE VOICES, THEY MIGHT SAY, CALLING MY NAME, BUT WHEN A PSYCHIATRIST WRITES, THEY ARE COMMENTING UPON HIS BEHAVIOR, THAT IS DIAGNOSTIC OF A PSYCHOTIC DISORDER.

Q. THAT IS NOT THE FIRST TIME THAT BRANDON HAS COMPLAINED

OF THAT; IS THAT CORRECT?

A. NO.

Q. DR. SUESS NOTED THAT WELL A YEAR OR MORE IN ADVANCE OF THAT?

A. WELL, DR. SUESS'S NOTE WAS MORE STATING THAT IT APPEARED HE WAS RESPONDING TO INTERNAL STIMULI. WHAT DR. SUESS SAW WAS MR. BASHAM MUMBLING TO HIMSELF WHEN DR. SUESS WOULD ASK HIM QUESTIONS. BUT DR. MORGAN'S NOTE TALKS ABOUT WHAT THE CONTENT OF THE VOICES ARE, WHAT ARE THEY SAYING. AND, AGAIN, THAT IS JUST PATHOGNOMONIC OF THE PSYCHOTIC DISORDER.

Q. NOW, MOVING DOWN TO SEPTEMBER 11TH, WHAT IS SIGNIFICANT ABOUT THAT ENTRY?

A. WELL, THAT DR. MORGAN CONTINUES TO INCREASE HIS ANTIPSYCHOTIC MEDICATION. AND HE WRITES THAT "HE IS MORE RELAXED. VOICES ARE QUIETER AND NOT AS FREQUENT. THERE IS A NOTATION THAT HIS HALLUCINATIONS APPEAR TO BE RESPONDING TO THE INCREASE IN MEDICATION.

Q. NOW, YOU KNOW THAT THERE WAS -- BRANDON BASHAM WAS ACCUSED OF CUTTING A HOLE IN THE SCREEN AND MAKING A ROPE?

A. YES.

Q. AND I BELIEVE THAT WAS ON 9-15 THAT THERE WAS AN ENTRY NOTED IN THE RECORDS. WHAT IS SIGNIFICANT ABOUT THAT DATE?

A. IT IS THE DAY AFTER HIS BIRTHDAY.

Q. WAS THAT SIGNIFICANT TO YOU?

A.   YES.  IF YOU LOOK THROUGHOUT HIS MEDICAL RECORDS, HE HAS BEEN CONFINED MORE OF HIS BIRTHDAYS THAN HE HAS BEEN NOT CONFINED OR IN TREATMENT.

Q.   DID DR. MORGAN ALSO NOTICE ANY OTHER INCIDENTS OF PARANOIA OR MEMORY LOSS?

A.   YES.

Q.   WHAT WERE THEY AND WHEN?

A.   AGAIN,  THEY ARE IN PARTS OF HIS RECORD.  I DON'T KNOW IF YOU HAVE AN EXHIBIT.

Q.   WELL, I HAD AN EXHIBIT 343, BUT APPARENTLY IT IS NOT --

A.   THROUGH TALKING WITH DR. MORGAN BY TELEPHONE AND ALSO REVIEWING THEIR NOTES, THERE ARE CERTAINLY RECORDS THAT INDICATE THAT DR. MORGAN ALSO NOTED MEMORY IMPAIRMENT IN MR. BASHAM.

Q.   NOW,  UNDER "DISCHARGE SUMMARY" FOR BRANDON BASHAM BY MS. GAMON,  SHE IS A NURSE?

A.   YES,  I KNOW MS. GAMON.  I HAVE WORKED WITH HER.  VERY NICE LADY.

Q.   UNDER THE SECTION "ADMITTING DIAGNOSIS,"  DO YOU REMEMBER WHAT THAT DIAGNOSIS WAS, AND DO YOU REMEMBER IF THAT WAS DR. MORGAN OR DANAL?

A.   DANAL.  YES.  WHAT HAPPENED, SHE DICTATED THE DISCHARGE SUMMARY FROM THAT HOSPITALIZATION.  AND HER DIAGNOSES WERE GIVEN BY DR. DANAL ON THAT ADMISSION SUMMARY. I BELIEVE THE DIAGNOSIS WAS DEPRESSION NOT OTHERWISE

SPECIFIED. I WOULD HAVE TO LOOK AT THE RECORD TO BE SURE OF THE EVIDENCE. BUT THEY WEREN'T DR. MORGAN'S DIAGNOSIS.

Q. IS THERE ANY EVIDENCE IN THE RECORD THAT DR. DANAL EVER CONSULTED WITH DR. MORGAN BEFORE STOPPING ANY OF HIS MEDICATIONS?

A. NO.

Q. DID HE, IN FACT, STOP HIS MEDICATIONS?

A. YES.

Q. WHICH ONES?

A. MR. BASHAM HAD COME IN FROM THE RICHLAND COUNTY DETENTION CENTER ON CONCERTA, I BELIEVE SEROQUEL, AND ZOLOFT. AND DR. DANAL, UPON HIS ADMISSION TO JUST CARE, PLACED HIM ON REMERON AND STOPPED THE OTHER MEDICATIONS.

Q. NOW, DR. WATTS, YOU ALSO REVIEWED REPORTS OF MEDICAL RECORDS FROM BUTNER --

A. YES.

Q. -- FEDERAL CORRECTIONAL INSTITUTE?

A. YES.

Q. BRANDON BASHAM WENT THERE FOR AN EVALUATION --

A. YES, FOR TWO EVALUATIONS.

Q. -- A REBUTTAL EXAMINATION? ARE YOU IN AGREEMENT WITH ANY OF THE REPORT ISSUED BY DR. CAPEHART AND DR. GOURLEY?

A. SURE. THERE IS A LOT OF PARTS I AGREE WITH, ABSOLUTELY.

Q. WHAT ARE YOU IN AGREEMENT WITH, AND WHAT DO YOU DIFFER

WITH?

A.   DR. CAPEHART HAD DIAGNOSED HIM WITH ATTENTION DEFICIT HYPERACTIVITY DISORDER, COMBINED TYPE, WHICH I AGREE.  ALSO DIAGNOSED HIM WITH A NUMBER OF DEPENDENCE ON DRUGS, I BELIEVE, INCLUDING INHALANTS.  I DON'T HAVE THE REPORT WITH ME, BUT I BELIEVE ALSO MARIJUANA AND COCAINE, WHICH I AM IN AGREEMENT WITH.  HE DIAGNOSED MR. BASHAM WITH LEARNING DISABILITIES, WHICH I AM IN AGREEMENT WITH, I CODED THEM IN A DIFFERENT WAY. I INCLUDED THAT DIAGNOSIS UNDER ANOTHER CONDITION.  BUT WHAT I DIDN'T AGREE WITH IS HE DIAGNOSED HIM WITH AN ANTISOCIAL PERSONALITY DISORDER, AND I DID NOT MAKE THAT DIAGNOSIS.

I ALSO DIAGNOSED MR. BASHAM WITH A FORM OF PSYCHOSIS, WHICH DR. CAPEHART DIDN'T.  I DIAGNOSED MR. BASHAM WITH AN ANXIETY DISORDER, WHICH DR. CAPEHART DIDN'T.  AND I DIAGNOSED HIM WITH DEMENTIA, WHICH IS THE BAD BRAIN, THE PROBLEMS WITH THE MEMORY, WHICH DR. CAPEHART DID NOT.

Q.   I WILL ASK YOU ABOUT THOSE IN A BIT.  YOU EXAMINED THE LEGAL HISTORY OF BRANDON BASHAM AS WELL, ALONG WITH THE MEDICAL HISTORY AND EVERYTHING ELSE WE HAVE TALKED ABOUT?

A.   YES.

Q.   AND PART OF THE MEDICAL HISTORY, DID YOU EXAMINE THE ORIGINAL FORGERY CHARGES THAT BRANDON BASHAM WAS ACCUSED OF OF WRITING THE CHECKS?

A.   YES.

Q.   DID YOU HAVE ANY OBSERVATIONS ABOUT THOSE?

A.    YEAH.

Q.    WOULD YOU TELL THE JURY?

A.    HE SIGNED HIS FATHER'S NAME AND COULDN'T EVEN SPELL HIS FATHER'S NAME RIGHT.  ONE OF THEM SAID "JIMIMIE," J-I-M-I-M-I-E, I BELIEVE ON THE CHECK.  BUT I THINK ON TWO OR THREE OF THE CHECKS, HE DIDN'T EVEN SPELL HIS FATHER'S NAME RIGHT.

Q.    NOW,  YOU ARE ALSO AWARE OF BRANDON'S HISTORY OF AWOL AND ALSO ESCAPE; IS THAT CORRECT?

A.    YES.

Q.    AS A MATTER OF FACT, YOU VISITED WESTERN STATE HOSPITAL WHERE HE WALKED OFF?

A.    I VISITED THE WESTERN STATE HOSPITAL WHERE HE HAS WALKED OFF.  I VISITED THE HOPKINSVILLE COUNTY DETENTION CENTER WHERE HE ESCAPED.  I VISITED JUST CARE, AS WELL, WHERE HE HAD CUT THE SCREEN AND HAD THE ROPE.

Q.    WHAT OBSERVATIONS DID YOU MAKE IN CONNECTION WITH THOSE?

A.    WELL, WESTERN STATE HOSPITAL WAS PRETTY EASY TO FIGURE OUT.  I TALKED WITH DR. LUNSFORD, THAT IS A STATE HOSPITAL. ALTHOUGH THERE ARE SOMETIMES PEOPLE ARE HOUSED IN STATE HOSPITALS THAT HAVE LEGAL CHARGES, THAT IS NOT A LOCKDOWN LEGAL UNIT.  WHAT HAPPENED IS MR. BASHAM WAS ALLOWED TO HAVE, AS HE HAD BEEN THERE OVER TIME, THEY ARE GIVEN YARD PRIVILEGES, WHICH MEANT HE WAS FREE TO WALK ABOUT THE YARD. HE

**JA 2101**

LEFT THE YARD.  MR. BASHAM STATES THAT THERE WERE VISITORS, AND HE GOT A RIDE HOME WITH ONE OF THE VISITORS.  SO HE, BASICALLY, JUST WALKED OFF THE CAMPUS,  GOT IN A CAR, AND WAS DRIVEN HOME.

IF YOU WANT ME TO CONTINUE, THE HOPKINSVILLE COUNTY DETENTION CENTER.  I SPOKE AT LENGTH WITH MAJOR SCHAFFER, WHO SHOWED ME THE STRUCTURE,  AND TOLD ME, I DON'T KNOW IF HE TOLD YOU ALL ABOUT THE KNUCKLES,  I LEARNED WHAT THE KNUCKLES WERE ON THE BOTTOM OF THE FENCE.  I WENT OUTSIDE INTO THE COURTYARD WHERE MR. BASHAM AND MR. FULKS ESCAPED AND WAS PRETTY IMPRESSED.  IT LOOKS VERY TECHNICAL.  AT FIRST, I WAS VERY AMAZED THAT SOMEBODY COULD GET OUT OF THERE.  BUT WHEN MAJOR SCHAFFER WAS ABLE TO SHOW ME THE DEFECT IN THE FENCE AND THAT THE FENCE WOULD BASICALLY JUST RIP APART LIKE A CURTAIN, HE DESCRIBED IT AS THEY GOT LUCKY.

THE ESCAPE FROM JUST CARE -- THE ATTEMPTED ESCAPE, I KNOW THESE OFFICERS VERY WELL.  I HAVE HAD A NUMBER OF PATIENTS OVER THERE.  I WORK WITH CHIEF PLEDGER OVER THERE, AND IT IS A PRETTY WELL-RUN FACILITY.  SERGEANT DRESCHER -- I WENT INTO THE ROOM WHERE MR. BASHAM WAS HOUSED.  I SAW THE SCREEN THAT HE WOULD HAVE CUT.  I SAW THE ROPE.  I CAME TO THE COURTHOUSE AND LOOKED AT THAT ROPE.  AND I ALSO TOOK A TOUR OF THE FACILITY THERE.  AND MY OPINIONS WERE A NUMBER OF THINGS.

MR. SCHOOLS:  YOUR HONOR,  I AM NOT SURE WHAT HER

OPINIONS ARE ABOUT THAT. I AM NOT SURE HOW THEY FALL IN THE REALM OF PSYCHIATRIC TESTIMONY.

MR. SWERLING: GOES TOWARD HIS COGNITIVE ABILITY, INTELLECTUAL LEVEL, TECHNICAL FUNCTIONING.

THE COURT: OVERRULED. GO AHEAD.

THE WITNESS: MR. BASHAM HAD CUT THE SCREEN AND HAD A PICTURE OVER IT. THAT IS HOW THE CORRECTIONS OFFICER WAS ALERTED TO THE SCREEN. THERE WAS A PICTURE ON THE SCREEN WHERE THERE ARE NOT SUPPOSED TO BE ANY PICTURES. AND IN LOOKING AT THE HOSPITAL, HAD HE BEEN SUCCESSFUL IN GETTING OUT OF THE WINDOW, IT IS ON THE FOURTH FLOOR, AND AFTER THE AREA THAT IS THE GROUNDS, THERE IS ALSO A FENCE THERE, AND ON THE TOP OF THAT FENCE, THERE WAS A RAZOR WIRE THERE THAT HE WOULD HAVE ALSO HAD TO HAVE BEEN ABLE TO GET THROUGH IN ORDER TO LEAVE THAT CAMPUS.

BY MR. SWERLING:

Q. DR. WATTS, IN ASSESSING OR DOING AN EVALUATION ON BRANDON BASHAM, DID YOU STUDY HIS RELATIONSHIPS WITH MALES AND WITH FEMALES?

A. YES.

Q. WHAT OBSERVATIONS DID YOU MAKE?

A. A FEW. IN PSYCHIATRY, WE DIAGNOSE PERSONALITY DISORDERS IN PEOPLE SOMETIMES. AND WHAT THAT MEANS, THAT IS A PATTERN, IT IS A MALADAPT PATTERN. IT IS NOT A GOOD THING IF YOU GET DIAGNOSED WITH A PERSONALITY DISORDER. IT IS A

MALADAPTIVE PATTERN WHERE YOU KEEP DEALING WITH PEOPLE IN SITUATIONS IN WAYS THAT ARE NOT HELPFUL. THE WAY I REFER TO IT, IF YOU KEEP RUNNING AND YOU BANG YOUR HEAD IN A BRICK WALL, YOU KEEP DOING THAT EVERY TIME INSTEAD OF TRYING A DIFFERENT WAY IN TRYING TO DEAL WITH SITUATIONS IN A LIFETIME.

WHAT IS SIGNIFICANT THERE IS THAT YOU HAVE TO LOOK AT YOUR RELATIONSHIPS OVER TIME. YOU HAVE TO LOOK AT THE BIG PICTURE OF HOW PEOPLE FUNCTION OVER A PERIOD OF TIME. ONE OF THE WAYS WE DO THAT IS WE LOOK AT HOW DO YOU GET ALONG WITH OTHERS. WHAT ARE YOUR RELATIONSHIPS WITH PEOPLE? IN LOOKING AT MR. BASHAM'S HISTORY, ONE OF THE THINGS THAT I FOUND WAS VERY SIGNIFICANT IS HIS RELATIONSHIP WITH FEMALES. YOU CAN SEE IN SOME OF THE SEXUAL RELATIONSHIPS HE HAS HAD THAT HE DEVELOPS A VERY INTENSE ATTACHMENT, VERY QUICKLY WITH FEMALES. BETH MCGUFFIN IS A VERY GOOD EXAMPLE. HE ONLY SPENT A VERY FEW DAYS WITH HER, YET STATES HE LOVES HER, HE WRITES HER LOVE LETTERS. YOU CAN ALSO SEE WITH SOME OF THE CLINICIANS OVER TIME WHERE HE HAS BEEN HOSPITALIZED HE DEVELOPS VERY INTENSE ATTACHMENTS TO THEM, MS. TITZER. HE HAS HAD SOME TEACHERS, AS WELL. SO WITH THE FEMALES, HE HAS A VERY INTENSE ATTACHMENT THAT IS PROBABLY PATHOLOGICAL. THAT IS PATHOLOGICAL.

Q.    WHAT ABOUT WITH MALES?

A.    HE HAS TWO DIFFERENT KINDS OF RELATIONSHIPS WITH MALES. WHEN HE IS AROUND MALES THAT ARE NOT -- THAT ARE NONAUTHORITARIAN, THESE WOULD BE FRIENDS, THESE WOULD BE

PEOPLE IN HIS COMMUNITY, AND ACTUALLY DR. MORGAN PROBABLY FALLS UNDER THAT AND ALSO HIS FATHER, THAT HE DEVELOPS A DEPENDENCY ON MALES. AND WHAT HE DOES WHEN HE IS AROUND MALES THAT HE DEEMS HIGHER FUNCTIONING THAN HIM, HE SEEKS A LOT OF ADVICE FROM THEM. HE IS THE FOLLOWER IN THOSE KINDS OF SITUATIONS.

ON THE OTHER HAND, YOU CANNOT DENY IT, WHEN MR. BASHAM IS AROUND AUTHORITARIAN MALES, HE IS VERY AGGRESSIVE. HE CAN BE AGITATED. HE IS VERY RESISTANT IF THEY ASK HIM TO FOLLOW RULES OR DO THINGS. AT TIMES, THERE IS NO QUESTION THAT HE HAS DIFFICULTY IN FOLLOWING THE RULES.

Q. ON THE WHOLE, OBVIOUSLY, WHO DOES HE RELATE TO?

A. DEFINITELY FEMALES.

Q. THAT IS HISTORICALLY FROM THE RECORDS, AS WELL?

A. YES.

Q. DR. WATTS, YOU HAVE ALSO, I BELIEVE, BEEN QUALIFIED AS AN EXPERT IN FORENSIC PSYCHIATRY WITH ADDITIONAL EXPERTISE IN SEXUAL DISORDERS; IS THAT CORRECT?

A. YES.

Q. AND COULD YOU ELABORATE BRIEFLY ON THAT? JUST TELL US WHAT THAT INVOLVES.

A. I ALREADY DID. I WAS THE COURT-APPOINTED DOCTOR FOR THE SEXUALLY VIOLENT PREDATOR STATUTE. I STILL TREAT. I HAVE ACTUALLY HAD TRAINING. I TRAINED IN CANADA UNDER PROBABLY ONE OF THE WORLD'S EXPERTS IN SEXUAL DISORDERS. I

PRESENTLY GO AND TREAT THE SEX OFFENDERS IN OUR UNIT NOW ONCE A WEEK.

Q.    IN THE OVERALL EXAMINATION OF BRANDON BASHAM'S SEXUAL HISTORY, HAVE YOU MADE ANY OBSERVATIONS?

A.    YES.

Q.    COULD YOU ELABORATE?

A.    SURE.    IN OBTAINING A SEXUAL HISTORY, THAT IS THE PART OF PSYCHIATRY THAT IS SOMETIMES LEFT OUT.  AS YOU CAN IMAGINE, NOBODY LIKES TO TALK ABOUT THEIR SEX LIFE, THAT IS VERY PRIVATE.  BUT ONE OF THE THINGS WE TYPICALLY DO WHEN WE GET A SEXUAL HISTORY IS, OF COURSE, YOU HAVE TO GET THE HISTORY IF SOMEONE HAS BEEN ABUSED IN THEIR LIFETIME AND EXPOSED TO ABUSE.  SO, I WENT THROUGH THAT WITH MR. BASHAM AND TRIED TO DELINEATE THE TIMES THAT HE WAS A VICTIM OF SEXUAL ABUSE.

THERE WAS THE INCIDENT WITH MR. GROVES WITH THE FONDLING. THERE WAS THE INCIDENT THAT HE REPORTED WITH THE MAN NAMED J. R., WHO WAS THE HOMELESS GENTLEMAN THAT HIS FATHER BROUGHT INTO THE HOME.  THERE WAS THE EPISODE WHERE HE WITNESSED ABUSE AT THE METHODIST HOME WITH THE TWO JUVENILES.  ONE WAS BEING SODOMIZED BY ANOTHER, AND MR. BASHAM WITNESSD THAT. AND THE FOURTH EPISODE WAS A NEIGHBOR THAT MR. BASHAM SPENT THE NIGHT WITH THAT HAD ATTEMPTED TO FONDLE HIM, AS WELL. SO PART OF WHAT WE DO IS GOING THROUGH THE HISTORY OF EXPOSURE TO SEXUAL ABUSE.

THE NEXT THING I DO IS YOU LOOK AT THE NUMBER OF PARTNERS, CONSENTING SEXUAL PARTNERS THAT SOMEONE HAS HAD OVER TIME. MR. BASHAM'S SEXUAL RELATIONSHIPS ARE CHARACTERIZED AS VERY BRIEF RELATIONSHIPS THAT ARE SEXUAL.  NOT A LOT OF RELATIONSHIP BEHIND THEM.  HE DID DESCRIBE HE HAD TWO LONG-TERM RELATIONSHIPS,  ONE WITH A GIRL NAMED, I BELIEVE, MARGIE, AND THEN THERE WAS ANOTHER NAMED CARLA.  I THINK HER NAME IS CARLA.  THEN THE OTHER WAS A YOUNG LADY NAMED AMBER, WHOM HE HAD MET AT STATE HOSPITAL,  WESTERN STATE HOSPITAL.

AND THEN, FINALLY, WHAT I DO, THERE ARE SEXUAL DISORDERS, THINGS THAT ARE WRONG WITH PEOPLE THAT THEY ARE THE KINDS OF PEOPLE THAT ARE OVER IN THE UNIT I WORK.  THERE ARE NINE DIFFERENT KINDS OF SEXUAL DISORDERS, AND I SCREENED FOR THOSE DISORDERS AS WELL.  MR. BASHAM HAS A VERY BAD HISTORY, AND MORE RECENTLY THAN NOT, OF EXPOSING HIS GENITALS TO SOME OF THE FEMALE STAFF.  THIS HAS HAPPENED EVIDENTLY AT RICHLAND COUNTY DETENTION CENTER AND ALSO IN THE BUTNER HOSPITAL.  I UNDERSTAND THAT THROUGH READING THE RECORDS AND THE TESTIMONY, THAT THERE HAVE BEEN SOME NURSES THAT HAVE BEEN EXPOSED BY MR. BASHAM.

I DID NOT DIAGNOSE HIM WITH A SEXUAL DISORDER.  AND THE REASON BEING, THERE IS A SEXUAL DISORDER KNOWN AS EXHIBITIONISM. AND THAT IS THE GUYS YOU SEE ON THE STREET THAT EXPOSE THEMSELVES TO UNSUSPECTING PEOPLE.  I HAVE HAD IT HAPPEN TO ME, IT HAPPENS.   BUT THE DIFFERENCE IS, THAT

DISORDER OCCURS ALL THE TIME WITH THESE PEOPLE.  IT OCCURS IF YOU ARE IN A HOSPITAL,  OCCURS IF YOU ARE OUT IN THE STREET, IT OCCURS IN YOUR OCCUPATION.  MR. BASHAM'S EXPOSING ONLY OCCURS WHEN HE IS CONFINED. NO RECORD I HAVE FOUND THAT HE HAS BEEN CHARGED WITH INDECENT EXPOSURE IN THE COMMUNITY. THERE IS NO RECORD OF THAT.  WHILE IN MY OPINION IT IS INCREDIBLY POOR JUDGMENT, THERE ARE OTHER REASONS FOR THAT. I DID NOT DIAGNOSE HIM WITH SEXUAL DISORDER.

Q.    NOW,  YOU ALSO,  YOU KNOW,  SOME EVIDENCE OF HIS ACTUAL MASTURBATING,  PEOPLE WITNESSING HIS MASTURBATION,  AN INCIDENT WHERE HE EVEN EJACULATED WHEN HE WAS IN PRISON.

A.    YES.

Q.    YOU TRAVEL THROUGHOUT THE PRISONS; IS THAT CORRECT?

A.    YES.

Q.    YOU ARE NOT A STRANGER TO THE PRISONS IN SOUTH CAROLINA?

A.    NO.

Q.    COULD YOU ELABORATE TO THE JURY YOUR VIEWS ABOUT KNOWING BRANDON BASHAM AS TO HIS NOT ONLY EXPOSING HIMSELF, BUT ALSO THE MASTURBATION INCIDENTS THAT HE HAS BEEN ACCUSED OF OR HAVE BEEN REFERRED TO IN THIS CASE?

A.    SURE.  UNFORTUNATELY, THAT IS ONE OF THE -- CERTAINLY NOT A PERK OF BEING IN CORRECTIONAL PSYCHIATRY IF YOU ARE A FEMALE.  IT HAPPENED TO ME, AS WELL.  WHEN YOU WORK IN CORRECTIONAL SETTINGS AS A FEMALE, YOU HAVE TO REMEMBER A FEW

THINGS. FIRST OF ALL, THERE AREN'T MANY FEMALES IN ALL-MALE INSTITUTIONS. SO, WHEN THERE IS A FEMALE AROUND, THEY ARE PROBABLY GOING TO HAVE A LOT OF ATTENTION DRAWN TO THEM.

THE SECOND THING THAT HAPPENS, AND I KNOW THIS IS NOT WHAT PEOPLE WANT TO HEAR, BUT IT DOES HAPPEN. SOMETIMES IN CORRECTIONS, THERE ARE RELATIONSHIPS BETWEEN INMATES AND STAFF. AS YOU SAW, I READ TINA SEVERANCE'S TESTIMONY. SHE HAD A RELATIONSHIP WITH ONE OF THE INMATES, A MAN NAMED ERIC. I DON'T KNOW HIS LAST NAME. BUT SOMETIMES THAT HAPPENS. AND WHAT HAPPENS IS INMATES TEST EMPLOYEES. WHAT THEY DO IS, THEY MASTURBATE IN FRONT OF THEM. IF YOU DON'T GET WRITTEN UP, THERE MIGHT BE A CHANCE THAT, AT SOME POINT IN THE FUTURE, YOU MIGHT BE ABLE TO HAVE A RELATIONSHIP WITH THAT PERSON. SO, A LOT OF TIMES WHAT HAPPENS IS THE INMATE MASTURBATES IN FRONT OF A STAFF, AND IT IS A FORM OF TESTING. AGAIN, IT IS VERY POOR JUDGMENT. NEVER CONDONED, BUT THAT IS SOMETHING THAT HAPPENS IN CORRECTIONAL INSTITUTIONS.

Q. IT IS NOT A REFLECTION ON THE FEMALE?

A. NO, NOT AT ALL. MORE OFTEN THAN NOT, I THINK THEY GET WRITTEN UP AND GET MORE IN TROUBLE. I DON'T THINK THERE ARE TOO MANY FEMALES THAT ARE RECEPTIVE OF THAT KIND OF BEHAVIOR.

Q. NOW, IN DOING ALL OF THAT, IN ASSESSING ALL OF THAT USING YOUR EXPERIENCE, DOES BEING ABUSED AS A CHILD -- SEXUALLY BEING ABUSED AS A CHILD MAKE IT MORE LIKELY THAT YOU

ARE GOING TO ABUSE SOMEONE WHEN YOU ARE AN ADULT?

A. NO. IN PSYCHIATRY, YOU ALWAYS HEAR, AND THIS IS TRUE IN GENERAL, THAT PAST BEHAVIOR IS THE BEST PREDICTOR OF FUTURE BEHAVIOR. WELL, THE ONE AREA THAT IS ABSOLUTELY NOT TRUE IS IN SEXUAL ABUSE. AND WHAT HAPPENS, WHEN SOMEONE IS SEXUALLY ABUSED FOR AROUND THE PERIOD OF TIME THAT THEY ARE ABUSED, ESPECIALLY CHILDREN, THEY WILL BECOME QUITE SEXUALIZED. FOR EXAMPLE, IF YOU HAVE A SIX-YEAR-OLD THAT HAS BEEN FONDLED, YOU MIGHT NOTICE HIM FONDLING IN SCHOOL. HE MIGHT BE DOING SOME VERY INAPPROPRIATE THINGS. PERHAPS TOUCHING HIS PRIVATES THROUGH HIS CLOTHES, BUT THAT SORT OF THING. BUT THERE IS ABSOLUTELY NO EVIDENCE THAT IF YOU WERE ABUSED AS A CHILD, YOU ABUSE AS AN ADULT. AND THAT IS PART OF THE AREA THAT I TRAINED IN. WHEN IN EVALUATING THESE PEOPLE UNDER THE SEXUALLY VIOLENT PREDATOR STATUTE, THAT IS, BASICALLY, WHAT WE DO FOR THE COURT. WE ARE LOOKING FOR, ARE THERE RISK FACTORS THAT THESE PEOPLE HAVE THAT MAKE THEM LIKELY TO REOFFEND. WE KNOW, THROUGH ALL OF THE PSYCHIATRIC LITERATURE, THERE IS NO EVIDENCE THAT BEING ABUSED IN THE PAST MAKES YOU AN ABUSER. THAT IS JUST ABSOLUTELY NOT TRUE.

Q. HAS BRANDON BASHAM EVER DONE ANYTHING LIKE THAT WITH YOU?

A. NO.

Q. WE HAVE GONE OVER HIS DRUGS AND USE OF HIS DRUGS. HAVE YOU TALKED TO BRANDON ABOUT WHAT WOULD HAPPEN TO HIM WHEN

HE WAS USING DRUGS?

A.      YES.

Q.      DIFFERENT TYPES OF DRUGS?

A.      YES.

Q.      COULD YOU GIVE THE JURY A SUMMARY OF THAT?

A.      YES.   I WAS VERY INTERESTED IN WHAT EFFECTS THESE MEDICATIONS HAD ON HIS MENTAL STATE, BECAUSE, AS I HAVE ALREADY ALLUDED TO, I THINK THERE ARE A NUMBER OF THINGS GOING ON WITH HIM.   SO, ONE OF THE THINGS WE USE DIAGNOSTICALLY, IF YOU CAN SEE HOW DRUGS AFFECT SOMEONE'S MENTAL CONDITION, SOMETIMES THAT GIVES YOU INFORMATION ABOUT THEIR DIAGNOSIS.

THE INHALANTS, I WAS VERY CURIOUS AS TO WHAT KIND OF INHALANTS HE ABUSED, AND THAT IS FOR A NUMBER OF REASONS. WHEN HE WOULD HUFF LAWNMOWER GAS,  HE WOULD HAVE AUDITORY HALLUCINATIONS.   HE WOULD HEAR BUZZES, WHICH IS VERY CONSISTENT.   HE WOULD HEAR THINGS,  BUZZING.   WHEN HE WOULD HUFF GOLD PAINT, HE WOULD SEE THINGS; THAT IS A VISUAL HALLUCINATION.   AND HE STATED HE WOULD SEE THINGS LIKE PRETTY FLOWERS ON TREES.   SO, THE DIFFERENT KINDS OF INHALANTS THAT YOU USE CAN HAVE DIFFERENT EFFECTS SOMETIMES.

THE INTERESTING THING THAT I GATHERED ABOUT HIS INHALANT ABUSES, THAT HE WOULD GO IN A TRANCE-LIKE STATE FOR A PERIOD OF OF TIME.  AND THAT IS VERY CONSISTENT WITH OUR MEDICAL JOURNALS THAT IT CAN AFFECT YOU ACUTELY WHILE YOU ARE INTOXICATED.

THE MARIJUANA WAS VERY INTERESTING.  MR. BASHAM HAS ALWAYS BEEN ON RECORD WITH ME STATING MARIJUANA CALMS HIM DOWN.  AND THAT IS VERY CONSISTENT WITH THE HISTORY I HAVE OF TREATING THE YOUNG MEN OVER AT DJJ, ESPECIALLY THE ONES THAT ARE HYPERACTIVE.  IT CALMS THEM DOWN.

THE EFFECTS OF COCAINE AND SPEED, ESPECIALLY THE SPEED, MR. BASHAM HAS USED CRANK OVER TIME.  NOW, HE DOESN'T CONSIDER THAT A DRUG OF CHOICE, HE HAS USED IT INTERMITTENTLY. BUT HE STATED HE DIDN'T LIKE THAT DRUG BECAUSE IT MADE HIM FEEL LIKE HE WAS ON RITALIN.  IT WOULD SLOW HIM DOWN AND FOCUS IT.  HE STATES WHEN HE WAS ON THE STREET, HE DIDN'T WANT THAT EFFECT, HE DIDN'T WANT TO BE FOCUSED.

THEN, FINALLY, THE COCAINE.  THE MOST INTERESTING THING ABOUT THE CRACK IS IT MAKES MR. BASHAM PARANOID.  I THOUGHT IT WAS A VERY GOOD EXAMPLE IN BETH MCGUFFIN'S TESTIMONY, SHE STATED THE FIRST NIGHT WHEN THEY ALL WERE TOGETHER SMOKING CRACK, BRANDON WAS THE ONE LOOKING OUT THE WINDOW THINKING THAT PEOPLE WERE COMING TO GET HIM.  SO, THE EFFECT OF THESE DRUGS ON HIS BEHAVIORS AND HIS PERCEPTIONS ARE VERY IMPORTANT.

Q.    DOCTOR, YOU HAVE GONE THROUGH ALL OF YOUR SOURCES OF INFORMATION AND VARIOUS HISTORIES YOU HAVE LOOKED AT.  AND HAVE YOU BEEN ABLE TO FORMULATE A DIAGNOSIS OF BRANDON BASHAM OR MORE THAN ONE?

A.    YES.

Q.    COULD YOU EXPLAIN HOW YOU GO AHEAD AND DO A DIAGNOSIS?

A.    SURE.    YOU HAVE TO TAKE ALL OF THE HISTORY TOGETHER, AND ALL OF THE RECORD REVIEWS, ALL OF THE INTERVIEWS, THE CONSULTATIONS WITH DR. BRANNON, AND DR. BRAWLEY, AND DR. MORGAN, AND MS. VOGELSANG.    WHAT I DID IS, WE HAVE IN PSYCHIATRY, I BROUGHT IT FOR YOU, WE HAVE A BOOK CALLED DSM-TR.    THIS IS JUST LIKE IF YOU GO TO YOUR INTERNIST, YOU KNOW, THEY HAVE THAT BIG RED BOOK CALLED THE ICD-9, THAT LISTS ALL OF THE DIAGNOSES, SO WHEN YOUR INSURANCE COMPANY CALLS AND THEY HAVE TO GIVE THEM A CODE NUMBER.    SO, WE HAVE A VERY SIMILAR SYSTEM IN PSYCHIATRY.

YOU CAN ACTUALLY USE THE ICD-9 IN PSYCHIATRY, BUT THIS BOOK, THE DSM, IT IS JUST FOR PSYCHIATRY.    SO, IT IS MUCH MORE DETAILED THAN THE ICD-9 BOOK.    BUT THE WAY THIS BOOK GOES IS IT HAS DIFFERENT AXIS THAT YOU DIAGNOSE SOMEBODY WITH. AN AXIS-I DISORDER IS A MAJOR MENTAL ILLNESS, OR IT IS A CONDITION SO BAD THAT ANYBODY WOULD HAVE PROBLEMS.    SO, FOR EXAMPLE, IF YOUR SPOUSE WERE TO DIE, AND YOU CAME INTO MY OFFICE, I WOULD DIAGNOSE YOU WITH AN AXIS-I.    THAT WOULDN'T MEAN YOU HAVE A MAJOR MENTAL ILLNESS.    THAT MEANS YOU HAVE WHAT IS CALLED AN ADJUSTMENT DISORDER.    THAT YOUR REACTION, ANYBODY WOULD BE EXPECTED TO BE UPSET UNDER THOSE SITUATIONS. SO, MAJOR MENTAL ILLNESSES AND CONDITIONS THAT AFFECT PEOPLE WOULD BE DIAGNOSED ON AXIS-I.

AXIS-II IS USED FOR PERSONALITY DISORDERS.    AND, AGAIN, THOSE ARE MALADAPTIVE WAYS OF DEALING WITH THE WORLD.    AND IT

IS ALSO USED TO DIAGNOSE DISORDERS OF INTELLECTUAL ABILITIES.

AXIS-III IS USED FOR MEDICAL ILLNESSS THAT MAY AFFECT YOUR MENTAL STATE.  SO, WHAT WE DO IS WE ASSIGN AM AXIS-I, AXIS-II,  AND AN AXIS-III ILLNESS, WHICH I WAS ABLE TO DO IN THIS CASE.

NOW, WHAT IS NEAT ABOUT THIS BOOK IS IT LISTS THE CRITERIA.  SO,  FOR EXAMPLE, IF I CALL A PSYCHIATRIST IN SAN FRANCISCO AND I SAY, PATIENT JOE HAS A MAJOR DEPRESSION,  HE AND I UNDERSTAND THAT WE ARE TALKING ABOUT THE SAME DIAGNOSIS BECAUSE OF THIS LIST OF CRITERIA.  WE MAKE THE DIAGNOSIS USING THE DSM.

Q.    HOLD UP THE BOOK.

A.    IT HAS HAD A LOT OF REVISIONS.  THIS IS THE FOURTH, AND IT IS REVISED.  THE FIFTH ONE, UNFORTUNATELY, IS COMING OUT PRETTY SOON.  BUT I THINK THIS HAS BEEN AROUND ABOUT 20 YEARS, AND IT HAS NOT HAD TOO MANY REVISIONS. WHEN THE REVISIONS COME, THEY ARE NOT VERY MUCH DIFFERENT, PERHAPS A DISORDER WAS TAKEN OUT, OR SOMETIMES MORE TEXT IS WRITTEN ABOUT THE DISORDERS.  NOT ONLY DOES THIS BOOK HAVE THE DIAGNOSIS, IT ALSO DESCRIBES SOME THINGS ABOUT THE DIAGNOSIS. IT IS A VERY GOOD SOURCE OF INFORMATION.

Q.    NOW,  DOCTOR, WHAT WAS YOUR FIRST AND PRINCIPLE DIAGNOSIS?

A.    DEMENTIA DUE TO MULTIPLE ETIOLOGIES.

Q.    WHAT DOES THAT MEAN?

JA 2114

A.    BASICALLY, WHAT THAT MEANS, THAT IS A MAJOR MENTAL ILLNESS.  IT IS WHAT IS CALLED AN ORGANIC ILLNESS,  AN ILLNESS OF THE BRAIN.  AND WHEN I SAY "DEMENTIA," I AM NOT TALKING ABOUT ALZHEIMER'S.  THERE ARE MANY DIFFERENT FORMS OF DEMENTIA THAT SOMEBODY CAN BE DIAGNOSED WITH.  SOMETIMES YOU CAN HAVE DEMENTIA FROM STROKES,  SOMETIMES YOU CAN HAVE ALZHEIMER'S DEMENTIA. AND THERE ARE A LOT OF DRUGS,  A LOT OF SUBSTANCES THAT PEOPLE CAN ABUSE OVER TIME THAT CAN CAUSE THE DEMENTIA.  YOU CAN ALSO HAVE DEMENTIA IF YOU HAVE A LOT OF HEAD TRAUMAS OR IF YOU HAVE HAD A HISTORY OF THOSE.

SO, WHAT DEMENTIA DUE TO MULTIPLE ETIOLOGIES MEANS IS, IN MY OPINION,  HE SUFFERS FROM A BRAIN CONDITION.  AND, IN MY OPINION, IT WAS CAUSED FROM THE INHALANT ABUSE THAT HE HAD SINCE THE AGE OF TEN THAT HAS BEEN ONGOING AND CONTINUES AT TIMES, AND THAT HE HAS ALSO HAD A LOT OF MINOR HEAD INJURIES. IF YOU LOOK AT EACH ONE, THERE IS NOTHING MAJOR.  BUT IF YOU TAKE A LOT OF THESE INJURIES OVER TIME, AND ALSO SOME EPISODES THAT HE HAS HAD WHERE HE WAS EXPOSED TO THINGS THAT COULD AFFECT THE BLOOD FLOW OF OXYGEN TO HIS BRAIN,  I THINK THOSE ARE THE ETIOLOGIES OF HIS DEMENTIA.

Q.    DOCTOR, IS THE HUFFING OR INHALING GASOLINE AND OTHER KINDS OF PRODUCTS LIKE THAT, IS THAT WELL DOCUMENTED IN ALL OF THE MEDICAL RECORDS THROUGHOUT?

A.    ABSOLUTELY.

Q.    GOING ALL THE WAY BACK TO THE AGE OF TEN?

A.   YES.

Q.   I AM GOING TO SHOW YOU EXHIBIT 188  -- WELL,  188-C THROUGH D, AND I WILL REFER SPECIFICALLY TO D.

          THE CLERK:  ANY OBJECTION?

          MR. SWERLING:  NO OBJECTION.

          THE COURT:  ADMITTED.

BY MR. SWERLING:

Q.   IS THIS A PAGE OUT OF THE DIAGNOSTIC MANUAL YOU WERE JUST REFERRING TO?

A.   YES.

Q.   NOW,  WOULD YOU TELL ME IF THIS REFLECTS THE DSM-TR CRITERIA FOR THE DIAGNOSES YOU GAVE, DEMENTIA DUE TO MULTIPLE ETIOLOGIES?

A.   YES.  AND I NEED TO ADD TO THE JURY.   THERE IS,  I AM SPLITTING A TECHNICAL HAIR HERE, BUT I WANT YOU TO KNOW, IF YOU LOOK ON THE BOTTOM, IT SAYS CODING NOTE.   IF YOU ARE RENDERING THIS DIAGNOSIS, YOU NEED TO BE SPECIFIC ABOUT WHAT THE CAUSES ARE.  AND SO, TECHNICALLY, IT WOULD BE CALLED SUBSTANCE INDUCED PERSISTING DEMENTIA AND DEMENTIA SECONDARY TO HEAD TRAUMA.   SO, YOU LIST THOSE SEPARATELY, BUT THEY DO HAVE A CRITERIA HERE,  DEMENTIA DUE TO MULTIPLE ETIOLOGIES. SO, I PICKED THIS ONE TO SHOW YOU ALL,  BECAUSE THIS IS MY DIAGNOSIS.   ALTHOUGH, IF I WERE CODING IT, IF I WAS GOING TO GIVE THIS REPORT TO THE DOCTOR IN SAN FRANCISCO, I WOULD HAVE TO PUT DEMENTIA -- DUE TO -- INHALANT-INDUCED DEMENTIA AND

DEMENTIA DUE TO HEAD TRAUMA.

Q.    WHY DON'T YOU GO THROUGH THAT AND TELL US WHAT YOU SAW. GO AHEAD AND JUSTIFY THIS DIAGNOSIS.

A.    SURE.  THIS IS WHAT DEMENTIA IS.   IT IS NOT ALWAYS JUST THE ALZHEIMER'S THAT YOU THINK ABOUT.   THE FIRST THING YOU HAVE TO HAVE IS MEMORY IMPAIRMENT.   AND THERE ARE TWO DIFFERENT WAYS THAT WE SEE MEMORY IMPAIRMENT IN PSYCHIATRY. ONE IS THE INABILITY TO LEARN NEW INFORMATION.  MEANING THAT YOU CAN'T EVER REALLY GET IT INTO YOUR BRAIN, IT JUST WON'T GET IN THERE.   THE OTHER PROBLEM IS THAT YOU CAN'T RECALL THINGS THAT YOU USED TO KNOW.   SO, ONCE YOU GET IT IN YOUR BRAIN, YOU CAN'T PULL IT BACK OUT.   MR. BASHAM CLEARLY HAS BOTH OF THOSE,  BOTH OF THOSE COMPONENTS OF MEMORY IMPAIRMENT. AND, IN MY OPINION, THEY HAVE BEEN PRESENT SINCE THE AGE HE WAS EIGHT.

     I TODAY, IN PREPARATION FOR TESTIMONY, WENT OVER THE NUMBER OF PEOPLE THAT HAVE NOTICED SOME KIND OF MEMORY IMPAIRMENT OVER TIME.   BRENDA THOMPKINS, WHEN HE WAS EIGHT YEARS OLD; HE HAD A DR. RIVARD WHEN HE WAS 14;  NURSE ALTMAN AT THE PENNYROYAL MENTAL HEALTH CENTER; DR. WALKER AT RICE AUDUBON; DR. LUNSFORD AT WESTERN STATE HOSPITAL; DR. SUESS; DR. BRAWLEY; DR. BRANNON; DR. GOURLEY; DR. MORGAN; MYSELF; AND EVEN DR. CAPEHART IN HIS EVALUATION, IN HIS MENTAL STATUS EXAMINATION OF MR. BASHAM, NOTES MEMORY IMPAIRMENT.   SO, THERE HAVE BEEN A NUMBER OF CLINICIANS OVER TIME,  OVER A

PERIOD OF YEARS THAT HAVE DOCUMENTED MEMORY IMPAIRMENT IN MR. BASHAM, EITHER BY HIS OWN HISTORY OR THEIR OWN EXAMS.

THE SECOND -- YOU HAVE TO HAVE, AS YOU SEE ON A, IT SAYS, "THE DEVELOPMENT OF MULTIPLE COGNITIVE DEFICITS MANIFESTED BY BOTH."  SO, HE HAS NUMBER ONE.  UNDER NUMBER TWO, LOOK AT (D), AND THAT IS THE MAIN SYMPTOM THAT HE HAS OF HIS DEMENTIA, IT IS "DISTURBANCE IN EXECUTIVE FUNCTIONING."  AND THE EXECUTIVE FUNCTIONING, WHAT THAT MEANS IS, THAT IS THE FRONT PART OF OUR BRAIN.  THAT IS KIND OF -- SOMEBODY DESCRIBED IT AS THE MAESTRO OF THE ORCHESTRA.  IT IS THE ONE THAT CONDUCTS AND MAKES EVERYBODY -- EVERY OTHER PART DO WHAT THEY ARE SUPPOSED TO DO.  SO, THAT IS THE PART OF YOUR BRAIN THAT IS PLANNING, PUTS THINGS IN ORDER, THAT MAKES JUDGMENT. AND THAT IS THE MAIN AREA WHERE I SEE IMPAIRMENT IN MR. BASHAM.

AND CRITERIA B, IT HAS TO "CAUSE SIGNIFICANT IMPAIRMENT." IT HAS TO "REPRESENT A DECLINE FROM A PREVIOUS LEVEL OF FUNCTIONING."  MY CONSULTATION WITH DR. BRAWLEY SHOWS THAT OVER TIME THAT MR. BASHAM HAS CLEARLY HAD A DECLINE IN HIS FUNCTIONING OVER THE YEARS, IF YOU LOOK AT SOME OF HIS TEST RESULTS AND THAT SORT OF THING.

AND C, "THERE IS EVIDENCE FROM THE HISTORY, THE EXAM, OR THE LAB THAT THE DISTURBANCE HAS MORE THAN ONE ETIOLOGY."  WE HAVE THE HISTORY OF THE INHALANT ABUSE, WE HAVE THE ABNORMAL NEUROLOGICAL EXAM BY DR. BRANNON, AND WE HAVE THE ABNORMAL

NEUROPSYCHOLOGICAL TESTING BY DR. BRAWLEY.

AND THEN D IS, "THESE DEFICITS DON'T OCCUR DURING A DELIRIUM." WHAT THAT MEANS "IN A DELIRIUM," IF YOU HAD A FEVER OF 104, YOU WON'T KNOW WHAT DATE IT IS. AND IF I TRY TO TEACH YOU SOMETHING, IT WON'T STAY IN YOUR HEAD. SO, WE RECOGNIZE, AS DOCTORS, IF YOU ARE DELIRIOUS, YOU ARE NOT GOING TO BE ABLE TO RETAIN INFORMATION.

Q. NOW, DID BRANDON HAVE ANY MULTIPLE REPEATED -- WE KNOW HE HAD MULTIPLE REPEATED HEAD INJURIES, DID HE HAVE ANY MENTAL STATES, ALTERED MENTAL STATES?

A. YES. HE HAS HAD A NUMBER OF THINGS, IN LOOKING AT THE RECORDS OVER A PERIOD OF TIME, THAT CALLED ATTENTION TO ME. FIRST OF ALL, WE KNOW ABOUT THE MINOR HEAD INJURIES. THERE IS THE ONE WHEN HE WAS YOUNGER, WHICH MAY HAVE BEEN MORE SIGNIFICANT WHERE HE FELL A FEW FEET. WE HAVE CERTAINLY AS A CHILD, HE FELL OFF THE BIKE, GOT STITCHES IN HIS CHIN. HE WAS HIT WITH AN IRON BAR IN THE FACE. I WAS ALSO ABLE TO GATHER A HISTORY FROM MR. BASHAM AND HIS MOTHER, KATHY BASHAM, THAT WHEN HE WAS 12 YEARS OF AGE, HE WAS INVOLVED IN A MOTOR VEHICLE ACCIDENT WHERE HIS HEAD HIT THE WINDSHIELD AND HE HAD SOME FACIAL TRAUMA, AT THAT TIME, AS WELL. HE DENIED THAT HE WAS UNCONSCIOUS AT THAT PERIOD OF TIME.

WE ALSO KNOW THAT LATER ON, OF COURSE, HE IS INHALING AND THOSE SORTS OF THINGS. BUT WE SEE IN ONE OF THE DETENTION CENTERS, HE HAD A FEW HANGING ATTEMPTS. AND WHAT WAS

SIGNIFICANT IN ONE OF THE HANGING ATTEMPTS THAT THE AMBULANCE RECORDS NOTES THAT HE HAD TWO PERIODS FOR 15 SECONDS WHERE HE LOST CONSCIOUSNESS.   SO, IN MY OPINION,  THIS ATTEMPT, AGAIN,  NO ONE CAN KNOW HOW SEVERE, BUT THE FACT THAT HE HAD TWO 15-SECOND PERIODS WHERE HE WAS NOT CONSCIOUS.

OVER TIME NOW, IN LOOKING AT SOME OF THE DETENTION CENTER RECORDS, I HAVE ALSO NOTICED SIMILAR FINDINGS THAT CAUSE ME CONCERN.   ALSO KEEP IN MIND THAT IT WAS DR. STOCKER AT THE CARDINAL TREATMENT CENTER THAT ALSO NOTICED THAT PICKING. SO,  AGAIN, IF YOU JUST LOOK BACK AND TAKE A HISTORY,  THERE IS A HISTORY OF SOME THINGS THAT ARE GOING ON WITH HIS BRAIN THAT MAYBE REPRESENT HEAD INJURIES,  LACK OF BLOOD FLOW TO THE BRAIN, THAT SORT OF THING.

Q.    NOW,  EXHIBIT 232 IS AN ADMISSION ON 9-17-91 TO RIVENDELL.  INDICATED HERE HE IS IN AN ALTERED MENTAL STATE; IS THAT CORRECT?

A.    YES.  THIS REPORT SAYS, "RULE OUT SEIZURE."  THE REASON DR. LITTLETON PUT THAT IS THAT THEY WERE CONCERNED. SOMETIMES, AGAIN, WHEN WE TALK ABOUT THE INTERMITTENT EXPLOSIVE DISORDER, SOMETIMES PEOPLE ARE REAL AGGRESSIVE BECAUSE IT IS A FORM OF A SEIZURE.  SO, ONE OF THE THINGS WE DO IS WE KIND OF RULE THAT OUT.   AND THE FACT THAT THAT BRAIN WAVE STUDY WAS NOT NORMAL, AT THAT TIME,  GIVEN HIS AGE, THAT WAS A CONCERN FOR DR. LITTLETON.

Q.    THAT IS JUST THE SECOND PAGE OF THE REPORT.  I JUST

WANTED TO HAVE THE WHOLE PAGE UP THERE.

DO YOU HAVE ANY EVIDENCE THAT BRANDON HAS HAD DIFFICULTY IN LEARNING?

A.    YES.   OF COURSE, HE HAS BEEN DIAGNOSED WITH LEARNING DISABILITIES OVER THE YEARS, SO THAT HAS BEEN A CHRONIC THING. THE REASON I DIDN'T DIAGNOSE LEARNING DISABILITIES IS BECAUSE I THINK NOW THE DEMENTIA THAT HE HAS FROM THE HEAD TRAUMAS AND THE INHALANTS SUPERSEDE ANY LEARNING DISABILITY.   I WOULD NOT BE ABLE TO, AT THIS POINT, TO TEASE OUT WHICH IS A LEARNING DISABILITY AND WHICH IS A RESULT OF BRAIN DAMAGE.

I THINK THERE ARE A NUMBER OF EXAMPLES.   YOU HAVE OFFICER ARISON WHO SHOWED THAT, EVEN WITH A LITTLE EDUCATION, HE COULDN'T PASS A SCREEN TEST.   BUT THE WAY THAT YOU SHOW THAT HE CAN'T LEARN,  AND I THINK DR. CAPEHART DID THIS BEAUTIFULLY IN HIS EXAMINATION OF MR. BASHAM.  WHAT WE DO IS WE ASK YOU, IF YOU EVER GO TO A PSYCHIATRIST, YOU WILL KNOW ALL OF OUR TRICKS NOW, SO DON'T TELL IT.   THE FIRST THING WE DO IS WE ASK YOU TO REPEAT THREE WORDS.   WE GIVE YOU THREE WORDS.  AND THE WORDS I USE ARE:  BROWN, TULIP, AND EYE DROPPER.  AND WHAT I DO IS I TELL YOU TO REPEAT THOSE WORDS AFTER ME.   AND WHEN YOU DO THAT, THAT IS SOMETHING CALLED REGISTRATION.   THAT MEANS I KNOW YOUR BRAIN HEARD THE SAME WORDS THAT CAME OUT OF MY MOUTH.   SO, I ASK YOU TO SAY THOSE WORDS BACK TO ME.   AND THEN, WHAT I TELL YOU IN THE EXAM IS THAT IN FIVE MINUTES I AM GOING TO ASK YOU WHAT THOSE WORDS WERE.  AND I TELL YOU AHEAD

OF TIME I AM GOING TO ASK YOU.  I TELL YOU I AM GOING TO TRY TO TRICK YOU TO MAKE YOU FORGET THEM, SO REMEMBER THE WORDS.

AND, USUALLY, WHAT THE PSYCHIATRIST WILL DO IS HAVE YOU PERFORM TASKS OF CONCENTRATION.  WE WILL MAKE YOU CALCULATE THINGS.  WE WILL ASK YOU THINGS ABOUT THE PRESIDENT TO SEE HOW YOUR FUND OF KNOWLEDGE IS.  AND THEN, AFTER FIVE MINUTES, WE ASK YOU WHAT WERE THOSE WORDS.  USUALLY PEOPLE CAN REMEMBER, YOU DON'T THINK YOU CAN, BUT YOU USUALLY REMEMBER.  AND IF YOU ARE IN YOUR FORTIES AND ABOVE, WE DON'T HAVE TO REMEMBER ANYTHING, IT IS OKAY FOR US BECAUSE THERE ARE TOO MANY THINGS GOING ON IN YOUR MIND.  BUT WHEN YOU ARE YOUNGER, YOU HAVE TO REMEMBER ALL OF THEM.

SO WHAT HAPPENS IS,  IF YOU CAN -- IF IT IS A PROBLEM THAT YOU JUST CAN'T REMEMBER THEM, YOU WON'T REMEMBER EVEN IF WE GIVE YOU HINTS.  BUT IT SHOWS THAT YOU CAN'T LEARN INFORMATION IF I GIVE YOU HINTS AND YOU STILL CAN'T RECALL IT. SO SAY, FOR EXAMPLE, IF YOU COULDN'T REMEMBER THE FIRST WORD, I WOULD SAY, WELL, IT IS A COLOR, AND USUALLY THAT WOULD SPARK YOUR MEMORY.  AND YOU WILL SAY, OKAY, IT WAS BROWN.  WITH MR. BASHAM, WHEN YOU GIVE HIM THOSE PROMPTS,  HE CAN'T EVEN REMEMBER THE WORDS.  AND THAT IS A SIGN OF INABILITY TO LEARN NEW INFORMATION.

Q.    THAT IS INABILITY TO LEARN NEW INFORMATION AND IS ALSO AN INDICATION OF SHORT-TERM MEMORY IMPAIRMENT?

A.    THAT'S CORRECT, UNDER THE FIRST CRITERIA OF DEMENTIA,

THAT'S CORRECT.  SO, NOT ONLY IS IT SOMETIMES YOU CAN'T RETRIEVE THINGS, BUT YOU CAN'T EVEN LEARN THEM THEM ONCE THEY GET IN THERE.  YOU CAN'T LEARN THEM.

Q.    SO, HE HAS DIFFICULTY RECALLING THINGS?

A.    YES.

Q.    HE HAS LANGUAGE DISTURBANCE; IS THAT CORRECT?

A.    ONLY -- THE MAIN SYMPTOM THAT HE HAS OF DEMENTIA IS THE 1 AND THEN 2(D), BUT HE HAS A LITTLE BIT OF LANGUAGE DISTURBANCE, BUT NOTHING LIKE YOU WOULD SEE IN OTHER CASES OF DEMENTIA.  WHEN WE TEST LANGUAGE DISTURBANCE, YOU SHOW SOMEBODY A BOOK, AND YOU ASK THEM WHAT THAT IS.  THEY SHOULD SAY A BOOK.  THE ONLY SYMPTOM I HAVE NOTICED OF LANGUAGE DISTURBANCE IN MR. BASHAM, AND I HAVE WITNESSED IT, IS WHEN HE BECOMES VERY ANXIOUS, HE CONFUSES HIS LAWYER'S NAMES, RIGHT WHEN THEY ARE IN THE MIDDLE OF THE SAME CONVERSATION.  I HAVE SEEN HIM WITH YOU, MR. SWERLING, SAY, "JACK, I NEED," AND THEN ALL OF A SUDDEN, "GREG, GREG, GREG."  SO, I HAVE SEEN HIM CONFUSE NAMES.

Q.    WE CONFUSE THEM, TOO.

A.    BUT THAT IS NOT ONE OF THE MORE PROMINENT SYMPTOMS OF HIS DEMENTIA.  IT IS VERY MILD, AND I DON'T SEE THAT IS ANY EVIDENCE OF A MAJOR SYMPTOM.

Q.    NOW, YOU MAY HAVE TOUCHED ON THIS, I JUST WANT TO MAKE SURE YOU DID.  DOES HE HAVE A DISTURBANCE IN PLANNING, ORGANIZING, SEQUENCING, AND ABSTRACTING?

A.    YES.  THAT IS THE MAIN SYMPTOM.  THAT IS THE SYMPTOMS THAT CAUSE A LOT OF HIS BEHAVIORAL PROBLEMS AND MAKES IT VERY DIFFICULT TO DEAL WITH HIM.

Q.    COULD YOU EXPLAIN?

A.    SURE.  WHAT YOU SEE IN THIS DEMENTIA, YOU CAN'T -- YOU ARE VERY IMPULSIVE.  SOMEONE WITH THIS KIND OF DEMENTIA IS VERY, VERY IMPULSIVE AND THEY CANNOT PLAN AHEAD.  IT IS NOT THAT THEY DON'T CHOOSE TO PLAN AHEAD, THEY CANNOT PLAN AHEAD.  SO, TO PUT THINGS IN ORDER, IT IS VERY DIFFICULT FOR THEM.  FOR THEM TO SAY, OKAY, IF I DO A, THEN B RESULTS, THEY HAVE DIFFICULTY EVEN -- THEY DON'T HAVE THE CAPACITY TO REMEMBER THAT.  IT IS NOT THAT THEY SAY, I DON'T CARE, THIS WORLD IS ABOUT ME,  I'M GOING TO DO IT ANYWAY.  THEY DON'T HAVE THAT ABILITY.

THE MAIN THINGS THAT I HAVE SEEN IN MR. BASHAM THAT ARE VERY EVIDENT OF HIS DEMENTIA IS SOMETHING CALLED PERSEVERATION.  AND WHAT THAT IS, IF MR. BASHAM HAS SOMETHING FIXED IN HIS MIND, HE IS NOT GOING TO DEVIATE FROM THAT NO MATTER WHAT YOU DO.  AND HE IS GOING TO COME BACK TO THAT SAME CONCEPT OVER, AND OVER, AND OVER.  AND THE EXAMPLE OF THAT IS HIS NICOTINE.  THERE HAVE BEEN, IF YOU LOOK IN HIS CHARTS AND IN HIS RECORDS, OVER AND OVER AGAIN HE HAS GONE TO GREAT LENGTHS TO GET NICOTINE.  HE HAS TAKEN NICOTINE OFF OF PAVEMENTS,  HE HAS GONE TO GREAT LENGTHS TO OBTAIN THAT.

NOW, WHAT HAS HAPPENED, THERE HAVE BEEN TIMES WHERE MR.

BASHAM WANTED DIP, FOR EXAMPLE. AND I HAVE SEEN PEOPLE TRY TO REASON WITH HIM ABOUT SOMETHING ELSE THAT IS VERY IMPORTANT, AND HE CAN'T SHIFT. HE CANNOT GET OFF THE FACT THAT HE NEEDS THAT NICOTINE. HE WILL NOT DEAL WITH WHATEVER THAT PERSON IS TRYING TO SPEAK WITH HIM ABOUT, HE CAN'T. HE CAN'T SHIFT FROM ONE SET OF IDEAS TO ANOTHER. HE IS NOT THE KIND OF PERSON THAT HE CAN MULTITASK. HE DEFINITELY CAN'T TALK TO YOU -- TO HIS ATTORNEY OR THE COURT ABOUT SOMETHING WHILE HE IS THINKING OF THIS OTHER THING. HE CAN'T SHIFT GEARS, SO TO SPEAK, AND THAT IS A VERY PROMINENT SYMPTOM IN HIM.

Q.    AND IT IS CALLED?

A.    PERSEVERATION. IT IS LIKE YOUR BRAIN IS IN THE SAME NEUROLOGICAL PATHWAY. IT IS THINKING THE SAME THOUGHT. IT GOES OVER AND OVER AGAIN AND IT WON'T LEAVE THAT AREA AND SWITCH TO ANOTHER CONCEPT. VERY COMMON WITH PEOPLE WITH DEMENTIA.

Q.    WHEN YOU ARE REFERRING TO THAT, IS THAT CONSISTENT WITH WHAT WE HAVE SEEN WITH A CERTAIN BUTT THAT HE TRIED TO GET IN THE PARKING LOT AND THE DIP HERE IN THE COURTROOM?

A.    TO A DEGREE. THAT IS, AGAIN, IS HE GOING TO ANY LENGTHS TO GET THAT BECAUSE OF THE EFFECTS OF NICOTINE. BUT I THINK WHAT IS MORE CONSISTENT IS THE BLOWUP THAT HE HAD IN COURT WHEN HE DIDN'T GET HIS DIP.

Q.    AND HOW DO YOU EXPLAIN THAT, CONSISTENT WITH HIS

PROBLEMS?

A.    WHEN HE IS FOCUSED ON A CONCEPT, SUCH AS NICOTINE, THAT IS ALL HE IS THINKING ABOUT.    SO,   IF HE KNOWS THAT HE IS GOING TO HAVE A SMOKE BREAK IN AN HOUR,   HE IS THINKING ABOUT WHAT IS GOING TO HAPPEN -- THAT HOUR SMOKE BREAK.   THAT IS WHAT HIS BRAIN IS FOCUSING ON, THAT ONE IDEA.   SO, IF SOMETHING HAPPENS THAT STOPS THAT FLOW, HE CAN'T PROCESS IT.

Q.    AND IS THERE EVIDENCE IN THE RECORD TO INDICATE THESE KIND OF DIFFICULTIES WITH TOBACCO IN THE PAST?

A.    YES.

Q.    THIS PERSEVERATION?

A.    YES.   ALL THROUGHOUT HIS RECORD.   THERE WAS A PSYCHIATRIC FACILITY, RIVENDELL, WHERE HE WAS THERE SIX DAYS TO RECEIVE SUBSTANCE ABUSE TREATMENT.   BECAUSE HE WASN'T ALLOWED SMOKE BREAKS, HE WASN'T PARTICIPATING AND, EVENTUALLY, GOT KICKED OUT.   HE HAS ALWAYS BEEN VERY FOCUSED ON NICOTINE. AND THERE ARE REASONS FOR THAT,   BUT THAT HAS BEEN A LONG-TERM BEHAVIOR.

Q.    YOU HAVE CONSULTED WITH DR. BRANNON, AND YOU ALSO CONSULTED WITH DR. BRAWLEY.

A.    YES.

Q.    NOW, WHY ARE YOU THE FIRST PSYCHIATRIST?  CAN YOU EXPLAIN WHY YOU MAY BE THE FIRST PSYCHIATRIST TO DIAGNOSE HIM WITH DEMENTIA?

A.    YES.   I AM CERTAINLY NOT THE FIRST PSYCHIATRIST THAT

HAS NOTED MEMORY IMPAIRMENTS IN HIM.  I AM CERTAINLY NOT THE FIRST PSYCHIATRIST THAT HAS NOTICED HE HAS AN IMPAIRED ABILITY TO LEARN.  I'M NOT THE FIRST PSYCHIATRIST TO NOTICE THAT HE IS IMPULSIVE, THAT HE CAN'T PLAN, THAT HE HAS PROBLEMS SEQUENCING.  BUT I HAVE HAD THE LUXURY NONE OF THESE OTHER DOCTORS DID.  I HAVE HAD THE LUXURY OF HAVING A YEAR AND A HALF TO GO THROUGH HIS RECORDS AND TO LOOK AT ALL OF THESE THINGS AND TO FIND WHERE HE HAS NOT HAD A CONTINUITY OF CARE. I HAVE HAD ALL OF THESE RECORDS BEFORE ME WHERE I CAN SEE THESE TRENDS THAT WEREN'T AVAILABLE TO THE OTHER CLINICIANS TREATING HIM.

Q.    SO, YOU HAD THE BENEFIT OF GOING THROUGH ALL OF THE MEDICAL HISTORY?

A.    SURE.  AND A LOT MORE TIME THAN THEY DID.  AND, OF COURSE, I WASN'T IN A SITUATION WHERE I WAS TREATING HIM. AGAIN,  MR. BASHAM IS VERY COMPLEX, AND SO WHEN HE COMES INTO A TREATMENT SETTING, IF HE IS VERY HYPERACTIVE, IT MIGHT BE REALLY EASY TO FORGET THAT HE HAD POOR MEMORY BECAUSE HE IS SO HYPERACTIVE.  THOSE SYMPTOMS KIND OF OVERCOME PERHAPS A THOUGHT, OH, I NEED TO ASSESS HIS MEMORY.  HE ALSO, AS DR. BRANNON HAD POINTED OUT, HE IS SO HYPERACTIVE AND ANXIOUS SOMETIMES IT IS HARD TO FINISH EVALUATING HIM BECAUSE HE IS NOT ABLE TO COMPLETE THOSE EXAMS.  I HAVE CERTAINLY HAD THAT PROBLEM AT TIMES WITH HIM.

Q.    DR. WATTS,  HOW MANY HOURS HAVE YOU SPENT IN EVALUATING

THE RECORDS, AND INTERVIEWING THESE PEOPLE, AND TRAVELLING TO DIFFERENT SITES, AND ALSO BRANDON BASHAM?

A.    I LOST SIGHT SOMEWHERE LAST WEEK AFTER 200 HOURS.   I WAS UP -- I KNEW WHEN IT WAS AROUND 200 HOURS, BUT I AM OVER THAT, AND IT IS PROBABLY 250 HOURS, AT THIS POINT.

Q.    HOW MANY OCCASIONS DID YOU HAVE TO INTERVIEW BRANDON BASHAM?

A.    I HAVE SEEN -- I ASKED MARILYN, MY ASSISTANT, TO CHECK THAT FOR ME BECAUSE I WILL HAVE THE DATES LOGGED IN.  AND HER REPORT TO ME THAT IT HAD BEEN SOMEWHERE AROUND 40 TIMES.

Q.    NOW, THIS DEMENTIA, IS IT WORSENING?

A.    NO.   I WAS VERY CONCERNED ABOUT THAT.   THERE ARE SOME FORMS OF DEMENTIA THAT CAN WORSEN OVER TIME.   DR. BRAWLEY RETESTED MR. BASHAM ABOUT A YEAR LATER, ABOUT A YEAR AFTER THE FIRST TIME.  AND THERE WERE SOME THINGS THAT HAD GOTTEN MILDLY WORSE, BUT THERE WAS NO EVIDENCE THAT THIS IS PROGRESSING.

NOW, I HAVE TO SAY IN ALL FAIRNESS SAKE, IF HE WERE -- IF HE WERE TO USE INHALANTS ON A DAILY BASIS AND HUFF A LOT, THERE IS A CHANCE THAT IT COULD GET WORSE.   BUT THERE IS NO EVIDENCE, AT THIS TIME, THAT IT HAS.

Q.    AND MEDICAL EVIDENCE KNOWS THAT THE HUFFING DESTROYS BRAIN CELLS?

A.    YES, IT DOES.   IN MY OPINION, NEXT TO ECTASY, IT IS ONE OF THE WORST DRUGS THERE ARE.

Q.    THERE IS NO REPLACING THOSE?

A.    ONCE YOU KILL A BRAIN CELL, IT DOESN'T COME BACK.

Q.    DO YOU ALSO SEE MOOD MOBILITY IN THIS DISORDER?

A.    YES.   PEOPLE WITH DEMENTIA CAN OFTEN GET VERY IRRITABLE AND SOMETIMES THEY EVEN GET AGGRESSIVE.  IT IS NOT THEIR FAULT, BUT, YES, THAT HAPPENS.  IT IS VERY FREQUENT.

Q.    WITH THIS DYSFUNCTION THAT HE HAS, THIS DISORDER THAT YOU HAVE GIVEN HIM, HAVE YOU HEARD THAT HE PLAYS CHESS, READS NOVELS?  COULD YOU COMMENT ON THAT?

A.    WELL, I KNOW HE PLAYS CHESS.  HE TOLD ME THAT, AND I HAVE ALSO LOOKED AT THE RECORDS.  THERE WAS EVIDENCE FROM CHARTER OF EVANSVILLE THAT HE WAS PLAYING CHESS BACK IN 1996. NOW, THAT IS A SKILL THAT HE HAS HAD, HE HAS ACQUIRED, HE HAS HAD PRACTICE AT IT.  BUT I WANTED TO PLAY CHESS WITH HIM. I HAVE NOT HAD A CHANCE TO DO THAT BECAUSE I WANTED TO SEE HOW WELL HE PLAYED.  BUT I ASKED HIM ABOUT HIS STRATEGIES.  AND WHAT HE TOLD ME IS THAT HE IS AGGRESSIVE.  HE DOESN'T PLAY DEFENSIVELY AT ALL, AND THAT HE MAKES HIS MOVES. SO, THERE ARE A LOT OF THINGS ABOUT CHESS THAT YOU LEARN.  YOU LEARN MOVES OVER TIME IF YOU PLAY.  IF YOU ARE PLAYING SOMEONE THAT IS NOT AS SKILLED AS YOU, YOU CAN ABSOLUTELY BEAT THEM.

THE OTHER THING IS THE DEMENTIA THAT MR. BASHAM HAS, IT IS PATCHY.  THERE ARE SOME AREAS OF HIS BRAIN THAT STILL WORK. AND ACCORDING, I TALKED WITH DR. BRANNON AND DR. BRAWLEY ABOUT THAT BECAUSE THEY ARE THE EXPERTS IN THE BRAIN, MUCH MORE

THAN ME. THE AREA OF YOUR BRAIN THAT PLAYS CHESS IS NOT AFFECTED BY AND AT LEAST IN EVIDENCE OF THEIR PHYSICAL -- DR. BRANNON'S EXAM OR DR. BRAWLEY'S TESTING. SO, THAT PART OF HIS BRAIN DOES WORK.

NOW, IF HE IS READING NOVELS, TO ANSWER THE SECOND PART OF YOUR QUESTION, I WOULD LIKE TO SEE WHAT NOVELS THEY ARE. AND MY OPINION WOULD BE IT WOULD TAKE HIM A VERY LONG TIME BECAUSE HE HAS ATTENTION DEFICIT DISORDER. WE KNOW THAT HE HAS HAD DIFFICULTIES IN LEARNING, AND I WOULD BE VERY IMPRESSED AND WOULD LIKE TO SEE THOSE BOOKS.

Q.     HAVE YOU EVER SEEN THEM?

A.     NO.

Q.     OKAY. DR. WATTS, DID YOU ALSO DIAGNOSE HIM WITH ANOTHER AXIS-I ILLNESS?

A.     YES.

Q.     WHAT WAS THAT?

A.     PSYCHOSIS, INHALANT-INDUCED PSYCHOSIS.

Q.     PULL UP 186, IT IS WITHOUT OBJECTION.

IS THIS OUT OF THE DSM AS WELL, 186-E?

A.     YES.

Q.     CAN YOU ENHANCE THAT PAGE, PLEASE?

WOULD YOU TELL THE JURY WHY YOU FOUND THAT DIAGNOSIS APPROPRIATE?

A.     SURE. LET ME EXPLAIN A MINUTE. THIS IS NOT LIKE SCHIZOPHRENIA, THIS IS NOT A DIAGNOSIS OF MAJOR DEPRESSION

WITH PSYCHOTIC FEATURES.  THIS IS NOT A DIAGNOSIS OF SCHIZOAFFECTIVE DISORDER.  THIS MEANS THAT HE, IN MY OPINION, HE DOES HAVE HALLUCINATIONS, BUT HIS HALLUCINATIONS,  IN MY OPINION,  ARE PROBABLY DUE TO THE EFFECTS OF THE INHALANTS. NOW,  HE MAY HAVE AN UNDERLYING PSYCHOTIC DISORDER UNDER THERE, BUT I CAN'T TELL BECAUSE THE USE OF INHALANTS HAS BEEN SO PRONOUNCED THAT THAT SUPERSEDES ANY OTHER CAUSE OF IT. BUT WHAT IT MEANS IS THAT BECAUSE OF THE DAMAGE THAT HE HAS INCURRED TO HIS BRAIN FROM THE INHALANTS THAT HE DOES, HE INDEED DOES HAVE PERIODS WHERE HE HAS HALLUCINATIONS.

Q.    SO,  THAT IS A DIAGNOSIS OF A PSYCHOSIS?

A.    THAT IS CORRECT.  BUT, BASICALLY, WHAT THAT MEANS IS THERE ARE PERIODS WHERE HE HEARS VOICES.  I HAVE WITNESSES,  I HAVE REVIEWED THIS IN OTHER DOCTORS' NOTES WHERE THEY HAVE SEEN HIM RESPONDING TO VOICES.  WHEN YOU TREAT PATIENTS AND YOU WORK IN SETTINGS,  ESPECIALLY WITH SOME OF THE MENTAL DISORDERS,  IT IS VERY EASY TO TELL WHEN SOMEBODY IS HEARING VOICES.  THEY PERHAPS TALK BACK TO THE VOICES,  YOU MIGHT SEE THEM MUMBLING.  I HAD A GENTLEMAN IN THE PRISON LAST WEEK DUCKING UNDER THE TABLE.  WHEN I ASKED HIM WHAT WAS HAPPENING, HE ASKED ME DID I SEE THE GHOST FLYING IN THE ROOM, AND HE WAS DODGING THE GHOST.  SO, IT IS PRETTY APPARENT IN PSYCHIATRY,  YOU CAN SEE WHEN SOMEONE IS RESPONDING TO SOMETHING OTHER THAN YOUR CONVERSATION.  AND I HAVE WITNESSED THAT IN MR. BASHAM.  AND DR. SUESS, IN HIS NOTES, HAD ALSO

WITNESSED SIMILAR BEHAVIORS, AS WELL AS DR. MORGAN.

Q.    NOW, DO YOU TREAT A NUMBER OF PEOPLE EACH WEEK WITH PSYCHOSIS?

A.    YES.  WHEN I GO TO THE PRISON ON THURSDAYS AT THE ACUTE PSYCHIATRIC HOSPITAL,  OUT OF THE 20 PATIENTS I SEE, PROBABLY 14 ARE ACUTELY PSYCHOTIC.

Q.    FROM YOUR REVIEW OF THE RECORDS, WHAT WAS THE ONSET OF THESE HALLUCINATIONS?

A.    FROM WHAT I CAN TELL, AROUND AGE, I BELIEVE IT WAS ABOUT 16, 15 OR 16, THE FIRST TIME THIS WAS OBSERVED WHEN HE WAS AT THE TEN BROECK HOSPITAL WITH DR. ASUMENDI SADDIQUI.

Q.    IS THERE ANYTHING ELSE UNIQUE ABOUT THE HALLUCINATIONS ONSET?

A.    YES.  THE ONSET ALSO WOULD HAVE BEEN AFTER HIS SEXUAL ABUSE.  WHEN YOU TALK WITH MR. BASHAM ABOUT THE CONTENT OF HIS HALLUCINATIONS, HE BELIEVES THAT THE VOICE SOUNDS SIMILAR TO THE MAN WHO MOLESTED HIM,  THE MAN J. R, ALSO KNOWN AS TOMMY.

Q.    HAVE YOU OR ANY OTHER PHYSICIAN SEEN WHAT APPEARS TO BE MUMBLING ON HIS PART?

A.    YES.

Q.    WHAT IS THAT?

A.    AGAIN, HE MIGHT BE RESPONDING TO INTERNAL STIMULI. BASICALLY, I CAN GIVE YOU AN EXAMPLE.  WHEN I FIRST MET MR. BASHAM IN JANUARY OF 2003,  I WOULD ASK HIM A QUESTION.  I

WOULD SAY, TELL ME ABOUT YOUR SUBSTANCE ABUSE, AND HE WOULD, (WITNESS INDICATING), IT WASN'T VERY NOTICEABLE, HE TURNED HIS HEAD TO THE SIDE, AND YOU WOULD SAY, EXCUSE ME, AND HE WOULD COME BACK AND SAY, WHAT, WHAT DID YOU SAY? IT WAS OBVIOUS THAT HE WAS ATTENDING TO SOMETHING ELSE OTHER THAN THE WORDS THAT I WAS SPEAKING.

Q.    WHEN HAVE YOU NOTICED THAT THIS IS MOST PREVALENT?

A.    THIS MAKES NO SENSE MEDICALLY. IT IS WHEN HE IS NOT ON HIS CONCERTA. CONCERTA IS A MEDICATION THAT SHOULD MAKE -- IT CAN CREATE PEOPLE, IT CAN CREATE VOICES IN PEOPLE AT TIMES. WHAT I HAVE LEARNED AFTER KNOWING MR. BASHAM AND SEEING HIM OVER A NUMBER OF PERIOD OF TIMES, I BELIEVE THE CONCERTA FOCUSES HIS ATTENTION ENOUGH THAT HE CAN IGNORE THE HALLUCINATION AND HE IS ABLE TO ATTEND TO THE CONVERSATION. I HAVE NEVER SEEN ANYTHING LIKE IT. BUT WHEN HE IS NOT ON THE CONCERTA, THESE SYMPTOMS ARE MUCH MORE APPARENT.

Q.    DOES HE ALSO HAVE ANY PARANOID FEATURES OF HIS PSYCHOSIS?

A.    YES, VERY MUCH.

Q.    WOULD YOU ELABORATE ON THAT?

A.    SURE. THE LETTER TO NURSE LINKS WOULD BE SYMPTOMS OF THAT. I KNOW THAT, EVEN WITH ME NOW, MR. BASHAM HAS SOME PARANOIA IDEAS, BUT IT IS VERY COMMON WHEN HE IS IN A SITUATION WHERE HE IS FRIGHTENED OR CONFUSED THAT HE ATTRIBUTES MOTIVES TO PEOPLE THAT DON'T EXIST.

Q.   NOW,  DID YOU DIAGNOSE BRANDON BASHAM WITH ANOTHER ILLNESS?

A.   YES.

Q.   WHAT WAS THAT?

A.   JUST KEEP IN MIND, YOU CAN HAVE A NUMBER OF ILLNESSES ON AXIS-I.  SO, THAT IS NOT UNCOMMON.   YOU HAVE -- IF SOMEONE ABUSED SUBSTANCES, YOU HAVE TO INCLUDE THAT ON AXIS-I.   BUT HE DOES HAVE ANOTHER TOTALLY DIFFERENT ILLNESS.  THE DEMENTIA IS A DISORDER OF THE BRAIN.   THE PSYCHOSIS IS A DISORDER SECONDARY TO THE SUBSTANCE ABUSE.   I ALSO DIAGNOSED HIM WITH AN ANXIETY DISORDER.   AND THIS IS SECONDARY TO HIS HISTORY OF SEXUAL ABUSE, AND IT IS ALSO THE SYMPTOMS OF PANIC THAT HE HAS.

Q.   I WILL PULL UP THE PAGE FROM THE DIAGNOSTIC MANUAL, IT SHOULD NUMBER 187.   IS THIS WHAT YOU ARE REFERRING TO?

A.   YES.  NOW, THERE ARE A NUMBER ANXIETY DISORDERS.  SOME ARE CALLED POSTTRAUMATIC STRESS DISORDER, WHICH THAT IS SHELL SHOCK, WHICH YOU CAN SEE, FOR EXAMPLE, IN PEOPLE THAT HAVE BEEN EXPOSED TO TRAUMA.   THERE IS ANOTHER KIND OF ANXIETY DISORDER KNOWN AS PANIC DISORDER.   THERE IS AN ANXIETY DISORDER KNOWN AS OBSESSIVE/COMPULSIVE DISORDER.   THE REASON I DIAGNOSED MR. BASHAM WITH ANXIETY DISORDER NOT OTHERWISE SPECIFIED, IS THAT HE HAS FEATURES OF A FEW OF THESE.  HE HAS FEATURES OF THE POSTTRAUMATIC STRESS DISORDER.   THERE IS NUMEROUS DOCUMENTATION THAT HE HAS HAD FLASHBACKS, HE HAS HAD

NIGHTMARES ABOUT HIS SEXUAL ABUSE, AND THAT IS CLEARLY RECORDED IN THE RECORDS OVER TIME. AND IT IS ALSO CLEARLY RECORDED THAT HE HAS PANIC SYMPTOMS. SO, HE DEFINITELY HAS OVERWHELMING ANXIETY. AND WE KNOW THAT ONE OF THE TRIGGERS FOR THAT IS HIM FEELING BOXED-IN, CLAUSTROPHOBIC, NOT HAVING HIS FLAP OPENED.

Q. IS SOMEBODY WITH BRANDON'S BACKGROUND AT RISK TO DEVELOP THESE ANXIETY DISORDERS?

A. SURE. NOW, THE ANXIETY DISORDERS DON'T ALWAYS COME FROM TRAUMA. SOMETIMES THEY JUST HAPPEN. JUST LIKE, THAT IS ONE OF THE MYSTERIES OF MEDICINE, YOU CAN WAKE UP ONE DAY AND HAVE HIGH BLOOD PRESSURE WHEN THE DAY BEFORE YOUR BLOOD PRESSURE WAS NORMAL. WE DON'T UNDERSTAND ALL OF THESE ILLNESSES YET. BUT, FOR EXAMPLE, ILLNESSES LIKE OBSESSIVE/COMPULSIVE DISORDER, THAT IS THE HAND WASHING OR THE COUNTING. SOMETIMES THOSE COME ON WITH NO TRAUMA AT ALL. PANIC DISORDER, OFTEN THERE IS REALLY NO TRAUMA THAT HAPPENS BEFOREHAND THAT MAKES SOMEONE PANIC. YOU JUST WAKE UP ONE DAY AND ALL OF A SUDDEN YOUR HEART IS RACING AND YOU HAVE PANIC DISORDER. IT IS VERY HARD FOR THOSE KINDS OF ILLNESSES BECAUSE OUR TENDENCY IS TO TRY TO FIND AN EXPLANATION OF WHY IT HAPPENED, AND SOMETIMES WE DON'T HAVE ANY. YOUR BRAIN, JUST FOR SOME REASON, STOPS WORKING CORRECTLY. THIS DISORDER IS CAUSED, PART OF HIS DISORDER IS CAUSED BY THE PRIOR TRAUMAS.

Q.    TRAUMA?

A.    YES.   SEXUAL ABUSE -- LOTS OF THINGS.  SEXUAL ABUSE, PHYSICAL ABUSE,  WITNESSING SEXUAL ABUSE,  WITNESSING PHYSICAL ABUSE.   ALL OF THOSE THINGS,  EACH ONE OF THOSE SEPARATELY COULD CAUSE THIS.

Q.    HAVE YOU SEEN SYMPTOMS IN BRANDON BASHAM IN LOOKING AT THE RECORDS AT HOPKINS COUNTY JAIL, AS WELL AS ALVIN GLENN, ABOUT PANICS WHEN THE CELL FLAP IS CLOSED?

A.    YES.

Q.    WOULD YOU ELABORATE ON THAT?

A.    YES.  MR. BASHAM HAS GONE TO THE POINT,  I HAVE SEEN BOTH OF HIS ARMS BRUISED SEVERELY WHERE THE FLAP DOOR WAS SHUT ON HIS ARMS BECAUSE HE REFUSED TO HAVE THAT DOOR SHUT, AND REFUSED TO BRING HIS ARMS IN.   THERE ARE MEDICAL ORDERS FOR HIM TO KEEP HIS FLAP OPEN.

Q.    DOES HE HAVE ANY SYMPTOMS KNOWN AS, I THINK, AUTONOMIC AROUSAL?  CAN YOU EXPLAIN HOW THAT FITS INTO THIS?

A.    AUTONOMIC AROUSAL IS A SYMPTOM OF POSTTRAUMATIC STRESS DISORDER.   AND THE BEST WAY I CAN DESCRIBE IT TO YOU,  IS IF YOU HAVE EVER -- SAY YOU WERE WALKING ACROSS THE STREET AND YOU ALMOST GOT HIT BY A CAR,  YOU KNOW HOW YOUR HEART RATE SPEEDS UP, AND YOU GET FRIGHTENED FOR A MINUTE, AND THERE IS A PERIOD FOR A FEW MINUTES AFTERWARDS WHERE YOU ARE STILL KIND OF A LITTLE NERVOUS,  YOU ARE A LITTLE TENSE,  OR ALMOST CLOSE TO A CAR WRECK, THAT YOU WILL HAVE THAT LITTLE PERIOD OF TIME

WHERE YOU CAN KIND OF --

THE COURT: YOU NEED TO SLOW DOWN A LITTLE BIT.

THE WITNESS: I'M SORRY.

YOU WILL HAVE A PERIOD OF TIME WHERE YOUR HEART RATE IS UP, KIND OF HAVE A LOT OF ENERGY, YOUR BODY HAS GIVEN YOU A SUBSTANCE CALLED ADRENALINE, WHICH PREPARES YOU TO THINK, RUN FAST, DO SOMETHING.

MR. BASHAM HAS PERIODS OF THAT IN RESPONSE TO OTHER SITUATIONS. SO, FOR EXAMPLE, IF YOU HAVE A VIETNAM VETERAN, AND SAY HE WAS EXPOSED TO A LOT OF GUNFIRE, IF HE HEARS A CAR BACKFIRE, HIS BRAIN DOESN'T KNOW THAT IT IS A CAR BACKFIRING AND ALERTS HIM BECAUSE HE THINKS HE IS IN DANGER, SO HE MIGHT STARTLE. THOSE ARE PHYSIOLOGIC RESPONSES THAT YOUR BODY MAKES WHEN IT PERCEIVES IT IS IN DANGER.

BY MR. SWERLING:

Q. ONE OTHER QUESTION ALONG THAT LINE. ARE THERE ANY PHYSICAL MANIFESTATIONS OF AN ANXIETY DISORDER THAT BRANDON HAS SHOWN?

A. YES. HE HAS HAD A HISTORY OF HIVES, OF UTICARIA. AND IT IS CLEARLY DOCUMENTED THROUGHOUT HIS RECORDS. WHEN HE GETS UPSET, HE BREAKS OUT IN HIVES. AND IT IS ALL THROUGHOUT HIS RECORDS.

Q. WHEN YOU BREAK OUT IN HIVES, YOU ITCH?

A. SURE.

MR. SWERLING: JUDGE, THIS MAY BE AN APPROPRIATE

BREAKING POINT.  I AM WITHIN SIGHT, MAYBE ABOUT 35, 40 MINUTES.

THE COURT:  OKAY.  LET'S GO AHEAD AND BREAK. MEMBERS OF THE JURY, WE WILL ADJOURN COURT FOR THE DAY AND ASK YOU TO BE BACK AT 9:00 O'CLOCK TOMORROW MORNING.

LET ME SAY, I GAVE YOU THE LETTER THAT I MENTIONED EARLIER, I ASSUME YOU HAVE GOTTEN IT BY NOW.  NOT GOTTEN IT. WE WILL GIVE YOU A LETTER, AND LET ME JUST SAY REGARDING VOTING NEXT TUESDAY, IF WE ARE IN TRIAL NEXT TUESDAY, AND IT APPEARS WE WILL BE, I PLAN TO ADJOURN EARLY THAT DAY SO THAT ANYONE WHO WANTS TO GO HOME TO VOTE CAN DO SO.  WE WILL NOT HOLD COURT FRIDAY, AND THE LETTER THAT YOU ARE GOING TO GET WILL BE YOUR CERTIFICATION THAT YOU CAN VOTE BY ABSENTEE BALLOTS.  ANYONE WHO WANTS TO GO INTO THE COUNTY SEAT, COUNTY ELECTION OFFICE, VOTE BY ABSENTEE BALLOT, MAY DO SO. IF YOU DO THAT, EVEN IF WE ADJOURN EARLY NEXT TUESDAY FOR THOSE WHO DON'T GO IN AND VOTE FRIDAY, YOU CAN STAY HERE IN COLUMBIA AND NOT MAKE THAT DRIVE HOME.  IN OTHER WORDS, YOU WILL HAVE AN OPTION IF YOU WANT TO VOTE BY ABSENTEE BALLOT FRIDAY OR YOU WANT TO DRIVE HOME TUESDAY.  WE WILL TRY TO ADJOURN BY MIDAFTERNOON, I GUESS.  BUT I KNOW A NUMBER OF YOU ARE STAYING IN A HOTEL, AND GIVING YOU THAT OPTION OF VOTING ON FRIDAY WILL ELIMINATE THE DRIVE HOME FOR YOU POSSIBLY.

HAVE A NICE EVENING, DON'T DISCUSS THE CASE, WE WILL SEE

YOU TOMORROW AT 9:00 O'CLOCK.

*** END OF REQUESTED TRANSCRIPT ***
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
CERTIFICATE OF REPORTER
I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

S/DEBRA R. JERNIGAN, RPR, CRR                DATE

JA 2139

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

# JOINT APPENDIX AND INDEX
# VOLUME 9

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for
Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,    )    CR. NO. 4:02-992
)    COLUMBIA, SC
)    OCTOBER 28, 2004
)
VERSUS    )
)
BRANDON L. BASHAM,    )
DEFENDANT.    )
_____    )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XXVII

APPEARANCES:

FOR THE GOVERNMENT:          SCOTT SCHOOLS, FIRST AUSA
JONATHAN S. GASSER, AUSA
JOHN DUANE, AUSA
UNITED STATES ATTORNEY'S OFFICE
1441 MAIN STREET, SUITE 500
COLUMBIA, SC  29201

FOR THE DEFENDANT:           JACK SWERLING, ESQ.
1720 MAIN STREET
SUITE 301
COLUMBIA, SC  29201

GREG HARRIS, ESQ.
1720 MAIN STREET
SUITE 301
COLUMBIA, SC  29201

COURT REPORTER:              DEBRA R. JERNIGAN, RPR, CRR
UNITED STATES COURT REPORTER
901 RICHLAND STREET
COLUMBIA, SC 29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

THE COURT: MR. SWERLING, PLEASE CONTINUE.

MR. SWERLING: GOOD MORNING, YOUR HONOR. GOOD MORNING, LADIES AND GENTLEMEN.

DIRECT EXAM CONTINUED

BY MR. SWERLING:

Q. DR. WATTS, TO CONTINUE WHERE WE LEFT OFF YESTERDAY, AND THE END IS IN SIGHT. DID YOU DIAGNOSE -- WE ENDED UP TALKING ABOUT, I WANT TO MAKE SURE I GET THE WORD RIGHT, AUTONOMIC AROUSAL. THAT IS WHERE WE WERE.

A. YES.

Q. DID YOU DIAGNOSE BRANDON WITH ANOTHER ILLNESS?

A. YES.

Q. WHAT WAS THAT?

A. ATTENTION DEFICIT DISORDER, ATTENTION DEFICIT HYPERACTIVITY DISORDER.

MR. SWERLING: YOUR HONOR, MR. SCHOOLS AND I HAVE STIPULATED TO THE FOLLOWING EXHIBITS, 184 AND 191. I ASK 184 TO COME UP ON THE SCREEN.

THE COURT: YOU STIPULATED ADMISSIBILITY?

MR. SWERLING: YES.

THE COURT: IS THAT CORRECT, MR. SCHOOLS?

MR. SCHOOLS: YES, SIR.

THE COURT: YOU MAY PROCEED.

BY MR. SWERLING:

Q. LET'S TAKE THIS PART FIRST AND SEE IF WE CAN'T ENHANCE

IT.   DOCTOR, THIS IS FROM THE <u>DIAGNOSTIC MANUAL</u> THAT YOU WERE TALKING TO THE JURY ABOUT YESTERDAY?

A.   YES.

Q.   NOW, I UNDERSTAND THE GOVERNMENT DOCTORS AGREE WITH YOUR CONCLUSION ON THIS.

A.   YES.

Q.   AND WOULD YOU BRIEFLY DESCRIBE HIS CONDITION TO THE JURY?

A.   SURE.   ATTENTION DEFICIT HYPERACTIVITY DISORDER, IT IS A MAJOR MENTAL ILLNESS.  IT IS CODED ON AXIS-I.   AND IT BASICALLY CONSISTS OF TWO DIFFERENT SETS OF SYMPTOMS.  THERE ARE SETS OF SYMPTOMS THAT HAVE TO DO WITH INATTENTIVENESS, THAT IS THE ABILITY TO PAY ATTENTION TO THINGS.   AND YOU HAVE TO HAVE THESE SYMPTOMS, A NUMBER OF THESE SYMPTOMS, SIX OF THEM.   AND YOU USUALLY HAVE TO HAVE ONSET OF THIS DISORDER BY THE AGE OF SEVEN.   AND MR. BASHAM, CLEARLY, IF YOU GO THROUGH THE CRITERIA OUT OF SECTION ONE, HE MEETS THE CRITERIA FOR (A), OFTEN FAILS TO GIVE CLOSE ATTENTION TO DETAILS, OR MAKES CARELESS MISTAKES IN SCHOOLWORK, OR OTHER ACTIVITIES. HE HAS CRITERIA (B), HE HAS A DIFFICULTY SUSTAINING ATTENTION IN TASKS.   CRITERIA (C), OFTEN DOES NOT SEEM TO LISTEN WHEN SPOKEN TO DIRECTLY.   HE HAS CRITERIA (D), HE DOES NOT FOLLOW THROUGH ON INSTRUCTIONS AND FAILS TO FINISH SCHOOLWORK, CHORES, OR DUTIES.   HE HAS CRITERIA (E), DIFFICULTY ORGANIZING TASKS AND ACTIVITIES.   HAS CRITERIA (F), HE AVOIDS

AND DISLIKES TO ENGAGE IN TASKS THAT REQUIRE SUSTAINED MENTAL EFFORT.  HE HAS DEFINITELY, PROBABLY TO ME, ONE OF HIS MOST PROMINENT SYMPTOMS IS THE CRITERIA (H).  THAT IS, HE IS VERY EASILY DISTRACTED.  THAT IS USUALLY ONE OF THE MORE PROMINENT SYMPTOMS THAT CAUSE CHILDREN AND GROWNUPS DIFFICULTY.  WHAT THE DISTRACTIBILITY MEANS, THIS IS ONE OF THE QUESTIONS I USE. IF YOU ARE IN SCHOOL, AND YOU ARE DOING YOUR WORK, AND SOMEBODY DROPS A PENCIL, THAT IS THE KID WHOSE HEAD IS ALWAYS UP AND LOOKING AROUND.  OR WHEN AN AIR CONDITIONER CUTS ON, THAT IS THE KID THAT PICKS HIS HEAD UP.  ONE OF THE MOST PROBABLY DISTURBING FEATURES OF THIS DISORDER,  EVEN IN THOSE PERIODS OF TIME WHEN YOU ARE TRYING TO PAY ATTENTION, YOU GET VERY EASILY DISTRACTED FROM YOUR TASK.  HE CLEARLY HAS MORE THAN SIX OF THOSE CRITERIA.

Q.    IS THAT DISTRACTIBILITY, WOULD THAT BE SOMETHING TO CONSIDER IN HIS ABILITY TO TAKE TESTS?

A.    ABSOLUTELY.  THAT HAS CLEARLY BEEN SHOWN THROUGH SOME OF HIS TESTING.  MANY OF THE PSYCHOLOGISTS WHO HAVE GIVEN HIM TESTS HAS NOTICED HOW DISTRACTED HE IS.  I HAVE SEEN IT IN MY INTERVIEWS WITH HIM.  YOU CAN BE IN THE MIDDLE OF ASKING HIM SOMETHING,  SOMEBODY SLAMS THE DOOR,  ONE OF THE OFFICERS, PERFORMING A ROUTINE CHECK, LOOKS THROUGH THE WINDOW, HIS HEAD IS UP AND LOOKING.

Q.    TO THE SECOND HALF,  PART TWO, LET'S GO TO THE SECOND HALF.  DISCUSS THAT WITH THE JURY.

A.     THIS IS THE SECOND PART.   WE HAVE INATTENTIVENESS AND THEN THE HYPERACTIVITY THAT GOES WITH IT. HE HAS CRITERIA (A), OFTEN FIDGETING WITH HANDS, OR FEET, OR SQUIRMS IN SEAT.   I HAVE SEEN THIS DURING MY TESTIMONY.   I PERIODICALLY CHECK ON MR. BASHAM TO SEE WHAT HE IS DOING.  THIS HAS CLEARLY BEEN DOCUMENTED IN HIS HISTORY.  HE WOULD LEAVE HIS SEAT IN THE CLASSROOM OR IN OTHER SITUATIONS WHERE YOU ARE SUPPOSED TO STAY SEATED.

PROBABLY, THE BEST DOCTOR THAT IS IN CRITERIA (C) IS DR. WALKER.  HE STATED DURING HIS INTERVIEW HE WALKS ABOUT, CLIMBS EXCESSIVELY IN SITUATIONS IN WHICH IT IS INAPPROPRIATE. I THINK HIS  DESCRIPTION OF MR. BASHAM IN HIS OFFICE RUNNING AROUND, GRABBING GLOVES, AND THE EAR OTOSCOPE AT THE AGE OF 16 CLEARLY SHOWS THAT.   HAS DIFFICULTY ENGAGING IN LEISURE ACTIVITIES QUIETLY.   THERE ARE PLENTY OF NOTES THAT TALK ABOUT MR. BASHAM MAKING NOISES WITH HIS MOUTH, AND THAT SORT OF THING.   SO,  CLEARLY, MEETS THAT CRITERIA.

I THINK THE MOST PROMINENT SYMPTOM IN THIS CRITERIA IS (E).  HE IS OFTEN ON THE GO OR ACTS AS IF HE IS DRIVEN BY A MOTOR.   I THINK THAT IS HIS VERY HYPER,  HIGH-SPEED ACTIVITY, AND THAT HAS BEEN CLEARLY NOTED.   LIKE DR. CARDONA AT THE STONER CREEK HOSPITAL,  SEVERAL PEOPLE SAW THAT HIGH ENERGY. IT MIGHT BE DESCRIBED AS A MOOD DISORDER.  I THOUGHT THAT WAS ALSO CONSISTENT WITH ATTENTION DEFICIT DISORDER.

AND OFTEN TALKS EXCESSIVELY, HE ALSO HAS THAT CRITERIA.

UNDER THAT, YOU HAVE IMPULSIVITY THAT GOES WITH ATTENTION DEFICIT DISORDER. HE MEETS REQUIREMENT (H) AND (I). HE HAS DIFFICULTY WAITING FOR HIS TURN, AND HE OFTEN INTERRUPTS OR INTRUDES ON OTHERS.

Q.    THIS CONDITION, WE TALKED ABOUT IT YESTERDAY BRIEFLY, YOU SAID THAT THERE WERE DIFFERENT LEVELS, MILD, MODERATE, AND SEVERE.

A.    YES.

Q.    BRANDON BASHAM'S CASE, HIS ADHD, HOW WOULD YOU QUANTITATE?

A.    WELL, I ACTUALLY SHARE DR. WALKER'S OPINION. WE WERE TALKING, I WOULD HAVE TO SAY, I HAVE ONE OTHER PATIENT THAT MIGHT TIE WITH MR. BASHAM. I WOULD HAVE TO SAY HE IS ONE OF THE MOST HYPERACTIVE INDIVIDUALS I HAVE EVER SEEN IN MY 11 YEARS OF PRACTICING FORENSIC PSYCHIATRY.

Q.    WE ARE NOT TALKING ABOUT A CHILD WHO IS IN SCHOOL, WHO IS HAVING TROUBLE PAYING ATTENTION, AND HE IS DIAGNOSED WITH THAT CONDITION FOR PURPOSES OF SCHOOLWORK ONLY?

A.    CORRECT.

Q.    WE ARE TALKING ABOUT SOMETHING MUCH MORE SEVERE?

A.    OH, YES. A LOT OF ATTENTION DEFICIT DISORDER DISAPPEARS USUALLY BY THE AGES OF 16 OR 17. IT IS VERY NICE OVER AT THE DEPARTMENT OF JUVENILE JUSTICE BECAUSE WHEN THE YOUNG MEN TURN ABOUT 16, I WILL GIVE THEM A TRIAL OFF OF THEIR MEDICINES, AND A LOT OF THEM ARE ABLE TO STOP. BUT STUDIES

HAVE DIFFERENT RATES, BUT I THINK THE LOWEST AND THE SAFEST ESTIMATE IS ABOUT 4 PERCENT OF PEOPLE THAT HAVE ATTENTION DEFICIT AS CHILDREN GO ON TO HAVE IT AS ADULTS.

NOW, THERE ARE SOME STUDIES THAT SHOW HIGHER RATES, BUT THE LOWER END IS PROBABLY MORE RELIABLE AT THIS POINT. FOUR PERCENT DO PERSIST INTO ADULTHOOD. HE IS IN THE 4 PERCENT, THERE IS NO QUESTION.

Q. IS THIS A CONDITION THAT DOCTORS KNOW, MEDICINE KNOWS IS GENETICS?

A. IT HAS COMPONENTS OF BOTH. IT IS ANOTHER ONE OF THE FIELDS OF STUDY BEING STUDIED. A HIGH RATE OF GENETIC TRANSMISSION THERE, WE ARE REALLY NOT SURE. AGAIN, A LOT, THEY CALL SOFT SIGNS, MINIMAL BRAIN DAMAGE SOMETIMES, PROBLEMS THAT COULD HAPPEN WHILE THE BABY IS IN THE WOMB. WE KNOW THAT FOR SOME TIME, WITH NEUROLOGICAL CONSULTS, THERE IS ALSO A GENETIC COMPONENT. IT IS SAFE TO SAY IT COMES PROBABLY FROM THE ENVIRONMENT OF GROWING UP, YOU KNOW, INSULTS TO THE BRAIN, BUT ALSO THERE IS A GENETIC COMPONENT.

Q. AND IT CAN -- CAN IT BE AFFECTED BY WHAT A MOTHER DOES DURING HER PREGNANCY?

A. YES. THE STUDIES CLEARLY SHOW THAT MOMS THAT SMOKE DURING PREGNANCY, THERE IS A HIGHER RATE OF THEIR CHILDREN HAVING ATTENTION DEFICIT DISORDER. THE LAST STUDY I SAW, I BELIEVE IT SAID MAYBE THEY ARE TWO TIMES MORE LIKELY, IT MIGHT DOUBLE THE RISK OF HAVING ATTENTION DEFICIT DISORDER.

BUT IT DOES PLAY A ROLE.

Q.    HAS HE BEEN ON MEDICATIONS FOR THIS CONDITION SINCE HE WAS ABOUT SEVEN YEARS OLD?

A.    YES.    HE HAS BEEN TREATED OFF AND ON.    THERE HAS BEEN THOSE PERIODS OF TIME THAT WE TALKED ABOUT YESTERDAY,  PERIODS OF HOSPITALIZATIONS WHERE HE WAS NOT ON THOSE MEDICATIONS, BUT INTERMITTENTLY, HE IS WHAT,  23 NOW,  SO,  FOR OVER TEN YEARS AT LEAST,  14 YEARS OR SO,  15 YEARS, OFF AND ON, HE HAS BEEN ON THESE MEDS.

Q.    IS HE STILL ON THAT?

A.    YES.

Q.    NOW,  DOES THIS DISORDER MAKE HIM -- CONTRIBUTE TO HIM BEING IMPULSIVE?

A.    YES.

Q.    AND DOES HIS DEMENTIA THAT YOU DESCRIBED MAKE HIM IMPULSIVE,  TOO?

A.    YES.

Q.    DO NEUROBIOLOGICAL STUDIES SHOW A REDUCED BRAIN VOLUME?

A.    YES.    AGAIN,  THERE IS -- IN  PSYCHIATRY, THIS IS A GREAT TIME TO BE A PSYCHIATRIST, ESPECIALLY THOSE WHO ARE DOING RESEARCH.    THEY ARE DOING A LOT OF STUDIES ON THE BRAIN.    THEY HAVE THESE NEAT SCANS THAT SHOW NOT WHAT YOUR BRAIN LOOKS LIKE BUT HOW YOUR BRAIN WORKS.    THEY ARE DOING A LOT OF STUDIES WITH THESE IMAGING ON PEOPLE WITH DIFFERENT PSYCHIATRIC DISORDERS.  AND WE KNOW THROUGH SOME OF THE SCANS

AND THE STUDIES GOING ON THAT THE BRAIN VOLUME IS SMALLER.

Q.    ARE ANXIETY DISORDERS COMORBID WITH THIS ILLNESS, AND WHAT DOES THAT MEAN?

A.    YES.  IF YOU JUST READ THE MANUAL AND HAVE THE EXPERIENCE OF TREATING PATIENTS, IT IS VERY COMMON TO HAVE AN ANXIETY DISORDER IN ADDITION TO THE ATTENTION DEFICIT DISORDER.  IT JUST MEANS THAT IT IS ANOTHER DISORDER THAT COMMONLY OCCURS WITH IT.

Q.    IS BIPOLAR DISORDER ASSOCIATED WITH IT?

A.    YES, IT IS.  AGAIN, THAT IS ONE OF THE DIFFERENTIALS. AND A LOT OF PEOPLE CAN HAVE BOTH, BOTH ILLNESSES.  THAT IS VERY COMMON IN CHILD PSYCHIATRY.

Q.    AND CHILDREN WITH THIS DISORDER HAVE DIFFICULTY IN SCHOOL, OBVIOUSLY, I THINK YOU HAVE ALREADY SAID THAT.  AND IN BRANDON BASHAM'S CASE, IS THAT EVIDENT FROM HIS HISTORY?

A.    YES.  AND, MR. SWERLING, THEY HAVE DIFFICULTY IN SCHOOL, HOME, IN ALL SITUATIONS.  THAT IS THE HALLMARK OF ATTENTION DEFICIT DISORDER.  IT IS NOT JUST A PROBLEM IN A SCHOOL, IT AFFECTS YOUR LIFE EVERY DAY, EVERY INTERACTION YOU HAVE.  EVERY TIME YOU TRY TO SIT DOWN AND SUSTAIN ATTENTION ON ANY KIND OF TASK, IT AFFECTS YOU.

Q.    DID YOU DIAGNOSE BRANDON WITH ANY SUBSTANCE DEPENDENCE?

A.    YES.

Q.    WOULD YOU DESCRIBE THAT BRIEFLY?

A.    IN PSYCHIATRY, WE TRY TO DIFFERENTIATE BETWEEN

SUBSTANCE ABUSE AND SUBSTANCE DEPENDENCE. SUBSTANCE ABUSE MEANS THAT YOU USE DRUGS OR PERHAPS ALCOHOL TO THE POINT WHERE YOU HAVE SOME NEGATIVE CONSEQUENCES. IT AFFECTS YOUR LIFE. YOU MAY GET INTO SOME LEGAL TROUBLE. SUBSTANCE DEPENDENCE IS A HIGHER FORM, MEANING IT IS A LITTLE WORSE. THAT YOU HAVE DEVELOPED TOLERANCE TO CERTAIN DRUGS, THAT YOU NEED MORE OF THOSE DRUGS TO GET THE SAME AFFECT, THE SAME HIGH, SO TO SPEAK. AND, IN MY OPINION, MR. BASHAM HAS SUBSTANCE DEPENDENCE FOR COCAINE, MARIJUANA, AND INHALANTS.

Q. AGAIN, IS THIS ONE OF THE CONDITIONS THAT HAS A GENETIC PREDISPOSITION?

A. YES. WE KNOW A LOT MORE ABOUT ALCOHOLISM RUNNING IN FAMILIES THAN WE DO OF THE OTHER DRUGS. AND STUDIES SHOW THAT WHEN YOU HAVE ALCOHOLISM, WHEN IT COMES FROM YOUR FATHER'S SIDE OF THE FAMILY, THAT YOU HAVE A WORSE COURSE OF ILLNESS. WE KNOW THAT ALCOHOLISM THAT COMES FROM YOUR MOTHER'S GENES, THEY TEND TO DO BETTER IN TREATMENT. THEY TEND TO BE ABLE TO ABSTAIN FROM USING ALCOHOL MORE OFTEN, SO WE KNOW THAT MUCH. BUT, YES, THERE IS DEFINITELY A GENETIC COMPONENT TO THESE ILLNESSES, AS WELL. SO LOTS OF THING WE USED TO KIND OF BLAME PARENTS FOR OR YOUR ENVIRONMENT, WE ARE NOW LEARNING THAT THESE ILLNESSES ARE PHYSICAL ILLNESSES, THEY HAVE A HEREDITARY COMPONENT, AND IT IS NOT JUST POOR UPBRINGING OR JUST YOUR ENVIRONMENT.

Q. DO THE RECORDS REFLECT THAT HE HAD THIS CONDITION OF

ABUSING DRUGS SINCE A VERY EARLY AGE?

A.    YES.  ONE OF THE EARLIEST AGES I HAVE BEEN ABLE TO GET A HISTORY ON, THERE ARE REPORTS OF EIGHT,  NINE

Q.    DID YOU FIND THAT THE HISTORY THROUGHOUT REFLECTS USE OF DRUGS,  SUBSTANCE?

A.    YES.

Q.    DOES HE HAVE ANY PERMANENT MENTAL AND BRAIN IMPAIRMENTS BECAUSE OF THIS?

A.    YES.

Q.    COULD YOU EXPLAIN THAT?

A.    YES.  AGAIN,  AS WE TALKED ABOUT YESTERDAY, THE DEMENTIA,  WHICH IS THE BAD MEMORY, AND THE FRONTAL LOBE FUNCTIONING, AND THE HALLUCINATIONS, IN MY OPINION, THAT HE EXPERIENCES,  I ATTRIBUTE BOTH OF THOSE TO THE INHALANT ABUSE, THE INHALANT DEPENDENCE, THE LONG USE OF INHALANTS.  SOME TIMES FOR PERIODS OF TIME WHERE IT IS VERY FREQUENT USE.  BUT MR. BASHAM HAS EVEN, ON OCCASION, IN THE DETENTION CENTER, HE HAD ACCESS TO SOME CLEANING SOLVENTS, AND ALTHOUGH HE DOESN'T NEARLY,  IT IS CALLED HUFFING,  ALTHOUGH HE DOESN'T HUFF AS MUCH AS HE HAS IN THE PAST,  ON OCCASIONS HE HAS CONTINUED TO DO THAT,  EVEN IN THE DETENTION CENTER.

Q.    DID YOU DIAGNOSE BRANDON WITH ANY PERSONALITY DISORDERS?

A.    NO.

Q.    WHY NOT?

A.     THAT IS A GOOD QUESTION.  HE CLEARLY HAS MANY,  MANY MARKED PERSONALITY TRAITS.  THERE IS NO QUESTION ABOUT THAT. BUT THE PROBLEM IS IN DIAGNOSING MR. BASHAM WITH A PERSONALITY DISORDER,  THE FIRST THING THE DSM SAYS,  IS THAT IF THESE SYMPTOMS ARE CAUSED BY OTHER MENTAL CONDITIONS,  YOU DON'T DIAGNOSE PERSONALITY DISORDER.  AND SO, EVEN DR. CAPEHART AND I AGREE ON A LOT OF THE SYMPTOMS THAT MR. BASHAM HAS,  BUT HE ATTRIBUTES THEM TO A PERSONALITY DISORDER, AND I DON'T.  I ATTRIBUTE THEM TO THE BRAIN DAMAGE THAT HE HAS HAD FROM THE SUBSTANCE ABUSE.  I ATTRIBUTE THEM TO HIS OTHER ILLNESSES.

Q.     DR. WATTS, I WILL PUT ON THE SCREEN THE DIAGNOSTIC MANUAL WHICH SHOWS CHARACTERISTICS FOR ANTISOCIAL DISORDER. IT WILL BE 191-A THROUGH  F.

MR.  SWERLING:  YOUR HONOR,  191-A THROUGH F HAVE BEEN AGREED TO BY THE GOVERNMENT.

THE COURT:   ALL RIGHT.  ADMITTED WITHOUT OBJECTION. BY MR. SWERLING:

Q.     YOU MAY HAVE THIS IN FRONT OF YOU WHILE YOU ARE DISCUSSING IT.

A.     THANK YOU.

Q.     WOULD YOU GO THROUGH AND EXPLAIN TO THE JURY WHY YOU DON'T AGREE WITH THIS DIAGNOSIS?

A.     SURE.  SURE.  NOW, KEEP IN MIND THAT HE CLEARLY HAS FEATURES OF THIS PERSONALITY,  THERE IS NO QUESTION ABOUT IT. AND PEOPLE ARE KIND OF LIKE DIAMONDS WITH LOTS OF FACETS.

YOU HAVE TO LOOK AT THE WHOLE DIAMOND, YOU JUST CAN'T LOOK AT THE FACETS.   HE CLEARLY HAS FACETS OF THIS PERSONALITY, THERE IS NO QUESTION.

I THINK HE CLEARLY MEETS THE CRITERIA FOR NUMBER (1).  IT SAYS, "A FAILURE TO CONFORM TO SOCIAL NORMS WITH RESPECT TO LAWFUL BEHAVIORS AS INDICATED BY REPEATEDLY PERFORMING ACTS THAT ARE GROUNDS FOR ARREST."   THERE IS NO QUESTION, MR. BASHAM HAS BEEN IN LOTS OF LEGAL TROUBLE,  THAT HE HAS DONE A LOT OF THINGS THAT ARE ILLEGAL, AND THAT HE HAS BEEN ARRESTED FOR THOSE THINGS, AND HE HAS BEEN ADJUDICATED FOR THOSE THINGS,  NO QUESTION.

THE NEXT CRITERIA I THINK, TO A DEGREE, HE ABSOLUTELY HAS. "DECEITFULNESS, AS INDICATED BY REPEATED LYING,  USE OF ALIASES, OR CONNING OTHERS FOR PERSONAL PROFIT OR PLEASURE." NOW, THERE IS A LITTLE BIT OF CONFLICT, AND ONE OF THE THINGS THAT YOU HAVE TO KEEP IN MIND WITH THAT CRITERIA IS IT IS CLEAR MR. BASHAM HAS USED AN ALIAS.  HE USED AN ALIAS IN THIS CASE WHEN HE WAS ARRESTED IN KENTUCKY.  I BELIEVE HE USED THE NAME JOSH RITTMAN.

WE KNOW THAT HE CERTAINLY HAS LIED IN THE PAST, AND I DON'T THINK EVEN MR. BASHAM WOULDN'T DENY THAT.  BUT ONE OF THE THINGS ON CRITERIA (2) THAT YOU HAVE TO KEEP IN MIND,  IS THAT THE REPEATED LYING HAS TO BE FOR "PERSONAL PROFIT OR PLEASURE."   THERE HAVE BEEN A LOT OF TIMES WHEN MR. BASHAM HAS LIED TO GET HIS NEEDS MET IN TERMS OF FOOD OR WHETHER THAT

IS MONEY FOR CANTEEN WHEN HIS FAMILY WOULDN'T COME TO VISIT HIM.  WHEN YOU INCARCERATED AND YOU ARE IN A SITUATION WHERE THERE ARE MANY PEOPLE WITH SIMILAR PERSONALITY DISORDERS, SOME OF THE WAYS YOU HAVE TO ADAPT,  AND SOME OF THE WAYS YOU HAVE TO FUNCTION IS BY BEATING THE SYSTEM.  SO, HE DOES HAVE THAT CRITERIA,  BUT KEEP IN MIND THAT SOME OF HIS LYING HAS BEEN IN THE PAST TO SECURE NEEDS. AND SO, THAT IS DIFFERENTIATED FROM JUST ALWAYS LYING TO GET PERSONAL GAIN. BUT HE DOES MEET THAT CRITERIA.

Q.    WHEN YOU SAY "DIFFERENTIATE,"  HOW DOES THAT IMPACT ON HIS DIAGNOSIS?

A.    WELL, IT IS JUST SOMETHING TO KEEP IN MIND.  I THINK HE STILL MEETS THE CRITERIA.  I THOUGHT A LOT ABOUT THIS ONE. I THINK HE STILL MEETS THE CRITERIA, BUT YOU HAVE TO KEEP IN MIND THAT NOT ALL OF HIS LYING IS ALWAYS FOR PERSONAL GAIN.

HE MEETS THE CRITERIA FOR NUMBER (3).  HE IS DEFINITELY IMPULSIVE,  BUT THIS IS NOT ATTRIBUTED TO HIS ANTISOCIAL PERSONALITY DISORDER.  SO, I DON'T THINK THAT CRITERIA (3) FITS IN THIS CASE, BECAUSE I THINK HIS IMPULSIVITY IS FROM ATTENTION DEFICIT DISORDER AND THE BRAIN DAMAGE HE HAS.  I DON'T THINK THAT THE IMPULSIVITY YOU SEE IN A SOCIOPATH OR SOMEBODY WITH ANTISOCIAL PERSONALITY DISORDER IS SOMEONE THAT DECIDES TO DO SOMETHING ANYWAY WITHOUT CARING FOR WHAT HAPPENS.  THAT MEANS YOU HAVE TO BE ABLE TO PLAN ENOUGH AHEAD TO KNOW THAT IF YOU DO SOMETHING IMPULSIVE, IT IS GOING TO

HARM SOMEONE. MR. BASHAM DOESN'T EVEN GET TO THAT POINT. SO, I THINK, ALTHOUGH HE IS IMPULSIVE AND I AGREE WITH THAT SYMPTOM, I DON'T ATTRIBUTE THAT TO A PERSONALITY DISORDER.

Q. SO, YOU ARE DISTINGUISHING THAT FROM THAT CRITERIA, YOU BELIEVE THAT THE IMPULSIVITY IS A RESULT OF OTHER ISSUES, ONE OF THEM BEING DEMENTIA, THE OTHER BEING ADHD?

A. ABSOLUTELY. HE DOESN'T HAVE THE CAPACITY. IT SAYS, "FAILURE TO PLAN AHEAD." HE DOESN'T HAVE THE BRAIN CAPACITY TO PLAN AHEAD. HE CAN'T DO THAT. AN ANTISOCIAL PERSON CAN DO THAT, BUT THEY CHOOSE NOT TO. HE DOESN'T HAVE THE CAPACITY TO DO THAT.

Q. WHEN YOU SAY, "DOESN'T HAVE THE CAPACITY," HOW HAVE YOU SEEN THAT IN THE MEDICAL COLLATERAL, AS WELL AS YOUR REVIEW OF THIS ENTIRE CASE. HOW DOES HIS BRAIN FUNCTION WITH RESPECT TO THAT KIND OF THING, PLANNING, FOR EXAMPLE?

A. I THINK THE BEST EXAMPLE I CAN GIVE HAS BEEN SOME OF HIS CONDUCT IN COURT. IF HE HAD THE CAPACITY TO PLAN AHEAD, IF HE HAD A CONTROL OVER HIS IMPULSIVENESS, HE WOULD CERTAINLY HAVE BEHAVED DURING THE PERIOD AFTER HE WAS ARRESTED AND HE HAS BEEN AWAITING TRIAL. HE HAS HAD WRITE-UP, AFTER WRITE-UP, AND HE CAN'T CONTROL THAT. I MEAN, IT WOULD BE IN HIS BEST INTEREST CLEARLY TO HAVE NOT GOTTEN WRITE-UPS, TO HAVE BEEN ABLE TO CONTROL HIS OUTBURSTS. HE DOESN'T HAVE THE CAPACITY TO DO THAT. SOMEONE WITH ANTISOCIAL PERSONALITY MIGHT HAVE A HISTORY ONCE THEY ARE CONFINED OF RAISING ALL

Q.   SO, THAT BEHAVIOR, TO YOU, IS INCONSISTENT WITH WHAT HE IS FACING?

A.   ABSOLUTELY.

Q.   YOU ATTRIBUTE THAT TO THE IMPULSIVITY?

A.   ABSOLUTELY.

Q.   WITH IMPULSIVITY, CAN THAT BE CONTROLLED FOR ANY DEGREE OF TIME? FOR EXAMPLE, CAN IT BE -- IS IT SOMETHING THAT AT SOME POINT THE IMPULSIVENESS IS GOING TO TAKE OVER EVEN IF YOU TRY TO CONTROL IT FOR A FEW MOMENTS?

A.   YES.   IT IS EASY FOR A PSYCHIATRIST.   IT IS NOT FAIR BECAUSE NO ONE ELSE HERE IS A PSYCHIATRIST.   IT IS EASY FOR A PSYCHIATRIST TO MANAGE THOSE SYMPTOMS.  WE HAVE TOOLS TO DO THAT.   AND I THINK SOME OF THE -- I THINK IT IS CLEAR, MAJOR SCHAFFER CLEARLY HAD A HANDLE ON HOW TO MANAGE MR. BASHAM. TIME AND EXPERIENCE IN GETTING TO KNOW MR. BASHAM, YOU CAN DIVERT A LOT OF HIS BEHAVIORS.   YOU CAN SEE WHEN HE IS GETTING UPSET, YOU HAVE CLUES TO TELL WHEN HE IS BECOMING IRRITABLE OR UPSET, AND YOU REDIRECT HIM.   THERE ARE TOOLS THAT YOU CAN USE.   AND IN SOME OF THE TREATMENT PROGRAMS HE HAS HAD, IT IS CALLED BEHAVIOR MODIFICATION. SOME OF THE DOCTORS HAVE DONE THAT WITH HIM OVER THE YEARS.   YOU REWARD

HIM FOR DOING GOOD THINGS.  PUNISHING MR. BASHAM FOR NOT MEETING STANDARDS ISN'T GOING TO WORK, THAT IS CLEAR FROM THE RECORDS.  WHEN HE LOSES PRIVILEGES FOR MISBEHAVING, THAT DOESN'T HELP.  AND SO WHAT HAS WORKED FOR HIM IS THAT HE GAINS PRIVILEGES BY ATTEMPTING TO WORK WITHIN VERY STRICT RULES OF CONFINING, CONTROLLING HIS BEHAVIOR.  HE NEEDS MEDICINES TO HELP HIM DO THAT, AS WELL.

Q.    ANYTHING ELSE THAT --

A.    YES.  CRITERIA (4), "IRRITABILITY AND AGGRESSIVENESS AS INDICATED BY REPEATED PHYSICAL FIGHTS OR ASSAULTS." AGAIN, HE CLEARLY, CLEARLY HAS THOSE BEHAVIORS, NO QUESTION.  BUT, AGAIN, I THINK THESE SYMPTOMS HAVE TO BE LOOKED AT.  THE FIRST THING I NOTICED, MANY TIMES MR. BASHAM HAS BEEN INVOLVED IN AN ALTERCATION IS WHEN HE IS BEING TOUCHED.  IF YOU LOOK THROUGH THE RECORDS, YOU CAN HEAR HIM SAYING DON'T TOUCH ME, AND AS SOON AS HE IS TOUCHED, HE BECOMES VERY ASSAULTIVE AND VERY RESISTANT.  THIS IS VERY CONSISTENT WITH SOMEONE WHO HAS BEEN SEXUALLY ABUSED.  YOU DON'T TOUCH THEM IN A NONCONSENTING FASHION.  THAT IS AUTONOMIC AROUSAL.  YOU GET VERY UPSET, YOU CAN GET AGGRESSIVE, AND YOU WILL PERCEIVE THAT YOU ARE BEING ATTACKED, AND YOU WILL DEFEND YOURSELF.  IT IS NOT RIGHT. THE BEHAVIOR IS NOT ADAPTIVE, BUT THAT IS WHAT IT IS.  IT COMES FROM HIS DISORDER, COMES FROM THE ANXIETY, IT COMES FROM BEING A VICTIM OF SEXUAL ABUSE.  I HAVE EVEN READ IN

SOME OF THE TESTIMONY HERE, THE INCIDENT HE HAD WITH THE MARSHALS, THE FIRST WORDS YOU HEAR ARE, "DON'T TOUCH ME. GET YOUR HANDS OFF OF ME." THAT IS A VERY CONSISTENT PATTERN WHEN HE HAS BEEN RESTRAINED OVER THE YEARS.

THE NEXT SYMPTOM, "RECKLESS DISREGARD FOR SAFETY OF SELF OR OTHERS." CLEARLY HAS THAT. NO QUESTION ABOUT IT. BUT, AGAIN, THAT IS BECAUSE HE DOESN'T HAVE THE CAPACITY TO PLAN AHEAD. AN EXAMPLE I WAS TRYING TO THINK OF THE OTHER DAY, AND I THINK THAT PRETTY MUCH MATCHES, WHEN YOU HAVE A CHILD AND YOU KNOW YOU HAVE THE HOT BURNER ON THE STOVE, YOU TEACH YOUR CHILD DON'T TOUCH THAT BURNER. AND YOU KNOW THEY ARE GOING TO TRY TO TEST LIMITS AND THEY WILL PUT THEIR HANDS UP. THEY ONLY NEED TO GET BURNED ONCE TO FIGURE OUT WHY YOU TOLD THEM NOT TO TOUCH THAT BURNER. MR. BASHAM IS GOING TO TOUCH THAT BURNER WITHOUT EVEN A REGARD WHETHER IT IS GOING TO HARM HIM OR NOT. HE IS NOT ABLE TO STOP AND THINK IN BETWEEN THAT WHAT EFFECT WOULD THAT HAVE.

MY POINT BEING THAT HIS RECKLESSNESS DISREGARD, IT NEVER SERVES HIM, IT NEVER HELPS HIM. HE NEVER GETS AHEAD IN LIFE BECAUSE THIS IS A CHOICE, IT IS NOT A CHOICE. IT DOESN'T SERVE HIM IN ANY WAY.

THE NEXT SYMPTOM, "CONSISTENT IRRESPONSIBILITY AS INDICATED BY REPEATED FAILURE TO SUSTAIN CONSISTENT WORK BEHAVIOR OR HONOR FINANCIAL OBLIGATIONS." MR. BASHAM HAS BEEN DISABLED. HE HAS BEEN ON DISABILITY SINCE HE WAS TEN

FOR ATTENTION DEFICIT DISORDER.  HE HAS NOT BEEN ABLE TO WORK, AND HE COULDN'T WORK.  I WOULD BE VERY PESSIMISTIC IN BEING ABLE TO EMPLOY MR. BASHAM IN ANY KIND OF FASHION.

THEN THE LAST SYMPTOM, "LACK OF REMORSE."  IT IS MY OPINION, AND IT IS CERTAINLY DR. MORGAN'S OPINION, WHOM I HAVE TALKED WITH, THAT THAT IS NOT A SYMPTOM MR. BASHAM HAS.

HE IS 18 YEARS OF AGE,  CRITERIA B, HE MEETS THAT.

CRITERIA C,  THERE IS EVIDENCE OF CONDUCT DISORDER.  HE CLEARLY HAS THAT.

AND THEN THE LAST CRITERIA,  IT IS NOT DURING SCHIZOPHRENIA OR A MANIC EPISODE.  HE IS CERTAINLY NOT SCHIZOPHRENIA,  AND HE DOES NOT HAVE MANIA AT THIS TIME, NOR HAS HE HAD A MANIA AT ANY TIME THAT WE HAVE EVALUATED HIM.

Q.    DID YOU ALSO THINK HE HAS ANY SIGNIFICANT INDEPENDENT PERSONALITY TRAITS?

A.    YES.

Q.    TELL US ABOUT THAT.

A.    THAT IS WHAT I MEAN WHEN WE TALK ABOUT THE FACETS. THERE ARE LOTS OF DIFFERENT THINGS ABOUT MR. BASHAM'S PERSONALITY, AND WE ALL HAVE THIS.  THERE ARE TIMES, WE WERE JUST TALKING ABOUT THAT THIS MORNING IN COURT.  IF YOU GO THROUGH THE DSM,  WE HAVE ALL OF THESE PERSONALITY DISORDERS. WELL IF YOU READ THROUGH THE CRITERIA, YOU START TO PANIC BECAUSE YOU SAY, WELL THAT SOUNDS LIKE ME OR THAT SOUNDS LIKE MY HUSBAND.  WE ALL HAVE THESE TRAITS AT TIMES.  THE POINT

IS, THOSE TRAITS ARE ADAPTIVE.  THEY ARE USED TO HELP YOU. IT IS ONLY DEFINED AS A PERSONALITY DISORDER WHEN IT IS MALADAPTIVE, YOU KNOW, THAT IT DOESN'T WORK IN THE SITUATION, YOU DON'T GET AHEAD,  YOU ARE NOT FUNCTIONING WELL, IT DECREASES YOUR FUNCTIONING.  WE ALL HAVE THESE SYMPTOMS. THERE IS NO QUESTION ABOUT THAT.  IN FACT, I WAS TEASING, THE WAY I LEARNED THESE CRITERIA IN MEDICAL SCHOOL IS I PUT MY FRIENDS' NAMES DOWN BY THE PERSONALITY DISORDER, SO WHEN WE HAD THE TEST, I COULD JUST THINK ABOUT THAT PERSON AND SOME OF THE BEHAVIORS THEY HAD, AND IT HELPED ME REMEMBER THEM.

BUT THE DEPENDENCY TRAITS ARE VERY EVIDENT WITH MR. BASHAM WHEN YOU LOOK AT HIS RELATIONSHIP WITH OLDER, HIGHER FUNCTIONING MALES.  HE HAS DIFFICULTY MAKING DECISIONS, HE NEEDS REASSURANCE FROM THEM.  I THINK IN LOOKING AT THE CRIME SPREE MR. BASHAM WAS ON, THAT WAS VERY EVIDENT WHEN HE AND ANDREA RODDY WERE LEFT IN THE HOTEL AND CHAD FULKS AND TINA SEVERANCE HAD LEFT.  ALMOST THE PANIC,  THE SCARINESS.  SO, HE HAS A VERY DIFFICULT TIME FUNCTIONING.  HE RELIES UPON OLDER MALES TO LOOK FOR GUIDANCE.

IF YOU EVEN LOOK AT HIS CRIMES.  ACTUALLY, I WENT BACK ON HIS LEGAL HISTORY, AND WHEN HE HAD CODEFENDANTS IN HIS PRIOR CRIMES,  THERE WAS A MAN NAMED TIMMY BURDIN IN ONE OF HIS JUVENILE CRIMES,  MR. BURDIN WAS THREE YEARS OLDER.  I BELIEVE HE HAD BUCK EMORY, WHO WAS ANOTHER CODEFENDANT WHO WAS OVER TEN YEARS OLDER THAN HIM.  AND MR. FULKS WAS OLDER THAN HIM.

SO, EVEN IN THE CRIMES THAT YOU LOOK AT WHERE HE HAS HAD CODEFENDANTS, THEY HAVE BEEN OLDER OR HIGHER FUNCTIONING PEOPLE. SO, THAT IS WHERE YOU SEE THE DEPENDENCY IN MR. BASHAM.

Q. DID YOU DIAGNOSE HIM WITH ANY MEDICAL CONDITIONS?

A. YES. THERE IS ONE MORE PERSONALITY TRAIT.

Q. I'M SORRY. GO AHEAD. I DIDN'T MEAN TO --

A. BEING PUSHY TODAY.

THE GOVERNMENT AND I ALSO AGREE THAT HE HAS BORDERLINE PERSONALITY TRAITS. AND WHAT BORDERLINE PERSONALITY TRAITS ARE, THAT IS A SEQUELLA OF BEING ABUSED, OR NEGLECTED, OR WITNESSING ABUSE. AND WHAT SOME OF THOSE TRAITS ARE IS THAT HE MUTILATES. IF YOU EVER SAW THE MOVIE, FATAL ATTRACTION, GLENN CLOSE HAD THOSE PERSONALITY TRAITS.

WHEN MR. BASHAM CUTS HIMSELF, IT ACTUALLY RELIEVES ANXIETY FOR HIM. HE FEELS BETTER. IT RELIEVES TENSION. IT IS KIND OF LIKE SCRATCHING THE ITCH. SO, HE HAS HAD A LONG HISTORY OF MUTILATING HIMSELF AT TIMES WHEN HE IS UPSET OR ANXIOUS, HE WILL CUT. HE MIGHT BE VERY IMPULSIVE IN OVERDOSING ON A MEDICATION. SO, A LOT OF HIS BEHAVIORS ARE ALSO CONSISTENT WITH SOMEONE WHO HAS BEEN ABUSED OVER A PERIOD OF TIME.

Q. IS THERE ANY DISTINGUISHING FEATURE BETWEEN ANTISOCIAL PERSONALITY DISORDER AND WHAT YOU FOUND WITH DEMENTIA, AS WELL AS THE ADHD?

A.    YES. AGAIN, THE IMPULSIVENESS THAT YOU SEE WITH THOSE DISORDERS, THEY ARE NOT CONTROLLED. DON'T GET ME WRONG, THE PERSON KNOWS WHAT THEY ARE DOING. THERE IS NO QUESTION, MR. BASHAM KNOWS RIGHT FROM WRONG.  HE CLEARLY KNOWS THAT. THESE DISORDERS DON'T STOP HIS BRAIN FROM UNDERSTANDING THINGS THAT ARE RIGHT AND THINGS THAT ARE WRONG.  BUT THE IMPULSIVENESS THAT COMES WITH EVERYDAY LIVING, IT IS NOT DRIVEN BY HIS DESIRE TO GET AHEAD IN THE WORLD.  HE DOESN'T HAVE THE CAPACITY TO THINK OR REASON THINGS THROUGH, HE JUST DOESN'T HAVE THE TOOLS TO DO IT.

Q.    NOW, THAT KIND OF BRINGS US INTO THE NEXT AREA I WANT TO GO INTO.  HAVE YOU REVIEWED ALL OF THE MATERIAL AVAILABLE CONCERNING THE ESCAPES, THE AWOLS, AND THE ATTEMPTS MR. BASHAM HAS BEEN THROUGH?

A.    YES.

Q.    AND DOES THIS IMPULSIVITY AFFECT THAT IN ANY WAY?

A.    WELL, YES, I THINK IT DOES.  IT CLEARLY DOES.

Q.    COULD YOU ELABORATE ON THAT?

A.    WELL, FOR EXAMPLE, ONE OF THE ESCAPE ATTEMPTS HE HAD FROM THE COURTHOUSE, HE WAS FOUND IN A TRASH CAN DOWN THE ROAD.  HE RAN FROM A COURTHOUSE, I DON'T KNOW WHERE HE WOULD HAVE THOUGHT HE COULD HAVE RUN TO.  THE POINT WAS, IT WAS RUNNING.  THERE IS NO EVIDENCE THAT HE WAS RUNNING TO A CAR THAT WAS WAITING FOR HIM AROUND THE CORNER.  IT COULD HAVE HAPPENED, I WASN'T THERE.  BUT IN READING THE INCIDENT

REPORT, HE WAS FOUND IN A TRASH CAN. I DON'T THINK THAT WAS A VERY WELL-PLANNED ESCAPE ATTEMPT.

I THINK THE ATTEMPT AT HOPKINSVILLE WAS -- THERE WAS DEFINITELY PLANNING INVOLVED IN THAT. THERE IS NO QUESTION ABOUT THAT.

Q. YOU SAID YOU VISITED THERE?

A. YES.

Q. WHAT WERE YOUR OBSERVATIONS IN CONNECTION WITH YOUR OBSERVATIONS ABOUT BRANDON?

A. WELL, AGAIN, ACCORDING TO MR. BASHAM'S REPORT, MR. FULKS WAS THE ONE THAT WAS ABLE TO TEAR THE FENCE APART BECAUSE -- MAJOR SCHAFFER SAYS NOBODY COULD HAVE KNOWN THAT THE KNUCKLES WERE OUT, AT LEAST HE DIDN'T THINK SO. HE JUST THOUGHT THAT WAS LUCKY THAT WHEN THEY GOT UP TO THE POINT WHERE THEY WERE ABLE TO PULL THE FENCE APART, IT CAME APART.

Q. YOU SPOKE TO MAJOR SCHAFFER?

A. OH, YES, YES. HE TOOK ME ON A TOUR AND SHOWED ME.

Q. MAJOR SCHAFFER ACTUALLY SHOWED YOU THE AREA WHERE THE ESCAPE TOOK PLACE; IS THAT CORRECT?

A. YES. I WENT INTO THE COURTYARD. I SAW THE AREA OF THE ROOF THAT WOULD HAVE BEEN SCALED. I SAW THE FENCE ABOVE IT, AND SAW HOW THEY WOULD HAVE HAD -- AND HE WENT THROUGH AND SHOWED ME WHERE THE ROPE WOULD HAVE HAD TO HAVE BEEN THROWN OVER IN THE AREA WHERE THE FENCE WAS TORN.

Q. IN YOUR OPINION, BASED UPON WHAT YOU FOUND IN BRANDON,

DO YOU THINK HE HAD THE ABILITY TO PLAN BEYOND THAT?

A.    NO.    I DON'T THINK HE HAD THE ABILITY TO PLAN THAT ATTEMPT.    I THINK HE HAD SOME ABILITIES TO PARTICIPATE IN IT, AND HE CLEARLY DID.    I TALKED WITH OFFICER ARISON,  MAJOR SCHAFFER, AND ALSO OFFICER BLAIR, AND NO ONE IS OF THE OPINION THAT HE WAS THE CHIEF ORCHESTRATOR OF THIS PLAN.

Q.    THE OTHER MATTERS DEALING WITH,  WESTERN STATE, JUST CARE,  METHODIST HOME,  CARDINAL TREATMENT CENTER, WHAT WERE YOUR OBSERVATIONS ABOUT THOSE?

A.    WELL,  IN WESTERN STATE HOSPITAL,  AGAIN,  I VISITED THERE, AND IT WAS EASY AS WALKING OFF THE CAMPUS.    IT WAS AN OPEN YARD.    AND MR. BASHAM REPORTED TO ME,  NOW,  THIS IS NOT IN THE INCIDENT REPORTS.    THERE IS ALLEGATIONS THAT PERHAPS HE HAD ESCAPED WITH AMBER FOWLER, WHO WAS A PATIENT THAT HAD VISITED HIM A FEW DAYS BEFORE,  BUT MR. BASHAM REPORTS TO ME THAT THERE WERE VISITORS ON THE DAY THAT HE ESCAPED AND HE GOT A RIDE WITH ONE OF THE VISITOR'S FAMILY MEMBERS.

Q.    THIS IS AN OPEN CAMPUS?

A.    YES.

IN TERMS OF THE JUST CARE FACILITY, I WENT THROUGH THAT A LITTLE BIT YESTERDAY.    SERGEANT DRESCHER WALKED ME THROUGH. AND I SAW THE SCREEN.    AFTER HE CUT THE SCREEN,  THERE IS A SMALL WINDOW THAT HE -- I GUESS ABOUT ONE FEET MAYBE BY FOUR FEET,  ONE FEET BY THREE FEET, THAT ROLLS OUT THAT HE WOULD HAVE TO GO THROUGH, OR HE WOULD HAVE HAD TO HAVE HAD SOMETHING

TO BREAK THE UPPER PANE IN THE WINDOW, WHICH IS QUITE LARGE AND COULD EASILY FIT A BODY THROUGH IT. HE WOULD HAVE HAD TO HAVE HAD THE ROPE, GO DOWN. THE BUILDING WAS FOUR STORIES HIGH, SO HE WOULD HAVE -- I DON'T KNOW HOW LONG THE ROPE WAS, IT WAS PRETTY LONG. HE PROBABLY WOULD HAVE HAD A LITTLE BIT OF A JUMP, BUT PROBABLY NOT ENOUGH THAT IT WOULD HAVE HARMED HIM. HE WOULD HAVE TO GO OUT THROUGH THAT OPEN AREA. THERE WOULD HAVE BEEN ANOTHER FENCE. THERE IS RAZOR WIRE ABOVE THAT FENCE. AND THEN FARROW ROAD, WHICH IS A FAIRLY BUSY ROAD. ALSO IN THAT FENCE AREA, THERE IS A GUARD'S GATE THERE. SO, AGAIN, I THINK HE HAD PLANS TO GET OUT OF THE WINDOW. I AM NOT SURE WHAT WOULD HAVE HAPPENED AFTER THAT.

Q. OKAY. ANYTHING ELSE?

A. YES. THE CARDINAL TREATMENT CENTER HE LEFT. HE WAS ON DINING ROOM DUTY AND LEFT WITH ANOTHER PEER.

Q. HE WAS GONE FOR A WEEK OR SO?

A. YES. HE WAS GONE FOR QUITE A PERIOD OF TIME.

Q. DO YOU KNOW THE CIRCUMSTANCES SURROUNDING HIS COMING BACK WITH THE INDIVIDUAL LEAVING HIM?

A. YES, I AM AWARE OF THAT. MR. BASHAM STATED THAT WHEN HE LEFT THE CARDINAL TREATMENT CENTER, THAT HE -- HIS MAIN MEMORY THAT HE SPOKE WITH ME ABOUT IS THAT HE SPENT TIME WITH AN OLDER MAN. THAT HE WAS IN AN APARTMENT COMPLEX, AND HE WAS INVITED INTO AN OLDER MAN'S HOME, AND HE SPENT A LOT OF TIME WITH HIM, AND ATE DINNER WITH HIM, THAT SORT OF THING. HE

REMEMBERED SOMEONE TAKING CARE OF HIM.  BUT HE WAS, EVENTUALLY,  THE OTHER MAN, THE YOUNG BOY HE ESCAPED WITH LEFT, AND SO HE CAME BACK.

Q.   AND ONE OTHER, THE METHODIST HOME,  HE LEFT FOR A COUPLE OF HOURS?

A.   YES.  AT THE METHODIST HOME.  HE WENT OUT THE WINDOW AND HE WAS OBSERVED SHUTTING THE WINDOW.

Q.   SO, YOU VISITED WESTERN STATE,  YOU VISITED JUST CARE, AND YOU VISITED THE HOPKINS COUNTY DETENTION CENTER TO PUT THIS INTO YOUR ANALYSIS; IS THAT CORRECT?

A.   YES.

Q.   YOU SPOKE TO THE PEOPLE AT THOSE DIFFERENT LOCATIONS?

A.   YES.

Q.   IS THAT THE BEST WAY TO GO AHEAD AND ACTUALLY DETERMINE WHAT HAPPENED IN A SITUATION?

A.   IF YOU CAN, SURE.  NOT EVERYONE HAS THE LUXURY OF DOING THAT.  THIS IS ONE OF THE FEW OCCASIONS I HAVE HAD, BECAUSE I HAVE HAD A LOT OF TIME TO WORK ON THIS.  YES, IF YOU ARE ABLE TO DO THAT,  IT IS ALWAYS BETTER TO BE ABLE TO TALK WITH THE PEOPLE WHENEVER IT IS POSSIBLE.

Q.   BY THE WAY,  DID DR. BRAWLEY ALSO COME WITH YOU AND INSPECT THE ROPE IN CONNECTION WITH THAT JUST CARE SITUATION?

A.   YES,  SHE DID.  BOTH DR. BRAWLEY AND I CAME TO THE COURTHOUSE.  THEY WERE KIND ENOUGH TO PULL THE ROPE OUT OF THE EVIDENCE, AND SO WE WERE ABLE TO LOOK AT THAT ROPE.

Q.    THE ABILITY TO MAKE THAT ROPE, IS THAT SOMETHING INCONSISTENT WITH WHAT YOU HAVE TESTIFIED?

A.    NO.    NOT AT ALL.    ACTUALLY, DR. BRAWLEY, THAT IS -- SHE REALLY KNOWS THE BRAIN WELL.    I KNOW SOME OF THE BRAIN, SHE KNOWS THE BRAIN.    SHE AND I WENT AND QUESTIONED MR. BASHAM AFTER WE SAW THE ROPE AND SPECIFICALLY ASKED HIM QUESTIONS.    HE WAS ABLE TO REPORT THAT HE WAS TAUGHT HOW TO MAKE THAT ROPE, AND THAT HE HAD A NUMBER OF ATTEMPTS THAT HE HAD TO LEARN.    AGAIN, IT IS HARD FOR HIM TO LEARN THINGS, SO HE HAS TO PRACTICE AND PRACTICE, AND HE WAS TAUGHT THAT BY ANOTHER INMATE.    IF YOU ACTUALLY LOOK AT THE ROPE, ITSELF, IT IS TWO SHEETS.    ONE IS TWISTED, THE OTHER ONE IS TWISTED, AND THEN THE TWO STRANDS ARE TWISTED AROUND EACH OTHER.    SO, ALTHOUGH IT IS QUITE IMPRESSIVE, IT IS NOT AS COMPLICATED AS A BRAID.

Q.    YOU ARE ALSO AWARE OF THE FACT, THERE IS A CROSS THAT HE WEAVED TOGETHER?

A.    YES.    HE HAS GOT A HISTORY, EVEN IN CHARTER OF EVANSVILLE, THAT HE MAKES NECKLACES.    AND HE IS KNOWN TO BE PRETTY GOOD WITH STRING.

Q.    NOW, WE ARE GETTING CLOSE TO THE END.

I WANTED TO ASK YOU SOME QUESTIONS CONCERNING MR. BASHAM'S ATTEMPT TO LOCATE MS. DONOVAN'S BODY, OKAY?

A.    YES.

Q.    WOULD HIS DEMENTIA, IN YOUR OPINION, BE CONSISTENT WITH

HIS INABILITY TO LOCATE THE BODY?

A.    YES.

Q.    WOULD YOU ELABORATE ON THAT AND TELL THE JURY WHAT YOU DID TO SUPPORT YOUR CONCLUSION ON THAT?

A.    SURE.   WHEN SOMEONE HAS DEMENTIA AND, AGAIN, KEEP IN MIND, MR. BASHAM'S DEMENTIA IS NOTHING LIKE ALZHEIMER'S.   IT IS A MILD DEMENTIA.   IF YOU ARE GOING TO QUALIFY IT,  IT IS MILD.   HE STILL HAS SOME ABILITIES.  HE CLEARLY HAS MEMORY IMPAIRMENT,  HE CLEARLY HAS AN INABILITY TO LEARN, BUT THAT DOESN'T MEAN THAT LIKE WITH NUMEROUS, REPEATED ATTEMPTS HE CAN'T BE TAUGHT SOME THINGS UNDER OPTIMAL CONDITIONS.   BUT YOU HAVE TO REMEMBER,  HE HAD NEVER -- THE REPORTS WERE HE HAD NEVER LEFT KENTUCKY OTHER THAN, I BELIEVE, HE WAS IN A HOSPITAL IN EVANSVILLE,  INDIANA. AND I BELIEVE ONE OF THE HOSPITALS MAY HAVE BEEN IN OHIO.  HE HAD NOT LEFT HIS STATE BEFORE, SO HE WAS IN A PLACE THAT HE WAS UNFAMILIAR.   WHEN YOU TAKE SOMEONE WITH LEARNING DISABILITIES,  OR WITH INABILITY TO LEARN,  ANY KIND OF NEW OR NOVEL SITUATIONS, THAT IS NOT A GOOD WAY TO LEARN SOMETHING.   SO, FIRST OF ALL,  HE WAS IN A PLACE HE WAS NOT FAMILIAR WITH AT ALL.

SECONDLY,  HE WAS USING DRUGS.   THERE WAS CLEAR EVIDENCE IN MR. BASHAM'S REPORT IN THE RECORDS THAT HE WAS UNDER THE INFLUENCE OF DRUGS, AT THE TIME.   SO,  YOU HAVE TWO FACTORS AFFECTING ALREADY HIS LIMITED CAPACITY.   IT IS ALREADY -- THE CARTON OF EGGS,  HE IS OPERATING ON SIX EGGS,  NOW YOU HAVE

DONE SOME THINGS TO TAKE AWAY A FEW MORE EGGS, SO HIS ABILITIES ARE GOING TO BE VERY LIMITED UNDER THOSE CIRCUMSTANCES. I THINK IT IS CLEAR, I THINK HE DID REMEMBER SOME THINGS. HE REMEMBERED SOME SIGNS, AND THAT SORT OF THING. BUT, IN MY OPINION, HE DIDN'T HAVE THE CAPACITY TO BE ABLE TO FIND THAT LOCATION.

AND I WENT THERE MYSELF. IT IS A BIT CONFUSING. IF YOU TAKE THE ROUTE THAT MR. BASHAM AND MR. FULKS ALLEGEDLY TOOK, THERE ARE SOME TURNS THERE, AND THERE IS DEFINITELY -- IN FACT, THE INVESTIGATOR THAT TOOK ME MADE THE WRONG TURN ON THE ROAD LEADING TO BEE TREE FARMS. SO, IT IS NOT THAT COMPLICATED, BUT IT IS A VERY SMALL ROAD OFF OF THE MAIN HIGHWAY THERE NEAR WINNABOW, SO IT IS A REMOTE AREA.

Q. AND REMOTE IN THAT THERE IS A NUMBER OF ROADS IN AND OUT OF THAT AREA, DIRT ROADS?

A. YES. THERE ARE A LOT OF DIRT ROADS, I REMEMBER, ON THE LEFT, AND A FEW ROADS ON THE RIGHT.

Q. YOU SAID IT WAS REMOTE. IS IT BASICALLY THE SAME KIND OF ROAD, TREES, DIRT ROADS?

A. YES.

Q. VERY SIMILAR?

A. COUNTRY. IT IS THE COUNTRY WITH A FEW HOUSES IN BETWEEN.

Q. WOULD THE FACT THAT IT WAS EARLY IN THE EVENING, LATE AFTERNOON, AND BEING ON DRUGS ALSO AFFECT HIS ABILITY IN

CONJUNCTION WITH THE DEMENTIA?

A.    ABSOLUTELY.

Q.    NOW, YOU HAVE TOUCHED ON IT A LITTLE BIT ABOUT HIS  --
DURING THE PERIOD OF TIME FROM HIS ARREST TO THE TRIAL, HOW HE
HAS REACTED IN CERTAIN OF THE JAILS.

A.    YES.

Q.    AND HIS REACTION TO CERTAIN OF THE PEOPLE WHO ARE
CORRECTIONAL OFFICERS, AS WELL AS THE MARSHALS?

A.    YES.

Q.    HAVE YOU MADE SOME OBSERVATIONS ABOUT THAT?

A.    YES.

Q.    YOU HAVE ALSO SAID YOU HAVE TALKED TO PEOPLE.  WHO DID
YOU TALK TO IN CONNECTION WITH THAT?

A.    I HAVE AN ONGOING DIALOGUE WITH A LOT OF THE OFFICERS
THAT HAVE TO DEAL WITH HIM BECAUSE HE IS DIFFICULT TO DEAL
WITH.  I KNOW IT HAS GOT TO BE VERY FRUSTRATING FOR LAW
ENFORCEMENT OFFICIALS TO DEAL WITH HIM.  HE IS DIFFICULT TO
MANAGE.  SO, MANY TIMES IN THE DETENTION CENTER WHEN I WOULD
GO AND SEE MR. BASHAM, THE OFFICERS WOULD COME UP AND COMPLAIN
TO ME, AND I JUST TOLD THEM TO THINK OF HIM AS A LATENCY-AGE
CHILD WITH BIG MUSCLES THAT WAS STRONG.  MEANING THAT YOU
HAVE TO BE PATIENT, YOU HAVE TO REALIZE THAT HE IS STRONG,
AND THAT HE HAS AN ABILITY TO RESIST, AND HE HAS, AT TIMES, TO
BE AGGRESSIVE.  I HAVE SPOKEN WITH MANY OFFICERS THAT HAVE
HAD TO DEAL WITH HIM ON A DAILY BASIS.

Q.   DID YOU SPEAK WITH SOME WHO COULD NOT MANAGE HIM AND HAD DIFFICULTY MANAGING HIM AS WELL AS THOSE THAT DID MANAGE HIM?

A.   YES.

Q.   WHAT WERE YOUR OBSERVATIONS FROM THOSE CONVERSATIONS AND REVIEW OF THE RECORDS IN THIS CASE?

A.   I THINK THE MOST IMPORTANT OBSERVATION, AND, AGAIN, I DON'T WANT TO BEAT A DEAD HORSE, BUT MAJOR SCHAFFER.  I THINK HE IS VERY SMART AND HE SAID SOMETHING, THESE WERE HIS WORDS, AND I HAVE USED THEM.  DON'T DEAL WITH HIM WITH ANGER. DON'T MEET HIS ANGER WITH ANGER, BECAUSE IT WILL ONLY ESCALATE HIS BEHAVIOR.  AND THAT HAS BEEN OBVIOUS.  I HAVE SEEN MANY OFFICERS THAT YELL AT HIM, THAT DIRECT HIM FORCEFULLY, AND THAT DOESN'T WORK.  I HAVE SEEN OTHER OFFICERS THAT ARE ABLE TO JUST CALM HIM DOWN AND SAY, COME WALK TO THE CELL, MOVE OVER HERE, AND HE WILL FOLLOW.  BUT HE IS CLEARLY, HE IS DIFFICULT TO MANAGE.

Q.   HAVE THERE BEEN TREATMENTS FOR BRANDON THAT HAVE BEEN REALLY SUCCESSFUL?

A.   YES.

Q.   WHAT ARE THOSE CALLED?

A.   AGAIN, THOSE ARE THE BEHAVIOR MODIFICATION TREATMENTS. THOSE ARE PLANS, AND THEY -- ACTUALLY, AT JUST CARE HE HAD A BEHAVIOR MODIFICATION TREATMENT.  AFTER HE HAD ESCAPED, HE WAS CONFINED  -- AFTER HE ATTEMPTED TO ESCAPE, HE WAS CONFINED

IN HIS ROOM FOR PERIODS OF TIME, AND HE WAS SLOWLY GIVEN BREAKS, AND HE WAS ALLOWED TO GET OUT OF HIS ROOM AS HE BUILT UP HIS TRUST AGAIN WITH THE STAFF.  SO, THAT PROGRAM WORKED PRETTY WELL FOR HIM.

Q.    CAN THAT KIND OF PROGRAM BE USED IN PRISON?

A.    SURE.  I HAVE GOT A PATIENT IN SUPERMAX, WHICH IS THE HIGHEST SECURITY IN THE DEPARTMENT OF CORRECTIONS.  RIGHT NOW I HAVE HIM ON A BEHAVIOR MODIFICATION PROGRAM.  SURE.

Q.    ARE THOSE KINDS OF PROGRAMS SUCCESSFUL?

A.    YES.  YES.  THIS IS -- THE GENTLEMEN I AM REFERRING TO HAS BEEN IN LOCKUP ON SOLITARY CONFINEMENT FOR THREE YEARS. WE HAVE HIM GETTING OUT OF THE CELL NOW FOR PERIODS OF TIME BASED ON HE HAS TO DO THINGS TO BE ABLE TO EARN THOSE PRIVILEGES.  BUT YOU MAKE SURE THE THINGS THAT YOU ASK A PERSON TO DO, THEY HAVE THE CAPACITY TO DO.  YOU CAN'T SET SOMEONE UP FOR FAILURE.  YOU CAN'T ASK SOMEONE TO DO SOMETHING THEY ARE NOT ABLE TO DO.

Q.    SO, THIS IS IN TERMS OF MANAGEMENT OF A PERSON WHO IS IN CUSTODY; IS THAT CORRECT?

A.    YES.

Q.    ANOTHER THING I WANTED TO ASK YOU ABOUT WAS HIS MEDICINE, CHEEKING MEDICINE, INSTANCES WHERE HE HAS BEEN NONCOMPLIANT WITH MEDICINE.  COULD YOU GIVE US YOUR THOUGHTS ON THAT?

A.    SURE.  FIRST OF ALL, NONCOMPLIANCE.  NOT MANY

PATIENTS ARE ALWAYS COMPLIANT IN TAKING THEIR MEDICATIONS, THAT IS A GIVEN.  I DON'T EVEN FINISH ALL OF MY ANTIBIOTICS SOMETIMES WHEN I AM SUPPOSED TO BECAUSE I FEEL BETTER.  THAT IS NORMAL.  HE HAS BEEN NONCOMPLIANT ON MANY, MANY OCCASIONS.  PART OF NONCOMPLIANCE COMES FROM YOUR MENTAL ILLNESS.  SOMETIMES THE MEDICATIONS WE PRESCRIBE DON'T MAKE YOU FEEL WELL.  IF YOU WERE TO TAKE ONE OF THOSE SEROQUELS THAT HE IS ON, 200 MILLIGRAMS, YOU WOULD BE VERY SLEEPY. THESE MEDICATIONS HAVE SIDE EFFECTS.  AND SOMETIMES THE SIDE EFFECTS ARE INTOLERABLE.  MANY OF THE MEDICATIONS MR. BASHAM STOPPED WERE FOR HIS REPORTS OF SIDE EFFECTS.  HE WOULD COMPLAIN OF DIARRHEA, I REMEMBER ON DEPAKOTE; ITCHINESS, ON LITHIUM; ITCHINESS, ON IMIPRAMINE. SO, SOMETIMES HE DOESN'T TAKE THE MEDICINES BECAUSE HE DOESN'T LIKE THE SIDE EFFECTS.

OTHER TIMES, HE TAKES THEM BECAUSE HE IS NONCOMPLIANT, AND HE CHOOSES NOT TO.  WHEN I HAVE ASKED HIM ABOUT HIS CONDUCT ON THE STREET, AND HE STATED HE DIDN'T LIKE HIS MEDS BECAUSE HE WANTED TO BE ABLE TO RUN AROUND.  AND SO, HE HAS NOT BEEN COMPLIANT WITH HIS MEDICATIONS WHEN HE HAS NOT BEEN IN TREATMENT.

AND THEN, THIRDLY, SOME OF HIS NONCOMPLIANCE, HE TRADES HIS MEDICINES FOR MONEY, AND FOOD, AND COMMISSARY. SOMETIMES THAT MEDICATION HAS BEEN USED TO BARTER FOR NEEDS.

Q.   HOW DO YOU DEAL WITH THAT?

A.    OH, THERE ARE EASY WAYS TO DEAL WITH THAT.   WE DEAL

WITH THAT IN THE PRISON ALL THE TIME. YOU GIVE AS MANY LIQUID MEDICINES AS YOU CAN SO YOU CAN'T CHEEK THEM. THERE IS LOTS OF MEDICINES THAT COME IN LIQUID FORMS. THERE IS MEDICINES THAT COME IN SHOTS. THERE IS WAYS TO DEAL WITH THAT IN A CORRECTIONAL SETTING.

Q. SO, AGAIN, IT IS A MANAGEMENT SITUATION?

A. SURE.

Q. AND, LASTLY, YOU HAD SAID THAT THERE WERE -- A LOT OF HIS CONDUCT WAS INCONSISTENT WITH WHAT HE IS FACING. YOU WOULD THINK HE WOULD BE ACTING JUST THE OPPOSITE, CORRECT? YOU HAVE ALREADY TOLD US ABOUT THAT, I JUST WANTED TO ASK YOU ONE OTHER THING. IS STRESS A FACTOR IN THE TYPE OF DIAGNOSIS YOU HAVE GIVEN HIM AND HIS ABILITY TO BE IMPULSIVE OR NOT BE IMPULSIVE, I GUESS IS WHAT I AM TRYING TO SAY?

A. SURE. WE ALL HAVE THAT. AGAIN, STRESS TAKES AWAY OUR CAPACITY BECAUSE WE ARE WORRIED ABOUT SOMETHING. IT TAKES AWAY SOME OF YOUR BRAIN FUNCTION BECAUSE YOU ARE WORRIED ABOUT SOMETHING, OR YOU ARE DEALING WITH A STRESS, OR THAT YOU DON'T HAVE THE CAPACITY TO MAKE THE SAME KIND OF DECISIONS YOU DO WHEN YOU AREN'T UNDER STRESS. THE BEST EXAMPLE I CAN GIVE YOU ABOUT THAT, FOR EXAMPLE, IF SOMEONE HAS A DEPRESSION, THEY MIGHT BE IRRITABLE. THAT MIGHT BE THE ONLY TIME A MOM SPANKS A CHILD. PERHAPS SHE NEVER SPANKS HER CHILD, BUT IF SHE IS HAVING A BAD DAY, OR SHE HAS A DEPRESSION, SHE MIGHT SPANK WHEN SHE NORMALLY DOESN'T DO THAT. HER CAPACITY IS

AFFECTED BECAUSE SHE DOESN'T FEEL WELL. THAT IS VERY COMMON FOR ANYONE UNDER STRESS.

ANOTHER EXAMPLE IS MOVING. WHEN YOU BUY A NEW HOME, YOU ARE EXCITED, BUT IF YOU CAN REMEMBER YOUR MOOD, OR YOUR IRRITABILITY, YOU PROBABLY HAVE PERIODS DURING THE MOVE WHERE YOU BECOME STRESSFUL AND YOU DON'T MAKE THE SAME DECISIONS THAT YOU NORMALLY WOULD. SO, STRESS AFFECTS EVERYBODY, AND IT AFFECTS MR. BASHAM, TOO. IT TAKES AWAY FROM HIS ALREADY LIMITED CAPACITY.

MR. SWERLING: DR. WATTS, THANK YOU VERY MUCH. I WILL ASK YOU TO ANSWER ANY QUESTIONS THAT MR. SCHOOLS HAS.

THE WITNESS: THANK YOU. IT HAS BEEN A PLEASURE TO WORK WITH YOU.

THE COURT: MR. SCHOOLS, YOU MAY CROSS-EXAMINE THE WITNESS.

MR. SCHOOLS: GOOD MORNING, JUDGE. GOOD MORNING, LADIES AND GENTLEMEN. HOW ARE YOU?

CROSS EXAM

BY MR. SCHOOLS:

Q. GOOD MORNING, DR. WATTS. HOW ARE YOU?

A. GOOD MORNING.

Q. DO YOU PREFER WATTS OR SCHWARTZ-WATTS?

A. WATTS IS MUCH EASIER FOR EVERYBODY. THAT IS FINE.

Q. DR. WATTS, WHY DO SOME KILLERS KEEP PERSONAL ITEMS THAT THEY TAKE FROM THEIR VICTIM?

A.    GOOD QUESTION.    THAT IS KIND OF MORE OF A PROFILING ISSUE, WHICH IS A LITTLE BIT OUT OF MY EXPERTISE,  BUT I DO HAVE SOME KNOWLEDGE, AND I WILL BE GLAD TO ANSWER THAT. STUDIES SHOW THERE ARE DIFFERENT KINDS OF KILLERS.  AND I THINK WHAT MR. SCHOOLS IS REFERRING TO, THE PEOPLE THAT ARE SERIAL KILLERS.   THERE IS AN ILLNESS KNOWN AS SADISM, WHICH IS ONE OF THE SEXUAL DISORDERS,  ONE OF THE NINE SEXUAL DISORDERS WE DISCUSSED YESTERDAY.   SADISM, WHERE PEOPLE HEAL AS PART OF A SEXUAL ACT, AND THAT THEY KEEP ITEMS FROM THE VICTIM, AND THAT IS KIND OF LIKE A MEMENTO,  IT IS A TOKEN. AND SO, THERE IS CERTAINLY A GROUP OF KILLERS THAT ARE KNOWN AS SADISTS, AND THAT IS A VERY COMMON TRAIT AMONGST THEM.

Q.    WHAT PURPOSE --

A.    WELL, THERE IS ONE OTHER KIND,  TOO.  SORRY.  THE OTHER KIND OF KILLER WHERE YOU MAY SEE SOMEONE KEEPING ITEMS,  THEY PAWN THEM.   THEY USE THEM FOR MONEY TO SELL OR FOR OTHER REASONS.

Q.    FAIR ENOUGH.   THE FIRST TYPE YOU MENTIONED,  WHAT PURPOSE DOES THE KEEPSAKE SERVE FOR THEM?

A.    IT IS A MEMENTO.   IT IS A REMINDER.   THEY GET PLEASURE OUT OF KEEPING WHAT THEY HAVE.  IT IS A TROPHY.

Q.    AND YOU ARE AWARE,  AREN'T YOU, DR. SCHWARTZ-WATTS, THAT ON NOVEMBER 15TH OF 2002,  SIX DAYS AFTER SAMANTHA BURNS WAS KIDNAPPED,  CARJACKED, AND KILLED,  BRANDON BASHAM HAD HER RING?

A.    YES,  I AM VERY AWARE OF THAT.

Q.    YOU ARE AWARE THAT ON NOVEMBER 17TH, 2002, THREE DAYS AFTER BRANDON BASHAM KIDNAPPED, AND CARJACKED, AND ALICE DONOVAN WAS KILLED, HE WAS ARRESTED IN ASHLAND,  KENTUCKY?

A.    YES.

Q.    YOU ARE AWARE THAT IN HIS POCKET WAS A KNIFE THAT BELONGED TO ALICE DONOVAN?

A.    YES.

Q.    HE DIDN'T PAWN THE RING?

A.    NO.

Q.    HE DIDN'T PAWN THE KNIFE?

A.    NO.

Q.    AND YOU ARE ALSO  -- SCRATCH THAT.

YOU ARE AWARE THAT, JUST PRIOR TO HIS ARREST IN ASHLAND, KENTUCKY, HE APPROACHED ANDREA FRANCIS IN THE PARKING LOT OF THE MALL IN ASHLAND, KENTUCKY, AND ATTEMPTED TO GET IN HER CAR?

A.    YES.

Q.    MEMENTOS ARE REMINDERS?

A.    ABSOLUTELY.

Q.    MEMENTOS SERVE TO REMIND US OF THINGS THAT WE REMEMBER?

A.    YES, OR THEY HAVE SENTIMENTAL VALUE,  YES,  SURE.

Q.    SO,  WHEN A HUNTER, FOR EXAMPLE, HAS THE MOUNT -- THE HEAD OF A DEER MOUNTED,  A BUCK,  PUTS IT ON HIS WALL,  IT SERVES AS A REMINDER?

A. SURE. BRAGGING RIGHT, BUT, YES, IT IS A REMINDER OR SOMETHING MAYBE THEY LIKE ART, BUT, YES, THAT IS TRUE.

Q. DO YOU KNOW SOME HUNTERS?

A. MY BROTHER.

Q. AND YOU KNOW THAT IF YOU WALK INTO THE DEN OF A HUNTER, AND THERE IS A BUCK ON THE WALL, AND YOU ASK THE HUNTER ABOUT IT, THEY CAN TELL YOU EVERY DETAIL?

A. SURE. WELL, THEY ARE GLAD TO TELL YOU. I DON'T KNOW EVERY DETAIL, BUT THEY ARE CERTAINLY GLAD TO TELL YOU THEIR STORY, SURE.

Q. THEY CAN TELL YOU WHAT TIME OF DAY THEY GOT IN THE DEER STAND. THEY CAN TELL YOU WHAT THE WEATHER WAS LIKE. THEY CAN TELL YOU WHERE THE DEER CAME OUT OF THE WOODS. THEY CAN TELL YOU HOW THEY RAISED THEIR GUN AND POINTED IT AT THE DEER. THEY CAN TELL YOU HOW THE DEER REACTED WHEN IT GOT SHOT. THEY CAN TELL YOU WHETHER THE DEER RAN IN THE WOODS OR NOT. THEY CAN TELL YOU WHERE THEY FOUND IT. IT REMINDS THEM OF THE EXPERIENCE, DOESN'T IT?

A. SURE.

Q. THAT IS WHAT MEMENTOS DO.

A. YES.

Q. DOCTOR, YOU MENTIONED ON MORE THAN ONE OCCASION ABOUT -- OR IT HAS BEEN MENTIONED ABOUT THE DEFENSE TEAM. AND I JUST WANT TO BE CLEAR ABOUT WHAT IS THE DEFENSE TEAM. YOU ARE SORT OF THE HEAD OF THE MITIGATION TEAM, AREN'T YOU, FOR THE

DEFENSE?

A.    I WOULDN'T SAY THAT.   BUT I WOULD PROBABLY SAY MS. TARR IS THE HEAD, SHE IS A MITIGATION SPECIALIST.   THAT IS NOT QUITE MY EXPERTISE, BUT I AM CERTAINLY PART OF THAT TEAM, THERE IS NO QUESTION.

Q.    MS. TARR, WHO IS OPERATING THE COMPUTER, AND PROBABLY WON'T GET SOME SLEEP.

A.    YES.

Q.    SHE IS THE HEAD OF THE MITIGATION TEAM?

A.    YES.

Q.    THE MITIGATION TEAM INCLUDES YOU?

A.    YES.

Q.    IT INCLUDES DR. BRANNON?

A.    YES.

Q.    IT INCLUDES DR. BRAWLEY?

A.    YES.

Q.    IT INCLUDES MS. VOGELSANG?

A.    YES.

Q.    IT INCLUDES DR. MORGAN?

A.    YES, I THINK THAT IS FAIR, YES.

Q.    AND THE GOAL OF THE MITIGATION TEAM IS TO COME TO COURT AND PRESENT A MITIGATION CASE IN A DEATH PENALTY TRIAL?

A.    WELL, THAT IS MAYBE MS. TARR'S GOAL, THAT IS NOT ALWAYS A FORENSIC PSYCHIATRIST'S GOAL BECAUSE THERE ARE A LOT OF TIMES I HAVE BEEN ON A MITIGATION TEAM AND I COULDN'T COME AND

PRESENT. BUT THE POINT IS, SURE, IF THERE IS A MENTAL ILLNESS, AND THE LAWYER MAKES THE ULTIMATE DECISION. BUT PERHAPS, WHEN I WENT TO MR. SWERLING AND TOLD HIM WHAT MR. BASHAM'S ILLNESSES ARE, IT IS HIS CHOICE WHETHER TO USE MY TESTIMONY OR NOT. BUT YOU ARE CORRECT, WHAT YOU DO IN MITIGATION IS IF THERE IS AN ILLNESS THAT NEEDS TO BE PRESENTED FOR THE COURT OR THE JURY, THEN IT IS PRESENTED.

Q. THERE IS A WHOLE TEAM OF PEOPLE WHO ARE ASSEMBLED TO DO THAT.

A. SURE, IN SOME CASES. SOME CASES, THERE IS NOT. THIS ONE IT DEFINITELY HAS. THEY HAD GOOD RESOURCES.

Q. IN MOST CASES, THERE IS A TEAM JUST LIKE THIS THAT COMES TO COURT AND PRESENTS SOME SORT OF MITIGATION EVIDENCE. NOT NECESSARILY THE SAME STUFF THAT HAS BEEN PRESENTED HERE, BUT THERE IS AN EFFORT TO PRESENT MITIGATION EVIDENCE?

A. SURE. ABSOLUTELY.

Q. YOU MENTIONED -- AND THE TEAM CONSULTS WITH THE ATTORNEYS ABOUT THE PRESENTATION AND WHAT WITNESSES TO CALL. I MEAN, IT IS A TEAM EFFORT TO PRESENT THE MITIGATION CASE AT TRIAL.

A. WELL, MS. TARR WOULD DO THAT. I DON'T MAKE WHAT WITNESSES ARE TO BE CALLED. BUT, SURE, THAT ABSOLUTELY OCCURS. I HAVE WORKED ENOUGH IN THAT SITUATION THAT I KNOW THAT.

Q. WHO MADE THE DETERMINATION OF WHO YOU WOULD SPEAK WITH

IN KENTUCKY?

A.    ME.

Q.    WHEN DID YOU SPEAK WITH THEM?

A.    AUGUST OF THIS YEAR.

Q.    OKAY.    YOU SPOKE WITH PENNY TITZER AT THE CHARTER EVANSVILLE FACILITY?

A.    YES.

Q.    YOU DID NOT SPEAK WITH MICHAEL EATMON, BRAD WEBBER, OR CHRISTINA PINKSTON?

A.    CORRECT.

Q.    THAT WAS A DECISION YOU MADE?

A.    YES.

Q.    YOU DID NOT SPEAK WITH DR. GILLINGHAM AT THE CHILDREN'S PSYCHIATRIC HOSPITAL IN KENTUCKY?

A.    THAT'S CORRECT.    BY THE WAY, I AM NOT SURE, I ASKED THE TEAM, I DID WANT TO SPEAK WITH DR. WEBBER.    WE HAD HEARD REPORTS, I DIDN'T KNOW IF HE WAS ALIVE OR NOT.    I DID TRY TO ATTEMPT THAT, BUT WE WEREN'T ABLE TO REACH HIM.

Q.    NONETHELESS,  YOU MADE THE CALL ABOUT WHO YOU WERE GOING TO TALK TO,  WHO YOU WEREN'T GOING TO TALK TO?

A.    SURE.

Q.    YOU TALKED TO THEM IN AUGUST OF THIS YEAR?

A.    YES.

Q.    WHEN DID YOU REVIEW THE MEDICAL RECORDS?

A.    AFTER CHRISTMAS.    I REMEMBER I MET WITH MR. SWERLING

AROUND CHRISTMAS EVE, AND SOME TIME AFTER -- EARLY JANUARY AT SOME POINT BEGAN.  I HAD SOME RECORDS BEFORE THAT.  THERE WAS A PACKET OF INFORMATION THAT I HAD.  MR. BASHAM'S ABNORMAL EEG,  SOME REPORTS FROM RIVENDELL VERY BRIEFLY THAT THEY HAD BEEN PROVIDED BY THE OTHER ATTORNEY.  BUT THE FULL GAMUT, THE 30-PLUS VOLUMES WERE REVIEWED BETWEEN JANUARY AND RE-REVIEWED EVEN AS RECENTLY AS LAST WEEK.

Q.    YOU WERE AWARE THAT ON JANUARY 20TH OF 2004,  THE DEFENSE WAS REQUIRED TO SEND THE PROSECUTION A LETTER SETTING FORTH WHAT THEY ANTICIPATED THAT THEIR EXPERTS WOULD TESTIFY ABOUT?

A.    YES,  I WAS.

Q.    AND WE RECEIVED A LETTER INDICATING THAT YOU WOULD DIAGNOSE MR. BASHAM AS HAVING DEMENTIA OF MULTIPLE ETIOLOGIES?

A.    YES.

Q.    INHALANT-INDUCED PSYCHOSIS?

A.    YES.

Q.    AND ANXIETY DISORDER?

A.    YES.

Q.    SINCE THEN, YOU HAVE NOT SPOKEN TO ANY OF THE PEOPLE YOU HAD SPOKEN TO?

A.    THAT'S CORRECT.

Q.    YOU HAD NOT REVIEWED THE MEDICAL RECORDS?

A.    WELL, I HAD REVIEWED SOME, BUT, CORRECT, NOT NEARLY AS WELL AS TODAY,  THAT'S CORRECT.

Q. THE MEDICAL RECORDS YOU HAD REVIEWED IN JANUARY 2004, INCLUDED THE RECORDS FROM RIVENDELL WHEN MR. BASHAM WAS VERY YOUNG?

A. YES.

Q. AND THE RECORDS FROM THE HOPKINS COUNTY DETENTION CENTER WHERE DR. SUESS HAD TREATED MR. BASHAM WHILE HE WAS IN THE HOPKINS COUNTY DETENTION -- TREAT MIGHT NOT BE THE RIGHT WORD, WHERE HE HAD SEEN HIM?

A. I DON'T KNOW IF I HAVE THOSE OR NOT.

Q. BUT YOU HAD SEEN THE RECORDS FROM RIVENDELL?

A. YES. KEEP IN MIND NOW, I HAD SEEN MR. BASHAM A NUMBER OF TIMES, SO I WAS AWARE OF THE HOSPITALIZATIONS THAT HE HAD. I WAS AWARE OF SOME OF THOSE CIRCUMSTANCES. AND ALTHOUGH I HAD NOT TALKED WITH SOME OF THOSE PEOPLE, SOME OF THE OTHERS, MS. VOGELSANG, MS. TARR, SOME PEOPLE HAD ALREADY HAD CONTACT WITH SOME OF THESE INDIVIDUALS. BUT YOU ARE CORRECT, I HAD SOME KNOWLEDGE, BUT NOT NEARLY AS MUCH AS I HAD AFTERWARDS.

Q. SO, ON JANUARY 20TH OF 2004, BEFORE YOU SEE ANY MEDICAL RECORDS ALL OF THEM, BEFORE YOU HAD TALKED TO ANYBODY YOU TALKED TO, I TAKE IT YOUR DIAGNOSIS IS THE SAME AS IT IS TODAY?

A. YES.

Q. SO, WHAT YOU HAVE DONE DOCTOR, IT IS YOUR JOB, I AM NOT CRITICIZING YOU FOR IT, BUT YOU HAVE HIGHLIGHTED SOME RECORDS THAT ARE LOCATED WITHIN 15,000 PAGES OF RECORDS, OR

12,000, OR WHATEVER IT IS, RIGHT?

A.    YES.

Q.    AND WHAT YOU ARE SUPPOSED TO DO, YOU ARE SUPPOSED TO HIGHLIGHT THE RECORDS THAT SUPPORT YOUR DIAGNOSIS.

A.    NO, I AM SUPPOSED TO LOOK AT ALL THE RECORDS AND KEEP ALL OF THOSE THINGS.  BUT THAT IS COURT, FOR COURT, I'M GOING TO TRY TO PARE THAT DOWN SO THE JURY DOESN'T HAVE TO GO THROUGH ALL OF THOSE RECORDS WITH ME.

BUT IT IS CERTAINLY FAIR TO SAY THAT I PICKED OUT PART OF THOSE RECORDS THAT I THOUGHT WOULD SHOW, FOR ME, THE MAIN THING, THE MEMORY IMPAIRMENT THAT HE HAS HAD FOR A LONG PERIOD OF TIME.

Q.    RIGHT.  YOU DECIDED WHICH RECORDS WERE GOING TO BE SHOWN TO THIS JURY DURING THE COURSE OF YOUR PRESENTATION, DIDN'T YOU?

A.    NO, MR. SWERLING MAKES THAT DETERMINATION.

Q.    YOU HAD SOME INPUT INTO THAT?

A.    SURE.

Q.    YOU ARE AWARE THAT THE FIRST TIME WE WERE AWARE WHAT RECORDS YOU WERE GOING TO RELY ON WAS LAST WEEK?

A.    I AM NOT AWARE OF THAT AT ALL.  THE INDIVIDUAL, I MEAN, YES.  WHAT MR. SCHOOLS IS REFERRING TO, AND THAT HAS BEEN THE LEGAL END, BUT WHAT EXHIBITS WAS SHOWN TODAY, YES, THAT WAS -- I UNDERSTAND THAT YOU WERE GIVEN QUITE LATE NOTICE OF THAT.

Q.   AND YOU HAVE NOT PREPARED A REPORT SETTING FORTH THE REASONS AND RATIONALE FOR YOUR DIAGNOSIS?

A.   NO, I WASN'T ASKED TO.

Q.   THERE IS A REASON YOU WEREN'T ASKED TO, ISN'T IT?

A.   WELL, THERE ARE A LOT OF TIMES I AM NOT ASKED TO MAKE A REPORT.  I DON'T ALWAYS KNOW THE REASONS.

Q.   WELL, THE TRUTH IS, IF YOU WRITE A REPORT, YOU GOT TO GIVE IT TO US, AND THEN WE CAN READ IT AND PREPARE TO CROSS-EXAMINE YOU, RIGHT?

A.   WELL, THAT MIGHT BE ONE REASON.  THE OTHER REASON, IF I WERE TO WRITE A REPORT, IT PROBABLY WOULD BE ABOUT 300 PAGES LONG, AND IT PROBABLY WOULD HAVE TAKEN QUITE A BIT OF TIME, MORE HOURS THAN WHAT HAS ALREADY BEEN SPENT ON THIS CASE.

Q.   YOU REVIEWED A REPORT THAT DR. CAPEHART WROTE THAT WAS ABOUT 120 PAGES LONG.  THAT WAS PROVIDED TO ALL OF THE PARTIES IN THE CASE SO THAT THEY WOULD KNOW WHAT HE WAS LOOKING AT TO MAKE THE BASIS OF HIS OPINION.

A.   ABSOLUTELY.

Q.   YOU HAVE TESTIFIED HERE TODAY AND AGAIN YESTERDAY, DR. SCHWARTZ-WATTS, REGARDING YOUR RELIANCE ON STATEMENTS THAT WERE MADE TO YOU BY THIRD PARTIES ON SOME RECORDS WHICH ARE IN EVIDENCE AND SOME RECORDS WHICH ARE NOT IN EVIDENCE.  AND THE FIRST TIME THE PROSECUTION HAS A CHANCE TO KNOW WHAT YOU WERE GOING TO RELY ON IS WHEN YOU TESTIFIED ON THAT WITNESS STAND; IS THAT RIGHT?

A.    SURE.  I AM HERE TO PRESENT MY FINDINGS IN PERSON.  BUT KEEP IN MIND, THAT IS A LEGAL ISSUE.   I AM ALWAYS GLAD TO TALK TO ANYBODY.  I WOULD HAVE GLADLY TALKED TO YOU.  AND IF ANYONE INSTRUCTED ME TO, I WOULD BE MORE THAN GLAD TO.   THAT IS LEGAL ISSUES.  THAT DOESN'T HAVE ANYTHING TO DO WITH THE METHODOLOGY I USE.   I TALK WITH WHOM THE LAW ALLOWS ME TO OR WHOM I AM INSTRUCTED.

Q.    EXACTLY.

NOW, I WANT TO GO THROUGH JUST A FEW EXHIBITS WITH YOU, JUST TO MAKE IT -- AND I TALKED ABOUT THE FACT THAT YOU OR SOMEONE SELECTED WHICH RECORDS WOULD BE EMPHASIZED DURING THE COURSE OF YOUR TESTIMONY, RIGHT?

A.    SURE.

Q.    AND YOU WOULD AGREE THAT THE NUMBER OF RECORDS THAT HAVE BEEN ADMITTED DURING THE COURSE OF YOUR TESTIMONY IS MINUSCULE COMPARED TO THE NUMBER THAT EXIST?

A.    ABSOLUTELY.

Q.    AND YOU WOULD HAVE TO AGREE, WOULDN'T YOU, DOCTOR, THAT THERE ARE RECORDS IN THAT OTHER GROUP OF RECORDS THAT ARE INCONSISTENT WITH WHAT YOU DIAGNOSED?

A.    ABSOLUTELY.  CAN I SAY NOT INCONSISTENT, THEY ARE THE SAME BEHAVIORS, BUT PROBABLY THE MOTIVES OR THE DIAGNOSIS -- THE BEHAVIORS WERE ALL THERE.  BUT, YES, I THINK THAT IS FAIR TO SAY.  LOTS OF DIFFERENT DOCTORS HAVE HAD LOTS OF DIFFERENT OPINIONS ABOUT WHAT CAUSES MR. BASHAM'S BEHAVIOR.

THAT IS VERY FAIR TO SAY.

Q.    WE CAN BE MORE SPECIFIC ABOUT THIS, BUT THERE ARE RECORDS, A NUMBER OF RECORDS THROUGHOUT MR. BASHAM'S MEDICAL HISTORY WHEREIN HE IS DENYING ANY HALLUCINATIONS?

A.    SURE.

Q.    AND THERE IS A NUMBER OF RECORDS THROUGHOUT MR. BASHAM'S HISTORY DURING WHICH IT IS BEING DETERMINED HE HAS NO MEMORY LOSS?

A.    SURE.  I THINK -- THE REGISTRATION TESTS, THERE CERTAINLY HAVE BEEN EXAMS THAT HE HAS HAD WHERE HE DID NOT SHOW THOSE MEMORY IMPAIRMENT, SURE.

Q.    AND THE ONLY RECORD THAT I AM AWARE OF THAT TESTED HIS EXECUTIVE FUNCTION WAS CONDUCTED AT BUTNER AND SHOWED HIM TO BE OF AVERAGE EXECUTIVE FUNCTIONING, AND THE WISCONSIN CARD SORTING?

A.    NO.  I AM NOT A NEUROPSYCHOLOGIST.  I TRUST DR. BRAWLEY.  AND SHE IS ONE OF THE BEST NEUROPSYCHOLOGISTS I KNOW.  AND, IN MY OPINION, THE BEST IN THIS STATE.  AND IF DR. BRAWLEY TELLS ME ON HER TEST RESULTS THERE IS ABNORMAL EXECUTIVE FUNCTIONING, I HOLD THOSE FINDINGS VERY CREDIBLE.

Q.    SHE DIDN'T DO THE WISCONSIN CARD SORTING TEST, DID SHE?

A.    AGAIN, I AM NOT A NEUROPSYCHOLOGIST.  I CAN TELL YOU WHY DR. BRAWLEY TELLS ME SHE DOESN'T GIVE THAT TEST.  THAT IS CALLED A RIGID BATTERY.

Q.    YOU WOULD AGREE, WOULDN'T YOU, THAT AN AVERAGE SCORE ON

THE WISCONSIN CARD SORTING TEST WOULD CONTRADICT THE FINDING OF LOW EXECUTIVE FUNCTIONING?

A. I HAVE NO IDEA. I AM NOT A NEUROPSYCHOLOGIST. I DON'T KNOW ANYTHING ABOUT THE WISCONSIN CARD SORTING TEST. I KNOW WHAT IT IS. BUT, AGAIN, THAT IS OUTSIDE MY SPECIALTY. THAT IT IS NOT MY TRAINING. THAT IS WHY I HIRE OR ASK FOR A CONSULTANT BECAUSE THAT IS SOMEONE WHO HAS A SKILL OUTSIDE OF MY KNOWLEDGE. FOR EXAMPLE, IF I AM A CARDIOLOGIST AND I ASK FOR AN ECHOCARDIOGRAM, AND I AM NOT QUALIFIED TO GIVE AN ECHOCARDIOGRAM, I AM GOING TO RELY UPON THE RESULTS OF THE ECHOCARDIOGRAM SPECIALISTS. I MIGHT KNOW WHAT THAT TEST ENTAILS AND THE RESULTS, BUT I AM NOT AN EXPERT IN INTERPRETING THAT. THAT IS WHY YOU GET CONSULTS.

Q. DID YOU REVIEW THE TESTIMONY OF DR. BRANNON?

A. NO, I HAVEN'T.

Q. YOU SPOKE WITH DR. BRANNON?

A. YES.

Q. YOU KNOW WHAT HIS DIAGNOSIS WAS?

A. WELL, I KNOW WHAT HIS FINDINGS WERE.

Q. YOU KNOW WHAT HIS FINDINGS WERE?

A. YES.

Q. AND DR. BRANNON HAD PROVIDED YOU A REPORT?

A. EVIDENTLY, YES.

Q. APPARENTLY, YOU HAD NOT PROVIDED THAT REPORT TO THE DEFENSE ATTORNEYS?

A.   THAT IS NOT CORRECT.   I TURNED THAT OVER TO THE TEAM. MS. TARR HAD A COPY OF MY REPORT.   BUT I DID NOT RECEIVE THAT REPORT.  WHAT HAD HAPPENED WAS, EVIDENTLY, DR. BRANNON'S OFFICE IS ACROSS THE HALL FROM MINE.   AND IT WAS PLACED ON MY ADMINISTRATIVE ASSISTANT'S DESK.   I HAVE ACTUALLY ONE PAGE OF THE REPORT IN MY FILE.

Q.   AND YOU ARE AWARE THEN THAT THE U. S. ATTORNEY'S OFFICE, MR. GASSER, DID NOT HAVE THAT REPORT UNTIL DR. BRANNON WAS ON THE WITNESS STAND?

A.   I DIDN'T SEE THE SECOND PAGE OF THE REPORT UNTIL YESTERDAY EITHER, SO I AM AWARE OF THAT,  YES.

Q.   YOU DIDN'T EVEN KNOW IT EXISTED?

A.   CORRECT.

Q.   AND DR. BRANNON TESTIFIED, I WANT TO SEE IF YOU AGREE WITH THIS.  MR. GASSER ASKED HIM, THE EEG THAT WAS DONE WAS NORMAL ACCORDING TO THE NEUROLOGIST AT BUTNER.   HE SAID, THAT IS CORRECT.   YOU NEED TO KEEP IN MIND, BRAIN DAMAGE WILL NOT ALWAYS SHOW UP ON EEG, OR MRI, OR EVEN NEUROLOGICAL EXAM. THEY CAN SOMETIMES BE VERY GENERALIZED.  TEST REFLEXES DO CERTAIN THINGS.   I HAVE NOT SEEN TWO NEUROLOGISTS GIVE THE SAME NEUROLOGICAL EXAM.   THEY ALL HAVE THEIR OWN LITTLE FLARE TO THEM.   SO, JUST BECAUSE THEY HAVE A NORMAL TEST, THAT DOESN'T MEAN THAT THERE IS NOT SOMETHING THERE.   NONETHELESS, HE SAID, YOU NEED TO KEEP IN MIND, BRAIN DAMAGE DOES NOT ALWAYS SHOW UP ON EEG, OR MRI, OR EVEN NEUROLOGICAL EXAM.  DO

YOU AGREE WITH THAT?

A.    SURE.

Q.    LET ME SHOW YOU WHAT IS MARKED FOR IDENTIFICATION, THAT IS GOVERNMENT'S EXHIBIT 500.   DOES THAT APPEAR TO BE DR. BRANNON'S REPORT THAT WAS PROVIDED TO MR. GASSER WHEN DR. BRANNON WAS ON THE WITNESS STAND?

A.    YES.   THIS LOOKS LIKE THE COPY OF WHAT I HAVE REVIEWED.

Q.    AT THE BOTTOM OF THAT REPORT, DR. SCHWARTZ-WATTS, THERE IS A RECOMMENDATION,  I BELIEVE.

A.    YES.

Q.    WOULD YOU READ IT?

A.    SURE.

        "A BRAIN MRI WITH PARTICULAR
        ATTENTION TO THE BRAIN STEM,
        CEREBELLUM, AND BASAL GANGLIA
        REGIONS TO ASSESS POSSIBLE
        STRUCTURAL ABNORMALITIES.   HE NEEDS
        A REPEAT EEG TO SEE IF THERE IS A
        CURRENT ABNORMALITY."

Q.    DID Y'ALL DO THAT?

A.    NO.   WE DISCUSSED THIS.   WE HAD A MEETING.   I MET WITH DR. BRANNON.   AND WHAT WE HAD DECIDED TO DO WAS PERHAPS DO WHAT IS CALLED A PET SCAN, WHICH IS A -- AN MRI SHOWS WHAT YOUR BRAIN LOOKS LIKE ON STRUCTURE.   IT SHOWS A PICTURE OF

WHAT YOUR BRAIN LOOKS LIKE. A PET SCAN IS A NEWER SCAN THAT SHOWS HOW YOUR BRAIN FUNCTIONS. DR. BRANNON AND I DISCUSSED WHETHER TO ORDER A PET SCAN FOR MR. BASHAM. AND BECAUSE OF LEGAL REASONS, WE DECIDED NOT TO. AND WHAT THOSE LEGAL REASONS ARE, THE PET SCAN -- IF MR. BASHAM'S PET SCAN WERE TO COME BACK ABNORMAL, THIS SCAN IS TOO EARLY IN THE DEVELOPMENT OF MEDICINE, WE DON'T NECESSARILY KNOW WHAT THAT MEANS. SO, FOR EXAMPLE, IF YOU HAVE SOMEONE WITH ATTENTION DEFICIT DISORDER, AND THEY HAVE A PET SCAN, AND THE FRONT PART OF THE PET SCAN COMES BACK ABNORMAL, WE DON'T KNOW ENOUGH IN MEDICINE, AT THIS POINT, TO SAY THAT EVERYONE WITH ATTENTION DEFICIT DISORDER IS GOING TO HAVE THIS ABNORMALITY ON THE PET SCAN. IT IS JUST TOO EARLY IN MEDICINE. IT IS A WONDERFUL TEST.

SO, WHAT WAS DECIDED IS THAT THE NEUROPSYCHOLOGICAL TEST IS THE ONLY OTHER TEST THAT SHOWS HOW YOUR BRAIN FUNCTIONS. SO, AT THIS POINT IN MEDICINE, THE ONLY OPTIONS WE HAVE TO LOOK AT HOW SOMEONE'S BRAIN FUNCTIONS IS A PET SCAN OR THE NEUROPSYCHOLOGICAL TESTING. SO, ACTUALLY, IT WAS DR. BRANNON THAT, IN MEETING WITH THE TEAM, THAT MADE THOSE DECISIONS. I WAS GLAD TO DO WHATEVER RECOMMENDATIONS HE WANTED.

Q. SO, DR. BRANNON HAVING RECOMMENDED THAT AN MRI AND EEG BE DONE, LATER RECOMMENDED THEY NOT BE DONE?

A. HE DIDN'T RECOMMEND THAT THEY NOT. BUT AT THE END OF THE MEETING, THE DECISION WAS TO TRY TO ATTEMPT TO GET A PET

SCAN. AND DR. BRANNON HAD ASKED, HE SAID THERE ARE CERTAIN RADIOLOGISTS THAT ARE EXPERTS IN INTERPRETING THOSE PET SCANS. HE WAS NOT ABLE TO FIND ONE THAT HE THOUGHT WAS RELIABLE ENOUGH TO INTERPRET IT FOR THE COURT.

Q. SO, DOCTOR, NONE OF THAT WAS DONE. THE MRI WAS NOT DONE, THE EEG WAS NOT DONE, A PET SCAN WAS NOT DONE?

A. THAT'S CORRECT. AND ACTUALLY, DR. BRANNON IS THE ONE IN THE MEETING THAT SAID THE REPEAT EEG MAY OR MAY NOT BE HELPFUL. BECAUSE I ALSO BELIEVE, AT THAT TIME, THERE WAS A TIME LINE OF WHEN TESTS HAD TO BE DONE, SO THAT TEST WAS NOT DONE.

Q. DR. SCHWARTZ-WATTS, DR. BRANNON'S REPORT IS DATED MAY 13TH OF 2003. YOU HAD PLENTY OF TIME TO DO AN EEG OR MRI IF YOU CHOSE TO, DIDN'T YOU?

A. MR. SCHOOLS, THAT IS NOT MY -- THAT IS NOT MY JOB OR THAT IS NOT MY DUTY TO ORDER AN EEG OR MRI. THAT WAS DR. BRANNON'S JOB. THAT IS WHY HE IS A CONSULTANT. HE CAN RECOMMEND THINGS. HE MET WITH MR. SWERLING, HE MET WITH MR. HARRIS, AND FOR WHATEVER REASON, THEY DECIDED NOT TO DO THAT. THAT IS NOT MY DECISION TO MAKE.

Q. NOW, YOU TALKED ABOUT SOME OF THE DOCUMENTS, AND I JUST WANT TO GO THROUGH. YOU MENTIONED, AND I AM NOT GOING THROUGH A LOT, I WILL TRY TO MAKE THIS AS SHORT AS POSSIBLE, BUT YOU GOT TO WORK WITH ME ON THIS. I WANT TO SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 501. DO YOU RECOGNIZE THAT,

DR. SCHWARTZ-WATTS?

A.    YES.  THIS WOULD BE A DISCHARGE SUMMARY FROM THE WESTERN STATE HOSPITAL.

Q.    YOU TESTIFIED, WITH RESPECT TO TOMMY BASHAM,  THE DIAGNOSIS THAT IS IN THAT SUMMARY?

A.    I'M SORRY, THIS IS MR. TOMMY BASHAM.  I DIDN'T PAY ATTENTION.  IT IS TOMMY BASHAM'S HISTORY.

MR. SCHOOLS:  YOUR HONOR,  WE OFFER GOVERNMENT'S 501, AT THIS TIME.

THE COURT:   ANY OBJECTION?

MR. SWERLING:  NO OBJECTION.

THE COURT:  WITHOUT OBJECTION.

MR. SCHOOLS:  IF WE COULD LOOK AT PAGE 4 OF GOVERNMENT'S EXHIBIT 501  -- PAGE 5.

BY MR. SCHOOLS:

Q.    IT IS REPORTED ON PAGE 5, THAT ON 5-12-2003, DR. CATOE SAW HIM REGARDING HIS PAIN AND CONSULTATION.  "MADE PRN DARVON AVAILABLE."  MEANING HE GAVE HIM DARVON BECAUSE HE SAID HE NEEDED IT?

A.    I WOULD PRESUME SO,  YES.

Q.    IT SAYS:

      "I AM TOLD THE PATIENT HAS APPLIED

      FOR DISABILITY AND HAS A LAWYER.

      HE AND HIS WIFE ARE BOTH AFTER

      DISABILITY.   HIS WIFE IS ALLEGEDLY

LEAVING HIM, BUT THE TREATMENT TEAM IS VERY SKEPTICAL ABOUT THAT. WE THINK THAT WERE THEY DIVORCED AND BOTH ON DISABILITY, THEY WOULD LIKELY GET MORE MONEY."

NOW, THAT IS INFORMATION THAT IS RELEVANT TO ASSESS MR. BASHAM'S ACTUAL MENTAL STATE, ISN'T IT?

A. SURE.

Q. YOU DIDN'T TELL THE JURY ABOUT THAT, AND THAT IS BECAUSE YOU CHOSE NOT TO?

A. NO, I WASN'T ASKED. I WILL ANSWER ANY QUESTION THAT IS ASKED OF ME. I DON'T WITHHOLD ANYTHING.

Q. BUT YOUR DIRECT EXAMINATION WAS PREPARED, AND YOU HAD A ROLE IN IT?

A. MY COMMENT ON MR. TOMMY BASHAM WAS THE ONLY THING THAT I COMMENTED ON WAS WHAT HIS DIAGNOSIS WAS. THE REASON FOR THAT IS BECAUSE OF FAMILY HISTORY. YOU HAVE TO OBTAIN A FAMILY HISTORY. MY JOB WAS NOT TO DO AN ASSESSMENT ON MR. TOMMY BASHAM AND MAKE SPECULATIONS ABOUT HIS CREDIBILITY OR NOT. MY JOB WAS TO LOOK AT THE FAMILY HISTORY TO SEE WHAT ILLNESSES RUN IN MR. BASHAM'S FAMILY THAT PUTS HIM AT A GENETIC RISK TO DEVELOP THESE ILLNESSES. AND, IF I MAY SAY, EVEN THOUGH THE TREATMENT TEAM MAY QUESTION HIS MOTIVES, HE WAS STILL DIAGNOSED WITH A PSYCHOTIC DEPRESSION, AND THAT IS WHAT IS IMPORTANT.

Q.    BUT IT IS ALSO IMPORTANT TO NOTE THAT THERE IS AT LEAST SOME SPECULATIONS, ON BEHALF OF THE DOCTOR WHO IS DOING THE EVALUATION, THAT MR. BASHAM IS -- TOMMY BASHAM IS SEEKING MEDS AND WAS MANIPULATING HIS SITUATION FOR PURPOSES OF ENHANCING THE AMOUNT OF MONEY HE WOULD GET FROM DISABILITY?

A.    SURE.  AND WE SEE THAT IN PSYCHIATRY ALL THE TIME. PEOPLE MAY HAVE MOTIVES FOR COMING IN THE HOSPITAL.  AT THE VA HOSPITAL WHERE WE WORKED,  IT WAS ALWAYS COMMON THAT THE VETS WOULD COME IN FOR WHAT WE CALL, THREE HOTS AND A COT.  AT THE END OF THE MONTH,  IF YOU DIDN'T HAVE YOUR MONEY AND YOU NEEDED A PLACE TO STAY,  THEY WOULD COME AND CHECK INTO THE HOSPITAL.   THAT DOESN'T MEAN THEY WEREN'T SICK.  YOU CAN BE SICK AND HAVE LOTS OF BAD BEHAVIORS.  YOU CAN BE SICK AND DO LOTS OF THINGS THAT CAUSE SPECULATION, BUT THAT DOESN'T STILL CHANGE IF YOU ARE SICK.

Q.    LET ME SHOW YOU WHAT IS MARKED AS DEFENDANT'S 236-B. IT IS THE SECOND PAGE.  YOU ACTUALLY MADE REFERENCE TO THIS DOCUMENT,  DIDN'T YOU?  THIS IS THE PHYSICIAN'S MEDICAL REPORT FROM THE METHODIST HOME?

A.    YES.  I AM SORRY, I DIDN'T SEE THE FIRST PAGE,  BUT IT LOOKS FAMILIAR.

Q.    YOU CAN LOOK AT THE --

A.    I'M SORRY, MR. SCHOOLS, CAN YOU TELL ME, THOUGH, I DON'T SEE WHO WROTE THIS REPORT, IT WAS FLASHED REAL QUICKLY.

Q.    I WILL GIVE THE ORIGINAL.  THAT IS 236-A, ISN'T IT?

A.    YES.    THIS IS PROBABLY THE ADMISSION EXAM OF DR. RIVARD WHO WAS THE PSYCHIATRIST THAT TREATED MR. BASHAM AT THE METHODIST HOME.

Q.    AND YOU, ACTUALLY, TALKED ABOUT THIS DOCUMENT ON YOUR DIRECT EXAMINATION?

A.    YES.

Q.    AND YOU TALKED SPECIFICALLY ABOUT THE SECTION ON COGNITIVE TESTING?

A.    YES.

Q.    CAN WE BLOW THAT UP?

AND YOU DIDN'T MENTION THIS TO THE JURY, BUT ONE OF THE THINGS IT SAYS IN THERE IS THAT, "BRANDON DID DISPLAY A CERTAIN LACK OF EMPATHY TO STRANGERS"?

A.    SURE.

Q.    THAT ASSESSMENT IS RELEVANT TO DETERMINE MR. BASHAM'S OVERALL DIAGNOSIS, ISN'T IT?

A.    WELL, I CAN'T SAY THAT.  I MEAN, IT IS AN OBSERVATION.  I DON'T KNOW WHAT ROLE DR. RIVARD USED THAT IN MAKING A DIAGNOSIS.  IT IS AN OBSERVATION, IT IS A SYMPTOM. SURE, IT IS A BEHAVIOR.

Q.    IT IS ACTUALLY A SYMPTOM CONSISTENT WITH ANTISOCIAL PERSONALITY DISORDER.  MR. BASHAM WOULD HAVE BEEN TOO YOUNG, AT THAT TIME, TO BE DIAGNOSED WITH THAT.

A.    CORRECT.

Q.    BUT THAT IS A SYMPTOM THAT IS CONSISTENT WITH

ANTISOCIAL PERSONALITY DISORDERS.

A.     IT COULD BE.  IT COULD BE CONSISTENT WITH A LOT OF OTHER THINGS, TOO.  IT COULD BE CONSISTENT WITH SOMEONE THAT DOESN'T HAVE THE BRAIN CAPACITY TO PUT THEMSELVES IN SOMEBODY ELSE'S SHOES.  IT CAN MEAN LOTS OF THINGS.  IT IS A SYMPTOM, JUST LIKE BELLY PAIN.  UNTIL YOU DO THE EVALUATION AND ASSESSMENT, IT IS A SYMPTOM.  IT DOESN'T HAVE ANY MORE CREDENCE THAN THAT.

Q.     LET'S LOOK AT DEFENDANT'S EXHIBIT 332-A.   THIS IS ANOTHER EXHIBIT THAT IS IN EVIDENCE THAT YOU TALKED ABOUT. YOU TALKED ABOUT THIS PART,  "HIS RECENT AND REMOTE MEMORY IS SLOW.  IMMEDIATE RETENTION RECALL IS INTACT."  DO YOU RECALL THAT?

A.     YES.

Q.     JUST ABOVE THAT, THIS IS A REPORT FROM DR. SUESS DATED MARCH 27, 2002; IS THAT RIGHT?

A.     YES.

Q.     AND IT SAYS, "HE IS NOT VOICING CURRENT SUICIDAL OR HOMICIDAL IDEATIONS, OR AUDITORY OR VISUAL HALLUCINATIONS."

A.     CORRECT.  IF I MAY, WHEN YOU HEAR HALLUCINATIONS, YOU DON'T HEAR ALL THE TIME.  I MEAN, IT IS NOT SOMETHING THAT IS CONTINUOUS.  WHEN YOU TAKE PEOPLE WHO HAVE PSYCHOTIC DISORDERS AND A HISTORY OF HEARING VOICES, THERE ARE TIMES AND PERIODS WHERE YOU HAVE THOSE SYMPTOMS.  WHEN YOU ARE ANXIOUS. MOST COMMONLY, WHEN YOU ARE TRYING TO GO TO SLEEP AT NIGHT AND

THE DAY HAS KIND OF SLOWED DOWN. SO, IT IS NOT UNCOMMON AT ALL, EVEN WITH THE SCHIZOPHRENICS I SEE IN THE PRISON, THAT THERE ARE GOING TO BE PERIODS WHEN THEY ARE GOING TO BE ABLE TO TALK WITH ME AND THEY ARE NOT SUFFERING FROM THEIR CONDITION AT ALL.

Q. LET ME SHOW YOU WHAT IS MARKED AS DEFENDANT'S 336. THIS IS NOT IN EVIDENCE, BUT IT WAS MARKED BY THE DEFENDANT. THIS IS A REPORT, YOU HAVE SEEN THIS, HAVEN'T YOU, DOCTOR?

A. I'M SORRY. MY SCREEN IS BLANK. OKAY.

MR. SCHOOLS: WE WOULD OFFER 336, YOUR HONOR. IT IS A DEFENDANT'S EXHIBIT. I DON'T THINK THERE IS ANY OBJECTION.

THE COURT: IS THERE ANY OBJECTION?

THE WITNESS: YES. THIS IS DR. BERG'S NOTE. SHE WAS REFERRED FROM, I GUESS THIS CAME FROM JUST CARE, AND THEN WENT BACK TO THE RICHLAND COUNTY DETENTION CENTER FROM HER.

BY MR. SCHOOLS:

Q. IF WE COULD BLOW UP THE NOTE HERE. AND YOU TALKED ABOUT THIS RECORD AND ABOUT THE FACT THAT YOU WERE -- YOU BELIEVED THAT INITIALLY THAT MR. BASHAM SHOULD NOT BE ON CONCERTA?

A. THAT IS CORRECT.

Q. AND, INITIALLY, YOUR REASON FOR BELIEVING THAT, AMONG OTHERS, IS THAT MR. BASHAM WAS DRUG-SEEKING?

A. WELL, I DID SAY HE COULD BE DRUG-SEEKING. I WASN'T ABLE TO MAKE A DETERMINATION IF HE WAS, BUT I WAS VERY

CONCERNED. YOU DON'T GIVE PSYCHOTIC PATIENTS MEDICINES LIKE CONCERTA AND RITALIN. SO, I TOLD HER TO BE CAREFUL, THAT HE WAS PSYCHOTIC, AND HE MAY BE DRUG-SEEKING. SO, THOSE WERE SOME OF MY WORDS. THEY ABSOLUTELY WERE. THAT WAS CERTAINLY A CONSIDERATION I HAD AT THAT POINT, AS WELL.

Q. AND THEN I BELIEVE YOUR TESTIMONY WAS THAT, AFTER YOU MADE THAT ASSESSMENT WITH DR. BERG, AN ATTORNEY TOLD YOU TO GIVE HIM CONCERTA. IS THAT WHAT YOU SAID?

A. NO. NO. I SAID THERE IS ANOTHER NOTE THAT MENTIONS IN THERE THAT SHE HAD CONFERRED WITH THE ATTORNEY AND ME AT A LATER DATE, AND WE SAID IT WAS OKAY.

Q. AND IT IS YOUR TESTIMONY, DR. SCHWARTZ-WATTS, THAT BRANDON BASHAM IS THE ONLY PATIENT YOU HAVE EVER SEEN FOR WHOM CONCERTA ALLEVIATES RESPONSE TO PSYCHOSIS, TO HALLUCINATIONS?

A. YES. I HAVE TO SAY THAT IS ABSOLUTELY TRUE.

Q. BRANDON BASHAM HAS CONVINCED YOU THAT HE NEEDS CONCERTA SO THAT HE DOESN'T HAVE HALLUCINATIONS?

A. HE HASN'T CONVINCED ME OF ANYTHING. I DON'T PRESCRIBE IT.

Q. HE HAS CONVINCED DR. MORGAN.

A. I CAN'T SAY THAT. IF THAT IS THE CASE, THEN HE HAS CONVINCED A LOT OF DOCTORS FOR OVER 15 YEARS. AND THEN YOU WOULD HAVE TO BELIEVE THAT HE DOESN'T HAVE ATTENTION DEFICIT DISORDER, WHICH HE CLEARLY DOES.

Q. WELL, A LOT OF DOCTORS BELIEVE HE DOESN'T HAVE

Q. PSYCHOSIS, RIGHT?

A. SURE.

Q. SO, GIVING CONCERTA TO AN ADHD PATIENT WHO DOESN'T HAVE PSYCHOSIS IS STANDARD OPERATING PROCEDURE?

A. SURE.

Q. IT IS THE COMBINATION OF THE PSYCHOSIS AND THE CONCERTA THAT MAKES IT UNUSUAL TO GIVE THAT DRUG TO SOMEONE LIKE BRANDON BASHAM?

A. ABSOLUTELY.

Q. EXCEPT IN YOUR EXPERIENCE, HE IS THE ONLY GUY YOU HAVE EVER MET FOR WHOM CONCERTA ALLEVIATES THESE HALLUCINATIONS OR AT LEAST HIS RESPONSE TO THEM?

A. YES.

Q. LET ME SHOW YOU GOVERNMENT'S EXHIBIT -- DEFENDANT'S EXHIBIT NUMBER 320. THIS IS THE DISCHARGE SUMMARY FROM WESTERN STATE HOSPITAL. DO YOU RECOGNIZE IT FOR ACTUALLY BRANDON BASHAM, NOT HIS UNCLE OR COUSIN?

A. THANK YOU, YES.

Q. YOU SPOKE ABOUT THIS, CORRECT? YOU SPOKE ABOUT THE FACT THAT DR. LUNSFORD, I BELIEVE, DIAGNOSED HIM AS HAVING PSYCHOTIC DISORDER?

A. NO, DR. PASQUIN DID. DR. LUNSFORD JUST PUT IT ON THE DISCHARGE SUMMARY BECAUSE THAT WOULD HAVE BEEN A DIAGNOSIS THAT HE RECEIVED WHILE HE WAS THERE.

Q. AND THERE IS A NOTE ON THIS REPORT THAT --

MR. SCHOOLS:  WE OFFER DEFENDANT'S 320.

THE COURT:   ANY OBJECTION?

MR. SWERLING:  NO OBJECTION.

BY MR. SCHOOLS:

Q.   IF WE COULD,  LOOK AT THE 6TH PAGE OF THAT EXHIBIT, PLEASE.  AND BLOW UP THE NOTE,  PLEASE.   THE NOTE SAYS THAT:

"LEON BASHAM IS VERY PROBABLY USING ILLEGAL DRUGS AS OUTPATIENT.  AT THE TIME OF DISCHARGE THERE WAS NO ACTIVE EVIDENCE OF PSYCHOSIS.   I HAVE TO WONDER IF A DIAGNOSIS OF MOOD DISORDER NOT OTHERWISE SPECIFIED TO ACCOUNT FOR HIS CLAIMS OF ANGER ANXIETY AND DEPRESSION MIGHT BE A MORE RELEVANT DIAGNOSIS THAN PSYCHOTIC DISORDER, BUT I HAVE CHOSEN NOT TO MAKE A FORMAL CHANGE AT THIS TIME."

A.   YES.

Q.   AND THAT IS INFORMATION THAT WOULD BE RELEVANT TO THE WEIGHT THAT WOULD BE GIVEN TO THAT DIAGNOSIS FOR A DOCTOR REVIEWING THE RECORDS AND MAKING IT A SUBSEQUENT DIAGNOSIS?

A.   SURE. SURE.

Q.   THAT WAS A DEFENSE EXHIBIT THAT WAS MARKED AND NOT OFFERED?

A.    CORRECT.

Q.    SO, MY POINT WITH ALL OF THAT, DR. SCHWARTZ-WATTS, IS, THERE IS SOMETHING FOR EVERYBODY IN THESE RECORDS, ISN'T THERE?

A.    WELL, I THINK YOU COULD LOOK AT IT THAT WAY.  THE WAY I LOOK AT IT, I THINK THE BEHAVIORS ARE CONSISTENT.  I THINK THAT IS A FAIR STATEMENT.  YOU HAVE TO -- YOU HAVE TO LOOK AT ALL OF THE RECORDS IN TOTALITY.  YOU HAVE TO HAVE SPENT TIME WITH MR. BASHAM TO UNDERSTAND HOW HE THINKS, AND HOW HE FEELS, AND HOW HE ACTS.  BUT YOU ARE RIGHT.  IF SOMEONE WANTED TO COME IN AND PROBABLY SAY, DOES HE HAVE OBSESSIVE COMPULSIVE DISORDER?  YOU COULD PROBABLY LOOK BACK IN THE RECORDS AND MAKE A CASE FOR IT.

BUT I THINK WHAT IS IMPORTANT, IT IS CLEAR THAT HE HAS MAJOR MENTAL ILLNESS.  AND IN EVERY SITUATION THAT HE HAS BEEN IN THE HOSPITAL, HE HAS EITHER HAD SOME FORM OF TREATMENT, OR THERE HAVE BEEN SYMPTOMS THAT HAVE BEEN CONSISTENT WITH MAJOR ILLNESS.

Q.    YOU CAN MAKE A PRETTY GOOD CASE FOR ANTISOCIAL PERSONALITY DISORDER, TOO, CAN'T YOU?

A.    SURE.  IF YOU LOOK AT THE CRITERIA AND IF YOU DON'T UNDERSTAND THAT SOME OF THESE SYMPTOMS ARE COMING FROM BRAIN DAMAGE, ABSOLUTELY.  IF YOU CHECK THAT LIST OFF, HE HAD ABOUT EIGHT OF THEM OR SIX OF THEM.  HE HAD QUITE A FEW OF THEM, SURE.

Q.   OKAY.   NOW,   ONE OF THE THINGS ABOUT BEING A FORENSIC PSYCHIATRIST THAT IS CHALLENGING,   I THINK,   I WOULD IMAGINE --

A.   IT IS FUN.

Q.   -- IS THAT THE PATIENTS CHEAT A LOT?

A.   SURE.   OF COURSE, THEY DO.

Q.   AND THE CHALLENGE OF BEING A FORENSIC PSYCHIATRIST, AMONG OTHERS, IS DETERMINING WHO IS CHEATING AND WHO IS NOT?

A.   CORRECT.

Q.   AND PEOPLE HAVE CHEATED SOME PRETTY AMAZING THINGS?

A.   SURE.

Q.   IN FACT, YOU ARE AWARE OF CASES WHERE INDIVIDUALS HAVE -- AND THE PSYCHIATRIC WORD FOR CHEATING IS MALINGERING?

A.   YES,   THAT IS ONE TERM.   SOMETIMES PEOPLE CHEAT, AND IT IS JUST PART OF AN ILLNESS, AND THEY DO IT BECAUSE THEY LIKE GOING TO DOCTORS, AND THAT SORT OF THING.   ONE IS ON PURPOSE, AND ONE IS NOT.

Q.   BUT WHEN IT IS ON PURPOSE, IT IS CALLED MALINGERING?

A.   CORRECT.

Q.   YOU ARE AWARE OF PEOPLE CHEATING COMAS?

A.   I'M SORRY, WHAT?

Q.   MALINGERING COMAS.  COMAS.

A.   COMAS.   I CAN'T SAY I HAVE SEEN THAT, BUT IT WOULD CERTAINLY BE POSSIBLE.

Q.   PEOPLE CAN MALINGER.  THE CRIMINAL MIND IS AMAZING, IT

CAN MALINGER ALL TYPES OF SYMPTOMS.

A.    ANYONE'S MIND IS AMAZING AND CAN MALINGER SYMPTOMS. BUT SURE, THE POINT IS, PEOPLE THAT HAVE SOMETHING TO LOSE ARE MUCH MORE ADEPT -- MALINGERING IS COMMON IN SETTINGS LIKE THE ARMY, WHERE PEOPLE ARE TRYING TO GET OUT OF ACTIVE DUTY, AND SO THEY FABRICATE SYMPTOMS.  IT IS COMMON IN CORRECTIONAL SETTINGS WHERE PEOPLE HAVE SOMETHING AT STAKE.  IT IS COMMON IN CERTAIN SETTINGS.  SO, IT IS MORE COMMON IN SOME SETTINGS THAN OTHERS, BUT IT USUALLY MEANS YOU HAVE SOMETHING TO LOSE, AND SO YOU ARE TRYING TO FAKE THERE IS SOMETHING WRONG WITH YOU SO YOU CAN GET OUT OF RESPONSIBILITY FOR SOMETHING.

Q.    NOBODY HAS GOT MORE TO LOSE THAN BRANDON BASHAM HAS, RIGHT?

A.    I WOULD ABSOLUTELY AGREE WITH THAT.

Q.    SO, WHEN YOU ARE LOOKING AT DETERMINING WHAT HAPPENED TO BRANDON BASHAM IN THE PAST, AND WHAT HIS SYMPTOMOLOGIES WERE THROUGHOUT HIS HISTORY, ONE OF THE THINGS YOU WOULD WANT TO DO IS LOOK THROUGH THE RECORDS AND SEE WHETHER HIS REPORT OF THE SYMPTOMS ARE CONSISTENT.

A.    ABSOLUTELY.

Q.    BECAUSE WHEN PEOPLE ARE TELLING THE TRUTH, THEY TELL THE SAME STORY OVER, AND OVER, AND OVER AGAIN.

A.    OH, THAT IS NOT TRUE.  THAT IS NOT TRUE AT ALL.

Q.    THEY TRY TO.

A.    IT DEPENDS ON WHAT YOUR CAPACITY IS.  IF YOU HAVE

BRAIN DAMAGE, YOU MAY NOT BE ABLE TO TELL THE SAME STORY. IF YOU ARE FOUR YEARS OLD, WE KNOW THIS, THERE ARE STUDIES THAT WERE DONE, THERE WERE CHILDREN ON THE CHOWCHILLA BUS. THERE WAS A GROUP OF CHILDREN THAT WERE KIDNAPPED ON A BUS, AND A FAMOUS PSYCHOLOGIST, LENORE TERR, DID A STUDY OF THESE CHILDREN. THEY WEREN'T ABLE TO GIVE THE SAME ACCOUNTS. IT DEPENDS ON YOUR BRAIN DEVELOPMENT, IT DEPENDS HOW OLD YOU ARE, IT DEPENDS WHAT ARE YOU TRYING TO REMEMBER. IT IS NOT THAT SIMPLE. I WISH IT WERE. YOU CAN'T GIVE A BLANKET STATEMENT FOR THAT. IT DEPENDS. EVERYBODY IS DIFFERENT. IT DEPENDS ON A LOT OF THINGS.

Q.    ONE OF THE THINGS YOU WOULD WANT TO CONSIDER IN ASSESSING WHETHER A FORENSIC CLIENT OF YOURS IS TELLING THE TRUTH IS WHETHER THEIR REPORTS OF SYMPTOMS HAVE BEEN CONSISTENT THROUGHOUT THEIR MEDICAL HISTORY?

A.    SURE. OR IF THEY ARE MENTIONED, SURE.

Q.    CONSISTENCY WOULD BE EVIDENCE OF TRUTH?

A.    CONSISTENT MEANS THAT IT IS REPORTED EVERY TIME. YOU LOOK THAT THE SYMPTOMS REPORTED ARE CONSISTENT WITH MENTAL ILLNESSES THAT WE KNOW OF.

Q.    DR. SCHWARTZ-WATTS, WE WILL BE HERE A LONG TIME IF YOU DON'T ANSWER MY QUESTIONS. CONSISTENCY WOULD BE EVIDENCE OF TRUTH, WOULDN'T IT?

A.    WELL, YOU ARE KIND OF ASKING ME QUESTIONS THAT AREN'T PSYCHIATRIC, THEY ARE KIND OF COMMON SENSE. SO, I WOULD SAY

IN THAT SENSE, SURE.  YOU LOOK FOR, IS THE STORY THE SAME OVER TIME.  I THINK THAT IS FAIR.

Q.   I WANT TO TALK TO YOU ABOUT BRANDON BASHAM'S REPORTS OF SEXUAL ABUSE, THE INCIDENT WHEN HE WAS SIX.

A.   SURE.

Q.   THAT INCIDENT, AS FAR AS I CAN TELL, THAT WAS FIRST REPORTED IN AUGUST OF 1996.

A.   CORRECT, THAT IS MY UNDERSTANDING, TOO, FROM REVIEWING THE RECORDS.

Q.   JUST SO THE JURY IS CLEAR ABOUT THIS, THE INCIDENT THAT WAS REPORTED AND INVESTIGATED BY THE DEPARTMENT OF SOCIAL SERVICES WHEN HE WAS TEN, IS NOT THE INCIDENT THAT HE HAS REPORTED IN AUGUST OF 1996?

A.   YES.

Q.   THIS IS A PREVIOUSLY UNREPORTED INCIDENT?

A.   CORRECT.

Q.   IN FACT, ON AUGUST 7TH OF 1996, AT THE METHODIST HOME, MR. BASHAM DENIED ANY FORM OF PHYSICAL ABUSE, SEXUAL ABUSE, OR NEGLECT?

A.   CORRECT.

Q.   ON AUGUST 11TH OF 1996, FOUR DAYS LATER, MR. BASHAM IS IN A GROUP SETTING, AND THE PROGRESS NOTE REFLECTS THAT HE TEASED A PEER ABOUT KNOWING NOTHING ABOUT SEX, AND THE PEER WAS DEALING WITH SEXUAL ABUSE ISSUES.  ARE YOU AWARE OF THAT?

A.   YES.

Q.    AND THEN, FOUR DAYS LATER, ON OCTOBER  -- ON AUGUST 15TH, 1996, WAS THE FIRST TIME THAT MR. BASHAM, HIMSELF, REPORTED THIS INCIDENT WHEN HE WAS SIX.

A.    THAT IS MY UNDERSTANDING FROM REVIEWING THE RECORDS AS WELL, THAT IS CORRECT.

Q.    AND THROUGHOUT THE RECORDS,  HE HAS FAIRLY CONSISTENTLY SAID THAT SOMETHING HAPPENED WHEN HE WAS YOUNGER THAN TEN?

A.    YES.

Q.    AND HE HAS DESCRIBED THE AGES,  EIGHT TO NINE?

A.    YES.

Q.    SIX?

A.    YES.

Q.    SEVEN?

A.    YES.

Q.    HE HAS DESCRIBED THE INCIDENT AS A SINGLE INCIDENT?

A.    YES.

Q.    AS OCCURRING OVER A PERIOD OF TIME?

A.    CORRECT.

Q.    HE HAS TOLD ONE COUNSELOR THAT HIS SISTER SAW THE INCIDENT?

A.    YES.

Q.    SHE DENIES THAT?

A.    SHE DENIES THAT.   AND I ASKED HER AGAIN, AND SHE CONTINUES TO DENY THAT.

Q.    IN FACT,  IN 1997,  I BELIEVE IT WAS, WHEN HE WAS AT --

WHEN MS. TITZER TESTIFIED, WHEN HE WAS IN EVANSVILLE, HE REPORTED ANOTHER INCIDENT?

A.    CORRECT.

Q.    AND THEN THAT ONE SORT OF DISAPPEARS FROM THE RECORDS FOR A WHILE.   HE DOESN'T CONTINUE TO REPORT THAT.

A.    I AM NOT SURE IF HE WAS ASKED ABOUT IT.   HE WOULD REPORT IT WITH CLINICIANS WHO WERE TREATING HIM AND WHOM HE TRUSTED.

Q.    WELL, HE WAS ASKED ABOUT HIS SEXUAL ABUSE HISTORY EVERY TIME HE WENT INTO A FACILITY?

A.    SURE.   HE WAS ASKED ABOUT PHYSICAL ABUSE HISTORY ALL ALONG,  AND WE KNOW THAT HAPPENED, AND HE DENIED THAT, AS WELL.  THAT IS NOT UNCOMMON.  WHEN PEOPLE ARE ABUSED, THEY ARE NOT GOING TO ADVERTISE THAT, AND THEY ARE NOT GOING TO TELL YOU UNLESS THEY TRUST YOU OR IF YOU ARE IN A THERAPEUTIC RELATIONSHIP WITH THEM.  THAT WOULD BE VERY POOR JUDGMENT.

Q.    THE INCIDENT HE REPORTED WHEN HE WAS 13, HAVE YOU READ THE DEPARTMENT OF SOCIAL SERVICES INVESTIGATION OF THAT?

A.    WILL YOU REFER ME TO WHICH INCIDENT YOU ARE REFERRING TO?

Q.    THE EDDIE INCIDENT?

A.    I'M SORRY?

Q.    THE EDDIE INCIDENT.

A.    EDDIE COWAN, YES.

Q.    YOU ARE AWARE THAT MR. BASHAM DATED THAT INCIDENT

AROUND JULY 4TH OF 1996?

A.    YES.

Q.    YOU ARE AWARE HE WAS AT THE METHODIST HOME ON THAT DATE?

A.    YES.

Q.    I WANT TO TALK TO YOU NOW A LITTLE BIT ABOUT HIS MOTHER AND FATHER AND WHAT HE HAS REPORTED ABOUT THEM.

A.    SURE.

Q.    THROUGHOUT THE RECORDS, HE CONSISTENTLY REPORTS HIS FATHER IS AN ALCOHOLIC?

A.    YES.

Q.    HE CONSISTENTLY REPORTS THAT HIS MOTHER HAS NERVE PROBLEMS?

A.    YES.

Q.    HE DOES NOT CONSISTENTLY REPORT THAT HIS MOTHER IS A DRUG ABUSER?

A.    YES, THAT IS EXACTLY CORRECT.

Q.    HE, ON OCCASION, DISCLOSES THAT SHE USES MARIJUANA?

A.    YES.

Q.    I HAVE SEARCHED, AND I CAN'T FIND THE RECORD WHERE HE SAYS THAT SHE SMOKES CRACK, BUT HAVE YOU SEEN ONE?

A.    NO.   I DON'T RECALL ANY RECORD THAT I CAN THINK OF EITHER, MR. SCHOOLS.   I HAVEN'T SEEN THAT.

Q.    AND THAT IS WITH DOCTORS HE TRUSTS, AND COUNSELORS HE TRUSTS, AND COUNSELORS HE DOESN'T?

A.   ABSOLUTELY.

Q.   IT IS CONSISTENT THAT HE HAS NEVER REPORTED TO ONE COUNSELOR THAT HIS MOTHER SMOKES CRACK?

A.   RIGHT.   NOW, I DON'T KNOW IF HE HAS TOLD DR. MORGAN OR NOT.   HE HAS REPORTED IT TO ME, BUT YOU ARE RIGHT, IN TERMS OF THE PAST NOTES, I DON'T SEE ANY EVIDENCE OF THAT.

Q.   YOU ARE FAMILIAR WITH THE EFFECTS OF CRACK COCAINE ON SOMEONE, AREN'T YOU?

A.   SURE.

Q.   I MEAN, ONE OF THE THINGS THAT HAPPENS WHEN YOU SMOKE CRACK IS, IF YOU ARE SMOKING A LOT OF IT IS, YOU LOSE WEIGHT?

A.   YES.

Q.   AND YOU LOSE A LOT OF WEIGHT?

A.   YES.

Q.   AND YOU HAVE LOOKED THROUGH KATHY BASHAM'S MEDICAL RECORDS?

A.   YES.

Q.   AND YOU CANNOT FIND ONE INSTANCE IN HER MEDICAL RECORDS WHERE IT IS REPORTED SHE IS USING CRACK OR MARIJUANA?

A.   THAT'S CORRECT.

Q.   AND ON OCTOBER 30TH OF 1996, KATHY BASHAM IS ABOUT FIVE FOOT THREE?

A.   YES,  I THINK THAT IS ABOUT RIGHT.

Q.   ON OCTOBER 30TH OF 1996, SHE WEIGHED ABOUT 122 POUNDS?

A.   RIGHT.

Q.    EXCUSE ME -- 116.  ON APRIL 9TH OF 97, 122?

A.    THE HIGHEST THAT I HAVE SEEN ANY WEIGHTS FOR HER ARE ABOUT THE HIGH 120'S AND THE LOWEST HAVE BEEN ABOUT 70 POUNDS.

Q.    APRIL 14TH OF 2000, SHE WEIGHED ABOUT 110?

A.    YES.

Q.    I MEAN, THAT IS NOT A WEIGHT THAT IS MARKEDLY ABNORMAL FOR A WOMAN WHO IS FIVE FOOT THREE?

A.    NO.  NOT AT ALL.  AND ESPECIALLY KNOWING AND SEEING MS. BASHAM, IF SHE WEIGHED THAT MUCH, SHE WOULD LOOK QUITE DIFFERENT THAN WHAT SHE DOES PRESENTLY.

Q.    AND IN SEPTEMBER OF 2002, JUST A MONTH AND A HALF BEFORE MR. BASHAM LEFT THE FACILITY, A YEAR AFTER HE HAD BEEN IN THERE, MORE THAN A YEAR, SHE, AT THAT POINT, WEIGHED 103, SEPTEMBER 25TH OF '02?

A.    2003?

Q.    TWO?

A.    YES, ABSOLUTELY.

Q.    AND THEN, LATER THE WEIGHT DROPS DRAMATICALLY?

A.    EXACTLY.

Q.    IT DROPS DOWN IN MAY OF 2003 TO 87 POUNDS?

A.    YES.  AND I AM PRETTY SURE WHEN I SAW HER IN AUGUST OF 2003, IT WAS MUCH, MUCH LOWER THAN THAT.

Q.    OCTOBER 24TH, 84 POUNDS?

A.    YES.

Q.    YOU WOULD AGREE, WOULDN'T YOU, DOCTOR, THAT THAT

WEIGHT REDUCTION IS CONSISTENT WITH A NUMBER OF THINGS, ILLNESS WOULD BE ONE OF THEM?

A.    SURE.  ESPECIALLY, HER VOICES HAVE TOLD HER IN THE PAST, DON'T EAT THE FOOD, IT IS POISON, THE FOOD IS NASTY. THAT HAS CERTAINLY BEEN CONSISTENT WITH HER MENTAL ILLNESS.

Q.    WELL, YOU HAVE MENTIONED THAT, TOO, DOCTOR, BUT THAT IS NOT SOMETHING THAT IS CONSISTENT THROUGHOUT THE RECORD WHEN KATHY BASHAM GOES TO A DOCTOR TO ASSESS HER MENTAL HEALTH NEEDS, SHE IS NOT CONSISTENTLY REPORTING FEAR OF FOOD?

A.    I HAVE SPOKEN WITH MS. BASHAM AND FOUND THAT SHE IS NOT ASKED.  IF YOU ASK HER THE SPECIFIC SYMPTOMS, AND IT IS VERY COMMON WITH PEOPLE THAT ARE PSYCHOTIC, THEY ARE NOT GOING TO -- YOU GOT TO REMEMBER, IF YOU ARE IN A PSYCHIATRIST'S OFFICE AND YOU ARE TELLING A DOCTOR YOU ARE HEARING VOICES, THEY ARE EITHER GOING TO INCREASE YOUR MEDS OR PUT YOU IN THE HOSPITAL. AND SO, THAT IS NOT -- PEOPLE LEARN WHEN YOU ARE MENTALLY ILL THAT YOU DON'T ADVERTISE THOSE SYMPTOMS BECAUSE THAT IS POOR JUDGMENT TO TELL PEOPLE THAT YOU ARE HALLUCINATING.  IF YOU ASK MS. BASHAM DIRECTLY, SHE WILL ANSWER YOU.  I ASKED HER DIRECTLY.  AND SHE REPORTED THAT EVEN A YEAR AGO SHE CONTINUED TO HEAR THOSE VOICES.  SHE STILL HAS SYMPTOMS OF HER MENTAL ILLNESS.

Q.    BUT SHE APPARENTLY WAS ABLE TO FIGHT THAT OFF AND EAT PLENTY OF FOOD TO BE 122 POUNDS, 110 POUNDS, AND 103 POUNDS THROUGHOUT THE HISTORY?

A.   IT WOULD DEPEND IF SHE WAS ON A MEDICATION, AT THE TIME.   THE HALLUCINATIONS -- WHEN YOU HAVE A MENTAL ILLNESS, THEY DON'T COME EVERY DAY.   AND THEY RESPOND TO MEDICATION. SO THERE MAY BE MONTHS AT A TIME, IF MS.  BASHAM IS TAKING HER MEDICINES AND SHE IS NOT USING DRUGS, THAT SHE WOULD FUNCTION VERY WELL.   SHE WOULD ALMOST LOOK NORMAL.

Q.   AND SHE WOULD HAVE A NORMAL WEIGHT?

A.   SURE, SURE.   HER WEIGHT, TO ME, IS A SYMPTOM OF HOW MUCH DRUGS IS SHE USING AND HOW SICK IS SHE.   IS SHE HEARING VOICES THAT TELL HER TO EAT OR NOT.

Q.   AND IF HER WEIGHT IS IN A NORMAL RANGE, IT IS A GOOD SIGN THAT SHE IS NOT SMOKING CRACK COCAINE EVERY DAY?

A.   THAT'S CORRECT.   AND HOPEFULLY SHE IS TAKING HER MEDICATIONS AND SHE IS NOT HEARING HER VOICES,  THAT IS FAIR.

Q.   YOU HAVE LOOKED AT A LOT OF RECORDS WHERE MR. BASHAM, HIMSELF, SELF-REPORTS HIS OWN SUBSTANCE ABUSE?

A.   YES.

Q.   YOU WOULD HAVE TO AGREE THAT THERE IS SOME INCONSISTENCY THERE, AS WELL?

A.   SURE.

Q.   IN MAY OF 1996, HE REPORTED THAT "HE EXPERIMENTS WITH ALCOHOL,  USED TO USE INHALANTS, EXPERIENCE WITH MARIJUANA, HAS NEVER USED COCAINE."

A.   CORRECT.

Q.   THAT IS MAY OF 1996 --

A.    SURE.

Q.    -- BEFORE HE EVER GOES INTO THE METHODIST HOME?

A.    YES.

Q.    IT IS FIRST REPORT.  IT IS NOT UNUSUAL,  I WILL CONCEDE, IT IS NOT UNUSUAL FOR SOMEONE TO MINIMIZE THEIR DRUG USE.

A.    NOT AT ALL.

Q.    NOW, IT IS A LITTLE UNUSUAL FOR SOMEONE TO REPORT THAT THEY ARE USING DRUGS AND THEN THAT THEY ARE USING SOME DRUGS THAT THEY ARE USING AND NOT REPORT OTHERS, THAT IS A LITTLE DIFFERENT, ISN'T IT?

A.    YES.  THAT IS -- NORMALLY, SOMEBODY IS GOING TO ADMIT TO SOME THINGS.  NOW, IT WOULD DEPEND IF THEY ARE LEGAL OR NOT.

Q.    IN JUNE OF 1996, MR. BASHAM REPORTED THAT HE DENIED HUFFING ANYTHING THE LAST TWO YEARS, DO YOU RECALL THAT?

A.    YES.

Q.    IN JULY OF '96, HE SAID THAT MARIJUANA AND METHAMPHETAMINE ARE THE ONLY TWO DRUGS HE HAS USED WITH ANY CONSISTENCY?

A.    YES.

Q.    A MONTH LATER OR THREE WEEKS LATER, IN AUGUST OF '96, HE DENIES CONSISTENT USE OF ALCOHOL.  AND SAYS THAT FOR THE PAST THREE YEARS, HE HAS SMOKED MARIJUANA FOUR TO FIVE TIMES PER WEEK,  USED CRANK ON SEVERAL OCCASIONS.  HE SAYS MARIJUANA

AND METH ARE THE ONLY TWO HE HAS USED WITH ANY CONSISTENCY?

A.    SURE.  AGAIN, KEEP IN MIND, THOUGH, MR. SCHOOLS, AND YOU ARE CORRECT.  IF YOU LOOK THROUGH MR. BASHAM'S HISTORY, THERE IS GOING TO BE INCONSISTENT REPORTS.  HE IS USING SOME DRUGS AT SOME PERIODS OF TIMES,  AND THERE ARE OTHER PERIODS OF TIME THAT HE IS NOT USING THOSE DRUGS.  BUT YOU ALSO HAVE TO KEEP IN MIND, IT IS WHAT THE DOCTOR ASKS.

THERE ARE SITUATIONS, FOR EXAMPLE, DR. WALKER WHO WAS A DOCTOR AT RICE-AUDUBON, HE IS A GREAT DOCTOR.  I MEAN, HE WORKS WITH KIDS, IT IS OBVIOUS HE KNEW WHAT HE WAS DOING, BUT HE DIDN'T ASK MR. BASHAM SPECIFICALLY ABOUT INHALANTS.  SO, WHEN YOU ASK SOMEBODY TO GIVE ME YOUR DRUG HISTORY, ESPECIALLY,  IF YOU HAVE USED AS MANY DRUGS AS MR. BASHAM HAS OVER THE YEARS, IT IS QUITE PROBABLE THAT YOU MIGHT NOT GET AN ENTIRE LIST.

WELL, WHAT I DID IN MR. BASHAM'S CASE IS I TRIED TO MEET WITH HIM A NUMBER OF TIMES AND GET LITTLE PIECES OF THE DRUG HISTORY EACH TIME.  YOU HAVE TO ASK SPECIFICALLY FOR DRUGS SOMETIMES, TOO, WHEN YOU ARE DOING A DRUG HISTORY.  SO, IT IS A LITTLE MORE COMPLICATED THAN THAT, AS WELL.

Q.    ON OCTOBER 23RD OF 1996, AT STONER CREEK, HE REPORTED THAT HE HAD HUFFED GAS ONCE.

A.    WELL, WE CERTAINLY KNOW THAT IS NOT CORRECT.

Q.    BUT HE WASN'T NOT ASKED ABOUT INHALANTS, THAT WAS HIS REPORT.

A. CORRECT. BUT, AGAIN, THERE IS A NUMBER OF INHALANTS. YOU HAVE TO ASK ABOUT SPRAY PAINTS, HAVE TO ASK ABOUT ANTIFREEZE, OR YOU HAVE TO ASK ABOUT BUTANE.

Q. AND IF WE FAST-FORWARD TO 2000, HE REPORTED IN AUGUST OF 2000 THAT HE WAS USING $400 OF COCAINE AND $200 OF MARIJUANA A DAY?

A. YES.

Q. SO, MR. BASHAM IS REPORTING TO A MENTAL HEALTH FACILITY THAT HE IS USING $600 OF COCAINE AND MARIJUANA A DAY?

A. SURE.

Q. NOW, THAT EQUATES TO ABOUT $4,200 A WEEK?

A. SURE.

Q. TWENTY THOUSAND, EIGHT-HUNDRED DOLLARS ($20,800) A MONTH?

A. SURE. ASSUMING THAT YOU HAVE THE MONEY AND THAT YOU ARE DOING IT EVERY DAY. BUT SURE, IT IS EXPENSIVE. BELIEVE IT OR NOT, I HAVE HAD PATIENTS THAT HAVE DONE MORE THAN THAT. BUT THAT IS A PRETTY COSTLY HABIT.

Q. AND MR. BASHAM DID NOT HAVE ACCESS TO THAT KIND OF MONEY, DID HE?

A. NO.

Q. SO, IF HE IS REPORTING TO A MENTAL HEALTH COUNSELOR THAT HE IS USING $400 OF COCAINE A DAY AND $200 OF MARIJUANA A DAY, THAT CAN'T BE TRUE.

A. WELL, WE DON'T KNOW HOW HE IS GETTING THE MONEY OR HOW

HE IS GETTING THE DRUGS. THERE IS LOTS OF BEHAVIOR PEOPLE DO TO OBTAIN DRUGS.

Q. YOU HAVE READ THE RECORDS, YOU KNOW WHAT MR. BASHAM'S RECORDS ARE, HE STEALS THINGS THAT DON'T COST VERY MUCH.

A. WELL, THERE IS OTHER BEHAVIORS HE HAS HAD IN THE PAST TO SECURE DRUGS THAT WOULD INCLUDE SOME RELATIONSHIPS WITH PEOPLE THAT PERHAPS WERE NOT FAVORABLE FOR HIM, BUT HE CHOSE TO GET IN RELATIONSHIPS WITH PEOPLE TO BE ABLE TO HAVE ACCESS TO DRUGS. SO, HE HAS DONE OTHER BEHAVIORS, IN ADDITION TO STEALING, AND TO MAKING FRIENDS WITH PEOPLE, AND TO DOING THINGS FOR PEOPLE TO GET HIS DRUGS.

Q. YOU WOULD HAVE TO AGREE, HIS REPORTING OF DRUG USE HAS BEEN INCONSISTENT.

A. SURE.

Q. I WANT TO TALK TO YOU NOW QUICKLY ABOUT HALLUCINATIONS. YOU TALKED ABOUT EVIDENCE IN THE RECORD THAT YOU BELIEVE THAT SUPPORTS MR. BASHAM HAS HALLUCINATIONS.

A. YES.

Q. I AM GOING TO JUST READ A LIST OF DENIALS, AND AFTER I READ IT, LET ME KNOW IF YOU THINK I AT LEAST GOT SOME OF THEM RIGHT?

A. SURE.

Q. OCTOBER 7, '92, TO THE SOCIAL SECURITY ADMINISTRATION.

A. YES.

Q. AUGUST 7TH, '96, AT STONER CREEK; AUGUST 19TH OF '96,

AT STONER CREEK; OCTOBER 23RD OF '96, AT STONER CREEK; NOVEMBER 6TH, '96, AT STONER CREEK.

A. MR. SCHOOLS, CAN I INTERRUPT? I DON'T KNOW IF YOU WANT ME TO -- IF YOU WANT ME TO GO THROUGH EACH ONE, EITHER GO SLOWER SO I CAN THINK BACK TO IT, OR I CERTAINLY TRUST YOU, I DON'T THINK YOU WOULD HAVE A REASON TO LIE, BUT YOU ARE EITHER GOING TOO FAST OR I DON'T KNOW IF YOU WANT ME TO ANSWER EACH ONE. MY BRAIN IS NOT THAT FAST THAT YOU CAN NAME ALL OF THOSE DATES AT ME AND I AM GOING TO BE ABLE TO REMEMBER.

Q. I WILL READ THE WHOLE LIST AND YOU TELL ME, WE WILL FIND OUT WHETHER YOU THINK IT IS REASONABLY ACCURATE, BASED ON THE RECORDS.

A. OKAY. AND I NEED TO KNOW WHO AND UNDER WHAT CIRCUMSTANCE.

Q. I AM JUST ASKING YOU WHAT IS IN THE RECORD.

A. OKAY. BUT KEEP IN MIND, THERE ARE 26,000 PAGES.

Q. I WILL LET YOU EXPLAIN YOUR ANSWER, DOCTOR.

A. OKAY.

Q. JANUARY 28TH, '97, CHARTER RIDGE; FEBRUARY 20TH, '97, CHARTER EVANSVILLE; JANUARY 25TH, '97, CHARTER EVANSVILLE; MARCH 13TH, '97, CHARTER EVANSVILLE; SEPTEMBER 29TH, '97, CARDINAL TREATMENT CENTER; JANUARY 24TH, '98, TEN BROEK HOSPITAL; FEBRUARY 27TH, '98, PENNYROYAL; JUNE 22ND, '99, RICE AUDUBON YOUTH DEVELOPMENT CENTER; JULY 22ND, '99 -- HOW DO YOU PRONOUNCE THAT, CERIDOS?

A. YES. CERIDOS.

Q. FEBRUARY 26TH OF 2000, THE SOCIAL SECURITY ADMINISTRATION; AUGUST 23RD OF 2003, PENNYROYAL, IN WHICH IT IS NOTED HE IS NOT PSYCHOTIC, DELUSIONAL, OR PARANOID. SEPTEMBER 13TH, 2000 --

MR. SWERLING: JUDGE, EXCUSE ME. MR. SCHOOLS IS JUST READING OUT A LIST OF DATES WITHOUT SHOWING DR. WATTS WHAT HE IS REFERRING TO. I MEAN, IT DOESN'T MAKE ANY SENSE.

MR. SCHOOLS: I AM JUST ASKING HER IF SHE THINKS THIS LIST IS REASONABLY ACCURATE. SHE HAS REVIEWED ALL THE RECORDS, I THINK SHE CAN ANSWER THAT QUESTION.

MR. SWERLING: HOW IS SHE TO --

THE WITNESS: I AM ABLE TO, AT THIS POINT. I DO HAVE SOME COMMENTS.

THE COURT: MAKE SURE YOU GO SLOW ENOUGH.

BY MR. SCHOOLS:

Q. SEPTEMBER 13TH, 2000, PENNYROYAL; DECEMBER 6TH OF 2000, PENNYROYAL; DECEMBER 19TH, 2000, AT THE WESTERN STATE HOSPITAL. HERE, HE HAD REPORTED HEARING THINGS, BUT THE DOCTORS THERE ASSESSED IT AS REALLY SELF-TALK AND NOT HALLUCINATION; IS THAT CORRECT?

A. THAT IS THEIR ASSESSMENT, CORRECT.

Q. JANUARY 5TH, 2000, THE WESTERN STATE HOSPITAL; FEBRUARY 12TH -- EXCUSE ME, THAT WAS 2001. FEBRUARY 12TH, 2001, DR. SUESS SAYS HE DOES HAVE HALLUCINATIONS; OCTOBER 17TH,

2001, DR. SUESS SAYS HE DENIES HALLUCINATIONS; MARCH 27TH, 2002, DR. SUESS SAYS HE DENIES HALLUCINATIONS.  ALL OF THAT IS IS IN THESE RECORDS, ISN'T, IT DOCTOR?

A.    YES, SIR.  AND THERE ARE SOME PROBLEMS.  IN THE TEN BROEK HOSPITALIZATION, HE ABSOLUTELY WAS EXPERIENCING HALLUCINATIONS.  DR. ASUMENDI AND DR. SIDDIQUI DIAGNOSED HIM WITH PSYCHOTIC FEATURES.  THEY SAID THAT HE HAD BIZARRE BEHAVIORS.  THAT HE WAS HIDING UNDER HIS BED.  THAT HE WAS EATING REYNOLDS WRAP.  AND THAT THEIR DIAGNOSIS INCLUDED PSYCHOSIS.  SO, I ABSOLUTELY DISAGREE WITH THAT ONE.

THE WESTERN STATE HOSPITAL, MR. BASHAM HAS ALWAYS GIVEN A HISTORY IN SOME OF THESE CASES WHERE HE HEARS VOICES.  WHAT A CLINICIAN DOES WHEN YOU HEAR VOICES, WHICH IS PERFECTLY APPROPRIATE, THERE ARE DIFFERENT KINDS OF VOICES.  WE ALL HAVE A CONSCIOUS IN OUR HEAD THAT, YOU KNOW, IT WAS BEST IN IF YOU SAW THE MOVIE, ANIMAL HOUSE.  THE BOY IS MAKING A DECISION, AND HE HAS THE ANGEL ON ONE SHOULDER AND THE DEVIL ON THE OTHER, AND THEY ARE COMMENTING, TELLING HIM, DO IT OR NOT.

A LOT OF TIMES WHEN SOMEONE HEARS A HALLUCINATION, THE FIRST THING YOU DO IS TO MAKE SURE THAT THAT IS NOT JUST THEIR SELF-TALK.  WE ALL HAVE OUR OWN THOUGHTS THAT SOMETIMES ARE CHEERING US ON AND SOMETIMES TORTURE US.  THEY CAN MAKE US FEEL GUILTY, AND THAT SORT OF THING.  TOTALLY NORMAL.

BUT WHAT I DISAGREE WITH ABSOLUTELY IS THEIR ASSESSMENT THAT THESE WERE NOT GENUINE HALLUCINATIONS.  FORENSIC

PSYCHIATRISTS, THAT IS ONE OF OUR EXPERTISE, TO DETERMINE WHETHER HALLUCINATIONS ARE REAL OR NOT. AND WHY I THINK THESE HALLUCINATIONS ARE GENUINE IS WHAT THESE DOCTORS WRITE ABOUT THE CONTENT OF THE HALLUCINATION. WHEN YOU HAVE A HALLUCINATION THAT COMMENTS UPON YOUR BEHAVIOR, THAT IS DIAGNOSTIC OF PSYCHOSIS. FOR EXAMPLE, PEOPLE CAN FAKE VOICES ALL THE TIME. YOU ASK THEM, WHAT DID THE VOICE TELL YOU TO DO? THE VOICE TOLD ME TO GO IN AND ROB THE BANK. WELL, USUALLY, THAT IS NOT TRUE. SOMETIMES, VOICES CAN TELL YOU TO DO THINGS, BUT THEY USUALLY AREN'T GOING TO TELL YOU THINGS THAT ARE SELF-SERVING.

WHEN MR. BASHAM REPORTS THINGS LIKE, THE VOICES ARGUE, THEY TELL ME THE TB TEST, TO WATCH OUT FOR THE TB TEST, TO WATCH MY BACK, THESE VOICES ARGUE ABOUT HIS BEHAVIOR. THAT IS DIAGNOSTIC OF A PSYCHOTIC DISORDER. AND SO, EVEN IN THE WESTERN HOSPITAL, I DISAGREED WITH THE ASSESSMENT. THAT WAS MADE BY PAULA HALCOMB, WHO IS A MASTER'S LEVEL PSYCHOLOGIST. AND I ABSOLUTELY DISAGREE.

WHAT IS CONSISTENT, WHEN SOMEONE RECORDS THE CONTENT OF MR. BRANDON BASHAM'S HALLUCINATIONS, THEY HAVE BEEN CONSISTENT. THAT IS CALLED A SCHNEIDERIAN SYMPTOM OF SCHIZOPHRENIA. IF YOU LOOK BACK IN ALL OF OUR TEXTBOOKS, VOICES THAT COMMENT UPON YOUR BEHAVIOR ARE GENUINE. YOU CAN'T -- YOU CAN MALINGER VOICES, BUT NO ONE KNOWS TO MALINGER THAT SYMPTOM OF A VOICE.

Q.    EXCEPT SOMEONE WHO HAS BEEN IN PSYCHIATRIC HOSPITALS AND LEARNED IT THROUGH LISTENING TO OTHER PEOPLE TALK ABOUT IT?

A.    NOT AT ALL.

Q.    IT IS POSSIBLE.

A.    EVEN A SCHIZOPHRENIC IS NOT AWARE THAT THE CONTENT OF A HALLUCINATION -- A GENIUS MIGHT.  IF SOMEBODY HAD AN IQ OF 140 AND THEY STUDIED MENTAL ILLNESS, I MIGHT AGREE WITH YOU, MR. SCHOOLS.  BUT NOT SOMEONE WITH MR. BASHAM'S CAPACITY,  NOT AT ALL.

Q.    WELL, IF MR. BASHAM HAS A HISTORY OF MALINGERING SYMPTOMS, DON'T YOU AGREE WITH THAT?

A.    NOT AT ALL.  I DO NOT AGREE WITH THAT AT ALL.

Q.    FAKE SUICIDES ARE A MALINGERING SYMPTOM, AREN'T THEY?

A.    SUICIDE ATTEMPT IS A RESULT OF HIS BORDERLINE PERSONALITY TRAITS.  HE HAS A HISTORY OF MUTILATING HIMSELF. HE HAS A HISTORY WHEN HE IS UPSET THAT HE HARMS HIMSELF TO GET RELIEF.  THAT IS NOT -- HE HAS NOT MALINGERED, IN MY OPINION, IN ANY WAY, SHAPE, OR FORM AT ALL.  IF ANYTHING, IF HE HAS MALINGERED ANYTHING,  HE HAS MALINGERED WELL SOMETIMES.  HE HAS PRESENTED HIMSELF THAT HE IS DOING BETTER THAN WHAT IS ACTUALLY GOING ON WITH HIM.

Q.    YOU TESTIFIED ON DIRECT THAT YOU ACTUALLY SAW MR. BASHAM RESPONDING TO THAT HALLUCINATION.  WOULD YOU DESCRIBE THAT AGAIN FOR THE JURY?

A.    SURE.    IT IS VERY SIMILAR TO WHAT DR. SUESS SAW IN THE JAIL WHEN HE WENT INTO HOPKINS COUNTY DETENTION CENTER.    YOU WOULD HAVE -- IT HAS NOT HAPPENED VERY OFTEN,  PROBABLY FOUR OR FIVE TIMES OVER THE YEAR AND A HALF THAT I HAVE KNOWN MR. BASHAM.  YOU WOULD ASK HIM A QUESTION, AND HE WOULD TURN TO THE SIDE, NOT WHERE YOU CAN SEE,  HE WOULD JUST TURN TO THE SIDE AND MOVE HIS MOUTH.  AND THEN COME BACK AND SAY, EXCUSE ME, WHAT?  HE WOULD LOSE TRACK OF WHAT YOU WERE ASKING HIM.

Q.    DR. WATTS,  YOU HAVE INTERVIEWED THE NUMBER OF PEOPLE THAT YOU TALKED ABOUT YOU INTERVIEWED.  YOU HAVE HAD ACCESS TO MR. BASHAM'S FAMILY MEMBERS.  THEY HAVE ALL TESTIFIED BEFORE, THERE IS NOT ONE WITNESS OUTSIDE OF A CLINICAL SETTING WHO IS GOING TO COME IN AND SAY THAT THEY SAW WHAT YOU JUST TESTIFIED ABOUT.

A.    DR. LARRY SUESS DID.

Q.    HE WAS IN A CLINICAL SETTING,  WAS HE NOT?

A.    ABSOLUTELY.  AND HE IS TRAINED TO WITNESS THAT.  HE IS TRAINED TO UNDERSTAND WHAT THAT MEANS.

Q.    MY QUESTION WAS, THERE IS NOT ONE LAY WITNESS WHO IS GOING TO COME TESTIFY IN THIS COURT THAT THEY HAVE EVER OBSERVED BRANDON BASHAM MAKE THAT RESPONSE?

A.    I DON'T KNOW THAT.  I WOULD TRUST THAT, IF YOU SAY THAT,  I WOULD TRUST THAT IS TRUE.

Q.    IN FACT, THERE IS NOT ONE LAY WITNESS THAT YOU HAVE TALKED TO THAT HAS TOLD YOU THAT?

A.    I HAVEN'T ASKED ALL WITNESSES, BUT I DID ASK CHARLOTTE BASHAM, AND SHE DENIED SHE HAD SEEN THAT HAPPEN.

Q.    IT IS AN IMPORTANT FACT.  I MEAN, BECAUSE IF YOU COULD BRING THAT EVIDENCE, IT WOULD BE IMPORTANT, WOULDN'T IT DOCTOR?

A.    I AM VERY COMFORTABLE IN SAYING THESE HALLUCINATIONS ARE GENUINE.

LET ME TELL YOU WHEN THEY ARE NOT GENUINE.  IF MR. BASHAM SAID, THIS VOICE TOLD ME TO GO KIDNAP ALICE DONOVAN AND KILL HER, WE WOULD KNOW IT IS MALINGERING.  HE HAS NEVER USED THESE VOICES TO EXCULPATE HIMSELF FROM ANYTHING.  WHEN PEOPLE MALINGER, IT IS TO GET OUT OF TROUBLE.  SOMEONE WHO WOULD BE MALINGERING IN HALLUCINATION WOULD BE ABLE TO SAY THE VOICE TOLD ME TO HIT THE MARSHAL BECAUSE I COULDN'T GET MY CIGARETTE.  THE VOICE TOLD ME TO STAND UP AND YELL AT THE JUDGE AND CAUSE A SCENE IN THE COURT.  THE VOICE TOLD ME TO KIDNAP THIS CAR.  MR. BASHAM HAS NEVER USED THESE REPORTS OF HALLUCINATIONS TO GET OUT OF RESPONSIBILITY FOR ANYTHING. THEY ARE JUST AN ILLNESS HE HAS.

Q.    DIDN'T HE TELL JENNIFER MIOSI THAT A VOICE WAS TELLING HIM TO MASTURBATE IN HER PRESENCE?

A.    THAT MAY BE A SYMPTOM HE HAS.  I HAVEN'T GOTTEN INTO THE SEXUAL NATURE OF HIS VOICES.  HE CHOSE NOT TO TELL ME ABOUT IT.  YOU CAN HAVE COMMAND HALLUCINATIONS.  IF HE SAID A VOICE TOLD HIM TO DO THAT, I WOULD BE SUSPECT OF THAT.

THE COURT: MR. SCHOOLS, WE NEED TO TAKE A BREAK SOMEWHERE IN HERE.

MR. SCHOOLS: NOW IS GOOD.

THE COURT: LET'S TAKE ABOUT A 15-MINUTE RECESS. PLEASE GO TO YOUR ROOM.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: BEFORE WE BRING IN THE JURY. LET'S TAKE UP SOME MATTERS THAT ARE STILL HANGING AND UNRESOLVED. MR. SCHOOLS, WE HAVE THE ISSUE ABOUT DR. BRANNON'S REPORT BEING FURNISHED TO DR. WATTS BUT NOT TO THE DEFENSE COUNSEL. YOU WENT INTO THAT, ARE YOU FINISHED WITH THAT, OR DO YOU NEED A RULING FROM ME ON IT?

MR. SCHOOLS: I'M DONE WITH IT.

THE COURT: THEN WE HAD YOUR REQUEST THAT THE JURY BE TOLD THAT THERE WAS SOME TYPE OF RULES VIOLATION BY THE DEFENSE TEAM FOR NOT DESIGNATING DOCUMENTS, AND THEN REDUCING THE NUMBER, AND THEN INCREASING THE NUMBER. I AM JUST NOT INCLINED TO DO THAT.

MR. SCHOOLS: I WITHDRAW THAT REQUEST, YOUR HONOR.

THE COURT: NOW, WE STILL HAVE THE FIVE EXHIBITS OFFERED THROUGH THE FIRST WITNESS OF THE DEFENSE TO WHICH THERE WAS AN OBJECTION. I THINK I OWE THE DEFENDANT A RULING BEFORE THEY REST THEIR CASE IN CASE THERE IS ANY TYPE OF FOUNDATIONAL PROBLEM, I MIGHT HAVE TO GIVE THEM THE OPPORTUNITY TO SHORE UP THAT PROBLEM. ALL RIGHT.

MR. SCHOOLS: YES, SIR.

THE COURT: SO, MAYBE WE CAN TAKE THAT UP OVER LUNCH.

MR. SCHOOLS: YOUR HONOR, I DON'T KNOW HOW MUCH LONGER I HAVE GOT WITH DR. SCHWARTZ-WATTS. IT WOULD BE, I THINK IT WOULD SAVE SOME TIME IF WE COULD BREAK FOR LUNCH -- IF THEY ARE GOING TO REST AT THAT POINT.

THE COURT: RIGHT.

MR. SCHOOLS: I THINK IT WOULD SAVE SOME TIME IF WE COULD BREAK FOR LUNCH SO I CAN SPEND A LITTLE BIT OF TIME WITH DR. CAPEHART.

THE COURT: SURE. THAT IS WHAT I INTENDED ON DOING. YOU MEAN AN EARLY LUNCH, IN OTHER WORDS?

MR. SCHOOLS: IT MAY NOT BE EVEN NOON.

THE COURT: OKAY. THAT IS FINE. PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: PLEASE CONTINUE.

MR. SCHOOLS: THANK YOU, YOUR HONOR.

BY MR. SCHOOLS:

Q. TO WRAP UP ON THAT HALLUCINATION ISSUE, I BELIEVE WHAT YOU TESTIFIED WITH REGARD TO HALLUCINATION WITH JENNIFER MIOSI, YOU SAID IF A VOICE TOLD HIM TO DO THAT, YOU WOULD BE SUSPECT OF THAT?

A.     SURE.    ACTUALLY, IN FORENSIC PSYCHIATRY, WE HAVE DONE STUDIES.  WE KNOW WHAT MAKES PEOPLE LISTEN TO VOICES WHEN THE VOICES TELL THEM TO DO SOMETHING.   SO, WE ACTUALLY, MR. SCHOOLS, HAVE SOME EXPERTISE IN THAT.   IT IS VERY INCONSISTENT THAT HE WOULD FOLLOW THAT COMMAND, SO I WOULD BE SUSPECT OF THAT.

Q.     AND JUST TO BE ALSO CLEAR ABOUT IT, DR. SCHWARTZ-WATTS, IT IS YOUR TESTIMONY THAT IF MR. BASHAM IS HEARING VOICES, THEY DID NOT TELL HIM TO KIDNAP AND CARJACK ALICE DONOVAN?

A.     THAT'S CORRECT.   HE HAS NEVER ALLEGED THAT.   THERE HAS NOT BEEN ANYTHING THAT I HAVE SEEN ABOUT THAT,  CORRECT.

Q.     NOW,  I WANT TO MOVE ON TO A COUPLE -- TALK BRIEFLY ABOUT YOUR DIAGNOSES.

A.     SURE.

Q.     YOU DIAGNOSED HIM AS HAVING DEMENTIA WITH MULTIPLE ETIOLOGIES.

A.     YES.

Q.     WHEN DID HE HAVE IT?

A.     THE ONSET? THAT IS DIFFICULT TO SAY.   IF YOU LOOK BACK OVER HIS HISTORY, THAT IS ONE OF THE THINGS I TRIED TO DO TO TIE THIS TOGETHER.   HE HAS HAD REPORTS OF MEMORY DEFICITS BEGINNING AT AGE EIGHT ON SOME OF THE TESTING.   AND IT HAS BEEN INTERMITTENT THROUGHOUT HIS ADOLESCENCE.   TO ME, IF I LOOK CLINICALLY, LOOKING AT THE NOTES AND WHEN THOSE COMPLAINTS BECAME MORE CONSISTENT AND THERE WAS SOME TESTING

THAT SHOWED A DECLINE IN HIS PERFORMANCE, IT WOULD HAVE BEEN SOMEWHERE AROUND THE AGE OF 16,  17.

Q.     SO,  YOU BELIEVE AT THE AGE OF 16 OR 17 YEARS OLD, MR. BASHAM HAD DEMENTIA OF MULTIPLE ETIOLOGIES?

A.     BEGAN HAVING EARLY SYMPTOMS OF THAT, SURE.  AND, AGAIN, NEUROPSYCHOLOGICAL TESTING WAS NOT DONE, AT THAT TIME, TO KNOW WHAT PARTS OF HIS BRAIN WERE WORKING OR NOT.  BUT IF YOU LOOK CLINICALLY, AGAIN, JUST REALIZING I AM JUST RELYING ON MY JUDGMENT HERE AND EXPERIENCE OF TREATING PATIENTS, IT WOULD BE THOSE LATER TEEN YEARS.

Q.     AND YOUR TESTIMONY ABOUT THIS DIAGNOSIS IS BASED ON HIS HAVING SIGNIFICANT MEMORY LOSS, IN YOUR OPINION?

A.     MEMORY LOSS,  INABILITY TO LEARN, AND THOSE EXECUTIVE FUNCTIONING THINGS THAT WE TALKED ABOUT YESTERDAY, YES.

Q.     THOSE ARE THE TWO COMPONENTS ON WHICH YOU RELY ON?

A.     YES.

Q.     EXCLUSIVELY?

A.     WELL, THERE ARE OTHER SOFT THINGS, BUT THOSE ARE THE MAIN SYMPTOMS.  I THINK THAT IS FAIR TO SAY.

Q.     THOSE ARE THE TWO ON WHICH YOU ARE RELYING ON TO MAKE YOUR DIAGNOSIS?

A.     YES.

Q.     AND WE HAVE ALREADY TALKED ABOUT THIS,  BUT YOU WOULD AGREE THAT THERE ARE RECORDS AFTER THE TIME WHEN HE WAS 16 OR 17, DURING WHICH IT IS REPORTED THAT HIS MEMORY WAS INTACT?

A.    SURE.    SURE.    REMEMBER,  THE ETIOLOGIES ARE INHALANT ABUSE, AND THAT IS ABSOLUTELY CORRECT,  MR. SCHOOLS.  IF YOU HAD JUST HUFFED OR PERHAPS IF YOU WERE WITHDRAWING,  YOU KNOW, DEPENDING ON WHAT DRUGS HE WAS USING AT THE TIME, AND DEPENDING ON LOTS OF DIFFERENT THINGS,  THAT IS CERTAINLY POSSIBLE.

SO, FOR EXAMPLE,  I AM SORRY I CONFUSED YOU.   LET'S SAY IF MR. BASHAM HAD HUFFED, AND THEN HE HAD DONE SOME COCAINE, AND THEN HE WENT INTO A HOSPITAL AND THE DOCTOR PERFORMED THOSE TESTS.  IT WOULD DEPEND, HAD HE USED DRUGS LATELY,  YOU MAY SEE THAT MEMORY IMPAIRMENT MORE PRONOUNCED.   WHEREAS OTHER TIMES WHERE HIS FUNCTIONING WAS HE ABLE TO REMEMBER THOSE ITEMS.

Q.    BUT IT DOESN'T -- I THINK DR. BRAWLEY TESTIFIED THAT ONCE YOU GOT IT, YOU GOT IT?

A.    SURE.   SURE.   BUT EVEN PEOPLE WITH DEMENTIA HAVE GOOD DAYS AND BAD DAYS.   MY GRANDMAMA, FOR EXAMPLE, SHE HAD IT. AND SOME DAYS YOU COULD SEE HER AND SHE WOULD KNOW HER NAME WAS MARGE.   THE NEXT DAY YOU SAW HER, SHE COULDN'T REMEMBER HER NAME.   SO, I WISH PEOPLE WERE THAT SIMPLE, BUT WE ARE VERY COMPLEX.   AND SOMETIMES THINGS AREN'T ALWAYS CONSISTENT. OUR BRAINS ARE VERY COMPLICATED.

Q.    AND I BELIEVE SHE SAID THAT IT IS NOT GOING TO GET WORSE.

A.    THAT'S CORRECT.   UNLESS HE HAS REPEATED INSULTS TO HIS

BRAIN.

Q.   AND AT THE AGE OF 16, HE HAD BEEN IQ TESTED -- LET ME BACK UP.   WITH RESPECT TO SOCIAL FUNCTION, ONE OF THE THINGS YOU RELY ON IS THE FACT THAT THERE WAS A TESTED DROP OF HIS IQ?

A.   NOT FOR SOCIAL FUNCTION, BUT ONE OF THE SYMPTOMS OF DEMENTIA IS THAT YOU SEE A DECLINE IN PREVIOUS FUNCTION, SO, YES, SIR, THAT IS RIGHT.

Q.   DECLINE IN PREVIOUS FUNCTION.   HE HAD AN IQ TEST ADMINISTERED BY DR. BRAWLEY SHOWED HIM WITH AN IQ OF 68.

A.   I WOULD BELIEVE THAT IS CORRECT, WITH MY UNDERSTANDING.

Q.   AND THE JULY 25TH, 1999, IQ TEST THAT HE WAS ADMINISTERED PRIOR TO THESE CHARGES BEING FILED, SHOWED HIM WITH AN IQ OF 89.

A.   I WOULDN'T CONTEST THAT.   I'M SORRY, I CAN'T PULL THAT NUMBER OUT, BUT I WOULD NOT DISAGREE WITH YOU.

Q.   BUT THAT REDUCTION IN IQ IS ONE OF THE THINGS ON WHICH YOU RELIED TO SUPPORT YOUR DIAGNOSIS OF DEMENTIA?

A.   IT IS A PIECE, BUT IT IS A WHOLE TREND.   IF YOU LOOK AT HIS IQ WHEN HE WAS IN FIRST GRADE, IT WAS HIGH AVERAGE. AND OVER THE YEARS, IT IS DOWN TO BORDERLINE.

Q.   HE WENT FROM 103 --

A.   YES.   WHICH IS AVERAGE, NOT HIGH AVERAGE, I'M SORRY.

Q.   -- TO A 100, TO 77, BACK UP TO 86, UP TO 89, AND THEN AFTER THESE CHARGES, DOWN TO 68.   THAT IS NOT A CONSISTENT

TREND, IS IT, DOCTOR?

A.    WELL, FROM THE HUNDREDS, TO THE EIGHTIES, TO THE HIGH SIXTIES IS A TREND.

Q.    BUT THERE IS A 77 IN THERE, AND HE GOT SMARTER BETWEEN THE TIME HE WAS 13 AND THE TIME HE WAS 17 OR 18?

A.    AGAIN.  I AM NOT A PSYCHOLOGIST, I'M NOT A NEUROPSYCHOLOGIST.  I CAN TELL YOU IT IS CLEAR THAT HIS TESTS HAVE SHOWN A SIGNIFICANT DECLINE IN FUNCTIONING OVER THE YEARS.  IF YOU TAKE HIM FROM THE TIME WHEN HE WAS YOUNG, AND IN THE SCHOOL SYSTEM, AND BEING TESTED,  NOT ONLY DID THE TEST SHOW THAT, HIS BEHAVIOR SHOWS THAT, HIS ABILITY TO FUNCTION. THIS YOUNG MAN HAS BEEN EITHER HOSPITALIZED OR INCARCERATED. HIS DECLINE IN FUNCTION IS STEADY.  THE PERIOD HE SPENT OUT ON THE STREETS WAS MUCH LESS THAN THE TIME THAT HE HAS BEEN CONFINED.  HE HAS HAD A PROGRESSIVE DETERIORATION OF FUNCTIONING OVER A PERIOD OF YEARS.

Q.    HOW DID HIS FUNCTIONING CHANGE? WHAT WAS HE DOING WHEN HE WAS 13?

A.    WHAT WAS HE DOING WHEN HE WAS 13? HE WAS DEALING WITH SEXUAL ABUSE,  HE WAS DEALING WITH PHYSICAL ABUSE,  HE WAS DEALING WITH NEGLECT.

Q.    SOCIAL --

A.    THESE ARE SOCIAL THINGS HE WAS DEALING WITH.  HE WAS DEALING WITH PHYSICAL ABUSE,  SEXUAL ABUSE,  NEGLECT,  A DYSFUNCTIONAL FAMILY, USING DRUGS, A MAJOR MENTAL ILLNESS OF

ATTENTION DEFICIT DISORDER, A LEARNING DISABILITY.  THIS YOUNG MAN, AT THE AGE OF 13, WAS DEALING WITH MORE THINGS THAN MOST GROWNUPS DEAL WITH IN A LIFETIME.

Q.    WHAT WAS HE DOING AT THE AGE OF 19?

A.    AT THE AGE OF 19, HE WAS ALREADY SUFFERING MORE INSULTS TO HIS BRAIN.  BY THE TIME HE WAS 19, HE WAS HEARING VOICES AND HAVING DIFFICULTIES WITH HIS MEMORY.

Q.    I AM TALKING ABOUT SOCIAL FUNCTIONS.  HOW DOES HE WORK IN THE WORLD, DOCTOR? WHAT WAS HE DOING WHEN HE WAS 13? HE WAS DOING DRUGS AND STEALING STUFF.

A.    SURE.

Q.    WHEN HE WAS 19, HE WAS DOING DRUGS AND STEALING STUFF.

A.    SOME OF THE BEHAVIORS WERE ABSOLUTELY CONSISTENT, SURE.

Q.    SOCIAL FUNCTION DIDN'T CHANGE AT ALL.

A.    OH, I DISAGREE.  HE WAS MORE AND MORE ALIENATED.  HE HAD LESS FRIENDSHIPS.  HE HAD DIFFICULTY GETTING ALONG WITH OTHERS.  THE LONGER HE WAS HOSPITALIZED, THE POORER HE DID WITH HIS RELATIONSHIPS.

Q.    CAN YOU POINT TO A TIME IN HIS HISTORY WHEN HE WAS GOOD AT ANY OF THAT STUFF?

A.    I'M SORRY?

Q.    CAN YOU POINT TO A TIME IN HIS HISTORY WHEN HE WAS GOOD AT ANY OF THOSE THINGS?  WHEN HE WAS 14 AND AT THE METHODIST HOME, HE WAS NOT GETTING ALONG WITH PEOPLE.

A.    YES, I ACTUALLY CAN.  I THINK EARLY ON, IN FIRST AND SECOND GRADE, AND THERE HAVE BEEN REPORTS IN THE HOSPITAL WHERE HE WAS DESCRIBED AS LIKABLE.  THERE HAVE BEEN SOME PEOPLE THAT HAVE BEEN VERY ATTACHED TO HIM OVER PERIODS OF TIME.  THERE WAS ALSO A PERIOD EARLIER ON WHERE HE WASN'T DESCRIBED AS AGGRESSIVE.  WHEN MS. METFORD TRIED TO GET HIM COMMITTED INTO A PSYCHIATRIC HOSPITAL, HE WAS DENIED ADMISSION BECAUSE HE WASN'T AGGRESSIVE.  THE WAY THE KENTUCKY MENTAL HEALTH SYSTEM WAS SET UP, YOU HAD TO BE AGGRESSIVE BEFORE YOU COULD GET INTO A HOSPITAL.

Q.    HE WAS AGGRESSIVE BY THE TIME HE WAS 13 WHEN HE THREATENED A TEACHER.

A.    SURE.

Q.    AND YOUR TESTIMONY IS THAT THE ONSET OF DEMENTIA WAS AT 16 OR 17?

A.    AGAIN, THAT IS A REALLY HARD QUESTION.  HE WAS BEGINNING TO HAVE SYMPTOMS THAT LOOKED CONSISTENT.  THE MEMORY IMPAIRMENT, WHAT I CAN SAY IS, THE MEMORY IMPAIRMENT WAS MUCH MORE CONSISTENTLY REPORTED FROM THAT TIME ON.

Q.    I WON'T ARGUE ANYMORE ABOUT IT WITH YOU, DR. SCHWARTZ-WATTS.  BUT SUFFICE IT TO SAY, THAT THE RELEVANT INQUIRY FOR THE PURPOSES OF THE DIAGNOSIS IS HIS SOCIAL FUNCTION OR A RELEVANT INQUIRY?

A.    IT IS A RELEVANT.  IT IS ONE OF THE MANY INQUIRIES.  THAT IS PART OF IT, SURE.

Q.    THAT IS ONE OF THE THINGS YOU LOOK AT?

A.    SURE.

Q.    AND THE OTHER THING WAS EXECUTIVE FUNCTIONING, AND YOU TALKED ABOUT THAT.

A.    YES.

Q.    AND YOU ARE AWARE THAT THE TEST THAT WAS CONDUCTED AT THE BUTNER FACILITY SHOWED HIM IN THE AVERAGE RANGE OF EXECUTIVE FUNCTIONING?

A.    I AM NOT GOING TO AGREE TO ANYTHING.   THAT IS OUTSIDE OF MY EXPERTISE.   I DON'T KNOW ENOUGH ABOUT THE WISCONSIN CARD SORTING.   I WOULD BE GLAD TO REFER THAT TO A NEUROPSYCHOLOGIST BECAUSE THAT IS JUST NOT MY AREA.

Q.    FAIR ENOUGH.

   YOU HAVE ALSO DIAGNOSED HIM WITH INHALANT-INDUCED PSYCHOSIS,  ALTHOUGH, YOU SAY IT REALLY DID NOT CONTRIBUTE TO THE COMMISSION OF THIS OFFENSE.

A.    CORRECT.

Q.    SO, A VOICE DIDN'T TELL HIM TO DO IT?

A.    NO.

Q.    HE IS NOT  -- HE DIDN'T GET OUT OF THE CAR IN THE WAL-MART PARKING LOT AND JUMP IN ALICE DONOVAN'S CAR BECAUSE SOME VOICE TOLD HIM TO DO IT?

A.    THAT'S CORRECT.   NONE OF THESE ILLNESSES, LET ME JUST BE CLEAR, MR. SCHOOLS,  NONE OF THESE ILLNESSES AFFECTED HIS ABILITY TO KNOW RIGHT FROM WRONG.   MR. BASHAM IS VERY ILL.

HE HAS A LOT OF MAJOR MENTAL ILLNESSES. BUT NONE OF THESE ILLNESSES AFFECTED HIS ABILITY TO DISTINGUISH RIGHT FROM WRONG.

Q. THERE HAS COME A TIME WHEN MR. BASHAM HAS IDENTIFIED THE HALLUCINATORY VOICE AS THE PERPETRATOR IN THE SEXUAL ABUSE.

A. SURE. HE SAID THE VOICE SOUNDS LIKE TOMMY, WHICH IS THE NAME OF J. R., WHICH IS THE MAN FROM HIS EARLY CHILDHOOD.

Q. J. R. WAS THE NAME UP UNTIL RECENTLY?

A. HE HAS BEEN KNOWN AS BOTH, BUT I CAN'T QUIBBLE WITH THAT. I AM NOT SURE.

Q. YOU HAVE REVIEWED THE RECORDS. ARE THERE RECORDS IN WHICH HE HAS REPORTED THAT THE ABUSER'S NAME WAS TOMMY UNTIL SUCH TIME AS HE GOT INTO THE MEDICAL CENTER AT BUTNER?

A. NO, THERE HAVE ALSO BEEN RECORDS WHERE HE WAS REFERRED TO AS J. R. IN THE 1996, THE AUGUST 19, 1996, EVEN AT THAT POINT, HE SAYS IT WAS TWO INITIALS AND HE COULDN'T REMEMBER WHAT THE INITIALS WERE. SO, IT HAS BEEN CONSISTENT THAT IT LOOKS LIKE IT HAS GONE BACK AND FORTH BETWEEN THE NAME OF THE MAN.

Q. AFTER HE IS ARRESTED ON THESE CHARGES, AND AFTER HE IS REPRESENTED TO BETH MCGUFFIN THAT HIS NAME IS TOMMY BLAKE, HE REPORTS THAT THE VOICE'S NAME IS TOMMY?

A. SURE. BUT ALSO KEEP IN MIND, I REVIEWED THAT WELL BECAUSE THAT WAS ALSO AN AREA I WAS INTERESTED IN. BUT I

ALSO BELIEVE THAT MR. FULKS INTRODUCED HIM AS TOMMY ON THAT FIRST OCCASION. I AM NOT SURE WHO CAME UP WITH THAT NAME, BUT I AGREE, HE WAS REFERRED TO AS TOMMY BLAKE.

Q. BRANDON BASHAM HAS AN UNCLE NAMED TOMMY BLAKE?

A. TOMMY BASHAM. HE MAY HAVE ONE NAMED TOMMY BLAKE, TOO, I AM NOT SURE. BUT I KNOW OF TOMMY BASHAM.

Q. BLAKE IS HIS MOTHER'S MAIDEN NAME?

A. YES.

Q. YOU HAVE DIAGNOSED HIM WITH ANXIETY DISORDER; IS THAT CORRECT?

A. YES.

Q. AND ONE OF THE THINGS THAT YOU WOULD OBSERVE IN AN ANXIETY DISORDER IS A PANIC ATTACK?

A. WELL, THAT IS ONE OF HIS SYMPTOMS, SURE.

Q. THE INCIDENT IN THE COURTROOM, AND THE INCIDENTS THAT THE JURY HAS HEARD, THOSE WERE NOT PANIC ATTACKS, WERE THEY?

A. NO. THE INTERACTION WITH THE MARSHALS, NOT AT ALL. NOW, I BELIEVE ON ONE OCCASION HE WAS TAKEN TO AN EMERGENCY ROOM. I WASN'T HERE AT THAT PART, I WAS HERE AT THE TAIL END, I AM NOT SURE WHAT HAPPENED THERE. NO, THE INTERACTION WITH THE MARSHAL, THAT WAS NOT A PANIC ATTACK.

Q. ALL OF THE INCIDENTS THAT YOU ARE AWARE OF THAT OCCURRED AT COLUMBIA CARE, AND THAT OCCURRED AT THE MEDICAL CENTER IN BUTNER, AND OCCURRED AT THE ALVIN GLENN DETENTION CENTER, THOSE ARE NOT THE RESULT OF PANIC ATTACK?

A.    SOME, SOME, I TAKE A LITTLE BIT OF AN ISSUE WITH THAT.  I THINK THE SPECIFIC INSTANCES WHERE I SEE SOME OF THE ANXIETY DISORDER IN TWO AREAS.  NUMBER ONE, WITH THE FLAP.  YOU ARE GOING TO SEE HE HAS GOTTEN IN A LOT OF TROUBLE OVER AT THE RICHLAND COUNTY DETENTION CENTER OVER THAT FLAP.  AND THOSE ARE BASED ON SYMPTOMS OF PANIC.  HE IS NOT PANICKING AT THE TIME, BUT HE KNOWS WHEN THE DOOR IS SHUT, THAT THAT IS GOING TO BRING ON A PANIC ATTACK.  SO, THEY ARE RELATED.  BUT YOU ARE CORRECT, WHEN HE IS IN THE PROCESS OF SHUTTING THAT DOOR, AND FIGHTING WITH THE OFFICERS, AND GETTING HIS ARMS SLAMMED, THAT IS NOT PANIC.

Q.    THAT IS AN ISSUE OF CONTROL, ISN'T IT?  MR. BASHAM WANTS TO BE ABLE TO CONTROL WHEN HIS FLAP IS OPENED AND WHEN IT IS CLOSED.

A.    I THINK IT IS AN ISSUE OF MENTAL SURVIVAL FOR HIM IN TRYING TO MINIMIZE HIS STRESS.

Q.    ARE YOU AWARE THAT OFFICERS AT COLUMBIA CARE -- AT THE ALVIN S. GLENN DETENTION CENTER WOULD SAY HE CLOSES HIS FLAP AT NIGHT WHEN HE WAS SLEEPING?

A.    I WOULD HAVE A HARD TIME WITH THAT, AND I WOULD WONDER IF THAT IS BY CHOICE OR NOT.

Q.    BUT NONETHELESS, IT IS AN ISSUE OVER WHICH, ABSENT A DOCTOR'S ORDER, HE WOULD NOT BE ABLE TO HAVE CONTROL?

A.    CORRECT.  BUT ON SOME OCCASIONS, EVEN BEFORE HE HAS HAD A DOCTOR'S ORDER, HE HAS HAD RELATIONSHIPS WHERE SOME OF

THE CORRECTIONAL OFFICERS WHERE THEY WOULD ALLOW HIM TO LEAVE HIS FLAP OPEN.  NOW, KEEP IN MIND, MR. BASHAM TALKS REALLY LOUDLY.  AND SO, IT HAS BEEN AN ISSUE FOR THE DETENTION CENTER BECAUSE WHEN HIS FLAP IS OPEN, SOMETIMES HE KEEPS OTHER PEOPLE AWAKE.  SO, IT IS A MANAGEMENT ISSUE THERE.  BUT THERE WERE TIMES, EVEN BEFORE HIS DOCTOR'S ORDER, WHERE SOME OF THE CORRECTION OFFICERS WOULD LET HIM KEEP HIS FLAP OPEN.

Q.    MY POINT IS THAT MR. BASHAM HAS CONVINCED DR. MORGAN TO TELL THE PEOPLE AT THE JAIL, YOU HAVE TO LEAVE HIS FLAP OPEN?

A.    NO.   DR. MORGAN HAS WRITTEN AN ORDER, BASED ON HIS 30 YEARS OF BEING A PSYCHIATRIST AND HIS ASSESSMENT, AND MR. BASHAM HAS AN ANXIETY DISORDER THAT REQUIRES HE KEEP HIS FLAP OPEN.  DR. MORGAN SEES HIM ENOUGH, AND SO AM I THAT WE KNOW WHEN WE ARE BEING MANIPULATED OR NOT.  TO BE MANIPULATED MEANS THAT YOU DON'T UNDERSTAND WHAT IS HAPPENING AND YOU ARE PLAYING INTO SOMEBODY'S WILL.  WE ARE VERY AWARE THAT MR. BASHAM HAS  -- HE HAS USED DECEIT IN THE PAST,  THAT HE HAS TRIED TO GET HIS NEEDS MET WITHOUT ALWAYS BEING HONEST.

Q.    HE DOESN'T DO THAT WITH YOU?

A.    HE HAS TRIED.

Q.    YOU HAVE ALSO DIAGNOSED MR. BASHAM WITH ATTENTION DEFICIT HYPERACTIVITY DISORDER,  CORRECT?

A.    YES.

Q.    JUST TO BE CLEAR,  AGAIN,  THERE IS NO CAUSE-AND-EFFECT THERE BETWEEN THE FACT HE HAS ADHD AND THE FACT HE KIDNAPPED

AND CARJACKED ALICE DONOVAN?

A.    NONE.

Q.    NONE WHATSOEVER?

A.    NO.

Q.    IN FACT, ADHD IS REALLY -- IT IS A DIAGNOSIS THAT SOMEWHERE BETWEEN THREE AND FIVE PERCENT OF THE CHILDREN IN THE COUNTRY HAVE ADHD, DON'T THEY?

A.    AGAIN, I TRY TO STAY AWAY FROM THE NUMBERS WITH THE JURY BECAUSE I JUST GOT -- I JUST OPENED MY MAIL THIS MORNING, THERE WERE TWO REPORTS SAYING NOW 26 PERCENT OF CHILDREN. IT IS PROBABLY OVERDIAGNOSED SOME.  IT DOES AFFECT.  THERE ARE A LARGE NUMBER OF CHILDREN, AND THEN A SMALLER NUMBER OF ADULTS THAT ARE AFFECTED BY THAT ILLNESS.

Q.    SUFFICE IT TO SAY, YOU HAVE ACKNOWLEDGED THIS, THAT HE DIDN'T JUMP IN ALICE DONOVAN'S CAR BECAUSE HE HAD ATTENTION DEFICIT DISORDER?

A.    NO.

Q.    YOU DID NOT, IN THE LETTERS THAT WE RECEIVED, DISCLOSURES WE RECEIVED, DIAGNOSE HIM WITH PERSONALITY DISORDER?

A.    CORRECT.

Q.    ONE OF THE THINGS THAT NEUROPSYCHOLOGISTS CAN DO TO TEST PERSONALITY DISORDERS IS GIVE THE MMPI?

A.    I DON'T KNOW.  IT WOULD DEPEND ON THE NEUROPSYCHOLOGIST.  NEUROPSYCHOLOGISTS ARE A SPECIALTY.  SO,

SOME OF THEM, I DON'T KNOW IF THEY ARE TRAINED IN MMPI OR NOT. IT PROBABLY WOULD VARY FROM NEUROPSYCHOLOGIST TO NEUROPSYCHOLOGIST.

Q. MY QUESTION WAS, SOME NEUROPSYCHOLOGISTS GIVE THE MMPI TO TEST PERSONALITY TRAITS?

A. SURE. IF THEY ARE ASKED TO, SURE.

Q. YOU HAD MENTIONED EARLIER THAT THE TEAM IN PLACE FOR MR. BASHAM HAD DECIDED NOT TO DO AN MRI, CORRECT?

A. WELL, AT DR. BRANNON'S -- YOU HAVE TO KEEP IN MIND, HE MADE THOSE RECOMMENDATIONS, AND THEN WE MET, AND WE WERE TALKING ABOUT PERHAPS BETTER TESTS. LET ME BACKTRACK ON THAT.

NORMALLY, WHEN I AM RETAINED ON A CAPITAL CASE, I ALWAYS ORDER AN MRI. AND THE REASON I DO THAT IS BECAUSE YOU DON'T WANT TO MISS BRAIN DAMAGE IN SOMEBODY AND THEN HAVE THE CASE COME UP A FEW YEARS LATER AND HAVE TO TRY IT AGAIN BECAUSE I MADE A MISTAKE. SO, NORMALLY, AS A SCREENING PROCEDURE, I ORDER AN MRI ON ANY KIND OF DEFENDANT THAT IS FACING SERIOUS CHARGES. IN THIS CASE, IT WASN'T NECESSARY, NUMBER ONE, BECAUSE WE ALREADY KNEW MR. BASHAM HAD BRAIN DAMAGE. THE NEUROPSYCHOLOGICAL TEST SHOWED THAT, AND THAT IS WHY I AM HERE TODAY TESTIFYING BECAUSE I HAVE AN OPINION ABOUT THAT.

SECONDLY, THERE IS A MUCH BETTER TEST OVER THE MRI, AND THAT WAS THE PET SCAN. AND THAT WASN'T MY DECISION, BUT DR. BRANNON IS THE EXPERT IN THAT AREA, AND THAT WASN'T DONE.

THIRDLY, I KNEW THAT BUTNER -- THAT ALL MEDICAL INSTITUTIONS THAT ARE CONDUCTING PRETRIAL EVALUATIONS, IT IS ALMOST ROUTINE FOR THEM TO ORDER MRI'S. AND I ALSO KNEW THAT AT SOME POINT HE WOULD GET ONE. SO, THAT IS THE STANCE ON THE MRI. AGAIN, I AM NOT A NEUROLOGIST, BUT I DO HAVE SOME TRAINING IN NEUROLOGY, AND I WOULDN'T HAVE EXPECTED IT TO BE ABNORMAL.

Q. YOU WOULD NOT HAVE EXPECTED IT TO BE ABNORMAL?

A. I WOULD HAVE EXPECTED A NORMAL MRI.

Q. DR. BRANNON, AFTER HE DID HIS TEST, BEFORE HE HAD A CHANCE TO MEET WITH THE TEAM, RECOMMENDED THAT YOU DO ONE AND THAT DO YOU AN EEG.

A. YES.

Q. IT WAS NEVER DONE.

A. UNLESS HE ORDERED IT, I DON'T KNOW. BUT I NEVER SAW RESULTS THAT ONE WAS DONE.

Q. OKAY. THE MMPI. DID THE TEAM MAKE THE DECISION NOT TO GIVE THAT TEST TOO?

A. THAT IS NOT A TEAM DECISION AT ALL.

Q. THAT IS A DR. BRAWLEY DECISION?

A. WELL, IT IS A DR. BRAWLEY DECISION, BUT IT IS PART OF WHATEVER I ASK FOR. I DIDN'T RETAIN A PSYCHOLOGIST TO HELP ME FIGURE OUT MR. BASHAM'S PERSONALITY. I HAVE 26,000 PAGES, I HAVE GOT MULTIPLE INTERVIEWS. I HAVE BEEN TREATING PATIENTS FOR OVER 15 YEARS, I DIDN'T NEED ANY HELP IN DETERMINING WHAT

WAS GOING ON WITH MR. BASHAM'S PERSONALITY. WHAT I ASKED FOR A CONSULT WAS WAS TO HELP ME FIGURE OUT WHAT WAS GOING ON WITH HIS BRAIN. SO, I DIDN'T ASK DR. BRAWLEY TO PERFORM A PERSONALITY ASSESSMENT. I ASKED HER TO RULE OUT BRAIN DAMAGE. I WAS VERY SPECIFIC IN WHAT I NEEDED THOSE TESTS FOR. I DIDN'T NEED A TEST TO TELL ME WHAT HIS PERSONALITY IS LIKE, I KNOW WHAT IT IS LIKE.

Q. SO, YOU ADVISED DR. BRAWLEY NOT TO DO AN MMPI?

A. I DID NO SUCH THING.

Q. YOU JUST DIDN'T ASK HER TO?

A. I DID NO SUCH THING. LET ME EXPLAIN SOMETHING. WHEN YOU ARE A DOCTOR, AND YOU ORDER A CONSULT, I GO TO A CARDIOLOGIST, PLEASE APPROVE THIS MEDICATION FOR THIS PATIENT. I DON'T TELL THE CARDIOLOGIST WHAT TESTS TO ORDER. I ASK HIM A QUESTION, WHATEVER TESTS HE WANTS TO DO, HE IS THE SPECIALIST. HE PICKS AND CHOOSES THOSE TESTS. HE PICKS WHATEVER TEST WILL ANSWER MY QUESTION SO THAT I CAN EITHER MAKE A DIAGNOSIS OR TREAT SOMEONE. I DON'T TELL A CONSULTANT WHAT TO DO OR WHAT NOT TO DO, THAT IS NOT MY BUSINESS.

Q. I UNDERSTAND. I THOUGHT I HAD ASKED YOU IF IT WAS DR. BRAWLEY'S DECISION AND YOU SAID IT WAS NOT?

A. IF I WOULD HAVE ASKED HER TO PERFORM A PERSONALITY ASSESSMENT, PERHAPS SHE WOULD HAVE CHOSEN THAT. I DIDN'T ASK HER TO PERFORM A PERSONALITY ASSESSMENT. SO, I CAN'T SAY WHY -- I DON'T THINK MMPI IS FOR BRAIN DAMAGE.

Q.    FAIR ENOUGH.

A.    I THINK THEY ARE TWO DIFFERENT THINGS.

Q.    MAYBE WE HAVE GOT IT STRAIGHTENED OUT.   YOU ARE THE DOCTOR THAT DECIDED NOT TO DO A PERSONALITY ASSESSMENT BY CONDUCTING THAT TEST?

A.    CORRECT,  CORRECT.  I DIDN'T ASK FOR THAT REFERRAL.

Q.    DO YOU REALIZE THAT THE WAY THAT THE RULES WORK WITH RESPECT TO THE GOVERNMENT'S RIGHT TO DO AN EXAMINATION OF MR. BASHAM,  THAT BECAUSE YOU DIDN'T DO ONE, WE COULDN'T DO ONE?

A.    I WASN'T AWARE OF THAT, AT THE TIME.   WHEN I ORDER A TEST ON SOMEBODY, IT IS NOT FOR THE GOVERNMENT, AND IT IS NOT FOR MR. SWERLING.  IT IS FOR ME TO MAKE A DIAGNOSIS, SO I CAN COME IN AND TELL THIS JURY WHAT I KNOW.  THEY CAN USE IT OR NOT USE IT.   I AM TRYING TO HELP THEM UNDERSTAND MR. BASHAM SO THAT THEY CAN MAKE WHATEVER DECISION THEY NEED.  AND, NO, UNFORTUNATELY, NO LEGAL PERSON IS RESPONSIBLE FOR WHAT CONSULTS I GET.   I AM PRACTICING MEDICINE WHEN I DO THAT.   I DO THAT SO I CAN DO A GOOD JOB EXPLAINING THINGS TO THE JURY.

MR.  SCHOOLS:  BEG THE COURT'S INDULGENCE ONE SECOND.

BY MR. SCHOOLS:

Q.    DR. SCHWARTZ-WATTS, I AM ACTUALLY ALMOST FINISHED. YOU WERE ASKED QUESTIONS ON DIRECT EXAMINATION ABOUT MR. BASHAM'S EFFORTS TO LOCATE ALICE DONOVAN'S REMAINS.

A.    YES.

Q.    IT WAS YOUR TESTIMONY THAT YOU DON'T BELIEVE  -- YOU

BELIEVE THAT THE DEMENTIA FROM WHICH HE SUFFERED, THE MEMORY LOSS, WOULD HINDER HIS ABILITY TO DIRECT LAW ENFORCEMENT TO THE PROPER LOCATION FOR THOSE REMAINS?

A.    SURE.   I CAN'T SAY HOW MUCH.  BUT YOU JUST HAVE TO KEEP IN MIND, WHEN YOU HAVE SOMEONE THAT IS DEMENTED, AND YOU ARE ASKING THEM TO DO SOMETHING THAT IS A NOVEL SITUATION, THAT THAT IS GOING TO BE DIFFICULT.  I CAN'T,  I CAN'T,  MR. SCHOOLS,  BLOCK THIS DOWN INTO EACH LITTLE EVENT AND TELL YOU WHICH WAS CAUSED BY DEMENTIA.  JUST KEEP IN MIND, THAT WHEN SOMEBODY HAS A BAD BRAIN, THEY ARE IN A NOVEL SITUATION, THAT BRAIN HAS ALREADY BEEN AFFECTED BY DRUGS AND ALCOHOL AROUND THE TIME THAT YOU ARE ASKING THEM TO RECONSTRUCT SOMETHING. THAT IS GOING TO BE VERY DIFFICULT.

Q.    BUT MR. BASHAM SENT LAW ENFORCEMENT OFFICERS TO A PLACE WHERE HE KNEW THE BODY WAS NOT.  THAT IS NOT A RESULT OF HIS LACK OF MEMORY, IS IT?

A.    I WOULDN'T KNOW.  AGAIN, I CAN'T -- I WOULD WONDER HOW WOULD SOMEONE KNOW THAT HE SENT SOMEONE TO A PLACE WHERE THE BODY WAS NOT.  I DON'T KNOW HOW TO MAKE THAT DETERMINATION. ALL I CAN TELL YOU AND THE COURT,  YOU CAN'T,  WHEN SOMEBODY HAS BRAIN DAMAGE, AND SOMEBODY HAS ALL OF THE ILLNESSES THAT MR. BASHAM HAS, AND SOMEBODY HAS PERSONALITY TRAITS THAT MR. BASHAM HAS,  YOU CAN'T TAKE EACH LITTLE ACT THAT THAT PERSON DOES AND ASSIGN SOMETHING TO IT, BECAUSE ALL OF THESE THINGS ARE GOING ON AT ONCE.  THIS IS THE EXAMPLE I USE.   I GAVE IT

TO MR. SWERLING TO TRY TO EXPLAIN THIS TO HIM.

Q. DOCTOR.

A. MAY I ANSWER?

Q. SURE. I WAS JUST GOING TO TELL YOU THERE IS SMOKE COMING OFF OF HER MACHINE. YOU NEED TO SLOW DOWN.

A. I'M SORRY.

THE COURT: PLEASE SLOW DOWN, IF YOU WOULD.

BY MR. SCHOOLS:

Q. GO AHEAD. I'M SORRY.

A. THAT IS FUNNY.

WHAT I TOLD MR. SWERLING, BECAUSE HE ASKED THE SAME QUESTION. THE ONLY WAY I CAN EXPLAIN THIS. IF YOU GO INTO THE ER AND YOU HAVE ACUTE ABDOMINAL PAIN, THE SURGEONS ARE REALLY LUCKY BECAUSE THEY CAN ORDER TESTS. THEY CAN SAY, ALL RIGHT, WE ARE GOING TO GET A CAT SCAN OF YOUR BELLY, AND WE WILL BE ABLE TO SEE IF YOU HAVE DIVERTICULITIS. WE CAN DO A PHYSICAL EXAM. IF YOUR BELLY IS REAL TENDER, WE WILL KNOW MAYBE IF IT IS APPENDICITIS. THEY CAN DO A URINE STUDY TO SEE MAYBE IF YOU HAVE KIDNEY STONE. THE POINT IS, THERE ARE LOTS OF DIFFERENT THINGS THAT CAUSE BELLY PAIN.

WELL, GUESS WHAT? IN PSYCHIATRY, WE AREN'T THAT LUCKY BECAUSE IT IS ALL OF THOSE THINGS CAUSING THE PAIN AT THE SAME TIME. SO, THAT WOULD BE LIKE A SURGEON HAVING EVERY ONE OF THOSE THINGS GOING ON TO CAUSE THE BELLY PAIN. WE CAN'T JUST CHECK A LITTLE BLOCK AND RULE IT OUT BECAUSE ALL OF THOSE

THINGS HAPPEN AT ONCE. AND SO, YOU HAVE TO BE ABLE TO LOOK AT THE PERSON AS A WHOLE, LOOK AT ALL OF THE ILLNESSES, LOOK AT THE BRAIN DAMAGE, LOOK AT THE EMOTIONAL IMPACT.

AND SO, AGAIN, IT IS NOT, MR. SCHOOLS, THAT I AM BEING DIFFICULT, IT IS VERY HARD. YOU CAN'T TAKE ISOLATED BEHAVIORS BECAUSE THEY DON'T OCCUR IN A VACUUM. ALL OF THOSE THINGS ARE GOING ON AT ONCE. NOW, I DON'T THINK ANYBODY HAS THE SKILL TO BE ABLE TO DO THAT. NO ONE.

Q. ARE YOU AWARE THAT MR. BASHAM, WHEN HE WAS FIRST ASKED WHERE ALICE DONOVAN'S REMAINS WERE, WHEN HE FIRST GAVE INFORMATION ABOUT IT, SENT LAW ENFORCEMENT OFFICERS TO THE SAVANNAH BLUFF AREA OF CONWAY, SOUTH CAROLINA?

A. SURE. BUT WHO KNOWS THAT IT IS NOT THERE? THAT IS MY POINT. THE BODY HAS NOT BEEN FOUND. SO, NO ONE CAN KNOW IF THAT IS THE RIGHT OR WRONG LOCATION.

Q. WELL, TWO DAYS -- CORRECTION, FIVE DAYS LATER, MR. BASHAM SENT LAW ENFORCEMENT OFFICERS TO AN AREA IN NORTH CAROLINA, 70 MILES AWAY.

A. CORRECT.

Q. NOW, MR. BASHAM KNEW THE BODY WAS NOT IN BOTH PLACES, WE CAN AGREE ON THAT, CAN'T WE?

A. SURE. BUT WHETHER HE REMEMBERED OR NOT WHERE THE LOCATION WAS, IS WHAT THE ISSUE IS. BUT I THINK THAT IS FAIR, SURE.

Q. AND SO, HE TOLD THEM WITHIN A FIVE-DAY SPAN THAT ALICE

DONOVAN'S REMAINS WERE IN TWO LOCATIONS THAT WERE 70 MILES APART.

A.    SURE.

Q.    AND HE ACTUALLY GAVE A PRETTY GOOD MAP OF THE AREA IN CONWAY, SOUTH CAROLINA, WHERE HE FIRST CLAIMED ALICE DONOVAN'S REMAINS ARE LOCATED.  HE COULD REMEMBER THAT PART?

A.    SURE.

Q.    AND HE ACTUALLY GAVE LAW ENFORCEMENT OFFICERS A PRETTY GOOD IDEA OF WHERE THEY SHOULD GO FROM THE AMOCO GAS STATION ON HIGHWAY 17 TO GET TO THE BEE TREE FARM HUNT CLUB?

A.    SURE.

Q.    HE COULD REMEMBER THAT PART?

A.    YES.

Q.    IT IS NOT YOUR TESTIMONY, IS IT, DOCTOR, THAT MR. BASHAM DID NOT KNOW, HE MAY HAVE BELIEVED THE BODY WAS AT ONE OF THOSE LOCATIONS, HE DIDN'T BELIEVE IT WAS AT BOTH OF THEM, DID HE?

A.    WELL, I DON'T WANT TO QUIBBLE WITH SEMANTICS BECAUSE I DON'T KNOW WHAT MR. BASHAM BELIEVED.  BUT I CAN GIVE YOU SCENARIOS WHERE SOMEBODY WITH DEMENTIA, IF HE TOLD YOU ONE PLACE AND THE BODY WASN'T THERE, PERHAPS HE WAS TRYING TO THINK SOMEWHERE ELSE ALONG THE ROUTE.  NO ONE KNOWS.  I CAN'T ANSWER THAT.  BUT FOR EVERY HYPOTHETICAL SITUATION YOU GIVE ME, I AM GOING TO HAVE ANOTHER ANSWER.  SO, NO ONE CAN SAY.  NO ONE KNOWS THAT BECAUSE HER BODY HAS NOT BEEN FOUND.

Q.    THERE IS ANOTHER EXPLANATION FOR THAT BEHAVIOR THAT IS PLAUSIBLE?

A.    SURE.

Q.    IS THAT HE WAS LYING?

A.    SURE.   ABSOLUTELY.

Q.    THAT IS SOMETHING WE AGREE.

NOW,  YOU TESTIFIED,  DR. SCHWARTZ-WATTS,  ABOUT MR. BASHAM'S SUSCEPTIBILITY TO OLDER,  HIGHER-FUNCTIONING MALES; IS THAT CORRECT?

A.    YES.   DEPENDENCY,  NOT SUSCEPTIBILITY,  DEPENDENCY.

Q.    DEPENDENCY.   AND THAT HE MAY BE DEPENDENT, AND YOU MENTIONED MR. FULKS IS THREE YEARS OLDER THAN MR. BASHAM?

A.    FOUR, THREE OR FOUR.

Q.    ARE YOU AWARE, DR. SCHWARTZ-WATTS, THAT MR. FULKS, LIKE MR. BASHAM, MADE A ROPE IN AN EFFORT TO ESCAPE FROM THE COLUMBIA CARE FACILITY?

A.    NO,  I ACTUALLY WASN'T, NO.

Q.    YOU ARE NOT?

A.    NO.

Q.    LET ME SHOW YOU WHAT IS MARKED AS --

MR. HARRIS:  MAY WE APPROACH,  YOUR HONOR?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. HARRIS:  MR. SCHOOLS HAS A ROPE THAT WE HAVE BEEN

TOLD WAS MADE BY CHAD FULKS AT COLUMBIA CARE THAT HE IS ABOUT TO SHOW THIS WITNESS.   FIRST OF ALL, THERE IS NO EVIDENCE IN THE RECORD -- THERE IS NO EVIDENCE TO SUPPORT, TO AUTHENTICATE THE ROPE.   SECOND OF ALL, SHE HAS NEVER SEEN THE ROPE. THIRD,  I DON'T HAVE ANY IDEA WHAT THE POSSIBLE RELEVANCE WOULD BE.   IF THEY WANT TO PUT IT IN TO SHOW FULKS'S EXECUTIVE FUNCTIONING ABILITY,  I DON'T THINK THAT IS AN ISSUE.   I DON'T KNOW WHY IT WOULD BE RELEVANT.

MR. SCHOOLS:  SHE CLEARLY IMPLIED THAT MR. FULKS WAS AN OLDER, HIGHER-FUNCTIONING MALE.   I THINK THE MANUFACTURER OF BOTH OF THOSE ROPES IS RELEVANT TO THEIR FUNCTIONING.  I AM SURE SHE IS GOING TO HAVE SOME EXPLANATION.

THE COURT:   I THINK IT GOES TO HIS MENTAL FUNCTIONING.  IT IS CROSS-EXAMINATION OF AN EXPERT.  SHE MIGHT NOT HAVE AN OPINION ABOUT IT AT ALL.

MR. HARRIS:  HOW DOES THE ROPE, ITSELF, COME IN?

THE COURT:   IT CAME IN WITHOUT OBJECTION, DIDN'T IT?

MR. HARRIS:  NO.  THE ROPE IS NOT IN,  JUDGE.   THE ROPE IS NOT IN.

MR. SWERLING:  IT IS NOT THE ROPE YOU ARE THINKING ABOUT.

MR. SCHOOLS:  I CAN AUTHENTICATE IT.   I CAN USE IT FOR DEMONSTRATIVE PURPOSES, AT THIS POINT, AND AUTHENTICATE IT THROUGH ANOTHER WITNESS.   SHE HAS TESTIFIED SHE REVIEWED ALL OF THIS STUFF, AND SO WHAT SHE HAS SEEN AND WHAT SHE HASN'T

SEEN IS EQUALLY RELEVANT. I CLEARLY HAVE TO SHORE UP --

THE COURT: GIVE ME THE BASIS WHY THIS ROPE SHOULD COME IN. HOW IS IT AUTHENTICATED?

MR. SCHOOLS: I DON'T THINK IT IS AUTHENTICATED YET. WHAT I WILL DO AT THIS POINT IS USE IT FOR DEMONSTRATIVE PURPOSES. CLEARLY, I HAVE GOT TO TIE THAT UP, WHICH WE CAN DO.

THE COURT: YOU CAN TIE THAT UP LATER.

MR. SCHOOLS: WE CAN CALL JEFF BRUNING WHO SEIZED IT FROM COLUMBIA CARE, IF THAT IS THAT THEY WANT US TO DO. I DON'T KNOW THAT THAT ADVANCES THE BALL. I DON'T THINK THEY DISPUTE THAT THAT IS WHAT IT IS.

THE COURT: MR. BRUNING WOULD SAY HE FOUND IT WHERE?

MR. SCHOOLS: HE RETRIEVED IT FROM COLUMBIA CARE. WE CAN CALL THE WITNESSES THAT FOUND IT. WE CALLED HIM IN THE LAST TRIAL.

MR. HARRIS: I STILL DON'T SEE THE PROBATIVE VALUE OF A ROPE MADE BY CHADRICK FULKS. THAT IS OUR ENTIRE ISSUE, YOUR HONOR. OBVIOUSLY, THERE IS AN AUTHENTICATION ISSUE. THE PRIMARY ISSUE IS A ROPE MADE BY CHAD FULKS.

MR. SWERLING: AS TO WHETHER OR NOT HE WAS OLDER AND HAD HIGHER FUNCTIONING.

MR. SCHOOLS: JUDGE, WHEN THEY INDICATED THEY WERE GOING TO ASK QUESTIONS ABOUT TALKING ABOUT MR. FULKS'S INFLUENCE ON MR. BASHAM, I SAID, WE OPEN THAT DOOR, WE WILL

WALK THROUGH THERE.

THE COURT: WHAT ALL DID SHE SAY ABOUT FULKS'S INFLUENCE?

MR. SCHOOLS: SHE SAID MR. BASHAM HAS A DEPENDENCY ON OLDER, HIGHER-FUNCTIONING MALES. AND THEN SHE MENTIONED THAT MR. FULKS IS OLDER THAN BRANDON BASHAM. CLEAR IMPLICATION TO THIS JURY BEING THAT MR. BASHAM WAS DEPENDENT ON MR. FULKS BECAUSE HE WAS OLDER AND HE WAS HIGHER FUNCTIONING.

THE COURT: YOU WILL SHOW HIS ROPE IS NOT AS GOOD AS MR. BASHAM'S ROPE?

MR. SCHOOLS: EXACTLY.

MR. HARRIS: AND THAT TESTIMONY WAS BROUGHT OUT ON CROSS-EXAMINATION. SO, WHAT WE HAVE EFFECTIVELY ALLOWED MR. SCHOOLS TO DO, IS ELICIT TESTIMONY, CREATED THE NECESSITY FOR HIM TO PUT THIS PIECE OF EVIDENCE IN FRONT OF THE JURY.

MR. SCHOOLS: WITH ALL DUE RESPECT TO MY GOOD FRIEND, MR. SWERLING ASKED THAT QUESTION ABOUT THE HIGHER FUNCTIONING. THAT IS IN MY NOTES. IT IS QUESTIONS THAT MR. SWERLING ASKED.

THE COURT: ALL RIGHT. WHAT SHE SAID WAS, HE IS DEPENDENT ON OLDER MALES, DEPENDS ON OR RELIES ON MALES.

MR. SCHOOLS: SHE SAID OLDER, HIGHER-FUNCTIONING MALES.

THE COURT: AND THEN SHE SAID CHAD FULKS WAS SUCH A PERSON?

MR. SCHOOLS: MR. SWERLING'S NEXT QUESTION WAS, AND

CHAD FULKS IS OLDER THAN BRANDON BASHAM? SHE SAID, YES.

MR. SWERLING: AND THEN SHE IDENTIFIED TWO OR THREE PEOPLE THAT HE HAD BEEN ASSOCIATED WITH OVER HIS LIFE WHO WERE OLDER. I MEAN, THAT IS THE CHARACTERISTIC.

MR. HARRIS: I DON'T KNOW THAT SHE SAID ANYTHING ABOUT HIGHER FUNCTIONING, THOUGH, YOUR HONOR.

MR. SCHOOLS: THAT IS WHAT SHE SAID. WE CAN CHECK THE RECORD.

THE COURT: LET ME GO BACK AND LOOK AT THE TRANSCRIPT. THIS IS PRETTY IMPORTANT BECAUSE THIS KIND OF FLIES IN THE FACE OF WHAT I DID EARLIER AND KEPT OUT ALL THE EVIDENCE ABOUT CHAD FULKS.

MR. SCHOOLS: THAT IS THE -- THAT IS WHY I OBJECTED WHEN THEY SAID THEY WANTED TO GO DOWN THIS ROAD. BECAUSE THEY, YOU KNOW, HIGHER FUNCTIONING I THINK ALSO IMPLIES HIS IQ, IMPLIES HIS BRAIN FUNCTION, AND IMPLIES HIS FETAL ALCOHOL SPECTRUM DISORDER. BASICALLY, HIGHER FUNCTIONING. WE STAYED AWAY FROM THAT. THAT WAS A DOOR WE DIDN'T WANT TO OPEN. NOW THAT THEY HAVE OPENED IT, THEY CAN'T ASK US NOT TO WALK THROUGH IT.

THE COURT: ANY PROBLEM WITH LETTING THE JURY GO TO LUNCH NOW?

MR. SCHOOLS: NO, SIR.

THE COURT: SO WE CAN TAKE THIS UP? HOW CLOSE ARE YOU TO FINISHING?

**JA 2251**

MR. SCHOOLS: I'M AT THE END.

THE COURT: HOW ABOUT REDIRECT?

MR. SWERLING: JUST A FEW MINUTES.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT: MEMBERS OF THE JURY, WE HAVE AN EVIDENTIARY MATTER THAT I NEED TO TAKE UP. THERE ARE A COUPLE OF OTHER THINGS I NEED TO TAKE UP WITH THE LAWYERS OUT OF YOUR PRESENCE. WE WILL GO AHEAD AND BREAK FOR LUNCH AT THIS TIME. WE ARE VERY NEAR THE END OF THE TESTIMONY OF THIS WITNESS. THIS WILL BE YOUR LAST WITNESS?

MR. SWERLING: YES, YOUR HONOR.

THE COURT: THIS IS THE LAST DEFENSE WITNESS. THE BEST THING TO DO IS BREAK FOR LUNCH NOW SO I CAN TALK TO THE LAWYERS. SO, I WILL ASK YOU TO BE BACK AT 1:00 O'CLOCK. THAT IS AN HOUR AND 20 MINUTES. WE WILL NEED A GOOD BIT OF THAT TIME HERE TO TALK ABOUT THE LEGAL MATTERS. HAVE A NICE LUNCH. DON'T DISCUSS THE CASE. BE BACK AT 1:00 O'CLOCK.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: LET'S GO BACK ON THE RECORD. I LOOKED AT THE RESPONSE THAT THE WITNESS GAVE AT 9:33:26, WHERE SHE TALKED ABOUT MR. BASHAM RELATING TO OLDER MALES FOR GUIDANCE, OR OLDER OR HIGHER-FUNCTIONING PEOPLE. I SEE THAT. BUT I DON'T SEE WHERE THE NEXT QUESTION WAS, MR. FULKS WAS OLDER.

MR. SCHOOLS, IS THAT IN THERE SOMEWHERE?

MR. SCHOOLS: YES, SIR.

MR. HARRIS: AT 9:33:50, YOUR HONOR, BUT IT DOESN'T SAY HIGHER FUNCTIONING. IT JUST SAYS MR. FULKS WAS OLDER.

THE COURT: WELL, I THOUGHT IT WAS IN RESPONSE TO A QUESTION. THE WITNESS JUST THREW IT IN.

MR. HARRIS: THERE IS NOTHING ABOUT MR. FULKS BEING HIGHER FUNCTIONING.

THE COURT: I AM LOOKING FOR A QUESTION FROM MR. SWERLING.

MR. SWERLING: THE QUESTION WAS ABOUT INTERDEPENDENT RELATIONSHIPS.

THE COURT: SO, MR. SCHOOLS, IT ISN'T QUITE LIKE IT APPEARED AT SIDE BAR, IN THAT THE WITNESS THREW IT OUT THERE, AND THEN MR. SWERLING OPENED THE DOOR BY ELICITING THAT MR. FULKS FELL INTO THE CATEGORY OF OLDER AND HIGHER-FUNCTIONING PEOPLE.

MR. SCHOOLS: IT IS HIS WITNESS. SHE HAS BEEN PREPARED, I MEAN, HIRED SINCE 2003. PRESUMABLY, HE KNEW WHAT THE ANSWER TO HIS QUESTION WOULD BE.

THE COURT: HERE IS MY CONCERN WITH IT. SHE SAID OLDER OR HIGHER FUNCTIONING. I AM NOT SURE HOW PROBATIVE IT IS THAT MR. BASHAM MADE A BETTER ROPE THAN MR. FULKS. IT COULD HAVE BEEN DUE TO EXTRANEOUS FACTORS. MR. FULKS MAY NOT HAVE HAD A CRANK FROM A BED IN HIS JAIL CELL. HE MAY HAVE

BEEN ON A WING OF A FACILITY WHERE THE GUARD DID BETTER BED CHECKS AND DIDN'T LET HIM HAVE ACCESS TO AS MANY SHEETS. I MEAN, THERE COULD BE EXTRANEOUS REASONS WHY HIS ROPE WAS NOT AS GOOD AS THE BASHAM ROPE. I DON'T KNOW IF I BELIEVE THAT IF I WERE THE FACT FINDER, BUT I JUST DON'T KNOW HOW PROBATIVE IT IS.

MR. SCHOOLS: OKAY. WE WON'T DO IT THEN.

THE COURT: LET ME SEE THE ROPE. LET ME SEE IT. IS THAT THE SAME ONE FROM THE FIRST TRIAL?

MR. SCHOOLS: YES, SIR. JUDGE, I JUST DON'T UNDERSTAND HOW THEY CAN ELICIT TESTIMONY CLEARLY IMPLYING THAT CHAD FULKS IS AN OLDER, HIGHER-FUNCTIONING GUY. THAT WAS THE CLEAR PURPOSE OF THE TESTIMONY, CLEAR IMPLICATION OF THE TESTIMONY, AND WHEN WE WANT TO REBUT IT, THEY SAY WE CAN'T.

THE COURT: I HAVEN'T RULED ON IT YET. I AM JUST TRYING TO GET EVERYTHING IN FRONT OF ME SO I WILL KNOW WHAT THE FACTS ARE.

MR. SCHOOLS: I UNDERSTAND.

THE COURT: I WAS JUST POINTING OUT THAT IT WASN'T MR. SWERLING THAT EXPLICITLY OPENED THE DOOR THROUGH A QUESTION. IT DID COME IN.

MR. SCHOOLS: WHEN HE ASKED THE QUESTION, DO YOU THINK HE HAS ANY SIGNIFICANT, I THINK IT SHOULD BE, DEPENDENT PERSONALITY TRAITS, THAT IS THE QUESTION THAT WOULD ELICIT THAT ANSWER. THAT IS WHAT IT WAS INTENDED TO DO. SO THAT

SHE CAN SAY, THROUGHOUT HIS HISTORY WHEN HE WAS INVOLVED IN CRIMES WITH OTHER PEOPLE, THEY ARE OLDER AND THEY ARE HIGHER FUNCTIONING. SHE REFERRED SPECIFICALLY TO THIS CRIME SPREE. I DON'T KNOW HOW THAT IS NOT WHAT THE JURY THINKS THE DEFENDANT AND THIS WITNESS WERE TRYING TO SAY, IS THAT BRANDON BASHAM IS YOUNGER AND LOWER FUNCTIONING THAN CHAD FULKS, AND, THEREFORE, DEPENDENT ON HIM.

MR. HARRIS: THE ONLY THING I WOULD ADD, JUDGE, ONE THING SHE POINTED OUT EARLIER, IT WAS PRESENTED TO THE JURY DYSFUNCTION RATHER THAN CONJUNCTION. IN OTHER WORDS, IT WAS NOT AND/OR. IT WAS OR.

THE COURT: SHE STUCK IT IN THERE THAT MR. FULKS WAS OLDER.

MR. HARRIS: EXACTLY.

MR. SCHOOLS: IF THEY WANT TO STIPULATE HE IS NOT HIGHER FUNCTIONING, WE WILL WITHDRAW IT. I DON'T THINK THEY WILL DO IT.

THE COURT: ALL RIGHT. I THINK I HAVE SEEN THE RELEVANT PORTIONS OF THE TRANSCRIPT. I HAVE LOOKED AT THE ROPE. IT IS THE SAME ROPE THAT CAME IN IN THE FULKS'S TRIAL. ASSUMING THE GOVERNMENT CAN CONNECT IT UP AND AUTHENTICATE IT LATER, I WILL OVERRULE THE OBJECTION AND ALLOW CROSS-EXAMINATION OF THE WITNESS, FOR WHATEVER IT MAY BE WORTH, AS TO IF THIS IMPACTS HER OPINION ON WHETHER MR. FULKS WAS THE OLDER, HIGHER-FUNCTIONING MALE.

**JA 2255**

I DID KEEP OUT EVIDENCE OF OTHER BAD ACTS BY MR. FULKS OVER THE DEFENDANT'S STRONG OBJECTION. BUT I DID SAY THAT EVIDENCE OF THE ROLE -- RELEVANT CULPABILITY, ROLE IN THE OFFENSE, THE FACT THAT MR. FULKS WAS A MANIPULATOR, HE SUCCESSFULLY MANIPULATED PEOPLE, WAS FAIR GAME IN THIS TRIAL. AND THIS GOES INTO THAT SECOND CATEGORY -- NOT THE SECOND CATEGORY. OVER THE OBJECTION OF THE DEFENDANT, I WILL ALLOW CROSS-EXAMINATION ABOUT THE ROPE.

MR. HARRIS: BASED ON THAT RULING, WE WILL WAIVE AUTHENTICATION OF THE EXHIBIT. WE ARE PRESERVING OUR OBJECTION.

THE COURT: YOU ARE CERTAINLY PROTECTED ON APPEAL. YOU WAIVE ANY REQUIREMENT THAT THEY LAY A FOUNDATION FOR IT?

MR. HARRIS: YES, SIR. WE WENT THROUGH THE FIRST TRIAL. WE KNOW AGENT BRUNING IDENTIFIED THIS AS A ROPE MADE BY MR. FULKS.

THE COURT: VERY GOOD. THANK YOU. THAT WILL SAVE TIME FOR ALL OF US.

LET'S TALK ABOUT THESE EXHIBITS WHILE YOU ARE HERE. ANYTHING ELSE BEFORE WE GET TO THE EXHIBITS?

MR. SCHOOLS: YOUR HONOR, I ALSO THINK THAT IT WILL BE RELEVANT, SINCE DR. SCHWARTZ-WATTS HAS TESTIFIED THAT SHE REVIEWED TESTIMONIES FROM PREVIOUS PROCEEDINGS, TO FIND OUT IF SHE HAD REVIEWED TESTIMONY FROM DOCTORS WHO HAD EVALUATED MR. FULKS, AND WHO HAD DETERMINED THAT HIS IQ WAS EITHER, I THINK,

75 OR 78.

THE COURT:  WHAT ABOUT THAT?

MR. SWERLING:  WELL, JUDGE, I DON'T THINK THE QUESTION OPENED UP THAT.  WE HAD A SIDEBAR YESTERDAY, AND WE LIMITED WHAT WE COULD ASK DR. WATTS WITHOUT OPENING THE DOOR. THIS QUESTION WAS, DID HE HAVE ANY INTERDEPENDENT PERSONALITY TRAITS.  I JUST DON'T SEE HOW THAT OPENS UP THIS WHOLE DOOR TO CHAD FULKS.  I RESPECTED YOUR HONOR'S RULING.  MR. SCHOOLS SAID HE WAS GOING TO GO INTO IT IF THAT OPENED THE DOOR.  SO, I ELIMINATED ALL OF THOSE QUESTIONS.  THIS QUESTION IS NOT DESIGNED FOR THAT PURPOSE.  THE QUESTION IS --

THE COURT:  I WILL KEEP OUT THE TESTIMONY OF THE IQ OF MR. FULKS BECAUSE THAT OPENS UP LOTS OF OTHER DOORS THAT WOULD JUST BRING THAT WHOLE TRIAL INTO PLAY HERE.  I WILL SUSTAIN THE DEFENSE OBJECTION TO TESTIMONY ABOUT HER REVIEW OF THE RECORDS OF MR. FULKS IN TERMS OF HIS IQ.

MR. GASSER:  YOUR HONOR, WE WOULD JUST THEN LIKE TO REMIND THE COURT OF THAT RULING FOR CLOSING ARGUMENT PURPOSES, BECAUSE IT WOULD BE PATENTLY UNFAIR FOR MR. SWERLING TO GET UP IN CLOSING ARGUMENT AND TO ARGUE HIS CLIENT'S LIMITED EXECUTIVE FUNCTIONING, AND HIS CLIENT'S -- TO DO ANY KIND OF COMPARISON ANALYSIS, BECAUSE THEY ARE KEEPING ALL OF THIS INFORMATION OUT, AND THEY SHOULDN'T BE REWARDED BECAUSE OF IT.

THE COURT:  THAT MAY BE A POINT WELL-TAKEN, MR. SWERLING.

MR. SWERLING: YOUR HONOR, THERE IS PLENTY OF EVIDENCE IN THE FIRST PART OF THE TRIAL ABOUT CHAD FULKS, HOW HE WAS THE LEADER OF THIS.

THE COURT: BEING A LEADER IS ONE THING, BUT HAVING A HIGHER LEVEL -- WHAT IS IT, EXECUTIVE FUNCTIONING? WHAT DID SHE CALL IT?

MR. SWERLING: I WILL NOT GO INTO THAT.

THE COURT: YOU WILL BE STRICTLY LIMITED IN YOUR CLOSING ARGUMENT.

MR. SWERLING: I WILL GO INTO HIS FUNCTIONING.

MR. GASSER: I DON'T HAVE A PROBLEM WITH THAT. BUT ANY TYPE OF COMPARISON ANALYSIS.

THE COURT: YOU CAN TALK ABOUT YOUR CLIENT'S FUNCTIONING LEVEL, BUT YOU CAN'T EVEN REMOTELY REFER TO MR. FULKS IF I AM GOING TO KEEP OUT THE IQ OF MR. FULKS.

MR. SWERLING: THAT IS WHAT I UNDERSTOOD YOUR RULING WAS. I DON'T SEE HOW THAT QUESTION OPENED THE DOOR TO LET THIS ROPE COME IN.

THE COURT: I AGREE WITH YOU ON THE IQ, BUT NOT ON THE ROPE.

LET'S GO BACK TO THESE FIVE EXHIBITS NOW. THESE HAVE BEEN OFFERED FOR SEVERAL DAYS AGO. LET'S TRY TO BREAK IT INTO CATEGORIES. FIRST ARE JUST TWO LISTS. THIS IS DEFENSE 198 AND 199. 198 IS THE ACCUMULATION OF RISK FACTORS LISTED. IT IS ONE SHEET OF PAPER WITH ABOUT PROBABLY 30 ENTRIES ON IT.

199 IS A LIST OF MEDICATIONS TAKEN, THREE PAGES LONG, 102 ENTRIES. AND THE PRIMARY OBJECTION BY THE GOVERNMENT IS THAT THIS IS SIMPLY A MINITRANSCRIPT, SO TO SPEAK, OF SELECTED TESTIMONY OF ONE WITNESS, RIGHT?

MR. SCHOOLS: YES, SIR. IT IS NOT A SUMMARY OF THE TESTIMONY IN THE CASE. IT IS NOT A SUMMARY OF THE RECORDS. IT IS A SUMMARY OF THAT WITNESS'S TESTIMONY. WELL, WITH RESPECT TO THE DRUGS --

THE COURT: THERE IS SOME OVERLAP AND DUPLICATION, AS WELL.

MR. SCHOOLS: THERE IS THAT. THERE IS ALSO -- I DON'T THINK THERE IS ENOUGH IN THERE FOR IT TO HELP THE JURY. ONE OF THE THINGS THE COURT SHOULD LOOK AT IN DECIDING WHETHER IT SHOULD GO IS WHETHER IT WOULD AID THE TRIER OF FACT. THE PROBLEM IS, THE JURORS DON'T KNOW WHAT DRUGS ON THERE TREATED HIS ALLERGY PROBLEMS, AND WHAT TREATED HIS COLD SYMPTOMS, AND WHAT TREATED HIS MENTAL PROBLEMS.

MR. HARRIS: YOUR HONOR, THEY WEREN'T OFFERED FOR THAT PURPOSE. THEY WERE A SUMMARY OF EVERYTHING THAT SHE HAD SEEN IN THE RECORD, NOT A SUMMARY OF HER TESTIMONY. THOSE ARE THE DRUGS THAT HE HAD BEEN GIVEN OVER HIS LIFETIME.

THE COURT: I THOUGHT SHE DID GO THROUGH AND READ IN EVERY ONE OF THESE DRUGS.

MR. HARRIS: SHE DID, YOUR HONOR.

THE COURT: SO, THIS IS JUST A CAPSULE VERSION OF

HER TESTIMONY, IN THIS RESPECT.

MR. HARRIS: IN THAT RESPECT, YOUR HONOR, BUT IT WAS FOLLOWED UP, AS YOU WILL RECALL, TESTIMONY FROM OTHER EXPERTS THAT THERE WERE DIFFERENT DOSES, THERE WERE DIFFERENT INTERVALS OF TREATMENT WITH THOSE DRUGS. THERE WAS A MULTITUDE OF TESTIMONY FROM 14,000 PAGES WORTH OF RECORDS THAT THOSE ARE THE DRUGS THAT HE HAS BEEN GIVEN OVER HIS LIFETIME. I DON'T KNOW THAT IT IS SIGNIFICANT IN THAT SOME ARE NARCOTICS, SOME ARE NONNARCOTICS. THE FACT OF THE MATTER IS, IS THAT OVER HIS LIFETIME, HE HAS BEEN TREATED FOR PHYSICAL ILLNESSES, HE HAS BEEN TREATED FOR EMOTIONAL ILLNESSES, HE HAS BEEN TREATED FOR ANY NUMBER OF PROBLEMS. WE ARE THE ONES THAT BROUGHT THAT OUT, YOUR HONOR. THAT IS THE METHOD THAT DOCTORS, OVER HIS LIFETIME, HAVE CHOSEN TO TREAT HIM WITH THOSE MEDICATIONS.

THE COURT: WELL, THIS COMES UP A GOOD BIT WHEN SOMEONE WANTS TO HAND UP AS AN EXHIBIT THAT GOES TO THE JURY DURING DELIBERATIONS, A NEAT POWERPOINT-TYPE RECITATION OF WHAT A WITNESS SAID. MY NORMAL REACTION IS, IT IS JUST NOT FAIR, BECAUSE IF WE START DOING THAT, THEN THE OTHER SIDE COULD GO OUT AND MAKE A NICE NEAT CHART OF SOME OF THE PERTINENT TESTIMONY OF ONE OF THEIR KEY WITNESSES, AND THEN THE JURY HAS BEFORE IT WRITTEN VERSIONS OF SOME OF THE TESTIMONY, BUT NOT ALL OF THE TESTIMONY.

MR. HARRIS: BUT, JUDGE, THE ALTERNATIVE, AND WHAT

THE RULES CLEARLY -- AND ONCE AGAIN, WE ARE NOT TALKING ABOUT THE RULES OF EVIDENCE HERE OTHER THAN IT IS GUIDING US. BUT WHAT THE RULES CLEARLY INTEND IS THAT EXHIBITS LIKE THIS COME IN TO THE JURY SO THAT THE DEFENDANT OR THE GOVERNMENT IS NOT PLACED IN A POSITION WHERE THEY HAVE TO BRING IN ALL OF THE PRESCRIPTION PADS. CERTAINLY, IF WE BROUGHT IN ALL OF THE PRESCRIPTION PADS FOR THE HUNDREDS OF THOUSANDS OF PILLS OR TENS OF THOUSANDS OF PILLS HE HAS TAKEN OVER HIS LIFE, THEY WOULD FILL THIS COURTROOM, AND THAT WOULD BE CUMBERSOME. AND THAT IS WHAT THE RULES INVOLVED. THAT IS WHY EXHIBITS LIKE THIS ARE APPROPRIATE.

THE COURT: SO, YOU SAY THE DRUG LIST IS A SUMMARY, REALLY, OF WHAT WOULD BE SHOWN BY THE PRESCRIPTION PADS AND OTHER MEDICAL RECORDS.

MR. HARRIS: I THINK THAT IS WHAT THE TESTIMONY HAS BORNE OUT.

MR. SCHOOLS: YOUR HONOR, UPON FURTHER CONSULTATION, WE WILL WITHDRAW OUR OBJECTION TO THE DRUG LIST, BUT WE MAINTAIN THE OBJECTION ON THE RISK FACTOR.

THE COURT: ALL RIGHT. WELL FINE. THEN THE DRUG LIST CAN COME IN, IT IS, BASICALLY, A SUMMARY. 199 IS ADMITTED WITHOUT OBJECTION.

198, I DO THINK, SHE TESTIFIED ABOUT ALL OF THESE RISK FACTORS, FAMILY HISTORY OF VIOLENCE, ET CETERA. I THINK IT IS JUST TOO MUCH OF A SMALL TRANSCRIPT OF KEY TESTIMONY. I

HAVE NO PROBLEM WITH YOU PUTTING IT ON THE BOARD DURING CLOSING ARGUMENT.  YOU CAN PUT IT ON THE SCREEN OR A BLOWUP, FOAM BOARD IF YOU WANT TO, AND REFER TO IT, AND DISPLAY IT DURING ARGUMENT, BUT I WILL NOT ALLOW IT TO GO INTO THE JURY ROOM DURING DELIBERATIONS.

          MR. HARRIS:  YES, SIR.

          THE COURT:   NOW WE COME TO THE GENOGRAM.

          MR. HARRIS:  JUDGE, IT IS 195-A AND 195-B.  A, BEING ONE SIDE OF THE FAMILY, THE BLAKE SIDE; B, BEING THE BASHAM SIDE OF THE FAMILY.

          MR. SCHOOLS:  WE WITHDRAW OUR OBJECTION TO THAT.

          THE COURT:   ALL RIGHT.  OBJECTION WITHDRAWN TO THE GENOGRAM.  195-A AND B.

     THEN WE COME TO THE TWO SCROLLS OF PAPER THAT GO FROM ONE WALL TO THE OTHER.

          MR. HARRIS:  WE WITHDRAW OUR REQUEST THAT THOSE GO BACK TO THE JURY,  YOUR HONOR.

          THE COURT:  YOU MADE MY JOB EASIER TODAY.  BOTH SIDES DID.

     THAT IS 196 AND 197 HAVE BEEN WITHDRAWN AS EXHIBITS, BUT YOU STILL WANT TO USE THEM FOR DEMONSTRATIVE.

          MR. HARRIS:  ABSOLUTELY DEMONSTRATIVE.

          THE COURT:  YOU MAY SCROLL THEM IN FRONT OF THE JURY.

          MR. HARRIS:  MAY I APPROACH?

          THE COURT:   YES, SIR.

WE GAVE YOU PROPOSED JURY INSTRUCTIONS YESTERDAY, AND -- I AM SORRY, THE DAY BEFORE YESTERDAY. AND I TOLD YOU I WOULD LIKE BY 9:00 O'CLOCK TOMORROW TO HAVE A MARKED-UP HARD COPY BACK TO ME. AND THEN I HAVE MY MEDICAL APPOINTMENT AT 8:00 O'CLOCK. HOPEFULLY, I CAN GET IN HERE BY 9:30 OR 10:00, HOPEFULLY. AND MY LAW CLERK AND I CAN LOOK AT WHAT YOU SUBMIT AND GO AHEAD AND MAKE SOME PRELIMINARY DETERMINATIONS AS TO HOW MUCH OF A PROBLEM WE HAVE, AND HOW MUCH DISCUSSION WILL BE NECESSARY. THEN I WOULD LIKE TO ASK YOU TO COME IN ABOUT 3:30 TOMORROW TO FORMALLY GO OVER THE CHARGE HERE ON THE RECORD. THEY HAVE LAW CLERK TRAINING FOR NEW LAW CLERKS TOMORROW, AND IT ACTUALLY RUNS THROUGH ABOUT 4:30, BUT I WAS GOING TO ASK MY LAW CLERK TO LEAVE EARLY AND HOPEFULLY LISTEN TO A RECORDING OF WHAT SHE MISSES LATER. IF WE START AT 3:30, I THINK IN ABOUT AN HOUR, HOUR AND A HALF, WE WILL HOPEFULLY KNOCK THIS OUT, ESPECIALLY IF I HAVE YOUR WRITTEN SUBMISSIONS TOMORROW MORNING. SO, HOW DOES THAT SOUND?

MR. SCHOOLS, DO YOU ANTICIPATE A LOT OF PROBLEMS WITH THE CHARGE BASED ON WHAT YOU HAVE SEEN?

MR. SCHOOLS: OUR ONLY PROBLEM WILL BE WITH THE MITIGATING FACTORS.

THE COURT: YOU STILL HAVE SOME PROBLEMS WITH THE WAY I BOILED THEM OUT?

MR. SCHOOLS: I HAVEN'T HAD A CHANCE TO LOOK AT THEM. MR. DUANE LOOKED AT THEM AND SAYS WE HAVE A FEW PROBLEMS, BUT

NOT A LOT.

THE COURT:   THAT IS FINE.   THAT IS FINE.

WHAT ABOUT FROM THE DEFENDANT? SOME OF YOUR OBJECTIONS WERE REPEATS OF WHAT WAS ARGUED THE FIRST TIME.   AND I DON'T CONSIDER MYSELF WED TO WHAT I DID EARLIER,  BUT WE START OFF WITH A PRESUMPTION THAT WHAT I DID EARLIER IS WHAT I OUGHT TO GIVE THIS TIME.

FOR EXAMPLE,  THE DEFENDANT WANTED THE WORD PERSONALLY INSERTED IN THE CARJACKING AND KIDNAPPING.  I THINK I CAREFULLY CONSIDERED THAT LAST TIME AND DECIDED IT WASN'T IN THE STATUTE AND THERE WAS NO BASIS FOR PUTTING IT IN.   I WILL BE GLAD TO HEAR FROM YOU ON THAT AND ANYTHING ELSE.

MR. HARRIS:  JUDGE, AS IS THE CASE WITH A LOT OF THE MATTERS THAT HAVE COME BEFORE YOU, BOTH ON EVIDENCE AND CHARGES,  WE HAVE ADOPTED A LOT OF WHAT THE PREVIOUS RULINGS WERE.   WE RECOGNIZE THAT YOU RULED ON A LOT OF THOSE.   WE WOULD JUST ASK THAT THOSE ARGUMENTS BE INCORPORATED INTO OUR RECORD IN REGARD TO THOSE REQUESTS THAT YOU ARE INDICATING. WE SUBMITTED A LOT OF CHARGES WE KNEW THAT YOU RULED ON PREVIOUSLY.   WE JUST WANT TO PRESERVE THOSE FOR MR. BASHAM.

THE COURT:   NOW, THE COPY YOU GAVE ME, I HAVE CUT AND PASTED WITH.   I ASSUME YOU GAVE THE CLERK ANOTHER COPY TO KEEP FOR THE RECORD.

MR. HARRIS:  WE FILED ONE WITH THE CLERK'S OFFICE.

THE COURT:   ALL RIGHT.   SO, YOUR REQUESTS, A HARD

COPY OF YOUR REQUEST IS IN THE RECORD?

MR. HARRIS: OH, ABSOLUTELY.

THE COURT: OF EVERYTHING YOU ASKED FOR. I WILL SAY RIGHT NOW, WHATEVER I DON'T GIVE THAT IS IN YOUR REQUEST, YOU HAVE DULY NOTED YOUR EXCEPTION TO.

MR. HARRIS: THE ONLY THING I HAVEN'T LOOKED AT, DID YOU BREAK DOWN -- THERE WAS ONE AREA THAT WE DISCUSSED INFORMALLY I THINK REGARDING HIM BEING ON DRUGS, HIM NOT BEING ON MEDICATIONS.

THE COURT: I THOUGHT THAT WAS ONE THAT DESERVED TO BE BROKEN DOWN INTO THREE SEPARATE MITIGATORS.

MR. HARRIS: CERTAINLY, WE BELIEVE IT SHOULD.

THE COURT: LET ME SAY. THERE WERE -- I THINK WE BOILED IT DOWN TO A LOW OF 22. THEN AFTER I EXPRESSED MY CONCERN THE DAY BEFORE YESTERDAY THAT SOME OF THEM MIGHT JUSTIFY INDEPENDENT LISTINGS, I THINK EVEN MR. SCHOOLS AGREED ON THE ONES THAT YOU JUST MENTIONED THAT THEY DESERVED SEPARATE LISTING. WE BROKE THOSE OUT, AND THERE WERE TWO OR THREE OTHERS MAYBE THAT WE WENT BACK AND BROKE OUT SEPARATELY. SOME OF THEM WE LEFT GROUPED TOGETHER BECAUSE WE FELT THEY JUST BELONGED TOGETHER.

MR. HARRIS: CAN I GET THAT FROM KRIS BEFORE, OR IS IT IN THE LATEST ROUND WE GOT?

THE COURT: IT IS IN WHAT YOU GOT. THE VERSION -- DIDN'T WE GO FROM 22 TO 27, 28 OR SOMETHING?

I THINK WE WENT UP FROM 22 TO 28 OR 30 OR SOMETHING.  27.

MR. HARRIS:  I DON'T THINK THERE IS A LOT LEFT TO DISCUSS, TO ANSWER YOUR QUESTION.

THE COURT:  I AM NOT TRYING TO TALK ANYBODY OUT OF OBJECTING.  I AM JUST TRYING TO GET SOME GAUGE OF HOW MUCH A DISPUTE THERE WILL BE.  I WANT TO MAKE IT CLEAR TO THE DEFENDANT, YOU WILL BE FULLY PROTECTED ON APPEAL, EVEN IF YOU DON'T MAKE ANY STRONG ARGUMENTS OR ANY ARGUMENTS WITH THE MATTERS YOU HAVE PUT HERE IN THE RECORD WITH THE REQUEST.

MR. HARRIS:  I DON'T THINK THERE WILL BE A VERY LONG DISCUSSION TOMORROW AFTERNOON.

THE COURT:  IF YOU COULD HELP ME BY GETTING THAT TO ME IN WRITING BY TOMORROW AFTERNOON.  NOT JUST SUBSTANTIVE MATTERS, BUT IF YOU SEE ANY TECHNICAL TYPOGRAPHICAL ERRORS, GENDER PROBLEMS, SINGULAR OR PLURAL, YOU CAN JUST GO AHEAD AND MARK THEM WHILE YOU ARE LOOKING AT IT.  IT WOULD HELP US BECAUSE THOSE THINGS ALWAYS COME UP SOONER OR LATER.

MR. HARRIS:  YES, SIR.

THE COURT:  ALL RIGHT.  ANYTHING ELSE? WHAT DOES IT LOOK LIKE, THIS IS YOUR LAST WITNESS?

MR. HARRIS:  YES, SIR,  IT IS.

THE COURT:  HOW FAR WILL WE GET WITH DR. CAPEHART TODAY, DO YOU THINK?

MR. SCHOOLS:  JUDGE, IT WOULD BE MY DESIRE WE FINISH HIM.  I WILL TRY NOT TO TAKE MORE THAN ABOUT ONE AND A HALF

TO TWO HOURS ON DIRECT, THEN HE WILL BE ON CROSS. WE HAVE ONE OTHER VERY SHORT WITNESS WHO WE WILL CALL, WILL BE A 15 TO 20-MINUTE WITNESS.

THE COURT: WE COULD FINISH TODAY, IN OTHER WORDS.

MR. HARRIS: THE ONLY OTHER MATTER I DO WANT TO BRING THE COURT'S ATTENTION, IT SLIPPED, WE ARE IN THE PROCESS OF POTENTIALLY TAPING MS. BASHAM, BRANDON'S MOTHER, TO ASK FOR MERCY. SHE CURRENTLY IS INTUBATED, AND I DON'T THINK SHE CAN SPEAK, AND HASN'T BEEN ABLE TO SPEAK FOR ABOUT THREE DAYS, SO WE HAVE NOT BEEN ABLE TO DO THAT. WE ARE MAKING EVERY EFFORT POSSIBLE. SHE WAS NOT SUPPOSED TO BE INTUBATED TODAY. WE WERE GOING TO DO THAT TODAY, I DON'T KNOW THAT IT HAS HAPPENED, YOUR HONOR. I DIDN'T WANT THE COURT TO BE MISINFORMED. IF SHE IS ABLE TO BE VIDEOTAPED, WE MAY HAVE A THREE-MINUTE VIDEO TO PLAY FOR THE JURY, AND THAT WOULD BE OUR LAST WITNESS.

THE COURT: HER TESTIMONY WOULD RELATE TO WHAT NOW?

MR. HARRIS: MERCY.

THE COURT: WELL, SHE WASN'T LISTED ON THE EXHIBIT LIST -- ON THE WITNESS LIST, RIGHT?

MR. HARRIS: SHE WAS NOT LISTED ON THE WITNESS LIST. THE WITNESS LIST THAT WE PROVIDED TO THE JURY FOR PURPOSES OF VOIR DIRE DID NOT REQUIRE US TO LIST OUT-OF-TOWN WITNESSES. IT MERELY REQUIRED US TO LIST IN-TOWN WITNESSES, AS WELL AS ANY OUT-OF-TOWN WITNESSES THAT WERE GOING TO TESTIFY AS

EXPERTS.

THE COURT: MR. SCHOOLS.

MR. SCHOOLS: I HAVE STRONG OBJECTION TO THAT, YOUR HONOR. FIRST OF ALL, WE ARE NOT THERE. SHE IS NOT ENTITLED TO TESTIFY WITHOUT BEING UNDER OATH. SECOND OF ALL, HER TESTIMONY IN THIS CASE, IF IT WERE PROFFERED, IT WOULD POTENTIALLY BE EXTREMELY IMPORTANT TO THIS JURY'S EVALUATION OF THIS WHOLE CASE.

THE COURT: SHE HAS BEEN KICKED ON AND DUMPED ON A GOOD BIT DURING THIS TRIAL.

MR. SCHOOLS: SHE HAS GOT SKID MARKS ON HER BACK, JUDGE. SO, I THINK, I THINK THAT FOR HER TO BE ABLE TO MAKE A STATEMENT WITHOUT BEING UNDER OATH, GIVEN THE CRITICAL NATURE OF THE ROLE SHE HAS PLAYED IN THE MITIGATION CASE, IS HIGHLY PREJUDICIAL.

IN ADDITION, SHE WAS HERE LAST WEEK, AND SHE WAS NOT IN INTENSIVE CARE. SHE WAS OUTSIDE IN THE HALL, I SAW HER. AND THE DEFENDANTS COULD HAVE, IF THEY HAD CHOSEN, CALLED HER AS A WITNESS LAST WEEK WHEN HER HEALTH WARRANTED HER BEING ABLE TO TESTIFY. I DON'T THINK HER -- THE HEALTH CONDITION HAS GOT HER -- IT IS NOT A NEW CONDITION. I AM AWARE SHE HAS BEEN SICK FOR SOME TIME, AND THIS WAS AN ONGOING PROBLEM. BUT I THINK, YOU KNOW, BY WAITING, THE DEFENDANTS HAVE NOW ASKED THE COURT TO GIVE THE DEFENDANT THE BENEFIT OF THE JURY SEEING A VIDEOTAPE OF HIS MOTHER IN INTENSIVE CARE ASKING FOR MERCY.

YOU CAN'T PUT DOLLARS ON THAT, JUDGE.  THAT IS SO PREJUDICIAL, THERE IS JUST NO REMEDY.  THERE IS NOTHING WE CAN DO TO COUNTERACT THAT.  WE CAN'T EVEN ASK HER A QUESTION.

MR. HARRIS:  MY RESPONSE TO THAT, JUDGE, IS HE JUST MADE MY POINT.  UNDER 804, SHE IS CLEARLY UNAVAILABLE.  SHE WAS AVAILABLE LAST WEEK.  WE COULD BRING IN ANY NUMBER OF DOCTORS TO TELL THE COURT THAT SHE IS UNAVAILABLE AND, THEREFORE, THAT WOULD REMEDY ANY OF THE PROBLEMS MR. SCHOOLS HAS WITH HER TESTIFYING -- MANY OF THE PROBLEMS MR. SCHOOLS HAS WITH HER TESTIFYING.

THE COURT:  I GUESS MY CONCERN IS THAT SO MUCH HAS BEEN SAID ABOUT HER THAT THE GOVERNMENT MIGHT WANT TO EXPLORE WHETHER SHE ADMITS OR DENIES SOME OF THESE THINGS THAT HAVE BEEN SAID ABOUT HER A LONG TIME AGO.

MR. HARRIS:  JUDGE, IF SHE ONLY ASKS FOR MERCY, WHAT WOULD THAT BE PROBATIVE TO? WHAT WOULD THAT BE RESPONSIVE TO? THERE ARE SEVERAL WITNESSES THE GOVERNMENT HAD FROM BUTNER WHO HAD KNOWLEDGE OF THE INNER WORKINGS OF THE DEPARTMENT OF JUSTICE AND THE HOUSING OF PRISONERS.  WE WERE NOT ALLOWED TO GO INTO THAT BECAUSE THAT WAS NOT RESPONSIVE TO THE INQUIRY THE GOVERNMENT WENT INTO.  IT WOULD BE SIMILAR HERE.  WE MERELY WOULD ASK THAT MS. BASHAM BE ALLOWED TO REQUEST MERCY. A MOTHER REQUESTING MERCY HAS NOTHING TO DO WITH WHETHER SHE IS A BAD MOTHER, WHETHER SHE IS A GOOD MOTHER.  WHETHER SHE IS ON DRUGS OR NOT ON DRUGS.  WHETHER SHE RAISED HIM AS A GOOD

SON OR BAD SON. IT WOULD MERELY BE A MOTHER ASKING FOR MERCY. THAT WOULD BE THE INTENT OF THE EVIDENCE THAT WE ARE OFFERING IF SHE IS AVAILABLE TO MAKE THAT.

THE COURT: IS THE FATHER STILL NOT GOING TO TESTIFY?

MR. HARRIS: NO, SIR.

THE COURT: SEE, THE GOVERNMENT IS GOING TO SAY, WELL, YOU DIDN'T PLAN TO CALL EITHER PARENT UNTIL ONE OF THEM WENT TO THE HOSPITAL. AND THEN THE CIRCUMSTANCES ARE SUCH NOW IT IS ADVANTAGEOUS TO EVOKE THE SYMPATHY. SO, YOU REVERSE GEARS TO CALL THE ONE PARENT IN THE HOSPITAL AND NOT THE OTHER.

MR. HARRIS: THEY CAN ARGUE THAT TO THE JURY, JUDGE. I DON'T THINK THEY SHOULD BE ARGUING IT TO THE COURT. THAT GOES TO WEIGHT. IT DOESN'T GO TO ADMISSIBILITY.

THE COURT: HOLD ON ONE SECOND.

I AM SHOWING MY IGNORANCE HERE. THERE IS LAW THAT ALLOWS A FAMILY MEMBER OF THE DEFENDNAT TO COME IN AND SIMPLY ASK FOR MERCY.

MR. HARRIS: THAT IS ALL THEY CAN ASK FOR.

MR. SCHOOLS: THEY HAVE TO TESTIFY. THE DEFENDANT CAN'T EVEN DO THAT. THE LAW IS, THE DEFENDANT DOES NOT EVEN HAVE A RIGHT TO ALLOCUTE WITHOUT BEING UNDER OATH. IF THERE IS A CASE OUT THERE THAT MR. HARRIS KNOWS OF WHERE A COURT HAS SAID THAT A DEFENDANT'S FAMILY HAS A RIGHT IN A DEATH PENALTY

TRIAL TO ASK FOR MERCY AND NOT BE UNDER OATH, I THINK HE NEEDS TO SHOW IT TO THE COURT, BECAUSE I DON'T THINK IT IS THERE.

MR. HARRIS: UNDER 804 EXCEPTION. AGAIN, WE ARE NOT TALKING ABOUT THE RULES OF EVIDENCE. CLEARLY, 804 SPEAKS TO THIS VERY SITUATION.

THE COURT: LET ME THINK ABOUT IT OVER LUNCH. YOU DON'T NEED TO MAKE ANY PREPARATION RIGHT NOW TO DO IT, OR DO YOU?

MR. HARRIS: QUITE FRANKLY, JUDGE, WE HAVE BEEN WAITING FOR HER TO BE ABLE TO MAKE A STATEMENT. SHE HAS NOT BEEN ABLE. THIS MAY BE A MOOT POINT BY THIS AFTERNOON. WE WILL CHECK ON IT OVER LUNCH.

THE COURT: IT MAY BE. LET ME TAKE IT UNDER ADVISEMENT. WE WILL REVISIT IT AFTER LUNCH.

MR. GASSER: JUDGE, ONE POINT ON THAT. MR. HARRIS KEEPS CITING 804. IF THEY WANTED TO CALL PAIGE TO TAKE THE WITNESS STAND TO SAY SHE HAS INTERVIEWED THE MOTHER, AND THE MOTHER, IF SHE COULD, SHE IS UNAVAILABLE, THE MOTHER WOULD ASK FOR MERCY, THAT IS FROM 804. HE KEEPS CITING 804. 804 IS GETTING IN A HEARSAY STATEMENT FROM ANOTHER WITNESS. NOT HAVING THE UNAVAILABLE WITNESS ACTUALLY GIVE THE TESTIMONY.

THE COURT: YOU ARE RIGHT ABOUT THAT.

ALL RIGHT. WE WILL SEE YOU AT 1:00 O'CLOCK

(WHEREUPON, A LUNCH RECESS WAS HELD.)

THE COURT: PLEASE BRING IN THE JURY. YOU MAY CONTINUE YOUR CROSS-EXAMINATION, MR. SCHOOLS.

MR. SCHOOLS: THANK YOU, YOUR HONOR.

BY MR. SCHOOLS:

Q. DR. SCHWARTZ-WATTS, BEFORE WE BROKE, I WAS ASKING YOU ABOUT YOUR TESTIMONY THAT MR. BASHAM, I BELIEVE, HAS A DEPENDENCY ON OLDER, HIGHER-FUNCTIONING MALES, CORRECT?

A. CORRECT.

Q. AND I ASKED YOU WHETHER YOU WERE AWARE THAT MR. FULKS HAD MADE AN EFFORT TO ESCAPE FROM COLUMBIA CARE WHILE HE WAS ARRESTED ON THE SAME CHARGES THAT MR. BASHAM IS INVOLVED IN HERE.

A. CORRECT. AND I WAS NOT AWARE OF THAT.

Q. AND YOU, I THINK, HAD INDICATED YOU HAD NOT SEEN ANY OF THE EVIDENCE FROM THAT ESCAPE?

A. CORRECT.

Q. LET ME SHOW YOU WHAT IS MARKED AS GOVERNMENT'S EXHIBIT 401. I THINK, BY STIPULATION WITH THE DEFENDANTS, WE AGREE IT IS A ROPE THAT WAS RETRIEVED IN CONNECTION WITH THE ESCAPE ATTEMPT MR. FULKS MADE AT THE COLUMBIA CARE FACILITY.

A. OKAY.

Q. YOU HAVE NEVER SEEN THIS BEFORE?

A. NO, SIR. MAY I STAND?

Q. I WILL SPREAD IT OUT AND LET YOU COME TAKE A LOOK. WILL YOU HOLD THAT END? THIS IS THE ROPE, GOVERNMENT'S 401,

THAT WAS RETRIEVED IN CONNECTION WITH THE INVESTIGATION OF MR. FULKS'S ESCAPE ATTEMPT.  YOU HAVE NEVER SEEN THAT BEFORE?

A.    NO, SIR.

Q.    IT APPEARS TO BE,  YOU MAY NEED TO TAKE A LITTLE LONGER LOOK, BUT IT APPEARS TO BE A SINGLE BEDSPREAD CUT INTO A LONG ROPE?

A.    YES, SIR,  IT CERTAINLY APPEARS THAT WAY TO ME.

Q.    AND, DR. SCHWARTZ-WATTS,  I BELIEVE YOU HAVE SEEN AND DID TALK ABOUT GOVERNMENT'S EXHIBIT 459, WHICH IS THE ROPE THAT MR. BASHAM MADE WHILE HE WAS IN COLUMBIA CARE?

A.    YES, SIR.

Q.    GOVERNMENT'S EXHIBIT 459, I BELIEVE IT IS, YOU HAVE SEEN THAT BEFORE?

A.    YES, SIR.

Q.    NOW, THIS GOVERNMENT'S EXHIBIT 459, YOU DESCRIBED IT ON YOUR DIRECT EXAMINATION AS A BUNCH OF BED SHEETS THAT ARE TWISTED TOGETHER, AND TIED TOGETHER, AND MADE INTO A ROPE?

A.    YES.  TWO SEPARATE STRANDS THAT ARE TWISTED,  THEN TWISTED UPON EACH OTHER, KNOTTED,  YES.

Q.    YOU ARE AWARE,  AREN'T YOU, DOCTOR,  THAT IN ORDER TO MAKE SUCH A ROPE IN A PRISON SETTING, ONE THING YOU HAVE TO DO IS YOU HAVE TO GATHER THE MATERIALS?

A.    SURE.

Q.    AND YOU CAN'T JUST GO TO THE COMMISSARY OR GO TO THE SERGEANT AT THE CELL AND SAY,  SARGE,  CAN I GET 20 SHEETS TO

MAKE A ROPE WITH?

A.    CORRECT.

Q.    YOU HAVE TO FIGURE OUT A WAY TO GATHER THE MATERIAL?

A.    CERTAINLY.

Q.    IN ANTICIPATION OF MAKING A ROPE?

A.    ABSOLUTELY.

Q.    AND THEN, AS YOU GATHER MATERIALS, YOU ARE PROBABLY GOING TO GATHER THEM IN A PRISON SETTING OVER A PERIOD OF TIME?

A.    I THINK THAT WOULD BE FAIR TO SAY.

Q.    AND YOU CAN'T JUST LEAVE A ROPE LAYING AROUND YOUR PRISON CELL IN THE PRISON?

A.    THAT WOULD NOT BE A VERY GOOD IDEA.

Q.    SO, WHILE YOU ARE IN THE PROCESS OF MAKING A ROPE, YOU GOT TO HIDE IT?

A.    CORRECT.

Q.    IN A PRISON CELL?

A.    SURE.

Q.    AND FINDING HIDING PLACES IN PRISON CELLS CAN BE SORT OF CHALLENGING?

A.    FOR SOME, YES.

Q.    AND IN THE PRISON SETTING, THE ATTENTION TO MAKING SUCH A ROPE, TO BE ABLE TO MAKE SUCH A ROPE, IT IS GOING TO TAKE A LITTLE WHILE, WON'T IT?

A.    DEPENDING UPON YOUR SKILL, SURE.  BUT I WOULDN'T

IMAGINE THAT WOULD BE SOMETHING THAT COULD BE DONE WITHIN AN HOUR.

Q.    RIGHT.    AND BECAUSE OF THE ABILITY OF NEED TO COLLECT MATERIALS, AND TO COLLECT ITEMS THAT YOU COULD USE TO MAKE THE ROPE, IT IS JUST GOING TO TAKE A LITTLE WHILE, A LITTLE PLANNING, AND A LITTLE EFFORT?

A.    SURE.

Q.    A LITTLE ATTENTION?

A.    SURE.

Q.    A LITTLE CREATIVITY?

A.    SURE.

Q.    NOW, TO MAKE A ROPE SUCH AS THIS ONE OUT OF A SINGLE BEDSPREAD, WOULD TAKE SIGNIFICANTLY LESS PLANNING, WOULDN'T IT?

A.    YES.

Q.    YOU DON'T HAVE TO SPEND THE TIME ACCUMULATING THE MATERIAL?

A.    CORRECT.  PRESUMING THAT EACH ONE IS ONE, CORRECT, YES.

Q.    YOU DON'T HAVE TO HIDE IT?

A.    WELL, IF IT IS KNOTTED, YOU ARE PROBABLY -- AND TIED IT, AT THAT POINT, YOU PROBABLY BETTER HIDE IT.  BUT IN TERMS OF IT JUST BEING A BEDSPREAD, ITSELF, ONE BEDSPREAD, THAT IS CORRECT, YOU DON'T NEED TO CONCEAL IT.

Q.    YOU DON'T NEED TO CONCEAL IT OVER A PERIOD OF TIME TO

MAKE IT?

A.    CORRECT.

Q.    AND THE ROPE THAT IS GOVERNMENT'S EXHIBIT 401 WAS MADE, BASED ON THE STIPULATION, BY CHAD FULKS, RIGHT?

A.    YES.

Q.    AND THE ROPE THAT IS GOVERNMENT'S EXHIBIT 459, WAS MADE BY BRANDON BASHAM?

A.    CORRECT.

Q.    YOU ARE AWARE, I BELIEVE, DR. SCHWARTZ-WATTS, THAT IN HIS CLOSING ARGUMENT IN THE GUILT PHASE, MR. SWERLING TOLD THIS JURY THERE IS NO QUESTION ABOUT IT. THERE IS A RING THAT BELONGED TO SAMANTHA BURNS THAT BRANDON BASHAM HAD THE NEXT DAY.

A.    ABSOLUTELY.

Q.    AND BRANDON BASHAM HAD THAT RING SIX DAYS LATER?

A.    I WOULDN'T CONTEST THAT. I DON'T KNOW HOW MANY DAYS, BUT, YES, I AM AWARE OF THAT.

Q.    THERE IS NO QUESTION THAT ON NOVEMBER 17TH, 2002, BRANDON BASHAM HAD IN HIS POSSESSION ALICE DONOVAN'S KNIFE?

A.    THAT IS MY UNDERSTANDING, YES.

Q.    THOSE ARE TROPHIES?

A.    YES.

        MR. SCHOOLS: THANK YOU, DR. SCHWARTZ-WATTS. I APPRECIATE YOUR PATIENCE.

        THE WITNESS: YOU'RE WELCOME. IT HAS BEEN A

PLEASURE TO WORK WITH YOU, MR. SCHOOLS, TOO.

THE COURT: MR. SWERLING, REDIRECT.

MR. SWERLING: JUST A FEW QUESTIONS.

REDIRECT EXAM

BY MR. SWERLING:

Q. DR. WATTS, MR. SCHOOLS KEEPS REFERRING TO A TEAM. WHEN LAWYERS ARE APPOINTED A DEATH PENALTY CASE OR GET INVOLVED IN A DEATH PENALTY CASE, DO THEY, IN YOUR EXPERIENCE, DO THEY NORMALLY CONTACT CERTAIN FORENSIC EXPERTS TO ASSIST THEM IN PRESENTING THE CASE TO THE JURY?

A. SURE.

Q. AND HAS THAT BEEN YOUR EXPERIENCE THROUGHOUT YOUR CAREER AS A PSYCHIATRIST?

A. YES. MOST OF THE ATTORNEYS THAT HAVE HAD EXPERIENCE DOING THAT, THAT WOULD BE THEIR METHODOLOGY. SOMETIMES IT DOESN'T HAPPEN IN SOME PARTS OF THE STATE, BUT, USUALLY, THAT IS WHAT HAPPENS.

Q. WOULD YOU BE SURPRISED IF A LAWYER DID NOT REACH OUT FOR THE BEST FORENSIC EXPERTS HE COULD FIND?

A. YES.

Q. AND YOU WOULDN'T EXPECT THAT, WOULD YOU, THAT HE WOULDN'T TRY TO FIND THE BEST FORENSIC EXPERTS --

A. NOT OUT OF YOU.

Q. -- THAT HE COULD FIND?

A. NOT OUT OF YOU.

Q.   IS THERE ANYTHING SINISTER ABOUT THAT IN TRYING TO GET THE BEST PEOPLE YOU CAN TO MAKE A PRESENTATION TO THE JURY?

A.   NOT AT ALL.

Q.   THE DEFENDANT, WHEN HE IS APPOINTED LAWYERS AND EXPERTS ARE MADE AVAILABLE, THAT IS THE ONLY WAY TO ACTUALLY PRESENT HIS STORY TO THE JURY FROM A HISTORICAL STANDPOINT AND AN EXPERT STANDPOINT IN OPINIONS, CORRECT?

A.   CORRECT.

Q.   IN THIS PARTICULAR CASE, THERE ARE -- OR WOULD YOU AGREE, THAT THERE ARE PROBABLY 12 TO 13 INSTITUTIONS THAT MR. BASHAM HAS EITHER RESIDED AT, BEEN TREATED AT, OR COMMITTED TO DURING THE COURSE OF HIS LIFE SINCE 1991?

A.   YES.

Q.   SO, HE WAS TEN YEARS OLD WHEN HE WAS FIRST TREATED AT A PSYCHIATRIC FACILITY?

A.   YES.

Q.   AND YOU HAVE EXAMINED THOUSANDS OF PAGES OF MEDICAL RECORDS, CORRECT?

A.   YES.

Q.   AND EVERY TIME YOU ARE FURNISHED A MEDICAL RECORD BY US, IT WAS UP TO US TO GATHER THAT, CORRECT?

A.   CORRECT.

Q.   THROUGH SUBPOENA --

A.   RIGHT.

Q.   -- POWER.  EVERY TIME WE COLLECTED ANY MEDICAL

RECORDS, YOU WERE SENT A COPY, CORRECT?

A. YES.

Q. AND WHEN YOU WERE SENT A COPY, WASN'T BUTNER CORRECTIONAL INSTITUTE, WHO WAS PERFORMING A FORENSIC EVALUATION, WEREN'T THEY ALSO SENT A COPY?

A. THAT WAS MY UNDERSTANDING. AND IN REVIEWING DR. CAPEHART'S REPORTS, IT LOOKS LIKE HE HAS RELIED ON ALL THE SAME MEDICAL DOCUMENTS THAT I HAVE HAD ACCESS TO.

Q. SO, WHATEVER WAS SENT TO YOU OVER THE COURSE OF THE LAST YEAR WHEN IT STARTED COMING IN IN JANUARY 2004, WAS ALSO FORWARDED TO THE DOCTORS AT BUTNER?

A. AS FAR AS I KNOW, THAT IS CORRECT, YES.

Q. THEY HAD THE SAME MATERIALS TO VIEW, CORRECT?

A. YES. AND, AGAIN, I HAVE A COPY OF DR. CAPEHART'S REPORT WHERE HE KINDLY LISTS HIS SOURCES, AND IT LOOKS LIKE WE HAVE RELIED ON THE SAME MEDICAL AND PSYCHIATRIC DATA.

Q. IS A LAWYER, FROM YOUR UNDERSTANDING, IS A LAWYER QUALIFIED TO GO THROUGH THOSE MEDICAL RECORDS AND MAKE ASSESSMENTS AS TO WHAT IT ALL MEANS?

A. YOU MIGHT COULD TRY, BUT I THINK IT WOULD BE VERY DIFFICULT. THERE ARE A LOT OF MEDICAL TERMS THERE. THERE IS A LOT OF MEDICAL KNOWLEDGE IN ALL THOSE VOLUMES OF BOOKS.

Q. OVER THOSE 12 TO 13 INSTITUTIONS, JUST A GUESS, IF YOU WOULD, HOW MANY PSYCHIATRISTS, PSYCHOLOGISTS DO YOU THINK BRANDON BASHAM HAS BEEN SEEN BY? A COUPLE DOZEN. IS

THAT A FAIR?

A.    I WAS GOING TO SAY SOMEWHERE AROUND 30 OR HIGHER.

Q.    AND WOULD YOU EXPECT A LAWYER TO CONTACT A FORENSIC PSYCHIATRIST TO GO AHEAD AND VIEW THOSE RECORDS AND --

A.    ABSOLUTELY.

Q.    -- TO PRESENT THEM TO A JURY, INTERPRET THEM FOR A JURY ON BEHALF OF A DEFENDANT?

A.    ABSOLUTELY.

Q.    NOW, YOU AND I, WE HAVE WORKED TOGETHER BEFORE?

A.    YES.

Q.    AND THERE HAVE BEEN CASES, AS I THINK YOU SAID TO MR. SCHOOLS, WHERE YOU HAVE NOT BEEN ASKED TO TESTIFY AFTER YOU HAVE DONE AN EVALUATION?

A.    THAT'S CORRECT.

Q.    BECAUSE YOU COULD NOT ASSIST IN ANY WAY THE LAWYER WHO WAS ASKING YOU TO MAKE THE PRESENTATION?

A.    THAT'S CORRECT.  EVEN YOU.

Q.    BASICALLY, YOU CALL THEM AS YOU SEE THEM?

A.    YES.

Q.    YOU ARE ALSO A TEACHER?

A.    YES.

Q.    AND YOU ARE EMPLOYED BY THE UNIVERSITY OF SOUTH CAROLINA SCHOOL OF MEDICINE?

A.    YES.

Q.    AND IF SOMEONE WERE TO CONTACT YOU TO HELP THEM CONDUCT

**JA 2280**

A FORENSIC EVALUATION OF A PARTICULAR PERSON WITH THE MEDICAL COLLATERAL THAT MR. BASHAM HAS, WOULD IT BE EXPECTED THAT YOU WOULD ALSO GO AHEAD AND CONSULT WITH OTHER EXPERTS, AS WELL?

A.    YES.   ABSOLUTELY.   THAT IS PART OF WHAT WE DO.

Q.    AND DO YOU DO THAT?

A.    YES, WHEN IT IS NEEDED.  IF I NEED A CONSULTATION, IF I CAN'T MAKE A DIAGNOSIS OF SOMEONE, BASED ON THE MEDICAL RECORDS, AND MY OWN INTERVIEW, AND MY OWN EVALUATION, I WILL NEED A CONSULTANT.

Q.    AND IN THIS PARTICULAR CASE, AS FAR AS THE MEDICAL ISSUES ARE CONCERNED, THE LAWYER RELIES ON YOU, CORRECT?

A.    ABSOLUTELY.

Q.    AS FAR AS MEDICAL ISSUES?

A.    SURE.

Q.    AND YOU, IN THIS PARTICULAR CASE, YOU SAID YOU NEEDED A NEUROLOGIST.  YOU WANTED A NEUROLOGIST INVOLVED IN THIS CASE; IS THAT CORRECT?

A.    YES.

Q.    AND WHO IS THE BEST NEUROLOGIST YOU KNOW ANYWHERE?

A.    CLEARLY, DR. BILL BRANNON, WITHOUT A DOUBT.

Q.    AND DOES DR. BRANNON GET INVOLVED IN THESE KINDS OF CASES?

A.    NO.   NOT ROUTINELY.

Q.    HOW MANY CASES HAS DR. BRANNON EVER TESTIFIED IN IN A CRIMINAL MATTER, AS FAR AS YOU KNOW?

A.    I KNOW HE HAS TESTIFIED FOR THE PROSECUTION IN SOME CASES.

Q.    FOR THE PROSECUTION?

A.    YES.    NOT VERY MANY,  THOUGH.

Q.    AND YOU HAVE CONFIDENCE IN DR. BRANNON.  APPARENTLY, THE UNITED STATES GOVERNMENT DID,  AS WELL?

A.    I ABSOLUTELY.   YOU HAVE MET DR. BRANNON.  NO ONE WILL TELL HIM WHAT TO DO.   HE IS PRETTY SMART, AND HE IS VERY SURE OF HIMSELF.   AND IF I MAY, THE REASONS I CHOSE DR. BRANNON IS, I KNOW -- I NEED THE BOTTOM LINE.  AND IF -- I KNOW, IF HE TELLS ME SOMEBODY HAS AN ABNORMAL NEUROLOGIC EXAM, I KNOW THEY DO.

Q.    DR. BRANNON WAS A NEUROLOGIST AT THE NAVAL HOSPITAL, CORRECT?

A.    YES.

Q.    WE HAVE ALREADY GONE THROUGH,  HE HAS TREATED SENATORS, PRESIDENTS,  GENERALS,  ALL THE WAY DOWN, FROM ANY KIND OF POSSIBLE WALK OF LIFE,  RIGHT?

A.    YES,  HE HAS.

Q.    NOW,  HE IS ALSO EMPLOYED BY THE UNIVERSITY OF SOUTH CAROLINA --

A.    YES.

Q.    -- MEDICAL SCHOOL,  CORRECT?

A.    YES.

Q.    NOW,  YOU ALSO DECIDED THAT YOU THOUGHT YOU NEEDED A

NEUROPSYCHOLOGIST?

A.    YES.

Q.    AND WHAT REASON WAS THAT?

A.    BECAUSE I KNEW VERY EARLY ON, IT WAS VERY CLEAR AFTER THE FIRST FEW TIMES THAT I SAW MR. BASHAM, THAT I NOTICED THAT HE DIDN'T HAVE THE ABILITY TO PROCESS INFORMATION.  THOSE WERE SIGNS TO ME THAT HE WAS BRAIN DAMAGED.  IT WAS VERY CLEAR, FROM MY INTERVIEWS WITH HIM, THAT HE WAS SUFFERING SOME KIND OF BRAIN DISORDER, AND I NEEDED A CLARIFICATION OF WHAT THAT WAS.

Q.    AND WHO IS THE BEST NEUROPSYCHOLOGIST YOU KNOW OF?

A.    WITHOUT A DOUBT, DR. TORA BRAWLEY.

Q.    HAVE YOU WORKED WITH DR. BRAWLEY BEFORE, AND KNOW THE QUALITY OF HER WORK?

A.    ABSOLUTELY.  IF I EVER LEAVE THE UNIVERSITY AND GO INTO PRIVATE PRACTICE, I WOULD LOVE TO HIRE HER WITH ME.  SHE IS EXCELLENT.

Q.    SHE IS ALSO EMPLOYED AND HAS BEEN EMPLOYED BY THE UNIVERSITY OF SOUTH CAROLINA SCHOOL OF MEDICINE?

A.    ACTUALLY, SOMEWHAT.  SHE IS A CONTRACT --

Q.    NOT RIGHT NOW?

A.    -- CONTRACT EMPLOYEE.  SHE HAS BEEN EMPLOYED BY THE DEPARTMENT OF MENTAL HEALTH, IN THE PAST.

Q.    DEPARTMENT OF MENTAL HEALTH?

A.    SHE HAS A CLINICAL APPOINTMENT THERE.  HER PRACTICE

GOES WITH THE UNIVERSITY.  BUT SHE IS NOT A FULL-TIME EMPLOYEE OF THE UNIVERSITY.

Q.   AND BOTH OF THOSE WITNESSES HAVE COME IN THIS COURTROOM AND TESTIFIED, CORRECT?

A.   YES.

Q.   BOTH OF THEM HAVE BEEN SUBJECTED TO CROSS-EXAMINATION?

A.   YES.

Q.   AS FAR AS YOU KNOW?

A.   YES.

Q.   DID YOU RELY ON WHAT BOTH OF THEM TOLD YOU?

A.   ABSOLUTELY.

Q.   IN MAKING YOUR ASSESSMENT?

A.   ABSOLUTELY.

Q.   THAT IS THE TEAM THAT WAS PUT TOGETHER, CORRECT?

A.   YES.

Q.   WHEN YOU WERE INVOLVED IN THIS CASE, YOU SAID THERE WERE SOME DISCUSSIONS EARLY ON ABOUT WHAT TESTS TO DO. DR. BRANNON RECOMMENDED SOME TESTS, AND THERE WAS SOME DISCUSSION ABOUT SOME TESTS?

A.   YES.

Q.   ONE OF THEM WAS THE MRI?

A.   CORRECT.

Q.   WAS THERE A DISCUSSION ABOUT WHETHER OR NOT BUTNER WOULD EVENTUALLY DO THAT?

A.   YES.

Q.    IS THAT WHY IT WAS NOT DONE?

A.    THAT WAS ONE OF THE REASONS, ABSOLUTELY.

Q.    BUT BUTNER DID DO THAT?

A.    YES.

Q.    DID WE ALSO HAVE A DISCUSSION THAT WE WERE GOING TO LET THE DOCTORS, THE NEUROLOGIST, NEUROPSYCHOLOGISTS, THE PSYCHIATRISTS AT BUTNER FCI, LET THEM KNOW THAT YOU WERE AVAILABLE TO COME UP TO BUTNER?

A.    ABSOLUTELY.

Q.    TO CONSULT WITH THEM?

A.    YES.

Q.    DID WE LET THEM KNOW THAT YOU WERE AVAILABLE TO CONSULT WITH THEM OVER THE PHONE?

A.    ABSOLUTELY.

Q.    DID WE ALSO LET THEM KNOW THAT DR. MORGAN WAS AVAILABLE, DR. BRANNON WAS AVAILABLE, AND DR. BRAWLEY WAS AVAILABLE, AS A RESULT OF THE MEETINGS WE HAD?

A.    YES.

Q.    WERE YOU EVER CONTACTED?

A.    NO.

Q.    WERE YOU EVER ASKED TO COME TO BUTNER?

A.    NO.

Q.    NOW, MR. SCHOOLS ASKED YOU SOME QUESTIONS ABOUT, WE REALLY DIDN'T KNOW WHAT YOU WERE GOING TO SAY, OTHER THAN THE LETTER THAT WE HAD SENT. YOU KNOW, BACK IN JANUARY, WE SENT

THE GOVERNMENT A LETTER AS TO WHAT THE EXPERTS -- JANUARY OF 2004, WHAT THE EXPERTS WERE GOING TO TESTIFY TO, CORRECT?

A.    YES.

Q.    HAS ANYBODY FOR THE GOVERNMENT CONTACTED YOU TO TRY TO SPEAK WITH YOU ABOUT THE CASE?

A.    NO.

MR. SCHOOLS:  YOUR HONOR, I THINK SHE IS A MEMBER OF THE DEFENSE TEAM.  THAT IS NOT SOMETHING ANY PROSECUTION WOULD EVER DO.

BY MR. SWERLING:

Q.    ARE YOU AWARE OF ANYBODY CONTACTING ME?

MR. SCHOOLS:  NOW HE IS MAKING HIMSELF A WITNESS.

MR. SWERLING:  JUDGE, HE OPENED THE DOOR.

MR. SCHOOLS:  NO, NO, NO.

MR. SWERLING:  THIS DOCTOR HAS BEEN AVAILABLE SINCE THE BEGINNING.

THE COURT:  ARE YOU SAYING, MR. SCHOOLS, SHE COULDN'T TALK TO THE GOVERNMENT BECAUSE SHE IS PART OF THE DEFENSE TEAM?

MR. SCHOOLS:  THAT IS WHAT I WOULD ASSUME, SIR, UNDER WORK PRODUCT PRIVILEGE.

MR. SWERLING:  JUDGE, THAT IS NOT CORRECT.  BECAUSE ALL HE HAD TO DO, ALL ANYBODY HAD TO DO WAS ASK ME AND DR. WATTS WOULD HAVE BEEN AVAILABLE.  ANY OF OUR EXPERTS WOULD HAVE BEEN AVAILABLE.

**JA 2286**

MR. SCHOOLS: JUDGE, LET'S MAKE THE RECORD CLEAR NOW. WE DIDN'T GET ANY OF THIS STUFF UNTIL RIGHT BEFORE -- A WEEK BEFORE THIS TRIAL, THAT IS WHAT THE RULES ALLOW.

MR. SWERLING: UNDER THE RULES, THAT IS WHAT THE RULES WERE, THAT AFTER THE OTHER PORTION OF THE TRIAL, THE GUILT PHASE OF THE TRIAL, WAS WHEN ALL OF THE MEDICAL COLLATERAL HAD TO BE TURNED OVER.

THE COURT: LET'S TAKE THIS UP AT THE BREAK. WE WILL DISCUSS THIS WHEN THE JURY IS OUT. LET'S MOVE ON.

BY MR. SWERLING:

Q. HAVE I MADE YOU AVAILABLE, AND HAVE YOU BEEN MADE AVAILABLE BEFORE TO PROSECUTORS SO THEY WOULD KNOW WHAT YOU WERE GOING TO TESTIFY TO?

A. SURE.

Q. AND HAVE YOU MET WITH PROSECUTORS BEFORE?

A. YES, I HAVE.

Q. TO DISCUSS WITH THEM WHAT YOU WERE GOING TO TESTIFY TO?

A. YES.

Q. HAVE I DONE THAT WITH YOU?

A. YES.

Q. NOW, MR. SCHOOLS SHOWED YOU THIS -- SOMETHING FROM CHAD FULKS. DOES THE FACT THAT THIS ROPE, OR WHATEVER IT WAS USED FOR, WAS GOING TO BE USED FOR, VERSUS THE ONE THAT BRANDON BASHAM MADE, DOES THAT INDICATE TO YOU THAT THERE IS SOME HIGHER LEVEL OF FUNCTIONING HERE, OR DOES IT JUST

INDICATE WHAT WAS AVAILABLE?

A.    IT INDICATES THAT MR. BASHAM -- LOOKS LIKE HE MADE A BETTER ROPE, THAT IS WHAT IT INDICATES.    THAT CAN BE DEPENDENT UPON A NUMBER OF THINGS:  SKILL,  PRACTICE,  PRIOR EXPERIENCE,  ACCESS TO MATERIALS,  IT IS MULTIFACETED REASONS.

Q.    I MEAN, I AM A LAWYER.   IF I HAVE NO MECHANICAL SKILLS,  SOMEONE WHO HAS MECHANICAL SKILLS WILL BE ABLE TO DO MUCH BETTER THAN I,  CORRECT?

A.    ABSOLUTELY.

Q.    AND VICE VERSA, IF SOMEONE HAS MECHANICAL SKILLS,  BUT NEVER BEEN TRAINED IN THE LAW,  THEY ARE NOT GOING TO BE ABLE TO PRACTICE LAW?

A.    CORRECT.

Q.    DO YOU KNOW ANY OF THE CIRCUMSTANCES SURROUNDING THAT BEING MADE BY CHAD FULKS OR GOING TO BE USED BY CHAD FULKS?

A.    NO.

MR. SWERLING:  THAT IS ALL I HAVE.

THE COURT:   ANYTHING FURTHER?

MR. SCHOOLS:  NO, SIR.

THE COURT:   THANK YOU.  YOU MAY STEP DOWN.

THE WITNESS:  MAY I BE EXCUSED,  YOUR HONOR?

THE COURT:   YOU ARE EXCUSED.

ANYTHING FURTHER FROM THE DEFENDANT?

MR. SWERLING:  YOUR HONOR,  AT THIS TIME, WE REST.

THE COURT:   ALL RIGHT.   MEMBERS OF THE JURY, YOU

JUST HEARD MR. SWERLING SAY THE DEFENSE HAS RESTED ITS CASE. WE NOW TURN TO THE GOVERNMENT TO SEE IF THE GOVERNMENT HAS ANY REPLY OR REBUTTAL TESTIMONY TO RESPOND TO ANY NEW MATTER BROUGHT OUT BY DEFENDANT.

MR. SCHOOLS:  CAN CAN WE APPROACH ONE SECOND?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SCHOOLS:  WE DON'T HAVE ANYTHING ON THE RECORD ABOUT THE DEFENDANT'S REFUSAL TO TESTIFY IN THIS STAGE OF THE CASE.  I DON'T KNOW IF WE NEEDED TO DO THAT BEFORE.

HE COURT:   LET'S EXCUSE THE JURY.

MR. HARRIS:  BEFORE WE REST, WE WANT TO RENEW OUR MOTION.  I KNOW WE WERE PROTECTED ON THAT BEFORE WE REST.  WE WOULD LIKE TO UNREST FIRST, MAKE THE MOTION.

THE COURT:   WE WILL REOPEN THE DEFENSE CASE FOR THAT MOTION, AND SO I CAN CONDUCT A COLLOQUY WITH THE DEFENDANT ABOUT TESTIFYING.

MR. SWERLING:  AN APPROPRIATE TIME,  MAYBE DURING THE CHARGE,  THE JURY NEEDS TO BE INSTRUCTED THAT WE DIDN'T WITHHOLD ANY INFORMATION TO THE GOVERNMENT.  THAT IS THE PROCEDURE ESTABLISHED BY THE UNITED STATES CODE.  THERE IS AN IMPLICATION,  I DON'T THINK THAT MR. SCHOOLS INTENDED TO DO THAT, BUT THERE IS CERTAINLY AN IMPLICATION HERE THAT WE WITHHELD INFORMATION UNTIL JUST A COUPLE OF WEEKS AGO.  THE

JURY NEEDS TO UNDERSTAND THAT IS JUST NOT THE CASE.   THE GOVERNMENT HAS HAD, NOT MR. SCHOOLS, BUT THE GOVERNMENT PHYSICIANS HAVE HAD IT SINCE JANUARY, FEBRUARY, MARCH.

THE COURT:   YOU CAN TALK ABOUT THAT WHEN YOU CROSS-EXAMINE DR. CAPEHART.  LET'S TALK ABOUT THAT LATER.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT:   LADIES AND GENTLEMEN, LET ME ASK YOU TO GO TO THE JURY ROOM FOR JUST A BRIEF MOMENT WHILE WE TAKE UP A LEGAL MATTER.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT:   MR. BASHAM, LET ME SPEAK TO YOU, SIR, IF I COULD.

THE DEFENDANT:  YES, SIR.

THE COURT:  MR. BASHAM, WE WENT THROUGH THIS IN THE GUILT PHASE OF THE TRIAL, I WANT TO GO THROUGH IT AGAIN.   AND THAT IS, WE EXPLAINED TO YOU YOUR RIGHT TO TESTIFY, IF YOU WANT TO, IN THIS CASE.

THE DEFENDANT:   SURE.

THE COURT:   WE ARE IN A DIFFERENT PHASE OF THE PROCEEDING NOW.  WE ARE IN THE PENALTY PHASE.   UNDER THE RULES OF PROCEDURE, YOU HAVE AN ABSOLUTE RIGHT TO TAKE THE WITNESS STAND, BE SWORN UNDER OATH, AND TESTIFY IN THIS CASE. YOU ALSO HAVE AN ABSOLUTE RIGHT NOT TO TESTIFY, IF YOU DON'T

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,          )      CR. NO. 4:02-992
                                   )      COLUMBIA, SC
                                   )      NOVEMBER 1, 2004
                                   )
      VERSUS                       )
                                   )
BRANDON L. BASHAM,                 )
            DEFENDANT.             )
_____  )

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XXIX


APPEARANCES:

FOR THE GOVERNMENT:                SCOTT SCHOOLS, FIRST AUSA
                                   JONATHAN S. GASSER, AUSA
                                   JOHN DUANE, AUSA
                                   UNITED STATES ATTORNEY'S OFFICE
                                   1441 MAIN STREET, SUITE 500
                                   COLUMBIA, SC  29201

FOR THE DEFENDANT:                 JACK SWERLING, ESQ.
                                   STEVE HISKER, ESQ.
                                   1720 MAIN STREET
                                   SUITE 301
                                   COLUMBIA, SC  29201

                                   GREG HARRIS, ESQ.
                                   1720 MAIN STREET
                                   SUITE 301
                                   COLUMBIA, SC  29201


COURT REPORTER:                    DEBRA R. JERNIGAN, RPR, CRR
                                   UNITED STATES COURT REPORTER
                                   901 RICHLAND STREET
                                   COLUMBIA, SC 29201



STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
*** *** *** ***

JA 2291

BUT WHEN THE BURNS'S FAMILY AND DONOVAN'S FAMILY WERE TESTIFYING, HE SHED NO TEARS.   THAT WAS THE ONLY REFERENCE TO THE COURTROOM DEMEANOR SITTING AT THE DEFENSE TABLE; HOWEVER, AS THE COURT HAS JUST RULED, I CAN COMMENT ALL I WANT ABOUT HIS DEMEANOR WITH REGARD TO HIS OUTBREAK IN THE COURTROOM, AND WHAT HE DID, AND HOW HE IS MORE CONCERNED --

THE COURT:   THAT WAS THE SUBJECT OF TESTIMONY.  THAT WAS THE SUBJECT OF TESTIMONY.

MR. GASSER:  YES, SIR.

THE COURT:   TO THE EXTENT YOU WANT TO SUGGEST THAT THAT OUTBREAK SUGGESTS A LACK OF REMORSE, I THINK THAT IS FAIR GAME BECAUSE, AS I SAID EARLIER, THAT WAS TESTIFIED ABOUT. ALL RIGHT.   ARE YOU READY TO PROCEED?

MR. SWERLING:  JUDGE, MAY I STEP IN THE REST ROOM A MOMENT?

THE COURT:   ALL RIGHT.   GO AHEAD.   WE WILL JUST WAIT RIGHT HERE.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT:   ALL RIGHT.  BRING IN THE JURY,  PLEASE.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:   THE COURT RECOGNIZES MR. JOHN GASSER FOR THE GOVERNMENT IN HIS CLOSING ARGUMENT.

MR. GASSER:  MAY IT PLEASE THE COURT.   GENTLEMEN. GOOD MORNING, LADIES AND GENTLEMEN.   WE HAVE AGAIN REACHED

THAT STAGE, THE SENTENCING PHASE OF THIS TRIAL, WHICH IS KNOWN AS CLOSING ARGUMENTS. THE PROCEDURE IS EXACTLY THE SAME AS IT WAS DURING THE GUILT PHASE OF THE ARGUMENT, WHICH YOU HAVE ALREADY DEALT WITH. THAT IS, I HAVE AN OPPORTUNITY, SINCE THE BURDEN OF PROOF IS ON THE GOVERNMENT IN THIS CASE, TO COME BEFORE YOU AND PROVIDE MY CLOSING REMARKS TO YOU. CLOSING REMARKS, AT THIS STAGE, ARE ACTUALLY SOMEWHAT SHORTER THAN CLOSING REMARKS DURING THE GUILT PHASE BECAUSE YOU HAVE OBVIOUSLY HEARD ALL OF THAT TESTIMONY AND SIMPLY HAVE TO INCORPORATE THAT TESTIMONY VERBALLY ON THE RECORD. SO, THEY WILL BE SOMEWHAT SHORTER, BUT, AGAIN, SOME LENGTH TO IT.

AS I ASK YOU TO DO, AND AS YOU DID FOR ME AND MR. SWERLING DURING THE GUILT PHASE, WE SIMPLY RESPECTFULLY REQUEST THAT YOU PAY ATTENTION TO US, AND I KNOW THAT YOU WILL BECAUSE YOU HAVE PAID REMARKABLE ATTENTION OVER THE LAST SEVERAL WEEKS AS THE SENTENCING PHASE HAS TAKEN PLACE.

THE IMPORTANCE OF JURY SERVICE, I AM SURE, WAS OBVIOUS TO EACH AND EVERY ONE OF YOU, PROBABLY SOMEWHAT IN THE ABSTRACT WHEN YOU CAME TO COURT SOME TIME BACK IN AUGUST, SOME OF YOU THE FIRST WEEK OR TWO IN SEPTEMBER. I WOULD LIKE TO THINK THAT YOUR EXPERIENCE ON THIS JURY HAS BEEN EDUCATIONAL. I KNOW AT TIMES IT HAS BEEN DIFFICULT SITTING THROUGH TESTIMONY, GOING BACK INTO YOUR JURY ROOM. I KNOW YOU HAVE HAD TIME AWAY FROM YOUR FAMILY, TIME AWAY FROM YOUR FRIENDS, TIME AWAY FROM YOUR WORK, AND I KNOW THAT HAS BEEN DIFFICULT. AND

I KNOW I SPEAK ON BEHALF OF THE DEFENSE ATTORNEYS, AS WELL, WE THANK YOU FOR THE REMARKABLE, REMARKABLE ATTENTION THAT YOU HAVE GIVEN THIS CASE.

LET ME APPROACH 9-11. AMERICA ELECTIONS WILL BE HELD TOMORROW. I THINK ONE OF THE THINGS THAT I HOPE YOU HAVE A SENSE OF IS PRIDE. PRIDE IN BEING A PART OF YOUR GOVERNMENT, A PART OF A SYSTEM OF JUSTICE IN WHICH SO MANY AMERICANS HAVE GIVEN THE ULTIMATE SACRIFICE TO. AND REGARDLESS OF WHAT VERDICT YOU REACH IN THIS CASE, IF THERE IS ONE THING EACH AND EVERY ONE OF YOU CAN TAKE AWAY FROM THIS EXPERIENCE, IT IS PRIDE. NO ONE WILL BE ABLE TO QUESTION YOUR VERDICT.

EACH AND EVERY ONE OF YOU, INCLUDING YOU ALTERNATES THAT MAY NOT SIT, EACH AND EVERY ONE OF YOU, EACH AND EVERY ONE OF YOU IS FACED WITH A CIVIC RESPONSIBILITY, AND YOU HAVE MET THAT RESPONSIBILITY. AND NO ONE, NO ONE HAS A RIGHT TO JUDGE YOU OR JUDGE YOUR VERDICT. YOUR VERDICT WILL BE INDIVIDUAL, AND YOUR VERDICT WILL BE COLLECTIVE, AND IT WILL BE A JUST VERDICT, WHETHER IT BE LIFE IN PRISON WITHOUT PAROLE OR WHETHER IT BE THE DEATH PENALTY. YOU SHOULD BE PROUD OF THAT FACT.

MR. SCHOOLS MENTIONED TO YOU IN HIS OPENING REMARKS DURING THE SENTENCING PHASE THAT BRANDON BASHAM HAS MADE A NUMBER OF OTHER CHOICES SINCE HE WAS ARRESTED ON THESE CHARGES. AND THEN HE OUTLINED FOR YOU SOME OF THE CHOICES THAT MR. BASHAM MADE, HIS CONDUCT, HIS ACTIONS SINCE HE WAS ARRESTED. I AM

**JA 2294**

GOING TO TALK TO YOU ABOUT THAT DURING A PORTION OF MY CLOSING REMARKS.  ONE THING I WANT TO REMIND YOU, I WANT TO REMIND YOU LADIES AND GENTLEMEN OF SOMETHING.  IT HAS BEEN 32 DAYS SINCE YOU JURORS CONVICTED BRANDON BASHAM OF THE KIDNAPPING, RESULTING IN DEATH AND CARJACKING, RESULTING IN DEATH OF 44-YEAR-OLD ALICE DONOVAN.  IT HAS BEEN 32 DAYS.  BUT DESPITE THAT TIME PERIOD, DESPITE ALL OF THE EVIDENCE AND TESTIMONY YOU HEARD DURING THE SENTENCING PHASE FROM THE GOVERNMENT'S WITNESSES AND FROM THE WITNESSES CALLED ON BEHALF OF MR. BASHAM, ONE THING REMAINS ABSOLUTELY CLEAR.  FROM THE TIME WE STARTED ON AUGUST 30TH SELECTING YOU JURORS, YOU HAVE HEARD THE TESTIMONY OF THE 89 WITNESSES DURING THE GUILT PHASE, AND THEN YOU HAVE HEARD THE TESTIMONY OF THE 44 GOVERNMENT WITNESSES, THE 31 DEFENSE WITNESSES, AND THE TWO WITNESSES THE GOVERNMENT OFFERED IN REPLY, ONE THING IS ABSOLUTELY CLEAR, THIS CASE HAS ALWAYS BEEN AND WILL ALWAYS BE ABOUT ALICE DONOVAN AND SAMANTHA BURNS AND THE CHOICES THAT BRANDON BASHAM MADE IN NOVEMBER OF 2002.

MR. HARRIS STATED TO YOU JURORS IN HIS OPENING REMARKS IN THE SENTENCING PHASE THAT DURING THE SENTENCING PHASE OF A DEATH PENALTY CASE OR IN THIS CASE, THE FOCUS SHOULD NOT BE ON WHAT HAPPENED, BUT WHY IT HAPPENED.  LADIES AND GENTLEMEN, AS I STAND BEFORE YOU TODAY, THE GOVERNMENT CANNOT DISAGREE ANY MORE STRONGLY WITH THAT STATEMENT.  WHY THIS HAPPENED, THAT MAY BE RELEVANT IN AN ACADEMIC SETTING,

THAT MAY BE RELEVANT AT A SEMINAR OR A CONFERENCE OF THOSE INDIVIDUALS THAT DEAL WITH ISSUES SUCH AS THAT, BUT THAT IS NOT RELEVANT FOR A JURY AND A CRIMINAL JUSTICE SYSTEM THAT OUR COUNTRY HAS TO DECIDE WHETHER LIFE IN PRISON WITHOUT PAROLE OR DEATH IS THE APPROPRIATE PUNISHMENT BASED ON THE FACTS, AND CIRCUMSTANCES, AND THE CONDUCT, AND ACTIONS OF A CRIMINAL DEFENDANT. IN THIS CASE, BRANDON BASHAM. WHAT HAPPENED IS CLEARLY THE MOST RELEVANT ISSUE THAT YOU JURORS WILL HAVE TO DECIDE UPON IN DETERMINING WHAT THE APPROPRIATE PUNISHMENT IS.

MR. SWERLING SAID SOMETHING WAY BACK ON SEPTEMBER 13TH IN HIS OPENING REMARKS DURING THE GUILT PHASE THAT WAS ABSOLUTELY TRUE AND IT WAS ABSOLUTELY GENUINE. IT WAS TRUE AND IT WAS GENUINE. MR. SWERLING STOOD BEFORE YOU DURING HIS OPENING REMARKS OF THE GUILT PHASE OF THIS TRIAL ON SEPTEMBER 13TH AND SAID, LADIES AND GENTLEMEN, I AM DEEPLY SORRY FOR THE DESPICABLE ACTS COMMITTED AGAINST ALICE DONOVAN. WHEN MR. SWERLING MADE THAT STATEMENT, HE WAS NOT ONLY SPEAKING ON HIS OWN BEHALF, HE WAS SPEAKING ON BEHALF OF MR. HARRIS. BECAUSE MR. SWERLING AND MR. HARRIS, THEY ARE DEEPLY SORRY. THEY ARE GOOD HUSBANDS, THEY ARE GOOD FATHERS, THEY ARE GOOD MEN. AND WHEN MR. SWERLING STOOD BEFORE YOU, HE WAS SPEAKING FROM HIS HEART.

LADIES AND GENTLEMEN, FOR YOUR ROLE, FOR YOUR PURPOSE, THE RELEVANT FACT IS THAT BRANDON BASHAM IS NOT. HE IS NOT. YOU HAVE SEEN THE TESTIMONY AND THE EVIDENCE OF BRANDON

BASHAM'S COURSE OF CONDUCT ON NOVEMBER 2002. HAVE YOU SEEN BRANDON BASHAM'S CONDUCT AND HIS ACTIONS SINCE HE WAS ARRESTED AND CHARGED WITH THE MOST SERIOUS OFFENSES KNOWN TO MAN, THE INTENTIONAL CARJACKING, KIDNAPPING, AND KILLING OF TWO RANDOM, INNOCENT WOMEN. YOU HAVE SEEN HIS CONDUCT. YOU HAVE SEEN HIS ATTITUDE. BRANDON BASHAM CARES MORE ABOUT GETTING A PINCH OF DIP OF TOBACCO BETWEEN HIS CHEEK AND GUM DURING THE MORNING AND AFTERNOON BREAKS OF THESE PROCEEDINGS THAN HE DOES ABOUT WHAT HE DID TO 19-YEAR-OLD SAMANTHA BURNS ALONG THE BANKS OF THE GUYANDOTTE RIVER. HE CARES MORE ABOUT THAT HIGH, ABOUT THAT RUSH THAN WHAT HE DID TO ALICE DONOVAN ON A SUNNY NOVEMBER DAY IN CONWAY, SOUTH CAROLINA.

AND IT MIGHT BE HARD FOR YOU TO UNDERSTAND THAT. YOU ARE GOOD PEOPLE. YOU GO ABOUT YOUR BUSINESS, AND YOU HAVE YOUR OWN LIVES, AND YOU ARE HONEST CITIZENS OF SOUTH CAROLINA. AND IT MAY BE DIFFICULT FOR YOU TO COMPREHEND HOW SOMEONE CAN JUST NOT CARE. BUT, LADIES AND GENTLEMEN, FACTS ARE FACTS. WE DO NOT LIVE IN A FANTASY LAND. THIS IS SOMETHING YOU ARE USED TO SEEING ON TELEVISION, OR SEEING IN THE MOVIES, OR READING ABOUT IN A NOVEL. IT WAS MAKE-BELIEVE TO YOU BEFORE YOU ENTERED THIS PROCESS. BUT THE FACT OF THE MATTER IS, IS THAT THAT MAN SITTING OVER THERE AT THAT TABLE DOES NOT CARE ONE BIT ABOUT WHAT HE DID TO THESE TWO WOMEN. AND IF THERE IS ANYTHING YOU REMEMBER DURING MY CLOSING ARGUMENT, IF THERE IS ANYTHING YOU REMEMBER THE REST OF TODAY, I ASK YOU, I ASK

YOU, BACK IN THAT JURY ROOM, REMEMBER THAT FACT. EMBRACE THAT FACT. ACCEPT THAT FACT, BRANDON BASHAM DOESN'T CARE.

MY OUTLINE FOR THESE CLOSING REMARKS WILL BE THAT I WILL DISCUSS WITH YOU THE LAW, THE LAW IN GENERAL. I WILL TALK TO YOU ABOUT SOME OF THE GATEWAY FACTORS, THE THREE GATEWAY FACTORS THE JUDGE DISCUSSED WITH YOU THAT YOU MUST FIND BEFORE YOU CAN EVEN CONSIDER THE DEATH PENALTY. I WOULD SPEND SOME TIME WITH YOU TALKING ABOUT THE INTENT FACTOR THAT YOU MUST FIND. I WOULD DISCUSS WITH YOU THE NONSTATUTORY AGGRAVATING FACTORS OR CIRCUMSTANCES, THE EVIDENCE AND TESTIMONY RELATED TO THE NONSTATUTORY AGGRAVATING FACTORS THAT THE GOVERNMENT HAS ALLEGED. AND THOSE ARE FACTORS WHICH SEPARATES A CASE, MAKES A HORRIBLE HOMICIDE MUCH MORE CRUELER, MUCH WORSE. THOSE ARE THE FACTORS THAT JUSTIFY THE SENTENCING OF A CRIMINAL DEFENDANT TO DEATH FOR HIS ACTIONS, FOR HIS CONDUCT.

I WILL DISCUSS WITH YOU, AS WELL, THE STATUTORY OR DEFENSE MITIGATION EVIDENCE AS WELL, VERY BRIEFLY. I WILL DISCUSS WITH YOU, IN GENERAL, DEFENSE MITIGATION, AS WELL. I WILL HAVE A FINAL POINT OR TWO BEFORE I WILL SIT DOWN.

BEFORE I GET TO THE LAW, A COUPLE OTHER POINTS I WANT TO DISCUSS WITH YOU OR REMIND YOU BECAUSE IT HAS BEEN 32 DAYS, 33 DAYS, ACTUALLY, SINCE I SUMMARIZED THE GOVERNMENT'S CASE IN GUILT FOR YOU JURORS. REMEMBER, THE EVIDENCE AND THE TESTIMONY THAT YOU SAW DURING THE GUILT PHASE OF THIS CASE, THIS WAS A TWO-MAN TEAM. THIS WAS BRANDON BASHAM AND CHAD

FULKS ACTING TOGETHER AS A TEAM.  THEIR ACTIONS,  THEIR CONDUCT,  THEIR CHOICES WERE MADE AS A TEAM.   BRANDON BASHAM COULD NOT HAVE CARJACKED AND KIDNAPPED SAMANTHA BURNS OR ALICE DONOVAN WITHOUT CHAD FULKS.   AND CHAD FULKS COULD NOT HAVE CARJACKED AND KIDNAPPED SAMANTHA BURNS AND ALICE DONOVAN WITHOUT BRANDON BASHAM.   THEY ARE EQUALLY CULPABLE.   BUT FOR THE ACTIONS OF BRANDON BASHAM, AND BUT FOR THE ACTIONS OF CHAD FULKS,  SAMANTHA BURNS WOULD BE ALIVE TODAY AND ALICE DONOVAN WOULD BE ALIVE TODAY.   BUT FOR BRANDON BASHAM'S ACTIONS, SAMANTHA BURNS WOULD BE FINISHING UP HER EDUCATION AT MARSHAL UNIVERSITY.  SHE WOULD STILL HAVE ALL OF HER HOPES AND DREAMS. AND ALICE DONOVAN WOULD STILL BE WORKING,  WOULD STILL BE WORKING ON HER DREAM HOUSE,  AND WOULD PROBABLY BE TALKING TO HER COWORKERS RIGHT NOW AND SHOWING THEM PHOTOGRAPHS OF WHAT HER GRANDCHILDREN DRESSED AS FOR HALLOWEEN.  BUT FOR BRANDON BASHAM AND CHAD FULKS,  NOT ONLY WOULD SAMANTHA BURNS BE ALIVE TODAY,  NOT ONLY WOULD ALICE DONOVAN BE ALIVE TODAY,  BUT NONE OF US,  NO ONE IN THIS COURTROOM WOULD BE HERE TODAY.

THIS CASE HAS ALWAYS BEEN ABOUT CHOICES.   IT HAS ALWAYS BEEN ABOUT CHOICES.   LADIES AND GENTLEMEN,  ON NOVEMBER 11TH, 2002,  BRANDON BASHAM CHOSE SAMANTHA BURNS.   HE DIDN'T KNOW SAMANTHA BURNS.   HE DIDN'T KNOW SHE WAS A STUDENT AT MARSHALL UNIVERSITY.   HE DIDN'T KNOW SHE WAS A LOVING DAUGHTER AND SISTER.   HE DIDN'T KNOW SHE HAD FRIENDS, THAT SHE ENJOYED PLAYING SOFTBALL ON HER HIGH SCHOOL TEAM.   HE DIDN'T KNOW

THAT SHE LOVED TO SHOP. HE HAD NO IDEA THAT, ON THAT VERY DAY, SHE HAD GONE TO LUNCH WITH HER MOTHER AND TALKED ABOUT FINISHING HER EDUCATION, FINDING SOMEONE TO FALL IN LOVE WITH, GETTING MARRIED, HAVING CHILDREN, AND RAISING HER FAMILY IN THE SAME LOCATION OF WEST VIRGINIA AS HER PARENTS AND HER GRANDPARENTS. BRANDON BASHAM DIDN'T KNOW THOSE THINGS. BRANDON BASHAM DIDN'T CARE.

ON NOVEMBER 14TH, HE MADE ANOTHER CHOICE. HE CHOSE ALICE DONOVAN. BRANDON BASHAM DIDN'T KNOW ALICE DONOVAN. HE DIDN'T KNOW SHE WAS A 44-YEAR-OLD GRANDMOTHER AND MOTHER. HE DIDN'T KNOW SHE WAS A DEVOTED WIFE TO BARRY. HE DIDN'T KNOW ALICE HAD A GREAT SENSE OF HUMOR, WAS A HARD WORKER. HE DIDN'T KNOW SHE ENJOYED CATS, SHE LOVED FLOWERS, AND GARDENING. SHE HAD JUST FINISHED BUILDING HER DREAM HOUSE. BRANDON BASHAM DIDN'T KNOW THOSE THINGS. AND HE DIDN'T CARE.

YOU SEE, IN NOVEMBER OF 2002, BRANDON BASHAM HAD TWO VERY IMPORTANT CHOICES TO MAKE WHEN IT CAME TO SAMANTHA BURNS AND ALICE DONOVAN, TWO VERY IMPORTANT CHOICES. SHOULD THEY LIVE OR SHOULD THEY DIE? AND BRANDON BASHAM WAS CONSISTENT IN HIS DECISION-MAKING. BECAUSE, BOTH TIMES, BRANDON BASHAM CHOSE DEATH.

THERE WAS NOBODY LOOKING OUT FOR THE INTEREST OF SAMANTHA BURNS AND ALICE DONOVAN ON THOSE DAYS. THERE WERE NO RULES OR REGULATIONS ALONG THE BANKS OF THE GUYANDOTTE OR OHIO RIVER TO PROTECT SAMANTHA BURNS. NO LAWS TO PROTECT ALICE DONOVAN

IN THE WOODS OF NORTH OR SOUTH CAROLINA, WHEREVER SHE MAY BE. ON THOSE DAYS, IT WAS THE LAW, ACCORDING TO BRANDON BASHAM AND CHAD FULKS, THAT PREVAILED. THEIR LAW, THEIR RULES, THEIR CHOICES. BRANDON BASHAM AND CHAD FULKS WERE ALICE DONOVAN'S JUDGE, THEY WERE ALICE DONOVAN'S JURY, AND THEY WERE ALICE DONOVAN'S EXECUTIONERS. THE TRAVESTY OF IT ALL, LADIES AND GENTLEMEN, IS THAT ALICE DONOVAN AND SAMANTHA BURNS TRULY WERE INNOCENT WOMEN. YOU CAN'T CHANGE THAT. YOU CAN'T CHANGE THAT. BUT YOU CERTAINLY HAVE THE POWER AND THE AUTHORITY TO REACH A VERDICT THAT HOLDS BRANDON BASHAM ACCOUNTABLE FOR HIS ACTIONS. AND THAT IS EXACTLY WHAT WE ARE GOING TO ASK YOU TO DO LATER ON THIS AFTERNOON IS HOLD HIM ACCOUNTABLE FOR HIS ACTIONS.

NOW THE LAW, IN GENERAL. BEFORE YOU CAN EVEN CONSIDER SENTENCING MR. BASHAM TO DEATH BY LAW, PROCEDURALLY, YOU HAVE TO FIND -- TAKE CERTAIN STEPS, AND THE JUDGE HAS ALREADY KIND OF DESCRIBED THOSE STEPS FOR YOU IN HIS INITIAL CHARGE TO YOU. YOU NEED TO TAKE CERTAIN STEPS BEFORE YOU CAN EVEN CONSIDER THE DEATH PENALTY AND MAKE CERTAIN FINDINGS BEYOND A REASONABLE DOUBT. THOSE ARE COMMONLY REFERRED TO AS GATEWAY FACTORS. THERE ARE BASICALLY THREE GATEWAY FACTORS THAT YOU JURORS UNANIMOUSLY MUST FIND BEYOND A REASONABLE DOUBT BEFORE YOU CAN EVEN CONSIDER SENTENCING MR. BASHAM TO DEATH. THE FIRST GATEWAY FACTOR IS THAT YOU MUST FIND, AT THE TIME THAT HE COMMITTED THE CRIMES OF CARJACKING, RESULTING IN DEATH, AND

KIDNAPPING RESULTING IN DEATH, YOU MUST FIND THAT MR. BASHAM WAS 18 YEARS OLD AT THAT TIME. THAT HAS OBVIOUSLY BEEN AGREED UPON. HE WAS 21 YEARS, AT THE TIME. THAT IS NOT AN ISSUE THAT YOU MUST DECIDE. TECHNICALLY, YOU HAVE TO DECIDE ON THAT, VOTE ON THAT, CHECK IT OFF.

SECOND GATEWAY FACTOR THAT YOU MUST FIND UNANIMOUS BEYOND A REASONABLE DOUBT, WHICH IS KNOWN AS A THRESHOLD INTENT FACTOR. I AM GOING TO GET INTO THAT IN A MOMENT. THERE WILL BE A CHART UP HERE IN A MOMENT. I WILL GET INTO THAT IN A MOMENT. THE JUDGE WILL CHARGE YOU THAT YOU JURORS ARE ONLY ALLOWED TO FIND ONE. NOW, THE GOVERNMENT SUBMITS TO YOU THAT THERE IS ACTUALLY EVIDENCE IN WHICH YOU JURORS COULD FIND FOUR OR ALL FOUR OF THEM. BUT, AS A MATTER OF LAW, YOU ARE ONLY REQUIRED TO FIND ONE. AND ONCE YOU FIND ONE, ONCE YOU FIND WHICH ONE IS THE MOST APPROPRIATE FOR THIS CASE, YOU CAN ONLY FIND ONE. YOU CAN ONLY SELECT ONE, DESPITE THE FACT THAT THERE IS EVIDENCE YOU BELIEVE THERE ARE TWO, OR THREE, OR ALL FOUR PRESENT.

ONCE YOU FIND HE IS 18 YEARS OLD AT THE TIME THE CRIME WAS COMMITTED, THEN YOU GO TO THE THRESHOLD INTENT FACTOR. SELECT ONE OF THE THRESHOLD INTENT FACTORS THAT IS PRESENT IN THIS CASE. I WILL GET TO THOSE AGAIN ON HOW THE EVIDENCE SUGGESTS THAT AT LEAST ONE, IF NOT MORE OF THOSE FACTORS ARE PRESENT.

THE THIRD, THIRD GATEWAY FACTOR YOU MUST FIND BEYOND A REASONABLE DOUBT UNANIMOUSLY, THE PRESENCE OF THE STATUTORY

AGGRAVATING FACTOR THE GOVERNMENT HAS ALLEGED AND THE JUDGE CHARGED YOU IN THE OPENING. THE GOVERNMENT -- THE STATUTORY AGGRAVATING FACTOR THAT THE GOVERNMENT ALLEGED IS THAT ALICE DONOVAN DIED IN THE COURSE OF A KIDNAPPING. I KNOW MOST OF YOU ARE PROBABLY SAYING TO YOURSELVES, JUST AS MR. SCHOOLS INDICATED, WELL, YOU ALREADY FOUND THAT FACTOR, THAT IS CORRECT. BUT YOU HAVE TO, YOU HAVE TO FOLLOW TECHNICAL PROCEDURES IN THIS CASE. I WILL DISCUSS THAT BRIEFLY WITH YOU, AS WELL, WHAT I MEAN BY THAT. THOSE ARE THE GATEWAY FACTORS.

I AM ALSO GOING TO DISCUSS WITH YOU NONSTATUTORY AGGRAVATING FACTORS. BUT, LADIES AND GENTLEMEN, ONCE YOU FIND HE IS 18, MR. BASHAM, AT THE TIME OF THE CRIME, ONCE YOU FIND ONE OF THOSE STATUTORY THRESHOLD INTENT FACTORS, AND ONCE YOU FIND THE PRESENCE OF THE AGGRAVATING FACTOR, THE KIDNAPPING, YOU ARE THEN AUTHORIZED TO CONSIDER GIVING MR. BASHAM THE DEATH PENALTY. YOU CAN THEN START DISCUSSING WHETHER THE DEATH PENALTY OR LIFE WITHOUT PAROLE IS THE APPROPRIATE PUNISHMENT.

NOW, WE ARE GOING TO DISCUSS WITH YOU NONSTATUTORY AGGRAVATING FACTORS. THERE ARE THREE GENERAL CATEGORIES OF NONSTATUTORY AGGRAVATING FACTORS THAT I WILL DISCUSS WITH YOU THAT YOU HAVE HEARD TESTIMONY AND EVIDENCE ON. THE GOVERNMENT DOESN'T HAVE TO PROVE ANY. YOU CAN SENTENCE, ONCE YOU FIND THE GATEWAY FACTORS BASED ON THE FACTS AND

TESTIMONY OF THIS CASE, YOU CAN SENTENCE MR. BASHAM TO DIE SIMPLY FOR WHAT HE DID TO ALICE DONOVAN. SIMPLY FOR WHAT HE DID TO ALICE DONOVAN, ONCE YOU FIND THOSE THREE GATEWAY FACTORS. TO THE EXTENT YOU DO FIND AND THE EVIDENCE IS OVERWHELMING, WHEN I WALK YOU THROUGH SOME OF THESE, YOU WILL RECOGNIZE THAT FACT. TO THE EXTENT THAT YOU JURORS FIND NONSTATUTORY AGGRAVATING FACTORS, YOU MUST DO SO BEYOND A REASONABLE DOUBT, UNANIMOUSLY.

ALSO, YOU HAVE HEARD TESTIMONY, YOU WILL HEAR ARGUMENT, YOU HEARD THE JUDGE DISCUSS WITH YOU IN HIS OPENING INSTRUCTIONS BOTH STATUTORY AND NONSTATUTORY MITIGATING FACTORS. WHAT ARE THEY? WELL, JUST AS AGGRAVATING FACTORS ARE EVIDENCE AND TESTIMONY THAT MAKES EITHER BRANDON BASHAM WORSE OFF OR THE CRIME ITSELF WORSE OFF, AGGRAVATES THE CRIME, NONSTATUTORY AND STATUTORY MITIGATING FACTORS, IF YOU BELIEVE THEM, DEPENDING UPON WHAT WEIGHT YOU WANT TO GIVE THEM IF THEY ARE EVEN PRESENT, TEND TO LESSEN SOME OF THE INVOLVEMENT IN THE CRIME OR TEND TO LESSEN WHAT THE APPROPRIATE PUNISHMENT SHOULD BE.

A COUPLE POINTS ON THE STATUTORY AND NONSTATUTORY MITIGATING FACTORS. FIRST OF ALL, THE GOVERNMENT HAS NO BURDEN. THE GOVERNMENT DOES NOT HAVE ANY BURDEN WHATSOEVER WITH REGARD TO MITIGATING FACTORS. THE BURDEN LIES SOLELY WITH THE DEFENDANT. THE DEFENDANT MUST PROVE TO ANY ONE OF YOU, ANY ONE OF YOU BY A PREPONDERANCE OF THE EVIDENCE THE

PRESENCE AND EXISTENCE OF A STATUTORY OR NONSTATUTORY MITIGATING FACTOR.  THE GOVERNMENT HAS NO BURDEN WHATSOEVER IN THIS PROCEDURE IN THE SENTENCING PHASE OF A DEATH PENALTY CASE.

SECOND POINT WE NEED TO KNOW.  JUST BECAUSE THE JUDGE HAS INCLUDED THE STATUTORY MITIGATING OR NONSTATUTORY MITIGATING FACTORS ON THE VERDICT FORM, JUST BECAUSE THEY ARE PRESENT, DOESN'T MEAN THEY ACTUALLY EXIST.  JUST LIKE THE ALLEGATIONS THE GOVERNMENT PUTS,  THE ELEMENTS OF THE CRIME YOU ALL FOUND BEYOND A REASONABLE DOUBT,  JUST BECAUSE THEY WERE PRESENT ON THE VERDICT FORM IN THE GUILT PHASE,  YOU STILL HAD TO FIND BEYOND A REASONABLE DOUBT UNANIMOUSLY THAT THEY EXISTED. JUST BECAUSE THEY ARE LISTED ON THE VERDICT FORM DOES NOT NECESSARILY MEAN THAT THEY ARE PRESENT OR THEY EXIST OR THAT THE DEFENSE HAS SATISFIED THEIR BURDEN.  AND MORE IMPORTANTLY,  MORE IMPORTANTLY,  JUST BECAUSE ANY ONE OF YOU, OR A GROUP OF YOU, OR ALL OF YOU JURORS MAY FIND THE PRESENCE OF A MITIGATING FACTOR, THAT DOES NOT NECESSARILY MEAN THAT SOMEHOW SHOULD WEIGH IN FAVOR OF LIFE WITHOUT PAROLE.  THAT IS STILL YOUR DECISION.  IT IS YOUR DECISION TO PUT WHATEVER WEIGHT OR NO WEIGHT ON A MITIGATING FACTOR, IF YOU SO FIND ONE.

ONE OTHER POINT ON MITIGATING FACTORS AND AGGRAVATING FACTORS.  JUST BECAUSE YOU MIGHT FIND MORE AGGRAVATING FACTORS THAN MITIGATING FACTORS DOESN'T MEAN YOU SHOULD AUTOMATICALLY

VOTE FOR DEATH. JUST BECAUSE YOU MAY FIND A NUMBER OR MORE OF MITIGATING FACTORS THAN AGGRAVATING FACTORS, IT DOESN'T MEAN YOU SHOULD AUTOMATICALLY VOTE FOR DEATH. THAT IS NOT THE WAY THE PROCESS WORKS. IT IS A WEIGHING PROCESS.

FOR EXAMPLE, THE JUDGE CHARGED YOU IN THE GUILT PHASE, YOU DON'T COUNT UP THE NUMBER OF WITNESSES. HE WILL TELL YOU IN THIS PHASE, JUST BECAUSE THE GOVERNMENT CALLED 46 WITNESSES, THE DEFENSE CALLED 31, DOESN'T MEAN YOU SHOULD AUTOMATICALLY VOTE FOR DEATH. IF THE DEFENDANT HAD CALLED 101 AND THE GOVERNMENT CALLED 46, YOU SHOULDN'T AUTOMATICALLY VOTE FOR LIFE. IT IS THE SAME WITH PRESENCE OF AGGRAVATING AND MITIGATING FACTORS. YOU DON'T COUNT UP THE FACTORS. THERE MAY BE ONE AGGRAVATING FACTOR, IF IT IS SERIOUS AND SIGNIFICANT ENOUGH, THERE MAY BE 50 MITIGATING FACTORS. YOU CAN STILL SENTENCE MR. BASHAM TO DIE. A 50-POUND BARBELL WEIGHS MORE THAN 50 FEATHERS, SAME CONCEPT.

NOW, THIS WEIGHING PROCESS, LADIES AND GENTLEMEN, ONCE YOU HAVE DETERMINED THE PRESENCE OF THE GATEWAY FACTORS, WHICH YOU MUST BEFORE YOU CAN CONSIDER THE DEATH PENALTY, 18, ONE THRESHOLD INTENT FACTOR, AGGRAVATING CIRCUMSTANCE OF KIDNAPPING, ONCE YOU HAVE DETERMINED THAT, THEN YOU REVIEW THE NONSTATUTORY MITIGATING FACTORS, WHICH ARE THE OTHER VIOLENT CRIMES AND ACTS OF VIOLENCE THAT BRANDON BASHAM COMMITTED, FUTURE DANGEROUSNESS AND EVIDENCE SUBMITTED ON THE IMPACT THIS CRIME HAS HAD ON ALICE DONOVAN'S FAMILY AND

FRIENDS.  THOSE ARE THE NONSTATUTORY AGGRAVATING FACTORS. YOU CAN REVIEW THOSE.  ONCE YOU REVIEW ANY STATUTORY NONSTATUTORY MITIGATING FACTOR,  ONCE YOU HAVE DONE THAT, ONCE YOU HAVE REVIEWED ALL OF THIS EVIDENCE AND TESTIMONY,, THEN YOU MUST ENGAGE IN BOTH INDIVIDUALLY AND COLLECTIVELY A WEIGHING PROCESS.  IT IS A SUBJECTIVE PROCESS.  IT IS NOT AN OBJECTIVE ANALYSIS.  IT IS A SUBJECTIVE PROCESS, BOTH INDIVIDUALLY IN YOUR HEART AND IN YOUR MINDS COLLECTIVELY AS A JURY.  THAT YOU SUBJECTIVELY WEIGH ALL OF THE EVIDENCE AND TESTIMONY IN AGGRAVATION AND MITIGATION, AND REACH WHAT YOU BELIEVE TO BE IS THE APPROPRIATE SENTENCE IN THIS CASE.  AND YOUR VERDICT MUST BE UNANIMOUS.

NOW, THE STATUTORY THRESHOLD FACTOR.  MR. SCHOOLS DISCUSSED THIS SLIDE WITH YOU IN HIS OPENING STATEMENT, AND THE JUDGE HAS ALSO DISCUSSED IT WITH YOU IN HIS INITIAL INSTRUCTIONS.  YOU MUST FIND, AFTER YOU FIND MR. BASHAM WAS AT LEAST 18 YEARS OLD AT THE TIME, THIS IS THE NEXT CHECK MARK.  YOU MUST FIND THE PRESENCE OF ONE OF THESE THRESHOLD INTENT FACTORS.  THE DEFENDANT, HIMSELF, INTENTIONALLY KILLED THE VICTIM.  THE DEFENDANT, HIMSELF, INTENTIONALLY INFLICTED SERIOUS BODILY INJURY THAT RESULTED IN THE DEATH OF THE VICTIM.  NOW,  THOSE ARE ACTUAL -- MR. BASHAM ACTUALLY, PHYSICALLY,  EITHER KILLING ALICE DONOVAN OR DOING SOMETHING TO HER TO WHERE SHE ULTIMATELY DIED.

THRESHOLD FACTORS THREE AND FOUR ARE FACTORS YOU CAN

CONSIDER IF YOU DON'T THINK BRANDON BASHAM'S HAND HAD A ROLE IN ACTUALLY KILLING ALICE DONOVAN. THAT IS WHAT THREE AND FOUR, THE DEFENDANT INTENTIONALLY PARTICIPATED IN AN ACT CONTEMPLATING THAT THE LIFE OF A PERSON WOULD BE TAKEN OR INTENDING THAT LETHAL FORCE WOULD BE USED IN CONNECTION WITH A PERSON, OTHER THAN ONE OF THE PARTICIPANTS IN THE OFFENSE, AND THE VICTIM DIED AS A DIRECT RESULT OF THE ACT, OR THE DEFENDANT INTENTIONALLY AND SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE, KNOWING THAT THE ACT CREATED A GRAVE RISK OF DEATH TO A PERSON, OTHER THAN ONE OF THE PARTICIPANTS IN THE OFFENSE, SUCH THAT PARTICIPATION IN THE ACT CONSTITUTED A RECKLESS DISREGARD FOR HUMAN LIFE, AND THE VICTIM, ALICE DONOVAN, DIED AS A DIRECT RESULT OF THE ACT.

I SUBMIT -- LET ME TAKE THESE BACKWARDS. I SUBMIT ON THE TESTIMONY AND EVIDENCE YOU HAVE HEARD, AND BASED ON THE VERDICTS YOU HAVE FOUND, THREE AND FOUR ARE NO-BRAINERS. NO-BRAINERS. LOOK AT NUMBER FOUR. THE DEFENDANT INTENTIONALLY AND SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE. LADIES AND GENTLEMEN, YOU HAVE CONVICTED BRANDON BASHAM AND, HE HAS ADMITTED IN STATEMENTS THAT HE KNOWINGLY ENGAGED IN THE ACT OF KIDNAPPING AND THE ACT OF CARJACKING ARMED WITH A DEADLY WEAPON, KNOWING THAT THE ACT CREATED A GRAVE RISK OF DEATH TO A PERSON, BEING ALICE DONOVAN.

LADIES AND GENTLEMEN, ANYTIME YOU ROB SOMEBODY, OR CARJACK SOMEBODY, OR KIDNAP SOMEBODY AT GUNPOINT,

PARTICULARLY AFTER YOU DID IT 72 HOURS BEFORE TO A 19-YEAR-OLD GIRL, THAT IS CREATING GRAVE RISK. BY DEFINITION, ARMED CARJACKING, ARMED KIDNAPPING IS A RISK OF DEATH TO ANY CITIZEN IN THIS STATE. BY HIS ADMISSIONS, BY YOUR VERDICT, BY YOUR CONVICTION OF BRANDON BASHAM, YOU HAVE FOUND INTENT LEVEL FOUR, THAT IS IF YOU BELIEVE MR. BASHAM'S HAND HAD NOTHING TO DO WITH KILLING ALICE DONOVAN.

RECKLESS DISREGARD FOR HUMAN LIFE. ARMED WITH A GUN. BRANDON BASHAM IS IN THE BACK SEAT OF THAT CAR. IN THE VERY LEAST, IN THE LIGHT MOST FAVORABLE TO BRANDON BASHAM, HE IS THE ONE THAT APPROACHED ALICE DONOVAN WITH A GUN WHILE CHAD FULKS WAS IN THE TRUCK. HE IS THE ONE THAT SAT IN THAT BACK SEAT. HE IS THE ONE THAT HELD THE GUN AT HER SIDE THAT KEPT HER FROM WALKING OUT OF THAT CAR WHEN CHAD FULKS WENT MULTIPLE TIMES TO USE THE ATM MACHINE. TWO TO THREE MINUTES CHAD FULKS WAS IN THE CONVENIENT STORE IN SHALLOTTE, NORTH CAROLINA. THE ONLY THING KEEPING ALICE DONOVAN FROM WALKING TO HER FREEDOM, FROM KEEPING HER ALIVE TODAY ALL THE TIMES CHAD FULKS WALKED AWAY FROM THAT CAR ON NOVEMBER 14TH, ONLY ONE PERSON, ONLY ONE PERSON, THAT WAS BRANDON BASHAM.

SO, BY YOUR CONVICTIONS, BY HIS ADMISSIONS, AND BY COMMON SENSE, NUMBER FOUR IS PRESENT, AND THAT IS IF YOU DON'T FIND HIS HAND ACTUALLY HAD A ROLE IN KILLING ALICE DONOVAN.

SAME THING WITH NUMBER THREE. NUMBER THREE, THE

DEFENDANT INTENTIONALLY PARTICIPATED IN AN ACT CONTEMPLATING THAT THE LIFE OF A PERSON WOULD BE TAKEN. LADIES AND GENTLEMEN, THIS IS THE MOTIVATIONAL FACTOR. HE HAD ALREADY CARJACKED, AND KIDNAPPED, AND KILLED ONE WOMAN. WHAT DO YOU THINK HIS MOTIVATION WAS? WHAT DO YOU THINK BRANDON BASHAM'S MOTIVATION IS? HE IS APPROACHING THE CAR WITH ALICE DONOVAN WITH THE GUN IN HER SIDE. DO YOU THINK EITHER CHAD FULKS OR BRANDON BASHAM, AFTER CARJACKING, KIDNAPPING, ROBBING ALICE DONOVAN, AFTER SPENDING ALL OF THAT TIME WITH ALICE DONOVAN, DO YOU THINK FOR ONE MINUTE THEY WOULD DROP HER OFF AT THE CORNER AND SAY, GO CALL THE POLICE. IDENTIFY ME IN A SOUTH CAROLINA COURTROOM. SEND ME AWAY TO PRISON FOR THE REST OF MY LIFE. CONTEMPLATING THAT A LIFE OF A PERSON WOULD BE TAKEN, USING LETHAL FORCE.

THE GUN PROVIDES LETHAL FORCE. AND, AGAIN, LADIES AND GENTLEMEN, FOR YOU JURORS TO HAVE CONVICTED MR. BASHAM OF CARJACKING, YOU HAD TO HAVE FOUND THAT INTENT FACTOR. YOU HAD TO HAVE FOUND, AT THE TIME OF THE CRIME, THAT BRANDON BASHAM INTENDED TO CAUSE DEATH OR SERIOUS BODILY HARM. AND, LADIES AND GENTLEMEN, YOU HAVE CONVICTED BRANDON BASHAM. HE IS GUILTY OF KIDNAPPING, RESULTING IN DEATH; HE IS GUILTY OF CARJACKING, RESULTING IN DEATH. NOT ONLY AS A MATTER OF FACT, BUT AS A MATTER OF LAW. YOU HAVE CONVICTED HIM ON THOSE TWO CHARGES. SO, EITHER ONE OF THOSE TWO ARE CLEARLY PRESENT BY YOUR PREVIOUS VERDICTS, AND BY THE TESTIMONY OF THE WITNESSES,

AND THE ADMISSION OF THE DEFENDANT.

NOW, WITH REGARD TO WHETHER OR NOT THE DEFENDANT INTENTIONALLY KILLED ALICE DONOVAN, LET'S LOOK AT THE EVIDENCE THAT INDICATES MR. BASHAM'S HAND HAD A ROLE IN ACTUALLY KILLING ALICE DONOVAN. FIRST, YOU HAVE GOT THE STATEMENTS OF MR. BASHAM ALONE ON NOVEMBER 25TH. IF YOU RECALL, THE STATEMENT TO FBI AGENTS VITO AND MALEY IN KENTUCKY, IN THE PRESENCE OF HIS OWN LAWYER, IN THE PRESENCE OF HIS LAWYER, TALKING ABOUT THE CEMETERY WHERE ALICE WAS KILLED. MR. BASHAM -- DO YOU REMEMBER THE TESTIMONY FROM THE AGENT? THIS IS WHERE MR. BASHAM SAID, "THEY DID THEIR THING." WHERE THEY DID THEIR THING AT THE CEMETERY. TELLING AGENT VITO AND AGENT MALEY THAT ALICE DONOVAN'S BODY WILL BE FOUND 20 TO 25 FEET DRAGGING DISTANCE OFF OF THE ROAD. HE TALKS ABOUT HOW AFTERWARDS, AFTER HE PARTICIPATED IN THE DRAGGING OF ALICE DONOVAN'S BODY, HE GOT BACK IN THE CAR AND GOT HIGH. THOSE ARE BRANDON BASHAM'S STATEMENTS TO TWO FBI AGENTS IN THE PRESENCE OF A LAWYER.

BUT IT DOESN'T STOP THERE. BECAUSE THREE DAYS LATER, ON THANKSGIVING DAY, ON NOVEMBER 28TH, UP IN THE BEE TREE FARM AREA OF WINNABOW, BRUNSWICK COUNTY, NORTH CAROLINA, DO YOU REMEMBER THE TESTIMONY OF SHERIFF HEWITT, IN THE PRESENCE OF HIS LAWYER, MR. LITTLEJOHN? BRANDON BASHAM, RIDING IN THE VAN THAT DAY, SEEING THOSE HUNTERS WALKING DOWN THE ROAD, SEEING THAT DOE RUN ACROSS THE PATH, BRANDON BASHAM SAYS, "HERE, I

COULDN'T EVEN KILL A DEER, AND I HAVE" -- AND THEN HE WAS STOPPED BY MR. LITTLEJOHN. "HERE I COULDN'T EVEN KILL A DEER, AND I HAVE" --

BUT IT DOESN'T STOP THERE. BECAUSE LATER ON, AT THE END OF THAT DAY WHEN EVERYBODY IS FRUSTRATED, THEY GET BACK TO THAT CEMETERY, THE CEMETERY YOU HAVE SEEN PICTURES OF. MR. PERDUE TESTIFIED ABOUT SEEING ALICE DONOVAN'S BMW. SEEING THAT REAR LIGHT THEY GO BACK TO THAT CEMETERY. WHAT DOES BRANDON BASHAM SAY IN THE PRESENCE OF SHERIFF HEWITT? IT IS NOT REALLY WHAT HE SAYS, IT IS WHAT HE DOES. HE IS SHACKLED. HE DESCRIBES A PURSE STRAP, AND HE DEMONSTRATES, HE DEMONSTRATES TO SHERIFF HEWITT HOW ALICE DONOVAN WAS STRANGLED. AND THEN HE TELLS SHERIFF HEWITT, "I THREW THE PURSE STRAP INTO THE WOODS." HE HAS DEMONSTRATED. HE EVEN HAS HIS ARMS DOWN. YOU SAW SHERIFF HEWITT STAND UP THERE AND SHOW.

NOW, DOES THAT MEAN BRANDON BASHAM'S STRANGLING OF ALICE DONOVAN IS THE ONLY HAND THAT CAUSED ALICE DONOVAN'S DEATH? THE GOVERNMENT DOESN'T SUBMIT THAT. THE GOVERNMENT SUBMITS, AND SUBMITTED ALL ALONG, THAT CHAD FULKS IS JUST AS RESPONSIBLE. CHAD FULKS HAD EVERY RIGHT, AS WELL, TO MAKE SURE ALICE DONOVAN DIED. THEY HAD GUNS, KNIVES. MR. FULKS HAD EVERY INCENTIVE, AS WELL, TO MAKE SURE THAT SHE WAS DEAD.

DID HE STOP THERE? CHRISTMAS EVE, DECEMBER 24TH, 2002, WHO DID BRANDON BASHAM REACH OUT TO? WHO DID HE REACH OUT TO? HE

REACHES OUT TO MR. CLIFFORD JAY.  MR. JAY, WHO IS A COUNSELOR OF MR. BASHAM.  THE SAME CLIFFORD JAY MR. BASHAM TOOK A KNIFE AND TOOK A SWING AT HIS THROAT WHEN MR. JAY WOKE HIM UP.  MR. BASHAM IS A TEENAGER, TOOK THAT KNIFE, TRIED TO SLASH MR. JAY'S THROAT.  MR. JAY, BEING A COUNSELOR, BEING SOMEBODY THAT WORKS WITH CHILDREN, HE DIDN'T HOLD THAT AGAINST MR. BASHAM.  YOU HEARD HIS TESTIMONY, AND SOME OF THE TESTIMONY FROM TEACHERS AND SOCIAL WORKERS, HE CONTINUED TO WORK WITH MR. BASHAM.  HE CONTINUED TO BEFRIEND MR. BASHAM'S FAMILY. HE CONTINUED TO LOOK OUT FOR MR. BASHAM.  AND ON DECEMBER 24TH, ON CHRISTMAS EVE, AS BRANDON BASHAM WAS SITTING IN JUST CARE IN COLUMBIA, SOUTH CAROLINA, HE REACHES OUT TO CLIFFORD JAY.  YOU HAVE THE PHONE RECORDS.

AT THAT POINT IN TIME, MR. BASHAM'S ONLY CHARGE WITH ALICE DONOVAN, NOBODY FROM KENTUCKY, NOBODY KNEW ANYTHING ABOUT IT, NEWSPAPERS, NOBODY HAD REPORTED ANYTHING ABOUT SAMANTHA BURNS, HE WASN'T CHARGED WITH ANY OF THAT.  THE ONLY THING HE WAS CHARGED WITH WAS ALICE DONOVAN.  A 44-YEAR-OLD WOMAN FROM GALIVANT'S FERRY, SOUTH CAROLINA.  MR. JAY ASKED MR. BASHAM WHEN MR. BASHAM CALLS HIM, NEEDS SOMEONE TO TALK TO ON CHRISTMAS EVE, MR. BASHAM TELLS MR. JAY, OR MR. JAY ASKS MR. BASHAM, BRANDON, "IS IT TRUE WHAT THEY ARE SAYING ABOUT YOU IN THE PAPERS?" AND WHAT WAS MR. BASHAM'S RESPONSE? "YES, SIR, MR. C. J., WE KILLED THEM.  YES, SIR, MR. C. J., WE KILLED THEM."

THINK ABOUT ALL OF THE PEOPLE WHO HAD INTERVIEWED MR. BASHAM, AND ALL OF THE PEOPLE -- LAW ENFORCEMENT PEOPLE AND EVERYBODY WHO WAS INTERVIEWING HIM WHEN HE KNEW WHAT HE SAID COULD BE USED AGAINST HIM.  HERE HE IS REACHING OUT TO SOMEONE THAT HAS NO IDEA THE AUTHORITIES WILL EVER TALK TO,  "WE KILLED THEM."  THE WORDS OF BRANDON BASHAM.  THE DEFENDANT INTENTIONALLY KILLED THE VICTIM. "WE KILLED THEM." "WE TIED THE WOMAN TO A TREE IN NORTH CAROLINA."  THAT IS WHAT HE TELLS MR. JAY.

NOW,  DOES IT STOP THERE? THAT IS DIRECT EVIDENCE FROM THE MOUTH OF BRANDON BASHAM.  THERE IS CIRCUMSTANTIAL EVIDENCE, AS WELL.  WHAT IS THE CIRCUMSTANTIAL EVIDENCE YOU HAVE HEARD? I WILL NOT GO THROUGH EVERYTHING, YOU HAVE HEARD IT.  I WILL JUST TOUCH ON NAMES, AND DATES, AND EVENTS SO IT WILL REFRESH YOUR MEMORY.  YOU GOT HIS ROLE IN SAMANTHA BURNS'S THREE DAYS BEFORE ALICE DONOVAN.  HIS ROLE IN THE CARJACKING AND KIDNAPPING OF SAMANTHA BURNS.  NOW,  AFTER CARJACKING, KIDNAPPING, AND KILLING SAMANTHA BURNS,  DO YOU THINK FOR ONE MINUTE BRANDON BASHAM WOULD ALLOW ALICE DONOVAN TO SURVIVE? YOU HAVE HIS ROLE.  THREE DAYS AFTER ALICE DONOVAN,  WHEN HE ATTEMPTS TO KIDNAP AND CARJACK ANDREA FRANCIS AT THE MALL IN ASHLAND,  KENTUCKY,  IT WAS BRANDON BASHAM WHO WALKED UP TO HER.  BRANDON BASHAM STUCK THAT GUN IN HER SIDE.  BRANDON BASHAM TRYING TO GET IN THAT CAR.  DON'T GET ME WRONG,  THEY HAD THE SAME MO.  CHAD FULKS WAS DRIVING THAT BMW AROUND,

SAME MO.   EQUALLY AS GUILTY.   BUT IT WAS BRANDON BASHAM DOING THE DIRTY WORK ON THE GROUND AT THE PARKING LOT AT THE CAR WITH THE 15-YEAR-OLD GIRL.

WHAT OTHER CIRCUMSTANTIAL EVIDENCE DO YOU HAVE? YOU HAVE HIS GENERAL CHARACTER OF VIOLENCE THROUGHOUT THIS CRIME SPREE. THINK ABOUT ALL OF THE -- FIRST OF ALL,  HE ARMED HIMSELF WITH A GUN.   HE WAS ARMED WITH A GUN THE ENTIRE TIME.   THAT IS TESTIMONY FROM TINA SEVERANCE AND ANDREA RODDY SUGGESTED.  HE IS THE ONE WHO CONTINUOUSLY HAD HIMSELF WITH A GUN.   HE IS THE ONE THREATENING POLICE OFFICERS.   IF HE WAS THREATENING TO KILL POLICE OFFICERS IF THEY KNOCKED ON THE DOOR IN STURGIS, MICHIGAN,  DO YOU THINK HE WOULD LEAVE ALICE DONOVAN ALIVE?  HE WAS THREATENING TO KILL THE TEENAGERS OVER THE MONEY.   HE WAS THREATENING TO KILL BETH MCGUFFIN'S BROTHER IF THEY RIPPED THEM OFF WITH A DRUG DEAL.

ARMED WITH A GUN,  THREATENING, AND GUESS WHAT?  DO YOU THINK HE IS CAPABLE?  THEY WANT YOU TO BELIEVE IT IS MERE PUFFING.  YOU SAW IT FOR YOURSELF.   YOU HEARD IT FROM MATTHEW DAVIS.   YOU SAW HOW BRANDON BASHAM IS INTENTIONALLY KILLING SOMEONE IF IT MEANS NOT GETTING CAUGHT.   YOU HEARD THE TESTIMONY FROM MATT DAVIS.  YOU HEARD HIM SAY HOW BRANDON SHOT ONCE IN THE AIR AND TURNED AROUND AND DREW DOWN ON HIM.   HE TRIED TO KILL MATT DAVIS.   WHAT DO YOU THINK WOULD HAVE HAPPENED IF THAT BULLET HAD HIT MATT DAVIS IN THE HEAD, FATHER OF TWO CHILDREN?  YOU HAVE SEEN HIM.   YOU HAVE SEEN

HIS CAPABILITY OF INTENDING TO KILL PEOPLE THAT MIGHT HARM HIM, THAT MIGHT PUT HIM AWAY. YET, BRANDON BASHAM DIDN'T INTENTIONALLY KILL ALICE DONOVAN. LIES. YOU CAN USE HIS LIES AS CONSCIOUSNESS OF GUILT. WHY ELSE IS HE LYING IF HE DIDN'T HAVE A HAND IN KILLING ALICE DONOVAN?

HE IS LYING TO LAW ENFORCEMENT FROM THE BEGINNING, LADIES AND GENTLEMEN. HE HAS ALICE DONOVAN ALIVE, THEN HE HAS HER DEAD. HE HAS ALICE DONOVAN IN KENTUCKY, THEN HE HAS HER IN SOUTH CAROLINA. HE HAS HER IN NORTH CAROLINA. WHEN FIRST CONFRONTED, HE TOLD THEM CHAD FULKS IS CAPABLE OF HURTING ANYONE, WOULD NOT HURT ALICE DONOVAN. WHEN THE FOCUS IS ON BRANDON BASHAM, HE SAID CHAD FULKS DID EVERYTHING, AND I AM AFRAID OF CHAD FULKS. HE IS BLAMING OTHERS.

YOU PROBABLY MAY HAVE FORGOTTEN THE NUMBER OF TIMES MR. DUANE, MR. SCHOOLS, AND I POINTED OUT THE GENOGRAM, ALL OF THE SOCIAL WORKERS, NURSES, DOCTORS, COUNSELORS, BRANDON BASHAM BLAMES OTHERS. BRANDON BASHAM BLAMES OTHERS. BRANDON BASHAM BLAMES OTHERS. A PATTERN THAT HAS BEEN WITH HIM SINCE TEN YEARS OLD HAS CONTINUED ON UNTIL AS WE SIT HERE TODAY.

LADIES AND GENTLEMEN, BRANDON BASHAM AND CHAD FULKS DID EVERYTHING TOGETHER DURING THAT 14 DAYS FROM NOVEMBER 4TH UNTIL HE WAS ARRESTED, BASHAM WAS, ON THE 17TH. DO YOU THINK AFTER WHAT THEY DID WITH ALICE DONOVAN, AFTER WHAT THEY DID WITH SAMANTHA BURNS THAT THEY BOTH WOULDN'T HAVE A ROLE IN KILLING ALICE DONOVAN? OR AS BRANDON TELLS MR. JAY, "WE

KILLED THEM?" YOU CAN ONLY FIND ONE OF THOSE FOUR. THE GOVERNMENT SUBMITS ALL FOUR OF THEM ARE PRESENT. HE KILLED ALICE DONOVAN. THE GOVERNMENT RESPECTFULLY REQUESTS THAT YOU COME BACK WITH THE THRESHOLD INTENT FACTOR THAT TELLS MR. BASHAM, WE FIND THAT YOU KILLED ALICE DONOVAN. AND IF YOU WANT TO GIVE HIM ANY BENEFIT OF THE DOUBT, THREE AND FOUR, THERE IS AN OVERWHELMING AMOUNT, FLIP A COIN.

NOW, AGGRAVATING FACTOR. KIDNAPPING, THE DEATH OF ALICE DONOVAN, AND THE INJURY RESULTING IN THE DEATH OF ALICE DONOVAN. THIS, LADIES AND GENTLEMEN, YOU HAVE ALREADY FOUND. YOU HAVE FOUND THIS AGGRAVATING FACTOR WHEN YOU FOUND MR. BASHAM GUILTY OF KIDNAPPING. AGAIN, THIS IS MERE FORMALITY. YOU HAVE ALREADY FOUND HIM BEYOND A REASONABLE DOUBT GUILTY OF KIDNAPPING. HE STANDS IN THE LAW GUILTY OF KIDNAPPING. SO, 18 YEARS OLD, THRESHOLD INTENT FACTOR, AND THEN ONE STATUTORY AGGRAVATING FACTOR, KIDNAPPING.

AT THIS JUNCTURE, LADIES AND GENTLEMEN, YOU JURORS, AS A MATTER OF LAW, CAN CONSIDER SENTENCING MR. BASHAM TO THE DEATH PENALTY. IN FACT, LADIES AND GENTLEMEN, YOU CAN SENTENCE HIM TO THE DEATH PENALTY EVEN IF YOU DON'T FIND ANY NONSTATUTORY AGGRAVATING FACTORS. ONCE YOU FIND THOSE GATEWAY FACTORS, IF YOU BELIEVE IT IS WARRANTED, YOU JURORS CAN SENTENCE MR. BASHAM TO DIE FOR SIMPLY WHAT HE DID TO ALICE DONOVAN.

AND REMEMBER WHAT HE DID TO ALICE DONOVAN, LADIES AND

GENTLEMEN.  BRANDON BASHAM AND CHAD FULKS TARGETED ALICE DONOVAN, A WOMAN ALONE WITH A NICE CAR.  THEY KIDNAPPED AND CARJACKED ALICE DONOVAN IN BROAD DAYLIGHT AT GUNPOINT IN A WAL-MART PARKING LOT,  THE LARGEST RETAIL SHOPPING CENTER IN THE WORLD, IN FRONT OF HUNDREDS OF CARS AND PEOPLE.  THEY ROBBED ALICE DONOVAN OF HER MONEY.  AND THAT DAY,  WE KNOW, AT LEAST BY MR. FULKS,  ALICE DONOVAN WAS ROBBED OF SOMETHING MORE PRECIOUS.  SHE WAS ROBBED OF HER DIGNITY.  THE FORENSIC EVIDENCE INDICATES, AT LEAST, THAT MR. FULKS RAPED ALICE DONOVAN IN THE BACK SEAT OF HER CAR.  AT THE VERY LEAST, MR. BASHAM STOOD BY AND WATCHED AS A LOOKOUT OR WHATEVER PLEASURE HE GOT.

NOW,  WHAT WE DON'T HAVE,  LADIES AND GENTLEMEN, IS ALICE DONOVAN'S BODY TO SEE ANY KIND OF EVIDENCE THAT MAY BE OBTAINED FROM HER BODY.  WE DON'T HAVE PANTIES OR CLOTHES BECAUSE BRANDON BASHAM AND CHAD FULKS GOT RID OF HER BODY, AND GOT RID OF HER CLOTHES, AND WE'RE INCAPABLE OF BRINGING YOU WHATEVER FORENSIC EVIDENCE THAT MAY HAVE REVEALED.  BRANDON BASHAM AND CHAD FULKS MADE ALICE DONOVAN MAKE A PHONE CALL TO HER DAUGHTER AND LIE AT GUNPOINT SO THAT THEY COULD CONTINUE TO DO AND HAVE TIME TO DO WITH HER WHATEVER THEY DID. BRANDON BASHAM AND CHAD FULKS KILLED ALICE DONOVAN WHEN THEY WERE FINISHED WITH HER.  THEY WERE DONE.  THEY KILLED HER. AND BRANDON BASHAM AND CHAD FULKS THEN DISPOSED OF ALICE DONOVAN'S BODY IN SUCH A WAY THAT IT HAS BEEN UNRECOVERABLE

FOR LAW ENFORCEMENT AND, MORE IMPORTANTLY, FOR THE FAMILIES. THAT IS WHAT BRANDON BASHAM DID TO ALICE DONOVAN.

YOU JURORS, ONCE YOU FIND THOSE THRESHOLD FACTORS, CAN SENTENCE HIM TO DEATH SIMPLY FOR THOSE EGREGIOUS, VILE, AND VICIOUS ACTS AGAINST ALICE DONOVAN.  BUT THERE IS MORE. THERE IS MUCH MORE.  WHAT ARE THE NONSTATUTORY AGGRAVATING FACTORS?  THREE OF THEM.  PARTICIPATION IN ADDITIONAL UNCHARGED MURDERS, ATTEMPTED MURDERS, OR OTHER SERIOUS ACTS OF VIOLENCE.  NOW, THIS FRAME IS GOING TO BE UP HERE FOR A SHORT PERIOD OF TIME.  I WILL GO THROUGH THE EVIDENCE ON EACH ONE OF THOSE THREE.

LADIES AND GENTLEMEN, ALL YOU HAVE TO DO IS FIND ONE THING, ONE THING BEYOND A REASONABLE DOUBT TO FIND ANY ONE OF THOSE THREE CATEGORIES OR ONE PIECE OF EVIDENCE OR TESTIMONY. WHAT DO I MEAN BY THAT? I WILL DISCUSS WITH YOU, PARTICIPATION IN ADDITIONAL UNCHARGED MURDERS, ATTEMPTED MURDERS, OR OTHER SERIOUS ACTS OF VIOLENCE. THERE ARE FIVE OF THEM.  IN FACT, I GUESS THERE ARE FIVE OF THEM.

ESCAPING FROM THE HOPKINS COUNTY DETENTION CENTER IS A FEDERAL LAW, AN ESCAPE IS.  YOU CONSIDER IT AN ACT OF VIOLENCE.  AND YOU HEARD THE TESTIMONY, I AM NOT GOING TO GO INTO IT, LADIES AND GENTLEMEN, BUT THAT REQUIRED PLANNING, IT REQUIRED DECEPTION, AND IT REQUIRED NERVE.  AND BOTH OF THEM ESCAPED.  NO QUESTION, MR. FULKS, AT THAT TIME, HAD MORE MOTIVE TO ESCAPE, NO QUESTION ABOUT IT.  BUT, AGAIN, IT

REQUIRED BOTH OF THEM. THERE IS NO WAY ONE OF THEM COULD HAVE GOTTEN UP ON THAT ROOF. IT REQUIRED BOTH OF THEM. IT REQUIRED MR. BASHAM'S KNOWLEDGE OF WHERE HIS BUS WAS WITH THE CHANGE OF CLOTHES. AND HE IS THE ONE WHO APPROACHED DIAN BLAIR. AND HE WAS EVERY BIT INVOLVED IN THAT PLANNING AND THAT DECEPTION.

LADIES AND GENTLEMEN, LET ME JUST TELL YOU RIGHT THERE. THE BABYING OF BRANDON BASHAM NEEDS TO STOP. IT NEEDS TO STOP RIGHT HERE AND RIGHT NOW. THE BABYING OF BRANDON BASHAM. HE WAS A 21-YEAR-OLD MAN WHEN HE ESCAPED WITH CHAD FULKS. A 21-YEAR-OLD MAN. THERE ARE 18 AND 19-YEAR-OLD MEN AND WOMEN SPILLING THEIR BLOOD IN TWO WARFRONTS ON ANOTHER CONTINENT MUCH YOUNGER THAN THIS MAN. HE IS RESPONSIBLE. HE IS NOT A CHILD. THE BABYING STOPS TODAY.

CARJACKING AND KIDNAPPING, RESULTING IN THE DEATH OF SAMANTHA BURNS. I WON'T GO OVER ALL OF THE EVIDENCE TODAY. I WILL TOUCH ON IT. THE PHYSICAL EVIDENCE, THE CANDY BOX FOUND IN THEIR VAN. THE RING, SAMANTHA BURNS'S RING THAT BRANDON BASHAM HAD THAT HE GAVE TO BETH MCGUFFIN. IT HAS BEEN IDENTIFIED, SIMILAR RING, OR THE EXACT SAME RING, JUST A DIFFERENT RING BECAUSE WE NEVER FOUND THE RING, BUT MS. BURNS WAS ABLE TO LOCATE THE JEWELER AND GET THE EXACT ONE AS BEING IN THE POSSESSION OF BRANDON BASHAM, MS. SEVERANCE, AND MS. MCGUFFIN.

THE ATM PHOTOGRAPH, HIS PARTNER AIDING AND ABETTING.

SAMANTHA BURNS'S DRIVER'S LICENSE THAT TINA SEVERANCE FOUND IN A BAG IN A MOTEL ROOM DOWN AT LAKE SHORE MOTEL THE DAY BEFORE ALICE DONOVAN WAS ABDUCTED.    FOUR PIECES OF PHYSICAL EVIDENCE THAT LINKS BRANDON BASHAM TO THE CARJACKING, KIDNAPPING, KILLING OF SAMANTHA BURNS.    DON'T FORGET THAT NO DRIVE THEORY, MR. BASHAM COULDN'T DRIVE.    MR. BASHAM COULDN'T DRIVE.    IN ORDER TO GET THE VAN AND SAMANTHA BURNS'S CAR TO THE APPROPRIATE LOCATIONS,  THERE IS ONLY ONE WAY THAT COULD HAVE HAPPENED.    CHAD FULKS HAD TO BE DRIVING THE VAN, AND SAMANTHA BURNS HAD TO BE DRIVING HER CAR, AND BRANDON BASHAM HAD TO BE IN SAMANTHA BURNS'S CAR.    IF THERE IS NO ONE IN SAMANTHA BURNS'S CAR, SHE GOES HOME.  SHE GOES TO THE POLICE STATION.    SHE GOES TO A CROWD OF PEOPLE.    BRANDON BASHAM CAN'T DRIVE.    THINK OF ALL OF THE HOURS AND ALL OF THE MILES THAT WERE DRIVEN THAT SAMANTHA BURNS DROVE IN HER CAR, DRIVING UP THAT MOUNTAINSIDE WITH CHAD FULKS LEADING THE WAY IN THE VAN.    SAMANTHA BURNS DRIVING UP THAT MOUNTAINSIDE TO GET HER CAR UP THERE.    BRANDON BASHAM IN THAT CAR.    ALL NIGHT, MAKING CHOICES,  MAKING DECISIONS ALONE.

THEY BURNED HER CAR.    THEY BURNED THE CAR SO NO PHYSICAL EVIDENCE COULD BE FOUND IN THE CAR.    WHAT DID CHAD FULKS AND BRANDON BASHAM DO WITH THAT CAR? WHY DID THEY NEED TO BURN THAT CAR?   THERE WAS MUD ON BOTH SIDES OF THE VAN UPON ITS RETURN TO THE MOTEL.  MUD ON THE CLOTHING OF BOTH BRANDON BASHAM AND CHAD FULKS, WHICH CLEARLY INDICATES THAT BOTH OF

THEM HAD A ROLE IN DUMPING HER BODY IN EITHER THE GUYANDOTTE OR OHIO. WHATEVER RIVER THEY DUMPED HER IN, THEY ARE BOTH MUDDY, MUD ON BOTH SIDES OF THE VAN, BOTH DECKED OUT IN CAMO.

FROM 6:30, SHE WALKS OUT OF THE J. C. PENNEY'S MALL, UNTIL 3:15 THE GENTLEMAN HEARS THE FIRE AND SEES THE FIRE. THAT IS NINE HOURS SAMANTHA BURNS HAD TO BE ALIVE TO DRIVE HER CAR UP TO THE TOP OF THAT MOUNTAIN. CHAD FULKS AND BRANDON BASHAM, MANY TIMES BRANDON BASHAM HAD SAMANTHA BURNS ALONE, BUT THEY HAD HER FOR NINE HOURS. FIVE FOOT TWO, 105 POUNDS, SAMANTHA BURNS. AND THEN THEY DISPOSED OF HER BODY. WHEN THEY WERE DONE WITH HER, JUST LIKE WHEN THEY WERE DONE WITH ALICE, THEY DISPOSED OF HER BODY, BRANDON BASHAM AND CHAD FULKS DID.

LADIES AND GENTLEMEN, BRANDON BASHAM AND THIS CANDY BOX. THIS CANDY MEANT MORE TO HIM THAN THE LIFE OF A 19-YEAR-OLD GIRL. THEY THROW SAMANTHA BURNS INTO A RIVER LIKE A PIECE OF GARBAGE WHEN THEY WERE DONE WITH HER. YET, HE KEEPS HIS CANDY.

THE BURGLARY OF SAM JORDAN'S RESIDENCE RESULTING IN THE ATTEMPTED MURDER OF CARL JORDAN. AIDING AND ABETTING. DESPITE THE FACT IT WAS MR. FULKS THAT SHOT THROUGH THE WINDOW, HE WAS PRESENT. HE IS GUILTY AS A PRINCIPAL IN THE BURGLARY. HE IS INSIDE THE RESIDENCE. HE IS ATTEMPTING TO STEAL. ALREADY UNLOADED GUNS AND JEWELRY OF SAM JORDAN'S

WIFE AND HIS OWN GUNS IN THE VAN. GUILTY OF BURGLARY AS A PRINCIPAL. GUILTY OF ATTEMPTED MURDER. AIDING AND ABETTING. TWO PEOPLE ARE GUILTY OF THE FACTS OF THEIR CODEFENDANT, AIDING AND ABETTING. YOU DON'T HAVE TO FIND HE, HIMSELF, ATTEMPTED TO KILL CARL JORDAN. HE WAS PRESENT AIDING AND ABETTING MR. FULKS. HE IS JUST AS GUILTY.

KIDNAPPING AND CARJACKING OF JAMES HAWKINS. REMEMBER HE INITIATED THE KNOCK ON THE DOOR, HE INITIATED THE THREATS. AGAIN, EVERYTHING THAT BRANDON BASHAM DID TO JAMES HAWKINS, CHAD FULKS IS GUILTY OF. EVERYTHING THAT CHAD FULKS DID TO JAMES HAWKINS, BRANDON BASHAM IS GUILTY OF, UNDER THE LAW, AIDING AND ABETTING.

THE ATTEMPTED MURDER OF ASHLAND POLICE OFFICER MATT DAVIS. REMEMBER THIS, LADIES AND GENTLEMEN, I AM NOT GOING TO GO OVER ALL THE FACTS IN EVIDENCE, I HAVE ALREADY DISCUSSED IT. HE ATTEMPTED TO KILL OFFICER MATTHEW DAVIS. HE ATTEMPTED TO KILL OFFICER MATTHEW DAVIS AFTER HIS ATTEMPT TO KIDNAP AND CARJACK 15-YEAR-OLD ANDREA FRANCIS DID NOT SUCCEED. LADIES AND GENTLEMEN, SEVERAL WEEKS AGO, EACH AND EVERY ONE OF YOU, NOT IN THIS COURTROOM, IN ANOTHER COURTROOM DOWN THE HALL, EACH AND EVERY ONE OF YOU TOOK THAT WITNESS STAND, WENT THROUGH THE SAME PROCESS. PRIOR TO TAKING THE WITNESS STAND, EACH AND EVERY ONE OF YOU HAD AN OPPORTUNITY TO SEE THE VIDEO THAT JUDGE ANDERSON HAD MADE SO YOU KNEW THIS CASE WAS ABOUT A 44-YEAR-OLD WOMAN BEING ABDUCTED, CARJACKED, AND KILLED.

WHILE YOU WERE ON THAT WITNESS STAND, YOU KNEW YOU WOULD HEAR EVIDENCE AND TESTIMONY ABOUT A 19-YEAR-OLD GIRL FROM HUNTINGTON, WEST VIRGINIA. EACH AND EVERY ONE OF YOU ANSWERED JUDGE ANDERSON'S QUESTIONS. YOU ANSWERED QUESTIONS FROM THE PROSECUTION. YOU ANSWERED QUESTIONS FROM DEFENSE COUNSEL. AND YOU SAID THAT YOU WOULD CONSIDER LIFE. YOU ALSO SAID, GIVEN THE APPROPRIATE CIRCUMSTANCES, YOU COULD GIVE THE DEATH PENALTY AGAINST A FELLOW CITIZEN. YOU KNEW IT WASN'T A CASE OF FLYING PLANES INTO A BUILDING; YOU KNEW IT WASN'T A CASE OF A GROUP OF CHILDREN BEING KILLED. YOU KNEW, BASICALLY, WHAT THE GENERAL FACTS WERE. EACH AND EVERY ONE OF YOU TOOK THAT WITNESS STAND. YOU SAID IF THE CIRCUMSTANCES WARRANTED, I COULD SENTENCE A FELLOW CITIZEN TO THE DEATH PENALTY.

YOU HAVE SEEN MR. BASHAM'S INVOLVEMENT IN THE RANDOM CARJACKING, KIDNAPPING, TERRORIZING, AND KILLING OF A 19-YEAR-OLD GIRL. YOU HAVE SEEN HIM ATTEMPT TO KILL OFFICER MATT DAVIS. YOU HAVE SEEN HIM IN THE CARJACKING, KIDNAPPING, AND KILLING OF A 44-YEAR-OLD WOMAN, AND DISPOSING OF HER BODY. I ASK YOU THIS. WHAT MORE DID BRANDON BASHAM HAVE TO DO TO WARRANT THE DEATH PENALTY?

YOU SAW ANDREA FRANCIS TAKE THAT WITNESS STAND. YOU SAW HER. SHE WAS 15 YEARS OLD, AT THE TIME. WHAT DO YOU THINK BRANDON BASHAM AND CHAD FULKS WOULD HAVE DONE TO ANDREA FRANCIS? WHAT DO YOU THINK THEY WOULD HAVE DONE WITH THAT YOUNG GIRL IF BRANDON BASHAM HAD BEEN SUCCESSFUL IN CARJACKING

AND KIDNAPPING HER? WHAT DOES IT TAKE? IS IT THE RANDOM CARJACKING AND KILLING OF THREE INNOCENT WOMEN? DOES BRANDON BASHAM NEED TO MAKE A HAT TRICK? IS THE KILLING OF TWO WOMEN AND WHAT HE DID TO ALICE AND SAMANTHA NOT ENOUGH? THOSE WOULD BE QUESTIONS THAT ONLY YOU, YOURSELVES, CAN RESOLVE IN YOUR HEART AND IN YOUR MIND.

NEED DANGEROUSNESS. ESCAPE RISK AS A RESULT OF FORMER ESCAPES. LADIES AND GENTLEMEN, HE HAS TRIED, AND TRIED, AND TRIED. IT IS NOT NECESSARILY WHETHER OR NOT HE IS GOING TO BE SUCCESSFUL OR NOT, IT IS THE FACT THAT LAW ENFORCEMENT OFFICIALS, PRISON OFFICIALS, POSSIBLY HOSPITAL PEOPLE, WHEN HE FEIGNS HIS SUICIDE ATTEMPT, WILL BE DEALING WITH BRANDON BASHAM'S ESCAPE ATTEMPTS FOR THE REST OF HIS LIFE.

HE ADMITTED TO NUMEROUS ACTS OF VIOLENCE AFTER HIS ESCAPE FROM JAIL. HE, HIMSELF, HAS ADMITTED TO NUMEROUS ACTS OF VIOLENCE AGAINST OTHER CITIZENS. FAILURE TO ADAPT HIS BEHAVIOR TO SOCIETAL NORMS, THEREBY DEMONSTRATING SIGNIFICANTLY LOW REHABILITATIVE POTENTIAL. LADIES AND GENTLEMEN, YOU HEARD ALL OF THE TESTIMONY, HIS FAILING TO ADAPT TO SOCIETAL NORMS. HE CANNOT BE REHABILITATED. YOU HEARD FROM HOPKINS COUNTY DETENTION CENTER, THIS IS WHEN HE IS ONLY SERVING A FIVE-YEAR SENTENCE. YOU HEARD HIS CONDUCT OF HOARDING DRUGS, THREATENING OFFICERS, HIS MASTURBATING IN FRONT OF FEMALE EMPLOYEES, YOU HEARD THAT TESTIMONY.

LADIES AND GENTLEMEN, SINCE HE HAS BEEN CHARGED WITH

THESE CRIMES, HE HAS ONLY GOTTEN WORSE.  YOU HEARD CHRIS SCHAFFER TESTIFY.  THIS WAS DURING CROSS-EXAMINATION BY MR. HARRIS.  CHRIS SCHAFFER TESTIFIED THAT I COULD MANAGE BRANDON BASHAM WHEN HE WAS ONLY SERVING A FIVE-YEAR FORGERY SENTENCE.  I DON'T KNOW WHETHER I COULD EVEN HANDLE BRANDON BASHAM IF HE IS SERVING LIFE WITHOUT PAROLE.  THAT WASN'T IN RESPONSE TO A GOVERNMENT'S QUESTION, THAT WAS IN RESPONSE TO A DEFENSE QUESTION.

JUST CARE.  REMEMBER MALITA COOK?  SHE NOW WORKS FOR AIR FREIGHT SERVICE. JANUARY 9TH, 2003,  MR. BASHAM, HE HAD ONLY BEEN IN SOUTH CAROLINA -- BEEN IN CUSTODY NOT VERY LONG, SEVERAL WEEKS.  ON THE PHONE HE IS LAUGHING,  HE IS BRAGGING, AND HE IS CURSING ABOUT HIS ESCAPE.  HE IS CHARGED WITH THE MOST SERIOUS OFFENSES, AND HE IS LAUGHING AND BRAGGING ABOUT IT.  YOU HEARD FROM DR. CYNTHIA MCFADDEN,  HEAD OF MENTAL HEALTH SERVICES.  TWO THINGS IMPORTANT ABOUT WHAT DR. MCFADDEN SAID.  SHE SAID HE IS ONE OF THE MOST WORST INMATES WE EVER HAD TO DEAL WITH AT JUST CARE.  REMEMBER HOW SHE TALKED ABOUT HOW HE WAS VERY MANIPULATIVE?  MANIPULATIVE AND DISRUPTIVE IN SOME OF THE GROUP SESSIONS.  SHE OBSERVED THAT,  AS WELL.

AND YOU REMEMBER WHAT SHE SAID ABOUT WHEN HE CLAIMED HE WAS HEARING VOICES.  THIS IS REALLY IMPORTANT.  DO YOU KNOW WHAT DR. MCFADDEN DID? SHE FOLLOWED HER TRAINING AND GOOD OLD COMMON SENSE.  MR. BASHAM IS CLAIMING WHEN HE IS TALKING TO

HER IN A CLINICAL SETTING, I AM HEARING VOICES. SO WHAT DID MS. MCFADDEN DO? SHE INSTRUCTED HER SOCIAL WORKERS, HER NURSES, HER COUNSELORS, WATCH MR. BASHAM WHEN HE DOESN'T KNOW YOU ARE WATCHING HIM. WATCH HIM WHEN HE IS INTERACTING WITH THE OTHER CLIENTS, OTHER INMATES, WITH OTHER PATIENTS. WATCH HIM WHEN HE IS IN HIS ROOM AND HE DOESN'T KNOW. GUESS WHAT? NONE OF THEM, ZERO, NO EVIDENCE OF HIM TALKING TO HIMSELF. NO EVIDENCE OF ACTING BIZARRE. NO HALLUCINATIONS. TELLS A CLINICIAN IN A ROOM IN A HOSPITAL SETTING, GEE, I AM HEARING VOICES. BUT WHEN YOU LOOK AT IT OBJECTIVELY, AND YOU ANALYZE IT OBJECTIVELY LIKE DR. MCFADDEN DID, NOTHING, NO EVIDENCE OF IT. IN FACT, WHEN SHE CONFRONTED HIM ABOUT IT, HE GOT ANGRY WITH HER. HE GOT ALL UPSET. HE GOT DISRESPECTFUL.

WHAT ELSE DID YOU HEAR AT JUST CARE? YOU HEARD THE ESCAPE ATTEMPT. YOU HAVE SEEN THAT ROPE. I AM NOT GOING TO PULL THAT THING OUT AGAIN. THIS IS A MAN WHO HAS POOR PLANNING. HE HAD TO HOARD ALL OF THOSE SHEETS TOGETHER. FIRST OF ALL, HAD TO GET ALL OF THE SHEETS WHEN HE IS ONLY SUPPOSED TO HAVE TWO. HE HAD TO HIDE THEM. WE KNOW HE IS GOOD AT UNSCREWING SCREWS. THERE WAS A VENT IN THERE. HOARDED THEM WITHOUT ANY OF THE GUARDS OR NURSES KNOWING ABOUT IT. HAD TO HIDE THEM. HAD TO CHOOSE AND SELECT THE TIME TO TWIST THOSE THINGS, AND TIE, AND GET THEM TOGETHER. HAD TO HAVE ENOUGH TO GET DOWN FROM THE THIRD STORY, NOT THE FOURTH STORY WINDOW. HE CUT

THROUGH THAT SCREEN, AS WELL. THE ESCAPE PLOT IN MR. BASHAM'S MIND.

AND THEN YOU HEARD AGAIN JUST HIS GENERAL DEMEANOR. YOU HEARD FROM ALVIN S. GLENN DETENTION FACILITY INDIVIDUALS. I WILL NOT GO THROUGH EACH EVENT, I WILL NOT PUT A CHART UP THERE. YOU PAID UNBELIEVABLY CLOSE ATTENTION THROUGH ALL OF THOSE WITNESSES. I WANT TO SUMMARIZE THAT TESTIMONY. FROM ALVIN S. GLENN DETENTION FACILITY, YOU HEARD, AGAIN, HIS GENERAL CONDUCT, HIS THREATENING, ASSAULTIVE BEHAVIOR, AND IT HAS ONLY GOTTEN WORSE, LADIES AND GENTLEMEN. IT HAS GOTTEN WORSE SINCE HE HAS BEEN CHARGED WITH THESE OFFENSES, SINCE HE HAS BEEN AWAITING ON WHAT HIS DEATH PENALTY JURY IS GOING TO DO. ASSAULTING, THREATENING CONDUCT. HIM INCITING OTHER INMATES. WORSE THAN OTHER INMATES AT ALVIN S. GLENN DETENTION FACILITY DO. HIS HOARDING DRUGS AND CONTRABAND. HIS ATTITUDE. I DON'T CARE. WHAT ARE THEY GOING TO DO TO ME? I DON'T CARE. THERE IS NOTHING THEY WILL DO TO ME. HIS TARGETED MASTURBATION. WE CALLED OFFICER DENNY -- I'M SORRY, NURSE DENNING, NURSE WHITE, NURSE SEVERUD, NURSE GILLESPIE, WITHIN FOUR TO FIVE WEEKS FOR TWO TIMES A MONTH, THE ONE HE TARGETED, SURE, IT IS NOT UNUSUAL FOR THEM TO WALK UP ON SOMEBODY WHEN THE INMATE DOESN'T KNOW THEY ARE BEING APPROACHED, THE INMATE MAY BE UNDER THE SHEETS DOING HIS THING, OR HAVE THE BACK TURNED TO THEM IN THE SHOWER. BUT WHAT EVERY ONE OF THEM WERE CONSISTENT IN WAS WHAT BRANDON

BASHAM DID WAS DIFFERENT THAN ANY OTHER INMATE. AT TIMES, THERE ARE 900 INMATES AT THE ALVIN S. GLENN DETENTION CENTER. AND WHAT HE DID WAS DIFFERENT THAN ALL OF THE OTHER INMATES. HE TARGETED THEM. HE WAITED UNTIL HE KNEW THEY WERE COMING AND ASKED FOR SOMETHING. HE TARGETED THEM. YOU REMEMBER OFFICER KENNETH BROWN TESTIFYING WHEN OFFICER SANDERS CAME AT ONE POINT IN TIME TO HIM, A FEMALE OFFICER, TO APPROACH MR. BASHAM, MR. BASHAM WAS MASTURBATING, EJACULATED, AND LAUGHED AND TOLD OFFICER BROWN ABOUT IT. OFFICER BROWN WORKED AT CCI, ONE OF THE MOST SUPER MAX PRISONS IN SOUTH CAROLINA. HE SAID HE HAD NEVER SEEN AN INMATE DO SOMETHING LIKE THAT.

WHAT ABOUT SOME OF THE OTHER OFFICERS THAT TESTIFIED? FRANCIS KIRKLAND IS THE GENTLEMAN THAT SPENT 20-PLUS YEARS IN MILITARY, DEEPLY IN HIS CHURCH, TESTIFIED ABOUT AN INCIDENT WHERE HE TOOK A TOWEL, MR. BASHAM BEING OUT OF THE CELL, BEING MOVED FOR ONE REASON OR ANOTHER. MR. BASHAM IS ALL UPSET AND ANGRY. APPROACHED AND ASSAULTED OFFICER KIRKLAND. HE WAS ABLE, MR. BASHAM WAS ABLE TO GET OUT OF HIS HANDCUFFS AND CUFF OFFICER KIRKLAND. AND HE WAS, IN HIS LANGUAGE, NOT MINE, NOT OFFICER KIRKLAND'S, YOU REMEMBER OFFICER KIRKLAND'S INTENSITY, "I CAN KILL YOU, MOTHER FUCKER. I WILL KILL YOU." NOT MY WORDS, AND THAT IS THE INTENSITY OF OFFICER KIRKLAND. TRYING TO BITE HIM. TRYING TO BITE HIM. HE DIDN'T BITE HIM. BRANDON BASHAM HAS GOT A 50-YEAR LIFE EXPECTANCY, IF YOU GO BY ACTURIAL TABLE, THAT IS COMMON SENSE. I DON'T KNOW

WHAT KIND OF COMMUNICABLE DISEASES BRANDON BASHAM MIGHT GET IN PRISON.  TRYING TO BITE OFFICER KIRKLAND AFTER HE GETS OUT OF HIS CUFFS AND HE IS CUFFING HIM,  HE IS THREATENING HIM, AND IT IS ALL OVER A TOWEL.   OFFICER KIRKLAND TOLD YOU ABOUT THE INCIDENT WITH NICHOLAS ON JULY 6TH, 2004.  MR. BASHAM HAD A VISITOR,  GOT ALL ANGRY, UPSET,  TOOK FIVE GUARDS TO SECURE HIM,  CARRY HIM BACK TO HIS CELL.  HE HAD GRABBED OFFICER SANDERS  -- NICK DANIELS' SHIRT.  REQUIRED A PRESSURE POINT TO GET OFF OF NICK DANIELS' SHIRT.   CALLED NICK DANIELS, VERIFIED THAT.   ALSO TESTIFIED ABOUT THE NUMEROUS INSTANCES OF MR. BASHAM INCITING OTHER INMATES TO VIOLENCE.

WE CONTACTED AND WE CALLED OFFICER JAMES SMITH,  KIND OF A BIG GUY.   JAMES SMITH IS ONE OF THE GUYS THAT HAD TO COME DOWN AND GET MR. BASHAM OFF OF FRANCIS KIRKLAND IN 2003. TOLD YOU ABOUT MR. BASHAM THROWING FLUIDS.   ABOUT MR. BASHAM TAKING A SWING AT HIM,  CONSTANT THREATS.   WORSE INMATE HE EVER HAD TO DEAL WITH AT ALVIN  S. GLENN DETENTION.   LEE JAMES,  EX-MILITARY,  SOMEBODY USED TO DEALING WITH YOUNG MEN. OFFICER LEE SAID HOARDING AND GETTING CONTRABAND OUT OF BRANDON BASHAM'S CELL.  MR. LEE SAID HE WAS THE ONLY INMATE EVER TO LAY A HAND ON HIM THE ENTIRE TIME HE HAS BEEN THERE. FRANCIS KIRKLAND, IN THE 11 YEARS HE HAS BEEN AT THE DETENTION FACILITY,  NO ONE HAS EVER DONE TO HIM WHAT BRANDON BASHAM DID TO HIM ON DECEMBER 31.

WE CALLED OFFICER ROBERT WATERS, 22-AND-A-HALF YEARS IN

MILITARY DEALING WITH YOUNG PEOPLE.  OFFICER WATERS TOLD YOU ABOUT AN INCIDENT WHERE HE WAS BREAKING UP A FIGHT WITH ANOTHER INMATE, BETWEEN AN INMATE AND MR. BASHAM.  TOLD THE OTHER INMATE TO GO UP AGAINST THE WALL.  HE COMPLIED.  NOT MR. BASHAM.  TOOK MULTIPLE GUARDS TO SECURE MR. BASHAM. TOLD HIM HOW STRONG MR. BASHAM WAS.  TOLD YOU HOW BRANDON NEVER ADMITS HIS FAULTS.  HE TOLD YOU HOW MANIPULATIVE BRANDON BASHAM WAS.

ROBERT MCEACHERN TALKED ABOUT THE FEIGNED SUICIDES.  WHAT IS IMPORTANT ABOUT THAT?  MCEACHERN SAID BRANDON BASHAM BRAGGED TO ANOTHER INMATE, "WATCH, I AM GOING TO A HOSPITAL TONIGHT."  SURE ENOUGH, HE GOT OUT OF THAT FACILITY.  HE FAKED A SUICIDE, GOT OUT OF THE HOSPITAL, AND REQUIRED PHYSICAL RESTRAINTS.  THAT IS WHAT OFFICER MCEACHERN TESTIFIED TO.

CALLED ERIC DASH TO TALK ABOUT ALL OF THE CONTRABAND AND DRUGS THAT MR. BASHAM SWAPS WITH OTHER INMATES.  OFFICER DASH SAID IN HIS EIGHT YEARS AT THE DETENTION FACILITY, BRANDON BASHAM IS THE WORST INMATE HE EVER HAD TO DEAL WITH.

MARKIOL ANDERSON, WHO TESTIFIED ABOUT THE SCREWS, FINDING THE SCREWS, AND HIM HOARDING TOWELS, AND HIM HOARDING OTHER CONTRABAND.  AND I END WITH THE RICHLAND COUNTY FOLKS WITH THIS STATEMENT FROM THAT WITNESS STAND.  I DON'T KNOW WHETHER IT WAS ON DIRECT OR CROSS, BUT MARKIOL ANDERSON SAID IT IS JUST A MATTER OF TIME BEFORE SOMEBODY GETS HURT.  OFFICER

ANDERSON SAID THAT TO Y'ALL.

LADIES AND GENTLEMEN, WE THEN CALLED THE BUTNER INDIVIDUALS. THEY TALKED TO YOU ABOUT THE PHONE CALL. BRANDON BASHAM TRYING TO USE SOME SORT OF CODE TO GET HIS SISTER TO BRING HIM CONTRABAND. HE WILL HAVE 300 MINUTES OF PHONE CALL SERVICE A MONTH IN THE BOP. THREE HUNDRED (300) MINUTES. YOU KNOW, LADIES AND GENTLEMEN, THAT IS 298 MINUTES MORE A MONTH THAN HE GAVE ALICE DONOVAN AND SAMANTHA BURNS TO TALK TO THEIR FAMILY MEMBERS. HE WILL HAVE 298 MINUTES A MONTH MORE THAN SAMANTHA BURNS AND ALICE DONOVAN HAD WITH SAMANTHA'S MOTHER AND ALICE'S DAUGHTER.

THEN YOU HEARD ABOUT THE JULY 23RD, 2004, INCIDENT IN WHICH HIS FAMILY WAS VISITING AND OVER A PAIR OF HANES UNDERWEAR, HE GOT IN A FIGHT. YOU HEARD FROM SHELLIE ANDERSON, OFFICER SHELLIE ANDERSON, LEWIS COUNCIL, AND LIEUTENANT LEDFORD. YOU SAW HOW BIG THOSE THREE GUYS WERE. YOU SAW HOW LARGE THEY WERE. IT TOOK ALL THREE OF THEM. ALL THREE OF THEM ALMOST TEN MINUTES TO CONTROL MR. BASHAM. ALL THREE OF THEM. LADIES AND GENTLEMEN, YOU HEARD LIEUTENANT LEDFORD AND THESE OFFICERS TESTIFY. "IF I HAD A SHANK, I WILL KILL YOU, MOTHER FUCKER. I WILL KILL YOU. I AM GOING TO KILL YOU." THE INTENSITY OF BRANDON BASHAM'S THREATENING TO KILL LIEUTENANT LEDFORD. HE CONTINUES WITH HIS THREATS ALL THE WAY UP TO AUGUST 3RD WHEN HE LEFT THAT FACILITY. SHELLIE ANDERSON TOLD YOU, SHELLIE ANDERSON, OFFICER SHELLIE

ANDERSON, HE TOLD YOU THAT HE HAS WORKED NINE-AND-A-HALF YEARS IN THE FEDERAL BOP AS A CORRECTIONAL OFFICER IN THE NORTH CAROLINA PRISON SYSTEMS. HE SAID IT WAS THE MOST FORCE AND THE LONGEST PERIOD OF TIME IT TOOK HIM EVER TO GET AN INMATE UNDER CONTROL IN NINE-AND-A-HALF YEARS WORKING WITH INMATES IN THE NORTH CAROLINA STATE AND FEDERAL SYSTEM. YOU HEARD ABOUT WHEN MR. BASHAM GOT BACK THERE IN JULY AND AUGUST OF LAST YEAR THROUGH LEWIS COUNCIL. YOU HEARD ABOUT HIM INCITING THE OTHER INMATES.

YOU HEARD OFFICER COUNCIL TALK ABOUT THE CELL, UNITED STATES VERSUS CELL. AT TIMES, INMATES ARE SO PSYCHOTIC, OR SO PSYCHOTIC THAT A FEDERAL JUDGE IN THIS CASE, SINCE IT IS BOP, HAS TO ORDER FORCED MEDICATION. INMATES THAT ARE WAY OFF, WAY WORSE OFF THAN MR. BASHAM, THAT IS CELL, CELL-INDUCED MEDICATION. YOU HEARD OFFICER COUNCIL TALK ABOUT THEY GET A FIVE-MAN CONTROL TEAM, FIVE OFFICERS, AND THEY GO AND THEY ARE TRAINED TO TALK TO THEM, AND GET THEM CALMED DOWN, AND GET THEM TO A POINT WHERE THEY WILL COOPERATE. THESE ARE THE HEAVILY PSYCHOTIC INMATES. WHAT DID YOU HEAR FROM OFFICER COUNCIL? MR. BASHAM, RIGHT WHEN THEY GET THESE INMATES UNDER CONTROL, HE STARTS INCITING THEM. HE STARTS INCITING THEM. WHY IS THAT IMPORTANT? BECAUSE THEN THE SAFETY OF THAT INMATE, THAT HEAVILY PSYCHOTIC INMATE, IS AT RISK. THE SAFETY OF THOSE OFFICERS ARE AT RISK BECAUSE OF MR. BASHAM'S INCITING. HE DIDN'T DO IT ONCE. HE DIDN'T DO IT

TWICE. OFFICER COUNCIL SAID HE DID IT FIVE OR SIX TIMES WHEN HE WAS BROUGHT BACK IN JULY AND AUGUST. HE IS THE ONLY INMATE, ONLY INMATE ON THAT WARD TO HAVE DONE SUCH A THING.

JENNIFER MIOSI. YOU HEARD HER TESTIMONY. YOU SAW THAT WOMAN FROM THE WITNESS STAND. I WILL NOT GO OVER HER TESTIMONY. SHE TESTIFIED FOR A GOOD BIT OF TIME. YOU HEARD HOW BRANDON BASHAM TARGETED HER THROUGH OFFICER ALLEN, HOW HE WAS FIXATED ON HER. TWENTY-EIGHT (28) PERCENT OF THE BOP EMPLOYEES ARE WOMEN. TWENTY-EIGHT (28) PERCENT. YOU HEARD HOW HE TARGETED NURSE MIOSI. HE WAITED TO MAKE SURE SHE WOULD BE THERE. HE WASN'T UNDER HIS SHEETS, HE WASN'T FACING HIS WALL, HE TARGETED HER. HE TRIED TO EJACULATE ON HER HANDS. HE TOLD HER, AT ONE POINT IN TIME, TO JUST STAND THERE WHILE HE IS MASTURBATING. LET ME FINISH SO I CAN WATCH YOU.

ON JULY 25TH, IN A FIT OF RAGE, BRANDON BASHAM TOLD NURSE MIOSI, I AM NOT GOING TO USE THE WORDS, HE THREATENED TO SODOMIZE HER. THIS IS BRANDON BASHAM IN A SUPERMAX SINGLE CELL, NOT BRANDON BASHAM IN GENERAL POPULATION WHERE THE MANIPULATIVE BRANDON BASHAM, ONCE HE KNOWS HE NEEDS TO ACT GOOD SO HE CAN GET IN GENERAL POPULATION, BY ACTING GOOD, HE IS MINGLING WITH ALL OF THE STAFF IN GENERAL POPULATION, HE THREATENED TO SODOMIZE JENNIFER MIOSI. NOW, IF THERE WASN'T A DOOR BETWEEN THE TWO OF THEM, DO ANY OF YOU JURORS ACTUALLY BELIEVE THAT HE WOULDN'T HAVE ATTEMPTED TO MAKE GOOD ON THAT THREAT?

AUGUST 3RD, 2004 THIS YEAR, HE IS GETTING TRANSFERRED BACK HERE. HE KEESTERED BATTERIES. EVEN GOES ACROSS, HE IS SMUGGLING, HE IS HOARDING THEM. HE LIES TO DEPUTY O'BRIEN OF THE MARSHAL SERVICE ABOUT THEM. HE IS THREATENING. THREATENED LIEUTENANT LEDFORD. "I SHOULD HAVE KILLED YOU." THREATENED HIM. "I SHOULD HAVE FUCKED YOU UP. YOU KNOW, I WILL BE BACK HERE. I WILL BE BACK HERE." BECAUSE, WHAT ELSE IS HE DOING? AIN'T NO JURY IN THE WORLD GOING TO GIVE ME THE DEATH PENALTY. IN FACT, FROM THE TRANSCRIPT, FROM THE REAL LIVE TRANSCRIPT, IF YOU REMEMBER OFFICER ANDERSON OR OFFICER COUNCIL, HE SAID, "I AIN'T SWEATING THIS SHIT. I AIN'T WORRIED. THE WORSE THEY CAN DO TO ME IS GIVE ME LIFE. I WILL SEE YOU BACK HERE." THAT IS THE ATTITUDE OF BRANDON BASHAM.

U.S. MARSHALS, SEPTEMBER 3RD THIS YEAR. HE COMES TO COURT THAT FRIDAY, HE SAYS HE IS SICK. COMES INTO THE COURTROOM, CLAIMS HE IS SICK. HE IS HYPERVENTILATING. GETS HIM TO THE HOSPITAL. BEFORE ANY PERSON SEES HIM, BEFORE ANY NURSE INTERVIEWS HIM, BEFORE ANY TREATMENT, ALL OF A SUDDEN BRANDON BASHAM IS FEELING MUCH BETTER. HE IS LAUGHING, JOKING AROUND. HE IS DIAGNOSED, THEY BRING HIM BACK. HE SEES A CIGARETTE. HE GOES TO PICK IT UP, HE FIGHTS, HE RESISTS. IT TOOK THE MARSHALS AND THE SECURITY DETAIL, IN BROAD DAYLIGHT, FROM THE PARKING LOT OF RICHLAND MEMORIAL HOSPITAL A FEW BLOCKS AWAY FROM HERE, TO GET HIM UNDER CONTROL, BACK IN

THE VAN, ALL OVER A CIGARETTE BUTT.  LADIES AND GENTLEMEN, WHAT WAS PART OF HIS TREATMENT IN THAT HOSPITAL EMERGENCY ROOM? WHAT DID THE DOCTOR AND THE NURSE GIVE HIM? A SHOT OF VALIUM.  IT STILL TOOK MULTIPLE OFFICERS TO CONTROL HIM, TO CONTROL HIS RAGE OVER A CIGARETTE BUTT.

SEPTEMBER 20TH, 2004, IN THIS VERY COURT ROOM WHILE YOU JURORS WERE SITTING BACK IN YOUR JURY ROOM.  IT TOOK SIX OFFICERS, FOUR MARSHALS, AND TWO FBI AGENTS TO CONTROL MR. BASHAM.  TO CONTROL HIM TO MAKE SURE HE DOESN'T HURT HIMSELF OR ANYBODY ELSE.  SIX OFFICERS.  THEY HAD TO TAKE HIM TO THE GROUND TWICE.  HE WAS CURSING, HE WAS TAUNTING, SIX OF THEM, ALL OVER DIP.

YOU KNOW WHAT IS REALLY IMPORTANT ABOUT THAT INCIDENT? THIS PERSON WHO IS SUPPOSED TO HAVE ALWAYS, EVERY TIME HE ACTS BAD, AND HE CAN'T HELP HIMSELF, HE PLANNED IT.  YOU HEARD THE DEPUTY MARSHAL TAKE THE WITNESS STAND.  HE WAS RIDING UP FROM THE LUNCH BREAK IN THE ELEVATOR BOASTING AND BRAGGING, WE AIN'T GOING TO BE THERE VERY LONG.  I WILL BE DOWNSTAIRS SHORTLY.  HE PLANNED IT.  DEMONSTRATES LACK OF REMORSE, USE OF ILLEGAL NARCOTICS.

I AM ALMOST THROUGH.  I APPRECIATE YOU BEARING WITH ME. I REALLY DO.  DEMONSTRATED A LACK OF REMORSE FOR THE CRIMES HE HAS COMMITTED.  USE OF ILLEGAL NARCOTICS DURING THE CRIME SPREE.  YOU KNOW, SOME OF YOU MIGHT THINK THAT SENTENCING A MAN LIKE BRANDON BASHAM TO PRISON FOR THE REST OF HIS LIFE IS

WORSE THAN THE DEATH PENALTY.  THAT BRANDON BASHAM WILL SIT IN HIS CELL AND THINK ABOUT WHAT HE DID TO SAMANTHA BURNS EVERY DAY AND THINK ABOUT WHAT HE DID TO ALICE DONOVAN EVERY DAY.  AND YOU KNOW SOMETHING? YOU MIGHT BE RIGHT, IF BRANDON BASHAM HAD A CONSCIENCE.  IF BRANDON BASHAM SHOWED THE LEAST BIT OF REMORSE.  IF THERE WAS OBJECTIVE EVIDENCE THAT HE CARED ONE BIT ABOUT WHAT HE DID TO THESE TWO WOMEN,  YOU MIGHT BE RIGHT.  BUT HE DOESN'T.  HE DOESN'T.  SO, WHEN HE IS SITTING IN HIS JAIL CELL, YOU GIVE HIM A LIFE SENTENCE AND HE IS IN GENERAL POPULATION,  HE WILL HAVE HIS GAMES,  HE WILL HAVE HIS TV,  HE WILL HAVE ACCESS TO A LIBRARY,  HAVE HIS 300 MINUTES,  HAVE THE VISITORS COMING,  HAVE HIS JOB, HAVE HIS BOOKS,  HE WILL HAVE HIS MAGAZINES,  HE WILL HAVE INTRAMURAL SPORTS.  AND DURING ALL OF THAT TIME WHEN HE IS EATING HIS FOOD,  WATCHING HIS COLOR TELEVISION,  READING HIS BOOKS,  TALKING TO HIS FAMILY,  NONE OF IT,  NOT ONE MINUTE OF IT WILL HE BE REFLECTIVE UPON WHAT HE DID TO THESE TWO WOMEN.

WHAT KIND OF A MAN,  LADIES AND GENTLEMEN,  ASK YOURSELVES, WHEN YOU ARE DETERMINING WHAT THE APPROPRIATE PUNISHMENT WOULD BE,  WHAT KIND OF A MAN ABDUCTS AND KILLS A 19-YEAR-OLD GIRL AND 24 HOURS LATER IS SMOKING MARIJUANA AND DRINKING IN A SOUTH CAROLINA MOTEL ROOM? WHAT KIND OF A MAN ABDUCTS, AND KIDNAPS, AND KILLS A 44-YEAR-OLD WOMAN,  24 HOURS LATER IS IN HUNTINGTON, WEST VIRGINIA SMOKING CRACK, AND DRINKING BEER, AND HAVING SEX WITH BETH MCGUFFIN? WHAT KIND OF

MEN DO SUCH THINGS? WHAT WAS HIS DEMEANOR LIKE ON NOVEMBER 15TH WHEN CHAD FULKS AND BRANDON BASHAM RETURNED TO BETH MCGUFFIN'S HOUSE? THE TWO OF THEM, THEY WERE LAUGHING, THEY WERE JOKING, THEY WERE TALKING ABOUT GOING TO A BIKE RALLY. THEY ACTED AS BEST FRIENDS, ACCORDING TO THE WITNESSES THAT OBSERVED THEM.

ON FRIDAY NIGHT, NOVEMBER 15TH, FOUR DAYS AFTER SAMANTHA BURNS WAS MISSING, HER DAD, HER DAD, JOHN BURNS, ON THAT FRIDAY NIGHT, DON'T YOU THINK HE WAS HITTING THE WOODS OF HUNTINGTON, WEST VIRGINIA? DON'T YOU THINK IN HIS MIND HE WAS ASKING HIS MAKER FOR INTERVENTION? DON'T YOU THINK HE WAS WONDERING WHERE IS HIS LITTLE GIRL? WHAT HAS HAPPENED TO HIS LITTLE GIRL? AND WHEN JOHN BURNS IS LOOKING FOR HIS LITTLE GIRL, WHAT IS BRANDON BASHAM DOING? HE IS GETTING HIGH. HE IS CELEBRATING WITH CHAD FULKS. DON'T YOU THINK THAT FRIDAY NIGHT, SEVERAL HUNDRED MILES AWAY WHEN BARRY DONOVAN SEES THAT ATM PHOTOGRAPH AND REALIZES THAT HIS WIFE HAS BEEN ABDUCTED, WHEN BARRY DONOVAN IS WONDERING, WHERE IS ALICE? I WASN'T THERE FOR ALICE. WHO IS PROTECTING ALICE? AS BARRY DONOVAN, AS HIS HEAD HIT HIS PILLOW THAT NIGHT, WHAT WAS BRANDON BASHAM DOING? HE WAS LAUGHING, HE WAS JOKING, HE WAS HAVING SEX, HE WAS HAVING A GOOD TIME. AS THE BODY OF SAMANTHA BURNS LAY IN SOME BODY OF WATER, FLOATING SOMEWHERE, AS ALICE DONOVAN IS DEAD, LAYING IN SOME WOODED AREA IN EITHER NORTH OR SOUTH CAROLINA, BRANDON BASHAM AND CHAD FULKS WERE DOING THEIR

THING. LIFE WAS GOOD. THEY HAD THEIR DRUGS, THEY HAD THEIR ALCOHOL, AND BRANDON BASHAM HAD IT GOOD. NO, LIFE WAS GOOD. NO REMORSE, NO CONSCIENCE, IT HAS JUST GOTTEN BETTER.

LADIES AND GENTLEMEN, BRANDON BASHAM WEARS THESE ATROCITIES LIKE A BADGE OF HONOR. HE IS PROUD, HE IS ARROGANT, HE DON'T CARE. I ASK YOU, LADIES AND GENTLEMEN, WHEN YOU GO BACK THERE TO REACH A VERDICT THAT STRIPS HIM FROM HIS TWISTED SENSE OF SELF-RIGHTEOUSNESS WHEN IT COMES TO WHAT HE DID TO THESE TWO WOMEN, REACH A SENTENCE THAT PUNISHES HIM, A PUNISHMENT THAT HE SO RICHLY DESERVES.

I AM GOING TO BRIEFLY DISCUSS WITH YOU THE DEFENSE MITIGATION, IN GENERAL, AND THEN I AM GOING TO SIT DOWN. I WILL HAVE AN OPPORTUNITY TO DISCUSS IN REPLY. FIRST OF ALL, YOU NEED TO BE VERY CLEAR ON THIS. THE GOVERNMENT IS ASKING YOU, IN RELYING ON REACHING A DEATH SENTENCE, THE TESTIMONY AND THE EVIDENCE IN THE GUILT PHASE, THE AGGRAVATING CIRCUMSTANCES I HAVE JUST DISCUSSED WITH YOU, THAT IS WHAT WE ARE RELYING ON IN ASKING YOU TO SENTENCE MR. BASHAM TO DEATH. THE GOVERNMENT HAS NO BURDEN WHEN IT COMES TO MITIGATION. WE DID NOT NEED TO CALL ANY WITNESSES. WE DECIDED TO CALL DR. CAPEHART, AT LEAST, TO PUT SOME OF WHAT THEIR WITNESSES WERE SAYING IN PROPER PERSPECTIVE. WE DIDN'T HAVE TO DO THAT. WE HAVE NO BURDEN TO DO THAT. WE ARE NOT RELYING ON BRANDON BASHAM'S PAST OR WHAT ISSUES HE MIGHT BE DEALING WITH WHEN WE WERE ASKING YOU JURORS TO SENTENCE HIM TO DEATH.

BUT, GENERALLY, WHAT DID THEIR EXPERTS SAY? WHAT IS THE MOST IMPORTANT THING THEY SAID? BRANDON BASHAM KNOWS THE DIFFERENCE BETWEEN RIGHT AND WRONG, AND THERE IS NO CAUSE-AND-EFFECT BETWEEN WHATEVER ISSUES BRANDON BASHAM IS DEALING WITH IN THE KIDNAPPING AND CARJACKING RANDOMLY OF TWO INNOCENT WOMEN.   THERE IS NO CAUSE-AND-EFFECT. IT IS NOT LIKE IF YOU WERE BORN INTO AN ALCOHOLIC FAMILY, YOU RUN THE RISK OF BEING ALCOHOLIC.  THERE IS NO CAUSE-AND-EFFECT OF BRANDON BASHAM'S UPBRINGING OR ANY PROBLEMS BRANDON BASHAM HAS WITH THE EFFECT OF HIM RANDOMLY TARGETING, AND KIDNAPPING, AND KILLING TWO INNOCENT WOMEN.   EVERY SINGLE DEFENSE EXPERT TOOK THAT WITNESS STAND AND ACKNOWLEDGED THAT BECAUSE THEY HAD TO. BECAUSE THAT IS A FACT.   NO CAUSE AND EFFECTS.   THERE ARE THOUSANDS AND THOUSANDS OF KIDS AND ADULTS WALKING THIS COUNTRY,  STREETS OF OUR NEIGHBORHOOD,  OF THIS STATE, AND OF ALL 50 STATES THAT GREW UP IMPOVERISHED, MUCH POORER THAN BRANDON BASHAM, WITH PHYSICAL DISABILITIES HE DID NOT HAVE. WITH SIGNIFICANT,  SIGNIFICANT MENTAL ISSUES THAT DON'T KILL, THAT DON'T CARJACK.   THERE ARE TENS OF THOUSANDS,  HUNDREDS OF THOUSANDS OF CITIZENS, OF 21-YEAR-OLD MEN IN THIS COUNTRY THAT SEE VIOLENCE, THAT GET BEATEN BY THEIR PARENTS THAT DON'T KILL AND CARJACK.  AND THAT IS ABSOLUTELY CRITICAL.

THEIR WITNESSES OPINED THREE THINGS:  BASICALLY, THAT BRANDON BASHAM HAS -- HE CAN'T CONTROL HIS IMPULSES.  THAT BECAUSE OF BRAIN INJURY, THAT HE HAS DIFFICULTY MAKING

APPROPRIATE CHOICES. THAT IS THAT EXECUTIVE FUNCTIONING YOU HEARD ABOUT. AND THAT HE HAS DEMENTIA OR MEMORY LOSS. MEMORY LOSS. YOU KNOW, THIS WEEKEND, AS I WAS REFLECTING UPON WHAT I WAS GOING TO SAY TO YOU, LADIES AND GENTLEMEN, I THOUGHT ABOUT ALL THE TIME THAT WAS SPENT THAT YOU HAD TO SIT THROUGH DIRECT EXAMINATION AND CROSS-EXAMINATION OF, I MEAN, LITERALLY, HOURS AND DAYS OF TESTIMONY ABOUT WHETHER OR NOT BRANDON BASHAM HAD A MEMORY PROBLEM. I WAS SITTING ON MY BACK PORCH LAST NIGHT AND IT CAME TO ME. BRANDON BASHAM HAS A MEMORY PROBLEM. WHAT DIFFERENCE DOES THAT MAKE? WHAT DOES BRANDON BASHAM HAVING A MEMORY PROBLEM HAVE TO DO WITH TARGETING ALICE DONOVAN IN THE WAL-MART PARKING LOT, AND KIDNAPPING, AND CARJACKING HER? WHAT DOES A MEMORY PROBLEM HAVE ANYTHING TO DO WITH THE FACTS AND CIRCUMSTANCES OF THIS CASE AS TO WHAT HAPPENED TO SAMANTHA BURNS AND WHAT HAPPENED TO ALICE DONOVAN? WHAT DOES A MEMORY PROBLEM HAVE TO DO WITH THAT, IF YOU SO FIND THAT HE HAS A MEMORY PROBLEM?

IMPULSE BEHAVIOR. IMPULSE CONTROL. HE HAS DIFFICULTY CONTROLLING HIS IMPULSES. SO, I GUESS THE ARGUMENT IS, TO EXPLAIN BRANDON BASHAM'S CONDUCT DURING THIS CRIME SPREE, THE VIOLENT ACTS HE COMMITTED, TO EXPLAIN HIS CONDUCT IN THIS COURTROOM, TO EXPLAIN HIS CONDUCT WHILE INCARCERATED THAT HE HAS DIFFICULTY CONTROLLING HIS IMPULSES, THAT IS THE EXPLANATION. WELL THEN, ASK YOURSELVES THIS, LADIES AND GENTLEMEN. YOU KNOW, ALICE DONOVAN WAS NAKED IN THE BACK

SEAT OF THAT CAR.  WE KNOW THAT WHEN CHAD FULKS, AT LEAST, AT THE VERY LEAST, RAPED HER.  HE IS IN THE PRESENCE OF ALICE DONOVAN, IN THE PRESENCE OF SAMANTHA BURNS.  THEY WANT YOU TO BELIEVE HE CAN'T CONTROL HIS IMPULSES, WHICH EXPLAINS WHY HE WAS INVOLVED IN A CARJACKING AND KIDNAPPING.  HE WAS ABLE TO CONTROL HIS IMPULSES.  HE DIDN'T LAY A FINGER ON ALICE DONOVAN.  DIDN'T LAY A FINGER ON SAMANTHA BURNS.  HE IS ABLE TO CONTROL HIS IMPULSES THERE,  BUT NOT CONTROL HIS IMPULSES IN GETTING INVOLVED IN CRIMINAL CONDUCT TO BEGIN WITH.  IS THAT LOGICAL? IS THAT RATIONAL? IS THAT REASONABLE?

AND WITH REGARD TO THIS EXECUTIVE FUNCTIONING,  DIFFICULTY MAKING CHOICES.  I AM NOT GOING TO GO OVER ALL OF THE EVIDENCE THAT WE CROSS-EXAMINED AND PROVIDED IN OUR CASE IN CHIEF.  WE CROSS-EXAMINED ALL OF THE TIMES,  ALL OF THE STEPS BRANDON BASHAM HAD TO TAKE IN DECEIVING PEOPLE, GOING ABOUT HIS CRIMINAL CONDUCT AND PLANNING.  I WILL NOT GO OVER IT ALL AGAIN,  YOU HEARD IT ALREADY ONE TIME.  PUT IT IN PROPER PERSPECTIVE,  NOT ABLE TO MAKE GOOD CHOICES.  LEAVING YOUR BICYCLE OUT IN THE RAIN IS NOT MAKING A GOOD CHOICE.  YOU TURN TO DRUGS OR ALCOHOL TO DEAL WITH A PROBLEM IS NOT MAKING A GOOD CHOICE.  YOU ENGAGE IN PETTY THEFT OR FORGERIES BECAUSE YOU WANT MONEY.  PETTY CRIMINAL ACTIVITY IS NOT MAKING A GOOD CHOICE.  IT IS AN AWFUL LARGE LEAP,  LADIES AND GENTLEMEN, TO USE THIS WHOLE IDEA THAT HE HAS DIFFICULTY MAKING CHOICES TO THE RANDOM KIDNAPPING AND CARJACKING AND

KILLING OF TWO WOMEN.  YOU JUST CAN'T DO IT.  YOU JUST CAN'T DO IT.

BOTTOM LINE IS, LADIES AND GENTLEMEN, FROM ALL OF THE TESTIMONY AND EVIDENCE YOU HAVE HEARD, FROM THE TIME MR. BASHAM WAS TEN YEARS OLD, YOU HAVE HEARD DOZENS AND DOZENS OF TREATMENT FACILITIES.  MR. BASHAM HAS HAD THE OPPORTUNITY TO HAVE COUNSELORS, MENTAL HEALTH WORKERS, NURSES, DOCTORS, SOCIAL WORKERS PROVIDE HIM ASSISTANCE, PROVIDE HIM MEDICATION.  AND EACH AND EVERY TIME, I WILL NOT GO THROUGH IT ALL, YOU HEARD THE TESTIMONY, YOU HEARD THE CROSS-EXAMINATION FROM MR. SCHOOLS WITH MANY OF THE WITNESSES, EACH AND EVERY TIME, WHERE OTHER INDIVIDUALS IN LIKE SITUATIONS WITH MR. BASHAM WAS TAKING ADVANTAGE OF WHAT HAPPENED, WHAT THESE FACILITIES HAD TO OFFER, HE WASN'T.  HE WAS MANIPULATING, HE WAS DECEIVING, HE WAS REJECTING.  THOSE WERE THE CHOICES THAT HE WAS MAKING.  PEOPLE, LADIES AND GENTLEMEN, WERE TRYING TO OFFER HIM HELP WHEN HE WAS A YOUNGSTER. HE REJECTED IT. AND REMEMBER, ALL OF THAT TESTIMONY WAS BEFORE HE WAS 18 YEARS OLD.  THREE YEARS GO BY, LADIES AND GENTLEMEN, BEFORE HE CHOOSES TO ESCAPE AND KILL THESE TWO WOMEN.  THREE YEARS.

THE DEFENSE WANTS YOU TO FOCUS ON WHEN HE WAS A CHILD.  THE GOVERNMENT ASKS YOU TO FOCUS ON HIS CONDUCT WHEN HE IS A MAN.  WHEN HE IS A MAN.  THE GOVERNMENT'S EXPERTS OPINED THAT ANTISOCIAL PERSONALITY DISORDER, WHERE THERE IS NO TREATMENT, ANTISOCIAL PERSONALITY DISORDER IS WHAT BRANDON

BASHAM HAS.  YOU KNOW WHAT?  YOU LOOK AT THE FACTORS I GO OVER IN MY REPLY, IT EXPLAINS HIS BEHAVIOR.  IT EXPLAINS HIS BEHAVIOR IN THIS CRIME SPREE.

DEFENSE EXPERTS OPINE THAT HE HAS A SELF OR INDUCED, INHALANT-INDUCED PSYCHOSIS.  AND THAT HE HAS GOT DEMENTIA, MEMORY LOSS.  DR. WATTS, ON THE WITNESS STAND IN RESPONSE TO MR. SCHOOLS, ACKNOWLEDGED THAT THOSE TWO PROBLEMS DON'T EXPLAIN HIS BEHAVIOR.  SO, THE GOVERNMENT'S PSYCHIATRIST DIAGNOSED HIM WITH SOMETHING THAT EXPLAINED HIS BEHAVIOR AGAINST SAMANTHA BURNS AND ALICE DONOVAN.  AND THE DEFENSE EXPERT OPINES TWO PROBLEMS IN WHICH SHE ACKNOWLEDGES DOES NOT EXPLAIN HIS BEHAVIOR.  WHO GOT IT RIGHT? THAT IS FOR YOU TO DECIDE.  YOU KNOW, DECIDING ON WHO GOT IT RIGHT ON THAT ISSUE CLEARLY ONLY GOES TO SHOW WHAT MITIGATION, WHAT WEIGHT YOU WILL CONSIDER TO GIVE THAT WHEN YOU ARE DELIBERATING AS TO WHAT THE APPROPRIATE PUNISHMENT WILL BE.  REGARDLESS OF ALL OF THE YELLING, RAISING VOICES, AND ATTACKING SOMEONE FOR WHAT SCHOOL THEY WENT TO, THE FACTS SPEAK FOR THEMSELVES, LADIES AND GENTLEMEN.

AND ONE OF THE TOUGHER POINTS YOU CAN'T FORGET, THERE IS ABSOLUTELY NO QUESTION MR. BASHAM KNEW RIGHT FROM WRONG.  NO QUESTION, THAT WHATEVER HIS ISSUES ARE, THERE IS NO CAUSE-AND-EFFECT.

LASTLY, AS I INDICATED TO YOU, LADIES AND GENTLEMEN, MR. BASHAM IS 23 NOW; HE WAS 21 AT THE TIME OF THESE CRIMES.

JA 2344

ON MAY 7TH, 1958, THE HAND OF GOD TOUCHED A SOUL WITH ALICE DONOVAN AND CREATED LIFE. ON APRIL 23RD, 1983, THAT SAME MIRACLE PRODUCED SAMANTHA BURNS TO JOHN AND KANDI BURNS IN A SMALL TOWN OUTSIDE OF HUNTINGTON, WEST VIRGINIA. IN NOVEMBER OF 2002, AT THE HANDS OF BRANDON BASHAM, ALICE DONOVAN AND SAMANTHA BURNS'S LIVES WERE TERMINATED IN A CRUEL, HORRIBLE MANNER FOR NO JUST CAUSE, NO EXCUSE. AND YOU CAN'T CHANGE THAT. BUT UNDER THIS SYSTEM, YOU DO HAVE THE POWER TO HOLD BRANDON BASHAM ACCOUNTABLE. YOU HAVE THE ABILITY, LADIES AND GENTLEMEN, WHEN YOU GO BACK TO YOUR JURY ROOM LATER ON THIS AFTERNOON, TO HOLD MR. BASHAM RESPONSIBLE FOR THE CHOICES THAT HE MADE FOR WHAT HE DID TO SAMANTHA AND FOR WHAT HE DID TO ALICE. IT WILL BE YOUR CHOICE, IN THE FINAL ANALYSIS. YOUR CHOICE WHAT THE APPROPRIATE PUNISHMENT SHOULD BE.

ON BEHALF OF THE UNITED STATES GOVERNMENT, I SIMPLY ASK YOU TO CHOOSE WISELY.

THE COURT: MEMBERS OF THE JURY, LET'S TAKE A 15-MINUTE RECESS. WE WILL COME BACK AND HEAR THE DEFENDANT'S ARGUMENT.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: TWO THINGS, MR. SWERLING. CAN YOU GIVE ME SOME CLOSE APPROXIMATION OF HOW LONG YOU WILL TAKE? I HAVE TO ORDER THE LUNCH. I AM NOT TRYING TO RUSH YOU OR HOLD YOU

TO IT, JUST GIVE ME YOUR BEST GUESS.

MR. SWERLING: JUDGE, 75 MINUTES TO 80 MINUTES; AN HOUR AND 15 MINUTES.

THE COURT: ALL RIGHT. UNDERSTAND, I WILL NOT SIT YOU DOWN IF YOU RUN OVER. I WANT TO HAVE THE LUNCH HERE AT THE RIGHT TIME.

MARY, CAN YOU TAKE IT FROM THERE?

LET'S GO TO THE VERDICT FORM. SHOULD THE VERDICT FORM NOT INCLUDE FINDINGS ON STATUTORY AGGRAVATORS, AS WELL AS NONSTATUTORY AGGRAVATORS -- I MEAN, MITIGATORS, RATHER?

MR. SWERLING: YES, SIR.

THE COURT: MR. SCHOOLS?

MR. SCHOOLS: YES, SIR. SUBJECT TO OUR EARLIER OBJECTION, THEY DON'T NEED TO BE IN THERE AT ALL.

THE COURT: ALL RIGHT. WE WILL BE IN RECESS FOR 15 MINUTES.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: PLEASE BRING IN THE JURY.

THE COURT RECOGNIZES MR. SWERLING FOR HIS CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT.

MR. SWERLING: THANK YOU, YOUR HONOR. GENTLEMEN. GOOD MORNING, LADIES AND GENTLEMEN.

WE ARE, I THINK AS OF SATURDAY, WE HAVE SPENT THE LAST EIGHT WEEKS TOGETHER. BEEN A LONG TIME. AND IN A FEW MOMENTS, MAYBE A COUPLE OF HOURS, ACTUALLY, YOU ARE GOING

TO GET THIS CASE AND MAKE THE DECISION THAT YOU NEED TO MAKE.

BUT WE HAVE TRAVELLED TOGETHER A VERY LONG ROAD OVER THAT EIGHT WEEKS.  DURING THAT PERIOD OF TIME, WE HAVE SEEN EACH OTHER EVERY MORNING.  WE HAVE ALL PAID ATTENTION TO YOUR VIEWING THE EVIDENCE IN THE CASE, BOTH THE WITNESSES, AS WELL AS THE DOCUMENTS IN THE CASE.  AND I THINK EVERYBODY IN THE COURTROOM IS IMPRESSED WITH THE WAY YOU WERE ABLE TO KEEP YOUR ATTENTION FOR THOSE LAST EIGHT WEEKS.  AND FOR THAT, I THANK YOU.  I THANK YOU NOW, AND IT WOULD NOT BE EFFECTED BY WHATEVER THE OUTCOME OF THE CASE IS BECAUSE YOU, BY BEING HERE, BY TAKING THE OATH THAT YOU TOOK, YOUR JOB IS TO SEEK JUSTICE AND TO DO JUSTICE.  AND WE TOLD YOU AT THE BEGINNING OF THE CASE, AT THE GUILT PHASE OF THE CASE, AS LONG AS YOUR VERDICT IS FOUNDED ON JUSTICE, NO ONE CAN REALLY QUARREL WITH YOU.

OBVIOUSLY, IN THIS CASE, THIS PART OF THE CASE, WE ARE ASKING YOU TO CONSIDER A LIFE SENTENCE.  WE ARE ASKING YOU NOT TO CONSIDER THE DEATH SENTENCE IN THIS CASE.  BUT THAT IS A DECISION THAT ONLY YOU CAN MAKE AFTER THIS LONG JOURNEY. NOW, DURING THIS PERIOD OF TIME, WE HAVE, AT DIFFERENT PERIODS OF TIME, GONE THROUGH THE GUILT PHASE OF THE CASE WHERE WE DISCUSSED, THE STATE AND THE GOVERNMENT DISCUSSED THE CASE INVOLVING MR. BASHAM AND MR. FULKS FROM THE TIME THEY LEFT HOPKINS COUNTY JAIL.  YOU WENT ALL THE WAY THROUGH THE STATES THEY TRAVELLED, THE DAYS THEY TRAVELLED, ULTIMATELY

THROUGH THE BURNS'S CASE AND THE DONOVAN CASE, MS. DONOVAN'S CASE. YOU HAVE HEARD A LOT OF TESTIMONY. I BELIEVE MR. GASSER POINTED OUT TO YOU, WELL OVER A HUNDRED WITNESSES. YOU RESOLVED THAT PART OF THE CASE AGAINST MR. BASHAM. YOU FOUND HIM GUILTY. I WILL REMIND YOU, AT THE BEGINNING OF THAT CASE AND EVEN AT THE CONCLUSION, I TOLD YOU THAT IT WAS NOT GOING TO BE A WHOLE LOT OF THINGS IN DISPUTE. FROM THE VERY BEGINNING, I STOOD UP HERE AND TOLD YOU THAT. THAT A LOT OF THE ISSUES THAT THE GOVERNMENT WAS ASKING YOU TO FIND IN THE INDICTMENT, WE WERE CONCEDING AS FAR AS THE CHARGES HERE IN SOUTH CAROLINA.

I TOLD YOU AT THE BEGINNING OF THE CASE THAT THE MAIN ISSUE WAS GOING TO BE WHETHER OR NOT BRANDON BASHAM HAD THE INTENT TO HURT OR KILL ALICE DONOVAN. AND THAT WAS THE MAIN ISSUE THAT YOU HAD TO DECIDE AT THE GUILT OR INNOCENCE STAGE OF THIS CASE. NOW YOU ARE GOING TO BE CALLED ON THIS SIDE TO DECIDE WHAT THE ULTIMATE PUNISHMENT WILL BE.

I THOUGHT ABOUT IT THIS WEEKEND, AS WELL AS MR. GASSER. YOU KNOW, WE SIT AROUND, WE DON'T JUST COME IN THE COURTROOM, AS YOU OBVIOUSLY HAVE SEEN, AND JUST START TALKING AND ASKING QUESTIONS. THERE IS A LOT OF PREPARATION THAT GOES INTO WHAT WE DO. WEEKS AND WEEKS, AND MONTHS AND MONTHS WENT INTO THE PREPARATION FOR THIS CASE BY THE GOVERNMENT AND MR. HARRIS AND I. I THOUGHT ABOUT IT THIS WEEKEND THAT, LOOKING BACK OVER THE 31 YEARS I HAVE BEEN PRACTICING LAW,

SINCE 1973, I WAS BLESSED TO COME TO THIS STATE BACK THEN AND GO TO LAW SCHOOL.   THAT THERE REALLY HAS NEVER BEEN ANY TRAINING, OR EDUCATION, OR EXPERIENCE THAT PREPARES A LAWYER TO STAND UP IN FRONT OF A JURY AND ARGUE FOR SOMEONE'S LIFE. THERE IS NONE.   THERE IS NOTHING TO FALL BACK ON.   YOU CAN THINK ABOUT IT 24 HOURS A DAY,  SEVEN DAYS A WEEK.  AND WHEN YOU THINK ABOUT WHAT YOU ARE GOING TO SAY THAT WOULD HAVE A JURY BELIEVE THAT A LIFE SENTENCE IS MORE APPROPRIATE THAN A DEATH SENTENCE,  THERE REALLY IS NOTHING TO GO TO,  NO EXPERIENCE THAT YOU CAN FIND TO GO AHEAD AND RELY ON.

SO,  WHAT I HAVE TO RELY ON ARE THE FACTS IN THE CASE, AND MY INSTINCT, AND MY HOPE THAT, AT THE BEGINNING OF THE TRIAL, WHEN WE TALKED ON VOIR DIRE,  WHEN WE ASKED YOU CERTAIN QUESTIONS, YOU GAVE US CERTAIN ANSWERS, THAT THAT IS STILL THE CASE.

YESTERDAY, I THOUGHT ABOUT SOMETHING.  THAT A LAWYER KIND OF MAKES THREE ARGUMENTS IN A CASE.   WE CALL THESE ARGUMENTS, REALLY NOT ARGUMENTS BECAUSE WE CAN'T DISCUSS IT,  IT IS A CLOSING STATEMENT,  CLOSING POSITION.  IT IS WHAT WE SUGGEST THE EVIDENCE SHOWS IN THE CASE.   BUT A LAWYER REALLY DOES THREE OF THEM.   HE DOES THE ONE HE PREPARES OVER THE LAST FEW DAYS,  WHAT I WANT TO SAY TO THE JURY; HE DOES THE ONE HE DELIVERS,  WHICH IS WHAT I AM DOING RIGHT NOW; AND THEN HE DOES THE ONE TONIGHT, WHEN I THINK OF ALL OF THE THINGS I SHOULD HAVE SAID.  AND I HOPE THAT, DURING THE COURSE OF THE

NEXT HOUR, HOUR AND TEN MINUTES, THAT I AM ABLE TO DELIVER TO YOU EVERYTHING THAT I WANTED TO SAY TO YOU.

AT THE BEGINNING OF THE CASE, WE SPENT A LONG TIME IN SELECTING YOU. AS I TOLD YOU, AT THE END OF THE GUILT PHASE OF THIS CASE, BOTH THE COURT, THE GOVERNMENT, AND MR. HARRIS, AND I, ON BEHALF OF MR. BASHAM, HAD FAITH THAT, THOSE OF YOU SITTING IN THE JURY BOX WERE THE BEST JURORS WE COULD ASSEMBLE FROM SOUTH CAROLINA TO SIT AND DECIDE THE MERITS OF THIS CASE. AT THE BEGINNING OF THE CASE, THE GUILT AND INNOCENCE PHASE, AND NOW, AS WELL, IN THE PENALTY PHASE, BECAUSE WE WENT THROUGH AN EXTENSIVE VOIR DIRE PROCESS WITH YOU.

AS WE EXPLAINED TO YOU, AT THAT POINT, IT IS A VERY UNIQUE PROCESS. WE DON'T DO IT VERY OFTEN WHERE WE GET TO ASK JURORS QUESTIONS. MOST OF YOU PROBABLY SAY, WHY ARE THEY ASKING ME THESE QUESTIONS? WHY WOULD I HAVE TO COME HERE TO ANSWER THESE QUESTIONS? SOME OF THEM ARE VERY PERSONAL, SOME OF THEM INVOLVE AND AFFECT BELIEFS THAT YOU HAVE. BUT AS YOU CAN SEE NOW, THERE REALLY IS A PURPOSE TO GO AHEAD AND DO THAT. AND IT IS TO EXPLORE WITH YOU SOME OF YOUR ATTITUDES, SOME OF YOUR BELIEFS, SOME OF THE THINGS THAT YOU FEEL. SO THAT ALL OF THE PARTIES CAN, AS MR. GASSER SAID, STAND BEFORE YOU AND BELIEVE THAT YOU ARE STILL GOING TO BE ABLE TO CONSIDER EVERYTHING THAT YOU TOLD US YOU WOULD AT THE BEGINNING OF THE CASE. AS MR. GASSER SAID, HE REMINDED YOU, ONE OF THE COMMITMENTS YOU SAID WAS YOU COULD SIT AND LISTEN TO THE CASE

AND, IF WARRANTED, YOU COULD IMPOSE THE DEATH PENALTY. EVERYBODY KNOWING THAT WE NEEDED TO TELL YOU THAT IN THE BRIEF PERIOD DURING VOIR DIRE.

ON THE OTHER HAND, I WOULD LIKE TO REMIND YOU THAT WE LAID OPEN FOR YOU, AS BEST WE COULD IN THAT VOIR DIRE PROCESS, THAT YOU WOULD HEAR EVIDENCE OF THE DEATH OF ALICE DONOVAN, YOU WOULD HEAR EVIDENCE OF THE DEATH OF SAMANTHA BURNS, AND YOU WOULD HEAR EVIDENCE OF MITIGATION, WHAT IS CALLED MITIGATION UNDER THE LAW. YOU WOULD HEAR EVIDENCE OF THE AGGRAVATION THAT THE GOVERNMENT WOULD HAVE. EACH OF YOU SAID, AT THE BEGINNING OF THE CASE WHEN WE HAD THAT VOIR DIRE, THAT YOU COULD STILL CONSIDER, EVEN AFTER HEARING ALL OF THAT, YOU COULD STILL CONSIDER A LIFE SENTENCE IN THIS CASE.

NOW, I AM NOT HERE TO DEBATE THE DEATH PENALTY, WHETHER IT IS APPROPRIATE OR NOT. IT IS THE LAW OF THIS LAND. IT IS THE LAW OF THIS STATE. AND EACH ONE OF YOU HAS, TO SOME DEGREE, A FEELING THAT THE DEATH PENALTY IS APPROPRIATE. SOME OF YOU FELT A LITTLE STRONGER ABOUT IT THAN OTHERS. BUT THE FACT OF THE MATTER IS, THAT ALL OF YOU BELIEVE, UNDER THE RIGHT CIRCUMSTANCES, THAT THE DEATH PENALTY WOULD BE IMPOSED. BUT ALL OF YOU, AS WELL, FELT, UNDER THE RIGHT CIRCUMSTANCES, A LIFE SENTENCE WAS AN ALTERNATIVE THAT YOU CAN CONSIDER AND IMPOSE, EVEN AFTER HEARING A BRIEF SUMMARY OF THE CASE. THAT IS ONE OF THE THINGS I AM ASKING YOU TO STILL LOOK BACK ON, WHAT YOU TOLD US THAT DAY, WHAT YOU HAVE BEEN

HOLDING INTO YOU AND LISTENING FOR THE LAST EIGHT WEEKS AND TODAY AS YOU HEAR THE ARGUMENTS THAT WE MAKE AND THE JUDGE'S INSTRUCTIONS ON THE LAW.  AS MR. GASSER ASKED YOU FOR THE DEATH SENTENCE,  I,  ON BEHALF OF MR. BASHAM,  ASK YOU TO SPARE HIS LIFE.  I, ON BEHALF OF MR. BASHAM, ASK YOU FOR MERCY.

I COULD TELL YOU THIS.  IT IS VERY DIFFICULT TO STAND UP HERE AND TRY TO FIND THE WORDS THAT I NEED TO FIND TO GO AHEAD AND ASK YOU FOR MERCY.  ALL I CAN DO IS GO THROUGH THE EVIDENCE IN THE CASE WITH YOU.  GO THROUGH THE AGGRAVATING FACTORS WITH YOU THAT THE GOVERNMENT HAS ALLEGED.  AND GO THROUGH THE MITIGATING FACTORS AND TRY TO EXPLAIN TO YOU THAT WE ARE NOT OFFERING AN EXCUSE.  THAT IS NOT THE PURPOSE OF MITIGATION.  THE PURPOSE OF MITIGATION IS TO GIVE YOU A COMPLETE AND TOTAL PICTURE OF THE INDIVIDUAL THAT THE GOVERNMENT IS ASKING YOU -- WHOSE LIFE THEY ARE ASKING YOU TO TAKE.  YOU NEED TO HAVE THE TOTAL PICTURE, JUST LIKE YOU NEED TO HAVE THE TOTAL PICTURE ABOUT THE CRIME AND THE CIRCUMSTANCES SURROUNDING THE CRIME.  YOU NEED TO HAVE THE TOTAL PICTURE OF THE INDIVIDUAL THAT THE GOVERNMENT IS ASKING YOU TO SENTENCE TO DEATH.  THAT IS WHY WE HAVE MITIGATING CIRCUMSTANCES.  THAT IS WHY WE HAVE THE STATUTE IN PLACE THAT WE DO.  SO THAT YOU WILL KNOW THAT.  SO YOU WILL HEAR THAT. AND YOU HAVE HEARD IT, AND YOU CAN CONSIDER IT, AND DECIDE WHETHER OR NOT THAT IS THE PUNISHMENT YOU SHOULD IMPOSE OR A

LIFE SENTENCE, AS WE ASK YOU TO IMPOSE.

NOW, THE LAW, BY ESTABLISHING THE PROCESS THAT IT HAS, RECOGNIZES THAT THE DEATH PENALTY IS APPROPRIATE IN CERTAIN CASES. BUT IT ALSO RECOGNIZES THAT THE DEATH PENALTY IS NOT APPROPRIATE IN EVERY CASE. BUT LAST, WHAT WE CAN RELY ON, RECOGNIZING THAT THE DEATH PENALTY IS NOT APPROPRIATE IN EVERY CASE WHERE THERE IS AN AGGRAVATING CIRCUMSTANCE, THE LAW THAT WE RELY ON, ALL OF US RELY ON HERE IN THIS COURTROOM SAYS THAT, EVEN WHEN THERE IS A HOMICIDE, EVEN IF THERE IS AN AGGRAVATING FACTOR PROVEN TO YOU BEYOND A REASONABLE DOUBT, A JURY SHOULD STILL CONSIDER, AS AN OPTION, A LIFE SENTENCE WITHOUT THE POSSIBILITY OF RELEASE, WITHOUT THE POSSIBILITY OF PAROLE.

THE JUDGE WILL TELL YOU DURING HIS CHARGE, AND I WILL TELL YOU A COUPLE OF TIMES DURING MY DISCUSSION WITH YOU, THAT NO MATTER WHAT YOU FIND IN THIS CASE, WHETHER YOU FIND THE THRESHOLD FACTORS THAT THE GOVERNMENT IS TALKING ABOUT BEYOND A REASONABLE DOUBT UNANIMOUSLY, WHETHER YOU FIND THE STATUTORY AGGRAVATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT UNANIMOUSLY, WHETHER YOU FIND THE NONSTATUTORY AGGRAVATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT UNANIMOUSLY, AND EVEN IF YOU WERE NOT TO FIND ANY MITIGATING CIRCUMSTANCES, THE LAW NEVER REQUIRES YOU, NEVER DEMANDS THAT A JURY IMPOSE THE DEATH SENTENCE. THAT IS AN INDIVIDUAL DECISION THAT EACH OF YOU WILL HAVE TO MAKE IN THE NEXT COUPLE OF HOURS. AN

INDIVIDUAL DECISION.  AND IT IS NEVER A REQUIREMENT.  I NEED TO SAY THAT TO YOU SEVERAL TIMES BECAUSE I WANT YOU TO UNDERSTAND THAT NO MATTER HOW YOU FEEL,  NO MATTER HOW OTHER PEOPLE ON THE JURY MAY FEEL,  I UNDERSTAND THERE WILL BE DISPUTE,  I UNDERSTAND THERE WILL BE A DIFFERENCE.  PEOPLE WILL HAVE DIFFERENT OPINIONS WHEN THEY GO BACK THERE AND DELIBERATE.  BUT WHAT I WOULD LIKE, THOSE OF YOU WHO ARE LEANING TOWARD A LIFE SENTENCE AS OPPOSED TO A DEATH SENTENCE, THAT YOU UNDERSTAND THAT NO MATTER WHAT,  NO MATTER WHAT OTHER PEOPLE FEEL ON THE JURY,  YOU HAVE THE RIGHT TO SAY LIFE WITHOUT PAROLE.  AND UNLESS IT IS UNANIMOUS, UNLESS ALL OF YOU, THE 12 OF YOU WHO ARE DELIBERATING WILL AGREE TO A DEATH SENTENCE,  IT CANNOT BE IMPOSED.  SO,  I AM SPEAKING TO ALL OF YOU, BUT I AM SPEAKING TO THOSE OF YOU WHO STILL BELIEVE THAT WHAT THEY TOLD US THAT DAY IS CORRECT,  THAT YOU CAN STILL CONSIDER A LIFE SENTENCE IN THIS CASE.

THE PROCESS THAT MR. GASSER TALKED ABOUT, THE PROCESS THAT THE JUDGE WILL TELL YOU ABOUT TALKS ABOUT THE CERTAIN FACTORS THAT YOU WILL HAVE TO FIND BEYOND A REASONABLE DOUBT BEFORE YOU CAN CONSIDER THE DEATH PENALTY.  ONE OF THEM IS THAT THE DEFENDANT IS 18 YEARS OF AGE AND, OBVIOUSLY,  THAT IS SOMETHING THAT IS NOT AN ISSUE. HE IS 18 YEARS OF AGE, AND YOU CAN FIND THAT BEYOND A REASONABLE DOUBT.

YOU HAVE TO FIND PROOF BEYOND A REASONABLE DOUBT OF THE INTENT FACTORS.  THAT IS SOMETHING YOU HAVE SPOKEN TO AS FAR

AS THE VERDICT IS CONCERNED IN THE GUILT PHASE. YOU NEED TO GO BACK AND CONSIDER WHAT YOU SAID IN THE GUILT PHASE OF THE CASE, CONSIDER WHAT I SAID IN THE GUILT PHASE OF THE CASE, AND UNDERSTAND THAT MR. BASHAM TOOK THE POSITION THEN AND STILL NOW THAT HE NEVER INTENDED, WHEN THERE WAS AN ABDUCTION OR CARJACKING OF ALICE DONOVAN, THAT IT WOULD RESULT IN HER DEATH. I HAVE CERTAIN THINGS THAT I WILL RELAY TO YOU DURING MY DISCUSSION WITH YOU AS TO WHY HE TAKES THAT POSITION AND WHY WE SUGGEST THE EVIDENCE SUPPORTS THAT.

YOU WILL ALSO HAVE TO FIND PROOF BEYOND A REASONABLE DOUBT OF STATUTORY AGGRAVATING FACTORS. YOU WILL HAVE TO FIND, IF YOU DESIRE, PROOF BEYOND A REASONABLE DOUBT OF ANY OF THE NONSTATUTORY AGGRAVATING FACTORS, WHICH I WILL DISCUSS WITH YOU, AS WELL.

ONCE YOU FIND THOSE BEYOND A REASONABLE DOUBT, IF YOU DO, THEN YOU WILL HAVE TO WEIGH THOSE AGGRAVATING FACTORS AGAINST ANY OF THE MITIGATING FACTORS THAT ANY ONE OF YOU FIND. AND, AS I SAID, EACH ONE OF YOU IS ENTITLED TO MAKE THAT DECISION BASED UPON YOUR OWN EXPERIENCES IN LIFE. EVERYBODY HAS HAD DIFFERENT LIFE EXPERIENCES SO, THEREFORE, MITIGATING CIRCUMSTANCES FOR ONE MAY NOT BE MITIGATING CIRCUMSTANCES FOR ANOTHER. THAT IS WHY IT IS MADE TO BE AN INDIVIDUAL DECISION. YOU CAN GIVE CONSIDERATION TO WHETHER OR NOT IT IS FROM WHAT THE JUDGE INSTRUCTS YOU. YOU CAN WEIGH IT, BUT EACH JUROR IS GOING TO HAVE TO MAKE THAT DECISION, AND YOU DO

NOT HAVE TO DO IT BEYOND A REASONABLE DOUBT.   YOU CAN FIND THE MITIGATING CIRCUMSTANCE BY WHAT WE CALL THE GREATER WEIGHT OR PREPONDERANCE OF THE EVIDENCE.   IN OTHER WORDS, IS THERE EVIDENCE IN THE RECORD THAT ESTABLISHES A MITIGATING CIRCUMSTANCE? AND THEN YOU WEIGH THOSE.   YOU WEIGH THE AGGRAVATING CIRCUMSTANCES AGAINST THE MITIGATING CIRCUMSTANCES, AND IF YOU BELIEVE THAT THE MITIGATING --  THE AGGRAVATING FACTORS OUTWEIGH THE MITIGATING FACTORS,  THEN YOU CAN CONSIDER A DEATH SENTENCE.   IF YOU FIND THAT THE AGGRAVATING FACTORS EXIST ALONE AND THERE ARE NO MITIGATING CIRCUMSTANCES,  YOU CAN CONSIDER THE DEATH SENTENCE.   IF YOU FIND THAT THERE ARE MITIGATING CIRCUMSTANCES AND AGGRAVATING CIRCUMSTANCES,  YOU STILL CAN CONSIDER THE DEATH SENTENCE. BUT UNDER ALL OF THOSE CIRCUMSTANCES, YOU ARE NEVER REQUIRED, EVEN IF YOU FIND THE AGGRAVATING CIRCUMSTANCES AND YOU FIND THAT THEY OUTWEIGH THE MITIGATING CIRCUMSTANCES, OR EVEN IF YOU FIND THE AGGRAVATING CIRCUMSTANCE AND DO NOT FIND ANY MITIGATING CIRCUMSTANCES,  THE DECISION TO VOTE FOR LIFE IS YOURS AND YOURS ALONE.   IT IS NEVER MANDATED. THE JUDGE 'S CHARGE WILL INSTRUCT YOU ON THAT.

MR. GASSER HAS ALREADY GONE OVER WHAT THE INTENT FACTORS ARE.   THERE ARE FOUR OF THEM.   AND I AM NOT GOING TO GO BACK OVER THEM AGAIN.   WE HAVE DISCUSSED THIS REALLY AT THE END OF THE GUILT PHASE OF THE CASE AS TO MR. BASHAM'S POSITION ON INTENT.   IT IS OUR POSITION THAT MR. BASHAM DID NOT KILL

ALICE DONOVAN.  ALICE DONOVAN DID NOT MEET HER DEATH AT THE HAND OF BRANDON BASHAM.  THE ONLY CONCEIVABLE ONE, WE SUBMIT TO YOU, THAT YOU COULD DECIDE WAS AN INTENT FACTOR IS THE FOURTH FACTOR, AND THAT WAS THE DEFENDANT INTENTIONALLY AND SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE KNOWING THE ACT CREATED GRAVE RISK OF DEATH.  BUT REMEMBER, WE SUBMIT THAT EVEN THOUGH MR. BASHAM HAS ADMITTED A LOT OF CONDUCT IN THIS CASE AND ADMITTED THE ABDUCTION OF ALICE DONOVAN,  IT WAS ALWAYS HIS BELIEF,  ALWAYS BEEN HIS POSITION, THAT HE DID NOT KNOW THAT SHE WAS GOING TO SUSTAIN SERIOUS BODILY INJURY OR DEATH.

NOW,  THE STATUTORY AND AGGRAVATING FACTORS:  THAT DEATH OCCURRED DURING THE DEFENDANT'S COMMISSION OF A KIDNAPPING, IN VIOLATION OF FEDERAL LAW.  MR. GASSER HAS DISCUSSED THAT WITH YOU.  AND YOUR FINDING OF GUILT, YOU CAN USE THAT TO SUPPORT THE FINDING OF A NONSTATUTORY AGGRAVATING FACTOR BEYOND A REASONABLE DOUBT.  YOU MUST FIND IT AGAIN BEYOND A REASONABLE DOUBT.  THAT IS YOUR DUTY.  GO AHEAD AND FIND THE DEATH OCCURRED DURING A KIDNAPPING IN VIOLATION OF FEDERAL LAW. THE NONSTATUTORY AGGRAVATING FACTORS THAT THE GOVERNMENT IS RELYING ON ALSO, AS I SAID, HAVE TO BE ESTABLISHED BEYOND A REASONABLE DOUBT.  AND YOU HAVE TO CONSIDER WHETHER OR NOT THEY SUPPORT THE IMPOSITION OF THE DEATH PENALTY.

THE FIRST THING MR. GASSER HAS TALKED ABOUT, THE FIRST AGGRAVATING FACTOR, THAT IS NOT A STATUTORY AGGRAVATING

FACTOR. IT IS THE UNCHARGED CONDUCT, THE ATTEMPTED MURDERS, AND OTHER SERIOUS ACTS OF VIOLENCE THAT THE GOVERNMENT ALLEGES. YOU MUST BE SATISFIED BEYOND A REASONABLE DOUBT AND YOU MUST COME TO A UNANIMOUS CONCLUSION AS TO ANY ONE OF THOSE THAT YOU WOULD WANT TO CONSIDER IN IMPOSING A DEATH PENALTY.

THE FIRST ONE IS THE ESCAPE FROM HOPKINS COUNTY JAIL. WELL, CLEARLY, MR. BASHAM ESCAPED FROM THE HOPKINS COUNTY JAIL. THE CARJACKING THAT RESULTED IN THE DEATH OF SAMANTHA BURNS. THAT HAS NOT BEEN A CHARGE IN THIS CASE. IT HAS NOT BEEN ONE OF THE CHARGES THAT ARE IN THE INDICTMENT. IT IS BEING RELIED ON BY THE GOVERNMENT AS A NONSTATUTORY AGGRAVATING FACTOR. IN OTHER WORDS, ADDITIONAL EVIDENCE THAT THE GOVERNMENT SUGGESTS WOULD WARRANT THE IMPOSITION OF THE DEATH PENALTY. AS YOU REMEMBER, DURING THE COURSE OF YOUR DELIBERATIONS IN THE GUILT OR INNOCENCE PHASE OF THE CASE, THAT WAS NOT ONE OF THE CHARGES. YOU HEARD A LOT OF TESTIMONY ABOUT -- HEARD A LOT OF EVIDENCE ABOUT THAT AND, LADIES AND GENTLEMEN, ALL I CAN SAY TO YOU IS THAT IS A TERRIBLE, TERRIBLE TRAGEDY. THAT IS ALL I CAN SAY TO THE FAMILY BECAUSE THERE ARE NO WORDS, REALLY, FOR ME, AS A LAWYER, OR FOR ANYONE, ACTUALLY, TO STAND UP HERE AND EXPRESS TO THEM THE SADNESS AND THE SORROW, THE TRAGEDY THEY WENT THROUGH.

THE NIGHT THAT BRANDON BASHAM WAS BEING QUESTIONED BY THE AGENTS IN WEST VIRGINIA AND HE SPOKE TO HIS LAWYER RICHARD

HUGHES, WHAT I WOULD LIKE YOU TO CONSIDER IN THINKING ABOUT THE SAMANTHA BURNS'S CASE IS THAT BRANDON BASHAM AUTHORIZED RICHARD HUGHES TO LET THE FAMILY KNOW THAT SAMANTHA BURNS WAS DEAD. HE AUTHORIZED RICHARD HUGHES TO GIVE THE AUTHORITIES THE LOCATION. HE TESTIFIED ABOUT THAT. THE AGENTS TESTIFIED ABOUT THAT TO YOU. AND YOU CAN CONSIDER THAT IN YOUR DECIDING WHETHER OR NOT THIS AGGRAVATING FACTOR HAS BEEN PROVEN OR NOT. BUT THAT TESTIMONY WAS GIVEN TO YOU DURING THE GUILT AND INNOCENCE PORTION OF THIS CASE. AND, AS YOU KNOW, THAT EVIDENCE HAS BEEN INCORPORATED AND BROUGHT FORTH.

THE BURGLARY AND ASSAULT OF CARL JORDAN AND THE SAM JORDAN'S HOME. WELL, YOU HAVE HEARD TESTIMONY ABOUT THAT. LADIES AND GENTLEMEN, THAT BASICALLY WAS CONCEDED DURING THE OPENING PORTION OF THIS CASE. THAT MR. BASHAM DID PARTICIPATE IN THE BURGLARY OF SAM JORDAN'S HOUSE. BUT WE HAD A DIFFERENCE OF OPINION AS TO WHETHER OR NOT BRANDON BASHAM ACTUALLY FIRED ANY WEAPON AT CARL JORDAN. AND WE WILL DISCUSS THAT IN A FEW MINUTES WHEN I TALK ABOUT THE ROLES IN THE CASE.

THE KIDNAPPING AND CARJACKING OF JAMES HAWKINS. WELL, THERE IS NO QUESTION THAT MR. HAWKINS WAS KIDNAPPED. IN THAT PARTICULAR CASE, MR. BASHAM'S POSITION, AGAIN, AS IT HAS BEEN IN THE DONOVAN CASE, THAT HE DID NOT INTEND TO HARM, HE DID NOT INTEND TO HURT OR KILL JAMES HAWKINS. AND, LADIES AND GENTLEMEN, EVEN THOUGH JAMES HAWKINS WAS KIDNAPPED, HE WAS

NOT HURT.  BRANDON BASHAM DID NOT HURT HIM, DID NOT KILL HIM, DID NOT INJURE HIM.  WE WILL DISCUSS THAT IN A LITTLE BIT ABOUT THAT PART OF THE CASE AND HOW THAT RELATES TO WHAT I WOULD LIKE YOU TO CONSIDER IN THIS CASE.

THE OTHER ONE IS THE DEFENDANT PARTICIPATED IN THE ATTEMPTED MURDER OF MATT DAVIS IN ASHLAND, KENTUCKY.  WELL, LADIES AND GENTLEMEN, THE EVIDENCE IS FAIRLY UNDISPUTED THAT BRANDON BASHAM FIRED HIS WEAPON ON TWO OCCASIONS:  ONCE IN THE AIR AND ONCE IN THE DIRECTION OF MATT DAVIS IN ASHLAND, KENTUCKY, AN OFFICER WHO WAS PURSUING MR. BASHAM.

ONE OF THE THINGS I WOULD LIKE YOU TO CONSIDER IN THAT CASE, THOUGH, IF YOU REMEMBER THE EVIDENCE DURING THE GUILT OR INNOCENCE PORTION OF THIS CASE IS THAT THERE APPEARS TO BE A SITUATION WHERE MR. BASHAM MAY HAVE STARTED TO FIRE A THIRD SHOT BUT PUT THE HAMMER BACK DOWN NOT TO FIRE THE THIRD SHOT. NOW, YOU CAN CONSIDER THAT FOR WHAT YOU WOULD LIKE TO.  I WOULD ASK YOU TO CONSIDER THIS.  MR. BASHAM, WHEN CONFRONTED WITH THAT CHOICE ABOUT WHETHER TO FIRE THAT THIRD SHOT OR NOT, DECIDED NOT TO.  AND I WOULD ASK YOU TO CONSIDER THAT IN DECIDING WHETHER OR NOT BRANDON BASHAM IS THE KIND OF INDIVIDUAL THAT YOU THINK SHOULD BE SENTENCED TO DEATH. BECAUSE, APPARENTLY, HE HAD THE OPPORTUNITY, BUT HE DID NOT TAKE IT.

THE OTHER FACTOR THE GOVERNMENT IS RELYING ON AS A NONSTATUTORY FACTOR IS FUTURE DANGEROUSNESS.  I WOULD LIKE TO

**JA 2360**

SPEND A LITTLE BIT OF TIME WITH YOU ON THAT RIGHT NOW.   I AM TAKING THEM IN ORDER,  NOT NECESSARILY IN IMPORTANCE.   THE GOVERNMENT HAS RELIED ON A LOT OF TESTIMONY IN THIS CASE FROM PEOPLE WHO HAVE KNOWN MR. BASHAM IN A JAIL ENVIRONMENT,  IN A JAIL SETTING, WHETHER IT BE HOPKINS COUNTY JAIL,  WHETHER IT BE JUST CARE,  WHETHER IT BE ALVIN GLENN, OR BUTNER.   ALL OF THIS IS POSTCHARGE IN THIS CASE,  AFTER HE HAS BEEN CHARGED IN THIS CASE IN NOVEMBER OF 2002.   I HAVE MY OWN THING ON THAT, MY OWN TWIST, THE WAY I WOULD LIKE YOU TO LOOK AT THAT.  AND MAYBE THE SUGGESTION I WOULD MAKE THAT YOU WOULD LOOK AT IT, AS TO BRANDON BASHAM, AND THAT YOU SHOULD CONSIDER THAT ON THE ISSUE OF FUTURE DANGEROUSNESS.

LET ME FIRST SAY THIS ABOUT FUTURE DANGEROUSNESS.   NUMBER ONE,  YOU HEARD FROM JAMES AIKEN, WHO IS WARDEN OF CCI HERE IN SOUTH CAROLINA.   JAMES AIKEN IS A SOUTH CAROLINA MAN, WHO IS NOW A CONSULTANT AND TRAVELS AROUND TEACHING WARDENS, INSPECTING PRISONS,  LOOKING AT DIFFERENT PROGRAMS, CLASSIFICATIONS,  SECURITY.   WE BROUGHT HIM IN HERE TO TELL YOU, CONTRARY TO WHAT MR. GASSER HAS TOLD YOU,  THAT MR. BASHAM,  BECAUSE OF HIS SECURITY RISK,  BECAUSE OF THE FACT HE ESCAPED IS NOT GOING TO BE IN POPULATION.  HE WOULD NEVER BE CLASSIFIED AS BEING IN POPULATION.   HE WILL BE AN OLDER, OLDER MAN BEFORE HE WOULD EVEN BE CONSIDERED, YEARS DOWN THE ROAD, BEFORE HE WOULD EVEN BE CONSIDERED TO BE PUT IN POPULATION.

NOW, THE GOVERNMENT SAYS THAT TO YOU, EVEN KNOWING THAT THE BUREAU OF PRISONS IS GOING TO CLASSIFY MR. BASHAM AS AN ESCAPE RISK.   THE GOVERNMENT TELLS YOU THAT BECAUSE THEY WANT YOU TO BE AFRAID THAT MR. BASHAM CAN ESCAPE AGAIN.   BUT THE FACT OF THE MATTER IS, LADIES AND GENTLEMEN, YOU HEARD FROM JAMES AIKEN AS TO THE SECURITY MEASURES IN THE MAXIMUM SECURITY THEY HAVE WITHIN THE BUREAU OF PRISONS, AND THE DIFFERENT INSTITUTIONS THEY HAVE, AND THE SECURITY MEASURES THEY CAN TAKE TO PROTECT NOT ONLY OTHER EMPLOYEES, OTHER INMATES, AND THE PUBLIC, AS WELL, FROM BRANDON BASHAM FOR MANY MONTHS AND YEARS DOWN THE ROAD.   AND HE WOULD NOT BE CLASSIFIED IN THE GENERAL POPULATION FOR ANY OF THE NEAR FUTURE, IT WOULD BE YEARS.   SO, I WOULD LIKE YOU TO CONSIDER THAT WHEN YOU DECIDE WHETHER OR NOT BRANDON BASHAM POSES A FUTURE DANGER TO ANY EMPLOYEES OR INMATES OF THE PUBLIC AT-LARGE.   IF HE DOES, THEN THERE IS SOMETHING WRONG WITH THE FEDERAL PRISON SYSTEM.   IF, IN FACT, BRANDON BASHAM CAN GO INTO THE FEDERAL PRISON AND BE A DANGER TO OTHER PEOPLE OR CAUSE HARM, BE AN ESCAPE RISK, THEN THE ENTIRE FEDERAL PRISON SYSTEM NEEDS TO BE FIXED.   AND I SUGGEST TO YOU IT IS NOT BROKEN.   THERE HAS NOT BEEN AN ESCAPE FROM A FEDERAL PENITENTIARY SINCE 1993.

NOW, IS THERE VIOLENCE IN PRISON? YES.   IS THERE VIOLENCE IN JAILS? YES.   YOU HAVE TO LOOK AT THE PEOPLE YOU ARE DEALING WITH.   MANY OF THEM ARE VIOLENT.   AND PEOPLE WHO

ARE IN THE ADMINISTRATION OF PRISONS KNOW THAT, AND UNDERSTAND THAT, AND TAKE APPROPRIATE MEASURES WHEN SOMEONE IS CLASSIFIED AND WHEN THEY ARE PUT IN A PRISON. MR. AIKEN TOLD YOU ABOUT ALL OF THE THINGS THAT WERE AVAILABLE, ALL OF THE DIFFERENT SECURITY MEASURES THEY WILL HAVE, ALL OF THE RESTRAINTS THAT THEY CAN IMPOSE ON SOMEBODY, ALL OF THE DIFFERENT PROCEDURES THAT THEY CAN FOLLOW, THE SEARCHES THAT THEY CAN DO. THE TIMING OF WHERE A PERSON IS DURING ANY POINT DURING A GIVEN DAY. ALL OF THOSE THINGS CAN BE MONITORED, VERY SAFELY, THROUGH THE BUREAU OF PRISONS. FROM THE MINUTE THAT BRANDON BASHAM HITS THE BUREAU OF PRISONS, THEY WILL KNOW WHERE HE IS, THEY WILL KNOW HOW TO MONITOR HIM, THEY WILL KNOW HOW TO TAKE CARE OF HIM. THEY WILL BE ABLE TO PROTECT THE OTHER INMATES, IF THAT IS YOUR CONCERN. THEY WILL BE ABLE TO TAKE CARE OF THE OTHER EMPLOYEES IN THE PRISONS, IF THAT IS YOUR CONCERN. AND BRANDON BASHAM CERTAINLY, EVEN THOUGH HE HAS ESCAPED FROM THE HOPKINS COUNTY JAIL, AND THE GOVERNMENT OBVIOUSLY TAKES A POSITION HE IS AN ESCAPE RISK BECAUSE OF THE OTHER ESCAPE ATTEMPTS, WHICH WE WILL TALK ABOUT, HE CAN BE LODGED IN THE FEDERAL PRISON WITHOUT BEING A DANGER TO ANYONE.

I WON'T GO OVER EVERYTHING WITH WHAT MR. AIKEN SAID. I DON'T WANT TO BE UP HERE A COUPLE OF HOURS. I WILL GO THROUGH A COUPLE OF THINGS WITH YOU THAT JAMES AIKEN TOLD YOU OF HOW THE SECURITY MEASURES ARE IN PLACE, HOW THE BUREAU OF PRISONS WOULD DEAL WITH BRANDON BASHAM.

NOW, THE GOVERNMENT CALLED A NUMBER OF PEOPLE FROM THE HOPKINS COUNTY JAIL: MALCOLM COUCH, GLEN GOODSELL, GENE ZELL, MAJOR SCHAFFER. EACH ONE OF THEM TOLD YOU A LITTLE BIT ABOUT BRANDON BASHAM OF HOW HE LIKES TO HIDE HIS MEDICINE, LIKES TO TRADE HIS MEDICINE, LIKES TO ARGUE WITH EVERYBODY, THAT HE IS BOISTEROUS, HE HOARDS HIS MEDICATION. THAT HE HAS CONTRABAND IN HIS CELL. I THINK MAJOR SCHAFFER SAID EVEN, ON OCCASION, AT HOPKINS COUNTY HE EVEN MASTURBATED AND HE WAS FOUND STANDING NAKED.

EACH ONE OF THEM ALSO TOLD YOU THAT, UNDER THE RIGHT CIRCUMSTANCES, THEY KNEW HOW TO DEAL WITH BRANDON BASHAM. THEY KNEW HOW TO DE-ESCALATE HIM. THEY KNEW HOW TO TALK TO HIM. THEY KNEW HOW TO MAKE SURE THAT BRANDON DID NOT GET OUT OF HAND. ON A COUPLE OF OCCASIONS, YES, MAJOR SCHAFFER SAID THEY HAD TO TAKE HIM DOWN ON ONE OR TWO OCCASIONS. MAJOR SCHAFFER SAID HE LIKED BRANDON. YOU REMEMBER THAT BRANDON TOUCHED HIM, THAT HE SAW THIS YOUNG MAN AS A CRY FOR HELP. HE DIDN'T THINK HE WAS A BAD INDIVIDUAL. THAT YOU HAVE TO SET LIMITS FOR SOMEONE LIKE BRANDON BASHAM, BUT THAT HE COULD BE MANAGED. AND HE DEALT WITH BRANDON BASHAM FOR WHAT HE WAS. HE DEALT WITH HIM LIKE HE WAS A CHILD.

NOW, DID HE TELL MR. GASSER WHETHER OR NOT HE KNEW WHAT HE WAS GOING TO BE LIKE IN THE FUTURE? WELL, THAT IS TRUE. NO ONE KNOWS WHAT SOMEBODY IS GOING TO BE LIKE IN THE FUTURE. BUT I ASK YOU TO LOOK AT THE WAY HE WAS HANDLED AT THE HOPKINS

**JA 2364**

COUNTY JAIL AND SEE WHETHER OR NOT PEOPLE LIKE COUCH, AND MARKS, AND GOODSELL, AND ZELL, AND SCHAEFFER DID HANDLE HIM.

I AM NOT -- I AM NOT ARGUING.  I AM NOT STANDING UP HERE AND TELLING YOU BRANDON BASHAM DOESN'T HAVE A VULGAR MOUTH.  I AM NOT STANDING UP HERE AND TELLING YOU AND ARGUING THAT BRANDON BASHAM DOES NOT GET,  I GUESS WHAT I CALL IT, NOT OFFENSIVE BUT RESISTANT.  THAT HE DOESN'T ATTACK PEOPLE, BUT WHEN PEOPLE TRY TO DO SOMETHING WITH HIM OR CONTROL HIM IN SOME CASES,  HE RESISTS.  I AM NOT GOING TO TELL YOU THAT BRANDON BASHAM HAS NEVER BEEN A DISCIPLINE PROBLEM AT HOPKINS COUNTY JAIL OR ANY OTHER PLACE.  HE IS.  HE HAS BEEN.  BUT YOU HAVE SEEN A NUMBER OF PEOPLE COME BEFORE YOU IN THE LAST FEW WEEKS WHO HAVE TOLD YOU THAT THERE ARE WAYS TO DEAL WITH BRANDON BASHAM.  THERE ARE WAYS TO TALK WITH BRANDON BASHAM. THERE ARE WAYS THAT YOU CAN HANDLE BRANDON BASHAM WITHOUT EXPOSING YOURSELF TO ANY KIND OF RISK.

THOSE FIVE PEOPLE THAT CAME HERE FROM THE HOPKINS COUNTY JAIL, PRESENTED BY THE GOVERNMENT,  NONE OF THEM EVER TOLD YOU THAT BRANDON BASHAM HAD A WEAPON.  NONE OF THOSE PEOPLE EVER TOLD YOU THAT BRANDON BASHAM HAD OR DID ANY OFFENSIVE CONDUCT IN THAT JAIL, THAT HE EVER ATTACKED ANYBODY.  THE MOST THAT THEY SAID WAS THAT SOMETIMES HE WOULD RESIST AND SOMETIMES THEY WOULD HAVE TO TAKE ACTION.  REMEMBER MAJOR SCHAFFER SAYING, WHEN HE WAS IN THE MEDICAL FACILITY ONE DAY,  HE HAD TO TAKE HIM DOWN TO THE GROUND BECAUSE, INSTEAD OF PEPPER

SPRAYING HIM, HE WANTED TO TAKE HIM DOWN TO THE GROUND BECAUSE BRANDON WAS ACTING OUT. BUT NOT ON ONE OCCASION DID ANY OF THOSE PEOPLE EVER TELL YOU THAT BRANDON BASHAM ATTACKED THEM, BIT THEM, GOUGED THEM, KICKED THEM, OR HURT THEM. THAT IS SIGNIFICANT. BECAUSE, LADIES AND GENTLEMEN, I WILL SUBMIT TO YOU THAT THERE ARE MANY, MANY PEOPLE THAT ARE HOUSED IN FACILITIES LIKE JAILS OR PRISONS THAT DO EXACTLY THOSE THINGS. YOU CAN SEARCH THIS RECORD OF JAILS, OF EVERY OFFICER THAT HAS EVER TESTIFIED IN THIS CASE AS TO WHETHER OR NOT BRANDON BASHAM HAS EVER USED ANY KIND OF WEAPON AGAINST THEM IN ALL OF THE FACILITIES HE HAS BEEN, WHETHER OR NOT HE HAS CAUSED ANY INJURY TO ANY OF THOSE PEOPLE. YOU CAN SEARCH THE RECORD AND YOU WILL NOT FIND IT. YOU CAN SEARCH THE RECORD, AND ALL YOU WILL FIND IS BRANDON BASHAM, IN MOST OF THOSE CASES THAT HAVE BEEN DESCRIBED TO YOU, HE RESISTS, HE ARGUES. EVEN THE SITUATION HERE IN THE COURTROOM. GO BACK AND LISTEN TO THAT. THERE ARE SEVEN OR EIGHT PEOPLE TRYING TO GET BRANDON BASHAM ON THE GROUND. HE IS ON THE GROUND. BUT EVERYBODY KEEPS TELLING BRANDON BASHAM STOP RESISTING. IT IS NOT THAT HE IS BITING, IT IS NOT THAT HE IS KICKING, IT IS NOT THAT HE IS DOING ANYTHING TO ANYBODY. HE HAD HIS ARMS UNDERNEATH HIS CHEST AND HE WAS RESISTING, GETTING THE HANDCUFFS PUT ON. IS IT RIGHT? I AM NOT STANDING UP HERE AND TELLING YOU THAT IS RIGHT.

THERE IS A DIFFERENCE, LADIES AND GENTLEMEN, BETWEEN

OFFENSIVE CONDUCT AND RESISTING AUTHORITY.  THERE IS A DIFFERENCE.  AND DECIDE WHAT THE APPROPRIATE PUNISHMENT IN THIS CASE SHOULD BE.  THAT SHOULD BE A DISTINCTION THAT IS MADE IN THIS CASE.  THE GOVERNMENT CANNOT COME UP HERE AND POINT TO ONE SITUATION WHERE BRANDON BASHAM HAS EVER USED A WEAPON AGAINST SOMEONE, OR HAS EVER CAUSED ANY INJURY TO ANYONE.  THE POSSIBILITY OF IT? WELL, THEY ARE GOING TO SUGGEST DIFFERENT CIRCUMSTANCES WHERE THE POSSIBILITY COULD HAVE TAKEN PLACE, WHETHER OR NOT IT COULD HAVE HAPPENED.  I THINK THE SITUATION UP IN BUTNER THAT THEY REFERRED TO, THE RAIL ON THE HANDICAPPED BED WAS TAKEN OFF.  BUT IT WASN'T USED AS A WEAPON.  THE GOVERNMENT DOES NOT HAVE A SITUATION WHERE BRANDON BASHAM HAS TAKEN ANY KIND OF SHANK, YOU HAVE HEARD WHAT THOSE WERE, OR ANY KIND OF WEAPON AND INFLICTED A WOUND ON ANY CORRECTIONAL OFFICER AT ANY TIME.

NOW, YOU HEARD FROM PEOPLE AT COLUMBIA CARE. MS. MCFADDEN, MS. BOWMAN, MS. HICKMAN, JEREMIAH BUSH, MR. TURNER.  YOU HEARD ABOUT THE ESCAPE ATTEMPT, THE ROPE HE MADE. LADIES AND GENTLEMEN, THAT IS ONE OF THE FACTORS WE WILL ASK YOU TO CONSIDER, AS WELL.  THE GOVERNMENT SAYS THAT WAS AN ESCAPE ATTEMPT.  WHAT WAS ULTIMATELY ON BRANDON BASHAM'S MIND? ONLY HE KNOWS.  BUT THE FACT IS, I WOULD LIKE YOU TO CONSIDER THIS, IT WASN'T VERY WELL PLANNED OUT, WAS IT? THE ROPE WAS MADE GOOD.  I MEAN, HE HAS THE MECHANICAL SKILLS TO GO AHEAD AND DO THAT.  I THINK YOU HEARD ENOUGH TESTIMONY

ABOUT THAT. THAT HE HAS THOSE KIND OF MECHANICAL SKILLS THAT HE CAN MAKE A ROPE. BUT, OBVIOUSLY, HE DIDN'T THINK IT THROUGH, EVERYTHING THAT COULD BE DONE IN THAT CASE.

FOR EXAMPLE, THE WINDOW THAT HE COULD GET OUT WAS ONLY ONE FOOT HIGH. AND IT DID OPEN OUT BY A CRANK. NOW, HOW WAS HE GOING TO GET THROUGH THERE? PLAN? HOW WOULD HE GET THROUGH THERE? HOW WOULD HE GET DOWN TO THE GROUND? ONCE HE GOT DOWN TO THE GROUND, HOW WOULD HE GET THROUGH THE TWO ROWS OF WIRE? THE FENCE THAT IS BENT BACKWARDS LIKE THIS (INDICATING). THE OTHER FENCE WITH THE RAZOR WIRE. NOT VERY WELL THOUGHT OUT.

WE SUBMIT THAT YOU CAN CONSIDER THAT IN SUPPORT OF WHAT WE CLAIM IS BRANDON BASHAM'S MENTAL PROBLEMS. HIS LACK OF EXECUTIVE FUNCTIONING. HIS IMPAIRED EXECUTIVE FUNCTIONING. BECAUSE HE MAY THINK THAT HE CAN DO SOMETHING LIKE THAT, BUT, AS A PRACTICAL MATTER, HE HASN'T PLANNED IT VERY WELL, HAS HE?

YOU HEARD EDDIE TUCKER FROM COLUMBIA CARE. NEVER GOT PHYSICAL WITH HIM. HE HAS BEEN LOUD, BOISTEROUS. WE HAVE ALL HEARD THAT, RECOGNIZED THAT. JEREMIAH BUSH ADMITTED IT WAS BRANDON'S ROPE. NEVER HAD ANY PROBLEM WITH HIM. TALKED WITH HIM. HE KNEW HOW TO DEAL WITH HIM. HE KNEW HOW TO LISTEN TO HIM. HE KNEW HOW TO TALK TO HIM AND TELL HIM WHAT TO DO. YOU REMEMBER HE SAID HE GOT BRANDON TO GO UP AND DOWN THE HALLWAY CLEANING THE HALLWAY. IT WAS JUST THE MANNER IN

WHICH HE TALKED TO HIM.   I THINK YOU WILL SEE THAT, AND I SUBMIT YOU SEE THAT ALL THROUGHOUT HIS CASE.   CELIA BOWMAN SAID HE WAS CHEEKING MEDS.   YES, LADIES AND GENTLEMEN, YOU HAVE HEARD TESTIMONY THAT THAT IS SOMETHING THAT HAS BEEN DONE IN THE CORRECTION SYSTEM FOR A LONG TIME.   PEOPLE HOARD THEIR MEDICATION, THEY CHEEK THEIR MEDICATION, THEY TRADE THEIR MEDICATION.   THEY TRADE IT FOR COMMISSARY PRIVILEGES WHEN THEY DON'T HAVE ANY MONEY.   BUT YOU KNOW WHAT? THAT IS NOT THE REASON TO PUT SOMEBODY TO DEATH BECAUSE THEY CHEEK MEDICATION OR THEY HOARD MEDICATION, THEY DON'T TAKE THEIR MEDICATION.   CYNTHIA MCFADDEN TOLD YOU, IN ADDITION TO WHAT MR. GASSER TOLD YOU, THAT BRANDON BASHAM HAD POOR COPING SKILLS, POOR JUDGMENT, AND SEVERE DEPRESSION.   YOU ALSO HEARD THAT FROM SOME OF THE EXPERTS IN THIS CASE BECAUSE, FOR EVERY WITNESS THAT YOU HEARD FROM THAT THE GOVERNMENT WANTS TO RELY ON, THERE IS A LITTLE SOMETHING FOR EVERYBODY.   JUST LIKE THERE WAS WITNESSES THAT WE PRESENTED, THAT WAS A LITTLE SOMETHING FOR THE GOVERNMENT.

ALVIN GLENN DETENTION CENTER.   LADIES AND GENTLEMEN, UNTIL TODAY, CORRECT ME IF I AM WRONG, YOU ARE ABOUT READY TO DELIBERATE, UNTIL MR. SMITH TESTIFIED TODAY, IN THE TWO YEARS THAT BRANDON BASHAM HAS BEEN AT THE ALVIN GLENN DETENTION CENTER, I DON'T RECALL ANOTHER SITUATION WHERE HE ACTUALLY KICKED SOMEONE IN THE CHEST.   HE HAD ATTEMPTED TO GRAB A SHIRT, HAD ATTEMPTED TO THROW A PUNCH, HAD ATTEMPTED TO

RESIST, HAD ATTEMPTED TO GO AHEAD AND PUT THE CUFFS ON MR. KIRKLAND, THINGS OF THAT NATURE. NOT WHERE HE ACTUALLY WENT AND KICKED SOMEONE. YOU HEARD THAT TODAY. BUT, AGAIN, LADIES AND GENTLEMEN, THERE WAS NOTHING.

BRANDON IS A MANAGEMENT PROBLEM AND HE CAN BE MANAGED. UNDER THE RIGHT CIRCUMSTANCES, THESE KINDS OF THINGS WILL NOT HAPPEN. ALL THE GENTLEMEN AND LADIES THAT TESTIFIED FROM THE ALVIN GLENN DETENTION CENTER TOLD YOU THAT BRANDON BASHAM HAS BEEN DOWN THERE TWO YEARS. MOST OF THESE PEOPLE TALK TO YOU ABOUT WHETHER OR NOT HE CHEEKS MEDICINE, HOARDED MEDICINE, WAS SENDING SOMETHING TO AN INMATE NEXT TO HIM IN THE NEXT CELL, OR WHETHER OR NOT HE WAS YELLING AFTER SOMEBODY, TRADING SOMETHING, SOMETHING OR ANOTHER, I THINK SOME CANDY, SENDING TO SOMETHING NEXT DOOR. MOST OF THESE PEOPLE DIDN'T HAVE A PHYSICAL CONFRONTATION WITH BRANDON BASHAM. MOST OF THESE PEOPLE OBSERVED THINGS ABOUT BRANDON BASHAM. OBSERVED SUICIDE ATTEMPTS, OBSERVED PILLS IN THE ROOM, OBSERVED CLEANING FLUIDS, OBSERVED THINGS HE SHOULDN'T BE DOING, BUT MOST OF THEM DID NOT HAVE THE PHYSICAL AGGRESSION WITH HIM.

THERE ARE SEVERAL PEOPLE WHO HAD PHYSICAL PROBLEMS WITH BRANDON BASHAM DURING THE COURSE OF THE TWO YEARS HE WAS THERE. BUT, LADIES AND GENTLEMEN, REMEMBER THIS, IT IS TWO YEARS. SOME OF THESE PEOPLE CAME IN AND TESTIFIED THAT THEY HAD ONE PROBLEM WITH BRANDON BASHAM. ONE OF THE GUARDS, CORRECTIONAL OFFICERS, SAID HE HAD A PROBLEM LAST MAY, BUT HAS

NEVER BEEN A PROBLEM SINCE.  WILL ANDERSON TESTIFIED THAT THE CONDUCT OF BRANDON BASHAM WAS SNATCHING AWAY, NOT OFFENSIVE CONDUCT.  ROBERT MCCEACHERN TOLD YOU THAT HE FOUND PILLS IN HIS CELL WHEN HE MADE A SUICIDE ATTEMPT.  WATERS SAID HE HAS THE ABILITY TO GO AHEAD AND DE-ESCALATE WHENEVER BRANDON BASHAM'S ANXIETY INCREASES, HE CAN TALK TO HIM.  IN ALL THE TWO YEARS HE HAS BEEN THERE, SEES HIM ALL THE TIME, HAS ONLY ONE INCIDENT.  VERBALLY ABLE TO DIRECT BRANDON BASHAM.  DOES NOT GET PHYSICAL WITH HIM EXCEPT THAT ONE TIME.  REMEMBER WHAT HE SAID.  BRANDON BASHAM THROWS TANTRUMS LIKE A KID. HE TOLD YOU HE HAS NEVER ATTACKED HIM.

NOW, WE DO HAVE SOME SITUATIONS, AS MR. GASSER HAS POINTED OUT, WITH THE NURSES.  AND I AM NOT STANDING UP HERE AND TELLING YOU I CONDONE THAT IN ANY WAY.  I MEAN, THAT IS JUST VILE CONDUCT, IT IS DISGUSTING CONDUCT.  LADIES AND GENTLEMEN, IT IS THE KIND OF CONDUCT THAT I SUBMIT TO YOU SUPPORTS THERE IS SOMETHING WRONG WITH BRANDON BASHAM.  IT IS THE KIND OF CONDUCT THAT, IN SOME WAY, CORROBORATES WHAT OUR EXPERTS CAME HERE TO TELL YOU, AND THAT IS THAT HE HAS MENTAL PROBLEMS.  NO ONE IN BRANDON BASHAM'S POSITION WHO IS FACING A DEATH PENALTY CHARGE IS GOING TO GO AHEAD AND COMMIT THIS KIND OF CONDUCT IN A JAIL KNOWING THAT THESE PEOPLE ARE GOING TO COME INTO THE COURTROOM AND TELL THE JURY ABOUT WHAT HE IS DOING.

EACH ONE OF THESE WOMEN, WITH THE EXCEPTION OF ONE WHO

CONTINUED TO HAVE A PROBLEM, SAID THAT WHEN THEY TOLD BRANDON BASHAM TO NOT DO IT ANYMORE, HE DIDN'T DO IT ANYMORE. THEY WERE ALL ABLE TO GET HIM TO STOP. ONE OF THEM SAID IT CONTINUED OVER A PERIOD OF SEVERAL MONTHS. BUT, AGAIN, IT IS NOT BEING JUSTIFIED, IT IS HORRIBLE CONDUCT. BUT I WILL JUST SUBMIT TO YOU IT IS A JAIL. AND AS JAMES AIKEN SAID, AT THE END, THAT KIND OF CONDUCT CAN BE CONTROLLED. BECAUSE BRANDON BASHAM WANTS TO CONTINUE DOING THOSE KIND OF THINGS, HE CAN JUST GET HIS MEDICINE IN A RESTRAINT CHAIR WHERE HE CAN'T DO THAT KIND OF CONDUCT.

LADIES AND GENTLEMEN, THAT IS NOT A REASON TO GO AHEAD AND KILL SOMEONE. THE GOVERNMENT SPENT AN AWFUL LOT OF TIME DEALING WITH THE NURSES AND WHAT BRANDON BASHAM DID AS FAR AS THE MASTURBATION AND THINGS HE SAID. WAS IT WRONG? IS IT WRONG? ABSOLUTELY. THERE IS NO QUESTION ABOUT IT. BUT IS IT THE KIND OF CONDUCT THAT YOU SHOULD GO AHEAD AND SAY SOMEONE SHOULD BE EXECUTED? NO. BUT, YET, AS MR. GASSER POINTED OUT, SOME OF THE TIME WE SPENT WITH OUR EXPERTS, THEY SPENT AN AWFUL AMOUNT OF TIME EXPLAINING TO YOU WHAT BRANDON BASHAM'S SEXUAL ISSUES WERE. WE THINK, WE SUBMIT TO YOU, THEY SUPPORT THE FACT THAT THERE IS SOMETHING WRONG WITH HIM.

KENNETH BROWN SAID THAT THERE WAS ONE INCIDENT WHERE HE THREW A PUNCH THROUGH THE DOOR, DID NOT HIT HIM. SEES HIM FOR ALMOST TWO YEARS EVERY DAY. IN TWO YEARS, THE ONLY INCIDENT. FRANCIS KIRKLAND DID HAVE A PROBLEM AND HE TESTIFIED ABOUT IT

WHEN HE WAS TRYING TO GET MR. BASHAM OVER TO HIS CELL.   AND MR. BASHAM SWITCHED A HANDCUFF ON HIM FROM HIS LEG IRON TO HIS HAND.   BUT BRANDON BASHAM DID NOT HURT MR. KIRKLAND.   HE HAD THOSE CUFFS ON HIM,  COULD HE HAVE USED THOSE AS A WEAPON? YES.   DID HE USE IT AS A WEAPON? NO.   MR. GOLDWIRE CAME IN AND TOLD YOU ABOUT BRANDON HITTING HIS HEAD ON THE DOOR AND HOW MANY ISSUES THAT BRANDON BASHAM HAS HAD WHILE HE IS DOWN AT THE CELL.   HE PERSONALLY DID NOT HAVE A LOT OF PROBLEMS WITH BRANDON BASHAM. HE NEVER HAD AN ALTERCATION WITH BRANDON BASHAM.   AND HE TOLD YOU THAT SOME OF THE GUARDS,  SOME OF THE OFFICERS TREAT BRANDON A LITTLE TOO HARSHLY.   SOME OF THEM DO NOT DEAL WITH BRANDON BASHAM IN AN APPROPRIATE WAY.   WESLEY FOUND AN EXTRA MATTRESS IN HIS ROOM,  CONTRABAND.   NOT SUPPOSED TO HAVE IT.   FOUND PILLS.   NOT SUPPOSED TO HAVE IT. BUT NEVER HAD ANY PERSONAL PROBLEMS WITH HIM.

THE GOVERNMENT, TIME AND TIME AGAIN, HAS OFFERED UP NOT ONLY PEOPLE BRANDON HAS HAD ALTERCATIONS WITH,  BUT PEOPLE WHO FOUND BRANDON TO HAVE EXTRA PILLS,  TOWELS,  THINGS OF THAT NATURE, IS THAT THE REASON TO GO AHEAD AND EXECUTE SOMEONE? I SUBMIT TO YOU, IT IS NOT.   DOES IT MEAN THEY ARE A FUTURE DANGER TO SOCIETY? I SUBMIT TO YOU, IT IS NOT.

WALTER SMITH.   THERE WAS A SITUATION WHERE HE HAD TO RESTRAIN MR. BASHAM BECAUSE HE HAD A SMALL PIECE OF METAL IN HIS MOUTH ABOUT THE SIZE OF A THUMBNAIL,  HAD TO RESTRAIN HIM. ONE INCIDENT.   JAMES SMITH IS THE ONE THAT FOUND THE EXTRA

TOWEL. HE HAD TO GO AHEAD AND HELP MR. KIRKLAND. BUT NONE OF THESE INDIVIDUALS HAD MORE THAN A COUPLE OF SITUATIONS WHERE THEY EVER HAD TO HAVE THAT KIND OF ALTERCATION WITH BRANDON BASHAM. AND THERE ARE SITUATIONS THAT GO ON, AND ON, AND ON. THE KIND OF SITUATIONS THAT, AS I SAID, LADIES AND GENTLEMEN, SUPPORT, NUMBER ONE, OUR POSITION, THAT IF BRANDON BASHAM HAD ALL OF HIS FACULTIES ABOUT HIM, BRANDON BASHAM TOTALLY MADE SENSE AND WAS NOT ILL, THEN WHY WOULD HE BE DOING THESE THINGS, BECAUSE HE KNOWS SOME DAY HE WILL HAVE TO COME IN FRONT OF A JURY AND HAVE THAT JURY DECIDE WHAT HIS FATE IS GOING TO BE. AND IF THIS WAS NOT AN INDICATION OF WHETHER OR NOT HE IS AN ILL, SICK PERSON, THEN I SUGGEST NOTHING IS. IN THE FACE OF EVERYTHING HE IS FACING, HE STILL HAS THIS KIND OF CONDUCT. LADIES AND GENTLEMEN, THAT JUST DOESN'T MAKE SENSE. THAT IS NOT LOGICAL THAT HE WOULD DO THAT.

AT BUTNER, I WOULD LIKE YOU TO REMEMBER THIS AT BUTNER. NURSE MIOSI. FIRST, LET'S TALK ABOUT HER. WHAT BRANDON BASHAM DID WITH NURSE MIOSI, AGAIN, IS A DISGUSTING TYPE OF CONDUCT. I WILL NOT STAND UP HERE AND JUSTIFY IT. I WILL NOT EXCUSE IT. I WILL NOT SAY SHE IN ANY WAY CONTRIBUTED TO IT. I WILL NOT SAY IN ANY WAY SHE DESERVED IT. WHAT BRANDON BASHAM DID TO HER WAS DISGUSTING AND VILE. LADIES AND GENTLEMEN, AS MR. AIKEN TOLD YOU, THAT KIND OF CONDUCT CAN BE CONTROLLED IN A PRISON ENVIRON. THAT IS NOT THE KIND

OF CONDUCT THAT BRANDON BASHAM OUGHT TO BE EXECUTED FOR.

THE FIRST TIME THAT BRANDON BASHAM WAS AT BUTNER, AND THIS IS SOMETHING I WOULD ASK YOU TO CONSIDER IN DECIDING BRANDON BASHAM'S DANGER TO THE COMMUNITY OR DANGER TO THE PRISON SYSTEM, THE FIRST TIME HE WAS UP THERE FOR SEVERAL WEEKS, THE ONLY INCIDENT HE HAD WAS WITH NURSE MIOSI. THERE WERE NO OTHER PROBLEMS WITH ANY OF THE CORRECTIONAL OFFICERS THERE. FOR THE ENTIRE PERIOD OF TIME HE WAS THERE, THERE WAS NOT A SITUATION WHERE HE WAS WRITTEN UP FOR ANY KIND OF CONFRONTATION WITH ANY OFFICER, ANY TIME THERE WAS ANY CONFRONTATION. WHEN HE WENT BACK UP THERE A SECOND TIME IN JULY 2004, JUST A COUPLE OF WEEKS BEFORE THE TRIAL, ALL OF A SUDDEN, HE STARTS HAVING PROBLEMS WITH SEVERAL OF THE OFFICERS.

NOW, LADIES AND GENTLEMEN, YOU CAN CONSIDER THAT FOR WHAT IT IS WORTH. HOW, ON ONE OCCASION, WHY, ON ONE OCCASION WHEN HE GOES UP THERE, THERE IS NO DIFFICULTY, BUT THE SECOND TIME HE GOES UP THERE, THERE IS? IS IT THE WAY PEOPLE DEAL WITH HIM? IS IT THE WAY PEOPLE TREAT HIM? YOU HAVE TO CONSIDER THAT. WE SUGGEST THAT HAS SOMETHING TO DO WITH IT. DENISE SIMMONS TOLD YOU SHE IS THE UNIT MANAGER UP THERE. THAT THE DAY THAT THIS HAPPENED, THIS INCIDENT HAPPENED, I THINK IT WAS JULY 23RD, BRANDON WAS UPSET BECAUSE HE DIDN'T GET TO SEE HIS SISTER. HE SAW HIS FATHER. THEY WANTED TO STRIP SEARCH HIM. DID THEY HAVE A RIGHT TO STRIP SEARCH HIM? ABSOLUTELY.

NOBODY IS QUESTIONING WHETHER THEY DID OR NOT. WHEN HE STARTED RESISTING, LIEUTENANT LEDFORD TOLD HIM TO PUT THE HANDCUFFS BACK ON. GOT THE HANDCUFFS BACK ON HIM. WHEN THEY STARTED WALKING HIM DOWN THE HALL, OUTSIDE THE ROOM TO EXIT THE ROOM, WHAT DID LIEUTENANT LEDFORD TELL YOU? HE PULLED AWAY. THAT IS WHAT HE TESTIFIED TO. HE PULLED AWAY. HE SNATCHED AWAY. LADIES AND GENTLEMEN, THEREAFTER, BRANDON BASHAM WAS HITTING HIS HEAD ON THE FLOOR AND HITTING HIS HEAD AGAINST THE WALL.

LADIES AND GENTLEMEN, THREE BIG GUYS WERE ABLE TO GET BRANDON BASHAM DOWN TO THE GROUND. I SUBMIT TO YOU THAT JUST LIKE IT IS HERE IN THE COURTROOM, JUST LIKE IT WAS AT ALVIN GLENN, JUST LIKE IT WAS AT BUTNER, BRANDON BASHAM IS USUALLY THE ONE THAT WINDS UP ON THE BAD END OF THESE THINGS. NONE OF THOSE THREE OFFICERS WERE HURT. NONE OF THEM SUFFERED ANY INJURIES. THERE WERE NO WEAPONS USED. YES, THERE WAS VULGARITY; YES, THERE WERE THREATS. BUT THAT IS THE WAY BRANDON BASHAM HAS BEHAVED, AND THAT IS THE WAY HE DOES BEHAVE, AND THAT IS WHY HE NEEDS TO BE MANAGED APPROPRIATELY AND PROPERLY. AND JAMES AIKEN SUGGESTED REASONS AS TO WHY THAT SHOULD BE DONE AND HOW IT SHOULD BE DONE.

LIEUTENANT LEDFORD CONTINUED TO HAVE PROBLEMS WITH BRANDON BASHAM HE TESTIFIED TO. BUT THE DAY HE WAS LEAVING, I WOULD ASK YOU TO REMEMBER THIS. THE DAY HE WAS LEAVING, HE WAS IN A ROOM WITH BRANDON BASHAM. BRANDON BASHAM DID NOT HAVE ANY

HANDCUFFS ON HIM. BRANDON GAVE A DIRTY LOOK, ACCORDING TO LIEUTENANT LEDFORD. HE DIDN'T ATTACK. HE MAY HAVE SAID SOMETHING TO HIM, BUT HE DID NOT GO AFTER HIM. BRANDON BASHAM IS A LOT OF MOUTH. THAT IS WHAT HE IS. AND HIS MOUTH HAS GOT HIM IN TROUBLE OVER, AND OVER, AND OVER AGAIN.

SHELLIE ANDERSON WAS THE OTHER OFFICER. LEWIS COUNCIL WAS ANOTHER OFFICER FROM UP THERE. BRONNER ALLEN, LEONARD EDWARDS, THEY ALL TOLD YOU THE SAME THING, THAT BRANDON BASHAM, ON SEVERAL OCCASIONS, THEY HAD PROBLEMS WITH HIM UP THERE, BUT NONE OF THEM CAN TESTIFY THAT BRANDON BASHAM EVER USED A WEAPON OR ANY OF THEM EVER GOT HURT. THAT IS SOMETHING THAT YOU NEED TO CONSIDER WHEN YOU CONSIDER THE ISSUE OF FUTURE DANGEROUSNESS.

THE SITUATION WHEN HE WAS GETTING OUT OF THERE THAT DAY AND THEY FOUND THE BATTERIES. MR. GASSER PROBABLY TALKED TO YOU ABOUT THAT. FRANKLY, I JUST DON'T UNDERSTAND IT. IT DOESN'T MAKE ANY SENSE TO ME EXCEPT FOR WHAT HE TOLD THE MARSHAL. THAT HE WAS GOING TO TAKE THE BATTERIES BACK TO RICHLAND COUNTY DETENTION CENTER. HE WAS GOING TO KEEP ONE, AND HE WAS GOING TO SELL ONE. IT IS OBVIOUSLY NOT A WEAPON. I MEAN, IT OBVIOUSLY SHOULDN'T HAVE HAPPENED. IT OBVIOUSLY SHOULD NOT BE SOMETHING THAT HE WOULD DO TO STICK THOSE IN HIS HOLE AND HAVE IT BE SHOWING UP ON THAT, THE METAL DETECTOR. THE FACT OF THE MATTER IS, AGAIN, LADIES AND GENTLEMEN, IT IS NOT A WEAPON. WHEN THOMAS O'NEILL ASKED HIM, ULTIMATELY,

**JA 2377**

AFTER PERSUADING, TELLING THE TRUTH, HE FINALLY TOLD HIM. AND HE SAID, I HAVE TO TELL THE TRUTH. I HAVE THOSE TWO BATTERIES IN ME. ONE IS TO KEEP AND ONE IS TO SELL.

YOU HEARD TESTIMONY FROM THE MARSHALS WHEN THEY TOOK HIM TO THE HOSPITAL THAT DAY. HE WAS SUFFERING FROM AN ANXIETY ATTACK. THAT WAS VERIFIED BY THE DOCUMENTS AND EVIDENCE. HE RESISTED AFTER THE MARSHALS TRIED TO GET THE CIGARETTE BUTT FROM HIM. HE DID RESIST. HE RESISTED GOING INTO THE VAN. THERE IS NO QUESTION ABOUT THAT. THAT IS NOT APPROPRIATE. THAT IS NOT APPROPRIATE CONDUCT ON BEHALF OF BRANDON BASHAM. HE DID. BUT, LADIES AND GENTLEMEN, YOU WILL REMEMBER, NO ONE GOT HURT AGAIN. THERE WAS NO WEAPON USED. AFTERWARDS, HE WAS CRYING, AND HE APOLOGIZED FOR HIS ACTIONS.

THE SITUATION WITH THE DIP. BRANDON BASHAM, AS YOU HEARD FROM THE TESTIMONY ON THE WITNESS STAND, HAS A COMPELLING NEED FOR TOBACCO. HE ALSO HAS A PROBLEM, ONCE HE IS PROMISED SOMETHING, ONCE HE IS TOLD HE CAN HAVE SOMETHING, OF ACCEPTING THAT KIND OF REJECTION. ON FRIDAY BEFORE THE INCIDENT HERE IN THE COURTROOM, EVERYONE THOUGHT IT WAS GOING TO BE OKAY FOR HIM TO HAVE THE DIP, INCLUDING HIM. NOW, PLANS CHANGED. CHANGED ON MONDAY. AND ON MONDAY MORNING WHEN WE CAME UP HERE AND HE WAS COMING UPSTAIRS, HE ALREADY KNEW THAT THE MARSHALS WERE GOING TO TAKE THE POSITION THAT HE SHOULDN'T HAVE THE DIP. SO, WHEN HE CAME UPSTAIRS, HE WAS SAYING TO THEM, I AM NOT GOING TO BE UP HERE LONG. WHY WAS

HE SAYING THAT? BECAUSE HE KNEW IF HE DIDN'T GET THE DIP, HE WANTED TO GO BACK DOWNSTAIRS.  AND WHEN THE JUDGE HAD TO TELL HIM HE WAS NOT GOING TO ALLOW HIM TO HAVE THE DIP,  HE GOT UPSET.  AND IF YOU REMEMBER FROM THE TRANSCRIPTS AND WHAT YOU HEARD,  WE ASKED HE BE ALLOWED TO GO DOWNSTAIRS.  THE JUDGE HAD A RIGHT TO TELL HIM NO,  TO SIT DOWN IN HIS CHAIR,  AND HE DID.  AND HE SHOULD HAVE RESPECTED THAT AUTHORITY, BUT BECAUSE OF BRANDON'S BRAIN PROBLEMS,  BECAUSE OF HIS EXECUTIVE FUNCTIONING PROBLEMS,  HE WAS NOT ABLE TO PROCESS THAT.  AND WHEN ONE OF THE MARSHALS TOUCHED HIM ON THE BACK, IT ALL BROKE LOOSE.  BRANDON BASHAM WAS NOT KICKING AT THEM.  HE WAS NOT THROWING PUNCHES AT THEM, AS I SAID BEFORE.  WHAT HE WAS DOING WAS RESISTING.  AND WHEN HE WENT DOWN ON THE GROUND AND ALL OF THESE PEOPLE WERE ON TOP OF HIM,  ALL IT AMOUNTED TO WAS HIM HAVING HIS HANDS UNDER HIS CHEST AND NOT LETTING HIS HANDS COME UP SO HE COULD BE HANDCUFFED.  IS IT WRONG? YES. IS IT CONSISTENT WITH BRANDON'S PROBLEMS? YES.  CAN IT BE DEALT WITH AND MANAGED? YES.

NOW, WE BROUGHT IN A NUMBER OF WITNESSES WHO ARE ALSO FROM CORRECTIONAL FACILITIES, WHO ALSO TOLD YOU, IN ADDITION TO SOME OF THE WITNESSES THAT THE GOVERNMENT BROUGHT IN, THAT BRANDON BASHAM CAN BE MANAGED, CAN BE DEALT WITH,  CAN BE TALKED TO.  IT IS ALL ABOUT HOW YOU DEAL WITH BRANDON BASHAM. THAT IS ONE OF HIS PROBLEMS.  THAT IS THE PART OF HIS BRAIN DAMAGE.  THAT IS PART OF HOW IT MANIFESTS ITSELF.

JEWEL DICKERSON CAME IN, HE WAS A CAPTAIN AT THE HOPKINS COUNTY SHERIFF'S OFFICE; MARVIN PHILLIPS CAME IN; KATHY TERRELL CAME IN; LEON MCMILLAN FROM ALVIN GLENN; MR. MILHOUSE FROM ALVIN GLENN; CHARLES DEVEAUX FROM ALVIN GLENN; JOSEPH GARVIN FROM ALVIN GLENN; REGINA MOORE; AND, PAUL ARISON.  ALL OF THOSE ARE CORRECTIONAL OFFICIALS, LADIES AND GENTLEMEN, FOR HOPKINS COUNTY AND FOR ALVIN GLENN.  WHAT DID THEY TELL YOU? IT ALL COMES DOWN TO HOW YOU DEAL WITH HIM.  HOW YOU MANAGE HIM.  HOW YOU TALK TO HIM.  DO YOU LISTEN TO HIM? DO YOU TALK TO HIM, OR DO WHAT YOU DO TO CAUSE HIM TO GET HIM IN AN UPROAR?  EACH OF THESE PEOPLE DIDN'T HAVE A PROBLEM. JEWEL DICKERSON, WHO WAS A CAPTAIN, SAID ANYTIME BRANDON BASHAM GOT IN TROUBLE, HE LOST.  IT WAS ALWAYS HIM ON THE RECEIVING END OF THE HURT.  HE KNEW HOW TO TALK WITH HIM. HE SAID THE DEFENDANT, BRANDON BASHAM, IS A GOPHER IN THE JAIL.

MARVIN PHILLIPS WAS ANOTHER CAPTAIN AT HOPKINS COUNTY. HAD A SON WITH SIMILAR PROBLEMS AS BRANDON.  HE KNEW HOW TO TALK TO HIM, HOW TO DEAL WITH HIM.  HE SAID SOME OF THE PEOPLE AT THE JAIL IN HOPKINS KNEW HOW -- WHAT BUTTONS TO PUSH TO SET BRANDON OFF.

KATHY TERRELL TOLD YOU BRANDON WAS A KID WITH A LOT OF PROBLEMS.  HE GOT AGITATED, HE WAS HYPER.  ANYTIME HE GOT INVOLVED IN A FIGHT WITH ANOTHER INMATE, HE GOT HIS BUTT WHIPPED.  THAT WAS HER LANGUAGE.  HE WAS A PAIN, ACCORDING TO

HER.  BUT HE WOULD TALK TO HER.  HE HAD FEELINGS.  HE CRIED A LOT.  HE APOLOGIZED FOR HIS CONDUCT.

THE GENTLEMAN FROM ALVIN GLENN ALSO TOLD YOU THE SAME THING.  IT IS OTHER GUARDS, OTHER GUARDS DOWN AT ALVIN GLENN DO NOT TREAT BRANDON BASHAM APPROPRIATELY.  SOME OF THEM NEEDLE HIM. SOME OF THEM EGG HIM OFF.  SOME DON'T TALK WITH HIM.  SOME DON'T TRY TO REASON WITH HIM.  I DON'T BLAME THEM.  EVERYBODY HAS DIFFERENT PERSONALITIES.  IN EVERY CORRECTIONAL FACILITY, YOU HAVE DIFFERENT PERSONALITIES.  THE FACT OF THE MATTER IS, IF YOU KNOW SOMEONE CAN GET AGITATED LIKE BRANDON BASHAM CAN BECAUSE OF HIS PROBLEMS, IT WOULD MAKE SENSE TO ME AND TO YOU THAT YOU DEAL WITH HIM AND YOU MANAGE HIM SO THAT YOU DO NOT CAUSE ANY PROBLEMS.  THAT MAKES SENSE.

JOSEPH GARVIN, ONE OF THE SENIOR OFFICERS DOWN THERE, SAYS YOU HAVE TO HAVE PATIENCE WITH HIM.  HAVE PATIENCE AND TALK WITH HIM AND YOU WON'T HAVE THOSE PROBLEMS.

REGINA MOORE AND PAUL ARISON.  REGINA MOORE SAID SHE KNEW HIM AS A CHILD.  SHE CAUGHT HIM ONE TIME STEALING, THEN SHE USED TO BUY HIM DINNER, BUY HIM CLOTHES, THEN LATER SAW HIM AT THE JAIL.  SHE SAW SOMETHING IN HIM.

AND PAUL ARISON, WHO IS NOT BY CAREER A CORRECTIONAL OFFICER, HE HAD ANOTHER CAREER ALTOGETHER.  HE WENT TO HOPKINS COUNTY JAIL WHERE HE ADMINISTERED THE EDUCATIONAL PROGRAM AT HOPKINS COUNTY JAIL.  WHAT DID HE TELL YOU? BRANDON BASHAM, WHEN HE TRIED TO GET HIS GED, AND HE WANTED TO GET HIS

GED, WAS NOT EVEN ABLE TO PASS THE ELEMENTARY TEST TO GO AHEAD AND GET IN THE GED PROGRAM. HE ONLY HAD A THIRD-GRADE READING LEVEL AND DID NOT QUALIFY TO GO AHEAD AND GET THE GED.

NOW, LADIES AND GENTLEMEN, THAT IS SAD. IN WHAT WAY DOES THAT SUPPORT OUR CASE OF WHAT WE ARE TRYING TO SHOW YOU? IT SHOWS YOU THAT BRANDON BASHAM ACTUALLY ACTS OUT LONG BEFORE HE EVER CAME INVOLVED IN THIS CASE. LONG BEFORE HE EVER CAME TO COLUMBIA, SOUTH CAROLINA, OR ANY PART OF SOUTH CAROLINA. HE HAD MENTAL PROBLEMS. HE HAD BRAIN PROBLEMS. HE HAD CLOSE -- HIS IQ HAD ALREADY DROPPED DOWN TO SUCH A LEVEL WAS ALL HE HAD WAS A THIRD-GRADE EDUCATION. A THIRD-GRADE READING LEVEL. LADIES AND GENTLEMEN, LET ME ASK YOU SOMETHING. DOES IT MAKE SENSE THAT SOMEONE WITH A THIRD GRADE READING LEVEL CAN SIT IN JAIL AS SOME OF THE OFFICERS SAID AND READ NOVELS? IT IS LIKE DR. WATTS SAID, I WOULD LIKE TO SEE WHAT KIND OF NOVELS HE IS ABLE TO READ WITH A THIRD-GRADE READING LEVEL.

THE OTHER NONSTATUTORY AGGRAVATING FACTOR THAT THE GOVERNMENT PROPOSES IS VICTIM IMPACTS. MR. GASSER WILL TALK TO YOU WHEN HE GETS BACK UP HERE ABOUT THE IMPACT ON THE LOSS OF ALICE DONOVAN TO HER FAMILY AND HER FRIENDS. THERE IS JUST NO WAY I CAN EVEN MEASURE THAT. NO WAY I COULD EVEN ADDRESS IT OR DISCUSS IT. IT IS SOMETHING, AS I TOLD YOU AT THE BEGINNING OF THE CASE, I CANNOT IMAGINE GOING THROUGH IT. I CANNOT IMAGINE THERE ARE ANY WORDS IN ANY WAY COULD CONSOLE

THEM.  IT IS A TERRIBLE TRAGEDY.  YES, THERE IS NO QUESTION THAT THIS DEATH, HER DEATH, AS WELL AS SAMANTHA BURNS'S DEATH, HAS HAD A TREMENDOUS IMPACT ON THESE FAMILIES AND THEIR FRIENDS.

NOW, ON THE OTHER SIDE OF THE PRESENTATION, WHAT YOU HAVE HEARD OVER THE LAST COUPLE OF WEEKS HAVE BEEN WHAT WE CALL MITIGATING FACTORS.  THINGS WE SUGGEST TO YOU OR REASONS WHY THE DEATH PENALTY SHOULD NOT BE IMPOSED.  THINGS WE WOULD LIKE YOU TO CONSIDER.  THE JUDGE WILL TELL YOU THAT THERE ARE WHAT ARE CALLED STATUTORY MITIGATING FACTORS.

NOW, WHY ARE THESE MITIGATING FACTORS IMPORTANT, LADIES AND GENTLEMEN? WHY DO WE GO THROUGH ALL THE TROUBLE OF BRINGING IN THIRTY-SOMETHING WITNESSES AND EVEN UNDERSTANDING THAT SOME OF THEM ARE GOING TO TESTIFY AND NOT BE PARTICULARLY INTERESTED IN WHAT THEY WERE GOING TO TESTIFY TO? WHY DID WE DO THAT? WE DID IT BECAUSE YOU NEEDED TO KNOW EVERYTHING ABOUT BRANDON BASHAM SO YOU COULD MAKE THIS IMPORTANT DECISION IN YOUR LIFE.  THE JUDGE WILL TELL YOU THAT THE STATUTORY MITIGATING FACTORS, THE ONES SET OUT BY STATUTE THAT YOU CAN CONSIDER IN THIS CASE, ARE WHETHER OR NOT HE HAD IMPAIRED CAPACITY.  NOT THAT IT ROSE TO THE LEVEL OF DEFENSE IN THE CASE, BUT WHETHER OR NOT HE HAD AN IMPAIRED CAPACITY TO APPRECIATE THE WRONGFULNESS OF HIS CONDUCT UNDER THE REQUIREMENTS OF THE LAW.  TO APPRECIATE THE WRONGFULNESS OF HIS CONDUCT UNDER THE REQUIREMENTS OF LAW.  OF WHETHER OR NOT

IT WOULD BE SIGNIFICANTLY IMPAIRED, REGARDLESS OF WHETHER THAT CAPACITY WAS SO IMPAIRED TO CONSTITUTE A DEFENSE TO THE CHARGE.

ANOTHER FACTOR THE JUDGE SAID YOU WILL CONSIDER, HE WILL TELL YOU IN THE CHARGE, IS WHETHER OR NOT BRANDON BASHAM ACTED UNDER DURESS.

ANOTHER ONE IS WHETHER OR NOT HE WAS A MINOR PARTICIPANT IN THE CONDUCT IN WHICH THE GOVERNMENT ALLEGES. MINOR PARTICIPATION DOES NOT ALSO, AGAIN, HAVE TO AMOUNT TO A DEFENSE. AND MINOR PARTICIPATION IS ALSO SOMETHING YOU WILL BE ABLE TO CONSIDER IN THE NONSTATUTORY AND MITIGATING CIRCUMSTANCES, THE ONES THAT ARE OUTLINED IN THE JURY CHARGE THAT THE JUDGE WILL GIVE YOU. THAT BEING WHETHER OR NOT BRANDON BASHAM PLAYED A LESSER ROLE IN THE CRIME THAN CHAD FULKS.

ANOTHER ONE IS THE DEFENDANT, BRANDON BASHAM, DID NOT HAVE A SIGNIFICANT PRIOR HISTORY OF OTHER CRIMINAL CONDUCT. LADIES AND GENTLEMEN, ONE OF THE THINGS THAT WE WOULD LIKE YOU TO CONSIDER IN THIS CASE IS THE LACK OF SIGNIFICANT CRIMINAL HISTORY ON BRANDON BASHAM. THERE IS AN EVENT WHERE HE WAS 15 YEARS OLD, I THINK, WHEN HE WAS IN MONTE MEFFORD'S CLASS WHERE CLIFFORD JAY, WHO WAS THE ASSISTANT IN THAT CLASS, CAME BEHIND HIM, TAPPED HIM ON THE SHOULDER, AND WOKE HIM UP. HE RESPONDED BY TAKING OUT A KNIFE AND GOING AT HIM. NOT CUTTING HIM, BUT ATTEMPTING TO STRIKE HIM. LADIES AND

GENTLEMEN, THAT WAS WRONG. YOU HEARD REASONS WHY THAT COULD HAVE HAPPENED. DR. WATTS TALKED ABOUT THAT, HOW HE RESPONDS TO PEOPLE TOUCHING HIM. YOU HEARD THAT FROM A NUMBER OF OTHER WITNESSES IN THE CASE. THE FACT OF THE MATTER IS, IT IS WRONG. THE FACT OF THE MATTER IS, HE WAS PROSECUTED FOR IT. LADIES AND GENTLEMEN, THAT IS THE ONLY SITUATION IN BRANDON BASHAM'S BACKGROUND WHERE THERE WAS ANY KIND OF WEAPON USED UP UNTIL THEY ESCAPED FROM THE HOPKINS COUNTY JAIL. HE DID NOT HAVE A HISTORY OF HAVING A WEAPON. THE ONLY EVENT IN HIS HISTORY WAS THAT PARTICULAR TIME WHEN HE WAS IN MONTE MEFFORD'S CLASS. FORTUNATELY, MR. JAY WAS NOT CUT. AND THE EVIDENCE SHOWS, FROM MS. MEFFORD, THAT CLIFFORD JAY CONTINUED IN THE CLASS. HE CONTINUED WHEN MR. BASHAM CAME IN TO BE HOME SCHOOLED, AND THEY CONTINUED IN THEIR RELATIONSHIP. AND, OBVIOUSLY, THEIR RELATIONSHIP WAS STRONG ENOUGH, LADIES AND GENTLEMEN, EVEN AFTER THAT INCIDENT, THAT THE PERSON THAT BRANDON BASHAM CALLED ON CHRISTMAS EVE 2002 WHEN HE WAS HERE AT THE JAIL WAS CLIFFORD JAY. SO, THAT PARTICULAR EVENT DID NOT AFFECT HIS RELATIONSHIP.

OTHER THAN THAT, WHAT IS MR. BASHAM'S CRIMINAL RECORD? HE HAD BANK CHARGES. HE TOOK HIS AUNT'S PLAY STATION FROM HIS COUSIN, TRIED TO SELL IT DOWN THE STREET. THAT IS HOW MUCH PLANNING WENT IN THAT. HE WAS PROSECUTED FOR THAT. BEVERLY PROSECUTED HIM FOR THAT. AND THEN HE HAD SOME DRUG OFFENSES AND PETTY OFFENSES, PETTY THEFT OFFENSES. THAT IS

BRANDON BASHAM'S CRIMINAL HISTORY.  THAT,  LADIES AND GENTLEMEN,  THE LAW ALLOWS YOU TO CONSIDER AS MITIGATING CIRCUMSTANCE AS TO WHETHER OR NOT BRANDON BASHAM IS THE TYPE OF PERSON, BECAUSE OF HIS LACK OF SIGNIFICANT CRIMINAL HISTORY, IS A PERSON THAT SHOULD BE PUT TO DEATH.

THE OTHER ONE OF THE STATUTORY MITIGATING CIRCUMSTANCE, THE DEFENDANT COMMITTED THE OFFENSE UNDER SIGNIFICANT EMOTIONAL OR MENTAL DISTURBANCE.  ANY OTHER THAT MITIGATES AGAINST THE IMPOSITION OF THE DEATH PENALTY.  ANYTHING ELSE IN HIS BACKGROUND.

LADIES AND GENTLEMEN, NO ONE HAS EVER SUGGESTED TO YOU, NOT A WITNESS AND NOT US, THAT BRANDON BASHAM'S PROBLEMS,  HIS MENTAL HISTORY, IN SOME WAY, WAS AN EXCUSE.  IN SOME WAY EXCUSED HIM TO COMMIT SOME CRIME.  NO ONE HAS EVER SUGGESTED THAT TO YOU.  WHAT WE HAVE TRIED TO SHOW YOU BY PRESENTING THE TESTIMONY WE DID IS THAT BRANDON BASHAM HAS SIGNIFICANT MENTAL PROBLEMS.  HE HAS SIGNIFICANT BRAIN DAMAGE,  SIGNIFICANT IMPAIRMENTS TO HELP EXPLAIN HIS CONDUCT,  HIS RELATIONSHIP WITH CHAD FULKS,  BUT NOT TO OFFER YOU SOME EXCUSE AS TO WHY THE CRIME WAS COMMITTED OR SOME REASON WHY THE CRIME WAS COMMITTED.  THAT IS NOT WHY THAT TESTIMONY WAS OFFERED TO YOU.  IT WAS OFFERED SO YOU WOULD HAVE THE TOTAL PICTURE. SO YOU COULD UNDERSTAND THE CONTEXT IN WHICH EVERYTHING HAPPENED.  BUT NOT THE CAUSE.  NO ONE EVER SAID THAT WAS THE CAUSE OF ANY OF THESE CRIMES.

THE JUDGE WILL ALSO TELL YOU ABOUT THE NONSTATUTORY MITIGATING FACTORS, AND THERE ARE A NUMBER OF THEM.   THERE ARE ABOUT 30 OF THEM.   THESE ARE FACTORS THAT YOU CAN CONSIDER.  ANY ONE OF THEM YOU COULD CONSIDER AS A REASON TO IMPOSE A LIFE SENTENCE IN A CASE.   BUT, ESSENTIALLY, WHAT THEY COME DOWN TO,  LADIES AND GENTLEMEN,  IS BRANDON'S BACKGROUND,  HIS FAMILY HISTORY,  HIS ABUSE,  SEXUAL ABUSE, AND PHYSICAL ABUSE,  THE MENTAL PROBLEMS HE HAS HAD SINCE HE WAS A YOUNG CHILD AT SEVEN YEARS OF AGE WHEN HE WAS FIRST DIAGNOSED.  THE HISTORY HE HAD IN ALL OF THESE INSTITUTIONS THAT YOU HEARD ABOUT,  12 OR 13 OF THEM, DURING THE COURSE OF HIS SHORT LIFE.  ALL OF THESE THINGS ARE NONSTATUTORY MITIGATING CIRCUMSTANCES THAT THE JUDGE WILL TELL YOU YOU CAN CONSIDER IN THIS CASE.

SOME OF THEM INVOLVE,  AS I SAID,  INSTEAD OF MINOR PARTICIPANT, WHETHER OR NOT HE HAD A LESSER ROLE.   BUT I WOULD LIKE TO GO THROUGH THESE WITH YOU, BRIEFLY.   FOR BRANDON BASHAM, WE PRESENTED A NUMBER OF WITNESSES FOR YOU TO CONSIDER, SO YOU WOULD UNDERSTAND THIS ROAD THAT WE TOOK, OF BRANDON BASHAM'S HISTORY. AND I WOULD SUBMIT THAT YOU WANT TO HEAR THESE ISSUES.   IT MAY NOT HAVE BEEN, AS I SAID, PARTICULARLY INTERESTING AT TIMES,  IT WAS IMPORTANT FOR YOU TO KNOW WHERE THIS KID CAME FROM.

MONTY MEFFORD TOLD YOU AND SOME OF THE WITNESSES TOLD YOU HE HAD THE WORST BACKGROUND THEY HAD EVER SEEN.   NOW,  AGAIN,

THIS IS NOT BEING OFFERED AS AN EXCUSE.  IT IS BEING OFFERED, AS THE WORDS SUGGEST, IN MITIGATION.  YOU HEARD FROM CHARLOTTE BASHAM, HIS SISTER; YOU HEARD FROM JEROME MCEACHERN; SUMMER RULEY; AND, TOMMY BASHAM, JR.; YOU HEARD FROM TOMMY BASHAM SR.; AND BEVERLY BASHAM.  ALL SIX OF THEM TOLD YOU THE CIRCUMSTANCES UNDER WHICH BRANDON BASHAM GREW UP.

BRANDON BASHAM GREW UP IN A HOME WHERE THERE WAS NO LOVE AND AFFECTION, WHERE THERE WAS PHYSICAL ABUSE.  WHERE THERE WAS VERY LITTLE INTERACTION BETWEEN THE PARENTS AND THE CHILD. WHERE THERE WAS A SITUATION WHERE DRUGS WERE USED ALL OVER THE HOUSE AT A VERY EARLY AGE.  WHERE HIS MOM, WHO BECAUSE OF HER BACKGROUND AND CIRCUMSTANCES UNDER WHICH SHE GREW UP AND MENTAL ILLNESS, SHE HAD STARTED USING DRUGS AT A VERY EARLY AGE, HAD A LOT OF PROBLEMS.  HE GREW UP IN THAT HOUSE WHERE, AT A COUPLE OF YEARS OF AGE, IN ORDER TO QUIET HIM, HIS MOTHER BLEW MARIJUANA IN HIS MOUTH.  AT EIGHT YEARS OF AGE, HE STARTED SMOKING MARIJUANA.  AT TEN YEARS  -- EIGHT YEARS OF AGE, HE STARTED HUFFING GASOLINE.  HE STARTED USING CRACK. LADIES AND GENTLEMEN, IS THERE ANY SERIOUS QUESTION ABOUT WHETHER OR NOT BRANDON BASHAM GREW UP UNDER THOSE CIRCUMSTANCES?

HIS FAMILY, ALL THE WAY BACK TO 1933 ON BOTH SIDES HAS SIGNIFICANT MENTAL ILLNESS.  YOU HAVE HEARD ABOUT HOW THE GENETICS ARE INVOLVED IN THAT.  NO ONE IS BLAMING HIS MOM. NO ONE IS BLAMING HIS DAD.  THEY WERE DEALT THE HAND THEY

WERE DEALT WHEN THEY WERE CHILDREN, AS WELL. AND SO, WHEN THEY BROUGHT UP BRANDON, THEY BROUGHT HIM UP IN THE SAME WAY, IN THE SAME MANNER IN WHICH THEY WERE BROUGHT UP. THEY HAD THE SAME LIABILITIES THAT BRANDON HAD. THEY HAD MENTAL ILLNESS, THEY HAD ALCOHOLISM. AND THIS CONTRIBUTED TO BRANDON'S PROBLEMS. ALL THROUGHOUT HIS MEDICAL RECORDS, ALL THROUGHOUT HIS MEDICAL RECORDS, THERE WAS A HISTORY OF DRUG ABUSE IN THE FAMILY, HISTORY OF ALCOHOLISM IN THE FAMILY. IT SHOULD NOT COME AS ANY SURPRISE THAT THAT IS THE KIND OF THING THAT BRANDON BASHAM WENT THROUGH.

TOMMY BASHAM SR., EVEN TOLD YOU, ON ONE SITUATION WHEN HE CAME BACK FROM LOUISVILLE, WHEN HE WAS LOOKING GOOD, HE WAS CLEAN, HE WAS HEALTHY. HE HAD SOME CONCERNS ABOUT GOING BACK UP TO HIS MOM'S AND GETTING BACK INVOLVED IN DRUGS AND SMOKING CRACK.

LADIES AND GENTLEMEN, KATHY BASHAM DOES SMOKE CRACK. SHE HAS BEEN SMOKING CRACK FOR YEARS. BRANDON GOT INVOLVED IN CRACK WITH HER. BRANDON, AT HIS MOM'S INSISTENCE, WOULD GO AHEAD AND GET CRACK. SHE WOULD GIVE HIM CRACK. THEY WOULD STEAL THINGS SO SHE COULD GET CRACK. HIS OWN SOCIAL SECURITY MONEY WAS USED TO BUY CRACK. HE ROAMED THE STREETS FOR CRACK. BUT HE HAD -- NO ONE ESTABLISHED PARAMETERS. NO ONE EVER SET THE RULES. HE HAD NO GUIDANCE. HE NEVER HAD ANY SOCIAL SKILLS DEVELOPED. IT WAS BECAUSE OF THIS LACK OF A FAMILY STRUCTURE.

HIS DAD IS ONE OF THE SWEETEST GUYS YOU WILL EVER MEET. MONTE MEFFORD SAID WHENEVER ANYTHING WOULD EVER HAPPEN, IT WAS DAD WHO BROUGHT BRANDON TO THE SCHOOL. IT WAS DAD THAT BROUGHT BRANDON TO THE HOSPITALS THAT HE TRIED TO GET HIM INTO. HE HAD HIS LIMITATIONS BECAUSE HE WAS A SEVERE ALCOHOLIC. EVERY NIGHT HE CAME HOME FROM WORK, AND INSTEAD OF INTERACTING WITH THE FAMILY, WENT AND SAT DOWN AND GOT INTOXICATED. THAT IS THE FAMILY.

THEY EXPLAINED TO YOU THE SITUATION ON BOTH SIDES OF THE FAMILY, THE MENTAL ILLNESS THAT RAVAGED THE FAMILY THROUGHOUT. INCLUDING TOMMY BASHAM, WHO GOES TO WESTERN STATE HOSPITAL AND IS SCHIZOPHRENIC. JEROME MCEACHERN, WHO, AS A YOUNG CHILD, WOULD GO OVER TO KATHY'S HOUSE AND SMOKE MARIJUANA AND DRINK ALCOHOL. SUMMER TOLD YOU THAT. TOMMY BASHAM TOLD YOU THAT HOW HE STARTED HUFFING GASOLINE WITH BRANDON, THE FIRST TIME AT EIGHT YEARS OF AGE. WHEN HIS MOTHER FOUND OUT ABOUT IT LATER ON, GOT HIM IN AN INSTITUTION AND GOT HIM CLEAR ON THAT.

ALL OF THESE PEOPLE -- BEVERLY TOLD YOU WHAT SHE OBSERVED; TOMMY TOLD YOU WHAT HE OBSERVED, THE HOUSE. IT WAS NOT KEPT. NO FOOD IN THE HOUSE, NOBODY SAT DOWN FOR DINNER. THERE WERE NO SOCIAL SKILLS LEARNED. THEY NEVER WENT ANYWHERE, NEVER WENT TO DINNER, NEVER WENT TO A MOVIE, NEVER WENT TO A PARK. IT IS A TROUBLED FAMILY. IT IS NOT BEING OFFERED AS AN EXCUSE, IT IS JUST TO SHOW YOU THE ENVIRONMENT WITH WHICH BRANDON BASHAM GREW UP IN. HIS

OPPORTUNITIES WERE VERY LIMITED. AND HE CARRIED THOSE OPPORTUNITIES FORWARD IN THE YEARS THAT WENT AHEAD.

JOYCE TAPP CAME IN AND TOLD YOU ABOUT HOW BRANDON BASHAM, WHEN SHE MET HIM, NO SOCIAL SKILLS. SHE WAS THE BUSDRIVER. MET HIM YEARS LATER, MET HIM ON THE BUS, KNEW HIS SISTER. SHE WAS APPALLED OF WHAT SHE SAW WHEN BRANDON CAME TO HER HOUSE AND WHAT SHE SAW, THE LACK OF SOCIAL SKILLS THAT HE HAD.

SHARON WATKINS CAME IN, A TEACHER. SUZANNE MACE. REMEMBER WHAT SHARON WATKINS SAID? THE DAY THAT KATHY CAME TO SCHOOL WAS THE WORST DAY SHE EVER HAD IN 27 YEARS OF TEACHING. BECAUSE SHE SAT DOWN NEXT TO BRANDON AND INSISTED THAT HE READ FROM A BOOK THAT HE COULD NOT READ FROM. MS. WATKINS GOT SO UPSET, SHE STILL REMEMBERS THAT INCIDENT. BRANDON DIDN'T HAVE THE ABILITY TO DO THAT.

SUZANNE MAYES SAID THAT BRANDON WAS A MANAGEMENT PROBLEM IN SCHOOL. NO QUESTION HE WAS DEVELOPMENTALLY AND SOCIALLY BEHIND. REMEMBER WHAT SHE SAID WHEN YOU GO BACK TO CONSIDER THE PUNISHMENT. AT SEVEN YEARS OF AGE, BRANDON'S SOLE DESIRE WHEN HE GREW UP WAS TO BE A STRIPPER. AT SEVEN YEARS OF AGE, HE WANTED TO BE A MALE STRIPPER BECAUSE AT NIGHT, WHEN HIS DAD WOULD GET TOGETHER WITH HIS FRIENDS, THEY WOULD GET HIM TO STAND ON THE TABLE TO PERFORM. THAT IS WHAT BRANDON BASHAM'S LIFE WAS LIKE, LADIES AND GENTLEMEN. THAT IS NOT COMING FROM BRANDON BASHAM OR ANY OF HIS FAMILY, THAT IS COMING FROM A TEACHER WHO REMEMBERS THAT INCIDENT SO MANY

YEARS AGO.

MONTE MEFFORD WHO TOLD YOU, YOU SAW HER ON THE WITNESS STAND, THIS IS A WOMAN WHO CARES ABOUT EVERYTHING SHE DOES. SHE HAS BEEN TEACHING, BEEN IN THE EDUCATIONAL SYSTEM FOR YEARS, AND SHE IS A SPECIAL PERSON, LADIES AND GENTLEMEN, BECAUSE SHE IS A PERSON WHO WORKS WITH KIDS LIKE BRANDON BASHAM, KIDS LIKE CHASE, KIDS WHO HAVE THOSE KINDS OF PROBLEMS, THOSE DISABILITIES. PEOPLE LIKE MONTE MEFFORD ARE SPECIAL.

SHE CAME DOWN HERE TO TELL YOU ABOUT BRANDON BASHAM AND WHAT BRANDON BASHAM WAS LIKE WHEN HE WAS IN SCHOOL WITH HER. SHE CAME DOWN HERE TO TELL YOU THAT SHE GOT BRANDON BASHAM TO GO TO THE ALLERGIST; SHE GOT BRANDON BASHAM TO GO TO THE OPTOMETRIST;SHE GOT BRANDON BASHAM TO GO THE NEUROLOGIST. SHE SENT BRANDON BASHAM TO TWO STATE HOSPITALS WHO WOULDN'T TAKE HIM BECAUSE HE WASN'T VIOLENT ENOUGH. SHE TRIED EVERYTHING SHE COULD, BUT ONLY UNDER VERY LIMITED CIRCUMSTANCES. SHE ONLY HAD HIM FOR A FEW HOURS A DAY.

ON MONDAY MORNING, SHE COULD TELL IF BRANDON WAS GIVEN HIS MEDICINE OR NOT. SHE COULD GIVE HIM THE MEDICINE AT SCHOOL ON MONDAY; OVER THE WEEKEND, HE HAD TO GET THE MEDICINE FROM HIS PARENTS. IF HE DIDN'T GET THE RITALIN, HE WOULD BE BOUNCING OFF THE WALLS.

SHE TOLD YOU HE WAS A GOOD-HEARTED KID. SHE ALSO TOLD YOU HOW HE CARED FOR THOSE WHO WERE LESS FORTUNATE THAN HE

WAS.  GAVE OTHER KIDS JACKETS WHEN OTHER KIDS WERE COLD AND DID NOT HAVE A JACKET, PARENTS DID NOT GIVE IT.  TOOK CARE OF CHASE.  CHASE NOT ONLY HAD LOW INTELLIGENCE, BUT HAD DEFORMITIES.  HIS MOUTH WAS DEFORMED.  HE WAS A VERY, VERY SICK PERSON.  HIS MOTHER CAME IN HERE AND TOLD YOU THIS.  BUT BRANDON BASHAM PROTECTED HIM AND CARED FOR HIM.  PROTECTED HIM FROM THE OTHER KIDS.  HE EMPATHIZED WITH HIM.  THIS IS BRANDON BASHAM, THE PERSON THE GOVERNMENT SAYS SHOULD BE PUT TO DEATH.

AND MONTE MEFFORD ALSO TOLD YOU ABOUT HER GRANDDAUGHTER, HER SISTER.  HOW HE IDENTIFIED WITH HER GRANDDAUGHTER WHEN SHE WOULD BRING THE GRANDDAUGHTER TO SCHOOL AND HER SISTER, WHO IS DISABLED.  BRANDON BASHAM WOULD BE CURIOUS ABOUT HER, TAKE CARE OF HER, WOULD INQUIRE ABOUT HER.  THAT IS THE BRANDON BASHAM THAT THESE PEOPLE KNEW.

LYNN COY WHO TOLD YOU WHAT HE DID WITH CHASE, HER SON.  THEN, LADIES AND GENTLEMEN, BROUGHT IN PEOPLE LIKE KELLIE MULLINS, BRENDA SHANER, SUSAN DAVENPORT.  BROUGHT IN DANNY STRINGFIELD, PENNY TITZER.  NOW, WHY DID WE BRING THOSE FOLKS IN, LADIES AND GENTLEMEN? TWO SIDES TO THAT COIN.  NUMBER ONE, WE WANTED YOU TO HAVE THE BENEFIT OF HEARING WHAT THOSE PEOPLE SAW IN BRANDON BASHAM OVER THE YEARS THAT THEY KNEW BRANDON BASHAM AND TREATED BRANDON BASHAM.  BUT WE ALSO KNEW THAT THE GOVERNMENT WAS GOING TO BE ABLE TO ASK THEM QUESTIONS AND POINT OUT THINGS THAT THE GOVERNMENT THOUGHT

SUPPORTED THEIR CASE. HOW BRANDON BASHAM ACTED OUT, HOW BRANDON BASHAM NEVER SEEMED TO BENEFIT FROM ANY OF THESE PSYCHIATRIC FACILITIES HE WAS IN. BUT, LADIES AND GENTLEMEN, THESE FIVE PEOPLE CAME IN AND TOLD YOU WHEN THEY HAD BRANDON BASHAM, BRANDON BASHAM RELAYED TO THEM, NUMBER ONE, THAT HE HAD BEEN SEXUALLY ABUSED. WE HAVE DISCUSSED WHAT HAPPENS TO PEOPLE WHO HAVE BEEN SEXUALLY ABUSED, HOW THEY REACT LATER ON IN THEIR LIVES. ABOUT THE HISTORY, HOW THEY DEVELOP, HIS HOME LIFE. TALKED ABOUT IMPAIRMENTS HE HAD WHILE HE WAS THERE. THEY TALKED TO YOU ABOUT THE PROGRESS THAT THEY SAW IN HIM. THEY ALSO TOLD YOU, LADIES AND GENTLEMEN, THAT THERE IS SOMETHING ABOUT BRANDON BASHAM THAT STUCK WITH THEM.

THOSE PEOPLE ARE VERY SPECIAL PEOPLE. THOSE PEOPLE CAME DOWN HERE. THEY INDICATED A WILLINGNESS TO COME DOWN HERE. THEY WANTED TO RELATE TO YOU THAT BRANDON BASHAM HAD SOMETHING IN HIM THAT THEY SAW THAT WAS WORTH IT. I THINK IT WAS KELLIE MULLINS SAID BRANDON BASHAM WAS AN INSPIRATION FOR HER. NOT INSPIRATION FOR WHAT HE HAS DONE, BUT INSPIRATION THAT YOU HAVE GOT TO KEEP WORKING WITH KIDS. YOU HAVE GOT TO KEEP TRYING WITH KIDS. THAT IS WHAT SHE MEANT. AND ALL OF THESE PEOPLE WERE DEDICATED PROFESSIONALS. THEY TOLD YOU THAT BRANDON BASHAM WAS AFRAID AT NIGHT. THAT KELLY WOULD HAVE TO GO DOWN TO HIS ROOM AND SIT OUT IN FRONT OF HIS ROOM AND DO HER WORK SO HE WOULD NOT BE AFRAID. ALWAYS SLEPT WITH HIS BACK TO THE WALL, WHICH IS AN INDICATION HE HAD BEEN SEXUALLY

ABUSED.  HAD TO HAVE A LIGHT ON BECAUSE HE WAS AFRAID AT NIGHT, ANOTHER INDICATION THAT HE HAD BEEN SEXUALLY ABUSED.

THESE PEOPLE ALSO TOLD YOU THAT, AT DIFFERENT TIMES DURING THE STAY THAT HE HAD WITH THEM, HE WOULD REVEAL OTHER INSTANCES OF ABUSE.  HE WAS DEVELOPING.  THE PROBLEM IS, AS DR. WATTS TOLD YOU, THERE WAS NO CONSISTENT CARE IN THE STATE OF KENTUCKY.  LADIES AND GENTLEMEN, BETWEEN THE TIME BRANDON -- FROM 1991 UNTIL THE YEAR 2000, THAT IS NINE YEARS, WAS IN 12 DIFFERENT INSTITUTIONS, EITHER BEING COMMITTED BECAUSE OF THE  RESULT OF A COURT ORDER, OR THE RESULT OF PSYCHIATRIC PROBLEMS.  PENNY TITZER TOLD YOU THAT WHEN SHE WAS AT CHARTER OF EVANSVILLE, ONE OF THE REASONS WHY HE ACTED OUT THE ENTIRE TIME THERE, EVEN THOUGH SHE WAS WORKING WITH HIM ON A ONE-ON-ONE BASIS, BECAUSE THE DOCTOR NEVER PUT HIM ON HIS RITALIN.  HOW IS BRANDON BASHAM SUPPOSED TO ACT IN AN ENVIRONMENT LIKE THAT WHEN HE IS NOT EVEN TAKING THE RITALIN THAT HE IS SUPPOSED TO BE TAKING TO KEEP HIM CALMED DOWN?

YOU HAVE HEARD TESTIMONY FROM DR. WATTS AND DR. BRAWLEY WHO TOLD YOU THAT THEY WERE TOLD BY DR. SANDERS IN KENTUCKY THAT BRANDON BASHAM IS THE MOST HYPERACTIVE CHILD HE HAS EVER SEEN IN HIS ENTIRE CAREER.  THEY HAVE TOLD YOU THE SAME THING.  THIS IS NOT SOMEONE WHO HAS A LEARNING DISORDER.  SOMEBODY IN THE THIRD OR FOURTH GRADE CLASS HAS A LEARNING PROBLEM.  HE IS SEVERELY IMPAIRED, IS LEARNING DISABLED, AND HAS HYPERACTIVITY.

PENNY TITZER SAID SHE HAD BEEN WORKING WITH BRANDON AND REVEALED ANOTHER INCIDENT OF ABUSE.  THEY REPORTED IT TO THE POLICE.  HIS MOM, INSTEAD OF BACKING HER SON UP AND GIVING HIM THE SUPPORT HE NEEDED, DIDN'T WANT BRANDON TO GO AHEAD AND REPORT IT.  DIDN'T WANT BRANDON TO GO AHEAD AND PROSECUTE IT BECAUSE IT WOULD UPSET THE NEIGHBORHOOD.  AND AS A RESULT OF THAT, SHE INSTRUCTED THE CHARGES BE DROPPED.  KATHY, AGAIN, BECAUSE OF HER BACKGROUND, AND HER LIMITED CAPABILITY, AND BECAUSE OF HER PARTICULAR PROBLEM, WAS SO CONCERNED ABOUT BRANDON THAT SHE WANTED HIM OUT BEFORE THE SOCIAL SECURITY CHECK STOPPED, WHICH WAS GOING TO BE IN FOUR MONTHS.

NOW, THAT DOESN'T SOUND RIGHT, LADIES AND GENTLEMEN. THAT IS NOT THE KIND OF THING YOU WOULD EXPECT TO HEAR FROM A MOTHER.  FINDING OUT, NUMBER ONE, HER CHILD HAS A MENTAL PROBLEM; SECOND OF ALL, HE HAS JUST REPORTED SOME ABUSE. NEEDS HELP.

IT IS ALSO KATHY WHO TOOK HIM OUT OF RIVENDELL AGAINST MEDICAL ADVICE.  DIDN'T WANT HIM TO HAVE THE MEDICINE.  THIS IS THE TYPE OF CARE HE GOT FOR LACK OF CONTINUITY, THE NUMBER OF DOCTORS HE SAW OVER THOSE NINE OR TEN YEARS, THE NUMBER OF PSYCHOLOGISTS HE SAW.  LADIES AND GENTLEMEN, IT WAS JUST -- IT IS JUST NOT A PRETTY PICTURE OF THE STATE OF MENTAL HEALTH IN KENTUCKY.  BRANDON BASHAM SUFFERED FOR IT.

YOU ALSO HEARD TESTIMONY WHEN HE WAS IN SCHOOL THAT HE STARTED OFF WITH AN IQ OF A HUNDRED, 101 MAYBE, ACTUALLY A

LITTLE BIT HIGHER. HE TOOK ANOTHER IQ TEST, IT DROPPED DOWN TO 86. IN 1995, HE HAD TAKEN ANOTHER IQ TEST. IT HAD DROPPED DOWN FROM THE ORIGINAL BY 23 POINTS. NOW, LADIES AND GENTLEMEN, THAT IS A SIGNIFICANT DROP IN AN IQ. YOU HAVE HEARD TESTIMONY AS TO WHY THAT WOULD HAPPEN. YOU HAVE ALSO HEARD TESTIMONY AS TO WHAT EFFECT THAT WILL HAVE ON SOMEONE. THAT IS DOCUMENTED IN THE RECORD.

NOW, DR. BRAWLEY CAME IN, AND WE WILL TALK ABOUT THAT IN JUST A MOMENT. I AM GETTING CLOSE TO THE END. I WANT TO DISCUSS WITH YOU A FEW MORE THINGS. THE FACT OF THE MATTER IS, THAT THAT IS DOCUMENTED IN THE RECORD THAT HIS IQ HAD BEEN DROPPING OVER A NUMBER OF YEARS. AND YOU HEARD TESTIMONY, AS A RESULT OF THE HUFFING THAT HE HAD BEEN DOING, AND THAT IS A SIGNIFICANT MENTAL IMPAIRMENT ON HIS PART.

YOU ALSO HEARD TESTIMONY FROM OUR EXPERTS. I WOULD LIKE TO TALK ABOUT THEM, FIRST. FIRST OF ALL, DR. BRANNON. DR. BRANNON WAS A NEUROLOGIST IN WASHINGTON. ONE OF THE BEST NEUROLOGISTS IN THE AREA. WHEN DR. CAPEHART GOT ON THE STAND AND STARTED TALKING ABOUT THE TEAM WE HAD PUT TOGETHER AND WHAT OUR TEAM WAS SUPPOSED TO DO, IT WAS A LITTLE BIT OF RESENTMENT HERE, NO QUESTION ABOUT IT. WHAT WE WERE TRYING TO DO WAS, WE TRIED TO GET -- TRIED TO DO THE BEST FOR YOU. TRIED TO PRESENT THE BEST WITNESSES WE COULD GET, PEOPLE WHO ARE EXPERTS IN THAT FIELD. PEOPLE WHO ARE EMPLOYED RIGHT HERE AT THE UNIVERSITY OF SOUTH CAROLINA SCHOOL OF MEDICINE

WHO TEACH OTHER DOCTORS, WHO PRACTICE MEDICINE, PRACTICE NEUROLOGY, PRACTICE NEUROPSYCHOLOGY, PRACTICE PSYCHIATRY, AND TEACH OTHERS HOW TO DO IT. WE BROUGHT THEM IN HERE FOR YOU, SO YOU WOULD HEAR THE BEST. AND IT WAS A LITTLE INSULTING TO HEAR DR. CAPEHART MINIMIZE AND ACTUALLY DISRESPECT THEM, BECAUSE HE COULD DISAGREE WITH THE DIAGNOSES, BUT HE WENT BEYOND THAT. YOU RECALL WHAT HIS TESTIMONY WAS.

WHAT DID DR. BRANNON TELL YOU? DR. BRANNON TOLD YOU THAT BRANDON BASHAM IS BRAIN DAMAGED, PERIOD. IT IMPAIRS HIS EXECUTIVE FUNCTIONING. PERIOD. HE HAS A PROBLEM PLANNING, HE HAS A PROBLEM WITH JUDGMENT, HE HAS DIFFICULTY MAKING CHOICES. HE HAS A DIFFICULTY WITH HIS IMPULSIVITY. HE IS BRAIN DAMAGED.

DR. BRAWLEY CAME IN HERE, AND SHE ALSO IS HIGHLY QUALIFIED. BY THE WAY, DR. BRANNON, THIS IS THE SECOND SITUATION, SECOND TIME EVER I THINK THAT DR. BRANNON SAID HE CAME IN HERE AND TESTIFIED IN A COURTROOM IN A CRIMINAL CASE. NOW, DOES THAT LOOK LIKE SOMEONE WHO IS BIASED? SOMEONE WHO HAS SOMETHING TO GAIN IN THIS CASE? DR. BRAWLEY CAME IN, SHE TESTED BRANDON. BRANDON HAD AN IQ OF AROUND 68. IT HAD DROPPED EVEN FURTHER. SHE TOLD YOU HE HAD ADHD AND SUFFERED FROM DEMENTIA. BRAIN DAMAGE. DEMENTIA. HE HAS A PROBLEM MAKING CHOICES, JUDGMENT, PLANNING, ABSTRACT, ALL OF THESE FACTORS OF EXECUTIVE FUNCTIONING. DR. BRAWLEY CAME IN TO TELL YOU THAT. AND DR. WATTS CAME IN, WHO IS A BOARD

CERTIFIED FORENSIC PSYCHIATRIST, TO TELL YOU THAT BRANDON HAS DEMENTIA, INHALING-INDUCED PSYCHOSIS WITH HALLUCINATIONS AND ANXIETY DISORDER. WHAT WOULD THE EFFECT OF THAT BE ON HIM AND HOW HE WOULD GO THROUGH HIS LIFE WITH THAT?

LADIES AND GENTLEMEN, THEY ALSO TOLD YOU THAT IT WAS WELL DOCUMENTED IN ALL OF THESE HISTORICAL RECORDS, THE 13,000 PAGES OF MATERIALS, THAT THESE PROBLEMS HAD BEEN GOING ON SINCE HE FIRST SAW A PSYCHIATRIST. THERE WERE PROBLEMS WITH IMPAIRED MEMORY, PROBLEMS WITH HALLUCINATIONS. ALL KINDS OF PROBLEMS THAT ARE DOCUMENTED IN THE RECORD.

NOW, HIS IMPAIRED MEMORY. MR. GASSER SAID SOMETHING ABOUT IMPAIRED MEMORY. WHAT DOES THAT HAVE TO DO WITH THIS CASE? WHAT IT HAS TO DO WITH THE CASE, LADIES AND GENTLEMEN, THAT IS A CLINICAL SIGN THAT BRANDON BASHAM DOES HAVE BRAIN DAMAGE. THAT HE DOES SUFFER FROM DEMENTIA. THAT IS WHAT THE IMPORTANCE OF IT IS. THAT HE HAS THIS LACK OF EXECUTIVE FUNCTIONING. HE CAN'T REMEMBER THESE KINDS OF THINGS. YES, IT IS NOT A QUESTION OF MINIMIZING HIS INVOLVEMENT IN THE CRIME. IT IS A QUESTION TO EXPLAIN BRANDON BASHAM TO YOU SO YOU WILL UNDERSTAND, SO THAT YOU CAN GET A GRASP OF WHAT THIS CHILD IS LIKE, WHAT THIS KID IS LIKE, WHAT HE WAS LIKE AS A CHILD, AND WHAT HE IS LIKE RIGHT NOW. CAN HE MAKE CHOICES? DOES HE HAVE GOOD JUDGMENT? IS HE DEPENDENT ON SOMEONE LIKE CHAD FULKS, WHO, I SUBMIT TO YOU, IS THE PLANNER, THE SCHEMER, AND THE LEADER.

DR. WATTS WENT THROUGH A FULL DISCUSSION WITH YOU ABOUT ALL OF THE IMPLICATIONS THAT THIS DISEASE HAD AND HOW IT AFFECTED BRANDON BASHAM.   THAT HE HAD NO CHOICE ABOUT THE GENETIC PREDISPOSITION IN THIS CASE.   HAD NO CHOICE ABOUT DEVELOPMENTAL HISTORY.   HE HAD NO CHOICE ABOUT MANY OF THE THINGS THAT HAPPENED TO HIM BECAUSE IT WAS ENVIRONMENTAL, SOCIOLOGICAL.

LADIES AND GENTLEMEN, WE HAD AN OBLIGATION TO BRING THOSE PEOPLE TO YOU, AND WE JUST DIDN'T PICK JUST ANYBODY.   WE PICKED WHO WE THOUGHT WOULD BE THE BEST EXPERTS TO COME IN HERE AND GIVE YOU A COMPLETE PICTURE OF BRANDON BASHAM SO THAT YOU COULD UNDERSTAND THAT THE PERSON SITTING OVER THERE,  THE PERSON CHARGED WITH THIS CRIME,  THE PERSON YOU WILL HAVE TO DECIDE WHETHER OR NOT HE SHOULD LIVE OR DIE, IS A NORMAL, FUNCTIONING INDIVIDUAL OR IS SOMEONE WHO IS BRAIN IMPAIRED, WHO SUFFERS FROM DEMENTIA.   BECAUSE, LADIES AND GENTLEMEN, THAT IS A FACTOR THAT SHOULD BE CONSIDERED IN THIS CASE.   IT IS A FACTOR TO CONSIDER WHETHER OR NOT HE CAN PLAN, AND SCHEME, AND THINK, AND MAKE CHOICES.   THOSE ARE FACTORS THAT MUST BE CONSIDERED IN THIS CASE, BECAUSE IF YOU DON'T CONSIDER THOSE, WHAT ARE THEY? WHAT ELSE WOULD YOU CONSIDER? WHAT OTHER KIND OF MITIGATION WOULD THERE POSSIBLY BE IN ANYBODY'S CASE? THE FACT THAT SOMEONE IS BRAIN DAMAGED, THOSE ARE IMPORTANT DECISIONS IN THIS CASE THAT YOU WILL HAVE TO MAKE,  WHETHER OR NOT HE IS OR NOT.   WHETHER HE IS OR IS NOT.

NOW, THE GOVERNMENT BROUGHT IN DR. CAPEHART. WHAT IS SIGNIFICANT ABOUT THAT? I WOULD LIKE TO JUST BRIEFLY ADDRESS THIS. DR. CAPEHART CAME IN HERE ON HIS OWN WITH A MINIMUM AMOUNT OF EXPERIENCE IN PSYCHIATRY. IT WASN'T A QUESTION OF WHAT SCHOOL HE WENT TO. IT WAS A QUESTION OF THE CONCLUSIONS HE MADE AND WHAT HE SAID ABOUT THE OTHER EXPERTS. BECAUSE IT WASN'T A MATTER OF JUST HIS DIAGNOSIS BEING DIFFERENT. IF YOU RECALL, DR. CAPEHART SAID, I SCRATCHED MY HEAD BECAUSE I COULDN'T UNDERSTAND WHAT THEY WERE TALKING ABOUT. WELL, LADIES AND GENTLEMEN, WE BROUGHT YOU THE BEST.

AND IT NEEDED TO BE POINTED OUT THAT DR. CAPEHART WAS INEXPERIENCED TO GO AHEAD AND MAKE THAT DIAGNOSIS TO BE ANTISOCIAL. BECAUSE THE REASON THAT THE ANTISOCIAL PERSONALITY IS SO IMPORTANT IN THIS CASE THAT HE DIAGNOSED IS BECAUSE THE GOVERNMENT WILL ARGUE THAT YOU CAN'T CONTROL BRANDON BASHAM. BUT, LADIES AND GENTLEMEN, ALL THROUGHOUT HIS LIFE, ALL THROUGHOUT HIS TREATMENT, AND ALL OF THESE FACILITIES, BRANDON BASHAM HAD THE MEMORY IMPAIRMENT, HAD THE HALLUCINATIONS, HAD THE PARANOIA, HAD ALL OF THESE THINGS HE WAS HAVING EVEN NOW. AND DR. CAPEHART CAME IN HERE AND SAID, NOT ONLY WAS HE ANTISOCIAL, BUT HE WAS MALINGERING NOW. LADIES AND GENTLEMEN, MALINGERING MEANS FAKING.

THE REASON IT WAS SO IMPORTANT TO BRING OUT DR. CAPEHART'S LIMITED CREDENTIALS WAS THAT BRANDON BASHAM, TO BE FAKING, HAD TO START FAKING BACK IN 1991 AND BEFORE. BECAUSE IF HE

IS FAKING NOW, HE HAD TO HAVE BEEN FAKING THEN. AND, LADIES AND GENTLEMEN, THAT IS JUST NOT RIGHT. IT IS NOT CORRECT. YOU HAVE SEEN IT. FIRST OF ALL, HE HAD NO REASON TO FAKE THEN. WHY WOULD A YOUNG BOY WANT TO SPEND ALL OF HIS LIFE IN JUVENILE FACILITIES, MENTAL HEALTH HOSPITALS? HE WASN'T MALINGERING THEN. HE WASN'T MALINGERING NOW. AND I SUBMIT TO YOU THAT DR. CAPEHART MISDIAGNOSED HIM IN THAT DR. WATTS AND DR. BRAWLEY CORRECTLY DIAGNOSED HIM SAYING THAT HE HAD THE DEMENTIA AND THAT WAS THE REASON WHY HE HAD THE IMPAIRED EXECUTIVE FUNCTIONING. WHY HE HAD THE JUDGMENT AND THE LACK OF SKILL, LACK OF PLANNING, LACK OF ABSTRACT THINKING. REMEMBER THE LAST QUESTION I ASKED DR. CAPEHART WAS, READ THE LAST SENTENCE BEFORE THE CRITERIA FOR ANTISOCIAL PERSONALITY. THAT SENTENCE WAS THIS:

"ANTISOCIAL PERSONALITY DISORDER APPEARS TO BE ASSOCIATED WITH LOW SOCIOECONOMIC STATUS IN URBAN SETTINGS. CONCERNS HAVE BEEN RAISED THAT THE DIAGNOSIS MAY, AT TIMES, BE MISAPPLIED TO INDIVIDUALS IN SETTINGS IN WHICH SEEMINGLY ANTISOCIAL BEHAVIOR MAY BE A PART OF A PROTECTIVE STRATEGY, SURVIVAL STRATEGY IN ASSESSING ANTISOCIAL BEHAVIOR."

WHAT THAT MEANS, LADIES AND GENTLEMEN, THAT DR. CAPEHART DID NOT TAKE INTO CONSIDERATION WHAT IS IN THE MANUAL, THE DIAGNOSTIC MANUAL. DR. CAPEHART ALSO DID NOT BRING WITH HIM HIS NEUROLOGIST, AND HE DID NOT BRING WITH HIM HIS NEUROPSYCHOLOGISTS WHO DID THE TESTING. DR. CAPEHART ADMITTED THAT, THROUGHOUT THE RECORDS, HE WOULD HAVE TO ADMIT THAT BRANDON DID HAVE MEMORY IMPAIRMENT. HE DID HAVE THE HALLUCINATIONS. ALL THROUGHOUT HIS RECORDS. DR. CAPEHART ALSO HAD TO ADMIT THAT, EVEN IN THE TESTS THAT HE GAVE, THOSE VERY SIMPLE TESTS ABOUT NAMING THE PRESIDENT AND NAMING THE -- AND DECIDING NUMBERS AND DIFFERENT ITEMS, HE HAD PROBLEMS WITH HIS MEMORY.

DR. CAPEHART ALSO HAD TO ADMIT THAT HIS OWN NEUROLOGIST FOUND THAT HE HAD SOME COGNIZANT PROBLEMS, HE WAS HAVING SOME PROBLEM IN HIS HEAD. THE DOCTOR NEVER PROCEEDED AFTER THAT. HE NEVER FOLLOWED UP ON THAT. NEVER CHECKED UP ON THAT. THE NEUROLOGIST WAS NOT HERE TO BE CROSS-EXAMINED BY ME AS TO WHY HE DID NOT. HE FOUND THE SAME THING THAT DR. BRANNON FOUND. HE FOUND COGNITIVE IMPAIRMENT.

DR. GOURLEY, WHO WAS THE NEUROPSYCHOLOGIST, FOUND THE SAME TESTING THAT DR. BRAWLEY DID. THAT WAS DR. CAPEHART'S GENERAL CONCLUSION, THEY GENERALLY FOUND THE SAME THING.

NOW, LADIES AND GENTLEMEN, THEY SHOULD HAVE BEEN BROUGHT HERE. THEY SHOULD HAVE BEEN BROUGHT HERE SO YOU COULD HAVE HEARD FROM THEM INSTEAD OF RELYING ON DR. CAPEHART WHO TOLD

YOU DR. BRANNON USED TERMS THAT ARE NOT EVEN IN EXISTENCE ANYMORE. UNTIL HE FOUND OUT DR. BRANNON IS A NEUROLOGIST, REFERS TO A COMPLETELY DIFFERENT BOOK THAN HE DOES. DR. CAPEHART'S ASSESSMENT IN THIS CASE IS SIMPLY NOT CREDIBLE. HE WANTS YOU TO BELIEVE THAT BRANDON BASHAM IS AN ANTISOCIAL PERSON AND THAT THERE IS NO HELP FOR HIM. YET THROUGHOUT HIS HISTORY, BRANDON HAS HAD PROBLEMS. BRANDON IS NOT MALINGERING. BRANDON HAS BEEN HAVING SAME PROBLEMS FOR THE LAST 12 OR 13 YEARS, LADIES AND GENTLEMEN. IT IS NOTHING NEW. IT IS NOT SOMETHING THAT CAME ABOUT RIGHT AFTER HE WAS CHARGED WITH A CRIME THAT HE WAS FAKING SOME KIND OF SYMPTOMS OF MENTAL ILLNESS. HE HAS HAD THESE FOREVER. HE IS NOT MALINGERING. THE GOVERNMENT MAY WANT TO ARGUE THAT HE IS, BUT THERE REALLY IS NO EVIDENCE OF THAT. DR. CAPEHART, AFTER BEING CROSS-EXAMINED, ESSENTIALLY HAD TO ADMIT THAT. THAT EVERYTHING THAT OUR DOCTORS TESTIFIED TO, WITH THE EXCEPTION OF HIS DIAGNOSIS, WAS FOUND BY HIS OWN STAFF AT BUTNER.

THE LAST THING I WANT TO TALK ABOUT IS THIS: STATUTORY MITIGATING CIRCUMSTANCES OR ROLE IN THE OFFENSE. THAT HE HAD A LESSER ROLE, MINOR OFFENSE. NONSTATUTORY MITIGATING CIRCUMSTANCE IS THAT HE HAD A LESSER ROLE IN THE OFFENSE, OBVIOUSLY, WITH CHAD FULKS. WHAT YOU WILL HAVE TO DO, LADIES AND GENTLEMEN, YOU NEED TO GO BACK AND EXAMINE THE TESTIMONY FROM THE FIRST PHASE OF THIS TRIAL. BECAUSE WHAT

WE SUBMIT TO YOU IS, THAT IS ONE OF THE BIGGEST MITIGATING FACTORS THAT YOU SHOULD BE CONSIDERING IN THIS CASE IS WHETHER OR NOT BRANDON BASHAM WAS EQUALLY CULPABLE UNDER THE MITIGATING FACTOR. UNDER THE LAW, DID HE HAVE AN EQUAL ROLE AS CHAD FULKS, OR WAS CHAD FULKS THE LEADER IN THIS CRIME VENTURE AND BRANDON BASHAM MERELY FOLLOWED ALONG? CHAD FULKS USED HIM LIKE A PUPPET. USED HIM BECAUSE HE WAS FAR SUPERIOR IN INTELLECT, FAR SUPERIOR IN HIS ABILITY. THESE ARE THE THINGS I WOULD LIKE YOU TO CONSIDER. I WILL JUST HIGHLIGHT THEM.

LOOK AT THE BACKGROUND OF THESE TWO INDIVIDUALS. CHAD FULKS WAS A CON MAN. CHAD FULKS HAD A CRIMINAL HISTORY WHEN HE WAS IN THE HOPKINS COUNTY JAIL, A LOT MORE SEVERE THAN BRANDON BASHAM. CHAD FULKS WAS ABLE TO GET TINA SEVERANCE TO DO ANYTHING HE WANTED HER TO DO. SHE WAS WAITING FOR HIM WHEN HE GOT OUT. WITHIN THREE WEEKS, HE MOVED ON AND GOT SOMEONE ELSE. PEOPLE FROM HOPKINS COUNTY JAIL, DIAN BLAIR, CHRIS SCHAFFER, PAUL ARISON, KATHY TERRELL ALL TOLD YOU THAT CHAD FULKS WAS SOMEONE YOU HAD TO WATCH OUT FOR. REMEMBER THE CALL MARVIN PHILLIPS SAID? I THINK IT WAS MARVIN PHILLIPS OR PAUL ARISON, I CAN'T REMEMBER RIGHT NOW, CHRIS SCHAFFER SAID, YOU WATCH THAT MAN. KATHY TERRELL, EVEN THOUGH HE WAS NOT ASSESSED AS A HIGH RISK, KATHY TERRELL ASKED CHRIS SCHAFFER TO PUT A RED ALERT ON HIM BECAUSE SHE THOUGHT HE WAS SO DANGEROUS. DIAN BLAIR SAID, I WILL NEVER FORGET THE LOOK

IN CHAD FULKS'S EYES.  THESE WERE THE PEOPLE WHO WE RELY ON. THE GOVERNMENT WITNESSES.  SOME OF THOSE ARE GOVERNMENT WITNESSES.

THE MOTIVE TO ESCAPE.  THE ABILITY TO PLAN.  BRANDON BASHAM DID NOT HAVE THE ABILITY TO PLAN THAT ESCAPE, AND CHRIS SCHAFFER TOLD YOU THAT.  ALL OF THESE WITNESSES TOLD YOU THAT.  CHAD FULKS PLANNED THE ESCAPE, AND CHAD FULKS WAS THE ONE WHO HAD THE MOTIVE TO ESCAPE.  BRANDON BASHAM HAD A VERY SHORT SENTENCE IN FRONT OF HIM,  BUT CHAD FULKS HAD JUST BEEN SERVED WITH AN ABUSE WARRANT,  CHILD ABUSE WARRANT.  HE WAS LOOKING AT ANOTHER 40 YEARS.  EVEN TOLD TINA SEVERANCE THAT. CHAD FULKS, DID YOU REMEMBER, HAD TORN OFF THE RETURN ADDRESS ON HIS ENVELOPES.  HE WAS PLANNING ON ESCAPING. HE WAS THE ONE WHO WAS CUNNING AND SMART.

WHEN THEY LEFT THE JAIL, WENT TO JAMES HAWKINS.  YOU REMEMBER JAMES HAWKINS.  YOU REMEMBER THE TESTIMONY IN THE CASE.  YES,  BRANDON BASHAM DID TAKE THE KNIFE OUT.  YES, BRANDON BASHAM DID SIT IN THE FRONT SEAT WITH HIM.  BUT BRANDON BASHAM DIDN'T HURT HIM. CHAD FULKS SAID, YOU DO WHAT YOU WANT WITH HIM, AND HE SAID, I DON'T WANT IT TO END OFF LIKE THAT.  BRANDON BASHAM GAVE HIM A RING FOR HIS TROUBLE, GAVE HIM A COAT SO HE WOULD BE WARM.  DIDN'T HURT HIM, DIDN'T TIE HIS HANDS TIGHT. WAS RUBBING HIS HANDS BECAUSE HE WAS SO COLD.  THIS IS THE PERSON THE GOVERNMENT WANTS YOU TO THINK TURNED AROUND WITHIN A FEW DAYS AND MURDERED TWO WOMEN.

THIS IS THE PERSON THAT JAMES HAWKINS, HE WAS WORRIED ABOUT HIM BEING COLD OUT THERE IN THE COLD WEATHER, BUT HE GAVE HIM THE RING FOR HIS TROUBLE, AND COVERED HIM, AND WANTED TO MAKE SURE HE WAS NOT TOO COLD.  AND WHEN HE WAS LEAVING SAID, CAN YOU BREATHE WITH THE TAPE THAT CHAD FULKS HAD PUT AROUND HIS MOUTH?  IS THAT THE PERSON YOU THINK THAT ACTUALLY,  WITH HIS OWN PHYSICAL HAND, KILLED SAMANTHA BURNS AND ALICE DONOVAN?

THE BREAK-IN AT ROBERT TALSMA'S HOUSE WAS PLANNED BY CHAD FULKS.  CHAD'S FAMILIARITY WITH ALL OF THE LOCATIONS THEY STOPPED AT.  WHO MADE THE DECISIONS,  LADIES AND GENTLEMEN, TO STOP,  WHERE TO STOP,  WHAT TOWN TO STOP IN,  WHAT MOTEL TO STOP IN, WHEN TO LEAVE, AND WHERE TO GO?  WHO CONTROLLED THE MONEY?  WHO CONTROLLED WHEN THEY ATE? WHO HAD ABSOLUTE CONTROL OVER ALL OF THE PEOPLE THAT WERE WITH THEM?  CHAD FULKS.

HE HAD CONTROL OVER BRANDON BASHAM,  HAD CONTROL OVER TINA SEVERANCE,  HAD CONTROL OVER ANDREA RODDY.  HE MADE ALL OF THE DECISIONS.  AND EVERY PLACE HE WENT, HE HAD SOME CONNECTION TO,  INCLUDING KENOVA,  WEST VIRGINIA.  EVEN THERE, BECAUSE THAT IS WHERE HE HAD BEEN LIVING.  HE HAD FAMILY THERE.  ALL OF THESE PLACES WERE PLACES THAT CHAD WAS CONNECTED WITH.  EVEN DOWN TO MYRTLE BEACH AND THE MOTELS AT MYRTLE BEACH.  CHAD FULKS HAD SOME CONNECTION WITH EVERY STOP THAT WAS MADE.

WHO WAS THE PERSON THAT WAS AGGRESSIVE IN THIS CASE? CHAD FULKS WAS.  CHAD FULKS WAS THE ONE THAT PUNCHED BRANDON

BASHAM IN THE MOUTH.  YOU HAVE NOT HEARD OF ANY PHYSICAL AGGRESSION COMMITTED BY BRANDON BASHAM TO CHAD FULKS. BRANDON BASHAM DID EVERYTHING CHAD SAID.  HE WAS SCARED TO DEATH OF CHAD FULKS.  TINA SEVERANCE TOLD YOU THAT THE PERSON WHO PULLED THE GUN ON HER AND POINTED IT AT HER FACE WAS CHAD FULKS.  REMEMBER WHAT CHAD FULKS DID? HE WANTED TINA SEVERANCE, IN FACT SHE DID,  LIE TO THE FBI ABOUT WHETHER OR NOT BRANDON BASHAM POINTED THAT GUN.  THAT IS THE KIND OF POWER THAT CHAD FULKS HAD.

IN ADDITION TO THAT,  CHAD WAS THE ONE THAT TOLD TINA TO STEAL THE MONEY FROM BRANDON BASHAM.  CHAD HAD ALL OF THAT INFLUENCE OVER ALL OF THOSE THREE PEOPLE THE ENTIRE TIME THEY WERE ALL RIDING TOGETHER,  LADIES AND GENTLEMEN.  CHAD HAD THE CONNECTION WITH WEST VIRGINIA WHERE SAMANTHA BURNS WAS ABDUCTED.  HE HAD A CONNECTION WITH THE MOUNTAINTOP WHERE THE CAR WAS BURNED.  IT WAS ALL CHAD FULKS ALL THE WAY THROUGH. ALL OF THE PLANNING,  ALL OF THE SCHEMING,  ALL OF THE CUNNING, AND ALL OF THE VIOLENCE.  I SUBMIT TO YOU IT POINTS TO CHAD FULKS, NOT BRANDON BASHAM.

WHEN THEY GOT TO SOUTH CAROLINA,  CARL JORDAN'S HOUSE, LET ME ASK YOU ABOUT THIS,  LADIES AND GENTLEMEN.  WHEN THEY WENT TO CARL JORDAN OR SAM JORDAN'S HOUSE, CARL JORDAN WAS OUT THERE.  WHO TRIED TO RAM CARL JORDAN? THAT WAS CHAD FULKS. WHO SHOT RIGHT THROUGH HIS WINDOW BARELY MISSING HIM? THAT WAS CHAD FULKS.  REMEMBER WHAT CARL JORDAN SAID? THAT BRANDON

BASHAM FIRED THE GUN, BUT WHEN WE WENT OUT THERE THE NEXT DAY AND LOOKED, THERE WERE TWO HOLES IN THE AWNING THAT WERE 90 DEGREES FROM HIM. IN OTHER WORDS, WHEN BRANDON BASHAM FIRED THE GUN, HE WAS FIRING IN THIS DIRECTION INSTEAD OF THAT DIRECTION WHERE CARL JORDAN WAS.

LADIES AND GENTLEMEN, IS BRANDON BASHAM THE ONE THAT KILLED ALICE DONOVAN AND SAMANTHA BURNS? THE SAME PERSON WHO FIRED AWAY FROM CARL JORDAN, THEN WITHIN A COUPLE OF DAYS TURNED AROUND AND KILLED ALICE DONOVAN? I SUBMIT TO YOU THAT DOES NOT MAKE SENSE. THAT DOES NOT PASS THE SMELL TEST, AS WE SAY. HE SPARES JAMES HAWKINS, HE SPARES CARL JORDAN, BUT THE GOVERNMENT WANTS YOU TO BELIEVE HE TAKES ALICE DONOVAN'S LIFE AND SAMANTHA BURNS'S LIFE.

MARGARET MOORE. WHO WENT BACK TO HER HOUSE? IT WAS CHAD FULKS. WHO DID ALL OF THE ATM TRANSACTIONS. IT WAS CHAD FULKS. WHO TRIED TO RUN OVER BILLY MARTINI? THAT WAS CHAD FULKS. BETH MCGUFFIN. REMEMBER WHEN SHE SAID CHAD WAS THE DOMINANT PERSON IN THE PAIR? THAT BRANDON WAS SUBMISSIVE TO CHAD. THAT CHAD CONTROLLED EVERYTHING. STACY WORKMAN SAID THAT CHAD WAS THE MANIPULATOR. ANTHONY CREMEANS HAD THE -- WAS THE CON MAN. HAD THE GUN, THE MONEY, THE CAR HE WAS TRYING TO SELL.

YOU HEARD TESTIMONY THAT MR. GASSER REFERRED TO THAT BRANDON BASHAM HAD THE GUN WHEN THE POLICE OFFICER WAS OUTSIDE THE MOTEL, MADE SOME THREATS TO BETH MCGUFFIN'S BROTHER, BUT

**JA 2409**

YOU KNOW WHAT? SO FAR, THERE IS NO PROOF YET THAT MR. BASHAM CARRIED OUT ANY VIOLENT ACTS THAT HE SAID HE WOULD CARRY OUT OR THREATENED TO CARRY OUT. THAT IS WHY I SUBMIT TO YOU, AT THE END OF THE GOVERNMENT'S CASE, THE GUILT PHASE, WE REFER TO IT AS PUFFING. CHAD FULKS ACTUALLY DOES IT, BRANDON BASHAM BOASTS ABOUT IT OR PUFFS.

LADIES AND GENTLEMEN, WE HAVE TO LOOK AT BETH MCGUFFIN'S HOUSE AND WITH ANDREA AND DEANNA FRANCES. I WANT YOU TO CONSIDER THIS. BRANDON BASHAM APPROACHED THE CAR. YES, HE HAD A GUN. BUT HE BACKED AWAY. THE GOVERNMENT ARGUES IT WAS BECAUSE SHE WAS ON THE PHONE, BUT HE KNEW THAT BECAUSE HE SAW HER WALKING AROUND THERE. WHEN HE SAW HOW AFRAID THEY WERE, HE WALKED AWAY AND SAID, "I AM SORRY." THAT IS THE SAME MAN THAT THE GOVERNMENT WANTS YOU TO BELIEVE KILLED SAMANTHA BURNS AND ALICE DONOVAN.

TROOPER MAYO. CHAD FULKS TRIED TO RUN DOWN TROOPER MAYO WHEN HE WAS CHASING HIM. TRIED TO KILL A TROOPER.

LADIES AND GENTLEMEN, LOOK AT THE FORENSICS IN THIS CASE. REMEMBER WHOSE SEMEN IS ON THE BACK SEAT OF ALICE DONOVAN'S CAR. THERE IS NO EVIDENCE IN THIS RECORD THAT BRANDON BASHAM DID ANYTHING OF A SEXUAL NATURE, NONE. THE GOVERNMENT CAN ARGUE INSINUATION, THEY CAN ARGUE CONJECTURE, THEY CAN OFFER SPECULATION. THE FACT OF THE MATTER IS, THERE IS NO EVIDENCE. THE ONLY EVIDENCE IN THIS RECORD, THE ONLY EVIDENCE IN THIS CASE WE HAVE HEARD FOR EIGHT WEEKS IS THAT

CHAD FULKS RAPED ALICE DONOVAN.   NOT BRANDON BASHAM.

WHEN BRANDON BASHAM WAS CAUGHT,  THE GOVERNMENT WILL DISAGREE TO THE EXTENT BECAUSE WE HAVE ALREADY DISAGREED, INTERVIEWED BY FBI AGENTS,  SLOWLY,  SLOWLY KEPT REVEALING DIFFERENT INFORMATION.   LADIES AND GENTLEMEN,  HE WENT DOWN ON NOVEMBER 25TH AND TOOK THE GOVERNMENT, AFTER THE PHONE CALL THAT HE HAD, AND POINTED OUT LANDMARKS,  THE AMOCO STATION, THE BANK,  THE BEE TREE FARM,  THE ROADS,  THE CEMETERY.  ALL OF THAT INFORMATION WAS POINTED OUT BY BRANDON BASHAM, AND HE DIDN'T HAVE TO DO THAT.   THE GOVERNMENT DID NOT KNOW -- HE DID NOT KNOW THE GOVERNMENT HAD ANY INKLING AT ALL ABOUT THEM BEING UP IN THAT AREA.   BUT HE REVEALED THAT INFORMATION. HE WAS REVEALING THOSE LOCATIONS IN AN ATTEMPT TO ASSIST.

NOW,  THEY DIDN'T FIND ALICE DONOVAN, BUT YOU HEARD TESTIMONY FROM DR. WATTS AND A LOT OF OTHER PEOPLE THAT THAT IS A CONFUSING AREA.  THE ROADS ARE CONFUSING.   YOU HAVE ALREADY HEARD FROM DR. SCHWARTZ-WATTS THAT THAT AREA HE, BRANDON BASHAM, DID NOT HAVE THE CAPABILITY TO FIND THAT BODY. YOU HEARD ALSO EVIDENCE THAT IT WAS LATE IN THE AFTERNOON. YOU HEARD THAT THEY WERE HIGH ON DRUGS,  AND REALLY BEEN NO WAY THAT HE COULD HAVE LOCATED THAT BODY.   BRANDON BASHAM MADE DISCLOSURES THAT I SAID BEFORE ABOUT SAMANTHA BURNS. AND HE DID,  HE MADE SOME DISCLOSURES ABOUT THE AREA DOWN IN SAVANNAH BLUFF.   WHAT HAPPENED ON THAT PHONE CALL AS TO WHY HE DID THAT,  I DON'T KNOW.   I CAN'T OFFER ANY EVIDENCE OF

THAT EXCEPT TO TELL YOU THIS.  THAT THE FBI AGENT WAS THE ONE WHO WAS ACTUALLY DRAWING THE MAP BASED UPON WHAT BRANDON WAS TELLING HIM.  YES, IT IS THERE.  BUT THE OTHER EVIDENCE ABOUT UP IN NORTH CAROLINA IS ALSO IN THE RECORD, AS WELL. THAT EFFORT THAT WAS MADE BY BRANDON BASHAM TO IDENTIFY THE AREA WHERE THEY HAD BEEN, UNKNOWING THAT THE POLICE KNEW THEY HAD BEEN IN THAT AREA.

LADIES AND GENTLEMEN, THE LAST THING I WANT YOU TO CONSIDER WHEN YOU DEAL WITH THIS ISSUE ABOUT WHO HAD THE LESSER ROLE IN THIS MATTER, WHO HAD THE MINOR ROLE OR LESSER ROLE, IS THE FACT THAT WHEN IT WAS ALL SAID AND DONE, AND BRANDON BASHAM WAS CAPTURED, HE WAS IN THE ASHLAND JAIL. WHERE WAS CHAD FULKS? CHAD FULKS WAS TRYING TO LURE AMY WARD, WHOSE LICENSE HE HAD, TRYING TO LURE HER DOWN TO MEET HIM AT 10:30 AT NIGHT WHEN HE LEFT A MESSAGE ON THE PHONE.  NOW, WHY IS THAT IMPORTANT? IT IS IMPORTANT SO YOU WILL UNDERSTAND AND YOU WILL SEE WHO ACTUALLY WAS CALLING AND MAKING THE DECISIONS IN THIS CASE.  WHO WAS THE LEADER AND WHO WAS THE FOLLOWER. WHO WAS THE PUPPETEER AND WHO WAS THE PUPPET.

LADIES AND GENTLEMEN, CHAD FULKS IS AN EVIL PERSON. CHAD FULKS IS A CON MAN.  CHAD FULKS HAS A HISTORY OF DOING THAT TO OTHER PEOPLE, AND HE HAD A HISTORY, IN THIS CASE, OF DOING WORSE THAN DESPICABLE ACTS.

AS FAR AS THE MITIGATING FACTORS ARE CONCERNED IN THIS CASE, WHETHER THEY ARE THE STATUTORY ONES OR NONSTATUTORY

ONES, I ASK YOU TO CONSIDER THAT BRANDON BASHAM DID NOT HAVE THE LEVEL OF CULPABILITY, THE LEVEL OF RESPONSIBILITY, WHEREVER WAY YOU WANT TO LOOK AT IT. CULPABILITY CAN TRANSLATE INTO THE MANNER IN WHICH HE ACTED IN THIS CASE. NOT NECESSARILY RESPONSIBILITY. HE IS RESPONSIBLE, UNDER THE LAW, BUT HIS CULPABILITY, NOT RESPONSIBILITY, JUST CULPABILITY IS NOT AS GREAT AS CHAD FULKS.

LADIES AND GENTLEMEN, LIFE WITHOUT PAROLE IS A SERIOUS SENTENCE. FOR THE REST OF HIS LIFE, BRANDON BASHAM WILL BE LOCKED IN A CELL UNTIL HE IS VERY OLD WHEN HE MAY GET OUT INTO POPULATION. HE HAS FORFEITED ALL OF HIS RIGHTS TO BE IN SOCIETY BY YOUR CONVICTION. HE WILL BE MANAGED AND HE WILL BE DEALT WITH IN A PRISON ENVIRONMENT. THAT IS A SEVERE SENTENCE. HE WILL NOT BE OUT WEIGHTLIFTING, WATCHING TV, READING NOVELS, THAT IS JUST POPPYCOCK. THAT WILL NOT HAPPEN. NOT WITH HIS BACKGROUND.

WE ARE AT THAT POINT IN THE CASE WHERE I AM GOING TO HEAD BACK THIS WAY AND GO BACK DOWN THE ROAD WE TOOK, AND YOU HAVE GOT TO DECIDE AT THE FORK IN THE ROAD WHICH WAY YOU ARE GOING TO GO. WE HAVE TRIED TO GIVE YOU A MAP. MR. GASSER HAS GIVEN YOU A MAP FOR THE GOVERNMENT. I HAVE TRIED TO GIVE YOU A MAP TO LOOK AT THE DEFENDANT'S CASE. BASED ON WHAT WE HAVE TOLD YOU AND THE MITIGATING FACTORS IN THIS CASE, WE ASK YOU TO PLEASE IMPOSE ON BRANDON BASHAM'S BEHALF A LIFE SENTENCE. WE SUBMIT TO YOU, TAKING INTO CONSIDERATION ALL OF THE FACTS

IN THIS CASE, ALL OF BRANDON'S HISTORY, HIS MENTAL PROBLEMS, HIS BRAIN DAMAGE, AND HIS ROLE IN THIS OFFENSE, THAT A LIFE SENTENCE WOULD BE THE MORE APPROPRIATE SENTENCE IN THIS CASE AND NOT THE DEATH SENTENCE. WE HOPE THAT YOU TAKE THE ROAD THAT CHOOSES LIFE. WE HOPE THAT YOU DO NOT TAKE THE ROAD THAT CHOOSES DEATH.

THANK YOU.

THE COURT: THANK YOU, MR. SWERLING. MEMBERS OF THE JURY, WE WILL GO AHEAD AND TAKE OUR LUNCH BREAK. I WOULD LIKE TO BREAK FOR 45 MINUTES. THAT SHOULD GIVE YOU TIME TO PARTAKE OF YOUR MEAL THAT WE HAVE HAD BROUGHT IN. IF ANY OF YOU WANT TO GO OUTSIDE FOR 10 OR 15 MINUTES FOR FRESH AIR, YOU SHOULD BE ABLE TO DO THAT, AS WELL. WE WILL PICK BACK UP IN 45 MINUTES. PLEASE GO TO YOUR JURY ROOM.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: MR. GASSER, HOW LONG WILL YOUR REPLY BE?

MR. GASSER: LAST TIME, I KEPT IT AT 29 MINUTES, 30 MINUTES. THAT IS WHAT I INTENDED TO DO.

THE COURT: IN STATE COURT PRACTICE, THE DEFENDANT GETS THE LAST CRACK AT THE JURY IN A DEATH PENALTY CASE. I AM ASSUMING THE STATUTE PROVIDES FOR REBUTTAL TESTIMONY?

MR. SCHOOLS: YES, SIR.

THE COURT: I THOUGHT SO. IT IS STATUTORY. ALL

RIGHT.  WE WILL BE IN RECESS FOR 45 MINUTES.

(WHEREUPON, A LUNCH REECESS WAS HELD.)

THE COURT:   ALL RIGHT.  ONE TECHNICAL QUESTION BEFORE WE RESUME.  WHEN WE ADDED THE STATUTORY MITIGATING FACTORS TO THE VERDICT FORM,  THE LAST ONE, THE SIXTH ONE UNDER THE STATUTORY CATEGORY IS A CATCHALL, AND IT DOESN'T MAKE MUCH SENSE TO LEAVE IT IN THERE AND ASK HOW MANY JURORS FOUND THAT CATEGORY.   IT READS:

"ANY OTHER FACTORS IN MR. BASHAM'S

BACKGROUND,  REFERENCE OF CHARACTER,

OR ANY OTHER CIRCUMSTANCES THAT

MITIGATES AGAINST DEATH IN THIS

FACTOR OF MITIGATING.   NUMBER OF

JURORS FINDING THIS MITIGATING

FACTOR,  SINGULAR."

IT IS OPEN-END, A CATCHALL THAT LEADS INTO THE NONSTATUTORY REALLY.   I THINK WE SHOULD PROBABLY DELETE IT RATHER THAN ASK THEM TO RETURN A FINDING ON AN UNDEFINED CATEGORY.

MR. SWERLING:  JUDGE,  I THINK THE LAW IS THEY CAN LOOK AT ANY FACTOR THAT THEY FIND IS MITIGATING, EVEN IF WE DON'T MENTION IT.

THE COURT:   THAT IS RIGHT.

MR. SWERLING:  THAT IS WHAT I THINK THAT CATCHALL IS REFERRING TO.

THE COURT:  YOU DON'T THINK THEY SHOULD IDENTIFY WHAT IT IS, IT IS GENERIC?

MR. SWERLING:  I THINK THE CASES SAY THEY CAN FIND FACTORS WE DON'T EVEN MAKE.

THE COURT:  CERTAINLY CAN.  SUITS ME TO LEAVE IT LIKE IT IS.  I WANT TO LEAVE IT UNTIL WE PRINT IT.

MR. SCHOOLS:  YOU INSTRUCT THEM THROUGHOUT.  I DON'T THINK IT MAKES ANY SENSE FOR JURORS TO MAKE A FINDING ON THAT. EACH INDIVIDUAL JUROR COULD BE MAKING FINDINGS ON SEPARATE THINGS.  IT IS HOPEFULLY CONFUSING.

THE COURT:  TO LEAVE IT IN THERE, WE NEED TO REQUIRE THEM TO TELL US WHAT IT IS RATHER THAN --

MR. SCHOOLS:  WE THINK IT SHOULD COME OUT.  WE HAVE, WITH ADDING THE STATUTORY AGGRAVATING FACTORS, THAT IS 34 OF THEM, I BELIEVE.  I DON'T THINK THAT ADDS ANYTHING.  IT JUST CONFUSES ABOUT WHAT THEY ARE SUPPOSED TO FIND OR NOT FIND.

THE COURT:  WHAT ABOUT UP IN THE JURY CHARGE PART, LEAVE IT THERE?

MR. SCHOOLS:  I DON'T HAVE ANY PROBLEM WITH THAT.  I JUST DON'T KNOW WHAT THEY WILL FIND.

THE COURT:  THAT POINTS OUT THE DIFFICULTY WHEN YOU PUT THIS IN THE VERDICT FORM AND REQUIRE A FINDING, WHEN IT IS THEORETICALLY UNLIMITED IN TERMS OF WHAT THEY CAN FOCUS ON AS MITIGATING FACTOR.

MR. SWERLING, HELP ME WITH THIS.  I AM WILLING TO LEAVE

IT IN.   IF WE DO IT, WE WILL HAVE TO REQUIRE THEM TO SPELL IT OUT OR SOMETHING,  TELL US HOW MANY JURORS FOUND IT.   DO YOU SEE WHAT I AM SAYING? ONE JUROR MIGHT THINK UP THREE MORE THAT AREN'T LISTED,  ONE JUROR MIGHT THINK UP FOUR MORE THAT AREN'T LISTED, AND DO THEY ADD THOSE TWO JURORS TOGETHER THERE AND PUT TWO, EVEN THOUGH THEY FOUND DIFFERENT THINGS? IF I TOOK IT OUT,  IF I TOOK IT OUT, WHEN I AM GOING THROUGH THE VERDICT FORM WITH THE JURY, I COULD SAY,  NOW, LET ME REMIND YOU THAT YOU AREN'T LIMITED BY THIS LIST THAT I JUST WENT OVER WITH YOU.   YOU CAN COME UP WITH YOUR OWN MITIGATING FACTORS, EVEN THOUGH THEY AREN'T ENUMERATED, EVEN THOUGH IT IS NOT A PLACE FOR YOU TO RECORD YOUR FINDING ON HERE.   I MEAN, THAT IS ONE WAY TO HANDLE IT, IF POSSIBLE.

MR. SWERLING:  JUDGE,  THIS IS -- MY CONCERN IS THIS. I HAVE A PROBLEM TO DELETING IT BECAUSE IT SEEMS TO ME WHAT THEY ARE TRYING TO SAY THERE WITH NUMBER EIGHT IS THAT ALL INCLUSIVE ONE THAT THEY CAN FIND FOR WHATEVER REASON THEY WANT TO.   NOW, MAYBE YOU CAN'T BE SPECIFIC ABOUT IT AS TO WHAT THE ISSUE WAS, AND I GUESS I THINK THAT IS THE PURPOSE OF HAVING THE CASE LAW THE WAY IT IS DEVELOPED,  WHATEVER REASON THEY WANT TO GIVE.   ANY SUCH FACTOR.

MR. SCHOOLS:  YOUR HONOR,  YOU HAVE BEEN EXTRAORDINARILY GENEROUS WITH RESPECT TO THESE FACTORS ALREADY.   LEFT IN IMPAIRED CAPACITY, WHICH I DON'T THINK THERE IS ANY EVIDENCE OF THAT.   LEFT IN DURESS, THERE IS VERY

LITTLE OR NO EVIDENCE OF THAT.  I JUST THINK THAT WHAT YOU ARE INVITING THE JURY TO DO IS JUST TO GET CONFUSED AND POTENTIALLY TO RETURN SOME SORT OF FINDING THAT THERE IS X JURORS WHO AGREE WITH THAT, AND WE DON'T EVEN KNOW IF THEY ARE AGREEING ON THE SAME THING.  ONE JUROR MAY THINK IT IS ONE THING, ONE JUROR MAY THINK IT IS THE OTHER.  IT IS OF LITTLE OR NO CONSEQUENCE TO THE DEFENSE, AND I THINK IT PRESENTS A SIGNIFICANT POTENTIAL FOR CONFUSION.

THE COURT:  I WILL TAKE IT OUT.  I WILL TELL THE JURY THAT THEY AREN'T LIMITED BY THIS LIST.

MR. SCHOOLS:  YES, SIR.

THE COURT:  ALL RIGHT.  OVER THE DEFENDANT'S OBJECTION, I WILL TAKE IT OUT.

ALSO, ONE FINAL THING.  ON THE PARAGRAPH WE HANDED OUT THIS MORNING ABOUT IMPOSING LIFE FOR ANY REASON OR NO REASON AT ALL, I HAD CIRCLED IN BLACK, BLACK MARKER WHAT I HAD FROM THE GEORGIA DEATH PENALTY CASE.  I TOLD MR. SWERLING I MIGHT TRY TO DELETE SOME OF THE LAST SENTENCE.  I HAVE TRIED, AND I JUST CANNOT FIGURE OUT A GOOD WAY TO DO IT, SO I WILL LEAVE THAT QUOTATION JUST AS IT IS TAKEN FROM THAT OTHER JURY CHARGE.  WITH THAT, LET'S MOVE FORWARD.

MR. HARRIS:  WHERE DO YOU ADD THE LANGUAGE, JUDGE, THAT GOES TO THE EIGHTH FACTOR?

THE COURT:  WHEN I AM WALKING THROUGH THE VERDICT FORM WITH THEM.  I WILL BE FOLLOWING A WRITTEN SCRIPT,

FLIPPING PAGES, EXPLAINING PAGES. I WILL TELL THEM THEY AREN'T LIMITED BY THE LIST. I TELL THEM IN THE TEXT EARLIER IN THE CHARGE THEY AREN'T LIMITED. I WILL TELL THEM AGAIN WHEN WE GET TO THE VERDICT FORM.

MR. HARRIS: WILL IT BE IN WRITING FOR THEM TO TAKE BACK WITH THEM, YOUR HONOR?

THE COURT: NO.

MR. HARRIS: WE WOULD ASK THAT THAT BE IN SOME FORM OF WRITING.

THE COURT: IT WILL BE IN THE JURY CHARGE. IT WILL BE IN THE JURY CHARGE. I WILL GO BACK AND READ THAT BACK TO THEM VERBATIM, TELL THEM IT IS NOT ON THE LIST. TELL THEM THEY CAN CONSIDER ANY OTHER FACTOR THAT THEY THINK IS MITIGATING. ALL RIGHT. PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: ALL RIGHT. THE COURT RECOGNIZES MR. GASSER FOR HIS REPLY ARGUMENT.

MR. GASSER: MAY IT PLEASE THE COURT, YOUR HONOR. LADIES AND GENTLEMEN, AS YOU KNOW, I SAID I WOULD DO AGAIN AS I DID IN THE GUILT PHASE PORTION OF THIS PROCESS. I HAVE THE RIGHT, REPRESENTING THE GOVERNMENT AND THE CITIZENS OF SOUTH CAROLINA, TO COME BEFORE YOU AND REPLY TO MR. SWERLING. I BELIEVE I KEPT IT RIGHT TO 30 MINUTES IN THE GUILT STAGE, THAT IS WHAT I PLAN ON DOING NOW.

YOU HAVE EATEN LUNCH, YOU HAVE HEARD A LOT THIS MORNING. I KNOW YOU ARE READY TO GET RIGHT TO THE WORK THIS DAY.  I PLAN ON KEEPING IT AT A LIMITED TIME.

ONE OF THE THINGS I WANTED TO MAKE CLEAR IS THAT THE GOVERNMENT IS NOT RELYING ON ANY ONE FACT IN ASKING YOU JURORS TO SENTENCE MR. BASHAM.  IT WASN'T THE FACT HE HOARDS HIS DRUGS THAT HE DESERVES THAT SENTENCE.   IT WASN'T THE FACT THAT HE PARTICIPATED IN THE ATTEMPTED MURDER OF MATT DAVIS THAT HE DESERVES THE DEATH SENTENCE.   I AM SURE YOU CAN ALL UNDERSTAND THAT, BUT TO KIND OF TAKE IT IN CONTEXT, SO BRANDON BASHAM DOES SUCH-AND-SUCH, IS THAT A REASON TO KILL HIM? SO BRANDON BASHAM DID SUCH-AND-SUCH, IS THAT A REASON TO KILL HIM? THAT IS CLEARLY BEING -- TAKING FACTS AND EVIDENCE OUT OF CONTEXT IN WHAT WE ARE ASKING YOU TO DO.   WE ARE ASKING YOU TO CONSIDER ALL OF THE FACTS,  ALL OF THE TESTIMONY, AND ALL OF THE ACTIONS, AND ALL OF THE CONDUCT OF BRANDON BASHAM.  AND WE ARE ASKING YOU TO CONSIDER ALL OF THE MITIGATION EVIDENCE THAT WAS PRESENTED BY THE DEFENSE.

THE GOVERNMENT NEVER SUGGESTED TO YOU IN OPENING STATEMENTS IN THE PENALTY PHASE, I DID NOT SUGGEST TO YOU THAT YOU JURORS SHOULD NOT CONSIDER EVERY ASPECT,  EVERY ANSWER FROM EVERY WITNESS PRESENTED TO YOU BY THE GOVERNMENT AND THE DEFENSE IN THIS CASE.   YOU SHOULD ABSOLUTELY CONSIDER ALL OF THE TESTIMONY AND ALL OF THE EVIDENCE.   AND IT IS UP TO YOU JURORS TO DECIDE WHAT,  IF ANY, WEIGHT OF ANY OF THE TESTIMONY

OR ANY OF THE EVIDENCE SHOULD BE GIVEN.  IT IS TOTALLY UP TO YOU.  THE LAWYERS CAN'T TELL YOU WHAT TO CONSIDER.  THE LAWYERS CAN'T TELL YOU WHAT WEIGHT.  THE JUDGE CAN'T TELL YOU WHAT WEIGHT.  YOU WILL HAVE TO CONSIDER ALL OF THE EVIDENCE. IT IS TOTALLY YOUR PREROGATIVE, LADIES AND GENTLEMEN.

ONE OF THE THINGS I WANT TO MAKE ABSOLUTELY CLEAR AGAIN. AT ONE POINT IN TIME, MR. SWERLING INDICATED THAT ONE TIME IN HIS LIFE BRANDON BASHAM WAS KIND TO CHASE WHEN HE WAS 10,  11 YEARS OLD.  AND HE MADE THE STATEMENT, AND THIS IS THE BOY THAT THE GOVERNMENT IS ASKING YOU TO KILL.  NO, IT IS NOT. THAT IS WHAT I MEANT WHEN I TALKED TO YOU IN MY CLOSING ARGUMENT.

ONE OF THE THINGS THE DEFENSE WANTS YOU TO FOCUS ON IS BRANDON BASHAM.  BECAUSE, LET'S FACE IT,  NO CITIZEN,  NO 16 CITIZENS WOULD EVER CONSIDER,  SHOULD THEY EVER CONSIDER KILLING A TEN YEAR OLD OR KILLING A 12 YEAR OLD.  AND WE ARE NOT ASKING YOU TO DO THAT.  WE ARE ASKING YOU,  LADIES AND GENTLEMEN,  TO LOOK AT BRANDON BASHAM,  THE MAN,  BRANDON BASHAM THE MAN AT 21 YEARS OLD, NOW 23 YEARS OLD,  BUT 21 YEARS OLD WHEN HE WAS KIDNAPPING AND CARJACKING THESE TWO WOMEN AND KILLING THESE TWO WOMEN.  BRANDON BASHAM,  THE MAN. BRANDON BASHAM'S ACTIONS AS A MAN.  THE GOVERNMENT SUBMITS THAT IS WHERE THE FOCUS OF YOUR ATTENTION SHOULD BE ON, BRANDON BASHAM, THE MAN.  BECAUSE HE IS A MAN,  HE COMMITTED THESE CRIMES.  A MAN WHO SITS HERE BEFORE YOU ON TRIAL,

LADIES AND GENTLEMEN.

NOW, A COUPLE OF GENERAL POINTS I WILL TALK TO YOU ABOUT THAT MR. SWERLING DISCUSSED WITH YOU. FIRST OF ALL, CHAD FULKS. NEED I REMIND YOU AGAIN THAT CHAD FULKS AND BRANDON BASHAM WERE CHARGED WITH THE SAME EXACT CRIMES? THAT DEATH NOTICES WERE PROVIDED AGAINST MR. BASHAM AND MR. FULKS? THAT IT RESOLVED A LEGAL ISSUE THAT THESE CASES WERE SEVERED? YOUR SOLE RESPONSIBILITY, YOUR SOLE RESPONSIBILITY IS THE APPROPRIATE PUNISHMENT OF MR. BASHAM. THE GOVERNMENT SOUGHT THE DEATH PENALTY AGAINST MR. FULKS AND THE GOVERNMENT SOUGHT THE DEATH PENALTY AGAINST MR. BASHAM. BECAUSE IT IS THE GOVERNMENT'S POSITION THAT AN OBJECTIVE VIEWPOINT OF THIS EVIDENCE INDICATES THAT THEY WERE BOTH EQUALLY CULPABLE IN SAMANTHA BURNS AND THE ALICE DONOVAN CASE. THE GOVERNMENT IS SEEKING -- THE GOVERNMENT HAS SOUGHT DEATH PENALTIES AGAINST BOTH OF THESE INDIVIDUALS. THAT IS VERY IMPORTANT. THAT IS EXTREMELY CRITICAL FOR YOU TO UNDERSTAND THAT THE GOVERNMENT IS NOT SAYING THAT CHAD FULKS IS LESS CULPABLE THAN BRANDON BASHAM. NEVER HAVE SAID THAT.

THE GOVERNMENT 'S POSITION IS THE TWO OF THEM ARE EQUALLY CULPABLE. IT JUST SO HAPPENS IT IS YOUR LEGAL RESPONSIBILITY FOR YOU TO DETERMINE BRANDON BASHAM'S APPROPRIATE PUNISHMENT. HE SPOKE ABOUT MR. FULKS. LET'S PUT MR. FULKS IN PERSPECTIVE HERE.

THERE IS NO QUESTION MR. FULKS WAS LEADING THE PACK AS FAR

AS WHO WAS DRIVING THE CAR AND WHERE THEY WERE GOING.   THERE IS ABSOLUTELY NO QUESTION ABOUT THAT.   BUT I REMIND YOU, LADIES AND GENTLEMEN, WHO WAS THE ONE THAT TOOK THE LEAD DURING ALL OF THOSE HOURS WHEN SAMANTHA BURNS WAS ALONE IN THE CAR WITH HER PERPETRATOR?  IT WAS BRANDON BASHAM BECAUSE MR. FULKS HAD TO BE DRIVING THE VAN.   AS MR. FULKS WAS IN THE VAN, IT WAS MR. BASHAM TAKING THE LEAD.   IT WAS MR. BASHAM THAT HAD THAT GUN ON SAMANTHA BURNS, THE GOVERNMENT SUBMITS TO YOU.  WHO WAS THE ONE WHO TOOK THE LEAD AND APPROACHED ANDREA FRANCIS?  IT WAS MR. BASHAM THAT TOOK THE LEAD.

THEY MENTIONED THE FACT THAT THE ACTS OF MR. BASHAM ARE MERE PUFFING, BUT THAT THE FACTS OF MR. FULKS SHOW VIOLENCE. THERE IS NO QUESTION, WE ARE THE ONES THAT PRESENTED THE EVIDENCE WHEN MR. FULKS TRIED TO SHOOT CARL JORDAN IN THE HEAD,  HE TRIED TO KILL CARL JORDAN.  THE GOVERNMENT PRESENTED THAT TESTIMONY WHEN I DIRECTLY EXAMINED MR. JORDAN.   NO QUESTION, WE AGREE.   WHY IS IT A VIOLENT ACT WHEN MR. FULKS IS TRYING TO SHOOT MR. JORDAN IN THE HEAD,  AND IT IS NOT A VIOLENT ACT WHEN MR. BASHAM IS TRYING TO KILL MATT DAVIS?  HOW DO YOU DISTINGUISH THE TWO? THE FACT THAT HE WAS THREATENING TO KILL THOSE STURGIS MICHIGAN POLICE OFFICERS IS MERE PUFFING, WHEN CHAD FULKS POINTS THE GUN AT TINA SEVERANCE'S FACE,  IT IS AN ACT OF VIOLENCE.   HOW CAN YOU HAVE IT BOTH WAYS? YOU CAN'T.

REASONABLE PEOPLE, I SUBMIT TO YOU, CLEARLY, WHEN LOOKING

AT THIS EVIDENCE, THERE IS EVIDENCE IN THE RECORD THAT CHAD FULKS WAS VIOLENT TOWARDS INNOCENT PEOPLE, AND THERE IS EVIDENCE IN THE RECORD THAT BRANDON BASHAM WAS VIOLENT TOWARDS INNOCENT PEOPLE. EQUALLY VIOLENT. CHAD FULKS, AS I TOLD YOU IN MY GUILT PHASE, I AM NOT DEFENDING THE GUY. THE GOVERNMENT'S POSITION IS CHAD FULKS DESERVES TO DIE FOR THESE CRIMES, TOO. CHAD FULKS DIDN'T KILL JAMES HAWKINS EITHER. IN FACT, IF YOU REMEMBER, CHAD FULKS SAID, YOU DO WITH HIM WHAT YOU WANT TO. SO, WHEN IT WAS LEFT UP TO CHAD FULKS LEAVING IT UP TO BRANDON BASHAM, MR. HAWKINS SURVIVED. TWO WOMEN ARE DEAD.

THEY WANT YOU TO BELIEVE THAT BRANDON BASHAM CAN BE EASILY MANIPULATED. THERE IS NO QUESTION ABOUT IT. BRANDON BASHAM, HE HAS BEEN ON BOTH ENDS OF THIS. HE CAN BE EASILY MANIPULATED. HE HAS ATTEMPTED TO AND, IN FACT, HAS MANIPULATED PEOPLE BEFORE. REMEMBER JAMES EDWARDS' TESTIMONY? THERE ARE LEADERS AND FOLLOWERS IN PRISON. THERE ARE LEADERS AND FOLLOWERS IN PRISON.

IT IS INTERESTING, WHEN MR. SWERLING WAS EXPLAINING TO YOU WHY, PUTTING IN CONTEXT WHY MR. BASHAM WOULD REACT THE WAY HE DID WITH SOME OF THE GUARDS, WELL, SOME OF THESE GUARDS WOULD TELL HIM WHAT TO DO AND HE DIDN'T LIKE THAT. THAT IS NOT HOW YOU DEAL WITH BRANDON BASHAM. YOU DON'T TELL BRANDON BASHAM WHAT TO DO. DO YOU REMEMBER THAT PORTION OF HIS CLOSING ARGUMENT? SO, ON THE ONE HAND, THEY WANT YOU TO

BELIEVE THAT BRANDON BASHAM CAN'T BE TOLD WHAT TO DO BY THE PRISON GUARDS, AND ON THE OTHER HAND, BRANDON BASHAM IS BEING TOLD WHAT TO DO THROUGHOUT THIS ENTIRE CRIME SPREE BY CHAD FULKS. HOW DO YOU BALANCE THOSE TWO? THEY WANT YOU TO BELIEVE THAT, THEY OFFER AS AN EXPLANATION, YOU CAN'T TELL BRANDON BASHAM WHAT TO DO BY A PRISON GUARD OR ELSE HE WILL EXPLODE. ON THE OTHER HAND, THEY WANT YOU TO BELIEVE THAT CHAD FULKS WAS TELLING HIM EVERYTHING OF WHAT TO DO. HE IS LEADING HIM. I'M NOT TALKING ABOUT LEADING ABOUT WHERE THEY ARE GOING. IT DOESN'T MAKE SENSE. YOU CAN'T HAVE IT BOTH WAYS.

YOU RECALL THE BEST EXPLANATION FOR CHAD FULKS AND BRANDON BASHAM DURING THAT TIME PERIOD. TINA SEVERANCE SAID, LIKE TWO PEAS IN A POD.

AND AS FAR AS WHO THE ACTUAL KILLER IS, THE FACT THAT IT DOESN'T PASS THE SMELL TEST. I WILL USE HIS OWN ANALOGY. WHAT DIDN'T MR. SWERLING TALK TO YOU ABOUT? HE DIDN'T TALK TO YOU ABOUT THE ADMISSION BRANDON BASHAM MADE TO AGENT VITO AND AGENT MALEY, THIS IS WHERE "THEY DID THEIR THING." HE DIDN'T TELL YOU ABOUT BRANDON BASHAM STANDING IN FRONT OF SHERIFF HEWITT WITH THAT PURSE AS IF HE HAS A BELT AND DOING THIS AND SAYING HE THREW THAT BELT STRAP INTO THE WOODS. HE DIDN'T MENTION ANYTHING TO YOU ABOUT BRANDON BASHAM REACHING OUT TO MR. C. J., TO CLIFFORD JAY ON CHRISTMAS EVE, DECEMBER 2003, SAYING, "WE KILLED THEM." DOES THAT PASS THE SMELL TEST AS

TO WHETHER OR NOT HE ACTUALLY PARTICIPATED IN THE DEATH OF THESE TWO WOMEN? "WE KILLED THEM."  WHAT MORE DO YOU NEED AS FAR AS HIS INVOLVEMENT?  HIS OWN WORDS REACHING OUT TO A COUNSELOR HE HAS NO IDEA WILL TAKE THAT INFORMATION TO LAW ENFORCEMENT.

THERE WAS NO EVIDENCE OF A PRISON WRONGDOING ON MR. FULKS AT HOPKINS COUNTY DETENTION CENTER.  AND KATHY TERRELL PUT BRANDON BASHAM -- CLASSIFIED BRANDON BASHAM AND MOVED BRANDON BASHAM INTO CHAD FULKS'S CELL.  DON'T YOU AGREE,  KATHY TERRELL,  SCHAFFER, ALL OF THESE PEOPLE AT HOPKINS COUNTY DETENTION CENTER, IF THEY THOUGHT IN SOME WAY CHAD FULKS WAS GOING TO BE ABLE TO EQUALLY MANIPULATE MR. BASHAM, THEY WOULD HAVE PUT HIM IN THE CELL WITH HIM IF THEY HAD SOME CONCERN?

JAMES AIKEN.  MR. AIKEN.  ONE OF THE THINGS YOU REMEMBER MR. SWERLING -- I MEAN, MR. SCHOOLS, WHEN HE STARTED CROSS-EXAMINING HIM, ASKED HIM ABOUT WHERE HE WAS EARLY IN OCTOBER.  HE WAS IN A STATE DEATH PENALTY TRIAL IN CONWAY.  IN THAT CASE,  MR. AIKEN ACKNOWLEDGED THAT ONE OF THE REASONS WHY HE WAS BEING OFFERED AS AN EXPERT WAS TO REVIEW THAT DEFENDANT'S PREVIOUS RECORDS,  HIS PREVIOUS CONDUCT WHILE INCARCERATED, AND HE OFFERED AN OPINION TO THAT JURY.  AND IN HIS OPINION,  THAT DEFENDANT WOULD ADAPT TO PRISON LIFE.  HE ACKNOWLEDGED,  BASED ON THIS CASE,  HE COULDN'T SIT IN THAT WITNESS STAND AND OFFER THAT SAME OPINION.

MR. SWERLING: OBJECTION,  YOUR HONOR.  HE WASN'T

**JA 2426**

ASKED TO.

MR. GASSER:  NO, SIR.  MR. SCHOOLS ON CROSS-EXAMINATION, YOUR HONOR.

THE COURT:  ALL RIGHT.  MEMBERS OF THE JURY, THE LAWYERS HAVE A DISAGREEMENT OF WHAT IS IN THE EVIDENCE.  YOU WILL HAVE TO DECIDE, BASED ON YOUR RECOLLECTION OF WHAT YOU HEARD, WHICH LAWYER IS CORRECT.

MR. GASSER:  THEY OFFERED HIM TO TALK ABOUT PRISON SECURITY.  MR. SCHOOLS ASKED HIM, ISN'T IT TRUE YOU WERE OFFERED AS AN EXPERT IN THAT CASE FOR THAT DEFENDANT IN CONWAY ABOUT HIS PRISON ADAPTABILITY, AND HE ACKNOWLEDGED THAT.  AND THE VERY NEXT QUESTION FROM MR. SCHOOLS WAS, AND YOU WEREN'T OFFERED AS AN EXPERT, YOU WEREN'T OFFERED FOR THAT OPINION IN THIS CASE.  THAT IS THE FACTS.  THAT IS WHAT CAME FROM THAT WITNESS STAND.  AND THERE IS A REASON FOR THAT.  THE GOVERNMENT SUBMITS TO YOU IT IS BECAUSE MR. AIKEN COULD NOT LOOK YOU JURORS IN THE EYES, BASED ON BRANDON BASHAM'S PAST AND SAY --

MR. SWERLING:  JUDGE, I HAVE TO APPROACH SIDE.  I HATE TO INTERRUPT MR. GASSER'S CLOSING ARGUMENT, BUT CAN I APPROACH A MOMENT?

THE COURT:  ALL RIGHT.

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SWERLING:  I HAVE TO OBJECT TO THAT KIND OF TESTIMONY.  ACTUALLY, MOVE FOR MISTRIAL.  I MEAN, HE IS ASKING THE WITNESS, HE IS MAKING A COMMENT ON A WITNESS THAT WE NEVER ASKED TO DO AN ADAPTABILITY TEST.  HE IS COMMENTING THAT HE COULD NOT DO AN ADAPTABILITY TEST.

THE COURT:  WE WENT THROUGH THAT.  HE WAS DESIGNATED AS AN EXPERT THAT WOULD TESTIFY ABOUT ADAPTABILITY.

MR. SWERLING:  NO, NEVER ASKED HIM ABOUT IT.  DID NOT ASK HIM TO DO IT.

THE COURT:  HE WAS DESIGNATED FOR IT.

MR. GASSER:  FIRST OF ALL, THAT WAS MR. SCHOOLS'S FIRST 15 MINUTES OF HIS CROSS-EXAMINATION, ENTIRE 15 MINUTES OF CROSS-EXAMINATION.

MR. SWERLING:  I BELIEVE MR. HARRIS OBJECTED TO IT.

MR. GASSER:  HE DID NOT.  HE DID NOT OBJECT TO THAT. SCOTT KNOWS IT BETTER THAN I DO.

THE COURT:  I OVERRULE THE OBJECTION.  I THINK IT IS PROPER ARGUMENT.

MR. SWERLING:  HAVE MY OBJECTION CONTINUING?

THE COURT:  IT IS CONTINUED.

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

MR. GASSER:  THANK YOU, YOUR HONOR.  YOU HEARD THAT TESTIMONY.  THAT IS WHY MR. SCHOOLS BROUGHT UP TO DISTINGUISH THAT TESTIMONY FROM CONWAY BY THIS WITNESS, AND FROM THIS

WITNESS IN THIS CASE BEFORE YOU. YOU HEARD THAT TESTIMONY, LADIES AND GENTLEMEN. IF YOU NEED TO HEAR IT AGAIN, THE COURT REPORTER CAN PLAY IT BACK FOR YOU AGAIN. BOTTOM LINE, MR. AIKEN ACKNOWLEDGED IN CROSS-EXAMINATION THAT THE FEDERAL BUREAU OF PRISONS WOULD TAKE MR. BASHAM, LIKE ALL OTHER INMATES, AND BE PLACED IN A PERIOD OF SOLITARY CONFINEMENT FOR A PERIOD OF TIME UNTIL SUCH TIME, UNTIL SUCH TIME THAT THEY COULD PROPERLY EVALUATE HIM. ON THE ONE HAND, MR. SWERLING WANTS YOU TO BELIEVE THAT HE HAS NEVER ASSAULTED ANY GUARDS, NEVER USED ANY WEAPONS, HE HAS NEVER CARRIED OUT HIS THREATS, IT IS MERE PUFFING, AND HE HAS NO HISTORY OF VIOLENCE.

ON THE OTHER HAND, HE SUGGESTS TO YOU IF MR. BASHAM DOES NOT ACT OUT WHILE HE IS INCARCERATED EARLY ON, HE WILL NOT GO INTO GENERAL POPULATION. THAT IS NOT WHAT MR. AIKEN TESTIFIED TO ON CROSS-EXAMINATION WITH MR. SCHOOLS. ONCE THEY GET HIM IN THERE, ONCE THEY CLASSIFY HIM, IF THEY DON'T HAVE ANY PROBLEMS WITH HIM WHILE HE IS IN THE CLASSIFICATION HE IS IN WHEN HE ENTERS IN, HE WOULD MAKE HIS WAY INTO GENERAL POPULATION. THAT IS WHAT MR. AIKEN TESTIFIED TO.

THIRD POINT. HE TALKED ABOUT GIVING SOME SORT OF BENEFIT, IF YOU WILL, TO MR. BASHAM FOR PROVIDING THE INFORMATION ON NOVEMBER 25TH THROUGH HIS LAWYER IN THE SAMANTHA BURNS'S CASE. FOURTEEN DAYS AFTER SAMANTHA BURNS WAS ABDUCTED, CARJACKED, AND KILLED, BRANDON BASHAM TELLS HIS LAWYER THAT HE CAN OFFER LIMITED INFORMATION. QUALIFIES

IT AS SAMANTHA BURNS WAS KILLED AND HER BODY WAS DUMPED IN A RIVER. FOURTEEN DAYS AFTER THE FACT. LADIES AND GENTLEMEN, JOHN AND KANDI BURNS, JOHN AND KANDI BURNS HAVE NOT SLEPT ANY BETTER BECAUSE 14 DAYS AFTER THE FACT, MR. BASHAM OFFERS THAT LIMITED QUALIFIED INFORMATION.

HE TALKS ABOUT THE LIMITED -- THE INFORMATION HE OFFERS UP ON THANKSGIVING DAY, THREE DAYS LATER. WHAT WASN'T DISCUSSED WAS WHAT HE WAS DOING A WEEK BEFORE THAT IN KENTUCKY WHEN HE WAS TELLING THE FBI AGENT, MALEY, BASED ON HIS MEMORY. THIS IS A GENTLEMAN WHO HAS MEMORY PROBLEMS. YOU HAVE GOT THAT INFORMATION. YOU HAVE GOT THAT GOVERNMENT'S EXHIBIT, 333 AND 338 BACK IN YOUR JURY ROOM. HE WAS ABLE TO RECALL, NEVER HAVING BEEN TO SOUTH CAROLINA, BEEN TO SAVANNAH BLUFF ONCE, WHEN MR. COOK SAW HIM AND TONYA RICHARDSON SAW HIM THERE, HE WAS ABLE TO VISUALIZE IN HIS MIND THE EXACT LOCATION OF SAVANNAH BLUFF. HE WAS ABLE TO DO IT SO GOOD THAT AN FBI AGENT WAS ABLE TO SKETCH IT, FAX IT, AND LIEUTENANT SESSIONS WAS ABLE TO LOOK AT WHAT MR. BASHAM WAS ABLE TO VISUALIZE IN HIS MIND. AND REMEMBER, WHEN THE FBI AGENT DREW IT DOWN SAID, THAT IS SAVANNAH BLUFF. THE DETAILS WERE INCREDIBLE.

WHAT IS SO IMPORTANT ABOUT THAT, LADIES AND GENTLEMEN, IS THAT WAS ALL A LIE. THAT WASN'T A MISTAKE. THINK OF THE IMPACTS ON THE VICTIMS. THINK OF THE IMPACT ON JENNIFER, AND ANGIE, AND BARRY. THE IMPACT OF THE CRIME ITSELF IS

INTOLERABLE. BUT THEN WHEN THEY ARE TOLD BY LAW ENFORCEMENT THAT MR. BASHAM, SEVERAL DAYS LATER, IS SAYING SHE IS ALIVE AND SHE IS IN THE SAVANNAH BLUFF AREA TIED TO A TREE, CAN YOU GET ANY MORE CRUEL THAN THAT? KNOWING IN HIS MIND SHE IS 70 MILES AWAY AND THAT SHE IS DEAD? THINK OF THE CRUELTY OF MR. BASHAM MAKING THAT FBI AGENT DRAW THAT MAP AND FAXING IT IN HOPES THEY WOULD FIND HER ALIVE. THINK OF THE CRUELTY. THINK OF WHAT WAS GOING THROUGH JENNA, ANGIE, AND BARRY'S MIND. AND YOU ARE ALLOWED TO THINK OF THOSE THINGS WHEN YOU ARE JUDGING MR. BASHAM'S CONDUCT AND WHEN YOU ARE LOOKING AT VICTIM IMPACT.

AND THE WHOLE IDEA THAT THERE IS NO BODY, THAT BRANDON BASHAM HAS SUCCESSFULLY, SUCCESSFULLY, ALONG WITH CHAD FULKS, GOTTEN RID OF ALICE'S BODY. DON'T YOU THINK BARRY DONOVAN, DON'T YOU THINK ANGIE AND JENNIFER WARNER, DON'T YOU THINK JUDY EZELL AND ALICE'S OTHER SISTERS, DON'T YOU THINK HER MOTHER, DON'T YOU THINK HER FRIENDS, THAT A DAY DOESN'T GO BY WHEN THEY WONDER WHEN THEY WAKE UP, THEY THINK TO THEMSELVES, IS SOMEBODY GOING TO STUMBLE ACROSS ALICE'S REMAINS? WHERE IS ALICE? WHERE IS ALICE? THE IMPACT OF ANY HOMICIDE IS HORRIBLE, BUT TO DELIBERATELY AND CRUELLY LIE ABOUT WHERE THE BODY IS AND THAT SHE IS ALIVE, IS IMMEASURABLE. YOU ARE ALLOWED TO CONSIDER THAT.

YOU KNOW, MR. SWERLING SAID IT IS HARD AS A LAWYER, THEY DON'T TEACH YOU, THEY DON'T TEACH YOU AS A DEFENSE LAWYER,

THEY DON'T TEACH YOU HOW TO STAND BEFORE A JURY AND ASK FOR MERCY.  I AGREE WITH YOU TOTALLY ON THAT.   THEY DON'T TEACH YOU IN LAW SCHOOL OR ANY PROSECUTION SEMINAR AS TO WHAT WORDS YOU CAN USE TO CONVEY TO A JURY SITTING IN A SANITIZED COURTROOM LIKE THIS,  HOW DO YOU DESCRIBE THE EVENTS THAT TOOK PLACE SO THAT THEY CAN HAVE A GRASP OF REALITY WHILE YOU ARE SITTING IN A JURY BOX UNDER ALL THESE RULES AND REGULATIONS?

HOW CAN I DESCRIBE TO YOU SAMANTHA BURNS'S LAST NINE HOURS ON THIS EARTH? HOW CAN I DESCRIBE TO YOU WHAT ALICE DONOVAN WENT THROUGH? IT IS IMPOSSIBLE FOR ME TO DO THAT.   YOU ARE GOING TO HAVE TO DO THAT YOURSELVES WHEN YOU ARE DECIDING THE IMPACT OF WHAT BRANDON BASHAM DID ON ALICE DONOVAN AND HER FAMILY.

THURSDAY, NOVEMBER 14TH,  2002,  STARTED OFF AS A GOOD DAY FOR ALICE DONOVAN.   IT WAS HER DAY OFF.  SHE HAD A CUP OF COFFEE, SHE HAD A CIGARETTE IN HER HAND,  SHE WAS PLANNING ON GOING SHOPPING.   CHRISTMAS SHOPPING FOR HER GRANDCHILDREN. IT STARTED OFF AS A PRETTY GOOD DAY.   AND IT ENDED IN HORROR. LADIES AND GENTLEMEN,  THE LAST THING ALICE DONOVAN SAW WAS EVIL.   EVIL IN ITS PUREST FORM.   EVIL IN THE FORM OF CHAD FULKS AND BRANDON BASHAM.   AND THE LAST THING SHE EXPERIENCED WAS FEAR,  FEAR.   AND THE LAST THING SHE FELT, NO MATTER HOW SHE DIED, HAD TO HAVE BEEN PAIN.   AND THE ONE THING, I SUBMIT TO YOU, THAT HAD TO HAVE BEEN GOING THROUGH ALICE DONOVAN'S MIND,  THIS WOMAN WHO WAS PHYSICALLY AND SEXUALLY ABUSED AS A

CHILD, THIS WOMAN WHO WAS IN AN ABUSIVE RELATIONSHIP, WAS BEATEN AND ABUSED BY HER FIRST HUSBAND, THIS WOMAN THAT WAS ABLE TO PICK HERSELF UP BY THE BOOT STRAPS, THIS WOMAN THAT WAS ABLE TO RAISE HER DAUGHTERS, THIS WOMAN WHO WAS ABLE TO FIND ANOTHER MAN TO FALL IN LOVE WITH, THIS WOMAN WHO WAS ABLE TO MOVE TO OUR STATE AND ADAPT TO OUR STATE AS HER HOME STATE, THIS WOMAN WHO WAS ABLE TO GET A JOB, THIS WOMAN WHOSE LIFE WAS PERFECT AT THE AGE OF 44, THE LAST THING THAT HAD TO BE GOING THROUGH HER MIND, I SUBMIT TO YOU, AFTER EVERYTHING SHE OVERCAME, WAS HERE SHE IS, AT THE HANDS OF THESE TWO MEN.

AND YOU KNOW WHAT THEY GOT FOR KILLING ALICE DONOVAN? DO YOU KNOW WHAT ALICE DONOVAN'S LIFE WAS WORTH TO BRANDON BASHAM AND CHAD FULKS ON THURSDAY, NOVEMBER 14TH? WHEN YOU LOOK AT HOW MUCH MONEY THEY STOLE, AND HOW MUCH GAS THEY PUMPED ON HER CREDIT CARD, WHAT WAS ALICE DONOVAN'S LIFE WORTH TO BRANDON BASHAM AND CHAD FULKS? ONE THOUSAND THIRTY DOLLARS AND FIFTEEN CENTS ($1,030.15). THAT IS HOW MUCH MONEY CHAD FULKS AND BRANDON BASHAM GOT ON ALICE'S CARD.

DEFENSE EXPERTS, BRIEFLY. FIRST OF ALL, LADIES AND GENTLEMEN, IT IS CRITICAL TO REMEMBER THAT THEY ALL ACKNOWLEDGE, WHEN YOU ARE DIAGNOSING SOMEBODY, WHETHER IT IS FOR PSYCHOLOGICAL REASON, MENTAL HEALTH REASON, MEDICAL REASON, THE CLINICAL INFORMATION THAT IS PROVIDED IS JUST AS IMPORTANT. SO, THE CREDIBILITY OF THE PERSON PROVIDING THE INFORMATION IS VERY, VERY IMPORTANT. I WILL GET TO THAT IN

A MOMENT.

SECOND, THIS WHOLE IDEA OF BRAIN DAMAGE. THERE IS A REASON WHY. BRAIN DAMAGE. BRAIN DAMAGE. YOU CAN'T HELP BUT STRIKE AN EMOTIONAL NERVE. SOMEBODY IS BRAIN DAMAGED, IT STRIKES AN EMOTIONAL NERVE. BUT WHAT DO WE ALSO KNOW, LADIES AND GENTLEMEN? THERE IS NO PHYSICAL EVIDENCE OF ANY BRAIN DAMAGE. THE MRI'S THAT WERE DONE, THE EEG'S THAT WERE DONE, THERE IS ABSOLUTELY NONE. THEY TOOK -- THEY TOOK THE MOST SOPHISTICATED BRAIN IMAGING THAT POSSIBLY COULD HAVE BEEN DONE ON ANYBODY, AND THAT WAS DONE IN THIS CASE. WE CAN LOOK AT THE MRI. THE DEFENSE EXPERT NEUROLOGIST HAD A CHANCE TO LOOK AT THAT. THERE IS NO EVIDENCE OF ANY IDENTIFIABLE, PHYSICAL EVIDENCE OF BRAIN DAMAGE TO BRANDON BASHAM. ZERO. NONE.

WHAT ELSE? EVERY SINGLE NEUROLOGICAL EXAMINATION PERFORMED ON BRANDON BASHAM, I WENT THROUGH IT TWICE, I KNOW YOU WERE BORED OF IT, EIGHT TO 10 OVER A PERIOD OF YEARS. ONE WHEN HE WAS TEN YEARS OLD SHOWED UP ABNORMAL, AN EEG THAT WAS EXPLAINED AWAY BECAUSE EVERY ONE AFTER THAT WAS NORMAL. NO EPISODES OF SEIZURE ACTIVITY, AND EVERY ONE AFTER THAT, EVERY SINGLE EXAMINATION CONDUCTED BY A NEUROLOGIST, EVERY SINGLE MEDICAL EXAM WAS CONSISTENT IN ONE REGARD, THERE WAS NO EVIDENCE OF NEUROLOGICAL DAMAGE, NO EVIDENCE OF ANY BRAIN INJURY, PHYSICAL BRAIN INJURY.

NOW, LADIES AND GENTLEMEN, THEY CALLED DR. BRANNON. I ASKED HIM HOW LONG HE SPENT WITH HIM. SPENT ONE HOUR WITH

HIM.  THAT INCLUDED MOST OF THE 45 MINUTES TAKING THE ORAL HISTORY.  HE USES A PEN.  TOOK 15  MINUTES TO CONDUCT HIS NEUROLOGICAL EXAMINATION TO COME IN AND TELL YOU JURORS HIS OPINION.   TOOK HIS PEN AND HE DID AN EYE STIGMA TEST.  THIS IS IN THE RECORD.  I WENT BACK AND LOOKED AT IT BEFORE I CAME BEFORE YOU.   HE HAD MR. BASHAM PUT HIS HEELS TOGETHER AND CLOSE HIS EYES, AND THEN HE HAD HIM TAKE HIS LEFT THUMB, TOUCH HIS NOSE, AND PUT HIS RIGHT PINKY ON HIS RIGHT EAR. ALL IN THE TRANSCRIPT.

DR. BRAWLEY.   DR. BRAWLEY ACKNOWLEDGED SHE DID A LOT OF TESTING,  IQ TESTING.   MR. SWERLING TALKS ABOUT THAT 23-POINT DROP FROM 101, OR WHATEVER, TO 77.  THAT IS WHY I PUT IN THE PIECE OF PAPER TO SHOW HER THAT YEARS AFTER THAT, INCLUDING WHEN HE WAS TWO MONTHS SHY OF HIS 18TH BIRTHDAY, HE WAS BACK UP TO 89 AGAIN.  BACK UP JUST BELOW AVERAGE.  ONE REASON WE SHOWED YOU THAT IS BECAUSE YOU JUST CAN'T TAKE TESTING ALONE. YOU CAN'T JUST TAKE THE TEST RESULTS ALONE.  IS THE PERSON TRYING TO FAKE BAD? WAS THE PERSON HAVING A BAD DAY? WE DO KNOW THAT TWO MONTHS SHY OF HIS 18TH BIRTHDAY HE WAS TESTED JUST BELOW AVERAGE.  JUST BELOW AVERAGE.  THAT WAS A COUPLE OF YEARS AFTER,  ALMOST FOUR YEARS AFTER THE 77.  IN FACT, OF ALL OF THE IQ'S, THAT WAS THE ONLY ONE THAT WAS EVER AT 77 UNTIL,  UNTIL HE IS CHARGED WITH A CRIME AND HE IS SERVED WITH DEATH NOTICE.  HE KNOWS THESE PEOPLE ARE TRYING TO HELP HIM AND HE IS GIVEN A TEST.  A TEST HE HAS BEEN GIVEN MULTIPLE

TIMES IN HIS LIFE.  A TEST WHERE NO OBJECTIVE WAY TO DETERMINE WHETHER OR NOT HE IS TELLING THE TRUTH WHEN HE IS ANSWERING QUESTIONS.

I ASKED THESE QUESTIONS, AND YOU PROBABLY GOT TIRED OF ME. I ASKED OF DR. BRAWLEY,  DR. BRANNON, THE TWO OF YOU,  DID YOU INTERVIEW ANY OF THE WITNESSES INVOLVED IN THIS CRIME SPREE TO SEE BRANDON BASHAM'S BRAIN IN ACTION? NO,  NO,  NO.  WHY WOULD I DO THAT?  DID YOU LOOK AT ANY DISCOVERY IN REGARD TO BRANDON BASHAM'S CONDUCT DURING THIS TWO-WEEK CRIME SPREE?  DIDN'T NEED TO DO THAT.  THE GOVERNMENT'S EXPERTS ARE NOT CLAIMING HE HAS EXECUTIVE FUNCTIONING PROBLEM.  THEY ARE NOT THE ONES COMING IN HERE OPINING HE HAS EXECUTIVE FUNCTIONING PROBLEMS AND CAN'T PLAN WELL.  THESE TWO EXPERTS WERE.

AND WHY WAS I ASKING THOSE QUESTIONS? WHEN I ASKED THEM, DO YOU AGREE WITH THIS NEUROLOGIST FROM THE UNIVERSITY OF PENNSYLVANIA THAT YOU CAN DO ALL OF THE CLINICALS, BUT YOU ALSO WANT TO LOOK AT THE PERSON'S BRAIN IN ACTION? I SUBMIT TO YOU THAT IS COMMON SENSE.  YOU DON'T HAVE TO ACCEPT THAT. MAYBE I AM WRONG.  MAYBE THE GOVERNMENT IS WRONG.  I SUBMIT TO YOU IT IS COMMON SENSE YOU DON'T LOOK AT THE CLINICAL FINDINGS AND TEST SCORES.

I CAME UP WITH TWO EXAMPLES.  NOW, I'M A SPORTS FAN.  I WILL GIVE YOU TWO RECENT SPORTS EXAMPLES ABOUT LOOKING AT SOMETHING IN ACTION.  WE JUST FINISHED THE WORLD SERIES. ONE OF THE PITCHERS FOR BOSTON RED SOX IS CALLED KURT

SHILLING. KURT SHILLING IN THE LAB, IN THE CLINICALS, THEY DIAGNOSED HIM. HE HAD A TORN LIGAMENT IN HIS ANKLE. THEY DID IMAGING ON IT, DID ALL OF THE CLINICAL WORK, HE COULD TELL THEM HOW IT WORKED, COULD TELL THEM ABOUT IT WHEN HE PUT HIS WEIGHT ON IT. HAD A BRAIN SCAN, THEY COULD LOOK AT IT. BUT UNTIL KURT SHILLING -- UNTIL THESE EXPERTS, UNTIL THESE ORTHOPEDICS SAW KURT SHILLING'S ANKLE IN ACTION DIDN'T KNOW IF HE WOULD PITCH AGAINST THE YANKEES, DIDN'T KNOW IF HE COULD PITCH AGAINST THE CARDINALS. HE HAD TO GO OUT AND STAND ON THAT RUBBER AND PERFORM. THEY DIDN'T WANT IT JUST CLINICALLY, THEY WANTED TO SEE THE ANKLE IN ACTION. YOU CAN'T JUST TAKE A TEST IN A CLINICAL, YOU WANT TO SEE THAT ANKLE IN ACTION.

SAME THING, I DON'T KNOW IF YOU ARE CAROLINA FOOTBALL FANS, IS DONRELL PINSTONS. HE HAS A TORN ROTATOR CUFF. HE HAS HAD IT SEVERAL WEEKS. HAD IT SEVERAL WEEKS. PLAYED AGAINST UNIVERSITY OF TENNESSEE. IN CLINICAL, YOU CAN TAKE X-RAYS, CAT SCANS, MRI, YOU CAN SEE HE HAS A TORN ROTATOR. HE CAN TELL YOU WHAT HE CAN AND CANNOT DO. UNTIL YOU SEE HIM THROW THE FOOTBALL, UNTIL YOU SEE HIS SHOULDER IN ACTION, YOU CAN'T TELL WHETHER OR NOT HE CAN PLAY OR NOT. I SUBMIT BRANDON IS NO DIFFERENT. THAT IS THE REASON WHY THE GOVERNMENT SUBMITS TO YOU, FROM A COMMON SENSE PERSPECTIVE, LET'S LOOK AT BRANDON BASHAM'S BRAIN IN ACTION. LET'S SEE THE DECISIONS AND CHOICES HE IS MAKING DURING THIS TWO-WEEK

CRIME SPREE. THAT IS ALL I WAS ASKING. THE GOVERNMENT THINKS IT IS LOGICAL. YOU DON'T HAVE TO ACCEPT THAT. YOU DON'T HAVE TO ACCEPT THAT. THE GOVERNMENT SUBMITS TO YOU THAT IS JUST COMMON SENSE.

NOW, THE GENOGRAM. TALKED ABOUT THE GENOGRAM OR PUT IN THE LONG GENOGRAM. LADIES AND GENTLEMEN, YOU KNOW, MR. SCHOOLS METHODICALLY WENT OVER WHAT WAS LEFT OFF OF THOSE CHARTS. METHODICALLY WENT OVER ALL OF THE THREATS, ALL OF THE MANIPULATIONS, ALL OF THE LIES, SO MANY OF WHICH WAS LEFT OFF OF THOSE CHARTS.

NOW, THEY HAD IT WHEN BRANDON BASHAM HAD DIAPER RASH, AND THEY HAD IT WHEN BRANDON BASHAM HAD TO HAVE EYE DROPS OR EAR DROPS AT SIX MONTHS. MR. SCHOOLS WENT OVER THE LIST, AFTER LIST, AFTER LIST OF WHAT WAS LEFT OFF OF THE CHARTS. REMEMBER THOSE THINGS. REMEMBER THE MANIPULATIONS. REMEMBER THE RESISTANCE. REMEMBER THE DIAGNOSIS FROM PSYCHIATRIST AFTER PSYCHIATRIST TO PSYCHOLOGIST AFTER PSYCHOLOGIST THAT BRANDON BASHAM IS NOT COOPERATING. BRANDON BASHAM IS MANIPULATING. BRANDON BASHAM IS AGGRESSIVE. WE HAVE A PROBLEM WITH BRANDON BASHAM. HE IS NOT CHOOSING TO RESPOND. REMEMBER THOSE THINGS THAT MR. SCHOOLS WENT OVER AND PULLED OUT AND SHOWED THE WOMAN THAT WAS ON THE WITNESS STAND THAT WASN'T LISTED ON HER GENOGRAM.

HEARING VOICES. REAL QUICKLY, LADIES AND GENTLEMEN. YOU KNOW, IT IS INTERESTING, THERE IS NO EVIDENCE THAT

ANYONE OUTSIDE OF A CLINICAL SETTING EVER OBSERVED MR. BASHAM HEARING VOICES. NOW, MR. SCHOOLS WENT THROUGH ALL OF THE TIMES IN WHICH HE DENIED HEARING VOICES, DENIED HEARING VOICES, DENIED HEARING VOICES. ONE TIME WHEN DR. SUESS, AT THE HOPKINS COUNTY DETENTION CENTER, IN A CLINICAL SETTING, BRANDON SAYS, I AM HEARING VOICES. OTHER TIMES, BRANDON TALKED ABOUT IT WITH OTHER EXPERTS SAID HE WAS JUST -- IT WAS JUST RUMINATIONS, HE WAS THINKING TO HIMSELF. BUT ONE TIME, RIGHT BEFORE HE ESCAPES, THE DOCTOR GIVES HIM SOME SEROQUEL, THEN THE DOCTOR CUTS HIM OFF SEROQUEL. YOU REMEMBER WHY I ASKED HIS SISTER CHARLOTTE ON THE WITNESS STAND ABOUT THAT? DID YOU GO VISIT HIM THE TWO YEARS, THE ONE PERSON, SHE ACKNOWLEDGED, THE MOST CLOSEST PERSON TO BRANDON BASHAM, JUST AS SHE ADMITTED TO DR. CAPEHART, BRANDON NEVER EVER, EVER, EVER, IN THOSE TWO YEARS, EVER SAID ANYTHING TO ME ABOUT HEARING VOICES.

I REMIND YOU AGAIN ABOUT DR. CINDY MCCAIN, WHO DID THE COMMON SENSE THING. NOT LOOKING AT BRANDON BASHAM, BRANDON TALKING OUT OF THE CORNER OF HIS MOUTH, AND JUST ASSUME HE IS BEING CREDIBLE WHEN HE IS SAYING HE WAS HEARING VOICES WHEN HE WASN'T. HAD HIM WATCHED. HE IS CHARGED, HE IS FACING THE DEATH PENALTY, LO AND BEHOLD, TOMMY BLAKE IS TELLING HIM WHAT TO DO.

LADIES AND GENTLEMEN, WHAT IS IMPORTANT ABOUT WHAT THE DEFENSE DID SAY, THEY ACKNOWLEDGED THROUGH ALL THE EXPERTS AT

THE END WAS THAT BRANDON BASHAM IS NOT GOING TO GET ANY BETTER.  DR. WATTS ACKNOWLEDGED THAT THE BEST PREDICTOR OF FUTURE BEHAVIOR IS PAST CONDUCT.  THOSE WERE HER WORDS.  SHE ACKNOWLEDGED THAT.

NOW, COUPLE OF POINTS FOR THE GOVERNMENT, AND I WILL SIT DOWN.  ANTISOCIAL PERSONALITY DOCUMENT.  ANTISOCIAL PERSONALITY DISORDERS.  NOW, YOU HAVE A COPY OF THIS, IT IS ACTUALLY A DEFENSE EXHIBIT.  I WILL NOT GO OVER EVERY ONE OF THESE.  I WILL ASK YOU, WHEN YOU TALK ABOUT THIS DISORDER, IF YOU CHOOSE TO TALK ABOUT IT, PULL THIS LIST OUT, GO THROUGH THIS LIST, AND REMEMBER AND RECALL ALL OF THE EVIDENCE AND TESTIMONY FROM ALL OF THE WITNESSES AND ALL OF THE EXPERTS AND ALL OF THE MEDICAL RECORDS THAT FITS THIS DIAGNOSES LIKE A GLOVE.  LIKE A GLOVE.  AND EXPLAINS HIS BEHAVIOR.  IT EXPLAINS HIS BEHAVIOR DURING THE TWO WEEKS HE IS COMMITTING THESE CRIMES AGAINST SAMANTHA AND ALICE.  IT EXPLAINS HIS BEHAVIOR SINCE HE HAS BEEN ARRESTED ON THESE CHARGES.  HIS CREDIBILITY IS CRITICAL.

I TOLD YOU I WOULD GET BACK TO THIS.  THIS CHILDREN'S PSYCHIATRIC HOSPITAL OF KENTUCKY, THIS OTHER SLIDE.  THIS IS JUST ONE OF THE RECORDS. AND YOU RECALL, REPEATEDLY, THIS IS THROUGHOUT HIS MEDICAL RECORDS, I AM NOT JUST PICKING THIS ONE OUT AND HIGHLIGHTING, USING THIS AS AN EXAMPLE, THE MANY, MANY NURSES, SOCIAL WORKERS, AND COUNSELORS THAT CAME TO THIS ACTION.

"BRANDON IS A YOUNG MAN WHO IS VERY ANTISOCIAL IN HIS APPEARANCE AND MANNERISMS.   HE TALKS AND ACTS LIKE A CON ARTIST.   AT 15 YEARS OF AGE, HE IS SMOOTH AND ADULTIFIED."

DOES THAT SOUND LIKE SOMEONE WHO HAS EXECUTIVE FUNCTIONING PROBLEM?

"HE IS A CON ARTIST AT THE AGE OF 15.   IT IS POSSIBLE THAT THE APPEARANCE OF GRANDIOSE THINKING RELATED TO HIGH MOOD IS, IN FACT, RELATED TO BRANDON'S FREQUENT TRAIT OF REPORTING EXAGGERATED OR UNTRUE INFORMATION.   WE MUST BE VERY CAUTIOUS WITH THIS YOUNG MAN LEARNING OR REPEATING MENTAL HEALTH-RELATED ISSUES SINCE HE SEEMS BOTH UNTRUTHFUL AND PROBABLY HIGHLY SUGGESTIBLE."

THIS IS AN EXPERT PSYCHIATRIST, WAY BEFORE BRANDON BASHAM WAS EVER CHARGED WITH THESE CRIMES, HAVING THE OPPORTUNITY TO ASSESS HIM.   AND THIS ISN'T ONE WE PICKED.   YOU SAW ALL OF THE ASSESSMENTS OF BRANDON BASHAM THAT WERE CONSISTENT WITH THIS DIAGNOSIS.

WHAT ELSE DID YOU HEAR? YOU HEARD FROM DR. WATTS THAT HIS

ATTACHMENT TO WOMEN HE JUST MEETS IS ALMOST PATHOLOGICAL. THAT IS DR. WATTS'S TESTIMONY.   YOU HEARD IN THE RECORDS THAT ONE OF THE PSYCHIATRISTS THAT WAS TREATING MR. BASHAM, HIS DIAGNOSIS, HIS CONCLUSION, "THIS YOUNG MAN IS A PSYCHOPATH, AND THERE IS NOTHING WE CAN DO FOR HIM."   YOU HEARD FROM ONE OF THE EXCERPTS FROM THE PSYCHOEDUCATIONAL ASSESSMENT, "THIS BRANDON BASHAM DOES NOT SHOW ANY SYMPATHY OR EMPATHY TO STRANGERS."   I AM NOT MAKING THIS UP.   THIS WAS IN THE RECORDS.

YOU HEARD, LADIES AND GENTLEMEN, THROUGHOUT HIS STAY AT THE METHODIST HOME AND OTHER OF THESE FACILITIES, THAT HE WOULD FREQUENTLY, HE WOULD FREQUENTLY CHALLENGE AND PICK ON HIS PEERS.   THOSE THAT WERE LESS ADVANTAGED OR DISADVANTAGED. THAT IS THE BRANDON BASHAM LADIES AND GENTLEMEN.   THAT IS THE BRANDON BASHAM AS A GROWING UP TEENAGER, AND THAT IS THE BRANDON BASHAM AS A MAN, AS A 23-YEAR-OLD MAN, SITTING IN THIS COURTROOM.

AND WHAT ELSE DO WE KNOW ABOUT BRANDON BASHAM? WE KNOW BRANDON BASHAM LIKES TO KEEP TROPHIES.   AND WHAT DID DR. WATTS TELL YOU, BASED ON HER FORENSIC EXPERIENCE? SADISTS KEEP TROPHIES.   THIS WAS THE RING HE KEPT FROM SAMANTHA BURNS; THIS WAS THE KNIFE THAT WAS FOUND IN HIS POCKET WHEN HE WAS ARRESTED, THE KNIFE BARRY DONOVAN GAVE HIS WIFE.   IT IS NOT A GOVERNMENT WITNESS.   THAT IS DR. WATTS.   SADISTS KEEP TROPHIES.   THERE IS NO CURE FOR SADISTS, FOR PEOPLE WITH

ANTISOCIAL PERSONALITY DISORDER, AND FOR PSYCHOPATHS. NONE. AND BRANDON BASHAM IS 23 YEARS OLD.

LADIES AND GENTLEMEN, IN CLOSING, I WILL LEAVE YOU WITH A COUPLE OF THOUGHTS AND, AGAIN, I THANK YOU FOR YOUR ATTENTION, FOR YOUR INCREDIBLE ATTENTION.

FOR ANY CITIZEN TO SENTENCE A FELLOW CITIZEN TO DEATH IS A HARD THING, AS IT SHOULD BE. IT SHOULD NEVER BE EASY. THE LAWYERS ON BOTH SIDES HAD AN OPPORTUNITY, WE HAD INFORMATION ON YOUR BACKGROUND, EACH AND EVERY ONE OF YOU. WE HAD AN OPPORTUNITY TO GAUGE YOUR BODY LANGUAGE AND TO TALK TO YOU. AND THE LAWYERS AGREED THAT WE WANTED YOU JURORS TO MAKE THIS PARAMOUNT AND IMPORTANT DECISION. IT SHOULD NEVER EVER, EVER BE EASY FOR A GROUP OF CITIZENS TO SENTENCE SOMEBODY TO DEATH. AND FOR THE PROSECUTOR TO STAND BEFORE ANY OF THE JURORS AND SAY SO IS IRRESPONSIBLE, I WOULD SUBMIT TO YOU. AND NO ONE ON THE GOVERNMENT'S TEAM HAS EVER INDICATED AS SUCH.

LADIES AND GENTLEMEN, YOU ARE ALL RESPONSIBLE, EXPERIENCED ADULTS. YOU HAVE HAD TO MAKE INCREDIBLY DIFFICULT DECISIONS, PERSONAL DECISIONS, FAMILY-RELATED DECISIONS, BUSINESS DECISIONS, SOCIAL DECISIONS YOUR WHOLE LIVES, ALL YOUR LIVES. SOMETIMES, I SUBMIT TO YOU, THE MOST DIFFICULT DECISIONS, THE TOUGHEST DECISION IS THE RIGHT DECISION. SHOULD YOU JURORS DECIDE THAT DEATH IS THE APPROPRIATE PUNISHMENT AS WAS TOLD TO YOU DURING THE VOIR

DIRE, YOU WOULD HAVE TO SIGN YOUR NAME ON THE DEATH VERDICT FORM, IF ALL 12 OF YOU BELIEVE THAT IS THE APPROPRIATE PUNISHMENT.  JUST REMEMBER, LADIES AND GENTLEMEN, IF THAT IS YOUR VOICE, IF THAT IS YOUR CHOICE.  IT WAS THE CONDUCT AND THE ACTIONS OF BRANDON BASHAM.  IT WAS THE CONDUCT, AND THE ACTIONS, AND THE CHOICES OF BRANDON BASHAM ON NOVEMBER OF 2002 AS TO WHY WE ARE HERE.  AS TO WHY THAT SIGNATURE WOULD NEED TO GO ON THAT PIECE OF PAPER.  BRANDON BASHAM'S CHOICES. WHAT HE DID TO SAMANTHA BURNS AND ALICE DONOVAN DEFIES HUMANITY.

FOR THOSE OF YOU WHO HAVE A TOUCH OF DOUBT, FOR THOSE OF YOU WHO ARE SAYING, I KNOW WHAT HE DID TO SAMANTHA BURNS AND ALICE DONOVAN IS HORRIFIC, IS TERRIBLE, I REMIND YOU OF THE EVIDENCE AND THE TESTIMONY OF BRANDON BASHAM'S CONDUCT SINCE HE HAS BEEN ARRESTED:  OF HIS ATTITUDE SINCE HE HAS BEEN ARRESTED; OF HIS THREATENING CONDUCT; OF HIS I DON'T CARE ATTITUDE.

LADIES AND GENTLEMEN, THE GOVERNMENT SUBMITS TO YOU THAT BRANDON BASHAM REPRESENTS A CLEAR AND PRESENT DANGER TO ANYONE HE COMES IN CONTACT WITH IN A PRISON SETTING.  AS A REPRESENTATIVE OF THE GOVERNMENT, I ASK YOU, CAN YOU TAKE THAT CHANCE? CAN YOU TAKE THAT CHANCE?  AND EACH AND EVERY ONE OF YOU WILL HAVE TO ASK YOURSELVES IN YOUR HEART AND YOUR MIND BACK IN THAT JURY ROOM, WILL YOU TAKE THAT CHANCE? HE HAS BRAGGED, NO JURY WILL EVER SENTENCE ME TO DEATH.  LADIES AND

GENTLEMEN, PROVE BRANDON BASHAM WRONG.

THE COURT: THANK YOU, MR. GASSER. LADIES AND GENTLEMEN, I WILL NEED YOUR FULL ATTENTION FOR THE INSTRUCTIONS ON THE LAW. LET'S TAKE A QUICK 10-MINUTE RECESS, THEN WE WILL BRING YOU BACK AND CONCLUDE THIS TRIAL. PLEASE GO TO YOUR JURY ROOM.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

MR. SWERLING: JUDGE, THE LAST COMMENT THAT MR. GASSER MADE TO THE JURY, "CAN YOU TAKE THAT CHANCE?" I DO NOT THINK IS PERMISSIBLE CONDUCT. I THINK IT PERSONALIZES THIS ISSUE TO THE JURY AND FOR SEVERAL REASONS. FIRST OF ALL, IT INJECTS AN ARBITRARY AND CAPRICIOUS FACTOR IN HERE UPON WHICH A JURY CAN FIND A VERDICT. SECOND OF ALL, I DO THINK IT GOES TO THEM CREATING SOME SORT OF FEAR IN THEM THAT, CAN YOU TAKE THAT CHANCE? AND I DON'T THINK YOU CAN DO THAT. I THINK THAT DOES PERSONALIZE IT. SO, ALONG THAT LINE, I WOULD HAVE TO MOVE FOR A MISTRIAL AND DO NOT THINK THAT THAT IS AN APPROPRIATE COMMENT.

THE COURT: ALL RIGHT. WHAT ABOUT IT FROM THE GOVERNMENT?

MR. GASSER: YOUR HONOR, I DIDN'T ARGUE FUTURE DANGEROUSNESS, I DIDN'T MENTION FUTURE DANGEROUSNESS. MR. SWERLING STRENUOUSLY CHALLENGED THE GOVERNMENT ON FUTURE DANGEROUSNESS, THAT IS WHAT REPLY ARGUMENT IS ALL ABOUT. I

**JA 2445**

DID NOT MAKE THAT COMMENT IN THE GUILT PORTION.  IT WASN'T UNTIL MR. SWERLING STRENUOUSLY CHALLENGED, IN FACT, SAID "POPPYCOCK."  "POPPYCOCK" IS, I BELIEVE, THE WORD THAT MR. SWERLING USED.  FOR THE GOVERNMENT NOT TO BE ABLE TO RESPOND, BASED ON THE EVIDENCE AND THE TESTIMONY IN KIND, THAT IT WAS POPPYCOCK THAT HE WOULD EVER HURT ANYBODY EVER AGAIN.

THE COURT:  MR. SWERLING, YOU ARE REFERRING TO THE PHRASE, "CAN YOU TAKE THAT CHANCE"?

MR. SWERLING:  YES.

THE COURT:  THE JURY COULD SPECULATE OR BASE THE VERDICT ON LESS THAN FULL EVIDENCE.  IS THAT YOUR POINT?

MR. SWERLING:  YES.  WHAT THE GOVERNMENT IS DOING IS APPEALING TO THE INDIVIDUAL JURORS SOME FEAR THAT THEY OUGHT TO HAVE TO TAKING A CHANCE THAT SOMEONE COULD POSSIBLY GET HURT IN THE FUTURE.  THAT GOES BEYOND THE SCOPE OF JUST ARGUING FUTURE DANGEROUSNESS.  YOU CAN ARGUE FUTURE DANGEROUSNESS, BUT NOT PUT THE JURY IN THE POSITION OF SAYING, "CAN YOU TAKE THAT CHANCE?"

MR. GASSER:  I DON'T UNDERSTAND THE DIFFERENCE.  I DON'T UNDERSTAND THE DISTINCTION.

THE COURT:  I THINK IN TAKING IT IN ITS ENTIRETY, THE ARGUMENT WAS NOT MISLEADING OR PREJUDICIAL.  I DON'T SEE A NEED TO GIVE A CURATIVE INSTRUCTION, AND I WILL NOT GRANT A MISTRIAL.  THANK YOU.

MR. SWERLING:  YOUR HONOR,  IN THE ALTERNATIVE OF A

MISTRIAL, WE WOULD ASK FOR A CURATIVE INSTRUCTION.

THE COURT: ALL RIGHT. I THINK IT IS ALL FOR THE JURY TO DECIDE. I WILL DECLINE THAT REQUEST. ALL RIGHT. LET'S TAKE A 10-MINUTE RECESS.

(WHEREUPON, A SHORT RECESS WAS HELD.)

THE COURT: BEFORE WE BRING IN THE JURY, I ASKED MY DOCKET CLERK TO HAVE BOTH SIDES LOOK OVER THE ORIGINAL VERDICT FORM TO MAKE SURE THERE ARE NO GLITCHES OR PROBLEMS THAT ANYONE IS AWARE OF.

IS EVERYBODY SATISFIED WITH THE VERDICT FORM, MR. SCHOOLS?

MR. SCHOOLS: YES, SIR.

THE COURT: MR. HARRIS?

MR. HARRIS: YES.

THE COURT: I ALSO UNDERSTAND THAT YOU HAVE ALREADY AGREED THAT WE HAVE ALL OF THE PROPER EXHIBITS ASSIMILATED AND READY TO GO INTO THE JURY DURING THEIR DELIBERATIONS, CORRECT?

MR. SCHOOLS: YES, SIR.

MR. HARRIS: YES, SIR.

THE COURT: VERY GOOD.

PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT: MEMBERS OF THE JURY, I WILL NOW INSTRUCT YOU ON THE LAW. AS YOU KNOW, OBVIOUSLY, WE HAVE GIVEN YOU A WRITTEN SET OF MY INSTRUCTIONS THAT YOU MAY USE TO FOLLOW

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 10

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

UNITED STATES OF AMERICA,      )      CR. NO. 4:02-992
                               )      COLUMBIA, SC
                               )      NOVEMBER 2, 2004
                               )
     VERSUS                    )
                               )
BRANDON L. BASHAM,             )
          DEFENDANT.           )
_____)

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.,
CHIEF UNITED STATES DISTRICT COURT JUDGE
JURY TRIAL XXX


APPEARANCES:
FOR THE GOVERNMENT:                SCOTT SCHOOLS, FIRST AUSA
                                   JONATHAN S. GASSER, AUSA
                                   JOHN DUANE, AUSA
                                   UNITED STATES ATTORNEY'S OFFICE
                                   1441 MAIN STREET, SUITE 500
                                   COLUMBIA, SC  29201

FOR THE DEFENDANT:                 JACK SWERLING, ESQ.
                                   1720 MAIN STREET
                                   SUITE 301
                                   COLUMBIA, SC  29201

                                   GREG HARRIS, ESQ.
                                   1720 MAIN STREET
                                   SUITE 301
                                   COLUMBIA, SC  29201


COURT REPORTER:                    DEBRA R. JERNIGAN, RPR, CRR
                                   UNITED STATES COURT REPORTER
                                   901 RICHLAND STREET
                                   COLUMBIA, SC 29201




          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                    *** *** *** ***

JA 2448

(WHEREUPON, AT 9:00 A.M., THE JURY RESUMED DELIBERATING.)

(WHEREUPON, AT 1:15, THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT:  THE MARSHAL HAS ADVISED ME THAT THE JURY HAS COME TO A VERDICT.  MS. FLOYD RECEIVED A SUGGESTION FROM COUNSEL THAT IN PUBLISHING THE VERDICT, IF THE JURY GOT TO THE MITIGATING FACTORS,  THAT SHE WOULD DISPENSE WITH THE READING OF EACH MITIGATING FACTOR AND REFER TO IT BY NUMBER AND THEN INDICATE THE NUMBER OF JURORS WHO VOTED FOR THAT FACTOR.  I THOUGHT THAT WAS A GOOD IDEA.  THE MORE I THINK ABOUT IT, I AM SOMEWHAT CONCERNED ABOUT THE STATUTORY REQUIREMENT THAT THE JURY CONFIRM ORALLY IN COURT THAT THE VERDICT THAT IS BEING PUBLISHED IN COURT IS, IN FACT, THEIR VERDICT.  IT ADDS ABOUT 20 MINUTES TO THE PROCESS OF READING THE VERDICT TO DO THAT. IF IT IS REQUIRED, I THINK WE SHOULD SPEND THAT 20 MINUTES DOING THAT.

MR. SCHOOLS, WHAT IS YOUR POSITION?

MR. SCHOOLS:  OUR POSITION IS, BY CONFIRMING THE NUMBERS, THE JURORS HAVE A VERDICT FORM,  THEY HAVE HAD A VERDICT FORM IN THEIR NOTEBOOKS,  THEY HAVE REACHED THE FINDINGS THEY HAVE REACHED IF THEY GOT TO THAT POINT.  I HAVE SPOKEN WITH DEFENSE COUNSEL.  THEY THINK THAT WOULD BE AN APPROPRIATE WAY FOR THE CLERK TO PUBLISH THE VERDICT, AND THAT IS WHAT WE WOULD REQUEST.

THE COURT:  THEN, WE WILL NEED TO INSTRUCT THEM TO BRING THEIR NOTEBOOKS OUT WITH THE SAMPLE VERDICT FORMS

ATTACHED SO THEY CAN FOLLOW ALONG.

MR. SCHOOLS: THAT WOULD BE APPROPRIATE. THEY CAN KNOW WHETHER THE FACTOR THAT IS BEING ADDRESSED IS THE RIGHT ONE.

THE COURT: MR. SWERLING.

MR. SWERLING: WE DID SPEAK WITH MR. SCHOOLS ABOUT IT. AND THERE IS -- THERE WILL ONLY BE THE NUMERICAL COUNT AS TO HOW MANY OUT OF 12. SO, WE SPOKE TO MR. BASHAM ABOUT IT, AND AS LONG AS THE JURY IS FOLLOWING ALONG AS IT IS BEING PUBLISHED BY NUMBER IN THE LEFT-HAND COLUMN, YOU KNOW, WE AGREE WITH THAT. SO DOES MR. BASHAM. STAND UP.

THE COURT: MR. BASHAM; IS THAT CORRECT?

THE DEFENDANT: YES, SIR. I AGREE TO THAT.

THE COURT: ALL RIGHT.

MR. BASHAM, YOU UNDERSTAND THE STATUTE SAYS IF A VERDICT -- WHATEVER THE VERDICT IS, THE JURY HAS TO UNANIMOUSLY INDICATE IN COURT THAT IS THEIR VERDICT. THIS VERDICT FORM IS QUITE LENGTHY. THE LAWYERS PROPOSE, WHEN WE GET TO THE SOMEWHAT INTRICATE AND EXTENDED DISCUSSION OF ALL OF THESE MITIGATING FACTORS, THAT WE DISPENSE WITH READING THE FACTORS AND JUST REFER TO THEM BY NUMBER, THAT IS WHAT WE ARE TALKING ABOUT.

THE DEFENDANT: I AGREE WITH THAT.

THE COURT: IT WILL SPEED UP TO GETTING TO THE END OF THE VERDICT BY ABOUT 20 MINUTES IF THAT IS SATISFACTORY

WITH YOU TO NOT HAVE IT READ, WE WON'T; IF YOU WANT IT READ, I WILL HAVE IT READ.

THE DEFENDANT:   NO.

THE COURT:   IF THE MARSHAL WILL INSTRUCT THE JURY TO BRING THEIR NOTEBOOK WITH THE SAMPLE VERDICT FORM INTO THE COURTROOM WITH THEM.

(WHEREUPON, AT 1:22, THE JURY ENTERED OPEN COURT AND THE FOLLOWING WAS HEARD.)

THE COURT:   MS. WILSON, HAS THE JURY UNANIMOUSLY REACHED A VERDICT IN THIS CASE?

THE JUROR:   YES, SIR.

THE COURT:   WOULD YOU HAND THE VERDICT FORM TO THE BAILIFF, PLEASE?

ALL RIGHT.   THE VERDICT APPEARS TO BE REGULAR ON ITS FACE. I WILL PERMIT THE CLERK TO PUBLISH THE VERDICT.

MEMBERS OF THE JURY, YOU MIGHT RECALL THAT I TOLD YOU DURING JURY SELECTION, THE FEDERAL DEATH PENALTY LAW REQUIRES THAT ONCE THE VERDICT IS READ IN THE COURTROOM, WE MUST CALL THE ROLL OF THE JURY TO LET EACH JUROR AFFIRM ORALLY HERE IN COURT THAT THAT IS THE VERDICT OF THE JURY AND THAT IS HIS OR HER INDIVIDUAL VERDICT.   THE ENUMERATION OF STATUTORY AND NONSTATUTORY MITIGATING FACTORS TAKES QUITE SOME TIME TO READ. IF WE READ EACH ONE, IT WOULD ADD 20 TO 30 MINUTES TO THE PROCESS OF READING EACH VERDICT, THAT IS WHY I ASKED THAT YOU BRING OUT YOUR SAMPLE VERDICT FORM THAT IS ATTACHED TO THE

BACK OF THE JURY INSTRUCTIONS SO THAT WHEN MS. FLOYD GETS TO THE STATUTORY AND NONSTATUTORY MITIGATING FACTORS, SHE CAN JUST REFER TO THEM BY NUMBER AND GIVE THE NUMBER OF JURORS WHO VOTED FOR THAT MITIGATING FACTOR WITHOUT HAVING TO READ THE FULL TEXT OF THE MITIGATING FACTOR.  SO,  IT IS IMPORTANT THAT THE VERDICT THAT IS PUBLISHED IS YOUR VERDICT.  SO,  I WOULD LIKE FOR YOU TO START ON PAGE 1 -- WHICH ONE WILL YOU PUBLISH FIRST?

THE CLERK:  COUNT 1.

THE COURT:  START WITH COUNT 1, CARJACKING, RESULTING IN DEATH.  MS. FLOYD WILL READ YOUR VERDICT, AND I WILL ASK THAT YOU FOLLOW ALONG ON YOUR WRITTEN COPY SO THAT, WHEN SHE FINISHES READING THE COPY AND CALLS THE ROLL, EACH OF YOU WILL BE ABLE TO INDICATE WHETHER THIS IS YOUR VERDICT.

MS. FLOYD, YOU MAY PUBLISH THE VERDICT.

THE CLERK:  MAY IT PLEASE THE COURT.  IN THE CASE OF THE UNITED STATES OF AMERICA VERSUS BRANDON LEON BASHAM, CRIMINAL NUMBER 4:02-992, COUNT 1, CARJACKING, RESULTING IN DEATH.  DO YOU,  THE JURY,  UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT BRANDON BASHAM WAS 18 YEARS OF AGE OR OLDER AT THE TIME OF THE OFFENSE,  CARJACKING,  RESULTING IN DEATH? YES.  SIGNED BY THE FOREPERSON, CYNTHIA WILSON.

THRESHOLD INTENT FACTOR NUMBER 4.  BRANDON LEON BASHAM INTENTIONALLY AND SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE,

KNOWING THAT THE ACT CREATED A GRAVE RISK OF DEATH TO ALICE DONOVAN, SUCH THAT PARTICIPATION IN THE ACT CONSTITUTED A RECKLESS DISREGARD FOR HUMAN LIFE, AND ALICE DONOVAN DIED AS A DIRECT RESULT OF THE ACT. SIGNED BY THE FOREPERSON, CYNTHIA WILSON.

STATUTORY AGGRAVATING FACTOR. DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT THE DEATH OF ALICE DONOVAN OR THE INJURY RESULTING IN THE DEATH OF ALICE DONOVAN OCCURRED DURING BRANDON BASHAM'S COMMISSION, OR ATTEMPTED COMMISSION OF, OR DURING HIS IMMEDIATE FLIGHT FROM HIS COMMISSION OF A KIDNAPPING? YES. SIGNED BY THE FOREPERSON, CYNTHIA WILSON.

NONSTATUTORY AGGRAVATING FACTORS. DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT, BRANDON LEON BASHAM, ONE, ESCAPED FROM A DETENTION FACILITY IN HOPKINS COUNTY KENTUCKY ON NOVEMBER 4, 2002, WHERE HE WAS SERVING A FIVE-YEAR SENTENCE RELATED TO FORGERY CONVICTIONS? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN A CARJACKING AND KIDNAPPING THAT RESULTED IN THE DEATH OF SAMANTHA BURNS, A 19-YEAR-OLD WOMAN IN HUNTINGTON, WEST VIRGINIA? YES. SIGNED BY THE FOREPERSON, CYNTHIA WILSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN A FIRST DEGREE BURGLARY AND OTHER CRIMINAL CONDUCT THAT RESULTED IN THE

ASSAULT WITH INTENT TO KILL CARL JORDAN, A CITIZEN OF CONWAY, SOUTH CAROLINA? YES. SIGNED BY THE FOREPERSON, CYNTHIA WILSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN A KIDNAPPING AND CARJACKING OF JAMES HAWKINS, A CITIZEN OF HANSON, KENTUCKY? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN THE ATTEMPTED MURDER OF A POLICE OFFICER IN ASHLAND, KENTUCKY? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

IF YOU FIND THAT ONE OR MORE OF THE ACTS IN 1 THROUGH 5 OCCURRED BEYOND A REASONABLE DOUBT, DO YOU FIND FURTHER THAT THIS FACTOR OR FACTORS IS AGGRAVATING? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT, BRANDON BASHAM, WOULD BE A DANGER IN THE FUTURE TO THE LIVES AND SAFETY OF OTHER PERSONS, INCLUDING, BUT NOT LIMITED TO, INMATES AND CORRECTIONAL OFFICERS IN AN INSTITUTIONAL CORRECTIONAL SETTING, AND THAT THIS FACTOR IS AGGRAVATING? NO. SIGNED BY CYNTHIA WILSON, FOREPERSON.

DO YOU, THE JUST, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THE EFFECT OF THE DEATH OF ALICE DONOVAN ON HER FAMILY, INCLUDING THE EXTENT AND SCOPE OF THE INJURIES AND LOSSES SUFFERED BY ALICE DONOVAN AND HER FAMILY, AND THAT THIS FACTOR IS AGGRAVATING? YES,

SIGNED BY CYNTHIA WILSON, FOREPERSON.

STATUTORY MITIGATING FACTORS.  NUMBER OF JURORS FINDING MITIGATING FACTORS:

NUMBER 1, WOULD BE SIX JURORS.

NUMBER 2, ZERO JURORS.

NUMBER 3, ZERO JURORS.

NUMBER 4, ZERO JURORS.

FIVE, ONE JUROR.

NONSTATUTORY MITIGATING FACTORS:

NUMBER 1, ZERO JURORS.

NUMBER 2, 12 JURORS.

NUMBER 3, EIGHT JURORS.

NUMBER 4, EIGHT JURORS.

NUMBER 5, SEVEN JURORS.

NUMBER 6, SEVEN JURORS.

NUMBER 7, 12 JURORS.

NUMBER 8, ZERO JURORS.

NUMBER 9, ZERO JURORS.

NUMBER 10, ZERO JURORS.

NUMBER 11, ZERO JURORS.

NUMBER 12, TEN JURORS.

NUMBER 13, 12 JURORS.

NUMBER 14, 12 JURORS.

NUMBER 15, TWO JURORS.

NUMBER 16, THREE JURORS.

NUMBER 17, ZERO JURORS.

NUMBER 18, ZERO JURORS.

NUMBER 19, ONE JUROR.

NUMBER 20, ZERO JURORS.

NUMBER 21, ZERO JURORS.

NUMBER 22, ZERO JURORS.

NUMBER 23, ZERO JURORS.

NUMBER 24, ZERO JURORS.

NUMBER 25, SIX JURORS.

NUMBER 26, ONE JUROR.

NUMBER 27, ZERO JURORS.

NUMBER 28, ZERO JURORS.

NUMBER 29, ZERO JURORS.

NUMBER 30, ZERO JURORS.

WE, THE JURY, AS TO BRANDON LEON BASHAM, UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE AGGRAVATING FACTORS PROVED IN THIS CASE OUTWEIGH THE MITIGATING FACTORS SO AS TO JUSTIFY A SENTENCE OF DEATH. OR IN THE ABSENCE OF ANY MITIGATING FACTOR, THAT THE AGGRAVATING FACTOR OR FACTORS ALONE JUSTIFY A SENTENCE OF DEATH. WE, THEREFORE, UNANIMOUSLY CONCLUDE THAT BRANDON LEON BASHAM SHALL BE SENTENCED TO DEATH. SIGNED BY THE 12 JURORS -- 11 JURORS, ALONG WITH THE 12TH JUROR, FOREPERSON, CYNTHIA WILSON, ON NOVEMBER 2, 2004.

SHOULD I READ ALL THE JURORS' NAMES?

THE COURT: YES, WHY DON'T YOU.

THE CLERK: THE FOLLOWING JURORS SIGNED: SHANNON BURNETT; WENDY DOBY; JOYCE HARTZOW; SUZANNE HINSON; TONY HOLBROOK; MARCUS HOLSTEEN; ALAN JENNINGS; GREG PRICE; SHELDA RICHARDSON; AND, JUNE ROBERTSON; AND, DAVID STOVER; ALONG WITH THE FOREPERSON, CYNTHIA WILSON.

CERTIFICATION STATEMENT. BY SIGNING BELOW, EACH JUROR CERTIFIES THAT THE CONSIDERATION OF THE RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN, OR SEX OF THE DEFENDANT, BRANDON LEON BASHAM, OR THE VICTIM, ALICE DONOVAN, WAS NOT INVOLVED IN REACHING HIS OR HER INDIVIDUAL DECISION. THAT THE INDIVIDUAL JUROR WOULD HAVE MADE THE SAME RECOMMENDATION REGARDING A SENTENCE FOR THE CRIME OR CRIMES IN QUESTION REGARDLESS OF THE RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN, OR SEX OF THE DEFENDANT OR THE VICTIM. ALSO SIGNED BY ALL 12 JURORS. ON NOVEMBER 2, 2004.

COUNT 2, KIDNAPPING, RESULTING IN DEATH. DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT BRANDON LEON BASHAM WAS 18 YEARS OF AGE OR OLDER AT THE TIME OF THE OFFENSE, KIDNAPPING, RESULTING IN DEATH? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

THRESHOLD INTENT FACTOR NUMBER 4. BRANDON LEON BASHAM INTENTIONALLY AND SPECIFICALLY ENGAGED IN AN ACT OF VIOLENCE, KNOWING THAT THE ACT CREATED A GRAVE RISK OF DEATH TO ALICE

DONOVAN, SUCH THAT PARTICIPATION IN THE ACT CONSTITUTED A RECKLESS DISREGARD FOR HUMAN LIFE, AND ALICE DONOVAN DIED AS A DIRECT RESULT OF THE ACT. SIGNED BY CYNTHIA WILSON, FOREPERSON.

STATUTORY AGGRAVATING FACTOR. DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT THE DEATH OF ALICE DONOVAN, OR THE INJURY RESULTING IN THE DEATH OF ALICE DONOVAN, OCCURRED DURING BRANDON LEON BASHAM'S COMMISSION, OR ATTEMPTED COMMISSION OF, OR DURING HIS IMMEDIATE FLIGHT FROM HIS COMMISSION OF A KIDNAPPING? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

NONSTATUTORY AGGRAVATING FACTORS. DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT, BRANDON LEON BASHAM, ESCAPED FROM A DETENTION FACILITY IN HOPKINS COUNTY KENTUCKY ON NOVEMBER 4, 2002, WHERE HE WAS SERVING A FIVE-YEAR SENTENCE RELATED TO FORGERY CONVICTIONS? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN A CARJACKING AND KIDNAPPING THAT RESULTED IN THE DEATH OF SAMANTHA BURNS, A 19-YEAR-OLD WOMAN IN HUNTINGTON, WEST VIRGINIA? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN A FIRST DEGREE BURGLARY AND OTHER CRIMINAL CONDUCT THAT RESULTED IN THE

ASSAULT WITH INTENT TO KILL CARL JORDAN, A CITIZEN OF CONWAY, SOUTH CAROLINA? YES, SIGNED BY CYNTHIA WILSON, FOREPERSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN THE KIDNAPPING AND CARJACKING OF JAMES HAWKINS, A CITIZEN OF HANSON, KENTUCKY? YES, SIGNED BY CYNTHIA WILSON, FOREPERSON.

SUBSEQUENT TO HIS ESCAPE, PARTICIPATED IN THE ATTEMPTED MURDER OF A POLICE OFFICER IN ASHLAND, KENTUCKY? YES, SIGNED BY CYNTHIA WILSON FOREPERSON.

IF YOU FIND THAT ONE OR MORE OF THE ACTS IN 1 THROUGH FIVE OCCURRED BEYOND A REASONABLE DOUBT, DO YOU FIND, FURTHER, THAT THIS FACTOR OR FACTORS IS AGGRAVATING? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT, BRANDON LEON BASHAM, WOULD BE A DANGER IN THE FUTURE TO THE LIVES AND SAFETY OF OTHER PERSONS, INCLUDING BUT NOT LIMITED TO, INMATES AND CORRECTIONAL OFFICERS IN AN INSTITUTIONAL CORRECTIONAL SETTING, AND THAT THIS FACTOR IS AGGRAVATING? NO. SIGNED BY CYNTHIA WILSON, FOREPERSON.

DO YOU, THE JURY, UNANIMOUSLY FIND THAT THE GOVERNMENT HAS ESTABLISHED BEYOND A REASONABLE DOUBT THE EFFECT OF THE DEATH OF ALICE DONOVAN ON HER FAMILY INCLUDING THE EXTENT AND SCOPE OF THE INJURIES AND LOSSES SUFFERED BY ALICE DONOVAN AND HER FAMILY, AND THAT THIS FACTOR IS AGGRAVATING? YES. SIGNED BY CYNTHIA WILSON, FOREPERSON.

STATUTORY MITIGATING FACTORS. AND NUMBER OF JURORS. 1, FOUR JURORS. NUMBER 2, ZERO JURORS. NUMBER 3, ZERO JURORS. NUMBER 4, ZERO JURORS. NUMBER 5, ONE JUROR.

NONSTATUTORY MITIGATING FACTORS AND NUMBER OF JURORS. NUMBER 1, ZERO JURORS. NUMBER 2, 12 JURORS. NUMBER 3, SIX JURORS. NUMBER 4, FIVE JURORS. NUMBER 5, FIVE JURORS. NUMBER 6, SIX JURORS. NUMBER 7, 12 JURORS. NUMBER 8, ZERO JURORS. NUMBER 9, ZERO JURORS. NUMBER 10, ZERO JURORS. NUMBER 11, ONE JUROR. NUMBER 12, FOUR JURORS. NUMBER 13, 11 JURORS. NUMBER 14, 10 JURORS. NUMBER 15, TWO JURORS. NUMBER 16, FOUR JURORS. NUMBER 17, ONE JUROR. NUMBER 18, ONE JUROR. NUMBER 19, ONE JUROR. NUMBER 20, ZERO JURORS. NUMBER 21, ZERO JURORS. NUMBER 22, ZERO JURORS. NUMBER 23, ZERO JURORS. NUMBER 24, ZERO JURORS. NUMBER 25, FOUR JURORS. NUMBER 26, ZERO JURORS. NUMBER 27, ZERO JURORS. NUMBER 28, ZERO JURORS. NUMBER 29, ZERO JURORS. NUMBER 30, ZERO JURORS.

WE, THE JURY, AS TO BRANDON LEON BASHAM UNANIMOUSLY FIND BEYOND A REASONABLE DOUBT THAT THE AGGRAVATING FACTORS PROVED IN THIS CASE OUTWEIGHS THE MITIGATING FACTORS SO AS TO JUSTIFY A SENTENCE OF DEATH, OR IN THE ABSENCE OF ANY MITIGATING FACTOR, THAT THE AGGRAVATING FACTOR OR FACTORS ALONE JUSTIFY A SENTENCE OF DEATH. WE THEREFORE UNANIMOUSLY CONCLUDE THAT BRANDON LEON BASHAM SHALL BE SENTENCED TO DEATH. SIGNED BY THE FOLLOWING JURORS. SHANNON BURNETT, WENDY DOBY, JOYCE

HEART SEW, SUSAN HINSON, TONY HOLBROOK, MARCUS HOLSTON, ALLEN JENNINGS, GREG PRICE, SHELL DAY RICHARDSON, JUNE ROBERTSON, DAVID STOVEER, AND CYNTHIA WILSON, FOREPERSON, ON NOVEMBER 2, 2004.

CERTIFICATION STATEMENT. BY SIGNING BELOW, EACH JUROR CERTIFIES THAT CONSIDERATION OF THE RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN, OR SEX OF THE DEFENDANT, BRANDON LEON BASHAM, OR THE VICTIM, ALICE DONOVAN, WAS NOT INVOLVED IN REACHING HIS OR HER INDIVIDUAL DECISION. AND THAT THE INDIVIDUAL JUROR WOULD HAVE MADE THE SAME RECOMMENDATION REGARDING A SENTENCE FOR THE CRIME OR CRIMES IN QUESTION, REGARDLESS OF THE RACE, COLOR, RELIGIOUS BELIEFS, NATIONAL ORIGIN, OR SEX OF THE DEFENDANT OR THE VICTIM. ALSO SIGNED BY ALL 11 JURORS AND CYNTHIA WILSON, FOREPERSON, ON NOVEMBER 2, 2004. MADAME FORELADY, LADIES AND GENTLEMEN --

THE COURT: MEMBERS OF THE JURY, THE FEDERAL DEATH PENALTY LAW REQUIRES THAT IN ADDITION TO SIGNING THE VERDICT FORM INDIVIDUALLY, EACH JUROR MUST AFFIRM THE VERDICT ORALLY HERE IN COURT. SO, MS. FLOYD IS GOING TO CALL THE ROLL OF EACH JUROR. AS SHE CALLS YOUR NAME, WE NEED FOR YOU TO INDICATE WHETHER OR NOT THE VERDICT THAT HAS JUST BEEN READ HERE IN THIS COURTROOM IS, IN FACT, YOUR VERDICT.

BY THE CLERK:

Q. SHANNON BURNETT?

A. YES.

Q.     WENDY DOBY?

A.     YES.

Q.     JOYCE HARTZOW?

A.     YES.

Q.     SUSAN HINSON?

A.     YES.

Q.     TONY HOLBROOK?

A.     YES.

Q.     MARCUS HOLSTON?

A.     YES.

Q.     ALAN JENNINGS?

A.     YES.

Q.     GREG PRICE?

A.     YES.

Q.     SHELDA RICHARDSON?

A.     YES.

Q.     GENE ROBERTSON?

A.     YES.

Q.     DAVID STOVER?

A.     YES.

Q.     AND CYNTHIA WILSON?

A.     YES.

        THE COURT:   ANYTHING FURTHER FROM THE GOVERNMENT BEFORE I DISCHARGE THE JURY?

        MR. SCHOOLS:  NO, SIR,  YOUR HONOR.  THANK YOU.

THE COURT: ANYTHING FURTHER FROM THE DEFENDANT?

MR. HARRIS: NO, SIR.

THE COURT: ALL RIGHT. MADAME FORELADY, MEMBERS OF THE JURY, THIS WILL CONCLUDE YOUR SERVICE IN THIS CASE. WE BEGAN THIS PROCESS ON AUGUST 30TH. WE REACHED A VERDICT HERE ON NOVEMBER 2ND. I HAVE BEEN A JUDGE 18 YEARS. THIS IS, BY FAR, THE LONGEST TRIAL I HAVE PRESIDED OVER BY GOOD MEASURE. BEFORE EXCUSING YOU, I WOULD CERTAINLY BE REMISS IF I DID NOT THANK YOU FOR THE SERVICE YOU HAVE RENDERED TO OUR JUDICIAL SYSTEM. AS I TOLD YOU IN THE VIDEO YOU VIEWED ON THE DAY YOU CAME TO THIS COURTHOUSE FOR THE FIRST TIME, YOUR PRESENCE IS WHAT MAKES OUR JURY SYSTEM AND OUR SYSTEM OF CRIMINAL JUSTICE WORK IN THIS COUNTRY.

I APOLOGIZE THAT WE RAN LONGER THAN WE THOUGHT. I ASSURE YOU IT WAS NOT BECAUSE WE WEREN'T OUT HERE WORKING. MANY TIMES AFTER YOU WENT HOME FOR THE EVENING, WE STAYED HERE AND WENT OVER LEGAL MATTERS, EVIDENTIARY ISSUES. WE WORKED THROUGH THE LUNCH BREAK SOMETIMES. WE DID OTHER THINGS, TOO. WE DID ALL WE COULD TO KEEP THIS CASE ON TRACK AND MOVE IT ALONG.

I WANT TO THANK THE LAWYERS ON BOTH SIDES FOR THEIR PART IN KEEPING THIS MOVING FORWARD. THIS HAS BEEN A FAIRLY SMOOTH TRIAL TO PRESIDE OVER, AND THAT IS NOT ALWAYS THE CASE. I EXPRESS MY APPRECIATION TO THE ATTORNEYS FOR THE GOVERNMENT AND THE DEFENDANT FOR THE SERVICE THAT THEY HAVE RENDERED TO

OUR SYSTEM, AND THE FAITHFUL REPRESENTATION THEY HAVE PROVIDED TO THEIR RESPECTIVE CLIENTS.

THAT WILL DO IT.  I WILL EXCUSE YOU, AT THIS TIME.  UNDER OUR RULES, YOU WON'T BE ELIGIBLE TO BE ON FEDERAL JURY FOR AT LEAST A YEAR.  BUT AFTER A YEAR, YOUR NAME GOES BACK IN THE HOPPER AND YOU ARE FAIR GAME.

UNLESS THERE IS AN OBJECTION, I WOULD LIKE TO SPEAK TO THE JURY IN THE JURY ROOM BEFORE THEY LEAVE.

MR. SCHOOLS:  NONE FROM US,  JUDGE.

THE COURT:   THAT WILL INCLUDE THE ALTERNATES.  IF THE FOUR ALTERNATES COULD REJOIN YOUR COMRADES HERE IN THE ROOM BEFORE YOU LEAVE THE BUILDING.  THANK YOU VERY MUCH. YOU ARE EXCUSED.  PLEASE STAY IN THE JURY ROOM UNTIL I CAN COME IN TO GREET YOU.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT:   IS THERE ANY PROBLEM WITH MY SIGNING THE STANDARD ORDER TO RETURN THE EXHIBITS TO THE PARTIES WHO OFFERED THE EXHIBITS TO KEEP CUSTODY OF IN THE CASE OF AN APPEAL?

MR. SCHOOLS:  NO.

MR. SWERLING:  NO.

THE COURT:   YOU HAVE ALREADY FILED YOUR MOTION FOR S NEW TRIAL SND A REQUEST FOR AN EXTENSION OF TIME.  IS THERE ANYTHING ELSE YOU WOULD LIKE TO PUT ON THE RECORD HERE TODAY?

MR. SWERLING: NO, YOUR HONOR, NOT AT THIS TIME. I BELIEVE I AM GOING TO CHECK THAT ORDER. I THINK YOU GAVE US 30 DAYS FROM TODAY.

THE COURT: I THINK THAT IS CORRECT.

ANYTHING FROM THE GOVERNMENT?

MR. SCHOOLS: NO, YOUR HONOR. THANK YOU.

THE COURT: THANK YOU VERY MUCH. WE WILL BE IN RECESS.

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____          _____
S/DEBRA R. JERNIGAN, RPR, CRR            DATE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

**FILED**

**NOV 2**  2004

LARRY W. PROPES, CLERK
COLUMBIA, SC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:02-992 (JFA,Jr.) |
| | ) | |
| vs. | ) | |
| | ) | **SPECIAL VERDICT FORM** |
| BRANDON LEON BASHAM | ) | |
| _____ | ) | |

## COUNT 1 – CARJACKING RESULTING IN DEATH

### I.   AGE OF DEFENDANT

*Instructions:* *Answer "YES" or "NO":*

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:   Brandon Leon Basham was eighteen years of age or older at the time of the offense (carjacking resulting in death)?

☑ YES        ☐ NO        *Cynthia Wilson*
                                          Foreperson

*Instructions:*  *If you answered "NO" with respect to the determination in this Section, then stop your deliberations, skip over Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.*

*If you answered "YES" with respect to the determination in this Section I,  proceed to Section II which follows.*

Count 1

## II.    THRESHOLD INTENT FACTOR

*Instructions:    Select below the Threshold Intent Factor, if any, you unanimously find that the government proved beyond a reasonable doubt.  You may not select more than one.*

☐    1.    Brandon Leon Basham intentionally killed Alice Donovan.

☐    2.    Brandon Leon Basham intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

☐    3.    Brandon Leon Basham intentionally participated in an act, contemplating that the life of Alice Donovan would be taken or intending that lethal force would be used in connection with Alice Donovan, and Alice Donovan died as a direct result of the act.

☑    4.    Brandon Leon Basham intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act.

☐    5.    The government failed to prove a threshold intent factor beyond a reasonable doubt.

*Cynthia Wilson*
Foreperson

*Instructions: If you did not find any Threshold Intent Factor, then stop your deliberations, skip over Sections III, IV, V, and VI of this form, and proceed to Section VII.  Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.*

*If you found one of the Threshold Intent Factors in this Section II, proceed to Section III which follows.*

Count 1

Page 2

**JA 2467**

## III.  STATUTORY AGGRAVATING FACTOR

*Instructions:*  *For the following Statutory Aggravating Factor, answer "YES" or "NO":*

1.  Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the death of Alice Donovan, or the injury resulting in the death of Alice Donovan, occurred during Brandon Leon Basham's commission or attempted commission of, or during his immediate flight from, his commission of a kidnapping?

    ☑ YES        ☐ NO

    *Gyllia Wilson*
    Foreperson

*Instructions:*  *If you answered "NO" with respect to the Statutory Aggravating Factor in this Section, then stop your deliberations, skip over Sections IV, V and VI of this form, and proceed to Section VII of this form.  Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.*

*If you found the requisite age in Section I, the Threshold Intent Factor in Section II, and answered "Yes" with respect to the Statutory Aggravating Factor in this Section III, proceed to Section IV which follows.*

Count 1

## IV. NON-STATUTORY AGGRAVATING FACTORS

*Instructions*: *For each of the following Non-Statutory Aggravating Factors, answer "YES" or "NO"*:

I.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham:

1.    Escaped from a detention facility in Hopkins County, Kentucky on November 4, 2002, where he was serving a five-year sentence related to forgery convictions?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

2.    Subsequent to his escape, participated in a carjacking and kidnapping that resulted in the death of Samantha Burns, a 19-year-old woman in Huntington, West Virginia?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

3.    Subsequent to his escape, participated in a first-degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan, a citizen of Conway, South Carolina?

☑ YES    ☑ NO

*Cynthia Wilson*
Foreperson

4.    Subsequent to his escape, participated in the kidnapping and carjacking of James Hawkins, a citizen of Hanson, Kentucky?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

5.    Subsequent to his escape, participated in the attempted murder of a police officer in Ashland, Kentucky?

☑ YES    ☐ NO

*Cynthia Wilson*
Foreperson

Count 1

Page 4

**JA 2469**

If you find that one or more of the acts in 1-5 occurred beyond a reasonable doubt, do you find, further, that this factor or factors is aggravating?

☑ YES    ❑ NO



Foreperson

II.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham, would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting, and that this factor is aggravating?

❑ YES    ☑ NO

Foreperson

III.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family, and that this factor is aggravating?

☑ YES    ❑ NO

Foreperson

*Instructions*:  *Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows.*

Count 1

## V.  MITIGATING FACTORS

*Instructions:  For each of the following Mitigating Factors, indicate in the space provided, the number of jurors, if any, who have found it proved by a preponderance of the evidence and that it is mitigating.*

*A finding with respect to a Mitigating Factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a Mitigating Factor must consider such a factor in considering whether to impose a sentence of life in prison without the possibility of release or a sentence of death, regardless of the number of other jurors who agree.  Further, any juror may also weigh a Mitigating Factor found by another juror, even if he or she did not also find that factor to be mitigating:*

Statutory                                                                Number of Jurors Finding
Mitigating Factors:                                                      the Mitigating Factor:

1.      Impaired capacity.  Brandon Leon Basham's capacity to appreciate the wrongfulness of his conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge, and this factor is mitigating.      __6__

2.      Duress.  Brandon Leon Basham was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, and this factor is mitigating.      __0__

3.      Minor participation. Brandon Leon Basham is punishable as a principal in the offense, which was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge, and this factor is mitigating.      __0__

4.      Brandon Leon Basham did not have a significant prior history of other criminal conduct, and this factor is mitigating.      __0__

5.      Disturbance.  Brandon Leon Basham committed the offense under severe mental or emotional disturbance, and this factor is mitigating.      __1__

Non-Statutory
Mitigating Factors:

Number of Jurors Finding
the Mitigating Factor:

1.     Brandon Leon Basham played a lesser role than Chadrick
Evan Fulks in the kidnapping and carjacking of Alice Donovan,
and this factor is mitigating.                                              _0_

2.     Brandon Leon Basham's family, including both his maternal
and paternal sides, has a history of violence, substance abuse, and mental
illness, including schizophrenia, psychosis, depression, delusions, paranoia,
and suicide, including numerous suicide attempts by Brandon's mother,
and this factor is mitigating.                                              _12_

3.     Brandon Leon Basham's mother abused alcohol and illegal drugs
while she was pregnant with him and had a negative attitude towards
prenatal care, and this factor is mitigating.                              _8_

4.     Brandon Leon Basham's parents spent most of the family's
money on drugs and alcohol and Brandon frequently saw both parents
intoxicated or under the influence, and this factor is mitigating.         _8_

5.     Brandon Leon Basham's mother entertained strange men at her
home for drugs and sex, sometimes kicking Brandon, Jimmie, and Charlotte
out of the house on such occasions, and sometimes allowing the family to remain,
resulting in Brandon Leon Basham occasionally seeing his mother involved
with these strange men, and this factor is mitigating.                     _7_

6.     Brandon Leon Basham was sexually abused by men, and this factor
is mitigating.                                                             _7_

7.     Brandon Leon Basham's parents often engaged in physical, verbal,
and emotional violence towards each other and towards Brandon and his
sister Charlotte, and this factor is mitigating.                          _12_

8.     Brandon Leon Basham's parents did not know how to take care
of a special needs child and never concerned themselves with his education
or treatment, and this factor is mitigating.                              _0_

9.     Brandon Leon Basham's parents and family failed to show up for visits
or conferences at hospitals and institutions, and this factor is mitigating.  _0_

Count 1                                                                    Page 7
                                                                          **JA 2472**

10.    Brandon Leon Basham had inconsistent and inefficient nutrition provided to him in his home, and this factor is mitigating.    _0_

11.    Brandon Leon Basham's home was often filthy and infected with roaches, and this factor is mitigating.    _0_

12.    Brandon Leon Basham's mother removed him from appropriate care facilities, refused to follow recommendations of doctors and counselors, and refused to give him his prescribed medication for his mental illness, but gave him illegal drugs instead, and this factor is mitigating.    _10_

13.    Brandon Leon Basham's mother encouraged him to steal to support their drug habits, and this factor is mitigating.    _12_

14.    Brandon Leon Basham began huffing gasoline, smoking marijuana, and smoking crack cocaine at a young age, and this factor is mitigating.    _12_

15.    Brandon Leon Basham was diagnosed with ADHD [Attention-Deficit/ Hyperactivity Disorder] as a young child, was placed in a mental hospital for the first time at age 10, and was subsequently placed in several mental health facilities and institutions, and this factor is mitigating.    _2_

16.    Brandon Leon Basham has received inconsistent care and has been prescribed an ever-changing mix of medicines, including antipsychotics, anxiolytics, antidepressants, and anticonvulsants, and this factor is mitigating.    _3_

17.    Brandon Leon Basham suffers from emotional, behavioral, and learning disabilities and was placed in special education classes in early elementary school, and this factor is mitigating.    _0_

18.    Brandon Leon Basham shows signs of neurological damage due to head trauma and substance abuse, which has inhibited his ability to process information and inhibit impulses, and this factor is mitigating.    _0_

19.    Brandon Leon Basham suffers from dementia due to multiple etiologies, inhalant induced psychosis with hallucinations, and anxiety disorder not otherwise specified and ADHD, combined type, and this factor is mitigating.    _1_

20.    Brandon Leon Basham has a mental condition that causes him to reject prescribed medications and self-medicate with other non-prescribed substances such as illegal drugs and alcohol, and this factor is mitigating.    _0_

Count 1

21.    Brandon Leon Basham is unable to operate a car, an ATM machine, or a phone card, and this factor is mitigating.

O

22.    Brandon Leon Basham has suffered from low self esteem, sadness, and hopelessness from a young age, and this factor is mitigating.

O

23.    Brandon Leon Basham has attempted suicide several times, and this factor is mitigating.

O

24.    Brandon Leon Basham's intelligence scores have been deteriorating due to head injuries and substance abuse at an early age, and his I.Q. level is now in the low 70s, and this factor is mitigating.

O

25.    Brandon Leon Basham is easily influenced and led by others, and this factor is mitigating.

6

26.    At the time of the offenses, Brandon Leon Basham was suffering from severe mental and emotional disturbances, and this factor is mitigating.

1

27.    At the time of the offenses, Brandon Leon Basham was not on his prescribed medication, and this factor is mitigating.

O

28.    At the time of the offenses, Brandon Leon Basham was under the influence of alcohol and drugs, and this factor is mitigating.

O

29.    Brandon Leon Basham has never harmed anyone in a correctional facility with or without a weapon, and this factor is mitigating.

O

30.    No one has escaped from a high security federal prison since 1993, and this factor is mitigating.

O

Count 1

## VI.  DETERMINATION OF SENTENCE

**Life in prison without possibility of release**

We unanimously conclude that Brandon Leon Basham shall be sentenced to life imprisonment without possibility of release.

_____
Foreperson

_____
Date

*If you answer that a sentence of life in prison without possibility of release shall be imposed, then you must proceed to Section VII.*

**OR**

**Death**

We, the jury, as to Brandon Leon Basham, unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) so as to justify a sentence of death; or, in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death. We, therefore, unanimously conclude that Brandon Leon Basham shall be sentenced to death.

Foreperson

November 2, 2004
Date

*If you answer that a sentence of death shall be imposed, then you must proceed to Section VII.*

Count 1

JA 2476

## VII.  CERTIFICATION STATEMENT

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant, Brandon Leon Basham, or the victim, Alice Donovan, was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

Foreperson

November 2, 2004
Date

Count 1

**JA 2477**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

**FILED**
NOV 2 2004
LARRY W. PROPES, CLERK
COLUMBIA, SC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 4:02-992 (JFA,Jr.) |
| | ) | |
| vs. | ) | |
| | ) | **SPECIAL VERDICT FORM** |
| BRANDON LEON BASHAM | ) | |
| | ) | |

## COUNT 2 – KIDNAPPING RESULTING IN DEATH

### I.    AGE OF DEFENDANT

*Instructions:* *Answer "YES" or "NO":*

1.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:   Brandon Leon Basham was eighteen years of age or older at the time of the offense (kidnapping resulting in death)?

☑ YES      ☐ NO        *Cynthia Wilson*
                                                 Foreperson

*Instructions:*  *If you answered "NO" with respect to the determination in this Section, then stop your deliberations, skip over Sections II, III, IV, V and VI of this form, and proceed to Section VII.  Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.*

*If you answered "YES" with respect to the determination in this Section I,  proceed to Section II which follows.*

Count 2                                                                                      Page 1
                                                                                          **JA 2478**  806

## II.    THRESHOLD INTENT FACTOR

*Instructions:    Select below the Threshold Intent Factor, if any, you unanimously find that the government proved beyond a reasonable doubt.  You may not select more than one.*

❑    1.    Brandon Leon Basham intentionally killed Alice Donovan.

❑    2.    Brandon Leon Basham intentionally inflicted serious bodily injury that resulted in the death of Alice Donovan.

❑    3.    Brandon Leon Basham intentionally participated in an act, contemplating that the life of Alice Donovan would be taken or intending that lethal force would be used in connection with Alice Donovan, and Alice Donovan died as a direct result of the act.

☑    4.    Brandon Leon Basham intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act.

❑    5.    The government failed to prove a threshold intent factor beyond a reasonable doubt.

*Cynthia Wilson*
Foreperson

*Instructions: If you did not find any Threshold Intent Factor, then stop your deliberations, skip over Sections III, IV, V, and VI of this form, and proceed to Section VII.  Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you found one of the Threshold Intent Factors in this Section II, proceed to Section III which follows.*

Count 2

## III. STATUTORY AGGRAVATING FACTOR

*Instructions:* *For the following Statutory Aggravating Factor, answer "YES" or "NO":*

1.  Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the death of Alice Donovan, or the injury resulting in the death of Alice Donovan, occurred during Brandon Leon Basham's commission or attempted commission of, or during his immediate flight from, his commission of a kidnapping?

    ☑ YES        ☐ NO        *Cynthia Wilson*
                             Foreperson

*Instructions:* *If you answered "NO" with respect to the Statutory Aggravating Factor in this Section, then stop your deliberations, skip over Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.*

*If you found the requisite age in Section I, the Threshold Intent Factor in Section II, and answered "Yes" with respect to the Statutory Aggravating Factor in this Section III, proceed to Section IV which follows.*

Count 2                                                                              Page 3

**JA 2480**

## IV. NON-STATUTORY AGGRAVATING FACTORS

*Instructions: For each of the following Non-Statutory Aggravating Factors, answer "YES" or "NO":*

I.    Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham:

1.    Escaped from a detention facility in Hopkins County, Kentucky on November 4, 2002, where he was serving a five-year sentence related to forgery convictions?

☑ YES    ☐ NO    Cynthia Wilson
                            Foreperson

2.    Subsequent to his escape, participated in a carjacking and kidnapping that resulted in the death of Samantha Burns, a 19-year-old woman in Huntington, West Virginia?

☑ YES    ☐ NO    Cynthia Wilson
                            Foreperson

3.    Subsequent to his escape, participated in a first-degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan, a citizen of Conway, South Carolina?

☑ YES    ☐ NO    Cynthia Wilson
                            Foreperson

4.    Subsequent to his escape, participated in the kidnapping and carjacking of James Hawkins, a citizen of Hanson, Kentucky?

☑ YES    ☐ NO    Cynthia Wilson
                            Foreperson

5.    Subsequent to his escape, participated in the attempted murder of a police officer in Ashland, Kentucky?

☑ YES    ☐ NO    Cynthia Wilson
                            Foreperson

Count 2                                                                                     Page 4

If you find that one or more of the acts in 1-5 occurred beyond a reasonable doubt, do you find, further, that this factor or factors is aggravating?

           ☑ YES      ❑ NO       _Cynthia Wilson_
                                                  Foreperson

II.      Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant, Brandon Leon Basham, would be a danger in the future to the lives and safety of other persons, including, but not limited to, inmates and correctional officers in an institutional correctional setting, and that this factor is aggravating?

           ❑ YES      ☑ NO       _Cynthia Wilson_
                                                  Foreperson

III.     Do you, the jury, unanimously find that the government has established beyond a reasonable doubt the effect of the death of Alice Donovan on her family, including the extent and scope of the injuries and losses suffered by Alice Donovan and her family, and that this factor is aggravating?

           ☑ YES      ❑ NO       _Cynthia Wilson_
                                                  Foreperson

_Instructions_:  _Regardless of whether you answered "YES" or "NO" with respect to the Non-Statutory Aggravating Factors in this Section IV, proceed to Section V, which follows._

Count 2                                                              Page 5

## V.  MITIGATING FACTORS

*Instructions:  For each of the following Mitigating Factors, indicate in the space provided, the number of jurors, if any, who have found it proved by a preponderance of the evidence and that it is mitigating.*

*A finding with respect to a Mitigating Factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a Mitigating Factor must consider such a factor in considering whether to impose a sentence of life in prison without the possibility of release or a sentence of death, regardless of the number of other jurors who agree.  Further, any juror may also weigh a Mitigating Factor found by another juror, even if he or she did not also find that factor to be mitigating:*

Statutory                                                                    Number of Jurors Finding
Mitigating Factors:                                                             the Mitigating Factor:

1.      Impaired capacity.  Brandon Leon Basham's capacity to appreciate the wrongfulness of his conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge, and this factor is mitigating.     __4__

2.      Duress.  Brandon Leon Basham was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge, and this factor is mitigating.     __0__

3.      Minor participation. Brandon Leon Basham is punishable as a principal in the offense, which was committed by another, but his participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge, and this factor is mitigating.     __0__

4.      Brandon Leon Basham did not have a significant prior history of other criminal conduct, and this factor is mitigating.     __0__

5.      Disturbance.  Brandon Leon Basham committed the offense under severe mental or emotional disturbance, and this factor is mitigating.     __1__

Count 2                                                                                    Page 6

**JA 2483**

Non-Statutory
Mitigating Factors:

Number of Jurors Finding
the Mitigating Factor:

1.      Brandon Leon Basham played a lesser role than Chadrick
Evan Fulks in the kidnapping and carjacking of Alice Donovan,
and this factor is mitigating.                                           0

2.      Brandon Leon Basham's family, including both his maternal
and paternal sides, has a history of violence, substance abuse, and mental
illness, including schizophrenia, psychosis, depression, delusions, paranoia,
and suicide, including numerous suicide attempts by Brandon's mother,
and this factor is mitigating.                                           12

3.      Brandon Leon Basham's mother abused alcohol and illegal drugs
while she was pregnant with him and had a negative attitude towards
prenatal care, and this factor is mitigating.                           6

4.      Brandon Leon Basham's parents spent most of the family's
money on drugs and alcohol and Brandon frequently saw both parents
intoxicated or under the influence, and this factor is mitigating.      5

5.      Brandon Leon Basham's mother entertained strange men at her
home for drugs and sex, sometimes kicking Brandon, Jimmie, and Charlotte
out of the house on such occasions, and sometimes allowing the family to remain,
resulting in Brandon Leon Basham occasionally seeing his mother involved
with these strange men, and this factor is mitigating.                  5

6.      Brandon Leon Basham was sexually abused by men, and this factor
is mitigating.                                                          6

7.      Brandon Leon Basham's parents often engaged in physical, verbal,
and emotional violence towards each other and towards Brandon and his
sister Charlotte, and this factor is mitigating.                        12

8.      Brandon Leon Basham's parents did not know how to take care
of a special needs child and never concerned themselves with his education
or treatment, and this factor is mitigating.                            0

9.      Brandon Leon Basham's parents and family failed to show up for visits
or conferences at hospitals and institutions, and this factor is mitigating.   0

Count 2

10.    Brandon Leon Basham had inconsistent and inefficient nutrition provided to him in his home, and this factor is mitigating.    _O_

11.    Brandon Leon Basham's home was often filthy and infected with roaches, and this factor is mitigating.    _1_

12.    Brandon Leon Basham's mother removed him from appropriate care facilities, refused to follow recommendations of doctors and counselors, and refused to give him his prescribed medication for his mental illness, but gave him illegal drugs instead, and this factor is mitigating.    _4_

13.    Brandon Leon Basham's mother encouraged him to steal to support their drug habits, and this factor is mitigating.    _11_

14.    Brandon Leon Basham began huffing gasoline, smoking marijuana, and smoking crack cocaine at a young age, and this factor is mitigating.    _10_

15.    Brandon Leon Basham was diagnosed with ADHD [Attention-Deficit/ Hyperactivity Disorder] as a young child, was placed in a mental hospital for the first time at age 10, and was subsequently placed in several mental health facilities and institutions, and this factor is mitigating.    _2_

16.    Brandon Leon Basham has received inconsistent care and has been prescribed an ever-changing mix of medicines, including antipsychotics, anxiolytics, antidepressants, and anticonvulsants, and this factor is mitigating.    _4_

17.    Brandon Leon Basham suffers from emotional, behavioral, and learning disabilities and was placed in special education classes in early elementary school, and this factor is mitigating.    _1_

18.    Brandon Leon Basham shows signs of neurological damage due to head trauma and substance abuse, which has inhibited his ability to process information and inhibit impulses, and this factor is mitigating.    _1_

19.    Brandon Leon Basham suffers from dementia due to multiple etiologies, inhalant induced psychosis with hallucinations, and anxiety disorder not otherwise specified and ADHD, combined type, and this factor is mitigating.    _1_

20.    Brandon Leon Basham has a mental condition that causes him to reject prescribed medications and self-medicate with other non-prescribed substances such as illegal drugs and alcohol, and this factor is mitigating.    _O_

21.     Brandon Leon Basham is unable to operate a car, an ATM machine, or a phone card, and this factor is mitigating.

0

22.     Brandon Leon Basham has suffered from low self esteem, sadness, and hopelessness from a young age, and this factor is mitigating.

0

23.     Brandon Leon Basham has attempted suicide several times, and this factor is mitigating.

0

24.     Brandon Leon Basham's intelligence scores have been deteriorating due to head injuries and substance abuse at an early age, and his I.Q. level is now in the low 70s, and this factor is mitigating.

0

25.     Brandon Leon Basham is easily influenced and led by others, and this factor is mitigating.

4

26.     At the time of the offenses, Brandon Leon Basham was suffering from severe mental and emotional disturbances, and this factor is mitigating.

0

27.     At the time of the offenses, Brandon Leon Basham was not on his prescribed medication, and this factor is mitigating.

0

28.     At the time of the offenses, Brandon Leon Basham was under the influence of alcohol and drugs, and this factor is mitigating.

0

29.     Brandon Leon Basham has never harmed anyone in a correctional facility with or without a weapon, and this factor is mitigating.

0

30.     No one has escaped from a high security federal prison since 1993, and this factor is mitigating.

0

## VI.  DETERMINATION OF SENTENCE

### Life in prison without possibility of release

We unanimously conclude that Brandon Leon Basham shall be sentenced to life imprisonment without possibility of release.

_____
Foreperson

_____
Date

*If you answer that a sentence of life in prison without possibility of release shall be imposed, then you must proceed to Section VII.*

**OR**

Count 2

**Death**

We, the jury, as to Brandon Leon Basham, unanimously find beyond a reasonable doubt that the aggravating factor(s) proved in this case outweigh(s) the mitigating factor(s) so as to justify a sentence of death; or, in the absence of any mitigating factor, that the aggravating factor or factors alone justify a sentence of death. We, therefore, unanimously conclude that Brandon Leon Basham shall be sentenced to death.

Foreperson

November 2, 2004
Date

*If you answer that a sentence of death shall be imposed, then you must proceed to Section VII.*

Count 2

**JA 2488**

## VII.  CERTIFICATION STATEMENT

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant, Brandon Leon Basham, or the victim, Alice Donovan, was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim.

Foreperson

Date

Count 2

Page 12

**JA 2489**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

UNITED STATES OF AMERICA,      )        Cr. No. 4:02-992
                               )
                               )
VERSUS                         )        Columbia, S.C.
                               )        February 14, 2005
BRANDEN L. BASHAM,             )
                               )
                               )
          Defendant.           )
------------------------------)

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE JOSEPH F. ANDERSON, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Appearances:

For the Government:        SCOTT SCHOOLS, ESQ.
                           JONATHAN S. GASSER, ESQ.
                           JOHN DUANE, ESQ.
                           Assistant U.S. Attorneys
                           1441 Main Street, Suite 500
                           Columbia, S.C.  29201

For the Defendant:         JACK B. SWERLING, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

                           GREGORY P. HARRIS, ESQ.
                           1720 Main Street
                           Columbia, S.C.  29201

Court Reporter:            Gary N. Smith, CM
                           901 Richland Street
                           Columbia, S.C.  29201
                           (803) 256-7743

          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

endeared her to all that knew her.

I consider your actions to be those of pure evil. In my observations, there has been no sign of remorse in any of your actions or statements, and no one I have spoken to has observed any sign of remorse. In many ways your anger, hatred, and actions are more reprehensible than those of Chad Fulks.

As I said to Chad Fulks, this trial was not about revenge, but accountability. Now you are being held accountable for your actions.

In life and in death, Alice's goodness, kindness, and courage had a profound effect on the life of everyone she met. And now her death will have a profound affect on your life. Alice and Samantha both had so much to live for, and that was stolen from them.

I don't believe that death by lethal injection is true punishment for you nor true justice for them. I hope that during this trial you have listened as friends and family described their personalities and lives. Perhaps you will have an appreciation for how much they are still loved and how much they are missed.

Thank you.

THE COURT: Thank you, Mr. Donovan.

Anything further from the government?

MR. SCHOOLS: No, sir.

THE COURT: All right, Mr. Swerling, Mr. Harris, I

will be glad to hear from you. If there's anything you would like to say.

MR. SWERLING: Excuse me a moment.

THE COURT: All right.

MR. SWERLING: Judge, of course, we recognize the fact that under Title 18, United States Code 3594, that since the jury recommended death, that Your Honor has no discretion, has to go ahead and sentence Mr. Basham to death.

We don't think that that same thing applies as to the guideline calculations. We think the court can go below the maximum sentence, and in fact in this case should.

While the jury did not find that the mitigating factors we presented were sufficient to overcome their recommendation of death, we do feel that there are compelling reasons in Mr. Basham's background that would warrant a sentence of less than life in prison.

THE COURT: Thank you, sir.

Mr. Basham, under our rules of procedure, I'm required to address you personally and advise you that if there is anything you would like to say to me before I decide upon the sentence in your case, I will be glad to review it. I will be glad to hear anything you want to say or review anything you present for me to look at. This is your chance to speak, I will be glad to hear from you.

THE DEFENDANT: I just like -- I would just like the

court to -- to the families and everybody, that this is -- this has been a real bad situation. It's a tragedy that -- I have no words to present of what's gone on and -- and for me to say what's been taken away from the victims. And to the judge, and to the jury, to everybody that has dealt with these things and had to try to understand, I guess, my personality and the way that I am.

And that I just hope and pray that -- that the victims' families can find it in their heart to -- I know they can never forget, I just pray they forgive. And for the judge and for you, that for all your -- all your working with me throughout the trial and trying to help me in getting all the people to help me, I appreciate that. And I just want to thank you for that.

THE COURT: Thank you, sir.

All right, anything further before sentencing?

MR. SWERLING: No, sir.

THE COURT: All right, as to the noncapital counts, that is to say, counts 3 through 8, the sentence of the court is as follows:

Pursuant to the Sentencing Reform Act of 1984, it is the sentence and judgment of the court as to counts 3, 4, 5, 7, and 8, that the defendant, Branden Leon Basham, is hereby committed to the custody of the Bureau of Prisons for a term of 660 months. This term consists of 10 years on count 3, five

years on count 4, 20 years on count 5, 10 years on count 7, and 10 years on count 8, all to run consecutively, pursuant to sentencing guideline 5 G 1.2 D.

As to count 6, which is a statutorily required consecutive sentence, the defendant is sentenced to a term of 84 months consecutive to all the other sentences imposed this morning, and previously imposed by any other court.  Therefore, the total term of imprisonment for counts 3 through 8 is 744 months.  I find the defendant does not have the ability to pay a fine in this case, therefore the fine is waived.

It is further ordered that the defendant shall pay to the United States a special assessment fee of $600, which shall be due immediately.

If the defendant is ever released from prison, then upon release he shall be placed on supervised release for a term of five years.  This term consists of three years on counts 3, 4, 5, 7, and 8, and five years on count 6, to be served concurrently.

Within 72 hours of release from custody, the defendant shall report in person to the probation office in the district to which he is released.  While on supervised release, the defendant shall comply with the mandatory and standard conditions of supervision outlined in Title 18 of the United States Code, Section 3503 (d), and also the following special condition:

The defendant shall participate in a mental health treatment program as directed and approved by the U.S. Probation Office.  That is my sentence as to counts 3 through 8.

I am required by statute to state my reasons for imposing this sentence.  I have adopted the presentence report as modified, either by consent or by court ruling on disputed matters this morning.  The sentence that was imposed is a guideline sentence.

I am mindful of the fact that the guidelines are no longer mandatory, they are advisory only.  However, it is my determination after carefully reviewing the facts of this case, that a guideline sentence is a reasonable sentence in this case.

I have certainly considered the statutory factors contained in Title 18 of the United States Code, Section 3553 (a).  I have considered and given careful reflection on all those statutory factors, and have determined that the sentence announced is the reasonable sentence for Mr. Basham on the counts that do not carry a death sentence.

As to counts 1 and 2, for which the jury returned a death verdict, the sentence of the court is as follows:

On September 30th, 2004, the defendant, Branden Leon Basham, was found guilty of, among other things, counts 1 and 2 of the superseding indictment.

Pursuant to the jury's verdict, the defendant is adjudged guilty of carjacking resulting in the death of Alice Donovan on or about November 14th, 2002, a violation of Title 18 of the United States Code, Section 2119. That's contained in count 1. And kidnapping resulting in the death of Alice Donovan on or about November 14th, 2002, a violation of Title 18 of the United States Code, Section 1201. That is the charge of count 2.

Pursuant to the Federal Death Penalty Act of 1994, appearing at Title 18, Section 3591 through 94, and the special findings of the jury returned on November 2nd, 2004, and the jury's unanimous vote recommending that the defendant shall be sentenced to death, it is the judgment of the court that the defendant, Branden Leon Basham, is sentenced to death on counts 1 and 2 of the superseding indictment.

It is ordered that the defendant pay to the United States a special assessment in the amount of $100 on count 1 and $100 on count 2, which shall be paid immediately. The court declines to impose a fine due to the defendant's inability to pay.

It is further ordered that the defendant's sentence shall be executed by a United States Marshal, designated by the director of the United States Marshal's Service. The defendant's sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to

cause death.

Defendant's sentence shall be executed on a date and at a place designated by the Director of the Federal Bureau of Prisons, which date shall be no sooner than 60 days from the entry of this judgment of death.

The sentence shall be executed at a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons by a United States Marshal, designated by the director of the United States Marshal's service, assisted by additional personnel selected by the marshal and the warden of the designated institution, and acting at the direction of the marshal, and by intravenous injection of a lethal substance or substances, to be determined by the Director of the Federal Bureau of Prisons, and to be administered by qualified personnel selected by the warden and acting at the direction of the marshal.

If the date for execution passes by reason of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay is lifted. Unless the President of the United States intervenes, the United States Marshal shall not stay execution of the sentence on the basis that the defendant has filed a petition for executive clemency.

Except to the extent a court orders otherwise, the warden of the designated institution shall notify the defendant

of the date designated for execution at least 20 days in advance, except when the date follows a postponement of fewer than 20 day of a previously scheduled and noticed date of execution, in which case the warden shall notify the defendant as soon as possible.

Beginning seven days before the designated date of execution, the defendant shall have access only to his spiritual advisors, not to exceed two, his defense attorneys, under supervision, members of his family, and the officers and employees of the institution.

Upon approval of the Director of the Federal Bureau of Prisons, the warden may grant access to such other persons as defendant may request.

In addition to the marshal and the warden, the following persons shall be present at the defendant's execution:  One, necessary personnel selected by the marshal and warden; two, those attorneys of the Department of Justice who the deputy attorney general determines are necessary; three, not more than the following number of persons selected by the defendant, one spiritual advisor, two defense attorneys, and three adult friends or relatives; and four, not more than the following number of persons selected by the warden: first, eight citizens; and second, 10 representatives of the news media.

No other persons shall be present at defendant's

execution, unless leave for such person's presence is granted by the Director of the Federal Bureau of Prisons or by this court. No person younger than 18 years of age shall witness the execution.

The warden should notify those individuals described in paragraph C above of this section as soon as practicable before the designated time of execution.

No photographic or other visual or audio recording of the execution shall be permitted. After the execution has been carried out, qualified personnel selected by the warden shall conduct an examination of the defendant's body to determine that death has occurred, and shall inform the marshal and warden of his determination.

Upon notification of defendant's death, the marshal shall complete and sign the return attached to the order that I will enter and/or any similar document, and shall file such document with the court.

The defendant's remains shall be disposed of according to procedures established by the Director of the Bureau of Prisons.

No officer or employee of the Department of Justice shall be required to be in attendance or to participate in the execution if such attendance or participation is contrary to moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such

participation or attendance contrary to medical ethics.

For purposes of this paragraph, the term "participation" means or includes personnel -- personal participation of the condemned individual, and the apparatus used for execution and supervision of the activities of the other personnel in carrying out such activities.

Pursuant to the provisions of Title 18, Section 3596, it is ordered that the defendant is committed to the custody of the Attorney General of the United States, or his authorized representative, for appropriate detention until exhaustion of the procedures for appeal of the judgment of conviction and for a review of the sentence.

When the sentence is to be implemented by the attorney -- excuse me, when the sentence is to be implemented, the attorney general shall release the defendant to the custody of the United States Marshal who shall supervise the implementation of the sentence in the manner prescribed by law.

The defendant is remanded to the custody of the United States Marshal to await placement in or at the appropriate facility.

Does the government have any objection to the technical form of the sentence?  Mr. Schools?

MR. SCHOOLS:  No, Your Honor.

THE COURT:  Any objection by the defendant to the technical form of the sentence?

MR. HARRIS:  The only question I have, Your Honor, is at the beginning it sounds like you said the verdict -- the death verdict was in September, and I believe the death verdict was November the 2nd.  Maybe I'm --

THE COURT:  Well, I said on September the 30th he was found guilty, that was the guilt phase verdict, I think.  And then on November 2nd the vote on the death sentence came in.

MR. HARRIS:  Okay.

THE COURT:  All right.  Mr. Basham, you have 10 days from today to appeal your conviction by the jury.  You also have 10 days from today to appeal the sentence the court has imposed on counts 1 and 2, which are the capital counts, and counts 3 through 8, which are the noncapital counts.

If you wish to appeal and cannot afford an attorney, the court would appoint one for you for purposes of appeal.

THE DEFENDANT:  Yes, sir.

THE COURT:  I think that will do it.  Thank you very much.  We will be in recess.

MR. SCHOOLS:  Thank you, Judge.

MR. HARRIS:  Two matters before we do recess.  I have handed to the court and provided to the government an affidavit from the Spartanburg Herald that we would ask you make part of the record.

THE COURT:  Right.

MR. HARRIS:  The last hearing we referred to it.

THE COURT: This eliminated the need to have that evidentiary hearing?

MR. HARRIS: Right.

THE COURT: Right. I was wondering if that had been put in the record. We will put that in the record for completeness.

MR. HARRIS: Secondly, Your Honor, we would ask that the marshals transport Mr. Basham immediately to Terre Haute, Indiana where he will be housed at that death facility. And we would also ask that when he is so moved, that all medical records and treatment plans that he is currently under be sent with him forthwith.

THE COURT: All right. Well, I don't know if I should order immediately. I think I should say, "As soon as reasonably possible he should be transferred to Terre Haute." And obviously his medical records need to go along with him so that he can receive proper medications.

Thank you, we will be in recess.

(Thereupon, the proceedings were adjourned.)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from my stenographic notes in the above-entitled matter.

_____          _____

s/ Gary N. Smith, CM

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:02-992-JFA |
| Plaintiff,<br>-v-<br>BRANDON LEON BASHAM,<br>Defendant. | Judge Joseph F. Anderson, Jr.<br><br>DEATH PENALTY CASE |

---

### DEFENDANT'S MOTION FOR COLLATERAL RELIEF

### PURSUANT TO 28 U.S.C. § 2255

---

**JA 2503**

TABLE OF CONTENTS

I.    Preliminary matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    Form of citations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    Form of motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.    Request for ruling on statute of limitations. . . . . . . . . . . . . . . . . . . 2

II.   Statement of the case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  Introductory comments regarding claims raised in this motion. . . . . . . . . . 8

IV.   Claims for relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Claim 1
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Claim 2
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Claim 3
The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties.  In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

i

**JA 2504**

A.      The trial court excluded jurors based on their general opinions on the death penalty rather than their inability to follow the law. . . . . . . . . 25

B.      Appellate Counsel was ineffective for failing to raise this issue on appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Claim 4
Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . 37

Claim 5
Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense.  In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Claim 6
The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Claim 7
Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.. . . . . . . . . . . . . . . . . . . . . . . . 44

JA 2505

Claim 8

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Claim 9

Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking... . . . . . 47

Claim 10

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers. In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Claim 11

The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by relying on Sheriff Hewett;s false testimony in its closing argument... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Claim 12

Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.. . . . . . . . . . . 57

JA 2506

Claim 13
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.. . . . . . . . . 57

Claim 14
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Claim 15
Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Claim 16
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.. . . . . . . . . . . . 67

Claim 17
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

iv

Claim 18

Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.. . . . . . . . . . . . 75

Claim 19

Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.. . . . . . . . . . . . . . 81

    A.    Mental retardation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

    B.    Fetal Alcohol Spectrum Disorder (FASD).. . . . . . . . . . . . . . . . . . . 85

    C.    Other mitigating evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Claim 20

Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team.  In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    A.    The bias of defense investigator Carlisle McNair created a conflict of interest within the defense team. . . . . . . . . . . . . . . . . . . . . . . . . . . 87

    B.    Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Claim 21

Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

**JA 2508**

Claim 22

The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing. As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Claim 23

The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial. Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Claim 24

Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence. By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

    A.    The Government's improper questioning and argument constituted prosecutorial misconduct.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

    B.    Defense counsel was ineffective in failing to object to the Government's cross-examination and closing argument on the basis of *Tennard*.. 112

    C.    Appellate counsel rendered ineffective assistance in failing to raise a *Tennard* claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

vi

**JA 2509**

Claim 25

The Court's instruction to the jury on mitigating evidence violated Mr. Basham's Eighth Amendment rights because it created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating. Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was ineffective for failing to raise this issue on direct appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Claim 26

The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt. Appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they unreasonably failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . 119

Claim 27

Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.. . . . . . . . . 124

Claim 28

Newly discovered evidence suggests that Juror Wilson was untruthful in her testimony to the Court concerning her contact with other jurors. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.. . . . . . . . . . . . . . . . . . . . . . 133

Claim 29

Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

JA 2510

Claim 30

Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.  In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Claim 31

Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment.  Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Claim 32

A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced.  This Court should vacate Mr. Basham's sentence on this basis alone... .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

    A.     Eighth amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

    B.     Statutory right to justice without discrimination. . . . . . . . . . . . . . . 151

    C.     Supervisory powers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

    D.     The FPDA's omission of "plain-error" review.. . . . . . . . . . . . . . . 153

Claim 33

The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

JA 2511

Claim 34
Mr. Basham's Conviction and Sentence Must be Vacated Due to the Cumulative
Prejudicial Effect of the Errors in this Case... . . . . . . . . . . . . . . . . . . . . . . . . 162

V.     Reservation of Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

VI.    Prayer for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

**JA 2512**

COMES NOW Defendant BRANDON LEON BASHAM, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rules 2 and 3 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct his sentences.

## I.    PRELIMINARY MATTERS

### A.    Form of citations

This pleading will be referred to herein as the "Motion."   Citations to pleadings, transcripts, and other documents will be as follows:

(1)    Documents on the official court docket, including pleadings, motions, and orders, will be cited by their docket number:  Dkt *xxx*.

(2)    Documents on the official court docket of the United States Court of Appeals for the Fourth Circuit, including briefs and motions, will be cited by their docket number: App. Dkt. *xxx*.

(2)    Transcripts will by cited by date and page number: Tr. *xx/xx/xx* at *xx*.

(3)    Exhibits to this Motion will be consecutively numbered and cited accordingly: Exh. *xxx*.

(4)    All other citations will be self-explanatory or based on the Blue Book.

**JA 2513**

**B.    Form of motion**

Pursuant to Rule 2(c) of the Rules Governing Section 2255 Proceedings, this Motion attempts to comply with Form AO 243, available through this Court's official website.  Pursuant to Form AO 243, to the extent feasible, this Motion will not cite or argue case law, but will instead solely state the specific facts supporting each claim.  Because of the complexity of the issues presented in this capital case, however, and to clarify the precise nature and scope of Mr. Basham's claims, minimal citation to legal authority will be unavoidable.  Mr. Basham will file a separate motion seeking this Court's permission to file a legal memorandum in support of the claims raised in this Motion.

**C.    Request for ruling on statute of limitations**

Pursuant to 28 U.S.C. § 2255(f), the statute of limitations on a motion brought pursuant to § 2255(a) begins to run from the latest of:

(1)    the date on which the judgment of conviction becomes final; [or]

(2)    the date on which the impediment to making a motion created by governmental action in violation of the Constitution or law of the United States is removed, if the movant was prevented from making a motion by such governmental actions.[1]

---

[1]The statute provides alternative commencement dates for the running of the statute of limitations that are not relevant for purposes of this argument.  *See* 28 U.S.C. § 2255(f)(3) and (4).

2

**JA 2514**

To guarantee Mr. Basham's right to post-conviction review of his convictions and sentences, counsel for Mr. Basham have filed this Motion within one year of the United State Supreme Court's denial of Mr. Basham's petition for writ of certiorari on June 1, 2010, thereby satisfying the most stringent statute of limitations deadline established by 28 U.S.C. § 2255(f)(1). Counsel for Mr. Basham, however, respectfully submit that, because of an impediment created by the Office of the Clerk of the Court for the United States District Court for the District of South Carolina (the "Clerk's Office") in violation of the Constitution and laws of the United States, the statute of limitations in this case in fact did not begin to run until, at the earliest, May 19, 2011. As is explained below, until May 19, 2011, despite diligent efforts on the part of the Office of the Federal Public Defender for the District of Arizona ("Arizona FPD"), counsel for Mr. Basham had been unable to access significant portions of the official court record in this case.

This Court appointed the Arizona FPD to represent Mr. Basham for purposes of his § 2255 proceedings. (Dkt. 1247 and 1323.) This Court's appointment of the Arizona FPD resulted in substantial financial savings to the United States District Court for the District of South Carolina and the United States Court of Appeals for the Fourth Circuit because virtually all costs associated with investigating, researching, and preparing the § 2255 motion in Mr. Basham's case were borne by

**JA 2515**

the Arizona FPD, which paid for these expenses from its internal budget.

The more than 2000 mile distance between the federal districts of Arizona and South Carolina, however, necessitated that the Arizona FPD have ready online access to the official court record, both sealed and unsealed, in this case. Immediately upon its appointment to this case, the Arizona FPD assigned a paralegal to obtain and organize the official court record in this case. That record contains more than 1,300 documents on more than 12,000 pages. The Arizona FPD attorneys and the paralegal assigned to Mr. Basham's case experienced difficulties in accessing numerous documents noted on this Court's docket for this case. Attachment A to Exhibit 1 to this Motion is a document, created by an Arizona FPD paralegal, Kimmberly Taylor, listing over 200 pleadings and orders (many of them sealed) that the Arizona FPD was unable to access either via Pacer or via other internal links provided by the Clerk's Office. Ongoing discussions occurred between the Arizona FPD paralegal and the Clerk's Office in a good-faith attempt by all parties to clarify the nature of the pleadings that the Arizona FPD was unable to access and to facilitate access to those documents. (*See* Exh. 1 (Declaration of Kimmberly Taylor).) Ultimately, on May 16, 2011, the Clerk's Office sent Ms. Taylor the final remaining documents to which the Arizona FPD had been denied access. (*See* Exh. 1.)

**JA 2516**

A federal prisoner has the right to reasonable access to the official court record in his case for purposes of preparing a motion pursuant to 28 U.S.C. § 2255, and denial of that right is violative of his First Amendment right of access to the courts. *See, e.g., Rush v. United States*, 559 F.2d 455, 458 (7th Cir. 1977) ("It is now settled beyond doubt that prisoners have a substantive constitutional right of access to the courts and that inmate access must be 'adequate, effective and meaningful.'") (*quoting Bounds v. Smith*, 430 U.S. 817 (1977)). "Moreover, when the prosecuting sovereignty is the federal government . . . , the federal courts may also draw on their inherent supervisory powers to establish more liberal access than that mandated by the Constitution." *Rush*, 559 F.2d at 459.

Counsel for Mr. Basham respectfully submit that, because of the Clerk's Office's difficulties in providing access to the entire official court record in this case, that office unintentionally created an impediment to Mr. Basham's "making a motion" for collateral relief. *See* 28 U.S.C. § 2255(f)(2). Because that impediment was not remedied until May 6, 2011, when the Clerk's office sent the final portions of the record to which the Arizona FPD had been denied access, counsel for Mr. Basham submit that the statute of limitations for Mr. Basham's § 2255 motion did not begin to run until that date. Accordingly, the statute of limitations in this case does not expire until May 6, 2012.

5

**JA 2517**

Counsel for Mr. Basham have filed this preliminary Motion in order to preserve Mr. Basham's right to collateral relief.  By filing this Motion, however, Mr. Basham does not concede that his attorneys' lack of access to the official record in his case was not an impediment to filing a comprehensive petition.  Rather, this Motion is filed solely as a precautionary measure, in the event that this Court, or an appellate court on review, were to reject Mr. Basham's claim of statutory tolling of the statute of limitations.

For the foregoing reasons, counsel for Mr. Basham respectfully request that this Court issue an order holding that, pursuant to 28 U.S.C. § 2255(f)(2), the statute of limitations in this case did not begin to run until May 6, 2011.

## II.    Statement of the case

On September 30, 2004, a jury convicted Mr. Basham of the following federal crimes:

(1)    carjacking resulting in death, in violation of 18 U.S.C. § 2119;

(2)    kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a);

(3)    interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312;

(4)    conspiracy to commit (a) carjacking, (b) kidnapping, (c) interstate transportation of a stolen vehicle, (d) possession of firearms by a convicted felon, and (e) possession of stolen firearms, in violation of 18 U.S.C. § 371;

**JA 2518**

(5)    conspiracy to use, carry, and possess firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C. § 924(o);

(6)    carrying, using, and possessing firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C. § 924(c);

(7)     being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); and

(8)    possession of stolen firearms, in violation of 18 U.S.C. § 922(j).

(Tr. 9/30/04 at 56-58.)

On November 2, 2004, the same jury returned verdicts imposing death on Counts 1 and 2 of the Superceding Indictment.  (Tr. 11/2/04 at 4-14.)  This Court subsequently sentenced Mr. Basham to death by lethal injection on Counts 1 and 2 and to various terms of years totaling 55 years (660 months) on the remaining counts. (Tr. 2/14/05 at 57-64.)

Mr. Basham appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed his convictions and sentences. *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009).  The Supreme Court of the United States denied Mr. Basham's subsequent petition for writ of certiorari on June 1, 2010. *Basham v. United States*, 130 S. Ct. 3353 (2010).

Mr. Basham, through his undersigned counsel, now files this Motion pursuant to 28 U.S.C. § 2255, and asks this Court to grant him a new trial, vacate the judgment

**JA 2519**

entered against him, and/or vacate, set aside or correct his sentences.[2] *See* 28 U.S.C. § 2255(a).

## III.     INTRODUCTORY COMMENTS REGARDING CLAIMS RAISED IN THIS MOTION

The Government's prosecution of Mr. Basham was lengthy, complex, and costly. Throughout the course of the proceedings, this Court demonstrated a heightened awareness of the financial, temporal, and emotional consequences that

---

[2]On May 19, 2011, Mr. Basham, assisted by "an Inmate Legal Aid (sic)," filed a *pro se* pleading entitled "Defendant's Waiver of Any and All Proceedings Pursuant to 28 U.S.C. § 2255." (Dkt. 1391.) The statute of limitations for this proceeding may run on June 1, 2011, the one-year anniversary of the United States Supreme Court's denial of Mr. Basham's petition for writ of certiorari. *See* 28 U.S.C. § 2255(f)(1). For reasons set forth elsewhere in this Motion (*see* Section I(c)), counsel for Mr. Basham maintain that, because of a governmental impediment created by the Clerk of the Court for United States District Court for the District of South Carolina, the statute of limitations in this case in fact did not begin to run until May 19, 2011. *See* 28 U.S.C. 2255(f)(2). In any event, to preserve Mr. Basham's right to review of his post-conviction claims, undersigned counsel are filing this preliminary Motion in an abundance of caution. Because the effect of Mr. Basham's *pro se* pleading purportedly "waiving" his right to pursue relief under 28 U.S.C. § 2255 is not likely to be resolved before June 1, 2011, the possible statute of limitations deadline, counsel for Mr. Basham are filing this Motion despite Mr. Basham's claim that he "had informed his lawyers that he does not want any such petition to be filed on his behalf." (Dkt. 1391 at 2.) Undersigned counsel take this action to preserve their client's rights in the event that (a) this Court exercises its discretion to disregard Mr. Basham's *pro se* pleading, *see, e.g., United States v. Ayesh*, 2011 WL 590608 *3 (E.D. Va., February 9, 2011) (defendant represented by counsel is generally not permitted to file *pro se* pleadings); (b) Mr. Basham later decides to pursue relief under 28 U.S.C. § 2255; or (c) this Court determines that Mr. Basham has not made a knowing, voluntary, and intelligent waiver of his right to pursue post-conviction relief.

could result from the introduction of reversible error into the case. Even a cursory review of the record reveals that the Court conscientiously attempted to protect Mr. Basham's constitutional right to a fair trial, while endeavoring to see the case through to completion.

The claims raised in this Motion are a reflection of the enormity of the task facing the Court in this particular case, rather than the Court's response to that task. There is no doubt that the Court willingly authorized the expenditure of the extraordinary amount of financial resources necessary to provide Mr. Basham with due process of law. Yet, from the outset, the Court was presented with novel legal and practical issues, any one of which threatened to derail the case.

Counsel for Mr. Basham present numerous claims for relief in this Motion. Remarkably, despite their diversity, almost all of these claims share a common thread: they pertain to violations of Mr. Basham's constitutional and statutory rights that were beyond this Court's ability to control. They concern errant jurors; an incompetent defendant; a prosecution that, in its zeal to convict Mr. Basham, may have overlooked its foremost obligation to ensure that justice was obtained; and defense attorneys who, despite their experience and apparent dedication, committed grievously prejudicial errors in their representation of Mr. Basham.

9

**JA 2521**

To place into perspective the claims of ineffective assistance of counsel raised in this Motion, counsel for Mr. Basham ask this Court to consider as a cautionary tale another example of grievous error committed by a seemingly competent professional. Although upon first reading this example might appear incongruous, it in fact aptly reflects the dilemma presented to Mr. Basham in this Motion: namely, alleging error on the part of highly respected and unquestionably experienced professionals.

On March 27, 1977, two Boeing 747 passenger jets collided on the runway of the airport on Tenerife in the Canary Islands, killing 583 people in what remains to this day the worst airline disaster in history. The cause of the disaster was ultimately attributed to error on the part of KLM Royal Dutch Airlines Captain Jacob van Zanten, the pilot of one of the jets. Captain van Zanten, a pilot with 30 years of experience and over 11,000 flight hours, was the head of KLM's flight training department. Despite his unparalleled expertise, or ironically, perhaps because of it, Captain van Zanten made erroneous decisions that day in March 1977 that resulted in tragedy.

In its order of August 3, 2010, denying the § 2255 motion of Mr. Basham's co-defendant, Chadrick Fulks, this Court recited at length the qualifications and experience of the attorneys appointed to represent Mr. Fulks. (Dkt. 1326 at 8-11.) Without question, a similar litany of the experience and qualifications of Mr.

**JA 2522**

Basham's trial attorneys, Jack Swerling and Greg Harris, could fill numerous pages of an order in Mr. Basham's case. The general abilities and commitment of these two lawyers, however, is not at issue, and in filing this Motion counsel for Mr. Basham in no way mean to impugn the reputation of these respected attorneys.

Nevertheless, as the story of Captain Jacob van Zanten tragically demonstrates, even the most talented and experienced professionals can err. In the pages of this Motion, counsel for Mr. Basham set forth claims of ineffective assistance of counsel by Mr. Basham's trial attorneys. These good faith claims are supported by the facts of this case, and are entitled to serious and impartial consideration by this Court. Regardless of the outcome of this proceeding, the reputations of Messrs. Swerling and Harris will remain deservedly intact. The professional standing of these two lawyers does not depend on this Court's imprimatur. The continuing validity of the Constitution and laws of the United States, however, *does* depend on this Court's impartial protection. Accordingly, this Court must resolve the claims of ineffective assistance of counsel raised in this Motion based on the particular acts or omissions of Mr. Basham's trial attorneys in this case, not on their resumes.

In addition, in examining Mr. Basham's allegations of ineffective assistance of trial counsel, this Court should note that two legal principles apply to the claims as a group. First, the alleged Sixth Amendment violations are subject to the two-part

**JA 2523**

standard established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), under which "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (*citing Strickland*).   Counsel's performance falls below *Strickland*'s "objective standard of reasonableness" if it is outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690.  "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*,  539 U.S. at 534 (*quoting Strickland*, 466 U.S. at 694).   Second, when assessing counsel's conduct, and more particularly the impact of that conduct on the reliability of the proceedings, counsel's deficiencies must be considered cumulatively as opposed to item-by-item. *See*, *e.g.*, *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.").

With these factual and legal perspectives in mind, counsel for Mr. Basham present the following claims for relief.[3]

---

[3]To the extent possible, the claims in this Motion are presented in the order in which they arose in Mr. Basham's prosecution.

12

**JA 2524**

## IV.    CLAIMS FOR RELIEF

### CLAIM 1

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

On November 28, 2002, Mr. Basham and the two attorneys originally appointed to his case, Cameron Littlejohn and William Monckton IV, assisted in a search for Alice Donovan's body in the area of the Bee Tree Farms Hunt Club, in Brunswick, North Carolina.  Mr. Basham and his attorneys were joined by Federal Bureau of Investigation officers, the Conway, South Carolina Police Department, and the Brunswick County Sheriff's Department.  (Tr. 9/27/04 at 13.)  Near the end of the search, defense counsel inexplicably allowed Mr. Basham to walk off alone with law enforcement officers.  This objectively unreasonable action of counsel fell below the prevailing professional norms of practice, and without the damaging evidence that resulted, it is likely that Mr. Basham would have gained a more favorable result at his trial.  *See Strickland*, 466 U.S. 688; *Rompilla v. Beard*, 545 U.S. 374 (2005).

13

**JA 2525**

Although counsel had been appointed only the previous day by the presiding magistrate judge, multiple steps were taken to ensure that Mr. Basham was constantly accompanied by, and had access to, his attorneys. Although not yet privy to any police or FBI reports, Mr. Monckton was present for a law enforcement briefing with FBI Agent Jeffrey Long the morning of the search, while Mr. Littlejohn traveled with Mr. Basham from a nearby jail facility. (Tr. 2/25/04 at 30, 98.) Mr. Basham did not have a proffer agreement with the Government, and the Government's position was that any statement Mr. Basham made that day could be used against him. (Tr. 9/27/04 at 169, 202.) Accordingly, it was of the upmost importance that Mr. Basham have constant attorney supervision during his interactions with law enforcement officers.

Mr. Basham rode in a van with his lawyers and other law enforcement officers, including Sheriff Ronald Hewett of Brunswick County, who knew the area well. (Tr. 9/27/04 at 14.) The purpose of the excursion was to locate Ms. Donovan's body, not to interrogate Mr. Basham. Neither Mr. Monckton nor Mr. Littlejohn gave permission for Mr. Basham to be interviewed, and in fact, they specifically informed FBI Agent Long that Mr. Basham was not to be questioned. (Tr. 2/25/04 at 72, 99, 112). After his lawyers first viewed and approved them, Mr. Basham was shown pictures to assist in the search. Mr. Basham gave directional information to the officers in the van, specifically to Sheriff Hewett. (Tr. 9/27/04 at 16-17.)

14

**JA 2526**

Throughout the day, questions posed to Mr. Basham were given in the presence of his attorneys. (Tr. 2/25/04 at 48.) Mr. Basham was allowed to consult privately with his attorneys while riding in the van (Tr. 9/27/04 at 26; Tr. 2/25/04 at 49, 81); he was prevented by his lawyers from completing potentially damaging statements (Tr. 9/27/04 at 24-25); and at one point, he was permitted to confer alone with his attorneys in the van. (Tr. 2/25/04 at 44, 68, 85.)[4]

The group spent several hours and covered over one hundred miles driving around the area surrounding Bee Tree Farms attempting to locate Ms. Donovan's remains. (Tr. 2/25/04 at 65.) Eventually, after much frustration, the van stopped at a cemetery where Mr. Basham and Chad Fulks had been observed by witnesses on the day of the crime. While the remainder of the group, including Mr. Monckton and Mr. Littlejohn, were talking amongst themselves, Mr. Basham walked to the edge of the cemetery with Sheriff Hewett and two Conway Police Officers (neither of whom testified at trial). (Tr. 2/25/04 at 67, 83.) Mr. Basham had not been advised by his

---

[4]The ultimate result of Mr. Basham's private conference with his attorneys was the lawyers' disqualification from the case. When the attorneys emerged from the van, Mr. Littlejohn shared with law enforcement officers a "hypothetical" scenario about the circumstances of Ms. Donovan's death, which the Government later unsuccessfully sought to introduce at trial. The Government was successful, however, in their motion to disqualify Messrs. Monckton and Littlejohn from representing Mr. Basham. This Court subsequently appointed Jack Swerling and Greg Harris to replace Monckton and Littlejohn.

15

attorneys that day that his statements could be used against him.  (Tr. 2/25/04 at 100, 104.)  According to Sheriff Hewett, during their conversation outside the presence of counsel, Mr. Basham demonstrated for him how Ms. Donovan was killed with a purse strap and how he threw the strap into the woods.[5]  (Tr. 9/27/04 at 53;  Tr. 2/25/04 at 66.)

At trial, the Government seized on the statements Mr. Basham allegedly made outside the presence of his attorneys, and emphasized them during closing arguments at both the guilt and penalty phases.  In summation at the guilt phase, the Government argued, "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan.  Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it."  (Tr. 9/29/04 at 80 (emphasis added).)  The importance of this evidence is revealed by the Government's closing argument at the guilt phase:

> Ladies and Gentlemen, I wanted to finish with that because how would you go back in your jury room after listening to Sheriff Hewitt

---

[5]Sheriff Hewett did not write a report of the events of that day, but rather was interviewed by Lt. Crocker of Brunswick County, who then prepared a report about the events.  Nowhere in Lt. Crocker's  report does it state that Mr. Basham indicated how *he* killed Ms. Donovan.  In fact, the report states only that "Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery," and that Mr. Basham responded, "It is," in response to Hewett's question, "Is this where it happened?"  (Exh. 2 at 00818.)  Similarly, in his testimony at the hearing on the motion to disqualify counsel, Sheriff Hewett stated only that Mr. Basham described the length of the strap and demonstrated how he threw it into the woods.  (Tr. 2/25/04 at 66.)

[sic] and after seeing Sheriff Hewitt [sic] demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and *the government submits those two witnesses and that limited testimony, alone, seals the deal.*

(Tr. 9/29/04 at 81-82.) (emphasis added.)

In response to the Government's statements, defense counsel Jack Swerling argued, "The Government is automatically asking you to consider that Brandon Basham was the one that did the act with the strap. That is what they are asking, at the conclusion, they are asking you to draw." (Tr. 9/29/04 at 160.) Mr. Swerling tried to soften the blow of Sheriff Hewett's damaging testimony by arguing that it was "far more likely that Chad Fulks was the one that did the strangulation with the strap, if that is what happened." (Tr. 9/29/04 at 160.) In rebuttal closing argument, however, the Government argued that, to conclude that Mr. Basham himself did not kill Alice Donovan, the jury would have to "disregard Sheriff Hewitt [sic] and disregard Mr. Jay." (Tr. 9/29/04 at 173.)

The Government continued to emphasize this damaging testimony during the penalty phase of Mr. Basham's trial:

What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to

17

**JA 2529**

> Sheriff Hewitt [sic] how Alice Donovan was strangled.  And then he tells Sheriff Hewitt [sic], "I threw the purse strap into the woods" . . . . You saw Sheriff Hewitt [sic] stand up there and show.

(Tr. 11/1/04 at 57.)  The Government referred to "Brandon Basham's strangling of Alice Donovan" in its closing argument, (Tr. 11/1/04 at 57), going so far as to state that "he [Basham] killed Alice Donovan."  (Tr. 11/1/04 at 62.)  Considering that Sheriff Hewett's testimony was the *only* evidence suggesting that Mr. Basham was the actual killer of Alice Donovan, it was unquestionably damaging, and it is therefore unsurprising that the Government took as many opportunities as it did to remind the jury of Hewett's testimony.

Permitting a client to walk off alone with law enforcement officers would be objectively unreasonable under any circumstance.  Littlejohn and Monckton rendered deficient performance when they inexplicably allowed Mr. Basham to walk off with Sheriff Hewett while at the cemetery near Bee Tree Farm.  Given the importance of Sheriff Hewett's subsequent testimony at Mr. Basham's trial concerning Mr. Basham's alleged demonstration of how he killed Alice Donovan with the purse strap, there can be no doubt that Mr. Basham was prejudiced by his attorneys' deficient performance.

18

CLAIM 2

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At defense counsel's request, the Court conducted a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964), to determine the admissibility of various statements made by Mr. Basham following his capture and arrest. (Tr. 2/24/04.) As evidenced by comments made by counsel at the *Jackson v. Denno* hearing, by the date of the hearing, Mr. Basham's attorneys were well aware of his extensively documented history of intellectual, psychological, and emotional difficulties. As Mr. Swerling explained to the Court:

> [T]here are nine or 10 statements that the government intends to try and offer. Because of Mr. Basham's history, his mental history, and his low intellectual and intelligence capacity, what we are asking the court to do is make a threshold determination as to whether or not he was given his rights and whether or not he waived his rights.

(Tr. 2/24/04 (a.m.) at 11.)

19

**JA 2531**

Swerling continued:

> This is a unique situation, it's a death penalty case. He has had many, many commitments to different institutions, he has low intellectual capacity. And I just think the record ought to reflect whether or not the court thinks the statements are voluntary before they are admitted and played before the jury.

(Tr. 2/24/04 (a.m.) at 12.)

Remarkably, however, despite recognizing the gravity of the consequences at issue in this capital case and acknowledging Mr. Basham's obvious deficits, Mr. Swerling essentially informed the Court that he did not intend to advocate on his client's behalf with regard to seeking preclusion of Mr. Basham's statements: "[W]e think it's prudent to go ahead and have the court pass on the voluntariness of the statements without us necessarily arguing vigorously that they are not voluntary." (Tr. 2/24/04 (a.m.) at 11-12.)

True to his word, neither Mr. Swerling nor Mr. Harris "argu[ed] vigorously" that Mr. Basham's statements were involuntary. For example, Detective Dan Mooney of the Ashland Kentucky Police Department testified that Mr. Basham informed him that he had ingested both marijuana and cocaine earlier on the day of his arrest. (Tr. 2/24/04 (p.m.) at 29-30.) In his "argument" to the Court at the conclusion of Detective Mooney's testimony, however, Mr. Swerling made no reference to Mr. Basham's drug use and its possible effect on the knowing, intelligent, and voluntary

20

nature of his waiver of his *Miranda* rights and his statements to the police. Rather, Mr. Swerling again only referred vaguely to "Mr. Basham's, I think, limited intellectual ability and mental capacity." (Tr. 2/24/04 (p.m.) at 40.) Mr. Swerling's failure to pursue this potentially relevant issue prompted the Court to ask the parties about the significance of Mr. Basham's drug use: "Well, we have a little bit of testimony for the first time about some marijuana use and cocaine use in the hospitalization. What about it[?]" (Tr. 2/24/04 (p.m.) at 40.) Mr. Swerling offered no response to this inquiry.

In ruling that Mr. Basham's statements to Detective Mooney were admissible, the Court acknowledged that Mr. Basham "may have been under the lingering effects of cocaine and marijuana." (Tr. 2/24/04 (p.m.) at 41.) Remarkably, however, Mr. Swerling informed the Court that the defense was "[n]ot necessarily [arguing] that he was using it or that he was under the influence at that time." (*Id.*)

FBI agent Scott Vito testified about his interrogation of Mr. Basham, which began at 1:58 a.m. on November 19, 2002. In his cross-examination of Agent Vito, rather than challenge the necessity for this nighttime interrogation of a mentally and emotionally challenged young man, defense counsel Greg Harris *confirmed* that his client was "alert and coherent" throughout the entire two-hour interview. (Tr. 2/24/04 (p.m.) at 52-53.)

21

**JA 2533**

Other portions of Mr. Harris's cross-examination of Agent Vito are similarly perplexing. For example, although the following colloquy would appear to have been conducted by the Government on direct examination of the FBI agent, it is in fact part of Mr. Harris's cross-examination:

> Q.   At any time during this interview did Mr. Basham ask for a lawyer?
>
> A.   No, sir.
>
> Q.   At any time during this interview did he say he didn't want to answer a question?
>
> A.   No, sir.
>
> Q.   At any time during this interview did he not agree to supplement the earlier interview?
>
> A.   No, sir, he was very cooperative.
>
> Q.   Okay.  You gave him Cokes?
>
> A.   Yes, sir.
>
> Q.   You gave him cigarettes?
>
> A.   We did.
>
> Q.   Did you talk to him about anything other than this case, your investigation?  Personal matters, football games?
>
> A.   Certainly.  Certainly.  I'm sure that we did.
>
> Q.   So, you had a pleasant conversation with Mr. Basham?

22

A.   We did.

Q.   Was he in any way aggressive towards you during this interview?

A.   Not at all.

Q.   Were you aggressive towards him?

A.   Not at all.

(Tr. 2/24/04 (p.m.) at 68.)

Moreover, despite having had access to psychiatric, neuropsychological, and neurological experts for months, defense counsel presented no witnesses to testify about Mr. Basham's deficits and how those deficits reflected on his ability to knowingly, intelligently, and voluntarily waive his constitutional rights. Indeed, defense counsel offered no witnesses whatsoever. Extensive evidence was available to defense counsel, both before the *Jackson v. Denno* hearing and from the testimony elicited by the Government during the hearing, to suggest that Mr. Basham's post-arrest statements were coerced, or at the very least, were not knowingly and intelligently made. Similarly, substantial evidence existed from which counsel could have argued that Mr. Basham's waivers of his *Miranda* rights were not knowingly, voluntary, and intelligent. Defense counsel made absolutely no effort to argue these issues on their client's behalf. Indeed, the totality of their failure would seem to suggest a strategy on the part of Swerling and Harris were it not for the fact that no

23

**JA 2535**

reasonable strategy could justify their inaction.

Defense counsel rendered deficient performance in their representation of Mr. Basham in both their preparation for and their presentation during the *Jackson v. Denno* hearing. Because Mr. Basham's own statements were the centerpiece of the Government's case against him, he was profoundly prejudiced by his attorneys' failure to advocate on his behalf at this critical stage of the proceeding. Had defense counsel reviewed the discovery provided to them by the Government, they would also have been aware of the disturbing facts surrounding law enforcement's interrogations of Mr. Basham. These facts include, but are not limited to, Mr. Basham's lengthy and nighttime interrogations. Upon information and belief, defense counsel were also aware of other factors demonstrating the coercive nature of the interrogations to which Mr. Basham was submitted, including the denial of food and medicine. Defense counsel were also aware that Mr. Basham suffered from an anxiety disorder that was triggered by being enclosed in confined areas, such as an interrogation room.

Despite the considerable evidence supporting a claim of suppression of Mr. Basham's statements to law enforcement, defense counsel entirely failed to make an effort to press that claim on Mr. Basham's behalf. Counsel's performance fell below the minimal standards of practice and unquestionably prejudiced Mr. Basham.

<center>24</center>

<center>**JA 2536**</center>

CLAIM 3

**The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties. In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

A.   **The trial court excluded jurors based on their general opinions on the death penalty rather than their inability to follow the law.**

Mr. Basham's convictions, sentences, and death verdict violate the Fifth, Sixth, and Eighth Amendments because the Court erroneously excluded for cause at least two prospective jurors who were actually qualified to serve, thereby depriving Mr. Basham of his right to an impartial jury. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *see Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

The Court committed prejudicial error by granting the Government's motion to exclude venirepersons Cathy Roberts and Michael Williams for cause. Neither of these potential jurors expressed views regarding the death penalty that justified their exclusion under *Witherspoon*, 391 U.S. 510, or *Wainwright v. Witt*, 469 U.S. 412 (1985). The trial Court also erred when it dismissed venirepersons Rubina Khan and Susan Jackson without allowing the defense an opportunity to rehabilitate the jurors in voir dire.

25

**JA 2537**

In *Witherspoon*, the United States Supreme Court held that the government in a capital case may challenge a juror for cause on the basis of opposition to death only when the juror makes it unmistakably clear that he or she "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial." 391 U.S. at 523 n. 21. The Supreme Court explained in *Witherspoon* that "a sentence of death cannot be carried out if the jury that imposed it or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or conscientious or religious scruples against its infliction." *Id.* at 522.

The Court has never retreated from the central constitutional point it made in *Witherspoon*, that "[a] man who opposes the death penalty, no less than one who favors it can make the discretionary judgment entrusted to him by the [government] and can thus obey the oath he takes as juror." 391 U.S. at 519. Indeed, "those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). A challenge for cause is warranted only when a juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424

26

**JA 2538**

(internal citations omitted).

Accordingly, prospective jurors are not excusable under *Witherspoon* and *Witt* merely because they (1) express general or religious concerns regarding imposition of the death penalty," *Witherspoon*, 391 U.S. at 522; (2) express nervousness or emotion stemming from the "potentially lethal consequences of their decision," *Adams v. Texas*, 448 U.S. 38, 49 (1980); or (3) are otherwise "hesitant in their ability to sentence a defendant to death," *see Morgan v. Illinois*, 504 U.S. 719, 732 (1992). This is because "even a juror who believes that capital punishment should never be inflicted and who is irrevocably committed to its abolition could nonetheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror." *Witherspoon*, 391 U.S. at 515 n. 7.

"[I]t is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." *Witt*, 469 U.S. at 423. The Supreme Court has recognized that prospective jurors who express concerns about the death penalty may "clarif[y] their positions upon further questioning and reveal[] that their concerns about the death penalty [are] weaker than they originally stated." *Gray v. Mississippi*, 481 U.S. 648, 662-63 (1987). Improper exclusion of jurors in violation of *Witt* is harmful *per se* and no prejudice need be shown. *Id.* at 659-60.

Because of the automatic exclusion of any juror who marked that he or she would never impose a sentence of death, several potential jurors were lost before voir dire even began. (Tr. 9/1/04 at 51, 56). "If the [Government] had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty. But when it swept from the jury all who expressed conscientious or religious scruples against capital punishment and all who opposed it in principle, the [Government] crossed the line of neutrality ." *Witherspoon*, 391 U.S. at 520. Here, the Court erred because, "[i]n its quest for a jury capable of imposing the death penalty . . . [it] produced a jury uncommonly willing to condemn a man to die." *Id.* at 520-21.

Prospective juror Cathy Roberts permissibly expressed concerns about the death penalty. Ms. Roberts's questionnaire contained contradictory positions on the death penalty. She wrote that she believed "the death penalty is imposed too seldom," but also circled "I'm strongly opposed to the death penalty and I would have a difficult time voting to impose it." (Tr. 8/30/04 at 108). In explaining these opposing statements, Ms. Roberts stated that she was simply confused or nervous. (Tr. 8/30/04 at 108).

28

**JA 2540**

When the Court asked Ms. Roberts directly if she thought she could put aside her beliefs "and follow the law as the judge announces," she unequivocally stated she could do so. (Tr. 8/30/04 at 109). Although she initially expressed some concern about whether she could impose death in a case where the defendant did not "strike the fatal blow" (Tr. 8/30/04 at 112), she ultimately stated that "[if] selected [she] would follow the law." (Tr. 8/30/04 at 113.) In voir dire from the Government, Ms. Roberts agreed that she could not impose death upon someone if they did not actually take another person's life (Tr. 8/30/04 at 125), and that life without parole "would be the appropriate sentence in every case where somebody didn't actually kill someone." (Tr. 8/30/04 at 128.) However, when given a hypothetical in which the defendant did not inflict the fatal blow, she agreed that she could probably impose death even in that circumstance. (Tr. 8/30/04 at 120.) The Court excused Ms. Roberts "over the defendant's strong objection." (Tr. 8/30/04 at 132.)[6]

The Court's decision that Ms. Roberts was not qualified to serve was

---

[6]The exclusion of Ms. Roberts and other jurors based on the "fatal blow" grounds is especially troubling given that the Government ultimately argued that Mr. Basham in fact did inflict the fatal blow: The Government argued in closing: "What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled. . . . You saw Sheriff Hewitt [sic] stand up there and show." (11/1/04 at 57.) Additionally, the Government unequivocally stated "he [Basham] killed Alice Donovan." (11/1/04 at 62.)

29

erroneous. The Court excused her based on the mistaken belief that she had stated "she would always vote for the death penalty if the defendant didn't strike the fatal blow." (Tr. 8/30/04 at 129.) The record reflects, however, that, when given a hypothetical in which a defendant did not inflict the fatal blow, Ms. Roberts said she could impose death in such a scenario. Although the Court "deliberately told something that wasn't this case" (Tr. 8/30/04 at 132), it was a scenario in which she could impose death. Accordingly, the claim that "she would always vote for death penalty if the defendant didn't strike the fatal blow" (Tr. 8/30/04 at 129) was entirely contradicted by Ms. Roberts' statements, which were unequivocally that she would obey her "civic duty" and follow the law. (Tr. 8/30/04 at 113.)

Potential juror Michael Williams also expressed concerns about the death penalty. He initially voiced hesitation, stating, "I really am not sure about the death penalty part." (Tr. 9/7/04 at 207). He agreed, however, that he could put that opinion aside and "conscientiously follow the law." (Tr. 9/7/04 at 208). He also agreed that, although he was generally opposed to the death penalty, there were situations in which it was appropriate. (Tr. 9/7/04 at 213.) The Government asked Mr. Williams about his religious beliefs, and whether he had a problem with the death penalty personally. (Tr. 9/7/04 at 218.) Mr. Williams responded, "But the judge says you got to go by what the law says." (Tr. 9/7/04 at 218.) Trying to back him into a corner,

the Government asked if imposing a sentence of death would "create[] stress . . . because to do so would violate a religious principle you believe in." (Tr. 9/7/04 at 219.) Mr. Williams agreed, but did not retreat from his original statement he would follow the law. When asked whether, "given your feelings about the death penalty [could you] ever come out of that balancing test and decide that the death penalty is the appropriate sentence," he responded, "I really am not sure." (Tr. 9/7/04 at 220.) Finally, the Government questioned whether that decision would be even more difficult where the defendant did not strike the fatal blow. (Tr. 9/7/04 at 221.) The Court did not allow defense counsel to attempt to rehabilitate Mr. Williams, but continued to ask questions itself. Mr. Williams stated that he was "uncomfortable knowing [he would] be signing [his] name on something for someone to die." (Tr. 9/7/04 at 223.)

The Government argued that Mr. Williams was "clearly not qualified. I don't think he is comfortable." (Tr. 9/7/04 at 224.) Defense counsel responded that Williams "has his personal opinions about [the death penalty]. But he also understands what the law is that your honor gave him." (Tr. 9/7/04 at 226.) The Court brought Mr. Williams back to the courtroom and questioned him further. Mr. Williams candidly admitted that he was "really not sure" whether having to stand up and sign his name to a death verdict would affect his ability to be fair, but said that

31

**JA 2543**

in certain cases the death penalty was appropriate and cited the Susan Smith case as an example, although he would still feel "very, very uncomfortable signing the document." (Tr. 9/7/04 at 230.) At that statement, without further argument or questioning from the parties, the Court excused Mr. Williams for cause. (Tr. 9/7/04 at 230.)

Additional prospective jurors expressed stronger reservations about serving on a death penalty case and did not give the unequivocal statements of Mr. Williams and Ms. Roberts that they could subvert their personal beliefs to the law. Yet rather than allow counsel to inquire whether the jurors could set aside their beliefs and follow the law, the Court erroneously dismissed the jurors from service because of their views on capital punishment.

First, potential juror Rubina Khan stated that she strongly opposed the death penalty, but added, "I guess I could be able to put aside my views." (Tr. 8/31/04 at 271.) She disagreed that she would fall into the category of people who "could never see [themselves] voting for it under any circumstances." (Tr. 8/31/04 at 271.) Like prospective juror Williams, Ms. Khan expressed unease with signing her name to the verdict form. (Tr. 8/31/04 at 276.) She expressed concerns about pressures from the fact that a jury verdict had to be unanimous. (Tr. 8/31/04 at 276.) The Court asked Ms. Khan to step outside. The Government argued that she was not qualified to

32

serve. (Tr. 8/31/04 at 277.) Defense counsel responded that she "answered all the questions that she was willing to keep an open mind and consider the death penalty," and that counsel should be given an opportunity to explore the concerns about the verdict form. (Tr. 8/31/04 at 278.) Although the Court brought Ms. Khan back in, he did not allow counsel to question her. Based on her statement, "I don't think I can vote for capital punishment, I don't think I can," the Court excluded her without giving defense counsel the opportunity to attempt to rehabilitate her. (Tr. 8/31/04 at 280-81.)

The next prospective juror of concern is Susan H. Jackson. Before she was even brought into court, the Government moved to disqualify her based on an answer in her questionnaire. (Tr. 9/3/04 at 67). Ms. Jackson checked on her questionnaire that she was "strongly opposed to the death penalty and would have a difficult time voting for it, regardless of the facts and law in the case." She also wrote, "Taking a life under any circumstances is reprehensible." (Tr. 9/3/04 at 67). Under questioning from the Court, she stated that she did not think she could conscientiously follow the law. (Tr. 9/3/04 at 73.) Defense counsel requested an opportunity to question whether there were some circumstances where she could impose the death penalty. (Tr. 9/3/04 at 73.) Although the Court brought her back and questioned her again, the Court did not allow counsel to ask that question, nor did the Court ask the questions

33

defense counsel requested. Ms. Jackson was disqualified for cause. (Tr. 9/3/04 at 75.)

A juror, although opposed to capital punishment, is fit to serve if he is able and willing to "temporarily set aside his own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986); *see also Witherspoon*, 391 U.S. at 515 n. 7. A juror obviously is not required to abandon his beliefs. Yet the Court excluded venirepersons based on their beliefs, rather than their ability to consider both life and death sentences.

When asked directly whether her beliefs would interfere with her ability to serve, prospective juror Roberts unequivocally stated she could put her beliefs aside and follow the law. It was clearly erroneous to exclude her from service in light of her answers. Prospective juror Williams expressed discomfort with signing the verdict, but also said he could put his opinions aside and "conscientiously follow the law." (Tr. 9/7/04 at 207-08). Although he candidly admitted his discomfort, he never said it would impede his ability to follow the law. Yet the Court seemed to rest its determination upon this discomfort, rather than the response that he could put his beliefs aside and follow the law. "As *Witt* makes clear, however, our inquiry does not end with a mechanical recitation of a single question and answer." *Darden v. Wainwright*, 477 U.S. 168, 176 (1986). It is necessary to "examine the context

34

surrounding [the venireperson's] exclusion." *Id.* Both Roberts and Williams stated that they would follow the law and consider the death penalty despite their personal beliefs or discomfort about the penalty.

The final prospective jurors, Ms. Khan and Ms. Jackson were removed without further questioning to determine if there was any circumstance where they could consider the death penalty. "[I]f prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams*, 448 U.S. at 48 (*quoting Witherspoon*, 391 U.S. at 522 n. 21). The government "may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 522. Considering the context of the exclusion of prospective jurors Roberts, Williams, Khan and Jackson, it is clear that the Court did precisely that, and the exclusions were therefore improper.

The foregoing violations of Mr. Basham's constitutional rights, taken alone or in combination with other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahmson*, 507 U.S. 619, 637-38, n. 9 (1993). However, even assuming the

35

**JA 2547**

harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Mr. Basham's rights had a serious and injurious effect or influence on Mr. Basham's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

**B.    Appellate counsel was ineffective for failing to raise this issue on appeal.**

Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000). To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). Although weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy, exclusion of jurors because of their views against capital punishment, but who could nevertheless follow the law, is not a weak issue. Moreover, the "weeding" principle has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims in light of the unique nature of the death penalty and the possibility of

36

**JA 2548**

preclusion or a change in the law in later courts.

As a result of the Court's removal of otherwise eligible jurors, the jury (including alternates) was composed of thirteen individuals who responded that they "generally favored the death penalty." *See* Supp. juror questionnaires for jurors 51, 93, 143, 171, 302, 314, 325, 328, 352, 466, 562, 575, 584, 593, 621, 677, 776. Appellate counsel rendered ineffective assistance in not raising this claim on direct appeal, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland*, 466 U.S. 668.

## CLAIM 4

**Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's convictions and sentences were rendered in violation of his constitutional rights to due process, to a fair and reliable determination of guilt and penalty, to present a defense, and to the effective assistance of counsel because he was tried, convicted, and sentenced to death when he was mentally incompetent to stand trial.

"The conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). The test for whether a defendant is competent to stand trial "seeks to ascertain whether a criminal defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (*quoting Dusky v. United States*, 362 U.S. 402 (1960)). Where a preponderance of the evidence demonstrates that a defendant lacks the requisite understanding and ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S.348 (1996).

The record in this case is replete with instances of Mr. Basham's inability to communicate or work productively with his attorneys; his suicide attempts; his inability to remain awake during court proceedings after having received heavy, inappropriate, or delayed doses of medication; his inability to focus on the proceedings; and his inability to control his behavior in court. Mr. Basham's severe mental difficulties were the subject of numerous *ex parte* hearings before the Court, many of which were requested by defense counsel out of frustration with their inability to communicate with or control their client. Mr. Basham will demonstrate

in the course of these proceedings that at critical times during his prosecution he was legally incompetent. Specifically, Mr. Basham will demonstrate that, at the time of his trial, he lacked the "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky*, 362 U.S. 402.

The trial and sentencing of Mr. Basham while he was mentally incompetent constitutes a deprivation of due process necessitating the granting of relief by this Court without a further showing of prejudice. *Pate*, 383 U.S. at 386-87. The error deprived Mr. Basham of a fair and reliable determination of his guilt and of the appropriate penalty in this case.

## CLAIM 5

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense. In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Soon after their appointment to the case, Mr. Basham's original attorneys, Cameron Littlejohn and William Monckton, filed a motion pursuant to 18 U.S.C. §

39

**JA 2551**

4241(a) and Rule 12.1(c)(1)(A) of the Federal Rules of Criminal Procedure, requesting that Mr. Basham be evaluated to determine his mental competency. (Dkt. 22.) No action was taken on the motion for determination of competency before Messrs. Littlejohn and Monckton were disqualified by this Court for unrelated reasons on April 9, 2003. (*See* Dkt. 69.) Later that month, the Court appointed attorneys Swerling and Harris to represent Mr. Basham. (Dkt. 71.)

On May 13, 2003, Mr. Basham attempted suicide. (*See* Dkt. 95.) Almost one month later, citing the attempted suicide as cause, Mr. Basham's new attorneys filed a motion to have Mr. Basham transferred to the Columbia Care Center. (*Id.*) Attached to that motion was the affidavit of Donna Schwartz-Watts, M.D., a psychiatrist. Dr. Schwartz-Watts observed in her affidavit that Mr. Basham suffered from "severe mental illness" that had been "exacerbated" by his confinement, and she noted that Mr. Basham had "decompensated greatly" since her earlier evaluations of him. (Dkt. 95, attached Affidavit of Donna M. Schwartz-Watts, M.D.)

On June 17, 2003, the Government filed is own motion pursuant to 18 U.S.C. § 4241, requesting a determination of Mr. Basham's competency. Despite earlier counsel's specific request for a determination of competency, Mr. Basham's new attorneys *opposed* such an evaluation, dismissing any suggestion that Mr. Basham was incompetent within the meaning of the federal statute. (Dkt. 99.) At a hearing

40

**JA 2552**

conducted on June 18, 2003, the Government withdrew its request for a determination of competency based on defense counsel's avowal that they were not presently raising an issue as to Mr. Basham's competency to stand trial.[7]    (Tr. 6/18/03 at 4-5.) Accordingly, the Government agreed to have Mr. Basham transferred to Columbia Care Center.    (*Id.* at 4-7.)    This Court subsequently ordered that Mr. Basham be transferred to that facility.    (Dkt. 110.)

In a motion filed September 25, 2003, defense counsel requested that Mr. Basham's stay at Columbia Care be extended until October 15, 2003.    (Dkt. 146.) Attached to that motion was a letter from Dr. Schwartz-Watts indicating that she had been unable to evaluate Mr. Basham because he had not been receiving his prescribed medications and, as a result, his "mental state [was not] conducive for any interviewing."    (Dkt. 145, attachment (September 24, 2003, letter to Jack Swerling from Donna Schwartz-Watts).)

The record is devoid of any evidence that, between September 2003 and the commencement of Mr. Basham's trial in September 2004, defense counsel took any further steps to confirm Mr. Basham's competency to stand trial.    At an evidentiary

---

[7]Greg Harris informed the Court at that hearing that Dr. Schwartz-Watts had not rendered an opinion as to Mr. Basham's competency, and that she could not do so under the circumstances of his confinement at the time.    (Tr. 6/18/03 at 3.)

**JA 2553**

hearing on this claim, Mr. Basham will demonstrate that his defense attorneys were aware that he was unable to communicate with them about his case in a rational manner. Defense counsel nevertheless took no steps to bring their client's incompetence to the Court's attention.

On September 20, 2004, during the guilt phase of his trial, Mr. Basham had a lengthy altercation with U.S. Marshal's officers while in the courtroom. The Court was witness to this altercation, and the jury was later made aware of the altercation as part of the Government's case at the penalty phase of trial. Upon information and belief, Jack Swerling consulted Dr. Donna Schwartz-Watts that same day and was informed by her that Mr. Basham was incompetent. Nevertheless, defense counsel failed to inform the Court of their concerns about Mr. Basham's competency, and took no steps to delay or terminate Mr. Basham's trial because of his incompetency. At a hearing on this claim, Mr. Basham will demonstrate that, even after the events of September 20, 2004, his attorneys were aware of his ongoing incapacity to assist in his defense, yet took no steps to protect his due process right to a fair trial at which he could be a knowing and active participant.

In guaranteeing a defendant's due process right not to be tried or sentenced while mentally incompetent, "judges must depend to some extent on counsel to bring [competence] issues into focus." *Drope*, 420 U.S. 176-77. Whenever information

42

that is made known to the trial court raises a doubt that a defendant is mentally incompetent to stand trial, the minimal guarantees of due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough, and reliable mental health evaluation. *See Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990).

In this case, trial counsel's actions, or more accurately, their inactions, with regard to Mr. Basham's incompetency at trial fell below any minimal standard of competent representation. Moreover, because Mr. Basham was tried while he was legally incompetent, he was unquestionably prejudiced by his attorneys' deficient performance.

## CLAIM 6

**The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Throughout both the guilt and penalty phases of Mr. Basham's trial, the Court was witness to, or informed of, numerous instances giving rise to reasonable cause to believe that Mr. Basham was not sufficiently mentally competent to assist properly

43

in his own defense.  These instances include, but are not limited to, (1) numerous *ex parte* conferences with defense counsel (both with and without Mr. Basham's presence), concerning counsel's difficulties in communicating with and controlling their client because of his mental impairments; and (2) Mr. Basham's altercation with U.S. Marshal officers in the presence of the Court on September 20, 2004.

Pursuant to 18 U.S.C. § 4241(a), a court "shall order" a competency hearing on its motion "if there is reasonable cause to believe that the defendant may be presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable . . . to assist properly in his defense." *See United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995) ("The district court must *sua sponte* order a competency hearing if reasonable cause is demonstrated.").  Mr. Basham submits that, in light of the considerable evidence presented to the Court of his inability to assist properly in his own defense, the Court denied him due process of law when it failed to order *sua sponte* a hearing to determine his competency.

<div align="center">

**CLAIM 7**

</div>

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.**

<div align="center">

44

</div>

<div align="right">

**JA 2556**

</div>

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's appellate attorneys negligently failed to raise the issue of his incompetency, as well as this Court's failure to fulfill its *sua sponte* obligation under 18 U.S.C. § 4241(a), in his direct appeal. Because the record in this case plainly reflects his incompetency, Mr. Basham was prejudiced by his appellate attorneys' failure to raise this meritorious claim on direct appeal.

### CLAIM 8

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Trial counsel retained Donald Morgan, M.D., a psychiatrist, to treat Mr. Basham while he was incarcerated in South Carolina. (Dkt. 181 at 2.) Upon information and belief, between June 2003 and December 2004, Dr. Morgan prescribed a series of antipsychotic, narcotic, and other medications for Mr. Basham that included, but were not limited to, Concerta (a psychostimulant for ADHD),

45

Seroquel (an antipsychotic), Neurontin (a bipolar disorder/seizure disorder medication), and Zoloft and Remeron (both antidepressants). These medications, either alone or in combination, rendered Mr. Basham, at different times and in varying degrees, incoherent, agitated, suicidal, violent, and heavily sedated. Throughout Mr. Basham's trial, these medications caused him to vacillate between uncontrollable agitation and drowsiness so severe that he could not remain awake, even when he was in the presence of the jury.

Upon information and belief, Dr. Morgan, who was hired by and under the control of defense counsel, was the sole physician permitted to prescribe medication for Mr. Basham during this time period. Mr. Basham alleges that his attorneys rendered ineffective assistance of counsel in violation of the Constitution and laws of the United States when, during the eighteen-month period between June 2003 and December 2004, they permitted Dr. Morgan to continue to prescribe a series of contradictory and contraindicated medications that rendered Mr. Basham incompetent and often incoherent. Although defense counsel were not medical professionals, because Dr. Morgan acted at their direction, they assumed responsibility for Dr. Morgan's treatment plan for Mr. Basham. "The failure of a defense attorney to . . . supervise . . . his expert can amount to the ineffective assistance of counsel." *Couch v. Booker*, 650 F. Supp.2d 683, 695 (E.D. Mich. 2009).

46

**JA 2558**

CLAIM 9

**Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At some point prior to opening statements, defense counsel Jack Swerling decided that he would concede all allegations against his client, save one. Specifically, Mr. Swerling decided that, at the outset of trial, he would inform the jury that all of the Government's charges against Mr. Basham were true except for the allegation that he committed the carjacking of Alice Donovan with the "intent to cause death or serious bodily harm." (*See, e.g.*, Tr. 9/13/04 at 65-69.)

In a move that could have served no other purpose but as an attempt to immunize himself from a later claim of ineffective assistance of counsel, Mr. Swerling requested an *ex parte* hearing be held immediately before opening statements at which he would put his (incompetent) client's verbal consent to his trial strategy on the record. Mr. Swerling explained:

**JA 2559**

I want the record to reflect following this procedure that there is no question later about any strategy that we follow and that I have discussed this with Mr. Basham. Mr. Harris and I discussed it with him Friday. Actually, discussed it with him on several occasions particularly again on Friday and again this morning. Mr. Harris was present on Friday, was present for a few moments this morning as well as Dr. Watts who was also present this morning.

Judge, essentially what I am going to do with Mr. Basham's consent is, as far as the allegations of the indictment, we are going to tell the jury that most of the allegations in the indictment are not in controversy. Most of the charges in the indictment are not in controversy. What will be in controversy for the jury to decide will be with respect to Count 1, and I believe it is the conspiracy count as it related to carjacking, as well. That would be Count 4, part of the conspiracy count there, conspiracy to carjack, there are other crimes, as well.

What I am prepared to tell the jury that is under controversy under the carjacking statute is whether there was an intent on the part of Mr. Basham, at the time the car was taken, to either kill Ms. Donovan or cause her serious bodily harm. [. . . .] So, basically, we are going to be conceding many of the issues in the opening statement that are in the indictment, and I have explained that to him. I have explained his right to have all of it contested. We are prepared to do all of it if that is what he wants. But, as a matter of strategy, we think this is the best approach.

(Tr. 9/13/04 (Ex Parte Hrg.) at 2-3.)

Fortunately for Mr. Basham, Mr. Swerling's apparent attempt to protect himself

from future questioning of his "strategy" was of no legal significance. As a threshold

matter, as is argued elsewhere in this Motion, Mr. Basham was not competent to stand

trial, much less competent to weigh the relative merits of Mr. Swerling's proposed

48

**JA 2560**

"strategy." More importantly, however, as a legal matter, a criminal defendant cannot be forced to waive a claim of ineffective assistance of counsel. *See United States v. Craig*, 985 F.2d 175 (4th Cir. 1993).[8]  Thus, Mr. Swerling's attempts to protect himself were a legal nullity.[9]

Defense counsel for Mr. Basham rendered ineffective assistance of counsel within the meaning of federal constitutional and statutory law when they conceded their client's guilt to virtually all of the charges against him, including the capital offense of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a).  No reasonable strategy justified the concessions made by counsel.  For example, if counsel believed that they were engendering goodwill with the jurors by conceding the client's guilt to a capital offense at the outset of the guilt phase, they were

---

[8]Mr. Basham also notes that Mr. Swerling's own statements at the *ex parte* hearing on September 13, 2004, reveal another act of ineffective assistance of counsel on his part.  Specifically, Mr. Swerling stated at the hearing that he discussed privileged trial strategy with Mr. Basham in the presence of a trial witness, Dr. Schwartz-Watts.  (Tr. 9/13/04 (Ex Parte Hrg.) at 2.)  By doing so, Mr. Swerling rendered deficient performance by waiving the attorney-client privilege.

[9]In any event, even if the defense attorneys' attempt to obtain Mr. Basham's "consent" to their trial strategy had any legal significance, it was too late.  Counsel had already revealed during voir dire that, in their opinion, Mr. Basham had no defense to most of the charges against him, including the capital offenses.  For example, Greg Harris stated in voir dire, "You are most likely going to get to the second part of the trial [the penalty phase], I will tell you that right now."  (Tr. 9/08/04 at 89.)

mistaken. Perhaps if, as in Mr. Basham's co-defendant's case, counsel had advised their client to plead guilty, the jury would at least have been spared an approximately three-week trial, involving the testimony of more than 90 witnesses. As it was, defense counsel told the jurors that their client was guilty, but then necessarily implied that Mr. Basham was nevertheless going to require them to sit through weeks of a trial on what was actually a *fait accompli*. There is no reasonable possibility that this "strategy" worked to Mr. Basham's advantage.

Moreover, by conceding their client's guilt to almost all of the charges against him, including the offense of kidnapping resulting in death, defense counsel also unintentionally conceded to the jury, at the very least, that Mr. Basham was guilty of intentionally and specifically engaging in an act of violence, knowing that the act created a grave risk of death to a person, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. *See* 18 U.S.C. § 3591(a)(2)(D). In other words, by informing the jurors at the outset of the guilt phase of trial that Mr. Basham was guilty of kidnapping resulting in death, defense counsel also conceded that their client was death-eligible. Defense counsel's deficient performance severely prejudiced Mr. Basham, and requires that this Court vacate his convictions and sentences.

**JA 2562**

CLAIM 10

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers. In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

When court resumed after a lunch break on September 20, 2004, on the fifth day of testimony in the guilt phase of his trial, the Court informed Mr. Basham that, contrary to its earlier decision, it would not permit him to use "dip" in the courtroom "to either keep him awake or to calm his nerves." (Tr. 9/20/04 at 148.) In response, Mr. Basham immediately informed the Court, "I would like to go back downstairs, if I may. Go back. I don't feel good." (Tr. 9/20/04 at 148.) The Court informed Mr. Basham that is was "not possible" for him to go back to the holding cell because he "need[ed] to be here to help your lawyers defend this case."[10]

The record reflects that, while the Court took up an administrative matter with

---

[10]In light of the fact that Mr. Basham was both legally incompetent to assist his attorneys, and that his attorneys had already conceded his guilt to almost every charge against him, the Court's assertion is subject to challenge.

51

**JA 2563**

the prosecution, Mr. Basham must have been advising his attorney of his need to leave the courtroom, because Mr. Swerling then stated, "Judge, he is not going to be here. It will be a problem. It is against my judgment, my wishes." (Tr. 9/20/04 at 149.) In response, the Court informed Mr. Swerling, "I will not let him leave here. He will stay right here." (*Id.*) Mr. Basham continued to plead with the Court, stating that all that he was asking was to be able to go downstairs so he could lay down. (Tr. 9/20/04 at 149-50.) As Mr. Basham spoke to the Court, several U.S. Marshal officers grabbed Mr. Basham.[11] The ensuing struggle, which was videotaped and later shown to the jury, lasted for several minutes.

Both the Court and defense counsel violated Mr. Basham's constitutional and statutory rights when they refused to permit Mr. Basham to leave the courtroom. Federal criminal rule 43(c)(1)(A) contemplates that a defendant may voluntarily absent himself from his trial, "regardless of whether the court informed the defendant of an obligation to remain during trial." Moreover, defense counsel rendered deficient performance when they refused to accede to their client's wish to absent himself from the courtroom. Counsel were well aware of Mr. Basham's emotional,

---

[11]A videotape of the encounter reveals that at no time did Mr. Basham attempt to leave the courtroom on his own accord. Rather, throughout the incident, he stood still, respectfully addressing the Court. The motives of the U.S. Marshal officers in grabbing Mr. Basham is unclear, given that the Court had instructed the Mr. Basham would be remaining in the courtroom.

intellectual, and psychological deficits, which had already been the subject of several *ex parte* hearings during the course of the case. In addition, upon information and belief, defense counsel were not communicating with the client during courtroom proceedings (despite Mr. Basham's efforts to do so), so counsel could not reasonably argue that they needed Mr. Basham by their side to defend his case. And, finally, as alleged elsewhere in this Motion, Mr. Basham was not legally competent to assist his attorneys anyway. No strategic or practical purpose justified counsel's refusal to argue on their client's behalf when he expressed the need to absent himself from the courtroom.

The prejudice that resulted to Mr. Basham from this episode is unquestionable. As a result of the Court's refusal to permit Mr. Basham to leave, and his attorneys' failure to advocate on his behalf, the jury eventually was shown a lengthy videotape portraying Mr. Basham, at least in the minds of U.S. Marshal officers, as a violent criminal. Mr. Basham is entitled to relief from his convictions and sentences because of this violation of his constitutional and federal statutory rights.

## CLAIM 11

**The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by relying on Sheriff Hewett's false testimony in its closing argument.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

On April 22, 2003, the Government presented the testimony of FBI Agent Jeffrey Long to the Grand Jury in its attempt to obtain a superceding indictment against Mr. Basham. (Tr. 4/22/03 at 19-106.) In his testimony before the Grand Jury, Agent Long testified that, during the search of the Bee Tree Farms area on November 28, 2002, Mr. Basham indicated, among other things, that Chadrick Fulks strangled Alice Donovan by the use of a purse strap. (Tr. 4/22/03 at 71-72.) Agent Long's testimony before the Grand Jury was consistent with the report he prepared immediately after the events of November 28, 2002. In that report, Agent Long wrote, "After FULKS raped her, FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan." (Exh. 3 (FBI 302 report prepared by Jeffrey Long, transcribed on December 4, 2002).)

54

**JA 2566**

At Mr. Basham's trial, the Government presented the testimony of both Agent Long and Sheriff Hewett. On cross-examination, Sheriff Hewett testified for the first time, and contrary to all other evidence in the case, that Mr. Basham had demonstrated for him how he (Basham), rather than Fulks, had used the purse strap to strangle Ms. Donovan. (Tr. 9/27/04 at 53-54.) Specifically, Sheriff Hewett gave the following responses to defense attorney Jack Swerling's questions on cross-examination:

> Q.   There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A.   No, sir.  He did not tell me he used the strap.  He demonstrated, though.
>
> Q.   He demonstrated?
>
> A.   Yes, sir.
>
> Q.   Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A.   That is true because he didn't say.  He showed.

(Tr. 9/27/04 at 53-54.)

Upon information and belief, Mr. Basham submits that, in light of the reports previously prepared by both the FBI and the Brunswick County Sheriff's Office, the Government knew that Sheriff Hewett's testimony during cross-examination,

55

**JA 2567**

indicating that Mr. Basham had been the actual killer of Ms. Donovan, was false. By failing to correct this false testimony, the Government violated its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). Standing alone, this misconduct on the part of the Government entitles Mr. Basham to a new trial.

At Mr. Fulks's earlier trial, at a colloquy outside the presence of the jury, the Government stated, "Remember Sheriff Hewitt [sic] demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled." [Fulks Tr. 6/22/04 at 255]. This statement by the prosecutor removes any doubt that the Government knew that Sheriff's Hewett's testimony at Mr. Basham's trial was false.

The Government's misconduct regarding Sheriff Hewett did not stop with its passive failure to correct his false testimony. Instead, as discussed in Claim 1, the prosecution repeatedly used Hewett's false testimony to its advantage in its closing arguments at both the guilt and penalty phases of Mr. Basham's trial. (Tr. 9/29/04 at 81-82; Tr. 11/1/04 at 57, 62.)

Upon information and belief, Mr. Basham alleges that the Government obtained his conviction through the use of false testimony. Sheriff Hewett's false statements were directly material to issues of both guilt and punishment in this case, a fact that is demonstrated by the Government's use of those statements in its closing

56

arguments at both the guilt and penalty phases.  The due process requirements enunciated in *Napue* and *Giglio* mandate that Mr. Basham's convictions and sentences be vacated and that he be afforded a new trial.

## CLAIM 12

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's appellate attorneys negligently failed to raise the issue of the Government's misconduct under *Napue*, 360 U.S. 264 (1959), and *Giglio*, 405 U.S. 150, in his direct appeal.  Mr. Basham was prejudiced by his appellate attorneys' failure to raise this meritorious claim on direct appeal.

## CLAIM 13

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

**JA 2569**

As discussed in Claim 2, considerable evidence existed that Mr. Basham's waiver of his *Miranda* rights and his statements to law enforcement officers were neither knowing, intelligent, or voluntary. In addition to extensive evidence documenting Mr. Basham's medical, intellectual, emotional, and psychological disabilities, defense counsel were provided Government discovery and heard the testimony of law enforcement officers who interrogated Mr. Basham. That discovery and testimony revealed, among other things, that Mr. Basham was interrogated in the middle of the night, while under the possible effects of cocaine and marijuana. Defense counsel were also aware that Mr. Basham suffered from an anxiety disorder that was triggered by being enclosed in confined areas, such as interrogation rooms.

Defense counsel rendered deficient performance in failing to argue to the jury the involuntariness of Mr. Basham's statements to law enforcement, and Mr. Basham was prejudiced by this failure.

### CLAIM 14

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

**JA 2570**

Upon information and belief, in 2002, defense counsel Jack Swerling and members of his family were victims of a violent and harrowing home invasion. Undersigned counsel recognize that Mr. Swerling's status as a victim of a violent crime does not, standing alone, reflect on his ability to serve effectively as a criminal defense attorney. Nor do counsel wish to add to the trauma Mr. Swerling and his family suffered as a result of the crime against them. Facts discovered by counsel during their investigation of this case, however, have given rise to a good faith belief that Mr. Swerling had a personal conflict of interest during his representation of Mr. Basham that prevented him from rendering effective assistance of counsel. These facts include: (1) the temporal overlap between Mr. Swerling's representation of Mr. Basham and his testimony as a victim in the trial of Jimmy Causey, who was not only convicted of kidnapping Mr. Swerling and his family, but who was also a former client of Mr. Swerling; (2) similarities between the charges against Mr. Basham and Mr. Causey; and (3) evidence that Mr. Swerling's behavior and statements to the defendant and defense counsel during the Causey trial reflected upon his ability to act as a zealous advocate for Mr. Basham.

In light of the evidence discovered by Mr. Basham, he alleges that Mr. Swerling's personal conflict of interested prevented him from rendering constitutionally sufficient performance on Mr. Basham's behalf, and that Mr. Basham

59

was prejudiced thereby.

## CLAIM 15

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At a pretrial conference on August 4, 2004, the Government informed both the Court and defense counsel that it intended "to offer evidence of the Samantha Burns' [sic] murder during the guilt of phase of this case." (Tr. 8/4/04 at 37.) Citing *United States v. Chin*, 83 F.3d 83 (4th Cir. 1996), the Government maintained that evidence of the crimes against Samantha Burns was "intrinsic" to the Donovan case and therefore was not subject to exclusion on Rule 404(b) of the Federal Rules of Evidence. The following exchange then occurred:

60

**JA 2572**

Mr. Swerling:    [The prosecutor] told us about that this morning. We would like an opportunity to think about that. I understand what their position is. We certainly can let them know and let the Court know whether we object under 404. Take the position we don't think it is.

The Court:    If you object, that is fine. But I need some authority from both sides. Just the fact that it hurts my client or it helps the Government's case is not persuasive. I need some authority on what the Rules provide at a guilt phase where the Rules of Evidence do apply. In other words, I guess the big question is, is it intrinsic to the crime charged here?

The Prosecutor:    I think our obligation is to put them on notice that we intend to offer. If they want to file a motion in limine to exclude it, they can do it. We have to respond in writing.

(Tr. 8/4/04 at 38.)

Defense counsel never filed a motion in limine. At a subsequent pre-trial hearing three weeks later, Greg Harris appeared to concede that the facts of the Samantha Burns crimes "were all intrinsic to this case." (Tr. 8/25/04 at 78.) Later in the same hearing, however, Jack Swerling returned to the issue, although Swerling did not take a firm position on the matter: "[T]he government's position is going to be that's intrinsic in the guilt phase, and therefore is admissible, we understand that we need to probably cover that, but I don't want the court to think the record is reflecting we are waiving an objection." (Tr. 8/25/04 at 114.) Swerling reiterated,

61

**JA 2573**

"I just didn't want Your Honor to think that – or the government to think that we were not objecting to the Samantha Burns' evidence coming in during the guilt phase." (*Id.* at 115.)  The Court assured defense counsel that they had not waived their right to object to the evidence.  (*Id.*)

Early in the guilt phase of Mr. Basham's trial, the Government began to present evidence of the crimes against Samantha Burns.  Defense counsel failed to object to the admission of this evidence, and the Government proceeded to call several witnesses, including several members of Samantha Burns's family to testify not only about her disappearance, but about her characteristics and the impact of her disappearance on her family and friends.  Defense counsel offered no objection during any of this extended testimony.[12]  At the adjournment of proceedings on September 15, 2004, the Court finally raised the issue for the defense, offering to give the jury a cautionary instruction concerning the evidence:

| The Court: | I had one question before we adjourn. The Defendant has – the jury has heard about the Samantha Burns's [sic] incident.  Does the Defendant want any cautionary instruction, any 404(b)-type instruction, opportunity, common scheme and plan?  You don't have to tell me now, you can think about it overnight.  I need to offer that |

---

[12]Defense counsel also offered no objection to the admission of detailed testimony concerning the kidnapping of James Hawkins, which occurred shortly after Mr. Basham and Fulks escaped from jail.

instruction, if you wanted it. The Government will say it is all intrinsic to the crime. There is no cautionary instruction needed, right?

The Prosecutor:   That's right.

The Court:   Expound on that a little bit. Intrinsic to what crime now. There are eight different counts.

The Prosecutor:   Intrinsic to all of the crimes. Certainly intrinsic to the conspiracy count, which spans the time from the time of the escape to the time of Mr. Basham and Mr. Fulks's arrest. We also think it is because it is intrinsic to conspiracy. The other alleged crimes occurred within the course of the conspiracy. We think it is intrinsic to all of that. Certainly puts all of the evidence in context.

The Court:   Wait a minute now. Let's think about it. The conspiracy to carjacking and kidnapping Ms. Donovan, you are saying it occurred – that they formulated the plan to do that up in West Virginia?

The Prosecutor:   Multi-objective conspiracy. One of its objects to steal firearms, have in possession firearms by felons, to transport a vehicle across state lines, carjack and kidnap Ms. Donovan. We think at the very least the conspiracy to have firearms began the night Mr. Fulks approached Ms. Severance and got acquisition of the firearms.

The Court:   I will find out what the defendants want tomorrow. Most of the time the defendant doesn't want a cautionary instruction, it sometimes hones it in for the jury, makes it worse. We will see what the defendant wants tomorrow and then decide.

63

**JA 2575**

(Tr. 9/15/04 at 291-93.)

Defense counsel did not engage in this colloquy, but rather stood by mute. Two days later, however, Mr. Swerling informed the Court, "We are not looking for a limiting instruction until possibly your final charge.  We will discuss it at that time. Not now."  (Tr. 9/17/04 at 10.)

By this time, however, damage that could not be undone by a limiting instruction had already occurred.  Without any objection from defense counsel, the Government had turned the trial of Alice Donovan's murder into the trial of the murders of both Ms. Donovan and Samantha Burns.  The Government not only told the jury that Samantha Burns's disappearance had occurred and that Mr. Basham had been involved, it provided powerful and sympathetic witnesses who testified at length about the tragic disappearance of a nineteen-year-old college student and the effect that disappearance had on their lives.

No rational trial strategy could justify defense counsel's failure to attempt to preclude this testimony in its entirety or, failing that, to limit the extent and scope of the testimony offered about Samantha Burns's disappearance.  Instead, defense counsel simply stood idly by while the Government transformed the case from a single-homicide to a double-homicide prosecution.

64

**JA 2576**

Defense counsel rendered deficient performance in several ways with regard to the Samantha Burns evidence. First, they made no effort to challenge the Government's dubious claim that every crime committed between Mr. Basham's escape from jail and his arrest more than two weeks later was "intrinsic" to the charges for which he was on trial. The Government relied on the Fourth Circuit's ruling in *United States v. Chin*, 83 F.3d 83, but its broad reliance on this case was questionable. *Chin* does not stand for the broad rule that the Government suggested, but because defense counsel made no effort whatsoever to challenge the Government's interpretation of *Chin*, the prosecution was able to use that case as a gateway to admit extensive amounts of damaging—and arguably inadmissible—evidence against Mr. Basham.

Defense counsel further rendered deficient performance in failing to request that the Court determine whether, even if the evidence of the Samantha Burns kidnapping were admissible as evidence "intrinsic" to the Alice Donovan kidnapping, its unfairly prejudicial effect on Mr. Basham's case rendered the evidence nevertheless subject to preclusion under Rule 403 of the Federal Rules of Evidence. Given the particularly damaging effect of the substantial evidence about Mr. Basham's role in the disappearance of Samantha Burn on his ability to defend the charges against him related to Alice Donovan's disappearance, it is not improbable

**JA 2577**

that the Court would have determined that the evidence of Ms. Burns's disappearance should be precluded or truncated.

Even if the Court had ruled that evidence of Samantha Burns's disappearance was admissible (either as intrinsic evidence or under Rule 404(b)) at Mr. Basham's trial in the Donovan case, defense counsel nevertheless could have made sustainable objections to the extent to which the Government elicited testimony about Ms. Burns's disappearance. It would be one thing to inform the jury of Ms. Burns's kidnapping; it was quite another thing to treat the Donovan trial as an opportunity to try the case of the disappearance of Samantha Burns. Yet, defense counsel made no effort whatsoever to limit the Government in its presentation of this evidence. No reasonable strategy could possibly have justified this inaction on the part of defense counsel. Their performance in this regard was plainly deficient, and the prejudice to Mr. Basham as a result of the admission of the extensive evidence concerning the Samantha Burns kidnapping is unquestionable. Mr. Basham is entitled to relief on this claim.

Finally, Mr. Basham was denied the effective assistance of appellate counsel guaranteed him by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when his appellate counsel failed to raise on appeal the issue of the admission of the extensive evidence concerning Samantha Burns's disappearance. Not only did

JA 2578

counsel fail to request that the Fourth Circuit conduct a plain error review of the admission of this evidence, they in fact conceded that "the Burns kidnapping was properly admitted as similar act evidence." (App. Dkt. 181 at 116.) Appellate counsel rendered deficient performance in this regard and Mr. Basham was prejudiced as a result.

<div align="center">

**CLAIM 16**

</div>

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Trial counsel filed a motion placing the Government on notice that they intended to introduce "relevant factual assertions from the government's closing argument" in the Fulks case pursuant to Federal Rule of Evidence 801(d)(2)(D). (Dkt. No. 724 at 1.) Of particular importance was the statement that "he [Fulks) is the leader . . . . Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." (Dkt. No. 724 at 9.) In response, the Government argued that the Court "should consider the admissibility of the

<div align="center">

67

</div>

<div align="right">

**JA 2579**

</div>

government's prior closing argument only after the government has presented its case and Basham has identified which government assertions, if any, are allegedly inconsistent." (Dkt. No. 745 at 3.)  The Court agreed, stating, "I think the thing to do is, just once the Government's evidence is in, take a time out, see if the defense attorneys can show me in some way that the prosecutors have been inconsistent or taken contrary position in this case from the first case.  So that is how I would like to handle that one."  (Tr. 9/10/04 at 11.)  Mr. Swerling responded, "Judge, that works for us."  (*Id.*)  Despite being given the permission by the Court to do so, however, counsel never renewed the argument at any point during Mr. Basham's trial.  There is no indication that Mr. Basham's counsel decided to abandon the motion to admit the statements for any strategic reason.

On direct appeal, Mr. Basham argued that the District Court abused its discretion by preventing Mr. Basham from offering the Government's statement in Fulks's trial that Fulks was the leader of the crime spree and Mr. Basham merely his puppet.  (App. Dkt. 181 at 77.)  Counsel argued that the evidence was "obviously admissible under the FDPA's permissive standard" pursuant to 18 U.S.C. § 3593(c).  (App. Dkt. 193 at 54.)  The Government responded that, because Mr. Basham's trial counsel never renewed the motion despite the Court's statement that it would "take a time out" after the completion of the Government's case to consider the issue, Mr.

**JA 2580**

Basham's attorneys failed to preserve the claim for appellate review. (App. Dkt. 180 at 114.) The Fourth Circuit agreed, holding that because defense counsel "never moved for admission of the statements," and thus failed to request that the Court rule on the admissibility of the evidence, the argument was waived, and not even plain error review was available to Mr. Basham on appeal. *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009).

Had trial counsel re-urged the issue of admission of the Government statements during the Fulks closing argument, the result undoubtedly would have been different. First, as a result of the Government's arguments that "he [Basham] killed Alice Donovan," the Court may have agreed with defense counsel and allowed the Government's statements to come before the jury. (Tr. 11/1/04 at 62.) For example, hearing that even the prosecution characterized Mr. Basham as a "puppet" would likely have caused jurors to give more credence to the argument that Mr. Basham played a minor role in the crimes. Absent this characterization, not a single juror found the Minor Participant statutory mitigator. (Dkt. 805 at 6). Under the circumstances discussed above, there is a reasonable likelihood that, absent trial counsel's error, the result would have been different. *See Strickland*, 466 U.S. at 694.

Even if the Court had ruled against Mr. Basham, the issue would have been preserved for appellate review. Trial counsel's failure to re-urge the motion meant

69

**JA 2581**

that even plain error review was unavailable.  *Basham*, 561 F.3d at 335.  Thus, it is unambiguous that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "*Strickland* is not always fastened to the forum in which counsel performs deficiently; even when it is *trial* counsel who represents a client ineffectively in the *trial court*, the relevant focus in assessing prejudice may be the client's appeal."  *Davis v. Secretary for Department of Corrections*, 341 F.3d 1310, 1315 (11th Cir. 2003) (finding ineffective assistance of counsel where trial counsel raised, but failed to re-urge the issue at the close of voir dire as required by Florida law, and thus failed to preserve the issue for appeal).

<div align="center">

### CLAIM 17

</div>

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

At trial, Mr. Basham's former teacher's aide, Clifford Jay, testified on direct examination that, on Christmas Eve, 2002, Mr. Basham called him from jail after

<div align="center">

70

</div>

<div align="right">

**JA 2582**

</div>

being arrested for Alice Donovan's murder.  (Tr. 9/27/04 at 224.)  According to Mr. Jay, Mr. Basham told him that he was "in a lot of trouble."  (Tr. 9/27/04 at 228.)  Mr. Jay asked, "Did you do – I just want to know if you did what they said you did?," to which Mr. Basham allegedly replied,  "Yes, sir.  We killed them."  (Tr. 9/27/04 at 228.)  Mr. Jay testified that he "specifically remember[ed) [Basham] saying 'them' because it struck [him] by complete and utter surprise," as he was only aware of the Alice Donovan case.  (Tr. 9/27/04 at 228-29.)  Mr. Jay subsequently reported the conversation to someone at the sheriff's department in  Madisonville, Kentucky.  (Tr. 9/27/04 at 229.)  Although Mr. Jay claimed that he and the officer with whom he spoke had been "good friends throughout the years" and that he had "known him [his] whole life," Jay could not remember the officer's name.  (Tr. 9/27/04 at 235.)

On cross-examination, Mr. Swerling questioned whether Mr. Basham in fact told Mr. Jay, "We killed *her*."  (Tr. 9/27/04 at 238 (emphasis added).)  Mr. Jay adamantly denied that this was the case.  Mr. Swerling refreshed Mr. Jay's memory that the person he spoke with from the sheriff's department was David Morris.  Mr. Swerling also questioned whether Mr. Jay had spoken with a Detective Addison from Myrtle Beach.  Mr. Jay affirmed that he had spoken with a Myrtle Beach officer, but could not recall his name.  (Tr. 9/27/04 at 239.)  Although Mr. Jay agreed that he asked Mr. Basham questions about Alice Donovan, and not Samantha Burns, he was

71

**JA 2583**

adamant that Mr. Basham had said, "We killed *them*."   (Tr. 9/27/04 at 239-40 (emphasis added).)

The next day, during oral argument concerning the Rule 20 motion, the Government relied on Mr. Jay's testimony to challenge the motion.  The Court asked defense counsel, "What about the statement he made to Clifford Jay, 'we killed them'?"   Defense counsel Greg Harris conceded that the testimony was "problematic," but countered that Mr. Swerling probed that statement.  (Tr. 9/28/04 at 6.)  The Court responded that the testimony was "essentially unchallenged," and that there was no evidence to support the cross-examination question about whether Mr. Basham had in fact said "her" instead of "them."  (Tr. 9/28/04 at 7.)  The Court observed that he "wondered at the time if we were going to hear from those police officers," and he questioned whether there was "a good-faith basis for asking a question like that."  (Tr. 9/28/04 at 8.)

Mr. Swerling argued that he did have a good faith basis for the question, indicating that the defense team had checked with both of the officers and confirmed that Mr. Jay never told them about Mr. Basham's supposed reference to "them" in his statement to Jay.  Mr. Swerling stated, however, that the defense had "opted not to present it at this stage of the trial," but left open the possibility that it might present testimony from the officers at the penalty phase.  (Tr. 9/29/04 at 9.)  Mr. Swerling

72

**JA 2584**

informed the Court that, when he and Greg Harris interviewed Mr. Jay, Jay had

conveyed that Mr. Basham had said, "We killed her." (Tr. 9/29/04 at 9-10.) The

Court responded that, nevertheless, Mr. Jay did not retreat from his testimony while

on the stand, and it denied the Rule 20 motion. (Tr. 9/28/04 at 10.) Despite asserting

that he "wanted to set it up in case we wanted to try to get into it later," defense

counsel never called David Morris or Detective Addison to impeach Clifford Jay's

damaging testimony.

The failure to impeach a key government witness with prior inconsistent

statements constituted ineffective assistance of counsel. The effect of this failure was

devastating to Mr. Basham's defense, and the Government seized upon this failing.

In guilt phase closing argument, the Government revisited Jay's testimony with the

jury. The prosecutor argued,

> I wanted to finish with that because how would you go back in your jury
> room after listing to Sheriff Hewitt (sic) . . . [and] Clifford Jay when
> Brandon Basham told you jurors through Clifford Jay, we killed them
> and find him not guilty of carjacking, resulting in death? And find him
> not guilty of kidnapping, resulting in death? I have been up here for two
> hours, and the government submits *those two witnesses and that limited
> testimony, alone, seals the deal*. "We killed them."

(Tr. 9/29/04 at 81-82 (emphasis added).) Despite the Government's argument that

Clifford Jay's comment was one of the two most damaging statements against Mr.

Basham, Mr. Swerling did not address or attempt to challenge the Jay statement in his

73

**JA 2585**

closing argument.

In penalty phase closing argument, the Government again emphasized the importance of the unchallenged testimony, arguing, "'We killed them.' The words of Brandon Basham. The defendant intentionally killed the victim. 'We killed them.' 'We tied the woman to a tree in North Carolina.' That is what he tells Mr. Jay." (Tr. 11/1/04 at 59.) In his penalty phase closing argument, Mr. Swerling once again did not discuss or attempt to discredit the Jay testimony. And in its rebuttal closing argument, the Government seized upon this failure: "And as far as who the actual killer is . . . . [w]hat didn't Mr. Swerling talk to you about? . . . . He didn't mention anything about Brandon Basham reaching out to Mr. C.J., to Clifford Jay on Christmas Eve, December 2003 [sic], saying, 'We killed them.'" (Tr. 11/1/04 at 170.) The Government continued, "'We killed them.' What more do you need as far as his involvement. His own words . . . ." (Tr. 11/1/04 at 171.)

As the Government recognized, Clifford Jay's testimony was devastating to Mr. Basham's case. Had it not been, the Government would not have argued that it, along with the Hewett testimony, was enough to convict Mr. Basham. Yet, defense counsel, despite having the ability to rebut this testimony with the testimony of Officer Morris and Detective Addison, failed to do so. Given how important Mr. Jay's testimony was to the Government's case against Mr. Basham, there was simply

74

no strategic or objectively reasonable basis to fail to call the rebuttal witnesses, or in any way challenge Jay's statement. Even if defense counsel had not realized how damaging the testimony would be in the guilt phase, after hearing Mr. Jay testify, and hearing its central role in the Government's guilt phase closing argument, the failure to call the officers during penalty phase, as Mr. Swerling had discussed doing at hearing on the September 28, 2004, was inexcusable and fell below accepted standards of performance of counsel.

The record plainly shows prejudice. The verdict form indicates that not a single juror found the Minor Participation mitigating factor. (Dkt. 805 at 6.) Defense counsel's failure to call witnesses to rebut Clifford Jay's testimony or even to address Jay's testimony in closing argument was a failure that tipped the balance in favor of a death verdict, and thus was undeniably prejudicial.

## CLAIM 18

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

75

**JA 2587**

At trial, Mr. Basham's counsel elicited damaging testimony from Sheriff Ronald Hewett. Defense counsel's anemic cross-examination of Sheriff Hewett, and his failure to impeach the witness with information previously available to the defense, constituted deficient performance and greatly prejudiced Mr. Basham.

Sheriff Hewett testified at the *Jackson v. Denno* hearing in Mr. Basham's case. As discussed in more detail in Claim 1, *supra*, Hewett testified that he walked off alone with Mr. Basham and that Mr. Basham then demonstrated how Alice Donovan was killed with the purse strap, as well as how he threw the strap into the woods. (Tr. 9/27/04 at 53; Tr. 2/25/04 at 66.)

Sheriff Hewett did not author a report, but rather had Lieutenant Crocker interview him and write a report based on that interview. The report never states that Mr. Basham killed Alice Donovan, or that he demonstrated to Hewett how he had done so. The report states only that "Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery," and that when Hewett asked, "Is this where it happened?," Basham responded, "It is." (Exh. 2.)

Defense counsel also had, as part of discovery, an FBI "302" report prepared by Agent Jeffrey Long. The FBI 302 report notes that Mr. Basham had a conversation with his attorney, Cameron Littlejohn, and that Mr. Littlejohn conveyed to law enforcement that "[a] purse strap was used by FULKS to strangle DONOVAN.

76

BASHAM threw the purse strap out of the window of the BMW as they left the cemetery."[13] (Exh. 3.) Sheriff Hewett testified about this conversation at the *Jackson v. Denno* hearing, stating only that Mr. Basham discussed the leather strap used to kill Alice Donovan, but not that he had indicated who had wielded it. (Tr. 2/25/04 at 63-64.)

As noted *supra*, Claim 1, the Government's position at the Fulks trial was that Sheriff Hewett's *Jackson v. Denno* testimony was that Mr. Basham had told Hewett that *Fulks* strangled Ms. Donovan with the purse strap. At Basham's trial, Sheriff Hewett testified on direct that Mr. Littlejohn told them that they "needed to be looking for a purse strap." (Tr. 9/27/04 at 27.) As noted above, Hewett also testified during cross examination, and contrary to all other evidence in the case, that Mr. Basham had demonstrated how *Basham* had strangled Donovan. (Tr. 9/27/04 at 53-54). In response to Hewett's testimony that Mr. Basham had demonstrated how *he* had used the purse strap, defense counsel responded only:

---

[13] Agent Long's report also contains a second reference to Fulks using the purse strap to strangle Donovan. Although not noted in the report, this statement was part of the hypothetical used by Mr. Littlejohn that ultimately resulted in his and co-counsel Monckton's disqualification. This Court ruled that the statement was not admissible. Thus, counsel wishes to make clear that it is the first reference, and not that which was part of the hypothetical, that defense counsel should have elicited through either Long himself, or through Sheriff Hewett.

77

Q.    Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?

A.    That is true because he didn't say.  He showed.

(Tr. 9/27/04 at 53-54.)

Counsel did not attempt to impeach Sheriff Hewett with his *Jackson v. Denno* testimony that he was present when Littlejohn provided the information about Fulks using the purse strap.  Counsel also did not ask Hewett if he was aware that Agent Long's report indicated that the statement from Littlejohn was that Fulks used the purse strap to strangle Ms. Donovan, not Mr. Basham.  Nor did counsel question whether Hewett had testified at previous hearings, and whether in those hearings he had not indicated that Mr. Basham had shown him how *he* (Basham) strangled Alice Donovan.  In fact, counsel did not ask any further questions about the purse strap.  Instead, appearing rattled, he asked a disjointed, rambling question about an entirely different matter: "Now, did you go – let me rephrase this.  During the six hours that you were out there, isn't it a fair statement to say that it is approximately – you tell me, how fair is it from the Amoco on Highway 17 until you turn off on Green Hill Road?"  (Tr. 9/27/04 at 54.)  Counsel never returned to the topic of the purse strap, leaving the damaging testimony to stand unchallenged.

78

**JA 2590**

Exacerbating his deficient performance in his cross examination of Sheriff Hewett, defense counsel failed to elicit testimony from Agent Long, consistent with his report, that would have called Hewett's testimony into question. Cross examination of Agent Long contained the following exchange:

> Q.    Also the information about the purse strap. Now, Brandon Basham provided that information to y'all, didn't he? You didn't give that information?

> A.    I personally received that information from attorney Littlejohn. I wasn't – I did not hear the Sheriff get that information from Brandon. Attorney Littlejohn told me what the deal was with the purse strap and that we would be sure we were in the right location if we could find it.

(Tr. 9/27/04 at 206.)

Counsel failed to ask Agent Long any questions about the notation in his 302 report that Fulks, not Basham, had wielded the purse strap. Nor did he ask Long whether Sheriff Hewitt was present when Attorney Littlejohn conveyed this information. Had defense counsel asked these simple questions, with which Agent Long either would have had to agree, or acknowledge a gross error in his report, the damage from Sheriff Hewett's testimony would have been minimized. The unchallenged testimony would not have been allowed to stand. Defense counsel would have had testimony to argue in closing argument to contradict the damaging closing statements by the Government discussed in Claim 1 of this Motion. The

79

**JA 2591**

failure to engage in any meaningful cross-examination of either witness fell far below the accepted standards of competency and resulted in prejudice to Mr. Basham.

The damaging testimony that it was Mr. Basham who strangled Alice Donovan was elicited by defense counsel. Eliciting damaging evidence without sound strategy "falls well below an objective standard of reasonableness." *See White v. McAninch*, 235 F.3d 988, 997-98 (6th Cir. 2000). No sound strategy existed for asking Sheriff Hewett the question that resulted in the damaging testimony. The Government had not elicited any testimony that Mr. Basham was the actual killer. The statement that Fulks strangled Ms. Donovan could have been elicited from Agent Long, who had already confirmed this in his report.

Moreover, the excuse that counsel did not know what Hewett was going to say does not remove the error. In fact this "argument violates a cardinal rule of examination - if defense counsel did not know what [Hewett] would say, he should not have asked." *Chatmon v. United States*, 801 A.2d 92, 109 (D.C. 2002). "A person charged with a crime has the right to expect his lawyer's questioning will not help the [Government] prove its accusation." *People v. Orta*, 836 N.E. 2d 811, 813 (Ill. App. 2005). Unfortunately, that is precisely what counsel did here, and there is no possible strategy that could support such a decision. Accordingly, counsel's performance was deficient. For the reasons outlined in Claim 1, *supra*, this deficient

80

performance clearly prejudiced Mr. Basham, as even the Government acknowledged it was one of the most important pieces of evidence against him.

<div align="center">

**CLAIM 19**

</div>

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham had a constitutionally protected right to have his trial counsel investigate, develop, and present mitigating evidence related to his background and character, as well as to the circumstances of the crime. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). Trial counsel were expected to perform in a manner consistent with prevailing professional norms of capital defense practice. *See Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005).

Acts and omissions of counsel require a new trial when there is a reasonable probability that the outcome of the proceeding would have been more favorable to the defendant. In a capital case, this standard is met if "there is a reasonable probability that a least one juror would have struck a different balance" in the penalty phase of the trial. *Wiggins*, 539 U.S. at 537. In sum, the Sixth Amendment is violated in a

<div align="center">81</div>

<div align="right">

**JA 2593**

</div>

capital sentencing proceeding when defense counsel fails to take necessary steps to provide the jury with information that can help them understand the defendant and offer an explanation for his conduct. "Where it is apparent from the evidence concerning the crime itself, from conversation with the defendant, or from other readily available sources of information, that the defendant has some mental or other condition that would likely qualify as a mitigating factor, the failure to investigate will be ineffective assistance." *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir. 1997).

Mr. Basham alleges that his attorneys rendered constitutionally ineffective assistance of counsel in failing to investigate, develop, and present powerful mitigating evidence at the penalty phase of his trial. Indeed, at least some of the evidence defense counsel unreasonably failed to pursue (namely, evidence of mental retardation) would have categorically removed Mr. Basham from the class of defendants eligible for a death sentence. *See Atkins v. Virginia*, 536 U.S. 304 (2002).

In this Motion, Mr. Basham discusses, by way of example, two substantive areas in which defense counsel failed to investigate and develop powerful mitigating evidence, despite obvious and repeated indications that these areas of investigation would have proved fertile in developing a mitigation case or, as noted above, completely exempted Mr. Basham from the possibility of a death sentence. Mr.

82

Basham's claim of ineffective assistance of counsel in failing to investigate, develop, and present mitigating evidence, however, is not limited to these two areas. Counsel for Mr. Basham submit that their client's mental incompetency, which continues to this day, both prevents them for alleging all instances in which trial counsel rendered deficient performance in this area and suggests that additional areas of mitigation remain unexplored.[14] With that proviso, counsel for Mr. Basham allege the following specific examples of deficient performance by counsel with regard to the investigation, development, and presentation of relevant mitigating evidence.

### A.    Mental Retardation

At the time of trial, Mr. Basham had a Full Scale IQ of 68. Typically, an Full Scale IQ of 70 or lower fulfills the "significant deficits in intellectual functioning" prong of a diagnosis of mental retardation. Despite Mr. Basham's low IQ, at trial, his attorney informed the jury that mental retardation was "not an issue here." (Tr. 10/26/04 at 53.)

Mr. Basham submits that his defense counsel rendered constitutionally

---

[14]For example, upon information and belief, defense counsel may have failed to investigate the issue of Mr. Basham's vision, whether he was wearing corrective lenses at the time of the crimes, and if not, whether his uncorrected vision might have affected his ability to assist law enforcement officials in searching for Alice Donovan's remains during the search conducted on Thanksgiving Day, 2002. Because of Mr. Basham's current incompetency, counsel are unable to confirm additional specific information concerning this issue at this time.

**JA 2595**

ineffective assistance of counsel in failing to investigate, develop, and present evidence that would have shown that mental retardation *was* "an issue" in Mr. Basham's case. Mr. Basham anticipates that defense counsel's explanation for not pursuing the critical issue of his mental retardation will be that earlier IQ tests administered before Mr. Basham turned 18 placed him above the IQ range typically associated with mental retardation.

Mr. Basham submits that, had his attorneys fulfilled their obligation to adequately investigate this issue, they would have discovered compelling evidence of the invalidity of the earlier IQ scores assigned to him. In fact, upon information and belief, Mr. Basham submits that defense counsel ignored evidence that his earlier IQ testing had been skewed by seemingly well-meaning professionals to reflect a higher IQ so that Mr. Basham could be admitted to juvenile care facilities that set minimum IQ requirements for patients. Upon information and belief, defense counsel also failed to obtain the raw data associated with the earlier IQ tests to determine the validity of the administration and scoring of those tests. Most significantly, despite the tens of thousands of dollars they spent on mitigation investigators and psychological and psychiatric experts, defense counsel failed to retain and consult an expert on mental retardation. Such an expert would have been able to explain the intricacies of a mental retardation diagnosis, and upon information and belief, would

84

**JA 2596**

have been able to explain to counsel, the Court, and the jury why Mr. Basham should be diagnosed as a person with mental retardation—a critical diagnosis that would have rendered him constitutionally ineligible for a death sentence.

## B.    Fetal Alcohol Spectrum Disorder (FASD)

Another example of defense counsel's failure to fulfill their obligation to investigate, develop, and present mitigating evidence on behalf of their client is seen in their complete failure to pursue evidence of Mr. Basham's exposure to drugs and alcohol *in utero* and to seek expert advice on the intellectual, neurological, and neuropsychological effects of that exposure on Mr. Basham. Upon information and belief, Mr. Basham submits that an adequate investigation into this issue would have revealed compelling mitigating evidence and that the failure to conduct such an investigation prejudiced him.

## C.    Other mitigating evidence

Counsel for Mr. Basham submit that, because of Mr. Basham's ongoing incompetency, he is unable to assist his current attorneys in discovering and investigating other areas of mitigation that trial counsel failed to pursue. His attorneys reserve the right to amend this Motion after such time that Mr. Basham has regained sufficient competency to meaningfully assist his attorneys in these proceedings.

JA 2597

## CLAIM 20

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team.  In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

"It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387; *see also Buckner v. Polk*, 453 F.3d 195, 215 (4th Cir. 2006) (Gregory, J., concurring in part and dissenting in part).  Defense counsel were obligated to collect as much information as possible to use on Mr. Basham's behalf at trial.  *See Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995).  The current ABA standards indicate that, at the very least, a capital defense team should be comprised of two attorneys, a mitigation expert, and investigator.  American Bar Association, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 4.1 (2003).

86

Rule 5.3 of the ABA Model Rules of Professional Conduct attributes to the attorney responsibility for the conduct of an investigator or other non-lawyer working with the lawyer. The lawyer must ensure that the non-lawyer's work and conduct are "compatible with the professional obligations of the lawyer." ABA Model Rule 5.3(b). The lawyer has a duty to supervise, and is responsible for the conduct of those working for him. ABA Model Rule 5.3 (c). Although defense counsel in this case did assemble a defense team, the team was one riddled with personal problems, conflicts of interest, and ineffective performance. Counsel failed to recognize these issues and failed in their duties properly to supervise and manage their capital defense team. Accordingly, their performance fell below the professional norm in violation of Mr. Basham's rights.

## A.     The bias of defense investigator Carlisle McNair created a conflict of interest within the defense team.

Soon after their appointment to Mr. Basham's case, defense counsel identified Carlisle McNair, a "retired" former captain from the Lexington County Sheriff's Office, to be the "overall coordinator of the investigation." (Tr. 8/28/03 at 3.) Unfortunately for Mr. Basham, McNair was a woefully inappropriate choice for the job of assisting in the defense of this capital defendant.

**JA 2599**

The record is bare regarding McNair's experience or training in the investigation of capital cases. Upon information and belief, Mr. Basham alleges that McNair was both professionally and personally biased against him, and that his bias, which was evident to the entire defense team, grossly compromised his investigation of Mr. Basham's case.

Upon information and belief, Mr. McNair, who professed to be a retired law enforcement officer, had in fact resigned from his prior post following several instances of misconduct, as well as inappropriate behavior of a sexual nature. As a result of internal affairs investigations involving him, McNair was relieved from his position as Headquarters' Region Commander at the Lexington County Sheriff's Department and demoted to the rank of lieutenant. He also was placed on probation for six months and suspended from duty for one pay period. (Exh. 4.) On October 14, 2002, McNair resigned from Lexington County. (Exh. 5.) Less than one year later, defense counsel retained him as the lead investigator in Mr. Basham's case.

Upon information and belief, McNair had a personal bias against Mr. Basham, based on McNair's belief that Basham was homosexual. Further, upon information and belief, McNair, because of his lengthy and recent law enforcement experience, had a professional bias against Mr. Basham that was known by, or easily discovered by, Mr. Basham's attorneys. At a hearing on this claim, Mr. Basham will demonstrate

**JA 2600**

that, during his investigation of this case, McNair directed an inordinate amount of time and resources towards irrelevant (and often prurient) matters at the expense of investigating issues that had direct and critical significance to the case against Mr. Basham.  For example, McNair seems to have been extremely focused on Chad Fulks's ex-wife, Veronica; the fact that she was a stripper; and the possibility that tapes existed that portrayed her performing sexual acts.  Mr. McNair spent a substantial amount of time interviewing Ms. Evans and her associates.  In fact, upon information and belief, in his role as investigator, McNair convinced an associate of Evans to turn over a videotape showing Evans engaging in a sex act with the individual.  It is difficult to see how this material was in any way relevant to Mr. Basham's trial.  McNair's focus on Veronica Evans was inexplicable, as she neither knew Mr. Basham, nor testified at his trial.

Due to McNair's focus on collateral and unimportant matters, he failed to spend adequate time investigating areas that in fact did affect Mr. Basham's case.  A prime example of this deficiency became apparent at penalty phase when the Government called several guards from Butner FCI to testify that Mr. Basham bragged that he would never get the death penalty.  (Tr. 10/14/04 at 177, 182.) Defense counsel was taken by surprise by this testimony, asked for a sidebar and argued, "We have never been put on notice that our client has made this statement."

89

**JA 2601**

(Tr. 10/14/04 at 179.)  The Government responded that every one of the witnesses were interviewed by the defense team before the prosecution.  [*Id.*]  The Government argued that it was not the prosecution's "problem" if defense counsel did not identify the appropriate issues when they interviewed the witnesses.  (Tr. 10/14/04 at 180.) When defense counsel continued to argue that the evidence was not disclosed, the Government responded,

> What is incredible to me, Mr. Harris had access to all of these witnesses for a much longer period of time . . . than the government did . . . . I assume they were asking the same questions we were asking.  What are the positive things about Brandon Basham?  What are the negative things?  What kind of inmate is he?

(Tr. 10/14/04 at 181.)

Every one of the witnesses who testified that Mr. Basham bragged about not getting the death penalty was interviewed by Carlisle McNair.  (Tr. 10/14/04 at 188.) One of the witnesses, Eddie Ledford, III, testified that he was interviewed by McNair, and that McNair only asked him approximately eleven questions and spent fifteen minutes with him.  (Tr. 10/14/04 at 223, 240.)  Ledford testified that, had Mr. Swerling or Mr. Harris met with him, he would have answered their questions.  He also testified that, had McNair asked him if Mr. Basham was boastful or bragging, he would have responded to him the same way he did to the Government's questions. (Tr. 10/14/04 at 239-40.)

90

**JA 2602**

Unlike Veronica Evans or her former lovers, Ledford was an important government witness whose testimony covers eighty-three pages of the penalty phase transcript, and who was the supervisor in the mental health unit where Mr. Basham was housed at Butner. McNair, however, spent only minimal time interviewing him and asked a mere eleven questions.

McNair's personal and professional bias against Mr. Basham violated the duty of loyalty that is one of the paramount duties that counsel, and those working at their direction, owe to a client. Defense counsel's reliance upon and failure to supervise a biased, unqualified investigator fell below the accepted standard of effective assistance of counsel. McNair's failure to investigate and discover both positive and negative facts about Mr. Basham caused counsel to be unprepared for damaging testimony at his trial, and prejudiced his case.

**B.  Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.**

Very little information exists in the record regarding Paige Tarr. At the same *ex parte* hearing where Mr. McNair was identified as the coordinator of the investigation, the Court indicated it had approved Ms. Tarr as a mitigation specialist. (Tr. 8/28/03 at 2). It is clear that Ms. Tarr was given substantial responsibility for investigating and developing mitigating evidence in Mr. Basham's case. When Dr.

91

**JA 2603**

Schwartz-Watts was asked on cross-examination by the Government if she was the head of the mitigation team, she replied "Ms. Tarr is the head, she is a mitigation specialist." (Tr. 10/28/04 at 41). During trial, Ms. Tarr was brought in to sit at counsel table to help Mr. Basham understand what was going on and to attempt to keep him awake. (Tr. 9/17/04 (Ex Parte Hrg) at 4; Tr. 9/17/04 at 143.)

Upon information and belief, Mr. Basham alleges that Ms. Tarr provided grossly deficient performance in her role as director of mitigation efforts in his case, and that his attorneys failed adequately to supervise Ms. Tarr and failed to take prompt remedial steps when her deficiencies came to their attention.[15] Because the "mitigation function is of utmost importance in the defense of capital cases . . . all members of the defense team [must] perform in accordance with prevailing national norms when representing a client who may be facing execution." *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 677 (2008). Considering the important role mitigation was to play in Mr. Basham's case, the fact that the head of the mitigation team was either unable to devote her attention to the case or was deficient in her efforts was prejudicial to Mr. Basham. Ms. Tarr's performance, and counsel's inability to

---

[15]Upon information and belief, Mr. Basham also alleges that Ms. Tarr was instructed by another South Carolina court to no longer practice on capital cases as a result of her deficient performance.

adequately supervise her fell below the well-defined norms of capital defense and resulted in deficient performance and prejudice.

## CLAIM 21

**Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.**

The Federal Death Penalty Act of 1994 ("FDPA") provides that, if the defendant has been found guilty of a capital offense, the trial judge "shall conduct a separate sentencing hearing to determine the punishment to be imposed." 18 U.S.C. § 3593(b). At this hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor," regardless of its admissibility under the Federal Rules of Evidence § 3593 (c). The Government must prove, beyond a reasonable doubt, the existence of at least one of sixteen aggravating factors before the defendant is considered eligible for the death penalty. The defendant has the burden of proving, by a preponderance of the evidence, any mitigating factor. *Id.* The jury then considers all of the information presented during the hearing.

If the jury finds true any aggravating factor, it must return "special findings" identifying the statutory and non-statutory aggravating factors it has unanimously found to exist, and also the mitigating factors that one or more jurors have found to

93

**JA 2605**

exist.  If no statutory aggravating factor is found beyond a reasonable doubt, "the court shall impose a sentence other than death."  18 U.S.C. § 3593(d).  If, however, the jury finds the requisite mental state and at least one statutory aggravating factor, then it "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death" and, based upon this consideration, recommend by unanimous vote "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some other lesser sentence."  18 U.S.C. § 3593(e).

The United State's Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), raises serious questions about the constitutionality of the unitary sentencing hearing, where the jury makes, in a single deliberative process, its "eligibility" decision and its "selection" decision.

To the extent that FDPA's single sentencing hearing provisions survive constitutional challenge under *Ring*, it is nonetheless necessary that courts structure the jury's deliberations so as to avoid the myriad problems associated with admitting information on one issue, such as a nonstatutory aggravating factor like victim impact, that is not relevant to another issue, such as a statutory aggravating factor related to the circumstances of the offense.  Several courts have ordered trifurcated proceedings for these reasons.  *See, e.g., United States v. Natson*, 444 F. Supp. 2d

**JA 2606**

1296, 1309 (M.D. Ga. 2006); *United States v. Johnson*, 362 F. Supp. 2d 1043, 1110-11 (N.D. Iowa 2005); *United States v. Mayhew*, 380 F. Supp. 2d 936, 955-57 (S.D. Ohio 2005); *cf. United States v. Jordan*, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005).

Mr. Basham's trial attorneys failed to request a trifurcated proceeding, thus subjecting him to an overly prejudicial sentencing hearing that violated his constitutional rights and resulted in his death sentence. In the first phase of a trifurcated proceeding, the "merits" phase, the jury deliberates on the defendant's guilt or innocence of the charged offenses. In the second phase, the "eligibility" phase, the jury determines whether the Government has proven the mental state factors and the statutory aggravating factors beyond a reasonable doubt. In the third phase, the "penalty" or "selection" phase, the jury decides on the nonstatutory aggravating factors and the mitigating factors, undertakes the process of weighing, and determines the sentence.

Absent a trifurcated capital proceeding under the FDPA, a defendant is forced to have a jury decide whether the government has proven the remaining elements of a capital offense, *i.e.*, the defendant's eligibility for the death penalty, at the same proceeding where the jury ultimately decides whether to in fact impose such a punishment. By allowing the jury's determination regarding death eligibility under

**JA 2607**

the FDPA to be potentially tainted by evidence that relates to nonstatutory aggravating factors and the process of weighing the aggravating and mitigating factors, the FDPA commingles two fundamentally different decisions which must be kept separate: (1) whether the government has proven all elements of a capital offense beyond a reasonable doubt; and (2) if so, whether death or life without the possibility of release is the appropriate sentence.

Statutory aggravating factors and the intent requirements of 18 U.S.C. § 3592 are elements of a charged capital offense because those factors serve to raise the lawful maximum penalty from life imprisonment to death. *Ring v. Arizona*, 536 U.S. 584 (2002); *see United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003). In light of *Ring*, and to properly meet the requirements of the Fifth, Sixth and Eighth Amendments, proceedings under the FDPA must be trifurcated.

Mr. Basham's trial attorneys failed to object to the single sentencing proceeding to which he was subjected. This omission on the part of trial counsel was objectively unreasonable, and Mr. Basham was prejudiced as a result.

<div align="center">

**CLAIM 22**

</div>

**The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing.  As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Upon information and believe, Mr. Basham alleges that the Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose material exculpatory or impeachment evidence to Mr. Basham that was necessary to his ability to prepare and present a defense.  The non-disclosed *Brady* evidence includes, but is not limited to, (1) information concerning federal, state, and local investigations of Ronald Hewett; (2) information concerning the Government's investigation of juror misconduct in Mr. Basham's case, including interviews of jurors or any person with information concerning possible extrajudicial contact with the jurors or premature deliberations by the jurors; and (3) any agreements or promises made by the Government or any governmental agency with or to witnesses who testified at either Mr. Basham's or Mr. Fulks's trial.

<div align="center">

97

</div>

<div align="right">

**JA 2609**

</div>

## CLAIM 23

**The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial. Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The Government took diametrically opposed positions in the Fulks and Basham trials, arguing in each defendant's trial that *that* defendant wielded the purse strap used to strangled Alice Donovan. This "manipulation of the evidence," which allowed the Government at the separate trials to identify both Mr. Fulks and Mr. Basham as the actual killer, "deprived [Mr. Basham] of due process and rendered his trial fundamentally unfair." *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000).

At Mr. Basham's trial, the Government argued in closing:

What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled . . . . You saw Sheriff Hewitt [sic] stand up there and show.

98

**JA 2610**

(Tr. 11/1/04 at 57.)   Additionally, the Government unequivocally stated, "He [Basham] killed Alice Donovan".   (Tr. 11/1/04 at 62.)   The Government acknowledged that this testimony was one of the most important pieces of evidence in the case.  (Tr. 9/29/04 at 81-82.)

Previously, however, at Mr. Fulks's trial, in a colloquy outside the presence of the jury, the Government put a very different spin on the Hewett statement, arguing, "Remember Sheriff Hewitt [sic] demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled."   (Fulks Tr. 6/22/04 at 255).   The Government argued to the jury that Fulks "intentionally killed Alice Donovan." (Fulks Tr. 6/22/04 at 171).

When "'an inconsistency . . . exist[s] at the *core* of the prosecutor's cases against the defendants for the same crime,'" Due Process "prohibits the government from presenting mutually inconsistent theories." *United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003) (*quoting Smith*, 205 F.3d at 1052). "Although the prosecutor must prosecute with earnestness and vigor and 'may strike hard blows, he is not at liberty to strike foul ones.'"   *Smith*, 205 F.3d at 1049.   Accordingly, the Government's prime directive in a criminal case is "'not that it shall win a case, but that justice shall be done.'" *Smith*, 205 F.3d at 1049 (*quoting Berger v. United States*, 295 U.S. 78, 88 (1976)).  As part of this pursuit of justice, prosecutors have a duty to

99

ensure integrity and fairness in the legal process. *See Berger*, 295 U.S. at 88. The Government's "duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for the truth." *Smith*, 205 F.3d at 1051.

The argument that Fulks struck the fatal blow was an important part of Mr. Basham's overall mitigation case. The Government recognized the importance of the fatal blow issue, as was shown in its voir dire and in its closing argument, where it argued that Sheriff Hewett's testimony that Mr. Basham demonstrated how he strangled Alice Donovan was one of the most important issues in the case. Despite defense counsel's arguments that Mr. Basham was merely a follower, and Fulks the leader, not a single juror found the Minor Participant statutory mitigator. (Dkt. No. 805 at 6).

Because the Government relied "upon factually inconsistent and irreconcilable evidence at the two trials," Mr. Basham's trial and sentence of death "was fundamentally unfair and he was deprived of due process." *See United States v. Paul*, 217 F.3d 989, 998 (8th Cir. 2000) (*quoting Smith*, 205 F.3d at 1052-53). Given its own statements that the testimony regarding the purse strap was one of the most important pieces of evidence in the case, the Government cannot claim that this is a circumstance in which the inconsistency may be forgiven because it does not go to

**JA 2612**

the core of the case. (*See* Tr. 9/29/04 at 81-82.) "The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall," but rather to see that justice is done. *Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974) (Douglas, J., dissenting).

Here, in its pursuit of death verdicts for both Fulks and Basham, the Government manipulated the facts and presented diametrically opposed theories that went to the core of their case against Mr. Basham. As a result, the process was rendered fundamentally unfair.

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. Mr. Basham was also denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.

**JA 2613**

<center>CLAIM 24</center>

**Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence.  By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.  Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The prosecutors in Mr. Basham's case repeatedly urged the jury to ignore mitigating evidence presented by the defense because no causal nexus existed between that evidence and the crimes for which Mr. Basham had been convicted.  The United States Supreme Court, however, had previously ruled in *Tennard v. Dretke*, 542 U.S. 274 (2004), that such a nexus requirement has never been required by the Eighth Amendment.  Trial counsel failed to make any contemporaneous objections to the prosecutors' comments and argument, nor did counsel move for a mistrial based on them.  Appellate counsel failed to raise this issue on appeal.

In closing argument, the Government set forth a legally flawed argument that the jury must find some causal nexus between the mitigation evidence presented and

<center>102</center>

the crime committed before the evidence could be considered.

Specifically, counsel for the Government argued:

> But generally what did their experts say?  What is the most important thing they said?  Brandon Basham knows right from wrong and there is *no cause-and-effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking randomly of two innocent women.  There is no cause and effect.*  It is not like you were born into an alcoholic family, you run the risk of being an alcoholic.  *There is no cause-and-effect* of Brandon Basham's upbringing or any problems Brandon Basham has with the effect of him randomly targeting, and kidnapping, and killing two innocent women.  Every single defense expert took that witness stand and acknowledged that because they had to.  Because that is a fact.  *No cause and effects*.  There are thousands and thousands of kids and adults walking around this country . . . that grew up impoverished, much poorer than Brandon Basham, with physical disabilities he did not have.  With significant, significant mental issues that don't kill, that don't carjack . . . *[a]nd that is absolutely critical.*

(Tr. 11/1/04 at 85 (emphasis added).)

The Government did not stop there.  Rather, the prosecution compounded its misconduct by specifically attacking the mitigation testimony presented and arguing that it should be disregarded because there was no nexus:

> What does Brandon Basham having a memory problem have to do with targeting Alice Donovan in the Wal-Mart parking lot, and kidnapping and carjacking her?  What does a memory problem have anything to do with the facts and circumstances of this case as to what happened to Samantha Burns and what happened to Alice Donovan?  What does a memory problem have to do with that, if you so find that he has a memory problem?

103

**JA 2615**

(Tr. 11/1/04 at 86.)

The Government also argued that their expert's testimony should be held in higher regard than that of the defense experts because he had shown a nexus. They argued that this fact should not only go to the weight of the mitigation, but whether it should be considered at all. The Government argued:

> [T]he Government's psychiatrist diagnosed [Mr. Basham] with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That is for you to decide. You know, deciding on who got it right on that issue clearly only goes to show *what mitigation*, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be . . . the facts speak for themselves . . . and one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong. *No question whatever his issues are, there is no cause-and effect*.

(Tr. 11/1/04 at 89 (emphasis added).)

The Government's closing argument was simply a summation of the misconduct that permeated Mr. Basham's penalty phase through an assault on Mr. Basham's constitutional right to have the jury consider all relevant mitigation regardless of causal nexus. With every expert witness the defense called, and even with some of Mr. Basham's family, the Government cross-examined the witnesses regarding whether there was a cause-and effect connection between Mr. Basham's history and deficits and the crimes of which he had been convicted.

104

**JA 2616**

Beginning with clinical social worker Jan Vogelsang, the Government questioned: "So, because there is a volitional component [to an act of murder], you cannot take these factors and say that they caused Brandon Basham to carjack and kidnap Alice Donovan, you can't say that, can you?" (Tr. 10/20/04 at 205-06.)  Ms. Vogelsang attempted to clarify that she was "not providing this information for that purpose." (*Id.* at 206).  The Government did not accept that position, however, and continued to push its nexus requirement argument, asking, "The other family members . . . who you indicated may have had issues similar to Mr. Basham's did not go out and carjack and kidnap strangers?" *Id.* at 210.

The Government also questioned Mr. Basham's sister, Charlotte, and his cousin, Jerome McKechnie, about the similarities the backgrounds they shared with Mr. Basham's and their lack of violent criminal histories.  The prosecutor questioned Charlotte: "You chose not to steal . . . you chose not to arm yourself with illegal weapons . . . you chose not to rob people . . . you chose not to hurt people . . . . Despite the environment that you have described to the jury, you knew once you reached a certain age of maturity that those things are wrong." (Tr. 10/21/04 at 105 (cross-examination of Charlotte Basham).)  The prosecutor questioned Mr. McKechnie: "Any other members on the [maternal] side that you know that ever carjacked anybody . . . kidnapped an innocent woman . . . killed two innocent

**JA 2617**

women?"  (*Id.* at 151 (cross-examination of Jerome McKechnie).)

Finally the Government challenged the diagnoses of the medical experts based on the lack of nexus.  In the cross-examination of Dr. Brannon, a neurologist, the Government proceeded as follows:

Q:    There is no evidence of – I mean, there are literally tens of thousands of kids diagnosed every year, probably hundreds of thousands of kids that have been diagnosed with ADD and ADHD across the country, have there not?

A:    I suppose so.

Q:    *There is no cause-and-effect between being diagnosed with ADD and ADHD and the likelihood of carjacking and kidnapping strangers, would it?*

A:    I wouldn't know.

Q:    That is something, in the field of neurology, you have never read anything that there is some sort of correlation of being symptomatic of attention deficit disorder that you are more prone to randomly kidnap and kill?

A:    No.  I have never found that and have never looked for it.

(Tr. 10/25/04 at 278 (emphasis added).)

The questioning continued: "[T]here is no cause-and effect between Mr. Basham's deficiencies . . . and major violent criminal conduct, because if there were, you would provide that data or that information to this jury."  Dr. Brannon replied, "Well, I don't know that there is a cause-and-effect . . . his brain doesn't work right.

End of the story as far as I am concerned." (*Id.* at 290.)

The Government's questioning of defense neuropsychologist, Dr. Tora Brawley, took a similar path. "There are people who also have bad lives who don't end up like Mr. Basham . . . . In fact, the overwhelming majority of people who grow up in poor families and abusive situations don't kill people?" (Tr. 10/26/04 at 111.) The Government specifically asked, "There is *no cause and effect* with regard to brain damage and being more likely to commit violent crime?" (*Id.* at 159 (emphasis added).) When Dr. Brawley countered that people with head injuries are a high risk population, the Government argued, "[B]ut the point I am trying to make, though, is that just because you have got brain damage, or been injured, or have Alzheimer's or have MS, or have Parkinson's disease, or has [sic] ADHD does not mean you are more likely to commit violent crime? You don't want to scare the hundreds of thousands of parents out there that have kids with ADHD?" (*Id.*)

The final assault on Mr. Basham's right to have his mitigation considered regardless of its nexus to the crimes came with the cross-examination of Dr. Donna Schwartz-Watts, who diagnosed Basham with dementia and inhalant-induced psychosis:

> Q:    He is not – he didn't get out of the car in the Wal-Mart parking lot and jump in Alice Donovan's car because some voice told him to do it?

A:    That's correct.  None of these illnesses . . . affected his ability to know right from wrong.

(Tr. 10/28/04 at 96.)

Q:    You have diagnosed Mr. Basham with Attention Deficit Hyperactivity Disorder, correct?

A:    Yes.

Q:    Just to be clear, again, *there is no cause-and-effect* there between the fact he has ADHD and the fact he kidnapped and carjacked Alice Donovan.

A:    None.

(*Id.* at 100-01.)

As if the point had not been driven home to the jury thoroughly enough, in its re-direct examination, the Government engaged in the following exchange with their rebuttal expert, Dr. Bruce Capehart:

Q:    I think there are some things [Dr. Schwartz-Watts] testified about . . . that you may agree with.  Dr. Schwartz-Watts testified that dementia did not cause Mr. Basham to carjack Alice Donovan. Do you agree with that?

A:    Yes.  That is true.  I agree with that.

Q:    She testified that inhalant-induced psychosis did not cause Mr. Basham to carjack Alice Donovan.  Do you agree with that?

A:    I do.

(*Id.* at 330.)

**JA 2620**

Excluding mitigating evidence from the sentencing decision by means of a causal-nexus test violated Mr. Basham's right to a sentencing decision that allowed the fact-finder to give effect to all relevant mitigating evidence. *See Tennard*, 542 U.S. 274 (2004); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978).

### A.    The Government's improper questioning and argument constituted prosecutorial misconduct.

Prosecutorial misconduct provides ground for a new trial when the prosecutor's conduct was improper and sufficiently prejudicial to deprive the defendant of a fair trial. *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003). The conduct of the Government in this case, both in its cross-examination of experts and its reliance on a legally incorrect argument in summation, satisfies both elements of the *Higgs* test.

The Government's arguments and cross-examination regarding cause-and-effect were plainly an attempt to persuade the jury that, if it found that Mr. Basham's background did not cause him to commit the crimes for which he had been convicted, it could not consider Mr. Basham's background for its mitigating effect at all. Demanding a causal nexus, as the prosecution did in its examinations of every defense expert and multiple times in closing argument, goes against the weight of authority.

**JA 2621**

The United States Supreme Court issued its opinion in *Tennard* on June 24, 2004. The unconstitutional arguments of the Government took place several months later, in October and November 2004. Accordingly, Government cannot claim ignorance as an excuse for an argument plainly contrary to law and in violation of Mr. Basham's constitutional rights. Besides, in its opinion in *Tennard*, the Supreme Court emphasized that a causal nexus had *never* been required by its interpretations of the Eighth Amendment.

Moreover, the Government's arguments cannot be dismissed as mere attempts to convince the jury to give little weight to mitigating evidence that lacked a causal connection to the crime. To the contrary, the prosecutor specifically stated in summation, "You know, deciding on who got it right on that issue clearly only goes to show *what mitigation* [the jury can consider.]" (TR. 11/1/04 at 89) This statement implied to the jury that Mr. Basham's background had no relevance whatsoever in their weighing of the aggravation and mitigation.

The Government's misconduct in summation was compounded by its improper questioning concerning cause-and-effect. By pushing the experts to concede the absence of cause-and-effect, and then arguing this fact in summation, the Government was not merely commenting on the evidence. Rather, by using defense experts to make its "no cause-and-effect" argument, the Government created the false

110

**JA 2622**

impression that the evidence presented by the experts had no value whatsoever.  It is very likely that as a result of the Government's arguments and cross-examination, the jury did not consider Mr. Basham's mitigating evidence at all, due to the absence of a cause-and-effect.  "When . . . jurors have been left the option of relying upon a legally inadequate theory, there is not reason to think that their own intelligence and expertise will save them from that error."  *Griffin v. United States*, 502 U.S. 46, 59 (1991).  As the Government emphasized in summation, the failure to show cause-and-effect by the defense experts was "absolutely critical."  (Tr. 11/1/04 at 85.)

The Government's argument that the mitigating evidence presented was irrelevant because it lacked a cause-and-effect relationship with the crime was "not only a misrepresentation of the law, but it withdrew from the jury one of the most central sentencing considerations . . . most likely to tilt the decision in favor of life." *See Drake v. Kemp*, 762 F.2d 1449, 1460 (11th Cir. 1985) (finding misconduct where prosecutor cited 100-year-old case law implying mercy in a capital case was frowned upon, but did not make clear to the jury the age of the cases).  The statements by the Government in this case were consistent and deliberate, and the prejudice to Mr. Basham was great.  The conduct here "so polluted" Mr. Basham's trial that it requires relief.

This Court's final instructions were silent as to a causal-nexus requirement. Although the jury instructions did not exacerbate the Government's misleading cross-examination and summation, they failed to correct it. Because the Government's misconduct was not limited to summation, but included the cross-examination of witnesses, the instruction that lawyers' arguments are not evidence was insufficient to curb the effect of the Government's urging of a legally incorrect position.

**B.    Defense counsel was ineffective in failing to object to the Government's cross-examination and closing argument on the basis of *Tennard*.**

Like the prosecution, defense counsel had no excuse for being unaware of *Tennard*. Defense counsel's failure to recognize and object to the improper cross-examination and argument of the Government on the grounds that it was contrary to Supreme Court precedent was gross error, without a strategic purpose, and outside of the range of accepted professional standards. Accordingly, Mr. Basham was deprived of counsel as guaranteed under the Sixth Amendment and 18 U.S.C. §§ 3006(A) and 3599.

This failure to object greatly prejudiced Mr. Basham. In both his opening statement and closing argument in the guilt phase, defense counsel admitted Mr. Basham's guilt. Accordingly, for Mr. Basham to have any hope that his life would be spared, he needed the jury to consider all of the mitigating evidence he proffered.

**JA 2624**

The Government's improper argument, and defense counsel's failure to object to that improper argument, deprived the jury of the required "effective vehicle" through which it could evaluate and give effect to the mitigation evidence. *Smith*, 543 U.S. at 44. As a result, Mr. Basham was deprived of his rights under the Sixth and Eighth Amendments to the United States Constitution. An effective vehicle would have involved sending the jurors into deliberations with the absolute knowledge that they could consider evidence to be mitigating despite the lack of a causal nexus. Both Mr. Basham and the jury were failed in that regard.

Had counsel objected, either in cross-examination or in summation, this Court could have given a curative instruction making clear to the jurors that they could consider *all* relevant mitigation, regardless of nexus. Furthermore, defense counsel failed even to address the issue of cause-and-effect in his closing argument, thus implying to the jury that the Government's argument was unassailable.

Trial counsel's failure to object to the Government's "legally inadequate theory" caused prejudice to Mr. Basham because, had the jurors understood that they could consider any relevant evidence regardless of causal nexus, the range of evidence available to them would have been substantially greater, and could well have spared Mr. Basham's life.

<div align="center">113</div>

<div align="right">**JA 2625**</div>

## C.    Appellate counsel rendered ineffective assistance in failing to raise a *Tennard* claim.

Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000). To show prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). Although weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy, a jury's miscomprehension of the Eighth Amendment's requirements, and the Government's active role in perpetuating this miscomprehension, are not weak issues. Moreover, the "weeding" principle has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims in light of the unique nature of the death penalty and the possibility of preclusion or a change in the law in later courts.

As a result of the misconduct by the Government in arguing a legally incorrect theory, and the ineffective assistance of trial counsel for failing to challenge the Government's improper questioning and argument, the jury engaged in deliberations without the understanding that it could consider *any* relevant mitigation, regardless of its nexus to the crimes. It is very likely, considering the overwhelming amount of

114

JA 2626

mitigation presented to the jury, that had the jurors understood that they could give effect to mitigating evidence regardless of its nexus to the crimes, Mr. Basham's life would have been spared.

<div align="center">

**CLAIM 25**

</div>

**The Court's instruction to the jury on mitigating evidence violated Mr. Basham's Eighth Amendment rights because it created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating. Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was ineffective for failing to raise this issue on direct appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Section 3592 (a) recognizes certain factors to be mitigating, as a matter of law. The only relevant factor for a juror to decide is whether the factor exists by a preponderance of the evidence. Any juror who finds that a mitigating factor exists, is constitutionally obligated to consider and give effect to that factor. *See Boyde v. California*, 494 U.S. 370, 377-78 (1990).

Here, the Court gave an instruction that told the jury that both for statutory and non-statutory mitigators, a *two-step* process was required. This instruction was incorrect as to the statutory mitigators because there has been a determination by law,

<div align="center">

115

</div>

<div align="right">

**JA 2627**

</div>

codified in the statute, that such factors are necessarily mitigating, and thus the jury did not need to determine the first step.

The offending portion of the instruction was as follows:

> As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a *two-step* process in determining whether any one or more of the mitigating factors have been proven.

> Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, *you must determine whether the factor is mitigating*, as I have defined that term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

(Tr. 11/1/04 at 220 (emphasis added).)

The instruction was identical to that given in the co-defendant, Fulks's case. As the Court noted, the instruction came about as a result of a colloquy between the Court, counsel for Fulks and the Government when the Government, concerned about the large number of mitigating factors proposed by Fulks's lawyers characterized them as an attempt to "'sand bag' the government's case by listing a large number of somewhat duplicative, and potentially irrelevant factors for the jury to consider as mitigators." *Fulks v. United States*, 2010 WL 3069390 at *35. The Court also

116

**JA 2628**

expressed its concern about this issue, and ultimately the Government proposed that the jury be instructed that "with regard to mitigators, there were two issues: '(1) is it proved; and (2) is it mitigating?'" *Id.* Fulks's lawyers objected but the Court ruled against them. *Id.*

The same instruction was given, word for word, in Mr. Basham's trial. Unlike Fulks's lawyers, Mr. Basham's attorneys failed to object, although it is clear that they recognized the problem inherent in this instruction.

Prior to the Court finalizing jury instructions, Mr. Basham submitted a forty-two page document of proposed jury instructions. Of note was the request that the court insert after the first paragraph of its mitigation instruction the following language: "Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified. In determining whether a sentence of death is to be imposed, you *shall* consider any mitigating factor, including the following:" and listed the five statutory mitigators argued in Mr. Basham's case. (Dkt. No. 801 (emphasis added).) This language was consistent with the bright line rule from *Eddings v. Oklahoma*, 455 U.S. 104, 144-15 (1982), that jurors "may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."

**JA 2629**

The Court declined to include this language, and Mr. Basham's counsel failed to object to the unconstitutional "two-step" language. This objectively unreasonable performance of counsel fell below the standards set forth in prevailing professional norms.

By following the instructions of this Court, a juror could determine, contrary to *Eddings* and § 3592(a), that a statutory factor was not mitigating, and rather that determining what weight to give it, give it no consideration at all. No jurors found statutory mitigating factors two through four, one juror found factor five, and six jurors found factor one. (Tr. 11/2/04 at 8.) The Court's verdict form did not separate the jury's findings into the two step outlined in the instruction, so it is impossible to determine whether the jurors decided that the factors in question did not exist, or that the factors were not valid mitigators.

This error was especially egregious in light of the fact that the jury had already been misled, through cross-examination and in summation by the Government, by when the Government argued for the requirement of a causal nexus before evidence could be considered as mitigating. *See Tennard*, 542 U.S. 274. Mr. Basham has raised this as a separate claim 24, in this petition. Faced with unconstitutional instructions by the Court, unconstitutional argument by the Government, and defense counsel's objectively unreasonable failure to object, the risk that the jury would

**JA 2630**

screen out and fail to give effect to facts that were unquestionably mitigating was substantial.

As an additional basis for relief, Mr. Basham alleges that his appellate counsel rendered ineffective assistance of counsel by failing to raise the issue of the improper jury instruction in Mr. Basham's direct appeal.

## CLAIM 26

**The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt. Appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they unreasonably failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham's death sentence and confinement are unlawful and were obtained in violation of his rights under the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and the Cruel and Unusual Punishment Clause of the Eighth Amendment because the Court failed to instruct the jury that the reasonable doubt standard governed the ultimate penalty determination in this case. *See Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

119

**JA 2631**

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

Although this Court instructed the jury that is must determine whether the government had proven the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The jury was provided with the following penalty phase instruction regarding the weighing process:

> You must decide, in regard to both offenses [carjacking resulting in death and kidnapping resulting in death], whether the aggravating factors, which you have found to exist, sufficiently outweighs [sic] the mitigating factors found to exist for that offense, so as to justify imposing a sentence of death, rather than a sentence of life without the possibility of release; or, in the absence of any mitigating factors, whether the aggravating factors alone are sufficient to justify imposing a sentence of death, rather than a sentence of life, without the possibility of release.

> The weighing process you are called upon to undertake in this part of the trial is different from the fact-finding process. If you find the threshold intent, aggravating, and mitigating factors, you must use your experience, judgment, and common sense in weighing the aggravating and mitigating factors to arrive at your ultimate determination in this case.

(Tr. 11/1/04 at 201.)

This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating

120

**JA 2632**

factors "sufficiently outweigh" any mitigating factors.  *See* 18 U.S.C. § 3593(e).

However, as discussed below, the instruction falls short of the requirements of the United States Constitution, which require that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified and that death is the appropriate penalty to be imposed under all the circumstances.

The Government may not impose a sentence greater than that authorized by the jury's simple verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are also submitted to the jury and proved beyond a reasonable doubt.  *Apprendi*, 530 U.S. at 455.  The *Apprendi* principles applies to factfindings necessary to put a capital defendant to death.  *Ring*, 536 U.S. at 609.

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase.  In order to impose the increased punishment of death, the jury must make additional *factual* findings at the penalty phase.  These findings include a finding that the aggravating factors outweigh any mitigating factors.

Under the *Apprendi* holding, because additional factual findings are absolutely required in order to impose an increased punishment, they are sentencing factors that

121

**JA 2633**

must be proved beyond a reasonable doubt. Under the *Apprendi* rationale, petitioner was entitled to a jury instruction that before a death verdict could be returned, the jury was required to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt.[16]

Moreover, because a death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Basham's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional.

---

[16]Here, the Court only instructed the jury that it was required to find that the Government had proven the threshold intent and aggravating "factors" beyond a reasonable doubt. The jury was not instructed that it was required to find beyond a reasonable doubt that the aggravating factors outweighed the mitigating facts before it could impose a sentence of death.

122

JA 2634

The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana*, 508 U.S.275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

To the extent that defense counsel failed to request an appropriate instruction on this issue, they rendered constitutionally ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668. 686 (1984). Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Basham would not have been sentenced to death. Had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Basham would have been granted a new penalty trial.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

JA 2635

CLAIM 27

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The day after Mr. Basham's jury returned a death verdict, a producer for a local television station in Spartanburg, North Carolina, left a voicemail at the United States Attorney's office stating that a juror from the Basham case had contacted her a week prior. The Government notified the Court of this improper contact, and a series of hearings were held, ultimately resulting in a contempt conviction for jury foreperson Cynthia Wilson, but a denial of Mr. Basham's motion for new trial based on Wilson's misconduct. Counsel for Mr. Basham have discovered, however, that Wilson not only violated the Court's orders by contacting media, but also lied on her juror questionnaire and in voir dire. This information was readily available to counsel at the time of Mr. Basham's trial, and trial counsel's failure to independently investigate this information constituted deficient performance that prejudiced Mr. Basham.

124

**JA 2636**

Because this Court is fully familiar with the facts of these proceedings, only a brief summary of events will be recounted here. WSPA news producer Shannon Mays testified that she was contacted by a female juror who asked why the station was not covering the Basham trial. When Mays responded that the trial was not in WSPA's viewing area, the juror told her it "would be good TV," and added that Mr. Basham was "acting up in court" and "had fallen asleep." (Tr. 11/12/04 at 19.) More importantly, Mays testified that Wilson expressed concern "over whether or not Mr. Basham would be sentenced to death, because there were jurors that were for the death penalty and others that were not." (Tr. 11/12/04 at 19.) Additionally, Mays recounted a brief conversation with the juror in which Mays told her that she had previously lived in Indiana and had covered the case, which she described as "the never ending case." (Tr. 11/12/04 at 19.) Both shared a laugh over this. (Tr. 11/12/04 at 19.)

After narrowing the potential offending juror to three possibilities, the Court called the three jurors in for a hearing and provided counsel for them to consult with if they desired. Although she did not immediately confess to her violations, it was immediately clear that Wilson was the offending juror. (Tr. 1/14/05 at 59.) Eventually, after consulting with her appointed lawyer, Wilson admitted to contacting three television stations. (Tr. 11/12/04 at 70.) She denied that the conversation

**JA 2637**

contained the content recounted by Mays, and testified that she called because she "felt it was important that somebody cover it, and that was it." (Tr. 11/12/04 at 71.) She denied watching other coverage. (Tr. 11/12/04 at 75.) Later, she claimed that her motivation was altruistic, and that she was just concerned with "public safety awareness." (Tr. 11/23/04 at 40.) Wilson stated that her husband had done internet research on the Basham case, but that he had not shared any of it with her. (Tr. 11/12/04 at 75.) She also denied any premature deliberations in the jury room. (Tr. 11/12/04 at 76.)

Eventually all the jurors and alternates were summoned to Court for further hearings to probe the scope of the misconduct. Although none of the jurors was able to state conclusively that he or she heard premature deliberations, several identified Wilson as engaging in questionable conduct. Juror Shelda Richardson stated that Wilson had approached her to try to "feed [her] information to feel [her] out to see where [she was], as far as which way [she was] leaning." (Tr. 11/18/04 at 17.) Richardson said that Wilson made her "uncomfortable" and she sought to avoid her. (Tr. 11/18/04 at 42.) June Robertson also noticed that Wilson would "corner" other jurors, and an alternate juror testified to observing the same thing. (Tr. 11/18/04 at 27.) Wilson, however, denied that any of the conversations were about the trial, although she then seemingly contradicted herself by stating that she had discovered

126

that Richardson had some hesitation about imposing a death sentence. (Tr. 11/23/04 at 10, 12.)

Cynthia Wilson's husband, Greg, was also called before the Court. He testified that Wilson said the trial was a "big opportunity for [her]" and that she had a stack of papers inches thick, but he never reviewed them. (Tr. 11/23/04 at 16, 19.) Mr. Wilson denied sharing any information about the trial with his wife, and he testified that he was unaware that she had contacted the media. (Tr. 11/23/04 at 18, 22.)

Although Wilson was asked whether she recalled "anything else" that she did during Mr. Basham's trial that violated the Court's orders, she failed to disclose that in addition to the three television stations she admitted contacting, she had also contacted two newspapers. (Tr. 12/13/04 at 3; Tr. 12/21/04 at 33.) When confronted with proof of this information, Wilson contended that she simply forgot about that contact. The Court accepted Wilson's excuse. (Tr. 12/21/04 at 33.)

In addition to her calls to media, Wilson also spent a remarkable amount of time during the trial on the phone with fellow jurors. In fact, Wilson called her fellow jurors seventy-one times. As counsel pointed out, many of these conversations happened at key points in the trial. Despite acknowledging that "it's just hard to explain that number of calls," the Court precluded any further questioning regarding premature deliberations. (Tr. 1/14/05 at 10.)

127

**JA 2639**

Based on Wilson's shocking violation of the Court's instruction, made forty-one times throughout trial, not to contact the media, Mr. Basham was entitled to a rebuttable presumption of prejudice. *Remmer v. United States*, 347 U.S. 227 (1954). Despite acknowledging that Wilson's testimony was inconsistent with the account offered by the news producer, and recognizing the weakness of her excuse that she did not remember contacting newspapers outlets in addition to television stations, the Court concluded that the Government had rebutted the presumption of prejudice and denied Mr. Basham's motion for new trial.

The decision whether to grant a new trial was clearly one over which the Court struggled. The Court observed, "If I go one way, a life is taken, if I go the other way, the Government is put to the expense of several million dollars – and I don't say that with hyperbole." (Tr. 11/12/04 at 92.) After the evidence of Wilson's misconduct increased, the Court mulled, "What about the idea that a juror who is just that determined to violated the judge's instructions, it just stinks so bad that the whole verdict is suspect? That juror such as that should just not be permitted to be one of 12 votes for a death penalty?" (Tr. 12/13/04 at 35.) Finally, the Court stated, "Honestly, from the bottom of my heart, I don't know how I will rule on this. It is the toughest call I have." (Tr. 12/13/04 at 64.)

**JA 2640**

Ultimately, the Court concluded that the Government had "rebutted the presumption of prejudice because the contact did not involve the defendant, the government, or any witnesses in the case, and Wilson reached out to strangers in the suit who would have no information other than what was available in the public arena." *United States v. Basham*, 561 F.3d 302, 318 (2009) (internal citations omitted.)   Furthermore, the Court found that there was no evidence that Wilson informed the other jurors about her phone calls to the media and that the misconduct was merely harmless error. *Id.* at 318-19.  This issue was raised on direct appeal, and the Fourth Circuit held that, although this Court's conclusion was not "inevitable, it plainly was not an abuse of discretion." *Id.* at 321 (internal citations omitted.)

The Court's decision relied heavily on its acceptance of Wilson's testimony. From the outset, the Court acknowledged that "Ms. Wilson's testimony is a little bit suspect." (Tr. 11/18/04 at 47.)  Yet, despite the news producer's testimony that Wilson expressed concern that Mr. Basham would not get death and the Court's acknowledgment that Wilson likely perjured herself as to that issue,[17] the Court accepted Wilson's denial of any premature deliberations.  The Court also accepted Wilson's insistence that all of the seventy-one calls between herself and other jurors

---

[17]Specifically, the Court stated "[i]f I determine she committed perjury, which I essentially have when I say I accepted the station – the TV station's version of what happened . . . ."  (Tr. 12/13/04 at 20.)

were innocuous.  Wilson made all of these denials under oath.

Penalty of perjury also applied to the juror questionnaire.  Apparently unconcerned about the penalty of perjury, Wilson answered at least two items falsely on the questionnaire.  First, Question 41 read, "[H]ave you ever sued someone or been sued?"  Wilson checked "No."  [Juror 776 Questionnaire].  In truth, Wilson had two judgments against her in the Common Pleas Court in Spartanburg County prior to being selected as a juror in Mr. Basham's case.  In the first matter, case number 1995 TR4208826, filed November 13, 1995, by the South Carolina Department of Revenue, a judgment of $650.18  was awarded against Wilson.  The case terminated on February 11, 1996.  In the second matter, case number 1998 TR4211594, filed November 13, 1998, again by the South Carolina Department of Revenue, resulted in a judgment of $ 1,761.59 against Wilson.  The case was closed on March 17, 2000. (Exh. 6.)

Wilson also testified during voir dire on September 2, 2004, that she had been a nurse for four years.  (Tr. 9/2/2004 at 172-73.) Upon information and belief, however, Wilson did not receive her license until February 2002.  Thus, contrary to her statements on voir dire, Wilson had not been working as a nurse for four years in 2004.  (Exh. 6.)

**JA 2642**

The information regarding the judgments against Wilson was readily available in 2005.  Investigator John Castro, assisting Mr. Basham's appointed § 2255 counsel, was able to access and print the information from the South Carolina Judicial Website www.judicial.state.sc.us in less than fifteen minutes.  The information regarding Wilson's nursing license was also readily available.  Mr. Castro located and printed the information from www.llr.state.us in less than ten minutes.  (Exh. 6.)

Despite the easy accessibility of the information concerning Wilson's untruthfulness in her juror questionnaire and in voir dire, defense counsel did not pursue any independent investigation in an attempt to challenge Wilson's veracity or to show that she had lied under penalty of perjury from the outset.

Defense counsel had great concerns about Wilson's "continuing pattern of untruthfulness."  (Tr. 1/14/05 at 17.)  As Greg Harris argued,

> This Court has already asked her a series of questions involving her proprieties as a juror.  And she has answered yes, I didn't – yes, I didn't prematurely deliberate.  Well, that's just not true.  Yes, I didn't look at the internet.  That's probably not true.  Yes, I didn't read the newspapers.  That's probably not true.  And there's no way that we are ever going find out whether or not those things were untrue.

(Tr. 1/14/05 at 11.)  Harris also argued, "A juror, the forelady of Brad [sic] Basham's case, sat on that stand and lied to you."  (Tr. 1/14/05 at 22.)  Finally, defense counsel pointed out, "the only time she [Wilson] ever admits to something is when she has

**JA 2643**

to." (Tr. 1/14/05 at 50.)

Yet, despite their fervent belief that Wilson was lying, defense counsel failed independently to investigate whether Wilson had made statements at voir dire that were provably false. This failure was unreasonable and fell short of professional standards. Defense counsel had a duty to "make reasonable investigations, or make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691; *see also Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) ("when evaluating decisions not to investigate further, [the court] must regard counsel's choice with an eye for 'reasonableness in all the circumstances.'" (*quoting Strickland,* 466 U.S. at 691)).

With a jury already having returned a death verdict against their client, the only reasonable strategy to save Mr. Basham's life was to convince the Court that Wilson's misconduct mandated a new trial. To do this, counsel needed to show that Wilson was not impartial and not competent to serve. Evidence of her additional untruthfulness would have done much to convince the Court that this was true. Accordingly, the failure to engage in independent investigation to support their belief that Wilson was not telling the truth was unreasonable.

**JA 2644**

## CLAIM 28

**Newly discovered evidence suggests that Juror Wilson was untruthful in her testimony to the Court concerning her contact with other jurors. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.**

Mr. Basham incorporates by specific reference all facts allegations and arguments made elsewhere in this Motion and the exhibits thereto. Specifically, this claim incorporates the argument and facts in Claim 27.

As stated in the previous claim, information readily available to defense counsel in 2005 would have cast significant doubt on the veracity of Juror Cynthia Wilson. In addition to the information available to counsel at the time, however, newly discovered evidence suggests that Wilson was untruthful in her answers to this Court.

Cynthia Wilson testified before this Court three times in hearings regarding her misconduct. (Tr. 2/14/04 at 2.) She claimed that the jury had not deliberated prematurely. (Tr. 11/12/04 at 74, 76.) She avowed that, if she had engaged in one-on-one conversations, as witnessed and testified to by other jurors, she was only talking about softball or cheerleading. (Tr. 11/23/04 at 10.) At the hearings, Wilson also addressed her numerous calls to fellow juror Shannon Burnett following her calls

133

**JA 2645**

to the media. Wilson testified at the contempt hearing that she talked with Burnett about doing sod work in her back yard. (Tr. 12/21/04 at 35-36.)

The Court did not ask about the content of Wilson's calls to other jurors. Mr. Harris argued, however, that "Wilson made an incredible amount of phone calls to two particular jurors, both of them from the upstate, one Joyce Hartsoe and one Wendy Doby." (Tr. 1/14/05 at 3.) Harris pointed out that on a single day, Wilson and Doby talked for more than three hours and that the calls with Doby and Hartsoe coincided with important dates in the trial. (Tr. 1/14/05 at 3-7.) Harris noted that the record showed that "there is a very strong relationship between the day, what happened during that day and a lot of these telephone calls." (Tr. 12/28/04 at 32.) Harris argued:

> These records clearly indicate a willingness on this juror's part to reach out and touch other jurors, whether they are talking about cheerleading the entire time during these conversations, whether they are talking about – I think she said they talked about softball games, that is just unimaginable based upon the volume of phone calls of this juror to other jurors, that is just not believable. I believe this Court needs to determine the magnitude of this witness's discredit when determining whether or not she was faithful to her oath and was a fair juror to Mr. Basham.

(Tr. 12/28/04 at 27-28.) Despite Harris's argument, the Court precluded any further inquiry on the issue of premature deliberations. (Tr. 1/14/05 at 56.)

Logic would suggest that, if the multiple and lengthy calls between Wilson and her fellow jurors were solely about personal matters, these jurors must have formed substantial friendships and the contact among them would have continued even after the trial.[18] Yet, it appears that the "friendship" among these women ceased after Mr. Basham's trial. An investigator for Mr. Basham interviewed Greg Wilson, Cynthia's ex-husband and a witness at the contempt hearings. Mr. Wilson stated that, to the best of his knowledge, Cynthia Wilson did not remain friends with any of the jurors from the trial. He did not know the names "Wendy Doby" or "Joyce Hartsoe." (Exh. 7.) Apparently, the hours and hours of communications that Wilson claimed to be of a personal nature and not about the trial, ceased when the trial did. Regarding Wilson's testimony that she spoke with Juror Shannon Burnett about doing sod work for her, Mr. Wilson stated this would have been very odd, as he did all the maintenance and landscaping at their house himself. (Exh. 7.)

Unlike the phone calls with fellow jurors, Wilson's lies about her conduct in the Basham trial did not stop when the trial ended. Wilson was disciplined on January 6, 2007, for not disclosing the fact that she was put on probation for contempt

---

[18]As the Government recognized, "The idea that these jurors would develop . . . lifetime friendships, not only is something that's not unusual, I would submit to the Court that that's normal. If you remember the Fulks trial, one of the jurors, Mr. Curswell . . . invited eight of the jurors to his wedding." (Tr. 1/14/05 at 31.)

135

of court in the Basham trial. (Exh. 6.) Wilson's lies continued on her nursing license renewal application in April 28, 2008, on which she falsely stated that she did not have any prior disciplinary action before any nursing board in any jurisdiction. Wilson lied again on her license renewal application in April 15, 2010, when asked the same question. (Exh. 6.)

Finally, Wilson lied three times on her nursing license renewal application when asked whether she had ever been convicted under any federal law. She did not disclose that she had been held in criminal contempt of court by this Court. Wilson answered "no" to that question on her applications dated April 7, 2006, April 11, 2008, and April 5, 2010. (Exh. 6.)

This newly discovered evidence bolsters the position defense counsel took in the contempt hearings: "This is a person that came into this courtroom and lied. And she didn't just lie once or twice or three times or four times, she lied repeatedly." (Tr. 12/13/04 at 39.) Wilson's lies have only continued. Any decision that was based on acceptance of her testimony cannot stand. Accordingly, Mr. Basham respectfully requests that the Court vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.

136

**JA 2648**

<div align="center">

**CLAIM 29**

</div>

**Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

On October 6, 2008, following his guilty plea to a one-count indictment charging corruption and obstruction of justice, (Former) Sheriff Ronald Hewett was sentenced to serve sixteen months in federal prison, followed by two-years supervised release with mandatory drug testing provisions, and was fined $10,000.[19]  (Exh. 8.) The indictment against Hewett charged that he "repeatedly used his office for his personal benefit." (*Id.*)  "In addition to obstructing his office's criminal investigation of a relative, Hewett misused public funds by ordering deputies, while on duty, to perform manual labor at his house and work on his political campaigns." (*Id.*)  When federal agents subpoenaed numerous deputies for grand juries, Sheriff Hewett met with the deputies and instructed them to "plead the Fifth" or be vague in their

---

[19]Hewett also pled guilty to additional charges of embezzlement by a public official in Brunswick County Superior Court, and has been the defendant in numerous civil suits filed against him relating both to his time as sheriff and his criminal convictions. http://www.starnewsonline.com/article/10091016/ARTICLES/9101699 49 (last accessed May 24, 2010).  http://starnewsonline.com/article/20100303 (last (last accessed  March 18, 2010.)

<div align="center">

137

</div>

<div align="right">

**JA 2649**

</div>

testimony.  He threatened witnesses, retaliated against those who testified, and even had a chaplain attend staff meetings where the deputies were told that "they should not cooperate with evil on the witness stand."  (*Id.*)

As part of its prosecution of Hewett, the Government obtained hundreds of pages of affidavits detailing a litany of abuses, including allegations that Hewett was repeatedly intoxicated at crime scenes and sexually harassed female co-workers.  As United States Attorney Holding stated, "Ronald Hewett was not only a law enforcement officer, but he was also entrusted by the people of Brunswick County with leadership of their Sheriff's Office.  First, he breached that trust by operating the Sheriff's Office for his personal benefit.  Then, when that activity came under investigation, he unlawfully obstructed the investigation."  (Exh. 8.)

Before his fall from grace, Ronald Hewett played the role of the star witness in Mr. Basham's trial, a role he likely relished.[20]  At trial, the Government went out of its way to emphasize Hewett's damaging testimony to Mr. Basham, even arguing to the jury, "You remember how fair Sheriff Hewett was."  (Tr. 9/29/04 at 79).  Unfortunately, as his own convictions would eventually bear out, "fair" was not the

---

[20]"The sheriff became known around Brunswick County and beyond as 'Hollywood Hewett' because he was so often seen in television newscasts and newspaper photos after a major crime or event."  http://wwwlstarnewsonline.com/ section/topic32(last accessed May 24, 2010).  There was even a documentary about him on PBS.  (*Id.*)

138

best adjective to accurately describe Sheriff Hewett.

Unconcerned about false testimony, and drawn to the spotlight, it is highly possible that Hewett fabricated his testimony when he claimed that Mr. Basham had demonstrated how he (Basham) had strangled Alice Donovan with the purse strap. The possibility of fabrication on this issue is especially strong when considered in light of Hewett's memorialized interview with Lieutenant Crocker immediately after the Thanksgiving Day search, in which Hewett made no reference to Mr. Basham being the actual killer. Without Hewett's testimony, there is legitimate doubt as to whether the results of Mr. Basham's trial, especially the penalty phase, would have been different.

Mr. Basham submits that the post-trial evidence of Ronald Hewett's lack of veracity raises serious questions about whether he was convicted through the use of false testimony. Mr. Basham submits that Hewett's testimony concerning his alleged statements to and physical demonstrations for Hewett were so prejudicial that, in light of the evidence of Hewett's questionable veracity, the Court should vacate the convictions and sentences in this case and order a new trial. At the very least, the Court should conduct an evidentiary hearing on this issue.

**JA 2651**

CLAIM 30

**Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

A majority of courts, the Restatement of the Law Governing Lawyers, and the South Carolina Rules of Professional Conduct uniformly require that "a lawyer must deliver to [a] client or former client, at an appropriate time and in any event promptly after the representation ends, such originals and copies of other documents possessed by the lawyer relating to the representation as the client or former client reasonably needs." Restatement (Third) of the Law Governing Lawyers § 46 (2000); *see also Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 648 (N.D. Tex. 1989) (noting "the virtually universal practice of former attorneys transferring the entire client file to new counsel"); S.C. Rules of Prof'l Conduct R. 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client

140

is entitled . . . .").

Upon information and belief, despite an ethical obligation to surrender the files to which Mr. Basham was entitled, Mr. Basham's trial lead attorney, Jack Swerling, failed to protect Mr. Basham's interests by repeatedly refusing to surrender or allow appellate counsel reasonable access to the thousands of trial-related documents known to be in his possession. In denying appellate counsel unfettered access to those documents—and whatever claims may have lain therein—Mr. Swerling compromised the underlying appeal to an unknowable extent. That appellate counsel, through no fault of their own, may have erroneously omitted a viable claim, thereby depriving Mr. Basham of his due process right to the effective assistance of appellate counsel, is reason enough to grant this petition.

Upon information and belief, from the outset of the appeal process, Mr. Swerling treated Mr. Basham's files as his own and, in both word and deed, made clear that he alone held the keys. Working from Washington, D.C., without the benefit of an index to the scores of boxes of files in South Carolina, appellate counsel was forced to rely upon the trial docket, supposition, and blind instinct in requesting materials. (*See* Consent Mot. for Extension of Time ¶ 9, April 18, 2008, App. Dkt. 152 (citing number of boxes).)

Appellate counsel were, from the outset, at Mr. Swerling's mercy in attempting to discern meritorious issues.  Upon information and belief, despite repeated requests for the trial file, appellate counsel were unable to obtain the file from Mr. Swerling. Instead, appellate counsel was forced, days before filing the opening brief, to travel to South Carolina to obtain necessary documents.  Even after this trip, however, appellate counsel lacked most of the trial file in Mr. Basham's case.

To deny a former client, such as Mr. Basham, any documents produced in the course of representation is to "deny the client *the full benefit* of the services for which he paid, *often dearly*."  *Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 650 (N.D. Tex. 1989) (emphasis added).  Mr. Swerling, by not "surrendering papers and property to which [Mr. Basham was] entitled," put appellate counsel in an untenable position, one in which the only answer was denied by the very circumstances of the problem.  S.C. Rules of Prof'l Conduct R. 1.16(d).  "[T]his case is illustrative that in a complex [appeal] where the file may be voluminous (commensurably increasing the likely usefulness of work product materials to advise the client concerning ongoing rights and obligations), the client's need for access to a particular paper cannot be demonstrated except in the most general terms, in the absence of prior disclosure of the content of the very document to which access is sought."  *In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*, 689 N.E.2d 879, 882 (N.Y. 1997).  Just

**JA 2654**

as unfettered access to Mr. Basham's files would have "commensurably increas[ed] the likely usefulness of work product materials" in prosecuting his appeal, Mr. Swerling's refusal to surrender Mr. Basham's files or permit appellate counsel reasonable access to those files, immeasurably compromised the usefulness of those documents in prosecuting his appeal and, in turn, ensured that counsel would fall far short of providing Mr. Basham the effective assistance to which he was entitled.

Any one of the dozens of boxes of documents appellate counsel was unable to obtain from Mr. Swerling may have held a claim that, absent the error of its omission, would have demonstrated "a reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695, or for the purpose of this petition, "a reasonable probability that the omitted claim would have resulted in a reversal on appeal," *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).

Because his trial counsel failed to provide his appellate attorneys with files and records necessary for them to effectively represent him in direct appeal, Mr. Basham was deprived of the effective assistance of both his appellate counsel and his trial counsel. As is demonstrated by the several instances set forth in this Motion detailing appellate counsel's failure to raise meritorious claims in Mr. Basham's direct appeal, it is clear that Mr. Basham was prejudiced by this violation of his federal

143

constitutional and statutory rights.

<div align="center">

**CLAIM 31**

</div>

**Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment.  Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Mr. Basham was denied his right to due process, to a fair trial, the assistance of counsel, to confront the evidence presented against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence in contravention of the Fifth, Sixth and Eighth Amendments of the United States Constitution, because the indictment in his case made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592 (C) or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

The facts in support of this claim, among others to be presented after full investigation, discovery, and an evidentiary hearing, are as follows:

<div align="right">

**JA 2656**

</div>

As the Supreme Court has made clear in a line of cases:

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."

*Ring v. Arizona*, 536 U.S. 584, 600 (2002) *quoting Jones v. United States*, 526 U.S. 227, 243 n. 6 (1999).  In direct contravention of these principles, the Government failed to mention its pursuit of the death penalty or allege any of the aggravating factors which the government claimed justified Mr. Basham's death sentence in the indictment.  This structural defect in Mr. Basham's capital proceedings requires that his death sentence be vacated.

All of the constitutional violations alleged above warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, *supra*, 507 U.S. 619, 638 n. 9.  Moreover, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the death sentence, rendering it fundamentally unfair and resulting in a miscarriage of justice.

Appellate counsel unreasonably failed to raise this issue on direct appeal.  There is a reasonable probability that Mr. Basham would have been granted a new

145

trial if counsel had raised this issue on appeal.

<div align="center">

**CLAIM 32**

</div>

**A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced. This Court should vacate Mr. Basham's sentence on this basis alone**.

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In support of this claim, Mr. Basham alleges the following facts, among others to be presented after full discovery and an evidentiary hearing.

**A.    Eighth Amendment**

In a press conference on June 28, 2000, President Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty." Responding to that question, the President had the following to say about the federal death penalty:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime. I've got a review underway of both those issues at this time.

<div align="center">146</div>

<div align="right">**JA 2658**</div>

Partial Transcript of the President's 6/28/2000 press conference.

On September 12, 2000, the Department of Justice released a comprehensive study of how the federal death penalty has been administered from 1988 to mid-2000 (Exh. 9). The Department filed a supplemental report on June 6, 2001, after the change in administration. (Exh. 10.) The essence of the study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis. As reported in the DOJ Study, after 12 years of discriminatory and irrational charging decisions, the federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other." Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at that time had been sentenced to death in the South. Virginia and Texas had contributed four defendants apiece. No other jurisdiction, at the time of the DOJ Study's release, had sentenced more than a single defendant to death.[21]

---

[21]In 2003, the year the government chose to pursue a death sentence in Mr. Basham's case, federal death row had 38 residents: nine were white and 21 were African-American. In the modern death penalty era, there have been three federal executions: one white man (Timothy McVeigh), one black man (Louis Jones) and one Latino (Juan Garza). As of April 1, 2010, there were 59 inmates on federal death row. The federal districts in three "death friendly" states – Texas, Virginia and Missouri – account for almost half of this population (22 out of 59). Two of the three federal prisoners executed were sentenced to death in Texas.

In terms of which defendants actually faced the federal death penalty, the DOJ Study showed that of the 159 cases in which the Attorney General had authorized a capital prosecution, 44 defendants were white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%). (*See* Exh. 9, Table 1A, at p. T-2.)  Thus, more than 70% of the federal defendants targeted for the death penalty were non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the study revealed a regional bias to enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

1.    From 1995 onward, of the 94 federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.  (Exh. 9 at 12.)

2.    Twenty-two federal districts had never submitted a case for review at all.[22]  (Exh. 9 at T-59 - 62.)

---

[22]Any murder committed with a gun during a robbery is a potential federal death penalty case.  18 U.S.C. § 924.  In *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.

3.     Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[23]  *Id.*

The release of the report drew the following predictable public reactions from officials at the Justice Department and the White House:

> Saying she was 'sorely troubled' by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, Reno Troubled by Death Penalty Statistics, N.Y. Times, September 13, 2000.  The N.Y. Times also reported the reaction of Deputy Attorney General Eric Holder, at the time the highest-ranking African American at the Justice Department:

> 'I can't help but be personally and professionally disturbed by the numbers that we discuss today,' Deputy Attorney General Eric Holder said.  'To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process.  Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity.'

---

[23]The recommendation that accompanies a submission is of great importance. In 89% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  (Ex. 9 at 43.)  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id.* These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.

149

**JA 2661**

*Id.* CNN, also reporting on the story, noted that Attorney General Reno wanted "a broader analysis."[24] White House deputy press secretary Jake Siewert responded to the release of the report in the following manner: "'At first glance, those numbers are troubling. We need to know what's behind the numbers.'"[25] During his confirmation hearings, Attorney General John Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." *See United States v. Bass*, 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations. Mr. Basham is entitled to know what is "behind the numbers" and that, in the absence of a convincing race-and region-neutral explanation for the Department of Justice's capital-charging practices, his death-sentence must be reversed. Mr. Basham seeks a hearing on this issue.

---

[24]In *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *r'vsd*, 536 U.S. 862 (2002) (per curium), the Sixth Circuit quoted at length the public statements of Attorney General Reno and Deputy Attorney General Holder in response to the release of the DOJ Study. *Bass*, 266 F.3d at 538.

[25]Considering the impact of the study, Judge Sand in *United States v. Bin Laden*, 126 F. Supp. 2d 256, 258 (S.D.N.Y. 2000), found the statistical evidence "indeed troubling," but ultimately rejected a challenge to that capital prosecution.

150

### B.    Statutory right to justice without discrimination

Subsection (f) of 18 U.S.C. § 3593 is entitled "Special precaution to ensure against discrimination," and provides that in any capital sentencing proceeding:

> [T]he court . . . shall instruct the jury that in considering whether the sentence of death is justified, it shall not consider the race . . . of the defendant or of any victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or victim may be.

Moreover, each juror in an FDPA case is required to sign a certificate "that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation . . . no matter what the race . . . of the defendant or any victim may be."   While the explicit provisions of this section deal with jury instructions and jury decision making, the purpose of this subsection is broader.  This provision is unique in the Federal Criminal Code.  It demonstrates extreme sensitivity on the part of Congress to the danger of racial discrimination in capital prosecutions, and a commitment to eradicate any such discrimination.

The Congressional debate on the death penalty provisions of § 848(e) – limited as it was – included extended discussion of the problem of racial discrimination, and of the Supreme Court's treatment of racial bias in the then recent opinion in

**JA 2663**

*McCleskey*.  *See*, *e.g.*, *Congressional Record*, 57484 (June 9, 1988) (Sen. Orrin

Hatch, Utah, discussing the requirements for proof of discrimination under

*McCleskey*).  In particular, Senator Alphonse D'Amato of New York, the prime

sponsor of the § 848(e) bill, emphasized, in conjunction with the enactment of §

848(o), that Congress intended to "take every step possible to eliminate

discrimination by the juries, *by the prosecutors*, by the judges." *Congressional*

*Record*, S15753 (Oct. 13, 1988) (emphasis added).  In the context of that debate,

Senator D'Amato's comments reflect a clear legislative determination to take stronger

measures than those already embodied in *McCleskey* and to eliminate discrimination

in capital charging as well as capital sentencing.  They indicate that a federal capital

defendant has an affirmative *statutory* right to justice without discrimination.

## C.    Supervisory powers

Moreover, regardless of the text of § 3593(f), this Court has the independent

authority to curb charging discrimination and regional caprice by invoking its

supervisory powers over the administration of federal criminal justice:

> '[G]uided by considerations of justice,' *McNabb v. United*
> *States*, 318 U.S. 332, 341 (1943), and in the exercise of
> supervisory powers, federal courts may, within limits,
> formulate procedural rules not specifically required by the
> Constitution or the Congress. The purposes underlying use
> of the supervisory powers are threefold: to implement a
> remedy for violation of recognized rights [citations

152

**JA 2664**

omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury [Citations omitted]; and finally, as a remedy designed to deter illegal conduct [citations omitted].

*United States v. Hastings*, 461 U.S. 499, 505 (1983).

A court's supervisory authority to take action "not specifically required by the Constitution" is necessarily broader than its authority to enforce particular constitutional guarantees.  In state prosecutions, state courts exercise this general supervisory power, and federal courts (on *certiorari* in the Supreme Court or in habeas corpus) are restricted to enforcing the Constitution. In federal prosecutions, the federal courts exercise both functions simultaneously.  This is why, as the Sixth Circuit noted in *United States v. Robinson*, 716 F.2d 1095, 1100 (6th Cir. 1983), when a "case is before the court on direct review, not habeas corpus relief, the standard of review is more stringent."  *McCleskey*, of course, was a review of state proceedings in habeas corpus.  The federal discrimination complained of here is subject to a "more stringent" standard of review.

## D.     The FPDA's omission of "plain-error" review

Meaningful appellate review is an indispensable component of a constitutional death penalty scheme.  Such review provides a necessary check on the arbitrary and capricious infliction of the death penalty.  *Parker v. Dugger*, 498 U.S. 308, 321

153

**JA 2665**

(1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"); *see also Clemons v. Mississippi*, 494 U.S. 738, 749 ("this Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency").

In enacting the FDPA, however, Congress actually curtailed the scope of appellate review and, thereby, rendered the statute unconstitutional.  The relevant section reads as follows:

> (b) Review. – The court of appeals shall review the entire record on the case, including –
>
> (1) the evidence submitted during the trial;
>
> (2) the information submitted during the sentencing hearing;
>
> (3) the procedures employed in the sentencing hearing; and
>
> (4) the special findings required under section 3593(d).
>
> (c) Decision and disposition. –
>
> (1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports an aggravating factor required to be considered under section 3592.
>
> (2) Whenever the court of appeals finds that –

(A)   The sentence of death was imposed under the influence passion, prejudice, or any other arbitrary factor;

(B)   the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

(C)   the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

18 U.S.C. § 3595 (emphasis added).

By its plain language, the above-quoted provision precludes plain-error analysis by a court of appeals reviewing a capital case. *See* Fed. R. App. P. 52(b). The doctrine of plain error is available in all criminal appeals, and gives an appellate court the option of noticing obvious errors that were not brought to the attention of the district court. *See*, *e.g.*, *United States v. Frady*, 456 U.S. 152 (1982); *Silber v. United States*, 370 U.S. 717 (1962).

By failing to allow for plain-error review, the FDPA ignores the line of Supreme Court cases requiring meaningful appellate review as a pre-condition to a finding that a death-penalty scheme is constitutional. It also ignores the fact that the Supreme Court has repeatedly recognized that "death is different" and, in recognition of that difference, has required heightened standards of reliability to justify death verdicts.

155

**JA 2667**

A statute that requires an appellate court to affirm a death verdict that was returned as a result of plain error in the proceedings below is antithetical to concepts of heightened reliability, meaningful appellate review, and equal protection. The statute is therefore unconstitutional.

<div align="center">

**CLAIM 33**

</div>

**The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.**

The Supreme Court has held that the Constitution will not tolerate sentences of death that are imposed arbitrarily or capriciously. *Furman v. Georgia*, 408 U.S. 238 (1972). In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court reaffirmed "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."

The reality of the federal death penalty in practice is that there is no consistency or predictability in the manner in which federal courts have imposed the federal death penalty. In fact, there is no consistency in the cases that proceed to trial compared to those that plead out. Included as exhibits to this motion are summaries of the facts and circumstances of the status or resolution of every authorized federal death penalty case from 1988 until 2004, organized as follows: Exh. 11, Federal Capital Prosecutions Awaiting Trial; Exh. 12, Federal Capital Defendants Who Died

<div align="center">

156

</div>

<div align="right">

**JA 2668**

</div>

Before or During Trial; Exh. 13, Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons; Exh. 14, Federal Capital Prosecutions in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty; Exh. 15, Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other than Death; Exh. 16, Federal Capital Defendants Who Were Found Not Guilty of the Capital Charge or Were Innocent; Exh. 17, Federal Capital Defendants Convicted of a Lesser Offense; Exh. 18, Federal Capital Cases Where the Death Penalty Has Been Rejected by Juries or Judges: Exh. 19, Federal Capital Cases Resulting in a Sentence of Death; Exh. 20, Federal Capital Cases Resulting in Execution; Exh. 21, A Listing of Former Federal Death Row Inmates.

One cannot read the descriptions of these cases without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for indiscernible reasons, some defendants were sentenced to death, but the vast majority were not. If any basis can be distinguished, it is race and region.[26] Fairness and consistency are the opposite of arbitrariness and caprice. In the demonstrated absence of fairness and consistency, the federal death penalty must be set aside.

---

[26]As discussed previously in Mr. Basham's litigation, *See* Claim 32, the invidiousness and irrationality of these factors is an additional reason that the federal death penalty is unconstitutional.

JA 2669

This argument is not refuted by simply pointing out the difficulties inherent in comparing cases.  Selected summaries of the cases quickly put that overly simplistic argument to rest:

1. *United States v. Timothy McVeigh* (D. Colo.).  The Oklahoma City bombing case.  168 dead.  Hundreds injured.  Tried, convicted, sentenced to death, executed.

2. *United States v. Terry Nichols* (D. Colo.).  McVeigh's co-defendant.  Tried, convicted, sentenced to life.

3. *United States v. Khalfan Mohamed and Rashed al`-Owhali* (S.D.N.Y.).  Two defendants associated with Osama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa.  224 killed, including 12 Americans; thousands injured.  Tried, convicted, sentenced to life.

4. *United States v. Theodore Kaczynski* (E.D. Cal.).  The Unabomber.  Three murders by mailbombs.  Plea agreement. Sentenced to life.

5. *United States v. Joseph Minerd* (W.D. Pa.).  Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter.  Tried, convicted, sentenced to life.

6. *United States v. Coleman Johnson* (W.D. Va.).  Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support.  Tried, convicted, sentenced to life.

7. *United States v. Christopher Dean* (D. Vt.).  Defendant sent pipebomb through the mail killing victim and disfiguring victim's mother.  Plea agreement.  Sentenced to life.

**JA 2670**

8.    *United States v. Billy Cooper* (S.D. Miss.).  Carjacking killing of two victims.  Tried, convicted, sentenced to life.

9.    *United States v. Christopher Vialva and Brandon Bernard* (W.D. Texas). Carjacking double homicide. Tried, convicted, sentenced to death.

10.   *United States v. David Paul Hammer* (M.D. Pa.).  Prison inmate guilty of strangling to death cellmate at USP-Allenwood. Sentenced to death.

11.   *United States v. Michael O'Driscoll* (M.D. Pa.).  Prison inmate guilty of stabbing to death fellow inmate at USP-Allenwood. Same judge, same courtroom and same defense attorneys as Hammer.  Sentenced to life.

12.   *United States v. Storey* (D. Kansas).  Prison inmate with Aryan Brotherhood ties killed fellow prisoner at USP-Leavenworth. Plea agreement.  Sentenced to less than life sentence.

13.   *United States v. Douglas Black and Steven Riddle* (D. Colo.). Inmates at USP-Florence attacked two suspected "snitches," one killed, one injured.  Plea agreements.  Substantially less than life sentences.

14.   *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (E.D.N.Y.).  Chinese gang members who kidnapped, raped, and murdered victims held for ransom.  Fu Xin Chen and Jai Wu Chen entered plea agreements. Attorney General withdrew death authorization shortly before Peng trial.  Peng convicted after trial. All three sentenced to life.

15.   *United States v. Louis Jones* (N.D. Texas).  Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

16. *United States v. Corey Johnson, James Roane, and Richard Tipton* (E.D. Va.). Eleven drug-related murders. Tried, convicted, sentenced to death.

17. *United States v. Dean Anthony Beckford* (E.D. Va.). Six drug-related murders. Tried, convicted, life sentence.

18. *United States v. Clarence Heatley and John Cuff* (S.D.N.Y.). 14 drug-related murders. Plea agreement. Sentenced to life.

19. *United States v. Thomas Pitera* (E.D.N.Y.). Seven drug-related murders in organized crime context. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

20. *United States v. German Sinisterra and Arboleda Ortiz* (W.D. Mo.). One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

21. *United States v. Kevin Grey and Rodney Moore* (D.D.C.). Thirty-one drug-related murders. Tried, convicted, sentenced to life.

22. *United States v. Daryl Johnson* (N.D. Ill.). Two drug-related murders. Tried, convicted, sentenced to death.

23. *United States v. Peter Rollock* (S.D.N.Y.). Eight drug-related murders, including some ordered by defendant while incarcerated. Plea agreement. Sentenced to life.

24. *United States v. Tommy Edelin* (D.D.C.). Fourteen drug-related murders. Tried, convicted, sentenced to life.

25. *United States v. Reynaldo Villarreal and Baldemar Villarreal* (E.D. Texas). Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

26. *United States v. Juan Raul Garza* (S.D. Tex.). Three drug-related murders. Tried, convicted, sentenced to death, executed.

**JA 2672**

27. *United States v. Anthony Jones* (D. Md.).   Six drug-related murders.  Tried, convicted, sentenced to life.

28. *United States v. Chevy Kehoe and Daniel Lee* (D. Ark.).  Three murders in connection with activities of white supremacist organization.  Tried and convicted together. Kehoe – considered more culpable – sentenced to life.  Lee sentenced to death.

29. *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y.).  Millionaire Sikh businessman hired killers of two employees cooperating with authorities in criminal investigation of defendant.  Tried, convicted, sentenced to life.

30. *United States v. Trinity Ingle and Jeffrey Paul* (W.D. Ark.).  Murder of elderly, retired National Parks employee.  Victim shot while bound and gagged.  At separate trials, Ingle was convicted and sentenced to life; Paul was convicted and sentenced to death.

31. *United States v. Kristen Gilbert* (D. Mass.).  VA nurse murdered four patients and attempted to murder three more.  Tried, convicted, sentenced to life.

32. *United States v. LaFawn Bobbitt and Rashi Jones* (E.D. Va.).  Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

33. *United States v.Bille Allen and Norris Holder* (W.D. Mo.).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both sentenced to death.

Ultimately, the full force of this argument derives from the cumulative effect of examining, in their entirety, the case-by-case summaries of authorized cases compiled in the Exhibits.  By definition, because all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or

**JA 2673**

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394   Page 172 of 179

should be) the worst of the worst cases in the federal system. Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (or would not) argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries returned life verdicts or plea agreements were offered and accepted. If one cannot discern a principled basis for distinguishing between cases where death is imposed and cases where death is not, the death penalty falls as arbitrary and capricious. If such a principled distinction exists, Mr. Basham challenges the Government to articulate it. Should the Government prove unable to meet their burden of showing a legitimate distinction, then Mr. Basham's sentence must be set aside.

<div align="center">

**CLAIM 34**

</div>

**Mr. Basham's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case**.

Mr. Basham's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Basham's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487

<div align="center">162</div>

**JA 2674**

and n. 15 (1978).

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Basham re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Basham of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Motion individually justifies reversal, when considered cumulatively, these errors denied Mr. Basham his constitutional rights.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be

JA 2675

deemed harmless.  In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

## V.    RESERVATION OF CLAIMS

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

Upon information and belief, counsel alleges grave concerns that Mr. Basham's mental state renders him presently incompetent to assist in his appeal, to make appropriate decisions concerning his case, and to communicate rationally with counsel.  To protect his rights under this Motion, Mr. Basham reserves the right to amend with claims and information that might later come to light, but are currently unavailable due to Mr. Basham's inability to assist counsel because he is incompetent.

"[F]ederal habeas corpus has a particularly important role in promoting fundamental fairness in the imposition of the death penalty" and "meaningful assistance of counsel is essential to secure federal constitutional rights." *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 813 (9th Cir. 2003).  To promote this role of fundamental fairness, a petitioner must be competent to assist counsel, otherwise the right to counsel at this stage is meaningless.  Counsel's ability to effectively present

**JA 2676**

claims "depends in substantial part on the client's ability to communicate rationally and effectively with his counsel." *Id.*

The right to competence is "firmly established" in common law. *Rohan*, 334 F.3d at 807. Furthermore, 18 U.S.C. § 4241, the federal competency statute, applies to federal habeas petitioners. *See Carter v. Bradshaw*, 2011 WL 2039171 at *2, 7 (May 26, 2011) (applying § 4241 to habeas actions and finding inmate incompetent and tolling the AEDPA's limitation period until inmate competent to proceed in § 2254 petition). Encompassed in Mr. Basham's right to pursue this Motion are the rights to due process, effective counsel, freedom from cruel and unusual punishment, and other rights as guaranteed by the Fifth, Sixth, and Eighth Amendments to the United States Constitution. *See e.g. Rohan*, 334 F.3d at 809, 813. Waiver of these rights by Mr. Basham would be akin to waiving any collateral attack on his conviction or sentence, and thus he must at least "(1) understand the nature and consequences of the proceedings against him, and (2) assist properly in his defense." *Carter*, 2011 WL 2039171 at *2; *see also Rees v. Peyton*, 384 U.S. 312, 313-314 (1966). If claims are waived while Mr. Basham is incompetent to proceed, structural error will result. *See Rohan*, 334 F.3d at 818.

Here, counsel has grave concerns about Mr. Basham's current competence. Upon information and belief, counsel submits that, upon his transfer to Terre Haute

**JA 2677**

after his trial in Columbia, South Carolina, Mr. Basham was taken off all medications previously prescribed to him. Mr. Basham has refused to communicate with appointed counsel for several months. Additionally, Mr. Basham, with the help of "an Inmate Legal Aid (sic)," filed a *pro se* pleading seeking to waive any further proceedings in this Court. (Dkt. 1391.) Counsel has been unable to confer with Mr. Basham and seek to develop additional facts relevant to this Motion. Accordingly, counsel reserves the right to amend with additional claims and information that they are currently unable to develop because of Mr. Basham's present condition.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Defendant Brandon Leon Basham asks that this Court provide the following relief:

1.    That Defendant be permitted to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

2.    Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases in the United States District Court, identifying all proceedings conducted in Defendant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations

166

**JA 2678**

set forth above;

3. Permit Defendant to file a traverse or reply to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4. Permit Defendant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion, and any defenses thereto raised by the Respondent's Answer;

5. Permit Defendant to Amend this Petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Defendant's Response to any Affirmative Defenses raised by the Respondent. Because Defendant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7. Permit oral argument as appropriate and required;

**JA 2679**

8.    Vacate Defendant's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

9.    Grant such further and additional relief as may be just.

## CERTIFICATION

Pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings for the United States District Courts, undersigned counsel declare under penalty of perjury that they are attorneys appointed by the United States District Court for the District of South Carolina to represent Brandon Basham in his proceedings pursuant to 28 U.S.C. § 2255. As such, undersigned counsel are authorized to file this motion pursuant to 28 U.S.C. § 2255 on Mr. Basham's behalf. This Motion is signed by undersigned counsel under penalty of perjury.

168

**JA 2680**

Respectfully submitted this 31st day of May, 2011.

s/Julia Grace Mimms
Julia Grace Mimms
Law Office of Julia G. Mimms, P.A.
1001 Elizabeth Avenue, Suite 1A
Charlotte, North Carolina 28204
Telephone: (704) 333-1301
Facsimile: (704) 333-1290

s/Michael L. Burke
Michael L. Burke (Arizona Bar No. 013173)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
850 West Adams, Suite 201
Phoenix, Arizona 85007
michael_burke@fd.org
sarah_stone@fd.org
Telephone: (602) 382-2818
Facsimile: (602) 889-3960

Attorneys for Defendant
Brandon Leon Basham

169

**JA 2681**

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 11

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

Exhibit Index to motion for collateral relief
Pursuant to  28 U.S.C. § 2255

Exhibit 1:    Declaration of Kimmberly Taylor

Exhibit 2:    Interview Report of DA Crocker, Brunswick County Sheriff's Office

Exhibit 3:    FBI 302 report prepared by Jeffrey Long, transcribed on December 4, 2002.

Exhibit 4:    Memorandum of Discipline to Capt. Carlisle J. McNair, July 1, 2002.

Exhibit 5:    Capt. Carlisle J. McNair's receipt of resignation, October 15, 2002.

Exhibit 6:    Declaration of John Castro, May 23, 2011.

Exhibit 7:    Declaration of John Castro, May 31, 2011.

Exhibit 8:     DOJ, Eastern District of North Carolina, news release 10/6/2008.

Exhibit 9:    DOJ Study

Exhibit 10:   DOJ, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review.

Exhibit 11:   Federal Capital Prosecutions Awaiting Trial.

Exhibit 12:   Federal Capital Defendants Who Die Before or During Trial.

Exhibit 13:   Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons.

Exhibit 14:   Federal Capital Prosecutions in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty.

Exhibit 15:   Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other than Death.

**JA 2682**

Exhibit 16:  Federal Capital Defendants Who Were Found Not Guilty of the Capital Charge or Were Innocent.

Exhibit 17:  Federal Capital Defendants Convicted of a Lesser Offense.

Exhibit 18:  Federal Capital Cases Where the Death Penalty Has Been Rejected by Juries or Judges.

Exhibit 19:  Federal Capital Cases Resulting in a Sentence of Death.

Exhibit 20:  Federal Capital Cases Resulting in Execution.

Exhibit 21:  A Listing of Former Federal Death Row Inmates.

**JA 2683**

# Exhibit 1

JA 2684

**Declaration of Kimmberly Taylor**

I, Kimmberly Taylor, declare under penalty of perjury pursuant to the laws of the State of Arizona and of the United States of America:

1.    I am a paralegal in the Office of the Federal Public Defender.  I am assigned to Brandon Basham's case.  The Office of the Federal Public Defender has represented Brandon Basham since September 18, 2009.

2.    On December 10, 2009, I sent an email to Mary Floyd, courtroom deputy for Judge Anderson, specifically asking why there were gaps in the docket numbers.  At this time, we could view all pleadings except for sealed pleadings, including those before November 2004. Ms. Floyd's response was, "The document numbers are skipped due to more than one defendant in the case.  Some of the skipped numbers maybe on the co-defendants docket.  Sometimes a docket number was deleted for an incorrect entry and the corrected entry would get a new number."  I replied and explained that the gaps I was referring to appear in the combined docket of Fulks and Basham and already accounted for corrected entries.

3.    On December 11, 2009, Mary Floyd replied to my email.  "Those documents are sealed ex parte motions by Basham.  You need to file a motion requesting copies of the sealed documents."  Seeking further clarification, I replied, "You did inform me about filing a motion to get sealed documents, which we will do, but I wasn't aware that some sealed motions don't even appear on the docket as you stated below.  Is there a reason why the sealed ex parte motions you referenced (108-114) don't show on the docket and 135, for example (which shows as "Ex Parte Motion [sealed]..."), does?"  Ms. Floyd responded, "It is case participant sensitive.  The system and our procedures changed from when this case started to when it ended."

4.    In the first half of 2010, our access to PACER pleadings filed before November 2004 was revoked.

5.    On June 1, 2010, the Supreme Court of the United States denied the petition for writ of certiorari in Mr. Basham's direct appeal.

6.    On June 2, 2010, I called Mary Floyd to inquire about regaining access to the entire electronic record and obtaining copies of the sealed documents.  She spoke with the Judge and a telephonic conference was arranged to discuss.  From this conference, we learned that Ms. Floyd would have to manually copy the record prior to November 2004 (800+ documents) to send to us.

Initials _____

Page 1 of 3

**JA 2685**

7.   On July 20, 2010, our office filed a motion for Michael L. Burke and Sarah E. Stone to appear *pro hac vice*. The Court granted that motion on July 27, 2010.

8.   On August 6, 2010, I called and emailed Mary Floyd regarding getting the record.

9.   On August 10, 2010, Mary Floyd notified us that the Judge and the Clerk of Court had granted us access to the electronic docket sheet for both Fulks and Basham, and that it should happen within two weeks.

10.  On August 23, 2010, we were advised that we should now file the motion for ECF access.

11.  On August 30, 2010, we filed a Motion for ECF Access to Case File. The Court granted that motion on September 16, 2010.

12.  Mary Floyd was on medical leave for two weeks in September 2010. After she returned, we emailed back and forth about why we still could not access the record. It was discovered that Michael L. Burke and Sarah E. Stone needed to register for a S.C. ECF login ID. This was done and resolved on September 22, 2010.

13.  On May 6, 2011, I sent the following email to Mary Floyd:

     This email is a follow up to the telephone message I left earlier.

     1)   I've attached a list of sealed documents that we need to get copies of. How soon can we obtain these documents and what is the process?

     2)   Also attached is a list of missing docket entries.[1] These represent a gap in the numerical sequence of the docket that we have no explanation for. This list excludes any corrected entries. Are there documents attached to any of these numbers? If not, what do the gaps represent?

     3)   While we have been appointed local counsel, we are the ones actually doing the work involved in investigating and drafting the petition. It would be very cumbersome for the team to have to travel to South Carolina to facilitate the filing...do the rules

---

[1]A copy of the list is attached as Appendix A to this declaration.

Initials _LH_

**JA 2686**

permit Mike and Sarah to file the petition electronically from Arizona now that they have been granted ECF accounts?

4)    As you may or may not be aware, we are planning to file the habeas petition by June 1st, so time is of the essence. If there is any way that I can assist in expediting this request, including travel, please advise.

14.   On May 11, 2011, I sent to Michael Burke and Sarah E. Stone the following email summarizing phone calls I had with Mary Floyd:

I spoke with Mary Floyd today. She explained that the court requires them to assign docket numbers to every entry they make, including administrative and utility entries that go unseen to the public. She assured me that every document related to the Fulks and Basham case is visible to us on PACER, so we can ignore the missing numbers. While we are authorized to receive Basham's sealed pleadings, we do not have access to Fulks'. She is sending a disc with some of the missing sealed pleadings to me. It may arrive while I am on leave, so if you are looking for a sealed pleading that is not in the binders, please check my inbox for a disc from the court and it should be there.

15.   On May 16, 2011, I received discs with internal versions of the docket in Fulks and Basham, which has some entries we are not able to view online. We also received hard copies of all of the sealed pleadings in Basham, most of which are ex parte motions regarding funding. However, there are still gaps in the record for which we have no explanation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 31, 2011, in Phoenix, Arizona.

Kimmberly Taylor

**JA 2687**

# Appendix A

JA 2688

# MISSING DOCKET ENTRIES
## (DOCKET OF BASHAM AND FULKS)

| | | | |
|---|---|---|---|
| ☐ 2 | ☐ 1018 | ☐ 1229 |
| ☐ 3 | ☐ 1020 | ☐ 1232 |
| ☐ 15 | ☐ 1021 | ☐ 1233 |
| ☐ 33 | ☐ 1023 | ☐ 1239 |
| ☐ 34 (See 01/27/03 | ☐ 1024 | ☐ 1246 |
|    sealed order) | ☐ 1030 | ☐ 1257 |
| ☐ 51 | ☐ 1037 (SEE 1038) | ☐ 1260-1264 |
| ☐ 52 | ☐ 1039-1041 | ☐ 1279 |
| ☐ 54-63 | ☐ 1047 | ☐ 1283 |
| ☐ 66-69 | ☐ 1051 | ☐ 1285-1287 |
| ☐ 71-73 | ☐ 1052 | ☐ 1289-1290 |
| ☐ 75 | ☐ 1055-1060 | ☐ 1293-1294 |
| ☐ 76 | ☐ 1062 | ☐ 1298 |
| ☐ 78-84 | ☐ 1067 | ☐ 1301 |
| ☐ 87 | ☐ 1070-1074 | ☐ 1310 |
| ☐ 88 | ☐ 1076-1089 | ☐ 1311 |
| ☐ 95-100 | ☐ 1092 | ☐ 1313 |
| ☐ 104-105 | ☐ 1093 | ☐ 1316 |
| ☐ 108-114 | ☐ 1095 | ☐ 1324 |
| ☐ 120 | ☐ 1098 | ☐ 1325 |
| ☐ 174 | ☐ 1102 | ☐ 1328 |
| ☐ 190-193 | ☐ 1106 | ☐ 1333 |
| ☐ 369 | ☐ 1108 | ☐ 1335 |
| ☐ 440 | ☐ 1111-1113 | ☐ 1340-1342 |
| ☐ 825 | ☐ 1119 | ☐ 1346 |
| ☐ 828 | ☐ 1124 | ☐ 1352-1354 |
| ☐ 834 | ☐ 1125 | ☐ 1361 |
| ☐ 837 | ☐ 1129-1134 | ☐ 1366-1367 |
| ☐ 859 | ☐ 1136-1139 | ☐ 1370 |
| ☐ 860 | ☐ 1148 | |
| ☐ 870 | ☐ 1154 | |
| ☐ 876 | ☐ 1158 | |
| ☐ 877 | ☐ 1167 | |
| ☐ 923-925 | ☐ 1174 | |
| ☐ 934-943 | ☐ 1179 | |
| ☐ 973 | ☐ 1180 | |
| ☐ 974 | ☐ 1184-1186 | |
| ☐ 976-979 | ☐ 1212 | |
| ☐ 1005 | ☐ 1215 | |
| ☐ 1007 | ☐ 1219 | |
| ☐ 1017 | ☐ 1223 | |

JA 2689

# Exhibit 2

JA 2690

# BRUNSWICK COUNTY SHERIFF OFFICE
## INTERVIEW REPORT
## LT DA CROCKER

PERSON INTERVIEWED: **SHERIFF RONALD E HEWETT**
ADDRESS: PO BOX 09 BOLIVIA NC, BCSO
TELEPHONE: 910 253 2736
DATE: 12/03/02
LOCATION: BCSO
CASE NUMBER: 02-3758

The case is reference the abduction of Alice Donovan (statements / actions made by Brandon Basham)

On November 28, 2002, Sheriff Hewett met with Brandon Basham as pre-arranged with FBI agt Jeff Long (case agt), Basham's two attorneys, Two Conway Officer assigned to security on Basham (Sgt Parker and Sgt Sarvis).

Basham was transported from Florence SC to Brunswick County NC for the purpose of showing the location of Alice Donovan. Basham was at all times in the presence of his attorneys; he was afforded consultation to same attorneys prior to any action or statement made by Basham.

The above arrived into Brunswick County at (approx) 0830 hrs on Hwy 211 from Hwy 74/76. Basham and company were in a private white ford van and followed Sheriff Hewett to Hwy 17 to which they turned south on 17 and went directly to the Dodge City Amoco in Shallotte NC.

On arrival, Basham was allowed to use the restroom and given cigarette and drink. Waiting at the Amoco station was Chief Hendricks (Conway SC Police Dept) and other SC officers. Sheriff Hewett then lead Basham and company to hwy 17 and straight to Bee Tree Farm road off Green Hill road (Winnabow area of Brunswick County)

00814

**JA 2691**

Once there, formal introductions were made by all to include Sheriff Hewett to Basham and his Attorneys. Attorney Littlejohn agreed that a local officer was needed to aid in the directions given by Basham and that Sheriff Hewett was agreed upon by Attorney Littlejohn and Agent Long.

Seated in the van was a Conway Officer driving and Sheriff Hewett in the front passenger seat, behind the driver was Basham and to his right was attorney Littlejohn, in the rear seat was Basham's other attorney, Agt Long and the other Conway Officer.

Again introductions were made and as they rode Sheriff Hewett showed Basham 8x10 digital photos of the local area. Several pictures Basham indicated of no knowledge of the area and other he made comments as to seeing before. Attorney Littlejohn also observed the all the photos during the process, and approved.

Basham was shown pictures (now marked 1,2&3) and Basham indicated that the picture of the Bee Tree Hunting Club was familiar, but not the sign. Basham stated that the sign that he saw before was either 4x6 or 4x8 and was green with white letters, stated it had "animal" on the sign.

Basham was shown pictures (now marked 4&5) and Basham stated it was the same hunting camp and that he remembered they turned around as there were men standing on the porch.

Basham was shown pictures (now marked 6,7&8) and Basham stated he recognized the cemetery shown as "that's the cemetery", stated he thought there was more of a broken down fence but that it looks like it. (NOTED: There was an older broken down fence, approx 10ft in front the current fence at the cemetery)

Basham showed sheriff Hewett where he did not remember the turn around on the photo and stated, "we pulled right in there and we cut to the left behind a fence" indicating on the photo the area discussed. (later Basham illustrates to the Sheriff at the actual location and states "I think this is it" as they drive by the cemetery)

00815

JA 2692

Sheriff Hewett states that as they rode in the van a left was taken out of Bee Tree Farm road onto Green Hill road and they follow the road for several miles to which at one point Basham points out a house and claims, "I remember that place".

The route taken continued onto Zion church road to Hwy 17 and turned north to the Gregory Poole (Industrial Area near Leland NC) business and Basham indicated that nothing meant anything to him there. They road back to Green Hill road area to the CC road going to the Prosper Community in Columbus County NC with still no indications of knowing the areas.

Sheriff Hewett states that once on the "CC" road there were several hunters lined up and down the road. At one point while riding along a Doe (female deer) jumped on the hwy and ran in front of the van, in view of all of those riding in the van. Basham at this time states, "you know, I could never kill a deer and here I have...." Sheriff Hewett states he observes attorney Littlejohn (sitting next to Basham) then touch Basham and shake his head left to right (in a negative nod) to Basham. Sheriff Hewett states that Basham never completed the statement he started. Sheriff Hewett states that throughout the day this was the only time attorney Littlejohn corrected Basham in any action or statement.

Sheriff Hewett states that at one point Basham motioned at his attorney to come closer so he could whisper and Attorney Littlejohn gets closer to which Basham is heard saying, "should I tell them about, ? (Sheriff Hewett could here no more, as they whispered) Then Attorney Littlejohn stated "go Ahead, that would be OK" to Basham. Then Basham describes with his hands 16' to 20' inches long (with fingers extended in shackles) it's a leather strap. You need to back to the cemetery and look for the leather strap. Basham further described it with possibly a Liz Claiborne tag on it. At this time Sheriff Hewett instructed Deputy's and other personnel to return to the cemetery and further look for the purse strap. (Note: search revealed no strap)

00816

**JA 2693**

Sheriff Hewett states that once on Lewis Swamp road off Green Hill road, Basham stated "I think this could be it" and started obviously trembling. Sheriff Hewett states that at one time they located a stake near the road and again Basham became emotional. Basham further added that the trees (along the road) were closer together. Basham then states that, "Fulks was the leader that whatever Chad wanted to do, we did, Chad was driving".

Basham stated of remembering a Park and that Chad wanted to take her (victim) to the park and he (Basham) agreed to which Chad said to Basham, No there will be too many people around the park. Basham stated he remembered the park was on the right and just past the Park was the green Animal sign, further that the sign was on the left side of the road. Basham stated to Sheriff Hewett that he and Chad once had passed the park they turned around and traveled back to a road to which they drove down for a distance, a long way (maybe 20 minutes).

Basham stated that once on the road the trees got closer together and they stopped and pulled her out to the right side of the car, cut his (Bashams) leg, then they took her into the woods. Sheriff Hewett states at this point Basham is pulling on his leg irons in an attempt to show where he was cut by the stake, stating it scraped his leg. Basham states that after dragging her out, they got back in the vehicle. Basham states that the road was wide enough to do a turn around and go back the way they came. (maybe backed up one time).

Sheriff Hewett states they returned in the van onto Lewis Swamp road and Basham stated, "it's like this, but I don't think it's it"(referring to Lewis Swamp road). Sheriff Hewett states he observes Basham to be physically shaking and has red eyes. At one point the van is stopped in a possible area where there is a stake on the left hand side (ditch area of Lewis Swamp road) and Basham stated that that it won't (Donovan's body) be far from the road.

Sheriff Hewett showed Basham photo (now marked #9) and Basham states that he remembered the intersection that they turned right onto the road. (photo was of cherry tree and green hill road intersection)

Photos (now marked as 10&11) and Basham states, " that's the place where Chad paid for the gas and I was sitting in the back with her (victim)" (The photos was of Dodge City Amoco in Shallotte NC)

00817

**JA 2694**

Sheriff states they continued to check numerous areas to include Hwy 17, Governor's road and Funston road. States that over 50 to 60 miles were driven throughout the day and that at one time gas was obtained at the hwy 17 / hwy 87 Exxon station. (Basham again was given cigarette and a drink)

Sheriff Hewett states that at the end of the day (November 28 2002) the van and other officers gathered at the cemetery on Bee tree Farm road. States that at one point Basham was being descriptive to Sheriff Hewett as to what had happened and stated in response to Sheriff Hewett, " I'm trying sir (to help), but all the roads, pine trees and dirt look alike. Sheriff Hewett states that while talking at the cemetery Basham stated, "we parked right there", Basham pointing at an older fence and current fence (which is a location that was consistent to a witness had earlier observed the vehicle at the cemetery).

Sheriff Hewett states that while at the cemetery, Basham indicated how the (victims) pocketbook was used. (Sheriff Hewett was able to determine this meant, the pocketbook strap was **used** to strangle the victim to death)

Basham then walks to the left front edge of the cemetery (along with Sheriff Hewett and Conway Officers Sgt Parker and Sgt Sarvis. Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery. Basham indicated that the strap was 16 to 20 inches in length and was a leather type. Basham also showed an area to the left of the cemetery and again stating "check in those trees and over there. Basham appeared to be breathing heavy and stated it was "a Liz Claiborne pocketbook". Sheriff Hewett asked Basham directly, is this where it happened and Basham replied, "yes, this is it". (Sheriff Hewett observes Basham again get emotional) Sgt Parker and Sgt Sarvis during this conversation had walked into the woodline to the left of the Cemetery looking for the purse strap.

Sheriff Hewett observed that all through the day, Basham never denied participating in the crime.

After this Basham and his attorneys conferred privately in the van in an effort to grant time to discuss anything that had been missed throughout the day. Basham was with Sheriff Hewett from approx 0830 to 1500 hrs on November 28, 2002

00818

**JA 2695**

# Exhibit 3

JA 2696

FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   12/04/2002

        On November 28, 2002, Agents of the Federal Bureau of Investigation (FBI), North Carolina State Bureau of Investigation (SBI), Brunswick County Sheriff's Department and Conway, South Carolina Police Department conducted a search in the Winabow area of Brunswick County, North Carolina.  The search was conducted with the assistance of BRANDEN BASHAM and his two appointed attorneys, William (Billy) Monckton and Cam Littlejohn.

        BASHAM was transported from the Darlington County Detention Center, Darlington, South Carolina, to the Bee Tree Hunting Club in Brunswick County, North Carolina.  The hunting club was used as a starting point since BASHAM recognized the club and was aware that several witnesses observed the dark blue BMW with two males and a female making a turn in front of the club on November 7, 2002, just before dark.

        BASHAM traveled in a Ford van with both his attorneys, Sheriff Hewitt, Agent Jeffrey Long and two Conway Police Officers.  FBI Agents Clyde Merryman and Maurice Kelliher and Conway Police Chief Sam Hendricks followed the van in a trail vehicle.

        After leaving the hunting camp, which is located at the end of a fairly long, windy, dirt road, the van traveled down the road stopping at a small cemetery.  The cemetery is just off the dirt road prior to getting to a paved road.  Witnesses observed the BMW parked in the cemetery shortly after it had been observed at the hunting club.

        BASHAM looked at the cemetery from inside the van and indicated that he did not recognize it as being the same cemetery he, FULKS and Donovan had stopped at.

        BASHAM attempted to re-create his direction of travel after leaving the cemetery.  BASHAM was fairly precise in his directions, however, after he realized that the first turn he recalled making off the paved road did not exist, BASHAM began to show doubt in his ability to locate the dirt road where he and FULKS disposed of Donovan's body.

                                                        00125

Investigation on ___11/28/2002___ at __Brunswick County, NC_____

File # _7A-CO-27964, 7A-IP-92394, 7A-PG-71366___ Date dictated _12/04/2002_____

by __SA Jeffrey M. Long :jml_____

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**JA 2697**

FD-302a (Rev. 10-6-95)

7A-CO-27964, 7A-IP-92394, 7A-PG-71366

Continuation of FD-302 of _____ , On 11/28/2002 , Page   2

    Several hours were spent driving randomly around the area attempting to locate a single dirt road which would be recognizable to BASHAM.  A stop was made at a second cemetery which was located in the same general area as where the first cemetery was located. BASHAM walked the area and came to the conclusion that the second cemetery was also not the cemetery where they had stopped at. BASHAM recalled specific details about a shiny fence and small headstones resembling an animal cemetery.  A second stop was made at the first cemetery, allowing BASHAM to walk around the area. BASHAM concluded that it was not the same cemetery which they had stopped at.  BASHAM had a conversation with Attorney Littlejohn resulting in information being passed to this agent that BASHAM would be positive on the location of the cemetery if BASHAM located a purse strap in the area.  A purse strap was used by FULKS to strangle DONOVAN. BASHAM threw the strap out of the window of the BMW as they left the cemetery.

    Efforts continued to identify the dirt road where the Donovan's body was dumped.  While driving down one of the dirt roads in the area, BASHAM became visibly upset and stated that he believed that this was the road.  The van was stopped and a short search was conducted in the area of a metal stake which was observed on the side of the roadway.  Nothing was found and Sheriff Hewitt agreed that efforts had been made earlier in the week to search that area and nothing was located.

    As the van traveled back to the hunting camp to conclude the search efforts, a decision was made to stop at the first cemetery for a third time.  A request was made of the attorneys to ask BASHAM several questions about specific details as to what had happened to Donovan in the cemetery.  The attorneys met with BASHAM inside the van, outside of a law enforcement presence, and then provided the following information:

    The cemetery where we were currently located was in fact the cemetery where BASHAM and FULKS had stopped at.  Donovan was not taken outside the vehicle and remained in the back seat of the BMW.  FULKS raped Donovan in the back seat.  Donovan was only wearing a top.  After FULKS raped her, FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan. FULKS and BASHAM took Donovan out of the back seat and placed her in the trunk.  FULKS also took Donovan's panties and threw them in the trunk.  As FULKS drove the BMW out of the cemetery, BASHAM threw the purse strap out the window.  FULKS drove around the area for what seemed to BASHAM to be as much as an hour.  FULKS became

00126

**JA 2698**

FD-302a (Rev. 10-6-95)

7A-CO-27964, 7A-IP-92394, 7A-PG-71366

Continuation of FD-302 of _____ , On 11/28/2002 , Page 3

concerned that if Donovan was still alive in the trunk, she may punch out the tail light or pull the wires out. FULKS found a dirt road in the area of what BASHAM believed was an animal park or some type of wildlife area. BASHAM recalled FULKS using the word "park" and asked BASHAM if the "park" would be okay. BASHAM agreed and FULKS turned onto a wide, smooth dirt road. FULKS drove down the road for approximately five to ten minutes before coming to a stop in the road. Both FULKS and BASHAM took Donovan's body out of the trunk. As BASHAM was moving around the outside of the BMW, he stepped in a hole and cut his leg on a metal stake. At some point between leaving the cemetery and dumping Donovan's body, FULKS stabbed Donovan and slit her throat. BASHAM recalled FULKS taking the knife and placing it between FULKS' thigh and driver's seat of the BMW.

Both FULKS and BASHAM dragged Donovan's body approximately fifty feet into the tree line. They covered her body with leaves, sticks and light brush. Shortly after leaving the area where they dumped Donovan's body, FULKS threw the knife out of the car window. Donovan's pants and panties were disposed of after leaving the area where they dumped her body. BASHAM did not know the location where the clothing could be found.

A search team was sent to the cemetery to search for the purse strap allegedly used to strangle Donovan. The purse strap was not located. Sheriff Hewitt received information that the cemetery had been recently cleaned of leaves and debris. It was decided that Sheriff Hewitt would check into the crew who cleaned the cemetery and attempt to interview the cleaning crew.

BASHAM recalled seeing a sign, described as being green with white writing, with the word "park" and or "animal" on it. The dirt road where FULKS and BASHAM dumped Donovan's body was located approximately fifteen feet past the "park" sign. During the search, no street signs matching the description given by BASHAM were located.

BASHAM and the search team participants returned to the hunting club where it was determined that there were no further areas in Brunswick County to search. BASHAM was taken back to the Darlington County Detention Center. All search team participants cleared from the area and the search was terminated.

00127

**JA 2699**

# Exhibit 4

JA 2700



**Sheriff**

James R. Metts, Ed. D.

# LEXINGTON COUNTY SHERIFF'S DEPARTMENT

## MEMORANDUM OF DISCIPLINE

**TO:**     Capt. Carlisle J. McNair

**FROM:**   Col. Mel Seboe

**RE:**     Notice of Discipline

**DATE:**   July 1, 2002

The investigation surrounding the allegations made against you has been completed. On June 28, 2002 the results of the Investigation were formalized in an Investigative Report. On June 21, 2002 you provided a written statement in response to the allegations. The June 28th report sustained a finding of your having

> ...violated Policy and Procedure 300 in that he, on at least two occasions, displayed a video clip containing obscene material, to wit a bald headed man attempting to insert his head into a woman's vagina, to other employees with no criminal investigative or business necessity of doing so.

and

> ...violated Policy and Procedure 405, the instructions contained in the "Memorandum of Garrity Rights and Employee Responsibilities", and the instructions of Sheriff Metts.

In September of 2001 Chief James provided you with a "Letter of Caution" which specifically addressed the type of prohibited conduct resulting in this sustained complaint. This type conduct by a manager exposes both you and the department to unacceptable levels of liability. Even after having been explicitly warned of this unacceptable conduct, you elected to continue. Major Harris has, on several occasions, counseled you concerning noted deficiencies in your performance as the Headquarters Region Commander as reflected in his June 25, 2002 memorandum. In a further attempt to assist you in correcting these deficiencies, you were sent to supervisory/managerial training at Midland's Technical College. Unfortunately, deficiencies continued to arise even after this training and counseling. Further, you have also been the subject of other internal affairs investigations with founded allegations of misconduct.

Based upon the collective information available to the Department, the Department has concluded that your actions have demonstrated extremely poor judgment and highly unprofessional conduct. The purposes of this memo are to communicate to



A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

B-00423

**JA 2701**

A_42199

you the Department's deep dissatisfaction with both your conduct and judgment and to advise you of the following disciplinary action:

1. You are immediately relieved from your position as Headquarters' Region Commander and demoted to the rank of Lieutenant;

2. As a Lieutenant, you will serve a six-month probationary period.

3. You are suspended from duty for one pay period to begin immediately.

Upon your return, you are to report to Major Harris for assignment and to affirmatively contact Major Prill, as you are also required to attend anger management training and/or counseling. During your probationary period your undivided attention should be upon your assigned duties.

During this suspension you are to take no law enforcement action for any reason. You must immediately turn over all weapons (primary, backup, and shotgun), your department identification and badge(s), your county vehicle and keys, and your issued radio and/or beeper and cellular telephone to Major James Harris or his designee. You are not to be present on the premises of the Department without a business reason and prior notice to Major Harris.

Most importantly, during this suspension, and when you return to duty, you are not to engage in any retaliatory conduct, either directly or indirectly against anyone in anyway connected with this investigation. Any retaliatory action will result in immediate disciplinary action up to and including termination.

Served this _1st_ day of _July_ at _Lex. Co. S.O. 6:40 P.M. 2002_

By _Major James E. Harris_

Received by _[signature]_
_7/1/02_

B-00424

**JA 2702**
A_42200

# Exhibit 5

JA 2703



James R. Metts, Ed. D.

## LEXINGTON COUNTY SHERIFF'S DEPARTMENT

October 15, 2002

Carlisle J. McNair
812 Haskell Road
Gilbert, SC   29054

Dear Mr. McNair:

This is to acknowledge receipt of your resignation dated October 14, 2002.  Your kind remarks are greatly appreciated.

I hereby accept your resignation and wish you the very best in all your future endeavors.

Sincerely yours
In effective law enforcement,

James R. Metts, Ed.D.
Sheriff

JRM/cst

Cc: Personnel



B-00462

A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

JA 2704
A_42238

October 14, 2002

**VIA HAND DELIVERY**
The Honorable Dr. James R. Metts
Lexington County Sheriff Department
521 Gibson Road
Lexington, SC  29072 .

In Re:  Carlisle J. McNair

Dear Sheriff Metts:.

I have decided to resign as a Deputy at the Lexington County Sheriff Department. As I now have over Twenty-Five years in the Police Officers State Retirement System I feel that it is best for myself and my family to do so. As you know the majority of my time in law enforcement was spent as a Deputy Sheriff for Lexington County.

Thank you for your support over the years and if you have any questions please feel free to contact me.

Sincerely yours,

Carlisle J. McNair

cjm:aas                                                    B-00463

JA 2705    A_42239

# Exhibit 6

JA 2706

## Declaration of John Castro

I, John Castro, declare under penalty of perjury the following to be true to the best of my information and belief:

1. I am an investigator with the Capital Habeas Unit of the Federal Public Defender's Office in Arizona. Our office has been appointed to assist Mr. Brandon Basham in federal court.

2. Cynthia G. Wilson was a juror during Mr. Basham's trial in federal court in Columbia, South Carolina in 2004 and in fact was selected as the jury foreperson. Cynthia Wilson filled out and signed a juror questionnaire under penalty of perjury prior to being selected as a juror on the case on February 11, 2004. She was found to be in contempt of court for contacting the media prior to the end of trial, and she was sanctioned by the judge.

3. Question 41 on the questionnaire reads "have you ever sued someone or been sued," to which she checked "NO." Cynthia Wilson had two judgments against her in the Common Pleas Court in Spartanburg County prior to being selected as a juror in 2004.
    1. Case number 1995TR4208826 was filed on November 13, 1995 by the South Carolina Department of Revenue. A judgment against Cynthia Wilson in the amount of $650.18 was awarded and the case was disposed of on February 11, 1996.
    2. Case number 1998TR4211594 was filed on November 13, 1998, again by the South Carolina Department of Revenue. A judgment against Cynthia Wilson in the amount of $ 1,761.59 was awarded and the case was disposed of on March 17, 2000.

4. Cynthia Wilson testified during her voir dire questioning on September 2, 2004 that she worked as a nurse and had been working in that capacity for four years. Cynthia Wilson received her nursing license in February of 2002. She actually began working under the license on that date and had only been working as a nurse for two years and seven months at the time of her voir dire.

5. Cynthia Wilson was disciplined on January 6, 2007 by the nursing board for not disclosing the fact that she was put on probation for contempt of court by the judge in Mr. Basham's trial. Cynthia Wilson had earlier been placed on probation by her employer for medication and documentation errors on October 21, 2005.

6. Cynthia Wilson lied on her nursing license renewal application dated April 28, 2008. She answered "NO" when asked whether she had any prior disciplinary action before any nursing board in any jurisdiction.

7. Cynthia Wilson again lied on her nursing license renewal application dated April 15, 2010 when asked the same question.

Page 1 of 2
Initials: JC

**JA 2707**

8.  Cynthia Wilson lied on her nursing license renewal application three times when asked whether she had ever been convicted under any federal law. She failed to mention that she had been held in criminal contempt of court by the Federal District Court in Columbia, South Carolina. Cynthia Wilson put "NO" when asked that question on her applications dated April 7, 2006, April 11, 2008, and April 15, 2010.

9.  The information in item 3, the judgments against Cynthia Wilson, is readily available to the public on-line, and was also readily available in 2004 at the time of Mr. Basham's trial. It took me less than fifteen minutes to access and print that information from the South Carolina Judicial website: www.judicial.state.sc.us.

10. The information in item 4, nursing license information, is also readily available to the public @ www.llr.state.us. I looked up and printed the information on Cynthia Wilson (nee Galloway) in approximately 10 minutes. The information was readily available at the time of Mr. Basham's trial.

11. I obtained all of the information contained in items 5 through 8 from the website listed in item 9: www.judicial.state.sc.us in less than 15 minutes.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this 23rd day of May, 2011.

John Castro

JA 2708

# Exhibit 7

JA 2709

## Declaration of John Castro

I, John Castro, declare under penalty of perjury the following to be true to the best of my information and belief:

1.   My name is John Castro. I am an investigator for the Federal Public Defender's Office in Phoenix, Arizona. I have been assigned to assist the attorneys who were appointed to represent Brandon Basham in his federal appeals in the 4th Circuit.

1.   I interviewed Gregory Lee Wilson in his home on May 18, 2011. Mr. Wilson was married to Cynthia Wilson at the time of Mr. Basham's trial in 2004. Cynthia Wilson served as the foreperson for Mr. Basham's jury during the trial and sentencing phases.

2.   Mr. Wilson told me that he did not follow the proceedings in the Basham trial much. Mr. Wilson traveled extensively for work and he was out of town a lot.

3.   Mr. Wilson was called in as a witness to testify in Cynthia Wilson's misconduct hearing on one occasion during the course of that hearing. Mr. Wilson said that to his knowledge, Cynthia had to go the hearing on other days besides the one he was present at. Mr. Wilson added that he was only aware that Cynthia had contacted one television station.

4.   After the hearing, Cynthia Wilson was upset and told Mr. Wilson that the television news reporter was lying about the substance of their conversation.

5.   To the best of Mr. Wilson's knowledge, Cynthia Wilson did not stay friends or remain in contact with any of the jurors after the trial was over.

6.   The names Joyce Hartsoe and Wendy Doby are not familiar to Mr. Wilson.

8.   Mr. Wilson told me that no one named Shannon Burnett did any work around their house during or after the trial while he and Cynthia were still together. Mr. Wilson was adamant that there would have been no need for them to hire an outside person to do any landscaping or maintenance around the house because Mr. Wilson did all of that type of work himself.

9.   Several years prior to the Basham trial, Gregory and Cynthia Wilson's neighbor, Julie Roe, was convicted of killing her husband John Roe. Julie Roe is currently serving a life sentence in prison. There was a lot of police activity in the street when the incident occurred. Cynthia Wilson was friends with the couple before the incident.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this _31st_ day of May, 2011.

<br>

John Castro

**JA 2710**

# Exhibit 8

JA 2711



**U. S. Department of Justice**
*United States Attorney*
*George E. B. Holding*

*Eastern District of North Carolina*

## NEWS RELEASE

<u>FOR IMMEDIATE RELEASE</u>:
MONDAY - October 6, 2008

<u>FORMER BRUNSWICK COUNTY SHERIFF
SENTENCED TO 16 MONTHS IN PRISON</u>

**RALEIGH** - United States Attorney George E.B. Holding announced that **RONALD E. HEWETT**, 45, was sentenced in federal court today by Senior United States District Judge W. Earl Britt to 16 months imprisonment followed by two years of supervised release. **HEWETT** was also ordered to pay a fine of $10,000.

On May 8, 2008, **HEWETT** was charged in a one-count Criminal Information charging corruptly endeavoring to obstruct justice, specifically, a federal grand jury investigation into allegations of corruption of his office as Sheriff of Brunswick County, North Carolina. On June 2, 2008, **HEWETT** pled guilty to the charge. **HEWITT** was elected Sheriff of Brunswick County in 1994 and served in that capacity until he was suspended in late March of 2008. **HEWETT** formally resigned from his office as Sheriff on April 15, 2008.

During the last half of **HEWETT'S** tenure, he repeatedly used his office for his personal benefit, rather than for the protection of the citizens of Brunswick County. In addition to obstructing his office's criminal investigation of a relative, **HEWETT** misused

**JA 2712**

public funds by ordering deputies, while on duty, to perform manual labor at his house and to work on his political campaigns. On June 7, 2007, state and federal agents served 25 federal grand jury subpoenas on **HEWETT** and numerous deputies for the June and July grand juries. Almost immediately after receiving the subpoenas, **HEWETT** began meeting with his deputies and attempting to tamper with their testimony.

**HEWETT** began instructing his deputies to either assert their Fifth Amendment privilege or to be vague in their answers at grand jury. As **HEWETT** noted to one Captain: "what you don't tell, you don't have to explain." **HEWETT** also arranged for a note to be delivered to a grand jury witness not employed by the Sheriff's Office which contained the words the witness would need to read in grand jury in order to invoke his Fifth Amendment privilege.

As the investigation continued, **HEWETT** resorted to more direct threats of retaliation. For example, **HEWETT** approached a deputy just prior to the federal grand jury meeting dates and inquired as to how the deputy would pay his mortgage without a job and that the deputy had a lot to lose. **HEWETT** also arranged for a Chaplain to attend staff meetings and instruct deputies that they should not cooperate with evil on the witness stand and that while on the witness stand they should not be swayed in their testimony. Finally, **HEWETT** began to retaliate against persons he thought were testifying at grand jury or were cooperating with the federal investigation by taking away their police vehicles and taking away

JA 2713

their authority.

United States Attorney Holding said, *"Ronald Hewett was not only a law enforcement officer, but he was also entrusted by the people of Brunswick County with leadership of their Sheriff's Office. First, he breached that trust by operating the Sheriff's Office for his personal benefit. Then, when that activity came under investigation, he unlawfully obstructed the investigation. The state of North Carolina is seeking to hold him accountable for the former. Today, the federal court has held him accountable for the latter."*

Special Agent in Charge Nathan Gray, head of the FBI in North Carolina, stated, *"People have faith that as members of law enforcement we will protect them from criminals and violence. When the head of an agency is charged with a crime, it chips away at that trust."* SAC Gray went on to say, *"The US Attorney's Office and the agencies that took part in this investigation have proven through diligence and hard work that anyone committing a crime will be held accountable. This case proves that no one is above the law."*

The investigation has been conducted jointly by the North Carolina State Bureau of Investigation, the Federal Bureau of Investigation, and the United States Postal Inspection Service, in conjunction with the United States Attorney's Office. Assistant U.S. Attorney Dennis M. Duffy and First Assistant U. S. Attorney

JA 2714

John Stuart Bruce are prosecuting the case for the United States.

# # #

**News releases are available on the U. S. Attorney's web page at www.usdoj.gov/usao/nce within 48 hours of release.**

JA 2715

# Exhibit 9

JA 2716

# SURVEY OF THE FEDERAL DEATH PENALTY SYSTEM
## (1988-2000)

U.S. Department of Justice
Washington, D.C.
September 12, 2000

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| TABLE OF CONTENTS | | i |
| INTRODUCTION | | 1 |
| PART I: | STATISTICAL OVERVIEW | 6 |
| | A. Racial/Ethnic Distribution of Defendants Submitted by the United States Attorneys | 6 |
| | B. Rates at Which Each Participant Recommended/Authorized the Death Penalty with Respect to Each Racial/Ethnic Group | 6 |
| | C. Rates at which the Department of Justice Sought the Death Penalty With Respect to Each Racial/Ethnic Group | 7 |
| PART II: | THE UNITED STATES ATTORNEYS | 9 |
| | A. Background | 9 |
| | B. Statistical Highlights | 11 |
| | 1. Defendants | 11 |
| | a. Recommendations in favor of seeking the death penalty | 11 |
| | b. Recommendations against seeking the death penalty | 12 |

i

JA 2717

2.    Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.    Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    a.    Victims' race/ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    b.    Intraracial and interracial homicides . . . . . . . . . . . . . . . . . . . . . 15

    c.    Single- and multiple-victim cases . . . . . . . . . . . . . . . . . . . . . . . 16

PART III:    THE REVIEW COMMITTEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

  A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

  B.    Statistical Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    1.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    2.    Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    3.    Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      a.    Victims' race/ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      b.    Intraracial and interracial homicides . . . . . . . . . . . . . . . . . . . . . 20

      c.    Single- and multiple-victim cases . . . . . . . . . . . . . . . . . . . . . . . 21

PART IV:    THE ATTORNEY GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

  A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

  B.    Statistical Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    1.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    2.    Offenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

JA 2718

3.    Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    a.    Victims' race/ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    b.    Intraracial and interracial homicides . . . . . . . . . . . . . . . . . 25

    c.    Single- and multiple-victim cases . . . . . . . . . . . . . . . . . . . 26

PART V:    POST-AUTHORIZATION ACTIVITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  B.    Statistical Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    1.    Plea Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      a.    Pre-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      b.    Post-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    2.    Trial Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      a.    Pre-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      b.    Post-protocol cases . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    3.    Federal Defendants Sentenced to Death . . . . . . . . . . . . . . . . 34

PART VI:    AGREEMENTS AND DISAGREEMENTS IN THE
FEDERAL DECISION-MAKING PROCESS . . . . . . . . . . . . . . . . . . . . . . . . 38

  A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

  B.    Statistical Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    1.    Three-party comparisons . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    2.    Two-party comparisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      a.    The United States Attorneys and the
Attorney General . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

iii

JA 2719

b.    The United States Attorneys and the
      Review Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

c.    The Review Committee and the
      Attorney General  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

i

# THE FEDERAL DEATH PENALTY SYSTEM:
## A STATISTICAL SURVEY
## (1988-2000)

### United States Department of Justice
### Washington, D.C.
### September 12, 2000

## INTRODUCTION

This Survey provides information regarding the federal death penalty system since the enactment of the first modern capital punishment statute in 1988. The Survey explains the Department of Justice's internal decision-making process for deciding whether to seek the death penalty in individual cases, and presents statistical information focusing on the racial/ethnic and geographic distribution of defendants and their victims at particular stages of that decision-making process.

The Supreme Court issued a ruling in 1972 that had the effect of invalidating capital punishment throughout the United States – both in the federal criminal justice system and in all of the states that then provided for the death penalty. While many state legislatures revised their procedures relatively quickly to withstand constitutional scrutiny, the federal government did not do so until November 18, 1988, when the President signed the Anti-Drug Abuse Act of 1988. A part of this law, known as the Drug Kingpin Act (DKA), made the death penalty available as a possible punishment for certain drug-related offenses. The availability of capital punishment in federal criminal cases expanded significantly further on September 13, 1994, when the President signed into law the Violent Crime Control and Law Enforcement Act. A part of this law, known as the Federal Death Penalty Act (FDPA), provided that over 40 federal offenses could be punished as capital crimes. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which went into effect on April 24, 1996, added another four federal offenses to the list of capital crimes.[1]

As the law governing the federal death penalty has changed, the Department of Justice has modified its internal decision-making processes in capital cases. With the enactment of the

---

[1] The FDPA promulgated capital sentencing procedures and made them applicable to over 40 separately numbered sections of the United States Code. However, because many of these sections define multiple offenses (either in separately designated subsections or by listing different types of prohibited conduct in a single provision), the precise number of "offenses" to which the FDPA applies depends on the definition of "offense." A list of the 59 separate sections of the United States Code that define offenses currently subject to the death penalty (including the offenses added by the AEDPA) is set forth in Table 6 (page T-23).

JA 2721

DKA in 1988, the Department instituted a policy that required United States Attorneys in the 94 federal districts across the country[2] to submit to the Attorney General for review and approval any case in which the United States Attorney affirmatively wished to seek the death penalty. Under this policy, the decision not to seek the death penalty was left to the United States Attorneys' discretion. From 1988 until the end of 1994, United States Attorneys sought approval from Attorneys General to seek the death penalty 52 times and received it 47 times.

On January 27, 1995, the Department adopted the policy still in effect today – commonly known as the death penalty "protocol" – under which United States Attorneys are required to submit for review all cases in which a defendant is charged with a capital-eligible offense, regardless whether the United States Attorney actually desires to seek the death penalty in that case. The United States Attorneys' submissions are initially considered by a committee of senior Department attorneys in Washington, D.C. known as the Attorney General's Review Committee on Capital Cases (Review Committee), which makes an independent recommendation to the Attorney General. From January 27, 1995 to July 20, 2000 – the close of the reporting period for this Survey – United States Attorneys submitted a total of 682 cases for review and the Attorney General ultimately authorized seeking the death penalty for 159 of those defendants.

While a case progresses through the Department's review process, it simultaneously continues in the United States Attorney's Office and in the court system. Some cases submitted by United States Attorney for review are subsequently withdrawn due to events outside the review process. For example, the defendant and the United States Attorney may enter into a plea agreement that disposes of the case and results in the imposition of a prison term. In other cases, a judicial decision may result in the dismissal of either the entire case or the specific charges that are punishable by death. As a result, the total number of cases considered by the Review Committee is smaller than the total number submitted by the United States Attorneys, and the total number of defendants considered by the Attorney General is smaller still. Furthermore, not all defendants who proceed to trial receive the death penalty. As discussed below, since 1988, federal juries returned death verdicts against fewer than half of the defendants they found guilty of capital crimes. As of the date of this Survey, five defendants who were authorized for the death penalty during the "pre-protocol" period (1988-1994) were subject to a pending sentence of death; fourteen defendants authorized during the "post-protocol" period (1995-2000) were also subject to a pending sentence of death.

---

[2]There are 94 separate federal judicial districts in the United States. Twenty-six states, as well as the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and the Northern Mariana Islands, each comprise a single federal district, while each of the remaining 24 states is divided into two or more federal districts. Each district has a United States Attorney who is appointed by the President with the advice and consent of the Senate, with the exception that the District of Guam and the District of the Northern Mariana Islands share a single United States Attorney. Accordingly, there are total of 93 United States Attorneys. A list of the United States Attorneys' Offices showing the locations of the principal offices in each district is provided in Table 4 (page T-10).

2

JA 2722

Current Department policy provides that bias based on characteristics such as an individual's race/ethnicity must play no role in a United States Attorney's decision to recommend the death penalty. Also, in some districts, the United States Attorney (as opposed to the particular prosecutors handling a case) is likewise not informed of the defendant's race/ethnicity. Moreover, the United States Attorney's Office may not provide information about the race/ethnicity of the defendant to Review Committee members, to attorneys from the Criminal Division's Capital Case Unit (CCU) who assist the Review Committee, or to the Attorney General. As explained below, the only individuals in Washington, D.C. who are ordinarily privy to race/ethnicity information are paralegal assistants in the CCU who collect these statistics under separate cover from the United States Attorneys.[3] This information forms the pool from which most of the federal data on race/ethnicity reported below are drawn.

This Survey presents a series of statistics regarding the federal death penalty process that are broken down by time period (pre-protocol and post-protocol),[4] by participants in the decision-making process (the United States Attorneys, the Review Committee, and the Attorney General), and by the racial/ethnic groups of defendants and victims.[5] Part I presents highlights of a statistical overview of the Department's decision-making process. Parts II to V each presents highlights of data regarding particular stages of the process. In particular, Part II presents highlights regarding recommendations made by United States Attorneys; Part III presents highlights regarding recommendations made by the Review Committee; Part IV presents highlights regarding decisions made by Attorneys General; and Part V presents highlights regarding post-authorization activity (*e.g.*, plea agreements, jury trials) in all cases in which Attorneys General made decisions to seek the death penalty, with additional case-specific

---

[3]In presenting reasons why the death penalty should not be sought, defense counsel on occasion explicitly provide information about the race/ethnicity of defendants or victims to the United States Attorneys, the Review Committee, and the Attorney General.

[4]As noted above, on January 27, 1995, the Attorney General revised the Department of Justice procedures for deciding whether to seek the death penalty against defendants charged with capital offenses. This change in policy was made by means of a formal amendment to the United States Attorneys' Manual. For ease of reference, the "pre-protocol" period, when United States Attorneys submitted for review only recommendations to seek the death penalty against defendants charged with violations of the DKA, is discussed as having lasted from 1988 to 1994, despite the fact that the first 26 days of 1995 were also, strictly speaking within that period. Likewise, the "post-protocol" period is described, during which United States Attorneys submitted recommendations both for and against seeking the death penalty against defendants charged with a variety of capital offenses, is often described in this Survey as encompassing the years 1995 to 2000.

[5]This Survey refers to defendants and victims as "White," "Black," "Hispanic," or "Other," due in large part to the way in which data regarding the federal death penalty has been collected. The last category – "Other" – includes any person whose race is Asian, Pacific Islander, Native American, Aleut, Indian, or unknown. The Survey uses "Hispanic" as a separate category to refer to persons of Hispanic ethnicity, regardless of race. As a result, the terms "White," "Black," and "Other" as used in this Survey refer only to non-Hispanic members of those racial groups.

3

JA 2723

information about the 19 defendants now under a federal death sentence. Finally, Part VI presents highlights of data regarding the degree of consensus among United States Attorneys, the Review Committee, and the Attorney General.

The statistical information presented in the narrative of the Survey is based on the data contained in the tables set forth at pages T-1 to T-355. For the reader's convenience, those tables have been grouped together at the end of the Survey rather than interspersed within it. There are a number of important notes accompanying those tables that explain the methods and terms used in compiling the data, as well as the way in which anomalous cases have been treated in presenting overall characterizations of the statistics. Those notes are set out at the beginning of the tables (pages T-xi to T-xvii).

In evaluating the data presented in this Survey, the reader should bear in mind that the vast majority of homicides in the Untied States, like most violent crimes, are investigated exclusively by local police officers working hand-in-hand with local prosecutors, who file charges against defendants in state courts, either as a capital case or non-capital case.[6] When a homicide is prosecuted federally – either as a capital or non-capital case – it is often because of the availability of certain federal laws or because of a federal initiative to address a particular crime problem. Criminal organizations often operate in multiple jurisdictions, making it difficult for any single local prosecutor to investigate or prosecute a case. Additionally, many states lack the equivalent of the federal witness protection program and the ability to conduct complex long-term investigations using resource intensive investigative techniques such as court-ordered wiretaps and undercover operations.

Apart from these differences in laws and resources, which often affect whether a particular homicide is prosecuted in state or federal court – either as a capital or non-capital case – state and federal law enforcement officials often work cooperatively to maximize their overall ability to prevent and prosecute violent criminal activity in their respective communities. Such cooperation is a central feature of current federal law enforcement policy. In some areas, these cooperative efforts lead to agreements that certain kinds of offenses, particularly violent crimes, will be handled by federal authorities. In Puerto Rico, for example, the United States Attorney has agreed with his local counterpart that the federal government will prosecute carjackings involving death, which has led to a large number of homicides being handled by that particular United States Attorney's Office. In some cities, a large number of cases involving multiple

---

[6]Prior to 1972, capital punishment was available and carried out in both the federal and state systems for acts of murder and a variety of other crimes, such as rape, kidnaping, and treason. Today, while the vast majority of crimes subject to the death penalty under federal law involve homicides, a few do not. *See* 18 U.S.C. §§ 794 (espionage); 2381 (treason); 3591(b)(1) (certain aggravated narcotics trafficking offenses). Nonetheless, the federal government has not sought the death penalty in any such case since 1988 and all defendants now under a sentence of death in the states were convicted of crimes specifically related to homicides.

4

murders by drug and other criminal organizations are investigated by joint federal and local task forces and prosecuted federally due to some of the factors cited above, such as the geographic reach of the organization and the availability of a witness protection program. In other areas, by contrast, these cooperative efforts lead to a federal emphasis on crimes other than homicides. These decisions are not, however, static ones. A given homicide that appears to be of purely local interest may, upon further investigation months or years after the offense, prove to be related to organized multi-jurisdictional criminal activity that is being investigated by federal law enforcement officials, who may seek to transfer the case from state prosecutors to federal prosecutors. For these and other reasons, the factors that determine whether a particular homicide will enter the state or federal criminal justice systems are complex and difficult to quantify.

Overall, however, the federal government continues to play a relatively small role in administering the death penalty in this country. From 1930 to 1999, state governments executed over 4,400 defendants.[7] During the same time period, the federal government executed 33 defendants and has not carried out any executions since 1963.[8] Furthermore, the Department of Justice's Bureau of Justice Statistics (BJS) reports that by the end of 1998 (the most recent year for which this statistic is available), there were 3,433 defendants with pending death sentences in the States, compared to 19 defendants with currently pending death sentences in the federal system. Thus, despite the expansion of the availability of the federal death penalty since 1988, federal defendants account for approximately one-half of one percent of all the defendants on death row in the United States.

---

[7] *See* Bureau of Justice Statistics, U.S. Department of Justice, <u>Number of Persons Executed in the United States, 1930 – 99</u>, <http://www.ojp.usdoj.gov/bjs/glance/exe.txt>.

[8] *See* Federal Death Penalty Information Center, <u>Executions of Federal Prisoners 1927-1999</u>, <http://www.deathpenaltyinfo.org/fedexec.html>.

JA 2725

# PART I:  STATISTICAL OVERVIEW

Table Set I (pages T-1 to T-7) provides statistical summaries of the decision-making process at the Department of Justice by its primary participants – the United States Attorneys, the Review Committee, and the Attorney General – and how the decisions of those participants affect members of four different racial/ethnic groups.  Highlights of these summary tables are presented below.

A.    RACIAL/ETHNIC DISTRIBUTION OF DEFENDANTS
      SUBMITTED BY THE UNITED STATES ATTORNEYS

- From 1988 to 1994, a total of 52 defendants were submitted by the United States Attorneys under the Department's former decision-making procedures.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 52 | 7 | 39 | 5 | 1 |
| Percent | 100% | 13% | 75% | 10% | 2% |

- From 1995 to 2000, a total of 682 defendants were reviewed under the Department's current death penalty decision-making procedures.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 682 | 134 | 324 | 195 | 29 |
| Percent | 100% | 20% | 48% | 29% | 4% |

B.    RATES AT WHICH EACH PARTICIPANT RECOMMENDED/AUTHORIZED
      THE DEATH PENALTY WITH RESPECT TO EACH RACIAL/ETHNIC GROUP

Because cases continue to be litigated while the death-penalty decision-making process is proceeding at the Department of Justice, not all of the defendants who are the subject of a recommendation by a United States Attorney are considered by the Review Committee and the Attorney General.  The following highlights – which serve to allow a comparison of the rate at which each participant in the decision-making process recommends or authorizes seeking the death penalty – take that attrition into account by showing, for each racial/ethnic group, the rate

6

at which *each* participant recommended or authorized seeking the death penalty as a percentage of the total number of defendants considered by *that* participant. Thus, the percentages below reflect the number of defendants in a particular racial/ethnic group for which each participant in the death penalty process recommended/authorized the death penalty, divided by the total number of defendants of that racial/ethnic group that were considered by that participant.

- From 1988 to 1994, the Attorney General agreed with the United States Attorneys in most cases. (The Review Committee was not yet in existence).

| RATES AT WHICH EACH PARTICIPANT RECOMMENDED/ AUTHORIZED SEEKING THE DEATH PENALTY (1988-1994) | | | | | |
|---|---|---|---|---|---|
| | Overall | White | Black | Hispanic | Other |
| U.S. Attorneys | 100% | 100% | 100% | 100% | 100% |
| Attorney General | 90% | 100% | 87% | 100% | 100% |

- From 1995 to 2000, when United States Attorneys submitted defendants with recommendations both for and against seeking the death penalty, each participant in the decision-making process (including the Review Committee) recommended/authorized the death penalty against slightly less than one third of the defendants that each participant considered.

| RATES AT WHICH EACH PARTICIPANT RECOMMENDED/ AUTHORIZED SEEKING THE DEATH PENALTY (1995-2000) | | | | | |
|---|---|---|---|---|---|
| | Overall | White | Black | Hispanic | Other |
| U.S. Attorneys | 27% | 36% | 25% | 20% | 52% |
| Review Comm. | 30% | 40% | 27% | 25% | 50% |
| Attorney General | 27% | 38% | 25% | 20% | 46% |

7

JA 2727

C.    RATES AT WHICH THE DEPARTMENT OF JUSTICE SOUGHT THE
      DEATH PENALTY WITH RESPECT TO EACH RACIAL/ETHNIC GROUP

The percentages below reflect the number of defendants in each racial/ethnic group that the Attorney General authorized the death penalty, divided by the total number of defendants in that particular racial/ethnic group that initially entered the Department's review process.

- From 1988 to 1994, the Department of Justice sought the death penalty against 90 percent of the defendants submitted for review by United States Attorneys with recommendations exclusively in favor of seeking the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Total submitted | 52 | 7 | 39 | 5 | 1 |
| Decision to seek DP | 47 | 7 | 34 | 5 | 1 |
| Percent | 90% | 100% | 87% | 100% | 100% |

- From 1995 to 2000, the Department of Justice sought the death penalty against 23 percent of the defendants charged with crimes punishable by death and submitted for review by United States Attorneys with recommendations for or against seeking the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Total submitted | 682 | 134 | 324 | 195 | 29 |
| Decision to seek DP | 159 | 44 | 71 | 32 | 12 |
| Percent | 23% | 33% | 22% | 16% | 41% |

8

JA 2728

# PART II: THE UNITED STATES ATTORNEYS

### A.    BACKGROUND

As discussed above, with the enactment of the DKA in 1988, the United States Attorneys were required to submit to the Attorney General for review and approval only those cases in which the United States Attorney affirmatively wished to seek the death penalty. With the enactment of the new death penalty protocol on January 27, 1995, United States Attorneys were required to submit to the Attorney General for review "all Federal cases in which a defendant is charged with an offense subject to the death penalty, regardless of whether the United States Attorney intends to request authorization to seek the death penalty." For the reasons set forth below, this protocol does not require United States Attorneys to submit to the Attorney General *all* potentially capital-eligible defendants in the federal system.

First, United States Attorneys are not required to submit to the Attorney General for review cases in which the United States Attorney initially considered the case for federal prosecution, but ultimately decided to defer prosecution to state authorities. For example, a federal agent might arrest a defendant for committing a street robbery in which a homicide occurred, but the prosecution might be turned over to the local district attorney because of the lack of a substantial federal interest.[9]

Second, United States Attorneys retain the discretion not to charge defendants facing federal prosecution for a homicide with a capital-eligible offenses if they do not believe such a charge could be sustained. For example, a United States Attorney might decide at the outset of a particular case (*e.g.*, a vehicular homicide on federal land) that he or she simply could not prove to a jury beyond a reasonable doubt that the defendant had the requisite level of intent to be charged with a capital-eligible offense.

Third, at any time, either before or after indictment, United States Attorneys have the discretion to conclude a plea agreement with a defendant, which has the effect of foreclosing the death penalty. For example, either before or after indicting several defendants for capital-eligible offenses, a United States Attorney may decide to enter into a cooperation agreement with one of the defendants, under which that defendant agrees to plead guilty to certain crimes and testify

---

[9]Under general Department policy, United States Attorneys must determine, in deciding whether to accept a capital or non-capital case for federal prosecution, if there is a "substantial federal interest" in doing so. In making this determination, United States Attorneys weigh a number of factors, including federal law enforcement priorities, the seriousness of the particular offense, and issues specific to the individual defendant, such as his or her willingness to cooperate in the investigation or prosecution of others.

9

JA 2729

against his co-defendants in exchange for consideration – including the dismissal of certain charges and a promise to inform the sentencing judge about the cooperation – that has the effect of rendering the defendant ineligible for the death penalty. Likewise, United States Attorneys have the discretion to enter plea agreements with a defendant before or after he has been charged with capital-eligible offenses that do not require the defendants' cooperation. Such decisions may be made for a variety of reasons, including eliminating the risk of an acquittal in a difficult case, the unavailability of one or more key witnesses, or an unfavorable evidentiary ruling by the court that significantly weakens the case. If any such plea agreement is reached before a case has been submitted for review, the United States Attorney need not submit it thereafter [10]

There has been no centralized data collection process in place regarding these three categories of potential capital-eligible cases. As a result, the data regarding submissions by United States Attorneys that are reported in this Survey do not include information regarding the entire pool of potential capital-eligible defendants in the federal system since 1988.

There are, nonetheless, a significant number of cases that United States Attorneys have submitted to the Attorney General for review under the current protocol, namely, all cases in which a United States Attorney charges a capital-eligible offense and does not enter into a plea with the defendant before making a submission to the Attorney General. In submitting these cases, the United States Attorney must recommend to the Attorney General whether he or she believes that the death penalty should be authorized in that case. Prior to doing so, however, the United States Attorney or his or her designee will meet with the defendant's attorneys and allow them to make written and oral presentation as to why the death penalty should not be sought in the case.[11] In addition, many United States Attorneys employ additional decision-making procedures within their own offices; several have standing committees of senior prosecutors to

---

[10]Even when an offender commits an offense punishable by death, there are statutory limits on the categories of persons who can be executed. Specifically, in expanding the scope of offenses for which the death penalty is available, the FDPA added a provision prohibiting the execution of a pregnant woman or any person who is mentally retarded. The same statute also prohibits the execution of any person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person, and further prohibits the imposition of the death sentence on any person who was less than 18 years of age at the time of the offense. *See* 18 U.S.C. §§ 3591, 3596.

[11]Since 1988, federal law has expressly required that, upon the request of an indigent capital defendant, a federal judge shall appoint two attorneys to represent the defendant and make available sufficient funds for reasonable investigative and expert services. The attorneys appointed to represent an indigent defendant must have the "background, knowledge, or experience [that] would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation." *See* 21 U.S.C. § 848(q). Furthermore, a separate provision in effect since 1994 requires that at least one defense attorney be "learned in the law of capital cases" (a prior version of that statute, in effect from 1948 to 1994, provided for all capital defendants to be represented by "learned counsel"). *See* 18 U.S.C. § 3005.

10

JA 2730



review all potential capital cases, and others appoint such internal review committees on an ad hoc basis.[12]

Once a United States Attorney decides whether to seek authorization from the Attorney General to pursue the death penalty, he or she is required to submit detailed information about the case to the Criminal Division's CCU. In particular, the United States Attorney must submit a comprehensive discussion of the theory of liability; the facts and evidence relating to the issue of guilt or innocence; the facts and evidence relating to any aggravating factors (including victim impact) or mitigating factors; the defendant's background and criminal history; the basis for federal prosecution; and any other relevant information. The United States Attorney is also required to submit any material received from defense counsel in opposition to the death penalty, and other significant documents such as confessions, key witness statements, and autopsy and crime scene reports.

**B.    STATISTICAL HIGHLIGHTS**

The United States Attorneys submitted 52 cases for review during the pre-protocol period and 682 cases during the post-protocol period. Detailed information about these submissions are set forth in Table Set II (pages T-8 to T-126). This section provides highlights of the statistical data regarding these submissions and is divided into three parts. First, drawing on the statistics in Table Set II.A (pages T-9 to T-21), the cases are analyzed in terms of the defendants who were charged by the United States Attorneys and submitted for review. Second, using statistics from Table Set II.B (pages T-22 to T-56), the cases are analyzed in terms of the types of offenses charged. Third, the cases are examined with an emphasis on the race/ethnicity of the victims of the crimes charged against defendants, using the statistical compilations from Table Set II.C (pages T-57 to T-126).

1.    Defendants

a.    Recommendations in favor of seeking the death penalty

●    From 1995 to 2000, United States Attorneys recommended seeking the death penalty for 183 defendants, out of a total of 682 submitted for review by the Attorney General (27 percent).

---

[12]In some United States Attorneys' Offices, the United States Attorney, as well as members of the Office's internal committee that advises the United States Attorney on whether to recommend seeking the death penalty, are not informed by the prosecutors handling the case of the defendants' race/ethnicity.

11



| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 183 | 48 | 81 | 39 | 15 |
| Percent | 100% | 26% | 44% | 21% | 8% |

- The 183 recommendations to seek the death penalty were made by the United States Attorneys in 49 of the Nation's 94 districts.

- 10 of these 49 districts submitted only recommendations in favor of seeking the death penalty. These 10 districts accounted for 31 of the 183 recommendations against the death penalty in the post-protocol period (17 percent).

b.    Recommendations against seeking the death penalty

- From 1995 to 2000, United States Attorneys recommended against seeking the death penalty with respect to 494 defendants, out of 682 submitted for review by the Attorney General (72 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 494 | 85 | 242 | 153 | 14 |
| Percent | 100% | 17% | 49% | 31% | 3% |

- The 494 recommendations not to seek the death penalty were submitted by the United States Attorneys in 62 of the Nation's 94 districts.

- 23 of the 62 districts submitted only recommendations against seeking the death penalty.[13] These districts accounted for 87 of the 494 recommendations against the death penalty in the post-protocol period (18 percent).

- Including the 21 districts that have never submitted a case for review by the Attorney General, with a recommendation for or against the death penalty, there are a total of 40 districts out of 94 that have never recommended seeking the death penalty for any defendant.

---

[13]Of these 23 districts that submitted only recommendations against seeking the death penalty during the post-protocol period, four submitted at least one recommendation in favor of seeking the death penalty during the pre-protocol period.

12

JA 2732

2.    Offenses

During the pre-protocol period, defendants were charged exclusively under the DKA. With the enactment of the FDPA in late 1994, many other federal criminal offenses were punishable by death. The following highlights therefore refer exclusively to the post-protocol period. In considering statistics about the most frequently charged offenses, the reader should bear in mind that a single defendant may be charged with more than one statutory offense punishable by death.

The most frequently charged capital offenses were different for different racial/ethnic groups, although there were some constants. In particular, the use of a gun to commit homicide during and in relation to a crime of violence or drug trafficking crime, 18 U.S.C. § 924(j) ("firearms murder"), was always among the three most frequently charged capital offenses against each group, and both murder in aid of racketeering activity, 18 U.S.C. § 1959(a) ("racketeering murder") and murder in furtherance of a continuing criminal narcotics enterprise, 21 U.S.C. § 848(e)(1)(A) ("CCE murder"), were generally among the most frequently charged. Each of these crimes, and particularly firearms murder, can be charged in a wide array of circumstances, and is therefore more likely to be available as a charging option in a given case than more narrowly defined offenses such as kidnaping-related murder.

- Among the 134 White defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  - Murder within federal jurisdiction, 18 U.S.C. § 1111, which was charged against 28 of the 134 submitted White defendants (21 percent);

  - Firearms murder, which was charged against 22 of the 134 submitted White defendants (16 percent); and

  - Racketeering murder, which was charged against 20 of the 134 submitted White defendants (15 percent).

- Among the 324 Black defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

  - Firearms murder, which was charged against 105 of the 324 submitted Black defendants (32 percent);

  - CCE murder, which was charged against 85 of the 324 submitted Black defendants (26 percent); and

**JA 2733**

     —   Racketeering murder, which was charged against 70 of the 324 submitted Black defendants (22 percent).

- Among the 195 Hispanic defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

     —   Racketeering murder, which was charged against 60 of the 195 submitted Hispanic defendants (31 percent);

     —   Firearms murder, which was charged against 53 of the 195 submitted Hispanic defendants (27 percent); and

     —   Carjacking murder, 18 U.S.C. § 2119(3), which was charged against 34 of the 195 submitted Hispanic defendants (17 percent).

- Among the 29 Other defendants submitted for review from 1995 to 2000 the three offenses most frequently charged were:

     —   Firearms murder, which was charged against 6 of the 29 submitted Other defendants (21 percent);

     —   Murder within federal jurisdiction, 18 U.S.C. § 1111, which was charged against 5 of the 29 submitted Other defendants (17 percent); and

     —   Kidnaping murder, 18 U.S.C. § 1203(a), which was charged against 5 of the 29 submitted Other defendants (17 percent).

- As a general matter, the offenses most frequently charged against a given racial/ethnic group were also the most frequently charged against the members of that racial/ethnic group for whom United States Attorneys recommended seeking the death penalty.

3.   <u>Victims</u>

    a.     <u>Victims' race/ethnicity</u>

- From 1988 to 1994, there were a total of 65 identified victims of the capital offenses charged against defendants submitted for review by United States Attorneys (as to whom the recommendation was to seek the death penalty).

14

**JA 2734**



| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 65 | 6 | 49 | 9 | 1 |
| Percent | 100% | 9% | 75% | 14% | 2% |

- From 1995 to 2000, there were a total of 894 identified victims of the capital offenses charged against defendants submitted for review by United States Attorneys.[14]

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 894 | 278 | 474 | 118 | 24 |
| Percent | 100% | 31% | 53% | 13% | 3% |

- Of these 894 victims, 590 (66 percent) were victims of defendants for whom United States Attorneys recommended seeking the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 590 | 202 | 345 | 29 | 14 |
| Percent | 100% | 34% | 58% | 5% | 2% |

- Of the 894 victims, 302 (34 percent) were victims of defendants as to whom United States Attorneys recommended against seeking the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 302 | 75 | 129 | 88 | 10 |
| Percent | 100% | 25% | 43% | 29% | 3% |

---

[14] All of the victim-related statistics in this Survey are skewed to some degree by the large number of victims involved in the bombing of the American embassies in Tanzania and Kenya, which resulted in the indictment of several defendants in the Southern District of New York, and the bombing of the Alfred P. Murrah Federal Building in Oklahoma City, which resulted in the indictment of two defendants in the Western District of Oklahoma. A discussion of how the statistics are affected is set forth in the general explanatory notes to the statistical tables (*see* page T-57)

15

JA 2735

b.    Intraracial and interracial homicides

● Of the 677 homicide defendants submitted for review from 1995 to 2000,[15] 500 (74 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 500 | 109 | 227 | 150 | 14 |
| Percent | 100% | 22% | 45% | 30% | 3% |

● United States Attorneys recommended seeking the death penalty for 24 percent of the defendants charged with intraracial homicides (121 out of 500 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

— 38 percent of White defendants (41 out of 109 defendants);
— 20 percent of Black defendants (46 out of 227 defendants);
— 17 percent of Hispanic defendants (26 out of 150 defendants); and
— 57 percent of Other defendants (8 out of 14 defendants).

● Of the 677 homicide defendants submitted for review from 1995 to 2000, 177 (26 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).[16]

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 177 | 20 | 97 | 45 | 15 |
| Percent | 100% | 11% | 55% | 25% | 8% |

● United States Attorneys recommended seeking the death penalty for 35 percent of the defendants charged with interracial homicides (62 out of 177 defendants). The

---

[15]Five defendants (all of them White) submitted for review during the post-protocol period were charged with espionage offenses that did not involve any homicide.

[16]Of the 177 defendants charged in interracial homicide cases, 33 (19 percent) were charged with killing more than one victim. In each of those cases, at least one victim was of the same race/ethnicity as the defendant. Accordingly, if the definition of "intraracial" homicides included those in which at least one victim was of the same race/ethnicity as the defendant, 33 defendants would be reported in the intraracial rather than interracial category.

16

JA 2736

rats at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

— 35 percent of White defendants (7 out of 20 defendants);
— 36 percent of Black defendants (35 out of 97 defendants);
— 29 percent of Hispanic defendants (13 out of 45 defendants); and
— 47 percent of Other defendants (7 out of 15 defendants).

c. Single- and multiple-victim cases

Of the 677 homicide defendants submitted for review from 1995 to 2000, 520 (77 percent) faced capital charges involving only one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 520 | 103 | 240 | 153 | 24 |
| Percent | 100% | 20% | 46% | 29% | 5% |

United States Attorneys recommended seeking the death penalty for 23 percent of the defendants charged in single-victim cases (117 out of 520 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

— 31 percent of White defendants (32 out of 103 defendants);
— 20 percent of Black defendants (49 out of 240 defendants);
— 16 percent of Hispanic defendants (25 out of 153 defendants); and
— 46 percent of Other defendants (11 out of 24 defendants).

Of the 677 homicide defendants submitted for review from 1995 to 2000, 157 (23 percent) faced capital charges involving more than one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 157 | 26 | 84 | 42 | 5 |
| Percent | 100% | 17% | 54% | 27% | 3% |

United States Attorneys recommended seeking the death penalty for 43 percent of the defendants charged in multiple-victim cases (66 out of 157 defendants). The

17

rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

-   62 percent of White defendants (16 out of 26 defendants);
-   38 percent of Black defendants (32 out of 84 defendants);
-   33 percent of Hispanic defendants (14 out of 42 defendants); and
-   80 percent of Other defendants (4 out of 5 defendants).

# PART III:  THE REVIEW COMMITTEE

## A.    BACKGROUND

With the issuance of the new death penalty protocol on January 27, 1995, the Attorney General created a permanent advisory panel, the Review Committee, to assist her in determining whether to seek capital punishment in cases submitted for review by United States Attorneys. The Review Committee currently has five members appointed by the Attorney General (with three members required for a quorum), and includes, as a matter of practice, at least one designee of the Deputy Attorney General and at least one designee of the Assistant Attorney General for the Criminal Division.

For each case submitted by a United States Attorney, the Review Committee receives all of the underlying materials that have been submitted by the United States Attorney, including the materials from defense counsel.  The Review Committee then meets with defense counsel either in person or on video conference, along with attorneys from the United States Attorney's Office and the CCU.  During this meeting, defense counsel are invited to make an oral presentation to the Review Committee as to why the Attorney General should not authorize the United States Attorney to seek the death penalty.   Thereafter, the Review Committee makes its recommendation to the Attorney General (noting any dissenting views) as to why the death penalty should, or should not, be sought in that case.

## B.    STATISTICAL HIGHLIGHTS

From the time of its establishment in 1995 until the close of the reporting period, the Review Committee considered a total of 618 defendants.  Detailed information about the results of this consideration is set forth in Table Set III (pages T-127 to T-197).  This section provides highlights of the statistical data regarding these cases and is organized in the same manner as the preceding Section concerning the United States Attorneys. The analysis of the pool of defendants is based on the statistics in Table Set III.A (pages T-128 to T-132).  The analysis of offense data

18

**JA 2738**

is set forth in Table Set III.B (pages T-133 to T-162).  Victim-related statistics are set forth in Table Set III.C (pages T-163 to T-197).

1.    Defendants

● Of the 682 defendants submitted for review by United States Attorneys from 1995 to 2000, 15 were still under review as of July 20, 2000, and 49 others had been withdrawn.  The Review Committee considered the remaining 618.

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 618   | 120   | 300   | 172      | 26    |
| Percent | 100%  | 19%   | 49%   | 28%      | 4%    |

● From 1995 to 2000, the Review Committee recommended seeking the death penalty for 183 defendants, out of a total of 618 it reviewed (30 percent).[17]

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 183   | 47    | 80    | 43       | 13    |
| Percent | 100%  | 26%   | 44%   | 23%      | 7%    |

2.    Offenses

The Review Committee's practices with respect to charging practices were virtually identical to the trends reported above with respect to the recommendations of the United States Attorneys.  Accordingly, highlights of the statistical tables presenting information on this topic are not discussed further here.

---

[17]There were also 15 defendants as to whom the Review Committee completed its review but did not recommend either for or against seeking the death penalty.  In some of these cases, the Review Committee recommended that the Attorney General defer a decision (either because of the pendency of a state prosecution of the same defendant or because the defendant was a fugitive), and in others the Review Committee was evenly divided as to a recommendation.

19

JA 2739

3.  Victims

    a.  Victims' race/ethnicity

• From 1995 to 2000, there were a total of 853 identified victims of the capital offenses charged against defendants considered by the Review Committee.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 853 | 258 | 468 | 104 | 23 |
| Percent | 100% | 30% | 55% | 12% | 3% |

• Of these 853 victims, 600 (70 percent) were victims of defendants for whom the Review Committee recommended seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 600 | 193 | 346 | 46 | 15 |
| Percent | 100% | 32% | 58% | 8% | 3% |

• Of the 853 victims, 246 (29 percent) were victims of defendants as to whom the Review Committee recommended against seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 246 | 61 | 120 | 57 | 8 |
| Percent | 100% | 25% | 49% | 23% | 3% |

    b.  Intraracial and interracial homicides

• Of the 613 homicide defendants the Review Committee considered from 1995 to 2000, 449 (73 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

20

JA 2740



| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 449 | 94 | 211 | 131 | 13 |
| Percent | 100% | 21% | 47% | 29% | 3% |

- The Review Committee recommended seeking the death penalty for 29 percent of the defendants charged with intraracial homicides (129 out of 449 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  — 43 percent of White defendants (40 out of 94 defendants);
  — 23 percent of Black defendants (48 out of 211 defendants);
  — 25 percent of Hispanic defendants (33 out of 131 defendants); and
  — 63 percent of Other defendants (8 out of 13 defendants).

- Of the 613 homicide defendants the Review Committee considered from 1995 to 2000, 164 (27 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 164 | 20 | 90 | 41 | 13 |
| Percent | 100% | 12% | 55% | 25% | 8% |

- The Review Committee recommended seeking the death penalty for 33 percent of the defendants charged with interracial homicides (54 out of 164 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  — 35 percent of White defendants (7 out of 20 defendants);
  — 36 percent of Black defendants (32 out of 90 defendants);
  — 24 percent of Hispanic defendants (10 out of 41 defendants); and
  — 38 percent of Other defendants (5 out of 13 defendants).

c.    <u>Single- and multiple-victim cases</u>

- From 1995 to 2000, 468 of the 613 homicide defendants considered by the Review Committee (76 percent) faced capital charges involving only one victim.

21

**JA 2741**

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 468   | 90    | 221   | 136      | 21    |
| Percent | 100%  | 19%   | 47%   | 29%      | 4%    |

- The Review Committee recommended seeking the death penalty for 25 percent of the defendants charged in single-victim cases (115 out of 468 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 36 percent of White defendants (32 out of 90 defendants);
  - 20 percent of Black defendants (45 out of 221 defendants);
  - 21 percent of Hispanic defendants (28 out of 136 defendants); and
  - 48 percent of Other defendants (10 out of 21 defendants).

- From 1995 to 2000, 145 of the 613 homicide defendants considered by the Review Committee (24 percent) faced capital charges involving more than one victim.

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 145   | 24    | 80    | 36       | 5     |
| Percent | 100%  | 17%   | 55%   | 25%      | 3%    |

- The Review Committee recommended seeking the death penalty for 47 percent of the defendants charged in multiple-victim cases (68 out of 145 defendants). The rates at which they recommended seeking the death penalty for specific racial/ethnic groups were as follows:

  - 63 percent of White defendants (15 out of 24 defendants);
  - 44 percent of Black defendants (35 out of 80 defendants);
  - 42 percent of Hispanic defendants (15 out of 36 defendants); and
  - 60 percent of Other defendants (3 out of 5 defendants).

22

**JA 2742**

# PART IV:  THE ATTORNEY GENERAL

## A.    BACKGROUND

Before considering a particular case, the Attorney General receives the recommendation of the United States Attorney, the recommendation of the Review Committee, and all of the underlying materials that have been submitted by the United States Attorney, including the materials from defense counsel.  After discussing the case with the Review Committee and the CCU attorneys (and with the United States Attorney for the case when he or she disagrees with the recommendation of the Review Committee), and after careful review of all of the relevant material (including, at times, additional information gathered at the Attorney General's request), the Attorney General signs a letter to the United States Attorney either authorizing the filing of a notice of intent to seek the death penalty or authorizing the United States Attorney not to file such a notice.[18]

## B.    STATISTICAL HIGHLIGHTS

The Attorney General completed the review of 52 defendants submitted during the pre-protocol period and 588 defendants submitted during the post-protocol period.  Detailed information about the results of the consideration of those defendants is set forth in Table Set IV (pages T-198 to T-304).  This section provides highlights of the statistical data regarding these cases and is organized in the same manner as the preceding sections concerning the United States Attorneys and the Review Committee.  The analysis of the pool of defendants is based on the statistics in Table Set IV.A (pages T-199 to T107).  The analysis of offense data is set forth in Table Set IV.B (pages T-108 to T-235).  Victim-related statistics are set forth in Table Set IV.C (pages T-236 to T-304).

### 1.    Defendants

● In the pre-protocol period from 1988 to 1994, the United States Attorneys submitted 52 defendants for review.  Attorneys General decided to seek the death penalty for 47 of these defendants (90 percent).

---

[18]In some instances, the Attorney General does not make a decision on a case submitted for review by a United States Attorney.  For example, the United States Attorney may enter into a plea agreement with a defendant while the case is under consideration by the Attorney General (or the Review Committee).  In other cases, consideration of a given defendant may be indefinitely suspended if the defendant is a fugitive.

23

**JA 2743**



| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 47 | 7 | 34 | 5 | 1 |
| Percent | 100% | 15% | 72% | 11% | 2% |

- In the post-protocol period from 1995 to 2000, the United States Attorneys submitted 682 defendants for review. Of these, 31 were still pending review at the close of the reporting period; and 63 had been withdrawn by the United States Attorney. The Attorney General considered the remaining 588 defendants (86 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 588 | 115 | 287 | 160 | 26 |
| Percent | 100% | 20% | 49% | 27% | 4% |

- From 1995 to 2000, the Attorney General decided to seek the death penalty for 159 defendants, out of a total of 588 considered (27 percent).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 159 | 44 | 71 | 32 | 12 |
| Percent | 100% | 28% | 45% | 20% | 8% |

2.    Offenses

The Attorney General's practices with respect to charging practices were virtually identical to the trends reported above with respect to the recommendations of the United States Attorneys. Accordingly, highlights of the statistical tables presenting information on this topic are not discussed further here.

3.    Victims

a.    Victims' race/ethnicity

- From 1995 to 2000, there were a total of 833 identified victims of the capital offenses charged against defendants who were considered by the Attorney General.

24

**JA 2744**



| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 833 | 254 | 462 | 95 | 22 |
| Percent | 100% | 30% | 55% | 11% | 3% |

● Of these 833 victims, 578 (69 percent) were victims of defendants for whom the Attorney General decided to seek the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 578 | 190 | 340 | 35 | 13 |
| Percent | 100% | 33% | 59% | 6% | 2% |

● Of the 833 victims, 252 (30 percent) were victims of defendants as to whom the Attorney General decided not to seek the death penalty.

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 252 | 62 | 122 | 59 | 9 |
| Percent | 100% | 25% | 48% | 23% | 4% |

b.    Intraracial and interracial homicides

● Of the 583 homicide defendants whom the Attorney General considered from 1995 to 2000, 424 (73 percent) were charged with intraracial homicides (*i.e.*, each was of the same race/ethnicity as all victims).

| | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 424 | 90 | 200 | 121 | 13 |
| Percent | 100% | 21% | 47% | 29% | 3% |

● The Attorney General decided to seek the death penalty for 25 percent of the defendants charged with intraracial homicides (108 out of 424 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

25

JA 2745

– 41 percent of White defendants (37 out of 90 defendants);
– 21 percent of Black defendants (41 out of 200 defendants);
– 19 percent of Hispanic defendants (23 out of 121 defendants); and
– 54 percent of Other defendants (7 out of 13 defendants).

● Of the 583 homicide defendants whom the Attorney General considered from 1995 to 2000, 159 (28 percent) were charged with interracial homicides (*i.e.*, each was of a different race/ethnicity than at least one victim).[19]

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 159 | 20 | 87 | 39 | 13 |
| Percent | 100% | 13% | 55% | 25% | 8% |

● The Attorney General decided to seek the death penalty for 32 percent of the defendants charged with interracial homicides (51 out of 159 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

– 35 percent of White defendants (7 out of 20 defendants);
– 34 percent of Black defendants (30 out of 87 defendants);
– 23 percent of Hispanic defendants (9 out of 39 defendants); and
– 38 percent of Other defendants (5 out of 13 defendants).

c. Single- and multiple-victim cases

● From 1995 to 2000, 448 out of the 583 homicide defendants considered by the Attorney General (77 percent) faced capital charges involving only one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 448 | 86 | 210 | 131 | 21 |
| Percent | 100% | 19% | 47% | 29% | 5% |

---

[19]Of the 159 defendants charged in interracial homicide cases, 33 (21 percent) were charged with killing more than one victim. In each of those cases, at least one victim was of the same race/ethnicity as the defendant. Accordingly, if the definition of "intraracial" homicides included those in which at least one victim was of the same race/ethnicity as the defendant, 33 defendants would be reported in the intraracial rather than interracial category.

26

JA 2746

- The Attorney General decided to seek the death penalty for 22 percent of the defendants charged in single-victim cases (97 out of 448 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

  - 34 percent of White defendants (29 out of 86 defendants);
  - 19 percent of Black defendants (40 out of 210 defendants);
  - 14 percent of Hispanic defendants (18 out of 131 defendants); and
  - 48 percent of Other defendants (10 out of 21 defendants).

- From 1995 to 2000, 135 out of the 583 homicide defendants considered by the Attorney General (23 percent) faced capital charges involving more than one victim.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 135 | 24 | 77 | 29 | 5 |
| Percent | 100% | 18% | 57% | 21% | 4% |

- The Attorney General decided to seek the death penalty for 46 percent of the defendants charged in multiple-victim cases (62 out of 135 defendants). The rates at which the Attorney General decided to seek the death penalty for specific racial/ethnic groups were as follows:

  - 63 percent of White defendants (15 out of 24 defendants);
  - 40 percent of Black defendants (31 out of 77 defendants);
  - 48 percent of Hispanic defendants (14 out of 29 defendants); and
  - 40 percent of Other defendants (2 out of 5 defendants).

27

JA 2747

# PART V:  POST-AUTHORIZATION ACTIVITY

## A.     BACKGROUND

A decision by the Attorney General to seek the death penalty is always subject to reconsideration until the jury has returned a sentencing verdict.  Thus, even after such a decision to seek the death penalty has been made, additional facts or arguments may always be brought to the Attorney General's attention in support of a request to withdraw a notice of intent to seek the death penalty.  Such reconsideration can be sought by defense counsel, the United States Attorney, the Review Committee, or the Attorney General herself.  As explained above, the Attorney General's decision to authorize the seeking of the death penalty can also be changed by means of a cooperation or non-cooperation plea agreement between the United States Attorney and the defendant that forecloses the possibility of capital punishment.  Under Department policy, such agreements do not require the Attorney General's prior authorization.

For those defendants who proceed to trial, there are two phases to the case.  In the "guilt phase," the jury must decide unanimously whether the prosecution proved beyond a reasonable doubt that the defendant has committed the underlying death-eligible offense.  If the jury finds the defendant guilty, the case proceeds to the "sentencing phase."  At the sentencing phase, in order to meet legal requirements for the imposition of the death penalty, the prosecution must prove beyond a reasonable doubt that the defendant committed the capital offense with a certain level of intent.  In addition, the prosecution must prove any aggravating factors beyond a reasonable doubt, and must prove at least one from a list of specific factors set out in the applicable statute.[20]  In recommending a sentence, the jury may only consider aggravating factors that it unanimously finds to have been proven beyond a reasonable doubt.  Mitigating factors can include any of several specific factors listed in the statute, as well as anything else "in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence."[21]  Mitigating factors need only be proven by a

---

[20]Although the exact list of aggravating factors varies depending on the nature of the offense, the statutory list of factors generally includes: killing multiple victims; committing the capital offense against particularly vulnerable victims or high-level public officials; paying someone else to commit the murder; committing the murder for pecuniary gain; committing the murder while committing other serious crimes; causing a grave risk of death to persons other than the actual victims; committing the offense in a particularly heinous manner; engaging in substantial planning or premeditation in committing the murder; or having previous convictions for other serious offenses.  *See* 18 U.S.C. § 3592(b)-(d); 21 U.S.C. § 848(n).

[21]The specific mitigating factors listed in the FDPA are impaired capacity, duress, minor participation, equally culpable defendants who will not be punished by death, lack of a prior criminal record, mental or emotional disturbance, and consent by the victim.  18 U.S.C. § 3592(a); *see also* 21 U.S.C. § 848(m) (similar list of mitigating factors under DKA).

28

JA 2748



preponderance of the evidence, and each juror can make an individual decision as to which factors have been proven to his or her satisfaction. Both the prosecution and defense may, in the judge's discretion, present information that might not be admissible as evidence in the guilt phase of the trial (such as hearsay, for example); and may also rely on all of the evidence submitted during the guilt phase without having to present it anew during the penalty phase.

At the end of the sentencing phase, the federal judge instructs the jurors that they must each weigh the aggravating and mitigating factors and decide upon a sentence. The judge also instructs the jury that they may not in any way consider the race, national origin, sex, or religious beliefs of the defendant or the victim in reaching a verdict. Jurors are then given at least two sentencing options: death or life in prison without any possibility of release. With respect to certain offenses, jurors are also given a third option – to have the judge impose a lesser sentence authorized by statute. Jurors are never required to return a verdict of death. In reaching a verdict, which must be unanimous, each juror must certify that he or she did not, in fact, consider the race, national origin, sex, or religious beliefs of the defendant or the victim in reaching his or her determination and that his or her determination would have been the same regardless of those factors. In all cases, the jury's decision is binding upon the judge.[22]

After sentencing, a defendant subject to the death penalty is entitled to several forms of review. As with all federal criminal defendants, a defendant subject to a sentence of death may seek direct review of his or her conviction and sentence in the United States Court of Appeals for the circuit in which he or she was convicted. In capital cases, however, federal law explicitly requires the appellate court, in reviewing the case, to review the entire record and to address certain specific issues, including whether the sentence of death "was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the finding of the existence of an aggravating factor . . . ." 18 U.S.C. § 3595(c)(1). If the Court of Appeals affirms the conviction and sentence, the defendant may seek review in the United States Supreme Court by filing a petition for a writ of certiorari (and the government may likewise petition for a writ of certiorari if the conviction or sentence is reversed or vacated on appeal). Although the defendant is entitled to review in the Court of Appeals, the Supreme Court has discretion to decide whether to grant the petition for certiorari and review the case.

If the defendant fails to obtain relief on direct appeal, he or she may also seek collateral review by filing a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255 (which is sometimes described as a petition for a writ of habeas corpus). As with the proceedings in the underlying criminal case, such collateral review goes through three levels of the federal judiciary: the motion is made in the district court in which the defendant was

---

[22]Although federal law requires a judge to impose a sentence recommended by the jury in a capital case, the relevant statutes refer to the jury's sentencing decision as a recommendation. For ease of reference, this Survey refers to the determination made by a jury after a sentencing hearing as a "verdict."

29

convicted. Regardless of whether the conviction is upheld or vacated, the district court's resolution of the § 2255 motion is subject to direct appeal by the losing party. And, as with direct review, the judgment by the Court of Appeals concerning the § 2255 motion is subject to discretionary review by the Supreme Court.

If the defendant's sentence of death is upheld on both direct and collateral review, an execution date is set.[23] Under current policy, the Department will provide the defendant at least 120 days' notice of the scheduled execution date. *See* 65 Fed. Reg. 48379, 48380 (Aug. 8, 2000). Once judicial proceedings have ended and the defendant has received notification of the scheduled execution date, he or she may petition the President for a grant of executive clemency. *See* 28 C.F.R. § 1.10 (advisory regulations concerning clemency in capital cases). The Department reviews the case and makes a recommendation as to how it should be decided, but pursuant to the Constitution, the decision to grant or deny clemency or to stay the execution while a petition is under review is committed entirely to the discretion of the President.[24]

## B.    STATISTICAL HIGHLIGHTS

This Survey does not include separate tables for specific decision-making stages that occur after the Attorney General has authorized seeking the death penalty. However, information about those stages is set forth in Table Set I (pages T-1 to T-7).

### 1.    Plea Agreements

The statistical highlights regarding plea agreements reported in this Part reflect only those cases in which defendants actually entered into an agreement resulting in a guilty plea after the Attorney General authorized seeking the death penalty. They do not reflect the number of times that United States Attorneys offered to enter into such agreements but were refused or, conversely, the number of times that United States Attorneys declined to enter into agreements offered by defendants and their counsel.

Moreover, because the decision to offer and accept a plea agreement may be affected by many factors other than the Attorney General's decision about authorizing capital prosecution,

---

[23]While there are additional avenues of potential relief available under federal law, direct appeal and § 2255 review are the two most commonly used, and current Department policy is to await the completion of these two forms of review, but not others, to set an execution date in a case in which a defendant has been sentenced to death. A defendant seeking other forms of judicial relief once an execution date has been scheduled may also seek a judicial order staying the execution to allow consideration of the merits of the pending claim.

[24]Federal law provides that indigent defendants are entitled to appointed counsel throughout the appeal, collateral review, and clemency processes.

30

JA 2750

United States Attorneys and defendants can also decide to enter into plea agreements *before* the Attorney General makes a decision, either before the case is indicted, or after indictment but before the Department's decision-making process has been completed. Statistics that focus only on plea agreements after the Attorney General authorizes seeking the death penalty thus may not accurately reflect the degree to which defendants charged with offenses punishable by death avoid such punishment as the result of guilty pleas.[25]

a.    Pre-protocol cases

- From 1988 to 1994, the Attorney General authorized United States Attorneys to seek the death penalty for a total of 47 defendants. Of these, 14 defendants (30 percent) entered into plea agreements as a result of which the government withdrew the notice of intent to seek the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 14 | 3 | 10 | 1 | 0 |
| Percent | 100% | 21% | 71% | 7% | 0% |

- The rate at which defendants authorized for the death penalty entered plea agreements was 30 percent. The rates for individual racial ethnic groups were as follows:

  - 43 percent for White defendants (3 out of 7 authorized);
  - 29 percent for Black defendants (10 out of 34 authorized);
  - 20 percent for Hispanic defendants (1 out of 5 authorized); and
  - 100 percent for Other defendants (1 out of 1 authorized).

b.    Post-protocol cases

- From 1995 to 2000, the Attorney General authorized United States Attorneys to seek the death penalty for a total of 159 defendants. Of these, 51 defendants (32

---

[25]The statistics compiled for this Survey do not include the number of plea agreements that occurred in cases after the Attorney General decided *not* to seek the death penalty. Further, as noted above in Part II, this Survey does not account for plea agreements reached before submission by United States Attorneys.

31

JA 2751

percent) entered into plea agreements as a result of which the government withdrew the notice of intent to seek the death penalty.[26]

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 51 | 21 | 18 | 9 | 3 |
| Percent | 100% | 41% | 35% | 18% | 6% |

- The rate at which defendants authorized for the death penalty entered plea agreements was 32 percent. The rates for individual racial ethnic groups were as follows:

    —    48 percent for White defendants (21 out of 44 authorized);
    —    25 percent for Black defendants (18 out of 71 authorized);
    —    28 percent for Hispanic defendants (9 out of 32 authorized); and
    —    25 percent for Other defendants (3 out of 12 authorized).

2.    Trial Results

a.    Pre-protocol cases

- Of the 47 defendants as to whom the Attorney General authorized capital prosecution from 1988 to 1994, 20 (43 percent) proceeded to trial. The notice of intent to seek the death penalty was withdrawn as to 25 defendants, as the result of either a plea agreement (14 defendants) or reconsideration by the Attorney General (11 defendants). There were 2 defendants as to whom the notice to seek the death penalty was dismissed or the prosecution otherwise terminated by judicial action.

- Of the 20 defendants whose cases were tried, 16 (80 percent) were found guilty beyond a reasonable doubt of at least one offense subject to the death penalty.

---

[26]Of the 682 defendants submitted by United States Attorneys for review from 1995 to 2000, a total of 58 entered into plea agreements before the Attorney General made a decision, including 8 (14 percent) who were White, 27 (47 percent) who were Black, 20 (34 percent) who were Hispanic, and 3 (5 percent) who were Other. None of the defendants submitted for review during the pre-protocol period entered into plea-agreements before the Attorney General decided whether to seek the death penalty.

32

JA 2752

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 20 | 3 | 8 | 4 | 1 |
| Percent | 100% | 19% | 50% | 25% | 6% |

- Of the 16 defendants convicted of capital offenses, juries returned non-death penalty verdicts (or no verdicts) for 10 (65 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 10 | 1 | 5 | 3 | 1 |
| Percent | 100% | 10% | 50% | 30% | 10% |

- Of the 16 defendants convicted of capital offenses, juries returned death penalty verdicts for 6 (35 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 6 | 2 | 3 | 1 | 0 |
| Percent | 100% | 33% | 50% | 17% | 0% |

- The rate at which juries returned death penalty verdicts was 35 percent for all defendants. The rates for individual racial/ethnic groups were as follows:

    - 67 percent for White defendants (2 out of 3 decided);
    - 38 percent for Black defendants (3 out of 8 decided);
    - 25 percent for Hispanic defendants (1 out of 4 decided); and
    - 0 percent for Other defendants (0 out of 1 decided).

- At the close of the reporting period, one of the six defendants for whom juries returned death penalty verdicts had his sentence vacated and was subsequently re-sentenced to life in prison.

b.    Post-protocol cases

- Of the 159 defendants as to whom the Attorney General authorized capital prosecution from 1995 to 2000, 42 (26 percent) had been tried at the close of the reporting period. The notice of intent to seek the death penalty was withdrawn as

33

JA 2753

to 62 defendants, as the result of either a plea agreement (51 defendants) or reconsideration by the Attorney General (11 defendants). There were 4 defendants as to whom the notice to seek the death penalty was dismissed or the prosecution otherwise terminated by judicial action. The remaining 51 defendants were awaiting trial as of July 20, 2000.

- Of the 42 defendants whose trials had been completed at the end of the reporting period, 41 (98 percent) were found guilty beyond a reasonable doubt of at least one offense subject to the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 41 | 11 | 25 | 2 | 3 |
| Percent | 100% | 27% | 61% | 5% | 7% |

- Of the 41 defendants convicted of capital offenses, juries returned non-death penalty verdicts (or no verdicts) for 21 (51 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 21 | 7 | 12 | 0 | 2 |
| Percent | 100% | 33% | 57% | 0% | 10% |

- Of the 41 defendants convicted of capital offenses, juries returned death penalty verdicts for 20 (49 percent).

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 20 | 4 | 13 | 2 | 1 |
| Percent | 100% | 20% | 65% | 10% | 5% |

- The rate at which juries returned death penalty verdicts was 49 percent for all defendants. The rates for individual racial/ethnic groups were as follows:

    — 44 percent for White defendants (4 out of 11 decided);
    — 52 percent for Black defendants (13 out of 25 decided);
    — 100 percent for Hispanic defendants (2 out of 2 decided); and

34

JA 2754

&#x2014;    33 percent for Other defendants (1 out of 3 decided).

- At the close of the reporting period, four of the 20 defendants for whom juries returned death verdicts had their sentences vacated and were awaiting further judicial proceedings (which may or may not result in the reinstatement of the death sentence in each case); and two were awaiting the formal imposition of sentence by the trial court.

3.    Federal Defendants Sentenced to Death

Since 1988, federal juries have recommended the death sentence for a total of 26 defendants, of whom six were initially indicted before the protocol took effect on January 27, 1995. The sentences of four of these 26 defendants (one of whom is White, three of whom are Black, and all of whom were indicted under the Department's current protocol) were vacated in subsequent judicial proceedings; they are awaiting further proceedings in which their death sentences may or may not be reinstated. The sentence of one additional White defendant indicted in the pre-protocol period was vacated; this defendant was subsequently re-sentenced to life in prison. In addition, two Hispanic defendants are currently awaiting formal sentencing following the jury's recommendation of death. Thus, as of July 20, 2000, there were 19 defendants with pending federal death sentences, including eight who were litigating direct appeals, ten who were litigating collateral claims pursuant to 28 U.S.C. § 2255, and one who had completed both forms of post-verdict litigation and had been scheduled for execution.[27]

---

[27]In the case of the one defendant who had completed litigation of both direct appeal and the initial collateral review (Juan Raul Garza), the President granted a reprieve and set a new execution date after the close of the reporting period. Also, after the close of the reporting period, one defendant whose case had pending on direct appeal as on July 20, 2000 (David Paul Hammer), successfully petitioned the appellate court to dismiss the appeal and remand the case to the district court for the setting of an execution date.

JA 2755

Information about the federal defendants who have been sentenced to death is set forth in Table Set V (pages T-305 to T-309). This section provides highlights of the statistical data regarding these defendants.[28]

- As of July 20, 2000, 19 defendants were under a federal sentence of death.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 19 | 4 | 13 | 1 | 1 |
| Percent | 100% | 21% | 68% | 5% | 5% |

- These 19 defendants were prosecuted in 14 separate cases – 10 cases had one defendant convicted of capital charges and sentenced to death, while 4 cases had two or more capital defendants sentenced to death. The 14 cases were prosecuted in 12 different judicial districts in 10 different states. Only two United States

---

[28]This Survey generally does not attempt to document comparable state statistics regarding the death penalty decision-making process. Nevertheless, to allow a very general comparison of the relative size of the state and federal populations of death row, the following information compiled elsewhere by BJS is provided. As of December 31, 1998, BJS reports that there were 3,433 state defendants awaiting execution after being sentenced to death.

|  | Total | White | Black | Other |
|---|---|---|---|---|
| Number | 3,433 | 1,900 | 1,473 | 60 |
| Percent | 100% | 55% | 43% | 2% |

Significantly, these state statistics do *not* distinguish between persons of Hispanic ethnicity and non-Hispanic defendants in counting the total number of White, Black, and Other defendants. However, BJS also reports that 314 defendants of all races (9 percent of the total population of 3,433) were of Hispanics ethnicity.

Furthermore, BJS reports that the states executed a total of 505 defendants from 1988 to 1999.

|  | Total | White | Black | Other |
|---|---|---|---|---|
| Number | 505 | 317 | 177 | 11 |
| Percent | 100% | 63% | 35% | 2% |

BJS reports that 27 executed defendants of all races (7 percent of the total population of 505) were of Hispanic ethnicity.

36

JA 2756

Attorneys' Offices have prosecuted more than one capital case resulting in a death sentence, and none has prosecuted more than two such cases.

- 10 of these 19 defendants (53 percent) had capital convictions related to only one victim. 9 of the 19 defendants (47 percent) had capital convictions related to two or more victims.

- 18 of these 19 defendants were sentenced to death for crimes involving a total of 27 victims.

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 27    | 7     | 16    | 3        | 1     |
| Percent | 100%  | 26%   | 59%   | 11%      | 4%    |

- The remaining defendant, Timothy McVeigh, was found responsible for the deaths of 160 individuals of various races/ethnicities in connection with the 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City, Oklahoma.[29]

- 13 of these 19 defendants (68 percent) were sentenced to death for crimes against victims exclusively of the same race/ethnicity.

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 13    | 3     | 8     | 1        | 1     |
| Percent | 100%  | 23%   | 62%   | 8%       | 8%    |

---

[29]The victim-related data in this Survey is based exclusively on the number of victims set forth in the indictment against each defendant, which in some cases understates the actual number of victims who died as a result of a defendant's crimes. Thus, for example, although there were a total of 168 victims who died as a result of the bombing in Oklahoma City, the victim statistics in this survey include only 160 victims of that offense who at the time of the indictment were known to have died inside the building.

37

JA 2757

- 6 of these 19 defendants (32 percent) were sentenced to death for crimes against at least one victim of a different race/ethnicity. One of these 6 defendants was White and five were Black.[30]

---

[30]This Survey reports statistics only relating to implementation of the federal death penalty since its re-introduction in 1988. Prior to that year, the federal government had not executed any person since 1963. Information about federal executions before 1963 has been published by the Death Penalty Information Center (DPIC). Specifically, DPIC reports that there 34 federal defendants were executed between 1927 and 1963. Of these, 28 (82 percent) were White, 3 (9 percent) were Black, 2 (6 percent) were Other, 1 (3 percent) was of unknown race. DPIC does not separately report the number of executed federal defendants who were Hispanic. DPIC further reports that 19 (56 percent) of these defendants were executed for murder, 6 (18 percent) for sabotage, 4 (12 percent) for kidnapping, 2 (6 percent) for espionage, 2 (6 percent) for bank robbery, and 2 (6 percent) for rape. The total exceeds 34 because some defendants were convicted of multiple capital offenses. *See* Federal Death Penalty Information Center, Executions of Federal Prisoners 1927-1999, <http://www.deathpenaltyinfo.org/fedexec.html>.

38

JA 2758

# PART VI: AGREEMENTS AND DISAGREEMENTS IN THE FEDERAL DECISION-MAKING PROCESS

## A.  BACKGROUND

As suggested by the general similarity of the statistics reported about the recommendations and decisions made by each participant in the Department's death penalty review process, the United States Attorneys, the Review Committee, and the Attorney General often come to the same conclusion about whether or not the government should seek the death penalty for a given defendant.  This Section provides information about the extent to which such agreement has and has not occurred under the Department's review procedures.

## B.  STATISTICAL HIGHLIGHTS

Detailed information about the degree to which different participants in the federal decision-making process agreed and disagreed with one another is set forth in Table Set VI (pages T-310 to T-355).  The tables first analyze agreements and disagreements among all three participants in the decision-making process, *i.e.*, the United States Attorneys, the Review Committee, and the Attorney General (pages T-311 to T-327); and then focus on the extent to which specific pairs of those participants agreed and disagreed with one another (pages T-328 to T-355).

1.  Three-party comparisons

- From 1995 to 2000, there were a total of 571 defendants who were considered by all three participants in the decision-making process.  The Attorney General, the Review Committee and the United States Attorney all agreed with respect to 501 of these defendants (88 percent),

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 497   | 95    | 250   | 130      | 22    |
| Percent | 100%  | 19%   | 50%   | 26%      | 4%    |

- The rate of agreement was 88 percent (501 of 571 defendants as to whom the Attorney General made a decision upon recommendations from both of the other participants), including both decisions to seek the death penalty and decisions not

39

JA 2759

to seek it. With respect to specific racial/ethnic groups, the rates of agreement were:

— 86 percent for White defendants (95 of 110 defendants);
— 89 percent for Black defendants (250 of 280 defendants);
— 83 percent for Hispanic defendants (130 of 156 defendants); and
— 88 percent for Other defendants (22 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 84 percent (133 of 159 defendants for whom the Attorney General decided to seek the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:
— 82 percent for White defendants (36 of 44 defendants);
— 89 percent for Black defendants (63 of 71 defendants);
— 69 percent for Hispanic defendants (22 of 32 defendants); and
— 100 percent for Other defendants (12 of 12 defendants).

- The rate of agreement specifically for decisions against seeking the death penalty was 88 percent (368 of 417 defendants for whom the Attorney General decided not to seek the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:
— 87 percent for White defendants (59 of 68 defendants);
— 90 percent for Black defendants (191 of 212 defendants);
— 87 percent for Hispanic defendants (108 of 124 defendants); and
— 77 percent for Other defendants (10 of 13 defendants).

- In the 70 instances in which there was not overall agreement, the dissenting view was most often held by the United States Attorney and least often by the Attorney General.

- The United States Attorney held the dissenting view as to 50 defendants out of 70 as to whom there was a lack of consensus (71 percent), including 25 recommendations by United States Attorneys in favor of seeking the death penalty and 25 recommendations against doing so. Of these 50 defendants:

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 50 | 13 | 17 | 18 | 2 |
| Percent | 100% | 26% | 34% | 36% | 4% |

40

**JA 2760**

● The Review Committee held the dissenting view as to 18 defendants out of 70 as to whom there was a lack of consensus (26 percent), all of which were recommendations by the Review Committee in favor of seeking the death penalty.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 18 | 2 | 7 | 8 | 1 |
| Percent | 100% | 11% | 39% | 44% | 6% |

● The Attorney General held the dissenting view as to 2 defendants out of 70 as to whom there was a lack of consensus (3 percent), and decided in both cases against seeking the death penalty. Both of these defendants were Black.

2.    Two-party comparisons

a.    The United States Attorneys and the Attorney General

● From 1995 to 2000, a total of 575 defendants facing capital-eligible charges were the subjects of both a recommendation either for or against seeking the death penalty by a United States Attorney and a decision by the Attorney General. With respect to 522 of these defendants (91 percent), the United States Attorney and the Attorney General agreed as to whether or not the death penalty should be sought.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 522 | 98 | 263 | 138 | 23 |
| Percent | 100% | 19% | 50% | 26% | 4% |

● The overall rate of agreement was 87 percent (522 of 575 defendants), including both decision to seek the death penalty and decisions not to seek it. With respect to specific racial/ethnic groups, the overall rates of agreement were:
   — 88 percent for White defendants (98 of 111 defendants);
   — 93 percent for Black defendants (263 of 283 defendants);
   — 88 percent for Hispanic defendants (138 of 156 defendants); and
   — 92 percent for Other defendants (23 of 25 defendants).

● The rate of agreement specifically for decisions to seek the death penalty was 83 percent (133 of 160 defendants for whom the United States Attorney

41

JA 2761

recommended seeking the death penalty).  With respect to specific racial/ethnic groups, the rates of agreement were:
- 88 percent for White defendants (36 of 41 defendants);
- 84 percent for Black defendants (63 of 75 defendants);
- 73 percent for Hispanic defendants (22 of 30 defendants); and
- 86 percent for Other defendants (12 of 14 defendants).

● The rate of agreement specifically for decisions against seeking the death penalty was 94 percent (389 of 415 defendants for whom the United States Attorney recommended against seeking the death penalty).  With respect to specific racial/ethnic groups, the rates of agreement were:
- 89 percent for White defendants (62 of 70 defendants);
- 96 percent for Black defendants (200 of 208 defendants);
- 92 percent for Hispanic defendants (116 of 126 defendants); and
- 100 percent for Other defendants (11 of 11 defendants).

● The rate of agreement between the Attorney General and the United States Attorneys as to cases in which the latter recommended seeking the death penalty did not substantially change as a result of the adoption of the review protocol in 1995.  In the pre-protocol period (when the United States Attorneys submitted only recommendations in favor of seeking the death penalty), the cases of 51 defendants facing capital-eligible charges were submitted by the United States Attorneys and decided by the Attorney General.[31]  With respect to 47 of these defendants (92 percent), the Attorney General and the United States Attorney agreed that the death penalty should be sought.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 47 | 7 | 34 | 5 | 1 |
| Percent | 100% | 15% | 72% | 11% | 2% |

b.    The United States Attorneys and the Review Committee

● From 1995 to 2000, a total of 602 defendants facing capital-eligible charges were the subjects of recommendations either for or against seeking the death penalty by both a United States Attorney and the Review Committee.  With respect to 529 of

---

[31]The Attorney General deferred decision on one defendant, a fugitive who subsequently died.

JA 2762

these defendants (88 percent), the United States Attorney and the Review Committee agreed as to whether or not the death penalty should be sought.

|  | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|
| Number | 529 | 98 | 268 | 141 | 22 |
| Percent | 100% | 19% | 51% | 27% | 4% |

- The overall rate of agreement was 88 percent (529 of 602 defendants), including both decision to seek the death penalty and decisions not to seek it. With respect to specific racial/ethnic groups, the overall rates of agreement were:

  – 86 percent for White defendants (98 of 114 defendants);
  – 91 percent for Black defendants (268 of 295 defendants);
  – 84 percent for Hispanic defendants (141 of 168 defendants); and
  – 88 percent for Other defendants (22 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 84 percent (137 of 164 defendants for whom the United States Attorney recommended seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

  – 88 percent for White defendants (36 of 41 defendants);
  – 84 percent for Black defendants (65 of 77 defendants);
  – 75 percent for Hispanic defendants (24 of 32 defendants); and
  – 86 percent for Other defendants (12 of 14 defendants).

- The rate of agreement specifically for decisions against seeking the death penalty was 89 percent (392 of 438 defendants for whom the United States Attorney recommended against seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

  – 85 percent for White defendants (63 of 73 defendants);
  – 93 percent for Black defendants (203 of 218 defendants);
  – 86 percent for Hispanic defendants (117 of 136 defendants); and
  – 91 percent for Other defendants (10 of 11 defendants).

43

JA 2763

c.    The Review Committee and the Attorney General

- From 1995 to 2000, a total of 572 defendants facing capital-eligible charges were the subjects of recommendations either for or against seeking the death penalty by the Review Committee as well as a decision by the Attorney General. With respect to 552 of these defendants (97 percent), the Attorney General and the Review Committee agreed as to whether or not the death penalty should be sought.

|          | Total | White | Black | Hispanic | Other |
|----------|-------|-------|-------|----------|-------|
| Number   | 552   | 109   | 271   | 148      | 24    |
| Percent  | 100%  | 20%   | 49%   | 27%      | 4%    |

- The overall rate of agreement was 97 percent (552 of 572 defendants), including both decision to seek the death penalty and decisions not to seek it. With respect to specific racial/ethnic groups, the overall rates of agreement were:

  - 98 percent for White defendants (109 of 111 defendants);
  - 97 percent for Black defendants (271 of 280 defendants);
  - 95 percent for Hispanic defendants (148 of 156 defendants); and
  - 96 percent for Other defendants (24 of 25 defendants).

- The rate of agreement specifically for decisions to seek the death penalty was 89 percent (158 of 178 defendants for whom the Review Committee recommended seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

  - 96 percent for White defendants (44 of 46 defendants);
  - 89 percent for Black defendants (70 of 79 defendants);
  - 80 percent for Hispanic defendants (32 of 40 defendants); and
  - 92 percent for Other defendants (12 of 13 defendants).

- The rate of agreement specifically for decisions against seeking the death penalty was 100 percent (394 of 394 defendants for whom the Review Committee recommended against seeking the death penalty). With respect to specific racial/ethnic groups, the rates of agreement were:

  - 100 percent for White defendants (65 of 65 defendants);
  - 100 percent for Black defendants (201 of 201 defendants);

44

**JA 2764**

- 100 percent for Hispanic defendants (116 of 116 defendants); and
- 100 percent for Other defendants (12 of 12 defendants).

- The Attorney General has never disagreed with a recommendation by the Review Committee that the death penalty should not be sought in a given case.

45

JA 2765

# SURVEY OF THE FEDERAL DEATH PENALTY SYSTEM
## (1988-2000)

## LIST OF STATISTICAL TABLES

Page

LIST OF STATISTICAL TABLES ......................................... T-i

GENERAL EXPLANATORY NOTES ON TERMS AND METHODS .......... T-xi

TABLE SET I:      STATISTICAL OVERVIEW ........................... T-1

Explanatory Notes to Table Set I .................................... T-1

Table 1A:  Distribution of Defendants Within Each Stage of
the Federal Death Penalty Process (1995-2000) ...... T-2

Table 1B:  Distribution of Defendants Within Each Stage of
the Federal Death Penalty Process (1988-1994) ...... T-3

Table 2A:  Decision-making Rates Within Specific Stages
of the Federal Death Penalty Process (1995-2000) .... T-4

Table 2B:  Decision-making Rates Within Specific Stages
of the Federal Death Penalty Process (1988-1994) .... T-5

Table 3A:  Decision-making Rates Across All Stages of
the Federal Death Penalty Process (1995-2000) ...... T-6

Table 3B:  Decision-making Rates Across All Stages of
the Federal Death Penalty Process (1988-1994) ...... T-7

T-xlvi

JA 2766

TABLE SET II:    THE UNITED STATES ATTORNEYS ................. T-8

    A.    Defendants: Explanatory Notes to Table Set II.A ............... T-9

        Table 4:    Locations of United States Attorneys' Offices ....... T-10

        Table 5A:    U.S. Attorney Recommendations by District
           and Race/Ethnicity of Defendant (1995-2000) ...... T-14

        Table 5B:    U.S. Attorney Recommendations by District
           and Race/Ethnicity of Defendant (1988-1994) ...... T-18

    B.    Offenses: Explanatory Notes to Table Set II.B ................. T-22

        Table 6:    Federal Offenses Punishable by Death ............ T-23

        Table 7:    U.S. Attorney Recommendations by
           Capital Offense and Race/Ethnicity of Defendant
           (1995-2000) ................................. T-28

        Table 8-1:    U.S. Attorney Recommendations to Seek by
           District, Capital Offense, and Race/Ethnicity of
           Defendant (1995-2000) ....................... T-30

        Table 8-2:    U.S. Attorney Recommendations Not to Seek by
           District, Capital Offense, and Race/Ethnicity of
           Defendant (1995-2000) ....................... T-43

    C.    Victims: Explanatory Notes to Table Set II.C ................. T-57

        Table 9A:    U.S. Attorney Recommendations by District
           and Race/Ethnicity of Victim (1995-2000) ......... T-59

        Table 9B:    U.S. Attorney Recommendations by District
           and Race/Ethnicity of Victim (1988-1994) ......... T-63

        Table 10A:    Overall U.S. Attorney Recommendations by
           Race/Ethnicity of Victim and Race/Ethnicity
           of Defendant (1995-2000) ..................... T-67

JA 2767

Table 10A-1:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively White Victim(s) (1995-2000) . . . . . . . . . T-68

Table 10A-2:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant --
Exclusively Black Victim(s) (1995-2000) . . . . . . . . . T-72

Table 10A-3:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Hispanic Victim(s) (1995-2000) . . . . . . . T-76

Table 10A-4:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Other Victim(s) (1995-2000) . . . . . . . . . T-80

Table 10A-5:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Multiple Victims of Different Races/
Ethnicities (1995-2000) . . . . . . . . . . . . . . . . . . . . . . T-84

Table 10B:    Overall U.S. Attorney Recommendations by
Race/Ethnicity of Victim and Race/Ethnicity
of Defendant (1988-1994) . . . . . . . . . . . . . . . . . . . . . T-88

Table 10B-1:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant --
Exclusively White Victim(s) (1988-1994) . . . . . . . . . T-89

Table 10B-2:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Black Victim(s) (1988-1994) . . . . . . . . . T-93

Table 10B-3:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Hispanic Victim(s) (1988-1994) . . . . . . . T-97

Table 10B-4:  U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Exclusively Other Victim(s) (1988-1994) . . . . . . . . . T-101

JA 2768

Table 10B-5:   U.S. Attorney Recommendations by District
and Race/Ethnicity of Defendant –
Multiple Victims of Different Races/
Ethnicities (1988-1994) ........................ T-105

Table 11A:     Overall U.S. Attorney Recommendations
by Race/Ethnicity of Defendant and Number
of Victims (1995-2000) ....................... T-109

Table 11A-1:   U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Single Victim (1995-2000) ................... T-110

Table 11A-2:   U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Multiple Victims (1995-2000) ................ T-114

Table 11B:     Overall U.S. Attorney Recommendations
by Race/Ethnicity of Defendant and Number
of Victims (1988-1994) ....................... T-118

Table 11B-1:   U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Single Victim (1988-1994) ................... T-119

Table 11B-2:   U.S. Attorney Recommendations by
District and Race/Ethnicity of Defendant –
Multiple Victims (1988-1994) ................ T-123

TABLE SET III:     THE REVIEW COMMITTEE ...................... T-127

A.     Defendants: Explanatory Notes to Table Set III.A ............. T-128

Table 12:      Review Committee Recommendations by
District and Race/Ethnicity of Defendant
(1995-2000) ................................. T-129

T-xlix

JA 2769

B.      Offenses: Explanatory Notes to Table Set III.B ............... T-133

        Table 13:      Review Committee Recommendations by
                       Capital Offense and Race/Ethnicity of
                       Defendant (1995-2000) ...................... T-134

        Table14-1:     Review Committee Recommendations to
                       Seek by District, Capital Offense, and Race/
                       Ethnicity of Defendant (1995-2000) ............ T-136

        Table 14-2:    Review Committee Recommendations Not to
                       Seek by District, Capital Offense, and Race/
                       Ethnicity of Defendant (1995-2000) ............ T-149

C.      Victims: Explanatory Notes to Table Set III.C ............... T-163

        Table 15:      Review Committee Recommendations by
                       District and Race/Ethnicity of Victim (1995-2000) .. T-164

        Table 16:      Overall Review Committee Recommendations
                       by Race/Ethnicity of Victim and Race/Ethnicity
                       of Defendant (1995-2000) .................... T-168

        Table 16-1:    Review Committee Recommendations by
                       District and Race/Ethnicity of Defendant –
                       Exclusively White Victim(s) (1995-2000) ......... T-169

        Table 16-2:    Review Committee Recommendations by
                       District and Race/Ethnicity of Defendant –
                       Exclusively Black Victim(s) (1995-2000) ......... T-173

        Table 16-3:    Review Committee Recommendations by
                       District and Race/Ethnicity of Defendant –
                       Exclusively Hispanic Victim(s) (1995-2000) ...... T-177

        Table 16-4:    Review Committee Recommendations by
                       District and Race/Ethnicity of Defendant –
                       Exclusively Other Victim(s) (1995-2000) ......... T-181

        Table16-5:     Review Committee Recommendations by
                       District and Race/Ethnicity of Defendant –

T-1

JA 2770

Multiple Victims of Different Races/
Ethnicities (1995-2000) . . . . . . . . . . . . . . . . . . . . . . . T-185

Table 17:    Overall Review Committee Recommendations
by Race/Ethnicity of Defendant and Number
of Victims (1995-2000) . . . . . . . . . . . . . . . . . . . . . . T-189

Table 17-1:   Review Committee Recommendations by
District and Race/Ethnicity of Defendant –
Single Victim (1995-2000) . . . . . . . . . . . . . . . . . . . T-190

Table 17-2:   Review Committee Recommendations by
District and Race/Ethnicity of Defendant –
Multiple Victims (1995-2000) . . . . . . . . . . . . . . . . . T-194

TABLE SET IV:    THE ATTORNEY GENERAL . . . . . . . . . . . . . . . . . . . . . . T-198

A.    Defendants: Explanatory Notes to Table Set IV.A . . . . . . . . . . . . T-199

Table 18A:   Attorney General Decisions by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-200

Table 18B:   Attorney General Decisions by District and
Race/Ethnicity of Defendant (1988-1994) . . . . . . . . . T-204

B.    Offenses: Explanatory Notes to Table Set IV.B . . . . . . . . . . . . . . T-208

Table 19:    Attorney General Decisions by Capital Offense
and Race/Ethnicity of Defendant (1995-2000) . . . . . T-209

Table 20-1:   Attorney General Decisions to Seek by
District, Capital Offense, and Race/Ethnicity
of Defendant (1995-2000) . . . . . . . . . . . . . . . . . . . . T-211

Table 20-2:   Attorney General Decisions Not to Seek by
District, Capital Offense, and Race/Ethnicity
of Defendant (1995-2000) . . . . . . . . . . . . . . . . . . . . T-223

JA 2771

 

C.    **Victims: Explanatory Notes to Table Set IV.C** ............... T-236

Table 21A:    Attorney General Decisions by District and
Race/Ethnicity of Victim (1995-2000) ........... T-237

Table 21B:    Attorney General Decisions by District and
Race/Ethnicity of Victim (1988-1994) ........... T-241

Table 22A:    Overall Attorney General Decisions by
Race/Ethnicity of Victim and Race/
Ethnicity of Defendant (1995-2000) ............. T-245

Table 22A-1:    Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively White Victim(s) (1995-2000) ......... T-246

Table 22A-2:    Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively Black Victim(s) (1995-2000) ......... T-250

Table 22A-3:    Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively Hispanic Victim(s) (1995-2000) ...... T-254

Table 22A-4:    Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively Other Victim(s) (1995-2000) ......... T-258

Table 22A-5:    Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Multiple Victims of Different Races/
Ethnicities (1995-2000) ...................... T-262

Table 22B:    Attorney General Decisions by Race/
Ethnicity of Victim and Race/Ethnicity
of Defendant (1988-1994) ................... T-266

Table 22B-1:    Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively White Victim(s) (1988-1994) ......... T-267

JA 2772

Table 22B-2:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively Black Victim(s) (1988-1994) . . . . . . . . . T-271

Table 22B-3:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively Hispanic Victim(s) (1988-1994) . . . . . . T-275

Table 22B-4:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Exclusively Other Victim(s) (1988-1994) . . . . . . . . . T-279

Table 22B-5:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Multiple Victims of Different Races/
Ethnicities (1988-1994) . . . . . . . . . . . . . . . . . . . . . . T-283

Table 23A:    Overall Attorney General Decisions
by Race/Ethnicity of Defendant and
Number of Victims (1995-2000) . . . . . . . . . . . . . . . T-287

Table 23A-1:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Single Victim (1995-2000) . . . . . . . . . . . . . . . . . . . T-288

Table 23A-2:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Multiple Victims (1995-2000) . . . . . . . . . . . . . . . . . T-292

Table 23B:    Overall Attorney General Decisions
by Race/Ethnicity of Defendant and
Number of Victims (1988-1994) . . . . . . . . . . . . . . . T-296

Table 23B-1:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Single Victim (1988-1994) . . . . . . . . . . . . . . . . . . . T-297

Table 23B-2:  Attorney General Decisions by District
and Race/Ethnicity of Defendant –
Multiple Victims (1988-1994) . . . . . . . . . . . . . . . . . T-301

JA 2773

TABLE SET V:      FEDERAL DEFENDANTS SENTENCED TO DEATH .. T-305

Explanatory Notes to Table Set V ........................... T-305

Table 24-1:    Summary of Federal Cases in Which a
Jury Has Recommended Imposition of the
Death Sentence (1988-2000) ................... T-306

Table 24-2:    Description of Federal Cases in Which a
Jury Has Recommended Imposition of the
Death Sentence (1988-2000) ................... T-307

TABLE SET VI:     AGREEMENTS AND DISAGREEMENTS IN
THE FEDERAL DECISION-MAKING PROCESS ...... T-310

Explanatory Notes to Table Set VI ............................... T-310

Table 25:      Overall Agreement and Disagreement
Among U.S. Attorneys, the Review
Committee, and the Attorney General
by Race/Ethnicity of Defendant (1995-2000) ...... T-311

Table 25-1:    Agreement Among U.S. Attorneys, the
Review Committee, and the Attorney
General by District and Race/Ethnicity
of Defendant (1995-2000) .................... T-312

Table 25-2:    U.S. Attorney Disagreement with the
Review Committee and Attorney General
by District and Race/Ethnicity of Defendant
(1995-2000) .............................. T-316

Table 25-3:    Review Committee Disagreement with
U.S. Attorneys and the Attorney General
by District and Race/Ethnicity of Defendant
(1995-2000) .............................. T-320

Table 25-4:    Attorney General Disagreement with U.S.
Attorneys and the Review Committee
by District and Race/Ethnicity of Defendant
(1995-2000) .............................. T-324

T-liv

JA 2774

Table 26A-1:    Agreement Between U.S. Attorneys and
the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-328

Table 26A-2:    Disagreement Between U.S. Attorneys and
the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-332

Table 26B:    Agreement and Disagreement Between U.S.
Attorneys and the Attorney General by District
and Race/Ethnicity of Defendant (1988-1994) . . . . . T-336

Table 27-1:    Agreement Between U.S. Attorneys and
the Review Committee by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-340

Table 27-2:    Disagreement Between U.S. Attorneys and
the Review Committee by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-344

Table 28-1:    Agreement Between the Review Committee
and the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-348

Table 28-2:    Disagreement Between the Review Committee
and the Attorney General by District and
Race/Ethnicity of Defendant (1995-2000) . . . . . . . . . T-352

JA 2775

## GENERAL EXPLANATORY NOTES ON TERMS AND METHODS

The statistics presented in the following tables are based on a number of assumptions and employ a number of conventions that the reader should bear in mind. These general explanatory notes present items that are common to most or all of the statistical tables in this Survey. Section A addresses terminology, and Section B provides notes on the methods generally used in compiling the data in this Survey. Additional notes that apply only to particular sets of tables are set forth at the beginning of each table set.

### A.    METHODOLOGY

1.    How the statistical tables were compiled

As a general matter, the statistical tables in this Survey were compiled from information maintained by the Capital Crimes Unit (CCU) of the Criminal Division. As noted in the text of the Survey, when a United States Attorney submits a case for review, the prosecutors responsible for the case also submit information about the race/ethnicity of the defendant and any victim(s). That information is maintained in a database for statistical purposes only by paralegal assistants in the CCU and is kept apart from the information that is provided to the Review Committee and the Attorney General for use in the decision-making process.

In addition to the information described above, some of the statistical tables – particularly tables providing information about the charges against defendants – were compiled through a case-by-case review of memoranda submitted by United States Attorneys since 1988. That information, like the information on race/ethnicity drawn from the CCU database, was in some instances incomplete, and was supplemented by information provided by individual United States Attorneys' Offices in response to inquiries made specifically for purposes of preparing this Survey.

Although extensive efforts have been made to present accurate information in this Survey, some errors may remain as the result of incomplete information or as the result of data entry mistakes.

2.    Cases excluded from the statistical tables

a.    "Straddle" cases

In addition to the 682 post-protocol cases and 52 pre-protocol cases that are analyzed in this Survey, there were seven cases that cannot properly be considered either

T-xi

**JA 2776**

pre-protocol or post-protocol. Six of the seven cases involved offenses under the DKA, and the seventh was charged under a racketeering provision, 18 U.S.C. § 1959(a). In each of these seven cases, arising during the transition from the former procedures to the current ones, the United States Attorney submitted to the Attorney General a recommendation not to seek the death penalty in a case that had been indicted prior to the adoption of the protocol, even though no such submission was in fact required. Because these cases were not in fact reviewed under the new protocol, and need not have been submitted under the former policy, they are essentially indistinguishable from an uncounted number of cases from the 1988-1994 period (during which a United States Attorney's decision not to seek the death penalty was not submitted for the Attorney General's approval) that are not accounted for in this Survey. Accordingly, these seven cases are excluded from the statistical compilations in this Survey.

    b.    Incomplete submissions

On occasion, United States Attorneys submit the information required by the protocol over a period of time, rather than all at once. The statistical tables in this Survey do not include cases in which United States Attorneys had submitted only partial information relating to a case as of July 20, 2000. Further, in one case, a United States Attorney entered into a plea agreement with a defendant after sending a submission to the CCU, but before that submission was received and processed. The statistical tables in this Survey do not include that case.

    c.    Cases charging offenses other than violations of the DKA prior to September 13, 1994

Before the enactment of the FDPA in 1994, there were a number of federal criminal statutes that defined offenses punishable by death (e.g., mail bombing, in violation of 18 U.S.C. § 844(d)), albeit without providing procedures under which such a sentence could be imposed. For some time between the enactment of the DKA in 1988 (which set forth certain procedures for capital cases but did not explicitly apply them to all federal offenses which by their terms were punishable by death) and the enactment on September 13, 1994 of the FDPA (which set forth procedures that apply in any federal capital case), it was unclear whether the death penalty could be imposed for non-DKA offenses that, by the terms of the applicable statutes, were capital crimes. As a result, there were some cases prior to the enactment of the FDPA in which the government sought the death penalty for non-DKA offenses. Because the courts ultimately ruled that

JA 2777

the death penalty could not constitutionally be applied in such circumstances, the few non-DKA cases from the pre-protocol period are not counted in this Survey.[32]

3.    Counting methods

a.    Offense-related statistics.

In some cases, a defendant was charged with multiple offenses under different criminal statutes, each of which was potentially punishable by death.  Often in such cases, each decision-maker in the Department's process recommended the same outcome as to all offenses – either to seek the death penalty for all counts or for none.  But in some instances, the United States Attorneys, the Review Committee, or the Attorney General reached different conclusions about different statutory offenses committed by the same defendant.  Attempting to account for those relatively few cases proved to be very difficult, and risked causing more confusion in the presentation of statistics than was warranted.  Accordingly, in compiling the offense-related statistics reported in this Survey, a recommendation or decision to seek the death penalty against a defendant with respect to *any* offense was treated as a recommendation or decision to seek the death penalty with respect to *all* offenses charged against that defendant.

b.    Victim-related statistics

Several defendants were accused of crimes resulting in the deaths of multiple victims.  In many such cases, each decision-maker in the Department's process recommended the same outcome with respect to all victims – either to seek the death penalty for all the offenses resulting in the victims' deaths or not to seek the death penalty at all.  But in some instances, a participant in the review process reached different conclusions with respect to crimes against different victims committed by the same defendant.  Here again, in compiling the victim-related statistics reported in this Survey, a recommendation or decision to seek the death penalty against a defendant as punishment for causing the death of *any* victim was treated as a recommendation or decision to seek the death penalty with respect to *all* victims associated with that defendant.

Moreover, in several cases, multiple defendants were accused of crimes resulting in the death of the same victim.  In many such cases, each decision-maker in the Department's process recommended the same outcome with respect to all defendants

---

[32]A related issue, but distinct from that decided in the pre-FDPA cases, is whether the Constitution would preclude the use of the procedures now available under the FDPA to impose the death penalty in a non-DKA case in which the offense was committed prior to September 13, 1994.  The latter question has not yet been decided in any judicial opinion.

T-xiii

JA 2778

accused of causing the death of the same victim – either to seek the death penalty for all defendants or not to seek the death penalty for any of them. But in some instances, a participant in the review process reached different conclusions with respect to different defendants accused of causing the death of the same victim. In tables that report statistics about the race/ethnicity of victims *without* reference to the race/ethnicity of defendants, each victim is counted only once. In these tables, where a participant in the review process recommended or authorized seeking the death penalty for at least one defendant, the victim was counted as a victim of a crime for which the death penalty was recommended or authorized.

    c.    <u>Recommendations</u>

Both the United States Attorneys and the Review Committee occasionally altered their initial recommendations about whether the death penalty should be sought. While in some instances such reconsideration resulted from the discovery of new evidence or the presentation of additional information by the defendant, there were also cases in which it was the result of a frank exchange of views among the various participants in the decision-making process rather than the gathering of additional facts. For purposes of uniformity in reporting the statistics in this Survey, the tables in this Survey generally report only the *initial* recommendation of the United States Attorney and the Review Committee in each case. Exceptions to this practice in specific anomalous cases are noted below.

    c.    <u>Anomalous cases</u>

Certain cases involved anomalous circumstances that made it possible to count them in a number of different ways for purposes of this Survey. Each of those instances, and the choices made for how to count them, are described below.

-     <u>New information leading to reconsideration in favor of seeking death</u>. In the case of one Asian defendant (categorized in the "Other" racial group) in the Eastern District of California, the United States Attorney initially recommended that the death penalty not be sought, and the Review Committee and the Attorney General both concurred. After additional information about the case was discovered, the United States Attorney, the Review Committee and the Attorney General all favored seeking the death penalty. Throughout this Survey, this defendant is reported as having had recommendations in favor of seeking the death penalty by both the United States Attorney and the Review Committee, and as having had a decision by the Attorney General to seek the death

T-xiv

penalty. As a result, the initial recommendations and decision against seeking the death penalty are not reported in the statistical tables.

- <u>Fugitives</u>. Two defendants in separate cases (one Black defendant in the Eastern District of Virginia and one Hispanic defendant in the District of Puerto Rico) were fugitives at the time the respective United States Attorneys made the submissions required under the protocol. Both the Review Committee and the Attorney General reviewed each case and decided to defer taking final action. In each case, after the defendant was apprehended, but before the case was submitted for renewed consideration, the defendant entered into a plea agreement. Each of these cases is reported as having been the subject of a plea agreement after submission by the United States Attorney but prior to consideration by the Review Committee and the Attorney General. As a result, the initial decisions to defer are not reported in the statistical tables.

- <u>Overlapping prosecution</u>: With one exception, all of the 682 post-protocol defendants and 52 pre-protocol defendants are different individuals, each of whom was charged with federal offenses subject to the death penalty in only one district. The one exception is Theodore Kaczynski, a White defendant who was charged with capital offenses in both the Eastern District of California and the District of New Jersey. The recommendations by each United States Attorney are reported separately. As a result, although there were 681 individuals charged with federal offenses subject to the death penalty in the post-protocol period, the statistical tables report information about a total of 682 defendants.

4.    <u>Information about specific Attorneys General</u>.

The statistical tables in this Survey do not distinguish among the four Attorneys General who have made decisions about whether to seek the death penalty since the re-introduction of capital punishment in the federal criminal justice system in 1988. Limited information about the decisions of specific Attorneys General is therefore provided here.

All of the defendants considered during the post-protocol period were considered by Attorney General Reno. With respect to the pre-protocol cases, which were all submitted with recommendations by United States Attorneys in favor of seeking the death

T-xv

penalty, Attorney General Thornburgh decided to seek the death penalty against all of the eight defendants submitted to him for consideration; Attorney General Barr decided to seek the death penalty against all of the 20 defendants submitted to him for consideration; Acting Attorney General Gerson decided to seek the death penalty against all of the four defendants submitted to him for consideration; and Attorney General Reno decided to seek the death penalty against 15 of 20 defendants submitted to her for consideration. Of the remaining five pre-protocol defendants, Attorney General Reno decided not to seek the death penalty against four defendants; and she considered but did not make a death penalty decision with regard to one defendant who was a fugitive and who subsequently died.

B.    TERMINOLOGY

    1.    Differences between state and federal data due to different methods of accounting for Hispanic ethnicity

In presenting information about the federal government's implementation of the death penalty, this Survey uses the term "Hispanic" as a separate category to refer to persons of Hispanic ethnicity regardless of race. As a result (with the exception of state statistics obtained from other sources as noted), the terms "White," "Black," and "Other" as used in this Survey refer only to non-Hispanic members of those racial groups. In contrast, several compilations of state statistics, including some cited in this Survey, include persons of Hispanic ethnicity within the racial categories of "White," "Black," and "Other." As a result of these different uses of terminology, the reader should use care in comparing state and federal statistics concerning race and ethnicity.

According to the U.S. Census Bureau, approximately 91 percent of the Hispanic population would, if described by race, be categorized as "White," while approximately six percent would be categorized as "Black" and approximately three percent would be categorized as Other.[33] A reader seeking to compare the relative proportions of "White" and non-"White" individuals in a given group may thus draw very different conclusions based on the terminology used in presenting the data. For example, among the statistics reported in this Survey is the following: from 1995 to 2000, the Attorney General

_____

[33] See Department of Commerce, U.S. Census Bureau, Population Division, Publication NP-D1-A, Projections of the Population by Age, Sex, Race, and Hispanic Origin for the United States: 1999 to 2100 (Jan. 13, 2000) <<http://www.census.gov/population/projections/nation/detail/d1999_00.pdf>>. Similarly, the Department of Justice's Bureau of Justice Statistics (BJS) reports that of the 314 Hispanic persons under sentence of death in the United States at the end of 1998, 285 (91 percent) were White, 14 (4 percent) were Black, and 15 (5 percent) were of other races. See Department of Justice, Bureau of Justice Statistics, Capital Punishment 1998 (rev. Jan. 6, 2000) <<http://www.ojp.usdoj.gov/bjs/pub/pdf/cp98.pdf>>.

JA 2781

decided to seek the death penalty against a total of 159 defendants. Using "Hispanic" as a separate category that includes persons of any race whose ethnicity is Hispanic (and therefore using "White," "Black" and "Other" to refer only to non-Hispanic members of those respective racial groups), the racial/ethnic distribution of these 159 defendants are categorized as follows:

|         | Total | White | Black | Hispanic | Other |
|---------|-------|-------|-------|----------|-------|
| Number  | 159   | 44    | 71    | 32       | 12    |
| Percent | 100%  | 28%   | 45%   | 20%      | 8%    |

But if only racial categories were used, and if the Census Bureau statistics about the racial distribution of persons of Hispanic ethnicity were assumed to be applicable, the racial distribution of this same group of 159 defendants would likely appear as follows:

|         | Total | White | Black | Other |
|---------|-------|-------|-------|-------|
| Number  | 159   | 73    | 73    | 13    |
| Percent | 100%  | 46%   | 46%   | 8%    |

The difference made by the use of terminology does not necessarily explain all the apparent differences between the state and federal data. Nevertheless, the reader should exercise care in attempting to compare state and federal statistics.

2.    "Intraracial and "interracial"

In reporting information about the racial/ethnic characteristics of the victims of capital offenses, this Survey uses the terms "intraracial" and "interracial" to describe offenses. As used in this Survey, "intraracial" refers to a crime in which the offender and *all* victims are within the same racial/ethnic category, and "interracial" refers to a crime in which the racial/ethnic category of the offender differs from the category of at least one victim of the offense. With respect to individuals in the category of "Other" races, an offense is described as intraracial only if the defendant and victim(s) are members of the same specific racial group within the "Other" category (*e.g.*, if the defendant and victims are all Asian). In the single case where the defendant and victim were members of different racial groups within the "Other" category, the offense is described as an interracial homicide for purposes of the discussion below.

3.    Table numbering

T-xvii

JA 2782

a.     "A" and "B" Tables

A number of the tables in this Survey have numbers that include an "A" or a "B." "A" is used for tables reporting statistics about the post-protocol period from 1995 to 2000, and "B" is used for tables concerning the pre-protocol period from 1988 to 1994. No such suffixes are used with respect to tables concerning the Review Committee, because the Committee did not exist in the pre-protocol period.

b.     Number suffixes. There are several tables that provide statistics about specific subsets of cases. In each of these cases, a numbered suffix is used for each subset. Thus, for example, in reporting statistics about cases involving intraracial and interracial homicides, Table 10A reports on all cases in the post-protocol period, and is then followed by five separate tables, numbered 10A-1 through 10A-5, that provide more specific information about cases involving, respectively, White victims, Black victims, Hispanic victims, Other victims, and multiple victims of varied race/ethnicity.

T-xviii

JA 2783

# TABLE SET I: STATISTICAL OVERVIEW

## Explanatory Notes

Table Set I reports overall trends for the death penalty decision-making process at the Department of Justice. The tables in this set analyze the statistics in three separate ways. First, Tables 1A and 1B examine the racial/ethnic distribution of defendants within the total number of defendants at a given stage of the process. Thus, for example, the reader can compare the racial/ethnic breakdown of defendants submitted for review by United States Attorneys against the breakdown for the smaller group as to whom the Attorney General authorized capital prosecution. Table 1A examines the post-protocol period of 1995 to 2000, and Table 1B examines the pre-protocol period of 1988 to 1994.

In addition to examining the racial/ethnic breakdown of defendants *within* any given stage of the decision-making process, the data can be analyzed to learn how different racial groups fare as they proceed *through* the various stages of the decision-making process. In other words, aside from asking about the relative proportion of racial/ethnic groups at any given stage of review, the statistics can also be examined to see whether defendants in one racial/ethnic group get authorized for capital prosecution at a different *rate* than other defendants. This set presents information about the latter question in two ways.

Tables 2A and 2B show the rates at which decisions were made for defendants within a given racial/ethnic group by each of the three primary participants, as a percentage of the total number of defendants in that racial/ethnic group that was considered by that participant at each stage.

Tables 3A and 3B present the rate at which defendants in a given racial/ethnic group reach each stage of the process, as a percentage of all defendants in that racial/ethnic group who entered the Department's decision-making process.

T-1

TABLE 1A
DISTRIBUTION OF DEFENDANTS WITHIN EACH
STAGE OF THE FEDERAL DEATH PENALTY PROCESS
(1995-2000)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| SUBMITTED BY U.S. ATTORNEYS | 682 | 100.0% | 134 | 19.6% | 324 | 47.5% | 195 | 28.6% | 29 | 4.3% |
| No Recommendation | 5 | 100.0% | 1 | 20.0% | 1 | 20.0% | 3 | 60.0% | 0 | 0.0% |
| Recommendation Not to Seek Death Penalty (DP) | 494 | 100.0% | 85 | 17.2% | 242 | 49.0% | 153 | 31.0% | 14 | 2.8% |
| Recommendation to Seek DP | 183 | 100.0% | 48 | 26.2% | 81 | 44.3% | 39 | 21.3% | 15 | 8.2% |
| CONSIDERED BY REVIEW COMMITTEE | 618 | 100.0% | 119 | 19.3% | 301 | 48.7% | 172 | 27.8% | 26 | 4.2% |
| No Recommendation | 15 | 100.0% | 4 | 26.7% | 6 | 40.0% | 4 | 26.7% | 1 | 6.7% |
| Recommendation Not to Seek DP | 420 | 100.0% | 68 | 16.2% | 215 | 51.2% | 125 | 29.8% | 12 | 2.9% |
| Recommendation to Seek DP | 183 | 100.0% | 47 | 25.7% | 80 | 43.7% | 43 | 23.5% | 13 | 7.1% |
| CONSIDERED BY ATTORNEY GENERAL (AG) | 588 | 100.0% | 115 | 19.6% | 287 | 48.8% | 160 | 27.2% | 26 | 4.4% |
| Decision Deferred or Pending | 12 | 100.0% | 3 | 25.0% | 4 | 33.3% | 4 | 33.3% | 1 | 8.3% |
| Authorization Not to Seek DP | 417 | 100.0% | 68 | 16.3% | 212 | 50.8% | 124 | 29.7% | 13 | 3.1% |
| Authorization to Seek DP | 159 | 100.0% | 44 | 27.7% | 71 | 44.7% | 32 | 20.1% | 12 | 7.5% |
| AUTHORIZED BY AG TO SEEK DP | 159 | 100.0% | 44 | 27.7% | 71 | 44.7% | 32 | 20.1% | 12 | 7.5% |
| DP Notice Withdrawn – Plea Agreement | 51 | 100.0% | 21 | 41.2% | 18 | 35.3% | 9 | 17.6% | 3 | 5.9% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 100.0% | 1 | 9.1% | 3 | 27.3% | 5 | 45.5% | 2 | 18.2% |
| DP Notice Dismissed or Trial Terminated | 4 | 100.0% | 0 | 0.0% | 1 | 25.0% | 3 | 75.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 51 | 100.0% | 11 | 21.6% | 23 | 45.1% | 13 | 25.5% | 4 | 7.8% |
| Not Convicted of Capital Charge | 1 | 100.0% | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 41 | 100.0% | 11 | 26.8% | 25 | 61.0% | 2 | 4.9% | 3 | 7.3% |
| CONVICTED OF CAPITAL CHARGE | 41 | 100.0% | 11 | 26.8% | 25 | 61.0% | 2 | 4.9% | 3 | 7.3% |
| Jury Verdict – DP Not Recommended | 21 | 100.0% | 7 | 33.3% | 12 | 57.1% | 0 | 0.0% | 2 | 9.5% |
| Jury Verdict – DP Recommended | 20 | 100.0% | 4 | 20.0% | 13 | 65.0% | 2 | 10.0% | 1 | 5.0% |
| SENTENCED TO DEATH | 20 | 100.0% | 4 | 20.0% | 13 | 65.0% | 2 | 10.0% | 1 | 5.0% |
| DP Recommended by Jury But Not Yet Imposed | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% |
| DP Vacated by Court, Further Action Pending | 4 | 100.0% | 1 | 25.0% | 3 | 75.0% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 14 | 100.0% | 3 | 21.4% | 10 | 71.4% | 0 | 0.0% | 1 | 7.1% |

JA 2785

## TABLE 1B
## DISTRIBUTION OF DEFENDANTS WITHIN EACH
## STAGE OF THE FEDERAL DEATH PENALTY PROCESS
## (1988-1994)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| **SUBMITTED BY U.S. ATTORNEYS** | 52 | 100.0% | 7 | 13.5% | 39 | 75.0% | 5 | 9.6% | 1 | 1.8% |
| Recommendation to Seek Death Penalty (DP) | 52 | 100.0% | 7 | 13.5% | 39 | 75.0% | 5 | 9.6% | 1 | 1.8% |
| **CONSIDERED BY ATTORNEY GENERAL (AG)** | 52 | 100.0% | 7 | 13.5% | 39 | 75.0% | 5 | 9.6% | 1 | 1.8% |
| Decision Deferred or Pending | 1 | 100.0% | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Authorization Not to Seek DP | 4 | 100.0% | 0 | 0.0% | 4 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Authorization to Seek DP | 47 | 100.0% | 7 | 14.9% | 34 | 72.3% | 5 | 10.6% | 1 | 2.1% |
| **AUTHORIZED BY AG TO SEEK DP** | 47 | 100.0% | 7 | 14.9% | 34 | 72.3% | 5 | 10.6% | 1 | 2.1% |
| DP Notice Withdrawn – Plea Agreement | 14 | 100.0% | 3 | 21.4% | 10 | 71.4% | 1 | 8.3% | 0 | 0.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 100.0% | 1 | 9.1% | 10 | 90.9% | 0 | 0.0% | 0 | 0.0% |
| DP Notice Dismissed or Trial Terminated | 2 | 100.0% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 0 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not Convicted of Capital Charge | 4 | 100.0% | 0 | 0.0% | 4 | 100.0% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 16 | 100.0% | 3 | 18.8% | 8 | 50.0% | 4 | 25.0% | 1 | 6.3% |
| **CONVICTED OF CAPITAL CHARGE** | 16 | 100.0% | 3 | 18.8% | 8 | 50.0% | 4 | 25.0% | 1 | 6.3% |
| Jury Verdict – DP Not Recommended | 10 | 100.0% | 1 | 10.0% | 5 | 50.0% | 3 | 30.0% | 1 | 10.0% |
| Jury Verdict – DP Recommended | 6 | 100.0% | 2 | 33.3% | 3 | 50.0% | 1 | 16.7% | 0 | 0.0% |
| **SENTENCED TO DEATH** | 6 | 100.0% | 2 | 33.3% | 3 | 50.0% | 1 | 16.7% | 0 | 0.0% |
| DP Recommended by Jury But Not Yet Imposed | 0 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DP Vacated by Court, Re-sentenced to Life In Prison | 1 | 100.0% | 1 | 100.0% | 0 | 0.0 % | 0 | 0.0% | 0 | 0.0% |
| **DEATH SENTENCE PENDING** | 5 | 100.0% | 1 | 20.0% | 3 | 60.0% | 1 | 20.0% | 0 | 0.0% |

JA 2786

T-3

## TABLE 2A
## DECISION-MAKING RATES WITHIN SPECIFIC
## STAGES OF THE FEDERAL DEATH PENALTY PROCESS
## (1995-2000)

| STAGE | TOTAL # | TOTAL % | White # | White % | Black # | Black % | Hispanic # | Hispanic % | Other # | Other % |
|---|---|---|---|---|---|---|---|---|---|---|
| **SUBMITTED BY U.S. ATTORNEYS** | **682** | **100.0%** | **134** | **100.0%** | **324** | **100.0%** | **195** | **100.0%** | **29** | **100.0%** |
| No Recommendation | 5 | 0.7% | 1 | 0.7% | 1 | 0.3% | 3 | 1.5% | 0 | 0.0% |
| Recommendation Not to Seek Death Penalty (DP) | 494 | 72.4% | 85 | 63.4% | 242 | 74.7% | 153 | 78.5% | 14 | 48.3% |
| Recommendation to Seek DP | 183 | 26.8% | 48 | 35.8% | 81 | 25.0% | 39 | 20.0% | 15 | 51.7% |
| **CONSIDERED BY REVIEW COMMITTEE** | **618** | **100.0%** | **119** | **100.0%** | **301** | **100.0%** | **172** | **100.0%** | **26** | **100.0%** |
| No Recommendation | 15 | 2.4% | 4 | 3.4% | 6 | 2.0% | 4 | 2.3% | 1 | 3.8% |
| Recommendation Not to Seek DP | 420 | 68.0% | 68 | 57.1% | 215 | 71.4% | 125 | 72.7% | 12 | 46.2% |
| Recommendation to Seek DP | 183 | 29.6% | 47 | 39.5% | 80 | 26.6% | 43 | 25.0% | 13 | 50.0% |
| **CONSIDERED BY ATTORNEY GENERAL (AG)** | **588** | **100.0%** | **115** | **100.0%** | **287** | **100.0%** | **160** | **100.0%** | **26** | **100.0%** |
| Decision Deferred or Pending | 12 | 2.0% | 3 | 2.6% | 4 | 1.4% | 4 | 2.5% | 1 | 3.8% |
| Authorization Not to Seek DP | 417 | 70.9% | 68 | 59.1% | 212 | 73.9% | 124 | 77.5% | 13 | 50.0% |
| Authorization to Seek DP | 159 | 27.0% | 44 | 38.3% | 71 | 24.7% | 32 | 20.0% | 12 | 46.2% |
| **AUTHORIZED BY AG TO SEEK DP** | **159** | **100.0%** | **44** | **100.0%** | **71** | **100.0%** | **32** | **100.0%** | **12** | **100.0%** |
| DP Notice Withdrawn – Plea Agreement | 51 | 32.1% | 21 | 47.7% | 18 | 25.4% | 9 | 28.1% | 3 | 25.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 6.9% | 1 | 2.3% | 3 | 4.2% | 5 | 15.6% | 2 | 16.7% |
| DP Notice Dismissed or Trial Terminated | 4 | 2.5% | 0 | 0.0% | 1 | 1.4% | 3 | 9.4% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 51 | 32.1% | 11 | 25.0% | 23 | 32.4% | 13 | 40.6% | 4 | 33.3% |
| Not Convicted of Capital Charge | 1 | 0.6% | 0 | 0.0% | 1 | 1.4% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 41 | 25.8% | 11 | 25.0% | 25 | 35.2% | 2 | 6.3% | 3 | 25.0% |
| **CONVICTED OF CAPITAL CHARGE** | **41** | **100.0%** | **11** | **100.0%** | **25** | **100.0%** | **2** | **100.0%** | **3** | **100.0%** |
| Jury Verdict – DP Not Recommended | 21 | 51.2% | 7 | 63.6% | 12 | 48.0% | 0 | 0.0% | 2 | 66.7% |
| Jury Verdict – DP Recommended | 20 | 51.2% | 4 | 36.3% | 13 | 52.0% | 2 | 100.0% | 1 | 33.3% |
| **SENTENCED TO DEATH** | **20** | **100.0%** | **4** | **100.0%** | **13** | **100.0%** | **2** | **100.0%** | **1** | **100.0%** |
| DP Recommended by Jury But Not Yet Imposed | 2 | 4.9% | 0 | 0.0% | 0 | 0.0% | 2 | 100.0% | 0 | 0.0% |
| DP Vacated by Court, Further Action Pending | 4 | 9.8% | 1 | 9.1% | 3 | 12.0% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 14 | 34.1% | 3 | 27.3% | 10 | 40.0% | 0 | 0.0% | 1 | 33.3% |

JA 2787

TABLE 2B
DECISION-MAKING RATES WITHIN SPECIFIC
STAGES OF THE FEDERAL DEATH PENALTY PROCESS
(1988-1994)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| **SUBMITTED BY U.S. ATTORNEYS** | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Recommendation to Seek Death Penalty (DP) | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| **CONSIDERED BY ATTORNEY GENERAL (AG)** | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Decision Deferred or Pending | 1 | 1.9% | 0 | 0.0% | 1 | 2.6% | 0 | 0.0% | 0 | 0.0% |
| Authorization Not to Seek DP | 4 | 7.7% | 0 | 0.0% | 4 | 10.3% | 0 | 0.0% | 0 | 0.0% |
| Authorization to Seek DP | 47 | 90.4% | 7 | 100.0% | 34 | 87.2% | 5 | 100.0% | 1 | 100.0% |
| **AUTHORIZED BY AG TO SEEK DP** | 47 | 100.0% | 7 | 100.0% | 34 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| DP Notice Withdrawn – Plea Agreement | 14 | 29.8% | 3 | 42.9% | 10 | 29.4% | 1 | 20.0% | 0 | 0.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 23.4% | 1 | 14.3% | 10 | 29.4% | 0 | 0.0% | 0 | 0.0% |
| DP Notice Dismissed or Trial Terminated | 2 | 4.3% | 0 | 0.0% | 2 | 5.9% | 0 | 0.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not Convicted of Capital Charge | 4 | 8.5% | 0 | 0.0% | 4 | 11.8% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 16 | 34.0% | 3 | 42.9% | 8 | 23.5% | 4 | 80.0% | 1 | 100.0% |
| **CONVICTED OF CAPITAL CHARGE** | 16 | 100.0% | 3 | 100.0% | 8 | 100.0% | 4 | 100.0% | 1 | 100.0% |
| Jury Verdict – DP Not Recommended | 10 | 62.5% | 1 | 33.3% | 5 | 62.5% | 3 | 75.0% | 1 | 100.0% |
| Jury Verdict – DP Recommended | 6 | 37.5% | 2 | 66.7% | 3 | 37.5% | 1 | 25.0% | 0 | 0.0% |
| **SENTENCED TO DEATH** | 6 | 100.0% | 2 | 100.0% | 3 | 100.0% | 1 | 100.0% | 0 | 100.0% |
| DP Recommended by Jury But Not Yet Imposed | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DP Vacated by Court, Re-sentenced to Life In Prison | 1 | 16.7% | 1 | 50.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 5 | 83.3% | 1 | 50.0% | 3 | 100.0% | 1 | 100.0% | 0 | 0.0% |

JA 2788

TABLE 3A
DECISION-MAKING RATES ACROSS ALL STAGES
OF THE FEDERAL DEATH PENALTY PROCESS
(1995-2000)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| SUBMITTED BY U.S. ATTORNEYS | 682 | 100.0% | 134 | 100.0% | 324 | 100.0% | 195 | 100.0% | 29 | 100.0% |
| No Recommendation | | 0.7% | 1 | 0.7% | | 0.3% | | 1.5% | 0 | 0.0% |
| Recommendation Not to Seek Death Penalty (DP) | | 72.4% | 85 | 63.4% | | 74.7% | | 78.5% | 14 | 48.3% |
| Recommendation to Seek DP | | 26.8% | 48 | 35.8% | | 25.0% | | 20.0% | 15 | 51.7% |
| CONSIDERED BY REVIEW COMMITTEE | 618 | 90.6% | 119 | 88.8% | 301 | 92.9% | 172 | 88.2% | 26 | 89.7% |
| No Recommendation | | 2.2% | 4 | 3.0% | | 1.9% | | 2.1% | | 3.4% |
| Recommendation Not to Seek DP | 420 | 61.6% | 68 | 50.7% | | 66.4% | | 64.1% | | 41.4% |
| Recommendation to Seek DP | | 26.8% | 47 | 35.1% | | 24.7% | | 22.1% | | 44.8% |
| CONSIDERED BY ATTORNEY GENERAL (AG) | | 86.2% | 115 | 85.8% | | 88.6% | 160 | 82.1% | 26 | 89.7% |
| Decision Deferred or Pending | | 1.8% | | 2.2% | | 1.2% | | 2.1% | | 3.4% |
| Authorization Not to Seek DP | | 61.1% | 68 | 50.7% | | 65.4% | | 63.6% | | 44.8% |
| Authorization to Seek DP | 159 | 23.3% | 44 | 32.8% | | 21.9% | | 16.4% | | 41.4% |
| AUTHORIZED BY AG TO SEEK DP | 159 | 23.3% | 44 | 32.8% | | 21.9% | 32 | 16.4% | 12 | 41.4% |
| DP Notice Withdrawn – Plea Agreement | | 7.5% | 21 | 15.7% | | 5.6% | | 4.6% | | 10.3% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 1.6% | 1 | 0.7% | | 0.9% | | 2.6% | | 6.9% |
| DP Notice Dismissed or Trial Terminated | | 0.6% | 0 | 0.0% | | 0.3% | | 1.5% | 0 | 0.0% |
| Pending Trial or Completion of Trial | | 7.5% | 11 | 8.2% | | 7.1% | | 6.7% | | 13.8% |
| Not Convicted of Capital Charge | | 0.1% | 0 | 0.0% | | 0.3% | | 0.0% | | 0.0% |
| Convicted of Capital Charge | 41 | 6.0% | 11 | 8.2% | | 7.7% | | 1.0% | | 10.3% |
| CONVICTED OF CAPITAL CHARGE | 41 | 6.0% | 11 | 8.2% | 25 | 7.7% | | 1.0% | | 10.3% |
| Jury Verdict – DP Not Recommended | 21 | 3.1% | 7 | 5.2% | 12 | 3.7% | 0 | 0.0% | | 6.9% |
| Jury Verdict – DP Recommended | 20 | 2.9% | 4 | 3.0% | 13 | 4.0% | | 1.0% | | 3.4% |
| SENTENCED TO DEATH | 20 | 2.9% | 4 | 3.0% | 13 | 4.0% | 2 | 1.0% | 1 | 3.4% |
| DP Recommended by Jury But Not Yet Imposed | | 0.3% | 0 | 0.0% | 0 | 0.0% | | 1.0% | 0 | 0.0% |
| DP Vacated by Court, Further Action Pending | | 0.6% | 1 | 0.7% | 3 | 0.9% | | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 14 | 2.1% | 3 | 2.2% | 10 | 3.1% | 0 | 0.0% | 1 | 3.4% |

T-6

JA 2789

4·02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-3   Page 75 of 110

TABLE 3B
DECISION-MAKING RATES ACROSS ALL STAGES
OF THE FEDERAL DEATH PENALTY PROCESS
(1988-1994)

| STAGE | TOTAL | | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % |
| SUBMITTED BY U.S. ATTORNEYS | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Recommendation to Seek Death Penalty (DP) | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| CONSIDERED BY ATTORNEY GENERAL (AG) | 52 | 100.0% | 7 | 100.0% | 39 | 100.0% | 5 | 100.0% | 1 | 100.0% |
| Decision Deferred or Pending | 1 | 1.9% | 0 | 0.0% | 1 | 2.6% | 0 | 0.0% | 0 | 0.0% |
| Authorization Not to Seek DP | 4 | 7.7% | 0 | 0.0% | 4 | 10.3% | 0 | 0.0% | 0 | 0.0% |
| Authorization to Seek DP | 47 | 90.4% | 7 | 100.0% | 34 | 87.2% | 5 | 100.0% | 1 | 100.0% |
| AUTHORIZED BY AG TO SEEK DP | 47 | 90.4% | 7 | 100.0% | 34 | 87.2% | 5 | 100.0% | 1 | 100.0% |
| DP Notice Withdrawn – Plea Agreement | 14 | 26.9% | 3 | 42.9% | 10 | 25.6% | 1 | 20.0% | 0 | 0.0% |
| DP Notice Withdrawn – Subsequent AG Decision | 11 | 21.2% | 1 | 14.3% | 10 | 25.6% | 0 | 0.0% | 0 | 0.0% |
| DP Notice Dismissed or Trial Terminated | 2 | 3.8% | 0 | 0.0% | 2 | 5.1% | 0 | 0.0% | 0 | 0.0% |
| Pending Trial or Completion of Trial | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Not Convicted of Capital Charge | 4 | 7.7% | 0 | 0.0% | 4 | 10.3% | 0 | 0.0% | 0 | 0.0% |
| Convicted of Capital Charge | 16 | 30.8% | 3 | 42.9% | 8 | 20.5% | 4 | 80.0% | 1 | 100.0% |
| CONVICTED OF CAPITAL CHARGE | 16 | 30.8% | 3 | 42.9% | 8 | 20.5% | 4 | 80.0% | 1 | 100.0% |
| Jury Verdict – DP Not Recommended | 10 | 19.2% | 1 | 14.3% | 5 | 12.8% | 3 | 60.0% | 1 | 100.0% |
| Jury Verdict – DP Recommended | 6 | 11.5% | 2 | 28.6% | 3 | 7.7% | 1 | 20.0% | 0 | 0.0% |
| SENTENCED TO DEATH | 6 | 11.5% | 2 | 28.6% | 3 | 7.7% | 1 | 20.0% | 0 | 0.0% |
| DP Recommended by Jury But Not Yet Imposed | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DP Vacated by Court, Re-sentenced to Life In Prison | 1 | 1.9% | 1 | 14.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| DEATH SENTENCE PENDING | 5 | 9.6% | 1 | 14.2% | 3 | 7.7% | 1 | 20.0% | 0 | 0.0% |

JA 2790

# TABLE SET II: THE UNITED STATES ATTORNEYS

INTRODUCTION

The tables in this set generally provide information about the submissions and recommendations made by United States Attorneys. In each instance, the total number of submissions is reported for each district, along with a racial/ethnic breakdown of those totals. In addition, for the post-protocol period only, each of the tables in this set reports for each district the total number of recommendations for and against seeking the death penalty, respectively, again with a racial/ethnic analysis of those totals. Information regarding recommendations is not separately reported in the tables addressing the pre-protocol period because at that time, United States Attorneys were only required to make submissions when they recommended seeking the death penalty.

For a variety of reasons, such as the fact that the defendant was a fugitive, the United States Attorneys occasionally submitted defendants for review but did not make a recommendation as to whether the death penalty should be sought. Again, because United States Attorneys were only required to submit defendants for review in the pre-protocol period if they affirmatively recommended seeking the death penalty, such instances of submission without a recommendation occurred only during the post-protocol period. Specifically, five defendants were submitted without recommendations: one Black defendant from the District of Columbia, one White defendant from the District of Nevada, and three Hispanic defendants from the District of Puerto Rico. As a result, in the tables that report total submissions as well as a breakdown of recommendations, the figures in the "Total" columns do not always represent the sum of the corresponding figures in the two recommendation columns.

JA 2791

A.    DEFENDANTS: EXPLANATORY NOTES FOR TABLE SET II.A

Table 4 lists the locations of the United States Attorneys Offices that are the subjects of the statistics in this Survey.

Tables 5A and 5B report, on a district-by-district basis and with a racial/ethnic breakdown, information about the submissions made by United States Attorneys, as well as their recommendations about whether to seek the death penalty. Specifically, Table 5A reports on the 682 defendants submitted in the post-protocol period with a mix of recommendations for and against seeking the death penalty; and Table 5B provides information about the 52 defendants submitted in the pre-protocol period, all with recommendations to seek the death penalty.

Because United States Attorneys did not submit defendants for review in the pre-protocol period unless they recommended seeking the death penalty, there is no need to break down the total submissions reported in Table 5B by recommendation. For that reason, the recommendation columns in Table 5A are omitted in Table 5B.

T-9

JA 2792

## TABLE 4: LOCATIONS OF UNITED STATES ATTORNEYS' OFFICES

| DISTRICT | LOCATION |
| --- | --- |
| Alabama, Middle | Montgomery |
| Alabama, Northern | Birmingham |
| Alabama, Southern | Mobile |
| Alaska | Anchorage |
| Arizona | Phoenix |
| Arkansas, Eastern | Little Rock |
| Arkansas, Western | Fort Smith |
| California, Central | Los Angeles |
| California, Eastern | Sacramento |
| California, Northern | San Francisco |
| California, Southern | San Diego |
| Colorado | Denver |
| Connecticut | New Haven |
| Delaware | Wilmington |
| District of Columbia | Washington |
| Florida, Middle | Tampa |
| Florida, Northern | Tallahassee |
| Florida, Southern | Miami |
| Georgia, Middle | Macon |
| Georgia, Northern | Atlanta |
| Georgia, Southern | Savannah |
| Guam | Agana |
| Hawaii | Honolulu |
| Idaho | Boise |

JA 2793

| DISTRICT | LOCATION |
|---|---|
| Illinois, Central | Springfield |
| Illinois, Northern | Chicago |
| Illinois, Southern | Fairview Heights |
| Indiana, Northern | Dyer |
| Indiana, Southern | Indianapolis |
| Iowa, Northern | Cedar Rapids |
| Iowa, Southern | Des Moines |
| Kansas | Wichita |
| Kentucky, Eastern | Lexington |
| Kentucky, Western | Louisville |
| Louisiana, Eastern | New Orleans |
| Louisiana, Middle | Baton Rouge |
| Louisiana, Western | Shreveport |
| Maine | Portland |
| Maryland | Baltimore |
| Massachusetts | Boston |
| Michigan, Eastern | Detroit |
| Michigan, Western | Grand Rapids |
| Minnesota | Minneapolis |
| Mississippi, Northern | Oxford |
| Mississippi, Southern | Jackson |
| Missouri, Eastern | St. Louis |
| Missouri, Western | Kansas City |
| Montana | Billings |
| Nebraska | Omaha |
| Nevada | Las Vegas |

JA 2794

| DISTRICT | LOCATION |
|---|---|
| New Hampshire | Concord |
| New Jersey | Newark |
| New Mexico | Albuquerque |
| New York, Eastern | New York City (Brooklyn) |
| New York, Northern | Syracuse |
| New York, Southern | New York City (Manhattan) |
| New York, Western | Buffalo |
| North Carolina, Eastern | Raleigh |
| North Carolina, Middle | Greensboro |
| North Carolina, Western | Charlotte |
| North Dakota | Fargo |
| Northern Mariana Islands | Saipan |
| Ohio, Northern | Cleveland |
| Ohio, Southern | Columbus |
| Oklahoma, Eastern | Muskogee |
| Oklahoma, Northern | Tulsa |
| Oklahoma, Western | Oklahoma City |
| Oregon | Portland |
| Pennsylvania, Eastern | Philadelphia |
| Pennsylvania, Middle | Scranton |
| Pennsylvania, Western | Pittsburgh |
| Puerto Rico | San Juan |
| Rhode Island | Providence |
| South Carolina | Columbia |
| South Dakota | Sioux Falls |
| Tennessee, Eastern | Knoxville |

JA 2795

| DISTRICT | LOCATION |
|---|---|
| Tennessee, Middle | Nashville |
| Tennessee, Western | Memphis |
| Texas, Eastern | Beaumont |
| Texas, Northern | Dallas |
| Texas, Southern | Houston |
| Texas, Western | San Antonio |
| Utah | Salt Lake City |
| Vermont | Burlington |
| Virgin Islands | St. Thomas |
| Virginia, Eastern | Alexandria |
| Virginia, Western | Roanoke |
| Washington, Eastern | Spokane |
| Washington, Western | Seattle |
| West Virginia, Northern | Wheeling |
| West Virginia, Southern | Charleston |
| Wisconsin, Eastern | Milwaukee |
| Wisconsin, Western | Madison |
| Wyoming | Cheyenne |

JA 2796

T-13

## TABLE 5A: U.S. ATTORNEY RECOMMENDATIONS
### BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arizona | 12 | 1 | 3 | 6 | 2 | 1 | 0 | 0 | 0 | 1 | 11 | 1 | 3 | 6 | 1 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 15 | 3 | 4 | 6 | 2 | 3 | 1 | 1 | 1 | 0 | 12 | 2 | 3 | 5 | 2 |
| California, Eastern | 10 | 7 | 2 | 0 | 1 | 4 | 2 | 1 | 0 | 1 | 6 | 5 | 1 | 0 | 0 |
| California, Northern | 4 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 3 | 3 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 6 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 5 | 0 | 0 | 1 |
| Connecticut | 11 | 0 | 2 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 2 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 21 | 1 | 20 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 19 | 1 | 18 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 2 | 3 | 0 | 0 |
| Florida, Southern | 9 | 0 | 6 | 3 | 0 | 1 | 0 | 1 | 0 | 0 | 8 | 0 | 5 | 3 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Georgia, Northern | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Georgia, Southern | 5 | 0 | 3 | 2 | 0 | 4 | 0 | 3 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |

T-14

JA 2797

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 4 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 1 | 0 | 1 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 3 | 1 | 0 | 0 | 2 | 9 | 1 | 8 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 6 | 3 | 1 | 0 | 2 | 5 | 2 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 7 | 0 | 6 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 4 | 0 | 4 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 41 | 4 | 36 | 0 | 1 | 6 | 0 | 5 | 0 | 1 | 35 | 4 | 31 | 0 | 0 |
| Massachusetts | 13 | 3 | 9 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 12 | 2 | 9 | 1 | 0 |
| Michigan, Eastern | 17 | 0 | 14 | 3 | 0 | 4 | 0 | 3 | 1 | 0 | 13 | 0 | 11 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 2 | 4 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 5 | 0 | 4 | 0 | 1 | 5 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

T-15

JA 2798

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 4 | 4 | 0 | 0 | 0 | 4 | 2 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 4 | 2 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| New Mexico | 11 | 2 | 0 | 8 | 1 | 6 | 2 | 0 | 4 | 0 | 5 | 0 | 0 | 4 | 1 |
| New York, Eastern | 58 | 19 | 20 | 12 | 7 | 6 | 1 | 1 | 0 | 4 | 52 | 18 | 19 | 12 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 50 | 4 | 17 | 28 | 1 | 6 | 1 | 5 | 0 | 0 | 44 | 3 | 12 | 28 | 1 |
| New York, Western | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Eastern | 10 | 2 | 8 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 5 | 1 | 3 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 2 | 0 | 2 | 0 | 0 |
| North Dakota | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |

JA 2799

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 72 | 0 | 0 | 72 | 0 | 14 | 0 | 0 | 14 | 0 | 55 | 0 | 0 | 55 | 0 |
| Rhode Island | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| South Carolina | 7 | 1 | 5 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 6 | 3 | 3 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 11 | 1 | 10 | 0 | 0 | 6 | 1 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 8 | 3 | 3 | 2 | 0 | 4 | 1 | 2 | 1 | 0 | 4 | 2 | 1 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Virgin Islands | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| Virginia, Eastern | 66 | 5 | 59 | 2 | 0 | 21 | 0 | 20 | 1 | 0 | 45 | 5 | 39 | 1 | 0 |
| Virginia, Western | 6 | 2 | 4 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 11 | 5 | 5 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 8 | 2 | 5 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 682 | 134 | 324 | 195 | 29 | 183 | 48 | 81 | 39 | 15 | 494 | 85 | 242 | 153 | 14 |

T-17

JA 2800

## TABLE 5B:  U.S. ATTORNEY RECOMMENDATIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 5 | 0 | 5 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 |
| Georgia, Middle | | 0 | 4 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

JA 2801

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 3 | 0 | 0 | 0 |

T-19

JA 2802

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

JA 2803

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 9 | 0 | 9 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 52 | 7 | 39 | 5 | 1 |

JA 2804

B.    OFFENSES: EXPLANATORY NOTES FOR TABLE SET II.B

Table Set II.B examines charging practices.  As explained in the text of the Survey, when the modern use of the federal death penalty began in 1988, the only offenses subject to capital punishment were narcotics-related offenses under the DKA, and therefore all 52 submissions in the pre-protocol period were in cases where the defendant was charged with committing such offenses.  With the enactment of the FDPA in 1994, prosecutors were authorized to seek the death penalty for a variety of offenses.  Table 6 lists all of the federal offenses currently punishable by death.

Table 7 reports the extent to which each federal offense punishable by death has been charged against the 682 defendants reviewed in the post-protocol period, providing information about the total number of cases under each statute as well as the United States Attorneys' recommendations for and against seeking the death penalty.  The information in Table 7 is reported on a statute-by-statute basis, and does not contain information about particular districts.

Tables 8-1, and 8-2 provide offense-related information about each district.  Specifically, Table 8-1 reports on the subset of those cases in which United States Attorneys recommended seeking the death penalty, and Table 8-2 reports on the subset of the overall cases in which United States Attorneys recommended that the death penalty not be sought.

In any given case, the defendant's conduct can violate more than one federal statute that is subject to capital punishment, and many defendants have been charged with more than one capital offense in a single indictment.  As a result, the total number of offenses reported in Table Set B.2 exceeds the total number of defendants charged with capital offenses in the post-protocol period.

The fact that defendants can be charged with multiple offenses in a single case also means that the method of counting can affect the statistics.  In compiling Table Set II.B, multiple counts in an indictment charging the same statutory violation against the same defendant were counted only once, but different statutory violations charged against the same defendant in a single indictment were counted separately.  Thus, for example, assume that in District A, there were capital charges against two defendants:  one White defendant charged with five different murders, all in violation of the same statute, and one Black defendant charged with five different statutory offenses punishable by death.  The report for that district would show that one offense was charged against White defendants and five offenses were charged against Black defendants.  To help account for the effects of this methodology, each entry for a specific district in Tables 8-1, and 8-2 also report the total number of defendants charged in that district.

Table 6 provides information about the 59 sections of the United States Code that define criminal offenses punishable by death, with part 1 of the table listing offenses defined under Title 18 of the United States Code and part 2 listing offense defined under other titles of the United States Code. The description accompanying each citation is drawn from the name of the section as set forth in the United States Code, with additional parenthetical information added where appropriate. With one exception, the procedures set forth in the FDPA, 18 U.S.C. §§ 3591 to 3598, apply to capital prosecutions arising under all of the statutes listed below. The exception is that capital prosecutions arising under 21 U.S.C. § 848(e) (continuing criminal enterprise) are subject to the similar but not identical procedures of the DKA, as set forth in 21 U.S.C. § 848(g)-(r).

All but three of the statutes listed below provide for imposition of the death penalty only for offenses resulting in death. Under the terms of 18 U.S.C. §§ 794 (espionage), 2381 (treason), and 3591 (providing for imposition of the death penalty for violations of 21 U.S.C. § 848(c) involving trafficking in large quantities of narcotics by continuing criminal enterprise; or attempting, authorizing or advising the killing of any officer, juror or witness by a continuing criminal enterprise), the government need not prove that the offense resulted in death in order for capital punishment to be available. The federal government has not sought the death penalty for any offense not resulting in death since the reintroduction of the capital punishment into the federal criminal justice system in 1988.

Offenses under 18 U.S.C. §§ 32 and 33 (Nos. 4 and 5) are eligible for capital punishment by virtue of 18 U.S.C. § 34, which does not itself define a criminal offense, but instead provides that the death penalty may be imposed as punishment for any offense under Chapter 2 of Title 18 (aircraft and motor vehicles) that results in the death of any person. Likewise, offenses under 18 U.S.C. § 2241 (No. 39) are eligible for capital punishment by virtue of 18 U.S.C. § 2245, which does not itself define a criminal offense, but instead provides that the death penalty may be imposed as punishment for any offense under Chapter 109A of Title 18 (sexual abuse) that results in the death of any person.

Some offenses under 21 U.S.C. § 848 (No. 55) are eligible for capital punishment by virtue of 18 U.S.C. § 3591, which does not itself define a criminal offense, but instead provides that the death penalty may be imposed in certain circumstances as punishment for certain violations of 21 U.S.C. § 848(c). When the DKA was enacted in 1988, it provided for imposition of the death penalty for certain specified offenses, codified at 21 U.S.C. § 848(e). The FDPA added a provision, codified at 18 U.S.C. § 3591(b), that a defendant found guilty of engaging in a continuing criminal enterprise (as defined in 21 U.S.C. § 848(c)) could be sentenced to death if (1) the offense involved specified amounts of narcotics, or (2) the defendant was a leader of the enterprise and sought to obstruct an investigation or prosecution by attempting to kill an officer, juror or witness (or a member of any such person's family).

JA 2806

## 1. OFFENSES UNDER TITLE 18 OF THE UNITED STATES CODE

| No. | Citation | Description |
|---|---|---|
| 1 | 18 U.S.C. § 32 | Destruction of aircraft or aircraft facilities |
| 2 | 18 U.S.C. § 33 | Destruction of motor vehicles or motor vehicle facilities |
| 3 | 18 U.S.C. § 36 | Drive-by shooting |
| 4 | 18 U.S.C. § 37 | Violence at international airports |
| 5 | 18 U.S.C. § 115 | Influencing, impeding, or retaliating against a Federal official by murdering a family member |
| 6 | 18 U.S.C. § 229A | Penalties (crimes relating to chemical weapons) |
| 7 | 18 U.S.C. § 241 | Conspiracy against rights |
| 8 | 18 U.S.C. § 242 | Deprivation of rights under color of law |
| 9 | 18 U.S.C. § 245 | Federally protected activities |
| 10 | 18 U.S.C. § 247 | Damage to religious property; obstruction of the free exercise of religious rights |
| 11 | 18 U.S.C. § 351 | Congressional, Cabinet, and Supreme Court assassination |
| 12 | 18 U.S.C. § 794 | Gathering or delivering defense information to aid foreign government |
| 13 | 18 U.S.C. § 844 | Explosive materials |
| 14 | 18 U.S.C. § 924 | Firearms |
| 15 | 18 U.S.C. § 930 | Possession of firearms and dangerous weapons in Federal facilities |
| 16 | 18 U.S.C. § 1091 | Genocide |
| 17 | 18 U.S.C. § 1111 | Murder |
| 18 | 18 U.S.C. § 1114 | Protection of officers and employees of the United States |
| 19 | 18 U.S.C. § 1116 | Murder of foreign officials, official guests, or internationally protected persons |

JA 2807

| No. | Citation | Description |
|---|---|---|
| 20 | 18 U.S.C. § 1118 | Murder by a Federal prisoner |
| 21 | 18 U.S.C. § 1119 | Foreign murder of United States nationals |
| 22 | 18 U.S.C. § 1120 | Murder by escaped prisoners |
| 23 | 18 U.S.C. § 1121 | Killing persons aiding Federal investigations or State correctional officers |
| 24 | 18 U.S.C. § 1201 | Kidnapping |
| 25 | 18 U.S.C. § 1203 | Hostage taking |
| 26 | 18 U.S.C. § 1503 | Influencing or injuring officer or juror generally |
| 27 | 18 U.S.C. § 1512 | Tampering with a witness, victim, or an informant |
| 28 | 18 U.S.C. § 1513 | Retaliating against a witness, victim, or an informant |
| 29 | 18 U.S.C. § 1716 | Injurious articles as nonmailable |
| 30 | 18 U.S.C. § 1751 | Presidential and Presidential staff assassination |
| 31 | 18 U.S.C. § 1958 | Use of interstate commerce facilities in the commission of murder-for-hire |
| 32 | 18 U.S.C. § 1959 | Violent crimes in aid of racketeering activity |
| 33 | 18 U.S.C. § 1992 | Wrecking trains |
| 34 | 18 U.S.C. § 2113 | Bank robbery and incidental crimes |
| 35 | 18 U.S.C. § 2119 | Motor vehicles (carjacking) |
| 36 | 18 U.S.C. § 2241 | Aggravated sexual abuse |
| 37 | 18 U.S.C. § 2242 | Sexual abuse |
| 38 | 18 U.S.C. § 2243 | Sexual abuse of a minor or ward |
| 39 | 18 U.S.C. § 2244 | Abusive sexual contact |
| 40 | 18 U.S.C. § 2251 | Sexual exploitation of children |

JA 2808

| No. | Citation | Description |
|-----|----------|-------------|
| 41 | 18 U.S.C. § 2280 | Violence against maritime navigation |
| 42 | 18 U.S.C. § 2281 | Violence against maritime fixed platforms |
| 43 | 18 U.S.C. § 2332 | Terrorism |
| 44 | 18 U.S.C. § 2332a | Use of weapons of mass destruction |
| 45 | 18 U.S.C. § 2332b | Acts of terrorism transcending national boundaries |
| 46 | 18 U.S.C. § 2332c | Use of chemical weapons |
| 47 | 18 U.S.C. § 2340A | Torture |
| 48 | 18 U.S.C. § 2381 | Treason |
| 49 | 18 U.S.C. § 2441 | War crimes |

JA 2809

## 2. OFFENSES UNDER OTHER TITLES OF THE UNITED STATES CODE

| No. | Citation | Description |
|---|---|---|
| | 7 U.S.C. § 2146 | Administration and enforcement by Secretary (murder of officials enforcing laws relating to transportation, sale, and handling of certain animals) |
| | 8 U.S.C. § 1324 | Bringing in and harboring certain aliens |
| | 15 U.S.C. § 1825 | Violations and penalties (murder of officials enforcing laws relating to the protection of horses) |
| | 21 U.S.C. § 461 | Violations and penalties (murder of officials enforcing laws relating to poultry inspection) |
| | 21 U.S.C. § 675 | Violations and penalties (murder of officials enforcing laws relating to meat inspection) |
| | 21 U.S.C. § 848 | Continuing criminal enterprise |
| | 21 U.S.C. § 1041 | Violations and penalties (murder of officials enforcing laws relating to inspection of egg products) |
| | 42 U.S.C. § 2283 | Protection of nuclear inspectors |
| | 49 U.S.C. § 46502 | Aircraft piracy |
| | 49 U.S.C. § 46502 | Application of certain criminal laws to acts on aircraft |

T-27

JA 2810

TABLE 7
U.S. ATTORNEY RECOMMENDATIONS
BY CAPITAL OFFENSE AND RACE/ETHNICITY OF DEFENDANT
(1995-2000)

| CAPITAL OFFENSE | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 8 U.S.C. 1324(a) | 23 | 3 | 2 | 16 | 2 | 0 | 0 | 0 | 0 | 0 | 23 | 3 | 2 | 16 | 2 |
| 18 U.S.C. 32 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 33 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 36 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| 18 U.S.C. 37 | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 241 | 6 | 2 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| 18 U.S.C. 242 | 9 | 2 | 6 | 1 | 0 | 5 | 0 | 5 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| 18 U.S.C. 245(b) | 6 | 4 | 0 | 2 | 0 | 4 | 2 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 |
| 18 U.S.C. 247(d)(1) | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 794 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 |
| 18 U.S.C. 844(d) | 4 | 4 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| 18 U.S.C. 844(f) | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 844(i) | 20 | 14 | 2 | 1 | 3 | 10 | 6 | 1 | 0 | 3 | 10 | 8 | 1 | 1 | 0 |
| 18 U.S.C. 924(j) | 186 | 22 | 105 | 53 | 6 | 64 | 11 | 29 | 19 | 5 | 122 | 11 | 76 | 34 | 1 |
| 18 U.S.C. 930(c) | 6 | 4 | 2 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| 18 U.S.C. 1111 | 60 | 28 | 27 | 0 | 5 | 15 | 8 | 6 | 0 | 1 | 45 | 20 | 21 | 0 | 4 |
| 18 U.S.C. 1114 | 19 | 8 | 5 | 3 | 3 | 8 | 4 | 2 | 0 | 2 | 11 | 4 | 3 | 3 | 1 |
| 18 U.S.C. 1116(a) | 3 | 2 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 1118 | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 1121(a) | 5 | 0 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 1201(a) | 35 | 5 | 16 | 13 | 1 | 13 | 3 | 7 | 2 | 1 | 22 | 2 | 9 | 11 | 0 |

JA 2811

| CAPITAL OFFENSE | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 18 U.S.C. 1203(a) | 15 | 0 | 0 | 10 | 5 | 3 | 0 | 0 | 0 | 3 | 12 | 0 | 0 | 10 | 2 |
| 18 U.S.C. 1512(a) | 57 | 11 | 32 | 12 | 2 | 22 | 5 | 12 | 4 | 1 | 35 | 6 | 20 | 8 | 1 |
| 18 U.S.C. 1513(a) | 22 | 3 | 10 | 8 | 1 | 7 | 1 | 2 | 4 | 0 | 15 | 2 | 8 | 4 | 1 |
| 18 U.S.C. 1716 | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 1958(a) | 34 | 13 | 8 | 11 | 2 | 20 | 10 | 2 | 8 | 0 | 14 | 3 | 6 | 3 | 2 |
| 18 U.S.C. 1959(a) | 153 | 20 | 70 | 60 | 3 | 29 | 7 | 9 | 12 | 1 | 123 | 12 | 61 | 48 | 2 |
| 18 U.S.C. 2113(e) | 22 | 0 | 11 | 11 | 0 | 11 | 0 | 10 | 1 | 0 | 11 | 0 | 1 | 10 | 0 |
| 18 U.S.C. 2119(3) | 71 | 3 | 32 | 34 | 2 | 20 | 1 | 12 | 6 | 1 | 50 | 2 | 19 | 28 | 1 |
| 18 U.S.C. 2241(a) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2241(c) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2332a | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 21 U.S.C. 848(c) | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 21 U.S.C. 848(e)(1)(A) | 130 | 18 | 85 | 27 | 0 | 32 | 7 | 20 | 5 | 0 | 95 | 11 | 65 | 19 | 0 |
| 21 U.S.C. 848(e)(1)(B) | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 0 | 2 | 0 | 5 | 0 | 2 | 3 | 0 |
| 49 U.S.C. 46502 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| TOTAL | 926 | 191 | 432 | 268 | 35 | 296 | 83 | 130 | 65 | 18 | 625 | 107 | 301 | 200 | 17 |

JA 2812

T-29

TABLE 8-1
CAPITAL OFFENSES
U.S. ATTORNEY RECOMMENDATIONS TO SEEK THE DEATH PENALTY
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
(January 1, 1995 - July 20, 2000)

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Alabama, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Alabama, Northern | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| 2 of 2 defendants | total | 2 | | | | 2 |
| Alabama, Southern | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| 2 of 2 defendants | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | total | | 4 | | | 4 |
| Alaska | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Arizona | 18 U.S.C. 1111 | | | | 1 | 1 |
| 1 of 12 defendants | 18 U.S.C. 1114 | | | | 1 | 1 |
| | total | | | | 2 | 2 |
| Arkansas, Eastern | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| 3 of 3 defendants | 18 U.S.C. 1959(a) | 2 | | | | 2 |
| | total | 4 | 1 | | | 5 |
| Arkansas, Western | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 1111 | 2 | | | | 2 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | total | 5 | | | | 5 |

JA 2813

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| California, Central | 18 U.S.C. 245(b) | 1 | | | | 1 |
| 3 of 15 defendants | 18 U.S.C. 924(j) | 1 | | 1 | | 2 |
| | 18 U.S.C. 1111 | | 1 | | | 1 |
| | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | total | 3 | 2 | 2 | | 7 |
| California, Eastern | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 4 of 10 defendants | 18 U.S.C. 844(i) | | | | 1 | 1 |
| | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2241(a) | 1 | | | | 1 |
| | total | 5 | 1 | | 1 | 7 |
| California, Northern | 18 U.S.C. 924(j) | | | | 1 | 1 |
| 1 of 4 defendants | 18 U.S.C. 1512(a) | | | | 1 | 1 |
| | total | | | | 2 | 2 |
| California, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Colorado | n/a | | | | | 0 |
| 0 of 6 defendants | total | | | | | 0 |
| Connecticut | n/a | | | | | 0 |
| 0 of 11 defendants | total | | | | | 0 |

JA 2814

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Delaware | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| District of Columbia | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| 1 of 21 defendants | total | | 1 | | | 1 |
| Florida, Middle | 18 U.S.C. 924(j) | | | 3 | | 3 |
| 3 of 3 defendants | 18 U.S.C. 1959(a) | | | 3 | | 3 |
| | total | | | 6 | | 6 |
| Florida, Northern | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| Florida, Southern | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 9 defendants | total | | 1 | | | 1 |
| Georgia, Middle | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Georgia, Northern | 18 U.S.C. 1118 | | 1 | | | 1 |
| 1 of 5 defendants | total | | 1 | | | 1 |
| Georgia, Southern | 18 U.S.C. 924(j) | | 3 | 1 | | 4 |
| 4 of 5 defendants | 18 U.S.C. 1121(a) | | 3 | | | 3 |
| | 18 U.S.C. 1512(a) | | 3 | | | 3 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 9 | 2 | | 11 |
| Guam | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Hawaii | 18 U.S.C. 924(j) | | | | 1 | 1 |
| 1 of 6 defendants | total | | | | 1 | 1 |
| Idaho | n/a | | | | | 0 |

T-32

JA 2815

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Central | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Northern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 2 of 7 defendants | 18 U.S.C. 1121(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | | 5 | | | 5 |
| Illinois, Southern | 18 U.S.C. 37 | 2 | 1 | | | 3 |
| 3 of 3 defendants | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| | 18 U.S.C. 1958(a) | 2 | 1 | | | 3 |
| | total | 6 | 3 | | | 9 |
| Indiana, Northern | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Indiana, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Iowa, Northern | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 2 of 4 defendants | 18 U.S.C. 1201(a) | | | 2 | | 2 |
| | total | | | 4 | | 4 |
| Iowa, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Kansas | 18 U.S.C. 924(j) | | | | 2 | 2 |
| 3 of 12 defendants | 18 U.S.C. 930(c) | 1 | | | | 1 |

T-33

JA 2816

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Kansas | 18 U.S.C. 1111 | 1 | | | | 1 |
| 3 of 12 defendants (cont'd) | total | 2 | | | 2 | 4 |
| Kentucky, Eastern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Kentucky, Western | 18 U.S.C. 844(i) | | 1 | | 2 | 3 |
| 5 of 6 defendants | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | total | 2 | 1 | | 2 | 5 |
| Louisiana, Eastern | 18 U.S.C. 241 | | 2 | | | 2 |
| 3 of 7 defendants | 18 U.S.C. 242 | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 1 | | 1 |
| | total | | 6 | 1 | | 7 |
| Louisiana, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Louisiana, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maine | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maryland | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 6 of 41 defendants | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | | 1 | 1 |
| | total | | 5 | | 1 | 6 |

T-34

JA 2817

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Massachusetts | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 13 defendants | total | 1 | | | | 1 |
| Michigan, Eastern | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 17 defendants | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | total | | 4 | 1 | | 5 |
| Michigan, Western | n/a | | 0 | | | 0 |
| 0 | total | | 0 | | | 0 |
| Minnesota | n/a | | | | | 0 |
| 0 of 7 defendants | total | | | | | 0 |
| Mississippi, Northern | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 1111 | 1 | | | | 1 |
| | total | 2 | | | | 2 |
| Mississippi, Southern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Missouri, Eastern | 18 U.S.C. 924(j) | | 3 | | 1 | 4 |
| 5 of 5 defendants | 18 U.S.C. 1201(a) | | 1 | | 1 | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | | 8 | | 2 | 10 |
| Missouri, Western | 18 U.S.C. 924(j) | | | 3 | | 3 |
| 8 of 8 defendants | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| Missouri, Western | 18 U.S.C. 2241(c) | 1 | | | | 1 |

JA 2818

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 8 of 8 defendants (cont'd) | 21 U.S.C. | 2 | | | | 2 |
| | total | 4 | 2 | 6 | | 12 |
| Montana | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nebraska | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nevada | 18 U.S.C. 1959(a) | 4 | | | | 4 |
| 4 of 9 defendants | total | 4 | | | | 4 |
| New Hampshire | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| New Jersey | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 2 of 4 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | 2 | 2 | | | 4 |
| New Mexico | 18 U.S.C. 1959(a) | | | 4 | | 4 |
| 6 of 11 defendants | 21 U.S.C. 848(e)(I)(A) | 2 | | | | 2 |
| | total | 2 | | 4 | | 6 |
| New York, Eastern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 6 of 58 defendants | 18 U.S.C. 1203(a) | | | | 3 | 3 |
| | 18 U.S.C. 1959(a) | 1 | | | 1 | 2 |
| | 21 U.S.C. 848(e)(1)(A) | 1 | 1 | | | 2 |
| | total | 2 | 2 | | 4 | 8 |
| New York, Northern | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 2 of 6 defendants | total | | 2 | | | 2 |

JA 2819

T-36

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| New York, Southern | 18 U.S.C. 844(f) | 1 | 1 | | | 2 |
| 6 of 50 defendants | 18 U.S.C. 930(c) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1116(a) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | 18 U.S.C. 2332a | 1 | 1 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | 5 | 12 | | | 17 |
| New York, Western | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| North Carolina, Eastern | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| 3 of 10 defendants | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 6 | 3 | | | 9 |
| North Carolina, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Western | 18 U.S.C. 924(j) | 1 | 1 | | | 2 |
| 3 of 5 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| North Carolina, Western | 18 U.S.C. 1114 | | | | 1 | 1 |
| 3 of 5 defendants (cont'd) | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 2 | 2 | | 1 | |

JA 2820

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| North Dakota | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| | total | 2 | | | | 2 |
| Northern Mariana Islands | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Ohio, Northern | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Ohio, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Eastern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Oklahoma, Northern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Western | 18 U.S.C. 844(f) | 2 | | | | 2 |
| 2 of 3 defendants | 18 U.S.C. 1114 | 2 | | | | 2 |
| | 18 U.S.C. 2332a | 2 | | | | 2 |
| | total | 6 | | | | 6 |
| Oregon | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Pennsylvania, Eastern | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| 4 of 6 defendants | 18 U.S.C. 1959(a) | | | 3 | | 3 |
| Pennsylvania, Eastern | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| 4 of 6 defendants (cont'd) | total | | 1 | 6 | | 7 |
| Pennsylvania, Middle | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 3 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |

JA 2821

4:02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-3    Page 107 of 110

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| | 18 U.S.C. 1118 | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | total | 2 | | 6 | | 8 |
| Pennsylvania, Western | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 1 of 2 defendants | total | 1 | | | | 1 |
| Puerto Rico | 18 U.S.C. 924(j) | | | 6 | | 6 |
| 14 of 72 defendants | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 18 U.S.C. 1513(a) | | | 4 | | 4 |
| | 18 U.S.C. 2113(e) | | | 1 | | 1 |
| | 18 U.S.C. 2119(3) | | | 5 | | 5 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(B) | | | 2 | | 2 |
| | total | | | 22 | | 22 |
| Rhode Island | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| South Carolina | 18 U.S.C. 2119(3) | 1 | | | | 1 |
| 1 of 7 defendants | total | 1 | | | | 1 |
| South Dakota | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Tennessee, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Tennessee, Middle | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 6 defendants | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| | 18 U.S.C. 1958(a) | 2 | | | | 2 |

JA 2822

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
|  | 18 U.S.C. 2119(3) |  | 2 |  |  | 2 |
|  | total | 4 | 4 |  |  | 8 |
| Tennessee, Western<br>6 of 11 defendants | 18 U.S.C. 242 |  | 3 |  |  | 3 |
|  | 18 U.S.C. 1512(a) |  | 2 |  |  | 2 |
|  | 18 U.S.C. 1513(a) | 1 |  |  |  | 1 |
|  | 18 U.S.C. 2119(3) |  | 2 |  |  | 2 |
|  | total | 1 | 7 |  |  | 8 |
| Texas, Eastern<br>4 of 5 defendants | 18 U.S.C. 924(j) |  | 2 |  |  | 2 |
|  | 18 U.S.C. 1201(a) |  | 1 |  |  | 1 |
|  | 18 U.S.C. 2113(e) |  | 3 |  |  | 3 |
|  | total |  | 6 |  |  | 6 |
| Texas, Northern<br>6 of 10 defendants | 18 U.S.C. 245(b) | 1 |  | 2 |  | 3 |
|  | 18 U.S.C. 1201(a) |  | 3 |  |  | 3 |
|  | total | 1 | 3 | 2 |  | 6 |
| Texas, Southern<br>0 of 5 defendants | n/a |  |  |  |  | 0 |
|  | total |  |  |  |  | 0 |
| Texas, Western<br>4 of 8 defendants | 18 U.S.C. 1111 |  | 1 |  |  | 1 |
|  | 18 U.S.C. 1958(a) | 1 |  | 1 |  | 2 |

JA 2823

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Texas, Western | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| 4 of 8 defendants (cont'd) | total | 1 | 3 | 1 | | 5 |
| Utah | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Vermont | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Virgin Islands | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| Virginia, Eastern | 18 U.S.C. 924(j) | | 6 | 1 | | 7 |
| 21 of 66 defendants | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1958(a) | | 1 | 1 | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 10 | | | 10 |
| | total | | 26 | 2 | | 28 |
| Virginia, Western | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 4 of 6 defendants | 18 U.S.C. 924(j) | | 2 | | | 2 |
| | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | 2 | 3 | | | 5 |
| Washington, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |

JA 2824

T-41

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Washington, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| West Virginia, Northern | 18 U.S.C. 844(i) | 3 | | | | 3 |
| 3 of 11 defendants | total | 3 | | | | 3 |
| West Virginia, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wyoming | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| TOTAL | | | | | | |
| 183 of 682 defendants | | 83 | 130 | 65 | 18 | 296 |

JA 2825

## TABLE 8-2
## CAPITAL OFFENSES
## U.S. ATTORNEY RECOMMENDATIONS NOT TO SEEK THE DEATH PENALTY
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## (1995-2000)

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Alabama, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Alabama, Northern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Alabama, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Alaska | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 930(c) | 1 | | | | 1 |
| | 18 U.S.C. 1114 | 1 | | | | 1 |
| | total | 3 | | | | 3 |
| Arizona | 8 U.S.C. 1324(a) | | | 3 | | 3 |
| 11 of 12 defendants | 18 U.S.C. 924(j) | | | 2 | 1 | 3 |
| | 18 U.S.C. 1111 | | 1 | | 1 | 2 |
| | 18 U.S.C. 1114 | | 2 | 3 | 1 | 6 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(B) | | | 3 | | 3 |
| | 49 U.S.C. 46502 | 1 | | | | 1 |
| | total | 2 | 5 | 11 | 3 | 21 |

JA 2826

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Arkansas, Eastern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Arkansas, Western | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| California, Central | 8 U.S.C. 1324(a) | | | | 2 | 2 |
| 12 of 15 defendants | 18 U.S.C. 924(j) | | | 3 | | 3 |
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1114 | 1 | | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 1958(a) | | 3 | | | 3 |
| | 18 U.S.C. 1959(a) | | | 4 | | 4 |
| | 21 U.S.C. 848(e)(1)(A) | | | 1 | | 1 |
| | total | 3 | 3 | 8 | 2 | 16 |
| California, Eastern | 18 U.S.C. 245(b) | 2 | | | | 2 |
| 6 of 10 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | 3 | | | | 3 |
| | total | 7 | 1 | | | 8 |
| California, Northern | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 3 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| | total | 5 | | | | 5 |

JA 2827

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| California, Southern | 8 U.S.C. 1324(a) | | | 2 | | 2 |
| 2 of 2 defendants | total | | | 2 | | 2 |
| Colorado | 18 U.S.C. 1111 | 5 | | | 1 | 6 |
| 6 of 6 defendants | total | 5 | | | 1 | 6 |
| Connecticut | 18 U.S.C. 1114 | | 1 | | | 1 |
| 11 of 11 defendants | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1513(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | | 9 | | 9 |
| | total | | 3 | 9 | | 12 |
| Delaware | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| District of Columbia | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 19 of 21 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 3 | | | 3 |
| | 18 U.S.C. 1513(a) | | 3 | | | 3 |
| | 18 U.S.C. 1959(a) | | 4 | | | 4 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 7 | | | 7 |
| | 21 U.S.C. 848(e)(1)(B) | | 1 | | | 1 |
| | total | 2 | 23 | | | 25 |
| Florida, Middle | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Florida, Northern | 18 U.S.C. 1111 | 2 | | | | 2 |

JA 2828

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 5 of 5 defendants | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| | total | 2 | 3 | | | 5 |
| Florida, Southern 8 of 9 defendants | 8 U.S.C. 1324(a) | | | 3 | | 3 |
| | 18 U.S.C. 924(j) | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | total | | 5 | 3 | | 8 |
| Georgia, Middle 4 of 4 defendants | 18 U.S.C. 924(j) | | 2 | | | 2 |
| | 18 U.S.C. 1111 | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| | total | | 6 | | | 6 |
| Georgia, Northern 4 of 5 defendants | 18 U.S.C. 247(d)(1) | 1 | | | | 1 |
| | 18 U.S.C. 924(j) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 1 | 3 | | | 4 |
| Georgia, Southern 1 of 5 defendants | 18 U.S.C. 924(j) | | | 1 | | 1 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | | 2 | | 2 |
| Guam 0 of 0 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Hawaii 5 of 6 defendants | 18 U.S.C. 924(j) | | | 2 | | 2 |
| | 18 U.S.C. 1111 | 1 | | | 2 | 3 |
| | total | 1 | | 2 | 2 | 5 |

JA 2829

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Idaho | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Central | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Northern | 18 U.S.C. 1201(a) | | | 5 | | 5 |
| 5 of 7 defendants | 18 U.S.C. 1203(a) | | | 5 | | 5 |
| | total | | | 10 | | 10 |
| Illinois, Southern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Indiana, Northern | 18 U.S.C. 924(j) | | 3 | | | 3 |
| 4 of 4 defendants | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 3 | 1 | | 4 |
| Indiana, Southern | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| 2 of 2 defendants | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | total | | 4 | | | 4 |
| Iowa, Northern | 18 U.S.C. 924(j) | 1 | | 1 | | 2 |
| 2 of 4 defendants | 18 U.S.C. 1201(a) | 1 | | 1 | | 2 |
| | total | 2 | | 2 | | 4 |
| Iowa, Southern | 18 U.S.C. 2119(3) | 2 | | | | 2 |
| 2 of 2 defendants | total | 2 | | | | 2 |
| Kansas | 18 U.S.C. 924(j) | 1 | 8 | | | 9 |
| 9 of 12 defendants | total | 1 | 8 | | | 9 |
| Kentucky, Eastern | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| 1 of 1 defendant | total | | 1 | | | 1 |
| Kentucky, Western | 18 U.S.C. 924(j) | 1 | | | | 1 |

T-47

JA 2830

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 1 of 6 defendants | total | 1 | | | | 1 |
| Louisiana, Eastern | 18 U.S.C. 241 | | 1 | | | 1 |
| 4 of 7 defendants | 18 U.S.C. 242 | | 1 | | | 1 |
| | 18 U.S.C. 924(j) | | 3 | | | 3 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 3 | | | 3 |
| | total | | 9 | | | 9 |
| Louisiana, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Louisiana, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maine | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maryland | 18 U.S.C. 844(i) | 4 | | | | 4 |
| 35 of 41 defendants | 18 U.S.C. 924(j) | | 6 | | | 6 |
| | 18 U.S.C. 1111 | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 16 | | | 16 |
| | 21 U.S.C. 848(e)(1)(A) | | 8 | | | 8 |
| | 21 U.S.C. 848(e)(1)(B) | | 1 | | | 1 |
| | total | 4 | 32 | | | 36 |
| Massachusetts | 18 U.S.C. 1512(a) | | | 1 | | 1 |
| 12 of 13 defendants | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | 1 | 7 | 1 | | 9 |
| Massachusetts | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 12 of 13 defendants (cont'd) | total | 2 | 9 | 2 | | 13 |

JA 2831

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Michigan, Eastern | 18 U.S.C. 924(j) | | 3 | 2 | | 5 |
| 13 of 17 defendants | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1958(a) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 7 | 2 | | 9 |
| | total | | 11 | 6 | | 17 |
| Michigan, Western | 18 U.S.C. 924(j) | 3 | 2 | 2 | | 7 |
| 10 of 10 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | total | 4 | 2 | 6 | | 12 |
| Minnesota | 18 U.S.C. 924(j) | | 5 | | | 5 |
| 7 of 7 defendants | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | | 7 | | | 7 |
| Mississippi, Northern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Mississippi, Southern | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Missouri, Eastern | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| Missouri, Western | n/a | | | | | 0 |
| 0 of 8 defendants | total | | | | | 0 |

JA 2832

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Montana | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nebraska | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nevada | 18 U.S.C. 1958(a) | 1 | | | 2 | 3 |
| 4 of 9 defendants | 18 U.S.C. 1959(a) | 1 | | | | 1 |
| | total | 2 | | | 2 | 4 |
| New Hampshire | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| New Jersey | 18 U.S.C. 924(j) | | | 1 | | 1 |
| 2 of 4 defendants | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | total | 1 | | 2 | | 3 |
| New Mexico | 18 U.S.C. 1512(a) | | | | 1 | 1 |
| 5 of 11 defendants | 18 U.S.C. 1513(a) | | | | 1 | 1 |
| | 18 U.S.C. 1959(a) | | | 2 | | 2 |
| | 18 U.S.C. 2119(3) | | | 2 | | 2 |
| | total | | | 4 | 2 | 6 |
| New York, Eastern | 18 U.S.C. 241 | 2 | | 1 | | 3 |
| 52 of 58 defendants | 18 U.S.C. 242 | 2 | | 1 | | 3 |
| | 18 U.S.C. 924(j) | 2 | 5 | 3 | | 10 |
| | 18 U.S.C. 1203(a) | | | 1 | 2 | 3 |
| | 18 U.S.C. 1512(a) | 2 | 4 | | | 6 |
| | 18 U.S.C. 1958(a) | | 2 | | | 2 |
| New York, Eastern | 18 U.S.C. 1959(a) | 7 | 4 | 6 | 1 | 18 |

JA 2833

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 50 of 56 defendants (cont'd) | 21 U.S.C. 848(e)(1)(A) | 7 | 7 | 4 | | 18 |
| | total | 22 | 22 | 16 | 3 | 63 |
| New York, Northern | 21 U.S.C. 848(e)(1)(A) | | 3 | 1 | | 4 |
| 4 of 6 defendants | total | | 3 | 1 | | 4 |
| New York, Southern | 18 U.S.C. 32 | 1 | | | | 1 |
| 44 of 50 defendants | 18 U.S.C. 844(d) | 1 | | | | 1 |
| | 18 U.S.C. 844(f) | 1 | | | | 1 |
| | 18 U.S.C. 844(i) | 1 | | 1 | | 2 |
| | 18 U.S.C. 930(c) | 1 | | | | 1 |
| | 18 U.S.C. 1114 | 1 | | | | 1 |
| | 18 U.S.C. 1116(a) | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | | 1 | 5 | | 6 |
| | 18 U.S.C. 1512(a) | | 2 | 1 | | 3 |
| | 18 U.S.C. 1959(a) | 1 | 10 | 25 | 1 | 37 |
| | 18 U.S.C. 2332a | 1 | | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | 1 | | 2 |
| | total | 9 | 14 | 33 | 1 | 57 |
| New York, Western | 18 U.S.C. 36 | 3 | | | | 3 |
| 5 of 5 defendants | 21 U.S.C. 848(e)(1)(A) | 5 | | | | 5 |
| | total | 8 | | | | 8 |
| North Carolina, Eastern | 18 U.S.C. 924(j) | 5 | | | | 5 |
| 7 of 10 defendants | 18 U.S.C. 1201(a) | 4 | | | | 4 |
| | 18 U.S.C. 1959(a) | 5 | | | | 5 |
| North Carolina, Eastern | 18 U.S.C. 2119(3) | 5 | | | | 5 |
| 7 of 10 defendants (cont'd) | total | 19 | | | | 19 |

JA 2834

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| North Carolina, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Western | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 2 of 5 defendants | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | | 3 | | | 3 |
| North Dakota | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Northern Mariana Islands | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Ohio, Northern | 18 U.S.C. 33 | 1 | | | | 1 |
| 4 of 4 defendants | 18 U.S.C. 844(i) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | total | 2 | 3 | | | 5 |
| Ohio, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Eastern | 18 U.S.C. 1114 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Oklahoma, Northern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Western | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 3 defendants | total | 1 | | | | 1 |

JA 2835

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Oregon | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Pennsylvania, Eastern | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 2 of 6 defendants | total | | 2 | | | 2 |
| Pennsylvania, Middle | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 4 defendants | total | 1 | | | | 1 |
| Pennsylvania, Western | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 2 defendants | total | | 1 | | | 1 |
| Puerto Rico | 8 U.S.C. 1324(a) | | | 4 | | 4 |
| 55 of 72 defendants | 18 U.S.C. 924(j) | | | 13 | | 13 |
| | 18 U.S.C. 1203(a) | | | 4 | | 4 |
| | 18 U.S.C. 1512(a) | | | 6 | | 6 |
| | 18 U.S.C. 1513(a) | | | 3 | | 3 |
| | 18 U.S.C. 2113(e) | | | 8 | | 8 |
| | 18 U.S.C. 2119(3) | | | 21 | | 21 |
| | 21 U.S.C. 848(e)(1)(A) | | | 7 | | 7 |
| | total | | | 66 | | 66 |
| Rhode Island | 18 U.S.C. 1959(a) | | 4 | 1 | | 5 |
| 5 of 5 defendants | total | | 4 | 1 | | 5 |
| South Carolina | 18 U.S.C. 924(j) | | 5 | | | 5 |
| 6 of 7 defendants | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | | 1 | 1 |

JA 2836

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| South Carolina | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| 6 of 7 defendants (cont'd) | total | | 10 | | 1 | 11 |
| South Dakota | 8 U.S.C. 1324(a) | 3 | | | | 3 |
| 3 of 3 defendants | total | 3 | | | | 3 |
| Tennessee, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Tennessee, Middle | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| 2 of 6 defendants | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | 2 | 1 | | | 3 |
| Tennessee, Western | 18 U.S.C. 924(j) | | 4 | | | 4 |
| 5 of 11 defendants | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | | 6 | | | 6 |
| Texas, Eastern | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 5 defendants | total | | 1 | | | 1 |
| Texas, Northern | 18 U.S.C. 844(i) | | 1 | | | 1 |
| 4 of 10 defendants | 18 U.S.C. 1111 | 3 | | | | 3 |
| | total | 3 | 1 | | | 4 |
| Texas, Southern | 8 U.S.C. 1324(a) | | | 3 | | 3 |
| 5 of 5 defendants | 18 U.S.C. 924(j) | | | 2 | | 2 |
| | 18 U.S.C. 2119(3) | | | 2 | | 2 |
| | total | | | 7 | | 7 |

JA 2837

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Texas, Western | 8 U.S.C. 1324(a) | | | 1 | | 1 |
| 4 of 8 defendants | 18 U.S.C. 844(i) | 1 | | | | 1 |
| | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 2 | 1 | 1 | | 4 |
| Utah | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Vermont | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Virgin Islands | 8 U.S.C. 1324(a) | | 2 | | | 2 |
| 5 of 5 defendants | 18 U.S.C. 924(j) | | 2 | 1 | | 3 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 6 | 2 | | 8 |
| Virginia, Eastern | 18 U.S.C. 794 | 5 | | | | 5 |
| 45 of 66 defendants | 18 U.S.C. 924(j) | | 14 | 1 | | 15 |
| | 18 U.S.C. 930(c) | | 1 | | | 1 |
| | 18 U.S.C. 1111 | | 18 | | | 18 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1958(a) | | | 1 | | 1 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |

T-55

JA 2838

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Virginia, Eastern | 21 U.S.C. 848(c) | | 1 | | | 1 |
| 45 of 66 defendants | 21 U.S.C. 848(e)(1)(A) | | 12 | | | 12 |
| (continued) | total | 5 | 51 | 2 | | 58 |
| Virginia, Western | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 2 of 6 defendants | 18 U.S.C. 1958(a) | | 1 | | | 1 |
| | total | | 2 | | | 2 |
| Washington, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Washington, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| West Virginia, Northern | 21 U.S.C. 848(e)(1)(A) | 2 | 5 | 1 | | 8 |
| 8 of 11 defendants | total | 2 | 5 | 1 | | 8 |
| West Virginia, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wyoming | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| TOTAL | | | | | | |
| 494 of 682 defendants | | 107 | 301 | 200 | 17 | 625 |

JA 2839

# TABLE SET II: THE UNITED STATES ATTORNEYS

C.   VICTIMS: EXPLANATORY NOTES FOR TABLE SET II.C

Table Set II.C presents a variety of statistics about the victims of the capital offenses charged against defendants during the reporting period. In all of these tables, the victim-related statistics are drawn from cases in which defendants were charged with offenses that were known to have resulted in the death of at least one victim. Five white defendants from the Eastern District of Virginia were charged with espionage, a crime for which there were no identifiable victims, and are thus excluded from all of the statistics reported in Table Set II.C.

The statistics in all of these tables are skewed to some degree by two cases in which defendants were charged with bombing offenses that resulted in the deaths of massive numbers of victims. Specifically, the U.S. Attorney for the Southern District of New York recommended seeking the death penalty against certain defendants in connection with the bombing of the American embassies in Tanzania and Kenya. The indictment in that case charged the defendants with responsibility for the death of 223 victims (of whom, 7 were White, 215 were Black, and 1 was Other). The U.S. Attorney for the Western District of Oklahoma recommended seeking the death penalty against two defendants in connection with the bombing of the Alfred P. Murrah Federal Building in Oklahoma City. The indictment in that case charged the defendants with responsibility for the death of 160 victims (of whom, 121 were White, 32 were Black, 5 were Hispanic, and 2 were Other).[34] Between them, these cases account for 383 victims out of the total 894 (43 percent) in the post-protocol period. Although not all of the statistics presented below are reported with and without the inclusion of these two cases, the effect of these two cases can to some extent be seen by making the following comparison:

| U.S. Attorney Recommendations to Seek DP—Victims | Including 2 Bombing Cases | | | | | Excluding 2 Bombing Cases | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| Number | 590 | 202 | 345 | 29 | 14 | 207 | 74 | 98 | 24 | 11 |
| Percent | 100% | 34% | 58% | 5% | 2% | 100% | 36% | 47% | 12% | 5% |

---

[34]The victim-related data in this Survey is based exclusively on the number of victims set forth in the indictment against each defendant, which in some cases understates the actual number of victims who died as a result of a defendant's crimes. Thus, for example, although there were a total of 168 victims who died as a result of the bombing in Oklahoma City, the victim statistics in this survey include only 160 victims of that offense who at the time of the indictment were known to have died inside the building.

T-57

JA 2840

a.    Overview: Tables 9A and 9B report the racial/ethnic distribution of victims in all of the cases submitted for review by United States Attorneys, as well as the same information broken down by the recommendation for or against seeking the death penalty, with Table 9A reporting on the 682 post-protocol submissions and Table 9B reporting on the 52 pre-protocol submissions.

b.    Interracial and interracial homicides: The twelve tables labeled with the number 10 (10A to 10B-5) report on the extent to which the homicides at issue in the cases submitted by United States Attorneys for review were intraracial and interracial. Due to space limitations and the number of variable factors addressed (race/ethnicity of defendant, race/ethnicity of victim, and recommendation of the United States Attorney), it is not possible to report all of the relevant statistics on this topic in a single table with a district-by-district analysis. Accordingly, with respect to the post-protocol period, Table 10A provides an overview of the extent to which homicides were intraracial and interracial homicides without a district-by-district breakdown, and is followed by additional tables (labeled with numbered suffixes, as 10A-1 to 10A-5) that provide district-by-district information for cases involving victims in specific racial/ethnic categories. In addition to separate tables for cases involving exclusively White victims (Table 10A-1), exclusively Black victims (Table 10A-2), exclusively Hispanic victims (Table 10A-3), and exclusively Other victims (Table 10A-4),[35] there is also a table to account for the cases in which a defendant was charged with killing multiple victims who were not all of the same race/ethnicity (Table 10A-5).[36] The same analysis is provided with respect to the pre-protocol period in Tables 10B and 10B-1 to 10B-5.

c.    Number of victims: The six tables labeled with the number 11 (11A to 11B-2) report the extent to which the submitted defendants were charged in single- and multiple-victim cases. Here again space limitations and the number of variable factors addressed (race/ethnicity of defendant, number of victims, and recommendation of the United States Attorney) make it impossible to report all of the relevant statistics on this topic in a single table with a district-by-district analysis. Accordingly, with respect to the post-protocol period, Table 11A provides an overview of the extent to which homicides involved single or multiple victims without a district-by-district breakdown, and is followed by additional tables (labeled with numbered suffixes, as 11A-1 and 11A-2) that provide district-by-district information for cases involving single victims (Table 11A-1) and multiple victims (Table 11A-2). The same analysis is provided with respect to the pre-protocol period in Tables 11B, 11B-1 and 11B-2.[37]

---

[35]The "Other" category encompasses persons of several different races and ethnicities. With one exception — an "Other" defendant from the District of Hawaii, as to whom the United States Attorney recommended seeking the death penalty – all "Other" defendants who were charged with killing "Other" victims were of the same race/ethnicity as the victims. To account for that one exception, totals for interracial homicides in Table 10A include one case in which the defendant and victim were both "Other" and the totals for intraracial homicides exclude one such case.

[36]In each case in which a defendant was charged with killing multiple victims of different races/ethnicities, at least one such victim was of the same race/ethnicity as the defendant.

[37]The 157 post-protocol defendants charged with killing multiple victims were charged as follows: 2 victims – 98 defendants; 3 victims – 29 defendants; 4 victims – 8 defendants; 5 victims – 8 defendants; 6 victims – 2 defendants; 7 victims – 3 defendants; 10 victims – 1 defendant; 11 victims – 1 defendant; 13 victims – 2 defendants; 160 victims – 2 defendants; and 223 victims – 3 defendants. The 30 pre-protocol defendants charged with

JA 2841

## TABLE 9A: U.S. ATTORNEY RECOMMENDATIONS
## BY DISTRICT AND RACE/ETHNICITY OF VICTIM (1995-2000)

| DISTRICT | All Cases Submitted by U.S. Attorneys – Victims | | | | | U.S. Attorney Recommendations to Seek the Death Penalty – Victims | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Arizona | 8 | 2 | 2 | 2 | 2 | 1 | 0 | 0 | 0 | 1 | 7 | 2 | 2 | 2 | 1 |
| Arkansas, Eastern | 4 | 4 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 11 | 2 | 3 | 5 | 1 | 5 | 1 | 0 | 3 | 1 | 6 | 1 | 3 | 2 | 0 |
| California, Eastern | 9 | 5 | 3 | 0 | 1 | 7 | 4 | 2 | 0 | 1 | 2 | 1 | 1 | 0 | 0 |
| California, Northern | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Colorado | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 |
| Connecticut | 8 | 1 | 2 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 1 | 2 | 5 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 29 | 4 | 23 | 1 | 1 | 11 | 0 | 11 | 0 | 0 | 17 | 3 | 12 | 1 | 1 |
| Florida, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Florida, Southern | 6 | 0 | 3 | 3 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 1 | 3 | 0 |
| Georgia, Middle | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Georgia, Northern | 4 | 1 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 1 | 2 | 0 | 0 |

killing multiple victims were charged as follows: 2 victims – 17 defendants; 3 victims – 3 defendants; 4 victims – 3 defendants; 5 victims – 3 defendants; 6 victims – 1 defendant; and 9 victims – 3 defendants.

JA 2842

4.02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 18 of 142

| DISTRICT | All Cases Submitted by U.S. Attorneys – Victims | | | | | U.S. Attorney Recommendations to Seek the Death Penalty – Victims | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Georgia, Southern | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 5 | 2 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 1 | 4 | 2 | 0 | 2 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 3 | 0 | 2 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Illinois, Southern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Indiana, Southern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Iowa, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Kansas | 5 | 3 | 0 | 0 | 2 | 2 | 1 | 0 | 0 | 1 | 3 | 2 | 0 | 0 | 1 |
| Kentucky, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Kentucky, Western | 7 | 7 | 0 | 0 | 0 | 6 | 6 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 9 | 0 | 9 | 0 | 0 | 7 | 0 | 7 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 27 | 5 | 22 | 0 | 0 | 9 | 1 | 8 | 0 | 0 | 18 | 4 | 14 | 0 | 0 |
| Massachusetts | 10 | 6 | 4 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 7 | 3 | 4 | 0 | 0 |
| Michigan, Eastern | 21 | 3 | 17 | 1 | 0 | 5 | 2 | 3 | 0 | 0 | 16 | 1 | 14 | 1 | 0 |
| Michigan, Western | 5 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 3 | 1 | 1 | 0 |
| Minnesota | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |

JA 2843

4-02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 19 of 142

JA 2844

| DISTRICT | All Cases Submitted by U.S. Attorneys – Victims | | | | | U.S. Attorney Recommendations to Seek the Death Penalty – Victims | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Missouri, Eastern | 4 | 3 | 0 | 0 | 1 | 4 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 4 | 3 | 0 | 1 | 0 | 4 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 5 | 3 | 1 | 1 | 0 | 3 | 2 | 1 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| New Mexico | 13 | 2 | 5 | 4 | 2 | 9 | 2 | 4 | 3 | 0 | 4 | 0 | 1 | 1 | 2 |
| New York, Eastern | 45 | 12 | 18 | 11 | 4 | 9 | 3 | 3 | 0 | 3 | 36 | 9 | 15 | 11 | 1 |
| New York, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| New York, Southern | 288 | 15 | 247 | 23 | 3 | 243 | 7 | 233 | 2 | 1 | 45 | 8 | 14 | 21 | 2 |
| New York, Western | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| North Carolina, Eastern | 4 | 1 | 3 | 0 | 0 | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 7 | 5 | 2 | 0 | 0 | 5 | 4 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| North Dakota | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 161 | 122 | 32 | 5 | 2 | 160 | 121 | 32 | 5 | 2 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 5 | 0 | 2 | 3 | 0 | 1 | 0 | 1 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 1 | 1 | 0 | 3 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |

T-61

| DISTRICT | All Cases Submitted by U.S. Attorneys – Victims | | | | | U.S. Attorney Recommendations to Seek the Death Penalty – Victims | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Pennsylvania, Western | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Puerto Rico | 34 | 0 | 1 | 33 | 0 | 7 | 0 | 0 | 7 | 0 | 26 | 0 | 1 | 25 | 0 |
| Rhode Island | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| South Carolina | 5 | 2 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| South Dakota | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Tennessee, Western | 6 | 2 | 4 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Texas, Eastern | 6 | 3 | 3 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Texas, Northern | 5 | 2 | 3 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Texas, Southern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Texas, Western | 7 | 6 | 0 | 1 | 0 | 4 | 4 | 0 | 0 | 0 | 3 | 2 | 0 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Virgin Islands | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| Virginia, Eastern | 42 | 2 | 34 | 3 | 3 | 24 | 0 | 20 | 2 | 2 | 18 | 2 | 14 | 1 | 1 |
| Virginia, Western | 4 | 1 | 3 | 0 | 0 | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 7 | 1 | 0 | 0 | 5 | 5 | 0 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 894 | 278 | 474 | 118 | 24 | 590 | 202 | 345 | 29 | 14 | 302 | 75 | 129 | 88 | 10 |

JA 2845

## TABLE 7B:  U.S. ATTORNEY RECOMMENDATIONS
## BY DISTRICT AND RACE/ETHNICITY OF VICTIM (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 12 | 0 | 9 | 3 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 2 | 0 | 2 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 |
| Georgia, Northern | 4 | 0 | 4 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

JA 2846

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty — Victims | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 1 | 0 | 1 | 0 | 0 |
| Illinois, Northern | 1 | 0 | 1 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 10 | 0 | 10 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 1 | 0 | 2 | 0 |

JA 2847

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 2 | 0 | 1 | 0 | 1 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 2 | 2 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 2 | 0 | 2 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 1 | 0 | 0 | 1 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

T-65

JA 2848

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 1 | 1 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 13 | 0 | 13 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 65 | 6 | 49 | 9 | 1 |

JA 2849

## TABLE 10A: OVERALL U.S. ATTORNEY RECOMMENDATIONS BY RACE/ETHNICITY OF VICTIM AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| VICTIMS | DEFENDANTS | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| White | 198 | 109 | 55 | 22 | 12 | 74 | 41 | 22 | 5 | 6 | 122 | 67 | 32 | 17 | 6 |
| Black | 250 | 7 | 227 | 16 | 0 | 51 | 2 | 46 | 3 | 0 | 199 | 5 | 181 | 13 | 0 |
| Hispanic | 168 | 0 | 16 | 150 | 2 | 27 | 0 | 1 | 26 | 0 | 138 | 0 | 15 | 121 | 2 |
| Other | 28 | 3 | 10 | 0 | 15 | 14 | 1 | 4 | 0 | 9 | 14 | 2 | 6 | 0 | 6 |
| Multiple /Varied | 33 | 10 | 16 | 7 | 0 | 17 | 4 | 8 | 5 | 0 | 16 | 6 | 8 | 2 | 0 |
| Intra-racial | 500 | 109 | 227 | 150 | 14 | 121 | 41 | 46 | 26 | 8 | 375 | 67 | 181 | 121 | 6 |
| Inter-racial | 177 | 20 | 97 | 45 | 15 | 62 | 7 | 35 | 13 | 7 | 114 | 13 | 61 | 32 | 8 |
| Total | 677 | 129 | 324 | 195 | 29 | 183 | 48 | 81 | 39 | 15 | 489 | 80 | 242 | 153 | 14 |

JA 2850

TABLE 10A-1: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY WHITE VICTIM(S) (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 4 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 0 | 3 | 0 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Eastern | 5 | 5 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| California, Northern | 4 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 3 | 3 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 6 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 5 | 0 | 0 | 1 |
| Connecticut | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 2 | 3 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 2 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 3 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 2 |

T-68

JA 2851

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 4 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 1 | 0 | 1 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Kansas | 8 | 2 | 6 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 7 | 1 | 6 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 6 | 3 | 1 | 0 | 2 | 5 | 2 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 4 | 0 | 3 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 3 | 0 | 3 | 0 | 0 |
| Massachusetts | 4 | 3 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 2 | 0 | 1 | 0 |
| Michigan, Eastern | 2 | 0 | 1 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 6 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 4 | 0 | 2 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 5 | 3 | 2 | 0 | 0 | 5 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-69

JA 2852

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 4 | 4 | 0 | 0 | 0 | 4 | 2 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| New Mexico | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 22 | 19 | 2 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 21 | 18 | 2 | 1 | 0 |
| New York, Northern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| New York, Southern | 8 | 1 | 2 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 1 | 2 | 5 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 3 | 1 | 1 | 0 | 1 | 2 | 1 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-70

JA 2853

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 2 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 5 | 3 | 2 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Tennessee, Western | 3 | 1 | 2 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 4 | 3 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Texas, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Texas, Western | 7 | 3 | 3 | 1 | 0 | 4 | 1 | 2 | 1 | 0 | 3 | 2 | 1 | 0 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Virginia, Western | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 4 | 4 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 5 | 1 | 4 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 198 | 109 | 55 | 22 | 12 | 74 | 41 | 22 | 5 | 6 | 122 | 67 | 32 | 17 | 6 |

T-71

JA 2854

**TABLE 10A-2: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT EXCLUSIVELY BLACK VICTIM(S) (1995-July 20, 2000)**

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 5 | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 3 | 1 | 0 |
| California, Eastern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 15 | 0 | 15 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 14 | 0 | 14 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Georgia, Northern | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Southern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-72

JA 2855

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 7 | 0 | 6 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 4 | 0 | 4 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 30 | 0 | 30 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 25 | 0 | 25 | 0 | 0 |
| Massachusetts | 9 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 9 | 0 | 0 |
| Michigan, Eastern | 12 | 0 | 12 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 10 | 0 | 10 | 0 | 0 |
| Michigan, Western | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-73

JA 2856

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| New York, Eastern | 17 | 0 | 15 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 16 | 0 | 14 | 2 | 0 |
| New York, Northern | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| New York, Southern | 10 | 0 | 9 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 8 | 0 | 7 | 1 | 0 |
| New York, Western | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Eastern | 8 | 0 | 8 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |

JA 2857

T-74

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 4 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Tennessee, Western | 8 | 0 | 8 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Texas, Eastern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 6 | 1 | 3 | 2 | 0 | 5 | 1 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Eastern | 46 | 0 | 46 | 0 | 0 | 14 | 0 | 14 | 0 | 0 | 32 | 0 | 32 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 1 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 250 | 7 | 227 | 16 | 0 | 51 | 2 | 46 | 3 | 0 | 199 | 5 | 181 | 13 | 0 |

JA 2858

T-75

TABLE 10A-3:  U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY HISPANIC VICTIM(S) (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 7 | 0 | 0 | 5 | 2 | 1 | 0 | 0 | 1 | 0 | 6 | 0 | 0 | 4 | 2 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 8 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 8 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |

JA 2859

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Michigan, Western | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2860

T-77

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 2 | 0 |
| New York, Eastern | 10 | 0 | 1 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 1 | 9 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 21 | 0 | 1 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 0 | 1 | 20 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-78

JA 2861

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 68 | 0 | 0 | 68 | 0 | 14 | 0 | 0 | 14 | 0 | 51 | 0 | 0 | 51 | 0 |
| Rhode Island | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Texas, Western | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 7 | 0 | 5 | 2 | 0 | 2 | 0 | 1 | 1 | 0 | 5 | 0 | 4 | 1 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 168 | 0 | 16 | 150 | 2 | 27 | 0 | 1 | 26 | 0 | 138 | 0 | 15 | 121 | 2 |

JA 2862

T-79

TABLE 10A-4: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY OTHER VICTIM(S) (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arizona | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |

T-80

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 4 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 2 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2864

T-81

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York, Eastern | 9 | 0 | 2 | 0 | 7 | 4 | 0 | 0 | 0 | 4 | 5 | 0 | 2 | 0 | 3 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2865

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 5 | 0 | 5 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 28 | 3 | 10 | 0 | 15 | 14 | 1 | 4 | 0 | 9 | 14 | 2 | 6 | 0 | 6 |

JA 2866

TABLE 10A-5: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
MULTIPLE VICTIMS OF DIFFERENT RACES/ETHNICITIES (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-84

JA 2867

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 7 | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 4 | 3 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2868

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 4 | 1 | 0 | 3 | 0 | 4 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 10 | 3 | 5 | 2 | 0 | 4 | 1 | 3 | 0 | 0 | 6 | 2 | 2 | 2 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-86

JA 2869

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 33 | 10 | 16 | 7 | 0 | 17 | 4 | 8 | 5 | 0 | 16 | 6 | 8 | 2 | 0 |

JA 2870

T-87

| VICTIMS | DEFENDANTS<br><br>Total Defendants<br>Submitted by U.S. Attorneys | | | | |
|---|---|---|---|---|---|
| | Total | White | Black | Hispanic | Other |
| White | 8 | 4 | 0 | 4 | 0 |
| Black | 34 | 0 | 33 | 0 | 1 |
| Hispanic | 6 | 2 | 3 | 1 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 |
| Multiple/ Varied | 4 | 1 | 3 | 0 | 0 |
| Intra-racial | 38 | 4 | 33 | 1 | 0 |
| Inter-racial | 14 | 3 | 6 | 4 | 1 |
| Total | 52 | 7 | 39 | 5 | 1 |

JA 2871

TABLE 10B-1: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY WHITE VICTIM(S) (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

JA 2872

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|----------|-------|-------|-------|----------|-------|
|          | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 |

JA 2873

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

T-91

JA 2874

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 8 | 4 | 0 | 4 | 0 |

T-92

JA 2875

TABLE 10B-2:  U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY BLACK VICTIM(S) (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 3 | 0 | 3 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

T-93

JA 2876

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 |

JA 2877

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

JA 2878

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
| --- | --- | --- | --- | --- | --- |
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 9 | 0 | 9 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 34 | 0 | 33 | 0 | 1 |

T-96

JA 2879

TABLE 10B-3:  U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY HISPANIC VICTIM(S) (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

T-97

JA 2880

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 2 | 2 | 0 | 0 | 0 |

T-98

JA 2881



| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

T-99

JA 2882

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 6 | 2 | 3 | 1 | 0 |

T-100

JA 2883

TABLE 10B-4:  U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY OTHER VICTIM(S) (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

JA 2884

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 |

T-102

JA 2885

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

JA 2886

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
| --- | --- | --- | --- | --- | --- |
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 |

T-104

JA 2887

TABLE 10B-5:  U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
MULTIPLE VICTIMS OF DIFFERENT RACES/ETHNICITIES (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

T-105

JA 2888

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 1 | 1 | 0 | 0 | 0 |

T-106

JA 2889

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

JA 2890

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 4 | 1 | 3 | 0 | 0 |

T-108

JA 2891

TABLE 11A: OVERALL U.S. ATTORNEY RECOMMENDATIONS
BY RACE/ETHNICITY OF DEFENDANT AND NUMBER OF VICTIMS (1995-2000)

| VICTIMS | DEFENDANTS | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| Single victim | 520 | 103 | 240 | 153 | 24 | 117 | 32 | 49 | 25 | 11 | 399 | 70 | 190 | 126 | 13 |
| Multi-victim | 157 | 26 | 84 | 42 | 5 | 66 | 16 | 32 | 14 | 4 | 90 | 10 | 52 | 27 | 1 |
| Total | 677 | 129 | 324 | 195 | 29 | 183 | 48 | 81 | 39 | 15 | 489 | 80 | 242 | 153 | 14 |

JA 2892

TABLE 11A-1:  U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
SINGLE VICTIM (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arizona | 12 | 1 | 3 | 6 | 2 | 1 | 0 | 0 | 0 | 1 | 11 | 1 | 3 | 6 | 1 |
| Arkansas, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 12 | 3 | 4 | 3 | 2 | 2 | 1 | 1 | 0 | 0 | 10 | 2 | 3 | 3 | 2 |
| California, Eastern | 7 | 6 | 0 | 0 | 1 | 2 | 1 | 0 | 0 | 1 | 5 | 5 | 0 | 0 | 0 |
| California, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Colorado | 6 | 5 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 5 | 0 | 0 | 1 |
| Connecticut | 9 | 0 | 2 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 2 | 7 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 12 | 1 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 1 | 10 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 2 | 3 | 0 | 0 |
| Florida, Southern | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Georgia, Northern | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Georgia, Southern | 5 | 0 | 3 | 2 | 0 | 4 | 0 | 3 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 5 | 1 | 0 | 1 | 3 | 1 | 0 | 0 | 0 | 1 | 4 | 1 | 0 | 1 | 2 |

T-110

JA 2893

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 6 | 0 | 1 | 5 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 4 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 1 | 0 | 1 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 3 | 1 | 0 | 0 | 2 | 9 | 1 | 8 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 5 | 0 | 5 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 25 | 0 | 24 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 23 | 0 | 23 | 0 | 0 |
| Massachusetts | 11 | 2 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 2 | 8 | 1 | 0 |
| Michigan, Eastern | 9 | 0 | 6 | 3 | 0 | 3 | 0 | 2 | 1 | 0 | 6 | 0 | 4 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 2 | 4 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 5 | 0 | 4 | 0 | 1 | 5 | 0 | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

T-111

JA 2894

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 4 | 4 | 0 | 0 | 0 | 4 | 2 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 3 | 2 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| New Mexico | 5 | 1 | 0 | 4 | 0 | 2 | 1 | 0 | 1 | 0 | 3 | 0 | 0 | 3 | 0 |
| New York, Eastern | 46 | 18 | 13 | 9 | 6 | 3 | 0 | 0 | 0 | 3 | 43 | 18 | 13 | 9 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 36 | 1 | 10 | 24 | 1 | 1 | 0 | 1 | 0 | 0 | 35 | 1 | 9 | 24 | 1 |
| New York, Western | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| North Carolina, Eastern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 3 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 0 | 2 | 0 | 0 |
| North Dakota | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |

T-112

JA 2895

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 63 | 0 | 0 | 63 | 0 | 13 | 0 | 0 | 13 | 0 | 48 | 0 | 0 | 48 | 0 |
| Rhode Island | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| South Carolina | 7 | 1 | 5 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 6 | 3 | 3 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 7 | 1 | 6 | 0 | 0 | 6 | 1 | 5 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Texas, Western | 6 | 3 | 1 | 2 | 0 | 3 | 1 | 1 | 1 | 0 | 3 | 2 | 0 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Virgin Islands | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| Virginia, Eastern | 49 | 0 | 47 | 2 | 0 | 11 | 0 | 10 | 1 | 0 | 38 | 0 | 37 | 1 | 0 |
| Virginia, Western | 6 | 2 | 4 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| West Virginia, Northern | 8 | 2 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 2 | 5 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 520 | 103 | 240 | 153 | 24 | 117 | 32 | 49 | 25 | 11 | 399 | 70 | 190 | 126 | 13 |

T-113

JA 2896

4-02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-4    Page 72 of 142

## TABLE 11A-2: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
### MULTIPLE VICTIMS (1995-2000)

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 2 | 0 |
| California, Eastern | 3 | 1 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| California, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 9 | 0 | 9 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 8 | 0 | 8 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 4 | 0 | 1 | 3 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |

T-114

JA 2897

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 5 | 2 | 1 | 0 | 2 | 5 | 2 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 16 | 4 | 12 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 12 | 4 | 8 | 0 | 0 |
| Massachusetts | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Eastern | 8 | 0 | 8 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2898

T-115

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 6 | 1 | 0 | 4 | 1 | 4 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 1 | 1 |
| New York, Eastern | 12 | 1 | 7 | 3 | 1 | 3 | 1 | 1 | 0 | 1 | 9 | 0 | 6 | 3 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 14 | 3 | 7 | 4 | 0 | 5 | 1 | 4 | 0 | 0 | 9 | 2 | 3 | 4 | 0 |
| New York, Western | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| North Carolina, Eastern | 5 | 0 | 5 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 4 | 0 | 1 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2899

| DISTRICT | Total Defendants Submitted by U.S. Attorneys | | | | | U.S. Attorney Recommendations to Seek the Death Penalty | | | | | U.S. Attorney Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 9 | 0 | 0 | 9 | 0 | 1 | 0 | 0 | 1 | 0 | 7 | 0 | 0 | 7 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Texas, Western | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 12 | 0 | 12 | 0 | 0 | 10 | 0 | 10 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 157 | 26 | 84 | 42 | 5 | 66 | 16 | 32 | 14 | 4 | 90 | 10 | 52 | 27 | 1 |

T-117

JA 2900

| VICTIMS | DEFENDANTS Total Defendants Submitted by U.S. Attorneys | | | | |
|---------|-------|-------|-------|----------|-------|
|         | Total | White | Black | Hispanic | Other |
| Single victim | 22 | 3 | 14 | 4 | 1 |
| Multi-victim | 30 | 4 | 25 | 1 | 0 |
| Total | 52 | 7 | 39 | 5 | 1 |

T-118

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 76 of 142

JA 2901

TABLE 11B-1: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
SINGLE VICTIM (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 2 | 0 | 2 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

T-119

JA 2902

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|----------|-------|-------|-------|----------|-------|
|          | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 |

JA 2903

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

T-121

JA 2904

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 2 | 0 | 2 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 22 | 3 | 14 | 4 | 1 |

JA 2905

TABLE 11B-2: U.S. ATTORNEY RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
MULTIPLE VICTIMS (1988-1994)

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 3 | 0 | 3 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 |
| Georgia, Middle | 2 | 0 | 2 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 |

T-123

JA 2906

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 5 | 0 | 5 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 3 | 0 | 0 | 0 |

T-124

JA 2907

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 |

T-125

JA 2908

| DISTRICT | U.S. Attorney Recommendations to Seek the Death Penalty | | | | |
| --- | --- | --- | --- | --- | --- |
| | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 7 | 0 | 7 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 30 | 4 | 25 | 1 | 0 |

T-126

JA 2909

<u>INTRODUCTION</u>

The tables in this set generally provide information about the recommendations made by Review Committee. In each instance, the total number of submissions is reported for each district, along with a racial/ethnic breakdown of those totals. In addition, each of the tables in this set reports for each district the total number of recommendations for and against seeking the death penalty, respectively, again with a racial/ethnic analysis of those totals. The tables in this set address the post-protocol period exclusively, because the Review Committee did not exist prior to 1995.

With respect to the post-protocol period, the tables in Table Set II, which reported statistics about the submissions and recommendations of the United States Attorneys, provided information about a universe of 682 defendants. However, 15 of those submitted defendants were still under review by the Committee at the close of the reporting period on July 20, 2000, and 49 others had been withdrawn prior to the completion of consideration for a variety of reasons. Accordingly, there were 618 defendants as to whom the Review Committee completed its consideration during the reporting period, and these 618 comprise the universe of defendants about whom statistics are provided in Table Set III. Further, for a variety of reasons, including an equal division of views among its members, the Review Committee occasionally completed its consideration of a defendant without making a recommendation as to whether the death penalty should be sought. Specifically, the Review Committee made no recommendations as to 15 defendants: a White defendant from the Northern District of California; a Black defendant from the District of Columbia; two Hispanic defendants from the Middle District of Florida; a White defendant and an Other defendant from the Western District of Kentucky; two Black defendants from the Eastern District of Michigan; a Black defendant from the District of Minnesota; a White defendant from the Eastern District of New York; two Hispanic defendants from the District of Puerto Rico; a White defendant from the District of South Carolina; and two Black defendants from the Middle District of Tennessee. As a result, in the tables that report total submissions as well as a breakdown of recommendations, the figures in the "Total" columns do not always represent the sum of the corresponding figures in the two recommendation columns.

A.  DEFENDANTS: EXPLANATORY NOTES FOR TABLE SET III.A

Table 12 reports, on a district-by-district basis and with a racial/ethnic breakdown, information about the recommendations made by the Review Committee about whether to seek the death penalty.

T-128

JA 2911

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 86 of 142

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 9 | 1 | 3 | 4 | 1 | 1 | 1 | 0 | 0 | 0 | 8 | 0 | 3 | 4 | 1 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 13 | 3 | 4 | 6 | 0 | 6 | 1 | 3 | 2 | 0 | 7 | 2 | 1 | 4 | 0 |
| California, Eastern | 10 | 7 | 2 | 0 | 1 | 4 | 2 | 1 | 0 | 1 | 6 | 5 | 1 | 0 | 0 |
| California, Northern | 4 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 5 | 4 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 1 |
| Connecticut | 11 | 0 | 2 | 9 | 0 | 1 | 0 | 1 | 0 | 0 | 10 | 0 | 1 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 20 | 1 | 19 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 17 | 1 | 16 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Georgia, Southern | 5 | 0 | 3 | 2 | 0 | 2 | 0 | 1 | 1 | 0 | 3 | 0 | 2 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-129

4-02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 88 of 142

JA 2913

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 4 | 1 | 1 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 6 | 3 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 3 | 1 | 1 | 0 | 1 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 39 | 4 | 34 | 0 | 1 | 8 | 0 | 7 | 0 | 1 | 31 | 4 | 27 | 0 | 0 |
| Massachusetts | 13 | 3 | 9 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 12 | 2 | 9 | 1 | 0 |
| Michigan, Eastern | 15 | 0 | 12 | 3 | 0 | 3 | 0 | 2 | 1 | 0 | 10 | 0 | 8 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 4 | 2 | 0 | 2 | 0 | 6 | 2 | 2 | 2 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 5 | 0 | 4 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nevada | 9 | 7 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 3 | 1 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 11 | 2 | 0 | 8 | 1 | 7 | 2 | 0 | 4 | 1 | 4 | 0 | 0 | 4 | 0 |
| New York, Eastern | 48 | 12 | 19 | 10 | 7 | 4 | 0 | 0 | 0 | 4 | 43 | 11 | 19 | 10 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 46 | 4 | 17 | 24 | 1 | 15 | 1 | 7 | 7 | 0 | 31 | 3 | 10 | 17 | 1 |
| New York, Western | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Eastern | 9 | 2 | 7 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 4 | 1 | 2 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 64 | 0 | 0 | 64 | 0 | 14 | 0 | 0 | 14 | 0 | 48 | 0 | 0 | 48 | 0 |
| Rhode Island | 5 | 0 | 4 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 7 | 1 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |

T-131

JA 2914

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 6 | 3 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 11 | 1 | 10 | 0 | 0 | 6 | 1 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 6 | 2 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 59 | 5 | 54 | 0 | 0 | 18 | 0 | 18 | 0 | 0 | 41 | 5 | 36 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 4 | 3 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 618 | 120 | 300 | 172 | 26 | 183 | 47 | 80 | 43 | 13 | 420 | 68 | 215 | 125 | 12 |

JA 2915

B.    OFFENSES: EXPLANATORY NOTES FOR TABLE SET III.B

Table Set III.B examines charging practices. As explained in the text, when the modern use of the federal death penalty began in 1988, the only offenses subject to capital punishment were narcotics-related offenses under the DKA, and therefore all 52 submissions in the pre-protocol period were in cases where the defendant was charged with committing such offenses. With the enactment of the FDPA in 1994, prosecutors were authorized to seek the death penalty for a variety of offenses. Accordingly, Table 13 reports the extent to which each federal offense punishable by death has been charged against the 618 defendants that the Review Committee considered, providing information about the total number of cases under each statute as well as the Review Committee's recommendations for and against seeking the death penalty. The information in Table 13 is reported on a statute-by-statute basis, and does not contain information about particular districts.

Tables 14-1 and 14-2 provide offense-related information about each district and are organized in the same manner as the corresponding tables in Set II.B. The explanatory notes set forth in that section are applicable here as well.

4:02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-4    Page 91 of 142

JA 2916

## TABLE 13: REVIEW COMMITTEE RECOMMENDATIONS
## BY CAPITAL OFFENSE AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| CAPITAL OFFENSE | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 8 U.S.C. 1324(a) | 16 | 3 | 2 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 3 | 2 | 11 | 0 |
| 18 U.S.C. 32 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 33 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 36 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| 18 U.S.C. 37 | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 241 | 6 | 2 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| 18 U.S.C. 242 | 9 | 2 | 6 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 7 | 2 | 4 | 1 | 0 |
| 18 U.S.C. 245(b) | 6 | 4 | 0 | 2 | 0 | 4 | 2 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 |
| 18 U.S.C. 247(d)(1) | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 794 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 |
| 18 U.S.C. 844(d) | 4 | 4 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 844(f) | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 844(i) | 16 | 11 | 2 | 0 | 3 | 4 | 3 | 0 | 0 | 1 | 11 | 8 | 2 | 0 | 1 |
| 18 U.S.C. 924(j) | 169 | 22 | 92 | 50 | 5 | 62 | 14 | 28 | 15 | 5 | 99 | 7 | 59 | 33 | 0 |
| 18 U.S.C. 930(c) | 6 | 4 | 2 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| 18 U.S.C. 1111 | 57 | 27 | 26 | 0 | 4 | 18 | 12 | 6 | 0 | 0 | 39 | 15 | 20 | 0 | 4 |
| 18 U.S.C. 1114 | 18 | 8 | 5 | 3 | 2 | 8 | 5 | 2 | 0 | 1 | 10 | 3 | 3 | 3 | 1 |
| 18 U.S.C. 1116(a) | 3 | 2 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 1118 | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 1121(a) | 5 | 0 | 5 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| 18 U.S.C. 1201(a) | 34 | 5 | 16 | 12 | 1 | 13 | 4 | 7 | 1 | 1 | 21 | 1 | 9 | 11 | 0 |
| 18 U.S.C. 1203(a) | 15 | 0 | 0 | 10 | 5 | 3 | 0 | 0 | 0 | 3 | 12 | 0 | 0 | 10 | 2 |
| 18 U.S.C. 1512(a) | 49 | 8 | 30 | 9 | 2 | 22 | 4 | 11 | 5 | 2 | 26 | 3 | 19 | 4 | 0 |

T-134

JA 2917

| CAPITAL OFFENSE | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 18 U.S.C. 1513(a) | 22 | 3 | 10 | 8 | 1 | 7 | 1 | 3 | 2 | 1 | 15 | 2 | 7 | 6 | 0 |
| 18 U.S.C. 1716 | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 1958(a) | 29 | 12 | 7 | 8 | 2 | 16 | 7 | 3 | 6 | 0 | 12 | 4 | 4 | 2 | 2 |
| 18 U.S.C. 1959(a) | 140 | 17 | 65 | 55 | 3 | 34 | 2 | 13 | 18 | 1 | 103 | 14 | 52 | 35 | 2 |
| 18 U.S.C. 2113(e) | 22 | 0 | 11 | 11 | 0 | 10 | 0 | 9 | 1 | 0 | 12 | 0 | 2 | 10 | 0 |
| 18 U.S.C. 2119(3) | 66 | 3 | 29 | 32 | 2 | 15 | 2 | 10 | 2 | 1 | 48 | 0 | 17 | 30 | 1 |
| 18 U.S.C. 2241(a) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2241(c) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2332a | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 21 U.S.C. 848(c) | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 21 U.S.C. 848(e)(1)(A) | 112 | 10 | 76 | 26 | 0 | 35 | 6 | 18 | 11 | 0 | 75 | 4 | 58 | 13 | 0 |
| 21 U.S.C. 848(e)(1)(B) | 4 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| 49 U.S.C. 46502 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 841 | 172 | 397 | 242 | 30 | 285 | 83 | 123 | 63 | 16 | 536 | 84 | 266 | 173 | 13 |

T-135

JA 2918

TABLE 14-1:  CAPITAL OFFENSES
REVIEW COMMITTEE RECOMMENDATIONS TO SEEK THE DEATH PENALTY
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Alabama, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Alabama, Northern | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| 2 of 2 defendants | total | 2 | | | | 2 |
| Alabama, Southern | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| 2 of 2 defendants | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | total | | 4 | | | 4 |
| Alaska | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 930(c) | 1 | | | | 1 |
| | 18 U.S.C. 1114 | 1 | | | | 1 |
| | total | 3 | | | | 3 |
| Arizona | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| 1 of 9 defendants | 49 U.S.C. 46502 | 1 | | | | 1 |
| | total | 2 | | | | 2 |
| Arkansas, Eastern | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 2 of 3 defendants | 18 U.S.C. 1959(a) | 2 | | | | 2 |
| | total | 4 | | | | 4 |
| Arkansas, Western | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 1111 | 2 | | | | 2 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | total | 5 | | | | 5 |
| California, Central | 18 U.S.C. 245(b) | 1 | | | | 1 |

JA 2919

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 6 of 13 defendants | 18 U.S.C. 924(j) | 1 | | 1 | | 2 |
| | 18 U.S.C. 1111 | | 1 | | | 1 |
| | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1958(a) | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | | | 2 | | 2 |
| | total | 3 | 4 | 3 | | 10 |
| California, Eastern | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 4 of 10 defendants | 18 U.S.C. 844(i) | | | | 1 | 1 |
| | 18 U.S.C. 924(j) | | | 1 | | 1 |
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2241(a) | 1 | | | | 1 |
| | total | 5 | 1 | | 1 | 7 |
| California, Northern | 18 U.S.C. 924(j) | | | | 1 | 1 |
| 1 of 4 defendants | 18 U.S.C. 1512(a) | | | | 1 | 1 |
| | total | | | | 2 | 2 |
| California, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Colorado | 18 U.S.C. 1111 | 2 | | | | 2 |
| 2 of 5 defendants | total | 2 | | | | 2 |

JA 2920

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Connecticut | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| 1 of 11 defendants | 18 U.S.C. 1513(a) | | 1 | | | 1 |
| | total | | 2 | | | 2 |
| Delaware | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| District of Columbia | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 2 of 20 defendants | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | | 2 | | | 2 |
| Florida, Middle | 18 U.S.C. 924(j) | | | 1 | | 1 |
| 1 of 3 defendants | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | total | | | 2 | | 2 |
| Florida, Northern | 18 U.S.C. 1111 | 2 | | | | 2 |
| 2 of 5 defendants | total | 2 | | | | 2 |
| Florida, Southern | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 6 defendants | total | | 1 | | | 1 |
| Georgia, Middle | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Georgia, Northern | 18 U.S.C. 1118 | | 1 | | | 1 |
| 1 of 3 defendants | total | | 1 | | | 1 |
| Georgia, Southern | 18 U.S.C. 924(j) | | 1 | 1 | | 2 |
| 2 of 5 defendants | 18 U.S.C. 1121(a) | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 3 | 2 | | 5 |
| Guam | n/a | | | | | 0 |

JA 2921

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 0 of 0 defendants | total | | | | | 0 |
| Hawaii | 18 U.S.C. 924(j) | | | | 1 | 1 |
| 1 of 6 defendants | total | | | | 1 | 1 |
| Idaho | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Central | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Northern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 2 of 7 defendants | 18 U.S.C. 1121(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | | 5 | | | 5 |
| Illinois, Southern | 18 U.S.C. 37 | 2 | 1 | | | 3 |
| 3 of 3 defendants | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| | 18 U.S.C. 1958(a) | 2 | 1 | | | 3 |
| | total | 6 | 3 | | | 9 |
| Indiana, Northern | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Indiana, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Iowa, Northern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Iowa, Southern | 18 U.S.C. 2119(3) | 2 | | | | 2 |
| 2 of 2 defendants | total | 2 | | | | 2 |
| Kansas | 18 U.S.C. 924(j) | | 1 | | 2 | 3 |
| 4 of 12 defendants | 18 U.S.C. 930(c) | 1 | | | | 1 |

JA 2922

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | total | 2 | 1 | | 2 | 5 |
| Kentucky, Eastern<br>0 of 1 defendant | n/a | | | | | 0 |
| | total | | | | | 0 |
| Kentucky, Western<br>1 of 6 defendants | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | total | 1 | | | | 1 |
| Louisiana, Eastern<br>3 of 4 defendants | 18 U.S.C. 241 | | 2 | | | 2 |
| | 18 U.S.C. 242 | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 1 | | 1 |
| | total | | 6 | 1 | | 7 |
| Louisiana, Middle<br>0 of 0 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Louisiana, Western<br>0 of 0 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Maine<br>0 of 0 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Maryland<br>8 of 39 defendants | 18 U.S.C. 924(j) | | 3 | | | 3 |
| | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | | 1 | 1 |
| | total | | 7 | | 1 | 8 |
| Massachusetts<br>1 of 13 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | total | 1 | | | | 1 |
| Michigan, Eastern | 18 U.S.C. 924(j) | | 1 | | | 1 |

JA 2923

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 3 of 15 defendants | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | | 2 | 1 | | |
| Michigan, Western | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 4 of 10 defendants | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | total | 2 | | 2 | | 4 |
| Minnesota | n/a | | | | | 0 |
| 0 of 7 defendants | total | | | | | 0 |
| Mississippi, Northern | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 1111 | 1 | | | | 1 |
| | total | 2 | | | | 2 |
| Mississippi, Southern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Missouri, Eastern | 18 U.S.C. 924(j) | | 3 | | 1 | 4 |
| 4 of 5 defendants | 18 U.S.C. 1201(a) | | 1 | | 1 | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | | 7 | | 2 | 9 |
| Missouri, Western | 18 U.S.C. 924(j) | | | 3 | | 3 |
| 8 of 8 defendants | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| Missouri, Western | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| 8 of 8 defendants (cont'd) | 18 U.S.C. 2241(c) | 1 | | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| | total | 4 | 2 | 6 | | 12 |

T-141

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Montana | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nebraska | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nevada | n/a | | | | | 0 |
| 0 of 9 defendants | total | | | | | 0 |
| New Hampshire | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| New Jersey | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 2 of 3 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | 2 | 2 | | | 4 |
| New Mexico | 18 U.S.C. 1512(a) | | | | 1 | 1 |
| 7 of 11 defendants | 18 U.S.C. 1513(a) | | | | 1 | 1 |
| | 18 U.S.C. 1959(a) | | | 4 | | 4 |
| | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| | total | 2 | | 4 | 2 | 8 |

T-142

JA 2925

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| New York, Eastern | 18 U.S.C. 1203(a) | | | | 3 | 3 |
| 4 of 48 defendants | 18 U.S.C. 1959(a) | | | | 1 | 1 |
| | total | | | | 4 | 4 |
| New York, Northern | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 2 of 6 defendants | total | | 2 | | | 2 |
| New York, Southern | 18 U.S.C. 844(f) | 1 | 1 | | | 2 |
| 15 of 46 defendants | 18 U.S.C. 930(c) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1116(a) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | 1 | | 2 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 5 | 7 | | 12 |
| | 18 U.S.C. 2332a | 1 | 1 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | 5 | 14 | 8 | | 27 |
| New York, Western | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| North Carolina, Eastern | 18 U.S.C. 924(j) | 2 | 2 | | | 4 |
| 4 of 9 defendants | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | 6 | 6 | | | 12 |

T-143

JA 2926

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| North Carolina, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Western | 18 U.S.C. 924(j) | 1 | 1 | | | 2 |
| 3 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1114 | | | | 1 | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 2 | 2 | | 1 | 5 |
| North Dakota | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Northern Mariana Islands | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Ohio, Northern | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| Ohio, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Eastern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Oklahoma, Northern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Western | 18 U.S.C. 844(f) | 2 | | | | 2 |
| 2 of 3 defendants | 18 U.S.C. 1114 | 2 | | | | 2 |
| | 18 U.S.C. 2332a | 2 | | | | 2 |
| | total | 6 | | | | 6 |

JA 2927

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Oregon | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Pennsylvania, Eastern | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| 4 of 6 defendants | 18 U.S.C. 1959(a) | | | 3 | | 3 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | | 1 | 6 | | 7 |
| Pennsylvania, Middle | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 3 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1118 | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | total | 2 | | 6 | | 8 |
| Pennsylvania, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Puerto Rico | 18 U.S.C. 924(j) | | | 7 | | 7 |
| 14 of 64 defendants | 18 U.S.C. 1512(a) | | | 3 | | 3 |
| | 18 U.S.C. 1513(a) | | | 2 | | 2 |
| | 18 U.S.C. 2113(e) | | | 1 | | 1 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | | 6 | | 6 |
| | total | | | 20 | | 20 |
| Rhode Island | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 5 defendants | total | | 1 | | | 1 |

JA 2928

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| South Carolina | n/a | | | | | 0 |
| 0 of 7 defendants | total | | | | | 0 |
| South Dakota | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Tennessee, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Tennessee, Middle | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| 2 of 6 defendants | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | total | 4 | | | | |
| Tennessee, Western | 18 U.S.C. 924(j) | | 3 | | | 3 |
| 6 of 11 defendants | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | 1 | 7 | | | 8 |
| Texas, Eastern | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 5 defendants | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 2113(e) | | 3 | | | 3 |
| | total | | 6 | | | 6 |
| Texas, Northern | 18 U.S.C. 245(b) | 1 | | 2 | | 3 |
| 6 of 10 defendants | 18 U.S.C. 1201(a) | | 3 | | | 3 |
| | total | 1 | 3 | 2 | | 6 |
| Texas, Southern | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |

JA 2929

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Texas, Western | 18 U.S.C. 1111 | | 1 | | | 1 |
| 2 of 6 defendants | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | | 3 | | | 3 |
| Utah | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Vermont | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Virgin Islands | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Virginia, Eastern | 18 U.S.C. 924(j) | | 5 | | | 5 |
| 18 of 59 defendants | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 9 | | | 9 |
| | total | | 23 | | | 23 |
| Virginia, Western | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 1 of 5 defendants | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | | 2 | | | 2 |
| Washington, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Washington, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| West Virginia, Northern | 18 U.S.C. 844(i) | 3 | | | | 3 |

T-147

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 3 of 8 defendants | total | 3 | | | | |
| West Virginia, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wyoming | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| TOTAL 183 of 618 defendants | | 83 | 123 | 63 | 16 | 285 |

JA 2931

## TABLE 14-2:  CAPITAL OFFENSES
### REVIEW COMMITTEE RECOMMENDATIONS NOT TO SEEK THE DEATH PENALTY
### BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Alabama, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Alabama, Northern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Alabama, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Alaska | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Arizona | 8 U.S.C. 1324(a) | | | 1 | | 1 |
| 8 of 9 defendants | 18 U.S.C. 924(j) | | | 2 | | 2 |
| | 18 U.S.C. 1111 | | 1 | | 1 | 2 |
| | 18 U.S.C. 1114 | | 2 | 3 | 1 | 6 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(B) | | | 3 | | 3 |
| | total | | 5 | 9 | 2 | 16 |
| Arkansas, Eastern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 1 of 3 defendants | total | | 1 | | | 1 |
| Arkansas, Western | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| California, Central | 18 U.S.C. 924(j) | | | 3 | | 3 |
| 7 of 13 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| California, Central | 18 U.S.C. 1114 | 1 | | | | 1 |

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 7 of 13 defendants (cont'd) | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 1958(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | | 3 | | 3 |
| | 21 U.S.C. 848(e)(1)(A) | | | 1 | | 1 |
| | total | 3 | 1 | 7 | | 11 |
| California, Eastern | 18 U.S.C. 245(b) | 2 | | | | 2 |
| 6 of 10 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | 3 | | | | 3 |
| | total | 7 | 1 | | | 8 |
| California, Northern | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 2 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| | total | 3 | | | | 3 |
| California, Southern | 8 U.S.C. 1324(a) | | | 2 | | 2 |
| 2 of 2 defendants | total | | | 2 | | 2 |
| Colorado | 18 U.S.C. 1111 | 2 | | | 1 | 3 |
| 3 of 5 defendants | total | 2 | | | 1 | 3 |
| Connecticut | 18 U.S.C. 1114 | | 1 | | | 1 |
| 10 of 11 defendants | 18 U.S.C. 1959(a) | | | 9 | | 9 |
| | total | | 1 | 9 | | 10 |

JA 2933

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Delaware | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| District of Columbia | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 17 of 20 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 3 | | | 3 |
| | 18 U.S.C. 1513(a) | | 3 | | | 3 |
| | 18 U.S.C. 1959(a) | | 4 | | | 4 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 7 | | | 7 |
| | total | 2 | 21 | | | 23 |
| Florida, Middle | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Florida, Northern | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| 3 of 5 defendants | total | | 3 | | | 3 |
| Florida, Southern | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 5 of 6 defendants | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | total | | 5 | | | 5 |
| Georgia, Middle | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| | total | | 5 | | | 5 |
| Georgia, Northern | 18 U.S.C. 247(d)(1) | 1 | | | | 1 |
| 2 of 3 defendants | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 1 | 1 | | | 2 |
| Georgia, Southern | 18 U.S.C. 924(j) | | 2 | 1 | | 3 |

T-151

JA 2934

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 3 of 5 defendants | 18 U.S.C. 1121(a) | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 6 | 2 | | 8 |
| Guam | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Hawaii | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 5 of 6 defendants | 18 U.S.C. 1111 | 1 | | | 2 | 3 |
| | total | 1 | | 2 | 2 | 5 |
| Idaho | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Central | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Northern | 18 U.S.C. 1201(a) | | | 5 | | 5 |
| 5 of 7 defendants | 18 U.S.C. 1203(a) | | | 5 | | 5 |
| | total | | | 10 | | 10 |
| Illinois, Southern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Indiana, Northern | 18 U.S.C. 924(j) | | 3 | | | 3 |
| 4 of 4 defendants | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 3 | 1 | | 4 |

JA 2935

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Indiana, Southern | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| 2 of 2 defendants | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | total | | 4 | | | 4 |
| Iowa, Northern | 18 U.S.C. 924(j) | 1 | | 2 | | 3 |
| 3 of 3 defendants | 18 U.S.C. 1201(a) | 1 | | 2 | | 3 |
| | total | 2 | | 4 | | 6 |
| Iowa, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Kansas | 18 U.S.C. 924(j) | 1 | 7 | | | 8 |
| 8 of 12 defendants | total | 1 | 7 | | | 8 |
| Kentucky, Eastern | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| 1 of 1 defendant | total | | 1 | | | 1 |
| Kentucky, Western | 18 U.S.C. 844(i) | | 1 | | 1 | 2 |
| 3 of 6 defendants | 18 U.S.C. 924(j) | 1 | | | | 1 |
| | total | 1 | 1 | | 1 | 3 |
| Louisiana, Eastern | 18 U.S.C. 241 | | 1 | | | 1 |
| 1 of 4 defendants | 18 U.S.C. 242 | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | total | | 3 | | | 3 |
| Louisiana, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Louisiana, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |

JA 2936

T-153

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Maine | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maryland | 18 U.S.C. 844(i) | 4 | | | | 4 |
| 31 of 39 defendants | 18 U.S.C. 924(j) | | 4 | | | 4 |
| | 18 U.S.C. 1111 | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 15 | | | 15 |
| | 21 U.S.C. 848(e)(1)(A) | | 8 | | | 8 |
| | total | 4 | 28 | | | 32 |
| Massachusetts | 18 U.S.C. 1512(a) | | | 1 | | 1 |
| 12 of 13 defendants | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | 1 | 7 | 1 | | 9 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | 2 | 9 | 2 | | 13 |
| Michigan, Eastern | 18 U.S.C. 924(j) | | 2 | 2 | | 4 |
| 10 of 15 defendants | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1958(a) | | | 2 | | 2 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 5 | 2 | | 7 |
| | total | | 9 | 6 | | 15 |
| Michigan, Western | 18 U.S.C. 924(j) | 1 | 2 | 2 | | 5 |
| 6 of 10 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | | 2 | | 2 |
| | total | 2 | 2 | 4 | | 8 |

JA 2937

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Minnesota | 18 U.S.C. 924(j) | | 4 | | | 4 |
| 6 of 7 defendants | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | | 6 | | | 6 |
| Mississippi, Northern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Mississippi, Southern | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Missouri, Eastern | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| 1 of 5 defendants | total | | 1 | | | 1 |
| Missouri, Western | n/a | | | | | 0 |
| 0 of 8 defendants | total | | | | | 0 |
| Montana | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nebraska | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nevada | 18 U.S.C. 1958(a) | 1 | | | 2 | 3 |
| 9 of 9 defendants | 18 U.S.C. 1959(a) | 6 | | | | 6 |
| | total | 7 | | | 2 | 9 |
| New Hampshire | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| New Jersey | 18 U.S.C. 924(j) | | | 1 | | 1 |
| 1 of 3 defendants | 18 U.S.C. 1513(a) | | | 1 | | 1 |
| | total | | | 2 | | 2 |

T-155

JA 2938

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| New Mexico | 18 U.S.C. 1959(a) | | | 2 | | 2 |
| 4 of 11 defendants | 18 U.S.C. 2119(3) | | | 2 | | 2 |
| | total | | | 4 | | 4 |
| New York, Eastern | 18 U.S.C. 241 | 2 | | 1 | | 3 |
| 43 of 48 defendants | 18 U.S.C. 242 | 2 | | 1 | | 3 |
| | 18 U.S.C. 924(j) | 2 | 6 | 3 | | 11 |
| | 18 U.S.C. 1203(a) | | | 1 | 2 | 3 |
| | 18 U.S.C. 1512(a) | | 4 | | | 4 |
| | 18 U.S.C. 1958(a) | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | 3 | 4 | 4 | 1 | 12 |
| | 21 U.S.C. 848(e)(1)(A) | 4 | 7 | 4 | | 15 |
| | total | 13 | 23 | 14 | 3 | 53 |
| New York, Northern | 21 U.S.C. 848(e)(1)(A) | | 3 | 1 | | 4 |
| 4 of 6 defendants | total | | 3 | 1 | | 4 |
| New York, Southern | 18 U.S.C. 32 | 1 | | | | 1 |
| 31 of 46 defendants | 18 U.S.C. 844(d) | 1 | | | | 1 |
| | 18 U.S.C. 844(f) | 1 | | | | 1 |
| | 18 U.S.C. 844(i) | 1 | | | | 1 |
| | 18 U.S.C. 930(c) | 1 | | | | 1 |
| | 18 U.S.C. 1114 | 1 | | | | 1 |
| | 18 U.S.C. 1116(a) | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | | 1 | 4 | | 5 |
| | 18 U.S.C. 1512(a) | | 2 | 1 | | 3 |
| | 18 U.S.C. 1959(a) | 1 | 8 | 15 | 1 | 25 |
| New York, Southern | 18 U.S.C. 2332a | 1 | | | | 1 |

T-156

JA 2939

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 31 of 46 defendants (continued) | 21 U.S.C. 848(e)(1)(A) | | 1 | 1 | | 2 |
| | total | 9 | 12 | 21 | 1 | 43 |
| New York, Western 5 of 5 defendants | 18 U.S.C. 36 | | 3 | | | 3 |
| | 21 U.S.C. 848(e)(1)(A) | | 5 | | | 5 |
| | total | | 8 | | | 8 |
| North Carolina, Eastern 5 of 9 defendants | 18 U.S.C. 924(j) | | 3 | | | 3 |
| | 18 U.S.C. 1201(a) | | 4 | | | 4 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| | total | | 13 | | | 13 |
| North Carolina, Middle 0 of 0 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| North Carolina, Western 1 of 4 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | total | | 1 | | | 1 |
| North Dakota 0 of 0 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Northern Mariana Islands 0 of 0 defendants | n/a | | | | | 0 |
| | total | | | | | 0 |
| Ohio, Northern 4 of 4 defendants | 18 U.S.C. 33 | 1 | | | | 1 |
| | 18 U.S.C. 844(i) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | total | 2 | 3 | | | 5 |

T-157

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Ohio, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Eastern | 18 U.S.C. 1114 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Oklahoma, Northern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Western | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 3 defendants | total | 1 | | | | 1 |
| Oregon | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Pennsylvania, Eastern | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 2 of 6 defendants | total | | 2 | | | 2 |
| Pennsylvania, Middle | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 4 defendants | total | 1 | | | | 1 |
| Pennsylvania, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Puerto Rico | 8 U.S.C. 1324(a) | | | 4 | | 4 |
| 48 of 64 defendants | 18 U.S.C. 924(j) | | | 12 | | 12 |
| | 18 U.S.C. 1203(a) | | | 4 | | 4 |
| | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 18 U.S.C. 1513(a) | | | 5 | | 5 |
| | 18 U.S.C. 2113(e) | | | 8 | | 8 |

JA 2941

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Puerto Rico | 18 U.S.C. 2119(3) | | | 23 | | 23 |
| 48 of 64 defendants | 21 U.S.C. | | | 3 | | 3 |
| (continued) | total | | | 61 | | 61 |
| Rhode Island | 18 U.S.C. 1959(a) | | 3 | 1 | | 4 |
| 4 of 5 defendants | total | | 3 | 1 | | 4 |
| South Carolina | 18 U.S.C. 924(j) | | 5 | | | 5 |
| 6 of 7 defendants | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | | 1 | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | | 10 | | 1 | 11 |
| South Dakota | 8 U.S.C. 1324(a) | 3 | | | | 3 |
| 3 of 3 defendants | total | 3 | | | | 3 |
| Tennessee, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Tennessee, Middle | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| 2 of 6 defendants | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | 2 | 1 | | | 3 |
| Tennessee, Western | 18 U.S.C. 242 | | 3 | | | 3 |
| 5 of 11 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | | 6 | | | 6 |
| Texas, Eastern | 18 U.S.C. 1959(a) | | 1 | | | 1 |

JA 2942

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| 1 of 5 defendants | total | | 1 | | | 1 |
| Texas, Northern | 18 U.S.C. 844(i) | | 1 | | | 1 |
| 4 of 10 defendants | 18 U.S.C. 1111 | 3 | | | | 3 |
| | total | 3 | 1 | | | 4 |
| Texas, Southern | 8 U.S.C. 1324(a) | | | 3 | | 3 |
| 5 of 5 defendants | 18 U.S.C. 924(j) | | | 2 | | 2 |
| | 18 U.S.C. 2119(3) | | | 2 | | 2 |
| | total | | | 7 | | 7 |
| Texas, Western | 8 U.S.C. 1324(a) | | | 1 | | 1 |
| 4 of 6 defendants | 18 U.S.C. 844(i) | 1 | | | | 1 |
| | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 2 | 1 | 1 | | 4 |
| Utah | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Vermont | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Virgin Islands | 8 U.S.C. 1324(a) | | 2 | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 924(j) | | | 1 | | 1 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 2 | 2 | | 4 |
| Virginia, Eastern | 18 U.S.C. 794 | 5 | | | | 5 |
| 41 of 59 defendants | 18 U.S.C. 924(j) | | 11 | | | 11 |
| Virginia, Eastern | 18 U.S.C. 930(c) | | 1 | | | 1 |
| 41 of 59 defendants | 18 U.S.C. 1111 | | 18 | | | 18 |

JA 2943

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| (continued) | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | 21 U.S.C. 848(c) | | 1 | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 11 | | | 11 |
| | total | 5 | 45 | | | 50 |
| Virginia, Western | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 5 defendants | 18 U.S.C. 1958(a) | 1 | 1 | | | 2 |
| | total | 1 | 3 | | | |
| Washington, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | |
| Washington, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| West Virginia, Northern | 21 U.S.C. 848(e)(1)(A) | 0 | 4 | 1 | | 5 |
| 5 of 8 defendants | total | 0 | 4 | 1 | | 5 |
| West Virginia, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |

JA 2944

T-161

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|----------|-----------------|-------|-------|----------|-------|------------------------|
| Wyoming | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| TOTAL | | | | | | |
| 420 of 618 defendants | | 84 | 266 | 173 | 13 | 536 |

JA 2945

## C.    VICTIMS: EXPLANATORY NOTES FOR TABLE SET III.C

Table Set III.C presents a variety of statistics about the victims of the capital offenses charged against defendants during the reporting period. In all of these tables, the victim-related statistics are drawn from cases in which defendants were charged with offenses that were known to have resulted in the death of at least one victim. All of the remarks set forth in the explanatory notes to Table Set II.C apply to this set as well.

    a.    Overview: Table 15 reports the racial/ethnic distribution of victims in all the of cases considered by the Review Committee, as well as the same information broken down by the recommendation for or against seeking the death penalty.

    b.    Interracial and interracial homicides: Tables 16 through 16-5 report on the extent to which the homicides at issue in the cases considered by the Review Committee involved intraracial and interracial and interracial homicides. The tables are organized in the same manner as the corresponding tables in Table Set II.C, and the explanatory notes for that set apply here as well.

    c.    Number of victims: Tables 17 through 17-2 report the extent to which the defendants considered by the Review Committee were charged in single- and multiple-victim cases. Here as well, the organization is the same as for the corresponding tables in Table Set II.C, and the same explanatory notes apply to both sets.[38]

---

[38]The 145 post-protocol defendants charged with killing multiple victims were charged as follows: 2 victims – 92 defendants; 3 victims – 25 defendants; 4 victims – 7 defendants; 5 victims – 7 defendants; 6 victims – 2 defendants; 7 victims – 3 defendants; 10 victims – 1 defendant; 11 victims – 1 defendant; 13 victims – 2 defendants; 160 victims – 2 defendants; and 223 victims – 3 defendants.

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 122 of 142

JA 2947

## TABLE 15: REVIEW COMMITTEE RECOMMENDATIONS BY DISTRICT AND RACE/ETHNICITY OF VICTIM (1995-2000)

| DISTRICT | All Cases Considered by Review Committee - Victims | | | | | Review Comm. Recommendations to Seek the Death Penalty – Victims | | | | | Review Comm. Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 6 | 2 | 2 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 5 | 1 | 2 | 1 | 1 |
| Arkansas, Eastern | 4 | 4 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arkansas, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 10 | 2 | 3 | 4 | 1 | 7 | 1 | 1 | 4 | 1 | 3 | 1 | 2 | 0 | 0 |
| California, Eastern | 9 | 5 | 3 | 0 | 1 | 7 | 4 | 2 | 0 | 1 | 2 | 1 | 1 | 0 | 0 |
| California, Northern | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Colorado | 3 | 3 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Connecticut | 8 | 1 | 2 | 5 | 0 | 1 | 0 | 1 | 0 | 0 | 7 | 1 | 1 | 5 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 28 | 3 | 23 | 1 | 1 | 14 | 2 | 12 | 0 | 0 | 13 | 0 | 11 | 1 | 1 |
| Florida, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Georgia, Middle | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Northern | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Georgia, Southern | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 5 | 2 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 1 | 4 | 2 | 0 | 2 | 0 |

T-164

| DISTRICT | All Cases Considered by Review Committee - Victims | | | | | Review Comm. Recommendations to Seek the Death Penalty – Victims | | | | | Review Comm. Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 3 | 0 | 2 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Illinois, Southern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Indiana, Southern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Iowa, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 5 | 3 | 0 | 0 | 2 | 3 | 2 | 0 | 0 | 1 | 2 | 1 | 0 | 0 | 1 |
| Kentucky, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Kentucky, Western | 7 | 7 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 |
| Louisiana, Eastern | 7 | 0 | 7 | 0 | 0 | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 26 | 4 | 22 | 0 | 0 | 10 | 1 | 9 | 0 | 0 | 16 | 3 | 13 | 0 | 0 |
| Massachusetts | 10 | 6 | 4 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 7 | 3 | 4 | 0 | 0 |
| Michigan, Eastern | 21 | 3 | 17 | 1 | 0 | 4 | 1 | 3 | 0 | 0 | 15 | 2 | 12 | 1 | 0 |
| Michigan, Western | 5 | 3 | 1 | 1 | 0 | 2 | 1 | 0 | 1 | 0 | 3 | 2 | 1 | 0 | 0 |
| Minnesota | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Missouri, Eastern | 4 | 3 | 0 | 0 | 1 | 3 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Missouri, Western | 4 | 3 | 0 | 1 | 0 | 4 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2948

JA 2949

| DISTRICT | All Cases Considered by Review Committee - Victims | | | | | Review Comm. Recommendations to Seek the Death Penalty – Victims | | | | | Review Comm. Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 4 | 2 | 1 | 1 | 0 | 3 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 13 | 2 | 5 | 4 | 2 | 11 | 2 | 4 | 3 | 2 | 2 | 0 | 1 | 1 | 0 |
| New York, Eastern | 33 | 6 | 17 | 6 | 4 | 3 | 0 | 0 | 0 | 3 | 29 | 5 | 17 | 6 | 1 |
| New York, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| New York, Southern | 286 | 14 | 246 | 23 | 3 | 250 | 7 | 234 | 8 | 1 | 36 | 7 | 12 | 15 | 2 |
| New York, Western | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| North Carolina, Eastern | 4 | 1 | 3 | 0 | 0 | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 6 | 4 | 2 | 0 | 0 | 5 | 4 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 161 | 122 | 32 | 5 | 2 | 160 | 121 | 32 | 5 | 2 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 5 | 0 | 2 | 3 | 0 | 1 | 0 | 1 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 1 | 1 | 0 | 3 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 31 | 0 | 1 | 30 | 0 | 16 | 0 | 0 | 16 | 0 | 14 | 0 | 1 | 13 | 0 |
| Rhode Island | 2 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |

| DISTRICT | All Cases Considered by Review Committee - Victims | | | | | Review Comm. Recommendations to Seek the Death Penalty – Victims | | | | | Review Comm. Recommendations Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| South Dakota | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 3 | 2 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Tennessee, Western | 6 | 2 | 4 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Texas, Eastern | 6 | 3 | 3 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Texas, Northern | 5 | 2 | 3 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Texas, Southern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Texas, Western | 6 | 5 | 0 | 1 | 0 | 2 | 2 | 0 | 0 | 0 | 4 | 3 | 0 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Virginia, Eastern | 41 | 2 | 34 | 2 | 3 | 23 | 0 | 20 | 1 | 2 | 18 | 2 | 14 | 1 | 1 |
| Virginia, Western | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 7 | 5 | 2 | 0 | 0 | 5 | 5 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 853 | 258 | 468 | 104 | 23 | 600 | 193 | 346 | 46 | 15 | 246 | 61 | 120 | 57 | 8 |

JA 2950

T-167

4:-02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 126 of 142

JA 2951

TABLE 16:  OVERALL REVIEW COMMITTEE RECOMMENDATIONS BY
RACE/ETHNICITY OF VICTIM AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| VICTIMS | DEFENDANTS | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Defendants Considered by Review Committee | | | | | Review Committee Recommendations to Seek the Death Penalty | | | | | Review Committee Recommendations Not to Seek the Death Penalty | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| White | 174 | 94 | 49 | 19 | 12 | 64 | 40 | 18 | 2 | 4 | 102 | 50 | 28 | 17 | 7 |
| Black | 233 | 7 | 211 | 15 | 0 | 52 | 1 | 48 | 3 | 0 | 178 | 6 | 160 | 12 | 0 |
| Hispanic | 146 | 0 | 15 | 131 | 0 | 35 | 0 | 2 | 33 | 0 | 107 | 0 | 13 | 94 | 0 |
| Other | 27 | 3 | 10 | 0 | 14 | 14 | 2 | 3 | 0 | 9 | 13 | 1 | 7 | 0 | 5 |
| Multiple /Varied | 33 | 10 | 16 | 7 | 0 | 18 | 4 | 9 | 5 | 0 | 15 | 6 | 7 | 2 | 0 |
| Intra-racial | 449 | 94 | 211 | 131 | 13 | 129 | 40 | 48 | 33 | 8 | 309 | 50 | 160 | 94 | 5 |
| Inter-racial | 164 | 20 | 90 | 41 | 13 | 54 | 7 | 32 | 10 | 5 | 106 | 13 | 55 | 31 | 7 |
| Total | 613 | 114 | 301 | 172 | 26 | 183 | 47 | 80 | 43 | 13 | 415 | 63 | 215 | 125 | 12 |

T-168

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 4 | 1 | 0 | 3 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Eastern | 5 | 5 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| California, Northern | 4 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 5 | 4 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 1 |
| Connecticut | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 2 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2952

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 3 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 2 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 8 | 2 | 6 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 6 | 1 | 5 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 6 | 3 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 3 | 1 | 1 | 0 | 1 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 3 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 0 | 2 | 0 | 0 |
| Massachusetts | 4 | 3 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 2 | 0 | 1 | 0 |
| Michigan, Eastern | 2 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Western | 6 | 4 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 4 | 2 | 0 | 2 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 5 | 3 | 2 | 0 | 0 | 5 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2953

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 15 | 12 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 11 | 2 | 1 | 0 |
| New York, Northern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| New York, Southern | 7 | 1 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 1 | 2 | 4 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 2 | 1 | 0 | 0 | 1 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2954

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 5 | 3 | 2 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Tennessee, Western | 3 | 1 | 2 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 4 | 3 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Texas, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Texas, Western | 5 | 2 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Virginia, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 5 | 3 | 2 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 174 | 95 | 48 | 19 | 12 | 64 | 40 | 18 | 2 | 4 | 102 | 51 | 27 | 17 | 7 |

JA 2955

T-172

TABLE 16-2:  REVIEW COMMITTEE RECOMMENDATIONS
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
EXCLUSIVELY BLACK VICTIM(S) (1995-2000)

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 5 | 1 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 1 | 1 | 1 | 0 |
| California, Eastern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 2 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 15 | 0 | 15 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 14 | 0 | 14 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Georgia, Southern | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |




T-173

JA 2956

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 29 | 0 | 29 | 0 | 0 | 7 | 0 | 7 | 0 | 0 | 22 | 0 | 22 | 0 | 0 |
| Massachusetts | 9 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 9 | 0 | 0 |
| Michigan, Eastern | 10 | 0 | 10 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Michigan, Western | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2957

T-174

JA 2958

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 133 of 142

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| New York, Eastern | 16 | 0 | 14 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 14 | 2 | 0 |
| New York, Northern | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| New York, Southern | 9 | 0 | 9 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| New York, Western | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Eastern | 7 | 0 | 7 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 4 | 0 |

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Tennessee, Western | 8 | 0 | 8 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Texas, Eastern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 6 | 1 | 3 | 2 | 0 | 5 | 1 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Eastern | 42 | 0 | 42 | 0 | 0 | 13 | 0 | 13 | 0 | 0 | 29 | 0 | 29 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 233 | 6 | 212 | 15 | 0 | 52 | 1 | 48 | 3 | 0 | 178 | 5 | 161 | 12 | 0 |

JA 2959

T-176

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 5 | 0 | 0 | 5 | 0 | 2 | 0 | 0 | 2 | 0 | 3 | 0 | 0 | 3 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 8 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 8 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2960

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-4   Page 135 of 142

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Michigan, Western | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2961

T-178

JA 2962

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 2 | 0 |
| New York, Eastern | 8 | 0 | 1 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 1 | 7 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 19 | 0 | 1 | 18 | 0 | 8 | 0 | 1 | 7 | 0 | 11 | 0 | 0 | 11 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 60 | 0 | 0 | 60 | 0 | 14 | 0 | 0 | 14 | 0 | 44 | 0 | 0 | 44 | 0 |

T-179

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 5 | 0 | 4 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Texas, Western | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 146 | 0 | 15 | 131 | 0 | 35 | 0 | 2 | 33 | 0 | 107 | 0 | 13 | 94 | 0 |

JA 2963

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2965

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 4 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 2 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-182

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 9 | 0 | 2 | 0 | 7 | 4 | 0 | 0 | 0 | 4 | 5 | 0 | 2 | 0 | 3 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2966

T-183

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 5 | 0 | 5 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 27 | 3 | 10 | 0 | 14 | 14 | 2 | 3 | 0 | 9 | 13 | 1 | 7 | 0 | 5 |

JA 2967

T-184

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 11
## PART B

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

## TABLE 16-5: REVIEW COMMITTEE RECOMMENDATIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## MULTIPLE VICTIMS OF DIFFERENT RACES/ETHNICITIES (1995-2000)

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2968

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 7 | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 4 | 3 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2969

T-186

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 4 | 1 | 0 | 3 | 0 | 4 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 10 | 3 | 5 | 2 | 0 | 4 | 1 | 3 | 0 | 0 | 6 | 2 | 2 | 2 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2970

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 33 | 10 | 16 | 7 | 0 | 18 | 4 | 9 | 5 | 0 | 15 | 6 | 7 | 2 | 0 |

JA 2971

T-188

TABLE 17: OVERALL REVIEW COMMITTEE RECOMMENDATIONS
BY RACE/ETHNICITY OF DEFENDANT AND NUMBER OF VICTIMS (1995-2000)

| V I C T I M S | DEFENDANTS | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Defendants Considered by Review Committee | | | | | Review Committee Recommendations to Seek the Death Penalty | | | | | Review Committee Recommendations Not to Seek the Death Penalty | | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| Single victim | 468 | 90 | 221 | 136 | 21 | 115 | 32 | 45 | 28 | 10 | 345 | 56 | 172 | 106 | 11 |
| Multi-victim | 145 | 24 | 80 | 36 | 5 | 68 | 15 | 35 | 15 | 3 | 70 | 7 | 43 | 19 | 1 |
| Total | 613 | 114 | 301 | 172 | 26 | 183 | 47 | 80 | 43 | 13 | 415 | 63 | 215 | 125 | 12 |

JA 2972

T-189

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 9 | 1 | 3 | 4 | 1 | 1 | 1 | 0 | 0 | 0 | 8 | 0 | 3 | 4 | 1 |
| Arkansas, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 10 | 3 | 4 | 3 | 0 | 5 | 1 | 3 | 1 | 0 | 5 | 2 | 1 | 2 | 0 |
| California, Eastern | 7 | 6 | 0 | 0 | 1 | 2 | 1 | 0 | 0 | 1 | 5 | 5 | 0 | 0 | 0 |
| California, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Colorado | 5 | 4 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 1 |
| Connecticut | 9 | 0 | 2 | 7 | 0 | 1 | 0 | 1 | 0 | 0 | 8 | 0 | 1 | 7 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 11 | 1 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 1 | 9 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Georgia, Southern | 5 | 0 | 3 | 2 | 0 | 2 | 0 | 1 | 1 | 0 | 3 | 0 | 2 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |



4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 6 of 127

JA 2973

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 5 | 1 | 0 | 1 | 3 | 1 | 0 | 0 | 0 | 1 | 4 | 1 | 0 | 1 | 2 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 6 | 0 | 1 | 5 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 4 | 1 | 1 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 23 | 0 | 22 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 19 | 0 | 19 | 0 | 0 |
| Massachusetts | 11 | 2 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 2 | 8 | 1 | 0 |
| Michigan, Eastern | 9 | 0 | 6 | 3 | 0 | 2 | 0 | 1 | 1 | 0 | 7 | 0 | 5 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 4 | 2 | 0 | 2 | 0 | 6 | 2 | 2 | 2 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 5 | 0 | 4 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |



JA 2974

T-191

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 2 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 5 | 1 | 0 | 4 | 0 | 2 | 1 | 0 | 1 | 0 | 3 | 0 | 0 | 3 | 0 |
| New York, Eastern | 39 | 12 | 12 | 9 | 6 | 3 | 0 | 0 | 0 | 3 | 35 | 11 | 12 | 9 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 32 | 1 | 10 | 20 | 1 | 10 | 0 | 3 | 7 | 0 | 22 | 1 | 7 | 13 | 1 |
| New York, Western | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| North Carolina, Eastern | 4 | 2 | 2 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 2 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 56 | 0 | 0 | 56 | 0 | 10 | 0 | 0 | 10 | 0 | 44 | 0 | 0 | 44 | 0 |

T-192

JA 2975

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 5 | 0 | 4 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 7 | 1 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 6 | 3 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 7 | 1 | 6 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Texas, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Texas, Western | 4 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 43 | 0 | 43 | 0 | 0 | 9 | 0 | 9 | 0 | 0 | 34 | 0 | 34 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 5 | 0 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 468 | 90 | 221 | 136 | 21 | 115 | 32 | 45 | 28 | 10 | 345 | 56 | 172 | 106 | 11 |

JA 2976

T-193

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 10 of 127

## TABLE 17-2:  REVIEW COMMITTEE RECOMMENDATIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## MULTIPLE VICTIMS (1995-2000)

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 2 | 0 |
| California, Eastern | 3 | 1 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| California, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 9 | 0 | 9 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2977

JA 2978

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 5 | 2 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 1 |
| Louisiana, Eastern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 16 | 4 | 12 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 12 | 4 | 8 | 0 | 0 |
| Massachusetts | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 6 | 1 | 0 | 4 | 1 | 5 | 1 | 0 | 3 | 1 | 1 | 0 | 0 | 1 | 0 |
| New York, Eastern | 9 | 0 | 7 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 8 | 0 | 7 | 1 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 14 | 3 | 7 | 4 | 0 | 5 | 1 | 4 | 0 | 0 | 9 | 2 | 3 | 4 | 0 |
| New York, Western | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| North Carolina, Eastern | 5 | 0 | 5 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 4 | 0 | 1 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 8 | 0 | 0 | 8 | 0 | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 4 | 0 |

JA 2979

| DISTRICT | Total Defendants Considered by Review Committee | | | | | Review Comm. Recommendations to Seek the Death Penalty | | | | | Review Comm. Recommendations Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 4 | 0 | 4 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Texas, Western | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 11 | 0 | 11 | 0 | 0 | 9 | 0 | 9 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 145 | 24 | 80 | 36 | 5 | 68 | 15 | 35 | 15 | 3 | 70 | 7 | 43 | 19 | 1 |

JA 2980

T-197

INTRODUCTION

The tables in this set generally provide information about the decisions made by the Attorney General. In each instance, the total number of cases considered by the Attorney General is reported for each district, along with a racial/ethnic breakdown of those totals. In addition, each of the tables in this set reports for each district the total number of decisions for and against seeking the death penalty, respectively, again with a racial/ethnic analysis of those totals.

With respect to the post-protocol period, the tables in set II, which reported statistics about the submissions and recommendations of the United States Attorneys, provided information about a universe of 682 defendants. However, the Attorney General did not complete the review of 94 of those defendants, either because submissions were withdrawn before the review was complete or because consideration was still pending at the close of the reporting period on July 20, 2000. Accordingly, there were 588 defendants as to whom the Attorney General completed her consideration during the reporting period, and these 588 comprise the universe of defendants about whom statistics are provided in Table Set IV. For a variety of reasons, such as the fact that the defendant was a fugitive, the Attorney General occasionally completed her review of a defendant without making a decision as to whether the death penalty should be sought. Specifically, in the post-protocol period, the Attorney General considered but did not make a death penalty decision with regard to 12 defendants: a White defendant from the Northern District of California; two Hispanic defendants from the Middle District of Florida; a Black defendant from the Southern District of Georgia; a White defendant and an Other defendant from the Western District of Kentucky; a Black defendant from the District of Minnesota; two Hispanic defendants from the District of Puerto Rico; a White defendant from the District of South Carolina, and two Black defendants from the Middle District of Tennessee. Similarly, there was one defendant in the pre-protocol period, a Black defendant from the Eastern District of Virginia who was a fugitive and who later died, as to whom the Attorney General completed her review without making a decision either for or against seeking the death penalty. As a result, in the tables that report total defendants considered as well as a breakdown of decisions, the figures in the "Total" columns do not always represent the sum of the corresponding figures in the two decision columns.

JA 2981

4:02-cr-00992-JFA Date Filed 06/01/11 Entry Number 1394-5 Page 14 of 127

A.   DEFENDANTS: EXPLANATORY NOTES FOR TABLE SET IV.A

Tables 18A and 18B report, on a district-by-district basis and with a racial/ethnic breakdown, information about the cases considered by the Attorney General, as well as the Attorney General's decisions about whether to seek the death penalty. Specifically, Table 18A reports on the 588 defendants considered in the post-protocol period, and Table 18B provides information about the 52 defendants considered in the pre-protocol period.

JA 2982

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 8 | 0 | 3 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 3 | 4 | 1 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 10 | 3 | 4 | 3 | 0 | 5 | 1 | 3 | 1 | 0 | 5 | 2 | 1 | 2 | 0 |
| California, Eastern | 10 | 7 | 2 | 0 | 1 | 3 | 2 | 0 | 0 | 1 | 7 | 5 | 2 | 0 | 0 |
| California, Northern | 4 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 4 | 3 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 1 |
| Connecticut | 11 | 0 | 2 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 2 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 20 | 1 | 19 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 17 | 1 | 16 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

4-02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 16 of 127

JA 2983

4.02-cr-00992-JFA Date Filed 06/01/11 Entry Number 1394-5 Page 17 of 127

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 4 | 1 | 1 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 6 | 3 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 3 | 1 | 1 | 0 | 1 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 38 | 4 | 33 | 0 | 1 | 6 | 0 | 5 | 0 | 1 | 32 | 4 | 28 | 0 | 0 |
| Massachusetts | 12 | 3 | 8 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 11 | 2 | 8 | 1 | 0 |
| Michigan, Eastern | 15 | 0 | 12 | 3 | 0 | 3 | 0 | 2 | 1 | 0 | 12 | 0 | 10 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 2 | 4 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2984

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nevada | 9 | 7 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 3 | 1 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 11 | 2 | 0 | 8 | 1 | 6 | 2 | 0 | 4 | 0 | 5 | 0 | 0 | 4 | 1 |
| New York, Eastern | 48 | 12 | 19 | 10 | 7 | 4 | 0 | 0 | 0 | 4 | 44 | 12 | 19 | 10 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 45 | 4 | 17 | 23 | 1 | 8 | 1 | 6 | 1 | 0 | 37 | 3 | 11 | 22 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 8 | 2 | 6 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 4 | 1 | 2 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 60 | 0 | 0 | 60 | 0 | 13 | 0 | 0 | 13 | 0 | 45 | 0 | 0 | 45 | 0 |
| Rhode Island | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 7 | 1 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |

T-202

JA 2985

JA 2986

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 6 | 3 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 11 | 1 | 10 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 8 | 0 | 8 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 5 | 2 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 57 | 5 | 52 | 0 | 0 | 18 | 0 | 18 | 0 | 0 | 39 | 5 | 34 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 4 | 3 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 5 | 1 | 3 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 588 | 115 | 287 | 160 | 26 | 159 | 44 | 71 | 32 | 12 | 417 | 68 | 212 | 124 | 13 |

T-203

## TABLE 18B: ATTORNEY GENERAL DECISIONS
### BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1988-1994)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 5 | 0 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-204

JA 2987

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2988

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 2989

T-206

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 9 | 0 | 9 | 0 | 0 | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 52 | 7 | 39 | 5 | 1 | 47 | 7 | 34 | 5 | 1 | 4 | 0 | 4 | 0 | 0 |

JA 2990

T-207

B.    OFFENSES:  EXPLANATORY NOTES FOR TABLE SET IV.B

Table Set IV.B examines charging practices.  As explained in the text, when the modern use of the federal death penalty began in 1988, the only offenses subject to capital punishment were narcotics-related offenses under the DKA, and therefore all 52 submissions in the pre-protocol period were in cases where the defendant was charged with committing such offenses.  With the enactment of the FDPA in 1994, prosecutors were authorized to seek the death penalty for a variety of offenses.  Accordingly, Table 19 reports the extent to which each federal offense punishable by death has been charged against the 588 defendants that the Attorney General considered, providing information about the total number of cases under each statute as well as the Review Committee's recommendations for and against seeking the death penalty.  The information in Table 19 is reported on a statute-by-statute basis, and does not contain information about particular districts.

Tables 20-1 and 20-2 provide offense-related information about each district and are organized in the same manner as the corresponding tables in Set II.B.  The explanatory notes set forth in that section are applicable here as well.

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 25 of 127

JA 2992

TABLE 19:  ATTORNEY GENERAL DECISIONS
BY CAPITAL OFFENSE AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| CAPITAL OFFENSE | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 8 U.S.C. 1324(a) | 15 | 3 | 2 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 3 | 2 | 10 | 0 |
| 18 U.S.C. 32 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 37 | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 241 | 6 | 2 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 2 | 1 | 1 | 0 |
| 18 U.S.C. 242 | 9 | 2 | 6 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 7 | 2 | 4 | 1 | 0 |
| 18 U.S.C. 245(b) | 6 | 4 | 0 | 2 | 0 | 4 | 2 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 |
| 18 U.S.C. 247(d)(1) | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 794 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 |
| 18 U.S.C. 844(d) | 4 | 4 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 844(f) | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 844(i) | 15 | 10 | 2 | 0 | 3 | 4 | 3 | 0 | 0 | 1 | 10 | 7 | 2 | 0 | 1 |
| 18 U.S.C. 924(j) | 162 | 22 | 92 | 43 | 5 | 52 | 12 | 22 | 13 | 5 | 103 | 9 | 66 | 28 | 0 |
| 18 U.S.C. 930(c) | 6 | 4 | 2 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| 18 U.S.C. 1111 | 52 | 24 | 24 | 0 | 4 | 18 | 12 | 6 | 0 | 0 | 34 | 12 | 18 | 0 | 4 |
| 18 U.S.C. 1114 | 18 | 8 | 5 | 3 | 2 | 8 | 5 | 2 | 0 | 1 | 10 | 3 | 3 | 3 | 1 |
| 18 U.S.C. 1116(a) | 3 | 2 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 18 U.S.C. 1118 | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 1121(a) | 5 | 0 | 5 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 18 U.S.C. 1201(a) | 32 | 4 | 15 | 12 | 1 | 11 | 3 | 7 | 0 | 1 | 21 | 1 | 8 | 12 | 0 |
| 18 U.S.C. 1203(a) | 11 | 0 | 0 | 6 | 5 | 3 | 0 | 0 | 0 | 3 | 8 | 0 | 0 | 6 | 2 |
| 18 U.S.C. 1512(a) | 49 | 8 | 30 | 9 | 2 | 19 | 4 | 9 | 5 | 1 | 28 | 3 | 20 | 4 | 1 |
| 18 U.S.C. 1513(a) | 19 | 3 | 10 | 5 | 1 | 4 | 1 | 1 | 2 | 0 | 15 | 2 | 9 | 3 | 1 |
| 18 U.S.C. 1716 | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |

T-209

| CAPITAL OFFENSE | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| 18 U.S.C. 1958(a) | 29 | 12 | 7 | 8 | 2 | 16 | 7 | 3 | 6 | 0 | 12 | 4 | 4 | 2 | 2 |
| 18 U.S.C. 1959(a) | 133 | 17 | 62 | 51 | 3 | 25 | 2 | 11 | 11 | 1 | 106 | 15 | 51 | 38 | 2 |
| 18 U.S.C. 2113(e) | 22 | 0 | 11 | 11 | 0 | 10 | 0 | 9 | 1 | 0 | 12 | 0 | 2 | 10 | 0 |
| 18 U.S.C. 2119(3) | 61 | 3 | 27 | 29 | 2 | 13 | 2 | 10 | 0 | 1 | 45 | 0 | 15 | 29 | 1 |
| 18 U.S.C. 2241(a) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2241(c) | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 U.S.C. 2332a | 5 | 4 | 1 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 21 U.S.C. 848(c) | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| 21 U.S.C. 848(e)(1)(A) | 107 | 11 | 70 | 26 | 0 | 33 | 6 | 18 | 9 | 0 | 72 | 5 | 52 | 15 | 0 |
| 21 U.S.C. 848(e)(1)(B) | 4 | 0 | 1 | 3 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| TOTAL | 796 | 166 | 380 | 220 | 30 | 254 | 79 | 112 | 49 | 14 | 523 | 83 | 260 | 165 | 15 |

JA 2993

## TABLE 20-1: CAPITAL OFFENSES
### ATTORNEY GENERAL DECISIONS TO SEEK THE DEATH PENALTY
### BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Alabama, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Alabama, Northern | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| 2 of 2 defendants | total | 2 | | | | 2 |
| Alabama, Southern | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| 1 of 2 defendants | 18 U.S.C. 1513(a) | | 1 | | | 1 |
| | total | | 2 | | | 2 |
| Alaska | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 930(c) | 1 | | | | 1 |
| | 18 U.S.C. 1114 | 1 | | | | 1 |
| | total | 3 | | | | 3 |
| Arizona | n/a | | | | | 0 |
| 0 of 8 defendants | total | | | | | 0 |
| Arkansas, Eastern | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 2 of 3 defendants | 18 U.S.C. 1959(a) | 2 | | | | 2 |
| | total | 4 | | | | 4 |
| Arkansas, Western | 18 U.S.C. 924(j) | 2 | | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 1111 | 2 | | | | 2 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | total | 5 | | | | 5 |
| California, Central | 18 U.S.C. 245(b) | 1 | | | | 1 |
| 5 of 10 defendants | 18 U.S.C. 924(j) | 1 | | | | 1 |

JA 2994

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| California, Central | 18 U.S.C. 1111 | | 1 | | | 1 |
| 5 of 10 defendants (cont'd) | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1958(a) | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | total | 3 | 4 | 1 | | 8 |
| California, Eastern | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 3 of 10 defendants | 18 U.S.C. 844(i) | | | | 1 | 1 |
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2241(a) | 1 | | | | 1 |
| | total | 5 | | | 1 | 6 |
| California, Northern | 18 U.S.C. 924(j) | | | | 1 | 1 |
| 1 of 4 defendants | 18 U.S.C. 1512(a) | | | | 1 | 1 |
| | total | | | | 2 | 2 |
| California, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Colorado | 18 U.S.C. 1111 | 2 | | | | 2 |
| 2 of 4 defendants | total | 2 | | | | 2 |
| Connecticut | n/a | | | | | 0 |
| 0 of 11 defendants | total | | | | | 0 |
| Delaware | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| District of Columbia | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 3 of 20 defendants | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |

T-212

JA 2995

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| District of Columbia | 21 U.S.C. 848(e)(1)(B) | | 1 | | | 1 |
| 3 of 20 defendants (cont'd) | total | | 3 | | | 3 |
| Florida, Middle | 18 U.S.C. 924(j) | | | 1 | | 1 |
| 1 of 3 defendants | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | total | | | 2 | | 2 |
| Florida, Northern | 18 U.S.C. 1111 | 2 | | | | 2 |
| 2 of 5 defendants | total | 2 | | | | 2 |
| Florida, Southern | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 6 defendants | total | | 1 | | | 1 |
| Georgia, Middle | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Georgia, Northern | 18 U.S.C. 1118 | | 1 | | | 1 |
| 1 of 2 defendants | total | | 1 | | | 1 |
| Georgia, Southern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 1 of 3 defendants | 18 U.S.C. 1121(a) | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | total | | 3 | | | 3 |
| Guam | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Hawaii | 18 U.S.C. 924(j) | | | | 1 | 1 |
| 1 of 6 defendants | total | | | | 1 | 1 |
| Idaho | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Central | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |

T-213

JA 2996

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Illinois, Northern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 2 of 7 defendants | 18 U.S.C. 1121(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | | 5 | | | 5 |
| Illinois, Southern | 18 U.S.C. 37 | 2 | 1 | | | 3 |
| 3 of 3 defendants | 18 U.S.C. 924(j) | 2 | 1 | | | 3 |
| | 18 U.S.C. 1958(a) | 2 | 1 | | | 3 |
| | total | 6 | 3 | | | 9 |
| Indiana, Northern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Indiana, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Iowa, Northern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Iowa, Southern | 18 U.S.C. 2119(3) | 2 | | | | 2 |
| 2 of 2 defendants | total | 2 | | | | 2 |
| Kansas | 18 U.S.C. 924(j) | | 1 | | 2 | 3 |
| 4 of 12 defendants | 18 U.S.C. 930(c) | 1 | | | | 1 |
| | 18 U.S.C. 1111 | 1 | | | | 1 |
| | total | 2 | 1 | | 2 | 5 |
| Kentucky, Eastern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Kentucky, Western | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| 1 of 6 defendants | total | 1 | | | | 1 |

JA 2997

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Louisiana, Eastern | 18 U.S.C. 241 | | 2 | | | 2 |
| 3 of 4 defendants | 18 U.S.C. 242 | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 1 | | 1 |
| | total | | 6 | 1 | | 7 |
| Louisiana, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Louisiana, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maine | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maryland | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 6 of 38 defendants | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | | 1 | 1 |
| | total | | 5 | | 1 | 6 |
| Massachusetts | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 12 defendants | total | 1 | | | | 1 |
| Michigan, Eastern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 3 of 15 defendants | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | | 2 | 1 | | 3 |
| Michigan, Western | n/a | | | | | 0 |
| 0 of 10 defendants | total | | | | | 0 |

JA 2998

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Minnesota | n/a | | | | | 0 |
| 0 of 7 defendants | total | | | | | 0 |
| Mississippi, Northern | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 1 of 1 defendant | 18 U.S.C. 1111 | 1 | | | | 1 |
| | total | 2 | | | | 2 |
| Mississippi, Southern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Missouri, Eastern | 18 U.S.C. 924(j) | | 3 | | 1 | 4 |
| 4 of 4 defendants | 18 U.S.C. 1201(a) | | 1 | | 1 | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | | 7 | | 2 | 9 |
| Missouri, Western | 18 U.S.C. 924(j) | | | 3 | | 3 |
| 8 of 8 defendants | 18 U.S.C. 1201(a) | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| | 18 U.S.C. 2241(c) | 1 | | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| | total | 4 | 2 | 6 | | 12 |
| Montana | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nebraska | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nevada | n/a | | | | | 0 |
| 0 of 9 defendants | total | | | | | 0 |

T-216

JA 2999

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| New Hampshire | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| New Jersey | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 2 of 3 defendants | 18 U.S.C. 924(j) | | 1 | | | 1 |
| | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | total | 2 | 2 | | | 4 |
| New Mexico | 18 U.S.C. 1959(a) | | | 4 | | 4 |
| 6 of 11 defendants | 21 U.S.C. 848(e)(1)(A) | 2 | | | | 2 |
| | total | 2 | | 4 | | 6 |
| New York, Eastern | 18 U.S.C. 1203(a) | | | | 3 | 3 |
| 4 of 48 defendants | 18 U.S.C. 1959(a) | | | | 1 | 1 |
| | total | | | | 4 | 4 |
| New York, Northern | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 2 of 6 defendants | total | | 2 | | | 2 |
| New York, Southern | 18 U.S.C. 844(f) | 1 | 1 | | | 2 |
| 8 of 45 defendants | 18 U.S.C. 930(c) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1114 | 1 | 1 | | | 2 |
| | 18 U.S.C. 1116(a) | 1 | 1 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 4 | 1 | | 5 |
| | 18 U.S.C. 2332a | 1 | 1 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | 5 | 13 | 1 | | 19 |

T-217

JA 3000

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| New York, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Eastern | 18 U.S.C. 924(j) | 2 | 2 | | | 4 |
| 4 of 8 defendants | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | 6 | 6 | | | 12 |
| North Carolina, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Western | 18 U.S.C. 924(j) | 1 | 1 | | | 2 |
| 3 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1114 | | | | 1 | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | 2 | 2 | | 1 | 5 |
| North Dakota | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Northern Mariana Islands | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Ohio, Northern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Ohio, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Eastern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |

T-218

JA 3001

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Oklahoma, Northern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Western | 18 U.S.C. 844(f) | 2 | | | | 2 |
| 2 of 2 defendants | 18 U.S.C. 1114 | 2 | | | | 2 |
| | 18 U.S.C. 2332a | 2 | | | | 2 |
| | total | 6 | | | | 6 |
| Oregon | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Pennsylvania, Eastern | 18 U.S.C. 1958(a) | | | 3 | | 3 |
| 4 of 6 defendants | 18 U.S.C. 1959(a) | | | 3 | | 3 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | | 1 | 6 | | 7 |
| Pennsylvania, Middle | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 3 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1118 | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | total | 2 | | 6 | | 8 |
| Pennsylvania, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Puerto Rico | 18 U.S.C. 924(j) | | | 7 | | 7 |
| 13 of 60 defendants | 18 U.S.C. 1512(a) | | | 3 | | 3 |
| | 18 U.S.C. 1513(a) | | | 2 | | 2 |
| | 18 U.S.C. 2113(e) | | | 1 | | 1 |

JA 3002

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Puerto Rico | 21 U.S.C. 848(e)(1)(A) | | | 6 | | 6 |
| 13 of 60 defendants (cont'd) | total | | | 19 | | 19 |
| Rhode Island | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |
| South Carolina | n/a | | | | | 0 |
| 0 of 7 defendants | total | | | | | 0 |
| South Dakota | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Tennessee, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Tennessee, Middle | 18 U.S.C. 1512(a) | 2 | | | | 2 |
| 2 of 6 defendants | 18 U.S.C. 1958(a) | 2 | | | | 2 |
| | total | 4 | | | | 4 |
| Tennessee, Western | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| 3 of 11 defendants | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | 1 | 4 | | | 5 |
| Texas, Eastern | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 5 defendants | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 2113(e) | | 3 | | | 3 |
| | total | | 6 | | | 6 |
| Texas, Northern | 18 U.S.C. 245(b) | 1 | | 2 | | 3 |
| 6 of 10 defendants | 18 U.S.C. 1201(a) | | 3 | | | 3 |
| | total | 1 | 3 | 2 | | 6 |

JA 3003

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Texas, Southern | n/a | | | | | 0 |
| 0 of 5 defendants | total | | | | | 0 |
| Texas, Western | 18 U.S.C. 1111 | | 1 | | | 1 |
| 2 of 5 defendants | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | total | | 3 | | | 3 |
| Utah | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Vermont | 18 U.S.C. 844(d) | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Virgin Islands | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Virginia, Eastern | 18 U.S.C. 924(j) | | 5 | | | 5 |
| 18 of 57 defendants | 18 U.S.C. 1111 | | 2 | | | 2 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 2 | | | 2 |
| | 18 U.S.C. 2113(e) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 9 | | | 9 |
| | total | | 23 | | | 23 |
| Virginia, Western | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 1 of 5 defendants | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | | 2 | | | 2 |
| Washington, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |

JA 3004

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Washington, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| West Virginia, Northern | 18 U.S.C. 844(i) | 3 | | | | 3 |
| 3 of 8 defendants | total | 3 | | | | 3 |
| West Virginia, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wyoming | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| TOTAL | | | | | | |
| 159 of 588 defendants | | 79 | 112 | 49 | 14 | 254 |

JA 3005

T-222

## TABLE 20-2:  CAPITAL OFFENSES
### ATTORNEY GENERAL DECISIONS NOT TO SEEK THE DEATH PENALTY
### BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Alabama, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Alabama, Northern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Alabama, Southern | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| 1 of 2 defendants | 18 U.S.C. 1513(a) | | 1 | | | 1 |
| | total | | 2 | | | 2 |
| Alaska | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Arizona | 8 U.S.C. 1324(a) | | | 1 | | 1 |
| 8 of 8 defendants | 18 U.S.C. 924(j) | | | 2 | | 2 |
| | 18 U.S.C. 1111 | | 1 | | 1 | 2 |
| | 18 U.S.C. 1114 | | 2 | 3 | 1 | 6 |
| | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(B) | | | 3 | | 3 |
| | total | | 5 | 9 | 2 | 16 |
| Arkansas, Eastern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 1 of 3 defendants | total | | 1 | | | 1 |
| Arkansas, Western | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| California, Central | 18 U.S.C. 924(j) | | | 1 | | 1 |
| 5 of 10 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| California, Central | 18 U.S.C. 1114 | 1 | | | | 1 |
| 5 of 10 defendants (cont'd) | 18 U.S.C. 1716 | 1 | | | | 1 |
| | 18 U.S.C. 1958(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | | 1 | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | | 1 | | 1 |
| | total | 3 | 1 | 3 | | 7 |
| California, Eastern | 18 U.S.C. 245(b) | 2 | | | | 2 |
| 7 of 10 defendants | 18 U.S.C. 924(j) | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | 3 | | | | 3 |
| | total | 7 | 2 | | | 9 |
| California, Northern | 18 U.S.C. 924(j) | 1 | | | | 1 |
| 2 of 4 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| | total | 3 | | | | 3 |
| California, Southern | 8 U.S.C. 1324(a) | | | 2 | | 2 |
| 2 of 2 defendants | total | | | 2 | | 2 |
| Colorado | 18 U.S.C. 1111 | 1 | | | 1 | 2 |
| 2 of 4 defendants | total | 1 | | | 1 | 2 |
| Connecticut | 18 U.S.C. 1114 | | 1 | | | 1 |
| 11 of 11 defendants | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1513(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | | 9 | | 9 |
| | total | | 3 | 9 | | 12 |

JA 3007

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Delaware | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| District of Columbia | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 17 of 20 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | | 2 | | | 2 |
| | 18 U.S.C. 1512(a) | | 3 | | | 3 |
| | 18 U.S.C. 1513(a) | | 3 | | | 3 |
| | 18 U.S.C. 1959(a) | | 4 | | | 4 |
| | 18 U.S.C. 2119(3) | | 2 | | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | 7 | | | 7 |
| | total | 2 | 21 | | | 23 |
| Florida, Middle | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Florida, Northern | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| 3 of 5 defendants | total | | 3 | | | 3 |
| Florida, Southern | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 5 of 6 defendants | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | total | | 5 | | | 5 |
| Georgia, Middle | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| | total | | 5 | | | 5 |
| Georgia, Northern | 18 U.S.C. 247(d)(1) | 1 | | | | 1 |
| 1 of 2 defendants | total | 1 | | | | 1 |
| Georgia, Southern | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 1 of 3 defendants | 18 U.S.C. 1121(a) | | 1 | | | 1 |

JA 3008

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Georgia, Southern | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| 1 of 3 defendants (cont'd) | total | | 3 | | | 3 |
| Guam | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Hawaii | 18 U.S.C. 924(j) | | | 2 | | 2 |
| 5 of 6 defendants | 18 U.S.C. 1111 | 1 | | | 2 | 3 |
| | total | 1 | | 2 | 2 | 5 |
| Idaho | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Central | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Illinois, Northern | 18 U.S.C. 1201(a) | | | 5 | | 5 |
| 5 of 7 defendants | 18 U.S.C. 1203(a) | | | 5 | | 5 |
| | total | | | 10 | | 10 |
| Illinois, Southern | n/a | | | | | 0 |
| 0 of 3 defendants | total | | | | | 0 |
| Indiana, Northern | 18 U.S.C. 924(j) | | 3 | | | 3 |
| 3 of 3 defendants | total | | 3 | | | 3 |
| Indiana, Southern | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| 2 of 2 defendants | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | total | | 4 | | | 4 |
| Iowa, Northern | 18 U.S.C. 924(j) | 1 | | 2 | | 3 |
| 3 of 3 defendants | 18 U.S.C. 1201(a) | 1 | | 2 | | 3 |
| | total | 2 | | 4 | | 6 |

JA 3009

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Iowa, Southern | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Kansas | 18 U.S.C. 924(j) | 1 | 7 | | | 8 |
| 8 of 12 defendants | total | 1 | 7 | | | 8 |
| Kentucky, Eastern | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| 1 of 1 defendant | total | | 1 | | | 1 |
| Kentucky, Western | 18 U.S.C. 844(i) | | 1 | | 1 | 2 |
| 3 of 6 defendants | 18 U.S.C. 924(j) | 1 | | | | 1 |
| | total | 1 | 1 | | 1 | 3 |
| Louisiana, Eastern | 18 U.S.C. 241 | | 1 | | | 1 |
| 1 of 4 defendants | 18 U.S.C. 242 | | 1 | | | 1 |
| | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | total | | 3 | | | 3 |
| Louisiana, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Louisiana, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maine | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Maryland | 18 U.S.C. 844(i) | 4 | | | | 4 |
| 32 of 38 defendants | 18 U.S.C. 924(j) | | 6 | | | 6 |
| | 18 U.S.C. 1111 | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 14 | | | 14 |
| | 21 U.S.C. 848(e)(1)(A) | | 8 | | | 8 |
| | total | 4 | 29 | | | 33 |

JA 3010

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Massachusetts | 18 U.S.C. 1512(a) | | | 1 | | 1 |
| 11 of 12 defendants | 18 U.S.C. 1513(a) | 1 | | | | 1 |
| | 18 U.S.C. 1959(a) | 1 | 6 | 1 | | 8 |
| | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | 2 | 8 | 2 | | 12 |
| Michigan, Eastern | 18 U.S.C. 924(j) | | 4 | 2 | | 6 |
| 12 of 15 defendants | 18 U.S.C. 1512(a) | | 1 | | | 1 |
| | 18 U.S.C. 1958(a) | | | 2 | | 2 |
| | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 5 | 2 | | 7 |
| | total | | 11 | 6 | | 17 |
| Michigan, Western | 18 U.S.C. 924(j) | 3 | 2 | 2 | | 7 |
| 10 of 10 defendants | 18 U.S.C. 1111 | 1 | | | | 1 |
| | 18 U.S.C. 2113(e) | | | 2 | | 2 |
| | 21 U.S.C. 848(e)(1)(A) | | | 2 | | 2 |
| | total | 4 | 2 | 6 | | 12 |
| Minnesota | 18 U.S.C. 924(j) | | 4 | | | 4 |
| 6 of 7 defendants | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| | total | | 6 | | | 6 |
| Mississippi, Northern | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |
| Mississippi, Southern | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Missouri, Eastern | n/a | | | | | 0 |
| 0 of 4 defendants | total | | | | | 0 |

JA 3011

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Missouri, Western | n/a | | | | | 0 |
| 0 of 8 defendants | total | | | | | 0 |
| Montana | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nebraska | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Nevada | 18 U.S.C. 1958(a) | 1 | | | 2 | 3 |
| 9 of 9 defendants | 18 U.S.C. 1959(a) | 6 | | | | 6 |
| | total | 7 | | | 2 | 9 |
| New Hampshire | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| New Jersey | 18 U.S.C. 924(j) | | | 1 | | 1 |
| 1 of 3 defendants | 18 U.S.C. 1513(a) | | | 1 | | 1 |
| | total | | | 2 | | 2 |
| New Mexico | 18 U.S.C. 1512(a) | | | | 1 | 1 |
| 5 of 11 defendants | 18 U.S.C. 1513(a) | | | | 1 | 1 |
| | 18 U.S.C. 1959(a) | | | 2 | | 2 |
| | 18 U.S.C. 2119(3) | | | 2 | | 2 |
| | total | | | 4 | 2 | 6 |
| New York, Eastern | 18 U.S.C. 241 | 2 | | 1 | | 3 |
| 44 of 48 defendants | 18 U.S.C. 242 | 2 | | 1 | | 3 |
| | 18 U.S.C. 924(j) | 2 | 6 | 3 | | 11 |
| | 18 U.S.C. 1203(a) | | | 1 | 2 | 3 |
| | 18 U.S.C. 1512(a) | | 4 | | | 4 |
| | 18 U.S.C. 1958(a) | | 2 | | | 2 |

JA 3012

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| New York, Eastern | 18 U.S.C. 1959(a) | 4 | 4 | 4 | 1 | 13 |
| 44 of 48 defendants (cont'd) | 21 U.S.C. 848(e)(1)(A) | 4 | 7 | 4 | | 15 |
| | total | 14 | 23 | 14 | 3 | 54 |
| New York, Northern | 21 U.S.C. 848(e)(1)(A) | | 3 | 1 | | 4 |
| 4 of 6 defendants | total | | 3 | 1 | | 4 |
| New York, Southern | 18 U.S.C. 32 | 1 | | | | 1 |
| 37 of 45 defendants | 18 U.S.C. 844(d) | 1 | | | | 1 |
| | 18 U.S.C. 844(f) | 1 | | | | 1 |
| | 18 U.S.C. 844(i) | 1 | | | | 1 |
| | 18 U.S.C. 930(c) | 1 | | | | 1 |
| | 18 U.S.C. 1114 | 1 | | | | 1 |
| | 18 U.S.C. 1116(a) | 1 | | | | 1 |
| | 18 U.S.C. 1201(a) | | 1 | 5 | | 6 |
| | 18 U.S.C. 1512(a) | | 2 | 1 | | 3 |
| | 18 U.S.C. 1959(a) | 1 | 9 | 20 | 1 | 31 |
| | 18 U.S.C. 2332a | 1 | | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | 1 | | 2 |
| | total | 9 | 13 | 27 | 1 | 50 |
| New York, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Eastern | 18 U.S.C. 924(j) | | 3 | | | 3 |
| 4 of 8 defendants | 18 U.S.C. 1201(a) | | 3 | | | 3 |
| | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| | 18 U.S.C. 2119(3) | | 3 | | | 3 |
| | total | | 12 | | | 12 |

T-230

JA 3013

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|----------|-----------------|-------|-------|----------|-------|-----------------------|
| North Carolina, Middle | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| North Carolina, Western | 18 U.S.C. 924(j) | | 1 | | | 1 |
| 1 of 4 defendants | total | | 1 | | | 1 |
| North Dakota | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Northern Mariana Islands | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Ohio, Northern | 18 U.S.C. 1959(a) | | 3 | | | 3 |
| 3 of 3 defendants | total | | 3 | | | 3 |
| Ohio, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Eastern | 18 U.S.C. 1114 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Oklahoma, Northern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Oklahoma, Western | n/a | | | | | 0 |
| 0 of 2 defendants | total | | | | | 0 |
| Oregon | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 1 defendant | total | 1 | | | | 1 |
| Pennsylvania, Eastern | 21 U.S.C. 848(e)(1)(A) | | 2 | | | 2 |
| 2 of 6 defendants | total | | 2 | | | 2 |
| Pennsylvania, Middle | 18 U.S.C. 1111 | 1 | | | | 1 |
| 1 of 4 defendants | total | 1 | | | | 1 |

T-231

JA 3014

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Pennsylvania, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Puerto Rico | 8 U.S.C. 1324(a) | | | 4 | | 4 |
| 45 of 60 defendants | 18 U.S.C. 924(j) | | | 10 | | 10 |
| | 18 U.S.C. 1512(a) | | | 2 | | 2 |
| | 18 U.S.C. 1513(a) | | | 2 | | 2 |
| | 18 U.S.C. 2113(e) | | | 8 | | 8 |
| | 18 U.S.C. 2119(3) | | | 24 | | 24 |
| | 21 U.S.C. 848(e)(1)(A) | | | 3 | | 3 |
| | total | | | 53 | | 53 |
| Rhode Island | 18 U.S.C. 1959(a) | | 3 | 1 | | 4 |
| 4 of 4 defendants | total | | 3 | 1 | | 4 |
| South Carolina | 18 U.S.C. 924(j) | | 5 | | | 5 |
| 6 of 7 defendants | 18 U.S.C. 1512(a) | | 2 | | | 2 |
| | 18 U.S.C. 1513(a) | | 2 | | | 2 |
| | 18 U.S.C. 2119(3) | | | | 1 | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 1 | | | 1 |
| | total | | 10 | | 1 | 11 |
| South Dakota | 8 U.S.C. 1324(a) | 3 | | | | 3 |
| 3 of 3 defendants | total | 3 | | | | 3 |
| Tennessee, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Tennessee, Middle | 18 U.S.C. 1512(a) | 1 | | | | 1 |
| 2 of 6 defendants | 18 U.S.C. 1958(a) | 1 | | | | 1 |

JA 3015

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Tennessee, Middle | 18 U.S.C. 2113(e) | | 1 | | | 1 |
| 2 of 6 defendants (cont'd) | total | 2 | 1 | | | 3 |
| Tennessee, Western | 18 U.S.C. 242 | | 3 | | | 3 |
| 8 of 11 defendants | 18 U.S.C. 924(j) | | 4 | | | 4 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | total | | 9 | | | 9 |
| Texas, Eastern | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| 1 of 5 defendants | total | | 1 | | | 1 |
| Texas, Northern | 18 U.S.C. 844(i) | | 1 | | | 1 |
| 4 of 10 defendants | 18 U.S.C. 1111 | 3 | | | | 3 |
| | total | 3 | 1 | | | 4 |
| Texas, Southern | 8 U.S.C. 1324(a) | | | 3 | | 3 |
| 5 of 5 defendants | 18 U.S.C. 924(j) | | | 2 | | 2 |
| | 18 U.S.C. 2119(3) | | | 2 | | 2 |
| | total | | | 7 | | |
| Texas, Western | 18 U.S.C. 844(i) | 1 | | | | 1 |
| 3 of 5 defendants | 18 U.S.C. 1958(a) | 1 | | | | 1 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | 2 | 1 | | | |
| Utah | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Vermont | n/a | | | | | 0 |
| 0 of 1 defendant | total | | | | | 0 |

JA 3016

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Virgin Islands | 8 U.S.C. 1324(a) | | 2 | | | 2 |
| 3 of 3 defendants | 18 U.S.C. 924(j) | | | 1 | | 1 |
| | 18 U.S.C. 2119(3) | | | 1 | | 1 |
| | total | | 2 | 2 | | 4 |
| Virginia, Eastern | 18 U.S.C. 794 | 5 | | | | 5 |
| 39 of 57 defendants | 18 U.S.C. 924(j) | | 11 | | | 11 |
| | 18 U.S.C. 930(c) | | 1 | | | 1 |
| | 18 U.S.C. 1111 | | 16 | | | 16 |
| | 18 U.S.C. 1201(a) | | 1 | | | 1 |
| | 18 U.S.C. 1959(a) | | 1 | | | 1 |
| | 18 U.S.C. 2119(3) | | 1 | | | 1 |
| | 21 U.S.C. 848(c) | | 1 | | | 1 |
| | 21 U.S.C. 848(e)(1)(A) | | 11 | | | 11 |
| | total | 5 | 43 | | | 48 |
| Virginia, Western | 18 U.S.C. 924(j) | | 2 | | | 2 |
| 4 of 5 defendants | 18 U.S.C. 1958(a) | 1 | 1 | | | 2 |
| | total | 1 | 3 | | | 4 |
| Washington, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Washington, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| West Virginia, Northern | 21 U.S.C. 848(e)(1)(A) | 1 | 3 | 1 | | 5 |
| 5 of 8 defendants | total | 1 | 3 | 1 | | 5 |
| West Virginia, Southern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |

JA 3017

| District | Capital Offense | White | Black | Hispanic | Other | Total Capital Offenses |
|---|---|---|---|---|---|---|
| Wisconsin, Eastern | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wisconsin, Western | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| Wyoming | n/a | | | | | 0 |
| 0 of 0 defendants | total | | | | | 0 |
| TOTAL | | | | | | |
| 417 of 588 defendants | | 83 | 260 | 165 | 15 | 523 |

JA 3018

C.  VICTIMS: EXPLANATORY NOTES FOR TABLE SET IV.C

Table Set IV.C presents a variety of statistics about the victims of the capital offenses charged against defendants during the reporting period. In all of these tables, the victim-related statistics are drawn from cases in which defendants were charged with offenses that were known to have resulted in the death of at least one victim. All of the remarks set forth in the explanatory notes to Table Set II.C apply to this set as well.

a.  Overview: Tables 21A and 21B report the racial/ethnic distribution of victims in all the of cases considered by the Review Committee, as well as the same information broken down by the recommendation for or against seeking the death penalty, with Table 21A reporting on the post-protocol period and Table 21B reporting on the pre-protocol period.

b.  Interracial and interracial homicides: The twelve tables labeled with the number 22 (22A to 22A-5 and 22B to 22B-5) report on the extent to which the cases considered by the Attorney General involved intraracial and interracial homicides. The tables are organized in the same manner as the corresponding tables in Table Set II.C, and the explanatory notes for that set apply here as well.

c.  Number of victims: The six tables labeled with the number 23 (23A to 23A-2 and 23B to 23B-2) report the extent to which the defendants considered by the Attorney General were charged in single- and multiple-victim cases. Here as well, the organization is the same as for the corresponding tables in Table Set II.C, and the same explanatory notes apply to both sets.[39]

---

[39]The 135 post-protocol defendants charged with killing multiple victims were charged as follows: 2 victims – 85 defendants; 3 victims – 22 defendants; 4 victims – 7 defendants; 5 victims – 7 defendants; 6 victims – 2 defendants; 7 victims – 3 defendants; 10 victims – 1 defendant; 11 victims – 1 defendant; 13 victims – 2 defendants; 160 victims – 2 defendants; and 223 victims – 3 defendants. The 30 pre-protocol defendants charged with killing multiple victims were charged as follows: 2 victims – 17 defendants; 3 victims – 3 defendants; 4 victims – 3 defendants; 5 victims – 3 defendants; 6 victims – 1 defendant; and 9 victims – 3 defendants.

TABLE 21A: ATTORNEY GENERAL DECISIONS
BY DISTRICT AND RACE/ETHNICITY OF VICTIM (1995-2000)

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 5 | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 2 | 1 | 1 |
| Arkansas, Eastern | 4 | 4 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arkansas, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 7 | 2 | 3 | 1 | 1 | 4 | 1 | 1 | 1 | 1 | 3 | 1 | 2 | 0 | 0 |
| California, Eastern | 9 | 5 | 3 | 0 | 1 | 4 | 3 | 0 | 0 | 1 | 5 | 2 | 3 | 0 | 0 |
| California, Northern | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Colorado | 3 | 3 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Connecticut | 8 | 1 | 2 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 1 | 2 | 5 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 28 | 3 | 23 | 1 | 1 | 15 | 3 | 12 | 0 | 0 | 13 | 0 | 11 | 1 | 1 |
| Florida, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Georgia, Middle | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 5 | 2 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 1 | 4 | 2 | 0 | 2 | 0 |

T-237

JA 3020

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 3 | 0 | 2 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Illinois, Southern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Indiana, Southern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Iowa, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 5 | 3 | 0 | 0 | 2 | 3 | 2 | 0 | 0 | 1 | 2 | 1 | 0 | 0 | 1 |
| Kentucky, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Kentucky, Western | 7 | 7 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 |
| Louisiana, Eastern | 7 | 0 | 7 | 0 | 0 | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 25 | 4 | 21 | 0 | 0 | 9 | 1 | 8 | 0 | 0 | 16 | 3 | 13 | 0 | 0 |
| Massachusetts | 10 | 6 | 4 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 7 | 3 | 4 | 0 | 0 |
| Michigan, Eastern | 21 | 3 | 17 | 1 | 0 | 4 | 1 | 3 | 0 | 0 | 17 | 2 | 14 | 1 | 0 |
| Michigan, Western | 5 | 3 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 3 | 1 | 1 | 0 |
| Minnesota | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Missouri, Eastern | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 4 | 3 | 0 | 1 | 0 | 4 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3021

JA 3022

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 4 | 2 | 1 | 1 | 0 | 3 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 13 | 2 | 5 | 4 | 2 | 9 | 2 | 4 | 3 | 0 | 4 | 0 | 1 | 1 | 2 |
| New York, Eastern | 33 | 6 | 17 | 6 | 4 | 3 | 0 | 0 | 0 | 3 | 30 | 6 | 17 | 6 | 1 |
| New York, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| New York, Southern | 285 | 14 | 246 | 22 | 3 | 245 | 7 | 234 | 3 | 1 | 40 | 7 | 12 | 19 | 2 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 4 | 1 | 3 | 0 | 0 | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 6 | 4 | 2 | 0 | 0 | 5 | 4 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 160 | 121 | 32 | 5 | 2 | 160 | 121 | 32 | 5 | 2 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 5 | 0 | 2 | 3 | 0 | 1 | 0 | 1 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 1 | 1 | 0 | 3 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 29 | 0 | 1 | 28 | 0 | 15 | 0 | 0 | 15 | 0 | 13 | 0 | 1 | 12 | 0 |
| Rhode Island | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 5 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| South Dakota | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 3 | 2 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Tennessee, Western | 6 | 2 | 4 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Texas, Eastern | 6 | 3 | 3 | 0 | 0 | 4 | 3 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Texas, Northern | 5 | 2 | 3 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Texas, Southern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Texas, Western | 5 | 5 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Virginia, Eastern | 40 | 2 | 33 | 2 | 3 | 23 | 0 | 20 | 1 | 2 | 17 | 2 | 13 | 1 | 1 |
| Virginia, Western | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 7 | 6 | 1 | 0 | 0 | 5 | 5 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 833 | 254 | 462 | 95 | 22 | 578 | 190 | 340 | 35 | 13 | 252 | 62 | 122 | 59 | 9 |

T-240

JA 3023

## TABLE 21B:  ATTORNEY GENERAL DECISIONS
### BY DISTRICT AND RACE/ETHNICITY OF VICTIM (1988-1994)

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 12 | 0 | 9 | 3 | 0 | 12 | 0 | 9 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 4 | 0 | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3024

JA 3025

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Illinois, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 10 | 0 | 10 | 0 | 0 | 10 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 1 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3026

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 2 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | All Cases Considered by Attorney General – Victims | | | | | Attorney General Decisions to Seek the Death Penalty – Victims | | | | | Attorney General Decisions Not to Seek the Death Penalty – Victims | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 13 | 0 | 13 | 0 | 0 | 13 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 65 | 6 | 49 | 9 | 1 | 64 | 6 | 48 | 9 | 1 | 1 | 0 | 1 | 0 | 0 |

JA 3027

T-244

| VICTIMS | DEFENDANTS | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Defendants Considered by Attorney General | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| White | 167 | 90 | 48 | 17 | 12 | 61 | 37 | 19 | 1 | 4 | 100 | 50 | 27 | 16 | 7 |
| Black | 222 | 7 | 200 | 15 | 0 | 45 | 1 | 41 | 3 | 0 | 175 | 6 | 157 | 12 | 0 |
| Hispanic | 135 | 0 | 14 | 121 | 0 | 23 | 0 | 0 | 23 | 0 | 108 | 0 | 14 | 94 | 0 |
| Other | 26 | 3 | 9 | 0 | 14 | 13 | 2 | 3 | 0 | 8 | 13 | 1 | 6 | 0 | 6 |
| Multiple /Varied | 33 | 10 | 16 | 7 | 0 | 17 | 4 | 8 | 5 | 0 | 16 | 6 | 8 | 2 | 0 |
| Intra-racial | 424 | 90 | 200 | 121 | 13 | 108 | 37 | 41 | 23 | 7 | 307 | 50 | 157 | 94 | 6 |
| Inter-racial | 159 | 20 | 87 | 39 | 13 | 51 | 7 | 30 | 9 | 5 | 105 | 13 | 55 | 30 | 7 |
| Total | 583 | 110 | 287 | 160 | 26 | 159 | 44 | 71 | 32 | 12 | 412 | 63 | 212 | 124 | 13 |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 61 of 127

JA 3028

## TABLE 22A-1: ATTORNEY GENERAL DECISIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## EXCLUSIVELY WHITE VICTIM(S) (1995-2000)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Eastern | 5 | 5 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| California, Northern | 4 | 3 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 4 | 3 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 1 |
| Connecticut | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3029

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 3 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 0 | 2 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 8 | 2 | 6 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 6 | 1 | 5 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 6 | 3 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 3 | 1 | 1 | 0 | 1 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 3 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 0 | 2 | 0 | 0 |
| Massachusetts | 4 | 3 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 2 | 0 | 1 | 0 |
| Michigan, Eastern | 2 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Western | 6 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 4 | 0 | 2 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 5 | 3 | 2 | 0 | 0 | 5 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3030

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 15 | 12 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 12 | 2 | 1 | 0 |
| New York, Northern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| New York, Southern | 7 | 1 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 1 | 2 | 4 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 2 | 1 | 0 | 0 | 1 | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3031

T-248

4-02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 65 of 127

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 5 | 3 | 2 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Tennessee, Western | 3 | 1 | 2 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 4 | 3 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Texas, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Texas, Western | 5 | 2 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Virginia, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 5 | 3 | 2 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 167 | 90 | 48 | 17 | 12 | 61 | 37 | 19 | 1 | 4 | 100 | 50 | 27 | 16 | 7 |

EX 73 - 1225
JA 3032

### TABLE 22A-2: ATTORNEY GENERAL DECISIONS
### BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
### EXCLUSIVELY BLACK VICTIM(S) (1995-2000)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 5 | 1 | 3 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 1 | 1 | 1 | 0 |
| California, Eastern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 15 | 0 | 15 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 14 | 0 | 14 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-250

JA 3033

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 28 | 0 | 28 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 23 | 0 | 23 | 0 | 0 |
| Massachusetts | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 8 | 0 | 0 |
| Michigan, Eastern | 10 | 0 | 10 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 8 | 0 | 8 | 0 | 0 |
| Michigan, Western | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3034

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| New York, Eastern | 16 | 0 | 14 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 14 | 2 | 0 |
| New York, Northern | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| New York, Southern | 9 | 0 | 9 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 6 | 0 | 6 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 4 | 0 |

JA 3035

T-252

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Tennessee, Western | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 8 | 0 | 0 |
| Texas, Eastern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 6 | 1 | 3 | 2 | 0 | 5 | 1 | 2 | 2 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Eastern | 40 | 0 | 40 | 0 | 0 | 13 | 0 | 13 | 0 | 0 | 27 | 0 | 27 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 1 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 222 | 7 | 200 | 15 | 0 | 45 | 1 | 41 | 3 | 0 | 175 | 6 | 157 | 12 | 0 |

JA 3036

T-253

## TABLE 22A-3: ATTORNEY GENERAL DECISIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT EXCLUSIVELY HISPANIC VICTIM(S) (1995-2000)

JA 3037

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 2 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 8 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 8 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Michigan, Western | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3038

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 2 | 0 |
| New York, Eastern | 8 | 0 | 1 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 1 | 7 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 18 | 0 | 1 | 17 | 0 | 1 | 0 | 0 | 1 | 0 | 17 | 0 | 1 | 16 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 56 | 0 | 0 | 56 | 0 | 13 | 0 | 0 | 13 | 0 | 41 | 0 | 0 | 41 | 0 |

T-256

JA 3039

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 135 | 0 | 14 | 121 | 0 | 23 | 0 | 0 | 23 | 0 | 108 | 0 | 14 | 94 | 0 |

JA 3040

T-257



### TABLE 22A-4: ATTORNEY GENERAL DECISIONS BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT EXCLUSIVELY OTHER VICTIM(S) (1995-2000)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-258

JA 3041

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 4 | 0 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 2 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3042

T-259

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York, Eastern | 9 | 0 | 2 | 0 | 7 | 4 | 0 | 0 | 0 | 4 | 5 | 0 | 2 | 0 | 3 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3043

T-260

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 5 | 0 | 5 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 26 | 3 | 9 | 0 | 14 | 13 | 2 | 3 | 0 | 8 | 13 | 1 | 6 | 0 | 6 |

JA 3044

TABLE 22A-5: ATTORNEY GENERAL DECISIONS
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
MULTIPLE VICTIMS OF DIFFERENT RACES/ETHNICITIES (1995-2000)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3045

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 7 | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 4 | 3 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-263

JA 3047

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 4 | 1 | 0 | 3 | 0 | 4 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 10 | 3 | 5 | 2 | 0 | 4 | 1 | 3 | 0 | 0 | 6 | 2 | 2 | 2 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 33 | 10 | 16 | 7 | 0 | 17 | 4 | 8 | 5 | 0 | 16 | 6 | 8 | 2 | 0 |

JA 3048

TABLE 22B: ATTORNEY GENERAL DECISIONS BY
RACE/ETHNICITY OF VICTIM AND RACE/ETHNICITY OF DEFENDANT (1988-1994)

| VICTIMS | DEFENDANTS | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| White | 8 | 4 | 0 | 4 | 0 | 8 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| Black | 34 | 0 | 33 | 0 | 1 | 31 | 0 | 30 | 0 | 1 | 2 | 0 | 2 | 0 | 0 |
| Hispanic | 6 | 2 | 3 | 1 | 0 | 4 | 2 | 1 | 1 | 0 | 2 | 0 | 2 | 0 | 0 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Multiple /Varied | 4 | 1 | 3 | 0 | 0 | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Intra-racial | 38 | 4 | 33 | 1 | 0 | 35 | 4 | 30 | 1 | 0 | 2 | 0 | 2 | 0 | 0 |
| Inter-racial | 14 | 3 | 6 | 4 | 1 | 12 | 3 | 4 | 4 | 1 | 2 | 0 | 2 | 0 | 0 |
| Total | 52 | 7 | 39 | 5 | 1 | 47 | 7 | 34 | 5 | 1 | 4 | 0 | 4 | 0 | 0 |

JA 3049

T-266

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3050

4-02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 83 of 127

JA 3051

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3052

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 8 | 4 | 0 | 4 | 0 | 8 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3053

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-271

JA 3054

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3055

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3056

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 9 | 0 | 9 | 0 | 0 | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 34 | 0 | 33 | 0 | 1 | 31 | 0 | 30 | 0 | 1 | 2 | 0 | 2 | 0 | 0 |

JA 3057

T-274

## TABLE 22B-3: ATTORNEY GENERAL DECISIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## EXCLUSIVELY HISPANIC VICTIM(S) (1988-1994)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-275

JA 3058

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3059

T-276

JA 3060

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-277

JA 3061

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 6 | 2 | 3 | 1 | 0 | 4 | 2 | 1 | 1 | 0 | 2 | 0 | 2 | 0 | 0 |

T-278

## TABLE 22B-4:  ATTORNEY GENERAL DECISIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## EXCLUSIVELY OTHER VICTIM(S) (1988-1994)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3062

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-280

JA 3063

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3064

T-281

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3065

JA 3066

TABLE 22B-5: ATTORNEY GENERAL DECISIONS
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
MULTIPLE VICTIMS OF DIFFERENT RACES/ETHNICITIES (1988-1994)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

4:02-cr-00992-JFA Date Filed 06/01/11 Entry Number 1394-5 Page 99 of 127

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3067

T-284

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3068

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 4 | 1 | 3 | 0 | 0 | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3069

TABLE 23A:  OVERALL ATTORNEY GENERAL DECISIONS
BY RACE/ETHNICITY OF DEFENDANT AND NUMBER OF VICTIMS (1995-2000)

| VICTIMS | DEFENDANTS | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| Single victim | 448 | 86 | 210 | 131 | 21 | 97 | 29 | 40 | 18 | 10 | 344 | 56 | 166 | 111 | 11 |
| Multi-victim | 135 | 24 | 77 | 29 | 5 | 62 | 15 | 31 | 14 | 2 | 68 | 7 | 46 | 13 | 2 |
| Total | 583 | 110 | 287 | 160 | 26 | 159 | 44 | 71 | 32 | 12 | 412 | 63 | 212 | 124 | 13 |

JA 3070

## TABLE 23A-1: ATTORNEY GENERAL DECISIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## SINGLE VICTIM (1995-2000)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 8 | 0 | 3 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 3 | 4 | 1 |
| Arkansas, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 10 | 3 | 4 | 3 | 0 | 5 | 1 | 3 | 1 | 0 | 5 | 2 | 1 | 2 | 0 |
| California, Eastern | 7 | 6 | 0 | 0 | 1 | 2 | 1 | 0 | 0 | 1 | 5 | 5 | 0 | 0 | 0 |
| California, Northern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Colorado | 4 | 3 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 1 |
| Connecticut | 9 | 0 | 2 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 2 | 7 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 11 | 1 | 10 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 10 | 1 | 9 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3071

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 5 | 1 | 0 | 1 | 3 | 1 | 0 | 0 | 0 | 1 | 4 | 1 | 0 | 1 | 2 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 6 | 0 | 1 | 5 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 4 | 1 | 1 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 22 | 0 | 21 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 20 | 0 | 20 | 0 | 0 |
| Massachusetts | 10 | 2 | 7 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 2 | 7 | 1 | 0 |
| Michigan, Eastern | 9 | 0 | 6 | 3 | 0 | 2 | 0 | 1 | 1 | 0 | 7 | 0 | 5 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 2 | 4 | 0 |
| Minnesota | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3072

T-289

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 2 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 5 | 1 | 0 | 4 | 0 | 2 | 1 | 0 | 1 | 0 | 3 | 0 | 0 | 3 | 0 |
| New York, Eastern | 39 | 12 | 12 | 9 | 6 | 3 | 0 | 0 | 0 | 3 | 36 | 12 | 12 | 9 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 31 | 1 | 10 | 19 | 1 | 3 | 0 | 2 | 1 | 0 | 28 | 1 | 8 | 18 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 2 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 56 | 0 | 0 | 56 | 0 | 9 | 0 | 0 | 9 | 0 | 45 | 0 | 0 | 45 | 0 |

T-290

JA 3073

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 7 | 1 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 6 | 3 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 7 | 1 | 6 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Texas, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Texas, Western | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 41 | 0 | 41 | 0 | 0 | 9 | 0 | 9 | 0 | 0 | 32 | 0 | 32 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 5 | 1 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 1 | 3 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 448 | 86 | 210 | 131 | 21 | 97 | 29 | 40 | 18 | 10 | 344 | 56 | 166 | 111 | 11 |

JA 3074

T-291

## TABLE 23A-2: ATTORNEY GENERAL DECISIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## MULTIPLE VICTIMS (1995-2000)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 3 | 1 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| California, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 |
| California, Southern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 9 | 0 | 9 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 7 | 0 | 7 | 0 | 0 |
| Florida, Middle | 3 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3075

JA 3076

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 5 | 2 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 1 |
| Louisiana, Eastern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 16 | 4 | 12 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 12 | 4 | 8 | 0 | 0 |
| Massachusetts | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 6 | 1 | 0 | 4 | 1 | 4 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 1 | 1 |
| New York, Eastern | 9 | 0 | 7 | 1 | 1 | 1 | 0 | 0 | 0 | 1 | 8 | 0 | 7 | 1 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 14 | 3 | 7 | 4 | 0 | 5 | 1 | 4 | 0 | 0 | 9 | 2 | 3 | 4 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 5 | 0 | 5 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 4 | 0 | 1 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3077

T-294

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 3 | 0 |
| Texas, Western | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 11 | 0 | 11 | 0 | 0 | 9 | 0 | 9 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 135 | 24 | 77 | 29 | 5 | 62 | 15 | 31 | 14 | 2 | 68 | 7 | 46 | 13 | 2 |

JA 3078

T-295

TABLE 23B:  OVERALL ATTORNEY GENERAL DECISIONS
BY RACE/ETHNICITY OF DEFENDANT AND NUMBER OF VICTIMS (1988-1994)

| VICTIMS | DEFENDANTS | | | | | | | | | | | | | |
| | Total Defendants Considered by Attorney General | | | | Attorney General Decisions to Seek the Death Penalty | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Single victim | 22 | 3 | 14 | 4 | 1 | 17 | 3 | 9 | 4 | 1 | 4 | 0 | 4 | 0 | 0 |
| Multi-victim | 30 | 4 | 25 | 1 | 0 | 30 | 4 | 25 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 52 | 7 | 39 | 5 | 1 | 47 | 7 | 34 | 5 | 1 | 4 | 0 | 4 | 0 | 0 |

JA 3079

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3080

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3081

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3082

T-299

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 22 | 3 | 14 | 4 | 1 | 17 | 3 | 9 | 4 | 1 | 4 | 0 | 4 | 0 | 0 |

JA 3083

T-300

## TABLE 23B-2: ATTORNEY GENERAL DECISIONS
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT
## MULTIPLE VICTIMS (1988-1994)

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-301

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 117 of 127

JA 3084

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-5   Page 118 of 127

JA 3085

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 5 | 0 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-302

JA 3086

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-303

| DISTRICT | Total Defendants Considered by Attorney General | | | | | Attorney General Decisions to Seek the Death Penalty | | | | | Attorney General Decisions Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 7 | 0 | 7 | 0 | 0 | 7 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 30 | 4 | 25 | 1 | 0 | 30 | 4 | 25 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3087

T-304

<u>Explanatory Notes to Table Set V</u>:

The tables in this set provide information about federal defendants who have been sentenced to death since 1988.  Table 24-1 provides summary statistics about the 26 federal defendants against whom juries have returned death verdicts.  Table 24-2 provides a case-by-case report of information about each of those 26 defendants.  For each such defendant, the table provides the defendant's name, the defendant's race/ethnicity, the race/ethnicity of the victim(s) of the defendant's capital offense(s), the district in which the case was prosecuted,[40] whether the case was authorized for capital prosecution before or after the implementation of the current review protocol, and a description of the capital offense(s) of conviction.

---

[40]One case, against defendant Timothy McVeigh, was indicted in the Western District of Oklahoma and transferred to the District of Colorado for trial and other proceedings.  Each of the other defendants listed in Table 24-2 was tried in the same district in which he was indicted.

JA 3088

TABLE 24-1: SUMMARY OF FEDERAL CASES IN WHICH A JURY HAS RECOMMENDED IMPOSITION OF THE DEATH SENTENCE (1988-2000)

| | Total (All Cases) | | | | | Pre-Protocol Cases (Cases Indicted 1988 - 1994) | | | | | Post-Protocol Cases (Cases Indicted 1995 - 2000) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Jury verdict of death | 26 | 8 | 14 | 3 | 1 | 6 | 2 | 3 | 1 | 0 | 20 | 4 | 13 | 2 | 1 |
| Awaiting formal imposition of sentence | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Sentenced to death | 24 | 8 | 14 | 1 | 1 | 6 | 2 | 3 | 1 | 0 | 18 | 4 | 13 | 0 | 1 |
| Sentence vacated and defendant re-sentenced to life in prison | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sentence vacated and defendant awaiting further proceedings | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Under a current sentence of death | 19 | 4 | 13 | 1 | 1 | 5 | 1 | 3 | 1 | 0 | 14 | 3 | 10 | 0 | 1 |

JA 3089

TABLE 24-2: DESCRIPTION OF FEDERAL CASES IN WHICH A JURY HAS
RECOMMENDED IMPOSITION OF THE DEATH SENTENCE (1988-2000)
(Cases in which no death sentence was pending as of July 20, 2000, in *italics*)

| Name | Race of Defendant | Race of Victims (number) | District | Pre- or Post-Protocol | Capital offense(s) |
|------|-------------------|--------------------------|----------|----------------------|--------------------|
| Allen, Billie[1] | Black | White (1) | E.D. Mo. | Post-Protocol | 18 U.S.C. § 2113. Fatal shooting of a bank guard during a bank robbery. |
| *Barnette, Aquilia* | *Black* | *Black (1) White (1)* | *W.D. N.C.* | *Post-Protocol* | *18 U.S.C. § 2119(3). Carjacking murder in North Carolina; additional murder in Virginia.* |
| Battle, George | Black | Black (1) | N.D. Ga. | Post-Protocol | 18 U.S.C. § 1111. Murder of a prison guard. |
| Bernard, Brandon[2] | Black | White (2) | W.D. Tex. | Post-Protocol | 18 U.S.C. § 2119(3). Carjacking murder in Texas. |
| Chandler, David | White | White (1) | N.D. Ala. | Pre-Protocol | 21 U.S.C. § 848(e). Murder-for-hire of suspected informant in narcotics case. |
| Chanthadara, Bountaem | Other | Other (1) | D. Kan. | Post-Protocol | 18 U.S.C. § 924(j). Robbery and murder of the proprietor of a restaurant. |
| *Davis, Len[3]* | *Black* | *Black (1)* | *E.D. La.* | *Post-Protocol* | *18 U.S.C. § 241, 1512. Civil rights murder by police officer who ordered the murder of a witness who saw him beat another individual.* |
| Garza, Juan | Hispanic | Hispanic (3) | S.D. Tex. | Pre-Protocol | 21 U.S.C. § 848(e). Murder by narcotics trafficker of three other traffickers. |
| Hall, Orlando[4] | Black | Black (1) | N.D. Tex. | Post-Protocol | 18 U.S.C. § 1201(a). Kidnapping, sexual assault and murder of a 16-year-old female. |
| Hammer, David Paul | White | White (1) | M.D. Penn. | Post-Protocol | 18 U.S.C. § 1111. Murder of a federal prison cellmate. |

JA 3090

T-307

| Name | Race of Defendant | Race of Victims (number) | District | Pre- or Post-Protocol | Capital offense(s) |
|---|---|---|---|---|---|
| Hardy, Paul[9] | Black | Black (1) | E.D. La. | Post-Protocol | 18 U.S.C. § 241, 1512. Civil rights murder by police officer who ordered the murder of a witness who saw him beat another individual. |
| Holder, Norris[1] | Black | White (1) | E.D. Mo. | Post-Protocol | 18 U.S.C. § 2113. Fatal shooting of a bank guard during a bank robbery. |
| Johnson, Cory[5] | Black | Black (9) | E.D. Va. | Pre-Protocol | 21 U.S.C. § 848(e). Murders of suspected informants, rivals and others in connection with narcotics trafficking enterprise. |
| Johnson, Daryl | Black | Black (2) | N.D. Ill. | Post-Protocol | 18 U.S.C. § 1111(f). Gang leader who ordered the murder of a suspected informant and one other person. |
| Jones, Louis | Black | White (1) | N.D. Tex. | Post-Protocol | 18 U.S.C. § 1201(a). Kidnapping, sexual assault and murder of a soldier. |
| Lee, Daniel Lewis | White | White (3) | E.D. Ark. | Post-Protocol | 18 U.S.C. § 1959(a), 924(j). Murder of gun dealer and family in connection with a conspiracy to establish an exclusively White nation in the Pacific Northwest. |
| McCullah, John | White | White (1) | E.D. Okla. | Pre-Protocol | 18 U.S.C. § 848(e). Murder of person suspected of having stolen large quantity of cocaine from narcotics trafficking enterprise. |
| McVeigh, Timothy | White | Various (168) | W.D. Okla. | Post-Protocol | 18 U.S.C. §§ 2332a, 1114. Use of weapon of mass destruction resulting in 168 deaths (including murder of eight federal law enforcement officials) in the bombing of the Alfred P. Murrah Federal Building in Oklahoma City. |
| Ortiz, Arboleda A.[6] | Hispanic | Hispanic (1) | W.D. Mo. | Post-Protocol | 18 U.S.C. § 924 (j), 1958 (a). Murder of person suspected of stealing narcotics trafficking proceeds. |
| Paul, Jeffery | White | White (1) | W.D. Ark. | Post-Protocol | 18 U.S.C. § 1111(f). Robbery and murder on federal land in Arkansas. |

JA 3091

| Name | Race of Defendant | Race of Victims (number) | District | Pre- or Post-Protocol | Capital offense(s) |
|---|---|---|---|---|---|
| Roane, James[5] | Black | Black (9) | E.D. Va. | Pre-Protocol | 21 U.S.C. § 848(e). Murders of suspected informants, rivals and others in connection with narcotics trafficking enterprise. |
| *Sinisterra, German C.[6]* | *Hispanic* | *Hispanic (1)* | *W.D. Mo.* | *Post-Protocol* | *18 U.S.C. § 924 (j), 1958 (a). Murder of person suspected of stealing narcotics trafficking proceeds.* |
| Stitt, Richard | Black | Black (3) | E.D. Va. | Post-Protocol | 21 U.S.C. § 848(e). Three murders in connection with narcotics trafficking enterprise. |
| Tipton, Richard[5] | Black | Black (9) | E.D. Va. | Pre-Protocol | 21 U.S.C. § 848(e). Murders of suspected informants, rivals and others in connection with narcotics trafficking enterprise. |
| Vialva, Christopher[2] | Black | White (2) | W.D. Tex. | Post-Protocol | 18 U.S.C. § 2119(3). Carjacking murder in Texas. |
| Webster, Bruce[4] | Black | Black (1) | N.D. Tex. | Post-Protocol | 18 U.S.C. § 1201(a). Kidnapping, sexual assault and murder of a 16-year-old female. |

1. Allen and Holder were convicted for killing the same victim.
2. Bernard and Vialva were convicted for killing the same victims.
3. *Davis* and *Hardy* were convicted for killing the same victim.
4. Webster and Hall were convicted for killing the same victim.
5. Cory Johnson, Roane and Tipton were tried together for operating a continuing criminal enterprise.
6. *Sinisterra* and *Ortiz* were convicted for killing the same victim.

T-309

# TABLE SET VI: AGREEMENTS AND DISAGREEMENTS
## IN THE FEDERAL DECISION-MAKING PROCESS

EXPLANATORY NOTES TO TABLE SET VI:

The tables in this Set report the extent to which the three participants in the post-protocol decision-making process agreed with one another as to whether the death penalty should be sought against a given defendant. Tables 25 through 25-4 examine all three participants in the decision-making process as a group and provides information, broken down by district and by race/ethnicity, about the degree to which the Attorney General's decisions in the post-protocol cases were in accord with the recommendations of the Review Committee and the United States Attorneys. Table 25 gives a summary overview, without information about specific districts, of the number of cases in which each participant (if any) held a dissenting view as to the appropriate outcome. Tables 25-1 through 25-4 provide district-by-district information about each of four possible combinations of views: consensus among all three participants (Table 25-1), the United States Attorney disagreeing with both the Review Committee and the Attorney General (Table 25-2), the Review Committee disagreeing with both the United States Attorney and the Attorney General (Table 25-3), and the Attorney General disagreeing with both the Untied States Attorney and the Review Committee (Table 25-4).

Tables 26A-1 through 28-2 then report on the extent to which specific pairs of participants agreed and disagreed with each other during the post protocol period (with an additional report on the pre-protocol period only for agreements and disagreements between the Attorney General and United States Attorneys). Because of space limitations, each of these reports requires two separate tables, with one table reporting agreements (both in favor of seeking the death penalty and against doing so), and a second table reporting disagreements. These tables are organized as follows:

Table    Description

26A-1    Agreements Between United States Attorneys and the Attorney General (1995-2000)
26A-2    Disagreements Between United States Attorneys and the Attorney General (1995-2000)
26B    Agreements and Disagreements Between United States Attorneys and the Attorney General (1988-1994)[41]

27-1    Agreements Between United States Attorneys and the Review Committee (1995-2000)
27-2    Disagreements Between United States Attorneys and the Review Committee (1995-2000)

---

[41]Only one table is required because, in the pre-protocol period, United States Attorneys only submitted recommendations to seek the death penalty.

JA 3093

28-1    Agreements Between the Review Committee and the Attorney General (1995-2000)
28-2    Disagreements Between the Review Committee and the Attorney General (1995-2000)

4:02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-5    Page 127 of 127

JA 3094

## TABLE 25: OVERALL AGREEMENT AND DISAGREEMENT AMONG U.S. ATTORNEYS, THE REVIEW COMMITTEE, AND THE ATTORNEY GENERAL BY RACE/ETHNICITY OF DEFENDANT (1995-2000)

| Participant Holding Minority View | Total Defendants Considered by U.S. Attorney, Review Committee and Attorney General | | | | | Majority View to Seek the Death Penalty | | | | | Majority View Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other | Total | White | Black | Hispanic | Other |
| NONE (Consensus) | 501 | 95 | 250 | 130 | 22 | 133 | 36 | 63 | 22 | 12 | 368 | 59 | 191 | 108 | 10 |
| U.S. ATTORNEY | 50 | 13 | 17 | 18 | 2 | 25 | 8 | 7 | 10 | 0 | 25 | 5 | 10 | 8 | 2 |
| REVIEW COMMITTEE | 18 | 2 | 7 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 18 | 2 | 7 | 8 | 1 |
| ATTORNEY GENERAL | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 571 | 110 | 280 | 156 | 25 | 160 | 44 | 72 | 32 | 12 | 411 | 66 | 208 | 124 | 13 |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-6   Page 1 of 45

JA 3095

## TABLE 25-1 AGREEMENT AMONG U.S. ATTORNEYS, THE REVIEW COMMITTEE, AND THE ATTORNEY GENERAL BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| DISTRICT | Total Unanimous Views | | | | | Unanimous View to Seek the Death Penalty | | | | | Unanimous View Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 7 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 3 | 4 | 0 |
| Arkansas, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 7 | 3 | 2 | 2 | 0 | 2 | 1 | 1 | 0 | 0 | 5 | 2 | 1 | 2 | 0 |
| California, Eastern | 9 | 7 | 1 | 0 | 1 | 3 | 2 | 0 | 0 | 1 | 6 | 5 | 1 | 0 | 0 |
| California, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 1 |
| Connecticut | 10 | 0 | 1 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 1 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 18 | 1 | 17 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 17 | 1 | 16 | 0 | 0 |
| Florida, Middle | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |

JA 3096

T-313

JA 3097

| DISTRICT | Total Unanimous Views | | | | | Unanimous View to Seek the Death Penalty | | | | | Unanimous View Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 11 | 2 | 7 | 0 | 2 | 3 | 1 | 0 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 36 | 4 | 31 | 0 | 1 | 6 | 0 | 5 | 0 | 1 | 30 | 4 | 26 | 0 | 0 |
| Massachusetts | 12 | 3 | 8 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 11 | 2 | 8 | 1 | 0 |
| Michigan, Eastern | 12 | 0 | 9 | 3 | 0 | 3 | 0 | 2 | 1 | 0 | 9 | 0 | 7 | 2 | 0 |
| Michigan, Western | 6 | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 2 | 2 | 2 | 0 |
| Minnesota | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Unanimous Views | | | | | Unanimous View to Seek the Death Penalty | | | | | Unanimous View Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 4 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 3 | 1 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 10 | 2 | 0 | 8 | 0 | 6 | 2 | 0 | 4 | 0 | 4 | 0 | 0 | 4 | 0 |
| New York, Eastern | 46 | 11 | 18 | 10 | 7 | 4 | 0 | 0 | 0 | 4 | 42 | 11 | 18 | 10 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 37 | 4 | 15 | 17 | 1 | 6 | 1 | 5 | 0 | 0 | 31 | 3 | 10 | 17 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 7 | 2 | 5 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 4 | 1 | 2 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 42 | 0 | 0 | 42 | 0 | 5 | 0 | 0 | 5 | 0 | 37 | 0 | 0 | 37 | 0 |
| Rhode Island | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |

T-315



JA 3098

| DISTRICT | Total Unanimous Views | | | | | Unanimous View to Seek the Death Penalty | | | | | Unanimous View Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 6 | 0 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 4 | 3 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 5 | 1 | 4 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 3 | 2 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 57 | 5 | 52 | 0 | 0 | 18 | 0 | 18 | 0 | 0 | 39 | 5 | 34 | 0 | 0 |
| Virginia, Western | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 4 | 3 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 5 | 1 | 3 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 501 | 95 | 254 | 130 | 22 | 133 | 36 | 63 | 22 | 12 | 368 | 59 | 191 | 108 | 10 |

JA 3099

T-316

## TABLE 25-2: U.S. ATTORNEY DISAGREEMENT WITH THE REVIEW COMMITTEE AND THE ATTORNEY GENERAL BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| DISTRICT | Total Minority Views by U.S. Attorneys | | | | | Majority – Seek U.S. Attorney – Not to Seek | | | | | Majority – Not to Seek U.S. Attorney – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Arkansas, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 3 | 0 | 2 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-317

JA 3100

| DISTRICT | Total Minority Views by U.S. Attorneys | | | | | Majority – Seek U.S. Attorney – Not to Seek | | | | | Majority – Not to Seek U.S. Attorney – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 0 | 1 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3101

T-318

| DISTRICT | Total Minority Views by U.S. Attorneys | | | | | Majority – Seek U.S. Attorney – Not to Seek | | | | | Majority – Not to Seek U.S. Attorney – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 2 | 0 | 1 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 15 | 0 | 0 | 15 | 0 | 8 | 0 | 0 | 8 | 0 | 7 | 0 | 0 | 7 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3102

T-319

JA 3103

| DISTRICT | Total Minority Views by U.S. Attorneys | | | | | Majority – Seek U.S. Attorney – Not to Seek | | | | | Majority – Not to Seek U.S. Attorney – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 50 | 13 | 17 | 18 | 2 | 25 | 8 | 7 | 10 | 0 | 25 | 5 | 10 | 8 | 2 |

T-320

| DISTRICT | Total Minority Views by Review Committee | | | | | Majority – Seek Review Committee – Not to Seek | | | | | Majority – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-6   Page 11 of 45

| DISTRICT | Total Minority Views by Review Committee | | | | | Majority – Seek Review Committee – Not to Seek | | | | | Majority – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 4 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 0 | 2 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3105

| DISTRICT | Total Minority Views by Review Committee | | | | | Majority – Seek Review Committee – Not to Seek | | | | | Majority – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 6 | 0 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 1 | 5 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3106

T-323

| DISTRICT | Total Minority Views by Review Committee | | | | | Majority – Seek Review Committee – Not to Seek | | | | | Majority – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 18 | 2 | 7 | 8 | 1 | 0 | 0 | 0 | 0 | 0 | 18 | 2 | 7 | 8 | 1 |

JA 3107

T-324

| DISTRICT | Total Minority Views by Attorney General | | | | | Majority – Seek Attorney General – Not to Seek | | | | | Majority – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-6   Page 14 of 45

| DISTRICT | Total Minority Views by Attorney General | | | | | Majority – Seek Attorney General – Not to Seek | | | | | Majority – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3109

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-6   Page 16 of 45

| DISTRICT | Total Minority Views by Attorney General | | | | | Majority – Seek Attorney General – Not to Seek | | | | | Majority – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3110

| DISTRICT | Total Minority Views by Attorney General | | | | | Majority – Seek Attorney General – Not to Seek | | | | | Majority – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3111

T-328

## TABLE 26A-1: AGREEMENT BETWEEN U.S. ATTORNEYS AND THE ATTORNEY GENERAL
## BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 7 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 3 | 4 | 0 |
| Arkansas, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 7 | 3 | 2 | 2 | 0 | 2 | 1 | 1 | 0 | 0 | 5 | 2 | 1 | 2 | 0 |
| California, Eastern | 9 | 7 | 1 | 0 | 1 | 3 | 2 | 0 | 0 | 1 | 6 | 5 | 1 | 0 | 0 |
| California, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 2 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 1 |
| Connecticut | 11 | 0 | 2 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 2 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 18 | 1 | 17 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 17 | 1 | 16 | 0 | 0 |
| Florida, Middle | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |

JA 3112

T-329

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-6   Page 19 of 45

JA 3113

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 11 | 2 | 7 | 0 | 2 | 3 | 1 | 0 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 38 | 4 | 33 | 0 | 1 | 6 | 0 | 5 | 0 | 1 | 32 | 4 | 28 | 0 | 0 |
| Massachusetts | 12 | 3 | 8 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 11 | 2 | 8 | 1 | 0 |
| Michigan, Eastern | 14 | 0 | 11 | 3 | 0 | 3 | 0 | 2 | 1 | 0 | 11 | 0 | 9 | 2 | 0 |
| Michigan, Western | 10 | 4 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 4 | 2 | 4 | 0 |
| Minnesota | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-330

JA 3114
4:02-cr-00992-JFA  Date Filed 06/01/11  Entry Number 1394-6  Page 20 of 45

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 4 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 3 | 1 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 11 | 2 | 0 | 8 | 1 | 6 | 2 | 0 | 4 | 0 | 5 | 0 | 0 | 4 | 1 |
| New York, Eastern | 47 | 12 | 18 | 10 | 7 | 4 | 0 | 0 | 0 | 4 | 43 | 12 | 18 | 10 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 43 | 4 | 16 | 22 | 1 | 6 | 1 | 5 | 0 | 0 | 37 | 3 | 11 | 22 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 7 | 2 | 5 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 4 | 1 | 2 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Puerto Rico | 43 | 0 | 0 | 43 | 0 | 5 | 0 | 0 | 5 | 0 | 38 | 0 | 0 | 38 | 0 |
| Rhode Island | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| South Carolina | 6 | 0 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 4 | 3 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 8 | 1 | 7 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 3 | 2 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 57 | 5 | 52 | 0 | 0 | 18 | 0 | 18 | 0 | 0 | 39 | 5 | 34 | 0 | 0 |
| Virginia, Western | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 4 | 3 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 5 | 1 | 3 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 522 | 98 | 263 | 138 | 23 | 133 | 36 | 63 | 22 | 12 | 389 | 62 | 200 | 116 | 11 |

JA 3115

TABLE 26A-2: DISAGREEMENT BETWEEN U.S. ATTORNEYS AND THE ATTORNEY GENERAL
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Attorney General – Not to Seek | | | | | U.S. Attorney – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arizona | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| California, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-333

| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Attorney General – Not to Seek | | | | | U.S. Attorney – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Kansas | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 2 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3117

JA 3118

| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Attorney General – Not to Seek | | | | | U.S. Attorney – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 4 | 4 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Attorney General – Not to Seek | | | | | U.S. Attorney – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 15 | 0 | 0 | 15 | 0 | 7 | 0 | 0 | 7 | 0 | 8 | 0 | 0 | 8 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 53 | 13 | 20 | 18 | 2 | 27 | 5 | 12 | 8 | 2 | 26 | 8 | 8 | 10 | 0 |

T-336

JA 3119

**TABLE 26B:  AGREEMENT AND DISAGREEMENT BETWEEN U.S. ATTORNEYS AND THE ATTORNEY GENERAL BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1988-1994)**

| DISTRICT | Total | | | | | Agreements to Seek the Death Penalty | | | | | U.S. Attorney – Seek Attorney General – Not to Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 5 | 0 | 5 | 0 | 0 | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 4 | 0 | 4 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total | | | | | Agreements to Seek the Death Penalty | | | | | U.S. Attorney – Seek / Attorney General – Not to Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Illinois, Northern | 2 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 6 | 0 | 6 | 0 | 0 | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-338

JA 3122

| DISTRICT | Total | | | | | Agreements to Seek the Death Penalty | | | | | U.S. Attorney – Seek Attorney General – Not to Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 3 | 2 | 0 | 1 | 0 | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-6   Page 29 of 45

| DISTRICT | Total | | | | | Agreements to Seek the Death Penalty | | | | | U.S. Attorney – Seek Attorney General – Not to Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 8 | 0 | 8 | 0 | 0 | 8 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 51 | 7 | 38 | 5 | 1 | 47 | 7 | 34 | 5 | 1 | 4 | 0 | 4 | 0 | 0 |

JA 3123

T-340

TABLE 27-1: AGREEMENT BETWEEN U.S. ATTORNEYS AND THE REVIEW COMMITTEE
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 7 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 3 | 4 | 0 |
| Arkansas, Eastern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 10 | 3 | 2 | 5 | 0 | 3 | 1 | 1 | 1 | 0 | 7 | 2 | 1 | 4 | 0 |
| California, Eastern | 10 | 7 | 2 | 0 | 1 | 4 | 2 | 1 | 0 | 1 | 6 | 5 | 1 | 0 | 0 |
| California, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 3 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 0 | 1 |
| Connecticut | 10 | 0 | 1 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 1 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 18 | 1 | 17 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 17 | 1 | 16 | 0 | 0 |
| Florida, Middle | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 3 | 1 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Georgia, Southern | 3 | 0 | 1 | 2 | 0 | 2 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |

T-341

JA 3124

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 1 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 11 | 2 | 7 | 0 | 2 | 3 | 1 | 0 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 37 | 4 | 32 | 0 | 1 | 6 | 0 | 5 | 0 | 1 | 31 | 4 | 27 | 0 | 0 |
| Massachusetts | 13 | 3 | 9 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 12 | 2 | 9 | 1 | 0 |
| Michigan, Eastern | 12 | 0 | 9 | 3 | 0 | 3 | 0 | 2 | 1 | 0 | 9 | 0 | 7 | 2 | 0 |
| Michigan, Western | 6 | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 2 | 2 | 2 | 0 |
| Minnesota | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3125

T-342

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 4 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 3 | 1 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 10 | 2 | 0 | 8 | 0 | 6 | 2 | 0 | 4 | 0 | 4 | 0 | 0 | 4 | 0 |
| New York, Eastern | 46 | 11 | 18 | 10 | 7 | 4 | 0 | 0 | 0 | 4 | 42 | 11 | 18 | 10 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 37 | 4 | 15 | 17 | 1 | 6 | 1 | 5 | 0 | 0 | 31 | 3 | 10 | 17 | 1 |
| New York, Western | 5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Eastern | 8 | 2 | 6 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 4 | 1 | 2 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 4 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 3 | 3 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-343

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 46 | 0 | 0 | 46 | 0 | 5 | 0 | 0 | 5 | 0 | 41 | 0 | 0 | 41 | 0 |
| Rhode Island | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 6 | 0 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 4 | 3 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 5 | 1 | 4 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 4 | 2 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 2 | 0 | 1 | 0 |
| Utah | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 59 | 5 | 54 | 0 | 0 | 18 | 0 | 18 | 0 | 0 | 41 | 5 | 36 | 0 | 0 |
| Virginia, Western | 3 | 0 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 3 | 4 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 5 | 0 | 4 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 529 | 98 | 268 | 141 | 22 | 137 | 36 | 65 | 24 | 12 | 392 | 62 | 203 | 117 | 10 |

JA 3127

T-344

TABLE 27-2: DISAGREEMENT BETWEEN U.S. ATTORNEYS AND THE REVIEW COMMITTEE
BY DISTRICT AND RACE/ETHNICITY OF DEFENDANT (1995-2000)

| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Review Committee – Not to Seek | | | | | U.S. Attorney – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Arizona | 2 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 |
| Arkansas, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| California, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Connecticut | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3128

| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Review Committee – Not to Seek | | | | | U.S. Attorney – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 |
| Kansas | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 2 | 0 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 4 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 0 | 2 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3129

| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Review Committee – Not to Seek | | | | | U.S. Attorney – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 4 | 4 | 0 | 0 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| New York, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 9 | 0 | 2 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 2 | 7 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |



T-347

JA 3130



| DISTRICT | Total Disagreements | | | | | U.S. Attorney – Seek Review Committee – Not to Seek | | | | | U.S. Attorney – Not to Seek Review Committee – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 16 | 0 | 0 | 16 | 0 | 7 | 0 | 0 | 7 | 0 | 9 | 0 | 0 | 9 | 0 |
| Rhode Island | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 6 | 0 | 6 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 2 | 1 | 1 | 0 | 0 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 73 | 16 | 27 | 27 | 3 | 27 | 5 | 12 | 8 | 2 | 46 | 11 | 15 | 19 | 1 |

T-348

JA 3131

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 8 | 0 | 3 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 3 | 4 | 1 |
| Arkansas, Eastern | 3 | 2 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Arkansas, Western | 3 | 3 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 10 | 3 | 4 | 3 | 0 | 5 | 1 | 3 | 1 | 0 | 5 | 2 | 1 | 2 | 0 |
| California, Eastern | 9 | 7 | 1 | 0 | 1 | 3 | 2 | 0 | 0 | 1 | 6 | 5 | 1 | 0 | 0 |
| California, Northern | 3 | 2 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 |
| California, Southern | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 2 | 0 |
| Colorado | 4 | 3 | 0 | 0 | 1 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 1 |
| Connecticut | 10 | 0 | 1 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 1 | 9 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 19 | 1 | 18 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 17 | 1 | 16 | 0 | 0 |
| Florida, Middle | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 5 | 2 | 3 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Florida, Southern | 6 | 0 | 6 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Georgia, Middle | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Georgia, Northern | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Georgia, Southern | 2 | 0 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 6 | 1 | 0 | 2 | 3 | 1 | 0 | 0 | 0 | 1 | 5 | 1 | 0 | 2 | 2 |

T-349

JA 3132

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 7 | 0 | 2 | 5 | 0 | 2 | 0 | 2 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Illinois, Southern | 3 | 2 | 1 | 0 | 0 | 3 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Indiana, Southern | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 |
| Iowa, Northern | 3 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 | 0 | 2 | 0 |
| Iowa, Southern | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 12 | 2 | 8 | 0 | 2 | 4 | 1 | 1 | 0 | 2 | 8 | 1 | 7 | 0 | 0 |
| Kentucky, Eastern | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Kentucky, Western | 4 | 2 | 1 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 3 | 1 | 1 | 0 | 1 |
| Louisiana, Eastern | 4 | 0 | 3 | 1 | 0 | 3 | 0 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 36 | 4 | 31 | 0 | 1 | 6 | 0 | 5 | 0 | 1 | 30 | 4 | 26 | 0 | 0 |
| Massachusetts | 12 | 3 | 8 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 11 | 2 | 8 | 1 | 0 |
| Michigan, Eastern | 13 | 0 | 10 | 3 | 0 | 3 | 0 | 2 | 1 | 0 | 10 | 0 | 8 | 2 | 0 |
| Michigan, Western | 6 | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 2 | 2 | 2 | 0 |
| Minnesota | 6 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 0 | 0 |
| Mississippi, Northern | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Missouri, Eastern | 4 | 0 | 3 | 0 | 1 | 4 | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 8 | 3 | 2 | 3 | 0 | 8 | 3 | 2 | 3 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3133

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 9 | 7 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 9 | 7 | 0 | 0 | 2 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 3 | 1 | 1 | 1 | 0 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| New Mexico | 10 | 2 | 0 | 8 | 0 | 6 | 2 | 0 | 4 | 0 | 4 | 0 | 0 | 4 | 0 |
| New York, Eastern | 47 | 11 | 19 | 10 | 7 | 4 | 0 | 0 | 0 | 4 | 43 | 11 | 19 | 10 | 3 |
| New York, Northern | 6 | 0 | 5 | 1 | 0 | 2 | 0 | 2 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| New York, Southern | 39 | 4 | 16 | 18 | 1 | 8 | 1 | 6 | 1 | 0 | 31 | 3 | 10 | 17 | 1 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 8 | 2 | 6 | 0 | 0 | 4 | 2 | 2 | 0 | 0 | 4 | 0 | 4 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 4 | 1 | 2 | 0 | 1 | 3 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 2 | 2 | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 6 | 0 | 3 | 3 | 0 | 4 | 0 | 1 | 3 | 0 | 2 | 0 | 2 | 0 | 0 |
| Pennsylvania, Middle | 4 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

T-351

JA 3134

JA 3135

| DISTRICT | Total Agreements | | | | | Agreements to Seek the Death Penalty | | | | | Agreements Not to Seek the Death Penalty | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 57 | 0 | 0 | 57 | 0 | 13 | 0 | 0 | 13 | 0 | 44 | 0 | 0 | 44 | 0 |
| Rhode Island | 4 | 0 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 0 | 3 | 1 | 0 |
| South Carolina | 6 | 0 | 5 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 5 | 0 | 1 |
| South Dakota | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 4 | 3 | 1 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 0 |
| Tennessee, Western | 8 | 1 | 7 | 0 | 0 | 3 | 1 | 2 | 0 | 0 | 5 | 0 | 5 | 0 | 0 |
| Texas, Eastern | 5 | 0 | 5 | 0 | 0 | 4 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 |
| Texas, Northern | 10 | 4 | 4 | 2 | 0 | 6 | 1 | 3 | 2 | 0 | 4 | 3 | 1 | 0 | 0 |
| Texas, Southern | 5 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 5 | 0 |
| Texas, Western | 5 | 2 | 3 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 3 | 2 | 1 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 3 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 2 | 1 | 0 |
| Virginia, Eastern | 57 | 5 | 52 | 0 | 0 | 18 | 0 | 18 | 0 | 0 | 39 | 5 | 34 | 0 | 0 |
| Virginia, Western | 5 | 1 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 4 | 1 | 3 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 8 | 4 | 3 | 1 | 0 | 3 | 3 | 0 | 0 | 0 | 5 | 1 | 3 | 1 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 552 | 109 | 271 | 148 | 24 | 158 | 44 | 70 | 32 | 12 | 394 | 65 | 201 | 116 | 12 |

| DISTRICT | Total Disagreements | | | | | Review Committee – Seek Attorney General – Not to Seek | | | | | Review Committee – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Alabama, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alabama, Southern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Alaska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Arkansas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Eastern | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| California, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Connecticut | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| District of Columbia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florida, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Georgia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Guam | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

4:02-cr-00992-JFA   Date Filed 06/01/11   Entry Number 1394-6   Page 42 of 45

JA 3136

| DISTRICT | Total Disagreements | | | | | Review Committee – Seek Attorney General – Not to Seek | | | | | Review Committee – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Central | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Indiana, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Iowa, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Kentucky, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Louisiana, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maine | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maryland | 2 | 0 | 2 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Michigan, Western | 4 | 2 | 0 | 2 | 0 | 4 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mississippi, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Missouri, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

JA 3137

4:02-cr-00992-JFA    Date Filed 06/01/11    Entry Number 1394-6    Page 44 of 45

JA 3138

| DISTRICT | Total Disagreements | | | | | Review Committee – Seek Attorney General – Not to Seek | | | | | Review Committee – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nebraska | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Nevada | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Mexico | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| New York, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Southern | 6 | 0 | 1 | 5 | 0 | 6 | 0 | 1 | 5 | 0 | 0 | 0 | 0 | 0 | 0 |
| New York, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| North Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Northern Mariana | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ohio, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oklahoma, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Oregon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pennsylvania, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| DISTRICT | Total Disagreements | | | | | Review Committee – Seek Attorney General – Not to Seek | | | | | Review Committee – Not to Seek Attorney General – Seek | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other | TOTAL | White | Black | Hispanic | Other |
| Puerto Rico | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rhode Island | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| South Dakota | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Middle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Tennessee, Western | 3 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Texas, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utah | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virgin Islands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Washington, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Northern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Virginia, Southern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Eastern | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wisconsin, Western | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 20 | 2 | 9 | 8 | 1 | 20 | 2 | 9 | 8 | 1 | 0 | 0 | 0 | 0 | 0 |

JA 3139

# Exhibit 10

JA 3140

U.S. Department of Justice

# The Federal Death Penalty System:

## Supplementary Data, Analysis and Revised Protocols for Capital Case Review



JA 3141

# June 6, 2001

THE FEDERAL DEATH PENALTY SYSTEM:

Supplementary Data, Analysis and Revised Protocols for Capital Case Review

U.S. Department of Justice

Washington, D.C.

June 6, 2001

## TABLE OF CONTENTS

INTRODUCTION

PART I: LEGAL RULES AND ADMINISTRATIVE PROCEDURES

    A.   Federal Death Penalty Law

    B.   The Capital Case Review Procedure

PART II: STUDY OF THE SYSTEM

    A.   The September 12, 2000 Report

    B.   Related Justice Department and Administration Decisions

    C.   The Supplementary Study

PART III: ANALYSIS OF THE DATA

    A.   Potential Federal Capital Cases

    B.   Subsequent Decisional Stages

JA 3142



PART IV: PROTOCOL REVISION

A.  Broadening the Scope of the Process

B.  Simplification of Decisions Against Seeking the Death Penalty

THE FEDERAL DEATH PENALTY SYSTEM:

Supplementary Data, Analysis and Revised Protocols for Capital Case Review

U.S. Department of Justice
Washington, D.C.
June 6, 2001

INTRODUCTION

This report completes a survey and assessment of the federal death penalty system. At the direction of Attorney General Janet Reno, a study of decision-making processes and demographic factors in federal capital cases was carried out last year. The Department of Justice published an initial report setting out the results of this study on September 12, 2000 (hereafter, the "Sept. 12 report"). Attorney General Reno wished to supplement the information that was available at the time of the Sept. 12 report, and the Department undertook further information gathering and analysis. Noting the pendency of this follow-up study, President Clinton delayed the first scheduled federal execution in the modern period, and directed that the results of the Department's analysis be reported to the President by the end of April 2001.

Further study has now been carried out, and its results have been analyzed. The findings under the augmented data, and related policy decisions, may be summarized as follows:

The proportion of minority defendants in federal capital cases exceeds the proportion of minority individuals in the general population. The information gathered by the Department indicates that the cause of this disproportion is not racial or ethnic bias, but the representation of minorities in the pool of potential federal capital cases. A factor of particular importance is the focus of federal enforcement efforts on drug trafficking enterprises and related criminal violence. The prosecution of drug crimes has generally been a key priority both of Congress and of federal law enforcement for many years. Federal authorities are often better able to carry out effective prosecutions in this area for such reasons as the complexity of drug enterprise cases, their multi jurisdictional character, and the availability to federal prosecutors of greater investigative resources or more effective legal tools.

In areas where large-scale, organized drug trafficking is largely carried out by gangs whose membership is drawn from minority groups, the active federal role in investigating and prosecuting these crimes results in a high proportion of minority defendants in federal cases, including a high proportion of minority defendants in potential capital cases arising from the lethal violence associated with the drug trade. This is not the result of any form of bias, but reflects the normal factors that affect the division of federal and state prosecutorial responsibility: the nature of the offenses subject to federal jurisdiction, the demographics of crime in areas where that jurisdiction is exercised, the respective capacities of federal and state law enforcement authorities; and the cooperative arrangements and divisions of responsibility that federal and state authorities develop in light of these considerations.

Within the universe of federal cases that may be pursued as capital crimes, cases in which the death penalty is actually sought depend on subsequent exercises of prosecutorial judgment and discretion. Under existing Justice Department procedures, United States Attorneys cannot decide unilaterally whether to seek the death penalty in cases involving capital charges, but are required to submit all such cases to a central review procedure. These cases are reviewed by a committee of senior attorneys, and the Attorney General personally makes a final decision whether to seek a capital sentence. The Sept. 12 report found that at no stage of the review process were decisions to recommend or approve the seeking of a capital sentence made at higher rates for Black or Hispanic defendants than for White defendants. For example, in the cases considered by the Attorney General, the Attorney General approved seeking the death penalty for 38% of White defendants, 25% of Black defendants, and 20% of Hispanic defendants.

The data available in the preparation of the Sept. 12 report was limited to information concerning cases involving capital charges that were submitted to the review procedure. Data was not available concerning cases in the United States Attorneys' offices which would factually support charging an offense punishable by death, but which were not actually charged as capital crimes and submitted for review. Attorney General Reno accordingly directed that more complete information be obtained. The United States Attorney offices submitted this supplementary information subsequent to the Sept. 12 report.

Like the data considered in the Sept. 12 report, the augmented data provides no evidence that minority defendants are subjected to bias or otherwise disfavored in decisions concerning capital punishment. Within the broader universe of potential capital cases, capital charges and submission to the review procedure for a decision about seeking the death penalty did not occur with any greater frequency in cases involving Black or Hispanic defendants than in cases involving White defendants.

While the Department's review of existing federal death penalty procedures has produced no evidence of bias against racial or ethnic minorities, it has suggested that changes could be made to promote public confidence in the process's fairness and to improve its efficiency. For example, as noted above, consideration of the broader universe of potential capital cases reinforced the findings of the Sept. 12 study which tended to refute any assumption of bias against racial or ethnic minorities. However, obtaining information about this broader class of cases required an extraordinary effort because the existing review procedure does not regularly obtain information about cases in which a capital charge is factually supportable, but the U.S. Attorney office decides to charge (or accept a plea to) a noncapital crime. Hence, in the future, U.S. Attorneys will be required to submit information, including racial and ethnic data, about potential capital cases, as well as those in which a capital offense is actually being charged. This should help to maintain public confidence in the fairness of the process by making more complete racial and ethnic data available for both actual and potential federal capital cases on a continuing basis.

Part I of this report describes the legal rules and administrative procedures governing federal capital cases, including the existing safeguards against racial and ethnic bias. Part II describes the central findings of the Sept. 12 report, the reaction and policy decisions of Department and Administration officials at the time, their direction that more extensive data collection and analysis be carried out, and the results of further study. Part III analyzes the data as it bears on the role of racial or ethnic factors. Part IV discusses the contemplated revision of the Department's protocol for reviewing capital cases.

---

PART I: LEGAL RULES AND ADMINISTRATIVE PROCEDURES

Decisions of the Supreme Court beginning in the early 1970s imposed new restrictions on capital punishment, producing a temporary cessation in the use of the death penalty as a criminal sanction. Most states subsequently reformed their death penalty laws and procedures to conform to the new standards. Congress initially sought to do the same for federal cases



through provisions of the Anti-Drug Abuse Act of 1988, which made the death penalty available for certain drug-related offenses. The federal death penalty was effectively revived on a broader basis through provisions of the Violent Crime Control and Law Enforcement Act of 1994, which added death penalty authorizations to many additional offense provisions, and established general statutory procedures for seeking and imposing capital sentences. The federal offenses for which the death penalty is currently authorized generally require as a necessary element the killing of a victim, but they include a few non-homicidal offenses, such as treason and espionage.

These federal legislative enactments have been paralleled by the Justice Department's adoption of administrative standards and procedures for death penalty decisions in federal cases. Following the 1988 enactment, the Department adopted a policy that required United States Attorneys to submit to the Attorney General for review and approval any case in which the United States Attorney wished to seek the death penalty. Following the 1994 enactment's expansion of federal death penalty authorizations, the Department adopted the current protocol for death penalty cases. The current protocol requires United States Attorneys to submit to a centralized review process all cases involving a pending charge of an offense for which the death penalty is a legally authorized sanction, regardless of whether the United States Attorney wishes to seek the death penalty.

Both the legal rules and the administrative procedures that currently govern federal capital cases incorporate extensive safeguards against any influence of racial or ethnic bias or prejudice. The main features of the existing system are as follows:

## A. FEDERAL DEATH PENALTY LAW

The federal cases in which a defendant is eligible for a capital sentence are generally those in which: (1) the defendant is charged with a crime for which the death penalty is a legally authorized sanction, (2) the defendant intended or had a high degree of culpability with respect to the death of the victim, and (3) one or more aggravating factors specified in a statutory list are present in the case. The statutory aggravating factors include such factors as the commission of a killing in the course of another serious offense, the defendant's having a prior criminal history involving serious violent offenses, the commission of a killing after substantial planning and premeditation, killing multiple victims, or endangering the lives of other persons (in addition to the person killed) in committing the crime. 18 U.S.C. 3591-93.[1] To seek a capital sentence, a prosecutor must file a notice of intent to seek the death penalty. The notice must identify the aggravating factor or factors which the government proposes to prove as justifying a sentence of death. 18 U.S.C. 3593(a).

---

The prosecutor is constitutionally prohibited from engaging in discrimination or favoritism based on invidious factors, such as race or ethnicity, in deciding whether to seek a capital sentence, and is likewise prohibited from making any appeal to racial or ethnic prejudice in remarks to the jury. A showing that the prosecutor or other decision makers in the case acted on the basis of racial or ethnic bias would entitle the defendant to relief from a capital sentence.[2]

In cases where a capital sentence is sought, the defendant is entitled to the appointment of two lawyers to represent him, "of whom at least 1 shall be learned in the law applicable to capital cases." 18 U.S.C. 3005. Indigent capital defendants have a continuing right at all stages of litigation and review to provision of needed defense resources, and to appointment of defense counsel who satisfy specific years-of-experience standards or "whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation." 21 U.S.C. 848(q).

In the selection of the jury, potential jurors are subject to questioning ("voir dire") concerning bias, including possible racial or ethnic bias against the defendant. If it appears that a potential juror harbors such bias against the defendant, defense counsel can challenge the person "for cause," and the court will exclude the person from the jury. The parties in a capital case are also afforded a large number of peremptory challenges - 20 for each side - which they can use at their



discretion. Fed. R. Crim. P. 24(b). For example, defense counsel who suspect that a potential juror or jurors might be affected by racial or ethnic bias against the defendant can use peremptory challenges to exclude these persons from the jury. However, neither the prosecution nor the defense is permitted to use peremptory challenges to exclude persons from the jury because of their race or ethnicity.[3]

If the defendant is convicted of a capital offense, the guilt-determination phase of the trial is followed by a special hearing to determine whether a sentence of death is justified. The hearing is normally held before a jury of 12 members. At the hearing, the prosecutor presents evidence in support of the aggravating factors for which notice has previously been provided, and the defense is free to present evidence concerning any mitigating factors. The government must prove the existence of aggravating factors beyond a reasonable doubt, and the jury must unanimously agree that such a factor or factors have been established. The defendant need only establish the existence of mitigating factors by a preponderance of the evidence, and each juror is free to conclude that such factors have been established, regardless of whether other members of the jury agree. To recommend a sentence of death, the jury must determine that the defendant had the requisite culpability with respect to the victim's death, and must unanimously agree that the aggravating factor or factors it has found sufficiently outweigh any mitigating factors to justify a capital sentence. If the jury does recommend a capital sentence, the court is required to sentence the defendant accordingly. If the jury does not unanimously agree that the death penalty should be imposed, the defendant is given a lesser (non-capital) sentence. 18 U.S.C. 3593-94.

The rules for capital sentencing hearings require special instructions and certifications to guard against any possible influence of bias or prejudice. The court instructs the jury that, "in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be." On returning a recommendation concerning the sentence, the jury must also return to the court a certificate signed by each juror, "that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or any victim may be." 18 U.S.C. 3593(f).

In cases where a capital sentence is imposed, the court of appeals' review of the case includes a determination of "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." If the appellate court finds that the sentence was based on such improper factors, it must send the case back to the trial court for another capital sentencing hearing or imposition of a noncapital sentence. 18 U.S.C. 3595. Following the appeal, there is regularly further judicial review in capital cases, including a motion for collateral relief under 28 U.S.C. 2255. The defendant may thereafter apply for executive clemency. As noted above, the defendant has a continuing right to adequate resources and representation by competent counsel at all stages of the process.

## B. THE CAPITAL CASE REVIEW PROCEDURE

The Justice Department's capital case review procedure is governed by a protocol set out in section 9-10.010 et seq. of the United States Attorneys' Manual (USAM). The procedure "is designed to promote consistency and fairness." The protocol provides that "[a]s is the case in all other actions taken in the course of Federal prosecutions, bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty." USAM 9-10.080.

The protocol requires United States Attorneys to submit cases involving a pending charge of an offense for which the death penalty is a legally authorized sanction, regardless of whether or not the U.S. Attorney recommends seeking the death penalty. The death penalty cannot be sought without the prior written authorization of the Attorney General.

The U.S. Attorneys' capital case submissions are sent to the Criminal Division and must include a death penalty evaluation form for each defendant charged with a capital offense, a detailed prosecution memorandum, copies of indictments, written materials submitted by defense counsel in opposition to the death penalty, and other significant documents and evidence as appropriate. The Capital Case Unit of the Criminal Division reviews the submission, seeks additional information when necessary, and drafts an initial analysis and proposed recommendation.

The case is then forwarded to a committee of senior Justice Department lawyers, the Attorney General's capital case review committee. The review committee meets with the Capital Case Unit attorneys, the U.S. Attorney and/or the prosecutors in the U.S. Attorney's office who are responsible for the case, and defense counsel. During this meeting, defense counsel are afforded an opportunity to present any arguments against seeking the death penalty for their client. The review committee considers "all information presented to it, including any evidence of racial bias against the defendant or evidence that the Department has engaged in a pattern or practice of racial discrimination in the administration of the Federal death penalty." USAM 9-10.050. The review committee thereafter meets to finalize its recommendation to the Attorney General, to whom all submitted materials are forwarded. The Attorney General makes a final decision as to whether a capital sentence should be sought in the case.

As a safeguard against any possible influence of racial or ethnic bias, the review process is carried out in a "race-blind" manner. The United States Attorney's office does not provide information about the race or ethnicity of the defendant to review committee members, to attorneys from the Criminal Division's Capital Case unit who assist the review committee, or to the Attorney General. The only individuals in Washington, D.C., who are ordinarily given racial or ethnic information are paralegal assistants in the Capital Case Unit who collect the statistics under separate cover from the United States Attorneys.[4] This information provides the pool from which most of the data of the Sept. 12 report on race and ethnicity in federal capital cases was drawn.

PART II: STUDY OF THE SYSTEM

A. THE SEPTEMBER 12, 2000 REPORT

On September 12, 2000, the Department released the results of a survey of the federal death penalty system. The findings from that survey are set out exhaustively in the Sept. 12 report and its accompanying statistical tables, and need not be repeated here in detail. The central findings regarding racial and ethnic proportions were as follows:

First, in cases submitted by the United States Attorneys for departmental review, the proportions of Black and Hispanic defendants were greater than the proportions of Blacks and Hispanics in the general population. Of the 682 defendants reviewed under the Department's death penalty decision-making procedures in the period 1995 to 2000, 134 (20%) were White, 324 (48%) were Black, and 195 (29%) were Hispanic. (Sept. 12 report at 6.)[5]

Second, recommendations and decisions to seek the death penalty were less likely at each stage of the process for Black and Hispanic defendants than for White defendants. In other words, United States Attorneys recommended the death penalty in smaller proportions of the submitted cases involving Black or Hispanic defendants than in those involving White defendants; the Attorney General's capital case review committee likewise recommended the death penalty in smaller proportions of the submitted cases involving Black or Hispanic defendants than in those involving White defendants; and the Attorney General made a decision to seek the death penalty in smaller proportions of the submitted cases involving Black or Hispanic defendants than in those involving White defendants. (Sept. 12 report at 7.)

In the cases considered by the Attorney General, the Attorney General decided to seek the death penalty for 38% of the White defendants, 25% of the Black defendants, and 20% of the Hispanic defendants. (Sept. 12 report at 7.) The finding that the death penalty was sought at lower rates for Black and Hispanic defendants than for White defendants held true

JA 3147



both in "intraracial" cases, involving defendants and victims of the same race and ethnicity, and in "interracial" cases, involving defendants and victims of different races or ethnicities. (Sept. 12 report at 25-26.)[6]

## B. RELATED JUSTICE DEPARTMENT AND ADMINISTRATION DECISIONS

In announcing the results of the Sept. 12 report, Attorney General Reno noted that the information showed racial/ethnic disparities in the federal death penalty system, in comparison to the general population. Specifically, as noted above, in the 682 cases submitted to the Department's death penalty review procedure by U.S. Attorney offices between 1995 and July 2000, 20% involved White defendants, 48% involved Black defendants, and 29% involved Hispanic defendants. She further noted, however, that statistical disparities relating to race and ethnicity are not unique in any sense to the federal death penalty context, but are "true of the entire criminal justice system, both state and federal." With respect to the decisions made in the Department's review process, she noted that the proportion of cases in which seeking the death penalty was actually authorized was higher for White defendants than for defendants of other races/ethnicities. Specifically, as noted, in the cases considered by the Attorney General, the death penalty was authorized 38% of the time for White defendants, 25% of the time for Black defendants, and 20% of the time for Hispanic defendants.[7]

Attorney General Reno did not believe that the findings of this study showed that racial or ethnic bias affected the decision-making process in federal death penalty cases. However, the available information was generally limited to the information submitted by U.S. Attorney offices in connection with the capital case review procedure. She accordingly directed that further study be carried out to illuminate any statistical disparities at other stages of the process, such as decisions whether to pursue federal rather than state charges in potentially capital cases.

Attorney General Reno rejected the idea of declaring a moratorium on the federal death penalty pending the completion of further study for several reasons: (1) defendants in federal capital cases are competently represented (including representation by two attorneys at least one of whom is experienced in capital litigation, with sufficient defense resources), (2) there is no issue of federal capital convicts being innocent of the crimes for which they have been sentenced to death, (3) the evidence and the law have justified the decisions in all cases to seek capital punishment, and (4) the study's findings did not show bias - as opposed to disparities which could result from non-invidious factors - in federal capital cases.[8]

However, President Clinton thereafter issued a reprieve which delayed for six months the first scheduled federal execution in the contemporary period, pointing to the pendency of further study and analysis of the issue of racial and ethnic disparities. He directed that the Department's analysis be reported to the President by the end of April 2001.[9]

## C. THE SUPPLEMENTARY STUDY

The follow-up to the Sept. 12 report outlined by Attorney General Reno included solicitation of external research proposals, submission by the United States Attorneys within 60 days of data about potential capital cases in their offices that were not submitted to the Department's capital case review process, and other examination of factors used to decide which homicide cases are taken into the federal system when there is joint state and federal jurisdiction.

With respect to the potential solicitation of external research proposals, the National Institute of Justice held a meeting with researchers and practitioners on January 10, 2001. The discussion at the meeting indicated that attempting to obtain a comprehensive understanding of the statistical proportions found in federal capital (and potential capital) cases would entail a highly complex, multi-year research initiative. It further indicated that even if such a study were carried out, it could



not be expected to yield definitive answers concerning the reasons for disparities in federal death penalty cases. It was also clear that this approach could not produce policy-relevant findings within the time frame specified by President Clinton, or in time to inform decisions about carrying out death sentences whose execution dates were approaching.

It was possible, however, to carry out promptly the more defined tasks identified by the President and the Attorney General. The U.S. Attorneys submitted information concerning cases in their offices in which the facts would have supported a capital charge, but which were not charged as capital crimes and submitted to the departmental review procedure. Analysis of this additional information produced findings which were similar in character to the findings of the Sept. 12 report.

Within the broader pool of potential capital cases, the racial and ethnic proportions were again found to be different from those in the general population. This broader pool of cases involved 973 defendants, in comparison with the 682 defendants in the cases submitted to the departmental review procedure.[10] Of the 973 defendants in the broader class, 17% (166) were White, 42% (408) were Black, and 36% (350) were Hispanic.[11]

The augmented data was also similar to the original data of the Sept. 12 report in that it provided no evidence of favoritism towards White defendants in comparison with minority defendants. Rather, potential capital cases involving Black or Hispanic defendants were less likely to result in capital charges and submission of the case to the review procedure. Specifically, capital charges were brought and the case was submitted for review for 81% of the White defendants; the corresponding figures for Black defendants and Hispanic defendants were 79% and 56% respectively.[12]

Likewise, considering the process as a whole, potential capital cases involving Black or Hispanic defendants were less likely to result in decisions to seek the death penalty. Specifically, the Attorney General ultimately decided to seek the death penalty for 27% of the White defendants (44 out of 166), 17% of the Black defendants (71 out of 408), and 9% of the Hispanic defendants (32 out of 350).[13]

It was also possible to carry out within a reasonable time frame additional consultation concerning the reasons for the exercise of federal jurisdiction in potential capital cases. The information obtained indicates that the racial and ethnic proportions found in the general pool of potential federal capital cases, and differences among the racial and ethnic proportions in different districts, result from non-invidious causes. Some of these causes are general in nature, and apply to the findings in many districts; others reflect unique conditions in particular districts and the relationship between federal and state authorities in those districts. Part III of this report provides more specific analysis of this information.

PART III: ANALYSIS OF THE DATA

As discussed in Part I of this report, a wide range of protections and remedies exist, both legal and administrative, to guard against any influence of racial or ethnic bias in the administration of capital punishment at the federal level. Nor is there anything in the character, training, or background of federal prosecutors that would dispose them to act from such invidious motives. Rather, they are experienced legal professionals whose values and practices are shaped by general societal attitudes and the specific values of the legal system that strongly condemn discrimination based on race or ethnicity.

Given the absence of any reason to expect a priori that racial or ethnic bias would play a role in federal capital punishment decisions, the question then becomes whether there is empirical evidence which nevertheless demonstrates that the system is subverted by such bias. The findings of the Sept. 12 report and the further study conducted thereafter do not support such a conclusion. The following analysis considers this issue first in relation to the general pool of potential federal capital cases, and thereafter in relation to the decisions made at subsequent stages of the review process.

JA 3149

## A. POTENTIAL FEDERAL CAPITAL CASES

In assessing the implications of statistical data as possible evidence of bias or prejudice, it is necessary to distinguish between statistical disparities on the one hand and discrimination on the other. For example, in a federal district that prosecutes a large number of securities fraud cases, a finding that the defendants in these cases are practically all White would not imply that federal prosecutors in these cases are engaging in favoritism to potential Black and Hispanic defendants, or discriminating against White defendants. Rather, it may just be the case that most persons who commit these crimes in the district are White. Account must be taken of the differing incidences of crimes in different demographic groups.

This point applies to the pool of potential capital cases as in any other area. Both common experience and empirical data indicate that the offenses that may lead to homicides and capital charges are not evenly distributed across all population groups. Since crime and victimization are not evenly distributed across the general population, there is no reason to expect that the racial and ethnic proportions in potential capital cases will be the same as, or similar to, the racial and ethnic proportions in the general population.[14]

Turning to the area of federal capital cases, it must also be understood that federal criminal jurisdiction is limited, and generally supplementary, in character. The Sept. 12 report (at p. 4) explained:

> In evaluating the data ... the reader should bear in mind that the vast majority of homicides in the United States, like most violent crimes, are investigated exclusively by local police officers working hand-in-hand with local prosecutors, who file charges against defendants in state courts, either as a capital case or non-capital case. When a homicide is prosecuted federally - either as a capital or non-capital case - it is often because of the availability of certain federal laws or because of a federal initiative to address a particular crime problem. Criminal organizations often operate in multiple jurisdictions, making it difficult for any single local prosecutor to investigate or prosecute a case. Additionally, many states lack the equivalent of the federal witness protection program and the ability to conduct complex long-term investigations using resource intensive investigative techniques such as court-ordered wiretaps and undercover operations.
>
> Apart from these differences in laws and resources, which often affect whether a particular homicide is prosecuted in state or federal court - either as a capital or non-capital case - state and federal law enforcement officials often work cooperatively to maximize their overall ability to prevent and prosecute violent criminal activity in their respective communities. Such cooperation is a central feature of current federal law enforcement policy. In some areas, these cooperative efforts lead to agreements that certain kinds of offenses, particularly violent crimes, will be handled by federal authorities .... In some cities, a large number of cases involving multiple murders by drug and other criminal organizations are investigated by joint federal and local task forces and prosecuted federally due to some of the factors cited above, such as the geographic reach of the organization and the availability of a witness protection program.

As discussed in Part II of this report, the proportion of Black and Hispanic defendants in the pool of potential federal capital cases exceeds the proportion of Blacks and Hispanics in the general population. The Department's follow-up study of this issue produced no evidence that this statistical disparity results from bias or prejudice, as opposed to non-invidious factors like those discussed above, which can result in disparities in any part of the criminal justice system. To see concretely how these factors can affect the demographic proportions in federal capital cases, it is helpful to examine more specifically the nature of these cases, and the reasons for the exercise of federal jurisdiction, in a number of particular districts.

### 1. Eastern District of Virginia

In the 1995-2000 period considered by the Sept. 12 report, the U.S. Attorney office for the Eastern District of Virginia charged capital offenses in 66 cases and submitted these cases to the Department's capital case review procedure. Of these 66 defendants, 5 were White, 59 were Black, and 2 were Hispanic.



While the defendants in these cases were predominantly Black, analysis of the underlying grounds for federal prosecution shows only legitimate, non-invidious reasons for the district's actions. Of the 66 capital cases submitted by this district, 51% involved drug-related murders, 29% involved killings committed by inmates at the Lorton correctional facility, and 20% involved a mixed bag of offenses as discussed below. The reasons for the exercise of federal jurisdiction in these cases were as follows:

*Drug-related killings*

Most of the capital charges in the Eastern District of Virginia (51%) resulted from drug cases. The cases in this category originated primarily from large-scale trafficking organizations involving multiple murders, as indicated by the fact that 70% of them were charged under the provision defining the Continuing Criminal Enterprise (CCE) drug offense, 21 U.S.C. 848, or as conspiracies in relation to a CCE murder; 12% were charged as murder in aid of racketeering under 18 U.S.C. 1959, or under both 18 U.S.C. 1959 and 21 U.S.C. 848; and 18% were charged under 18 U.S.C. 924(j) (causing death through use of a firearm during drug offense). Most of these drug-related murder cases arose from federal, state, and local task forces.

The defendants in these cases are not White because the members of the drug gangs that engage in large-scale trafficking in the Eastern District of Virginia are not White. However, the large federal role in that district in prosecuting serious drug crimes generally, and potentially capital drug-related homicides in particular, has nothing to do with the race of the defendants. Rather, the factors which have contributed to this assumption of federal responsibility include the following:

First, Virginia prosecutors have had little ability to use state grand juries in investigations. The availability of compulsory process to federal prosecutors through the use of federal grand juries has provided a critical advantage in the investigation of ongoing drug conspiracies, which account for most of the drug-related murders in the district.

Second, until recently, each defendant was entitled to a separate trial in the state system. This is a severe disadvantage in prosecuting cases involving multiple defendants, whose joint activities may have resulted in numerous killings. There is no comparable problem in federal prosecutions, in which it is usually possible to secure a joint trial for defendants who have engaged in this type of coordinated criminal activity.

Third, Virginia has many prosecution units. The Eastern District of Virginia has within its boundaries 43 counties, each with its own Commonwealth's Attorney, and 21 independent cities, most of which also have their own Commonwealth's Attorneys. The state Attorney General does not have general prosecution authority throughout the state. Thus, in the state system, defendants who commit crimes in more than one jurisdiction must be prosecuted in each jurisdiction separately. Again, this is a serious disadvantage in attempting to prosecute drug trafficking activity, and related violence and homicides, which cut across jurisdictional boundaries within the state. The U.S. Attorney, in contrast, can prosecute a defendant or defendants in a single trial for activities committed in the various state jurisdictions which constitute federal crimes.

Fourth, Virginia prosecutors are generally in a less favorable position to prosecute conspiracy cases. Their offices often have limited resources and cannot devote the manpower to investigate ongoing conspiracies, particularly when the organizations permeate numerous other jurisdictions as well. Task forces including both law enforcement officers and prosecutors make the most sense in these cases. Combining the abilities of local law enforcement officers and the prosecution advantages of the federal system, it is possible to make many serious cases which might otherwise go unsolved or resist successful prosecution.

*Cases from Lorton*

As a result of recent reforms, persons sentenced to imprisonment for the commission of felonies under the District of



Columbia Code will serve their sentences in the regular federal prison system. However, prior to these reforms, incarcerated D.C. felons were housed in a separate prison located in Lorton, Virginia. The Eastern District of Virginia was responsible for prosecuting killings committed by inmates at that institution, which accounted for 29% of the cases it submitted to the Department's capital case review procedure. Not surprisingly, the incarcerated felon population deriving from a majority Black urban jurisdiction (D.C.) has been predominantly Black, and the defendants in potential capital cases arising from killings by inmates in that incarcerated felon population have been Black.

*Other cases*

The remaining 20% of the cases submitted by the Eastern District of Virginia involved five espionage defendants, two bank robbery defendants, two kidnapping defendants, three carjacking defendants, and one murder in a federal enclave. The five espionage defendants were White. Their race, of course, had nothing to do with the decision to prosecute these cases federally; espionage, by its nature, is a crime that only the federal government prosecutes. Likewise, the murder in a federal enclave implicated obvious federal interests.

The carjacking case involved three members of the same family who hijacked trucks and killed the drivers. They committed their crimes in more than one state and in more than one local jurisdiction within Virginia. Federal prosecution made possible a joint trial of these crimes, which otherwise would have had to be tried separately in various local Virginia jurisdictions.

The bank robbery was a complicated case in which the need to utilize the powers of a federal grand jury made federal prosecution appropriate. The two kidnapping cases arose from abduction-murders in which state prosecution was not an option, because it was not provable which particular states the victims were in at the time the kidnappers killed them. This is not an impediment to a successful federal kidnapping prosecution.

## 2. District of Puerto Rico

The District of Puerto Rico submitted 72 cases, all involving Hispanic defendants, to the Department's capital case review procedure. The District of Puerto Rico has an unusually large number of homicide cases because the U.S. Attorney has agreed with the local authorities that the U.S. Attorney's office will prosecute fatal carjacking cases. The obvious reason the defendants in these cases were Hispanic is that the population of Puerto Rico is generally Hispanic.

## 3. District of Columbia

The United States Attorney's office for the District of Columbia submitted cases involving 23 defendants to the Department's capital case review procedure, of whom 22 were Black. Most of these cases (66%) involved defendants charged in multi-defendant racketeering (RICO) and Continuing Criminal Enterprise (CCE) drug offense cases. Of the remainder, 13% involved federal carjacking charges, 13% involved killing a federal witness, 4% involved killing a law enforcement officer, and 4% involved terrorism.

The U.S. Attorney's office is responsible for the prosecution of local crimes under the District of Columbia Code, as well as being responsible for the prosecution of federal offenses in D.C. Hence, in contrast to other districts, the U.S. Attorney office in D.C. has jurisdiction to prosecute crimes occurring in its geographic area regardless of whether it brings federal charges. The choice for that office in murder cases is between pursuing a murder prosecution under local D.C. law in the D.C. Superior Court, or bringing a federal charge and prosecuting the case in federal district court.

Because of D.C.'s demographics, cases involving serious violent crimes - whether prosecuted under federal law or local D.C. law - usually involve Black defendants. Where the choice is made to proceed in federal court, the decision has nothing to do with the defendant's race or ethnicity. Rather, it depends on the availability of a federal offense that applies to the criminal

JA 3152

conduct, and whether there are prosecutorial advantages in litigating in one forum rather than the other.

For example, as noted above, most of the cases from D.C. submitted to the review procedure involved drug-related killings. The U.S. Attorney's office has frequently brought federal prosecutions involving drug trafficking groups and street gangs as a valuable alternative to single-incident murder cases in the local Superior Court for several reasons:

First, the federal courts are better suited and better equipped to handle multi-defendant complex criminal prosecutions than the local Superior Court. The federal district court in D.C. has extensive experience in handling these complex cases, which raise significant witness and jury security issues.

Second, use of the federal RICO and CCE offenses makes it possible to join together evidence relating to drug trafficking, murders, and other violence in a single case. This is a major advantage in comparison with single-incident prosecution of murders in the local Superior Court.

Third, the Federal Rules of Evidence are superior from a prosecutorial standpoint to the evidence rules applied in Superior Court proceedings - for example, in relation to the admissibility of evidence of the defendant's commission of similar or related crimes on other occasions.

Fourth, federal RICO/CCE prosecutions allow the government to: (1) introduce evidence of acts committed by violent defendants when they were juveniles, (2) avoid statutes of limitations issues for crimes other than murders (e.g., assaults and drug trafficking), (3) avoid venue problems in prosecuting multijurisdictional criminal operations, and (4) achieve consolidated trials of related criminal activity where severance would more likely occur in a Superior Court prosecution.

4. Central District of California

The Central District of California submitted cases involving 15 defendants to the Department's capital case review procedure, including three White defendants, four Black defendants, and six Hispanic defendants. The 40% (six out of 15) figure for Hispanics in this district was somewhat greater than the proportion of Hispanic defendants in submitted cases generally (29%). However, the proportion of Hispanic defendants in federal capital cases in this district is increased by federal prosecution of members of the "Mexican Mafia." This prison gang has been a serious problem in the California correctional system. The problem can be ameliorated through federal prosecution, which results in the defendants serving their sentences in the federal prison system.

Thus, the causes of the exercise of federal jurisdiction in potential capital cases are varied. Some, such as a federal enforcement emphasis on the prosecution of drug enterprises and related violence, are common to many districts. Others, such as the Eastern District of Virginia's jurisdiction over killings by inmates in D.C.'s prison, and the agreement concerning carjacking prosecutions in the District of Puerto Rico, are specific to particular districts. The common feature of these causes is that they may result in racial and ethnic disparities in federal capital cases when coupled with the demographics of crime in the areas where federal jurisdiction is exercised, but they do not involve any influence of racial or ethnic bias on federal prosecutorial decisions. Rather, as with the division of federal and state responsibility in other areas of prosecution and law enforcement, they reflect non-invidious decisions based on relative federal and state capacities, and cooperative arrangements developed with state and local authorities that take account of those capacities.

A final question in this area is that of "geographic" or "regional" disparity in federal capital cases, which was also identified as a matter meriting further examination in the follow-up to the Sept.12 study. This question, which relates to the



fact that some districts have generated larger numbers of potential capital cases than others, can be taken in two ways:

Taken in one way, the reference to "geographic" disparities may reflect a concern that such disparities result from racial or ethnic bias. Articulated more fully, the thought would be that U.S. Attorney personnel in some districts, for reasons of racial or ethnic bias, may have a particular desire to secure the death penalty for minority defendants. Hence, they exercise federal jurisdiction to prosecute more potentially capital cases involving such defendants, so as to be able to convict them federally for capital crimes and secure their execution. This might account for the unusually large number of capital case submissions from some districts.

If this were actually what was going on, one would expect the districts with unusually large numbers of capital case submissions to seek the death penalty with special vigor in relation to minority defendants. The data do not support this notion. For example, aside from the Eastern District of Virginia and the District of Puerto Rico, which have been discussed above, the districts with the largest number of capital case submissions have been the District of Maryland, the Eastern District of New York, and the Southern District of New York. The figures from these districts are as follows:

- The District of Maryland charged capital crimes and submitted to the Department's review procedure cases involving 41 defendants, of whom 36 were Black. However, it recommended the death penalty for only five of the 36, a proportion of 14%. This is below the national proportion of 25% for recommendations by U.S. Attorneys that the death penalty be sought for Black defendants in submitted cases.

- The Eastern District of New York submitted cases involving 58 defendants to the review procedure, of whom 19 were White, 20 were Black, 12 were Hispanic, and 7 were in the "Other" category. It only recommended the death penalty for one of the Black defendants, and for none of the Hispanic defendants.

- The Southern District of New York submitted cases involving 50 defendants to the review procedure, involving 4 White defendants, 17 Black defendants, 28 Hispanic defendants, and 1 "Other" defendant. This was a considerably higher proportion of Hispanic defendants than the national norm - but the district recommended the death penalty for none of them. The district recommended the death penalty for 5 of the 17 Black defendants, a proportion of 29%, which differed little from the national norm of 25%.

In short, there is nothing in the data from these districts which suggests that their high incidence of capital case submissions had anything to do with a desire based on racial or ethnic bias to secure capital sentences for minority defendants.[15]

---

A second way of taking the reference to "geographic" disparities would be as reflecting a sense that it is intrinsically necessary or desirable for capital cases to be distributed in some proportionate manner among the various districts, independent of any concern about racial or ethnic bias. In this sense, however, geographic "disparities" are neither avoidable nor undesirable. As this report has explained at length, the federal criminal jurisdiction is supplementary and complementary to state and local law enforcement jurisdiction. This necessarily results in large differences among the districts in enforcement priorities and in the division of responsibilities with their state and local counterparts. For example, in districts which accord a high priority to federal prosecution of violent drug gangs, that focus tends to generate a high volume of federal prosecutions involving drug-related killings. Other districts may not prioritize such prosecutions to the same degree because (for example) drugs are generally less of a problem in their areas, state and local authorities have relatively good capacities for dealing with such crimes, or there is relatively little advantage in federal, as opposed to state or local, prosecution in these cases.

There is nothing illegitimate about a district focusing on the actual needs of the geographic area for which it is responsible in decisions about the exercise of federal jurisdiction. Rather, a U.S. Attorney who failed to do so would be derelict in his or her basic responsibilities. To the extent that this results in varying numbers of federal capital cases among

 

the districts, it is no different than, nor any more objectionable than, the "disparities" among the districts which occur equally in non-capital cases.

## B. SUBSEQUENT DECISIONAL STAGES

With respect to recommendations and decisions by the Attorney General's review committee and by the Attorney General, there is little to add to the discussion in Part II of this report. Decisions to seek the death penalty have been recommended and approved in lower proportions of cases involving Black or Hispanic defendants than White defendants. There is nothing in these findings which suggests that the system involves racial or ethnic bias against minorities. As discussed above, the review process is designed to shield the review committee members and the Attorney General as far as possible from information concerning race and ethnicity in the submitted cases. What decisionmakers do not know about cannot influence their decisions.

Analysis of the actions of the U.S. Attorneys' offices is somewhat more complex, because they make a larger number of decisions which may affect the capital or non-capital treatment of their cases. However, the conclusion is the same. The U.S. Attorney offices have charged capital offenses and submitted cases to the review procedure in lower proportions of potential capital cases involving Black or Hispanic defendants than White defendants. They have also recommended seeking the death penalty in the submitted cases in lower proportions of cases involving Black or Hispanic defendants than White defendants. The racial and ethnic proportions in their recommendations have been similar to the racial and ethnic proportions in the recommendations and decisions by the review committee and the Attorney General. (Sept. 12 report at 7, 38-39.)

Following a decision by the Attorney General to seek the death penalty, a capital sentence may nevertheless not be sought because the U.S. Attorney office subsequently reaches a plea agreement to a non-capital charge with the defendant.[16] This has occurred for 48% of the White defendants, 25% of the Black defendants, and 28% of the Hispanic defendants in cases where the Attorney General approved the death penalty. (Sept. 12 report at 31-32).[17] While White defendants superficially fared better at this stage, inferring that these disparities resulted from racial or ethnic bias on the part of the U.S. Attorney offices would be unwarranted for a number of reasons:

First, in contrast to a recommendation for or against seeking the death penalty, the decision about pleas is not under the control of the U.S. Attorney's office. It takes two to make a plea agreement. Inferring bias from disparities in such agreements would not be justified unless non-invidious causes could be excluded, including possible differences in the inclination of defendants from different groups to seek or accept plea agreements. Indeed, since the actions of U.S. Attorney offices at all earlier stages of the process carry no suggestion of bias against racial or ethnic minorities - but rather involve seeking the death penalty with less frequency in cases involving Black or Hispanic defendants - it would be an odd assumption that such bias suddenly springs into existence at the end of the process, and becomes an operative factor at that point in decisions about non-capital pleas.

Second, the findings of the Department's study would not be suggestive of bias by the U.S. Attorneys' offices, even if one were to impute to those offices complete responsibility for the occurrence or nonoccurrence of pleas at the final stage of the process. Consider the class of potential capital cases in which a U.S. Attorney office concludes, either initially or at some point in the process, that a capital sentence should not be sought. The means the office potentially has at its disposal to achieve the desired non-capital treatment of the case include: (1) refraining from a capital charge and review procedure submission in the first place, (2) submitting the case to the review procedure with a recommendation against the death penalty and persuading the Attorney General to accept this recommendation, (3) reaching a non-capital plea agreement with the defendant following the review procedure submission of the case but prior to a decision by the Attorney General whether to seek the death penalty, or (4) reaching a non-capital plea agreement with the defendant subsequent to a decision by the Attorney General to seek the death penalty.

These methods will not necessarily be successful to the same degree at all stages of the process in achieving the desired result (i.e., non-capital treatment of the case) in relation to defendants from different population groups. To the extent that the desired result is not achieved at earlier stages in the process, there may be more motivation to use the methods available at later stages to secure a non-capital disposition. Given the possibility of such trade-offs between actions at different stages, the racial and ethnic proportions at the final plea stage are uninformative as possible indications of bias by the U.S. Attorney offices. Rather, one must look at what happens in the process as a whole.

---

This point can be assessed in quantitative terms by aggregating the effects of the various actions noted above that the U.S. Attorney offices can take to secure non-capital treatment of a case - refraining at the start from a capital charge and review procedure submission, submitting the case and successfully recommending against the death penalty, reaching a non-capital plea after submission but before an Attorney General decision, or reaching a non-capital plea after an Attorney General decision to seek the death penalty. When the figures are toted up, one finds that these actions of the U.S. Attorney offices secured non-capital treatment for 74% of the White defendants, 81% of the Black defendants, and 86% of the Hispanic defendants, in potential capital cases.[18] As with the other findings of the Department's study, there is nothing in these figures which suggests possible bias against minority defendants. Rather, the U.S. Attorney offices have exercised their powers with greater frequency to avoid death penalty prosecutions of minority defendants.[19]

A final point of some potential relevance is the outcome in capital cases that went to trial. Suppose the Department in its decisions about seeking capital punishment were favoring White defendants over minority defendants in comparable cases. One would expect such favoritism to result in a larger proportion of relatively weak cases for capital punishment involving minority defendants in which the Department sought the death penalty. This would in turn make it less likely that capital punishment would actually be imposed in cases involving minority defendants that went to trial. However, the outcome of tried cases provides no support for such a hypothesis. Rather, the jury returned a verdict for the death penalty in about half of the cases in which the Department sought it, and this proportion was about the same for White, Black, and Hispanic defendants.[20]

---

## PART IV: PROTOCOL REVISION

While the Department's study of its death penalty decision-making processes has found no evidence of bias against racial or ethnic minorities, the study has indicated that certain modifications of the capital case review procedure are warranted to promote public confidence in the fairness of the process and to improve its efficiency. Some of these changes effectively broaden the scope of the process, including submission of information concerning a larger class of cases by the U.S. Attorney offices. Other changes would simplify and abbreviate the process in cases where the decision is against seeking a capital sentence.

### A. BROADENING THE SCOPE OF THE PROCESS

Under the existing protocol, U.S. Attorneys submit to the capital case review procedure only cases in which an offense is being charged for which the death penalty is a legally authorized sanction. This limited the information that was available for the Sept. 12 report. Information was subsequently obtained from the U.S. Attorneys' offices concerning a broader class of potential capital cases, but a special, ad hoc effort was necessary to do so.

The Department has concluded that information of this type should regularly be available. This should help to maintain public confidence in the system by making more complete racial and ethnic data available for both actual and potential federal capital cases. The amendment to the protocol will specifically require that, where a United States Attorney has

**JA 3156**



obtained an indictment charging a capital offense or conduct that could be charged as a capital offense, the United States Attorney must fill out and submit a death penalty evaluation form, even if the United States Attorney does not intend to request authorization to seek the death penalty. These forms will include (among other information) gender, race, and ethnicity information for defendants and victims, the charges against the defendant, and the reasons the United States Attorney decided not to seek the death penalty or charge a capital offense.

The amendments to the protocol will also include two other changes in the direction of increased centralization:

First, in cases where the Attorney General approves seeking a capital sentence, the United States Attorney office will be required to submit the notice of intention to seek the death penalty it proposes to file in the case to the Criminal Division's Capital Case Unit. As discussed in Part I of this report, the notice includes a specification of the aggravating factors that the government intends to prove as the basis for imposing a capital sentence. Review by the Criminal Division will ensure consistent application of the statutory and nonstatutory aggravating factors in federal death penalty proceedings.

Second, where the Attorney General approves seeking a capital sentence, Attorney General approval will also be required for subsequent decisions to refrain from pursuing a capital sentence in the case. Under the current protocol, a United States Attorney can effectively negate a decision by the Attorney General to seek a capital sentence by subsequently reaching a plea agreement with the defendant to a noncapital offense. As in other areas, however, if subsequent developments show grounds for reconsidering a decision by the Attorney General, the proper recourse is to advise the Attorney General of the changed circumstances. The revised protocol will require this approach.

## B. SIMPLIFICATION OF DECISIONS AGAINST SEEKING THE DEATH PENALTY

The revised protocol will maintain a uniform requirement that the approval of the Attorney General be obtained both for decisions to seek a capital sentence and for decisions not to seek a capital sentence. The United States Attorneys will be required to submit information concerning cases involving capital charges, regardless of their recommendations concerning the sentence. However, an expedited and simplified decisional process - not requiring the participation of defense counsel - will be authorized in cases in which the U.S. Attorney does not wish to seek a capital sentence. The full-dress review process will be reserved for cases in which: (1) the United States Attorney does wish to seek the death penalty, or (2) the reviewers decline to accept the United States Attorney's recommendation against seeking the death penalty on the basis of the abbreviated review process.

This modification of the protocol will produce a more efficient process with no loss of fairness. The data of the Sept. 12 report showed that the United States Attorneys recommended against seeking the death penalty for 494 out of 682 defendants in submitted cases. (Sept. 12 report at 12.) In such cases, notwithstanding the negative recommendation, the full process must be run through under the current system. This includes submission of information concerning the case and supporting materials by the U.S. Attorney; preparation of an initial analysis and recommendation by the Criminal Division's Capital Case Unit; consideration by the capital case review committee, including hearing argument from defense counsel and U.S. Attorney personnel; and further review and a final decision by the Attorney General. In the vast majority of these cases - 94% - the Attorney General concurs in the U.S. Attorney's recommendation not to seek the death penalty. (Sept. 12 report at 40-41.) Hence, the normal result is no change from what the U.S. Attorney recommended.

The revised protocol will make it possible to focus the review procedure's resources more fully on cases in which the U.S. Attorney does propose to seek the death penalty, while providing a quicker and less burdensome process for reaching a final decision against seeking a capital sentence where the U.S. Attorney recommends against the death penalty. Defense resources will be conserved by not regularly requiring a presentation to the review committee by defense counsel where the U.S. Attorney office is not seeking a capital sentence. In addition, the costs of appointing a second lawyer for the defendant - as required by 18 U.S.C. 3005 for death penalty cases - will more frequently be avoided because the abbreviated process will produce quicker final decisions by the Department not to seek a capital sentence.



The Attorney General will, of course, retain legal authority as head of the Justice Department to determine in an exceptional case that the death penalty is an appropriate punishment, notwithstanding the United States Attorney's view that it should not be pursued. However, if the Attorney General declines to accept the United States Attorney's recommendation against a capital sentence on the basis of the abbreviated review process, the full review procedure will then be employed, including providing defense counsel an opportunity to be heard by the review committee. Hence, the protocol revision will increase the general efficiency of the process, while sacrificing no safeguard of fairness for defendants in cases where the Department may ultimately decide to seek the death penalty.

1. The capital sentencing procedures for most federal crimes appear in 18 U.S.C. 3591ff. Separate procedures of a similar character for certain drug-related capital offenses are set forth in 21 U.S.C. 848(e)-(r). Back

2. See McCleskey v. Kemp, 481 U.S. 279, 309 & n.30 (1987). Back

3. See id.; Batson v. Kentucky, 476 U.S. 79 (1986); Georgia v. McCollum, 505 U.S. 42 (1992). Back

4. Defense counsel, however, choose in some cases to provide participants in the review process with information concerning a defendant's race or ethnicity. Back

5. Except where otherwise indicated, the figures in this report relate to the operation of the Department's current capital case review procedure from its establishment in January 1995 until July 2000, which was the cutoff date for data considered in the Sept. 12 report. Defendants are classified for purposes of discussion and analysis as White, Black, or Hispanic. "Hispanic" includes Hispanic individuals regardless of race. It can be estimated that about 90% of the defendants in the "Hispanic" category would be characterized as White in racial terms. See Sept. 12 report at T-xvi & n.2. The Department's data also places some defendants in an "Other" category. This category is generally not discussed separately in this report because it combines individuals from several different groups - Asian, Pacific Islander, Native American, Aleut, Indian, or unknown - and the numbers involved are small. The "Other" defendants were 29 out of the 682 defendants considered under the review procedure, comprising 4% of the total. Back

6. The figures in the accompanying textual discussion relate to the period 1995-2000, during which the current statutes and capital case review procedure were in effect. In the period 1988-1994, the federal death penalty was only available for certain drug-related killings under 21 U.S.C. 848(e), and U.S. Attorneys submitted for the Attorney General's review only cases in which they recommended seeking the death penalty. See Sept. 12 report at 1-2. The cases so submitted involved 52 defendants, who were 13% (7) White, 75% (39) Black, 10% (5) Hispanic, and 2% (1) "Other." The Attorney General approved seeking the death penalty for 100% of the White defendants (7 out of 7), 87% of the Black defendants (34 out of 39), and 100% of the Hispanic defendants (5 out of 5). See Sept. 12 report at 6-7, 23-24. Back

7. Attorney General's Remarks Regarding the Federal Death Penalty Study (Dept. of Justice Sept. 12, 2000); Press Conference with Attorney General Reno and Deputy Attorney General Holder, Topic: The Death Penalty (Sept. 12, 2000). Back

8. See id. Back

9. Statement by the President: Staying the Execution of Juan Raul Garcia (The White House Dec. 7, 2000). Back

10. The supplementary data submitted by the U.S. Attorney offices included "A" data and "C" data. The "A" data was data on 231 cases (beyond the 682 submitted to the review procedure) that the offices provided in response to a directive to submit information concerning: (1) any cases that should have been, but were not, submitted to the capital case review procedure, (2) cases exempted from submission because the defendant pled to a noncapital offense, and (3) cases that could have been brought as death eligible cases but were not. When added to the 682 defendants in submitted cases, the



"A" data produced a broader class of 913 defendants who were 17% (158) White, 42% (387) Black, 37% (334) Hispanic, and 4% (34) "Other." The "C" data was data on additional cases which, according to the districts, had gone or were going through the review process, or involved fugitives. Adding the "C" cases as well as the "A" cases produces a universe of 973 defendants in potential capital cases, as indicated in the accompanying text. Back

11. The remaining 5% of defendants (49) in the augmented class were in the "Other" category. Back

12. The numbers of defendants whose cases were submitted to the review procedure were 134 out of 166 White defendants, 324 out of 408 Black defendants, and 195 out of 350 Hispanic defendants. See Sept. 12 report at 6. If only "A" cases are included in defining the universe of potential capital cases, the corresponding proportions of defendants in potential capital cases who were capitally charged and submitted to the review procedure are as follows: 85% of White defendants (134 out of 158), 84% of Black defendants (324 out of 387), and 58% of Hispanic defendants (195 out of 334). Back

13. The corresponding figures if "A" cases but not "C" are included in defining the universe of potential capital cases are as follows: 28% of White defendants (44 out of 158), 18% of Black defendants (71 out of 387), and 10% of Hispanic defendants (32 out of 334). Back

14. See, e.g., Bureau of Justice Statistics, Homicide Trends in the United States - Trends by Race, www.ojp.usdoj.gov/bjs/homicide/race.htm; Bureau of Justice Statistics, Violent Victimization and Race, 1993-98, at 2, 4, 6, 10 (Mar. 2001); Bureau of Justice Statistics, Correctional Populations in the United States, 1997, at iii, 4-5 (Nov. 2000). Back

15. The figures for submissions and recommendations by these districts, and the national average of 25% for recommendations to seek the death penalty in submitted cases involving Black defendants (81 out of 324 defendants), are documented in the Sept. 12 report, Table 5A, at T-14 to T-17. Back

16. The U.S. Attorneys currently have discretion to make such plea agreements. Under the revised protocol discussed in Part IV of this report, the Attorney General's approval will be required for a non-capital plea agreement subsequent to a decision by the Attorney General to seek a capital sentence. Back

17. The U.S. Attorney offices reached subsequent non-capital plea agreements with 51 out of the 159 defendants for whom the Attorney General authorized seeking the death penalty. See Sept. 12 report at 31. There were also 11 cases, almost all involving minority defendants, in which the Attorney General subsequently reversed her decision to seek the death penalty. See Sept. 12 report at 33, Table 3A at T-6 (reconsideration of decision to seek the death penalty for 1 White defendant, 3 Black defendants, 5 Hispanic defendants, and 2 "Other" defendants). In addition, in relation to 4 defendants (1 Black and 3 Hispanic), the death penalty was not pursued through trial because of dismissals or other judicial action. See id. Back

18. For example, the supplementary data submitted by the U.S. Attorney offices showed 166 White defendants in potential capital cases. Figures documented in the Sept. 12 report at 6, 41, 31-32 show the following: In relation to 32 of these defendants, the U.S. Attorney offices refrained from a capital charge and review procedure submission. In relation to 62 of these defendants, the U.S. Attorney offices submitted their cases to the review procedure with a recommendation against the death penalty, and the Attorney General concurred. In relation to 8 of these defendants, U.S. Attorney offices reached a non-capital plea agreement with the defendant following submission to the review procedure but before an Attorney General decision about the death penalty. In relation to 21 of these defendants, U.S. Attorney offices reached a non-capital plea agreement with the defendant after an Attorney General decision to seek the death penalty. Summing 32, 62, 8, and 21 gives 123 White defendants for whom the U.S. Attorney office successfully sought and secured non-capital treatment of their cases. This is 74% of the 166 White defendants in potential capital cases. Carrying out the same computation process for Black and Hispanic defendants yields the figures of 81% and 86% appearing in the text.

These figures include both "A" and "C" cases in defining the universe of potential capital cases. If the starting point is the somewhat smaller universe of potential capital cases which includes "A" cases but not "C" cases, the corresponding figures (by the same process of computation) are that the U.S. Attorney offices successfully avoided capital treatment for 73% of

JA 3159



White defendants, 80% of Black defendants, and 85% of Hispanic defendants. <u>Back</u>

19. The Sept. 12 report (at pp. 30-31) noted that focusing on plea agreements which occur after the Attorney General authorizes seeking the death penalty is potentially misleading, because plea agreements that foreclose a capital sentence can also occur at earlier stages of the process, including prior to indictment and review procedure submission, and during the pendency of cases in the review process. Statistical information was not available at the time concerning cases which were not submitted to the review procedure for such reasons as pre-indictment plea agreements to non-capital charges. The supplementary data submitted by the U.S. Attorney offices following the Sept. 12 report provided information on the broader universe of potential capital cases in the U.S. Attorney offices, making possible the accompanying textual discussion's more complete assessment of the treatment of defendants from different population groups. <u>Back</u>

20. Specifically, between the initial revival of the federal death penalty in 1988 and the July 2000 endpoint for data considered in the Sept. 12 report, juries convicted defendants of capital offenses in 57 out of 62 cases in which the government sought the death penalty. Where the defendant was convicted of a capital offense, the jury returned a death penalty verdict for 6 out of 14 White defendants, 16 out of 33 Black defendants, and 3 out of 6 Hispanic defendants. (Sept. 12 report at 32-34.) <u>Back</u>

JA 3160

## PROOF OF SERVICE

I declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled below; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, and at whose direction I served a copy of the attached **Appendix to Motion to Strike the Death Penalty (filed July 6, 2004)** on the following individuals by placing same in sealed envelopes for collection and interoffice delivery addressed as follows:

Patricia A. Donahue, Assistant U.S. Attorney, and,
Carole C. Peterson, Assistant U.S. Attorney
Office of the United States Attorney
1500 U.S. Courthouse
312 North Spring Street
Los Angeles, CA 90012

This proof of service is executed at Los Angeles, California, on July 12, 2004. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Mirela Popescu

# Exhibit 11

JA 3162

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

## David Bruck, Dick Burr & Kevin McNally
## Federal Death Penalty Resource Counsel Project

### TOPIC:

### Federal Capital Prosecutions Awaiting Trial

**Ferebee, Donald**
D. MD CR No. 96-96-2273
Race: B

A Baltimore drug dealer alleged to have arranged for the contract killing of a police informant who had implicated him in a prior dug-related murder. A female bystander was also killed accidentally during the shooting. The death penalty was authorized only for the murder of the witness/informant. The actual gunman is co-operating with the government and does not face the death penalty for either of the killings. The government also declined to seek the death penalty against the other perpetrator present at the scene of the killing. All defendants and both victims are African-American. Attorney General Reno authorized the death penalty against Ferebe in April, 1998, and the trial was postponed pending Ferebe's appeal since he is already serving a federal life-without-parole sentence for the initial murder. Attorney General Ashcroft rejected a plea agreement involving a life sentence.

**Green, Roy**
C.D. CA CR No. 98-337-CBM
Race: B

A prison murder at Lompoc FCI in California. Green, 40, an African-American, was indicted for the stabbing death of a 29-year-old white correctional officer in 1997. He is also charged with using the knife to assault four other officers who were wounded in the attack. Green was serving a 20-year sentence for drug possession in a Missouri case when he was sentenced to serve additional time for assaulting two officers at a Wisconsin prison. Green has convictions dating back to the 1970's for attempted murder, robbery, burglary and assaulting a police officer with a deadly weapon. He was found incompetent for a period of time.

**Peoples, Cornelius**
W.D. MO CR No. 98- 00149-02-CR-W-6
Race: B

The murder of a federal government witness. Peoples, 24, conspired with co-defendant Lightfoot to prevent the victim from testifying at Lightfoot's federal trial on charges of bank robbery. Lightfoot contracted the killing of his roommate for becoming a government witness. The victim, 33, was found dead of multiple gunshot wounds in his home in Kansas City. He contacted government witness, Anthony Hunter, who contacted Barfield who hired Haskell, the triggerman. Barfeeld did not face the death penalty and was acquitted. Haskell was sentenced to life in prison. All defendants are black. The victim is white. After Lightfoot was sentenced to life in prison, the government withdrew its request for the death penalty for Peoples. The Eighth Circuit reversed the convictions and the government is again seeking the

JA 3163

death penalty. 250 F.3d 360 (2001). An appeal is pending.

**Lightfoot, Xavier Lamar**
W.D. MO CR No. 98- 00149-02-CR-W-6
Race: B

The murder of a federal witness. Co-defendant Peoples, 24, conspired with Lightfoot to prevent the victim from testifying at Lightfoot's federal trial on charges of bank robbery. The victim, 33, was Lightfoot's roommate and was found dead of multiple gunshot wounds in their rental home in Kansas City. Peoples supposedly acted as a go-between (along with co-defendant Barfield) with the professional hit man (Haskell) who committed the murder which Lightfoot arranged from federal prison. Murder for hire is alleged as an aggravating circumstance. All defendants are black. The victim is white. After Lightfoot was sentenced to life in prison, the government withdrew its request for the death penalty for Peoples. The Eighth Circuit reversed the convictions and the government is again seeking the death penalty. 250 F.3d 360 (2001). An appeal is pending.

**Shakir, Jamal; Payne, Eben; Young, Donnell**
M.D. TN CR No. 3:98-00038 (NIXON)
Race: B

A gang called the "Rollin" 90s Crips or Bangside 90s faction out of Los Angeles which allegedly moved 150 kilos of crack to Las Vegas. From there sales operations were allegedly set up in Oklahoma City and Nashville. The group has also been called the "Shakir Enterprise." A Crips gang member and his wife were killed in Oklahoma City, and their 3 year old daughter, who was also shot, stayed with her dead parents and slept with them at night for several days. Richard Chambers, 59, was shot to death in Cheatham County, Tennessee. There may have been up to 13 killings in three states. Three victims were themselves charged with murder in the indictment. The indictment charges Shakir, 25, with six killings from 1995-97, Payne, 20, with participating in two killings and in the shooting of the gang associate's 3-year-old-girl, and Young, 24, with helping kill one person and assaulting and torturing two others. Four of the killings were said to be to silence potential witnesses, other slayings were allegedly motivated by revenge. Murder for hire is alleged as an aggravating circumstance.

**McIntosh, Richard; Knorr, Carl; Sahakian, David Michael**
S.D. IL CR No. 99-40044
Race: W

Three inmates at Marion alleged to be members of the Aryan Brotherhood. They are white and the victim black. Allegedly, Knorr held the victim while McIntosh stabbed him, on Sahakian's orders. Sahakian is allegedly one of three Aryan Brotherhood commissioners, the leader of the Aryan Brotherhood at Marion. The government claims the stabbing stems from an Aryan Brotherhood "war" with blacks from the District of Columbia transferred throughout the BOP from the District of Columbia facility at Lorton, Virginia.

**Hyles, Tyrese**
E.D. MO CR No. 01-CR-73-ALL
Race: B

A witness killing §1512 murder for hire involving interstate travel from Tennessee to Missouri. Hyles faced state drug charges. The victim was murdered after his preliminary hearing testimony. Attorney General Ashcroft required a capital prosecution.

**Garcia, Rico**
N.D. CA CR No. 00-CR-20018-ALL
Race: H

Involves multiple (five) Nuestra Familia murders including the 1998 RICO murder of another gang member in a war for control of the "Salinas regiment" of the Neustra Familia, a Latino prison gang. Garcia, 35, is charged as the triggerman in this killing. Two others were allegedly with him. This is another "Petite Policy" case as Garcia was originally charged in state court and plead to other charges for a 22 year sentence in exchange for the state dropping the homicide. The prosecution involves shootings, assaults, robberies and drug dealing. Ramirez is charged in two killings, Garcia was charged in three, now two, and the other defendants one each. Attorney General Ashcroft required a capital prosecution for Garcia. All involved are Hispanic.

**Quinones, Alan; Rodriguez, Diego**
S.D. NY CR No. 00 CR 0761 (JSR)
Race: H

murder of a New York Police Department informant, who was allegedly beaten or tortured. The victim, a drug dealer, had recently arranged two controlled buys from Quinones. Quinones is alleged to be the boss. Co-defendant Rodriguez allegedly participated in the killing. The victim's body was burned post-mortem. Murder for hire is alleged as an aggravating circumstance. Attorney General Ashcroft rejected a plea agreement and required a capital prosecution. A district court decision that the death penalty was unconstitutional due to the execution of innocents was reversed on appeal. United States v. Quinones, 313 F.3d 49 (2nd Cir. 2002). All involved are Hispanic

**Johnson, Angela; Honken, Dustin**
N.D. IA CR No. 00 CR 3034 MWB
Race: W

Five counts of murder in 1993 - a potential witness, his girlfriend and two daughters, in a drug conspiracy case. The fifth victim is Angela Johnson's former boyfriend, who disappeared in November of 1993. All involved are white.

**Williams, Michael; Williams, Xavier; Williams, Elijah Bobby**
S.D. NY CR No. 00-CR-1008
Race: B

Involves a multiple murder during a narcotics conspiracy. Three black men were killed in 1996. The defendants are also black. The Attorney General required a capital prosecution.

**Fell, Donald**
D. VT 00-M-66-ALL
Race: All W

Multiple (three) murders, a carjacking and an interstate kidnapping. The defendants were with Fell's mother and a male friend when an argument erupted. The victim's throat was slashed by Fell and Fell's mother stabbed to death by Lee, the co-defendant. The two then carjacked a middle-aged woman at a supermarket. Crossing into New York, they told her to get out and she attempted to run into the woods. They followed her and allegedly killed her by kicking her.

JA 3165

The defendants both made incriminating statements. All involved are Caucasian. Lee died in jail from asphyxiation, ruled an accident, but probably a suicide. Attorney General Ashcroft rejected a plea agreement and required a capital prosecution, stipulating life in prison. The Attorney General also rejected a bench trial. The court declared the FDPA unconstitutional. 217 F.Supp.2d 469 (2002). That decision is on appeal.

**Sablan, William; Sablan, Rudy**
D. CO CR No. 00-CR-531-ALL
Race: A

Inmate killing - evisceration stabbing of cellmate (in their cell). William Sablan allegedly confessed, on videotape, and said that he was defending himself. The letter "S" was written on the cell wall in the victim's blood. The USA requested permission to seek the death penalty and on her last day in office, Attorney General Janet Reno agreed. The defendants are Pacific Islanders, "Chmorran", from Saipan. The victim is Hispanic. The defendants, cousins, were doing federal time for a hostage-taking in Guam. Attorney General Janet Reno agreed to a capital prosecution on her last day in office.

**Taylor, Styles; Thomas, Keoin**
N.D. IN CR No. 2:01 CR 073 JM
Race: B

A robbery of a gun store and the killing of the proprietor. The defendants are African-American and the victim was white. Taylor was on parole. He has a juvenile record involving the robbery and shooting of a pizza delivery man.

**Lien, David**
N.D. CA CR No. 01-CR-20071-ALL
Race: A

Fugitive co-defendant Chang was married to a bomb victim's sister. There were domestic problems and a divorce. Lien was allegedly sent to the victim's home with a bomb inside a toy mechanical dog. The victim later purchases batteries, put them in the toy, which blew up, killing him. The Attorney General required a capital prosecution

**Agofsky, Shannon Wayne**
E.D. TX CR No. 1:03-CR 173
Race: W

Agofsky, along with his brother, was serving a life sentence for the 1992 abduction and murder of a president of a bank. Agofsky took him to the bank and forced him to open the vault and then killed him. Agofsky is now accused of beating, kicking and stomping to death a fellow inmate at a federal prison in Beaumont, Texas. The victim was serving a term for arson and firearms. The government alleges this was a premeditated "gang" hit. All involved are white. This is the fourth murder at Beaumont since March 1997.

**Jones, Milton; Canty, Raymond; Mitchell, Eugene**
E.D. MI CR No. 01-80571
Race: B

**JA 3166**

Involves a gang called the "Young Boys Inc.". Milton Jones, the alleged kingpin, is charged along with 13 others, including state representative Keith Stallworth. Three defendants face the death penalty. Jones is charged with multiple (two) murders in 1998. Murder for hire is alleged as an aggravating circumstance. One victim was a suspected government informant. Stallworth is charged with laundering money. Canty and Mitchell are charged with killing another in '97. Canty is charged in two murders. All involved are African-American. Attorney General Ashcroft required a capital prosecution.

**McClure, Cornell Winfrei**
D. MD CR No. 01-CR-367-ALL
Race: B

Shooting of a white woman at a secluded location on federal land. The victim was shot repeatedly with two different types of ammunition. There are signed confessions by both defendants. Millegan confessed that he committed the murder, along with McClure, both shooting the victim with their weapons. McClure wrote that he told Millegan they should "press her" about the robbery. The deceased was taken to a road on federal land in Beltsville, where both allegedly shot her. The defendants are black. The alleged motive was a belief that the victim had some involvement in the burglary of Millegan's apartment. The Attorney General required a capital prosecution

**Williams, Tyrone**
S.D. TX CR No. 03-CR-221-ALL
Race: B

An alien operation that led to mulitple (nineteen) immigrants' deaths in the back of a truck trailer driven by Williams. Joya is alleged to the leader of this smuggling ring. She was extradited from Guatemala. She is also accused of coordinating 3 smaller operations, gathering illegal immigrants together in South Texas, arranging them to be fed and housed and then placing them on trucks headed north. All involved are Latino, except Williams, who is black. Williams is the only one of the 17 defendants who will face the death penalty.

**Rudolph, Eric Robert**
N.D. AL CR No. 00-CR-422-ALL
Race: W

1998 Southside bombing of a Birmingham abortion clinic, resulting in the death of an off-duty white police officer and injury to a white clinic nurse. Rudolph, who is white, was described by Attorney General Ashcroft as "America's most notorious fugitive." Rudolph is also charged with three bombings in Atlanta: the 1996 Olympic park bombing that killed a black woman and two other bombings in 1997. He was captured after a 5 year manhunt.

**Moussaoui, Zacarias**
E.D. VA CR No. 01-CR-455-ALL
Race: B

An alleged foreign national co-conspirator in the September 11, 2001 terrorist attack on the World Trade Center and Pentagon which killed over 3,000 and resulted in four airline crashes in New York, Pennsyvlania and Washington, D.C. Moussaoui is French of Moroccan descent and is accused as a member of al-Qaida. He was in jail on September 11 after suspicious actions at a Minnesota flight school. There were victims of many nationalities and races.

**JA 3167**

**Cannon, Amesheo D.**
E.D. MO CR No. S1-1:01CR00073RWS
Race: B

A witness killing §1512 murder for hire involving interstate travel from Tennessee to Missouri. Hyles faced state drug charges. The victim, Coy L. Smith, Sr., was murdered after his preliminary hearing testimony. Cannon allegedly murdered the victim by shooting him in his bed. The Attorney General required a capital prosecution.


**Perez, Wilfredo; Gonzalez, Fausto**
D. CT CR No. 02-CR-7-ALL
Race: H

A drug gang, "the Perez Organization" at war with "the Savage Nomads" in Hartford, Connecticut over a turf dispute and a drug and money kidnapping and robbery. Gonzalez was the alleged triggerman in this murder for hire. The government claims that Gonzalez is a hired contract killer responsible for multiple (9) other murders. All involved are Hispanic. Attorney General Ashcroft required a capital prosecution.


**Mikos, Ronald**
N.D. IL CR No. 02 CR 137
Race: W

Involves the §1512 murder of a government witness to prevent her testimony before the grand jury. Mikos, a podiatrist, and another are accused in many counts of defrauding Medicare, HCFA and HHS. When the victim was served with a federal grand jury subpoena for her testimony regarding treatment/non-treatment by Mikos, he allegedly tried to persuade the victim to lie to the grand jury either by claiming lack of memory or stating that the surgery had been performed. When she refused he allegedly shot her. All involved are white


**Fulks, Chadrick; Basham, Branden**
D. SC No. 02-M-992-ALL
Race: W

A November 14, 2002 carjacking and interstate kidnapping from a WalMart parking lot of a woman who remains missing. Witnesses saw her with the defendants later that day in North Carolina. The defendants escaped November 4 from a Kentucky jail. Basham was arrested November 17, 2002 after allegedly trying to hijack a car at an Ashland, Kentucky mall. He has been charged with attempted murder and robbery. Fulks was arrested November 20, in Goshen, Indiana. The defendants are also suspected of kidnapping a Kentucky man and leaving him tied to a tree in Evansville, Indiana. Basham has told the FBI that he and Fulks abducted another victim, on November 11, 2003, a 19-year-old West Virginia college student, whose car was found burned in West Virginia. A separate federal capital indictment is pending in that state. All involved are white.


**Green, Darryl; Morris, Branden**
D. MA CR No. 02-CR-10301-ALL
Race: B

**JA 3168**

Two members of the Esmond Street Crew charged with the RICO shooting death of a gang rival ("Franklin Hill Giants") during the Caribbean Carnival in 2001. Key witnesses against them will be four members of the gang who have cut deals with federal prosecutors. Prosecutors allege four other shootings. Family members of the defendants claim the shooting was over a girl and not drugs. The grandmother of the victim and the state prosecutor criticized the decision to seek the death penalty. Both grew up in a violent neighborhood and Morris was shot when he was 16. An innocent bystander was spared when a bullet hit his rearview mirror.


**Skiba, Lawrence**
W.D. PA 01-CR-291-ALL
Race: W

An interstate mail fraud murder for hire, allegedly by uncharged hitman Eugene DeLuca, in 2000. Skiba and his brother-in-law, Shane Simeral, allegedly took out insurance policies on the victim in 1997. The United States alleges that Skiba was involved in two other suspicious deaths: a fatal fire at a hotel he owned in 1993 to collect insurance money and a 1998 suicide by a mentally challenged man after Skiba allegedly gave him a gun. Also alleged is an unsuccessful attempt to kill a man in 2000, three days before his death to collect on a $15,000 life insurance policy. All involved are white


**Corley, Odell**
N.D. IN CR No. 02-CR-116-ALL
Race: B

Five people, three African-American males, one African-American female and one white woman (the pregnant girlfriend of Johnson), rob a bank and shoot to death a white female teller, wounding a white male security guard and another male teller. Corley allegedly was the ring leader who burst into the bank shooting. Johnson was also a gunman. McGregor was a driver. Gay and Ramsey were some distance away.


**Foster, Aaron Demarco; Moses, Keon; Taylor, Michael Lafayette**
D. MD CR No. 02-CR-410-ALL
Race: B

Leaders of one of West Baltimore's most violent drug gangs, the Lexington Terrace Boys, who are charged in multiple (six) killings, including one potential government witness who was killed to prevent him from testifying about an earlier double homicide of two members of a rival gang, the Stricker Street group. Since 1999 the gang operated from the Lexington Terrace and Edgar Allan Poe Homes public housing projects. Foster was acquitted of attempted murder in state court in 1998. Taylor and Moses are charged together in the double homicide and in a witness killing. There was also an attempted kidnapping of another potential witness to the 2001 killings. The latest victim is the third brother of one family to die on the streets of Baltimore. Investigators claim the group is in some way connected to 40 homicides. Recently, a critical witness in the case was shot 10 times and killed. He had been shot at twice recently. All involved are African-American


**Cisneros, Luis; Cisneros, Felipe N.; Eppinger, Paul E.; Rivera, Angel R.**
D. AZ CR No. 03-CR-730-ALL
Race: All H

. JA 3169

Multiple (three) RICO murders by a prison and drug gang, "the Cisneros Organization." Luis Cisneros and Alvarado are charged in all three murders, the others in two. A father and son were allegedly murdered six months apart by this Hispanic gang. The father was a suspected government witness/informant. 18 U. S. C. §924 and 1512. Numerous other murders, some of potential witnesses, are alleged as FRE 404(b) evidence. The least culpable were apparently Llamas and Alvarado, who will not face the death penalty. The prosecution was moved from New Mexico to Arizona after an alleged courthouse security leak. All involved are Hispanic

**Nelson, Brian**
E.D. LA CR No. 02-CR-304-ALL
Race: B

September 2002 killing of a New Orleans man and the carjacking of his wife. The United States Attorney said: "If we're given the green light, we will seek the death penalty." However, the defendants entered into plea agreements with the United States Attorney. The defendants are black and the victims a young white married couple. The defendants had been mistakenly released by state authorities after allegedly being involved in a rape and robbery spree. Dawson and Franklin entered into plea agreements which were accepted and approved. Attorney General Ashcroft rejected a plea agreement and required a capital prosecution against Nelson.

**Bolden, Robert, Sr.**
E.D. MO CR No. 4:02-CR 0557 CEF (AGF)
Race: B

A bank robbery murder. 18 U.S.C. §§1111, 2113 and 924(c). The victim is white, the son of a police officer. The defendants are African-American. Only Bolden will face the death penalty.

**James, Richard; Mallay, Ronald**
E.D. NY CR No. 02-773 (S-1) (SJ)
Race: B

Multiple (two) insurance fraud murders for hire involving foreign nationals from Guyana. The victims are also from Guyana. One died there. Both died from alcohol and drug ingestion. James is an insurance broker. Mallay, 57, has heart trouble. He and James are suspected of arranging other deaths in an insurance fraud scheme. Federal authorities are investigating 21 deaths of people insured through James.

**Zapata, Jairo**
E.D. NY CR NO. 01-516
Race: H

Attorney General Ashcroft rejected a plea agreement and required a capital prosecution against a foreign national from Columbia who had a signed cooperation agreement. Zapata is charged in one CCE drug-related murder for hire in 1993. Two separate homicides are alleged in aggravation, all three occurred during a seven month period in 1993.

**Ward, Israel; Smith, Thomas**
W.D. MO CR No. 3:02 CR 05025-ALL

**JA 3170**

Race: B

Multiple (two) gun murders during course of drug trafficking by black defendants from Tulsa selling crack in Tulsa. Smith is alleged to be a leader. A black victim allegedly stole drugs and was shot to death along with a white female who was with him at the time. Attorney General Ashcroft required a capital prosecution.

**Villegas, Hernaldo Medina; Roman, Lorenzo Catalan**
D. PR CR No. 3:02-CR-117-ALL
Race: H

The Hobbs Act robbery of a local credit union, while an armered bank truck was making a deposit. A gunfight ensued and an armed guard was killed with a second head shot by Villegas after he was down. Lorenzo Catalan and Hernando Medina are alleged to have participated in the actual robbery, while Quester Sterling was allegedly the lookout. The 924(j) murder weapon was allegedly obtained in a carjacking. There are additional non-capital charges for a prior robbery of the same credit union by the same group. Only Villegas and Roman will face the death penalty. All involved are Hispanic.

**Breeden, Shawn Arnette; Carpenter, Michael Anthony; Cassell, Kevin Thomas**
W.D. VA CR No. 03-CR-13-ALL
Race: All B

Involves four defendants from D.C. who drove to Virginia with the intent to commit robbery. Cassell was the driver. Breeden is allaged to be the organizer, having lost his girlfriend's car payment while gambling. Carpenter allegedly held the victim, a drug dealer, at gunpoint. Carpenter shot the victim in the knee with a shotgun. Then Breeden allegedly stabbed the victim at least 7 times in the chest and neck. Outterbridge then shot the victim in the head. All involved are African-American, except the victims of a violent, but non-fatal, robbery of a white couple using an ATM that resulted in serious injury. The group also committed another robbery. Attorney General Ashcroft required a capital prosecution against Breeden, Carpenter and Cassell. Outterbridge, 19 and the youngest, is a cooperator. Burden has a prior stabbing conviction

**Ayala-Lopez, Carlos L.**
D. PR CR No. 03-CR-55-ALL
Race: H

Robbery of a gun from a Veteran's Administrative Hospital guard and the murder of the security guard. Attorney General Ashcroft rejected a plea agreement calling for a sentence of 35 years to life and required a capital prosecution.

**Fields, Edward**
E.D. OK CR No. 6:03-CR-00073
Race: W

A robbery and multiple murder of a married couple in the Winding Stair Campgrounds on federal land. All involved are white. Fields has no prior criminal record, a good military record and a history of mental illness. Fields had been living in the forest. The district court set a deadline for a decision by the Attorney General on the death penalty. The murders occurred around July 10.

**JA 3171**

**Le, Cuong Gia**
E.D. VA CR No. 03-CR-48-ALL
Race: A

A Vietnamese American gang member who came to the United States when he was 10 or 11 years old. Le is accused of mulitple (two) murders, shooting at a rival gang member multiple times in a Vietnamese restaurant on May 13, 2001 hitting three people. One died immediately and one died later. The rival gang member survived, identifying Le. Le, a foreign national, fled and was arrested in July of 2003. The court denied a motion to bar the death penalty due to a belated notice of intent.

# Exhibit 12

JA 3173

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

### TOPIC:

### Federal Capital Defendants Who Died Before or During Trial

**Pretlow, Bilal**
D. NJ CR No. 90-CR-238
Race: B

A young black New Jersey gang member committed suicide during his federal capital trial. He had been charged with two cocaine-and marijuana-related murders, one involving a 15-year-old-girl.

**Brown, Terrance**
E.D. MI CR No. 92-81127
Race: B

After a sealed indictment was handed down, an African-American man from Detroit was found murdered in Georgia, shot by other capital defendants, charged collectively with numerous homicides.

**Stephens, Charles Lee**
E.D. TX CR No. 2:99 CR 5
Race: B

Three young black defendants, who are members of the "Crips" gang, were involved in a series of robberies and killings in East Texas. Stephens, 21, Smith, 20, and Tatum, 20, faced the death penalty in both state and federal court for a botched bank robbery. They were accused of a bank robbery and fatally shooting teller Betty Paddle, 61. A 54 year old bank manager, was also shot, but survived. They are also charged with a kidnapping/robbery of a used car dealership (a Hobbs Act count) in which the victim was killed with a gun (a 924(j) count). The victim was a 63 year old retired minister. Stephens and Tatum were charged with another bank robbery in which a teller was killed. Tatum is charged in a November 4, 1998 slaying of Ronnie Dale Ritch, president of the First State Bank in Overton. Stephens and Tatum abducted Ritch, 50. Stephens had a brain tumor and died after surgery. The USA requested permission to seek the death penalty against all three, and was permitted to do so. All three deceased victims were white.

# Exhibit 13

JA 3175

## Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

### TOPIC:

## Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons

**Williams, George Travis**
M.D. GA CR No. 1:92-CR-142
Race: B

A black Atlanta drug distributor who had capital charges dismissed in connection with three murders. Mr. Williams was accused of ordering the killing of one person in 1988, and killing two in 1989 and another in 1990. Murder for hire is alleged as an aggravating circumstance. In June, 1994, the district court dismissed the capital charges on double jeopardy grounds, because the government had already secured a conviction and 30-year sentence for much of the alleged drug-related conduct. A government motion to reconsider this ruling was denied. All involved were African-American.

**Garcia, Efraim**
E.D. MI CR No. 97-80727
Race: H

A gang known as the "Cash Flow Posse" charged with various racketeering crimes, including five murders and other assaults. The motive was a dispute over gang territory. Garcia was a 29 year old Columbian national. All the killings but one predate the effective date of the '94 act. Garcia was the only capital defendant. He was charged with personally carrying out all five murders. Garcia was offered a plea to life, signed a Rule 11 plea agreement but the plea agreement broke down during the colloquy in court. The United States then decided to seek the death penalty. However, the district court dismissed the capital count (a racketeering murder) because of an insufficent "Commerce Clause" nexus. 68 F.Supp.2d 802 (E.D. MI 1999). The government decided not to appeal.

**Colon-Miranda, Andres; Martinez-Velez, David; Rosario-Rodriguez, Edwin**
S. D. PR CR No. 95-029 JAF
Race: All H

A judge blocked a capital trial of three Puerto Rican defendants involved in a drug gang homicide. 985 F.Supp. 36; 992 F.Supp. 82. The government initially indicated that authorization would not be sought for a capital prosecution, but then attempted to reverse its position seven weeks before trial. The Attorney General required a capital prosecution. The district court declined to continue the trial and refused, despite the Attorney General's authorization and notice of aggravating circumstances filed shortly before trial, to permit the government to ask for the death penalty.

**JA 3176**

**Brown, Ricky Lee; Brown, Barbara M.; Ables, Janette A.**
N.D. WV CR No. 1:98CR34
Race: All W

Arson/murder by their parents of five children, after an insurance policy was issued on the dwelling and the Brown's children. Federal charges were based on the use of the mail and phones. However, the capital counts were dismissed after the Supreme Court's decision in United States v. Jones, 592 U.S. 848 (2000). After a non-capital trial, the Browns were acquitted. Ables pled guilty and became a government witness. All involved are Caucasian. State charges were also filed.

**Stewart, Charles Louis**
W.D. KY CR No. 4:99-CR-11-M
Race: W

Involves multiple killings - contract killing of men in Alabama and Kentucky. Lyon, 19, and co-defendant Charles Stewart, 54, are charged with conspiracy and murder for hire. Stewart and Richard Dorman, 62, are charged with being partners in an 18-month forged-check and fraud scheme, using the deceased's identity. Lyon and his deceased father, Stewart's nephew, were hired to murder James Norris in Kentucky. Norris was found under a bale of hay beaten to death in a barn behind his home. Lyon was also hired to kill James Nichols in Alabama, whose body was discovered in 1999 in a partially submerged van. Nichols' 85 year old mother was also in the van, but survived. Co-conspriator Dorman was kidnapped (interstate) and locked into the trunk of a car that was then run into the Green River in Henderson County. He survived to be charged as part of the conspiracy. The elder Lyon committed suicide to avoid apprehension. Stewart was arrested in the Spring of 2000 after appearing on "America's Most Wanted." The Court set a deadline for the Attorney General's decision whether to seek the death penalty. Lyon faced the death penalty but was sentenced to life in prison after his jury was instructed that Stewart would not because the Attorney General took too long to file a notice of intent to seek the death penalty. A third bank fraud victim is missing and presumed dead. Lyon committed an unrelated fourth murder. The Court set a deadline for the Attorney General's decision whether to seek the death penalty. All involved are white.

**Gomez-Olmeda, David**
D. PR CR No. 03-CR-73-ALL
Race: H

A killing during an FBI undercover sting operation involving guns. The victim was an FBI confidential informant who was wired at the time. The FBI witness was shot to death and robbed in an FBI surveillance van. A videotape recorded the murder. The money robbed was FBI money and the car stolen was an FBI car. David Gomez entered into a plea agreement. However, Attorney General Ashcroft rejected a plea agreement and required a capital prosecution.

**Pennington, Tiffany Dominique**
W.D. KY CR No. 01-CR-35-ALL
Race: B

A bank robbery/murder of a white woman by two black defendants. Pennington was the triggerman. Moore provided the gun and was the get-a-way driver. Only Pennington will face the death penalty. He attempted to plead guilty before the government filed a notice of intent

to seek the death penalty, but the plea was rejected and the government filed its notice. Thereafter, his guilty plea was accepted. Since the indictment does not allege Post-Ring "special findings," the District Court dismissed the Notice of Intent to seek the death penalty. A government appeal was dismissed.

**Frye, James Edward**
S.D. MS CR No. 01-CR-8
Race: All B

Involves carjacking and multiple killings of two black victims who were attempting to buy about $30,000 worth of cocaine and were ripped off and killed. Both African-American defendants confessed, blaming the other as the triggerperson. There was a post-mortem attempt to dismember and rebury the bodies. The Notice of Intent to Seek the Death penalty against Frye was dismissed as filed too late. Cooper's life sentence was affirmed. 2003 WL 21672845 (5th Cir.).

**Safarini, Zayd Hassan Abd Latif**
D. DC CR No. 91-CR-504-ALL
Race: AR

One of the four hijackers who used semiautomatic weapons, hand grenades and explosives to take over a Pan Am flight in Karachi, Pakistan in 1986, which left 22 people dead, including 2 Americans of Indian descent. Safarini is a Palestinian.

**Hatten, Charles**
D. DC CR No. 91-CR-504-ALL
Race: W

A drug gun murder of a possible government cooperating witness, a member of a multi-state methampetamine drug trafficking ring. Both the defendant and the victim have substantial criminal records. All involved are white. Attorney General Ashcroft required a capital prosecution but the District Court dismissed the Notice of Intent to Seek the Death Penalty as filed late. A government appeal was dismissed on motion by the Department of Justice.

# Exhibit 14

JA 3179

# Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

### TOPIC:

### Federal Capital Cases in Which the Attorney General Withdrew a Notice of Intent to Seek the Death Penalty

**Mathis, Ronald Eugene**
M.D. FL CR No. 91-301-CR-T (18) (A)
Race: B

A black Tampa, Florida drug distributor, for having allegedly ordered a murder in retaliation for the theft of drugs. Murder for hire is alleged as an aggravating circumstance. In 1994, the government withdrew its notice of intention to seek the death penalty, and subsequently withdrew the 21 U.S.C. '848(e) homicide count as well. Trial began on the remaining (noncapital) counts and Mathis was convicted. This case had been authorized as a capital prosecution by Attorney General Barr in early 1992.

**Brown, Oliver; Green, William**
E.D. LA CR No. 92-468
Race: All B

Two black New Orleans inner-city gang members, in connection with an allegedly drug-related murder. In 1992, the Government dropped its request for the death penalty in this case. The defendants subsequently entered pleas to conspiracy to murder and a weapons offense in January, 1993. Brown received a 10-year sentence; Green received 15 years.

**Carrington, Arleigh; Chatfield, Tony**
M.D. GA CR No. 92-82MAC-WDO
Race: All B

Two black crack cocaine dealers in Macon, Georgia, in connection with the murders of two other crack dealers. Attorney General Barr authorized this death prosecution in his last week in office. In 1993, the government dropped its request for the death penalty against these two defendants. Both 848(e) murder charges were also later withdrawn, and the defendants subsequently pleaded guilty to various narcotics-related charges.

**Hoyle, Mark; McCollough, John; Goldston, Anthony; Harris, Mario**
D. DC CR No. 92-CR-284-01
Race: All B

Involves multiple killing. Four African-American D.C. residents who were charged with a total of eight murders as leaders of a District of Columbia drug gang known as the Newton Street

**JA 3180**

Crew. This case involved a triple slaying in which the killers wrapped the victims' heads in duct tape before shooting them at close range. Despite authorization to seek the death penalty by Attorney General Barr in 1992, the government did not ultimately request the death penalty at trial. McCollough participated in five murders. Goldston founded the gang. Hoyle ran the gang. The defendants and victims were all African-Americans.

**Murray, Michael**
M.D. PA CR No. 92-200
Race: B

A member of an African-American gang headed by one Jonathan Bradley, which involved the killing of a black Harrisburg drug dealer. DOJ declined to approve the U.S. Attorney's request to authorize the death penalty against Bradley, who allegedly ordered the killing, and against another participant in the shooting, Emmanuel S. Harrison. In 1994, after jury selection had already begun, Murray was permitted to plead guilty to a term of years, and the government withdrew its request for the death penalty. Judge Sylvia Rambo rejected the recommended less-than-life sentence and the case was reset for trial. In 1995, the Attorney General instructed the United States Attorney not to seek the death penalty on the eve of a capital trial scheduled to begin on the following Monday.

**Thomas, Vernon**
E.D. VA CR No. 3-92-CR- 68
Race: B

The last of the four Richmond, Virginia defendants in the "Newtown gang case." The government dropped its request for the death penalty on the eve of Thomas' separate trial from the other three capital defendants, just before an evidentiary hearing to determine whether the death penalty should be barred because the defendant had mental retardation.

**Tidwell, Tyrone**
E.D. PA CR No. 94-353
Race: B

A 35 year old African-American beauty salon owner who allegedly was a middle man between crack cocaine organizations in New York and Philadelphia. Tidwell solicited the killing of two black men in 1989 and 1991, one for selling crack on "his corner" and a second suspected of stealing drugs. Murder for hire is alleged as an aggravating circumstance. In 1996, the Attorney General authorized the death penalty for the 1989 homicide. However, shortly before the defendant's trial, the U.S. Attorney requested that the death penalty be withdrawn, and the Attorney General approved the request.

**Wyrick, Kevin**
W.D. MO CR No. 94-00194-01
Race: W

When the jury deadlocked on the punishment for the "boss" of a drug ring, Damon Moore, the government announced that it was withdrawing its request for the death penalty for Wyrick, the triggerman.

**JA 3181**

**Acosta, John Lefty**
D. NM CR No. 95-538-MV
Race: H

Involves multiple killings and murder in the aid of racketeering. The charges involve an L.A. gang, Sureno 13, moving crack and PCP from L.A. to Albuquerque. Among the seven murders connected to the gang one was of a high school student and another was a triple homicide. Five attempted murders were alleged, as well as a conspiracy to kill rival black drug dealers. Authorization was requested and granted by the Attorney General in 1996, for four of six defendants, but the government later withdrew its request for the death penalty as to one, after he was shown to be uninvolved in one of the two homicides originally charged against him. The remaining three entered guilty pleas: Mazzini received 25 years; Najar received 30 years; and De LaTorre received 22 years.

**DesAnges, Omar**
W.D. VA CR No. 95-00046RH
Race: B

The killing of an African-American, apparently a crack addict, who was a state's witness. The government withdrew its intention to seek the death penalty shortly before the scheduled April 1996 trial after the Attorney General declined to authorize the death penalty in an unrelated case in the Western District of Virginia, being prosecuted by the same Assistant United States Attorney. So the United States reached agreement with the defense on the drug distribution charges and agreed the homicide count would be tried as a non-capital case.

**Martin, Roy Ray; Mungia, Eli Trevino; Mungia, Ricky Rivera**
N.D. TX CR No. 5-95-CR- 0017-C (Cummings)
Race: W, H, H (resp.)

In the fall of 1994, three (one white, two Hispanic) young men randomly attacked blacks, killing one and seriously wounding two, in a racially motivated spree in Lubbock, Texas. Authorization was granted by Attorney General Reno in early October, 1995. The district court granted severance and the first defendant was scheduled for trial but the government withdrew the death penalty notice as to all three defendants who were then joined for trial and convicted.

**Peng, You Zhong**
E.D. NY CR No. 95 0870
Race: A

Two foreign national Chinese gang members who kidnaped intrastate Chinese nationals living in the U.S. for ransom to be paid by relatives in China. One victim was raped and severely abused before being strangled after her family failed to pay the ransom demanded. Jia Wu and Fu Xin Chen pled guilty and received life sentences in 1996. Capital authorization against a third defendant, You Zhong Peng, was withdrawn by the Department of Justice just three days before his scheduled 1997 trial.

**Williams, Jerry**
D. MD CR No. WMN 97-0355
Race: B

JA 3182

Involves multiple killings. Williams' co-defendant Anthony Jones faced death penalty for three murders, including an allegation that he ordered his step-brother killed from jail because he feared he was about to become a government witness. Williams was charged as the triggerman in a single homicide. Numerous other homicides were alleged in aggravation as to Jones. The cases were severed. Jones was convicted in 1998, and the jury recommended a life sentence. Thereafter, the government withdrew the request for the death penalty as to Williams, who was convicted and is serving a life sentence.

**Westmoreland, Guy; Lewis, DeAndre**
S.D. IL CR No. 98-30022- WDS
Race: W, B (resp.)

The murder of Debra Abeln in East St. Louis, Illinois, in front of her 12 year old son. Co-defendant Richard Abeln confessed to hiring Deandre Lewis, 23, through Westmoreland, to kill his wife. Murder for hire is alleged as an aggravating circumstance. Abeln faced the death penalty but pled guilty and received a life sentence. All involved are white, except Lewis, who is African-American.

**Marrero, Jose Rodriguez; Pena-Gonzalez, Nicholas**
D. PR CR No. 97-284 (JAF)
Race: All H

A large scale drug conspiracy and two 1996 killings by Valle-Lassalle and one by the others in 1996. The second was a witness elimination -- the government witness was cut up with a machete. Murder for hire is alleged as an aggravating circumstance. The Attorney General required a capital prosecution against all four defendants. All involved are Hispanic.

**Locust, Jeremiah**
W.D. NC CR No. 2:98CR185
Race: NA

The killing of 36 year old, white, National Park Service ranger for the Great Smoky Mountains National Park in 1998 by a Native American who was intoxicated. Locust was threatening visitors to the park with a rifle. Kolodski and other park rangers responded. (Locust fired at another ranger's car smashing the windshield.) Kolodski was wearing a bullet proof vest but the single shot grazed his vest before entering his chest and wounding him fatally. The jury rejected a premeditation theory and the government withdrew its request for the death penalty.

**Perez, Luis Gines; Perez, Ricardo Melendez**
D. PR CR No. 98-164 (DRD)
Race: All H

Drug smuggling and a single homicide of a co-conspirator. The defendants are Hispanic, college educated businessmen. There was a joint plan to kill and Gines was alleged to have shot the victim on Melendez's boat and together they dumped the body. Authorization was withdrawn when a key government witness flunked a polygraph on whether he was the actual killer.

**Best, Jason**
N.D. IN CR No. 2:00CR171RL

JA 3183

Race: B

A 1999 drug trafficking 924 (c) and (j), gang murder. The murder was allegedly revenge for the robbery of drug trafficking proceeds from Best's girlfriend. Best was alleged to be a member of the "Bronx Boys" who was released from prison in 1998 after a two year sentence for cocaine sales. Best pled guilty with others in 1996 after stray shots into a house killed a 10 year old boy in his bed in 1993. The Attorney General required a capital prosecution but eventually allowed prosecutor's to dismiss the murder count after Best was given a life sentence after a separate trial in the drug case. Murder for hire is alleged as an aggravating circumstance. All involved are African-American.

**McMillian, Christopher**
N.D. NY CR No. 3:00 CR-269-ALL
Race: B

Murder during a CCE, involving a drug rip off. Another drug dealer was beaten to death. His marijuana and cash were stolen. The Attorney General required a capital prosecution against three defendants, later withdrawing the notice of intent as to McMillian, who was found to be mentally retarded by both the defense and government experts. All involved are African-American.

JA 3184

# Exhibit 15

JA 3185

# Summaries Of Cases
# Authorized for the Death Penalty
# 1988 - 2003

## David Bruck, Dick Burr & Kevin McNally
## Federal Death Penalty Resource Counsel Project

### TOPIC:

## Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other Than Death

**Culbert, Stacy; O'Bryant, Lonnie; Williams, Michael; Wilkes, Charles**
E.D. MI CR No. 92-81127
Race: All B

Involves multiple killings - an innocent gang member. After insisting for nearly two years he had murdered four people, including a child, the government dismissed capital murder charges against a Detroit man and began prosecuting a co-defendant for the same killing. The AUSA has claimed the gang was connected to "more than 50 murders."

**Johnson, Darryl**
W.D. NY CR No. 92-159-C
Race: B

Involves multiple killings. An African-American from the West Coast charged with two cocaine-related killings by a California and Tennessee connected, Buffalo, New York group, suspected in as many as five other murders. Murder for hire is alleged as an aggravating circumstance. A guilty plea was entered in 1995, on the morning of trial. The defendant was sentenced to life imprisonment.

**Zambrano, Jesus**
E.D. TX CR No. 9:91-CR4
Race: H

A third co-defendant in the Villarreal case who testified against the two brothers at trial.

**Perry, Wayne Anthony**
D. DC CR No. 92-474
Race: B

Involves multiple killings and a hitman for a D.C. cocaine distribution ring between 1989-1991, facing eight homicide counts. Murder for hire is alleged as an aggravating circumstance. In 1994, the defendant pleaded guilty to five homicide counts in exchange for the government's dropping the death penalty. He received five consecutive nonparolable life sentences and was sent to the federal "super max" prison in Colorado, ADX Florence.

JA 3186

**Valle-Lassalle, Victor Manuel**
D. PR CR No. 97-284 (JAF)
Race: H

A large scale drug conspiracy and two 1996 killings by Valle-Lassalle and one by the others in 1996. The second was a witness elimination -- the government witness was cut up with a machete. The Attorney General required a capital prosecution against all four defendants. Murder for hire is alleged as an aggravating circumstance. All involved are Hispanic. Valle-Lassalle received a 40 year sentence.

**Woody, Charles**
C.D. CA CR No. 99-84-AHM
Race: H

One of three related Mexican Mafia cases. A previous case, involving 12 murders and attempted murders, United States v. Alex Aguirre, et al.(C.D. CA CR 95-345(A)-RSWL) was not prosecuted as a death penalty case. The Attorney General required a capital prosecution. One defendant in that case was found not guilty and he is said to have been killed by Woody, 28, in a generational power struggle. Woody was also involved in several murder conspiracies

**Furrow, Buford**
C.D. CA CR No. 99-838 (A) -RAP
Race: W

The racially motivated shooting and killing of an Asian (Filipino) postal worker in 1999. Furrow, 37 and Caucasian, is alleged to be a member of the Aryian Nation. He also walked into a Jewish Community Care Center and shot five people, including three children. Furrow then carjacked a Toyota. Furrow described this attack as "a wake up call to America to kill Jews."

**McCauley, Donzell**
M. D. DC CR No. 94-121
Race: B

A young black man from the District of Columbia who struggled with and shot to death a police officer. Attorney General Reno required a capital prosecution for the murder of a white law enforcement police officer despite the U.S. Attorney's initial decision that the death penalty not be sought. This authorization marked the first time in the post-Gregg era of capital punishment that the Attorney General required a capital prosecution in a federal criminal case despite the initial opposition of the local U.S. Attorney. Subsequently, the defendant entered a plea of guilty and was sentenced to life imprisonment.

**Vest, James; Vest, Mark; Vest, Steven**
W.D. MO CR No. 94-00037-04
Race: All W

Involves multiple killings - three white brothers from Kansas City who were approved for a capital prosecution in 1994. They were charged with the well- planned double homicide of two Mexican drug dealers. Graves were dug and the victims abducted and bound with duct tape, suffocating to death. A fourth brother, Darrell Vest, did not face the death penalty. One defendant was also charged with a separate murder count in another drug rip-off. Guilty pleas were negotiated for all three.

**JA 3187**

**Bonds, Andre**
E.D. MO CR No. 4:95CR332
Race: B

A black teenager in a cross-racial car jacking case involving an 18 year old African-American defendant (and his 16 year old co-defendant) who allegedly killed one white female, took her car across state lines, kidnaping and raping her girlfriend - another Caucasian. Mr. Bonds pled guilty in 1996 and was sentenced to life imprisonment. The victim was white.

**Chen, Fu Xin; Chen, Jia Wu**
E.D. NY CR No. 95 0870
Race: All A

Two foreign national Chinese gang members who kidnaped intrastate Chinese nationals living in the U.S. for ransom to be paid by relatives in China. One victim was raped and severely abused before being strangled after her family failed to pay the ransom demanded. Jia Wu and Fu Xin Chen pled guilty and received life sentences in 1996. Capital authorization against a third defendant, You Zhong Peng, was withdrawn by the Department of Justice just three days before his scheduled 1997 trial.

**Damon, Marvin; Williams, Robert Russell**
E.D. VA CR No. 3:95CR45
Race: All B

Two members of a drug ring, from Richmond, Virginia, African-American, 52 and 30 years old, charged with the distribution of heroin, mainly in one housing development in Richmond where another African-American was shot to death in 1994 by Damon, at co-defendant Williams' request. The government alleged numerous other homicides committed by Damon as Williams' enforcer. Murder for hire is alleged as an aggravating circumstance. Damon agreed to plead guilty, attempted suicide and finally entered a plea. Williams pled guilty after a jury was seated

**DeLaTorree, Jason; Mazzini, Marcos; Najar, Vincent**
D. NM CR No. 95-538-MV
Race: All H

Involves multiple killings and murder in the aid of racketeering. The charges involve an L.A. gang, Sureno 13, moving crack and PCP from L.A. to Albuquerque. Among the seven murders connected to the gang one was of a high school student and another was a triple homicide. Five attempted murders were alleged, as well as a conspiracy to kill rival black drug dealers. Authorization was requested and granted by the Attorney General in 1996, for four of six defendants, but the government later withdrew its request for the death penalty as to one, after he was shown to be uninvolved in one of the two homicides originally charged against him. The remaining three entered guilty pleas: Mazzini received 25 years; Najar received 30 years; and De LaTorre received 22 years

**Fleming, Lamont; Gist, Cory**
E.D. NC CR No. 4:95-CR-41-1-H-2
Race: All B

Involves multiple killings and a crack cocaine conspiracy alleging four 1995 murders by an African-American gang originating in Brooklyn, New York. Fleming, Gist and co-defendant Linton were triggermen. DOJ did not authorize capital prosecutions against four other defendants, including Linton. Guilty pleas were entered by the two capital defendants who were charged in two murders. The two capital homicides involved the separate murders of two participants in a prior drug-related murder. All involved are black. Attorney General Reno required a capital prosecution as to Gist.

**Haworth, Richard; Spivey, Everett**
D. NM CR No. 95-491 LH
Race: All W

Haworth was the leader of a New Mexico drug trafficking conspiracy, during the course of which he murdered at least three individuals (two Hispanic, one Anglo). The government dropped its request for the death penalty in exchange for his plea and a life sentence on the eve of his scheduled trial in February, 1997. After six weeks of jury selection, the government accepted Spivey's guilty plea to a single homicide count and a 30-year sentence. Both Haworth and Spivey are white.

**Beckford, Devon Dale**
E.D. VA CR No. 3:95CR00087
Race: B

Involves multiple killings. Another New York - Richmond cocaine connection was uncovered which involved members of a Brooklyn gang, all African-American, who transported crack cocaine to Richmond, Virginia. The 32-count indictment charged five of the alleged members of the so-called "Poison Clan" with capital murder in six killings, two in 1988 and four in 1994. (Devon Dale Beckford, 33, identified by the FBI as a gang leader was not arrested until July, 1997.) Murder for hire is alleged as an aggravating circumstance. After a seven-week trial, a jury declined to impose the death penalty on all four defendants: Dean Beckford, 32, Leonel Romeo Cazaco, 22, Claude Gerald Dennis, 28 and Richard Thomas, 22. Dean Beckford and Claude Dennis were found guilty of the 1998 double murder. (Dennis had previously been acquitted on these charges in state court in 1989.) Cazaco and Thomas were also convicted of a capital charge. Thomas had been acquitted in state court on the one homicide count on which he was convicted in federal court.

**Bennett, Daniel Ray; Stanley, Edward**
C.D. CA CR No. 96-1140(A)-ER
Race: All B

An African-American drug boss and a hitman. United States v. Daniel Ray Bennett and Edward Stanley (C.D. CA CR No. 96-1140(A)). In this first Ninth Circuit case to be authorized for death penalty prosecution, Stanley was accused of hiring Bennett to murder a former member of Stanley's drug trafficking operation in Las Vegas, Nevada. Murder for hire is alleged as an aggravating circumstance. Government court filings indicated that the murder conspiracy was monitored by wiretap. Both pled guilty. Attorney General Reno required a capital prosecution.

**Cable, Donald Thomas; Holloway, Tim**
M.D. TN CR No. 3:96- 00004
Race: All W

The 1995 killing of a federal grand jury investigation witness two days before her testimony. The female victim was in her early 40's and white, as are all the defendants. Cable was the triggerman who is said to have stabbed the victim to death. Dugger hired Cable after one David Day, the government's key witness, hired Dugger on behalf of a large-scale methamphetamine dealer, Tim Holloway. Dugger was in poor health (a recent liver transplant) and allegedly incompetent. Day received a 20 year sentence as a government witness.

**Clary, Moses**
D. NJ CR No. 96-576 (Rodriguez)
Race: B

A 19-year-old African-American defendant with a history of mental illness was charged with complicity because his deceased co-conspirator shot a security guard during a robbery of an armed car in a suburban Camden, N.J. shopping mall. The male victim was black and seventeen. A white bystander, a 14 year old girl, was accidentally shot and killed by the security guard during the robbery. Clary accepted an offer of life in 1998, attempted to withdraw it, and was refused

**Cuff, John: Heatley, Clarence**
S.D. NY CR No. 96 CR 515 (MJW)
Race: All B

Involves multiple killings in a CCE prosecution of the leaders of a drug organization which operated in the Bronx and Manhattan for a decade. Heatley, 43, ordered 14 homicides, admitting involvment in 13, ten of which were carried out by Cuff, who acted as Mr. Heatley's bodyguard and driver. Cuff had been a housing police officer from 1982 until 1986. Heatley pled guilty in return for a life sentence. On the 1999 trial date, Cuff also pled guilty. He also received a life sentence. Heatley has a serious history of crimes of violence, but was previously acquitted four times in state court trials.

**Kaczynski, Theodore John**
E.D. CA CR No. S-96-259
Race: W

The Unabomber case. The defendant faced capital indictments in two federal districts, Eastern District of California and District of New Jersey, for terrorist mail bombings over a period of 18 years. Three men were killed, in California and New Jersey, and 29 were injured, including one man whose arm was blown off and another who lost a hand. A plea was negotiated as opening statements were about to commence and after a BOP psychiatrist had confirmed defense experts' findings that the former Berkeley professor suffered from paranoid schizophrenia. Kaczynski tried, but failed, to withdraw his guilty plea. 2001 WL 114688 (9th Cir. 2001). He remains at ADX Florence

**Montanez, Ian Rosario**
D. PR CR No. 96-001 (PG)
Race: H

The first death penalty case to be authorized in a Puerto Rico federal court. The Attorney General required a capital prosecution against the alleged triggerman in a bank robbery during which a security guard was killed and several bystanders injured. Montanez pled guilty in April

1998 to a less-than-death sentence.

**Ortiz-Velez, Felix; Otero, Julio**
M.D. PA CR No. 3:CR-96- 005 (Rambo)
Race: All H

Two drug-related murders, one involving torture. Murder for hire is alleged as an aggravating circumstance. Ortiz pled guilty to being an "enforcer," acting on the instructions of Mr. Otero, who also pled guilty. Otero's homicide counts were dismissed although both received life sentences, Otero on the drug case.

**Storey, Gregory**
D. KS CR No. 96-40018-01-OES
Race: W

A white prison inmate who killed another white prisoner at the United States Penitentiary at Leavenworth. Storey may have had Aryan Brotherhood ties. The death penalty was initially sought. However, the prosecution ended in a negotiated guilty plea to second degree murder in 1997. Storey was sentenced to 327 months, to run consecutive to sentences imposed in Nevada and Colorado. He subsequently was charged in a nationwide Aryan Brotherhood RICO indictment in Los Angeles.

**Walter, Abram**
D. AK CR No. F96-026 (HRH)
Race: W

A white survivalist, charged with the robbery murder of a native Alaskan storekeeper whose remote outpost in a roadless Alaskan wilderness served as a U.S. Post Office. The Attorney General required a capital prosecution.

**Frank, Deric**
S.D. NY CR No. 97 CR 269 (DLC)
Race: B

Domestic killing - the March 11, 1997 intrastate kidnaping of the (former) girlfriend of co-conspirator, turned government wirness, Deric Frank, from Stamford, Connecticut. The defendants assaulted her and took her to the Bronx where she was burned alive in the trunk of her car. There were multiple orders of protection of the deceased due to repeated domestic violence complaints against Frank. Both the defendants, and the victim, 24, are black. Deric Frank was authorized for a federal capital prosecution, pled guilty and became a witness against Bailey. Bailey was sentenced to life in prison, but did not face the death penalty. All involved were African-American.

**Holland, Charles**
N.D. AL CR No. 96-B-0208-NE
Race: W

The 1991 killing of an informant in a drug conspiracy case who had been given a new identity and sent out of state. However, he returned and was spotted at a flea market in Ft. Payne. The drug ring boss, Marvin Holley, and Mr. Holland kidnaped the victim and killed him with

a hammer. Holley's trial in 1998 resulted in a life sentence. All involved are white.

**Lam, Tanh Huu**
E.D. CA CR No. S 97-054-WBS
Race: A

The throwing of a Molotov cocktail through a dining room window. One victim, a 9 year old Asian female, was killed. Others were injured. The target was alleged to be a man who had an affair with Lam's wife. There were two cars seen at the time of the bombing. Authorization for Lam was initially not sought or granted. The jury deadlocked at Lam's first trial. The government then produced a new witness who tape-recorded Lam talking about setting up another arson. The Attorney General gave the go-ahead to seek the death penalty at a retrial, but a conditional guilty plea was entered. Federal jurisdiction is based on the happenstance that an apartment building was bombed. All involved were Vietnamese.

**Reader, Arthur Charles**
E.D. TX CR No. 5:97 CR 15
Race: B

The abduction of a 27 year old African-American female by her 35 year old African-American boyfriend in Texarkana, Texas. After crossing the line over into Texarkana, Arkansas, the victim was stabbed eighty four times, hit in the head with a brick and left to die. The defendant allegedly would not tell law enforcement officials where she was because he wanted her to die.

**Wooldridge, Steven**
W. W.D. AR CR No. 4:97 CR 40013-001
Race: W

A Ft. Smith, Arkansas kidnaping, sexual attack and murder. Wooldridge asked for directions from the female victim in her front yard in Texarkana, Arkansas. He then forced her into his vehicle and took her to a storage shed in Texas where he may have sexually assaulted her. Eventually, Wooldridge took his victim to another location and killed her. Wooldridge confessed, denying sexual assault. All involved are white.

**Black, Douglas; Riddle, Steven**
D. CO CR No. 98-CR-196
Race: All W

Two "super-max", Florence, Colorado inmates, who attacked two suspected snitches. One inmate, an ex-police officer, was murdered. Another inmate survived the attack. The stabbing was witnessed by prison staff who were assaulted when they tried to get co-defendant Riddle off the victim. The United States Attorney did not seek permission to ask for the death penalty but the Attorney General required a capital prosecution. Riddle negotiated a 168 month cap. Black agreed to plead to aggravated assault in return for a sentence of no more than 84 months. Black had a prior murder. Riddle had a record of crimes in and out of prison. Riddle was sentenced to 120 consecutive months. Black's sentence was 78 consecutive months.

**Kauffman, Christopher; McMahan, Jamie**
S.D. IA CR No. 97 Wolle
Race: All W

**JA 3192**

Two carjackings/murders, a bank robbery and interstate flight by two young, white step-brothers. Two white women were murdered in their homes and their cars were used in the robbery of $70,000 from a bank. Each brother was a triggerman. The United States Attorney and defense counsel negotiated plea agreements shortly after the Attorney General required a capital prosecution.

**Llamas, Tamara; Wakefiled, Jimmy**
E.D. NC CR No. 7:97-CR-63-1-H
Race: All W

A murder-for-hire of an informant in a marijuana conspiracy. Llamas, a white female, allegedly ordered the killing of a drug informant. The triggerman was Wakefield. The drug informant was carelessly named in a warrant, and was murdered a month later. The marijuana conspiracy involved North and South Carolina, Texas and Oregon.

**Pena, Richard**
E.D. LA CR No. 97-CR- 145-ALL
Race: H

Involves multiple killings and the prosecution of an alleged cocaine drug lord (Richard) and his brother (Johnny). Richard Pena, a 32 year old Dominican Republican foreign national, who became an American citizen in 1994, was a drug kingpin of a group that moved large amounts of cocaine and marijuana in Southeastern United States. Murder for hire is alleged as an aggravating circumstance. This group involved numerous family members and a New Orleans police officer. Richard Pena was charged with eight homicides, four approved as capital counts by the Attorney General. Pena, himself, committed two of the murders, and ordered the death of the others. A non-capital co-defendant was an ex-police officer who arrested one victim in August of 1995 and delivered him to Pena and two associates. His remains were found two months later. Pena pled guilty and received a sentence of life without release.

**Rausini, Walder Pierre**
N.D. CA CR No. 95-0319- SI
Race: H

Involves the murder of the head of a "Continuing Criminal Enterprise." Lance Estes, a 34 year old white male, had been involved in drug trafficking for many years and had taken over a CCE, whose head had gone to prison. Charged with involvement in this CCE, Estes worked out a deal as an informant for the government but continued to direct his drug enterprise. Rausini was alleged to be working as a "cook" in the Estes organization, converting methamphetamine into "ice." He ordered the murder of Estes in an effort to take over Estes' organization. A co-defendant shot Estes, whose body turned up after Labor Day 1995 in a dumpster in Oceanside with a single gunshot wound to the head. Rausini is also accused of ordering a second murder of another member of the of the CCE because of his plans to become a government informant. Another co-defendant was the killer in this murder. Rausini was 26 years old at the time of the murders with which he is charged and had no serious prior convictions. Murder for hire is alleged as an aggravating circumstance. The government did not seek the death penalty against Rausini's codefendants. Rausini is a Brazilian foreign national of mixed race. The victims are both white.

**Abeln, Rick**

S.D. IL CR No. 98-30022- WDS
Race: W

The 1997 murder of Debra Abeln in East St. Louis, Illinois, in front of her 12 year old son. Richard Abeln and co-defendant Guy Westmoreland were indicted for conspiracy to distribute marijuana and cocaine, as well as the killing of Mrs. Abeln. Mr. Abeln confessed to hiring Deandre Lewis through Westmoreland to kill his wife. It was alleged that Mrs. Abeln was killed to cover up drug trafficking. Deandre Lewis has been identified as the gunman. Lewis' motivation was said to be a drug debt. Westmoreland was initially not authorized for a capital prosecution, but after Abeln's guilty plea, Westmoreland and Lewis were charged in a superseding capital indictment. Murder for hire is alleged as an aggravating circumstance . All involved are Caucasian, except Lewis, who is African-American.

**Rollack, Peter**
S.D. NY CR No. S4 97 CR 1293
Race: B

Eight racketeering murders between 1994 and 1997 by a gang headed by Rollack called "Sex, Money and Murder" which later affiliated itself with "the Bloods." Rollack approved a Thanksgiving 1997 double killing and personally killed four others, including a witness to another homicide. One victim in the Thanksgiving shooting was thought to be a witness in a North Carolina drug enterprise prosecution against Rollack, but actually was not. Only Rollack was targeted, and authorized for, a federal capital prosecution. All involved were African-American, or Hispanic. On January 3, 2000, just before jury selection was to begin, the defendant entered a guilty plea in exchange for a life sentence. He was sent to "super-max," with severe restrictions on who he may communicate with.

**Dean, Chris**
D. VT CR No. 2:98M0021
Race: W

A mail bomb which killed a 17 year old Vermont man and disfigured his mother. The bombing was motivated by an internet dispute involving the deceased's fraudulent behavior. All involved are white. The United States Attorney did not request that this be a capital prosecution, but the Attorney General required a capital prosecution. Main Justice disagreed. Both the defendant and his victim were white. Dean pled guilty in September of 1999 and was sentenced to life.

**Santiago, Jose**
S.D. NY CR No. 98-CR- 290
Race: H

Two- count RICO indictment charging murder in aid of racketeering. The defendants are members of the Latin Kings. Hector Colon put out a "terminate on sight order on the deceased." The victim had stabbed Colon after an argument over a girl. Santiago entered the victim's apartment alone, with a gun provided by another gang member, Angel Lugo, and shot the victim in front of his family, including two young children. Colon was killed in September of 1999 in a shootout with the FBI. The Attorney General required a capital prosecution against Santiago alone. The government first announced that Lugo (the superior who ordered the killing) would face the death penalty but decided to file a "notice" only as to Santiago. Santiago agreed to a 50 year sentence.

**JA 3194**

**Chong, Richard Lee Tuck**
D. HI CR No. 98-00416 ACK
Race: A

A defendant originally indicted in the State of Hawaii for murder and various firearms violations. He fled the jurisdiction. A federal prosecution under 18 U.S.C. §924(j), use of a firearm to commit a drug related murder, was filed. The 47 year old Chong has a lengthy record of convictions for serious offenses and a violent prison record, including sodomy/assault with an ice pick and starting a fire. He had only been recently released when he allegedly shot the victim over a $100 drug debt. The defendant is Asian and the victim is Hawaiin. Chong entered a guilty plea and was sentenced to life in prison.

**Lane, Robert**
D. MD CR No. L-98-73
Race: B

A series of carjackings, culminating in a cross-racial murder where the 86 year old victim apparently resisted and was beaten with a hammer or lead pipe on the head and killed by Lane who had been released from prison after abducting a woman. Lane faced the death penalty but was allowed to plead guilty.

**Bullock, Joseph**
E.D. VA CR No. 3:98CR150
Race: B

Involves multiple killings and another Richmond, multi-defendant, multiple murder, drug conspiracy prosecution ... this one involving four killings in 1993 and 1994. Two co-defendants, Hickman and Lightfoot, agreed to plead guilty before authorization was considered. Another co-defendant, Robert Lavelle Weaks, was not the target of a request to seek the death penalty and was not authorized for a capital prosecution.

**Glover, Cody**
D. KS CR No. 98-10059-01-MLB
Race: B

Another Kansas Hobbs Act prosecution involving a robbery/murder in a convenience store. Glover, who is black, confessed to entering the store, demanding money and then attempting to execute the two white store clerks who did not resist, killing one employee and critically wounding a second. Co-defendant Mark Holley admitted he was to receive part of the robbery proceeds for being the getaway driver. Holley was not authorized for a capital prosecution but Glover faced the death penalty for use of a gun during a crime of violence, although the United States Attorney apparently did not request authority to seek Glover's execution. The Attorney General required a capital prosecution. Glover pled guilty in April 1999 and received a life sentence

**Kee, Charles Michael**
S.D. NY CR No. 98 Mag 1603
Race: B

A Bronx gang member who attempted to extort money to repay a debt by keeping a female

juvenile hostage. A few days later, the girl's boyfriend was murdered by a juvenile in Kee's presence. Kee was a "Bloods" gang leader, organizing juveniles to commit crimes. The United States Attorney did not request permission to seek the death penalty, but the Attorney General required a capital prosecution.

**Aiken, Ian Orville**
S.D. FL CR No. 97-233-CR- GOLD
Race: B

Involves multiple killings and a racketeering indictment against a gang known as the "Moscow Posse," who engaged in acts of violence, including murder, robbery, kidnapping, witness tampering, narcotics trafficking and extortion. Ian Aiken, the kingpin, and Oliver Lyons were accused of murdering Derrick Christian in New York City on October 27, 1995. Roland Aiken, Daniel Aiken and Eric Morris are accused of gunning down Desmond LaTouch in a Florida parking lot the next day, at Ian Aiken's request. Aiken also faced state murder charges in Miami. (The Moscow Posse was being investigated by authorities since the massacre at the Taste of the Islands restaurant, where four people died and 18 others were wounded in a gang shootout in August of 1992.) It is alleged in aggravation that Aiken was involved in a total of four murders, an attempted murder, a burglary, a robbery and a kidnapping. There may have been as many as 15 homicides alleged. Only Aiken faced the death penalty

**Burgett, James Harold**
W.D. TN CR No. 98-20160- G
Race: W

A witness killing. Burgett killed his ex-wife because she helped authorities arrest him for making pornographic tapes of his 3 year old daughter. When Burgett found out she secretly tape-recorded him, he shot and killed Diane Wilcox and wounded his 18 year old step-daughter while on bail awaiting a 27 months prison term for child pornography. State capital charges were dismissed although Burgett pled guilty in a separate statutory rape state case. Both Burgett and Wilcox are white. Burgett pled guilty and was sentenced to life in prison

**Lawrence, Jonathan Huey; Rodgers, Jeremiah**
M. N.D. FL CR No. 3:98CR73 (RV)
Race: All W

An apparently motiveless murder on federal property. The defendants met while in a state prison mental health facility. The government's theory was that this was a thrill killing. Rodgers allegedly shot a man through a window a month later. All parties are white. The Attorney General required a capital prosecution. Both Lawrence and Rodgers pled guilty in exchange for the government's agreement not to seek the death penalty. Both subsquently received the death penalty in state court.

**Gomez, Edsel Torres**
D. PR CR No. 98-72
Race: H

Involves multiple (seven) killings in a cocaine and heroin trafficking conspiracy. In the "Cayey Massacre," four men were tortured and murdered. Later, three other men were shot and killed in two incidents. Gomez, one of Puerto Rico's major drug dealers, agreed, in concert with another drug dealer, to eliminate various competitions who were trying to take over Gomez's

**JA 3196**

market. Gomez was the only defendant authorized for a capital prosecution. Three co-defendants, including one accused of murders in 1991 and 1993, did not face the death penalty. Murder for hire is alleged as an aggravating circumstance. All persons involved are Latino.

**Nieves-Alonso, Heriberto**
D. PR CR No. 97-284 (JAF)
Race: H

A large scale drug conspiracy and two 1996 killings by Valle-Lassalle and one by the others in 1996. The second was a witness elimination -- the government witness was cut up with a machete. Murder for hire is alleged as an aggravating circumstance. The Attorney General required a capital prosecution against all four defendants. All involved are Hispanic.

**Clemente, Louis**
M.D. FL CR No. 98-436 CRT 26B
Race: H

Involves multiple killings - the murder of two suppliers to whom Clemente owed $35,000 for methamphetamine. The government had initially sought the death penalty against Clemente, and had said they would seek the death penalty against the two shooters, only one (Hernandez-Miranda) of whom was arrested. Duran and Krammer claim they were outside when the shooters went into the victims' house. The shooters disposed of the bodies in an orange grove. Clemente allegedly provided the bleach to clean the house and paid the shooters, who fled. Duran has a domestic battery conviction. Clemente has claimed that Duran, his uncle, is the main instigator of the murder.

**Cooper, Carl Derrick**
D. DC CR No. 99-0266 (Green)
Race: B

Three charges of felony murder. Cooper, 29, confessed in writing to shooting three employees, 25, 24 and 18, in a failed robbery attempt of Starbucks Coffee Shop. Cooper claimed in his confession to police that he had a struggle with the shop's manager. She apparently was shot while attempting to flee after being unable to open the safe. Cooper was also arrested in connection with the 1996 wounding of an off-duty Prince George's County police officer during an attempted robbery. Cooper is black and two of the three victims are white. The government also alleged a 1993 armed robbery and murder of a security guard, three 1989 armed robberies, three 1996 armed robberies, a 1997 armed robbery, various conspiracies to rob and various shootings. The Attorney General required a capital prosecution.

**Friend, Travis; Friend, Eugene**
E.D. VA CR No. 3:99CR201
Race: All B

The carjacking of a Chinese truck driver, who was murdered by out-of-work African-American truckers, who wanted to make off with the truck and its cargo. A third brother, a juvenile, 15, as well as the mother and a girlfriend are also involved but do not face the death penalty. Both defendants pled guilty. Eugene may have been involved in a second homicide.

**JA 3197**

**Carpenter, Robert L.; Carpenter, Antonio**
W.D. TN CR No. 99-20155
Race: All B

A cross-racial carjacking case in a suburb of Memphis. The victim was a 63 year old white female and the carjacking occurred "in broad daylight at noon" at a Sonic "drive-in." The defendants were 18 and 19 and African-American. A third, uncharged defendant was a juvenile. The Carpenter brothers plead guilty during jury selection. They were tried in Tennessee state court and sentenced to life in prison.

**Kendall, Michael Robbie**
N.D. MS CR No. 3:99CR102
Race: W

The murder of an Ole Miss senior accountancy major in 1999. Lowery was shot at Puskus Lake. Others were in the line of fire.

**Llera-Plaza, Carlos Ivan; Acosta, Wilfredo Martinez; Rodriguez, Victor**
E.D. PA CR No. 98-362
Race: All H

Involves a Puerto Rico/Philadelphia cocaine connection between 1996-1998 and multiple (four) murders for hire, three in Pennsylvania and one in Puerto Rico. Rodriguez allegedly ran the organization with a fugitive named Cacerez. Two victims were suspected of carjacking a courier and stealing cocaine. A $25,000 contract was allegedly offered but an innocent victim was mistakenly killed in Puerto Rico. One suspect was located in Philadelphia and two Hispanic males, ages 29 and 17, were killed. The 17 year old was an innocent victim, the high school student nephew of the target. Later, the second target was located and killed. Martinez-Acosta, 21, allegedly did the shooting in the first three, on orders of the alleged kingpin Rodriguez. Llera-Plaza was allegedly the middle-man in arranging the killings and the driver. The triggerman in the fourth killing is a principal government witness. The governement seeks the death penalty against Rodriguez in four killings, Llera-Plaza in three and Martinez-Acosta in two. Attorney General Ashcroft approved plea agreements for Llera-Plaza and Martinez-Acosta, specifying life sentences. Judge Pollak then declared a mistrial for Rodriguez. All involved are Hispanic.

**Stayner, Cary**
E.D. CA CR No. CR-F-00- 5217 AWI
Race: W

Involves multiple killings - four homicides in two separate incidents in Yosemite National Park. Stayner, 37 and a motel handyman, confessed to the (intrastate) kidnapping, sexual assault and decapitation killing of a park naturalist. He also confessed to killing three sightseers, a mother and two teenage girls, five months earlier. There were initially arrests of ex-convicts for the killing of the sightseers. Stayner's brother was a highly publicized kidnap victim in 1972. All involved are white. He faces the death penalty in state court

**Satcher, Steve**
D. MD CR No. AW00-0105
Race: B

A domestic killing - the carjacking, interstate kidnapping and murder of the mother of Satcher's child. Satcher engaged the services of co-defendants Horton and Stancil for one-half kilogram of cocaine. They abducted the victim and took her from Maryland to North Carolina in the trunk of her car. She was strangled and beaten. Horton and Stancil doused the car with gasoline and ignited it. Murder for hire was alleged as an aggravating circumstance. All three defendants are African-American, as is the victim. Stancil became a government witness. Attorney General Reno refused a request to seek the death penalty against Horton. Attorney General Ashcroft approved a plea agreement to a life sentence.

**Pham, Trung Thanh**
E.D. CA CR No. 00-CR-411-ALL
Race: A

The throwing of a Molotov cocktail through a dining room window allegedly by Pham. One victim, Hien Tran, a 9 year old Asian female, was killed. Others were seriously injured. The target was a man who had an affair with co-defendant Lam's wife. Authorization for Lam was initially not sought or granted. The jury deadlocked at Lam's first trial. The government produced a new witness who said Lam ordered the firebombing. Attorney General Reno gave the go-ahead to seek the death penalty at a retrial, but a guilty plea was entered. Later, the government decided to seek the death penalty against Pham, who, along with two others, was allegedly paid to do the firebombing. Federal jurisdiction is based on the happenstance that an apartment building was bombed. Attorney General Ashcroft later approved a plea agreement with Trung Pham who received a life sentence with a possible Rule 35 reduction to 30 years. Tu Trong and Quac Pham did not face the death penalty. All involved are of Asian descent.

**Lallamand, Sienky**
N.D. IL CR No. 00 CR 143
Race: B

Mr. Lallamand is accused under 18 U.S.C. §2232(a) with constructing a pipe bomb and delivering it to the victim who was married to a woman with whom Lallamand was having an affair. The defendant and the deceased are African-American. Lallamand defrauded the deceased of $200,000 using the victim's identification. A plea agreement was reached but the defendant withdrew. The Attorney General required a capital prosecution. Attorney General Ashcroft approved a plea of guilty with a life sentence. The victim was African-American.

**Wilson, Bryant Lakeith**
W.D. TN CR No. 01-20041-DV
Race: B

A bank robbery in which a 79 year old white woman was killed in front of her daughter. This was the last in a series of eight such heists from Houston to Memphis. The defendants are African-American. Attorney General Ashcroft required a capital prosecution against Wilson, but then approved a plea agreement specifying a life sentence, the same agreement reached in state court.

**Shorter, Ramon Lori**
W.D. TN CR No. 01-20041-DV
Race: B

A bank robbery in which a 79 year old white woman was killed in front of her daughter. This was the last in a series of eight such heists from Houston to Memphis. The defendants are

African-American. The Attorney General approved a plea agreement specifying a life sentence, the same agreement reached in state court

**Millegan, Rufus Jerry, Jr.**
D. MD CR No. 01-CR-367-ALL
Race: B

Shooting of a white woman at a secluded location on federal land. The victim was shot repeatedly with two different types of ammunition. There are signed confessions by both defendants. Millegan confessed that he committed the murder, along with McClure, both shooting the victim with their weapons. McClure wrote that he told Millegan they should "press her" about the robbery. The deceased was taken to a road on federal land in Beltsville, where both allegedly shot her. The defendants are black. The alleged motive was a belief that the victim had some involvement in the burglary of Millegan's apartment. The Attorney General required a capital prosecution, but then approved a plea agreement specifying a life sentence.

**Maxwell, William**
W.D. TN CR No. 01-CR-20247-ALL
Race: B

A bank robbery resulting in the death of a black female employee of Union Planters Bank. A security guard was also shot in the face by Johnson, but survived. The defendants are African-American. Haynes was a shooter. The state and federal government both sought the death penalty against Haynes and Maxwell but not against Johnson who may be retarded. A federal jury sentenced Haynes to life imprisonment. After this verdict, Attorney General Ashcroft reversed his position and approved a plea agreement specifying a life sentence for Maxwell

**JA 3200**

# Exhibit 16

JA 3201

## Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

### TOPIC:

## Federal Capital Defandants Who Were Found Not Guilty of the Capital Charge or Were Innocent

**Brown, Reginald**
E.D. MI CR No. 92-81127
Race: B

Involves multiple killings - an innocent gang member. After insisting for nearly two years he had murdered four people, including a child, the government dismissed capital murder charges against a Detroit man and began prosecuting a co-defendant for the same killing. The AUSA has claimed the gang was connected to "more than 50 murders."

**Crummie, Chedrick; Mack, Edward Alexander; Rozier, Kevin Denard**
S.D. FL CR No. 93-252-CR-UUB
Race: All B

Two drug-related murders committed in the course of a Miami narcotics trafficking operation. The three defendants faced the death penalty on one of the homicides. Attorney General Reno authorized a capital prosecution in early 1994; trial began on September 18,1995 and ended in an acquittal on the homicide counts on February 5, 1996. The government alleged that the defendants had intentionally shot an innocent female victim after the defendants kicked the door to her bedroom down while searching for a rival drug dealer who had ripped them off. This version, based on informant testimony, was contradicted by physical and eye-witness testimony. The defendants were convicted of non- capital drug trafficking charges.

**McKelton, Antonio**
E.D. MI CR No. 98-80348
Race: B

A bank robbery in which an employee was killed while servicing an ATM machine. McKelton was serving a state sentence for the armed robbery of a jewelry store and was suspected in six other robberies at jewelry stores. McKelton's print was on the clip inside the gun. The black victim had fired one shot off as he dove to the ground. McKelton, also a black man, suffers from Hodgkin's disease. The defense and the prosecutor jointly petitioned the Attorney General's Committee to withdraw the death penalty request. The request was first denied but was eventually granted. The indictment was dismissed when additional evidence was uncovered.

JA 3202

**Alejandro, Joel Rivera; Martinez, Hector Acosta**
D. PR CR No. 99-044 (SEC)
Race: H

Intrastate kidnapping, killing and dismembering of a Rio Piedras businessman who may have been involved in the illegal numbers racket called "bolleta," after his family ignored a million dollar ransom demand and called the police. The accused allegedly belonged to a gang of kidnappers suspected in as many as 15 abductions. Alejandro was alleged to be the triggerman. Only Alejandro and Martinez were to face the death penalty, but the district court declared the death penalty unconstitutional in Puerto Rico. 106 F.Supp. 311 (D. PR 2000). However, this decision was reversed by the Circuit. 252 F.3d 13 (2002). Both capital defendants had prior local murder convictions. Both were acquitted at trial. All involved are Hispanic.

**Castillo, Mario; Jacobo, Gerardo**
C.D. CA CR No. 99-83-(A)-DT
Race: H

Involves multiple murder charges against two co-defendants of Mariano Martinez who were approved for a capital prosecution while Martinez was on trial. Jacobo, 21, and Castillo, 22, were charged as the triggermen in a November 1998 triple slaying, allegedly by the Mexican Mafia, La Eme (Spanish for The M). Three men, one a drug dealer and two innocent bystanders, were killed in a Monticello autobody shop. After three months of trial, the government withdrew its notice of intent to seek the death penalty after the Court threatened to bar the testimony of two witnesses negligently not discovered or disclosed before trial. 18 U.S.C. Section 3432. The witnesses testified but the jury acquitted both defendants. All involved are Hispanic. The trial lasted 6 months. Castillo and Jacobo were acquitted of murder.

**Church, Walter Lefight**
W.D. VA CR No. 00-CR-104-ALL
Race: W

The April 1989 shotgun multiple murder of a family of three. A federal grand jury indicted Gilmore, a former mayor and convicted cocaine kingpin, and co- defendants Ealy and Church, charging them with two capital murders in the furtherance of a drug-trafficking enterprise and a third murder of a potential federal witnesses. They are charged with these murders during an alleged robbery of $30,000 belonging to a drug ring. The murders occurred one week after Gilmore learned that federal investigators were aware of his ties to drug trafficking.

**Jones, Luke**
D. CT CR No. 00-CR-238-ALL
Race: B

Six murders in two indictments and other attempted murders by the members of gangs called "The Middle," "Q & A Mob" or the "Batman Crew." The gangs dealt in cocaine, crack or heroin. Powell, Harris and Baldwin were charged in multiple (two) racketeering murders in 1996 and 1997. 18 U.S.C. " 1959 and 924(c). Luke Jones was charged in two murders in 1998 and 1999. The others were charged in one homicide. Luke and Lance Jones were found wearing bullet proof vest in a car in which several loaded weapons were found. Lance Jones is serving a 24 year federal prison term and Luke a 10-year sentence for being a felon in possession of a gun. All involved are African-American. Attorney General Ashcroft required a capital prosecution against Luke Jones. The jury found Luke Jones not guilty of one murder and

**JA 3203**

Judge Nevas granted a Rule 29 motion as to the other, finding that the second murder victim was not involved with a drug organization and did not pose a threat to Jones' drug enterprise, rather he was killed after a personal dispute.

**Rice, Darrell David**
W.D. VA CR No. 02-CR-26-ALL
Race: W

The multiple 1996 murders of two young female hikers in Virginia's Shenandoah National Park by cutting their throats. The victims were found bound and gagged. According to Attorney General Ashcroft, who announced pursuit of the death penalty himself, Rice has said he hates women and enjoys assaulting the vulnerable and that the two women deserved to die because they were lesbians. Review of tape recordings indicate Rice said only that the governement was portraying him that way. Rice is currently serving a 135 month sentence in federal prison for the 1997 attempted abduction of a female bicyclist in the park. Attorney General Ashcroft stated at a news conference: "We're inclined to prosecute hate crimes like this one, prosecute them to the fullest." All involved are white. Days before the October 2003 trial date the trial was postponed when the FBI "found a new hair" and also re-examined a hair linking Rice to the women and admitted there was no connection. The new hair did not come from Rice or the women. There is male DNA on both ligatures that did not come from Rice. Eventually, the prosecution was dismissed.

**Lentz, Jay**
E.D. VA CR No. 01-CR-150-ALL
Race: W

Interstate domestic violence and kidnapping resulting in death. The defendant lived in Virginia and his ex-wife was kidnapped from Maryland. Her body was never located. A bloody car was found in D. C. All involved are white. A government pretrial appeal involved statements by the defendant. 225 F.Supp.2d 672, aff'd, 2003 WL 253949 (4th Cir. (VA)). Lentz was convicted and the jury recommended a life sentence. However, the judge vacated the conviction for lack of any evidence of interstate kidnapping. A government appeal is pending.

**Gilmore, Charles Wesley**
W.D. VA CR No. 00-CR-104-ALL
Race: W

The April 1989 shotgun multiple murder of a family of three. A federal grand jury indicted Gilmore, a former mayor and convicted cocaine kingpin, and co- defendants Ealy and Church, charging them with two capital murders in the furtherance of a drug-trafficking enterprise and a third murder of a potential federal witnesses. They are charged with these murders during an alleged robbery of $30,000 belonging to a drug ring. The murders occurred one week after Gilmore learned that federal investigators were aware of his ties to drug trafficking

**JA 3204**

# Exhibit 17

JA 3205

# Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

## TOPIC:

## Federal Capital Defendants Convicted of a Lesser Offense

**Smith, Howard L.**
E.D. VA CR No. 97-341-A
Race: B

The stabbing death of a Lorton Correctional Center prisoner. The defendant was serving a 20-life sentence for a murder he committed ten years previously, at age 17. Lorton is the District of Columbia prison complex, but is located in suburban Virginia. After a one-week 1998 trial, a jury in Alexandria, Virginia, rejected first-degree murder charges and convicted Smith of second-degree murder, which is not a death-eligible offense. Although a number of Lorton murders have been prosecuted in federal court since passage of the 1994 Crime Bill, the Smith case was the first approved for capital prosecution. Smith was sentenced as a "career offender" to life without parole.

**Thomas, Christopher**
E.D. VA CR No. 99-477-A
Race: B

Another murder at the District of Columbia Department of Corrections facility in Lorton. The victim allegedly brought a shank to the fight and the defendant wrestled it from him and stabbed him three times. Thomas was convicted of second degree murder. All involved are African-American. This was Thomas' third murder conviction.

JA 3206

# Exhibit 18

JA 3207

# Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

## TOPIC:

## Federal Capital Cases Where the Death Penalty Has Been Rejected By Juries or Judges

**Hutching, James Norwood; Molina, Ramon Medina**
E.D. OK CR No. 1:92-032-S
Race: W, H (resp.)

Two white and one Hispanic defendants were tried jointly in connection with the drug- related intrastate kidnap/murder of a Muskogee, Oklahoma auto dealership employee. The two capitally-charged "managers" of the drug enterprise received life sentences from the jury. A wheelman, present on the scene, was sentenced to death, but that sentence was overturned on appeal. The victim was white.

**Cooper, Alex; Davis, Darnell Anthony**
N.D. IL CR No. 89-CR- 580
Race: All B

Two black Chicago gang members received life sentences for the cocaine-related murder of an informant after separate trials. The Government had offered one defendant, but not the other, a plea bargain prior to trial. 19 F.3d 1154 (7th Cir. 1994).

**Pitera, Thomas**
E.D. NY CR No. 90-0424 (RR)
Race: W

Involves multiple killings. A white Mafia contract killer, the only person with mob connections to face the federal death penalty, received a life sentence from a Brooklyn, New York jury after being convicted of seven murders, two of which qualified as capital crimes under 21 U.S.C. § 848(e). Several of the murders involved torture and dismemberment of the victims. 5 F.3d 624 (2d Cir. 1993).

**Villarreal, Reynaldo Sambrano; Villarreal, Baldemar**
E.D. TX CR No. 9:91-CR4
Race: All H

Two Hispanic defendants in Texas were sentenced to life imprisonment and 40 years, respectively, for the marijuana-related murder of a law enforcement officer after a joint trial. The sentencing jury found no facts legally warranting the death penalty. 963 F.2d 725 (5th Cir.), cert. denied, 113 S.Ct. 353 (1992). A third Hispanic defendant, Jesus Zambrano, was also initially approved for capital prosecution but received a sentence of 30 years after he

pleaded guilty and testified for the government against the Villarreals.

**Johnson, Shaheem; Johnson, Raheem**
E.D. VA CR No. 97-00314-A
Race: All B

Involves multiple killings - five killings of African-Americans, four males, one female, all cocaine-related murders, two in Virginia (a supplier/witness and his girlfriend with Raheem Johnson as the triggerman), one in Maryland (drug supplier with both Raheem and Shaheem firing weapons), one in Philadelphia (supplier/witness with Raheem Johnson as the triggerman) and another "murder for hire" in New York (drug supplier hit ordered by both Shaheem and Raheem Johnson). The two lead defendants, brothers Shaheem and Raheem Johnson, were authorized for a capital prosecution. Trial began in Alexandria in November, 1998 and ended in life verdicts for both brothers.

**Minerd, Joseph**
W.D. PA CR No. 99-215
Race: W

A case, 1999 New Year's Day arson resulting in the death of the defendant's girlfriend, her three year old child by another man and her fetus, the defendant's child. The ATF believes there was a pipe bomb as there was a shard of metal found in the deceased's exhumed body. All involved are white. Attorney General Ashcroft approved a plea agreement but the defendant backed out of the deal. 176 F.Supp. 424. 182 F.Supp.2d 459. 197 F.Supp.2d 272.

**Henry, Arnold Mark; Oscar, Frantz; Oscar, Jean Claude**
E.D. VA CR No. 93-CR-131
Race: All B

Involves multiple killings. Three blacks, two brothers born in Haiti, another man born in Grenada, were accused of two killings of an African-American man and a woman in related incidents where the victims were suspected of stealing crack cocaine. A Norfolk, Virginia jury refused, in March, 1994, to impose the death penalty upon any of the three capitally-charged defendants. Attorney General Reno authorized a capital prosecution in this case in 1993. Life sentences were affirmed on appeal. 82 F.3d 419 (4th Cir. 1996) (unpub.).

**Moore, Todd**
E.D. VA CR No. 2:93CR16
Race: B

Involves multiple killings. A black New York-based crack cocaine distributor was spared in the first and (to date) only judge-sentencing procedure. Attorney General Reno approved the death penalty in this case in 1994. Moore pled guilty to an indictment charging him with having ordered the murder of a member of his Newport News, Virginia drug organization. The government waived a jury for sentencing, and a sentencing hearing was held before the district court. One month later, the district judge declined to impose the death penalty, and sentenced Moore to life without possibility of release. The sentence was affirmed on appeal, 81 F.3d 152 (4th Cir. 1996) (mem.). At the trial of the admitted triggerman in the murder, Derek Kelley, Moore offered to testify as a government witness. However, the government declined to use Moore as a witness, and Kelley was subsequently acquitted of all charges and released.

**Diaz, Walter; Walker, Tyrone**
N.D. NY CR No. 94-CR-328
Race: All B

Involves multiple killings. Two African-Americans on a drug-related crime spree were approved for capital prosecution by Attorney General Reno in April 1995. The spree involved the alleged drug-related murder of a white victim by two African-American defendants. Two additional cross-racial homicides were alleged in aggravation, one during the course of a robbery in New York City, another of an elderly lawyer in upstate New York. Trial began in 1995 and sentences of life were returned after a vote of 11 to 1 for life for Diaz and 11 to 1 for death for Walker.

**Moore, Dennis B., Sr.**
W.D. MO CR No. 94-00194
Race: W

Recruited his associate (Wyrick) to kill a rival drug marijuana dealer. Murder for hire is alleged as an aggravating circumstance. Both the defendants and the deceased are Caucasian. In 1996, the jury deadlocked on the punishment for Moore, resulting in a life sentence.

**Nguyen, Phouc**
H. D. KS CR No. 94-10129-01
Race: A

The co-defendant of Chanthadara was also involved in a Hobbes Act robbery/murder. A Wichita, Kansas jury voted to sentence the defendant to life imprisonment in 1996, following his conviction for a murder committed during a commercial robbery. Mr. Chanthadara was previously sentenced to death by a different Wichita jury.

**Nichols, Terry Lynn**
D. CO CR No. 96-CR-68-M
Race: W

The co-defendant in the Oklahoma City bombing case. At a separate trial following McVeigh's, a Denver federal jury failed to reach a unanimous finding on Nichols' alleged intent to kill, a legal requirement for imposing the death penalty. The same jury's guilt phase verdicts indicated that the government had failed to prove that Nichols intended a lethal attack on the Murray Building. He was sentenced in 1998 to life imprisonment and faces the death penalty in state court.

**Beckford, Dean Anthony; Cazaco, Leonel; Dennis, Claude; Thomas, Richard**
E.D. VA CR No. 3:95CR00087
Race: All B

Involves multiple killings. Another New York - Richmond cocaine connection was uncovered which involved members of a Brooklyn gang, all African- American, who transported crack cocaine to Richmond, Virginia. The 32-count indictment charged five of the alleged members of the so-called "Poison Clan" with capital murder in six killings, two in 1988 and four in 1994. (Devon Dale Beckford, 33, identified by the FBI as a gang leader was not arrested until July, 1997.) After a seven-week trial, a jury declined to impose the death penalty on all four defendants: Dean Beckford, 32, Leonel Romeo Cazaco, 22, Claude Gerald Dennis, 28 and

Richard Thomas, 22. Dean Beckford and Claude Dennis were found guilty of the 1998 double murder. (Dennis had previously been acquitted on these charges in state court in 1989.) Cazaco and Thomas were also convicted of a capital charge. Thomas had been acquitted in state court on the one homicide count on which he was convicted in federal court.

**Ingle, Trinity Edward**
W.D. AR CR No. 6:96CR60022
Race: W

Two white teenagers charged with the robbery-murder of an elderly retired National Parks employee who was found shot and bound with tape near a hiking path in Hot Springs National Park, a federal preserve within the city of Hot Springs, Arkansas. Ingle was convicted of the murder in 1997 after a 6-day trial; two days later a Hot Springs federal jury unanimously sentenced him to life imprisonment. Paul was sentenced to death following a separate, eight-day trial. All involved are white.

**Jones, Anthony**
D. MD CR No. WMN-96-0458
Race: B

Involves multiple (six) killings: one in '94, four in '96, one in '97. Authorization was granted to seek the death penalty for three murders, including an allegation that Jones ordered his step-brother killed from jail because he feared he was about to become a government witness. Jones also ordered the murder, by the victim's own bodyguards, of a rival Baltimore drug dealer who had earlier attempted to arrange the murder of Mr. Jones. Numerous other homicides, attributed to Jones, were alleged in aggravation. Murder for hire is alleged as an aggravating circumstance. Jones was convicted in 1998, sentenced to life without release. Eight co-conspirators were involved in multiple murders but did not face the death penalty. Chapman, Hill and Ross were charged in at least 2 killings. Jones was sent to the "Control Unit" at "super-max," ADX in Florence, Colorado, where he is under severe communication restrictions for 10 years.

**Ray, Quan**
N.D. IL CR No. 96 CR 379
Race: B

Involves multiple killings and a "Gangster Disciple" enforcer. In 1997, a Chicago jury declined to impose the death penalty after convicting Mr. Ray of having murdered a fellow gang drug trafficker on orders of a Gangsters Disciples' higher-up, Darryl Johnson. Murder for hire is alleged as an aggravating circumstance. The jury found that no statutory aggravating factor had been established beyond a reasonable doubt, rejecting the government's allegation that the murder had been committed "after substantial planning and premeditation." Johnson was sentenced to death for the same and one additional murder.

**Bobbitt, LaFawn; Jones, Rashi**
E.D. VA CR No. 97 CR 129
Race: All B

Two defendants were charged with the fatal shooting of an bank teller during an attempted robbery of a Nationsbank branch in Richmond, Virginia. Both defendants and the victim are African-American. A security guard was shot and blinded during the robbery, but survived.

**JA 3211**

Trial began in 1998. The jury opted against the death penalty for both defendants.

**Holley, Marvin Lee**
N.D. AL CR No. 96-B-0208-NE
Race: W

The 1991 killing of an informant in a drug conspiracy prosecution who had been given a new identity and sent out of state. However, the government witness returned and was spotted at a flea market in Ft. Payne. The drug ring boss, Mr. Holley, and co-defendant Charles Holland are alleged to have kidnaped the victim and killed him with a hammer. Holley is also alleged to have attempted to arrange the killing of government witnesses from prison. Holley was sentenced to life in prison and is also serving several consecutive life sentences in state prison for drug trafficking. All involved are White

**Gonzales-Lauzan, Luis**
S.D. FL CR No. 02-CR-20572-ALL
Race: H

A murder-for-hire/informant killing case. Gonzales-Lauzan is charged with having arranged the murder of a government witness in a federal firearms case against his father. 18 U.S.C. " 924(j), 1111, 1512 and 1513. He allegedly provided a gun and a silencer and waited in another car nearby. Wiggins, the triggerman, allegedly shot the victim at his home in order to work off a drug debt to Gonzales-Lauzan. Hernandez is charged with having helped set up the shooting. Wiggins entered into a plea agreement to testify against Gonzales-Lauzan, who will face the death penalty. All involved are Cuban/Americans.

**Kehoe, Chevy**
E.D. AR CR No. LR-CR-97-243
Race: W

Involves multiple killings - the murder of a family of three (an Arkansas gun dealer, his wife and their 8 year old child) in the Fall of 1996 by white supremacists. Chevie Kehoe faced sentencing before the jury first and was sentenced to life imprisonment. Co-defendant Lee followed and was sentenced to death

**O'Driscoll, Michael**
M.D. PA CR No. 4:CR-01-277
Race: W

The stabbing and killing of an inmate at USP - Allenwood in 1997. There were half a dozen correctional officers who witnessed the end of the stabbing. Both the defendant and victim are white.

**Dhinsa, Gurmeet Singh**
E.D. NY CR No. 97-672 (S-3) (ERK)
Race: I

Involves multiple killings - a wealthy Indian businessman alleged to head a racketeering enterprise which killed two. Murder for hire is alleged as an aggravating circumstance.

**JA 3212**

**Al-Owhali, Mohamed Rashed Daoud**
S.D. NY CR No. S6 98 CR 1023
Race: AR

Alleged accomplices of Usama bin Ladin, purported to be the organizer of two bombings of American embassies in Africa. The August 7, 1998 bombings in Kenya and Tanzania killed 224 people (11 in Tanzania), including 12 Americans, and more than 5,000 people injured. Al-'Owhali is a 21 year old Saudi citizen who was arrested in Nairobi after the Kenya bombing. They are alleged members of al Qaeda, an international terrorist organization, led by bin Laden, a Saudi millionaire, who issued various "fatwahs" against the United States. Bin Laden and 7 others are fugitives. Al-'Owhali allegedly was ordered to create a diversion for the Kenya bomb by throwing grenades. Mohamed allegedly rented the house where the Tanzania bomb was made. The 12 dead Americans included 4 blacks, 4 whites and 1 Asian. The other victims were mostly black Africans.

**Finley, James A**
W.D. NC CR No. 4:98CR243
Race: W

Involves multiple killings - the murder of two campers at a national park by a young man with a history of drug abuse but no violence. The crime may have been a robbery\murder. All parties are white. Mitigation involved Finley's drug abuse and depression. The defendant was sentenced to life after an April 1999 trial

**Gilbert, Kristin**
D. MA CR No. 98-30044-MAP
Race: W

The killing of four patients at the Department of Veterans Affairs, and the attempted killing of three others. Ms. Gilbert, 31, used epinephrine, a drug that can overstimulate the heart, on her patients. Federal prosecutors said Gilbert murdered one patient, a 41-year-old invalid, after asking a supervisor if she could "leave early if he died." All involved are Caucasian. The jury deadlocked and Gilbert was sentenced to life in prison.

**Tello, Plutarco**
W.D. MO CR No. 98- 00311-01/05-CR-W-2
Race: H

Four Columbians charged in a drug related murder. The "kingpin", Hinestroza, was never arrested and may have fled to Columbia. Hinestroza and his gang sold cocaine in the Kansas City area. The victim and his nephew (who sold cocaine for the gang) stole $240,000 from them. The defendants tied up, interrogated, duck taped and shot both victims. The nephew lived, escaped and identified the defendants. Sinisterra shot and killed one victim. Ortiz or Tello shot the surviving victim. Sinisterra and Ortiz were sentenced to death. The jury deadlocked on punishment for Tello, and he was sentenced to life in prison.

**Bass, John**
E.D. MI CR No. 97-80235
Race: B

Involves multiple killings and eleven death eligible defendants who were charged in a four victim (continuing criminal enterprise) Detroit drug/murder case under 21 U.S.C. '848(a)(1)(A). Of the eleven, only Bass was chosen to face a federal capital prosecution. All involved are African-American. A pretrial appeal involved the issue of discovery of Department of Justice charging practices in capital cases. In a per curiam opinion, the United States Supreme Court reversed the order granting discovery. United States v. Bass, 122 S.Ct. 2389 (2002). John Bass and his brother Patrick allegedly started a drug gang called the "Dog Pound" (because members owned many pit bulls), which sold crack in Michigan and Ohio. John Bass is charged with arranging two murders - of his brother and a rival.

**Edelin, Tommy**
D. DC CR No. 98-264
Race: B

A drug conspiracy, racketeering, multiple murder CCE prosecution. Tommy Edelin faced the death penalty alone among many capital eligible defendants, including his father. Edelin, 30, was charged with ordering 14 murders and attempting to have another dozen killed during the 1990's, in his role as the so-called "drug kingpin" of the "1-5 Mob". Murder for hire is alleged as an aggravating circumstance. The gang was charged with the shooting of a D.C. police officer and in another incident in which three people were shot while attending a crowded neighborhood picnic. One victim was shot several times while returning from a prom with his girlfriend. Two teenagers were targeted by mistake on their way to a church Christmas Party. Edelin was acquitted of this double killing by co-defendant Bostick. Much of the violence stemmed from a turf battle with members of the "Stanton Terrace Crew," which is now essentially out of business after numerous members were killed or convicted of first-degree murder. Edelin was convicted of four murders, including paying a hit man to kill a 19 year old who alleged robbed an associated. 11 jurors deliberated 3 hours before voting for a life sentence. The capital charge was a conviction of murder for hire of a 14 year old who allegedly robbed an associate of Tommy Edelin. Edelin was born as a result of a brief sexual encounter to a convicted drug addict. He had an abusive, deprived, depraved childhood in a crime infested neighborhood. This was the first death penalty trial in the District of Columbia since the last execution in 1957. D.C. voters rejected the death penalty in 1992.

**Haynes, Willis**
D. MD CR No. PJM-98- 0502
Race: B

Involves multiple (two) killings - the January 1996 triple intrastate kidnapping/murder of three black females from D.C. Haynes has confessed three time, blaming Higgs the first two. A third defendant, Victor Gloria, also has confessed and will plead guilty as an accessory after the fact. The AUSA says he will seek permission to argue for the death penalty for Haynes and Higgs. They were involved in another shooting six weeks before. All involved are African-American.

**Martinez, Mariano**
C.D. CA CR No. 99-84- AHM
Race: H

Involves defendants in one of three related multiple murder Mexican Mafia prosecutions. "Chuy" Martinez, 41, is a defendant in one indictment, and the target of a murder plot in another. There are a total of four murders charged and 13 conspiracies to commit murder charged. Three men, one a drug dealer and two innocent bystanders, were killed in a Monticello autobody shop. Martinez, head of a drug organization allegedly orchestrated the

killing using a walkie-talkie. Max Torvisco, once Martinez's right hand man, worked a deal with the government. He admitted ordering 140 murders and planning to kill Martinez who had survived a 1997 assassination attempt. Wiretaps show Martinez ordering hits on numerous targets.

**Lyon, Billy Joe**
W.D. KY CR No. 4:99-CR-11-M
Race: W

Involves multiple killings - contract killing of men in Alabama and Kentucky. Lyon, 19, and co-defendant Charles Stewart, 54, were charged with conspiracy and murder for hire. Stewart and Richard Dorman, 62, were partners in an 18-month forged-check and fraud scheme, using the deceased's identity. Lyon and his deceased father, Stewart's nephew, were hired to murder James Norris in Kentucky. Norris was found under a bale of hay beaten to death in a barn behind his home. Lyon was also hired to kill James Nichols in Alabama, whose body was discovered in 1999 in a partially submerged van. Nichols' 85 year old mother was also in the van, but survived. Co-conspriator Dorman was kidnapped (interstate) and locked into the trunk of a car that was then run into the Green River in Henderson County. He survived to be charged as part of the conspiracy. The elder Lyon committed suicide to avoid apprehension. Stewart was arrested in the Spring of 2000 after appearing on "America's Most Wanted." Lyon faced the death penalty but was sentenced to life in prison after his jury was instructed that Stewart would not because the Attorney General took too long to file a notice of intent to seek the death penalty. A third bank fraud victim is missing and presumed dead. Lyon committed an unrelated fourth murder. All involved are white.

**Tatum, Kenneth A.; Smith, Daymon**
E.D. TX CR No. 2:99 CR 5
Race: All B

Involves multiple killings - three young black defendants, members of the "Crips" gang, involved in a series of robberies and three killings in East Texas. Stephens, 21, Smith, 20, and Tatum, 20, faced the death penalty in both state and federal court. Smith was convicted of a botched 1999 bank robbery involving the fatal shooting of a 61 year old white female teller. A female bank manager was wounded. Tatum and Stephens kidnapped (intrastate) and robbed a used car dealership (a Hobbs Act count). The victim, a 63 year old retired minister was shot and killed. Tatum was also convicted of a 1998 slaying of a president of a bank. Stephens and Tatum abducted the 50 year old white male. Stephens died of a brain tumor before trial. Tatum and Smith received life sentences at separate trials after a change of venue. The victims were white.

**Garrett, Lemond**
S.D. GA CR No. 4-99-133
Race: B

Two young death eligible defendants, ages 18 and 20, involved in a drug conspiracy, in which a long time federal informant was killed. Both defendants and the victim are African-American. The United States Attorney requested permission to seek the death penalty against Lamond. Savanah police arrested Lamond Garrett in March of 1999 for the shooting death of Joseph Smart, Sr., 52. DeLoach, the get-a-way driver, was convicted for killing his cousin outside a sports bar in December 1998, and sentenced to life in prison in state court. Joe Perry Garrett was not arrested until shortly before trial. He ordered the killing of the DEA informant who was wearing a bullet-proof vest when he was shot. The bullet pierced his side in an unprotected area. The Court set a deadline for the Attorney General's decision whether to seek the death penalty. The government failed to meet the Court's deadline as to Joe Perry and he did not

face the death penalty.

**Mohamed, Khalfan Khamis**
S.D. NY CR No. S6 98 CR 1023
Race: AR

Alleged foreign national accomplices of Usama bin Ladin, purported to be the organizer of two bombings of American embassies in Africa. The August 7, 1998 bombings in Kenya and Tanzania killed 224 people, including 12 Americans. More than 5,000 people were injured. Al-'Owhali is a 21 year old Saudi citizen who was arrested in Nairobi after the bombing. All are alleged members of al-Qaida, an international terrorist organization, led by bin Laden, who issued various "fatwahs" against the United States. Al-'Owhali was ordered to create a diversion for the Kenya bomb by throwing grenades. Mohamed rented the house where the Tanzanian bomb was made. The 12 dead Americans included 4 blacks, 4 whites and 1 Asian. The other victims were mostly black Africans. The Kenya bomb killed 213 and the second bomb eleven.

**Wills, Christopher Andaryl**
E.D. VA CR No. 99-00396
Race: B

A witness-elimination in Alexandria, Virginia. Wills, 33, an African American, lured the victim from suburban Virginia to Washington, D.C. by means of a phoney job advertisement. The victim disappeared and is presumed to have been murdered. The Afghan national victim had recently testified against Wills at a preliminary hearing on state burglary charges. Wills was permitted to represent himself. He filed a motion to dismiss and the Court ruled that Wills cannot be charged with the capital crime of interstate kidnapping leading to death because his victim crossed state lines voluntarily and alone. The 4th Circuit reversed. 2000 WL 1781402. The jury deadlocked and Wills was sentenced to life in prison. Wills, who has 5 other felony convictions, is also serving 14 years for an unrelated Baltimore carjacking.

**Sanders, Marcus**
S.D. AL CR No. 98-0056-CB
Race: B

The April 1999 murder of a witness in a federal drug prosecution two days before Sanders drug conspiracy trial. Sanders did not appear for trial. Sanders was alleged to the triggerman and was the only defendant authorized for a federal capital prosecution, but he was sentenced to life in prison at a separate trial.

**Denis, Jose**
S.D. FL CR No. 99-00714 CR (KING)
Race: H

One capital eligible 924(c) count - a homicide occurring during a 1996 drug rip-off at Hialech motel. Everyone involved is Hispanic. Denis was the alleged triggerman. He had no prior criminal record. The defendant was attending Florida State University at the time of his arrest. The victim was allegedly tortured prior to his death. The court set, then extended, a deadline. 246 F.Supp.2d 1250.

**JA 3216**

**Gray, Kevin; Moore, Rodney**
D. DC CR No. 1:00CR00157
Race: B

Involves RICO multiple killings - a Southeast Washington, D.C., gang, alleged to be connected to approximately 40 slayings. The indictment charges 31 murders. Murder for hire was alleged as an aggravating circumstance. The leader, Kevin Gray, 28, is charged with carrying out the racketeering slayings of 10 people. Members of this heroin and marijuana conspiracy allegedly gunned down rivals and people they thought might testify against them, catching victims by surprise at a gas station, a beauty salon and on street corners, sometimes in broad daylight. Three of the victims were killed because they were viewed as potential witnesses. Another victim was shot by mistake. The 158 count indictment alleges 10 attempted murders. Gang members allegedly took outside contracts as hit men. Gray is charged in 22 murders. He and Moore are the only defendants to face the death penalty. The victims were Hispanic and African-American.

**Johnson, Coleman**
W.D. VA CR No. 3:00 CR 00026
Race: W

one §844(ii) count for allegedly leaving a pipe bomb in 1997 which killed his ex-girlfriend, who was eight months pregnant, to avoid the child support that he would have to pay. DNA indicates he was the father of the child the victim was carrying. All involved are white. 136 F.Supp.2d 553

**Ealy, Samuel Stephen**
W.D. VA CR No. 00-CR-104
Race: All W

Another Petite policy case involving the April 1989 shotgun multiple murder of a family of three. Ealy avoided trial in state court in 1991 by a successful motion to suppress. A federal grand jury indicted Ealy and Church, charging them with two capital murders in the furtherance of a drug-trafficking enterprise and a third murder of a potential federal witnesses. They are charged with these killings while trying to rob one victim of $30,000 that he was holding for a drug ring. The victims were white. 2001 WL 686954, 855894, 1661706. 151 F.Supp.2d 715. 163 F.Supp.2d 633, 2002 WL 229700, 273317, 376880, 1205035.

**Waldon, Carl**
M.D. FL CR No. 3:00-CR-436-J25-TJC
Race: B

Involves a CCE-related murder. Sinclair was a narcotics detective and Waldon an uniformed patrol officer. Three drug dealers apparently implicated Sinclair in drug trafficking as part of a 5K1 deal. Waldon and Sinclair are charged with murder. Sinclair worked as a bank guard. He saw an Arab-American storeowner withdraw $50,000 from the bank. Sinclair tipped Waldon who detained the victim on a pretext traffic stop and tried to rob him. The victim was strangled in the police cruiser, near a school in broad daylight. Two others were present, including Kenneth McLoughlin, who participated and testified as a government witness. The Attorney General required a capital prosecution against only Waldon. The penalty phase was bifurcated and the jury deadlocked on whether the mental state threshold (intentional killing) or sole aggravating circumstance (pecuniary gain) was present.

JA 3217

**Haskell, Carl**
W.D. MO CR No. 00-CR-395
Race: All B

Involves the sequel to the Peoples and Lightfoot trial in October of 1999, resulting in life sentences. The government's theory is that Peoples, on behalf of Lightfoot and himself, enlisted the services of hired killers, one of whom allegedly was Haskell, to do away with one Jovan Ross, a white male. Ross was Lightfoot's homosexual live-in lover. The pair lived in a house in KC. After a lover's quarrel, Ross informed on Lightfoot regarding robberies pulled by Lightfoot and Peoples in Nebraska and led police to a cache of blank certified checks stored in the crawl space under the Lightfoot/Ross home. Shortly after, Lightfoot was arrested, and while in jail received information about Ross' involvement. Not long after that, Ross ended up dead. Attorney General Ashcroft approved Haskell, the alleged triggerman, for a capital prosecution, but denied permission to seek the death penalty against co-defendant Barfield.

**Britt, L.J.**
N.D. TX CR No. 00-CR-260-ALL
Race: B

A Fort Worth drug trafficking prosecution of the leaders of an Arlington-based drug ring responsible for multiple (three) murders. The first killing involved a 1998 shooting of an African-American, mistaken for the intended victim, in a car traveling on Cential Expressway. A second 1999 killing was of an Hispanic person, also mistaken for the intended victim, his brother, who allegedly sold a fake kilo of cocaine to Robinson. Britt was the triggerman in the third 1999 killing of another drug dealer, a Mexican national, who had stolen 20 kilos from a Laredo drug kingpin. Robinson was following in another car. Britt and Robinson, African-American, both allegedly fired weapons in the first and second incidents. The Court set, then extended, a deadline for the approval of a capital prosecution. A plea agreement to a life sentence for co-defendant Robinson was rejected by the Attorney General. He was sentenced to death. The victims were Hispanic and African-American.

**Cooper, Billy D.**
S.D. MS CR No. 01-CR-8
Race: All B

Involves carjacking and multiple killings of two black victims who were attempting to buy about $30,000 worth of cocaine and were ripped off and killed. Both African-American defendants confessed, blaming the other as the triggerperson. There was a post-mortem attempt to dismember (head and hands) and rebury the bodies. The Notice of Intent to Seek the Death penalty against Frye was dismissed as filed too late. Cooper's life sentence was affirmed. 2003 WL 21672845 (5th Cir.).

**Ostrander, Robert Norman; Ostrander, Michael Paul**
W.D. MI CR No. 01-M-59-ALL
Race: W

Slaying of a man found buried in a previously dug grave in the Manistee National Forest. The Ostrander brothers are charged with the August 2000 use of a firearm causing death during drug trafficking, involving marijuana and cocaine. The Attorney General required a capital prosecution.

**JA 3218**

**Davis, Johnny**
E.D. LA CR No. 2:01-CR-282-ALL
Race: B

involves multiple killings (four) - 924(c) 2001 gun murders by a drug gang pushing heroin in a New Orleans Housing project. The alleged kingpin, Richard Porter, was convicted of one murder and did not face the death penalty. The enforcer for the group, Johnny Davis, was convicted of four murders. All involved are African-American. The government sought the death penalty against only Davis.

**Haynes, Aaron**
W.D. TN CR No. 01-CR-20247-ALL
Race: B

Bank robbery resulting in the death of a black female employee of Union Planters Bank. A security guard was also shot in the face by Johnson, but survived. The defendants are African-American. Haynes was a shooter. The state and federal government both sought the death penalty against Haynes and Maxwell but not against Johnson who may be retarded. A federal jury sentenced Haynes to life imprisonment. After this verdict, Attorney General Ashcroft reversed his position and approved a plea agreement specifying a life sentence for Maxwell. 242 F.Supp.2d 540. 269 F.Supp.2d 970, 265 F.Supp.2d 914.

**Regan, Brian Patrick**
E.D. VA CR No. 01-CR-405-ALL
Race: W

A 20 year veteran of the Air Force who worked in the headquarters of the National Reconnaissance Office, charged with three counts of attempted espionage and one count of mishandling classified information. The government charged Regan of creating a "grave risk of death" to U.S. military pilots patrolling the no-fly zone over Iraq. Regan intended to sell Iraqi resident Saddam Hussein secret details about American satellites. Prosecutors said Regan apparently used a form letter to solicit money from at least two foreign countries. Investigators said Regan told Hussein in a letter, "If I am caught, I will be imprisoned for the rest of my life, if not executed for this deed." Two of the charges carried the death penalty.

**Matthews, Lavin; Tucker, Tebiah Shelah**
N.D. NY CR No. 3:00 CR-269-ALL
Race: B

Murder during a CCE, motivated by a drug rip off. Another drug dealer was beaten to death. His marijuana and cash were stolen. The Attorney General required a capital prosecution against three defendants, later withdrawing the notice of intent as to McMillian, who was found to be mentally retarded by both the defense and government experts. All involved are African-American

**Dixon, Emile**
E.D. NY CR No. 01-CR-389-ALL
Race: B

Dixon is one of the leaders of the inter-state "Patio Crew" gang, charged with taking part in a July 26, 2002 murder of a witness and another murder. A government informant, Robert Thompson, 30, was machine-gunned to death in his car, and his brother was wounded. A

**JA 3219**

superceding indictment was filed charging a 1992 drug-related murder. Attorney General Ashcroft required a capital prosecution overruling, press accounts indicate, his own review committee. Dixon is a foreign national, a Jamaican immigrant. The multiple victims were African-American.

JA 3220

# Exhibit 19

JA 3221

# Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

## TOPIC:

## Federal Capital Cases Resulting in a Sentence of Death

**Johnson, Corey; Roane, James; Tipton, Richard**
E.D. VA CR No. 3-92-CR-68
Race: All B

Three of four young black inner-city gang members in Richmond, Virginia, who were sentenced to death in 1993, for their roles in eleven crack-related murders. The trial of a fourth defendant, Vernon Thomas, was severed. Appeals by the three death-sentenced defendants were rejected. United States v. Tipton, 90 F.3d 861 (4th Cir. 1996). A petition for certiorari was denied by the Supreme Court in 1997, and a post-conviction petition pursuant to 28 U.S.C. § 2255 was filed in 1998.

**Hall, Orlando C.**
N.D. TX CR No. 4:94-CR-121-Y
Race: All B

The first approval of a death penalty prosecution under the 1994 Federal Death Penalty Act. Hall, and his co-defendant, Webster, both African-American, were charged in Fort Worth, Texas, with the abduction, sexual assault and beating murder of a 16-year-old black female whose older brother had allegedly stolen marijuana. In 1995, Hall was sentenced to death after the jury heard testimony from co-defendants who pled guilty and testified in return for leniency. Expert testimony suggested the victim was still alive when buried. After a separate trial, Bruce Webster was sentenced to death by a jury in 1996. Webster is the first case in which a federal defendant has been sentenced to death after attempting to establish his ineligibility for the death penalty by reason of mental retardation. Hall's appeal was denied by the Fifth Circuit in 1998, 152 F.3d 381, and certiorari was denied in 1999. Webster's appeal was also rejected in 1999. 162 F.3d 308. Post-conviction petition was denied.

**Webster, Bruce**
N.D. TX CR No. 4:94-CR-121
Race: All B

The first approval of a death penalty prosecution under the 1994 Federal Death Penalty Act. Hall, and his co-defendant, Webster, both African-American, were charged in Fort Worth, Texas, with the abduction, sexual assault and beating murder of a 16-year-old black female whose older brother had allegedly stolen marijuana. In 1995, Hall was sentenced to death after the jury heard testimony from co-defendants who pled guilty and testified in return for leniency. Expert testimony suggested the victim was still alive when buried. After a separate trial, Bruce Webster was sentenced to death by a jury in 1996. Webster is the first case in which a federal defendant has been sentenced to death after attempting to establish his

**JA 3222**

ineligibility for the death penalty by reason of mental retardation. Hall's appeal was denied by the Fifth Circuit in 1998, 152 F.3d 381, and certiorari was denied in 1999. Webster's appeal was also rejected in 1999. Cert. denied 528 U.S. 829. Post-conviction petitions are pending.

**Battle, Anthony**
N.D. GA CR No. 1:95 CR 528
Race: B

A black prisoner with a history of psychiatric problems who was sentenced to death for the hammer-murder of an African-American guard in the Atlanta federal penitentiary. Mr. Battle was serving a life sentence for the murder of his wife when the killing occurred. In 1997 a federal jury rejected Mr. Battle's insanity defense and returned a death sentence after three hours' deliberation. Appeal to the United States Court of Appeals for the Eleventh Circuit was rejected in 1999. 173 F.3d 1433. A petition for writ of certiorari was denied. 529 U.S. 1022. A post-conviction petition pursuant to 28 U.S.C. ' 2255 was denied on April 30, 2003. 264 F. Supp. 2d 1088.

**Hammer, David Paul**
M.D. PA CR No. 4-96-CR-239
Race: W

A strangulation murder of a federal prison inmate by his cellmate. The defendant and the victim are white. Mr. Hammer was serving a 1200+ year Oklahoma state sentence at the time of the homicide, but had been incarcerated in the federal penitentiary at Allenwood, Pennsylvania. Mr. Hammer abandoned his direct appeal. 226 F.3d 229 (3d Cir. 2000). An execution date was set for November 15, 2000, but was vacated when Mr. Hammer decided to file a post-conviction action.

**Johnson, Darryl Alamont**
N.D. IL CR No. 96 CR 379
Race: B

Involves multiple killings and a "Gangster Disciple" drug conspiracy/racketeering/multiple murder case. Two homicides were charged, one of a government confidential informant. Co-defendant Quan Ray committed two murders on orders of Mr. Johnson. Four additional homicides were alleged in aggravation. Murder for hire is alleged as an aggravating circumstance. Ray was sentenced to life in prison at a separate trial. Johnson's jury recommended a sentence of death in 1997. An appeal to the Seventh Circuit was rejected in 2000. 223 F.3d 665. Certiorari was denied on October 1, 2001. 534 U.S. 829. Post-conviction relief was denied on March 12, 2003. 2003 WL 1193257.

**Paul, Jeffrey Williams**
W.D. AR CR No. 6:96CR60022
Race: W

Paul is one of two white teenagers charged with the robbery-murder of an elderly white National Parks employee in Hot Springs National Park, a federal preserve within the city of Hot Springs, Arkansas. A Hot Springs federal jury unanimously imposed a life sentence on co-defendant Trinity Ingle on June 6, 1997. Paul's separate trial began on June 17, 1997, and ended with a death sentence on June 25, 1997. An appeal to the United States Court of Appeals for the Eighth Circuit was rejected in 2000. 217 F.3d 989. Certiorari was denied on

October 1, 2001. 534 U.S. 1156. All involved are white.

**Allen, Billie Jerome**
E.D. MO CR No. 4:97 CR 0141 ERW (TCM)
Race: B

Two black defendants charged with the fatal shooting of a white bank guard during a robbery. Attorney General Reno authorized the government to seek the death penalty on August 1, 1997. After separate trials, death sentences were returned on March 10, 1998 for Allen and April 3, 1998 for Holder. Appeals were rejected by the Eighth Circuit. 247 F.3d 741 (2001). The Supreme Court remanded in light of Ring v. Arizona, 536 U.S. 953

**Holder, Norris G.**
E.D. MO CR No. 4:97 CR 0141 ERW (TCM)
Race: B

Two black defendants charged with the fatal shooting of a white bank guard during a robbery. Attorney General Reno authorized the government to seek the death penalty on August 1, 1997. After separate trials, death sentences were returned on March 10, 1998 for Allen and April 3, 1998 for Holder. Appeals were rejected by the Eighth Circuit. 247 F.3d 741 (2001). Certiorari was denied. 124 S.Ct. 19.

**Barnette, Aquila Marcivicci**
W.D. NC CR No. 3:97CR23-P
Race: B

Multiple murder including a domestic killing. Barnette confessed to murdering a motorist during a Charlotte, North Carolina carjacking. He drove the victim's car to Roanoke, Virginia, where he killed his former girlfriend. Barnette has a long history of domestic abuse of the second victim. The defendant and the female victim are black; the carjacking victim was white. A Charlotte, North Carolina jury imposed the death penalty in 1998. Two years later the appeals court ordered a new sentencing trial. 211 F.3d 803 (4th Cir. 2000). Barnette was again sentenced to death in 2002.

**Gabrion, Marvin**
W.D. MI CR No. 1:99-CR-76
Race: W

The disappearance of an alleged rape victim before Gabrion's trial, as well as the multiple disappearance of her 3 year old child and three men. The bound victim was found in a lake, part of federal land. Attorney General Ashcroft required a capital prosecution in this 18 U.S.C. '1111 case. All involved are white.

**Lee, Daniel Louis**
E.D. AR CR No. LR-CR-97-243
Race: W

Involves multiple killings - a RICO prosecution of an organization supposedly intent upon starting a revolution. The capital crime was the murder of a family of three (an Arkansas gun dealer, his wife and their 8 year old child) in the Fall of 1996. The defendants may have believed the gun dealer was an ATF informant. The victims were killed by duct-taping plastic bags over their heads, handcuffing the three and throwing them in a river. The defendants and

**JA 3224**

the victims are white. Co-defendant Chevie Kehoe was charged in two additional murders as well. The defendants were also charged with bombing the Spokane, WA city hall. Kehoe, older, whom some considered more culpable, was first sentenced to life by the jury at a 1999 separate penalty hearing. At that point the United States Attorney attempted to withdraw the request for the death penalty. The Attorney General was unavailable, so the Deputy Attorney General declined the request. Lee was then sentenced to death. The next year the District Court ordered a new sentencing hearing for Lee. 89 F.Supp.2d 1017 (E.D. AR). That decision was reversed by the Eighth Circuit. 274 F.3d 485 (2001). Petition for cert. denied 537 U.S. 1000 (2002).

**Stitt, Richard**
E.D. VA CR No. 2:98CR47
Race: B

Involves multiple killings - three homicides and other attempted homicides committed by co-defendants on Stitt's urging. Authorization to seek the death penalty was only granted by the Attorney General for Stitt. Four co-defendants did not face the death penalty. One of the shooters plead guilty to a life sentence. Stitt received a sentence of death in 1998 after a joint trial with three of the non-capital codefendants. He has a lenghty record of assaultive conduct. An appeal was rejected by the Fourth Circuit. 250 F.3d 878 (5/25/01). Certiorari was denied. 535 U.S. 1074 (2002).

**Ortiz, Arboleda**
W.D. MO CR No. 98- 00311-01/05-CR-W-2
Race: H

Four foreign national Columbians charged in a drug related murder. The kingpin, Hinestroza, was never arrested and may have fled to Columbia. Hinestroza and his gang sold cocaine in the Kansas City area. The victim and his nephew (who sold cocaine for the gang) stole $240,000 from them. The defendants tied up, interrogated, duck taped and shot both victims. The nephew lived, escaped and identified the defendants. Sinisterra shot and killed one victim. Ortiz or Tello shot the surviving victim. Sinisterra and Ortiz were sentenced to death. The jury deadlocked on punishment for Tello, and he was sentenced to life in prison. The Eighth Circuit affirmed. 315 F.3d 873 (2002). Petition for cert. denied 124 S.Ct. 920 (2003).

**Sinisterra, German**
W.D. MO CR No. 98- 00311-01/05-CR-W-2
Race: H

Four foreign national Columbians charged in a drug related murder. The kingpin, Hinestroza, was never arrested and may have fled to Columbia. Hinestroza and his gang sold cocaine in the Kansas City area. The victim and his nephew (who sold cocaine for the gang) stole $240,000 from them. The defendants tied up, interrogated, duck taped and shot both victims. The nephew lived, escaped and identified the defendants. Sinisterra shot and killed one victim. Ortiz or Tello shot the surviving victim. Sinisterra and Ortiz were sentenced to death. The jury deadlocked on punishment for Tello, and he was sentenced to life in prison. The Eighth Circuit denied relief. 315 F.3d 873 (2002). Petition for rehearing en banc denied 2003 U.S. App. LEXIS 1863.

**JA 3225**

**Higgs, Dustin**
D. MD CR No. PJM-98- 0502
Race: B

Involves multiple (two) killings - the January 1996 triple intrastate kidnapping/murder of three black females from D.C. on federal land. Haynes, 20, confessed that he fired the shots. He said Higgs, 26, gave him the gun and told him to do it after an argument with the women. The defendants are African-American and were involved in another shooting six weeks before. Haynes= jury deadlocked and he was sentenced to life in prison. Higgs was sentenced to death by an all male jury at a separate, subsequent trial. The government suggested a wintess killing motive at this trial and alleged Higgs plotter to kill a government witness and/or his family. He was already serving a 17 year sentence on a drug conviction. Appeal is pending in the Fourth Circuit. All involved are African-American.

**Vialva, Christopher Andre**
W.D. TX CR No. W99CR070
Race: B

Vialva, 19, Bernard, 18, and two juveniles, all with alleged gang affiliations. These African-Americans were convicted of a 1999 ' IIII carjacking/double homicide and robbery of a young white church couple. The bodies of the victims were found in the trunk of their car just inside the Fort Hood boundary, with gunshot wounds to the face and head. The vehicle had been set on fire. Authorities believe Vialva shot the victims. The Fifth Circuit rejected appeals. 299 F.3d 467 (5th Cir. 2002). Rehearing en banc was denied. 299 F.3d 467. Certiorari was denied. 123 S.Ct. 2572 (2003).

**Bernard, Brandon**
W.D. TX CR No. W99CR070
Race: B

Vialva, 19, Bernard, 18, and two juveniles, all with alleged gang affiliations. These African-Americans were convicted of a 1999 ' 1111 carjacking/double homicide and robbery of a young white church couple. The bodies of the victims were found in the trunk of their car just inside the Fort Hood boundary, with gunshot wounds to the face and head. The vehicle had been set on fire. Authorities believe Vialva shot the victims. The Attorney General required a capital prosecution for Bernard. The Fifth Circuit rejected appeals. 299 F.3d 467 (5th Cir. 2002). Rehearing en banc was denied. 299 F.3d 467. Certiorari was denied. 123 S.Ct. 2572 (2003).

**Nelson, Keith**
D. W.D. MO CR No. 99-CR-303-1
Race: W

The intrastate1999 kidnapping and murder of a ten year old girl, in violation of 18 U.S.C. '1201. Both the defendant and the victim are white. The Eighth Circuit affirmed in 2003. 347 F.3d 701. Petition for rehearing en banc and panel denied. 2003 U.S. App. LEXIS 26278.

**Jackson, Richard**
W.D. NC CR No. 00-CR-74
Race: All W

# Exhibit 20

JA 3227

## Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

### TOPIC:

### Federal Capital Cases Resulting in an Execution

**Garza, Juan Raul**
S.D. TX CR No. 93-009
Race: H

An Hispanic marijuana distributor was sentenced to death by a jury in 1993 in Brownsville, Texas, in connection with the murders of three other drug traffickers in the Brownsville area, two Hispanic and one Anglo. Garza ordered two murders and killed a third person himself. The government introduced 5 unadjudicated murders in aggravation, 4 were in Mexico. All but one victim were males. Attorney General Barr authorized the prosecution to seek the death penalty in December, 1992. Mr. Garza's death sentence was affirmed. United States v. Flores, 63 F.3d 1342 (5th Cir. 1995), and a petition for writ of certiorari was denied by the Supreme Court in 1996. Habeas relief was denied in 1998-1999. Garza's first two execution dates in 2000 were postponed by President Clinton pending a Department of Justice study of racial and geographic disparities in the federal death penalty, the second time on December 7, 2000 for 6 months. He was executed on June 19, 2001.

1.

**McVeigh, Timothy**
D. CO CR No. 96-CR-68-M
Race: W

The 1995 Oklahoma City bombing in which 160 lost their lives, including 19 children. The President and Attorney General immediately announced that the death penalty would be sought, even before any suspects were identified. A Denver jury convicted McVeigh and voted to sentence him to death in 1997. Appeal to the United States Court of Appeals for the Tenth Circuit was quickly denied in 1998, 153 F.3d 1166, as was a post-conviction petition. 118 F.Supp.2d 1137 (D. CO 2000). Thereafter, Mr. McVeigh decided to abandon further appeal. His execution was scheduled for May 16, 2001, was delayed by the Attorney General upon the discovery of over 6,000 pages of FBI reports not disclosed to the defense. He was executed on June 11, 2001.

**Jones, Louis**
N.D. TX CR No. 6-95-CR-0015-C
Race: B

A 46 year old African-American -- a retired 22-year decorated Persian Gulf veteran--was convicted of the cross-racial abduction murder of a young white female soldier. The victim's family traveled to Washington to seek DOJ approval of the death request. The trial occurred in Lubbock on change of venue, after thousands of San Angelo residents signed petitions calling for the death penalty. The defendant was sentenced to death in 1995, the Fifth Circuit affirmed in 1998, but the United States Supreme Court granted review to consider issues

A capital defendant in state court who pled guilty to second degree murder, intrastate kidnaping and rape of a 22 year old woman jogging Holloween morning in a Nation Forest. Jackson received a 25 - 31 years sentence in state court. He was charged in federal court after the North Carolina Supreme Court reversed his original death sentence and conviction, and suppressed his confession on Edwards grounds. Jackson was 31 years old. The victim was tied with duct tape to a tree on federal land in the Bend Creek Recreation Area off Blue Ridge Parkway, raped and shot one time. All involved are white. An appeal was rejected by the Fourth Circuit. 327 F.3d 273 (2003). Cert. denied 124 S.Ct. 566 (2003).

**Robinson, Julias Omar**
N.D. TX CR No. 00-CR-260
Race: All B

A Fort Worth drug trafficking prosecution of the leaders of an Arlington-based drug ring responsible for multiple (three) murders. The first killing involved a 1998 shooting of an African-American, mistaken for the intended victim, in a car traveling on Cential Expressway. A second 1999 killing was of an Hispanic person, mistaken for the intended victim, his brother, who allegedly sold a fake kilo of cocaine to Robinson. Britt was the triggerman in the third 1999 killing of another drug dealer, a Mexican national, who had stolen 20 kilos from a Laredo drug kingpin. Robinson was following in another car. Britt and Robinson, African-American, both allegedly fired weapons in the first and second incidents. The Court, set, then extended, a deadline for the approval of a capital prosecution. Attorney General Ashcroft rejected a plea agreement involving a life sentence. Co-defendant Britt was sentenced to life in prison at a separate trial.

**Sampson, Gary**
D. MA CR No. 01-CR-10384-ALL
Race: W

A series of carjackings, two in Plymouth County, Massachussetts, and one in New Hampshire on July 23 and 24, 2001. The defendant confessed. He also confessed to five North Carolina bank robberies. Sampson was accused of carjacking and stabbing to death a 69 year old man and abducting and killing a 19 year old college student. Sampson called the FBI before the killings but the call was dropped and then covered up. All involved are white. Sampson pled guilty. Memorandum opinion and order 2004 U.S. Dist. LEXIS 1527 (2/4/2004).

**Purkey, Wesley Ira**
W.D. MO CR No. 01-CR-308-ALL
Race: W

The 1998 interstate kidnapping (from Missouri to Kansas), rape and murder of a 17 year old high school girl, whose body was then dismembered and burned. Purkey is serving a prison sentence for another killing. Previously, Purkey was paroled after 17 years for shooting a man. Both victim and defendant are white.

**Fields, Sherman Lamont**
W.D. TX CR No. 01-CR-164-ALL
Race: B

Fields escaped from jail, where he was being held on federal weapons charges with the aid of a deputy sheriff in November 2001 and killed his girlfriend with a gun. He received 12 years

on the gun charge. He allegedly carjacked a vehicle at gunpoint. Fields represented himself during the guilt phase of the trial. All involved are black.

**Mitchell, Lezmond**
D. AZ CR No. 01-CR-1062-ALL
Race: NA

Murder on Navajo tribal land. All involved are Native American. The defendant and a juvenile got a ride from a woman and her 9 year old granddaughter, killed both and stole the car supposedly for use in an armed robbery. Each was stabbed at a separate location. In an attempt to hide the victim's identity, the hands and heads of the victims were removed. Attorney General Ashcroft required a capital prosecution against Mitchell under a carjacking theory -- although the Indian tribe has not "opted in" to the death penalty.

**LeCroy, William Emmet**
N.D. GA CR No. 02-CR-38-ALL
Race: W

A carjacking murder. The victim, a nurse practitioner, came home where she was raped, stabbed to death in her bedroom. LeCroy took car keys from her purse and then stole her Ford Explorer. He was arrested two days later in Minnesota trying to enter Canada with the victim's SUV. All involved are white.

**Brown, Meier Jason**
S.D. GA CR No. 02-M-53-ALL
Race: B

The stabbing murder of a United States Postal Service employee during a robbery at a United States Post Office. Brown confessed and blood was found on his jacket and bike. The victim is white and the defendant is black. She was stabbed 10 times. There was a conditional plea agreement specifying a life sentence. Attorney General Ashcroft rejected a plea agreement and required a capital trial.

**Bourgeois, Alfred**
S.D. TX CR No. 02-216-ALL
Race: B

A two year old child who died from "shaken baby syndrome". The baby was found unresponsive beside her father's tractor-trailer. Bourgeois and his wife told authorities the toddler had fallen out of the cab while they were making a delivery at Naval Air Station Corpus Christi. The toddler had seven major hemorrhages - two behind her right ear, two above her right eye and three in the back of her skull. Bourgeois's wife and his 7-year-old daughter alleged Bourgeois had abused the toddler before. All involved are African-American

relating to the jury's sentencing instructions in this first case conducted under the 1994 Federal Death Penalty Act. The Supreme Court affirmed the Fifth Circuit's decision in 1999. 119 S.Ct. 2090. A post-conviction action has been filed and denied, as was a successor petition raising a Ring issue. President Bush denied clemency the same evening as announcing the second Gulf War. Jones was executed the next morning, March 18, 2003.

# Exhibit 21

JA 3232

# Summaries Of Cases
## Authorized for the Death Penalty
## 1988 - 2003

### David Bruck, Dick Burr & Kevin McNally
### Federal Death Penalty Resource Counsel Project

## TOPIC:

### Former Federal Death Row Inmates

**Chandler, David Ronald**
N.D. AL CR No. 90-CR-H-266-E
Race: W

A white Alabama marijuana grower was sentenced to death for the murder for hire of a subordinate in his drug ring. The triggerman in the killing was granted immunity in exchange for his testimony, later recanted, that Chandler offered him $500 for the murder. Insisting on his innocence, Chandler refused a pretrial plea offer of life imprisonment. Chandler's convictions and death sentence were affirmed by a panel of the Eleventh Circuit in mid-1993. 996 F.2d 1073 (11th Cir. 1993), cert. denied, 114 S.Ct. 2724 (1994). He filed a motion to vacate his convictions under 28 U.S.C. ' 2255, and an execution date originally set for March 31, 1995, was stayed by the District Court. After several evidentiary hearings, 950 F.Supp. 1545 (N.D.AL1996), the District Court denied relief. 957 F.Supp. 1505 (N.D. AL 1997). A panel reversed, 193 F.3d 1297 (11th Cir. 1999) but the en banc court decided that Chandler received effective assistance of counsel in a 6-5 vote. 218 F.3d 1305. On January 20, 2001, President Clinton granted clemency.

**Davis, Len; Hardy, Paul**
E.D. LA CR No. 94-381
Race: All B

An African-American New Orleans police officer, Len Davis, who was being investigated (and tape recorded) in a drug conspiracy case. Davis ordered the murder of a 32 year old mother of three, Kim Groves, who witnessed his beating of a witness in an unrelated incident. Groves had filed a brutality complaint against Davis. Paul Hardy, 27, carried out the killing. Murder for hire is alleged as an aggravating circumstance. Davis, then Hardy, were sentenced to death by a jury IN 1996, which heard sequential penalty phase presentations. Davis did not attend his. The Fifth Circuit reversed one of the convictions and ordered a new sentencing trial on the remaining convictions in 1999. 185 F.3d 407. On remand the District Court dismissed the Notice of Intent to Seek the Death Penalty based on Ring v. Arizona.

**McCullah, John Javilo**
E.D. OK CR No. 1:92-032-S
Race: W

Two white and one Hispanic defendants were tried jointly in connection with the drug-related intrastate kidnap/murder of a Muskogee, Oklahoma auto dealership employee. The two capitally-charged "managers" of the drug enterprise, co-defendants Hutching and Molina, received life sentences from the jury, while the third defendant, McCullah (who, unlike the bosses, had been present at the killing) was sentenced to death in 1993. United States v.

McCullah, 76 F.3d 1087 (10th Cir. 1996) ordered a new penalty hearing due to introduction of an involuntary statement and double counting of aggravating circumstances. Rehearing en banc was denied by a 6 to 6 vote, 87 F.3d 1136 (6/26/96), and the government declined to seek review in the Supreme Court. The government finally withdrew its request for the death penalty while McCullah's resentencing was pending. The victim was white

**Chanthadara, Bountaem**
D. KS CR No. 94-10129-01
Race: A

A "Hobbs Act" case, in which five defendants of Asian descent (Laotian and Vietnamese) were charged with the armed-robbery of a Chinese restaurant and killing co-proprietor Barbara Sun, in Wichita, Kansas in 1994. Federal jurisdiction was based on the Hobbs Act, 18 U.S.C. ' 1951, prohibiting obstruction of inter-state commerce. The Attorney General's approval of this capital prosecution for Chanthadara and Phouc Nguyen was announced in 1995. It marked the first time that the Hobbs Act was used to federalize as a capital case a prosecution for murder committed during a commercial robbery. Chanthadara beat and shot the victim in an attempt to get her to open a safe the female proprietor could not. Nguyen was present. Chanthadara's jury recommended the death penalty in 1996. After a separate trial, Phouc Nguyen's jury sentenced him to life imprisonment. The Eighth Circuit reversed Chanthadara's death sentence on November 1, 2000. 230 F.3d 1237. He was sentenced to life in prison in 2002.

**JA 3234**

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

# JOINT APPENDIX AND INDEX
# VOLUME 12

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816  voice
(602) 889-3960  facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for
Defendant-Appellant Basham*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Cr. No. 4:02-992-JFA |
| | ) |
| v. | ) |
| | ) |
| BRANDON L. BASHAM, | ) |

MEMORANDUM OF LAW OF THE UNITED STATES IN OPPOSITION TO
PETITIONERS MOTION PURSUANT TO 28 U.S.C. § 2255

**TABLE OF CONTENTS**

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Response to Claim 1: Basham's initial trial counsel acted reasonably in allowing him to accompany officers in an attempt to find Alice Donovan's body.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Response to Claim 2: Basham's trial counsel adopted a reasonable strategy at the <u>Jackson v. Denno</u> hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Response to Claim 3: The Court did not err in excluding jurors whose opposition to the death penalty would substantially impair the performance of their duties.. . . . . . . . . . . . . . . . 16

Response to Claims 4, 5, 6 & 7: Basham is not, and has never been, mentally incompetent. . . .25
    Response to Claim 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Response to Claim 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Response to Claim 6. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Response to Claim 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Response to Claim 8: Basham's trial counsel were not required to second-guess the medical decisions of Basham's treating physician.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Response to Claim 9: Basham's trial counsel adopted a reasonable strategy by conceding certain allegations and focusing on Basham's intent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Response to Claim 10: There was no reason to excuse Basham from the courtroom prior to his altercation with the Marshals.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Response to Claims 11 and 12: There is nothing on the record to suggest that Sheriff Hewett testified falsely; the prosecutor's argument was consistent with its overarching argument that both Basham and Fulks killed Alice Donovan. . . . . . . . . . . . . . . . . . . . . . . . . . 49

Response to Claim 13: Pursuant to a reasonable trial strategy, Basham's counsel chose not to argue that Basham's statements to law enforcement were involuntary.. . . . . . . . . . . . 59

Response to Claim 14: Jack Swerling did not have a conflict of interest.. . . . . . . . . . . . . . . . 60

Response to Claim 15: The Samantha Burns evidence was admissible. . . . . . . . . . . . . . . . . .61

Response to Claim 16: There was no basis to admit isolated parts of the Government's closing argument from the Fulks trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**JA 3236**

Response to Claim 17: Basham's trial counsel decided not to call impeachment witnesses based on valid strategic reasons.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Response to Claim 18:  Basham's trial counsel did not  ineffectively cross examine Sheriff Hewett and Agent Long.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Response to Claim 19: Basham's trial counsel conducted an exhaustive investigation of Basham's background and developed an extensive mitigation case.. . . . . . . . . . . . . . . . . . . . . . . . . 79

Response to Claim 20: Basham's counsel have failed to show that trial counsel failed to assemble a competent capital defense team or that he was prejudiced by any alleged failure of his counsel to supervise the defense team.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Response to Claim 21: There was no basis to trifurcate Basham's trial.. . . . . . . . . . . . . . . . . . 101

Response to Claim 22: The Government did not violate its Brady obligations.. . . . . . . . . . . .  112

Response to Claim 23: The Government did not present inconsistent theories at Fulks's and Basham's trials.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Response to Claim 24: The Government did not commit misconduct in its closing argument.. 128

Response to Claim 25: The Court correctly instructed the jury on mitigating evidence. . . . . . .135

Response to Claim 26:  The Court correctly instructed the jury regarding the finding of aggravating and mitigating factors.  Appellate counsel could not have prevailed had he challenged the instruction on appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Response to Claim 27: Basham's trial counsel were not ineffective for failing to investigate Cynthia Wilson's statements to the Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .143

Response to Claim 28: There is no basis to grant a new trial based on Cynthia Wilson's alleged contact with other jurors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .152

Response to Claim 29: There is no basis to grant a new trial based on newly discovered evidence concerning Sheriff Ronald Hewett.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

Response to Claim 30: Basham's trial counsel did not fail to provide necessary files to Basham's appellate counsel.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

Response to Claim 31:  The Superseding Indictment charged an aggravating factor, along with the citation to the statutory authority, which is part of the Federal Death Penalty Act, required for a capital offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

**JA 3237**

Response to Claim 32: The Federal Death Penalty Act is constitutional. . . . . . . . . . . . . . . . . .162

Response to Claim 33:  Basham has failed to show that the process mandated by the FDPA operates in an arbitrary and capricious manner; therefore, "the extraordinary step of finding a federal statute facially unconstitutional is not warranted.".. . . . . . . . . . . . .  167

Response to Claim 34: There is no cumulative error.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

JA 3238

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Cr. No. 4:02-992-JFA |
| | ) | |
| v. | ) | |
| | ) | |
| BRANDON L. BASHAM, | ) | |

## INTRODUCTION

COMES NOW the United States of America, by and through the undersigned counsel, in response to the Motion to Vacate under 28 U.S.C. § 2255 purportedly brought on behalf of Brandon Leon Basham. Because Basham has preemptively filed two motions to waive any further appeals or § 2255 proceedings in his case, the Government respectfully submits that the present § 2255 motion is not properly filed on Basham's behalf. In any event, the claims presented in the motion lack merit, and the Government requests that the motion be denied.

At this stage of the proceedings, this Court is, of course, well aware of the facts and procedural history of Basham's case. A summary of the facts underlying Basham's conviction and sentence is set forth in the published opinion of the United States Court of Appeals for the Fourth Circuit in United States v. Basham, 561 F.3d 302, 308-14 (4th Cir. 2009). The Government will recount additional facts as necessary in response to each of the claims raised in the § 2255 motion brought by habeas counsel.

As for the procedural history, the Government highlights the following events relevant to the § 2255 motion and Basham's requests to waive further appellate and collateral relief. On September 18, 2009, this Court appointed Julia Grace Mimms as local counsel to represent Basham in the preparation of a motion under 28 U.S.C. § 2255. Dkt. # 1247. On June 14, 2010, Basham filed a

-1-

**JA 3239**

*pro se* motion to drop all further appeals and to request a "speedy execution." Dkt. # 1317. On July 27, 2010, the Court granted Federal Public Defenders Michael L. Burke and Sarah Stone leave to appear *pro hac vice* on Basham's behalf. Dkt. # 1323. On May 19, 2011, Basham filed an additional *pro se* motion to waive any and all proceedings under § 2255. Dkt.# 1391. In this motion, Basham states that he "had informed his lawyers that he does not want any such motion to be filed on his behalf." Dkt. # 1391 at 2. Even so, on May 31, 2011, Basham's habeas counsel (Mimms, Burke, and Stone) filed a § 2255 motion on Basham's behalf. Dkt. # 1393.

On June 29, 2011, the Court held a status conference regarding the § 2255 motion and Basham's waiver requests.[1] Dkt. # 1397; transcript filed at Dkt. # 1400. The Court questioned Basham, who appeared at the conference via satellite video, about his desire to waive further proceedings. Basham affirmed that he indeed wanted to have his death sentence carried out and that he was "not going to change [his] mind." 06/29/11 Status Hearing Tr at 12-13. The Court announced that it would appoint a forensic psychiatrist to examine Basham to determine his competency. 06/29/11 Status Hearing Tr at 14. The Court stated, however, that it would not suspend the briefing schedule; the competency determination and briefing schedule would proceed on "parallel tracks." 06/29/11 Status Hearing Tr at 19. On July 29, 2011, the Court appointed Dr. George F. Parker to conduct a mental evaluation of Basham. Dkt. # 1401. As of the date of this response, Dr. Parker has not yet completed his evaluation.

Because this Court has ordered the briefing schedule in this case to proceed, the Government

---

[1] In the introduction to their § 2255 motion, habeas counsel argued that an impediment created by the clerk's office tolled the beginning of the statute of limitations period to May 19, 2011. Motion, at 3. At the outset of the June 29 hearing, habeas counsel all but abandoned that argument, stating that they did not "believe that the Court needs to make any ruling regarding the statute of limitations." 06/29/11 Status Hearing Tr at 5.

-2-

hereby submits its response to the claims raised in the § 2255 motion brought by habeas counsel. The Government does not concede, however, that the motion is properly brought on Basham's behalf. As the Government noted in the status conference on June 29, 2011, Basham has never been adjudicated incompetent at any time. 06/29/11 Status Hearing Tr at 19-20. Basham has been clear and unwavering in his desire to waive further collateral and appellate proceedings. If Dr. Parker's evaluation confirms that Basham is competent, the § 2255 motion should be dismissed as having been filed without Basham's authorization.

In any event, the Court should deny the § 2255 motion because the claims raised in it are without merit. There was no error committed by the Court, no misconduct by the Government, and no ineffective assistance on the part of defense counsel. As to the ineffective-assistance claims brought by habeas counsel, not only have Basham's trial counsel earned sterling reputations in general, the merit of those reputations was on display in Basham's case. Trial counsel were zealous and strategic in their efforts to defend Basham. They did not act unreasonably in any of the respects alleged in the § 2255 motion, and Basham suffered no prejudice.

**Response to Claim 1**: **Basham's initial trial counsel acted reasonably in allowing him to accompany officers in an attempt to find Alice Donovan's body.**

Trial counsel was not ineffective for accompanying Basham on the Thanksgiving Day search and Basham was not prejudiced by any alleged ineffective assistance of counsel.

A.    Standard of Review

Under Strickland v. Washington, 466 U.S. 668, 687 (1984), in order to establish a violation of his Sixth Amendment rights, a petitioner must show that his counsel's performance was deficient and that the deficiency so prejudiced his defense as to deprive him of a fair trial. The performance

of counsel is measured in terms of "reasonableness under prevailing professional norms." Id. at 688.

A court's evaluation of performance "must be highly deferential," judged "on the facts of the particular case," and considered "from counsel's perspective at the time." Id. at 689, 690. A criminal defendant is entitled to a fair trial, not a perfect one. United States v. Lighty, 616 F.3d 321, 336 (4th Cir. 2010)(citing United States v. Hastings, 461 U.S. 499, 508-09 (1983)("Given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial.")). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991)(citing Strickland, 466 U.S. at 686).

      B.     Analysis

          1.     Trial counsel was not ineffective in allowing Basham to be a part of the Thanksgiving Day search and in accompanying Basham during the search

Basham's habeas counsel complain that his initial trial counsel provided ineffective assistance because they allowed him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him. §2255 Mot. at 13-14. They state that he was prejudiced due to his demonstration of how Alice Donovan was killed with a purse strap. §2255 Mot. at 16. Basham cites no legal authority to support his claim.

Basham's counsel were not ineffective for failing to literally "hold his hand" during the day-long search for Alice Donovan's body on Thanksgiving Day 2002. This first claim presupposes that counsel is required to stay within a few feet of a client during any cooperation with law enforcement

**JA 3242**

— including a search for a body, a debriefing, or any other interaction with officers after a defendant has decided to cooperate. No such requirement exists for effective representation.

In this particular case, it is clear that counsel were effective because they attempted to help Basham obtain some credit by convincing law enforcement to allow Basham to help attempt to locate the body of Alice Donovan. To be sure, the sole purpose of Basham's visit to the Bee Tree Farms area was to provide directions to Donovan's body. This cooperation was inherently inculpatory, indicating that Basham had knowledge of the crimes committed against Donovan. Of course, that fact was hardly in dispute at the time investigators began the Thanksgiving Day search: Basham's participation in Donovan's abduction had been captured on video, and Basham had already given police information about his role in the crimes. Based on the inculpatory nature of Basham's effort to locate the body and the incriminating statements already made by Basham, effective representation did not require counsel to intervene to stop Basham from continuing to cooperate. See United States v. Heatley, 39 F.Supp.2d 287, 315 -316 (S.D.N.Y. 1998).

As noted below, Basham had already made numerous statements admitting to his active participation in the abduction and death of Alice Donovan. Prior to the Thanksgiving Day search, Basham had already told FBI agents about a cemetery where they could find Alice Donovan's body, noting that "this is where they did their thing." TT 9:216-17. The fact that Basham later went to this same location on the Thanksgiving Day search and demonstrated where Donovan was strangled and where a purse strap was thrown simply confirms what he had earlier said. Moreover, Basham had already told officers that they should be looking for a purse strap in the vicinity of the cemetery. Basham first mentioned the purse strap to officers as they traveled together in the van. Basham leaned over to confer with his counsel Cameron Littlejohn; after this confidential conversation with

-5-

**JA 3243**

Littlejohn, Basham announced to the officers that they needed to look for a purse strap near the cemetery. Officers were dispatched to that location to look for the strap, but they did not find it. Later in the day, the group returned to the cemetery. It was there that Basham walked over with Sheriff Hewett and demonstrated how he had disposed of the strap. This demonstration was designed to further pinpoint the location of the strap, a matter that Littlejohn had already authorized Basham to discuss with the officers.

            2. Basham was not prejudiced by any alleged ineffective assistance of counsel.

Additionally, Basham could not have been prejudiced by the demonstration because he had already admitted his involvement in the murder. In fact, Basham, through his counsel in Kentucky, had asked to be transported as quickly as possible to South Carolina and to the area he had identified as the place Alice Donovan's body was located so he could help find her. 2/25/04 Hearing Tr at 155. The purpose of the Thanksgiving-day search was to find Alice Donovan's body. Id. at 60. Basham's counsel in South Carolina, Cam Littlejohn, recognized the dilemma Basham faced. At the Jackson v. Denno hearing he testified: "Now, the fact that he was going to attempt to point out the location where Ms. Donovan's body was, obviously there was no way to keep this from being evidence later on, and hopefully it would be evidence in Brandon's favor." Id. at 137. By admitting that he knew where the body was located, Basham had to admit that he was present when Alice Donovan was killed. Basham's counsel also knew Basham's kidnapping of Alice Donovan was on videotape, Id. at 95, so Basham could not deny his involvement in the abduction. Basham's attorneys reasonably hoped that if he helped find Alice Donovan's body, he would receive a benefit. Id. at 136. They hoped that if Basham helped locate the body, the Government would not seek the death penalty, Id. at 97, or that they could use it as evidence in mitigation, Id. at 136. His attorney

**JA 3244**

explained: "We really felt like we were going to find her that day." Id. at 127.

So, with his attorney's approval, and in what at that time appeared to be an effort to help locate the body,[2] Basham had advised officers that they needed to look for a purse strap which was used to kill Alice Donovan. Id. at 64, 17-18. As his attorney testified: "[T]he thing about the purse strap was that we were trying to assist them in giving them directions and honing in on the location where Ms. Donovan might be found." Id. at 141. Basham also advised that he and Fulks had drug Alice Donovan's body about 50 feet and had covered it with leaves. Id. at 76, 79. Thus, when Basham momentarily walked to the cemetery with officers, he revealed nothing more to them than had already been provided in the presence of his counsel. Thus, nothing Basham said or did while he was outside the presence of his counsel during the search was prejudicial.

Further, Basham could not have been prejudiced by his indication during the search at the Bee Tree Farms area that he knew how Alice Donovan was killed. Within days of being arrested in Kentucky, Basham admitted to participating in the kidnapping and murder of Alice Donovan. TT 9: 247, 218. When Basham admitted his involvement in the murder, he was well aware that anything he said could be used against him. He had been advised at least four times during the days prior to coming to South Carolina that anything he said could be used against him.

On November 19, 2002, F.B.I. Agent Vito advised Basham of his constitutional rights prior to interviewing him. TT 9: 134-135, 223-224, 240, 255; 2/25/04 Hearing Tr at. 3. Basham agreed to waive his rights and to speak with the agent. TT 9: 135. At that time, Basham said that he and

---

[2] After Basham was convicted, a fragment of Alice Donovan's bone was discovered in the Savannah Bluff area. Based on information Basham provided after he was arrested, he was aware of the difference between the Savannah Bluff area in the Myrtle Beach area and the Bee Tree Farms area in North Carolina.

**JA 3245**

Fulks had kidnapped Alice Donovan, and that she was now with Fulks, driving back to South Carolina. TT 9: 148-149.

Agent Vito again interviewed Basham later during the morning of November 19. TT 9: 159. He showed Basham the "Advice and [sic] Rights Form" he had read and signed prior to the first interview. TT 9: 160. Basham said he would like to talk and initialed the form. TT 9: 60. Basham gave a similar account of events. After taking a break, Agent Vito told Basham that he did not believe he was being truthful. TT 9: 176-177. Basham then told Agent Vito that Fulks had left him in a Myrtle Beach parking lot for about an hour while Fulks took Alice Donovan to tie her up. Basham said that when Fulks returned, Basham asked him what he had done with the woman, and Fulks told him: "not to worry about it, that it was over." TT 9: 177. Basham said he believed the woman was dead. TT 9: 177. On November 20, 2002, Agent Vito interviewed Basham a third time because he believed Basham had more information. Vito again advised Basham of his rights, and Basham waived his rights. TT 9: 188. Basham added some details and assisted in developing a hand-drawn map of where he believed Fulks had left Alice Donovan. TT 9: 206-209. The map was of an area similar to what was identified as the Savannah Bluff area. TT 9: 198.

Agent Vito did not speak with Basham again until November 25, 2002. His supervisor, Pat Maley, had received voice mail from Basham that he wanted to talk. TT 10: 71. Agent Maley contacted Basham's attorney, Mr. Hughes, who indicated he would provide details of the location of Alice Donovan's body. TT 9: 211; TT 10: 71. Prior to the interview, "out of an abundance of caution," Agent Maley read Basham his rights because "whenever I interview somebody in jail, I want to be sure it is very clear to them that whatever they say can be used against them." TT 10: 74. During the interview, a map was drawn with an Amoco station in Shallotte, North Carolina as a

-8-

**JA 3246**

reference point. TT 9: 212. As Agent Vito and his supervisor received the information, they relayed

it to agents in South Carolina. TT 9: 213. Basham told agents that Alice Donovan's body was

within dragging distance off the road. TT 9: 218; TT 10: 80. He indicated the location of a small

run-down cemetery on the map, and stated: "that is where they did their thing." TT 9: 216. At trial,

Agent Vito testified:

> A.  . . . . Mr. Hughes was standing beside Mr. Basham, and Mr. Maley [agent] was standing beside Mr. Basham. They were working on the map. And Mr. Basham turned and said that, at that point.
>
> Q.  Said it in whose direction?
>
> A.  In Mr. Hughes' direction.
>
> Q.  His comment again is what?
>
> A.  "That is where they did their thing."
>
> Q.  Do you recall having any reaction to that?
>
> A.  I recall looking at Mr. Maley and him looking at me, and I felt that was very significant.
>
> Q.  Why?
>
> A.  It indicated that he had done something, "their thing."

TT 9: 217.

Basham's statement that they had done "their thing" when they were at the cemetery

demonstrates that even when counsel was present with Basham, counsel could not prevent him from

making statements potentially detrimental to his case. Cam Littlejohn, Basham's attorney during

the search, had told Basham "that we were going to only be giving directions, that we weren't going

to give any statements, and we would have to talk at a later time and determine whether it would be

JA 3247

in his best interest to make any further statements." 2/25/04 Hearing Tr at 139. Even after providing this admonition, Basham's attorney had to stop him mid-sentence when he started saying that he could never kill a deer. Further, counsel could not be with Basham at all times. Basham had a strong desire to talk, and in doing so, he incriminated himself and engaged in behavior which likely prevented jurors from feeling much sympathy for him.

For example, Basham called his former teacher's aide, Clifford Jay, on December 24, 2002, and admitted: "We killed them." TT 10: 228. **"Yes sir, we killed them."** <u>Id</u>. at 229. While he was incarcerated at Butner FCI, he told the nurse: "I am going to fuck you up the ass, Ms. Miosi. I am going to kill you, psych bitch." TT 18: 91. He scuffled with officers at Butner, threatened correctional Lt. Ledford, and told officers: "I will show you mother fuckers how to cause pain. You don't know how to cause pain." TT 18: 14-15. He also bragged to prison personnel that a jury would never find him guilty, and that "[t]he worst they can do is give me life." TT 17: 206; 18: 21. These statements and others were arguably as much or more damaging to his case as the statement of which Basham complains.

Basham's habeas counsel incorrectly state: "Considering that Sheriff Hewett's testimony was the only evidence suggesting that Mr. Basham was the actual killer of Alice Donovan, it was unquestionably damaging. . . ." §2255 Mot. at 18. As noted above, Basham confessed to Clifford Jay: "We killed them." Further, the Government never argued that Basham was the only killer. The Government's closing argument was consistent with Basham's admission, discussed further under Claim 11, that both Fulks and Basham, working together, killed Alice Donovan, and that one was as culpable as the other. The Government told the jury:

> If Brandon Basham was alone, or if Chad Fulks were alone on November 11, 2002

<center>-10-</center>

<center>**JA 3248**</center>

and November 14, 2002, Samantha Burns would be alive today. . . . Brandon Basham and Chad Fulks were acting together in unison as a team, a death squad . . . the two of them, together, aiding and abetting each other when they kidnaped, and carjacked, and killed Alice Donovan, the two of them.

TT 12:12. As Tina Severance, who was with Basham and Fulks from the day after they kidnapped James Hawkins until the night they killed Alice Donovan, testified, Basham and Fulks "were always talking amongst themselves"; they drank together, smoked together, and ate together. TT 2: 249. And it was the Government's theory that they killed together, not that Basham, alone, killed Alice Donovan with a purse strap.

Basham's habeas counsel complain that the importance of his demonstration of how the purse strap was used is evidenced by the prosecutor's closing argument that the testimony of Clifford Jay that Basham admitted: "We killed them," and the testimony of Sheriff Hewett that Basham demonstrated how the purse strap was used "alone seals the deal." §2255 Mot. at 17. However, any number of other pieces of evidence could have "sealed the deal." The videotape of Basham kidnapping Alice Donovan from the Wal-Mart parking lot and Basham's admission to Clifford Jay that "[w]e killed them," would have certainly "sealed the deal." Basham's statement to the FBI indicating that they "did their thing" in the cemetery would have "sealed the deal." The videotape plus Basham's claim a few days after his arrest that Alice Donovan's body was within dragging distance of the road could have "sealed the deal." Carl Jordan's testimony that Basham and Fulks stole his guns and shot at him, TT 4: 33, Margaret Moore's testimony that Basham, with Fulks in tow, attempted to convince her to give him a ride to the store or allow him into her house to use the telephone, TT 4: 87-87, and Olieta Hyman's testimony that the two men [Basham and Fulks] stole her truck, the one seen on the videotape from which Basham exited at the Wal-Mart parking lot in

-11-

**JA 3249**

order to kidnap Alice Donovan, TT 4: 99-102, could have "sealed the deal." The testimony of Tina Severance, the burned car, the camouflage gear, and all of the other evidence regarding the death of Samantha Burns, plus the video of Basham kidnapping Alice Donovan could have "sealed the deal."

While the purse strap demonstration may have provided a bit of drama, it clearly was not necessary in order for the jury to find Basham guilty. It was one piece of evidence on the mountain of evidence showing Basham kidnapped Alice Donovan, knowing that she would be, and was, killed. Thus, even if counsel was ineffective for failing to constantly be by Basham's side, there was no prejudice.

**Response to Claim 2: Basham's trial counsel adopted a reasonable strategy at the <u>Jackson v. Denno</u> hearing.**

In Claim 2, Basham habeas counsel argue that his trial attorneys were ineffective for failing to "prepare for and/or effectively litigate" the <u>Jackson v. Denno</u> hearing. §2255 Mot. at 19. They contend that his attorneys should have elicited evidence of his "intellectual, psychological, and emotional difficulties" and should have cross-examined witnesses more vigorously in an attempt to argue that his statements to police and his waiver of his <u>Miranda</u> rights were involuntary. <u>Id.</u> at 19-23. This argument misses the mark because his trial counsel proceeded strategically at the <u>Jackson v. Denno</u> hearing: They preserved the voluntariness issue while retaining their ability to argue to the jury that Basham's statements to police were indicative of his cooperation in the investigation into Alice Donovan's abduction and murder.

As Basham's habeas counsel acknowledge, "At defense counsel's request, the Court conducted a hearing pursuant to <u>Jackson v. Denno</u>, 378 U.S. 368 (1964), to determine the admissibility of various statements made by Mr. Basham following his capture and arrest." §2255

**JA 3250**

Mot. at 19.  On the morning of the scheduled date for this hearing, defense counsel informed the Court that Basham appeared to be ill and incoherent, and defense counsel questioned Basham's ability to assist them during the hearing.  02/24/04  (a.m.) Tr at 2-3.  The Court then held a colloquy with both sides to determine if it was necessary for Basham to assist in his defense at the hearing. Id. at 6-9, 11-12.  The Government argued that it would depend on what was at issue in the hearing: If the only issue was whether Miranda warnings were given, then Basham's participation would be less important; if, however, defense counsel's contention was that Basham's statements were involuntary, then his participation would be more critical.  Id. at 7-8.

The Government noted:

> They filed a very generic motion to dismiss.  And as we noted, if what they are suggesting is that the statements weren't voluntary, then they may be boxing themselves into a position that they can't claim later that he was attempting to assist law enforcement when he provided those statements.

Id. at 8.  The Court agreed that this was a "good point," stating:

> It's a two edged sword to raise a voluntariness issue in a death penalty case, because if I hear the testimony and determine the statements were voluntary, they come in. . . . Then if he gets convicted and we move into the penalty phase — I don't know, I never thought about it — but I probably would disallow the defendants from trying to suggest to the jury that he should get some credit for his statements if he tried to keep them out.

Id. at 8-9.

In response, defense counsel attempted to clarify their position:

> [T]here are nine or 10 statements that the government intends to try and offer.  Because of Mr. Basham's history, his mental history, and his low intellectual and intelligence capacity, what we are asking the court to do is to make a threshold determination as to whether or not he was given his rights and whether or not he waived his rights. . . .

-13-

**JA 3251**

> We are not necessarily contending that the statements were voluntary, but we think it is prudent to go ahead and make the determination under 104 that the statements are in fact admissible. We . . . do not intend, as I told you, to present testimony at this point, so I don't think we are making — raising inconsistent positions.

Id. at 11. Defense counsel further explained:

> [W]e think it's prudent to go ahead and have the court pass on the voluntariness of the statements without us necessarily arguing vigorously that they are not voluntary. . . . This is a unique situation, it's a death penalty case. He has had many, many commitments to different institutions, he has low intellectual capacity. And I just think the record ought to reflect whether or not the court thinks the statements are voluntary before they are admitted and played before the jury.

Id. at 11-12. Ultimately, the Court was able to have Basham examined and found competent that day, and the hearing moved forward with Basham at counsel's table. 2/24/04 (p.m.) Tr at 3.

Basham's habeas counsel contend that "no reasonable strategy" could have justified counsel's decision not to present evidence and vigorous argument that Basham's statements to police were involuntary. §2255 Mot. at 23-24. But the Court perfectly summarized the quandary that counsel was in: If counsel took the position that Basham's statements were involuntary, they might later be precluded from arguing to the jury at sentencing that Basham's statements were indicative of voluntary cooperation with law enforcement, thus depriving them of a potential mitigating factor. Defense counsel were able to take a middle ground: They asked the Court to rule on the voluntariness of Basham's statements, thereby establishing a record and preserving the issue for appeal; but they also maintained their ability to argue to the jury that Basham willingly cooperated with police.

Basham's counsel followed this strategic approach in their cross-examination of the

-14-

**JA 3252**

Government's witnesses in the <u>Jackson v. Denno</u> hearing. The witnesses' testimony did not suggest that Basham's statements were involuntary, so defense counsel used their cross-examination to lay a foundation that Basham was cooperative with investigating officers.

For example, Detective Dan Mooney testified that Basham provided a statement regarding his shooting at a police officer on November 17, 2002. 02/24/04 (p.m.) Tr at 29. Detective Mooney also testified that Basham admitted having used marijuana and cocaine on the day of the statement. <u>Id.</u> at 30. Mooney arrived at the hospital to speak with Basham at 9:48 p.m.; Basham said that he had used cocaine at approximately noon that day and had smoked marijuana at approximately 4:00 p.m. that day. <u>Id.</u> Mooney affirmed, however, that Basham was coherent and did not appear to be under the influence of drugs at the time of his statement. <u>Id.</u> at 28; <u>see</u> <u>also</u>, TT 6: 255-256. In keeping with their overall strategy, defense counsel did not argue that Basham was "under the influence at that time" but contended that Basham's statement concerning drug use was an "admi[ssion] to other crimes." <u>Id.</u> at 41; <u>see</u> <u>also</u>, TT 6: 274 (confirming during cross examination that Basham was not aggressive or combative). In any event, there was no evidence that Basham's statement was involuntary, as it had been several hours since he last ingested drugs and there was no indication that he was suffering from diminished capacity.

FBI Agent Scott Vito testified about his interviews of Basham on November 19, 2002. Agent Vito testified that the first interview began at 1:58 a.m. 02/24/04 (p.m.) Tr at 47. In his §2255 Motion to Vacate, Basham argues that his trial counsel should have questioned "the necessity for this nighttime interrogation of a mentally and emotionally challenged young man[.]" §2255 Mot. at 21. The necessity of the late hour was obvious, however, as Agent Vito and other investigators were under the impression that Alice Donovan was still alive and being held captive by Chad Fulks.

-15-

**JA 3253**

02/24/04 (p.m.) Tr at 52; see also TT 9: 148. With no indication that Basham's statements were involuntary, defense counsel thus focused on the fact that Basham was "very cooperative" in answering questions about Donovan's location. Id. at 68; see also TT 9: 224.

In summary, Basham's habeas counsel cannot point to any evidence that he was coerced or that his statements to police were involuntary. Basham's trial counsel were able to raise the issue of Basham's voluntariness while preserving their ability to argue to the jury that Basham had freely cooperated with police. Thus, trial counsel acted with a reasonable strategy in an effort to secure the best outcome for Basham.

**Response to Claim 3: The Court did not err in excluding jurors whose opposition to the death penalty would substantially impair the performance of their duties.**

In Claim 3, Basham's habeas counsel claim that the Court violated "his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties." §2255 Mot. at 25. Specifically, they argue that the Court erred in excluding venire members Cathy Roberts and Michael Williams for cause and that the Court erred in dismissing venire members Rubina Khan and Susan Jackson without allowing defense counsel an opportunity to rehabilitate them in voir dire. Id. They also argue that his appellate counsel was ineffective for failing to raise this issue on appeal. Id.

The record, however, supports the Court's finding that all four of these prospective jurors harbored concerns about the death penalty that would substantially impair their ability to abide by the Court's instructions and their oath as jurors. The Court was in a position not only to judge the substance of their answers on voir dire but also to observe their demeanor and assess their credibility. Faced with ambiguous and often contradictory answers from these venire members, the Court validly

-16-

**JA 3254**

exercised its discretion to remove these individuals for cause. Accordingly, appellate counsel had ample reason not to raise this issue in Basham's appeal.

> A.    The Court validly exercised its discretion to remove venire members whose views on the death penalty would substantially impair their ability to abide by their instructions and oath.

In Witherspoon v. Illinois, 391 U.S. 510, 522 (1968), the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." As the Court put it in subsequent cases, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 419 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). The prosecution "may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." Id. Accordingly, a prospective juror in a capital case "must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to [render a verdict] without conscious distortion or bias." Adams, 448 U.S. at 46. The prosecution "does not violate the Witherspoon doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." Id.

Whether a venire member's reservations concerning the death penalty amount to a "'substantial impairment' is perforce committed in the first instance to trial court discretion based upon the voir dire inquiry." United States v. Tipton, 90 F.3d 861, 880 (4th Cir. 1996). "[W]hat is being inquired into is a state of mind whose determination turns largely on assessments of demeanor

-17-

**JA 3255**

and credibility, matters peculiarly within the province of trial judges[.]" Id.

> 1.    Cathy Roberts

The district court excused Cathy Roberts for cause because her answers to the juror questionnaire and to voir dire questioning, although inconsistent at times, indicated that her opposition to the death penalty would substantially impair her ability to abide by her oath and the Court's instructions.

On the supplemental juror questionnaire, Roberts indicated that the death penalty was used "too seldom" while affirming that she was "strongly opposed to the death penalty" and "would have a difficult time voting to impose it, regardless of the facts and law in the case."  08/30/04 Jury Selection Tr at 105-06.  Roberts attributed this apparent inconsistency to her being "confused" or "nervous."  Id. at 108.  When the Court asked her if she could put aside her personal beliefs and "follow the law as the judge announces," Roberts replied: "I believe I can."  Id. at 109.

But when the Court asked Roberts whether she could "consider the possibility of imposing the death penalty against someone, even if that person didn't strike the fatal blow if it was supported by the facts and the law of the case," Roberts twice announced:  "I'm not 100 percent sure if I could."  Id. at 112-13.  When the Court rephrased the question, Roberts equivocated: "I don't know. If it was my civic duty, I would.  I mean, [if] selected I would follow the law."  Id. at 113.  The Court noted that it observed by Roberts's "hesitancy" and "body language" that she seemed "to have some difficulty with this idea[.]"  Id. at 114.  Roberts affirmed that was true "to a degree."  Id.

In its voir dire, the Government asked Roberts: "[I]s it fair to say, ma'am, that given your pretty strong opposition to the death penalty in general, that as you sit there today you couldn't sentence somebody to die if they didn't actually take another person's life; isn't that true, Ms.

Roberts?" Id. at 125.  Roberts answered: "Yeah, that's true." Id.  Likewise, Roberts said that it was "a fair statement" that "in every single case, if life in prison without parole was one of the options, [she] would feel that that would be the appropriate sentence in every case where somebody didn't actually kill someone[.]" Id. at 128.  Finally, she affirmed that although she "could give the death penalty under a certain set of circumstances . . . [she] would draw the line when the person did not even kill someone[.]" Id. at 128-29.

Viewed in their overall context, Roberts's statements indicated that her views on the death penalty would substantially impair her duties as a juror. True, Roberts's answers were contradictory at times.  But jurors "cannot be expected invariably to express themselves carefully or even consistently.  Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially." Patton v. Yount, 467 U.S. 1025, 1039, (1984).  Thus, "where the prospective juror's response, as captured in the transcripts, reflects some ambiguity in the state of mind of the juror, then the determination made by the trial court, based on its eyeing the juror, is presumed to be consistent with the applicable standard." Maynard v. Dixon, 943 F.2d 407, 415 (4th Cir. 1991).   Despite her inconsistencies, Roberts "expressed reservations, never retracted, sufficient to warrant the district court's determination that they would substantially impair [her] performance of duty to vote for the death penalty if the evidence and law so dictated." Tipton, 90 F.3d at 880.

2.    Michael Williams

As it did with Ms. Roberts, the district court excused Michael Williams for cause based on contradictory answers he provided regarding his ability to render a fair verdict on the death penalty.

During voir dire from the Court, Williams initially affirmed that he could decide the case

"based solely on the evidence produced at trial and in the context of the rules of law[.]" 09/07/04 Jury Selection Tr at 201-02. He agreed that he fell in the "middle category" of potential jurors who were not pre-committed to impose or reject the death penalty. Id. at 202-03. He likewise affirmed that he understood that someone could be eligible for the death penalty even if he did not personally strike the fatal blow. Id. at 206-07. When the Court asked if there was any reason why he could not be fair and impartial, Williams answered: "I really am not sure about the death penalty part, but other than that, I could be fair." Id. at 207. Williams affirmed, however, that he could set aside his opinion on the death penalty and conscientiously follow the law as pronounced by the court. Id. at 207-08.

Upon questioning by Government counsel, Williams articulated a different position. When asked what he had meant when he said he could be fair "except for the death penalty part," Williams explained: "I am not really sure I could do it. I guess after the judge explained the law, I would have to do it, what the law says to impose the death penalty." Id. at 217-18. He acknowledged that he had "some problems emotionally or personally because of some of [his] previously-held beliefs about the death penalty[.]" Id. at 218. Williams stated that it was a "difficult situation" to sign one's name to a death penalty verdict "[b]ut the judge says you got to go by what the law says." Id.

The Assistant United States Attorney then explained to Williams that even if he found that the Government had proved its case, he would not be required to impose the death penalty; he would still have to make a "personal judgment" about whether the death penalty was appropriate in the case. Id. at 220. The AUSA then asked Williams if he "could ever come out of that balancing test and decide that the death penalty is the appropriate sentence[.]" Id. Williams answered: "I really am not sure." Id. Williams affirmed that the balancing process would be even more difficult if the

<div align="center">-20-</div>

<div align="right">**JA 3258**</div>

defendant did not strike the fatal blow.  Id. at 220-21.  The AUSA then asked if Williams could "meaningful[ly] consider and have that balancing test come out in favor of the death penalty" in such a case.  Id. at 221.  "I don't think I would," Williams replied.  Id.

The district court followed up and clarified that determining the sentence was not a "mathematical calculation" in which the jurors were required to impose the death penalty if the Government proved certain facts.  Id. at 222.  The Court emphasized that it needed to know whether Williams fell into an "extreme category" of jurors – whether he was "so strongly opposed to the death penalty he couldn't vote for it under any circumstance[.]"  Id. at 223.  Williams again answered: "I am really not sure, Your Honor.  I guess I feel uncomfortable knowing I will be signing my name on something for somebody to die."  Id.  After hearing argument from the attorneys on whether Williams should be excused for cause, the Court called Williams back and asked if his discomfort with signing a death verdict would "impede [his] ability to be fair to both sides[.]"  Id. at 230.  Williams responded:

> I am really not sure, Your Honor.  In certain cases, in the Susan Smith case, you know, to me, there is no doubt what she did to her two boys, she should have gotten the death penalty.  And maybe it is because kids were involved, I don't know.  But I feel, you know, I would have to be honest, I would still feel very, very uncomfortable signing the document saying the death penalty.

Id.  The Court then excused Williams for cause.  Id.

Thus, at both the beginning and the end of voir dire, Williams expressed that he was "not sure" he could be impartial in light of his reluctance to hand down a verdict of death.  He did state that he could follow the law as explained by the Court.  The totality of his answers, however, indicated that he initially thought he would be required to impose the death penalty in certain

**JA 3259**

situations.  Once it was explained to him that he would never be required to reach a death verdict but would instead have to make a personal judgment on the propriety of the sentence, Williams expressed uncertainty about whether he could ever impose the death penalty.  In light of these answers, the district court did not abuse its discretion in finding that Williams's views on the death penalty would substantially impair his ability to follow his oath and the Court's instructions.

> 3.    Rubina Khan

When the district court explained to venire member Rubina Khan that the Court was looking for jurors who were not pre-committed to impose or reject the death penalty, Khan stated: "Well, I do strongly oppose it, but I guess I could be able to put aside my views."  08/31/04 Tr at 271.  When asked if she was "so strongly opposed" to the death penalty that she could never vote for it under any circumstances, Khan answered: "No, I don't think I fall in that category."  Id.  Later, the Court explained to Khan that, if the jury returned a verdict of death, all the jurors would have to sign their names to the verdict.  Id. at 275.  Upon learning this, Khan stated: "I don't know if I would be too easy about that."  Id. at 276.  Khan expressed a concern that she might be pressured into reaching a verdict with which she did not agree.  Id. at 276-77.

After momentarily excusing Khan and hearing argument from counsel, the Court asked some follow-up questions of her.  Id. at 279.  The Court reiterated that if the jury decided upon the death penalty, all of the jurors (not just Khan) would have to sign their names to the verdict.  Id. at 280.  The Court asked Khan if she "had some problems" with that requirement.  Id.  "I don't think I can vote for capital punishment, I don't think I can," Khan replied.  The Court then excused her for cause.  Id.

-22-

**JA 3260**

Basham's  habeas counsel argue that the district court erred in dismissing Khan without giving defense counsel the opportunity to rehabilitate her.  §2255 Mot. at 33.  Basham's habeas counsel  point to no authority suggesting that a court must provide an opportunity to rehabilitate a potential juror who has given disqualifying answers.  In fact, the Fourth Circuit has expressly declined to create such a rule.  Boggs v. Bair, 892 F.2d 1193, 1201 (4th Cir. 1989) ("[W]e decline to introduce into the law the rule argued for by Boggs which would say that a trial judge has a constitutional duty to try to rehabilitate by his personal questioning any juror who has been shown to be disqualified[.]").

Moreover, Basham's habeas counsel can only speculate whether Khan, upon questioning from defense counsel, would have retracted her statement that she did not think she could vote for capital punishment.  If the Court had allowed defense counsel to ask rehabilitative questions, it presumably would have allowed the Government to ask questions as well.  The Government's questions likely would not have been geared towards "rehabilitation" and may well have shown Khan's reservations to be even more pronounced.  In any event, even if the Court had allowed rehabilitation by the defense, and even if Khan retracted her earlier statements, the Court would be left with a venire member who had given contradictory responses.  As it did with other potential jurors, the Court would have been justified in excusing Khan in the face of such contradictions.  The Court was in the best position to determine whether further questioning of Khan would be beneficial or whether (as it decided here) Khan's answers and demeanor had already demonstrated a "substantial impairment."

        4.     Susan Jackson

Susan Jackson stated in her written questionnaire that she was "strongly opposed to the death

**JA 3261**

penalty and would have a difficult time voting for it, regardless of the facts and law in the case."

09/03/04 Jury Selection Tr at 72.  She also wrote: "Taking a life under any circumstances is

reprehensible."  Id.  During voir dire, the district court asked Jackson whether she could "set those

beliefs aside and conscientiously follow the law as announced by the trial judge[.]"  Id. at 73.

Jackson replied: "I don't think I can, sir."  Id.

        After some discussion with the attorneys, the Court called Jackson back in for further

questioning.  Id. at 74.  At that time Jackson informed the Court that she "probably" should have

checked the questionnaire box which indicated that she was "personally morally or religiously

opposed to the death penalty and would never vote to impose it, regardless of the facts and law[.]"

Id. at 74-75.  "After sleeping on it," Jackson concluded that she actually fell in the disqualifying

category.  Id. at 75.  The Court then disqualified her.  Id.

        Basham's habeas counsel argue that the district court should have allowed defense counsel

an opportunity to rehabilitate Jackson.  §2255 Mot. at 33.  But as explained above, there is no

requirement that the Court grant such an opportunity.  And Jackson was forceful and direct in

explaining that her opposition to the death penalty would hinder her ability to follow her oath and

instructions.  In fact, the more she thought about it, the stronger her opinion became that she could

never impose the death penalty, regardless of the circumstances.  There is no indication that

additional questioning would have led Jackson to recant her position or, even if that occurred,

satisfied the Court that Jackson could be a fair and impartial juror.

        B.      Basham's appellate counsel was not ineffective for failing to challenge the exclusion
                of these jurors, as counsel could have reasonably determined that this was a weak
                argument that would undermine the overall force of Basham's appeal.

        As explained above, the district court validly exercised its discretion to remove the

JA 3262

challenged jurors for cause. Accordingly, any appellate challenge to their removal would have been weak. Basham recognizes that "weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy[.]" §2255 Mot. at 36. Basham's habeas counsel maintain, however, that the "weeding" principle "has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims . . . ." Id. at 36-37. They offer no support for this proposition. To be sure, it would be practically (if not theoretically) impossible for appellate counsel to include every conceivable issue in a capital appeal, even if there were no word or page limits. If perceived errors in the trial proceedings are not filtered by the merits of challenges to those errors, there will always be one more challenge to raise.

Because an appellate challenge to the exclusion of the challenged jurors would have been without merit, appellate counsel was not deficient for declining to raise this issue. For the same reason, Basham cannot demonstrate any prejudice; even if his appellate lawyers had raised the issue, there is no reasonable probability that doing so would have changed the outcome of his appeal.

**Response to Claims 4, 5, 6 & 7**: **Basham is not, and has never been, mentally incompetent.**

In Claims 4-7, Basham's habeas counsel make various claims centered around the unsupported claim that Basham was supposedly "tried, convicted, and sentenced to death when he was mentally incompetent to stand trial." §2255 Mot. at 37. These claims include direct appeal issues and ineffective assistance of trial and appellate counsel claims. These claims all fail for a number of reasons.

Most importantly, despite numerous evaluations by various mental health professionals throughout Basham's life, Basham has never been found incompetent. Tellingly, the psychiatrists retained by Basham's trial counsel never made a finding that he was incompetent. Nothing in the

-25-

**JA 3263**

record indicates that Basham was incompetent to stand trial. Instead, even after a tussle with Deputy U.S. Marshals, Basham's psychiatrist testified the next morning that Basham was competent. As noted by the Fourth Circuit on direct appeal, the record indicates that Basham was a manipulative individual, not one who was incompetent. See Basham, 561 F.3d at 333 ("Basham's actions and manipulation . . . point to a manipulative individual."). Apparently because of this lack of medical support for an incompetency defense, trial counsel decided that they did not have a good faith basis to raise a competency defense and affirmatively decided to not pursue a competency evaluation for strategic reasons. Appellate counsel was certainly wise to not raise an issue that had no support. Likewise, the trial court had no reason to order a competency evaluation, particularly when Basham's trial counsel objected to any such order and informed the Court that Basham was not incompetent. These claims must fail.

A.    Brief Factual Background relating to Claims 4, 5, 6 & 7

Basham has received mental health treatment since childhood. The Fourth Circuit summarized how this evidence was presented in the mitigation/penalty phase of his trial:

> Basham also put forth mitigation evidence regarding his mental condition Basham showed that he was diagnosed with learning disabilities at a young age and eventually placed into youth homes following his expulsion from school. Basham also put forth evidence suggesting that he had a deteriorating mental condition—to wit, Basham's IQ had declined from 100 as a youth to approximately 68 due to illegal drug abuse and other factors. Experts testifying on Basham's behalf diagnosed him as suffering from a brain impairment, multiple-cause dementia, drug-inhalant psychosis and anxiety. His psychiatrist admitted under oath, however, that these problems did not contribute to his offenses or keep him from distinguishing between right and wrong. Finally, Basham put forth evidence of his ability to adapt to prison life through the testimony of prison officials.

Basham, 561 F.3d at 315. Despite this detailed mental health evidence, at no point did any mental health care expert indicate that Basham was incompetent.

It is true that Basham's initial trial counsel, Cameron Littlejohn and William Monckton, filed what can be described as a "pro forma" motion for a mental competency evaluation on December 11, 2002, just a few weeks after Basham was arrested.  See  Docket # 22.  However, this one-page motion provided no specific details to justify the ordering of a mental competency evaluation. Littlejohn and Monckton were disqualified on April 9, 2003.  Trial counsel Jack Swerling and Greg Harris were appointed to replace Basham's original trial counsel.

Basham's trial counsel retained numerous mental health experts to treat Basham and evaluate Basham's mental health.  Some of these experts included forensic psychiatrists Donna Schwartz-Watts and Donald Morgan, neuropsychiatrist Tora Brawley and neurologist William Brannon.  Dr. Schwartz-Watts alone interviewed Basham forty (40) times.[3]  Neither Dr. Schwartz-Watts nor any other expert ever made a finding that Basham was incompetent.

While examinations and evaluations by defense experts began, on June 9, 2003, trial counsel Swerling and Harris requested that Basham be moved out of the Richland County Detention Center and transferred to Columbia Care Center.  Counsel stated that Dr. Schwartz-Watts "suggests Basham be moved from the detention center to the Columbia Care Center for more appropriate treatment and monitoring."  Docket # 95, at p. 2.  In response to this request, the Government requested that Basham undergo a competency evaluation.  Trial counsel opposed this request.  Docket # 99.  Trial counsel stated that Basham was not incompetent: "With the necessary therapy, Defendant Basham has been able to assist in his defense and to understand the gravity of the charges he faces."  Id. at 2.  At a hearing on Basham's motion to transfer to Columbia Care Center, the defense noted that

---

[3]  In addition, BOP Psychiatrist Bruce Capehart examined Basham and produced a 120-page report. 10-27-04 TT Transcript Vol. 26, at p. 106

Dr. Schwartz-Watts was examining Basham "for the purpose of establishing his competency" and a transfer to Columbia Care Center "would allow her to complete her evaluation and to make a determination so that she [could] properly advise [defense counsel]as to his competency and his ability to stand trial."  6/18/03 Hearing Tr at 3.  At the same hearing, the prosecution made the following uncontradicted observations:

> In their response . . . it states that there is no current intention on their part to suggest that [Basham] is not competent to stand trial . . . We have reviewed discovery pertaining to the Defendant. We have reviewed statements that he made. We have gotten correspondence that he sent to third parties and there is nothing in there to suggest that he is not competent to stand trial.

6/18/03 Hearing Tr, at 5.  Based on the defense's affirmation that Basham was not raising competency as an issue at that time, the Government withdrew its request for a competency determination and agreed to have Basham transferred to Columbia Care Center.  The Court ordered that Basham be transferred to Columbia Care Center for 30 days.  Docket # 110.  The Court subsequently continued Basham's stay at Columbia Care Center until October 15, 2003.  Docket # 147.

As noted above, Dr. Schwartz-Watts interviewed Basham at least 40 times. TT 26: 114-117, 264.[4]  There is nothing to suggest that Dr. Schwartz-Watts  found Basham to be incompetent.  In fact, at a <u>Jackson v. Denno</u> hearing on February 24, 2004, the Court had Dr. Schwartz-Watts examine Basham and she found him to be competent.  2/24/04 (p.m.) Tr at 3.

On September 20, 2004, during the guilt phase of the trial, Basham "refused to comply with the district court's instruction to take his seat" and "a tussle ensued in the courtroom between the

---

[4]Dr. Schwartz-Watts testified that she had "reviewed more medical records in this case than I ever have on any other case, period." TT 26:103.

**JA 3266**

defendant and the marshals." Basham, 561 F.3d at 333; TT 5: 149-53. After the situation was under control and Basham was sent to a holding cell, trial counsel asked for a continuance to allow Dr. Schwartz-Watts to examine Basham to determine his competency. Id. at 153-54 ("We would ask for a delay . . . We have a doctor on the way . . . We are concerned about the competency."). The Court granted this delay.

Dr. Schwartz-Watts examined Basham both that afternoon and the next morning. On September 20, after examining Basham for "about 15 or 20 minutes," Dr. Schwartz-Watts testified that she had "concerns about his competency." Id. at 162. However, she noted that "with a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed." Id.

The next morning, at the start of court, Mr. Swerling announced that Basham "is competent this morning according to Dr. Watts." TT 6: 6. Dr. Schwartz-Watts testified that she "spent about 45 to 50 minutes with Mr. Basham" and determined he was "back to his baseline this morning. . . . He is able to make decisions." Id. The Court then asked counsel: "You are satisfied your client is competent to go forward?" Mr. Swerling answered that "[t]here is no question about competency." Id.

A month later, Dr. Schwartz-Watts testified for two days at the mitigation phase of the trial. TT 26: 81-274 & TT 27: 4-151. Dr. Schwartz-Watts testified extensively about Basham's mental state, including his conduct at trial, but never hinted that Basham was incompetent. In fact, Dr. Schwartz-Watts testified that although Basham had major mental illnesses, "none of these illnesses affected his ability to distinguish right from wrong." TT 27: 97. Dr. Schwartz-Watts also testified regarding Basham's altercation with the U.S. Marshal's officers in the courtroom, that it was "not

-29-

**JA 3267**

at all" the result of a panic attack. TT 27: 98. At no point during her testimony did Dr. Schwartz-Watts suggest that Basham was incompetent.

B.    Response to Claim 4

In Claim 4, Basham's habeas counsel claim that he was tried and sentenced while legally incompetent in violation of the Fifth, Sixth and Eighth Amendments. They claim that "at the time of trial, he lacked the 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" (§2255 Motion, at p. 39, citing Dusky v. United States, 362 U.S. 402 (1960)).

This issue must be dismissed because it is procedurally barred. This is a direct appeal issue which is not an appropriate claim in a § 2255 motion. This issue was not raised on direct appeal; hence, Basham has procedurally defaulted on this issue and is barred from raising this issue. Haynes v. United States, 451 F.Supp.2d 713, 722-23 (D.Md. 2006); Ludwig v. United States, 162 F.3d 456, 458 (6th Cir.1998) (petitioner who procedurally defaulted a competency claim was procedurally barred from raising the claim in post-conviction proceedings unless he could show cause and prejudice or actual innocence); Coleman v. United States, 188 F.3d 506, *2-3 (6th Cir.1999) (unpublished); Lewal v. United States, 152 F.3d 919, *1-2 (2d Cir. 1998) (unpublished).

C.    Response to Claim 5

In Claim 5, Basham's habeas counsel claim that his trial attorneys rendered ineffective assistance of counsel by failing to request that the trial court determine Basham's competency to stand trial. Alternatively, they argue that trial counsel was ineffective for failing to request a delay in trial until such time that Basham became competent. This claim must fail for several reasons.

First, there is nothing in the record to support Basham's habeas counsel's assertions that

-30-

**JA 3268**

Basham was incompetent to be tried.  As recounted above, trial counsel resisted the Government's

motion for a determination of mental competency to stand trial.  Docket # 99.  Trial counsel noted

that "[w]ith the necessary therapy, Basham has been able to assist in his defense and to understand

the gravity of the charges he faces."  Id. at 2.  Even in the middle of trial, after the tussle with the

marshals, Dr. Schwartz-Watts determined that Basham was competent to stand trial.    TT  6: 6.

Mr. Swerling assured the Court that "[t]here is no question about competency."  Id.  To argue that

trial counsel was ineffective for failing to mount a competency defense flies in the face of the record

developed before and during Basham's trial.  It also would have required trial counsel to challenge

the findings of their primary psychiatric witness, Dr. Schwartz-Watts.

Second, as the Fourth Circuit noted, defense counsel did not challenge Basham's competency

for strategic reasons.  See  Basham, 561 F.3d at 325 (noting that "Swerling later withdrew

[previously filed competency motion], indicating that [they] were pursuing a different strategy").

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options

are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S.Ct. 2052.  The choice whether to

pursue an incompetency defense turns in part on defense counsel's choice of strategy, and for obvious

reasons counsel's strategy judgments are ordinarily given special deference. See id. at 689, 104 S.Ct.

2052.

"Competency" in this context is a comparatively narrow concept and must not be confused

with broader or different uses of the term. It is not the same as whether the defendant has an insanity

or diminished capacity defense on the merits or whether his ideas about how to live or what to

believe are common in the community or seem sensible to others. Rather the competency insisted

on by the courts is a functional concept focusing on the defendant's part in the trial.  Robidoux v.

JA 3269

O'Brien, 643 F.3d 334, 339 (1ˢᵗ Cir. 2011).

The two settled requisites of competency are that the defendant understand the nature of the proceedings against him and that he be able to cooperate with counsel in his defense. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Drope v. Missouri, 420 U.S. 162, 171–72 (1975). The "understanding" required is of the essentials—for example, the charges, basic procedure, possible defenses—but not of legal sophistication. One of the jobs of counsel—and, in limited respects, the judge—is to explain matters to the defendant, and it is that understanding that is required.

Basham's habeas counsel claim that "this case is replete with instances of Mr. Basham's inability to communicate or work productively with his attorneys; his suicide attempts; his inability to remain awake during court proceedings . . .; his inability to focus on the proceedings; and his inability to control his behavior in court." §2255 Motion, at p. 38. However, these assertions are not well supported by the record and do not contradict the fact that the record is barren of support for Basham's alleged incompetency. Furthermore, even if the Court were to accept Basham's habeas counsel's assertions at face value, none of these asserted facts required Basham's counsel to assert what would have been, at best, an extremely weak competency defense.

It is clear that "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." Walton v. Angelone, 321 F.3d 442, 460 (4ᵗʰ Cir. 2003). Similarly, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Id. Needless to say, trial counsel "is in the best position to evaluate a client's comprehension of the proceedings." Hernandez v. Ylst, 930 F.2d 714, 718 (9ᵗʰ Cir. 1991).

**JA 3270**

The question is not whether a court or some other attorney thinks that counsel should have raised the competency issue but whether the trial counsel was "unreasonable" in concluding that under the circumstances they should not raise such a defense. This Court cannot conclude that trial counsel's strategic decision to not pursue a competency defense was unreasonable when there is no evidence that Basham failed to understand the proceedings and that he was unable to cooperate with counsel. See Robidoux v. O'Brien, 643 F.3d at 340.

Finally, Basham's ineffective assistance of counsel claim must fail because he can show no prejudice.  As described above, even if counsel challenged his competency there is not a reasonable probability that Basham would have been found incompetent.

D.    Response to Claim 6

In Claim 6, Basham's habeas counsel argue that the trial court's failure to hold a competency hearing despite supposed indicia of his incompetence was an abdication of the court's obligation under 18 U.S.C. § 4241(a) and violated his procedural due process rights under Drope, 420 U.S. at 171-72, 95 S.Ct.  This challenge is unavailing and fails because: (1) this is a direct appeal issue that Basham procedurally defaulted; (2) there was not reasonable cause to believe that Basham was incompetent and (3) Basham's trial counsel resisted such an order for strategic reasons and affirmatively told the Court that Basham was not incompetent.

A trial court is required to order a competency hearing only when the court finds "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. §4241(a).  Similarly, a trial court's failure to inquire into competency, *sua sponte*, where there is

-33-

**JA 3271**

reason to doubt a defendant's competency, violates due process because it deprives the defendant of his right to a fair trial. <u>Drope</u>, 420 U.S. at 172, 95 S.Ct. 896; <u>Pate</u>, 383 U.S. at 385-86, 86 S.Ct. 836. But barring indicia of incompetence, due process does not require that a competency hearing be held. <u>Godinez v. Moran</u>, 509 U.S. 389, 402 n. 13, 113 S.Ct. 2680 (1993).

Because evidence of a defendant's demeanor at trial is relevant in determining competency, a district court may determine informally whether reasonable cause exists by observing the defendant's demeanor and assessing his statements during colloquies and other interactions with the court. <u>United States v. Jones</u>, 642 F.3d 1151, 1161 (D.C. Cir. 2011); <u>United States v. Weathington</u>, 507 F.3d 1068, 1073 (7th Cir. 2007); <u>United States v. Grimes</u>, 173 F.3d 634, 636 (7th Cir. 1999). If the preliminary inquiry does not establish reasonable cause to believe the defendant is incompetent, a hearing is not mandatory. <u>United States v. Graves</u>, 98 F.3d 258, 261 (7th Cir.1996).

Basham did not challenge the district court's failure to order a competency hearing pursuant to 18 U.S.C. § 4241 during trial.  Moreover, Basham did not raise this issue on direct appeal. Basham brings this challenge for the first time in this §2255 proceeding.  Alleged violations of 18 U.S.C. § 4241 are not cognizable under section 2255.  <u>See</u> <u>United States v. Williams</u>, 819 F.2d 605, 607 (5th Cir. 1987) If a defendant fails to raise an issue at trial or on direct appeal, he must show cause excusing the procedural default and actual prejudice resulting from the alleged error to prevail under section 2255.  <u>United States v. Frady</u>, 456 U.S. 152, 167-68 (1982); <u>United States v. Dunham</u>, 767 F.2d 1395, 1397 (9th Cir.1985).  Basham cannot show cause or prejudice.  Therefore, this claim is barred.

Even it this claim were not defaulted, the district court did not err or abuse its discretion in refusing to order a competency evaluation or hold an evidentiary hearing to determine Basham's

<div align="center">-34-</div>

**JA 3272**

competence to stand trial. As noted above, Basham's behavior did not suggest that he was incompetent. Trial counsel and Dr. Schwartz-Watts informed the Court at different times that Basham was competent. See United States v. Clark, 617 F.2d 180, 186 (9th Cir.1980)(fact that defendant's attorney considered defendant competent to stand trial was significant evidence that defendant was competent). Furthermore, Basham's trial counsel affirmatively sought to prevent the Court from ordering a competency evaluation and hearing.[5]    Hernandez, 930 F.2d at 718 (trial counsel in best position to evaluate client's comprehension of the proceedings). Under such circumstances, the Court cannot be held to abuse its discretion in failing to *sua sponte*, order a competency hearing. See e.g., Jermyn v. Horn, 266 F.3d 257, 298 (3d Cir. 2001)(no competency hearing required "where there were no medical opinions on competency submitted to the trial court, no signs from trial counsel that the defendant's competence was in doubt in his view, and the defendant's behavior, while strange, was not sufficiently indicative of a individual who was incapable of understanding the nature of the proceedings, communicating with counsel or assisting in his defense"). Accordingly, the trial court did not err in refusing to order a competency hearing *sua sponte.*

> E.    Response to Claim 7

In Claim 7, Basham's habeas counsel argue that Basham's appellate counsel were ineffective for failing to raise the issues of his supposed incompetency and "this court's failure to fulfill its *sua sponte* obligation under 18 U.S.C. §4241(a)" by asserting that the "record in this case plainly reflects

---

[5]Having pursued this approach at trial at his counsel's insistence for strategic purposes, Basham should not now be allowed to "whip-saw" the trial court and claim incompetence. See generally Wheat v. United States, 486 U.S. 153, 161-62 (1988) (trial courts confronted with multiple representations "face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule").

[Basham's] in competency." §2255 Mot. at 45. This claim should be summarily dismissed.

The selection of which issues to present on appeal is, almost by its very nature, a strategic decision. See Burket v. Angelone, 208 F.3d 172, 189 (4th Cir.2000) ("[A]ppellate counsel is given significant latitude to develop a strategy that may omit meritorious claims in order to avoid burying issues in a legal jungle."); Haynes v. United States, 451 F.Supp.2d 713, 722 (D.Md.2006) ("Limiting the issues to the stronger or strongest ones while winnowing out the weaker is sound appellate strategy."). "Effective assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, and [the Court] must accord counsel the presumption that he decided which issues were most likely to afford relief on appeal." Lawrence v. Branker, 517 F.3d 700, 709 (4th Cir.2008) (quotation marks, brackets, and citations omitted). "Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy," and "counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims." Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (alteration, citations, and internal quotation marks omitted). Consequently, while it is conceivably possible to bring an ineffective assistance claim premised on an appellate counsel's failure to raise an issue, "it will be difficult." Id., 236 F.3d 149, 164 (4th Cir.2000) (quotation marks and brackets omitted). An ineffective assistance claim based on an ignored issue generally will only succeed "when ignored issues are clearly stronger than those presented." Lawrence, 517 F.3d at 709.

This case does not present an instance of ineffective assistance of appellate counsel. Appellate counsel submitted a thorough and well reasoned 164-page opening brief which set forth sixth issues and a subsequent 64-page reply brief. The appeal of Basham's trial and sentencing

-36-

**JA 3274**

resulted in a lengthy opinion.  See Basham, 561 F.3d at 302-339.  As noted above, and contrary to Basham's habeas counsel's assertion, the record in this case plainly did not reflect Basham's incompetency.  The present case presents a textbook case of [w]innowing out weaker arguments on appeal and focusing on those more likely to prevail."  Bell, at 164.  Competence was not asserted at trial and could not have been viewed by appellate counsel as stronger than the issues that were presented.   In these circumstances, appellate counsel was not ineffective for failing to raise competency as an issue on appeal and Basham was not prejudiced by this decision to not raise the issue.

**Response to Claim 8: Basham's trial counsel were not required to second-guess the medical decisions of Basham's treating physician.**

In Claim 8, Basham's habeas counsel claim that Basham's trial counsel were constitutionally ineffective because they permitted treating physician psychiatrist Donald Morgan "to prescribe a series of contradictory and contraindicated medications that rendered Mr. Basham incompetent and often incoherent."   §2255 Mot. at  46.  This allegation, which would place a criminal defense attorney in the position of supervising a medical doctor in the prescription of medication to a defendant, should be summarily dismissed.

At  its heart, this claim centers around Dr. Morgan's prescribing of certain medications to treat Basham during the time period of June 2003 through the end of the 2004.  Basham's habeas counsel complain that the combination of medications caused Basham to vacillate between "uncontrollable agitation and drowsiness."   Id.  While conceding that Basham's trial counsel "were not medical professionals," Basham's habeas counsel assert that trial counsel were ineffective because "Dr. Morgan acted at their direction [and] they assumed responsibility for Dr. Morgan's

-37-

**JA 3275**

treatment plan for Mr. Basham." Id.

This claim suffers from a number of fatal defects.   First, this assertion is a complaint that trial counsel were not able to better supervise a psychiatrist in the very specialized field of psychiatry.  It presupposes that trial counsel would be at least equal to the psychiatrist in knowledge of psychiatry and the effectiveness of medications that are used to treat mental health issues.  This is not required of criminal defense attorneys.  As the Fourth Circuit has noted:  "An attorney is not required to be so expert in psychiatry."  Pruett v. Thompson, 996 F.2d 1560, 1574 (4th Cir. 1993).  To require what Basham's habeas counsel suggest would require trial counsel to delve into the unauthorized practice of medicine.

Second, this argument is really a claim that Dr. Morgan was ineffective as a treating expert psychiatrist.  The claim must fail.  The Fourth Circuit has consistently "rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel."  Wilson v. Greene, 155 F.3d 396, 401 (4th Cir. 1998); Pruett, 996 F.2d at 1573 n.12; Poyner v. Murray, 964 F.2d 1404, 1418 (4th Cir. 1992); Waye v. Murray, 884 F.2d 765, 766-67 (4th Cir. 1989).

Finally, there is no indication that Dr. Morgan was somehow "ineffective" in his treatment of Basham.  Although habeas counsel claims that Basham's conduct at trial was caused by the medications that Basham was prescribed by Dr. Morgan, there is no support for this claim.  In fact, the Fourth Circuit found that Basham's conduct was more likely "points to a manipulative individual."  Basham, 561 F.3d at 333.  For the forgoing reasons, Claim 8 should be dismissed.

<p style="text-align:center">-38-</p>

<p style="text-align:right">**JA 3276**</p>

**Response to Claim 9: Basham's trial counsel adopted a reasonable strategy by conceding certain allegations and focusing on Basham's intent.**

In Claim 9, Basham's habeas counsel claim that Basham's trial counsel, in particular, Jack Swerling, rendered ineffective assistance of counsel when he conceded in opening statements all the indictment allegations against Basham except for Basham's "intent to cause death or serious bodily harm" in connection with the carjacking and kidnapping. §2255 Mot. at 47-50. This claim is without merit. Mr. Swerling's comments in opening statements were done for valid strategic reasons. Basham was fully informed of the approach Mr. Swerling proposed to pursue and Basham consented to this approach. Additionally, case law and experts in the field of capital litigation confirm that Mr. Swerling's comments in opening statements were done pursuant to a valid trial strategy and clearly did not constitute ineffective assistance of counsel.

As noted above, Mr. Swerling is an experienced defense attorney with vast experience in defending murder cases and death penalty cases. See Basham, 561 F.3d at 325 (citing Sims v. Brown, 425 F.3d 560, 582 n. 14 (9th Cir. 2005) (noting Swerling's experience at the time included 100 homicide cases, four of which involved the death penalty)). Swerling used his experience, along with co-counsel Greg Harris, to craft a strong trial strategy in an attempt to spare Basham from a death sentence.

During trial, Basham admitted culpability in the carjacking and kidnapping, but argued that Fulks committed Donovan's murder and was the instigator throughout the crime spree. To that end, during Basham's opening statement, Mr. Swerling argued that the only "issue in controversy" was Basham's intent to cause death or commit serious bodily harm to Donovan at the time of the abduction. TT 1: 65-69. Counsel attempted to gain credibility by noting that "I am not going to

-39-

**JA 3277**

stand here and tell you that he did nothing." <u>Id</u>. at 61.    In framing the issue, Basham's counsel brought out that Basham could not drive a car and had never been outside of Kentucky prior to the prison escape, that all of the places Fulks and Basham visited on their crime spree were places from Fulks's past, and that Fulks was the dominant and intelligent leader while Basham was limited intellectually and a passive follower.  <u>Id</u>. at 64-66, 57-58.

Initially, it is clear from the record that trial counsel's statements in opening statements were made as part of a valid trial strategy after consultation with and obtaining the consent of Basham. In an *ex parte* hearing before the opening statements, Mr. Swerling explained his discussions with Basham and the fact that his concessions in the opening statements were strategic and with Basham's consent:

> I want the record to reflect following this procedure that there is no question later about any strategy that we follow and that I have discussed this with Mr. Basham. Mr. Harris and I discussed it with him Friday. Actually, discussed it with him on several occasions particularly again on Friday and again this morning. Mr. Harris was present on Friday, was present for a few moments this morning as well as Dr. Watts who was also present this morning.
>
> Judge, essentially what I am going to do with Mr. Basham's consent is, as far as the allegations of the indictment, we are going to tell the jury that most of the allegations in the indictment are not in controversy. Most of the charges in the indictment are not in controversy. What will be in controversy for the jury to decide will be with respect to Count 1, and I believe it is the conspiracy count as it related to carjacking, as well. That would be Count 4, part of the conspiracy count there, conspiracy to carjack, there are other crimes as well.
>
> What I am prepared to tell the jury that is under controversy under the carjacking statute is whether there was an intent on the part of Mr. Basham, at the time the car was taken, to either kill Ms. Donovan or cause her serious bodily harm. Mr. Basham has always maintained, although he did participate in the abduction of Ms. Donovan, there was never any intent to hurt or kill her. So, basically, we are going to be conceding many of the issues in the opening statement that are in the indictment, and I have explained that to him. I have explained his right to have all of it contested. We are prepared to do all of it if that is what he wants. But, as a matter of strategy, we think this is the best approach.

<div align="center">-40-</div>

<div align="right">**JA 3278**</div>

9/13/04 Ex Parte Hearing before Opening Statements at 2-3. A few moments later, trial counsel

also explained:

> Judge, the only other thing I would like to put on the record with respect to that is that, generally, I am going to probably concede to the jury–not probably, I will concede to the jury that I fully expect we will be going into a sentencing phase on this trial. And explain to them what is going to happen in that phase, but not go into any great detail, but at least concede that as probably where this case is going.

Id. at 4. After these statements and explanations by Basham's trial counsel, this Court had a short

colloquy with Basham to confirm that he agreed with his counsel's strategy:

The Court: You heard what your lawyer Mr. Swerling just told me, correct?

The Defendant: Yes, Sir.

The Court:     He basically says, in his opening statement to the jury, he is going to not contest many of the elements of the charges against you. And that means that the jury will probably assume those matters to be proved from the very beginning of this case. Apparently Mr. Swerling thinks that, on a strategic point of view, it will gain you some goodwill with the jury to not contest certain matters and only contest and fight about the things that he thinks are important to us. That is a strategy matter. It is not my business. But I just want to find out if that meets with your approval.

The Defendant: Yes, Sir.

The Court: Have you discussed it thoroughly with Mr. Harris and Mr. Swerling?

The Defendant: Yes.

The Court: You agree with Mr. Swerling on what he proposes he told me he would do?

The Defendant: Yes, Sir.

Id. at 5.

Trial counsel's own words before his opening statement reveal that his concessions made in

his opening statement were strategic and pursuant to a valid trial strategy. The Fourth Circuit has

-41-

**JA 3279**

found:

> In considering a Sixth Amendment ineffectiveness claim, a reviewing court does not "grade" the lawyer's trial performance; it examines only whether his conduct was reasonable "under prevailing professional norms," and in light of the circumstances. <u>Strickland</u>, at 697, 688, 104 S.Ct. 2052. Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."

 <u>Carter v. Lee</u>, 283 F.3d 240, 248-49 (4th Cir. 2002).

It is clear that this approach trial counsel settled upon is a well recognized strategy in capital cases. A strategy in which a defendant acknowledges his involvement in the killing but denies that he was guilty of capital murder because he lacked the requisite mental state or intent may prevent the backlash that can occur when a defendant denies guilt and then asks for mercy after conviction:

> Contesting guilt has an obvious value at the guilt phase, but it also has potential value at the penalty phase, because residual doubt about guilt is a strong predictor of life sentences. The value of actively contesting guilt, however, must be weighed against the frequency with which jurors are angry at defendants who deny their involvement when evidence of guilt is strong. A denial defense at the guilt or innocence phase is more than twice as likely to result in a death sentence as compared to cases where the defendant acknowledges his guilt from the start, particularly when the defendant has taken the stand and testified to his innocence. In such cases, jurors frequently dismiss the case in mitigation as just another attempt by the defendant to avoid responsibility for his actions. In the juror's eyes, the defense team tried to fool them at the first phase by denying his guilt, and now he is trying to fool them again with the mitigation evidence to cheat the executioner.
>
> Sometimes the tension between contesting guilt and acknowledging responsibility can be bridged by partial defenses; a defendant may contest his mental state, or his role in a multi-defendant crime without necessarily incurring the jury's wrath when he "switches" to a focus on mitigation in the penalty phase. **Likewise, a defense that acknowledges involvement in the killing but denies that the defendant was guilty of capital murder appears to escape this backlash**, at least where the defense is plausible on the facts.

John H. Blume, Sheri Lynn Johnson & Scott F. Sundby, <u>Competent Capital Representation: The</u>

-42-

**JA 3280**

Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation, 36 Hofstra L.Rev. 1035, 1044-45 (2008) (emphasis added); See also Scott E. Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 Cornell L. Rev. 1557, 1593-94 (1998) (noting that jurors are likely to perceive the defendant who fails to take any responsibility in the guilt phase as continuing to deny responsibility in the sentencing phase if he then offers mitigation focusing on child abuse, substance abuse, or other impairments).

The case law likewise confirms that a strategy of essentially conceding guilt in the guilt phases of a capital case is a valid strategy that certainly is not ineffective assistance. See e.g. Bell v. Evatt, 72 F.3d 421, 429 (4th Cir.1995) (concluding counsel reasonably conceded defendant's guilt of kidnapping to retain credibility for penalty phase); State v. Elmore, 111 Ohio St. 3d 515, 857 N.E.2d 547 (2006) (counsel's decision to concede capital murder defendant's guilt on kidnapping charge during guilt phase closing arguments was a tactical one, and was not ineffective assistance; decision to concede guilt maintained defense credibility and allowed defense to focus jury's attention on defense counsel's argument that defendant was guilty of murder rather than aggravated murder, the former of which would have rendered defendant ineligible for the death penalty).

In Florida v. Nixon, 543 U.S. 175 (2004), the Supreme Court held that counsel has the authority to concede the defendant's guilt in the guilt/innocence phase of a death penalty trial **even without receiving consent from his client**. Id. at 175 (emphasis added). The Court's decision in that case turned, in part, on its assessment that skilled criminal defense lawyers employ the strategy of conceding guilt in capital trials. Id. at 191-92. After all, the Court pointed out, the decision by Nixon's lawyer to concede guilt, although ultimately not successful, was a strategy once employed by none other than Clarence Darrow. Id. at 192 ("Renowned advocate Clarence Darrow, we note,

-43-

**JA 3281**

famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold.").

Furthermore, it is clear that Basham's trial counsel's decision was made only after extensive discussions with Basham and only after Basham consented to this approach. See Strickland, 466 U.S. at 690, 104 S.Ct. at 2066 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable ...."); Lawrence v. Branker, 517 F.3d 700, 716 (4th Cir. 2008) ("Lawrence was fully apprised of his trial counsel's defense strategy before closing arguments, and he consented to the plan of attack. He cannot now claim error in the very strategy that he authorized"); see also Lobosco v. Thomas, 928 F.2d 1054, 1057 (11th Cir.1991) (holding that, largely because the defendant concurred in the strategy, it was not ineffective assistance under Strickland for defense counsel to use his closing argument at the guilt stage of the trial to concede the defendant's guilt and begin building a case for mercy based on his contrition); United States v. Weaver, 882 F.2d 1128, 1140 (7th Cir.1989) ("Where a defendant, fully informed of the reasonable options before him, agrees to follow a particular strategy at trial, that strategy cannot later form the basis of a claim of ineffective assistance of counsel [under Strickland]."); United States v. Williams, 631 F.2d 198, 204 (3d Cir.1980) (no ineffective assistance existed because the defendant ultimately concurred in his trial counsel's tactical decision).

Trial counsel's concession in opening statements was done for valid strategic reasons. Basham was fully informed of the approach Mr. Swerling proposed to pursue and Basham consented to this approach. Case law and experts in capital litigation confirm that Mr. Swerling's comments in opening statements were done pursuant to a valid trial strategy and clearly did not constitute ineffective assistance of counsel.

-44-

**JA 3282**

**Response to Claim 10: There was no reason to excuse Basham from the courtroom prior to his altercation with the Marshals.**

In Claim 10, Basham's habeas counsel claim that Basham's trial counsel were ineffective in refusing to comply with Basham's request to exit the courtroom immediately before a tussle with the Deputy U.S. Marshals. Trial counsel was not ineffective when they insisted that Basham be present in the courtroom. It is clear that trial counsel wanted Basham to be present in the courtroom to assist them in his defense and were concerned that his absence would have an adverse impact on the jury. TT 5: 180-81. Additionally, according to Dr. Schwartz-Watts after her examination of Basham immediately after the tussle with the marshals, she was "not sure that [absenting the courtroom] was what [Basham] really wants. He is reacting to situations . . . in his limited capacity at this point. . . . I don't think he can hold on to a decision, he is quite impulsive." TT 5: 163.

At the end of the first week of trial, Basham negotiated with the Court to be allowed to use chewing tobacco to help him stay awake. Basham, 561 F.3d at 332-33. The following Monday, September 20, however, the Court withdrew its promise on the advice of the United States Marshal because Basham had a history of flinging fluids. Id. at 333. After the lunch recess on September 20, the Court read a note that stated that Basham had told another marshal that he did not actually care about having chewing tobacco, but that he just wanted to make U.S. Deputy Marshal Riley, an African-American, mad. TT 5: 146; Basham, 561 F.3d at 333. Basham then told of the alleged causes for his inability to "get along" with Deputy Marshal Riley. Id. at 146-48.

When the Court told Basham, "you are not adding anything to the discussion here" and ruled that Basham would not be allowed to use dip in the court room, Basham asked to "go back downstairs." Id. at 148. The Court told Basham that it was not possible because he "need[ed] to be

-45-

**JA 3283**

[in the courtroom] to help his lawyers defend this case." Id. at 148-49. Trial counsel Swerling noted that if Basham left the courtroom "it will be a problem" and against Swerling's "judgment" and "wishes." Id. at 149. See also Basham, 561 F.3d at 333 ("Basham's counsel had previously indicated opposition to him leaving the courtroom"). Basham then refused to comply with the Court's instruction to "be seated." Marshals approached Basham to "assist him to his seat." Id. at 149-50; Basham, 561 F.3d at 333. Basham refused. A seven or eight minute scuffle then ensued between Basham and Deputy U.S. Marshals. In the end, eight marshals and security officers were needed to subdue Basham. TT 5:,150-53, 158.

Dr. Schwartz-Watts examined Basham that afternoon. After examining Basham for "about 15 or 20 minutes," Dr. Schwartz-Watts testified that she had "concerns about his competency." Id. at 162. However, she noted that "with a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed." Id. Additionally, Dr. Schwartz-Watts said that she was "not sure that [absenting the courtroom] was what [Basham] really wants. He is reacting to situations . . . in his limited capacity at this point. . . . I don't think he can hold on to a decision, he is quite impulsive. I don't know how knowingly and intelligent that would be . . . with the mental state he is in." Id. at 163. Counsel reiterated that they were adamant that Basham be present in the courtroom to assist them in his defense and were concerned that his absence would have an adverse impact on the jury. Id. at 180-81. Court was adjourned for the day.

The next morning, at the start of court, Dr. Schwartz-Watts advised that Basham was competent and the trial proceeded. As the Fourth Circuit noted: "Thereafter, the district court permitted Basham to have dip during breaks , and Basham behaved himself." Basham, 561 F.3d at 333.

The Sixth Amendment guarantees a defendant's right to be present in the courtroom during the trial of his case. See Lewis v. United States, 146 U.S. 370, 372 (1892). But, there are recognized limitations to this right. "A defendant can lose his right to be present at trial if, after he has been warned by the trial judge that he will be removed if he continues his disruptive behavior, he nevertheless insists upon conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." Illinois v. Allen, 397 U.S. 337, 343 (1970).

Interestingly, habeas counsel seem to assert that a defendant has the opposite right–the right to absent oneself from a capital trial. Although habeas counsel cite to Rule 43 of the Federal Rules of Criminal Procedure to support their argument, they overlook the fact that this rule may actually *require* a capital defendant's presence in a capital case, at least during sentencing proceedings. See Fed.R.Crim.P. 43(c)(1)(B) ("a criminal defendant who was initially present at trial waives the right to be present . . . in a noncapital case, when the defendant is voluntarily absent during sentencing"). Furthermore, it is unsettled in the Fourth Circuit whether a capital defendant can waive his presence at trial except when he is purposefully disruptive. See Near v. Cunningham, 313 F.2d 929, 931 (4th Cir. 1963) (capital defendant cannot waive presence at trial); United States v. Tipton, 90 F.3d 861, 873-74 (4th Cir. 1996) (reserving decision on question of whether capital defendant could waive his right to presence at trial); But see Bell v. Evatt, 72 F.3d 421, (4th Cir. 1995) (upholding the removal of defendant from closing argument in capital case after defendant continually disrupted his own counsel's closing argument and refused to remain quiet when instructed to do so by judge). See L'Abbe v. DiPaolo, 311 F.3d 93, 97 (1st Cir.2002) (observing that "the Supreme Court has never directly ruled on the issue of whether a criminal defendant can waive his right to presence in a capital

-47-

**JA 3285**

case"). Because the law was and still is unsettled regarding this issue, it is nearly impossible for trial counsel to have been ineffective in insisting that Basham be present for his capital trial.

Basham's habeas counsel's claim that trial counsel was ineffective for refusing to comply with Basham's request to exit the courtroom immediately before the tussle with the marshals must fail for several other reasons. This claim relies upon the 20/20 vision of hindsight, refuses to credit counsel's strategic reasons for Basham to be present at the trial and ignores the manipulative aspect of Basham's request.

It is well settled that "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. In other words, the challenged conduct is to be evaluated in light of the circumstances surrounding the decision, not with the 20/20 vision of hindsight.

Basham's habeas counsel seem to claim that trial counsel should have known that Basham would have a tussle and that if they had supported Basham's claim to absent himself, the tussle would never have occurred. See §2255 Mot. at 53. This claim would require the Court to view counsel's actions and decision with the 20/20 vision of hindsight. However, the Court is charged with evaluating the conduct from counsel's perspective at the time.

It is clear that trial counsel had solid strategic reasons for Basham to stay in the courtroom during the trial. As Mr. Swerling explained: "There is no way I can agree to [Basham watching the trial from a holding cell]. I am representing somebody in a death penalty case. I have to insist that he be in the courtroom to assist us and not have an adverse impact on the jury if he were not here." TT 5: 180. This considered strategic decision to have Basham remain present in the courtroom to

-48-

**JA 3286**

assist counsel and so that there would be no adverse impact caused by his absence is nearly unassailable.

Finally, Basham's conduct before, during and after his tussle with the marshals and his "negotiations" with the Court regarding his need for chewing tobacco shows an individual who was manipulating the Court. See Basham, 561 F.3d at 333. After the Court agreed to allow Basham to dip during breaks, he behaved himself the rest of the trial. The Government agrees with Dr. Schwartz-Watts's statement that she was "not sure that [absenting the courtroom] was what [Basham] really wants." The more likely truth was that he simply wanted to manipulate the courtroom and the Court to get what he wanted – chewing tobacco.

Trial counsel was not ineffective when they insisted that Basham be present in the courtroom. This claim would require the Court to take an inappropriate approach and employ the 20/20 vision of hindsight in evaluating counsel's actions. The law is not clear that a capital defendant can waive his presence at trial except when he is purposefully disruptive. However, it is clear that trial counsel had a strategic reason for wanting Basham to be present in the courtroom to assist them in his defense and that they were concerned that his absence would have an adverse impact on the jury. TT 5: 180-81. This claim should be dismissed.

**Response to Claims 11 and 12: There is nothing on the record to suggest that Sheriff Hewett testified falsely; the prosecutor's argument was consistent with its overarching argument that both Basham and Fulks killed Alice Donovan.**

Basham's habeas counsel allege that Sheriff Ronald Hewett testified falsely, and that the Government committed misconduct by not correcting the allegedly false testimony and then using the testimony during its closing argument. §2255 Mot. at 54-56. Basham did not raise this issue on appeal. An error can be attacked on collateral review only if first challenged on direct review.

United States v. Harris, 183 F.3d 313, 317 (4ᵗʰ Cir. 1999).  Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in a federal habeas proceeding only if the defendant can show both cause for and actual prejudice from the default, or that he is actually innocent.   Id. (internal citations omitted).   If appellate counsel were constitutionally ineffective under the standard established in Strickland, cause is established for the procedural default.  Williams v. French, 146 F.3d 203, 215 (4ᵗʰ Cir. 1998).  As Basham cannot show ineffective assistance of appellate counsel, his claim of witness and prosecutorial misconduct should be dismissed.

Reviewing courts must accord appellate counsel the "presumption that he decided which issues were most likely to afford relief on appeal."   Bell v. Jarvis, 236 F.3d 149 (4ᵗʰ Cir. 2000)(quoting Pruett v. Thompson, 996 F.2d 1560 (4ᵗʰ Cir. 1993)).  Counsel is not obligated to raise all nonfrivolous issues on appeal.  Id. (citing Jones v. Barnes, 463 U.S. 745, 752 (1983)). Winnowing out weaker arguments and focusing on issues more likely to prevail is the hallmark of effective appellate advocacy.  Id.  (citing Smith v. Murray, 477 U.S. 527, 536 (1986)).  "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  Id.  Basham's appellate counsel raised six issues.  See United States v. Basham, 561 F.3d 302, 308 (4ᵗʰ Cir. 2009).  Basham has failed to show that the issues of witness perjury and prosecutorial misconduct are "**clearly** stronger than the ones presented."   In order for Basham to have prevailed on appeal on a claim that the prosecutor's closing argument violated his right to due process, it would have been necessary for him to convince the Court of Appeals that the prosecutor's remarks were improper, and that "the proceeding . . . was rendered fundamentally unfair by the improper argument."  See  Boyd v. French, 147 F.3d 319, 329 (4ᵗʰ Cir.

<div align="center">-50-</div>

1998).

Basham has failed to show a denial of due process.  Due process is denied if the Government knowingly uses perjured testimony against the defendant to obtain a conviction.  <u>United States v. Griley</u>, 814 F.2d 967, 971 (4th Cir. 1987)(citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)).  A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was perjured.  <u>Id.</u>  Mere inconsistencies in testimony by government witnesses do not establish the Government's knowing use of false testimony.  <u>Id.</u>  Basham has failed to show that Sheriff Hewett's testimony was perjured.

Sheriff Hewett's testimony at Basham's trial was consistent with his testimony during the <u>Jackson v. Denno</u> hearing that Basham demonstrated how the purse strap was used.  At Basham's trial, he testified:

> Q.    There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A.    No, Sir.  He did not tell me he used the strap.  He demonstrated, though.
>
> Q.    He demonstrated?
>
> A.    Yes, sir.
>
> Q.    Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A.    That is true because he didn't say.  He showed.

TT 10: 53-54.  While this testimony was ambiguous, there is nothing to suggest that it was untruthful. It was consistent with his testimony at the <u>Jackson v. Denno</u> hearing:

> A.    . . . He [Basham] walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek.  He showed me the length of the strap - -

**JA 3289**

Q.      How did he do that?

A.      May I demonstrate?

Q.      Certainly.

A.      Like this.  Because he couldn't pull his hands very - - very far apart, he was shackled.  He showed me the length of the strap.  Says that he believed it to be a Liz Claiborne strap, and that he had thrown it into the woods.  He then demonstrated the manner in which he threw it in the woods.

Q.      Would you stand up and do that for the court so the record is complete as   well.?

A.      Yes, sir, I will.  We were standing at the corner of the cemetery, Branden Basham is chained.  I said, **"Branden, how did you do that?"  And he said, "Like that.  And I threw it over there."**

A.      Basham described the Liz Claiborne 16 to 20 inch strap.

Q.      Okay.

A.      And indicated by this motion that it was used to strangle Alice Donovan.

Q.      Okay.  It wasn't said, it wasn't verbalized, it was just used in - -

A.      Yes, sir.

2/25/04  Hearing Tr at 66-67, 77-78.  The context - Basham was emotional and crying when he demonstrated - strongly suggests that he was involved in strangling Alice Donovan.[6]  The prosecutor argued during the closing for the guilt phase of the trial:

What does he tell the sheriff?  He tells the sheriff that it was right there at that gate.  He tells - he not only tells, he demonstrates.  He demonstrates for that sheriff a Liz Claiborne purse strap was used to kill Alice Donovan.  Then what does he say? I threw it in the woodline.  Mr. Swerling asks Sheriff Hewett says he didn't say I killed Alice Donovan.  Sheriff Hewett said to you in this courtroom in front of you . . . . No, he demonstrated it.

---

[6]  It appears Basham may have been caught in his own web of deceit, since a piece of Alice Donovan's remains was found several years later at the Savannah Bluff area, many miles from the  Bee Tree Farms area.

TT 12 at 80.

During the closing for the penalty phase, the prosecutor argued:

> What does Brandon Basham say in the presence of Sheriff Hewett?  It is not really what he says, it is what he does.  He is shackled.  He describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewett how Alice Donovan was strangled.  And then he tells Sheriff Hewett, "I threw the purse strap into the woods."  He has demonstrated.  He even has his arms down.  You saw Sheriff Hewett stand up there and show.

TT 29: 57.

Basham's habeas counsel suggest that since Basham told officers during the trip to the Bee Tree Farms area that Fulks strangled Alice Donovan, that he could not have subsequently demonstrated to Sheriff Hewett how the purse strap was used to kill Alice Donovan. §2255 Mot. at 54-56. Obviously, he could have done both.  They are not mutually exclusive.  Even if they were in conflict, one could not reach the conclusion that Agent Long or Sheriff Hewett was being dishonest.  Basham made several conflicting statements about what happened to Alice Donovan within the same time period.  For example, on November 19, 2003, Basham said Alice Donovan was with Fulks, driving to South Carolina.  TT 9: 148-149.  Several hours later, on the same day, Basham said Fulks had left him in a Myrtle Beach parking lot for about an hour while Fulks took Alice Donovan to tie her up.  TT 9: 177.  The next day, November 20, Basham described an area and drew a map of what was determined to be the Savannah Bluff area.  TT 9: 198.  He said there was a big sign with "inn" or "hotel" near the road they had taken, and that they had tied Alice Donovan with silver-colored duct tape near a lake with a boat ramp.  TT 9: 198-199.  Five days later, he described a totally different area and implied that Alice Donovan had been killed.  TT 9: 218; TT 10: 80.  Thus, it would not have seemed unusual for Basham to say one thing during the morning of the search and another thing in the afternoon, and reports and statements in conflict with each other reflect on the

**JA 3291**

veracity of Basham, not the officer reporting them.

Just as Sheriff Hewett did not perjure himself, the prosecutor did not commit prosecutorial misconduct during his closing characterization of the evidence. In assessing alleged prosecutorial misconduct, the Court asks "whether the [misconduct] so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Caro, 597 F.3d 608, 624 (4th Cir. 2010)(quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). To prove reversible error, the defendant must show (1) "that the prosecutor's remarks or conduct were improper" and (2) "that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." Id. at 624-625 (quoting United States v. Sheetz, 293 F.3d 175, 185 (4th Cir. 2002)). An assessment of prejudice requires the court to consider (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury. Sheetz, 293 F.3d at 185-186 (citing United States v. Wilson, 135 F.3d 291, 299 (4th Cir. 1998)). Isolated passages which are part of a prosecutor's closing argument, billed to the jury in advance as a matter of opinion, not of evidence, do not constitute prosecutorial misconduct amounting to a denial of constitutional due process. See Donnelly v. DeChristoforo, 416 U.S. 637, 646-648 (1974). While a prosecutor must limit his closing argument to the evidence and reasonable inferences that may be drawn from it, he may argue his personal interpretation of the evidence. United States v. White, 241 F.3d 1015, 1023 (8th Cir. 2001).

-54-

**JA 3292**

The prosecutor's remark during closing could not have misled jurors. There was no attempt to convince jurors that Basham alone was the one who actually killed Alice Donovan. From start to finish, the Government argued that Basham and Fulks, together, killed Alice Donovan. The themes of the opening statement were choices and teamwork. The prosecutor defined "team," and discussed the characteristics of a team. TT 1: 29. He told jurors: "Brandon Basham and Chad Fulks chose each other. And then **the team of Fulks and Basham** chose to escape from the prison . . . and **they** chose to kidnap, carjack, burglarize, kidnap, carjack, kill, burglarize, kidnap, carjack and kill again." TT 1: 30. The prosecutor explained that Fulks and Basham "played different roles on their **team**, but their participation, their success . . . was entirely dependant on their **joint participation**." TT 1: 30. The Government's theory from start to finish, during both trials, was that the hand of Fulks was the hand of Basham and vice versa. At the beginning of his opening statement, the prosecutor told jurors: "Brandon Leon Basham . . . and Chadrick Fulks had been making their own choices. . . . **They** chose Alice . . . . Chose to carjack her; chose to kidnap her; chose to kill her." TT 1: 26. Throughout the opening, when he spoke of the crimes, including the killing, he referred to "he and Chad Fulks." TT 1: 27. The prosecutor stated: "Alice Donovan was not the first victim of **the team of Fulks and Basham,**" TT 1: 27; "it took 48 seconds for them to choose Alice," TT 1: 37; "**Fulks and Basham** having kidnapped, carjacked, and killed two women went back to Huntington," TT 1: 39; "Seventeen days, 2,275 miles, three carjackings, three kidnappings, two killings, two attempted killings, all committed by two **teammates, Chad Fulks and Brandon Basham**," TT 1: 42; "**Brandon Basham and Chad Fulks** planned these crimes **together**, executed them **together**, and they prepared for them **together**," TT1: 47; "the evidence will show **they** took Alice Donovan from Conway, South Carolina into North Carolina, and death resulted," TT 1: 48.

-55-

**JA 3293**

At the conclusion of the guilt phase of Basham's trial, the prosecutor reiterated the teamwork theme:

> If Brandon Basham was alone, or if Chad Fulks was alone on November 11, 2002 and November 14, 2002, Samantha Burns and Alice Donovan would be alive today. . . . **Brandon Basham and Chad Fulks were acting together in unison as a team**, a death squad. . . . the two of them together, aiding and abetting each other when **they** kidnapped and carjacked Samantha Burns, when **they** kidnapped, and carjacked, and killed Alice Donovan, the two of them.
>
> . . .
>
> The Government does not have to prove, and, more importantly, you jurors do not have to find who, specifically, killed Alice Donovan in order to convict Brandon Basham of carjacking, resulting in death or kidnaping resulting in death. . . . The evidence shows **they acted together and killed Alice Donovan**.

TT 12: 12-13.  The Government told the jury that it was not claiming that Basham was more culpable or that Fulks was more culpable, because it took both of them to kill Alice Donovan.  TT 12: 13.  The prosecutor argued:

> Looking at the actions and conduct of Chad and Brandon as a whole, can come to only one conclusion, but for the actions of Brandon Basham, Alice Donovan would be alive today.  But for the actions of Chad Fulks, Alice Donovan would be alive today.  **The two of them are responsible for the death of Alice Donovan**.

TT 12: 13.  The Government reiterated this theme throughout its closing.  See TT 12:  20 ("it was a **two-man team**," "**it took two**"); 12-22 (each was more aggressive at different times); 12-40 (there was mud on both sides of the car, both Fulks and Basham dumped Samantha Burn's body in a river); 12-41 ("**they** killed her [Samantha], and **they** were disguised"); 12-47 ("**they** targeted Alice. . . . It took the actions of Chad Fulks and the actions of Brandon Basham to carry out that kidnaping, to carry out that carjacking."); 12-52 ("took two of them to get them to the isolated area. Chad Fulks to drive, Brandon Basham to make sure she didn't get away.  **Both of them together acting as a team**."); 12-62 ("seventeen days in November of 2002, seventeen days of carnage.  Two murders,

-56-

two attempted murders, three kidnappings, three carjackings, an attempted kidnaping and carjacking of a 15-year-old girl committed by **Brandon Basham and Chad Fulks acting as a team in unison.**") 12-69 ("he [Basham] participated directly in her death"); 12-70 ("Brandon Basham, himself, participated in the killing of Alice Donovan").

Finally, the Government summed up its argument using Tina Severance's analogy: "Like two peas in a pod. Brandon Basham could not have carjacked, kidnapped, and killed Alice Donovan without Chad Fulks; Chad Fulks could not have carjacked, kidnapped, and killed Alice Donovan without Brandon Basham." Id. at 12-82. Thus the Government did not ask the jury to find Basham guilty because his action was the final one that caused Alice Donovan to die. The Government always contended that it, ultimately, did not matter. Sheriff Hewett testified to what Basham did, the Government referred to this testimony during its closing, and the Government argued that it was part of the evidence that showed Basham was one member of the two-man team that killed Alice Donovan.

The purse-strap comment of which Basham complains was one remark made during the summation of the evidence when the prosecutor was describing the Thanksgiving-day search at the Bee Tree Farms area. TT 12: 80. Thus, the comment was an isolated remark taking up less than three lines in a 76-page closing which constantly reiterated the theme of teamwork between Fulks and Basham. The evidence was so strong against Basham, that this one remark could not have affected the jurors' decision. During the two-and-a-half weeks prior to the guilt-phase closing, the jurors heard 89 witnesses and reviewed hundreds of exhibits. TT 12: 8. Jurors saw Basham on videotape kidnapping Alice Donovan. They heard the testimony of agents who interviewed Basham during the first few days after he was arrested talk about his various statements incriminating

-57-

**JA 3295**

himself.  Ultimately, Basham claimed he could show agents where he and Fulks had drug Alice Donovan's body from the car and into the woods and covered her body with leaves and sticks.

On top of this evidence, jurors heard Clifford Jay's testimony that Basham had admitted: "We killed them."  In addition to the video of Basham jumping into Alice Donovan's car as she attempted to park at Wal-Mart, and his own admissions regarding his participation in the kidnapping and killing of Alice Donovan, there was testimony that Basham shot at a police officer when the officer was attempting to arrest him, and that he threatened to kill police officers in Indiana, and that he possessed a knife belonging to Alice Donovan when he was arrested.  James Hawkins testified how Basham talked him into giving him and Fulks a ride, and then held him at knifepoint.  Beth McGuffin testified that Basham wore a ring, later determined to belong to Samantha Burns, around his neck.   Andrea Frances testified that as she and her mother were leaving Wal-Mart, Basham pointed a gun at her and attempted to get into the car on top of her.  TT 10: 252.  Thus, there could be no doubt that Basham kidnapped Alice Donovan, knowing that she would be killed.

As to the fourth factor, there is no reason to believe the prosecutor was attempting to divert jurors' attention to extraneous matters. Regarding the fifth factor, the Government does not contend that defense counsel's conduct at trial was improper.  The sixth factor favors the Government's position.  The Court, both prior to closing arguments and afterwards, when charging the jury, instructed jurors that what attorneys say during closing is not evidence, and that jurors must rely on their own recollections and interpretations of the evidence. See TT 12: 7 ("If your memory of the evidence differs from what the lawyers say, you must base your decision on what you remember."); TT 12: 190 ("Remember that anything the lawyers say is not evidence in the case.  It is your own recollections and interpretation of the evidence that controls.") Thus, after analysis of the six factors

-58-

**JA 3296**

set forth by the Fourth Circuit, the Court should determine that, even if the prosecutor's remark were improper, the remark did not prejudicially affect Basham's substantial rights so as to deprive him of a fair trial.

**Response to Claim 13**: **Pursuant to a reasonable trial strategy, Basham's counsel chose not to argue that Basham's statements to law enforcement were involuntary.**

In Claim 13, a claim very similar to Claim 2,[7] Basham's habeas counsel argue that his trial attorneys were ineffective for failing to argue to the jury that his post-arrest statements to law enforcement officers were involuntary. §2255 Mot. at 57-58.

This claim fails for the same reason Claim 2 fails. First, there is no evidence that Basham's statements were involuntary. Basham's habeas counsel point only to his alleged mental deficits, the fact that he had used cocaine and marijuana on the day of one of the statements, and that some of the statements were taken late at night. However, the officers who took the statements all testified that Basham was alert, coherent, and clear when he made the statements, and there is no evidence indicating otherwise. Second, and perhaps more important, Basham's trial counsel risked presenting contradictory theories if they argued to the jury that the statements were involuntary. If they had argued that the statements were involuntary, and the jury nonetheless convicted Basham, the district court might have precluded defense counsel from arguing at sentencing that Basham voluntarily cooperated with the police. But even if the district court did not preclude defense counsel from arguing at sentencing that the statements were voluntary, they still would have had a credibility problem before the jury — having made contradictory claims at the guilt and sentencing phases. Basham's trial counsel could reasonably have determined that the risk of presenting contradictory

---

[7]In Claim 2, Basham argues that his attorneys were ineffective for failing to adequately challenge the admission of these statements. §2255 Mot. at 19.

theories was greater than any chance they had of persuading the jury that the statements were involuntary. Thus, trial counsel was not ineffective on this point.

**Response to Claim 14: Jack Swerling did not have a conflict of interest.**

In Claim 14, Basham's habeas counsel claim that Basham's trial counsel Jack Swerling was ineffective because he was hindered by a supposed personal conflict of interest. This alleged conflict of interest is based upon the fact that Swerling and his family were victims of an armed robbery in their home in 2002. This claim should be summarily dismissed.

A conflict of interest exists when a defense attorney owes duties to a party whose interests are adverse to those of the defendant in the context of a particular representation. In this case, the burden is on Basham to demonstrate, from the record, that an actual conflict of interest adversely affected his attorney's performance. Mickens v. Taylor, 535 U.S. 162, 173–74 (2002). Even where a defendant has demonstrated the possibility that his attorney was representing conflicting interests, the claim fails when the defendant fails to establish an actual conflict and when he does not demonstrate how his attorney's conflict of interest affected his attorney's performance at trial. Although a defendant need not demonstrate that the outcome of the trial would have been different but for the conflict, the defendant must show that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. See Mickens v. Taylor, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), aff'd without consideration of this point, 535 U.S. 162 (2002). Tellingly, Basham's habeas counsel has not even suggested an alternative strategy or tactic that might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to Mr. Swerling's supposed other loyalties or interests.

-60-

**JA 3298**

Mr. Swerling has spent his entire career defending criminal defendants. He has vast experience representing those who have been accused of murder, rape, kidnaping, robbery and other violent crimes. See http://www.jackswerling.com/representative-cases/. Mr. Swerling has represented literally hundreds of clients accused of violent crimes both before and after he and his family were the victims of a home invasion and robbery.

Basham has failed to demonstrate that he was in any way deprived of an alternate defense because Mr. Swerling was laboring under a conflict of interest. Additionally, Basham fails to even acknowledge that co-counsel Mr. Harris was a full partner in the defense of Mr. Basham and did not labor under any supposed conflict of interest. This claim should be summarily dismissed as failing to state a claim and failing to have any basis in law or fact.

**Response to Claim 15: The Samantha Burns evidence was admissible.**

In Claim 15, Basham's habeas counsel argue that his trial and appellate attorneys were ineffective for failing to challenge the admission of evidence concerning Samantha Burns's kidnaping and murder during the guilt phase of Basham's trial. §2255 Mot. at 60. Specifically, they raise four arguments along this front. First, they argue that his trial attorneys should have objected to the Samantha Burns evidence under Federal Rule of Evidence 404(b). Id. at 65. Second, they contend that his trial attorneys should have objected to the Samantha Burns evidence under Federal Rule of Evidence 403. Id. Third, they contend that his trial attorneys should have at least objected under Rules 404(b) and 403 to the *extent* of the evidence concerning Samantha Burns's disappearance. Id. Fourth, they argue that his appellate attorneys should have raised these issues in his direct appeal. Id.

These arguments are without merit. The evidence concerning Basham's involvement in

-61-

**JA 3299**

Samantha Burns's kidnaping and murder was intrinsic to the crimes for which Basham was charged. To the extent that the Samantha Burns evidence was not intrinsic but was prior act evidence, it was admissible under Rule 404(b) to show intent. And it was not unduly prejudicial under Rule 403 given the mountain of similarly damning evidence surrounding Basham's involvement in Alice Donovan's kidnaping and murder. Moreover, Basham's trial attorneys adopted a reasonable strategy of not objecting to the Samantha Burns evidence because they used that evidence to support their theory that Chad Fulks was the dominant figure in Fulks and Basham's multi-state crime spree. Finally, appellate counsel reasonably decided not to raise these issues on appeal because of their lack of merit.

A.   The evidence concerning Samantha Burns's kidnaping and murder was intrinsic to the crimes charged.

Federal Rule of Evidence 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

By its terms, Rule 404(b) applies only to "[e]vidence of *other* crimes, wrongs, or acts." It does not limit evidence concerning "acts intrinsic to the crime charged[.]" United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996). "Other criminal acts are intrinsic when they are 'inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged.'" Id. (quoting United States v. Lambert, 995 F.2d 1006, 1007 (10th Cir. 1993). "Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged

-62-

**JA 3300**

conduct] is necessary to complete the story of the crime on trial.'" United States v. Basham, 561 F.3d 302, 326 (4th Cir. 2009) (quoting United States v. Siegel, 536 F.3d 306, 316 (4th Cir. 2008)); see also United States v. Cooper, 482 F.3d 658, 663 (4th Cir. 2007) (noting that evidence is intrinsic if it is necessary to "provide context relevant to the criminal charges").

The Samantha Burns evidence was intrinsic because it was integral to several of the charges against Basham. During the guilt phase of Basham's trial, the story unfolded of how Basham and Chad Fulks together escaped from jail in Kentucky and embarked on a multi-state crime spree. From the early stages of this violent escapade until their captures, Basham and Fulks were armed with stolen firearms. Their efforts to stay on the run and evade capture included a bevy of "bad acts" including burglaries, carjackings, shootings, high-speed chases, and two murders. Although Basham would like to characterize most of these acts as unrelated to the charges for which he was indicted and convicted, they in fact comprised the basis for several of those charges. These included Basham's convictions for: being a felon in possession of a firearm; possessing a stolen firearm; carrying, using, and possessing firearms during and in relation to, and in furtherance of, crimes of violence; conspiring to possess stolen firearms; and conspiring to carry, use, and possess firearms during and in relation to, and in furtherance of, crimes of violence. Basham cannot escape the fact that the evidence of his crimes prior to Alice Donovan's carjacking — including his participation in the carjacking and murder of Samantha Burns — was directly related to his conspiracy and gun charges.

Moreover, the Samantha Burns evidence was intrinsic to the charges related to Alice Donovan because it "arose out of the same series of transactions as the charged offense" and was "necessary to complete the story of the crime on trial." As stated above, Basham and Fulks's

<div align="center">-63-</div>

<div align="right">**JA 3301**</div>

carjacking and murder of Alice Donovan was one link in a chain of criminal acts designed to further the transient lifestyle of these two fugitives. It was thus necessary for the jury to learn what happened before and after Alice Donovan was forcefully abducted from that Wal-Mart parking lot in Conway, South Carolina. It was necessary for them to learn, as the Government emphasized during closing argument in the guilt phase, that Basham and Fulks employed "the same plan" in Alice Donovan's carjacking as they did in the carjacking of Samantha Burns and the attempted carjacking of Deanna and Andrea Francis. TT 12: 57. Basham's crimes against Alice Donovan arose from one series of transactions and were part of one story.

> B. Even if the Samantha Burns evidence was not intrinsic to the charged crimes, it was admissible under Rule 404(b).

Even if it was not intrinsic, the Samantha Burns evidence was admissible under Rule 404(b) to prove Basham's intent in carjacking and murdering Alice Donovan. As the Fourth Circuit noted in denying Basham's direct appeal, "Basham's specific intent to kill Donovan or cause her serious harm was the crucial issue at trial; Basham admitted to carjacking and kidnapping Donovan during his opening statement and contended only that he lacked that specific intent." Basham, 561 F.3d at 328. And the Fourth Circuit held that the Government did not make an impermissible propensity argument based on the Samantha Burns evidence but made a permissible argument that the Samantha Burns evidence was proof of Basham's intent in carjacking Alice Donovan. Id. at 329-30. The Government presented evidence that just a few days before Alice Donovan's carjacking, Basham participated in the carjacking and murder of Samantha Burns. This evidence was relevant to show that at the time he carjacked Alice Donovan, Basham had the intent to murder her. As the Fourth Circuit held, it was not introduced to show that Basham had bad character or a propensity to commit

JA 3302

carjacking or murder.

C.    The Samantha Burns evidence was not unduly prejudicial under Rule 403.

Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Basham argues: "Given the particularly damaging effect of the substantial evidence about Mr. Basham's role in the disappearance of Samantha Burns on his ability to defend the charges against him related to Alice Donovan's disappearance, it is not improbable that the Court would have determined that the evidence of Ms. Burns's disappearance should be precluded or truncated." §2255 Mot. at 75-76.

Contrary to Basham's habeas counsel's argument, the admission of the Samantha Burns evidence was not unfairly prejudicial to Basham's defense in the guilt phase of his trial. Basham conceded to the jury that he was involved in Alice Donovan's carjacking. This was a reasonable strategy to adopt in light of the overwhelming evidence against him (which included video footage of the carjacking, as well as Basham's own statements and efforts to locate Donovan's body). So there was no danger that the jury would unfairly identify Basham as being involved in Donovan's abduction based simply on his involvement in Burns's carjacking; Basham's identity as one of Donovan's abductors was not at issue. Rather, Basham's theory at trial was that at the time he carjacked Donovan from the Wal-Mart parking lot, he did not know she was going to be killed. And it was on this point that the Samantha Burns evidence was most probative. The fact that — just three days prior to Alice Donovan's abduction — Basham participated in the carjacking and murder of

-65-

**JA 3303**

Samantha Burns under similar circumstances, was powerful evidence that Basham intended to cause death or serious bodily injury at the time of Donovan's carjacking. Thus, the Samantha Burns evidence was certainly damaging to Basham's case, but it was damaging because it was probative of the key issue at trial.

Basham's habeas counsel argue that even if the Samantha Burns evidence was admissible, his trial counsel should have objected to the extent of that evidence. §2255 Mot. at 66. Basham does not identify which facts concerning Samantha Burns were outside the scope of admissibility or what principle the Court should have used in determining the scope. Basham does note that the Government introduced witnesses who testified not only about Burns's disappearance but also "about her characteristics and the impact of her disappearance on her family and friends." Motion to Vacate, at 62. Several of Samantha Burns's friends and family members did testify in the guilt phase about such matters as Samantha's personality, relationships, and future plans. See, e.g., TT 3: 161-64 (testimony of Melissa Jeffers, Samantha's aunt); id. at 171-73 (testimony of Kandi Burns, Samantha's mother); id. at 249-52 (testimony of Whitney Collins, a friend); id. at 257-61 (testimony of Kristen Pritchard, a friend); id. at 266-67 (testimony of Wesley Burns, Samantha's brother); id. at 279-81 (testimony of John Burns, Samantha's father). In context, however, this testimony was not introduced as impermissible victim impact evidence. Instead, it was relevant to show that Samantha had a stable life involving her family, friends, school, and job. These facts tended to prove that she would not have voluntarily disappeared without telling her family and friends. This was an important point, as the Government sought to establish that Samantha Burns was forcefully abducted by Basham and Fulks against her will.

In any event, the testimony concerning Samantha Burns's personal life did not make up a

-66-

**JA 3304**

substantial part of the Government's overall case.[8]  There is no reason to think the jury gave it undue

weight, especially in light of similar evidence concerning Alice Donovan's personal life, which

Basham does not challenge.  See, e.g., TT 9: 17-29 (testimony of Angie Warner, Alice's daughter);

id. at 29-36 (testimony of Barry Donovan, Alice's husband).  And there is no indication that the jury

would have relied on this evidence in determining whether Basham intended to cause death or

serious bodily injury to Donovan at the time of her carjacking.

> D.     Basham's trial counsel had a valid strategic reason not to contest the
> admission of the Samantha Burns evidence.

Again, the Fourth Circuit noted in Basham's direct appeal that "during the guilt phase,

Basham focused on his lack of specific intent to kill Alice Donovan or cause her serious bodily harm.

To that end, Basham repeatedly contended that Fulks was the leader during the crime spree, the

driving force behind the violence."  Basham, 561 F.3d at 328.  Basham's trial attorneys thus had a

valid strategic reason not to contest the Samantha Burns evidence: They used that evidence to

advance their theory that Chad Fulks was the dominant figure in the pair's criminal activity.  Basham

and Fulks's activity in West Virginia, where Samantha Burns was abducted and murdered, centered

around locales with which Fulks was familiar.  The evidence showed that Fulks made key decisions

during this portion of the crime spree.  This allowed the defense to argue that Fulks was leading the

way, a fact that would support their contention that Basham lacked the intent to kill or seriously harm

Alice Donovan — because he wasn't in charge of what was happening.  True, as mentioned above,

the Samantha Burns evidence did support the contrary inference that Basham in fact had specific

intent.  But the fact that the evidence cut both ways did not make it unreasonable for defense counsel

---

[8]Out of 87 witnesses and 10 volumes of guilt-phase trial testimony, only 6 witnesses offered a total of roughly 20 pages of testimony concerning Samantha's personal life.

to try to use the evidence to their advantage. Without it, it would have been more difficult for the defense to paint a picture of Chad Fulks as the more violent, dominant individual during the crimes.

E.     Basham's appellate counsel did not raise these issues because they lacked merit.

For all the reasons stated above, there was no basis for Basham's appellate counsel to argue that this Court committed plain error in admitting the Government's evidence concerning Basham's involvement in Samantha Burns's kidnaping and murder.

**Response to Claim 16: There was no basis to admit isolated parts of the Government's closing argument from the Fulks trial.**

In Claim 16, Basham's habeas counsel argue that his trial attorneys were ineffective for failing to request that the Court admit at the penalty phase of Basham's trial certain comments the Government made during its closing argument in Fulks's trial. §2255 Mot. at 67. Specifically, Basham contends that his lawyers should have moved to introduce the Government's statement that "he [Fulks] is the leader . . . . Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." Id. Basham argues that this information could have led the jury to find that he was a minor participant in the charged crimes. Id. at 69.

Prior to the guilt phase of Basham's trial, his attorneys filed a notice that they intended to introduce certain assertions from the Government's closing arguments in Chad Fulks's trial. Docket # 724. The Court deferred the issue, indicating that defense counsel should make a motion after the Government had presented its case, if the defense could show that the Government had taken a contrary position in Basham's case. 09/10/04 Tr at 11. Basham's trial counsel did not subsequently move to admit the statements. On direct appeal, Basham's appellate counsel argued that the Court had abused its discretion by not admitting the statements. The Fourth Circuit held that Basham had

-68-

**JA 3306**

waived that argument.  United States v. Basham, 561 F.3d 302, 335 (4th Cir. 2009).  Basham now

contends that the jury's verdict would have been different had the statements been introduced and

that he at least would have preserved the issue for appellate review.

Basham's habeas counsel's argument must fail for several reasons.  First, there was no

evidentiary basis for the Court to admit any of the Government's closing argument from Fulks's trial.

Second, to the extent that the Court could have admitted the closing argument, it would have been

inequitable to admit only isolated portions of it.  Third, there is no reasonable probability that

admission of the argument would have changed the result, either at trial or on appeal.

A.     There was no evidentiary basis for the Court to admit any of the
       Government's closing argument from Fulks's trial.

Even under the liberal evidentiary standard applicable to the penalty phase of a capital case,

there was no basis for admitting any of the Government's closing argument from Fulks's trial.  As

courts so often explain to juries, what lawyers say during closing argument is not evidence.  See

United States v. Lopez, 219 F.3d 343, 347 (4th Cir. 2000) (holding that a defendant who delivered

the closing argument in his own trial did not offer testimony inconsistent with his proffer statement

because, as the district court instructed, "[t]he statements, objections, arguments by the defendant

and by the attorney for the government [are] not evidence.").  There are, of course, sound reasons

for this rule.  The trial attorneys are not under oath, do not have first-hand knowledge of the facts,

and are not subject to cross-examination.  So while AUSA Gasser's closing argument in the Fulks

trial provided commentary on the evidence, the argument itself was not evidence.  To be sure, the

jury in the Fulks trial could not have based their verdict (either in whole or in part) on Gasser's

statements.  The jury could have found Gasser's characterizations of the evidence persuasive, but

they had to base their verdict solely on the evidence presented at trial. It makes little sense to say that Gasser's statements could not have served as a basis for the verdict in Fulks's trial but could have served as a basis for the verdict in Basham's trial.

Basham's habeas counsel contend that the Government's argument at Fulks's trial that Fulks was "the leader" and Basham "a puppet" was an admission by a party-opponent's agent under Federal Rule of Evidence 801(d)(2)(D). "Generally, statements by an attorney concerning a matter within his employment may be admissible against the retaining client." United States v. Blood, 806 F.2d 1218, 1221 (4th Cir. 1986) (citing United States v. McKeon, 738 F.2d 26, 30 (2nd Cir. 1984)). "Further, a clear and unambiguous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." Id. Accordingly, courts have allowed the admission of a party's prior jury argument if "the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial." See, e.g., McKeon, 738 F.2d at 33. However, "[s]peculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the [opponent's] case or invitations to a jury to draw certain inferences should not be admitted." Id.

The general rule set forth in Blood and McKeon does not apply here. In arguing at Fulks's trial that Fulks was the leader and Basham a puppet, the Government did not make "a clear and unambiguous admission of fact." Rather, the Government offered a characterization of the evidence and invited the jury to draw certain inferences from the evidence. Moreover, as explained below, even if the Government's argument in Fulks's trial could be considered a factual assertion, it was not inconsistent with the assertions made by the Government in Basham's trial.

-70-

**JA 3308**

B.    It would have been inequitable to admit only isolated portions of the Government's closing argument from the Fulks trial.

To the extent that the Court could have admitted any of the Government's closing argument from the Fulks trial, it would have been inequitable to admit only isolated portions favorable to Basham. In other words, had Basham's trial counsel moved to admit statements such as "[Fulks] was the leader" and "Basham was a puppet," the Government should have had a corresponding opportunity to admit portions of its closing argument indicating that Fulks and Basham were equally culpable in the charged crimes. As explored more fully in the Government's response to Claim 23, the Government did not present contradictory theories at the two trials but presented a consistent theme of equal culpability between the two defendants. The Court stated that it would entertain Basham's motion following the Government's case if Basham could identify any evidence in the Basham trial that contradicted evidence from the Fulks trial. There was no contradictory evidence, and defense counsel did not bring the motion. Even now, Basham does not identify any contradictory evidence adduced at the two trials. If Basham had been given the opportunity to introduce certain portions of the Government's argument in the Fulks trial suggesting that Fulks was the dominant aggressor in the crimes, then the Government presumably would also have been able to introduce portions of the argument that highlighted Basham's equal responsibility.

C.    There is no reasonable probability that admission of the statements would have changed the result, either at trial or on appeal.

Brandon Basham had ample opportunity during both the guilt and penalty phases of his trial to present his theory that Chad Fulks was the dominant aggressor and that he was a minor participant in the charged crimes. But no jury member found the "Minor Participant" statutory mitigating factor to be present. Introduction of the Government's statements from the Fulks trial would not have

-71-

changed the jury's minds.  The Government never suggested at either trial that Basham was a minor participant.  In fact, as highlighted in the Government's response to Claim 23, the Government consistently argued to both juries that Fulks and Basham were a team and could not have accomplished the crimes without each other's help.  Even if one were to accept that Fulks was the leader, it does not follow that Basham had only a minor role in the crimes.  The jury in Basham's trial had before it considerable evidence that Basham displayed aggression and initiative throughout the crime spree, regardless of whether Fulks was present at the time.  When taken in context with other statements made by the Government and in light of the evidence, there is no reasonable probability that the jury would have been swayed by the admission of the contested statements.  And as noted above, because there was no basis for the Court to admit the statements at all, there is no reasonable probability that Basham's appeal would have succeeded had his trial counsel preserved the issue.

**Response to Claim 17: Basham's trial counsel decided not to call impeachment witnesses based on valid strategic reasons.**

In Claim 17, Basham's habeas counsel claim that trial counsel were ineffective for failing to call witnesses who might partially impeach Clifford Jay's testimony that Basham had told Mr. Jay on Christmas Eve 2002 that "We killed them."  §2255 Mot. at 70-75.  This claims fails.  The decision to not call these witnesses was made for strategic reasons and clearly was not the result of oversight or a failure to contemplate the possible approaches of dealing with Mr. Jay's clear and unequivocal testimony.

In assessing this ineffective assistance of counsel claim, the Court must consider whether habeas counsel have demonstrated that trial counsel's performance was objectively unreasonable.

-72-

**JA 3310**

Strickland, 466 U.S. at 688, 104 S.Ct. 2052. In doing so, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. at 689, 104 S.Ct. 2052.

Clifford Jay, who had been Basham's counselor and teacher's aide for three or four years during Basham's middle school years,[9] testified at the end of the guilt phase. He testified that on Christmas Eve of 2002, Basham called him from jail after being arrested for the murder of Alice Donovan. TT 10: 224, 227. Mr. Jay testified that Basham told him: "I am in a lot of trouble." Id. at 228. Mr. Jay then asked Basham, "Did you do–I just want to know if you did what they said you did?" Id. Mr. Jay testified that Basham answered, "Yes, sir. We killed them." Id. Mr. Jay testified:

> I specifically remember him say 'them,' because it struck me by complete and utter surprise because I had seen the name Alice Donovan, and I knew the report had–the paper had told reports of one female, but in his conversation he said that "We killed them."

Id. at 228-29. See also Id. at 231-32. Mr. Jay also testified that he told Basham that he needed "to cooperate with the authorities and tell them everything that they need to know about finding this body." Id. at 232. Mr. Jay then asked Basham, "Do you know where the bodies are?" Id. at 232-33. Mr. Jay testified that Basham responded, "We tied her to a tree." Id. at 233. After the phone call ended, Mr. Jay reported the phone call to the Madisonville, KY Sheriff's Department. Id. at 229, 235. Later, Mr. Jay spoke with a Myrtle Beach Police officer. Id. at 235, 239.

On cross examination, Mr. Swerling asked Mr. Jay, "Have you ever stated ever, in the past, to anyone he states 'We killed her?'" Id. at 238 (emphasis added). Mr. Jay responded emphatically,

---

[9]Mr.Jay testified that Basham looked up to him and that Mr. Jay "dealt with [Basham] and kept [Basham] probably as much as his parents because [Mr. Jay] had him in school." Id. at 231, 237.

JA 3311

"No, sir. Not that I remember that. I specifically remember that. It caught me completely off guard, and I have never stated the other." Id. Mr. Swerling then had Mr. Jay confirm that he had spoken with Deputy David Morris of the Madisonville Sheriff's Office and an officer from the Myrtle Beach Police Department. Id. at 239. In response to Mr. Swerling's questioning, Mr. Jay continued to confirm that he had told both police officers that Basham had told him, "We killed them." Id. at 239-40.

The next day, trial counsel Jack Swerling explained the basis for his cross examination of Clifford Jay. He explained that he had spoken with those two officers and they had told him that Mr. Jay had not told them about Basham's reference to "them" in his statement to Mr. Jay. TT 11: 9. Mr. Swerling then noted, revealing that trial counsel had made a knowing decision to not attempt to present testimony from the officers, that "we opted not to present it [testimony from the officers] at this stage of the trial." Id. He further noted that the strategic decision on whether to present any testimony by the police officers at the mitigation phase had not yet been finally determined: "The question is whether or not we are going to go ahead and present that later on. . . . That is just a decision we have to make." Id. In the end, defense counsel opted to not call the police officers.

The decision to not call the police officers to potentially partially impeach Mr. Jay was a clear strategic decision. United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004) ("decision whether to call a defense witness is a strategic decision" demanding the assessment and balancing of perceived benefits against perceived risks, and one to which "[w]e must afford ... enormous deference"); Byram v. Ozmint, 339 F.3d 203, 209 (4th Cir. 2003) (review of counsel's strategic decisions as to which evidence to present at trial is "highly deferential," and there is a presumption that "counsel's conduct falls within the wide range of reasonable professional assistance"). It was not the result of

-74-

**JA 3312**

oversight or a failure to contemplate the possible approaches of dealing with this damaging testimony. Defense counsel "opted not to present it [testimony from the officers] at [the guilt] stage of the trial." TT 11: 9. Defense counsel contemplated introducing the evidence in the mitigation phase. Id. However, in the end, they did not attempt to introduce the evidence. Such a strategic decision to not call the officers is not ineffective assistance of counsel. See Gustave v. United States, 627 F.2d 901, 905 (9th Cir. 1980) (addressing counsel's failure "to utilize prior sworn testimony of various witnesses in an effort to destroy their in-court identification with alleged inconsistencies" and concluding failure was "obviously a matter of trial tactics and falls far short of ineffective counsel"). It is clear that trial counsel had not stopped "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

There are several obvious reasons why trial counsel were not ineffective for deciding to not attempt to introduce testimony from the two police officers. Even in the light most favorable to Basham, the officers' testimony would have, at best, resulted in some question about whether Basham admitted to Mr. Jay that "We killed them" or "We killed her." In either version, Basham admitted that Basham and Fulks ("we") killed. It is not clear that this would have been helpful. Introducing testimony from two police officers who would confirm that Clifford Jay was told by Basham that "We killed" "her" or "them" would highlight the fact that Basham was a full participant in the killing of Alice Donovan and/or Samantha Burns. This would have undercut the defense theory that Fulks was the leader and Basham was just a passive follower. See Basham, 561 F.3d at 315 ("During trial, Basham admitted culpability in the carjacking and kidnapping, but argued that Fulks committed Donovan's murder and was the instigator throughout the crime spree.").

Additionally, the police officers apparently would have confirmed Mr. Jay's testimony that

-75-

**JA 3313**

Basham told him, "We tied her to a tree." Id. at 233. If anything, the police officers' testimony would have confirmed this fact and emphasized the teamwork employed by Basham and Fulks ("we") in their commission of their heinous crimes. Sometimes, as in this case, the hallmark of effective advocacy is to know when to "leave well enough alone." United States v. Knox, 287 F.3d 667, 671 (7th Cir. 2002); Carr v. Rowland, 927 F.2d 608 (9th Cir. 1991) ("Counsel might have felt that the safest strategy was to leave well enough alone rather than risking introduction of even more damaging material.").

There was yet another possible reason that counsel was wise to hesitate in calling the police officer. The police officers with whom Clifford Jay spoke may not have had as clear a memory of the conversation as Jay had. As noted above, Jay was emphatic that he specifically remembered that Basham said "We killed them" because "it struck [Jay] by complete and utter surprise" as Jay was only aware of the Alice Donovan case. Needless to say, it would have been dangerous to introduce evidence that might have been less emphatic than the testimony of Mr. Jay. To attack Mr. Jay's credibility would have been quite risky. Mr. Jay was a father-figure to Basham and had absolutely no reason or motive to be anything but truthful about the conversation that he had with Basham.

For all the forgoing reasons, it is clear that trial counsel were not ineffective. The decision to not call the officers to testify was done for strategic reasons and clearly was not the result of oversight or a failure to contemplate the possible approaches of dealing with this damaging testimony. This claim should be dismissed.

**Response to Claim 18:   Basham's trial counsel did not  ineffectively cross examine Sheriff Hewett and Agent Long.**

Basham's habeas counsel complain that his trial counsel elicited damaging testimony from

-76-

**JA 3314**

Sheriff Hewett on cross examination, and then failed to mitigate the damage. §2255 Mot. at 75-76. Basham incorrectly states that Sheriff Hewett, during cross examination, stated that Basham demonstrated how he strangled Alice Donovan with the purse strap. As discussed in Claim 11, Sheriff Hewett's statement was ambiguous. Neither the Government nor Basham's counsel chose to delve further into the meaning of Sheriff Hewett's statement. Under the Government's theory, it did not matter, because Fulks and Basham were both so intimately involved in the murder that the hand of one was the hand of both. As far as Basham's counsel's actions, any attempt to mitigate could have been highly damaging, because Hewett may have clarified his testimony by testifying that Basham was demonstrating how he pulled the purse strap around Alice Donovan's neck. Basham's counsel reasonably responded by moving to a different line of questioning.

Basham's suggestion that his counsel should have questioned Agent Long about a statement in his 302 report that Cam Littlejohn had told him that Basham had told him that Fulks had used the purse strap to strangle Alice Donovan would have been double hearsay. It would not have refuted Sheriff Hewett's testimony that Basham demonstrated how the purse strap was used. Basham could have done both, and, as pointed out in the Government's responses to Basham's other claims, Basham had frequently changed parts of his story. So, testimony by Agent Long about what Basham told his former attorney would likely have done no more than emphasize one more instance where Basham changed his story within a short period of time, and would have imprinted in jurors' minds the involvement of Basham in Alice Donovan's murder.

Furthermore, even if the Court were to find that Basham's trial counsel was ineffective in cross examining Sheriff Hewett or Agent Long, the Court must dispose of this issue under the second prong of Strickland, because Basham suffered no prejudice as a result of his counsel's alleged

-77-

"anemic cross-examination of Sheriff Hewett."  Under <u>Strickland</u>:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -including an appellate court, to the extent that it reweighs the evidence - would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

466 U.S. 668 at 695.  Basham's own statements admitted all the facts required for a conviction.  <u>See</u> <u>Young v. Catoe</u>, 205 F.3d 750, 762 (4th Cir. 2000).  As for the sentence, the evidence showed that Basham had participated in the kidnappings of three randomly-selected people, the killings of the two female victims, that he was apprehended after he attempted to kidnap a third female victim, that the crimes were committed in a particularly vile and cruel manner, and that Basham's behavior even after he was arrested was in conformity with his actions in committing the crimes.  Jurors heard how Basham had fired a gun at a police officer who was attempting to arrest him after his unsuccessful attempt to kidnap a fourth victim, and that he had threatened to kill other police officers.  Thus, it is simply unreasonable to suggest that jurors would not have convicted Basham, and would have recommended a life sentence, but for Hewett's ambiguous statement during cross examination or his counsel's failure to cross examine Sheriff Hewett and an F.B.I. agent vigorously enough.

As the Fourth Circuit found when Basham appealed his conviction and sentence:

> "The Constitution entitles a criminal defendant to a fair trial, not a perfect one." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Brandon Basham's capital trial may not have been a perfect one, but a review of the proceedings below and the district court's cautious and thorough handling of them convinces us that he did receive a fair one.

561 F.3d at 339.  Thus, Basham has failed to show that he was denied due process during his trial.

**JA 3316**

**Response to Claim 19: Basham's trial counsel conducted an exhaustive investigation of Basham's background and developed an extensive mitigation case.**

Basham's habeas counsel complain his attorneys were constitutionally ineffective for failing to investigate, develop, and present powerful mitigating evidence at the penalty phase of his trial. §2255 Mot. at 82. "[B]y way of example," they discuss two areas -mental retardation and fetal alcohol spectrum disorder - which trial counsel allegedly failed to investigate and develop as mitigating evidence at the penalty phase.

"Although counsel should conduct a reasonable investigation into potential defenses, Strickland does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Green v. French, 143 F.3d 865, 892 (4th Cir. 1998), *abrogated on other grounds by* William v. Taylor, 529 U.S. 362 (2000). "In the end, 'a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.'" Tucker v. Ozmint, 350 F.3d 433, 440 (4th Cir. 2003)(quoting Wiggins v. Smith, 539 U.S. 510 (2003)). "It is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" Meyer v. Branker, 506 F.3d 358, 371 (4th Cir. 2007)(quoting Strickland, 466 U.S. at 690).

A.    Mental Retardation

Basham's habeas counsel claim that at the time of trial he had a full scale IQ of 68, and that "[t]ypically, an Full Scale IQ of 70 or lower fulfills the 'significant deficits in intellectual functioning' prong of a diagnosis of mental retardation." §2255 Mot. at 83. They complain that if trial counsel had retained and consulted with an expert on mental retardation, the expert would have

**JA 3317**

been able to explain why Basham should be diagnosed as being mentally retarded, thus rendering him constitutionally ineligible for a death sentence. §2255 Mot at 84-85. The problem with this argument is there was no real evidence to suggest that Basham is mentally retarded. "[T]he touchstone of effective representation must be sound, evidence-based judgment." Meyer v. Branker, 506 F.3d at 371.

In Green v. Johnson, 515 F.3d 290 (4th Cir. 2008), the Fourth Circuit found that the state supreme court's determination that the petitioner had not established his claim of mental retardation, in spite of the fact that one of the four intelligence tests he had taken resulted in a score of 55, was not unreasonable. Id. at 300. The state supreme court had noted that three of the scores were higher than 70, and that a person can fake a lower score, but not a higher score. Id. The Fourth Circuit concluded that the court had properly applied the factors set forth in Atkins v. Virginia, 536 U.S. 304 (2002). Id. In Atkins, the Supreme Court found that the clinical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction, that became manifest before age 18. Id. at 318. It quoted the definition of mental retardation used by the American Association on Mental Retardation (AAMR):

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work. Mental retardation manifests before age 18.

Atkins, 536 U.S. at 309 n.3 (citing *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed.1992)). It also quoted a similar definition by the American Psychiatric

-80-

**JA 3318**

Association:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

Id. Thus, a showing of borderline or below-average intelligence does not alone constitute an adequate showing of mental retardation. United States v. Webster, 421 F.3d 308, 313 (5th Cir. 2005).[10]

Basham has failed to show that he is mentally retarded under the definitions used by the Supreme Court and appellate courts. Clearly, he did not suffer from "subaverage general intellectual functioning" prior to age 18. When Basham was "almost 18," his IQ was 89. TT 25: 66. The only evidence offered by Basham to support his claim that he was mentally retarded at the time of trial is the result of one IQ test conducted shortly before trial which indicated a full-scale IQ of 68. TT 25: 53. At that time, Basham had a strong motivation to appear to have low intelligence.

Additionally, Basham's habeas counsel have failed to show he has significant limitations in adaptive skills such as communication, self-care, and self-direction, that became manifest before age 18. Id. at 318. There has never been any suggestion that Basham cannot take care of his daily needs. Further, observation of his behavior prior to and during the commission of his current crimes and during his trial show that Basham possessed communication and self-direction skills. For example, the Fourth Circuit, in addressing Basham's claim on appeal regarding the admissibility of video of

---

[10] It does not appear the Fourth Circuit has extensively addressed this issue post-Atkins in a federal death penalty case. In addressing the issue in state death-penalty cases, it has generally referred to definitions of "mentally retarded," similar to those quoted in Atkins, developed by state general assemblies. See Walker v. Kelly, 593 F.3d 319, 321 (4th Cir. 2010).

-81-

**JA 3319**

a courtroom scuffle at the sentencing stage of his hearing, observed: "Basham's actions and manipulation during the episode . . ., coupled with the fact that he remained calm during the remainder of the trial once he was permitted to have his chewing tobacco during breaks, point to a manipulative individual."  Basham, 561 F.3d at 333.

Furthermore, after Basham and Fulks escaped from prison, Basham was the one who went to James Hawkins' door at night and convinced Hawkins to give him a ride to his non-existent broken-down vehicle, thus demonstrating an impressive ability to communicate persuasively with another person.  When Basham stole a book of checks from Robert Talsma's box of checkbooks, he did not take the checkbook from the top.  TT 2: 99.  Rather, he stole a checkbook from the middle of the box - another example of Basham's reasoning ability.  Margaret Moore's testimony of Basham's attempt to convince her to take him to the store to get gas or to allow him into her house to use the telephone, revealed Basham's planning and communication skills.  TT 4: 87.  More recently, in writing about himself on the web site for Death Row Speaks, Basham states that he reads books by Stephen King and John Grisham.  See www.deathrowspeaks.info/profiles/brandonbasham. Basham's actions clearly show that he operates at a level exceeding the ceiling abilities for mental retardation, giving credence to Dr. Capehart's belief that Basham's IQ score of 75 on the test he gave him represented the minimum level of his cognitive functioning and potential.  Forensic Eval., p. 114.

Basham's habeas counsel complain that his trial counsel, during the direct examination of Tora Brawley, Ph.D., a neuropsychologist, asked: "that [mental retardation] is not an issue here, correct?".  §2255 Mot at 83.  When the statement is placed in the context of the entire direct testimony, it is obvious there was no ineffectiveness.  Dr. Brawley testified that she performed a

-82-

**JA 3320**

neuropsychological assessment of Basham. TT 25: 26. She administered a battery of tests in May 2003 and August 2004. TT 25: 27, 57. Dr. Brawley explained each type of test administered. TT 25: 34-52. She described the intellectual functioning test, the Wechsler Adult Intelligence Scale, third edition. TT 25: 34-35. Dr. Brawley stated: "If you are 69 or below, then you are in the extremely low or mentally retarded range in the bottom one to two percent of the population." TT 25: 38. Defense counsel asked: "If I have 69, does that mean I am retarded. Mentally retarded?" Dr. Brawley replied:

> Not necessarily. You need to look at why the IQ is down. For example, I have Alzheimer's patients that score at the 69 or below because of their disease process, it is not because they are mentally retarded, it is because they have Alzheimer's disease. So, in that case, their low IQ is accounted for by dementia. [11]

TT 25: 38. When Dr. Brawley was discussing the results of the tests administered to Basham, she stated he had a full-scale IQ of 68. TT 25: 53. Counsel then asked: "Now, you talked earlier about mentally retarded. That is not the issue here, correct?" Id. Dr. Brawley responded: "That's correct." Id.

Dr. Brawley went on to explain that, based on the results of all of the tests she administered, she determined that Basham "had some real brain problems," so she asked for records, consulted with other professionals, and interviewed Basham's family and long-term acquaintances to try to figure out the source of the problems. TT 25: 58. She discovered that there had been seven previous IQ tests administered through schools Basham had attended or psychiatric centers which had treated Basham. TT 25: 59. Dr. Brawley testified that at age seven, Basham had an IQ of 101; at age eight

---

[11] According to definitions by the American Association on Mental Retardation and the American Psychiatric Association, mental retardation manifests before age 18. Adkins, 536 U.S. at 308 n. 3. When Basham was "almost 18," his IQ was 89. TT 25: 66.

**JA 3321**

years, seven months, an IQ of 100; at age ten, an IQ of 88; at age 10.8, an IQ of 100; at age 13.8, an IQ of 77; at age 14. 8, an IQ of 86; and at "almost age 18," an IQ of 89. TT 25: 59-66.

When Dr. Brawley interviewed Basham's sixth-through-eighth-grade special education teacher, the teacher told her that Basham had described to her how he huffed gas. TT 25: 72. Basham's mother admitted to Dr. Brawley that she used marijuana while she was pregnant with Basham. TT 25: 76. His sister told Brawley that Basham started huffing gas at age eight and smoking crack at age twelve. TT 25: 77. Based on the testing and the interviews, Dr. Brawley diagnosed Basham as having "dementia due to multiple etiologies," including head injuries and drug abuse. TT 25: 81, 85-88. Defense counsel are not required to second-guess their experts' examinations or opinions. Goines v. Angelone, 52 F.Supp.2d 638, 664 (E.D.Va. 1999)(citing Pruett v. Thompson, 996 F.2d 1560, 1573-74 (4th Cir. 1993); Poyner v. Murray, 964 F.2d 1404, 1418 (4th Cir. 1992)(holding that there was no right to effective assistance of expert witnesses distinct from the right to effective assistance of counsel and the deficiencies in the performance of experts are not automatically imputed to the performance of counsel)).

Had Basham's counsel not pointed out that Basham's alleged low IQ was a recent occurrence, rather than the result of mental retardation, counsel would have risked losing credibility with the jurors. All but one of Basham's prior IQ scores indicated average intellect. Dr. Brawley's explanation regarding Basham's recent low IQ offered jurors an explanation, other than malingering, for Basham's low IQ. Indeed, during cross examination of Dr. Brawley, the prosecution noted that in July of 1999, Basham had a full-scale IQ score of 89. The prosecutor questioned Dr. Brawley:

> Q.    And then, so, having been in custody after scoring this 89 on the IQ test, for all but 130 days, during a three-and-a-half year period, he goes on his crime spree, he gets arrested, he gets indicted, he gets served with his death penalty notice, and

-84-

**JA 3322**

then you are hired to do these neuropsychological testing, which includes the IQ tests, on him?

A.    Right.

Q.    And lo and behold, he has got a 68 full-scale IQ?

TT 25: 176.  Instead of Basham's counsel being ineffective by raising the phenomena of Basham's recent alleged decline in IQ, it is obvious he was employing the widely-used tactic of preemptive questioning regarding a possibly damaging fact that would undoubtedly be raised by the prosecution.

Dr. Brawley's opinion contradicted much of the opinion of Dr. Bruce Capehart, a staff psychiatrist at the Federal Medical Facility, who conducted a court-requested evaluation of Basham. Dr. Capehart administered the Wechsler Adult Intelligence Scale - III, which indicated a full-scale IQ of 75.  See Forensic Evaluation, p. 108.  Basham scored in the average range when tested for his ability to demonstrate reasoning and knowledge about practical and social problems.  Id. at 112. Importantly, he scored in the range of possible malingering on a test designed to measure effort and motivation.  Id. at 113.  Dr. Capehart opined: "Given Mr. Basham's questionable motivation and his current legal circumstances, the current results are considered a minimum estimate of his cognitive functioning and potential."  Id. at 114.  Dr. Capehart pointed out that Basham had exhibited a high degree of variability over time.  He noted that Basham's most recent evaluation prior to his arrest on the current charges was conducted in July 1999 and resulted in a full-scale IQ in the average range, with scores on nine of the twelve sub-tests being in the average range.  Id. at 114.

Considering that Basham scored above the mental retardation level on all of the many IQ tests he took prior to his arrest for murder, and that he scored in the average range on the last IQ test taken prior to Alice Donovan's murder; and considering that Basham was quite capable of taking

-85-

**JA 3323**

care of himself and was highly manipulative when he wanted to accomplish a self-serving goal, it is highly unlikely that Basham's counsel could have succeeded in pursuing a claim of mental retardation. Therefore, his counsel did not err by not pursuing such a claim.

B.     Fetal Alcohol Spectrum Disorder

Basham's habeas counsel complain that his counsel were ineffective for failing to pursue evidence of his exposure to drugs and alcohol *in utero*, and to seek expert advice on the effects of this exposure. §2255 Mot at 85. Other than a general claim that this would have revealed "compelling mitigating evidence," Basham fails to explain how evidence of fetal alcohol spectrum disorder would have caused the jury to reach a different conclusion.[12] "[T]he reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation." Byram v. Ozmint, 339 F.3d 203, 210 (4th Cir. 2003)(quoting McWee v. Weldon, 283 F.3d 179, 188 (4th Cir. 2002)).

At the time of trial, an MRI was the tool used to determine whether a person had brain injury due to his mother's ingestion of alcohol. TT 20:197. Basham's MRI was normal. TT 20: 198. Jan Vogelsang, a social worker who conducted numerous interviews with Basham's family, friends, teachers, and neighbors, and who reviewed thousands of pages of records, admitted that though she suspected that Basham had suffered brain injury due to his mother's alcohol consumption, she could find no physical evidence of such injury. TT 20: 198. This was consistent with a neurological

---

[12]  Basham's trial counsel had seen co-conspirator Chad Fulks present an extensive case for mitigation based on fetal alcohol spectrum disorder relying on stronger evidence than in Basham's case. Yet the jury recommended the death penalty.

examination performed when Basham was a child. The neurologist had administered a series of tests, but had found no neurological abnormality. TT 23: 143. Thus, there was no reason for counsel to allocate time and resources to further pursue an argument based on fetal alcohol spectrum disorder.[13]

Moreover, Basham has failed to show that he was prejudiced by counsel's decision not to further pursue a fetal alcohol spectrum disorder defense. The jury found that Basham had participated in the murder of a South Carolina woman with whom he had never had contact until he jumped into her car and kidnapped her from a Wal-Mart parking lot. Evidence was presented that only a few days prior to this murder, Basham had participated in the kidnapping and murder of a college student in West Virginia. The night Basham was arrested, he had attempted to kidnap another young woman from a mall parking lot. Assuring the jury that Basham could not control his behavior because his mother had consumed alcohol during her pregnancy would probably would not have helped Basham significantly, as it may have created greater concerns about his future dangerousness. See Schiro v. Landrigan, 550 U.S. 465, 481 (2007)(given the defendant's record of violence and lack of remorse, "assuring the court that genetics made him the way he is could not have been very helpful").

C.    Mitigation Investigation

Counsel has a responsibility to adequately investigate and present evidence in mitigation of guilt. Byram, 339 F.3d at 209-210. However, counsel is only required to make a reasonable

---

[13] Nonetheless, Basham's counsel presented evidence of the use of alcohol and drugs by Basham's mother during her pregnancy. TT 20: 74. Ms. Vogelsang further testified that Basham's mother would smoke marijuana while she was nursing him, and blow marijuana into his face to calm him. TT 20:41.

JA 3325

investigation for possible mitigating evidence. Id. (citing Matthews v. Evatt, 105 F.3d 907, 919 (4th Cir. 1997)). Basham's habeas counsel's claim that his trial counsel failed to adequately investigate, develop, and present mitigating evidence completely fails based on the record. If Basham's counsel did not uncover "every scrap of evidence that could conceivably help" him, they undoubtedly came close, as summarized below.

Basham's trial counsel conducted an exhaustive mitigation investigation and presented a compelling mitigation case. Jan Vogelsang, a highly-respected clinical social worker who has helped hundreds of crime victims and treated 50-100 offenders, and who has testified as an expert in 30-35 death penalty cases, conducted an extensive biopsychosocial assessment of Basham. TT 20: 6-21. During the assessment, Ms. Vogelsang visited Madisonville, Kentucky three times to interview more than forty people, including Basham's parents, sister, teachers, relatives, psychologist, psychiatrists, social workers, childhood acquaintances, neighbors, probation officers, psychiatric hospital staff, and jail employees. TT 20:22-24. She reviewed approximately 8,000 pages of records, including medical and mental health records of Basham and his family, school records, his mother's military records, social services records, and jail records. TT 20: 18, 24-25. Ms. Vogelsang developed a chart, called a genogram, to show patterns of behavior that run in Basham's family. TT 20: 26. She explained the chart to jurors, showing that many members of Basham's family, going as far back as the 1930's, had suffered from severe mental illnesses with characteristics including auditory hallucinations, paranoia, irritability, restlessness, hyperactivity, suicide-attempts, depression, aggression, and violence. TT 20: 27-35. Ms. Vogelsang emphasized that the histories of Basham's parents were characterized by family violence, substance abuse, learning difficulties, and mental, emotional, and behavioral impairments. TT 20-36. She pointed out that Basham was

-88-

**JA 3326**

a special-needs child, was physically abused, and "was completely corrupted and mis-socialized" and "taught all of the wrong things." TT 20-36. Ms. Vogelsang explained that Basham had responded to this negative home environment by developing "protective survival strategies," such as "drug use, lying, manipulation, aggression, and running away." TT 20: 37.

Ms. Vogelsang testified in detail about the numerous mental and physical health problems Basham experienced as a child. TT 20: 48-55. At age ten, Basham was diagnosed with intermittent explosive and oppositional defiant disorders and seizure disorder. TT 20:107. However, his mother refused to give him the prescribed medication. TT 20: 107-108. Ms. Vogelsang told jurors about the numerous institutions where Basham had been treated, and stated that Basham's mother would try to remove him from an institution prior to Basham's Social Security check being discontinued, because she used the check for drugs. TT 20: 75. She discovered that there had been no continuity of care, and that medical recommendations were not followed. TT 20: 126-127.

In addition to pointing out the problems with Basham's treatment, Ms. Vogelsang testified about Basham's dysfunctional home life. His mother shoplifted, grew marijuana in the back yard, and allowed drug users and dealers to infest the house. Violence was commonplace. TT 20: 60. Ms. Vogelsang described one particular incident when Basham's aunt shot his father, after which his father grabbed his aunt by the jaw and ripped the flesh from her face. TT 20: 60-61. Other incidents involved a fifteen-year-old cousin who was killed by a group of boys after his father forced him to confront the boys who were bullying him; and an incident in which his mother's boyfriend held a knife to her throat. TT 20: 71-72. Ms. Vogelsang said that Basham rarely saw any consequences resulting from the bad and illegal behavior. TT 20: 61.

Ms. Vogelsang testified that when Basham was in the first or second grade, tests indicated

-89-

**JA 3327**

he had a learning disability and poor social skills, judgment, and insight, and that he needed structure. TT 20: 81. Basham's aggressiveness became progressively worse with age. TT 20: 82. Basham's mother hit him with coat hangers, frying pans, and anything else she could get her hands on. TT 20:87, 96. She could not control him, and so, when Basham was twelve-years-old, she sent him to live with a twenty-year-old, mentally-handicapped, former drug user. TT 20: 98. At age fifteen, he was sent to a group home, where he was molested by a man. TT 20: 74.

After Ms. Vogelsang provided a detailed look into Basham's mental and physical problems and how they affected him, Charlotte Basham Morris, Basham's sister, testified about their family. She said that their mother could not hold a job and was on anti-psychotic medication. TT 21: 21. Ms. Morris testified that for as long as she could remember, her father failed to communicate with her. TT 22: 21. She described him as being "almost like an inanimate object. You could talk to him, but you didn't get [a] response." TT 22: 21. Ms. Morris testified that her parents provided the basic necessities, but never provided any guidance or affection. TT 21: 23-24. She said they never did anything as a family. TT 21-25. Their mother sometimes became enraged for no apparent reason and began beating the children or their father. Ms. Morris testified that when their mother attacked their father, Basham would try to get between them, and that he once was kicked in the stomach when he was a young child trying to break up a scuffle. TT 21: 32. Ms. Morris testified that her mother grew marijuana, dried it in Basham's room, and sold it from their house. TT 21: 39-40. When Basham was about eight-years-old, his mother began giving him marijuana to use. TT 21: 52. Ms. Morris said that when she and her brother could not get marijuana, they would inhale gas, paint, or liquid cement. TT 21: 67-68. When Basham was approximately thirteen-years-old, he, Ms. Morris, and their mother used crack cocaine openly in their house. TT 21: 77-78, 81.

-90-

**JA 3328**

Ms. Morris testified that when Basham was a child, he told his parents that an acquaintance tried to fondle his genitals. His mother was angry, but his father said the man was just playing and had done the same thing to him and his brother when they were children. TT 21: 58. Ms. Morris said that their parents did not report the incident, but the man was serving a prison sentence at the time of trial for sexually abusing children. TT 21: 58-59. Ms. Morris said that investigators from Child Protective Services came to their house numerous times because teachers could see that something was wrong with the Basham children. However, usually nothing happened because their mother instructed them to lie, and they did not want to upset her. TT 21: 59-60. Finally, after Charlotte's mother stabbed her in the head with scissors when she jumped on Charlotte and tried to cut her hair as punishment for driving the car when she was fourteen, Protective Services awarded custody to their father. TT 21: 61-62.

Other family members confirmed Ms. Morris's testimony and added more details. Jerome McKetchnie, a cousin, in addition to testifying about the daily drug use and violence in Basham's household, testified about numerous men - both boyfriends and drug users - frequenting the house. TT 21: 129. Summer Ruley, a second cousin who was in school with Basham, testified that he was "slower than normal children." TT 21: 173. She said that other children did not want to associate with him because they looked at him as being lower class and because he was annoying - constantly touching or moving. TT 21: 174-175. Another cousin testified that he saw Basham and his mother using crack together. TT 21: 186. Beverly Basham, a "cousin by marriage," testified that Basham's mother smoked marijuana from the time she got up in the morning until she went to bed. TT 21: 189, 196. She said Basham was loud and obnoxious, and that his mother would "shotgun" marijuana into his face to calm him. TT 21: 194-195. She testified when Basham was older, his mother

-91-

**JA 3329**

encouraged him to steal in order to get drugs.  TT 21: 201.

Another cousin, Thomas Basham, told about the time Basham fell out of a tree and wounded his head.  TT 21: 225.  He said that Basham was not the same after the injury - "He acted like he was slower."  TT 21: 225.  Thomas Basham testified that even though he had once lived with his uncle, Brandon Basham's father, and was close to him, he stopped visiting at their house because Basham's mother was selling drugs from the house, and he was afraid law enforcement would come there and arrest him based on the drug activity.  TT 21: 238-239.  He said that once when Basham returned from a stay at a psychiatric institution, he looked healthier and he confided that he wanted to go back to school, and he believed he would be fine if he could stay away from his mother.  TT 21: 239.  So, Basham's father got him a trailer, and he stayed away from his mother for two months.  TT 21: 239.  However, Basham and his mother got back together after two months, and Basham began to steal and get into trouble.  TT 21: 239-240.  As a result, Basham was arrested.  TT 21: 240.

Joyce Tapp, a school bus driver when Basham was in the first grade, testified that Basham stayed at her house as their son's guest for five days the summer before school started.  TT 21: 259-260.  She said he was not used to eating at a table, washing his hands, bathing before bed, or going to bed at a regular time.  TT 21: 261.  When it came time to leave, he cried and wanted to live with the Tapps.  TT 21: 260.  Ms. Tapp testified that other children teased Basham when he was on the school bus, and that he would fight them.  TT 21: 264.  She said some mornings when Basham got on the bus he was crying and upset.  TT 21: 266.

Sharon Watkins, Basham's first grade teacher, testified that Basham was the most impulsive child she had ever taught, and that he clearly had a learning disability.  TT 22: 18.  Suzanne Mayes, Basham's second grade teacher, also testified that Basham was a difficult child to teach because he

-92-

**JA 3330**

was constantly talking, moving around, and demanding attention.  TT 22: 42.  She said that he couldn't focus on anything, so he had trouble comprehending things.  TT 22: 42.  Ms. Mayes testified that it appeared Basham had never been exposed to a structured environment and that he did not interact with other children well.  TT 22: 43.  When Ms. Mayes asked the students what they would like to be when they grew up, Basham responded that he would like to be a male stripper, because his dad would have him dance on the table, and his friends would give him quarters.  TT 22: 45-46.  Ms. Mayes said Basham's parents never showed any interest in his education.  TT 22: 46.  Monte Mefford, a teacher for children with emotional and behavior problems, taught Basham for two years.  TT 23: 106-109.  She testified that Basham had major deficits in social and behavior skills.  TT 23: 117-118.  She said that even though he was obnoxious and aggravating to other children, he had a lot of good qualities.  Ms. Mefford testified that Basham had "a very good heart," mentioning that he worried about the disabled children in wheelchairs, and would cover them with his own jacket if they were outside during cold weather.  TT 23: 119.  Ms. Mefford said that she made medical appointments for Basham and took him to the appointments.  TT 23: 126-127.  She testified that he loved animals and had a ferret, which he loved, but he was allergic to it, so she obtained medication for him.  TT 23: 127-128.  Ms. Mefford said she had a mentally retarded sister, whom Basham was fond of and often expressed concern about.

Lynn Coy, the mother of a mentally-retarded child with a behavior disorder, testified that her son was in special needs classes with Basham.  TT 22: 53.  She said that Basham would take up for her son when other children picked on him, and that he once helped her son clean up a light bulb after her son had thrown it during a temper tantrum.  TT 22: 57-59.  Brenda Shaner, treatment and academic program coordinator, at the Methodist Home, testified that Basham was referred to the

-93-

**JA 3331**

Methodist Home by the Department of Social Services. TT 22: 126, 124. Kellie Mullins, a cottage supervisor at the Methodist Home, testified that Basham was impulsive, loud, hyper, and had low self esteem, and that most of his misbehavior involved food, confinement to his room, or taking of personal belongings.   TT 22: 62, 68, 76-78. She said that Basham "had a good heart," and that she considered him to be one of the special-needs children Kentucky had failed. TT 22: 94-95.

Penny Titzer, unit manager for Charter Hospital, a locked psychiatric hospital, in Evansville, Indiana, where Basham was admitted by his probation officer for residential treatment on January 28, 1997, testified that Basham was sent there because he had run away from the Methodist Home. TT 23: 177, 183-185. Basham was fifteen-years-old at the time. He came up to her and, with a big smile and an energetic manner, introduced himself. TT 23: TT 23: 185-186. He was personable and polite. TT 23: 186. She testified that Basham received very few visitors or telephone calls, and had no support system. TT 23: 192. Ms. Titzer had once-a-month counseling sessions with Basham and his family. TT 23: 207-209. During one of those sessions, Basham discovered that his mother had sold some of his personal belongings because she claimed she needed the money. TT 23: 209. Ms. Titzer testified extensively about her attempts to work with Basham regarding two alleged incidents of sexual abuse. TT 23: 210 - 24: 18. Basham reported sexual abuse at age fourteen by a man in their neighborhood. TT 24: 15. Investigators interviewed Basham regarding the incident. TT 24:15. However, Basham's mother refused to cooperate because she was afraid the neighbor would hurt them or burn down their house, so law enforcement could not prosecute the abuser.[14] TT 24: 17-18. Ms. Titzer testified that her employment with Charter Hospital ended on June 9, 1997.

---

[14]  During cross examination, Ms. Titzer admitted that she was not aware that on the date of the alleged sexual assault at the neighbor's house, Basham was residing at the Methodist Home.  TT 24: 40.

TT 24: 18.  On September 11, 1997, Basham was released to Cardinal Treatment Center.[15]  TT 24: 65.

Susan Davenport, the vocational counselor at Cardinal Treatment Center, where Basham was referred by the Department of Juvenile Justice at age sixteen, testified that Basham was always respectful toward her, but that he had problems with peers, who would tease him because his family never visited him.  TT 22: 185- 197.  She said he wanted to be a mechanic, like his father.  TT 22: 189.  Danny Stringfield, chairman of the treatment team while Basham was at Cardinal Treatment Center, testified that on several occasions, Basham's peers acted aggressively toward him.  TT 23: 29.  He also testified that there was a time when Basham and another resident left without permission, but that Basham was later picked up after he became lost and disoriented subsequent to the other resident abandoning him.  TT 23: 64-65.

Regina Moore testified that she first met Basham when he was a child and attempted to steal video tapes and music cd's from the store at which Ms. Moore worked.  TT 24:92.  She said he was small and dirty.  TT 24: 92.  Basham told her he wanted to sell the items to get money for food.  TT 24: 92.  Moore said she had previously seen Basham getting food out of dumpsters.  TT 24: 93. After the theft attempt, Ms. Moore bought Basham food every night for approximately a year and a half.  TT 24: 93.  Several years later, when Ms. Moore was working at the jail, she saw Basham on his eighteenth birthday, when he was transferred from a juvenile facility to the jail.  TT 24: 96. Ms. Moore testified that during the ten months Basham was at the "old" jail, he never caused her any problems.  TT 24: 98.  Ms. Moore testified that after they were transferred to the "new" jail, she functioned only as the booking officer, and she did not have an opportunity to see Basham regularly.

---

[15]  Basham's discharge diagnosis was conduct disorder and dysthymia.  TT 24: 70.

**JA 3333**

TT 24: 99-100. Ms. Moore said that she was surprised when she discovered that Basham had escaped, because she did not think he would know how to get out of town, since he had never been outside of Madisonville. TT 24: 103.

Paul Arison, deputy jailer at Hopkins County Jail, testified that when Basham was an inmate, he wanted to acquire his GED. TT 24: 115. He said that Basham's pre-GED test indicated he had the equivalent of less than a third-grade education. TT 24: 115. Mr. Arison told the jury that Basham was like an eight or nine-year-old child, and that, even though he came to class regularly, his attention span was so poor that he could not stay focused. TT 24: 117-118. Former Hopkins County Jail Captain Jewel Dickerson testified that Basham was a follower and a "gofor" for the other inmates, and that he acted like a six-year-old. TT 24: 124-125. Captain Marvin Phillips testified that Basham was "on the slow side." TT 24: 139. He said that when Basham was not on his medication that he was agitated and nervous, and would talk to the walls. TT 24: 140. Lt. Kathy Terrell, who worked at the Hopkins County Jail, testified that Basham was a follower. TT 24: 176. Several officers from Alvin Glenn Detention Center, where Basham was jailed during his trial, testified that they treated Basham with respect and talked with him, and that he had not caused them any problems. TT 24: 193, 206-207, 210-211. One officer testified that Basham "is a good person." TT 24: 218.

After numerous witnesses testified to Basham's unfortunate childhood, inability to learn, and child-like mentality, Basham's counsel presented the testimony of Dr. William Brannon, a neurologist. TT 24: 223. Dr. Brannon testified that Basham has a brain impairment which affects his reasoning and judgment, making him impulsive and easily manipulated. TT 24: 250-252. After Dr. Brannon testified, James Aiken, an expert on prison and institution management, told jurors

-96-

**JA 3334**

about the extensive security measures that are part of a maximum-security prison.  TT 26: 21-32.

Basham concluded his mitigation case with the testimony of Donna Schwartz-Watts, a forensic psychiatrist, who worked on Basham's case for "probably 250 hours."  TT 26: 81, 264.  Dr. Schwartz-Watts testified that she had interviewed Basham about forty times and in different settings over a year-and-a-half, reviewed his medical records and discovery, consulted with Dr. Brannon and Dr. Brawley, read transcripts of the guilt and first part of the penalty phase of Basham's trial, and worked with investigators and mitigation specialists on Basham's defense team.  TT 26:102-107, 264.  Dr. Schwartz-Watts said that she had also reviewed Chad Fulks' entire case because "you can't understand Mr. Basham without understanding his relationship with his codefendant."  TT 26: 107.  Additionally, Dr. Schwartz-Watts interviewed members of Basham's family, correctional officers, teachers, psychologists and psychiatrists who had previously treated Basham, social workers, and witnesses, such as Andrea Roddy and Ronald Perdue.  TT 26: 108-112.

Dr. Schwartz-Watts testified regarding Basham's developmental history.  TT 26: 122-150.  She said that his mother beat him with a coat hanger when he was five-years-old, and that Basham, at a young age, saw his mother banging his sister's head against a brick wall.  TT 26: 133.  Dr. Schwartz-Watts testified that records indicated that when Basham was between the ages of eight and twelve, he was sodomized by a homeless man his father had brought into the home.  TT 26: 144.  She said that Basham's drug use, physical and sexual abuse, and head trauma had likely affected his brain and his social development, and that he had one of the worst developmental histories she had seen.  TT 26: 150.  Dr. Schwartz-Watts said that one of the psychiatrists where Basham had been hospitalized opined that Basham did not have any control over his behavior, and that he was easily manipulated by others.  TT 26: 172-173.  Dr. Schwartz-Watts discussed the significance of the

JA 3335

numerous evaluations performed at the various institutions which had treated Basham, and the medications prescribed. TT 26:167-216. Ultimately, she concluded that Basham has "dementia due to multiple etiologies" and "inhalant-induced psychosis." TT 26: 250, 266. Dr. Schwartz-Watts said that Basham also suffers from auditory hallucinations, anxiety disorder, and paranoia. TT 26: 267-270. However, she stated that her primary diagnosis would be dementia due to multiple etiologies. TT 26: 250.

It is clear Basham's sentence was not due to a weak mitigation case. It is difficult to imagine what else trial counsel could have done. The mitigation evidence simply could not overcome the convincing evidence of Basham's guilt and the cruelty inflicted upon his victim, plus the evidence that Basham was attempting to kidnap another victim when he was finally captured. See Gardner v. Ozmint, 511 F.3d 420, 427-428 (4th Cir. 2007)(since the sentence in a death penalty trial depends in large part on what occurred during the guilt phase, the strength of this evidence likely provided the critical reason for the jury's conclusion that the defendant's conduct warranted a death sentence). The final attempted kidnapping revealed Basham had no remorse for the prior two murders and that he would continue to murder. Further, not all of the information about Basham's life prior to the murders was cause for sympathy. For example, the prosecution, during cross examination of Dr. Brawley, questioned her regarding a 1997 psychological assessment stating:

> Brandon has little ability to empathize with others and shows little or no remorse for his misbehaviors. He may be assaultive or very aggressive as he reports considerable problems with controlling his anger. Brandon may appear charming, intent to make a good first impression; however, his interpersonal relationships are likely to be very shallow. He is interested only in his own pleasure and is insensitive to the needs of others. He seems unable to experience guilt while causing others trouble.

TT 25: 141. The prosecution questioned Dr. Brawley about another evaluation, done when Basham

was almost eighteen-years-old, in which the neuropsychologist observed: "Women were seen as objects of sexual gratification. And there was no indication of emotional or relational involvement when they appeared in his stories." TT 25: 133. Thus, even if Basham's trial counsel had somehow been ineffective, Basham's current counsel cannot show prejudice, because there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Moody v. Polk, 408 F.3d 141, 152 (4th Cir. 2005)(quoting Wiggins v. Smith, 539 U.S. 510, 534 (2003)).

**Response to Claim 20: Basham's counsel have failed to show that trial counsel failed to assemble a competent capital defense team or that he was prejudiced by any alleged failure of his counsel to supervise the defense team.**

Basham's habeas counsel complain that his trial counsel "failed to recognize" the "personal problems, conflicts of interest, and ineffective performance" of the defense team and "failed in their duties properly to supervise and manage their capital defense team." §2255 Mot at 87. Specifically, they complain of the performance of Carlisle McNair, an investigator working on his case and Paige Tarr, a mitigation specialist.

A.    Investigator Carlisle McNair

Basham's counsel complain that Investigator McNair was "both professionally and personally biased against him, and that his bias . . . grossly compromised his investigation." §2255 Mot at 88. He claims that McNair's biases caused him to fail to discover that Government witnesses, guards from Butner FCI, would testify that Basham bragged that he would never receive the death penalty. §2255 Mot. at 89. Other than making the general allegation that his counsel were caught off guard and unprepared to respond, Basham has failed to show how he was prejudiced. See Byram, 339 F.3d at 211 ("Byram offers no evidence to support his claim that greater supervision of [the mitigation

-99-

expert] or better communication between the members of his defense team would have produced a different result in his case."). Basham's counsel attempted to prevent the testimony. They argued to the Court that it would be more prejudicial than probative. TT 17: 180. However, the Government pointed out that, according to their opening statement, Basham's counsel intended to present significant testimony regarding Basham's impaired mental state, and, therefore, Basham's boasting that he would never get the death penalty due to his mental illness was relevant. TT 17: 191. The Court agreed. Id. The Government also pointed out that if the testimony of the guards was not allowed during the Government's presentation, it would certainly be allowed during the rebuttal case, making it some of the last evidence the jurors would hear prior to deliberations. TT 17: 193.

Thus, Basham has failed to show how prior knowledge of Basham's bragging would have allowed counsel to prevent the testimony or to mitigate the damage. Further, Basham's counsel has failed to suggest what Investigator McNair could have found to prevent the jury from finding Basham guilty. As discussed previously, the evidence of Basham's guilt was overwhelming. In addition to his own admissions, a witness testified to seeing Basham shoot a gun, as he was stealing the witness's guns shortly before he was seen on video kidnapping Alice Donovan from the Wal-Mart parking lot. There was also evidence, including testimony that Basham wore Samantha Burns' ring around his neck, indicating that Basham was involved with the murder of Samantha Burns. TT 5: 94-95. Basham's counsel has suggested nothing that Investigator could have found that would have countered this and other evidence of Basham's guilt. Consequently, Basham's counsel have failed to satisfy the prejudice prong of the Strickland test.

B.    Mitigation Specialist Paige Tarr

Basham's counsel make the unsupported allegation that mitigation specialist Paige Tarr was

-100-

**JA 3338**

"either unable to devote her attention to the case or was deficient in her efforts." §2255 Mot at 92. Basham has failed to show how Ms. Tarr's performance was deficient or how he was prejudiced by the alleged deficient performance. As discussed above regarding Claim 19, Jan Vogelsang, a social worker and mitigation specialist, plus numerous others, testified extensively regarding Basham's difficult childhood, and his family, educational, and mental health problems. The jury heard mitigation evidence for seven days. Basham's counsel have not pointed to any essential stone that was left unturned.

**Response to Claim 21: There was no basis to trifurcate Basham's trial.**

In Claim 21, Basham's habeas counsel argue that his trial attorneys were ineffective for failing to request a trifurcated trial. §2255 Mot. at 93. More specifically, they contend that his attorneys should have asked the district court to divide the sentencing hearing into two separate phases: (1) an "eligibility phase" in which the jury would hear the Government's evidence regarding threshold intent factors and the statutory aggravating factor in determining whether Basham was eligible for the death penalty; and (2) a "penalty" or "selection" phase in which the jury would consider non-statutory aggravating factors and all mitigating factors, and in which the jury would weigh the aggravating and mitigating factors in deciding whether to impose the death penalty. Id. at 95. Basham's habeas counsel claim that a trifurcated trial was necessary to ensure that the jury was not swayed by evidence of non-statutory aggravating factors (such as victim impact evidence) in deciding whether the Government had first proven Basham's eligibility for the death penalty beyond a reasonable doubt. Id. at 95-96.

This argument fails for several reasons. First, the Federal Death Penalty Act contemplates a single sentencing hearing encompassing all information relevant to the sentence — including both

-101-

**JA 3339**

aggravating and mitigating factors.  Second, the district court clearly instructed the jury that it must reach a unanimous verdict on the threshold intent factors and the statutory aggravating factor before it could consider non-statutory aggravating factors and mitigating factors.  Third, to the extent that the single sentencing hearing employed by the district court allowed the jury to consider "penalty" or "selection" information in determining Basham's eligibility for the death penalty, such a procedure had potential to work in Basham's favor.  For example, mitigating information regarding Basham's mental health might have kept a juror from finding a threshold intent factor.  Finally, in any event, Basham was not prejudiced by the bifurcated trial proceeding; the information regarding the threshold intent factor and statutory aggravating factor found by the jury was overwhelming.

> A.    <u>The FDPA contemplates a single sentencing hearing encompassing all aggravating and mitigating evidence.</u>

Under 18 U.S.C. § 3593(b), if a defendant is convicted of an offense for which the death penalty may be imposed and for which the Government has provided proper notice of its intent to seek the death penalty, the district court "shall conduct a separate sentencing hearing to determine the punishment to be imposed."  Section 3593© provides:  "At the sentencing hearing, information may be presented as to *any* matter relevant to the sentence, including *any* mitigating or aggravating factor *permitted or required* to be considered under section 3592."  (Emphasis added).  Thus, by its express terms, the FDPA contemplates a single sentencing hearing at which information is presented on both statutory and non-statutory aggravating factors and mitigating factors.  See <u>United States v. Bolden</u>, 545 F.3d 609, 618 (4th Cir. 2008) ("As the plain language of §§ 3593(b)-(e) . . . makes clear, the FDPA contemplates a single penalty phase hearing at which all relevant evidence is admitted and, if the defendant is found eligible for the death penalty, ultimately weighed by the jury.").

<center>-102-</center>

Even so, the federal appellate courts to have considered the issue have held that although the FDPA contemplates a single sentencing hearing, it does not prohibit a district court from bifurcating the sentencing hearing (and thus trifurcating the trial) to avoid confusion of the issues before the jury. Bolden, 545 F.3d at 618; United States v. Fells, 531 F.3d 197, 240 n.28 (2nd Cir. 2008). The appellate courts, however, have not held that trifurcation is mandatory but have left the matter to the discretion of the district courts. See Bolden, 545 F.3d at 618-19.

Basham' habeas counsel cannot demonstrate that Basham's trial attorneys were constitutionally ineffective for failing to request a trifurcated proceeding. Although it would have been within the discretion of the district court to grant a trifurcated trial if requested, Basham's habeas counsel have not shown that the only reasonable course was for his trial attorneys to make such a request. The statutory default procedure under the FDPA is for the district court to conduct a single sentencing hearing, and, as explained further below, the hearing conducted in this case did not prejudice Basham and in fact had potential to work in his favor. Basham cannot now argue that his attorneys should have taken a different approach simply because the jury's verdict was against him.

      B.      The district court clearly instructed the jury that it must determine Basham's eligibility for the death penalty before it could consider non-statutory aggravating factors and mitigating factors.

The district court issued a thorough and careful jury charge at the conclusion of the sentencing hearing. The Court began by outlining "the deliberative steps [the jury] should follow in considering as to both of the offenses for which the death penalty is a possible punishment." TT 29: 199.

-103-

**JA 3341**

First, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, that the Defendant was at least 18 years of age at the time of his offense.

Second, you must consider whether the Government has proven beyond a reasonable doubt and to your unanimous agreement, one of four threshold intent factors.

Third, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, the statutory aggravating factor alleged.

Fourth, if you find these first three steps have been proved to your unanimous agreement, then you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, any nonstatutory aggravating factors identified by the Government.

Fifth, you must consider whether any one or more of you individually find that the Defendant has proven any mitigating factor or factors by a preponderance of the evidence. You may find any mitigating factor by considering everything that you have learned during either phase of the trial, regardless of whether or not Mr. Basham's attorneys have asserted that factor.

Sixth, all of you then must weigh the aggravating factors you have unanimously found to exist against any mitigating factor or factors any one of you individually found to exist, to determine the appropriate sentence.

Id. at 199-200. In this way, the district court indicated that the steps were sequential, and that the jury had to find Basham eligible for the death penalty (based on his age, the threshold intent factor, and the statutory aggravating factor) before they could consider other aggravating factors and mitigating factors.

The district court further emphasized this point during the jury charge. The Court stated: "[B]efore you may consider the imposition of the death penalty, you must first unanimously agree, beyond a reasonable doubt, that the Defendant was 18 years of age or older at the time of the

-104-

**JA 3342**

offenses involved in this case[.]" Id. at 202.  Then, the Court explained: "[B]efore you may consider

the imposition of the death penalty, you must also unanimously find, beyond a reasonable doubt, that

the Defendant acted with one of four potential mental states, called threshold intent factors[.]"  Id.

at 203.  The Court emphasized: "You must find one of these threshold intent factors . . . before you

may continue your deliberations."   Id. at 206.   Next, the Court stated: "If and only if you

unanimously find beyond a reasonable doubt that the Defendant acted with one of the threshold

intent factors. . . you must proceed to determine whether the Government has proved beyond a

reasonable doubt the existence of the statutory aggravating factor[.]"  Id. at 207.  "If you do not

unanimously find that the Government has proven the statutory aggravating factor," the Court

instructed, "you should so indicate . . . and no further deliberations will be necessary."  Id. at 208.

The Court thus made it plain that the jury could only proceed to the "penalty" or "selection"

deliberations once the Government had proven all of the eligibility requirements (age, threshold

intent factor, and statutory aggravating factor).  "Jurors are presumed to follow their instructions,"

and there is no indication in the record that they did not do so here.  Bolden, 545 F.3d at 619 (citing

Shannon v. United States, 512 U.S. 573, 584-85 (1994)).

      C.     The bifurcated trial proceeding had potential to work in Basham's favor.

As explained above, the district court's jury charge made it abundantly clear that the jury was

not to consider nonstatutory aggravating factors or any mitigating factors until the Government had

proven beyond a reasonable doubt that Basham was eligible for the death penalty.  But assuming

(only for the sake of argument) that the jury might have misunderstood or disregarded the Court's

instructions on this matter, the jury might have considered information regarding *mitigating factors*

as well as information regarding nonstatutory aggravating factors in deciding whether Basham was

**JA 3343**

eligible for the death penalty.

Basham's trial attorneys submitted six statutory mitigating factors and thirty nonstatutory mitigating factors for the jury's consideration. TT 29: 222-27. Many of these proposed mitigating factors related to Basham's mental or emotional health in general or his mental state at the time of the offense (e.g., Basham's impaired capacity, duress, disturbance, family history of mental illness, drug use, low IQ, learning disability, etc.). As the Court instructed, these factors were not relevant to whether Basham was *eligible* for the death penalty, and the jury was not to consider them until after they had made their eligibility determination. But to the extent that the jury might have intentionally or unintentionally considered these factors in deciding eligibility, this process could have worked in Basham's favor. For example, a juror who found the presence of a mitigating factor related to Basham's mental health might have relied on this factor to find that none of the threshold intent factors were present. Basham's trial counsel could reasonably have concluded that to the extent the bifurcated trial procedure allowed room for impermissible spillover of evidence, this spillover might work to Basham's advantage. There is, of course, no indication that any spillover in fact occurred. But it would not have been unreasonable for Basham's trial counsel to decide not to challenge the bifurcated proceeding based on their determination that any confusion of the issues might be favorable to Basham. After all, to obtain a life sentence they only needed one juror to find that Basham lacked the necessary intent.

D.    In any event, the bifurcated trial proceeding did not prejudice Basham given the overwhelming evidence of the threshold intent factor and statutory aggravating factor.

In the §2255 Motion, Basham's habeas counsel generally argue that a trifurcated trial proceeding is necessary to allow the jury to reach a determination as to intent and statutory

-106-

**JA 3344**

aggravating factors without any prejudice or confusion that might come from information relating to nonstatutory aggravating factors. They do not, however, specifically identify any information presented at his sentencing hearing that could have swayed the jury's determination that he was eligible for the death penalty. In fact, they get no more specific than saying there are "myriad problems" with a bifurcated trial which admits "information on one issue, such as a nonstatutory aggravating factor like victim impact, that is not relevant to another issue, such as a statutory aggravating factor related to the circumstances of the offense." §2255 Mot. at 94.

Basham's habeas counsel simply cannot show that the bifurcated trial procedure prejudiced Basham. For one thing, the jury was already aware of much of the Government's information on nonstatutory aggravating factors because that information had been presented as evidence in the guilt phase of Basham's trial. It is unlikely that additional information, such as that relating to Basham's conduct in prison or victim impact, would have swayed the jury in light of the heinous facts of this case already adduced at trial. In any event, much of the Government's case on Basham's eligibility for the death penalty was conceded by the defense, and the evidence was overwhelming on those points that were not conceded.

> 1.    The jury was already aware of much of the information relating to nonstatutory aggravating factors.

At Basham's sentencing, the Government presented information, and the jury was instructed, regarding three nonstatutory aggravating factors. TT 29: 210. These were: (1) uncharged murder, attempted murders, and other serious acts of violence; (2) future dangerousness; and (3) victim impact. Id. Extensive evidence regarding the first factor (uncharged acts of violence) had been presented to the jury during the guilt phase of Basham's trial because it was intrinsic to the charged

crimes. During the Court's jury instructions at the end of the sentencing hearing, the district court specifically explained that, as to the first nonstatutory factor, the Government was relying on five acts: (1) Basham's escape from a detention facility in Kentucky; (2) Basham's participation in the carjacking and kidnapping resulting in the death of Samantha Burns; (3) Basham's participation in the first degree burglary and other criminal conduct that resulted in the assault with intent to kill Carl Jordan; (4) Basham's participation in the carjacking and kidnapping of James Hawkins; and (5) Basham's participation in the attempted murder of police officer Matt Davis. TT 29: 211-17. Evidence regarding all of these acts had been presented during the guilt phase, so there was no danger of improper spillover of evidence regarding this information during the sentencing hearing.

> 2. Information relating to future dangerousness and victim impact would not have swayed the jury in light of the heinous facts of this case.

Although Basham's habeas counsel do not specifically identify which information at the sentencing hearing might have "spilled over" into the jury's determination on his eligibility for the death penalty, the only information on nonstatutory aggravating factors that the jury had not already heard during the guilt phase was the information regarding future dangerousness and victim impact. There is little danger that this information would have had an undue impact on the jury's minds as they made their eligibility determination. This is especially true given the graphic and shocking nature of the trial evidence concerning Basham and Fulks's crime spree.

During the trial's guilt phase, the jury heard evidence about how Basham engaged in a violent rampage that crossed several states. As noted above, the jury heard how Basham escaped from jail in Hopkins County, Kentucky. They heard how he carjacked James Hopkins, held him at knifepoint, and helped tie him to a tree. They heard how he burglarized Robert Talsma's house and possessed

-108-

**JA 3346**

stolen firearms. They heard how he threatened to kill police officers and a group of teenagers. The jury heard how Basham participated in the carjacking and murder of Samantha Burns, a 19-year-old college student. They heard how he participated in a burglary near Conway, South Carolina and fired shots at Carl Jordan. The jury heard how Basham participated in the carjacking and killing of Alice Donovan. They heard how Basham demonstrated to Sheriff Hewett how Alice had been strangled with a purse strap. They heard how he tried to force his way into Deanna and Andrea Francis's car. And the jury heard how he fired shots at Officer Davis in a final attempt to escape capture.

All of this evidence, properly admitted during the guilt phase of the trial, was strong proof that Basham would be a danger to individuals in the future, regardless of whether he was incarcerated. There was little chance that the additional evidence presented on this issue by the Government during the sentencing hearing (such as Basham's disciplinary record in prison) had an undue influence on the jury's minds as they determined whether the Government had proven the threshold intent factors and the statutory aggravating factor.

The same holds true for information regarding victim impact. Given the heinous nature of the crimes Basham committed against Samantha Burns and Alice Donovan, it would come as no surprise to the jury that their murders had a devastating impact on their family members. Basham cannot demonstrate that the testimony of these family members injected passion or prejudice into the jury's deliberations regarding eligibility for the death penalty.

        3.      The proof regarding Basham's eligibility for the death penalty was overwhelming.

As noted above, to find Basham eligible for the death penalty, the jury had to unanimously

**JA 3347**

find beyond a reasonable doubt one of the four threshold intent factors and the charged statutory aggravating factor.[16]  Although the primary argument as to Claim 21 seems to be that a bifurcated trial violates a capital defendant's rights because it allows improper spillover between proof of statutory and nonstatutory aggravating factors, the statutory aggravating factor in Basham's case was *conceded*.

The lone statutory aggravating factor was that Alice Donovan's death occurred during Basham's commission, attempted commission, or immediate flight from his commission of a kidnapping in violation of federal law.  TT 29: 207-08.  The jury had already found Basham guilty of kidnapping resulting in death.  Accordingly, Jack Swerling told the jury:

> Now, the statutory and aggravating factors: that death occurred during the Defendant's commission of a kidnapping, in violation of federal law.  Mr. Gasser has discussed that with you. And your finding of guilt, you can use that to support the finding of a nonstatutory [sic] aggravating factor beyond a reasonable doubt. You must find it again beyond a reasonable doubt.  That is your duty. Go ahead and find the death occurred during a kidnapping in violation of federal law.

TT 29: 102.

Thus, the only eligibility factor at issue in Basham's sentencing hearing was whether he acted with one of the four threshold intent factors.  Basham's trial counsel did not concede that any of the threshold intent factors had been proven.  Rather, Swerling argued to the jury that "the only conceivable one" was the fourth factor, which was that "the Defendant intentionally and specifically engaged in an act of violence knowing the act created grave risk of death."  Id. at 102.  Swerling maintained, however, that Basham "did not know that [Alice Donovan] was going to sustain serious

---

[16]The jury also had to find that Basham was 18 or older at the time of the offense, but that fact was never in dispute.

bodily injury or death." Id.

This fourth factor was the one found by the jury. And under that factor, Basham did not need to know that Donovan was going to die; it was sufficient that he "intentionally and specifically engaged in an act of violence, knowing the act created *grave risk of death* to Alice Donovan, such that participation in the acts constituted a reckless disregard for human life." Id. at 204-05.

The Government's proof on this fourth threshold intent factor was overwhelming. At the time Brandon Basham and Chad Fulks kidnapped Donovan from the Wal-Mart parking lot in Conway, they had already engaged in numerous dangerous and violent acts. Chief among these, Basham and Fulks had similarly kidnapped Samantha Burns from a mall parking lot and murdered her. So at the time of his participation in Donovan's kidnapping, Basham knew what they had done to Burns. He knew that they had restrained or attempted to kill other individuals (James Hawkins, Carl Jordan) in their efforts to avoid capture. He knew that he and Fulks were armed with guns. So when Basham carjacked and kidnapped Alice Donovan, he engaged in an act of violence, knowing the act created a grave risk of death to Donovan.

Basham's trial counsel appeared to recognize the strength of the Government's case on this point. Out of Swerling's entire closing argument, which spans 68 pages of the trial transcript, only one paragraph is devoted to contesting threshold intent. Id. at 101-02; cf. id. at 91-159. Thus, only one paragraph out of 68 pages is devoted to contesting Basham's eligibility for the death penalty, as the other elements were conceded. Given the undeniable evidence that Basham acted with reckless disregard for Alice Donovan's life, it is implausible that the jury's exposure to the Government's nonstatutory aggravating factors would have unduly influenced its decision to find this threshold intent factor. See Fell, 531 F.3d at 240 ("Presented with two uncontested factors, and needing to find

-111-

**JA 3349**

only one to deem Fell 'death eligible,' the jury, in our view, was unlikely to have been swayed by the additional 'death-selection' evidence-mainly victim impact and character evidence-when deliberating on whether Fell was 'death eligible.'").

**Response to Claim 22: The Government did not violate its Brady obligations.**

In Claim 22, Basham's habeas counsel claim "upon information and belie[f]" that the Government violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963). This claim is completely without factual support and should be summarily dismissed.

Basham's habeas counsel support this claim by speculating that the Government withheld from the defense the following: (1) information concerning investigations of Ronald Hewett; (2) information concerning the government's investigations of juror misconduct in Basham's case and (3) any agreements or promises made by the governments with or to witnesses who testified at either Basham's or Fulk's trials. This claim fails.

In order to establish a Brady violation, a petitioner must demonstrate that the information at issue was "favorable to the accused"; that it was "suppressed by the [Government], either willfully or inadvertently"; and that prejudice to the defense ensued. United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004) (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Under Brady and Giglio, the prosecution is required to disclose exculpatory evidence, including evidence that may impeach the credibility of a witness. Giglio v. United States, 405 U.S. 150, 154 (1972). However, the evidence must exist at the time of trial for it to be Brady material. United States v. Robinson, 627 F.3d 941, 951-52 (4th Cir. 2010) (holding that investigating officers' knowledge of their own misconduct, which was unrelated to defendant's case, was not attributable to government, for purposes of defendant's motion for new trial, even though officers were working on government's

-112-

behalf, absent evidence government knew of officers' misconduct; <u>Brady's</u> constructive knowledge doctrine does not require prosecutors to conduct full interviews and background checks on everyone involved in case); <u>United States v. Jones</u>, 399 F.3d 640, 647 (6th Cir. 2005) (noting that evidence of misconduct by police discovered after trial "did not exist at the time of trial [and] was not Brady material"); <u>United States v. Erickson</u>, 561 F.3d 1150, 1163 (10th Cir. 2009).  Evidence withheld by the Government is "material" and requires reversal of a conviction only if there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different.  <u>United States v. Bagley</u>, 473 667, 674-75 (1985).  The defendant has the burden of demonstrating that the Government withheld favorable evidence and that the evidence raises a reasonable probability that the defendant would have obtained a different result if he had had the evidence.  <u>See</u> <u>Maynard v. Dixon</u>, 943 F.3d 407, 417 (4th Cir. 1991)(citing <u>Bagley</u>, 473 U.S. at 680)).

Basham's habeas counsel present no factual support for these very serious <u>Brady</u> allegations. It is their burden to establish that the evidence exists.  This they have not done.

With regard to the investigation of Ronald Hewett, this investigation began in approximately December of 2006 by the United States Attorney's Office in Eastern District of North Carolina.  <u>See</u> Docket in Criminal number 7:08-CR-51-BR (E.D.N.C.).  <u>See</u> Docket # 18 (Government's Sentencing Memorandum), at p. 3 ("In approximately December of 2006, the Government began investigating {Hewett] in connection with his misuse of office.").  Accordingly, this <u>Brady</u> claim fails because no evidence of Hewett's misconduct existed at the time of Basham's trial in 2004. <u>Robinson</u>, 627 F.3d at 951-52 ; <u>Jones</u>, 399 F.3d at 647.  There was no <u>Brady</u> material to turn over.

With regard to investigations of alleged juror misconduct, the Government possessed no <u>Brady</u> material that was not turned over.  Likewise, the Government did not withhold any agreements

-113-

or promises made with or to witnesses who testified in Basham's trial.

This claim is unsupported and should be summarily dismissed

**Response to Claim 23: The Government did not present inconsistent theories at Fulks's and Basham's trials.**

In Claim 23, Basham's habeas counsel argue that the Government violated his right to due process by presenting a theory at his trial that was inconsistent with the theory it presented at Chad Fulks's trial. §2255 Mot at 98. They claim the Government "took diametrically opposed positions" at the two trials, "manipulated the evidence," and "relied upon factually inconsistent and irreconcilable evidence at the two trials." Id. at 98-101. Specifically, they claim that during the Fulks trial the Government argued that Chad Fulks killed Alice Donovan by strangling her with a purse strap, while during the Basham trial the Government argued that Brandon Basham was the one who strangled Donovan with the strap. Id. at 98-99. Basham contends that these conflicting theories rendered his trial fundamentally unfair. Id. at 98.    This argument is without merit.

The Government did not raise inconsistent theories at the two trials. Rather, the record of those trials demonstrates that the Government advanced a consistent theory as to both defendants: Chad Fulks and Brandon Basham were equally involved and equally culpable in the murder of Alice Donovan. Assuming for the sake of argument that an inconsistency did exist between the Fulks and Basham trials, the inconsistency was minor and did not affect the core of the Government's case.

A.    There was no inconsistency in the Government's evidence against Fulks and Basham.

The alleged inconsistency stems from a demonstration that Brandon Basham gave to Sheriff Ronald Hewett on Thanksgiving Day, 2002, when Basham attempted to lead investigators to Alice Donovan's remains. Basham led the investigators to a cemetery near Bee Tree Farms in Brunswick

**JA 3352**

County, North Carolina.  Basham had already told the investigators that they should be looking in that area for a leather purse strap.  At the cemetery, Basham demonstrated to Sheriff Hewett (by motioning with his shackled hands) the length of the purse strap, how it had been used to strangle Alice Donovan, and how he (Basham) had thrown the strap into the woods.

Sheriff Hewett did not testify at Chad Fulks's trial.  He did testify at Brandon Basham's trial, and he testified at a joint <u>Jackson v. Denno</u> hearing that occurred before the two defendants' cases were severed.  At that joint hearing, Sheriff Hewett described Basham's demonstration regarding the purse strap:

> Q:    You previously indicated to the court that you were having many discussions with Mr. Basham, to include a purse strap?
>
> A:    Yes.
>
> Q:    Do you recall that testimony?
>
> A:    I do.
>
> Q:    And did you want to know more information about that purse strap and how it was used and where it might be located?
>
> A:    I did.
>
> Q:    Wanting that to occur, tell the judge what you did with Mr. Basham.
>
> A:    Mr. Basham and myself and the two Conway sergeants, which were Sergeant Parker and Sarvis, I believe, we walked back down to the cemetery.  Branden [sic] Basham, he was shackled at his hands, belly chained around the waist, and shackled at his feet.  He walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek.  He showed me the length of the strap —
>
> Q:    How did he do that?

-115-

A:    May I demonstrate?

Q:    Certainly.

A:    Like this.  Because he couldn't pull his hands very    — very far apart, he was shackled.  He showed me the length of the strap.  Says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods.  He then demonstrated the manner in which he threw it in the woods.

Q:    Would you stand up and do that for the court so the record is complete as well?

A:    Yes, sir, I will.  We were standing at the corner of the cemetery, Branden [sic] Basham is chained.  I said, "Branden [sic], how did you do that?"  And he said, "Like that.  And I threw it over there."

2/25/04 Hearing Tr at 66-67.

During the Fulks trial, the attorneys for Chad Fulks sought to introduce testimony about a statement Brandon Basham made to investigators as they rode in a van looking for Alice Donovan's body.  When a doe darted across the road in front of the van, Basham spontaneously uttered, "You know, I could never kill a deer, and here I have . . . ."  Basham was stopped from completing the statement by Cameron Littlejohn, one of his appointed attorneys.  Fulks's trial counsel wanted to introduce the "deer statement" as evidence that Basham had admitted responsibility for Donovan's murder, but they did not want other statements by Basham to be admitted into evidence.

The Government, on the other hand, argued that the "deer statement" should not be admitted unless the Government were allowed to introduce other statements by Basham that inculpated Fulks.  As an example of a statement made by Basham that arguably inculpated Fulks, the Government cited Sheriff Hewett's testimony from the Jackson v. Denno hearing.  In a colloquy with the district court outside the jury's presence, Assistant United States Attorney Johnny Gasser stated:

**JA 3354**

Mr. Gasser:    Your Honor, just factually, Ms. Johnson is incorrect. If you recall the Jackson v. Denno hearing, Sheriff Hewett was my witness.  Sheriff Hewett took the witness stand and testified to this court at the suppression hearing.  Sheriff Hewett took detailed notes and described the statements of which the court has not ruled on yet.

The Court:    I thought there were some direct statements.

Mr. Gasser:    Talking about leading down the way, showed photographs, talked about the purse strap, talked about Chad.  He demonstrated — remember Sheriff Hewett demonstrating, because he was in handshackles, demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled.  So, this was not the only statement that was provided by Brandon Basham to law enforcement.

Fulks TT 06/22/04 at 255.  After hearing argument from the Government and Fulks's counsel, the district court ruled that it would not allow the "deer statement."

Thus, at Fulks's trial, the Government did not present evidence or argue to the jury that Chad Fulks strangled Alice Donovan with a purse strap.  The Government did not call Sheriff Hewett as a witness or otherwise seek to introduce Brandon Basham's statement about the strap.  Of course, the Government *could not have* introduced Basham's statement as evidence against Fulks, because it would have been inadmissible hearsay and in violation of Fulks's rights under the Confrontation Clause.  In fact, the Government's inability to introduce Basham's statements at Fulks's trial was the reason the Government opposed Fulks's counsel's attempt to introduce an isolated statement by Basham.  Thus, in context, the Government's interpretation of Sheriff Hewett's testimony concerning the purse strap (that Basham demonstrated how Fulks had strangled Alice Donovan) was part of the Government's argument why another statement made by Basham (the "deer statement") should not be admitted into evidence.  And this entire discussion occurred outside the jury's presence; the Government never presented the Fulks jury with evidence or argument regarding this

-117-

**JA 3355**

issue.

Sheriff Hewett did testify at Brandon Basham's trial. And the Government did question him on Basham's statement about the purse strap. But the Government did not elicit — and Sheriff Hewett did not offer — testimony regarding which of the two men actually strangled Alice Donovan with the strap. Rather, the Government elicited testimony about *how* Donovan was strangled with the strap (with no indication who did the strangling) and how Basham had thrown the strap into the woods.

> Q:    And what did he [Basham] describe to you on Thanksgiving Day, the location that you have just described to the jury, tell this jury what Brandon Basham described to you as to what happened to Alice Donovan.
>
> A:    May I.
>
> Q:    You can demonstrate, if he demonstrated.
>
> A:    Brandon Basham had his hands like this once again. I have explained to you how he was shackled. He took his hands together and did this (indicating), "Then I threw it over there. Check in those trees right over there." Which, if you will look at how I am facing you, I am facing the semicircle. So, we walked to the area right here at the corner, and that is where he did this and did that. He couldn't throw very far because he was shackled. That is when he said, "Check over there." At that time, Sergeant Parker and Sergeant Sarvis, those were the two individuals that were with me, they began to look again, but that area had already been searched, and the strap was not to be found.

TT 10: 40. The Assistant United States Attorney was careful to use the passive voice in asking "what Brandon Basham described to you as to what happened to Alice Donovan." The AUSA did not ask about what Basham said *he* did to Alice Donovan. And Sheriff Hewett testified about Basham's demonstration of *how* Donovan was strangled; he did not testify that Basham indicated

-118-

**JA 3356**

*who* did the strangling.

On cross-examination, Sheriff Hewett affirmed that Basham did not confess to having used the strap to strangle Donovan.

> Q:    Now, at the cemetery, and I would like you to refer  to your notes if that will help you.
>
> A:    Okay.
>
> Q:    There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicated that Brandon Basham told you that he used the strap, is there?
>
> A:    No, sir.  He did not tell me he used the strap.  He demonstrated, though.
>
> Q:    He demonstrated?
>
> A:    Yes, sir.
>
> Q:    Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A:    That is true because he didn't say.  He showed.

TT 10: 53-54.  This testimony, elicited on cross-examination, left it ambiguous as to who used the strap.  Sheriff Hewett made it clear that Basham did not say that *he* used the strap.  Sheriff Hewett testified that Basham demonstrated how the strap was used and how he disposed of the strap, but Hewett did not testify that Basham intended the demonstration to indicate that *he* (Basham) used the strap to murder Donovan.

True, the jury could have inferred from this testimony that Basham strangled Donovan.  But the jury may also have inferred merely that Basham was present and assisting Fulks during Donovan's murder.  Either theory would have been sufficient to convict Basham; it was not

-119-

**JA 3357**

necessary for the Government to prove that Basham dealt the fatal blow himself.  And regardless of

how the jury may have interpreted it, Sheriff Hewett's testimony does not contradict any evidence

from Fulks's trial because there was no evidence presented at that trial concerning Basham's purse

strap demonstration.

      B.    <u>There was no inconsistency in the Government's closing arguments<br>against Fulks and Basham.</u>

Just as it did not present contradictory evidence at the two trials, the Government did not

argue inconsistent theories about what conclusions should be drawn from the evidence.  At both

trials, the Government argued that Fulks and Basham acted as a team throughout their crime spree

and were equally culpable for Alice Donovan's murder.

      1.    Chad Fulks's Trial

AUSA Johnny Gasser laid out this theme early in his closing argument at the Fulks trial:

> On November 14th, 2002, if Chad Fulks and Brandon Basham had been alone, Alice Donovan would be alive today.  Alice Donovan would be enjoying her daughters, and her grandchildren, and her great marriage with Barry.  That is an absolute fact.  Make no mistake about it.  It required the actions and the conduct of both Chad Fulks and Brandon Basham.
>
> The two of these men acted together as one in concert with one another.  They were a two-man death squad.  Two men, forming one team.  They could not have done things that they did to Samantha [Burns], and they could not have done the things they did to Alice [Donovan] without acting in unison, without acting as one.
>
> The Government is not saying Chad Fulks is more culpable than Brandon Basham.  And the Government is not saying that Brandon Basham is more culpable than Chad Fulks.  They are equally culpable.  Any objective view of the evidence and testimony that you saw, any reasonable juror looking at this objectively, not looking at it from the point of view of Chad Fulks, not looking at it from the point of view of Brandon Basham, if you look at it objectively, there

<div align="center">-120-</div>

<div align="right">**JA 3358**</div>

is but one conclusion: These two men were acting together as one. But for the conduct of Chad Fulks and but for the conduct of Brandon Basham, Alice Donovan and Samantha Burns would be alive today.

Fulks Trial Tr. 06/29/04 at 24-25.

AUSA Gasser then emphasized that the jury did not have to make a finding as to which of the two men actually killed Alice Donovan, because that determination was impossible to make.

There is one point that is very important. This is a very important point, ladies and gentlemen. For you jurors to sentence Chad Fulks to death, you do not, you do not have to find, beyond a reasonable doubt, that he actually killed Alice Donovan. Judge Anderson is going to give you the charge on the law. And there is one thing he is not going to tell you. He is not going to tell you, ladies and gentlemen of the jury, if you don't find that it was Chad Fulks's hand that killed Alice Donovan, then you can't sentence him to death. You are not going to hear that from Judge Anderson. Because that is not the law.

And there is a reason for that. There is a reason why Congress has passed the Federal Death Penalty Statute. And it is a situation involving brute violence. When two or more people combine together to kill, to take a human life, and they do so in an isolated area, and they leave no eyewitnesses, and the crime is not caught on videotape or camera, and the person does not confess, in those situations, it is impossible, it is impossible to determine, beyond a shadow of a doubt, who the actual killer is. It is impossible.

\*\*\*

The fact of the matter is, with no eyewitnesses, when the case isn't caught on videotape, and with no confession, it is, virtually, impossible to, with direct evidence, to prove who the killer is. That is why the Government does not have to prove that. It is common sense. And it is justice.

Id. at 25-27.

Then, near the end of his closing argument at the Fulks trial, AUSA Gasser argued that both Chad Fulks and Brandon Basham intentionally killed Alice Donovan.

-121-

**JA 3359**

> They needed each other to abduct Alice Donovan. They both carjacked her, both kidnaped her, both raped her. Do you honestly believe that, at one point in time, that the two of them were not going to act together? Circumstantial evidence, both of them, ladies and gentlemen, intentionally killed Alice Donovan, the Government submits to you.

Id. at 107.

### 2. Brandon Basham's trial — Guilt Phase

The Government resumed the theme of equal culpability in Basham's trial. During his closing argument in the guilt phase of Basham's trial, in words nearly identical to those he had used at Fulks's trial, AUSA Gasser stressed to the jury that Fulks and Basham had worked as a team to kill Alice Donovan.

> Before I get to those 17 days in November, let me make one thing perfectly clear. The Government submits to you, ladies and gentlemen, if Brandon Basham was alone, of if Chad Fulks were alone on November 11th, 2002 and November 14th, 2002, Samantha Burns and Alice Donovan would be alive today. Think about it. During those events, during those events, Brandon Basham and Chad Fulks were acting together in unison as a team, a death squad, if you will. The two of them, together, aiding and abetting each other when they kidnapped and carjacked Samantha Burns, when they kidnapped, and carjacked, and killed Alice Donovan. The two of them.

> The Government does not have to prove, and more importantly, you jurors do not have to find who, specifically, killed Alice Donovan in order to convict Brandon Basham of carjacking, resulting in death or kidnapping, resulting in death. We don't have to prove definitively that Brandon Basham killed Alice Donovan. We don't have to prove definitively that Chad Fulks, alone, killed Alice Donovan. We don't have to prove definitively, the two of them, although I submit to you the evidence shows they acted together and killed Alice Donovan, but we don't have to prove that. There is a reason for that. When two or more people decide to commit violent acts against innocent people, they decide to kill innocent people and leaving no witnesses, and that is not captured on videotape, it would be an impossible burden for the Government to prove when two or

-122-

**JA 3360**

> more are involved in a killing of an innocent person with no witnesses. The citizens would not fall for that, neither has Congress, and neither has the rules of law.
>
> The Government is not saying that Brandon Basham is more culpable than Chad Fulks. And the Government is not saying that Chad Fulks is more culpable than Brandon Basham. The Government submits to you, ladies and gentlemen, based on all of the evidence and testimony that you heard, from the escape through the apprehension, that any reasonable, and rational, and objective juror or person, looking at the actions and conduct as a whole, looking at the actions and conduct of Chad and Brandon as a whole, can come to only one conclusion, but for the actions of Brandon Basham, Alice Donovan would be alive today. But for the actions of Chad Fulks, Alice Donovan would be alive today. The two of them are responsible for the death of Alice Donovan. And your charge, I submit to you today, is to hold Brandon Basham responsible and accountable.

TT 12: 14.

Later in his closing in Basham's guilt phase, Gasser argued that Basham's purse strap demonstration was evidence of his participation in Donovan's murder.

> And later on, at the end of that day when they get to that cemetery, he is pulled out of that van and he is in shackles. What does he tell the sheriff? He tells the sheriff that it was right there by that gate. He tells — he not only tells, he demonstrates. He demonstrates for that sheriff a Liz Claiborne purse strap was used to kill Alice Donovan. Then what does he say? I threw it in the woodline. Mr. Swerling asks Sheriff Hewitt [sic] says he didn't say I killed Alice Donovan. Sheriff Hewitt [sic] said to you in this courtroom in front of you, the jury, no, he demonstrated it.

Id. at 79-80.

3.    Brandon Basham's Trial — Penalty Phase

And again, AUSA Gasser repeated this equal-culpability theme during his closing argument in the penalty phase of Basham's trial.

-123-

**JA 3361**

Remember, the evidence and the testimony that you saw during the guilt phase of this case, this was a two-man team. This was Brandon Basham and Chad Fulks acting together as a team. Their actions, their conduct, their choices were made as a team. Brandon Basham could not have carjacked and kidnapped Samantha Burns or Alice Donovan without Chad Fulks. And Chad Fulks could not have carjacked and kidnapped Samantha Burns and Alice Donovan without Brandon Basham. They are equally culpable. But for the actions of Brandon Basham, and but for the actions of Chad Fulks, Samantha Burns would be alive today and Alice Donovan would be alive today.

TT 29: 43-44.

Later in his closing in Basham's penalty phase, Gasser argued that the jury could find that Basham possessed any of the four threshold intent factors required to trigger the death penalty, including that Basham intentionally killed Alice Donovan. In making this point, Gasser referred to Sheriff Hewett's testimony:

What does Brandon Basham say in the presence of Sheriff Hewett? It is not really what he says, it is what he does. He is shackled. He describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewett how Alice Donovan was strangled. And then he tells Sheriff Hewett, "I threw the purse strap into the woods." He has demonstrated. He even has his arms down. You saw Sheriff Hewett stand up there and show.

Now, does that mean Brandon Basham's strangling of Alice Donovan is the only hand that caused Alice Donovan's death? The Government doesn't submit that. The Government submits, and submitted all along, that Chad Fulks is just as responsible. Chad Fulks had every right, as well, to make sure Alice Donovan died. They had guns, knives. Mr. Fulks had every incentive, as well, to make sure that she was dead.

TT 29: 57.

So in the closing arguments in Basham's guilt and penalty phases, just as it had done in the Fulks trial, the Government referred to Basham's purse strap demonstration in the passive voice;

-124-

**JA 3362**

AUSA Gasser explained that Basham demonstrated how the "purse strap was used to kill Alice Donovan" and "how Alice Donovan was strangled." Gasser did not say that Basham confessed to being the strangler. Gasser did argue, however, that Basham's demonstration to Sheriff Hewett was evidence that Basham participated in strangling Alice Donovan. But when Gasser mentioned "Basham's strangling of Alice Donovan" in his penalty phase closing, it was in a rhetorical question emphasizing that the Government did *not* contend that Basham's was the only hand that caused Donovan's death. The Government's consistent position in both trials was that Fulks and Basham acted together in murdering Donovan.

Thus, at both trials, the Government argued that Fulks and Basham were equally culpable. At both trials, the Government argued that Fulks and Basham acted as a team and could not have accomplished their crimes without one another. At both trials, the Government argued that Fulks and Basham, acting together, intentionally killed Alice Donovan. There simply is no inconsistency.

C.  Even assuming for the sake of argument that there was an inconsistency, it did not go to the core of the Government's case and did not violate Basham's right to due process.

To support the argument that the Government "manipulated the evidence" in the two trials to deprive him of due process, Basham's habeas counsel cite the Eighth Circuit case of Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000). Smith is distinguishable from the present facts.

In Smith, the prosecution tried several individuals separately for the murder of two people killed during a burglary. A key witness gave the police two different accounts of the burglary. In his first statement to police, the witness gave an account that inculpated Defendant Cunningham. In his second statement to police, the witness gave a contrary account that inculpated Defendant Smith. The witness later recanted this second statement. At Smith's trial, the witness testified in

-125-

accord with his first statement (inculpating Cunningham). Under a Missouri rule of evidence, the prosecution used the witness's second statement (inculpating Smith) both to impeach the witness's testimony and as substantive evidence against Smith. Smith was convicted. Then, at Cunningham's trial, the prosecution called the witness and elicited testimony in accord with his first statement (and with the testimony he gave at Smith's trial). The prosecution did not introduce evidence concerning the witness's second statement. Cunningham was also convicted.

Smith filed a federal habeas petition raising the issue of "whether the Due Process Clause forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event." Smith, 205 F.3d at 1049. Answering the question in the affirmative, the Eighth Circuit noted that the witness's testimony "was *the sole basis* for two different convictions on two contradictory theories." Id. at 1051 (emphasis added). The court further noted that Smith could *not* have been convicted under both theories. Id. The court limited its ruling, stating: "We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principles of due process." Id. at 1052. "To violate due process," the court explained, "an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime." Id.

Basham's case is distinguishable from Smith in several key ways. First, the Government did not elicit inconsistent testimony at Fulks's and Basham's trials. The only testimony concerning Basham's demonstration of how the purse strap was used to strangle Alice Donovan was provided by Sheriff Hewett at Basham's trial; Hewett did not testify at Fulks's trial. Second, the Government did not argue irreconcilable or inconsistent theories at the two trials. The Government's consistent

-126-

theory at both trials was that Fulks and Basham acted in concert to murder Donovan and were thus equally culpable. Third, Sheriff Hewett's testimony was not the "sole basis" for Basham's conviction; it was part of a mountain of overwhelming evidence against Basham. Finally, assuming *arguendo* that the Government presented differing accounts in some respect at the two trials, Basham *could* have been convicted and sentenced to death under either account. As the Government emphasized at both trials, neither man acted alone in causing Alice Donovan's death; they aided and abetted one another in the murder; and the federal death penalty statute was intended to cover such situations.

The Eighth Circuit's reasoning in United States v. Paul, 217 F.3d 989 (8th Cir. 2000), decided on the heels of Smith and also cited by Basham, applies here. Paul and a co-defendant, Ingle, were tried separately and convicted for the murder of an elderly man in a national park. The man's body was recovered, and an autopsy revealed that he had been shot several times. On appeal, Paul contended that the Government violated his due process rights when it "argued at both Paul and Ingle's trials that the defendant on trial pulled the trigger." Paul, 217 F.3d at 998. The Eighth Circuit rejected this argument, finding that "the theory that either Paul or Ingle, or both, shot Williams, was not factually irreconcilable and was supported by the evidence." Id. "More importantly," the court observed, "Paul could have been convicted of aiding and abetting in the murder of Sherman Williams under either theory." Id. Finally, the court noted that "Paul only argues that the prosecutor made inconsistent *arguments* at the two trials, but cannot point to the use of evidence at the different trials which was factually inconsistent and irreconcilable." Id. (emphasis in original). The court held: "When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's

argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent."

Id. at 998-99 (citing Nichols v. Scott, 69 F.3d 1255, 1268–69 (5th Cir. 1995)).

The Eighth Circuit's rationale in Paul applies here.  First, even if the Government prevented dual theories about who wielded the purse strap, those theories are not factually irreconcilable.  It certainly is conceivable that both Fulks and Basham acted together, or took turns, in strangling Alice Donovan with the purse strap.[17]  Second, both men could have been convicted of the murder regardless of who actually wielded the strap, as they were both charged with aiding and abetting one another in Donovan's murder.  Finally, Basham cannot point to any inconsistent *evidence* presented in the two trials.  There was no testimony at Fulks's trial concerning Basham's demonstration with the purse strap.  And Sheriff Hewett's testimony at the joint Jackson v. Denno hearing concerning Basham's purse strap demonstration was consistent with his testimony at Basham's trial.  At most, Basham contends that the Government presented different *arguments* at the two trials about what inference should be drawn from Hewett's testimony (and the Government's argument on this point occurred outside the jury's presence in the Fulks trial).  Under the Eighth Circuit's holding in Paul, the Government's argument that each defendant wielded the strap is not factually inconsistent — given that it cannot be determined which defendant physically caused Alice Donovan's death, and either defendant could have been convicted under either theory.

**Response to Claim 24: The Government did not commit misconduct in its closing argument.**

Basham's habeas counsel complain that his trial and appellate counsel were ineffective for

---

[17]For example, consider the testimony of James Hawkins.  Early in their crime spree, Fulks and Basham carjacked Hawkins and duct-taped him to a tree.  Basham started taping Hawkins to the tree when Fulks interrupted and took over the process, insisting that Basham was not doing it correctly.  It is not implausible that something similar occurred with the murder of Alice Donovan.

failing to argue that the Government had imposed an impermissible "nexus requirement" on the jury's mitigation findings.  §2255 Mot. at 102.  Specifically, they contend that in its cross-examination of certain witnesses and its closing argument, the Government urged the jury "not to give effect to Mr. Basham's mitigating evidence." Id.  Basham's habeas counsel argue that his trial attorneys should have objected to this "prosecutorial misconduct" and that his appellate attorneys should have raised this issue on appeal. Id. at 112-15.

This claim fails because the prosecutor did not suggest — either during cross-examination or summation — that the jury was required to find a causal nexus between the mitigating evidence and the crime for the evidence to be considered by the jury in its sentencing decision.  Moreover, the Court's instructions made sure the jury was aware it could consider all mitigating evidence without regard to any nexus.

A.    The Government did not argue that the jury could not consider mitigating evidence absent some nexus to the crime.

During the sentencing phase of Basham's trial, the Government did question witnesses on whether Basham's upbringing or mental condition was causally related to the capital crimes for which he was convicted.  To be sure, the point of this questioning was to establish the fact that Basham's background did not cause him to carjack and kill Alice Donovan.  Without a doubt, the Government's position was that the jury should give little weight to Basham's mitigation evidence, and the Assistant United States Attorney made just this argument in summation.  At no point, however, did the AUSA suggest that the jury could not consider the mitigation evidence absent some nexus between that evidence and the crimes.

Basham's habeas counsel selectively and misleadingly quote from the Government's closing

-129-

**JA 3367**

argument at sentencing to create the impression that the AUSA told the jury it could not consider mitigation evidence unless there was a nexus. They contend that "the Government's arguments cannot be dismissed as mere attempts to convince the jury to give little weight to mitigating evidence that lacked a causal connection the crime." §2255 Mot. at 110. They then quote the AUSA as saying:

> You know, deciding on who got it right on that issue clearly only goes to show *what mitigation* [the jury can consider.]

Id. (emphasis and bracketed paraphrase original to Basham's brief). This is an incorrect quote of the AUSA's statement. The AUSA's actual statement was:

> You know, deciding on who got it right on that issue clearly only goes to show what mitigation, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be.

TT 29: 89. Thus, Basham's habeas counsel replace the actual phrase "what weight you will consider" with an incorrect bracketed paraphrase of "the jury can consider." They attempt to gloss over the fact that the AUSA explicitly told the jury that the psychiatric evidence was relevant to Basham's mitigation case and that it was for the jury to determine what weight to give that evidence.

In context, the AUSA was explaining to the jury that they were the ones who would decide which expert witnesses to believe:

> Defense experts opine that he has a self or induced, inhalant-induced psychosis. And that he has got dementia, memory loss. Dr. Watts, on the witness stand in response to Mr. Schools, acknowledged that those two problems don't explain his behavior. So, the Government's psychiatrist diagnosed him with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That is for you to decide. You know, deciding on who got it right on that

-130-

**JA 3368**

issue clearly only goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be. Regardless of all of the yelling, raising voices, and attacking someone for what school they went to, the facts speak for themselves, ladies and gentlemen.

And one of the tougher points you can't forget, there is absolutely no question Mr. Basham knew right from wrong. No question, that whatever his issues are, there is no cause-and-effect.

TT 29: 89. There was nothing improper about this line of argument. The Government was entitled to argue that the jury should give little weight to Basham's mitigating evidence because it did not diminish his culpability. Likewise, defense counsel was entitled to its argument that although Basham's "significant brain damage, significant impairments" were not "an excuse" for or "the cause" of his conduct, they did "help explain" his conduct. TT 29: 131. Obviously, the two sides disagreed about the inferences to be drawn from the mitigating evidence and what import those inferences held. But the Government never suggested that the mitigating evidence must pass some threshold nexus test before the jury could consider it.

Basham's habeas counsel rely on Tennard v. Dretke, 542 U.S. 274 (2004), to support their argument that the Government committed misconduct in arguing a lack of cause and effect. The facts of the Tennard case, however, are easily distinguishable from those of Basham's case. In Tennard, a Texas state capital case, the jury was instructed to answer only two "special issues" used at the time in Texas to establish whether a sentence of life imprisonment or death would be imposed. The two questions submitted to the jury were: (1) "Was the conduct of the defendant that caused the death of the deceased committed deliberately and with reasonable expectation that the death of the deceased or another would result?" and (2) "Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?" 542 U.S. at 277.

-131-

During the penalty phase of the trial, Tennard's counsel called one witness — Tennard's parole officer — who testified that Tennard's prison record indicated he had an IQ of 67.  Id.  The prosecution argued during closing that the evidence of low IQ was irrelevant.  Id. at 278.  The jury answered both of the "special issues" questions affirmatively and sentenced Tennard to death.  Id.

Eventually, Tennard sought federal habeas corpus relief.  Id. at 280.  The Fifth Circuit found that mitigating evidence at trial must be "conditionally relevant," meaning that "the evidence must show (1) a uniquely severe permanent handicap with which the defendant was burdened through no fault of his own . . . and (2) that the criminal act was attributable to this severe permanent condition."  Id. at 283.  The Fifth Circuit denied Tennard's claim because his low IQ evidence bore no nexus to the crime and was thus irrelevant to the only two issues put before the jury.  Id. at 284. The Supreme Court reversed, noting its previous holding that the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence.  Id. at 285 (citing Boyde v. California, 494 U.S. 370, 377-78 (1990)).

Unlike the jury in Tennard, Basham's jury was not limited in their consideration of mitigating evidence.  In addition to the statutory mitigating factors set forth in the FDPA, Basham's attorneys submitted 31 non-statutory mitigating factors for the jury's consideration. TT 29: 223. The jury was required to consider each mitigating factor and to indicate the number of jurors, if any, who found each mitigating factor.  TT 29: 221.  So unlike the Texas statutory scheme in Tennard that focused the jury's determination on just two issues, the jury here was specifically required to make findings on each of the mitigating factors submitted by Basham.  And unlike the prosecutor in Tennard who argued that the defendant's IQ was irrelevant to the special issues, the prosecutor in Basham's case never argued that Basham's mitigating evidence was irrelevant.  To the contrary, the AUSA here

-132-

explicitly noted to the jury that Basham's psychiatric evidence was relevant because it "goes to show what mitigating, what weight you will consider to give that when you are deliberating as to what the appropriate punishment will be."  TT 29: 89.

        B.      <u>The Court's instructions clearly informed the jury that they could consider any mitigating evidence regardless of any nexus to the crime.</u>

The Court clearly instructed the jury that they were not limited in their consideration of mitigating evidence.  The Court never suggested that there must be some nexus between mitigating evidence and the charged crimes before the jury could consider the mitigating evidence.  To the contrary, the Court explained that "[a] mitigating factor is not offered to justify or excuse a defendant's conduct."  TT 29: 219.  The Court instructed jurors they could consider any factor to be mitigating if the factor tended to suggest life in prison without parole and not death should be the appropriate sentence.  TT 29: 220.  Moreover, the Court instructed the jury that "there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list."  <u>Id.</u>  After listing the mitigating factors, the Court emphasized to the jury: "The law does not limit your consideration of mitigating factors to those that are listed for you; therefore, if there are any mitigating factors not listed in these instructions, but which any juror finds to be established by a preponderance of the evidence, that juror is free to consider them in his or her sentencing decision."  TT 29: 227.

Thus, the Court did not suggest to the jury that there had to be any causal connection between the mitigating factor and the crime, and no reasonable person would believe there was such a requirement.    <u>See</u> <u>United States v. Fell</u>, 531 F.3d 197, 222-23 (2nd Cir. 2008) (holding that the district court's thorough instruction regarding mitigating factors made it "extremely unlikely that the

<p style="text-align:center">-133-</p>

jury felt constrained in its consideration of Fell's mitigating evidence").

Moreover, the jury's verdict demonstrates that they did in fact consider the mitigating evidence, particularly the evidence of his troubled background and impaired mental faculties.  Of the statutory mitigating factors, six jurors found that Basham suffered from an impaired capacity (Statutory Factor No. 1) and one juror found that Basham committed the offense under severe mental or emotional disturbance (Statutory Factor No. 5). TT 30: 8.  Of the non-statutory mitigating factors, all twelve jurors found that Basham had a family history of mental illness (Non-statutory Factor No. 2), that Basham grew up in a home filled with domestic violence (Non-statutory Factor No. 7), that Basham's mother encouraged him to steal to support their drug habit (Non-statutory Factor No. 13), and that Basham began using drugs at an early age (Non-statutory Factor No. 14). TT 30: 8-9.  One or more jurors found ten other non-statutory mitigating factors (Non-statutory Factors 3, 4, 5, 6, 12, 15, 16, 19, 25, 26). Id.  In order for the jurors not to have considered the numerous mitigating factors they found, they would have had to blatantly ignore the Court's verbal instructions and the written instructions.  Basham's habeas counsel have failed to show such error by the jury. See Fell, 531 F.3d at 224 (The fact that jurors unanimously found several of the defendant's mitigating factors regarding his background demonstrated that the prosecutor's argument did not confuse jury, as "[n]o juror could have reached such conclusions while believing that to qualify as a mitigating factor, that factor need have a nexus to the crime.").

In addition to the Court providing clear instructions to the jury regarding its findings of mitigating factors, Basham's trial counsel spoke to the jury extensively in order to ensure the jurors were aware they could find and give effect to mitigating factors without finding that those factors caused Basham to commit the crimes. TT 29: 131 ("He has significant brain damage, significant

-134-

impairments to help explain his conduct . . . But not the cause. No one ever said that was the cause of any of these crimes."). Basham's counsel proceeded to explain to the jury why all of the information about his brain mattered and why it should be taken into account during deliberations. TT 29: 144 ("It is not a question of minimizing his involvement in the crime. It is a question to explain Brandon Basham to you . . . ."). Basham's counsel argued at length and with fervor that the jury should show compassion by sentencing him to life imprisonment because so many forces in Basham's life had worked against him. TT 29:158-59.

In summary, the Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by a defendant. Boyde v. California, 494 U.S. 370, 377-78 (1990). The Government never suggested that the jury could not consider all of Basham's mitigating evidence. Moreover, the Court and Basham's trial counsel made sure the jurors had the understanding and knowledge to consider all mitigating evidence, and it is clear the jury did so. Consequently, Basham did not suffer from ineffective assistance of counsel regarding this issue.

**Response to Claim 25: The Court correctly instructed the jury on mitigating evidence.**

In Claim 25, Basham's habeas counsel argue that his trial and appellate counsel should have challenged the Court's jury instruction regarding mitigating evidence. §2255 Mot. at 115. They contend that the Court's instruction "created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating." Id.

Specifically, they take issue with the following instruction given by the Court at the conclusion of the sentencing phase:

-135-

**JA 3373**

As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a two-step process in determining whether any one or more of the mitigating factors have been proven.

Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, you must determine whether the factor is mitigating, as I have defined the term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

TT 29: 220.

Basham's habeas counsel argue that this instruction was legally deficient because it applied to both statutory and non-statutory mitigating factors. §2255 Mot. at 115-16. According to them, the instruction was faulty as to the statutory mitigating factors because those factors are necessarily mitigating as a matter of law under 18 U.S.C. § 3592(a), which requires the jury to consider them. Id. They contend that the Court's two-step instruction impermissibly allowed the jurors to give statutory mitigating factors no weight, in contradiction to the FDPA's determination that those factors are always to be considered as mitigating. Id.

Contrary to this argument, the FDPA does not require jurors to assign any particular weight to the mitigating factors listed in § 3592(a). That section provides, in relevant part: "In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor, including the following . . . ." 18 U.S.C. § 3592(a). The Court instructed the jury on each of the statutory mitigating factors, and the jury rendered specific findings as to each of them. TT 29: 222-23; TT 30: 8. Thus, the Court's instruction complied with the FDPA's mandate that the

-136-

**JA 3374**

jury "shall consider" these factors.

Basham's habeas counsel nonetheless argue that the Court's two-step instruction violated the Supreme Court's "bright line rule from Eddings v. Oklahoma, 455 U.S. 104, 144-45 (1982), that jurors 'may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.'" §2255 Mot. at 117. They point out that his trial counsel submitted the following proposed language:

> Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified. In determining whether a sentence of death is to be imposed, you *shall* consider any mitigating factor, including the following . . .

§2255 Mot, at 117 (quoting Dkt. # 801 (emphasis added)). They submit that this proposed language is consistent with Eddings. But the Court did provide a nearly identical instruction:

> Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified, that is why they are called statutory. They appear in the statute of the laws. The statutory mitigating factors alleged in this case which you must consider are . . . .

TT 29: 222. Basham's proposed instruction provided that the jury "shall" consider the statutory mitigating factors; the actual instruction provided that the jury "must" consider them. If anything, the instruction given by the Court was even more emphatic than the proposed instruction, because the Court's instruction emphasized that the statutory mitigating factors were mandated by law and that the jury "must" consider them.

Once the Court had explicitly instructed the jury to consider the statutory mitigating factors, the demands of Eddings were satisfied. The Fourth Circuit has held: "[T]he Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating. There is no

-137-

**JA 3375**

constitutional requirement that the jury find a mitigating factor even when it is supported by uncontradicted evidence." United States v. Higgs, 353 F.3d 281, 327 (4th Cir. 2003) (emphasis in original; citations omitted); see also United States v. Paul, 217 F.3d 989, 999 (8th Cir. 2000) ("Neither the FDPA nor . . . Eddings require a capital jury to give mitigating effect or weight to any particular evidence."). And the Fifth Circuit has approved mitigating evidence instructions that required the jury to determine first that the facts established a mitigating factor and second that the factor was mitigating. United States v. Jackson, 549 F.3d 963, 983 (5th Cir. 2008) ("[T]he jury was not required to find that a factor was mitigating, even if it believed the factor's factual predicate to be true. All the law requires is that jurors be aware that they *can* consider a factor to be mitigating.") (emphasis in original).

In assessing the effect of a challenged jury instruction, the court "accept[s] at the outset the well-established proposition that a single instruction to a jury may not be judged in isolation, but must be viewed in the context of the overall charge." Boyd, 494 U.S. at 378 (quoting Cupp v. Naughten, 414 U.S. 141 (1973)). The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Id. at 380. A capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility that the jury was impermissibly inhibited by the instruction. Id. Where the context of the proceedings would lead reasonable jurors to believe that evidence of a defendant's background could be considered in mitigation, even the absence of an instruction on the concept of mitigation and of instructions on particular statutorily-defined mitigating factors does not violate the Eighth Amendment. Buchanan v. Angelone, 522 U.S. 269,

-138-

278-279 (1998); see also Lyons v. Lee, 316 F.3d 528, 534 n.6 (4th Cir. 2003). A jury instruction that directs the jury to "base its decision on all the evidence" satisfies the constitutional requirement that the sentencing jury have a full opportunity to consider mitigating evidence. Eaton v. Angelone, 139 F.3d 990 (4th Cir. 1998).

It is clear from the Court's instructions to the jury and the context of the proceedings that the jury had a full opportunity to consider mitigating evidence, and that the jury instructions did not impermissibly inhibit the jury's consideration of relevant mitigation evidence. For the jury to have believed it could not consider Basham's mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose. See Brown v. Payton, 544 U.S. 133, 144 (2004). Given the Court's instruction and the extensive trial time devoted to mitigating evidence, there is no possibility jurors screened out mitigating factors based on a belief that the jury instructions limited such consideration.

**Response to Claim 26**:  **The Court correctly instructed the jury regarding the finding of aggravating and mitigating factors.  Appellate counsel could not have prevailed had he challenged the instruction on appeal.**

Basham's habeas counsel complain that the Court erred by failing to instruct the jury that the "reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors," thus violating "the Impartial Jury Clause of the Sixth Amendment, the Due Process Clause of the Fifth Amendment," and the "Cruel and Unusual Punishment Clause of the Eighth Amendment."  §2255 Mot at 119-120.

The burden of proof regarding aggravating and mitigating factors in a death penalty case is set forth in 18 U.S.C. § 3593©: "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond

-139-

**JA 3377**

a reasonable doubt.  The burden of establishing the existence of any mitigating factor is on the

defendant, and is not satisfied unless the existence of such a factor is established by a preponderance

of the information." "The jury . . . shall consider whether all the aggravating factor or factors found

to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence

of death.  18 U.S.C. § 3593(e); United States v. Caro, 597 F.3d 608, 612 (4th Cir. 2010); United

States v. Lighty, 616 F.3d 321, 343 (4th Cir. 2010).  In the weighing process, jurors may only

consider those aggravating factors found unanimously to exist beyond a reasonable doubt, but any

juror may consider any mitigating factor found by him to exist by a preponderance of the evidence,

without regard to whether it has been found by any other juror.  United States v. Tipton, 90 F.3d

861, 893 (4th Cir. 1996).

The Court's instruction to the jury did not deviate in any manner from the requirements of

the law.  The Court told jurors:

> Third, you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, the statutory aggravating factor alleged.

> Fourth, if you find these first three steps have been proved to your unanimous agreement, then you must consider whether the Government has proven, beyond a reasonable doubt and to your unanimous agreement, any nonstatutory aggravating factors identified by the Government.

> Fifth, You must consider whether any one or more of you individually find that the Defendant has proven any mitigating factor or factors by a preponderance of the evidence. You may find any mitigating factor by considering everything you have learned during either phase of the trial, regardless of whether or not Mr. Basham's attorneys have asserted that factor.

> Sixth, all of you must then weigh the aggravating factors you have unanimously found to exist against any mitigating factor or factors any one of you individually found to exist to determine the appropriate sentence.

> You must decide, in regard to both offenses, whether the aggravating factors, which

-140-

**JA 3378**

you have found to exist, sufficiently outweigh the mitigating factors found to exist for that offense, so as to justify imposing a sentence of death, rather than a sentence of life without the possibility of release . . . .

The weighing process you are called upon to undertake in this part of the trial is different from the fact-finding process. If you find the threshold intent, aggravating and mitigating factors, you must use your experience, judgment, and common sense in weighing the aggravating and mitigating factors to arrive at your ultimate determination in this case.

As to all of the factors that the Government must prove . . .the Government must prove the factor to each and every one of you beyond a reasonable doubt. If the Government fails to prove a factor beyond a reasonable doubt, then you must find that that factor has not been proven.

TT 29: 200-201

Basham's habeas counsel have cited no case, and the Government could find none, which supports his assertion that the Federal Death Penalty Act is unconstitutional to the extent that it does not require a finding beyond a reasonable doubt that death is the appropriate punishment. See §2255 Mot. at 122. The Tenth Circuit has held that the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. United States v. Barrett, 496 F.3d 1079, 1108 (10th Cir. 2007)[18]. Basham's habeas counsel attempt to use the holdings of Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), to support their position.

In Apprendi the Supreme Court held that other than the fact of a prior conviction, **any fact** that increases a defendant's sentence beyond the statutory maximum sentence must be found by a jury and proved beyond a reasonable doubt. In Ring, the Supreme Court reiterated: "If a state makes

---

[18] Barrett observes that Justice Scalia, in his concurring opinion in Kansas v. Marsh, 548 U.S. 163 (2006), recognized that the Constitution does not require a reasonable doubt standard as to the weighing process, and that no member of the Marsh Court disagreed. 496 F.3d at 1108 (citing Marsh, 126 S.Ct. 2516, 2532 n. 2.)

-141-

**JA 3379**

an increase in a defendant's authorized punishment contingent on [a] **finding of fact**, **that fact** - no matter how the state labels it - must be found by a jury beyond a reasonable doubt." 536 U.S. at 602. Apprendi and its progeny indicate that the reasonable doubt standard is appurtenant to the right to a jury trial. United States v. Fields, 483 F.3d 313, 346 (5th Cir.2007). Since the Constitution does not require a jury to do the weighing, it does not require the application of a beyond-a-reasonable doubt standard to the weighing process. Id. The Apprendi and Ring holdings clearly do not reach the weighing aspect of the sentencing process. See Barrett, 496 F.3d at 1107 ("[t]he Apprendi/Ring rule does not extend to the ultimate decision whether to impose the death penalty"); Fields, 483 F.3d at 345; United States v. Smith, 3:07CR433, *2 (E.D.Va. Aug. 8, 2008)(once a jury has found a defendant to be death-eligible, the fact-finding process is concluded)[19]; United States v. Green, No. 5:06CR-19, 2008 WL 4000902, *3 (W.D.Ky. Aug. 26, 2008)(while the Ring Court extended the logic of Apprendi to aggravating factors in capital cases, it does not require the jury to apply the reasonable doubt standard during the weighing process).

A jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Barrett, 496 F.3d at 1107. Thus, the instruction to consider whether aggravating factors "sufficiently outweigh" mitigating factors does not impose an evidentiary burden on the Government. United States v. Fort, No. CR 05-00167, 2008 WL 5221090, *2 (N.D.Cal. Dec. 12, 2008)(observing that at least four courts of appeals besides the Ninth have reached the same conclusion). It involves a process, not a fact to be found. United States v. Sampson, 486 F.3d 13, 32 (1st Cir. 2007)(district court's instructions, which did not instruct jurors that they must find

---

[19] The district court in Smith announced: "This Court will join other reviewing courts in declining to elevate the weighing process to an essential element requiring proof beyond a reasonable doubt."

-142-

beyond a reasonable doubt the aggravating factors outweighed mitigating factors, were free of Apprendi error). At this stage of the proceedings, each juror is to consider the factors already found and to make an individualized judgment whether a death sentence is justified. United States v. Mitchell, 502 F.3d 931, 993 (9th Cir. 2007). The sentence imposed at the penalty phase of a capital case "reflects a reasoned moral response to the defendant's background, character, and crime." Barrett, 496 F.3d at 1107 (citing Penry v. Lynaugh, 492 U.S. 302, 319 (1989)). The Apprendi rule applies only to findings of fact, not to moral judgments. Id. Therefore, the Court did not err in instructing jurors regarding the weighing of aggravating and mitigating factors.

**Response to Claim 27: Basham's trial counsel were not ineffective for failing to investigate Cynthia Wilson's statements to the Court.**

The essence of Claim 27 is that Basham's trial counsel were ineffective because they failed to comb through the juror questionnaire and the juror voir dire and discover that Juror Cynthia Wilson's answers to two questions were untruthful. §2255 Mot. at 130. Habeas counsel assert that had trial counsel pointed out these inconsistencies, they would have "persuaded the Court that further investigation into claims of juror misconduct was warranted." §2255 Mot. at 124.

The first question habeas counsel contend was answered untruthfully is Question 41: "[H]ave you ever sued someone or been sued?" Wilson responded "no," even though she had two prior state tax judgments against her, one which, according to Basham's counsel, was terminated on February 11, 1996, and the other for which the case was closed on March 17, 2000. The other instance in which Basham's counsel claims Wilson was untruthful was during voir dire, when she said she had been a nurse for four years, but she had actually been a registered nurse for only two-and-a-half years. Basham's counsel claim that this evidence "would have done much to convince the court"

-143-

**JA 3381**

that Wilson's misconduct mandated a new trial, and that trial counsel's failure to engage in independent investigation to support their assertion that Wilson was untruthful was unreasonable. §2255 Mot. at 132. This claim is without merit.

When evaluating decisions not to investigate further, a court must regard counsel's choices "with an eye for 'reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.'" Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991)(quoting Strickland, 466 U.S. at 689).  The reasonableness of an investigation is evaluated by the totality of the circumstances facing an attorney at the time.  Burt v. Eagleton, CA NO. 3:08-3110-SB, 2009 WL 2997069, 18 (D.S.C. Sept. 17, 2009).  Courts recognize limits to investigation based on time, resources, and relevance.  Id.  "Strickland does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client."  Id. (quoting Green v. French, 143 F.3d 865, 892 (4th Cir. 1998) *abrogated on other grounds by* Green v. Taylor, 529 U.S. 362 (1998)).

A.    Basham's trial counsel conducted a more than reasonable investigation regarding juror misconduct.

Basham's counsel cavalierly claim that it took their investigator a total of 25 minutes to locate both pieces of information.  §2255 Mot. at 131.  They do not state how long he combed through other questions and testimony before he checked the answers to those two particular questions.  The investigator for the § 2255 claim, no doubt, had an easier job than the trial team, since the trial team and the Court had already investigated the more material questions regarding juror misconduct and potential bias for weeks.  Further, Basham's trial counsel were preparing briefs and preparing for and attending hearings during the investigation.  The Court could not delay the

**JA 3382**

process indefinitely so that trial counsel could discover every minor discrepancy on the jurors' questionnaires and during their voir dire. Thus, trial counsel had to make tactical decisions about which lines of investigation might be most likely to reveal persuasive evidence to show juror misconduct so prejudicial as to merit a new trial.

Trial counsel reasonably chose to analyze telephone records of calls made during the trial. They culled through Juror Wilson's telephone records in order to discover that she had attempted to contact two newspaper publishers. 12/13/04 Hearing Tr at 3. They used this evidence to support a request for a delay in arguments so that they could look for additional evidence. Id. Trial counsel identified one of the television reporters they believed Juror Wilson had contacted. Id. at 7. They also discovered from telephone records that Juror Wilson had had extensive contact with other jurors. Id. at 8; 12/28/04 Hearing Tr at 21. Basham's trial counsel prepared and discussed diagrams of telephone calls between Juror Wilson and her husband, and suggested that because there were daily calls between the two, they must have been discussing the case. 1/14/05 Hearing Tr at 24. They noted that the longer telephone calls coincided with important events during the trial. Id. They also noted the length of the calls between Juror Wilson and other jurors and correlated them to events during the trial. Id. at 25-26.

Habeas counsel has failed to show that trial counsel's decision as to how to use its investigatory time was unreasonable. It was far more reasonable for trial counsel to investigate the telephone records for calls made during the trial, than to spend their limited time to discover minor irrelevant discrepancies in answers to juror questionnaires and voir dire questions, which likely were not lies, and which had nothing to do with the trial. Even if the responses had been intentional untruths, thus reflecting on Juror Wilson's credibility, habeas counsel has failed to show prejudice,

-145-

since the Court heard testimony from the other jurors and alternates, Wilson's husband, and the news

media, none of which revealed that there had been outside influence or premature deliberations.

   B.   The Court's finding that Basham was not prejudiced by Juror Wilson's contact
        with the media was made only after all evidence regarding the matter had been
        heard and extensively analyzed.

   The Court did not base its decision primarily on Juror Wilson's testimony regarding the

question of whether the jurors had engaged in premature deliberations or whether they had been

influenced by outside information.  Between November 10, 2004 and February 14, 2005, the Court

held nine hearings regarding Juror Wilson's misconduct.  Basham, 561 F.3d at 316-318, 321.  On

November 10, 2004, the Court held a status conference, during which it decided to call the three

female jurors from the upstate to court to question them under oath.  561 F.3d at 316. On November

12, the Court heard testimony from Shannon Mays, the news producer who reported the contact by

a juror.  561 F.3d at 316-317.  Ms. Mays told the Court that around October 27th[20], she received a

call from a woman claiming to be a juror in Basham's trial.  11/12/04 Hearing Tr at 17-19.  She

wanted to know why the television station was not covering the trial.  Id. at 19.  Ms. Mays responded

that the trial was not in the station's viewing area, and they could not take cameras into a federal

courtroom.  Id.   The woman, later determined to be Juror Wilson, told Ms. Mays that Basham was

acting up in court and falling asleep, and that the trial would be good tv.  Id.  Juror Wilson asked Ms.

Mays if she was familiar with the case, and Ms. Mays responded that she was, because she had

worked in Indiana.  Id.  Ms. Mays testified that Juror Wilson said she had some concern over

whether Mr. Basham would be sentenced to death, because there were jurors that were for the death

penalty and others that were not.  Id.  The juror told Ms. Mays she would call her after the sentencing

---

[20]  Telephone records later revealed that the call was actually made on October 29, 2004.

phase ended.  Id. at 20.

The Court allowed Basham's trial counsel to question Ms. Mays.  11/12/04 Hearing Tr at 22-35.  Trial counsel pressed Ms. Mays for further information in an obvious attempt to get her to answer in a way to show she had imparted information to Juror Wilson about the case or to suggest jurors had begun to deliberate.  Id.  At one point, the Court informed trial counsel: "Mr. Harris, most judges handle issues like this in chambers with no lawyers present.  I want y'all to have some input, but I 'm not going to let you go all afternoon asking every question six different ways."  Id. at 31.  Trial counsel responded that "any piece of information could potentially taint."  Id.  The Court reminded counsel: "I know, but you have asked every question 10 different ways and we don't know one bit more information than when I finished asking my questions."  Id.  Nonetheless, trial counsel persisted with several more questions.  Id. at 31-35.

The Court then questioned the three jurors.  Id. at 31-37.  Juror Wendy Doby said she had not discussed the case with anyone during the trial, and that the jurors had not discussed what the penalty should be before hearing the Judge's instructions on the law.  Id. at 49, 52.  Juror Joyce Hartsoe testified that she had not contacted anyone during the trial to discuss the case, and that she was not aware of any juror discussing the case prior to all of the evidence being presented.  Id. at 58-61.  Juror Wilson admitted calling the television station, but testified that none of the people she spoke with imparted any information.  561 F.3d at 317.  She also testified that the jurors did not begin discussing the penalty portion of the case prior to deliberations.  561 F.3d at 317.  Juror Wilson told the Court that she recalled contacting three television stations close to the end of the penalty phase to tell them someone should cover the case.  Id. at 71-72.  She said she did not discuss what the verdict should be with any other juror, and that she was not aware of such discussions by other

-147-

**JA 3385**

jurors. Id. at 73-74. She said the newsperson with whom she spoke did not reveal any information to her other than the fact that she was aware Basham had escaped from prison in Kentucky because the newsperson had lived in the area. Id. at 72-74. Juror Wilson said she had not acquired outside information about the case during the trial. Id. at 75-77. Juror Wilson denied telling the news media that Basham was acting out or sleeping, or that some jurors were in favor of the death penalty and some were not. Id. at 79.

On November 18, the Court recalled the remaining regular jurors for questioning under oath.[21] 561 F.3d at 318. It held another hearing on November 23, 2004, to question the alternate jurors, Wilson, and her husband, Greg Wilson. Id. No new information was revealed. Order, March 14, 2005, Docket # 890. On December 1, 2004, Basham's trial counsel moved for a new trial, and the Court granted trial counsel's motion to obtain phone records. 561 F.3d at 318. On December 13, 2004, the Court convened to hear arguments regarding the issue of juror misconduct. At the beginning of the hearing, Basham's trial counsel asked the Court to delay arguments so that the record could be more fully developed, because the Government had provided telephone records which revealed Juror Wilson had contacted two newspapers during the trial.[22] 12/13/04 Hearing Tr at 3. The Court informed trial counsel that it would accept Ms. Mays' version of the conversation over the version of Juror Wilson. 12/13/04 Hearing Tr at 4-5. Regarding Juror Wilson, Basham's trial counsel argued "We think her credibility is completely open to question now." Id. at p. 7. The Court responded: "I am saying you win this battle. I am accepting Ms. Mays' version. . . . . [I]f you

---

[21] The Court observed at the hearing on December 28, 2004: We brought [the jurors] in one at a time. We conducted a closed hearing." P. 31.

[22] One of the calls lasted one minute, and the other lasted two minutes. 12/13/04 Hearing Tr at 6.

win the credibility battle right now, I don't know what additional evidence would help in that regard."[23] Id.

Nonetheless, the Court proposed that counsel argue that day, and that the Court would consider the possibility of further developing the record before ruling on the issue. Id. at 12. The Court also agreed to contact the news organizations which had been contacted by Wilson, and to require them to identify anyone who could recall the telephone contacts. Id. at 13. The Court noted that, beyond hearing the testimony of anyone from the news organizations who had spoken with Wilson and questioning Wilson about the two telephone calls, it was not sure any further information gathering would be necessary, since all of the jurors had already been called back and questioned. 12/21/04 Hearing Tr at 21-22. The Court stated that it would assume that prejudice had occurred due to the improper contact, and that it would fall upon the Government to establishment that there was, in fact, no prejudice to Basham as a result of the third-party contacts. 12/13/04 Hearing Tr at 25-26.

On December 21, 2004, the Court had a follow-up hearing, at which time Stephanie Moore, the news researcher for the 11:00 p.m. news at a Greenville television station testified that she recalled a woman calling her and asking why they were not covering the Basham trial, and suggesting that they should cover the closing arguments. 12/21/04 Hearing Tr at 10-14. Joe Loi, the assignments editor with another Greenville television station, testified via teleconference that he had sent an e-mail to employees who might have received the call from Juror Wilson, and

---

[23] The only possible evidence to support the argument by Basham's trial counsel that jury deliberations had been tainted by Juror Wilson's conduct or that deliberations had begun before the close of evidence came from Ms. Mays, whose version of the contact the court accepted over Juror Wilson's. Therefore, there could have been no prejudice by counsel's failure to raise the discrepancy on the juror questionnaire or the alleged untruthful answer during voir dire.

that nobody recalled speaking with her. Id. at 4-8.

At a hearing on January 14, 2005, Basham's trial counsel asked the Court to conduct additional hearings to re-question the jurors about conversations they may have had among themselves. 1/14/05 Hearing Tr at 26. After hearing extensive argument, the Court denied trial counsel's motion, finding that the inquiry it had conducted was more than required by the Fourth Circuit in United States v. Barnette, 390 F.3d 775 (4th Cir. 2004), *vacated on other grounds by* Barnette v. United States, 546 U.S. 803 (2005). Id. at 56.

Ultimately, the Court concluded that juror misconduct had occurred, but that the Government had rebutted the presumption of prejudice. Order, March 14, 2005, Docket #. 890. The Court pointed out that it had held nine hearings, heard from nineteen witnesses, authorized the subpoena of hundreds of telephone records, and facilitated the cooperation of five media outlets in an effort to uncover the truth. Id. The Court further observed that the news organization representatives were clear in their assertion that no information had been imparted to Juror Wilson during their conversations, and, thus, the case involved "egregious misbehavior by a juror, but no showing that she learned anything or was influenced in any way." Id. The Court further found that there had been no showing of anything more than harmless error, as there had been no showing that the verdict would have differed had the contact not occurred, or had the Court discovered the juror's indiscretion prior to the verdict and dismissed the juror. Id.

Thus, the Court's decision was not predicated on Juror Wilson's credibility or lack thereof, but on the totality of the evidence. The Court did not ignore or diminish the egregiousness of Juror Wilson's misconduct. Consequently, more information regarding immaterial, and possibly unintentional, misrepresentations on a juror questionnaire and during the answer to a question during

-150-

**JA 3388**

voir dire, would not have caused the Court to order a new trial. Thus, Basham cannot show that he was prejudiced by the alleged ineffective assistance of counsel.

C.    Requiring counsel to glean through juror questionnaires and voir dire to discover all minor discrepancies, no matter how immaterial, and then to argue juror misconduct, would place an unacceptable burden on counsel and the court, would do nothing to ensure the fairness of a verdict, and would discourage citizens from serving on juries.

It is not clear that Juror Wilson was being untruthful when she responded that she had not been sued by anyone. Many people likely do not think of themselves as being "sued" by the Government when the Government seeks, through a court judgment, payment of overdue taxes. As to Juror Wilson overstating the amount of time she had been a nurse by a year-and-a-half, it is not clear her answer was incorrect or that Wilson made an intentional misrepresentation. Habeas counsel uses the date Juror Wilson received her license as the sole basis for alleging untruthfulness. It is possible that Juror Wilson worked in some capacity providing nursing care before she became a registered nurse. Further, she could have simply made a mistake. Habeas counsel has provided no conclusive proof that Juror Wilson lied, and have shown absolutely no materiality regarding the one-and-a-half year alleged discrepancy.

Requiring defense attorneys to discover such immaterial minutia would undermine the criminal justice system. It would discourage attorneys from representing criminal defendants due to the overwhelming commitment of time and personnel required to verify the response to every question posed to jurors. In the overwhelming number of cases, the discovery of minor discrepancies would not prevent the juror from being selected for service. It would discourage service on juries because trial counsel and courts could potentially delve into private matters having nothing to do with a citizen's jury service. But most importantly, this requirement would likely do nothing to

-151-

**JA 3389**

improve the administration of justice. Indeed, it would distract counsel from discovering and analyzing more material evidence related to a defendant's guilt or innocence.

**Response to Claim 28: There is no basis to grant a new trial based on Cynthia Wilson's alleged contact with other jurors.**

First, this claim is untimely. Under Rule 33, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.R.Crim.P. 33(b)(1). Basham was found guilty on September 30, 2004. Basham was sentenced to death on November 2, 2004. Judgment was entered on February 16, 2005.

Basham's §2255 was filed on May 31, 2011, which is more than six (6) years after the verdict. It is of no help that this "newly discovered evidence" issue is raised in a §2255 motion; it must be timely under the provisions of Rule 33. United States v. Berry, 624 F.3d 1031, 1039 (9th Cir. 2010). This Court must conclude that Claim 29, which is in essence a motion for a new trial under Rule 33, is untimely.

Further, even if habeas counsel's claim were not considered to be untimely, it must fail on the merits because habeas counsel cannot satisfy the stringent multi-stage test used to evaluate a motion for new trial based on newly discovered evidence. See United States v. Gootee, 34 F.3d 475, 479 (7th Cir. 1994). In analyzing such a claim, the Court must consider five factors:

> (a) the evidence must be, in fact, newly discovered, i.e. discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; © the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Robinson, 627 F.3d 941, 948 (4th Cir. 2010)(quoting United States v. Custis, 988 F.2d 1355, 1359 (4th Cir. 1993)). Generally, all five elements must be met. Id. (citing United States

-152-

v. Fulcher, 250 F.3d 244, 249 (4th Cir. 2001)).

Habeas counsel have satisfied none of these factors. The answers to the juror questionnaire and the voir dire are not newly discovered evidence. According to habeas counsel, the alleged inconsistencies could have been easily discovered, so habeas counsel obviously was not diligent in discovering these inconsistencies many years after the trial. The alleged new evidence from the interview with Juror Wilson's ex-husband - (1) Wilson did not maintain her friendships with the other jurors, and (2) it was odd Wilson would talk to Juror Shannon Burnett about buying sod, because Wilson's ex-husband did all of the landscaping at their home - is not newly discovered evidence. It is the opinion of Juror Wilson's ex-husband, and any suggestion that it shows Wilson and the other jurors were engaging in premature deliberation is bald speculation. Further, the new information could have been discovered years ago, so counsel has not been diligent in discovering it. Most importantly, it is impeachment information, immaterial to the issues involved, and would certainly not be of the magnitude to produce an acquittal. The information is simply the irrelevant opinion of an ex-spouse and has nothing to do with the guilt or innocence of Brandon Basham. To pursue it would serve only to invade the privacy of the jurors.

The second category of information habeas counsel claim to be newly discovered evidence involves answers by Juror Wilson to questions on her nursing license renewal applications.[24]  §2255 Mot. at 136.  Much of the information is more than three years old, and, according to habeas counsel, could have been discovered, with diligence, sooner. However, it is merely impeachment information, and not material to Basham's case. Since it is immaterial to Basham's guilt or

---

[24]  Habeas counsel have not provided a copy of the applications. The exhibit they reference is an affidavit by an investigator.

-153-

innocence, it would not produce an acquittal.

The Fourth Circuit in <u>Robinson</u> quotes the sketch, set forth in <u>United States v. Custis</u>, 988 F.2d 1355, 1359 (4th Cir. 1993) of a situation in which newly discovered impeachment evidence is enough for a retrial:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly untrustworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial.

627 F.3d at 949. As in <u>Robinson</u>, the situation in Basham's case is far removed from the <u>Custis</u> example. The Court did not rely on the testimony of Wilson regarding the issues of outside influence and premature deliberations. The Court heard testimony under oath from every juror and alternate and from persons from the media. There was no evidence that Wilson's misconduct affected juror deliberations.

For the Court to vacate Basham's convictions and sentences on the basis of speculation of jurors' communications, when there has not been one shred of evidence that one juror's misconduct affected her decision or entered into the deliberations of other jurors, would encourage fishing expeditions by trial and habeas counsel in the future, would cause an invasion of the privacy of jurors, and would discourage citizens from serving as jurors. Additionally, it would undermine the finality of a conviction, because it would be necessary for defense counsel to monitor the actions of jurors continuously and indefinitely.

Based on the above, the Court should deny Basham's motion for a new trial as being untimely or, in the alternative, deny the motion because habeas counsel has failed to satisfy all of the five factors necessary to receive a new trial on the basis of newly discovered evidence.

<div align="center">-154-</div>

<div align="right">**JA 3392**</div>

**Response to Claim 29: There is no basis to grant a new trial based on newly discovered evidence concerning Sheriff Ronald Hewett.**

In Claim 29, Basham's habeas counsel claim that Basham is entitled to a new trial in light of the fact that Sheriff Ronald Hewett pled guilty to obstruction of justice in October 6, 2008. Basham's habeas counsel claim that this impeachment evidence entitles Basham to a new trial pursuant under Federal Rule of Criminal Procedure 33. This claim must fail because it is untimely and also because newly discovered impeachment evidence of one witness which was unrelated to the case does not serve as a basis for a new trial.

First, this claim is untimely. Under Rule 33, "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed.R.Crim.P. 33(b)(1). Basham was found guilty on September 30, 2004. Basham was sentenced to death on November 2, 2004. Judgment was entered on February 16, 2005. Sheriff Hewett pled guilty on October 6, 2008. Basham's habeas counsel filed the §2255 motion on May 31, 2011.

Basham's §2255 motion in which counsel assert a new trial claim in Claim 29, was filed on May 31, 2011, which is more than six (6) years after the verdict and more than two and a half years after Hewett pled guilty. It is of no help that this "newly discovered evidence" issue is raised in a §2255 motion; it must be timely under the provisions of Rule 33. United States v. Berry, 624 F.3d 1031, 1039 (9th Cir. 2010). This Court must conclude that Claim 29 which is in essence a motion for a new trial under Rule 33 is untimely.[25]

---

[25]This claim cannot be smuggled into a § 2255 motion. The Supreme Court has repeatedly stressed the limits of a § 2255 motion. For example, the Court has cautioned that § 2255 may not be used as a chance at a second appeal. See, e.g., United States v. Addonizio, 442 U.S. 178, 184 (1979). Further, short of proof of actual innocence, claims solely based on new evidence are generally not cognizable on habeas. See Conley v. United States, 323 F.3d 7, 14 (1st Cir.2003) (en banc) ("Merely to claim that new evidence casts doubt, even grave doubt, on the

**JA 3393**

Second, even if this claim were timely, the impeachment evidence related to Sheriff Hewett is unrelated to the case and does not serve as a basis for a new trial. Rule 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Court of Appeals reviews the district court's Rule 33 decision for abuse of discretion. See, e.g., United States v. Fulcher, 250 F.3d 244, 249 (4th Cir.2001). In analyzing whether newly discovered evidence requires a new trial, the Court must examine five factors:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; © the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Custis, 988 F.2d 1355, 1359 (4th Cir.1993) (quoting United States v. Bales, 813 F.2d 1289, 1295 (4th Cir.1987)). "Without ruling out the possibility that a rare example might exist, [the Fourth Circuit has] never allowed a new trial unless all five elements were established." Fulcher, 250 F.3d at 249.

The Fourth Circuit recently reiterated its extreme reluctance to order retrials because of subsequently discovered impeachment evidence. See United States v. Robinson, 627 F.3d 941, 948-49 (4th Cir. 2010) (Newly discovered impeachment evidence that police officers who investigated

---

correctness of a conviction is not a ground for relief on collateral attack."). Rather, a motion under § 2255 must be based upon an independent constitutional violation. See Herrera v. Collins, 506 U.S. 390, 400 (1993) ("[N]ewly discovered evidence ... alleged in a habeas application ... must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." (emphasis in original); Turner v. Calderon, 281 F.3d 851, 872 (9th Cir.2002) (rejecting habeas claim based upon newly discovered evidence because the petitioner "neither allege[d] an independent constitutional violation nor present[ed] affirmative proof of his innocence").

defendant and testified against him were engaged in unrelated misconduct did not warrant retrial in

prosecution for drug trafficking and firearm offenses because government's case did not rest entirely

on uncorroborated testimony of officers, and officers' misconduct, while serious, did not relate to

counts for which defendant was convicted or to truth-finding function of proceedings).  It appears

that the Fourth Circuit has never found a situation in which a new trial should be granted based on

newly discovered impeachment evidence.

The Fourth Circuit has previously noted that newly discovered impeachment evidence would

result in a new trial in only the narrowest of circumstances:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial....

Custis, 988 F.2d at 1359 (quoting United States v. Taglia, 922 F.2d 413, 415 (7th Cir.1991)).

It should go without saying that Basham's situation does not resemble the one described in

Custis.  The Government's case did not rest entirely on the uncorroborated testimony of Sheriff

Hewett.  Sheriff Hewett was just one of eighty-nine witnesses in Basham's guilt phase.  Basham, 561

F.3d at 314.  As noted above, his testimony was never contradicted.  In fact, it was corroborated by

statements he gave explaining how Basham demonstrated to him how Alice Donovan had allegedly

been strangled.  Just as important, the evidence against Basham was "overwhelming," as discussed

above and by the Fourth Circuit.  See Basham, 561 F.3d at 328 ("The Government presented an

overwhelming case Basham during the guilt phase"), at 329 ("overwhelming evidence against

Basham"), at 330 ("overwhelming evidence against Basham").  Under these circumstances, even if

this claim were not untimely, such a new trial claim of newly discovered impeachment evidence does

JA 3395

not present a basis for relief.

**Response to Claim 30: Basham's trial counsel did not fail to provide necessary files to Basham's appellate counsel.**

In Claim 30, Basham's habeas counsel make the remarkable claim that Basham's trial counsel, in particular, Jack Swerling, "failed to protect Mr. Basham's interests by repeatedly refusing to surrender or allow appellate counsel reasonable access to the thousands of trial-related documents known to be in his possession "thereby depriving Basham of effective assistance of appellate counsel. This claim is without merit and should be summarily dismissed.

Basham was represented at trial by Jack Swerling and Greg Harris, two of the best "criminal defense lawyers in the State of South Carolina." TT 17: 184. See Basham, 561 F.3d at 325. After the trial, they both initially represented Basham on appeal. On February 16, 2005, they filed a notice of appeal on behalf of Basham. Docket # 888. On February 24, 2005, Swerling and Harris were appointed as Basham's appellate attorneys. Fourth Circuit Appeal No. 05-5, Docket # 2. More than six months later, on September 8, 2005, Mr. Swerling moved to withdraw as lead appellate counsel and substitute Timothy J. Sullivan, Esq. as lead appellate counsel. Fourth Circuit Appeal No. 05-5, Docket # 60. On September 13, 2005, the Fourth Circuit relieved Mr. Swerling and appointed Mr. Sullivan as new lead appellate counsel for Basham. Id. at Docket #. 63. For the next twenty-three months, Mr. Harris continued to represent Basham on appeal with Mr. Sullivan. Two and a half years after the notice of appeal was filed, on August 13, 2007, Mr. Harris moved to withdraw as appellate counsel. Id. at Docket # 131. On September 1, 2007, the Fourth Circuit relieved Mr. Harris as appellate counsel and suspended the briefing schedule until a second appellate attorney was appointed. Id. at Docket # 133. On November 16, 2007, the Fourth Circuit appointed Melissa A.

**JA 3396**

Meister, Esq. as appellate counsel.  Id. at Docket # 138.  The Fourth Circuit set a briefing schedule

that required Basham's joint appendix and brief be filed on December 31, 2007.  Id. at Docket #

140.    The Fourth Circuit extended the briefing schedule several times, giving extensions of time

that extended the briefing schedule several months.    Id. at Docket #s  144. 150 & 155.  Ultimately,

Basham's appellate counsel filed a 164-page initial brief on May 13, 2008.    Id. at Docket #  159.

After the Government filed its initial brief, appellate counsel filed a 63-page reply brief on

September 22, 2008. Id. at Docket #  193.

In preparing the appellate briefs, appellate counsel reviewed the entire trial transcript, hearing

transcripts and the filings in district court.  Mr. Sullivan served as lead appellate counsel for two and

a half years before the filing of Basham's initial appellate brief.  For nearly two years, trial counsel

Harris served as Mr. Sullivan's co-counsel on appeal.  Afterwards, Ms. Meister served as appellate

counsel for six months prior to the filing of Basham's initial appellate brief.

Appellate counsel came to Columbia in January 2008 to reviewed sealed materials.  Later,

appellate counsel reviewed additional sealed materials which they received via email from the

District Court Clerk of Court at the beginning of April 2008.  Appellate counsel met with Mr.

Swerling to discuss Basham's case and review the files pertaining to trial counsel's representation

of Basham.  Appellate counsel met with Mr. Swerling on at least two occasions at his Columbia, SC

office in January 2008 and early April 2008.    Fourth Circuit Appeal No. 05-5, Docket #s 146 &

152, at ¶¶ 8-9. At no time did appellate counsel claim that Mr. Swerling hindered or prevented them

from reviewing trial counsel's files.

Contrary to Basham's habeas counsel's assertions, at no time did Mr. Swerling or Mr. Harris

"fail to protect Mr. Basham's interests by repeatedly refusing to surrender or allow appellate counsel

-159-

**JA 3397**

reasonable access to the thousands of trial-related documents known to be in [their] possession."

As evidenced by the short recitation of the procedural history of the appellate proceedings prior to

the filing of Basham's appellate brief, Basham was provided with experienced appellate counsel who

were given adequate time and resources to prepare excellent appellate briefs.  The resulting 38-page

published opinion affirming Basham's conviction and sentence demonstrates that appellate counsel

raised strong arguments that were well supported.  Tellingly, Basham's habeas counsel point to no

claim(s) that appellate counsel failed to raise because of Mr. Swerling's supposed recalcitrance.

Accordingly, there would be no resulting prejudice even if this claimed were supported by any

factual basis.  More importantly, however, this claim is completely without factual support.  It should

be summarily dismissed.

**Response to Claim 31**:  **The Superseding Indictment charged an aggravating factor, along with the citation to the statutory authority, which is part of the Federal Death Penalty Act, required for a capital offense.**

In claim 31, Basham's habeas counsel  complain that Basham:

was denied his rights to due process, to a fair trial, the assistance of counsel, to confront the evidence against him, to a trial by a jury of his peers, and to a fair and reliable conviction and sentence, in contravention of the Fifth, Sixth and Eighth Amendments of the United States Constitution, because the indictment . . .  made no mention of the federal death penalty and did not charge the aggravating factors required for a capital offense under 18 U.S.C. § 3592©, or any of the additional non-statutory aggravating factors relied upon by the Government during the penalty phase.

§2255 Mot. at 144.

A review of the record shows that counsel's allegation is incorrect   The Superseding

Indictment  cited the pertinent sections of the Federal Death Penalty Act.  The statute which

Basham's counsel claim the Government violated, 18 U.S.C. § 3592©, "Aggravating factors for

homicide," states in pertinent part:

-160-

**JA 3398**

In determining whether a sentence of death is justified for an offense described in section 3591(a)(2), the jury . . .shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist:

(1) Death during commission of another crime of another crime. - The death or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of, an offense under . . . section 1201 (kidnapping). . . .

. . . .

(8) Pecuniary gain. - The defendant committed the offense for consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

18 U.S.C. 3592©.  The eight-count Superseding Indictment filed on April 23, 2003, indicated under Counts 1 (carjacking resulting in death) and 2 (kidnapping resulting in death) that the maximum penalty is death.  It included a "Notice of Special Findings" as to Counts 1 and 2.  Superseding Indictment, p. 14.  These special findings included:

f.    The death of Alice Donovan, and the injury resulting in the death of Alice Donovan, occurred during the [sic] **CHADRIC EVAN FULKS' and BRANDEN LEON BASHAM'S** commission and attempted commission of, an offense under Title 18, United States Code, Section 1201 [Title 18, United States Code Section 3592(c)(1)].

Thus, contrary to Basham's habeas counsel's claim, the Superseding Indictment charged an aggravating factor, along with the citation to the statutory authority, which is part of the Federal Death Penalty Act, required for a capital offense.  See United States v. Fulks, 454 F.3d 410, 417 (4th Cir. 2006)("the grand jury returned a superseding indictment charging Fulks and Basham with eight separate offenses and setting forth special findings supporting the imposition of the death penalty on the first two counts").

Moreover, if the statutory aggravating factors had been inadequately alleged in the Superseding Indictment, the deficiency was harmless.  See United States v. Barnette, 390 F.3d 775, 786 (4th Cir. 2004), *vacated on other grounds by* Barnette v. United States, 546 U.S. 803 (2005)

-161-

**JA 3399**

(defendant was not prejudiced where the indictment provided the factual structure from which the aggravating factors could have been found, and where the Government served the defendant with a formal notice of intent to seek the death penalty under 18 U.S.C. § 3593). In addition to including the facts in the Superseding Indictment from which the aggravating factors making Basham eligible for the death penalty could have been found, the Government filed a "Notice of Intent to Seek the Death Penalty" under 18 U.S.C. §§ 3591-3598, on September 12, 2003. See Docket # 144; United States v. Basham, 561 F.3d 302, 314 (4th Cir. 2009). The notice listed the statutory aggravating factors under 18 U.S.C. § 3592©, and the non-statutory factors under § 3593(a) and ©, it intended to prove. Thus, the Government provided adequate notice so that Basham could prepare his defense.

**Response to Claim 32: The Federal Death Penalty Act is constitutional.**

In Claim 32, Basham's habeas counsel argue that the Federal Death Penalty Act ("FDPA") is unconstitutional. §2255 Mot. at 146. More specifically, they contend that the FDPA violates the 8th Amendment because it is enforced disproportionately against racial minorities and against defendants tried in Southern states. Id. at 146-50. They also argue that the FDPA is unconstitutional because it does not allow for plain error review on appeal. Id. at 153-54. Additionally, they argue that capital defendants have a statutory right to justice without discrimination and that federal courts have inherent supervisory authority to "curb charging discrimination and regional caprice." Id. at 151-53. They accordingly request an evidentiary hearing on this claim so he can attempt to prove that this Court should strike down the FDPA. Id. at 150.

These arguments are without merit, and no hearing is necessary on these issues. First, they have produced no authority to suggest that the FDPA violates the 8th Amendment. To the contrary, federal courts have held that the FDPA is not racially or geographically discriminatory. Second, the

-162-

**JA 3400**

Supreme Court has held that the FDPA does not create an exception to plain error review.  Third, this Court fully instructed the jury that it was not to consider race or other prohibited factors in making its sentencing determination, and they have pointed to no statutory right that was violated in Basham's case.  Finally, the Government respectfully submits that the Court lacks the authority to strike down the FDPA or enjoin its application absent a showing that the FDPA is unconstitutional.

> A.    The FDPA does not violate the 8th Amendment based on racial or geographic discrimination.

Basham's habeas counsel claim that the FDPA violates the 8th Amendment due to racial and geographic disparities in its enforcement are nearly identical to those brought by the defendant in United States v. Sampson, 486 F.3d 13 (1st Cir. 2007).  Like Basham, the defendant in Sampson was a white man who made no claim that *he* was sentenced to death on the basis of *his* race, the race of *his* victims, or the geographic location of the district in which *he* was tried.  Id. at 25.  Rather, Sampson (like Basham) attempted to "assert the rights of other capital defendants."  Id.

The First Circuit first questioned whether Sampson had standing to raise such a challenge, noting the general rule that "if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations."  Sampson, 486 F.3d at 25 (quoting County Court v. Allen, 442 U.S. 140, 155 (1979)).

Assuming for the sake of argument that Sampson did in fact have standing, the First Circuit nonetheless held that the FDPA was not unconstitutionally applied on the basis of race or geography. Just as Basham does, Sampson relied on the 2000 Department of Justice study to make his argument

JA 3401

that the federal death penalty is unevenly applied to racial minorities and in districts in Southern states. Sampson, 486 F.3d at 26. The First Circuit held that the DOJ study did not prove unconstitutional discrimination.

> Apparent disparities in sentencing are an inevitable part of our criminal justice system.... [O]ur consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." Where the discretion that is fundamental
>
> to our criminal process is involved, we decline to assume that what is unexplained is invidious.

Id. (quoting McCleskey v. Kemp, 481 U.S. 279, 312-13 (1987) (further citation omitted)). "The DOJ study," the First Circuit held, "provides no basis for attributing the statistical discrepancies with respect to geography and race in FDPA prosecutions to discrimination rather than to other factors, such as differences in the nature of the crimes involved." Sampson, 486 F.3d at 26; see also United States v. Jones, 287 F.3d 325, 334-35 (5th Cir. 2002) (holding that FDPA did not unconstitutionally discriminate on the basis of race or geography); United States v. Bin Laden, 126 F.Supp.2d 256, 261-63 (S.D.N.Y. 2000) (same).

The reasoning of the First Circuit and the Southern District of New York is persuasive. Basham's habeas counsel do not argue that race or geography played any part in his prosecution or sentence. Accordingly, Basham lacks standing to bring a challenge on behalf of other defendants. In any event, Basham's habeas counsel have pointed to no evidence that any statistical discrepancies in the application of the federal death penalty are due to race or geography rather than the circumstances of the individual defendants and their crimes.

-164-

B.    The FDPA does not eliminate plain error review on appeal.

Basham's habeas counsel argue that by its "plain language," the FDPA precludes plain error review in a capital case.  §2255 Mot. at 155.  To make this argument, they cite 18 U.S.C. § 3595(c)(2):

> (2) Whenever the court of appeals finds that—
>
> (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> (B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or
>
> (C) the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*,
>
> the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death. The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

(Emphasis added).  On its face, this section does not eliminate plain error review. Instead, it references legal errors that were preserved for appeal "under the rules of criminal procedure."  And Rule 52(b) of the Federal Rules of Criminal Procedure specifically provides for plain error review of unpreserved errors.

Moreover, Basham's habeas counsel point to no authority holding that § 3595(c)(2) eliminates plain error review.  To the contrary, the United States Supreme Court has held that the FDPA "does not explicitly announce an exception to plain-error review, and a congressional intent

-165-

**JA 3403**

to create such an exception cannot be inferred from the overall scheme." Jones v. United States, 527 U.S. 373, 388-89 (1999); see also United States v. Fell, 531 F.3d 197, 210 n.8 (2nd Cir. 2008) (applying plain error review to capital defendant's claims and citing Jones). In fact, the Fourth Circuit applied plain error review to several of Basham's claims in his direct appeal. See United States v. Basham, 561 F.3d 302, 329-30 (4th Cir. 2009). Thus, Basham's habeas counsel's claim that the FDPA does not allow for plain error review is wholly without merit.

C.    No statutory right was violated in Basham's case.

Basham's habeas counsel contend that Basham has a "statutory right to justice without discrimination." §2255 Mot. at 151. Again, they do not claim that *his* prosecution or sentence was discriminatory. They apparently argue that the death penalty violates federal law by allowing for discrimination in other cases. They quote 18 U.S.C. § 3593(f), which provides that the court must instruct the jury not to consider race in its sentencing determination. This Court fully complied with § 3593(f), which they seem to acknowledge. §2255 Mot. at 151 (arguing that § 3593(f) evinces a "broader purpose" of Congress). They then cite Congressional debate on 21 U.S.C. 848(e), the death penalty provision concerning continuing criminal enterprises. But Basham was not charged or sentenced under § 848(e). It is difficult to discern exactly what their argument is on this point, but just as the federal death penalty does not unconstitutionally discriminate on the basis of race or geography, it does not discriminate in violation of federal statutes. And there certainly is no error in Basham's case, as the Court fulfilled its statutory obligations in instructing the jury. See Sampson, 486 F.3d at 25 n.4 (rejecting Sampson's claim that he was denied his statutory right to "justice without discrimination" when district court instructed jury in keeping with 18 U.S.C. § 3593(f)).

<div align="center">-166-</div>

<div align="right">**JA 3404**</div>

D.    The Court lacks authority to refuse to enforce the FDPA.

Basham's habeas counsel invite the Court to exercise its "supervisory powers" to overturn the FDPA, or to refuse to enforce capital sentences under the FDPA, in the name of eliminating "charging discrimination and regional caprice[.]"  §2255 Mot. at 152.  They then cite United States v. Hastings, 461 U.S. 499, 505 (1983), which recognizes the authority of federal courts to formulate certain procedural rules.[26]  Hastings does not, of course, authorize a federal court to overturn a statute that is constitutional, based solely on the court's determination that the statute may be discriminatory in some case not before the court.  See Sampson, 486 F.3d at 25 n.4  (assuming that even if such a supervisory power existed, there is no basis for its use where the defendant is not the victim of discrimination).

**Response to Claim 33**:  **Basham has failed to show that the process mandated by the FDPA operates in an arbitrary and capricious manner; therefore, "the extraordinary step of finding a federal statute facially unconstitutional is not warranted."**

Citing Furman v. Georgia, 408 U.S. 238 (1972), and Eddings v. Oklahoma, 455 U.S. 104, 112 (1982), habeas counsel for Basham argue that the FDPA is unconstitutional because it is not fairly and consistently imposed.  §2255 Mot. at 156.  They conclude their argument with the erroneous assertion: "Should the Government prove unable to meet their burden of showing a legitimate distinction [between cases where the death penalty is imposed and cases where it was not imposed], then Mr. Basham's sentence must be set aside."  §2255 Mot. at 162.

It is Basham's habeas counsel's burden to show that Basham's sentence violates the Constitution.  See United States v. Taylor, 635 F.Supp.2d 1243, 1246 (D.N.M. 2009)(defendant

---

[26]In Hastings, the Supreme Court held that a court's supervisory power did not include the authority to ignore the doctrine of harmless error in reversing a conviction to punish prosecutors for making inappropriate remarks.  461 U.S. at 506-07.

**JA 3405**

bears the burden of establishing that the FDPA is unconstitutional)(citing Lujan v. G & G Fire Sprinklers, Inc., 532 U.S. 189, 198 (2001)). In order to meet this burden, Basham's counsel "must establish that no set of circumstances exists under which the Act would be valid. . . ." Id. (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). Under the canons of statutory construction, a statute must be construed, if possible, to give it constitutional effect. Id. (citing INS v. St. Cyr, 533 U.S. 289, 299-300 (2001)).

Basham's habeas counsel have failed to meet their burden. "Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." McClesky v. Kemp, 481 U.S. 279, 307 (1987). The sole basis Basham's counsel offer in requesting this Court to declare the FDPA unconstitutional is that more defendants were not sentenced to death. Their argument focuses on what appear to be inconsistencies in results of federal death penalty cases. The Supreme Court has made it clear that the focus must be on the procedure and process of a death penalty statute. Absent a showing that a capital punishment system operates in an arbitrary and capricious manner, a defendant cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty. McClesky v. Kemp, 481 U.S. 279, 306-307 (1987).

Basham's habeas counsel's superficial review of federal death penalty cases does not reveal why those sentenced to life received more lenient treatment. Jurors making sentencing decisions must be permitted to focus on the individual characteristics of a defendant and the circumstances of the crime. United States v. Sampson, 486 F.3d 13, 24 (1ˢᵗ Cir. 1007)(citing Eddings, 455 U.S. at

-168-

**JA 3406**

112).  The Supreme Court has observed:

> The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt ... . The capability of the responsible law enforcement agency can vary widely.  Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority.

McClesky, 481 U.S. at 307 n.28.

Together, Furman and Gregg v. Georgia, 428 U.S. 153 (1976), require that a death-penalty statute "(1) rationally narrow the class of death-eligible defendants and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  United States v. Sampson, 486 F.3d 13, 23-27 (1st Cir. 2007)(quoting Kansas v. Marsh, 548 U.S. 163 (2006); United States v. Green, Cr. No. 5:06CR-19-R, 2008 WL 4000943 (W.D.Ky. Aug. 26, 2008).  The FDPA complies with these requirements.  Indeed, it was designed for the very purpose of eliminating arbitrariness in capital sentencing.  United States v. Caro, 614 F.3d 101 (4th Cir. 2010)(*denying petitioner's motion for rehearing*).  Thus, it authorizes the death penalty only for certain crimes.  It further requires that the jury find at least one aggravating factor, and that it also consider mitigating factors.  Caro, 614 F.3d at 102.  This structure "passes constitutional muster," and "the extraordinary step of finding a federal statute facially unconstitutional is not warranted."  Id.

**Response to Claim 34: There is no cumulative error.**

In Claim 34, Basham's habeas counsel argue that the cumulative effect of all the errors alleged in his §2255 Motion mandates reversal of his conviction and sentence.  §2255 Mot. at 162.

JA 3407

This argument fails because they have not shown any errors. Legitimate cumulative error analysis evaluates only the effect of matters actually determined to be constitutional error. See Fisher v. Angelone, 163 F.3d 835, 852-53 n.9 (4th Cir. 1998); Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir. 1998) (cumulative error analysis applies when there are two or more actual errors; it does not apply to the cumulative effect of non-errors). The present case is not one in which there were a number of constitutional errors or a variety of instances of ineffective assistance of counsel. In short, there were no actual errors. Therefore, there is no cumulative error analysis to be done.

## CONCLUSION

For the foregoing reasons, Basham's §2255 motion should be denied.

Respectfully submitted,

WILLIAM N. NETTLES
United States Attorney

By: s/Robert F. Daley, Jr.
ROBERT F. DALEY, JR. (Fed. ID No. 6460)

By: s/Jimmie Ewing
JIMMIE EWING (Fed. ID No. 7292)

By: s/ Jeffrey Mikell Johnson
JEFFREY MIKELL JOHNSON (Fed. ID No. 10587)

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

---

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

---

## JOINT APPENDIX AND INDEX
## VOLUME 13

---

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for
Defendant-Appellant Basham*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  4:02-992-JFA |
| Plaintiff, | |
| -v- | Judge Joseph F. Anderson, Jr. |
| BRANDON LEON BASHAM, | DEATH PENALTY CASE |
| Defendant. | |

_____

DEFENDANT'S REPLY TO MEMORANDUM OF LAW OF
THE UNITED STATES IN OPPOSITION TO DEFENDANT'S MOTION
FOR COLLATERAL RELIEF PURSUANT TO  28 U.S.C. § 2255

_____

**JA 3409**

TABLE OF CONTENTS

Claim 1
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Claim  2
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Claim 3
The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties.  In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Claim 4
Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . 28

Claim 5
Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense.  In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

i

**JA 3410**

Claim 6

The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Claim 7

Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.. . . . . . . . . . . . . . . . . . . . . . . 48

Claim 8

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Claim 9

Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking... . . . . . . 51

Claim 10

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers.  In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

ii

**JA 3411**

Claim 11
The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by relying on Sheriff Hewett's false testimony in its closing argument... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Claim 12
Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.. . . . . . . . . . . 72

Claim 13
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.. . . . . . . . . . 75

Claim 14
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Claim 15
Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

iii

**JA 3412**

Claim 16
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.. . . . . . . . . . . . . 88

Claim 17
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Claim 18
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.. . . . . . . . . . . 100

Claim 19
Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.. . . . . . . . . . . . . 106

Claim 20
Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team.  In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

JA 3413

A.    The bias of defense investigator Carlisle McNair created a conflict of interest within the defense team. . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

B.    Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Claim 21
Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

Claim 22
The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing. As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Claim 23
The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial. Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Claim 24
Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence. By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal,

in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

Claim 25
The Court's instruction to the jury on mitigating evidence violated Mr. Basham's Eighth Amendment rights because it created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating. Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was ineffective for failing to raise this issue on direct appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

Claim 26
The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt. Appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they unreasonably failed to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Claim 27
Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.. . . . . . . . . 157

Claim 28
Newly discovered evidence suggests that Juror Wilson was untruthful in her testimony to the Court concerning her contact with other jurors. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.. . . . . . . . . . . . . . . . . . . . . . . 165

JA 3415

Claim 29

Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

Claim 30

Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Claim 31

Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment. Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Claim 32

A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced. This Court should vacate Mr. Basham's sentence on this basis alone.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Claim 33

The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

Claim 34

Mr. Basham's Conviction and Sentence Must be Vacated Due to the Cumulative Prejudicial Effect of the Errors in this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . 185

Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

**JA 3416**

COMES NOW Defendant BRANDON LEON BASHAM, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Rule 5(d) of the Rules Governing Section 2255 Proceedings, and this Court's order of January 11, 2012 (Dkt. 1431), and replies to the "Memorandum of Law of the United States in Opposition to Petitioners [sic] Motion Pursuant to 28 U.S.C. § 2255." (Dkt. 1416.)

## I.     FORMS OF CITATION

Throughout this Reply, "Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255" (Dkt. 1394) will be referred to as the "Motion" or the "§ 2255 Motion," and cited as "Motion at *xxx*."  The "Memorandum of Law of the United States in Opposition to Petitioners [sic] Motion Pursuant to 28 U.S.C. § 2255" (Dkt. 1416) will be referred to as the "Answer" or the "Opposition" and cited as "Opp. at *xxx*." Citations to other pleadings, transcripts, and other documents in this Reply will be as follows:

(1)     Documents on the official court docket, including pleadings, motions, and orders, will be cited by their docket number:  Dkt *xxx*.

(2)     Transcripts will by cited by date and page number: Tr. *xx/xx/xx* at *xx*.

(3)     Exhibits to this Reply will be consecutively numbered and cited accordingly: Rep. Exh. *xxx*.

(4)     All other citations will be self-explanatory or based on the Blue Book.

1

**JA 3417**

## II.    CLAIMS FOR RELIEF

### CLAIM 1

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his lawyers permitted him to speak with law enforcement officers outside of their presence and failed to advise him that his statements could be used against him.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's counsel were ineffective for allowing Mr. Basham, a man charged with capital murder, to walk off, unaccompanied, with law enforcement. This objectively unreasonable action fell below the prevailing professional norms of practice, and without the damaging evidence that resulted, it is likely that Mr. Basham would have gained a more favorable result at his trial. *See Strickland v. Washington*, 466 U.S. 688 (1984); *Rompilla v. Beard*, 545 U.S. 374 (2005).

"[W]henever important interests of a defendant are at stake, the defendant is entitled to be represented by a lawyer." *United States v. Herrera-Figeroa*, 918 F.2d 1430,1436 (9th Cir. 1990) (emphasis omitted).  Unquestionably, Mr. Basham had important interests at stake on the day of the search for Alice Donovan.  Although the Government disputes that an agreement or proffer was in place, there is no dispute

2

that the purpose of the search that day was for Mr. Basham to cooperate with the government in the hopes of finding Donovan's body and, accordingly, benefit Mr. Basham's potential sentence. (Opp. at 6; Tr. 9/27/04 at 169, 202.) Accordingly, Mr. Basham, had a right to assistance of his counsel throughout the day. *See Patterson v. Illinois*, 487 U.S. 285, 290 (1988) ("[t]here can be no doubt" that right to counsel exists in post-indictment interviews with law enforcement).

"Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect." *Patterson*, 487 U.S. at 290 n. 3. Mr. Basham and the two attorneys originally appointed to his case, Cameron Littlejohn and William Monckton IV, assisted in a search for Donovan's body. Mr. Basham and his attorneys were joined by Federal Bureau of Investigation officers, the Conway, South Carolina Police Department, and the Brunswick County Sheriff's Department. (Tr. 9/27/04 at 13.) The Government argues that counsel was not ineffective for failing to "literally hold [Mr. Basham's] hand" during the search. (Opp. at 4). Despite the Government's attempt to trivialize the issue, Mr. Basham's counsel had the absolute obligation to stay with him, observe, and intercede in any statements Mr. Basham made to law enforcement, and protect Mr. Basham from any attempts by law enforcement to get incriminating

3

statements.[1]  The Sixth Amendment guaranteed Mr. Basham "the right to rely on counsel as a 'medium' between him and the State." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).  Contrary to the government's assertion that counsel could not be with Mr. Basham at all times, great care was taken to ensure that they in fact were.  One of Mr. Basham's attorneys rode with him in the transport from the jail to meet up with law enforcement for the search.  (Tr. 2/25/04 at 30, 98.)  Seating in the van was carefully arranged so that Mr. Basham had counsel close at hand.  Counsel were given times alone in the van to consult with Mr. Basham in private.  (Tr. 9/27/04 at 14; Tr. 2/25/04 at 44, 68, 85.)

The search lasted for several hours and several hundred miles.  (Tr. 2/25/04 at 65.)  Eventually, after much frustration, the van stopped and everyone exited the vehicle.  While Mr. Monckton and Mr. Littlejohn were talking with the remainder of the group, Mr. Basham was shockingly left alone to walk to the edge of the cemetery with Sheriff Hewett and two Conway Police Officers (neither of whom testified at trial).  (Tr. 2/25/04 at 67, 83.)  Left alone, Mr. Basham was at the mercy of Sheriff

---

[1]When the government and their agents took advantage of counsel's abandonment of Mr. Basham, they breached their obligations under the Sixth Amendment.  "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is . . . a breach of the State's obligation not to circumvent the right to assistance of counsel." *Maine v. Moulton*, 474 U.S. 159, 176 (1985).

4

Hewett.  "Once an uncounselled, targeted individual meets with prosecutors or law enforcement, his fate will depend entirely upon the integrity of his adversary." Pamela R. Metzger, *Beyond the Bright Line: A Contemporary Right-to-Counsel Doctrine*, 97 Nw.U.L.R. 1635, 1666 (2003).  As addressed in Claim 29, *infra*, Sheriff Hewett's integrity was an unfortunate choice for Mr. Basham to hang his fate upon. Sheriff Hewett took advantage of the time alone with Mr. Basham, violated his Sixth Amendment right to counsel, and elicited (or fabricated) extremely prejudical statements that proved to be some of the most damning evidence against Mr. Basham at trial and penalty phase.

Mr. Basham's right to counsel guaranteed that he be given advice and protection from "falling into traps" devised by opposing parties.  *United States v. Ming He*, 94 F.3d 782, 789 (2nd Cir. 1996) (internal citations omitted) ("We guarantee the right to counsel to save the defendant from falling into traps devised by a lawyer on the other side and to see to it that all available defenses are proffered."). While it may be true that the questions here were designed to find Ms. Donovan's body, "the potential obviously exists for the statements to be used later against the defendant.  Thus, counsel has a role to play, even in interviews covering essentially factual matters." *Id.*

The role of counsel in such a situation is tri-fold.  A lawyer can help their client

5

understand the questions and keep them calm. "Some defendants are not sophisticated or intelligent enough to grasp a question's purport and may blurt out unthinking answers because the interview process intimidates them." *Id.* at 789. Next, a lawyer can keep the client focused on the fact that the opposing party does not share his interests. Third, "a defense attorney might help resolve the potential disagreements between the government and defendant and assist the defendant in clarifying his answers to ensure they are complete and accurate." *Id.* at 790.

Here, Mr. Basham was certainly not intelligent or sophisticated enough to understand that Sheriff Hewett was attempting to elicit damaging information, and that Sheriff Hewett did not share his interests, despite Hewett's efforts throughout the day to create a rapport with Mr. Basham (Tr. 9/27/04 at 42).[2] Even after having only spent only one day with him, defense counsel had to be aware that they had a client likely to blurt out damaging statements. (Tr. 9/27/04 at 24-25). Considering that the government first took the position that Mr. Basham's statement was that Fulks

---

[2]Sheriff Hewett's attempts to befriend Mr. Basham compounded the likelihood that Basham would make incriminating statements in his presence. "The cooperating defendant has a complex and confusing relationship with prosecutors and law enforcement. On the one hand, the government seems to be offering him a place, of sorts, on the government team. On the other hand, the defendant and the government have fundamentally adverse interests and, if negotiations break down, the government can withdraw its promised help and protection." *Beyond the Bright Line: A Contemporary Right-to-Counsel Doctrine.* 97 N.W.U.L.R. 1635, 1667-68 (2003).

strangled Mrs. Donovan, and then that it was Mr. Basham, (*see* Claim 23 *infra*) had counsel been present the truth would not have been so muddied and counsel could have ensured that the statement was complete and accurate. Due to counsel's abandonment of their client, Mr. Basham was denied such assistance.

Counsel utterly failed in their duties when they allowed Mr. Basham to walk off, without counsel, with law enforcement. As a result, Mr. Basham was severely prejudiced. "If pre-charge bargaining fails, the defendant may well have sealed his fate at trial by providing statements and evidence that will guarantee his conviction." Metzger, *supra*, at 1666. Because the search failed to disclose the location of Mrs. Donovan's body, Mr. Basham was left with no benefit for his actions and indeed sealed his fate with his statements to Sheriff Hewett. "Cooperation and full disclosure carry sentencing risks that may be hidden from the unrepresented individual." *Id.* at 1667. Left alone, temporarily abandoned by counsel, Mr. Basham made what the government themselves characterized as the statements that "seal[ed] the deal." (Tr. 9/29/04 at 81-82.) The attempt by the government to now downplay the damaging impact of that evidence, and say that numerous other pieces of evidence could have "sealed the deal," is disingenuous. The record and the Government's own words speak for themselves:

> Ladies and Gentlemen, I wanted to finish with that because how would
> you go back in your jury room after listening to Sheriff Hewitt [sic] and

7

**JA 3423**

after seeing Sheriff Hewitt [sic] demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death?  And find him not guilty of kidnapping, resulting in death?  I have been up here for two hours, and *the government submits those two witnesses and that limited testimony, alone, seals the deal.*

(Tr. 9/29/04 at 81-82, (emphasis added).)

Unsurprisingly, the government only addresses the potential impact of the statement on the guilt phase of Mr. Basham's trial, whereas the penalty phase was where the most significant damage was done.  The Government maintains that Mr. Basham could not have been prejudiced by his statements during the search because he had made several other statements to law enforcement.  However in *none* of those previous statements did he implicate himself as the actual hand that dealt the fatal blow.  The government characterizes the "We killed them" statement to Clifford Jay as showing that Basham was the killer.  This argument simply does not hold water. "We killed them" is not "I strangled her."  And, in summation at the guilt phase, that is exactly what the government argued Mr. Basham meant when he showed Sheriff Hewett how Ms. Donovan died.  "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan.  Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it."  (Tr. 9/29/04 at 80 (emphasis added).)  The purse strap did more than "provide[] a bit of drama."  (Opp. at 12).  It was the sole

8

**JA 3424**

piece of evidence that allowed the Government to argue that Mr. Basham was the hand that took Ms. Donovan's life. By allowing Mr. Basham to walk off unaccompanied with law enforcement, counsel's actions fell far below the the prevailing professional norms of practice. The result of this failure resulted in either the elicitation or fabrication of one of two pieces of evidence that "sealed the deal" for Mr. Basham's conviction and death sentence, and the only piece of evidence that allowed the government to argue that Mr. Basham was the killer. Unquestionably, Mr. Basham was prejudiced by this result.

## CLAIM 2

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to prepare for and/or effectively litigate the *Jackson v. Denno* hearing in his case.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

In its Opposition, the Government argues that, in failing to present any evidence or put forth any meaningful argument in support of Mr. Basham's motion to suppress his post-arrest statements (*see* Dkt. 232), trial counsel "proceeded strategically." (Opp. at 12.) Specifically, the Government maintains that counsel

9

**JA 3425**

took a reasonable "middle ground" between (1) challenging the voluntariness of their client's statements (statements that were at the heart of the Government's case against both Mr. Basham and Mr. Fulks); and (2) preserving their ability to later argue to the jury as a mitigating circumstance at sentencing that Mr. Basham's statements "were indicative of voluntary cooperation with law enforcement." (Opp. at 14.) The Government's position, however, is contrary to both constitutional law and common sense, and is not supported by the facts in this case.

The Government attempts to implicate the Court in trial counsel's failings by suggesting that, if counsel had actively challenged the constitutional admissibility of the statements elicited from Mr. Basham by law enforcement, the Court would have precluded counsel from arguing at sentencing that Mr. Basham's statements could be considered by the jury in assessing his cooperation with police as a mitigating factor. (Opp. at 13.) The Government makes this charge by focusing on a passing observation made by the Court at the *Jackson v. Denno* hearing that, although he had "never thought about it" before, he "probably would disallow the defendants from trying to suggest to the jury that he should get some credit for his statements if he tried to keep them out." (Tr. 2/24/04 (a.m.) at 8-9.) What the Government fails to note in its Opposition, however, is that the Court immediately clarified, *"That's not a ruling*, I'm just saying that's something we have to think about . . . ."  (*Id.* at 9)

10

**JA 3426**

(emphasis added.)

Of course, what defense counsel should have known, and what the Court ultimately would have considered before making a ruling on this issue, is that the United States Supreme Court has long held that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). Thus, for example, a criminal defendant cannot be forced to waive his Fifth Amendment right against self-incrimination in order to assert his Fourth Amendment right against unreasonable searches and seizures. *Id.* Similarly, a defendant cannot be forced to choose between his right to challenge the voluntariness of his statements to the police and his right under the Eighth Amendment to have the sentencer in a capital case consider and give effect to all relevant mitigating evidence.

What the Government asks the Court to now conclude is that it would have committed constitutional error in precluding Mr. Basham from arguing to the jury at sentencing that it could consider his statements to law enforcement officers as mitigating evidence in the form of cooperation. Presuming that a judge will not follow the law, however, is "speculation that is never appropriate." *Correll v. Ryan*, 539 F.3d 938, 951 (9th Cir. 2008).

There is no legitimate reason to believe that the Court would have violated Mr.

11

**JA 3427**

Basham's Eighth Amendment rights in this case in the way that the Government suggests. Fear on trial counsel's part that the court will make an improper ruling, especially when counsel makes no effort to inform the court of the controlling law, is not "strategy," it is ineffectiveness.

Moreover, even if there were some basis to believe that the Court would have improperly precluded Mr. Basham from presenting relevant mitigating evidence to the jury, the action on counsel's part that would have precipitated such a ruling by the Court happened long before the *Jackson v. Denno* hearing in February 2004. The Court observed at the hearing:

> It's a two edged sword to raise a voluntariness issue in a death penalty case, because if I hear the testimony and determine the statements were voluntary, they come in . . . . Then if he gets convicted and we move into the penalty phase – I don't know, I never thought about it – but I probably would disallow the defendants from trying to suggest to the jury that he should get some credit for his statements if he tried to keep them out.

(Tr. 2/24/04 (a.m.) at 8-9.)

By the time the Court made these observations, trial counsel had already "tried to keep [Mr. Basham's statements] out." Specifically, they filed a motion to suppress those statements on December 31, 2003, and expressly requested an evidentiary hearing on the matter. (Dkt. 232.) In other words, trial counsel had already "raise[d] a voluntariness issue." Accordingly, if the Court had been intent on improperly

12

**JA 3428**

punishing Mr. Basham for exercising his constitutional right to challenge the voluntariness of his statements by precluding him from presenting mitigating evidence at sentencing, it would have done so regardless of counsel's efforts (or lack thereof) to suppress Mr. Basham's statements at the *Jackson v. Denno* hearing itself. Counsel had already "raise[d] a voluntariness issue" in their December 2003 motion. Applying the Government's reasoning, the damage had already been done. No further damage – but certainly a great deal of benefit – could have resulted from a meaningful presentation of the considerable evidence that Mr. Basham's post-arrest statements were constitutionally inadmissible.

The Government also argues that, because "[t]he witnesses' testimony did not suggest that Basham's statements were involuntary," trial counsel reasonably used the *Jackson v. Denno* hearing "to lay a foundation that Basham was cooperative with investigating officers." (Opp. at 15.) Trial counsel, however, called no witnesses at the hearing. Rather, they relied solely on cross-examination of the Government's witnesses. It is no surprise that the law enforcement officers called by the Government provided no evidence of coercion, and it constitutes deficient performance on trial counsel's part to rely solely on cross-examination of such witnesses to develop evidence of coercion. *Bynum v. Lemmon*, 560 F.3d 678, 684 (7th Cir. 2009) ("Graddick testified at the post-conviction hearing that he intended

13

**JA 3429**

to elicit evidence of coercion through the officers' testimony.  But this plan, as the district court aptly observed, is 'not trial strategy; it is television fantasy.'").

Further, the Government's argument that trial counsel strategically chose to forego Mr. Basham's constitutional challenge to the voluntariness of his statements in favor of arguing cooperation as a mitigating factor overlooks the critical fact that, even after abandoning his viable argument for suppression of his statements, defense counsel never offered Mr. Basham's cooperation with law enforcement as a mitigating factor in this case.  (*See* Dkt. 805 and 806 (special verdict forms).)  The reason for this is evident: trial counsel had long known (and certainly before the *Jackson v. Denno* hearing) that the Government intended to argue that Mr. Basham had in fact intentionally misled law enforcement with his post-arrest statements.  (*See, e.g.,* Dkt. 69 at 5("[A]ccording to the government, Basham's misleading statements about the location of the body could be used to prove that, instead of attempting to help investigators locate the body, Basham actually intended to divert them away from the body's true location with the hope that the passage of time would render forensic details of the murder less reliable.").)

Accordingly, the Government's post-hoc justification of trial counsel's failings at the *Jackson v. Denno* hearing do not withstand factual scrutiny.  Moreover, even if the Government were correct that trial counsel intentionally choose to forego a

14

**JA 3430**

viable challenge to the admissibility of Mr. Basham's statements in favor of preserving their ability to argue at sentencing that Mr. Basham had cooperated with law enforcement, such a strategy would have been objectively unreasonable in light of the Government's expressed intention to argue that Mr. Basham had not cooperated with law enforcement, but had instead sent them on "a deliberately false, wild-goose chase."   (Tr. 3/4/04 at 13 (trial court summarizing Government's position).)

Finally, in its only discussion of the prejudice requirement of *Strickland*, the Government states that "Basham's habeas counsel cannot point to any evidence that he was coerced or that he statements to police were involuntary." (Opp. at 16.) The Government misses the point.   There is no "evidence" in the record of the involuntariness of Mr. Basham's post-arrest statements because his trial attorneys rendered deficient performance in failing to present any.  At an evidentiary hearing on this claim, however, Mr. Basham will demonstrate *Strickland* prejudice by presenting, among other things, the evidence of his "mental history, and his low intellectual and intelligence capacity" (Tr. 2/24/04 (a.m.) at 11) to which trial counsel alluded but failed to demonstrate, as well as the coercive conditions of his interrogations.

15

CLAIM 3

**The Court deprived Mr. Basham of his right to an impartial jury by erroneously excluding potential jurors whose concerns about the death penalty would not have substantially impaired the performance of their duties. In addition, by failing to raise this issue on appeal, appellate counsel rendered ineffective assistance of counsel within the meaning of the Fifth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's convictions, sentences, and death verdict violate the Fifth, Sixth, and Eighth Amendments because the Court erroneously excluded for cause at least two prospective jurors who were actually qualified to serve, thereby depriving Mr. Basham of his right to an impartial jury. *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *see Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

Contrary to the Government's assertion, the Court did not validly exercise its discretion when it removed the jurors for cause. While the Government is correct that whether or not a venireperson's reservations amount to a "substantial impairment" is based upon the voir dire inquiry, *see United States v. Tipton*, 90 F.3d 861, 880 (4th Cir. 1996), a court cannot exclude jurors based on their general opinions rather than an inability to follow the law. *Witherspoon*, 391 U.S. at 522. Indeed, "those who

16

firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

The Court committed prejudicial error by granting the Government's motion to exclude venirepersons Cathy Roberts and Michael Williams for cause. Neither of these potential jurors expressed views regarding the death penalty that justified their exclusion under *Witherspoon*, 391 U.S. 510, or *Wainwright v. Witt*, 469 U.S. 412 (1985). The Court also erred when it dismissed venirepersons Rubina Khan and Susan Jackson without allowing the defense an opportunity to rehabilitate the jurors in voir dire. The statements by the jurors at issue are discussed at length in both Mr. Basham's § 2255 Motion and the Government's Response. Thus, they will only be briefly summarized here.

Venireperson Cathy Roberts initially expressed concern about the death penalty in a case where a defendant did not inflict the fatal blow (Tr. 8/30/04 at 112), but she ultimately stated that "[if] selected [she] would follow the law." (Tr. 8/30/04 at 113.) Ms. Roberts unequivocally stated she could put aside her beliefs "and follow the law as the judge announces." (Tr. 8/30/04 at 109). Venireperson Michael Williams also expressed initial hesitation, but stated that although he might have personal issues

**JA 3433**

with the death penalty, "the judge says you got to go by what the law says." (Tr. 9/7/04 at 207, 218.) He ultimately said he was "very, very uncomfortable signing the document" for death, but still felt there were some cases, like the Susan Smith case, where it was appropriate. (Tr. 9/7/04 at 230.)

Venirepersons Rubina Kahn and Susan Jackson expressed stronger reservations. Ms. Kahn gave conflicting statements of "I don't think I can vote for capital punishment, I don't think I can" (Tr. 8/31/04 at 280-81), and "I guess I could be able to put aside my views" (Tr. 8/31/04 at 271). She stated she was not someone who could never vote for death under circumstances. (Tr. 8/31/04 at 271.) Yet the Court dismissed her without any giving the defense any attempt to rehabilitate or clarify her answers. (Tr. 8/31/04 at 281). Ms. Jackson was disqualified for cause based on her statements in the questionnaire that she was "strongly opposed to the death penalty and would have a difficult time voting for it, regardless of the facts and law in the case." She also wrote, "Taking a life under any circumstances is reprehensible." (Tr. 9/3/04 at 67). The government moved to dismiss her immediately. (Tr. 9/3/04 at 67). Although the Court brought her in and questioned her, the Court denied defense counsel the opportunity to do so. (Tr. 9/3/04 at 73-75.)

Turnabout was not fair play in this courtroom. The Court reacted much differently when pro-death penalty jurors gave conflicting answers to their positions

18

on the death penalty. When venirepersons gave answers that showed they were predisposed to death, the Court went out of its way to rehabilitate them and refused to strike them over strenuous defense objections. As a result, the jury pool was stacked with death-leaning jurors.

Venireperson Lisa McCormick stated in her questionnaire that she would have a hard time voting against the death penalty regardless of the facts of the case. (Tr. 8/31/04 at 62). On voir dire she stated that if the government can prove the murder, then the defendant should get the death penalty. (Tr. 8/31/04 at 60-62.) At this point the Court interrupted the Government's voir dire and said, "you are telling [defense counsel] something different from what you told me." (Tr. 8/31/04 at 62.) McCormick, admonished by the judge for her inconsistency, then backpedaled on her answer. The Court and defense counsel both gave lengthy speeches on how the penalty phase worked. (Tr. 8/31/04 at 63-66.) McCormick stated that, despite her strong leanings towards the death penalty, she would not automatically vote death. (Tr. 8/31/04 at 66.) Under questioning by the government McCormick stated that she could envision a scenario where death was not appropriate. (Tr. 8/31/04 at 74).

McCormick's answers were nothing more than the answers of venirepersons Roberts and Williams in reverse. Both Roberts and Williams stated that they had strong objections to the death penalty but ultimately stated that they could follow the

19

law. Yet they were stricken. Defense counsel moved to strike McCormick based on her answer that if Mr. Basham was found guilty, she would vote for death. (Tr. 8/31/04 at 77.) The Government argued that, because McCormick said she would follow the law, so she was qualified. (Tr. 8/31/04 at 80.) The Court left McCormick on the panel over defendant's "strenuous objection." (Tr. 8/31/04 at 80.) Thus, the argument that a juror is qualified to serve when they state they will follow the law despite strong leanings to one side was successful for jurors predisposed to death, but failed for those predisposed to life.

The trend continued with other venirepersons. Billy Small hesitated when asked if he could remain open-minded in a case with two homicides. He stated that he had some concern that he could not be open minded in such a situation. He agreed that he "might be inclined" to say mitigation did not matter at that point. (Tr. 9/1/04 at 79.) Once again, the Court intervened in defense questioning and admonished the juror, "[Y]ou understand you are changing what you told me and what you are telling Mr. Swerling." Like McCormick, Small backpedaled and said "I would *want* to –I would be open-minded" on both. (Tr. 9/1/04 at 79-80.) Defense counsel moved to strike the juror for cause because he was "mitigation impaired." (Tr. 9/1/04 at 89.) Despite his conflicting answers, and concern over ability to be fair in a case with two murders, Smalls was retained over the defense objection. (Tr. 9/1/04 at 90-91.)

20

**JA 3436**

Venireperson Gregory Brown stated in his questionnaire and in voir dire that death should be given in robbery and rape of a minor, that he generally favored it, and that it was used too seldom. (Tr. 9/1/04 at 232, 243, 246.) Under questioning in voir dire, he stated it would be hard to say if he could consider mitigation in a case with a second death. Defense counsel explained that he could consider the second death but would have to hear the mitigation. Brown said he thought he could do that and then, when told that answer sounded "iffy," corrected to say he could do that. (Tr. 9/1/04 at 228-229.) Brown was aware that Fulks had pled guilty but stated it would not affect his judgment. (Tr. 9/1/04 at 236-37.) Defense counsel objected to Brown's qualification. He asked the record to reflect that Brown shook his head during the questions about the two homicides. The impression was "that he did not want to tell the Court he couldn't be fair." (Tr. 9/1/04 at 250-51.) His body language was that he could not consider mitigation. Finally, with robbery and rape of a minor at issue, it was very close to the factual situation of this case. (Tr. 9/1/04 at 251.) The Government argued that Brown was simply nervous and the Court qualified Brown over the defense objection. (Tr. 9/1/04 at 252-53.) This juror is another perfect example of the double standard applied by this Court that stacked the jury in favor of death. While the Court found that the "body language" and "hesitancy" and the feeling that venireperson Roberts "seemed to have some trouble with the idea [of the

21

**JA 3437**

death penalty]" (Tr. 8/30/04 at 114) was sufficient to dismiss her for cause, despite her unequivocal statement that if "selected I will follow the law" (Tr. 8/30/04 at 113), the same concerns about body language, hesitancy, and conflicting statements did not pass muster to strike Brown for cause.

Venireperson Laurie Hogan also expressed concern about ability to be fair when the defendant was alleged to have committed two murders. She stated she could not give a definite yes or no answer but would try her "best" to lay everything out and follow instructions and wait to form an opinion, if that is what she was told to do. (Tr. 9/2/04 at 17-18.) She also wrote in her questionnaire that death should be applied in cases of rape and child abuse. (Tr. 9/2/04 at 24.) Defense counsel moved to strike for cause. (Tr. 9/2/04 at 21-22.) The Court allowed questioning to continue. Under leading questions, Hogan agreed that she could follow instructions, put her opinions aside, and listen to the evidence. (Tr. 9/2/04 at 25.) Hogan stated that she had very strong opinions on rape, especially when it is done to a child, and that no woman or child should be abused. (Tr. 9/2/04 at 36, 44.) As to the death penalty, she said her convictions are very strong, but she could go into a jury room and discuss them, but if there was no doubt in her mind, her position would not change. (Tr. 9/2/04 at 42.) Defense counsel objected to Hogan's qualification, arguing that she was "mitigation impaired." Over the objection, despite strong leanings towards

22

**JA 3438**

death, and conflicting answers, the Court found Hogan qualified.  (Tr. 9/2/04 at 49.)

Venireperson, and ultimately juror, Joyce Hartsoe, was another who expressed hesitation about whether or not she could be fair and open-minded with two homicides.  (Tr. 9/2/04 at 230-31.)  Ultimately, after further questioning she responded affirmatively to the leading question that she would have an open mind. (Tr. 9/2/04 at 233.)  Defense counsel moved to strike, noting that she really hesitated with the second homicide question and would be "mitigation impaired."  (Tr. 9/2/04 at 239-240.)  Again, although concerned with the hesitation by venireperson Roberts, *see supra*, here the Court defended the juror's hesitancy as just confusion and qualified Hartsoe over defense counsel's objection.  (Tr. 9/2/04 at 240).[3]

Venireperson Marcus Holston was yet another juror that hesitated regarding ability to be fair in a case with two murders.  Holsten gave numerous conflicting answers as to this issue.  First he stated he thought he could remain open.  Then, that he could, but qualifying it with, "I'm not going to say I would be tempted [to decide right away upon hearing about second death] but I would listen to the evidence." (Tr. 9/2/04 at 325.)  When asked by defense counsel about sitting on a case with two homicides, Holston stated he would "*try* to have an open mind,"  but that he might be

---

[3]It is of note that Hartsoe was one of the jurors that had significant phone contact with foreperson Cynthia Wilson, later held in contempt of court for her misconduct as a juror in this case.  (Tr. 4/12/28 at 22 generally).

23

tempted to make a decision right away. Nonetheless, he affirmed he could give meaningful consideration to mitigation. (Tr. 9/2/04 at 339-40 (emphasis added).) Defense counsel objected, expressing concern that Holsten was "mitigation impaired." The Court again defended the death-leaning juror's conflicting answers, stating, "he's just being brutally honest," and qualified Holsten over the defenses objection. (Tr. 9/2/04 at 341.)

The response of venireperson Julia Balsiger were "picture perfect," consistantly stating that she could be fair and impartial under the circumstances of the case. (Tr. 9/3/04 at 180.) However, twenty years prior, her fourteen-year-old daughter was raped by four men. They took her away in a car, took her out into the wildnerness, and raped her. Three of the men wanted to kill her. (Tr. 9/3/04 at 159-60). Defense counsel objected. Although the Court initially expressed concern about the fact that Balsiger's daughter's rape was so close to the factual scenario here, he ultimately qualified her. (Tr. 9/3/04 at 177-78; 9/9/04 at 271.)

Venireperson Vicki Jackson had a daughter close in age to Samantha Burns. (Tr. 9/7/04 at 173.) She first stated that she was "not sure" whether or not that closeness in age would affect her, but that she thought she could put it aside, and then later stated that she could put it aside. (Tr. 9/7/04 at 173-74, 182.) She stated that she felt like a defendant should try to prove themselves innocent one way or another,

24

although she could follow the judge's instruction and not hold it against a defendant who did not come forward. (Tr. 9/7/04 at 180-82.) She stated that she was "not so sure" if she could consider mitigation in the absence of a presentation by the defendant, she would want to hear from the defendant; before she could consider a life sentence. (Tr. 9/7/04 at 189.) Based on that answer, defense challenged Jackson for cause. The Government argued that Jackson's use of the phrase "prove his innocence" was simply a term of art and she was not aware of the ramifications. (Tr. 9/7/04 at 192.)

Like venirepersons Kahn and Susan Jackson, both of whom expressed strong opinions that death was not appropriate, Vicki Jackson was unambiguous that she would require evidence from a defendant before considering life. Yet unlike Kahn and Susan Jackson, the Court allowed Jackson to return and be rehabilitated. The Court lectured Jackson that a defendant does not have to prove anything, that death was not automatic, and explained aggravation and mitigation, all the while asking leading questions to which Vicki Jackson replied little more than, "Yes, sir." (Tr. 9/7/04 at 192-195.) Responding to the leading question from the Court that it "want[ed] to make sure that is not your position" that death would be automatic if no mitigation was put forth, Jackson assured the Court it was not. (Tr. 9/7/04 at 195.) Defense counsel renewed their objection, and the Court overruled it and qualified

**JA 3441**

Jackson. (Tr. 9/7/04 at 196.)

Venireperson Kenneth Caldwell also expressed hesitancy over his ability to fairly hear case with a second murder. He candidly stated that it would be hard to know how much it would "sway you" without knowing the facts of what would be presented. (Tr. 9/8/04 at 169.) Defense counsel objected to Caldwell, stating that he gave "the worst long pause . . . in two weeks" with the two death question. (Tr. 9/8/04 at 178.) The Court agreed that Caldwell "struggled with the death question" but felt that "once he understood it . . . he came out ok." (Tr. 9/8/04 at 178.) The Court qualified Caldwell over the defendant's objection. (Tr. 9/8/04 at 183.)

As the recitation of the facts above makes clear, Mr. Basham was deprived of an impartial jury when the Court granted the Government's strikes for cause based on general opinions about the death penalty rather than ability to follow the law, but then denied similar arguments to strike venirepersons by the defense. This inconsistent and unconstitutional application of the law violated Mr. Basham's rights to a fair trial. As stated in Mr. Basham's § 2255 Motion, the foregoing violations of Mr. Basham's constitutional rights, taken alone or in combination with other errors alleged in the Motion, constitute structural error and warrant the granting of this Motion without any determination of whether the violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahmson*, 507 U.S. 619, 637-38, n. 9

**JA 3442**

(1993). However, even assuming that the harmless error doctrine applies to this claim, the foregoing constitutional violations, alone and in combination with the other errors alleged in this Motion, so infected the integrity of the proceedings that the error cannot be deemed harmless. The foregoing violations of Mr. Basham's rights had a serious and injurious effect or influence on Mr. Basham's convictions and sentences, rendering them fundamentally unfair and resulting in a miscarriage of justice. *See id.* at 622, 637-38.

Appellate counsel was ineffective for failing to raise this claim on appeal. As the record above demonstrates, the inconsistent application of *Witherspoon* was a non-frivolous issue. Although weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy, exclusion of jurors because of their views against capital punishment, but who could nevertheless follow the law, is not a weak issue. Moreover, the "weeding" principle has little or no applicability in capital cases, for appellate counsel in a capital case has a duty to consider all potentially available claims in light of the unique nature of the death penalty and the possibility of preclusion or a change in the law in later courts.

As a result of the Court's removal of otherwise eligible jurors, the jury (including alternates) was composed of thirteen individuals who responded that they "generally favored the death penalty." *See* Supp. juror questionnaires for jurors 51,

27

93, 143, 171, 302, 314, 325, 328, 352, 466, 562, 575, 584, 593, 621, 677, 776.
Appellate counsel rendered ineffective assistance in not raising this claim on direct appeal, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Strickland*, 466 U.S. 668.

<div align="center">

CLAIM 4

</div>

**Mr. Basham was tried and sentenced while legally incompetent in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

In Claim 4 of the Motion, Mr. Basham argued that his convictions and sentences were rendered in violation of his constitutional rights to due process, to a fair and reliable determination of guilt and penalty, to present a defense, and to the effective assistance of counsel because he was tried, convicted, and sentenced to death when he was mentally incompetent to stand trial. The Government responds that this claim is procedurally barred because it was not raised on direct appeal. (Opp. at 30.) The Government, however, misstates the law.

In Claim 4, Mr. Basham raised a "substantive competency claim," *i.e.*, a claim that he was tried and convicted while he was actually incompetent. *See United States*

<div align="center">

28

</div>

<div align="right">

**JA 3444**

</div>

*v. General*, 278 F.2d 389, 396 (4th Cir. 2002); *see also Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). "[T]his kind of claim 'is not subject to procedural default and must be considered on the merits.'" *Battle*, 419 F.3d at 1298 (*quoting Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995)). *Accord Vogt v. United States*, 88 F.3d 587, 590 (11th Cir. 1996).

"The conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). The test for whether a defendant is competent to stand trial "seeks to ascertain whether a criminal defendant 'has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him.'" *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (*quoting Dusky v. United States*, 362 U.S. 402 (1960)). As the Supreme Court has emphasized:

> Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (*quoting Riggins v. Nevada*, 504 U.S. 127, 139-40 (1992) (opinion of Kennedy, J.)).

29

**JA 3445**

Where a preponderance of the evidence demonstrates that a defendant lacks the requisite understanding and ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper*, 517 U.S. 348. This preponderance of the evidence standard applies in a § 2255 proceeding. *See Battle*, 419 F.3d at 1298 (*citing Medina*, 59 F.3d 1292). To satisfy this standard, Mr. Basham need only prove that it is more likely than not that he was incompetent within the meaning of *Drope* and *Dusky* during his trial. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (discussing preponderance of evidence standard).

Contrary to the Government's assertion that "at no point did any mental health care expert indicate that Basham was incompetent," (Opp. at 26), Dr. Donna Schwartz-Watts told the Court on September 20, 2004, immediately follow an in-court altercation between Mr. Basham and United States marshals, that Mr. Basham *was* incompetent:

> I do have concerns about his competency. It is my opinion right now that because of his mental defect that he can't assist his attorneys. Now, the problem with that, and the good news probably is, his mental state fluctuates, and there is going to be times in this trial where he has competence fluctuation.

(Tr. 09/20/04 at 162.) The Government presented no testimony or other evidence to contradict Dr. Schwartz-Watts's expert opinion.

30

**JA 3446**

Moreover, contemporaneous handwritten notes created by Jack Swerling on September 20, 2004, appear to indicate that he spoke with Dr. Schwartz-Watts and she informed him that Mr. Basham was "incompetent." Rep. Exh. 1. Co-counsel Greg Harris also expressed concerns about Mr. Basham's competence on September 20:

> To respond to Mr. Schools, to get back on this issue about whether or not this is manipulation or whether he is competent, what I just saw in the courtroom didn't look like any attempt to manipulate I had ever seen. Looked like someone who didn't have the ability to control the simple function of sitting down in a seat. That is why we have a concern about the competence today. The 20th of September.

(Tr. 9/20/04 at 157-58.)

Accordingly, the record plainly establishes by a preponderance of the evidence that, *at the very least*, on September 20, 2004, Mr. Basham was incompetent during his trial. Although the Court did not proceed with the trial immediately following Mr. Basham's demonstrated incompetency on the afternoon of September 20, remarkably, it later allowed both a videotape and an audiotape of an incompetent Mr. Basham struggling with United States marshals to be shown to the jury at the penalty phase in support of the Government's request for a death sentence. (Tr. 10/18/04 at 45, 47; Trial Exh. at 469-A & 469-B.) The record in this case indicates by a preponderance of the evidence, at the very least, that Mr. Basham was incompetent when the videotape and audiotape were made of his struggle with the United States marshals,

31

and the Court deprived him of his right not to be tried while incompetent when it allowed the Government to use his incompetence to its own advantage.

The afternoon of September 20, however, was not the only occasion on which Mr. Basham's incompetence was evident. The record itself demonstrates numerous occasions on which Mr. Basham was unable to stay awake or was otherwise unable to assistant his attorneys.[4] (Tr. 9/7/04 at 231-32 (discussing Mr. Basham's inability to stay awake); 9/8/04 at 184 ("MR. SWERLING: "Apparently he just can't keep his head up. I am getting frustrated. I am trying to do the job here, I don't want the jury to see him in this fashion."); Tr. 9/17/04 (*Ex Parte* hearing) at 7 ("THE COURT: If you can sit there and stay awake today, we will have you some chewing tobacco Monday when we come back, I promise you. Work with us and try to stay awake today."); Tr. 9/20/04 at 88 ("THE COURT: Last Friday there were two issues: Your stress that you were almost having a panic attack, supposedly, and then, you were sleepy."); Tr. 10/12/04 at 69 (Greg Harris Opening Statement in Penalty Phase: "Why would someone, after having been charged, and arrested, and confronted with death penalty offenses, sleep in his trial and during his jury selection? Why would someone

---

[4]The Government's contrary claims that "there is nothing in the record to support Basham's habeas counsel's assertions that Basham was incompetent to be tried," (Opp. at 31), or that "the record is barren of support for Basham's alleged incompetency" (Opp. 32), are patently erroneous.

32

argue with his lawyers during the trial?); Tr. 10/12/04 at 69-70 (Greg Harris Opening Statement in Penalty Phase: "We see someone sleeping in a courtroom during his death penalty trial, and we logically conclude that he is uninterested.  And that is very rational decision.  We see someone arguing with his lawyers and we think to ourselves, how can he choose to argue with the same – with the only people that are trying to save his life?"); Tr. 10/15/04 at 225 (the Court discussing its decision to give Mr. Basham dip: "And at some point, he appeared to be dozing again, and that is when we got into the question about dip . . . .  I said, if that is what it takes to keep the Defendant awake and active in this proceedings, it is the thing to do."); and Tr. 10/18/04 at 53 (Jack Swerling: "There were a couple of occasions where, in the courtroom, there was an expression by either Mr. Harris or I about Mr. Basham's apparently being drowsy and sleeping at inappropriate times?").)

In addition, Mr. Basham will present evidence at the evidentiary hearing in this case that Mr. Basham's attorneys were well aware of their client's inability to assist them.  For example, on September 17, 2004, Jack Swerling  wrote the following note to himself:

> *Brandon will not sit up.  He has his head down.  Then he sits back and sleeps back in chair.  He has refused my request, Greg's request and Paige's request.  He said "they can give him the D/P when I tell him the jury is looking at him[.]"*

(Rep. Exh. 2 )

33

During the morning session on September 20, 2004, Swerling noted: *"[Defendant] is obsessing the whole time re 'dip.'"* (Rep. Exh. 3. ) On September 22, 2004, two days after the episode with the U.S. Marshals, Swerling wrote:

*Starts right off about Dip.*

*Before break   Dip*

*During Trial – Dip*

*After Break   Dip*

*Before lunch – Dip*

(Rep. Exh. 4.)  On September 29, 2004, Swerling wrote: *"After Johnny's closing, [Defendant] just wanted some 'dip.'"* (Rep. Exh. 5.)  The next day Swerling wrote: *"\* During this difficult discussion [Defendant] is driving me crazy about Dip – what the jail told the Marshall [sic] about a Valium."* (Rep. Exh. 5.)

Moreover, as both the record and Jack Swerling's notes attest, Mr. Basham's ability to "consult with his attorney with a reasonable degree of rational understanding" did not improve during the penalty phase of his trial. *See Drope*, 420 U.S. at 172.  For example, on October 22, 2004, the transcript reflects that, because of Mr. Basham's psychological state, trial counsel Greg Harris had to interrupt the court proceedings while Jack Swerling was conducting direct examination of a mitigation witness.  (Tr. 10/22/04 at 212 ("THE COURT: Your colleague says we

34

**JA 3450**

need a recess.  Let's take about a 10-minute recess.  Please go to your jury room.").)

After the jury left the courtroom, Greg Harris informed the Court that "Mr. Basham

has progressively worsened his condition over the course of the afternoon."  (Tr.

10/22/04 at 212.)  The transcript of the proceeding then reflects the following:

| | |
|---|---|
| THE DEFENDANT: | I am trying, Jack.  I can't take it.  I cannot.  I'm ready. |
| THE COURT: | What is the Government's position to adjourn early? |
| MR. SCHOOLS: | It is fine, Judge. |
| THE COURT: | You agree to it? |
| MR. SCHOOLS: | Whatever they want. |
| THE DEFENDANT: | I do, too.  I don't care.  I can't take it no more. |
| THE COURT: | Mr. Basham, we will go ahead and recess. |
| THE DEFENDANT: | I'm sorry, man.  I'm out of emotions.  I don't even know how to express it. |
| THE COURT: | All right.  Please bring in the jury. |
| THE DEFENDANT: | I want to see my family, man. |
| MR. SWERLING: | Before the jury come in, may he be taken out? |
| THE COURT: | Yeah, go ahead and take him out. |
| THE DEFENDANT: | Yeah, take me out after it is over. |
| MR. SWERLING: | Can you sit there? |

**JA 3451**

THE DEFENDANT:    Yeah.

MR. SWERLING:    I was anticipating a problem.

THE DEFENDANT:    I ain't trying.

(Tr. 10/22/04 at 212-13.)

On October 26, 2004, trial counsel informed the Court that Mr. Basham had not been given his antipsychotic medication and was in a "very agitated state." (Tr. 10/26/04 at 6.) When the Court ordered Mr. Basham take his medication, Basham responded, "I can't stay awake. I think it is nighttime. That is not why I am agitated. It is, but it is because of things that happen at the jail. Nobody will listen to me." (Tr. 10/26/04 at 7.) When asked its position by the Court, the Government stated that the defense "need[s] someone here to see if he is competent to go forward before we proceed with the trial." (Tr. 10/26/04 at 8.) The Court then recessed until 1:00 p.m.

While the Court was in recess, it held an *ex parte* hearing with Mr. Basham and his counsel. During the hearing, the Court told Mr. Basham that his lawyers had convinced the Court that he was "not competent to go forward in front of a jury." (Tr. 10/26/04 (*Ex Parte*) at 3-4.) At 1:00 p.m., however, Mr. Basham apparently was still not sufficiently competent to assist his attorneys, who asked for and received an additional 15 minutes. (Tr. 10/26/04 at 14.) When the Court returned, trial counsel expressed concern about Mr. Basham's ability to participate in his own defense:

36

**JA 3452**

MR. HARRIS:      My observation of Mr. Basham is that he is not going to be able to sit in the courtroom and pay attention to the testimony, remain silent. And I am concerned that he will - - that this jury will not look favorably upon the way he is appearing to me to be acting this afternoon.

THE COURT:       Mr. Schools.

MR. SCHOOLS:     Our position is, we need to go, Judge. We have rearranged everybody's schedule to accommodate Mr. Basham's feelings from moment to moment. I think we have done that enough. I think we now are to the point where he thought he would get this if he did this by habit. So, if we are there, I think we should bring the jury. At some point, he is going to have to suffer the consequences of his own behavior. And this is as good a time to start now as any.

THE COURT:       Well, I agree with everything you said, except the failure to take the medicine was not really his fault.

MR. SCHOOLS:     Once again, Judge, if it is a medical problem, Dr. Schwartz-Watts should be here to testify about it. I mean, that is why they are paying all of these doctors all of this money to treat him. I don't know where she is, but she is not here. So now, we go to Mr. Harris to opine about whether his own client is competent or not, rather than have a doctor here who might actually know.

THE COURT:       Mr. Harris, I have tried to bend over backwards to do everything possible to keep the defendant on an even keel and a good frame of mind, and especially so that he won't show out in front of the jury. But the jury is really worn out. They have sent signals indirectly to me. They really want to see this case move along. I think there is a danger to be balanced

37

**JA 3453**

against what you say. These continued delays are going to be held against the Defendant, I think. I think the jury will figure out that it is the Defendant that is causing these delays. So, I think I have got to weigh in the balance of the aspect of it, versus the danger of going forward with him appearing to be a little bit disheveled over there.

(Tr. 10/26/04 at 14-16.) Although trial counsel objected that Mr. Basham was not "in a state, frame of mind to go forward," the Court called the jury in and proceeded with testimony.[5] (*Id.* at 16-18.) When the Court took its afternoon break, however, trial counsel informed the Court, "Mr. Basham is slurring his words. He seems to be groggy and just out of it. That is for lack of a better word. He was sleeping when Mr. Harris was doing the direct examination of Dr. Brawley." (Tr. 10/26/04 at 92-93.) Despite counsel's concerns about Mr. Basham's ability to assist in his own defense, the Court concluded, "I think we need to at least make an effort to go forward. I understand your request, Mr. Swerling, but I just respectfully disagree." (*Id.* at 95.)

The improper administration of psychiatric medication can render a defendant incompetent. *United States v. Quintieri*, 306 F.3d 1217, 1233 (2nd Cir. 2002)

---

[5]Mr. Harris furthered stated: "And I will point out that as I am addressing the Court right now, the record should reflect that my client is discussing over my shoulder, loud enough that I can hear, and certainly loud enough for the jury could hear, having discussions with Mr. Swerling about that the fact that he will be good. The fact that his audibly saying, 'I will be good,' that is the kind –." (Tr. 10/26/04 at 16.)

38

("Certainly, the improper administration of psychiatric medicine can render an individual temporarily incompetent."). As the Supreme Court has observed, "It is clearly possible that such side effects [of psychiatric medication] had an impact upon not just [the defendant's] outward appearance, but also . . . his ability to follow the proceedings, or the substance of his communication with counsel." *Riggins*, 504 U.S. at 137. Justice Kennedy's observations in his concurring opinion in *Riggins* are particularly relevant to this case:

> As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, or his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.

504 U.S. at 143-44 (Kennedy, J., concurring).

The Court violated Mr. Basham's right to due process in this case when it proceeded with his trial while he was incompetent.[6] It also violated his due process

---

[6]Whenever information that is made known to the trial court raises a doubt that a defendant is mentally incompetent to stand trial, the minimal guarantees of due process require the suspension of criminal proceedings until the defendant's competency can be determined on the basis of an adequate, thorough, and reliable mental health evaluation. *See Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990).

rights when it allowed the Government to use a videotape and audiotape of him in an incompetent state as part of its case for a death penalty.

Even if Mr. Basham were required to show prejudice for the violation of is "fundamental right" not to be tried while incompetent, *see Cooper*, 517 U.S. at 354, a requirement Mr. Basham does not concede, there can be no doubt that he was profoundly prejudiced by the Court's failure to protect his right to due process of law. Nevertheless, the trial and sentencing of Mr. Basham while he was mentally incompetent constitutes a deprivation of due process necessitating the granting of relief by this Court without a showing of prejudice. *Pate*, 383 U.S. at 386-87. The error deprived Mr. Basham of a fair and reliable determination of his guilt and of the appropriate penalty in this case.

### CLAIM 5

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to request that the Court determine Mr. Basham's competency to stand trial, despite numerous indications prior to and during trial that Mr. Basham was incapable of properly assisting in his own defense. In the alternative, defense counsel was ineffective in failing to request that Mr. Basham's trial be delayed or postponed until such time as he was competent to assist in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this

**JA 3456**

Reply.

The Government advances three arguments in response to Mr. Basham's claim that his attorneys rendered constitutionally ineffective assistance of counsel in failing to protect his due process right not to be tried while incompetent. First, it argues that the record does not indicate that Mr. Basham was incompetent. (*See, e.g.*, Opp. at 32 ("the record is barren of support for Basham's alleged incompetency").) Second, it argues that "trial counsel's strategic decision to not pursue a competency defense" was not unreasonable because "there is no evidence that Basham failed to understand the proceedings and that he was unable to cooperate with counsel." (Opp. at 33.) Third, it maintains that, even if trial counsel rendered deficient performance, Mr. Basham cannot establish prejudice because "there is not a reasonable probability that Basham would have been found incompetent." (*Id.*) The Government is wrong on each of these points.[7]

Most critically, the Government appears to misunderstand the constitutional right at issue here. Specifically, it discusses trial counsel's "strategy" not to pursue a "competency defense." (Opp. at 33.) Competency to stand trial is not a "defense;" it is a "rudimentary" and "fundamental" constitutional aspect of due process of law.

---

[7]Mr. Basham addressed this mischaracterization of the record by the Government in Claim 4, *supra*.

41

*Cooper*, 517 U.S. at 354.  No "strategy" to deprive a client of his fundamental right to be tried only if he is competent could ever be considered "reasonable."  Indeed, the very case the Government cites in support of its argument *contradicts* its position.  In *Robidoux v. O'Brien*, 643 F.3d 334 (1st Cir. 2011), the court emphasized the distinction between a strategic decision to pursue an insanity or diminished capacity defense and the obligation of counsel to protect his or her client's right to be tried only while competent:

> By contrast, where there are substantial indications that the defendant is not competent to stand trial, counsel is not faced with a strategy choice but has a settled obligation under [state] law and under federal law as well to raise the issue with the trial judge and ordinarily to seek a competency examination.
>
> This is perhaps surprising, if stated as an invariable rule, because that course could sometimes be adverse to the client's interest; the obvious instance is the case of an incompetent defendant with an excellent merits defense.  Nevertheless, this obligation has been deemed necessary to the dignity interests of defendants and the integrity of the trial process.

*Robidoux*, 643 F.3d at 339.

Applying the restrictive relief provisions of the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. §2254, to its review of the state court's adjudication of the defendant's claim that his attorney was ineffective in failing to raise the issue of his competence to stand trial, the federal court in *Robidoux* held only that, given the paucity of evidence that the defendant was incompetent, it could not conclude that the

42

state court unreasonably applied clearly established federal law.  643 F.3d at 340.

*Robidoux* thus does not advance the Government's argument; it support's Mr. Basham's.

Tellingly, other than its inapt "strategy" argument, the Government offers no defense of trial counsel's failure to fulfill their obligation to ensure that Mr. Basham was not tried while incompetent.  It has therefore waived any other argument that counsel did not render deficient performance.  *See McCalvin v. Yukins*, 444 F.3d 713, 723 (6th Cir. 2006) (Cole, J., dissenting) ("The government may not depend on this Court to assume that it is advancing every available argument; the petitioner certainly enjoys no such benefit.").

The Government's final argument is that Mr. Basham is not entitled to relief because "he can show no prejudice" because "there is not a reasonable probability that [he] would have been found incompetent." (Opp. at 33.)  It is unclear upon what evidence the Government bases this broad assertion.  Because his attorneys failed to challenge his competency, Mr. Basham was never permitted to create a record on this issue.  Moreover, even absent this opportunity, as discussed with regard to Claim 4, *supra*, the record in this case is replete with references to Mr. Basham's obvious incompetence during his trial.  And certainly Mr. Basham was prejudiced when his attorneys failed to argue his uncontested incompetence as a basis for excluding the

Government's use of the videotape and audiotape of his struggle with the United States marshals.

Most importantly for current purposes, Mr. Basham has alleged a colorable claim of ineffective assistance of counsel, and he is entitled to an evidentiary hearing at which he can develop the factual basis of his claim. *Vogt*, 88 F.3d at 589 (court held evidentiary hearing on claim of ineffective assistance for failing to raise competency); *Speedy v. Wyrick*, 702 F.2d 723 (8th Cir. 1983) (remanding for evidentiary hearing on ineffective assistance claim concerning petitioner's competency); *accord Becton v. Barnett*, 920 F.2d 1190, 1194 (4th Cir.1990) (discussing "colorable claim" of ineffective assistance based on the failure to investigate competence). At an evidentiary hearing on this claim, Mr. Basham will demonstrate, among other things, that his defense attorneys were aware that he was unable to communicate with them about his case in a rational manner. Defense counsel nevertheless failed to advocate on his behalf concerning his competency to be tried and failed to argue that evidence of his incompetence (in the form of the videotape and audiotape) could not constitutionally be admitted to the jury as evidence supporting a death sentence.

44

CLAIM 6

**The Court abdicated its obligation under 18 U.S.C. § 4241(a) to ascertain whether Mr. Basham was competent to stand trial, despite the fact that considerable evidence was presented to the Court that Mr. Basham was in fact unable to assist properly in his defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government argues that Mr. Basham is not entitled to relief on Claim 6 because (1) the claim is procedurally defaulted; (2) "there was not reasonable cause to believe that Basham was incompetent;" and (3) trial counsel resisted a competency evaluation "for strategic reasons and affirmatively told the Court that Basham was not incompetent." (Opp. at 33.) In his discussion of Claims 4 and 5, *supra*, Mr. Basham has already addressed the Government's unfounded assertion that there was no basis to be concerned about Mr. Basham's competency and its erroneous assertion that a trial attorney can permit his or her client to be tried while incompetent as part of a trial "strategy." Mr. Basham will therefore address the Government's argument that the claim is procedurally defaulted because he did not raise the claim in his direct appeal and that the Court was relieved of its independent duty to monitor Mr. Basham's competency because Jack Swerling, his trial attorney, informed the Court that Mr. Basham was competent. (*See* Opp. at 34-35.)

45

**JA 3461**

The Government relies on *United States v. Williams*, 819 F.2d 605 (5th Cir. 1987), in arguing that Claim 6 is procedurally defaulted.  Mr. Basham concedes that, to the extent Claim 6 invokes 18 U.S.C. §4241, it could be found to be procedurally defaulted under *Williams*.  Of course, as the Government concedes, a court may adjudicate a procedurally defaulted claim in a § 2255 proceeding if, among other things, a petitioner can demonstrate cause and prejudice.  In Claim 7, Mr. Basham alleged that his appellate counsel rendered ineffective assistance of counsel when they failed to raise on direct appeal the argument that the Court failed to fulfill its obligation under 18 U.S.C. § 4241. (*See* Motion at 44-45.) The ineffective assistance of Mr. Basham's appellate counsel constitutes "cause" for his failure to raise the § 4241 claim earlier, and because Mr. Basham can demonstrate at an evidentiary hearing in this case that he was prejudiced by his appellate counsel's failure to raise the claim, this Court can adjudicate the claim on its merits.

More importantly, however, *Williams* makes clear that, even if a petitioner's § 4241 claim is barred, he may raise in a § 2255 proceeding that "closely related" claim, premised on *Pate v. Robinson*, 383 U.S. 375 (1966), that "the evidence before the trial court presented a 'bona fide doubt' as to his competency and therefore the court was required to hold a competency hearing before proceeding with trial[.]" *Williams*, 819 F.2d at 607; *accord Floyd v. United States*, 365 F.2d 368, 376 (5th Cir.

46

1966), *and cases cited therein*.

Accordingly, to the extent that Mr. Basham's failure to raise his § 4241 claim on direct appeal is not excused by his appellate counsel's ineffective assistance, he hereby expands Claim 6 to include the constitutional argument that, regardless of § 4241, the Court was obligated under *Pate* to conduct a competency evaluation in his case. Because the Government addressed the merits of such a claim in its Opposition (Opp. at 34-35), it cannot reasonably argue that it is prejudiced by this expansion of Claim 6.

To prevail on a *Pate* claim, a petitioner "must establish that the trial court ignored facts raising a 'bona fide doubt' regarding [his] competency to stand trial." *Walton v. Angelone*, 321 F.3d 442, 459 (4th Cir. 2003) (*quoting Pate*, 383 U.S. at 384-86). "Even if a defendant is mentally competent at the beginning of a trial, the trial court must continually be alert for changes which would suggest that he is no longer competent." *Id.*

The record in this case plainly demonstrates that the Court "ignored facts raising a 'bona fide doubt'" as to Mr. Basham's competency. For example, on October 26, 2004, disregarding facts that raised a bona fide doubt as to Mr. Basham's competency to proceed with the penalty phase of his capital trial, the Court, because of scheduling concerns, elected to proceed despite Mr. Basham's obvious, erratic

behavior and his attorney's expressed concern about his competency to proceed. (*See* Tr. 10/26/04 at 14-17.)  The Court's actions deprived Mr. Basham of his procedural and substantive due process rights, and he is entitled to relief.

<div align="center">

**CLAIM 7**

</div>

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of his incompetency as a basis for reversal on direct appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government's sole argument in response to Claim 7 is that Mr. Basham's appellate attorneys made a "strategic decision" to exclude from the issues they raised on appeal the issue of Mr. Basham's competency and the Court's failure to fulfill its obligations under 18 U.S.C. § 4241.  As the Fourth Circuit has noted, "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (*quoting Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

<div align="center">

48

</div>

<div align="right">

**JA 3464**

</div>

In this case, Mr. Basham has demonstrated the merits of his claims that he was incompetent during his trial and that the Court ignored facts raising a bona fide doubt as to his competence. Mr. Basham submits as an exhibit to this Reply an undated memorandum from Erik Haren, one of his appellate attorneys at the Washington, D.C. law firm Jenner & Block, to Melissa Meister, another attorney at the firm, discussing in detail the merits of an argument that the district court erred in failing to order that Mr. Basham's competency be evaluated either pursuant to *Pate v. Robinson* or 18 U.S.C. § 4241. (Rep. Exh. 6.) For reasons that Mr. Basham will develop at the evidentiary hearing in this case, appellate counsel unreasonably chose to forego this meritorious argument in favor of other, much weaker, arguments, including evidentiary arguments which the Fourth Circuit could review only for plain error – or not at all – because of trial counsel's failures to raise timely objections. *See United States v. Basham*, 561 F.3d 302, 334-35 (4th Cir. 2009).

Mr. Basham has alleged a colorable claim of ineffective assistance of appellate counsel and he is entitled to an evidentiary hearing on that claim.

**JA 3465**

## Claim 8

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by permitting their psychiatric expert to medicate Mr. Basham with a potent combination of drugs that rendered him incapable of properly assisting in his own defense.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Further investigation of Claim 8 by undersigned counsel has revealed that Mr. Basham's incompetency at his trial apparently was not the result of the medications prescribed by Dr. Morgan, but rather errors in the proper administration of those medications by employees of the various facilities at which Mr. Basham was incarcerated prior to and during his trial. Because trial counsel did not have authority to monitor or control the actions of those employees, Mr. Basham hereby withdraws Claim 8.

**JA 3466**

<div align="center">

**CLAIM 9**

</div>

**Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded before the jury in opening statements all indictment allegations against Mr. Basham except for Mr. Basham's "intent to cause death or serious bodily harm" in connection with the alleged carjacking.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's trial attorney rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when he conceded Mr. Basham's guilt to virtually all of the charges against him, including the capital offense of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a).

The Government argues that defense counsel's admission of guilt to a death eligible offense was done for "valid strategic reasons." (Opp. at 39). Further, the Government argues that "case law and experts in the field of capital litigation confirm that Mr. Swerling's comments in opening statement" were part of a valid legal strategy. *Id.* Contrary to the Government's assertion, however, trial counsel's strategy was not just unsuccessful, it was unreasonable. *See Carter v. Lee*, 283 F.3d

<div align="center">

51

</div>

<div align="right">

**JA 3467**

</div>

240, 248-49 (4th Cir 2002).  No reasonable strategy justified the concessions made by counsel.

The Government attempts to validate defense counsel's strategy by arguing that "this approach is . . . a well recognized strategy in capital cases.  A strategy in which a defendant acknowledges his involvement in the killing but denies that he was guilty of capital murder because he lacked the requisite mental state or intent." (Opp. at 42). However, this is precisely the problem.  Had Mr. Basham's only death-eligible offense been the carjacking charge, counsel's challenge to Mr. Basham's mental state would have been a textbook example of the strategy the Government would like the Court to believe was at play here.  Mr. Basham, however, was also charged with the capital offense of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a). Here, defense counsel engaged in an unreasonable strategy and conceded *all elements*.

Mr. Basham's counsel did not employ the "well recognized strategy" in which counsel "denied that [the defendant] was guilty of capital murder because he lacked the requisite mental state or intent." (Opp. at 42).  By conceding Mr. Basham's guilt to almost all of the charges against him, including the offense of kidnapping resulting in death, defense counsel also unintentionally conceded to the jury, at the very least, that Mr. Basham was guilty of intentionally and specifically engaging in an act of

52

**JA 3468**

violence, knowing that the act created a grave risk of death to a person, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act. *See* 18 U.S.C. § 3591(a)(2)(D).

In other words, by informing the jurors at the outset of the guilt phase of trial that Mr. Basham was guilty of kidnapping resulting in death, defense counsel also conceded that their client was death-eligible. "Once [Basham's] court appointed attorney told the jury that there was no reasonable doubt" regarding Mr. Basham's guilt on the kidnapping charge, and thus death eligibility, he "ceased to function as defense counsel." *United States v. Swanson*, 943 F.2d 1070, 1075 (9th Cir. 1991). "An effective attorney 'must play the role of an active advocate, rather than a mere friend of the court.'" *Id.* (*citing Osborn v. Schillinger*, 861 F.2d 612, 624 (10th Cir. 1088)). "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt. *United States v. Cronic*, 466 U.S. 648, 656-57 n.19 (1984). Counsel for Basham presented an unreasonable strategy that rendered defense counsel's representation of Mr. Basham "a tenuous and unacceptable legal fiction." *Faretta v. California*, 422 U.S. 806, 821 (1975). Defense counsel's deficient performance severely prejudiced Mr. Basham, and requires that this Court vacate his convictions and sentences.

The cases cited by the Government either actually support Mr. Basham's position or are irrelevant. In *State v. Elmore*, 857 N.E.2d 547, 524-25 (2006), the court found trial counsel's decision to concede guilt on a kidnapping charge a tactical one. The concession allowed trial counsel to argue "vigorously" that the defendant was guilty "only of murder and not aggravated murder." *Id.* Success with this tactic would have rendered the defendant ineligible for the death penalty, thus the strategy could not be found ineffective. *Id.* Similarly, in *Lawrence v. Branker*, 517 F.3d 700 (4th Cir. 2008), defense counsel conceded defendant's guilt on second-degree murder but "*denied* his guilt for first-degree murder" and other crimes based on voluntary intoxication. *Id.* at 716. There was no such argument in Mr. Basham's case, the concession to kidnapping *was* a concession to death eligibility. *Bell v. Evatt*, 72 F.3d 421, 426 (4th Cir 1995), is a case where guilt was conceded in order to present a guilty but mentally ill defense and thus is not relevant to the facts before this Court. Likewise, *Lobosco v. Thomas*, 928 F.2d 1054 (11th Cir. 1991), is irrelevant to the case at hand because it is not a capital case. In *Florida v. Nixon*, 543 U.S. 175 (2004), the Government got closer to the mark. In that case, however, defense counsel conceded that his client caused the victim's death, but not facts making his claim death eligible. In contrast, Mr. Basham's counsel not only conceded guilt to the underlying offenses, but in regard to the kidnapping charge, conceded at least one

54

**JA 3470**

threshold factor, thus conceding Mr. Basham's eligibility for a death sentence. (Tr. 9/13/04 (ex parte hearing) at 2-3.)

The Government cites an article written by Basham's co-defendant's counsel, John Blume, for the proposition that contesting guilt must be weighed against the anger jurors may feel towards a defendant who denies involvement and then asks for mercy at the penalty phase. (Opp. at 42, *citing* John H. Blume, Sheri Lynn Johnson & Scott F. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding what Jurors Tell Us About Mitigation*, 36 Hofstra L.Rev, 1035, 1044-45 (2008).) In this case, however, if counsel believed that they were engendering goodwill with the jurors by conceding the client's guilt to a capital offense at the outset of the guilt phase, they were mistaken. Perhaps if, as in Mr. Basham's co-defendant's case, counsel had advised their client to plead guilty, the jury would at least have been spared an approximately three-week trial, involving the testimony of more than 90 witnesses. As it was, defense counsel told the jurors that their client was guilty, but then necessarily implied that Mr. Basham was nevertheless going to require them to sit through weeks of a trial. There is no reasonable possibility that this "strategy" worked to Mr. Basham's advantage.

The Government's attempts to justify the strategy based on defense counsel's consultation with Mr. Basham is of no consequence. Mr. Swerling made sure that the

**JA 3471**

record reflected that he had spoken to Mr. Basham, and that he agreed with the strategy. Such a statement on the record served no purpose other than to attempt to protect himself from an ineffective assistance of counsel claim. However, this apparent attempt to protect himself from future questioning of his "strategy" was of no legal significance. As a threshold matter, as is argued elsewhere in this Motion, Mr. Basham was not competent to stand trial, much less competent to weigh the relative merits of Mr. Swerling's proposed "strategy." More importantly, a criminal defendant cannot be forced to waive a claim of ineffective assistance of counsel. *See United States v. Craig*, 985 F.2d 175 (4th Cir. 1993). Finally, even if Mr. Basham disagreed with the strategy, it was too late. Counsel had already revealed during voir dire that, in their opinion, Mr. Basham had no defense to most of the charges against him, including the capital offenses. For example, Greg Harris stated in voir dire, "You are most likely going to get to the second part of the trial [the penalty phase], I will tell you that right now." (Tr. 9/08/04 at 89.) Thus, Mr. Swerling's attempts to protect himself were a legal nullity and irrelevant to the argument before this Court.

56

**JA 3472**

CLAIM 10

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by ignoring their client's repeated requests to exit the courtroom immediately before an altercation between Mr. Basham and United States Marshal officers. In the alternative, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's trial attorneys rendered ineffective assistance of counsel when they ignored Mr. Basham's repeated requests to exit the courtroom immediately before an altercation with the United States Marshal officers, resulted in damaging penalty-phase testimony and evidence. Further, the Court violated Mr. Basham's right under Rule 43(c) of the Federal Rules of Criminal Procedure to voluntarily absent himself from his trial.

During trial, despite the fact that defense counsel had already conceded almost every charge against him, the Court ordered that Mr. Basham remain in the courtroom despite his requests to leave and watch the proceedings from a satellite monitor downstairs. Mr. Basham informed the Court that he did not feel good and pleaded with the Court to let him go lie down. (Tr. 9/20/04 at 148-50.) Defense counsel,

57

**JA 3473**

without asking for a moment to confer with his client and assess the situation, stated that he did not want Mr. Basham to leave the courtroom.[8]  (Tr. 9/20/04 at 149.)

As Mr. Basham spoke with the Court, he became agitated and began to rock side to side.  Although he made no aggressive movements towards the Court, his counsel,  or the United States Marshals, several Marshals grabbed Mr. Basham and forced him to the floor.  Once on the floor, Mr. Basham struggled with the Marshals for several minutes.  The altercation was videotaped and audiotaped and ultimately played for the jury in the penalty phase of Mr. Basham's case.  (Tr. 10/18/04 at 45; Trial Ex. 469B).  During closing the Government argued very negative inferences from the videotape.  They stated "it took six officers . . . to control Mr. Basham.  To . . . make sure he doesn't hurt himself or anybody else.  Six officers." (Tr. 11/1/04 at 81).  Further, the Government argued that what was important about the incident was that it showed that Mr. Basham, rather than lacking the ability to control himself, planned the incident.  They argued that the altercation "demonstrate[d] lack of remorse."  (Tr. 11/1/04 at 81.)

Both the Court and defense counsel violated Mr. Basham's constitutional and statutory rights when they refused to permit Mr. Basham to leave the courtroom.  The

---

[8]*See* Claim 14, *infra*, for discussion of another incident in which Mr. Swirling called a defendant a "coward" for wanting to absent himself from the courtroom.

Government argues that this claim lacks merit because it requires 20/20 hindsight and ignores Mr. Basham's manipulation of events. The Government also argues that defense counsel had strategic reasons to want to keep Mr. Basham in the courtroom and that Rule 43 of the Federal Rules of Criminal Procedure may actually require a defendant's presence in a capital case. (Opp. at 47-49.) However, as illuminated below, these arguments lack support in caselaw or statute.

Federal criminal rule 43(c)(1)(A) contemplates that a defendant may voluntarily absent himself from his trial, "regardless of whether the court informed the defendant of an obligation to remain during trial." The Government concedes that the issue of whether a defendant may voluntarily absent himself from trial is unsettled. However, the Government fails to cite a single case to challenge the plain meaning of this rule or holding that a defendant (not the attorney purportedly acting on defendant's behalf) is barred from voluntarily absenting himself from court.

In *Near v. Cunningham*, 313 F.2d 929, 931-32 (4th Cir. 1963), the issue was whether absence at two in-chambers conferences violated petitioner's right to be present at every stage of the trial. The case does not state that petitioner himself waived his presence at that hearing and thus does not apply. Further, in *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), as the Government noted, the Fourth Circuit dodged the issue of whether a capital defendant could waive his presence at trial.

**JA 3475**

However, the Court acknowledged that "[a]t least one circuit has flatly held that intervening Supreme Court decision have established that waiver is possible in such cases. *See Campbell v. Wood*, 18 F.3d 662, 671-72 (9th Cir. 1994) (concluding that *Snyder*, 291 U.S. at 106, 117, and *Allen*, 397 U.S. at 342, by rejecting as 'mere dicta' earlier statements of non-waivability in, e.g., *Hopt* [*v. Utah*, 110 U.S. 574 (1884)] and *Lewis v. United States*, 146 U.S. 370 (1982), have rejected any such rule." *Id.* at 873 n. 3. Further, the Fourth Circuit has held that a petitioner was not denied his right to be present after he was removed for disrupting proceedings. *Bell v. Evatt*, 72 F.3d 421, 432 (4th Cir. 1995), *citing Illinois v. Allen*, 397 U.S. 337, 343 (1970). It defies logic that a Court can order a defendant from the courtroom and not violate their rights, but a defendant cannot voluntarily absent himself.

Defense counsel rendered deficient performance when they refused to advocate for their client's need to absent himself from the courtroom. Contrary to the Government's assertion that this claim relies on 20/20 hindsight, counsel and the Court were well aware of Mr. Basham's emotional, intellectual, and psychological deficits, as well as overriding competency issues. (Opp. at 48). It was not, as the Government claims, manipulation that drove Mr. Basham's altercation with the Marshals, but his "limited capacity" and incompetency interfering with his ability to "be calm enough to proceed." (Tr. 9/20/04 at 162.) Following the altercation, Dr.

60

**JA 3476**

Donna Schwartz-Watts examined Mr. Basham briefly and testified that she had "concerns about his competency." (Tr. 9/20/04 at 162-63.)  Due to Mr. Basham's state, and concerns for his competency, court was adjourned for the day, but only after the Government now had damaging evidence for the penalty phase.

Counsel, knowing that Mr. Basham's competency had been at issue at other points in the trial could have asked for a brief recess to speak with, or allow Dr. Schwartz-Watts to examine, Mr. Basham and determine his fitness and ability to remain in the courtroom.  However, they failed to do so and ignored Mr. Basham's pleas. Further, upon information and belief, defense counsel were not communicating with the client during courtroom proceedings (despite Mr. Basham's efforts to do so), so counsel could not reasonably argue that they needed Mr. Basham by their side to assist in his defense. Accordingly, contrary to the Government's argument otherwise, there was no strategic or practical purpose that justified counsel's refusal to advocate their client's need to absent himself from the courtroom.

Counsel's and this Court's failure to listen to Mr. Basham's needs resulted in unquestionable prejudice.  Due to the failure to allow Mr. Basham to absent himself from the courtroom when he was not well, the jury was shown a damaging videotape at penalty phase, portraying Mr. Basham, at least in the minds of U.S. Marshal officers, as a violent criminal. Mr. Basham's rights were violated and grave prejudice

resulted.

## CLAIM 11

**The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by relying on Sheriff Hewett's false testimony in its closing argument.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government engaged in misconduct when it failed to correct testimony of Sheriff Ronald Hewett that it knew or should have known to be false, in violation of its obligations under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The Government compounded this misconduct by seizing on Sheriff Hewett's false testimony to bolster its closing argument.

As a threshold matter, the Government argues that this claim should be dismissed because it is procedurally defaulted. However, they acknowledge that where a petitioner can show cause for, and actual prejudice from the default, he may raise the claim in federal habeas. *See United States v. Harris*, 183 F.3d 313, 317 (4th Cir. 1999). Here, because, as argued in Claim Twelve, *infra*, appellate counsel's performance fell below *Strickland*'s "objective standard of reasonableness,"

62

**JA 3478**

*Strickland*, 466 U.S. at 690, and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Wiggins*, 539 U.S. at 534 (*quoting Strickland*, 466 U.S. at 694), cause is established and the Court must review the merits of this claim. Mr. Basham is entitled to relief because the Government's use of Hewett's false testimony was not only improper, it prejudiced Mr. Basham "to such an extent as to deprive him of a fair trial." *United States v. Golding*, 168 F.3d 700, 702 (4th Cir. 2007).

The dual obligation of a federal prosecutor in our justice system is to "strike hard blows" but refrain from striking "foul ones;" to use legitimate means to attempt to secure a conviction without employing improper methods to do so. *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also United States v. Lamarr*, 75 F.3d 964, 968-69 (4th Cir. 1996). Their job is not "just to win, but to win fairly, staying well within the rules." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). Unfortunately, that did not happen here.

Prior to trial, the information that the Government had about the purse strap purportedly used to strangle Alice Donovan consisted of a Lieutenant Crocker's report documenting his interview with Sheriff Hewett (Exh. 2), a 302 report written by Agent Long, as well as the Grand Jury testimony of Agent Long. Agent Long's testimony was consistent with his 302 report that stated, "After FULKS raped her,

63

FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan." (Exh. 3). Crocker's report was more vague. It simply stated, "Basham indicated how the (victim's) pocketbook strap was used. (Sheriff Hewitt was able to determine that this meant the pocketbook strap was used to strangle the victim to death)." (Exh. 2). The report is specific however that Basham "demonstrate[d] visually how *he* threw the strap into the wood line at the cemetery." (Exh. 2). Finally, Hewett himself testified at the *Jackson v. Denno* hearing that Mr. Basham showed him the length of the purse strap, and how he threw it into the woods. Basham indicated by his motions that the strap was used to strangle Alice Donovan. (Tr. 2/25/04 at 66-67, 77-78).

The Government today argues that Hewett's testimony at the *Denno* hearing was "ambiguous," and that Basham's statements to other officers and Hewett were not mutually exclusive. (Opp. at 51, 53.) However, during the trial of Mr. Basham's co-defendant, Chad Fulks, the Government was decidedly unambiguous in their position on what Hewett's evidence showed. In Fulks's case, the defense sought to introduce Mr. Basham's "deer statement" as evidence that Fulks was not the actual killer. The Government vehemently argued against the statement's admission. In doing so, it specifically and clearly told the Court that Mr. Basham's use of the purse strap was to show that Fulks strangled Donovan. Specifically, the Government said

64

**JA 3480**

"[r]emember Sheriff Hewitt [sic] demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled." (Fulks Tr. 6/22/04 at 255.)  On the basis of this assertion, Fulks was precluded from using the deer statement at his trial. Inarguably, the Government's position at this point was not that Basham had made one statement to Hewett and another to other officers, as they now argue, but that Hewett's testimony, like Agent Long's, was that Basham said Fulks strangled Donovan.  Tellingly, the Government makes no attempt to even address their characterization of Hewett's testimony at Fulks's trial in their Response to this claim.

The Government continues the "foul blows" to Mr. Basham's case by attempting to justify the its failure to correct Sheriff Hewett's trial testimony that Mr. Basham demonstrated how *he* used the purse strap to strangle Mrs. Donovan by arguing that it was consistent with the *Denno* hearing testimony. (Opp. at 51.)  The Government cannot have it both ways. Either the Government misrepresented Sheriff Hewett's testimony to the Court at Fulks's trial, or they misrepresent it here.  Agent Long's testimony and 302 report, and Hewett's *Denno* hearing testimony, all support the position the Government took in the Fulks trial, that Fulks, not Basham was the strangler.  Only upon Hewett's incompatible testimony at Mr. Basham's trial did the Government change their position.

The Government had a duty to correct Hewett's false testimony.  The United

65

**JA 3481**

States Supreme Court has long held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio*, 405 U.S. 153 (*quoting Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). The jury depends on the truthfulness and reliability of witnesses to determine guilty or innocence of a defendant in any given case. *Napue*, 360 U.S. at 269. When a prosecutor allows false testimony to be presented to the court, either by encouraging it or by allowing the presentation of such testimony to go unchecked, it is a violation of due process. *Id.*

Hewett's testimony that Basham demonstrated how he strangled Alice Donovan was contradictory to his previous testimony at the *Jackson v. Denno* hearing. Further it was contrary to the Government's characterization of that testimony. This triggered a duty on the part of the Government. "When a prosecutor suspects perjury, the prosecutor has a duty to at least investigate. The duty to act 'is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it.'" *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (*quoting Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1118 (9th Cir. 2001)). A prosecutor cannot avoid their obligation to the truth by remaining "willfully ignorant." *Id*.

Counsel does not assert that the Government solicited the false testimony, and

66

it is unnecessary to prove that they did to support this claim.  Simply allowing false testimony on a relevant issue to go uncorrected is sufficient to violate a defendant's rights.  "A lie is a lie, not matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth."  *Napue*, 360 U.S. at 269-270.

It is also unnecessary to prove that the prosecutor knew the testimony was false.  Rather, it is enough if the prosecutor "should have known."  *United States v. Agurs*, 427 U.S. 97, 103 (1976);  *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994).  If this standard is met, the conviction must be reversed if there is *any probability* that the evidence impacted the jury verdict.  *Napue*, 360 U.S. at 269-272;  *Giglio*, 405 U.S. at 154;  *Agurs*, 427 U.S. at 103;  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  Due process claims based on *Napue* are a subset of *Brady* violations.  *Agurs*, 427 U.S. at 103-04. The false evidence must still be material to be reversible error, however the required showing of materiality is lower than a standard *Brady* claim because "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair."  *Agurs*, 427 U.S. at 103.  The Government, having previously argued that Sheriff Hewett's testimony was that "Brandon Basham said that Chad Fulks took the purse strap and strangled," cannot now feign that they should or could not have known the testimony was false.  (Fulks Tr. 6/22/04 at 255).  At a bare

**JA 3483**

minimum, the prosecution had a duty to resolve the conflict in the Hewett testimony.

The Government's reliance on Hewett's false testimony furthers the showing of prosecutorial misconduct. Failure to call the Court's attention to false testimony, and exploitation of that testimony in closing argument, is grounds for reversal. *See Brown v. Wainwright*, 785 F.2d 1457, 1458 (11th Cir. 1986) (granting habeas relief where prosecutor referenced false testimony in closing argument). Prosecutors are prohibited from actively participating in misleading jurors by capitalizing on false testimony. *See Tassin v. Cain*, 482 F.Supp. 2d 764, 773 (E.D. La. 2007) (noting that prosecutor's active participation in misleading jury following witnesses's testimony that gave jurors a false impression of the time witness was facing is the "sort of capitalization upon misleading testimony by the State [that] clearly runs afoul of *Napue* and *Giglio*"), *aff'd* 517 F.3d 770 (5th Cir. 2008).

The prosecutors in Mr. Basham's case engaged in prosecutorial misconduct and violated his due process rights as defined in *Napue*. However, rather than correct or attempt to resolve the false testimony presented, they exacerbated the error by seizing upon and using it to emphasize that Mr. Basham was the actual killer in closing argument. A prosecutor's knowing use of false testimony involves not "just" prosecutorial misconduct, but "more importantly . . . corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104. The standard for materiality

68

of false testimony is not onerous; only if there is "no reasonable likelihood" that the false evidence could "have affected the judgment of the jury" can error be denied. *Napue*, 360 U.S. at 271. Considering that the Government repeatedly used Hewett's trial testimony in closing argument, there can be no doubt it was material to both the guilt and penalty phases. (Tr. 9/29/04 at 81-82; Tr. 11/1/04 at 57, 62.) The Government's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010).

The Government's conduct was not only improper, but it denied Mr. Basham a fair trial. The Government's assertion that the prosecutor's closing remarks were not intended to convince jurors that Basham alone killed Donovan defies logic, as does the contention that it was simply an "isolated remark taking up less than three lines in a 76-page closing." (Opp. at 54, 57). Although the closing argument passages are cited in both the § 2255 motion, and the Government's Response, they bear repeating here.

In summation at the guilt phase, the Government argued, "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." (Tr. 9/29/04 at 80) (emphasis added).) The importance of this evidence is revealed by the

69

**JA 3485**

Government's closing argument at the guilt phase:

> Ladies and Gentlemen, I wanted to finish with that because how would you go back in your jury room after listening to Sheriff Hewitt [sic] and after seeing Sheriff Hewitt [sic] demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled, how do you listen to Clifford Jay when Brandon Basham told you jurors . . . we killed them and find him not guilty of carjacking, resulting in death? And find him not guilty of kidnapping, resulting in death? I have been up here for two hours, and *the government submits those two witnesses and that limited testimony, alone, seals the deal.*

(Tr. 9/29/04 at 81-82 (emphasis added).)

In rebuttal closing argument the Government argued that, to conclude that Mr. Basham himself did not kill Alice Donovan, the jury would have to "disregard Sheriff Hewitt [sic] and disregard Mr. Jay." (Tr. 9/29/04 at 173.)

The Government continued to emphasize this damaging testimony during the penalty phase of Mr. Basham's trial:

> What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled. And then he tells Sheriff Hewitt [sic], "I threw the purse strap into the woods" . . . . You saw Sheriff Hewitt [sic] stand up there and show.

(Tr. 11/1/04 at 57.) The Government referred to "Brandon Basham's strangling of Alice Donovan" in its closing argument (Tr. 11/1/04 at 57), going so far as to state that "he [Basham] killed Alice Donovan." (Tr. 11/1/04 at 62.)

There is no mention of Chad Fulks in these passages. There is no mention of

70

teamwork. Instead, there is the clear, unambiguous argument that Basham himself was the killer.[9] That argument relies *solely* on the testimony of Hewett that is in direct contradiction to the Government's position at Fulks's trial that Hewett testified that Basham showed how Fulks strangled Donovan. (Fulks Tr. 6/22/04 at 255.) At a bare minimum, the Government had a duty to reconcile the issue that Hewett's testimony was in direct conflict with not only his previous testimony, but their own characterization of it. Instead, the Government seized upon an opportunity to present damning evidence that "sealed the deal" to Mr. Basham's conviction and death sentence.

"[T]he duty of the United States Attorney [is] 'not simply to prosecute, but to do justice." *United States v. Smith*, 55 F.3d 157, 158 (4th Cir. 1995) (*quoting United States v. Weber*, 721 F.2d 266, 268 (9th Cir. 1983)). Upon information and belief, Mr. Basham alleges that the Government violated those responsibilities when they obtained his conviction through the use of false testimony. Sheriff Hewett's false statements were directly material to issues of both guilt and punishment in this case,

---

[9]Basham does not dispute the Government's statement that throughout closing argument there were various references to teamwork. However, these references were not with respect to the Sheriff Hewett testimony. The clear purpose of the Hewett testimony as the argument above makes clear, was to show that Mr. Basham was the hand that dealt the fatal blow. Without Hewett's testimony, the Government had no other evidence to support this element of their argument.

71

a fact that is demonstrated by the Government's use of those statements in its closing arguments at both the guilt and penalty phases. The due process requirements enunciated in *Napue* and *Giglio* mandate that Mr. Basham's convictions and sentences be vacated and that he be afforded a new trial.

## CLAIM 12

**Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise the issue of the Government's misconduct as a basis for reversal on direct appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys negligently failed to raise the issue of the Government's misconduct under *Napue*, 360 U.S. 264, and *Giglio*, 405 U.S. 150, in his direct appeal. Mr. Basham was prejudiced by his appellate attorneys' failure to raise this meritorious claim on direct appeal.

Mr. Basham was entitled to the effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 395-96 (1985) ("A first appeal as of right . . . is not

72

**JA 3488**

adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). When assessing appellant counsel's performance, the *Strickland* standard applies. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). The Government argues that reviewing courts must give appellate counsel the "presumption that he decided which issues were more likely to afford relief on appeal." *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000). However, "[w]hile appellate attorneys should always attempt to winnow out their best issues for presentation to the courts, in a capital case, which by definition involves the ultimate society sanction, appellate attorneys must err on the side of inclusion, particularly when, as here, there exist a significant number of facts to support the claim." *Greer v. Mitchell*, 264 F.3d 663, 679 (6th Cir. 2001). Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000).

To demonstrate prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the non-frivolous issue, he would have prevailed on appeal. *See Smith*, 528 U.S. at 285-86. Here, appellate counsel failed to raise an issue regarding evidence that the Government qualified as some of the strongest against Mr. Basham, both at guilt and penalty phase. This omitted issue was stronger than other issues presented and there was no reasonable justification for the

issues omission. *Mapes v. Coyle*, 171 F.3d 408, 427 (6th Cir. 1999) (analyzing whether omitted issues were "'significant and obvious'"); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) (noting that if "appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance").

As discussed *supra*, the testimony of Sheriff Hewett was not only contrary to all other reports and testimony previously in the record, it was also diametrically opposed to the Government's characterization of Hewett's prior testimony in a hearing to exclude evidence in Fulks's case. (Fulks Tr. 6/22/04 at 255). The testimony was characterized as "seal[ing] the deal" in Mr. Basham's case. (Tr. 9/29/04 at 81-82.) Appellate counsel should have been on notice that this testimony was of great import, and the contradictions in the record regarding Hewett's testimony were significant and obvious. There was no legal basis or strategic reason to fail to challenge this issue. *See Mapes*, 171 F.3d at 427-28*; Howard v. Gramley*, 225 F.3d 784, 790 (7th Cir. 2000) ("We deem performance insufficient when counsel omits a 'significant and obvious issue' without a legitimate strategic reason for doing so."). Accordingly, appellate counsel rendered ineffective assistance in not raising this claim on direct appeal, and the Court should consider the claim on the merits. *Coleman v. Thompson*, 501 U.S. at 753-54; *Strickland*, 466 U.S. 668.

74

**JA 3490**

<center>CLAIM 13</center>

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to argue to the jury that Mr. Basham's post-arrest statements to law enforcement officers were involuntary.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

As Mr. Basham alleged in Claim 2 of the Motion, considerable evidence existed that his waiver of his *Miranda* rights and his statements to law enforcement officers were neither knowing, intelligent, nor voluntary. In Claim 13 of the Motion, Mr. Basham alleged that trial counsel rendered deficient performance in failing to argue to the jury the involuntariness of his statements to law enforcement. He further alleged that he was prejudiced by this failure.

In response, the Government advances essentially the same arguments that it made in opposing Claim 2, including its claim that, had trial counsel urged the unconstitutionality of Mr. Basham's post-arrest interrogation, the Court, in violation of Mr. Basham's Eighth Amendment rights, would have precluded them from arguing cooperation with law enforcement as a mitigating factor in the penalty phase. (*See* Opp. at 59-60.) Mr. Basham has already addressed the error in the Government's

<center>75</center>

<div align="right">**JA 3491**</div>

reasoning in his reply to Claim 2, and will not restate the argument here.

The Government argues in the alternative that, even if the Court had permitted trial counsel to argue cooperation with law enforcement as a mitigating factor, they would have faced a "credibility problem" with the jury, "having made contradictory claims at the guilt and sentencing phases." (Opp. at 59.)  Once again, however, the Government overlooks the fact that, even though trial counsel failed to argue voluntariness to either the Court or the jury, they actually did *not* present cooperation with law enforcement as a mitigating factor at sentencing.  As Mr. Basham explained with regard to Claim 2,  trial counsel had long known that the Government intended to argue that Mr. Basham had in fact intentionally misled law enforcement with his post-arrest statements.  Accordingly, any attempt to argue cooperation as a mitigating factor would have been futile.  To suggest that trial counsel followed a reasonable "strategy" of not challenging the voluntariness of Mr. Basham's post-arrest statements in order to preserve the opportunity to make a penalty-phase argument they never intended to make defies common sense.

As it did with regard to Claim 2, the Government also argues that, even if trial counsel were deficient, Mr. Basham was not prejudiced because "there is no evidence that Basham's statements were involuntary."  (Opp. at 59.)  Of course, the Government's argument merely begs the question.  There is no evidence *in the record*

76

**JA 3492**

because trial counsel improperly failed to present it.  That is the essence of both Claim 2 and Claim 13.  Mr. Basham has raised a colorable claim of ineffective assistance of counsel and, at an evidentiary hearing on this claim, will present evidence of prejudice, specifically, evidence that a reasonably probability exists that, had trial counsel effectively represented Mr. Basham with regard to admission of his post-arrest statements, those statements would either have been precluded by the trial court or disregarded by the jury.

<div align="center">CLAIM 14</div>

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorney, Jack Swerling, was hindered by a personal conflict of interest.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government mistakenly assumes that, in alleging that Jack Swerling's representation of him was adversely affected by a personal conflict of interest, Mr. Basham is raising a claim akin to *Cuyler v. Sullivan*, 446 U.S. 335 (1980), or *Mickens v. Taylor*, 535 U.S. 162 (2002).  (*See* Opp. at 60.)  He is not.  *Sullivan* and its progeny concern situations in which an attorney has a conflict of interest stemming from joint representation of another criminal defendant.  In Claim 14, however, Mr.

<div align="center">77</div>

<div align="right">**JA 3493**</div>

Basham alleges that Mr. Swerling was rendered ineffective because of his personal conflict of interest arising from his role as a testifying victim in the trial of Jimmy Causey, a man who held Mr. Swerling and his family captive during a 2002 home invasion.  Mr. Basham's claim must be adjudicated under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  *See, e.g.*, *Joiner v. Sec'y, Dept. of Corrections*, 2011 WL 5081145 at *5-6 (N.D. Fla. 2011) (discussing conflict of interest claims that do not involve dual representation).  To succeed on this claim, Mr. Basham must – and can – demonstrate both deficient performance and prejudice.

In 2002, the same year of the crimes at issue in this case, Mr. Swerling and his family were held at gunpoint in their home by two masked men.[10]  One of those men, Jimmy Causey, was a former client of Mr. Swerling.  (Rep. Exh. 7 (Clif LeBlanc, *Swerling Tells of Being Terrorized*, The State, February 11, 2004).)  Mr. Swerling began representing Mr. Basham in late April 2003.  Less than one month later, Mr. Causey and his co-defendant where charged with the kidnapping of the Swerling family.  (Rep. Exh. 8 (Clif LeBlanc, *2 Charged in Break-in at Area Lawyer's Home*, The State, May 15, 2003.).)  Swerling spoke with a reporter for The State after the charges were announced.  The article that followed conveyed the following:

---

[10]Apparently, the masks consisted of pantyhose the men had purchased from Wal-mart.

Swerling said he and his family are relieved by the arrests.

But the Swerlings don't live the same way anymore.

The lawyer who once sat at defense tables next to the most reviled killers in the state and the Midlands now carries a concealed gun.

The doors are locked, and no one goes outside alone.

"I have never felt vulnerable in my life before," Swerling said. "Now I have that sense that whenever I get out of the car, someone could be there. When I leave the house, someone could be there."

"That's not a good way to live."

(Rep. Exh. 8.)

The State of South Carolina's case against Jimmy Causey proceeded contemporaneously with the Government's case against Brandon Basham. As Mr. Swerling, the victim, prepared for the trial of his kidnapper, Mr. Swerling, the attorney, prepared for Mr. Basham's trial for kidnapping. On January 17, 2004, Swerling met with Mr. Basham at the jail. (Rep. Exh. 9.) At that meeting, Swerling wrote the following notes:

*[Defendant] now says statements are not voluntary*

1.  *No medicine*

2.  *Cigarettes – have to sign*

3.  *Snacks – " " "*

4.  *If you want to [eligible] – " " "*

79

**JA 3495**

5. *Help him if he told everything*
   *Knew Chad was leader*

6. *He was coerced.*

7. *Admits he knew right to lawyer*

8. *Told him if you told the truth*
   *would not be held against him,*
   *only Chad – no charges*

(Rep. Exh. 10.) Especially when viewed in light of his intellectual disabilities and his history of psychological and emotional difficulties, Mr. Basham's statements to Swerling at the January 17 meeting would have lead a reasonable attorney to give serious consideration to a fully contested *Jackson v. Denno* hearing. Given that Swerling had moved for such a hearing only 18 days earlier (Dkt. 232), a reasonable attorney would have developed this evidence for the February 24 hearing. Swerling, however, had other matters with which to contend before the *Jackson v. Denno* hearing: On February 10, 2004, he testified as the victim in the state court kidnapping trial of Jimmy Causey. (Rep. Exh. 7.) Apparently, the crimes against Mr. Swerling and his family had received considerable press attention. The start of Mr. Causey's trial was delayed because more than half of the jury pool was already aware of the crime. (Rep. Exh. 11 (*Publicity Hinders Swerling Jury Choices*, The State, February 10, 2004.).)

**JA 3496**

On the same day that he spent more than two hours on the stand testifying about, among other things, being "terrorized" by the intruders during the kidnapping, Mr. Swerling billed 3.6 hours to Mr. Basham's kidnapping case. (Rep. Exh. 7 at 1; Rep. Exh. 9(Out-of Court Hourly Worksheet – Jack B. Swerling – February 2004).) On February 11, 2004, the second day of Mr. Causey's trial, and apparently the day that Mr. Swerling's wife testified about the home invasion, (*see* Rep. Exh. 7 at 2), Mr. Swerling logged 1.5 hours to Mr. Basham's case. (Rep. Exh. 9.) Mr. Swerling's attention, however, appears to have been on record review, rather than preparation for the *Jackson v. Denno* hearing. (Rep. Exh. 9.)

The jury reached its verdict in Mr. Causey's case on February 12, 2002. (Re. Exh. 12 (Clif LeBlanc, *Causey is Sentenced to Life Without Parole*, The State, February 13, 2004).) Not unlike Mr. Basham would do at various points during his trial, Mr. Causey attempted to absent himself from the courtroom that day. (*Id.*) A reporter for The State recounted what transpired next:

> The four-day trial ended unusually and dramatically.
>
> In a twist, Causey refused to stay in the courtroom to hear the verdict or be sentenced. He waited in a holding cell just outside Courtroom 2-A in the county courthouse.
>
> That triggered a courtroom eruption from Swerling, a defense attorney for 30 years.
>
> He called Causey a coward unwilling to face the consequences of his

81

**JA 3497**

crime.

Shouting and pointing a finger, Swering also berated the three public defenders who constituted Causey's team of lawyers.

He said the cross-examination of his 26-year-old daughter Wednesday was "disgraceful" and "gratuitous" because it implied [she] might have been involved by leaving doors unlocked, not being bound as tightly as her parents and other details of the crime, her father said.

"That defendant, Jimmy Causey, and his lawyers terrorized my family again," Swerling said loudly. As his anger grew, he began shouting, "You ought to be embarrassed."

The judge stopped him.

(Rep. Exh. 12.)   After Mr. Swerling's outburst, a family member of the defendant spoke about Mr. Causey's difficult life and his belief that "Causey was out of his mind when he committed the crime." (Rep. Exh. 12.)

The following day, February 13, 2004, Swerling received a stern order from the Court in this case rebuking the defense for failing to disclose medical and mental health records to Government doctors who were evaluating Mr. Basham pursuant to Rule 12.2 of the Federal Rules of Criminal Procedure. (Dkt. 307). Among other things, the Court order defense counsel to file a memorandum within 24 hours "explaining their failure to comply with the court's [previous] order" requiring that the records be disclosed. (Dkt. 307 at 2.) Swerling and Harris filed their response to the judge's order later that day. (Dkt. 310.) The next day, February 14, 2004,

82

**JA 3498**

Swerling met with Mr. Basham's family members and mitigation specialist, Paige Tarr, for 2.3 hours. (Rep. Exh. 9.)

As noted previously, Mr. Basham's *Jackson v. Denno* hearing was scheduled to commence February 24, 2004. Defense counsel met with the prosecution for approximately one hour on February 16, 2004, to discuss the hearing. (Rep. Exh. 9.) On the Friday before the hearing, the Government filed a 15-page memorandum arguing why Mr. Basham's statements were admissible. (Dkt. 317.) Defense counsel filed nothing. The only evidence that Swerling gave any thought to the upcoming *Jackson* hearing was an email he sent to a federal trials listserve the Thursday proceeding the hearing. The email read:

> has anyone every heard of this.?
> a lawyer challenges the voluntariness of a statement in a jackson v denno- no allegation of coercion.the lawyer does not argue voluntariness before the jury. does anyone think that the defense would be estopped from arguing later in the trial that the defendant tried to help law enforcement in mitigation ?

(Rep. Exh. 13.)

The *Jackson v. Denno* hearing in Mr. Basham's case took place twelve days after Swerling's outburst at the Causey trial in which he called the defendant "a coward unwilling to face the consequences of his crime."[11] (Rep. Exh. 12.) As is

---

[11]The media attention surrounding Mr. Swerling's testimony as a victim in the Causey trial continued throughout this period. On February 25, 2004, The State ran

**JA 3499**

discussed in the Motion and previously in this Reply, defense counsel presented no evidence at the hearing in support of the suppression of Mr. Basham's post-arrest statements.

Mr. Basham has presented a colorable claim that Jack Swerling's personal conflict of interest rendered him ineffective in his representation of Mr. Basham and that Mr. Basham was prejudiced as a result.  He is entitled to an evidentiary hearing on this claim.

---

a letter to the editor, captioned "Swerling Walking in Victims' Shoes."  The letter read:

> Not that I wish bad things to happen to people, but it's quite humorous to read that Jack Swerling, the trial lawyer who has spent the past 30 years defending criminals, is now having to where the shoes of a victim.
>
> One of his former clients is on trial for breaking into his house, holding his family at gunpoint and ransacking his Spring Valley home.  Why didn't Mr. Swerling defend Jimmy Causey, the accused, this time? Maybe its because Mr. Swerling has a personal interest in this case and wants the guilty actually to be convicted instead of trying to get him off as he's done for 30 years.  Mr. Swerling said, "I have a lot of anxiety about going through the trial."  What about the anguish and anxiety all the victims and family members have suffered at the hands of his past criminal clients?

(Rep. Exh. 14.)

84

CLAIM 15

**Mr. Basham's trial attorneys rendered ineffective assistance of counsel in violation of 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when they failed properly to object to the admission of unfairly prejudicial prior act evidence during the guilt phase of Mr. Basham's trial. Appellate counsel similarly rendered ineffective assistance of counsel, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they not only failed to raise this issue on appeal, but in fact conceded the admissibility of evidence concerning the Burns kidnapping.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

At Mr. Basham's trial for the crimes against Alice Donovan, the Government presented, without objection, the testimony of eleven witnesses who testified solely about the disappearance of Samantha Burns. These witnesses included Ms. Burns's mother, father, brother, aunt, and two close friends. (*See generally* Tr. 9/17/04.) The witnesses testified, without objection, about their relationships with Ms. Burns, about Ms. Burns's personality, and about her plans for the future.

In his § 2255 Motion, Mr. Basham argued that no rational trial strategy could have justified trial counsel's failure to attempt to preclude or limit this highly prejudicial testimony. (Motion at 64.) The Government responds, however, that trial counsel "had a valid strategic reason" not to challenge the admission of the evidence:

85

JA 3501

"They used that evidence to advance their theory that Chad Fulks was the dominant figure in the pair's criminal activity." (Opp. at 67.) The Government fails to explain, however, how Ms. Burns's close relationships with her parents and her brother, her desire to have children by the time she was 25 years old, her "happy go lucky" personality, the "kinds of things that made her happy," or the fact that she never had the opportunity to live in the house her family had been building "advance[d] [the defense] theory that Chad Fulks was the dominant figure" in the crimes involving Alice Donovan.

In fact, the evidence discussed above could have had only one purpose: to impress upon the jury the tragedy of Samantha Burns's death and the devastating loss experienced by those who loved her. To whatever extent such evidence might have been relevant in a trial concerning Ms. Burns's disappearance, it was wholly irrelevant in a trial concerning Alice Donovan's disappearance. Yet, Mr. Basham's attorneys took no steps to preclude or limit the admission of this evidence, nor did they request that the jury be instructed about the very limited purpose for which evidence of Ms. Burns's disappearance was permissibly admitted.

Even if the Court had ruled that evidence of Samantha Burns's disappearance was admissible (either as intrinsic evidence or under Rule 404(b)) at Mr. Basham's trial in the Donovan case (a ruling which the Court was never called upon to make),

86

**JA 3502**

defense counsel nevertheless could have argued that the evidence be excluded or limited pursuant to Rule 403 of the Federal Rules of Evidence to avoid undue prejudice to Mr. Basham. *See United States v. Fortenberry*, 971 F.2d 717, 721 (11th Cir. 1992) (even intrinsic evidence may be excluded pursuant to Rule 403); *see also United States v. Davidson*, 449 F.3d 849, 853-54 (8th Cir. 2006) ("it certainly would have been reasonable for the district court to limit further the scope of the 'background' testimony based on the balancing test of Rule 403").

The Government argues that this evidence was not "unduly prejudicial" under Rule 403. (Opp. at 65-66.) This argument misses the mark, however. Although Mr. Basham disagrees with the Government's Rule 403 analysis, the issue now is not whether the evidence could have survived a Rule 403 balancing test, but rather whether Mr. Basham was prejudiced under *Strickland* by his attorneys' failure to ask the Court to conduct such a balancing test. To establish prejudice under *Strickland*, Mr. Basham need only establish a reasonable probability of different outcome. *See United States v. Higgs*, 663 F.3d 726, 740 (4th Cir. 2011). A "reasonable probability" is less than a preponderance of the evidence standard. *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006). Mr. Basham submits that, had his attorneys presented the Court with an argument that Rule 403 warranted exclusion of much of the Samantha Burns evidence presented by the Government, a "reasonable probability" exists that the

**JA 3503**

Court would have agreed and limited the scope of the evidence. Moreover, given that the Court expressly asked trial counsel if they wanted a limiting instruction to be given to the jury (Tr. 9/15/04 at 291-92), it is almost a certainty that the Court would have given such an instruction.

## CLAIM 16

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial attorneys failed to request that this Court admit at the penalty phase of Mr. Basham's trial comments made by the Government at his co-defendant's trial concerning Mr. Basham's lesser culpability.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied the effective assistance of counsel when his trial attorneys failed to request that this Court admit comments made by the Government at the co-defendant's trial concerning Mr. Basham's lesser culpability. But for counsel's errors, the result of Mr. Basham's trial would have been different.

There is no question that trial counsel recognized that the Government's statements in closing argument at the Fulks trial were helpful to their trial theme that Fulks was the leader and Mr. Basham was the follower. Counsel filed a notice that they intended to introduce "relevant factual assertions from the government's closing

88

argument" in the Fulks case pursuant to Federal Rule of Evidence 801(d)(2)(D). (Dkt. No. 724 at 1.)  Of particular importance were statements that showed the division of leadership, such as "he [Fulks] is the leader . . . .  Brandon Basham was a puppet, and Chad Fulks was pulling his strings throughout a lot of this crime spree." (Dkt. No. 724 at 9.)  The Court agreed with the Government argument that it was not an appropriate time to rule and deferred the issue but the court made clear that defense counsel could re-urge the issue if it became clear that the Government had taken contrary position in Mr. Basham's and Fulks's cases.  (Tr. 9/10/04 at 11.) Despite the explicit permission by the Court to do so, counsel never renewed the argument at any point during Mr. Basham's trial.  There is no indication that Mr. Basham's counsel decided to abandon the motion to admit the statements for any strategic reason.

On direct appeal, Mr. Basham argued that this Court abused its discretion by preventing Mr. Basham from offering the Government's "puppet" statement.  (App. Dkt. 181 at 77.)  Counsel argued that the statement was "obviously admissible under the FDPA's permissive standard" pursuant to 18 U.S.C. § 3593(c).  (App. Dkt. 193 at 54.)  The Government responded that, because Mr. Basham's trial counsel never renewed the motion despite the Court's statement that it would "take a time out" after the completion of the Government's case to consider the issue, Mr. Basham's

**JA 3505**

attorneys failed to preserve the claim for appellate review. (App. Dkt. 180 at 114.) The Fourth Circuit held that the argument was waived because defense counsel never actually moved for the statements' admission, and thus failed to request that the Court rule on the admissibility of the evidence. *United States v. Basham*, 561 F.3d 302, 335 (4th Cir. 2009).

Contrary to the Government's assertion, had defense counsel re-urged admission of the puppet statement, the Court should have admitted it. As argued in Claim 23, *infra*, the Government argued inconsistent theories at Mr. Basham's and Fulks's trials. While the Government takes the position that they argued consistent theories of teamwork, they also told the jury in Fulks's case that Fulks was the mastermind and Mr. Basham "the puppet." (Fulks Tr. 6/29/04 at 66). Further, they argued, "Brandon Basham is so stupid, he will do anything." (Fulks Tr. 6/29/04 at 66). At Fulks's trial, they argued to the jury that Fulks "intentionally killed Alice Donovan." (Fulks Tr. 6/22/04 at 171). Meanwhile, in Mr. Basham's case, the Government argued that Basham was the hand that dealt the fatal blow, stating, "It is not really what [Basham] says, it is what he does." (Tr. 11/1/04 at 57.) The Government also asserted, "He [Basham] killed Alice Donovan." (Tr. 11/1/04 at 62.)

This was precisely the type of "inconsistent" position this Court indicated would be relevent to its determination of whether or not the statements were

**JA 3506**

admissible. (Tr. 9/10/04 at 11.)  At a minimum, the statements that Fulks was a leader and that Mr. Basham was "a puppet" and stupid should have been admitted under Federal Rule of Evidence 801(d)(2)(D).  Rule 801 (d)(2)(D) concerns the admissibility of statements of a party opponent.  Such statements are not hearsay.  They are "excluded from this definition on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions fo the hearsay rule."  117 A.L.R. Fed. 599 § 2.  Here, the statements were made and adopted by Mr. Basham's party-opponent, and were subject to admission.

Contrary to the Government's assertion that its statements regarding Mr. Basham's lesser culpability in Fulks's trial were not admissible because what lawyers say in opening statements and closing arguments is not evidence, "a clear and unambigous admission of fact made by a party's attorney in an opening statement in a civil or criminal case is binding upon the party." *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986).  Admissions by defense attorneys in opening statements have been held to eliminate the need for additional proof of an element of the offense.  *United States v. McKeon*, 738 F.2d 26, 30 (2nd Cir. 1984) (*citing Dick v. United States*, 40 F.2d 609, 611 (8th Cir. 1930); *Chaffee v. Kraft Gen. Foods*, 886 F. Supp. 1164, 1168 (Dist. N.J. 1995)).

In *McKeon*, the Second Circuit was faced with the question of whether a

91

**JA 3507**

criminal defendant's attorney's "seemingly inconsistent statement at an earlier trial [could be used] to prove that fundamental portions of the defendant's case [were] fabricated." *Id.* at 30. The court held that such statements were not *per se* inadmissible. "To hold otherwise would not only invite abuse and sharp practice, but would weaken confidence in the justice system itself by denying the function of trials as truth seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact." *Id.* at 31.

Contrary to the Government's argument, this was not mere "[s]peculation[] of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the [opponent's]case or invitations to a jury to draw certain inferences." (Opp. at 70, *quoting McKeon*, 738 F.2d at 33.) Referring to Mr. Brandon as a puppet in one trial and co-equal in the other was precisely the type of harm admission of party opponent statements seeks to remedy. *See McKeon*, 738 F.2d at 31 (noting that guidance is found in the civil arena where a party may not "advance one version of the facts in its pleadings, conclude that its interest would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief the trier of fact will never learn of the change in stories). As argued more fully in Claim 23, the

Government presented inconsistent theories in Mr. Basham's and Fulks's cases. They exacerbated that harm when, although they said Mr. Basham was a puppet in the Fulks closing argument, they described him as a equal partner in his own case. Here, the Government, deciding that they were better served by denying that Mr. Basham was a follower, advanced a different version of the facts and the trier of fact never knew otherwise, violating Mr. Basham's right to a fair trial.

Contrary to the Government's argument, had trial counsel re-urged the issue of admission of the Government statements during the Fulks closing argument, the result of Mr. Basham's trial undoubtedly would have been different. As a result of the Government's inconsistent theories in the two trials, the statements in the Fulks case should have been admissible. The jury, hearing that even the prosecution characterized Mr. Basham as a "puppet," would likely have given more credence to the argument that Mr. Basham played a minor role in the crimes. Absent this characterization, not a single juror found the Minor Participant statutory mitigator. (Dkt. 805 at 6.) Even if the Government is correct that Fulks's role as a leader does not make Basham a minor participant (Opp. at 72), it was certainly relevant to the non-statutory mitigating factor that Basham played a *lesser* role that Fulks, which no jurors found. (Dkt. 806 at 7, factor 1.) Additionally, because the Government argued about how "stupid" Mr. Basham was in Fulks's trial, additional statutory mitigating

93

factors such as impaired capacity (only four jurors found) and whether Basham committed the offense under severe mental or emotional disturbance (only one juror found) would have been more powerful.  (Dkt. 805 at 6.)  Non-statutory mitigating factors that (1) Basham showed signs of neurological damage that inhibited his ability to process information and inhibit impulses (one juror found); (2) Basham suffered from dementia (one juror found); (3) Basham's IQ scores were in the low 70's (no jurors found); and (4) Basham was easily influenced and led by others (four jurors found), might have been more accepted if the jurors knew that the Government characterized Basham as "stupid" and a "puppet."  (Dkt. 806 at 7-9.)

Under the circumstances discussed above, there is a reasonable likelihood that, absent trial counsel's error, the result would have been different.  *See Strickland*, 466 U.S. at 694.  Even if the Court had ruled against Mr. Basham, the issue would have been preserved for appellate review.  Trial counsel's failure to re-urge the motion meant that even plain error review was unavailable.  *Basham*, 561 F.3d at 335. "*Strickland* is not always fastened to the forum in which counsel performs deficiently; even when it is *trial* counsel who represents a client ineffectively in the *trial court*, the relevant focus in assessing prejudice may be the client's appeal."  *Davis v. Secretary for Department of Corrections*, 341 F.3d 1310, 1315 (11th Cir. 2003) (finding ineffective assistance of counsel where trial counsel raised, but failed to re-

94

urge the issue at the close of voir dire as required by Florida law, and thus failed to preserve the issue for appeal).  Here, due to deficient performance of trial counsel, Mr. Basham was denied his right to effective assistance of counsel.

<h3 style="text-align:center">CLAIM 17</h3>

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied the effective assistance of counsel guaranteed by when his trial counsel (a) failed effectively to cross-examine a key Government witness; (b) failed to call rebuttal witnesses to challenge the Government witness's testimony; and (c) failed to respond to the Government's argument concerning the witness's testimony.  No sound strategy existed to explain such failures.

Near the close of guilt phase, Clifford Jay, a former teacher's aide, testified on direct examination that, on Christmas Eve, 2002, Mr. Basham called him from jail and told him that he was "in a lot of trouble." (Tr. 9/27/04 at 224-28.)  Mr. Jay asked,

<p style="text-align:center">95</p>

<p style="text-align:right">**JA 3511**</p>

"Did you do – I just want to know if you did what they said you did?," to which Mr. Basham allegedly replied, "Yes, sir. We killed them." (Tr. 9/27/04 at 228.) Mr. Jay subsequently reported the conversation to law enforcement. (Tr. 9/27/04 at 229, 235.)

On cross-examination, Mr. Swerling questioned whether Mr. Basham in fact told Mr. Jay, "We killed *her*." (Tr. 9/27/04 at 238 (emphasis added).) Mr. Jay adamantly denied that this was the case. Mr. Jay said the Madisonville officer he reported the statement to had been his good friend over the years, but he then claimed not to remember his name. (Tr. 9/27/04 at 235.) Mr. Swerling refreshed Mr. Jay's memory that the person he spoke with from the sheriff's department was David Morris. Mr. Swerling also questioned whether Mr. Jay had spoken with a Detective Addison from Myrtle Beach. Mr. Jay affirmed that he had spoken with a Myrtle Beach officer, but Jay could not recall his name. (Tr. 9/27/04 at 239.)

The next day, during argument on the Rule 20 motion, the Court asked defense counsel, "What about the essentially unchallenged statement 'we killed them'?" The Court charged that there was no evidence to support the cross-examination question about whether Mr. Basham had in fact said "her" instead of "them," "wondered at the time if we were going to hear from those police officers," and questioned whether there was "a good-faith basis for asking a question like that." (Tr. 9/28/04 at 7-8.) Defense counsel argued the good faith basis for the question was that the defense

96

**JA 3512**

team had confirmed with both of the officers that Mr. Jay never told them about Mr. Basham's supposed reference to "them."  however, that the defense had "opted not to present it at this stage of the trial," but possibly would at penalty phase.  (Tr. 9/29/04 at 9.)  Defense counsel never called David Morris or Detective Addison.

Counsel's failure to impeach a key government witness with prior inconsistent statements denied the jury the ability to "independently judging the merits of the case" and constituted ineffective assistance of counsel.  *United States v. Campbell*, 616 F.2d 1151, 1152 (9th Cir. 1980).  The Government asserts that failure to impeach Jay and call the officers was the result of a strategic decision, as doing so would have only highlighted Basham's involvement, the officers might not have had as clear a memory as Jay, and Jay had no motivation to harm Basham. However, Jay had more of a history with Mr. Basham than just being a "father figure" as the Government claims.  (Opp. at 76).  Mr. Basham was expelled from school when Jay was his teacher's aid because when Jay startled him by trying to wake him up, Mr. Basham pulled a knife on him. (Tr. 10/22/04 at 133-34.)  Further, Mr. Basham's involvement was already highlighted by the numerous witnesses that testified about his actions in the case.  Calling two additional police officers who could have case doubt on one of the most damaging statements in Mr. Basham's case and at worst would have given testimony that was merely cumulative cannot be excused on the basis of any strategy.

**JA 3513**

The failure to impeach a key government witness with prior inconsistent statements constituted ineffective assistance of counsel. *See Driscoll v. Delo*, 71 F.3d 701, 710 (8th Cir. 1996) (finding "no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony . . . took on such remarkable detail and clarity over time"). Defense counsel failed to call witnesses to rebut Clifford Jay's testimony or even to address Jay's testimony in closing argument. The Government seized upon this failure: "And as far as who the actual killer is . . . . [w]hat didn't Mr. Swerling talk to you about? . . . . He didn't mention anything about Brandon Basham reaching out to Mr. C.J., to Clifford Jay on Christmas Eve, December 2003 [sic], saying, 'We killed them.'" (Tr. 11/1/04 at 170.) The Government continued, "'We killed them.' What more do you need as far as his involvement. His own words . . . ." (Tr. 11/1/04 at 171.) When counsel "fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *United States v. Cronic*, 466 U.S. 648, 659 (1984). Here, counsel inexplicably failed to subject testimony that the Government argued was one of two pieces of evidence that "seal[ed] the deal" on Mr. Basham's guilt to any meaningful adversarial testing. (Tr. 9/29/04 at 82 ).

**JA 3514**

Reasonably competent defense counsel would have realized how devastating this testimony was to Mr. Basham. Yet, despite having the ability to do so, defense counsel failed to rebut this testimony with the testimony of Officer Morris and Detective Addison. Such questioning is standard practice in challenging a witness's credibility. *See Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) ("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." (*quoting* 3A J. Wigmore, Evidence § 1042, p. 1056 (Chandborne rev. 1970)). Hearing two law enforcement officers testify that Jay did not tell them what he claimed would have, at a bare minimum, softened the blow of that testimony.

Given how important Mr. Jay's testimony was to the Government's case against Mr. Basham, there was simply no strategic or objectively reasonable basis to fail to call the rebuttal witnesses, or in any way challenge Jay's statement. Even if defense counsel had not realized how damaging the testimony would be in the guilt-phase, after hearing Mr. Jay testify, and hearing its central role in the Government's guilt phase closing argument, the failure to call the officers during penalty phase, as counsel had claimed he might, was inexcusable and fell below accepted standards of performance of counsel.

The record plainly shows prejudice. As the Government recognized, Clifford

99

**JA 3515**

Jay's testimony was devastating to Mr. Basham's case and argued that it, coupled with the Hewett testimony, was enough to convict Mr. Basham. The verdict form indicates that not a single juror found the Minor Participation mitigating factor. (Dkt. 805 at 6.) Defense counsel's failure to call witnesses to rebut Clifford Jay's testimony or even to address Jay's testimony in closing argument was a failure that tipped the balance in favor of a death verdict, and without such failure "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. Counsel "failed to render reasonably effective assistance" and that failure resulted in the "denial of fundamental fairness." *United States v. Elksnis*, 528 F.2d 236, 337 (9th Cir. 1975).

## CLAIM 18

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett, in fact elicited damaging testimony from Hewett, and then failed to mitigate the damage caused by his deficient cross-examination of Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution when his trial counsel failed effectively to cross-examine Sheriff Ronald Hewett. Defense counsel's cross-examination was deficient because it elicited damaging testimony from Hewett, and failed to mitigate the damage.

As discussed *supra*, Sheriff Hewett testified at the *Jackson v. Denno* hearing in Mr. Basham's case. Hewett testified that he walked off alone with Mr. Basham and that Mr. Basham then demonstrated how Alice Donovan was killed with the purse strap, as well as how he threw the strap into the woods. (Tr. 9/27/04 at 53; Tr. 2/25/04 at 66.) Although the Government now claims this testimony is ambiguous, at the Fulks trial they characterized it as Basham demonstrating how Fulks strangled Alice Donovan. (Fulks Tr. 6/22/04 at 255).

The other evidence concerning the purse strap consisted of a report of Lieutenant Crocker's interview with Hewett that contained no reference to who killed Donovan (Exh. 2) and an FBI "302" report prepared by Agent Jeffrey Long noting that Basham's attorney, Littlejohn, conveyed to law enforcement that "[a] purse strap was used by FULKS to strangle DONOVAN. BASHAM threw the purse strap out of the window of the BMW as they left the cemetery." (Exh. 3.)

**JA 3517**

At Basham's trial, Hewett, contrary to all other evidence and his own prior testimony, stated during cross examination that Mr. Basham had demonstrated how *Basham* had strangled Donovan. (Tr. 9/27/04 at 53-54). Defense counsel responded only:

> Q.    Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A.    That is true because he didn't say. He showed.

(Tr. 9/27/04 at 53-54.)

"The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witness against him.'" *Davis v. Alaska*, 415 U.S. 308, 316 (1974). More than just physical confrontation, "our cases 'construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination.'" *Id.* at 315. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* Here, counsel failed to meaningfully test Sheriff Hewett's testimony and deprived Mr. Basham of his right to confrontation and effective assistance of counsel. Counsel did not confront Hewett with any of the prior evidence or testimony regarding the purse strap. Exacerbating the deficient performance in his cross examination of Hewett, defense counsel failed to ask Agent Long any questions about the notation in his 302 report that Fulks, not Basham, had wielded the purse strap. (Tr. 9/27/04 at 186-210.)

102

In sum, counsel failed to mount any challenge at all to Hewett's damaging testimony.

Eliciting damaging evidence without sound strategy "falls well below an objective standard of reasonableness." *See White v. McAninch*, 235 F.3d 988, 997-98 (6th Cir. 2000). The Government contends that counsel could not have questioned Long about the statement in his report that Fulks killed Donovan because it would be double hearsay. The Government forgets the basic bright line rule of evidence that hearsay is admissible if one of the Federal Rules of Evidence exceptions applies. Here, there would be an exception for each level of hearsay. Mr. Basham's statement would be deemed an admission against interest, provable against him as an exception of the hearsay rule. Fed. R. Evid. 804(b). Although Basham stated that Fulks killed Donovan, he admitted to his participation in her kidnapping and proximity to her murder. Fulks's statement could be admitted under multiple theories. First, because the Government's position was that Fulks was "a coconspirator of a party during the course and in furtherance of the conspiracy," his statement would be an admission by a party-opponent and thus not hearsay at all. Fed. R. Evid. 801(d)(2)(E). If hearsay, Fulks's statement could be deemed an admission against penal interest. Fed. R. Evid. 804(b). Finally, the United States Supreme Court has recognized that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."

**JA 3519**

*Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). There is no question defense counsel *could* have questioned Long about the statements. Failure to do so compounded the deficient performance of counsel's failure to effectively cross-examine Hewett.

No sound strategy existed for asking Sheriff Hewett the question that resulted in the damaging testimony, nor failing to challenge it with Hewett directly or by calling it into question by asking Long about the statements in his 302 report that Fulks strangled Donovan. Given that Government contends that to do so would have only been more damaging. As the Government took Hewett's testimony and argued that Basham was the actual killer: ("Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it.") it is hard to imagine how anything else Hewett said could have been worse. (Tr. 9/29/04 at 80 (emphasis added).) Hewett's testimony already allowed the Government to argue that Basham was the hand that dealt the final blow. The argument that Long's report would have only emphasized how many times Basham changed his story is also insufficient strategy. At the very least, counsel needed to call into doubt statements that Basham was the killer. Even if the jurors found the statement to be inconsistent, it was better than the only, unchallenged statement before them that Basham was the killer. Such testimony

104

**JA 3520**

would have been significant to Basham's case because it could have cast doubt on Hewett's unchallenged testimony.

Finally, contrary to the Government's arguments otherwise, Mr. Basham suffered prejudice as a result of counsel's deficient performance. As discussed more fully in Claim 1, *supra*, even the Government acknowledged that the Hewett testimony, elicited and unchallenged by defense counsel, was one of the most important pieces of evidence against Mr. Basham. It was the only item of evidence or piece of testimony that allowed the Government to stray from the "team" argument and persuade the jury that Basham himself was the killer. Due to counsel's failure to effectively cross-examine witnesses, the Hewett testimony remained unchallenged. This unchallenged testimony deprived Mr. Basham of a fair trial because "the actions [or inactions] of his attorney precluded the fact-finder from independently judging the merits of the case." *United States v. Campbell*, 616 F.2d 1151, 1152 (9th Cir. 1980). Without the Hewett testimony, and with Long's testimony that Basham told him Fulks was the killer, there is a reasonable probability the result would have been different. *Strickland*, 466 U.S. at 694.

**JA 3521**

## CLAIM 19

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when they failed adequately to investigate, develop, and present mitigating evidence at the penalty phase of Mr. Basham's trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Counsel for Mr. Basham filed his § 2255 Motion on May 31, 2011. (Dkt. 1393.) As the Court is aware, since that time the parties have been involved in litigating issues surrounding Mr. Basham's competency to waive this proceeding. Defense resources and time have been devoted almost exclusively to that critical issue since the Motion was filed. Counsel anticipate that the matter of Mr. Basham's *pro se* attempt to terminate this proceeding will be resolved by the pleading ordered by this Court to be filed no later than March 10, 2012 (*see* Dkt. 1460), and that this proceeding will proceed unabated. Nevertheless, at this time, counsel for Mr. Basham are unable to provide more factual information in reply to the Government's opposition to Claim 19. Counsel stand by the arguments raised in the § 2255 Motion and will supplement those arguments as soon as is practicable.

Mr. Basham, however, does address the following aspects of Claim 19 and the

106

**JA 3522**

Government's response to that claim.  First, although Claim 19 asserts ineffective assistance of counsel for failure to investigate and present evidence of mental retardation, the broad language of 18 U.S.C. § 3596(c) plainly indicates that, regardless of whether Mr. Basham is able to satisfy the deficient performance prong of *Strickland* with regard to trial counsel's failure adequately to pursue mental retardation as a constitutional bar to Mr. Basham's death sentence, if he can now prove that he is mentally retarded, the Government may not execute him.  The statute's proscription is clear: "A sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).

Second, the Government misconstrues the standard for demonstrating significant impairment in adaptive skills, one of the three prongs of an MR diagnosis. Specifically, the Government erroneously focuses on random skills allegedly demonstrated by Mr. Basham as proof that he does not have deficits in adaptive behavior.  (*See* Opp. at 82.)  The American Association on Intellectual and Developmental Disabilities (AAIDD), formerly known as the American Association on Mental Retardation (AAMR),[12] which is the principal professional organization in the field of mental retardation, has propounded and refined the definition of mental

---

[12]Because the AAIDD was known as the AAMR during the period in which it published the materials Mr. Basham references in this Reply, he will refer to the organization as the AAMR.

107

retardation for many decades. *See* James W. Ellis, *Mental Retardation and the Death Penalty: A Guide to State Legislative Issues*, 5 (2002) (hereinafter "Ellis"). In 2002, the AAMR refined its definition of mental retardation to read: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports*, at 1 (10th ed. 2002).[13]

The AAMR identifies five assumptions that are essential to the application of its definition of mental retardation. One of these five essential assumptions provides that "[w]ithin an individual, limitations often coexist with strengths." *Id. Accord*

---

[13]The American Psychiatric Association's definition of mental retardation is similar:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant *limitations* in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

*Diagnostic and Statistical Manual of Mental Disorders* 39 (4th ed. 2000) (emphasis added).

Caroline Everington & Denis W. Keyes, *Mental Retardation: Diagnosing Mental Retardation in Criminal Proceedings: The Critical Importance of Documenting Adaptive Behavior*, The Forensic Examiner 31, 32 (July/Aug. 1999) ("adaptive limitations often coexist with strengths in other adaptive skills and personal capabilities."). This assumption is critical because mental retardation is concerned with *limitations* in adaptive behavior. The presence of adaptive behavior skills does not preclude a finding of mental retardation. Stated differently, because the definition of mental retardation incorporates strengths as well as limitations, any diagnosis of mental retardation must be confined to the existence of adaptive *limitations*:

> The focus in evaluations (and ultimately adjudications) under the adaptive prong must remain focused on the individual's *limitations* rather than any skills he or she may also possess. AAMR and other clinical experts emphasize that the presence of skills cannot preclude the appropriate diagnosis of mental retardation. In the most recent edition, the definition of mental retardation is prominently accompanied by the admonition that "Within an individual, limitations *often* coexist with strengths." AAMR, *Mental Retardation* (2002), *supra* note 17, at 1 (emphasis supplied). *Accord* AAMR, *Mental Retardation* (1992), *supra* note 16, at 1 ("Specific adaptive limitations often coexist with strengths in other adaptive skills or other personal capabilities."). The skills possessed by individuals with mental retardation vary considerably, and the fact that an individual possesses one or more that might be thought by some laypersons as inconsistent with the diagnosis (such as holding a menial job, or using public transportation) cannot be taken as disqualifying. The sole purpose of the adaptive prong of the definition for the

109

> criminal justice system is to ascertain that the measured intellectual impairment has had real-life consequences, and thus it is the presence of confirming deficits that must be the diagnostician's focus.

Ellis, *supra*, at 8 n.25 (emphasis in original).

Accordingly, the Government's discussion of Mr. Basham's alleged "skills," (Opp. at 81), is irrelevant to the issue of whether or not he suffers from mental retardation.

Third, concerning the issue of trial counsel's failure adequately to investigate and present evidence that Mr. Basham suffered from Fetal Alcohol Spectrum Disorder (FASD), the Government argues that Mr. Basham cannot demonstrate *Strickland* prejudice because an FASD diagnosis would have convinced the jury that Mr. Basham "could not control his behavior" and that the evidence would have "created greater concerns about his future dangerousness." (Opp. at 87.) The Government, however, minimizes the import of this evidence and ignores the jury's finding that Mr. Basham *did not* present a risk of future dangerousness, despite the Government's heavy focus on this alleged non-statutory aggravating factor at trial. (Dkt. 805 and 806.) It likewise ignores the fact that on Count 1 (Carjacking) half of the jurors found that Mr. Basham's "capacity to appreciate the wrongfulness of his conduct" was impaired, and that on Count 2 (Kidnapping), four jurors made this finding. (*Id.*)

<div align="center">110</div>

<div align="right">**JA 3526**</div>

The term "Fetal Alcohol Spectrum Disorder" refers to the variety of abnormal features that can occur in children exposed to alcohol *in utero*.[14] "Patients with FASD are often described as having poor judgment, failure to consider consequences, and poor planning and organizational skills as well as poor impulse control and decision-making skills." Ann Streissguth and Kieran O'Malley, *Neuropsychiatric Implications and Long-Term Consequences of Fetal Alcohol Spectrum Disorders*, Seminars in Clinical Neuropsychiatry, Vol. 5, No. 3, July 2000, at 179. These behavioral difficulties are the result of alcohol's toxic effect on the fetus's developing brain. *See id.* at 180. *See also Regina v. J. (T.)*, 1999 Carswell Yukon 99, [1999] Y.J. No. 57 ("The cognitive processes that people use to regulate their conduct and to adapt to their social environment are located primarily in the anterior frontal lobe of the brain. The effect of alcohol on the fetal brain is such that this region does not develop sufficiently to allow the person afflicted with FAS to appropriately control his or her actions.").

As one study of teenagers with FASD found, "[t]he most significant problems were a lack of impulse control and bursts of aggression. The children seemed not to

---

[14]FASD is "an umbrella term that refers to the full range of prenatal alcohol-induced impairments." This term subsumes previous diagnostic categories such as Fetal Alcohol Syndrome ("FAS"). Timothy E. Moore and Melvyn Green, *Fetal Alcohol Spectrum Disorder (FASD): A Need for Closer Examination by the Criminal Justice System*, Criminal Reports, Vol. 19, Pt. 1, July 2004, at 1.

realize the consequences of their own behavior and demanded much more attention than normal children." Streissguth and O'Malley at 181. These issues do not disappear once a person with FASD reaches adulthood. Rather, "[g]estational exposure to alcohol can cause a wide spectrum of disabilities that have lifelong physical, mental, and behavioral implications." *Id.* (internal citation omitted); *see also* Timothy E. Moore and Melvyn Green, *Fetal Alcohol Spectrum Disorder (FASD): A Need for Closer Examination by the Criminal Justice System*, Criminal Reports, Vol. 19, Pt. 1, July 2004, at 1 ("FASD is a lifelong disability; one does not 'outgrow' it.").

Had trial counsel fully investigated and presented the effects of Mr. Basham's *in utero* exposure to drugs and alcohol, a reasonable probability exists that other jurors would have been convinced that his "capacity to appreciate the wrongfulness of his conduct was impaired" and would have weighed this mitigating factor in deciding between life and death.

112

<center>CLAIM 20</center>

**Mr. Basham was denied the effective assistance of counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Sixth Amendment to the United States Constitution because his attorneys failed to assemble a competent capital defense team.  In the alternative, Mr. Basham was denied the effective assistance of counsel under the above provisions because his attorneys failed adequately to supervise the team they had assembled.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham was denied effective assistance of counsel when his attorneys assembled a defense team riddled with personal problems, conflicts of interest, and ineffective performance.  Counsel failed to recognize these issues and failed in their duties properly to supervise and manage their capital defense team.  Accordingly, their performance fell below the professional norm in violation of Mr. Basham's rights.

Given the "severity and irrevocability of a death sentence, extraordinary obligations are placed on counsel to prepare and try such a case." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. 1117, 1120 (2003). One of the chief obligations was that Mr. Basham's defense counsel had the duty "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to

<center>113</center>

<div align="right">**JA 3529**</div>

facts relevant to the merits of the case and the penalty in the event of conviction."

*Rompilla*, 545 U.S. at 387; *see also Buckner v. Polk*, 453 F.3d 195, 215 (4th Cir. 2006) (Gregory, J., concurring in part and dissenting in part).  In order to do so, counsel had to assemble a competent capital defense team.

Beyond the two attorneys, the other "core members of the defense team are the investigator and mitigation specialist."  *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1123.  Rule 5.3 of the ABA Model Rules of Professional Conduct attributes to the attorney responsibility for the conduct of an investigator, mitigation specialist, or any other non-lawyer working with the lawyer.  The lawyer must ensure that the non-lawyer's work and conduct are "compatible with the professional obligations of the lawyer."  ABA Model Rule 5.3(b).  The lawyer has a duty to supervise, and is responsible for the conduct of those working for him.  ABA Model Rule 5.3 (c).  In this case, counsel failed in their duties to properly choose and supervise core members of the defense team.

### A.    Investigator Carlisle McNair

"A skilled and trained investigator is an essential member of the core team in capital cases." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. 1125-26, *citing* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.5 (C)(2)(a) (rev. ed. 2003) (hereinafter Guidelines)).  Soon after

**JA 3530**

their appointment to Mr. Basham's case, defense counsel identified Carlisle McNair, a "retired" former captain from the Lexington County Sheriff's Office, to be the "overall coordinator of the investigation." (Tr. 8/28/03 at 3.) As coordinator of the investigation in Mr Basham's capital case, McNair was required to "thoroughly investigate the charged capital offense and any other offense charged in the case regardless of any statement or admission made by the client or evidence of overwhelming guilt. *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1126. Unfortunately for Mr. Basham, McNair was a woefully inappropriate choice.

Mr. McNair, who professed to be a retired law enforcement officer, had in fact resigned from his prior post following several instances of misconduct, as well as inappropriate behavior of a sexual nature. As a result of internal affairs investigations, McNair was relieved from his position as Headquarters' Region Commander at the Lexington County Sheriff's Department and demoted to the rank of lieutenant. He also was placed on probation for six months and suspended from duty for one pay period. (Exh. 4.) On October 14, 2002, McNair resigned from Lexington County. (Exh. 5.) Less than one year later, defense counsel retained him as the lead investigator in Mr. Basham's case. It is unclear if defense counsel was aware of Mr. Carlisle's questionable history. They either failed to properly vet their defense team, or failed to recognize how damaging McNair's history could be to Mr.

115

**JA 3531**

Basham's case. Under either scenario, their performance fell below acceptable professional norms.

There is no question that the Government discovered the skeletons in McNair's closet. They subpoenaed his Personnel File, Internal Affairs Report, and Discipline from Lexington County Sheriff's Department. (Rep. Exh. 15.) In April 2004, Lexington County complied with the subpoenas and the results were a shocking record of bad judgment, dishonesty and inappropriate behavior.

In 1998, McNair was suspended from duty based on an infraction in violation of the department's policy on handling evidence. (Rep. Exh. 16.) Specifically, McNair removed a piece of evidence (a cassette tape) from another detective's desk without permission, thereby breaking chain of custody. The tape was of allegedly harassing phone calls made by a woman who was also a snitch whom McNair used. (Rep. Exh. 17.) Next, in 2001, McNair was found to have lied in an internal investigation, violated the Fourth Amendment's search warrant requirement, and behaved insubordinately by not following a superior's instruction. Specifically, McNair ignored an order to wait for a search warrant to enter the scene of a murder/suicide. Other officers stated that McNair said that "as far as he (McNair) was concerned, the search warrant was already signed." (Rep. Exh. 18.) Although McNair denied those statements and denied entering the residence improperly, the

116

**JA 3532**

complaint against him was sustained.  (Rep. Exh. 18.)

In June of 2002, the Sheriff's office began an investigation into McNair's most abhorrent and egregious misbehavior at his job.  Following a training class on Sexual Harassment and Policy Procedure, a female employee stated that "women did not feel that they could come forward and report incidents [of sexual harassment] . . . and to do so would be to commit 'professional and personal suicide.'" (Rep. Exh. 19.)  An investigation commenced regarding McNair and the playing of pornographic videos in the office.  The investigation report sustained a finding that McNair violated procedure when he "on at least two occasions, displayed a video clip containing obscene material, to wit a bald headed man attempting to insert his head into a woman's vagina, to other employees with no criminal investigative or business necessity of doing so." (Rep. Exh. 19; Exh 4.)  McNair attempted to defend his conduct and claimed that the video had come into his hands as part of an investigation.  However he could not say which one, nor explain what need justified showing the tape.  McNair stated that he was "'curious as to whether or not the portrayed sexual act was 'for real.'" (Rep. Exh. 19.) McNair was given explicit instructions "that he should not intimidate or attempt to improperly influence any potential witnesses." (Rep. Exh. 19.) McNair ignored these instructions and had several discussions with employees about the investigation, some of which caused the

117

**JA 3533**

employees to feel uncomfortable. The investigation report found that he violated policy and procedure by trying to provide a copy of his written statement defending himself to one employee, warned other employees to destroy images on their computers, and alerted employees that investigation was underway and that his computer had been seized. (Rep. Exh. 19.)

As a result of his conduct, McNair was counseled on several occasions "concerning noted deficiencies" in his performance. (Exh 4.) He was sent to training to further assist him in "correcting these deficiencies." (Exh 4.) In a "Notice of Discipline" sent to McNair on July 1, 2002, Major James Harris noted that, despite efforts to help McNair understand his inappropriate behavior, "[u]nfortunately, deficiencies continued to arise even after this training and counseling. Further, you have also been the subject of other internal affairs investigations with founded allegations of misconduct." (Exh 4.) The report continued that McNair's actions "demonstrated extremely poor judgment and highly unprofessional conduct." (Exh 4.) McNair was relieved of his position as Headquarters Region Commander and demoted to Lieutenant, to serve a six month probationary period and suspended from duty immediately for one pay period. (Exh 4.) Ultimately, on October 14, 2002, McNair resigned from Lexington County. (Ex. 5).

One of the bright line rules of criminal cases is that counsel cannot act as a

118

**JA 3534**

witness. Even if counsel themselves conduct interviews, it is necessary to have a third person present, normally an investigator, "should they need to present testimony regarding such matters as conflicting statements, recantations, etc." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1126, quoting Guideline 4.1, commentary. Considering the shocking and distasteful misconduct that led to McNair's resignation, calling him as a witness was impossible in Mr. Basham's case. Because part of the findings leading to McNair's discipline was that he lied about his conduct while at Lexington County, it likely would have been admissible in court. Had the jury heard the graphic details about McNair that the Government recovered as a result of its subpoenas, McNair would not only have credibility issues, but the jury would have been disgusted with him and could have reflected that disgust on to Mr. Basham's case.

McNair's history was not the only reason he was a grossly inappropriate choice for Mr. Basham's case. Counsel submits upon information and belief that McNair directed an inordinate amount of time and resources towards irrelevant (and often prurient) matters at the expense of investigating issues that had direct and critical significance to the case against Mr. Basham. For example, McNair seems to have been extremely focused on Chad Fulks's ex-wife, Veronica; the fact that she was a stripper; and the possibility that tapes existed that portrayed her performing sexual

**JA 3535**

acts. Mr. McNair spent a substantial amount of time interviewing Ms. Evans and her associates. In fact, in his role as investigator, McNair convinced an associate of Evans to turn over a videotape showing Evans engaging in a sex act with the individual. (Rep. Exh. 20.) It is difficult to see how this material was in any way relevant to Mr. Basham's trial. Considering Mr. McNair's history of inappropriate behavior with sexually prurient videos, the time spent tracking down an irrelevant pornographic video is concerning. McNair's focus on Veronica Evans was inexplicable, as she neither knew Mr. Basham nor testified at his trial.

Further, upon information and belief, McNair had a personal bias against Mr. Basham, based on McNair's belief that Basham was homosexual. McNair spend a large part of his time questioning witnesses about Mr. Basham's potential homosexual relationships. It was unclear, what, if any relevance this had to the themes and theories of Mr. Basham's case. Although it was known within the defense team that Mr. Basham had been the victim of sexual abuse, McNair spent little time asking witnesses about this rich mitigation theme and intense, focused on whether Mr. Basham engaged in consensual same sex relationships. (Rep. Exh. 21.) It appears McNair may have held a bias against homosexuals. In one email, McNair refers to a witness he intended to locate and talk to as "another homo friend of Branden's Can't wait." [sic] (Rep. Exh. 22.) Due to McNair's bias against what he

120

**JA 3536**

believed to be Mr. Basham's sexual orientation, McNair was unable to competently and thoroughly investigate the case.

Upon information and belief, McNair, because of his lengthy and recent law enforcement experience, had a professional bias against Mr. Basham that was known by, or easily discovered by, Mr. Basham's attorneys. For example, in an e-mail to potential law enforcement witnesses McNair stated "I know I am working on the other side, but the 'FACTS DON'T CHANGE.' I am, and always will be, a 'cop' at heart. (Rep. Exh. 23.). "Counsel cannot be expected to challenge the elements of the capital offense, statements by the client or other witnesses, forensic evidence, or the conduct of law enforcement or the prosecution absent a thorough independent investigation by the defense team." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1126. Due to his professional bias, McNair was incapable of providing counsel with a thorough, independent defense investigation. As McNair himself stated: "Fulks and Basham are in a heap of trouble and I am, in no way, attempting to change those facts." (Rep. Ex. 23.).

As discussed in the § 2255 Motion, due to McNair's focus on collateral and unimportant matters, he failed to spend adequate time investigating areas that in fact did affect Mr. Basham's case. A prime example of this deficiency became apparent when defense counsel was taken by surprise by testimony that Mr. Basham bragged

**JA 3537**

to guards that he would not get the death penalty.  Defense counsel asked for a sidebar and argued, "We have never been put on notice that our client has made this statement." (Tr. 10/14/04 at 179.)  Every one of the witnesses who testified that Mr. Basham bragged about not getting the death penalty was interviewed by Carlisle McNair.  (Tr. 10/14/04 at 188.)  The Government argued that it was not the prosecution's "problem" if defense counsel did not identify the appropriate issues when they interviewed the witnesses.  (Tr. 10/14/04 at 180.)

One of the witnesses, Eddie Ledford, III, testified that he was interviewed by McNair, and that McNair only asked him approximately eleven questions and spent fifteen minutes with him.  (Tr. 10/14/04 at 223, 240.)  Ledford testified that, had Mr. Swerling or Mr. Harris met with him, he would have answered their questions.  He also testified that, had McNair asked him if Mr. Basham was boastful or bragging, he would have responded to him the same way he did to the Government's questions.  (Tr. 10/14/04 at 239-40.)  Ledford was an important government witness whose testimony covers eighty-three pages of the penalty phase transcript, and who was the supervisor in the mental health unit where Mr. Basham was housed at Butner. McNair, however, spent only minimal time interviewing him and asked a mere eleven questions.

McNair's personal and professional bias against Mr. Basham, his misspent time

122

**JA 3538**

chasing down irrelevant and prurient information, and his overall inability to perform a thorough, unbiased investigation violated the duty of loyalty that is one of the paramount duties that counsel, and those working at their direction, owe to a client. McNair's personal history made it impossible for him to serve as a witness in Mr. Basham's case. Contrary to the Government's assertions, these failures prejudiced Mr. Basham in the preparation of guilt and penalty phase – fundamental to every capital case. Defense counsel's reliance upon and failure to supervise a biased, unqualified investigator fell below the accepted standard of effective assistance of counsel.

### B. Mitigation Specialist Paige Tarr rendered deficient performance in her investigation in Mr. Basham's case, and defense counsel failed adequately to supervise her.

Upon information and belief, Mr. Basham alleges that Ms. Tarr provided deficient performance in her role as director of mitigation efforts in his case, and that his attorneys failed adequately to supervise Ms. Tarr and failed to take prompt remedial steps when her deficiencies came to their attention.[15] Upon information and belief, Mr. Basham alleges that defense counsel were required to bring in additional mitigation specialist assistance because Paige Tarr could not meet the substantial

---

[15]Upon information and belief, Mr. Basham also alleges that Ms. Tarr was instructed by another South Carolina court to no longer practice on capital cases as a result of her deficient performance.

responsibility give to her as lead mitigation specialist. Because the "mitigation function is of utmost importance in the defense of capital cases . . . all members of the defense team [must] perform in accordance with prevailing national norms when representing a client who may be facing execution." *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 677 (2008).

"Capital clients present a host of impairments and/or life experiences that affect their development and behavior, including for example: developmental, cognitive, and mental impairments and disorders; histories of physical, sexual, and psychological abuse; histories of neglect, trauma, and maltreatment; and alcohol and drug abuse or dependence." *The Defense Team in Capital Cases*, 3 Hofstra L. Rev. at 1130. Mitigations specialists need to have the expertise to recognize these issues, and the tact to speak with the client, family, and others about these sensitive issues. *Id.* Certainly Mr. Basham presented a host of impairments and life experiences that bordered on overwhelming. Upon information and belief, counsel submits that Ms. Tarr was not an appropriate choice for the task and failed to perform the duties required of a qualified mitigation expert.

Considering the important role mitigation was to play in Mr. Basham's case, the fact that the head of the mitigation team was either unable to devote her attention

124

**JA 3540**

to the case or was deficient in her efforts was prejudicial to Mr. Basham.  Ms. Tarr's performance, and counsel's inability to adequately supervise her fell below the well-defined norms of capital defense and resulted in deficient performance and prejudice.

## CLAIM 21

**Counsel provided ineffective assistance of counsel in failing to request that the Court trifurcate Mr. Basham's trial.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government maintains that no reasonable possibility exists that Mr. Basham was prejudiced by his attorneys' failure to request that the penalty phase of his trial be bifurcated.  The jury in this case, however, found only one of the four threshold factors to exist: that Mr. Basham "intentionally and specifically engaged in an act of violence, *knowing* that the act created a grave risk of death to Alice Donovan, such that participation in the act constituted a reckless disregard for human life, and Alice Donovan died as a direct result of the act." (Dkt. 805 and 806.)  This threshold factor required the jury to consider Mr. Basham's mental state *at the time of the crime*.  In other words, the jury was required to determine whether the Government had established beyond a reasonable doubt that Mr. Basham knew that his participation with Chad Fulks in the carjacking and kidnapping of Alice Donovan

125

**JA 3541**

created a "grave risk of death" for Ms. Donovan.  The final witnesses the jury heard

from in the Government's case-in-chief at the penalty phase were the family members

of Alice Donovan, who testified about the impact of Ms. Donovan's death on their

lives.  (Tr. 10/18/04 at 114-170.)  Because trial counsel failed to request that Mr.

Basham's penalty phase proceedings be bifurcated, the jury was exposed to this

undeniably powerful and heartbreaking testimony about *the fact* of Alice Donovan's

death.  It is difficult to imagine that the jurors were able to disregard this testimony,

as they were required to do, in deliberating about the very specific—but

critical—issue of whether Mr. Basham *knew* that his actions on the day of the crime

"created a grave risk of death" to Ms. Donovan.  The Government is therefore

incorrect when it argues that Mr. Basham could not have been prejudiced by the

failure to bifurcate the penalty phase of his trial.

## CLAIM 22

**The Government violated its obligations under *Brady v. Maryland* and its progeny by failing to disclose information material to Mr. Basham's ability to prepare and present a defense at trial and sentencing.  As a result of the Government's misconduct, Mr. Basham was denied his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution.**

Mr. Basham incorporates by specific reference all facts, allegations, and

arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this

Reply.

126

Mr. Basham's investigation into his *Brady* claim is ongoing. At this time, he has nothing to add to this claim beyond what is alleged in the § 2255 Motion.

### CLAIM 23

**The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with the theory it presented at Mr. Fulks's trial. Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories. In addition, Mr. Basham was denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Government violated Mr. Basham's right to due process when it presented a theory of the case that was inconsistent with theory presented at Fulks's trial. By failing to object to the inconsistent theories, Mr. Basham's trial attorneys rendered ineffective assistance of counsel. In addition, Mr. Basham was denied the effective assistance of appellate counsel when his appellate attorneys failed to raise this issue on appeal.

The Government maintains that it presented consistent theories at both Fulks's

127

and Mr. Basham's trials. The record makes clear that is simply not the case. At the heart of the inconsistency is the Government's characterization of testimony by Sheriff Hewett regarding who strangled Alice Donovan with a purse strap. Sheriff Hewett testified at a *Jackson v. Denno* hearing for both Fulks and Mr. Basham, and again at Mr. Basham's trial. The positions the Government took regarding that testimony were in fact diametrically opposed.

At a pre-trial hearing in Fulks's case, the Government sought to keep out testimony that was damaging to Mr. Basham and exculpatory as to Fulks, specifically, Mr. Basham's "deer statement." In their successful argument to exclude the statement, the Government stated that if the deer statement came in, they should be able to introduce statements that inculpated Fulks. Specifically, "remember Sheriff Hewett demonstrating . . . how Brandon Basham said that *Chad Fulks* took the purse strap and strangled." (Fulks Tr. 6/22/04 at 255) (emphasis added.)

The Government attempts to justify this discrepancy by arguing that since the argument was only presented at a pre-trial hearing in Fulks's case, and outside the presence of the jury, it should be of no consequence. However, the Government used this inconsistent theory to their advantage, to exclude exculpatory evidence in Fulks's trial, and to argue that Mr. Basham was the actual killer in Mr. Basham's. In fact, the Government seems to concede that they changed their interpretation of Hewett's

128

**JA 3544**

testimony concerning the purse strap, based on the context of the argument they needed to make. (Opp. at 117 ("Thus, in context, the Government's interpretation of Sheriff Hewett's testimony concerning the purse strap . . . was part of the Government's argument why another statement made by Basham (the "deer statement") should not be admitted into evidence).)

Clearly, at Mr. Basham's trial, the Government put a new spin on their position on the Hewett/purse strap evidence. The Government argued in closing:

> What does Mr. Basham say in the presence of Sheriff Hewitt [sic]? It is not really what he says, it is what he does. He is shackled, he describes a purse strap, and he demonstrates, he demonstrates to Sheriff Hewitt [sic] how Alice Donovan was strangled . . . . You saw Sheriff Hewitt [sic] stand up there and show.

(Tr. 11/1/04 at 57.)   Additionally, the Government unequivocally stated, "He [Basham] killed Alice Donovan". (Tr. 11/1/04 at 62.)   The Government acknowledged that this testimony was one of the most important pieces of evidence in the case. (Tr. 9/29/04 at 81-82.)

The Government next claims there was no inconsistent theory because it only elicited testimony about *how* Alice Donovan was strangled. Yet at closing the Government took that *how* and argued *who*. "It is not really what [Basham] says, it is what he does." (Tr. 11/1/04 at 57.) They went on to state, "He [Basham] killed Alice Donovan." (Tr. 11/1/04 at 62.) At Fulks's trial, they argued to the jury that

Fulks "intentionally killed Alice Donovan." (Fulks Tr. 6/22/04 at 171.) The Government maintains that, when Sheriff Hewett responded on cross-examination to the question, "There is nothing in your notes, not is there anything in Lieutenant Crocker's notes that indicated that Brandon Basham told you that he used the strap," and Hewett responded, "That's is true, because he didn't say. He showed," that testimony was "ambiguous as to who used the strap." (Tr. 9/27/04 at 53-54.) Yet, in closing argument, the Government did not take the position that it was ambiguous. Rather, they argued that "Sheriff Hewitt [sic] says he [Mr. Basham] didn't *say* I killed Alice Donovan. Sheriff Hewett said to you in this courtroom in front of you, the jury, no, he *demonstrated* it." (Tr. 9/29/04 at 80 (emphasis added).) Contrary to the Government's assertion and this Court's decision in *Fulks v. United States*, 2011 WL 3069390, this was not passive voice. There is nothing ambiguous about that argument. The Government now attempts to hedge its unambiguous statement and claim that the jury *could* have inferred from this that Basham was the killer or that they could have merely inferred that Basham was present and assisted Fulks in disingenuous at best. The clear purpose of the Government's closing argument, however, was to argue that Basham was the hand that dealt the fatal blow.

These inconsistent positions were exacerbated by the conflicting arguments at both Fulks's and Mr. Basham's penalty phases. While the Government takes the

position that they argued teamwork, they also told the jury in Fulks's case that Fulks was the mastermind and Mr. Basham "the puppet." (Fulks Tr. 6/29/04 at 66); *see* Claim 16, *supra*. Further they argued, "Brandon Basham is so stupid, he will do anything." (Fulks Tr. 6/29/04 at 66.) At Mr. Basham's trial they argued Basham was equally manipulative, and that he and Fulks were "equally culpable," and at times were both "leaders of the pack." (Tr. 11/1/04 at 44, 168.) The Government's argument that the prosecutors took the position in both trials that Basham and Fulks acted as a team fails to acknowledge that in describing Basham as a "puppet" in one trial and not the other is not only inconsistent, but an inconsistency at the core of their case. *See United States v. Higgs*, 353 F.3d 281, 326 (4th Cir. 2003).

The Government argues that even if it did take contrary positions, it is irrelevant because either theory was sufficient to convict Mr. Basham. Further, the Government argues that any inconsistency, was "minor and did not affect the core of the Government's case." (Opp. at 114). At the very least, this argument fails as to the penalty phase. These were not mere inconsistencies. The argument that Fulks struck the fatal blow and that Basham was the follower were important parts of Mr. Basham's overall mitigation case. The Government recognized the importance of the fatal blow issue, as was shown in its voir dire and in its closing argument, where it argued that Sheriff Hewett's testimony that Mr. Basham demonstrated how he

131

strangled Alice Donovan was one of the most important issues in the case. The Government also recognized that characterizing Basham as a follower was an important part of the defense argument at penalty phase, so rather than use that phrase as they did at Fulks's trial, they took the position both were leaders at times. Despite defense counsel's arguments that Mr. Basham was merely a follower, and Fulks the leader, not a single juror found the Minor Participant statutory mitigator. (Dkt. No. 805 at 6).

Due Process "prohibits the government from presenting mutually inconsistent theories." *Higgs*, 353 F.3d at 326 (*quoting Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000)). The Government's reliance "upon factually inconsistent and irreconcilable evidence at the two trials" to secure convictions and death sentences in the severed trials of Mr. Basham and Fulks "was fundamentally unfair and [Basham] was deprived of due process." *See United States v. Paul*, 217 F.3d 989, 998 (8th Cir. 2000) (*quoting Smith*, 205 F.3d at 1052-53). The "heightened need for reliability in capital cases only underscores the gravity" of the serious questions raised "when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens." *Jacobs v. Scott*, 513 U.S. 1067, 1070 (1995) (Souter, J., concurring).

The Government's reliance on *Paul*, 217 F.3d 989, is misplaced. In *Paul*, co-

132

defendants were separately tried for the murder where the autopsy revealed the victim had been shot several times. The Eighth Circuit found that the "the theory that either [defendant], or both, shot [the victim] was not factually irreconcilable and was supported by the evidence." *Id.* at 998. However, the Government in the trials of Mr. Basham and Mr. Fulks did rely on factually inconsistent theories. In one case they argued that Basham was Fulks's puppet and in another that they were co-equal. They argued separately, depending on which was more damaging to the case at the time, that either Fulks or Basham wielded the purse strap that strangled Donovan. Without these opposing positions, based on the same facts, there can be no confidence that Mr. Basham would have been sentenced to death.

As argued *supra*, the prime directive of a prosecutor is not to win at any cost, "but that justice shall be done." *Berger*, 295 U.S. at 88. The Government's use of inconsistent theories at the two trials in Mr. Basham's and Mr.s Fulks's cases was "inherently unfair" and rendered the convictions unreliable. *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring) (the use of inconsistent theories is "inherently unfair"); *Smith*, 205 F.3d 1045 (use of inconsistent theories renders convictions unreliable). The Fourth Circuit has not yet addressed the standard appropriate to adjudicate due process violations arising out of inconsistent theories in separate trials of co-defendants. Mr. Basham submits that error that goes to the

**JA 3549**

fundamental fairness of the trial is structural and should require no separate finding of prejudice.    Absent the Government's constitutionally violative "actions, the outcome of the trial probably would have been different." *Groose*, 205 F.3d at 1052.

Mr. Basham's trial attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, by failing to object to the Government's use of inconsistent theories.    This failure fell below the "objective standard of reasonableness" as it was outside "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690.  Mr. Basham was also denied the effective assistance of appellate counsel guaranteed by 18 U.S.C. § 3006(A), 18 U.S.C. § 3599, and the Fifth Amendment to the United States Constitution when his appellate attorneys failed to raise this significant and obvious issue on appeal. *Evitts*, 469 U.S. at 395-96; *Mapes*, 171 F.3d at 426.  Because the confidence in the outcome of the trial is undermined, due to these failures, Mr. Basham has established prejudice and is entitled to relief. *Wiggins*,  539 U.S. at 534.

**JA 3550**

CLAIM 24

**Mr. Basham's rights under the Eighth Amendment to the United States Constitution were violated when the Government engaged in misconduct by arguing, contrary to controlling precedent, a causal nexus requirement to persuade the jury not to give effect to Mr. Basham's mitigating evidence. By failing to object to the Government's misconduct, trial counsel rendered ineffective assistance of counsel, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. Mr. Basham's appellate attorneys were similarly ineffective for failing to raise this issue on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

As Mr. Basham set forth in his Motion, the Government's overriding theme in its attempt to discredit mitigating evidence offered on Mr. Basham's behalf was that no "cause-and-effect" existed between the proffered mitigation and the crimes with which Basham stood convicted. Throughout the penalty phase of the trial, the Government returned to this theme. Mr. Basham identified several of those instances in his Motion, but other, more subtle, examples exist. For instance, in his cross-examination of social worker Jan Vogelsang, First Assistant United States Attorney Scott Schools asked: "Assume 183 murders in Kentucky. That would indicate that not all of the people impoverished, not all the people living in single-family homes,

135

not all of the people suffering the consequences that Mr. Basham has suffered *are going out and killing people*?" (Tr. 10/19/04 at 205.) In response to a later question about the scope of her findings, Ms. Vogelsang stated, "I think the most you could say is that people with these environments are at higher risk to end up in very serious circumstances. I don't think you can predict what those circumstances are going to be." Mr. Schools responded, "Vast majority of those people, vast majority, do not kill strangers?" Ms. Vogelsang agreed, and with that Schools ended his cross-examination. (Tr. 10/19/04 at 211.) The import of Schools's questioning was clear, and would become a familiar theme to the jury: Evidence of Mr. Basham's deficits was irrelevant if it did not explain why he committed the crimes.

In his closing argument, Assistant United States Attorney Johnny Gasser took a more direct approach. Although he statements are set forth in the Motion, they are worth repeating here:

> But generally what did their experts say? What is the most important thing they said? Brandon Basham knows right from wrong and there is *no cause-and-effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking randomly of two innocent women. There is no cause and effect.* It is not like you were born into an alcoholic family, you run the risk of being an alcoholic. *There is no cause-and-effect* of Brandon Basham's upbringing or any problems Brandon Basham has with the effect of him randomly targeting, and kidnapping, and killing two innocent women. Every single defense expert took that witness stand and acknowledged that because they had to. Because that is a fact. *No cause and effects*. There are thousands and thousands of kids and adults walking around this country . . . that

136

grew up impoverished, much poorer than Brandon Basham, with physical disabilities he did not have.  With significant, significant mental issues that don't kill, that don't carjack . . . *[a]nd that is absolutely critical.*

(Tr. 11/1/04 at 85 (emphasis added).)[16]

In light of these statements to the jury, it is insupportable for the Government to argue that it "never suggested that the mitigating evidence must pass some threshold nexus test before the jury could consider it."  (Opp. at 131.)  The Government told the jurors that "the most important thing" the defense experts said, the fact that was "absolutely critical," was that there was "no cause-and-effect."

The Government further argues that, even if an *Eddings/Tennard* violation occurred, Mr. Basham was not prejudiced by it because "the jury's verdict demonstrates that they did in fact consider the mitigating evidence." (Opp. at 134.) As a legal matter, the Government's argument fails because, as the Fifth Circuit has

---

[16]In its Opposition, the Government accuses habeas counsel of "selectively and misleadingly quot[ing] from the Government's closing argument." (Opp. at 129-30.) The Government takes particular issue with counsel's use of bracketed language to complete a quotation. (Opp. at 130.) It was not counsel's intention to mislead the Court, and counsel apologizes if that was the effect. It is important to note, however, that counsel set forth *in full* on page 104 of the § 2255 Motion the quotation the Government states counsel "misleadingly" quoted. In any event, even if the Court were to disregard the argument on page 110 that the Government finds offensive, there are multiple—unedited—instances in the record where the Government emphasizes its "cause-and-effect" theme to remove Mr. Basham's mitigating evidence from the jury's consideration.

137

held, harmless error analysis is inappropriate in the causal nexus context because:

> *Penry* error deprives the jury of a "vehicle for expressing its 'reasoned moral response to the defendant's background, character, and crime,'" which precludes it from making "'a reliable determination that death is the appropriate sentence.'"

*Nelson v. Quarterman*, 472 F.3d 287, 314 -15 (5th Cir. 2006) (*quoting Penry II*, 532 U.S. at 797).  Because federal harmless error analysis would be the equivalent of allowing "an appellate court to substitute its own moral judgment for a moral judgment that the [sentencer] was unable to make," it is inappropriate in this context. *Id.* at 315.  A review of Supreme Court decisions applying *Eddings* reveals that the Court has never applied a harmless error analysis to this type of Eighth Amendment violation.

The Government's argument also fails as a factual matter.  The Government makes much of the fact that some jurors found mitigating evidence to exist, thereby suggesting that those jurors necessarily disregarded the impermissible causal nexus arguments with which the prosecutors bombarded them.  (Opp. at 134.)  This argument misses the point, however.  (In addition, it also demonstrates why harmless error analysis is inappropriate in the *Eddings*/*Tennard* context.)  The fact that *some* of the jurors found mitigating evidence to exist (presumably despite its lack of a causal nexus) does not negate the fact that *other* jurors did not find the evidence to be mitigating.  It is impossible to know whether those jurors rejected the evidence

138

because it lacked the "cause-and-effect" to which the prosecution had repeatedly referred or whether some other reason explained their refusal to credit the proffered mitigating evidence.  Moreover, if some or all of the jurors who did not find the mitigating factors to exist reached their conclusions because of the Government's impermissible causal nexus argument, it is impossible to know whether the outcome of the jury's sentencing verdict would have been different if they had not been misled by the prosecution's argument.

The Special Verdict Forms provided to the jury, although not incorrect in themselves, would have been insufficient to resolve any juror confusion arising from the prosecution's improper argument.  Specifically, the forms stated: "For each of the following Mitigating Factors, indicate in the space provided, the number of jurors, if any, who have found it proved by a preponderance of the evidence *and that it is mitigating*."  (Dkt. 805 and 806 (emphasis added).)  A juror, having been told by the Government that the "most important thing" and the point that was "absolutely critical" about the proffered mitigating evidence was that it failed to show "cause-and-effect," could well have concluded that the defense proved by a preponderance of the evidence that the facts supporting a mitigating factor existed, but that because no causal nexus existed, it was not "mitigating."

The inability to know what went through the jurors' minds as they attempted

139

to express their "reasoned moral response" to the evidence, *see Penry v. Johnson*

(*Penry II*), 532 U.S. 782, 797 (2001) (*quoting Penry I*, 492 U.S. at 328), is precisely

the reason *Eddings/Tennard* error cannot be subjected to a harmless error analysis.

Accordingly, Mr. Basham is entitled to relief on this claim.

### CLAIM 25

**The Court's instruction to the jury on mitigating evidence violated Mr. Basham's Eighth Amendment rights because it created a substantial risk that the jury would screen out statutory mitigating factors, and thus fail to give effect to evidence that was, by law, mitigating.  Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was ineffective for failing to raise this issue on direct appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and

arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this

Reply.

At penalty phase, the Court instructed Mr. Basham's jury that, in determining

both statutory and non-statutory mitigators, a *two-step* process was required.  Because

§ 3592 (a) recognizes certain factors to be mitigating, as a matter of law, this

instruction created a substantial risk that the jury would screen out statutory

mitigating factors, and thus fail to give effect to evidence that was by law mitigating.

Accordingly, this instruction violated Mr. Basham's Eighth Amendment rights.  Trial

140

**JA 3556**

counsel was ineffective for failing to object to this charge, in violation of the Sixth

Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel was

ineffective for failing to raise this issue on direct appeal, in violation of the Fifth

Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.

The offending portion of the jury instruction read as follows:

> As to the mitigating factors asserted by the defendant, Mr. Basham in this case, the law provides that there is essentially no limit on the number of factors or things that the jury may consider in mitigation as to each of the factors submitted by the defendant and on which I am about to list. You must essentially engage in a *two-step* process in determining whether any one or more of the mitigating factors have been proven.

> Specifically, you must first determine if the evidence that you heard establishes the existence of the factor by a preponderance of the evidence. Secondly, if you determine the factor has been proven, *you must determine whether the factor is mitigating*, as I have defined that term for you. That is, it tends to suggest that life in prison, without the possibility of release, and not death is the appropriate punishment.

(Tr. 11/1/04 at 220 (emphasis added).) A similar two-step instruction was given on

the verdict form. (Dkt. 805 at 6).

The instruction was proposed by the Government in Fulks's case after it raised

concerns that the large number of mitigating factors proposed by Fulks's lawyers was

an attempt to "'sand bag' the government's case." *Fulks v. United States*, 2010 WL

3069390 at *35. The Court shared this concern and ultimately decided, pursuant to

the Government's proposal and over Fulks's objection, that the jury be instructed that

"with regard to mitigators, there were two issues: '(1) is it proved; and (2) is it mitigating?'" *Id.* The same instruction was given, word for word, in Mr. Basham's trial. Unlike Fulks's lawyers, however, Mr. Basham's attorneys failed to object, although it is clear that they recognized the problem inherent in this instruction.

The Eighth Amendment requires that a capital sentencer "may determine the weight to be given relevant mitigating evidence. But [the sentencer] may not give it no weight by excluding such evidence from [its] consideration." *Eddings v. Olklahoma*, 455 U.S. 104, 114-15 (1982). The Government appears to argue that there is no difference between refusing to consider evidence entirely and considering it but giving it little weight. It contends that this instruction did not violate Mr. Basham's rights because the FPDA "does not require jurors to assign any particular weight to the mitigating factors listed in § 3592(a). (Opp. at 136.) The Government failed to recognize that this was in fact *precisely* the constitutional line drawn by the *Eddings* Court. As the Government concedes, § 3592(a) states that "in determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor," and proceeds to list the statutory mitigating factors. Thus, while the Government is correct that the FPDA does not require any particular weight be given to a mitigating factor, it does however require that, if a defendant proves a statutory factor to be true, the sentencer must weight it in deciding the

142

sentence.  In other words, the sentencer is *not* permitted to decide "is it mitigating?" Once a statutory factor is found to exist, but simply how much weight to give to that factor.  Therefore, contrary to the Court's erroneous instruction, the only relevant factor for a juror to decide is whether the factor exists by a preponderance of the evidence.  *See Boyde v. California*, 494 U.S. 370, 377-78 (1990).

Further, the Government argues that any error caused by the two-step instruction was ameliorated, "Federal law specifically defines several statutory mitigating factors to be considered in determining whether a sentence of death is justified, that is why they are called statutory.  They appear in the statute of laws.  The statutory mitigating factors alleged in this case which you must consider are . . . " (Tr. 11/1/04 at 222).  Immediately before that instruction, however, the jury was instructed that it should determine if a statutory mitigating factor was proven by a preponderance of the evidence *and* that the factor was also mitigating.  (Tr. 11/1/04 at 222).  Simply having one correct statement of law did not cure the fundamental flaw in the two-step instruction that allowed jurors to screen out, and therefore refuse to consider and give effect to, constitutionally relevant mitigating evidence. This two-step instruction told the jurors not to weight the evidence at all, even if they found it to exist, unless the jurors themselves determined that the evidence was mitigating.

143

**JA 3559**

The cases cited by the Government: *United States v. Higgs,* 353 F.3d 281 (4th Cir. 2003), *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000); and *United States v. Jackson*, 549 F.3d 963 (5th Cir. 2008), all deal with *non-statutory* mitigators. However, even in the case of non-statutory mitigators, the two-step instruction was problematic. Under the Eighth Amendment, "relevant mitigating evidence" is defined in the most expansive terms as any "evidence which tends logically to prove or disprove some fact or circumstance which a fact finder could reasonably deem to have mitigating value. *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). The non-statutory factors presented here were of the type routinely recognized at "relevant mitigating evidence" in a capital case. *See, e.g.*, *Brewer v. Quarterman*, 550 U.S. 286, 290, (2007) (abusive childhood, drug use); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 239-40 (2007) (how unhappy childhood effected defendant's mental health); *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (low IQ score); *Tennard*, 542 U.S. at 287-88 (impaired intellectual functioning); *Jones v. Polk*, 401 F.3d 257, 263 (4th Cir. 2005) (unhappy and violent childhood). Since, as a matter of Eighth Amendment jurisprudence, the proffered evidence was relevant mitigating evidence, jurors were required to weigh that evidence if it were found to exist. As with the statutory mitigating evidence, the two-step instruction told jurors that even if they found a factor to exist, they could determine for themselves it was mitigating.

**JA 3560**

There is a reasonable likelihood that the jurors applied the two-step instruction in a way that prevented their consideration of constitutionally relevant evidence. *Boyde*, 494 U.S. 370, 378. By following the two-step instruction, a juror could determine, contrary to *Eddings* and § 3592(a), that a statutory factor was not mitigating, and rather that determining what weight to give it, give it no consideration at all.

This error was especially egregious in light of the fact that the jury had already been misled, through cross-examination and in summation by the Government, that a causal nexus was needed before evidence could be considered as mitigating. *See Tennard*, 542 U.S. 274; Claim 24 *supra.* The Government argued that the jury should not credit evidence as mitigating unless they also found a "cause and effect" relationship between the evidence and the offense. The Government urged the jury to unconstitutionally narrow the definition of "relevant mitigating evidence" to situations where there was a causal link. *See* Claim 24, *supra*.

Contrary to the Government's argument, it is not sufficient to assume the jury knew they could give effect to the evidence simply because extensive trial time was devoted to it. (Opp. at 139). Substantial portions of the mitigation "functioned as a 'two-edged sword,' because it 'may diminish the blameworthiness of his crime even as it indicates that there is a probability that he will be dangerous in the future."

**JA 3561**

*Abdul-Kabir*, 550 U.S. at 255 (*quoting Penry*, 492 U.S. at 342). "When the evidence proffered is doubled edged," as it was here, "in the absence of an appropriate instruction directing the jury to consider fully" the evidence as mitigating, one "cannot be sure that [the jury] did so." *Abdul-Kabir*, 550 U.S. at 255.

No jurors found statutory mitigating factors two through four, one juror found factor five, and six jurors found factor one. (Tr. 11/2/04 at 8.) It is impossible to know with any certainty whether jurors failed to credit defense evidence as a factual matter, or if they simply failed to give it any mitigating effect. Faced with unconstitutional instructions by the Court, unconstitutional argument by the Government, and defense counsel's objectively unreasonable failure to object, the risk was substantial that the jury would make an independent conclusion that evidence was not mitigating *at all*, and that as a result, the Eighth Amendment was violated. *See Eddings*, 455 U.S. at 114-15, 117. Accordingly, Basham is entitled to relief. To hold otherwise is to "risk that the death penalty [was] imposed in spite of factors which may call for a less severe penalty." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

Defense counsel had no sound strategy for failing to object to the confusing and unconstitutional two-step instruction. Fulks's lawyers had already brought attention to the problems with this instruction. Reasonably competent counsel should

146

have been aware of the constitutional rights this instruction threatened. Because "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceedings would have been different," Mr. Basham is entitled to relief. *Strickland*, 466 U.S. at 694.

Furthermore, appellate counsel rendered ineffective assistance of counsel by failing to raise the issue of the improper jury instruction in Mr. Basham's direct appeal. Appellate counsel performs ineffectively when he or she fails to discover and brief non-frivolous issues. *Delgado*, 223 F.3d at 980-81. While appellate counsel must sift through issues on appeal, there is no excuse for failure to raise a clearly meritorious claim. *See Smith v. Murray*, 477 U.S. 527, 536 (1986); *Greer*, 264 F.3d at 678. Here, the two-step mitigation instruction was a "significant and obvious" issue, apparent in the record and contrary to clear and specific United States Supreme Court law. *See Mapes*, 171 F.3d at 426. Because this error is flatly contradictory to the requirement that sentencers be permitted to consider mitigation, it is per se reversible and harmless error analysis should not apply. *See Eddings*, 455 U.S. at 117 (reversing death sentence for refusal to consider relevant mitigating evidence without conducting harmless error analysis); *Mills v. Maryland*, 486 U.S. 367, 384 (1988) (reversing death sentence on basis of erroneous unanimity requirement without applying harmless error analysis). Accordingly, appellate counsel rendered

147

ineffective assistance in not raising this claim on direct appeal, and the Court should consider the claim on the merits. *Coleman*, 501 U.S. at 753-54; *Strickland*, 466 U.S. 668.

<div align="center">

**CLAIM 26**

</div>

**The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt. Appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they unreasonably failed to raise this issue on appeal.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The Court's instructions to the jury violated Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments because the Court failed to instruct that the reasonable doubt standard governed the ultimate penalty determination in this case. *See Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Trial counsel was ineffective for failing to object to this charge, in violation of the Sixth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599; and appellate counsel violated Mr. Basham's right to the effective assistance of counsel guaranteed by the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599 when they

<div align="center">148</div>

<div align="right">**JA 3564**</div>

unreasonably failed to raise this issue on appeal.

Six years after the Federal Death Penalty Act was enacted in 1994, the United States Supreme Court recognized for the first time that, under the Sixth Amendment right to jury trial, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Two years later, the Court applied this principal to fact findings that are a prerequisite for imposing a death sentence. *Ring*, 536 U.S. at 588. In a federal capital proceeding, the determination that aggravating factors outweigh mitigating ones is absolutely required before the jury is permitted to impose a death sentence. *See* 18 U.S.C. § 3593(e).

Here, the Court's instruction fell short of the Constitutional requirement that the jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that the death penalty is justified.

Specifically, the jurors here were instructed:

> You must decide, in regard to both offenses [carjacking resulting in death and kidnapping resulting in death], whether the aggravating factors, which you have found to exist, sufficiently outweighs [sic] the mitigating factors found to exist for that offense, so as to justify imposing a sentence of death, rather than a sentence of life without the possibility of release; or, in the absence of any mitigating factors,

<div align="center">149</div>

<div align="right">**JA 3565**</div>

whether the aggravating factors alone are sufficient to justify imposing a sentence of death, rather than a sentence of life, without the possibility of release.

The weighing process you are called upon to undertake in this part of the trial is different from the fact-finding process. If you find the threshold intent, aggravating, and mitigating factors, you must use your experience, judgment, and common sense in weighing the aggravating and mitigating factors to arrive at your ultimate determination in this case.

(Tr. 11/1/04 at 201.)

Thus, although this Court instructed the jury that is must determine whether the Government had proven the aggravating factors beyond a reasonable doubt, the Court failed to instruct the jury that this reasonable doubt standard must also apply to the weighing of the aggravating and mitigating factors. The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana*, 508 U.S.275, 281 (1993). It is, therefore, reversible per se. *Id.* at 281-82.

Under the United States Supreme Court precedent of *Apprendi* and *Ring*, while the determination that aggravating factors do or do not outweigh mitigating ones may be a subjective and moral judgment, it nevertheless qualifies as a fact finding under the Sixth Amendment. The Government cites *United States v. Barrett*, 496 F.3d 1079, 1108 (10th Cir. 2007), to argue to the contrary that "the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors

150

outweigh the mitigating factors beyond a reasonable doubt." (Opp. at 141.) Further they argue that the Constitution does not require a jury to do the weighing, and therefore no "beyond a reasonable doubt standard" is applicable to the weighing process. (Opp. at 142) (*citing* to *Barrett*, 469 F.3d at 1107; *United States v. Fields*, 483 F.3d 313, 346 (5th Cir. 2007); *United States v.* Green, 2008 WL 4000902 (E.D. Ky. Aug. 26 2008); United *v. Smith*, 2008 WL 3285911 (E.D. Va. Aug. 8, 2008).) Finally, they argue that a capital jury's weighing decision is not a finding of fact. (Opp. at 142 (*citing United States v. Fort*, 2008 WL 5221090 (N.D. Cal. Dec. 12, 2008); *United States v. Sampson*, 486 F.3d 13, 32 (1st Cir. 2007); *United States v. Mitchell*, 502 F.3d 931, 993 (9th Cir. 2007).

This is an issue of first impression in this Circuit. As the Government notes, and Mr. Basham concedes, several courts have held a reasonable doubt instruction is not required for a capital juries weighing process. However, several courts, and various dissenting judges, have agreed that the weighing of aggravating and mitigating factors at a capital sentencing is a factual finding governed by the constitutional right to a jury trial. *See Woldt v. People*, 64 P.3d 256, 264-67 (Colo. 2003); *State v. Whitfield*, 107 S.W. 3d 253, 256-59 (Mo. 2003); *Mitchell*, 502 F.3d at 1011-13 (Reinhardt J., dissenting); *Duest v. State*, 855 So.2d 33, 53 & n.18 (Fla. 2003) (Anstead, CJ., dissenting); *Evans v. State*, 886 A.2d 562 578, 582-84 (Md.

**JA 3567**

2005) (Raker, Green, JJ. & Bell, C.J., dissenting).

Moreover, the issue is up for review in a sister Circuit in *United States v. Gabrion*, 648 F.3d 307 (6th Cir 2010) (rehearing *en banc* granted, opinion vacated Nov. 17, 2011).  In *Gabrion*, petitioner was granted relief on several issues and the Sixth Circuit subsequently granted a hearing *en banc* and vacated the opinion.  As the Sixth Circuit did not issue an order clarifying which issues it wished to hear *en banc*, it appears all grounds for relief are up for review.  In *Gabrion*, petitioner made an identical argument to Mr. Basham – "that the jury should have been instructed that in order to impose death they need to find 'beyond a reasonable doubt' the element of the death sentence that the aggravating factors outweigh the mitigating factors." *Gabrion*, 648 F.3d at 325.  In the now-vacated decision, the court found error holding "a much greater degree of certainty is required when the life of a person is at stake. We therefore hold that a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt, the same standard constitutionally required for all other findings of fact and mixed questions of law and fact." *Id.*  The court noted that, although the Federal Death Penalty Act "styles" the determination of whether death is justified "as a 'recommendation,' it is one that the judge is obligated to follow." *Id.* (*quoting* 18 U.S.C. § 3594).  Further, the court noted that 18 U.S.C. § 3593(e) –the provision that

152

**JA 3568**

both petitioner and Mr. Basham's jury instructions mirrored – left "up in the air the measure of persuasion and the jury's requisite degree of belief on the ultimate element of the offense concerning the comparison of aggravators and mitigators." *Id.* at 325-26. "Mere sufficiency" is all that is impliedly required. *Id.* at 326.

The requirement in "run-of-the-mill" criminal cases that prosecutors must prove every element of an offense beyond a reasonable doubt insures the 'moral force of the criminal law.'" *Id.* (*quoting In re Winship*, 397 U.S. 358, 364 (1970).) This caveat should be particularly true in death cases. *Gabrion*, 648 F.3d at 326. The court noted that the recent trends in federal constitutional law confirmed that reasonable doubt should be applied to the weighing process in a capital case. *Id.* at 326-27. Specifically, the court found that the reasoning in *Apprendi* and *Ring* "surely applies to the jury's determination of whether the Government has proven a defendant worthy of society's ultimate punishment, in spite of features in his case that may militate in favor of a life sentence." *Id.* at 327.

The cases, such as those cited by the Government, that have found the Sixth Amendment's reasonable doubt standard inapplicable to the weighing decision in a federal capital case rely on the argument that this weighing is a moral, rather than factual, judgment. *See Gabrion*, 648 F.3d at 327. However, it has "never been the case that the constitutional requirement of proof beyond a reasonable doubt applies

153

only when the jury is tasked with the determination of objective truth[s] . . . susceptible to . . . proof or raw facts." *Id.* at 328 (internal quotations omitted). As the court noted, the United States Supreme Court specifically held that the requirement of proof beyond a reasonable doubt extended to "mixed questions of law and fact." *Id.* (*quoting United States v. Gaudin*, 515 U.S. 506, 511 (1995).) "[T]he jury's constitutional responsibility is not merely to determine the facts, but apply the law to those facts and draw the ultimate conclusion of guilt or innocence." *Gaudin*, 515 U.S. at 514. "Surely that responsibility is even more acute where the ultimate conclusion is not just guilt or innocence, but life or death." *Gabrion*, 648 F.3d at 328.

Further, those cases that do not apply the reasonable doubt standard to weighing in capital cases ignore the United States Supreme Court's more recent pronouncements on *Apprendi* that apply a functional test for identifying a fact-finding subject to *Apprendi*, that includes even moral and subjective judgments like the weighing determination in a capital sentencing. In *Blakely v. Washington*, 542 U.S. 296 (2004), the Court invalidated a sentencing statute that allowed a sentence beyond the set range if the judge found "substantial and compelling reasons." The law listed some factors to justify a harsher sentence but was merely illustrative and not exhaustive. *Id.* at 299. In striking down the statute, the Court rejected the state's efforts to get around the required fact-finding for sentence enhancement and made

154

**JA 3570**

clear that for *Apprendi* purposes, "the relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. *Id.* at 303-04. *Cunningham v. California,* 549 U.S. 270 (2007)*,* further solidified this functional test when it struck down a California sentencing statute that allowed an upward departure when "justified by the circumstances in aggravation or mitigation" not found by the jury beyond a reasonable doubt. 549 U.S. at 278-79. In doing so, the court rejected the argument, and the dissent's view that *Apprendi* did not apply because a circumstance in aggravation could include a policy judgment or even the judge's subjective belief about the appropriate sentence. *Id.* at 862; *id.* at 879 (Alito, Kennedy & Breyer, JJ., dissenting). The "attempt to characterize the weighing step as resulting in something other than an *Apprendi* finding of fact reflects a level of formalism rejected by both *Apprendi* and *Ring*." *Mitchell*, 502 U.S. at 1013 (Reinhardt, J., dissenting). "[T]here is no practical difference between the increase in the punishment due to the finding of an aggravating factor and the increase due to the finding that aggravators outweigh mitigators. Because the Federal Death Penalty Act requires both findings in order for a judge to sentence a defendant to death, the Sixth Amendment requires a jury to make these findings beyond a reasonable doubt." *Id.*

155

As the cases applying a reasonable doubt standard to the weighing process recognize, because the death penalty is qualitatively different from any other criminal punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). "We pay mere lip service to the principle that death is different" if a lower level of certainty is imposed in the death penalty cases than in others. *Evans*, 886 A.2d at 584-85 (Raker, Green, JJ. & Bell, C.J., dissenting). This requirement of heightened reliability requires that the jurors making a finding beyond a reasonable doubt that the death penalty is the appropriate punishment for capital defendants.

This Court's failure to provide such an instruction to the jury renders Mr. Basham's death sentence unconstitutional. To the extent that the federal death penalty scheme allows capital defendants to be sentenced to death without a finding beyond a reasonable doubt that death is the appropriate punishment, it too is unconstitutional. Defense counsel's failure to request an appropriate instruction on this issue, constituted constitutionally ineffective assistance of counsel. *Strickland*, 466 U.S. at 686. Their performance fell far below the standards expected of competent counsel in capital cases. Moreover, had counsel requested an appropriate instruction on this issue, there is a substantial probability that Mr. Basham would not

**JA 3572**

have been sentenced to death. Further, had appellate counsel raised this issue on appeal, there is a reasonable probability that Mr. Basham would have been granted a new penalty trial. *See Smith v. Murray*, 477 U.S. at 536; *Greer*, 264 F.3d at 678.

These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 n. 9. Erroneous description of the reasonable doubt standard "vitiates all the jury's findings" and is structural error, not subject to harm analysis and requiring automatic reversal. *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). Furthermore, these constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

### CLAIM 27

**Mr. Basham's attorneys rendered ineffective assistance of counsel, in violation of the Sixth Amendment to the United States Constitution, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.**

Mr. Basham incorporates by specific reference all facts, allegations, and

157

arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Mr. Basham's attorneys rendered ineffective assistance of counsel, when, upon learning that Juror Cynthia Wilson had engaged in misconduct, they failed to investigate easily identifiable instances of Wilson's untruthful statements to the Court that likely would have persuaded the Court that further investigation into claims of juror misconduct was warranted.

As this Court is well aware, the foreperson of Mr. Basham's jury was held in contempt of court for her outrageous misconduct when she ignored at least forty-one clear instructions by this Court not to talk to anyone about the case. At a bare minimum, it is undisputed that Ms. Wilson called at least three television stations and two newspapers before the jury rendered their death verdict. (Tr. 11/12/04 at 70; Tr. 12/13/04 at 3; Tr. 12/21/04 at 33.) However there was significant evidence that Wilson's misconduct was much more widespread and insidious, including suspicion that deliberations began before the close of evidence, bullying other jurors, and talking with individual jurors outside the presence of the entire jury. Nonetheless, despite grave concern to the contrary, the Court accepted Ms. Wilson's word that her misconduct did not spread beyond that which was irrefutable – the calls to media. Had counsel researched Ms. Wilson, and been able to show a greater pattern of her

**JA 3574**

lies to the Court, the Court may well have determined a different answer to his question "What about the idea that a juror who is just that determined to violated the judge's instructions, it just stinks so bad that the whole verdict is suspect?  That juror such as that should just not be permitted to be one of 12 votes for a death penalty?" (Tr. 12/13/04 at 35.)

The Court held several hearings on the issue.  In the hearings, Ms. Wilson initially denied any violations of the Court's orders and her oath as a juror, after speaking with an attorney she admitted to calling the television stations. (Tr. 1/14/05 at 59; Tr. 11/12/04 at 70.)  Ms. Wilson claimed she only committed such egregious violations of her oath and orders for altruistic reasons.  She denied early deliberations and talking to anyone else outside of the jury including her husband.  (Tr. 11/12/04 at 71-76.)  In one of the most shocking displays of lack of candor with this Court, it was later discovered that Wilson had not only contacted the three television stations but also two newspapers as well. (Tr. 12/21/04 at 33.)  Wilson had been specifically asked if she recalled "anything else" that she did during Mr. Basham's trial that violated the Court's orders. (Tr. 12/13/04 at 3.)  When confronted with the discovery of the additional media sources, Wilson claimed that she simply had forgotten about the calls. Despite Wilson's egregious misconduct, and dishonesty, the Court accepted this excuse for her lack of candor. (Tr. 12/21/04 at 33.)

159

**JA 3575**

Despite her claims that she had not talked prematurely with other jurors, both Shelda Richardson and June Robertson had concerns about Wilson's conduct. (Tr. 11/18/04 at 17, 27, 42.) Wilson, who would admit to nothing until squarely confronted with irrefutable evidence of her guilt, denied that any conversations she had alone with jurors were about the case. (Tr. 11/18/04 at 27.) However, she later flatly contradicted herself by stating that she had discovered Shelda Richardson had some hesitancy about imposing the death penalty. (Tr. 11/23/04 at 10, 12.) It was also discovered that Ms. Wilson spent a shocking amount of time on the phone with fellow jurors. Defense counsel pointed out that the lengthy calls would often fall after key points in the trial. (Tr. 1/14/05 at 10.) Wilson denied that anything about the case was discussed during these calls.

This issue was one the Court was candid about struggling with. The Court observed, "If I go one way, a life is taken, if I go the other way, the Government is put to the expense of several million dollars – and I don't say that with hyperbole." (Tr. 11/12/04 at 92.) Despite some evidence that Ms. Wilson had been less than candid with the Court, and even acknowledging that Wilson likely perjured herself on at least one issue before the Court (Tr. 12/13/04 at 20 ( "[i]f I determine she committed perjury, which I essentially have when I say I accepted the station – the TV station's version of what happened . . . ." )), the Court denied Basham a new trial because it

160

**JA 3576**

accepted Wilson's word that she had not engaged in premature deliberations with other jurors, or told them about her calls with the media. *United States v. Basham*, 561 F.3d 302, 318-19 (2009) (internal citations omitted.)

The Government argues that the Court did not base its decision on Wilson's testimony regarding the question of premature deliberation. (Opp. at 146.) The record contradicts this assertion. Although numerous jurors were called in during the juror misconduct hearings, neither the Government nor the defense were aware of the phone calls between Wilson and the jurors, and they were not questioned about it. (Tr. 12/21/04 at 21-22.) The testimony of the news producer, Ms. Mays, who contacted the prosecution regarding the misconduct was that Wilson said she had concern over whether Basham would be sentenced to death because some jurors were not for the death penalty, testimony Wilson refuted. (Tr. 11/12/04 at 19). The other news sources were contacted and either gave statements or testified, and argument was held. Ultimately, the Court concluded that, although Wilson's acts were misconduct, the Government had successfully rebutted the presumption of prejudice from her misbehavior. (Dkt. 890). Although the Government is correct that there was testimony regarding the contact with media, no jurors were called back to be questioned about the phone calls. The Court's only testimony on that was from Ms. Wilson, who denied any premature deliberations and insisted that all of the seventy-

**JA 3577**

one calls between herself and other jurors were innocuous.  Wilson made all of these denials under oath.

Given the Court's struggle when faced with this difficult issue, and suspicion of Ms. Wilson's perjury, anything the defense found to impugn her credibility could have tipped the scales in favor of doubting her testimony and thus entitling Basham to a new trial.  At the point that Ms. Wilson's misconduct was discovered, Mr. Basham was already sentenced to death.  Ms. Wilson's misconduct was, at that point, the only issue trial counsel had to undo the death sentence.  There is no argument it was of utmost importance.  Contrary to the Government's argument otherwise, reasonably competent counsel would have recognized that Mr. Basham's life literally hung on the balance of Ms. Wilson's credibility.  All efforts should have been made to call it into question.  Failure to do so was unreasonable.  *See Strickland,* 466 U.S. at 691; *see also Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) ("when evaluating decisions not to investigate further, [the court] must regard counsel's choice with an eye for 'reasonableness in all the circumstances.'" (*quoting Strickland,* 466 U.S. at 691)).

The Government argues that, because trial counsel analyzed telephone calls and were able to show that Wilson had been dishonest when she admitted only to contacting the three television stations, as well as discovering extensive telephone

162

**JA 3578**

contact with her husband and other jurors, they were justified in ignoring any further investigation into Ms. Wilson's credibility. (Opp. at 145.) The Government contends that information showing Ms. Wilson made false statements on her juror questionnaire are "immaterial." (Opp. at 150.) However, it is undisputed that the jurors were informed that their answers on the questionnaires were under oath. (Juror 776 Questionnaire.) Evidence that Ms. Wilson gave false responses under oath is anything but immaterial. Evidence, discussed in detail in the § 2255 Motion, calling into question Ms. Wilson's veracity as to at least the questions regarding whether she had been sued (she answered no when in fact she had been sued and had judgments issued against her at least twice) and length of time she had worked as a nurse was readily available in minimal time. (Exh. 6.)

Defense counsel made clear in their argument to the Court that they believed that Wilson was lying and that as such, Basham was entitled to relief.[17] Because so much hung on Wilson's credibility, reasonably competent counsel would have seen the benefit in devoting resources to attacking it. With a death verdict returned, the

---

[17]Counsel argued "This Court has already asked her a series of questions involving her proprieties as a juror. And she has answered yes, I didn't – yes, I didn't prematurely deliberate. Well, that's just not true. Yes, I didn't look at the internet. That's probably not true. Yes, I didn't read the newspapers. That's probably not true. And there's no way that we are ever going find out whether or not those things were untrue."(Tr. 1/14/05 at 11.) Further counsel argued "A juror, the forelady of Brad [sic] Basham's case, sat on that stand and lied to you." (Tr. 1/14/05 at 22.)

163

**JA 3579**

only reasonable strategy to save Mr. Basham's life was show that Wilson's misconduct mandated a new trial. Evidence of Wilson's additional untruthfulness would have done much to convince the Court that she was not impartial and actively disregarded numerous Court orders and engaged in behavior to ensure Mr. Basham was sentenced to death. Accordingly, the failure to engage in independent investigation to support their belief that Wilson was not telling the truth was unreasonable.

Finally, the Government attempts a policy argument that requiring counsel to comb through juror questionnaires and voir dire for discrepancies would place an unacceptable burden on counsel and the court and would discourage citizens from serving on juries. General policy arguments to not apply to the individual aspects of this trial. Ms. Wilson engaged in what the Court itself characterized as "a flagrant violation of the court's instructions." (Tr. 1/24/05 at 27.) As stated above, as a result of Wilson's misconduct, Mr. Basham made a motion for a new trial, and the *only* reasonable strategy available to defense counsel to save Mr. Basham's life was to uphold the rebuttable presumption that Ms. Wilson's conduct so infected the trial process that it was rendered fundamentally unfair. *See Remmer v. United States*, 347 U.S. 227 (1954). Therefore, under the unique circumstances in this case, combing through Wilson's questionnaire and voir dire was not only appropriate, but necessary,

164

investigation to prepare for the hearing on Mr. Basham's motion for a new trial.

The policy argument that it would discourage citizens from serving on juries is ridiculous. As officers so often like to say to those they interrogate, "If you have nothing to hide, you have nothing to worry about."  If Ms. Wilson had not engaged in such outrageous conduct that it resulted in her being convicted of contempt of court, it would have been unnecessary for counsel to delve into her private matters. Because she engaged in conduct that "distresse[d] the court so much" (Tr. 1/24/05 at 20), she made herself and her credibility fair game.  Counsel's failure adequately to attack her very questionable veracity and credibility fell below the standard of reasonably competent assistance.

## CLAIM 28

**Newly discovered evidence suggests that Juror Wilson was untruthful in her testimony to the Court concerning her contact with other jurors.  Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences.  In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.  Specifically, this claim incorporates the argument and facts in Claim 27.

As a preliminary matter, the Government argues that this claim is untimely

165

**JA 3581**

because under Rule 33 motions for new trial based on newly discovered evidence must be filed within three years of the guilty verdict. (Opp. at 152, *citing* Fed. R. Crim. P. 33(b)(1).) The Government contends that this Court must conclude that Claim 29 [sic], "which is in essence a motion for a new trial under Rule 33, is untimely." (Opp. at 152.) The Government is incorrect. Although there is some overlap, "there are critical differences" between Rule 33 and § 2255. *United States v. Prescott*, 221 F.3d 686, 688 (4th Cir. 2000). "Where a claim for relief based on newly discovered evidence is based on actual innocence, rather than new evidence of a constitutional violation, the claim is not cognizable under § 2255 and, properly construed, is a Rule 33 motion." *Ruiz v. United States*, 221 F.Supp. 2d 66, 72-73 (D. Mass. 2002). Attacks on final judgment related to violations of the Constitution or laws of the United States are properly raised pursuant to 28 U.S.C. § 2255. *Id.* (*citing United States v. Addonizio*, 442 U.S. 178, 184 (1979)); *Hill v. United States*, 368 U.S. 424, 428 (1962). Mr. Basham's § 2255 Motion alleges the latter. Counsel for Mr. Basham filed this Motion within one year of the United State Supreme Court's denial of Mr. Basham's petition for writ of certiorari on June 1, 2010, thereby satisfying the most stringent statute of limitations deadline established by 28 U.S.C. § 2255(f)(1). Accordingly, Claim 28 is timely and this Court must consider it on the merits.

As discussed in detail in Claim 27, the issue of juror Wilson's veracity with the

166

**JA 3582**

Court was of great import.  In addition to information readily available to counsel at the time, newly discovered evidence suggests that Wilson was untruthful in her answers to this Court.  One of the primary areas of concern was the number of phone calls between Wilson and several other jurors.  (Tr. 1/14/05 at 3.)  Cynthia Wilson testified three times in hearings regarding her misconduct.  (Tr. 2/14/05 at 2.)  She claimed that the jury had not deliberated prematurely.  (Tr. 11/12/04 at 74, 76.)  She avowed that, if she had engaged in one-on-one conversations, as witnessed and testified to by other jurors, she was only talking about softball or cheerleading.  (Tr. 11/23/04 at 10.)  At the hearings, Wilson also addressed her numerous calls to fellow juror Shannon Burnett, which followed her calls to the media.  Wilson testified at the contempt hearing that she talked with Burnett about doing sod work in her backyard.  (Tr. 12/21/04 at 35-36.)

As discussed in detail in the § 2255 Motion, logic would suggest that, if the multiple and lengthy calls between Wilson and her fellow jurors were solely about personal matters, these jurors must have formed substantial friendships.  Yet, it appears that when Mr. Basham's trial ended, so did the "friendship."  Wilson's ex-husband could not recall ever meeting any of the jurors Wilson spent so many hours talking to.  He could not recall her talking to them after the trial. Regarding Wilson's testimony that she spoke with Juror Shannon Burnett about doing sod work for her,

167

**JA 3583**

Mr. Wilson stated this would have been very odd, as he did all the maintenance and landscaping at their house himself.  (Exh. 7.)

Furthermore, while Wilson's "friendship" with the Basham jurors ended, her lies about her conduct in the Basham trial did not.  Wilson was disciplined on January 6, 2007, for not disclosing the fact that she was put on probation for contempt of court in the Basham trial.  (Exh. 6.)  Wilson's lies continued on her nursing license renewal application in April 28, 2008, on which she falsely stated  that she did not have any prior disciplinary action before any nursing board in any jurisdiction. Wilson lied again on her license renewal application in April 15, 2010, when asked the same question.  (Exh. 6.)

Finally, Wilson lied three times on her nursing license renewal application when asked whether she had ever been convicted under any federal law.  She did not disclose that she had been held in criminal contempt of court by this Court.  Wilson answered "no" to that question on her applications dated April 7, 2006, April 11, 2008, and April 5, 2010.  (Exh. 6.)

The Government contends that in order to be entitled to a new trial, Mr. Basham must pass a five prong test:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; © [sic] the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the

**JA 3584**

issues involved; and (e) it must be such, and of such nature as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

(Opp. at 152, *quoting United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (internal citations omitted).)  However, every case the Government cites to support this contention shows that they continue to confuse motions for new trial under Federal Rule of Criminal Procedure 33, with Motions for Collateral Relief Pursuant to U.S.C. § 2255.  *See United States v. Gootee*, 34 F.3d 475, 476 (7th Cir. 1994) ("Gootee also appeals the district court's refusal to hold an evidentiary hearing on his motion for new trial"); *Robinson*, 627 F.3d at 944 ("Robinson seeks retrial"); *United States v. Custis*, 988 F.2d 1355, 1357 (4th Cir. 1993) (petition claimed that he was entitled to new trial); *United States v. Fulcher*, 250 F.3d 244, 246 (4th Cir. 2001) (affirming grant of new trial to defendant).

Even if the Rule 33 standard were applied, however, Mr. Basham would meet every element.  First, the evidence was clearly discovered since Mr. Basham's trial. The evidence that the friendships did not continue, and that Wilson continued to lie about her conduct during the trial, required the passage of time to even occur. Accordingly, Mr. Basham meets the second prong of diligence.  Because the information was not discoverable at the time of trial, or even during the hearings on Wilson's contempt of court and Mr. Basham's motion for new trial, and because

169

direct appeals are limited to issues on the record, this Motion for Relief pursuant to § 2255 is Mr. Basham's first opportunity to timely raise this issue before a court. Upon information and belief, counsel submits that the evidence goes to the issue of Wilson's false statements to the court, and her continued issue with dishonesty regarding her actions during the Basham trial. Because Mr. Basham's motion for new trial hung on the believability of Wilson's claims that she did not talk to other jurors about her conversations with the media, and did not engage in premature deliberations, they are clearly material to the issues involved in Mr. Basham's claim that Ms. Wilson's conduct warrants a new trial. Finally, the material is of such a nature, that had the Court had it at its disposal during the hearings on Mr. Basham's motion for new trial, an issue the Court clearly struggled greatly over,[18] this evidence could have tipped the Court in favor of ruling, even in light of his concern about the enormous cost to retry, that the error in this case was too great and Mr. Basham was entitled to a new trial. *See Sawyer v. Whitley*, 505 U.S. 333, 335-36 (1992) (fundamental justice exception where defendant is actually innocent of the death penalty rather than the offense of conviction).

This newly discovered evidence bolsters the position defense counsel took in

---

[18]"Honestly, from the bottom of my heart, I don't know how I will rule on this. It is the toughest call I have." (Tr. 12/13/04 at 64.)

170

the contempt hearings: "This is a person that came into this courtroom and lied. And she didn't just lie once or twice or three times or four times, she lied repeatedly." (Tr. 12/13/04 at 39.) Wilson's lies have only continued. Any decision that was based on acceptance of her testimony cannot stand, and any reasonable fact-finder, having the newly discovered information before it, would not find Wilson credible. Accordingly, Mr. Basham respectfully requests that the Court vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on the issue of premature juror deliberations.

<div align="center">CLAIM 29</div>

**Mr. Basham is entitled to a new trial in light of newly discovered evidence profoundly undermining the credibility of the Government's witness, Sheriff Ronald Hewett.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

Newly discovered evidence that an important Government witness, Sheriff Hewett, pled guilty to corruption and obstruction of justice, profoundly undermines his credibility as a witness in Mr. Basham's trial. Accordingly, this Court should vacate its previous order denying a new trial and vacate Mr. Basham's convictions

<div align="center">171</div>

<div align="right">**JA 3587**</div>

and sentences.  In the alternative, this Court should order an evidentiary hearing on this issue.

As in Claim 28, *supra*, the Government argues that this claim is untimely because, under Rule 33 motions for new trial based on newly discovered evidence must be filed within three years of the guilty verdict.  (Opp. at 155 citing Fed. R. Crim. P. 33(b)(1).)  The Government contends that this Court must conclude that Claim 29, "which is in essence a motion for a new trial under Rule 33, is untimely." (Opp. at 152.)  The Government is incorrect.  Although there is some overlap, "there are critical differences" between Rule 33 and § 2255.  *Prescott*, 221 F.3d at 688. "Where a claim for relief based on newly discovered evidence is based on actual innocence, rather than new evidence of a constitutional violation, the claim is not cognizable under § 2255 and, properly construed, is a Rule 33 motion."  *Ruiz*, 221 F.Supp. 2d at 72-73.  Attacks on final judgment related to violations of the Constitution or laws of the United States are properly raised pursuant to 28 U.S.C. § 2255.  *Id.* (*citing Addonizio*, 442 U.S. at 184); *Hill*, 368 U.S. at 428.  Mr. Basham's Motion for Collateral Relief Pursuant to U.S.C. § 2255 alleges the latter.  Counsel for Mr. Basham filed this Motion within one year of the United State Supreme Court's denial of Mr. Basham's petition for writ of certiorari on June 1, 2010, thereby satisfying the most stringent statute of limitations deadline established by 28 U.S.C.

172

JA 3588

§ 2255(f)(1). Accordingly, Claim 29 is timely and this Court must consider it on the merits.

As discussed in detail in Claims 1, 11, 12, 18, and 23, *supra*, Sheriff Hewett was the star witness in the Government's case against Mr. Basham. His testimony that Basham indicated how he had strangled Alice Donovan was characterized as one of two pieces of testimony that sealed Mr. Basham's fate. The Government went out of its way to emphasize Hewett's testimony and credibility, even arguing to the jury, "You remember how fair Sheriff Hewett was." (Tr. 9/29/04 at 79). Unfortunately, as his own convictions would eventually bear out, "fair" was not the best adjective to accurately describe Sheriff Hewett.

On October 6, 2008, (former) Sheriff Hewett pled guilty to corruption and obstruction of justice. He was sentenced to prison, supervised release, and fined. (Exh. 8.) As part of its prosecution of Hewett, the Government obtained hundreds of pages of affidavits detailing a litany of abuses, including allegations that Hewett was repeatedly intoxicated at crime scenes and sexually harassed female co-workers. The indictment against Hewett charged that he "repeatedly used his office for his personal benefit," including obstructing an investigation against a relative and misuse of public funds. (*Id.*) He forced deputies to perform manual labor at his house and work on his political campaigns. (*Id.*) He engaged in threats and retaliation against those who

173

testified against him and encouraged employees to be uncooperative with the investigation, even going so far as to have a chaplain attend staff meetings where the deputies were told that "they should not cooperate with evil on the witness stand." (*Id.*)

As United States Attorney Holding stated, "Ronald Hewett was not only a law enforcement officer, but he was also entrusted by the people of Brunswick County with leadership of their Sheriff's Office.  First, he breached that trust by operating the Sheriff's Office for his personal benefit.  Then, when that activity came under investigation, he unlawfully obstructed the investigation." (Exh. 8.)  Due to this newly discovered evidence, Mr. Basham is entitled to a new trial.

The Government contends that in order to be entitled to a new trial, Mr. Basham must pass a five prong test:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; © [sic] the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

(Opp. at 156, *quoting Custis*, 988 F.2d at 1359 (internal citations omitted)).

However, every case the Government cites to support this contention shows that they continue to confuse motions for new trial under Federal Rule of Criminal Procedure

174

**JA 3590**

33, with Motions for Collateral Relief Pursuant to U.S.C. § 2255. *See Robinson*, 627 F.3d at 944 ("Robinson seeks retrial"); *Custis*, 988 F.2d at 1357 (petition claimed that he was entitled to new trial); *Fulcher*, 250 F.3d at 246 (affirming grant of new trial to defendant).

However, even if the Rule 33 standard were applied, Mr. Basham would meet every element. First, the evidence was clearly discovered after Mr. Basham's trial. The evidence of Hewett's astounding corruption and misconduct was only borne out after a lengthy government investigation against him which culminated in his guilty plea in 2008. Accordingly, Mr. Basham meets the second prong of diligence. Defense counsel could not have gained access to the information showing Hewett's corruption even if it had existed at the time. It was only after the government investigation became public record that Mr. Basham became aware of the real story behind the Government's star witness.

Because the information was not discoverable at the time of trial, and because direct appeals are limited to issues on the record, this Motion for Relief pursuant to § 2255 is Mr. Basham's first opportunity to timely raise this issue before a court. Upon information and belief, counsel submits that the evidence goes to the issue of Hewett's false statements to the court. Finally, the material is of such a nature that, had the jury been aware of Hewett's corruption, the testimony about Mr. Basham

JA 3591

strangling Alice Donovan would have been even more suspect, especially when considered in light of Hewett's memorialized interview with Lieutenant Crocker immediately after the Thanksgiving Day search, in which Hewett made no reference to Mr. Basham being the actual killer.

Without Hewett's testimony, there is legitimate doubt as to whether the results of Mr. Basham's trial, especially the penalty phase, would have been different. Accordingly, Mr. Basham respectfully requests that the Court vacate its previous order denying a new trial and vacate Mr. Basham's convictions and sentences. In the alternative, this Court should order an evidentiary hearing on this issue.

### CLAIM 30

**Trial counsel's failure to provide appellate counsel all files produced in the course of representing Mr. Basham necessarily resulted in Mr. Basham being denied effective assistance of counsel on appeal, in violation of the Fifth Amendment, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599. In addition, trial counsel's failure to provide the record to his successor constituted ineffective assistance of counsel within the meaning of the Fifth and Sixth Amendments, 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

In Claim 30, Mr. Basham alleged that his appellate attorneys were rendered ineffective by Jack Swerling's improper refusal to turn over to them Mr. Basham's

176

**JA 3592**

files.  He further alleged that Swerling's actions themselves constituted ineffective assistance of counsel.  The Government describes this claim as "remarkable" and "completely without factual support." (Opp. at 158, 160.) The Government is correct that the claim is "remarkable;" it is incorrect, however, in asserting that it is without a factual basis.

As Mr. Basham discussed in his § 2255 Motion, an attorney "must deliver to [a] client or former client . . . such originals and copies of other documents possessed by the lawyer relating to the representation as the client or former client reasonably needs." (Motion at 140.)   This rule derives from the fact that a client, not counsel, "owns his file," and therefore counsel, not the client, must "bear the expense of retaining a copy." *Averill v. Cox*, 761 A.2d 1083, 1092 (N.H. 2000); *see also Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 648 (N.D. Tex. 1989) ("[A]ny materials which [former counsel] wish to keep are copied at their own expense.").

In this case, Jack Swerling refused to provide Mr. Basham's appellate counsel with the file in his case.  Appellate counsel first requested the file in a letter dated January 14, 2008.  (*See* Rep. Exh. 24 ("[Y]ou have known of our need for the file since at least January 14, 2008, when Mr. Sullivan wrote you a letter[.]").)  Over the next ten weeks, appellate counsel made five more requests, one of them in person. (*Id*.)  None, however, were honored.  (*Id*.)  On March 31, 2008, with the filing

177

deadline for the opening brief less than a month away and not one of the requested documents in hand, appellate counsel made a sixth request, prompting Swerling to respond that he "did not understand the urgency" and would "get with staff in am." (*Id.*) The following day, Melissa Meister of Jenner & Block sent Swerling a detailed letter wherein she noted the gravity of the situation and informed him, as she had a week earlier, that he was "welcome to Federal Express all of Basham's trial files to [her]" at her firm's expense so she could "go through them for the relevant materials." (*Id.*) In reply, Swerling simply reiterated that "the files were available to [co-counsel] or anyone else and copies could be made of whatever was wanted." (Rep. Exh. 25.)

Ultimately, it took an ultimatum to put the wheels in motion, an ultimatum delivered by Meister in a manner that Swerling characterized as "totally unnecessary in its tone and content" but that was, viewed objectively, in fact quite appropriate. (Rep. Exh. 25.) To quote: "If I do not receive the files that I requested on Wednesday, March 31st, by 5:00 p.m. on Friday, April 4th, I will file a motion with the United States Court of Appeals for the Fourth Circuit, asking for court-ordered production of the files." (Rep. Exh. 24.) Although Swerling took the unsupportable position "that until last wednesday march 26 [sic], no request was made of me as to any specific document from the file" (Rep. Exh. 26), Meister relented and traveled to South Carolina on April 3, 2008, to spend an afternoon reviewing Mr. Basham's files.

**JA 3594**

All told, Meister culled two boxes' worth of documents, which she delivered to the local branch of Document Technologies for copying and shipment to her offices in Washington.[19]  (Rep. Exh. 27.)  Yet even this modest foray into Mr. Basham's files exceeded the bounds Swerling had set.  As Meister wrote in an e-mail to Swerling that evening:

> [The] boxes were handed off to Brandon at Document Technologies Inc. to be copied and shipped.  However, after learning that you did not want the boxes to be stored out of your office overnight, I made arrangements to have the boxes returned to your office . . . and to have Document Technologies pick those two boxes back up at 8:30 a.m. from your office to be copied off-site, the originals returned to you, and the copies sent to me in D.C.

(Rep. Exh. 27.)  Swerling responded: "Just so you know i don't let files out my office [sic] without knowing what's going or being copied by me first."  (Rep. Exh. 27.)  Despite the obstacles he had created to appellate counsel's access to the file in Mr. Basham's case, Swerling ironically closed his email to Meister by stating, "If you

---

[19]Three employees of the Office of the Federal Public Defender for the District of Arizona, which experienced similar difficulties with Mr. Swerling in its attempt to obtain Mr. Basham's file, traveled to Swerling's office in Columbia, South Carolina, in February 2011, to review the file.  Even a cursory review of the file, which encompassed 77 boxes of materials, took five days.  (Rep. Exh. 28 (Declaration of Christine Oliver).)  The fact that Ms. Meister, working alone, was afforded only one day to conduct a similar review and was able to cull only two boxes of documents is itself evidence that Swerling's obfuscation rendered Mr. Basham's appellate attorneys ineffective.

need anything further just ask and we will try to accommodate." (*Id.*)[20]

With only two boxes of documents in hand and the filing deadline for the opening brief just twenty-two days away, the guess-and-peck process of locating meritorious claims only intensified. A brief sampling of the correspondence between Swerling and appellate counsel amply illustrates how inexact and consequently damaging a process it was:

"Jack, were there ever any exhibits regarding Basham's statements, to the FBI, regarding the Burns carjacking and murder? I have Fulks' statement, but they're rather incriminatory toward Brandon, and I'm guessing he said something different?" (Rep. Exh. 29.)

"There we're [sic] statements. Are you referring to a physical statement introduced?" (Rep. Exh. 29.)

"Well, I'm bound by whatever is in the record, so the extent [sic] that there were 302s introduced by the Government . . . I'm looking for those . . . . Does that help?" (Rep. Exh. 29.)

"I was in trial when you asked and i am off today. Did I answer you. [sic]"   (Rep. Exh. 29.)

"I have the testimony from Vito and Long re the statements Basham made to authorities about Donovan, but I have no statements regarding Burns, yet he pled guilty in WV. To your knowledge, is there any

---

[20]Of course, as a matter of law, Meister, as Mr. Basham's counsel, was perfectly at liberty to tote the boxes containing Mr. Basham's file to Washington, with or without Swerling's permission. As to why Swerling could not countenance Mr. Basham's file spend an evening off the premises, even when entrusted to the professional care of a nationwide document services firm, his sole explanation was to opaquely remark, "I have had a couple of bad experiences." (Rep. Exh. ___.)

180

record of Basham relating the events of the Burns' murder to authorities that would be in the Basham or Fulks' record.  If not I'll go with what I have, but . . . I'd like to insert Basham's account to the extent it's on the record." (Rep. Exh. 29.)

"Jack, I am quite sure that you have other matters on your plate, but finding a place where you and Harris explicitly challenged the Government's 'intrinsic acts' position is critical to Brandon's appeal. Have you found anything on this issue?  I know that you mentioned a joint motion with Fulks.  We have not found anything, unfortunately. Also, to the extent that you can find anything that was introduced by Basham regarding the Burns matter, that would also be very helpful. *Unfortunately, time is running short for filing this appeal, so the sooner you can get back to me, the better*.  (Rep. Exh. 30 (emphasis added).)[21]

The foregoing is indeed troubling.  But nowhere is the damage wrought by this process more apparent than in an e-mail Ms. Meister sent to Swerling on April 16, 2008.  The message in this case is more of an explanation than a request: "I was wondering if it's possible to get all of the FBI statements (the agent reports) from Basham's file?  I don't recall those when I was down in your office, *but given the amount of paper, I could have easily missed them*." (Rep. Exh. 31 (emphasis added).) Nothing in the Constitution or the caselaw of any federal or state court guarantees an appellant in a capital case the assistance of doubt-free counsel.  Surely, however, such

---

[21]On April 18, 2008, Appellate counsel filed an unopposed motion for extension of time with the Court of Appeals, in which counsel requested a fourteen-day extension of the filing deadline for the opening brief.  *See* Consent Mot. for Extension of Time, April 18, 2008, ECF No. 152.  The court subsequently granted the motion, extending the deadline to May 13, 2008.

181

**JA 3597**

an appellant is entitled to the assistance of counsel who, unlike Meister, would not so readily concede, or confirm in writing, that critical portions of the record "could have easily [been] missed." (*Id.*)

To deny a former client, such as Mr. Basham, any documents produced in the course of representation is to "deny the client *the full benefit* of the services for which he paid, *often dearly*." *Resolution Trust Corp. v. H—, P.C.*, 128 F.R.D. 647, 650 (N.D. Tex. 1989) (emphasis added). Jack Swerling, by not "surrendering papers and property to which [Mr. Basham was] entitled," put appellate counsel in an untenable position, one in which the only answer was denied by the very circumstances of the problem. S.C. Rules of Prof'l Conduct R. 1.16(d). "[T]his case is illustrative that in a complex [appeal] where the file may be voluminous (commensurably increasing the likely usefulness of work product materials to advise the client concerning ongoing rights and obligations), the client's need for access to a particular paper cannot be demonstrated except in the most general terms, in the absence of prior disclosure of the content of the very document to which access is sought." *In re Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn LLP*, 689 N.E.2d 879, 882 (N.Y. 1997). Just as unfettered access to Mr. Basham's files would have "commensurably increas[ed] the likely usefulness of work product materials" in litigating his appeal, Swerling's refusal to surrender Mr. Basham's files, or permit appellate counsel reasonable access

**JA 3598**

to the files, despite counsel offering every accommodation imaginable, severely compromised the usefulness of those documents in litigating his appeal and, in turn, ensured that counsel would fall far short of providing Mr. Basham the effective assistance to which he was entitled. *Id*.

Any one of the scores of boxes of documents Meister was forced to leave in South Carolina may have held a claim that, absent the error of its omission, would have demonstrated "a reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt," *Strickland*, 466 U.S. at 695, or for the purpose of this Motion, "a reasonable probability that the omitted claim would have resulted in a reversal on appeal," *Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001).

As Meister wrote in a letter to Swerling, "I am sure you understand the grave nature of a death penalty appeal and the necessity for a person facing imposition of the death penalty to be represented by able and informed counsel. *Basham's trial files are essential to our ability, as counsel on appeal, to represent Basham ably and effectively*." (Rep. Exh. 24 (emphasis added).) Nevertheless, only a minute portion of Mr. Basham's files came into the hands of his appellate counsel. Impeded by an inadequate record, counsel could not, and therefore did not, provide Mr. Basham effective assistance. *See People v. Barton*, 579 P.2d 1043, 1047–48 (Cal. 1978) (holding that, where the record on appeal was incomplete, "[a]ppellant was denied his

right under the Fourteenth Amendment to the competent assistance of counsel on appeal because [appellate] counsel failed to obtain an appellate record adequate for consideration of appellant's claims").

## CLAIM 31

**Mr. Basham's rights under the Fifth, Sixth and Eighth Amendments were violated due to the Government's failure to include necessary charges in the Indictment. Mr. Basham's Due Process Rights, as well as his rights under 18 U.S.C. § 3006(A), and 18 U.S.C. § 3599, were violated by appellate counsel's unreasonable failure to raise this issue on appeal.**

Mr. Basham agrees with the Government's opposition to this claim and therefore withdraws it.

## CLAIM 32

**A system, such as the federal death penalty, in which capital punishment is sought on both the invidious basis of race and the irrational basis of geography should not be enforced. This Court should vacate Mr. Basham's sentence on this basis alone**.

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply. Mr. Basham relies on the arguments made in his § 2255 Motion in support of this claim.

JA 3600

<div align="center">

**CLAIM 33**

</div>

**The absence of a principled basis for distinguishing cases in which the federal death penalty is imposed from those in which it is not imposed renders the FDPA unconstitutional.**

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.  Mr. Basham relies on the arguments made in his § 2255 Motion in support of this claim.

<div align="center">

**CLAIM 34**

</div>

**Mr. Basham's conviction and sentence must be vacated due to the cumulative prejudicial effect of the errors in this case**.

Mr. Basham incorporates by specific reference all facts, allegations, and arguments made in his § 2255 Motion, the exhibits thereto, and elsewhere in this Reply.

The combination of errors in this case deprived Mr. Basham of his right to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487 n. 15 (1978).  As a result of the cumulative effect of the errors in Mr. Basham's guilt and penalty phases, his convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth,

<div align="center">

185

</div>

**JA 3601**

Sixth and Eighth Amendments to the United States.

When evaluating cumulative error, while only guilt phase errors are relevant to Mr. Basham's convictions, "*all errors* are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (emphasis added) (*citing Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Coleman v. Saffle*, 869 F.2d 1377, 1396 (10th Cir. 1989); *Alvarez v. Boyd*, 255 F.3d 820, 824 (7th Cir. 2000)). As stated in his § 2255 Motion, Mr. Basham incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mr. Basham re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

Even if the above errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Mr. Basham, and when viewed cumulatively in the totality of the circumstances, it is clear Mr. Basham did not receive a fair trial. As the cases cited by the Government acknowledge, constitutional error found to be harmless standing alone, when analyzed collectively with other individually harmless errors, can create a conclusion that the combined error can no longer be determined to be harmless because together "they created a negative synergistic effect, rendering the degree of overall unfairness to the defendant more

186

than that flowing from the sum of the individual errors." *People v. Hill*, 952 P.2d 673, 699 (Cal. 1998); *see also Fisher v. Angelone*, 163 F.3d 835, 852-53 n.9 (4th Cir. 1998); *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998). In sum, "[t]he cumulative effect of two of more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Darks*, 327 F.3d at 1018 (internal citations omitted).

Here, the cumulative effect of the errors in this case resulted in an abridgment of the fundamental fairness of the trial process during all phases. Each of these errors deprived Mr. Basham of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

The aggregate harm of these constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht*, 507 U.S. at 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Basham's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair. Considering all the errors above, this Court must

187

**JA 3603**

conclude that Mr. Basham was denied a fair trial.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in his § 2255 Motion,

Mr. Basham respectfully requests that the Court vacate his convictions and sentences

and order that appropriate guilt and/or resentencing proceedings be conducted.

Respectfully submitted this 2nd day of March, 2012.

s/Julia Grace Mimms
Julia Grace Mimms
Law Office of Julia G. Mimms, P.A.
1001 Elizabeth Avenue, Suite 1A
Charlotte, North Carolina 28204
Telephone: (704) 333-1301
Facsimile: (704) 333-1290

s/Michael L. Burke
Michael L. Burke (Arizona Bar No. 013173)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
850 West Adams, Suite 201
Phoenix, Arizona 85007
michael_burke@fd.org
sarah_stone@fd.org
Telephone: (602) 382-2818
Facsimile: (602) 889-3960

Attorneys for Defendant
Brandon Leon Basham

**JA 3604**

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

# JOINT APPENDIX AND INDEX
# VOLUME 14

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

<u>Exhibit Index to Defendant's Reply to Memorandum of Law of the United States</u>
<u>in Opposition to Defendant's Motion for Collateral Relief</u>

Reply Exhibit 1:     Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 2:     Handwritten note authored by Jack Swerling on September 17, 2004

Reply Exhibit 3:     Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 4:     Handwritten note authored by Jack Swerling on September 22, 2004

Reply Exhibit 5:     Handwritten notes authored by Jack Swerling on September 29-30, 2004

Reply Exhibit 6:     Undated memorandum from Erik Haren

Reply Exhibit 7:     Clif LeBlanc, *Swerling Tells of Being Terrorized*, The State, February 11, 2004

Reply Exhibit 8:     Clif LeBlanc, *2 Charged in Break-in at Area lawyer's Home*, The State, May 15, 2003

Reply Exhibit 9:     Out of Court Hourly Worksheets - Jack B. Swerling - January and February 2004

Reply Exhibit 10:   Handwritten note authored by Jack Swerling on January 17, 2004

Reply Exhibit 12:   *Publicity Hinders Swerling Jury Choices*, The State, February 10, 2004

Reply Exhibit 13:   Clif LeBlanc, *Causey is Sentenced to Life Without Parole*, The State, February 13, 2004

Reply Exhibit 14:   E-mail to a federal trials listserve authored by Jack Swerling, February 19, 2004

**JA 3605**

Reply Exhibit 15:     *Swerling Walking in Victims' Shoes*, The State, February 25, 2004

Reply Exhibit 16:     Carlisle McNair's Personnel File, Internal Affairs Report, and Discipline subpoenaed from Lexington County Sheriff's Department

Reply Exhibit 17:     Notice of Disciplinary Action, December 16, 1998

Reply Exhibit 18:     Internal Affairs Investigative Report, November 2, 1998

Reply Exhibit 19:     Internal Affairs Investigative Report, November 30, 2001

Reply Exhibit 20:     Investigative Report, June 20, 2002

Reply Exhibit 21:     Memorandums authored by Carlisle McNair, January 21, 2004 and April 16, 2004

Reply Exhibit 22:     Memorandums authored by Carlisle McNair, November 17, 2003 thru August 5, 2004

Reply Exhibit 23:     E-mail authored by Carlisle McNair, October 13, 2003

Reply Exhibit 24:     Letter authored by Melissa A. Meister to Jack B. Swerling, April 1, 2008

Reply Exhibit 25:     E-mail authored by Jack B. Swerling, April 1, 2008 5:10 p.m.

Reply Exhibit 26:     E-mail authored by Jack B. Swerling, April 1, 2008 5:32 p.m.

Reply Exhibit 27:     E-mails authored by Melissa A. Meister and Jack B. Swerling, April 3, 2008 and April 4, 2008

Reply Exhibit 28:     Declaration of Christine R. Oliver, March 2, 2012

Reply Exhibit 29:     E-mails authored by Melissa A. Meister and Jack B. Swerling, April 16, 2008 and April 18, 2008

Reply Exhibit 30:     E-mail authored by Melissa A. Meister to Jack B. Swerling, May 3, 2008

**JA 3606**

Reply Exhibit 31:   E-mail authored by Melissa A. Meister to Jack B.Swerling, April 16, 2008

# Reply Exhibit 1

JA 3608

9/20 PM proceeding
Got letter from Donna

Judge denied request

D. asked to excuse him to discuss

Judge refused

Branden fault 8 marshall's on his
way out

Called Donna - D incompetent

Court rescheduled down Till AM

9/21 Met with Donna & D & Greg
I told Donna he had a line of
Cocaine. He is competent because it is a
stimulant. Donna felt like she was in a
position to discuss. I was concerned that

# Reply Exhibit 2

JA 3610

9/17/04 Afternoon

Bradon will not sit up. He has
his head down. Then he sits back
and sleeps back in chair. He has
refused my request, Greg's request and
Paige's request. He said "they can
pull him the D/P when I tell him
the jury is looking at him."

We break. Judge talks to D. Said
he is tired of all this. Will not
sign death warrant. Wants to leave.
I said he needs to remain —
Can't render effective assistance of
counsel.

We ask for break — Judge refuses

# Reply Exhibit 3

9/17 Mr. Watts comes.
In camera discussion
I ask the Judge about "Dip". Judge approves.

9/20 Judge says he will not go to Greenville
One week off
on Tobacco Row
Warner (v Daughter) heard Juror say re Hawkins - "Same heroic story" on elevator. She said "you ain't heard nothing yet"

Greg Price - Only juror who acknowledged heard comment re Hawkins
heard "   " re "You ain't seen nothing yet"

Judge questioned each juror.
Gov't will produce Mrs Warner
I to be present the whole time re "Dip"

JA 3634

# Reply Exhibit 4

JA 3614

4 minutes

laughing, talking inappropriately, talking inappropriately. Keep telling him to stop

Made a deal $5 per day if he is quiet

9/22/04 Starts right off with DIP

Before break DIP
During Them - DIP
After Break DIP

Before Lunch - DIP

Klan Fiber 222#14
This is boot D says like this

# Reply Exhibit 5

JA 3616

5. Curly Box

6. Location of body

I was only able to conceale the body.

I prould I could conceale he got in car with Dorner.

After Johnny's Closing, I just wanted some "Dip".

9/30/04 Jury charge issue of Intent in Carjacking

Alston    376 F3d 135    3rd Cir.

"At the precise moment"

＊ During this difficult discussion △ is driving me crazy about Dip — what the Jail told the Marshall about a Valium.

JA 3617

# Reply Exhibit 6

JA 3618

To: Melissa Meister
From: Eric Haren
Re: Competency

"The conviction of an accused person while he is legally incompetent violates due process." *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). The test for whether a defendant is competent to stand trial "seeks to ascertain whether a criminal defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)); *Mason*, 52 F.3d at 1289. The duty to inquire into this issue rests not only on defense counsel, but also upon the court itself in equal measure, as will be explained below.

In this matter, the district court abused its discretion by failing to order a hearing to determine Mr. Basham's competency after (1) the district court was made aware of the defendant's lifelong mental health issues; (2) the court observed his courtroom demeanor, where he simply could not focus and would fall asleep because of his medication during afternoon proceedings; (3) the district court observed the defendant getting into a scuffle with courtroom officers over "dip," which the court had "prescribed" in order to calm the defendant down at the defendant's request;[1] (4) the district court observed, and was made aware of repeatedly by the defendant's lawyers, that the defendant's inability to focus on the proceedings was distracting his attorneys from their duties; and (5) the defendant attempted to take his own life. These conditions created a situation where any reasonable jurist would have inquired into the defendant's competency, and the district court's failure to do so below consequently was an abuse of discretion.

Under the federal statute that governs this issue, the district court had an obligation – independent of any motion by defense counsel or the government – to order such a hearing. The statute says:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, *or shall order such a hearing on its own motion*, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a) (emphasis added). The text could not be clearer. If there is the relevant "reasonable cause," then the court *shall*: (a) grant the defendant's motion for a competency

---

[1] The district court admitted that, in attempting to deal with the defendant's courtroom demeanor, it was playing the role of an "armchair doctor." [cite].

**JA 3619**

hearing; (b) grant the government's motion for a competency hearing; or (c) grant a competency hearing on its own motion. *Id.*[2] The statute thus imposes an independent obligation upon district courts to inquire, by means of a hearing, into the competency of the defendant when such "reasonable cause" arises. *Mason*, 52 F.3d at 1289 ("The district court must *sua sponte* order a competency hearing if reasonable cause is demonstrated.") (citations omitted).

The statutory obligation imposed upon district courts by § 4241 is a codification of the duty imposed on lower courts by the Supreme Court. Two bedrock Supreme Court cases demonstrate the courts' obligation to enforce this due process principle: *Pate v. Robinson*, 383 U.S. 375, and *Drope v. Missouri*, 420 U.S. 162. In *Pate*, the Court held that a state court's failure to observe procedures adequate to protect a defendant's right to not be convicted while legally incompetent violated the Due Process Clause of the Fourteenth Amendment. Specifically, the defendant's counsel had claimed he was insane at the time of the crime at issue. The trial court denied such an inquiry was necessary and the state appellate courts affirmed, holding that the defendant had waived an inquiry into his competency.

The Supreme Court reversed, holding that the state court's failure to provide a defendant with a competency hearing was constitutional error when the defendant "had a history of erratic behavior" and mental illness, "suffered headaches during his childhood," and had varying degrees of outbursts through his life, including one instance where he "lost his mind and was pacing the floor saying something was after him." *Id.* at 378-79. The state had contended that, because the defendant had displayed "mental alertness and understanding . . . in his colloquies with the trial judge," *id.* at 385, the defendant was not entitled to a hearing. The Court rejected that contention, holding that such reasoning offered "no justification for ignoring" evidence of the defendant's past illnesses and irrational behavior. *Id.* at 386. The Court further held that while trial demeanor may be relevant, it cannot be dispositive on the issue of whether to hold a hearing; the court also must look to the medical evidence that it has available. *Id.*

---

[2] One court has suggested that, when the defendant does not raise the issue below, he must present before the court of appeals "facts sufficient to positively, unequivocally and clearly generate a real, substantial, and legitimate doubt as to his mental competence." *United States v. Teague*, 956 F.2d 1427, 1432 (7th Cir. 1992) (citing *United States v. Collins*, 949 F.2d 921, 927 (7th Cir. 1991)). We contend that the adoption of different standards is inconsistent with the statute's text, which says that whenever "reasonable cause" exists the district court *shall order* a competency hearing, regardless of whether a party moves for it. That burden is consistent with the Supreme Court cases on point, which require that "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 181 (1975). Of course, if at a particular point (as occurred in this case), defense counsel does not believe a competency hearing is necessary and relates that belief to the district court, that may weigh on the district court's analysis of whether the defendant is competent at the time his counsel makes that representation. However, if later events unfold that establish "reasonable cause," then the district court does not get a pass, because it "must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." *Drope*, 420 U.S. at 181.

In *Drope*, the Court stressed that the need to protect this due process right is not a one-time affair, but rather a duty that continues throughout trial. "Even when a defendant is competent at the commencement of his trial, *a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.*" *Drope*, 420 U.S. at 181 (emphasis added). The burden does not rest solely on counsel to raise the issue. Due process requires that courts, both federal and state, remain alert to the danger of a defendant's becoming incompetent during the trial. This is consistent with the text adopted by Congress in § 4241(a), which places an obligation on district courts to hold a competency hearing on its own motion if there is "reasonable cause" to believe the defendant is incompetent.

As noted above, the test for whether a defendant is competent to stand trial "seeks to ascertain whether a criminal defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Drope*, 420 U.S. at 172. The *Drope* Court also explained three factors relevant to that inquiry. First, "information concerning [a defendant's] suicide attempt" during trial, along with other evidence, "created a sufficient doubt of his competence to stand trial to require further inquiry on the question." *Id.* at 180. Second, "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient." *Id.* at 180. That circumstance is essentially a restatement of the Court's holding in *Pate*, *i.e.*, that both courtroom conduct and the defendant's history are pertinent factual sources. And third, defense counsel's opinion on whether his client is competent at a particular point in time is relevant to the district court's own determination, because counsel is, in theory, closer to his client and has a good vantage point on that issue. *Id.* at 176-77.[3]

The rub of the Court's pronouncements in *Drope* combined with § 4241(a) means that whenever a consideration of the listed factors – attempts to harm oneself (suicide), mental health history, demeanor at trial, other irrational behavior, and counsel's opinion – creates "reasonable cause" to believe that the defendant is incompetent, the district court must hold a hearing to determine the defendant's competency. This was the Court's holding in *Pate* and *Drope*, where the Court held that the Due Process Clause of the Fourteenth Amendment mandated that state courts hold competency hearings when such conditions are present, despite the government's argument in *Pate* that the defendant had waived the issue.[4] Nevertheless, the district court's

---

[3] Counsel's opinion about whether his client is competent at a particular point in time is most relevant to whether the defendant is competent at that point in time. If later events develop, where, for example, the defendant has outbursts, attempts suicide, or is obviously unable to assist in his own defense, and counsel does not then voice a new opinion, his earlier opinion is of limited relevance. The district court's obligation under *Pate* and *Drope* is to assess whether there is reasonable cause to believe the defendant is incompetent using all evidence before the court.

[4] According to the Court, "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently waive his right to have the court determine his capacity to stand trial." *Pate*, 383 U.S. at 384.

failure to order a competency hearing is reviewed for abuse of discretion, with the Court of Appeals determining whether the district court's failure to act was arbitrary. *Mason*, 52 F.3d at 1289-90.[5]

---

[5] Reviewing a district court's failure to follow its own statutory obligation under § 4241(a) for an abuse of discretion seems an odd sort of review. There is no specific decision of the district court to review. There is instead only the entire trial record, the evidence presented to the court on various motions, and the evidence presented during the trial itself. Read in light of the statute, though, the review is not odd: if, at any point in the proceedings, the relevant "reasonable cause" exists, the district court's statutory obligation kicks in. 18 U.S.C. § 4241(a). The question on appeal therefore must be there a point during the trial where it would have been an abuse of discretion not to order a competency hearing.

# Reply Exhibit 7

JA 3623

Westlaw.    NewsRoom

2/11/04 THESTATE B1    Page 1

2/11/04 Columbia State (SC) B1

2004 WLNR 19299358
Loaded Date: 02/21/2006

Columbia State (SC)

Copyright 2004 The State
February 11, 2004

Section: METRO/REGION

## SWERLING TELLS OF BEING TERRORIZED

CLIF LeBLANC, Staff Writer

Lawyer Jack Swerling testified Tuesday that he lay bound and helpless on his den floor and could feel the masked gunman's breath against him.

With Swerling's wife and daughter also tied up nearby, Swerling said the frustrated intruder knelt beside him.

"He put the gun in the nape of my neck. He said, 'I'll give you one more chance. Where's the money, or I'll kill you,'" Swerling said.

The family did not keep cash in their Spring Valley home, Swerling said. "I didn't have what he wanted.

"Frankly, I felt that at any time I was going to get a bullet, or my daughter or my wife," Swerling said. "I was scared for myself and my family."

Swerling, 57, was the first witness in the home invasion trial of Jimmy Causey, a 33-year-old former client. The trial is likely to last a couple more days.

It was the first time in the Columbia lawyer's storied 30-year legal career that he testified as a crime victim.

In a hushed monotone - in contrast to his usually booming courtroom voice - Swerling testified for 21/4 hours about the night of June 27, 2002, when two men "terrorized" his family.

During Swerling's testimony, chief prosecutor Barney Giese lay face down on the courtroom floor in a re-enactment of the crime, as Swerling narrated the events step-by-step.

Several jurors on the eight-woman, four-man jury stood to watch.

Erika Swerling, 56, later testified that despite the fact that the intruder was wearing a stocking mask and she got a quick

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

look, she could identify Causey as the person she saw in her den.

She said she had the best view of the first of two intruders.

"Please don't kill my husband. Please don't hurt my daughter," a panicked Erika Swerling said as the other intruder ransacked the house. "I said it over and over again."

She admitted she did not describe facial features when she first talked to Richland County deputies. She also said officers never showed her a photo lineup of suspects.

Her first glimpse of Causey's face, she said, was in a small photograph published in Sunday's State newspaper with an article about the upcoming trial.

But as soon as Causey walked into the courtroom Monday afternoon for jury selection, Erika Swerling said, she knew he was the man with a black gun and mask from that summer night.

The county courthouse jury did not hear her testimony Tuesday.

But Judge James Williams overruled the defense team's protest that her memory is almost two years old and she never before said she could detect facial features. She is scheduled to repeat her testimony today for the jury.

Jack Swerling gave a detailed physical description that is consistent with Causey, but the lawyer said he couldn't be more specific about the face other than to say it was distinctly oval.

Causey's demeanor during the trial has been upbeat. He regularly watches the Swerlings, the media and the public. Causey takes notes and talks readily with his three attorneys.

His co-defendant, Charles Dwayne Wilson, 22, testified against Causey Tuesday.

Wilson said he didn't know Swerling, whose high-profile legal practice has made him a public figure.

Causey said he felt that Swerling had mishandled an earlier case, Wilson said. "He didn't feel he had gotten a fair trial," Wilson testified.

Wilson and Causey had been using cocaine that day and needed money for more, the co-defendant testified.

Wilson said they bought pantyhose from Wal-Mart, and he stole blue latex gloves from a nearby hospital during a visit to Causey's ailing girlfriend hours before the home invasion.

They parked Causey's pickup near woods several hundred yards from the Swerling home, pulled on the masks and gloves, and walked to a screened porch at the back of the home, arriving just before 10 p.m., testimony said.

"I taped the Swerlings up," Wilson said. "I taped their hands and feet."

Causey instructed him to look for a safe and take nothing but cash, said Wilson, who was in an inmate uniform.

Prosecutor David Pascoe directed Wilson through his testimony and his plea agreement.

Prosecutors have dropped some charges in both the Swerling home invasion and a bank robbery that occurred about two months after it, Pascoe said.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

JA 3625

But Wilson confessed before a plea agreement was reached, he is serving a 10-year sentence on the bank robbery, and prosecutors have agreed only to recommend no more than 10 years in the Swerling case, Pascoe said.

Lead public defender Sam Mokeba called the agreement a "sweet deal" for Wilson.

Under cross-examination, Mokeba questioned Wilson about inconsistencies in his statements to police, including some about his role in the home invasion.

"You're walking away from a life sentence," Mokeba told Wilson.

"Possibly, yes sir," Wilson answered.

Reach LeBlanc at (803) 771-8664 or cleblanc@thestate.com

---- INDEX REFERENCES ---

COMPANY: WAL MART STORES INC

Language: EN

OTHER INDEXING: (COLUMBIA; ERIKA SWERLING; JACK SWERLING; LAWYER JACK SWERLING; SWERLING; SWERLINGS; WAL MART) (Causey; Charles Dwayne Wilson; David Pascoe; Frankly; James Williams; Jimmy Causey; Lead; Mokeba; Pascoe; Sam Mokeba; SWERLING; Wilson)

KEYWORDS: CRIME TRIAL

EDITION: FINAL

Word Count: 944

2/11/04 THESTATE B1
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

JA 3626

# Reply Exhibit 8

JA 3627

Westlaw.

5/15/03 THESTATE B1

5/15/03 Columbia State (SC) B1

2003 WLNR 14710420
Loaded Date: 02/21/2006

Columbia State (SC)

Copyright 2003 The State
May 15, 2003

Section: METRO/REGION

2 CHARGED IN BREAK-IN AT AREA LAWYER'S HOME

CLIF LeBLANC Staff Writer

It's a crime chock-full of irony.

Consider that the victim, Jack Swerling, is one of the state's best-known defense lawyers, who's feeling crime a whole lot more personally than a courtroom affords.

Consider that one of the accused, Jimmy Causey, was among the hundreds of clients Swerling has defended. And Swerling negotiated a lighter sentence for Causey in 1991.

This time, prosecutors are trying to put Causey, 32, in prison for the rest of his life.

The rest of Swerling's life - and the lives of his wife, Erika, and daughter, Stephanie, 25 - won't be nearly as carefree as before.

The defense lawyer has also discovered a different kind of appreciation for what cops do.

On Wednesday, Richland County detectives charged Causey and Charles Wilson, 21, each with five offenses in the June 28 home invasion of the Swerling household in upscale Spring Valley.

Detectives and Swerling say the two staked out the sprawling house on a lake. That summer night they walked in through an unlocked back porch door wearing stocking masks and gloves. One was carrying a gun.

They ordered everyone onto the floor, bound them with duct tape and ransacked the home.

They wanted money, Sheriff Leon Lott said. Causey figured Swerling, a well-to-do lawyer, kept plenty of cash in the house. Swerling didn't. The men escaped with only a Palm Pilot and a little bit of money.

Detectives had suspected Causey since September when he was linked to a holdup of an NBSC bank branch near the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

entrance of Spring Valley, Lott said.

A woman also called Swerling to report that someone had told her he robbed Swerling, the lawyer said. Swerling directed her to deputies.

But the real break came when Wilson decided to cooperate, Lott and Swerling said.

Swerling recognized Causey from a burglary case he handled during the years Swerling was a law partner with Dick Harpootlian, who later was elected chief prosecutor for Richland and Kershaw counties.

Swerling worked out a deal for Causey in which he would be treated as a nonviolent offender, which allowed him to be eligible for parole after 33/4 years instead of waiting five years.

But the laws are different now. If convicted of the first-degree burglary and armed robbery charges in the Swerling home invasion, Causey will automatically be sentenced to life without parole under the "two-strike" law, Richland County prosecutor David Pascoe said.

Swerling said he and his family are relieved by the arrests.

But the Swerlings don't live the same way anymore.

The lawyer who once sat at defense tables next to the most reviled killers in the state and the Midlands now carries a concealed gun.

The doors are locked, and no one goes outside alone.

"I had never felt vulnerable in my life before," Swerling said. "Now I have that sense that whenever I get out of the car, someone could be there. When I leave the house, someone could be there.

"That's not a good way to live."

---- INDEX REFERENCES ---

NEWS SUBJECT: (Social Issues (1SO05); Property Crime (1PR85); Crime (1CR87))

Language: EN

OTHER INDEXING: (NBSC) (Causey; Charles Wilson; David Pascoe; Dick Harpootlian; Erika; Jack Swerling; Jimmy Causey; Leon Lott; Lott; Spring Valley; Stephanie; Swerling; Swerlings; Wilson)

KEYWORDS: CRIME ROBBERY VICTIM ARREST

EDITION: FINAL

Word Count: 578

5/15/03 THESTATE B1
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**JA 3629**

# Reply Exhibit 9

JA 3630

OUT OF COURT HOURLY WORKSHEET - JACK B. SWERLING - JANUARY 2004          CASE NUMBER - 4:02-992

| Date | Brief Description of Services | Interviews and Conf w/Client (b) | Witness Interviews (c) | Consult w/ Investigators & Experts (d) | Obtaining & Rev the Court Record (e) | Obtaining & Rev Documents & Evidence (f) | Consulting w/Expert Counsel (g) | Legal Research & Writing (h) | Travel (i) | Other (j) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1-18-04 | Travel to Indiana 7:15 am-6:00 pm (Reading) | | | | | | | | 10.8 | |
| 1-18-04 | Travel to motel 10:15 -12:00 (reading) | | | | | | | | 1.8 | |
| 1-19-04 | Travel to Chicago to Columbia 6:30 am-3:00 pm | | | | | | | | | 8.5 |
| 1-19-04 | Review motions, call to Lesa Watson, call to John Blume | | | | 1.5 | | | | | |
| 1-20-04 | Prepare for hearing-review motions; conf. w/ Greg Harris; P/C w/ John Blume and Johnny Gasser re: Jury - 7:15-8:30 am | | | | 1.2 | | | | | |
| 1-20-04 | P/C w/ Carolyn Graham in Illinois re: motions w/ Traci for books | | | | | .8 | | | | |
| 1-20-04 | Conf. w/ Carlisle McNair and Carolyn Graham | | | .5 | | | | | | |
| 1-20-04 | P/C w/ Lisa Kimbrough and Paige Tarr | | | .3 | | | | | | |
| | Page Total | -0- | -0- | .8 | 2.7 | .8 | -0- | -0- | 12.6 | 8.5 |
| | Grand Total | | | | | | | | | |

Page 9 of 14

JA 3631



OUT OF COURT HOURLY WORKSHEET - JACK B. SWERLING - FEBRUARY 2004          CASE NUMBER - 4:02-992

| Date | Brief Description of Services | Interviews and Conf w/Client (b) | Witness Interviews (c) | Consult w/ Investigators & Experts (d) | Obtaining & Rev the Court Record (e) | Obtaining & Rev Documents & Evidence (f) | Consulting w/Expert Counsel (g) | Legal Research & Writing (h) | Travel (i) | Other (j) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2-10-04 | Conf. w/ Paige Tarr; Greg Harris; Tora Brawley; P/C w/ Dr. Capehart 8:30-9:15 | | | .7 | | | | | | |
| 2-10-04 | Review emails and memos - 5:45-7:00 | | | | | 1.2 | | | | |
| 2-10-04 | Review Hopkins Jail records 9:30-11:15 | | | | | 1.7 | | | | |
| 2-11-04 | Review Trover Hospital records 6:15-7:45 am | | | | | 1.5 | | | | |
| 2-2-04 to 2-5-04 | Jacobs trial | | | | | | | | | |
| 2-9-04- to 2-12-04 | Swerling trial | | | | | | | | | |
| 2-13-04 | Work on response to Judge Anderson | | | | | 1.0 | | | | |
| 2-13-04 | Conf. w/ G. Harris re: Basham family | | | | | .5 | | | | |
| 2-14-04 | Meeting w/ Paige Tarr and Kathy and Charlotte Basham | | 2.3 | | | | | | | |
| 2-14-04 | Emails; memos | | | | | .8 | | | | |
| 2-14-04 | Review DJJ records 2:00-4:45pm | | | | | 2.8 | | | | |
| 2-15-04 | Review Cardinal Health records 12:15-2:30 p.m. | | | | | 2.2 | | | | |
| | Page Total | -0- | 2.3 | .7 | -0- | 11.7 | -0- | -0- | -0- | -0- |
| | Grand Total | | | | | | | | | |

Page 2 of 7

**JA 3632**

# Reply Exhibit 10

JA 3633

△ NOW SAYS STATEMENTS ARE
STATEMENT NOT VOLUNTARY

① NO MEDICINE

② CIGARETTES - HAVE TO SIGN

③ SNACKS - " " " "

④ IF YOU WANT TO LIVE - " " "

⑤ HELP HIM IF HE TOLD EVERYTHING
KNEW (HAD) WAS LEADER

⑥ HE WAS COERCED.

⑦ ADMITS HE KNEW RIGHT TO LAWYER

⑧ TOLD HIM IF YOU TOLD THE TRUTH
WOULD NOT BE HELD AGAINST HIM,
ONLY (HAD) - NO CHARGES

JA 3634

# Reply Exhibit 11

JA 3635

Westlaw.

NewsRoom

2/10/04 THESTATE B3

Page 1

2/10/04 Columbia State (SC) B3

2004 WLNR 19298637
Loaded Date: 02/21/2006

Columbia State (SC)

Copyright 2004 The State
February 10, 2004

Section: METRO/REGION

METRO NEWS BRIEFS

From Staff and Wire Reports

Publicity hinders Swerling jury choices

Jury selection was delayed a day because of publicity about the June 2002 home invasion of a prominent Columbia attorney.

Half of the 49 Richland County jurors in the trial of Jimmy Causey said Monday they had read or heard about the robbery at the home of lawyer Jack Swerling.

Judge Jimmy Williams said that if any of those jurors are randomly drawn for consideration, they will be questioned about their objectivity.

If an unbiased jury cannot be selected today, Williams said he would consider moving the trial.

Causey, 33, is charged with five felonies and, if convicted, faces up to life without parole.

Toal hires lobbyist to seek court revenue

GREENVILLE - South Carolina Supreme Court Chief Justice Jean Toal has hired a lobbyist group to influence legislators, hoping to increase revenue for the judicial branch.

Toal said she would pay political consulting firm J. Warren Tompkins Inc. $30,000 this year, The Greenville News reported.

Toal said she would use money from bar-exam fees to pay for it.

Thirteenth Circuit Solicitor Bob Ariail hired Tompkins' firm last year to help push through legislation that created a $25 surcharge on traffic tickets.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**JA 3636**

2/10/04 THESTATE B3                                                                                      Page 2

Toal said that she was grateful for the 3.7 percent her office gets from the surcharge but it was not enough.

S.C. man confirmed to have had West Nile

A sixth case of West Nile virus in humans has been confirmed, the state Department of Health and Environmental Control reported Monday.

The case was contracted by a man from Jasper County. He is more than 50 years old and was hospitalized in November.

He experienced symptoms of fever, rash and muscle weakness.

During 2003, West Nile virus was found in 282 birds, 51 equines, one alpaca and six humans in South Carolina.

Man sentenced to life in shooting death

A man was sentenced to life without parole Monday in connection with the slaying of a Lexington County man who was shot to death in front of his family, said 11th Circuit senior prosecutor Tav Swarat.

Whelthy McKune, 20, of Columbia, pleaded guilty last month to first-degree burglary and criminal conspiracy in the death of Paul Edward Keith, 30, Swarat said. McKune was the driver of the getaway car when Keith was shot on Nov. 13, 2002, at his Kingsberry Terrace home near West Columbia.

Swarat said Keith was shot in retaliation for turning in his cousin, Nykrenda L. Keith, for selling marijuana at their grandmother's funeral.

300 attend District 5 building plan meeting

More than 300 people turned out at Leaphart Elementary School Monday night to listen to or voice opinions about a proposed $91 million school building plan before Lexington-Richland District 5.

The majority of the 40 or so people who spoke urged District 5 trustees to move quickly in deciding to build a new elementary school in the Dutch Fork area as well as additions to several existing schools.

One option before the school board is borrowing between $12 million and $15 million immediately so construction could begin this year. Trustees made no decision Monday night.

Some who testified, however, said no new schools should be built without putting construction plans before voters for their approval.

Woman admits taking more than $200,000

A Camden woman pleaded guilty Monday to embezzling more than $200,000 from the Columbia law firm where she worked as the payroll director, according to the U.S. attorney's office.

Linda B. Hagins, 48, defrauded the firm of Nelson, Mullins, Riley and Scarborough of $230,788.02 between October 1999 and August 2003, officials said.

Hagins, who faces a $250,000 fine and/or five years in prison, will be sentenced later.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**JA 3637**

2/10/04 THESTATE B3                                                                                    Page 3

---- INDEX REFERENCES ---

COMPANY: METRO NEWS

NEWS SUBJECT: (Criminal Law (1CR79); Social Issues (1SO05); Legal (1LE33); Legislation (1LE97); Judicial (1JU36); Property Crime (1PR85); Crime (1CR87); Government (1GO80))

REGION: (Alabama (1AL90); North America (1NO39); USA (1US73); Americas (1AM92); South Carolina (1SO63))

Language: EN

OTHER INDEXING: (CAMDEN; CAROLINA SUPREME COURT; DUTCH FORK; J WARREN TOMPKINS INC; KINGSBERRY TERRACE; LEAPHART ELEMENTARY SCHOOL; METRO NEWS; STATE DEPARTMENT OF HEALTH; TOMPKINS) (Bob Ariail; Causey; During 2003; Hagins; Half; Jack Swerling; Jimmy Causey; Jimmy Williams; Keith; Linda B. Hagins; McKune; Nykrenda L. Keith; Paul Edward Keith; Swarat; Tav Swarat; Thirteenth Circuit Solicitor; Toal; Whelthy McKune; Williams)

KEYWORDS: CRIME

EDITION: FINAL

Word Count: 726

2/10/04 THESTATE B3
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

JA 3638

# Reply Exhibit 12

JA 3639

Westlaw.                                                                          NewsRoom

2/13/04 THESTATE B1                                                                       Page 1

2/13/04 Columbia State (SC) B1

2004 WLNR 19301214
Loaded Date: 02/21/2006

Columbia State (SC)

Copyright 2004 The State
February 13, 2004

Section: METRO/REGION

CAUSEY IS SENTENCED TO LIFE WITHOUT PAROLE

CLIF LeBLANC Staff Writer

A 33-year-old man whom prosecutors called a career criminal but whose family described as a man adrift was sentenced Thursday to life in prison for the home invasion of a prominent Columbia attorney.

A Richland County jury on Thursday took 31 minutes to convict Jimmy Causey of five felonies in the June 27, 2002, drug-driven robbery and kidnapping of Jack Swerling, his wife, Erika, and their daughter Stephanie.

Judge James Williams sentenced Causey to five life terms without the possibility of parole. Williams called the case against him "about as powerful as I've ever seen." The sentences, required by law because of Causey's earlier convictions, are concurrent.

The four-day trial ended unusually and dramatically.

In a twist, Causey refused to stay in the courtroom to hear the verdict or be sentenced. He waited in a holding cell just outside Courtroom 2-A in the county courthouse.

That triggered a courtroom eruption from Swerling, a defense attorney for 30 years.

He called Causey a coward unwilling to face the consequences of his crime.

Shouting and pointing a finger, Swerling also berated the three public defenders who constituted Causey's team of lawyers.

He said the cross-examination of his 26-year-old daughter Wednesday was "disgraceful" and "gratuitous" because it implied Stephanie Swerling might have been involved by leaving doors unlocked, not being bound as tightly as her parents and other details of the crime, her father said.

"That defendant, Jimmy Causey, and his lawyers terrorized my family again," Swerling said loudly. As his anger grew,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**JA 3640**

he began shouting, "You ought to be embarrassed."

The judge stopped him.

Later, the public defenders said they were only doing their jobs.

Causey's family spoke through John Campbell, who told Williams he is Causey's stepgrandfather.

Causey was out of his mind when he committed the crime, Campbell said.

Elbert Causey, 75, said he was Jimmy Causey's grandfather.

In an interview, the elder Causey said his grandson lost his way after his father died when he fell from a tree in October 2001. The Causeys have had a tree-removal business, Elbert Causey said.

Reach LeBlanc at (803) 771-8664 or cleblanc@thestate.com.

---- INDEX REFERENCES ---

NEWS SUBJECT: (Legal (1LE33))

Language: EN

OTHER INDEXING: (CAUSEY) (Campbell; Causey; Causeys; Elbert Causey; Erika; Jack Swerling; James Williams; Jimmy Causey; John Campbell; Reach LeBlanc; Stephanie Swerling; Swerling; Williams)

KEYWORDS: CRIME COURT VERDICT SENTENCE

EDITION: FINAL

Word Count: 435

2/13/04 THESTATE B1
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

JA 3641

# Reply Exhibit 13

JA 3642

Subj:    **jackson v denno/mitigation**
Date:    2/19/2004 6:51:15 PM Eastern Standard Time
From:    Jacklaw
To:      fedtrials-l@Hofstra.edu
CC:      Jacklaw

**has anyone ever heard of this.?**
**a lawyer challenges the voluntariness of a statement  in a jackson v denno-**
**no allegation of coercion.the lawyer does not argue voluntariness before the**
**jury. does anyone think that the defense would be estopped from arguing**
**later in the trial that the defendant tried to help law enforcement in**
**mitigation ?**


**Jack B. Swerling**
**803-765-2626-o**
**803-730-9400-c**
**803-799-4059 -f**

# Reply Exhibit 14

JA 3644

Westlaw.                                                                              NewsRoom

2/25/04 Columbia State (SC) A14

2004 WLNR 19310805
Loaded Date: 02/21/2006

Columbia State (SC)

Copyright 2004 The State
February 25, 2004

Section: EDITORIAL

SWERLING WALKING IN VICTIMS' SHOES

Not that I wish bad things to happen to people, but it's quite humorous to read that Jack Swerling, the trial lawyer who has spent the past 30 years defending criminals, is now having to where the shoes of a victim.

One of his former clients is on trial for breaking into his house, holding his family at gunpoint and ransacking his Spring Valley home. Why didn't Mr. Swerling defend Jimmy Causey, the accused, this time? Maybe it's because Mr. Swerling has a personal interest in this case and wants the guilty to actually be convicted instead of trying to get him off as he's done for 30 years. Mr. Swerling said, "I have a lot of anxiety about going through the trial." What about the anguish and anxiety all the victims and family members have suffered at the hands of his past criminal clients?

MICHAEL HILL

Gaston

---- INDEX REFERENCES ---

NEWS SUBJECT: (Legal (1LE33))

Language: EN

OTHER INDEXING: (Jack Swerling; Jimmy Causey; MICHAEL HILL; Spring Valley; Swerling; SWERLING WALKING)

EDITION: FINAL

Word Count: 163

2/25/04 THESTATE A14
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**JA 3645**

# Reply Exhibit 15

JA 3646

James R. Metts, Ed. D.

# LEXINGTON COUNTY SHERIFF'S DEPARTMENT

April 22, 2004

Scott N. Schools
Assistant U.S. Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201

RE:    Your Subpoena in U.S. v. Fulks and Basham; 4:02-992-17
       Underlying Reports – McNair Internal Affairs Report

Dear Mr. Schools,

Please find attached copies of three internal affairs reports, provided pursuant to your subpoena, concerning our former employee Carlisle McNair as provided to me by Insp. Joel Huggins of our Professional Standards Division. It is my understanding that by provision of these documents our obligation under the subpoena is satisfied and no appearance is necessary.

Should further questions arise, please do not hesitate to contact me directly at 803.3951.2404 at the Department. Should an urgent need arise after daytime business hours; please feel free to page me at 803.954.1711.

Best regards,

John W. Tate
General Counsel

Enclosures

cc:    Chief Tim James, LCSD
       file

B-00409

A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

JA 3647    A_42185



James R. Metts, Ed. D.

# LEXINGTON COUNTY SHERIFF'S DEPARTMENT

April 8, 2004

Scott N. Schools
Assistant U.S. Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201

RE:    Your Subpoena in U.S. v. Fulks and Basham; 4:02-992-17
       Underlying Report – McNair Discipline

Dear Mr. Schools,

        Please find attached a copy of the underlying report noted in the July 2, 2002
notice of discipline of Carlisle McNair, our former employee, pursuant to your subpoena.
It is my understanding that by provision of these documents our obligation under the
subpoena is satisfied.

        Should further questions arise, please do not hesitate to contact me directly at
803.3951.2404 at the Department.  Should an urgent need arise after daytime business
hours; please feel free to page me at 803.954.1711.

                                            Best regards,

                                            John W. Tate
                                            General Counsel

Enclosures

/JT



B-00422

A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

JA 3648

A_42198



James R. Metts, Ed. D.

# LEXINGTON COUNTY SHERIFF'S DEPARTMENT

April 6, 2004

Scott N. Schools
Assistant U.S. Attorney
1441 Main Street, Suite 500
Columbia, South Carolina  29201

RE:    Your Subpoena in U.S. v. Fulks and Basham; 4:02-992-17
       Personnel file of Carlisle McNair

Dear Mr. Schools,

        Please find attached a copy of the entire personnel file of Carlisle McNair, our former employee, pursuant to your subpoena served on us yesterday by Agent Fedyszen of the Columbia F.B.I. office.  Such are maintained by Lt. Alan Driggers of our Administrative Division.  It is my understanding that by provision of these documents our obligation under the subpoena and attached "Forthwith Order" is satisfied.

        Should further questions arise, please do not hesitate to contact me directly at 803.3951.2404 at the Department.  Should an urgent need arise after daytime business hours; please feel free to page me at 803.954.1711.

Best regards,

John W. Tate

Enclosures

/JT



B-00434

A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

JA 3649

A_42210

# Reply Exhibit 16

JA 3650

# Notice of displinary action

Date:    12/16/98

To:    Detective Markley

From:   Sgt. John Phillips

RE:    Notice of Suspension

---

This is official notice that you are being suspended from duty beginning Wednesday December 16, 1998 at 1630 hours until Monday December 21, 1998 at 1630 hours.

The above action is taken for an infraction of Departmental Policy 702, Handling of evidence. On or about October 20, 1998 evidence in your custody was left unattended and was improperly taken be another officer with the department. This violated the chain of custody and jeopardizes the prosecution of the individual arrested.

Sergeant John Phillips

My signature documents that I have been provided a copy of this written notice for my records.

B-00413

12/16/98                    Confidential                    1

**JA 3651**

A_42189



# Sheriff
James R. Metts, Ed. D.

## LEXINGTON COUNTY SHERIFF'S DEPARTMENT

TO: Sgt. Carlisle McNair

FROM: Lt. George Brothers

DATE: December 16, 1998

SUBJECT: Internal Investigation #98IA031

The conclusion of this investigation sustained that you removed a piece of evidence (tape) from Det. Markley's desk and broke the chain of custody. This evidence was played outside of the court for the defendant's relatives. The tape was later returned to Det. Markley.

As you are aware there are procedures for the release of evidence to defendants or their attorney. These procedures have been discussed and are written into criminal procedure manuals. Chief McCarty discussed the problems that can be associated with not following these procedures and the possible outcome in a meeting with all investigators earlier this year.

As a supervisor, you must uphold these procedures and set an example for your subordinates. This type of action can not be tolerated. As a result of your actions, you will be suspended for three days without pay. The three days will begin at 1630 on December 22, 1998 and end on December 25, 1998.

Sandie Isbill has been involved in several incidents that you have investigated and has been an informant of yours. Other investigators will handle any further incidents that involve Ms. Isbill. You should not have any further contact with Ms. Isbill and should notify me immediately of any attempts by her to contact you. Any information provided by her will be given to another investigator for follow up investigation

Cc:    Captain Harris
       Personnel File


I have received a copy of this letter for my personal file.

Signature: _____    Date: 12/16/98

B-00412

P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

JA 3652

A_42188

# Reply Exhibit 17

JA 3653



**Sheriff**
James R. Metts, Ed. D.

## LEXINGTON COUNTY SHERIFF'S DEPARTMENT

### INTERNAL AFFAIRS INVESTIGATIVE REPORT

Report # 98IA031
Date Initiated: 2 Nov 98
Investigator: Insp. Ned Banks

Complainant: A. Lewis McCarty
             Chief Deputy
Address:     Lexington County Sheriff's Department

### SYNOPSIS

On 12 October 1998, One Sandie Perry Isbill allegedly made a threatening phone call to an Ami Abbott. A report was made to LCSD (**Exhibit A**) was duly forwarded to Det. Jim Markley for action. On 20 October 1998 SGT Carlisle McNair informed Markley that he would have Isbill turn herself in to LCSD for arrest. Markley remarked that he had a tape of the threatening call so McNair stated that he wanted to hear the tape to see if he recognized Isbill's voice. In fact, McNair said that it was not Isbill on the tape and that Markley had no case. Later, Markley noticed that the tape of Isbill's call and his recorder were gone from his desk. Markley was told that McNair had the tape in Bond Court. In that the tape was removed from Markley's desk without his consent or knowledge, the chain of custody was broken and Markley complained to his superiors. LT George Brothers (**Exhibit C**) gave IO the file and told him that Chief McCarty had told him to initiate an internal investigation.

### INVESTIGATIVE FINDINGS

Markely states (**Exhibit B**) that McNair asked him if he could hear the voice on the tape. McNair stated (**Exhibit D**) that he had seen the initial report and, noting that it was for harassing phone calls, knew that Markley would have it. McNair stated that the voice did not sound like Isbill.

McNair states that Isbill is an informer who he has used from time to time. He states that he has endeavored to help her with her drug problem and has transported her to Richland Springs on two occasions. He states that he suspected that the complaint was a "Railroad Job" so wanted to keep Isbill out of harm's way if the voice was indeed, someone's other than her's. At a later date (the day Isbill got out of jail) McNair looked for Markley so that he could let some of Isbill's relatives hear the tape. Unable to locate Markley, and seeing the tape on Markley's desk, McNair put the tape and the recorder in his pocket and went to the Traffic Court. After conducting his business, he found Isbill's relatives outside Court and played the tape for them.

SGT McNair admits that he took the tape and broke the chain of custody. He states that he later completed a Chain of Custody form on the tape.

## CONFIDENTIAL
### INTERNAL AFFAIRS REPORT

B-00410

P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

JA 3654
A_42186

## CONCLUSION

The complaint that SGT Carlisle McNair removed a piece of evidence (the tape) from Det. Markley's desk, without permission and breaking the chain of custody, is SUSTAINED.

Ned Banks
Inspector, PSD
19 November 1998

Concur ☑    Non-Concur ☐

Mel Seboe
COL, Operations Bureau
Commanding

CONFIDENTIAL
INTERNAL AFFAIRS REPORT

B-00411

JA 3655    A_42187

# Reply Exhibit 18

JA 3656



# Sheriff
James R. Metts, Ed. D.

## LEXINGTON COUNTY SHERIFF'S DEPARTMENT

### INTERNAL AFFAIRS INVESTIGATIVE REPORT

Report # 01IA079
Date Initiated: Nov. 30, 2001
Investigator: Insp. Joel Huggins

Complainant: John Tate
Address:    LCSD

### SYNOPSIS

Major John Tate stated that he received a telephone call from Captain Carlisle McNair asking whether or not a search warrant was needed to enter a residence where a murder/suicide occurred. The crime scene had been established and McNair was inquiring as to whether a search warrant was needed to search the residence. Tate informed McNair a search warrant was needed. Tate received information that McNair entered the residence and began the search before obtaining the warrant. As a result, this investigation was begun.

### INVESTIGATIVE FINDINGS

Tate stated that Sergeant Nathaniel Collins told him McNair and Sergeant PC Faglie entered the residence in question before a search warrant was obtained. Tate also relayed additional information he obtained from Collins. IO will obtain that information directly from Collins. According to Tate's written statement (EXHIBIT A), he told McNair to obtain a search warrant before entering the crime scene.

Collins stated (EXHIBIT B) that he was dispatched to 1545 Old Charleston Rd. in reference to case number 0183697. After arriving, a discussion took place as to whether a search warrant was necessary. McNair called Tate and then it was decided that a search warrant was needed. He remembers McNair making the statement that as far as he (McNair) was concerned, the search warrant was already signed. Sergeant PC Faglie instructed Detective Oscar McIntosh to get the warrant signed by Judge Whittle. Coroner Todd Caughman arrived and they spoke for a couple of minutes. They started looking around and noticed that some lights were on inside the residence. When they got to the front door, Faglie and McNair were already inside. McNair instructed ID Investigator Glenn Oxendine to start processing the scene and they would fudge the times later. McIntosh returned prior to the evidence being collected. Collins stated verbally that McNair's order for Oxendine to start processing the scene was before McIntosh had time to get a search warrant signed.

IO called Caughman. He did not hear any of the comments allegedly made by McNair, but knows that everyone was inside the residence before the search warrant was at the scene. He is unsure when and if anyone was notified by radio that the search warrant was signed.

B-00417



A Nationally Accredited Law Enforcement Agency
P.O. Box 639/Lexington, South Carolina 29071 (803) 359-8230, Fax # (803) 359-1162

JA 3657    A_42193

Oxendine stated (EXHIBIT C) that he arrived at the scene and was briefed by Sgt. Jim Crawford. During the evening, McNair made some telephone calls and it was determined that a search warrant would be needed before processing the scene. He heard McNair make the statement that as far as he (McNair) was concerned, the search warrant had already been signed. He believes this statement was made before McIntosh left to get the search warrant. He was instructed by McNair to start processing the scene before McIntosh's return. Sometime while inside the residence and while processing the scene, he remembers a radio transmission that the search warrant had been signed. As he was finishing processing the scene, McNair told him that he would get with Oxendine on the times for the search warrant. McNair never mentioned anything about the times after that. On the return (EXHIBIT L), Oxendine put the time of 0415 hours. He stated that he was not instructed to use that time. When asked where that time came from, he stated that that was either the time they started processing the scene, or that was the time they were notified that the search warrant was signed.

IO spoke to Detective Neil Rainwater. He was called to the scene for Emergency Protective Custody of the suspect and victim's children. He arrived at the scene and was told that the children were across the street at the Abel's residence. He went to talk to the children. When he returned, he asked McNair if he could enter the residence to obtain some clothing for the children because he was taking them to meet with DSS. McNair told him that he could enter the residence. When he entered, so did McNair, Faglie, and others (he believes ID). He was in the residence for several minutes because it took him a while to locate the clothes and shoes. He left and went back to where the children were located. Victim Assistance Officer Andrea Arnold had arrived and was with the children. He had Mr. Abel write a statement. He and Arnold then loaded the children and there luggage. McNair came over and spoke to the children for couple of minutes. He and Arnold then left the residence to take the children to the Children's Center. He prepared a written statement (EXHIBIT D).

Arnold stated (EXHIBIT E) that she arrived at the Abel's residence approximately 0415 hours. The Call Card (EXHIBIT F) shows that she arrived at 0418 hours. When she arrived, she met Mr. Abel and the two children. She inquired as to the whereabouts of the Detective. Mr. Abel told her that the Detective went to the incident location to retrieve some clothing for the children. She remained with the children until Rainwater returned. Rainwater returned. McNair, along with her and Rainwater, loaded the children and clothes in her car. Her and Rainwater left at approximately 0500 hours (Call Card shows 0501 hours) with the children in route to the Children's Center.

IO spoke to McIntosh. He stated that he arrived at the incident location and was given the crime scene log by a road deputy. There was some discussion as to whether a search warrant was needed and McNair called Tate to ascertain his opinion. It was decided that a search warrant was needed and Faglie instructed him to go to Judge Whittle's residence to get one. Rainwater arrived from across the street. He left the incident location (Call Card shows 0420 hours) and went to Whittle's residence. After the search warrant was signed, he called on channel 2 to inform those at the incident location that he was on the way with a signed search warrant. According to the CAD, this radio transmission was made at 0445 hours (an audio recording was made of this transmission (EXHIBIT G). When he returned, Rainwater was not at the incident location and the others were in the house at the incident location. He provided a written statement (EXHIBIT H).

B-00418

JA 3658

A_42194

IO spoke to Faglie. He stated (EXHIBIT I) that he responded to the incident location. Shortly after, there was a conversation about the necessity of a search warrant. He knew McNair made a telephone call inquiring whether the search warrant needed. He thought the call was made to Assistant Solicitor Dayton Riddle. It was determined that a search warrant was needed. He sent McIntosh to Whittle's residence to obtain the search warrant. He and others walked around the yard for a while and then Rainwater arrived and asked if he could enter the incident location to get some clothes for the children. He stated that that would be OK and went in with him. He is unsure who went in at that time, but McNair, Collins, Oxendine, and Caughman ended up inside. They spent time looking at the body and discussing possible scenarios for the sequence of events during the shooting, bullet trajectory, etc. At some point, Oxendine asked if he could start photographing the scene and McNair decided he could start. He concurred with McNair. He remembers McNair making a comment about the time of the search warrant, but does not remember what was exactly said or why the subject came up. As far as he knows, nothing was searched or disturbed other than looking in plain view until the search warrant was signed.

IO spoke to McNair on December 10, 2001 with Sgt. Rusty Manley present. He stated verbally that he did not enter the residence until McIntosh arrived at the incident location with the search warrant. He stated that he has been doing "this" for a long time and he knew a search warrant was needed. When asked if he knew a search warrant was needed, why call Tate, and , he stated to "CYA". After IO explained that all the others had admitted to being in the residence before McIntosh arrived with the search warrant, he admitted to going inside the residence, but only after he was notified by radio that the search warrant had been signed. He stated that he went in when he allowed Rainwater to enter to obtain clothes for the children. He was adamant about only entering the residence one time. He did state that he entered an outer building before the search warrant was signed. On December 12, IO asked McNair if he had prepared a written statement. He asked what needed to be in the statement. IO explained to write what he told IO two days before. IO explained that IO understood McNair to state that he entered the residence before McIntosh returned with the search warrant. McNair denied making those statements and again stated that he did not enter the residence until McIntosh returned with the warrant. IO asked him about entering with Rainwater and he stated that he did, but McIntosh had returned with the warrant. IO told McNair to put that in writing. McNair gave IO a written statement (EXHIBIT J). He stated that he responded to the incident location. After arriving, they questioned whether a search warrant was needed. He contacted Tate and was told to be on the safe side, get a search warrant. Faglie instructed McIntosh to contact Whittle for the search warrant. While waiting for the search warrant, he walked around and looked in a garage on the property. McIntosh advised by radio that the warrant had been signed. He entered the residence at this point. He denies making the statements that he would adjust the times on the search warrant, and that as far as he was concerned, the search warrant was already signed. After he submitted his written statement, IO asked McNair if he went to the Abel's residence to see the children. He stated that he did. IO then asked what he did next and he stated he went to the incident location and entered the residence.

Manley gave a written statement (EXHIBIT K) that McNair initially advised that he only entered the residence on one occasion and that was after McIntosh returned to the incident location with the search warrant. McNair then advised the he entered the residence after McIntosh advised him via radio that the search warrant was obtained. McNair also stated that he entered a storage shed that was located in the curtilage of the residence. McNair stated that he entered the residence along with Rainwater to locate clothing for the children of the residence.

B-00419

JA 3659

A_42195

## CONCLUSION

McNair admits to looking in a garage without the search warrant. He states that he entered the residence with Rainwater, but the search warrant had been signed. He also stated that he did not enter the residence until McIntosh returned with the warrant. According to Arnold, Rainwater was already at the incident location when she arrived at approximately 0415 hours. According to Rainwater, he went over to the incident location and immediately asked about retrieving the children's clothes. McNair gave him the OK and went in with him. This would have had to be around the 0415 hours because Rainwater left the children just before the arrival of Arnold. According to Oxendine, he put 0415 as the time on the search warrant. He stated that that time was either the time he started processing the scene, or the time the search warrant was signed. McIntosh called with the signed search warrant at 0445 hours, therefore, the time on the search warrant was the time the scene was processed. Again, the time matches the approximate time Rainwater would have arrived at the incident location asking to enter the residence, and the time Arnold arrived at the Abel's residence. Rainwater is unsure if McIntosh had even left when he went to retrieve the clothes, however, McIntosh remembers Rainwater being there before he left to get the search warrant. McIntosh left to get the search warrant at 0420 hours. The times would suggest that everyone entered the residence around the time McIntosh left the get the search warrant.

As far as Collins' accusation that McNair stated they would go ahead and get started and fudge the times later, no one remembers that exact statement. However, Oxendine stated McNair said he would get with Oxendine later on the times and Faglie remembers McNair mentioning the times on the search warrant. McNair denies making any statement about the times on the search warrant. Collins' accusation that McNair stated that as far as he (McNair) was concerned the search warrant was already signed was backed up by Oxendine. McNair also denied making that statement.

McNair told IO that he only entered the residence one time. That was when he went in with Rainwater. He also states that he entered the residence after seeing the children when Rainwater and Arnold were leaving. He could not have only entered the residence one time if he went in with Rainwater and then after Rainwater left with the children.

The Supreme Court has ruled that a "murder scene" exception to the 4th Amendment warrant requirement exists. However, the exigent circumstances that existed when the road deputies responded failed to exist when McNair, Faglie, Rainwater, Collins, McIntosh, and Oxendine arrived. McNair was told by Tate to get a search warrant. He gave Rainwater permission to enter the residence before the search warrant was signed and he also entered. While inside, he instructed Oxendine to begin taking pictures. All this being done before the search warrant was signed.

McNair lied during this internal investigation, violated the 4th Amendment warrant requirement, and was insubordinate by not following Tate's instruction. Therefore, this complaint is **SUSTAINED**.

B-00420

JA 3660

A_42196

Joel B. Huggins
Inspector, PSD
December 13, 2001

Concur ☐        Non-Concur ☐

Mel Seboe
COL, Law Enforcement Services
Commanding

B-00421

JA 3661

A_42197

# Reply Exhibit 19

JA 3662

GENERAL COUNSEL

INVESTIGATIVE REPORT

Complainant: N/A (see below)                    Report #: 02IA032
Address: LCSD                                   Date Initiated: June 20, 2002

## SYNOPSIS

As the result of comments made during a training session, I began to investigate the alleged display of an obscene/improper video clip in the Headquarters Region. Two distinct allegations emerged. The first is that Capt. Carlisle McNair displayed an obscene video clip to other employees without a business necessity. The second is that McNair violated policy and instructions subsequent to the initiation of this investigation.

As outlined above, this investigation did not arise out of a "complaint" of specific activity by a deputy; hence, no complainant is listed. This investigation was undertaken based on remarks made during a training session and investigated by John W. Tate, General Counsel.

## BACKGROUND

On July 18th at 1700 hrs. of this year I instructed a regularly scheduled Sexual Harassment Policy and Procedure training class for non-sworn and other personnel of the Department who would not have otherwise attended either Jail Legal Update or annual Block Training. Present were eighteen department members to include the members of the administrative staff, Nicole Howland (C.D.V. attorney), and the Code Enforcement Officers.

During the training class members were encouraged to participate, ask questions, and share comments on the material presented. Howland explained, in general terms, that she believed that women did not feel that they could come forward and report incidents that may arise to policy violations and to do so would be to commit "professional and personal suicide". I explained the mandatory reporting procedures, addressed confidentiality concerns and discussion arose. During that discussion, Howland eluded to three incidents with some degree of factual specificity that had not been reported. One included the display of a computer video image (hereinafter "video") of a bald headed man inserting his head into a woman's vagina.

Given the specificity of the examples, I believed that there was underlying material that would need to be addressed. I made Chief James aware of my concerns that evening. On July 20th[1] Chief James directed that I look into the matter.

I arranged a meeting with Howland immediately. Upon her arrival at my office I explained to her that an official inquiry was being undertaken, that she was compelled to answer my questions, and she must do so truthfully. She, in turn, reiterated her

---

[1] I was out of town on the 19th.

B-00425                                        1

JA 3663

A_42201

comments from the class and stated that she understood she must answer my questions truthfully. I then explored each of the three incidents mentioned previously and a fourth that arose during discussion. This report deals with the computer video, above described, shown by Capt. McNair in his office. The other incidents are addressed separately in 02IA034, 02IA035 and the IA General Miscellaneous memorandum to file.

At the conclusion of my interview, I instructed Howland to prepare at written statement that was returned to me June 26th and is included in this file. The gist of Howland's statement, as it pertains to this particular allegation was that "within the last two weeks Capt. Carlisle McNair had people looking at a video of a bald man inserting his head into a woman's vagina".

Sheriff Metts, Chief James, Col. Seboe, Major Harris and myself then met with Capt. McNair. McNair was provided with a written Garrity advisement. He then admitted having shown the video[2] and explained that it had come to the department as part of an investigation. He could not articulate what case it was related to but that he thought it was Oscar McIntosh's[3] investigation. Further, he could not explain what, if any, business necessity was being fulfilled by the display of the tape. He did offer that he was "curious" as to whether or not the portrayed sexual act was "for real". McNair remembers that McIntosh, Howland, Faglie, Milton, Prichard, and maybe Stout or Oxendine[4] were in his office at the time the video clip was played. In addition to the written Garrity warning, Sheriff Metts explicitly explained to Capt. McNair that he was not to further discuss the matter, nor indicate that his conduct was under investigation; and that he should not intimidate or attempt to improperly influence any potential witnesses. McNair submitted a written statement which I received June 21, 02.

During the above interview conducted in Chief James' conference room, Capt. McNair's computer, a Dell laptop, was removed from its docking station and submitted for forensic examination. The results of that examination are contained in the investigative findings section of this report.

I then began interviewing other persons who had been alleged to have knowledge of the making, transmission, dissemination, or viewing of this video file. The results of those interviewed are set out below. I maintained handwritten notes of each interview. Eleven persons were interviewed[5] in addition to Howland and McNair. Four deputies[6] received written Garrity warnings based upon their immediately perceived degree of culpability based upon the information available at the time. Each deputy/employee was instructed to prepare and return a written statement. All have been returned. When any statement was returned which required further explanation, the appropriate question was

---

[2] The video has been described as a 15 to 20 second clip which was contained on a 3.5 floppy disk as an mpeg file.
[3] Further investigation revealed that it was Investigator Pritchard's case.
[4] Later investigation revealed Oxendine to be at SLED for training and was not present.
[5] These were McIntosh, Milton, Sims, Peake, Pritchard, Stout, Aiken, Oxendine, T. Collins, Faglie, and Frier.
[6] McNair, Oxendine, Stout, and Peake

B-00426

2

A_42202

handwritten and the deputy asked to answer and initial his response. This was attached to the previously provided statement.

As the investigation progressed, I became aware of additional information not having to do the original incident but directly related to alleged violations of the written Garrity warning and specific instructions of Sheriff Metts to Capt. McNair. Those are set out herein.

INVESTIGATIVE FINDING

As to Display of the Obscene/Improper Video Clip:

On June the 10th of 2002, Deputy Stoner responded to 717 Greenwood Drive and met with Tamara Upchurch[7]. The gist of her complaint, as it relates to this inquiry, was that her husband may have child pornography on their home computer, digital camera, and related computer disks[8]. Inv. Stout responded to the scene where Ms. Upchurch turned over the items upon signing a consent form. Stout returned to LCSD and logged the items into evidence. Inv. Pritchard was assigned to the matter and during the course of his investigation obtained "Consent to Search" forms from both Mr. and Ms. Upchurch for the computer, camera, and disks.

On June 12th Pritchard and Stout met and reviewed the computer, disks, and camera searching for any evidence of child pornography. They located multiple images of nude persons but did not locate any evidence of a criminal violation. One image did raise questions as to the age of the subject[9]. Pritchard and Stout notified Sgt. Faglie who came to Stout's work area, viewed the image, and concurred that the female was most likely an adult. During this visit, Faglie was made aware of and viewed the video clip previously described[10]. Faglie then informed McNair and Aiken of what he had seen. Faglie then asked Pritchard to take the disk to McNair based upon McNair's request.

Pritchard and Stout then went to McNair's office with the disk containing the video clip. Statements vary as to exact individuals present in McNair's office during the multiple playing. All or parts of the video were displayed to Aiken (who walked out upon seeing what was playing), Pritchard (who reported that he left after the first playing), Milton, Howland, Stout, Faglie, and McIntosh. Other persons may or may not have been present during one or more of the exhibitions. In McNair's written statement, he admits to playing the video two times.

Neither McNair nor anyone else could explain what, if any, crime was being investigated as to the video clip. The photograph of the individual ("Beth") whose age was in dispute was neither viewed nor discussed. There was no issue discussed as to the

---

[7] LCSD Case No. 0242849

[8] Twenty-one computer disks were turned over to Stout.

[9] This image was labeled "Beth" and was a still photograph of a nude woman who "looked young".

[10] All statements are consistent in describing the video as a "bald man inserting his head into the vagina of a woman". One witness noted that the video was accompanied by audio of "moaning and music".

3

B-00427

**JA 3665**

A_42203

relative age of the participants in the video or its value as evidence in any investigation. In McNair's oral interview he repeatedly stated that he was watching the video out of "curiosity" and that his interest was if the act displayed was possible. Conversations in the room generally centered on whether the individuals viewing the video thought that this act was "real" or animated. No one interviewed could explain the nexus of this video to any criminal act nor provide any explanation related to any business necessity of its viewing.

Stout then returned the computer disk to the evidence locker along with the computer, camera, and other disks. All items, to include the disk containing the video image described, were returned to the owner, Ms. Upchurch.[11] No criminal prosecution was initiated. Pritchard exceptionally cleared the case on June 20, 2002. There is no evidence to indicate that the disk was ever copied, duplicated, or viewed elsewhere.

McNair's laptop[12] was submitted for forensic examination. The examination revealed:

> The Dell Latitude laptop was previewed on 06/21/02. A file named "giving-head.lnk" was identified. This file was created on 06/12/02 at 3:45 p.m. and last accessed on 06/20/02. There was no further information as to the contents of this file.

The computer analysis was not able to discern how many times the file had been accessed or played. The .lnk file suffix is consistent with a disk having been inserted into the "A" drive and the file accessed. This is also consistent with the account of McNair and others interviewed. Also, Stout, in his written statement recalls "getting head" was the name of the file on the disk containing the video.

Policy and Procedure as to the Video:

Lexington County Sheriff's Department Policy and Procedure No. 300, Non-Discrimination / Anti-Harassment provides in III (B):

> The Lexington County Sheriff's Department has taken special steps to prevent employees from being subjected to inappropriate conduct in the workplace. The department believes that all employees desire a professional, productive, and pleasant work environment. Providing such a work environment requires the cooperation of all employees.
>
> > 1. Sexual harassment includes but is not limited to any inappropriate behavior, which because of an individual's gender has the effect of creating a hostile, intimidating, or otherwise unpleasant work environment. The following, in no particular order, are some of the more obvious types of behavior that the Lexington County Sheriff's Department considers to be highly inappropriate in the workplace:

---

[11]  All evidence handling to include the return of the items to the owner was documented in material provided by Sgt. Collins.
[12]  CPU Model: Dell Latitude CPt, Serial No.: 24766330609

B-00428

4

JA 3666
A_42204

. Displays of sexually explicit pictures or objects;
. Demands or requests for sexual favors;
. Sexually.oriented jokes;
. Sexually oriented talk or commentary not associated with official business;
. Compliments of a sexual or suggestive nature.

and; in III.(B)(5)

Employees, including supervisors, who are determined to have violated this policy, will
be subject to serious disciplinary action up to and including termination, commensurate
with the seriousness of the conduct.

Lexington County Sheriff's Department Policy and Procedure No. 205,
Information Technology provides in III (D):

Employees are reminded that computers and other equipment are to be used for official
business. The employee has **no expectation of privacy** for any data stored or transmitted
from a departmentally owned computer.

As to Events Occurring after McNair's Interview:

During his interview and meeting with Sheriff Metts as above described, McNair,
prior to being questioned, was provided with a written <u>Garrity</u> advisement entitled
"Memorandum of Garrity Rights and Employee Responsibilities" which he signed. In
part, the memorandum provides:

Further, you are not to discuss this investigation and / or the underlying facts with
members of this department or anyone else who is now or may become a subject in this
matter as such would likely jeopardize this investigation.

Further, Sheriff Metts explicitly explained to Capt. McNair that he was not to
further discuss the matter, nor indicate that his conduct was under investigation; and that
he should not intimidate or attempt to improperly influence any potential witnesses.
Based upon McNair's agreement that he follows the instructions, he was not suspended
pending the outcome of this investigation.

On the day immediately following McNair held a meeting of Headquarters'
Region personnel in the squad room. In that meeting he read the Policy and Procedure
No. 300 to those assembled asking if everyone understood or had questions after each
paragraph. Prior to beginning the policy review, McNair produced a micro-cassette
recorder and explained that he was going to record what he said as he felt previous
comments of his had been taken out of context and reported to Major Harris.[13]  He further

---

[13]  During the course of this investigation Major Harris directed McNair to turn over the tape. McNair told
Harris that he had hit "Play" instead of "Record" and no tape of the meeting was made. See Statement of
Major Harris, June 26, 2002

B-00429          5

**JA 3667**
A_42205

explained that he would recommend termination of anyone he caught using profanity and that he was in the middle of some "pooh – pooh".[14] Several attending indicated the tone of the meeting was hostile and intimidating. Sgt. Faglie described it as "one of Carlisle's regular rants and raves".[15]

After this meeting McNair invited Peake, Sims, Aiken, Frier, and Faglie to breakfast at Lizard's Thicket. Aiken, also interviewed and asked to provide a supplemental statement, writes:

> ...Capt. McNair invited several individuals to join him for breakfast at the Lizard[s] Thicket. Before entering the restaurant Capt. McNair stated to me that a Sexual Harassment complaint had been filed against him. This comment was made in the presence of Inv. D. Peake. Capt. McNair stated that his computer had been seized along with those of Inv. Peake and Inv. B. Sims[16]. It was at this point that McNair and Peake mentioned they shouldn't talk about what was going on because there was an internal investigation underway.
>
> Capt. McNair, Inv. D. Peake, Inv. S. Frier, Inv. B. Sims, Sgt. Faglie and myself attended the breakfast. During this time McNair stated that if any investigator had sexually explicit images or files on their computer they should erase or destroy them immediately....

On Monday June 24th, Howland came to my office visibly upset. As she relates in her written statement:

> On Monday, June 24, 2002, Scottie Frier was in my office when Captain McNair walked by and yelled from down the hall that if Scottie was not talking about a case he needed to leave my office. That kind of conduct is exactly the fallout I was afraid would happen. If Capt. McNair thinks it is appropriate to yell across investigations that [a] person needs to stay out of my office unless discussing a case, my co-workers may feel like they cannot talk to me, thus creating a hostile environment. Capt. McNair's conduct on Friday and Monday are exactly the reasons people are afraid to speak. After McNair' comments, I went to Major Tate in tears because of the fear of retaliation I had expressed to him on Thursday appeared, to me, to be occurring. I am afraid of losing my job and being treated as an outcast for speaking out at the sexual harassment class, and the way Capt. McNair has behaved has reinforced that fear.

Frier also provided a written account similar to the above. He further explained that the angry tone and public pronouncement concerned him. He reports that he later

---

[14]  Written statement of Milton, Frier used the exact expression in his oral interview.
[15]  Oral Interview of Faglie
[16]  Sims computer was never seized. He was interviewed as a witness and was at SCLEOA's annual conference in Myrtle Beach at the time of the viewing of the video.

JA 3668
A_42206

met with McNair and McNair apologized for "snapping" at him. McNair further explained that the comment was not directed at Frier but he "needed to stay away from her".[17]

While interviewing Aiken, he explained that McNair had attempted to show him a copy of his (McNair's) statement. The implication is that McNair was attempting to influence Aiken as to his reporting of the investigation. Aiken refused to read the paper and returned it to McNair. I instructed Aiken to prepare a supplement to his original statement and forward it to me. In its entirety it reads:

> This memo is a supplement to my original statement of June 21, 2002.
>
> On this date [June 24, 2002] I was speaking to Capt. McNair in his office pursuant to the investigators morning roll call. During this conversation about general investigative issues Capt. McNair handed me a single piece of paper from his desk drawer. Looking down at the paper I noticed some wording in the text body that referred to a video. At the same time Capt. McNair stated, "you haven't seen this." I immediately turned the paper over handed it back to him without reading anything further.
>
> Capt. McNair indicated that this was his statement about the video. We did not discuss any content of the statement nor was there any discussion about the pending inquiry. The document handed to me was a single piece of paper with type written text that covered approximately three quarters of the page. A signature was affixed at the bottom of the text and it was void of any logo at the top. End.

Aiken's description of McNair's statement is consistent with the statement provided to me during this investigation.

Policy and Procedure As to Events Occurring after McNair's Interview:

LCSD Policy and Procedure 405 III, entitled Employee Code of Conduct, provides:

> E. Employees shall diligently, completely, and without delay or question, carry out all lawful orders of a supervisor that pertain to the performance of their duty....
>
> and
>
> Y. All employees shall cooperate with and assist in any administrative internal investigation.

---

[17] Written statement of Frier.

B-00431

7

JA 3669

A_42207

## CONCLUSION

McNair violated Policy and Procedure 300 in that he, on at least two occasions, displayed a video clip containing obscene material, to wit a bald headed man attempting to insert his head into a woman's vagina, to other employees with no criminal investigative or business necessity of doing so. (Sustained)

McNair violated Policy and Procedure 405, the instructions contained in the "Memorandum of Garrity Rights and Employee Responsibilities", and the instructions of Sheriff Metts by attempting to provide a copy of his written statement to Aiken, in instructing other employees to destroy images on their computers, alerting other employees of this ongoing investigation and telling them his computer had been seized. (Sustained)

In addition to any punitive measures taken, I believe it is in the best interest of the department that McNair be specifically instructed not to harass or retaliate, either directly or indirectly, against anyone involved in this investigation; and should be administratively and physically moved out of the headquarters complex. **I simply cannot overemphasize the necessity of this instruction and separation should he be retained.** His contact with anyone involved in this investigation should be limited to absolute business necessity with no supervisory responsibility. In the same vein, those employees affected by his conduct should be instructed to report any suspected retaliation or improper conduct.

John W. Tate
General Counsel

Concur __✓__    Non-concur_____

_Col. Mul Suhoe_ 6/28/02
Title

B-00432

8

**JA 3670**

A_42208

Exhibit Index to Defendant's Reply to Memorandum of Law of the United States
in Opposition to Defendant's Motion for Collateral Relief

Reply Exhibit 1:    Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 2:    Handwritten note authored by Jack Swerling on September 17, 2004

Reply Exhibit 3:    Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 4:    Handwritten note authored by Jack Swerling on September 22, 2004

Reply Exhibit 5:    Handwritten notes authored by Jack Swerling on September 29-30, 2004

Reply Exhibit 6:    Undated memorandum from Erik Haren

Reply Exhibit 7:    Clif LeBlanc, *Swerling Tells of Being Terrorized*, The State, February 11, 2004

Reply Exhibit 8:    Clif LeBlanc, *2 Charged in Break-in at Area lawyer's Home*, The State, May 15, 2003

Reply Exhibit 9:    Out of Court Hourly Worksheets - Jack B. Swerling - January and February 2004

Reply Exhibit 10:    Handwritten note authored by Jack Swerling on January 17, 2004

Reply Exhibit 12:    *Publicity Hinders Swerling Jury Choices*, The State, February 10, 2004

Reply Exhibit 13:    Clif LeBlanc, *Causey is Sentenced to Life Without Parole*, The State, February 13, 2004

Reply Exhibit 14:    E-mail to a federal trials listserve authored by Jack Swerling, February 19, 2004

**JA 3671**

Reply Exhibit 15:   *Swerling Walking in Victims' Shoes*, The State, February 25, 2004

Reply Exhibit 16:   Carlisle McNair's Personnel File, Internal Affairs Report, and Discipline subpoenaed from Lexington County Sheriff's Department

Reply Exhibit 17:   Notice of Disciplinary Action, December 16, 1998

Reply Exhibit 18:   Internal Affairs Investigative Report, November 2, 1998

Reply Exhibit 19:   Internal Affairs Investigative Report, November 30, 2001

Reply Exhibit 20:   Investigative Report, June 20, 2002

Reply Exhibit 21:   Memorandums authored by Carlisle McNair, January 21, 2004 and April 16, 2004

Reply Exhibit 22:   Memorandums authored by Carlisle McNair, November 17, 2003 thru August 5, 2004

Reply Exhibit 23:   E-mail authored by Carlisle McNair, October 13, 2003

Reply Exhibit 24:   Letter authored by Melissa A. Meister to Jack B. Swerling, April 1, 2008

Reply Exhibit 25:   E-mail authored by Jack B. Swerling, April 1, 2008 5:10 p.m.

Reply Exhibit 26:   E-mail authored by Jack B. Swerling, April 1, 2008 5:32 p.m.

Reply Exhibit 27:   E-mails authored by Melissa A. Meister and Jack B. Swerling, April 3, 2008 and April 4, 2008

Reply Exhibit 28:   Declaration of Christine R. Oliver, March 2, 2012

Reply Exhibit 29:   E-mails authored by Melissa A. Meister and Jack B. Swerling, April 16, 2008 and April 18, 2008

Reply Exhibit 30:   E-mail authored by Melissa A. Meister to Jack B. Swerling, May 3, 2008

**JA 3672**

Reply Exhibit 31:   E-mail authored by Melissa A. Meister to Jack B.Swerling, April 16, 2008

**JA 3673**

# Reply Exhibit 20

JA 3674

**From:**    "Carlisle McNair" <cjm0501@alltel.net>
**To:**      "Carlisle McNair" <cjm0501@alltel.net>
**Sent:**    Sunday, January 25, 2004 10:53 PM
**Subject:** Fw: Interview: Joe Jones

----- Original Message -----
**From:** Carlisle McNair
**To:** Carolyn Graham
**Sent:** Monday, January 26, 2004 12:31 AM
**Subject:** Interview: Joe Jones

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

*TO:*        *Basham File*
*FROM:*       *Carlisle McNair*
             *Carolyn Graham*
*DATE:*        *January 21, 2004*
*RE:*         *Interview: Joe Jones*
             *818 Polk Ave. Charleston, Ill.*
             *217-345-1164 (h)  217-348-3950 (w)*

*On January 21, 2004, we traveled to Charleston, Ill and located Joe Jones, an ex-boyfriend of Veronica Evans. Jones advised he dated Veronica for about 7 months, fall of 2000 to spring of 2001. Advised Veronica is a bi-polar, crazy, lying individual. Jones made it clear to us that Veronica is a big liar. Advised Veronica wanted more out of their relationship than he was willing to give. Advised their relationship was strictly sexual. Veronica, as well as her friends, Amanda West, Crystal Montaque & Dina Jones Babar, dated black men. Advised he dated Dina for a period of time , also. Advised all four of these women are nothing but whores and big, big trouble. Advised Veronica's son Miles was fathered by Amanda's boyfriend at the time. Advised when he was dating Dina, and lived at 1607 10th Street, Charleston, Ill, Dina & Veronica got into a fight at his house over him. Advised police were called. Advised he has seen Illinois Dept. of Children & Family Services paperwork showing Veronica diagnosed bi-polar. Advised he will attempt to locate these papers at his residence. (On January 24, 2004, I received a phone call from Jones, who advised he did not locate the papers in question, but felt sure Children & Family Services would have the information). Advised he knows for a fact Veronica is a marijuana and crystal meth user. Veronica & Denis, Christian's father, cooked meth in their house in Kentucky. Jones was asked bout the incident involving Michael Jordan & Veronica. Jones advised that happened after his relationship ended with Veronica and he didn't have any details. Advised Dina's mother works for Dept. of Children & Family Services and he feels this may be the reason Veronica has not been prosecuted for child abuse. Asked if he knew of any other boyfriends of Veronica, he advised James Williams, b/m, works for the East Illinois University Police in Charleston, Ill. Asked if he had any videos of Veronica, he advised he did, which he gave to us. The other videos he had of Veronica had been taped over or destroyed. This particular video shows Veronica performing oral sex on Jones. A portion of the video shows Veronica stopping the sex act for a moment and telling a child to get another bowl of cereal. Jones advised he would be available if we needed him in the future.*

**JA 3675**

2/9/2011

From:       "Carlisle McNair" <cjm0501@alltel.net>
To:         "Jack Swerling" <Jacklaw@aol.com>
Cc:         "Carolyn Graham" <cgrahamsc@aol.com>
Sent:       Friday, April 16, 2004 3:52 PM
Subject:    Addendum to interview w/ Dina Babar

# MEMORANDUM
# ATTORNEY/CLIENT ONLY

*TO:*          *Basham File*
*FROM:*        *Carlisle McNair*
*DATE:*        *April 16, 2004*
*RE:*          *Addendum to interview w/ Dina Babar*

---

*On December 16, 2003, I spoke to Dina Babar, who is Veronica Evans aunt by marriage. Dina's brother is married to Veronica's mother. In this interview, Dina advised, other than the information she had already relayed to me, she would write a detailed statement pertaining to Veronica & Chad. After numerous attempts to contact Dina, by phone number she supplied, which is disconnected and through her mother, Cindy Babar (217-234-3606), whom I have spoken to on a number of occasions and who has told me she has given Dina the messages to call me, I have been unable to make contact with her.*

*The information pertaining to the possibility that a video tape existed of Veronica Evans performing a sex act on a black male individual, was supplied to us by Dina Babar, who also told us Veronica was a habitual liar. Babar advised Joe Jones in Mattoon, Ill worked for a video store and video taped Veronica performing sex acts on him. Babar advised Veronica was aware of the tapings and allowed Jones to do so. As a follow-up to this information, we contacted Joe Jones in Mattoon, Ill who agreed to talk to us. Mr. Jones verified he taped Veronica performing sex acts on him and stated he destroyed all but one of the tapes. Jones gave Carolyn Graham an 8mm tape of Veronica Evans performing a sex act on Jones. The majority of the tape had been used to tape a movie. Jones advised he had no more tapes of Veronica or anyone else for that matter.*

*On one of the interviews with Veronica, I asked her if there was anything out there we needed to know about, any surprises that may come up in a courtroom setting, that she was not telling me about, that may discredit her in any way. Veronica told me about naked pictures taken of her by Chad, that she felt were either taken from her house by Tina Severence or were in the custody of the Madisonville, Ky PD. Veronica assured me there were no other pictures/videos or anything else of that nature, that may be used to discredit her. After locating Joe Jones and receiving from him a video tape of Veronica, I called her & told her what we had obtained from Jones and asked if there were anymore pictures/videos anywhere. I also asked Veronica what else in her statement to me was untrue. She became very defensive and demanded I mail her the video. I advised Veronica no one other than myself & Carolyn Graham knew about the video and in no way could it be used against her, that the video was absolutely no value to anyone. I told Veronica it concerned me we had uncovered something she assured me didn't exist and that I wanted to know what else may be out there; that if there were any incontinences in her statement, we needed to address them at this time before trial. This conversation ended on a good note, other than the fact that Veronica was verbally aggressive toward me, demanding I send her the tape.*

*As of April 16, 2004, there has been no contact with Veronica Evans since the 1st week in February, 2004.*

# Reply Exhibit 21

JA 3677

---

**From:** "Carlisle McNair" <cjm0501@alltel.net>
**To:** "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com>
**Sent:** Sunday, November 23, 2003 7:15 PM
**Subject:** Informal Interview: Charlotte Basham Morris

# <u>MEMORANDUM</u>
## <u>ATTORNEY/CLIENT ONLY</u>

*TO:*          *Basham File*
*FROM:*        *Carlisle McNair*
*DATE:*        *November 17, 2003*
*RE:*          *Informal Interview: Charlotte Basham Morris*

---

*Charlotte advised Brad Basham was beat to death ay a cemetery behind North Hopkins HS, about 6 years ago. Brad was their second cousin. They were not close at all. Saw Brad maybe 5 times in her life. Advised her mother used drugs during her pregnancy with Branden and most likely smoked marijuana when she was pregnant with Charlotte. Charlotte was a heavy crystal meth user and crack cocaine smoker. She has been clean for 5+ years. Charlotte does not want to be a looser like the rest of her family. I asked Charlotte how she got off crystal meth and crack cocaine. She advised she got out of the environment; stopped hanging around with those types, such as her mother. I asked her if she was in the environment living with a known drug dealer, Mark Phebus. She advised Mark did his time in jail and doesn't want to go back. He has a successful construction company and has seen what drugs can do to people. He has told Charlotte he would have nothing more to do with her if she got back on drugs. Charlotte is aware of the allegations that make Mark a suspect in two homicides in Hopkins Co. She advised law enforcement has never been able to prove Mark was involved. Mark has denied any involvement whatsoever in the murders, one of which, according to Det. Troutman was Mark's wife. Charlotte advised Mark is 44yoa and started out as a "Sugar Daddy" but she fell in love with him. Advised Mark has put the past behind him and is moving on this is life and staying out of trouble. He is concentrating on building a long lasting, respectable construction company. Charlotte is aware of the burden she will have to be the spokesperson for her family on Branden's behalf. She knows Cathy's is not capable of telling the truth about Branden's childhood. Jimmy will lie to cover for Cathy's lies. Charlotte has agreed to share with us all the deep dark family secrets, good & bad, past & present. She is aware she has all the answers, but we don't have the questions. She fully understands we have to know the family history in order to build a defense for Branden. As far as Branden's homosexually, Charlotte advised Branden has told her he did what he did to get what he needed, money & drugs.*

JA 3678

**From:**    "Carlisle McNair" <cjm0501@alltel.net>
**To:**    "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland"
<Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson"
<yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>;
"Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg
Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>;
"Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian
Kandare" <akandare@justice.com>
**Sent:**    Sunday, November 23, 2003 7:22 PM
**Subject:**    Interview: Tracey Davis

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

*TO:*          *Basham File*
*FROM:*        *Carlisle McNair*
*DATE:*        *November 17, 2003*
*RE:*          *Interview Tracey Davis*

---

*On 11/17/03 I spoke to Tracey Davis at Lot 7 Wadlingtons MHP Madisonville, Ky. Tracey knew
Branden through Carla Gibson. Never associated with Branden. Doesn't know if he uses drugs or
not. Doesn't know if he is homosexual or not. Not any help.*

From:      "Carlisle McNair" <cjm0501@alltel.net>
To:        "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland"
           <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson"
           <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>;
           "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg
           Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>;
           "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian
           Kandare" <akandare@justice.com>
Sent:      Friday, December 05, 2003 6:57 PM
Subject:   Interview: Raymond "Bucky" Emory

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

TO:        **Basham File**
FROM:       **Carlisle McNair**
            **Carolyn Graham**
DATE:       **December 1, 2003**
RE:         **Interview: Raymond "Bucky" Emory  w/m**
            **816 S. Main St. Lot #10**
            **Madisonville, Ky.**
            **270-821-7515 (w)**

On December 1, 2003, we spoke to Emory at his residence. Emory advised Branden lived in his residence prior to him buying it from Jimmy & Cathy Basham. Advised Branden would stay with him on occasion. Advised Branden got him started on crack cocaine. Branden sold all of Emory's cloths, shoes and other items to get money to buy crack. Branden didn't care whose property he sold to buy crack. Branden would do anything to get money to buy crack. Branden would perform sex acts on Emory for money to buy drugs or he would promise Emory he would get him a girl for sex, which according to Emory, Branden never kept his promise about the girl. Emory described Branden as a "sneaky snake." Branden was not a violent person. Emory advised noone has ever caught him having sex with Branden. I asked Emory about the time Carla Gibson caught them. He advised Carla is a lying, crack smoking, whore. Emory never admitted or denied Carla caught them in a sex act. Asked if he knew anyone else Branden hung around with. Advised Jeremy Baber, who is in & out of jail, was another person Branden spent a lot of time with. Asked if Jeremy was gay? Advised he didn't know. Emory advised he has been in jail in the past for bad checks. He served 6 months about 2 years ago. Advised he knew about Branden stealing his fathers checkbook and writing checks. Advised he was the person who told Jimmy & Cathy what Branden was doing. As far as he knows, Branden has never known he was the person who told on him. Advised he doesn't trust Branden. Branden would knock you down & rob you, but he's not capable of killing anyone. A small knife is the only weapon he has ever seen Branden with. Branden has attempted to steal Emory's car in the past, but was unable to figure out how to drive it. Asked if his car was an automatic or straight drive. He advise automatic. I asked was Branden that stupid? Emory advised he was not very bright. Emory advised he has worked as a cook at Ferrell's Restaurant for 7 years (8pm-5am), Thursday-Sunday. Advised he has been off crack cocaine for about 3 years. Emory denied being a homosexual.

JA 3680
2/22/2011

| | |
|---|---|
| **From:** | "Carlisle McNair" <cjm0501@alltel.net> |
| **To:** | "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com> |
| **Sent:** | Friday, December 05, 2003 9:39 PM |
| **Subject:** | Interview: Mark Phebus |

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

| | |
|---|---|
| **TO:** | *Basham File* |
| **FROM:** | *Carlisle McNair* |
| | *Carolyn Graham* |
| **DATE:** | *December 2, 2003* |
| **RE:** | *Interview: Mark Phebus  w/m* |
| | *270-399-0118 (cell)* |

*On December 2, 2003, we spoke to Mark Phebus. Phebus is a convicted drug dealer. Served 26 months in state pen and lost $2m in drug assets. Advised he was considered a drug kingpin in Hopkins Co. Very proud of himself. Advised he made millions selling drugs. Started in the drug business in the 1970's off-loading boats in Florida, making $75,000.00 a boat. Advised he unloaded 3 boats a week. Advised he has been straight & clean for 9 years. Makes $200,000.00 a year building houses. Advised his brother-in-law is VP of Continental Airlines and helped him get back on his feet after prison. Met Charlotte Morris (Basham) through a stripper he was dating, who smoked marijuana with a Charlotte. Charlotte was never a stripper. First time he met Branden, it wasn't, "Hi, nice to meet you," it was, "Hey, you got $5.00." Branden has a very low IQ. He has never driven a car, nor does he have a drivers license. Branden would sit up in a tree and huff gas fumes while his father was trying to coax him to come down. Branden started smoking crack cocaine with his mother, Cathy. Cathy still smokes crack daily. Branden received a monthly disability check Cathy spent on drugs. Branden is borderline retarded. Branden and Bucky Emory were homosexual lovers. Shane Blanton, who works for Phebus when he isn't in jail, was in jail with Branden and told Phebus Branden was considered everyone's "bitch' in jail. Charlotte purchased a new pair of $50.00 shoes for her daughter and left them at Cathy's house. When she came back to get them, Cathy had traded the shoes for crack. Branden never had a chance in life. Cathy has boyfriends over when Jimmy is there. Jimmy drinks and passes out at the kitchen table and Cathy trades sex acts for crack. When Branden was small, Cathy would put him in a stroller and go to Wal-Mart and shoplift, putting the stolen items in Branden's stroller. Branden has been writing letters to Cathy from jail. Phebus was asked if he picked up Branden & Chad after they escaped, that Christy Baldwin gave law enforcement a statement saying he did. Phebus advised Christy is a lying, crack whore. Phebus bailed Christy out of jail in exchange for sex. Christy never paid up. Advised with the reputation he has in Hopkins County, if law enforcement had any indication he was involved with the escape, they would have been all over him. Phebus advised he didn't pick up Branden & Chad and doesn't know where that came from. Phebus advised when Charlotte & Branden were small children, Jimmy & Cathy would load them up and go to Florida, in the family stationwagon and smuggle dope back to Madisonville for Harold Tosh. Tosh was caught for drugs and is serving federal time in a medical unit in Minnesota. Tosh was sentenced out of McCracken Co. Ky, Paducah Federal Court about 6 or 7 years ago. (Unable to verify at this time. Still checking to see if Tosh is incarcerated.) Spoke to Phebus 12/05/03 and advised him I couldn't find Tosh in the federal system. He advised his son Jerry Tosh is also serving time in a federal facility in Florida. I will attempt to verify.*

2/22/2011

**From:**   "Carlisle McNair" <cjm0501@alltel.net>
**To:**   "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland"
<Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson"
<yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>;
"Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg
Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>;
"Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian
Kandare" <akandare@justice.com>
**Sent:**   Friday, December 05, 2003 9:56 PM
**Subject:**   Interview: Shawn Blanton

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

*TO:*        *Basham File*
*FROM:*       *Carlisle McNair*
            *Carolyn Graham*
*DATE:*       *December 2, 2003*
*RE:*         *Interview: Shawn Blanton  w/m  26yoa  DOB 09/25/77*
            *Hopkins County Jail*

---

*On December 2, 2003, we spoke to Shawn Blanton, an inmate at the Hopkins Co. Jail Annex,
serving time for drug possession. Advised he met Branden when he was put in the same
cell block with him. Shawn was in cell #810 when Chad & Branden escaped. Branden was known
in the cell black as anyone's "bitch". Branden would do anything, including sex acts on other
inmates, to get cigarettes or anything else he needed while in jail. Branden was always put in lock-
up because he gave the guards problems. Asked if he heard about the escape before it happened.
Advised he did not. That inmates are always talking about how they could get out. Shawn is a
trustee, working in the courthouse.*

| | |
|---|---|
| **From:** | "Carlisle McNair" <cjm0501@alltel.net> |
| **To:** | "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com> |
| **Sent:** | Friday, December 05, 2003 10:22 PM |
| **Subject:** | Interview: Donnie Durham |

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

*TO:*          **Basham File**
*FROM:*        **Carlisle McNair**
               **Carolyn Graham**
*DATE:*        **December 3, 2003**
*RE:*          **Interview: Donnie Durham  w/m  26yoa  DOB 11/07/77**
               **Hopkins Co. Jail**
               **146 Sycamore Dr.  Morton's Gap, Ky**

*On December 3, 2003, we spoke to Donnie Durham at the Hopkins Co. Jail. Donnie was serving time for a drug charge. Advised he use to live in the same neighborhood as Branden. He sold Branden marijuana on the street. Branden very seldom had money and usually traded something, he had most likely stolen, for the marijuana. Advised he knows Bucky Emory and that he is gay. Crystal Massey is an ex-girlfriend who smoked crack with Cathy Basham. Never saw Branden drive or knew if he had a drivers license or not. Branden would get into fights in jail because he always wanted to fit in and would pester people to the point a fight would start. Advised he has sold Branden Ritalin in the past and huffed gas fumes with him. Advised Branden was prescribed Ritalin while in jail and would conceal it in is mouth, letting the guard think he had swallowed it. He would use the Ritalin to trade for cigarettes or pay off jail house debts. The guards started watching him closer to make sure he swallowed is medication. Branden was a "punk" in jail. Anyone's "bitch". He was very easily manipulated and always a follower. Inmates were always talking about the possibility of escape. Chad & Branden escaped by one of the plans that was talked about among the inmates. Inmates in the jail talked about, if they could get to the roof, they could get through the fence to the outside. Donnie advised he had thought about it and knew if he could get to that fence he could get out. Advised a fence alone is not going to hold him. Advised he didn't have any prior knowledge about the escape before it happened. Donnie advised his sister, Alisha Sharpe and his mother, Carol Sharpe, would be able to shed some light on Branden's home life. Carol & Alisha live at 146 Sycamore Dr. Morton's Gap, Ky. 270-258-5548 (h) 270-821-2467 (Carol's work # Dairy Queen on S. Main St.)*

JA 3683

2/22/2011

From:     "Carlisle McNair" <cjm0501@alltel.net>
To:       "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland"
          <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson"
          <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>;
          "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg
          Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>;
          "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian
          Kandare" <akandare@justice.com>
Sent:     Saturday, December 06, 2003 10:49 PM
Subject:  Interview: Alishia Sharpe

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

TO:        **Basham File**
FROM:      **Carlisle McNair**
           **Carolyn Graham**
DATE:      **December 3, 2003**
RE:        **Interview: Alishia Sharpe   w/f  19yoa  DOB 08/20/84**
           **146 Sycamore Dr.  Morton's Gap, Ky.**
           **270-258-5548 h**

*On December 3, 2003, we spoke to Alishia Sharpe, who is Donnie Durham's sister, at her residence. Alisha advised she grew up with Branden during the 4th thru 7th grades. Advised she thought Branden "hung the moon." Has never seen Branden use drugs or be violent toward anyone. Branden was the love of her life. Never mean to her, never hollered at her, never hit her, just a great guy to be around. Knows Branden is gay and lived with Bucky Emory who is also gay. She has seen Branden & Bucky kiss each other on the mouth and hold hands in public. She also knows Basil "Junior" Jones who also lived in the same neighborhood. Advised she heard about Branden escaping from jail, but didn't know about the murders and all the trouble Branden was in. It didn't surprise her when I told her Branden was someone's "bitch", "boyfriend" in jail. Branden was a willing partner as far as a homosexual relationship with another man was concerned. Branden never had a drivers license, but he would drive his mother's car around the neighborhood. Cathy Basham was always high & on drugs. Jimmy Basham was a mean, out of control drunk. Advised she very seldom saw Charlotte. Alishia was scared to go to Branden's house because his parents were always drunk or strung out on drugs and fighting. Branden would always come to her house. Branden was never a leader. Always a follower. Branden wanted to be a car salesman and work on cars when he grew up. He was always tinkering with his bicycles, motorcycles, go carts & etc. I asked Alishia where Branden got all of these motorized vehicles? She advised she assumed they were his. She has never seen Branden steal anything nor has she heard that he was a thief. She didn't find out about Branden's stealing problem until she moved from the neighborhood. Cathy told her Branden had gotten into trouble for stealing cars. Branden told her he got caught for stealing cars. Branden got into fights at school because everyone picked on him about his long hair and calling him a "fagot".*

*One strange thing about this interview: Alisha's mothers maiden name was Burns (Samantha Burns). And Alisha's 7 month old son is named Donovan (Alice Donovan).*

**JA 3684**
2/22/2011

| | |
|---|---|
| **From:** | "Carlisle McNair" <cjm0501@alltel.net> |
| **To:** | "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com> |
| **Sent:** | Saturday, December 06, 2003 11:00 PM |
| **Subject:** | Interview: Carol Sharpe |

## MEMORANDUM
## ATTORNEY/CLIENT ONLY

*TO:*      *Basham File*
*FROM:*   *Carlisle McNair*
          *Carolyn Graham*
*DATE:*    *December 3, 2003*
*RE:*      *Interview: Carol Sharpe  w/f*
          *146 Sycamore Dr.  Morton's Gap, Ky*
          *270-258-5548 h   270-821-2467 w*

*On December 3, 2003, we spoke to Carol Sharpe, who is Donnie Durham's mother, at her residence. Advised she felt sorry for Branden. When he was 7 or 8 years old, he would be walking the streets all hours of the night. He was the type that could be easily influenced. He had absolutely no type of parental care what-so-ever. Branden never talked about his parents. He spent a lot of time on the streets and talked about doing drugs and smoking marijuana when he was 9 years old. Advised she has never seen Branden drive a vehicle. Always walking or on a bicycle. Advised she had only heard Branden was gay, but knows Bucky Emory is gay. She knows at one time, Branden lived with Bucky. Carol works at Dairy Queen, on S. Main St., where she has been for 8 years.*

JA 3685
2/22/2011

| | |
|---|---|
| **From:** | "Carlisle McNair" <cjm0501@alltel.net> |
| **To:** | "Traci Theirolf" <traci@swerlinglaw.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com>; "Lisa Kimbrough" <lisajkimbrough@yahoo.com> |
| **Sent:** | Friday, April 16, 2004 9:26 PM |
| **Subject:** | Interview: Daryl Gossett |

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

| | |
|---|---|
| *TO:* | *Basham File* |
| *FROM:* | *Carlisle McNair* |
| | *Carolyn Graham* |
| *RE:* | *Interview: Daryl Gossett* |
| | *270-825-9220* |
| *DATE:* | *March 29, 2004* |

*On March 29, 2004, we spoke to Daryl Gossett, who advised the following:*
*--Gossett was employed at HCDC for 3 years*
*--Gossett was a lieutenant when he was terminated by the Jailer*
*--Advised he was sent a letter of termination 1/2003. The reason for termination was "lack of professionalism".*
*--Advised he was involved in a lawsuit against HCDC over overtime pay*
*--Advised he didn't agree with the administration at HCDC*
*--Advised he saw things that were not right and told his supervisor, Capt. Shaffer about these things and that he was not going to keep is mouth shut if things didn't change. Gossett didn't elaborate.*
*--Advised he was off the day of the escape*
*--Advised he knew Brandon during his time at HCDC*
*--Advised he knew Fulks, whom he described as a quite inmate, not a troublemaker*
*--Describe Brandon as mouthy, always wanting to "show out"*
*--Advised Brandon was treated to a "blanket party" in the old jail, where inmates throw a blanket over another inmate and beat him up. Brandon had to be transported to a medical facility after the beating because he was throwing up blood*
*--Advised Brandon helped Jeremy Barber hang himself*
*--Advised he was on duty that night & cut Barber down*
*--Feels the hanging incident was a plan by Brandon & Jeremy to get their cell door open in an attempt to escape. They knew they were short handed and that there were only two correctional officers on duty and one was a female.*
*--Advised Brandon punched Jeremy in the mouth to make it look good*
*--Advised when he reached the cell, Brandon was hold holding Jeremy up, to keep the pressure off his neck*
*--Advised Brandon was a trustee for a short period, but lost the status after some discipline problems*
*--Advised Brandon sold or traded his medication for food, toiletry items, to other inmates*
*--Advised Brandon didn't have any family that cared about him. He didn't have any money.*
*--As far as the escape was concerned, Gossett advised his 5 year old could have escaped from HCDC. It didn't take a smart person to figure out a way to escape from HCDC.*
*--Advised Chet Goff and another inmate attempted to escape from the same recreational area approx 1 year prior to Fulks & Basham. Advised he didn't remember how they got caught.*
*--Advised he was aware Brandon attempted to escape from deputies at the courthouse but was quickly apprehended*
*--Advised Brandon shared a cell with Robert Rector, who was a known homosexual and it was rumored that Brandon performed oral sex on Robert for a pair of tennis shoes*
*--Robert Rector is 40 - 50 yoa and is currently serving time at the Kentucky State Pen (270-388-*

**JA 3686**
2/22/2011

2211) in Eddyville, Ky for credit card theft & forgery. Rector is from Nortonville, Ky Hopkins County.

--Advised 6 months before Fulks & Basham escaped, he warned the Chief of Operations that he felt things were not secure enough. Advised his supervisors "blew him off".

--Advised after the escape, it surprised him the jails Emergency Response Team was not activated. As far as he knows calling out this team on an escape is SOP.

--Advised 2 people, a cook and retired military worker, searched for Fulks & Basham after they escaped

--Advised the administration felt the Emergency Response Team was not needed

--Advised he feels the escape could have been prevented if they (admin) had listened to him about his concerns about security

--Advised the administration always thought of the inmates as "good old boys" and didn't take the possibility of escape seriously

JA 3687

2/22/2011

From: "Carlisle McNair" <cjm0501@alltel.net>
To: "Traci Theirolf" <traci@swerlinglaw.com>; "Steve Hisker" <hisker@scbar.org>; "Paige Tarr" <paige@brucklaw.com>; "Lisa Kimbrough" <lisajkimbrough@yahoo.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com>; "Anna Rawl" <Rawlae@yahoo.com>
Sent: Monday, July 26, 2004 8:00 PM
Subject: Interview: Jeremy Wayne Barber

## MEMORANDUM
## ATTORNEY/CLIENT ONLY

TO: *Basham File*
FROM: *Carlisle McNair*
DATE: *July 22, 2004*
RE: *Jeremy Wayne Barber  DOB 02/13/82  SS# 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*
*410 Brown Rd. Madisonville, Ky.*
*270-797-7311 Heather(wife)  270-821-9302 Carol Minton(aunt)*

*On July 22, 2004, I spoke to Jeremy Wayne Barber at the Logan Co. Jail, where Barber was awaiting transfer to Kentucky Dept. of Corrections on a probation violation. Advised he has know Basham since they were nine years old. Barber advised he lived in Oakdale MHP, just a few blocks from Bashams house. Barber credits Basham for saving his life when he attempted to hang himself in the old Hopkins Co. Jail. Advised Basham apparently heard him gasping for air and gurgling and woke up. Advised Basham hollered for the correctional officer and held him up, keeping pressure off his neck, until help arrived. Advised it wasn't a scheme to escape from jail. Advised he meant to hang himself. Advised he was in a cell with Basham and the correctional officers had been giving them a hard time. Advised they took their cloths and bed linen from them and gave them each a sleeping bag. Advised he ripped strips from the sleeping bag to create a noose. Advised the correctional officers treated Basham badly and beat him while in jail. Advised the correctional officers would put Basham in solitary confinement for no reason whatsoever, for days at a time. Advised Amanda Churchwell, Bucky Emory's niece, caught Basham & Bucky having sex in Bucky's car. Advised Amanda works at Ferrell's Restaurant, also. Advised Basham never attempted anything sexual with him. Advised he received 18 months to serve.*

From:       "Carlisle McNair" <cjm0501@alltel.net>
To:         "Jack Swerling" <Jacklaw@aol.com>
Sent:       Monday, August 09, 2004 7:56 AM
Subject:    from: Carlisle

*Patricia Mayes Blake*
*2280 Fawcett Dr.*
*Madisonville, Ky.*
*270-535-8380 cell#*
*-married to Bobby Blake for 2 years*
*-divorced for 15 years*
*-Bobby was a very abusive husband*
*-Jimmy was a drunk*
*-Cathy was a drug user*
*-described Cathy as an "out & out nut case"*
*-Charlotte & Brandon were out of control children*
*-neither had a father or mother figure in their lives*
*-Cathy always complaining she couldn't do anything with Brandon*
*-not surprised Brandon is in trouble, based on his family life*

*Ellis McKechnie*
*5830 Isley Rd.*
*St. Charles, Ky*
*270-669-4285*
*-married to Becky Blake for 10 years*
*-divorced since 1983*
*-known Jimmy since they were teenagers*
*-Jimmy can fix anything, but never had any drive in life*
*-Brandon had too much mouth*
*-Cathy always used drugs*
*-knows Cathy stopped using drugs while pregnant with Charlotte; continued to use drugs*
* while pregnant with Brandon*

*Brenda Dwyer Zeller*
*930 Hinton Rd.*
*Lewisburg, Ky.*
*270-657-9580 w*
*-Brandon was a confused young man*
*-drank, smoked dope, took any pill he could get his hands on*
*-smoked crack cocaine with Cathy*
*-would steal to get drugs for Cathy*
*-when he was 5 or 6 years of age, Cathy had him going to get drugs for her*
*-if he didn't get his way he would start hitting the walls, throwing stuff, breaking stuff until he*
* got what he wanted*
*-Brandon is a follower*
*-knows Bucky Emory is gay and Brandon lived with him*
*-Cathy told Brenda Brandon was gay*

*Let me know if you want me to go with you, if you decide to talk to these people.*
*Carlisle*

**JA 3689**
2/9/2011

From:       "Carlisle McNair" <cjm0501@alltel.net>
To:         "Traci Theirolf" <traci@swerlinglaw.com>; "Steve Hisker" <hisker@scbar.org>; "Paige Tarr"
            <paige@brucklaw.com>; "Lisa Kimbrough" <lisajkimbrough@yahoo.com>; "Lesa Watson"
            <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>;
            "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg
            Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>;
            "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian
            Kandare" <akandare@justice.com>; "Anna Rawl" <Rawlae@yahoo.com>
Sent:       Saturday, August 14, 2004 8:13 AM
Subject:    Interview: Margie Woods Jimenez

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

TO:          *Basham File*
FROM:        *Carlisle McNair*
DATE:        *August 3, 2004*
RE:          *Margie Woods Jimenez   w/f   DOB 05/27/80   27yoa*
             *4297 Adams Mill Rd   Cadiz, Ky.  42211   270-522-5462*

*On August 3, 2004, I met with Margie Woods Jimenez at her father's residence at 2131 Miners Loop Beechmont, Ky. 270-476-2828. Margie advised the following:*
*-met BB in 1998 at Brenda Dwyer's house on Twin Tunnel Hill Rd. Dunmor, Ky.*
*-Brenda was seeing Jerome McKechnie, BB's cousin, who was living with Brenda. Brenda was 32 yoa at the time & Jerome was 21 yoa. Jerome had or has a drinking problem.*
*-Margie met Brenda, as well as Tommy Blake, over the CB radio. Much like e-mail is used today. Tommy's CB handle was "Green Rabbit". Margie couldn't remember Brenda's handle.*
*-Margie had an on & off relationship with BB until she moved to Arkansas, 12/200.*
*-BB would come to Dunmor looking for her. On occasion he would find her at Brenda's house*
*-Margie advised she would make herself hard to find, because she didn't want to spend as much time with BB as he wanted.*
*-Advised BB would have people give him rides to Dunmor to see her or look for her*
*-Advised the last time she saw BB was at Brenda's house. Jerome & BB got into a fight, doesn't remember what over, and Margie took BB to Madisonville.*
*-After getting to Madisonville, Margie advised BB took her car without her permission. When he returned, it was too late to drive back to Dunmor. Cathy let her spend the night. During the night, BB attempted to have anal sex with Margie, which she refused to do. Margie advised BB became violent and started beating & choking her. Advised she started screaming, hitting & kicking BB to get him off of her. Cathy came in and told BB to stop or she would call the police. BB left the house & Margie drive to Dunmor. This was the last time she saw BB.*
*-Margie advised she drove a Chevy Z-24, which BB has driven*
*-Advised BB is manipulative and a follower*
*-Advised she knows Bucky Emory and that he is gay. She also knows BB would spend a lot of time at Bucky's house.*
*-Advised she knew BB received a check every month that Cathy would get and spend the money on drugs*
*-Advised she remembers only one occasion BB had money. He gave her money for gas.*
*-Advised BB never used drugs in front of her, but she knew he was a user*
*-Advised she also knew Cathy used drugs, that she was always "spaced out & jumpy."*
*-Advised she met Charlotte at Brenda's house sometime after she met BB. She saw Charlotte a second time at BB's house in Madisonville for a short time. She had Brittany with her & was leaving as she was arriving.*
*-Advised she feels BB's parents hated him. They didn't want him near them. Cathy was always cussing at BB, calling him a "little bastard and motherfucker". Jimmy acted as if BB wasn't even there. BB grew up with a alcoholic father & a drug using mother.*

**JA 3690**

2/22/2011

-Advised BB is a compulsive liar. He would lie about his age, anything. One would never know when or if he was telling the truth or not.

-Advised BB got his finger cut off helping Tommy Blake work on a lawnmower

-Advised BB lived with Brenda for approx. 2 months. She saw BB on daily during that period in 1998

-Advised she has never been at Western State Hospital nor has she ever visited anyone there

-Advised she was in jail one time for bad checks, 3/2001. She served 1 month. Has not been back.

-Advised she met Jaime Jimenez 4/2001, got pregnant, married 7/2002 and moved to Cadiz, Ky.

-Advised BB wrote her letters which he sent to Brenda's house. Advised she never read them.

-Advised she does not want to testify, that it's a close chapter in her life

-Advised she is a housewife with two small children. She doesn't have anyone who can take care of them if she had to come to SC

**JA 3691**
2/22/2011

From:     "Carlisle McNair" <cjm0501@alltel.net>
To:     "Anna Rawl" <Rawlae@yahoo.com>; "Adrian Kandare" <akandare@justice.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Carolyn Graham" <cgrahamsc@aol.com>; "ecr" <ecr@nmrs.com>; "Gary Collias" <gacollias@citynet.net>; "Greg Cook" <wvcookpi@citynet.net>; "Greg Harris" <GregHarris@justice.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Jean Strickler" <jeans@swerlinglaw.com>; "Lesa Watson" <yetto@mis.net>; "Lisa Kimbrough" <lisajkimbrough@yahoo.com>; "Paige Tarr" <paige@brucklaw.com>; "Steve Hisker" <hisker@scbar.org>
Sent:     Sunday, August 15, 2004 6:27 AM
Subject:     Interview: Brenda Dwyer Zellers

# MEMORANDUM
## ATTORNEY/CLIENT ONLY

TO:        *Basham File*
FROM:    *Carlisle McNair*
DATE:     *August 5, 2004*
RE:        *Interview: Brenda Dwyer Zellers  w/f  DOB 08/06/67*
                     *930 Hinton Rd.*
                     *Lewisburg, Ky.   270-657-9580 w*

*On August 5, 2004, I spoke to Brenda Dwyer Zellers at her place of employment at Lake Malone. Brenda advised the following:*
*-Jerome McKechnie, BB's cousin, lived with her in Dunmor, Ky. in 1998*
*-BB would come from Madisonville and visit and stay on occasion*
*-Margie Woods met BB while he was staying at her house*
*-described BB as a confused young man*
*-BB drank alcohol, smoked marijuana and took any type of pill he could get his hands on*
*-BB told Brenda he smoked crack cocaine with Cathy all the time*
*-BB would steal to get he and his mother drugs*
*-advised BB told her when he was around 5 or 6 yoa, Cathy would send him out on the street to buy her drugs*
*-advised she has seen BB hit the walls, throw stuff around, break things, throw a temper tantrum, until he got his way. It was his way or things would start getting destroyed.*
*-advised she has never seen BB drive, but Margie has told her BB drove her car a lot of times*
*-advised BB is, without a doubt, a follower*
*-advised she has always suspected BB of being homosexual*
*-advised Cathy told her BB was homosexual*
*-advised she has taken BB to Bucky Emory's house, on occasion, after Cathy had thrown BB out. Brenda knows Bucky is homosexual*

**JA 3692**
2/22/2011

# Reply Exhibit 22

JA 3693

**From:**    "Carlisle McNair" <cjm0501@alltel.net>
**To:**    "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com>
**Sent:**    Sunday, December 07, 2003 8:57 PM
**Subject:**    Carlisle's plans

Going to Hopkinsville/Madisonville to locate & talk to:

1. **Angel Eichelholz**
  **-wrote letters back & forth to Branden while in jail**
2. **Det. Paul Johnson**
  **-arrested Branden on Nebo Rd in 2001**
3. **Jimmy Hill**
  **-homosexual friend of Branden**
  **Looking forward to this one**
4. **Jeremy Babar**
  **-another homo friend of Branden's**
  **Can't wait**
5. **Linda McVay**
  **-in jail with Veronica**
6. **Charlotte Morris**
  **-follow-up on interview Paige had with ex-in laws**
7. **Tom DeFatte**
  **-attempt to locate**
  **-assaulted Branden as a child**
8. **Talk to Lindsey Clan's mother about possible three way calls she may have done for Veronica.**
9. **Attempt to locate and talk to inmates who were in jail with Fulks & Basham.**
10. **Serve two subpoenas for records in Nashville & Russellville, Ky.**

**Carlisle McNair**
**803-608-5576 cell**
**cjm0501@alltel.net**

# Reply Exhibit 23

JA 3695

| | |
|---|---|
| **From:** | "Carlisle McNair" <cjm0501@alltel.net> |
| **To:** | "Addison" <saddison@cityofconway.com>; "Domogauer" <jdomogauer@cityofconway.com>; "hendrick" <shendrick@cityofconway.com>; "hipp" <chipp@cityofconway.com>; "Parker" <dparker@cityofconway.com>; "perrit" <lperrit@cityofconway.com>; "rizzo" <rrizzo@cityofconway.com>; "schilling" <lschilling@cityofconway.com>; "sessions" <csessions@cityofconway.com>; "staples" <tstaples@cityofconway.com>; "wilkerson" <twilkerson@cityofconway.com> |
| **Sent:** | Monday, October 13, 2003 9:39 PM |
| **Subject:** | Fw: Fulks & Basham |

*My name is Carlisle McNair. I retired October 2002, with 27 years, as Captain of Investigations, with the Lexington County Sheriff's Department. I am an FBINA Graduate, 184th Session, and currently have a Private Investigations agency in Columbia, McNair Investigations, SLED # 2188. I have been appointed by the Federal Court as an investigator, assigned to Jack Swerling, court appointed attorney for Basham. I know I am working on the other side, but the "FACTS DON'T CHANGE." I am, and will always be, a "cop" at heart. Fulks & Basham are in a heap of trouble and I am, in no way, attempting to change those facts.*

*Swerling has directed me to conduct interviews of all parties, civilian and law enforcement, pertaining to this case. Reviewing the discovery, I saw your name on lead sheets. I just need you to take the time to answer one question:*

*Other than the leads you were assigned, and based on what you know about the case, is there <u>anything,</u> good or bad, you can share with me pertaining to Fulks & Basham?*

*Please e-mail me with your response. Thank you for taking the time to do so.*

*Be safe.*
*Carlisle McNair*
*803-356-2324 h*
*803-608-5576 cell*
*803-765-2626 w*
*<u>cjm0501@alltel.net</u>*

**JA 3696**

2/9/2011

# Reply Exhibit 24

JA 3697

Fax from   : 9 202 639 6091

04-01-08 03:43    Pg:  1

# FAX TRANSMITTAL     JENNER&BLOCK

Jenner & Block LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington DC, DC 20005
Tel  202 639-6000
www.jenner.com

Chicago
Dallas
New York
Washington, DC

| | | | |
|---|---|---|---|
| Date: | April 1, 2008 | | |
| To: | Jack B. Swerling, Esq. | Fax:<br>Voice: | 803 799-4059 |
| From: | Melissa A. Meister<br>mmeister@jenner.com | Fax:<br>Voice: | 202 661-4805<br>202 639-6034 |
| Employee Number: | | Client Number: | 63020-10004 |

**Important:** This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is attorney work product, privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via postal service. Thank you.

**Message:**
Please read the enclosed letter.  Thank you.

| | |
|---|---|
| Total number of pages including this cover sheet: 7 | Time Sent: |
| If you do not receive all pages, please call: 202 639-6000 | Sent By: |
| Secretary: | Extension: 6034 |

**JA 3698**

Fax from   : 9 202 639 6091                              04-01-08 03:43    Pg:  2

## JENNER&BLOCK

April 1, 2008

Jenner & Block LLP          Chicago
601 Thirteenth Street, NW    New York
Suite 1200 South             Washington, DC
Washington, DC 20005
Tel 202-639-6000
www.jenner.com

**VIA FACSIMILE**

Melissa A. Meister
Tel  202 639-6034
Fax  202 661-4805
mmeister@jenner.com

Jack B. Swerling, Esq.
1720 Main Street
Suite 301
Columbia, SC  29201

Re:     *United States v. Brenden Basham* Trial Files

Dear Mr. Swerling:

This letter is to follow up on the numerous requests that my co-counsel, Timothy J. Sullivan, and I have made for the trial files of our client, Branden Basham. I understand that you are no doubt busy with other matters, but as you are aware, we have a firm deadline of April 29, 2008, by which to file Mr. Basham's appeal, and his trial files are essential to our ability to do so. Therefore, if I do not receive the files that I requested on Wednesday, March 31st, by 5:00 p.m. on Friday, April 4th, I will file a motion with the United States Court of Appeals for the Fourth Circuit, asking for court-ordered production of the files.

I appreciate your work-load and resources, but you have known of our need for the files since at least January 14, 2008, when Mr. Sullivan wrote you a letter requesting that you provide him with a set of Basham's trial files, or permit him access to the files in person. Additionally, Mr. Sullivan met with you in person on January 29, 2008, and again requested Basham's files, which you stated that you would provide. It is my understanding that Mr. Sullivan attempted to follow up on his requests via phone after the meeting, but was unable to reach you.

I contacted you via phone on March 26, 2008, and in an effort to be conciliatory and speed up the production of relevant files, I requested a list of specific items from Basham's trial files. I then provided you with a written list of these items via e-mail on March 26, 2008, along with a Federal Express number so that neither you nor your firm would have to bear the expense of producing these documents. I also informed you that I needed the items delivered to me by March 31st. Alternatively, I offered to fly down to South Carolina on Monday, March 31st to retrieve relevant items myself, so as to avoid unnecessary burden on your resources. I e-mailed you again on Thursday, March 27, 2008, to insure that you received the list of items necessary and you assured me via e-mail that you would "get someone on it." When I did not receive any files on March 31st, I e-mailed you again to ask for production of the files and you stated that you "did not understand the urgency" and would "get with staff in am."

I am sure you understand the grave nature of a death penalty appeal and the necessity for a person facing imposition of the death penalty to be represented by able and informed counsel. Basham's trial files are essential to our ability, as counsel on appeal, to represent Basham ably and effectively. I therefore hope that you can locate and provide, as quickly as possible, the

**JA 3699**

Fax from  : 9 202 639 6091                                04-01-08 03:44    Pg:   3

Jack B. Swerling, Esq.
April 1, 2008
Page 3


items that I requested last Wednesday (a list of which is attached to this letter).  Conversely, if it is more administratively feasible for you, you are welcome to Federal Express all of Basham's trial files to me and I will go through them for the relevant materials.  Thank you.

Sincerely,

Melissa A. Meister
Attorney


Enclosures

cc:    Tim Sullivan

### Items Requested From Basham's Trial Files

(1)  The videotape of the Basham scuffle from 9/20/2004.  Please also include any audiotape recordings and/or transcripts.

(2)  Any and all motions regarding the disqualification of Monckton and Littlejohn.  These items are not listed on PACER, though we know them to exist.

(3)  The following motion:

12/11/2002        22  MOTION by Branden L Basham for determination of mental competency (amil) Modified on 12/13/2002 (Entered: 12/11/2002)

(4)  Any psychological report filed with the Court on behalf of Basham, including Dr. Schwartz-Watts' report.

(5)  Any transcript that you have of the following docket entry:

10/07/2004        775  TRANSCRIPT OF MOTION HEARING/ with sealed envelope of sealed portion of hearing as to Brandon L Basham for dates of 8/2/04 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Debra Jernigan (mflo) Modified on 5/18/2006 (mflo, ). (Entered: 10/07/2004)

(6)  Any transcript or notes that you have of the Government's closing argument at the guilt phase of Fulks' trial, which was on 6/29/2004.

I also have a number of motions from the Fulks' trial that I would appreciate, to the extent you have them.  They are as follows:

4:02-cr-00992-JFA-1

10/09/2003        176  MOTION by Chadrick E Fulks for Bill of Particulars , and Renewal Motion for Disclosure of intent to use evidence of other crimes, wrongs or acts under Rule 404(b) (mflo) (Entered: 10/09/2003)

12/31/2003        214  MOTION by Chadrick E Fulks in limine to exclude evidence of unadjudicated offenses or in the alternative to establish procedure for pretrial determination of admissibility of such evidence and for specified burden of proof to be sustained by the Government with respect to unadjudicated offenses offered at the sentencing phase (mflo) (Entered: 12/31/2003)

12/31/2003        219  MOTION by Chadrick E Fulks to preclude or place substantive limitations on and establish procedural protections for the

**JA 3701**

Fax from   : 9 202 639 6091                                      04-01-08 03:44     Pg: 5

admissibility and consideration of victim impact evidence (mflo)
(Entered: 12/31/2003)

| | | |
|---|---|---|
| 05/10/2004 | 560 | RE-FILED MOTIONS by Chadrick E Fulks to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence , to allow allocution without cross examination during penalty phase , in limine to exclude evidence of unjudicated offenses, or in the alternative to establish procedure for pretrial determination of admissibility of such evidence, and for specified burden of proof to be sustained by the government with espect to unadjudicated offenses offered at the sentencing phase , to strike and/or limit aggravating factors , to strike (mflo) (Entered: 05/10/2004) |
| 05/24/2004 | 581 | MOTION by Chadrick E Fulks in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a realiability hearing (mflo) (Entered: 05/24/2004) |
| 05/24/2004 | 583 | MOTION by Chadrick E Fulks in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement (mflo) (Entered: 05/24/2004) |
| 05/26/2004 | 597 | RESPONSE by USA as to Chadrick E Fulks re [583-1] motion in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement (mflo) (Entered: 05/26/2004) |
| 05/27/2004 | 599 | MOTION HEARING as to Chadrick E Fulks held before Chief Judge Joseph F. Anderson Jr ORAL ORDER tentative denied [589-1] motion in limine to prohibit evidence of the abuse of Myles Evans as to Chadrick E Fulks (1), under advisement [588-1] motion for appropriate limitations on admission and consideration of evidence in support of non statutory aggravating factors as to Chadrick E Fulks (1), granted in part and denied in part [586-1] motion in limine to exclude to redact portions of letters as to Chadrick E Fulks (1), denying [585-1] motion for John Blume and William Nettles to withdraw as attorney as to Chadrick E Fulks (1), under advisement [584-1] motion in limine to exclude to limit admission and consideration of evidence in support of future dangerousness to information showing that defendant poses a future danger within the confines of a Federal Prison as to Chadrick E Fulks (1), denied [583-1] motion in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement as to Chadrick E Fulks (1), mooting [582-1] |

2

**JA 3702**

Fax from   : 9 202 639 6091                                    04-01-08 03:45    Pg:  6

motion for Disclosure of exculpatory material information as to Chadrick E Fulks (1), denied in part and tentative granted in part [581-1] motion in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a realiability hearing as to Chadrick E Fulks (1), mooting [566-1] motion to preclude the Government from utilizing jailhouse snitch testimony as to Chadrick E Fulks (1), mooting [565-1] motion for Disclosure of Government communications with witnesses presently exposed to criminal liability as to Chadrick E Fulks (1), under advisement [560-1] motion to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence as to Chadrick E Fulks (1), under advisement [560-2] motion to allow allocution without cross examination during penalty phase as to Chadrick E Fulks (1), under advisement [560-3] motion in limine to exclude evidence of unjudicated offenses, or in the alternative to establish procedure for pretrial determination of admissibility of such evidence, and for specified burden of proof to be sustained by the government with espect to unadjudicated offenses offered at the sentencing phase as to Chadrick E Fulks (1), under advisement [560-4] motion to strike and/or limit aggravating factors as to Chadrick E Fulks (1), terminated [560-5] motion to strike as to Chadrick E Fulks (1); detailed order to be filed on these rulings; Court Reporter: Gary Smith. (mflo) Modified on 05/28/2004 (Entered: 05/27/2004)

| | | |
|---|---|---|
| 05/28/2004 | 600 | ORDER NO. 43 as to Chadrick E Fulks remains under adisement [589-1] motion in limine to prohibit evidence of the abuse of Myles Evans, denied [588-1] motion for appropriate limitations on admission and consideration of evidence in support of non statutory aggravating factors, denied [585-1] motion for John Blume and William Nettles to withdraw as attorney, denied [584-1] motion in limine to exclude to limit admission and consideration of evidence in support of future dangerousness to information showing that defendant poses a future danger within the confines of a Federal Prison, denied [583-1] motion in limine to exclude for the government from relying upon evidence of certain alleged prior bad acts due to non complaince with notice requirement, mooting [582-1] motion for Disclosure of exculpatory material information, granted in part and denied in part [581-1] motion in limine to exclude the government from referring in opening statement to any unadjudicated prior offenses and from introducing evidence of such offenses prior to a realiability hearing, mooting [566-1] motion to preclude the Government from utilizing jailhouse snitch testimony, mooting |

3

JA 3703

Fax from  : 9 202 639 6091                           04-01-08 03:45    Pg: 7

[565-1] motion for Disclosure of Government communications with witnesses presently exposed to criminal liability, denied in part and deferred in part until trial [560-1] motion to preclude or place substantive limitations on and establish procedural protections for the admissibility and consideration of victim impact evidence, denied [560-2] motion to allow allocution without cross examination during penalty phase, denied in part and granted in part [560-3] motion in limine to exclude evidence of unjudicated offenses, or in the alternative to establish procedure for pretrial determination of admissibility of such evidence, and for specified burden of proof to be sustained by the government with espect to unadjudicated offenses offered at the sentencing phase, remains under advisement [560-4] motion to strike and/or limit aggravating factors, terminated [560-5] motion to strike (Signed by Chief Judge Joseph F. Anderson Jr ) (mflo) (Entered: 05/28/2004)

| Date | No. | Entry |
|------|-----|-------|
| 06/18/2004 | <u>632</u> | TRANSCRIPT OF MOTIONS HEARING as to Chadrick E Fulks, Branden L Basham for dates of 1/15/03 before Chief Judge Joseph F. Anderson Jr held in Columbia Court Reporter: Jack Clarke (mflo) Modified on 5/31/2006 (mflo, ). (Entered: 06/18/2004) |
| 05/24/2004 | 584 | MOTION by Chadrick E Fulks in limine to exclude to limit admission and consideration of evidence in support of future dangerousness to information showing that defendant poses a future danger within the confines of a Federal Prison (mflo) (Entered: 05/24/2004) |

4

JA 3704 P.07

# Reply Exhibit 25

JA 3705

Fwd: Letter Dated April 1, 2008

**From:** jacklaw@aol.com
**To:** tsullivan@bsm-legal.com; jacklaw@aol.com
**Subject:** Fwd: Letter Dated April 1, 2008
**Date:** Tue, 1 Apr 2008 5:17 pm

-----Original Message-----
From: jacklaw@aol.com
To: MMeister@jenner.com; Jacklaw@aol.com
Sent: Tue, 1 Apr 2008 5:10 pm
Subject: Re: Letter Dated April 1, 2008

your letter was totally unneccessary in its tone and content. i am sorry that you are under a deadline by april 29,2008,,but don't try and pass off the fault to me.
when you contacted me on wednesday, i told you i was on my way out of town. you asked about certain documents and you were willing to try and get them from the court or other sources, but in an effort to make it easier on you i said we would help and that is what we are doing.
when i spoke with you and when i spoke with tim i made it perfectly clear that the files were here and that they were extensive. NO request has been made of me to provide you with anything until last week and that was volunteered on my part. i told tim when he was here that the files were available to him or anyone else and copies could be made of whatever was wanted. he said he would get back with me as to how he wanted it done i repeat NO request was made of me for any contents of the file until we spoke last week.
i arrived home from florida on monday evening and i am trying to get what you want

-----Original Message-----
From: Meister, Melissa A. <MMeister@jenner.com>
To: jacklaw@aol.com
Cc: Timothy J. Sullivan <tsullivan@bsm-legal.com>
Sent: Tue, 1 Apr 2008 4:50 pm
Subject: Letter Dated April 1, 2008

Jack,

This letter was also sent to you via fax, but I wanted to shoot it to you via e-mail as well.

Thank you,

Melissa

**Melissa A. Meister**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

Planning your summer road trip? Check out AOL Travel Guides.

Planning your summer road trip? Check out AOL Travel Guides.

JA 3796

# Reply Exhibit 26

JA 3707

Re: Letter Dated April 1, 2008

From: jacklaw@aol.com
To: MMeister@jenner.com; Jacklaw@aol.com
Cc: tsullivan@bsm-legal.com
Subject: Re: Letter Dated April 1, 2008
Date: Tue, 1 Apr 2008 5:32 pm

in the event you deem it necessary to file a motion in the fourth circuit as you threatened to do, please be advised that my position is that until last wednesday march 26, no request was made of me as to any specific document from the file. in fact i offered to try and assist you in retrieving the documents you were seeking rather than have you run around in circles looking for them. i have never refused to make the file available to anyone whether it be for the purpose of review or copying. your letter appears to be an effort to pass on to me some blame for your running short on the time for filing your brief. i will not accept that.

-----Original Message-----
From: Meister, Melissa A. <MMeister@jenner.com>
To: jacklaw@aol.com
Cc: Timothy J. Sullivan <tsullivan@bsm-legal.com>
Sent: Tue, 1 Apr 2008 4:50 pm
Subject: Letter Dated April 1, 2008

Jack,

This letter was also sent to you via fax, but I wanted to shoot it to you via e-mail as well.

Thank you,

Melissa


**Melissa A. Meister**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.


Planning your summer road trip? Check out AOL Travel Guides.

**JA 3708**
                                                                                                                4/1/2008

## Linda Brown

**From:** "Jack B Swerling" <jacklaw@aol.com>
**To:** "Linda Brown" <linda@swerlinglaw.com>
**Sent:** Tuesday, April 01, 2008 5:57 PM
**Subject:** Fw: Letter Dated April 1, 2008

Please run copy and put on my desk.
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Jack B Swerling" <jacklaw@aol.com>

Date: Tue, 1 Apr 2008 21:53:59
To:"Meister, Melissa A." <MMeister@jenner.com>
Cc:tsullivan@bsm-legal.com, "Jack Swerling" <jacklaw@aol.com>
Subject: Re: Letter Dated April 1, 2008


You may come down whenever you wish and may copy whatever you want. By the way
there hasn't been any miscommunication- no one asked me for anything. The files are and
have been available for rev iew and copying. Had you not waited until march 26th, With
a deadline of march 31 ( especially when i volunteered to help) perhaps we could have
helped even more
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Meister, Melissa A." <MMeister@jenner.com>

Date: Tue, 1 Apr 2008 17:42:32
To:<jacklaw@aol.com>
Cc:<tsullivan@bsm-legal.com>
Subject: RE: Letter Dated April 1, 2008


Jack,

I understand your position, and as I said on the phone, I do apologize if there was a

4/2/2008

miscommunication between Mr. Sullivan and myself, or between Mr. Sullivan and you. I am not trying to pass off my deadlines on to you, and I appreciate your offer to make the files available to me on such short notice. I certainly would have been down sooner had I known that was the case.

I am available to come down this Thursday to look through all the files, make copies of what is necessary for the appeal, and send the copies back to my office. Hopefully, this will be the least inconvenience to you and anyone in your office. I will let you know, via e-mail as you requested, as soon as I confirm flight times, as you said that anytime will work with your schedule.

Thank you.

Melissa

JA 3710

Jack,

This letter was also sent to you via fax, but I wanted to shoot it to you via e-mail as well.

Thank you,

Melissa

-----------------

Melissa A. Meister
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com <mailto:MMeister@jenner.com>
www.jenner.com <http://www.jenner.com/>

CONFIDENTIALITY WARNING: This email may contain privileged or confidential
information and is for the sole use of the intended recipient(s). Any unauthorized use or
disclosure of this communication is prohibited. If you believe that you have received this
email in error, please notify the sender immediately and delete it from your system.

-----------------

-----------------

Planning your summer road trip? Check out AOL Travel Guides
<http://travel.aol.com/travel-guide/united-states?ncid=aoltrv00030000000015> .

JA 3711
4/2/2008

# Reply Exhibit 27

JA 3712

Page 1 of 2

## Linda Brown

**From:** "Jack B Swerling" <jacklaw@aol.com>
**To:** "Linda Brown" <linda@swerlinglaw.com>
**Sent:** Friday, April 04, 2008 10:47 AM
**Subject:** Fw: Confirmation of Document Arrangements

Please run copy and put on my desk.
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Jack B Swerling" <jacklaw@aol.com>

Date: Fri, 4 Apr 2008 13:20:21
To:"Melissa Meister" <meisterjd@gmail.com>, "Jack Swerling" <jacklaw@aol.com>
Subject: Re: Confirmation of Document Arrangements

You are welcome. Just so you will know i don't let files out my office without knowing what's going or being copied by me first. I have had a couple of bad experiences. If you need anything further just ask and we will try to accommodate
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Melissa Meister" <meisterjd@gmail.com>

Date: Thu, 3 Apr 2008 22:10:32
To:jacklaw@aol.com
Subject: Confirmation of Document Arrangements

Jack,

I just wanted to send you an e-mail confirming the box arrangements we made this evening. After a review of all of Basham's trial files, I had pulled two boxes' worth of materials to be copied and shipped to me. Those boxes were handed off to Brandon at Document Technologies Inc. to be copied and shipped. However, after learning that you did not want the boxes to be stored out of your office overnight, I made arrangements to

**JA 3713**
4/4/2008

have the boxes returned to your office (which I understand they were at approximately 5:30 p.m.), and to have Document Technologies pick those two boxes back up at 8:30 a.m. from your office to be copied off-site, the originals returned to you, and the copies sent to me in D.C.

I will be checking in with Document Technologies tomorrow to make sure everything goes smoothly, and I made a list of everything I loaded into the boxes, so that if something should get lost in the shuffle, we'll know what it is. If you have any questions or concerns, feel free to e-mail me, as I'll be checking my Blackberry.

Thanks again for the unfettered access on such short notice.

Melissa A. Meister

# Reply Exhibit 28

JA 3715

## Declaration of Christine R. Oliver

I, Christine R. Oliver, declare under penalty of perjury the following to be true to the best of my information and belief:

1.    I am a paralegal with the Capital Habeas Unit of the Federal Public Defender's Office in Arizona. Our office has been appointed to assist Mr. Brandon Basham in federal court.

2.    In February 2011, Michael Burke, Sarah Stone and I went to Jack Swerling's office.

3.    Over a one-week period, we reviewed the contents of 77 boxes of discovery.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this 2 day of March 2012.

_Christine R. Oliver_
Christine R. Oliver

JA 3716

# Reply Exhibit 29

JA 3717

Re: Statements made by Basham re Burns case                                    Page 1 of 2

From: Jack B Swerling <jacklaw@aol.com>
     To: Meister, Melissa A. <MMeister@jenner.com>; Jack Swerling <jacklaw@aol.com>
Subject: Re: Statements made by Basham re Burns case
  Date: Fri, 18 Apr 2008 3:18 pm

I know there are statements from w va but i do not recall if anything physically
entered in the record.
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Meister, Melissa A." <MMeister@jenner.com>

Date: Fri, 18 Apr 2008 13:32:41
To:"jacklaw@aol.com" <jacklaw@aol.com>
Subject: RE: Statements made by Basham re Burns case


Thanks for getting back to me...I have the testimony from Vito and Long re the
statements Basham made to authorities about Donovan, but I have no statements
regarding Burns, yet he pled guilty in WV.  To your knowledge, is there any
record of Basham relating the events of the Burns' murder to authorities that
would be in the Basham or Fulks' record?  If not, I'll go with what I have, but
obviously, Fulks made some pretty damning statements about Basham's behavior in
the Burns case and I'd like to insert Basham's account to the extent it's on the
record.  Thanks.

Melissa

-----Original Message-----
From: Jack B Swerling [mailto:jacklaw@aol.com]
Sent: Friday, April 18, 2008 2:29 PM
To: Meister, Melissa A.; Jack Swerling
Subject: Re: Statements made by Basham re Burns case

I was in a trial when you asked and i am off today. Did i answer you. I do not
have an exhibit list or docket sheet but if there is an indication a statement
was entered let me know and i will try and find it.
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Meister, Melissa A." <MMeister@jenner.com>

Date: Thu, 17 Apr 2008 09:15:22
To:"jacklaw@aol.com" <jacklaw@aol.com>
Subject: RE: Statements made by Basham re Burns case


Well, I'm bound by whatever is in the record, so the extent that there were 302s
introduced by the Government regarding Basham's statements to FBI about Burns
and Donovan, I'm looking for those.  Does that help?

Melissa

-----Original Message-----
From: Jack B Swerling [mailto:jacklaw@aol.com]
Sent: Thursday, April 17, 2008 7:46 AM
To: Meister, Melissa A.; Jack Swerling
Subject: Re: Statements made by Basham re Burns case

JA 3718

There we're statements. Are you referring to a physical statement introduced ?
------Original Message------
From: Meister, Melissa A.
To: Jack Swerling
Sent: Apr 16, 2008 7:24 PM
Subject: Statements made by Basham re Burns case


Jack,

Were there ever any exhibits regarding Basham's statements, to the FBI,
regarding the Burns carjacking and murder?  I have Fulks' statements, but
they're rather incriminatory toward Branden, and I'm guessing he said something
different?  Anyway, to the extent there is anything that was filed in the
record, could you let me know?  Thanks much.

Melissa

---

Melissa A. Meister
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
http://www.jenner.com/

CONFIDENTIALITY WARNING: This email may contain privileged or confidential
information and is for the sole use of the intended recipient(s). Any
unauthorized use or disclosure of this communication is prohibited. If you
believe that you have received this email in error, please notify the sender
immediately and delete it from your system.

---

Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

Exhibit Index to Defendant's Reply to Memorandum of Law of the United States in Opposition to Defendant's Motion for Collateral Relief

Reply Exhibit 1: Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 2: Handwritten note authored by Jack Swerling on September 17, 2004

Reply Exhibit 3: Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 4: Handwritten note authored by Jack Swerling on September 22, 2004

Reply Exhibit 5: Handwritten notes authored by Jack Swerling on September 29-30, 2004

Reply Exhibit 6: Undated memorandum from Erik Haren

Reply Exhibit 7: Clif LeBlanc, *Swerling Tells of Being Terrorized*, The State, February 11, 2004

Reply Exhibit 8: Clif LeBlanc, *2 Charged in Break-in at Area lawyer's Home*, The State, May 15, 2003

Reply Exhibit 9: Out of Court Hourly Worksheets - Jack B. Swerling - January and February 2004

Reply Exhibit 10: Handwritten note authored by Jack Swerling on January 17, 2004

Reply Exhibit 12: *Publicity Hinders Swerling Jury Choices*, The State, February 10, 2004

Reply Exhibit 13: Clif LeBlanc, *Causey is Sentenced to Life Without Parole*, The State, February 13, 2004

Reply Exhibit 14: E-mail to a federal trials listserve authored by Jack Swerling, February 19, 2004

**JA 3720**

Reply Exhibit 15:    *Swerling Walking in Victims' Shoes*, The State, February 25, 2004

Reply Exhibit 16:    Carlisle McNair's Personnel File, Internal Affairs Report, and Discipline subpoenaed from Lexington County Sheriff's Department

Reply Exhibit 17:    Notice of Disciplinary Action, December 16, 1998

Reply Exhibit 18:    Internal Affairs Investigative Report, November 2, 1998

Reply Exhibit 19:    Internal Affairs Investigative Report, November 30, 2001

Reply Exhibit 20:    Investigative Report, June 20, 2002

Reply Exhibit 21:    Memorandums authored by Carlisle McNair, January 21, 2004 and April 16, 2004

Reply Exhibit 22:    Memorandums authored by Carlisle McNair, November 17, 2003 thru August 5, 2004

Reply Exhibit 23:    E-mail authored by Carlisle McNair, October 13, 2003

Reply Exhibit 24:    Letter authored by Melissa A. Meister to Jack B. Swerling, April 1, 2008

Reply Exhibit 25:    E-mail authored by Jack B. Swerling, April 1, 2008 5:10 p.m.

Reply Exhibit 26:    E-mail authored by Jack B. Swerling, April 1, 2008 5:32 p.m.

Reply Exhibit 27:    E-mails authored by Melissa A. Meister and Jack B. Swerling, April 3, 2008 and April 4, 2008

Reply Exhibit 28:    Declaration of Christine R. Oliver, March 2, 2012

Reply Exhibit 29:    E-mails authored by Melissa A. Meister and Jack B. Swerling, April 16, 2008 and April 18, 2008

Reply Exhibit 30:    E-mail authored by Melissa A. Meister to Jack B. Swerling, May 3, 2008

**JA 3721**

Reply Exhibit 31:   E-mail authored by Melissa A. Meister to Jack B.Swerling, April 16, 2008

# Reply Exhibit 30

JA 3723

## Linda Brown

**From:** "Jack B Swerling" <jacklaw@aol.com>
**To:** "Linda Brown" <linda@swerlinglaw.com>
**Sent:** Sunday, May 04, 2008 9:12 AM
**Subject:** Fw:

Please run copy and put on my desk.
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Jack B Swerling" <jacklaw@aol.com>

Date: Sun, 4 May 2008 12:27:12
To:"Meister, Melissa A." <MMeister@jenner.com>
Cc:"Haren, Eric R." <EHaren@jenner.com>, "Jack Swerling" <jacklaw@aol.com>
Subject: Re:


I seem to remember that when fulks and basham were still joined we were allowed to join
in each others motions. Do you have all the transcripts from those hearings ?
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Meister, Melissa A." <MMeister@jenner.com>

Date: Sat, 3 May 2008 14:21:48
To:"jacklaw@aol.com" <jacklaw@aol.com>
Cc:"Haren, Eric R." <EHaren@jenner.com>
Subject:


Jack,

I am quite sure that you have other matters on your plate, but finding a place where you
and Harris explicitly challenged the Government's "intrinsic acts" position is critical to
Brandon's appeal.  Have you found anything yet on this issue?  I know that you

JA 3724

mentioned a joint motion with Fulks.  We have not found anything, unfortunately.

Also, to the extent that you can find anything that was introduced by Basham regarding the Burns matter, that would also be very helpful.

Unfortunately, time is running short for filing this appeal, so the sooner you can get back to me, the better.

Thank you,

Melissa

---

Melissa A. Meister
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
http://www.jenner.com/

Please note the Washington office of Jenner & Block will be moving. Effective May 24, 2008 our new address will be 1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412. Our telephone numbers will remain unchanged.

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

# Reply Exhibit 31

JA 3726

## Linda Brown

**From:** "Jack B Swerling" <jacklaw@aol.com>
**To:** "Linda Brown" <linda@swerlinglaw.com>
**Sent:** Thursday, April 24, 2008 5:55 PM
**Subject:** Fw: Items from Basham file

Please run copy and put on my desk.
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Jack B Swerling" <jacklaw@aol.com>

Date: Thu, 17 Apr 2008 11:43:01
To:"Meister, Melissa A." <MMeister@jenner.com>,     "Jack Swerling"
<jacklaw@aol.com>
Subject: Re: Items from Basham file


There would be a 302 for every witness they interviewed. Can you give me an idea of
what you are looking for. Also may need a disclosure order- i would need to check with
the judge
Jack B Swerling
cell 803-237-6300
office 803- 765-2626
fax 803-799-4059

-----Original Message-----
From: "Meister, Melissa A." <MMeister@jenner.com>

Date: Wed, 16 Apr 2008 22:45:58
To:"jacklaw@aol.com" <jacklaw@aol.com>
Subject: Items from Basham file


I was wondering if it's possible to get all of the FBI statements (the agent reports) from
Basham's file? I don't recall those when I was down in your office, but given the amount
of paper, I could have easily missed them.

Melissa

JA 3727

4/25/2008

Exhibit Index to Defendant's Reply to Memorandum of Law of the United States
in Opposition to Defendant's Motion for Collateral Relief

Reply Exhibit 1:    Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 2:    Handwritten note authored by Jack Swerling on September 17, 2004

Reply Exhibit 3:    Handwritten note authored by Jack Swerling on September 20, 2004

Reply Exhibit 4:    Handwritten note authored by Jack Swerling on September 22, 2004

Reply Exhibit 5:    Handwritten notes authored by Jack Swerling on September 29-30, 2004

Reply Exhibit 6:    Undated memorandum from Erik Haren

Reply Exhibit 7:    Clif LeBlanc, *Swerling Tells of Being Terrorized*, The State, February 11, 2004

Reply Exhibit 8:    Clif LeBlanc, *2 Charged in Break-in at Area lawyer's Home*, The State, May 15, 2003

Reply Exhibit 9:    Out of Court Hourly Worksheets - Jack B. Swerling - January and February 2004

Reply Exhibit 10:   Handwritten note authored by Jack Swerling on January 17, 2004

Reply Exhibit 12:   *Publicity Hinders Swerling Jury Choices*, The State, February 10, 2004

Reply Exhibit 13:   Clif LeBlanc, *Causey is Sentenced to Life Without Parole*, The State, February 13, 2004

Reply Exhibit 14:   E-mail to a federal trials listserve authored by Jack Swerling, February 19, 2004

**JA 3728**

Reply Exhibit 15:    *Swerling Walking in Victims' Shoes*, The State, February 25, 2004

Reply Exhibit 16:    Carlisle McNair's Personnel File, Internal Affairs Report, and Discipline subpoenaed from Lexington County Sheriff's Department

Reply Exhibit 17:    Notice of Disciplinary Action, December 16, 1998

Reply Exhibit 18:    Internal Affairs Investigative Report, November 2, 1998

Reply Exhibit 19:    Internal Affairs Investigative Report, November 30, 2001

Reply Exhibit 20:    Investigative Report, June 20, 2002

Reply Exhibit 21:    Memorandums authored by Carlisle McNair, January 21, 2004 and April 16, 2004

Reply Exhibit 22:    Memorandums authored by Carlisle McNair, November 17, 2003 thru August 5, 2004

Reply Exhibit 23:    E-mail authored by Carlisle McNair, October 13, 2003

Reply Exhibit 24:    Letter authored by Melissa A. Meister to Jack B. Swerling, April 1, 2008

Reply Exhibit 25:    E-mail authored by Jack B. Swerling, April 1, 2008 5:10 p.m.

Reply Exhibit 26:    E-mail authored by Jack B. Swerling, April 1, 2008 5:32 p.m.

Reply Exhibit 27:    E-mails authored by Melissa A. Meister and Jack B. Swerling, April 3, 2008 and April 4, 2008

Reply Exhibit 28:    Declaration of Christine R. Oliver, March 2, 2012

Reply Exhibit 29:    E-mails authored by Melissa A. Meister and Jack B. Swerling, April 16, 2008 and April 18, 2008

Reply Exhibit 30:    E-mail authored by Melissa A. Meister to Jack B. Swerling, May 3, 2008

**JA 3729**

Reply Exhibit 31:   E-mail authored by Melissa A. Meister to Jack B.Swerling, April 16, 2008

**JA 3730**