No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 15

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

----------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
     -vs-                                   October 9, 2012

BRANDON LEON BASHAM,

          Defendant

----------------------------------


            BEFORE HON. JOSEPH F. ANDERSON, JR.
            UNITED STATES DISTRICT COURT JUDGE
                     MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:     HON. WILLIAM N. NETTLES
                    UNITED STATES ATTORNEY
                    BY:  ROBERT F. DALEY, JR.
                         JIMMIE EWING
                         JEFFREY M. JOHNSON
                         WILLIAM K. WITHERSPOON
                    Assistant United States Attorneys
                    1441 Main Street
                    Columbia, SC  29201

FOR DEFENDANT:      JULIA G. MIMMS, ESQ.
                    JULIE G. MIMMS LAW OFFICE
                    1001 Elizabeth Ave., Suite 1A
                    Charlotte, NC  28204

                    ARIZONA FEDERAL PUBLIC DEFENDER
                    BY:  MICHAEL L. BURKE
                         SARAH E. STONE
                    Assistant Federal Public Defenders
                    850 W. Adams, #201
                    Phoenix, AZ  85007

COURT REPORTER:      DANIEL E. MAYO, RDR
                      Certified Realtime Reporter
                      901 Richland Street
                      Columbia, SC  29201

STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

**JA 3732**

THE COURT: All right. We're here for the evidentiary hearing in the case of United States of America versus Brandon Leon Basham, it is docket number 4:02-992. We have counsel for both sides present. Mr. Basham is present by way of satellite conference. Mr. Basham, can you hear me satisfactorily?

DEFENDANT: I hear you, I hear you.

THE COURT: Who is seated there with you?

MR. MURRAY: Ken Murray with the Federal Defender in Arizona, your Honor.

THE COURT: All right. Very good. And you have good voice and visual communication with us here?

MR. MURRAY: We do.

THE COURT: All right. Let me ask counsel to make -- just note your appearance, present in the courtroom, to note your appearances just for the record.

MR. DALEY: Yes, sir, your Honor. This is Robert Daley on behalf of the United States. And seated at counsel table with me is Jimmie Ewing, behind me are Jeff Johnson and William Witherspoon, and we will be representing the government in this matter.

THE COURT: All right.

MR. BURKE: Good morning, your Honor. Michael Burke from the Federal Public Defender's Office on behalf of defendant Brandon Basham. And with me today at counsel table

is Sarah Stone who is also with the Federal Public Defender's Office, and Julia Mimms, who is local counsel.

THE COURT: All right. And the attorney in Terra Haute, give us your name again, sir.

MR. MURRAY: Ken Murray, your Honor. And I do have a request of you, if I could.

THE COURT: All right.

MR. MURRAY: Would it be possible to have the guards unshackle Mr. Basham's hands so he can take notes with us here today?

THE COURT: Is the guard present in the room?

MR. MURRAY: He is not in the room, he's right outside. He said if we ask --

THE COURT: I think that's a reasonable request. Ask the guard to step in.

MR. MURRAY: Let me get him real quick.

DEFENDANT: Thank you.

OFFICER SLAGEN: Yes, sir.

THE COURT: Give your name, sir.

OFFICER SLAGEN: Officer Slagen.

THE COURT: The attorney for Mr. Basham has asked that I authorize you to release his handcuffs so that he can take notes during the hearing. Would that present a security problem if we did that?

OFFICER SLAGEN: No, sir. He's locked in this room,

so I don't think it would be too much of a problem.

THE COURT: Well, go ahead, if you would then, unshackle his hands so he can participate in this hearing by way of taking notes.

DEFENDANT: Appreciate it.

OFFICER SLAGEN: All right.

THE COURT: All right. This is under Section 2255 challenging the defendant's conviction and death sentence in this court back in 2004. The original petition raised 34 claims. And two have been withdrawn, is that correct, claims 8 and 25?

MR. BURKE: Yes, your Honor.

THE COURT: And I would suggest that two additional claims were resolved by the Fulks appeal, claim 9 dealing with conceding guilt, and claim 25 dealing with the so-called two step mitigation jury charge issue. Do you disagree with that, or --

MR. BURKE: Your Honor, on the second claim I agree that that was addressed by the court in Fulks. With regard to claim 9, however, that claim is ineffective assistance, again is Mr. Basham's trial counsel. That's never been addressed by any court.

THE COURT: Well, but Mr. Fulks did essentially the same thing by conceding guilt and going to trial. I'm not trying to talk you out of it, I'm just thinking out loud. And

the Fourth Circuit said that that was a legitimate trial strategy.  And here your argument is they conceded guilt on the kidnapping but had denied guilt on the other substantive claims, and by conceding guilt on the kidnapping made him death eligible.

MR. BURKE:  Yes, your Honor.

THE COURT:  Isn't that subsumed by the Fourth Circuit's holding in the Fulks case then?

MR. BURKE:  I disagree, your Honor.

THE COURT:  We will talk about it later.  I'm not trying to talk you out of any issues, I was just trying to find out how many we've got to hear.

MR. DALEY:  Your Honor, I would say that there is a subtle difference in that Mr. Swerling did not -- they did not enter a guilty plea, there was a guilt and then a penalty phase.  So there is some distinction there, your Honor, I would note.

THE COURT:  All right.  Ready to proceed?

MR. DALEY:  Your Honor, I have just one thing to put on the record.  Special Agent Jeff Long is in the courtroom and I don't think there's any objection to him being here.

MR. BURKE:  No objection.

THE COURT:  All right.

MR. DALEY:  I think the witnesses are going to be sequestered.  I will tell Mr. Burke we have Dr. Frierson, who

may be a rebuttal witness for us after we see their expert's report. Dr. Hyde is going to be testifying I think in December, and so we may be calling Dr. Frierson in to rebut that testimony. He's in the courtroom this morning. I didn't know if they had anything to --

MR. BURKE: We have no objection, that's fine.

THE COURT: No objection to the potential expert staying in, but all other fact witnesses are subject to the rule on sequestration then. Both sides requested it and at this time if there's anyone here besides the doctor who is a potential witness you will need to step outside until such time as you are called to testify, except for the FBI agent, obviously.

MR. BURKE: And Mr. Monckton who is going to be the first witness.

THE COURT: Very good. Please call your first witness.

MR. DALEY: Your Honor, I thought that at the beginning we should go ahead and move all the exhibits that were agreed to into evidence.

THE COURT: Very good.

MR. DALEY: Your Honor, the government would move Government's Exhibits 1 through 223 into evidence. I understand there's no objection from Mr. Basham's counsel.

THE COURT: Mr. Burke, is that correct?

MR. BURKE: And, your Honor, defense would move for the admission of Exhibits 1 through 101 with the exception of Defendant's Exhibit 45, which we are withholding at this time and may --

THE COURT: Without objection then the Government's Exhibits numbers 1 through 223 are admitted and Defense Exhibits 1 through 101 are admitted except for Exhibit 45, which we may talk about later.

MR. DALEY: And for clarity of the record, your Honor, we do not have an Exhibit 49, I think it was a duplicate, we do not have a Government's Exhibit 49.

THE COURT: 49 is a gap.

MR. DALEY: Yes, sir.

THE COURT: Very good. Anything else before we begin?

MR. BURKE: Your Honor, I just -- I thought to give the court a little bit of a roadmap I would briefly go over the witnesses we will be calling and the issues that we will primarily be focusing on. As your Honor noted in one of our prior conferences, several of the claims in our 2255 motion are based on the record so they won't be the subject of testimony now.

I will tell the court that over the next few days the claims that we will be focusing on through the presentation of testimony would be claim one, which concerns a claim of

ineffective -- I will just tell court, otherwise we will be here for quite a while.  Claim one, claim two, claim five, claim seven, claim nine, claim 15, claim 16, claim 19, claim 20, claim 24, claim 27, and claim 30.  Some of those obviously to a much greater extent than others, but those are the ones we will be addressing.  So --

THE COURT:  Very good.

MR. BURKE:  With that, your Honor, we will call -- the defense could call their first witness, William Monckton.

(William H. Monckton, VI duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Good morning, Mr. Monckton.

A.  Good morning.

Q.  Before we begin I wanted to take a moment to thank you for getting up at four in the morning and driving across the state to be here today.  You have been very accommodating, and your willingness to do that and your willingness to give up a date of work for this is much appreciated.  And throughout this proceeding you have been very candid with the United States Attorney and with us, so thank you very much for your assistance.

Can you tell us your -- give us a little bit of information about your background?

A.  From Myrtle Beach, graduated law school in 1992.  My first

job I clerked for Paul Burch on the Circuit Court bench, resident judge out of the Fourth Circuit. After that I was a Solicitor in the Fourth Circuit for about a year-and-a-half, two years. Then moved back home to Myrtle Beach in 1995 and went into private practice, primarily criminal defense and personal injury work.

Q. Now, at one point were you appointed to represent Brandon Basham in federal district court proceedings?

A. I was.

Q. And can you tell us, do you recall when that occurred?

A. It was November of 2002. Don't remember the exact date, but it was the day before Thanksgiving. I had come into the office, my office was closed, the phone rang and I answered, it was Judge Rogers calling me to -- to Florence at that time. The case is well-known, he said he was appointing me, that Brandon Basham was coming back, was going to assist in the discovery of Miss Donovan's body and he was appointing me second chair and I needed to be in Florence within I think two hours.

Q. And do you recall this was before Thanksgiving of 2002, right? You do --

A. The Wednesday before Thanksgiving.

Q. Okay. So all happening in a very fast time frame then?

A. Very rapid pace. Went home, told my wife, changed clothes, went to court. Met with Judge Rogers I think briefly

in chambers where he gave me some additional information. I believe that Brandon Basham had -- already at that time was known had given some information to law enforcement where he was in Kentucky and had provided -- wanted to help find the body. A search had already been organized to take place on Thanksgiving day and Judge Rogers did not want Mr. Basham going unrepresented.

Q. Okay. Now, before we go into the events that followed after your appointment, let me ask you a couple of questions just to confirm some issues about your background. You are from the Myrtle Beach area, is that correct?

A. That's correct.

Q. You had been practicing criminal defense law in that area for approximately?

A. Since 1995, about seven years.

Q. About seven years. Can you tell us the nature of your criminal practice? Did you -- were you retained by private clients, did you accept court appointments?

A. When I first got back to the beach, like most lawyers you take court appointments. Being from there I had a lot of people I knew throughout the area where I got private clients from. Being a solicitor in the Fourth Circuit, a lot of the attorneys up there referred clients to me when people got in trouble in Myrtle Beach. So it was combination of both.

I think in 1996, actually Judge Seymour was the magistrate

at the time in Florence, and I went and met with her about getting on the CJA list for federal appointments.

Q.   And did you get on the CJA list at that time?

A.   I did.

Q.   So for approximately six years before you became involved in that in case you had been representing criminal defendants in federal court, correct?

A.   That's correct.

Q.   Coming from the Myrtle Beach area were you familiar with -- personally familiar with any of the law enforcement officers who were involved in the investigation into Alice Donovan's disappearance?

A.   Yes.

Q.   And who, if you remember?

A.   Pretty much everybody with the Conway Police Department that was involved in the investigation.  There were some Horry County officers, Mr. Long with the FBI, Clyde Merriman with the FBI.  I did not know the North Carolina authorities but knew pretty much everybody in South Carolina.

Q.   Thank you.  We're going to be talking today about the events that occurred on Thanksgiving day in 2002.  And before we do that let me ask you, in your six years representing -- six years as of 2002 in representing clients in federal prosecution defense had you been involved in situations involving the interrogation and questioning of your clients by

law enforcement?

A.   Yes.

Q.   Would you describe that as something that happened regularly or infrequently or --

A.   I mean, typical case, a drug case, perfect example, I have been involved in numerous debriefings of drug clients, numerous proffer agreements in both state and federal court. So, yes, I was aware of the interrogation process.

Q.   All right.  Mr. Monckton, I would like to have you take a look at what's been admitted as Defense Exhibit 1.

          MR. BURKE:  And, Miss Floyd, I'm not sure, this is my first time appearing in this court, does it appear on the screen for Mr. Monckton?

          THE CLERK:  Yes, they do.

Q.   Do you prefer hard copies, Mr. Monckton or --

A.   That's fine.  This is fine.

Q.   Okay.  Thank you.

          THE CLERK:  I'm sorry.  Could you tell me the exhibit number?

          MR. BURKE:  Defense Exhibit 1.

Q.    (MR. BURKE) Mr. Monckton, do you recognize the handwriting on this document?

A.   Yes, that is my handing writing.

Q.   And can you tell us to the best of your memory what Exhibit 1 is?

A. That was dated 11-27-02, which was Wednesday. I think that was my first bit of information I was provided. It's got Brandon Basham at the top, so that may have come from Brandon Basham. I list Cam Littlejohn's name and my name, which means we were present. I think I actually had spoken with Richard Hughes, who was the attorney in Kentucky, and he had provided, that's his address, his phone numbers, and I believe that information came from Mr. Hughes out of Kentucky.

Q. And the information below that regarding Wal-Mart, is that correct?

A. That's correct.

Q. Okay. So is it fair to say that the notes on this first page of Exhibit 1 reflect information that you probably obtained before meeting Mr. Basham?

A. That's correct. Actually, there should be other notes that -- where I actually spoke with Mr. Basham.

Q. And if you can turn to the second page of Exhibit 1 there are more notes. Can you tell us if you recall taking these notes and where you obtained the information?

A. These notes would have been taken in Florence the day of the appointment. I believe a lot of this information had come from Mr. Hughes where I was given basic background on Brandon, found out that he had a bunch of psychological hospitalizations. And those are my notes and those are my thoughts on things that I needed to do. If something was

important to me I have a star on both sides so I know going
back through my notes it was something I needed to address.

Q. Thank you. If you could look at page two of Exhibit 1 for
us, you have a notation near the top that says found
incompetent, in a hospital psychiatric for four years.

A. That would have been information that I believe I would
have received from Mr. Hughes, to the best my recollection.

Q. And then on the bottom of the page you have some notations
with asterisks on each side. Why the asterisks?

A. That's where I describe where I star, asterisk, just
things that when I review my notes as I'm taking them that I
know I need to come back to and address.

Q. Do you recall, you make a notation, need an evaluation?

A. Yes.

Q. Do you recall, was that a conclusion you made on your own
or was there a recommendation made to you about that?

A. That would have been -- those are my thoughts right there.
That would have been me thinking that.

Q. Was that based on information you had received from
Mr. Hughes in Kentucky?

A. Just based upon the prior information I had received
regarding Brandon's prior history.

Q. So is it safe to say, Mr. Monckton, that the very first
day you were appointed to this case you had on your to do list
an evaluation of your client?

A.   That's correct.

Q.   And what do you mean by evaluation?

A.   What I'm looking for is a competency evaluation right off the bat, find out if Brandon is competent to go forward in representation.

Q.   If you could turn to the third page of Exhibit 1, and there are more notes.  Do you know when you would have taken these notes?

A.   If they are attached to the first page they probably would have been taken on 11-27-02.  I know the medications, I got that from Brandon himself.

Q.   So Mr. Basham told you that about the medications he was on, correct?

A.   That's correct.

Q.   Do you remember when you first met Mr. Basham?

A.   I'm fairly certain I met him on that day.  I know I had to wait for some time, but I'm fairly certain I spoke to him on the 27th.

Q.   While you were in Florence?

A.   In Florence.

Q.   And so to the best your recollection, if you look at the top of that third page of Exhibit 1, you've written, been off meds since arrested.  Do you believe that that was information you received from your client?

A.   Yes.

Q.   Okay.   So to put this in a time frame context, you first met Mr. Basham on November 27th of 2002.

A.   That's correct.

Q.   And on April 9 of 2003 this court issued an order disqualifying you and your co-counsel Cam Littlejohn from the case.   Does that sound correct?

A.   That does.

Q.   Okay.   So for a period of approximately four-and-a-half months you were counsel for Mr. Basham.

A.   And I'm not -- I think Judge Anderson may have had Jack Swerling and Greg Harris already involved to a degree as shadow counsel at the time.   I'm not certain.   But he wasn't unrepresented during that time period.

Q.   All right.   And if the record reflects that the government filed a motion to disqualify you and Mr. Littlejohn mid-January, January 14, 2003?

A.   That's correct.

Q.   Can you just tell us how your work on the case changed after that motion was filed?

A.   I believe Cam and I spoke, we got advice from several different people, and I think from that time period on until the disqualification issue was resolved we actually ceased making any decisions on Brandon's behalf.   I do remember law enforcement wanting to go back out and search again, and I informed them that we weren't going to do that because based

on what had happened during the first search we couldn't do that because the disqualification issue was pending.

MR. DALEY: Your Honor, I just want to make clear, because this came up a few times in the Fulks hearing, I want to make sure that we know for the record that to the extent they are attempting to assert facts that they would try to amend their petition with, this seems to be outside of any of the claims as far as just the whole concept that they ceased representing him. I don't want to suddenly be caught where we have a claim that there was a time period in which he did not have counsel.

MR. BURKE: And, your Honor, that is not a claim we will make or -- no, I'm just --

THE COURT: No substantive claim.

MR. DALEY: Thank you.

MR. BURKE: That's not a substantive claim.

MR. DALEY: Thank you, Mr. Burke.

BY MR. BURKE:

Q. During the four months that you were Mr. Basham's counsel do you recall how many times you met with him in person or over the phone?

A. It was numerous times. I've given you my notes, and even there's a time sheet in there with detailed notes and it lists the times. But it was multiple times. Usually every time I met with Brandon, for a time period he was in Darlington,

which is about an hour from the beach, hour and a half.  And he was at Columbia Care in Columbia, which is about two-and-a-half hours.  Whenever I came to meet with him I can't say I met with him for any time less than an hour.  Sometimes it was longer than that.

Q.  Can you tell us what your impression was of Mr. Basham when you met him on November 27th?

A.  I think my initial impression of Brandon was he appeared not like he does today, he did not have facial hair, he had hair, he looked like a young child, was the best way to describe it.

Q.  And did you have any impressions of his demeanor when you met with him?

A.  I guess the best way to describe that, I can honestly say I don't think he understood the seriousness of the situation, to be honest with you.

Q.  And can you elaborate --

A.  Almost child-like.

Q.  And from your notes he apparently had told you at that time that he had been off medication since his arrest, is that correct?

A.  That's correct.  And I think he had been arrested several days prior to being transported back to Florence.

Q.  Okay.  Susie, could you bring up Defense Exhibit 6, please?

Mr. Monckton, what's on this screen is Defendant's Exhibit number 6.  Can you tell us what is that document?

A.  Those are my time notes with entries of what I had done with phone calls, e-mails.  Just a detailed time sheet I kept on my computer.

Q.  Exhibit 6 is a three-page document.  The pages are actually numbered five, six, and seven.  I'm not -- I'm not sure why, to be completely frank with you, but if you could go to the third page, Susie, of that document, which is technically page seven.

Mr. Monckton, if you would look for me, do you see on the second entry on that page an entry for December 4 at 3:32 p.m.?

A.  Yes.

Q.  And I know it's pretty small print, can you read that notation or would you like me to read it?

A.  Spoke with Cam, and extreme details concerning jurisdiction and Brandon's mental condition.

Q.  And this December 4th would have been approximately a week after you became involved in the case, correct?

A.  That's correct.

Q.  Do you recall today what you discussed with Mr. Littlejohn about Brandon's mental condition?

A.  I can't recall in detail, but I know it had to do with his prior history, the medications he was on, and his demeanor

just caused me to believe that Brandon was not normal, I guess the best way to describe it. I'm not a psychiatrist, it's just my initial impression that he was not normal.

Q. If you can turn to the second page of Exhibit 3, it's the one that's marked page six, Susie. On that page we have notations from, excuse me, early November -- excuse me, early December. And if you look at the third one down, Mr. Monckton, I can read it for you, it's December 9th, it says notes, an inmate called and said that Brandon needs to see Billy. Not being allowed to shower and is not getting his meds.

Now, is it correct to assume from the way that that notation is written that this was written by somebody else in your office? Do you recall?

A. No, I was the only one that would write on this time sheet. That may have been a notation to my office staff and they would have told me about it and then I would have made a note. And then I believe shortly after that I may have gone to see him or made a phone call.

Q. Do you have any independent recollection of that phone call today?

A. I do not.

Q. Okay. Is it unusual in your practice for other inmates to call you on behalf of your clients?

A. Honestly, no.

Q.   No?

A.   I've had clients don't have phone privileges, they get a note to somebody else, say, Mr. Monckton, such and such needs to see you, they can't get to the phone, they are in lock down.  A number of things.

Q.   On that same page, this is on a somewhat different topic, but the notation right above that, same day, December 9th, you make a notation that you spoke with Sheriff Hewitt.  Can you again tell us who Sheriff Hewitt is?

A.   Sheriff Hewitt was the lead local investigator in Brunswick County.  I believe he was the Brunswick County Sheriff at the time.

Q.   Do you recall the substance of your conversation with Mr. Hewitt that day?

A.   Since we're in that close proximity to the search in December -- on Thanksgiving day, I assume we were probably talking about additional searches for Miss Donovan.

Q.   Now I would like to turn your attention to Defendant's Exhibit number 3.  Is that up on the screen for you, Mr. Monckton?

A.   It is.

Q.   Okay.  Defendant's Exhibit number 3 is an e-mail, it's not authored by you, but if you will look at the CC line of that e-mail do you see that you were copied on this e-mail?

A.   I do.

Q.  Okay.  Can you tell us what this e-mail is in regard to?

A.  If you can highlight the next section so I can read on this screen.  It's hard to read on this screen.

Q.  Sure.  Susie, the line -- I can't see it.

A.  It's -- I believe initially in the case, because this was the first federal death penalty case in South Carolina, if I remember correctly, I made several calls and reached out to several people concerning what we may need to do with Brandon's mental condition.  I think I may have spoken with David Bruck, I know I spoke with Kevin McNally, and it was a federal death penalty resource center, I believe, is where they were connected to that I called.

Q.  Do you recall having a conversation with Mr. Bruck about your thoughts about obtaining a competency evaluation of Mr. Basham?

A.  Yes.  I would have to say yes.  It should be in my notes.

Q.  Now, sitting here today do you recall having a conversation where Mr. Bruck spoke to you about the importance of avoiding a nonconfidential court-appointed psychiatric evaluation?

A.  I believe it's in my notes.  I do remember I spoke to Mr. Bruck and I think I detailed those in my notes.  Without seeing my notes, I believe that's the conversation we did have.

Q.  Okay.  The government may correct me on this, I don't

believe I have seen any written notes on that.  That's fine.

A.  I believe it may have been a time entry in the time entry notes.

Q.  Okay.  That --

A.  Not handwritten notes, in my time entry notes.  I remember glancing at them this morning and saw some reference to Mr. Bruck.

Q.  Yes, that is correct.  Exhibit 6 on the first page, which is page five, there is an entry midway down the page for Wednesday, December 11th, more than halfway down the page.  Are those the notes you were thinking of?

A.  Donna Schwartz-Watts, she does a lot of competence work here in the state and I've used her in the past, and that was probably me reaching out to her for a private competency evaluation.

Q.  Let's look at -- if you note, it says phone call to David Bruck at the top.

A.  I'm look -- looking at the December 11, 2002 at 4:46.

Q.  Does that say phone call to David Bruck?

A.  Right.

Q.  So this might have been a conversation that you had, do you recall, with Mr. Bruck?

A.  He would have provided me that information on her phone number and pager.

Q.  Do you remember today, sitting here today, why Mr. Bruck

advised you against obtaining a confidential -- or a nonconfidential evaluation of your client?

A. Well, we didn't want to subject Brandon to a government evaluation where he would be basically interrogated.

Q. On December 10th of 2002 you and Mr. Littlejohn had actually filed a motion for a determination of competency, and so I think that based on the record in this case it appears that the conversation with Mr. Bruck would have occurred after the motion had been filed, correct?

A. I believe so. I think that motion may have been withdrawn, if I'm not mistaken.

Q. And we will talk about the history of the motion as we proceed. On Defendant's Exhibit 6 there's an entry for Friday, December 13th, and at 11:39 a.m. If you could just read to yourself, Mr. Monckton, your notes from that entry.

A. Right.

Q. So this references a telephone call you had with your co-counsel Mr. Littlejohn, correct?

A. That's correct.

Q. You mentioned that you spoke with him concerning our own treating psychiatrist.

A. That's correct.

Q. Do you remember that conversation?

A. In detail that far back I do not know the details, other than we were discussing getting a private psychiatrist to

evaluate Brandon.

Q.   Now I would like to turn to Exhibit 2.  Is Defendant's Exhibit 2 in your handwriting, as well?

A.   That's correct, it is.

Q.   Okay.  And what do these notes reference?

A.   This would have been my meeting with Brandon.  I don't delineate where I am so I don't know if I'm in Darlington or Columbia Care.  I know I took some medical authorizations for him to sign because we were starting to track down a fairly large history of medical records from a young age from different facilities and we were trying to get those.

The notes under that would have been my observations of him.  You know, I think I write, seems very dazed and confused.  Sometimes in my conversations with Brandon he would appear to understand what I was talking about and then sometimes he would -- just seems like he just drifted off. The Beth McGuffin, that was one of the girls that he had met throughout this time frame, and I think I later found out that law enforcement were using her to communicate with Brandon by sending letters, so I advised him to stop sending letters. And I may have even have had a conversation with her or authorities, I think she was out of West Virginia, not to do that anymore.

Q.   You also have a reference to needs psychiatry -- psychiatrist ASAP?

A.   That's correct.  It was my observation that something was just not right with Brandon and there was some talk about suicide.  I think I notified the Marshals that I was concerned that he may try something, and then shortly after that or some time period after that, I don't think Darlington County was equipped to handle Brandon, so he was transported to Columbia Care facility in Columbia.

Q.   To clarify, what do you mean by not equipped to handle Brandon?

A.   I don't know if you've ever been to Darlington County.

Q.   No.

A.   But they do not, other than maybe put Brandon in a maximum holding facility, in a cell by himself, they did not have the people on staff to handle something like that.

Q.   And so were you concerned then that day about a real potential of suicide attempt by Mr. Basham?

A.   Yes.  Because I actually wrote in my notes I notified the Marshals at 11:01 a.m. concerning a possible imminent suicide.

Q.   Do you recall -- we have do not have an exhibit for this, your Honor, but it is part of the record from the trial -- the arraignment for Mr. Basham on January 7, 2003?

A.   Is there a document --

Q.   I don't have a document for you.  It was an arraignment before Judge Rogers.

A.   Rogers, that's correct.

Q. And you recall that.

A. Vaguely.

Q. Do you recall, and again there are notations in the record so if you don't, it's fine, but do you recall any discussion at that January 7th court hearing about competency evaluations?

A. Without seeing notations, since it was January and I'd already had those notes there probably was some discussion, but I don't want to testify that I know for certain there was.

Q. On December 14, a week after his arraignment, the government filed a motion to disqualify you.

A. January 14.

Q. Excuse me, January 14. And I think, as you testified, you thought it appropriate to pull back until that was resolved afterwards, correct?

A. That's right. We did not -- I think I said we suspended representation, that's the wrong terminology, we did not actively make decisions that could strategically affect the case at that time.

Q. Thank you. Is it safe to say that during the time that you were regularly interacting with Mr. Basham then, based on what you've testified today, and your notes, that you had concerns about his competency?

A. Yes, from my notes there's no doubt.

Q. In your experience as of 2002 had you had dealings with

other clients who had problems with competency?

A.   Yes.

Q.   So this wasn't your first experience with this.

A.   No.

Q.   So I would like to completely shift focus now and talk to you about -- first let me ask you one other question, if -- Susie, could you bring up Exhibit 4, Defendant's Exhibit 4. Mr. Monckton, that's a letter from you to your co-counsel Mr. Littlejohn.  And it's somewhat lengthy, I just want to draw your attention to near the end of the first large paragraph you wrote, I'm hoping Rosemary will issue a letter to the Marshals and possibly do a consent order barring all law enforcement access to Brandon without you or I present.

A.   That's right.  The reason we did that is this case I've never seen in my involvement where you had so many law enforcement agencies wanting to take and prosecute Brandon. You had Rex Gore, the prosecutor in North Carolina, who wanted it, you had the U.S. Attorney's Office out of Columbia that wanted it, and you had Greg Hembree out of Horry County that wanted it.

     This occurred after we had been appointed and he had been charged federally.  The City of Conway charged him and they went and served a warrant and tried to interview Brandon at Darlington County.  And what upset me is these were the same officers that had been with us on the search and I knew them

all, so obviously they had been, in my opinion, had been told to not to go try and interview him.

THE COURT: What did the City of Conway indict him for?

THE WITNESS: They charged him with kidnapping, murder. You know, Judge, without seeing -- but I know those two. Because Horry County was also -- Greg Hembree's office was already talking about pursuing the death penalty against Brandon and Fulks.

BY MR. BURKE:

Q. And based on your letter to Mr. Littlejohn is it correct to say that you had -- you had concerns about protecting your client from being questioned or interrogated without you being present?

A. Well, I knew we had an issue with North Carolina hadn't charged him, nobody really knew where the body was, there was a girl missing out of West Virginia, so I was already seeing down the road, if Conway was coming, we were going to have law enforcement from West Virginia coming to try to interview him. And I was just trying figure out a way to protect him from being interviewed without us, a blanket representation agreement or to let everybody know nobody could talk to him without us being there.

Q. Thank you. So let's -- now I'm going to switch focus entirely and we're going to talk about the Thanksgiving day

2002 events. Can you tell us what was the reason, as far as you know, I know you had just gotten on the case, behind allowing Mr. Basham to participate in the search that occurred in North Carolina on that day?

A. Before we got appointed and even met Brandon wheels had already been put into motion, Brandon was being transported back from Kentucky, he had told either through his attorney or given statements in Kentucky that he knew where Miss Donovan's body was and he wanted to help find her.

They had also abducted a gentleman in Kentucky, I believe it was Kentucky, and left him duct taped to a tree and they found him alive. So initially there was a thought that Miss Donovan, although it's in November, may be still alive was a thought. So Brandon was coming back, law enforcement had already made arrangements to organize a fairly detailed search on Thanksgiving day. I think I was even told that by Judge Rogers when he called me at my office on the Wednesday.

I got over there, met briefly with Brandon, and the U.S. Attorney Miss Parham, and confirmed that Brandon did in fact want to continue and help try and locate Miss Donovan's body. From then, logistics, working on how we were going to accomplish that.

Q. Do you recall where the search took place that day?

A. The search took place in Brunswick County, North Carolina, which is right across the line in North Carolina from Horry

County, and it started at a recreational facility.  I remember -- let me set the stage a little earlier.  We had agreed that Cam would come up with Brandon.  Cam drove to Darlington County, got in the van with Brandon and law enforcement and he drove up.  I actually made arrangements to ride up with FBI Agent Jeff Long and we rode up and waited on Brandon to arrive at I believe it was a deer hunting camp is where Brandon first showed up.

Q.  How far from Conway, South Carolina was the location where you were conducting the search that day?

A.  Probably an hour, hour from Conway to Brunswick County, I'd say.  You got to go some back roads to get there, but it would be about an hour's driving.

Q.  Do you know, did Mr. Basham choose this location to search?

A.  No, the location had already been chosen by the authorities in Brunswick County.  Apparently Brandon and Chad and Miss Donovan were seen in the BMW, had pulled into this hunting camp, and that was where they wanted to start the search.  Brandon had apparently given information that it was near a hunting place or had seen hunting or an animal, was the information we were given, and law enforcement believed that it was somewhere around that area.

Q.  Do you recall today if you knew at the time Mr. Basham had any familiarity with South Carolina, North Carolina?

A.  My understanding this was Brandon's first time down here. And if I can set the stage, what it was is Brandon said they were near some animal facility and they had pulled off the road and Miss Donovan's body had been dumped right near the side of a road by a metal stake off a dirt road.  If you've ever been in this part of Brunswick county, North Carolina, all it is is a big pine forest and you have nothing but intersecting dirt roads with what I call forestry gates, big metal one sling-arm gates blocking off the different dirt roads.  And that was where he apparently, he and Mr. Fulks, had dumped her body.  And as soon as you started driving down these roads, if you've got any experience in the woods, you said there was no way we're going to find her.

Q.  You say that you said there's no way we're going to find her.  Was that a belief that you had that day?

A.  After about ten minutes that's a belief I had, that there's no way we're going to find her.

Q.  Jumping ahead seven years just for a moment, are you aware that in 2009 remains were discovered that were identified as the remains of the victim Alice Donovan?

A.  Yes, they were found on a place called Water Tower Road in Horry County.

Q.  In Horry County.  And where is that location in location to where the search occurred Thanksgiving 2002?

A.  Water Tower Road's about five minutes from my office.  It

actually intersects between Conway and Brunswick County. It would have been -- I'd say Water Tower Road where her body was found was maybe 35, 40 minutes from there to Brunswick County where we started the search.

Q. So returning to the day of the search and Thanksgiving 2002, had you had a chance that morning or previous to that morning to communicate with Mr. Littlejohn regarding the parameters of the search?

A. Yes. We had decided that -- well, actually, Cam rode up with Brandon, and when we got to the hunt camp, started doing the searching, since he had been riding in the car for about two-and-a-half hours it was decided that rather than both of us try and talk to him that he would primarily just talk to Cam Littlejohn.

And actually when we rode in the van I think I rode in the very back of the van with Agent Long and then Brandon and Cam Littlejohn sat on the front bench seat, there was another bench seat and then another bench seat, and there was a driver and I think Sheriff Hewitt was sitting in the front passenger's seat, if I remember correctly.

Q. Had you and Mr. Littlejohn had any conversations about whether you were going to allow Mr. Basham to be questioned?

A. On the 27th when I first met with the U.S. Attorney I asked for a proffer letter. They would not give us a proffer letter at that time. So when we met with everybody we

informed them that, you know, Brandon would not be -- unique situation, but Brandon would not be making any statements or being interrogated, everything would go through us.

And, you know, the thought process was Brandon would whisper to Cam and they will talk and through some way we would use that process trying to find Miss Donovan's body. We knew from the -- from the information he had already given regarding his involvement that, you know, honestly, felt like the only way to save his life and not have the death penalty sought was to find Miss Donovan that day.

Q. And you say about the information that had already been given. You were aware at that time that Mr. Basham had made statements after his arrest in Kentucky?

A. That's right.

Q. How did that fact, the fact that he had made statements, affect your and Mr. Littlejohn's decision to have or not have law enforcement question Mr. Basham during the search?

A. We didn't know the exact details of what was given so we were trying to protect Brandon. Because, like I said, things were moving so fast, and that day there was some thought that maybe she's still alive. So things were moving very fast and furious, so to speak. It was not time to interrogate him, it was pretty much we're going in the morning, I think we left Myrtle Beach at 5:30, 6:00 a.m. that morning to get up there. So things were moving at a furious pace.

We knew we weren't going to let anybody talk to him because we didn't know anything yet, we had not had a chance to interview Brandon in any great detail, but what he had -- he had been saying, our information was coming from the attorney out of Kentucky. We got enough information there to know that, you know, we didn't need to be playing games, so to speak. We had no leverage, so to speak.

Q. I'm sorry?

A. We had no leverage at that time.

Q. Now, you testified that you rode up to the location with Agent Long and that Mr. Littlejohn came from several hours away with Mr. Basham. When you and Mr. Littlejohn were together with Mr. Basham that morning did you ever discuss with him the -- whether he was to speak to law enforcement that day?

A. The comment was everything would have to go through Mr. Littlejohn or me.

Q. That conversation --

A. Specifically, Mr. Littlejohn. He was to speak to Mr. Littlejohn.

Q. And that was a comment made to Mr. Basham?

A. Yes.

Q. Okay. We have interviewed you in this case about two weeks ago, I believe, at your office in Myrtle Beach. Do you remember in that interview commenting about your concerns for

Mr. Basham with regard to the number of law enforcement officers who were present that day?

A. Actually, when I first got there with Agent Long we actually first pulled up to a recreational facility, and I bet there may have been 40 to 50 officers or people to help with the search. And when we got to the deer camp we were there first before the van got there, and I knew from just my conversation with Brandon, I asked all the law enforcement to step inside so he did not see a bunch of law enforcement sitting out waiting on him. I thought that that would rattle him somewhat so I asked law enforcement to do that and they in fact did.

Q. Were there any, if you remember, any expressed statements made by you or Mr. Littlejohn to law enforcement that day that there were to be no questions --

A. I don't remember making a big statement. I know that I had made comments to the different law enforcement officers that, you know, he's not going to be interrogated. You know, Brandon, when we rode around in the car, said some things that were not the result of any interrogation. I mean, he would just speak out.

Q. And when he did that do you recall what Mr. Littlejohn did in response?

A. Mr. Littlejohn would squeeze his knee or try to get him under control or whisper to him. Like I said, I was sitting

either right behind them or all the way in the back of the van.

Q. But all of this was occurring in a van with law enforcement there so they could observe how Mr. Littlejohn was guiding and communicating with his client?

A. Yes.

Q. Now, obviously -- do you recall how long this search went on that day?

A. I'm guessing we started about 8:00, 8:30 that morning, I know I got back to Myrtle Beach around 6:30, 7:00 o'clock. So we probably went up until 4:00 or 5:00 o'clock that day.

Q. And during the course of that search, that obviously -- well, who was asking most of the questions in the van, if you recall?

A. Sheriff Hewitt was the only one really asking, does this look familiar, does this look familiar. If you've ever -- they had information from Kentucky that it was near a dump or some kind of wildlife area. So any sign, I remember specifically seeing some circus sign or something, so there's a circus sign, who knows? We turned off down some road and rode around. Anything to do with animals, I mean, it was like a -- I hate to say that, but it was you are trying to think of anything, any sign. I mean, I remember asking are there any stables around here, are there any -- anything that sounds like what he's talking about.

Q.  So it sounds as though, and correct me if I am wrong, that almost everyone in the van was throwing out questions of one sort or another?

A.  Whenever I would -- I never really did that in front of Brandon.  We stopped at different places, it wasn't just a constant riding all day.  We may ride for 30, 40 minutes and then stop and try and regroup.  Because it was our van and -- I think we had two chase vehicles just kind of following with us.  At one point I remember one of the information pieces that had been given was that there was a large metal spike and her body was there, and I remember telling the van to stop because I saw a big metal spike off a dirt road, and stopped and everybody got out.  And, you know, Brandon stayed in the car, law enforcement went in and looked around.

But really we were trying to figure out anything because, if I remember correctly, they came through here in dusk or dark.  Brandon was not driving, he was the passenger in the vehicle.  And, just common sense, you don't really pay that much attention if you are not driving.  Plus there was allegations that there may have been some drug use going on, as well.  So literally we're trying to figure out, trying to put a puzzle together.  And where they actually found Miss Donovan makes sense based upon the descriptions that had been given, because there's a wildlife management area right there where her body was found.

Q. So your testimony is that the statements that Mr. Basham was making that day you said now makes sense in the context that we now know of the location where Miss Donovan's remains were found.

A. That I believe her remains were found right off Water Tower Road, it's paved now and at the time it was a dirt road. And it was part of that new development down there, Highway 31, Highway 22. There's an overpass over Highway 31 just, if you know the Myrtle Beach area, Water Tower Road is right across from restaurant row in Myrtle Beach. You go across the waterway and there's a road that crosses over Highway 31 which runs north and south. And that's Water Tower Road and it runs out into basically a forest.

Q. You say now that it makes sense, some of the statements that were made. On that day did law enforcement ever express to you some frustration with the way the search was going?

A. I would say near the end of the day we were stopped, I think we're back at the deer camp, I can't remember, and we stopped, actually it was a group of law enforcement, I believe some representatives of Conway were there, I believe Jeff was there, I know Clyde Merriman was there, because it's the first time we realized they had searched before.

Apparently a map had been sent by Brandon back to law enforcement in South Carolina, I assume through his attorney, and detailing an area. And Clyde Merriman made the statement

he had been walking through a swamp or in his waders for two days and I think in the Red Bluff area, if I'm not mistaken. Now looking back that's I think what y'all informed me. And he thought Brandon was just yanking his chain, this was just a big game to Brandon. So they were extremely frustrated at that point in time. But later comes out where the body was found is right next to the Red Bluff area over there at Water Tower Road kind of intersects up to the Highway 90 area, which is -- a bunch of deer hunting kind of up in the Red Bluff area. I never saw the map, though, so I never saw what he drew, just what I was told.

Q. As you testified earlier, you were in North Carolina because law enforcement wanted to be there, correct?

A. Miss Donovan, I think her cell phone had pinged right next to that area was the last pinging of her cell phone, and her BMW was seen at that deer camp, so that's where everybody assumed that Miss Donovan was still in the vehicle at that deer camp.

Q. You said that one of the law enforcement agents thought that Mr. Basham was yanking his chain or yanking their chain. Did they -- did anyone suggest to you they were going to terminate the search that day?

A. It was getting to the point where it was going to end. At that time Brandon, we probably -- I don't know, maybe, 30, 40 feet outside of Brandon's hearing distance talking to law

enforcement, there was one deputy I think from Conway may have been standing at the van, Brandon may have been outside of the van right there. And I think Cam and I went back, Cam talked to Brandon and then Cam came back and presented a hypothetical. We talked to law enforcement, I don't know, five, ten minutes more. And at that time I think we loaded back up and went and attempted to drive a couple other places.

Q. And there has been lots of discussion in this case about that hypothetical, and I will tell you right now, and let me let the court know we're not going there, be going into the hypothetical, that's not a point we really need to discuss today.

Just a couple of questions, though. You said that Mr. Littlejohn talked to Mr. Basham. Were you with them when --

A. I believe -- I know I was over there when the conversation started, I don't know if I stayed there the whole time because I think I may have gone back to talk to law enforcement. You know, hey guys, let's -- I knew this was our chance, you know, give him a second, let him talk to him, and then Cam came over and then, you know, the hypotheticals were presented to the officers.

Q. Were you with Mr. Littlejohn when the hypothetical was presented?

A. Yes.

Q. Was Mr. Basham?

A.  No.  Brandon stayed back, we had to be 30, 40 feet away from the van, Brandon stayed over there.

Q.  Were you able to see the van while you were communicating with the law enforcement officers?

A.  No, the van would have been to my back.

Q.  Do you recall now, I know it's been ten years, but do you remember if Sheriff Hewitt was with law enforcement officers when the hypothetical was presented?

A.  I can't say that he was there or not.  Obviously, from reading 302s he said he walked off with Brandon and had a conversation with him.  I don't remember that occurring.  I didn't see that occur.  If it happened when we were giving the hypothetical, it could have, I don't know.  I just didn't see him walk off with Sheriff Hewitt.

Q.  Do you recall that my co-counsel Miss Stone and I met with you at your office in June of 2012 and at that meeting we informed you of the information about that?  And do you recall what your initial response was?

A.  No way, I think my initial response was.

Q.  Didn't happen.

A.  Didn't happen.

        THE COURT:  The information about what now?

        MR. BURKE:  The information regarding Mr. Basham being taken off alone with Sheriff Hewitt.

        THE COURT:  All right.

MR. BURKE:  And Mr. Monckton responded to that, that didn't happen, correct?

THE WITNESS:  If it happened, I didn't see it.

THE COURT:  All right.

BY MR. BURKE:

Q.  This should be obvious but I want to make sure I made it clear, was it your intention that day to let law enforcement talk to Mr. Basham outside your presence?

A.  No.

Q.  Was that ever your intention?

A.  No.

Q.  Do you believe you made that intention clear to law enforcement that day?

A.  I think the way -- it had to be clear the way we rode in the van, the way everything had to go through Mr. Littlejohn, the fact that we were acting as a buffer pretty much the whole day.

Q.  If we could -- for the court's information, for your, I'm getting very close to the end of my questions.  So could you direct your attention, please, to Defendant's Exhibit number 5, Mr. Monckton?  And can you tell us, that's a two-and-a-half page document, can you tell us what that is?

A.  That was a summary of our representation that I did for Morgan Martin who represented myself in the disqualification hearing.  I did a summary for him so he did not have to go

through all my notes and everything, I just did a brief
summary for him.

Q.  So this document would have been created by you sometime
in early 2003.

A.  It would -- it would have been created probably in January
of 2003, early February.

Q.  If you could go to page two of that document, Susie, at
the very bottom, the very last line, going over in the next
page, beginning, at no time.

THE COURT:  Hold on one second.  What happened to Mr.
Basham?

MR. MURRAY:  Your Honor, he said he had an emergency
to go to the restroom.  They just walked him out.

THE COURT:  All right.  Why don't we take the morning
recess at this time then.

MR. BURKE:  Thank you your Honor.

THE COURT:  Take a ten minute recess.

(A recess transpired)

THE COURT:  I understand the proposal now is to
interrupt the testimony of Mr. Monckton so we can hear from
Mr. Basham's appellate counsel who is on the phone from
California and will be testifying telephonically by
stipulation from both sides that that will be acceptable?

MR. DALEY:  Yes, your Honor, it's acceptable with the
government.

MR. BURKE: Yes, your Honor.

THE COURT: Mr. Basham, can you hear me?

DEFENDANT: Yeah.

THE COURT: The next witness is not going to be present in the courtroom, she's going to be on a telephone hookup where we can hear her voice but not see her presence. And your attorney tells me that that meets with your approval, is that correct?

MR. MURRAY: Just say yes.

DEFENDANT: Yeah, yeah, that's fine, whatever.

THE COURT: Mr. Basham, if you need to leave to go to the restroom that's fine, but tell us about it so we can coordinate our bathroom breaks here at the same time as yours because you need to be present for these proceedings, all right?

DEFENDANT: All right. Well, I didn't realize -- I just figured he was in here and I really wasn't thinking about it.

MR. MURRAY: I discussed it with him, your Honor, he should be doing that.

THE COURT: Please proceed.

MR. BURKE: Thank you, your Honor, for accommodating the schedules of the witnesses. I appreciate it. Is she --

THE CLERK: She can't hear you yet. Are you going to call her?

MR. BURKE: Yes, your Honor, the defendant calls as its next witness Melissa Meister.

THE COURT: Miss Meister, are you on the line?

THE WITNESS: Yes, I am.

THE COURT: If you will raise your right hand and state your name for the record.

THE WITNESS: Melissa Ann Meister.

(Melissa A. Meister duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q. Miss Meister, this is Mike Burke from the Federal Public Defender's Office. We have spoken a few times?

A. Yes.

Q. Hi. Just as a housekeeping matter I think the government, and I know we have tried to e-mail you exhibits in the last day. Did you receive those?

A. I did, yes. I have them up right now.

Q. Oh, wonderful. Thank you. I think this should go fairly smoothly. Can you give us your name again for the record, please?

A. Sure. It's Melissa Ann Meister, MEISTER.

Q. And, Miss Meister, where are you employed?

A. Employed at the United States Attorney's Office in the Southern District of California.

Q. And so it's approximately about 8:20 there this morning?

A.  Yes, sir.

Q.  Thank you.  I would like to spend just a minute going over your background so that the court has some familiarity with who you are and what role you play in this case.  Can you tell us a little bit about your background?  Where did you go to law school?

A.  Sure.  I went to law school at university of -- James E. Rogers College of Law at University of Arizona.

Q.  What year did you graduate?

A.  2003.

Q.  Following your graduation in 2003 what was your next job?

A.  I clerked for the United States Court of Appeals for the Ninth Circuit from 2003 to 2004.

Q.  And which judge in particular?

A.  Judge William C. Canby.

Q.  Miss Meister, was Judge Canby a senior judge when you were clerking for him?

A.  Yes, he was.

Q.  Did that affect the number of calendars he would hear each year?

A.  Yes.  He heard -- I believe when I was there he heard between four to six calendars per year.  The standard for the Ninth Circuit is eight.

Q.  Do you recall during your clerkship did you work both on a broad range of civil and criminal work, cases?

A.  I worked primarily on civil and immigration matters, and the judge excused himself from death penalty matters so we did not work on those.

Q.  Thank you.  Following the completion of your clerkship with Judge Canby what was your next employment?

A.  I was accepted into the Department of Justice Honors Program as a civil attorney with the civil fraud section of the civil division.

Q.  And what was -- what were your job responsibilities in that position?

A.  I was a trial attorney assigned to investigate and bring to court False Claims Act cases, individuals and companies that defrauded the government, and I also did immigration appeals.

Q.  Did you have any trials while you were with the Justice Department?

A.  I did not.

Q.  But I believe you did have some appellate work, correct?

A.  I did.  I did two oral arguments and four briefs.

Q.  Now, according to my research you began at the Justice Department October of 2004.

A.  That's correct.

Q.  When did you leave the Justice Department, Miss Meister?

A.  I believe it was March 2007.

Q.  And when you left the Justice Department what was your

reason for leaving?

A. I accepted a job offer with Jenner & Block.

Q. And Jenner & Block, can you just give us -- I think most people know the firm, but it's a very large firm, isn't it?

A. It's not in D.C., it is in Chicago, I accepted a job offer with D.C. which was about 60 to 70 attorneys. The office in Chicago is well over 200. It's now much bigger than it used to be when I applied.

Q. Is Jenner divided into departments or sections?

A. At the time I worked for them they only had two sections in D.C., litigation and government contracts. I was hired in litigation.

Q. Litigation. Okay. So that was it safe is to say that was a fairly large umbrella, litigation?

A. It was, yes.

Q. What type of cases, primarily, did you work on while you were at Jenner?

A. The type of cases I primarily worked on, I did some False Claims Act cases, some government contract cases, I did appeals, and then just general litigation. I did some of the Fanny Mae litigation with the government at the time, as well. So I guess fraud, False Claims Act, and appeals.

Q. So in the fraud cases then is it correct to say you were representing agencies or companies or persons charged with fraud?

A.   I was representing companies that were either charged with fraud by the government or that had -- were charged with fraud or misconduct by other companies.

Q.   Was that in the civil context or criminal fraud?

A.   Primarily the civil context.  I don't think I worked on any criminal fraud cases while I was there.

Q.   Okay.  With the exception of Mr. Basham, while you were at Jenner & Block did you have any criminal defense clients?

A.   I worked on a criminal appeal to the Supreme Court prior to my work with Mr. Basham, although that was in a First Amendment context.

Q.   And that was in preparation of a brief to the U.S. Supreme Court?

A.   Yes, an amicus brief on behalf of the Free Speech Coalition.

Q.   So, Miss Meister, if you could, I apologize, I know this might be somewhat unwieldy, but you received exhibits from the government and you received exhibits from us.  And, unfortunately, I'm going to have to jump back and forth as we go, and I apologize in advance for the inconvenience on that.

A.   That's fine.  The government, just to let you know, the government's exhibits are broken up over four e-mails and they are by number, so -- and it might just be easier if you are looking at a government's exhibit if you just give me a number and give me a minute to pull it up.

Q.   The first I would like to begin with is Defendant's
Exhibit number 8.

A.   Those are the time sheets?

Q.   The time sheets, correct.

A.   The time reports?

Q.   Yes.

A.   Okay, I have it.

Q.   Are you familiar -- just so that you know, Miss Meister,
the government and Mr. Basham have agreed that all of these
exhibits will be admitted into evidence so we don't have to
worry about the technical foundation on any of these, they are
already in the record, okay?

A.   Okay.

Q.   Okay.  Have you ever seen a time report like this?

A.   I would get my own time reports at the end of the month
when I worked for Jenner.

Q.   Okay.  Can you -- as far as you are aware, is this a time
report that deals specifically with the work that was done on
Mr. Basham's case?

A.   Yes, it looks -- because it looks like a time report that
was pulled by the client number, which would have been
specific to that one case.

Q.   Do you know -- now, you left the Department of Justice in
March of 2007.  When did you begin at Jenner?

A.   April 2007.

Q.   April 2007.  Okay.  Do you know when Jenner & Block became involved in Mr. Basham's case?

A.   There was an initial e-mail that went out for interest, and I want to say it was December of 2007, is my best recollection.

Q.   Okay.

A.   I don't know if there was involvement prior to that.  That was the first I became aware of it.

Q.   Okay.  And so an e-mail went out asking for attorneys in the firm who would be interested in working on the case?

A.   Yes.  It's generally how Jenner gives out pro bono work, because they would send out e-mails, this was what we have, is anyone interested in working on the case.

Q.   Now, what was Jenner's policy, if you know, at the time for pro bono work on the part -- let me just clarify.  You were an associate at that time?

A.   That's correct.

Q.   What was the Jenner policy with regard to working on pro bono matters?  Did you receive full hour credit for that?

A.   No, you received up to 50 hours of credit towards your overall billable hours.

Q.   So anything above 50 hours spent on a pro bono case was, for lack of a better --

A.   It was on the associate, and you needed to make it up in other ways.

Q.   What was the billing hour requirement in Jenner in 2008?

A.   2,000 minimum, 2,200 if you wanted a bonus.

Q.   Do you recall staying -- we may have this in the records, we may get to it but it's not significant, but I'm just curious, how many hours did you spend on Mr. Basham's case?

A.   I believe -- I initially thought I spent about 500 with the argument.  I believe when you sent me the time reports it looks like it's more between 350 and 400, but I don't know if that calculates the argument prep and doing the argument.

Q.   That's correct, it does seem to be missing -- at least the time reports that we received from Jenner seem to be missing those entries for you during that time frame.  And I assume it's safe to assume you did prepare for the oral argument?

A.   Yes, quite a few hours, quite a few overnights.  So, I mean, I would add at least 50 hours to whatever it shows just preparing for the oral argument.

Q.   Okay.  Now, you were one of the attorneys who responded to the e-mail asking for interest in working on the case?

A.   Yes.

Q.   Can you tell us, if you remember, what happened next?  Who contacted you, how did you get involved?

A.   Sure.  I responded, I believe it was David DeBruin, Dave DeBruin who sent out the e-mail, I responded that I was interested.  Dave I believe either came by or shot me an e-mail or called me, I don't remember which, and said, you

know, I was the first person to respond and there were other people, he mentioned the other people. We talked a little bit about his criminal background, we talked about my criminal background, or lack thereof at the time, and we came up with the plan to sort of set up the team with him and some other partners supervising because they had -- he and other partners in the firm had a lot of criminal law experience, I would oversee the associates. And initially I was supposed to write just one part of the brief and oversee the younger associates writing other parts of the brief.

Q. Now, when you mentioned younger associates, when you -- you had been at Jenner just a matter of months when you'd begun working on Mr. Basham's appeal, correct?

A. Yes.

Q. But did you come in, given your experience, at a somewhat higher level?

A. Yes, I was considered a fourth year attorney at that point, so by younger associates I mean attorneys who were either in their first, second or third years.

Q. And were there any such attorneys who worked on Mr. Basham's appeal?

A. Yes, there were.

Q. Do you recall now how many?

A. There were three younger associates who worked on the appeal.

Q. Do you remember being interviewed by the government in this case on September 11, 2012?

A. Yes.

Q. I remember you testifying or you stating, if this helps to describe your role, your role was sort of as a fulcrum in the case. Do you remember that?

A. Yes, I think that was initially I was set to be the fulcrum passing -- basically the gatekeeper of the work done by the associates, clarifying it, giving them feedback, making it better, and then coordinating their efforts also with the partners, and then coordinating -- I was supposed to also make sure the statement of facts read as if it was a unified brief.

Q. Okay. But you mentioned that there were partners who worked on the case, as well, and you mentioned David DeBruin. And for the record that's DEBRUIN, one word.

A. That's correct.

Q. Was Mr. DeBruin, I believe he's now the managing partner of Jenner & Block, is he not?

A. He is.

Q. Was he at the time?

A. He was not.

Q. Okay. To your knowledge, did Mr. DeBruin have experience in criminal law?

A. Yes, he did.

Q. And had experience in death penalty cases, as well?

A.   Yes, he did.

Q.   So did you and Mr. DeBruin ever have a discussion regarding what role he would take in the case?

A.   Yes.  I believe during our initial discussion he, you know, he said he would advise us, he would be present at all the meetings to the extent that he could, he would help us when we were looking at issues, he would overlook snippets of the brief that were done.  He sort of divided that up amongst the partners.

Q.   Okay.  So there were other partners available to you that you could run issues by, run drafts by, that's correct?

A.   Yes.

Q.   Now, when you became involved in the case was there another lawyer appointed to Mr. Basham's appeal?

A.   Yes, there was.

Q.   And who was that?

A.   Timothy Sullivan.

Q.   Okay.  Mr. Basham was sentenced in 2005, and you stated that you became involved in the case somewhere late 2007.

A.   Yes.

Q.   Do you know what had been occurring in Mr. Basham's direct appeal in the several months before Jenner became involved?

A.   I believe Mr. Sullivan requested a number of continuances.

Q.   Okay.  Do you know if he was alone on that case during that period of time or did he have co-counsel?

A.   If I remember correctly, there was a conflict with the trial counsel, because one of the trial counsel began a law firm with one of the prosecutors, and I think that's how Mr. Sullivan came into the picture.  And then I don't know why, I don't recall why he asked for so many continuances.

Q.   Referencing again the interview the government conducted of you on September 11, I have in my notes, and I don't know if this was accurate so let me ask you, that when you were asked about Mr. Sullivan's involvement and why Jenner got involved did you state that it was because Mr. Sullivan was in over his head?

A.   I believe he -- well, I don't know why he asked for so many continuances, but I believe he brought it to the firm not as far as he was over his head as far as the subject matter but because he was too busy.  I don't feel like he believed he had the time to take on the full direct appeal.

Q.   And would you agree that it's safe to say it was a fairly voluminous record?

A.   Yes, it was very voluminous.

Q.   Now, Miss Meister, I would like to direct your attention to government exhibit -- actually, let me see just one moment, please.

A.   Sure.

Q.   Yes, it's Government Exhibit 188.  And let me know when you have that available.

A.  188?

Q.  Yes, 188.  It's a consent motion.

A.  That was not sent to me.

Q.  Okay.

A.  Sorry.

Q.  That's fine.  No, that's fine.  Then let's go back to exhibit -- Defendant's Exhibit number 8.

A.  Okay.

Q.  And that is, again back to the time report, and you will hear me every once in a while refer to Susie, I'm not calling you Susie, my assistant over here is bringing up things for us to see.

A.  Sure, no problem.

Q.  Susie, could you enlarge the top maybe three lines of text -- right, yeah, right in there so that we can -- so, Miss Meister, what we're enlarging is on the first page, which is technically page three of Defendant's Exhibit 8, are some entries from January 7, 2008?

A.  Yes.

Q.  Do you see those?

A.  Yes.

Q.  Okay.  Do you recall having a meeting with Tim Sullivan in January of 2008?

A.  Yes.

Q.  So by this point you had been -- you had already been

appointed to the case to assist, correct?

A.  I believe so.

Q.  And I will tell you it's in the record, the record will speak for itself, but you were appointed by the Fourth Circuit as co-counsel to Mr. Sullivan.  Was there any discussion in the your firm as to who would be the -- who would be the attorney from your firm who would be named as co-counsel?

A.  Yes, it was supposed to be me.

Q.  Okay.  Okay.  So if you could look at those entries for January 7, 2008.  It appears that you and your colleagues, there's a reference to an E. Haren.  Who is E. Haren?

A.  E. Haren is Eric Haren.

Q.  Was he a partner or an associate?

A.  He was an associate.  I believe he was a second year associate.

Q.  And did Mr. Haren do a considerable amount of work in this case?

A.  Yes.  I believe he probably billed the most hours of anybody.

Q.  Okay.  So do you recall going to Greenbelt, Maryland to meet with Mr. Sullivan to discuss the case?

A.  Yes.

Q.  Okay.  All right.  So that was -- do you remember if when you met with Mr. Sullivan in January of 2008 if he had a copy of trial counsels' records?

A. He did not have a copy of trial counsels' records.

Q. Okay. Do you know, did he have a copy of the transcripts from the trial?

A. Yes, he did.

Q. Okay. Do you recall in that meeting in January of 2008 if you had any discussion with Mr. Sullivan about obtaining trial counsels' records? I know it's been several years, but if you can remember.

A. Yes, I believe it was raised in that meeting, and it also had been raised in the -- on the phone with him during the month of January.

Q. Okay. Raised with him, you mean with Mr. Sullivan.

A. That's correct.

Q. Okay. Do you recall what Mr. Sullivan said about the records?

A. I believe Mr. Sullivan said he had asked for the records from Mr. Jack Swerling, that they would be sent up so that we could have them locally and that he had been having difficulty getting them.

Q. Okay. Sticking still with that same Exhibit 8, if you could look at an entry for January 10th for an attorney named Carrie Apfel?

A. Yes.

Q. Was Miss Apfel an associate at the firm?

A. She was an associate. I think she was actually a fourth

year associate.  She had volunteered to work on the case but she didn't have a lot of time so she just volunteered to do research inquiries.

Q.  And did she in fact do research on January 10, 2008?

A.  Yes.

Q.  And what was she researching?

A.  I had her research basically the right that appellate counsel had to trial counsel's records, i.e., whether we could force Mr. Swerling to send the records up or whether we had to go to South Carolina to review the records in his office.

Q.  Okay.  So by the time you became involved in the case, at least by January of 2008 there was an issue with regard to whether you were able to obtain your client's file?

A.  That was my understanding from Mr. Sullivan.  Up until that point Mr. Sullivan had been talking to Mr. Swerling.  I had no discussions with Mr. Swerling so that was based on my understanding from Mr. Sullivan there had been some difficulties.  And so that was why I was researching whether we could -- if Mr. Basham owned them we should be able to force Mr. Swerling to send the records up.

Q.  Now, did you receive Government's Exhibit 186, Miss Meister?

A.  Let's see.  No, I did not.  It goes Exhibit 14, 15, 16, 17 and then it skips to Exhibit 190.

Q.  All right.  That will help me in my questioning then.  Do

you recall traveling to South Carolina in January of 2008 with Tim Sullivan?

A. I don't recall traveling in January of 2008, no.

Q. Okay. Are you aware of a letter Mr. Sullivan sent to Mr. Swerling in January of 2008 requesting the file in Mr. Basham's case?

A. I am not.

Q. Okay. So sticking with Defendant's Exhibit number 8, and on that same page three there is a -- let's see. Actually, excuse me, no, it would be -- can we go to the next page, Susie? And one more, please.

So the third page of that exhibit is dated January 25, 2008. And there's an entry for an attorney, I assume, named Mushtaq Gunja.

A. That's correct.

Q. Was that Mr. Gunja?

A. Yes.

Q. And was he an associate at the firm, too?

A. Yes. I think he was a first year associate.

Q. And what was he researching for you on that day?

A. He was researching -- following up on some research from Miss Apfel regarding ownership of the trial counsel's files, because Miss Apfel didn't have time to do more research.

Q. Okay. So it was still a live issue for you?

A. Yes.

Q. Okay. Now, if we could still look at the same document, the same page, the page marked page 8 of February of 2006 -- excuse me, February 26 of 2008. And there is, if you will see the exact -- I'm sorry, February 26.

A. Yes, I have it.

Q. February 26. Was there an attorney on the case who did some more research on that date on the same issue?

A. That appears Mr. Gunja did some more research on the same issue, yes.

Q. So a month later is it safe to say that you were still having trouble getting the records?

A. Yes, we still did not have the records, and I think I began pressing Mr. Sullivan more about why we don't have them, what the status is, et cetera.

Q. Okay. And enough so that you were actually still having other lawyers research the issue of your legal rights, correct, of your client's legal rights?

A. Correct.

Q. Okay. Is it appropriate to say that the time that Jenner spent on this issue was spent because you believed it was important to receive trial counsels' file?

A. Yes, I think that's fair to say.

Q. Among the team in both -- in and out of Jenner, was there anyone who was considered to be the point person for contact with Mr. Swerling about getting that records from him?

A.    Originally that would have been Tim Sullivan.

Q.    Tim Sullivan.  Okay.  Now, I'm sorry, I'm going to write down this time so I don't have to ask again.  When did the government's exhibits begin for you?

A.    I have Exhibits 14 through 17 and then they start at 190.

Q.    Okay, great.

A.    And go up to 218.

Q.    Thank you.  Can we have you look at Defendant's Exhibit 18, please.

A.    Hold on, I'm getting to it.  Okay, I have it.

Q.    Okay.  Can you tell court what this is?

A.    Sure.  It's an e-mail from me updating everyone who was working on the Basham appeal about the conversation I had with Mr. Basham's initial attorney Cam Littlejohn.

Q.    Okay.  And in that e-mail do you also reference Mr. Basham's subsequent attorney Jack Swerling?

A.    Yes, I do.

Q.    Okay.  And is it correct to say that this e-mail indicates that you then had been trying to contact Mr. Swerling?

A.    It does, yes.

Q.    And were you successful?

A.    No.  From this e-mail, which would have been written contemporaneous with my discussion with Cam Littlejohn, it says that I have two calls in to Jack Swerling and they have not been returned.

Q.  Now, with regard to your conversation with Mr. Littlejohn, why did you call Mr. Littlejohn?

A.  Two reasons.  One, I wanted to see if he had any files -- specifically there was a motion for competency that he had filed that we were unsure whether it had been withdrawn at some point, so I was calling to see if he had any files related to Mr. Basham, specifically that motion.  And who -- to get a greater understanding of his disqualification, just to talk to him and what his understanding of it was.

Q.  Okay.  Now, to put all of this work in context, do you recall -- I will tell you the record indicates the following: The Jenner file, the opening brief in Mr. Basham's case on May 13, 2008, does that sound familiar?

A.  Yes.

Q.  Okay.  And did you at one point receive a two-week extension of time in order to do that?

A.  I don't recall, but if that's what the record says then I would agree with that.

Q.  Okay.  Okay.  And the record indicates that initially the brief was due April -- well, there had been other extensions, but for purposes of our discussion your brief was due April the 29th and then you received a two-week extension.

A.  Okay.

Q.  Can you now look at Government's Exhibit 190 for us, please?

A.   Okay.  I'm reviewing it, hold on.

Q.   Um-hmm.

          (There was a pause in the proceedings)

          THE WITNESS:  Okay.

Q.    (MR. BURKE) So does that reflect that you had a conversation on the phone with Mr. Swerling on March 26, 2008?

A.   Yes, it does.

Q.   And this was an e-mail to follow up, is that correct?

A.   That is correct.

Q.   And what was the purpose of the e-mail and the phone call?

A.   To get records from the trial files.

Q.   And was it to get specific records?

A.   It was to get specific records.  At that point, I mean in January I believe we already had all of the transcripts or most --  we had all of the transcripts and most of the motions, so we had most of the direct record but there were -- I asked all of the associates for things they felt they needed to complete their sections and I asked Mr. Swerling for those specific items.

Q.   So this was your followup from requests from your colleagues about specific information that they needed but did not have, correct?

A.   Correct.

Q.   Okay.  Then among the materials, if you can just look very quickly, were you requesting information on the competency

motion that was filed in Mr. Basham's case?

A.  Yes.

Q.  And do you recall whether any of your colleagues was researching the question of Mr. Basham's competency at trial?

A.  Yes.  I mean, that was an issue that we flagged.  I believe I flagged it and I think Mr. Haren also flagged it.

Q.  Okay.  And then if we look at Government's Exhibit 191.

A.  Okay.

Q.  Very short e-mail.  What is that e-mail?

A.  That's a an additional item that I'm adding to Jack's list of things to prepare, which includes the order by the judge that disqualified Mr. Basham's initial attorneys.

MR. BURKE:  And to try to speed things along, there are other exhibits and, your Honor, there are exhibits that are in the record that will show e-mails sent from Miss Meister to Mr. Swerling around that time, and I'm referring to the Government's Exhibit 192.  And I won't go through each of them, but they were requests for specific documents that the attorneys at Jenner did not have but were in need of.

THE COURT:  All right.

Q.  (MR. BURKE) Now, at some point did you ask a lawyer at your firm to research whether you had the right to compel Mr. Swerling to provide you with the records, do you recall?

A.  I don't.  I mean, I think that was the basis of the

research that Mr. Gunja and Miss Apfel did.  I went to Mr. DeBruin when -- I mean, I kept asking him when are we going to get the records and, sorry, Mr. Sullivan, Mr. Sullivan was kind of like, you know, Mr. Swerling is being difficult but no worries, I'll get them.  And at a certain point I just -- I couldn't rely on Mr. Sullivan anymore so I went to Mr. DeBruin and I said, look, this is the status, we still don't have the records, I'm not confident Mr. Sullivan is going to get them, so here's my idea.  Which is to tell Mr. Swerling he can either allow us access to the records or I can get the court to order him to give us access to the records.

Q.   Okay.  And that takes us to Government's Exhibit 192.

A.   Okay.

Q.   Do you recognize Exhibit 192?

A.   It appears to be an e-mail I sent to Mr. Swerling.

Q.   Okay.  Actually, I'm looking for a faxed letter to Mr. Swerling dated April 1st.  I may have the wrong --

A.   That's 193.

Q.   Okay.  I was doing this pretty late last night.  Do you remember drafting that -- sending that letter to Mr. Swerling?

A.   I do.

Q.   Having been -- I think we have all been in this situation where we're relatively new lawyers having to deal with more experienced lawyers.  Did you find it sometimes to be a little bit daunting?

A.   Not really, but that's just not my personality.

Q.   Well, Mr. Basham's glad to know that, because -- you sent a letter to Mr. Swerling on April 1, 2008, correct?

A.   On April 1 -- let me see.  Yes, that's correct, I sent it to him via fax but I also shot it to him via e-mail.

Q.   And this was essentially your shot across the bow, is it safe to say, now's the time to give us what we need?

A.   This is my attempt to create a paper record so that if he did not comply I had something to attach to a motion to the court.

Q.   Is it safe to say or is it correct you had previously had trouble getting Mr. Swerling to respond promptly to your requests?

A.   Yes, that's correct.

Q.   Okay.  Did he respond to this letter?

A.   Yes, he did, almost immediately.

Q.   Okay.  If you'd look at Government's Exhibit 194.

A.   Give me a minute.  Okay.

Q.   I believe that this is Mr. Swerling's response to you in which he calls your letter totally unnecessary in its tone and content?

A.   Yes, that's correct.

Q.   You remember receiving that?

A.   I do.  I also got a phone call from him.

Q.   And what occurred during that phone call?

A.  I was, to use the colloquialism, chewed out on the phone.

Q.  Do you recall why Mr. Swerling chewed you out?

A.  He said that, you know, how I impugned his integrity, he's been a member of the bar of South Carolina for longer than I think had been alive, is what he said.  That, you know, he's always done his best for his clients and he will give us anything we need, we have only to ask.

Q.  Okay.  Did Mr. Swerling say to you in the e-mail he sent you that no one had ever requested anything from him?

A.  That's correct.

Q.  Excuse me.  I didn't mean to interrupt you, but until the week before?

A.  That's what his e-mail says, yeah.

Q.  Do you believe that's accurate?

A.  That was not my understanding from Mr. Sullivan.  And I had asked him, I think the -- I mean, the week prior than the week before the 1st, I believe is when I started getting involved, and he didn't return my phone calls.

Q.  Okay.  If we could look, please, Gayle, at Exhibit 195, Government's Exhibit 195.  And if you could -- and again I've got the wrong number.  All right.

    Well, you had a series of e-mails with Mr. Swerling even that day, correct?

A.  Correct.

Q.  And what was decided about what you would do to obtain the

record or what you needed from the record?

A.   I basically volunteered to fly down on a moment's notice to South Carolina to go through all of the boxes he had, because he did not want to send them to D.C.

Q.   Did he tell you why he would not send them to D.C.?

A.   He did not.

Q.   Okay.  And so you say you would arrange a trip to South Carolina to get the documents that you needed?

A.   Yes.  Initially, I believe I told him I could come down Monday, March 31, he hadn't responded so that's when I sent the letter, and then I volunteered to come down that Thursday, and he said you can come down whenever you wish.

Q.   Gayle, could we see 196, please?  Hopefully this will be -- and I have written this down right.

     So Government's Exhibit 196, I believe you do have that one, Miss Meister?

A.   I do.

Q.   Okay.  That's an e-mail from you to Mr. Swerling, correct?

A.   The first part looks like it's an e-mail from Linda Brown, but there is an e-mail from me contained on that e-mail, yes.

Q.   Okay.  Is it an accurate description to say that you were -- once you were given permission to come down and at least go into the file you were doing what you could to accommodate Mr. Swerling's requirements?

A.   Yes, I was attempting to do what I could to accommodate

his requirements.

Q.   Okay.   When you went down to South Carolina you went to Mr. Swerling's office, is that correct?

A.   Yes.   Mr. Sullivan also went down, we met in the morning at the hotel, and then I went to Mr. Swerling's office for the day and Mr. Sullivan went to the courthouse.

Q.   Okay.   So you alone in going through the records in Mr. Swerling's office?

A.   I was.

Q.   Do you recall what you -- can you describe the record for us that you saw that day?

A.   Sure.   It was a room full of those plastic long boxes that you can get at Home Depot that have the white tops that sort of seal in a jigsaw on top.   And then a few file cabinets strewn over the entire room in no order whatsoever.

         MR. BURKE:   Your Honor, we won't -- just for the record purposes, the government has admitted Exhibits 4 through 7 in this proceeding.   Those are actually photographs of the file in this case.   Miss Meister I don't believe has those so I won't ask her any questions.   Everyone stipulates that's a fair picture of the file situation in this case.

         MR. DALEY:   What they looked like as of two or three days ago, yes, your Honor.

         THE COURT:   What I understand, some were in bankers boxes and some were in filing cabinets?

THE WITNESS: Some -- well, there was I think maybe one or two filing cabinets, there were some bankers boxes, but there's also these large plastic tubs that files were put into.

THE COURT: All right. I understand.

BY MR. BURKE:

Q. And was your understanding at the time that that was the entirety of the record in the case?

A. Yes.

Q. Okay. You had one day to go through those boxes?

A. I had one day. I believe I was there that day and -- I can't remember if I went back part of the next morning, as well. But I had a day set aside to go through the records, yes.

Q. Do you recall, you were going to make -- were you going to make copies of what you thought was important?

A. Yes, I was supposed to make copies of everything that I found that was important and then bring those back or ship them back to Jenner's offices in D.C.

Q. Do you remember having any conversations with Mr. Swerling about his requirements about boxes leaving his office?

A. Yes, he had very strict requirements about boxes leaving his office and where they could be overnight, and so that was -- made it a little extra difficult to comply with.

Q. So did you comply with that for him?

A.  As much as I was able.  I believe I probably violated a little bit, but -- because I think technically they were at the copy office from 10:00 o'clock at night until, I don't know, I think I went and picked them up at 3:00 in the morning because he didn't want them out of his office all night.

Q.  Did he tell you why?

A.  No.

Q.  Do you believe that the period of time that you were given in early April 2008 to review the numerous boxes in this case was sufficient time to become familiar with the records that were there?

A.  I mean, it was enough time to look for the list of items I had that we needed to find, and I found some additional stuff, too.  As far as -- I mean, for a direct appeal I don't know if it was sufficient, it was pretty close to sufficient.  For a habeas appeal, no.

Q.  You mean -- I'm sorry.

A.  It would depend.

Q.  Okay.  At that time do you remember, it appears from the record, I don't want to state this as a fact, but it appears that the issue of Mr. Basham's competency was still an issue that you were considering as an issue for the brief, correct?

A.  Yes.

Q.  And as an appellate lawyer, of course, you are bound by the record on appeal, correct?

A.  Yes.

Q.  In assessing whether you had a viable claim, however, would it have helped you if you had had Mr. Swerling's notes from the trial and his pretrial notes in determining whether you had a valid claim of competency?

A.  That might have pointed us where in the direct appeal to look or what his thoughts were, but they weren't something we could have used on a direct appeal.

Q.  Thank you.  Now, I would like to turn for a moment and just to move away from the -- the obtaining of the record and talk about the actual issues that was raised in this case.

A.  Okay.

Q.  Could you just tell the court, if you remember, what were -- and this is, of course, it's a matter of public record, but what were the primary issues that were finally included in the appeal in this case.

A.  They were juror misconduct, improperly admitted 404(b) evidence, cumulative error, a verdict form irregularity, and improper disqualification of counsel, I believe.

Q.  And at that time what did you view as -- what was the first issue in the brief?  What was your primary issue?

A.  Juror misconduct.

Q.  Now, there are a series of e-mails that have been admitted and in the interest of time I won't make you go through them all, they are in the record and the government agrees they say

what they say and they were sent by whomever it says they were sent by.

Were there discussions occurring among the lawyers at Jenner & Block in the week of -- several days, let's say May 6 through May 13, where you were discussing the issues that would ultimately end up in the brief?

A.   Yeah, we had many -- we had many meetings about what issues would ultimately end up in the brief.

Q.   Do you recall at any point did -- at any point, not just that one week, but at any point was there ever any discussion about your issues regarding the selection of the jury in this case?

A.   There was some discussion.  I believe Mr. Haren pointed out some jury selection issues, yes.

Q.   Were those included in the brief that was ultimately filed?

A.   No, they were not.

Q.   Okay.  Was there discussion among the attorneys in this time frame regarding including the claim regarding Mr. Basham's competency?

A.   That was an issue that we discussed to include in the brief and deciding where it should go or should it be included at all, yes.

Q.   And but we have sent you these exhibits, and then I believe several days ago or a few days ago I sent you just a

general packet of e-mails for you to review, correct?

A.   Yes, I received a binder on Friday.

Q.   Okay.  Do you recall reviewing or recall from the time e-mails from Mr. DeBruin asking essentially where do we stand on the competency issue?

A.   There were e-mails.

Q.   And I can direct you actually -- I'm sorry, Defendant's Exhibit 13 might be one.

A.   Okay.  Hold on.

Q.   Did you find that?

A.   Wait, that's not 13.  Yes, there's an e-mail from David DeBruin to Steve Ascher and Kali Bracey that I wasn't included on.

Q.   And that is an e-mail dated March -- excuse me, May 6, 2008?

A.   That's correct.

Q.   And that's one week before the brief was filed in this case?

A.   Yes, I believe so.

Q.   And is that -- is that Mr. DeBruin asking if a decision had been made about including competency?

A.   It appears to be.

Q.   Okay.  Could you look at the top of that page for us, the very last entry?  These e-mails, you have to read them in the reverse order, so the top would be the last entry.  Was that a

response from you, Miss Meister?

A.  Yes.

Q.  Okay.  And you were responding, you say agreed.  Do you remember what you were agreeing to?

A.  It looks -- based on the context it looks as if Steve -- Kali Bracey had sent an e-mail to Steve which had been on his to do pile, he said that he thought we should include the competency argument, Kali agreed, and then I agreed and said that I didn't think it was a weaker argument and it did favor the disqualification section, so I think there was an agreement we should include it.

Q.  Now, Miss Meister, you are working at a disadvantage, and we are too, in that -- and I think, Mr. Daley, you can speak on this, too, your former employer Jenner, we only have the e-mails that they gave us so we are not suggesting to you that this is the entirety of the e-mails that exist out there, but this is all that we were allowed access to.

A.  Sure.

Q.  This e-mail, as I said, was the week before you filed the brief.  Do you recall what discussions occurred in that final week regarding including the competency claim?

A.  I believe we discussed whether to make it a stand-alone section versus have it be part and parcel of the disqualification of counsel section.

Q.  Okay.

A.   And I believe it was ultimately decided that it was part and parcel -- to be included as part and parcel of the disqualification section.

Q.   But not just a stand-alone issue?

A.   No.

Q.   Okay.  Do you recall raising an issue on the appeal, it may not have been drafted by you, regarding the trial court's -- the district court's refusal to allow in evidence regarding Mr. Basham's codefendant Mr. Fulks from Mr. Fulks' trial?

A.   To allow in -- I'm sorry, I didn't understand the question.

Q.   Yes, certainly.  Do you remember an issue in the brief concerning a claim that the trial court here had erred in not allowing the defense to present evidence of Mr. -- from Mr. Fulks' trial concerning Mr. Fulks' prior actions and the government's description of Mr. Fulks?

A.   I believe that Eric Haren raised that issue.

         MR. BURKE:  And, your Honor, the record will speak for itself on that.  That issue was presented to the court and the Fourth Circuit found in that case that they could not even address it for plain error because your Honor was never given an opportunity by trial counsel to rule on the question because it was never renewed to you.  So the Fourth Circuit's ruling was this is not a viable issue, it was never presented

so we couldn't review it for that purpose.

Q. I'm not going to -- there are a series of exhibits, defendant's exhibits, that just focus on the various claims in the last week and what was -- and I think they speak for themselves. One thing that's not in there, and I'm curious, Miss Meister, did you ever have a conversation with Mr. DeBruin, and I'm going to direct to you Defendant's Exhibit number 10?

A. Okay.

Q. And this is actually an e-mail in which you were not included, so -- an e-mail from Mr. DeBruin to Mr. Ascher concerning his concerns about how he, Mr. DeBruin, had handled the case. Do you remember -- well, you've never seen this before. He says I now realize that I handled this project very poorly. I assumed I could let the associates run with it led by Melissa Meister. I should have been more involved or gotten help much earlier in evaluating the facts and the potential issues. But you, Mr. Ascher, are doing a great job of damage control.

Did you have a conversation with Mr. DeBruin about his concerns about how the brief had been handled?

A. No, he never raised that with me.

Q. Okay. And ultimately you argued this case to the Fourth Circuit, did you not?

A. I did.

Q.  And do you recall the primary issue in the argument concerned the juror issue with regard to Miss Wilson?

A.  That's correct.

Q.  Okay.

THE COURT:  Let me stop you and let me read this e-mail.  You are going through it pretty fast.  Hold on one second.

(There was a pause in the proceedings)

THE COURT:  Who is Stephen Ascher?

MR. BURKE:  Miss Meister, who was Stephen Ascher?

THE WITNESS:  Stephen Ascher was a partner from the New York office of Jenner & Block that had been assigned to work on the case.  And he also, like Mr. DeBruin, was assigned to review our work and provide input.

Q.  (MR. BURKE) Do you recall, Miss Meister, did Mr. Sullivan take an active role in the preparation of the brief?

A.  He did not.  He only drafted his section, which had to do with the verdict form.

Q.  Okay.

A.  He did read the brief but he had nothing substantive really in response to our draft.

Q.  Okay.  And then you argued this case October the 31st of 2008.  Do you remember that?

A.  Yes.

Q.  Okay.  There is an exhibit, and I do apologize, I'm having

trouble finding it at the moment, but it was one of the exhibits I believe that -- well, it would have been sent to you. I don't know if you had the opportunity to look at it. It is an e-mail from you to members of the team, it looks like sent out after midnight, Defendant's Exhibit number 7. Let me know when you've found that.

A. Yes.

Q. Okay. And that was sent out at 12:40 Friday, October 31. I'm sure you were staying up late doing prep for the argument that day?

A. Yes.

Q. Do you recall doing an internet search that day?

A. This e-mail refreshes my recollection that I did.

Q. You do remember that? Can you read for us what you sent to the members of your team that early morning?

A. Sure. I had -- I had been looking at news information and I found a story, I believe it was local to South Carolina, about Chadrick Fulks' appeal. There had been an anonymous comment on that news story, said I was on the jury for Brandon Basham. If you could have heard the stories from the families and the things they did to these women you would see they truly deserve to die, but they need to suffer in prison for a while. Death is too easy.

        MR. BURKE: Thank you, Miss Meister. I have no further questions.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q. Thank you, your Honor. Miss Meister, this is Jeff Johnson, I'm an Assistant U.S. Attorney here in South Carolina. I'm the one who interviewed you back on September 11.

A. Yes, I remember you, Mr. Johnson.

Q. All right. It's good to talk to you again. And, like Mr. Burke, I want to thank you for your testimony today. Obviously, you're having to do this fairly early in the morning there in California in addition to your work responsibilities that you have, and we both appreciate your time to come and testify with us.

A. Thank you.

Q. And just to let you know up front, Mr. Burke has been very thorough in his examination of you and I'm going to try my best to avoid any duplicative questions to the very best that I can.

A. Okay.

Q. I want to start off, go back to the team that you had at Jenner & Block.

A. Okay.

Q. You already testified some about that, but my understanding is that you had Tim Sullivan who was appointed

first and he was co-counsel for Mr. Basham, correct?

A.  Correct.

Q.  And there at Jenner & Block you had a team of attorneys who were working on Mr. Basham's appeal.

A.  Correct.

THE COURT:  Now, Mr. Sullivan wasn't with the firm.

MR. JOHNSON:  No, your Honor, I didn't mean to imply he was.

THE COURT:  I wanted to make sure I understood that correctly.

Q.  (MR. JOHNSON) That was correct, right.  Mr. Sullivan was not an associate or, excuse me, or a partner at Jenner & Block?

A.  Correct.  He had his own office at the time, of which I believe he was a partner.

Q.  So Mr. Sullivan had his own practice and he was, as an individual, was co-counsel.

A.  Correct.

Q.  And then you were named co-counsel while you were an associate at Jenner & Block.

A.  Correct.

Q.  And then also working with you at Jenner & Block was a team of other attorneys, right?

A.  Yes.

Q.  And I think we mentioned in your direct examination that

when you went back and looked at your time sheets your estimate of how many hours you personally spent on the case was between 350 and 400 hours, is that right?

A.  Yes, that would be accurate.

Q.  And those are just your personal hours, correct?

A.  Those are just my personal hours.

Q.  And I think we said that that did not account for time that you had spent in preparation for oral argument, right?

A.  That's correct.

Q.  And it certainly doesn't account for the hours spent by other attorneys from Jenner & Block, or Mr. Sullivan.

A.  No, it does not.

Q.  I believe you said on direct that Mr. David DeBruin was the supervising partner for the Basham appeal, correct?

A.  Yes.

Q.  I believe you also said Mr. DeBruin had considerable experience in the field of criminal law, is that right?

A.  Yes, he did.  That was my understanding.

Q.  And, more specifically, he also had death penalty experience, is that right?

A.  Yes.

Q.  And I also understand Mr. DeBruin at one time was a law clerk for Supreme Court Justice John Paul Stevens?

A.  Yes, I believe that's correct.

Q.  And he's now managing partner at Jenner & Block, although

he wasn't in that capacity at the time.

A.   Right, that's true.   He was the chair of the pro bono, I believe, at the time.

Q.   I want to go very briefly over some of the other lawyers who were working on this appellate team with you.   And I think some of them you've already mentioned.   In addition to yourself and Mr. DeBruin, Stephen Ascher was on the team, correct?

A.   Yes.

Q.   And was he a partner at the time?

A.   He was.

Q.   All right.   You've already mentioned Eric Haren, who I believe you said was an associate, is that right?

A.   Yes.

Q.   Was Kali Bracey another lawyer who was working on that team?

A.   She was.

Q.   Was she an associate or a partner?

A.   Partner.

Q.   All right.   Melissa Cox, she worked on the team as swell, didn't she?

A.   She did.   She was an associate.

Q.   And I also have Thomas Pulham?

A.   Yes, he was also an associate.

Q.   Are there any other -- we mentioned a couple of other

attorneys who made entries on the time sheets doing some research. One of those was Carrie Apfel, and the name of the other gentleman I'm going to butcher, Mr. Gunja?

A. That's correct. Yes, they did small research projects but no writing.

Q. All right. Other than those that I just mentioned were there any other attorneys on the team that spent time working on the Basham appeal that you remember?

A. Not that I remember.

Q. Okay. Thank you.

THE COURT: So while you are on the subject, how many lawyers in all worked on the team, attorneys and associates? Go back and just do me a head count.

Q. (MR. JOHNSON) All right. The judge has asked for a head count of the total number of attorneys from -- well, you have Tim Sullivan, and then how many attorneys do we have from Jenner & Block that worked on the appeal?

A. I think there were a total of seven who had some hand in writing it, and then approximately nine to ten who between writing and doing additional research.

Q. Let's talk about the -- let's break that down even further and talk about the ones who were involved in writing. Who were the seven that had a hand in writing the brief?

A. Kali Bracey, Stephen Ascher, David DeBruin, myself, Eric Haren, Melissa Cox and Tom Pulham.

Q.   And then who were the other ones that participated but did not write?

A.   Carrie Apfel and Mushtaq Gunja.

Q.   Thank you.  And we've spoken about Tim Sullivan.  He was appointed to the case on appeal prior to anyone from Jenner & Block being appointed, is that correct?

A.   Correct.

Q.   And I understand that one of his roles was to serve as the primary contact person who spoke with Brandon Basham personally, is that right?

A.   Yes.  He had a personal relationship with Basham so he was the point person there.

Q.   I want to talk about how the brief was put together.  Actually, I'm going to grab a copy of it to help me.

     Miss Meister, there were six issues that were raised in the brief, and I want to talk to you about how these were broken down.

A.   Okay.

Q.   And since I just talked to you about Tim Sullivan being the first attorney appointed, serving as a contact liaison for Mr. Basham, and I believe you said he also drafted one of the arguments sections for the brief, is that right?

A.   Yes.  Well, he did the initial draft on Section 5, the special verdict form.

Q.   So Mr. Sullivan did the draft for the argument section

that the district court committed reversible error by excluding statutory other factors from the special verdict form that the jury used to return a death verdict.  He drafted that section?

A.  Yes.  I think -- I believe he drafted about 26 pages of it, which we narrowed down to seven.

Q.  So Mr. Sullivan drafted issue number five?

A.  Correct.

Q.  And so of the remaining portions of the brief, which would have included facts section, statement of the case, and all the other issues, those portions of the brief were divided up among the members of your Jenner & Block team, is that correct?

A.  Correct.

Q.  Let's start with your responsibilities.  I understand that you drafted the entire facts section regarding disqualification of counsel, is that right?

A.  That's correct.

Q.  And I believe you also drafted the arguments section regarding disqualification of counsel.

A.  That's correct.

Q.  That would have been issue six in the brief.

A.  Yes, that's correct.

Q.  And when we talked to you back on September 11 I believe you told us that while other facts sections -- my

understanding was that other facts sections of the statement of facts were crafted by the attorneys who were working with the corresponding arguments section, and then your job was to kind of take all those factual accounts and blend them or meld them into a cohesive whole.  Is that a fair way to say it?

A.  Yes.  I drafted the juror misconduct and disqualification statement of facts, everyone else did their statement of facts, and my job was no meld them into a uniform statement of facts.

Q.  Thank you.  I was just about to get to in addition to drafting the arguments section regarding disqualification of counsel you also drafted the arguments section regarding juror misconduct, which was issue one?

A.  Melissa Cox actually did the initial draft of that.  When it came up to me I went to David DeBruin and we agreed that it wasn't appropriate to include that in the brief, so I then took over and I believe I almost completely drafted a new section, yes.

Q.  So Melissa Cox had an initial draft and then you and Mr. DeBruin decided that it wasn't adequate so you basically redid the whole section.

A.  Correct.

Q.  So you drafted two issues then in the arguments section, the disqualification and juror misconduct?

A.  Correct.

Q.  And I believe you said when Mr. Burke was speaking with you that you acted as the head of the junior associates who were working on the case?

A.  Yes.

Q.  And how many of those were there?

A.  Three.

Q.  Three?  And who were those attorneys?

A.  Melissa Cox, Eric Haren, and Thomas Pulham.

Q.  Thank you.  So far we have you doing issues one and six, Mr. Tim Sullivan did issue five, that leaves us with three issues that were in the brief.  Eric Haren, who was one of the associates working under your supervision, he drafted the arguments section on the 404(b) claim, which was issue two, correct?

A.  Correct.

Q.  And I think he also worked with Thomas Pulham on issue three, which is evidentiary standard claim, is that right?

A.  That's correct.

Q.  And then I have that issue four was also drafted by Thomas Pulham, which is the argument that Basham's sentence was imposed under the influence of passion and prejudice, is that right?

A.  That's correct.

Q.  And then over all of this was Mr. DeBruin exercising supervisory authority and editorial review, is that fair to

say?

A.   Him and Stephen Ascher, I believe is more fair to say.

Q.   So DeBruin and Stephen Ascher together exercising --

A.   Yes.

Q.   -- supervisory authority.  And they were both partners, correct?

A.   Correct.

Q.   And Mr. DeBruin also exercised some decision-making authority about which issues would be included in the final version of the brief, is that right?

A.   Yes, he did.

Q.   Thank you.  I think that covers the team that was working on the brief and the roles that they had in the appellate process.  I want to talk to you a little bit now about the substance of the brief itself, or rather your decision-making process in determining which issues would be included and which would not.

And in speaking with you back on September 11th it's my understanding when you were deciding which issues to include in the brief the team generally thought you would have an unfavorable audience in the Fourth Circuit and therefore wanted to include only those issues that had the best chance of success, is that correct?

A.   That's a fair and accurate representation.

Q.   In particular, you didn't raise the issue of about

Basham's competency on appeal because Mr. DeBruin made the decision that there was an insufficient basis in the record to raise that claim, is that right?

A.  I think we decided to raise it in the disqualification of counsel to point out different counsel would have taken different with Mr. Basham's case.  But, yes, we felt when we discussed the competency issue, we felt hamstrung by the fact that there was very little on the record by trial counsel that was ultimately selected.

Q.  I would like to talk to you a little bit more about that. I want you to find, if you could, Government's Exhibit 15.

A.  Okay.

Q.  And if we could blow up that paragraph there for those of us here in the court.  And you have seen this e-mail before, haven't you?

A.  Yes, I have.

Q.  And this was sent to you, you were one of the listed recipients, along with several other members of the appellate team that we have been talking about, correct?

A.  Yes, I am.

Q.  And this e-mail was sent on Thursday, May 8th, and this was very shortly before the final brief was filed, is that right?

A.  Yes.

Q.  And in this e-mail Mr. DeBruin says that he had reviewed

some of the competency materials in the trial court?

A.  Yes.

Q.  And he went on to say that there was nothing that provides independent support of the competency issue which would put the court on notice of an independent obligation to assess competency, is that right?

A.  Yes.  He's referencing -- we discussed competency and raising it in numerous phases of the trial.  This is in reference to the initial motion for competency that was filed shortly before Littlejohn and Monckton were removed as counsel.

Q.  So it's fair to say that this e-mail, which appears to be coming to a final decision on whether it was going to be included or not, this came at the end of a lengthy discussion among your appellate team about whether to raise competency as an independent issue in the brief, is that right?

A.  Yes, that's correct.

Q.  And ultimately Mr. DeBruin's conclusion was in the last sentence of that paragraph there, that the competency issue appears mixed and complex and he was reluctant to go down that road without knowing more than he did about the record.

A.  Yes, that's correct.

Q.  I'd also like you to look at Government's Exhibit 200.  And as that's coming up on our screen --

A.  I have it up.

Q.   You have it up.  I wanted to ask you this:  Not only do you discuss the competency issue among yourselves at Jenner & Block, you had some correspondence with Mr. Swerling, did you not, about the competency issue?

A.   Yes, I did.

Q.   All right.  You have Exhibit 200 of the government's exhibits there before you?

A.   Yes, I do.

Q.   I would like you to go to the bottom of the page there, which would have been the e-mail prior in time, which was -- appears to be an e-mail from you to Jack Swerling sent April 15, 2008 at 3:58 p.m.

A.   Yes.

Q.   You see that?  And it seems that you were asking him in this e-mail, you mention there was this original competency motion that was filed when Cam Littlejohn and Billy Monckton were still the attorneys for Mr. Basham and that that was not ever followed up in asking the court to appoint someone to assess Mr. Basham's competency.  And it seems like you are asking Mr. Swerling more about why that decision was made or why there wasn't a formal request for an independent evaluation.  Is that what you were asking him?

A.   Yes.

Q.   All right.  And I would like to move toward the top of the page then to Mr. Swerling's response, an e-mail dated the same

day, April 15, a couple of hours later at 5:29 p.m.  I'm sorry, that's from you following up with him and he follows up that same day at 5:58 p.m. where he says our own psychiatrist said that he was competent.  That is an e-mail he sent to you?

A.  Yes, he did.

Q.  So it's fair to say, Miss Meister, that in addressing whether you were going to raise the competency issue on appeal, you discussed it with both trial counsel and the other members of your team and determined that there was an insufficient basis in the record to support that claim.

A.  Yes, for a direct appeal that's true.  With regards to the initial competency and the competency motion, yeah, we discussed it again.  Also when he was found incompetent for a time during trial, but for similar reasons we decided not to include it.

Q.  And, again, your strategy in deciding what issues would be included in the brief was to include the issues that you felt had a reasonable chance of success before the Fourth Circuit, is that correct?

A.  Correct.

Q.  And you didn't want to water your -- water your brief down with issues that were weaker.  And that was a strategy decision on your team's part, is that right?

A.  Yeah, that's one way to characterize.  But, yes, we didn't -- we wanted to present the best brief possible that we

thought the Fourth Circuit would have the most likelihood of granting in Mr. Basham's favor.

Q. All right. Thank you. If you could give me just one second here --

A. Sure.

Q. -- I'm going to make another transition.

(There was a pause in the proceedings)

Q. (MR. JOHNSON) All right. I want to talk to you about other correspondence that you had with Mr. Swerling, particularly as it relates to obtaining or being able to review his trial files and notes and other things that may not have been in the record of the case.

A. Okay.

Q. Let's -- can we pull up Defense Exhibit 19?

A. Okay.

Q. And I'm looking at the middle message there, or the bottom message in that chain, which was sent on Tuesday, March 25th, 2008?

A. Yes.

Q. All right. Remind me again, Kali Bracey is one of the individuals that's a recipient of this e-mail, was she a partner?

A. She was a partner.

Q. So she was one of at least three partners working on this case, right? Her and Mr. DeBruin and Mr. Ascher?

A. Yes.

Q. Now, first looking at this e-mail, your first contact with Mr. Swerling would have been in late March 2008, is that correct?

A. Yes, my first contact would have been around that time.

Q. All right. Thank you. I would like you to look also at Government's Exhibit 190.

A. Okay.

Q. Now, this is -- pull up the one there. That's an e-mail you sent. Apparently you had a phone conversation with Mr. Swerling on March 26th, 2008, correct?

A. Yes.

Q. And I take it that given that you say in this e-mail here, sent 2:15 p.m., it begins, pursuant to our conversation today. So you had a phone call with Mr. Swerling earlier that day and then this e-mail was to follow up on that, correct?

A. Correct.

Q. And in this e-mail you provide Mr. Swerling with a list of items that you would like to review from his trial file, correct?

A. Correct.

Q. And some of these include motions that would have been part of the district court record, right?

A. Yes, it should have been, but they weren't retrievable from the district court. But we pulled everything from the

district court before making this request.

Q. Let's take a couple other government exhibits. If you go to the top of that page there, are we at the top? Okay. That's a follow-up that you sent on Thursday, March 27th, 2008, 7:45 p.m. following up to make sure he had gotten that list, correct?

A. Correct, because I heard nothing from him.

Q. All right. Let's go from -- go in order here in the exhibits from Government 190 to Government 192.

A. 192?

Q. 192, correct.

A. Okay.

Q. If we can blow that up a little bit. On the bottom is a message you sent on Monday, March 31st, 2008. And then at the top is a response from Mr. Swerling?

A. Yes.

Q. And your e-mail to him was sent Monday, March 31st, if I'm doing the time transition correctly, at is that 8:38 p.m.? And then he responds at 8:42 p.m. that he's been out of town in Florida and was -- get with his staff in the morning?

A. That's what the e-mails say.

Q. If we can go to Government's Exhibit 193.

A. Yes.

Q. What is this?

A. This is a letter that I sent to Mr. Swerling via fax and

via e-mail on April 1, 2008.

Q.  So this would have been the following day from the exhibit that we just looked at, the e-mail exchange that occurred on -- March 31 was I believe a Monday, correct?

A.  That's correct.

Q.  And then this, and this is a letter that you sent to him by fax and e-mail both on that same date?

A.  Yeah, on April 1st, correct.

Q.  And also like us to look at Government's Exhibit 194.

A.  Yes.

Q.  All right.  If we could pull up Mr. Swerling's message there at the top.  And in this message he says that he told you on Wednesday, which would have been March 26th, that he had told you he was on his way out of town.  I believe he was going to Florida.

A.  He said he was in Florida.  I don't recall him telling me he was on his way out of town.

Q.  But you remember him telling that he was in Florida?

A.  He sent me the e-mail saying he was in Florida, or FLA, yes.

Q.  Okay.  If we could go back to Government's Exhibit 192.  And just so I'm clear on the chronology here, and 193 being the letter that you sent to him because, as I understand it, you had asked what to do and Mr. DeBruin said you should send him a letter.  And I assume this is a response to their

instruction, correct?

A. Well, I mean, it was a little bit more extensive than that. But I had drafted this letter the week prior and it had been sent up for review by Mr. DeBruin before it was sent.

Q. So it was reviewed by Mr. DeBruin before it was sent?

A. It was.

Q. Thank you. And I believe that you said on direct examination that the purpose of this letter was to give you a paper record, I believe you called it, of the attempts you had made to contact Mr. Swerling regarding the file, correct?

A. Yes, that's correct.

Q. And so the purpose of this letter then would be to detail the various contacts that you had with him so if you had to file a motion to compel with the Fourth Circuit you could show that you had done your due diligence, right?

A. Correct.

Q. All right. Let's -- so according to this letter that you send to Mr. Swerling, if we could scroll down just a little bit toward the bottom, according to this letter, you contacted him by phone on March 26th, which was a Wednesday. And then the next contact that you had with Mr. Swerling was an e-mail that you sent him on Thursday, March 27th, correct?

A. Well, according to the letter I contacted him via phone on March 26th, I e-mailed him on March 26th, and then I e-mailed him again on March 27th.

Q. Okay. And in response to that e-mail on March 27th, and I know it's not in this letter, but he told you that he would get someone on it, correct?

A. Yes.

Q. And March 27th would have been a Thursday, and your next contact with him was the e-mail exchange you had with him on Monday, March 31st, correct?

A. That's correct.

Q. And so the e-mail you sent him on March 31st was around 8:00, 8:30 in the evening, he responded that he would get his staff on it in the morning, correct?

A. That's correct.

Q. And then the next contact would have been in the afternoon of Tuesday April 1, 2008, right?

A. Actually, I believe I called him that morning and asked if his staff was on it, and he said they were not, before I sent the letter.

Q. On --

A. He said he would get with his staff in the morning. So I believe I called him that -- the morning I sent the letter I called him and asked if he had gotten together with his staff yet, Mr. Swerling said no, so then I sent the letter.

Q. Okay. So you called him on April 1st and later that day you sent the letter?

A. Yes.

Q.   If we could pull up Government's Exhibit 195.

A.   Okay.

Q.   And in one of his responses to your letter, this is -- I guess it would be at 9:53 p.m. that evening, he told you that you may come down whenever you wish and copy whatever you want, is that correct?

A.   Yes, he does represent that.

Q.   And then that's on Tuesday, April 1st.  And you actually went to South Carolina to visit his offices that Thursday, April 3rd, is that right?

A.   That's correct.

Q.   So based on what we have looked at, and I know it's fairly tedious to go through this and I appreciate your patience, but it seems to me that based on this chain of correspondence you first contacted Mr. Swerling middle of the week around Wednesday March 26th, and then eight days later on April the 3rd you were able to get into his office and copy the file.

A.   Me personally, yes, that's the first contact I personally had with him.  It's not the first contact Basham's team had with him.

Q.   Let's talk about the files that you looked at in his office.  And I believe you said there were a lot of files because it was a big case, but there were not any files that you requested to see that Mr. Swerling refused to let you see, correct?

A. I have no idea what he -- whether he took anything out of the room or not. He let me access to the room and he said all the files were there. And there wasn't anything specific that he said you can't see.

Q. In fact, he specifically told you that you could look at everything that he had, correct?

A. That's what he said when he let me -- well, then he had his assistant let me into the room, correct.

Q. And there were no files on your list that he refused to provide you.

A. Not specifically, no.

Q. And there weren't any appellate claims that you considered raising or were unable to raise because he refused to give you access to his files, correct?

A. Let me think about that. I mean, I think he made certain things more difficult and we were more rushed but, no, I don't think there were any appellate issues that we couldn't raise because of his behavior.

Q. And, in fact, I think you told Mr. Burke that the access that he gave you was sufficient for direct appeal, which was what you were handling, correct?

A. That's correct. If it wasn't I would have stayed additional time.

Q. Now, you mentioned the contact that you had with Mr. Swerling, and I know that in the letter you sent to him on

April 1st you talked about in addition to the contact that you had with him, contact that you had -- that Mr. Sullivan had had with him, is that right?

A. That's correct.

Q. All right. If we could go back to that, I think it's Government's 193?

A. Yes, I have it.

Q. And I know we're jumping around a lot. I'm almost done. So the contacts that you detail in this letter between Mr. Sullivan and Mr. Swerling, you say that Mr. Swerling has known of the need for the files since at least January 14, 2008. And was that based on Mr. Sullivan's letter to Mr. Swerling on that date?

A. Yes. I think Mr. Burke asked me on direct if I remember the letter and I didn't recall, but now I recall I asked Mr. Sullivan if he ever sent him any correspondence, he sent me the letter he had sent Mr. Swerling on January 14. That's when it was dated.

Q. All right. And then the letter also recounts that there was a meeting between Mr. Sullivan and Mr. Swerling here in Columbia on January 29th, 2008?

A. That's correct.

Q. And you weren't there for that meeting, is that right?

A. I was not.

Q. And you've never been party to any phone conversations or

any other contacts that Mr. Sullivan had with Mr. Swerling, is that right?

A. No, I have not.

Q. We talked a little bit, or you talked a little bit in direct examination, and if we could pull up I think it's a Defense Exhibit 8, which is selections from the time sheets there at Jenner & Block.

A. Uh-huh, yes.

Q. And I may not know the exact page number, but it would be an entry for January 10th. And we talked about an entry that Carrie Apfel had made where she was researching the right of appellate counsel to --

A. Okay.

Q. -- access files. Do you see that?

A. Yes.

Q. Now, was she doing this -- she was doing this research on your behalf, correct?

A. That's correct.

Q. And the entry shows that that work was done on January 10th, 2008. Does that date reflect the date that the work was actually done? In other words, she would have spent in a hour researching on January 10th?

A. Yes.

Q. And the entry says that it was as to appellate counsel's rights to counsel below's records. But from the face of that

that doesn't distinguish whether the issue she was researching was right to access the records or right to physical possession of the records, does it?

A. It does not.

Q. And I believe there was also an entry from Mr. Gunja, I know he had a couple, I know one was in February 26th and the other was in January, if we could pull up the one in January.

A. Yes.

Q. Do you know the date on that?

A. January 25th.

Q. January 25th. Okay, I see it now. January 25, 2008 it shows that he spent three hours researching ownership of client files. But, again, it doesn't indicate whether ownership in this case refers to access or physical possession, does it?

A. It does not so indicate.

Q. If you would give me just one moment.

(There was a pause in the proceedings)

MR. JOHNSON: All right, Miss Meister. I know this hasn't been exactly fun, but I appreciate your cooperation and that's all the questions I have on cross-examination.

THE WITNESS: Thank you.

THE COURT: All right. I don't have any questions. How long do you think you will be?

MR. BURKE: If I have five questions tops.

THE COURT: Go ahead and finish. I apologize to the staff for going so long but I'm trying too finish while she's on the phone.

REDIRECT EXAMINATION

BY MR. BURKE:

Q. Miss Meister, this is Mike Burke again. I have just a couple of questions for you, okay? On the government's -- Defendant's Exhibit 19, Mr. Johnson had you take a look at that, and it was some conversation, e-mail conversation between you and Mr. Swerling. If we can -- if you could find that, I might have it handy. Defendant's 19?

A. I have Defendant's 19. It's a conversation between myself and Mr. DeBruin and Stephen --

Q. I'm sorry. I wrote this down wrong. Let me just ask you, you looked at some e-mails between you and Mr. Swerling --

A. Okay.

Q. -- in which Mr. Swerling commented about, you know, the delay in requesting the materials from him. Did you -- when you asked Mr. Swerling to provide you with the copies or the files did you offer to pay for all copying?

A. Yes.

Q. And you offered to pay to have everything sent to you, didn't you?

A. Yes.

Q. Okay. And I would like to refer to -- hopefully this is

the right one, Exhibit 15, Defendant's Exhibit 15.  And that is the e-mail Mr. Johnson asked you about competency?

A.  Defendant's Exhibit 15 or Government's Exhibit 15?

Q.  Defendant's Exhibit, I'm sorry, 11.  I do apologize to the court and you, Mr. Miss Meister.  Number 11 was the letter to you from Mr. DeBruin.  And Mr. Johnson asked you about that being Mr. DeBruin's last word on whether the competency claim should have been included.  Do you remember that?

A.  Yes, I have.

Q.  And what -- when was that sent?

A.  Thursday, May 8th at 8:25 in the evening.

Q.  Okay.  And what Mr. DeBruin concluded was that the issues was mixed and complex.  Correct?

A.  Yes.

Q.  Did he say I'm -- he said I'm reluctant to go down that road without knowing more than I do about the record, correct?

A.  Yes.

Q.  Okay.  I'd ask you to look at Defendant's Exhibit 10.  And then midway almost toward the bottom of the page there's an e-mail from David DeBruin, this is to Stephen Ascher?

A.  Yes.

Q.   Which Mr. DeBruin talks about his concerns about how he had handled the case.  When was that sent?

A.  Friday, May 9th, approximately 8:32 in the morning.

Q.  So twelve hours after he sent the e-mail saying he didn't

know enough about the competency issue to go into greater

depth?

A.   Correct.

Q.   Okay.  Mr. Johnson asked you about whether you -- your

intention was to include the strongest claims possible to the

exclusion of the weaker claims, is that correct?

A.   Yes, he asked me that.

Q.   And was that -- what was your response?  Did you agree

with him?

A.   Yeah, my response is that our appellate strategy was

because we didn't feel the Fourth Circuit was very amenable to

death penalty appeals that we wanted to present the strongest

issues possible and not have them lost among many arguments

that we didn't think were going to be successful.

Q.   And your law firm included a claim that the Fourth Circuit

in fact was never even able to review because it had not been

reserved, is that correct?

A.   Yes, that's correct.  I believe we included that.

         MR. BURKE:  Thank you.  I have no further questions.

         THE COURT:  I don't have any questions.  Anything

further from the government?

         MR. JOHNSON:  No, your Honor.

         THE COURT:  All right.  Very good.  Thank you very

much.  We will hang up now.  Thank you for being available.

         THE WITNESS:  Thank you, your Honor.

THE COURT: All right. And with that let's take our lunch recess. Is a hour and 15 minutes enough time or you want to take a hour and a half?

MR. BURKE: An hour and 15 is fine with us.

THE COURT: Let's say an hour and 20 minutes. Let's come back at 2:20, how about that? We will be in recess until 2:20.

(A recess transpired)

THE COURT: I don't know if you all heard what happened over lunch, but I received a call from the prison to indicate that as we adjourned Mr. Basham was being escorted out when he assaulted two officers and injured two officers and bit another officer, and the Bureau of Prisons does not want him to come back to the hearing. My law clerk also informed me this morning the Supreme Court of the United States heard argument on the question of what a judge should do when a competency issue arises in a 2255 hearing. And the quick blog that came out indicated that the court seemed to be leaning towards some strict requirements and not just referring to the judge's discretion. So here we are.

I had Dr. Parker examine Mr. Basham back late last year, who found him to be competent. Does the petitioner have any evidence to the contrary at this time from a medical doctor?

MR. BURKE: Your Honor, I can tell that you we have

spoken with Dr. Hyde, whose belief is that Mr. Basham was not competent at trial. We did not ask him to opine about his current competency and --

THE COURT: I'm raising the issue now on my own. Do you contend he's not competent at the present time?

MR. BURKE: We do, and I'll let Miss Stone address that.

MS. STONE: Your Honor, Mr. Murray, if you would like to get him on the phone, can speak in more detail. Part of how this went down is Mr. Murray was attempting to be let out of the prison over the lunch hour to call Mr. Burke and myself to let us know that he didn't think Brandon was competent this morning. He was emotional, he was struggling to sit through things, and Mr. Murray was having a very difficult time with Mr. Basham. Apparently the guard indicated Mr. Murray might not be allowed back in and --

THE COURT: I'm awaiting on the report from the prison as to what their official position is going to be. But let me just say this, I authorized them to take his cuffs off this morning, and the thanks I get to that he goes and bites a guard.

MS. STONE: And --

THE COURT: And it's awfully frustrating to try to manage this case and move it along. And I worked around y'all's schedules, I worked around everyone's schedule except

my own schedule. I had cataract surgery a week ago and I have complications from the surgery where my vision is worse than before. I'm having a difficult time reading. And I don't appreciate it when a defendant disrupts a proceeding if he's in fact competent. I ask again does defendant have a medical opinion that he is not competent at this time?

MS. STONE: We do not have a medical opinion.

THE COURT: That's a yes or no question.

MS. STONE: No, your Honor.

THE COURT: And I authorized your doctor to examine him, I signed an order authorizing the doctor to gain admission to the prison for the purpose of examining him. So what happened, he didn't examine him?

MR. BURKE: Your Honor, he did examine him. And I guess we will present some of Dr. Hyde's testimony right now. Dr. Hyde's position is because of Mr. Basham's brain damage and several other factors involved, his low IQ, he is not ever going to be able to be competent. He wasn't when he was tried, he is not now.

We went forward with this on our belief that as -- that for the very reason you say, your Honor, we're trying to accommodate. We would ask that you have some consideration for the difficulties that counsel have.

THE COURT: The easiest thing for me to do is adjourn this hearing and have him examined. Y'all are the ones that

are going to have to fly back home, and the next time I schedule this hearing it's going to be at my convenience and not counsel's convenience. Are we clear on this?

The easiest thing for me to do is say stop right now, have him examined. If the doctor says he's not competent, we'll stop, if he is competent we'll go forward. I'll probably rule he's waived his right to participate in this hearing by biting a guard after I authorized his handcuffs to be taken off.

Now, tell me why we shouldn't proceed that way?

MR. BURKE: We have no objection to that, your Honor.

THE COURT: What's the government's position?

MR. DALEY: Your Honor, we just would ask that any competency evaluation either be done by a court appointed expert or for us to be able to obviously have -- we retained an expert to do a competency evaluation.

THE COURT: Am I not correct, did I not authorize your doctor to go see him fairly recently?

MR. BURKE: Yes, your Honor.

THE COURT: Do we have a written report from that doctor?

MR. BURKE: He is preparing his written report right now. He's scheduled to testify in December, but Mr. Daley and I have talked, and he's preparing it. We should have it within a week or so.

THE COURT: He's going to say what?

MR. BURKE: Your Honor --

THE COURT: He never has been competent, never will be competent?

MR. BURKE: Well, let me specify that our purpose in asking him to evaluate Mr. Basham was for purposes of the evidence we wanted to present at this hearing, all right, not particularly concerning his current competency to participate in this hearing. His competency, in our experience, has been fluid, very fluid, and we have had times without problems, we have had times with severe problems.

I can tell you, your Honor, we have never, ever had problems at least that has occurred here today. This is shocking to us. But clearly -- and Mr. Murray is there with him, Mr. Murray has a considerable amount of experience in psychological issues in addition to his law degree, and he's telling us that he believes he's not competent, your Honor.

Your Honor, for what it's worth, we were informed that apparently before this incident occurred we just learned he was actually re-cuffed, so I don't believe that the actual removal of his cuffs had anything to do --

THE COURT: I don't care if he was cuffed or not, he bit an officer.

MR. BURKE: We don't disagree with that, your Honor. That's what we have been told.

MR. DALEY: Your Honor, the government I think at this point would -- I think if we were to adjourn for the day and evaluate the situation we might be able to determine whether we're going to be able to go forward. I don't know that we're not. We're all assembled and we have all the witnesses here, I don't know that we want to just right this moment say let's stop it and give up, because we do have the time blocked out for this week.

THE COURT: Has your doctor gone out and examined him recently?

MR. BURKE: Not yet.

MR. DALEY: Not yet, your Honor. He was going to be in rebuttal to Dr. Hyde, and so we were waiting to get Dr. Hyde's report. So he has not. No, he hasn't.

THE COURT: You say wait a day. We won't know anything more tomorrow than we will today, will we?

MR. DALEY: Mr. Basham has had a history of doing certain things that can be categorized as potentially incompetent or can be seen as remarkably manipulative. In court in February of '04, February 24th, I believe, of '04, September 20th of '04, and I believe October 26th of '04, there may be more instances, where you were asked to stop proceedings, competency evaluations were done at least in February and in September, he was found to be competent by Dr. Schwartz-Watts, which was his own psychiatrist.

I can tell you that from our interviewing, and the defense has been on the other side during all the interviews, they have been in our interviews of Mr. Harris and Mr. Swerling, and both of them are going to say he's competent, he's been competent. He may have had moments where there was some question in February.

So, your Honor, I don't want to overstate because I don't know what happened and I don't want -- but what I would tell you, your Honor, is there is certainly, as the Fourth Circuit said, a strong case to be made that perhaps he is just really downright manipulative. And that's the only reason that I think we could pause.

THE COURT: I agree with you. But what do we know today that we won't know tomorrow? That's my question. Mr. Burke says it's going to take a week to get this report written. Let me ask this, could we get an expedited report?

MR. BURKE: If you'd like we could try to reach our expert, who's actually in Maryland, we could get his phone number and see if he could speak to you. I've not had a chance --

THE COURT: Can't he just give me a -- put him on the satellite and give me an oral report?

MR. BURKE: We might be able to do that, although he hasn't seen Mr. Basham today, and Mr. Basham is clearly in a compromised state today, from what we have been told. So I

don't know how much he would be able to inform your Honor about his current state of competency.

THE COURT: Then we examine him, if he's competent then we come back in December and then we have to go through that all over again. This case will never end. If we have got to examine his competency on a day-by-day basis we will never -- there will be no end to it.

MR. DALEY: And that seems to be the position that -- and I'm not casting aspersions, but that's the position that I think they are going to continue to take.

THE COURT: I didn't look very closely at Mr. Parker's report, Dr. Parker's report, because the request to drop his appeal was withdrawn. But did y'all get a copy of it?

MR. DALEY: We both got a copy.

THE COURT: Did he find any evidence of malingering or anything, or did he just say he was competent?

MR. DALEY: Your Honor, I'd have to look back. I have not looked at that for a few weeks. I don't have that.

THE COURT: Y'all want to adjourn and come back tomorrow morning?

MR. DALEY: I think that would be the wisest approach, your Honor.

THE COURT: I might see if I can get Dr. Parker over there to see him, as well. From before he needs like two

months advance notice of when he was going to do it so it's probably not feasible.

MR. DALEY: Your Honor, we're just realizing Mr. Monckton is here and I think he may have some scheduling issues for tomorrow anyway. But that's something that was brought to my attention.

THE COURT: Well, as I said, I scheduled this hearing around everybody's personal issues but my own, so I'm telling everybody don't schedule any nonrefundable trips or vacations from now until the end of the year.

All right. We will be in recess and start back at 9:30 tomorrow morning.

MR. DALEY: Thank you, your Honor.

(Recess, 2:41 p.m.)


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: 11-9-12                    s/  Daniel E. Mayo


                    DEFENSE WITNESSES

WILLIAM H. MONCKTON, IV

        DIRECT                9

MELISSA A. MEISTER

        DIRECT               47
        CROSS                84
        REDIRECT            109

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 16

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

121

                    UNITED STATES DISTRICT COURT
                    DISTRICT OF SOUTH CAROLINA
                       FLORENCE DIVISION

----------------------------------

UNITED STATES OF AMERICA              CR NO.: 4:02-992
                                      Columbia, SC
    -vs-                              October 10, 2012

BRANDON LEON BASHAM,

          Defendant

----------------------------------


            BEFORE HON. JOSEPH F. ANDERSON, JR.
             UNITED STATES DISTRICT COURT JUDGE
                     MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIE G. MIMMS LAW OFFICE
                     1001 Elizabeth Ave., Suite 1A
                     Charlotte, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

**JA 3851**

COURT REPORTER:       DANIEL E. MAYO, RDR
                      Certified Realtime Reporter
                      901 Richland Street
                      Columbia, SC   29201

            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

JA 3852

THE COURT: All right. We're back on the record in United States versus Basham. Following the scuffle that occurred during the lunch recess yesterday and at the suggestion of the government we adjourned court for the remainder of the day and I suggested we needed to look at the defendant's competency at this point. To that end I called Dr. Robert Parker, who was the court's appointed expert last year when Mr. Basham indicated he wanted to drop his appeals and be executed. To my surprise Dr. Parker indicated that he would clear his schedule today and travel to Terra Haute and examine the defendant and be available to testify by satellite as to the defendant's competency to go forward with a Section 2255 hearing.

When we sent that information out to the lawyers who were still in the courtroom yesterday the word came back that possibly Dr. Thomas Michael Hyde, who is the defense expert, might be available for testimony by way of telephone call this morning, is that correct?

MR. BURKE: Yes, your Honor.

THE COURT: And he's ready right now if we called him?

MR. BURKE: It's my understanding he is. We also have Dr. Donna Schwartz-Watts in court available, as well.

THE COURT: All right. Well, any problem with proceeding to hear from -- Dr. Parker is going to need to see

Mr. Basham when he gets there so we don't need to waste any time hearing from Dr. Hyde.

MR. DALEY: Your Honor, I'm just wondering exactly what Dr. Hyde will be testifying about. And, obviously, the government at this point hasn't seen a report or had an opportunity to --

THE COURT: I know. I fully understand that, but he's going to testify about the defendant's competency to go forward with a 2255 hearing.

(There was a pause in the proceedings)

THE WITNESS: Dr. Hyde.

THE COURT: Dr. Hyde, this is Judge Joe Anderson in Columbia, South Carolina. Good morning.

THE WITNESS: Good morning, your Honor. How are you?

THE COURT: We appreciate you being available on short notice for us. We're in the courtroom with the lawyers for the government and for Mr. Brandon Leon Basham, who I understand you have examined in preparation for some possible testimony in this case.

THE WITNESS: Yes, sir.

THE COURT: Because of events that happened yesterday we found it necessary to get you on the phone on short notice this morning for you to give some testimony about Mr. Basham's condition. I'll let the lawyers take you from here. I guess to the extent we can we need to swear you under oath, miss

Floyd will --

THE WITNESS: Would it be better if I was on a land line? I am on a cell phone.

THE COURT: I think a land line would be much better.

THE WITNESS: All right, your Honor. Who do you want me to give the number to?

THE COURT: Just go ahead and say the number now.

THE WITNESS: (410)955-0443.

THE CLERK: Zero what? I'm sorry, zero what?

THE WITNESS: (410)955-0443.

THE CLERK: Thank you.

THE COURT: Hang up and we will call you right back.

THE WITNESS: Yes, sir.

(There was a pause in the proceedings)

THE COURT: Good morning, again, Dr. Hyde. Miss Floyd, our clerk of court, is going to administer the oath to you in this case.

THE WITNESS: Yes, sir.

(Thomas M. Hyde duly sworn)

THE COURT: All right, Mr. Burke.

DIRECT EXAMINATION

BY MR. BURKE:

Q. Thank you, your Honor. Good morning, Dr. Hyde. It's Michael Burke.

A. Yes, sir.

Q.  Dr. Hyde, you have been retained by the office of the federal public defender as an expert in Mr. Basham's case, is that correct?

A.  Yes, sir.

Q.  And I won't spend the court's time going through your qualifications.  Can you just tell court what type of doctor that you are?

A.  I'm a behavioral neurologist, or some people call me a neuropsychiatrist.  I'm a person who occupies the space between neurology and psychiatry; in other words, I study people and treat people who have brain lesions and have behavioral manifestations.

Q.  And do you have any experience in conducting competency evaluations in forensic settings?

A.  Yes, I have done on numerous occasions, both for medical-legal work but also when I was -- as part of my clinical practice for the past 24 years, especially when I was head of neurology consultation clinics at St. Elizabeth's Hospital, Washington, D.C., which is a public mental health hospital for the District of Columbia.  I performed enumerable competency evaluations for a variety of legal and judicial settings.

Q.  Do you recall being contacted by our office sometime I believe in 2010 at a period of time in which Mr. Basham indicated he was desiring to waive his 2255 motion?

A. I actually think it was 2011, but, yes, I do believe that that is the case, yes.

Q. And did we ask you to travel to Terra Haute to evaluate Mr. Basham?

A. Yes, sir.

Q. Okay. And do you know when you did that?

A. Yes. I visited with Mr. Basham on two occasions, the first was on April 20, 2012, the second was on September 28, 2012.

Q. On the second occasion that you met with Mr. Basham was that at our request for purposes of evaluating or giving us an opinion on your -- your opinion as to his competency at the time of his trial in this case in 2004?

A. Yes.

Q. Okay. And then we had conversations subsequent to your meeting with him in the last week or so, is that correct?

A. Yes, sir.

Q. Okay. And then you and I spoke yesterday afternoon and I informed you that there had been an incident at the prison.

A. Yes, sir.

Q. Okay. Are you able today to give the court any guidance as to Mr. Basham's current mental competency to proceed with the hearing that we are at right now, this 2255 proceeding?

A. Yes, I am.

Q. And can you tell us what your opinion is, please?

JA 3857

A.   Yes.   I believe that Mr. Basham is incompetent on the basis of both neurological and psychiatric problems.

Q.   And can you specify the neurological problems that you have determined that Mr. Basham suffers from?

A.   Yes.   I believe Mr. Basham suffers from what we would call a static encephalopathy, which basically is a generic term, means he's brain damaged and that brain damage is of significant proportion.   The brain damage manifests itself both in neurological findings, cognitive impairment, and behavioral abnormalities such as the one that he exhibited, sadly, yesterday in the jail.

And I believe that this brain damage is irreversible, and it can be managed with appropriate medications and therapy, but I believe that he is permanently brain damaged and I believe that that limits his competence and makes him incompetent, in fact now and in the foreseeable future.

Q.   And, your Honor, excuse me, and, Dr. Hyde, did your answer incorporate your psychiatric findings, as well, or did you also find that he had additional psychiatric ailments, as well?

A.   Yes, he has psychiatric problems which compound his brain damage from his neurological issues.   On a psychiatric basis he has a mood disorder, clearly suffering from bipolar disorder with psychotic features at times.   And I believe that that intersects extremely adversely with his underlying

neurological damage and actually makes his prognosis much worse, in that individuals that have bipolar disorder and have organic brain damage have a much more protracted and irreversible course with respect to regaining competency than those individuals who suffer from bipolar disorder without concurrent brain damage.

Q.   And, Dr. Hyde, as part of your review of Mr. Basham's case and your evaluation of Mr. Basham, did we provide you with as many medical records from his period at the federal penitentiary in Terra Haute, and specifically with regard to the medications he received?

A.   Yes.  Yes, I have seen that.

Q.   And today, I know that this is very spur of the moment, but are you of the opinion that since Mr. Basham has been incarcerated in Terra Haute that he has been properly medicated for his neurological and psychiatric ailments?

A.   No, he is grossly under-medicated, and, sadly, I think we saw the results of that under-medication.  That medication should have been accompanied by therapy or counseling.  If you look at the treatment guidelines by the American Psychiatric Association, the APA, for individuals in this situation, medication management plus counseling yields a very positive outcome, at least as far as managing the behavioral problems such as the types of outburst we saw yesterday.  And that also must be accompanied by limitation of access to illicit

substances, if any of those are suspected to have intersected with his case, because individuals with mood disorders and brain damage should not be on any illicit substances, including alcohol.

Q.  And one final question from me, Dr. Hyde.  You also in preparation for your testimony, your upcoming testimony in this hearing in December, have reviewed some portions of the transcripts from Mr. Basham's trial that we provided to you, is that correct?

A.  Yes, sir.

Q.  And did those transcripts indicate instances in which Mr. Basham had difficulty or for whatever reason had outbursts of some nature while in court?

A.  Yes, sir.

Q.  Okay.  And there's been some -- there was suggestion made at Mr. Basham's trial, and there was some suggestion made yesterday, that the fact that these outbursts happened or appear to happen only during court proceedings suggests a level of manipulation on Mr. Basham's part.  Do you agree with that suggestion?

A.  Absolutely not.

Q.  And why is that?

A.  I think Mr. Basham has a limited mental capacity, he gets frustrated very easily, he's confused very easily, especially around complex legal proceedings.  He does not understand the

nuances or even some of the broad principles that underlie our legal system, making him unable to interpret what is going on around him.  He acts in a disinhibited and impulsive fashion in a way that he cannot govern himself due to the brain damage and concurrent mood disorder.

This is an individual who has front temporal damage.  The frontal and temporal lobe is very important in mood regulation, judgment, reasoning, and impulse control.  His behavior is classic for a disinhibited individual suffering from bipolar disorder with concurrent brain damage, and his behavioral outbursts in a setting of great stress, like court proceedings, that he cannot process and understand is almost to be expected, especially when he is unmedicated or under-medicated, as in this case.

Q.  And, Doctor, I misspoke, I do have one more question.  You mentioned a moment ago the detrimental effects of the use of illicit drugs for a person with Mr. Basham's ailments, is that correct?

A.  Absolutely.

Q.  Do you have reason to believe that Mr. Basham has been -- has used illicit drugs of any sort since your evaluations of him or during his incarceration?

A.  He has made references to certainly the use of alcohol while incarcerated, and if he can obtain alcohol-containing beverages while incarcerated it's likely he can also obtain

other substances.  And in these cases he's probably trying to self-medicate for his underlying psychiatric problems with these illicit substances, including alcohol, as I include alcohol as an illicit substance in anybody's who's incarcerated.

MR. BURKE:  Thank you, Dr. Hyde.  I believe the U.S. Attorney will have some questions for you.

THE COURT:  All right.  Cross-examination.

MR. DALEY:  Your Honor, may we have a couple of moments to confer?

THE COURT:  You want to take a recess?

MR. DALEY:  In a moment we may ask for one.  Just a second, your Honor.

THE COURT:  All right.

(There was a pause in the proceedings)

THE COURT:  Doctor, if you will bear with us just a moment, please.

THE WITNESS:  Your Honor, it's fine.  There's no problem whatsoever.

MS. STONE:  Your Honor, Mr. Murray indicated they need a call.

THE COURT:  All right.  Go ahead.

(There was a pause in the proceedings)

MR. DALEY:  Your Honor, Mr. Witherspoon is going to do the cross-examination, but I have a few requests at this

moment. This has been completely sprung on us. Until this testimony we had no idea that there was going to be testimony about his current competency. This doctor has not examined him in three weeks.

THE COURT: Right.

MR. DALEY: We would ask for several things. One, an adjournment for a short while, at least, at the minimum. Secondly, we would request, if possible, from the court reporter an immediate just rough draft transcript of this testimony that we have just gotten in realtime. And then we would also like a few moments to be able to -- we also would like that testimony provided to Dr. Parker who's going to do the competency evaluation. I think that would make sense for him to have this testimony. And then we would ask for an adjournment for some amount of time at a minimum to confer with our expert who we were able to get here this morning.

THE COURT: I think those are all reasonable requests. We need to adjourn fairly soon so that Dr. Parker can examine Mr. Basham anyway. That would give you time to look at the transcript and let your expert look at it, as well.

MR. DALEY: But I don't know how easy that's going to be for the court reporter to do, your Honor.

THE COURT: He can give you -- he's got a pretty doggone good one right now.

MR. DALEY:  All right.

THE COURT:  Doctor --

MR. BURKE:  I'm sorry, your Honor.  May I ask the doctor one more question?

THE COURT:  All right.  Go ahead.

BY MR. BURKE:

Q.  Dr. Hyde, this is Michael Burke again.  I didn't clarify something that I think is important.  You have not evaluated doctor -- you have not evaluated Mr. Basham today, have you?

A.  I have not.

Q.  You have not had any communications with him?

A.  Not since I saw him on September 28.

Q.  Okay.  And you are -- where are you located right now?

A.  I am located in my office in Baltimore, Maryland, at the Lieber Institute for Brain Development at Johns Hopkins University and Medical Campus.

Q.  And if you had the opportunity would you have chosen to personally evaluate Mr. Basham today?

A.  Well, obviously, you know, contemporaneous examination would be helpful.  But the underlying problem here is a static problem, and that is to say that this individual has brain damage.  Now, I can go and tell the causes of brain damage now or we can leave that for later because I know the judge is on a tight schedule here.  But this is an individual who has clearcut brain damage, it's been present for a long time, it's

not going to get any better.  He has a clearcut mood disorder that's not going to be getting any better, although it might be ameliorated somewhat with medications.  But the conflict of those two events render him permanently incapacitated and incompetent.

Q.  So the fact you were not able to evaluate him today does not have a detrimental effect on your -- in your opinion, on your ability to render an opinion today?

A.  No.  This person is incompetent now, he will be incompetent tomorrow, he was incompetent yesterday, he was incompetent during the trial.

        MR. BURKE:  Thank you.

        THE COURT:  Before we adjourn I had one or two questions.

        THE WITNESS:  Yes, your Honor.

        THE COURT:  You said you were at your office in Baltimore at the present time.

        THE WITNESS:  Yes, sir.

        THE COURT:  What were the nature of your conflicts that prevented you from being able to come down and testify this week or next week?

        THE WITNESS:  Unfortunately, I had made -- I am the chief operating officer of a large by biomedical research institute.  It's very hard for me drop things on a moment's notice.  I had not been given notice of this hearing in enough

136

time to allow me to reschedule a number of events, including visitors I'm bringing in from abroad to our global research initiative.

THE COURT: When were you told the date of this hearing? When were you notified that the hearing would be conducted beginning October 9?

THE WITNESS: I believe I heard that in the last few days.

THE COURT: Just one more question.

THE WITNESS: Yes, your Honor.

THE COURT: I spent a good bit of time looking through Dr. Parker's report, and his report goes into extensive medical history, and I did notice that someone at an early age diagnosed Mr. Basham as being manipulative.

THE WITNESS: Yes, sir.

THE COURT: No less authority than the Fourth Circuit Court of Appeals in Mr. Basham's first appeal said that he was a manipulative individual. But I take it from your testimony you totally disagree with that analysis.

THE WITNESS: I don't think you can explain his behavior on the basis of being manipulative, your Honor. I think this is an individual who genetically is predisposed towards cognitive problems and bipolar disorder. I think this is somebody who's had head trama that has caused him to have brain damage. This is somebody who has sniffed glue,

kerosene, and paint starting at a very young age, as well as using other substances, and those have rendered his brain, that was never good from the get go because of genetic factors, and to be an individual who now has significant brain damage.

And I think that even though he might be appear to be manipulative, I think one might agree that the way that he behaves is in a very primitive regressive fashion. This is not a -- this not an individual who's trying to manipulate the system, this is the sign and symptoms of somebody who has frontal lobe damage and has bipolar disorder who can't help themselves.

THE COURT: One final question. I have a daughter who is a doctor. Two or three years ago in a conversation with her totally unrelated to this case she put me on to a famous study. Are you familiar with the Rosenhan experiment back in 1973?

THE WITNESS: No, your Honor, I'm not.

THE COURT: Well, it's widely written about in the literature. There a study was done where pseudo patients were sent out to psychiatric hospitals in a given geographic area, and there was nothing wrong with any of them. And all of them were then admitted as being mental ill to the hospital. In other words, they had a 100 percent success ratio in faking out the doctors, so to speak.

And the second part of the study, one of the hospitals challenged the experiment producers to do it again. So the people conducting the experiment told the hospital they were going to send out a new group of pseudo patients, they didn't send out anybody, and the hospital then began rejecting a large number of people who came in with potentially real mental illness thinking that they were pseudo patients.

It was a very devastating study on -- well, I guess it points out how soft this science might be with someone who has a motive to manipulate. I'm not trying to be partisan, I'm just trying to explore fully, because I have a very tough call to make here, and we have a defendant who is really at the last stage of the proceedings against him in a death penalty case and arguably has a motive to fabricate.

I'm not challenging what you say in any respect. I respect your judgment and your training, and we appreciate the thorough analysis you've done. But I think I'm going to hear, well, I know I'm going to hear some contrary testimony, because I've already seen Dr. Parker's report earlier and every -- according to the government, every physician who examined Mr. Basham during the trial found him to be competent. And his own trial counsel, who was one of the best attorneys in the state of South Carolina, determined that it was not necessary to raise competency.

So I guess I'll leave it at that. I don't want to

sound like I'm engaging in an argument with you, I just asked you while we had you on the phone.

I am afraid we will have to ask you to just be available a little bit later on after the government has a chance to look at your testimony and share it with their expert. If you could stand by this phone and we will be back with you sometime later this morning.

THE WITNESS: Thank you.

THE COURT: If the court reporter will give both sides a quick transcript and we will take a recess. And, Mr. Daley, let me know when you are ready to proceed. Dr. Parker thought he would be ready to go on the satellite at 10:30. He'll be available on the satellite for visual and audio.

MR. DALEY: So you are going to excuse Mr. Basham to be examined?

THE COURT: Excuse him now to go meet with Dr. Parker. All right. We will be in recess.

(A recess transpired)

THE COURT: The prison has informed me Dr. Parker has completed his examination and is reviewing some other records, I assume that might be the transcript that was sent out there, and they proposed to bring him into the same room that Mr. Basham is in so he can be on satellite when he testifies. Is Mr. Basham restrained by handcuffs and shackles at this time?

MR. MURRAY: He is, your Honor.

THE WITNESS:  I ain't going to attack nobody.

THE COURT:  Before Dr. Parker comes in the Bureau of Prisons also told me Mr. Basham requested that he be allowed to exit the room and not participate further in this hearing. So what is the position of the defendant's attorneys on that issue?

MR. BURKE:  Your Honor, we would object to it.  We need Mr. Basham as long as -- as long as he has any competency to assist us we need him for that purpose, so we would object to having him absent himself from these proceedings.

THE COURT:  Of course, which is the exact same situation I faced at trial when Mr. Swerling said the same thing you just said, which leads to your claim number ten that I erred when I denied the defendant his right to leave the courtroom.

MR. BURKE:  Well, your Honor --

THE COURT:  You know, that's the frustrating thing about -- so you need to stay.

MR. BURKE:  Can you put that on mute, please?

THE COURT:  You want him to stay.

MR. BURKE:  I believe he needs to --

THE COURT:  What I don't want is another shouting match, especially when Dr. Parker is in there.

MR. BURKE:  I entirely agree, your Honor.  I would say that I think it should be obvious at this point that we

are unable to control Mr. Basham's responses as much as we would like to.

THE COURT: All right.

MR. BURKE: And if you will, your Honor, if there are any concerns about safety -- can I confer with my counsel for just one moment, please?

THE COURT: All right.

(There was a pause in the proceedings)

MR. BURKE: Your Honor, we do not object if the court has concerns about the safety, given what's happened in the last 24 hours, of Dr. Parker. We don't object to having Mr. Basham outside of the room for the purposes of Dr. Parker's testimony. And in an abundance of caution we do not object to that.

THE COURT: I was going to suggest either that or putting Dr. Parker on telephone like we did with the other doctor.

MR. BURKE: Whichever your Honor believes is best, there is no objection from us, I just want to make it clear.

THE COURT: What's the government's position?

MR. DALEY: Your Honor, I think we would like Mr. Basham in the room, as well. I think it's -- he has the right to be there, and but maybe just as importantly we would like Dr. Parker, I think it's better for the court to be able to see if --

THE COURT: Well, Dr. Parker didn't express any concerns about going in the room. The prison, because I specifically asked them, they said there would be additional security in there when Dr. Parker's in there. So let's just leave them all in the room. And I told them when Dr. Parker and security walk in the room we will know he's ready to go, they would not need to call me back.

So I don't really know how long -- Dr. Parker said on the phone yesterday he thought he could be ready by 11:30, obviously that was just a prediction. Why don't we go ahead and adjourn, there's no sense sitting here at attention. When he comes in, Miss Floyd, you will tell me.

THE CLERK: Yes, sir.

THE COURT: All right.

(A recess transpired)

THE COURT: All right. Dr. Parker, can you see us on the screen there where you are?

THE WITNESS: Yes, I can, sir.

THE COURT: Good morning. I would ask that you receive the oath from Miss Floyd, our courtroom deputy, at this time.

(George Parker duly sworn)

EXAMINATION

BY THE COURT:

Q. Dr. Parker, as you know, an issue has been raised as to

whether the defendant Mr. Basham is competent at this time such that he can participate in this Section 2255 proceeding. The defendant has retained an expert, the government has retained an expert, and I have appointed you as the court's expert to look into the question of competency.

Just to put on the record your history with this case, about this time a year ago an issue was raised as to whether the defendant could -- had the ability to drop his appeals and proceed to be executed in this case, and I found it necessary at that time to appoint you to examine the defendant in terms of his competency to drop an appeal. That issue fizzled out when the request to drop the appeal was withdrawn and so we're now on the merits of the petitioner's petition for relief from his conviction.

And so yesterday when the competency appeared to be an issue I called and asked you if you would be kind enough to set aside your other proceedings and go over and examine Mr. Basham for purposes of giving on opinion as a court-appointed expert on this issue. Is that how we stand at the present time?

A.  Yes, sir, it is.

Q.  All right.  Have you had enough time to examine Mr. Basham this morning?

A.  I believe so.

Q.  All right.  And could you just give us a narrative of what

your opinion is as to his medical condition, his mental condition, and his competency.

A.   Well, I'm basing my opinion on the evaluation I completed a year ago.  There's a report dated December 4, 2011 that I submitted.  I met with Mr. Basham this morning for close to an hour.  I also had a chance to review a transcript of testimony by Dr. Hyde earlier this morning.  And the prison staff kindly provided me with a copy of Mr. Basham's medical records, the meetings with the psychologist, over the past year.  So based on that information I think I can make a reasonably good effort to describe his current clinical status, as far as general diagnoses and how he's doing now.  And I believe I can offer an opinion regarding his competence to proceed.

Q.   All right.  And would you give us that opinion, please?

A.   Okay.  The clinical or the competence?  Which would you prefer first?

Q.   We'll hear the clinical first.

A.   Okay.  Mr. Basham clearly continues to meet criteria for a diagnosis of attention deficit hyperactivity disorder, otherwise known as ADHD.  He has met that diagnosis since he was a young man, probably as a pre-teen, and he continues to meet criteria for that diagnosis.  That is his primary diagnosis at this time.

He has a history of oppositional defiant disorder, a history of conduct disorder, and currently meets the criteria

for a diagnosis of antisocial personality disorder.  He also has a long history of substance abuse, which is not unusual for folks who have both ADHD and antisocial personality disorder.  In particular, Mr. Basham abused inhalants for several years as a young adult, teenager or young adult.  He also abused alcohol and many other drugs.

The primary clinical picture now is that of ADHD, along with the antisocial personality disorder that accompanies it.  So the primary issue is behavior, focus and attention on a clinical level.

During the interview today Mr. Basham made it quite clear that when he's left in the normal routine he does pretty well.  He keeps to himself, he follows the routine of the unit, and nobody bothers him and he doesn't bother anybody.  When events happen, like court hearings or visits from lawyers or family, that is a stimulating event and that brings to the surface essentially all of his ADHD symptoms with overwhelming effects on him, particularly the court case, which is, I think everyone agrees, complicated with many legal issues and lots of argument, which is overwhelming for Mr. Basham.

And I think the court and prison saw the results of that yesterday at the end of the hearing when there was an altercation, likely the result of Mr. Basham being over-stimulated and having little behavioral control as a result.

He does not, in my opinion, meet criteria for a diagnosis of bipolar disorder, though he does have irritability and some mood instability that is not sufficient to make a diagnosis of bipolar disorder but instead reflects his ADHD and his antisocial personality disorder.  I think that's the quick clinical summary.

On the competency, it's my opinion he is competent to proceed with the current hearing.  Mr. Basham is not a sophisticated kind of guy.  He is someone that has struggled in the school setting all his life due to his ADHD, addiction problems, conflict disorder, oppositional defiant disorder, and antisocial personality disorder, so he is not a well-educated person.  He does know his mind, but he has difficulty, as I said earlier, in stimulating environments so it is difficult for him to focus and to maintain a consistent line of thought in those situations.  So he's easily overwhelmed.

As I said, this is complicated litigation involved here, and Mr. Basham does not understand the nuances of this litigation.  He is not a lawyer, he will never be a lawyer. He does make clear that he knows his own mind and understands that he has been sentenced to death, that he is on death row, that he is awaiting execution.  He does not enjoy being in this environment and sees death as his doorway out, his escape.

He believes he has made it clear to his attorneys that this is what he wanted to do, which makes it difficult for him to work effectively with his attorneys because they sometimes seem to be at cross purposes.  It's also founded in part because of his ADHD.  He has trouble following court proceedings because to him they are immaterial and boring.  And I think as a result he's prone to being confused about events that have taken place.

Particularly he seems to be upset with Judge Anderson because he believed Judge Anderson turned down his request to be declared competent to waive his appeals when it actually appears that the judge's order was related to the request for medications and was not a denial of that request.

So Mr. Basham I think is easily confused by the legal issues, but maintains that he understands what he wants to do and feels conflicted because of the efforts of his attorneys and the conversations with his family.  In the end, though, I believe he retains the capacity to make decisions about the legal proceedings that he's involved with and retains the capacity to work with his attorneys.

THE COURT:  Does that cover your report?

THE WITNESS:  That's the summary, yes, sir.

THE COURT:  All right.  Any follow-up questions by counsel?  Mr. Burke?  This is the attorney representing Mr. Basham that will ask you some follow-up questions.

EXAMINATION

BY MR. BURKE:

Q.  Dr. Parker, can you see me now?

A.  Yes, I can.

Q.  Thank you for making yourself available for us today.  I have a few questions for you, first about your evaluation of Mr. Basham today.  Would you tell the court, were the conditions of your evaluation today, were they conducted in the ideal setting?

A.  Well, it's hard to say that any evaluation conducted in a jail or prison is ideal.  The conditions were pretty good, actually, compared to some of the county jails in Indiana.  It was a noncontact visit, we spoke through glass using the phones.  I had previously had contact visits with Mr. Basham and he recalled those visits, so we had a bit of a relationship already established.  Mr. Basham spoke freely, did not appear to be affected by it being a noncontact visit.  So I believe the conditions were satisfactory and certainly adequate.

Q.  Was anyone else present in this divided room in which you conducted the evaluation this morning?

A.  No, sir.  Mr. Basham was a little bit distracted by the traffic in the hallway behind him, as he could see the reflections when people passed by.  He's very alert to changes in his environment, so he noted the people walked by.  He was

a bit distracted by that but there were no people in the rooms.

Q.  Were there guards outside of the door, do you know?

A.  I was able to see one officer standing against the far wall of the hallway who was observing through the window, but he made no effort to come to the door except when Mr. Basham asked to use the bathroom.

Q.  Was Mr. Basham's attorney Mr. Murray present during your evaluation?

A.  No, sir, he was not.

Q.  Did you ask to speak to Mr. Murray as part of your evaluation this morning?

A.  I did not.

Q.  Did you ask to speak to myself or to Miss Sarah Stone, Mr. Basham's other attorneys?

A.  I did not.

Q.  Would you agree that a criminal defendant's ability to communicate effectively with his attorney is a relevant matter in assessing competency for a procedural hearing?

A.  Yes, it is.

Q.  Would you agree that the client's ability to comprehend instructions and advice from his counsel is a relevant factor to take into consideration?

A.  Yes.  Although in this situation it's a little bit more complicated than one would expect, because Mr. Basham has made

requests that his counsel have opposed.  So it's a difficult situation in which to ask attorneys about the issue when it's clear the attorneys have one goal and their client may have another goal.  So it's a rather fraught issue to bring up.  So it would be difficult to tease out all of the -- those issues.

Q.  All right.  I don't think anyone would disagree this is very difficult, Dr. Parker.  But let me ask you this:  You stated Mr. Basham had some confusion about whether the judge had ordered that he was not competent to waive his -- his 2255 proceedings earlier this year.  Is that correct?

A.  During the interview Mr. Basham made it clear that he was angry at the judge for daring to turn out down that -- turn down his request.  And from what I can gather, again this is from reading the psychologist's notes about some of the proceedings, that was not exactly the way it turned out.  But, again, I'm relying on sources that are not direct.

Q.  Would it have been a direct source to ask Mr. Basham's counsel about his -- the accuracy of his memory of the events that occurred?

A.  Yes, sir, that would be helpful.  I was on a rather tight time schedule so things happened quicker than I would have preferred.  But this was an urgent request.

Q.  Dr. Parker, in your report, I don't know if you have a copy of it available with you, but your report --

A.  I do.

Q.  -- from December 4, if you could please turn to page 11 of that report for me.

A.  Yes, sir.

Q.  The third paragraph of your report on that page, Doctor, the third sentence begins he did report a long history.  Do you see that?

A.  Yes, I do.

Q.  Of unstable mood, noting, quote, every day hour to hour I change, as well as problems with quick anger.  Do you stand by today that assessment of Mr. Basham?  Do you agree with that?

A.  That's his report, so I'm not going to disagree that that's his quote.  But it's clear from the history that Mr. Basham is prone to bouts of irritability and anger and to mood changes.  There was -- those are, as I believe I testified earlier, consistent with his ADHD, his antisocial personality disorder.  Those are the main explanation, to my understanding.

Q.  Doctor, would you agree with me that a defendant's ability to tolerate the stress of a trial and hearing is a relevant factor to consider in assessing his competency?

A.  Yes.

Q.  And you testified today, in fact, that the proceedings that are occurring right now cause Mr. Basham great stress, is that accurate?

A.  Well, since I said that I'm not going to disagree with

that, of course. That was his report to me. So my recommendation in a regular competence to stand trial evaluation for a gentleman like Mr. Basham I would recommend to the court that proceedings move at a slower pace than usual, that the distractions in the court be minimized in an attempt to help Mr. Basham maintain his focus, which he can only do for brief periods anyway, and so take it in small bites.

The change from the usual routine of Mr. Basham's unit to the relative maelstrom of the court proceedings he described as very upsetting and chaotic. And I can see that that would be very difficult for him, given his previous existence and his underlying ADHD and antisocial personality.

Q. Doctor, I believe you also testified a moment ago that there was a strong likelihood that the events of yesterday afternoon were precipitated by Mr. Basham -- by the stress Mr. Basham was experiencing during the hearing, is that correct?

A. I'm not sure I called it stress. He described it as being very frustrated with the proceedings, and given the change in routine he was easily set off and asserted himself into a discussion that he didn't need to, which is pretty classic for ADHD and for antisocial personality.

Q. Would you agree, Doctor, that Mr. Basham's ADHD and other deficits would, especially as a hearing progressed, prevent him from communicating with his attorneys in an effective

manner?

A.   Well, he might communicate rather more than the attorneys are ready to handle.  That's, in fact, happening now.  Because he has relative low impulse control he's going to want to talk when he wants to talk.  You know, the fact that he has ADHD and he has some behavioral manifestation that accompany that, as well as his antisocial personality, those are certainly challenges for the smooth running of proceedings.  But to my mind they do not prevent a person from assisting one's attorney or understanding what's going on, it just makes it more difficult.  And there are I believe some accommodations that can assist with that, as I discussed earlier.

Q.   Are you aware of Mr. Basham's -- Mr. Basham has any visual deficits that might affect his ability to observe the hearing on the screen in front of him, based on your --

A.   Other than he wears glasses, no, I'm not aware of any visual deficits.

        MR. BURKE:  Just one moment, please.

Q.   (MR. BURKE) Doctor, do you anticipate then that if this hearing proceeds that further difficulties similar to what we are experiencing today are likely to occur?

A.   That's always a possibility.  I'm not very good at predicting the future, but Mr. Basham's history of being easily irritated, easily over-stimulated, would certainly suggest that that's a risk.  So, as I said earlier, my

suggestion would be that the proceedings move in sort of small bites with relatively frequent breaks so that Mr. Basham does not become overwhelmed by the ongoing discussions and which he has trouble following anyway.  Because he has trouble maintaining focus.  So the challenge is to assist or to adopt the proceedings to help Mr. Basham stay focused over relatively short periods of time.  That way that might break up the monotony of it and that would allow him to be a more involved participant.

Q.  And can you give us something a little bit more specific as a guideline if we are to go forward, how frequently Mr. Basham would need to take a break and for how long he would need that break?

A.  I'm not sure that I'm in a great position to give you a definitive answer.  Some of it may depend on what's being talked about at any given time and on how Mr. Basham is doing relative to that at that point in time.  But I would guess that breaks somewhere every 20 to 30 minutes would probably be about as long as he could handle at any one time.  But I'm -- you sort of asked me to speculate based on -- on not a large knowledge base.

Q.  Doctor, how long have we have been talking today in the last --

A.  My estimate would be, I believe my testimony, my cross-examination has been going about 15 minutes or so.

Q.  And, Doctor, I just -- I'm at an advantage that you probably don't have, but I can see the entire room and I just noticed Brandon put his head down on the table either out of frustration or exhaustion or he's tired of listening to me talk, I don't know, but --

DEFENDANT:  All of these.

THE WITNESS:  So the hearing itself has lasted about a half hour between the judge's questions and your questions. And Mr. Basham has been physically restless during that time, shifts his position quite a few times.  I can see him out of the corner of my eye.  He whispered several times to his attorney.  This is pretty classic for ADHD.  This is not a surprise to me based on my previous evaluations.  This is who Mr. Basham is.  So that's just -- that's going to be an issue the court will need to deal with as these proceedings go forward.  I'm suggesting the approach that might assist in decreasing the level of frustration over time.

Q.   (MR. BURKE) In your medical opinion is Mr. Basham being manipulative when he has outbursts?

A.  Well, it's hard to say that with any certainty.  I haven't witnessed the outbursts.  Certainly there is going to be an element of poor impulse control, easy irritability, and easy frustration, all of which are consistent with ADHD.  He also has a long history, as I said earlier, of oppositional behavior, antisocial behavior, and that's going to play a

role, as well.

I don't think it's going to be consciously manipulative. I don't know that he has long-term planning that is going to support that. So in the short term it might look manipulative, but I suspect it's more just impulsivity and frustration that deal with that -- that leads to the behavior.

Q. One final question, Doctor. Would -- would Mr. Basham's ability to handle these proceedings or would issues that he's dealing with right now be decreased or -- would his ability to be present in a meaningful way in these proceedings be helped by any different regimen of medication than what he's on right now?

A. Good question. He's been tried on a lot of medications in various combinations over the past several years. It's not clear that they have had any dramatic impact on his functioning. Some of the medications are sedating, which is sort of a two-edged sword because you get better sleep but you also have decreased concentration as a result. Mr. Basham's on an extended release form of quetiapine or Seroquel right now and he doesn't like the way it feels in the morning. He feels a little bit hung over from that, which is not surprising.

You know, there are medications for ADHD, those are rarely prescribed in correctional settings because they are almost all stimulants and those have high abuse potential and so they

are not used in prisons or jails.  That might help, I don't know.  He hasn't been on those in several years.  So if this was a patient in a state hospital in Indiana he might get treatment with stimulant medication without being in a hospital setting.  It would depend on, you know, the clinical rules here and Mr. Basham's response to the treatment.

Q.  Do you think that it would be of any assistance to the court and Mr. Basham if he were to be removed from the facility he's currently in to a facility, a federal facility, that might be able to treat at least in the short run his medical and psychiatric needs?

A.  You mean like a federal medical center?

Q.  Yes.  I'm thinking something like Springfield, Missouri where there's a federal facility there.

A.  I don't know.  I mean, those facilities, in my understanding, are for folks that have serious medical illnesses, they are actively ill.  Mr. Basham has ADHD, which can certainly be a problem but it's not usually grouped with mental illnesses like schizophrenia or bad bipolar disorder. So from a clinical perspective he doesn't need to be in a hospital level care, he needs essentially good outpatient care, which -- and I believe he's received pretty adequate care here based on my quick review of the notes.

Q.  Doctor, didn't you say he has not received any medications for his ADHD?

A.   Yes.  But that doesn't mean that it's been a problem except in these settings.  During the regular course of events he has a very structured environment, very structured day, and for folks with ADHD they can actually adapt to that.  When they have the rules they follow them.  And Mr. Basham says, you know, if people just leave me alone I'm fine when I'm on my own.  When there's stimulation he's going to respond much more vigorously than somebody who doesn't have ADHD, and that's what we have seen over the past couple of days, in my opinion.

Q.   Well, and, Doctor, isn't it the -- didn't Judge Anderson ask you to determine whether Mr. Basham would be able to proceed with the required level of competency with the proceedings we're dealing with right now?  Wasn't that the question that was presented to you?

THE COURT:  I don't know if I asked him that question.  I asked was he competent or not competent.

Q.    (MR. BURKE) Well, then, let me ask you, you have told us that Mr. Basham because of his disabilities is -- it's very difficult for him to participate in the stressful nature of the evidentiary hearing we're having, is that correct?

A.   I said this is a stimulating environment for him and that given his ADHD he has difficulty following it, staying involved in it, and being an active participant.  This is not something he's ever been good at.

Q.  And he's not being treated for his ADHD at this moment, is he?

A.  He's being treated with medication, I believe he has an antidepressant medication, Paxil, and Seroquel for sleep and a bit of mood stabilization that might come with that.  Those are not classic treatments for ADHD, no.

MR. BURKE:  Thank you.  Thank you, Dr. Parker.

THE COURT:  Any questions from the government lawyers?

MR. WITHERSPOON:  Yes, sir, Judge.

THE COURT:  Mr. Witherspoon.

DEFENDANT:  That is just fucking garbage.

EXAMINATION

BY MR. WITHERSPOON:

Q.  Good afternoon, Dr. Parker.

A.  Good afternoon, sir.

Q.  Dr. Parker, my name William Witherspoon, I'm with the United States Attorney's Office.  I just want to ask you a few questions.  Now, you spent about an hour with Mr. Basham today, correct?

A.  I did.

Q.  And based upon your discussion with him did he understand what was happening today?

A.  His understanding was this is a hearing about his request for a waiver of his appeals.  I don't think if I asked him

directly that he would be able to say exactly what was going to happen today.

Q. Did he know who you were, sir?

A. Yes, he recognized me after I introduced myself. I explained to him that the judge has asked me to come again, talk to him about his competence to go forward with the proceedings. And as I always do, I told him that what we would talk about I would then -- would not be secret because I'd be testifying about it later that same day.

Q. And he knew who Judge Anderson was, correct?

A. Yes.

Q. And I think you testified earlier that he has some conflict with his lawyers because he wants to end his appeals and have the death penalty imposed, correct?

A. That was the source of conflict in my first round of evaluations. I believe I tried to explain earlier, because Mr. Basham is mad at the judge for turning down his request, or his understanding that the judge had turned down that request, he has been motivated to make life difficult for Judge Anderson by extending the appeals because he was annoyed with what he perceived as a denial of his request.

Q. But my question was, I think you said earlier that there was a conflict between he and his lawyers about him -- his ability to drop his appeals.

A. Correct, there was that difficulty. That was the issue

when I evaluated him last fall.

Q.  So that difficulty has gone away?

A.  Well, because Mr. Basham, from what I understand, again, having not talked to the defense attorneys, as was pointed out, believed that the judge had turned down the request to waive the appeals.  And so he's now mad at the judge and is working with his attorneys in part to make Judge Anderson's life difficult with filling up his basket with appeals.

Q.  So he's working with his attorneys in --

A.  At this point in time.

Q.  I'm sorry?

A.  That's my understanding at this point in time.  However, he does continue to express a desire to waive his appeals, although he said he's still conflicted about that position, as well.

Q.  And he knows he's on death row, doesn't he?

A.  Yes, he does.

Q.  And he knows why he's on death row, correct?

A.  Yes.

Q.  And he knows the ultimate punishment that could be imposed, correct?

A.  Correct.

Q.  And I think you said he does not have bipolar disorder?

A.  That is my opinion, yes, sir.

Q.  How many patients have you diagnosed with bipolar

disorder?

A. Oh, my. Well, I have evaluated hundreds of people for courts in Indiana and Ohio. I've heard a lot of people who say they have bipolar disorder, many of whom do not meet the criteria for the bipolar disorder described in the DSM-IV, which lists manic episodes or hypermanic episodes as well as depression. There are a lot of people who say they have bipolar disorder because they have unstable moods, and that, to my mind, does not meet the diagnostic criteria for the bipolar disorder in DSM-IV. So I've got a fair amount of experience with that issue.

Q. Okay. And you mentioned it, I thought, Mr. Basham is whispering, conferring with his attorney there, is that correct?

A. Yes. I'm not sure they would be conferring, I think it's conversing. He's making comments about what's going on. Again, consistent with ADHD, if he has something to say he's likely to say it.

Q. But he knows who the person sitting beside him, who that person is.

A. Yes, sir.

Q. And because he has ADHD that doesn't mean he's incompetent, does it?

A. Not necessarily, no, sir. It would be -- yeah, it would be unusual for ADHD to make somebody incompetent to stand

trial.

Q.   So Mr. Basham is not incompetent?

A.   In my opinion he is not incompetent to stand trial.

Q.   And because he has ADHD, that does not limit his ability to work with and assist his attorneys.  I think you said he's working with his attorneys to file as many appeals as he can to make Judge Anderson's life miserable.

A.   Right.  I think certainly having a difficult client is a challenge for any attorney, be it prosecutor or defense.  Mr. Basham is clearly a difficult person to work with because of his ADHD and his antisocial personality disorder and his addictions.  That does not necessarily mean he's incompetent to stand trial.

Q.   Does that mean he's not incompetent now, either, correct?

A.   No, he's not incompetent.  He may be difficult to deal with but he's not incompetent.

Q.   And you mentioned that these proceedings put additional stress on Mr. Basham, correct?

A.   Yes, because of his ADHD.

Q.   Wouldn't you agree with me that being on death row is also very stressful?

A.   Well, I would certainly agree.  I believe Mr. Basham would also agree.  But when he's left alone he has -- he falls back on the routine and life is quiet and uncomplicated.  And that's a relatively calm time for him, life just goes day to

day.  He doesn't enjoy it, he misses a lot of things.  So when he gets a reminder of the outside world, when he's smells cut grass, that's a big deal to him.  But other than that it's relatively calm.  When there are disturbances, that's when he overreacts because he's just set up for that.

DEFENDANT:  That's why I'm not going to do this no more.

Q.  And that's because of ADHD, Dr. Parker?

A.  Yes, sir, that would be a good example.

DEFENDANT:  Oh, my God.

Q.  And are you saying he's not able -- he's not able to communicate?

A.  He has poor impulse control.  That is almost by definition part of ADHD.

Q.  Poor doesn't mean inability, though, does it?

A.  It's going to be difficult for him to control his impulses.

Q.  But that --

A.  It does not mean it's impossible.

Q.  What medications is Mr. Basham on now, do you know?

A.  I asked him --

Q.  You asked him?

A.  I asked him.  He's been on Paxil, which is an antidepressant medication, and Seroquel, the extended release in a low dose in the evening.  And that was confirmed by my

quick review of the psychology notes from the facility.  He's been tried on a variety of medications over the past year, but I think that's where he stands right now on those two medications.

MR. WITHERSPOON:  Beg the court's indulgence one second.

(There was a pause in the proceedings)

DEFENDANT:  I don't care about this shit.  They can do it.  I have to go to the bathroom.  I'll be back.  Maybe they will be done but I'll be back.

MR. BURKE:  Let the record reflect Mr. Basham has left the room.

THE COURT:  All right.  Are you finished with your questions?

MR. WITHERSPOON:  I have one final one.

THE COURT:  Go ahead.

Q.  Dr. Parker, does he also know that these proceedings are broader than just waiving his appeal in this case?

A.  I'm not sure he understands the legal nuances of what's happening in these hearings well at all.  He's not focused on that.  And as we just witnessed, we're about 45 minutes into this particular portion of the hearing, he had to go to the bathroom and he left.  So he has difficulty following things for more than brief periods of time.  So I doubt that he understands all the legal ramifications of the current

hearing.

Q.  Well, I don't expect him to know all the legal ramifications that the lawyer, sometimes we don't understand all those.  But he understands it's more than just waiving his appeals in this case, correct?

A.  He understands that's the heart of the current proceedings regarding his appeals.  I don't know that he knows more than that at this point in time.

MR. WITHERSPOON:  Thank you.

MR. BURKE:  Your Honor, could I ask the doctor one specific question about medication?

THE COURT:  One question.

EXAMINATION

BY MR. BURKE:

Q.  Doctor, were you given a list today of Mr. Basham's current medication from the Bureau of Prisons?

A.  I was given the printout of the notes, and the most recent referral to the psychiatrist refers to being on quetiapine and on amitryptyline and Peroxitine, and that was from July of 2012.  I do not have -- I did not get a copy of his MAR, the medication administration record, so I don't know exactly what he's on at this time.

MR. BURKE:  Thank you.

THE COURT:  Thank you very much, Doctor.  I think that concludes the questioning.  Let me express the

appreciation of all people associated with this case when I say we appreciate you taking this assignment on short notice and going over this morning.  We're excusing you at this time. Thank you very much.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Anything else from either party on the competency issue?  Any other evidentiary developments?

MR. BURKE:  Your Honor, I'm not sure that -- the government was not able to question Dr. Hyde, and I would -- I'm not trying to delay this proceeding, but it would seem in all fairness Dr. Hyde --

THE COURT:  We need to get him back on the phone.

MR. BURKE:  But he should be able to know what Dr. Parker said.

THE COURT:  You want Dr. Hyde to see a transcript of what Dr. Parker said.

MR. BURKE:  I'm afraid so.  If we could e-mail it to him, it seems in all fairness he should know what the other -- what the court's psychiatrist said.

MR. DALEY:  I would find it hard to object to that request, your Honor.

THE COURT:  All right.  Do you plan to put up any additional witnesses on competency?

MR. DALEY:  At this time we don't.  Your Honor, you

may at some point want to engage in some short colloquy with Mr. Basham, we would suggest, about whether he understands that this case is obviously broader than simply whether he gets to waive his appeal and that we're dealing with the issues in the 2255 petition. I'm not sure it is clear from the record at this point.

MR. BURKE: Your Honor, another additional evidentiary matter you might want to consider is an ex parte conversation with Mr. Basham's attorneys. That was something that the doctor --

THE COURT: Let's do this then. Let me speak to the defendant personally as Mr. Daley suggested and let's break for lunch and do the same thing --

THE WITNESS: I ain't coming back.

THE COURT: -- ask the court reporter to get a transcript and you can all make arrangements to get it to the doctor as soon as possible.

MR. BURKE: Yes, your Honor.

THE COURT: And come back at what time?

DEFENDANT: What are we doing now?

THE COURT: We need an hour to finish the transcript or to edit the transcript, that will put us at 1:30, and he's going to need an hour to look at it, maybe.

MR. BURKE: I think he could probably do it in 15 minutes. I know time is of the essence, so, your Honor, and

also to -- Dr. Schwartz-Watts came today on our request. I didn't want to dismiss her if you had any questions --

THE COURT: I don't have -- you don't plan on calling her.

MR. BURKE: No, your Honor. She was here to advise us.

THE COURT: You can excuse her at this time.

MR. BURKE: Thank you, Dr. Schwartz-Watts.

THE COURT: Come back at say 2:15. That will give us time to get the transcript done, get it to the defendant's expert, let him review it, and we will go back on the telephone with him and then go from there.

MR. BURKE: Thank you, your Honor. I've got to -- if it takes him a hour to pull off --

THE COURT: Let's resume at 2:00. Mr. Basham, let me speak to you, sir. Can you hear me?

DEFENDANT: I hear you.

THE COURT: I want to be sure you understand the proceeding that we began yesterday is not a proceeding to determine if you can drop your appeals and proceed to be executed. We have crossed that bridge previously and I held several hearings and heard from you and heard from your attorneys and it became apparent to me that you were ambivalent about what you wanted to do and you wanted to bargain with me in terms of --

DEFENDANT: I didn't --

THE COURT: Let me finish my --

DEFENDANT: I only --

THE COURT: Mr. Basham, let me finish my statement. It became apparent to me you wanted to bargain with me so that if I would agree to have you given different medicine and agree to let your family visit with you then you would drop your appeals. That puts me in a very unfavorable, untenable position because I'm not empowered to bargain with somebody about a death penalty sentence.

In addition, your attorneys strongly opposed your request to drop your appeals. They still strongly oppose that request. So the issue of whether you can drop your appeals has come and gone. What we are here to look at today is the petition filed by your court appointed counsel raising a total of 34 errors that they say occurred in your trial. They have withdrawn two of those claims so we're now down to 32 claims of error and I'm supposed to hear evidence on those claims and then determine whether any error occurred and, if so, whether a new trial should be ordered. That's the purpose of the hearing that we began on yesterday. I want to be sure you understand why we're here.

DEFENDANT: All right. All right. And first thing I want to say that those are misunderstandings. I never tried to bargain with you, I never asked for my family to visit and

I didn't -- only thing I said to you was that I had -- I had my lawyers are telling me that if -- if I was in a different place and I could visit my family and hug them and have contact with them and be able to see them more often because they're home, and if I was on my proper medication to where I could stay focused and be able to deal with shit like -- excuse my language, stuff like this then would I still want to be executed and I said no. I said that's what I tried to tell you was that -- that's the same thing I tell all of them, I told everybody, yeah, okay, if I was -- if I had --

THE COURT: Mr. Basham, Mr. Basham. Slow down, Mr. Basham. Mr. Basham, you need to slow down. And, also, you need to know that everything that's said in this proceeding is being taken down by a court reporter. I stand by what I said about you wanting to bargain with me. You can't simply sit here today and tell me that's not true. I will stick my -- you know what's in the record in the transcript of this case. We don't need to discuss that any further. I told you -- I told you the purposes of these proceedings and I'm also going to tell you --

DEFENDANT: Okay.

THE COURT: -- the rules for this proceeding do not require your presence. Your presence is optional. And your -- let me finish, your attorneys asked that you be here in South Carolina --

DEFENDANT: Good, I'm gone --

THE COURT: Don't talk over me, Mr. Basham.

DEFENDANT: You heard him.

THE COURT: Let the record reflect Mr. Basham is now walking out of the room. All right. All I did was try to explain to him the nature of these proceedings and he stormed out of the room. Now, as you know, the rules for 2255 proceedings do not expressly require that the defendant be present. I asked counsel to give me an ex parte letter explaining the need to have the defendant present here in the courtroom in terms of what assistance he could provide. I have received that letter, I have not filed it. I will file it under seal because I think it was noticeably deficient in identifying anything that the defendant could assist with in this case.

The letter was a page-and-a-half long, and the first three-fourths of the letter explained how the defendant had bonded with his attorneys and felt warm and comfortable in their presence and therefore needed to be here in their presence so he would feel comfortable at these proceedings. I don't think I disclosed anything that was confidential by saying that.

The remainder of the letter was very weak on what additional input the defendant could provide to his counsel. In fact, yesterday in the United States Supreme Court the

issue argued there was whether there's any right to be present at a 2255 case when, as is usually the case, we're simply reviewing a fixed record, which I think is what we're doing here, we're reviewing a fixed record. So if he doesn't want to come back I'm not going to delay these proceedings if he doesn't want to be here.

Mr. Burke, do you want me to force the marshals to physically sit him in the room and not let him leave?

MR. BURKE: First may I respond to two things?

THE COURT: All right.

MR. BURKE: First, as point of clarification, your Honor, the arguments yesterday in the Supreme Court concerned whether a defendant had a right to be competent in a 2254 proceeding.

THE COURT: In a state court, I understand. And it was -- some courts held it was a statutory right but not a constitutional right.

MR. BURKE: And I reviewed the arguments and the United States Department of Justice in the Tippits case conceded in oral argument the matter is much different in a 2255 proceeding. That that is the first time often that new evidence is ever presented to the court for the very first time. We are not --

THE COURT: I understand the case is different. But -- I understand. But I stand on what I said. Your letter

174

to me was very short on what information he could impart on these 32 issues that I've got to decide. But I understand that. I'm not asking you to back off of any of your position. But my question to you is do you want me force him to be present on the camera in that room?

MR. BURKE: May I confer with my counsel, please?

THE COURT: Yes, sir.

(There was a pause in the proceedings)

MR. BURKE: Your Honor, we do not want you to force him to be in there against his will restrained. We don't want that. Miss Stone did point out for me for the record that Mr. Basham never responded to your question before he left the room whether he understood what these proceedings were about.

THE COURT: He never responded, he stood up and walked out. But I explained what the proceedings were about.

MR. BURKE: That does not mean he understands it.

THE COURT: I understand. Let's go ahead and adjourn for lunch so the court reporter can get started on this transcript. You want to say 2:30 just to be safe? Okay. Let's say 2:30 just to be safe. All right. We will be in recess until 2:30.

(A recess transpired)

THE COURT: All right. Just about five minutes ago while I was in contact with my people at the federal Bureau of Prisons in Terra Haute and I asked them to bring Mr. Basham

175

back to the room for one last effort to keep him here and let me explain he had a right to be here and it was important for him to be here, et cetera, et cetera. But I'm informed now he refuses to come back. Could I speak -- who is this on the screen now?

MR. ROYER: Your Honor, my name is Todd Royer. I am the case manager for the special compliance unit at USP Terra Haute.

THE COURT: Can you confirm what I just said, Mr. Basham refused to come back to the room with the camera?

MR. ROYER: That's correct, I can confirm that.

THE COURT: I guess we don't have any choice but to proceed. Y'all want me to forcibly bring him back?

MR. BURKE: Your Honor, I don't want you to forcibly bring him back. I think you are as well aware as any of us that that would be a disaster. I respectfully say that we believe we have an incompetent client and we believe without the expert that should be apparent to even a lay person today. And I know you are not making a decision, we're still going, but I don't want to -- I will for the purposes of Dr. Hyde's testimony and for Mr. Monckton's testimony waive his appearance today. The reality is Mr. Murray is no longer at the prison so there's no lawyer.

THE COURT: There's no need no keep the satellite up and running and spending that money, but I do think I need to

send word to the Bureau of Prisons if at any time he wants to return let us know ASAP and we will put him on satellite.

Let me tell the case manager, did you hear what I just said? We're going to shut down the --

MR. ROYER: I did, your Honor.

THE COURT: We're going to shut down the satellite. If at any time Mr. Basham expresses a desire to return to this hearing would you or the case manager contact my office right away so that we can set the satellite back up?

MR. ROYER: Yes, your Honor. In fact, I will notify Inmate Basham as soon as I leave this room that should he desire to return just to let us know.

THE COURT: Tell him that message, if he wants to come back he can come back and we will set it back up. All right? Thank you very much.

MR. ROYER: Yes, sir. Thank you.

MR. DALEY: Your Honor, the only other thing I would say, we don't know what the end result of this whole hearing is as far as your determination on competency, and I do want -- I have been conferring with folks in main Justice, we want to take whatever time you need to make that determination, whether it be orally or in writing. So that's just we are --

THE COURT: I thought what I would do is whichever way I go is rule orally and reduce it to a written order this

weekend sometime when I have time later on.

MR. DALEY: Thank you.

(There was a pause in the proceedings)

THE COURT: I didn't tell Mr. Basham if at any time he wants to talk with his attorney he has a right to consult with his attorney as this hearing progresses. Why don't you go call and tell them that. If he wants to talk to his attorney they will make arrangements for a telephone.

All right. Ready to call the witness that we interrupted this morning?

MR. BURKE: Yes, your Honor. This would be the government's cross-examination of Dr. Hyde. He should be available at the 410 number.

THE CLERK: Are you ready for me to dial him?

THE COURT: Yeah, go ahead and dial him.

(There was a pause in the proceedings)

THE COURT: Yes, sir. This is Judge Anderson again.

THE WITNESS: Hi Judge. How are you?

THE COURT: We're ready to resume now. It took a little longer than I thought this morning. I think you have been furnished a transcript of that testimony to review, and at this time I'm going to recognize Mr. William Witherspoon, one of the U.S. Attorneys who is handling this case for any questions he might want to ask you.

THE WITNESS: Yes, sir.

THE COURT: Mr. Witherspoon?

CROSS-EXAMINATION

BY MR. WITHERSPOON:

Q. Good afternoon, Dr. Hyde.

A. Good afternoon, sir.

Q. I'm not -- haven't had a chance to meet you and I'm looking forward to it, but I just have a few questions for you. Can you tell the court your opinion on the death penalty, sir?

A. I am opposed to the death penalty except for in cases of genocide.

Q. I'm sorry, I couldn't hear you.

A. I'm sorry. I am opposed to the death penalty except for cases of genocide.

Q. And when you say genocide, what do you mean?

A. I mean political acts where there is mass murder under the auspices of a political act --

Q. Okay.

A. -- of a group of people.

Q. And you mentioned earlier that you have been involved in cases dealing with competency before, correct?

A. Many cases over the years.

Q. Have you ever testified as an expert or a government witness where the death penalty was an issue?

A. I have testified in many cases where the death penalty is

an issue.

Q. No, sir. Have you testified for the government when the death penalty was an issue?

A. No, I have not.

Q. Why not?

A. I've never been asked.

Q. If the government asked you to testify as an expert witness where the death penalty was an issue would you testify for the government in that case?

A. No, I would not.

Q. Why not?

A. As I said before, I think the death penalty should be reserved only for those very select cases. The reason being is that our justice system, as hard as everybody works in the justice system, is not a hundred percent perfect and there's only one penalty that is totally irreversible and irredeemable and that is the death penalty if a mistake is made along the way.

Q. With that in mind, isn't the science of psychiatry not a hundred percent either?

A. You are absolutely correct.

Q. And wouldn't it be more appropriate, Dr. Hyde, and what case would it be more appropriate, who could make the better determination of competency of someone in a case? Would it be someone who saw him immediately or someone who is reviewing

records?

A.  I think that that is a very complicated question and I'm not quite sure I understand it.  Could you rephrase it, perhaps?

Q.  Sure.  When you make a determination of competency would you rather see the person then or would you rather just review records and make a determination?

A.  Well, always it's best if you can see the person head on. That being said, there are certain cases where competency is, with our current state of medical treatment, an irreversible condition and is not something that is going to change over the course of a day or a week or a month.

Q.  And so in your opinion when did Mr. Basham become incompetent?

A.  I think Mr. Basham has been incompetent throughout these entire legal proceedings.  I think he's incompetent as an adult.

Q.  So he's been incompetent since he's -- he was an adult?

A.  Yes.

Q.  Do you have -- and I think Mr. Burke has said you reviewed a number of his records, correct?

A.  I did.  I don't have them with me, sadly, because I wasn't anticipating this proceeding, I just have my notes from my actual evaluations of him and do have the testimony of Dr. Parker this morning.

Q. Other than yourself, has any other doctor determined he was incompetent?

A. I think that there were proceedings where -- were interrupted during some portion of the trial because he was not able to participate. I don't know if that was deemed that he was actually incompetent at the time. I believe he was. But because I don't have those records in front of me I can't testify a hundred percent to that certainty.

Q. But during those proceedings when there were interruptions do you realize he was seen by an expert, Dr. Donna Schwartz-Watts, who -- please let me finish -- who saw him and then determined that he was competent?

A. I don't think that that competency evaluation was complete.

Q. Would that surprise you that the defense now has hired Dr. Schwartz-Watts as an adviser to them?

A. Well, I'm sure that they would want to know the information that she had provided at that time but have it contextualized within the broader view of this individual's central nervous system function.

Q. I'm sorry, I am having a little hard time, maybe it's an echo, I'm having a hard time understanding you.

A. I'm sorry. Can you hear me now?

Q. Yes, sir.

A. I said I don't know the entire reasoning because the legal

staff has not shared this with me. That being said, I would think that there was nothing wrong with hiring her as an adviser to get her opinion from her direct interaction with that individual. But I think his overall competency issues have to be contextualized within the function of his central nervous system both from a neurological as well as from a psychiatric perspective.

Q. Now, you said he has brain damage, correct?

A. Yes, sir.

Q. How did you determine he had brain damage?

A. A combination of my examination and his history.

Q. So you determined he had brain damage based upon your examination and his history.

A. Yes, sir.

Q. Isn't it true that the better forum to determine brain damage is with a CT scan or MRI scan?

A. Well, that's a very interesting question, I'm glad you brought that up. So, for example, I think --

Q. Before you explain, you can say yes or no and then you can explain.

A. It's not a yes or no answer. So if somebody has a stroke, yes, if it's a large stroke. If it's a tiny stroke, no, because it's within the resolution of what those scans would show. But that presumes that you are looking at what we call a coarse, COARSE, brain lesion. We know that, for example,

people with schizophrenia usually have normal MRIs or CT scans yet their brains are markedly dysfunctional.  People with Down syndrome often have IQs in the 50s and 60s yet their MRI scans are often quite normal.  So there's a limit to the resolution of what these scans can tell us about the function and the structure of these brains once you get down below a large visual perspective.

Q.  So I guess the answer is yes in some cases and no in some cases?

A.  Absolutely.

Q.  Okay.

A.  Much more succinct than I said.

Q.  It was a yes or no answer there.  Would it --

A.  No, you offered binary.  So it's yes in some cases and no in some cases.  That's a little different than yes or no, with all due respect.

Q.  Did you do a neurological exam of Mr. Basham at some point?

A.  Yes, I did.

Q.  And what did it show?

A.  It showed that he had cognitive dysfunction, it showed that he had some abnormalities in his brain stem, it showed some abnormalities in his frontal lobe function.

Q.  Is that all?

A.  Yes, sir.

Q. Would that be recent damage or long-term damage?

A. I would presume it would be long-term damage, from his history.

Q. Okay. Did you know that December of 1991 he had a neurological exam and it was normal?

A. Well, I have not seen that report so I can't comment on that.

Q. Did you know in 1994 he had a neurological exam and it was normal?

A. Once again, I have not seen that report, I can't comment on that.

Q. Did you know January of 1996 he had a neurological exam and it was normal?

A. Once again, I'm relying upon your report.

Q. Did you know in 1998 he had a neurological exam and it was normal?

A. No.

Q. Did you know in 1999 he had a neurological exam and it was normal?

A. I have no record of that.

Q. So if he had all of those exams at that point during those years and it was normal and now you said he has a negative or a bad neurological exam and it has gone back all these years, all those reports would be wrong, wouldn't they?

A. I'd have to look at those reports to see how detailed that

examination was, who performed it, under what circumstances it was performed. There are a lot of reasons why examinations can change, particularly in a neurological sphere, because it is dependent upon the expertise and the care with which it's done. Some of these examinations are very cursory examinations, and so for when you are saying these neurological examinations were normal, he's not hemiplegic, he's not paralyzed on one side. That's not what we're talking about. We're talking about subtle findings which would be indicative of the type of brain damage that you would see with developmental or acquired brain damage.

And it's particularly hard to assay for brain damage in the frontal lobe on neurological examinations unless if you are doing the right tests. So for you to presume that those examinations were equivalent to my examinations, I would propose they are not equivalent. Therefore, without me looking at the actual paper record of them I am not prepared to say that those examinations were normal. They were normal for what the test was done.

It's a little bit like taking your car in for an examination to check the tires and they check the battery and say it's fine and then you go down the highway and the transmission falls out. Well, they didn't check the transmission so they wouldn't tell you that the car is fine. There are different levels to examinations.

Q.   Are you finished?  Dr. Hyde, are you finished?

A.   Excuse me?

Q.   Are you finished?  I just want to make sure you finish your answer.

A.   Yes, I am.

Q.   Okay.  And simply because he would have brain damage doesn't mean he would be incompetent, would it, Dr. Hyde?

A.   No, it would not.

Q.   Simply because he may have brain damage that doesn't -- doesn't indicate that he wouldn't know who the players are in this hearing today, would it, Dr. Hyde?

A.   He may recognize who the fundamental individuals are in the hearing, yes.

Q.   And what their roles are, wouldn't it, Dr. Hyde?

A.   He may have a very superficial understanding of what their roles are, yes.

Q.   Well, superficial, but he would know -- he's not a lawyer, he doesn't know all the roles, but he would know the roles of the judge, correct?

A.   Well, you know, it's very interesting that you ask that. So I asked -- actually asked him about some of those things.

Q.   And?

A.   He, like I said before, he has a very cursory definition of what these participants are.  Some of them were good, some are them were not good at all.  Would you like some examples?

Q. Sure, Dr. Hyde, go ahead.

A. So I asked him what a judge is, he said the judge, he judges me, he sentences me. The jury listens to the facts and comes to a decision. What is a sentence? The jury, no, the judge, no, I don't know, decides a sentence.

Q. Okay. Now, let me move on then. Simply because he had brain damage doesn't mean he can't control his behavior, true, Dr. Hyde?

A. That's correct.

Q. And because he has brain damage, that doesn't mean that he can choose -- cannot choose not to assault someone, correct, Dr. Hyde?

A. It depends on the brain damage. You're right, some people with brain damage can control that, other people cannot.

Q. What's the standard, Dr. Hyde, that you use to determine that he was incompetent?

A. That he understands the nature of the legal proceedings that are going on around him and is able to actively participate in assisting his counsel in his legal defense.

Q. And you have determined that he's not capable of doing that.

A. That is correct.

Q. Even though he has met with his attorneys a number of times and talked with them?

A. Sir, I have met with patients who are in a vegetative

state.  That doesn't mean they are competent in any way, shape or form.

Q.  But those people in a vegetative state can't talk to their attorneys, can they either, Dr. Hyde?

A.  No, they can't.

Q.  So that -- that example is not a good example, is it Dr. Hyde?

MR. BURKE:  I object, your Honor.  He's badgering the witness.  And the fact of the matter is that Mr. Witherspoon has no idea about the -- no one does, because no one asked us about the nature of our communications with our client.

MR. WITHERSPOON:  I'm not asking about the communication, but he's talked with him.  I'll move on, Judge.  I'll move on.

Q.  (MR. WITHERSPOON) Dr. Hyde, when did you determine Mr. Basham was incompetent?

A.  After my second visit with him.

Q.  So after September 28?

A.  Yes, sir.

Q.  And when did you notify his attorneys that he was incompetent?

A.  I don't remember the exact date, we have had a multiple conversations.  I think Mr. Burke can probably tell you the exact date.

Q.  Is it at that second meeting in September?

A.  Yes.  I had suspicions after the first meeting but confirmed after my second meeting.

Q.  So would it surprise you if the defense attorneys told the judge yesterday they had no medical determination that he was incompetent?

A.  Yes, it would surprise me.

Q.  Now, if he's incompetent, Dr. Hyde, could he fashion, if he wanted -- put it this way.  If Mr. Basham sent a letter through a third person to get to someone he wanted to read the letter, would that be signs of a person who is competent?

A.  Probably it's not determinative, not dispositive one way or the other.

Q.  But an incompetent person would not be able to get around the rules by sending it to a third person, would they, Dr. Hyde?

A.  I don't think giving somebody a letter to give to somebody else is part of the legal definition of competence.  I don't think it's determinative or bears upon it one way or the other.

Q.  That wasn't my question, whether you determine it was part of the legal definition.  My question was if he was incompetent could he mail a letter to a friend to send to another friend on death row because he couldn't send it himself?

A.  There's a straw man you are setting up there because you

are presuming all those things happened, that chain of events, and I can't comment on because I don't know the details of it.

Q. But assuming that happened, Dr. Hyde, is that a sign of a person who is incompetent?

A. It is -- I will say it one more time for you, it is not dispositive one way or another.

Q. And if he was incompetent since he was an adult, part of the crime here, Mr. -- Dr. Hyde, was he had to convince another person he kidnapped to allow them to use the phone, to use the phone, to convince that person to allow him to take him on a ride, and then to convince that person to take him to a different place. Is that a sign of anyone who's incompetent?

MR. BURKE: Your Honor, I would like to object. The purpose of the determination today is Mr. Basham's competency for purposes of this hearing. These questions will be addressed --

THE COURT: I was going to get into, you intend to bring the doctor back when we get to competency at trial later.

MR. BURKE: Yes, your Honor.

MR. WITHERSPOON: Well, Judge, Dr. Hyde said he was incompetent during the proceedings and he continued to be incompetent.

THE COURT: I understand. Well, I'm not going to

stop you, but understand we may get some of this again later if he's called.

MR. WITHERSPOON:  Very fine, Judge.

Q.   (MR. WITHERSPOON) Dr. Hyde, your response?

A.  Could you repeat the question, please?

Q.  Could the fact that he was able to convince another person that he kidnapped to allow them into his house, someone he did not know, to give him a ride, someone he did not know, and then convince that person to take him to another place, is that a sign of incompetency?

A.  That would be a sign that he was behaving competently within that sphere or function.

Q.  So he's -- part of the time he's competent and part of the time he's not competent, is what you're saying now?

A.  No, I'm not saying that at all.  We're talking about legal competence and you are talking about competence to perform a relatively simple social interaction.

Q.  So that's -- he can do that, he just doesn't understand all that's going on in the courtroom.

A.  Or the legal definitions or the legal terms or the options that are available to him.  No, he does not.

Q.  And you would agree with me these legal terms, these legal definitions, these legal concepts aren't things that everybody on the street would understand, wouldn't you, Dr. Hyde?

A.  No, I wouldn't say that they don't understand, but I'm

sure that they would learn them pretty quickly if they were in proceedings like he was.

MR. WITHERSPOON:  Beg the court's indulgence.

(There was a pause in the proceedings)

Q.   (MR. WITHERSPOON) Dr. Hyde, one final -- couple of final questions.

A.   Yes, sir.

Q.   I may have misspoke.  The convincing the person to give him a ride and the use of a third party -- person to send a letter may not be dealing with competency, but that's certainly an indication that he's manipulative.

A.   Once again, I don't know the details of that.  He was certainly manipulating a situation but, in general, does that show him to be a manipulative person?  Not necessarily.

Q.   And would you agree with me that competency is better to determine at that moment rather than using records to make that determination?

A.   Like I said before, and I'll repeat it again, I thought I already answered that question, it's always best to see an individual in person, but there are certainly clinical situations where there are static problems that would lead someone to be incompetent across time.

Q.   And so if a doctor saw Mr. Basham more than 40 times and spent more than 40 hours or a hundred hours with him, they would be in a better position to determine competency,

wouldn't they?

A.  Depends upon the training of the doctor and the nature of the interactions.

MR. WITHERSPOON:  Thank you, Judge.

THE COURT:  All right.  Any redirect?

MR. BURKE:  Yes, your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. BURKE:

Q.  Dr. Hyde, this is Michael Burke.

A.  Yes, sir.

Q.  I have a few questions for you.  My first question is you reviewed records in this case.  Did you also evaluate Mr. Basham?

A.  Yes, I did.

Q.  In person?

A.  Yes.

Q.  And that was on two separate occasions, correct?

A.  Yes.

Q.  So you based your opinion not solely on your review of the records but also on your evaluation, your in-person evaluation of Mr. Basham?

A.  Yes.

Q.  Okay.  Let me ask you a specific question about what type of doctor you are.  Are you a psychiatrist or are you a

neurologist?

A. I am a board certified neurologist in general neurology with additional training and expertise in psychiatry. I have published over 140 per reviewed papers and over 30 chapters primarily in psychiatric journals and psychiatric textbooks, so I am a cross-dimensional physician. I have been certified as an expert in both neurology and psychiatry in multiple venues around the country.

In addition, I'm a fellow -- I'm a member of the American College of Neuropsychopharmacology, which is a by invitation only college for experts in neuropsychopharmacology, which deals with drugs, neurological and psychiatric disorders.

Q. Now, Doctor, would in your opinion -- could it, in your opinion, affect a doctor's ability to render an opinion on competency if they lacked experience in -- let's give an example of neurology. If he were not a neurologist is that a factor that plays into a determination of competency in this case?

A. Well, in this case absolutely, since there are significant neurological issues as well as psychiatric issues here. And I think that having that background is very important in evaluating this individual.

Q. Now, over the break you were sent, I apologize for the short -- the court reporter did it as quickly as possible and we tried to get it to you as quickly as possible via e-mail,

transcript from Dr. Parker's testimony today.  Have you had an opportunity to review that?

A.  Yes.

Q.  I'm sorry, I didn't hear your answer.

A.  I'm sorry, yes.  Yes.

Q.  And you had a chance to review it in your -- in its entirety?

A.  Yes.

Q.  Okay.  Dr. Hyde, do you -- first let me ask you, do you have any concerns about the manner in which the competency evaluation was conducted this morning?

A.  I do have some concerns, because I don't see any comments about his mood state.  There seems to be some suppositions here but I don't see any descriptors of this individual's mood, nor did I see any direct questions that would go to the core of competency.  And that has to do with the individual's ability to understand the nature of the legal proceedings in which he is engaged and to participate fully and actively in his defense with his attorneys and communicate rationally and thoughtfully.

Q.  And is that what you mean by the term mood?  A lay person usually thinks of mood --

A.  No, no.  Those are two separate things.  I'm sorry if I was obtuse in my response.  I don't see that there was any investigation of his current mood state today, which would be

fluctuating, nor did I see any assessment of his cognitive profile vis-a-vis competency; that is, how he understands the nature of the proceedings against him, what -- how he might interface with his attorneys to make rational and informed decisions.

Q.  Now, before I forget, one point I would like to ask you, Mr. Witherspoon asked you if it would be -- if you would be surprised if Mr. Basham's attorneys had said that they had not been given a diagnosis, I believe, of incompetency or been told he was incompetent, and I think you seemed surprised by that.  Would it surprise you if Mr. Basham's lawyers in fact said they did not have a report addressing Mr. Basham's competency?

A.  That would be absolutely true.  I have not had time to put together a report.

Q.  As part of your -- I know I've changed subjects and I want to go back before I move on then.  Let me ask you, are there any other concerns you have about the adequacy of Dr. Parker's evaluation today?

A.  Well, I have to say it seems rather cursory, that's all I can say, is I didn't see any detail, at least in his testimony, other than he seemed to be fixated on the fact that Mr. Basham was distractable, which in fact he is, and that he is impulsive, which he is, which he ascribes to being antisocial and suffering from attention deficit hyperactivity

disorder.

Q. Do you agree with Dr. Parker's determination that Mr. Basham is competent today?

A. I disagree.

Q. Does the fact that Dr. Parker was able to see Mr. Basham in person today and you were not affect your opinion?

A. No.

Q. In reaching your determination in this case that Mr. Basham is incompetent, and again we're focusing solely on the -- on this hearing, today we're focusing on his competence for this hearing, have you had any discussions with his attorneys regarding their communications with Mr. Basham?

A. Yes, I have.

Q. And did that have any affect on your decision or your opinion about his current state of competency?

A. Yes.

MR. BURKE: Thank you, your Honor. I have no further questions.

THE COURT: All right. I don't have any further questions.

MR. WITHERSPOON: None from the government, your Honor.

THE COURT: Thank you very much, Doctor. We appreciate you working with us on the telephone. It appears that if we go forward with this case you might be called at a

hearing again later on the question of competency at the time of the trial --

THE WITNESS:  Yes, sir.

THE COURT:  -- back in 2004.  And if so we will hear from you then.

THE WITNESS:  Yes, your Honor.  Thank you for allowing me to participate.

THE COURT:  Thank you very much.  We will hang up now.

THE WITNESS:  Bye-bye.

THE COURT:  Anything further by way of evidentiary development on the competency question?

MR. WITHERSPOON:  Nothing from the government, your Honor.

MS. STONE:  Your Honor, I just wanted to respond briefly to a point that you made regarding that Rosenhan study you bought up.  I just wanted to make a record, I did some reading on that this afternoon.  When that study was done the DSM-II was the manual that was in place.  That study was actually used to help formulate the DSM-IV, which would be the diagnostic and statistical manual used here.  And so the general knowledge on that is -- that I read today is that those issues that were brought up in the Rosenhan study were addressed in the -- in creating the DSM-IV to try to eliminate those problems that the Rosenhan --

THE COURT: I don't think I would base a decision on that study. That was way back in '73. I'm sure the literature and the science and medicine has developed, has advanced significantly since then. I thought it was interesting. I always wanted to ask some medical professional their opinion about that, because it's just remarkable that they were able to get a hundred percent success ratio in false diagnosis, bad diagnosis. But I'm not going let that play any part in my decision.

MS. STONE: Well, it looked like the industry was concerned about it, as well, and they responded to that.

MR. BURKE: Your Honor, I would only add one other thing to the evidentiary development aspect of it, is that a critical aspect of a determination of a defendant's current competency is his ability to communicate effectively with his attorneys and to take guidance from his attorneys and be controlled by his attorneys. I would submit without any inquiry from the court on an ex parte basis about, well, perhaps on a sealed basis, I think perhaps --

THE COURT: You want to send the government out and tell me ex parte what you need to discuss with him?

MR. BURKE: What we need to discuss --

THE COURT: I mean you suggested this morning, I thought you suggested we needed an ex parte hearing with just you.

MR. BURKE: Yes.

THE COURT: You want to do that now?

MR. BURKE: That would be fine.

THE COURT: Let me ask the government to step out.

(There was a pause in the proceedings)

* * * * * * * * *

THE COURT: All right. Mr. Burke, can I share any of what you told me here now during the argument stage or would you rather it not be disclosed?

MS. STONE: Can we confer for a moment?

THE COURT: All right. Take your time.

MR. BURKE: It's such a delicate line, your Honor.

(There was a pause in the proceedings)

MR. BURKE: Your Honor, I believe that any statement that we made to you regarding our inability to communicate with Mr. Basham would be appropriate for you to reveal to the government. I know that's a broad statement, I'm not sure -- perhaps not the substance of the statements that he made.

THE COURT: What about just your experiences that you've seen?

MR. BURKE: Yes, your Honor.

THE COURT: All right. Well, Mr. Witherspoon, while you were out counsel told me that frequently when they went to

see Mr. Basham or try to contact him on a portable cell he was intoxicated as much as 40 percent of the time because he was able to brew or ferment fruit in his cell, which I have seen that happen before. And so he has a -- frequently they couldn't communicate with him or conduct meaningful conversations because of his inebriated condition. And then can I tell them about the hallucinations?

MR. BURKE: Yes, your Honor.

THE COURT: He also had some mice in his cell, and at one point he became distraught over the death of his mouse, and even began having hallucinations the mouse was speaking with him. So we have that additional information from counsel which I will accept at face value. I don't think it's necessary to try to get somebody from the Bureau of Prisons on the satellite to possibly rebut that, I think we just need to accept that.

So with those facts before me now let's -- I'll be glad to hear from you. I guess it's your motion, Mr. Burke. Let me hear from you.

MR. BURKE: Thank you, your Honor. Your Honor, our position is based on the events of the last two days that Mr. Basham is not currently competent to go forward with this 2255 proceeding. We believe that he has a right whose origin at this point I can't truly identify for you, because I'm not sure -- I would say the due process right, but looking at the

oral arguments yesterday from the Supreme Court I'm not sure even the Supreme Court is sure of the genesis of the right in this particular instance.

But even the United States government conceded in a 2255 proceeding the defendant should be competent and when he is not some type of brief recess should be taken, some period of time for an attempt to render the defendant competent.

Now, much has been made about -- and I think it's important for us to focus on the two elements of a competency determination under Dusky, and the first is where Mr. Basham has a present understanding of the proceedings. And I would tell the court that even your own expert today testified that Mr. Basham truly didn't understand the purpose of the proceedings today.

THE COURT: Well, he's still really mad at you and really mad at me for not granting his request to withdraw his appeal, I think. I think. And to this day I don't know why I backed off of that, but it became apparent to me it wasn't going anywhere, sooner or later he would change his mind or I would get in trouble because it looked like I bargained with him. And so I really don't know why I dropped the issue -- dropped that issue, because it never was fully and finally resolved in my mind what he wanted to do.

But your side kept objecting that we were invading the attorney-client privilege and I couldn't ask him what he

wanted to do straight up without y'all advising him what to say. So I think part of the problem has been created by you and me, actually, in terms of understanding what this hearing is about today.

MR. BURKE: Well, the second prong, your Honor, would be his ability to assist his attorneys in the proceeding. And I would -- I was looking at a list of items relevant to competency to stand trial, I would think that it would have some relevancy to a 2255 proceeding. This was something developed, your Honor, by the group for the advancement of psychiatry, and it's from a treatise that I can provide the court later. I simply photocopied this before I left the -- my home so that I would have it for purposes of cross-examinations during the hearing. But it's a 21-item list, and I would like to read a few of the items that are relevant to a determination of competency.

The defendant needs to have the ability to comprehend instructions and advice from counsel. I think your Honor could see that much of the interaction between Mr. Murray and Mr. Basham was -- went unheeded by Mr. Basham. And based on what we had told you about our experiences with Mr. Basham I think that further confirms it. He has to be able to make decisions after receiving the advice. And he clearly at this moment is not capable doing that. He needs to maintain a collaborative relationship with his attorney to help plan

legal strategy.

THE COURT: Well, all of what you say is certainly very true at trial. But I go back to the question of the fact that here we're almost relying exclusively on a fixed record. I've got your letter dated September 21 you sent to me ex parte in which you outline the things you needed to discuss with your client at trial, and I think that I need to file this with the clerk under seal as a court's exhibit in case the Fourth Circuit wants to look at it if we have an appeal. Any objection to that?

MR. BURKE: I do not, your Honor. And I understand that you have -- I'll let you go ahead and do that.

THE COURT: I've looked at the three categories of matters that you -- because I suggested I think at the pretrial conference that so many of these issues, whether my jury charge on the two-step process on mitigation was faulty or whether Mr. Swerling was rendered ineffective because he was a home invasion victim, Mr. Basham can't help counsel with any of those issues.

MR. BURKE: Absolutely not, your Honor. I agree with you. But there are -- there are several -- as the court has repeatedly noted, we have raised many claims of ineffective assistance of counsel, and many of those involved Mr. Basham's communications with the defense team. And so I would, if I had a competent client, need to confer with that client about

that.

THE COURT: Let me ask you this then: Is it or was it your intention to have Mr. Basham testify at this hearing?

MR. BURKE: Never, no.

THE COURT: So the communications would just be limited to confiding in you and suggesting questions that you would ask the various witnesses, in other words.

MR. BURKE: And confirming the accuracy of certain testimony. And if I could give an example of that, your Honor, we have two separate claims in the 2255 motion. The first claim is a claim of ineffective assistance regarding Mr. Littlejohn and Mr. Monckton with regard to the Thanksgiving day search which we were questioning about. We also had a claim about false testimony by Ronald Hewitt, Sheriff Ronald Hewitt. Those two claims mesh together, and I think for one to be true the other is not true.

When we met with Mr. Monckton the first time his position was that event had never happened. I can tell you, I can tell you that our client has -- was able to inform us when he was in his cell in a calm environment that in fact Mr. Hewitt did remove him from the van and did speak to him. That is the type of issue that I would require my client --

THE COURT: You are going to have -- is Sheriff Hewitt going to be called, former Sheriff Hewitt going to be a witness?

MR. BURKE: No, your Honor. But that was Sheriff's Hewitt's testimony he did that.

THE COURT: How about if Mr. Basham is not going to testify, Mr. Hewitt not going to be called, what good would a communication from the client to you about that issue? What role would it play?

MR. BURKE: There are two claims. If it had never occurred, and that was what we had learned from Mr. Monckton the first time we met, it had never occurred, that would be in support of our claim that Sheriff Hewitt had been untruthful on the stand. But when we were informed by our client that in fact those events had occurred then we knew that added -- that added strength to our claim of ineffective assistance of counsel by the first lawyers allowing that to happen. So that's the type of issue.

This is not a record-based proceeding like you normally would have in a 2254, this is the equivalent of the first state post-conviction proceeding. And so it does require us to be able to have meaningful communications with Mr. Basham, which we are clearly unable to have with him right now. We would ask, your Honor, that we are fully aware of the length of time this case has been going, but I do represent a man who I believe is incompetent and --

THE COURT: Well, if I agree with you and your expert then he will just be incompetent until infinity then, forever,

and there will -- the jury verdict will never be carried out. And that's the bottom line. Your expert is pretty clear he was and always will be incompetent.

MR. BURKE: Well, let me address that, your Honor. Two things. Dr. Hyde, and, of course, has not even truly testified on his report, has not testified that Mr. Basham is not competent to be executed. So that's a different issue. So but he says he is not competent to proceed at the hearing.

THE COURT: But still, if that's true and if the Supreme Court holds that you've got to stay the case pending a restoration of competency, then the case just drifts along forever, essentially.

MR. BURKE: But Dr. Hyde did testify that, and this is a quote from Dr. Hyde's testimony from this morning, that with medication management plus counseling yields a very positive outcome, at least as far as managing the behavioral problems such as the types of outbursts we saw yesterday. So our point is is that Mr. Basham has never been properly medically treated.

And there was some question by the government to Mr. -- to Dr. Hyde as to our hiring of Dr. Schwartz-Watts. I will tell the -- I will reveal our strategy. We hired Dr. Schwartz-Watts because our client was seeking to waive his appeals. Time was of the essence and there was no doubt that Dr. Schwartz-Watts had a working knowledge of this case. And

our primary concern was that Mr. Basham was being motivated by his lack of medication and his self-medication. That is why we hired Dr. Schwartz-Watts, so she could advise us on that.

THE COURT: All right.

MR. BURKE: And that is I think what Dr. Hyde testified to, that it is not a foregone conclusion he would never -- I have to let Dr. Hyde's testimony speak for itself. But at least with competency for this hearing it appears that with proper medication that Mr. Basham could possibly be competent to proceed. And as Dr. Hyde testified, he's currently grossly under-medicated, and so and I would simply reiterate that, sadly, Mr. Basham's words themselves speak for themselves as to his ability to control himself. And that's not -- your Honor, if you truly believe and if the government truly believes he wants to die, he has no reason to manipulate this court to make these proceedings go further. He's simply incapable of understanding what's going on and then controlling the trauma that occurs to him when he is in the situation that he's in right now.

THE COURT: All right. Thank you, sir. I'm going to make this -- ask the clerk to seal your September 21, 2012 letter to me, filed as a court's exhibit under seal. Already have it under seal. It was in response to my question of what discussions you might have with Mr. Basham if he were brought here in person. Which is the same basic issue as the question

today of what information do you need to gather from him to help adequately represent him in this case.

All right. Mr. Daley?

MR. DALEY: Yes, your Honor. The only thing I was going to ask is does that mean that it's under seal for and only they -- in other words, no one can see it except the court and the defense.

THE COURT: Right.

MR. DALEY: Just wanted to make sure.

THE COURT: It is basically attorney-client type -- if the Court of Appeals wants to see it they can see it and look at it.

All right. Mr. Witherspoon?

MR. WITHERSPOON: Your Honor, I'm not privileged to what Mr. Burke and Miss Stone told you while we were out, and but let me just say I think they have done the best that they could. However, I don't think anything that has happened today indicates that Mr. Basham is incompetent. At some point they told you that 40 percent of the time they met with him he was drunk. That has nothing to do with incompetency, Judge, nothing at all to do with incompetency. He himself decided, I guess, to drink the alcohol, he himself decided to not -- has nothing to do with his brain or brain damage or competency. He made a choice and his choice was to get drunk.

And as far as seeing mice in his cell and

hallucinations, we saw no hallucinations today. So if the issue is is he competent now but being drunk, and hallucinations are irrelevant because we saw none of that. And Mr. Burke said that Mr. Basham did not heed the advice given to him by his lawyers. But, Judge, if you remember yesterday morning the first thing, and I forget the attorney's -- Mr. Murray asked the court was can we take the handcuffs off so Mr. Basham can take notes and be involved. Well, if he's incompetent what is he going to do?

And simply because Mr. Basham made a decision or has made decisions not to heed their advice, Judge, you can see him on the screen, he decides he will do what he wants to do when he wants to do it. That's not incompetency. That is not incompetency.

He doesn't want to assist his attorneys because he wants to die. Why would he assist potentially when -- and have to spend potentially the rest of his life in jail, which he tells everybody he hates, when he wants to die? The standard is, Judge, can he understand the nature and of these proceedings, and I think the answer is yes. Can he consult with his counsel? Not that he will consult, but can he consult and can he assist in the preparation of his defense. Not will he, but can he. There has been no indication that he can't, it's just the choices that he has made, and that's not incompetency.

Oh, and one further thing, Judge. Dr. Hyde said this morning, and I'll read, and I believe that this brain damage is irreversible and it can be managed with appropriate medications and therapy, but I believe he's permanently brain damaged and I believe that the limits -- this limits his competency and makes him incompetent in fact now and in the foreseeable future. He will never be competent, according to Dr. Hyde, the person who disagrees with the death penalty, who would never work, provide the government assistance where the death penalty is involved.

And Dr. Parker, who the court hired, who the court instructed twice to go see Mr. Basham, and both cases who had no opinion for the government or the defense, on two occasions determined, including today, that Mr. Basham is competent. The court's psychiatrist has determined that he's competent. There has been no indications that he cannot assist in this trial. He may not want to, he may choose not to, but that doesn't say he can't do it. Thank you, Judge.

THE COURT: Any rebuttal?

MR. BURKE: First I would like to -- the record will speak for itself, but what Mr. Basham said to the court was that he had believed that could he be in a situation where he could, I forget his exact words, but have more freedom in the prison, essentially what I took that to mean and what our discussions have been was that if he could be off death row he

was interested in proceeding. And that was what -- that he communicated. And the transcript will speak for itself. So I think it is inaccurate to say Mr. Basham under all conditions still wants to die and wants us to stop and that's why he's not working with us. That is not accurate.

And just one second, if I may, your Honor.

(There was a pause in the proceedings)

MR. BURKE: And the final point, just, your Honor, is I think it's obvious from your expert that Mr. Basham today does not understand why we're here at these proceedings. We have informed him and he still does not understand and is incapable of understanding the true meaning of his proceedings. Thank you.

THE COURT: All right. Well, up until now in the long history of this case the jury has resolved all the disputed facts and all I've had to do was deal with the law. But today I'm called upon to make a factual determination in terms of the competency issue that was raised yesterday. And we spent the better part of a full day hearing from experts on both sides of the issue. I've heard argument from counsel on both sides, quite very capable argument on both sides, and after hearing all of the evidence and weighing the credibility of the doctors who testified it is my determination that Mr. Basham is in fact competent to proceed with the 2255 hearing in this case.

I intend to put my reasons for that decision in a written order because of the need for my reasons to be memorialized for the Court of Appeals.  But suffice it to say I had to make a call between two conflicting medical opinions, and I don't mean any disrespect to Dr. Hyde who testified for the defendant, but on based upon the totality of the evidence that I heard and the basis for the opinions given by the two physicians who testified, it's my determination that Mr. Basham can understand the nature of the proceedings here, he does have the ability to consult with counsel, and he does have the ability to assist the counsel in his preparation of the defense if he chooses to do so.  He's apparently chosen not to do so, which is his right.

So with that ruling we need to move forward.  I understand that Mr. Monckton is still here, is that correct?

MR. WITHERSPOON:  He is.

THE COURT:  Will you ask him to come back?  I believe at noontime today, is it remotely possible we can finish him today so he doesn't have to make the three-hour drive from Myrtle Beach tomorrow?

MR. BURKE:  Your Honor, I have at most five questions left.

THE COURT:  Let's see if we can finish him today then.  Please bring him back.

(There was a pause in the proceedings)

THE COURT: Mr. Monckton, we apologize for the long day. We do the best we could to move things along. We're going to resume your testimony, you are still under oath and Mr. Burke says he has just a few more questions for you.

THE WITNESS: Thank you, your Honor.

BY MR. BURKE:

Q. Mr. Monckton, I have to tell you you are the soul of patience. And I thank you for your willingness to come back all across the -- all the way across the state for this and to be here today. So thank you very much. I only have a few questions left for you and then I will turn your examination over to the government. Let me just --

When we left off yesterday we had been talking about the events of the Thanksgiving day search in 2002 and we were talking about the incident in which you and Mr. Littlejohn were away from the van in which Mr. Basham was sitting, presumably, and/or speaking with law enforcement about hypotheticals. Do you remember that?

A. I do.

Q. And I asked you if you remembered if you are clear in making your intentions known to the law enforcement officers there that day that Mr. Littlejohn and yourself did not want Mr. Basham to be interrogated, is that correct?

A. That's correct.

Q. If I could have you look at Defendant's Exhibit 5, and we

spoke about this briefly also, as well, yesterday.  If I recall, you said that you created this about the time that the disqualification motion was filed.

A.  That's correct.

Q.  If you could look at page -- the bottom of page two of that.  And, again, this would have been created sometime in early 2003, is that correct?

A.  That's correct.

Q.  Okay.  And can you read for us the sentence that begins at no.

A.  At no time will the police be allowed to question or interview Brandon concerning this incident.  You want me to read --

Q.  No, that's the part.  Do you agree still that that was your intention?

A.  That's correct.

Q.  Okay.  Do you recall, Mr. Monckton, if Jack Swerling or Greg Harris ever contacted you to ask about Sheriff Hewitt removing Brandon Basham from the van while you were not present?

A.  I can't recall if they did or did not.  Obviously, I kept detailed notes when I was representing Brandon.  After I ceased to represent Brandon I know I sent or had given a bunch of my information to Mr. Harris and Mr. Swerling.  And I don't know specifically if we talked about that.  I know there was a

lot of talk about the Thursday search but I can't remember any specific conversation with him.

Q. And do you recall testifying in February 2004 at the Jackson v. Denno hearing in Mr. Basham's case?

A. Yes.

Q. And prior to that testimony did you ever discuss with anyone on Mr. Basham's defense team Hewitt's claim that Mr. Basham had made any incriminating statements outside of your presence?

A. See, I can't remember if I did or didn't, to be honest with you. Because I didn't see -- I don't know that I saw -- I saw the 302s so I know it became the subject of a conversation when I saw the 302 from Jeff Long prior to the disqualification hearing that we had issues with that. But I don't know that I ever saw Sheriff Hewitt's statements that he made. Does that make sense?

Q. It does. Based on the testimony that you have given us today and yesterday do you believe that had you been asked about that event that you would have indicated to Mr. Basham's counsel -- his present -- his counsel at the time that that -- any questioning was done against your express direction to law enforcement officers?

A. I think Mr. Littlejohn and I would both have said that.

MR. BURKE: Thank you. No further questions.

THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MS. EWING:

Q.  Mr. Monckton, I also appreciate you coming back today. It's taken a while.  I just have a few questions, and I'll try to expedite this.

Now, what was the purpose of the Thanksgiving day search out around Bee Tree Farms area?

A.  The purpose was hopefully find Miss Donovan's remains.

Q.  And, now, the government refused to offer a proffer, right?

A.  That's correct.

Q.  Okay.  And but Mr. Basham still wanted to cooperate.

A.  That's correct.

Q.  Okay.  And so because of that initially you said Basham could only speak to his or through Mr. Littlejohn, correct?

A.  That's correct.

Q.  Okay.  Now, since he didn't have a proffer, if he blurted something out then that could be used against him, correct?

A.  I would agree with that.

Q.  Okay.  And I would like to take a look at -- it's Government's Exhibit 221, but it's the defense exhibit that you just looked at, number 5, I believe.  Okay.  And going down to, or actually the first full sentence at the top of the third page that comes immediately after the sentence you just quoted, could you read that sentence?  It starts with in fact.

A.    In fact, they were advised that they would not be allowed
to interview Brandon in any way, shape or form other than the
search of Donovan.

Q.    Other than the search for Donovan.  Okay.  Now, do you
recall testifying at the Jackson v. Denno hearing on
February 5, 2004?

A.    I do.

Q.    And can I show you part of your -- may I approach?

            THE COURT:  Yes, you may.

Q.    (MS. EWING) Part of your testimony on page 126 and 127 in
response to Judge Anderson.

A.    The highlighted section?

Q.    Well, yes.  That and continuing on.

A.    I remember testifying.

Q.    All right.

A.    Okay.

Q.    Thank you.  And your testimony at that time, you explained
the dilemma that, it appears to me, that you were in with the
situation with Mr. Basham not having a proffer.  And you said
but it gets to the point, you know, in this case there is no
way I can take him up there and look without some
communication back and forth.

A.    That's correct.

Q.    Directions, and quote, yeah, that looks familiar, no, that
doesn't look familiar.  You know, I don't see how you do that.

And you went on, according to this, and I guess that's been my concern in this case is you've got to put us in those set circumstances at that time. We are not -- everybody can Monday morning quarterback what's going on. We really felt like we were going to find her that day. Do you recall --

A. That's right.

Q. Okay. Beg the court's indulgence. Okay. So you kind of summed it up, as I recall, when we met with Mr. Burke present that it's hard to find a body without talking. Do you recall making that statement?

A. I do.

Q. Okay. And was it your hope that day during the search that if Mr. Basham assisted in finding the body that he would benefit from that?

A. Based on my conversations with the U.S. Attorney, yes.

Q. Okay. And basically didn't you feel that that was probably the only chance that you were going to save him from the death penalty?

A. It was his best option for him to be a witness against Fulks.

Q. And wouldn't knowing how the murder happened help provide law enforcement with insight as to what to look for?

A. I guess the answer to that can be both ways. I mean, in that time frame the information we were given was very limited due to the fact that we had been told he confessed, we had

been given just a rough idea of what he had said he had done. We were told that the body was dumped on the side of the road by a stake, and that law enforcement was already assembled in North Carolina where they believed he could help get them there. Based upon that information we didn't interview him in any detail at that time, just because for a logistical concern we had to get it.

Q. Wouldn't finding the instrument of the murder possibly help locate the body?

A. The information that I was later given was the instrument, the knife, was thrown out -- out a car window as Fulks and Basham were going down a dirt road. I don't know how that would have helped, not knowing where -- where to look.

Q. But being a knife or a purse strap, wouldn't that possibly lead you to the general vicinity of her body?

A. I guess it could -- I guess the answer to your question is yes. But the issue where they say they may have seen a purse strap was at a cemetery, and when we got to the cemetery it had been cleaned up a day or two before. And the sheriff verified that to us, that they'd come in, it was all freshly raked up and cleaned up. They said oh, there's no evidence we're going to find here. That was one of the cemeteries we looked at where I think the car had been seen, the BMW had been seen close by.

Q. But if the purse strap had been thrown into the woods,

say --

A.  If we had found the purse strap, yes, I think that would have helped us maybe locate the body.

Q.  And didn't Cam Littlejohn actually tell Sheriff Hewitt that they should keep their eyes hope for a purse strap?

A.  I can't remember if Cam said that or not.  If he said he said it, I believe it.  Like I said, when we were driving around he was at the front of the van with Sheriff Hewitt and they were talking back and forth.  I was in the back of the van so I can't -- if Cam Littlejohn says he said that, I believe him.

Q.  Thank you.  And if that were the situation, I think you already basically said this, that the purse strap that Basham described would be intrinsic to the search for Alice Donovan.

A.  If we had found -- as we understood it, if we had found something to show that they had been there, other than eyewitnesses, yes, that would have been helpful.

Q.  And close to the end of the day during that search at some point you became aware that law enforcement felt that they were being led on a wild goose chase by --

A.  That's right.  Several FBI agents, I specifically remember Clyde Merriman, I believe there were several Conway officers, we were 30, 40 feet away from the van and they were telling me how they had searched an area a couple of days before in the Conway, Red Bluff area and had not found Miss Donovan from a

map that we -- Cam and I found out at that time that Brandon had sent a map or some map had been created.  And they felt like he was just yanking their chains, so to speak.

Q.  And didn't you believe that realistically this Thanksgiving day search would be Brandon's only opportunity to help find this body?

A.  Yes.

Q.  And why is that?

A.  I'm a deer hunter, there's a huge deer hunter population in Brunswick County, they dog hunt a lot, and I knew that the body, based upon what we had been told, it had been dumped near the side of the road.  I knew that with the number of dog hunters we were going to run into or would be up there around the holidays, actually we ran into a dog hunting party while we were searching, that some hunter was going to find Miss Donovan, and if the hunters found Miss Donovan before we did that then that would not be to Brandon's benefit.

Q.  Thank you.  Moving on to this competency issue that we have been talking about, did you and Mr. Littlejohn have any trouble during that Thanksgiving day search of talking to Mr. Basham?

A.  Honestly, I did not speak to Mr. Basham much that day, it was primarily Cam.  He understood we were going to look for a body and wanted to help.  I can say he wanted to help find Miss Donovan, he said that numerous occasions.

Q. On Government's Exhibit 222, which were some of your notes, put that up there, there's a list of medications. Who provided that list of medications, do you recall?

A. That medication would have come, if I'm not mistaken, it could only have come from Brandon or the attorney out of Kentucky. I'm fairly certain that came from Brandon, though.

Q. And several pages over on that, starting with your notes made on December 1 of 2002, there are about nine pages of detailed notes. That would be page 55, I believe. I'm sorry.

A. If you could switch me to the very first page of these notes I can tell you where they were taken and who was there.

Q. Okay. Let's see, page 54. At the top is 12-1-02. It actually looks like 2-1-02.

A. That would have been at Darlington County where he was being housed. The purpose of that meeting was I was speaking with Joe Ciccarelli, he was the lead case agent out of West Virginia looking for the girl that had been abducted, and he had sent me pictures of a bridge area where they had information I believe it was Miss Burns had been dumped. And I was working with him showing the pictures to Brandon, seeing if that made sense, because they were trying to locate her body, they had information they were in this area. As I understood it, it was a small river that connected into the Ohio, maybe a couple hundred yards up, and they were trying to locate -- they had divers on the scene and they were trying to

locate Miss Burns' body.

Q. And the next page starting below where it says Brandon and Chad, were those notes based on what Mr. Basham told you? It's like several pages of notes after that detailed notes.

A. If I could see, if you could go to the next page for me. Yeah, this would have been with my interview by myself with Brandon at Darlington County.

Q. And that goes through like you have number one and it goes several pages over through number 21.

A. That's right.

Q. Okay. Thank you. And that goes through page 60 of those Monckton files. And then below that you have West Virginia and, again, numbered items one and going over several pages --

A. I think what I was doing is obviously they went through different states and I was trying to get a chronology and time line of what was going on in different states. And I was asking Brandon, because I didn't have access to the records of the interviews that had already taken place, he was housed up in I think Kentucky, so I was trying to get an overview of exactly what we were dealing with.

Q. So he was pretty helpful at providing detailed information that day.

A. Yes.

Q. Okay. Now, on the second page of that same exhibit, 222, at the bottom right-hand corner, it's 51, there's a statement,

found incompetent in a hospital psychiatric for four years. Now, where did that information come from, do you recall?

A. I don't know if I'm looking at the right document. Okay. That would have more than likely come from Brandon, if I'm not mistaken. I don't know if the attorney out of -- I want to say his name is Hughes, if it came from him. I feel certain that the way things are written here it may have come from Brandon.

Q. Okay. And I didn't see anywhere in your records, you did not have any mental health expert evaluation saying that Mr. Basham was incompetent, did you?

A. No, we -- when the disqualification motion was filed we did not make any strategic decisions on behalf of Mr. Basham as far as obtaining records, because we didn't know if we were going to be the ultimate ones to stay on the case. So I did not have an opportunity -- I think you can see where my notes were ramping up to start that process of gathering documentation, but I never requested anything. Once the disqualification got filed we thought it best not to actively pursue any records at that time.

Q. Okay. And even if a professional had found him to be incompetent at that time it wouldn't necessarily mean he was incompetent when he went to trial, correct?

MR. BURKE: Objection, beyond the scope of this witness' expertise.

MS. EWING: I'll move on, your Honor.

THE COURT: All right. Withdrawn.

Q. (MS. EWING) Now, I may be wrong on this, but I believe I recall you saying that when you first spoke with Mr. Basham he seemed dazed and confused?

A. If that's what my notes say from the first meeting, and I know the first time I met with him something just didn't seem right. And I don't know -- I think I may have said dazed and confused, because I remember seeing it in one of my notes.

Q. And I believe somewhere in the notes it says that he had not been on medications since his arrest.

A. That's right.

Q. Which in your experience of working with defendants is it possible that being off of medications could cause somebody to appear dazed and confused, just in your experience with defendants?

A. I mean, yeah, anybody that's not on -- if you are being prescribed those meds, if you are not on them you are going to appear different.

Q. Now, in your notes of 12-16-02, you did say on that date that he appeared dazed and confused. And, I'm sorry, I will get you a page number and -- one second. Okay. That would be page 66.

Now, on that date on your agenda you had get medical authorizations. Do you recall whether you obtained medical

authorizations from Mr. Basham on that date?

A.   I had -- I do a PI practice, too, so I think I had medical authorizations signed.  I can't remember then if they had the HIPAA notices on them.  Since it was going to be seeking psychological I feel like I had him sign them.  But I had -- because we were still trying to figure out where he had been, but I don't believe that we ever requested them.

Q.   Okay.  But if he were dazed and confused that day you would have some concern about actually having him sign a document authorizing that, wouldn't you?

A.   For the simple medical authorizations to get the records, no, I wouldn't.  I'd have just had him sign them, honestly, had him sign them to get the records to figure out what's going on.  Because he's going to be the only one that can authorize me to get them.

Q.   Okay.  And you also testified that you gave Mr. Basham a letter to give to law enforcement officers, and I believe that was Defendant's Exhibit 4.  It was a letter basically saying don't talk to me, because you were concerned that law enforcement officers were going to come in and talk with him?

A.   Well, the purpose of the letter was they did.  And the City of Conway took the position that I had been appointed, although they were the same officers that I had done the search with, they took the position that I was only appointed on the federal case and had nothing to do with the state case.

So to clear up any misunderstanding I may have given Brandon a letter that if anybody comes in, he's not to say a word to anybody and show them that.

Q. Had he been incompetent wouldn't that be a problem, that he wouldn't know who to give this letter to or when to give it to someone?

A. I mean, I didn't make a judgment call on incompetent or competent at that time. I knew it was going to be an issue. And you got to understand I had people coming at me from so many different ways wanting to get to Brandon, and he was being housed an hour and a half away, that I wanted law enforcement to know that if it ever became an issue, they got a statement from him, that I was going to have that letter in court to show a judge or whatever that, you know, everybody knew they couldn't talk to him.

Q. Switching gears once more, you discussed in an e-mail with David Bruck the possibility of getting a court-ordered competency evaluation, didn't you?

A. That's correct.

Q. And I believe in the exhibit, defendant's exhibit yesterday and Government's Exhibit 218, that Mr. Bruck advised against having a court-ordered competency evaluation.

A. You know, my experience with a lot of court evaluations have been in the state system and they are done a lot differently in the state system. So that's why I was reaching

out to someone like Mr. Bruck.  He advised not to do it,

obviously, until we had a private interview done.

Q.  Okay.  And basically that's what Mr. Swerling ended up

doing, wasn't it?

A.  Honestly, I don't know.

Q.  Okay.  Well, if I told you that Mr. Swerling with the

assistance of a psychiatrist who saw Mr. Basham on a regular

basis numerous, numerous times during the course of

litigation, that based on this Mr. Swerling felt that Mr.

Basham was competent, would you disagree with Mr. Swerling on

that?

A.  I'm not going to disagree with Mr. Swerling.

Q.  Okay.  Thank you.

          MS. EWING:  Beg the court's indulgence.

          (There was a pause in the proceedings)

          MS. EWING:  Thank you.  The government has no further

questions.

          THE COURT:  All right.  Mr. Burke, we're a little bit

over time for our afternoon break.  Do you think you will be

short or not?

          MR. BURKE:  I only have three questions.  I think I

only have three questions.

          THE COURT:  All right.  Go ahead.

          MR. BURKE:  That way Mr. Monckton can go home.

                    REDIRECT EXAMINATION

BY MR. BURKE:

Q. Mr. Monckton, the Thanksgiving day search, the intention was to have Mr. Basham speak to law enforcement in order to assist in finding Miss Donovan's body but to do so in your presence, is that correct?

A. That's correct.

Q. And you made it clear to law enforcement that was your intention, correct?

A. That's correct.

Q. Would you agree with me as a defense attorney that it's a significantly different matter to allow your client to be interrogated by law enforcement outside of your presence?

A. Yes, I would.

MR. BURKE: Thank you very much.

THE COURT: All right. Let's take our afternoon recess. We will be in recess for 15 minutes. Who will be next?

MR. BURKE: Mr. John Castro, who is our investigator from our office, who would be I think a very short --

THE COURT: All right. We will be in recess.

(A recess transpired)

THE COURT: Please call your next witness.

MR. BURKE: Your Honor, the defendant calls John Castro.

(John Castro duly sworn)

MR. BURKE:  Your Honor, just to give the court some guidance, Mr. Castro is going to provide some very brief testimony on his investigation regarding the issue regarding the juror Cynthia Wilson.

THE COURT:  All right.  Very good.

DIRECT EXAMINATION

BY MR. BURKE:

Q.  Would you state your name for the record, please?

A.  John Castro.

Q.  And, Mr. Castro, where are you employed?

A.  With the Federal Public Defender's office in Arizona.

Q.  And what is your position at the Federal Public Defender's office in Arizona?

A.  I'm a capital habeas investigator.

Q.  How long have you been in that position?

A.  For nine years.

Q.  Are you assigned to the case of Brandon Basham?

A.  Yes, I am.

Q.  As part of your role as investigator were you asked to investigate the issues in the case concerning the juror Cynthia Wilson?

A.  Yes, I was.

Q.  And did you review the transcripts of the several hearings that Judge Anderson conducted with regard to Juror Wilson's contact with the media?

A.  Yes, I did.

Q.  Do you remember any portions of the hearing transcripts concerning Cynthia Wilson's telephone calls to other jurors?

A.  Cynthia Wilson testified that, it's not verbatim, that if she made the call to Shannon Burnett it would have been about doing some sod work.

Q.  More generally, do you recall topics about questions regarding her calling jurors in the case?

A.  Yes.

Q.  Okay.  Did she testify concerning conversations she may have had with a juror by the name of Shannon Burnett?

A.  Yes, she did.

Q.  And let me first ask you, based on your investigation and based on the record, was the juror Shannon Burnett a male or a female?

A.  The juror was a male.

Q.  What did Juror Wilson testify to at the hearings about her calls to Mr. Burnett?

A.  She testified that, again, it's not verbatim, that if she made the call to Mr. Burnett that it would have been about him doing some sod work at her house.

Q.  Now, in May of 2011 in your work on this case did you travel to Maryland and Washington, D.C. with counsel?

A.  Yes, I did.

Q.  Okay.  And while you were there did you meet a man by the

name of Greg Wilson?

A. Yes, I did.

Q. And who was Greg Wilson.

A. He is the former husband of the juror Cynthia Wilson.

Q. And where did you meet with Mr. Wilson?

A. We met in his home in Pikesville, Maryland.

Q. Did Mr. Wilson appear reluctant to talk with you?

A. No, he did not.

Q. How long did you meet with him?

A. I would say an hour and 15 minutes, maybe an hour and a half.

Q. During that hour or hour and a half meeting did you talk with Mr. Wilson about his ex-wife's testimony at the hearings in this case?

A. Yes.

Q. Okay. Did you ask him about her testimony about her possible contact with the juror Shannon Burnett?

A. Yes.

Q. And without telling the court what Mr. Wilson said, did Mr. Wilson tell you anything that led you to believe that Miss Wilson's testimony to this court might not have been accurate?

A. Yes.

Q. Did you conduct an investigation regarding the telephone number for Shannon Burnett that Miss Wilson called in 2004?

A.  Yes, I did.

Q.  Did you review the juror questionnaire completed by Mr. Burnett, the juror in this case?

A.  Yes.

Q.  Could you bring up Defendant's Exhibit 28?  Mr. Castro, are you able to see that?  We can enlarge it, possibly.

A.  That's fine.

Q.  And can you tell --

        THE COURT:  Let me -- the Wilsons split up after the trial?

        MR. BURKE:  Yes, your Honor.

        THE COURT:  Okay.  All right.  Go ahead.

Q.  (MR. BURKE) That's my understanding.  Mr. Castro, do you know when Mr. and Mrs. Wilson divorced?

A.  Yes.

Q.  Is that based on Mr. Wilson's statements to you or did you find it in records?

A.  Yes.  He's since remarried.

Q.  Do you know when they divorced?

A.  Not off the top of my head, no.  I do have that information.

Q.  Can you tell us what Defense Exhibit 28 is, please?

A.  It's the juror questionnaire for Mr. Shannon Burnett, the juror in this case that we're talking about.

Q.  And was Mr. Burnett's telephone number available on that

questionnaire?

A. Yes. He had two numbers listed, including a home telephone number.

Q. Mr. Castro, based on your review of the record in this case are either of the numbers listed for Juror Burnett numbers that were called by juror Cynthia Wilson?

A. No, they are not.

Q. And can you tell us what is an Accurint, ACCURINT, database search?

A. That is a database available to us for searching for addresses and social security numbers, dates of birth and all kinds of information following that.

Q. Is it used to locate witnesses?

A. Yes, it is, among other things.

Q. Did you do an Accurint database search for the name Shannon Burnett?

A. Yes, I did.

Q. Did you find an entry for Shannon Burnett with the telephone number that Juror Wilson in fact called?

A. Yes, I did.

Q. Okay. Did that Accurint search indicate the gender of the person named Shannon Burnett who had the phone number that Juror Wilson called?

A. Yes, it was a female who lived in Moore, south Carolina, a different town from the juror.

Q.  Okay.  So your Accurint search suggested the number Cynthia Wilson called during the trial of Mr. Basham's case belonged to a woman named Shannon Burnett?

A.  That's correct.

Q.  And juror Shannon Burnett was a male, correct?

A.  Yes, sir.

Q.  Did you travel with members of the Basham defense team to South Carolina in June 2012?

A.  Yes, I did.

Q.  Okay.  What was the purpose of the trip?

A.  We were going to be doing juror interviews.

Q.  Were you in South Carolina for several days in 2012?

A.  Yes.

THE COURT:  I got lost on the numbers.  I'm trying to follow in the transcript here.  The juror with this name that served on the jury was a male and he found a number on the Accurint, Accurint, is the name that was a female?

MR. BURKE:  That had the number that Miss Wilson testified that Miss Wilson called.  We had printouts from the trial.

THE COURT:  Where are we going with this?

MR. BURKE:  Your Honor, the purpose of this testimony is to show that there is additional evidence that Miss Wilson testified untruthfully or inaccurately to this court about her actions.

THE COURT:  You know, the whole time, just to stop and talk about lawyers, the whole time we had these juror hearings, I think we had what, nine hearings, maybe?

MR. BURKE:  Yes, your Honor.

THE COURT:  I was concerned about evidence Rule 606, I'm sure you are familiar with it, which makes a juror incompetent to testify to anything that would impeach the verdict.  And I teach a course of evidence at the law school and the case book, there's a case written by Justice O'Connor where the jurors, you know, I'm sure you read it, took drugs, drank alcohol, slept during the trial, and Justice O'Connor said, read the rule, it's not admissible.

And the rule's grounded upon the need for finality in litigation where you -- you go back and challenge the verdict and flyspeck everything a jury did you'd never have any end to litigation.  So the cases that have been decided, in addition to that one case, cite the things like premature deliberations, the foreperson of the jury bullied everybody into a guilty verdict, the jury misunderstood the beyond a reasonable doubt jury charge and thought it was a preponderance of the evidence, all of that is off the table.

So what are we going to here, premature deliberations?  Because I think that is mentioned.  Granted, it's misconduct, it could be misconduct, but if it is something the rules of evidence permit.

MR. BURKE:  Well, your Honor, you are absolutely correct that Rule 606 would prevent us from going into that and I'm not attempting to do that.  And I don't want to overstate the extent of the evidence that we have, but it is something I felt was important.

THE COURT:  I remember being shocked at the number of calls, nighttime calls.

MR. BURKE:  Right.

THE COURT:  But, as I said at the time, I have had cases where jurors form a romantic relationship during the trial.  Not this one, but I mean -- and at some point I felt like we had to respect the privacy of the jurors, especially, especially when whatever they might say could be incompetent evidence under Rule 606.  But, anyway, with that observation go ahead.  I'm not trying to cut you off.  Go ahead.

MR. BURKE:  And I will concede, your Honor, this is a little bit confusing, and I will also concede that this evidence has I think limited evidentiary weight but is something we would like the court to consider with regard to our issue.

THE COURT:  Go ahead.

MR. BURKE:  And I will avow that we do not intend to go into Rule 606(b) evidence, nor do we intend to go to anything personal with regard to the jurors.  Our concern is, of course, if there was information provided to one juror from

another juror from an outside source, and our greatest concern was were any of the jurors informed prior to their deliberations that Mr. Fulks had in fact been sentenced to death.  That is the focus.

THE COURT:  All right.

BY MR. BURKE:

Q.  When you came to --

THE COURT:  Let me stop right there.  I think, I might be wrong, it's been a long time, there was a big debate about whether the jury should be told in this case what happened to Mr. Fulks.  And it was a two-edged sword.  I mean, if you represent the defendant, well, you could say, well, if this jury knows that Mr. Fulks has already been given the death penalty then this jury will be relieved to know that the real culprit has been caught and punished.  Or you could say well, since they acted together and were equally culpable, if Mr. Fulks got the death penalty that means Mr. Basham should probably get it, as well.

So nobody knew how that might play out with the jury. And I think in the final analysis we just reached a consensus to keep that from the jury.  And y'all probably know more about it than I do because you've read the transcript more recently than I have.  But did the defense lawyers ask me to admit that, to admit that to the jury and I declined or was it just agreed to?

MR. BURKE: Your Honor, I honestly can't give you an answer to that right now, but I can check and I can let you know. I honestly don't recall.

THE COURT: I remember it was discussed but I don't remember how it was resolved. All right, go ahead.

MR. BURKE: I just -- you are the fact finder here, Judge, and I want to make sure we're making -- so you understand the point we're trying to make, which is that we believe, and we presented some exhibits to suggest that Miss Wilson was not truthful to your Honor. And that I know you held her in contempt, and I know that you asked the jurors whether any of them had had premature deliberations, and those were the exact words that you asked. We're simply trying to create a record for your Honor to consider whether further, more detailed conversations with the jurors would have been appropriate.

THE COURT: All right. Well, the attorneys pushed me, Mr. Swerling and Mr. Harris pushed me hard to go further. And at some point I just said we have had nine hearings, we brought all the jurors back at least once, some of them several times. So go ahead.

MR. BURKE: Okay. Well, your Honor, I will simply ask Mr. Castro, did you meet, when you were in South Carolina, with a juror, with a woman -- with a woman named Shannon Burnett?

THE WITNESS:  Yes, I did.

Q.   (MR. BURKE) And was she a juror in this case?

A.  No, she was not.

Q.  Did you meet with the male who was a juror in this case, Mr. Burnett?

A.  Yes, I did.

Q.  And without telling me his response, did you ask him whether he had been contacted by a Juror Wilson?

A.  Yes.

Q.  You did ask him that?

A.  Yes.

Q.  Without telling me his response, telling us his response, did you ask him if he had ever had the following phone number, (864)587-2341?

A.  Yes.

Q.  Okay.  And after meeting with Mr. Burnett did you prepare a declaration for his signature?

A.  Yes, I did.

Q.  Did you return the next day in June of 2012 for him to sign it?

A.  Yes.

Q.  And were you successful?

A.  No.

Q.  What did you do with the declaration?

A.  We got back to the office maybe four days later and I

wrote a letter and mailed it out to him.

Q. When you met with jurors in 2012 did you carry with you a piece of paper that I had written that I asked everyone involved in the investigation to carry with them? Do you recall that?

A. Yes.

Q. Did that sheet of paper inform the jurors who we were, who we represented, and that they did not have to speak with us?

A. That's correct.

Q. Did it also say if they had any questions that they could contact Judge Anderson?

A. Yes.

Q. Okay. And you would have given that to Mr. Burnett?

A. We gave them to all the jurors, yes.

Q. When you met with the juror who was -- with the person who was not the juror who was a woman who was Shannon Burnett, did she talk with you about her knowledge of this case?

A. Yes.

Q. Did she have any knowledge of this case?

A. No.

Q. Okay. Did you ask her about her phone number?

A. Yes.

Q. Did she prepare -- did you prepare a declaration for her signature?

A. We actually prepared it together. We were present with

her.

Q. Okay. I'd like you to take a look at Exhibit 21. It's been admitted as Defense Exhibit 21. Mr. Castro, is that --

A. Can you enlarge it a little bit?

Q. Okay.

A. Thank you.

Q. Is that the declaration you obtained from the juror -- the non-juror Shannon Burnett?

A. Yes.

Q. And that states that she had in 2003 the telephone number listed there, which is, in fact, the number that Juror Wilson called during Mr. Basham's trial, correct?

A. That's correct.

Q. Okay. How many times did Miss Wilson call this number that belonged to the female Shannon Burnett?

A. Three occasions.

Q. Three occasions?

A. Yes.

Q. And how long were those phone calls?

A. One was very short, the other two were eight minutes and 11 minutes, or somewhere around that.

MR. BURKE: Okay. I have no further questions, your Honor.

THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MR. WITHERSPOON:

Q.  Good afternoon, Mr. Castro.

A.  Good afternoon.

Q.  My name is William Witherspoon with the U.S. Attorney's Office.  I want to get little bit of background information from you.  You have been with the Federal Public Defender for nine years, correct?

A.  Yes, sir.

Q.  What did do you before that?

A.  I worked with the Maricopa County Public Defender's Office for a little over ten years.

Q.  And before that?

A.  Was with the Office of Special Investigations, state of Arizona, and before that I was a Chicago policeman for 13 years.

Q.  So you've had a lot of police experience.

A.  Yes, sir.

Q.  And as part of that experience during your training -- you had a lot of training, too, haven't you?

A.  Yes, sir.

Q.  And part of that training is, as a police officer or an investigator, to be thorough, isn't it?

A.  Yes, sir.

Q.  Now, you provided an affidavit in this case, didn't you?

A.  Yes, I did.

Q.   Do you remember it?

A.   Yes.

Q.   Would you like to see it?

A.   Yes.

Q.   And then we will talk about it.  This is Exhibit number 6 to the 2255 filed by the defendant.

A.   Thank you.

Q.   Now, according to your affidavit, I'm looking at paragraph three, you intimate that Miss Wilson lied on her jury questionnaire, didn't you?

A.   Yes, sir.

Q.   And you base that on some records in the Spartanburg Clerk of Court's office, correct?

A.   Yes.

Q.   Pull up Government Exhibit number 185.  Is that one of the documents you talk about there, the $650.18 from the South Carolina Department of Revenue?

A.   I don't have them with me, but that looks correct, yes. That was among the documents.

Q.   That was one of them.  Do you know what this document references?

A.   It's a tax lien, I believe.

Q.   It's a tax lien?

A.   Yes.

Q.   Do you know how that tax lien is filed in South Carolina?

A.   It's through the court, I believe.   There's a -- I know there was a judgment issued by the court.

Q.   There's a judgment issued by the court.   But does that mean that someone has sued or been sued?

A.   No, not necessarily.

Q.   When Miss Wilson said I have not been sued or been -- sued or been sued, based upon this she didn't lie, did she?

MR. BURKE:   Objection, calls for a legal conclusion. Mr. Castro is not a lawyer and cannot --

MR. WITHERSPOON:   He said that's the judgment there. He can tell whether or not she lied or didn't lie because she had been sued.

MR. BURKE:   There is a judgment.

THE COURT:   Well, we can argue it.   I understand the point.   I mean, I don't think his answer is going to help me one way or another.   I'm trying to remember -- what type of a tax lien was it?

MR. WITHERSPOON:   Judge, we're going to have a witness tomorrow, possibly, who will lay all this out for us.

THE COURT:   All right.

BY MR. WITHERSPOON:

Q.   Pull up Government Exhibit number 184.   This also is in your paragraph number three.   This is a tax lien for $1,761.69, correct?

A.   That's correct.

Q.  When you got that document did you verify what that document was?

A.  Only in the sense that it followed up with the other document which I pulled from the South Carolina court index. That's where I got the original information from, which indicated a judgment.

Q.  Did you call the Department of Revenue, see what that document was?

A.  I called several days -- well, it's been a couple of weeks ago.

Q.  Did they tell you -- so you only called a couple of weeks ago?

A.  Right.

Q.  You did an affidavit back in 2011.

A.  That's correct.

Q.  So when you saw that you didn't follow up to figure out what that was.

A.  I just saw this recently, too.  I, like I said, I saw the original document that showed the index from the state of South Carolina.  This document I saw recently.

Q.  So you didn't go to the records to figure out what the documents, tax liens were, you just said it was a tax lien and so she must not been truthful?

A.  That's correct.  I sent her this document later on.

Q.  You would agree with me that that's not being thorough as

an investigator, don't you?

A. My understanding of what I was looking at with the South Carolina index judgment was that it was some kind of filing, civil filing in the South Carolina courts, and I was under the assumption she would need to report that on the jury questionnaire.

Q. But as an investigator with all this experience you made assumptions and you didn't follow through, correct?

A. That would be correct.

Q. Look at paragraph four. You state there that Miss Wilson lied or was not truthful when she stated that she had been working as a nurse for four years when actually she only had been licensed for two years and seven months, correct?

A. That's correct.

Q. Did you follow up and figure out if she had worked as a nurse without being licensed?

A. That was based on the licensing itself. That's all that statement means.

Q. So when she said I have been working as a nurse for four years, that may not be untruthful, it just means she hadn't had a license for four years, is that correct?

A. That would be correct.

Q. But you didn't follow up to figure out if this two years and seven months could have also added on time as a student nurse or training as a nurse, did you?

A.  I believe I could not find anything on that information, as I recall.

Q.  You couldn't find it or you didn't find it?

A.  I didn't find it.

Q.  So you did look?

A.  Yes, my recollection.

Q.  So the simple fact that she said that she had been a nurse for four years, that indicates that she was untruthful on her questionnaire, did it?

A.  Just based on the issuance of a license, that's what I went by.

Q.  But that's not what you said in --

A.  Correct.  I understand.

Q.  Mr. Basham feels she lied because she has only been a nurse for two years and seven months, and that's not true, is it, Mr. Castro?

A.  That's correct.

Q.  Look at paragraph six.

MR. BURKE:  Your Honor, I'm sorry, I object.  He's asking Mr. Castro to assume facts not in evidence.  We don't -- he's making an assumption she might have worked when she was not licensed.  Does he have in evidence of that?

MR. WITHERSPOON:  Judge, I think the issue is did he do any investigation and the answer is no.

THE COURT:  You said you had more testimony coming

from that tax lien.  Do you have more testimony coming about the --

MR. WITHERSPOON:  We do not.  We do not.

THE COURT:  As long as you just ask him about whether his investigation was thorough enough, I think it's a proper question.  I understand it might be speculation as to why the years were different, but I'll allow that question.

BY MR. WITHERSPOON:

Q.  Look at paragraph six in your affidavit.  You indicated that Miss Wilson was untruthful on April 28, 2008 when she was asked had she had any disciplinary action by a nursing board, correct?

A.  That's correct.

Q.  Do you know when this trial took place, sir?

A.  2004.

Q.  And do you know when the brief, the appeal briefs were filed in this case?

A.  Yes.

Q.  When?

A.  Well, no, I don't, actually.  I couldn't.

Q.  You wouldn't disagree it was filed in April of 2008, right?

A.  That sounds about right.

Q.  So the defendant and the court would not have been aware of something that happened on April 28, 2008, would they?

A.   That's correct.

MR. BURKE:  I'm not even sure I understand the question.  Can you say that again?

Q.   Certainly.  The brief in this case was filed when, Mr. Castro?  May 2008, wasn't it?

A.   That's what you said.

Q.   The appeal brief, right, correct?

A.   Yes.

Q.   And according to your paragraph six, Miss Wilson may have told a falsehood on April of 2008, correct?

A.   That's correct.

Q.   At that point the lawyers for Mr. Basham would not have been aware of that application, would they?

MR. BURKE:  Objection, your Honor.  This claim against -- regarding Juror Wilson is a claim of newly discovered evidence of her untruthfulness before the court in a hearing.  It's not a question of their ineffectiveness on that point.

THE COURT:  All right.

MR. WITHERSPOON:  Judge, April 2008 there was nothing before the court.  She had not been untruthful at least as far as that incident, because there was nothing here before the court.  It was in the appellate section.

THE COURT:  It was what?

MR. WITHERSPOON:  In the appellate section.  The

brief was filed May 2008.

THE COURT:  What was she sanctioned for?  What was she written up for?

MR. BURKE:  Your Honor, could I address that?

THE COURT:  Yes, sir.

MR. BURKE:  This goes to Miss Wilson's untruthfulness on her nursing license renewal.  When she was asked if she had -- I don't have the exact language.  After, your Honor, your Honor, after her contempt proceedings in your case when she answered no if she had any prior disciplinary actions before any nursing board in any jurisdiction.

THE COURT:  And my sanction was a disciplinary action.

MS. STONE:  I'm sorry, your Honor.  I worked on this claim a little bit more so I may be able to answer it. Miss Wilson was asked initially by the nursing board on a nursing license renewal whether or not she had ever been -- had any convictions.  She lied, they found that she lied about the contempt conviction by your Honor in this court, and she was disciplined for that.  She then subsequently lied again, and that's what the paragraph six refers to, about lying about that contempt conviction.  Does that -- it's very convoluted.

THE COURT:  It's a two-step series of lies, in other words.

MS. STONE:  And that's --

THE COURT:  But --

MS. STONE:  That's the point of our newly discovered evidence claim is this woman continued to lie and --

THE COURT:  Well, I'm just struggling with this, because we just got the rule on finality in inquiring into a jury verdict, if we went out and flyspecked every juror in every case to see if they had committed a lie later on in life to go back and impeach the verdict there would never be an end to litigation.

MR. BURKE:  Your Honor, not every -- you must agree with us that Miss Wilson is not every juror and --

THE COURT:  It's clear she was not a truthful person to me.  I mean, she lied right there in that chair several times.  So the fact that she was a perjurer has been well established.  I don't know that this really adds anything more to it.

MR. BURKE:  It's simply further evidence that we -- I understand she's not just any juror, she's the principal juror at the center of the misconduct that occurred.  But I understand your point, but --

THE COURT:  Mr. Witherspoon, anything else on this particular point?

MR. WITHERSPOON:  No, Judge.  If I can go into other points, exactly the same way.

THE COURT:  Go ahead.

BY MR. WITHERSPOON:

Q.  If you look at paragraph seven of your affidavit, you indicated that she was not truthful in April of 2010, correct?

A.  That's correct.

Q.  And, again, this was over in May -- at least in May of 2008 is when the brief was written, correct?

A.  That's correct.

Q.  Now look at paragraph eight.  In your affidavit you indicate that Miss Wilson was untruthful when she said that she has never been convicted under any federal law.  Correct?

A.  That's correct.

Q.  What federal law was she convicted of?

A.  This wording was from the document where she was disciplined.  I got this wording from their document.

Q.  What --

A.  They disciplined her for these -- for that very reason.

Q.  What federal law was she convicted of?

A.  Again, I'm reading -- taking this from their document.

Q.  So you didn't --

A.  The document's in evidence.  That's all I have.

Q.  So you didn't investigate, determine if that was a true statement or not?

A.  She was held in contempt and -- that's what they knew so they --

Q.  So being held in contempt is not a violation of federal

law, is it?

A.  What I'm saying is --

MR. BURKE:  Objection.

THE WITNESS:  This is dealing with what the report says.  I'm going -- I wrote what the report said in my declaration.

Q.  (MR. WITHERSPOON) But you never went further to investigate to make sure that was true, did you?

A.  I investigated as far as getting the document and reading it in the document.  Other than that, no.

THE COURT:  Did you have an objection?

MR. BURKE:  Your Honor, I have an objection to questions of Mr. Castro about criminal contempt being a -- I believe he answered the questions.  We withdraw the objection.

THE COURT:  Go ahead.

Q.  Now, let's talk about these phone calls.  In Mrs. Wilson's testimony before the court isn't it true she says I'm not sure I called Shannon Burnett?

A.  I believe the word was if I called him it would have been about --

Q.  If I called him it would have been about sod, not that I did call him, correct?

A.  I said that when I testified.  I said if I called him.

Q.  So the fact that she called another Shannon Burnett at this telephone number indicates nothing, does it?

A.  It indicates she was trying to contact Shannon Burnett.

Q.  But other than that it indicates nothing else.  Because she said if I called him it would have been about sod.  She tried to call a Shannon Burnett, it wasn't the juror, correct?

A.  Correct.

Q.  It was another Shannon Burnett, correct?

A.  Correct.

Q.  And there's only three phone calls, correct?

A.  That's correct.

Q.  And Miss Burnett said I never talked to her, correct?

A.  The female Shannon, yes.

Q.  The female Shannon never -- said I never talked to her, correct?

A.  Correct.

Q.  So she -- there is no indication she was false, that she gave -- testified falsely, is there?

A.  Other than the fact she called someone other than the juror Shannon Burnett, no.

Q.  But she never said I called someone other than the juror, she said if I called Shannon Burnett it would have been about sod.

A.  Yes, sir.

Q.  So she didn't testify falsely, did she?

        MR. BURKE:  Objection.  Calls for a legal conclusion.

        THE COURT:  Overruled.  I think it's a fair question.

Q. She didn't testify falsely, did she?

A. That would be correct, I guess.

Q. So the affidavit you supplied in this 2255 in a declaration from Mrs. Burnett, no indication that Mrs. Wilson was untruthful to this court during any time of the testimony when the judge was inquiring into the jury, correct?

A. Related to the trial, no, sir.

MR. WITHERSPOON: Thank you.

THE WITNESS: Okay.

THE COURT: All right.

MR. WITHERSPOON: Let me get that back from you.

THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. BURKE:

Q. Mr. Castro, was Cynthia Wilson disciplined by the nursing board for making false statements on a renewal application?

A. Yes, she was.

Q. There's no question about that, is there?

A. No, sir.

Q. And the documents support that?

A. Yes.

Q. Did Cynthia Wilson make three phone calls to a person by the name of Shannon L. Burnett?

A. Yes.

Q. During the trial of Mr. Basham?

A.   Yes, she did.

Q.   No question about that, either, is there?

A.   No, sir.

Q.   Okay.  Is there any question about the fact that Miss -- Miss Wilson was calling a Shannon Burnett by a -- with a phone number totally different from the numbers that belong to the juror Shannon Burnett?

A.   Yes.

Q.   Can you take a look at the affidavit, the declaration in Exhibit 21 that was prepared by Miss Burnett in this case, prepared by you and signed by Miss Burnett.  And could you look, please, Mr. Castro, at paragraph five of that declaration by non-juror Shannon Burnett.  And can you read the dates of the phone calls that Cynthia Wilson made to the non-juror Cynthia Burnett -- I mean Shannon Burnett?

A.   She wrote, I do not recall receiving phone calls on the dates of October 15, 18, or 29th of 2004 from a Cynthia Wilson or anyone regarding the Basham trial.

Q.   And does the record in this case indicate that Miss Wilson called that number on October 15, October 18, and October 29?

A.   Yes.

Q.   Of 2004?

A.   Yes.

Q.   Do you know, was that during the penalty phase of Mr. Basham's trial?

A. I believe, yes.

MR. BURKE: No further questions.

MR. WITHERSPOON: Just one follow up, Judge. If you could leave that up. If you could read paragraph six, please.

THE WITNESS: I spoke with my husband Joey Burnett and he does not recall a Cynthia Wilson or receiving any calls on the previously mentioned dates.

MR. WITHERSPOON: Thank you.

MR. BURKE: Okay.

THE COURT: I don't have any questions. I mean, the ghost of Cynthia Wilson still hovers over this trial. I mean, what -- to begin with, what are the odds the sheriff would be convicted for public corruption, the investigator hired by the defense lawyer we find out he's a sex pervert and had been disciplined, and now we find out Miss Wilson called somebody with the same name as a juror three times, two of the calls were eight minutes and 11 minutes, but the person who received those calls doesn't remember the calls.

MR. DALEY: If you wanted to hear argument about this and get it over with right now.

THE COURT: I want to make sure I'm not missing something. It's a big question mark.

MR. BURKE: I can say in one sentence, your Honor, we shouldn't execute someone when there's a big question about the fairness of his trial.

THE COURT: We will hear argument later. I just want to make sure I'm understanding the testimony.

MR. DALEY: The testimony is they have evidence she lied three or four years later on licensing board applications, they have evidence that perhaps she's trying to call juror Shannon Burnett and she instead calls the non-juror Shannon Burnett, and may -- or may have talked to the non-juror Shannon Burnett. And her testimony before you was I don't remember calling juror Shannon Burnett, but if I did I called about sod. And we have a declaration from her husband who said, I do all the yard work, actually her ex-husband, and there would have been no reason for me -- for her to have called somebody about sod. Well, I happen to do the yard work in my house and I don't do the sod. I mean, there's -- but anyway, I don't mean to --

THE COURT: We will argue it later. I just want to be sure I understand. There's sort of a question mark about the call. All right.

MR. BURKE: Thank you.

THE COURT: Anything further? Thank you, sir.

THE WITNESS: Thank you, your Honor.

THE COURT: It's's little bit after 5:00. Do you have a witness we can start on?

MS. STONE: We do, your Honor. Mr. Greg Harris is here and we can go ahead and start with him.

THE COURT:  Go ahead and start with him.

(Greg Harris duly sworn)

MS. STONE:  Your Honor, as a preliminary matter, I just spoke to the government about this but I want to let you and Mr. Harris know, to try and speed things along, I had originally intended to go through larger sections of transcripts.  I am going to briefly summarize in my question what those transcripts are.  If at any time the government or Mr. Harris or the court would like to see that actual transcript we do have them loaded and we can bring up the pages.  But to try and speed things along I'm not --

THE COURT:  Let me emphasize we're a little bit behind schedule but I'm not rushing anybody.  We can take all the time necessary to hear this case.

MS. STONE:  I think we can get everything -- I want everybody to know, I don't want to mischaracterize anything and we have the transcripts if people need to see them.

THE COURT:  Very good.

MS. STONE:  Thank you.

DIRECT EXAMINATION

BY MS. STONE:

Q.  Good afternoon, Mr. Harris.

A.  Good afternoon.

Q.  Thank you for being here and being here yesterday and being willing to miss your daughter's tennis match.  I know

it's been a bit of an ordeal, so thank you for your patience.

A.  Not a problem.  I actually got to go, thank you very much.

Q.  Good.  Can you give us a little bit of information about your background, where you went to law school?

A.  My background, I went to Irmo High School here in the Columbia area.  I attended The Citadel from 1979 through 1983. I immediately entered into the University of South Carolina School of Law and graduated 1986.

Q.  And what did you do when you graduated?

A.  After graduation I worked for a circuit court judge, Marion Kinon, for a year.  After that I went into what we have here, the solicitor's office, which is the district attorney's office where you are, and prosecuted any number of crimes. The end of my tenure there I was prosecuting violent crimes.

After that I was employed at the United States Attorney's Office here in the District of South Carolina.  I was there for approximately four years, where I served as a deputy chief of the criminal division under United States Attorney Bart Daniel.

Q.  And did you go into private practice at some point?

A.  Yes, I did.  Sometime I think March, it was March 3, 1993 I went to private practice.

Q.  And did you share office space with Jack Swerling?

A.  Yes, I did.

Q.  And how long did you do that for?

A.  I was sharing office space with Jack Swerling until five years ago in September, so I think it would have been 14 years.

Q.  You were sharing office space with Mr. Swerling at the time you were appointed on Mr. Basham's case, is that correct?

A.  That is correct.

Q.  And you were appointed in April of 2003?

A.  That's correct.

Q.  And is it correct that you were not the original lawyers appointed on Mr. Basham's case?

A.  Yes, it is.

Q.  Can you explain the circumstances of your appointment a little bit?

A.  Well, obviously, I believe Jack Swerling is on the top of everybody's list when it comes to appointing someone to a death penalty case.  I recall that Jack would have been contacted first.  I was contacted sometime thereafter, I can not remember by whom.  I know that I spoke with a number of death lawyers in the state.  I spoke with John Delgado, I spoke with Bill Nettles, I spoke with David Bruck.  I remember David Bruck called me and asked me would I be willing to be involved in the case.  And at some point I obviously spoke with Jack, and I believe that I was requested -- the court asked me to be involved in the case.

Q.  Thank you.  And would you agree with the characterization

that the Basham case was a massive undertaking?

A.  Oh, absolutely.

Q.  Can you expand on that little bit?  Can you describe maybe the scope of the case?

A.  It involved many states, it involved many witnesses.  And when I say many states, North Carolina, South Carolina, West Virginia, Kentucky, Indiana, Massachusetts.  I don't think we ever got to Florida, I don't think that we ever went into Tennessee.  But the states that I mentioned involved all those states and a lot of time in each of those states, with the exception of Massachusetts, where I think that we only had one appointment.

In terms of witnesses, it was probably one of the largest cases that I've ever seen anyone be involved in, much less myself having been involved in.  And certainly in terms of witnesses and amount of discovery that was created by not only the government but also by the defense team, it was one of the largest cases I've ever seen anyone involved in.  So when you say -- your adjective was accurate in terms of describing this case.

Q.  And can you talk a little bit about the division of labor between you and Mr. Swerling to try and tackle this massive undertaking?

A.  Jack was in charge, and I think it was clear from the very beginning, as it should have been, that in terms of division

of labor I certainly had my own ideas about how things should be divided and about who should be doing what.  But at the end of the day I was -- you know, Jack and I have a very good relationship, so I'm not here to say I deferred to Jack on anything, but at end of the day I respected Jack's opinion enough, his expertise enough, and his involvement in other matters such as this enough to most of the time that if Jack had an opinion about something that's how it was going to be done, including the division of labor.

Q.  And were there also steps taken to keep track of the information gathered or things that had been done?  Specifically, was there a policy to write a memo for everything in this case?

A.  You know, I mean, Jack and I wanted memos when someone was interviewed, because Jack and I wanted to know as soon as someone was interviewed, or as close as possible to when they were interviewed, what they had to say about a particular topic or subject, no matter what it was.  Whether it was a doctor at Rivendell or whether it was a nurse at Cardinal, or whether it was a caregiver at one of the facilities that Brandon had visited when he was 12.  You know, obviously we wanted to stay on top of the interviews, we wanted to stay -- to know what everybody was saying and what information that they could give to us.  So, yes, in terms of keeping a memo, we wanted memos if we weren't involved in the interview so we

would know what people were saying.

Q. And who was responsible for signing the vouchers in this case?

A. Jack.

Q. And who put the Basham team together?

A. I think it was a collaborative effort in many respects. I think, again, as the person most knowledgeable, the leader in this case, I think that certainly it could be fairly said that Jack had a very large role in putting that team together.

Q. And at this point my understanding is that Mr. Basham and Mr. Fulks were the first federal death penalty case in South Carolina, is that correct, to your knowledge?

A. Certainly in the last 50 to 70 years. I cannot speak to what happened in the '40s, the '30s, the '20s, but certainly in my lifetime, yes, that is correct.

Q. Did you have any state experience in death penalty cases at that point?

A. I did not.

Q. I want to go back to the team, and I want to focus on two team members and ask you some questions about Paige Tarr and then Carlisle McNair. First Paige Tarr. Would you agree that Paige Tarr fairly quickly built a relationship with Brandon Basham and some of the folks in Kentucky?

A. Yes, she did.

Q. And was she the lead litigation specialist?

A.   Initially she was.

Q.   And is it fair to say she was responsible for a fairly large number of interviews?

A.   You mean -- if you are looking at it now from when she started to where -- when she ended in her body of work, whether she participated in a large number of interviews, is that the question?

Q.   Whether she was responsible for finding a large number of individuals or taking a large chunk of that litigation investigation.

A.   Absolutely, I agree with that.

Q.   Was there an issue at some point in the case with Paige Tarr getting memos done in a timely manner?

A.   Yes.

Q.   And did Mr. Swerling have to speak with her about that issue?

A.   Yes.

Q.   At some point was Lisa Kimbrough brought in to replace some of Miss Tarr's hours?

A.   Yes, she was.

Q.   And did Miss Kimbrough have the same relationship with Mr. Basham as Miss Tarr did?

A.   I really can't speak to that.  I would guess yes, no, she wouldn't have, because I know Miss Tarr had really spent a good number of hours with Brandon's family and with Brandon.

So probably not.

Q. Okay. And I want to move on now to Mr. McNair. Who hired Mr. McNair? Who found him as a possible person --

A. Jack.

Q. And did you know Mr. McNair from his work when he was a law enforcement officer?

A. You know, I thought about that. I think someone asked me that question, you know, when we were preparing for this, maybe not that specific question, but I have given that some thought. I do not think that I ever had a case with Carlisle McNair before he worked with us in Basham.

Q. Okay. And we have had a chance to speak prior to this hearing. Is it a fair characterization of your words to say that you believe Mr. McNair was good at finding folks?

A. Yes.

Q. And folks, not Fulks. I apologize.

A. That's -- he was good at finding folks, yes.

Q. And his purpose on the team was to be a fact investigator, is that correct?

A. I mean, I would -- I don't want to say that was his singular purpose, but that was his role on the team was to -- that was one of his roles, yes.

Q. Okay. But I think, going into that thought, he also did interviews of witnesses who were potential mitigation witnesses?

**JA 3998**

A.  Correct.

Q.  Do you know if Mr. McNair had any training in mitigation work?

A.  I do not.

Q.  Another positive that's been said about Mr. McNair is he was good with interviewing law enforcement officers.  Would you agree with that?

A.  Yes.

Q.  Did Mr. McNair still view himself as a law enforcement officer?

A.  Did he?

Q.  Yes.

A.  I do not believe that he did.

Q.  Susie, can you bring up Exhibit 44?  And can -- the text part.  Thank you.  And just so you know, Mr. Harris, all of these have already been admitted in evidence by stipulation.  So this is an e-mail from Mr. McNair to the team.  Do you see there, once a cop always a cop?

A.  I see that, and that is Carlisle McNair.  When you said did he believe himself to be a cop, I want to make sure I'm clear.  He's a cop at heart.  I mean, you didn't have to show me this e-mail, my answer to you had you said, you know, did he believe to be a cop in the sense that he is always a cop, is he a cop at heart, I would have said yes.  Once a cop always a cop, I think that's probably the best description of

Mr. McNair, yes.

Q. So you think his description of himself there is accurate with your interactions with him?

A. Yes, that is correct.

Q. You are now aware Mr. McNair resigned from his job as a law enforcement officer after some issues, is that correct?

A. Yes.

Q. Do you recall what some of those reasons were?

A. It's a long time ago, I have not looked at those reports, but I think they had something to do with the inappropriate contact with an informant. It may have had something to do with inappropriate contact with young -- a young female, but --

Q. Do you recall?

A. It might have also had something to do with, and I don't want to say evidence tampering, but it might have had to do with a report or something that he pulled from a file that wasn't provided to defense during discovery.

Q. Do you recall anything about an obscene videotape, being disciplined for showing staff an obscene videotape?

A. No, I don't know that.

Q. You don't recall that. If it was in -- Susie, can you bring up 2255 exhibit -- I'm sorry, reply Exhibit 15. I'm sorry, 17. I apologize.

A. I don't deny that this document was provided to me. I'm

just telling you I don't recall it today as I sit here.  But if you tell me that that was part of the investigative summary that was provided to us in discovery and that it was part of it, I accept that.

Q.  Okay.  One of the issues that shows up in the e-mail between McNair and the team is that Mr. McNair was trying to run down a sex tape of Veronica Evans.  Who was Veronica Evans?

A.  Veronica Evans was the girlfriend, lover slash part-time wife, maybe, of Chadrick Fulks.  I don't know that they ever got married but they had a relationship.

Q.  Do you recall her profession?

A.  Her profession?  I think she may have had a number of professions.  She may have at some time been a dancer, if that's the question.

Q.  Was he seeking out --  was Mr. McNair seeking out this sex tape at your direction?

A.  No.

Q.  Susie, can you bring up reply Exhibit 20?  And I apologize, there's a lot of text here.  If you look close to the bottom you can see that there's a sentence, asked if he had any videos of Veronica.  He advised he did, which he gave to us.  This particular video shows Veronica performing oral sex on Jones.  Did you ever see that video?

A.  Have not seen it.

Q.   Is it fair to say that was not an important part of the case, mitigation case for Brandon Basham, from your point of view?

A.   You know, whether it's important or not, I don't know that I would have ever used it in a trial because she was never going to testify in our trial against us.  It was, no, it was of no importance to me.  It is -- as sit here today.

Q.   Another theme in Mr. McNair's e-mails was considerable references to Brandon Basham's homosexual friends.  Do you recall that at all?

A.   I really -- you know, again, you mention -- we talked about it the other day.  I have no recollection that there was an inordinate amount of references to Mr. Basham's orientation.

Q.   If the e-mail showed that, you wouldn't dispute it.

A.   No.  No, ma'am.  I just don't remember it.

Q.   Was Mr. Basham's sexual orientation a theme of the case, to your knowledge?

A.   No.

Q.   Was Mr. Basham gay, to your knowledge?

A.   I have no idea.

Q.   Okay.  And, again, if those questions were asked by Mr. McNair were those at your direction?

A.   No.

Q.   And back to the issue with the discovery that you received

from the government about Mr. McNair's termination.  Did you know about those issues with Mr. McNair prior to receiving that discovery?

A.  No, ma'am.

Q.  And I think you already mentioned this, but do you recall that some of the issues with his firing may have been issues with dishonesty regarding disclosure?

A.  I don't know that I'd use the word dishonesty, because I can't remember the specifics.  I don't think it was anything -- no, I wouldn't use the word dishonesty.  I remember something about -- again, this is me remembering something from eight years ago, I do remember something about a piece of evidence that was in evidence when -- when discovery needed to be turned over to the defendant and it was later determined he may have had a role in it being taken out of the file or some way secreted out of the police department.

Q.  And one last question about Mr. McNair.  Have you hired him since?

A.  I may have been involved with cases with Jack after Brandon's case where Carlisle worked on the case.  I know, I know that I have hired Carolyn Graham in Carlisle's firm.  I cannot tell you that I've had any direct contact with Carlisle, outside of something I may have done with Jack.

Q.  Okay.  So cases where it was at your direction you have not hired Mr. McNair, his firm --

A.  I can't recall a time where I have called Carlisle up since this case and asked him to work on one of my cases.

Q.  Now I want to move on to some questions about the Jackson v. Denno hearing in this case.  At that point you all had been on this case just under a year, does that sound accurate?

A.  Sounds right.

Q.  And you had several statements to deal with in the Jackson v. Denno hearing, correct?

A.  Yes, ma'am.

Q.  Today I just want to focus in on the statements with Sheriff Hewitt.  At one point later in the case the government characterized that Hewitt statement, not the government here, the government at trial, as one of the most damaging.  Would you agree with that assessment?  And let me -- I'm referring specifically to the purse strap statement.

A.  Oh, I would agree that was an impactful statement.

Q.  And at the Jackson v. Denno hearing did Mr. Hewitt testify?

A.  Yes, he did.

Q.  And his testimony at that point, would you agree that it was ambiguous as to who used the strap?

A.  Yes.

Q.  Specifically, his language was Mr. Basham showed how the strap was used.

Jumping ahead, you sat through much of the Chad Fulks

trial, correct?

A.  Fact witnesses.

Q.  Fact witnesses.  Were you present when the government discussed how -- who used the purse strap at the Chad Fulks trial?

A.  I don't think that I was.  I think I had access to the transcript so I'm aware of what references were made about that.  But no, I can't say that I was at the trial for that portion.

Q.  So through the transcript you were aware that the government characterized that Chad Fulks used the strap to strangle Alice Donovan.  And that's a yes, for the record?

A.  Yes.

Q.  Thank you.  What was your and Mr. Swerling's strategy at the Jackson v. Denno hearing?

A.  The strategy was to elicit as much information as we could from the officers to prove that Brandon Basham, from the moment that he was fished out of the river by law enforcement officers, began to attempt to assist law enforcement in the location of the body of Alice Donovan.

Q.  Was one of the strategies also to nail down witnesses on their statements?

A.  That's part of it, yes, ma'am.

Q.  And did you all call any witnesses at that hearing?

A.  I don't think that we did.

Q.  At this point, at the point of the Jackson v. Denno hearing you had several medical records on Mr. Basham, is that correct?

A.  Yes, ma'am.

Q.  And I realize it's been a long time, but if you had to estimate, how many placements and facilities had Mr. Basham been in as a juvenile?

A.  I have reviewed -- you know, I reviewed something I said in court, and is it 50 to 60 facilities that he had been shuffled between through his young life.  Mr. Daley?

MR. DALEY:  Excuse me, your Honor.  I just wasn't sure.  Is she asking how many records he had in his possession at the time of the Jackson v. Denno hearing or when they finally got to trial?

MS. STONE:  I apologize.  I'm asking at Jackson v. Denno.

THE WITNESS:  Oh, I don't recall at that time.  I'm sorry.

Q.  But eight, nine months in you all had gathered a substantial amount of records.

A.  Yes, we would have had a substantial amount of records by that time.

Q.  Did you know at that point that Mr. Basham had had several mental health evaluations done at some of these facilities?

A.  I can't tell you whether I did or did not know at that

time.

Q. Had you hired mental health experts at this point?

A. Yes.

Q. But a decision was made -- is it fair to say that a decision was made not to challenge the statements under any competency --

A. Yes.

Q. -- challenge?

A. Absolutely.

Q. Did Mr. Basham handle the Jackson v. Denno hearing well?

A. That's a difficult question. And I'm not trying to be difficult with you, but when you ask if Brandon handled something well, tell me exactly what you mean by that.

Q. I'll get to the point. Susie, can you bring in, I believe it's Exhibit 83. Can you look, please, at the -- again, this is -- these are already admitted. These are not your notes.

A. That's fine.

Q. These are Mr. Swerling's. But can you look at the last entry. Can you read Jack's writing?

A. I'm probably better than anyone at reading his writing.

Q. And does it reflect on the date of the Jackson v. Denno hearing defendant is incoherent?

A. Well, it reflects at some point during that hearing he may have been having a difficulty with either the evidence that he was listening to or circumstances just surrounding that day.

Q. And, Susie, can you bring up Exhibit 84? And this is an e-mail a few days after that hearing showing that it appears that Brandon had some sort of suicide attempt. Do you recall that?

A. Yeah, I do recall this.

Q. And that, again, was in close proximity to the Jackson v. Denno hearing.

A. I just don't have the date. I accept if you say it was, I accept that. Was this after or before?

Q. A few days after.

A. Okay.

THE COURT: Miss stone, we're past 5:30, it's been a long day, especially for the court reporter. Unless you think you are close to finishing?

MS. STONE: I'm not.

THE COURT: Let's go ahead and break for the day. Doesn't look like we're going to get to a good breaking point, this is as good as any.

MS. STONE: Thank you, your Honor.

THE COURT: Thank you. Mr. Harris, you need to be back at 9:30 tomorrow morning.

Anything before we adjourn?

MR. BURKE: Your Honor, may I speak about -- given the unexpected events of the last few days is it still your Honor's position we will not go on Friday morning?

THE COURT:  Unless y'all want to.

MR. BURKE:  I certainly don't, but --

THE COURT:  We will be off Friday.

MR. DALEY:  And, your Honor, we may be able to stipulate to the South Carolina Department of Revenue guy.

MR. BURKE:  Yeah, we will be able to stipulate.

THE COURT:  Very good.  We won't hold court on Friday, and try to go maybe not quite this late tomorrow, and --

MR. DALEY:  It may be Mr. Swerling might have to testify on Monday, your Honor.

MS. STONE:  I'm not close to done, but I don't think I will be too terribly long.  I would imagine we will at least get --

MR. DALEY:  We will get started with Mr. Swerling.

THE COURT:  All right.  We will see you at 9:30 tomorrow morning.  We'll be in recess.

(Recess, 5:35 p.m.)


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  11-11-12                    s/  Daniel E. Mayo

DEFENSE WITNESSES

THOMAS M. HYDE

    DIRECT               125

GEORGE PARKER

    BY THE COURT     143

    BY MR. BURKE     148

    BY MR. WITHERSPOON 159

    BY MR. BURKE     166

THOMAS M. HYDE

    CROSS              178

    REDIRECT         193

WILLIAM H. MONCKTON, VI

    DIRECT            214

    CROSS              217

    REDIRECT         230

JOHN CASTRO

    DIRECT            231

    CROSS              244

    REDIRECT         257

GREG HARRIS

    DIRECT            261

**JA 4010**

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 17

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
    -vs-                                    October 11, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------


          BEFORE HON. JOSEPH F. ANDERSON, JR.
            UNITED STATES DISTRICT COURT JUDGE
                    MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

COURT REPORTER:       DANIEL E. MAYO, RDR
                      Certified Realtime Reporter
                      901 Richland Street
                      Columbia, SC  29201


              STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: Miss Floyd says we have something to take up first?

MR. DALEY: Your Honor, it's going to be very brief. As the questioning came out late yesterday afternoon it appeared to me that, and this happened in the Fulks case and so I'm a little more on high alert than I have been previously, claim two, if you look at claim two in the petitioner's motion and then even in their reply, it appears to only focus on the statements made after his -- after Basham's arrest and those three, four days before he was transported down to South Carolina.

If you look at page 19 of their motion, in fact they only cite in their first paragraph to transcript 2-24-04. And then if you look in the substance of their claim two, the only two interviews that they are talking about are the interview of Detective Dan Mooney of the Ashland, Kentucky Police Department and then FBI Agent Scott Vito, who I think was also out of the Ashland office of the FBI.

It appeared yesterday that they were, I don't want to say shifting, but just they were now suddenly focusing on one statement made on Thanksgiving day and in South Carolina. And so I would just like to put on the record that I believe that this is an attempt to amend the motion, and I just would ask that the court -- I don't think Miss Stone is going to elicit any more testimony from Mr. Harris, but I do think that later

on they will --

THE COURT:  We have got Mr. Littlejohn coming on later in December, I guess.  To be honest with you, I read the briefs, I thought that the statement of Sheriff Hewitt was at play.

MR. DALEY:  No, it's at play, but if you look at -- it wasn't at play in claim two, your Honor.  It is definitely at play in some other claims, but if --

THE COURT:  I thought it was in play in claim two.  But, anyway, I think no matter what, I need to allow the testimony to come in, then we will argue later whether it's properly before me.

MR. DALEY:  Thank you, your Honor.

MR. BURKE:  Thank you, your Honor.  Your Honor, may I briefly make a record of Mr. Basham and his absence today?

THE COURT:  All right.

MR. BURKE:  I think the court is aware Mr. Basham will not come out of his cell.  Our colleague Mr. Murray went to the prison this morning to attempt to meet with him and he would not come out of his cell to talk with him.  We accept your Honor's order yesterday.  We disagree with it.  We believe that we have a client who is unable to assist us in this proceeding.

And we will today be questioning trial counsel about specific conversations that they had with Mr. Basham.  If I

had a client who was capable I would be referring to him and conferring with him about those conversations. So short of a request that we would ask court to stay these proceedings so we could be -- get our client into a state where he could assist us, we would just simply note for the record that we do have a continuing objection to going forward without him. And we don't want to have him physically forced to sit in that room because it will just lead to more disruption.

THE COURT: All right. But I understand you don't have access to him today but you have had free access him to him in the prison leading up to this hearing to question him about his version of his conversations with counsel.

MR. BURKE: Your Honor, we had access to the extent that he was capable of conversing with us, as we talked about yesterday.

THE COURT: All right. Very good.

MR. BURKE: Thank you.

THE COURT: If Mr. Harris could resume the stand. Mr. Harris, you are still under oath.

THE WITNESS: Thank you, Judge.

BY MS. STONE:

Q. Good morning, Mr. Harris.

A. Good morning.

Q. Yesterday we finished up talking about the Jackson v. Denno hearing and not using competency as a potential

challenge to those statements.  I would like to now talk to you about competency in general in this case.  Were you aware that the original trial attorneys, Mr. Monckton and Mr. Littlejohn, had filed a motion for a competency evaluation for Mr. Basham?

A.  Yes.

Q.  And was that withdrawn at some point by you and Mr. Swerling?

A.  Yes, it was.

Q.  And was that a strategy decision?

A.  Yes.

Q.  And is it a fair summary of that strategy decision to say there was concern about letting the government speak to Mr. Basham an additional time?

A.  Yes.

Q.  Any additional strategy to withdrawing that competency motion?

A.  Well, I would add to that we wanted our doctors to discuss Brandon with Brandon before the government doctors.  So it was a little more than not having their -- them have a crack at it first.  It was as much we wanted to get to know Brandon with our doctors before they did.

Q.  And were there points leading up to trial and during trial where you were concerned about Mr. Basham's mental state?

A.  There were points during particular days at times during

the days that I was concerned, yes.

Q.  Mr. Harris, can you take a look at this?  This is a memo that you wrote after jury selection.  Can you look at header number one?

A.  Yes.

Q.  And that basically says that Brandon started out the trial on a high note, he was in good spirits.

A.  Just -- this is one of my memos?

Q.  I'm sorry, Susie.  For a moment, can you go back to page one.  I apologize.  This is exhibit -- Defense 22.  Can you see there?

A.  Yeah, let me --

Q.  And now you can go back to page two.  And then header number two, by the third day Mr. Basham started to deteriorate, he was distracted?

A.  Yes.

Q.  And the third heading, he had intermittent outbursts with the marshals, with you, and with Jack?

A.  Yes.

Q.  And is that consistent with your memory?

A.  Yes, it is.

Q.  And things were given to keep Mr. Basham busy and occupied during the trial so that he wasn't a distraction to counsel and to the jury?

A.  We wanted to keep Brandon, yes, we wanted to keep Brandon

busy.

Q.   And then number five, there was an issue with Brandon sleeping through some of the voir dire?

A.   That's correct.

Q.   And, Susie, can you bring up Defense Exhibit 91?  Go to the last page.  And can you highlight the last three small paragraphs?

A.   And this is media coverage?

Q.   This is media coverage.  And again it discusses Mr. Basham's sleeping and drawing with markers.  And that's consistent -- is that consistent with your recollection of Mr. Basham's behavior during jury selection?

A.   Yes, it is.

Q.   And, Susie, can you bring up Defense Exhibit 87?  And I'm going to have -- ask Susie to scroll through Defense Exhibit 87 through 90 and have you take a look at those.  And do you recognize any of these drawings?

A.   No, I do not.

Q.   Are these consistent with what you recall Mr. Basham doing?  And the last one is a coloring book that Mr. Basham had to work on during trial?

A.   I don't deny that that's his artwork, I just have no recollection of specifics.

Q.   You don't remember the specific drawings?

A.   Correct.

Q.   But fair to say you do remember that --

A.   Absolutely.

Q.   -- is what he was doing during trial?

A.   Yes, ma'am.

Q.   Did you have concerns about Brandon controlling his behavior even leading up to trial?

A.   Yes.

Q.   Were there some incidents in the jail where he had trouble with arguing and fighting with guards and had his family visits suspended?

A.   Absolutely.

Q.   And do you recall advising him he had to control his behavior?

A.   I remember doing that on numerous occasions.

Q.   Numerous occasions you had to tell Brandon that.  And did it work?

A.   Well, yeah.  I mean, did it work is -- it worked sometimes.  But, obviously, the record is I think clear in this case that it didn't work all the time.

Q.   And during trial at some point Mr. Basham had an altercation with the marshals.  Do you recall that?

A.   Oh, yes.

Q.   Can you give us a little background on that incident?

A.   Brandon on Monday the 20th, I think, was expecting that during a break he would receive a reward of sorts for not

acting out. And that's -- that's an oversimplification of what happened, but at lunch or sometime around lunch break he learned that he was not going to get dip, I think, and he wanted to leave. And he got up to leave and it led to what everyone has now seen a videotape.

Q. And after -- after that incident was he removed from the courtroom?

A. Yes, ma'am.

Q. Was he evaluated by Dr. Schwartz-Watts shortly thereafter?

A. And the next morning.

Q. And do you recall shortly after that incident with the marshals that --

MR. DALEY: Your Honor, at this point I would object to the leading. I think at this point I would like to hear --

THE COURT: I agree. This is important testimony so don't lead your witness.

Q. (MS. STONE) Do you recall what Dr. Schwartz-Watts' diagnosis or opinion of Mr. Basham's competency was the day immediately preceding the argument with the marshals?

A. Dr. Schwartz-Watts informed us, the defense, as well as the court, in a hearing that he was not competent to continue that day.

Q. And did you have any reason to doubt that that was Dr. Schwartz-Watts' honest opinion?

A. No, that was her honest opinion.

Q.  And did you or Mr. Swerling ask her to give that opinion as any part of a strategy to the court?

A.  I asked her to render her best opinion, whatever it was. I just asked her opinion.

Q.  And, Susie, I'm going to bring up one transcript here. Can you bring up September 20, 2004, pages 157 to 158.

MS. STONE:  Your Honor, we did not mark the transcripts as exhibits because they are already part of the record.

THE COURT:  All right.

Q.  (MS. STONE) Susie is going to be highlighting a section of your statement to the court.  Can I ask you to read that?

A.  To respond to Mr. Schools, to get back on the issue about whether or not this is manipulation or whether he is competent, what I just saw in the courtroom didn't look like any attempt to manipulate anything I had ever seen.  Looked like someone who didn't have the ability to control the simple function of sitting down in a seat.

Q.  And do you have the bottom, as well?

A.  That is why we have a concern about the competence today, the 20th of September.

Q.  And, Mr. Harris, do you have a duty of candor to the court?

A.  Um-hmm.

Q.  And were you honoring that duty when you made that

statement?

A.   Absolutely.

Q.   Is it a fair statement you had an honest concern at that point at that day about Mr. Basham's competency?

A.   On the 20th of September at 2:00 o'clock in the afternoon, whenever I said this, I believed at that moment he was not competent to assist us in his defense.

Q.   And you expressed that concern to the court.

A.   Yes, I did.

Q.   Did Mr. Basham continue to have problems throughout the trial, especially with sleeping?

A.   Those are two questions.

Q.   First, did he continue to have problems throughout the trial?

A.   He had problems, Brandon always has problems focusing and paying attention.  So, yes, he had problems focusing and paying attention.  He also had -- there were situations where he did -- he was drowsy, and I don't know that he fell asleep during the trial but I know there were periods where he was drowsy.

          THE COURT:  Let me jump in here.  You know, lawyers go to seminars on how to try death penalty cases.  We judges go to seminars on how to preside over death penalty cases.  And one thing we're taught, don't let a capital defendant build up a record at your expense by sleeping or appearing to

sleep during the trial.  So during this trial I obviously did not have my eye trained on the defendant all of the time, but periodically I would look to the defendant and any time I saw him appear to be sleeping I stopped and told him to wake up and offered to get him coffee, caffeine, gum, whatever it took to keep him awake.  I guess I'm becoming a witness in the case almost, but I don't want this record to go unchallenged that he slept through the trial and I did nothing about it.

THE WITNESS:  And I may add to that, Judge, I think the record is fairly clear that -- and this is responsive to your question -- that I would think almost every occasion where we did see him sleeping we made that known to the court at least to the extent that we could.

Q.   (MS. STONE) I guess my question is was Mr. Basham falling asleep something you were concerned with?

A.   Yes.

Q.   Something you were fairly constantly concerned with throughout trial?

A.   I wouldn't say fairly constantly, I would say it was a concern.  I would agree with that characterization.

Q.   Were there days that Mr. Basham did not get his appropriate medication?

A.   I remember one time, if you say there were two occasions I wouldn't dispute that, I do remember one occasion where he didn't get his medication, he received it when he got to

court, and there was an issue as to whether that was causing him to be drowsy. And that's just, again that is my vague recollection. I don't recall another instance where he didn't receive his medication.

Q. And any time you had that kind of information you brought it to the attention of the court.

A. Yes, ma'am.

Q. So the record would be -- speak to that?

A. Yes.

Q. Do you remember addressing the issue of Mr. Basham sleeping with the jury in your opening of the penalty phase?

A. Yes, I do.

Q. Why did you do that?

A. I think I needed in some way to explain why he may have looked disinterested. I didn't need to, I wanted to.

Q. I'm sorry?

A. I wanted to explain to the jury why he may have appeared disinterested.

Q. Is it a fair statement you felt that was something that was important to address with them?

A. Yes.

Q. We talked about a little bit already with the incident. Do you recall asking the court to allow Mr. Basham dip?

A. Yes.

Q. And was one of the reasons for the dip to help Mr. Basham

stay awake?

A.   Mr. Basham wanted dip very badly, it was a very important -- it was very important to Brandon for whatever reason.  I discussed it with my experts.  As a lay person I know that there is some property or there's something in dip that, it's not caffeine, I don't know what it does, but it helps people stay awake.  So, yes, I thought it would help him.  I thought it would do a number of things to get him through the trial.

Q.   Do you recall if your expert opined that it would help him stay awake?

A.   Yes, she did.

Q.   Do you recall if the marshals objected to Mr. Basham getting that dip?

A.   They objected.

Q.   And do you recall that the judge overruled that objection and allowed him to have it?

A.   Yes.

Q.   Was part of that reason because Mr. Basham sleeping was such an issue?

A.   You would have to ask the judge, but I would suggest that the doctor came in, said it would help, and I would imagine that was part of the of the judge's reasoning to overrule the marshals service, because I know that that is -- it's a rare occasion where a judge overrules the marshals service.

Q.  Do you recall Mr. Basham getting emotional during certain testimony?

A.  Yes.

Q.  Was that -- what times do you recall that?

A.  I remember when one of his teachers, and I don't know if it was Penny Titzer or whether it was Miss Mumford, but I remember he was upset, became upset when she was testifying. I know what it was, it was a witness that was testifying that he had been abused in his childhood.  And I can't remember who that was.

Q.  And how did Mr. Basham react?

A.  He was upset, he cried.

Q.  Was it difficult to try a case with Mr. Basham sitting at counsel table?

A.  Was it difficult?  It was trying.

Q.  Explain that a little bit.

A.  Brandon is -- you know, Brandon communicates, communicated a lot with us about matters sometimes not related to the case. And I find it trying when I have a client in any case, whether it's, you know, a death penalty case or a fraud case, when my client is talking to me while I'm trying to listen to a witness examination.  So, yes, that sometimes was difficult.

Q.  And when you say matters not related to the case, was Brandon trying to communicate -- let me rephrase that question, strike that.  Do you recall any of the things that

Mr. Basham --

A.   Yes.

Q.   -- would communicate about?

A.   You know, we previously discussed this dip issue.  Before Mr. Basham, before Brandon got his dip there was a lot of discussion at that table about dip.  After he got his dip it was much better.  And but, you know, an hour or 30 minutes leading up to his dip break in the morning, 30 minutes leading up to his dip break in the afternoon there was a lot of conversation at the table not related to the trial.

Q.   We had testimony yesterday from a court-appointed doctor.  He indicated that Mr. Basham had the ability to control his behavior for short periods of time?

     MR. DALEY:  Your Honor, I'm not really sure she needs to preface her remarks with information about testimony yesterday.  I don't think that's relevant to what she's going to ask.  I think she's sort of giving away, suggesting an answer.

     THE COURT:  Do you see a need to preface your question?

     MS. STONE:  Your Honor, I think it's appropriate to the questions on whether or not Mr. Basham was able to control his behavior for large -- longer periods of time.

     THE COURT:  All right, I'll allow it.  Go ahead.

Q.    (MS. STONE) As I was stating, Mr. Harris, there was

testimony yesterday from a court-appointed doctor that Mr. Basham can control his behavior in court and assist counsel for short periods of time, I believe the testimony was 20, 30 minutes. Would that be consistent with your observations of Mr. Basham?

A. No.

Q. Would Mr. -- Susie, can you bring back up Exhibit 22?

A. Let me understand the question. You are saying that he can only assist us for 30 minutes at a time? Is that your question? Is that what the doctor opined?

Q. Did Mr. -- let me rephrase.

MR. DALEY: Your Honor, I think I would object because now we're --

THE COURT: You seem like you are asking him to agree or disagree with what the expert said yesterday.

MS. STONE: I'm asking him if that is consistent with his recollection.

THE COURT: Ask him what he recalls about the trial process.

Q. (MS. STONE) Did you observe Mr. Basham becoming increasingly distractible during long periods of testimony?

A. On occasions, yes.

Q. Was Mr. Basham able to sit still and control his behavior for long periods of time?

A. On occasions, yes.

Q.   Were you required or did you ask the judge to take breaks, for Mr. Basham to take a break and collect himself?

A.   I'm sure I did on a number of occasions.  Probably, the record is -- again, I would imagine the record reflects that. Yes, I would certainly have thought that was a good idea.

Q.   And why would you think that was a good idea for Mr. Basham in particular?

A.   Brandon wanted breaks so I asked the court for breaks. It's not unlike calling a time out in a football game. Sometimes Brandon needed a break so I would imagine we asked for a lot of breaks.

Q.   And if Mr. Basham did not get a break would he have trouble concentrating?

A.   I'm not sure we didn't get the breaks.  And, again, I'd have to look at the record, but we took a lot of breaks in this case.  I know that the court I think gave us a long break every morning and I know the court gave us a long break every afternoon.  And I would imagine the record is fairly -- I would imagine there were a lot of breaks.

Q.   Have you ever asked for breaks with this frequency with other cases?

A.   No.

Q.   Did you ever have concerns that Mr. Basham did not appreciate the gravity of the situation he was facing?

A.   No.

Q. Susie, can you bring up Exhibit 23? And can you highlight on number one. I'm sorry, that was the wrong -- prior to number one, the first paragraph. And, again, this is a memo from you to the Brandon Basham file. When you visited him and told him about the Fulks verdict you noted he appeared alarmingly unaffected. Why did you choose "alarmingly"?

A. I was shocked, I'm sure. That's an interesting use of the word alarmingly. I don't recall this memo, but if I said that, which I obviously did, then I was shocked that he was unaffected by a death verdict.

Q. And Mr. Fulks is his codefendant in this case?

A. Yes.

Q. Do you recall at a point during sentencing phase advising the court Mr. Basham was not competent to continue that day?

A. Can you direct me --

Q. Would you like that transcript?

A. Let me say this: I'm sure I did. Would you direct me --

Q. Sure.

A. -- to where I said that?

Q. Susie, transcript of October 26, 2004. There are two from that. The first one is the ex parte transcript at page four.

A. This may be the day I was talking about where there was a witness on the stand that. I don't know, let me look at it.

Q. And, Susie, can you highlight the very top? And can you see there that court is talking about whether or not Mr.

Basham was competent to go forward in front of a jury and having a colloquy with the defendant?

A. Is that the judge?

Q. Yes. I apologize. That's the court at the top speaking.

A. And that's -- of course. What's the question?

Q. And then I'm going to -- Susie, can you also bring up the non-ex parte transcript at 14, starting at page 14?

A. Is this when Brandon said he used drugs?

Q. Yes. That's what I'm trying to get to.

A. Right. And didn't Mr. Haraseth come in and drug test him?

Q. Yes. But did you immediately -- do you recall if you immediately knew the results of that?

A. I think we did. He was negative.

Q. You don't recall at this point advising the court you weren't able to go forward?

A. If Brandon Basham had -- I think he came in and said he used cocaine and I think we brought that to the court's attention, but I need to see the transcript. I don't dispute that happened.

Q. And about a little more than halfway down you can see, Mr. Harris, the first indication of your name.

A. That's what I said.

Q. And the same question I had before. Were you honoring your duty of candor to the court there?

A. Yes, I was.

Q. So if you said that, at that point on that day you had legitimate concerns about going forward.

A. At that point on that day I did.

THE COURT: Help me put this in context. October 28th, that was after the scuffle that broke out?

MS. STONE: Correct, your Honor. And this was the 26th. I apologize if I said --

THE COURT: The scuffle was on the 26th?

MS. STONE: The scuffle was on the 20th, I believe.

MR. DALEY: Of September. This was October 26 right before Brawley's testimony, your Honor.

MS. STONE: Yes, this is the penalty phase.and just one more question on competency. No court-appointed evaluation was ever requested by you or Mr. Swerling, is that correct?

A. When?

Q. Ever during -- you never asked to have a competency evaluation -- is it a true statement you never asked to have a competency evaluation by anyone but your hired doctors?

A. That's correct.

Q. You never asked to have Brandon shipped off to Springfield or Butner. I understand he went to Butner, but that was not at yours or Mr. Swerling's request, for a competency evaluation?

A. That's correct.

Q.   Next I want to talk to you about Mr. Basham's IQ.  Who did IQ testing for you?

A.   Dr. Brawley.

Q.   And were you responsible for coordinating with Dr. Brawley?

A.   Yes.

Q.   Do you recall what Mr. Basham's IQ was?

A.   68?

Q.   Good job.  Did that raise concerns for you?

A.   Yes.

Q.   And what did you do with those concerns?

A.   I discussed them with Jack and with our doctors.

Q.   Susie, can you bring up Exhibit 27, Defense Exhibit 27?  This is a memo from you and Mr. Swerling to the file regarding meeting with the death penalty review in Washington.  And it indicates they had inquired about your mental retardation testing and that you would get back with them.

     Was it your understanding that if you could make a strong case that death might come off the table?

A.   We had hoped that.  That was the purpose of our meeting with that organization, to see if they would recommend to the district, to this district, that they not seek the death penalty.

Q.   And, obviously, because we're here that ultimately did not happen.

A.   That is correct.

Q.   Are you familiar with the Atkins case?

A.   Not sitting here today off the top of my head, I'm sorry, I can not -- is that the case having to do, can't execute individuals that are mentally retarded?

Q.   That's correct.

A.   Then, yes, I am familiar with that case.

Q.   In preparing for Mr. Basham's case did you attend any continuing legal education or seminars on mental retardation or Atkins litigation?

A.   I went to a week-long death penalty seminar, and I can't tell you whether that was one of the topics addressed or not.

Q.   If Mr. Swerling had said I think we need to have an Atkins hearing in this case would you have supported that decision?

A.   Not based on our doctors' evaluation of Brandon.

Q.   Did you --

A.   Because I don't think we would have had any testimony to put on the record.

Q.   Did you recover -- did the Basham team, not necessarily you personally, recover any anecdotal evidence that Mr. Basham might be mentally retarded?

A.   I mean, we had thousands and thousands and thousands of pages of medical documents about his entire lifetime.  By anecdotal do you mean had he done crazy things or had he done things that would indicate that he doesn't function at a high

level in his lifetime?  If we had -- we had a lot of that type of evidence.

Q.  Bring up some examples.  Susie, Defense Exhibit 46.  This is not your memo, this is from Paige Tarr.  Would you have seen this memo?

A.  Oh, yes.  And that's kind of what I'm saying when I'm trying to figure out what you mean by anecdotal.  Yes, we interviewed a lot of people, we looked at a lot of documents, and there were a lot of people that would tell you that Brandon was slow.

Q.  So is it a fair statement that -- or would you disagree with me that the Basham file contains a lot of memos that have similar statements to this?

A.  Not -- I wouldn't say there are a lot of people that say he was mentally retarded, okay?  First of all, this is an opinion of a neighbor, I think is who this was --

Q.  I'm not asking doctors' opinions and medical testing, I'm asking about anecdotal evidence.

A.  A lot of people say that he was slow, a lot of people said -- you know, everybody has an opinion.  Not a lot of people said that Brandon was very, very, very smart.

Q.  Susie, can you bring up Defense Exhibit 59?  And can you highlight the very bottom two paragraphs of text?  Was fetal alcohol syndrome looked into in this case?

A.  We discussed that with our expert.

Q.   But that was also not pursued?

A.   It was not.

Q.   And, Susie, can you bring up Defense Exhibit 80.  And can you highlight, kind of hard to see, just do the bottom half.  That's fine.  And is this Mr. Swerling's writing?

A.   Yes, it is.

Q.   Do you see where it says retardation out.  It's in the -- in 12-5-03?

A.   Yes, I see that.  And --

Q.   At some point was a decision made not to pursue mental retardation?

A.   Yes.

Q.   And why was that?

A.   We didn't have an opinion to support it.

Q.   Are you familiar with the Flynn effect?

A.   No, I am not.

Q.   Susie, can you bring up Exhibit 65?  Defense Exhibit 65, I apologize.  Stop there, first paragraph on the page.  Did the Basham team in their investigation receive information there was a possibility that Mr. Basham -- well, let me back up.  Was one of the problems with making a case for mental retardation that Mr. Basham had some IQ tests that were higher?

A.   I remember three other IQ tests ranging anywhere from a hundred to the lowest being the test that we gave him.  I

think there was one in the 80s.  So, yes, I remember more than two IQ tests.

Q.  And in the course of the mitigation investigation did you and the team recover information that it's possible Mr. Basham's IQ may have been inflated by some facilities so that he could be admitted into them?

A.  Yes.

Q.  Was any effort made to rule those tests out as invalid, that you recall?

A.  I know that they were provided -- if I received them they would have been provided to Dr. Brawley for her evaluation. And but I can't tell you today whether -- what impact those tests had on her evaluation and her opinion.

Q.  And no -- was an Atkins hearing ever asked for in this case?

A.  No.

Q.  Was an independent mental retardation expert hired in this case?

A.  Dr. Brawley made that determination.  By independent do you mean --

Q.  Someone who specifically specializes in MR.

A.  No.

Q.  Susie, can you bring up defense Exhibit 98?  Mr. Harris, that was something from your file.  Were these questions that you typed up or -- can you tell us what the purpose of this

was?

A. It's kind of fuzzy on my screen. I don't think it's my eyes. Maybe --

Q. We will highlight a section. Voir dire questions on MR.

A. No, that would not have been something I typed up. That's probably something I may have gotten at a seminar I attended, or it might have been something I pulled up or Dr. Brawley may have provided me something like this. I can't at the time tell you where I got this. This was probably something I was just looking into when I was looking into the MR issue.

Q. Okay. And were you aware that in federal court the issue of mental retardation is submitted to the judge?

A. Um-hmm.

Q. Was that ever submitted to the court here?

A. It was not.

Q. Now I'm going to move on, and this will be very brief, the issue of conceding guilt in opening statement. And I understand you did not make those opening statements, which is why the section will be brief.

A. I understand.

Q. Do you recall Mr. Swerling conceding guilt on almost everything in Mr. Basham's case?

A. Yes.

Q. Were you on board with that strategy?

A. 100 percent.

Q. Did you and Mr. Swerling discuss that conceding everything accept intent on the carjacking would also be an admission that Mr. Basham was death eligible?

A. Yes.

Q. And you were still on board with that strategy?

A. Yes, I was.

Q. Okay. The next topic I want to move to is the intrinsic evidence or the Samantha Burns evidence.

A. Okay.

Q. Was the government successful in getting that evidence in front -- that Samantha Burns evidence in front of the jury?

A. Yes, they were.

Q. And just for some context, Miss Burns was not technically the victim in this case before the South Carolina federal court, is that correct?

A. That is correct.

Q. Do you recall the judge's ruling on how the evidence was allowed in?

A. Yes, I do.

Q. Can you explain it?

A. The judge ruled after, I don't remember when the hearing was, that everything between the escape and Brandon's arrest was admissible and intrinsic to the charged conduct.

Q. And you had a chance to look at the briefs filed by Mr. Basham and the government in this 2255 case, is that correct?

A.  I have.

Q.  One of the arguments the government makes, if you will recall, is that one of the reasons this evidence was important was to show that Miss Burns did not simply run off or run away.  Anywhere in the trial did you or Mr. Swerling ever argue that Samantha Burns was not dead?

A.  No.

Q.  Was there any discussion between you and Mr. Swerling after the court's ruling the evidence was intrinsic and would come in about an attempt to limit the scope of this evidence?

A.  The court had already ruled on that issue so I don't think on the record we objected.  Well, actually, I take that back.  There are some objections that we made on the record, I don't know if they were about any of the Burns testimony.  But we did not revisit on the record, I don't believe we revisited the issue that the court had ruled on regarding the intrinsic nature of that evidence.

Q.  And my question is more -- was there a discussion between you and Mr. Swerling to limit from whom or how many witnesses brought that intrinsic evidence in?

A.  I'm sure we discussed it because it was a damaging -- those are damaging pieces of evidence.  But the court had ruled and us discussing it really wasn't -- we were going to focus how we were going to address it more than we were going to keep it out, because the court had ruled it in.  So, yes,

we did discuss it.  I don't know whether the record reflects we continuously objected to what the court had ruled on or not.  Yes, we did discuss it.

Q.  And was there any attempt to limit of testimony of Miss Burns' numerous family members as improper victim impact statements in the guilt phase?

A.  No.

Q.  And, Susie, can you bring up Defendant's Exhibit 101?  And can you highlight the whole section?  This is an e-mail from Mr. Swerling to the team discussing you and him speaking with the jurors after the trial and that they were overcome with the death of two women.  Is that consistent with your recollection speaking to the jury, as well?

A.  I stayed in that room 15 minutes.  I shook everybody's hand and I left.  I don't have -- didn't have any conversation with any jurors about this case.

Q.  So it would have just been a conversation Jack had with the jurors?

THE COURT:  Wait a minute.  Why wouldn't this be barred by the evidence rule on juror deliberations and what effect evidence had on their mental process?  Seems to me like it does.

MS. STONE:  Your Honor, I'm just trying to establish if this was --

MR. BURKE:  May I respond?

THE COURT:  Yes, sir.

MR. BURKE:  We're not offing this evidence to attack the jury's verdict.

THE COURT:  I understand.

MR. BURKE:  We're offering it for evidence of prejudice resulting from a claim of ineffective assistance of counsel.

THE COURT:  If it's not admissible it's not admissible for any purpose.  And the rule says a juror is not competent to testify as to the effect of anything on that juror or another juror's vote.  What caused the juror to vote for the death sentence is incompetent testimony.

MR. BURKE:  If your Honor --

THE COURT:  If it's incompetent I don't think it can be used for impeachment or anything else, it does not come in.  I might be wrong, I'm just asking you.

MR. BURKE:  It's my understanding, your Honor, that the case law, and I will research it and perhaps we can address it later, I will be -- I will be attempting to discuss this with Mr. Swerling so I can discuss it then, as well.  But it's my understanding that Rule 606 applies for purposes of any attempt to attack the verdict.

THE COURT:  That's what you are doing.  This 2255 proceeding attacks the verdict.

MR. BURKE:  But we're not offering this statement

by -- in the first place, this is not a statement by a juror, this is a statement by Mr. Swerling.  It's not being --

THE COURT:  It's a statement by Mr. Swerling quoting hearsay from a juror.

MR. BURKE:  Yes, it is, your Honor.  There has been no objection.  In fact, it's already been admitted.

THE COURT:  Well, so, for example, if a lawyer interviews a juror after a verdict and the juror says the foreman bullied us into a guilty verdict or we misunderstood the burden of proof, we thought it was preponderance rather than reasonable doubt, or anything that the court felt is off limits, and you can convert that to ineffective assistance of counsel argument by arguing that the lawyer should have done a better job of explaining the burden of proof or a better job of telling the juror not letting one bully them.  I mean, you could -- you open a giant loophole to the bar on juror testimony to impeach a verdict.

MR. BURKE:  Your Honor, my first response, I understand that you --

THE COURT:  It's already in.  We can debate this, it's already in.  Even if I sustain the objection I would allow a proffer to be made in any event, so let's move forward.

MR. BURKE:  Thank you.

THE COURT:  All right.

BY MS. STONE:

Q. Were you concerned about this evidence coming in to Mr. Basham's trial because it was such powerful evidence?

A. Yes. And we objected to it.

Q. And do you recall the judge offering a limiting instruction on this evidence?

A. Yes.

Q. And do you recall if you and Mr. Swerling accepted that limiting instruction?

A. We decided that it would only highlight the testimony and therefore we did not ask for any instruction from the court.

Q. Thank you. We talked about the Samantha Burns testimony and how -- and that was a concern that that was damaging. I want to now move on to two statements that at trial the government argued were some of the most damaging, and that's Clifford Jay and Sheriff Hewitt's.

First I want to talk to you about Mr. Jay, and specifically the issue is we killed her, we killed them. Were you present for the interviews with Mr. Jay?

A. Yes, I was.

Q. And do you recall how many interviews there were?

A. I think I met with Clifford Jay, I know I met with him in his home and I know that I had -- I think I interviewed him over the phone a second time. I may have met with him three times. I know that I met with him either telephonically or in

person at least twice.

Q. And the in-person interviews with Mr. Jay, you were present for all of them, is that correct?

A. I think. I just -- I can't tell you. I know one time I was in his home sitting on his sofa discussing the case with him. So I know that I can tell you that. I know that for a fact.

Q. And can you explain this we killed her, we killed them issue a little bit?

A. He said in his house that Brandon had told him that we killed her. It's in my notes, it's in Jack's notes, it's in our investigator's notes. And, you know, while that's not a good statement for a client to make, it's a lot better than we killed them, which is what it later morphed into when he was interviewed by law enforcement.

Q. And that was my next question. At some point you became aware that that statement had morphed?

A. Yes.

Q. And when was that?

A. I can't --

Q. Not time-wise, but --

A. I would guess I found that out through discovery that was provided by the government. And I can't tell you when, but I think that's how I found that out.

Q. And was -- was the statement then changed to we killed

them?

A.   I mean, I found out that he had changed the statement he made to us.  Again, he changed it, I didn't change it.

Q.   Right.  I'm sorry, I was not clear on my question.  You became aware that Mr. Jay's statement had changed.

A.   Yes.

Q.   To we killed them?

A.   Yes.

Q.   Did you or the team go back and speak to him?

A.   I did.

Q.   And tell us about that.

A.   You know, I saw, working with you guys, again, I saw a memorandum I know I think I created.  I can't remember if I went and saw him face-to-face or if I called him.  But it's clear to me looking at memos that my purpose was only to ask that one question, but I asked a series of questions leading up to that and I tried to pin him back down why it had changed.  And his position was that it hadn't changed, that what Brandon told him was that we killed them.

Q.   And do you recall a Detective Addison who spoke to Clifford Jay before Detective Long?  Do you remember any of that?

A.   I remember that Clifford Jay had been interviewed by local law enforcement.  I can't tell you sitting here today who interviewed him or the names of the investigators.

Q.   Susie, can you bring up Defendant's Exhibit 36?  And can you highlight the memo portion, or actually, all of it so we can see who it's from.  This is a memo from Mr. McNair to the Basham file.  And, again, if it was in the Basham file you would have seen this memo?

A.   Oh, yes.

Q.   And did either you or Mr. Swerling direct Mr. McNair to speak with Detective Addison about his conversations with Mr. Jay?

A.   Yes.

Q.   And what does Mr. McNair report here?

A.   I don't know what you are asking.  Is it -- I'm reading it.  What is the question, whether I saw this memo?

Q.   Yeah, did you see --

A.   Yeah, I saw this memo.

Q.   And the memo informed you that if Mr. Jay had told Detective Addison something like we killed them he would have included it in his report?

A.   Yes.

Q.   Is your recollection that was not included in Detective Addison's report and that was the purpose of sending McNair to talk to him?

A.   I would agree with that.

          THE COURT:  Wait a minute.

          THE WITNESS:  I don't have his report, but if his

report didn't have it in there that's why I would have sent Carlisle to go interview anyone that had had contact with Mr. Jay.

THE COURT:  I thought, I didn't look at all the exhibits, I'll confess I have not looked at all the exhibits but I did read the briefs from each side three times, and I thought y'all said that the 302 statements or the statements of witnesses in this case by the investigators indicated that Mr. Clifford Jay told them he heard a conversation that said we killed her.  That's what this memo says.

MS. STONE:  The 302, your Honor, Agent Long's 302 statement, and I apologize if -- Agent Long's 302 statement indicates we killed them.  So that was --

THE COURT:  You are coming to that later, in other words.

MS. STONE:  Well, I guess I glossed over that.  That was information that Mr. Harris and Mr. Swerling received that made them go say, oh, this statement has changed from what he said to us and go back and reinterview him.  Mr. Addison's -- Detective Addison's report didn't have either, it was silent --

THE COURT:  All right.

MS. STONE:  -- as to that.  Does that clear that up? I apologize for confusing the issue.

THE COURT:  Which exhibit number is this?

MS. STONE:  This is Defendant's Exhibit 36.

THE COURT:  All right.

BY MS. STONE:

Q.  Do you recall who questioned Mr. Jay -- who cross-examined Mr. Jay at trial?

A.  Jack.

Q.  And do you recall how Mr. Jay testified regarding we killed her, we killed them at trial?

A.  He stated -- he testified that Brandon had told him that we killed them.

Q.  Did you and Mr. Swerling call anyone to rebut that testimony?

A.  No, we did not.

Q.  You did not call Detective Addison?  And that's a no?

A.  I'm sorry, no, because I don't think Addison -- I mean, my recollection is and this memo suggests that he didn't say one way or the other, that Mr. Jay had not told him one way or the other what Brandon had said.

Q.  And you did not call Paige Tarr who was present for the interviews --

A.  No, we did not.

Q.  -- of Mr. Jay either.  Do you recall Mr. Swerling putting his strategic reasons for not doing that on the record?

A.  No.  I know there was a decision not to do that, but we didn't put that on the record, no.

Q.   Do you recall what that reason was?

A.   Well, I mean, that's not good testimony, usually, to put a witness on the stand to say that your client admitted killing anybody.  And, quite frankly, we wanted to move past that statement as quickly as we could, and to re-ring the bell, to put Paige Tarr on the stand to say that our client actually admitted to killing somebody is generally not something that I would think is a good idea.

Q.   Susie, can you bring up the transcript, September 29, 2004, at page nine?

        THE COURT:  Hold on one second.

        (There was a pause in the proceedings)

        THE COURT:  All right.  Go ahead.

        MS. STONE:  Thank you, your Honor.

Q.   (MS. STONE) Do you recall discussing with Mr. Swerling you wanted to keep Clifford Jay as a friendly witness for the penalty phase?

A.   Yes.

Q.   Was Clifford Jay ultimately called in the penalty phase?

A.   He was not.

Q.   Now I'm going to move to the Hewett statements specifically dealing with the purse strap.

A.   And you just reminded me of something, if I may?

Q.   Sure.

A.   There was also a discussion about not attacking him

because we did want to use him, we might want to use him again. And I do remember that now that --

Q. Remember talking about trying to --

A. But we did, there was also a discussion about not attacking Clifford Jay because Clifford Jay actually had a lot of nice things to say about Brandon.

Q. Do you recall what some of those nice things were?

A. You know, he had been a caregiver during part of Brandon's life and felt bad about Brandon's home life and things like that. So I can't tell you what the specifics are, but I do know that I briefly looked at the memo the other day y'all had and I do know there was at least a page-and-a-half of my notes that -- things that he had kind things that he had to say and he felt empathy for Brandon and those things, so we had considered him as part of our presentation at the penalty phase.

Q. Thank you. Do you recall the government arguing that the Hewitt statement about the purse straps sealed the deal in their closing argument or similar testimony?

A. I'm sorry?

Q. That the purse strap statement sealed the deal in the case against Brandon?

A. Did I say that?

Q. Do you recall the government arguing that?

A. No, I don't.

Q.   Who crossed Sheriff Hewitt?

A.   I did.

Q.   And we have already discussed the Jackson v. Denno hearing and his previous testimony and that it was ambiguous on who used the strap.  We have also discussed that you sat through some of and got all of the transcripts from the Fulks case, is that correct?

A.   Yes.

Q.   And remind us again, how did the government characterize that statement in the Fulks case?

A.   They -- I can't verbatim tell you how they characterized it, but it was ambiguous as to who actually strangled Alice Donovan with that strap.

Q.   In the Fulks case it was ambiguous?

A.   No, not in the Fulks, in --

Q.   That was my question.  Do you recall --

A.   In the Fulks case, Chad Fulks, one of the government lawyers told the court at a hearing that law enforcement had indicated to him that Fulks actually used the strap.

Q.   And did they argue to the court that Fulks strangled Alice Donovan at any point, that you recall?

A.   I think they did.  But, you know, you would have to show me a transcript.  I believe that their position was that Fulks was the actor when it came to committing that act.  Is that a fair answer?

Q. Sure. And, Susie, can you bring up the Fulks transcript 6-22-04 at 255?

MR. DALEY: Your Honor, for the record, I believe this is in a bench conference outside the presence of the jury. I want that on the record.

MS. STONE: That's correct, your Honor. To give it some context, there was an argument over the admissibility of evidence, and this is discussed in the inconsistent theories claim more thoroughly. The government was, excuse me, Mr. Fulks' lawyers were seeking to admit Mr. Basham's deer statement, I couldn't kill a deer and here I have -- they were stopped from doing that ultimately, and one of the reasons they were stopped from doing that was the government's argument here.

Q. And you can see here, Mr. Harris, does that refresh your recollection on what the government said about the Hewitt statement?

A. Brandon had said Chad, yes, that Chad Fulks was the one that strangled Miss Donovan.

Q. And in preparing for your cross-examination of Mr. Hewitt would you have reviewed the Fulks transcripts --

A. Yes.

Q. -- that referenced him?

A. Um-hmm.

Q. In his cross-examination with you did Mr. Hewitt's

testimony evolve?

A.   Tell me in what way.

Q.   Did he say that Mr. Basham showed how Fulks strangled Miss Donovan?

A.   I asked Sheriff Hewitt a direct question, which was isn't it true, and we know what the question was, his response was not responsive, he said he showed me.

Q.   And he meaning who?

A.   He said Brandon showed me how she was strangled.

Q.   Were you --

A.   He did not tell me, he showed me, I think was something to the effect of his answer.

Q.   Were you at all surprised by his answer?

A.   Well, yes.  It was, A, not responsive, so anytime someone gives you a non-responsive answer you are surprised because that's not what you are trying to elicit.  And, yeah, I was surprised that he would have -- it was ambiguous as to what he was saying.  But, you know, it was open to -- well, it was open to the way his answer allowed Mr. Gasser, I think, to argue to the jury somewhat inconsistently with this.  I would agree with that.

Q.   And on that point do you recall if Mr. Gasser did any redirect of Sheriff Hewitt after your cross-examination?

A.   I don't know if he did or he didn't.  I don't think that he did.  It's been suggested to me the other day in meeting

for these that there was no redirect.

Q.  And you alluded to it a little bit already, do you recall how the government used Sheriff Hewitt's statements to you on cross-examination in their closing?

A.  I think I looked at it and there was a comment made that it was real close to suggesting that Brandon had actually had some role with the strangling, which would be inconsistent with this, with this statement here.  But without looking at the transcript I can't tell you exactly what was said.

Q.  And is it a fair statement that in yours and Mr. Swerling's case, mitigation case, it was important to show that Brandon had less culpability than Mr. Fulks?

A.  Absolutely.

Q.  Was there any attempt after Mr. Hewitt's testimony with you on cross-examination to estop the government from taking a different position than they did in Mr. Fulks' case, filing any motions or anything like that?

A.  No.  I don't know that they did at all, first of all, even in closing.  But there wasn't anything inconsistent between the testimony of Hewitt and closing.

Q.  And, out of curiosity, are you aware what happened with Mr. Hewitt since the trial?

A.  You know, I was told that he was taken out of office for some impropriety.  I don't know the specifics.

Q.  And now I would like to move to what we have been calling

the puppet statement from Mr. Fulks' trial.  Do you recall seeking to admit statements from Chad Fulks' trial by the government into Mr. Basham's case?

A.  I do.

Q.  And can you talk about that a little bit.

A.  Well, we believed that it was, as you suggested earlier, important to demonstrate to the jury relative culpability, who was the leader, who was the follower, who was the puppeteer, who was the puppet.  When you read the Fulks transcript it was clear, crystal clear, that Fulks was the leader of this 13-day odyssey, that they went where Fulks wanted to go, they snatched individuals that Fulks wanted to snatch, they committed acts that Fulks wanted them to commit, and Brandon was reactive almost on every occasion to Chad Fulks.

We wanted to put in evidence that the government had that belief and had demonstrated that clearly to a jury some two months before we were given the opportunity, and we filed a motion asking for the evidence to come in, as well as the comments by the assistant united states attorney in his closing statement.

Q.  And that was my next question.  You and Mr. Swerling did file a motion on this issue?

A.  Yes.

Q.  And do you recall the court's ruling on that motion?

A.  The court at the conclusion of the hearing decided that it

would hear how the government put -- how the government treated the evidence in the guilt phase and it would make a determination, if we decided to raise the issue, as to whether the government's theory of the case was inconsistent in the Basham trial and the Fulks trial.

Q.   And was that issue renewed at the close --

A.   It was not.

Q.   And in reviewing your notes and e-mails and memos to come here and testify, did you find any on this strategy for abandoning that motion?

A.   No, I did not.

Q.   Okay.   That's my last question for you on the puppet statement.   Very briefly I want to talk to you about the causal nexus issue.   Again, you had a chance to review the briefs in this case?

A.   Yes.

Q.   And do you recall the testimony, I'm sorry, the argument by the government at trial about no cause and effect?

A.   I remember the cross-examination of numerous witnesses. Is that what you mean by argument?

Q.   There was also -- that's part of it.   You do remember the government crossing -- who were they cross-examining?

A.   I think a lot of witnesses.   You know, certainly the experts.   I remember they examined Dr. Brannon, Dr. Brawley, Dr. Jan Vogelsang on whether those -- Vogelsang, for instance,

people with his background, do they always kill, do people with bad brains, you know, is that --

Q.   Exactly.  Do you remember the government arguing that cause and effect issue in their closing statements?

A.   I mean, I don't know that I call it a cause and effect argument.  You would have to ask either Mr. Gasser or Mr. Schools what their intent was.  I know that they argued that people -- just because somebody has a bad brain doesn't mean they are going to go kill someone or carjack someone.  So I do remember -- I do remember them making those points.  I don't know that I would call them cause and effect arguments.

Q.   And were you concerned about those statements or arguments?

A.   I did not think they were improper.

Q.   Were you familiar with the Tennard case?

A.   Yes.

Q.   And --

A.   I don't want to say right now I can tell you exactly what Tennard says.  I know that you can't tell a jury what you have -- as you have suggested in your brief, you can't tell a jury that the cause and effect issue and problems with that.  But I don't know that they violated that.

Q.   And was there a strategy on not objecting to those statements?

A.   I can't tell you there was a -- no, I cannot tell you that

we discussed not objecting to those statements.

Q.  And now I want to move on to your favorite issue, Miss Cynthia Wilson.

A.  Yeah.

Q.  Is it fair to say that you took the lead in the post-trial hearings regarding the jury misconduct?

A.  Yeah, I had a large role in that matter.

Q.  Can you give us some context and describe what happened with the forewoman of the jury in this case?

A.  The forewoman in this jury I believe contacted numerous media outlets during the trial, didn't tell anybody about it. The government was contacted within one or two days of the verdict by one of the media outlets who informed the government that Miss Wilson had, for whatever reason, contacted them trying to drum up some type of media attention to this case.  They notified immediately the defense and they notified the court, and the court had a hearing, numerous hearings, but initially had a hearing to ask Miss Wilson what she had done, if she had done anything, and why she had done it.

Q.  You went to my next question.  Were there several times that you recall Backford hearings on this juror misconduct issue?

A.  Numerous.

Q.  Do you recall Miss Wilson's excuse for contacting the

media?

A.   Yes.   I think her excuse was that she thought this case should get more attention as a public service to the public, so that people know this can actually happen.

Q.   What was your opinion of --

A.   I don't think she is a truthful person.

Q.   And was part of your strategy in these numerous hearings to attack her credibility?

A.   Absolutely.

Q.   Were there numerous calls to other jurors -- during the course of your investigation did you discover numerous calls to other jurors?

A.   Yes.

Q.   And can you talk about that a little bit?

A.   The court allowed us the latitude of subpoenaing Miss Wilson's cell phone records.  When we received her cell phone records we were able to identify numerous calls to numerous jurors as well as other media outlets, I might add, that she had not admitted to in previous hearings.  As a result of that we cross-referenced -- I spent a little bit of time cross-referencing the calls, length of calls, with particular days of the trial when impactful evidence might have been viewed by the jury or something interesting happened in the court, and I believe that there was a correlation.  We tried to explain that to the court the best that we could to

try to show when she is saying they are not talking about the case, which she did, it just didn't -- it didn't seem believable to me in light of the -- when the calls were made, the length of the calls and things like that.

Q.   When the results of the subpoena for those calls came in, was that before or after the jurors besides Cynthia Wilson had been called back to speak to the court?

A.   I think after.  Maybe.  I don't know.  You would have to -- you have --

Q.   Let me ask it this way:  Were you permitted by the court to specifically confront or question those individual jurors who she had calls with about those calls?

A.   We weren't able to confront them.  But to be clear about this, we had as many hearings as we needed, the court gave us as many hearings as we needed to flesh out, to try to flesh out the truth.  We were not allowed to directly confront any particular juror.

Q.   Do you recall if the jurors were brought back and questioned by the court about those individual calls?

A.   Absolutely.

Q.   About the calls?

A.   About the calls?  I don't remember.

Q.   But Miss Wilson was questioned about the calls.

A.   Um-hmm.

MR. DALEY:  Your Honor, again, I just want to be

protective of the record.  I'm not sure that this falls within the scope of any of the claims, and I certainly don't want to suddenly have a new claim that you abused your discretion in failing to order more hearings or -- anyway, so I would object to the extent they are trying to expand --

MS. STONE:  And, your Honor, I'm not trying to expand the claim.  Where I'm going with this is I think Mr. Harris would agree that they were limited in what they could do with the jurors themselves, they were able to gather evidence and so what evidence was -- just trying to set the stage for that. And now I want to go into what evidence was gathered and what was presented to the court.  I'm not attempting to amend any claims.

THE COURT:  Go ahead.

BY MS. STONE:

Q.  In preparing for your strategy to attack Miss Wilson's credibility you looked at these calls, you looked at the times they were made.  Did you look at her testimony for why she spoke to individual jurors?

A.  Yes.

Q.  Do you recall --

A.  I was there when she testified.

Q.  And do you recall her testimony regarding a juror named Shannon Burnett?

A.  I don't have any recollection, but you informed me last

week what they talked about, sod, I think.

Q. Correct. And have you had a chance to -- Susie, can you bring up Exhibit 21? Have you had a chance to see this declaration by a woman named Shannon Burnett?

A. No.

Q. Can you take a moment and read it over?

(There was a pause in the proceedings)

THE WITNESS: Um-hmm, okay.

Q. (MS. STONE) You don't have the benefit of your records now, but to give you some background, that 587 number was the number that your investigation showed Miss Wilson called.

Susie, can you bring up Defendant's Exhibit 30? This a memo from Carolyn Graham to you and Mr. Swerling. Do you recall the issue with Mr. Burnett's non-matching phone numbers to your attention?

A. I mean, I'm sure I would have seen this memo. I don't have any independent recollection of this memo. It's eight years ago.

Q. Was there any effort to call and see if that was the correct Shannon Burnett?

A. I don't think I was calling jurors directly. So, I mean, I can't say that I would have called a juror directly to ask if it was the Shannon Burnett that was in my trial.

Q. If you had information that Miss Wilson had called a Shannon Burnett that was not the juror she testified if I

spoke to him it was about sod work, would you have brought that to the court's attention?

A. I just -- I really don't know. I will say this, if I had information that she had been untruthful to the court about anything I assure you I would have brought that to the court's attention. Does that answer your question?

Q. It does. What about information that appeared to show she was seeking out people with the jurors' names to speak with?

A. I would have brought that to the court's attention.

Q. Do you believe Miss Wilson -- today do you believe Miss Wilson was honest with the court?

A. No.

Q. Do you believe she was seeking out jurors to speak with about this case?

A. Yes.

Q. Did you in fact recommend her for prosecution for perjury?

A. Yes, I did.

Q. And is it fair to say you would have presented any evidence to the court you had to show that?

A. Yes.

Q. The last thing I want to talk to you about, and then we are done, it's very brief, and it's about the claim on the appellate file. You were briefly appointed as appellate counsel, is that correct?

A. That is correct.

Q.   And we spoke about it previously.  What was the purpose of your appointment?

A.   I believe the purpose was primarily to act as part of the transition team to make sure that the appellate lawyers, to the extent they needed some historical background or where we had been for the past year-and-a-half, to help them get up to speed, to transition the files.  I thought my role was to help them create the best appellate brief they could for Brandon.

Q.   And who kept the master file in this case?

A.   Jack.

Q.   Did you ever have that file in your office?

A.   No, I did not.

Q.   Did you have any involvement with the discussions between -- or let me ask you -- strike that.  Were you ultimately withdrawn from the case and new appellate counsel appointed?

A.   Yes.

Q.   Do you recall who that counsel was?

A.   No earthly idea.  I know Tim Sullivan was lead counsel, and whatever conversations I would have had about that transition would have been between Tim and myself.  I just don't have any recollection of how that occurred.

Q.   So did you have any involvement with the discussions between Jack Swerling and a law firm called Jenner & Block regarding acquiring Mr. Basham's file?

A.  No, ma'am.

Q.  My last question.  Thank you very much for your patience.

A.  Thank you very much.

THE COURT:  It's time for our morning recess.  How long do you think your cross-examination will take?

MR. DALEY:  A couple of hours, probably, because it's sort of a direct, too, your Honor.

THE COURT:  All right.  We're behind schedule, obviously, but will we still be able to finish next week, do you think?

MR. BURKE:  Certainly, your Honor.  Mr. Daley and I were talking about that.  We will almost certainly Mr. Swerling this afternoon.  I seriously doubt we will finish with Mr. Swerling but we can return to him Monday, and then there will be our standard of care expert, Mr. Hammond.

THE COURT:  Who is the next --

MR. BURKE:  Mr. Hammond, Larry Hammond, is our standard of care expert who will be testifying immediately after Mr. Swerling.

THE COURT:  All right.

MR. BURKE:  That will be the end of the testimony.  So you had indicated you might want oral --

THE COURT:  Let's talk about that.  I was wondering if we could hear argument on any issues that are fully developed at this point.  Is that possible?  I'm amenable to

hearing some argument now and the rest later, or hearing it all in December when all the evidence is in, whichever you think would be better.

MR. BURKE: I always like to put off until tomorrow what I can do today, but we're willing to do either, your Honor, whichever would be of most assistance to you. We can argue it next week after Mr. Hammond.

THE COURT: Let me mention one thing, too. The law school has this mentoring program and every year I am appointed to be a mentor for four, five, freshman law students, and we're supposed so meet with them three times during the year. I always require them to come to one hearing to watch so they can see some court proceedings, and I try to pick out a good hearing. Next Monday I think they come in at 3:30 or 4:30 to watch some of this trial. We will clearly be going forward at that point, we're not going to finish early.

MR. BURKE: No, your Honor, we will not be finishing early.

THE COURT: Okay. All right. Let's take a 15 minute recess.

(A recess transpired)

THE COURT: All right. Who will be handling the cross-examination? Mr. Daley?

MR. DALEY: Yes, sir.

CROSS-EXAMINATION

BY MR. DALEY:

Q.  Good morning, Mr. Harris.

A.  Good morning, Mr Daley.

Q.  I just want to go to Government's Exhibit 3, if you could pull that up, please, Gail.  It's already been admitted into evidence.  But I just wanted to confirm with you that everything on Government's Exhibit 3 is correct and accurate. It's from your website.

A.  That is my website.

Q.  And --

A.  That's the bio on the website.

Q.  I'm sorry, that's your background, your --

A.  Yes.

Q.  -- biographical information.  One of the things I want to go over was a little bit about what you do besides this case. You have -- how many criminal cases would you say you've taken to trial?

A.  As prosecutor and a defense attorney?

Q.  Altogether, sure.

A.  A hundred.

Q.  A hundred.  Okay.  How many as a criminal defense lawyer at this point?

A.  Forty.

Q.  And what kinds of cases?  What's the range of case, just generally?

A.  I've tried DUIs to murders.

Q.  And how many murders have you actually tried, murder trials?

A.  Only three.  I defended only three.  I prosecuted a couple as a state court prosecutor.

Q.  And at this point are you somebody that does presentations for the bar?

A.  Yes.

Q.  What kind of presentations do you do?

A.  I speak at a program, Bridge the Gap program, twice a year until last year I have opted out.  But until last year for the past 15 years I had spoken at the South Carolina Bar convention every year on the federal practice, good federal practice session.

Q.  Covering criminal law?

A.  Yes, exclusively.

Q.  And what about any sort of federal sentencing?  You ever talk --

A.  I've spoken to various organizations, trial lawyers associations, I've spoken at bar functions on sentencing guidelines issues.  And I believe on a couple of occasions I have given presentations on updates, Fourth Circuit updates and Supreme Court updates as to federal issues.

Q.  What about trial practice?

A.  I have been on round table discussions on a bunch of them.

I can't sit here and tell you -- you know, I get called often on most things.  I was called to participate in one yesterday at the law school that I was unable to participate in.  So, yes, I have participated in numerous trial advocacy programs at the law school and with the bar.

Q.  I want to go to claim 14.  There was an allegation in claim 14 that Mr. Swerling was under a conflict of interest because he had been a victim of a home invasion and a kidnapping, and the trial went forward I think in January or February of '04.  You worked with Jack for how long?  I mean in the same office.

A.  In the same office we were together 14, 15 years.

Q.  And during this trial how often did you meet with Jack Swerling?

A.  Every day that we were in the office together I think it's safe to say we discussed this matter.

Q.  And did you see any change in how he approached this case compared to any others as a result of during that time frame him being a victim of a crime?

A.  Absolutely not.

Q.  Thank you.  Gail, would you pull up Exhibit 8?  When were you appointed on the case, the Basham case?

A.  April?

Q.  Okay.  And what I would like to do now is just talk through for a moment how -- who was on the defense team and

sort of what their role was, how it came together, I guess. So although they're in alphabetical order we will start with the lawyers. Jack was appointed first and then you were appointed?

A. I believe that's correct.

Q. And you believed you were contacted by perhaps David Bruck and/or John Delgado?

A. I know I was contacted by David Bruck. I also know that I had had conversations with John Delgado and maybe Bill Nettles about participating in this matter.

Q. And who at that point was already then on the team, or who quickly became a member of the dense team?

A. I know that it was very clear from the very beginning that we needed to put together a mitigation team, so my guess would be, and I cannot tell you in what particular order they came on, but I know that we wanted to bring Donna Watts, Schwartz-Watts in, because one of the concerns was that she would be hired by the government. She is probably the top testifying physician in the state in this area as to these issues. And normally in state death penalty cases, of which there are many more, the state snaps her up before the defense does. My guess is she would have been one of the very first ones. Paige Tarr would have come in early. Our investigators --

Q. Paige Tarr?

A.   Paige Tarr.

Q.   And what was her role going to be?

A.   She was a mitigation specialist.

Q.   Okay.  Who else?

A.   I'm sure that the investigators on the ground came in fairly early, which would have been Carlisle.

Q.   That's Carlisle McNair?

A.   Yes, Carlisle McNair.  My guess is, again, you know, I really don't have any specific recollection about who came first and who came second.  But, generally speaking, I think probably Carolyn Graham would have come in.  She was working for Jack at the time.

Q.   What was her role?

A.   Her role was keeping everything straight in terms of the volume of information that we were getting in, and she also conducted a large number of interviews.  She kind of became an investigator of sorts when we became shorthand and started, interviewed a lot of witnesses, also.

Q.   And what about Lesa Watson?  Who was she and what role did she play?

A.   Lesa Watson would have come in a little later, not much later.  But we had been assigned an expert of sorts, a Kevin McNally.

Q.   Kevin McNally?

A.   McNally.  He was assigned to us as a resource.

Q.  Resource counsel?

A.  Resource counsel.  He had dealt with Lesa Watson who was an investigator in the area, of the target area for our investigation and referred her.  So she would have been brought on fairly early as an investigator.

Q.  She's based out of Kentucky, I think Frankfort, Kentucky?

A.  Yes, that's correct.

Q.  Let me go through a few more of the names of the defense team.  And, by the way, are you and Jack talking about the different defense team members and deciding who to bring on or --

A.  Absolutely.  Absolutely.  Donna Watts would have probably referred Tora Brawley who came in later.  Tora and Donna had worked together.  I believe that --

Q.  Tora Brawley is a psychologist?

A.  She's a psychologist.

Q.  And has she testified in death penalty cases before?

A.  Yes.

Q.  With Dr. Watts?

A.  Yes.  Jan Vogelsang would have been brought in later, also.  And I cannot remember, I think that Donna might have worked, Donna Schwartz-Watts might have worked with her, also. I can't remember.  She is the preeminent expert in her area in the state, so --

Q.  Dr. Brawley?  No, Schwartz-Watts.

A.   No, Vogelsang, Jan Vogelsang.

Q.   Vogelsang, okay.  What is her job, what's her role?

A.   I can't remember what her title was, but the best way that I can explain her role was to introduce Brandon's life, the compilation of his life, to the jury.  You know, where he had been, by whom he had been treated, the medications that he had been taking, that he had taken.  She just really explained Brandon to the jury the best that she could, or the best that we could.

Q.   Let's go through some other information.  There's a Steve Hisker?

A.   Steve was an attorney in Jack's office, and I believe that Steve conducted some interviews and did some computer programming work for us, exhibits, things like that, I think.

Q.   What about Harrison Saunders?

A.   Harrison had been with Jack forever.  Harrison started with Jack back when he was 16 as a runner, and had attended University of South Carolina, took some time off and worked for Jack in the interim as a something, I don't know what his role was.  Then he went to law school, graduated, and was an attorney in Jack's office I think during this time period.

Q.   What about Greg Cook?

A.   I think he was an investigator?

Q.   Investigator in West Virginia?

A.   West Virginia.  I think he worked for Mr. Collias.

Q.   Correct.

A.   Who was Brandon's counsel in West Virginia for the Burns matter.

Q.   Were you able to use some of the resources from the West Virginia case then to investigate your case, as well?

A.   Yes.  He was assigned a number of interviews and was assigned to find locations and to find people.

Q.   At some point did you then end up retaining a neurologist?

A.   Bill Brannon.

Q.   And how did you come to hire him?

A.   I feel certain that Bill Brannon came to us, he's been around Columbia forever.  I know Johnny Gasser had actually used Bill Brannon in cases as a prosecutor.  I know that he had testified numerous occasions in federal court.  I don't know if he had ever worked in a death penalty case before, but he would have been referred probably by Dr. Watts.

Q.   I see Diane Follingstad was a team member.

A.   Dr. Follingstad was a jury consultant.

Q.   And then Shealy Boland.  She was a law clerk?

A.   She was my law clerk, very detail orient and was actually a very good law clerk.  She's an attorney now in Columbia.

Q.   What was one of her primary tasks?

A.   Shealy did timelines and was inputting information into a timeline that I was keeping, that we were keeping.  Again, she was very detail oriented and really did a great job with

everything she was given.

Q. Lisa Kimbrough?

A. Lisa Kimbrough was brought in probably eight months in, maybe six months in, to assist in mitigation.

Q. She's actually a lawyer?

A. Yes, she is.

Q. But she was brought in as a mitigation person, mitigation investigator?

A. Yes.

Q. So by my count you have at least five lawyers, and I guess if you include Mr. -- maybe more. But then you had it looks like three, four investigators, if you take Mr. McNair, if you include him with Kimbrough, Watson, and Tarr, is that correct?

A. Yes.

Q. And then you had a Dr. Donald Morgan, another psychiatrist. What was his role?

A. He was treating Brandon. He was not evaluating Brandon, he was treating Brandon while Brandon was in the custody of the Richland County Detention Center, as well as while Brandon was in the custody of the Just Care Health Center here in Columbia.

Q. And what about James Aiken?

A. Jim Aiken was the expert on jails. And Jack actually found Mr. Aiken. I don't know that he had dealt with him before, but I know that Jack did -- looked into that. We

wanted to present that evidence to the jury and Jim Aiken was our expert.

Q. And then you have David Good and Daniel Goldberg?

A. David and Daniel spent a lot of time with Brandon reading discovery to him.

Q. And a few other miscellaneous folks. One is Jean Strickler.

A. Jean was in Jack's office, she was a paralegal. Again, I think Jean's primary function was to maintain order with regard to the files. She did not participate in interviews, she did not really participate in any of our meetings, substantive meetings, about how the case should be handled or where people would go, conduct interviews or who would be interviewed.

Q. And Anna Rawl?

A. Anna was my law clerk during this entire time. I think I had a couple of them, actually, but Anna was -- she assisted me.

Q. And then Christina Rampy, who was with Nelson Mullins, I guess?

A. Christina was working with the Nelson Mullins law firm, that is a law firm all over the country, and she just volunteered her time on a few of the issues as they arose.

Q. Two of the allegations, claims 19 and 20, talk about the failure to assemble and supervise the team. We will get to

that a little bit later, but I thought I'd ask you first, seems like a team that -- did you feel like you were assembling everybody you needed? I mean, was there ever a time where you thought you needed somebody but we can't get it either because the judge wouldn't give the money or just for time purposes? I don't know, just did you ever feel like you didn't have what you needed?

A. As I explained to both lawyers preparing for this, at no time did Judge Anderson or any court ever deny us access to an expert or to an investigator, or travel, or anything that we needed to defend Brandon.

Q. If you had needed an expert you would have gone to the judge and tried to get it, right?

A. Yes, sir.

Q. As far as the management, again we're going to get to it in a little more detail later, your and Mr. Swerling's management and supervision of the team. How often were y'all keeping up with what was going on? Was it every once in a while, was it every day, was it 24/7?

A. Every day without question something was done on this case, someone was managed in this case, someone was interviewed, discussions were had between myself and Jack and the team.

Q. Let's go ahead and start with claim two. In claim two we have an allegation that you rendered ineffective assistance of

counsel because you didn't prepare for and effectively litigate the Jackson v. Denno hearing. Do you remember the Jackson v. Denno hearing starting February 24 of '04?

A. Yes.

Q. And it spanned a number of statements, correct?

A. Correct.

Q. And did you and Jack prepare for it?

A. Yes.

Q. Did you read all of the reports regarding the various statements that were made by Mr. Basham from the moment he was arrested until he was transported into South Carolina?

A. Absolutely.

Q. And when you were doing that were you looking to see if there were ways that you might be able to keep out some of those statements?

A. Yes.

Q. And did you at any point find that you had strong evidence that Mr. Basham was coerced?

A. No.

Q. Or that food or drink was withheld?

A. No.

Q. Or that he was somehow forced to give statements in any way?

A. No.

Q. I would like for you to look at Exhibit 12, which we will

pull --

MS. STONE:  Your Honor, this is the exhibit we talked about in chambers, and Agent Long is in the courtroom.

THE COURT:  All right.  You want him to step out at this time?

MS. STONE:  Yes, please.

(There was a pause in the proceedings)

BY MR. DALEY:

Q.  Can you tell me what this memorandum is?

A.  It is a memo that I created after having conducted interviews in December of 2003 in West Virginia.

Q.  I think it might have been Kentucky, but --

A.  Was it Kentucky?  Yes, that's where Brandon was arrested, that's correct.

Q.  And who did you interview?

A.  I interviewed Barbara McGuire, who was a -- who was a paralegal in the office, I interviewed Mr. Hewlett, who was a public defender, and I interviewed Richard Hughes, who was an attorney that did federal work Ashland, Kentucky.

Q.  I'll try to speed it --

A.  It's Brian Hewlett, I see it now.

Q.  Did she at some point during the time Mr. Basham was being interviewed get into talk to him?

A.  Yes.

Q.  Could you go to page two, Gail?  Just highlight the part

that -- just the middle part, if you would bring that up. I highlighted some parts, but the bottom line is during her time with Mr. Basham did she have any concerns that he didn't understand his rights?

A. No.

Q. And did she, in fact, have any concerns that he didn't understand what was going on?

A. No.

Q. In fact, did she say he's not stupid?

A. Everything in this report is accurate as to what she told me.

Q. And as a result of what she told you, that gave you a little less concern that he might somehow have been coerced?

A. Yes.

Q. Go to page three. This is a continuation, and just -- the highlighted part, again, she says -- you recount that she said she went so far as to have Brandon sign in writing the fact he was waving his right to an attorney and that he understood his advice of rights?

A. Correct.

Q. So she actually separate and apart from the waivers and the Miranda readings that the police, the FBI and folks gave, she actually did one herself, is that correct?

A. Correct.

Q. Let's go to the next page. This is actually the bottom of

page three.  It starts that you interviewed Brian Hewlett.
And this is the public defender?

A.  Correct.

Q.  And he went and talked to Brandon at some point, Mr.
Basham?

A.  I believe the following day.

Q.  And he, too, tried to keep Mr. Basham from talking, but
that Mr. Basham continued to talk, is that correct?

A.  That is correct.

Q.  Page five.  And then you talked with Mr. Hughes, who was
appointed by the federal court in Kentucky to represent Mr.
Basham in his proceedings in Kentucky?

A.  That's correct.

Q.  And, again, your recounting of what Mr. Hughes said is
that he understood his rights and he had decided he was going
to go ahead and talk and cooperate with law enforcement and
assist them in trying to find the bodies of Samantha Burns and
Alice Donovan.

A.  Yes, sir.

Q.  And, in fact, he on a tape that -- did you ever receive a
tape from him at some point?

A.  Yes, I had a transcript.

Q.  And in that tape it is Mr. Hughes and Mr. Basham talking?

A.  Yes, sir.

Q.  And in it he advises him of his rights again, Attorney

Hughes does?

A.   That is correct.

Q.   And Basham indicates he's not going to -- Mr. Hughes says don't talk and Mr. Basham says, no, I'm going to continue to cooperate with the FBI?

A.   To the best my recollection, that is on the tape.

Q.   And then last page, page six, Mr. Hughes' impression was that he understood all of his rights?

A.   Yes.

Q.   And he -- and Mr. Hughes even had went so far as to say to Mr. Basham how the statements he was making were going to be used against him.

A.   That is how he explained it to me, yes.

Q.   So at a minimum you had investigated well enough that you knew that when he was in Kentucky he was not only being advised of his rights by the law enforcement, but that he had had three different folks who were public defenders or the public defender's investigator telling him his rights, as well.

A.   Yes.

Q.   None of them indicating that he was incompetent, not able to give a statement, not understanding his rights.

A.   That is correct.

Q.   And, in fact -- will you pull up Exhibit 13, please? After the hearing and before trial, because there's an

allegation in claim 13 that you should have argued this to the jury, argued that the statements were involuntary, did you and Mr. Swerling go back and reinterview Mr. Hughes and Mrs. -- Miss McGuire?

A. Yes, we did.

Q. And they simply confirmed what they had said previously.

A. That is correct.

Q. Now, with regard to preparing for the hearing on September 25th, which would have been statements that are given in South Carolina, particularly the statements -- not the 25th, the 28th, Thanksgiving, the hearing was on February 25, about the Thanksgiving day search, did you take time to talk with and interview Mr. Monckton and Mr. Littlejohn?

A. I can't remember if I interviewed Mr. Monckton. I know that Mr. Littlejohn and I spoke about these matters.

Q. If I pulled up a time sheet of Mr. Swerling would that maybe refresh your recollection?

A. It would.

Q. Okay. I think it's Government's Exhibit 162 at pages five and six. Four, five, and six. I think if you go to the page six, Gail, I think it's the 2-24, the third one down. It's already been admitted into evidence. These are Mr. Swerling's time records. On 2-24 this has an entry, prep for motions hearing. PC with Billy Monckton and Cam Littlejohn and Greg

Harris.  I don't know if that a refreshes your recollection.

A.  I really -- I'm not -- this doesn't surprise me.  Like I said, I know that Cam and I spoke a lot about this.  I just don't have any independent recollection of discussing with Billy Monckton these matters.  I'm sure that I did, if Jack says we did on that day I have no reason to -- certainly no reason to doubt that.

Q.  And my point is, though, you were prepared, you did not go into that --

A.  Yes.

Q.  -- by the seat of your pants, correct?

A.  No, that is correct.

Q.  Now, tell me why in the end you ended up making certain arguments that required a finding by the court that the statements should be admissible but that you didn't go full bore and try to argue that there was any coercion or manipulation or --

A.  Well, I didn't believe that there was.  Statements were going to come out based on the facts as I knew them.  Our goal, at least my goal, I can't speak for Jack, although I know this was the plan, my goal was to elicit as much information from the agents that I could as to Brandon's cooperation and assistance and to demonstrate that Brandon was trying to help from day one, from the moment that he was fished out of the river, trying to help the location of the

bodies.

Q.  Now, you did, however, attack as being outside the scope of what was allowed some of the things that were said or done on the Thanksgiving day search, isn't that correct?

A.  Yes, that's correct.

Q.  But, again, you didn't attack those statements based on any police coercion, police withholding of food or making him stay up too late or anything.

A.  No, we didn't.

Q.  And did Mr. Monckton or Mr. Littlejohn give you any information that would have led you to want to pursue that, pursue attacking the statements because he was being coerced, for example?

A.  No.

Q.  Did you want to use the Jackson v. Denno hearing for discovery purposes?

A.  Yes.

Q.  That's a yes?

A.  That was a yes.

Q.  And what about for general, I mean, discovery basically? But then also to lock down testimony by --

A.  I wanted to lock down the agents for questions such as isn't it true that Brandon was trying to help you.  I wanted that agent on the record to say yes.  Isn't it true that Brandon was not aggressive towards you.  I wanted the agent to

say yes, so I had them locked down on that testimony so that when it came time to cross-examine that agent I knew exactly what they were going to say with regard to Brandon's assistance.

Q.  Let's go to claim five.  Actually it's claims four through seven in the petition that talk about competency.  The original attorneys, Mr. Littlejohn and Mr. Monckton, filed a motion on December 11.  You and Mr. Swerling, though, did not want a competency evaluation done, is that correct?

A.  Yes.

Q.  In fact, if you could have avoided it would you like the government to never have examined Mr. Basham?

A.  Absolutely.

Q.  Was there any possible reason you could see that you would want to make a motion to allow the government experts at Butner, for example, to examine Basham, if you could help it?

A.  No, I did not want Brandon -- I wanted to keep Brandon away from the doctors, the government doctors, as long as possible, and if he never got examined that would have been fine with me.

Q.  And, in fact, if you pull up Government's Exhibit 12 again, page four.  Down towards the bottom didn't you in fact ask that Mr. Hewlett withdraw his motion for a competency evaluation?

A.  I had not remembered this, but, yes, I did.  I did that,

yeah, now that this refreshes my recollection.

Q. And why were you --

A. I did not want the government to rely on any member -- any legal advice that Brandon was getting from anybody in any jurisdiction. I didn't want them saying he's being evaluated there, therefore we should be given access to him.

Let me also say another reason, Mr. Daley, we didn't want him evaluated. And this was a continuing battle that actually the court weighed in on during numerous hearings. We wanted control over the battery of tests that would be administered if the government got ahold of him. MMPI, for instance. I know there was a lot of discussion I remember about we didn't give that test, why should they. And the government -- I believe the court's ruling was that they were only entitled to similar or like testing. So there was somewhat of a battleground over what tests would be performed on Brandon. So that was just another reason we just didn't want to turn him over to allow the government to poke and to prod and to do everything that they wanted to do to evaluate Brandon.

Q. Do you believe there's an ongoing obligation to consider and make sure that your client's competent throughout the proceedings?

A. Oh, yes.

Q. And, in fact, isn't it true that each time you had a concern about Mr. Basham's competency you would bring it to

the court's attention?

A.   I did.

Q.   And at least in two instances, in the February 24th Jackson v. Denno hearing y'all had Dr. Schwartz-Watts come and examine him after getting a break for her to do so?

A.   I believe we did.

Q.   And then, of course, the September 20th incident, same thing happened.  And then I'm not sure whether you asked for it but you certainly brought it to the court's attention in October 26, is that correct?

A.   Is that when he told us he had ingested --

Q.   That was actually the September 21st morning after the altercation.  That's the morning when the cocaine --

A.   Yes.

Q.   When he said he --

A.   I agree there were a number of times I brought to the court's attention that I believed Brandon couldn't go forward for the rest of the day or for whatever reason.

Q.   And so competency becomes an issue.  Why didn't you say well, Judge, we should send him off to Butner then?

A.   Well, I think that on every occasion, given time, he was evaluated by our doctor, who knew him better than anyone, and she rendered an opinion he was competent to assist us, he knew what was going on in the trial and that he could go forward.  I don't know how we would have at that time asked for an

evaluation inconsistent with that.

Q. Have you asked for evaluations previously or since that time for other clients?

A. No, I haven't.

Q. And is it the same reason, that you don't want to have the government get ahold of your client?

A. I mean, I've never done it, so -- haven't been put in that position. If given the same choice with a similar set of facts I would certainly have wanted to have my client tested by my doctors before turning him over to the government.

Q. And avoiding the government's doctors as much as possible.

A. Absolutely.

Q. Besides perhaps that night, September 20th, did Dr. Schwartz-Watts ever find Mr. Basham to be incompetent?

A. Not that I recall. She found him to be incompetent that day in court one day.

Q. That's what I am saying, that time period, September 20, you said?

A. Okay, all right.

Q. I'm talking about besides that one time.

A. No. She found him on occasion, to be clear, she found him on occasion when he was at the Alvin S. Glenn, she found -- he was such that he couldn't be evaluated by her. Now, I don't know that that makes him not competent. He was uncomfortable in his surroundings, he was having problems with some of the

guards and he was in a very agitated state because of environmental issues that were going on.  That's why we had the court -- asked the court to move him so that we could conduct her examination, which occurred at Just Care.  So I want to be clear that while she didn't find him to be -- she found him to be competent, but there were problems associated with Brandon and in her evaluations, even.  So I want to be clear about that.

Q.  Was he helpful to you?  Could he give you information?

A.  Yes.

Q.  So he remembered names?

A.  Yes.

Q.  Could he remember events?

A.  Yes.

Q.  In fact, did he describe a lot of events that had happened?

A.  Yes, he did.

Q.  Did he sometimes lie to you?

A.  Brandon lied.

Q.  Did he sometimes lie to you?

A.  I mean, Brandon told me things that were inconsistent with what other people had told me.  Brandon told me things that were inconsistent with things -- with documents that I had been presented.  So to the extent that he was untruthful to me, I would say that he on occasion was untruthful.

Q.   And would one of those have been the Exhibit 12 where you interviewed those folks that had all explained to you the circumstances of the questioning?  Did he then give some inconsistent --

A.   Yes.

Q.   -- statements afterwards, because you wanted to check up on that?

A.   Yes.

Q.   Okay.

A.   I believe I -- I remember that I think I did a memo about that conversation.

Q.   Would you mind pulling up Exhibit 160.  160, which has been introduced into evidence, is a summary from your time sheets and Mr. Swerling's time sheets about how much time you spent with certain people.  I wanted to focus in on the time you spent with Mr. Basham.  This is the fourth to the right, Gail, and the first line, if you could highlight that.

     Why don't you take that down, sorry.

A.   I'm fine.  I can see --

Q.   From that can you tell how many times you met with Mr. Basham?

A.   I really can't now.  Can I look at the -- there we go.  It appears I met with, spoke with him on the phone 90 times.

Q.   That actually looks like the total for you and Mr. Swerling.

A.  I'm sorry, 50.

Q.  For how long?

A.  What do you mean, for how long?

Q.  How many hours, total?  The next column.

A.  109.

Q.  Does that seem to you to be about right, is that --

A.  Yes, I met with Brandon a lot.

Q.  Again, he was helpful in giving you information, telling you certain things that helped you track down records and what had happened previously in his life?

A.  I'm not going to sit her and tell you that he was my source or even a really good source, Mr. Daley, because he wasn't.

Q.  Okay.

A.  You know, Brandon and I talked about a lot of things over the year-and-a-half that I spent with him.  And I'm not going to sit here and tell you that I would take him a report and ask him specific questions about his father Jimmy or his uncle Tommy or where did you go after you left Rivendell, things like that.  He really was not all that beneficial in terms of connecting dots.  We did discuss all those matters and he was -- he did know, you know, he had a lot of information about those places.  Had a lot of complaints about those places.  He had nice things to say about, you know, the people that were kind to him.

So, yes, he understood almost everything we ever talked about, and while he wasn't the greatest historian, I mean he remembered names, he remembered times and places and things like that.  Maybe not as you or I would, but he did have recall for a lot of the information.

Q.  And when he would remember somebody who had been kind to him or had nice feelings about, did that often turn out to be somebody who might be helpful?

A.  Absolutely.

Q.  On the last line, if you go over to the fourth column, you met with or talked with Dr. Schwartz-Watts it looks like ten times for a total of 22 hours?

A.  That would surprise me.  I met with her a lot more than that.  But if that's what I billed for, that's what I billed for.  I met with Donna a bunch.  I can't imagine -- I can't imagine I only -- only ten entries in here.  But, yes, that's what --

Q.  Is it possible, do you think, that all your hours were captured on your time sheets?

A.  No.

Q.  Or think they were low?

A.  They were low.

Q.  Again, so you talked with Dr. Schwartz-Watts numerous times about Brandon's condition.

A.  Absolutely.

Q.   And about how he was doing.

A.   Yes.

Q.   And if there were problems she would tell you?

A.   Right.

Q.   Or if you saw problems you would tell her.  And then if there was a problem that perhaps could be done with medication or treatment Dr. Morgan would be involved?

A.   I was going to say I didn't deal with Dr. Morgan much at all.  I can't imagine what my -- Jack dealt with Dr. Morgan a lot.  So if there were issues with regard to Brandon's meds, generally speaking Jack and Dr. Morgan would have addressed those issues.

Q.   Why didn't you pursue an incompetency claim in this case?

A.   Didn't have any witnesses to testify that Brandon was not competent to stand trial.

Q.   Let's go to claim nine, the concession of guilt in the guilt phase.  The mostly concession of guilt with -- you knew what y'all were doing.  This didn't surprise you that basically you were pleading guilty to a crime that he was going to be eligible for the death penalty in, correct?

A.   The kidnapping, yes.

Q.   Well, I believe there's going to be a criticism that you gave up too much.

A.   Well, they -- that criticism may exist.  I disagree with it.

Q. And, again, the strategy for conceding what you did and leaving intent on the table was?

A. To the extent that the jury felt empathy for Brandon because he had accepted responsibility, and from, again, from the moment he got out of the water tried to make it better, we wanted to engender that. And we wanted to do it from opening statement. We didn't want to put a jury through a who done it for a month at the end of which it was obvious who done it, and then turn right around after a week break and say, okay, that didn't work, so how about sparing his life.

We thought a better course of conduct or better strategy, rather, to come in from the very beginning and say this is not a who done it, let me tell you what happened and, you know, start working from first opening bell until the trial end to try to work with the jury towards a good result.

Q. Did you have any doubt that if you had tried to just defend this case as best you could, do you have any doubt that he was still going to be convicted?

A. Oh, he was going to be convicted. There was no doubt in my mind about that.

Q. And the ex parte order where Mr. Swerling lays out the strategy I think is part of the record already. But I think it's Government's Exhibit 20. Did y'all talk about this with Mr. Basham?

A. Yes.

Q. Did you talk about it with each other?

A. Yes.

Q. And was there anybody who objected to this approach?

A. No.

Q. If you had an opportunity to do this again in a case like this would you do it?

A. Absolutely.

Q. Did you then later on try to use the concession that you had made later on in trial to try to explain to the jury that you had conceded because you weren't going to try to say that he didn't do it?

A. I think Jack did in his arguments. I don't know if we through the trial through witnesses ever -- that ever was ever really an issue. I don't know that that would have been relevant to come in through a particular witness.

Q. That was really talking more just about arguments, closing arguments.

A. Yes, I think certainly that was addressed in argument.

Q. Let's go to claim ten -- well, yeah, to claim ten, which is still -- claim ten still --

            MS. STONE:  I'm sorry?

            MR. DALEY:  Claim ten, you are still going forward with claim ten?

            MR. BURKE:  We're not waiving it. I think the record speaks for itself.

MR. DALEY:  Got you.

Q.   (MR. DALEY) Why did you want Brandon to be in the courtroom?

A.   I wanted the jury to see Brandon.  I mean, you always want your client in the courtroom.  I don't know what to say other than that.  Doing what we do, if a client is not in the courtroom there is -- I can't think of a positive inference to be drawn by a juror from your client not sitting beside you.

Q.   And I think you've said in the interviews that we had neither you nor Mr. Swerling saw the altercation with the marshals coming.  This was a surprise?

A.   The level --

Q.   Yeah.

A.   -- was a surprise.  The altercation was a surprise.

Q.   Let's go to 13 just for a minute.  Same thing as claim two about why you didn't argue the involuntariness of the statement to a jury.  And I guess the question, I mean, let me just ask you a leading question:  Did you think it would be inconsistent to suddenly argue that the statements were involuntary if you were trying to get some level of benefit from saying he was helpful from the beginning?

A.   Yes.

Q.   You want to say any more about why you didn't argue that to the jury, or do you think it covers --

A.   Trial strategy was to -- again, trial strategy was to

demonstrate a number of things.  One of the strategies was to demonstrate that from, again, the moment he was arrested he tried to help.

Q.  Claim 15 deals with the 404(b) evidence, in particular the Burns evidence, the Samantha Burns kidnapping evidence.  You did object to it, correct?

A.  Yes.

Q.  And the court found that it was intrinsic, correct?

A.  Yes.

Q.  And this, of course, is in the guilt phase.  They are only objecting to its admission, I guess the extent of it, in the guilt phase.  Do you think that even if it had been kept out that that would have impacted whether the jury convicted him of being guilty?

A.  I think not as to the conviction, not as to guilt or innocence in the guilt phase, no.

Q.  Okay.  And once you knew that the evidence was coming in did you see a potential benefit of that Burns evidence coming in to show the relative roles of Mr. Fulks and Mr. Basham?

A.  Now, I will say I see very little benefit at all in that evidence.

Q.  Okay.

A.  So I want to be clear about that.  For me to sit here and say I got any benefit out of that evidence coming in, that would be a ridiculous statement.  So, no, I saw no benefit at

all.  To the extent that we could squeeze any juice out of that at all it would be to try to demonstrate that after they took that young lady that they took her to places that only Chad Fulks knew existed, they took her from places that only Chad Fulks -- took her from places only Chad Fulks had been to.  So to the extent that we could at all receive any benefit of that, from that, we tried to show that, again, as it related to the Burns abduction Chad Fulks was the leader.

Q.  Claim 16, the failing to renew the request to have select portions of the closing argument statements in Fulks put in in your case.  Do you remember whether you had a reason you didn't renew that?

A.  Well, there's a couple of reasons.  First of all, my recollection of the colloquy with the court, we kind of talked about this and I still haven't seen this in the transcript, but the court referred to the rule of completeness.  One of my concerns was that if we put in evidence that Johnny Gasser, who was the prosecutor that we're talking about, had used the word puppet 46 times or however ridiculously large number of times that it was, if we put in that evidence, that his entire closing argument would have come in.  And I don't know if you've read Johnny Gasser's closing argument, but they are generally pretty good and they are generally very impactful. So I don't know that I would have -- I know that I didn't want that jury to read Johnny Gasser's closing argument in the

Fulks case.

The other reason that I don't think we raised it, because I still don't believe that they shifted theories. I thought that we were able to, through cross-examination, demonstrate who was the leader and who was the follower. I also thought, quite frankly, and I've looked at the -- I have looked at the testimony as to this issue, I thought the government fairly well intentionally diffused some of our cross-examinations by bringing out respective roles with their own witnesses, which kind of took the sting away from us when we got up and said isn't it true Chad Fulks was the leader, isn't it true Chad Fulks told Brandon Basham to tie you up and how to tie you up.

The Hawkins testimony was a good example of that, where they went to great lengths to talk about the respective roles of Fulks and Basham before we got to do it on cross-examination. So I never thought their position changed. I know that there was somewhat of a shift in Mr. Gasser's closing argument and I recognized that, but other than that, I don't know that the government ever shifted their positions. Which was the court's ruling, I will look at this if the government shifts their position. That's my recollection.

Q. Let's go to claim 17, the Clifford Jay testimony. Let's pull up Government's Exhibit 23. These are some notes from Mr. Swerling's file. I'm wondering if you recognize those -- is that his handwriting?

A.  Oh, yes.

Q.  And could you decipher it?  Because it took me a very long time to decipher what it said.

A.  Didn't want to impeach him because we might want to keep him as a favorable witness during the penalty phase.  I mean, he's basically saying there that we don't want to say liar, liar, pants on fire to him and then call him later.  Because he had so many good things to say about Brandon if we chose to call him later.

Q.  So at the time that he testified in the guilt phase it was certainly possible that he was going to testify in the penalty phase?

A.  He was on our list of witnesses that we may present during the mitigation phase of our presentation.

Q.  Isn't it true, first, you don't want somebody to get up and testify, whether it be Paige Tarr or whoever else it might have been, to say oh, he didn't say we killed them, he said we killed her.  You didn't really want that coming out, correct?

A.  I just didn't think -- that was just not good -- that's no way to try a case, I don't think.  That would have been a bad witness.

Q.  And, secondly, if you had impeached him or tried to impeach him how would that have impacted your ability to call him as a penalty --

A.  Again, we're saying that that witness was untruthful on

the stand, don't believe that, but we want you to believe it when he tells you all these nice things about Brandon.  I just didn't think that that was -- that doesn't make any sense to me.

Q.  And you did, in fact, interview everybody you possibly could, the two other officers who Clifford Jay had called?

A.  Yes.

Q.  And did any of them -- was their testimony, did you think, going to be helpful in impeaching him?

A.  No.  Their testimony, here was the question to them, the question to them, and I sent Carlisle out to find out if their notes are correct, if their reports are correct.  Because their reports don't say Clifford Jay called them up, because that's what he did, Clifford Jay picks up the phone and called Conway, South Carolina and says I've got some information about a murder in South Carolina.  I know Brandon Basham, here's what he said.  And he said that there was a murder that occurred.

I can't tell you verbatim what was in the report, but I know that it was a big deal when Clifford Jay all of a sudden said them instead of her and I wanted to know if that was in their report.  And so all they would have said was it's not in the report, we wrote down what's in our report.

Q.  And in his testimony it wasn't just simply he said we -- we killed them, I mean, Clifford Jay says that, but didn't he

give some reasons why that stuck in his mind so clearly when he testified?

A. You know, I can't remember, Mr. Daley. I'm sorry, I just --

Q. It's all right. The --

A. I know what he told me in his den, and he said that Brandon Basham said we killed her. And then he had, you know, he had -- it changed. It morphed into we killed them. I can't tell you why and, frankly, tell you specifics of his testimony.

Q. And you followed up, though, after you found out that he was saying that Basham said we killed them, and he confirmed that that's what his memory was when you -- when you reinterviewed him?

A. And I reminded him what he had told us and he stuck with we killed them.

Q. Let's go to claim 18. This is the cross-examination of Ronald Hewitt.

THE COURT: Before you move on, I still -- I'm a little confused. I thought the briefs by the petitioner said that the lawyers had information that two law enforcement officers were prepared to testify that they had talked with Clifford Jay and they would be prepared to say that Clifford Jay told them that Brandon Basham said, I'm sorry, that Mr. Basham said in a conversation we killed her. Is that not the

petitioner's position?

MS. STONE: Your Honor, I don't believe -- I'm not looking at it right now, but I believe our argument was they could have called Addison in rebuttal and he would say that Clifford Jay did not say we killed them, his report was silent as to her or them, but that he had spoken with Clifford Jay prior to Long. Long's report said them. The memos from Paige Tarr --

THE COURT: I know about Paige Tarr. This is yes or no. Is it your position that the defense team had information in its files that would suggest to them they should call two law enforcement officers, put them on the stand to impeach Clifford Jay and say that Jay said the word her and not them?

MS. STONE: No, to impeach Clifford Jay and say I never said them. But not -- not to call him as impeachment to say her. They could have called Paige Tarr with that impeachment. And I apologize if our arguments are not clear on that. Our position is not --

THE COURT: I thought when I read the briefs, I thought that was one of the most critical issues in this motion.

MS. STONE: No, we do not have their -- there are not police reports that say her. There are not. There are notes from Swerling, there are notes from Paige Tarr and notes from Mr. Harris. There is a 302 that came across which alerted

them to the change in testimony that says them.

THE COURT:  I guess I'm just mistaken looking at page 72 of your motion.  Mr. Swerling argued that he did have a good faith basis for the question, indicating that the defense team had checked with both of the officers and confirmed that Mr. Jay never told them about Mr. Basham's supposed reference to "them", in quote marks, in his statement to Jay.

MS. STONE:  And that's correct, your Honor.  The officers, as I said, the officers' report do not say what Agent Long's report says, them, but in all candor they do not say her either, they are silent.

THE COURT:  Okay.  All right.  I understand it.  I was -- I misread this a little bit.  I thought the argument was a little bit more straightforward, that he had direct impeachment 302s or something from the officers who used the word her.

MS. STONE:  No, your Honor.  Simply if that had been such a powerful -- if Jay had that elaboration it really struck me, why it struck him so strongly I think he would have been -- he would have told the officers, too.  But, no, they do not say her or them, they are silent.

THE COURT:  All right.

BY MR. DALEY:

Q.  Claim number 18 is the cross-examination of Sheriff Hewitt.  They criticize you for not -- after the questions

were asked of Sheriff Hewitt you decided to turn to another subject very quickly. And one criticism is you didn't try to come right back at him with a -- with his statement, I guess, or try to potentially impeach him. What's your response to --

A. The next question -- had I asked another question of that witness it would have been isn't it true you told Agent Long -- you know, isn't it true that what you are saying today is inconsistent with what you said to Agent Long. That would have been the next question. And he would have said the same thing to me that he said, which was non-responsive. He would have said yeah, but, and then he would have -- he would have said what he said. He would have said it all over again.

You know, sometimes we read witnesses and you can tell when somebody just wants to say something and it's not going to respond to your question. He didn't respond to my question, he said what he wanted to say, and I just tried to get away from it. Inartful or not, I just wanted to get away from that.

My intent with Sheriff Hewitt, if you look at his testimony, was there was two things. I wanted for the jury to understand the miles and miles of pine trees and roads and how confusing it is for somebody, you know, in law enforcement, much less Brandon Basham. And the other was to ask a very specific question and to address what he and Mr. Gasser had talked about on direct, which was that Brandon -- he made it

sound direct like Brandon was saying this, and I just wanted to point out that's nowhere in your notes, is it, and he didn't say that he did it, did he.  And it's a yes or no answer, really.  There's no explanation.  You know, usually can say yes, explain your answer.  The question is did you write it down and the answer is no, there's really no explanation.  And he you know, he gave me an explanation that was nonresponsive, I believe.

Q.  Let's go to claim 19 and 20.  That's the failure to investigate, develop, present mitigating evidence, and then also the failure to assemble team and supervise it.  I think we can go through this pretty quickly.  The mental retardation issue, that wasn't an issue you ignored, correct?

A.  Correct.

Q.  You had retained Tora Brawley.  One of her purposes was to determine his IQ, and if she found it to be low to potentially say he was mentally retarded if she could, correct?

A.  Correct.

Q.  And her opinion was that he was not mentally retarded.

A.  Correct.

Q.  In fact, there were at least three or four other IQs that were well above the magic 70 number, even though it's not really a magic number, correct?

A.  Again, I don't remember how many, but I know that there were a number of reports and testing that had been given,

tests that have been given to Mr. Basham over the years.

Q. And did Mr. Basham strike you as someone who was mentally retarded?

A. No, but I'm no expert. That's why we hire experts to tell us, to make those evaluations. I have obviously over my lifetime spent time with families with friends that have children with disabilities. He did not strike me as someone that has problems that some of my friends' children have. Again, that's merely a lay opinion.

Q. Did the defense team, not just you, but did the defense team, you and Jack and Dr. Schwartz-Watts and Dr. Brawley, talk about the IQ issue?

A. Yes.

Q. And talked about it in some length, correct?

A. Yes.

Q. So, again, you did get out as much as you could, at least from Dr. Brawley, about his low IQ, right?

A. Yes.

Q. And his low functioning?

A. That's correct.

Q. And all the issues that go with that, and that he was in special ed class, correct?

A. And all that is on the record. That was the thrust of her presentation to the jury.

Q. And do you understand, having sort of looked at the issue,

that obviously the IQ score alone is not determinative if somebody's mentally retarded, is that correct?

A.   Correct.

Q.   And were there ways he functioned that would have made it harder to argue that he was mentally retarded?

A.   Yes.

Q.   Separate and apart from the fact that apparently he hadn't been -- his IQs before made him really not able to be mentally retarded under the criteria?

A.   Yeah.  I mean, yes, Brandon could do things, and I don't know if this is responsive, but Brandon could do things that I can't do.  You know, it's -- there was a rope that was introduced in the trial that stretched from that wall to that wall, whatever the distance is.

Q.   The --

A.   It might be 40 or 50 feet.

Q.   The length of the courtroom.

A.   And it was created by Brandon by himself using the -- some type of equipment that was attached to the bed where he was housed at Columbia Care.  And he did it by tearing off tiny 12-inch or 12-inch strips of his bedding and intertwining them into what was a very complex rope.  You know, that doesn't mean somebody's not retarded, mentally retarded, it means they have some ability to function in some regards at a higher level than me.  And part of that, sad as it is, is because of

where he had been all of his life. He learns things at the facilities where he goes from facility to facility, he learns things that you or I don't learn. Again, does that mean he's mentally retarded or not? It doesn't. But it does mean that he has some ability to function at a level that's higher than others.

Q. Fetal alcohol spectrum disorder is another portion of this claim. They say you should have raised that, pursued that. Did you know about this fetal alcohol spectrum disorder defense that's used sometimes in cases?

A. Yes. Fulks had, I believe Chad Fulks' team had presented evidence of that to the jury, so we were aware of it. And our experts just said it did not exist in our case.

Q. So it was looked at?

A. Oh, yes.

Q. And, again, you relied upon your experts --

A. Yes.

Q. -- to determine that he didn't have it.

A. Another reason is there was a lot of family history with Brandon that suggested that that might have been something that -- might have had a factor in what he did and why he did it and how he lived his life. It just unfortunately, once we did the testing, and we didn't have it.

Q. Let's get to the team, to the defense team for a minute. And although the focus is primarily on Investigator Carlisle

McNair and mitigation investigator Paige Tarr, that was not the only -- those are not the only two folks that did investigations of mitigation, is that correct?

A.  Correct.

Q.  There was Lesa Watson, correct?

A.  Yes.

Q.  And I know Lisa Kimbrough did some work, as well.  Carolyn Graham did interviews, is that correct?

A.  I think it's a fair statement to say that everybody was part of the mitigation team because this was a mitigation case.  So from my perspective everybody was a part of the mitigation team.

Q.  So the lawyers Hisker and --

A.  Everybody.

Q.  -- Saunders, everybody?

A.  Yes.

Q.  And, in fact, you and Mr. Swerling interviewed 60, 70 people yourself?

A.  I was part of the mitigation team.

Q.  And one of the criticisms, and we will go back to, I guess, a few specifics, one of the criticisms is is that Mr. McNair was somehow distracted by certain things because of, I guess, they allege prurient interest in certain things.  Did you see any instance where Mr. McNair was not doing what he needed to do?

A.  No.

Q.  Do you -- I don't know if you've looked at some of the exhibits that we had prepared, I think we had given you some, but do you remember how many interviews, for example, Mr. McNair did?

A.  I was not aware until you -- while we were preparing for this both sides presented me with raw numbers.  I was not aware until then.

Q.  So it didn't surprise you when it ended up being about 200 interviews?

A.  No, it does not surprise me at all.

Q.  And, in fact, did Mr. McNair have a skill for finding certain people that no one else could find?

A.  He could find people.  I'm not -- attribute any special skill to Carlisle McNair, but Carlisle was good at finding people.

Q.  Well, let me give you one example though.  Wasn't there an Andrea Roddy who --

A.  He found Andrea Roddy 50 miles outside of Boston, Massachusetts, on the third floor of a tenement house, which I thought was pretty good.

Q.  And Paige Tarr, there has been some allegation that Paige Tarr wasn't doing a good job and she wasn't getting her memos in on time.  And it sounds like that there was an issue with that at some point, is that correct?

A.  Yes.

Q.  Did that go unresolved or was it immediately remedied by Mr. Swerling?

A.  I'm not going to say it was immediately remedied, but it was remedied and it had no, I don't believe -- well, it didn't have any effect on the way that I defended the case or the way Jack defended the case.  We got her memos in time to adequately prepare for trial.

Q.  And I guess more globally with both Mr. McNair and Paige Tarr, anything -- I mean, this is one of those cases where -- have you been to Mr. Swerling's office where all those boxes are?

A.  Of course.

Q.  The 70 --

A.  Of course.

Q.  I mean, literally how many institutions do you think you got information from?

A.  I think I probably myself --

Q.  Um-hmm.

A.  -- visited at least ten institutions.  Eight to ten.

Q.  And --

A.  Probably obtained information from 30 institutions.

Q.  And I mean --

A.  When I say institutions, I mean clinics all the way up through healthcare facilities where you are an inpatient

status.

Q. Let's talk for just a minute about Jan Vogelsang, too. What was her role?

A. Again, as I stated earlier, she presented Brandon's history, medical history, family history, criminal history, where he had been, who had seen him, who gave him drugs, what they gave him, how many they gave him, the problems that he had had in his past. She presented all of that to the jury.

Q. When --

A. Sociopsychological expert, something like that.

Q. And she put in certain charts and --

A. Right.

Q. -- and that sort of showed his life history, back to, I can't remember, his mother's birth? I can't remember.

A. Well, I know that our charts and some of the timelines we were creating went back to his grandparents. I think Jan's presentation, I think it began with Cathy and went through Cathy's problems all the way through the arrest.

Q. Do you see this as a case where y'all missed some large chunk of his life when trying to investigate his background and sort of what happened in his life?

A. Absolutely not. In fact, I'm confident sitting here today that we did not miss one week of Brandon Basham's life.

Q. And I don't think we have to show them, but there's been exhibits, 172 -- well, was there a thing called a cast of

characters?

A.  Yes.

Q.  Exhibit 169.

MR. DALEY:  May I approach, your Honor?

THE COURT:  Yes, sir.

Q.  (MR. DALEY) Just take a look at it for one second, Mr. Harris, and tell me what that is and why you had it in this case.

A.  This is order.  I mean, this is the only way to keep control over a case like this.  With the number of witnesses, the number of facilities, the locations, the only way to have order, any order at all, is to keep up with who needs to be interviewed, who has been interviewed, and what information they have.  And that's what a cast of characters is.

Q.  And so you had the name of the witnesses in alphabetical order?

A.  Um-hmm.

Q.  Then you had geographical areas, it looks like?

A.  Yes.

Q.  Because of the various geographical areas.  Then you'd have an address, if you had an address for the person, phone number if you got a phone number.  You would note when you had interviewed somebody and then initials of who did the interview, is that correct?

A.  Yeah.

Q.   And then if there were subpoenas that you had gotten, because I know some of these are actually institutions, you would say when you sent the subpoena and when it was received?

A.   Yes.

Q.   And then if there was information in the discovery you would then have that in a separate column?

A.   Yes.

Q.   Whose idea was this cast of characters concept?

A.   You know, I was actually involved in a case at the same time as this where we had one.  I don't know if it was my idea or Jack's idea, but it -- or Lesa's idea.  Quite frankly, I can't remember whose idea was and I don't know that anybody's claiming authorship over the idea.  It's just something that we all agreed we needed to have.

Q.   Do you now do a cast of characters in basically all your cases of any significance?

A.   Most cases you don't have a cast of characters because you don't have 600 witnesses.  But any time you have a case involving a large -- a lot of discovery, you probably ought to have a to do list, and what this is is a very fancy to do list.

Q.   I'm not going to go through them, but there is also a thing called a geographical index which was more by geography you would be able to track witnesses and what you had done?

A.   Yes.

Q.   And would that then be sent to people in geographic areas, whether it's Lesa Watson in Kentucky or Greg Cook in West Virginia, to help them know who they should be looking --

A.   No, I don't know if -- I don't know that you would send somebody the cast of characters and say Greg, you need to look at pages 13and14and tell me if you've got everything.  I think what would have happened is Jack and we would sit down, we would go through this often and say who do we need to interview and where are they.

And, you know, obviously some witnesses were more significant than others.  So, you know, a list would be generated and I called Lesa or I'd call Carlisle or whoever was going to travel, or even Paige, and we would say okay, you guys need to set up interviews with these five people in this location.  So that's how it would be used, more than just sending them the cast of characters list.

Q.   But everybody would end up with -- this would get updated?

A.   Yeah.

Q.   And it would get updated?

A.   Yes.

Q.   And I guess Lesa was doing most of the --

A.   I think Lesa Watson was in charge of making sure it was updated and it was accurate and it was orderly.

Q.   Gail, would you go he to Exhibit 31?  When this case first came up you obviously realized it was going to be enormous,

correct?

A. Yes.

Q. And I just wanted you to look at this e-mail dated September 23, '03. This is after the Department of Justice has decided to pursue the death penalty and you've gotten funding. I just wanted to ask you a few questions about that, because the allegation is, again, not great supervision. In this e-mail isn't it correct that -- and this was sent to -- I mean, all these e-mails are the folks we talked about, basically --

A. Yes.

Q. -- is that correct, who were on the team that Jack and you were to see every document and interview?

A. Yes.

Q. They were put in a basket. At this time you and Mr. Swerling had the offices next to each other, sort of --

A. Fifty feet away from each other.

Q. And everybody was required to give these memos in a timely fashion, isn't that correct?

A. Yes.

Q. And you and Mr. Swerling were going to talk about these things on a daily basis.

A. We did.

Q. And that is what happened?

A. It is.

Q. And about a week later, Exhibit 35, Mr. Swerling wants to obviously reiterate things, I guess.

A. Jack does that a lot.

Q. Is Mr. Swerling a hands off or hands on kind of manager?

A. Extremely hands on.

Q. Did anybody work on this case harder than Jack Swerling and Greg Harris?

A. No. No, Jack Swerling, leave me out of that equation, nobody worked harder than Jack Swerling.

Q. Anyone else know more about this case than Jack Swerling?

A. No. Jack's not only the hardest worker I know, he's one of the smartest people I've ever known.

Q. Did he bring all that to bear on this case?

A. Um-hmm. Absolutely.

Q. Let's just pull up for a second Exhibit 166. Can you see that on the screen?

A. Yes.

Q. This is another list. This is a geographical to do list?

A. Yes.

Q. And there's writing in red. Looks like this is dated July 13, 2004. Whose handwriting is that?

A. Jack's.

Q. Go through the pages, Gail.

A. And, you know, while I don't have a specific recollection of that day and those notes, this appears to be an afternoon

meeting between Jack and me, or a group of us, where each of us has our own list and we're going through saying okay, where are we on this thing, let's get that on the list, get an update. I would guess Lesa Watson was on the phone us. I would guess -- can you stop it for a second, please?

Q. Yes.

A. Get one that I can look at.

Q. Can we turn it?

A. Thank you. What would happen, we would all have -- Lesa could be in Kentucky, we would have one, Paige might be there, we might have everybody in the room, and we're just going through it line -- person by person.

Q. So page eight of Exhibit 166, you've got the first line it says interview, right?

A. This is -- this is probably the product of a four hour meeting where we're just going through them line by line, witness by witness, finding out where we are on the interviews, where we are on our investigation of every single person on this list.

Q. No stone is going to go unturned.

A. No.

Q. Let's go to Exhibit 51 real quickly. This is an e-mail from Lesa Watson. It says contacted/to be contacted. Who is she sending this to?

A. It looks like everyone.

Q.   It looks like the whole team.  And she is obviously reporting from the cast of characters and geographical to do list.  I guess she's updating what's going on, saying -- what's she basically telling y'all?

A.   I mean, it's fairly self-explanatory.  At this point in the investigation we had contacted 340 some odd people, but we had a lot more to do.

Q.   And these were the sorts of things that were just getting e-mailed back and forth.  I mean, can you imagine how many e-mails went back and forth in this case?

A.   No.

Q.   How could you tell Jack's e-mails, by the way?

A.   Jack writes in caps.  And Jack -- well, you know, I don't understand the question, really.

Q.   I just wondered if that's how you knew.  It seems like it always jumped out at me when I looked --

A.   Depending on Jack's mood you could -- you'd get e-mails from Jack at 10:30 at night, and I could always tell within two, three -- within two sentences whether he was aggravated or agitated or tired or what have you.  But, generally speaking, he was in all caps when he wanted something done immediately.  And he would write long e-mails, and the longer usually was not good.

Q.   Let's go to Exhibit 172.  This is a long document, so we're just going to show you the first page.  Do you recognize

that?

A. Yes.

Q. What is that?

A. This was the medical chronology, wasn't it?

Q. I think that's actually another one, medical psychiatric chronology.

A. I know Cathy's his mother, so --

Q. I think it was done by Shealy Boland.

A. She took medical records and put them together. Is this the medical record document?

Q. I think it isn't really the medical record document. I do know what you want to get to. Let's go to Exhibit 174. What is this?

A. That's the psychiatric chronology.

Q. I think it's 280 pages. This is -- how was this put together? Where were the sources of information?

A. This was all the information we got from the various facilities, medical facilities.

Q. And y'all put it in one document so it would be a resource and an encyclopedia of his life, I guess?

A. Yes.

Q. His medical life?

A. Yes.

Q. Let's go to claim 21.

       MR. DALEY: Your Honor, if we can have until about

1:00 o'clock be should be able to get through Mr. Harris.

THE COURT:  All right.

Q.  (MR. DALEY) The allegation is that you failed to request that the court trifurcate the trial in a guilt phase and then a two-part penalty phase where you first do eligibility and then later a penalty/selection phase.  That's the allegation. Did you think of that issue?

A.  No.

Q.  Okay.  Claim 23, inconsistent theories claim.  You didn't object to presentation of what they say, they allege, are inconsistent theories.  Why did you not?

A.  I don't believe, I didn't believe then and I don't believe now, the government presented inconsistent theories.

Q.  The causal connection argument that there was no nexus between the mitigation evidence and the crime committed, again, do you --

A.  I've read their filings.  I disagree with their interpretation of the -- of why the questions were asked and the impact they had.  And, again, but you would have to ask Mr. Schools why he asked those questions.

Q.  I think some of these, claim 25 is the two-step mitigation jury instruction which I think the Fourth Circuit has actually rejected that in Mr. Fulks' --

A.  I think Fulks raised that issue.  But we didn't, we didn't address that in our case.

MR. DALEY: Bear with me for a moment, please, your Honor.

(There was a pause in the proceedings)

Q. (MR. DALEY) Would you mind putting up Defense Exhibit 44, please? Yesterday Miss Stone talked about this e-mail that Mr. McNair sent out that says on the part -- do you see who he sent that e-mail to?

A. Donald Addison.

Q. Addison, do you remember Addison being one of the --

A. One of the cops in -- he was one of the police officers, rather, excuse me, in Conway, I think. He was one of the ones that took the Clifford Jay --

Q. And there's I guess Sheriff Hendrick or chief -- chief of police out of the City of Conway? In other words, I guess my question is, or to the extent you are able to tell, at least some of these appear to be law enforcement officers?

A. Yes.

Q. And is it your -- having worked with Mr. McNair, does it surprise you that he would be talking to police officers and saying he's a cop at heart when introducing himself?

A. No. And let me also say this: I have a vague recollection, and again this is just coming to me now so I apologize if we didn't discuss that last week, I have a vague recollection that these people would not talk to me.

Q. Okay.

A.   That they would not sit for my interview.  And that we had made inquiries previous to this into interviewing them as fact witnesses in the case and they had called Greg Hembree --

Q.   The solicitor?

A.   The solicitor, and would not sit for an interview with me. And I'm pretty sure that happened.

Q.   Right.

A.   And that may also understand about Carlisle would be acting like this in an e-mail to them to kind of engender some type of trust between the two of them.  But, no, I stand by everything I told Miss Stone yesterday about this e-mail.  But that's just Carlisle.  I don't disagree with her questions or her suggestions about Carlisle in this regard.

Q.   I think there was -- they asked whether you had ever hired Mr. McNair since this trial.  Is it your practice to hire SLED agents for state investigations, primarily?

A.   I use agents, FBI agents and SLED agents, as my investigators in my current practice of law.

Q.   And that's just what your preference is?

A.   Yes.

Q.   Is that from just experience, you like having them be former --

A.   It's from the kind of cases I primarily have in my office right now.  I'm not saying I wouldn't hire him, let's be clear, I wouldn't say I wouldn't hire him, I haven't hired

him.

MR. DALEY:  Beg the court's indulgence.  Your Honor, I think that's the first time ever I finished before I told a judge that I would finish.

THE COURT:  There's a first time for everything.  All right.  Any redirect we can get in before we break for lunch or do you --

MS. STONE:  Yes, your Honor, I believe --

THE COURT:  I'm sorry?

MS. STONE:  I do have redirect and I think I can close up before --

THE COURT:  Okay.

MS. STONE:  But if you feel the need to interrupt me --

THE COURT:  Suits me to keep going.

REDIRECT EXAMINATION

BY MS. STONE:

Q.  Hello again, Mr. Harris.

A.  Good afternoon.

Q.  All right.  Just to reiterate, you have significant trial experience and Mr. Basham was your first capital trial?

A.  Yes, ma'am.

Q.  And, accordingly, Mr. Basham's would have been your first penalty phase trial.

A.  Yes, ma'am.

Q.  And have you ever done an Atkins hearing since Mr.
Basham's trial?

A.  No, ma'am.

Q.  The government discussed with you Miss McGuire and Mr.
Hughes and their conversations with Mr. Basham.  Are you aware
if either of them have any background in mental health?

A.  No, ma'am.

Q.  Do you know if they had any records or background
information on Mr. Basham at the point they spoke with him?

A.  I would guess that they didn't.

Q.  Did not?

A.  Did not.  As a matter of fact, I think it is a fair
statement to say that they absolutely didn't have any medical
background on Brandon before they conducted those interviews.

Q.  And just for context, were their interviews, is it your
understanding their interviews with Mr. Basham were in close
proximity to his arrest?

A.  Yes, that's correct.

Q.  Jumping to the Jackson v. Denno hearing, you've testified
that one of your strategies was cooperation, showing that Mr.
Basham was trying to help the law enforcement officers.  Is
that an accurate statement?

A.  Yes, ma'am.

Q.  Were you concerned about the counter-argument the
government raised that Mr. Basham was just leading the

government and officers on a wild goose chase?

A.   Yes, I was.

Q.   Were you aware through police reports prior to the Denno hearing Mr. Basham walked off alone with Sheriff Hewitt, according to Sheriff Hewitt, Mr. Basham walked off alone with him and made a statement?

A.   And I believe that didn't come in at trial, the deer statement?

Q.   No, the purse strap statement.

A.   You know, sitting here right now I can't remember exactly where it happened during that Thanksgiving day, so --

MR. DALEY:  Your Honor, I think this is really outside the scope of redirect.

THE COURT:  Well, I'll allow it.  Overruled.  Go ahead.

Q.   Did you speak with Mr. -- you testified you recalled speaking with Mr. Littlejohn and possibly Mr. Monckton.  The government showed an exhibit that indicated that may have happened.  Do you have any independent recollection of speaking with Mr. Monckton and Mr. Littlejohn about Mr. Basham wandering off with Sheriff Hewitt?

A.   I do not.

Q.   Okay.

A.   And again, quite frankly, I don't have an independent recollection of discussing this with Billy Monckton, so I

certainly don't have any recollection of discussing that particular issue with Mr. Monckton.

Q. You also testified that and confirmed with the government that one of your strategies was to lock down the law enforcement officers in their testimony.

A. Yes, ma'am.

Q. Was Mr. Hewitt locked down on the purse strap statement?

A. I thought he was, and I wasn't going to ask him the question because he had -- he testified on direct examination, so, you know, he already said on direct examination that Brandon showed me, he already said that once, I didn't want to ask him, give him the opportunity to say it twice. And unfortunately I did.

Q. Moving to competency, would you agree that you and Mr. Swerling made the determination you'd have to use mental health information as mitigation to present a case to save Mr. Basham's life?

A. Did we make a decision at some point in time that it was going to be necessary to use experts in our -- during the penalty phase?

Q. That's a much better way to say that. Thank you.

A. Yes, yes.

Q. And that meant that the government would get to examine Mr. Basham, correct?

A. Yes, that's correct.

Q.  And isn't it true that Mr. Basham's first trip up to Butner was in January 21, 2004, or would you disagree with the records if that's what this showed?

A.  No, I know that's when it was, because I made that drive in a snowstorm and I was there snowed in for a week waiting for those evaluations.  So, yeah, I would agree with that.

Q.  And January 21, 2004 was prior to the Jackson v. Denno hearing, correct?

A.  Yes.

Q.  Did Dr. Schwartz-Watts ever talk with you and Mr. Swerling that Mr. Basham's competency would ebb and flow based on stressful situations?

A.  Not his competency.

Q.  What word would you use, or what word did she use?

A.  I don't know.  And I know that it wouldn't be competency, it would be -- I know this, and I don't know if this is responsive, I know that based on my conversations with our doctors I knew that we needed to ask the court for latitude with breaks, and the court on all occasions except for a few times when the judge said we're going forward, have a seat, Mr. Basham, with all -- the court gave us breaks.

Q.  And leading up to trial do you recall ever being able to have a long focused conversation with Mr. Basham about the specifics of his case?

A.  Yes.

Q.  Were you able to keep him focused for several hours at a time?

A.  No.

Q.  Were his conversations with you frequently interrupted by him for other needs, for things like snacks, dip, new sweatshirts?

A.  Absolutely.

Q.  I want to turn now very briefly to the confession issue. And I want to be clear about something the government asked you about.  Intent was left on the table only for the carjacking, is that correct?

A.  Yes.

Q.  There was no intent factor for the kidnapping.

A.  That is correct.

Q.  So is it a correct statement there was a full confession on the kidnapping count?

A.  Yes.

Q.  And that was -- was this a death eligible count, as well?

A.  Yes, it was.

Q.  And because that kidnapping resulted in the death of Alice Donovan did that also concede one of the threshold factors to make Mr. Basham death eligible?

A.  Yes.

Q.  Was there any -- one of the strategies for conceding was to get good will with the jury, is that correct?

A. Yes, I said that. Maybe that's too strong a term. It's hard to get good will with a jury in --

Q. To the extent you could.

A. To the extent we could, someone would be back there saying, you know, once he was caught he did what he could. If that's good will, then that's what we were hoping for.

Q. Were you ever concerned about losing that good will by making a jury sit through an almost month long trial that you conceded was a foregone conclusion?

A. No.

Q. Turning to the 404(b), or excuse me, intrinsic evidence about Samantha Burns. You stated that you didn't think it would affect the guilt phase if that evidence didn't come in?

A. No, I think what the question was was the guilty verdict.

Q. The guilty verdict?

A. There was a difference in his question in the guilt phase. I think it had a pronounced effect on the trial, okay? I don't think that was his question. My answer was was Brandon Basham going to be convicted of that offense, even without the Samantha Burns evidence, and my answer to that was yes.

Q. But do you believe it affected the penalty phase of the trial?

A. Yes, absolutely. That is why we attempted to have it excluded in pretrial motions.

Q. Turning to the puppet statement, did one of the concerns

with the rule of completeness and that perhaps Mr. Gasser's closing arguments could come in in their entirety.  Sitting here now can you recall anything from Mr. Gasser's closing argument in the Fulks trial that would have been more damaging to Mr. Basham than Gasser's closing argument in Basham's own trial?

A.  Well, any more damaging?

Q.  Any more damaging to anything that came out in Basham's.

A.  It was a really good closing in the sense that it was very effective, and also in the sense that it portrayed them not as equals, because that was the one we were trying to make.  But he also said things like we're going to be standing in front of a jury in two months asking that Mr. Basham also be put to death.  And he also -- and comments like that.  I haven't looked at it in six years, but I watched it and I have reviewed it for the purposes of the motion we're talking about now.  And while I don't have any specific recollection of things that he said, I do know that I didn't want it read to a jury.

Q.  All right.  And just to confirm, Clifford Jay was not called in the penalty phase for Mr. Basham.

A.  He was not.

Q.  Turning to the mental retardation, you've already testified you weren't familiar with the Flynn effect.  Did you have any discussions with Tora Brawley about the Flynn effect?

A.   I cannot tell if I did or I did not.  I just -- I don't remember.

Q.   Fair answer.  Is it a fair statement that Dr. Brawley could only rely on her testing and the records that she received to diagnose Mr. Basham?

A.   And her interviews.

Q.   And her interviews?

A.   She was given everything I believe she needed to make a proper evaluation.  That included medical records.  I don't have her testimony in front of me, but I know she interviewed a number of people, because she was looking at why his IQ had decreased, and to make that evaluation and determination she looked at drug usage, she looked at head trauma, she looked at a lot of environmental issues in reaching -- rendering her opinion.  So I think her opinion was based not on only records and Brandon's testing but also the universe of information that we had available about Brandon's life.

Q.   And universe of information provided to her by counsel and the team?

A.   Yes, ma'am.

Q.   You mentioned the MMPI.  Was one of the reasons that you all were successful in keeping that out was that Mr. Basham could not finish the MMPI in accordance with his protocol?

A.   No, it was because I didn't give it to him.

Q.   Didn't the government attempt to give it to him?

A. They tried and we objected to it.

Q. And do you recall that one of the reasons that objection was successful was that Mr. Basham could not complete it without having questions read to him?

A. I recall that we argued that.and let me say this --

Q. Sure.

A. Again, it's going -- something coming back to me. Donna Watts didn't give it to him because she said he will not, after all the testing I've done, all the time I spent with Brandon, he's not going to be able to sit for that test because the way that it is given. So you're correct. She may have testified to that in a hearing with the judge when he ruled that like testing meant you can't give him an MMPI if Donna gives him a CAT test, okay? And so that might have been the testimony. So I don't dispute that one of our grounds was yes, he couldn't sit for that test. But we didn't give it to him.

Q. Did you all hire independent FAFD experts, anybody that specialized in FAFD?

A. No.

Q. Do you recall what testing was done to rule out FAFD?

A. I do not. Done Schwartz-Watts would, Jack may know. I do not.

Q. Turning very briefly to Mr. McNair. Would you say that Mr. McNair was just a cop at heart when talking to officers or

when dealing with pretty much anyone?

A. My opinion is that he is a cop at heart when dealing with anyone.

Q. And the government asked about possibly if you would hire him in the future. Given the choice, if you had a hypothetical situation, two investigators relatively equal background and experience, would you prefer someone with or without the problems that Mr. McNair's background?

A. Well, I mean, that's -- I think that question comes along with an obvious answer.

THE COURT: Let me jump in here. And I'm sure my ignorance -- did Mr. McNair testify at trial?

THE WITNESS: No, sir.

MS. STONE: No. It's one of our claims, your Honor, is that he --

THE COURT: Afraid to put him on the stand because of background.

MS. STONE: He could not properly have been called to rebut anything if he needed to because my argument is because some of his issues regarded truth telling and veracity, that his background may have been relevant, and if that had come out in front of a jury they would not have liked that, especially the women on the jury.

THE COURT: All right.

THE WITNESS: I never conceded it was admissible.

okay?

MS. STONE:  I understand, and I apologize --

THE WITNESS:  I just want to make sure I'm clear about that.

MS. STONE:  I don't want to misstate.

THE WITNESS:  I already testified about it.

Q.  You said it's an obvious answer, but what's the obvious --

A.  I would hire someone that hadn't -- didn't have some of the problems that were alleged to have occurred or been the case with Mr. McNair.  Certainly these were not even -- was never charged with anything, these were mere allegations, and we know about what those are worth.  So, you know, it was what it was.  We got a file jacket said somebody said he had done something with really no evidence or no proof.

Q.  Did he make admissions for some of those instances?  Like showing a video?

A.  You know what?  I'm still not -- show the video, I'm sorry, I can't recall.  But, no, I would rather have an investigator that didn't have any problems at all, that had a long history with an agency where he was honored on the way out than somebody that didn't.

Q.  And occasionally do you as a defense attorney, do you have to call an investigator to the stand?

A.  Yes.  Yes, I have in the past.

MS. STONE:  Your Honor, may I have just a moment to

confer with counsel?

THE COURT:  All right.

(There was a pause in the proceedings)

MS. STONE:  I have no further questions.  Thank you.

THE COURT:  All right.  Brief recross, rather.

RECROSS-EXAMINATION

BY MR. DALEY:

Q.  Mr. Harris, did you not call Mr. McNair to the stand because of was there a decision at some point we can't call him, we would like to impeach somebody but we can't because of his background?

A.  No.  The situation never presented itself in the trial.

Q.  And, obviously, you know about the Garrity issues, and a lot of this information potentially would not be allowed anyway, is that correct?

A.  Yeah.  Like I said, I never thought it was admissible after evaluating it personally.

MR. DALEY:  No further questions.

THE COURT:  All right.  Anything further?

MS. STONE:  Your Honor, I just want to clarify, because I think there were two different answers there, if I may.

REDIRECT EXAMINATION

BY MS. STONE:

Q.  Do you not recall a situation where Mr. McNair might have

been needed to be called to the stand, or you are certain that there was not?

A.   No, I don't recall.  I don't recall.

MS. STONE:  Thank you.

THE COURT:  Why don't we recess until 2:20 like we did yesterday.  That will be a hour and 20 minutes.  Mr. Swerling will be up next?

(A recess transpired)

THE COURT:  All right.  Ready to call your next witness?

MR. BURKE:  Yes, your Honor, thank you.  The defense calls Mr. Jack Swerling.

(Jack Swerling duly sworn)

DIRECT EXAMINATION

BY MR. BURKE:

Q.   Good afternoon, Mr. Swerling.

A.   Good afternoon.  How are you?

Q.   Good to see you again.  Before we start I wanted to make sure that if there's any misunderstanding or any confusion, but you asked me a moment ago if there was statements made about you receiving or not receiving e-mails.  So I just want to make sure that that's on the record, in case you had any questions about that.

A.   Well, yeah, I would like to clear that up because I heard it when I walked in.  I don't know --

Q.  Did you receive -- did you e-mail me last night?

A.  Yes, at 8:18.  I checked my Blackberry.

Q.  Did you receive a response from me?

A.  No.

Q.  You received an e-mail from me that was sent at 7:48, about a half hour before the e-mail you sent me last night?

A.  No.

Q.  Did you receive a response from me from your e-mail that was sent at 8:28?

A.  No.

Q.  Did you receive an e-mail from my co-counsel Miss Sarah Stone?

A.  No.

Q.  Did you receive an e-mail from the Assistant U.S. Attorney Bob Daley?

A.  I can check my Blackberry.  That's what I was basing that on.  In fact, I was wondering why I did not hear back from you.

THE COURT:  What is the problem?  He's here, we haven't had a delay.

MR. BURKE:  Your Honor, I think it's -- I would like to pursue this, if I might.  I think it goes to some of the issues that we're dealing with in this case.

THE COURT:  All right.

MR. BURKE:  Also Mr. Swerling's approach to me about

it.  And so I think we need to have a clear record on it.

THE WITNESS:  I want to know where that misunderstanding came about.

(There was a pause in the proceedings)

THE WITNESS:  I sent him one at about the same time and I said will I be reached tomorrow.  And I believe I got one back but I don't see -- well, I must have gotten one back because I said thank you to him at 8:51.  But there is no e-mail, nothing from you or your co-counsel.  You can look at my Blackberry.

Q.   (MR. BURKE) I think that clarifies the problem.  I mean, we sent three -- I sent three, she sent one and you didn't receive it.

A.  I didn't receive a response, so I thought that was unusual.

Q.  Did you send a follow-up e-mail to me?

A.  No.  I sent one to you and one to Mr. Daley asking if I was up tomorrow.

Q.  Okay.

A.  About 8:00, 8:15 last night.

Q.  Mr. Swerling, as you know, you are here today to testify about your role as the lead counsel in Mr. Basham's trial in 2004.

A.  Yes, sir.

Q.  And as you also know, Mr. Basham through his counsel have

raised several issues of ineffective assistance of counsel against you and Mr. Harris, correct?

A.   Yes, sir.

Q.   Okay.  In fact, shortly after Mr. Basham filed his 2255 petition in this case did you contact the U.S. Attorney's Office to request a copy of that motion?

A.   Absolutely.  And I got a chiding letter from you reminding me of my ethical responsibilities not to have any confidential communications with Mr. Daley.  And I sent you a letter back saying that I know my ethical obligations and I have not had that discussion with him.  And I called Mr. Daley because he was local and I just said can you send me a copy of it.

Q.   Do you have e-mail?  Well, we're not sure, are we?  I mean, it's not -- is it possible in this day and age to send someone an e-mail, is it not correct, with an attachment?

A.   I don't understand your question.

Q.   Isn't it as easy for me to send you an e-mail with the petition attached than --

A.   I saw nothing wrong with asking Mr. Daley to send me a copy of a petition.  You are the one bringing the petition against me with -- I don't see what the problem is.

Q.   Well, the petition is not being brought against you.

A.   It is.  Yes, it is.

Q.   Had we had communications before filing the petition in this case, we filed the petition in this case, other than my

letter chiding you?

A. Yes.

Q. Okay. And had we met at your office on a couple of occasions?

A. Absolutely.

Q. And, in fact, on one occasion my co-counsel Miss Stone and I and our paralegal came to your office for approximately five days to review and scan the documents in your case.

A. That's correct.

Q. Okay. Now, your statement is that you needed to obtain a copy of the 2255 petition so that you could review it because the claims were against you, is that correct?

A. I didn't need it, I just -- I heard that it had been filed and so I called Mr. Daley, who I know, and saw absolutely nothing wrong with asking him to send me a copy of the petition.

Q. And is it safe that say you were -- you would want to see what was in the petition?

A. Yes.

Q. Okay.

A. Yes.

Q. Do you recall being interviewed by the government in the past several weeks in preparation for this hearing?

A. Three times.

Q. Three times.

A.  And you were present on the phone or -- you were present physically or on the phone on one occasion, but it's been three different occasions that I agreed to sit down.

Q.  Okay.  Can you tell us why there were three interviews conducted, why was it necessary to leave the interview and return again and resume it?  Can you --

A.  Because I was reading documents, 77 boxes, probably over a hundred thousand pages of documents.  I wanted to, as we were going through, I wanted to review things so I could be prepared for the next meeting.  So, as I recall, on the first meeting we addressed, you know, I don't know the number, but probably most of the allegations.  And there were several that I needed to review the transcript to refresh my memory, or notes or documents, and so we came back the second time.

Q.  Okay.  And --

A.  The third time it was a similar thing.  There were some things I still needed to check and review to refresh my memory.  It is eight years ago.

Q.  That's correct.  Okay.  And did you feel that you had an ample opportunity to be interviewed or questioned?  If you had any questions did you feel you were able to raise them during those interviews?

A.  Did I have any questions?  No.

Q.  Okay.  You mentioned the 77 boxes, if that's the number we throw out.  Is that a guess we all have?

A.  I have seen that number either from you or the government, there were 77.  It might have been 74, something like that.  I don't know.  You all have seen it, and I think the government came by maybe and took a picture of it.  And I was -- you know, could have brought 77 boxes with us.  I don't know.

MR. DALEY:  And, your Honor, for the record, I do think a couple of the boxes sort of say a certain number of boxes of 77.  I am pretty certain, though, that when we did it there's other miscellaneous boxes that turn out to be more than that.  But there's a numbering system, there's two numbering systems, I think, so it's a --

THE COURT:  All right.

MR. DALEY:  I don't think there's a clear number.

THE WITNESS:  There's a lot.

Q.   (MR. BURKE) That raises a question.  When we reviewed it we did notice that there seemed to be two numbering systems to your boxes, one of 30 some and one of -- do you have any recollection as to why that might be?

A.  No.  I mean, I had several different paralegals during this period of time and so I don't know how those numbers were assigned to the boxes.  What I tell them is I want -- what I would like them to do is have the full total number of boxes and then start labeling the boxes one of 50, two of 50.  So I don't know, I don't get involved in the numbering system.  But every box that I have has been made available to you and to

Mr. Daley.

Q. And when you say made available, what do you mean by that?

A. That you could -- that you looked at them or had the ability to come and look at them. So did Mr. Daley.

Q. So you are saying we had the ability to come to your office and review them?

A. Yes.

Q. Okay. Did we at one time, Mr. Swerling, attempt to make an entire copy of your file? Do you recall that?

A. Well, there have been several things going on about that. When we started off I simply requested -- never, absolutely never said you could not have a copy. What I said was I thought that I needed to retain a copy because I was trial counsel in the case. So we tried to work that out, whether or not start copying in the office or send it out to a copy shop. I remember we sent a number of boxes out to the copy shop. The bill was pretty expensive and so you and your office decided not to continue that process.

As I recall, Kelly, Kelly Switzer, who's my paralegal, went ahead and sent you all the disks that were available from the government, every disk that we had, which was a lot of most of the discovery in the case. Then there was some discussions about transporting the files. And what I remember, it was, again, just asking that I be able to keep a copy. There was a question about whether I keep a copy or an

original.  I eventually said I'll just keep a copy.

And I suggested on a couple of occasions going to the court to see whether or not there was any funding available to go ahead and do any copying of it.  Because it involves, you know, let's say a minimum of a hundred thousand pages or something in that neighborhood.  And we never got that far. That was in February of '11 when you came there, and I believe it was February '11 you spent five days, you had full access to my conference room, nobody bothered you.  You know, whatever questions you had I was happy to answer.

Mr. Harris had a file, I don't know if you ever went over there to look at his file.  But we tried to work out, both of us, I think you and I both tried to work out a way to do it. And after February of '11 I don't recall there was any other effort until this year.

And I think this year we went ahead again proposing that we look, and say I proposed or you proposed, I can't remember, going to the judge and asking for funding to make copies so that I could retain a copy and you could have it.  And I went ahead, you asked me to get an estimate of that.  And I brought in a copy shop and the copy shop did give us an estimate which I furnished you.  And that was basically the last conversation we had about that, I think.

Q.  Do you recall what the estimate was?

A.  It was expensive.  It was like $27,000, I think.

Q.  I believe, I mean, not to testify here, but I remember from our experiences the few boxes we sent over came to $8,000.

A.  It was a different kind of copy.

Q.  Different type of copy?

A.  The first time we were doing it we were taking the paper and making disks out of it.  Then the second time we did it we -- or proposed to do it is just make a hard copy, which was going to be cheaper.  It wouldn't have been $9,000 for several boxes, whatever it was.

Q.  Right.  Do you remember receiving a request from me personally to allow us to transfer your files to our office and to make a complete copy for you from our office?

A.  We discussed that and I said -- I didn't refuse, I was trying to work out where I could retain -- let me explain something, Mr. Burke.  I've got -- I was lead trial counsel in this case.  I had, let's say, 75 boxes.  I was worried about those boxes or the file in some way some part of it getting lost, some part of it being misplaced.  I'm responsible for it.  I mean, I was the trial counsel.  So I thought a reasonable accommodation was to give you complete access and also to request that I be allowed to retain a copy.  I still think it was a reasonable request.

Q.  And are you suggesting that we -- you do recall me asking if we could receive -- take and pay for transferring your

entire files?

A.  Yes.  I said yes.

Q.  And you were not in favor of that, is that correct?

A.  I was not in favor of it going out of my office and me not having a copy, that's the bottom line.  That's correct.

Q.  And is it your opinion that although you have not represented Mr. Basham in eight years that you have the responsibility for retaining his trial file?

A.  It is my -- it's my belief that I have an obligation, obligation to retain a copy of the file.  Yes, because for exactly this reason here.

Q.  Exactly, exactly.  But if you were offered, as you were in this case, to have an entire copy prepared for you wouldn't that satisfy whatever obligations you seem to think you had?

A.  Mr. Burke, it's just a question of how you want to do it. I thought we could make a copy here and then send you the original.  So it was just -- it was just the way we were both looking at it.  Nobody ever said you couldn't have a copy or the originals.

Q.  Well, we agreed so far, though, that the expense was prohibitive for us to do it in South Carolina, that's correct?

A.  I don't think the cost of doing a hard copy would have been prohibitive.  It would have been a question of asking the judge for it.  I don't know if the judge would have agreed or not agreed.  But it never got that far, as far as I

understand.

Q. So you retained the 77 boxes and now -- the government may show this, but just so that you know, Mr. Swerling, there are marked and admitted into exhibit photographs from the government of your conference room and the various boxes that are in there. The court will be able to get a visual picture of what it is that we're talking about. It is extensive.

In the process -- so when my colleagues and I came to your office in 2011 you said you had made the entire file available to us.

A. That's correct. I think there was one we discovered in June or July that my paralegal had a correspondence file somewhere starting, I don't know remember when it was, but most of it was letters between Brandon Basham and I over the last eight years. And there was some post-trial correspondence between me and West Virginia, because I had originally been appointed up there. So it was a folder, expando folder, which I sent you a copy of. And we sent you copies of many other things, as well. And I told you I was going to give you ten days to see if there was an objection that should be filed and if there was no objection then I was going to turn it over to the government.

Q. And we did not object, correct?

A. Correct. And I gave the government a duplicate copy of that file. But that file was in another area at the time and

actually my paralegal kept it.

Q. Now, when appellate counsel came to your office in 2008 for a similar purpose were they provided access to the entire file?

A. Absolutely.

Q. Absolutely?

A. Except that, and I've told you this, that office upstairs was not fully rented where the conference room is and where all the files are. So they were provided access to the files. It was a file cabinet in an empty office that I put all the vouchers in, as well as my spiral trial notebooks. They were in a locked cabinet.

Of course, several years after the event I had no recollection that they were in there, and I told you that as soon as I realized when we rented that office and opened up that cabinet that they were in there, explained to you that that's how it happened. You've got a copy of all of that.

Q. Yes, we did.

A. And so does the government. But so the only thing I'm aware of that appellate counsel didn't see, and it was completely inadvertent because nobody realized stuff had been put into that file cabinet, was my -- the vouchers, time sheets for everybody, as well as my spiral trial notebooks.

Q. And your spiral trial notebooks are those notebooks in which you keep handwritten notes from your cases?

A.   Correct.

Q.   And you keep them separately for each case, is that correct?  So Mr. Basham would have his own set of spiral notebooks?

A.   Well, they are normally kept with the file.  I didn't realize they weren't in one of those 77 boxes or -- again, I'll use 77.

Q.   We will stick with 77.

A.   So my understanding was they were in the 77 boxes.  There would have been to reason to have them outside, it's just that at some point years ago they were put into this cabinet and I was not aware of it when appellate counsel came.

Q.   And, please, I want to make sure as I question, I mean, you know as having reviewed the 2255 that we have alleged that the appellate counsel's failure to obtain the full record in your case hindered their ability to --

A.   That's absolute nonsense.  And I can explain.

Q.   No, I'm not asking you about that right now.  I'm just saying is it true we have alleged that?

A.   You've alleged it, I think it's nonsense.

Q.   And I understand that, but we will get back to that.  I want to make it clear that we're not suggesting and never have suggested that you've done anything to hide files from anyone deliberately.  It's not -- I mean so please don't think that that's what we're saying.  We do have -- my question for you,

though, and I think we have answered it, is that we now know that appellate counsel did not receive your time sheets and your handwritten notes from the trial, correct?

A. That's correct, because of inadvertence. I did not know that they were not in there.

Q. Absolutely. As I said, we're not suggesting it was anything else but that. Now, you did provide those files to us.

A. Because I found, we found, when we went to that office, we went in there and somebody opened up the file cabinet and saw that that's what was being kept in there. And that was several years ago, I mean, you know, after appellate counsel came, as far as I can recall. I mean, Mr. Burke, there's no reason for me to not provide the files for your access, or appellate counsel. If I didn't it was because of a mistake or inadvertence, it was never anything intentional. My understanding is you've had an opportunity to go through every single page of the Basham file and just like I did.

Q. Not just like you did, Mr. Swerling. And let's talk about that for a second. Let's imagine for a moment that when you were representing Mr. Basham, and you will agree it's -- the government has mentioned it many times and I'm sure they will mention it today, that this was a huge case. You obtained thousands of documents, thousands. You interviewed close to a thousand witnesses, or you and your team. It is a huge case.

A.   Correct.

Q.   If all those records had been kept at the office of Mr. Basham's West Virginia counsel would you have been able to do your job?

A.   West Virginia counsel?

Q.   Yes, Mr. McHammock.  If he had --

A.   I'm sorry, who's --

Q.   Jay McHammock?

A.   I don't know anything about that.

Q.   Were you not co-counsel for certain period of --

A.   Gary Collias I believe was my co-counsel in West Virginia.

Q.   Okay.  If the file in Mr. Basham's case had been kept in his office and you were to call him and ask him for which documents you needed, would you have been able to do an effective job?

A.   Mr. Burke, what I would have done is flown up to West Virginia, I would have gone through the entire file, I would have made arrangements to go ahead and honor that counsel's request that he be given a copy and that I have a copy.  So there's no question in my mind what I would have done.  And there's no question in my mind what I would have done is gone to the judge and said we have a very complicated situation here with all these boxes of discovery and both sides think that they, or you and I and the government, of course, is going to get it, as well, there needs to be some way worked

out that we can get a copy and everybody can have a copy.  It just makes sense to me.

Q.  And did it make sense for you, though, to allow us --

A.  I already said that.

Q.  That did not make sense?

A.  I did not want to release the file, send it by Federal Express and take the chance that boxes would be destroyed or boxes wouldn't be returned.  So I thought I made a reasonable request I be allowed to keep a copy and you work it out with me where you could get a copy, I could have a copy, and eventually we knew the government was going to get a copy, as well.

Q.  Now, returning to appellate counsel --

A.  Plus we did send you many documents.

Q.  That we requested.

A.  Absolutely.

Q.  That's after we had been to your office we realized we needed.

A.  Yeah, sure.  There was never, you know, no attempt to -- and what I wonder is there anything you haven't seen or you need.

Q.  Well, that's an interesting question, actually.  Did you receive an e-mail from me on Tuesday night of this week?

A.  And what was the e-mail?

Q.  Requesting a copy of -- in preparing for this hearing

there were time sheets that indicated that you had had an
e-mail with Dr. Donna Schwartz-Watts in this case which had
not been in the files that we had been provided.  And I
e-mailed you on Tuesday evening --

A.  And I responded.

Q.  You got that e-mail?

A.  Yes.  Mr. Burke, I did not get your e-mails last night.

Q.  Mr. Swerling --

A.  I can't make it any clearer.

Q.  Mr. Swerling, let --

A.  You can look at my Blackberry.

Q.  Let's lay the groundwork here.  I respect the fact you are
a well-regarded criminal defense attorney in this state.  I
don't question that.

A.  Thank you.

Q.  Today I am the defense attorney and I am the one who gets
to ask the questions.

A.  I didn't ask a question.

Q.  No, but --

A.  I just said is there something you need.

Q.  You are trying to direct -- please, please.  I don't want
to argue with you, sir, okay?  I know you are a great lawyer,
you are a great trial lawyer.  I'm trying to make a record
here about what happens in this case.  Okay?

A.  Mr. Burke, I'm not arguing with you.

Q.   Okay.

A.   I did send you a response on Tuesday night.

Q.   Okay.  So those were files -- what was the response that you sent us?

A.   You want me to read it?  Did you not get it?

Q.   No, I got it.

A.   The response was that you were asking me for an e-mail to Donna Schwartz-Watts on May 3rd of 2003 because it was on my time sheets and you couldn't find it.  I went Wednesday morning, maybe, or Tuesday morning, I can't remember how it worked, I can look at my Blackberry again, and I told Kelly, my paralegal, let's go find these, whatever e-mails there are regarding Donna Schwartz-Watts.  What she found was an e-mail -- no e-mail on May 3rd, and not even an entry on my voucher for May 3rd.  So that's what I told you.  And then I attached to the e-mail that I sent you three e-mails that we were able to find between me and Dr. Schwartz-Watts.

Q.   One second.

A.   Two or three.

Q.   Two or three?

A.   Whatever it was is what I sent you.

Q.   Okay.  And --

A.   I can look at my Blackberry.

Q.   Is your testimony today that you have provided us access to all e-mails that you had with all experts and team members

in the Basham case?

A.  Every e-mail that's in the file.  Now, let me explain something to you.  I don't file my e-mails.  I send a copy to one of my secretaries or one of my paralegals and they are supposed to file it.  Does that mean that every one gets filed and I can vouch for that?  No, it's -- but it's not something that I do.  Whatever is in the boxes you have gotten and had access to.

Q.  Okay.

A.  And whatever it was on your e-mail was a mistake, because there was no e-mail of May 3rd, or not even an entry for May 3rd.

        MR. BURKE:  Ask the court's indulgence for one moment, please.

        (There was a pause in the proceedings)

        THE WITNESS:  It may have been like May 6th.  We sent you that one.

Q.   (MR. BURKE) And that's the only e-mail that you have between you and Dr. Schwartz-Watts.

A.  Whatever I sent you is what Kelly was able to find.  There's thousands -- well, I shouldn't say a thousand.  There are probably close to a thousand e-mails that were generated in this case between everybody.  So I had her -- because you requested it I had her go through my e-mail folder to see whether or not there was any other communications to Dr.

Schwartz-Watts.  And whatever I sent you, whether it was Tuesday night or Wednesday, the attachment was what she was able to find.

Q.  And did your paralegal search for e-mails -- my request was specific.  I'm just asking did your paralegal search for e-mails with regard to other experts in the case?

A.  As far as I know, she did, yeah.  And there were copies of, you know, e-mails sent to people, not specifically to -- what I understood you wanted to know was what were the e-mails to Dr. Schwartz-Watts and to another expert, not copies that were sent out en masse.  And as you know, a lot of the e-mails were sent out en masse to a number of people on a list.  So, again, they are available.  You can come back and look at them if you think something is missing.

MR. BURKE:  This might be a good time to address this.  Perhaps the court could help us resolve this unresolved issue.  Our request all along with Mr. Swerling has been that we be allowed to take the file that is our client's property to Arizona to make a complete copy of all 77 boxes, to put them on disk for Mr. Swerling's assistance, if that would help, and then to return the originals to him.  Would we be allowed to receive an order from the court?

THE COURT:  You don't want them to leave your office.

THE WITNESS:  Judge, I'm concerned.  I've had bad experiences.  I mean, so many boxes, and the file now, because

so many people have gone through it, is just not organized the way I want it to be organized.  So I had difficulty going back through and trying to see, find everything.  I'm not saying anybody's going to take any documents out or not return them, but I think it's a reasonable request for me to be able to retain a copy.

THE COURT:  I didn't realize that we had this situation.  I thought the file had already been copied and provided.

MR. BURKE:  No, your Honor, it was left with we were -- we attempted to -- we attempted repeatedly to accommodate Mr. Swerling.  We attempted to obtain copies, it became cost prohibitive, and so Mr. Swerling is accurate in his statements that he suggested that I come to you.  My thought was that there was no reason for us to come to you when our budget allowed us to make those copies and return them to Mr. Swerling.  Which is something, I might add, my office of experienced professionals does in every case we get.  And I don't know of a case in which we have lost a file or a record or a document.

THE COURT:  Well, so even now you want to look at those documents even though we're in the middle of the hearing?

MR. BURKE:  Your Honor, I'm preparing for this hearing this week and I'm seeing reference to e-mails I did

not know existed.  Now, I will tell you that our office paid for my co-counsel and myself and my paralegal to come to South Carolina and spend a week going through the files in Mr. Swerling's office.

THE COURT:  Can you say you looked at most of the documents even though you haven't copied them?

MR. BURKE:  We looked at everything that was provided to us.  We -- the three of us opened those boxes and we went through, we made to the best our ability an index of what we were seeing.  It was impossible for us to -- what we had was a small portable scanner, so what we had to do, what Miss Oliver, our paralegal, had to do was Miss Stone and I would flag documents and say please scan this.  Which is what she did.  We didn't -- what we could do in the period that we had.  Now, I'm sure Mr. Swerling, I don't want to misstate the record, Mr. Swerling probably would have let us stay forever if we had wanted to.

THE WITNESS:  Which was what I would have done.  Or made arrangements.

THE COURT:  It's just a lot more cost beneficial to do it there in your office than have it sent out here.

MR. BURKE:  Absolutely, your Honor.

THE COURT:  I can see Mr. Swerling's point.  He's not being charged with any unethical conduct here, but he's just concerned about issues coming up and he's lost control of his

file, he isn't able to deal with it.

MR. BURKE:  Your Honor, I would -- we researched this issue and do now know from the testimony from Miss Meister that Jenner & Block researched this issue, as well.

THE COURT:  All right.

MR. BURKE:  The file is the property of the client.

THE COURT:  All right.

MR. BURKE:  It is not Mr. Swerling's property.  So it belongs to Mr. Basham and we are Mr. Basham's current counsel. We are not trying to prevent Mr. Swerling from having access to the records in this case, we're simply trying to effectively represent Mr. Basham in his 2255 proceedings.

THE COURT:  There's no way they could be scanned here locally by someone, bring in a scanner here and doing it here?

MR. BURKE:  Well, your Honor, we did that with a portable scanner.

THE COURT:  I'm talking about with a full mainframe scanner.

MR. BURKE:  And I think Mr. Swerling and I, we discussed that, and I think --

THE WITNESS:  I never did have any problem with a scanner.  I mean, the government came over and did it.

MR. BURKE:  Perhaps, Mr. Daley, were you able to scan all his documents?

MR. DALEY:  Your Honor, what we did, and it was

fairly straightforward, we came over with a scanner probably similar to Mr. Burke's scanner and we went through all the boxes, whatever the final number was. And quite a bit of it, I mean, several of the boxes were discovery, government's discovery that we had sent over. A bunch of it was the defense discovery.

And so we were selective in what we scanned. I think we ended up scanning about 80,000 pages. And so do I think I have everything from his files? I certainly don't. But I have -- I mean, I didn't feel -- it took us six days, I think, so it was not a short task and it was long hours.

THE COURT: You did it with a portable scanner?

MR. BURKE: Well, it was a scanner, it's portable, it's a good -- older scanner. It's five or six years old. It's not portable in the sense that I could carry it in a briefcase, no, your Honor.

We had -- but we did the same thing, just for your information, your Honor, with both Jenner & Block and Mr. Sullivan. We FedExed it for about 120 bucks up to DC and did the same thing with them, with both Mr. Sullivan and with the Jenner & Block folks.

And I will say we encountered some resistance -- no, I don't want to say we encountered a little resistance, we encountered very significant resistance with Jenner & Block, who refused to let us take the boxes out of their conference

room and who -- I'll leave it at that.  It was -- they would not let their files leave their conference room.  And we had to bring a scanner in to get their documents.  And we were there -- and there were 40 boxes, probably, for Jenner & Block.  But that's when --

THE COURT:  When you say the law is the file belongs to the client, that's -- we're talking about a cost problem. The client clearly is entitled to a copy of everything in their file.

MR. BURKE:  You're right.

THE COURT:  But is that -- are you saying that the rule is the client's entitled to the original documents to leave the lawyer's office?

MR. BURKE:  Not necessarily, your Honor.  But our point is, I think you hit the nail on the head, is it's a cost problem.

THE COURT:  Right.

MR. BURKE:  We were able to do that at no cost outside of what our office budget already is --

THE COURT:  Right.

MR. BURKE:  -- to anyone.  We were able to do it.  We do it all the time.  And we scan them on, then we have a working copy of the entire file, and then we return it to trial counsel if they request it.

I will tell you in my experience doing this work I

have never until this case had a trial counsel request the original files back. But I'm not saying that Mr. Swerling would not be entitled to it if he wanted. We didn't really research that as much as Mr. Basham's right to have access to all documents.

Now, Mr. Swerling's position is, and it's -- he's made it repeatedly, is he gave us access. But, your Honor, as you know, this is a very complicated and huge case. It's -- and you heard the testimony of Miss Meister and you saw the exhibits in which after she came down she was having to e-mail Mr. Swerling asking for him to go find specific documents in those 77 boxes. And, frankly, I would have thought that would be a great inconvenience to Mr. Swerling, just as it's been an inconvenience, I would assume, when we e-mail saying do you have this document or do you have that document.

THE COURT: What about the precedent of the appellate firm not giving the government physical custody of its files?

MR. BURKE: We have had a similar problem. In fact, the Jenner lawyers in that case, we did not have access to the e-mails that you saw until the government obtained them. And Mr. --

MR. DALEY: Again, your Honor, I will put on the record, I do --

MR. BURKE: We're in agreement on this.

MR. DALEY: I had to basically, let me be discreet, I

had to be very forceful and patient in refusing to take no for an answer with the managing partner of Jenner & Block in Washington, D.C. to obtain any e-mails related to this case. Truth be told, you know, those e-mails that I got, a number of them are now defense exhibits. But I think it's important for there to be a full record, so -- and I say that mainly to make a record that I was -- to the extent there was a claim made about how Mr. Swerling was conducting, how he was handling the files, apparently there was at least one other firm, and it sounds like the defense had the same -- he had the same challenge.

I think we have the vast universe of documents that would be necessary for claim 30, but I just say that to make the record clear that apparently at least Jenner & Block has a similar approach as to how they handle their files.

MR. BURKE: And, your Honor, I will add to that that Mr. Daley and I have commiserated with one other about the difficulty in obtaining records in this case. We are in a somewhat different position because I actually represent the client whose file it is. So we are in a somewhat different situation. But, of course, your Honor, you did issue an order allowing them access to relevant materials, so --

THE COURT: Let's take a quick recess. Let me hit the books on this just a minute. Let's take a ten minute recess. All right?

(Recess, 3:00 p.m.)

THE COURT: This case presents a number of difficult issues, this is one I did not expect, and it's a very difficult call. Mr. Burke, I appreciate your office taking this case and handling it on a greatly reduced budget from what we normally see in death penalty litigation. All your staff are on salary and I haven't had to look at these enormous vouchers I look at in other cases, and I appreciate that.

At the same time, I understand Mr. Swerling's concern about letting go of the original documents out of his office. It looks like this should have been raised at the pretrial conference we had about a month ago so we could have thrashed it out before the hearing began. Any reason it wasn't raised earlier?

MR. BURKE: Your Honor, let me also clarify that I wasn't intending to raise this particular issue this morning, I was actually going into Mr. Swerling's ability to prepare for today's hearing. In my mind we fought this battle and we have already had to file a motion in June of 2011, and the case had been -- we had problems with competency. In my mind the ship had sailed, we had not been able to get the records. It wasn't my intent to bring this up as a new issue, but I can't waive it. We certainly don't have the file.

THE COURT: I thought about it over the break.

Didn't find a whole lot of authority.  It's my interpretation what Mr. Swerling proposes is reasonable and should have been accepted and still can be accepted.  Bring in, send in a high powered scanner, he said he can -- he wants everything to be done on his premises and I find that's reasonable under the circumstances of this case, and it can still happen from this point forward.  So with that, let's move forward.

          MR. BURKE:  Thank you, your Honor.

BY MR. BURKE:

Q.  Mr. Swerling, you had the opportunity now to review the 2255 petition filed on Mr. Basham's behalf?

A.  Yes.

Q.  And are you -- sitting through the interviews, the last three interviews we had, it was my impression that you're of the position that none of the claims that Mr. Basham has raised alleging ineffective assistance of counsel against you have any merit, is that fair?

A.  I think that's fair.

Q.  Okay.  So that --

A.  I don't think I was ineffective, if that's what you are asking.

Q.  Yes.  I mean, it was my impression, and I kind of want to figure out if there's areas we have agreement that we not talk about them.  But your position is none of the claims we have raised raise any serious claim that you were -- you fell below

the standard of care in this case.

A.  I do not feel like I was ineffective, if that's answering your question.

Q.  Well, ineffectiveness is actually a legal standard and -- but my question is do you feel that you met the standard in this case of a -- of a reasonably competent attorney handling a federal death penalty case?

A.  Yes.

Q.  Okay.  Prior to Mr. Basham, how many clients had you represented who were charged with federal capital offenses?

A.  None.

Q.  None.

A.  Federal.

Q.  Federal capital offenses.  So this being your first, you are aware that we have retained a standard of care expert in this case, correct?

A.  That's correct.  That's what I heard.

Q.  Now, let me tell you, with all due respect, I know you have a very long and highly regarded career, our standard of care expert has been practicing for 40 years and in the course of that 40 years he has served as a Watergate prosecutor, he was a law clerk for Justice Hugo Black and for Justice Lewis Powell --

MR. DALEY:  Your Honor, I have to object.  I'm not sure why we need to know the credentials of their standard of

care expert until he testifies.  And I'm not sure where he's going with that.

MR. BURKE:  I think the objection would be more appropriate after I ask the question.

THE COURT:  Go ahead with the question.

Q.   (MR. BURKE) And Mr. Hammond has represented at least seven federally charged death penalty clients.  If Mr. Hammond is of the opinion that there are various claims, a number of claims in this case in which you fell below the standard of care, is your opinion he's simply mistaken?

A.   You are asking me if his opinion is mistaken?

Q.   Yes.

A.   I don't know what his opinion is.

Q.   That you fell below -- well, that's a little disingenuous, sir.  We have been through this in these -- in these hearings and we know that Mr. Hammond is -- said that you fell below the standard of care in a few areas.  And Mr. Daley spoke to you about that at Monday evening's interview.

A.   My understanding on Monday evening was that -- is it Hammond?  Is that what you said.

Q.   HAMMOND.

A.   My understanding was he hasn't even finished going through the file or the transcripts so how can he come to any opinion?  Isn't that what was said on Monday evening?

Q.   No, that's not what was said.  As I assumed you were

aware, I think that the conversation occurred that Mr. Hammond had been interviewed prior to you coming in.  Do you recall that?

A.  On Monday.  But my understanding was when I voluntarily showed up on Monday evening that Mr. -- he was still reviewing documents and would be prepared to testify, I guess, at some future date.  So, I mean, I can't answer your question in the abstract.  If he has a -- if you have something specific to ask me then I can respond to it, but I just don't know -- I can't respond to general, to a general question like that.

Q.  If Mr. Hammond is of the position that you fell below the standard of a reasonably competent attorney in litigating the Jackson v. Denno hearing in this case, would you say his position is incorrect?

A.  I would say that he's not taken into consideration all that I took into consideration.  It's easy to be, you know, a Monday morning quarterback.  Easy.

Q.  Well, I would -- Mr. Swerling, nothing about this case is easy.

A.  It's easy to be a Monday morning quarterback.

Q.  And is that your opinion of what a standard of care expert does in a federal death penalty post-conviction proceeding?

A.  No.  You just asked me a question and I'm telling you that it's easy to look at a case and say that there were things that were done that could have been done differently.  I'm

just saying it's very easy to look back at what someone's done in any case, criminal or civil, and say it could have been done different. So I disagree with him about the Jackson v. Denno issue because that was well thought out on my part and Mr. Harris' part about the way to approach that.

Q. Okay.

A. And if you will give me a chance at some point to explain why we did what we did then I will explain.

THE COURT: I think we ought to move on into the facts now. You laid the basis for the disagreement. Let's get into what happened.

MR. BURKE: All right. Your Honor, I would like the opportunity to go over Mr. Swerling's experience and background, though. It seems like reasonable questions I should be able to ask about his experience.

THE COURT: Certainly, you can. Go ahead.

Q. (MR. BURKE) Mr. Swerling, in preparing for this examination I looked at your website jackswerling.com.

A. Yes.

Q. And it's very, very comprehensive. And it seems to be updated quite frequently, is that correct?

A. I haven't updated it probably in eight or nine months. There's stuff to add, there has to be because I'm constantly litigating and doing things that I'd like to add to that, so --

Q.   Do you personally do that yourself?

A.   No, no way.  Lexis does it, and my paralegal.

Q.   Okay.  The government has marked and admitted as Exhibits 1 and 2, and if we could perhaps bring up -- actually, if you could just bring up Exhibit 2 so we can just go through this.

     While they are doing that, Mr. Swerling, given your reputation --

A.   Mr. Burke, I'm sorry.  This is not clear.  I don't know how to --

Q.   Okay.  I will have to blame the government for that. That's fine.  You are aware of your website, correct?

A.   I should be, yeah.

Q.   Okay.  Do you find that a large percentage of your business comes your website or does more come from simply your reputation in the community?

A.   Well, the website was a defensive mechanism that I resisted for a long time.  But I guess about two years ago, two-and-a-half years ago, everybody, virtually, was having a website.  I don't do any advertising.  If you look in the phone book you will see Jack Swerling, Law Offices of Jack Swerling.

     So what I decided to do was do a website but not advertise, not to advertise but just to have something that people could refer to, which is becoming much more common. When someone calls from Indiana or Arizona or Seattle they say

I've looked at your website, or I refer them to the website. Because I don't like to, when I'm sitting and talking with a client talking to them on the phone, I am not comfortable trying to tell them what my experience is.

Q. Has your entire career been in criminal defense work?

A. I started off doing a little bit of everything in 1973 with state Senator Isadore Lourie. I guess I did a little bit of everything. I did a couple of real estate transactions which turned into being disasters, did a couple of probate, and I did personal injury for five or six years, as well. But the criminal became something that kept coming into the firm, coming into me, and the person who in the firm was -- had been doing criminal went to Charleston, a fellow named Steve Knight.

So it really, combination of two factors, one is Mr. Knight left and went down to Charleston, another was a lot of the great criminal lawyers in this area had withdrawn or had passed away, Frank Taylor and some of the other guys in this area, Luther Lee, Alex Ball, people that had done criminal work. So the opening was there for me so I stepped into it and it kept coming. So eventually, I guess somewhere around '83, I defended a fellow name Donald Peewee Gaskins, and pretty much after that it was all criminal, I think. Whatever civil I got I passed off to somebody else in the firm or associated somebody from outside.

Q.   Okay.  And you mentioned a client in 1983.  Could you give me his name again?

A.   Donald Peewee Gaskins.  That was a death penalty case.

Q.   That was a death penalty case, correct?

A.   Yes.

Q.   So that was your first death penalty case in 1983?

A.   No, actually not.  Shortly after the new statute had been passed there was a murder at Transouth on Elmwood, and a fellow named Wendell Moore was charged with murder, I can't remember his codefendant's name, but I was appointed to represent him.  And we brought in the Southern Poverty Law Center, Millard Farmer and his staff, because no one had really ever tried a death penalty case under the new bifurcated system.

So we spent a lot of time with Millard Farmer and his staff.  Gaston Fairy and I, who's a well-known lawyer in the area, defended Wendell Moore and we just got a great education from those fellows and gals who had done extensive death penalty work.  I believe -- I believe it's Southern Poverty Law Center, Millard Farmer.  So that case eventually, after several days of jury selection we had seated four or five jurors who opposed the death penalty.  That's before they started ruling those people were not death qualified and couldn't get on a jury, so we got a life sentence out of it.  That would have been the first one.  And, obviously, we're

already in the trial and the preparation, but I had the good fortune of learning from some of the best.

Q. And this would have been, Mr. -- so Mr. Moyes' case was in -- sometime in the 1970s?

A. It would have been in the late '70s, maybe, or 1980, somewhere around that time. If I remember right it was the first or second death penalty case after the statute. There had been another one but it had been a guilty plea that I was -- I don't think I had the experience at that time to get appointed. But it was the Taylor Harkness murder, which was a particularly gruesome murder in this area, and it was a guilty plea and they both got the death penalty. But that probably was the first one.

Q. Now, it's my understanding from this proceeding and from this case that Mr. Basham's and Mr. Fulks' case were the first federal death penalty cases in the District of South Carolina, correct?

A. If I remember right, it was.

Q. So but you have had an extensive federal criminal defense practice, as well, correct?

A. Fortunately, yes.

Q. What type of cases have you handled in the federal courts?

A. Drug cases, fraud cases, other white collar crime cases, gun cases, interstate Hobbs Act cases. I mean, I think across the board.

Q.  What was the one you just said?

A.  I was trying to think, there was --

Q.  Hobbs Act?

A.  Yeah, Hobbs Act.  I said Hobbs Act.

Q.  Had you, prior to Mr. Basham's case, ever represented a defendant charged with a federal crime of carjacking?

A.  I don't recall.

Q.  How about the federal crime of kidnapping?

A.  Yes.

Q.  And who was that client?

A.  I don't remember the name, but it was -- we can get you the name.  It was actually in front of Judge Shedd.  And Judge Shedd ruled we had a -- at a pretrial motion, as I recall, Judge Shedd ruled that -- it was a natural mother who had -- the facts are a little blurry to me, but Judge Shedd ruled that did not violate the federal kidnapping statute and so we eventually, after working on the case and having the motion to dismiss, we got it dismissed.  So I was familiar with the federal kidnapping statute.  Grace something, I can't remember what it was.  Grace Sheik.

Q.  Your website jackswerling.com lists under represented in South Carolina criminal cases over I think a hundred cases that you handled in the course of your career.

A.  Those are not all.

Q.  These are simply --

A. Just representative cases.

Q. I think you described them as cases below is only a selection of cases Jack Swerling has successfully handled?

A. Successfully.

Q. Successfully.

A. Put in, you know, most of my successful cases. A lot of my successful cases.

Q. And as a criminal defense lawyer you have to take success in small doses and accept what comes your way.

A. Reward is measured differently when you defend criminal cases. But those, most of those, were acquittals or dismissals.

Q. There are some --

A. A couple of life sentences in death penalty case.

Q. Life sentence in death penalty cases, okay.

A. But that was successful, too.

Q. And I guess that would explain why Mr. Basham's case is not on the list.

A. It doesn't qualify under successful cases. That's the -- you understand that.

Q. I also noticed that --

A. I don't consider the outcome for Mr. Basham to be successful. He was sentenced to death, so why would I consider that a successful outcome?

Q. Okay. That was the question I was asking, so I accept

Q. your answer.  I see also that you on jackswerling.com under your heading on each page you list several, several television shows that you have been on?

A. Yes.

Q. And is that -- can you give us an example of why you've appeared on these types of television shows?  Does it vary or what's the reason for that?

A. They asked me to do interviews, or that I was asked to be a commentator.  For example, the Susan Smith case, NBC hired me to be a commentator for NBC in the Susan Smith case, and they paid me for it.  Another lawyer named IS Levy Johnson, he and I periodically went up to Union several days, actually a couple of times a week, and Mr. Harpootlian, who was my partner, was also hired by CNN, and we traveled up to Union to comment or be commentators on the Susan Smith case, which you are probably familiar with.

Q. Yes.  South Carolina death penalty case, correct?

A. Right.

Q. Involving a woman and her children?

A. Correct.

Q. It is a very wide range of television shows.  Ricky Lake, what was --

A. I have no recollection of why I was on that show, nor do I care.  It just -- it's representative of some of the shows I appeared on.  Nancy Grace, I was on that show, too.  I was on

the show as a commentator and as a victim, which you've raised as a grounds for my being ineffective.

Q. You were -- was that in 2005 after the -- after the man who had kidnapped your family escaped? Is that why you were on Nancy Grace?

A. Right.

Q. Mr. Basham says -- raised several claims of ineffective assistance of counsel, and the judge asked us to get in the merits of those. And I will right now -- I just want to make it clear what we're not alleging. I recognize we have alleged quite a lot, but there are things that I think that are important for purposes of focusing the issues that we have here.

One of them is that Mr. Basham has not alleged that you did not spend a remarkable amount of time working on his case. We don't dispute that. The records speak for themselves. Mr. Basham doesn't dispute that you hired several supporting staff and you worked with Mr. Harris, you had a very large defense team. He's not alleging that. He has alleged some concerns of the way in which a few members of the defense team were managed and hired, but that is not a claim -- and I also want the court to know, just in case there would be any question of it, no one has ever alleged that you have not been anything but very personally supportive of Mr. Basham.

A. Yeah.

Q.   Do you care could speak to --

A.   No.  I have a lot of empathy for Mr. Basham, having spent many, many hours with him and his family, and I found his upbringing to be one of the worst that I've ever seen.  And he had a lot of history of, you know, illnesses and going into various hospitals.  And so, I mean, there was a lot of empathy for him even despite the fact that this was a horrific crime.

He and I have maintained a relationship.  He writes me, calls me.  I've told you about that.  And I think I asked my office manager to give me a rough idea of what -- how much money I've sent him in the last eight years, and it's about $2,500.  Because he periodically will call me and ask me for money for hygienic purposes.  Last -- two weeks ago he called and asked me if he could get an MP3 player, I think, for his birthday, so we sent him some money.  That's been over eight years.

As I've told you, and I definitely, when you got involved in the case, I said I want to make sure that that was okay with you that I continue to send him money because he has nothing.  And so you said you were very kind and said go ahead.

Q.   We were thankful.

A.   The public defender's office can't afford to give him the money and so I've -- I think somewhere around $2,500, my office manager told me.

Q.   All right.

A.   So we have a very congenial relationship.

Q.   Do your telephone conversations with Mr. Basham, are those calls in which you actually speak with him or does he call your office?

A.   No, no, he calls me.  I mean, he has called, and I spoke with him a couple of weeks ago.

Q.   Okay.

A.   And that was when he told me about his birthday.  And he writes me a letter and then he will follow it up, if he doesn't get a check within a couple of weeks.  Sometimes it lays on my desk for a while, but he follows up with a phone call.  And, you know, and I'm not going to say no.  Generally in the neighborhood of a hundred, 125 bucks, $75, something like that.

Q.   Okay.  So it's clear that we're not disputing in this case that you didn't get a heck of a lot of records.  That's what we have been talking about.  I mean, you didn't interview a ton of people.  So when you were interviewed by the government earlier this week you were shown several charts and the like showing the extent of the work that you had done, the extensive to do lists and the like.  We don't dispute that any of that was done and that's really not what we're here to talk about.

     I would like then to turn to some of the substance issues,

and I mentioned the Jackson v. Denno hearing.

A.  Yes.

Q.  Do you know, Mr. Swerling, if there are any successful Jackson v. Denno hearings listed on jackswerling.com on your --

A.  Nobody would have any idea what they are, other than a lawyer.  So if I put out I had the following successful Jackson v. Denno hearings people would say what the hell is that.

Q.  Well, let me ask you, on your website, I refer to a case State versus Odom.  Do you remember that case?

A.  Yes.

Q.  Okay.  And your website says the defendant, a former prosecutor, was charged with solicitation of a minor over the internet.  We successfully argued the evidence should be suppressed.

A.  Right.  Well, that you understand.  Most people would understand that.  And what was interesting about that case was it was the first we raised the issue of whether or not a South Carolina judge could issue a warrant under the -- a telephone warrant, or I can't remember what the name of it is.  But, anyway, the process that was being used to go ahead and get the records in the case under Title III, it wasn't Title III, under the terrorism argument, we raised the issue of whether that could be done in South Carolina, whether or not South

Carolina had another procedure which would have barred that. So it went up to the Supreme Court, the judge threw it out and the Supreme Court reversed.

Q. Have you had successful -- had success in litigating Jackson v. Denno claims?

A. I think yeah, sure. I'm sure.

Q. Now, I would like to focus on the Jackson v. Denno hearing in this case, which occurred over a three-day period in February of 2004.

A. Correct.

Q. At that time would you agree that you had been on Mr. Basham's case for approximately ten months?

A. Whatever. I'll accept it if you tell me.

Q. My review of the record shows you were appointed in April of 2003, February of '04 would have been approximately ten months?

A. If you say ten months, it's ten months.

Q. Did you at any time interview Mr. Basham about his interrogations?

A. Sure.

Q. Do you know if you did it on -- when you did it in your representation? Was it early on?

A. You have my notes and, you know, you have my spiral notebook and --

Q. No, you --

A.  No, you have copies.

Q.  I have copies of some pages, that's true.

A.  So let's not be coy.  You have it and you have a page which says that I did interview him about it and he raised certain issues.

Q.  That's an undated page.  Can you tell us when that interview occurred?

A.  If you look at the page before and the page after it would kind of give you an idea of when this took place.

Q.  I'm not trying to be coy, I don't have the original binder.  I made copies of pages that I believed relevant.

A.  You can look at it.  If you want to we can bring over the next day.

Q.  Why don't we bring up Defendant's Exhibit 81.  Mr. Swerling, is that your handwriting?

A.  That's correct.

Q.  Do you recall the meeting that you had with Mr. Basham when you took these notes?

A.  No.

Q.  No.  So you have no memory of when it occurred?

A.  No.

Q.  Okay.

A.  But I would say it's like a checkbook.  If you look at the page before and the page after you can figure out when it was done.  And I just don't have it with me but we can provide

that to you.  Those have not been altered in any way.

Q.  And do you -- let's look at this particular document for a moment, and I have a question.  The notes begin on defendant now says statements are not voluntary.  When I read that it seems to me that you're suggesting that Mr. Basham had changed his account of what had happened.

A.  Yes.  And that was not unusual.

Q.  That was not unusual.  Do you have notes, and I will tell you right now I have not seen them, of a prior interview with Mr. Basham in which you set forth what he told you about his interrogation following his arrest?

A.  Mr. Burke, I don't know.  I have not been through all of those.  But they are there for your review.  I cannot tell you.  Now you are talking about ten years ago.

Q.  Correct.

A.  You know, so I can't remember last week a lot of things.

Q.  Would you agree with me that it is most likely that these notes were taken prior to the Jackson v. Denno hearing in this case?

A.  I don't know.  I mean, without looking at the spiral notebook I don't know when it was and I can't -- I'm not going to guess, you know, sitting up here on the witness stand.  I don't know.

Q.  Have you had an opportunity to go through these files prior to the hearing today?

A.   I went through about as much as I could go through.  What I was really concentrating on was reading the transcript and going through the transcript.  Because, as you know, I did not have a copy of the transcript, I did not do the appeal.  So over the last few weeks we have gotten the total transcript, we have gotten the disk.  We also requested different hearings that we did not have that y'all have had the benefit of.  So I needed to read those things.

Q.   Mr. Swerling, would it surprise you to know that the indexes we made of our review of your boxes when we were there in February 2011 indicate that, in fact, you did have a full set of the transcripts in this case?

A.   Well, I think what we had was the daily transcripts.  And I stand to be corrected on that because I haven't been through the whole file.  You actually probably have more knowledge about what's in there right now than I do.  But I remember getting daily -- the court provided us with -- the court reporter was providing us daily, maybe daily or maybe not the next day, but we were getting realtime transcripts, so that's probably in there.  And they were unedited, if I recall correctly, and those would be in the boxes.  I don't recall having the transcript, and if I did I didn't read it.

Q.   Well, perhaps that would be something we will be able to clarify when we return under the judge --

A.   I think you will find those were the unedited daily

transcripts that we were getting.

Q. Were there any transcripts that you felt you needed that you weren't provided to prepare for your testimony today?

A. Well, I don't have transcripts of a lot of the in camera hearings. Because as I was looking through the transcript the in camera hearings were sealed and not -- they are not listed, or they are not set out, most of the them, in the actual transcript. So I don't know that I have any of those. Maybe one or two. There are other pretrial hearings. Last week I requested the pretrial conferences that I noticed that we had not gotten from August of 2004, and I think you -- I asked and you sent them to me --

Q. Correct.

A. -- last Thursday night.

Q. Correct.

A. And I asked at some point for the February transcripts which we did not have. Those were the, as far as I know, the argument on the motions between -- with Fulks, we were arguing Fulks and Basham together, we were still joined together. So those motions I was -- those either you sent them to me or Mr. Daley sent them to me. I don't remember. There may be others, but I think I had -- I requested what I thought I needed. There may be others that I'm not aware of yet.

Q. But Mr. Daley or myself provided you access whenever you requested it, correct?

A.   Absolutely, sure.

Q.   Could you go with me for a moment and go over your notes from this meeting that you had with Mr. Basham?  And let me ask you, would that meeting have been, if you know, in person or on the phone?  What was more common for you with Mr. Basham?

A.   Most of the time I saw him.  He didn't have a whole lot of access to the phone back then that I'm aware of or -- I just don't remember.

Q.   These would have been interviews with him either at the jail or at Columbia Care, or whatever he was?

A.   Yeah.  I was down there frequently.  I think, looking at, what, 60, 40 something occasions, or something like that, that I saw on the time sheets that y'all have.

Q.   And that was something you were able to pick up from one of the charts the government prepared?

A.   Either last Friday or Monday night one of y'all, I think there were some charts prepared that I interviewed him on 40 occasions, or something like that.

Q.   Okay.  Now, when you interviewed him on the occasion where you took these notes, I will read what I can and might need you to decipher some of it for me.  It says defendant now says statements are not voluntary.  One, no medicine.

A.   Correct.

Q.   Do you recall discussing with Mr. Basham the situation

with regard to the medication he was on or was receiving?

A.   What I know, what I can recall, which having refreshed my memory, is that he had been off of Ritalin for a while and there had been some effort to try and get some drug that simulated Ritalin while they were on their five-state spree. So I remember that, they bought something in the drug store that would kind of give him that kind of kick.  But that's what I remember.

Q.   Do you --

A.   Bits and pieces, by the way, Mr. Burke.

Q.   Does -- you understand, and I recognize it's been ten years, so, just asking what you remember.  Is it your impression that Ritalin gives a person with ADHD a kick?

A.   Well, it gives them a kick to go ahead and focus.  When I say a kick I don't mean he gets high, he focuses, he has an ability to focus.

Q.   Okay.

A.   Which, you know, Brandon did not have.  I mean, he had some difficulty focusing at different times.

Q.   Your second entry on that reads cigarettes, have to sign. Do you know what you mean by have to sign?

A.   Actually, I don't.

Q.   Okay.

A.   Cigarettes I understand.  Have to sign, I don't know what this meant, unless somebody was saying -- maybe he was saying

that he had to sign for when he got them, or something like that.

Q.  But no independent recollection today?

A.  No, I don't.

Q.  I believe that's snacks with the same requirement, and number four I can't read.  If you want to --

A.  If you want to live.

Q.  If you want to live?

A.  Right.  LIVE.

Q.  You have to sign.

A.  Yeah.  I have no idea what that means.

Q.  And then number five reads helped him -- could you read number five for me?  I'm sorry.

A.  Help.

Q.  Helped him.

A.  Help.  Not helped, help.

Q.  Helped with a P?

A.  Yeah, but not with an ED on the end.

Q.  Help him.  Okay.  Help him if he told everything, knew Chad was leader.

A.  Right.

Q.  No recollection today about what Mr. Basham told you with regard to that?

A.  No, I don't have any recollection of any of this.  This is a --

Q.  We will -- I'll see if you can decipher some the of language for me then and we will go from there.

A.  Sure.

Q.  He told you he was coerced.  Says he knew he had the right to a lawyer and told him if you told the truth would not be held against him, only Chad, no charges.  Is that read correctly?

A.  That's what I wrote in here.

Q.  Those are the notes you wrote in your interview with Mr. Basham when he was talking about his interrogation, correct?

A.  Pardon?

Q.  Those are the notes that -- that's an accurate reading of the notes that you took that day when you --

A.  Those are the notes I took that day.

Q.  Okay.  Do you recall, I know you have no memory of that meeting, do you recall doing any type of investigation following up on the specific statements that were made by Mr. Basham to you that are memorialized in this note?

A.  I mean, we investigated the case, I mean.  So, I mean, and part of that would have included the Jackson v. Denno hearing. So people who were involved, 302s, different kind of statements.  We, you know, we interviewed Richard Hughes, who was a lawyer up in West Virginia, I guess, who got appointed. We interviewed -- Greg interviewed on another trip up there Mr. Hewlett, another lawyer, the public defender up in West

Virginia.  And also Barbara McGuire, who was the -- worked for the public defender's office.  These were three lawyers that had been appointed, or two lawyers and the staff, that had been appointed to represent Mr. Basham and overlap with these different statements that were being given.

Q.  Okay.  And so yourself --

A.  So we did.

Q.  You talked to those three people?

A.  Oh, yeah.  Those were three of the people I can identify right off the top of my head.  And, of course, Mr. Littlejohn, Mr. Monckton.  You know, all of whom were aware of the fact that Mr. Basham was talking to the authorities.

Q.  Now, do you have any -- did your investigation reveal whether any of those people were with Mr. Basham when the events that he relayed to you here occurred?  I mean, it's one thing to say you interviewed the lawyers, but this appears to be a situation in which your client is telling you inappropriate coercive statements were made to him by law enforcement.  My experience is law enforcement usually doesn't do that in front of lawyers.  Do you -- did you think that by talking to Mr. Basham's lawyers from Kentucky they would be able to help you?

A.  That was background.  I mean, we're trying to find out what the circumstances were surrounding the statements.  I think, you know, I can't remember all -- you know, there were

several hundred people interviewed.  And, you know, I know attempts were made to interview agents and police officers from five states, or four states.  Which ones were actually I could not name them for you, but I think we did, you know, some -- that we did some kind of investigation concerning the circumstances surrounding the statements.

Q.  Now, it's correct to state that the information included in these notes was never brought out at the Jackson v. Denno hearing in Mr. Basham's case, correct?

A.  No, you're right, it was not the strategy we adopted.  And I can't tell you that he did not change as we were going forward his -- his thought process with respect to those things.

Q.  You mentioned your strategy with regard to the Jackson v. Denno, and in the interviews we have discussed that.  I want to make sure I understand what the strategy was.  And is that your strategy was simply to get the officers' statements or the officers' version of what occurred on the record, pin down --

A.  That was part of it.

Q.  Why don't you tell me what was the purpose of the Jackson v. Denno hearing.

A.  Okay.  I need to give you a little bit of background, because, you know, here's the situation.  This was a horrific crime that took place over a period of some four, five states.

The two women were dead, had been brutally murdered, and they were -- their bodies were not discovered.  We --

Q.  Can I just clarify for one moment, though?

A.  I'm giving you my strategy.

Q.  No, I understand.  I want to clarify something.  How many victims were there in the case in which you represented Mr. Basham?

A.  Two.

Q.  Okay.

A.  Intrinsic evidence as to Miss Burns.

Q.  How many victims were there in the case in which you represented Mr. Basham in South Carolina?

A.  There was -- well, there was one victim in the death penalty case but there was evidence of intrinsic acts that the judge ruled on with Miss Burns, so we were dealing with two bodies.

Q.  Was he charged with anything --

A.  No, you know that.  But you are asking me how many victims there were and there were two.

Q.  There were -- your testimony today is there were two victims in the case in South Carolina with which Mr. --

A.  That's not what I said.  I said there was one victim in the South Carolina case but there was other evidence of another victim in West Virginia that was ruled to be intrinsic evidence in our case.  So that I'm talking about two women who

were killed and their bodies were never discovered.  That's all I've said.

Q.  Okay.  I'm sorry to interrupt you.  You were telling us the strategy.

A.  So we had a situation where there had been an escape at the jail, there had been this picking up James Hawkins and various other people, Tina Severance, Andrea Roddy, Samantha Burns, the South Carolina part of it.  So what we had, there was a lot of evidence in this case that both Mr. Fulks and Mr. Basham were guilty of the crimes, okay?  I mean, it would be, I think, an absurd position to argue otherwise.  So we had that.

We looked into Mr. Basham's background.  He had this history of going in and out of some institutions in western Kentucky and other places.  We had his family, his mother who, you know, she was just probably just one of the worst people I've ever met and ever heard of because of her upbringing of Brandon, her support of Brandon, what she got Brandon to do.  So coupled with the fact that there were two horrific crimes, there was a crime spree from western Kentucky to South Carolina back up to West Virginia.  With his background, his family background, it called for thinking outside the box.

And when we -- the Jackson v. Denno hearings, what we adopted was a -- I adopted a strategy, and Mr. Harris, as well, that we had to look and see -- and, you know, from my

opening statement we pretty much front-loaded the issue there about whether or not he was guilty or not and accepted the fact that we were going to go into a second phase of the trial, the penalty phase.

So looking at all of that in the overall strategy, when we had the Jackson v. Denno hearings what we were trying to do is show that Mr. Basham cooperated to the best of his ability, or could cooperate, to try to cooperate, to hopefully find out later on or be able to show the jury that he did cooperate in some extent. And there was a dispute about whether or not he was telling the truth all the time and whether or not he was being honest about some of the locations and exactly what happened. But essentially Brandon was cooperating.

Early on he had told them about the Samantha Burns murder and that they could stop looking for her body, that she was dead. He gave them a description over the phone, talking to FBI Agent Long, trying to describe an area down in South Carolina. He took them on a ride on November 28, Thanksgiving day ride. So those were kinds of things that we thought we ought to establish, get from the agents and the officers that he did -- he was cooperating, he was not insisting on a lawyer, that it was a voluntary, to somewhat extent, voluntary on his part to try and cooperate.

And so we had a Jackson v. Denno hearing, asked the court to pass on the voluntariness. But, as you know, we did not

argue voluntariness very much.  What we tried to do was get the officers locked in so that we could see how far we could go with this cooperation, to try and -- all the questions were really designed to try and show how much Brandon was cooperating over this period of time.

Now, let me also say this, which also took -- we also considered and I definitely considered over this period of time.  There were certain statements that were -- there's no way you could argue voluntariness.  And, for example, with Mr. Littlejohn and Mr. Monckton, he had counsel there so it would be a little difficult to argue voluntariness on those statements.  Mr. Hughes, Richard Hughes, was an experienced criminal lawyer who had told Brandon he didn't think he should cooperate without getting anything in return.  But despite that Mr. Basham wanted Mr. Hughes to convey information to law enforcement about Samantha Burns, about Alice Donovan.  So you weren't going to be able to argue that Richard Hughes' statements or statements given while Mr. Hughes was there were anything but voluntary.

And then you had Barbara McGuire and you had Mr. Hewlett who also came to see Mr. Basham during this interviewing process that was going on, and it was going to be hard to argue that those were not -- statements were made after he consulted with counsel were not voluntary.

In addition to that, Mr. Basham initiated contact with FBI

Agent Malley, I think it's Malley, called him and said he needed to talk with him. So we had a number of statements that were just -- I did not think, Mr. Harris I believe did not think, we could contest seriously about voluntariness. So that made the earlier statements that were given the first day or two less meaningful to try and suppress.

So we tried to adopt this consistency about his cooperation throughout not asking for a lawyer. But certainly the last four or five statements that the court ruled on were -- well, I'd say four or five, anything with Monckton, Littlejohn, Hughes, McGuire, and Hewlett, the statements that coincided with those days would be extremely difficult, if not impossible, to argue voluntariness.

Q. And when you mention Mr. Monckton and Mr. Littlejohn, you are referring to the Thanksgiving day search in --

A. November 28th. So to answer your question, you have a -- a series of statements that were very incriminating where voluntariness was just not going to be able to attacked. So we had to adopt a strategy outside the box, to go ahead and embrace the statements and try and use them to our advantage during the course of the trial.

Q. Now, by the time of the Jackson v. Denno hearing you had accumulated a huge amount of records from Mr. Basham's past, correct?

A. Yes.

Q. So you were familiar by that time through the to do lists or the charts, all the charts that were made by Lesa Watson and others, of his history of psychiatric and emotional deficits, correct?

A. Very extensive.

Q. Very extensive. And I understand what you are saying is that there were so many statements that, and I don't want to misstate it, and I will tell you right now I ask you these questions because I'm not a trial lawyer, I have never done a motion to suppress. So, you know, I'm sincerely wanting to know what the strategy would be here.

And would there have been a downside to at least presenting to Judge Anderson the information about Mr. Basham's intellectual and psychiatric and emotional --

A. It wasn't in my plan and I don't believe Mr. Harris' plan at that time to use that hearing for that purpose. What we were trying to do is trying to adopt a strategy that we could use for the trial about the Jackson v. Denno -- about the statements that the officers were going to make about Mr. Basham and what he exactly did say and what the circumstances surrounding it were, and trying embrace those and use them to our advantage.

Mr. Burke, if you've never litigated one, then you realize that whatever he said in front of -- when Mr. Littlejohn and Monckton were there was going to be admissible. Couldn't

be -- it's not going to be involuntary.  Whatever he said to Mr. Hughes and conveyed through Mr. Hughes and what he -- leading these people on a search was in some way going to be used -- you know, I can't tell you exactly how it would be used, but it was -- he had advice of counsel, he had advice of counsel with Mr. Hewlett.

So, you know, I just think that we had to have a strategy that was something that we could use and embrace and use to our -- use to some effectiveness for Brandon during the case and that's what we came up with.  And we followed through with that throughout the case.

Q.  Okay.

A.  You know, bringing out these things when we had these witnesses on the stand.

Q.  So in some ways we -- that is our long way of saying you were trying to pin the officers down for their future testimony.

A.  We were trying to find out what they were going to say, sure.  Sure.  Let's put it this way, if you get a chance at a pretrial hearing, you have a 302, but if you can have a chance at a pretrial hearing to have someone on the witness stand you would be a fool not to take it.  So you put them on the witness stand.  We made a -- we made a good faith Jackson v. Denno hearing, asked the court to rule on it.  But I think the record will bear out that we were not really arguing very

strongly about voluntariness, we were obviously using it for some other purpose.

Q.  What would have been the downside of arguing voluntariness?

A.  You can't argue voluntary statements with Mr. Littlejohn and Mr. Monckton or Mr. Hughes.

Q.  I realize that, but --

A.  Or Mr. Hewlett.  It would be absurd to try and take a position that those were not voluntary statements.

Q.  So is it your position, your professional opinion, that in a criminal case that some statements can come in, let's just let them all in?

A.  No, that's not what I said.  What I said was we were faced with a number of statements where voluntariness was just not going to be an issue, he had counsel.  Okay?

Q.  Let me ask --

A.  So therefore -- let me finish.

Q.  Okay.

A.  Therefore the earlier statements took on less significance than the ones that were going to be no doubt admissible because he had counsel.  So what we did is try to use those to our advantage and embrace those and figure out a strategy where we could -- it could help Mr. Basham during the course of the trial.

Q.  Okay.  I'll return to the question.  What would have been

the downside?  I understand the strategy, what would have been the downside of presenting information to Judge Anderson about Mr. Basham's intellectual deficits and his emotional deficits and his psychiatric deficits?

A.  Because it's not the strategy we adopted.

Q.  That's not my question, sir.

A.  So I can't tell you at this point because it wasn't something I considered.

Q.  You didn't consider --

A.  I don't believe that we -- I considered whether or not -- well, let's put it this way.  There might have been a period of time when we did consider it but we adopted a different strategy.  So, I mean, I'm sure that it was considered about his mental capacity.  But the strategy we adopted was a strategy that was put out in February of 2004.

Q.  So sitting here today what you remember is the ultimate strategy, but you don't have any particular recollection of what --

A.  No, and -- I don't.  And I will tell you this, we obviously had doctors who were telling us already about his mental problems, we already had the records.  I read every single page of the medical records.  And so, obviously, it was considered as to whether or not that would be an attack.  But the better approach that we thought was going to be the way we handled it because he had counsel.  At least starting with

November 19, I believe.

Q. Is it your opinion then, your professional opinion, that any defendant who has counsel, any statements he might make after being advised of his rights are -- are necessarily voluntary? That's what I'm hearing.

A. I don't understand the question.

Q. Can you -- could it not be true that a defendant who is with counsel but who has such deficits that he cannot knowingly and intelligently waive his rights could make involuntary statements despite having counsel?

A. Well, none of those lawyers said that.

Q. That wasn't my question.

A. But you would to have those lawyers at least support the fact that he didn't understand his rights. And somebody has -- how can a doctor come in -- let's just think about this for a minute. You've got three lawyers, four lawyers and an experienced paralegal for the public defender's office. Wouldn't one of them need to at least say that he did not understand what was going on? Even though he had these mental deficits, he knew we were lawyers, he knew we were telling him not to do it. None of those people said that they thought that Mr. Basham didn't understand. So I think that would have been essential. If you are asking me, that's what I'm telling you.

Q. Okay. All right. And now are you saying -- did you have

conversations with Billy Monckton prior to the --

A.  My notes reflect that I spoke with Billy.  I would be surprised if I didn't.  I know in preparation for the hearing, my recollection is prior to the hearing when there was some issues about -- I wasn't here for the disqualification, obviously.  We didn't get involved in the case until after that.  But as to whether or not the hypothetical was going to be admitted, I think both Monckton and Littlejohn were interviewed by me or me or Greg or both and were -- they were as witnesses in the case, as far as I remember, during the pretrial hearings.  So --

Q.  We do have notes.  Why don't we go through those.  I don't want to act like I'm not giving you all the information you need.

A.  Sure.

Q.  So, Susie, could you please bring up Defense Exhibit 80?  Mr. Swerling, I think we can all three agree that's -- this is your handwriting, right?  I won't keep asking you that.  These are your notes?

A.  Yes.  Nobody else writes like that.

Q.  If we come across notes that don't look like yours and I'm saying they are, please stop me.  And I once again --

MR. BURKE:  Hold on.  One moment, your Honor.  I think I --

(There was a pause in the proceedings)

Q.   (MR. BURKE) Well, let's -- first, there are notes, and if I can find them we will talk about them.  Oh, here they are. The second page of that exhibit, that's what's throwing me.

Mr. Swerling, could you look at the entry for December 24, 2003, highlighted, about this -- this would have been exactly two months before -- who's Kevin McNally?

A.   I'm not sure actually what the structure was, but there is a regional -- there is a group that manages each region of the country that helps supervise death penalty cases.  And David Bruck was the one for this particular area, who is someone I've known for many, many years.  But David Bruck was already working, he was already in that capacity on the Fulks case so we got assigned to Kevin McNally and his group and went to them often for motions, for cases.  I think I probably read every motion that's ever been filed in a federal death penalty case, and every case.  So McNally, I think, was the head of whatever that supervisory team was.  I don't remember what they are called.

Q.   Okay.  And I don't really -- I think it's resource counsel, but I'm not sure.

A.   It could be.

Q.   Okay.  So do you have any independent recollection today looking at these notes of a phone call that you had with Mr. McNally about the Jackson v. Denno hearing?

A.   No.

Q. No? All right. So apparently you took a notation of a call you had with him where he apparently recommended to do the Jackson v. Denno, no harm?

A. Um-hmm.

Q. Narrow answer re mental state. Now, what you talked to me about was your ultimate strategy was focused on the statements of the law enforcement officers, correct?

A. Yeah.

Q. And so two months before the hearing at least, is this consistent with what you are saying, you may have considered other options but ruled them out?

A. We adopted the strategy that we thought was the most successful.

Q. Okay.

A. Would have been the most successful. Other things obviously were considered.

Q. And you had no, again, no recollection whatsoever of this conversation with Mr. McNally.

A. No. It's nine years ago.

Q. Okay. Could we see Defendant's Exhibit 82, please, Susie?

A. I'm saying there go ahead and do the Jackson v. Denno, which is what we did. We had a different approach than what you might think was normal. Again, you said your expert, you know, about the Jackson v. Denno, again, we had lawyers who would be testifying in court. For us we could not bring them

into court and say they weren't voluntary statements.

Q. I'm just -- I'm just trying to go over the preparation that was done, Mr. Swerling.

A. Sure.

Q. That's really the extent of it. If you could look at Defendant's Exhibit 82, for the bottom entry, Susie, could you highlight that for us. I believe that says -- excuse me, February 16, 2004. Meeting with Scott and Greg re Jackson v. Denno?

A. Right.

Q. It's Scott Schools?

A. Scott Schools.

Q. Okay. What would the purpose have been for this meeting, do you recall?

A. Determining what the scope of the hearing was going to be, who was going to testify, how we were going to handle it, what he was going to require, stipulations. I mean, I have no idea. Scott Schools, you know, we have -- Scott was a very able Assistant United States Attorney and someone we worked with, him and Mr Gasser, on this case very closely. And, you know, obviously tried to come to an understanding about many of the issues. Stipulations, I mean, if you read the trial transcript, we entered into a lot of stipulations. I mean, obviously we talked to each other about scheduling and who's coming in, so that was not unusual to meet with Scott Schools

and Greg.

Q. Okay. Now, let me ask you, Susie, could we turn to the next page of that same exhibit? And, again, there are entries for February 19, 2004. So now it appears that you're in full throttle to prepare for the 24th, which was the beginning of the evidentiary hearing.

Can we look at the first entry, please? Could you -- all the way down. I also spoke -- there you go, and highlight that for us, please.

This is a conference with Monckton, is that correct?

A. Yeah. Yes.

Q. And you mentioned previously the hypothetical issue. Can you -- sorry, I just can't read your writing there.

A. It says all the hypothetical information came from Rosemary, not Mr. Basham. And there's a memo. And what I can tell you, what I think that means, again, this is bits and pieces, but in reading, one of the things, reasons we had to have three different meetings because I kept going back reading to refresh my memory.

What I understand is that there was an argument about, in the hypothetical in the February hearings, that the information was not coming from Brandon, it was coming from law enforcement to the lawyers, a lot of the information. So that was one of the reasons why we took the position the hypothetical should not be admissible, because a lot of the

information was being fed to the lawyers from law enforcement, including Rosemary Parham, who was the AUSA involved in the case that wouldn't allow a proffer in the case, wouldn't allow it to be done under the terms of a proffer.

So that was just a -- there's an argument that, as you know, was made during the February hearings that -- and I think I made it myself, that we should not attribute those comments to Basham, they were coming from the government, a lot of the comments. So it wouldn't be fair to let in a hypothetical if it wasn't his -- even if you get past the legal issues the question was not to let it in because a lot of the information was coming from the government, not from him.

Q. Okay. And I think, in fact, we have seen the memo that Mr. Monckton referred to in the conversation in this very proceeding, and I think your testimony --

A. I don't remember.

Q. Now, you have number ten. No idea what that refers to?

A. It's a number that could have been referring to a to do list or something. Could be.

Q. And there will be testimony -- well, let's get to this right now. You made a lot of to do lists in this case, correct?

A. Yes. I do a lot of to do lists in all my cases so that I have a running list of what we want done, and we cross them

off as they are done.  Then the to do list gets expanded again and they cross off more so that you have an ongoing script of what you want to accomplish or to do.

Q.  And --

A.  Kind of simple.

Q.  And at least in this case you numbered your to do lists?

A.  At some point I think we discovered when we were meeting, you were there, that I started numbering to do lists.  But not at the beginning.  I don't know why, I don't remember what the reason was.  At some point -- but maybe just to keep track of the to do lists between the team so that we could refer to to do list number ten.  Now, this could be a number ten on a particular to do list.  But it's obviously referring to something, either a to do list or a number in a to do list before we started numbering the to do lists.

Q.  Can you read for us your notes following that?

A.  Billy spoke with Larry Ellis and Sheriff Hewitt, Brunswick County.  Contradicts Thanksgiving, and also spoke to Joe Ciccarelli.

Q.  Who is Larry Ellis?

A.  I have no idea.

Q.  You recall who Sheriff Hewitt is, correct?

A.  Yes.

Q.  Any recollection today what contradicts Thanksgiving meant?

A. No.

Q. Susie, can you just move down that page for us. There were more -- there's more meetings on the same day with Mr. Monckton in your preparation for this. This was a Thursday and the hearing began on the 24th, which is a Tuesday. Monckton conference with Greg.

Did you advise Brandon what he said would be used, is that correct?

A. Yeah. That was, again, that had to do with the hypothetical. One of the arguments that we were making during the February hearings is that the hypothetical should not be admissible because no one told Brandon that what he said, what was going to be divulged in the hypothetical, could be used against him, and he didn't ever authorize that. So that's what we were trying to -- and we argued it, I think, you know, as best we could that, you know, there was no informed, not informed consent.

That would be the thing, but what we were -- I guess what I'm trying to say is what we were trying to argue, and we did argue to the court, is that no one told Brandon that what was being said in a hypothetical could be used against him so therefore he should not -- it should not be admissible against him.

Q. I understand.

A. And I think that's what we did argue, the best I can

recall.

Q. And at this time the hypothetical issue was still very alive because it was still being litigated.

A. We knew that was going to be an issue.

Q. Okay. And so, Susie, could you go to the next page of that same exhibit?

A. And, of course, the judge ultimately ruled it was not admissible.

Q. Right, right. Which is -- and you are talking about Monday morning quarterbacking from the perspective that we see things, we know the future as it was here. But it helps to hear from your perspective when you were there what was still, you know, a live issue.

On the next page there are notes from the 24th, which is the day of the evidentiary -- the beginning of the Jackson v. Denno evidentiary hearing. And I just really want to, if I can, focus on one area. Susie, can you move down where it says Hewett just fired off questions, and the sentence below that, too. And I will read this and see -- Hewett just fired off questions. They were told they could not talk to him. Any memory of this phone conversation with Mr. Monckton?

A. Well, I don't remember the phone conversation. I do remember from the testimony that, you know, Brandon was not supposed to be talking to them, that was part of the understanding, but Brandon was saying things. Now, I don't

remember anything about what Hewett fired off questions is, because I don't remember about Hewett firing off questions. But I do remember there was an understanding or supposed to be an understanding that they would not interview him.

Q. Okay.

A. But then I also remember there's some testimony that somebody allowed Brandon to walk off with the sheriff, which I never did quite understand and that's something I just read recently that I can't imagine Mr. Monckton, Mr. Littlejohn allowing that.

Q. Do you remember Sheriff Hewitt's testimony at the Jackson v. Denno hearing where he testified that he, in fact, walked off alone with Mr. Basham?

A. Well, that's what I'm referring to, and that doesn't make sense knowing Monckton and Littlejohn. But apparently that's -- you know, I can't contradict it.

Q. Did you ask --

A. I don't remember. Obviously, we did.

Q. Okay. And your understanding was that Mr. Monckton and Mr. Littlejohn, from these notes, had informed law enforcement the day that Mr. Basham was on the Thanksgiving day search they weren't allowed to talk to him, correct?

A. My understanding was the rules were that they weren't going to be talking to him directly, but they overheard things. For example, the comment about the deer, deer running

across the road and, you know, I can't believe I'm here, I couldn't even hurt a deer, and then it was cut off.  And that statement was ruled admissible, as I recall.

Q.  Do you remember the statements that Sheriff Hewitt claimed that Mr. Basham said to him when they walked off alone together?

A.  If you can refresh your memory.  I don't remember specifically what the comments were.

Q.  Sheriff Hewitt testified, and there is some dispute between defense and the government at this point as to whether his testimony ultimately morphed or changed, but at the hearing, the Jackson hearing, he testified he walked off alone with Mr. Basham and Mr. Basham showed him how the victim's purse strap was used to strangle her and then showed where it was thrown.  Does that refresh your memory?

A.  I remember something about the purse strap, but I thought that that was -- I didn't know -- I don't remember it being when they walked off.  I do remember a comment about the purse strap --

Q.  Okay.

A.  -- that he had mentioned.  I think it first came up that Brandon said something about look for a purse strap, that I threw a purse strap out the window, or something like that. So that started the conversation about the purse strap.  And they started looking for an area, or in the areas where they

had driven they started looking for a purse strap.  I think it was a, I don't know, maybe Liz Claiborne.  I don't remember, but --

Q.  I think that's correct, yes.

A.  There was a purse strap, and that became the focus of trying to find the purse strap in the areas that Brandon had pointed out.

Q.  Now, I'm --

A.  That led to just other discussions.  But the purse strap obviously was an issue.

Q.  At the Jackson v. Denno hearing Sheriff Hewitt testified that during that exchange between him and Mr. Basham, Mr. Basham showed Sheriff Hewitt how the strap was used to strangle Miss Donovan.

A.  Correct, showed him how the strap was used.  But, again, I don't remember where that was.  I don't remember if it was in the vehicle.  You know, you say it was when they walked off. I don't recall that and I want the record to reflect that.  I just remember there was a conversation where Hewett said Brandon showed him how the strap was used.

Q.  And you don't know at this point whether that statement was made outside the presence of Mr. Basham's counsel at the time?

A.  I don't recall that, where it was.  I don't even remember physically where it was.  I just remember it was said and

there was testimony about it. But I don't recall right now where it was.

Q. Now --

A. No, I don't recall where it was and who was present.

Q. Oh, I see. Where the statements were made and who was present when they were made. So --

A. I remember Hewett was not my witness, so if he was my witness I probably would have had a lot more, maybe had more recollection of it. But I remember it, I remember the comment and I remember the circumstances, but not where or who was present.

Q. So Hewett was not your witness at trial. Was he not also your witness at the Jackson v. Denno hearing?

A. I think it was the other way around. I don't remember, actually. I did, I did actually examine him on one occasion, yeah. I don't remember which one, though. Probably at the Jackson v. Denno hearing.

Q. If Mr. Hewett, given what you learned from Mr. Monckton and Mr. Littlejohn, if Sheriff Hewitt had testified at the Jackson v. Denno hearing, which the records speak for themselves as to what he testified, if he had testified that he walked off alone with Mr. Basham and Mr. Basham while they were alone showed him how he had used the strap, how the strap had been used to kill Miss Donovan, would you have had any concerns about the admissibility of that statement?

**JA 4218**

A. Since I don't remember where it was I can't tell you. I mean, I just don't know.

Q. I'm asking you a hypothetical. If he had testified that the statements were made outside the presence of counsel when he took Mr. Basham over to look at the area where the strap might be, if that was his testimony would you have had concerns about the admissibility of those statements, just those statements, the strap statements?

A. I'm trying to put it in context of where -- I don't remember that being the issue.

Q. Are you familiar with --

A. You are saying that, but I don't remember that being that way.

Q. Well, and the record will speak for itself.

A. Yeah.

Q. So are you -- you've handled lots of suppression and Jackson v. Denno hearings. Are you familiar with the Supreme Court's decision in Edwards versus Arizona about the right of law enforcement to question?

A. When a defendant initiates contact, yeah.

Q. Exactly.

A. I kind of remember that case.

Q. Do you remember that the ruling of Edwards is that the law enforcement cannot initiate interrogation with a witness who, with a defendant, excuse me, who has invoked his right to

**JA 4219**

counsel?  In a nutshell, that's the standard of Edwards.

Sitting here today does -- had you known at trial, or assume at the Jackson v. Denno hearing that Sheriff Hewitt had testified that he took Brandon away and walked off alone with him after being informed that he could not contact or could not communicate with Mr. Basham outside the presence of counsel, he testified he in fact did so and Mr. Basham ended up making statements that became critical to the government in their case in Mr. Basham's trial.

A.  It's been characterized that way, yeah.  My understanding was the sheriff said he was not saying that Basham said he strangled her but that it was the way she was strangled.  But I mean --

Q.  Either way, is that --

A.  Let me say this to you, that it had already been out there.  I mean, Basham had already put in or they had already put in the fact that there was a strap.  They were looking for a strap that was used to strangle her.  So you are leaving out those very important facts that had nothing to do with any statement that Basham made to Hewett.  They were looking for the strap that had been used to strangle Miss Donovan.

Q.  Well, this goes back to the question I guess I asked earlier.  Is this how you approach your cases?  If something -- some things are coming in others aren't worth --

A.  No, it's not the way.  In this particular case, since from

November 19 on he had counsel, the statements prior to that time took on less significance in determining our strategy. So dealing with statements that were made with lawyers, then we had to look at the statements made prior to the lawyers being involved, and what we did is we adopted a strategy of embracing all of it to try and use it for Mr. Basham's advantage.

Q. And the statements that Sheriff Hewitt testified at the Jackson v. Denno hearing would be made by Mr. Basham after he had invoked his right to counsel but when he was outside the presence of his counsel. And did you ever consider raising an argument that those statements were inadmissible, in violation of Edwards versus Arizona?

MR. DALEY: Your Honor, I have to object. I think we're expanding this claim number two. There's absolutely no mention of this in claim number two. Again, it doesn't deal with the 24th, if you look at claim number two. If you look at their claim, unless I'm mistaken --

THE COURT: I thought there was a claim counsel was ineffective, Mr. Littlejohn was ineffective for letting Mr. Basham walk off with the sheriff. Now we're getting that should have been suppressed.

MR. DALEY: And I think there's actually --

MR. BURKE: Your Honor, can I read you the claim? The government is raising this argument for the first time.

THE COURT:  Read the claim.

MR. BURKE:  Claim two.  Mr. Basham was denied the effective assistance of counsel guaranteed by certain statutes and the Sixth Amendment when his trial attorney failed to prepare for and/or effectively litigate the Jackson v. Denno hearing in this case.  That is the claim, and that is precisely what I'm asking Mr. Swerling about.

THE COURT:  I think it's properly before me.  How late do you want to go today?

MR. BURKE:  I'll stop whenever you want to, your Honor.

THE COURT:  Are you flying out tonight?

MR. BURKE:  I'm flying out in the morning, so --

THE COURT:  We're obviously not going to finish with Mr. Swerling today.

MR. BURKE:  No, sir.

THE COURT:  It's about time to take our afternoon recess.  I don't like to work the court reporter longer than an hour-and-a-half at a time if I can help it.

MR. BURKE:  I am at a break in subject matter, so --

THE COURT:  Well, I know Mr. Swerling doesn't want to have to come back any longer than he has to next week.  Why don't we just take a ten minute break and come back and do another 15, 20 minutes, if we could.  Let's take a ten minute recess.

(Recess, 4:39 p.m.)

THE COURT: Let's go about another 15 minutes, if we could.

MR. BURKE: 50 or 15?

THE COURT: 15.

MR. BURKE: That's fine.

BY MR. BURKE:

Q. My eyes got really big. Mr. Swerling, are you familiar with the U.S. Supreme Court's decision in Watkins versus Virginia?

A. I've heard it. I can't tell you what the principle is right now. I used to be able to do that.

Q. Okay. That's the decision from 2002 where the U.S. Supreme Court held that it violated the Eighth Amendment to execute the mentally retarded.

A. Right.

Q. It came down in 2002, so about a year before --

A. I remember.

Q. -- that you were appointed to this case. Do you recall for capital litigators like yourself that was kind of a big deal to have something positive from the Supreme Court that would actually be a complete bar in some situations. But I know that there were a lot of seminars put on right after the decision came down. Do you recall now whether you went to any seminars that talked about Watkins or talked about how to

pursue a Watkins claim?

A.   I would have no recollection of that at all.  I did go to CLEs, I do teach CLEs, I stay up with the law.  In this particular case what I will tell you is this, there are several boxes over there in the conference room filled with virtually almost every Supreme Court case dealing with the death penalty, and also about every pleading that had ever been filed by a federal death penalty lawyer.  So I know I kept up to that extent and sought out what other lawyers were doing around the country.  Greg and I both did that.

Q.   Okay.

A.   I mean, whether or not it was a specific seminar about Watkins, I just couldn't tell you.

Q.   Okay.  Thanks.  Did you know in 2003 how a claim of mental retardation, if it could be litigated, how it could be litigated in federal court in a death penalty case?

A.   I don't recall.

Q.   And clearly there had -- this was the first federal death penalty case in South Carolina in recent times, so it wouldn't have been --

A.   I can tell you I just don't have a recollection.

Q.   Okay.  I would like to show you what's been admitted as Defense Exhibit 98.  And I will tell you that this -- and, Susie, could you make -- just so the -- if you can make the title big enough, and the first two questions.

Mr. Swerling, I'm going to -- this was a document that was found among the 77 boxes.

A. I don't have anything on my screen. Yeah, okay.

Q. Do you recall ever seeing this document? It's a multiple -- multi-page document, I will tell you that.

A. Do I recall it? No. If it was in the box, though, I read it.

Q. Okay.

A. And I remember seeking out -- obviously, we're looking at voir dire questions, which was one of the things --

Q. Can you tell us, was the question of mental retardation an issue that you considered raising in Mr. Basham's case?

A. Well, we considered whether or not he was mentally retarded, but we had our experts who said he was not mentally retarded.

Q. And let's talk about that for a moment. If you were to have a client that you had concerns might be mentally retarded, what type of expert would you retain to evaluate him?

A. Neurologist, neuropsychiatrist, forensic psychologist, forensic psychiatrist. I mean, whoever they recommended, as well. Judge Anderson was very liberal and very generous about giving us money for whatever we needed on the team and whatever experts. So I wouldn't have hesitated if we had been led in that direction, if someone said he would qualify for

mental retardation.

Q.   Okay.  And I believe in this case testimony was admitted at the penalty phase from Tora Brawley, who was your neuropsychologist, about Mr. Basham's IQ.  So to refresh your memory, she was the expert --

A.   I know --

Q.   -- in your case.  We can agree that in a case such as this one where you have said that there was -- there was no hope that Mr. Basham would not be convicted that the issue from your very first day was to save his life.

A.   I think that's a fair statement, that I just did not think -- guilt or innocence I thought -- we were going into a second phase of the trial, I pretty much figured that.

Q.   Right.  And --

A.   And I think on the voir dire with the jury we even started off with that, that there was going to be a second phase of the trial.  And my opening statement to the jury was we're going into a second phase of the trial, I believe.  Again, that was all consistent with our strategy.

Q.   Okay.  And we don't -- okay.  Well, let me -- I'm just curious about that strategy.  I do have a question.  There have been issues about the fact investigator in this case, Mr. McNair, Carlisle McNair, and your hiring and supervision of him.  He did an immense amount of work in this case and he was for the most part, as I understand it, and correct me if I'm

wrong, he was a fact investigator, right, he wasn't a mitigation specialist?

A.  No.  I mean, we sent Carlisle where we thought he needed to be and, you know, he reported back and if we told him follow up on something.  So, I mean, he was an investigator. That's what he was at the Lexington County Sheriff's Department, so he was out there.  Now, if he picked up something in interviewing a witness that looked like it needed -- not only fact witness but went into the mental issues then we would follow up on that or ask him to follow up on it.  I don't remember specifics, but, I mean, obviously if -- if he was in western Kentucky talking to somebody and he called me up and said we got X, Y, Z, I said go ahead back and talk to the person.  So we didn't -- he was a fact investigator, but that doesn't mean he would not have crossed over and asked other questions, as well.

Q.  Okay.  Okay.  Well, turning to the question of this -- well, let me finish with that topic because it escaped my mind and I just remembered what I was going to ask you.  If your focus was in this case, as you said, let's focus on saving Mr. Basham's life, Mr. McNair did an extensive amount of investigation regarding the crime in this case.  Can you explain why there was so much focus on investigating the crime spree when you felt that he was -- he was almost virtually certain to be convicted?

A.  Well, I've tried scores of cases and dozens of murder cases.  I mean, my object in every case I've ever been involved in is to find out as much as the prosecution knows, and more.  That's the way I approach cases.  Anybody ever worked for me knows that.  I mean, I push people ad nauseam to find out -- you know, to interview people.  In this case it's a classic example.  I want to know it all.  I want to be able to put it all into the -- into the pot and come up with a strategy.  We interviewed hundreds of witnesses in this case.

Now, you may suggest that some of it was not necessary.  That's not the way I look at it.  I want to know everything about every witness and every aspect of the case.  And I did, I believe.

Q.  Well, and I suppose I am suggesting that.  I guess my question is at some point in a case such as this don't you need to -- to choose the, you know, the wheat from the chaff and decide it's just not worth the time, we only have a limited amount of time before trial so we need to focus on those issues that are most important and --

A.  I don't agree with you.

Q.  You don't.  Okay.

A.  No.  And what we did -- well, I agree with you to some extent.  As it got closer to trial we did to that.  But in the beginning we had the resources, Judge Anderson had given us the resources and the people to track down all of these

things.  And I would be up here answering questions about why I didn't track down something if we didn't do that.

So my strategy has always been in almost 40 years of the practice of law, my clerks, my investigators, everybody knows you find -- you talk to everybody about every incident that you can, and I want to know more than the government knows.

Q.  Okay.

A.  Or the state knows.  That's just the way I approach cases. Now, as it got closer to trial obviously we did throw out the things that were not necessary, but we couldn't have made that decision unless we had interviewed everybody.

Q.  Okay.

A.  I certainly wasn't doing it for my health.

Q.  I can only imagine the toll this took on your health.  So have you -- you had not as of the time that you represented Mr. Basham ever had a client where you presented the claim of mental retardation and under Atkins, because that decision had only been out for about a year.  So that's a safe assumption to make, correct?

A.  No, it's not.  Atkins obviously hadn't been decided, but I did have -- I've had cases where people were either borderline mentally retarded or mentally ill.  I mean, I started trying cases, Larry Gene Bell, for example, in 1985, was someone who I thought was insane, and I learned an awful lot about mental illness and insanity as a result of that trial.

Some of the doctors who were involved in that trial for the state asked me to come on the faculty as I guess you call it an adjunct or something for the medical university in the department of neuropsychiatry.  So I've always had a real -- you know, I like to look in those things, I like to have an understanding of them.  As a matter of fact, this afternoon I was supposed to be delivering a lecture over there and had to cancel it.  So it's something I am very aware of and very attuned to.

Now, mental retardation, I can't tell you that there's a specific case that I recall, but I remember Bell had an awful lot of these things.  I just don't remember if it was mental retardation or not.  We were looking more at insanity on that situation.

Q.  Okay, okay.

A.  Which we have, as you probably know, the McNaughton standard in state court, which is very difficult.

Q.  Yes.  We have it other jurisdictions, as well.  So although I've read some of the articles about Mr. Bell's case, and I will tell you it's very fascinating.

A.  It gave me an angioplasty.

Q.  Since your representation of Mr. Basham in 2003 have you represented any other clients in federal or state court who have been charged with the death penalty?

A.  I don't remember if Richard Hollis was before or after

that.  But I tried a case, death penalty case in Lexington County, and in that particular case it was -- we got a life sentence out of the case.  I think it was only the second time in Lexington County's history there was a life sentence.  So whether it was before or after Basham, I can't remember.  I won't do any more.

Q.  You don't do death penalty work anymore?

A.  No.

Q.  Is it safe to say this hearing might be one reason?

A.  No, absolutely not.  No.  I mean, that's not the issue at all.  I just think that it's very taxing, you know, working to 1:00 o'clock, 2:00 o'clock in the morning, getting up at 7:00 and always thinking there was something more to do.  Just may be for some younger lawyers.  I suppose if the right -- if a judge asked me to take a case for a specific reason or if it was something that came along I probably would do it.  I don't know that I'd relish doing it anymore.  I'm 66.  So sometimes you have to -- I still do murder cases, plenty of them.

Q.  It's just a different animal.

A.  There's no comparison between a death penalty case and a murder case.  You can't even put them in the same box.

Q.  Now, I know that in this case you had a division of resources as far as of manpower as to which attorney did the bulk of the work with one expert or another.  I mean, for example, perhaps I'm wrong about that, but, for example, at

the penalty phase Mr. Harris was the attorney who did the direct examination of Dr. Brawley?

A.  Right.

Q.  So, I mean, was that -- did he tend to work more with Dr. Brawley or did you work together, just set up --

A.  Well, first of all, as you know, Mr. Harris' and my office were like 15 feet apart from each other, which was one of the great aspects of this case, that we were able to keep -- we were in-house, we talked to each other all the time.  I mean, every day, lunch, whatever it was, I mean, very rare that Basham was not discussed during this period of time.  Plus many of the other people that were involved in the Basham team worked out of my office and the judge approved that.

So there was just a -- I couldn't tell you.  At one point Mr. Harris and I decided that I would do this witness or he would do this witness, but obviously there was collective input for a long time, and even after we separated, who was going to do what witness.  We collaborated all the time.

Q.  Okay.  Now, did you -- do you have a memory today of Dr. Brawley telling you what Mr. Basham's IQ was when she tested him?

A.  I think it was in the high 60s maybe, or something.

Q.  68 was Dr. Brawley's testimony.

A.  I have a vague recollection.

Q.  Are you familiar with the elements, the diagnostic

elements of mental retardation, what is required to show that someone is mentally retarded?

A.   You'd have to tell me.

Q.   The first -- there's a three-pronged test.  The first test, the first element is that the person have an IQ of 70 or less.

A.   All right.

Q.   The second is that they have deficits in what's called adaptive behavior, significant deficits in adaptive behavior. And the third is one that encompasses them all, which is that both of those two deficits must have been present prior to the age of 18.

Now, I will -- I will tell you, and if you want more information I will give it to you.  But I will tell you, to move things along, in this case Dr. Brawley found that Mr. Basham had an IQ of 68, which both Dr. Brawley and Dr. Schwartz-Watts concluded that the appropriate diagnosis for Mr. Basham was dementia.  And it appears from the testimony that the reason for that was that Dr. Brawley could not testify that Mr. Basham had an IQ below the required 70 before he turned 18.

A.   I don't remember that.

Q.   Okay.  Okay.

A.   What's ever in the record is what's in the record.  So, I mean, I guess what you are saying, also, is you look at other

things, as well, not only just the IQ, but --

Q.   Exactly.

A.   You look at the person person's ability to do things in society on an everyday basis as factors to consider, as well. Correct?

Q.   Yes, that's true.  And then but the deficits have to be prior -- have to exist prior to the age of 18.

A.   Correct.

Q.   Now, in this case there were -- you've reviewed all the records in this case and you've told us in your interviews you looked at everything.  And there were a series of IQ tests that have been administered to Mr. Basham throughout his life.

          MR. BURKE:  And I want to speed things along, your Honor.  If I begin to testify stop me, it's not my intent.  I think these are facts that everyone probably agrees with.

Q.   That Mr. Basham had numbers that from your investigation and from finding records had numbers that suggested his IQ had diminished over time from when he was a child.

A.   I seem to recall something like that.

Q.   So it was sort of a downward spiral.

A.   Right.

Q.   And at trial the counsel, Dr. Brawley, Dr. Schwartz-Watts testified about some explanations for why that might be.  Do you --

A.   Something like was the huffing.  I remember something

about huffing.

Q.   Exactly.   So you remember in your investigation Mr. Basham started huffing at a very young age?

A.   Yeah.   I don't remember the details, I just remember bits and pieces.   But I remember huffing, I remember talking to witnesses about huffing.

Q.   Okay.   So your investigators in this case, Lesa Watson, Paige Tarr, they obtained these various records and they went and talked to various people, with you or without you, and that information, the records were passed on to Dr. Brawley. Does that sound like that would have been what happened?

A.   I mean, that would be the way it would normally be done. I talked to a lot of the key people at the various institutions myself.   So did Mr. Harris.   And we would have passed it on to the doctor who -- you know, passed it on to the other doctor.   We would have shared all this information.

Q.   Do you remember personally any interaction with any witnesses, lay or medical, psychological, who indicated to you that they thought Mr. Basham might be mentally retarded?

A.   Sitting here I honestly can't say that I remember anybody saying he was mentally retarded.   You may have something in my notes that indicates otherwise and I stand to be corrected. Most -- a lot of the people we talked to, you know, had different opinions about Brandon.   Interestingly, some of the people at some of these institutions just thought the world of

him and came down here to testify even knowing what he was accused of doing. But a lot of the people talked about him being manipulative, most everybody talked about him being manipulative. And, you know, very cunning, street smart, not intellectually smart, but street smart. And so we had an awful lot of that.

Q. There was a lot of that. And you said -- would you say it was a consistent theme that when you talked to people from Mr. Basham's past that they all tended to agree that he wasn't very intellectually bright?

A. He was not intellectually bright. But I was thinking about that the other day. You go back and read the transcripts of the three letters that he wrote to Beth McGuffin which were introduced in trial and were stipulated it was his handwriting, I mean, those letters, I was just thinking about this the other day, those letters are pretty articulate and well thought out and well written. And he writes me letters, so I really have to just not -- I don't know what's the point you're getting at. Did we think he was mentally retarded? Obviously not. Did not think he was mentally retarded, not in my experience with him. I would not -- you know, I just could not say that.

Q. Well, and I think that is the point, that not only -- you would not be qualified to say that, correct?

A. No, I'm just talking -- but I'm qualified to a lay

opinion. And having dealt with, you know, scores of people over the years who have had mental problems I certainly can give an opinion, a lay opinion.

Q. On the professional --

A. I'm not trying to hurt him, but I just don't see where he had -- he may have not had the intellectual functioning but he had all the other functions.

Q. But ultimately you relied on your experts to tell you, correct?

A. Well, yeah. I'm not the one, I can't get up there. If they said he was mentally retarded then we would have been prepared to try and pursue that. But we would have also had to be prepared for what the government would have come back at to show that he was not.

Q. Would you agree that Dr. Brawley's assessment was only as good as the information that she was given by your defense team as far as his history?

A. Well, no. I mean, Dr. Brawley went out and did her own investigation, as well. As I recall, all of them did. The only one that may not have gotten out in the field was Dr. Brannon. I don't remember whether he did or not. But Dr. Watts was in western Kentucky with me several times, I believe. I don't remember about Dr. Brawley. But they had the medical records, they had the discovery, they had whatever we could get them, whatever they asked for. So I can't accept

that.

Q. Dr. Brawley was provided with medical -- with IQ results and reports that were done on Mr. Basham's life. And your investigators interviewed people, and I would like to show you an example of -- Susie, could we see exhibit, Defendant's Exhibit 65, please. And if you could go to the three of four page. It's the three of four.

THE COURT: Mr. Burke, let's take up this exhibit and let's adjourn for the day after you finish this.

Q. (MR. BURKE) And then could you highlight for us, please, Susie, the first paragraph of that document.

Now, Mr. Swerling, this is the third page of a memorandum that was done in February, February 18, actually, 2004, done -- written by Lesa Watson, who was your mitigation specialist. And it recounted an interview she conducted with two women by -- one by the name of Brenda Shaner, SHANER, and the other Connie Baker. And they were both people who had contact with Mr. Basham in one of the facilities in which he had been housed as a child.

A. Um-hmm.

Q. And then I would like to read to you what Miss Watson said about her interview with them. And they also pointed to the large skew between his verbal and performance IQs. He did not have the mental ability to verbalize. This should be investigated or brought to the attention of his current care

providers.

Also, they question his IQ that was higher at a younger age.  Back then facilities would not take a child unless the IQ was 80 or greater.  Many times a DSS worker would contact a doctor for psychological evaluation and casually state that they had to place this child, needed a psychiatric evaluation, and that they wouldn't be able to place the child unless the IQ was 80 or better.  They feel that Brandon's earlier IQ was a false or inflated number and suggested that if that original testing could be found to have it interpreted again.  Do you recall reading this memorandum?

A.  No.

Q.  Do you know if any investigation was done by you or your defense team to find the original tests, the original -- what's known as the raw data of Mr. Basham's IQ tests from his childhood to have those tests reinterpreted?

A.  I remember over the last -- in trying to get ready for this hearing that there was -- there were efforts made to try and find earlier IQ tests and all of that.  I read it recently.  But I can't remember who wrote the memorandum on it or not.  But it seems like I recall reading something that there were efforts made to go back and try and find these records.  It may have been Dr. Brawley who said that.  I don't remember.

Q.  But given the way this case was documented, if it was done

it would have some type of notation either in an e-mail or memorandum in your -- in the file, is that correct?

A. Well it should, but I can't tell you that it does. I mean, I can't -- I can't speak for everybody in the case. I just know what we tried to do, and everybody was under instructions from me to document things.

MR. BURKE: Your Honor, that's all I have on this exhibit.

THE COURT: All right. Let's break for the day then. Mr. Swerling, can you be back Monday morning?

THE WITNESS: Yes, sir.

THE COURT: All right. Have a nice weekend everybody. See you back Monday at 9:30.

MR. BURKE: Thank you, your Honor.

(Recess 5:25 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: 11-11-12                    s/ Daniel E. Mayo

DEFENSE WITNESSES

GREG HARRIS

DIRECT                285

CROSS                 338

REDIRECT              397

RECROSS               409

JACK SWERLING

DIRECT                410

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 18

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                CR NO.: 4:02-992
                                        Columbia, SC
     -vs-                               October 15, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------

                BEFORE HON. JOSEPH F. ANDERSON, JR.
                 UNITED STATES DISTRICT COURT JUDGE
                          MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

**JA 4242**

COURT REPORTER:        DANIEL E. MAYO, RDR
                       Certified Realtime Reporter
                       901 Richland Street
                       Columbia, SC  29201


                STENOTYPE/COMPUTER–AIDED TRANSCRIPTION

THE COURT: All right. If Mr. Swerling could resume the witness chair. You are still under oath, Mr. Swerling.

THE WITNESS: Yes, sir.

THE COURT: Good morning.

THE WITNESS: Good morning.

MR. BURKE: Your Honor, if I could address two issues that are -- one is, I'm not sure, I would let the record reflect that the video conference on the screen is not on today. I have been unable to -- I have not talked to Mr. Basham since last week. I don't know if the court has heard anything from the prison or not.

THE COURT: I have not heard a word. Want me to make arrangements for you to talk to him today sometime?

MR. BURKE: If that would be possible, because it takes a while for us to set it up, we would greatly appreciate.

THE COURT: We will see if we can try to do it over lunch.

MR. BURKE: All right. That would be wonderful. Thank you. And the other issue --

THE COURT: Hold on one second.

(There was a pause in the proceedings)

THE COURT: I'm going to leave word you would like to speak to him between 12:30 and 1:30 today on the phone.

MR. BURKE: Thank you, your Honor.

THE COURT: All right.

MR. BURKE: The other issue, your Honor, concerns, and I address this to Mr. Swerling as much as to you, there were some questions asked by me on Thursday about e-mails that I had sent and my co-counsel had sent to Mr. Swerling, and Mr. Swerling, for the record, informed us after he was done with his testimony on Thursday and showed us his Blackberry, he had not received those e-mails from us until after he was done. So I would like the record to reflect that, I mean, Mr. Swerling did not receive those, so if there was any suggestion on our part to the contrary, we do apologize.

THE COURT: Okay. Very good.

BY MR. BURKE:

Q. Mr. Swerling, when we finished on Thursday we were talking about the investigation done by the Basham team and allegations of mental retardation on Mr. Basham's part, and I would like to return to that. There are a few more questions I had for you.

Susie, could you bring up Defense Exhibit 26, please. Can you see that, Mr. Swerling?

A. Yes.

Q. That's an e-mail that you received from Greg Harris on May 27th, 2003. Can you tell us what Dr. Brawley discovered Mr. Basham's IQ was?

A. Indicated he possesses a 68 full scale IQ based on a 75

verbal score and a 65 performance score.

Q. This e-mail was sent May 27, 2003, so approximately one month after your appointment to the case, is that correct?

A. If I was appointed in April, yes. I'm not sure.

Q. And then if you look at the bottom of that last -- the last paragraph, it says Dr. Brawley has requested all medical and school records that we have in the case -- that they have in case she is called to testify at a later date. Who on your team was responsible for forwarding records on to your mental health experts?

A. I can't tell you who was responsible for sending these on. I mean, what I would recall after eight years or ten years, nine years, I guess, is that all the doctors got -- we went ahead and secured the school records, we secured all the medical records, and they would have been forwarded on to our experts, Dr. Brawley, Dr. Schwartz-Watts and Dr. Brannon, so -- but who did it, I don't know.

Q. And as far as you remember, there wasn't a particular person whose responsibility was to funnel records to experts?

A. No. I don't think at that point we had actually identified who was going to be responsible for certain people. As it got closer to trial we did that. This is from Greg Harris so, you know, one can assume to the best my recollection, you know, after nine years, that Harris would have been the one who had talked to Dr. Brawley about that

information and would have followed up on it.

Q. And I believe he did do her direct examination during the penalty phase?

A. Yes.

Q. Okay. I noticed in Defense Exhibit 26 Dr. Brawley also offered to prepare a report. From my review of the record there is no report done by her. Can you explain to us why?

A. I would have no recollection of why. To the best my knowledge, in a lot of cases I do not ask experts to do a report because they would be discoverable. So, you know, in this particular case, though, we did get reports from the doctors because we were required to notify the government at some point what their opinions were. But actual formal reports, I'm not big on those. But I can't say that that was the reason in this case. I don't have any recollection whether one was done or not.

Q. Okay. Now, you testified on Thursday that Judge Anderson was very lenient in granting your requests for funding throughout the trial, is that correct?

A. That's right. It was a massive case, over, five, six states that we were covering. And when we went to Judge Anderson and explained, you know, what we needed he was -- I don't think he ever turned down a request that we had.

Q. And you have no reason to think that had you requested funds to hire an expert in mental retardation that he would

have declined that request?

A.   I thought we had an expert in mental retardation.

Q.   And who was your expert in mental retardation?

A.   Dr. Brawley is a neuropsychologist, Dr. Brannon is a neuro, whatever.  He was a neurologist.  Dr. Schwartz-Watts was a forensic psychiatrist.  I thought that would have been covered in one of those three.

Q.   One of those three.  Do you ever recall asking any of those three whether they felt qualified to diagnose mental retardation?

A.   I mean, Mr. Burke, I have to assume that they are.  They are all forensic -- I mean, Dr. Schwartz-Watts particularly is a forensic psychiatrist, and Dr. Brawley is a forensic, or a psychologist.  I don't know if she's a forensic psychologist, I can't remember if she's board certified.  But, gee, God bless, I just can't imagine that she wouldn't have been qualified to talk about mental retardation.

Q.   My understanding is the psychiatrists are medical doctors who treat mental illness.  Do you consider mental retardation a mental illness?

A.   I have no idea if it is or it isn't.  I don't have how that's classified in the DSM or not.  I assume it probably is.

Q.   That Exhibit 26 you were just looking at you received in May of 2003.  I would like to take us to Defense Exhibit 27, Susie.  So this is a memorandum from both Mr. Harris and

yourself to the file dated July 22, so approximately two months after learning that Dr. Brawley had identified an IQ of 68 for Mr. Basham. And this e-mail or this memo appears to address the death penalty review committee that you attended in Washington, D.C. Do you recall that trip?

A. Yes, I do.

Q. Okay. If you could, Susie, could you highlight where it says Miss Griffey? Apparently Miss Griffey was the chairperson of the Attorney General's committee in assessing whether the U.S. Attorney's Office would go forward with the death penalty in this case. Can you read for us what you have highlighted in this memo that you prepared?

A. Miss -- it's actually, I guess, prepared by Greg Harris, because this says Jack and I appeared.

Q. Well, I see. Okay.

A. So I can't -- you know, it's from Mr. Harris. Miss Griffey inquired about our MR allegations. We informed her that we were in the process of getting a more definitive opinion from Dr. Watts but that we had no diagnosis yet. They agreed to let us revisit the issue once Dr. Watts formulates an opinion.

Q. Do you have any independent recollection of Miss Griffey making those comments when you were at the committee in D.C.?

A. Not after nine years. But we, as you can see, we kept detailed and regular memorandums and entries on everything we

did, so --

Q. So if you had gotten back to Miss Griffey about the MR allegations that would be in your records, is that safe to say?

A. I don't know. I'm just saying we did keep records, as you can see, and having reviewed the file. I have no recollection whatsoever whether that was done or not.

Q. And, Susie, could you bring up Defense exhibit 79, please, and then highlight that top for me. Just the very top.

Now, Mr. Swerling, you were also appointed to Mr. Basham's West Virginia case, is that correct?

A. Yeah, I received a call about that case and since I was involved in this case and a lot of it overlapped I initially agreed to go ahead and accept an appointment up there, because I don't think that they had a lawyer at that time that -- I vaguely recall there was nobody up there who was really -- they didn't have a state death penalty, and so there was nobody really done any death penalty work and so they asked me if I would do it and I agreed to, initially.

Q. And you went, in fact, to the Attorney General's death penalty review committee in the West Virginia case, as well?

A. It appears so, in September of '03.

Q. Do you remember if at that committee meeting there was any discussion about the possibility that Mr. Basham might have be a person with mental retardation?

A.  Well, without that memo right there in my own handwriting I wouldn't even have remembered going up to Washington.  So I guess the answer would be no.

Q.  Now, Susie, if you could stay on that and highlight the September 23rd for us.

So these, again, are your handwritten notes from your spiral notebooks that we discussed on Thursday.  It appears from your notes that the day after the meeting in Washington, D.C. on the West Virginia case you did in fact meet with your medical and mental health experts in the case, correct?

A.  Yes, it appears so.

Q.  And can you read what you have for me as to one, two, and three, just so we're clear as to what that says?

A.  Fetal alcohol component, Donna.  Fried his brain with drugs.  Three is IQ 68, verbal 75, performance 65.

Q.  Susie, could we go to your next page, as well?  Your notes continue on that next page, and if you could read three and four for us, please.

A.  Defendant fits in the first percentile on most testable issues and not malingering.

Q.  Okay.  So this is -- number four is an indication, as far as you remember, that one of the experts, perhaps all of the experts, informed you that Mr. Basham was not malingering with regard to his neurological and psychiatric deficits.

A.  Well, I don't know.  I don't know what they are referring

to, not malingering. I mean, they just said not malingering, so I would assume he was not feigning things that they were looking at. But I don't know specifically what they were talking about about not malingering, I just know what not malingering means in the general sense.

Q. Any independent recollection of this meeting?

A. No. It's nine years ago.

Q. I apologize. We'll probably have that a few times today. I realize it's been -- but I want to make sure if you do remember one I don't overlook it.

A. Sure.

Q. Your notes do reflect that Dr. Schwartz-Watts, that's the Donna, did indicate a fetal alcohol component in the case?

A. According to those notes, yes.

Q. Okay. Susie, if you could turn to Exhibit 46, please. Now, the first sentence of the second paragraph.

Now, you had investigators out in the field in Kentucky interviewing the acquaintances and teachers and family members of Mr. Basham, correct?

A. Yes.

Q. And you were regularly receiving these e-mails from your investigators about their interviews?

A. That's correct.

Q. I think you stated that, at least in your interviews, I'm not sure in your testimony, that every piece of paper, every

memo, ever e-mail went across your desk, correct?

A. I felt that I needed to review everything that came across me so I could put it where it was supposed to be or direct people to put it where it was supposed to be and direct people to follow up. And as you saw all my to do lists, so I had to see everything.

Q. Now, would you agree that in putting together a mitigation case in a capital case that in addition to working with your experts you also look for anecdotal evidence of the history of your client in order to look for clues of issues that you might be able to raise in mitigation?

A. Well, I think we did that exhaustively in this case. I mean, we talked to all of his teachers, we talked to neighbors, we talked to bus drivers that transported him to school, we talked to all the personnel at all the different institutions. So we were looking for that.

Q. Okay. Can you read for us, Mr. Swerling, the first sentence of the section that's been enlarged there?

A. The Garys always considered him to be mentally retarded or somewhere close that that.

Q. And this was in a memo from Paige Tarr of October of 2003.

A. Now, they are just neighbors, I guess.

Q. I believe at the top it says interview with Tim Gary, a neighbor who tried to help Brandon from time to time?

A. Right.

Q. And then it also says, in fact, when asked they said that they would give him an F for intelligence?

A. I assume intellectual, academic intelligence. As I told you on Thursday, he was pretty shrewd and street smart, and that has to be factored in, as well.

Q. Factored into what?

A. An assessment of Brandon. That's what we had -- you have had contact with him, we have had contact with him. When you are looking at these kinds of issues like mental retardation you look at all the factors, not just the test results, as I understand it. So we had to look at all of them.

Q. So is it your understanding of mental retardation that if a person has what we call street smarts, that is a factor to consider in whether they are diagnosable as mentally retarded?

A. No. I'm not an expert, I was offering that as something that one would have to consider, I would think. But I'm not an expert.

Q. Can we turn, Susie, to Defendant's Exhibit 47. Now, the e-mail we just looked at was from Paige Tarr, and Exhibit 47 is also a memo from Paige Tarr, who was one of your mitigation specialists?

A. That's correct.

Q. And, Susie, if you could, this was an interview of a person named Penny Titzer. Do you remember anyone by the name of Penny Titzer in this case?

A.  I spent a lot of time with Penny Titzer, and she testified in the case and I believe I presented her as a witness.  I can tell you I've kind of done some notes on all that.  Yeah, she was from Charter Hospital and I believe I did her direct examination, if I'm not mistaken.

Q.  Okay.

A.  So and I spent a long time with Miss Titzer, not only up in, I think I was up in Evansville with her.  We had a meeting after this, which would be reflected in my vouchers and notes, as well as when they came in for the trial we spent an awful lot of time at night going through everything.  So I remember her.

Q.  She actually had a close relationship with Brandon, didn't she?

A.  Yes.  She was fond of him.

Q.  In this memo from Miss Tarr on October 9th she indicates that Brandon was admitted to Charter Evansville in January of 1992, excuse me, 1997, so that would have made him 15 years old at the time.

Susie, could you bring up the third paragraph and enlarge it for us?  Thank you.  How about -- how about the fourth, because that was the one I wanted.  Thank you.

Mr. Swerling, could you read the first two sentences of that memo?

A.  Penny is well aware of Brandon's intellectual functioning,

or lack thereof. Instead of having a special ed teacher in the education room at Charter they hired a lady named Angela Matthews.

Q. Okay. And further down it states in the middle of that paragraph, 15-year-old Brandon would sit and struggle with the second and third grade books, correct?

A. Yeah, Brandon would sit and struggle with -- yes.

Q. Do you recall if you passed this or anyone on the team passed this information on to your mental health experts?

A. It was supposed to have been. I can't tell you a specific document was passed up. It was supposed to be.

Q. Susie --

A. Let me just say they had -- we tried to provide, as far as I know, doctors, particularly Dr. Schwartz-Watts and Dr. Brawley, all the discovery in the case as well as all the investigation we conducted. And I know Dr. Watts, I don't remember about Dr. Brawley, but I know Dr. Watts was up there, as well, and traveled several times to that area and she may have spoken with some of these people, as well. But that would all be reflected in the vouchers.

Q. Now, it would not have been a situation, though, since these were testifying experts, in which you would have given these actual memos to your experts, is it?

A. What are you saying?

Q. Well, if you anticipated that, let's say, for example, Dr.

Brawley was going to testify in Mr. Basham's penalty phase, would you have given her an internal work product memo like we're looking at right now?

A.   I can't tell you whether we did or we didn't.  I know we would have discussed it, but I don't remember whether she got the documents or not or just reviewed them at our office or we talked about it.  I just don't recall.

Q.   Would you have had concerns that an internal work product document like this memo could have been discoverable to the government?

A.   Probably so.  That would have been an issue, yeah.

Q.   Susie --

A.   But you are asking me to recall right now, and I can't recall.  If they had it, you know, I just don't remember.  If we didn't provide it to them, I don't remember.  But certainly what you just raised would be an issue that we would have thought about, whether or not -- turning it over or not to them.  We did turn over all the medical records, and those were reciprocally turned over to the government.

Q.   Defense Exhibit 52, please.

A.   I'd also say this.  They would be discoverable, we would have -- I'm sure that there was some documents that, memos turned over to them.  But they probably would have reviewed the medical records and things like that.  Whatever they got, medical records, would have been forwarded on to the

government.

Q. And when you say them, do you mean the government? You said would have been turned over to them. Do you mean there may have been memos turned over to the government that --

A. Whatever we forwarded to the doctors, whatever medical records we forwarded to the doctors would have been forwarded to Butner, per Judge Anderson's order. So but the memos, I can't tell you whether they were sent or not sent. They may have been reviewed and/or not reviewed, I don't recall.

Q. Okay. Now, Exhibit 52, which is on the screen in front of you, this is another memo from Miss Tarr. This would be dated approximately a month later in November of 2003.

And, Susie, if you could highlight for us the paragraph, second from the bottom, and the lower sentences, Sharon also knew.

Now, this is a memo regarding an interview with Sharon Watkins, who was Mr. Basham's first grade teacher. And this would have been a -- it does not say on here who the memo is directed to. Did Miss Tarr -- were these memos she simply submitted to the file or were they provided to the team?

A. They would come across my desk, I would assume.

Q. It would --

A. They would have come across my desk. And let me just also add this. I recall, the order that Judge Anderson signed was for us to turn over the medical records. So I don't know if

it would have included, nine years ago, whether it would have included our internal memos. I don't believe that the order covered that. So we may have sent these documents directly on to the doctors, I just have no recollection. I know the order provided medical records be turned over.

Q. I will tell you right now, Mr. Swerling, and when I ask you that it's not because I'm trying to catch you up --

A. No, I trying to give you an honest answer.

Q. So maybe the best way we can do it, I won't ask you whether you remember, but if you do would you please let me know if you remember a specific document, with the assumption that it has been nine years, almost ten years?

A. That's what I'm trying to do, yes.

Q. Okay. That's great. This document then indicates that when Miss Tarr spoke with Mr. Basham's first grade teacher she had concerns about his abilities, as well. It says -- well, could you read for us the sentence that is Sharon also knew?

A. Sharon also knew from the first day of school onward he needed to be evaluated for special ed. Although he stayed in her class for the entire year, she retained him in first grade and waited patiently for her request to have him tested -- tested be carried out.

Q. This was information that Miss Tarr provided to the team in November of '03, so a little less than a year before the penalty phase in this case, correct?

A.   Yes.

Q.   Okay.  Now, Susie, could you go to the next exhibit, which is exhibit -- Defense Exhibit 53?  And if you could, first would you just highlight the very top so that we see who this document was sent to.  Thank you.

So this was an e-mail from Carlisle McNair to the team, and I see you are included on that, I wanted to confirm.

Now, Susie, if you could go to the very bottom for us where the substance of the e-mail is.  That's perfect.  Thank you.

Now, we spoke some on -- well, I'm actually not sure if I asked you, could you tell us who Carlisle McNair was and his role in the team?

A.   He was an investigator on the case.

Q.   And this is an e-mail to the team from Mr. McNair about a November 2003 interview he had with someone by the name of Ruby Watson.  It's not clear from his memo who she is.  But could you read the first line where it reads says miss -- Mrs. Watson advised?

A.   She advised that she knows for a fact Cathy Basham used drugs during her pregnancy with Brandon.  She was a drug addict then, she's a drug addict now.

Q.   Do you recall that in September of '03 at your meeting with Mr. -- well, we looked at notes, your contemporaneous notes from September of 2003 where Dr. Schwartz-Watts

indicated there might be a fetal alcohol issue in this case?

A. And this would have been communicated to our experts, as well, in one form or another. Either coming to the office to review it, either being sent to them or being discussed with them, just like all of these would have been. Anything that would have dealt with his mental health would have been shared in some way with our experts.

Q. But ten years removed you have no way of remembering how that --

A. No, absolutely, there's no way I can remember. I just would -- that would be the way we would have handled it. There's no reason to do these things unless you share them with your experts, so in one way or another they were shared with the experts. What I'm telling you is I mechanically cannot tell you how that information was transferred.

Q. Okay. And you --

A. I trying to keep everybody advised. Me and everybody in the team was advised to keep everybody else advised what was going on.

Q. This memo from Mr. McNair also states that Miss Watson told him that Brandon was retarded and very, very slow mentally.

A. Well, I don't think there was any question he was slow, I think the question is whether or not an expert said he was retarded.

Q.  Susie, could you bring up Defense Exhibit 99, please.  Mr. Swerling, this is another e-mail that you got from Miss Tarr a few days after the e-mail that she sent you that we looked at a few moments ago regarding her investigation in Kentucky.

And, Susie, can you highlight the second paragraph that begins, obtaining?  She's talking about highlights of her trip, and if -- right there.

Mr. Swerling, would you -- this is an e-mail you received.  Would you mind reading what she wrote to you?

A.  Obtaining a copy of Brandon's health department records would show him getting yearly health screenings to participate in the Special Olympics.  Tell me how someone can give the death penalty to someone who competed in the Special Olympics?

Q.  Now I would like to look at Defense Exhibit 54, Susie.  This is another e-mail, this one dated December of '03, by Mr. McNair, of an interview with someone by the name of Mark Phebus.  Do you remember who Mark Phebus was?

A.  The name is familiar but I couldn't tell you who it was.

Q.  I can tell you from my understanding of the record he was Brandon's sister's ex-husband or boyfriend or --

A.  It's an unusual name.  I just seem to remember the name.

Q.  It says -- it's a lengthy e-mail but, Susie if, you could, in the middle of this page it says hey, you got five dollars?  Right after that there is a sentence he, meaning Brandon, the next one after that, after the five dollars, has.  Thank you.

So according to Mr. McNair, Mr. Phebus was another one of the witnesses who informed the Basham team that Mr. Basham -- that Brandon had a very low IQ. Now, Mr. Phebus would have known Mr. Basham, let's see, when he was still a teenager, probably. Do you believe --

A. I have no idea.

Q. Okay.

A. I know he's opining he has a low IQ, but he's not an expert. I just can't tell you what the basis of that was. I do remember something about the huffing, and that was something that I think was brought out last week, that part of the testimony when I was testifying, or maybe I just read it, where there was discussion with the experts about huffing gasoline, what it could do to his brain. And that was I think -- it may have been on Thursday afternoon I testified that Dr. Brawley may have opined that that had something to do with his deterioration in his IQ.

Q. Do you recall how old Brandon was when he began huffing?

A. No, absolutely I don't.

Q. So if the records indicate, at least some of the records indicate, that he was eight years old when he began huffing you wouldn't have reason to disagree with that?

A. I can't answer that question. Again, this would have been shared with our experts in one form or another.

Q. Now, Susie, can you go down two lines from that and where

it says Brandon is borderline, and then can you just go down the next line, too, as well.

I have two questions about this, Mr. Swerling. So more anecdotal evidence, I realize Mr. Phebus is not an expert in mental health, but you have more anecdotal information, at least, that someone who knew Brandon at an earlier age believed he was borderline retarded.

A. Yes. Mr. Phebus opined that, yes.

Q. And on a different subject, the next sentence reads Brandon and Bucky Emory were homosexual lovers. Now, I will be addressing to a certain extent some of Mr. McNair's e-mails, but one of the things that we have observed, that there was a frequent reference to homosexuality in Mr. McNair's memos regarding his investigation. Can you tell us, was there ever a focus of the investigation on Mr. Basham's sexuality or what that was or how that played into the case?

A. I have no idea. I do remember that somewhere in the back of my mind that we did have information and were getting information that Brandon would trade sexual favors for drugs. And I remember vaguely in the back of my mind something about he would perform oral sex on individuals so he could get some drugs. That's all I remember about that, about his sexuality. I just remember that was something that, you know, I took particular note of because Brandon -- Brandon was always trying to manipulate something or get something. He knew how

to get it.  And that was -- but what amazed me was he was willing to go to that extreme to go ahead and do it.  So that's why I remember it.

Q.  In your opinion, is providing oral sex to someone in exchange for drugs equivalent of manipulation?

A.  Well, to me it depends on what your definition of manipulation is.  Brandon, again what I was trying to tell you, I dealt with Brandon a long time.  You have, too.  And one of the things that interests me about Brandon a lot and one of the things we tried too explore is his ability to manipulate and/or to do things that were needed to get something done and this would have been something.  So you may not call it manipulation, but it was getting something done and going to an extreme to get it.  So you may not call that manipulation, but it's all -- to me it's all tied together.

Q.  Okay.  Susie, could you bring up Defendant's Exhibit 55?  And this is, Mr. Swerling, an e-mail from a Steve Hisker.  Could you tell us who Mr. Hisker is?

A.  Steve Hisker was one of the lawyers who worked in my office, and he was given a certain amount of hours to assist us in the case.

Q.  And the subject line is conversation with public defender Mike Ruschell, R-U-S-C-H-E-L-L.  And it appears from the substance of the memo that Mr. Ruschell was a public defender in Kentucky who represented Mr. Basham.  And, again, we're

looking at the anecdotal evidence that was provided to the court, excuse me, to the Basham team. And, excuse me, I know it's hard, it's small, if you could -- and if you see the first large paragraph about two-thirds of the way down, Ruschell believes that Brandon has second -- down one paragraph, two-thirds of the way down, Ruschell, that line. Thank you.

Do you see enter there Mr. Hisker indicated that the public defender who represented Mr. Basham believed that he had a very low IQ?

A. Oh, yes, yeah.

Q. Now, Susie, could we bring up Defense Exhibit 80, please. And, Susie, if you could go down to the middle of the page where it has a 12-5-03 meeting and highlight that section, please. Down one more. There you go.

So, Mr. Swerling, we're now back again at your notes that you took as part of your preparation in this case. And it appears that this was a meeting with Donna, who is Dr. Schwartz-Watts, correct?

A. Correct.

Q. Now, it says in your notes, no insanity under federal or state. Can you tell us, did you consider pursuing an insanity defense in this case?

A. We always would look at what the mental issues were, and so I must have written down that insanity was not an issue.

It just obviously would have been something we would have thought about.  I have, just for your information, Mr. Burke, I have many people interviewed for insanity and competency as a -- to protect their interests.  And so in many of them, most of them come back that they are competent and they are not insane, but it's a precaution that I do.  And I have done it over and over and over again over the years.

Q.  And when you say you do this over and over again, is that you have them evaluated by someone you have retained?

A.  Sure, yes.

Q.  On those same sections of notes, can you -- there's a line that begins retardation.  Could you read that for us, please?

A.  It says retardation out.

Q.  And can you continue?

A.  If we have physical causes not before 18.

Q.  Do you recall Dr. Schwartz-Watts ever telling you that a person could not be diagnosed with mental retardation if there were physical causes for their low IQ?

A.  I have no independent recollection of that.  Those are just my notes that were made either contemporaneous with or shortly thereafter the meeting.  But probably contemporaneous because they are handwritten, and I think I kept these -- most of those spirals were done in realtime, the spiral books that you have.

Q.  And then, Susie, can we look at Defendant's Exhibit 73,

please.

A. That would have been a good example of discussing the issues we have been talking about with Donna, communicating those things. Donna Schwartz-Watts.

Q. Susie, if you could highlight the title of this document first for us.

Mr. Swerling, this is a record that was among the thousands of records that you obtained and reviewed in this case. And apparently this was a petition for involuntary hospitalization or involuntary admission that's completed in Kentucky regarding Mr. Basham. And this is a document you would have reviewed, correct?

A. Western State Hospital, I think. I remember Western State Hospital.

Q. Okay. Susie, if you could click on the portion midway on that page where there's some boxes to be checked, and if you can enlarge that area a little bit lower. There, perfect.

Now, this was a report done by a psychiatrist by the name of Irene Pasquin, and this was to have Mr. Basham admitted because of psychiatric issues.

Would you look for me, please, and tell me, under the information about Dr. Pasquin requested she had to check a box indicating what her qualifications were. Can you tell us which -- there's two boxes, which one did she check?

A. A qualified mental health professional.

Q. And the other one is a qualified retardation professional, correct?

A. Correct.

Q. Could we look at the second page of that document, Susie? Mr. Swerling, this is -- number five on that page, please. This is a little bit off track, but since we have the exhibit up I wanted to ask you about it, as well. Did Dr. Pasquin find that Mr. Basham had hallucinations?

A. Apparently.

Q. And he would bang his head on the wall?

A. Apparently so.

Q. And that he is impulsive?

A. Apparently.

Q. Susie, can we now go to the Defendant's Exhibit 59, please? Now, we have managed now to January of '04 and we have another e-mail, if you would highlight for us the bottom portion of that where it says original message all the way down, please. The second -- yeah, that's fine.

Now, at the bottom we have a January 28th e-mail from Miss Tarr to you and the rest of the team. And can you read -- it's Miss Tarr speaking about fetal alcohol syndrome. Can you read the second sentence of her first paragraph for us, please.

A. As far as -- the first paragraph, you said?

Q. The second sentence.

A.   It's fascinating because it describes Brandon perfectly and is the number one cause of nongenetic mental retardation.

Q.   And do you see in that second paragraph Miss Tarr asked if anyone knew of a pediatric dysmorphologist who could have a look at Brandon?  Do you know whether there was ever any followup done into Miss Tarr's request that you look into finding a pediatric dysmorphologist?

A.   I have no recollection of that one way or the other.

Q.   Do you know what a dysmorphologist is?

A.   Absolutely not.  Obviously, it has something to do with somebody who knows something about fetal alcohol syndrome, I would assume.  But it's a pediatric -- I just don't know what that word means.

Q.   Susie, could you bring up Defendant's Exhibit 56, please. Now, this is another e-mail from February of 2004, so we're talking about seven months before trial in this case.  And if you could highlight the lower portion, Susie, that begins from Lesa Watson, and highlight all that for us, please.

     This is an e-mail from Lesa Watson, she was your mitigation specialist, on February 10, 2004.  And can you read that first entire paragraph for us, please?

A.   In my interview last night with Brenda Shaner and Connie Baker they were noticing the difference between BB's, Brandon Basham's, verbal versus performance IQ results and that the large point spread was indicative of his inability to

verbalize his feelings. Anyway, she said that back when BB was in the system all facilities, public and private, had a minimum IQ of 80 standard, that they would not take a child unless the child had an IQ of 80. It was intimated that Brandon's IQ could have been skewed to get him in the facilities, I assume. I need to figure out how to go about checking this out. Run this by Donna, see if she has info or has heard of this happening. I'll check with my sources.

Q. Thank you. Any recollection today of following up on that e-mail?

A. I would assume it was.

Q. I'm sorry?

A. I would assume it was followed up on.

Q. But no independent recollection?

A. No.

Q. Susie, Defense Exhibit 57, please. Mr. Swerling, this is an e-mail that was sent by Miss Tarr again, this one from June of 2004 regarding her interview of a witness named Deputy Paul Arson, ARSON, at the Hopkins County Detention Center. Do you recall Brandon was incarcerated at the Hopkins County Detention Center, correct?

A. Yes.

Q. And this is an e-mail about the GED program at the jail where Mr. Basham was. Susie, could you highlight the first sentence of the second paragraph for us?

Do you recall, Mr. Swerling, how old Brandon was when he was at Hopkins?

A. No.

Q. And, according to Miss Tarr, the deputy informed her that when Brandon came in he was tested at a third grade level, correct?

A. Correct.

Q. Okay. And this memo discusses Mr. Basham's attempts to attend the GED program. And, Susie, could you highlight the last line of that same paragraph for us, please? Just the very last line.

And Miss Tarr said Arson finally told Mr. Basham that no matter what he did he just didn't have the ability to learn enough to pass. You would have seen this e-mail as well, correct?

A. Yes. And we would, as I said, somehow or another it would have been communicated to our experts. As a matter of fact, I believe Dr. Schwartz-Watts actually interviewed some of the people at the Hopkins County jail, but I'll have to -- cannot remember that. It just seems to be in the back of my mind somewhere.

Q. Defense Exhibit 58, please. Now, this is a memorandum from Lesa Watson, who was your other mitigation specialist, and she was operating out of Kentucky, correct?

A. Yes.

Q.   Okay.  And the date of this is June 30, 2004, and it concerns an interview of Sharon Watkins, who was Mr. Basham's first grade teacher.  And, Susie, if you could highlight the -- just enlarge the first paragraph for us, please.

And do you see on the fifth line down, if you could highlight, she found him to be socially -- that line.  And the line below it.  Thank you.

So according to Miss Watson in her investigation in Kentucky in June of 2004, she interviewed the first grade teacher, and can you read for us what she found, what the first grade teacher found with regard to that?

A.   The highlighted portion?

Q.   Yes, highlighted part.

A.   Short for his age but not thin.  She found him to be socially and academically far behind peers.  He was at the lowest academic level.  He was living with his father at the time.  Miss Watson testified in the -- in the penalty phase of the trial, if I recall correctly.

Q.   Susie, could we have Defendant's Exhibit 65, please.  Now, here's an e-mail, or a memorandum, excuse me, from Miss Watson dated February 2004, again regarding an interview with Connie Baker and Brenda Shaner.  I believe we have already seen the name Brenda Shaner.

A.   She testified at the trial, as well.

Q.   And I believe, if you could go to page three, Susie, of

that same memo. I believe -- I may have asked you about this already, Mr. Swerling, and I apologize, it probably would have been on the Thursday, that top paragraph. Miss Watson indicated in February of 2004 that Miss Shaner and Miss Baker had indicated that Brandon's IQ may have been -- may have been well lower than the 80 that was required to get him into a facility. Do you remember that?

A. Let me just read it.

Q. Certainly.

A. What's the question?

Q. This e-mail from Lesa Watson, or this memo, was received eight months after the e-mail we looked at a minute ago where she raised the same issue with regard to the inflation of Mr. Basham's scores. Do you recall whether anyone on the Basham team took steps to verify the fact that it had been relayed from Miss Shaner?

A. Take steps to do what now?

Q. To verify or to investigate whether the possibility that that Mr. Basham's IQ scores had been artificially inflated in order to get him into facilities where he could receive care?

A. Mr. Burke, I would have no recollection of that. I mean, the motion in limine speaks for itself. These things would have been communicated to people on the team as well as to our experts, and I cannot answer that question because it's been nine years.

Q.   Susie, can we look at defendant's --

A.   Tried to follow up everything.

Q.   Defendant's Exhibit 61, please.  And, Susie, if you could go to the second page of that and I'll -- this is another e-mail from Lesa Watson, this one dated August 3, 2004.  So approximately a month before the beginning of trial in this case.

     Susie, could you go down to the last full paragraph where you are and highlight that for us?

A.   Who's being interviewed here?

Q.   This is an e-mail from Lesa Watson to a psychologist for -- from Cardinal Treatment Center by the name of Lisa Ann Potts?

A.   Lisa Ann -- I don't see the first page, I'm sorry.

Q.   Why don't we go back and highlight the information as to who --

A.   Lisa Ann Potts.  Okay, Cardinal Treatment.

Q.   And, actually, Susie, if you could go to page two, but highlight the first paragraph of page two for us.  Thank you.

     Now, this was a memo from Lesa Watson of a psychologist.  And then you were talking about a few moments ago about, Mr. Swerling, about looking into the question of what you perceived to be Mr. Basham's manipulation.  Do you see where she states in this memo that BB, meaning Mr. Basham, was very much a conduct disorder because of criminal history and

substance abuse, but she believed the cause of these traits were neurological in basis.  She strongly felt that BB had neurological damage because of his earlier fall, drug use and exposure, et cetera, and that is why she recommended to Dr. Stocker that a full neurological be done on BB.

Do you recall reading that and did that have any impact on your investigation as to what you called Mr. Basham's manipulation?

A.  Do I recall reading it?  No.  What I would have done about it would have been, as I believe we followed up on everything that was asked of us --

Q.  Okay.  And --

A.  -- communicated to the people who were making assessments.

Q.  Susie, could you bring up last the full paragraph of that page?  Thank you.

Could you read that paragraph for us, beginning when she reviewed.

A.  When she reviewed Dr. Laird's report she said she had not caught it at the time but Dr. Laird had calculated Brandon's IQ based upon symbol search instead of coding.  She said that this will cause the IQ to appear to be higher than it actually is.  She took down the symbol and coding scores and said she was going to put it through a computer program she had because she believes Brandon may have a lower IQ.

Q.  Could you bring up the next, Defendant's Exhibit 62,

please.  This is a -- if you could highlight the, yeah, that, all the way down, please.  This is an e-mail report from Mr. McNair again two days after the e-mail from or the memorandum from Miss Watson.  And this is of an interview with someone by the name of Ellis McKechnie.  It's not clear to me who he is from Mr. McNair's e-mail and his report.  Do you recall who Mr. McKechnie was?

A.  No, I don't, actually.

Q.  I will tell you, if this helps your memory, I believe that there were family members by the name of McKechnie, a cousin or something, but I'm just not sure.

A.  Well, I was going to say family, but I didn't want to be wrong about it, so --

Q.  And the e-mail itself?

A.  I don't remember it.

Q.  E-mail itself doesn't indicate it.  So the second --

A.  We interviewed an awful lot of his family.

Q.  Mr. McNair interviewed a lot of his family?

A.  Pardon?

Q.  Is that what you say?

A.  I said we interviewed as many members of his family as we could.

Q.  Okay.  That last, second to last line, Susie, could you highlight Ellis advised?  Thank you.

    And so Mr. McNair informed the team in August 2004, about

a month before trial, that this gentleman had advised that he knows Cathy stopped using drugs while pregnant with Charlotte but continued using drugs with her pregnancy with Brandon Basham. Again, we talked already about the fact that Dr. Schwartz-Watts indicated there might be a fetal alcohol issue in this case. Based on your practice you are saying you would have passed this information on to her?

A. As far as I know, everything was communicated to our experts in one form or another.

Q. And then, Susie, Defendant's Exhibit 63, please. Mr. Swerling we're getting close to trial in this case and so investigation is still ongoing. And this is an e-mail -- I'm sorry, Susie. Just one second.

(There was a pause in the proceedings)

Q. (MR. BURKE) I'm sorry. Exhibit 63, Mr. Swerling, this is an e-mail you prepared, right?

A. Yes.

Q. And you -- we talked about Miss Titzer before, she testified at trial and you had quite a bit of dealings with her, correct?

A. Yes.

Q. Susie, could you highlight the first sentence of the second paragraph?

And so according to your report Miss Titzer informed you that in school Brandon could not read?

A. Yes.

Q. And the second sentence, as well, Susie. The kids looked up to him but started to tease him because of his intellectual capacity. This is all things that Miss Titzer conveyed directly to you, correct?

A. It's in the memo.

Q. And then, Susie, can you go halfway down that page for he me, please, where she remembers, the line she remembers at 13? That's fine.

You also note in the report, Mr. Swerling, she, meaning Miss Titzer, remembers at 13 he was functioning at a third grade level. Now, you believe that Miss Titzer was a reliable witness, correct?

A. I don't remember her testimony, but, I mean, she seemed to be nice. I wouldn't have put there up there if I didn't think she was a good witness. This looks like she was talking about being interviewed by Dr. Capehart up in Butner.

Q. Oh, yes.

A. Penny believes if she told him, I don't -- I can't read this. Capehart was telling him to speak to his lawyer. Penny believes if he told him that he would probably clam up. She remembers at 13 he was functioning at a third grade level, something to that. I assume it says Capehart, she's referring to Dr. Capehart.

Q. I would assume so, as well. Do you recall that Mr. Basham

was on social security while he was child, social security disability?

A. Vaguely.

Q. And vaguely, you don't remember the reason he was?

A. No, I couldn't tell you he was or he wasn't. I have a vague recollection that he was on social security.

Q. Okay. Now, Dr. Brawley gave Brandon an IQ test and found he had an IQ of 68. The government gave him an IQ test, as well, found him to have an IQ, I believe a full scale IQ of 75. Do you recall how long after Dr. Brawley gave him the IQ test that the government gave him an IQ test?

A. No, but it would be in the reports.

Q. Are you aware of the concept associated with IQ testing known as the practice effect?

A. No.

Q. Okay. Are you aware of the standard of proof in federal district court for establishing mental retardation in a federal capital case?

A. Not at this time. I mean, probably when I was more boned up on the issues I probably would be able to tell you that.

Q. I would like to focus for a moment on Mr. McNair, your investigator.

A. Um-hmm.

Q. Did you select Mr. McNair for the Basham team?

A. Yes.

Q.   And had you worked with him before?

A.   Mr. McNair was with the Lexington County Sheriff's Department and he was -- I believe at one point he had risen to captain, investigative detective division.  And he was on the opposite -- he was opposite me in a number of cases.  He investigated a number of cases I had in Lexington County that I tried over there.  When he left the sheriff's department he may have worked on a couple of cases prior to Basham, I don't recall, but I did hire him for the Basham case because I thought he was a good on-the-street cop.

Q.   Good on the street?

A.   And detective.

Q.   Were you aware in 2003 of the circumstances surrounding Mr. McNair's departure from the Lexington County Sheriff?

A.   I don't recall that I was.  I just don't know.  I probably was not.  I think we got some documents from the government. I saw the subpoena was like April of '04, so I don't know when we would have gotten the discovery, but apparently they had his personnel file.

Q.   And that's --

A.   I really don't remember.

Q.   And so that you are aware that the U.S. Attorney's Office did subpoena his records as part of their investigation?

A.   Yeah.  And the -- as I said, I think there was a subpoena in April, but I don't know when we got it, the file, but that

would have been getting pretty close to trial.  So I don't know, I don't believe that I had information about Carlisle's personnel record prior to that time.

Q.  Okay.  Susie, could you bring up Defendant's Exhibit 44, please.  Mr. Swerling, you referred to Mr. McNair, I think, as an on-the-ground cop or something along those lines?

A.  Good on-the-street cop.

Q.  On-the-street cop.  Susie, could you enlarge the body of this e-mail for us, please?

Now, the first sentence Mr. McNair says that he retired in 2002 from the Lexington County Sheriff's Department.  At the time that he was working for you in 2003, is that what you believed, as well?

A.  Pardon?

Q.  Do you believe that he had retired from the Lexington County Sheriff?

A.  I don't remember.  I don't remember the circumstances that he told me why he left.  I just don't recall.

Q.  Susie, can you, on the fourth line down, the very last word is I.  I know I am working.

A.  Who is this to?

Q.  This is an e-mail found in the file from Mr. McNair to law enforcement officers in the City of Conway, South Carolina where Miss Donovan was kidnapped.  And it was sent in October of 2003.

A. Okay.

Q. And I will tell you that this is among the documents that we obtained from the files that we went through at your office.

A. Sure.

Q. Can you read what's been highlighted for us? I have been appointed by the federal court as an investigator and that -- could you read the next sentence?

A. Assigned to Jack Swerling, court-appointed attorney for Basham. I know I am working on the other side, but the facts don't change. I am and will always be a cop at heart. Fulks and Basham are in a heap of trouble and I'm no way attempting to change the facts.

That's actually one of the reasons why I like Carlisle. What he can do, one cop can get more information from another cop than anybody else. And I think what he was doing, he was letting them know he was a cop and always would be a cop. So I think it's kind of cagey what he was doing there.

Q. Do you think it was cagey for a member of the Basham team to inform the law enforcement that the Basham team believed Mr. Basham was in a heap of trouble?

A. Well, he was in a heap of trouble. I don't know that anybody can dispute that.

Q. Can we look at Exhibit 43, please, sir?

A. I think he was trying to get himself in with the cops.

Q.   This is another e-mail from Mr. McNair.  This e-mail, though, is to the team, the Basham team, and it's from Sunday, December 7th, 2003, and it is a report of his investigation in Kentucky.  I asked you before whether Mr. Basham's sexuality was an issue that the Basham team was investigating for any purpose in this case, and I believe you said other than Mr. Basham's sexual acts in return for drugs that it was not.  Is that correct?

A.   I said I didn't remember.  I believe that it was -- I remember that one issue about the trade sex for drugs.  What I don't -- I can't tell you and what I don't remember, because it's nine years ago, is that we were obviously trying -- I could tell you what I recall now or what I would think now. If he had those issues and they were being used by him in some way I would have wanted to know about it.

Now, whether or not -- if it was just being a homosexual that would not have been much of an issue.  But if he was -- if his homosexuality was used to further his aims or means or what he was trying to get then it would be an issue.  So I would think that it would have been just good investigation to try and look into those things.

Q.   Something you would certainly want to know, I would think, one way or the other.

A.   Yeah.  As I said on Thursday, I want to know more than the government knows when I'm getting involved in a case.  So, I

mean, did I specifically say I want you to find this out?  I can't tell you I did.  I just -- I would have wanted to know and I would want to know today.

Q.  And one of the persons on the Basham team that would have been responsible for finding that out for you would have been Mr. McNair, correct?

A.  That was not his purpose.  It was part of the investigation, I would assume, that he was looking into that. I can't, you know, remember nine years later what the discussions were about it or not.  But if I was assigned to the case today it would be something -- every aspect of Mr. Basham's background and his character would be something that I would want to explore.

Q.  Now, in Exhibit 43 Mr. McNair is talking about who he's intending to interview.  And, Susie, could you enlarge numbers three and four for us?  And number three and number four. Yes.  These are two witnesses that Mr. McNair was going to interview.  Could you read that for us, please?

A.  Jimmy Hill, homosexual friend of Brandon.  Looking forward to this one.  Jeremy Babar, another homo friend of Brandon's. Can't wait.

Q.  Did this suggest to you that Mr. McNair had issues with dealing with witnesses who are homosexual?

A.  Doesn't suggest to me anything.  I don't remember it.

Q.  Reading it today does it suggest that to you?

A.   It doesn't suggest anything other than what's written there.  You are reading something into it that I don't.

Q.   What did Mr. -- what did you read into the statement, another homo friend of Brandon's.  Can't wait?

A.   That he's looking forward to the interview.

Q.   Sincerely?

A.   Pardon me?

Q.   Sincerely looking forward to it?

A.   I don't understand what you are asking.

Q.   I'll move on.

A.   Can you define it?

Q.   Do you still retain Carlisle McNair in this case?  Excuse me.  Do still retain Carlisle McNair in any cases?

A.   He has actually stopped working, probably within the last year.  But he did a number of cases after this for me.

Q.   Now, I would like to switch focus again to another topic. This is a question that has been recurring in this case, and that's the question of Mr. Basham's competency.

     Now, you were interviewed by the government I believe on three occasions in this case, is that correct?

A.   Right.  You were there each time, either by phone or physically.

Q.   And do you remember at one of those interviews did you state when asked by the government about Brandon's competency at trial that you only believed him to be incompetent on one

Q. or two occasions?  Does that -- is that consistent with what you remember saying?

A. Well, when I -- being incompetent on one or two occasions, there was events, that's what we were talking about.  As far as I know there were events during the trial where we raised the issue about whether or not he was competent to continue.  So that's what I'm talking about.

Q. And what events are you talking?

A. Well, I remember one was the situation after he got into a fight with the marshals, and, I mean, I was just -- we just could not communicate with him at all.  He was so riled up and agitated that it was just impossible.  And I think we got -- the judge asked us to get Dr. Watts over here, and we got Dr. Watts over here and she opined at that time that she didn't feel like he was competent to go forward that afternoon but felt like by the next morning that he would be.  And I think she came in the next morning, I'm drawing from my memory, and said that he was fine to go forward.

Q. Your memory is accurate on that.

A. Pardon me?

Q. Your memory is accurate on that.  Now, were there any other events that you had that you remember where you had concerns about --

A. There was one during -- during the Jackson v. Denno hearing, I think, where the -- pretrial motions in February of

'04 we had to stop for a period of time to get Dr. Watts in. And she came over, and I think actually I was reading, I think Mr. Harris was the one that was having a dialogue with the court about that at that time and Dr. Watts came over. I mean, she came over on more than one occasion. But, in other words, they were events, not general incompetency.

Q. Not an ongoing problem, in your opinion, only isolated events?

A. Correct.

Q. Susie, could you bring up Defendant's Exhibit 79, please, and go to page two.

A. And, Mr. Burke, you know, if I can answer, what I interpret that to mean is that at that point for one reason or another he just couldn't go forward. You know, Brandon can get pretty agitated and it's hard to reason with him and it's hard to get anything out of him or get him to keep quiet or to stop. And so I guess it depends upon what the definition of incompetency is, but at that point, particularly the day with the marshals, I just remember that was an awful day and he just was not able to go forward. Whether or not it was mental incompetency or he was just riling himself up so much we just couldn't go forward.

Q. He was incompetent when he had the --

A. No, he was not incompetent. And I saw you suggested that. I don't believe he was incompetent when he had the fight, I

think he was incompetent after the fight.

Q.  And what do you base that opinion on?

A.  Because of his behavior.  Afterwards we just could not reason with him at all, at all.  Before Brandon did what he did during certain times during the trial, he insisted on doing stuff that he wanted to do.  At that point I think he was trying to leave the courtroom and I might have suggested that he be allowed to do that.  And the court after some delay in hearing -- it may have been an in camera hearing or something like that, I don't have -- I have a vague recollection of it, said no, and that's when he -- one of the marshals put his hand on him and he just went ballistic.  But I never thought at that moment he was incompetent, I thought he was incompetent when the whole thing came about afterwards.

Q.  Were you able to communicate with him when he was addressing the judge to calm him down?

A.  You can always communicate with him, the question was whether he was listening and whether he wanted to -- as you saw during the trial and you saw yourself, there were times when Brandon would just do what he wanted to do, it didn't matter what you wanted him to do.

Q.  And I'm not sure of your basis for this, Mr. Swerling. How do you differentiate between when Mr. Basham just doesn't want to listen and when he can't?

A.  It's just instinct.  I mean, it's being with him.  After

that fight, I mean there was no communicating with Brandon.

Q.  Was there communicating with him prior to the fight that morning?

A.  He understood -- I believe he understood what I was trying to do, and I was trying to get him excused from the courtroom, as I recall.  But he was insisting, he stood up, if I recall correctly, and started addressing the judge even though I told him not to.  That happened on a couple of occasions during the trial.  So I don't know that that made him incompetent, I think it made him impulsive and what he wanted to do he was going to do.

Q.  And your recollection is that you -- you tried to make it possible for Mr. Basham to leave the courtroom?

A.  It seems like it, but the record would have to speak for itself at that point.  It's thousands and thousands of pages and I just can't recall exactly.  I tried to read -- I read a good part of the transcript preparing for this, and but I remember reading about that, just don't remember exactly the dialogue that took place.

Q.  Would it have been sound strategy on your part to suggest that your client who was having problems that morning absent himself from the courtroom?

A.  I think I was just -- again, the record has to speak for itself.  I mean, I can't tell you exactly what's in the record, but it seems at that point I was asking if he could

leave the courtroom. You know, I didn't want Mr. Basham out of the courtroom during the trial, if that's what you are asking. I was opposed to it. I mean, I think a lawyer would want his client in the courtroom during the trial and so the jury could see him. If he's absent from the courtroom the jury would have to have some negative inference from that.

Q. Okay.

A. So I was -- and I know you've mentioned that before, but I was opposed to Mr. Basham being out of the courtroom when the jury was in the box.

Q. Now, Mr. Swerling, what we have on the screen now is the second page of Defendant's Exhibit 79. And it's -- I will tell you that your notes begin on September 23 of '03, so this is a year before trial. And they are notes that you took during your meeting we discussed earlier with Dr. Schwartz-Watts, Dr. Morgan, Dr. Brannon, and Dr. Brawley.

A. This is another page of that memo?

Q. Yes, this is the second page of your notes. Susie, right in the middle could you highlight Dr. Morgan, that line for us, please? Thank you.

Can you read that line, just the first, one for us, please?

A. Yeah, that's -- that's Don Morgan, who we had, we actually had him doing the -- he was not going to testify in the case, and there were a lot of reasons for that, but he was treating

him.  And he's treating and he says he's irrational off medicine.  Sent Dr. Brawley all the hospital records.  Using daily inhalants.  I don't know -- I don't know what that part of it meant.

Q.  Now, so now Dr. Morgan informed you as early as September of 2003 that if Mr. Basham was off his medicine he would be irrational?

A.  Apparently tried to keep him on his medicine.  I think -- I remember reading one dialogue between the court and I about we found out that he had been sent back from Butner and he was supposed to have some medicine and they were not giving him the medicine at the jail.  And we had to make sure that they did, Neurontin or something like that.  I don't know why I remember that, but probably because I just read it recently.

Q.  And you were at the -- it wasn't as if you were giving Mr. Basham his medication and --

A.  Pardon?

Q.  It wasn't as though -- you couldn't give Mr. Basham his medication.

A.  No.  But I remember informing the court on one of the days of the trial about this particular issue, and I remember the court being concerned that they, the jail, had not been following -- I think that's what it was, the jail had not followed Butner's recommendation what he was supposed to be on or what Dr. Morgan said he should be on.  And so I don't

remember what the outcome was, but I remember that I think it got straightened out.

Q. Susie, on that same page could you highlight number six, all of the it, for us and just enlarge that for us?

These are your notes still, and they appear to be sort of a summary of each expert's nutshell of the situation that you were dealing with in September of 2003. Do you see where you wrote with regard to Dr. Morgan, he apparently stated that Mr. Basham was psychotic?

A. I remember writing it down. As to what he meant at that point or when he was referring to, I have no idea. Sometimes, you know, nine years later my notes can only remind me sometimes there are some things, so I don't know what he was referring to at that point.

Q. I understand. Now, in the summer of 2003 Mr. Basham was transferred to a place called Columbia Care?

A. Yes.

Q. Can you tell me what Columbia Care is?

A. It's a medical facility that from the Alvin Glenn Detention Center, they send people there. And he was being housed at the Alvin Glenn Detention Center, which is the Richland County jail, and he was in a security pod there, and Columbia Care is a medical facility for the jail, as far as I understand it.

THE COURT: Mr. Burke, it's about time for our

morning recess.  Could we take a break here?

MR. BURKE:  Yes, sir.

THE COURT:  All right.  Let's take a 15 minute recess.

(A recess transpired)

THE COURT:  All right.  Miss Floyd made arrangements for a phone call to be made to Mr. Basham, but they wanted to have it at 12:25 so we will have to stop a little bit earlier this morning.

THE CLERK:  The call will be at 12:30 but we need to stop at 12:25 because they want it at 12:30 1230 on the dot.

MR. BURKE:  Thank you very much, Miss Floyd and your Honor.  Appreciate it.

THE COURT:  All right.

BY MR. BURKE:

Q.  Mr. Swerling, when we took the break we were talking about your -- you were telling us about the Columbia Care center in Columbia.  Do you recall why the defense made a request that Mr. Basham be sent there?

A.  Up on the screen before we reconvened there was something that you had asked me about Dr. Morgan.  And could I go back to that for a moment?  You don't have to put it back on the screen.

Q.  We can bring it back up.

A.  I think the record ought to reflect we could not put Dr.

Morgan on the stand as a witness. There are memos in the file as to why, communications he had with Brandon, and I can't specifically recall what they were, but I think the record ought to reflect we were not able to put him on the stand.

Q. Okay. Now, just so the record is clear, Dr. Morgan was his treating psychiatrist, right?

A. Yeah. We had separated responsibilities so that Dr. Watts would have opinion, give the opinions or have to be the expert, Dr. Morgan was treating. And, of course, he had -- I think he had a long -- he had a relationship with Brandon even after the trial. He was also sending him some money, I think, too, from what I heard.

Q. Was it Dr. Morgan or Dr. Schwartz-Watts who suggested that he, Brandon, be sent to Columbia Care?

A. I really don't remember. I don't remember why he was sent, I apologize. I'm sure there's something in the file to reflect that, or a motion or something like that, but I just specifically don't recall why he was sent there.

Q. The record does reflect that at one point, I believe in September of 2003, there was a request to extend his time at Columbia Care, and that's in the record, it speaks for itself. And there was attached to that request was a letter from Dr. Schwartz-Watts explaining that she had had difficulties evaluating Mr. Basham when he got to Columbia, and I don't want to misstate it, as, again, it speaks for itself, but do

you independently recall having conversations with Dr. Schwartz-Watts about her inability to evaluate Mr. Basham for a period of time when he was at Columbia Care?

A.  I don't have any recollection of that.

Q.  Okay.

A.  One way or the other.  I have no recollection.  I just don't have a recollection one way or the other.

Q.  Susie, could you bring open Defendant's Exhibit 83.  Mr. Swerling, I think you mentioned that one of the occasions where you may have had concerns about Mr. Basham's competency was at the Jackson v. Denno hearing so I would like to talk about that for a moment and go over -- Susie, if you could highlight that bottom portion for us and just enlarge it for us.

These are your notes from the February 24, '04, which was the first day of the hearings.  Can you read the second line for us?

A.  Yeah, he's incoherent.

Q.  Okay.  And, Susie, could you bring up -- what we're going to show you, Mr. Swerling, is a transcript from that day, part of the record in this case from the 24th.  And if you can go to page two, beginning at line 18, if you can enlarge that for us, Susie, to the bottom.

And, Mr. Swerling, could you read that first paragraph for us?  You are addressing the court.

A. Okay. Judge, Mr. Basham at this point appears to Mr. Harris and I to be incoherent and not understanding the nature and purpose of the proceedings today. He had told us he thinks he's here for trial today.

Q. Okay. Now, this would have been one of the occasions when you had concerns about his competency?

A. Yeah, it speaks for itself. You know, my recollection of, you know, specific things that were said nine years ago, eight years ago, is not very good. But that the record speaks for itself.

Q. Now, there was some -- Susie, can you go to the next page? I believe there may be some reference where you state, yes, the top -- that top paragraph.

You also informed the court that apparently there was some attempt last night by him, meaning Mr. Basham, to slash his wrists again and that's why he's in restraints today. And any independent recollection today of that attempt to slash his wrists?

A. No.

Q. You said again. So that suggests that there was previous attempts by him to slash his wrists. Do you remember those?

A. Again, you mean talking about the word "again"?

Q. Yes.

A. I mean, as to others? There's a vague recollection somewhere but I don't recall, I really don't.

Q.   Okay.

A.   I remember my concern at this point was I think there was some dialogue between the court and I about whether we could go forward with the motions, and I thought specifically Jackson versus Denno hearing, I thought we could not because it would require maybe talking to Mr. Basham about things, and I was concerned.  Some of the other motions we argued, you know, maybe could have been done in his absence because they were legal issues, but this particular motion I thought was important for him to be here and I think we recessed.

Q.   Um-hmm.  Okay.  And I think that is what the record will reflect.

A.   This may be the situation, Mr. Burke, where he had the medicine problem, also, where Dr. Watts said that he did not get some medicine he was supposed to get or -- I don't remember.  But, anyway, I'm trying to draw on my memory, but it's hard.

Q.   And I -- and I appreciate that and I'm not -- and I can't, I think, to be honest with you, I'm not even sure myself so I don't want to speak to that so I wanted to ask you a question.

Now, this is a government's exhibit so we have no -- certainly can bring it up, but I will tell you what I have here, maybe you can just answer a question for me.  So there was a suicide attempt or a slitting of the wrists, let's call it, by Mr. Basham immediately prior to the Jackson v. Denno

hearing in this case, which was the hearing started on the 24th.  And the Government's Exhibit 162 is the time sheets from -- your time sheets from Mr. Basham's entire case?

A.  Um-hmm.

Q.  And I noticed on the 23rd of February of '04 there was an entry by you of a phone call to Andy Savage.  Who is Andy savage, do you know?

A.  He's lawyer in Charleston who is one of my contemporaries.  And it's not unusual, he would be one of the people that I might have gone to and asked a question of.

Q.  Regarding --

A.  Anything.

Q.  Anything.  Okay.

A.  He's a criminal lawyer down there, and we refer each other cases, so -- I can't tell you why I spoke with him, but I did, obviously, if it's on my time sheet.

Q.  It could have been in relation to the Jackson v. Denno hearing?

A.  Well, it had to be in relation to the Basham case if it's on the time sheet, but I really have no idea.  I spoke with a lot of lawyers during this case trying to note --

Q.  On the same day you spoke to another lawyer who we mentioned previously, Kevin McNally.  You have a time entry for him.

A.  I think Mr. McNally was the lawyer, if I remember

correctly, was the supervising -- I don't remember what the title was.

Q.  I think they called him resource counsel.

A.  Resource counsel.

Q.  Yeah.  Now, your notes in your time sheet, and I'm reading from Exhibit 162 here, it says PC with Kevin McNally.  Have judge make finding because of limited capacity.  Sitting here today can you tell us what you meant --

A.  I think -- I can't tell you exactly what that means, but that's what we did, we asked the judge to make a finding on Rule 104 as to each of the statements as to the voluntariness issues.  So we did do that.

Q.  Did you present evidence of Mr. Basham's limited capacity?

A.  Oh, no, no.  This was -- I told you the other day, that was not our strategy because the statements -- I mean, we can go back into that, but --

Q.  Yeah, I don't want to rehash.

A.  Miss McGuire and Mr. Hewlett and Mr. Hughes and Mr. Monckton and Mr. Littlejohn, those were the statements that were under advice of counsel and so those were the statements, the real serious statements, the efforts to find the Burns body, the efforts to find the Donovan body, those were the ones of particular concern.  But there were lawyers involved in those.

Q.  On this February 23 phone call with Mr. McNally you have

also an entry on your time sheet, don't call Dr. Watts, does not see mitigation problems.

A. Please state, does not --

Q. Does not see mitigation problems. Do you remember that?

A. No.

Q. This was information -- these time sheets were submitted to the court, correct?

A. Yeah. Are you asking me if I remember it? I don't remember it.

Q. No, I understand that. I'm curious, it would seem some of these statements would be work product and I'm not sure why they would be included on a time sheet.

A. Mr. Burke, I don't know. You know, I may have put something down there that, you know, maybe in retrospect maybe -- I don't know. I mean, I tried to maybe explain why I was calling and so I can't tell you.

Q. Okay.

A. What did I put down?

Q. This is with regard to a telephone call with Mr. McNally, have judge make finding because of limited capacity. Don't call Dr. Watts, does not see mitigation problems.

A. I have no idea what that means. I guess the government wouldn't either, if they had seen it.

Q. Returning to the morning of the 23rdth, Mr. Basham's incoherent, as your notes indicate.

Susie, could you go to page six of that transcript for me, please. Actually, make it page seven. And could you highlight that first paragraph for me, please, and enlarge that.

Mr. Swerling, this is on the previous page, it's you making a statement to the court. And can you read the sentence beginning, after my recollection, read the rest of the paragraph for us.

A. In situations where he has -- there have been notes made about his being sort of out of touch, talking to himself, and things of that nature, which one of the things he's doing right now, Mr. Harris overheard him talking to himself. But I don't believe there has been a judicial determination ever.

Q. Okay.

A. And that, I think what we were referring to there, to the best of my recollection, would be that there were some entries in some of his medical records about that. If so, that's what we would have been referring to.

Q. Now, that day Dr. Watts was called in to evaluate Mr. Basham for you and she testified later in the afternoon. And I think that doctor -- and, again, the record will speak for itself, but that Dr. Watts testified she was concerned about Mr. Basham's medication. I think that's what you alluded to?

A. That's what I was referring to before, yeah.

Q. Did she, to your recollection, talk to you that day about

her concerns about whether he was being properly medicated while at the jail?

A.  I do not recall.  I do recall that there was some -- I made some statements to the court about the jail and giving him medicine, but I don't know if it was that day or some other day.  I just remember that in the back of my mind.

Q.  Did you consider that day asking the court to stay your proceedings so that Mr. Basham could have a full competency evaluation performed?

A.  Did I?  Are you asking me did I?

Q.  Did you, yes.

A.  I don't think the record reflects that I did, and I think what the record reflects is I called Dr. Donna Schwartz-Watts, who I have great deal of confidence in, to come over and take a look at Brandon.  She had had experience with him already.

Q.  Now, you had testified, or least you said in your interview, at one point your strategy was that you did not want to have Mr. Basham evaluated for competency because you didn't want to make him available to the government.

A.  I didn't want him evaluated by the government at that time.

Q.  Now, the record indicates that Mr. Basham, for a different purpose, was sent to Butner from January -- late January to mid-February immediately preceding this Jackson v. Denno hearing.

A.  I don't remember the time.

Q.  But if this were the case, then your strategy to not have the government have access to him would no longer be in play, correct?  Because the government already had access to him for a month.

A.  I'm not sure I understand what you are asking.

Q.  I'll try to rephrase it.  The strategy that you did not want to raise competency to proceed because you didn't want to make Mr. Basham available to the government to be evaluated --

A.  We were talking about earlier in the case about giving him over to the government to determine competency.  At some point they were entitled to have him taken to Butner.  So, no, I'm not talking about that period of time, I'm talking -- your questions the other day were about early on and how there was a motion made by Mr. Monckton to have him determined -- determine whether or not he was competent or not or be evaluated, and I was opposed to that, Mr. Harris was opposed to that, because we didn't want to turn him over to the government at that point in time.

Q.  But any time after he had been to Butner that concern would no longer be there.  If you had competency concerns you could have requested a competency evaluation without having the concern of disclosing --

A.  I had my own doctors.

Q.  Okay.

A.  I mean, I didn't have a whole lot of faith in Dr. Capehart being objective.  He was the -- he was the doctor at Butner and we were getting vibes that he was not very favorable toward Brandon.

Q.  I would like to move on to Mr. Basham's competency, or lack thereof, at his trial.  First I have a question:  Did you ever consider having Mr. Basham, like his codefendant, plead to the offenses with which he was charged?

A.  Do what now?

Q.  Did you ever consider having Mr. Basham plead guilty to the offenses with to which he was charged?

A.  No.

Q.  No?  Can you tell us why?

A.  No, it's not a format that I like to do in a death penalty case because I think that it's important to have, if you can come up with a legitimate reason to have a bifurcated trial. Even if in the guilt-innocence phase you don't strongly argue about guilt or innocence, it's better to separate those issues, guilt or innocence, and then go into the sentencing phase of the trial.

So what I did in this case, and I've done in other cases once in a while, is in this particular case the carjacking issue had a specific intent requirement that when the car was -- when the car was hijacked, carjacked, that there was an intent to do bodily harm or there was a reasonable -- I don't

remember exactly how it's defined, but there was a reasonable chance of bodily harm.  So I felt like we could argue that and not lose the jury thinking that we were wasting their time, and therefore we could have the guilt-innocence phase of the trial, separate that from the penalty phase of the trial, and in the guilt-innocence phase of the trial really go after trying to show from these witnesses that Brandon was a follower, that Chad was in charge, that we -- we had all of these witnesses, Hawkins, who Brandon had done some favorable things with during that kidnapping, Tina Severance, Andrea Roddy, Beth McGuffin, all of these people, jailers, we were able to during the guilt-innocence phase of the trial bring out things that we wanted to and separate that from the penalty phase of the trial.

Number two, it didn't work in the Fulks case.  They tried that, they pled guilty, so it furthered my belief that that was just not the way to go.  But I do believe sometimes it's better to front load in the guilt or innocence phase and not seriously argue about guilt or innocence so he could keep credibility with the jury, come back and argue that, okay, you know, we went through the guilt-innocence phase, this is the reason why we did it but now we would like you to save his life.

Q.  Susie, could you bring up Defendant's Exhibit 86, please.  And, Mr. Swerling, this is another of the many, many e-mails

in the case.  This one's from Lesa Watson dated August 27, 2004, so just a couple of weeks before trial, correct?

A.  Yes.

Q.  And, Susie, could you highlight the first two lines for me, please, of the substance?  In this memo Miss Watson informed you that Brandon had just called her twice.  He wanted to tell me he is not pleading because he cannot say what he has to say because it is not true.  Do you remember receiving this e-mail from Miss Watson?

A.  I have no idea what he's talking about.

Q.  No idea?

A.  No.  There was never any really, as I recall, never made any kind of decision to try and get him to plead guilty.  It didn't work with Fulks, and my experience in the past, that's not the way I would have gone.

Q.  Mr. Swerling, Government's Exhibit 162 is a large exhibit we just discussed about your time sheets, and I would like to read for you your entry for August 23 of 2004, which would have been four days before the e-mail in which Miss Watson said that Brandon had called her about not being willing to plead.  There is an entry of a two-and-a-half hour visit with your client on August 23rd.  Thank you very much.  It's actually, Gayle, page ten of 14 for -- I don't know if that helps, and that's the bottom entry right now.  Thank you, Gayle, I appreciate it.

Now, the entry is difficult to read, but it appears to say on the very bottom, to jail with Greg Harris re plea, and a word I can't make out.  Can you make out that word?  Mr. Swerling, are you able to read what this word means?

A.  No.  I can't see the second word.

Q.  Does this refresh your recollection as to whether you ever had any conversations with Mr. Basham about pleading guilty in this case?

A.  Let's put it this way, we may have discussed it.  That was not anything I was ever asking him to do, that I can recall. If you have my notes from this day, in all fairness put them up.  But I don't believe that that was something that I ever recommended him to do.  I think I discussed the -- probably would have discussed the options with him but not that I was serious about doing.

Q.  Okay.  And I will tell you that as far as I know I don't have notes from that day.  But, in all fairness, I would include them.

Susie, can you return to Defendant's Exhibit 86 for me for just a minute?

THE COURT:  It says plea and -- well, I can't --

Q.  (MR. BURKE) I really, I'm not sure what this word is, either, to be honest.  So --

A.  Rules.  Maybe rules, that was rules.

Q.  Okay.

A.   Maybe.

Q.   Now, this e-mail from Miss Watson, if you -- if you would look at the second paragraph which has been highlighted, she was talking with Mr. Basham about his behavior at the upcoming trial, and she said that he likes coloring books, connect the dot books and words, seek and find puzzles.  I told him Paige would have them and he is to work on them and focus on that.  Was that -- was that the team's strategy, to have Mr. Basham focus on coloring books and word seek?

A.   Well, the strategy would have been to keep Mr. Basham from being fidgety and -- lack of a better -- I'm trying to think what another word would be.  Keep him focused.  And I think that at some point, I don't know if we already had this discussion with the judge, but he approved Miss Paige sitting with Mr. Basham because he really liked her and listened to her during the course of the trial.

     So, you know, Brandon was, for one reason or another, I didn't think was going to be actively participating in writing notes and telling me what questions to ask and opinions about things.  So I just wanted to keep him quiet and focused on something so he was not -- would not be disruptive.

Q.   Susie, could you bring up Defendant's Exhibit 90 for me, please?  Mr. Swerling, Defendant's Exhibit 90 is a multiple page document that we found actually in appellate counsel's file in this case.

MR. BURKE:  And, your Honor, may I make -- may I approach the witness to show him?

THE WITNESS:  I wonder how they got it and I didn't have it?

MR. BURKE:  Your Honor, may I approach the witness?

THE COURT:  Yes, sir.

MR. BURKE:  Thank you.

Q.   (MR. BURKE) Does that look familiar to you?

A.  No, no.

Q.  Do you recall whether Mr. Basham was working with a document or a book like this?

A.  No.  I mean, I don't remember at all.  What I was trying to do is give you a reason why we would have -- I would have said something like that, because I wanted to keep Brandon concentrated and quiet in the courtroom.

Q.  Susie, could you keep rolling down for me, please.  And I think if you -- there we go.

Mr. Swerling, I think the second to last page, I'm not sure you will be able to read that, but there appears to be notes written that to the best our knowledge is in Mr. Basham's handwriting.  So do you see that page, Mr. Swerling?

A.  Yes.

Q.  Do you remember receiving some type of note from Mr. Basham to the effect of why can't -- why you can't talk in front of me, it makes me feel --

A.   That's a note to me?

Q.   It's a note to someone.  Do you recall receiving that?

A.   No.

Q.   Okay.

A.   I don't know what it means either.  If you are suggesting I didn't tell Brandon --

Q.   I just asked.

A.   I'm just telling you, it could be completely wrong.

Q.   I asked if you had seen the note, that's all I asked you.

A.   I like to explain the answer.

Q.   Susie, can we go to Defendant's Exhibit 91, please?

Mr. Swerling, this is a newspaper article from September 14th concerning the jury selection in Mr. Basham's case and commencement of jury selection.

And, Susie, could you go to the second page for me.  And in the context of the last two paragraphs of -- right there, could you highlight that for us?

Now, this report in the newspaper says Basham's actions in court also can influence jurors.  He appeared disinterested during much of the jury selection, drawing with markers on a sketch pad or sleeping.  They notice that, Sneed says.  If he is -- if he's not paying attention it shows he doesn't care.

THE COURT:  Let me jump in again here.  That is a newspaper article.  Isn't this hearsay?

MR. BURKE:  It's hearsay, your Honor, and the

government did -- I have to tell you we got these documents late in the game and we were trying to be accommodating.  I'm not really sure how Mr. Swerling can testify to it.  I guess potentially to refresh his recollection.  But to the extent it --

THE COURT:  I've got a --

MR. DALEY:  The truth of the matter, sir, is it really is nothing but hearsay.

THE COURT:  Mr. Burke, what about it?

MR. BURKE:  We're not offering it, your Honor, for the truth of the matter asserted.  In the first place it's a -- I mean, it's a statement that I simply wanted to introduce to ask Mr. Swerling if he recalls Mr. Basham spending time drawing with markers during the jury selection in this case.

THE WITNESS:  I remember Mr. Basham, because we just went through the fact that there was some coloring books, and Paige Tarr was sitting with him there.  But the problem with Brandon was that Brandon listened to what he wanted to listen to and he didn't listen to what he didn't want to listen to.

Q.   (MR. BURKE) How do you know that?

A.   Because I -- I worked with him for eight weeks in court and some 60 hours prior to that.  And I know Brandon, and Brandon was responsive to what he wanted to be responsive to and not responsive to what he didn't want to.  And that was

his history.

Q. But you are not a psychiatrist, is that correct?

A. No.  I don't have be a psychiatrist to tell you that.

Q. That's your opinion then --

A. I worked with him for eight weeks.

Q. As his lawyer?

A. Yes.

Q. Correct?

A. One of my -- with you asking me questions about whether or not he was drawing and stuff, yes, we were trying to keep him focused in the courtroom so he would not be disruptive, not act out.  And that was the purpose of it.

THE COURT:  The reason I'm concerned, I had a conversation a long time ago with a state judge that tried a death penalty case, and I think it went all the way to the U.S. Supreme Court.  And the newspapers reported the defense lawyer who was appointed in state court was, you know, a retired real estate title examiner who has come out of drug rehab, was blind in one eye who slept through the trial.  And the judge was really irate that the newspaper reported that the lawyer slept through the trial when the judge said I was there and the lawyer did not sleep through the trial.

And it disarms me a little bit that a reporter from somewhere saying he slept through the trial when I did every single thing I could to stop him sleeping during the trial.

Every time I looked over and he appeared to have his eyes closed I would stop and do something.  So I will admit it for what it's worth, with that understanding.

MR. BURKE:  Thank you.  And we will move on.

THE WITNESS:  And I would like to say, I don't recall that he was sleeping.  There were a couple of occasions where, as the court just reported, that he would close his eyes, but there was -- one occasion I think we raised the issue that he was actually sleeping.  And that became a medication issue, if I recall.

Q.    (MR. BURKE) Susie, could you bring up Defendant's Exhibit 22, please.  Mr. Swerling, Defendant's Exhibit 22 is a memorandum from your co-counsel Greg Harris dated 9-13-04. Given the contents of the memorandum, which we'll go over in a second, I think that this might have been an ongoing memorandum that might have continued past September 13th, but the document will speak for itself.

Susie, if you could go to the second page of this.  And this is entitled jury selection, Basham, is the subject of the memo.  And can we go to a few observations, and can you raise that whole area for us, please.

Can you read number two for us, Mr. Swerling?

A.  By the third day of jury selection Brandon's relationship with the marshals had deteriorated and he was noticeably more distracted by the realization that trial had begun.

Q.  And what about number three?

A.  Intermittent outbursts between Basham and the marshals, Basham, Jack and me, and Basham and himself.  These outbursts were mixed with periods of time when Brandon would attempt to sleep through jury selection.  Attempted to sleep.  Brandon's inability to stay awake during portions of the jury selection is a matter of record.  That's what I said, I remember at least one occasion but I don't remember others.

Q.  Do you recall, as Mr. Harris noted, that Mr. Basham had intermittent outbursts with himself, between Basham and himself?  Do you remember him talking to --

A.  He would just shout out sometimes.  Could you go back to the beginning?  I thought there was something interesting in the beginning of this memo.  First of all, who wrote the memo?

Q.  Greg Harris, your co-counsel.

A.  Okay.  There was something in the first paragraph.

Q.  Okay.  We can increase that for you.

A.  Each morning Brandon, Jack, and I were provided with an outline regarding each individual juror and Dr. Follingstad's impression regarding their tendencies.  While we didn't give him a copy of every questionnaire he was upon his request allowed to look over each questionnaire regarding an individual juror.  So he was participating in jury selection.

            MR. BURKE:  Now, your Honor, we have references in our pleadings, and I won't go through these with Mr. Swerling

because they are just transcript records from the 7th of September, the 8th of September, the 17th of September, which addresses your attempts to work with Mr. -- with Mr. Basham to keep him awake and alert during the trial.

Q. I would like though to look at Defendant's Exhibit 93, Susie, if you could bring that up. Mr. Swerling, these are your handwritten notes from September 17th of '04. And, actually, could you just read that entire entry for us, please?

A. Yeah. Brandon would not sit up, he has his head down, then he sits back and sleeps back in the chair. He has refused my requests, Greg's requests, and Paige's requests. He said they can give him the death penalty, when I tell him the jury is looking at him. We break, the judge talks to him, said he is tired of all this of.

Yeah, actually, I remember this exchange. Will plead, sign the death warrant, wants to leave. I said he needs to remain. Can't render effective assistance of counsel. We asked for a break, court refused, judge refuses. So that's a situation that I can remember.

Q. Do you recall, and, again, the records will speak for themselves, that judge -- that Dr. Schwartz-Watts testified or addressed the judge in an ex parte, at least one ex parte hearing on September 17th about Mr. Basham's difficulty staying awake and paying attention?

A.   That's what I was saying before.  I remember at least one occasion when we had that issue, and I thought it had to do something with the medication he took.  I could be wrong about that.  Obviously, my notes refreshed my memory that there might have been more than one occasion, but I was telling you what I remembered.  At least that one occasion that was the one time we called Donna over here.

Q.   And if the record indicates that Dr. Schwartz-Watts told the court that Mr. Basham was quite paranoid about legal counsel, would that --

A.   It wasn't me.

Q.   Okay.

A.   I don't think -- I don't think he had -- I don't think he ever said that about me.

Q.   No, and I think that's an accurate memory.  I think his difficulties were with Mr. Harris, at least in that regard.  And I think the record will reflect that.

A.   He had some kind of issue with Greg, and I don't remember what it was.  But, you know, Greg was doing a heck of a job trying to represent him, but he perceived something, I can't remember what it was.

Q.   On September 17th Dr. Schwartz-Watts also, and this is in the record, said we are seeing his brain damage.  Pretty much shut down, these are excerpts, and his brain damage making it difficult for him to relate to his attorneys.

Do you remember her making those statements to the court?

A. No. But she was my expert.

Q. Now --

A. If she felt he couldn't go forward then that's what we needed to do. I listened to her.

Q. The 20th of September is the day that we have talked about a few times. That was the day with the struggle with the marshals. I would like to look at Defense Exhibit 94, Susie. Now, and if you could for the 20th just enlarge all of that for us, please.

These, again, Mr. Swerling, are your notes from the 20th of September. If you will recall, there was an incident in the trial in which the daughter of the victim may have made a comment in an elevator that might have been heard by a juror, and there was some question about that and the judge looked into it.

A. Yeah, questioned the jurors, or the court did.

Q. Can you read for me, please, the last entry of your hand notes on that page?

A. About the dip?

Q. Yes.

A. The line before that, he's obsessing the whole time about the dip. Yeah. There was a big thing in this case.

Q. So when you said obsessing, you mean he was focused on it and couldn't get off of it?

A.   He was just -- all he kept talking about is he wanted his dip.  And at one point the court considered it on a -- I don't remember if it was maybe a Friday or -- and then we came back on Monday and the court tried to work other ways, like nicotine gum or coffee, and the marshals didn't want him to have the dip.

And then as a couple of days progressed he kept talking about the dip, and which is Brandon's manipulation.  And he, as I recall what happened, was if we agreed or I had to agree to be with Brandon when he was having his dip during the breaks, and so that I would go back there in the holding cell and sit with Brandon while he had his dip.

Q.   Susie, can you scroll down that page for us of notes?  And we also see you have notes then from there were -- I'm sorry, Defendant's Exhibit 95.  I'm sorry.

And these are your notes from the 20th afternoon, and also the 21st.  And I would like to turn to page two of those notes.  And, Susie, if you could highlight the very last line, two lines for us, please.  And can you read that for us?

A.   Constantly talking loud, having problems with the marshals.  What day is this?

Q.   That is the 21st of September, the day after the incident with the marshals.

A.   He did that.

Q.   And then, Susie, can you go to the next page of that

exhibit, which is a continuation of the note from that day.

And, Mr. Swerling, could you read for us, there are two lines crossed out, but can you read the entry after that? There we go. Yeah. What does that say?

A. He was laughing, he was sitting inappropriately, looking inappropriately. Kept talking, telling him to stop. I made a deal with him to give him five dollars a day if he was quiet.

Q. And then could you, Susie, scroll down and highlight that entry for us, please. This is for the next day.

And I will read this for you to give you a break. Starts right off with dip. Before break, dip. During -- maybe you have to read that for me. During, something, trial, dip. After break, dip. Before lunch, dip. In your experience as a defense lawyer are you familiar with the psychological or psychiatric term called perseveration?

A. Who?

Q. Perseveration. Have you ever heard that term used?

A. I'm not sure I have. But I do know Brandon wanted his dip.

THE COURT: What is the term exactly?

MR. BURKE: It's P-E-R-S-E-V-E-R-A-T-I-O-N. And in lay terms, as I understand it, your Honor, it's an inability to remove yourself from a specific thought. And I've heard the example given of the movie Rain Man when he keeps talking about Judge Wapner, 4:00 o'clock. That type of thing is

considered a perseveration.

THE WITNESS: Can I explain something in response to that, now that I know what it is?

MR. BURKE: You can explain to Mr. Daley when questions you. I don't have any more questions on that issue, so --

THE COURT: We will let you come back to that on cross.

BY MR. BURKE:

Q. Susie, can you go to Exhibit 96, please? We're on to the next day now of -- we're at the guilt phase of the trial, and, Susie, can you highlight all of September 23rd for us? And the 24th, as well. That's fine.

And again I'll read what I can for you, Mr. Swerling. These are your notes for September 23rd. Every day the dip. Now he wants me to spend lunch with him. Morning break with him. Says he wants to ask questions but conversation is really about dip. And the next day you also have more dip incidents, correct?

A. Yeah. I mean, he wanted his dip and he -- there has been a discussion about whether he was going to get it or not, then there was a discussion he was not going to get it. And he was just -- now, let me just say this to you. This does not mean that we were not -- other things were going on, you know, that he was paying attention when we were in court, that he was

doing things in court.  This was not a constant -- I think you are trying to suggest that because I wrote it there it was constant dip, dip, dip, dip, dip.  It was not.

Q.  Well, I think --

A.  I made notes that he was asking for the dip, but that doesn't mean it was the whole afternoon and the whole morning.

Q.  Well, I think --

A.  There were other things going on.

Q.  And they can speak for themselves, but I would note on those dates when you were taking notes of what you thought were important there's no reference to any other information, isn't that correct?

A.  Well, I don't know.

Q.  Well, the notes are in front of you.

A.  I'm making a note there, obviously, that I wanted to reflect in my notes that he was asking for the dip.  But what I'm saying is that does not negate that there were other things going on in court that day and other discussions I had with him.  It was he kept coming back to the dip.  And it was getting to a point where he was -- he wanted his dip and he was -- he just was not going to get off that issue.  But not to the exclusion of everything else that was going on.

Q.  Susie, can we look at Defendant's Exhibit 97, please.  And if you could -- the September 30th entry is the date when the jury was being charged with instructions in the guilt phase of

Mr. Basham's case. You did take some notes about that going on. Could you read what you wrote after the asterisks for us, plea.

A. During this difficult discussion the defendant is driving me crazy about the dip. Which is what he was doing. And now he -- that's what Brandon wanted. Nothing else was going to satisfy him, the gum, the coffee, he wanted dip and he figured out a way where he could get dip in here and that's what he kept pushing.

Q. He couldn't get his mind off of it, could he?

A. He got his mind off of it, Mr. Burke. These are notes that reflect that he was raising this issue with me. But he did get his mind off of it when we were sitting in court. These were just he kept -- would come back to it. Now, you are trying to make this as a realtime situation. There were other discussions we had during that period of time.

Q. Well, Mr. Swerling, you have your spiral notebooks still in your possession, and what we're showing you are your notes from those days. And would you agree with me that the vast majority of your notes from the guilt phase of trial concerns Mr. Basham's fixation on obtaining dip?

A. No, I would not agree with that.

Q. Well, the entries will speak for themselves on that.

A. I made entries about the dip because it was an important issue. But what you are trying to suggest is that the only

discussions we had, there's no way to make notes about your discussions all day long or what's going on in court all day long. I was making these note because there was -- it kept coming back to that issue.

Q. During these instructions to the jury was Mr. Basham driving you crazy with his --

A. I don't remember.

Q. Well, your notes say on November 30 -- September 30 --

A. Tell me where. Let's see.

Q. September 30, the jury charge, during --

A. You are talking about during this difficult discussion?

Q. Right.

A. He was asking me about dip.

Q. Susie, do we have the transcript for October 26th of 2004? If not I'll just -- could you go to page 92 and 93?

Now, Mr. Swerling, while she brings that up, October 26th was well into the penalty phase of the case. And I would like, Susie, at the very bottom of that page Mr. Swerling addresses the court, if you could highlight that. Yeah, that would be perfect. Can you highlight down there to the next page for us?

So on the 26th of October, Mr. Swerling, you informed the court, before you bring in the jury I need to put this on the record. Mr. Basham is slurring his words, he seems to be groggy and just out of it. That is, for lack of a better

word, he was sleeping when Mr. Harris was doing the direct examination of Dr. Brawley. I just think that the record needs to reflect that, Judge. I understand that in the past he's caused delays but I think that this particular situation is not his fault. His medicine I think is taking affect on him that he normally had at night when he would go to sleep.

So this was one of those occasions in which you were concerned about his competency?

A. Doesn't talk about competence, just slurring his words. And I don't think I raised the issue of competency, I just said I wanted the court to be aware that he was slurring his words, he seems to be groggy.

Q. What would be the purpose of informing the court of that?

A. I don't remember. It's nine years ago, eight years ago.

Q. I would like to move on to another issue, Mr. Swerling, and that concerns the evidence that was presented in this case concerning the abduction of Samantha Burns.

Early in the guilt phase of Mr. Basham's trial the government presented testimony of 11 witnesses, by my count, who testified exclusively about the disappearance of Samantha Burns. You did not object to any of that testimony. Can you tell us why?

A. If you give me a moment.

Q. Certainly.

(There was a pause in the proceedings)

THE WITNESS: Yeah, there were -- the court had ruled in March, March 5th, 4th or 5th, that all the evidence from the escape to arrest was intrinsic to the crime. And the government called witnesses, starting I think with Melissa Jeffers and possibly ending with John Burns, I think. But there were a number of witnesses and they were family or friends of Samantha Burns. And each one of those witnesses was asked specific questions about the events of that day or the day before. So the government very cagily was putting them up on the stand and but asking them specific questions concerning the disappearance of Samantha Burns.

My feeling at that time, I would think, looking back now and trying to refresh my memory, because I have no specific recollection as to what the issue was at that time, but just using my experience at that time and what I think I would have been thinking at that time was that we were not going to object to -- we had already objected to the testimony, we did not --

Q.   (MR. BURKE) When did you do that, Mr. Swerling?

A.   Back in February. And there was an order issued in March by the court that everything between escape and arrest was intrinsic to the crime. That would have included Samantha Burns.

Q.   And what --

A.   So -- if I can finish my answer. So I used my experience

as a trial lawyer to decide not to object, which is something that I think is instinctive in a trial lawyer. There are times when you object and there were times when you don't object. You don't object when the parents of a victim are on the stand and they are not -- there's nothing in that testimony that's specifically hurting you. So it's instinctive, it's experience, and that would have been the reason probably why I didn't object, because I did not want to have a negative inference from objecting to the friends and family testifying.

Q. So just to make sure I understand, you are not saying the reason you didn't object was because the judge had already resolved the issue --

A. I just said that. The judge ruled that it was admissible, that the evidence concerning Samantha Burns was admissible.

Q. As intrinsic evidence?

A. As intrinsic evidence. There's an order, March 4th.

Q. And we will talk about that in a minute, Mr. Swerling. But in your experience then when a judge rules that evidence is intrinsic to the crime with which the defendant is charged does that mean that all evidence then just comes in and --

A. No, you know better than that. When I objected, for example, when Basham was in the motel with Roddy or Severance, I can't remember which one, and there was a police officer who was coming down on the motel, and there was some other --

there were some kids there, and I think there was some -- they were going to try and offer some testimony about Basham making a statement about shooting the cop or doing something to the kids, and I objected to that because I did not think that was intrinsic to the crime.  There was no crime.

So I did object to that.  I chose not to object specifically as to these witnesses, and all I can say is based on my experience and what I felt was the best course of action at that time.  And I've cross-examined hundreds of witnesses over the years and you decide when you want to object and when you don't want to object.  And, you know, people on the stand who are family of these folks, and it was coming in.  The fact that Samantha Burns was in, the fact that he knew about Samantha Burns, the fact that he with Richard Hughes told the officers that Samantha Burns was dead and where she was located, I did not think this testimony was something that I should individually object to when these people were testifying.

Q.  Did you consider filing a motion or making a motion outside the presence of the jury to the court asking him to limit the evidence pursuant to Rule 403 of the rules of evidence?

A.  Apparently -- I don't know.  If it's there, I did.  If --

Q.  You did not.

A.  Then, okay.

Q. Okay. This order that you mentioned, I never -- you said you filed a motion to preclude --

A. I don't remember. I know there was a motion -- at that point in time we were joined with Chad Fulks and there were motions filed and the court allowed us to adopt each other's motions.

Q. You were adopting --

A. I don't know that.

Q. Well --

A. I have no recollection of it. There were hundreds of motions filed between both sides, I guess. Scores of motions.

MR. BURKE: My review of the record, your Honor, and the government can correct me if I am wrong on it, is there was a motion filed prior to the Jackson v. Denno hearing by the Fulks counsel. But, of course, counsel had an understanding that they would join in, in which the court asked the judge to -- to disclose -- to order the government, excuse me, which defense counsel asked the government to disclose all prior bad act evidence under 404(b).

THE COURT: Right.

MR. BURKE: And on March 5th you concluded that the time frame from the escape from Kentucky to the arrest of the two codefendants was -- all acts were intrinsic so the government was not required to disclose those as prior bad acts but they were required to disclose all others.

THE COURT:  And that was a Fulks motion, a Fulks 404(b) advance disclosure motion, basically.

MR. BURKE:  Yes, your Honor.

THE COURT:  And I think we did have a deemer provision in effect where each defendant was deemed to have joined in the other defendant's motions.

MR. BURKE:  Absolutely.  There was no question Mr. Basham would have joined in that motion if it were made.  And the understanding was that defense counsel had to specifically opt out of a motion --

THE COURT:  Right.

MR. BURKE:  -- to not be included.

THE COURT:  I'm trying to think back.  Seemed like on the direct appeal one of the two defendants, the Fourth Circuit went into some other bad acts that the court, Fourth Circuit agreed were intrinsic, some of the shootings and using drugs and so forth.  And the argument on direct appeal was I should have kept that out, and the court said it's all intrinsic.  I don't think they necessarily addressed the Samantha Burns issue, maybe.

MR. BURKE:  Well, I don't want to misspeak, and I can check during the break, your Honor, to see.  It's my understanding at least in Mr. Basham's direct appeal to the Fourth Circuit that his appellate counsel conceded that the Samantha Burns evidence was intrinsic and so they did not

address that.

THE COURT: Right.

MR. BURKE: Our focus, your Honor, is on the trial counsel's failure to ask your Honor to limit the amount and scope of that testimony.

THE COURT: Because you say victim impact crept into it.

MR. BURKE: Right. And we would also point out, your Honor, and I won't go through this with Mr. Swerling because the record speaks for itself, but I can give your Honor the transcript entries which indicate that when, after the Fulks trial when you were handling Mr. Basham's trial, you on numerous occasions gave defense counsel the opportunity to persuade you that this evidence was not intrinsic. And so you were -- there was never any discussion during Mr. Basham's separate trial that this matter was closed.

The record is perfectly clear that throughout you said to counsel, you know, other than telling me that it hurts your client, if you give me a reason it's not intrinsic I will consider that. And that was never made. There was never a 403 motion made to your Honor. And then after the evidence came in there was a -- you addressed defense counsel and asked if they wanted a limiting instruction and they, and this is in the pleadings, but they indicated they would get back to you.

Ultimately, and I don't want to be testifying here, I

just -- this is something in the record that I don't want us to waste time going through, you can look at the settling the jury instructions in this case which occurred on September 28th, 2004, and there's extensive discussion on pages 24 through 33 where the court is going over a 404(b) instruction that it gave to the jury on this very evidence.  I would like the record to reflect that it was not necessarily this court's ruling that all of that Samantha Burns evidence was intrinsic, you gave the defense counsel multiple opportunities to limit it, narrow it, and even try to convince you that it should not come in at all.

THE COURT:  All right.

BY MR. BURKE:

Q.  I would like to move on --

A.  I would like to comment on that.  I don't believe there were multiple opportunities, as you're overstating it.  The court did invite us if we wanted to at one or two of the pretrial conferences prior to the trial that if we wanted to re-raise the issue he would entertain it.  But I think it's just being overstated.

MR. BURKE:  Okay.

THE WITNESS:  And if you say we did not, then we did not.

Q.  And I --

A.  Just one other thing.  I don't ask for limiting

instructions. I don't like them.

Q. I would indicate for the record that the court can look at the following entries: August 25th at pages 114 and 115, September 15th at page 291, September 17th at page ten, all of those are just discussions regarding the admission of this Samantha Burns evidence in the midst of its admission.

A. I would agree with that, just not numerous.

Q. I would like to move on to what's claim 16, Mr. Swerling, in our case. On August 25th, which was less than a month before trial, you filed a pleading informing the court and the government that you intended to introduce relevant factual assertions from the government's closing argument in Fulks' trial pursuant to Federal Rule of Evidence 801(d)(2)(B). Do you remember filing that motion?

A. I don't remember the motion but I remember the theory.

Q. And what was the theory?

A. That if we wanted to we were going to try and argue or put in, try and put in what the government said in the Fulks trial regarding Brandon Basham and Chad Fulks in the Basham trial.

Q. And what was the --

MR. DALEY: Your Honor, may I, if we're -- I think we about need to break, just as informational purposes, but also I do want to make it clear that the government understands claim 16 to only involve statements made in the closing arguments in Fulks' case.

THE COURT:  Right.

MR. DALEY:  I'm looking at the claim, and that's what it appears to be focused on.  I just want to make sure, and my -- Mr. Burke might very well agree, I don't know.

MR. BURKE:  Your Honor, through the process we have -- there has been discussion of the limits of it.  And I went back and looked at the way we represented the claim and I think Mr. Daley is being accurate.  We did in our pleadings limit it to the statements that were made by the government in their closing arguments.  So I will limit my questions to that.

THE COURT:  But I raised this earlier.  Can't an argument be made that the Fourth Circuit put this issue to rest in the 2255 appeal in the Fulks case?  Because they quoted, if I remember correctly, the Fourth Circuit quoted from the argument made in one case and the arguments made in the other case and explained how they were not inconsistent, so --

MR. BURKE:  Your Honor, they were addressing that in the context of whether there was prosecutorial misconduct to presenting inconsistent theories.  What we're doing is saying that trial counsel had the opportunity to ask you to rule on whether the information, statements made by the government at the closing in Fulks could be used in Mr. Basham's case.

THE COURT:  All right.  So there is a difference

there, I guess.

MR. BURKE: There is. And I will tell you, the Fourth Circuit did rule in Mr. Basham's case that they couldn't address the issue because it was never presented to your Honor.

THE COURT: All right. We've got about two minutes before we need to break.

MR. BURKE: Might be a good time to break.

THE COURT: Let's go ahead and break right now. We will be in recess until 2:00 o'clock. We will pick up the testimony at 2:00 o'clock.

(A recess transpired)

THE COURT: Miss Floyd says we need to have a quick ex parte conference to talk about the telephone call?

MR. BURKE: Yes, sir.

THE COURT: Could the government lawyers step out just a minute, please?

(There was a pause in the proceedings)

* * * * * * * * *

THE COURT: Ready to resume?

MR. BURKE: Thank you, your Honor.

BY MR. BURKE:

Q. Mr. Swerling, I have just two very brief areas I would

like to cover with you and then I'll -- I'm done with my questioning.  So the first area addresses something I touched on right before lunch, that was the motion that you filed prior to trial to admit statements made by the government at the closing arguments in Mr. Fulks' trial.  And the way that issue was left was that it was going -- the court did not rule on the motion, the government's position was until they had presented their evidence it was not an issue that needed to be addressed.

In our pleadings we have said that you never raised the issue again and we have alleged that that was ineffective assistance.  Can you explain to us why you chose not to raise the issue again?

A.  Well, again, you know, trying to think back eight years as to what the decision was at the time is very difficult.  I would say that I assessed it, thought about it, tried to use my experience and knowledge in making that decision.  And in addition to that, after reading everything and trying to refresh my memory, there was in August when we -- in some pretrial conferences there was a discussion about that, about the government's position using him, or some reference there about a puppet on a string.

And, of course, government's position at that time was that they were referring to the puppet on the string as to the different things that they did during the course of their --

from going from the escape until eventually their arrest and it really had nothing to do with the actual killings of Donovan and Burns.

So that obviously would have been in my mind when I was making that decision. I think the government was talking about at that time maybe, you know, that that in and of itself, you know, if we tried to use something like that might invite some kind of response or maybe something else should come in from their closing statement. And I felt pretty good at that point. Again, we were talking about the guilty or innocence phase of the trial, that we had established pretty much that Brandon was sort of the follower in this whole thing. All of our questions, every witness that we examined who had knowledge of the two of them was basically acknowledging that. So rather than create the issue I went ahead and just did not pursue it during our closing statements, or the closing statements. I thought -- I thought we had established it sufficiently at that point without getting into that issue.

Q. Okay. My other question for you, did that analysis apply equally to the closing statements that -- arguments that were made both at penalty and -- at the guilt and penalty phase? Was --

A. Specifically what issue?

Q. Well, the decision that you felt that you had enough

evidence without risking having damaging evidence come in. That's sort of what I understand your response to be. Was that also your analysis for the penalty phase, as well?

A. I don't know what the analysis was. I'm trying to think back after refreshing my memory as to what I would have been thinking about.

As far as the penalty phase, and, again, that was not the only issue about inviting some other information back from the government. I know what the government's theory was and what they would have argued because they revealed their hand in the August hearings. So that was a part of my decision, I would assume, in not going ahead and asking the court to admit that into the guilt phase of the trial.

As far as the penalty phase of the trial, I again thought, I would think that I thought, that we had made that particular issue -- we had developed that pretty well. And I would think that one of the issues was was that inconsistent with what they had said in both the penalty phase, the guilt phase and the penalty phase. And according to what their explanation was going to be it was not inconsistent because they were saying that they were equally responsible for the murder. They had never put up any evidence who they thought was the actual killer, either one of them. So I'm sure that would have entered into my decision, as well.

Q. But they did also argue that Mr. Basham was a puppet of

Mr. Fulks. I mean, it's clear that they did make -- did make that statement with regard to Mr. Basham, correct?

A. Yes, that was what they said. But, again, if you look at the August transcripts, I don't know if it was the 4th or 25th, or something like that, their explanation was that was as to other issues in the case and not the actual killings. And I think that it was -- the evidence had been developed that he was actually a follower in that case and by virtually all of the witnesses.

Q. Okay. My last questions concern the concessions made by defense counsel to the jury at the outset of the guilt phase regarding the various charges against Mr. Basham. And there was a concession, essentially, to all elements with the exception of the intent factor for carjacking?

A. Correct.

Q. And can you tell us what your strategy was in making those concessions?

A. Well, I think I said earlier that what I was thinking about, we were not going to plead guilty to the charges, I wanted to have a bifurcated proceeding so we could put the guilt or innocence evidence up front and then bifurcate the trial into the penalty phase but try and maintain credibility with the jury that if, when they found him guilty, that we could go into the penalty phase and legitimately argue in good faith and without any damage to our case that they should

spare his life.

So that was the overall strategy that I developed, or that Mr. Harris and I developed. And I'm sure there were many other reasons. I just drew on my experience as a lawyer trying many, many cases to try and make the best judgment at that time.

And I don't think there was ever any question or could be any question that Mr. Basham was going to be found guilty of those offenses. I mean, the evidence was overwhelming. What I was trying to do is adopt a strategy that I could save his life. He was not going to be found not guilty in this case.

And that was another reason, I was thinking going to lunch, about Burns. One of the things that I probably was thinking about at that point about letting that kind of evidence in and not objecting to it would have been get it all in to desensitize the jury or put the issues out there what they were going to be hearing during the penalty phase of the trial, as well, and try and get it up front, load it up front so that we could come in later during the sentencing phase and try and argue that they should spare his life. As far as the opening argument to the jury, I'd do exactly the same thing today that I did then.

Q. One of the -- and I will concede I'm not a trial lawyer, so but one of the thoughts that occurred to me when I read that and then I read the rest of the trial is that I can

understand the concept of wanting to concede in order to boost credibility with the jury. But the jury was told that Mr. Basham was guilty of a capital offense and then they were required to sit through multiple weeks of I believe more than 90 witnesses on those issues. Do you feel that that damaged the credibility --

A. Absolutely not. I mean, we had the Fulks trial to go by, and I've had other people who I have seen try to do that, to go ahead and just plead guilty. I just didn't think that that was the appropriate way to go and then try and argue the penalty phase. What I wanted to clearly do is have a guilt or innocence phase and then a penalty phase.

And what I thought the appropriate way to do was have a legitimate argument that I could make in the opening and in the closing that there was a reason why we were here, and the jury is going to have to decide whether or not the intent element was there in the carjacking.

So, no, I don't feel like that worked against us. I think that it was a legitimate strategy. That's a strategy that's been employed by many trial lawyers, particularly in death penalty cases. That's a strategy I've employed in many other homicide cases and other kinds of case. It's, for lack of a better word, I think I read it once it's called confession of error, that you admit particular conduct but try and gain your credibility later to argue a particular issue. And this issue

was going to be to try and save his life.

So I do not believe it was an exercise that hurt us at all. I think we got a lot of evidence in in the guilt or innocence phase that helped us in the punishment phase and separated the two. So, again, if I was to try that case tomorrow, my argument, opening argument would have been the same. I would not change that at all.

Q. And it was your intention to concede that Mr. Basham was guilty of a capital offense, correct?

A. Well, he's guilty of kidnapping, I don't know anybody could get around that, and that's a death eligible charge. I mean, to me, to stand up in front of that jury and say he was not guilty of kidnapping I think would have been absurd.

Q. Why would the jury then need to decide on the carjacking intent, if they had already been told --

A. I think I just explained it to you and you are not apparently understanding what I'm trying to say. I wanted a legitimate reason to be able to argue to the jury that why we're trying the guilt or innocence phase, it was a legitimate reason. In fact, the jury was out a couple of hours on that issue, may have come back for a charge on the intent issue again. I don't remember.

But I remember commenting, or people commenting, you know, you may have them confused about that. So it was a legitimate argument to make that the carjacking was something they would

have to decide on the intent element.  So I certainly understood that kidnapping was a death eligible charge, but I was trying to legitimize my guilt or innocence phase part of the trial so the jury would not think they were there wasting their time, that there was an issue.  And apparently they debated that issue.

So, again, I would do it the same way.  There was no doubt, there's no way in that case that the jury could not come back with a kidnapping verdict, so I chose the carjacking because it had a different intent element.

MR. BURKE:  Thank you.

THE WITNESS:  Yes, sir.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. DALEY:

Q.  Good afternoon, Mr. Swerling.

A.  Mr. Daley.

Q.  I would like to go over your experience for just a moment. I know we went through a lot of it already but I would like to go through a little bit more.  In particular let's focus on your death penalty experience that you've had over the years.

A.  Yes.

Q.  Some of it will be repetitive but I want to try to get it into the order that will make sense here.  As I understand it, the first death penalty case you tried was the Wendell Moye

case?

A.   Yes.

Q.   Is that M-O-Y-E.

A.   M-O-Y-E.  It was a Transouth murder on Elmwood.

Q.   And this was one of the first, if not the first, death penalty case after the new statute came about in the late '70s?

A.   The recollection is it might have been the first trial.  I did the Harkness case, it was I think before that, and they did a guilty plea on that and both defendants were sentenced to death.  So obviously I had that, would have had that on my mind, as well.

Q.   The next case that, and these may not be in chronological order but I'll try to get them as close as possible, the next case would have been Donald Peewee Gaskins?

A.   To the best my recollection, that would have been the next one.  I mean, there might have been one in there, but to the best my recollection that would have been the next one.

Q.   And that involved a fellow who committed a crime while in prison?

A.   He carried out a contract to kill another death row inmate.  And Mr. Gaskins had been convicted of about nine or ten murders previously.  After Furman versus Georgia his sentence was commuted to life.  And while he was in prison he took a contract to kill another inmate on death row, and so

they went for the death penalty again after the re-institution of the bifurcated proceeding in the death penalty cases.

Q.  And then the next one ones may have been the Larry Gene Bell cases.  There were two of those?

A.  Yes, '83, '84, '85, in that area.  I think the trial was, the first one was in '85, maybe a year later was a second trial.

Q.  And in that case were there a number of instances where you stopped the trial to have competency evaluations done?

A.  Yes, that was -- we had a first trial, was in Moncks Corner, and Bell was an extremely difficult person to handle. And there were a number of cases, a number of occasions during the trial in Moncks Corner where I had to call in my experts to determine competency.  And, of course, in that particular case, as I recall, there was -- there really was no -- we had evidence and our experts opined that he might have been definitely incompetent at various points, maybe even before the trial.  And he had a lot of mental -- he had a history of mental illness, as well.

Q.  And the first trial was a guilt and penalty phase.  Was the second trial guilt and penalty phase or was it just the penalty phase?

A.  No, they were both, they were both guilt phases and penalty phases.

Q.  And so you were successful, at least in the first

Q.   instance, of having his conviction reversed?

A.   No, not Bell.

Q.   No?

A.   I don't believe so.

Q.   How did it work out there were two trials?

A.   There were two murders.

Q.   Oh, okay.

A.   They were about three weeks apart.  One was in -- I think they were actually both in Lexington.  One was in Saluda, one was in Lexington, and there were change of venues granted in both cases.  And one was tried in Moncks Corner and the second one was tried in Pickens.  And he was sentenced to death on both of them.  It was a particularly gruesome crime, and he had killed two young teenagers and just -- there was some chilling things in the trial and he was sentenced to death.

Q.   The next case I have is the Steve Beckham death penalty case?

A.   I think there was one -- there was a death penalty case down in Aiken where we eventually, Mr. Harpootlian and I represented him, and we were eventually able to get them to dismiss the case because of some evidence that we found that --

Q.   This is before Beckham?

A.   Yeah, I guess before that.  I'm trying to think if there was anything else before that.  Robert South.

Q.   Okay.

A.   Dick Harpootlian and I represented him over in Lexington. He shot and killed a police officer just for the hell of it. And Harpootlian was -- that's when he and I went into practice together and he and I tried that case together.

Q.   And then the next death penalty case you believe was Steve Beckham's case?

A.   Probably Beckham in the mid '90s.  That was a contract for hire, and Dick Harpootlian and I had -- he had already, I'm trying to remember, he had already been solicitor and then came back out in private practice.  His office was one-half of a floor where we have our office at 1720 now.  We were not in practice together at that time.  But I said why don't you try this case with me, and we tried the case together again, and he was given a life sentence.

Q.   Brett Hollis, I guess?

A.   Brett Hollis would have been -- chronologically I'm trying to figure out when that was, whether it was before Basham or after Basham.  It had to be, I guess, before Basham, and that was a pretty difficult murder case over in Lexington.  The difficulty in Lexington is that the jury over there, I think Donny Myers had an incredible string of convictions in death sentences, and I believe the Hollis case was maybe only the second time that a Lexington County jury did not return the death penalty when Myers wanted it.  And there were a lot of

interesting issues in that case, as well, and the jury came back with a life sentence. And I remember trying that. I believe I tried that with some of the folks from the death penalty resource center.

Q. And then I know there's at least one more case in which you were associated, I'm not sure you actually tried the death penalty case, but the Mitchell and Carlton Simms case?

A. Yeah. And, frankly, I remember that was down in maybe Berkeley County, Moncks Corner. An individual had killed some -- executed some people at a pizza -- Domino's Pizza and he had gone out to California and done the same thing. And we were involved in the South Carolina case. I can not remember how it happened, but they sent him out to California and he was appointed a public defender out in California, and they went for the death penalty there and I basically acted, you know, did some work on the ground here in South Carolina to help them out in California.

So, I mean, that case was not tried here and I don't remember actually how it ended. I was trying to think about that the other day, whether -- whether he's actually ever been sentenced here. But we may have done a life sentence on that case because I believe he got the death penalty out in California. And there was another one that John Blume and I did, we were down in Clarendon County where I think there had at least been a notice given, but we were able to work out a

plea. There are probably a few cases where notices had been given and we worked out a plea.

Q. Okay. So --

A. And I don't remember the name of that case.

Q. I'm looking in my notes. What about the State versus Bradbury case? Was that --

A. That was the one in Aiken I was talking about that we had, Harpootlian and I had represented, and we eventually had the case dismissed.

Q. Okay. Some murder cases, I know, I think I asked you this question in our interviews but I don't know that you were able to give a firm answer. How many murder cases have you represented somebody? Whether they actually went to trial or not, do you know how many murder clients you've had?

A. I would say all homicides, you know, from whatever means, probably close to, you know, somewhere in the neighborhood of 150 to 200. I think back in '90s I tried to do some kind of calculation, I remember coming up with some significant number. Somewhere in that area. That's not the ones that went to trial, but -- I've always had three or four murder cases pending at a time, generally.

Q. How many murder cases can you think of that have actually gone to trial?

A. Dozens.

Q. Dozens?

A.  I'd have to say dozens.  I don't keep track of them, but I know it's been many of them.

Q.  One of the allegations is their claim nine where they talk about the fact you shouldn't have conceded in opening certain things and you did it for strategic reasons.  In a similar way have you had instances in your state practice murder cases where you are going to concede perhaps some, maybe even the killing, in the hopes of getting a lesser charge?

A.  Yeah, I have done that many times where, you know, there's no question about someone has done the killing, there's no question that a jury could come back with murder, and I have tried to argue up front that it was maybe voluntary manslaughter.  In other words, concede that there was a death, concede that there was, you know, a killing, an unlawful killing, and hope the jury comes back with a lesser charge.  So, I mean, that's a fairly typical strategy.

Q.  And let me just give you the names of a few of the cases that we talked about previously in our interviews.  Willy Earl Reese, is that a case where that --

A.  That one, unfortunately, he was found guilty of murder.  That was not a manslaughter.

Q.  Okay.

A.  But we tried -- that was one of those cases where we tried to argue that either, I can't remember if we -- what happened in that case is he put the gun up to his wife's head and shot

her.  And I think he was arguing it was accidental and we were trying to, you know, argue that up front, trying to get a reduction in charge, obviously, from the jury.  But they came back with a murder.  It was a contact wound.

Q.  What about Willy Wiggins?  Remember that case, Willy Wiggins?

A.  The name is familiar.  I can't remember from where, though.  Maybe upstate, Bennettsville, somewhere around there.

Q.  What about Fay Huggins, or --

A.  Fay Huggins was a case I handled on appeal, got it reverses and then worked out a plea for time served, I believe.

Q.  What about Albert Fuller?  Was that a case that started as murder and ended up --

A.  Albert Fuller was a prison guard who was out near Mary's Celebrity Club.  He was accosted by a couple of guys, driven off the road, he came out of his car shooting.  And he was run off the road, actually.  And he was Afro American, they were two white males.  And the interesting thing about the Albert Fuller case was State versus Davis had come out in '84, which was -- the Supreme Court spoke out and said these are the four elements of self-defense.  And when we tried Fuller the court which tried that case, and I can't remember which judge it was, but only gave the State versus Fuller charge.  And we asked for all the other charges that would come along with

self-defense, like appearances, size, parties' -- prior acts of parties.

And so he was convicted of one of manslaughter and he was found not guilty of one. And we took it up to the Supreme Court and the Supreme Court decided that he was entitled to all of those charges, not just the State versus Davis charge. We went back to trial and he was acquitted.

Q. So if there had been any possibility that you thought you can pursue a strategy where perhaps Mr. Basham would not be convicted of a death eligible crime, would you have pursued that?

A. Oh, sure. I mean, yeah. I mean, that's not an easy decision to make, you know, as to whether or not, you know, you go in and go ahead and front load it and admit or confess some error in the case. I mean, you have to -- you would only do that in a situation where you were trying to save your chips for later and argue either for a lesser offense or you were trying to go ahead in a death penalty case and try and save a person's life.

Q. A few of the publications that you've done, you talked about, there has been some criticism about the cross-examination in some instances. Have you written a law review article about cross-examination for the South Carolina Law Review?

A. I wrote a law review article on cross-examination, and I

put a chapter on closing argument and cross-examination in Ralph King Anderson's trial book, Circuit Judge Ralph King Anderson. And I -- I've done a number of lectures on cross-examination, because it's really one of my passions.

Q. And I was interested about your comments earlier that you're adjunct instructor at the medical school. Could you explain how that came about?

A. Well, it came about after the Bell case. I worked so closely, there were a number of psychiatrists and psychologists on both sides of the fence, and so there was a -- there were a lot of things going on in that case dealing with mental illness. And at some point Dr. McKey, who was a forensic psychologist who testified for the state, thought it would be a great idea if I came over to the medical university and started working with their staff over there.

I think at that time it was the William Hall Institute that we started with, because that's where they did the forensic examinations at the Cooper Building. And then it transferred over at some point in the medical university itself when they took that over.

So over the years I've worked with some of the residents over there and I've conducted seminars with the staff there, social workers, psychiatrists and stuff. And one of the things that I've talked to them about is preparing them for cross-examination.

Q.  We're going to pull up what's already been admitted into evidence as Government's Exhibit 8.

MR. DALEY:  May I approach the witness, your Honor?

THE COURT:  You may.

Q.   (MR. DALEY) One of the allegations is that you were ineffective in compiling a mitigation team, a defense team well, and so I thought we would go through this just for a moment about the defense team.  And, as you can see, I think -- I think you've reviewed this at least once in the interviews that we had, is that correct, Mr. Swerling?

A.  Yes.

Q.  And in it I think it lists the person, whether they are an expert or not, what their role was, the general times in which they were involved in the case, and then in some instances the amount of time that they -- I believe their vouchers reveal how much time they spent on the case.  Is that correct?

A.  Yes.

Q.  I'm not expecting you have read every single page of the underlying documents but I know you have reviewed it.  Does that look like a full and complete listing of the defense team for the Basham case?

A.  Yeah, it -- at a glance it does, yeah.

Q.  Let's just go over for a minute a few of the -- well, the players on the team.

A.  Okay.

Q. There was -- obviously, you were first appointed, is that correct?

A. Right. Somehow or another in the back of my mind David Bruck, who I worked with, and John Blume, they were together, and but David called me and asked me if I would accept -- be willing to accept a death penalty appointment. And I think he said Cam Littlejohn and William Monckton were out of the case at that point. And he called me and asked me about that.

He did say at that point that he would not be in the position of, you know, supervising it but he would have someone else, and I guess that's when Ken McNally came in.

Q. And then shortly thereafter Mr. Harris was also put on the case, maybe in the same order --

A. I think David Bruck may have suggested that someone, that I be appointed in the case. I don't remember how that happened. And then Greg Harris came in on the case. And Greg and I shared an office together for 14 years. And I just had, you know, a very close, like brothers, and we confer all the time, so it would -- it was a perfect arrangement. He was in the office, and I thought his skills were incredible, as well. So it was a great combination, I thought.

Q. And then the investigators or the mitigation specialists in the case. There was Lesa Watson, and she was out of Kentucky?

A. Yeah. And I don't remember, we may have gotten her name

through David Bruck or Kevin McNally as someone up in that area who could act as a mitigation specialist/investigator.

Q. And Paige Tarr was --

A. Paige was I believe already involved in the case with Cam Littlejohn and William Monckton. And I knew Paige and knew her husband, who is a lawyer, as well. And we -- I kept her on in the case.

Q. And then there was Carlisle McNair who we have had talked about on direct a little bit. And you said you used him previously before this case?

A. I know we were -- we opposed each other several times in Lexington County when he was a detective, he worked up some of the cases that I tried. And after he left Lexington County it's possible, I believe I said that I may have used him between his retirement, or whatever it was from Lexington County, and the time of the trial. I can't give you a specific case, but I think I did. So I got him involved in the Basham case and used him a number of times after the Basham case. He was my go to investigator for a period of time.

Q. And then we also have on the list a Greg Cook?

A. I don't remember how he got involved. I think -- well, I can tell you he got involved through the West Virginia case, because I think he's an investigator up there and we may have gotten his name from Gary Collias who was my co-counsel in

that case for a period of time I was involved in it.  But I don't remember exactly how he got involved in it.

Q.  So you actually at this point had investigators based out of Kentucky, out of West Virginia, and then out of South Carolina, as well.

A.  Correct.

Q.  Okay.  And going, moving down the list, Harrison Saunders?

A.  Harrison had been working for me since he was about 19 years old in various capacities, in college, law school, and then -- I think he graduated maybe in 2002, law school, and I employed him as a lawyer, as well as having previously employed him as a clerk.  And we're just very close, and he's a very capable and competent guy.  And he's back in my office now.  Not employed by me but sharing office space.  He left for a couple of years to go do some personal injury work but he's back.

Q.  And Steve Hisker, another lawyer?

A.  Hisker was a law clerk who became a lawyer and I employed him as a lawyer.  He and Saunders were the two lawyers in my office at that time that I employed.

Q.  And then I know that there was a Carolyn Graham who I guess was the investigator and paralegal?

A.  She was a paralegal.  At some point, I don't remember whether it was during Basham or after Basham, she and Carlisle McNair formed a business together.  And probably was after

Basham.  But she was my paralegal for a number of years.

Q.  And let's go to the lineup of the some of the experts and then we will see who's left here at the end.  Tora Brawley was the psychologist?

A.  Yeah, Tora is a well-known, respected --

Q.  Neuro --

A.  I think it's called a neuropsychologist.  And she is definitely a go to person when you have a case that requires that kind of discipline.

Q.  And had you used her before, or how did you come across her, do you remember?

A.  Well, I know I've used her, whether it was before or afterward.  She and Donna Schwartz-Watts worked a lot together, so I can't remember exactly.  I've used Donna Schwartz-Watts for a long time.  I've used her, Don Morgan.  I didn't hire Don, I guess he did some evaluations.  Harold Morgan.  So as to where these people fit in, but I have been using Donna for a long time.

And Donna, the reason I like Donna Schwartz-Watts so much is that she calls it like it is.  She has come back and told me I didn't have anything in a case, as well, that she could not help.  So I know that she and Tora worked together quite frequently.  They both might have been employed by the medical -- the school of medicine in Columbia at some point, or the university hospital, something like that.

Q.   So Dr. Brawley and Dr. Schwartz-Watts came on, Dr. Donald Morgan was brought on more as a treating physician?

A.   I met Don Morgan during the Bell case.  I think he was the head of the forensic unit at that time and he headed up the forensic unit for South Carolina for years.  He had been the psychiatrist over at Walter Reed, he was just an incredible guy.  And so he was somebody we called in on this case.  He had retired at that point and so he was brought in on this case.

Q.   Dr. William Brannon, a neurologist?

A.   I have met Dr. Brannon before.  From what I understood from Dr. Brawley and Dr. Schwartz-Watts, his willingness to get involved in the case was a big coup because he did not generally do criminal cases.  But he was a widely respected neurologist.

Q.   Janet Vogelsang, Jan Vogelsang?

A.   I did not -- I met Jan during this case.  And she was referred to us, I don't remember by who.  But she apparently had had experience in a number of death penalty cases.

Q.   And she did his life social history kind of from birth to the point he was arrested.

A.   Right.  Mr. Harris worked with her pretty closely.

Q.   And then we have got -- actually I left out one person who was a mitigation investigator, Melissa Kimbrough, Lisa Kimbrough?

A.   Yeah.  At one point Lisa Kimbrough started doing some of these chronologies and helping us with records, extracting or abstracting from records.  And she was actually in our building, 1720 Main Street.  At some point we moved her upstairs to the offices next door to me that I rented.  And she was right there and she was -- she was very effective.

Q.   We also on the list have a James Aiken.

A.   Yeah, Mr. Aiken was a -- he's been an expert in many death penalty cases.  And I believe he was the warden, I'm trying to -- I apologize, but I can't remember.  He was the director of the Department of Corrections, a commissioner, or he was the warden at CCI.  I apologize, I don't remember exactly.

Q.   You had a couple of law clerks.  It looks like one is Shealy Boland.  Do you remember what she did?

A.   Shealy was one of the law clerks in the office.  I think she might have been Greg's law clerk.  And, of course, she did work on the case, but she was not a -- she wasn't part of the financial -- we weren't charging for her.  I don't believe she was getting any remuneration.

Q.   She was doing the time line or chronology that we're going to talk about in a little while?

A.   That's from refreshing my memory and talking with people, that's what she did.  I have really -- I remember her but I don't remember exactly what she worked on.

Q.   And then you had a jury consultant Diane Follingstad?

A.  Diane Follingstad was a psychologist I worked with on cases before.  And she was one of the few in this area who did any work on jury research.  She had also done a lot of evaluations for me, along with Dr. Harold Morgan in years gone by.  I think she's left the area now.

Q.  And then a couple of reading clerks, Dan Goldberg and David Good.  They would go and read discovery or documents to Brandon Basham?

A.  Yes, among -- it seems like there was something else I had an -- I just can't remember.  Yes, but that's what they did.

Q.  Okay.  There may be a few others.  I think Jean Strickler, maybe, and Linda Brown?

A.  Jean Strickland was a secretary, Steve Hisker's secretary, and she did a lot of work on getting the vouchers together and did the motions, kept track of the motions.  But, yeah, she was another one.  I was just -- the reason I was looking is that she was not actually on paid staff.  We weren't submitting vouchers for her.

Q.  Mr. Swerling, you have been accused of not supervising people closely enough.  And from the questioning on direct it appears one of the allegations is that you weren't directing information that needed to go to certain people.  How would you describe your supervision of this team, this fairly large team spread out over several states?  Would you call it one of a hands off approach or one that was closer to a micromanager?

A.   Well, I mean, I tend to micromanage.  That's kind of just my nature.  And so I probably stayed on top of all these people.  At some point we divvied up the responsibilities, like Mr. Harris, Dr. Brawley and Dr. Vogelsang, or not -- she's not a doctor, I'm sorry.  But, you know, I tried to stay on top of all of it.

The rule was to go ahead and do a memo or to advise me of what was going on.  We had a basket outside my office.  If you did something, whatever it was, it went in that basket so I could review it and I can tell people where to file it.  And generally Greg and I would discuss all the time about followup and how we were going to follow up things.  Again, we were 15 feet apart and we spoke with each other numerous times during the day.  So I believe my -- I had hands on with all of these individuals.

Q.   Let's pull up Government's Exhibit 31, please.

A.   And I believe my vouchers would indicate that.  I'm not a timekeeper, I never did much with -- I probably have had in my 40 years maybe ten people that I've billed on an hourly basis.  But in this particular case I really tried to put down whatever was going on in the case.  But I would say that probably it doesn't even come close to the number of hours that went -- were involved in the case, discussions, phone calls, meetings.

Q.   Let's look at Government's Exhibit 31.  This appears to be

an e-mail that you sent out in September in the case. Can you explain what protocol or what procedures you were putting in place for the case to keep track of all these documents and all this information coming in?

A. Yeah, this is what I was talking about, having -- this was outside my office, and they had to put everything in there and give Greg a copy. And I said in here, this was September of --

Q. '03, I think?

A. I don't even see the date. September -- it says September.

Q. I think down at the bottom, perhaps?

A. Okay.

Q. All the way down.

A. Yeah, September of '03. But that Greg and I would be meeting daily, which, you know, we pretty much did. I don't think there was a day that went by that we didn't have some discussion about the Basham case.

Q. I want to get to this issue a little bit later. Mental retardation, it appears that the suggestion is is that, you know, you didn't pursue that mental retardation well enough or that that information didn't get to the people that it needed to get to. I mean, did you talk about mental retardation? Was that an issue that you and Mr. Harris discussed and discussed with your experts?

A.   Yeah.  I think some of the memos that, or some of my handwritten -- I'm sure there are others, you know, I think y'all have seen.  I don't know, I wouldn't want to overestimate, it's got to be a thousand e-mails in the file, I would think, somewhere in that neighborhood.  But we -- our purpose was to gather the information.  And we virtually subpoenaed every medical record, every jail record, every school record that we could find, and we tried to get it out to the people in one form or another who were going to be following up with it, whether it be Lesa Watson, Carlisle McNair, Carolyn Graham, Paige Tarr, and also in one form or another tried to get to people who were ultimately going to be making some decisions about in the expert area.

     And what I said before was I don't remember the method of communicating, whether or not it was a memo to the experts or a phone call with the experts or sit down with the experts.  But, I mean, obviously what we were trying to do is get all the information we could, follow up on whatever information we still needed, and pass it on.

Q.   Let's go to Government's Exhibit 32.

A.   And if you will notice, Mr. Daley, a lot of these e-mails go to a number of, you know, like ten people or so.

Q.   I was about to say, let's look at the line, the block about who these e-mails were sent to.  So this would have been, at least at the time, perhaps the team in place that you

were sending this e-mail to, is that correct?

A.  At this particular time that would have been -- Linda Justice has been with me, she's my office manager, and --

Q.  That's' --

A.  My personal secretary, Linda Brown, she has been with me like 25 years.

Q.  And then you have Carolyn Graham, e-mail, I guess?

A.  Jean Strickler, who was Hisker's secretary, Greg, Paige. ECR, I think --

Q.  Was there a lawyer from Nelson Mullins involved in the case for a while?

A.  Yes, Christina Rampey I think volunteered some time. Nelson Mullins had a pro bono, I don't know if she came through the pro bono program, but she assisted us for some period time with some research.  Me, Tracey Thierolf, I think that was -- she was one of the secretaries in the office. Shealy Boland we talked about.  CJM is Carlisle McNair, Harrison, and Yetto was Lesa Watson.

Q.  So you are keeping everybody informed.  There's basically, when you are sending e-mails out, when memos are coming in, it's getting shared across the whole team, is that correct?

A.  That was my goal.

Q.  Yeah.  And in this e-mail you are asking several things. One, you are requesting, not requesting, saying they have to do a separate memo for each interview.

A.   Yeah, I don't -- I tell my investigators I don't want a running investigative report, I want an e-mail, I want a memo on each person that's contacted, whether it's fruitful or not fruitful, that's the only way I can keep up with them, and stick them in a file.  So I think that's what I was probably saying there, a separate memo.

Q.   And they had to do a memo within five days, it looks like, from this --

A.   Yes.

Q.   -- e-mail?

A.   Yes, that's what it says.  Should be sent to us right away but in no event more than five days.  Monday of each week Greg and I would like a summary of what was done by you the week before.

Q.   What about team meetings?  Did you gather as a team?  And as he's thinking about that could you bring up Government's Exhibit 47, please?  Actually, the bottom part.

A.   Yeah, that's calling a meeting for December 23, 2003.  And those are the people who were -- Lesa Watson, she was going to be by phone conference, but everybody else was pretty much -- all of these people at that point were on premises, which also was a good thing.  The only one that was not was Lesa. Carlisle had his own office.  But Jack Swerling, Carolyn Graham, Greg Harris, Harris Saunders, Steve Hisker, and I think Paige was using one of the desks next door, as well.

Q.   In your office?

A.   Yeah.  We had -- at that point I had not rented a lot of those offices in the -- next door to my office.  I bought that half of the floor sometime around this time.

Q.   And so you not only had the proximity of a lot of these people physically on the same floor, same building as you, but then to the extent anybody was outside of that area they were being kept in the loop by e-mails?

A.   Yes.

Q.   And did these meetings happen -- I mean this is on December 23rd.  I mean, how often would you have a group meeting like that, do you remember?

A.   I can't tell you how often it was.  I mean, I think the only thing I can to do is refer to the vouchers and the different notebooks I maintained.  I tried to keep pretty good records.  I can tell that you that e-mail was probably, looks like it was typed by me because at that time I only typed in capital letters because I couldn't do very well with the shift so I just typed it in one case, lower case or upper case.

Q.   Let's go ahead and go to claims two and 13, they are related.  Claim two is the allegation that you rendered ineffective assistance of counsel not preparing for and effectively litigating the Jackson v. Denno hearing.  Claim 13 is the allegation that you were ineffective because you didn't argue to the jury that Mr. Basham's post-arrest statements

were involuntary.

A.   Yeah.  If I can, over the weekend -- I had read all of these things, all the motions, all the transcripts prior to last week but I don't know that I felt quite organized on Thursday when I testified.  So I went back and tried to organize it in a different way so one can see what we were confronted with.  What I was talking about, trying to say on Thursday, was that there were some main statements that had been given that were sort of going to be the controlling statements in the case.  And it started with on, I would say, November 20th, which was a Wednesday.  He was arrested on the 17th.  So let me just go over this and maybe make it a little more intelligible than I was maybe Thursday.  He was arrested on the 17th, which appears to be a Sunday, and he was interviewed by David Sloane on site, no Miranda warnings.  He talked about at that point, I believe -- hold on one second. He just -- only statement he made at that point was that I don't know why you are arresting me, he was just walking across the tracks.  There were no Miranda warnings, it was a spontaneous statement, so Miranda would not have been applicable.

On Sunday again he was given his rights by Todd Kelly and at 9:11 p.m. Kelly didn't ask him any questions but he heard another officer ask him something after the Miranda and he said I was shooting in the air.  Robert Brunte, also on that

date, did some interviewing of him after post-Miranda, and this was -- he was from the Ashland Police Department, and Mr. Basham said he did not know about a gun, he threw the gun in the water, he might want to talk to a lawyer. Might want to talk with a lawyer.

MR. BURKE: Your Honor, I would ask the record reflect Mr. Swerling is reading from whatever notes he prepared for his testimony.

THE COURT: All right. So noted.

Q. (MR. DALEY) Mr. Swerling, just so the record is complete, those are just notes that you compiled?

A. Yeah. Anybody's welcome to them.

Q. Reminding -- I mean, okay.

A. And these were done in the recent week or two. They were not something -- was not given to anybody because I just did them in preparation for the hearings. We did litigate that and the court ruled that that was admissible. That was one of the ones we asked the court to rule on.

On Sunday he was interviewed by Mooney, this is on the 17th -- I'm sorry, on Monday morning Mr. Mooney, who was with the Ashland PD, he acknowledges his Miranda warnings, he told Mr. Mooney he did not shoot, he tripped over a log and the gun went off, he fired to get the cop to start -- stop chasing him and he thought the cop was shooting at him. And that was that comment he made in an equivocal statement about a lawyer, I

might want -- need an attorney. And the court ruled that was admissible on February 24th or 25th, whatever date it was.

Then we get into the FBI, Scott Vito, November 18th, which was Monday. And at that time I believe Vito knew that he was a suspect in a South Carolina kidnapping and a kidnapping in Indiana and shooting at an officer. He got there at the jail at 11:00 o'clock and he, because of the equivocal asking for an attorney, he checked with his legal counsel, I guess, and it was determined by them that he could continue to interview him. He had a signed waiver of rights from Mr. Basham on that date. And they just -- what he did is discussed, and I'm giving you just a generality, but there was a general discussion about what happened from the time of his escape. He mentioned -- Vito mentioned Donovan for the first time and Brandon's remark was that last time he had seen Donovan was with Fulks at the Wal-Mart, and they did discuss the Hawkins case, and that was one that we presented to the court in the format that we did asking the court to rule on the voluntariness, and the court determined it was admissible.

Then Vito interviewed him again on the 19th, which was Tuesday, and got him to re-initial the Miranda form and he had a polygraph that day. At that point what he had said was that generally that he last saw Donovan with Fulks and Fulks left with Donovan, came back alone to the hotel.

Then on the 20th, which was Wednesday, Scott Vito, the FBI

agent, interviewed him again and started 11:00 o'clock in the morning. There had been no discussion of West Virginia at this point. And I believe Pat Malley was also there from the FBI. They did a new Miranda form, and the comments that were made generally were that he stayed with Beth McGuffin in West Virginia. He told the FBI that Fulks had gotten an ID and a credit card from a girl in West Virginia.

As far as Donovan was concerned, Miss Donovan, he said that Fulks told him that he had sex with the woman and tied her up. And there was some discussion about the area. About 5:40 in the afternoon Barbara McGuire, who was the chief investigator for the public defender's Office there, came by and she described that she bullied her way in and spent about an hour and 15, 20 minutes with Mr. Basham and told him to keep his mouth shut and not to talk with the FBI but he said he was going to continue. And she advised Mr. Vito after she left that Mr. Basham was going to continue to talk to him. Vito re-advised Mr. Basham of his rights after that and there was some kind of map drawn. That was also presented to the court and was determined to be admissible.

On November 21st -- now, Mr. Harris interviewed Miss McGuire so we knew what Miss McGuire was going to say. We could not call her because she had damaging things to say about Mr. Basham, and we have given both of you and Mr. Burke a copy of that memorandum. But she was not somebody we could

call as a witness for obvious reasons, because she had -- her impressions of Mr. Basham were not good.

On November 21st the public defender went to see him, Mr. Hewlett, and Mr. Harris interviewed him. Of course, Mr. Hewlett, according to the interview, as I recall, said he told Brandon to keep his mouth shut but that didn't work. On November 22nd Mr. Hewlett went back to see him. And so there were two days there Mr. Hewlett went to see him. And now on the 25th, so far there wasn't a whole lot said until we get to the day when McGuire and Hewlett, McGuire is there and then --

MR. BURKE: Your Honor, I would object to the narrative. If the U.S. Attorney has questions of Mr. Swerling that would be fine, but this is turning into a narrative.

THE COURT: I sustain the objection on the narrative response.

Q. (MR. DALEY) Okay. As far as the context that you are trying to lay for us, you are setting forth sort of what happened up to this point and whether he's had a lawyer or not and what he's been advised of, correct?

A. Right. And the purpose of it is that there's been some question about why we didn't vigorously challenge the statements, and the whole purpose of this is to lay groundwork for the court to see that the real statements, the crux of the case came down to statements that were being made after he had counsel, after Miss McGuire came by on behalf of the public

defender's office, after Mr. Hewlett came by on behalf of the public defender's office and he continued to talk.

Q.   Well --

A.   So I was trying to -- what I was simply trying to do is explain that we're getting into the real meat of the cases, of the meat of discussions.

Q.   Well, let's -- let me ask you some questions then regarding -- on November 25th what happened from your memory, and obviously in preparation for what you were going to do with this case, as far as litigating the Jackson v. Denno hearing, what happened on the 25th?

A.   Well, the 25th was significant because at that point Mr. Hughes, Richard Hughes, had been appointed to represent Mr. Basham.

Q.   And he had been appointed by the federal judge I believe in Kentucky?

A.   Correct.  Now, he had -- I think he actually had been appointed a few days before that.  But on the 25th, and just so you know, Mr. Harris went up and interviewed him at one point, Mr. Harris and I went up together to interview Mr. Hughes.  On that particular day Hughes met with Pat Malley at the jail.  The other significant thing is that Brandon had actually called Mr. Malley himself and left him a message saying he wanted to talk to him.

So on the 25th there was a meeting with Basham with

Richard Hughes, who was his lawyer, Pat Malley, and Scott Vito. And this was when there was an advice of rights form done, and Hughes was providing directions to Donovan's body through Brandon Basham.

Also on that date -- so that was coming in, whether -- in some form or another the fact that Brandon was telling them where the Donovan body was seemed to be really critical in the case and it was being done with counsel being present. Malley wrote down Mr. Basham made some statements, or unilateral statements, also about an animal park, the gas station, the cemetery, tape being bought at the gas station.

Q. Now, and, again, this is all in the context so that you are setting up why it would have been -- anyway, why your strategy was the way it was in the Jackson v. Denno?

A. Exactly. Because now we're talking about counseled statements which were going to come in because they were counseled statements. You can start with McGuire and you can question whether or not that would have come in, but Mr. Hewlett was advising him to stop, Miss McGuire was advising him to stop, and now we have an actual meeting where Richard Hughes is telling the authorities how to find Alice Donovan's body and certain landmarks.

So this is, to me, was critical in the case and critical in our decision to try and, as we said on Thursday, embrace the statements, that the fact that Brandon was trying to

cooperate and was not asking for a lawyer, was trying to give them information even though it may not have -- at one time developed or it seemed to be truthful, but it was evolving. And so this was a critical meeting that day.

Q. Okay. And what -- anything happen after that?

A. Well, Mr. Hughes was on the phone with the agents in South Carolina, as well, giving them a description about where Donovan's body was. And I think one of the things that I tried to describe on Thursday was to try to use these hearings to try and get some good statements from the police. I noticed on page 105 of the Jackson v. Denno hearing we, either Greg or I got, Mr. Malley to state that Brandon was cooperating to the best of his ability. So these were the type of things that we were looking for in the way we litigated the Jackson v. Denno hearing.

Of course, then you had on the 26th Richard Hughes at Brandon's insistence --

Q. And on November 26th Brandon Basham at that point is represented by Mr. Hughes?

A. Correct.

Q. And he is still speaking with the FBI?

A. Right. And has now given them information about Donovan's body, which would only indicate one thing, he was present when Alice Donovan was murdered.

Q. And what happened on the 26th then at that point?

A.  The 26th, as I understand it, and from the testimony Pat Malley got a call from Richard Hughes and Brandon wanted him to convey to the FBI, because he was worried about Samantha Burns and he was concerned about the Burns case, that he wanted to convey to the family of Mrs. Burns that the -- their child was dead and the location of the body.  So he put them -- put himself right there in the middle of the Burns murder, as well, with the advice of counsel.  And he gave them information about where they dumped the body.  And according to Malley he passed that information on Joe Ciccarelli, I think is his name.

Q.  If I can now hand you -- or let's put it up on the screen Government's Exhibit 12.  I just want to go through this very briefly.  This was something that you were given fairly quickly after an interview that Greg Harris and Lesa Watson did of the three folks you've already talked about.  Barbara McGuire, who was she again?

A.  Barbara McGuire was the chief investigating -- chief investigator for the public defender's office up in Ashland. I don't know what the name of the county is, but whatever that county was where Brandon was arrested.

Q.  I think it says Polk County here in this memo.  Polk County.  And then who was again -- who was Brian Hewlett?

A.  Brian Hewlett was the public defender, and he was in court on the first day, and he sent Barbara McGuire over there and

she interrupted the meeting that he was having with Scott Vito. And, of course, you can read Barbara McGuire's interview and understand why we could not call her as a witness in the case.

Q. Right. And then the third person interviewed was Richard Hughes?

A. Yeah. He was very cooperative. In fact, he testified here, a portion -- I think the government called him as a witness. But he was the lawyer appointed on the federal case.

Q. Let's home in on couple of things. The top of page two at the -- near the top, if you will, this is Mr. Harris' notes about his interview with Miss McGuire. It appears that she was firm in her belief that he had been given his rights and he had waived them, he understood them, and despite advice to not talk he was continuing to talk.

A. That's correct.

Q. And then on page three she once again in her interview talks about the fact that although jittery, Mr. Basham was calm and emotionless during the four-hour interview. Is that correct?

A. Yes.

Q. And, again, she says that he understood his rights, he understood everything that she had told him, apparently.

A. That's correct.

Q. And, in fact, she, despite everybody else reading him

rights and having him sign an advice of rights form, she, too, did one that said he was waiving his right to an attorney and understood his advice of rights?

A.   That's correct.

Q.   And the next page would be page four, this is where Mr. Hewlett says that he requested that Basham stop talking because he believed Basham wasn't getting any credit for it, and that apparently Basham continued to talk to the police.

A.   Yes, that was on the -- right, exactly.

Q.   And then as far as the interview of Mr. Hughes on page five towards the top, Mr. Harris and Miss Watson in their interviews of Mr. Hughes said that Hughes said that the whole time I talked with him Mr. Basham was totally calm, he was more concerned about the West Virginia case than the South Carolina deal, but that Basham had reached a point where he was going to spend the rest of his life in prison and he decided to assist law enforcement in locating the body of Samantha Burns and Alice Donovan.

A.   That's correct.  And Mr. Hughes, there was no question that Mr. Hughes felt at that point that the best way to help save Brandon's life was to have him cooperate with the authorities and try to find at this point Alice Donovan's body.

Q.   And Mr. Hughes went so far as to even tape his conversation with Mr. Basham where he advised him that he

should stop talking and that Mr. Basham indicated he was not going to follow Mr. Hughes' advice.

A. Yes. Yeah, I mean, correct. Mr. Hughes was telling him that, but he was -- he was going to do it anyway.

Q. Right, and then the last --

A. That's what happened to Burns' situation, as well, as I understand it.

Q. Well, last page, page six, the highlighted portion, please, Gayle. Mr. Hughes also said that as to Mr. Basham's understanding of his constitutional rights, it was Mr. Hughes' impression that he understood them all, particularly because he had been told them numerous times.

A. Correct. And these were the three non-law enforcement people that we had to go to about the Jackson v. Denno issues.

Q. And then you said that you followed up later, so obviously after the Jackson v. Denno hearing. But we might as well go ahead and look at Government's Exhibit 13 now while we're on this topic.

You followed up with and interviewed both Mr. Hughes and Miss McGuire, and it appears down at the bottom of this that Miss McGuire reiterated, the next to last sentence, she said that he was not manic, he was coherent, he was using manipulation. He would not listen but he understood everything.

A. Yes. And he made some other comments which were not --

she described him as having no remorse.  Obviously, what I was saying before, there was no way we could call this woman to testify in the case.  But I forgot, I did interview her with Greg, apparently, on the second trip.

Q.  Why were you interviewing her again and Mr. --

A.  I can't tell you exactly now why we interviewed her again. Probably at that point I thought it was important to follow up on some questions maybe that we had.

Q.  In preparing for the Jackson v. Denno hearing you obviously interviewed these three folks.  You interviewed who else?  You obviously interviewed Mr. Littlejohn and Mr. Monckton.

A.  Yes, we talked with both of them.  Because this was, again, a continuation of counsel being involved in Brandon's cooperation.  They were trying to also save his life and felt like the best way to do that was to have him cooperate.  And, of course, he had advice of counsel at that point in time which would have made the Jackson versus Denno issue very difficult to litigate.

Q.  And did you interview any of the law enforcement that had done questioning of Mr. Basham?

A.  I have to defer to the memos and entries and vouchers.  I mean, independently I cannot tell you whether we did or not. I can remember bits and pieces.

Q.  And so by the 26th at some point it was determined that

Mr. Basham was going to -- he wanted to come down and try locate Miss Donovan's body, is that correct?

A. That's correct.

Q. And so then he comes down and the search ends up being fruitless. But there was the hypothetical that y'all vigorously opposed, correct?

A. I'm sorry?

Q. There was the hypothetical that was opposed by --

A. Yes.

Q. -- Mr. Littlejohn?

A. Yeah.

Q. And that was vigorously opposed?

A. Right, we did oppose that. And we also, I mean, reference back to the transcripts from the Jackson v. Denno would also show that we were opposing, there is at least four, five pages that I was able to identify where we opposed anything, any statements other than statements had to do with directions.

Q. Correct.

A. The issue, to state it briefly, was that there was no proffer given in the case. As everybody knows, the government refused a proffer. And so basically it was fair game, whatever was going to be used -- whatever he said was going to be used. Cam, Mr. Littlejohn, and Mr. Monckton made it very clear to everybody that it was not going to be an interview, but it was going to be used, the whole trip was going to be

used for directions so they could locate Miss Donovan's body.

There were statements made both to the sheriff and to -- about the deer. There were a number of statements made that were not directional and we argued about those, we put forth those should be excluded, as well. The court ruled that all the statements were admissible, including the statements on the 28th. And but excluded -- sometime in, I think in August, the court issued an order excluding the hypothetical but having previously ruled on the other statements like killing the deer and that kind of thing.

Q. So your strategy, in a nutshell, was to challenge, to the extent you could legally, certain statements like the hypothetical being outside, I guess, the scope of the directional -- you know, only directions were supposed to come in as far as --

A. Being allowed.

Q. And that to the extent you were challenging any of the earlier statements back -- the 17th through the 26th, it would have been simply for the judge to make a determination about whether they were voluntary or not, but you weren't going to vigorously oppose --

A. No, we were not. Because what we were trying to do is show this evolution of cooperation, not asking for a lawyer, being willing to talk to the police. And then when it gets down to counseled, where he's being given counsel, that's

where the real meat of the case, that's where it really starts getting incriminating. And you had McGuire, Hewlett, Hughes and Monckton and Littlejohn. So we had to recognize that. And we again tried to embrace all of it to make it beneficial for us to be able to argue later he tried to cooperate.

Q. Let's put up Government's Exhibit 9. Do you recognize this e-mail? Take a moment to read it.

A. I had forgotten about that. What this particular e-mail, what happened was we were given -- I'm a member of certain list serves, criminal list serves? But this particular one was dedicated, I believe, to death penalty cases, as I recall.

Q. Okay.

A. And I remember putting out this e-mail on February 19th just putting it out there to see what people thought about it, and someone named Niland, I guess?

Q. Right.

A. Texas defender organization, e-mailed back this particular document.

Q. And so you were obviously wanting to find out whether there could have been some downside to vigorously opposing or attacking the statements because they were coerced, is that correct?

A. Yeah. And if you see the -- my particular e-mail was that some discussion had taken place, and I don't remember when, or maybe it was --

Q.  I think the judge had suggested, and maybe the government, as well, that perhaps that you could get yourself in a situation where you were going to be, I don't know the word would be estopped, but at least the evidence could come in that you had previously vigorously challenged it?

A.  Right.  And the court, I remember the court saying I'm not ruling on it but it is something for you to consider, and whether or not you would challenge the voluntariness of the statement and then try and later argue that you were cooperating.

That was not the controlling issue here, though.  That was maybe a factor that we considered but it would not have been the controlling issue.  I mean, we had already obviously thought about the idea that we were going to try and use this for our benefit, and recognizing that a number of those statements were really incriminating were coming in because they were with advice of counsel.

Q.  Let's go to Exhibit number 10.  This looks like another response to that question.  Take a moment to look at that.

A.  Yep.

Q.  Again, you're thinking about the issue, you put it out there, you are getting back advice, at least this attorney is giving you the advice that it could be a double-edged sword, isn't that correct?

A.  Yeah.  Could you move this up a little bit?  No, I'm

sorry, down. Down. Yeah, okay. It was from David Ruhnke and a copy to McNally, who was our supervising lawyer to me and Greg. I was just trying to see who it originated from. But Ruhnke was apparently someone who's involved in death penalty litigation, as well. I remember the name. Of course, I also know McNally, or know of his name, I don't know that I've ever actually met him. But we were putting that out there to see whether or not, you know, we could gain some advantage by doing it this way.

Q. And then it looks like if you go to Exhibit number 11 you respond to Mr. Ruhnke and you explain what you are going to do.

A. Yeah. That is actually what I was reviewing with all those statements, and the only one that was not Miranda was the first one at the scene. And then one or two involved other lawyers. I simply wanted the judge to make the necessary Jackson v. Denno findings and not pursue the issue with the jury, right.

Q. Did you have anybody that was going to be able to come in and testify that somehow the statement was coerced?

A. No.

Q. One of the suggestions is that you should have put up a whole bunch of mental health experts to show the conditions made it so that this was an involuntary statement. Did that -- did that approach cross your mind? Was that something

that you thought about seriously doing?

A.  I think I said on Thursday that I certainly probably would have considered those kinds of issues.  However, this was the way we opted to go based on all of the information we had and trying to make what I thought and what Mr. Harris thought would be the best approach with our experience and our knowledge of the case.

Q.  And then you were obviously hoping to be able to then use that attempt to help, attempt to cooperate, you were hoping to be able to use that to some benefit, particularly in the penalty phase.

A.  Right.  Let the jury know -- there was a couple of things going on in the penalty phase, I'm sorry, in the guilt phase. Did you say guilt phase?

Q.  I was talking more the penalty phase.

A.  And actually we tried to develop this all the way through. We put a lot of evidence in in the guilt phase which also would have been something to argue in the penalty phase.

Q.  And in the Jackson v. Denno hearing you were hoping that the police officers would talk about how helpful he was, because they obviously wanted to show that it was admissible, and that would lock down their testimony to some extent?

A.  Well, we were trying to lock down their testimony in the Jackson versus Denno hearings and try to get some favorable comments about the fact he was cooperating.  Of course, the

government was taking a position that he was misleading people all the way.

However, when you get down to the statements that were given by Mr. Hughes, I mean there were certain things there that were irrefutable, the fact of the Amoco station, the fact it was in North Carolina, the fact the tape was bought, the fact there was an animal park sign, those things were clearly, you know, obviously helpful for the government.

Q. Let's go to claim five in particular, the competency claim.

THE COURT: Mr. Daley, I have a quick conference call I have to take at 3:30. You want to take a break?

MR. DALEY: This would be a fine time to take a break, yes, sir.

THE COURT: Let's take a recess, 15 minute recess.

(A recess transpired)

THE COURT: Please continue.

MR. DALEY: Your Honor, with agreement of opposing counsel we are introducing two more exhibits into evidence. They are Government's Exhibit 224, which is a letter to the Fourth Circuit from Mr. David DeBruin, who was appellate counsel in -- it is in support of their CJA voucher. It just tells how many hours they worked and what they were actually requesting for their work in the case. And then Government's Exhibit 225 is one page of Mr. Swerling's notes dated 7-6-04,

July 6th, '04.  So those are two more government's exhibits that are being introduced without objection.

THE COURT:  All right.  Very good.

Q.   (MR. DALEY) Mr. Swerling, let's turn for a moment to the competency issue, about your decision on how to pursue the issue in this case.  In particular, there is question as to why you didn't request a competency evaluation.  I think you've pretty clearly articulated that that's because you didn't want the government's doctors to get to Mr. Basham first as far as an evaluation.  At least in part that's part of the reason.

A.   Correct.  Part of it, right.

Q.   Is it also part of the reason you wanted to limit whatever the -- whatever the doctors did, assuming you are going to put mental health evidence in, which I assume you always knew you were going to put mental health evidence in, is that correct?

A.   Yeah, we knew that from the beginning based upon the history.

Q.   So but one of the questions on direct was well, then once the evaluation was done by Butner then that reason sort of falls by the wayside.  My follow-up question to you would be, though, weren't you also trying to limit the scope of what kind of evaluation could be done by the government doctors?

A.   I mean, I can sit back and try and remember about eight years ago or nine years ago.  I really can't say, but it seems

like that would have been something that would have been on our mind.

Q. Well, isn't it true that in this case the government doctors at Butner were only allowed to do an evaluation up to the scope of the evaluation or the scope of what you were going to present to the court? In other words, they couldn't do tests that you didn't do and since you weren't raising competency they didn't actually do a competency evaluation?

A. Yeah. Actually, you are refreshing my memory and I think that's correct. I can't remember all the details of that, but your statement is correct, as far as I can recall.

Q. And was there any reason that you wanted a full-blown, broad evaluation that would have included a competency evaluation by the government, if you could avoid it?

A. No. I mean, our own experts were saying he was competent and so there really would have been no logical reason to let the government pass on that issue, as well. I mean --

Q. So when you say your experts found that he wasn't incompetent except -- I do want to -- the caveat would be that at least that September 20th after the altercation with the guards, it may very well have been that he was not able to assist you for at least the time, is that correct?

A. Right. According to -- I mean our observations and trying to communicate with him, and Dr. Schwartz-Watts, her conclusion, that is correct. But there were generally no

general issues regarding competency at all. There were individual episodes, but not generally.

Q. And so let's talk about your experts for a second. Dr. Schwartz-Watts, who you said is somebody who is a straight shooter, I think is the term you used, correct?

A. Correct.

Q. She will -- she's testified for both the state and for the defendants, is that correct?

A. She does an awful lot of work for governmental agencies, including the state, you know, in criminal prosecutions. So, you know, I think she has a lot of credibility because of that. She's not gotten into this niche of just testifying for one side or the other.

Q. And then Dr. Morgan, as well, long time, well-respected psychiatrist, correct?

A. From everything I knew about him and my own impressions, yes.

Q. Now, these two were treating him and then also examining him quite frequently, is that correct?

A. Dr. Schwartz-Watts had a lot of contact. I mean, Dr. Morgan, I can't remember how often Dr. Morgan was going down there, but I know he was like the treating -- he was prescribing the medicine, he was the treating physician. I just -- I do not recall how often he went down there.

Q. On direct there was a bunch of -- quite a bit of testimony

about certain things, about his drowsiness, about his wanting

dip, his using coloring books.  All this information presented

to Dr. Schwartz-Watts, I mean, would it be a shock if -- would

she have -- and she knew about this, is that correct?

A.   Yeah.  You know, I spoke, Greg and I would both speak with

her during the course of the trial.  She actually came over

here a couple of occasions.  So, yes, I have no reason to

believe that she was not aware of it.

Q.   And I want to clear this up.  Did all Brandon Basham do

was talk about dip or were there certain times, at least, lots

of times where he was providing you with some information, was

at least engaging in conversations with you, helping you with

the case?

A.   Yeah.  That's what I was trying to say before when Mr.

Burke was asking the questions.  To have dip in my notes

doesn't mean that's the only thing being discussed.  I put it

in my notes, obviously, because I wanted the notes to reflect

that this is really getting -- this was an issue for him.  But

it doesn't mean that was -- I mean, we were in court all day

long together and we had a lot of discussions.  I would be

back there with him in the back.  So there are a lot of things

going on, but I noted the dip because the dip was an issue

that was a problem.

Q.   And whenever something got to be such a problem that you

felt like he was not competent or that there was concerns

about his competency, his ability to be able to assist you in the case, did you call on the court to stop the proceedings and call for Dr. Schwartz-Watts to come and examine him?

A.   Right.   Not only in this case, but in any case I've ever been involved with, that is just something I do.   If there's a question about competency, you try and bring in an expert.   I did in the Bell case a number of times.   I did it in this case several times, as well.   I'm not going to let someone be tried who's not competent without raising the issue and having that person examined.

Q.   And when you went to your experts, I mean, here's the question, when you went to your experts did they ever say, look, we need to stay the proceedings because he's in and out of competency so much that he's not competent?

A.   No.   I think that Dr. Schwartz-Watts appeared before the court on a couple of occasions, and some of them were in camera hearings which I don't have the transcripts from, but there were colloquies, I am sure, that I recall where the court propounded questions to Dr. Schwartz-Watts, as well, as well as we did, too.   So, I mean, she was here when those issues came up.   Nobody ever said we have to stop the proceedings, nobody ever suggested we had to stop the proceedings.   Never saw any reason to try and ask to stop the proceedings.

Q.   You understand that it's an ongoing obligation and

responsibility to monitor whether somebody is competent throughout the trial, correct?  You didn't just make a decision on the front end and say oh, well, he's competent, I don't have to worry about that anymore, did you?

A.  No.  That would be so uncharacteristic of me from my past experience and in this case.  I'm very attuned to that and would not have let that happen without raising the issue.

Q.  Again, was there ever a time where you strategically or just because you were fearful of how it would impact the case not bring it to the court's attention if you had a concern about Mr. Basham's competency?

A.  No.  I mean, I think the record has those indications in there that I did bring it to the court's attention when I thought there was a problem.  Mr. Daley, Brandon was a difficult client.  Like I said, I had a lot of empathy for him but he was difficult, and we did everything we could to try and keep his attention focused and to keep the trial moving and make sure, ensure he got a fair trial.  But that doesn't mean he was an easy client.

Q.  No, I certainly wasn't meaning to --

A.  No, no.  I just want everybody to understand that.

Q.  Have you had other clients that were difficult like Brandon Basham?

A.  I have had several.

Q.  And they -- and what would happen in those cases?

A.   I'd bring in somebody who I thought was qualified to try and either give an opinion to the court that the person was incompetent, or insane.  Had some insanity cases, which in South Carolina are very difficult because of the McNaughton standard.  But I am not hesitant to bring in someone if there's a mental issue involved and there's a competency issue and whether or not the person is participating to some -- to the extent that they want to in a trial.

Q.   Let's go and pull up Government's Exhibit 225 while we're -- if you can blow that up just a little bit, Gayle, maybe the first -- a little bit further down, too.  There you go.

     Mr. Swerling, this appears to be notes that you took on July 6, 2004.  Can you read that what that note says?

A.   Yeah.  Conference with Brandon.  He mouthed off to Captain Johnson.  There was an altercation with four guards and he was carried to the room.  Actually, it seems like I was there when this happened.  They were bringing him to me, seems like that was the case.  Carried him to the room, left -- let out after 30 minutes, spent the -- he spent the whole time talking about the incident, about the guards and who was at fault, who started it and this and that.  And then he was manipulating me to buy him dip.  Brandon --

Q.   You used that phrase "manipulate" a number of times.  What do you mean by that?

A.   Well, Brandon, with me and a couple of the law clerks, the readers, was always trying to convince somebody to bring something in there.  And dip would have been contraband.  And, you know, he liked dip because it gave him a kick, a high.  I guess some high.  I've never had it.  But, I mean, the dip was obviously, during the trial, this was back in July and when he wanted me to buy him -- to get him dip, which I had no problem with the financial part of it, it was just bringing it into the jail, I wasn't going to do that.  So he plays games trying to get you to -- he will stay on a subject trying to get you to concede eventually.  And I can't -- the readers were under instructions they were to bring nothing into the jail.  I specifically remember a couple of instances, and I can't remember exactly what it was he wanted, but there were a couple of instances where he wanted them to sneak something in there.  And I just wasn't going to allow it.

Q.   I'm now interested in focusing on this middle part of the notes.  Would you, Gayle, would you mind just highlighting this little part right here?

Can you read what your notes say.

A.   The number 5434 and 55 --

Q.   Is that like a discovery number?

A.   It could have been a Bates stamp number, but it was something I must have been going over with him and said he can read very well, he also has complete comprehension.  For

example, 5433, which was a letter from Cabinet, that was one of the institutions, he understands this was a finding. So I made a note of that at that time. What date is that?

Q. That is July 6th, '04.

A. Okay.

Q. Is it your memory that he could read well, or you don't recall now? I mean --

A. I don't recall but that -- the note has to speak for itself. I wouldn't have made the note if he did not. Whatever was going on that day he read it and I made that note.

Q. Okay.

A. But I don't have any independent recollection of that.

Q. I understand.

MR. DALEY: Beg the court's indulgence for a moment, please.

(There was a pause in the proceedings)

THE WITNESS: Mr. Daley, and also with reference to that, I thought it might have been pretty important to make a note of it and that's why I did. It must have been important to me at the time that he could read or was reading.

Q. (MR. DALEY) Okay. We will pull up Government's Exhibit 14, please. Mr. Swerling, I think I'm going to give you the original here so you can read the whole thing.

MR. DALEY: May I approach, your Honor?

THE COURT: Yes, sir.

Q. (MR. DALEY) Handing you Government's Exhibit 14, if you'd take a look at that for one second. What is that?

A. It's one of the e-mails, a number of e-mails between myself and Melissa Meister dated April 15, 2008. She was asking me a question about the competency hearing and why we didn't want him assessed. And I responded -- initially I didn't get the text in her message but then I did and then I answered saying our own psychiatrist said he was competent, and she said thanks for the quick response. It was like four e-mails on one page, it looks like.

Q. And so you're telling the appellate attorneys why you -- why competency ended up not being an issue in the case.

A. Right.

Q. For the same reason you are saying right here, correct?

A. And I would also say if competency was an issue there was no reason for me not to raise it, I would have raised it. No benefit to me not to raise it, no reason I wouldn't raise it.

Q. Let's pull up Government's Exhibit 160, please. Mr. Swerling, this is a chart of time spent with various people and I wanted to just get from you, on this chart it appears that you met at least 40 times or talked with Mr. Basham 40 times for a total of 61, a little over 61 hours. This comes from your CJA vouchers. Does that sound like -- does that sound low or high, as far as the amount of time you spent with

him outside of court?

A.   I would say that -- I would say the overall hours that I spent on the case are probably underestimated because they probably didn't include a lot of things that we were doing, discussions, phone calls.  I tried to be as accurate as I could, so if I said if there were 40 entries and 61.35 hours, I would try -- I would like to say I think that that is accurate.

Q.   But at a minimum you met with Mr. Basham at least 40 times before trial?

A.   That's correct.

Q.   And Mr. Harris met at least 50 times with him, is that correct?

A.   Yes.

Q.   Which looks like it works out to over 160 hours total?

A.   Yeah.  And in actuality the reason, Harris went up to Butner more than I did.  The agreement was when they were going to -- Dr. Capehart was going to talk to Brandon one of us was going to be there.  So we went up there to Butner, but I think Mr. Harris went more often than I did.

Q.   And actually, looking at this chart, and it turns out that between 40 and the 50 times there are only four times, apparently, where you went and met him on the same date.  So we were talking about 86 times at a minimum that the two of you met with Brandon Basham.

A.  Yeah, that would be accurate.

Q.  And if issues came up did you -- would y'all communicate about issues that might be coming up with Mr. Basham, or just in the case generally, but with Mr. Basham in particular?

A.  Sure, we communicated all the time.

Q.  And if there was a concern about his competency you would have shared it with one another, correct?

A.  Yes.

Q.  And if you needed to you would have sent Dr. Schwartz-Watts out to examine him, to talk with him, correct?

A.  Yes.

Q.  And, in fact, she did, didn't she?

A.  Yes.

Q.  Let's go down to the bottom here of this same chart.  And it looks like you met with Dr. Schwartz-Watts the chart says 29 times and for a total of almost 70 hours.  Again, does that sound like a reasonable amount, or maybe met with her more, or hard to recall?

A.  You know, the only thing I can pass on is the overall hours.  Individually I would assume that is fairly accurate. It might be a little bit under, it's never over.  I always give the benefit of the doubt to being a little bit less, you know.  And, for example, if I thought it was an hour, I wouldn't hesitate to put down 55 minutes because I just want to make sure I was trying to be accurate.  So I underestimated

a little.

Q. What I'm trying to get to is is this an ongoing obligation of yours, Mr. Swerling, to make sure that he is competent, is that correct?

A. Yes.

Q. And so you're meeting with your forensic psychiatrist, the woman that you hired to deal with mental issues, correct?

A. Yes.

Q. And you're providing her with records, right? She's not sort of doing this on the fly, correct?

A. She and I spent a lot of time together, yeah.

Q. And, again, if concerns came up you would have relayed those to her, is that correct?

A. Without hesitation.

Q. And it looks like Mr. Harris met with her another ten times, for a total of basically about 84 hours, it appears, if you take away the common hours. So this is not an instance where you are not conferring with your forensic psychiatrist.

A. No.

Q. You didn't just -- let me put it this way, you didn't just simply say, here, Dr. Schwartz-Watts, go and give us an evaluation and then we will use it in court.

A. No, it wasn't like that at all. And I think that the vouchers would and my notes would clearly show that I was managing the team and trying to meet with them and keep

pushing them forward.

Q. If he had problems sleeping she would have known about that. You would have relayed that to her, correct?

A. I would have relayed to her anything I thought was important, yes.

Q. The dip, that issue, you --

A. She was well aware, everybody was aware of the dip issue, yeah. That's what he missed when he was in jail, he missed the dip.

Q. On September, I'm sorry, not on September -- how about on February 24th of '04, this was before the Jackson v. Denno hearing, you asked for a delay so Dr. Schwartz-Watts can examine him, is that correct?

A. Right. There was some issue in court that day.

Q. And isn't it true that he, right before he got into court, said he was hearing voices?

A. I don't remember that, Mr. Daley. But I guess the note would reflect it or the court proceedings would reflect it. I don't remember.

Q. Okay. I may refresh your recollection with some notes, some transcript pages. But let me ask you this --

A. I think Mr. Harris made that comment about that, according to -- Mr. Burke asked me a question about it and I remember reading something Mr. Burke had up there, Mr. Harris was saying something about hallucinations, if that's the same day.

**JA 4401**

Q.   It is the same day.  And do you recall that the judge

actually ended up having one of the marshals come and testify

about whether -- about this, how Basham had acted before he

got there?

A.   Yeah.  I think the judge was asking some questions of the

marshals as to how he was reacting or how he was acting before

he got into court that day.

Q.   And do you recall that at least there was some mention

that he didn't seem to be hearing voices until just before he

got into court?

A.   I think the marshal testified that he was fine.

Q.   Again, I know that you are not an expert, but would this

be another example of ways in which he might try to manipulate

the situation to get what he wanted?

A.   Yeah.  I mean, I think that I have said that Brandon was

street savvy and smart and when he wanted something he would

devise ways to go ahead and get it.  So that, to me, is

manipulation.

Q.   And at least in one instance he was able, I don't know if

you saw in one of the previous e-mails, he was able to escape

for a short while.  In fact, let's go to Defense Exhibit 55,

if you don't mind.  And this is an interview Steve Hisker did

of the public defender in -- I believe it's in Kentucky.

A.   Let me just answer it.  That being said, what I just said

doesn't mean that if we thought that this nicotine gum or the

**JA 4402**

coffee or the dip would assist the situation, you know, we didn't try and assist, because there were indications that he needed some sort of kick.  I think the court tried several things, nicotine gum and the coffee, even some -- there might have been some Mountain Dew or something.  At one point there was some drinks or drinks with caffeine in it.  There were several attempts made to try and give him some sort of stimulant.

Q.  Would you mind blowing up just the text?  What I'm interested in is that, one, he escaped.  You did know he escaped from a courtroom prior to this case?

A.  Yes.

Q.  And that as a result of Brandon Basham, who although he may have a low IQ, you say he has street smarts, he actually had -- they changed the way they did business in Hopkins County Courthouse as result of Brandon Basham, isn't that correct?

A.  I think that's correct, yes.

Q.  Mr. Swerling, were you -- if you had tried to put up, let's say you tried to strain and put up a -- let's say you went and tried to find an the expert to say he was incompetent, let's say you were advising another attorney, do you think that would be a wise approach in this case?  Because that's basically what they are saying you should have done.  Or you should have tried to force a competency issue where you

didn't see one. Because, I mean, I want you to be able to respond because that's the allegation against you, Mr. Swerling.

A. We had -- I mean, our investigation tried to cover every aspect of Brandon's life, the people knew him, people saw him regularly, the people that treated him. And so, obviously, we were trying to find anything we could about his mental health, his -- issues related to mental health. So we were trying to find anybody we could that could assist in that area. Which would include, you know, if there was any issue about competency. No one ever said he was incompetent, that I'm aware of. My memory could be refreshed, but there's thousands, what, a hundred thousand pages or something somebody told me, but so I don't -- I mean, it really would have been trying to manufacture something because there was nobody said he was not competent. In fact, the three people, for example, just Hewlett --

Q. Hewlett?

A. Hewlett, the lawyer.

Q. Um-hmm.

A. And McGuire and Hughes all did, you know, they were saying he was competent. I assumed that Mr. Littlejohn, Mr. Monckton would not have let him show these people, attempt all day long on Thanksgiving of 2002 to try and show where all these -- where Miss Donovan's body was and these different landmarks if

they didn't believe he was competent at that time.

Q.  So they never told you he was incompetent at that time?

A.  Not at that time.  I don't believe a lawyer would have let him do that if they thought he was incompetent.  I -- now, I'd be shocked if someone said he was incompetent on November 28th and they let him talk to the police and the authorities and led him on that -- led them on that excursion.  So I guess what I'm saying, there was really nobody, even people that -- non-law enforcement who said that.  And plus our own people who are saying he was competent.  If there had been an issue about competency we would have followed up with and pursued it.

Q.  The September 20th scuffle that led you to ask for a delay for a competency evaluation by Dr. Schwartz-Watts?

A.  Correct.

Q.  Next morning, no question she found him competent?

A.  She came in the next morning and told the court what her findings were, what she found, and that he was competent.

Q.  And, interestingly, that same morning he decided he's going to tell everybody that he's taken -- taken some cocaine?

A.  Yeah.  But I think didn't it turn out that there was -- I think the court gave a test or had a test administered by Probation.  It turned out there was no cocaine.

Q.  The record does reflect it was -- was field tested and it was negative.

A.   Yeah.  Which just showed he wasn't telling the truth.

Q.   And --

A.   If I recall correctly.

Q.   And then the one other time where you had a concern you -- this is on October 26th, I think right before the testimony of Tora Brawley, you again brought up the fact you heard his speech was slurred and that you thought maybe there should have been a delay?

A.   If that was the -- what was being referred to before, yes.

Q.   It was, yes.

A.   Yes.

Q.   So, again, when you had concerns you brought them to the court's attention.

A.   Yes.

Q.   Throughout --

A.   Always.

Q.   From the Jackson v. Denno hearing back in February up through near the end of the sentencing phase.

A.   Yeah.  I mean, here's the thing.  If he had demonstrated any signs of incompetency that would have only helped us in trying to save his life.  That was the whole goal.  You know, it would have contributed in some way to help us to do that.  I mean, the whole goal here was to save Brandon Basham's life, so there would be absolutely no reason at all for me not to pursue it if it was there, if somebody was saying it was or if

anybody observed that he was incompetent. We're talking about some situations but not overall. Everybody thought he was competent.

Q. Let's move to claim nine where there's an allegation that you shouldn't have conceded guilt, certainly not every -- not to the extent that you did. And I think we have gone over, I think, you and Mr. Burke went over it fairly well. I would want to, though, point to Exhibit 20, which is the transcript of the ex parte hearing right before opening statements. Have you actually seen that?

A. The ex parte hearing?

Q. Yeah. I mean you were obviously there.

A. I didn't have -- the trial transcript was furnished to me but I don't remember getting -- the ex parte hearings were not part of the trial transcript.

Q. Let me --

A. Somebody may have shown me one at the meeting at your office.

Q. You may have seen it at one of our interviews, but let me give it to you and have you read it for a moment. I just want to ask you a few questions after you've had a chance to read it.

(There was a pause in the proceedings)

THE WITNESS: Yeah. I was pretty up front about it, about my conceding, except the carjacking.

Q.   (MR. DALEY) And you did it -- having read that, and you may have remembered this anyway, this was discussed with Mr. Basham, is that correct?

A.   Yes.

Q.   And then it was put on the record, obviously, I guess anticipating that this could be a claim later on, it was put on the record and the judge actually had a short colloquy with Mr. Basham, correct?

A.   Correct.  The reason I did that is that I have seen several situations where lawyers have done that and then the client comes back later and says well, I never authorized that.  And I recall either in conversations with -- I'm a member of certain groups that attend certain conferences, and I remember having some discussions with lawyers at one point or another, you know, that it's probably better to put it on the record, make sure you establish a record about it if you are going to go ahead and do that.

One of the cases that I particularly remember was I was a local counsel in, and I think the lawyer -- the client later said the lawyer didn't have the authority to concede, that she was -- I think it was -- this was a CCE case, continuing criminal enterprise case, and he conceded certain issues up front to try and save her from the CCE, but she was convicted anyway.  That was years ago.  So, I mean, it's not something -- this is something that's out there and so I

thought it would be prudent to put it on the record.  And, you know, he agreed, he understood.

Q.  And when you then got later in the trial did you in fact make reference to your concessions, to your concession in the front end later on when you were doing your closing at the penalty phase?

A.  Right.  That is what I said before, that I wanted to let the jury know why we were starting this trial, what we were -- what they weren't going to have to be concerned about and what they needed to be concerned about.  And I tied it back up later that that's what we told you at the beginning of the trial.  And that was all trying to maintain our credibility with the jury going into what we knew was going to be a penalty phase.

Q.  And let's go through it one other time, one more time, as far as why didn't you do the straight up guilty plea.  What were the reasons that you didn't just say he's guilty, let's go to the penalty phase?

A.  Well, I mean, my experience is they don't work, and they did not work in the Fulks case.  So, I mean, we had something that had just taken place a couple of months before so let's try another approach and instead of putting it all into a penalty phase of the trial and having the jury decide that one issue, I thought that we were better off having to bifurcate a trial, guilt or innocence, and then go into the penalty phase.

But, you know, we put a lot of evidence, let a lot of evidence come in in the guilt or innocence phase trying to let the jury know what they were going to be -- what was going to be coming anyway. So sort of trying to desensitize them to what we knew was going to be coming in the penalty phase of the trial, front loaded in the guilt or innocence phase. For example, the Samantha Burns kinds of stuff. It was coming in.

Q. Claim number ten is an allegation that you rendered ineffective assistance of counsel by ignoring Mr. Basham's request to leave the courtroom right before his scuffle with the marshals.

A. Right.

Q. I think you've already said that you wanted Mr. Basham in the courtroom if the jury were in the box.

A. Yeah. I don't remember exactly the dialogue. There was one occasion where I asked the court to let him leave the courtroom and --

Q. This is a -- this is not that -- that is an allegation you didn't request and he didn't --

A. And I just remember a period of time where I just -- maybe just it was time to let him go out of the courtroom at that moment. Not permanently, but, yeah, at that point. I mean, I was asked my strategy. My opinion is that he needed to be there in front of the jury, he did not need to be absent. I had that happen with Bell, that Bell was not --

Q. Larry Gene Bell case?

A. For a short period of time he was -- the judge told him he could watch the trial, because he was very disruptive, he could watch the trial from a holding cell, as I recall.

Q. And I think I do recall that. In fact, that's one of the cases I believe we both briefed in getting ready for this case. How do you feel that impacted the verdict? How -- was there a -- did you notice a reaction, or what did the jury think, if you recall?

A. I can't specifically remember a reaction, but I can't imagine a jury not looking over at the counsel table and seeing the defendant not there and they are going to have to surmise or they are going to have some conjecture or speculate as to why he's not there, and it can't be favorable.

Q. Did you see this altercation coming? I mean, was that surprise to you?

A. Actually, I didn't that coming. I mean, I think I was -- I knew there was an issue here because he was insistent at that point, and but I did not realize, I did not see that coming. I think someone put their hand on his shoulder.

Q. I believe --

A. That's when he went just ballistic, and that I didn't see coming at all. Couldn't imagine he was going to fight in the courtroom.

Q. So have you ever allowed a defendant to voluntarily absent

themselves?  I know that in Larry Gene Bell he was forced out because of his conduct.  Have you ever agreed to let a defendant sit out?

A.  No, not that I can recall.  I just don't think that's something I would agree to.  I can only think of that one occasion it happened it was involuntarily done.  But it may have been more than one occasion.

Q.  We have already gone over the Jackson v. Denno hearing, and we sort of brushed over a little bit, but claim 13 actually is an allegation that you were ineffective, you and Mr. Harris were ineffective for failing to argue to the jury that Basham's post-arrest statements to law enforcement were involuntary, that you should have argued that to the jury. You probably don't need to add much, but what's your response to that allegation?

A.  I mean, especially when you get to the jury you want -- our whole strategy was to try and develop this, you know, evolving cooperation and not asking for a lawyer, being cooperative with law enforcement.  So I just don't think it would have been very -- it would not have been consistent to argue with the jury, it would have I think a negative impact if we took would the position that he's cooperating and trying to help authorities to his limited extent, because he obviously did not know that area, but then to come in front of the jury and say it was all involuntary.

Q.   I think at least in one conversation we had is that you would lose credibility with the jury if you tried to do that.

A.   Yeah, that's probably a better way of saying it.  But credibility is big issue with the jury.  You want to maintain credibility with the jury.

Q.   And the reality is you are not one who thinks that you should throw up every possible defense, you want to try to have a consistent theme and try to have a specific strategy, and you are going to push aside other things that might clutter up that strategy.  Is that a fair statement of your approach to trials?

A.   I watched other trials and I have seen lawyers, and it's just everybody has got their own approach, but I have seen lawyers throw it all up against the wall and hope something would stick, and that's just not the way I approach trials.  I like to try a theme and go for that and just not throw it all up there, see if one of it sticks.

Q.   Let's go to claim 14.  And I don't think we will spend much time on this, but I do want to cover it.  Claim 14 is the allegation that you had a personal conflict of interest that impacted your representation of Mr. Basham because you had been a victim of a home invasion, I think it was in 2002.

And, in particular, I think the allegation is that there was a close proximity in time to when the case was tried and that there were similarities in the charge that the defendants

in your case where you were a victim and the charges that Mr. Basham faced, those were similar, and finally that you had -- during your trial you grew angry with some approach that the defense counsel had taken in the case.

A.   The crime took place in the summer of 19 -- 2002.  It was a personal tragedy, two individuals entered my home with a pistol.  My wife and my daughter and I were sitting in the den.  They tied us up face down, they continually threatened me with a gun.  They wanted money.  And for about an hour my daughter, my wife, and I were laying on the floor and we were basically terrorized, okay?  It was a personal tragedy, one that took me -- obviously, it takes a while to recover from those things, as anybody would expect.  But I did.

It did not affect my representation of Mr. Basham or any other individual because I am dedicated to the defense of criminal cases, been doing it now for almost 40 years.  And I have my own, you know, standards by which I follow when I represent someone.  So it did not affect that, and never would, never would.  When the trial -- during the Jackson v. Denno hearings, somewhere around that time, I think we had the trial which, would have been in 2004.

Q.   I believe the trial was the first or second week of February of 2004.

A.   Something like that.  Yeah, it was very close in time to the Jackson v. Denno hearings.  And I remember I think there's

an allegation that I -- my attention was diverted during the trial.  But it was I was involved in a trial as a witness, my daughter was a witness, my wife as witness.  You know, we certainly thought we were going to be killed that night, or there was a good chance of it.

And but it's interesting that during that period of time when I was in the trial there was an entry, or at least one entry when I worked on the Basham case for three-and-a-half hours on one of the evenings, so it didn't divert me too much because I worked on Basham.

The defense in that case, I had no problem with them having lawyers.  Obviously, he was entitled to a defense.  The lawyers, who I knew, I brought them out to my house, showed them everything in my house, where the guy would have been hiding, when they came in, what they did.

Q.  You took the defense lawyers --

A.  Took the defense lawyers out there.  I mean, I'm a defense lawyer myself so I tried to make their job as easy as I could.  During the trial, to the amazement of everyone in the courtroom, because there was a lot of people in the courtroom, they suggested that my daughter was an accomplice in the case, that my daughter had left the door open, that her hands were not tied as tightly as mine.  And it just really shocked everybody in the courtroom.

And most of the people in the courtroom were my friends,

were lawyers, just could not understand where that was coming from. So when the verdict came in it was guilty and it came back in just a few minutes. When Judge Williams was going to sentence Mr. Causey, Causey would not come out of the holding cell to get sentenced. And I got upset.

And, you know, I yelled a little bit and I told the lawyers what I thought about the way they handled the case. And what I was referring to was about my daughter, suggesting that she may have been an accomplice in the case. So I yelled some and told them I didn't like what they had done.

And the next day when I calmed down I went around to every judge in the courthouse who was also -- most of them were there when the sentencing took place and I apologized to them because I had lost my -- I really just momentarily lost it. And, you know, it was about my daughter.

Q. And now let's go --

A. I still don't understand why they did it. None of them ever -- and have never provided any kind of explanation before it. Nobody has.

Q. But now let's get to your representation of Mr. Brandon Basham as far as how this -- did this impact your defense of Brandon Basham?

A. No, absolutely not.

Q. Did it make --

A. I'm still a lawyer.

Q. Did it make it any difficult, just a smidge? I'm just not going to work quite as hard because I now see what it's like to be a victim? Did that impact you at all?

A. My handling of Brandon Basham's case was in no way affected by my own personal problem. And I never, I can honestly say this, it has never entered into my mind in the defense of any case. And I've tried a lot of cases since Brandon Basham's case. It's just not a factor in my work. It was a tragedy and took a while for my family to get over it.

Q. Was Brandon Basham any less a priority when you were appointed in 2003 than he was the week after or the day after this trial?

A. He was always -- he was always a priority. And, as I said, I think the records will reflect I worked on the case several hours during the trial. I think when we were in your office I looked at it and whenever we pinpointed the date I remember some entry of like three-and-a-half hours on one of the days of the trial.

Q. And if I remember right you've actually, with Mr. Burke's knowledge, you still keep up with Mr. Basham, is that correct?

A. Yes.

Q. And, in fact, have you told him that he shouldn't drop his appeal, he shouldn't give up?

A. He called me some time ago, whenever this issue came up, and was telling me about he wanted information about waiving

**JA 4417**

the appeal.  I said Brandon, I'm not giving you any information.  The only thing I can tell you is you listen to your lawyers and you take advantage of everything the system affords you, you know, as far as this particular sentence is concerned.  And I've never hesitated from telling him that.  I mean, it's just --

Q.  So you are encouraging him to keep up his ineffective assistance of counsel claims against you --

A.  Sure.

Q.  -- in effect.

A.  That's part of the system.  And why I have -- I mean, I would never do anything other than that.  I spoke with him on the phone and I've written him letters and he writes me letters.  Every once in a while he wants a few bucks and I don't hesitate to send it to him.

Q.  Let's go on to claim 15, ineffective assistance of counsel for failing to object to the 404(b) evidence, or at least to the extent of the 404(b) evidence, in particular the Samantha Burns kidnapping evidence.  And specifically the allegation is in the guilt phase.  I don't think they are making any allegation about the sentencing phase, if it had come in then.  And their allegation is is that you should have, I guess, done a motion in limine to limit the testimony of the family members.  I believe if you were to reduce it down that would have been -- that's their real complaint.

A.   Right.

Q.   So why didn't you?

A.   Well, again, I can not specifically recall my thought process eight years ago.  I have gone over in my head what would have been the factors in my head even as late as the lunch hour trying to think about that.  And, again, the government was using those witnesses to establish certain points during the day to prove that she would not have just absented herself, that she was missing.  And certain, like the candy box and the money in the candy box and the license plate, there was a stadium seat, different things that each witness came brought to the table.

     And I guess one of the things that would have been on my mind is we're using this part of the guilt or innocence phase, we're going into a penalty phase so let's front load it a little bit.  So I let it in.  It's coming in anyway and I'm not going to object to a mother or father or sister or aunt being on the stand.  I did not think that any of the evidence that came in on the, still don't think, that any of the evidence that came in about Samantha Burns affected the verdict in the case because I think the verdict was pretty much going to be what it was going to be.

     So I just used my judgment, my experience, my instinct and did not object to it any further.  I did not object to it beforehand, either.  And I guess getting it in, put it before

the jury, and so they would not have been shocked when they heard it during the guilt or innocence phase -- I mean during the penalty phase.

So I think it was a logical process in my mind. But, again, specifically I can't tell you, I just can tell from you my experience those have been some of the things I would have been thinking about. And not to object, you know, the lawyer needs to learn when not to object as much as when he needs to object.

Q. Claim 16, the claim that you failed to request the trial court to admit the closing argument, at least a portion of the closing argument statements in the penalty phase of the Fulks case into your case, into Mr. Basham's case. The failure to reraise that issue.

A. You mean the puppet on the string comment?

Q. Correct. Were you concerned about the fact that if you let in a little bit of it that the court might potentially end up allowing most or all and then you would actually end with two closing arguments, basically, in front of jury that were done by the prosecution?

A. Well, certainly that was going to -- that was a possibility. I mean, I think Scott Schools and Johnny Gasser are very sharp prosecutors and good prosecutors. Gasser and I have tried a number of cases against each other before. I think that was my first experience actually trying a case with

Scott.  But they were already anticipating that and there were discussions about it at the August hearings.  So I wanted to keep it as clean as possible.

And my argument and their argument, the only way it would have come out is if it was really inconsistent, they took inconsistent positions.  I think -- well, actually that's one of the ways it would have come out.  The other way would have been just if they had changed their theory of the case.  And they were already thinking about it and they were very shrewd about it saying that, you know, we were not saying he was a puppet on a string with regards to the murders, it was a team effort.  The puppet on the string comment had to do with other things that Brandon and Fulks did together and that Basham did at Fulks' request or insistence.

And I thought that that had really been established during the testimony in the case from the jailers, all throughout, that Basham really was a follower, that Fulks was the leader.  Fulks controlled the money, Fulks did the driving, Fulks knew the areas, they went to places that Fulks knew, Fulks was in control.  So I thought we had really covered that without getting into a potential quagmire and problems during the closing statements.

Q.  Let's go to claim 17.  And if you would pull up Government's Exhibit 23.  This is the allegation that you failed to cross-examine Clifford Jay or call a rebuttal

witness after he testified on direct that Mr. Basham on

Christmas Eve 2002 told him in response to some questions from

Mr. Jay that we killed them.  And you did cross-examine

Mr. Jay but he held firm to that, that statement.

A.  Right.

Q.  I just wanted you to look at this Exhibit 23 and tell me

what is this exhibit?

A.  Well, this is a note made, apparently what this is, I

think I guess I had -- I probably had typed up what each

particular witness, the highlight of what they were going to

testify to.  And then I wrote on the page what's here, decided

not to offer impeaching evidence to keep him as potentially

favorable in the penalty phase.  If we impeach him he would

probably potentially become unfavorable.

Clifford Jay had some good things to say about Brandon, he

had some negative things to say about Brandon.  This

particular thing had to do with he had told us when I was up

there, and I believe when Mr. Harris was up there, that

Brandon had called and said we killed her.  So this particular

statement seemed to be inconsistent of what he had told us.

So when he testified that and wouldn't back off of that I

decided not to impeach him, it was one of those instinctive

things that I thought was the best thing at that time not to.

And I made a note about it because, you know, obviously it was

important for me to go ahead and make a note and to

memorialize it so I would remember it.

And I decided not to because I thought that we would -- might potentially call him during the penalty phase of the trial, did not want to impeach him.  The fact of the matter is the evidence was already in there that both women had been killed so I didn't see it was worth losing him as a potential penalty phase witness then by impeaching him.

The other thing was the two police officers in the case, I think some police officers had also written down that he had told them that, as well, and I was just not going to call the police officers as an impeachment witness because you can't control what happens when they get up there.  And they are certainly not favorable to you.  So I think all of those things went into that decision not to go ahead and impeach him on that.

Q.  And you had -- you had gotten a heads up there had been a 302 done where he had been interviewed by the FBI and he said that Basham had told him we killed them.

A.  Yeah.  That must have been where that came from, number 90, it must have been advising that we killed them.  That came from some document that I knew he was going to be inconsistent.

Q.  Well, it looks like not only did the FBI do their 302, but then Mr. Harris went back up there on August 5th, '04 and found out that that's what Mr. Jay was going to --

A.   Yes, he was interviewed a couple of times, once by me and maybe once together, or once together and once by Greg.

THE COURT:  Let me jump back in again here.  This came up last week, of course, and I still don't understand it. Is it the defense's contention that Mr. Swerling had some type of knowledge or documentation that two law enforcement officers had interviewed Mr. Jay and was told that the statement was we killed her?  I think you said that was not the case, that the statements were somewhat ambiguous or non-descriptive in terms of it was one killing or two, is that right?

MS. STONE:  That's correct, your Honor.  That our position is they were law enforcement officers whose reports did include the we killed them statement, and they had interviewed Mr. Jay previously to Mr. Long and at some point Mr. Jay added that information to Mr. Long.

THE COURT:  And let me ask one question.  Mr. Swerling, what type of favorable information did you think Mr. Jay could provide at the sentencing, penalty phase?  He had known him as a schoolchild, in other words?

THE WITNESS:  He had some favorable things to say about him, as I recall.  There should be a memo somewhere.

THE COURT:  Right.

THE WITNESS:  But he was -- he liked Brandon.  And that was the thing, it was obvious he liked Brandon.  This was

not something he felt comfortable about going over with us.

THE COURT: And I remember you actually put on the record, I think, if I recall correctly, that you were making a conscious decision not to impeach Mr. Jay at that time for the reason you stated. Is that correct?

THE WITNESS: Judge, I don't remember if I put it on, but if that's your recollection -- I'm not sure.

THE COURT: Isn't that in the transcript?

MR. DALEY: It's in the transcript, your Honor. And Mr. Burke can help me, or Miss Stone, I believe what Mr. Swerling said was we're not going to do that at this time, and I think he used the word it's our strategy, we will wait and see in the penalty phase.

THE COURT: Right. All right.

MR. DALEY: And, your Honor, I would tell you that -- let's pull up Government's Exhibit 29. Government's Exhibits 29 and 30 are interviews done by Carlisle McNair where he went and interviewed the two police officers who talked with Mr. Jay that night or the next night when Mr. Jay called. And the bottom line is neither one of them, they are silent about whether -- I mean, they don't say Mr. Jay said that. And so that's -- but it doesn't say that he said we killed her or we killed them. It just -- there's no information that Mr. Jay told them anything about Mr. Basham saying that to him. So that's Government's Exhibit 29 and 30, more for the court's

information than --

THE WITNESS:  Of course, that would have all gone, that decision, I had to make a decision at that point whether to do it or not, to try to impeach him or not.

Q.   (MR. DALEY) And you had just a week before, obviously, reached out to these police officers so you --

A.   Yeah, they were interviewed on September 20th, so --

Q.   You were obviously anticipating at least trying to impeach him if they potentially had given better information.

A.   Right.  I like to be prepared.

Q.   Let's just for a moment, though, let's say they said, no, I'm pretty sure I think he said or he did say we killed her, would you potentially have still wanted that in, two police officers getting up and repeating that -- and it may be it's speculation, but I'm just, as somebody who tries cases, I mean, so let's just think about it for a moment.

You have two police officers are saying no, Mr. Jay said that Basham said we killed her, not we killed them.  Do you put those two police officers up?  You just said you don't like calling police officers.

A.   I really don't like calling police officers.  And, you know, you have them on direct examination so I really can't say at that point.  I mean, you have to understand what -- all of this is a process, mental process that you go through at the time trying to decide what the best thing is, use your

experience and experience in examining hundreds of witnesses and try and decide what's the best approach, and that's what I did.  So all of these factors entered into that decision as to the way to approach it.

Q.  So you are not sure if -- if they had said we -- you know, Basham said to Jay that Jay relates to the police officers that Basham says we killed her, you may or may not have.  But you didn't even have it that good here, obviously?

A.  I'm sorry?

Q.  You didn't have anything that good.  It was just simply silent?

A.  It would be sheer speculation for me to say at this point I would have called them or not called them.  I would have had to put that into the formula.

MR. DALEY:  Your Honor, I know you wanted to end at 5:00.  I can --

THE COURT:  How much longer do you think you will be with Mr. Swerling?

MR. DALEY:  An hour, hour and a half.  I'm not sure. Maybe.

THE COURT:  We definitely won't finish today even if we went late.

MR. DALEY:  I don't think so.

THE COURT:  How long do you think redirect will take?

MR. BURKE:  At this point I would think no more than

ten minutes.

THE COURT: All right.

MR. BURKE: Maximum.

THE COURT: How long is your standard of care expert going to be tomorrow, approximately? Just --

MR. BURKE: Perhaps an hour and a half.

THE COURT: We can still finish the testimony tomorrow and probably get in some argument, as well.

MR. BURKE: I believe so.

MS. STONE: We're hoping.

THE COURT: Y'all are the ones going to stay over an extra night. I can take a ten minute break and talk to my students and we can come back and have a little bit more if you need to. But since we're not going to finish him today, as long as you're sure we can finish tomorrow I would like to go ahead and break at this time.

MR. BURKE: We're growing to like Columbia so if we're going to stay another day that won't --

THE COURT: How long will your cross of the expert take?

MR. DALEY: I believe Mr. Johnson --

MR. JOHNSON: I would say about an hour.

THE COURT: All right. Have y'all picked out which five issues you want to argue about yet? Have you talked about it?

MR. BURKE: We talked briefly in the men's room about it, but we haven't come --

MR. DALEY: May be able to pick out five we don't have to argue at all, your Honor, maybe more.

THE COURT: You can submit on the briefs?

MR. BURKE: Correct.

MR. DALEY: We may be able to decide on another five.

THE COURT: Since we're quitting a little early today why don't you talk about that when you -- Mr. Swerling, you're going to have to come back tomorrow, it doesn't look like we're going to finish today.

Very good. All right. We will be in recess until 9:30 tomorrow morning. Let me ask the students to step back into chambers, if you could.

(Recess, 5:00 p.m.)


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: 11-14-12                    s/  Daniel E. Mayo


                    DEFENSE WITNESSES

JACK SWERLING

        DIRECT                 515

        CROSS                  613

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 19

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF SOUTH CAROLINA
                        FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                CR NO.: 4:02-992
                                        Columbia, SC
     -vs-                               October 16, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------


            BEFORE HON. JOSEPH F. ANDERSON, JR.
             UNITED STATES DISTRICT COURT JUDGE
                      MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:      HON. WILLIAM N. NETTLES
                     UNITED STATES ATTORNEY
                     BY:  ROBERT F. DALEY, JR.
                          JIMMIE EWING
                          JEFFREY M. JOHNSON
                          WILLIAM K. WITHERSPOON
                     Assistant United States Attorneys
                     1441 Main Street
                     Columbia, SC  29201

FOR DEFENDANT:       JULIA G. MIMMS, ESQ.
                     JULIA G. MIMMS LAW OFFICE
                     1001 Elizabeth Avenue, Suite 1A
                     Charleston, NC  28204

                     ARIZONA FEDERAL PUBLIC DEFENDER
                     BY:  MICHAEL L. BURKE
                          SARAH E. STONE
                     Assistant Federal Public Defenders
                     850 W. Adams, #201
                     Phoenix, AZ  85007

COURT REPORTER:      DANIEL E. MAYO, RDR
                     Certified Realtime Reporter
                     901 Richland Street
                     Columbia, SC   29201


          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: I'm informed Mr. Basham wishes to participate again. This is Tuesday of the second week of the hearing. Mr. Basham is on the satellite and I'm informed that counsel would like a quick ex parte conference.

MR. BURKE: Yes, your Honor, just to explain the situation.

THE COURT: If the government lawyers could step out for just a moment, please.

(There was a pause in the proceedings)

* * * * * * * * * *

(The government attorneys return to the courtroom)

MS. STONE: Mr. Basham would like to apologize to the court for the language the other day.

THE COURT: All right. Does he want to speak?

DEFENDANT: Yes, please.

THE COURT: Go ahead.

DEFENDANT: I just wanted to -- I just want to say I'm sorry for blowing up the other day. I'm just -- this is -- and I just, I kind of said things without thinking and, you know, me being here like this having to do it this way is very hard on the officers and, in turn, that makes it very hard on me and I'm just very stressed out. Like he said, I didn't even sleep last night I was so stressed out. I wasn't

going to come today but I wanted to be here and at least say I apologize. That's all I want to say.

THE COURT: Very good. Thank you, sir. Let's move forward. Mr. Swerling, you are still under oath. Resume the cross-examination, please.

MR. DALEY: Your Honor, one thing the government would like for you to do is have a short colloquy with Mr. Basham to determine he understands the case we're having right now is not simply on whether he gets to dismiss or withdraw his 2255, his appeal of his conviction, but also that we are litigating here today, and have been, the substance of the various claims in his 2255 petition. I don't know that we have actually been able to get that on the record yet, your Honor.

THE COURT: Mr. Basham, I want to make sure you understand the purpose of the proceeding that we're now engaged in. Last year you filed a request to drop your appeals and be executed and we attempted to have a hearing on that out in Indiana where you are, and that effort was abandoned when it appeared to me that you were not strongly -- you did not strongly hold those beliefs such we should go forward with that effort.

So what we are here on today is the petition filed by your attorneys asking me to set aside your conviction and your death sentence because of alleged errors that occurred during

the trial.  And I am here hearing testimony about those alleged errors, will make a decision on the petition after all the testimony is concluded.  Do you understand all that?

DEFENDANT:  A little bit.  A little bit.  Kind of.

THE COURT:  Well, the main thing is we're not here today deciding whether your should be able to drop your appeals, that issue has come and gone.

DEFENDANT:  Like when they -- these packets and stuff with this stuff that you are doing and stuff, but I don't want to -- I don't really -- I don't even have the patience to read it.  A lot of it don't make sense like, you know, Jackson versus this one and that one.  And I know, you know, what -- I mean, I'm just -- events of incompetence I guess I came down to hear what was going on.

THE COURT:  All right.  The petition raises a lot of very complicated legal issues and it's not at all surprising that you don't understand all those legal issues.  But there may be some issues that you are able to help your lawyers with so you need to pay attention and speak with your lawyers when you think it is necessary or when they think it's necessary.  Now let's move forward.

DEFENDANT:  Yes, sir.  All right.

BY MR. DALEY:

Q.  Good morning, Mr. Swerling.

A.  Good morning, Mr. Daley.  I was wondering if I could

readdress or revisit something that happened at the end of the day yesterday, the last issue.

Q. Yes, you are welcome.

A. Your Honor, you had asked me, and I was -- obviously, I was getting very tired by the end of the day, but you had asked me about whether or not there had been something put on the record about Clifford Jay.

THE COURT: Right.

THE WITNESS: And at that time I was not recalling that but, actually, there was something put on the record. As I understand in looking at it that what happened was it came up by Mr. Gasser, that he was questioning the fact that the cross-examination had gone unchallenged. And he was concerned that the jury would take that as evidence in the case, I think it was sort of the tone of what he was trying to say. And then a discussion went to whether or not there was a good faith basis to ask the question. And I believe we established that there had been a good faith basis to ask the question because of prior contact with Mr. Jay.

So I just wanted your Honor to understand, I do remember now that particular colloquy, and but essentially what I was saying yesterday was that, and I would reaffirm today, that we decided not to go ahead and attempt to impeach Mr. Jay. The two officers, as evidenced by the memos in the file, were not sure, they said they did not remember those

things.  But we were not going to -- we decided not to try and impeach him and put him up by that because it was soft evidence, as well as the fact that we wanted to keep him as a viable witness for the guilt phase, I mean the penalty phase, and it just would have given the opportunity to go back and even if instead of we killed them, we killed her would just be to re-emphasize that.  So I just wanted the court to know I do recall that now and I just got tired.

THE COURT:  Very good.  Thank you.

BY MR. DALEY:

Q.  Mr. Swerling, let's go to claim 18.  Although this may only tangentially impact you it involves the failure to cross-examine Sheriff Ronald Hewitt effectively, in particular Mr. Harris' cross-examination where Sheriff Hewitt testified after being asked whether his notes had anything in there about Basham saying he killed Alice Donovan, and Sheriff Hewitt's response was he demonstrated, there was nothing in there, he didn't say anything, he demonstrated.

And in particular my question, though, goes to -- first I assume that this all just happened as Mr. Harris was doing his cross-examination.  He didn't confer with you immediately after this exchange with Sheriff Hewitt, did he, or --

A.  You mean right at the time it was happening?

Q.  Right, yeah.

A.  I don't recall that we had a conversation right at that

point.

Q. The allegation that would impact you is that they also allege under this claim that there was a failure to mitigate the damage caused by the cross-examination and, in particular, they find fault with the fact you didn't try to cross-examine FBI Agent Jeff Long regarding certain items in his 302 that appears to be a summary 302 of the search, but has some language in there that would be -- would have been helpful, they say.

Do you recall you were actually the one who cross-examined Agent Long? He testified about a number of things. Do you recall if there was a discussion about trying to go down that road, or do you not recall at this time?

A. Well, I don't recall whether there was a discussion about it, I remember the issue. And I can tell you in looking back at everything, and again trying to refresh my memory for eight years, from eight years, my concern at that time was obviously, and I believe apparently and obviously, that going into that with Agent Long would have opened up the possibility that we have opened the door to allow evidence from the hypothetical in because there were communications between Mr. Littlejohn and Mr. Special Agent long in dealing with the purse strap.

And, if you recall, Special Agent Long did not distinguish in his 302 between what was part of a hypothetical and what

was not, where Sheriff Hewitt did.  So there would be a concern there of opening the door to try and -- where the government would have been able to argue that they could come back with evidence of the hypothetical that had already been ruled out.  So I didn't think we should go down that dangerous path.

THE COURT:  Let me interrupt here.  I'm rusty on what the hypothetical statement was.  I know that that was the basis which I discharged the original attorneys, because they might be witnesses, and then ultimately at the trial I did not allow it to come in anyway.

MR. DALEY:  Correct, your Honor.

THE COURT:  So but what was the hypothetical statement?  I've honestly forgotten now.

MR. DALEY:  I'm rusty as to the substance of that, as well, your Honor.

THE COURT:  It didn't come in at trial, so -- it was a long time ago.

MR. DALEY:  It actually didn't --

MR. BURKE:  Right.  I think we're all a little bit rusty on it.  Our understanding of the hypothetical is that Mr. Littlejohn informed the law enforcement there, you know, hypothetically they should be looking for a purse strap.

Now, let me tell -- you will remember, your Honor, that that he -- Mr. Littlejohn and Mr. Monckton testified at

the hearings on their disqualification that the information that they conveyed in the hypothetical was almost entirely information they had received from U.S. Attorney Rose Mary Parham the day before. But the hypothetical they should look for a purse strap, I believe that the victim's body had been dragged from the car and a number of yards into the brush or the woods, that the -- after that there was the -- there was a knife that was under Mr. Basham's leg, I believe this is all part of the hypothetical, that was then thrown out the window as they were leaving. And at this point, without going back and checking exactly, that is what I seem to remember.

MR. DALEY: Your Honor, I don't fault Mr. Burke because I'm almost certain that the purse strap was mentioned, though, in the van and Mr. Basham was given permission and allowed by Mr. Littlejohn to say that they need to be looking for a purse strap.

THE COURT: I read Sheriff Hewitt's trial testimony over the weekend and he said that Basham told him about the strap.

MR. DALEY: In the van.

THE COURT: He didn't say it was part of any hypothetical at all.

MR. BURKE: It may have been.

MR. DALEY: It may have also been, this is where I am rusty, the hypothetical mentioned purse strap, too.

MR. BURKE:  As well, your Honor.

THE COURT:  We all need to go back and refresh our memory on what was in the hypothetical.  But suffice it to say that was the basis which I discharged the attorneys, because of the possibility they might be witnesses or --

MR. DALEY:  Correct.

THE COURT:  -- later be subject to a charge they structured the trial in a way so they wouldn't have to be witnesses.  There's all kinds of bad possibilities.  And ultimately at trial I did not allow the hypothetical statement in anyway.

MR. DALEY:  Correct.

THE COURT:  So you could say the disqualification was out of an abundance of caution, really.  But I just want to put any context of what Mr. Swerling just said about he didn't want to open the door to the hypothetical as one reason he made that strategy decision.

MR. DALEY:  And I'm pretty sure -- I know Mr. Burke is right, there was the mention of the knife and that they, I'm -- I think it was Mr. Basham said that Mr. Fulks slit her throat and put her in the trunk of the car.  So there's overlapping information but then there's also unique information in the hypothetical.

MR. BURKE:  During the first break, your Honor, we will try to locate as best as possible the exact language from

the hypothetical.

THE COURT: All right. That would be helpful if you could do that. I think we could all benefit from that.

THE WITNESS: Judge, for your information, I have Agent Long's 302 which describes what's in the hypothetical.

THE COURT: Go ahead and put that on the record right now, if you would.

MR. DALEY: Excuse me, Mr. Burke. I think he's going to read Agent Long's 302. He actually has it, it has the -- I don't think --

MR. BURKE: I don't think it's necessary, I think we can work this out without Mr. Swerling's assistance.

THE COURT: All right.

THE WITNESS: Well, Judge, suffice it to say then if they don't want me to read it, that's fine. But the strap was mentioned on two different occasions, one to Sheriff Hewitt and then also Agent Long refers to the strap as part of the hypothetical. And so, you know, trying to think back eight years, what I was trying to think about as far as strategy, there would be a dangerous road, I think, to walk about where the information in the hypothetical came in and where other information came in, and so that would have been one of the reasons not no do it.

The other reason was that it was -- as I remember the conversation, that Special Agent Long could have been

cross-examined on it, it was hearsay, it was about how Fulks used -- Basham saying how Fulks used the strap. So that would have been another issue, because I probably -- at that point the objection would have been sustained. I'm sure an objection would have been made about hearsay, so --

THE COURT: Let me jump in here. I told my law clerk a story last week, I tried a plane crash case in 1997 where some U.S. Air pilots flew into a thunderstorm in Charlotte, the plane crashed and killed 37 people. And at trial, about two-thirds of the way through trial, a giant dispute erupted as to whether the pilot in question had testified earlier in the trial about whether he would ever knowingly have flown into a thunderstorm before. And the plaintiff said he clearly admitted he had flown into a thunderstorm before and the other side said no, he didn't say that.

And I said well, let's get out the transcript, we had several disputes about that, I said let's go back to the transcript and see what he says. So what he said was, the question was have you ever flown into a thunderstorm before, and he said anyone who's ever flown planes in the south during the summer knows about flying into thunderstorms.

So it was an ambiguous answer, and it seemed to me both sides were scared to clarify it. Both sides. You've got that ambiguous answer and each side thought well, strategically I'm going to let it sit at that so I can later

argue he admitted flying into a thunderstorm or he didn't admit it.  And neither side wanted to clarify it.

It seems like we almost have the same thing here with the strap quotation.  The sheriff gave somewhat of an ambiguous reference as to what the -- how the strap was described, and both sides were scared to touch it.  Am I -- Mr. Swerling, am I reading things right or not?

THE WITNESS:  Well, during the testimony you had that issue about whether or not he actually said something or he just demonstrated, and it --

THE COURT:  I know Mr. Gasser in his closing said he demonstrated how Mr. Fulks killed her and what more do you need, or words to that effect, right?

MR. BURKE:  At Mr. Basham's trial he testified that, excuse me, he argued, Mr. Gasser argued Mr. Basham had demonstrated how Mr. Basham had killed the victim.

THE COURT:  Right.  But if you look at the sheriff's testimony I thought he said Mr. Basham described how she was strangled and how he, Basham, threw the strap out of the car. I thought he made it somewhat ambiguous.

MR. BURKE:  And I can get the exact language for you, your Honor.

MR. DALEY:  Your Honor, I can tell you that, maybe we can go ahead and pull it up, it's the trial transcript, September 27, that's volume ten, and I believe it's at page

54.  I think we can probably pull that up.  The questions, first, and then --

MR. BURKE:  The record will speak for itself.

MR. DALEY:  Yeah, just --

MS. STONE:  Judge, I think you are correct that was his testimony at the Jackson versus Denno hearing.  That's -- my recollection, again the transcript will speak for itself, but what you just described is exactly the testimony at the Jackson v. Denno hearing.

THE COURT:  Which is what I read last weekend, that's why I was thinking that.  He said Basham described how she was strangled.

MS. STONE:  Correct.

THE COURT:  Passive verb, and how he threw the strap out, active verb.  So somewhat ambiguous answer.

MS. STONE:  I think that's correct.

MR. DALEY:  Maybe it's the previous page.  Okay.  This is page 53 of the trial transcript and this is Mr. Harris in his cross-examination saying -- he's asking Sheriff Hewitt, they came to a certain point, and Mr. Basham, Answer, he was emotional?  Question, he was emotional.  Answer, frustrated, I'm thinking.  Anger, I didn't see any anger, I just saw Brandon Basham emotional at the cemetery.  Question, now at the cemetery, and I would like you to refer to your notes, if you will.  Okay, is the answer.

Question, there's nothing in your notes nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there? Answer, no, sir, he didn't tell me he used the strap. He demonstrated, though. Question, he demonstrated? Answer, yes, sir.

THE COURT: That's Mr. Harris cross-examining?

MR. DALEY: That is. And then a follow-up question, your notes nor Lieutenant Crocker's notes say that he did that, isn't that true? And then the answer on the next page, page 54, that is true. Because he didn't say, he showed.

And that's -- that's pages 53 and 54 of the trial transcript, volume ten, on September 27th, your Honor.

THE COURT: Go back to the page before.

MR. DALEY: Starts at line 17.

THE COURT: All right. Well, I think a fair inference would be that it's still somewhat ambiguous, it's still somewhat ambiguous. But I think it's more direct on Mr. Basham's involvement than the Jackson v. Denno testimony was.

MR. DALEY: It's the way the question was asked, too. And I will tell you, your Honor, and it's obviously in the record, there is a point in the closing where Mr. Gasser in the penalty phase says is the government saying Brandon Basham strangling Alice Donovan is, it's said in that way, are we saying that's what you should give him the death penalty for?

And it's followed up by no, they were -- they couldn't have done it, they had to do it together.  So there is at least what you call a rhetorical question that would refer back to the cross-examination answers of Sheriff Hewitt.

THE COURT:  All right.

MR. DALEY:  So that's where we are.  I'm sorry that we sort of got off -- I'm not sure there is anything more for Mr. Swerling to testify to, but perhaps that will help you in resolving this.

THE COURT:  I guess my point is the testimony you just said read, if the questioning attorney had asked for clarification it would have been a stronger answer.  He didn't say, he demonstrated.  He demonstrated what?  He demonstrated how he killed them or how the codefendant killed her or what -- I mean, it could have been followed up and made clearer.

MR. DALEY:  It could have.

THE COURT:  And I suspect it's because the lawyer was scared of the answer he might get.  I mean, I'm just thinking out loud.

MR. DALEY:  Well, you know, and the record will reflect, but Mr. Harris did say he was concerned about getting, I can't remember what the phrase was, but having him ring the bell again.  I can't remember what the --

THE COURT:  Mr. Burke?

MR. BURKE:  The only thing we would add to this, your Honor, two things, actually.  One is that they did -- defense counsel did have the 302 by FBI Agent Long which states expressly that according to Sheriff Hewitt Mr. Basham had said -- had said that Mr. Fulks had used the strap to kill the victim.  So they did have that for purposes of impeaching the testimony.

THE COURT:  So you say they should have driven that point home in cross-examination with the 302?

MR. BURKE:  Yes, your Honor, that's one of our arguments.  And the other argument, returning to Mr. Daley's statement about closing arguments and Mr. Gasser' statements, he is correct, but we would also say to the court the record will reflect Mr. Gasser's final statements to the jury were to the effect I don't see how you can go back there given what Mr. -- what Sheriff Hewitt said to you and what Clifford Jay said to you and not convict him.

THE COURT:  He focused on those two points.

MR. BURKE:  Yes, your Honor.

MR. DALEY:  I think there also may have been a third point in there, too.  But there were two or three points that --

THE COURT:  We will hear argument on this later.  All right, go ahead.

MR. DALEY:  And, your Honor, the government is more

than willing if we need to take a break at any point, if Mr. Basham needs a break we want to make it clear that we want to do everything we can to accommodate him.  So --

THE COURT:  All right.

BY MR. DALEY:

Q.  Let's go to claim 19, Mr. Swerling.

A.  I had one more point I wanted to make about the 302.

Q.  Okay.

A.  I don't know where it says that the sheriff told Mr. Long that information Mr. Burke was just saying.

Q.  Well, I guess we're not -- it looks like a summary 302.

A.  It's a summary 302, and the problem is that what he was saying, what he wrote, what Agent Long wrote, we're talking about cross-examination, what he wrote was that Basham -- I'm sorry, Basham had a conversation with Attorney Littlejohn resulting in information being passed to this agent that Basham would be positive on the location of the cemetery. Basham located a purse strap.  That was one part of it.

And later down below it talks about the attorneys met with Basham inside the van outside of law enforcement presence and then provided the following information.  And that's where the language from the hypothetical is, although he doesn't clearly say it was the hypothetical.

But the bottom line is that what he was saying was that Basham would have said that Fulks used the purse strap, and

that's in his 302.  And I did not think that we could cross-examine him on what -- bring that up, that Fulks said that, because that would be hearsay.  And that people were jealously guarding the record about hearsay in that kind of situation, and it could have potentially opened the door for further discussion about it.  And I don't remember where he says that she would have told him that.  So that would not -- I don't know that I would have been impeaching Hewitt at that point.

BY MR. DALEY:

Q.  Let's try to move on now to claim 19 and 20.  In particular, we're going to go through what you did in this case, but the two issues that seem to have -- they focused on is the failure to raise a mental retardation issue and then the fetal alcohol syndrome or fetal alcohol spectrum disorder.

Mr. Swerling, we're not going to put these into evidence, but I want to just show you some things that were put into your file and wanted to just see if you knew these were in your files when we went to look at them.  And I just want to have them put on the record just to show that there were materials that you at least had in your files and perhaps read, I'm not certain.

So let's talk about this for just a second regarding mental retardation.  The first one is a document entitled "Materials Related to Litigating Mental Retardation in Federal

Capital Prosecutions."  And it's authored by a number of folks.  I think the document is on the screen.

A.  Yes.

Q.  Two of the three we have heard spoken about quite a bit, David Bruck and Kevin McNally.  Do you recall reading this document or looking it over at some point?

A.  Well, I would have read it.  Do I recall it?  No.

Q.  But you think you did read it?

A.  I would have.

Q.  The next document is a memorandum that was in your file that is to counsel in federal capital cases from David Bruck, "Re Materials on Mental Retardation in Federal Capital Sentencing."  February 2000 is the date of it.  It talks about the federal death penalty not allowing -- federal death penalty act not allowing for the execution of the mentally retarded.  You believe if it's in your file, which it was, that you read it?

A.  Yes.

Q.  Okay.  The next document is a document entitled "Mental Retardation and the Death Penalty:  A Guide for State Legislative Issues."  It was written by James Ellis, who was the regents professor of law at the University of New Mexico School of Law.  Again, same answer.  If it's in your files it's in -- it appears to be materials that were sent by resource counsel, it was in one of those boxes.  If you got it

you would have read it?

A.  Mr. Daley, we solicited a lot of information from various sources.

Q.  Okay.

A.  And there are a couple of boxes in the file room that had documents such as this, and I would have read them.

Q.  And then the next document is actually the Atkins versus Virginia case.  Again, in your files, you would have read it, is that correct?

A.  Correct.

Q.  Next document is a law review article, "Mitigating Mental Retardation in Capital Cases, Finding the Invisible Defendant," by Dennis Keyes and some other folks.

A.  Yes.

Q.  And, again, you would have read it.  The next document actually is -- only has a table of contents, but it's actually initialed by you.  Are those your initials on the top right-hand corner?

A.  That's my writing.

Q.  12-19-03 and that's a JS?

A.  Yes.

Q.  Let me hand this up to you and see if you can -- it appears to be a brief that must have been filed in the state Supreme Court in South Carolina in which a couple of lawyers -- who are the lawyers that wrote this brief?  It's to

the very back, last page, perhaps, of this document. It appears that they have filed a motion to have all of these folks that were suspected to be mentally retarded on South Carolina's death row taken off death row because of their mental retardation?

A. John Blume is one of them, Robert Dudek, Robert Lominack, David Voison, Teresa Norris, Diana Holt, Jeff Bloom. These were people that worked for either the Death Penalty Resource Center or, remembering what the name was, the Center for Capital Litigation.

Q. And John Blume was also a lawyer who litigated -- who tried the Fulks case, correct?

A. Correct.

Q. And so it's initialed, so you are pretty sure that would indicate you obviously read it, as well?

A. Yes, I would have read it.

Q. And the next document is a document entitled "A Newsletter for Defense Counsel in Federal Capital Cases." It's prepared by the Federal Death Penalty Resource Counsel Project. Says on the top right-hand corner, to read. And that is your handwriting up there?

A. Yes.

Q. And, again, in your files, you would have read this?

A. Yes.

Q. On page nine of it it appears that there is an article

that, "Investigating Mental Retardation?"

A.   Yes.

Q.   It was dated April 2003.  The last document that we'll go over that was in your file is an article from John Blume and Pamela Blume Leonard that is entitled, "Principles of Developing and Presenting Evidence of Mental Retardation," May 2002, from -- I'm not sure of the publication.  But, again, in your files, you would have read it?

A.   Yes.

          MR. BURKE:  Your Honor, we would -- we would request that these materials -- they are not among the exhibits that are the government's exhibits, but we would ask they be made government's exhibits.  And we do not oppose their admission.

          MR. DALEY:  That would be fine, your Honor.  I just --

          THE COURT:  Give them an exhibit number now then.

          MR. DALEY:  Okay.  We have some -- we have got some others that we're going to be admitting that we have already numbered, so it would be 237 --

          MR. BURKE:  We don't have any objection to these others.

          MR. DALEY:  Your Honor, if we can move the other exhibits into evidence, they are Exhibits 225 through 236.  They are actually -- I think it starts at, we have already done 225 so it starts at 226 and goes through 236.  And these

are a number of memos prepared by Mr. Swerling in reviewing various medical records and school records, and also at least one memorandum from Lesa Watson, an interview of a doctor at the Methodist Home, and there's also at least one document, one document it looks like a list of things to talk about with -- it's entitled Paige to Donna. So that's actually Government's Exhibit 235. We ask to move these into evidence without objection from --

THE COURT: All right. Without objection, admitted.

MR. DALEY: And then so starting at 237 to 244 we would move the additional documents that that Mr. Swerling has just testified to, move those into evidence, as well.

THE CLERK: 244, you said?

MR. DALEY: 244. Yes.

(There was a pause in the proceedings)

BY MR. DALEY:

Q. Mr. Swerling, let's start with why didn't you make a pretrial claim of mental retardation before Judge Anderson? I mean, obviously, if that had been successful the death penalty would have been taken off the table prior to trial.

A. The only thing I can tell you at this point is that we did not have experts who were supporting the fact that he fit the definition of mental retardation.

Q. Let's go ahead and put up -- well, here, I think Mr. Burke went through lay people, several lay people who said he had

low intellectual functioning, a couple who opined he was retarded, and a couple others that said he had very low IQ. So it's six or eight people. In counterbalance to that, I mean, were not the records just overwhelming with references to his manipulation that he used, that he was manipulative?

A. I mean, a lot of records reflected that, yes.

Q. Well, let's go ahead --

A. If you have something specific --

Q. I do, I do. Let's go ahead and put up Government's Exhibit 226. And this, what is this, Mr. Swerling?

A. Could you come down a little further? Okay. That's my review of the Penny -- I don't have it spelled right, the Penny Royal Hospital, the records that I had gotten from Penny Royal. And what I did generally is when records would come in I would -- when I read them I would make notations on them, and hopefully most of the time I did make a typewritten review of it. And then if I felt like there were people in the records that we needed to follow up and go interview, then I would either designate people to go interview them or they would be people that I eventually would go ahead and interview myself.

Q. If we go to page two, and it starts there is a note of Dr. James Rozell, about halfway down. A little bit higher, Gayle. And in this, obviously, your notes reflect that you put down that there was a Dr. Rozell who talks about Brandon being

quite obnoxious, and he's referred to as manipulative and uncontrolled, is that correct?

A.   That would have been something I extracted from the documents.  Along with all these other things, as well.

Q.   It was your practice as these documents came in to personally, you actually would review these medical records?

A.   Right.  For the purpose, and as I guess you will get into, we had various chronologies and time lines we were also doing.  So what I would do, as I would review these things we would get together and put them into the chronologies.  We would follow up on people that need to be interviewed out of these records or documents to get that are referred to in these records, and who was going to interview them.  And ultimately a lot of these people I went ahead and interviewed a number of them, as well.  So I read documents for that purpose.

Q.   Let's go to Government's Exhibit 227.  Same thing.  You are reviewing documents from the Hopkins County School records?

A.   That's correct.

Q.   And then if we go down to the second full paragraph, Gayle, first, towards the end of that first paragraph there's a note that he is manipulative, correct, from an evaluation done by Brenda Tompkins?

A.   Yeah.  That, okay, first paragraph.  Okay.

Q.   I'm sorry?

A.   Starts with, there is an evaluation by Brenda Tompkins, yeah.

Q.   And there's a note -- it's noted by this counselor?

A.   Correct.  I would have extracted that from the document.

Q.   Okay.

A.   Among the other things.

Q.   Let's go to the next document, Government's 228.  And the top, this is a review of the Charter Ridge records?

A.   Right.  That was another hospital.

Q.   Next, the first full paragraph below the date there.  He is described throughout as manipulative and abusive, impulsive, dishonest, easily frustrated.  So, again, throughout he's described as manipulative?

A.   Correct.  And those were -- that was an extract, I guess, in my own words, it wasn't verbatim, out of the documents.

Q.   Correct.  And then if we go down to page 487, which is two-thirds of the way down the page, Gayle, at 487, again he is noted to be manipulative.

A.   I'm sorry, page 487 of the records.

Q.   This is obviously going through the medical records.

A.   Right, okay.

Q.   Two more lines down at page 498 he is noted to be argumentative and manipulative.

A.   Correct.

Q.   And the next page at 512 and 539, at 544, again, he is

manipulative, aggressive and manipulative. He's aggressive and manipulative.

A. These are, again, notes that I was extracting out of the records.

Q. And, again, these are -- this is information that obviously went into several different databases and information that would have been forwarded to Dr. Schwartz-Watts and Dr. Brawley?

A. Well, I think actually I believe she's noted on the recipient in the e-mails.

Q. On some of these --

A. Dr. Schwartz-Watts.

Q. I do see that. Okay. Let's go to the next exhibit, 229. This is a review of records from Ridge Behavioral Systems.

A. Correct.

Q. Third paragraph, you're again extracting information from the records. At page 683 he's described as manipulative, is that correct?

A. Yes.

Q. Next page at the top at page 748, and then says noted to dominate group being aggressive and manipulative. And then at page 768 he is noted to be argumentative, manipulative, with testing limits. So, again, the documents are just strewn with references by counselors, by professionals, that he is manipulative, is that correct?

A.   Yes.

Q.   Let's go to Government's Exhibit 230.  This appears to be the review of Rivendell Psychiatric records?

A.   Yes, it's another one of the institutions.

Q.   That Mr. Basham was in at some point.

A.   Yes.

Q.   Third paragraph, page 3806, a Dr. Littleton, second line, noting that he again is manipulative.

A.   That's correct.

Q.   Again, these are not lay people, these are folks who are -- records from institutions that he's been in, correct?

A.   Right.  And we went, tried to go back as far as we could to get records from the institutions where he was at.  That's what you have in those -- in our medical records.

Q.   Lets go to Government's Exhibit 231.  This is a review of the records of the Cardinal Center.  You remember the Cardinal Center?

A.   I remember the name.

Q.   Let's go down towards the bottom at page 5145.  He's aggressive, defiant, argues, manipulative.  Is that correct?

A.   Yes.

Q.   And we have got -- at the bottom of the page we have a report from the Children's Psychiatric, I guess hospital, I don't know if she's a counselor, I think Gillingham might be a doctor, but what's it say there?  The note is no remorse, he

is a con artist, manipulative?

A.  Yes.

Q.  So again this is --

DEFENDANT:  You motherfucker.  When I was a kid he's saying -- it's over.

MR. DALEY:  If you would like for us to take a break we would be happy to, your Honor.

THE COURT:  Let's go ahead and take our morning recess at this time.

DEFENDANT:  I'm sorry.  I didn't mean to interrupt the courtroom, but you keep saying stuff, you don't think of what they do in prison for what you do.  The same people you get to lock me in a fucking room and fucking addicted to --

THE COURT:  All right.  Let's take our morning recess.

(A recess transpired)

THE COURT:  Please continue.

BY MR. DALEY:

Q.  Mr. Swerling, let's go and look at Government's Exhibit 232, please.  And this appears to be another memo of yours where you are reviewing Kentucky DJJ records, apparently.

A.  Yes, it appears so.

Q.  We will go down about the fifth notation of yours, page 4564.  Again there's a notation he was manipulative, is that

correct?

A. Yes, that would be -- and, again, an abstract or an extract out of the records that I --

Q. Next page, the fourth full line, page 4516, appears that you're extracting, again, information, and it notes that Mr. Basham is manipulative, charming, and uses others to promote agenda?

A. That's what the record reflected.

Q. And, again, you are just simply taking what these professionals -- what the records from these institutions have noted in their records, I assume, is that correct? There's no commentary, it's just simply --

A. No, there's no commentary in here by me at all, it's just taking information out of the records and putting it down in a memo form.

Q. The next exhibit would be 233, which is another short review of the records from a Ten Broeck Hospital?

A. Yeah, that was another one of the institutions. Hold on a second. That's what I have noted out of the record.

Q. And the fourth line down apparently one of the doctors notes he is manipulative. Fourth line down?

A. Correct, that's what was written in the record.

Q. Let's go to Government's Exhibit 234. Looks like you met with a Dr. Sadiq, I think is his name?

A. Yes.

Q. And you are talking about some psychiatric evaluation he did. And looks like the bottom of the first paragraph, another notation of yours, that this doctor must have told you that Mr. Basham is manipulative and he tried to manipulate the drugs.

MR. BURKE: I'm sorry to interrupt. Can we, your Honor, let the record note Mr. Basham has indicated he's leaving, he will not be present?

THE COURT: All right. Mr. Basham is leaving now, it's about -- 10:41 a.m.

MR. DALEY: He's still there, your Honor.

THE COURT: All right. Go ahead.

MR. BURKE: He probably will be leaving, your Honor. He is just --

DEFENDANT: I'm waiting for them to come get me, that's all. I'm gone.

THE COURT: Very good. All right. Please continue.

Q. (MR. DALEY) Mr. Swerling, if you would take a look at Government's Exhibit 235, it's a three page document, and I want to just simply hand up a copy of it to you. It's on the screen but I thought maybe having the whole document in front of you would be helpful.

If you would review that for just a moment.

MR. DALEY: Your Honor, I think you can now let the record reflect Mr. Basham did just leave.

THE COURT: He did just leave at about 10:42 a.m.

Q. (MR. DALEY) Two things. Well, several things I want to talk about. Do you know what this document was or is, what it was used for?

A. It appears to be something generated by Paige Tarr to Donna Schwartz-Watts about has not changed behavior since arrest and has a list of some 48 observations, I would imagine they would be. And the writing on there is my handwriting.

Q. It looks like at least in the original it's in red, is that correct?

A. Correct.

Q. That's your handwriting so you would have gone through this?

A. Yeah.

Q. Do you remember if you went through it with Dr. Schwartz-Watts?

A. Mr. Daley, I don't recall, you know, in actuality who I discussed it with. I really don't. It would be likely I would have discussed it with Paige, and if Donna's name is on that then it would be likely I did discuss it with her, but I can't say. I have no independent recollection of it.

Q. And do you recall, though, if you look at number eight on this list, being concerned and having to deal with the fact you were going to have to handle the issue of his manipulation, him being manipulative, she was going to have to

testify about that and figure out what her testimony would be about that?

A.  It was -- I mean, it's there.  I'm trying to just put the document in context.  Could you give me a moment?

Q.  Absolutely.  Take as long as you like.

(There was a pause in the proceedings)

THE WITNESS:  Okay.  What it appears is, again, I do not have an independent recollection of something eight years ago, but it appears this was sort of like a checklist of things we were going to have to deal with or address.

Q.  (MR. DALEY) And besides number eight I would like for you to look at number three, which is on page three.  And I believe Dr. Schwartz-Watts actually testified about Mr. Basham playing chess.  Do you recall that testimony or do you remember that he could play chess, or just --

A.  I have a vague recollection of it but I couldn't give you any other details of it.

Q.  But, obviously, if someone could play chess you were going to have to deal with that issue, as well?

A.  Well, she must have felt, also, it was an issue that had to be addressed, but I really don't have -- on that particular issue I can't tell you exactly what I was thinking.

Q.  Okay.  Let me take that.

A.  I'm finished.

Q.  Are you done with that?

A.   Yes.

Q.   I'll take that back.  Thanks.

A.   It looks -- are you asking me still to look at the document on the screen?  47 talks about a whole life of manipulation since the age of eight.  I don't know if you were asking me to pull out this or not.

Q.   I wasn't.  I was just wanting to -- again, so it was something that you were going to have to deal with, obviously.

A.   Yeah.

Q.   The manipulation.

A.   This is apparently a checklist that was developed that we needed to cover, needed to address.

Q.   So, again, the allegation is you should have developed a mental retardation defense argument.  And your response -- I guess one of the questions, I guess, is you went and found every possible document you could find, correct, we're going to talk a minute about that in a minute or two, that you could find about Mr. Basham, isn't that correct?

A.   As far as I know.  I mean, I can not imagine a document that existed in this young man's life that we did not either get or attempt to get.

Q.   And you talked to everybody, friends, neighbors, teachers, counselors, people that were in hospitals, folks that were in jail with him.  I mean, you talked with everybody, is that correct?

A.   School bus driver, I mean, people -- Mr. Jay, people who
had him -- we just -- we really tried to cover everyone or
every aspect of his life from anybody who he had been involved
with in his life.  And I would be, again, be surprised, we may
have missed somebody but it was not because we didn't try.
There's always a possibility you missed one person, but I have
not heard of anybody who we missed.

Q.   And did any qualified psychologist or any other person who
gave an IQ test, anybody say he was mentally retarded?

A.   No.  Other than what you have been showing me, I mean,
which just references --

Q.   Besides -- not the lay people who opined about it, I'm
talking about --

A.   I just do not recall anyone making -- any kind of any
expert or any person qualified to say that he was mentally
retarded.  I just don't believe it's anywhere in those
records.

Q.   And --

A.   I could stand corrected if there was a document that says
otherwise.  You and Mr. Burke have all the documents.

Q.   I understand.

          MR. BURKE:  We would like the record to reflect that
Mr. Swerling does, as well.

          THE WITNESS:  Yes, I do.  Yeah.  I didn't say I
didn't.

Q.   (MR. DALEY) If we could pull up Defense Exhibit 79,
please.  Dr. Brawley was retained as a neuropsychologist,
correct?

A.   That's correct.

Q.   And she was retained to do IQ testing and a number of
other things, correct?

A.   Whatever a psychologist does, including testing.

Q.   And as we're waiting, you wanted to give her all the
records that she wanted, correct?  I mean anything that she
needed you wanted to make sure she had, correct?

A.   That would have been our goal.

Q.   And on the second page of Defense Exhibit 79 in the middle
of the page there is a notation, send Dr. Brawley all hospital
records.  Do you see that?

A.   Yes.

Q.   In your handwriting?

A.   Yes.

Q.   And this was dated, if you could go back up on this
exhibit for me, please, it appears to be dated -- maybe we
have to go back to the next page, I'm sorry.  September 23 of
'03.  And this was in a conference, at least your note is a
conference, with whom?  Can you tell who all of --

A.   Donna Schwartz-Watts, Don Morgan, William -- Dr. Brannon,
Dr. Brawley, Paige Tarr, Greg Harris, and myself.

Q.   And we will come back to this exhibit for another purpose

in a moment.  But so you obviously had your experts, your team of experts together and y'all were talking about what the approach was going to be.  And you were wanting to make sure you explored everything, correct?

A.  Yes.

Q.  Let's go to the trial testimony, volume 25, of Tora Brawley.  I think that's October 26th.  In particular, if we can go to page 58.  And to highlight the answer after I did, Dr. Brawley's testimony at trial.  It appears she was asked for and was given certain records, is that correct?

A.  Reading here, yes.

Q.  And then if we would go down to the bottom of 58 and start of 59, if you would read the records that you provided to Dr. Brawley for her evaluation.

A.  She was provided by the office, one person or another, I mean I can't say I physically did it.  And I point out this is Greg Harris' direct examination of Dr. Brawley, not mine.  She said she had records from Hopkins County Board of Education, Rivendell Psychiatric Center, Neurobehavioral Medicine Associates, the Trover Foundation, Penny Royal Center, Columbia Hospital, Bourban General, Methodist Home, the Charter Ridge Behavioral Hospital, the Cardinal Treatment Center, Charter Behavioral of Evansville, and Charter Behavioral of Louisville, Western State Hospital, Edelson & Associates, Child and Family Services, and Butner Federal

Medical Center.

Q. Now, a number of those were obviously institutions that we just talked about you reviewed the records and extracted certain information out?

A. Right.

Q. So these are the same records about manipulation, con artist and some of the things like that, is that correct?

A. Those are the records I would have reviewed and made notes from.

Q. And as part of the process of wanting to give her all the records, isn't it true you gave her all the IQ tests that you could find?

A. I'm sure we did. I mean, I can't tell you, have an independent recollection of it, but I'm sure we did. And I think I said last Thursday, I seem to remember that there was a particular IQ test that she was trying to find that had been administered early on. And we attempted to locate that and seems like we did but I'm not sure. I just have a vague recollection of it, a specific test that she was looking for and we were trying to get.

Q. So you not only were looking for the tests but then you sometimes would look behind the test to try to find the records behind --

A. Yeah. I just seem to remember that she was interested in a particular test but I can't remember the details. I'm

sorry.  It's so long ago.

Q.  Well, do you remember how many IQ tests -- the record reflects there were seven IQ tests.

A.  No, I don't remember.

Q.  Okay.

A.  Whatever the record reflects I would concur in.

MR. DALEY:  For the court's information, pages 59 through 66 of this transcript, your Honor, Dr. Brawley goes through the seven IQ tests which were introduced as defense exhibits.  I'm not certain whether -- how easy those will be to recover if the court wants to review those for the purposes of this issue.  But I would just note it for the record, your Honor.

THE COURT:  All right.

THE WITNESS:  Could you scroll down a little bit?

Q.  (MR. DALEY) Certainly, certainly.  This is at the bottom of page --

A.  She actually lists the different IQ tests, different ages they were given.  That's what I was trying --

Q.  She does.

A.  Yeah, okay.

Q.  If you would like, I actually have an excerpt of it, if you wanted to review it for a second?

A.  I do have some other questions.  I was trying to see whether or not she actually went through the series of tests,

while someone's reading.  I can't remember everything, I've done so much reading.

Q.  I just know there was some testimony, it wasn't certain, how many IQ tests he had, how many he would have taken.  I think she's testified that seven is, I think, the most she's ever seen.  But, anyway.  And but Mr. Harris was primarily responsible for working with Dr. Brawley?

A.  Right, as -- at some point as we got closer to the trial, I can't give you a definitive date, we started concentrating on certain witnesses that he was going to do and that I was going to do.  And he was going to do Dr. Brawley.

Q.  And the bottom line on this mental retardation issue is you just didn't have anybody who was going to testify that he was mentally retarded, correct?

A.  To the best my recollection, we did not have anybody that was going to say anything about mental retardation, or had.

Q.  And there was an allegation that you -- not an allegation, there was a suggestion that obviously you went before the attorney general's death penalty review protocol group?

A.  Correct.

Q.  And that they said you can come back if you have any further information about the mental retardation issue, and you obviously didn't.  And why is that?

A.  I don't think it was -- apparently it was not developed. I remember the notation about being at the -- in Washington

that we looked at maybe last week.  But, you know, if I didn't go back it's because we didn't have anything.

Q.  And isn't it true that you just didn't have an IQ -- in fact, the lowest IQ you had prior to the trial was an IQ of 77, isn't that correct?

A.  Somewhere in that area.  I mean, I can not be specific, but it was somewhere in that area.

Q.  And you don't dispute that at 17 years old and ten months Brandon Basham was tested and had a full scale IQ of 89, do you?  Do you dispute that?

A.  Do I?

Q.  Yes.

A.  No.  I have to say whatever's in the record.  I can't possibly answer that, I'm sorry.

Q.  Okay, great.  Let's go to the fetal alcohol issue under claim 19.  The allegation is that you should have developed evidence of fetal alcohol spectrum disorder or fetal alcohol syndrome.  If we would bring back up Defense Exhibit 79, and if you would just blow up the nine -- the conference part, 9-23.  The bottom part.  I'm sorry, yeah, this -- that part there.

    I think on direct Mr. Burke asked you about, number one, it says, fetal alcohol component - Donna.  And he suggested, and I just wanted to know whether you agree with it, whether this notation actually meant that she had determined there was

a fetal alcohol component or that he may have it, or whether there was simply an assignment for her to look into the issue?

A. Well, I mean, I think using the word "component" would have meant to me, I believe it would have meant to me at that time that there was something to look at.

Q. Okay.

A. I mean it doesn't say --

Q. That he has it, obviously.

A. Right.

Q. So there wasn't a determination at that time that he had it.

A. Yeah. I mean, she must have used or someone must have used the word "component" as something that would indicate to me from reading this at this point that it's something to be looked at.

Q. Well, so obviously this is an issue that you at least looked at or thought about because it was out there.

A. I was gathering the information and leaving it up to the experts to come up with the diagnosis and following up on whatever documents they needed to either include or exclude that. So, I mean, that's really -- I mean, we just did everything we could to try and get supporting documentation one way or the other, either to include or exclude.

Q. And you knew about this defense, at least in part, or this issue that you might use in mitigation because it was used in

the Fulks case, isn't that correct?

A.   Right.  Alcohol and drugs in utero and the affect on him.

Q.   In the end Dr. Schwartz-Watts obviously determined that there wasn't a strong enough -- not strong enough evidence to support this defense or this -- try to use this in mitigation.

A.   If we didn't present it then, you know, I have to -- I would have to say that it was not there, we didn't have the information necessary to go ahead and do it.  But to tell you that I have an independent recollection of that now eight years ago, I can't tell you that.

Q.   So you relied on your experts.

A.   Correct.

Q.   And, obviously, if they needed something you would give it to them, correct?

A.   Right.

Q.   And their diagnosis, was their diagnosis -- you weren't going to try to manipulate that, were you?

A.   Absolutely not.  I thought I had three, actually four extremely qualified individuals working, Jan Vogelsang, Dr. Donna Schwartz-Watts, William Brannon, Tora Brawley, and Don Morgan, so five people, I just had a lot of confidence in and had been around the block on death penalty cases.

Q.   When you were concerned about an issue you obviously would send out your people to look at the issue, isn't that correct?

A.   We had, I mean, to do lists that required people to go

ahead and do certain things, and I was micromanaging.

Q.   Let's go to Defense Exhibit 65, please, page two of that. First let's bring up the first page so he can see it.  What is this?

A.   It's from Lesa Watson, and apparently interview with Connie Baker and Brenda Shaner, February 18, 2004.

Q.   Do you remember who these ladies were?

A.   I remember we had Shaner came in for the trial.

Q.   Um-hmm.

A.   I believe.

Q.   I think they may have been Methodist Home.  I'm not a hundred percent certain, I don't need to misspeak.  So let's go to page two now of that.  This is Lesa Watson interviewing people.  And if you look at the fifth paragraph, the paragraph starts Brandon reacted best to those who talked and listened?

A.   Yes.

Q.   And then if you look at about the fifth, fourth line, do you see there they did not notice evidence of fetal alcohol syndrome, but --

A.   Yes.

Q.   And so, obviously, you were sending people out, that people who were interviewing were looking for this issue, they were looking for evidence to try to gather about this issue, isn't that correct?

A.   Well, it would appear from that that Lisa, that was one of

the goals that she was going to accomplish is ask them about that.

MR. BURKE: Your Honor, just so the record is complete could we have the witness read in that entire sentence, that they did not notice.

THE COURT: Read the entire sentence, please.

Q. (MR. DALEY) After the comma. They did not notice evidence of fetal alcohol syndrome, but --

A. You want me to read it?

Q. Go ahead, sure.

A. They did not notice evidence of fetal alcohol syndrome, but that was not fully recognized and not within their field of expertise.

Q. And let's go to Government's Exhibit 235. If you bear with us just a moment, we're having technical difficulties.

(There was a pause in the proceedings)

Q. (MR. DALEY) 236, I guess. Can you tell me what this is?

A. This is a memo from Lesa Watson from an interview, I guess, yeah, Dr. Cheryl Rivard from the Methodist Home.

Q. In fact, I think later on maybe you even interviewed her, too. I don't know if you recall that.

A. If the record -- I don't independently recall it, but --

Q. Okay.

A. -- whatever the vouchers say, or my notebooks.

Q. And it appears that she's a psychiatrist. Let's go to the

second page, and if you would go down to the first paragraph, the fifth line. Keep going. And the fifth line starting she was aware.

A. Okay.

Q. Can you -- would you mind reading?

A. She was aware of FAS, which I assume is fetal alcohol syndrome, at the time she treated him and does not recall thinking of that condition in reference to Brandon Basham.

Q. So you have, again, somebody on the ground, one of your mitigation people interviewing people who treated, took care of Mr. Basham when he was younger who -- you're investigating whether they thought he had fetal alcohol syndrome, is that correct?

A. Right. And they would have -- they would been given direction, or these people who were doing these interviews, to find out certain things, certain key points. So that obviously is what she was doing. That was one of the issues she was looking into, we were looking into.

Q. And, obviously, you didn't raise it because your experts didn't feel it was there. If they had felt that it could be raised would you have raised the fetal alcohol syndrome?

A. There would have been no reason not to.

Q. Okay.

A. If we had that information and that evidence we would have raised it. We really were basing our case on the mitigation

to try and save his life, and I thought we had put that compelling case to mitigation with his medical history and his family history and his social history and everything else that we knew.

Q. Let's go to the broader now allegation about your failure to supervise, assemble and then supervise your capital defense team, okay? We have already gone through the team, I know it seems like a long time ago, and I guess it was, the Exhibit 8 we talked about all the team members. But now let's just go through how you dealt with your team. Let's first, I guess, start with Carlisle McNair. If you look at Government's Exhibits 65 through 70, 65, not 165. Let me just --

MR. DALEY: May I approach, your Honor?

THE COURT: Yes, sir.

Q. (MR. DALEY) Let me just hand you the exhibits. We will scroll through them, too, but if you want to look at it. These are exhibits that reflect Mr. McNair, Investigator McNair trying to contact, giving lists of law enforcement. Exhibit 65 through 70. Would you take a look through those very quickly? Would you scroll through 65 through 70 for my benefit and the judge's, as well?

(There was a pause in the proceedings)

THE WITNESS: Okay. I'm sorry. One more. Okay.

Q. (MR. DALEY) I guess my first question is those reflect, I assume you would agree, that Mr. McNair was the primary

contact with law enforcement.

A.   Right.  I thought that he would be the best one because he had been a former detective.

Q.   Hoping that that would inure to your benefit, they might be more willing to talk to somebody who's a former police officer?

A.   Sure, sure.  He knew how to talk with police officers, law enforcement, and he had been one of them.  So I thought he would get -- obviously know how to do the interview with law enforcement and know what to ask.

Q.   Let's pull up Exhibit 64, please, Government's Exhibit 64. It appears that he was the first -- did all the interviews in South Carolina that you could find in the discovery, so you sent him out apparently early on to interview all the fact witnesses in South Carolina, is that correct?

A.   Yes.  Excuse me, right.  He spent some time down at the coast interviewing witnesses.

Q.   I'm going to try to lump some of these together, and if I start to testify, Mr. Burke, you let me know.  Exhibit 60 through 63 are memos that reflect that Mr. McNair drove several routes.  So let's look at Exhibit 63 to start with. Apparently -- well, let's go to the bottom part of that first, Gayle.  Sorry.

If you would just read that very briefly, very quickly.

A.   Read it myself or out loud?

Q. Sure, just read it to yourself. My question with regard to all these exhibits is that Mr. McNair was charged with the duty of recreating certain routes that Mr. Basham and Mr. Fulks took throughout the crime. Apparently this is the one, one of the ones where they were traveling the area of Conway up to North Carolina right after they abducted Miss Donovan. Is that correct?

A. That's correct, yeah. I remember when Greg Harris went down there, and I, one of the things we were looking at is the correlation between the times, known times from certain documents like the ATM receipt, and what was -- had been described in the discovery. So --

Q. And as a result of some of this you actually got down to almost minute by minute certain times of what happened in the crime, is that correct, in some of your documents?

A. We tried to, tried to have a time line as exactly what happened for most of the time that they were involved in this.

Q. And Exhibits 60 through 62 are other instances where Mr. McNair drove routes. For example, apparently he is driving in Kentucky to Indiana. I guess this is another route that was taken at some point. He's actually literally giving details down to the tenth of a mile?

A. Correct.

Q. He would have been doing that because you wanted to know exactly where they had been and how far it was and certain key

details about where -- where it took them, I guess, is that correct?

A.   I mean, he and I would have discussed that.  And at that point, obviously, we were trying to determine whether or not everything fit, all the times fit, and to see what was in the discovery, whether it was -- it could be disputed or not.  Or whether it was corroborated.

Q.   Let's go to Exhibit 73.  One of the roles that Mr. McNair played is that he went, and although not familiar with the West Virginia area the way Investigator Greg Cook was, he went up there, I guess, so that you had a team member up there while the different interviews and activities were going on in West Virginia, is that correct?

A.   Correct.  And it's generally better to have two people doing an interview, as well.

Q.   Let's go to Exhibit 74, please.  And this apparently is the activities that he did up there with Mr. Cook on the week of February 1, '04 through February 5, '04.  You were having folks not only give you memos but also summarize what activities they did during the investigation of this case?

A.   Yeah.  I mean, I'm trying to remember.  We were doing that also, you know, for voucher purpose, I mean, to make sure that everything was documented.  I mean, I was trying to supervise that.  I was supervising that, as well, make sure that whatever was being done.  I can't say clearly this document

was related to that, but I was trying to check when the voucher would be submitted that there was supporting documentation.

Q.  Exhibit number 76, please.  Again, this looks like he's in West Virginia investigating the case, assisting Greg Cook, is that correct?

A.  Yes.

Q.  So not only were you able to take advantage of the West Virginia investigator, but you also had your own investigator, isn't that correct?

A.  Correct.

Q.  Let's go to Exhibit 75.  Mr. McNair also played other roles.  He would check on addresses, I mean, it looks like in this instance he literally went back to where Mr. Fulks had lived in South Carolina and talked with the landlord and I guess the current residents of the house where Mr. Fulks had lived, is that correct?

A.  Yeah, it appears so.  I mean, if you will recall from the trial, the Myrtle Beach area was an area that Fulks was familiar with, as he was with most of the areas they went to. And we were trying to obviously show that, as well, that he had the contacts in these particular areas where they went from the escape to their arrest in West Virginia.  And so it was important to go back.  And we were also looking into Mr. Fulks' background, as well.

Q. Exhibit 77. At some point Investigator McNair went and viewed a videotape of an altercation between Mr. Basham and correctional staff at Alvin Glenn and then gave you a summary? You remember sending him on that task or --

A. I don't remember that. Let me just read it. I just honestly do not have an independent recollection of that event.

Q. But, obviously, that would not be a surprise. I mean, that's one of the things you would have sent him to do, to go into a correctional facility. He would be more comfortable, familiar with trying to do that, I guess?

A. Sure. Oh, yes.

Q. How about Exhibit 78 and 79? Isn't it true that you tasked Mr. McNair with interviewing the correctional officers who might have something to say about Mr. Basham or Mr. Fulks, both in the Alvin S. Glenn facility and then later on at the FCI Butner facility?

A. That's correct. I mean, he did that, those interviews. I believe also he may have done interviews when there were incident reports. I think he was the one that followed up, we got him to follow up on whatever incident reports were at the institutions. But, yes, he was the one -- he would have been one of the people to go down and talk to these individuals.

Q. Let's go to Government's --

A. I can't say he's the only one that talked to them.

Q. Right. No, I think y'all did some followups. But he at least did the initial ones. Let's go to Government's Exhibit 159. I think those last two documents show that he interviewed between 50 and 55 officers and nurses in the different correctional facilities.

One of the people he did interview was an Eddie Ledford. I think the allegation is is that he didn't interview him well enough. Mr. Ledford was one of I think 50, like I said, 50 or more correctional officers. Mr. McNair was interviewing everyone you told him to interview, correct?

A. Yes.

Q. And doing -- and wanting to extract certain information, correct?

A. Yes.

Q. And --

A. This was the gentleman who testified that Brandon boasted about not getting the death penalty.

Q. Correct.

A. If I recall correctly.

Q. And, you know, do you have any -- I mean, he obviously didn't get that from Lieutenant Ledford.

A. Apparently not.

Q. Let's go to Government's Exhibit 178. I know we have shown you these, they come from your file, just for the court's reference. They have been admitted into evidence, we

don't plan to -- well, there's backup documents, I believe, there if the court wishes, but they are summary charts.

And I know you, Mr. Swerling, have looked at this for a moment. Does it surprise you that this summary and the documents that back it up reflect that Mr. McNair did well over 200 interviews?

A. Doesn't surprise me at all.

Q. You were relying on him to do a whole bunch of things.

A. I had him out there all the time.

Q. And I think if we --

A. Well, let me qualify it. Not all the time. He was out there a lot, okay? I mean out there, I'm talking about different states investigating.

Q. All right. Do you ever recall a time where you felt like he wasn't doing his job, that he wasn't getting done what needed to get done?

A. No. Never felt that way about Mr. McNair.

Q. He was getting his memos in on time?

A. Yeah. And he would communicate with me, we had no problems at all. I mean Carlisle was a very -- two things about Carlisle. Well, several things. First of all, he had the experience and he was a good investigator. Second of all, he followed directions and, third, he was creative enough to follow through on things that maybe had not been told specifically but to try and follow through and get other

information, as well.

Q. And --

A. And then report back.

Q. Let's go to Government's Exhibit 8 and go to the entry of where Mr. McNair is found. Government's Exhibit 8. One of the things that I think is in there is from the vouchers we were able to calculate that Mr. McNair spent 4400 -- 4,444 hours in this case?

A. Yes, according to the chart.

Q. Looks like he beat everybody as far as the amount of time he spent on the case.

A. Yeah, he -- he was covering a number of states and law enforcement agencies and people.

Q. And if we can pull up Government's Exhibits 146 through 158. I'm not going to have you look at all of these, but I do think -- I'm not going to have you testify about all these but I would like for you to look through them very briefly and tell me what they are. And I will tell you that I think they are the weekly summaries that you had Mr. -- Investigator McNair reporting to you about what he was doing.

A. Well, I know I had him reporting to me what he was doing, I don't remember if it was weekly or not. But I don't dispute that. I just don't remember if it was weekly. I know it was regular.

Q. Okay.

A.   Did it say weekly?

Q.   It appears that there are -- it seems to be broken down, I don't know --

A.   Okay.  Yeah, right, in weekly periods.  Okay.  I'm not -- okay.  Looking at the -- what exhibit number is this?

Q.   This is Exhibit 146, I believe.  It's 146.

A.   Yeah.  And 148 says it's a weekly report so I guess I was doing it weekly.

Q.   You were keeping track of folks.  One of the allegations, I mean, let's just get down to the bottom of it, is that you weren't supervising him and that he was just off doing whatever he wanted and investigating --

A.   Absolutely not.

Q.   -- certain things for prurient interest instead of for the case, apparently.  That's their allegation.

A.   Yes.  I was in contact with these people a lot.  I was reviewing what they were doing, I was sending them e-mails, they were sending me e-mails.  Sometimes I was on the ground with them myself.  And it's -- because I made a number of trips myself.  So I was -- I believe that I was on top of all of the people, making sure they were getting done what they are getting done.  I was the one that had to sign on the vouchers and I was making sure that whatever time they were putting in that they were corroborating that and having supporting documentation for that.  That was my job in the

case.

Q.  Well, and what about the fact that he interviewed and was looking at certain things about Veronica Evans?  There's an allegation that he just was looking to find a videotape of her apparently engaged in some sort of sexual activity.

A.  You know, Veronica Evans I think was the one that had been married to Chad Fulks, and they had sort of a rocky relationship, and there was some child abuse allegations that had been made, I believe.  And so, obviously, she would have been a source of information to get information about Chad Fulks.  You know, as to a video or anything like that or, you know, sexual issues, I mean I just -- I can't remember.  And why he would have been -- leave it up to his discretion.  If there was something there to explore then he had the discretion to go ahead and ask about it.

Q.  Was there ever a point, again I think you've answered it, but was there ever a look you felt he was distracted from what he needed to do or did you always feel like he was accomplishing the tasks that you wanted him to accomplish?

A.  I felt he was accomplishing the tasks that I was asking him to do.  You know, he's the guy on the ground and, you know, he has to make decisions and judgments about what to ask for, what to pursue, what questions to ask and report back to me.

Q.  Let's turn to Paige Tarr.  I think we will be very brief

here. She was a mitigation investigator, correct?

A. She had worked on death penalty cases and she had worked with David Bruck and John Blume, I believe, as a mitigation specialist. The Capital Center for Litigation or the Death Penalty Resource Center. She was on this case before I got involved in the case, before I was appointed.

Q. And at some point she wasn't getting some of her memos in as quickly as you wanted, correct?

A. Correct.

Q. Did you remedy that situation?

A. I believe there is a memo there. First of all, there would have been verbal communications about it. I think I remember seeing an e-mail that where I told her she better do it. I think I sent out several e-mails like that to different people, you know, I expect -- I expect what I expect and what I told you to do. So I can't give you specific dates or contact communications, but there was a period of time where she was getting slow on the memos.

     Now, the memos were important to me, but also the substance of what was in the memos. So we did communicate, though. So the absence of a memo right away didn't mean we weren't communicating. We did. Paige was up in Kentucky a lot, she had a great rapport with the family and a lot of the people we were contacting, family, school official, hospital officials. So she was up there a good bit.

Q.   Let's pull up Government's Exhibit 33.  One the things that she played a role in was coordinating and making sure that subpoenas were issued, and tracking them, is that correct?

A.   Yeah.  Particularly I remember the hospitals and all those, but here we have mental health facilities, schools, detention facilities.

Q.   So you are communicating with her about making sure that you get all those subpoenas?

A.   Right.  That was September -- yes.

Q.   Some of the documents we talked about earlier today where you are reviewing the records, the documents where you noted numerous times about manipulation, manipulative, characteristics of Mr. Brandon in the records, those are the very records that we're talking about, that --

A.   Right.  We had gotten a forthwith -- I don't remember exactly when it was, but we had gotten forthwith orders from the court to get records and we got -- were getting them in and trying to review them.  And some came in slowly, some we had to go back for.  But it appears that she was the one keeping track.

Q.   Let's go to Government's Exhibit 41.  And at some point Paige was -- Paige Tarr was working with Jan Vogelsang.  Can you explain to the court how they were working together and why they were working together?

A.   Well, Paige was the mitigation, one of the mitigation specialists and she -- Jan was the doing this genogram where she was working on the history from the beginning to the present day.  So it would have been logical that they would have been working together.  And Paige knew everybody up in that area, she had been in contact with them all, and so I guess she probably helped facilitate Jan speaking with who she needed to speak with, as well, for her purpose.

Q.   Let's go to Government's Exhibit 50.  This looks like a list that Paige Tarr compiled of all the different teachers that might be of use, or maybe it's even a distilled list, I'm not sure.  Government's Exhibit 50.

THE WITNESS:  Judge, can I take two minutes to run down the hall?

THE COURT:  Yes, sir.  Let's take a recess, ten minute recess.

(A recess transpired)

THE COURT:  Please continue.

Q.   (MR. DALEY) Mr. Swerling, one other point about Mr. Carlisle McNair before we get back to Paige Tarr.  Was there ever a point where you wanted to call him, maybe, because there had been an inconsistent statement and you felt like you couldn't call him because of whatever had happened with the Lexington County Sheriff's Department?

A.   Apparently there's something was in evidence from Lesa

Watson about that.

Q. No, I don't think that actually has been put into evidence.

A. I don't recall the situation. Somebody asked me about that last week or the last time we were talking, and I have no recollection of him -- the inability to put him on the stand. I just don't recall that.

Q. Okay.

A. And, you know, people talking about his personnel record, first of all, I don't know the court would have allowed any of that in there for impeachment purposes and so I don't know that I would not have called him. So I don't know if that was an impediment.

Q. And after this case you did actually continue to retain him?

A. Well, I have. And, you know, and I've used him in a number of cases since then. So, you know, it's -- apparently there's some things in his personnel record the government provided us in April '04, it was subpoenaed in April '04. It's not affected my relationship with Mr. McNair or my ability to use him.

Q. Let's go now to Government's Exhibit 50. Do you remember Miss Paige Tarr compiling a master teachers' list, a list of teachers you might interview and descriptions where they came from? This is Government's Exhibit 50. Maybe you can blow

that up a little bit.

A.  This is not one of folders you left up here.  Okay.

Q.  Can you see it?

A.  Yes.

Q.  Do you recall her preparing that?

A.  I don't remember the document specifically, but it would seem like something we would have done and told her to do or that she initiated.  I mean, that's what her job was.

Q.  So you were giving these folks to do their job some instructions to do their job, is that correct?

A.  Yeah, as long as it went through me, they didn't -- again, if you have a person working for you you want them to follow directions, come up with ideas.  But you also want them to follow up with what they think they should do things, as well.

Q.  And, in fact, again, another one of these summaries of all the interviews she did.  She did at least, of the summaries that were in your file, over 70 interviews of people.  Does that sound like a --

A.  Sounds reasonable.

Q.  It doesn't surprise you?

A.  No, not at all.

Q.  And we won't bring it up, but I believe the Exhibit 8 which summarizes the hours people did, she worked over 1800 hours on the case?

A.  Right.  And she was in western Kentucky a lot.  And I

remember asking her when I would go up there to try and interview medical personnel, Paige was coordinating those meetings and attended them with me, as well. Also family. She had a great rapport with the family and she helped arrange those interviews. We drove around interviewing family, those who wished to cooperate. And got turned away a few times by those that did not want to cooperate. But Paige knew the area pretty well by that time.

Q. There was a point where she wasn't able to give as much time as you thought she had to give to the case. I don't know exactly why. Were you then able to obtain further funding for another person to help out, too?

A. Yeah. What I did, and I guess Greg and I discussed it, I don't remember whether -- it was probably a combination of reasons. But what we did is we took away some time from her and asked the court to allow us to hire Lisa Kimbrough and so try and split their time. Paige had certain things to do and Lisa Kimbrough had certain things to do.

Q. Is there anything in the defense in the mitigation case, investigation of this case, that was impacted by the time that she wasn't getting her memos in as quickly as you'd like or when she wasn't able to give as much time for a period of time to the case?

A. No. I'm not aware, nobody's ever brought to my attention anything that Paige Tarr didn't do or failed to do. Or failed

to uncover.

Q.  Let's just go through some of the other folks that did interviews in this case.  We have got the summaries here for the -- to speed things along I think I'll just refer to them and ask you, first, you did interviews?

A.  Yes.

Q.  And from the summaries it looks like over 60 interviews.  Does that surprise you, you would have done over 60 interviews?

A.  No.  No, it doesn't.

Q.  And many of those would have been doctors or key witnesses that you felt you needed to eyeball?

A.  I think I remember going to western Kentucky and we tracked down some people.  There were several states -- let me just say that, without trying to guess, and medical personnel, also Tina Severance and Andrea Roddy, who I knew were going to be critical in the case and they were important government witnesses, we obviously wanted -- I wanted and I did cross-examine both of them, I wanted to be prepared for cross-examination.  Because what I was trying to bring out from them was that Mr. Fulks was the guy in charge, he was the one driving, he was the one that kept the money, he was the one that had the familiarities with the places.  So I interviewed both of them.

One of them was not very cooperative, she stood on the top

of a stairs and talked to me, I think in Boston or something like that. But she -- I can't remember which one it was. Just slipped my mind. But we had the other one gave us -- this is terrible, I'm sorry. We got a bunch of letters from one of the ones who had been dating Fulks, and it was -- I don't know if that was Tina, it probably -- yeah, I think it was Tina Severance, I apologize. Teen Severance was the one that had been seeing Fulks, and she gave us -- we took her out for dinner one night and there was a bunch of letters she had given us that we eventually had a hearing on that were letters that Chad had written her. So, I mean, I spent a lot time with her. Andrea Roddy I think was the one in Boston that kind of stood at the top of the stairs and I talked to her but she wasn't particularly accommodating.

Q. And so I think your summary of interviews is Exhibit 175. Exhibit 176, Greg Harris did about an equal number of interviews. Same situation, he wanted to be there --

A. Right.

Q. -- for critical witnesses?

A. Yeah, he did. And some of them were joint that we both felt we needed to be there. Most of them were separated.

Q. Lesa Watson, she was in Kentucky, she did, according to Exhibit 179, over a hundred interviews?

A. Doesn't surprise me at all. I mean, she was -- she was obviously recommended to us by resource counsel, and I believe

that's where she came from.  And she had had work experience in this area and she did a lot of the interviews in different parts of the geographic areas that we were involved in.

Q.  Carolyn Graham did over 50 interviews, as well?

A.  Correct.

Q.  And how did you end up using her to do interviews?  I guess she had been a paralegal and started to become more in the investigative side of things?

A.  Well, she was always an investigator, but I had her as a paralegal.  And so -- and she was very capable of doing interviews, as well.  And she's actually now, it's been a while, I think she's doing a lot of capital litigation as a result of this case.

Q.  That was, I guess, Government's Exhibit 180.  Government's Exhibit 181, Harrison Saunders did interviews?

A.  Yes.

Q.  And this was another attorney that you --

A.  Attorney in the office.

Q.  Right.  And --

A.  Limited number of hours.

Q.  Right.  Steve Hisker, another attorney?

A.  Yes, another attorney in the office.  Limited number of hours.

Q.  But he was able to do some interviews.  I think at one point they split up maybe Just Care and Alvin S. Glenn and

reinterviewed folks, is that correct?

A.   I don't remember who it is right at the top -- if you showed me I could tell you who they interviewed.  But they were given certain assignments and they carried them out.

Q.   And then Greg Cook up in West Virginia did some interviews in West Virginia.  Even though he was appointed on the Basham case up in West Virginia you were able to use him, obviously, to investigate up in West Virginia this case down here?

A.   Yeah.  Gary Collias was the lawyer up there and Cook was an investigator.

Q.   There's a number of exhibits that we have introduced that we will pass by, but there are a number that reflect the fact that you wanted things -- you wanted to see everything, you know, we have gone over a few of them, and when somebody didn't you would let them know about it, isn't that correct?

A.   Yes.

Q.   Let's go then when --

A.   Doesn't always run smoothly so you have to step on people sometimes.

Q.   Let's go to exhibit, for example, Exhibit 35, Government's Exhibit 35 just for a moment.  This is about a week or two after you had sent out the initial e-mail.  Apparently you're wanting to reiterate -- do you remember why you want to reiterate?  Just wanting to make sure you got everything?

A.   I like to reiterate a lot so I can't -- I can't tell you

what an event was, what event prompted this.  But, obviously, I sent it out and told them I wanted them.

Q.  Let's go to Government's Exhibit 36.  And when new team members came on or people you wanted to have in the loop you made sure they got put into the e-mail chain, isn't that correct?

A.  Yeah.  I mean, the purpose of the e-mail, the way that -- so everybody would know what was going on at the same time.  I mean, so everybody could share information and people saw what other people were doing, had input, had the information that other people were gathering so that could be a collective effort.

Q.  And here you added Greg Cook to the list.  I guess since he's up in West Virginia it's really critical he's on the e-mail, correct?

A.  Yes.

Q.  Let's go to Exhibit 42.  And it looks like Steve Hisker has been added so you want too make sure he's added to the e-mail list, is that correct?

A.  That's correct.

Q.  So you are continuing to make sure everybody is on the same sheet of music, isn't that correct?

A.  Tried to.

Q.  Again, the summaries that you wanted people to provide, let's go to Government's Exhibits 126 through 145.  Can you

look at Government's Exhibit 126 and tell me what that is?

A.   It's a weekly report from Lesa Watson.

Q.   And, again, you are doing this both for voucher purposes and to keep track of what they are doing, is that correct?

A.   Yeah, it was connected together.  Because I think, I don't remember exactly the procedure on the vouchers, I haven't seen them in a while, but there was, you know, documentation required, and I -- as I recall, I had to sign off on it.  So it's a combination of things, getting information up to date and also for the voucher purposes.  Which Jean Strickler was the secretary in the office who I gave responsibility to help me coordinate the vouchers.

Q.   And could you explain briefly Lesa Watson's role?  It sounds like she was a mitigation investigator and also I guess kind of a general investigator?

A.   I think she was both.  I think she helped on the mitigation part and she was investigating, as well.  And she accompanied me on several of the interviews I did, and she was doing her own interviews, as well.

Q.   All right.  Let's go to Government's Exhibit 160.  This is the exhibit we looked at a couple of different times, it comes from your vouchers, the amount of time you spent in meetings or phone calls with different people.

     Now we're talking about Paige Tarr and Carlisle McNair.  So the second line it appears that between you and Mr. Harris,

you met with her or talked with her over a hundred times totaling almost, well, 126 hours, if you take away double counting.  Does that seem about right?  I mean, you were -- that's a lot of time talking with somebody.

A.  Well, yeah.  Of course, yes.

Q.  Same thing with Mr. McNair, Investigator McNair.  Looks like you talked with him less, but do you remember, were you communicating more with e-mail or --

A.  I believe there's a lot of e-mails there.  But, you know, when if you are talking about -- I just don't recall.  I mean, it seems like that's understated.  I think it would be more than that, but maybe not.  But it's a lot of communication with him.

Q.  All right.  Mr. Swerling, we're going through these quickly, Exhibits 80 through 125.  First, globally these are the -- I think we have noted several times the to do lists. You like to do lists, don't you?

A.  Yes.  It helps me keep up with things that have to be done and also who's supposed to be doing them.  And we try and check them off as things are done.  And the to do lists keep growing because as you get in reports you add to the next to do list.  So it's constantly changing.

Q.  This first one is obviously one that is directed to Lesa, I guess, and Paige, more than anybody else.

A.  Right.

Q.   But it looks like the Ten Broeck Hospital, one of those hospital records that we saw earlier, that's one that you are wanting to make sure it gets listed in the records.  You obviously are looking to try to find all the different names of people that may have been involved with him, is that correct?

A.   Yeah.  I mean, my goal was to try and interview and get records from everyone that had contact with Brandon Basham.

Q.   And we will talk about the geographical charts and the cast of characters.  But obviously these were documents to help keep track of who all the people were that could potentially be witnesses in the case, is that correct, and where they were located?

A.   The geographical chart?

Q.   Geographical chart.

A.   Oh, yeah.  That was -- that was an idea that we devised, I don't know who devised it, but there was constant input into the geographical chart to designate certain areas of the states that were involved in this particular case and which witnesses were in those areas and when they had been interviewed, who interviewed them.  If I could see the chart it's pretty --

Q.   We can do that.

A.   Okay.

Q.   Let's go to --

A.  But it was designed to keep everything organized and accessible.

Q.  Let's go to Government's Exhibit 164.  What is Government's 164?

A.  This is something that we designated as a geographical index.  It's a compilation of witnesses and their geographical location, what their address was, who they were, whether or not they had been interviewed, whether or not at some point whether or not they had been subpoenaed, and what reference was made to that particular person in the discovery.  So that if we wanted to talk about Detective Matt Dillon, or Allen, I'm sorry, he was listed here.  He had an armed robbery charged on the defendant, Hopkins County Sheriff's Department. He was interviewed on March 23, '04, by who was he interviewed, and if there had been a reference in the government's discovery the page number, Bates stamp number would have been noted in the last column.

And this just helped me and everybody else keep up with the witnesses and what area they are.  The area, the reason we did a geographical index was to try and have people be able to go to certain areas when they traveled and try and interview people in certain areas.  So certain people would concentrate on certain areas.

Q.  Let's go to Government's Exhibit 34.  I believe this is the e-mail that was the genesis of the geographical chart,

also the cast of characters, and the timeline that you wanted
to have done?

A.  Yes.

Q.  So these, the group 1 through 12, and I think if you can
go to the next page it maybe goes to 16 or 17, these were the
areas, the geographical areas in the geographical chart?

A.  That's correct, the areas that had been identified in the
case.

Q.  And people needed to e-mail their information to Lesa to
make sure she could update that, is that correct?

A.  Right.  I think she was the one keeping this particular
document updated.  Of course, I had a copy, she had a copy,
and it was sent back and forth.  But it was something we could
work off of and keep us organized.

Q.  And it looks like there's also about, fourth paragraph,
fifth paragraph down, Lesa would also use the information you
send her to maintain an alphabetical list of every conceivable
witness.  Is that the cast of characters that --

A.  It's just something I've used over the years.  I call it
cast of characters, and it has a geographical -- and it's
alphabetical by each witness.  Try to put as much information
as you can there so that I can go to the cast of characters
and tell who a person is, where he is, what's his relationship
to the case, has he been interviewed, has he been subpoenaed.

Q.  I'm just handing you Government's Exhibit 169.  This is

the cast of characters, one version of the cast of characters.

A. Right. At this time it was integrated into the geographical index.

Q. Right. So it also had the geographical component to it.

A. Right, right.

Q. And, again, this is to keep everybody on the same sheet of music so everybody knows what everybody is doing, is that correct?

A. Right. And also, I mean, particularly me so that I could coordinate everything. Because one of the big things here was the interviews, who was being interviewed, when they were interviewed -- not when they were interviewed but who was being interviewed, and also being able to go right to the discovery page in the government discovery as to whether a particular person was referenced or gave a 302 or a statement or something like that.

Q. So let's get back to the geographical index, which is Exhibit 164, right? That's the mammoth document, I think 98 pages, Government's Exhibit 164. At some point as trial got closer morphed it down. I think at one point there was a question about whether you were focused too much on all these details. Did you get it down where you were filtering, I think separating the wheat from the chaff, as Mr. Burke said, and so the geographical index became a geographical to do list?

A. Do you have that?

Q. Let me pull up Government's Exhibit 165. I think that's an e-mail from Lesa Watson talking about doing this very thing.

A. I'm sorry. Because I have just seen so many documents, just a massive amount.

Q. I understand.

A. Well, this was paring down the to do list. It says I have updated chart with work. McNair and Graham did this past week. I have gone over line by line with Paige for whomever goes with her next week for that followup.

Q. And here is Government's Exhibit 166, 167, 168. These appear to be, and confirm for me if it's true, these appear to be the geographical index becoming a geographical to do list.

A. That is what they appear to be, yes, different dates. One's dated July 13, it was apparently updated July 26, it was apparently updated on August 8, 2004, right before the trial.

Q. Let's go to Government's Exhibit 166 just for a moment. In seems to have a lot of handwriting on it and is in red. Is that your handwriting?

A. Yes, it is.

Q. Okay. Let's go through some of the pages. It appears that you've gone through each of these pages and you are coming up with things that either need to be done or have been done or crossing out things. Is this just you continuing to

try to make sure that you are preparing for trial and things are getting done?

A.   If you go back to the previous page -- well, this page is fine.  I mean, if you look at the entry of Becky Hickland, for example, I was wanting a memo on that, I apparently did not see a memo when I went through the file so I was asking for a memo.  So that's what I was doing, going through this and trying to keep the information flowing and keep -- make sure that everything was being done that was -- should have been done.

Q.   So you've got interview here, you've got JBS check on another witness.  What's H/S, notation down fourth, fifth, next to Kenneth Holder?

A.   HS?  The only thing I can think of would be Harrison Saunders, but -- it's the only thing I can think of.

Q.   Okay.  But the bottom line is you were going through this witness by witness making sure that things are getting taken care of.

A.   Yes.

Q.   And it was updated, as you said, 166, 167, 168, showed that it was being updated continuously as you got closer to trial?

A.   That's correct.  This was -- I don't know if this was the last one, but this was the month before trial.

Q.   Let's go to Exhibit 48.  It appears that these -- the

geographical chart from time to time was actually used to help people know sort of the area, people that needed to be sure to be interviewed.  If you look under number one it seems -- it's got an e-mail to Greg Cook saying refer to cast of characters geographical area E.  So it was actually used to help people see what witnesses you were interested in trying to find even if they were, say, in Kentucky, or West Virginia in this instance.

A.  Right.  I mean, I think I said it before, I mean, if you were in an area working on a case and try to do what else is required in that area so that it would not be an overlap or unnecessary having to go back to a particular area.  I'm trying to just keep it efficient.

Q.  I see.  Yes.  Let's look at Government Exhibits 170 through 173.  A few other charts that you used were charts that were being used to keep track of a chronology, both a medical chronology and also a fact chronology of the entire case?

A.  Yes.

Q.  Do you remember that?

A.  Yes.

Q.  And that one of the people responsible for helping to make that happen was Shealy Boland?

A.  Right.  That was, I think, Greg's law clerk.

Q.  And let me just hand up to you Government's Exhibits 170

through 174.  Let's just talk about those for one second.
Let's look at Government's Exhibit 171.

A.  Okay.

Q.  This appears to be a time line from Mr. Basham's birth
through mid-2003 after the arrest.  Looks like it was updated
last on 10-23-04.  Do you remember this document?

A.  Yes.

Q.  And it appears that from Exhibit 170 you instructed and
Shealy Boland was carrying out the desire to split the time
line into two parts.  One was one that ended at Mr. Basham's
arrest, which appears to be Exhibit 172.  And then also in
this e-mail it looks like a second time line was to start
after Basham's arrest, and that appears to be Government's
Exhibit 173.  Is that correct?

A.  Let me just check.

Q.  So my point is Government's Exhibit 171, eventually you
split the chronology into pre-arrest and post-arrest.

A.  Right, it was split up.  Yes, that's correct, 172 and 173.

Q.  And the purpose of having this minute by minute,
sometimes, time line was what?

A.  Well, to have access to something that would give us
answers we needed right away rather than having to go through
box after box of documents.  So having it in here gave us what
I thought was an efficient way of dealing with the massive
amount of materials, people, and discovery, mental health

records, whatever it was.  By having these documents I thought
it was an efficient way to deal with that and for me to follow
the case and for other people to follow the case.
Particularly to access things, as well.

Q.  Let's go to Government's Exhibit 174, as well.  This is
the one last large document we will talk about.  It's entitled
Medical/Psychiatric Chronology of Brandon Basham.  I know
there were a number of versions, but this one is September 21,
2004, and this was a chronology that encapsulated all of
his -- basically all treatment, medical and psychiatric
treatment, any -- any medical treatment he had, correct?

A.  That was the idea, to go ahead and do that and have
something that was suitable to be able to refer to without
having to go through every single document.  It gave us -- it
just gave us the information readily -- it's a massive
document, but it was a lot less than going through all the
materials and having all the materials every time you wanted
to go access something.

Q.  And, again, this is all to try to keep up with this.  Have
you ever been involved in a case like this?  I mean, is this
truly the largest, just documents and spanning the geographic
areas, of any case you have been involved in?

A.  As far as documents and people involved, yes.  I've had
some other trials that have lasted this long, a couple of
them, but did not have the documents and the number of people

involved.

Q. Let's go to government's exhibit -- back to the to do list for a second.

A. Mr. Daley, you were asking me something about this, I guess it's 174.

Q. Yeah?

A. I mean, if you look at -- well, it's in evidence so the court can see it. I'm sorry, I was trying to explain it.

Q. Go ahead.

A. It's just an entry of what we did is it's daily, every day entry that there were records for and we just identified the date and then what the record was.

Q. So it's all the records, again some records you were reviewing, we talked about it earlier today?

A. Yes. It was a time line, as well. And then we did that with the discovery, as well.

Q. Again, a way to keep track of this mass --

A. Absolutely. Just to keep track and have an efficient way of access to the information.

Q. Now if we go to government's exhibit, one of the to do lists -- let's just go to Government's Exhibit 125. This appears to be a to do list about Jim Aiken, just taking this for example. Again, apparently you had least 41 to do lists in this case. This may be the last one that's actually numbered.

A.  At some point I started numbering them to keep track of them.

Q.  And the issue that Mr. Aiken was going to testify to was about future dangerousness, I guess, and about Mr. Basham being housed in a federal penitentiary and whether he could escape and things like that, and whether he would be a danger to folks?

A.  Yes.

Q.  And, actually, it looks like because of all the review of the records, you are saying as we know of him being manipulative.  Again you are using the records that you have to make sure that Aiken doesn't get caught short in cross-examination, is that correct?

A.  Correct.  I mean, he was going to be our expert and he needed to know the worst of the situations so that he would not be caught unprepared to respond.

Q.  And let's go to Government's Exhibit 120 just as another example.  It's a to do list number 37, it looks like.  It looks like you are assigning institutions, go to the first page, looks like assigning institutions to make sure people are responsible for different -- the records from different institutions.  Make sure, I guess, that you have everything and that it's all in order, is that correct?

A.  Yeah.  I mean, it says -- the document says that they are -- each of these people is to study the records from that

institution, review my memos in connection with those records. And those were those things we looked at before when I was extracting information from the records and follow through with interviewing all of the designated people. I said many of the interviews can be done from Columbia by phone, but doctors and psychologists who had substantial contact should be interviewed personally. When appropriate two people should conduct the interviews.

Q. And so, again, you are using this to do list to keep track of what's going on and to make sure people do what they are supposed to, correct?

A. Yeah. It was something I kept going over and revising, updating.

Q. Let's just do one more. Let's do Government's Exhibit 111. This appears to be one that you've sent specifically to Carlisle McNair. And you want to have -- at this time you were trying to interview some of Mr. Fulks' cell mates in these different facilities, obviously for the purpose of finding out information. I don't think the case had been severed yet.

A. 1-29, no, it had not. 1-29-04.

Q. We're not going to go through all the to do lists, but clearly you were on top of this case.

A. I believe I was. I believe I spent an incredible amount of time in this case managing the case. And, you know, I

think management is the best word, managing all the documents, all the people involved, and managing gathering information and interviews and making sure things got done not only by other people but myself.

Q. Let's go to government's -- to the claim number 23. And the allegation in that is ineffective assistance for you for failing to object to the presentation of inconsistent theories in the two different trials. Did you object to the alleged presentation of inconsistent theories in this case?

A. I don't believe there was an objection.

Q. No, there wasn't.

A. And I still, I don't believe that they were truly inconsistent theories. The government was well prepared for that argument. And I remember in August right before the trial that issue was being addressed before the court about us being able to put in certain evidence. And what it came down to and, of course, you have to decide whether to object and whether not to object, and it's just as important not to object as it is to object.

But sometimes you draw attention to by objecting, sometimes you invite other responses which you don't want, and sometimes you win the battle but lose the war. And in this particular situation the government's theory was that they acted as a team, that was throughout, that they, the two of them, acted together. Fulks may have done more directing,

more driving, more the planning, but they, as far as the actual murder, they acted together.

Q. Let's go to claim 24. Again, it's a question about the jury instruction about causal connection.

A. I've read that argument, I just don't see where that is. I was saying -- I believe during my argument I was saying to the jury that we're not saying his mental history or the factors for his mental history caused the crimes, what we were doing is we're saying this is mitigation we'd like you to consider.

The questions that were being asked by Scott Schools or Johnny Gasser were basically the same thing. You are not saying, Doctor, or whoever it was, that this caused the crime. I don't believe anywhere in here there was any suggestion by the government that the jury would have to find a nexus between the condition and the crime in order to use that as mitigating circumstance. So I really don't, still don't, understand that argument. I don't believe that that's what was being said when you read it and you pick it apart.

Q. All right. Claim number 27 is the failure to investigate Juror Wilson's questionnaire answers.

A. You know, I mean, I think we had somebody said, what, nine hearings on the juror issue? The court gave us a lot of latitude. Every time we came into court it seemed another issue developed. We issued subpoenas for phone records, we

would come in there was something else developed, so eventually it took nine hearings to go ahead and resolve the issue.

I do not recall investigating, I mean I probably would have looked at it, but I don't recall investigating the juror questionnaire. And if the fact that she was -- reported a nurse, she was a nurse six months longer than she put on the questionnaire, or whatever the issue was, I just don't think is significant and would not have changed -- let me put it in this way, Mr. Daley. I don't know that anybody really thought she was telling all the truth because it kept developing over a period of nine weeks that this was something that was said that was not truthful. So her credibility was already well at issue. These things that are in the allegation certainly I don't think would have made a difference. And one of them about Stacey Burnett, I think was about one of the jurors, that she had communications with a juror, in actuality I think Stacey Burnett is also a friend of hers or someone she knew and that was what came out during the hearing. And she testified that she did not know of being in contact with Stacey as a juror but if she had been it would have been about planting some sod or something like that. So I think it was done exhaustively, the entire process.

Q. Let's go to claim 30, I think this is last one we will have to do, and it deals with the allegation that you didn't

provide your appellate files in a timely fashion.  Let's go to Government's Exhibit 186.  Can you see Government's Exhibit 186, Mr. Swerling?

A.   Yeah.  Let me get this out of here.

Q.   Let me get that out of your way.

A.   Too many things here right now.

Q.   Okay.  What is that?

A.   It's a letter from Tim Sullivan to me dated January 14, 2008 telling me he had been appointed along with Melissa Meister to represent Mr. Basham on the appeal.

Q.   And he's asking for access to the file, correct?

A.   Correct.

Q.   And to meet with you?

A.   He came down sometime toward the end of January or February, saw the file, and I believe what he said was I'm requesting you either provide me with a complete master set or in the alternative provide me access to the master set so it could be inspected and copied.  And, of course, he was provided access to it and I don't believe there was a request made for the file itself, unless there's some document that has been introduced since I last saw all these documents that there was a request to copy the file.

Q.   So to the best of your recollection you don't remember any request until we get towards the end of March.  We will get to those --

A. I don't remember, but I could stand being corrected if some document has surfaced from Miss Meister. I don't know. But my recollection is that between -- according to my records and my documents there was no contact between January 14 and March 25th or 26th, I believe.

Q. Let's go to Government's Exhibit 189. This looks like you have received a message from -- who is Linda Brown?

A. Linda Brown is my personal secretary and --

Q. Actually looks likes Kellie Switzer has --

A. Yeah, the original message is here from Kellie Switzer to Jack, March 25 at 12:19, subject Melissa Meister, reference the Basham appeal.

Q. Okay. And then --

A. I either called her that day or the next day, I can't remember.

Q. Let's go to Government's Exhibit 190.

A. Okay. That's the e-mail is -- one of the e-mails is dated Wednesday, March 26th. So that would have been the same day. Is that the -- was that the date on the first one?

Q. The one below, the lower one is the March 26th, Wednesday, March 26th e-mail.

A. Okay. So --

Q. In that it appears she's asking for certain documents out of the file.

A. So she is saying pursuant to our conversation today here

is a list the items I need from the Basham files.  I'd appreciate if you could find as many of the items as you can by Monday March 31st and have them shipped overnight.  I'll be happy to fly down and visit your office and make copies of the following documents.

Q.  She's offering to come down Monday, March 31st, correct?

A.  Right.  I'm -- right, right.

Q.  I think from -- do you remember if you had left or were leaving town for Florida during this time period, if not --

A.  I believe there's an e-mail in here from March 31st where I say I'm just returning from -- that I had told you I was on my way out of town and I've just returned on the evening of March 31st from Florida.

Q.  Well, let's go to Government's Exhibit 192 then.

A.  And also I'll tell you this.  At this time one of the problems with getting the -- she asked for them on March 26th, of course that was a Wednesday, as I recall, and I looked up the dates.  So I was on my way out of town.  No one in the office, none of the paralegals who were in the office at that time had been there during the Basham case.  It was a complete change in personnel except for Linda Brown, who really only did my personal typing on the Basham case, was not involved in the case per se.  So there certainly was nobody to go ahead and get into that 77 boxes, or whatever it is, to go ahead and do this, and I was in Florida.

Q. So the 31st comes and she sends an e-mail it looks like, if you look towards the bottom, at 8:38 at night.

A. Correct.

Q. Asking what the status of the records are and whether you've sent them, correct?

A. Yeah. I hate to be a nuisance, but I would like to find out the status of the records I had requested. Of course, I hadn't been there, as I said. I can send someone down to make copies.

Q. So then your response a few minutes later, four minutes later it looks like, is?

A. Yeah. They did not, I have been in Florida and I'm just returning tonight. And did not understand the urgency like that. All of a sudden now it is a whole -- from March 26th to March 31st it seems like the world is going to end if she doesn't get these documents.

Q. So then it looks like, if you look at Government's Exhibit 191, she also asks for one more thing, I think. She's also asking for the order disqualifying Monckton and Littlejohn.

A. She added that to the list. And some things were sent. I mean, we did -- I think we sent -- I've got a folder, I don't know, you probably --

Q. I think we may actually get to some of that.

A. Okay.

Q.   All right.  Obviously, this is 11:00 o'clock at night on the 31st.  Any indication that there's a problem that, you know, you're -- you know, that there's going to be any kind of -- that there's a problem, that she's stressed out to the point that she's going to demand files in any way?

A.   No.  Obviously, she was wanting to get these things and started on March 26th.

Q.   Let's go to Government's Exhibit 193.  Do you remember this letter that was sent on April 1st about 3:00 o'clock in the afternoon, 3:30?

A.   Yeah.  It was the next day.  I had gotten in from Florida, obviously e-mail was at 11:00 o'clock, that's not unusual for me anyway to be e-mailing at 11:00 o'clock.

Q.   The second page.

A.   Yeah.  This kind of got my goat a little bit.  First of all, she said the numerous requests that me and my co-counsel Timothy Sullivan had made for the trial files of our client Brandon Basham.  And, again, you have documents, and I turned over to Mr. Burke the documents I have in connection with this issue.  It only indicates the January 14th communication, visit by Tim Sullivan, and then the March 26th.  If there's another document I would like to know about it.  But so there were no numerous requests.  And then --

Q.   Let's go to Government's Exhibit 194.  This is your reply to that letter.

A.   Yeah.  I just said I didn't like her letter, in tone and content.  And I felt like she was trying to pass off her fault, or whatever she may have let down the issue of trying to pass it on to me in that letter.

Q.   Although --

A.   She said something about going to the Fourth Circuit, and I don't know if that's in this letter or not.

Q.   I think it was in the April 1st letter.

A.   In the April 1st letter.  It was just ridiculous as far as I'm concerned.

Q.   And you said, though, the last sentence here, you say I arrived home from Florida Monday evening and I'm trying to get you what you want.

A.   Right.  This is the next day.

Q.   And you are making efforts, actually it's that evening, you are actually -- that's the response.  The e-mail, the letter was faxed in I think 3:30 or 4:00 and you are responding an hour later with your response and also saying I'm trying to get you what you want, is that correct?

A.   Yeah.  And here's -- Mr. Daley, I said you contacted me Wednesday, last Wednesday.  I told you I was on my out of town.  You asked about certain documents.  I'm trying to -- trying to get them.  You were trying to get them from the court or other sources but in an effort to make it easier for you I said we would help and that's what we're doing.

Q.   And so let's go to government's exhibit --

A.   I told her the files were here.

Q.   Okay.  Let's go to Government's Exhibit 195.  Again April 1st?

A.   That's about 9:53, I guess.

Q.   Um-hmm.  And you make the offer that they can come down whenever they want and copy whatever they want?

A.   Yes, come on down, which is what she volunteered to do.

Q.   So --

A.   And I said the files are and have been available for reviewing and copying.

Q.   So if we look at Government's Exhibit 196, plans were made for her to fly down on Thursday, is that correct?

A.   Correct.

Q.   Thursday April 3rd.  And then Government's Exhibit 197 --

A.   And if you notice in that particular exhibit, we had already packaged up stuff to send her and she said just wait until tomorrow when she got there.

Q.   And Government's Exhibit 197, looks like delivering some things to her.  I don't know if these actually -- she actually picked them, up but they were --

A.   I can't remember.  I think that she said something about keeping it.  Instead of FedExing it she'd pick it up.

Q.   This was the CD of the --

A.   Fight.

Q.  -- September 20th fight with the marshals.  And then Government's Exhibit 198, you sent motions notebook, looks like three of them, looks like all the motions you had regarding Chad Fulks, and also all the orders that you had in the Basham case?

A.  Right.  These were big, huge notebooks, one, two, and three of the motions, all motions regarding Fulks and all orders.  So these were like five or six big notebooks that we had copied that she could have copies of.

Q.  So she is planning to come down Thursday, April 3rd. Let's look at Government's Exhibit 199.

A.  Is this letter also dated the 2nd?  I can't see.

Q.  Let's go back to 197, 198.

A.  It was Wednesday.

Q.  That's the 2nd.  But I think you may have not -- may have held onto them and given her --

A.  At her request.

Q.  So let's go to Government's Exhibit 199.  We need the whole thing, actually, I think, Gayle, because I think it's a stream.

A.  Pardon?

Q.  I'm sorry, I'm talking to Gayle.  Can you highlight the bottom part first?  This appears she's been there that day, apparently she's pulled two boxes of materials to be copied and shipped.  They were handed off, fellow at Document

Technologies, not Brandon Basham but a person at Document Technologies. Is that a copy company, I guess, that she had --

A. Somebody we -- I don't remember. It might have been somebody we used in the past, but -- or they had wanted to use. Maybe they had an account there. I don't remember. But I gave her access to the files in the conference, the room that y'all have had access to, and Mr. Basham's counsel, and she made these two boxes. But I was, as I recall, I was not in the office when they were sent out there so I did not want them to stay overnight at the copy place. So I simply said bring them back, we will send them back to you in the morning. And I don't know, she seemed to have a problem with that. But it was -- the delay was really no delay because it was at night.

Q. And --

A. Late in the afternoon.

Q. The next page of Government's Exhibit 199, second page, she says -- at some point she talks about more details about the boxes and then the last sentence of her e-mail?

A. Thanks again for the unfettered access on such short notice.

Q. So originally she had planned, if possible, that she would travel down on Monday March 1st, but --

A. 31st.

Q.  I mean, and instead she ended up coming down on Thursday, April 3rd, is that correct?

A.  Correct.

Q.  Let's go back to the first page of 199.  And just your response to her in the middle, if you can just blow up the middle where Mr. Swerling is responding to her.  Thank you.

You say in here, you say you are welcome, and then you also say that you don't let files out of your office.  You said you've had a couple of bad experiences.  What's the -- what's your concern about keeping your files in your office intact, the originals?

A.  Well, I mean, ultimately, you know, certainly the client, it's the client's file and the client's entitled to the file.  But ultimately I'm going to be the one that has to be -- I have to be responsible for the file, as well, to make sure what I have is intact.  You know, boxes get destroyed, things get lost, so I like to keep a copy of the file, or the copy or the original, doesn't matter, but I need to keep that myself, just like in this case, so I could make it available to myself and make it available to you.

And I said I have had a couple of bad experiences.  As a matter of fact, in this case there's one bad experience because motion notebook number one for Basham is gone.  I can't find it.  And, I don't know, I'm not accusing anybody but it's gone.  So somewhere along the line this notebook that

was in that conference room, out of a number of big notebooks, is not there. And it may have been misplaced, but now I've got to spend some time -- I was trying to look for it last night. I spent about two hours looking for it in the conference room and couldn't find it. That's the kind of thing that concerns me.

Q. After this happened and they get the documents that they wanted did you continue to consult with them and --

A. Yeah, we communicated all the way through the end of May, I think. I think there's correspondence.

Q. And I think there's exhibits, we won't go through them, Exhibits 200 through 217 it looks like you, this is 17, 18 e-mails where they are asking you questions about certain things and you are trying the best you can, sometimes you are not able to, but providing them information, is that correct?

A. Yeah. And not only that, what I did is I told them if they had a specific question I contacted Greg Harris and see if he remembered the situation or if he had the document. Also John Blume, since motions, a lot of our motions were joint motions up until the time of the severance, so I would contact John to help them out to try and see if John had a particular document that they needed.

And so the e-mails, they document that, that Greg and John I called in. And, in fact, I invited her to call John but it seems like she could not get in touch with him, and I did and

got whatever information I needed, or the lack of information, that was being requested. So, I mean, I actively stayed involved, I believe, until sometime mid or late May trying to help her.

MR. DALEY: Your Honor, no further questions for Mr. Swerling.

THE COURT: All right. Redirect examination.

MR. BURKE: Your Honor, if I could pull some exhibits, please.

THE COURT: All right.

(There was a pause in the proceedings)

MR. BURKE: May I approach?

THE WITNESS: Could I add one thing, before -- just, Judge, if I could, I wanted to add one thing to the last question. I may have said it on last Thursday, but the only documents that Miss Meister did not have access to were the vouchers and my notebooks because they were in a filing cabinet locked in an unoccupied office. And I did not know they were not in the file, and I did not discover those until somebody rented that office and we looked in that file cabinet. So that would have been the only thing that she was not -- did not have.

THE COURT: I know what the vouchers are, what were the notebooks?

THE WITNESS: Just my handwritten, what you have been

seeing here, a lot of the handwritten entries.  They were just spiral notebooks.

THE COURT:  All right.  You may proceed.

REDIRECT EXAMINATION

BY MR. BURKE:

Q.  Those are the only things Miss Meister was not allowed --

A.  As far as I know, it was the -- not a -- it wasn't a question of not being allowed, it was a question of not realizing they were not in the file.

Q.  Okay.  Let's go back to the trial for a second, Mr. Swerling.  Why do you think the government repeatedly asked your expert witnesses about whether there was a connection between the mitigating evidence they were talking about and the crimes in this case?

A.  Because I think they were trying to argue that you have this evidence, the evidence is there, but it didn't cause the crime.  And which is exactly what I've said.  It didn't -- we weren't trying to argue to the jury that the condition, ADHD or whatever his mental illness was, caused the crime.  We were trying to say it's mitigation.  The nexus argument that I think is being made in the allegation is the government was saying well, you can't consider this as mitigating evidence unless you find a nexus between the condition and the crime. And I don't think that's what's being said.

Q.  Did the government argue several times in its closing

argument that there was no connection between the mitigating evidence that you had presented and the crimes?

A. Yeah, but they didn't say that he --

Q. Yes or no, sir. We'll be here for weeks. Yes or no, did they?

A. Did they? I don't recall. Point it out to me.

Q. All right. Well, were you concerned at any point that the jury may begin to believe that the mitigating evidence you were presenting was something that they really couldn't consider unless they could find that it explained the crimes in this case or it had some causal connection between the crimes in this case?

A. No, I don't read it that way.

Q. Okay.

A. I do not believe that's what was being said.

Q. Okay. Let's talk for a minute about your geographical to do lists.

A. Correct.

Q. Now, we talked about Exhibit 167, which is your geographical to do list. And we don't need to bring it up, that was one that was prepared in August of 2004, a month before trial in this case. Do you recall notations that you made on that document?

A. No.

Q. Okay.

(There was a pause in the proceedings)

Q.   (MR. BURKE) Mr. Swerling, do you recall Mr. Daley showing you a document or one of your to do lists that had red handwriting all over it?

A.   There was a list of red handwriting.

Q.   And that was in your handwriting?

A.   Yes.

Q.   Okay.  Mr. Swerling, I have in front of you, right in those manila folders, Government's Exhibits 237 through 244 that were admitted today.  And for the court's -- these are the mental retardation exhibits that were admitted under stipulation today.

Mr. Swerling, I would like you to take a minute and look through those exhibits and tell me if there is a single notation or highlight on any of those documents.

(There was a pause in the proceedings)

THE WITNESS:  Through what number?

Q.   (MR. BURKE) 237 to 244.

A.   I mean, there's something here, 12-19-03 I signed my initials.  That's so 242.  And on 243 it says to read.  That's my handwriting, as well.

Q.   To read?

A.   To read.

Q.   Okay.

A.   Which meant I did.

Q. That notation --

A. I don't necessarily put red marks on things I read or highlight in yellow, I read.

Q. When was this action decided, Mr. Swerling?

A. I don't know. We can look.

Q. Yeah, let's do that. Let's look at I believe Exhibit 240, but I'll check.

A. What number?

Q. 240, please.

A. Okay. Handed down June of '02.

Q. This is your copy of Atkins that was in your file, correct?

A. I assume. These are the documents from the file?

Q. Yes.

A. Okay.

Q. Any highlights, any notes?

A. No, apparently not.

Q. Where did you get these materials from on mental retardation?

A. They would have been gotten maybe from David Bruck or John Blume or from the resource counsel, or other people that I solicited information from.

Q. I would like to have you look for a second, Mr. Swerling, at Exhibit 241, if you would. That is a law review article dated August of 1998, so approximately four years before

Atkins was decided, and this was in your files.  And if you could look for me on page nine of that document, the number across the bottom is 31180, for a minute.

A.  Okay.

Q.  And do you see these -- the heading, finding and using an expert?

A.  Yes.

Q.  Could you read for the court the first two sentences of that paragraph?

A.  Mental retardation represents approximately two percent to three percent of the population.  It is a small, specific subspeciality for mental health professionals.  Typically these professionals have little experience and training with people who have mental retardation.

Q.  Okay.  And could you turn to Exhibit 243, Government's Exhibit 243 for us, please?

A.  Okay.

Q.  And that's the exhibit that you had marked to read, which you say meant you read it.  Could you --

A.  Well, it says to read, which means it was in the stack to read.  And I read it all sorts of hours.  So I mean --

Q.  I'm sorry, I thought you did say that you --

A.  I said I have read it.  But this says, I'm correcting, it doesn't say I read it, it says to read.

Q.  Okay.  Can you go to page 11 of that document for me,

please?

MR. BURKE:  And, your Honor, rather than bring all of these up I will just try to specify so that we can -- I would like Mr. Swerling to be able to go on with his life, so I'm trying to get this done as quickly as possible.

THE COURT:  You can ask leading questions because technically he's not your witness.  Technically.

THE WITNESS:  Page 11?

Q.   (MR. BURKE) Page 11.  And the top there says, working with a mentally retarded client, correct?

A.   Still trying to unfold the pages.  Yes.

Q.   Okay.  Do you recall reading the following description of a mentally retarded individual?  And it's at the bottom of the page and I'll read it for record.  Many clients are able to talk for hours on a single subject and appear to have extensive knowledge so long as the conversation remains within the area they have comfort.  For instance, one client was able to recite backwards and forwards starting at any point the kings and queens of Europe over hundreds of years and their relationships to each other.  This area of competence must be explored to assess the depth and width of the client's knowledge.  This client was not able to calculate change from a dollar he would get back after buying a 60 cent soda.  Do you remember reading that?

A.   No, I don't remember specifically reading that, no.  I did

read the document, though.  If it was in the box I read the document.

Q.  Do you remember it having any impact on you?

A.  Eight years later, nine years later, no, can't tell you what the impact was.  I can tell you I read the document, familiarizing myself with the areas of the things I was going to be confronting.

Q.  Let's turn to Government's Exhibit 226, please.  I'm not sure you have those, so just one second.

(There was a pause in the proceedings)

Q.  (MR. BURKE) Mr. Swerling, I'm going hand you what has been marked 226 through 235.  They are actually admitted into evidence.

A.  Okay.

Q.  These are documents that Mr. Daley reviewed to you, were reviewed with you of your memoranda that you made when you were reviewing medical records for Mr. Basham.  And you testified upon questioning by Mr. Daley about the incidents of Mr. Basham's manipulation.  Do you remember that this morning?

A.  I remember he was referring to specific paragraphs that I had noted, extracted from the medical records.

Q.  Okay.  Could you turn to the second page of Exhibit 226, please?

A.  226.  Okay.

Q.  And midway down there's a notation made by you that we saw

earlier. I will read it. There is a note of a Dr. James Rozell, August 1, 1990. He talks about Brandon being quite obnoxious today. Brandon is referred to as manipulative and uncontrolled. How old was Mr. Basham in 1990, Mr. Swerling?

A. I don't know.

Q. You don't know?

A. At this time, no, I don't know. Do you, how old was he?

Q. He was nine years old.

A. Okay.

Q. Could you look at Exhibit 227 for me, please?

A. What number?

Q. 227. I hope I gave that to you.

A. I don't have that.

Q. Okay.

(There was a pause in the proceedings)

Q. (MR. BURKE) And, Mr. Swerling, Exhibit 227 is a memorandum made by you about your review of Hopkins County school records.

A. I don't have it.

Q. Oh, I'm sorry, I thought you said you did. Okay. You went over this with Mr. Daley, as well. There is a reference in here, that you write there is a note that he is manipulative, has poor impulse control, hyperactivity, and distractibility.

Would you agree with me, Mr. Swerling, that these notes

from 1989 would have meant Mr. Basham was eight years old when those records were created?

A. He was a year younger than 1999.

Q. 1990. You are not saying, are you, that a person with brain dysfunction can't me manipulative?

A. Am I saying that?

Q. Yes.

A. I have no idea. I'm not a doctor.

Q. And you are not saying someone with an IQ of 68 can't be manipulative?

A. I'm not sure I understand the question. I am not -- I'm not saying -- that's a double negative. Can you explain it?

Q. Certainly. Is it your opinion that a person with an IQ of 68 is incapable of being manipulative?

A. I have no idea.

Q. Okay.

A. All I testified to is he is manipulative.

Q. There was a reference --

A. It went back, obviously, when he was eight years old, as you pointed out.

Q. Do you have Exhibit 235 up there?

A. Yes.

Q. Okay. Can we open that one, please? And this is another document that Mr. Daley went through with you with regard to Paige to Donna. And there was some discussion about Mr. -- on

page three about whether Mr. Basham plays chess. Did you ever play chess with Mr. Basham?

A. I can't play chess.

Q. So you can't --

A. I play checkers, I never played chess.

Q. So you never played with him?

A. No.

Q. And you don't know --

A. I never said I did.

Q. You don't know how he would have played chess, right?

A. No. I don't know where that information came from. Apparently there's a note somewhere he played chess.

Q. Let's turn to the first page of that exhibit, entry number 14. Blames others. And that is your handwriting afterwards, is it not, that says like five or six years old?

A. That's my handwriting, right.

Q. Okay. And then on the next page under item 21, subsection C, there's grandiose thinking, and in your handwriting it says psychosis, is that correct?

A. Correct.

Q. And then number 23 says, choose wrong. And can you read your note for me there?

A. Does not have capacity.

Q. Can you look at --

A. I don't know what that means.

Q. Can you look at page -- the final page of this document for me, numbers 40 and 41? It says can he help himself? Research. Can he control it? Research.

A. Um-hmm.

Q. Do you recall what those issues were, if those issues were ever researched?

A. I cannot -- do not recall whether they were or they were not. The file would reflect it.

Q. You provided Dr. Brawley or someone on your team provided Dr. Brawley with the IQ scores for Mr. Basham, the seven or eight IQ scores, right?

A. I believe they were provided based on -- my recollection is based upon what I was shown in the testimony and having read the testimony. I don't have the individual communications with Dr. Brawley that I can put my hand on right now.

Q. If the record in this case contained only the IQ scores themselves in most instances but not the tests themselves would that indicate that that information was not provided to Dr. Brawley?

A. I can't answer that. I don't know.

Q. You ever ask Dr. Brawley to re-score any of the prior IQ tests?

A. I have no recollection of conversations with Dr. Brawley about that one way or the other.

Q. Can you tell us the standard of proof for Atkins proceedings in federal court?

A. Not right now I can't. I haven't looked at Atkins in nine years, eight years.

Q. Now, you would agree with me, wouldn't you, that in 2003, 2004 with regard to Mr. Basham you had a client who your expert was saying had an IQ of 68.

A. I'm sorry?

Q. Would you agree with me that your expert stated that Mr. Basham had an IQ of 68, correct?

A. If that's what it was, 68, then that's correct.

Q. Did you know that your client had never obtained a driver's license?

A. Yes.

Q. Did you know he had never held a steady job?

A. That I don't remember. I remember about the driver's license. We brought out the fact he did not have the ability to drive and he never had driven.

Q. Who on the Basham team would have had the ultimate responsibility to make the decision whether to request an Atkins hearing?

A. Greg Harris and I.

Q. And in this case you had two of the three elements of an IQ diagnosis present. An IQ below 70, correct, and evidence of deficiencies in his adaptive behavior, correct?

A. Say that again now?  I just didn't understand your question.

Q. That's fine, that's fine.  It's been a long day for all of us, so -- if you could look again at Government's Exhibit 243 for me.  And, Mr. Swerling, 243 is one we looked at, is a newsletter for defense counsel in federal capital cases dated April 2003.

A. Correct.

Q. April in 2003 is when you were appointed to this case, correct?

A. Yes, I think so.

Q. The bottom of that first page references a training on mental retardation being held by the Administrative Offices of the Courts on May 1st and 2nd of 2003.  Did you attend that training?

A. Not that I recall.

Q. I would like to turn for a moment to the Jackson versus Denno hearing in this case.  You mentioned several times during your testimony a December 29, '03 memo that's Exhibit 12 in this case prepared by Greg Harris regarding his interviews with Barbara McGuire, Richard Hughes, and a Mr. I believe Hewlett in Kentucky?

A. Right.

Q. Did that memo play a significant role in developing your strategy with regard to the Jackson v. Denno hearing?

A.   No.

Q.   No?  Okay.

A.   It just -- it was just something that you -- obviously, we couldn't call Barbara McGuire because of the other things she had said.  I think it was a danger of some of that stuff coming out, her impressions.

Q.   Barbara McGuire was a member of Mr. Basham's defense team in Kentucky, correct?

A.   No.

Q.   She was not?

A.   In Kentucky?

Q.   Yes.

A.   I thought it was in Ashland.  I don't remember.  Do you have a document?

Q.   I guess the location isn't all that important.

A.   Well, she was appointed, the public defender was appointed on the Ashland arrest.

Q.   And she was an investigator or paralegal with the public defender, correct?

A.   Correct.  And Ashland, not -- as I recall, I don't remember it being in Hopkins County.

Q.   My concern is simply her role, she was on --

A.   I'm trying to find out what you were --

Q.   She was a member of the defense team, correct, for Mr. Basham's case, for Mr. Basham in Kentucky, not your defense --

A.   Not Kentucky.

Q.   Then I think --

MR. DALEY:  I think it is, actually.  I think it's Ashland, Kentucky.

THE WITNESS:  Okay.  I'm sorry.  I thought -- I was thinking of West Virginia for some reason or another.  I apologize.  That's why I was asking for a clarification.  Okay.

Q.   (MR. BURKE) Would you normally call a person who had confidential privileged communications to the stand in a Jackson v. Denno hearing to testify?

A.   I just said I wouldn't call her.

Q.   And you said because of the memo you wouldn't call her.

A.   Well, that, too.

Q.   Okay.  Do you remember when you first revealed this memorandum to my co-counsel and myself?

A.   Well, we discussed -- I asked you a couple of times whether or not you had seen that and you -- two of you were in my office and because nobody ever mentioned it.

Q.   Can you tell us when?

A.   Absolutely not, I can't tell you when.  You can tell me.

Q.   Could it have been in June of 2012?

A.   It's possible.  But let's remember this, Mr. Burke.  You never went over to see Greg Harris' file and that's where it was.  It was not in my file.  And I pointed that out to you,

because I said to you, have you seen -- you've never commented on the Richard Hughes memo that Greg did. And that's when we realized it was not in my file.

Q. So you did not have this memo in your file --

A. It was not in my file, and you know that. And I told you that Greg Harris had it but you never went over to see Greg Harris prior to that time and look at his file. And I called him right away and I said, in fact, get me that Richard Hughes thing because apparently we don't have it, they have not seen it. And then you went over there on Friday to go ahead and review it.

Q. Were you privy to the conversations that Miss Stone and I had with Mr. Harris about who had all of his records in the case?

A. Mr. Harris has about -- has several couple dozen boxes, as well.

Q. And you never had a copy of this memorandum in your file --

A. I didn't say I did or didn't. It wasn't in the file when you copied it and I don't know why it was not there. I told you that. And I got it for you. I told Mr. Harris to make me a copy and give you copy, because I was concerned that you had never mentioned that memo. So I was the one that brought it up. And you never tried to even interview Mr. Harris or I or that would have been revealed, had you or Miss Stone tried to

even interview us, which we certainly would have been glad to.

Q. Well, let's talk about that for second. Did I not introduce myself to you in early 2011?

A. You did, I met you.

Q. That was not an interview?

A. I don't believe you interviewed me.

Q. Okay. Well, we will let that --

A. Never went over anything with me in the case. I certainly was available, and so was Mr. Harris.

Q. Let's go back to this memo again. Let me ask you another question. You made yourself available, did you make yourself available to my standard of care expert?

A. No.

Q. Okay. Thank you.

A. I told you that --

Q. I don't have a question, Mr. --

A. Well, can I explain my answer?

Q. If you want -- if the government wants to do it on redirect --

THE COURT: Go ahead and explain your answer.

THE WITNESS: You asked me whether or not I would make myself available to your standard of care expert, and I thought that the fact that you had never interviewed me was preposterous and so therefore I just said no, I was not going to be interviewed by your standard of care expert. Just

like -- and I just felt like I wasn't going to do that.

Q. Under oath is that what you told me on the telephone the day we had the conversation?

A. Say what? What part of it?

Q. That you were not going to speak to my standard of care expert because I had not --

A. I didn't say the last part of it. I said that's what I was thinking. I told you I was not going to speak to your standard of care expert. And I'm telling you one of the reasons why is I thought it was pretty ridiculous that you and Miss Stone never sat down with me or Mr. Harris and interviewed us about the case. Still don't understand that.

Q. Do you also recall saying to me that you didn't want to speak to Mr. Hammond because he'd obviously already made up his mind?

A. I may have said that. But I did not -- I didn't have to submit to an interview with him. And I didn't.

Q. Okay. Let's go back to the memo regarding Miss McGuire. And did you feel that the memo was relevant in any way to your decision to conduct a Jackson v. Denno hearing?

A. Was it relevant? What was relevant about it, and I think I explained that yesterday or today, I can't remember anymore I'm so tired, but what it was relevant to was the main statements, the ones that dealt with the disappearance of Burns and her location and the disappearance and what happened

to Donovan and her location, were given when Miss McGuire was already involved in the case and told him to shut up, when Mr. Hewlett told him to shut up, who was the public defender, when Richard Hughes advised against it but shared the information said by Basham against it. And then when Monckton and Littlejohn were involved. So those statements, when all of those lawyers were involved, there was just no way that we were going to be able to show that those were not voluntary statements.

Q. Were any of those three witnesses, McGuire, Hughes, or Hewlett, qualified to tell you what the effect of Mr. Basham's low IQ would have on his ability to knowingly and intelligently waive his rights?

A. I don't believe that was the issue for me.

Q. Was that not the issue in the Jackson v. Denno hearing?

A. It was -- yes, but I'm not -- I said calling them, or are you saying that I think they were qualified to give that, that was not the issue for me.

Q. Okay.

A. They advised Mr. Basham. None of them said he was incompetent, none of them said he didn't understand his rights, none of them said he did not understand what their admonition was not to speak with law enforcement.

Q. Now --

A. So that was --

Q.   That reminded me of some of your testimony yesterday, that none one of the prior counsel ever suggested there was concern about Mr. Basham's competency.  Are you aware that Mr. Monckton in fact took notes about Mr. Basham being dazed and confused?

A.   I'm not aware of that now, right now.  I may have been aware of it way back.  But if he testified to that or if he has testified, I'm not aware of it.  What I did say yesterday, and I qualified it, is that there was a motion filed by Mr. Littlejohn and Mr. Monckton about a competency hearing.  And that's what I remember.

     But I also said yesterday, even though I was tired, that I do remember this, that I said that I did not believe, knowing Mr. Littlejohn or Mr. Monckton, that they would have allowed him to participate in a full-day search looking for a woman's body who he was accused of murdering if they believed he was not competent at that time.

Q.   Okay.

A.   That's what I said yesterday.

Q.   Okay.  You mentioned with regard to the Jackson v. Denno hearing that Mr. Basham told you, I believe on the second morning of the hearing, that he ingested cocaine.  Do you remember that?

A.   Yes, I think we went over that yesterday.

Q.   And he was tested for cocaine and it was negative,

correct?

A.   As I recall, yes.

Q.   Do you recall saying that just shows he wasn't telling the truth?

A.   If I said it, I said it.

Q.   Okay.   Isn't it possible that Mr. Basham ingested a substance he thought was cocaine that day?

A.   I don't know what's possible.

Q.   Perhaps the substance an inmate told him was cocaine but he was too gullible to --

A.   I have no idea, Mr. Burke.

Q.   It's not possible?

A.   I didn't say it was not possible, I said I have no idea.

Q.   Let's turn to your concession of all the elements --

A.   Obviously he had not ingested cocaine.

Q.   That's what the -- yes.   But it is not as obvious that he was not telling the truth.

A.   He was not under the influence of cocaine.   Couldn't have been.

Q.   Let's talk about your concession of all the elements of the offenses against Mr. Basham except for the intent element of carjacking.   You requested an ex parte hearing before Judge Anderson in which you discussed with the judge that you had informed -- discussed with Mr. Basham about your strategy and that Mr. Basham had agreed, correct?

A.   The record would reflect it.

Q.   Can you tell me how this on-the-record waiver benefited Mr. Basham?

A.   How the waiver benefited him?

Q.   No, how the on-the-record discussion with the judge was of benefit to Mr. Basham, your client?

A.   I don't know that it had -- I don't know if that was the purpose of making a benefit for Mr. Basham, it was a purpose of making a record about it, and that was a recommendation that had been -- other lawyers had been making for a long time now.  Because clients often will come back later and say that they did not authorize that.  So I put it on the record. Didn't hurt him.

Q.   Did you explain to Mr. Basham your strategy for conceding all the elements except for intent and kidnapping -- excuse me, carjacking?

A.   I don't remember those complete discussions.  I told Mr. Basham what my strategy was, and the strategy was revealed in my opening statement and what I said before the court.

Q.   Did you have any concerns that your client who had an IQ of 68 might have had difficulty understanding the nuances of the federal carjacking and hijacking statutes?

A.   I don't think that he had the -- I don't know that Mr. Basham had the intellectual capacity to understand all the things that you and I understand and Mr. Daley understands and

the court understands about the judicial process or the law, but I have no trouble communicating with Mr. Basham.

Q.   And, finally, can you tell us specifically what in the government's closing argument in Mr. Fulks' case was more damaging to Mr. Basham than the evidence that they presented at Mr. Basham's case?

A.   I'm sorry.  I don't understand what you are saying.  I apologize.

Q.   You testified you had concerns that if you attempted to bring in the government's statements about Mr. Fulks, about Mr. Basham in Fulks' trial, that you had concerns about whether they would be, under the concept of completeness, they would be able to admit the entire closing statement or argument for Mr. --

A.   No, I never said that.  I never said the entire closing statement.  I said it would be inviting a response and possibly something from that.

Q.   And what from that was -- was more damaging to Mr. Basham than the evidence that the government --

A.   It was a factor, which I believe is what I testified to. And I can't possibly remember now.

Q.   Thank you.

A.   I have not read the Fulks transcripts in years.

        MR. BURKE:  No further questions.

        THE COURT:  All right.  I assume no recross.

MR. DALEY: No, your Honor.

THE COURT: All right. Thank you, Mr. Swerling. You may step down, you are excused.

All right, you said you think your next witness will be up about a hour on direct?

MS. STONE: I think. I'll try and keep it to that. I actually said yesterday about 90 minutes, about. I'll try and be conscious of the time.

THE COURT: Y'all want to break to lunch for an hour today to save time?

MR. BURKE: Your Honor, can we also just briefly address, Mr. Daley and I spent yesterday to discuss issues with closing argument. It may assist the court, we were actually able to agree on several claims in which we'll just submit on the briefs.

THE COURT: All right.

MR. BURKE: So that would give the court the opportunity to begin going forward with those claims. And I could identify those now, if you would like.

THE COURT: All right. Claims on the brief only.

MR. BURKE: Yes, I will read the numbers for you. Three, ten, 13, 14, 17, 21, 22, 25, 26, 27, 29, 32, and 33. So those are 13 of the claims that we are agreeing to submit on the briefing.

MR. DALEY: And claims eight and --

MR. BURKE: The two claims have been withdrawn. Claim eight --

MR. DALEY: And I think it's 31.

MR. BURKE: And I believe claim 31.

THE COURT: All right.

MR. BURKE: In the event that Mr. Hammond's testimony goes longer today, he does have a flight scheduled for the morning. So I don't know if we would be able to get to the argument.

THE COURT: If we can't, we just can't get to it. I was thinking it might be helpful, but, to be frank with you, I told you I'm having some vision problems and I have been pretty tired when we adjourn.

MR. DALEY: Your Honor, it will not really hurt either of our feelings. I feel I can tell you that I don't know that anybody is -- we're pretty tired, too. We might give --

THE COURT: Let's plan on coming back after lunch and finishing the last witness and not doing arguments.

MR. BURKE: Thank you, your Honor.

MR. DALEY: Thank you.

THE COURT: All right. You want to -- let's say an hour 15 minutes. Come back at 2:30. All right. We will be in recess until 2:30.

(A recess transpired)

THE COURT: Ready to move forward?

MS. STONE: We are your Honor.

THE COURT: Call your next witness.

MR. BURKE: The defense calls Larry Hammond to the stand.

(Larry Hammond duly sworn)

DIRECT EXAMINATION

BY MS. STONE:

Q. Good afternoon, Mr. Hammond.

A. Good afternoon.

Q. Let me start out by apologizing to the court reporter. I'll try and speak as strongly as I can. My voice is pretty weak today. How many years have you been practicing, Mr. Hammond?

A. 43.

Q. And where do you currently work?

A. In Phoenix, Arizona with a private law firm.

Q. And let's talk briefly about your educational history. Starting with your undergrad, can you tell us a little about that?

A. Yes, I started out at the University of New Mexico in 1963 as a Russian major, transferred eventually to the University of Texas, obtained my undergraduate degree in government and then my law degree at the University of Texas in 1970.

Q. And you've had some judicial clerkship experience?

A.  Yes, I have.

Q.  Can you tell the court about that.

A.  Yes.  I had three clerkships.  I clerked initially for the Honorable Judge Carl McGowan on the D.C. Circuit Court of Appeals in Washington.  And then I was a law clerk to Hugo Black who passed away while I was clerking.  I then clerked for -- I was the first law clerk for Lewis Powell and clerked for him for two years.

Q.  And during the time that you clerked for Justice Powell did you work on death penalty cases?

A.  I did.

Q.  And was it a particularly interesting time in death penalty jurisprudence?

A.  Well, I was a law clerk for Lewis Powell and for Hugo Black when Furman versus Georgia was decided.

Q.  And did you work on that case?

A.  I did.

Q.  After your judicial --

THE COURT:  Did Justice Powell write that decision?

THE WITNESS:  I'm sorry?

THE COURT:  Did Justice Powell write the Furman versus Georgia decision?

THE WITNESS:  Every justice eventually wrote.  There were nine opinions.  It's now very public knowledge that Justice Powell believed for many, many months that his opinion

that I worked on with him was going to be the court opinion. It eventually was not, it came out to be a five-four decision the other way and his opinion, which he hoped would be the court opinion, wound up being a dissenting opinion.

Q.    (MS. STONE) After your judicial clerkships where did you go?

A.    I went to work for Archibald Cox in the office of the Watergate special prosecutor.

Q.    And did you work for the Carter administration?

A.    Yes, I did.  When Jimmy Carter was elected I was asked by Griffin Bell, who was the incoming Attorney General, to come to the Department of Justice, and I worked at the Department of Justice throughout that administration.

Q.    And during your time at the Department of Justice did you have any work or any connection to death penalty work there?

A.    Yes, we did.  I was the deputy in the office of legal counsel, and during the administration President Carter asked that our office do what was then known as a white paper on the death penalty so that he could consider the history of the death penalty in making public statements about capital punishment.  And I was the supervisor in charge of the team that put together that white paper.

Q.    And after your time with the Department of Justice where did you go?

A.    I had -- I had been for three years in Phoenix, Arizona

with a law firm and I returned to that law firm in 1981.

Q.   And that was where -- the Osborne Maledon firm there?

A.   The name has changed but it's the same core law firm that's been there over 35 years now.

Q.   I want to move now into some of the professional organizations you are involved in.  I know if I focused on everything we would be here past when we would like to be so I would like to just focus in on organizations that deal with capital punishment or wrongful conviction.  Can you tell us a little bit about some of those organizations?

A.   Yes.  I think probably chronologically the oldest of the organizations I have been affiliated with on the death penalty has been the Arizona Capital Representation Project, which was founded in 1989.  I was one of the founding members and have served on the board either as an officer or a board member for as long as that project has been in existence.

Q.   And what does that project do?

A.   That started out, much as other projects around the country, as a resource center funded by the federal government.  After federal funding was taken away in the mid '90s the project became a nonprofit organization that attempts to assist lawyers who have death penalty cases in Arizona, people have who have been convicted and sentenced to death in Arizona.  They do some direct representation, but most of their work is counseling and assisting others who were doing

death penalty work.

Q. Are you also involved with an organization called The Justice Project?

A. Yes, the Arizona Justice Project was founded in 1998. I was one of the founding members of the criminal defense association in Arizona that created that project.

Q. And tell us a little bit about that project.

A. The project, which is now nearing it's 15th anniversary, is the fifth oldest innocence project in America. It's patterned very much like the one that Barry Scheck and Peter Neufeld started in New York a couple of years earlier. We attempt to assist inmates who have significant claims of actual innocence or of some very manifest injustice. We started out as an all volunteer organization, we now have the benefit of modest funding from several sources and have a staff of lawyers. We have reviewed over the last 14 and almost 15 years over 4,000 cases, and the project has filed and is involved in somewhere between, have been or currently involved in somewhere between 50 and 100 cases.

Q. And is ineffective assistance of trial counsel one of the many issues the Justice Project looks at when trying to determine if a case --

A. Yes. Among the principal causes of wrongful conviction we have found pretty common knowledge these days that the ineffective assistance of counsel, both the incompetence and

in some cases the failure to abide by the Strickland

standards.  But they are often under-funded and

under-resourced lawyers.

Q.  Are you also involved with The Judicature Society?

A.  Yes.  I began serving on the board of The American

Judicature Society back sometime, I don't know, but a long

time ago.  I became the president in 19, I'm sorry, 2004 to

2006, and I still serve on the, what I think they call the

forensic science reform committee of AJS.

Q.  And tell us a little more about The Judicature Society.

Who composes that group?

A.  It's -- it's a nonprofit volunteer organization.  Over

half of its members are judges.  It is an organization created

in 1913 to assist in improving the quality of our judicial

system, but also the respect it deserves in the community.

Q.  And can just anyone join that society?

A.  Anyone can, and there are -- there are nonlawyers who are

members, that are journalists who are members.  But at least

when I was aware of the details I would say that most of the

people were lawyers, and most of them senior lawyers.

Q.  And does the Judicature, excuse me, difficult to

pronounce, Judicature Society also look at issues of wrongful

conviction when looking at the integrity of our legal system?

A.  Yes.  And, by the way, there's almost nobody who can

pronounce judicature.  But, yes, it has been involved in

attempting to look at questions of wrongful conviction and ineffective assistance of counsel.

Q.   And let me ask you, we throw around the term wrongful conviction, does that term refer to innocent people that are convicted or does it also refer to when penalty phase or when the inappropriate penalty is imposed?

A.   The term wrongful conviction, as we have used it both with the Justice Project and these other organizations, includes cases that I would consider to be cases of injustice, not cases, very often not cases of an actually innocent person.

Q.   And are there any other professional organizations I've missed that you are involved with that deal with capital punishment?

A.   I think the other one that I was going to say dogs me, but that wouldn't be the right phrase, I was appointed as the chair of the Arizona State Bar Indigent Defense Task Force in 1995.  I have been the chair of that task force for 17 years, and most of the work of that task force has been related to the death penalty in Arizona and to questions of establishing standards for the competence and quality of lawyers who are appointed by the court to capital cases in the state of Arizona.

Q.   Have you published articles relevant to capital defense?

A.   Yes, numerous articles.

Q.   And, again, we would be here for a long time, but some of

the organizations or newspapers you have written for?

A. Well, I think there is a list of the publications somewhere in our law firm's resume, but articles have been published in the Arizona Attorney which is the state bar journal, the ASU, excuse me, Arizona State University Law Journal, the University of Arizona Law Journal, Judicature Magazine that's off the TAJS magazine, and I know there are others, but those are the principal ones that come to mind.

Q. Have you also had teaching experience with regards to the death penalty?

A. Yes. I have taught, I hesitate over the word taught, I'm not sure there's more to be taught than there is to be learned, but I have taught the death penalty course at the undergraduate level at Arizona State University and at the law school level at Arizona State, and I taught courses that dealt with the death penalty, along with other topics, both at Arizona State, New Mexico, and the University of Arizona.

Q. Have you also done a visiting professor at Elon University?

A. Yes. In 2008 I served as an adjunct or visiting professor in the fall semester and taught a course there called The Failures of the Criminal Justice System, in which we attempted to focus, among other things, on ineffective assistance of counsel and on the death penalty.

Q. As a result of all of your work and publications and

teaching in this area have you received some honors and awards?

A. Yes.

Q. Can you go through some of those, some of the more recent ones, perhaps?

A. Let me do the oldest one first. That's not a recent one, but I don't like to talk about a lot of these things, but I've always said I was proudest of being named the Exceptional Service recipient by Department of Justice in 1980. So that's a very long time ago, but they give that award to one person every year, and I've always looked back on that as the award that I value most.

I've also been the recipient of the American Judicature Society's Justice Award for lifetime service. I was given two years ago by the University of Alabama and the Morris Dees Institute of the Southern Poverty Law Center an award called the Morris Dees award. I have been given the Samaritan Award by the University of Alabama. And I have been named, I should have said this first, I was named the Dirty Shirt Lawyer of the Year by the Arizona Criminal Defense Lawyers, an award they give out for lifetime criminal defense service. I think I was the seventh person in Arizona to receive that award.

Q. And now I want to focus on your work history. And, again, so that we can get through this want to focus specifically on your work history in capital cases. Do you have trial

experience in capital cases at the state level?

A.   Yes.

Q.   Can you talk about some of those cases a little bit?

A.   Sure.  Let me try to give you a short --

Q.   Let me see.  Maybe I can home in a little bit.  You previously -- I'm going to lead a little bit to try to get us there, if you think I'm going too far.

     You had a conversation with the government about your opinions in this case?

A.   Yes.

Q.   And I think in that conversation we talked about three cases that actually went to trial.  And those were the Knapp case, Burch case, and the Democker case?

A.   Yes.

Q.   Can you briefly speak about your experience with those three cases?

A.   Very, very briefly.  John Henry Knapp was the first of those death penalty cases that ultimately became a jury trial.  It was a man convicted of burning his babies to death, pouring a gallon of Coleman fuel on them while they slept.  I began representing him when he was on death row.  We obtained for him a new trial, and eventually I was part of the defense team that represented him at his jury trial in 1992.

     I then did the Dale Burch case, which went to trial in 1995, I believe, an anesthesiologist that was charged with

bludgeoning his former wife to death. And then most recently we did the death penalty trial, began as a death penalty trial but death was taken off the table after jury selection, in a case involving a man named Steven DeMocker whose case went to trial in Prescott, Arizona in 2010.

Q. And, obviously, not DeMocker, but did any of those cases go to a penalty phase?

A. Yes. The only one that went to a penalty phase was the Burch case, and at that time in Arizona, Rain versus Arizona had not yet been decided by the United States Supreme Court so we had judge sentencing and we had a separate several day sentencing hearing before an Arizona state court judge.

Q. And although the other cases did not go to penalty phase did you prepare for penalty phases in those cases?

A. Yes, we prepared for penalty phases from the day that we were appointed in those cases.

Q. And have you had, and I don't want to go into specifics, but have you had other cases where death was a consideration at some point in the trial?

A. Well, yes. And at the state court level you are asking now?

Q. Yes, still at the state court level.

A. Yes, there are -- there's a significant number of them. I wouldn't be able to know to tell you exactly how many, but certainly somewhere in the eight to 12 range.

Q.  Let's move now to federal death penalty experience.  Can you tell us about your experience with federal death penalty cases?

A.  Yes.  I have been appointed as what is known under the federal statute as learned counsel in eight or nine federal death penalty cases, the first being shortly after the criminal code was amended in '94, so it must have been in '95 or '96 was the first one of those I did.  I have been appointed as counsel in New Mexico, Nevada, Arizona, and California in federal death penalty cases.

Q.  Have you ever dealt with mental retardation issues in federal court?

A.  Yes.

Q.  Can you describe that briefly?

A.  Well, let me say only one of those eight cases actually went to trial.  But in I think all of the cases the issue of mental state, and particularly among the mental state issues mental retardation was an issue that our defense teams focused on from the outset of each -- I believe each of those cases.

Q.  Have you ever had a case in federal court where you had to bring concerns about your client's competence to the court's attention?

A.  Yes.  In the one case that I mentioned that went to trial it was in federal court, a prison killing case, and death came off the table shortly before trial.  But we did have a very

significant client competence issue that we litigated.  And that eventually went to the Ninth Circuit.

Q.  Have you had experience with death penalty cases beyond the trial level?

A.  Yes.  I have been involved in death penalty cases at -- I believe I said the other day that I could not recall a direct appeal in a death penalty case that I had done.  I actually have thought of one or two, but I think it's fair to say that I've done every phase of death penalty post-conviction litigation, both in state post-conviction and federal, and clemency.

Q.  And those are areas that you continue to practice in?

A.  Yes.

Q.  Do you keep up on death penalty jurisprudence through training and seminars?

A.  I try to.

Q.  And have you previously testified as an expert on standard of care for what we call a Strickland expert?

A.  Yes, I have a number of times.  And we tried to go through those in the interview.  I don't know exactly how many there are, but I think we came to something like seven, or something like that.

Q.  Is there anything about your background in capital defense that I have neglected to bring to the court's attention that you think is relevant for today?

A.   I don't really think there is anything that we haven't touched on.

MS. STONE:  Your Honor, at this time we would offer Mr. Hammond as an expert in the area of standard of care, also known as the Strickland expert.

THE COURT:  Any additional voir dire by the government?

MR. JOHNSON:  No objection, your Honor.

THE COURT:  All right.  I find the witness qualified to give opinions under Rule 702.  You may proceed.

MS. STONE:  Thank you, your Honor.

Q.   (MS. STONE) Mr. Hammond, let's start with the materials you reviewed for this case.  Can you address that for the court?

A.   Yes.  I have reviewed the 2255 petition, response and reply.  I have tried to look at the exhibits that were referred to in those documents and other attachments.  I could not begin to tell you that I have read them all but I have tried to look at a fair number of them.  I've read the published opinions both in this case and in the Fulks case.  I have read the openings and closings from both the guilt innocence phase and the sentencing phases of this case.  And I've reviewed other materials that are not coming to mind, but I know there are others.

Q.   And do you recall when we retained you on this case?

A.  Yes.  I think, I think Mr. Burke first tried to get in touch with me in July of this year, but I believe that I wasn't actually retained until sometime in August.

Q.  And partially because of that short timeframe did we ask you to focus in on specific claims raised in the petition?

A.  Yes, you did.

Q.  And did we in a meeting with the government, did we let them know what those claims were?

A.  Certainly, insofar as I was involved in the interview.  I think we did identify the claims I was focusing on.

MS. STONE:  And for the court's information, those claims will be one, two, five, nine, 15 and 16.

Q.  (MS. STONE) And then did we also discuss having you opine on the mental retardation claim, as well?

A.  Yes.

Q.  Before we get into the individual claims, how do you approach evaluating a case as a standard of care expert?

A.  Well, I think, like everybody in this field, I think you have to start out with Strickland versus Washington.  That has been the guiding principle now for almost 29, 28 years.  It couldn't be that long.  So I think you have to start with looking at the objective standards of reasonableness.

In that connection, to the extent that there is literature or knowledge gained from experience, you need to look at that. I often have worked with and consulted at the ABA about its

guidelines where they are applicable. But, generally speaking, you look for the standards that are known to and should be well-known by criminal defense lawyers generally. And you also try to keep in mind all of the things that we have learned about the Sixth Amendment and the right to effective assistance in the cases that have been decided since then.

Q. In your experience have you found that even very experienced lawyers make errors that fall below the standard of care from time to time?

A. Yes, I don't believe that I know of criminal defense lawyer or a death penalty lawyer who does not believe that she or he has fallen below the standard of care.

Q. And specific to this case, are you aware of any claim that these attorneys didn't put sufficient hours in?

A. No. And, in fact, in sitting here the last couple of days my impressions on that topic have been confirmed. I said to you earlier that there have been cases in which the principal issue was effort, time spent. That is not -- that has not been in any way my impression here.

Q. Is it also your impression this is also not a case where attorneys were denied resources to do their job?

A. Yes. And I must say I was very glad to see that. I wish I could say that in all of the other cases that I have been around or have been involved in there has been the same

ability to get and pursue the assistance of investigators, mitigation specialists, and experts.

Q.  Let's move specifically to the claims, individual claims in this case.  And I want to start with claim one.  That's the claim where Mr. Basham -- where Mr. Basham was allowed to walk off alone with Sheriff Hewitt during the Thanksgiving day search for Miss Donovan's body.  Can you talk about what troubles you about this claim?

A.    Yes.  The circumstances confronting Mr. Littlejohn and Mr. Monckton are certainly troubling and in many ways maybe unlike what lawyers would typically encounter.  But the first thing that bothers me about it, before we get to the details of what happened during the search for the body of Alice Donovan, the idea that lawyers would agree or consent to allowing a client who they did not know well, for whom they had just been retained, to communicate with the government under any circumstances is I think for most criminal defense lawyers would be a very serious question that would have to be thought about with some intensity.

But even if one were to conclude that there might be some discernible benefit in communicating with the government, I think lawyers would want to have a very clear understanding with respect to the use of any information obtained and the benefit to be realized from that cooperation.  And as I've looked over the information about that claim it became clear

to me that the lawyers never really got that kind of assurance.

Q.   By assurance are you talking about a proffer agreement?

A.   Yes.  And I understand from reading the papers, and I'm certainly not a South Carolina lawyer, but there may be some unique aspects of the term "proffer" as used in this jurisdiction.  But certainly in my practice we would use a phrase like that to say you would want some kind of very clear assurance signed off on by the government with respect to the use of information and to the consequences of being less than -- government deciding you were less than truthful.

Q.   And just to be clear, that's your opinion about this issue even with the understanding that there was what's been called the race to the body or Chad Fulks was possibly giving information, as well, and so each defendant wanted to help first?

A.   I'm sorry.  I understand that that may have been one of the things that motivated counsel at that time, to have been encouraged, I think actually the public defenders may have first encouraged Mr. Monckton and Littlejohn to go forward for that reason.  So I know it was -- that was what they thought was an animating reason.

Q.   That would not alleviate your concerns about letting your client talk with law enforcement?

A.   No, and I don't think it would for most lawyers.  I mean,

these gentlemen knew this was a death penalty matter from their very first association with it.  While that always produces a desire to want to find a way out of the death penalty arena, it certainly heightens the importance of careful decision making.  And I frankly do not think they could have gone through the process of careful decision making, particularly with this client, in the short amount of time that they had available to them.

Q.  And you stated that there were two troubling circumstances for you with this claim, the first being what you just described.  What's the other issue for you in this claim?

A.  The other is the confusion, maybe I shouldn't call it confusion, but uncertainty about what exactly the arrangement was, this difference between saying you may not interrogate Mr. Basham but you may ask him to assist in giving directions.

I think if we posed that question to a law school class and asked them whether that was a distinction that could survive even if you had a very, a very talented and resourceful client who understood your instructions, I think most of us would say that just almost couldn't be accomplished.  And the prophesy I think was fulfilled by seeing how that trip and the search for the body unfolded.  Which then leads, I don't want to go on here, but --

Q.  Let's --

A.  Leads to the question about getting away --

Q.   And let's focus in on that, where Mr. Basham apparently wandered off with Sheriff Hewitt at some point during the search.  Can you talk about that aspect of the claim?

A.   Yes.  And I don't know if this is a legally appropriate word, but I was horrified by that part of the transcripts. The idea that a client could be out in the field with numerous law enforcement people, by the way, I think all of whom these defense lawyers were not personally acquainted with, or at least many of them my impression is were not acquainted with, and to have a circumstance arise where their client could have been some distance from them and could have been having a conversation with someone from law enforcement is just totally unacceptable.  I think the Supreme Court decided a very long time ago that those kinds of communications initiated by law enforcement are inadmissible and inappropriate.

Q.   When we have spoken previously about this case you talked about an umbilical cord between the client and lawyer.  Can you explain that a little bit?

A.   Yes.  I think any time a lawyer, and I think this is a rule in any serious criminal matter but certainly in death penalty cases, there is not a circumstance that I can really imagine in which I would allow my client to be separated from me in any way.  And that's why I used the umbilical cord analogy.  I would want to be that close to my client that no communication could come between us that I wouldn't be aware

of.

Q. And is it sufficient just to advise law enforcement that there will be no questioning of your client if you were out on such a search?

A. No, I think the answer to that is of course not. And not because of bad faith. The police, please don't get me wrong here, sometimes perfectly well-meaning law enforcement officers, police officers, sheriffs, FBI agents, will communicate thinking that there may be nothing wrong with it. So I think that makes it doubly important to not allow there to be any separation between lawyer and client.

Q. Is it your opinion the attorneys -- the original attorneys in this case as to this claim fell below the standard of care?

A. Yes, for the reasons I summarized.

Q. Let's move on to claim two, that's the Jackson v. Denno hearing, some of which involved statements recovered at that search. Based upon your review of the record do you agree with defense counsel's approach in this case?

A. I'm sorry, with --

Q. With defense counsel's approach in this case, and, more specifically, defense counsel's approach not to vigorously challenge the statements?

A. No. No, I do not.

Q. And can you expand on that a little bit?

A. Yes, a little bit. The Jackson v. Denno hearing, as

defense counsel has testified here, is -- first of all, it's always an opportunity to gain discovery and to pin witnesses down. So when one I think starts with, and competent lawyers typically start with the idea that the Jackson v. Denno hearing is a very important opportunity to gain precision and understanding about what the government's position is going to be.

The idea that there could be some significant downside to pressing thoroughly and aggressively not in a confrontational way, but in a thorough way, the examination of witnesses at a Jackson v. Denno hearing is I think not something that lawyers would do. And that the specific question here based -- I understood the topic of being concerned about taking a position at the Jackson v. Denno hearing that would be different from trial I do not think would weigh heavily in the scale --

THE COURT: Let me interrupt here, because I think I might have been the one that injected that notion, and I might have been wrong. But you say it would not be inappropriate for a capital defendant to move to suppress statements in a Jackson v. Denno hearing and argue that the statements were coerced or not voluntary, and if convicted to then argue to the jury at the penalty phase that they should be given credit for making voluntary statements. The court would have no ability to do anything about that? I'm just asking. I never

had that come up before.

THE WITNESS: Well, and I don't think in this particular context I have either, but I think --

THE COURT: It's unique because only in capital cases does the jury get to look at sentencing. I'm thinking if I have a case I try and I have a suppression hearing where the defendant says the officers beat me and beat the confession out of me, and the officers testify contrary to that and I resolve the credibility in favor of the law enforcement officers and say there was no coercion, the defendant gets convicted, then he comes back before me at sentencing, I'm not going to let him argue he should get credit for voluntarily giving the information to the officers so that the trial wouldn't be necessary. I mean, it just seems to me it would be the same thing with a capital sentencing jury, wouldn't it?

THE WITNESS: I don't think so, and I may tell you why.

THE COURT: I might be wrong, I just never had it come up. But if there was error there I might have partially caused it. Was I the one that raised it or did someone else raise it?

MS. STONE: Your Honor, it may have been you, it may have been the government. I honestly --

THE COURT: I think I was careful to say that wasn't a ruling, but I just raised the question.

MS. STONE: That's correct. I am confident there was no ruling, it was a concern that was raised. And I just don't recall if it was you or the government who initially raised that concern. But there was no ruling.

MR. BURKE: Your Honor, for the record, by your recollection of the record is it was you who raised the question and asked would this become an issue.

THE COURT: Right. All right.

THE WITNESS: And it may be easier, your Honor, if you -- if we focus on it not just in the hypothetical of a law enforcement officer beating a confession out of someone and then later defense lawyers arguing it's voluntary, but if you think about the --

THE COURT: Not that it's -- but they should get credit for helping law enforcement solving the case.

THE WITNESS: But take his reduced mental state for just a moment. If at the Jackson v. Denno hearing they had raised the voluntariness of the client because the client couldn't appreciate the consequences of his conduct, if you had ruled against counsel on that issue and said no, I think it was voluntary, I think it was knowing and intelligent, I would be very surprised if when we get to sentencing I wouldn't be able to stand up and argue to you as the judge, or to the jury, that his statements were voluntary, to the extent he could make a voluntary statement I ought to get full

credit.

THE COURT:  Because I would have made a fact finding it was voluntary.

THE WITNESS:  You would have made a fact finding it was voluntary and I -- I think even though I had argued vehemently to the contrary I don't think I should be foreclosed from --

THE COURT:  All right.  I understand.

BY MS. STONE:

Q.  And that leads into my next question.  That case where a client has issues like you've heard some of Mr. Basham's are, or least are alleged to be, do you think there is a special duty of care for a lawyer in a capital case?

A.  Yes, I think that, and in sitting here for the last couple of days has been a very brisk reminder to me of the importance of the responsibilities of a lawyer in a case in which there are serious mental state issues involving the client.

Q.  Do you feel that that duty of care was observed in this case, at least as to the Jackson v. Denno hearing?

A.  No.  At the Jackson versus Denno hearing I think it's pretty clearly no.  I think they decided not to put into issue the voluntariness of the client's statements and his mental capacities at the time of his Thanksgiving day statements, and I believe in doing that they fell below the standard of care.

Q.  Beyond potentially challenging the statements based on Mr.

Basham's mental issues, in your opinion should there have been a potential challenge based on Sheriff Hewitt's conduct?

A. Yes. And that's the same conduct I mentioned earlier with respect to claim one. That whole factual issue about what Brandon Basham said and how he said it, whether he made a statement or made a demonstration, exactly what he did and said I think should have been challenged. And I don't know this is the only way, but certainly it raised in my mind a very important Edwards versus Arizona issue. That was not ventilated at the hearing.

Q. And you've read, as you said, the portions of the transcript and openings and closings. Would you agree that Sheriff Hewitt's statement was damaging to Mr. Basham's trial?

A. I think everybody now agrees with that. When I first became involved in this case I didn't know, but I think it is quite evident now that his statements were of great importance.

Q. And would a reasonably competent defense attorney vigorously challenge that statement?

A. I would think so.

Q. Anything else about the Jackson v. Denno hearing we failed to cover?

A. Nothing that comes to mind right now.

Q. Let's move on to claim five, that's the competency claim. Do lawyers have a continuing duty to assess competency of a

client to proceed?

A.   They absolutely do.

Q.   And a subpart of that, is it a duty of defense counsel to communicate with their experts in a case about challenges with communication or other challenges they may have with their client?

A.   Yes, I think -- I think for several reasons that's certainly one of the things that defense counsel needs to consult with his consultants and experts about.

Q.   And why is that so important?

A.   Well, I think that the most important thing is that communication between lawyer and client is critically important.  And it's not just a matter of being able to speak to your client and have your client speak to you, it is -- it is important that you have some significant understanding about whether your client is really comprehending what you are saying at every stage, whether it's a plea negotiation or whether it's strategy for preparation for trial.

Q.   In your experience trying death penalty cases, would you be concerned if to keep your client under control during trial you had to provide your client markers and coloring books?

A.   Yes.  I think there are just a host of factual questions like that.  But certainly needing to distract a client so that they don't misbehave or interfere with the proceedings would be a cause for concern.

Q.  How about if a client was perseverating on specific issues and you had difficulty discussing important aspects of the case with him?  Would that be a cause for concern?

A.  I must say I hadn't heard the word perseverating in several years until yesterday, so I'm not sure I can recall it.

Q.  Fixate.

A.  Well, obsessing, fixating.  I certainly have encountered, and many other lawyers have, that kind of behavior from a client.  And it's very, it's very troubling, not only because of what it does to the dynamic between lawyer and client but what it tells you about the mental state of your client.

Q.  How about a client who is slurring their words or unable to stay awake or groggy?

A.  Well, I said there was a host of factors that have been talked about here.  Those are certainly among them, the inability to stay focused, the changes in speech pattern, all of those kinds of things would be of concern.

Q.  Some of what was discussed by trial counsel was that Mr. Basham had events of incompetence.  What are a lawyer's duties when a client has what's been described as events of incompetence?

A.  Well, I think there are two duties.  One is that you need to be able to be sure at all times that your client is competent to communicate with you and to assist in his defense

at that time.  But I think those episodes of apparent incompetence tell you -- they certainly raise huge red flags about whether there may be deeper or more serious problems about competency over a longer period of time.

Certainly, as you said earlier, competence needs to be evaluated at every moment.  But they aren't isolated moments. Those events of incompetence of a client should be telling defense counsel that there could be much larger problems.

Q.  If a client is found incompetent for an afternoon of trial and competent the next morning, is the problem fixed?

A.  No.  For the reason I tried to say it wouldn't be fixed, it would be a cause for continuing concern.

Q.  Can not raising competence ever be a strategy decision?

A.  I don't think so.  And I don't think so either as a matter of competent counsel or as a part of counsel's ethical responsibility.  I don't think that there's anything else you can weigh against having an incompetent client.

THE COURT:  Let me jump in here and ask that. Because I don't want to sound partisan, but a capital defendant who realizes he's in for a tough fight, he's on video abducting the victim, and so forth, what is to keep him from pretending to doze off and asking for coloring books just to create a competency issue?  Are there any telltale signs of malingering or such as that?

I guess I'm saying could that ever backfire on

defense counsel to say to the jury my client's incompetent because he has a coloring book and because he's sleeping, when some jurors might subjectively say he's just putting on a show for us. And I'm not saying that's what happened here, I want to hasten to add, but I'm just asking could that blow up on you sometimes?

THE WITNESS: I think it certainly could. I think if you posit a situation in which -- in which the lawyer -- let me stop. Lawyers can't do this alone, this is one of those areas where the assistance of qualified professionals is just critical.

My views of the competence of my client are pretty dadgum important but they are not the only thing. And so when I've been involved in cases, and many of the federal cases they have all been I think multiple defendant cases, and there have been other defendants in cases that I've been involved in who I would say may have adopted, your Honor, the kind of strategy that you are talking about, that I'm either going to misbehave so much or I'm going to appear to be so out of it that I will either gain sympathy with the jury or I'll stop this trial.

And I think that the lawyers representing those kinds of clients have a very difficult job, and it's a job that they cannot perform by themselves, they need the help of experts. But if they think their client is essentially acting out and

if qualified professionals confirm that, then certainly that's a matter for lawyer/client communication to talk about. But I would hope that no competent lawyer would seek to have his client declared incompetent based upon essentially nonsense kinds of things. I hope I responded.

Q.    (MS. STONE) And you reviewed the testimony of Mr. Harris, I believe, and you sat through Mr. Swerling's testimony. Are you aware of times they spoke to the court with concerns about Brandon's -- about Mr. Basham's inability to stay awake?

A.    Yes.

Q.    And is it your impression that they sincerely believed he was having those problems?

A.    I have no reason to doubt that they were sincerely reporting what they thought was a problem with the client's staying awake.

Q.    And the same goes for any other issues that they reported with Brandon's problems focusing?

A.    Yes.

Q.    And staying calm?

A.    Yes. And, by the way, I read the portion of Mr. Swerling's testimony that I did not see from last Thursday, and I have read all of Mr. Harris', and I have no reason to think that at any moment they were either exaggerating or gilding the lily, if you will, with respect to their concerns about their client's behavior and competence in the courtroom.

Q.  If you were Mr. Basham's attorney would you have had concerns about his competency?

A.  I would have had deep and abiding concerns about his competence.

Q.  And can you expand on that a little bit?

A.  Well, I know at some point we're going to talk a little bit about the mental retardation issue, so let me just say that you start out with a client who has a very doubtful intellectual quotient, his IQ is not great.  You have a whole host of other factors that become very evident, and they certainly were to this defense team and to their experts. There were all kinds of issues going to his reduced mental state.  Those same issues are ones that would I think call for a lawyer to be concerned about whether his client was really competent to assist in the defense.

Q.  And what's your opinion as to the lawyers' conduct in claim five on whether or not they performed as a reasonably competent attorney would?

A.  Well, I want to say I think they had a hard job, but my opinion is that the standard of care was not met here.

Q.  Let's go ahead and move to mental retardation now, since we were just discussing that.  We all agree that the Atkins decision came out before this case and that imposes an absolute bar to the death penalty to those who fall into the Atkins category.  Is there a special duty of defense counsel

to pursue these types of claims where there is an absolute bar?

A.   I don't know that I would call it a special duty, it's certainly a very significant duty and it has become over the years a critically important part of representing clients in death penalty cases.  The duty to thoroughly investigate and determine whether your client is mentally retarded is an obligation that knows no compromise.

Q.   And is it enough to gather, simply gather the records and previous IQ scores?

A.   Well, it clearly isn't.  You looked earlier today at some of the literature from the late 1990s and early years of this century, and I think there is now a wealth of information available to defense lawyers that should tell us all that you need to do a lot more than simply look at someone's IQ score.

Q.   And you mentioned the information earlier, we saw Government's Exhibits 235 through 244, which were Mr. Swerling's materials from his file in Atkins.  Based on your experience, is that consistent with the type of information that was available to defense counsel around the time of Mr. Basham's trial?

A.   Yes.  And particularly with lawyers who have been blessed, as Mr. Harris and Mr. Swerling were, and as I was, by having the federal resource center available.  Many of the names you heard today are among America's most qualified death penalty

lawyers. They have worked very hard to make sure that people who are drafted to do the jobs that they were, these gentlemen were drafted to do and that I have been drafted to do, have the assistance of somebody who can at least help you get started in looking at these fundamental questions of mental retardation.

Q. Would you agree with me that in the death penalty world the Atkins decision was a huge deal?

A. Yes, it was a very much a big deal. And it was a big deal before Atkins was decided. You don't -- I don't want to dwell on this, but for the Supreme Court of the United States to rule that evolving standards of decency in a civilized society tell us that we cannot execute the mentally retarded has to be seen as one of the three or four most important decisions of the Supreme Court in the last 20 years.

Q. In going back to investigations, if counsel has IQ scores is there a duty to try and recover the raw data and have that scored by appropriate experts?

A. Yes. Well, step one is gathering the data, and an impressive amount of at least the first level data appears to have been gathered here. But just knowing the IQ scores isn't going to get you where you need to go as a criminal defense lawyer, particularly as a death penalty lawyer.

Q. Is anecdotal evidence about some of the client's deficiencies and everyday functioning also an important part

of preparing for Atkins?

A. Yes. I think those anecdotal experiences, and you talked about a number of them here, are very important deficiencies. There may be nothing more important, Miss Stone, in this area than having available an expert in mental retardation. There are lots of other kind of experts that are available to us in the psychiatric and psychological field, but the people who deal with mental retardation on a daily basis are a very highly specialized group.

Q. And in your view of the record and listening to the testimony you've heard, is it your understanding that kind of expert was retained?

A. I think I've heard testimony in this proceeding that such an expert was not available to the defense, is the phrase I think I've heard.

Q. And what is your opinion on counsel's conduct regarding pursuing mental retardation with a client with a 65 IQ and with Mr. Basham's deficits and not pursuing an Atkins claim in this case?

A. I'm not sure it was 65 --

Q. 68?

A. It might have been --

Q. You know the record better than I do.

A. It might have been 68. But I think this, unfortunately, fell well below the standard of care.

Q.  Let's move to claim nine, the conceding guilt claim.

THE COURT:  Before we move on, could we stop and let me get a complete list of the medical experts that were retained by defense counsel and what their profession was?  Because he just told me that the five that I heard about, none of them were qualified.  So can y'all --

MR. DALEY:  The government has a document, I think it's Government's Exhibit 8, that gives the list of I believe all --

THE COURT:  I think it's Government's Exhibit 8, and if that's it we don't need to put it on the record now.

MR. DALEY:  I'm pretty sure it has all the experts they were -- Dr. Schwartz-Watts, Dr. Morgan, Dr. Tora Brawley, Dr. William Brannon, and then Jan Vogelsang who was I think actually an MSW, but those I believe were the five.

(There was a pause in the proceedings)

MR. BURKE:  Yes, your Honor.  I think Government's Exhibit 8, which is a document created by the government, accurately states the experts that were retained by defense counsel.

THE COURT:  Well, I just want to make it clear that the witness, you looked at the professional qualifications of all five medical experts and none of them were trained in diagnosing mental retardation?

THE WITNESS:  I think that is the correct.  The

closest might have been, I'll mispronounce her name, Tora Brawley, she may have been the closest.  And I have not worked with her, but I do not believe, and from the testimony here I think it was confirmed that she is not an expert in mental retardation.  She was a psychologist, but I do not think her speciality was mental retardation.

THE COURT:  You can be a psychologist, but without that specialization you would not recognize mental retardation issues?

THE WITNESS:  Yes.  And I must say this was a learning experience for me the first time I had one of these --

THE COURT:  Well, it is for me, too.  And I'm not trying to argue with you, I'm trying to make sure I understand your testimony.

THE WITNESS:  Yes, the world of mental retardation is a very, very specialized world.  The understanding of what the IQ tests meant at a particular time, what form of tests were being used, how old those tests were, how much -- how much creep was going on with respect to the things we talked about, I heard talked about here like the practice effect, those kinds of things are very highly specialized and most psychologists, at least in my experience, will tell you that that's not their field.

THE COURT:  All right.  Go ahead.

MS. STONE:  Good.

Q.   (MS. STONE) Let's move to claim nine.  Do you agree with defense counsel's strategy to concede guilt on everything but the intent factor on the carjacking in this case?

A.   No, I have a hard time with this claim, as well.

Q.   And taking a step back, it's my understanding that at the evidentiary hearing in the Fulks trial their standard of care expert testified it's never an appropriate strategy to concede guilt.  Do you agree with that statement?

A.   No, excuse me, no, I don't.

THE COURT:  If I recall correctly, she told me that her view was undisputed by any criminal defendant expert in the country and I rejected it and the Fourth Circuit rejected it.

MS. STONE:  Sounds like Mr. Hammond is rejecting it, as well.

THE COURT:  She would lead me to believe every single Strickland expert agreed with her on conceding guilt is a bad thing to do, or pleading guilty, rather.  All right.  Go ahead.

THE WITNESS:  I know Andrea Lyons and I respect her a great deal, and I have her book.  And I have thought a lot about the things that she said and there's great merit in it, but as an absolute it simply is not correct.

THE COURT:  All right.

BY MS. STONE:

Q.  In this case then why was conceding guilt concerning?

A.  Well, first of all, I think you would concede guilt only -- only, I mean, it would take a lot, I think, for a defense counsel in any case to concede guilt and go to trial. But if you were going to do that I would hope that there was some very clear, discernible benefit doing that.

And let me just say I have a particular difficulty with very experienced, qualified courtroom lawyers taking the position that Mr. Swerling took here.  The idea that with a very highly qualified defense counsel, courtroom lawyer, that the jurors would in some way hold it against you if you put the government to its proof I cannot accept.  I think good courtroom defense lawyers can always explain to a jury why you go through the innocence/guilt phase of a trial.

Q.  And you talked about taking advantage of concession.  In your review of this case and this claim did you see much advantage that Mr. Basham got out of this concession?

A.  Well, he clearly didn't get a benefit out of it.  But the goal to achieve that benefit is the word ephemeral comes to mind.  I can't understand what real value there was in conceding guilt to the kidnapping elements, which made this a capital offense, and not going forward to trial on that but knowing you were then going to have a penalty phase.

Q.  And in your review of the case did it appear that the case

proceeded with the prosecution's presentation of evidence as if nothing had been conceded?

A. Seems to me quite obvious that's that what they did throughout the case.

Q. What about the strategy of putting the strategy on the record? Is there any benefit to the client by doing that?

A. I cannot understand this at all. I'd simply, and I don't want to be too blunt about this, but I cannot see a reason under which in the representation of a client I would -- I would tell the court that I had conferred and that my client had agreed to my strategy. I do not see how that serves the client's interest at all. It serves only my interest as a lawyer and not that of my client.

Q. Is it your -- what is your opinion on defense counsel's performance in conceding guilt to a death eligible offense? Did that fall below the standard of care?

A. I think it did fall below the standard of care. And let me just say one other thing. Given the tremendous resources that were available to a quite able defense team I would have hoped to have seen a great deal more in the way of consultation and careful analysis of this particular. Obviously, it's a fulcrum point in the trial, that particular strategy.

Q. Let's move now to claim 15, that's the intrinsic evidence or 404(b) evidence and information about Samantha Burns, the

West Virginia victim.  Would you agree that this was particularly damning evidence in Mr. Basham's case?

A.  I think that's undeniable.

Q.  Do you agree with the approach that Mr. Basham's team took in this case?

A.  I'm sorry.  Could you say that again?

Q.  Do you agree with the approach Mr. Basham's team took towards that evidence in this case?

A.  No, I don't.

Q.  And what issues do you take with how they handled this?

A.  Well, first of all, the decision that the Samantha Burns evidence was intrinsic to the crime is itself a debatable point.  But let's assume for a moment that a decision had been made prior to trial focused on the 404(b) question and intrinsic evidence and a decision had been made that the Samantha Burns evidence was intrinsic.  Assuming that had happened, and I don't really think that did happen here, but if it did happen then I think the lawyer's next responsibility is to limit so far as reasonably possible the development and use of that, of that evidence in the trial.

Q.  And in your review of this case and listening to the testimony did you see any efforts by defense counsel to limit the use of that evidence?

A.  No.  And the way -- what I was looking for would have been requests primarily out of the presence of the jury.  I accept

the idea that in front of a jury a defense counsel may very well not want to be jumping up and appearing to try to throttle evidence, and particularly from grieving loved ones. But outside of the presence of the jury I would have expected to see very straightforward and detailed arguments by counsel to limit the number of witnesses and the nature of testimony.

Q. And you basically answered my next question, but I just want to make it clear, one of the strategies for not challenging was they didn't want to object during the testimony of grieving parents and family members. Am I to understand there are other ways to challenge that testimony?

A. Well, I think that there is, and I'm sorry for getting --

Q. No, that's fine. What about the argument that they wanted to front load the damaging evidence and it was all going to come in at the penalty phase anyway? Can you address that aspect?

A. I understand the idea of drawing the sting and going ahead and letting the jury hear about evidence that they may later find damaging, but I think that reasoning is really fraught with difficulty. Now, what actually happened here, at least in the portions of the record that I spent time looking at, is that the Samantha Burns story gets told, I guess told many more times, but it gets told twice to the jury, and in terms that I'm sure defense counsel knew were going to be graphic and gripping for the jury. So rather than removing the sting

from it they doubled the intensity of that information.  And I think that was foreseeable, frankly.

THE COURT:  Let me jump in again.  I haven't read the transcript, I read your briefs, but you are saying that the jury was allowed to hear victim impact-type statements from Miss Burns' family?

MS. STONE:  Our argument is it was akin to victim impact statements.  The government argued I think at trial, as well, that the idea was to show that she didn't just run away, she had actually been murdered by Mr. Basham and Mr. Fulks.  We countered that wasn't a defense raised by the defense team, and it wasn't just the type of testimony but also that victim after victim after victim came in and testified about their loss, not being able to ever have her sleep in the room of the house they were building and that she wouldn't be able to finish the career that she was studying for.  That, in our opinion, was victim impact-type evidence that put up very unlimited Samantha Burns disappearance could have been discussed by an officer.  There were many, many ways that that evidence could have come in under that intrinsic evidence argument and not been so prejudicial.

THE COURT:  All right.

BY MS. STONE:

Q.  Anything else on claim 15, Mr. Hammond?

A.  Not that comes to mind right now.

Q.   Okay.  Let's move into the puppet statement in claim 16.
Do you agree with defense counsel's decision not to pursue,
aggressively pursue, bringing in the puppet statement by the
government in Chad Fulks' closing into Mr. Basham's case?
A.   No, I don't.
Q.   And do you agree with that even if the government was
consistent with their theories of the case with Mr. Fulks and
Mr. Basham that they still should have pursued bringing in the
government's words?
A.   I still would want to bring it in.  I don't share their
view that they were entirely consistent positions, but setting
that aside, the power of statements by the government, the
power of those statements on juries shouldn't be discounted.
There is I think almost always greater value in a statement by
the government, by the very people who are prosecuting a case,
than almost any other witness.
Q.   Is it a fair statement that it's very important in a
penalty phase when there are codefendants to examine relative
culpability?
A.   Well, it is in any case.  It's particularly true in a
federal death penalty case where we recognize reduced role in
the offense as an identified mitigator and also allow it as a
general mitigator.
Q.   Can you find a tactical reason for failing to ask the
judge a second time to -- failure to re-urge the puppet

statement issue?

A.   Well, I certainly don't think that there's a tactical issue for failing to raise it again with the court.

Q.   And you heard --

THE COURT:   Let me jump in again.  Again, I don't want to sound like I'm being adversarial.  We're going to argue this case back later in December and I want to be sure I'm on top of everything while you are here.  But as I understand, the government's position is, or Mr. Swerling's position, that if they had asked me to admit selected portions of Johnny Gasser's closing argument about the puppeteer and the puppet I would have probably enforced the evidence rule that says you can't take something out of context, you've got to put in the full context, which might have led to a good chunk of the entire summation from the Fulks case being read to the jury in this case, thereby giving the government essentially two closing arguments.  You don't put any weight to that?

THE WITNESS:   Well, I understand the rule of context and I certainly think that there was a -- that there was a risk that by asking you to allow in the puppeteer-related statements that the government would say and you would agree that broader context would be necessary.  I do not think that the rule of completeness would lead a court to conclude that most of the closing argument would be admitted.

But, frankly, if that were the court's conclusion, if the court were to tell me since you want the puppeteer's statement in I'm going to put in, I'm going to allow the prosecution to put in the whole closings, if you had so ruled I would then have an important decision to make. And my decision at that point conceivably could have been all right, your Honor, I withdraw my request.

THE COURT: It would have been at least fleshed out and discussed.

THE WITNESS: But it certainly should have been, my use, certainly should have been addressed. And, frankly, your Honor, even if court had ruled that the large portions, indeed, maybe all of the closing could be admitted, given the breadth and depth of argument that was allowed I don't think that one more rendition of the closing --

THE COURT: The Fourth Circuit held in the appeal of the Fulks 2255 petition that the government did not take inconsistent positions. And even once the -- went so far as to quote Mr. Gasser in each case where he was saying it took both of these men to make this crime succeed. Basically, in substance that's when he said.

THE WITNESS: And I have read that.

THE COURT: Right.

THE WITNESS: But I don't think that, I don't want to disagree with the Fourth Circuit, but at least as I have read

the materials from the Fulks case, and I haven't read very much of them, but certainly looking at the government's position in that case and reading with care the closing arguments of the government in this case, I think they are distinctly different and competent defense counsel would have wanted to argue those differences.

Yes, in Fulks the government said that they were a team, but they made very clear in that case that Fulks was the leader of the team and they pressed on that with some intensity.  In this case they dropped the Fulks had the -- had the leadership role.  They didn't drop it but they didn't score with it, and then they very well emphasized -- and, by the way, I thought it was an eloquent closing argument to treat these guys as if they were the American hockey team, as if they were all members of the same team with a common goal and common expectation, which puts them all on the same playing field.

THE COURT:  One more question and I'll shut up.  I read Sheriff Hewitt's testimony, trial testimony from the Basham case over the weekend.  And he admitted, I think, in his testimony that his interaction with Mr. Basham on that fateful day on Thanksgiving day, that Mr. Basham was a follower and Mr. Fulks was the leader.  I mean, I don't think that that concept didn't -- I think that concept did creep in the case to some extent, at least through Sheriff Hewitt, if

not other places.

THE WITNESS:  I think you are entirely right.  I think I was inartful when I said they tried but they didn't score.  I think that concept of Basham as the follower was there, and I take Mr. Swerling at his word that they tried to breathe that into the defense.

But let me just stop for a second here.  If you talk about closings and if you talk about the government's position in closing, I think that particular information has such elevated power that it should have been used in this case, even if there was evidence of the concepts of difference there --

THE COURT:  Because I tell them several times in my jury charge that what the lawyers say is not evidence, the evidence comes from the witness stand.  I emphasize that in every trial, really.

THE WITNESS:  But the position that the government has taken in another case is of a different character.

THE COURT:  All right.  Okay.  I understand.

THE WITNESS:  That's my argument.

THE COURT:  I apologize for interrupting so much, but while he's here I want to get all the information I can.

MS. STONE:  I appreciate that, your Honor.  I actually don't have any other questions on claim 16.  Is there anything that I didn't cover with you?

THE WITNESS:  Not that I recall right now.

Q.   (MS. STONE) And just a couple final questions, because I think it will probably come up with the government.  What's your position on capital punishment?  Do you agree with it?

A.   Today I do not.

Q.   Has that opinion evolved over time?

A.   It has.  I began believing that it was possible to envision a system of capital punishment that would involve competent counsel adequately funded and an ability of government to differentiate, the system of criminal justice to differentiate the worst of the worst, and I think it's now become evident to me and to a lot of people that that just can't happen.

Q.   Because of your opposition to capital punishment would you find ineffective assistance of counsel in any case you were asked to help with?

A.   No.

MS. STONE:  May I have just a moment to confer with counsel?

(There was a pause in the proceedings)

MS. STONE:  No further questions, your Honor.  Thank you.

THE COURT:  All right.  Cross-examination.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q.  Good afternoon, Mr. Hammond.

A.  Good afternoon, counsel.

Q.  Now, I know you're already aware, but just for the record my name is Jeff Johnson, and about a week ago, last Monday October 8th, I believe it was, I had the pleasure of interviewing you over the phone.  Do you remember that?

A.  Yes, I do.  And I do recall your name.

Q.  All right.  So thank you.  And if for no other reason I always remember that interview because I learned a new word, and today we have been talking about perseveration and how you don't hear that one too often.

During our interview you told me that I had a mellifluous voice and I had to go back and look that one up to see if you were insulting or complimenting me.  As it turned out you were complimenting me, as I understand the word, and I appreciate that.

So we sat down and had an interview last Monday night, October or -- afternoon, morning your time, October 8th.  And habeas counsel were present in the room and you were there by phone.

A.  That's correct.

Q.  I want to start with one question that Miss Stone finished off with, which is that you are now personally opposed to the death penalty, correct?

A.  I am.

Q.  And, in fact, as Miss Stone asked you rather extensively during the beginning of her questions, the death penalty is obviously a topic in which you have immersed your life throughout your career, and particularly as of late, would that be fair to say?

A.  As of -- I don't know about as of late, but, yes.

Q.  Certainly throughout your career then.

A.  Yes.

Q.  And you've written extensively on the death penalty, you've taught courses both at the undergraduate and law school level about the death penalty.  And one of the articles that you authored, and I think it's appeared in several places, one of which is the Arizona Republic.  Is that the name of the major newspaper there in Phoenix?

A.  Yes.  It's the only major newspaper in town.

Q.  And did you write an article that appeared in the Arizona Republic entitled "Why Should you Oppose the Death Penalty?"

A.  I believe I did.  I didn't pick that title, they don't let you pick your own titles, but I think I did.  There is an article that has had that title.

Q.  And in that article you spelled out a couple of reasons for why people should oppose the death penalty.  And was one statement that you made that for the death penalty to be carried out capital defendants have to have competent lawyers,

adequately funded?

A.  Yes.

Q.  Now, in this case your testimony is not that any of the attorneys involved at the trial level were incompetent lawyers generally, is it?

A.  That's absolutely correct.

Q.  You are not contending that Mr. Swerling or Mr. Harris are incompetent lawyers.

A.  I am not.

Q.  And there has not been a claim made in this case, has there, that they were inadequately funded, has there?

A.  I have not heard that.  In fact, I heard the opposite, that all of their requests for funding were granted.

Q.  And didn't you say on direct examination that, thankfully, this case is different than a lot of the cases that you see and talk about and write about in that these lawyers were competent lawyers and that they were adequately funded?

A.  I think I did say that.

Q.  And so in many respects the case about which you have been asked to offer expert testimony today is a lot different than many of the ineffective assistance cases that you dealt with throughout your career.

A.  It's different in that respect.

Q.  And because you are not contending that they are incompetent lawyers, generally, your opinion is based on the

decisions that they made and didn't make during the trial of this case, correct?

A. Both them and their predecessors.

Q. Mr. Swerling and Mr. Harris along with Mr. Littlejohn and Mr. Monckton.

A. For the limited reason I discussed earlier, yes.

Q. Given that your opinion today is based on their performance during the preparation for trial and the trial of Mr. Basham's case I would like to talk about your experience, and particularly your trial experience. Now, I know you have been practicing for a long time, over 40 years, is that correct?

A. 43.

Q. And in the course of those 43 years you have tried about 25 criminal cases, is that correct?

A. That have actually gone to trial, yes, I believe so.

Q. 25 cases that have gone through trial?

A. I think that's what I estimated when we spoke. I told you I'm not sure of that number, but I think that's a fair estimate.

Q. And of those 25 criminal cases that you've tried I think you testified on direct today that you had tried three capital cases, correct?

A. Three cases that began trial as capital cases, yes.

Q. And all those were in Arizona state court?

A.  All three of those are in Arizona state court.

Q.  And just to make sure I'm not missing anything, that was the trial of John Henry Knapp, the trial of Dale Burch, I believe it's pronounced?

A.  Yes.

Q.  And the trial of Steve DeMocker?

A.  Yes.

Q.  Those are the three?

A.  Yes.

Q.  And of those three only one, the trial of Dale Burch went to a penalty phase, correct?

A.  Yes.

Q.  And in the Burch case, the penalty phase, did I understand you to say during your direct testimony that the penalty phase was tried before a judge?

A.  Yes.

Q.  And so of the three criminal capital cases that you've tried, none of them had a jury sentencing component.

A.  That's correct.

Q.  And so to this day you haven't tried a death penalty case to a jury as far as it concerns sentencing.

A.  Yes.

Q.  And I believe you said you had eight to 12 other state death penalty cases that didn't go to trial?

A.  I think the eight number was federal death penalty cases,

JA 4607

but that it may be -- it may be eight to 12 state and eight federal.  I don't know.  Something like that.

Q.  Okay.  Now, you said that you had reviewed the -- I know that you sat through a portion of Mr. Swerling's testimony, and I believe you said that the part you didn't sit through from last week you've reviewed the transcript.

A.  I did.

Q.  And you reviewed the transcript for Mr. Greg Harris?

A.  I did.

Q.  And are you aware that Mr. Greg Harris has tried about a hundred criminal cases?

A.  Mr. Harris has?

Q.  Mr. Harris.

A.  I believe there was a number like that, I don't remember how it was characterized, whether it was criminal cases or homicide cases, or -- but certainly a substantial number.

Q.  And did you read or hear Mr. Swerling's testimony that he has represented between 150 and 200 murder clients?

A.  I heard that.

Q.  And did you also become aware that Mr. Swerling has tried dozens of those cases?

A.  I heard that, too.

Q.  And did you also become aware that Mr. Swerling has tried seven capital cases?

A.  I don't recall the exact number.

Q. Now, three state cases that you tried, capital criminal cases, and then I believe you testified just a moment ago that in federal court you served as learned counsel in about eight to nine federal capital offenses?

A. That's right.

Q. I would like to go through those, if I could, if you can remember them. I have a -- when we were doing our interview last Monday night, in lieu of a CV or a resume Mr. Burke provided me a copy of a declaration that you provided in the case of Wendi Elizabeth Andriano. Do you remember providing a declaration in that case?

A. Yes.

Q. And I believe that you provided this declaration, it's signed, and then I can show it to you if you would like, February of 2012, does that sound correct?

A. Yes.

THE COURT: Let me interrupt. I should know this, you start off saying he had practiced over 40 years, participated in 25 trials, of which three cases began as capital cases all on the Arizona state court level. But then he was appointed learned counsel in eight to nine federal capital cases, is that right?

THE WITNESS: That's right.

THE COURT: And did any of those result in a trial?

THE WITNESS: One of them went to trial, but by the

time it went to trial death had been taken off the table by the government.

THE COURT: I think you covered that earlier. Thank you, sir.

BY MR. JOHNSON:

Q. In the declaration you state, consistent with what you are saying today, that you have served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the district of Arizona, and one in the District of Southern California. Does that sound correct?

A. I think it's at least that. I know I've had some -- for some reason I think nine, there might have been nine cases, but I think eight is what I can recall.

Q. And having heard and read the testimony of Mr. Swerling, at one point in the early phase of Mr. Swerling's testimony Mr. Burke asked Mr. Swerling prior to Brandon Basham's case how many federally charged capital defendants he had represented and I believe that Mr. Swerling's answer was none. Do you recall that?

A. Yes, I do.

Q. And then Mr. Burke also asked Mr. Swerling, are you aware that our expert counsel retained in this case has represented at least seven federally charged capital defendants? Do you remember reading that?

A. Vaguely.

Q.   I would like -- I tried to figure out who the seven clients were and so I went on Pacer to the different districts that you mentioned in your declaration and searched by your name and tried to see if I could find the cases on which you had worked.  And I would like to just go through those to see if I'm looking at the right ones.  And if you don't remember, that's fine, or if you could just tell me whether or not I'm on the right track here.

     And I believe you said that you started doing this in the mid '90s.  Do you remember handling a case representing a gentleman named Oscar Villa, or Villa?

A.   Yes, Oscar Villa.

Q.   And would that have been in the time period 1995 to 1997 in the District of New Mexico?

A.   I told you I wasn't sure, but that must be it.

Q.   Okay.  Now, in that case prior to trial the government filed a notice not to seek the death penalty, is that correct?

A.   Yes.

Q.   And that case was resolved by a plea agreement?

A.   I think the charge against my client was dismissed without a plea.

Q.   So that one didn't go to trial at all?

A.   No.  Well, the rest of the case went to trial.  There were eight defendants, I believe.

Q.   And did you represent any of the other --

**JA 4611**

A.   No.  When my involvement ended on behalf of my client I left that case.

Q.   And in this next case, looks like it had a rather tortuous journey, do you remember representing Mr. Filipe Cisnaros?

A.   Tortured is a good word, Mr. Johnson.  I do remember it.

Q.   And as I understood this, this actually began in the District of New Mexico around 2001 to 2003?

A.   Approximately.

Q.   And in the New Mexico federal case the government actually dismissed all the charges so it could re-file in Arizona, is that correct?

A.   Eventually they dismissed all the charges.

Q.   And then you represented him when the charges were filed in the District of Arizona, as well, correct?

A.   I was appointed by the federal court in Arizona to represent Mr. Cisnaros again.

Q.   And when you represented him again those charges were resolved by way of guilty plea, is that correct?

A.   Yes.

Q.   Did you represent a gentleman named Gregory Nikai in the District of Arizona?

A.   Yes, and I think that was the name I couldn't recall.  I think this is a shooting of a police officer on the Navajo reservation.

Q.   It would have been 2001 to 2003?

A.   I would have thought it was earlier, but I can't tell you.

Q.   But you do to the best your ability recall representing Mr. Nikai?

A.   I think that's the gentleman's name, yes.

Q.   Is that the one -- well, in that case the government also filed a notice not to seek the death penalty, correct?

A.   They had first said they were seeking it and then they withdrew the notice.

Q.   So prior to trial they ended up filing a notice not to seek the death penalty?

A.   They did.

Q.   And did that one actually go to trial?

A.   No, it did not.

Q.   Did you represent a gentleman named Vincent Cling in the District of Arizona between 1996, 1997?

A.   That's the confusion I was having.  Yes, Mr. Cling, I'm sorry, I have gotten this backwards, Mr. Cling was the man who was charged with killing the Navajo police officer, I believe.

Q.   And in that case also the government filed a notice not to seek the death penalty prior to trial.

A.   That's the case in which they first noticed and then withdrew the notice.

Q.   But they also filed a notice in Mr. Nikai's case, as well.

A.   They did eventually, yes.

Q.   And it's after the government withdrew the notice to seek

the death penalty that Mr. Cling's the one that went to trial.

A. No, neither of those cases went to trial. I'm sorry.

Q. Jesse Rothchild Moore?

A. Yes, Jesse Moore.

Q. And that was in 2003 to 2008 in the district of Arizona. Would that be about right?

A. Yes, about that time period.

Q. And also in that case the government filed a notice not no seek the death penalty, correct?

A. Very shortly before trial began, yes.

Q. Is that the one that went to trial?

A. Yes.

Q. And he received a life sentence after the jury trial, correct?

A. He did. And that's the case that went to the Ninth Circuit and was reversed by the Ninth Circuit.

Q. All right. I've got one more here, and I'm going to do my best to pronounce it. Francisco Javier Arellano-Felix?

A. Yes, that's exactly how his name is pronounced.

Q. And he's in the Southern District of California?

A. Was.

Q. And that case was resolved by plea agreement?

A. Also on the eve of trial.

Q. Okay. So that's seven that I have. Now, you mentioned one -- so far I've covered the District of New Mexico,

Arizona, and the Southern District of California.  You mentioned that you have one in Nevada, and I certainly don't dispute that, I just wasn't able to find it in Pacer.  Do you know which -- which ones I'm leaving out, if any?

A.  I'm delighted you can't find it.  The one in Nevada was on behalf of a man named Steven Cino, C-I-N-O.

Q.  And what happened with his case?

A.  Mr. Cino was charged in a conspiracy in Nevada with a capital murder, and eventually he also entered into a plea.  And I don't know, Mr. Johnson, whether the death penalty committee at main justice had yet decided to seek death or not.  I just don't remember.  Mr. Cino had a heart attack on the day he was arrested and spent the next six months in Springfield, Missouri having a quadruple bypass and recovering from it.

Q.  That brings us to eight if we count Filipe Cisnaros twice, in both districts.  Are there any others I'm leaving out in which you were learned counsel?

A.  Well, I think there's one other, but I can't tell you what it was.

Q.  Okay, fair enough.  But in all of the cases that we have discussed, either prior to trial or the government filed a notice not to seek the death penalty or it was resolved by way of plea agreement, correct?

A.  Yes.

Q. So there aren't any cases where you went to trial in federal court when the death penalty was still on the table.

A. That's correct.

Q. And in only one of these did you go to trial at all, correct?

A. That's correct.

Q. I would like to ask you this question. As I said, Mr. Burke asked Mr. Swerling toward the beginning of his testimony, prior to Mr. Basham had you represented any federally charged capital defendants and he said no. Is that relevant to whether Mr. Swerling or Mr. Harris, because my understanding is that he didn't have federal capital experience prior to this case, is that lack of experience relevant to their performance in this case?

A. It could be.

Q. How?

A. I think the federal resource center people would tell you, and I would agree with them, that having experience in federal death penalty cases and the management of those cases is an important skill. And let me just give you one, or an important experience. Let me give you one example from Mr. Swerling's testimony.

There was testimony about the defense team going to Washington to meet with the death penalty committee, and acknowledging that the mental retardation issue was one that

they asked about at main justice. And that Miss Griffey said if you have other information you want to bring to us feel free to come back.

I think, respectfully, and ultimately it may not matter in the details of this case except for on the MR issue, but that's a huge red flag. Had a very experienced federal death penalty lawyer been aware of those conversations, a federal death penalty lawyer would have said you need to really dig into this MR issue.

THE COURT: It's time to take that recess. We have been going a pretty good while. We will take a ten minute recess.

(A recess transpired)

THE COURT: Please continue.

MR. JOHNSON: Thank you, your Honor.

BY MR. JOHNSON:

Q. Mr. Hammond, the last question I left off with was to what extent, if any, was the experience of Mr. Harris and Mr. Swerling in federal capital cases relevant. And I believe that your answer was, as I understood it, and you can correct me if I am wrong, is that you offered an example of the mental retardation issue and said that if they had been conversant with the resources available to federal capital litigators they could have drawn on more research and resources in investigating the mental retardation issue. Is that what you

said?

A.  Well, yeah, that's sort of -- that's one way to summarize it.  I think my point was maybe less specific even than that. What I'm saying is that I think for anyone who had been in the crucible of federal death penalty cases at that time the knowledge that there was a concern about mental retardation would have opened up I think more focus on getting down to the details of the MR argument.

Q.  So what I understand you to be saying is at that time mental retardation was a hot topic, if you will, among federal capital litigators due to the recent Atkins case and so that would have been more in the forefront, maybe, of their thinking?

A.  Might be.  And some of the articles that Mr. Daley used I think are good examples of that.

Q.  But looking at -- looking at that and the other claims that have been raised that you have been asked to testify about, mental retardation itself is not a topic that's peculiar to the federal system, correct?

A.  No.  It was at one time but it's not anymore.

Q.  And Jackson v. Denno hearings aren't peculiar to the federal system?

A.  That's correct.

Q.  Determining whether your client is competent to stand trial happens in both state and federal court.

A. Yes.

Q. Determining which issues to concede and which issues to contest is not peculiar to the federal criminal jurisdiction, is it, capital jurisdiction?

A. No, it's not unique to the federal system.

Q. Whether and to what extent to object to prior bad act evidence is not peculiar to federal capital cases, is it?

A. No. I mean, the rules vary from state to state but, no, I think the general notions are common.

Q. And deciding whether to argue that the government has taken inconsistent positions in related cases is not peculiar to the federal capital system, is it?

A. No.

Q. I want to talk about the kinds of materials and resources that you consult when you are determining whether an attorney has provided deficient performance in a particular case. And determining whether an attorney has provided deficient performance is really in all cases a very fact-dependent inquiry, would that be fair to say?

A. I don't know if I would say in all cases, but I think the general proposition is correct.

Q. Okay. Now, I think in our interview I asked you this same question. When you are trying to determine whether an attorney has been deficient, what resources do you look at and on what authorities do you draw and who do you consult? And I

think one thing you said that you would do is that you would talk to specific resource individuals, I think is the term that you gave it, is that correct?

A. Yes.

Q. So talking to people, like maybe people you mentioned earlier, who are knowledgeable in the field of federal capital litigation?

A. Right. And the names you've heard here in this case are certainly among those.

Q. Would David Bruck be one of those names?

A. Certainly.

Q. Kevin McNally? Are you familiar with him?

A. Very.

Q. David Ruhnke?

A. Yes.

Q. So these would be the kinds of individuals that you would want to consult in determining whether an attorney has been deficient in a capital case.

A. They are among the kinds of attorneys, yes.

Q. And have you consulted any of those three individuals that I just mentioned in preparation for your testimony today?

A. No. In fact, I decided not to contact any of them.

Q. Did you contact any resource individuals that I haven't listed?

A. No.

Q.  I think another thing that you said you would consider is consulting secondary literature.  What is secondary literature?

A.  Well, for example, the articles that were talked about earlier today that deal with the mental retardation issue, as one example.  But there are in the death penalty area, every year there are very intense conferences on the development of mitigation, on integrating the penalty phase with an innocence guilt phase and there were materials at all of those conferences.  So that kind of material is what I was thinking of.

Q.  So secondary literature would be things like law review articles, medical journals that are relevant to the topic, that kind of thing?

A.  Yes.

Q.  And have you read any secondary literature specifically in preparation for this case?

A.  I think I read a couple of the articles that, read superficially, I should say, a couple of articles that came up I think it was yesterday or today.

Q.  Okay.  So you read maybe the law review article that was shown to Mr. Swerling?

A.  Yeah.  One of those articles I know I had read years ago when it came out.  And a couple of others I looked at.

Q.  But other than those, no?

A. No, no, no.

Q. I think you said you didn't consult anyone from the federal death penalty -- and, I'm sorry, there are so many organizations and sometimes I get, you know, the alphabet soup confused. But David Bruck and Kevin McNally, they are with Federal Death Penalty Resource Counsel?

A. The name has changed over time, which is one of reasons I may be a little confusing, but I think it's now called the Federal Death Penalty Resource Center. I'm not positive of that.

Q. And you haven't contacted anyone from there?

A. No.

Q. Okay. And I think you said you didn't, no one else.

A. No one else with the Federal Death Penalty Resource Center.

Q. Any other resource individuals, though?

A. Well, yes.

Q. And who would they be?

A. Well, among them would be my partner Anne Chapman.

Q. Okay, Anne Chapman.

A. Um-hmm.

Q. And she's your partner there at Osborne Maledon?

A. She is.

Q. What does she do at Osborne Maledon?

A. She's a criminal defense lawyer, but her background is

death penalty work.

Q.  And what, specifically, did you consult with her about?

A.  I consulted with her about the reduced mental state issues and the competency issues.

Q.  And I think when we had our interview last Monday on the 8th you said the same thing.  I think I asked you have you consulted with anyone other than Mr. Basham's habeas counsel about the claims that they asked you to testify on and I think you mentioned Miss Chapman's name.  So you had consulted with her at least some prior to that date, correct?

A.  I had.

Q.  Anyone else besides Miss Chapman?

A.  I do think there's somebody else, Mr. Johnson.  I can't remember who it is.

Q.  If secondary literature consists of law review articles and journals and that sort -- those sorts of materials, then would primary literature be things like cases, or is there such a thing as primary literature?  Is that even a term?

A.  It's a great question.  I'm not actually sure that I know for sure.  But I think of the primary sources as things like the cases that you are involved in, and maybe the reported cases would fit under the banner of primary resources.

Q.  So as an expert if you are trying to figure out whether a particular attorney has been deficient, then the case law would be something that you would want to look at, correct?

A. Yes.

Q. And I think you mentioned ABA standards and guidelines --

A. Yes.

Q. -- would be other material. Have you looked at any particular ABA standards or guidelines in preparation for your testimony today?

A. Not particularly in preparation for this testimony.

Q. Have you consulted any cases in preparation for your testimony in this case?

A. I did look at a number of cases.

Q. Which cases did you look at and what claims did they relate to?

A. Well, I went back and looked at Tennard, which you will have to tell me the claim number, but I think it's -- is it 24 or --

Q. I think that's correct.

A. I looked at Atkins again, I looked at Edwards versus Arizona, which I mentioned earlier.

Q. And that's in the Fifth Amendment context, Sixth amendment, about counsel and -- invoke the right to counsel?

A. Yes. And what happens once you exercise that right to counsel.

Q. Any others come to mind?

A. There are others that might come to mind, as well, but --

Q. Okay.

A. Oh, Strickland.

Q. Strickland?

A. I always go back and reread that case, and I did it here, too.

Q. I think another resource that you said you sometimes consult outside of counsel when trying to determine whether an attorney was deficient would be mitigation specialists, if you are dealing with a claim involving mitigation, obviously. Did you consult any mitigation specialists in preparation for testimony today?

A. Not in preparation for this testimony.

Q. I think you testified on direct that Mr. Basham's current attorneys contacted you about serving as an expert in this case in August of this year.

A. I think they tried to contact me in July and I think it was August before we actually met.

Q. Do you know what date in August? Early or late in the month?

A. I do not. I think -- no, I shouldn't guess. I don't know.

Q. So two to two-and-a-half months ago, would that be a fair estimate?

A. That's pretty fair.

Q. Did you -- I know in your declaration from this case where you signed a declaration back in February, in that case you

said that you had been contacted in a certain month and then you signed -- the engagement was confirmed in a written agreement sometime later. Do you have a similar written agreement with Mr. Basham's attorneys?

A. There is a written agreement that I signed.

Q. And would that also have been done in August?

A. I don't know. It was sometime after we started being involved in the matter.

Q. And I think you testified on direct that, or Miss Stone asked you, they provided you with a list of the particular claims on which they wanted you to offer expert testimony, is that how it worked?

A. No, if I said that I got it wrong. They asked me initially to read the through all the claims, and then after that we had conversations that resulted in paring the list down to what turned out to be seven or nine claims.

Q. And what was the basis for determining which claims you would testify as an expert on and which claims you wouldn't?

A. I would describe it as collaborative. There were a number of claims that they were particularly wanting me to focus on, given the short amount of time available. There were a couple in addition that I thought ought to at least be talked about. So I think it was mostly issues that they wanted me to focus on plus a couple others.

Q. So are there claims in the petition that you declined to

offer expert testimony on because you felt like you couldn't opine that the lawyers had violated the standard of care?

A. There was at least one claim that I did not want to address.

Q. What claim was that?

A. I didn't feel comfortable addressing the claim about whether Mr. Swerling had a personal conflict of interest.

Q. Fair enough. Any others that you can recall that would fall into that same category?

A. There may be some, but none come to mind.

Q. Talking again about your preparation, and in this case in particular, now, obviously, you were here earlier this morning, and during a portion of that time Mr. Basham was available by video teleconference. Was that the first time you've ever seen Mr. Basham?

A. Yes.

Q. So you've never met him.

A. No.

Q. Have you ever talked to him on the phone or had any other communication with him?

A. No.

Q. Have you ever communicated or spoken with any of his family members?

A. No.

Q. And I think there has been, or I know there has been some

testimony throughout this hearing that you have not had an opportunity to speak with Mr. Swerling or Mr. Harris before your testimony today.

A.   No.  I think you know that we wanted to do that, but it did not happen.

Q.   What about Cam Littlejohn?

A.   No.  I have not spoken to any of those lawyers.

Q.   Did you attempt to talk to Cam?

A.   No, I did not.

Q.   What about Billy Monckton?

A.   No.  I have read his testimony.  I should have --

Q.   Mr. Monckton's testimony, and obviously Mr. Littlejohn hasn't testified yet.  Some of the issues in this case involve either mental retardation, incompetency, and you understand that Mr. Swerling and Harris have retained Donna Schwartz-Watts as one of their psychological/psychiatric experts?

A.   Yes.

Q.   Have you spoken with Dr. Schwartz-Watts?

A.   Not about this matter.

Q.   Do you know her from other matters?

A.   She may not know that I know her but I do.  She's involved in a case that I'm counsel for in Arizona, I'm local counsel for.

Q.   A case that's going on currently?

A.   Yes.

Q.   And in that capacity what's the nature of -- what information do you have about her?  What types of information do you have about her from that other case?

A.   Well, this is a capital post-conviction relief case pending in state court in Arizona in which there was a concern that the client might want to volunteer to terminate all proceedings and to be executed.  There was an effort to find a competent expert who would assist in communicating with the client.  Among the names that were considered was Donna Schwartz-Watts, and she ultimately agreed to become involved in the matter.

Q.   So, if I understand this correctly, you represent this defendant or are on the team representing him?

A.   I am.

Q.   And this client has talked about or expressed interest in going ahead and being executed?

A.   Yes.

Q.   Similar to what Mr. Brandon Basham has done in this case.

A.   Well, similar in form, yes.

Q.   Okay.  And you wanted to make sure that this client was competent to make that kind of decision, or you had concerns about their competency.

A.   The team did, yes.

Q.   And so in retaining an expert to help determine that

competency Dr. Schwartz-Watts is one of the individuals that you considered and you ultimately retained her?

A.  She was retained.

Q.  But you have not spoken to her about this case?

A.  No.

Q.  The Brandon Basham case.

A.  No.  I haven't spoken to her about the case in which she was retained.

Q.  So she has been retained but you didn't speak to her?

A.  I haven't spoken to her personally.

Q.  Have you read any evaluation reports or materials that she prepared in Mr. Brandon Basham's case?

A.  I think I have read a couple of the things she did in this case.

Q.  Okay.  And what -- from trial transcripts or things outside the testimony?

A.  Maybe they were in -- not even her reports, but summaries of what she had said that were in the record here.  I can't tell you that I've looked at any specific thing that I know she wrote.

Q.  And when you say they were in the record, does that mean they were either in the trial transcripts or that they were part of the exhibits?

A.  Or part of what's happened in this proceeding itself, yes.

Q.  It could have been something you saw during the hearing.

A.   Yes.

Q.   Or read from last week.

A.   Right.

Q.   What about Dr. Tora Brawley?  Have you spoken with her?

A.   No.

Q.   Have you read Dr. Schwartz-Watts' testimony in the Brandon Basham case?

A.   I don't believe so.

Q.   Have you read Dr. Tora Brawley's testimony?

A.   No.

Q.   Read any reports or materials prepared by Dr. Brawley?

A.   I can't say with any more specificity than I did about Dr. Schwartz-Watts.

Q.   Are you familiar with Dr. Thomas Hyde?

A.   I'm familiar with who he is.

Q.   Are you aware that he has been retained by habeas counsel as an expert in this 2255 proceeding?

A.   That's why I'm aware of him, yes.

Q.   And have you spoken to him about this case at all?

A.   No.

Q.   Did you review his testimony from last week?

A.   No.

Q.   And I take it you haven't seen any reports prepared by him.

A.   No.

Q.  I want to go through a few more of these.  And I'm not trying to be tedious.  Carlisle McNair was Mr. Basham's defense team investigator during the trial portion of this case, and I assume you've heard some things based on the testimony that's gone on in this hearing about Carlisle McNair.

A.  Yes.  And I have read what was said about him in the 2255 petition response and reply.

Q.  All right.  Are you familiar with the testimony from this proceeding and what was said about him in the filings?  But other than that did you read any of his memos?

A.  No.

Q.  And I take it you never spoke with him.

A.  Correct.

Q.  Other than what is in the 2255 filings and what was said in this hearing, have you reviewed anything prepared by Paige Tarr?

A.  No.

Q.  And the same -- other than the 2255 filings and what's gone on in this hearing, have you spoken with or reviewed anything prepared by Lesa Watson?

A.  No.

Q.  So is it fair to say that other than what's gone on in this hearing and what may have been attached as exhibits or part of the files in this 2255 case, you have not spoken to or

consulted any materials prepared by the defense team in the trial portion of this case.

A. I believe that's right.

Q. And I understand that you have had a lot going on in your life recently. I want to preface this question by letting you know this is not intended to question your integrity or work ethic in any way because I know you've had a lot going on in your life. But during your interview last Monday night on October 8th I asked you how many hours you had spent in preparation for your testimony in this case up until that point, and you replied not enough, isn't that correct?

A. I do remember I said that.

Q. Okay. And I think that you had estimated you had spent less than 50 hours in preparing for your testimony as of that point.

A. If you recall that's what I said, I accept it. I remember the not enough response but I don't recall exactly what I said about time.

Q. And also at the time of our interview one week ago I asked you which materials you had reviewed and which materials you had not reviewed, and I believe that at that time you said you had not reviewed any of his mental health records or other information concerning competency other than what was in the filings, is that correct?

A. Yes.

Q. And in the week since then, other than what was in the filings have you reviewed any of his mental health records?

A. Not with particularity, no.

Q. And other than what was in the filings and what's been said in court this week and last, have you reviewed any other information concerning competency?

A. Well, I may well have. I mean, I have tried in the last week to read as much as time permitted, and I certainly have spent more than 50 hours in the last week alone. So how much of that I had touched before and how much of it now, I couldn't tell you.

Q. But concerning competency, would those have been materials that were -- would it be fair to say the materials you have seen in past week which would be all of the competency materials that you've looked at? Because I think you haven't looked at any as of last Monday. Is it fair to say everything you looked at in the past week has been in the record in the way of filings or transcripts?

A. I think that's right.

Q. And the same would be true for the mental retardation issue. Everything that you've reviewed this past week would be in the filings or the transcripts?

A. I believe so.

Q. Well, other than the filings and the transcripts, I know that's kind of a mantra, has been becoming one, have you

reviewed any of the discovery in this case?

A. Not apart from those things. I don't think so.

Q. All right. Obviously, Chad Fulks was tried before Brandon Basham and he pled guilty so there was only a penalty phase trial for him. Have you read the entire transcript of the Fulks trial?

A. No.

Q. Have you read any of the transcript of the Fulks trial?

A. Not -- if you call that a primary resource, I haven't read it as a primary resource, I've read things where portions have been incorporated in other documents, but I haven't read the transcript itself.

Q. For example, you may have read excerpts from the Fulks trial that were included in the pleadings but not the transcript itself from Fulks.

A. Correct.

Q. Have you read the entire transcript in Brandon Basham's trial?

A. No.

Q. What portions -- have you read any portions of the transcript other than what were mentioned in this hearing this week or what was in the filings?

A. Well, I may have. I tried to look at the places that were identified as having been in the transcript where there were references to Brandon Basham's behavior in court. And I can't

tell you whether all of those things are actually attachments or not.

Q. Okay. So if, for example, there was a reference in the filings or what we have been talking about this week to something that happened in the trial, you may have gone to the transcript and then looked at that. You know, there's a citation to whatever, you may have gone and looked at that excerpt but otherwise you didn't review his trial transcript.

A. Yeah. And almost all of it is the latter, is the review of what was attached to something in support of a claim.

Q. All right. There was -- bear with me one second and I think we can start moving into actual claims and get away from this.

THE COURT: Let me interrupt here. I have a program I have to go to at 6:00 o'clock tonight. Are we going to finish today? Both sides underestimated yesterday when I asked about predictions, so --

MR. JOHNSON: Yes, your Honor.

THE COURT: Had I known that we might have worked harder yesterday or started earlier this morning or something.

MR. JOHNSON: I think we can move a lot more quickly and --

THE COURT: I don't want to rush anybody, don't get me wrong. We can -- we can adjourn at 6:00, come back tomorrow. We can adjourn at 6:00 o'clock and if y'all want to

put this witness on telephone for the rest of his testimony, y'all are the ones that have got travel plans tomorrow.

MR. BURKE:  Your Honor, Mr. Hammond has made clear to me and as Miss Stone that if he needed to be here tomorrow to testify he can be.  So if the court is available and that's necessary -- is that correct, Mr. Hammond, you can be here tomorrow?

THE WITNESS:  Yes.  I really don't want people to rush themselves for that purpose.

THE COURT:  I'm not trying to rush you at all.

MR. JOHNSON:  I'm fairly confident I can finish by six without --

MS. STONE:  My redirect is really brief.

THE COURT:  Let's go ahead, but don't -- I'm not trying to push anybody.

MR. JOHNSON:  Beg the court's indulgence for one second.

(There was a pause in the proceedings)

BY MR. JOHNSON:

Q.  Have you gone through the government's exhibits and looked at all those?

A.  No, only the ones that have been talked about here in court or that were referred to last week.

Q.  Only the ones that have been mentioned this week?

A.  Yes.

Q.   I'm going to go ahead and move into the claims themselves. Claim one is about the purse strap demonstration Mr. Basham made when he was with law enforcement officers on the Thanksgiving day search for Alice Donovan's body in 2002.  And when we talked last week on October 8th you told me that you didn't want to be dogmatic about this issue because the facts are disputed.  Is that true?

A.   I think I told you that that claim particularly bothered me, that it wasn't just because it was the first claim, because I know you and I talked about the claims were roughly chronological and I didn't want you to misunderstand what I was saying.  And I didn't want to be sounding to you like I was dogmatic about it, but this claim really bothered me.  I hope that's what I communicated.

Q.   So you are saying that when you said you didn't want to be dogmatic about it, you didn't want to -- you didn't want me to think because it was the first issue that you were just coming out of the box against everything.  Is that --

A.   I didn't -- I didn't want you to misunderstand me or me to miscommunicate to you that I thought there was no circumstance on earth where a lawyer could ever have his client talk to the government.

Q.   But you did say -- you wouldn't deny saying that you didn't want to be dogmatic because the facts are in dispute?

A.   Well, if that's --  I don't dispute that that's what I

could have communicated.

Q.   How far away physically was Brandon Basham from his attorneys when he gave the purse strap demonstration?

A.   You know, I have been obsessed by this question.  In some testimony there was some reference to a potted plant in the back of the courtroom, and I have been looking at this potted plant for the last couple of days and wondering if when people were referring to the potted plant in the back of the courtroom they were referring to this one, and I think they were.

And so I heard some testimony that said 25 to 30 feet and then I heard one of the witnesses say as far as I am from the potted plant.  Looks to me like more than 25 or 30 feet.  But those are the estimates that I think I've heard talked about.

Q.   So but it's fair to say that there is some question about how far he was away from his attorneys.

A.   Well, yeah, there's uncertainty about that.  At least from what I could glean from the transcripts.

Q.   What is the standard, we're talking about the standard of care here, what is the standard for how far a defendant can be from his attorney when they are searching for a body?

A.   Well, what I told you today and in response to Miss Stone's questions is that I think whenever you are with your client and law enforcement is around there must be an umbilical cord between you.  And I intended to imply a very

small distance, small enough so that there could not be conversations that you couldn't control, you as counsel couldn't control between the client and law enforcement.

Q. Is the phrase "umbilical cord" something you got from a case?

A. No.

Q. Is it something that you got from an ABA standard?

A. I don't think that there is a specific ABA standard that says how many feet that the client can be away, but I think there is a lot of literature that says you cannot be out of communication and control of your client when the client is speaking to the government.

Q. And there's also not a standard for any specific length of time that a defendant can be away from his attorneys during the search for a body, correct?

A. Well, I don't know of any standard that says a minute or 30 seconds. I say no time. And if there is going to be time someone has to go to the restroom or something there needs to be a very clear understanding that no communication will occur.

Q. So based on your umbilical cord theory your opinion is that the distance should be zero distance?

A. Should be as close to zero as you can get it.

Q. As close to zero as you can get it. And the time should be as you just said, no time.

A.   That's what I would start as my operating premise.

Q.   So if any separation of measurable length, whether it be in distance or time, violates the standard, then isn't it true we're no longer really talking about a standard of reasonable care?  Because it sounds an awful lot like strict liability. How is this not a strict liability standard?

A.   Well, I don't know whether -- I haven't thought about it as a strict liability standard, but it should be a strict standard.  I mean, Mr. Johnson, clients are in the control of law enforcement and out of my control very often on almost a daily basis in the work I've done over the years.  That happens.  But when it happens, whenever it happens there's a very clear understanding that nothing the law enforcement says to the client or client says to law enforcement is going to be part of any proceeding.  The problem here is that there wasn't that clear understanding.  Or a problem here, not the only one, but a problem here was there wasn't any clear understanding.

Q.   Let me ask you this:  In determining whether the separation of a client from his attorneys violated the standard of care, wouldn't it be important to know what caused the separation?  Because we're talking about a claim that the attorneys were negligent for allowing the separation to have occurred.  So isn't it important to know exactly how far away the separation was, how long it lasted and why it lasted?

Wouldn't those be important factors to consider in determining whether deficient performance was rendered by the attorneys?

A.   They would all be relevant factors, but I don't -- I think at the end of the day, as I tried to tell you, I don't think there are very many excuses for allowing your client to have uncounseled communication, particularly at this phase of a death penalty case.

Q.   So you would agree that they are relevant factors, and you would also agree that you don't know with any certainty how any of these factors play out.  You don't know how far it was, you don't know how long it was, and you can't say exactly why it occurred.  So on these important relevant factors you can't say what the answers are to any of these questions, can you?

A.   I can only tell you what's in the record here.  And I have seen and the record here says at least 25 to 30 feet, and maybe longer if it's as far away as that potted plant.  And it was some period of time while the lawyers were distracted talking to members of law enforcement who were there at that time.  That much I clearly know.  And at least one of those lawyers, and probably both of them, couldn't hear, were far enough away they couldn't hear or communicate at that moment with Brandon Basham and Sheriff Hewitt.

Q.   But how do you know for certain?  You seem to be taking it as a given that the interaction occurred when the attorneys were some distance away huddling with law enforcement

officers.  How do you know that?

A.   That's what I read in the transcript.

Q.   Where in the transcript and whose testimony was that?

A.   I can't tell you for sure which one, but I think this was in the transcript at the Jackson v. Denno hearing.  But I wouldn't be able to tell you without spending more time on it.

Q.   And you are aware, aren't you, that at the time this search for the body occurred Brandon Basham had already made several statements to various law enforcement officers?

A.   I am.

Q.   And have you read all those statements?

A.   I don't know that I have.  I don't know that anybody even knows all the statements.  But I think I've read about the ones that have been talked about here in the transcript, in the case.

Q.   For example, I think we have shown several times Government's Exhibit 12, which is a memo from Greg Harris to Jack Swerling that recounts statements Brandon Basham made to Dick Hughes and Barbara McGuire in the public defender's office in Kentucky.  Is that one of the statements that you've read?

A.   Oh, I'm sorry.  I thought you were talking about law enforcement communications.  Yes, I have read that.

Q.   You read that one?

A.   I have.

Q.   And I'm talking about the statements Basham made to all the police officers that he talked about, and there were several.  Have you read all the others?

A.   I don't know that I read them all, but I've read a number.

Q.   But you are aware that he's already made several statements.

A.   I'm aware now that he had already been talking, apparently, to anybody who would listen to him before Thanksgiving afternoon.

Q.   And you understand, don't you, that there was some degree of urgency in what the attorneys for Mr. Basham were trying to do, in that they understood the body of Alice Donovan may be in this area and their concern was that if Brandon Basham was unable to help them find this body they would lose, potentially, a powerful argument in mitigation, isn't that correct?

A.   I understand that that's one of the concerns that they had.

       MR. JOHNSON:  Just one second.

       (There was a pause in the proceedings)

Q.   (MR. JOHNSON) I think one of the things you testified about on direct was that you were concerned -- one of the things that gave you concern, among others, was that when they set off on this journey on Thanksgiving day to find a body there was no proffer agreement in place.  Isn't one of the

concerns you had?

A.   There was not a proffer agreement in place.

Q.   Right.   There was not a proffer agreement and so that's one of your concerns.   Are you aware that they had, the attorney for Mr. Basham had spoken with Rose Mary Parham of the U.S. Attorney's Office and she had already told them that no proffer was going to be given, correct?

A.   Well, I have read that.   And I've also read Mr. Monckton summarizing what he thought was his conversation or someone's conversation with Miss Parham in which she apparently said Carolina will do right by you.   And there's another statement in there that says nothing Mr. Basham says is going to be used against him.   I would say that the record is pretty confused on what the agreement was or wasn't.   Which is part of the problem here.

Q.   Well, have you read any of the 2255 proceedings that went on with Mr. Basham's codefendant Chad Fulks?

A.   Not unless they have been incorporated here.

Q.   Well, one of the things that went on in the Fulks case is -- and you are familiar with John Blume, correct?

A.   Yes.

Q.   And he would -- he's kind of in that camp with the federal death penalty resource gang, right?   He's now at Cornell, or has been.   He's at Cornell?

A.   Yeah.   I'm not sure I would call him part of the resource

gang, but I know who he is.

Q. Okay. And he was one of Mr. Fulks' attorneys in Mr. Fulks' trial. And in Mr. Fulks' 2255 there was a very similar claim, that Mr. Blume had allowed Chad Fulks to give statements that they had hoped would be mitigating for Mr. Fulks, spare him the death penalty, and that those statements should not have been made without a proffer agreement. And are you aware that that claim has already been rejected both here in the District Court for South Carolina and it's already been -- the denial of his 2255 petition has already been affirmed on direct appeal?

A. Yes. It's not my impression those are very similar claims, though.

Q. Well, they're both claims involving statements given to law enforcement in hopes of providing a mitigation specialist's argument that were not protected by a proffer and therefore it was ineffective assistance to provide the statements, correct?

A. Right. But we talked about the particularly troubling circumstances of this case, and I hope I've tried to make that clear.

Q. All right. Just one second.

(There was a pause in the proceedings)

Q. (MR. JOHNSON) All right. I'm going to move on to the claim two, which is the Jackson v. Denno hearing. You heard

Mr. Swerling's testimony, correct, that they did not have any witnesses who would testify that any of the statements Brandon Basham made to law enforcement officers were coerced, correct?

A.   I did hear him say that.

Q.   And you don't have any information that that's not true, correct?  You don't know of any witness that he could have called would have said the statements were coerced.

A.   And I think the way he was using that word coerced is a little bit like the way the judge was characterizing a hypothetical earlier about a claim that law enforcement beat an answer out of someone or coerced in that sense.  And I certainly accept that there was no witness available who would say that -- who would say that Mr. Basham was coerced in that way, physically threatened in some way.

Q.   So your concern would not be there's information in the record they should have used of actual coercion in the sense that we usually think of when we think of a statement being involuntary, but your concern is directed more towards Mr. Basham's competency and state of mind in whether this was a knowing and intelligent statement?

A.   Those are the words I would use, knowing and intelligent.

Q.   Knowing and intelligent.  I think you said in your October 8th interview with us that lawyers should approach a Jackson v. Denno hearing "with special care" when their client appears to be compromised, is that correct?

A.  I think that's a fair summary of what I said.

Q.  Having their client evaluated by a psychiatric expert, Dr. Donna Schwartz-Watts, the same expert that you have retained in this other case, that would be taking care, correct?

A.  That would be one step, yes.

Q.  And reviewing your client's entire medical history would be special care, would it not?

A.  It would be a step.

Q.  And reviewing prior statements made by the client in circumstances under which they were made, that would be taking care, correct?

A.  That would be relevant, too.

Q.  And spending extensive client -- excuse me, spending extensive time with the client himself would also be a form of taking care, correct?

A.  I agree all of those are relevant.

Q.  Wouldn't you agree whether you -- let's take the general principle rather than the specific.  I understand that on the specific you do not agree, as you've discussed with Judge Anderson, that there would have been an estoppel issue from using the statement later.  But wouldn't you agree that it is a strategic decision that Mr. Basham's trial attorneys made when they decided to use the Jackson v. Denno hearing to preserve the issue of voluntariness and knowing and intelligent, have the judge make a ruling on it, and still

preserve their ability to argue at sentencing that he made the statements voluntarily and that the jury should consider that in not giving him a death penalty?  That's a strategic choice they made, correct?

A.  I'm not sure I followed that question.

Q.  It was long.  You understood Mr. Swerling's testimony to be we wanted the judge to have a finding on the Jackson v. Denno issue but we didn't want to argue strongly that it was involuntary, because if we argued strongly that it was involuntary if we came back later at sentencing and said hey, jury, give him life, not death, because he voluntarily helped the cops look for the body, they were concerned there would be an estoppel issue.  They wanted to preserve the mitigating argument for the jury at sentencing, and all of that is a strategic decision, correct?

A.  Well, I guess you can call that a strategic decision. It's in the world of trial strategy.

Q.  Will you pull up Government's Exhibit 9?  Can you see that on your screen there?

A.  Yes.

Q.  Towards the bottom of this e-mail there is an e-mail that was sent from Mr. Swerling's e-mail account on February 19, 2004.  And can you read that paragraph or those couple of sentences that begin, a lawyer challenges?

A.  Yeah.  You would like me to read it?

Q.   If you would, please.

A.   Lawyer -- so this is a question.  A lawyer challenges the voluntariness of a statement in a Jackson v. Denno, no allegation of coercion.  The lawyer does not argue voluntariness before the jury.  Does anyone think that the defense would be estopped from arguing later in the trial that the defendant tried to help law enforcement in mitigation?

Q.   All right.  Do you understand this was sent on February 19th, which was a few days before the actual Jackson v. Denno hearing in this case?

A.   Yes.

Q.   So this was before Judge Anderson raised any question about estoppel from the bench.  Are you familiar with a person with last name of Niland or Neeland with the Texas Federal Defender organization?

A.   I am.

Q.   Who was that?

A.   He was at that time the ahead of the Texas Defender Organization, which was a resource center in Texas.

Q.   Would you read his response to the bottom e-mail at the top?  It begins, I think?

A.   I read this yesterday, but I will read it again.  I think that this is good strategy and works very well in the Jackson v. Denno area because in the suppression hearing the cop will be anxious to tell how cooperative and willing the client was

during the taking of the statement.  He will not likely understand the goal at trial is to use the client cooperation as mitigating, and with a good leading question examination you will likely be able to get him to spend hours describing how "they couldn't have done it without your client's cooperation."

Q.  So Mr. Swerling floats this idea out there prior to the Jackson v. Denno hearing and wants to know what do you guys think about the validity of this strategy, and he gets a response back from the head of the Texas Public Defender that not only is this a strategy, it's a good strategy.  At least that's what Mr. Niland said, right?

A.  Well, I think you are reading a lot into that.  I wouldn't -- I mean, if you are saying that a death penalty lawyer ought to rely on this kind of e-mail exchange with as little background as he had given, I think any person who responds, and I'm on this same list, have been for years, I think it would be wrong for us to sit here and say that that was advice that a lawyer could rely on.  And particularly when we're now four, five days before the hearing.  And, frankly, I'm not sure what Mr. Niland is saying.  I do not think that's a non-ambiguous response at all.

Q.  I don't want to debate the meaning of the e-mail, and Judge Anderson can read it, take it for what it's worth.  But, with all due respect, isn't it fair to say, though, that you

were prepared to say Mr. Swerling and Mr. Harris lacked any valid strategy in doing this even though you haven't read all the statements and you don't have all the background, and you don't know all of the medical information that Mr. Swerling knows?

I mean, it seems that you are saying that Mr. Niland couldn't have provided any advice on whether it was a good strategy, but you can opine as an expert whether it was no valid strategy at all.

A.  Absolutely not, Mr. Johnson.  Having been a member of this organization for now well more than a decade, and having been on the list serve, I think if Eric Friedman, the center of this website list serve, were to be here he would be deeply offended at the idea that a lawyer on the eve of an important hearing in a death penalty case could be sending out an e-mail that is this cryptic and expecting to get responses on which he can rely.

If you need that kind of advice and you need it in anticipation of a hearing that is about to come up this is not the way you do it.  Or this isn't the end of it.  If Mr. Swerling had said I picked up the phone and called Mr. Niland and we reviewed the whole case with him that might be a different circumstance.  But I don't believe that's what happened here.

Q.  So if Mr. Niland knew what you knew then he would be

saying what you're saying now and not what he said in this e-mail?

A.   I don't know what he would say.  But I would hope he would say the same thing I'm saying now, and think he would.

Q.   Can we go to Government's Exhibit 10?  Let's go to the one at the bottom that starts -- it's from David Ruhnke, February 26th -- 22nd.  And I will just read it.  It says, Jack, unfortunately I can see the argument that the defense can't have it both ways, i.e., the statement was involuntary but the defendant was voluntarily trying to be helpful.  He says, I don't know enough about the facts to weigh in, though, like whether the client actually said or signed anything in support of the motion.  But that kind of argument is probably a Simmons versus United States analogy that raises a legal argument or providing the factual basis for legal argument should not come at a price.  This is from David Ruhnke who you mentioned as with the Federal Death Penalty Resource Center, correct?

A.   Yeah.  I don't know if he was -- I hope I didn't say he was with the Federal Resource Center.  He may not have been at the time.

Q.   Okay.  But --

A.   He's a very experienced, very experienced death penalty lawyer, though.

Q.   So he also says he can see the argument defense can't have

it both ways.  He agreed at least that it's a concern.

A.   But, again, are you sure that they are talking about involuntary in the sense of not knowing and intelligent versus coerced?  It might make a huge difference, and I think if David Ruhnke were here he would want to know what are you talking about.  If it's the way we think of involuntary reflexively is the way the judge thought of it today.

Q.   But isn't it also true that what's at issue at a Jackson v. Denno hearing, if, if you argue the client didn't know what he was doing and then you come back later and say, yeah, he does know what he was doing, he was trying to be helpful, it's still inconsistent in the same basic way, isn't that correct?

A.   But I don't think that kind of inconsistency can be held against you.  That's what I was trying to say earlier.  I don't think that an argument you make on behalf of your client at a pretrial hearing, whether it's a Jackson v. Denno hearing or some other hearing, can then foreclose you from advocating on behalf of your client based upon whatever the court rules.

Q.   If we can briefly look at the e-mail at the top here.  I'm not going to try to read the whole thing.  And this is from -- well, there's one here in the middle that's from Kevin McNally in response to David Ruhnke and Jack Swerling is -- is copied on it.

And he says that the tactical advantage of getting the police officers on the record about the statements before

trial argues for making the motion.  And then at the top David Ruhnke replies, Kevin makes sense, as well.

(There was a pause in the proceedings)

Q.   (MR. JOHNSON) All right.  Hear's what we do know.  We know that this was an issue that Mr. Swerling thought it was important to raise prior to the -- prior to the hearing.  We know that David Ruhnke saw concerns, we know that Kevin McNally saw concerns, we know that Mr. Niland saw concerns, and then, in fact, without having been privy, of course, to any of this that's going on Judge Anderson had concerns about the issue, as well.  And so that suggested it was a difficult decision that Mr. Swerling, Mr. Harris had to make and one that was a strategic decision on how far to go in the Jackson v. Denno hearing.  It was a question up for debate, wasn't it?

A.   Well, it's a question you can debate, I don't argue that. But I simply don't think at the end of the day a court would foreclose you from making a mitigation argument.  I just, frankly, I think it's almost unimaginable that you would be prevented in the mitigation phase of your case from arguing anything that might be of benefit to your client.

Q.   But it was certainly imaginable to Jack Swerling and it was imaginable to Mr. Niland and imaginable to Mr. McNally and Mr. Ruhnke and it was imaginable to this court, isn't that true?  Because they talked about it.

A.   I don't think so.  Again I say you are reading way too

much into these e-mails.  And I think if you had these gentlemen here they would say the same thing.

Q.  And you don't -- although I understand what your opinion is, you don't have any cases or AB guidelines to cite to the court that an attorney doesn't have to worry about that when he's in a Jackson v. Denno hearing.

A.  No.

MR. JOHNSON:  I'm going to move on claim five, competency.

THE COURT:  Mr. Johnson, you still think we're finishing at 6:00.

MR. JOHNSON:  I'm going try.

THE COURT:  I'd rather not rush through, I really would.

MR. JOHNSON:  And I apologize.  You know, I'm not a trial lawyer so my estimate of what time testimony --

THE COURT:  It happens all the time.  Practically every lawyer underestimates time, I told my law clerk that today, it just comes with the territory.  And I'd feel more comfortable if we did come back tomorrow.

MR. JOHNSON:  That's perfectly fine.

THE COURT:  Y'all have obligations tomorrow that would keep you are from being here?

MR. DALEY:  No, your Honor.

MR. BURKE:  No, your Honor.

THE COURT:  Can you rearrange your flight schedule tomorrow?

MR. BURKE:  I e-mailed my assistant while we have been going so I think we should hopefully be able to --

THE COURT:  I'm pretty tired, as well.  So let's go ahead and break for right now.

Let me, before we break, I just want to -- one question that's kind of been haunting me a little bit going back to claim one, allowing the client to be unfettered, get away from the umbilical cord.  You know, in any death penalty cases we all know you have some major forks in the road as you go along and you've got to take one fork or another and then if you get a bad result it's easy to look back and say you should have gone the other direction.  And that's what I have to struggle with.

And I want to be sure I understand your testimony. Are you faulting defense counsel for allowing Mr. Basham to go out in the woods on Thanksgiving day to try to help find the body?  In other words, you could have had a situation where defense counsel said we're not doing anything, we're not going to give a statement, we're not going in the woods, it's Thanksgiving day, bring us our Thanksgiving meal here in prison, we'd like to assert the Fifth Amendment, see you at trial.  And if they had done that then the argument would have been any good defense lawyer should have realized the amount

of evidence against these defendants, they should have tried to make an effort to find a body in an effort to preserve their life, the life of the defendant. The defense strategy was a bad strategy, the only thing they had going was to find the body.

So are you saying they should not have even made an effort or that they should have made the effort but be more careful about what they said while out there?

THE WITNESS: Well, I am very close to saying that given these circumstances had they known anything about this client I think going forward at all was a bad idea. But if they wanted to go forward there are certainly other ways that they could have tried to approach this so that they wouldn't have the client making uncounseled statements in the field.

THE COURT: Well, the reason I ask that point is I might be mistaken, but I think that Mr. Basham made some other damaging statements while he was at the elbow of his lawyer about dragging the body into the woods. I might be wrong about that, but I think he did.

THE WITNESS: I know that there was a statement about the deer crossing the road.

THE COURT: Right, the deer statement was clearly made with the lawyer sitting right beside him.

THE WITNESS: But I don't know about when or under what circumstances the dragging of the body statement --

MS. STONE: Your Honor, I believe that was in the Littlejohn hypothetical.

THE COURT: The dragging of the body?

MS. STONE: Correct. And as Mr. Monckton testified, a lot of that information came from Miss Parham, she didn't agree with that, but the dragging distance comment I believe was the Littlejohn hypothetical.

THE COURT: What I'm struggling with, I'm just trying to envision how the defendant would go to the woods, try to help find the body but not say anything. He's got to say, look here, I remember a cemetery, I remember the animal farm or something, and he's either going to say it himself or through counsel or counsel has to make a hypothetical statement.

MR. JOHNSON: And in addition to the hypothetical, I think that, as we discussed, there was a moment in the van when Mr. Basham leaned over to Mr. Littlejohn and whispered something in his ear and Mr. Littlejohn said go -- or Mr. Littlejohn either said go ahead or Mr. Littlejohn provided information himself that the officers needed to be looking for a purse strap.

So in addition to the hypothetical there was information provided through counsel that a purse strap needed to be found, because obviously there was some connection to where the purse strap was going to be and where the body was.

THE COURT: I'm just I guess pointing out that Mr. Monckton and Mr. Littlejohn were really walking a tightrope out there in the woods trying to do the best thing to do. It was difficult.

THE WITNESS: And that's what I was trying to point out when I said that this idea that there was some difference between interrogating him and having him give directions. And, again, maybe with the benefit of hindsight this does seem different. I accept that there's foresight and hindsight, but, my goodness, if you were to sit down and think what's going to unfold here, if I draw the line between interrogating and seeking directions, what pitfall am I falling into. And I think, I think it would have become obvious to them that they would have to have a very tight constraint on what was going to happen from that moment forward.

THE COURT: With that, let's adjourn for the day. And I have a plea at 9:00 o'clock tomorrow. My guilty pleas normally take a half hour, with this defendant we'd better allow 45 minutes. We have been already been through two aborted guilty plea colloquies and I'm not sure this one is going to succeed either.

MS. MIMMS: Your Honor, if I may address the court?

THE COURT: Certainly.

MS. MIMMS: I have an obligation in Charlotte tomorrow, and as local counsel I'm not actively participating.

May I be excused tomorrow?

THE COURT: No problem at all. Thank you very much. We will be in recess.

(Recess, 5:55 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: date            s/ Daniel E. Mayo

DEFENSE WITNESSES

JACK SWERLING

       CROSS             704

       REDIRECT        799

LARRY HAMMOND

       DIRECT           824

       CROSS             873

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 20

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

932

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                    CR NO.: 4:02-992
                                            Columbia, SC
      -vs-                                  October 17, 2012

BRANDON LEON BASHAM,

            Defendant

------------------------------


            BEFORE HON. JOSEPH F. ANDERSON, JR.
            UNITED STATES DISTRICT COURT JUDGE
                    MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:        HON. WILLIAM N. NETTLES
                       UNITED STATES ATTORNEY
                       BY:  ROBERT F. DALEY, JR.
                            JIMMIE EWING
                            JEFFREY M. JOHNSON
                            WILLIAM K. WITHERSPOON
                       Assistant United States Attorneys
                       1441 Main Street
                       Columbia, SC  29201


FOR DEFENDANT:         ARIZONA FEDERAL PUBLIC DEFENDER
                       BY:  MICHAEL L. BURKE
                            SARAH E. STONE
                       Assistant Federal Public Defenders
                       850 W. Adams, #201
                       Phoenix, AZ  85007

**JA 4662**

COURT REPORTER:       DANIEL E. MAYO, RDR

                      Certified Realtime Reporter
                      901 Richland Street
                      Columbia, SC  29201


              STENOTYPE/COMPUTER—AIDED TRANSCRIPTION

**JA 4663**

THE COURT: Mr. Hammond, if you would resume the stand. Mr. Hammond you are still under oath. Let me follow up a few questions, if I could. And, Mr. Hammond, again, I'm not trying to be adversarial with you, but after you leave I'm trying to anticipate some of the argument that might go back and forth.

THE WITNESS: I understand.

THE COURT: But in the Fulks case regarding the issue of allowing the client to make a statement to law enforcement with no reward in return, no promise to take the death off the table, Mr. Blume's strategy as he articulated it here in the hearing, and which the Fourth Circuit recognized, was that he wanted a way to get his client's version of what happened in front of the jury without having to take the stand and suffer cross-examination. And he strategized the best way to do that was to make a statement to the officer putting a lot of the blame on Mr. Basham, knowing that the officers would be called as witnesses and would relay his version of what happened but yet he wouldn't have to get to the stand and say what happened. And that struck me as at least a reasonable course of action. I don't think Mr. Swerling articulated that as his strategy here, but what about that strategy? What about that notion, in other words?

THE WITNESS: Well, I did read the Fourth Circuit opinion, I don't know much more about the background. I guess

935

I would just have to honestly tell you, I find that troubling. Whether it is an acceptable exception to what I think of as the rule I just can't tell you. But I think details make a lot of difference here. How well you know your client and your client's mental state, how controllable your client is, how clear the ground rules are, and I don't know any of those things with respect to Mr. Fulks' case.

THE COURT: All right. And one more question. You suggested yesterday that one flaw in the defense trial team's methodology was the failure to get someone who really knew a lot about mental retardation. And so I just went back and looked last night, tried to find out what type of mental professional would that be. And I do note that Mr. Swerling and Mr. Harris called to their assistance, if this list is correct, a neurologist, a neuropsychologist, a psychologist, a treating forensic psychiatrist, and a forensic psychiatrist.

So starting with the proposition that none of those people were qualified to deal with mental retardation, what type of medical professional would be?

THE WITNESS: Well, first of all, my impression is that of those five Tora Brawley comes closest. She is a psychologist, and if I'm not misinformed she may have administered the last round of IQ tests to Mr. Basham. But I believe she would say, and maybe did say, that she's not a sufficiently specialized psychologist to really evaluate the

entire collection of Atkins-related issues.  It's not just a matter of the IQ score, of course, it's also an evaluation of adaptive behavior and it's an examination of the records before someone -- before the defendant was 18 years old and trying to make sense of those records.  So I think it is a very specialized type of psychologist.

THE COURT:  I was wrong in focusing upon the title in front of the doctor's name, it's whether the psychologist has the experience in mental retardation.

THE WITNESS:  And I think I read somewhere that the percentage of psychologists who would consider themselves to be experts in mental retardation is actually a very small percentage of that field of psychologists.

THE COURT:  All right.  Well, thank you for clearing that up for me.  All right.  That's all I had.  Please resume, Mr. Johnson.

MR. JOHNSON:  Thank you, your Honor.

BY MR. JOHNSON:

Q.  Good morning again, Mr. Hammond.

A.  Good morning, Mr. Johnson.

Q.  And I'm going to move on.  We discussed claims one and two yesterday afternoon, and unless the judge has any further questions about those claims I'm going to move on and pick up with the claim 19, which is the claim about which the judge just asked his question, it concerns mental retardation.

Now, my understanding is that Dr. Brawley is a neuropsychologist. Is that also your understanding of what she is, and her title?

A. I know she is a psychologist and I think I have heard the phrase neuropsychologist associated with her name, but you really shouldn't rely on me for that.

Q. Now, did I understand you to say yesterday that you had not read Dr. Brawley's testimony?

A. That's correct.

Q. And my understanding is that mental retardation has -- it may have various definitions clinically, but there is also a legal standard for mental retardation, is that correct?

A. Yes, I think generally I would say that's correct.

Q. And what is your understanding of what that standard is for a person to qualify as mentally retarded under Atkins, for example?

A. As a standard I think the usual formulation is that there is a three-part test. That the first part is that there must be a qualifying IQ result or testing result within an appropriate range, and that appropriate range now varies from jurisdiction to jurisdiction. Some states -- and if I'm telling you more than you want to know stop me.

Q. No, please continue.

A. Some states I believe now still require scores below 70. Most, I shouldn't say most, I believe most jurisdictions

employ a kind of a sliding scale that may say we will go farther if we have scores between 70 and maybe 75.  But that first prong may require a little bit more of a sensitive analysis than just looking at an IQ score itself.

The second category is what I mentioned to the court a moment ago, but I think is generally called adaptive behavior measures.  And as you probably know, there's been a fair scientific morphing of adaptive behavior.  At one time the convention was that there had to be two factors among either ten or 11, depending on whether you were looking at the DSM-IV or at, and I'm blanking on the acronym for the other traditional measure, but you had to have at least two significant deficits in adaptive behavior.  And then, third, there has to be evidence of onset prior to the age of 18.

Q.  So what I understand based on your explanation there is that there's basically three prongs, there is an IQ prong, there is a functioning or adaptive behavior prong, and then there's an onset prong, when did it manifest itself, is that correct?

A.  I think that is, although I certainly don't want to suggest that I'm an expert on this.  That's my understanding but I could easily be corrected on any of the details of that.

Q.  Let me ask you about the first prong, the IQ prong.  Now, you testified that the appropriate IQ range may vary based on the jurisdiction.  That in some jurisdictions at some points

in time and, maybe currently, 70 was kind of a magic IQ number, whereas in other jurisdictions they use a sliding scale, if you will?

A.   I think that's still being debated in the cases, yes.

Q.   What was the standard in federal jurisdictions in the time range that we're talking about of trial, let's say of trial, 2004?  What would have been the federal standard for qualifying IQ at that time?

A.   I would have to tell you I'm not -- I'm not 100 percent sure of what one would call the federal standard at that time, but I believe whatever it was just on that first prong the testing Dr. Brawley did would have satisfied that prong, whether it was below 70 and ranging up to 75.

Q.   And when you say testing Dr. Brawley did, are you talking about the IQ score that has been mentioned in court of around 68?

A.   Yes.

Q.   And I take it --

A.   Yesterday I wasn't sure she actually did the testing herself, but that was my understanding.

Q.   But that's -- but you mentioned Dr. Brawley.  That's an IQ score that you are associating in some way with her?

A.   Yes.

Q.   And I believe the testimony, and we mentioned it a couple of times, the number 68 has been thrown out.  Are you getting

that from the testimony from this hearing then?

A. You mean from the 2255?

Q. Well, that, too. I mean, you didn't read her testimony so I assume that you are getting the 68 number either from the filings or what's gone on in this hearing.

A. Yeah. I can't tell you precisely where I saw it, but I saw it in connection with my preparation in this case. So it must have been something that was in an exhibit or an attachment somewhere in the file in this case.

Q. I'll ask you a couple of followups, but I want to move to the second prong before I forget, the second prong being adaptive behavior. And I think you mentioned that at least in one point in time, and I'm just using common vernacular here, the standard was there has to be impairment or dysfunction in at least two life skills to satisfy the second prong. Is that kind of what we're talking about?

A. Right. Either two of ten or three of 11, depending on which scale you use.

Q. And I think you said that that has changed or some jurisdictions have changed that, the way that you count those life skills or the way that you analyze that prong, is that true?

A. Yeah. And I'm, again, I want to emphasize I'm not an expert and I'm relying on -- on this issue on things I have read recently, not necessarily in connection with this

proceeding. But my understanding is that this multi-part list of adaptive behaviors has been truncated, maybe that's not the right word, but brought down to essentially three categories of adaptive behavior, one of the three being necessary to satisfy the test of mental retardation.

Q. And do you know in 2004 in the federal jurisdiction what that standard had been as to the second prong at that time?

A. I believe at that time most federal courts, and I can't say all, I think were using the three of 11 test. But, again, I wouldn't feel comfortable stating that as an opinion.

Q. And then the third prong is that the first two have to manifest themselves prior to the age of 18, is that correct?

A. Essentially, yes.

Q. So you would have to have qualifying or low enough IQ score plus deficiencies in functioning which all manifest before you turn 18.

A. Again, I don't want to say that I'm confident that that's precisely right, but I think essentially that is my understanding.

Q. And I didn't hear you, excuse me, I didn't hear you mention -- you mentioned the IQ test has kind of fluctuated over time and based on the jurisdiction, and the adaptive behavior has done, as well. But is this third prong one that has been kind of static in terms of the definition that it's always been, has to manifest before age 18?

A.  Well, static is not the word I would use.  We talked a little bit I think yesterday about learning that has occurred over the last now maybe 14 or 15 years about the way in which IQ testing has occurred over time.  I think we're gaining a deeper understanding of what -- of how to analyze IQ testing.  We're looking, I shouldn't say we, the experts are looking in more detail at the type of testing, the age of the test, the things like we talked about yesterday, the practice effect, a series of other factors that may give a more -- a deeper understanding of the test scores someone achieved below age 18.

Q.  Thank you.  And I don't mean to suggest that the mental retardation is static.  Certainly we're learning more and more about the human body and the human brain and these kinds of things all the time.  I was asking more along the lines of the legal standard on when those sorts of things have to manifest themselves.  It seems to me, and I guess I'm asking you if you know anything to the contrary, it seems to be that the third prong has always been you've got to have this stuff before age 18.  Do you know of any legal standard that is different?

A.  No, I wouldn't suggest -- I agree with you on that.

Q.  Okay.  Thank you.

A.  My only point, Mr. Johnson, was that I know there are now cases and there are experts who have looked carefully at cases in which there is no IQ score below 70 for someone under the

age of 18 but have found in looking carefully at the test results that there are meaningful indicators of what the IQ -- the real IQ scores were. That's all I was suggesting.

Q. And that's fair enough. I understand that. But going back to what the legal standard was in 2004, if I were to posit to you that the legal standard were you had to have an IQ at or below 70, you had to have functioning deficiencies in X number of skills, and it has to manifest itself prior to the age of 18, you wouldn't dispute that that was the legal standard in 2004.

A. I wouldn't dispute that that was -- that that's a fair characterization of the legal standard. But I think if you ask in terms of a lawyer's responsibility in terms of developing defenses I think virtually all of the literature and training at that time was telling criminal defense lawyers, capital criminal defense lawyers, that you need to look into the details of that three-part test, and what your first impressions are from looking at the three-part test might very well be incorrect. That's what I was trying to suggest earlier.

Q. Okay. But there's -- regardless of the investigation that an attorney does, and I understand that you are saying they can't just look at the tests and that's all the investigation that they do, I understand that you're suggesting that they have to do more, but in terms of what they would have to prove

to Judge Anderson or an appellate court or some court down the road if they wanted to say in 2004 that Brandon Basham was mentally retarded, they would have to work with the legal standard that was in place at that time, correct?

A.  I accept that.

Q.  If I told you that Brandon Basham had taken multiple IQ tests, including multiple IQ tests prior to turning 18, you wouldn't dispute that, would you?

A.  No, I certainly heard that.

Q.  And if I told you that on none -- let me rephrase this. If none of the tests returned an IQ score that was lower than 77 prior to age 18 you wouldn't dispute that, would you?

A.  No, I think I have seen a list that's consistent with what you've just said.

Q.  And if I told you that he took an IQ test when he was 17 years old and ten months and on that IQ test he scored a 89, you wouldn't dispute that, would you?

A.  I won't dispute it, but I don't recall that particular number.  I know there was an IQ test when he was a teenager before the age of 18 and I know it was above 70.

Q.  I want to ask you this:  When we had our interview back on October 8th, last Monday, Mr. Burke and Miss Stone presented me a list of claims on which you would be testifying as an expert and claim 19 was not among them.  And we were informed yesterday, I believe, that you would also be offering an

opinion as to claim 19.  When was it determined that you would offer expert testimony as to the mental retardation claim?

A.  Well, I can't tell you when Mr. Burke and Miss Stone decided, I know that I told them sometime last week, and it may have been over this last weekend.  They were here last week, and then sometime over the weekend I spoke to at least one of them, and I said at that time that I was troubled about the MR issue and we talked a little bit about why it might be troubling.  So I don't know if that's what led them to decide to add that claim or not.

Q.  Okay.  Let me make sure that I understand this. Obviously, we had part of this hearing last week, and you weren't present but you've looked at the transcripts of what happened last week?

A.  Yes.

Q.  And so was it in looking at that those transcripts that you became concerned about the mental retardation issue and then approached Mr. Burke and Miss Stone over the weekend?

A.  It wasn't -- I can't tell you that it was looking at the transcripts themselves as much as just the other reading that I was trying to do.  I think I told you on the 8th that I was going to try to continue to read more deeply into the claims. And, frankly, maybe this isn't proper, but I was affected a little bit in my thinking by the events that occurred last week with Mr. Basham during the effort to provide a television

link to him.

Q. So it's fair to say that what prompted you to bring up the mental retardation issue was at least in part learning about what had happened with Mr. Basham in Indiana and also reading transcripts from last week. And I'm not suggesting it was all of it, but that was part of it, correct?

A. Yes. And when you read about the history of this case and the history of Mr. Basham, the adaptive behavior prong continues to re-occur. There seems to be significant areas in which his ability to adapt to the norms of society was in question.

Q. And when you talk about the reading and reading about Mr. Basham's history, you are talking about reading the filings in this case and the exhibits attached to the filings, correct?

A. I think so, although there -- I told you yesterday I'm not exactly sure which backup materials were marked, quote-unquote, as exhibits --

Q. Okay.

A. -- and which were other supporting documents. I just don't know.

Q. And I don't mean to be technical about any description between exhibits and attachments, but I think you testified yesterday that you had not read his mental history or his medical records, for example.

A. That's correct.

Q.  And you had not read any of the discovery in this case.

A.  I think that's correct, too.  Unless it was in one of those categories, unless it was either attached to or part of the backup for a claim.

Q.  And other than the filings and the attachments and the exhibits, and I think you said that there were some portions of the transcript if they were cited in any of those you might go back and read selected portions of the transcripts that were mentioned.  But other than that you haven't read the other transcripts.

A.  Right.  And at some point I also watched the video of the September 20th event, I think what you all might have called the dip event here in court.

Q.  Is that the scuffle when he was on the floor with the marshals and --

A.  Yes.  Do I have the wrong date for that?  I thought it was the 20th of September.

Q.  And, yeah, but that's what we're talking about?

A.  Yes.

Q.  So when you said you didn't read anything in addition to considering the events of last week, that is the reading that you're talking about.

A.  Yes.

Q.  And you mentioned, I believe, when Miss Stone was asking you questions that it's, "not enough to gather IQ scores" in

determining whether a client may be mentally retarded.  Is that a fair representation of one thing you said yesterday?

A.  Yes.

Q.  So it's fair to say that mental retardation is more than just IQ.

A.  Of course.

Q.  But wouldn't you agree that while it is more than just IQ it can't be less?  In other words, you have to have a qualifying IQ score to qualify under the legal standard of mental retardation?

A.  Well, and that's why we have -- we started with the first prong, yes.

Q.  All right.  I want to turn to a related claim, which is claim five, on competency.  And if you will give me just one second.

You are aware, aren't you, that -- and Judge Anderson mentioned several experts that were retained by Mr. Basham's trial team, and among those was Dr. Donna Schwartz-Watts?

A.  Yes.

Q.  Are you aware that she determined that Brandon Basham was competent to stand trial?

A.  Yes, I've heard that.

Q.  And one thing that you said yesterday going on along with that is that, and I think we would all agree on the general proposition that a trial attorney has a duty to monitor his

client's competency and if he has concerns about competency should bring them to the court's attention. And I think one thing that you said in making this determination about competency, lawyers can't do this alone. Is that what you said yesterday?

A. I'm sure I said something like that.

Q. Well, in this case Mr. Swerling and Mr. Harris didn't do it alone, did they? They had a whole team of experts, including Dr. Schwartz-Watts and Dr. Brawley and all of the others that Judge Anderson mentioned. They had a team helping them in this case, correct?

A. Yes.

Q. Then you also said that while an attorney can't do it alone, the attorney's opinion is important. Would that be fair to say?

A. That I know I said.

Q. Because at the heart of the legal test for competency to stand trial is the ability of a client to communicate with his attorneys, right?

A. That would be part of it.

Q. That's one part of it. And on that part of it the trial attorneys are in -- it's not an exclusive position, they certainly are in a special position to know facts about whether their client is competent, correct?

A. The attorneys and those who are in the very closest

communication with the client.

Q.   I couldn't -- attorneys and who else?

A.   I'm sorry.  Those who are in the -- the attorneys and those who are in the closest communication on a regular basis with the client.  So it might be -- in some cases it might be a paralegal or someone else who is also directly involved in the day-to-day communications with the client.

Q.   And you wouldn't dispute that Dr. Donna Schwartz-Watts would be that kind of person who's in close -- who was in close communication with Brandon Basham?

A.   Well, I'm really talking about people who see the client on a daily basis during the trial and in pretrial hearings and are meeting with the client about legal matters.  So I wouldn't include Donna Schwartz-Watts necessarily in that category.  Her opinion's important, but I was really focusing on the people who have the direct and immediate communication with the client.

Q.   And there you are talking about people like Paige Tarr has been mentioned, spent a lot of time with Brandon, the reading clerks who read discovery to him, those sorts of people?

A.   Right.  But particularly the people at the -- at and closely before the time of trial.

Q.   And I think another thing you said yesterday is that there were certain occasions during the trial, and we have already mentioned today the scuffle with the marshals over the dip.

That was a time when after that occurred Mr. Swerling came to Judge Anderson and said, your Honor, we do have concerns about his ability to go forward at this time, or today, we would like for him to take some time out to be evaluated. There were occasions when Mr. Swerling, if he had concerns, brought those to the court's attention, is that fair for say?

A.  I understand that.

Q.  And I think your testimony yesterday where I was trying to get to in prefacing this question, is that you take them at their word on those occasions. And I believe the phrase, you used word they weren't gilding the lily when they came to Judge Anderson and said we're concerned about his competency.

A.  I did say that.

Q.  And so while there were times when they brought those concerns to Judge Anderson and they weren't gilding the lily, then there were also many more times when they proceeded to trial, including the next day after he had been evaluated by Dr. Donna Schwartz-Watts, and the attorneys told Judge Anderson we're prepared to go forward, you have no reason to believe that they were gilding the lily then when they wanted to go forward, correct?

A.  Maybe I shouldn't have used that metaphor. I don't have any reason to think that they were saying something that they didn't believe to be true.

Q.  We talked about Donna Schwartz-Watts, and that we know in

the history of this case that early on Cam Littlejohn and Billy Monckton filed a motion to have Brandon Basham evaluated for competency. And later on that motion was withdrawn, and while they were not asking the court to have him sent on to Butner or one of the other federal facilities, they had Dr. Schwartz-Watts evaluate him for competency, isn't that your understanding?

A. Yes.

Q. And Mr. Harris, I believe, and I know Mr. Swerling testified that one reason they did that was that in that stage of the proceeding they did want Brandon Basham to be sent off to Butner and talk to a government evaluator, they wanted to have their own evaluator talk to him because they had no reason for him to be turning over information to a government evaluator, correct?

A. Yes. At some point prior to trial I understand that was their view.

Q. And, again, she came back and told them that Brandon Basham was competent, correct?

A. Yes.

Q. And there was no one else on the trial team, either the attorneys or any of these people that you say are in close contact with Brandon Basham, or any of the other psychological or psychiatric experts, none of these other people came back and told Mr. Swerling or Mr. Harris that Brandon was

incompetent, correct?

A.   I accept that.  I don't know, but I accept that that's the case.

Q.   One of the defense exhibits, Defense Exhibit 3, is a communication from David Bruck, who we talked about a little yesterday.  Could we bring that up?

MR. BURKE:  We no longer have the staff to do that.

MR. DALEY:  We can do that.

MR. JOHNSON:  Exhibit, e-mail from Bruck.  If you would just bring up the text, the body of the e-mail.  Would you scroll so that we can see the to and the date line and all that?

Q.   Mr. Hammond, I'm showing you what is an e-mail dated December 12, 2002.  And I understand that this would be before Mr. Swerling or Mr. Harris was brought on to the case, it was still while Mr. Monckton and Mr. Littlejohn were the attorneys, and their names are there at the bottom.  But this appears to be or is an e-mail from David at Brucklaw.com, David Bruck, and there are several people who are CCed.  One of those is Kevin McNally and then Mr. Littlejohn and Mr. Monckton are also CCed.

And it says, Kevin, I spoke yesterday with Billy Monckton and discussed the importance of avoiding a nonconfidential court ordered psychiatric eval, et cetera.  So here Mr. Bruck is telling Mr. McNally that there are benefits to avoiding a

nonconfidential court ordered psychiatric evaluation, and that's what Mr. Swerling and Mr. Harris said they wanted to avoid as well, correct?

A.  Well, yes, but I think they did it -- the e-mail, I think David's e-mail expresses in the next sentence some of the concerns that had been communicated to him.

Q.  And that's fair enough.  And we have heard Mr. Monckton's testimony that he had concerns and we have seen his handwritten notes.  But we also know that it wasn't that Mr. Swerling and Mr. Harris were unconcerned about competency, was it?  Because they in fact wanted to have a competency evaluation done and in fact had a competency evaluation done by their own expert rather than the government's expert, correct?

A.  Yes.

MR. JOHNSON:  Beg the court's indulgence for one second.

(There was a pause in the proceedings)

Q.   (MR. JOHNSON) All right.  We will move --

THE COURT:  Let me jump in before you move on.  I just want to be sure I understand.  Mr. Hammond, you know, lawyers representing a criminal defendant have an obligation under the ethics rules to represent their client zealously within the bounds of the law, I think the way the phrasing goes.  And certainly that principle is at its height, zenith,

in a criminal death penalty case. But it just seems odd to me that here when you've got a defendant charged with a major crime who has been furnished at taxpayers' expense two of the best criminal defense lawyers anywhere in this region, in the southeast even, and has been given not one but five medical professionals, including Dr. Schwartz-Watts who, as has been noted, I've had her in my courtroom many, many times and sometimes she's on the stand for the government, sometimes she's on for defendant, she's not one that always chooses up one side or the other. And when she tells them her client's -- their client is competent are you suggesting they have an obligation to override their own expert and urge to the court that the client is not competent?

THE WITNESS: No, your Honor, I'm not suggesting that.

THE COURT: All right. Well, how --

THE WITNESS: What I was trying to communicate, and I know this is a difficult area, but what I was trying to communicate is competency is a fluid concept.

THE COURT: I understand.

THE WITNESS: It waxes and it wanes.

THE COURT: All right.

THE WITNESS: And there are times in dealing with a client who has very significant mental deficits that lawyers who are close to the client, communicate with the client on a

regular basis, must begin to have doubts in their own mind about with all of the things that go on around a trial, whether the additional pressure and the reliving of events and all of those kinds of factors may have caused a client to no longer be able to really assist in the defense and really --

THE COURT:  Well, I'm sorry.  I didn't mean to interrupt you.

THE WITNESS:  What I was trying to say is that the lawyer needs to be excessively vigilant about the changes and the nuances.

THE COURT:  Didn't we see an episode of that when the September 20th occurred?  Mr. Swerling on the record expressed concerns that his client might not be competent at that time, Dr. Schwartz-Watts examined him right then and we adjourned court for the day and came back the next morning, and the next morning Dr. Schwartz-Watts gave us the green light and said he's competent now.  So, granted, it can wax and wane, but it looks like the lawyers did all they could to bring it to my attention when they thought it was appropriate.

THE WITNESS:  Well, I have no concerns about that. One is looking at the other things that were going on with this man prior to and during trial.  I couldn't help but wonder why they didn't bring it to the court's attention earlier.  It wasn't just this one episode, it was the other questions that I've heard talked about in this courtroom about

the coloring books and about the question whether the client was or wasn't sleeping in the courtroom, whether he was drowsy and attentive. All of those things go into considering whether your client may no longer be competent.

And I frankly don't think that a one hour evaluation by Dr. Schwartz-Watts, or by anyone else, is necessarily going to answer that question, particularly if you're focused on a single episode that happened in court. That outburst on the 20th of September may well be symptomatic of deeper problems. And I don't have confidence that in the span of an hour even an expert who knows him well could have come to the conclusion that he is now competent.

THE COURT: All right. Thank you, sir. Please continue.

BY MR. JOHNSON:

Q. And if I could follow up on just a couple of things based on your response to Judge Anderson. You are mentioning an hour's not enough. When you say that, what is this hour you're talking about?

A. Well, I didn't mean to just call it an hour, but whatever -- however much time Dr. Schwartz-Watts spent talking to the client that day, I have real questions about whether that's the way to handle a competency problem.

Q. But we also -- isn't it fair to say that we also had to put that in context? It's not as if she was someone who just

came in out of nowhere, sat down with him for an hour and then said, Judge, he's good to go. We're talking about an expert retained by the defense, and you wouldn't dispute, would you, she had met with Brandon Basham multiple times and conferred with the attorneys multiple times over weeks and weeks prior to the trial? You wouldn't dispute that, would you?

A. Whatever the record shows on that I wouldn't dispute.

Q. And the things that you're mentioning that give you concern, other than the scuffle, you mentioned things like coloring books and drawing during the trial and wanting dip. Those are all things that you have been learning about this past week, correct?

A. Yes.

Q. So there is nothing else in the record that you would point to, other than the scuffle, you are not basing your opinion on things that you've read in the record other than that, correct?

A. Well, I think the other thing we haven't really talked about is the emphasis that defense counsel seemed to have placed on what they call Mr. Basham's manipulation. As if -- as if to suggest that because they have observed him being what they would call manipulative, or what others over time have called manipulative, that must in some way mean that he is competent, he's just gaming the system. And the repeated references to manipulation as the reason why counsel didn't

address competency in a more aggressive way is also troubling to me. I don't know if I'm clear about that.

Q. I understand your answer, and I'm not expecting that we can, you know, come to an agreement and hold hands on this. But it's fair to say, is it not, that it's not as if they looked through the record and found all those references to manipulation and then just said well, he's probably competent. They had a team of experts in addition, and including Dr. Donna Schwartz-Watts, who all find that Brandon Basham was competent, correct?

A. Yes. My only point on the manipulation issue is that, and I don't know what Donna Schwartz-Watts would say so don't get me wrong on this, but I have been around too many cases in which lawyers decided, sometimes with the help of professionals, that their client was competent, and one of the things they seem to rely on is well, I've seen how manipulative he is in the jail, how he gets things he wants from people, how he gets people to give him money, to bring him snacks, in some cases to violate jail rules, which I know that Mr. Swerling and Mr. Harris wouldn't do.

But that kind of thinking by lawyers I find troubling. I think it's dangerous when you are trying to assess the competence of your client to conclude that he's -- he is not now incompetent because he has a history of exhibiting an ability to manipulate. I mean, a five-year-old can

manipulate. That's what I was trying to suggest.

Q. But you're not suggesting that instances of manipulation would be irrelevant, would you?

A. They are not irrelevant, but I would urge, and I know other people have urged, as well, that you really need to look at this whole concept of manipulation and malingering with great care and with -- you know, I guess skepticism is the word I would use.

I think many good experts would tell you that the ability of someone who is severely compromised to manipulate little things like getting the favors they want, getting dip in the courtroom, is not a sign that they are competent. It might indeed be a sign that would contribute to a finding that they are incompetent.

Q. And I don't mean to belabor this, and I understand that your testimony is that evidences of manipulation are not dispositive, and I'm not necessarily suggesting that they are, but while not dispositive they are certainly relevant things that the attorneys have to consider in addition to the opinion of their own experts, including Dr. Donna Schwartz-Watts, correct?

A. Right.

Q. And, you know, maybe I'm making a confession to the court here, but there have been times when I doodle on my pad while things are going on to help me stay focused. But I'm

listening, I'm doodling, does that make me incompetent?

A. No, of course not.

Q. I'm going to move on now from competency, unless the court has anything to follow up on that. And, of course, the judge can jump in whenever. But I want to go to claim number nine, which is a claim that and you opined that in making his opening statement Mr. Swerling conceded too much of the government case. Is that your opinion?

A. I'm not sure I'd put it exactly that way but, yes, I know what you're talking about.

Q. Remind me how -- I'm not trying to be cute here, but how did you put it?

A. Well, when we talked about this yesterday we talked about conceding guilt on the death eligible crime, on all the elements of a death eligible crime in this case.

Q. So it was below the standard of care to concede away those elements that would have made Brandon death eligible?

A. In my opinion it was in this case. And I said yesterday I'm not suggesting that there might not be some case in which after you've considered everything else that might be warranted. I just don't believe it was here.

Q. One thing that Mr. Harris testified about and Mr. Swerling testified about was that they came to the conclusion that there was very little chance, if any chance, that Brandon Basham was going to be acquitted of the charges against him.

Did you read their testimony on that point?

A.   I did.  I read and saw testimony on that.

Q.   So you read and saw that they said we determined that he's not going to be found not guilty so we need to proceed on what the best strategy is to save his life.  Do you have any reason to question their assessment that they weren't going to get a not guilty verdict from the jury?

A.   Well, I think all of us would question at some level whether that was the 100 percent inevitable outcome.  Anyone who is a skilled trial lawyer, and these people are certainly skilled courtroom trial lawyers, would know that there's no such thing as an inevitability.  Too many things happen in trial to say it's absolutely the case that your client is going to be convicted, and I don't think ultimately these defense lawyers would say that.

Q.   You mentioned that none of us can say with a hundred percent certainty what a jury is going to come back and do.  But when we're talking about the Strickland standard of care we're not talking about a hundred percent probability standard, right?

A.   Right.

Q.   There are all sorts of probabilities that occur during a trial, and lawyers have to make decisions about what is more probable than not.  There's always a risk/reward calculus that has to be made, correct?

A. Right.

Q. And in making the determination that they weren't going to be able to secure a not guilty verdict from the jury and then proceeded on that to figure out what was going to have to happen to save Brandon's life, they were relying on a whole host of facts that were within their knowledge, correct?

A. Yes.

Q. And they had talked to Brandon, they had reviewed the discovery, they had gone out and interviewed hundreds of witnesses, and you just aren't privy, are you, to anywhere close to the type or the amount of information that they had at the time that they made that decision, correct?

A. Of course.

Q. Have you seen the video from the Wal-Mart parking lot that depicts Brandon Basham kidnapping and carjacking Alice Donovan?

A. No, but I read about it.

Q. But yet you haven't seen that video.

A. No, I haven't actually seen the video.

Q. Now, you're obviously aware that Brandon Basham had a codefendant Chad Fulks who started off together and at one point their cases were severed. And you understand, don't you, that John Blume, he was one of Chad Fulks' attorneys, correct?

A. Yes.

Q.  And the strategy that Blume and his team made in Chad Fulks' case was that they were going to plead guilty and then just have a sentencing phase trial.  You understand that to be their strategy, right?

A.  Yes.

Q.  And I think at least one of the reasons behind that was we want to plead guilty, maybe the jury will look upon that favorably in deciding whether to save his life.  And in the 2255 proceedings after Mr. Fulks was sentenced to death their standard of care expert in that case came back and said Mr. Blume should not have pled guilty, but what he should have done was at least have a bifurcated trial so that during the guilt phase of the trial the defense could have all the evidence of the crime front loaded, the jury could express their moral outrage in finding him guilty, and then having vented themselves through the guilty verdict the jury could then focus on mitigating evidence at sentencing.  Have you read those 2255 proceedings in the Fulks case that talk about those different issues?

A.  I have read about them.

Q.  And one thing that the standard of care expert and the attorneys for Mr. Fulks in the 2255 argued was that Mr. Blume should have gone done exactly what Mr. Harris and Mr. Swerling did in this case, which is have a bifurcated trial.  So the very thing that the standard of expert -- standard of care

expert in the Fulks case said should have happened there is what happened here, correct?

A.  I don't -- I don't think that those two propositions actually fit together.

Q.  But it seems to me --

A.  I mean, I don't know what the experts in the other case would say if they were here today talking about the strategy that was used here.  Because every situation does -- I've said before it has to be decided based upon the unique circumstances of this case.  And I understand that broad latitude has to be afforded counsel, and I said that yesterday.  But to say that a strategy that might have been deemed acceptable in some other case wouldn't be acceptable here is not what I was saying.

Q.  It just seems to me, and agree I'm not expecting we can come to a meeting of the minds on this, but it seems that you are a defense attorney and you've got a client who has confessed, he had made multiple statements to police, he's on video carjacking the woman from Wal-Mart security footage, that's there's a mountain of evidence against him, and they make the decision we don't think there's a real chance that he's going to be acquitted by the jury, there are basically three options that I see.  They can have him plead guilty and hope the jury looks upon that favorably and then just go straight to sentencing, or, on the other hand, they can say

you know what, we don't think that he's going to be found not guilty but it's going to be Katie, bar the door at trial, we're going to contest everything the government puts up and hopefully that small percentage will come through and he will be found not guilty, but we also risk losing credibility with the jury.

Or they can take a middle road, which is we're going to concede what we feel like we have to concede, but we're going to give us a credible reason why we're having a bifurcated trial, why we're putting the government to its proof, and so we're taking that middle road. And that's at least a strategic decision. Even though you may not agree with it, don't you have to agree that that is a strategic decision that they had to make at the onset faced with a mountain of evidence against their client?

A. No, I don't agree with that.

Q. You don't agree it was a strategic decision at all?

A. I agree that it was a strategic decision, but I do not believe that there were only three choices, and nor do I believe that any criminal defense lawyer would look at it as has to either fight every element, every issue, every witness, plead, or concede guilt and hope to favor the jury.

Q. So I think what you would say is between pleading guilty and contesting everything there's a middle road, and that middle road can be narrow or that middle road can be wide,

it's a question of what are you going to concede and what are you going to contest. But these are within that middle road. Where you want to line up on the road is also a strategic decision, is it not? What are we going to concede and what are we going to contest, correct?

A. Yes. But you have to remember that these defense lawyers concluded that their job here was to save this man's life, period. They both have been very clear about that being their goal. Well, when they looked at how to save his life their focus primarily was on two significant categories of mitigation, Mr. Basham's reduced role in the offense and his serious mental deficits. I think those considerations posed the question how do you best, if you want to save his life, how do you best develop those mitigating factors.

There are other considerations, as well, I'm not saying they are the only ones, but those are important considerations. And then the question is can you develop those considerations as part of your integrated strategy without conceding guilt. And I would urge that particularly experienced lawyers who know how variable jury thinking is, juries are good, I don't dispute that, but if you look at any of the significant studies that have been done of capital juries, and we now have the benefit of a lot of work that's been done on the things that motivate capital juries, I think you would have to come to the conclusion I articulated

yesterday, that you abandon the chance of jurors failing to find unanimously guilt on the underlying charge only in the very rarest of the circumstances. There are just too many things that can happen. And I don't think you forfeit your ability to make your defense simply by respectfully putting the government to its proof.

Q. Okay. Putting the government to its proof, obviously something that happened here because we had a guilt phase trial. And one of the competing allegations is you allowed the government to put on too much proof.

A. That's exactly right. They went ahead and put on it looks to me -- and I haven't looked at everything, I said that.

Q. So what should they have conceded and should they not have conceded?

A. Well, I don't think at the point of opening statements it was necessary for them to concede any particular issue. I think they could quite easily say we are going to have a trial here. You can even say that it is not unlikely that there may be more than one phase to this trial, that will be up to you as jurors. But having to concede any particular issue, I don't know that you have to.

Q. Let's talk about what they did concede. In the -- and you read the opening statement, correct?

A. Yes.

Q. In the opening statement -- was that delivered by Mr.

Swerling or Harris?

A.   I think the one I'm thinking about was Mr. Swerling, but I
know Mr. Harris did a statement, as well.  So I'm not --

Q.   We're talking about the opening statement in the guilt
phase, right?

A.   Yes.

Q.   All right.  What specific, explicit concessions did the
lawyer make?  What did he say that he should not have said?

A.   Maybe you would have to pull up the transcript.  I can't
tell you right now without anything in front of me exactly
what he had said.  But I think he made it -- he made it very
clear that they were going to find the elements of kidnapping.

Q.   Because my recollection is that he said something very
similar to what you said he should have said, which is that
we're here, we're having a trial, there is probably going to
be a sentencing phase.  It seems like what the general
statements that he was saying is exactly what you said would
be appropriate to say.

A.   Yeah, maybe I'm not being articulate.  I wouldn't go that
far and I would hope that counsel would not go that far.  I
think you can acknowledge that there may be two phases to this
trial without conceding that the jury is likely to find that.
I just don't think you ought to take the burden off of the
jury to have to decide unanimously guilt on the underlying
charge.

Q.   But the decision that they made about how they were going to approach the trial and how they were going to approach opening statement was necessarily informed by the information that they had, having talked to Brandon, having reviewed all the government's discovery, and having generated all of their own discovery, and then knowing things that are in the universe of facts that aren't in any of the discovery, all of that informed the strategic decision that they made about how they were going to approach the guilt phase of the trial, correct?

A.   Well, I assume so.

Q.   Claim 15 is an argument that under 404(b), 403, various other evidentiary rules, a lot of information, a lot of evidence, their claim is there was a lot of stuff in the guilt phase trial about the abduction and killing of Samantha Burns and that you should have -- you should have opposed that more vigorously because the evidence itself and the extent of the evidence prejudiced Mr. Basham in the eyes of the jury and contributed to him being found guilty.

You are aware, aren't you, that the trial attorneys did in fact object to the admission of the Samantha Burns evidence and Judge Anderson ruled it was admissible because it was intrinsic to the crimes charged, correct?

A.   I'm a little unclear about whether the judge ruled the evidence was admissible as opposed to ruling prior to trial

that it was discoverable.  And I looked for that and I couldn't -- I couldn't find a place where the court had specifically ruled that the evidence of the Samantha Burns homicide was admissible at trial.

Q.  What do you mean by discoverable?  I'm not sure I understand.

A.  I think there was a discovery motion earlier on, not right on the eve of trial, for information with respect to the Samantha Burns, and there was a debate at that time about whether it was 404(b) or whether it might be appropriate because it was intrinsic.

Q.  My understanding is the ruling was that, an evidentiary ruling that the judge found that the evidence of everything from the escape from a Kentucky jail to arrest was intrinsic to the crimes charged and that therefore it was outside of the scope, actually, of 404(b) because it was intrinsic evidence.  That's not your understanding?

A.  Well, I haven't seen a ruling that said precisely that.  If there was one then I would stand corrected, but that's my impression is that -- sorry.

        MR. JOHNSON:  One second, your Honor.

        (There was a pause in the proceedings)

Q.  (MR. JOHNSON) I'm looking at an order, and I'll be happy to show it to you.

        MR. BURKE:  Can you provide a copy to the witness?

MR. JOHNSON: Do we have a copy? I have no objection to making a copy while we're assessing whether to do that. I'm looking -- I'll tell you I'm looking at an order from this case that's dated March 5, 2004 from Judge Anderson. It's order number 24 on rulings from the February 24th through 26th, 2004 hearings in this case. And on page eight of the order Judge Anderson addresses the defendant's motion -- and it's up. Page eight, down there at the bottom under that heading.

It says the government takes the position that anything that transpired from the time the defendants escaped from the Hopkins County jail November 4, 2002 until their arrest is intrinsic to the crime, and the court agrees. Therefore, the government obligation to disclose Rule 404(b) evidence includes only evidence of other crimes, wrongs, or acts that took place outside the time period.

So and I'll be happy to show --

A.   That's the --

Q.   Okay. Are you suggesting then that because the judge found that it was intrinsic for purposes of disclosure it may not have been intrinsic for purposes of admission into evidence?

A.   Well, certainly how much of it was admissible at trial remained an open question, and what I was saying to you is I don't think that question was ever resolved.

Q.  So --

A.  And if it was I'm mistaken.  But that's the motion or the order that I had been referring to earlier.

Q.  Irrespective of that, it's obviously the case that the judge made a ruling that it was intrinsic and not within the scope.  Because the issue is you've got to disclose Rule 404(b) evidence, there's a motion turn over to us the Rule 404(b) evidence, there's a question of all of this stuff between escape and arrest is within the scope of the Rule 404(b), and Judge Anderson holds it's not, it's intrinsic to the crime.  So what's clear is there's a ruling, a written order from the court that it is in fact intrinsic to the crimes charged, correct?

A.  Okay.

Q.  Your opinion that -- I take it your issue is not necessarily the Samantha Burns evidence itself, which had been contested and deemed intrinsic, you're talking about the scope, well, even if some of it could have come in it's a separate question of how much of it could come in, is that fair to say?

A.  That's not a small question.  I mean, I haven't seen any 403 motions here, I haven't seen argument with respect to what you call the scope of the evidence.  I mean, I would think almost surely that given the prejudiciality of this evidence that the court would have entertained motions to limit how

much of the Samantha Burns evidence was going to get in, particularly that it wasn't specifically relevant to proving what happened and when it happened.

Q.  So it's fair to say scope is important.

A.  Yes.

Q.  Scope is important, but you haven't read all the trial transcript, have you?

A.  No.  But I read, I think, some of the testimony of the Samantha Burns-related witnesses at the trial.

Q.  You read excerpts but you can't say that you've read all of the Samantha Burns evidence.

A.  I absolutely cannot.

Q.  And you haven't read all of the evidence that was later put in at sentencing, correct?

A.  I have not.

Q.  Well, it seems to me that scope can only be measured in context.  If you are arguing that the scope of the evidence is too much or may have been too much wouldn't you have to know how much of it came in and in what context it came in?

A.  Well, I mean, if we were going to get down to the absolute final analysis that would be -- that would be important.  My point is that I don't see an effort to limit that evidence, and I can see no reason prior to trial or prior to witnesses testifying that there couldn't have been motions and arguments with the court about how much of this evidence was going to

get in.

And particularly if you go back, Mr. Johnson, to the last claim we talked about, if you are going to decide to go to trial and to concede guilt on the kidnapping of Alice Donovan I would think you would want to be thinking real hard about what else is going to come in at this trial. And insofar as possible limiting the damaging effect of that, knowing that the jury is going to hear it now and since you conceded guilt they are going to hear it again in the penalty phase.

Q. But the claim that's been brought for this court is not -- you didn't think about limiting the scope of Samantha Burns evidence, it's that you just specifically made sure that these particular types of evidence didn't come in. So it is a specific claim.

MS. STONE: Objection, your Honor. Our claim does include the scope of the -- that misstates our claim.

MR. JOHNSON: My point, your Honor, is you can't consider scope unless you are specific about what you are talking about. It's not just that too much came in, we're not going to tell you what shouldn't have come in, but it was just too much.

Q. (MR. JOHNSON) What specifically came in about Samantha Burns that shouldn't have?

A. I have already said generally the kind of evidence that I think were problematic, but I haven't gone through each of the

witnesses.  I do believe that there were eight or more witnesses.  I believe that the testimony of some of those witnesses, from what I've heard about it here, was not essential to prove the elements that would be intrinsic to both crimes.

Q.  So you are not prepared to provide a list or to say this, this, this, this, and this are the portions of the testimony that shouldn't have come in?

A.  No.  But that should have happened, it should have happened a long time ago.  It should have happened at the time of trial.

Q.  But you are not prepared to say what that list is or what it should have been.

A.  No.  I mean, I just haven't had the time to do that.  But I think it could be done and it should have been done at the time of trial.

Q.  Sometimes this evidence that we have been talking about has been described as victim impact evidence.  And I think one thing that you said yesterday is that a problem is the jury gets hit with it twice if you are not careful, because they hear this victim impact evidence at the guilt phase and then they hear it again at sentencing and it just gets reinforced in their mind.  What victim impact evidence came out during the guilt phase of the trial?

A.  I've already tried to answer that.  And it wasn't just

what I would call victim impact evidence, but I think there were family members who testified who testified about the effect of the disappearance of Samantha Burns on them. And I can't tell you which pages and lines, and if it's not there I'll stand to be corrected. But I believe I have seen that and I have seen it in the government's closing in the guilt phase.

Q. And I understand that. But you cannot specifically identify anything that you would label as victim impact evidence other than saying you think you remember this general category of stuff but you can't point to anything specific, is that fair to say?

A. But I think it could be done. I just haven't had the time to do it myself.

Q. And so you also can't point to anything specific that came out in the guilt phase and it came out again in sentencing?

A. No, but I think -- I think it is certainly there and I think it can be done.

Q. All right. Last claim, claim 16, which is a claim that Mr. Swerling and Harris should have requested that at least a portion of the closing argument from the sentencing, and there was only a sentencing phase at Chad Fulks trial, there was a statement in Mr. Johnny Gasser's closing argument about a puppet. And the claim is that the trial attorneys for Mr. Basham should have asked Judge Anderson to admit in that

statement from the Fulks closing argument.  Is that what you understand the claim to be?

A.  Essentially, yes.

Q.  And you've read the entirety of that closing argument from the Fulks trial?

A.  Yes, from both trials.

Q.  So, having read that, you know that there are also many references in that closing argument to Fulks and Basham working as a team.

A.  Yes.

Q.  And you are aware there are also references in that closing argument that Fulks couldn't have done without Basham and Basham couldn't have done without Fulks.

A.  Well, in a phrase, yes.

Q.  You wouldn't deny that those types of arguments are in there.

A.  Yes, but I think -- I think that's not an accurate characterization of the differences between the two closings.

Q.  What is not an accurate characterization?

A.  The suggestion that they were just a team and one couldn't have done this without the other.  I think that's a pretty good characterization of the Basham trial.

Q.  But you don't think that's in the Fulks?

A.  I don't think it's a fair characterization of the closing argument in the Fulks trial.

Q.   But if I were to tell you that there are many instances in the Fulks closing argument that match up almost verbatim with what is in the Basham closing argument about the teamwork, about working together, about one not being able to do it without the other, you can't dispute whether there are correlations between the two closing arguments.

A.   I think there are words that are quite similar and phrases that are similar.  But I do not think that's the impression that someone -- if we brought in a group of people just to listen to those two closings I think most people would agree that they take a very substantially different tact.

Q.   I'm not sure I understand that last statement.  It we had a group of people and asked them what now?

A.   And maybe I shouldn't have done it -- shouldn't have said it that way.  But what I'm essentially saying is that the approach in the Fulks trial was significantly different in terms of Fulks' leadership responsibility for these crimes, as opposed to the way that the roles of both defendants were characterized in the second trial.

Q.   And you understand that the Fourth Circuit has held that the government did not take inconsistent positions between the Fulks and the Basham trial?

A.   As I said yesterday, I read the Fourth Circuit opinion.

Q.   And the transcripts can speak for themselves and the closing arguments are what they are, but there's a legitimate

chance, isn't there, under the rule of completeness if Mr. Swerling and Mr. Harris get up and say we want the puppet on the string statement to be admitted into evidence so we can argue it to the jury, good chance the government also stands up, and if that's the case, Judge Anderson, we want the whole thing in, just not a snippet.

A.   We talked about that yesterday and the judge inquired about that, I believe.  I understand that that's a response that the government might have made, but I do not think it is anywhere close to being inevitable that the court would have said, well, then, that they are going to -- the government's going to get to read the whole closing.

But posit for a moment that that's what the court said. Would defense counsel at that point be barred from saying, well, your Honor, if that's your ruling we would disagree with it but we're not going to ask that the portions be read if in fact it's going to have to all be read.  But let me also say I don't know it would have been all that much worse to have the whole thing read.

Q.   A couple parts to your answer.  One is you used the word inevitable.  And, again, when we're talking about strategy developing over the course of the trial we don't hold lawyers to the standard of what is inevitable, correct?  We're always talking about probabilities.  If I'm a lawyer and I make a motion there's a probability that the judge may rule a certain

way, one way is going to hurt, one way may help.  And so it's the standard something far less than what is inevitable and what is a reasonable strategy under the situation.  So it's not an inevitability standard, right?

A.  I disagree with your conclusion there.  What I was saying is when a lawyer seeks to have evidence introduced and the opposing party says well, if you are going to introduce A then for the sake of completeness under Rule 104, I guess, whatever it is, then you must admit the remainder, I think it is pretty clear at that point that the lawyer who moved for admission can say well, your Honor, if that's the case then I withdraw my motion.  I disagree with the court, respectfully, but I'll withdraw it.  So when I say it's far from inevitable, I'm asking myself why not make the motion.

Q.  A couple of things in followup.  In preparing for your opinion today on this issue did you go back and read Rule 801(b?)

A.  (d)(2)(B).

Q.  (d)(2)(B).

A.  I didn't read it in preparation for today but I have read it in the last couple of weeks.

Q.  Is it your opinion that you can say to the degree of certainty that you have to have to testify as an expert under Rule 801(d)(2)(B) the closing argument from the other trial is something that would have been admissible?

A. No, I can't say it is inevitable that it would have been.

Q. And one thing that Mr. -- and I don't think I brought this out specifically, but I know Mr. Harris in his testimony talked about, you know, Johnny Gasser is pretty good at delivering closing argument and we sure didn't want two of his closing arguments in one trial. It was an assessment of the harm that might come if they both come in. Did you read that part of his testimony?

A. I have heard that argument.

Q. And part of the point is, well, they should have asked for the puppet statement because if the jury hears the puppet statement then they might think, yeah, Brandon Basham was less culpable than Chad Fulks, or they might think, gee, it seems like the government is -- wants to have it both ways. They are arguing one thing there and another thing here. But if it all comes in that really lessens the impact of what they want that evidence to show, doesn't it? Because it can very well make this seem like no, the government has made the same argument in both trials and it seems like their theme has been consistent that these two guys were working together to kidnap and kill Alice Donovan.

A. Well, again, whether the closing would have been read for the sake of completeness is a question that I think was still within the ability of the defense to control. I do not believe that it is at all inevitable that the whole closing

would have -- it's not the choice they were faced with. They didn't have to choose do I want to have this statement in along with all of the closing or nothing at all. And as I've said before, there is significant power with juries, and I think every defense lawyer knows this, being able to stand up and say this is what the government said to a jury in another case on this exact point. It's important enough, and particularly where diminished role in the offense is one of your two primary mitigation targets, it's important enough, respectfully, I would say, that you ought to raise it and attempt to use it. That's all I was saying.

MR. JOHNSON: Beg the court's indulgence.

(There was a pause in the proceedings)

Q. (MR. JOHNSON) One final question. When we had our interview back on October 8th I think you told me you, and correct me if I am wrong here, you said as a standard of care expert what you do is you're testifying as to the first prong of the Strickland test. In other words, you are here to testify whether a given performance was deficient or not, but you are not proposing to the court what his ruling should be as to the prejudice prong of the standard.

A. That's essentially correct. I think I can testify, and have, that certain types of evidence are more or less prejudicial, the admission or exclusion is more or less prejudicial based upon my experience, but I wouldn't say that

I can be the expert, ultimately, on whom any judge relies in satisfying the second prong.

MR. JOHNSON: Thank you for answering my questions, Mr. Hammond. I have nothing else, your Honor.

THE COURT: It's time for our morning recess. How long do you think you will be?

MS. STONE: I don't think it will be more than 15 minutes.

THE COURT: Let's take a 15 minute recess.

(A recess transpired)

THE COURT: You may proceed.

MS. STONE: Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. STONE:

Q. Mr. Hammond, I am going to briefly address the article from the Arizona Republic that was brought up yesterday. Was that article a general article for abolition of the death penalty or did it address some unique problems with the death penalty in Maricopa County?

A. No, it was focused on what was known at that time as the death penalty crisis in Maricopa County. We had more than three times the number of pending death penalty cases than any other jurisdiction in the United States, and well more than the next three largest counties in the United States combined, Harris County, L.A., and Clark County, Nevada.

Q.   And the purpose of that article was to inform the readers of that paper of some of those issues unique to Maricopa County?

A.   Yes, to its charging decisions and to the funding made available to court-appointed lawyers in those 128 or so, I forget the exact number of cases.

Q.   And we talked some about your trial experience.  Are you a member of the American College of Trial Lawyers?

A.   I am.

Q.   And can you tell us a little bit about the size of that organization?

A.   Well, it's a national organization, it's been around for a great long time.  I notice that Mr. Swerling is also a member, I think he's been a member a good deal longer than I have. But it's a national organization that attempts to identify and select as members people who are experienced trial lawyers. The history of the organization has been almost entirely on the civil side, but there are a good number of criminal defense lawyers around the country who are members.  I believe there may only be three or possibly four criminal defense lawyers in the state of Arizona who have been asked to become members.

Q.   So this is not an organization where anyone can barge in and pay its dues and be a member.

A.   No, it's not.

Q.   Turning to your experience as a trial lawyer, can competent defense counsel sit back and wait to see if there's a withdrawal of the death notice or dismissal before they start working up a case?

A.   No, I would certainly hope not.

Q.   Do those things usually happen without substantial leg work on the part of the defense?

A.   No, they are very intense effort sorts of things.

Q.   Does competent defense counsel prepare for a penalty phase in every case where death is noticed?

A.   I would hope so.

Q.   And so although you've only had three cases actually go to trial, have you been involved in preparing for the penalty phase in other cases?

A.   Yes, in many cases.  And this has been, this theme of preparing for all phases of the trial at the same time has been a major issue.  And particularly in Arizona, because we went from judge sentencing to jury sentencing in 2002, and I'm sorry to say it took a while for some lawyers to get the idea that they really did need to integrate the trial, the innocence/guilt phase and the penalty phase.

Q.   Would you agree it's a good strategy for an attorney to work up a case and try and stop it from going to trial when death is on the table?

A.   Certainly.

Q. You mentioned that you spoke with your coworker Anne Chapman regarding some of the claims in this case. Does she have particular experience in competency issues?

A. Yes, that's really her field. She was a part of the Zacarias Moussaoui defense team in the Eastern District of Virginia before she joined my firm. And since then she has been a member of the Jared Loughner team focusing particularly on the mental competence issues. And that's a case that involved the shooting of Gabrielle Giffords and the death of Judge John R. Roll.

Q. And on competency, does there come a point for a lawyer where they have a client where competency, you used the term waxes and wanes or there are individual incidents of incompetency, where those become a larger issue for the lawyer?

A. Yes. And I think that's what I was trying to say both on direct and on cross. That client competence issues tend too often to be seen as very episodic, that they have a beginning, middle, and end and may all be within a few minutes of each other.

But I think the important point for criminal defense lawyers to recognize, and particularly in capital cases, is that a client who has serious competence issues may very well have the greatest stresses and the greatest occasions for being unable to participate in a defense as cases get close to

trial. Or into trial.

Q. And regarding the Jackson v. Denno hearing, the government showed you their Exhibit 9, which was the e-mails between resource counsel and Mr. Swerling. And you noted that one of the problems is that there's limited information in those e-mails. If I told you the record would show that at one point Mr. Basham said that Alice Donovan was alive and tied to a tree and then later she -- those statements that Mr. Swerling hoped to use as cooperation, no, Alice is dead and I'm going to help you find her, would that be one example of missing information that would be important to making a strategy decision?

A. Certainly. And it's a defect, but I think it's one that I'm sure Mr. Swerling and Mr. Harris recognized to the list serve. And particularly that one is a great resource. Eric Friedman and the people at Hofstra have done a terrific job, and I do not want to suggest that they aren't a valuable resource. But over and over again they have said, Mr. Friedman and others, Bruck, McNally, that it's an important resource but if you really intend to get advice that you want to seriously take into account, particularly on strategy questions, the way to do it is not to send out a global e-mail and look at a few one-paragraph responses.

Q. Mr. Johnson also showed you an order regarding the Samantha Burns evidence from this court, that the evidence was

intrinsic and the government had an obligation to disclose, referring to 404(b). Did you see anything in that order regarding scope of admissibility of that evidence?

A. No, there isn't anything in there.

Q. And do you recall Mr. Harris and Mr. Swerling testifying they were offered a limiting instruction and they declined that?

A. I do know that they were offered a limiting instruction, and I honestly don't know why it was declined.

Q. If part of their testimony was that they declined because they didn't want to call more attention to that evidence, would you agree with that strategy?

A. No. And that's what I heard here in court, but I don't understand that, since limiting instructions are almost inevitable, almost always used out of the presence of the jury. It's difficult for me to understand how the strategy could have been not to ask for a limiting instruction when the jury was out of the room.

Q. And you stated that you read the closing arguments on both guilt and penalty phase in this case?

A. Yes.

Q. And that includes the closing arguments of the government?

A. Yes.

Q. Do you have an opinion on whether or not that evidence, that Samantha Burns evidence, was an important part of the

government's closing, or a powerful part?

A. Yeah, I think -- I would think that any reader who knew anything about this trial would say that the use of the Samantha Burns information was devastating.

Q. You were also asked about the opinion in the Fulks evidentiary hearing that it's a valid strategy to have a bifurcated trial. Would you agree with me that the strategy to have a bifurcated trial and strategy to have a bifurcated trial where guilt is admitted on almost every offense and every element of the offense are two very different things?

A. Yes, and that's what I was trying to say.

Q. In a federal mitigation penalty phase do the rules of evidence apply?

MR. JOHNSON: Objection, your Honor, to the leading in these questions.

THE COURT: I don't think the last one was a leading question. Overruled as to the last question.

THE WITNESS: At the sentencing stages of the trial the rules of evidence do not limit the defense's ability to present information to the jury.

Q. (MS. STONE) Would that have been a potential argument to bring in the puppet statement, in your opinion?

A. There was no reason, as I've said before, not to attempt to introduce the puppet statement.

Q. And one final question regarding your experience. How

many former clients that you represented at the trial level where death was on the table at some point are now sitting on death row?

A. Clients I represented?

Q. At the trial level.

A. None.

MS. STONE: Your Honor, may I have just a moment to confer with counsel?

THE COURT: Yes, certainly.

(There was a pause in the proceedings)

MS. STONE: No further questions. Thank you.

THE COURT: All right. Thank you, sir.

THE WITNESS: Thank you.

THE COURT: Before you get an away, just a quick question. How long were you able to serve with Justice Black?

THE WITNESS: Four months. I spent a week with him before my clerkship because that's -- I was only across the street at the D.C. Circuit, so I spent a week with him when the Pentagon papers were argued, which was a wonderful experience for a young person to be able to watch somebody like Justice Black, who had such strong feeling about the First Amendment. So I had that glorious week with him and then I was the only law clerk around for the first four months of -- after the end of that term.

THE COURT: And he died suddenly, I guess.

THE WITNESS: He did die and --

THE COURT: And the Powell nomination took a while because it was tied up with the Haynesworth Carswell.

THE WITNESS: That is so true. So Justice Black died on the 16th of September 1971 and Lewis Powell was not sworn in until I believe it was the middle of December of 1971.

THE COURT: So it was a short -- I thought a longer interruption there.

THE WITNESS: It seemed like forever to me.

THE COURT: So then how long did you work with Justice Powell?

THE WITNESS: The rest of that term and the following term. He asked me at the very end of the term that I thought was going to be the only term I would spend with him, he asked me if I would stay for another year. And I've often mused since then that I am the only clerk Lewis Powell had for two years. I think he learned a valuable lesson and never asked anybody else to clerk for him twice.

THE COURT: Well, Hugo Black has always been one of my heroes. And I was in Tuscaloosa, Alabama one year and went by the law school there, and they have, you might know, they have a room that is a reproduction of his study from his house with all his books around, all of his volumes.

THE WITNESS: I was there last year, your Honor.

THE COURT: Is that right? Very impressive exhibit.

THE WITNESS: I will just, since you asked and I can't resist this, a powerful experience I think for any judge would be to look at the library of Lewis Powell at Washington & Lee.

THE COURT: They have the same thing there?

THE WITNESS: But what they have there is Lewis Powell's complete files on every case. Powell decided to make his records public of every case he was involved in, leaving out only the statements made by other justices. So that library is really an enormous glorious historical basis. Black's library, which I dearly love, is almost devoid of case-related information, and I'm sorry to say that was the case because Hugo Black's last wish was that his papers be destroyed.

THE COURT: Be destroyed.

THE WITNESS: Be destroyed. Because he did not believe that anyone should be able to know the internal deliberations of the court, but only what appears in a published opinion.

THE COURT: Well, going back to Justice Powell, do his files have memos back and forth with law clerks and things like such as that, behind the scenes information?

THE WITNESS: Yes, to my horror, they do. And all of the communications. I don't know if all of them, but the communications between Justice Powell and me on the Furman

case and on the Roe v. Wade are all there in the file.

THE COURT: Interestingly, Justice Black was kind of a forerunner of Justice Scalia in terms of strict literal interpretation of the text of the constitution, right?

THE WITNESS: Yes.

THE COURT: Even though politically they differ, or not politically but philosophically, they both had that same belief.

THE WITNESS: There was very recently an article that attempted to suggest that Hugo Black has the same philosophy as Clarence Thomas. And I've disputed that. But I think in terms of Black's approach to the constitution he's always said the words mean what they say they mean, which is why the First Amendment, no law means no law.

THE COURT: No law means no law.

THE WITNESS: And, you know, he distrusted judges all his life, and particularly after he became one. But so he was concerned always throughout his life that if we had a constitution that was more malleable judges would make of it what they chose to make of it, which he thought was very bad.

THE COURT: I thank you for that insight. Thank you very much. All right.

THE WITNESS: It's been a pleasure to visit with you.

THE COURT: Anything further before we adjourn until the first week of December?

MR. BURKE: Not from the defense your Honor.

MR. DALEY: Not from the government. Your Honor, I think the only order of business, I think we can work it out, we're going to get a report in the next week, do you think?

MR. BURKE: When I return to Arizona, I told Dr. Hyde we had two weeks, and I think we're approaching the end of that.

MR. DALEY: The only other thing, I don't know that we actually asked for it, we are going to ask or request, I think, after we get Dr. Hyde's report, an order for our expert to be able to go and examine Mr. Basham.

MR. BURKE: And we have no opposition to that, your Honor.

THE COURT: Let me ask a couple of questions, three questions about three issues that y'all said were going to be submitted on the briefs. These are real simple questions. I know y'all didn't want to argue, but claim 14 about Mr. Swerling being a crime victim, it's not really fleshed out too well in the -- well, let me just ask this. Is the argument that because Mr. Swerling was a victim of a crime similar to the crime at issue here that he is per se ineffective if any subsequent case he handled involved abductions or something similar, that he is just essentially disbarred from that type of practice because he was a crime victim? Or is the argument that that episode, coming as it did close to the time of the

trial, caused him to pull back or be less aggressive or commit some malfeasance that owed in part to the fact he was a crime victim? And if it's the second one, if it's the second of those two we're just right back to ineffective assistance of counsel. You've got to show he did or didn't do something he was supposed to do, and the argument is really inconsequential, right?

MR. BURKE: Absolutely, your Honor. Yes. When we alleged the claim I will concede that I wasn't sure of that dichotomy in the law. In filing our reply to the government's response I realized exactly your point, your Honor. Which is that for it to be a per se bar that rule really only applies when you have conflicts in clients, represent conflicting clients.

So what we attempted to do was to show factually how that affected Mr. Swerling's preparation for the Jackson v. Denno hearing. And we chose not to pursue it here, you will see Mr. Hammond testified he wasn't comfortable. I will say that we simply want to --

THE COURT: You can step down.

MR. BURKE: We want to submit it on the briefs, your Honor. And I want to be a zealous advocate on behalf of my client --

THE COURT: I'm not faulting you. I just want to be sure I understand your position.

MR. BURKE: You actually --

THE COURT: Next question. Claim 31, one at the very end, it says the death warrant is unconstitutional because of race and geographical factors. I don't fault you raising it, but is there any race factor in this case? To my knowledge every victim was Caucasian and obviously both perpetrators were Caucasian. So does race have anything to do with this?

MR. BURKE: No, your Honor. This more of a systemic challenge.

THE COURT: I misspoke, it's 32. It's claim 32, not 31, and that's not withdrawn?

MR. BURKE: You are correct, your Honor. There was -- as far as I know there were -- both defendants in the case and the victims all --

THE COURT: I'm not talking about the two murder victims. The Highway Patrolman almost got run over, the law enforcement that got shot at, the gentleman who was duct taped to a tree, I think everybody was Caucasian, I think. And then the other woman who almost was lured at a shopping mall, that was the Fulks case, not this case, wasn't it?

MR. DALEY: Correct, your Honor.

THE COURT: Even she was white. But that doesn't have anything to do with this case. But I don't fault you raising it because it may be the Supreme Court will come along and say because race is a factor in other cases we're going to

wipe out death altogether.

MR. BURKE: Exactly.

THE COURT: I don't fault you for raising that but I don't want to leave the impression that race crept into this case in any way, shape or form. Because I don't think it did.

MR. BURKE: It did not, your Honor. If our pleadings suggested that we would make it clear we are not alleging that. This is a systemic challenge to the federal death penalty.

THE COURT: I don't fault you for rasing that. Finally, trifurcation. I spoke with Judge Bob Conrad up in Charlotte sometime last year and he was in middle of a death penalty case. He said I've got to decide if I'm going to trifurcate or not. And that's the first time I ever heard that word mentioned. I don't know what he ended up doing. But can you tell me, is that being done as a matter of course now in death penalty cases, or have some courts done it?

MR. BURKE: Yes, your Honor. In our reply brief we show a few district courts who have trifurcated. In candor I don't say that I can tell you that I know enough about it. The totality of federal death penalty cases right now say it's a matter of course. But we did cite in our brief, in the reply brief -- well, I'm looking at the government's. No wonder I'm not finding what I'm looking for.

THE COURT: Take your time.

MR. DALEY: Your Honor, I know the government's research on this said that, the case law, it's certainly not required. And I think several courts have said it's in the discretion of the court. I think there's a Tenth Circuit case, this is all from memory right now, but that there is no requirement that the district court trifurcate under the federal death penalty act. That's the case law now. Mr. Burke is correct that there have been some district courts that have trifurcated.

THE COURT: But, correct me if I am wrong, the federal death penalty statute envisions a bifurcated, it calls for a separate penalty, guilt and penalty phases, right?

MR. DALEY: It does, yes. Their argument is I think you still need to bifurcate the second part.

THE COURT: The courts that have gone to trifurcation have just determined it's a fair way to do it but not called for by the statute per se.

MR. BURKE: There is no case law I'm aware of that has interpreted the statute as requiring it, your Honor.

THE COURT: That's all I wanted to ask.

MR. BURKE: Thank you.

THE COURT: Well, that took me over to page -- I have a nice round 100 pages of notes. I don't think I took that many pages at the trial itself. Of course, the jury was the fact finder there. Here I've got to do more work myself.

So we will pick up at page 101 in December. December 3rd at 9:30. How many witnesses will we have?

MR. DALEY: We have got that one situation, I don't know --

MR. BURKE: We're working out a stipulation, which I'm almost certain we will be able to do. At this point, your Honor, I have not received the report from Dr. Hyde, as well, so I don't want to say that he may not tell me something that I feel obligated to follow up on. But with that said, I think we're thinking three. Mr. Littlejohn, Dr. Hyde, our expert, and the government's expert. Is that where we stand right now?

MR. DALEY: Yes, that seems like -- again, with the caveat if something were to be raised in Dr. Hyde's report that we felt like we might need to get some other expert, I don't anticipate necessarily, but I don't want to be, you know --

THE COURT: All right. And give me a time prediction. And whatever you say I'm going to double it.

MR. DALEY: Four days, right?

MR. BURKE: Four days.

MR. DALEY: That's inflated.

THE COURT: You've already --

MR. BURKE: If Mr. Basham decides too attend, eight.

MR. DALEY: Four is a doubling on my part, but I

don't mean to --

THE COURT: All right. We will set aside plenty of time.

MR. BURKE: Your Honor, I don't -- this just occurred to me, I honestly don't know what the answer would be. I'm wondering if it would assist you, given the information that's come out about experts and mental retardation, if the government and I were to jointly interview Dr. Brawley to see her position on whether she felt that she was an expert. I just throw that out there.

MR. DALEY: I am inclined not to go down that road because I don't want to suddenly allow further development that really we have already committed to. I think we're in the middle of trial, basically, and --

MR. BURKE: That's fine.

THE COURT: All right. Well, we will see you back on December 3rd. And I think that does it. I don't think I have any other questions.

MR. DALEY: Thank you, your Honor.

THE COURT: Nice to see all of you. We will be in recess.

(Recess, 12:05 p.m.)

1002

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  11-19-12                    s/  Daniel E. Mayo


DEFENSE WITNESSES

LARRY HAMMOND

          CROSS                   936

          REDIRECT                984

JA 4732

                    UNITED STATES DISTRICT COURT
                    DISTRICT OF SOUTH CAROLINA
                       FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                CR NO.: 4:02-992
                                        Columbia, SC
     -vs-                               December 3, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------


          BEFORE HON. JOSEPH F. ANDERSON, JR.
           UNITED STATES DISTRICT COURT JUDGE
                    MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:     HON. WILLIAM N. NETTLES
                    UNITED STATES ATTORNEY
                    BY:  ROBERT F. DALEY, JR.
                         JIMMIE EWING
                         JEFFREY M. JOHNSON
                         WILLIAM K. WITHERSPOON
                    Assistant United States Attorneys
                    1441 Main Street
                    Columbia, SC  29201

FOR DEFENDANT:      JULIA G. MIMMS, ESQ.
                    JULIA G. MIMMS LAW OFFICE
                    1001 Elizabeth Avenue, Suite 1A
                    Charleston, NC  28204

                    ARIZONA FEDERAL PUBLIC DEFENDER
                    BY:  MICHAEL L. BURKE
                         SARAH E. STONE
                    Assistant Federal Public Defenders
                    850 W. Adams, #201
                    Phoenix, AZ  85007

COURT REPORTER:       DANIEL E. MAYO, RDR
                      Certified Realtime Reporter
                      901 Richland Street
                      Columbia, SC  29201


          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: We're here for the resumption of the evidentiary hearing in the case of United States versus Brandon Basham. I was just informed by my docket clerk and by the Bureau of Prisons that there's been a little bit of an outburst out in Terra Haute and the defendant does not wish to participate this morning. I was told by the caseworker that Mr. Basham appeared to be intoxicated, had some words with the guards. They requested that he submit to a breathalyzer that he refused to take, and he then announced he did not wish to participate. So any position on that from the government?

MR. DALEY: Your Honor, we believe we can go forward without his presence.

THE COURT: Mr. Burke?

MR. BURKE: Your Honor, it would seem to me that the federal government could house a prisoner on death row and manage him well enough that he couldn't make alcohol and become so intoxicated that he can't come to court. We sent our colleague out to Terra Haute so he could be there and --

THE COURT: I was surprised to hear that, too. A death row inmate has become intoxicated, that was a shock to me.

MR. BURKE: We have been dealing with this now for four years, three or four years. Makes it very difficult for us to do our job. I understand you have to go -- that you have a docket, as well. I would only submit that -- well, we

will agree to going forward today without Mr. Basham's presence. But I'm at the end of my rope with the Bureau of Prisons, your Honor.

THE COURT: Well, today we're going to get into competency, right? We have two witnesses on competency?

MR. BURKE: Yes, your Honor.

THE COURT: It seems to me that that is a matter of medical testimony, I don't know that his presence is as critical now as is maybe on some other aspects of the trial.

MR. BURKE: And I would agree with you, your Honor.

THE COURT: Let's proceed without Mr. Basham. And we will stay in contact with the Bureau of Prisons to see if his condition improves such that he can rejoin us. All right?

MR. BURKE: Your Honor, Mr. Murray is in a situation where if he leaves the prison he won't be able to come back in. So could he just sit there and monitor --

THE COURT: He can stay there just in case there's some development out there, I have no problem with it.

MR. BURKE: Thank you, your Honor.

THE COURT: Are you ready to put up your first witness?

MR. BURKE: Yes. Your Honor the defendant calls Dr. Thomas Hyde.

(Thomas M. Hyde duly sworn)

DIRECT EXAMINATION

**JA 4736**

BY MR. BURKE:

Q. Good morning. Could you state your name for the record, please?

A. Dr. Thomas M. Hyde, H-Y-D-E.

Q. Okay. And, Dr. Hyde, there's water up there if you need some. So, Dr. Hyde, what is your profession?

A. I'm a behavioral neurologist and a biomedical researcher.

Q. Can you explain for me what is a behavioral neurologist?

A. A behavioral neurologist is that subsection of neurology which is diseases of the central nervous system and the neuromuscular system. We specializes in the biological bases of behavior, those parts of the brain that are particularly involved in higher order functions, what we usually call intellectual abilities, cognitive activities.

Q. From a lay person's perspective can you explain for me, are you a neurologist or are you a psychiatrist?

A. Well, I occupy that demilitarized zone, that no man's land between the two professions. I have been trained and board certified in general neurology, I have done extensive additional training in psychiatry such that I have been considered to be, both by my peers in academia and clinical practice, as well as for legal purposes, an expert in both neurology and in psychiatry. And I specialize in seeing those patients who have behavioral problems which often fall in the psychiatric realm in trying to discern what, if any, component

of organic brain problems are contributing or causative of these behavior problems which are the types of behavior problems that are ordinarily classified as psychiatric illnesses.

Q.   Where do you practice, Dr. Hyde?

A.   Well, I have practiced in various parts of the country during the course of my training and in my clinical practice. Now I am restricted to the state of Maryland.

MR. BURKE:  And, your Honor, I believe that Exhibit 102 is Dr. Hyde's CV.

Mr. Witherspoon, we didn't discuss this directly, but do we have any objections to the admission of the CV and reports for both doctors?

MR. WITHERSPOON:  No objections.

THE COURT:  All right.  Admitted without objection.

Q.   (MR. BURKE) So, Dr. Hyde, your CV has now been part of the record.  So what I would like to do is just ask you a few questions about your experience and your training before we move on to the specifics of this particular case.

Where did you receive your medical training?

A.   I started my training as a medical student at the University of Pennsylvania in Philadelphia, where I did an MD PhD program, graduated in 1984.  I then did a general medical internship at the Presbyterian University of Pennsylvania Hospital of Philadelphia for one year before I moved on to

Stanford, where I did a residency in neurology at Stanford University in Stanford, California for three years, serving as chief resident in neurology my final year there. Basically running in conjunction with the faculty the neurology training program. I then --

Q. Let me follow that up for a minute. I want to ask some questions about your education. You said you received a joint degree in medicine and you've also received a PhD. What was your PhD in?

A. My PhD was in the department of anatomy studying brain function, particularly involved at that point in food and body weight regulation, how the brain regulates those behaviors, what we call ingestive behaviors. Today that would be in the department of neuroscience, but back in those ancient times of the 19 -- late 1970s and early '80s that was subsumed under the department of anatomy in medical school.

Q. What was your responsibility -- you mentioned that you had been at Stanford for four years, is that correct?

A. Three years.

Q. Three years. And what were your responsibilities at Stanford?

A. The first few years were general neurology training. The last year was supervising other neurology residents, running clinics, and organizing the clinical program as well as the education program for all the neurology residents and the

residents from other departments who would rotate through the neurology service. It was a fairly complex administrative and educational role within the purely clinical confines of the residency.

Q. And when you left Stanford what was your next stop?

A. My next stop was I was a contract employee of the National Institute of Mental Health, and I was sent to St. Elizabeth's Hospital, which at that time had just converted from being a federal mental health facility to run by the District of Columbia. And I was placed in charge of the neurology consultation clinics to perform all the neurology consultations on the inpatients and outpatients of the District of Columbia mental health system.

In addition, I was involved in training of fellows and residents both of the National Institute of Mental Health and at St. Elizabeth's Hospital Department of Psychiatry residency training program.

Q. And can you tell us a little bit about St. Elizabeth's? It may not be as well-known to others outside of D.C.

A. Yes. It's one of the oldest public hospitals in the country, dating back to the late 19th century. At one point it housed I think close to 10,000 inpatients and had a running farm and a variety of shops. It was really a model institution in many ways with the evolution in the treatment of psychiatric patients as well as the social awareness that

these large institutions may have not been optimal.  Most of the inpatients were sent home but they became when I was there a core of about a thousand chronic inpatients as well as several hundred that would cycle through.  And many of them had neurological problems compounding their psychiatric problems, and I was asked to perform consultations to discern how much of the illness was purely psychiatric, how much was neurological, and how that conjunction of illnesses might affect their clinical care and presentation.

I was also frequently asked to provide written reports and occasionally testimony regarding their competency either for managing their own affairs, such as finance and medical conditions, whether they needed guardianship, wards of the court, whether they were -- there was a necessity for them to be involuntarily hospitalized and committed, was the word that they used for varying periods of time, and when they had regained competency or if they were permanently incapacitated, incompetent.  And I might just add, during the course of the average year we would evaluate probably in the clinic well over a thousand individuals.

Q.  Did you have responsibilities at St. Elizabeth's in addition to your neurological consultations or that the --

A.  Correct.  I also did at the same time, because I liked to keep myself busy, I also conducted an active research program into the neuropathological bases of mental -- major mental

illness with a focus on schizophrenia and other major mental disorders. I also from 1988 to 2010 about 12 to 15 hours a week I ran my own private neuropsychiatric clinic in Chevy Chase, Maryland.

Q. How long were you affiliated with St. Elizabeth's?

A. I was affiliated with St. Elizabeth's through 2006, but I ran the clinics only from 1988 through 1996. In 1996 I moved into a full-time research position with the National Institute of Mental Health. Although I continued to be active in the training programs at St. Elizabeth's, I turned over the day-to-day running of the clinic to another individual, another physician.

Q. Have you ever taught at medical school?

A. Yes, I have been an instructor at George Washington University School of Medicine and currently joined the faculty at Johns Hopkins in Baltimore in the department of psychiatry.

Q. How long have you been affiliated or were you affiliated with George Washington University?

A. I think from 1989 through 2010.

Q. And can you tell the court how you are currently employed?

A. Yes. I'm the chief operating officer of Leiber Institute for Brain Development. Leiber Institute is a non-profit biomedical research institution independent of but affiliated with Johns Hopkins University whose goal is to translate our findings into the genetic and biological bases of mental

illness and to do treatments to ameliorate the symptoms and to even prevent the development or reverse the biological problems that underlie almost all nature of mental illnesses.

Q. And do you continue to maintain a private practice, as well?

A. No. At 2010 I closed the private practice. I do do a fair amount of clinical consultation work, retain an affiliation with the National Institute of Mental Health as a special volunteer, which is basically a guest researcher of the National Institute of Mental Health, helping them work on their clinical research protocols and evaluating the suitability of patients in order to enter those protocols from a neuropsychiatric perspective.

Q. Doctor, your CV that -- copy of the CV that we have from you Exhibit 102 lists numerous publications. Do you know if -- I believe these run through it appears 2009 or 2010. Is this a current list of your -- complete list of publications?

A. It's not the -- down to the bottom, I'm not sure. There should be peer-reviewed publications through 2012 in my updated CV.

Q. We may need to obtain after today, we might want to obtain a more up-to-date --

A. Absolutely. I can e-mail it to you very quickly.

Q. And you continue -- but you do continue to publish in peer-reviewed journals?

A.   Yes.  I average about somewhere between three and five peer-reviewed articles per year.

Q.   In 2008 you were elected to the American College of Neuropsychopharmacology.  Can you tell us, what is that organization?

A.   The American College of Neuropsychopharmacology is a fairly select organization of about I'd say 500 to 800 individuals drawn from neurology, psychiatry, pharmacology, and neuroscience, primarily.  And those are individuals who are considered to be highly accomplished in the fields of neuropsychopharmacology, that is to say, studying medications and major mental illnesses that are primarily in the psychiatric sphere but also may have a neurological component, as well.

Q.   Have you previously testified as a forensic expert in the field of neurology?

A.   Yes.

Q.   Have you previously testified as a forensic expert in the field of psychiatry?

A.   Yes.

     MR. BURKE:  Your Honor, based on Dr. Hyde's education, training, and experience we'd ask that you recognize him as an expert in the fields of neurology and psychiatry.

     THE COURT:  Any voir dire by the government?

MR. WITHERSPOON: None, your Honor.

THE COURT: I find he has the requisite qualifications and you may proceed under Rule 702.

MR. BURKE: Thank you, your Honor.

Q. (MR. BURKE) Dr. Hyde, before we turn to your examination and evaluation of Mr. Basham I'd like to return, you testified telephonically before this court in October of 2012. Do you remember that?

A. Yes, I do.

Q. And that was with regard to mr. Basham's functioning for purposes of proceeding with the proceedings that we are in today, do you recall that, his competency to proceed with his 2255 proceeding?

A. Yes.

Q. And during the U.S. Attorney's cross-examination of you you were asked your opinion about the death penalty. Do you remember that question?

A. Yes.

Q. Okay. If I'm correct, you stated that you're opposed to the death penalty except in cases of genocide. Is that still your position?

A. Yes.

Q. Okay. Do you believe that your opposition to the death penalty prevented you from making an objective diagnosis of Mr. Basham in this case?

A.  No.  I take the oath I swear before this court in a very serious fashion.

Q.  Would you ever compromise your professional ethics to assist a death sentence defendant?

A.  No.  In fact, in the majority of cases that I'm asked to evaluate I inform counsel that I have nothing pertinent to add to the legal proceedings that their defendant is facing.  In fact, I would say it's probably about 60 to 70 percent, I'd have to go back, I don't keep an exact number, but definitely a super majority of the cases I'm asked to evaluate I can not offer anything of substantive aid to the defendant's legal claims.

Q.  Okay.  And so in those situations you most likely do not end up testifying, would that be accurate?

A.  I am not asked to testify.

Q.  Okay.  Can you estimate for us generally what percentage of your professional practice today is devoted to forensic work?

A.  Probably ten to 15 percent.  Because I've closed my private practice and run the clinic the majority of my clinical work revolves around clinical research.

Q.  Now let's turn to Mr. Basham.  Do you recall, you may not recall the date, but do you remember being contacted by me earlier in 2012 and asked to evaluate Mr. Basham?

A.  Yes, I do.

Q.  And do you remember the circumstances under which we contacted -- I contacted you?

A.  I believe it had to do with his seizure disorder and other neurological issues confronting Mr. Basham.

Q.  And do you recall if we discussed or if Mr. Basham discussed with you his position at that time about proceeding with his legal case?

A.  Yes.  He just wanted to waive -- I believe he just wanted to waive all rights at that point and just let his sentence play out.

Q.  And so you evaluated Mr. Basham on how many occasions?

A.  Two occasions.

MR. BURKE:  And, your Honor, Exhibit 103 is Dr. Hyde's report, and it is part of the record so I will just go over portions of it and refer to portions of it just to proceed as quickly as possible.

Q.  Your report indicates that your first evaluation of Mr. Basham was in April of 2012.  Can you tell us, what did your examination consist of?

A.  Well, there are two components to my visit.  One is the interview and the second is the examination.  So I usually break my visit into two components.  I can describe both or just the examination.  I'm not sure --

Q.  I would like you to describe both and in the order in which you conducted them.

A.   So I interview the defendant first and I try and get some background history about their memories of their early childhood, their educational history, their childhood, adolescent behavioral history, their social history, their past medical history, their psychiatric history, their neurological history, their substance abuse history, their family history, and then I move in -- so it's a fairly extensive neuropsychiatric interview.  I usually conduct it in the same fashion so I don't miss anything.

So I have a relatively, wouldn't say rigid, but formal procedure I go through in order to assess the individual fully from both the neurological and a psychiatric perspective.  And I get the history and I move on to an examination, which is a focused neurological examination which includes a mental status examination, cranial nerve examination.  Cranial nerves are those nerves which innervate the head and the face.  They are obviously involved in special senses such as vision, a motor examination which includes strength, coordination, reflexes, fine motor movements, and involuntary movements.  A gait examination, which is looking at both regular walking and specialized walking and balance, a sensory examination, and then a limited general physical examination, follow the head and neck and cardiovascular system.

Q.   And, Doctor, let me ask you first, with regard to your neurological examination of Mr. Basham, with regard to the

motor examination, what did your examination of Mr. Basham reveal, do you recall?

A.  Is it possible for me to get a paper copy of my report, if that's okay?

Q.  I believe --

A.  I have --

Q.  I believe it's page six in your report.

THE COURT:  What is the exhibit number of this report?

MR. BURKE:  Your Honor, this is Exhibit 103, Defendant's Exhibit 103.

THE WITNESS:  So on his examination there were a variety of abnormalities noted.  On the mental status examination he could not spell the word "world" in reverse. He could not perform simple division, he had difficulty performing serial threes, he did not know the exact date, did not know the county or state in which he was incarcerated, did not know the current name of the president, the time of the evaluation in 2012.  He had difficulty copying three dimensional figures, and he scored 23 out of 30 on a formal mini-mental state examination, which is a brief screen of cognitive performance.

He did have some abnormalities on a cranial nerve examination, which is the nerves of the head and the face region, the four level nystagmus and decreased sensory

function on the right side of his face.

His motor examination was notable for clumsy fine motor movements bilaterally, worse on the right than the left. Finger consecutive maneuvers clumsy bilaterally, rapid alternating hand movements are clumsy and uncoordinated bilaterally.

Q.   (MR. BURKE) Now, a lot of this means a great deal to the doctors and very little to lay persons, so what does that tell us, what is the significance of what you just told us about the right or the bilateral --

A.   Finger repetitive movements are fairly simple tests looking at manual dexterity, and the clumsiness worse on the right than the left suggests that he probably has dysfunction in the left hemisphere, as the left side of the brain controls motor function on the right side of the body.

He had clumsy finger consecutive movements bilaterally, suggesting there was some degree of bilateral frontal lobe dysfunction.  He also had clumsy rapid alternating hand movements bilaterally, which can be due to either cerebellar or frontal lobe dysfunction.  The fact that he had normal finger to nose and heal to shin testing suggests it's probably more frontal lobe then cerebellar.  I don't want to get down in the weeds too much here.

He also had clumsy rhythmic foot tapping bilaterally.  He had clumsy complex motor sequencing, which is a subtle

neurological abnormality which is usually assigned to dysfunction of the frontal lobe, and he had one primitive reflex, a reflex you see in infants that disappears with normal brain development. Persistent or reappearance in adults is often associated with lobe dysfunction, and that was a glabellar reflex.

Q. And what is that?

A. That's where you tap on the forehead between the eyes above the visual field, and the person blinks involuntarily. You see that in infants. It disappears as the frontal lobe develops. Its persistence or reappearance is a sign of frontal lobe dysfunction.

Q. Now, Doctor, let me ask you a question: When you are conducting this examination of Mr. Basham did you tell him why you were asking him to do these movements?

A. I never tell a defendant the purpose of each one of these tests. We move through it in a routine, smooth pattern. I just explain to him this is part of my assessment of their medical status. I don't even tell them it's part of a brain check, so to speak. And he did not inquire at any point about any of these elements. They were reproducible so I had him do them on several occasions just to make sure that it wasn't just a one-off problem, that he wasn't paying attention, and it was a persistent finding with each one of these findings.

Q. Now, Doctor, Exhibit 103, Defendant's Exhibit 103, your

report, does not list what documentation or records you reviewed in forming your opinion in this case. Let me first ask you, did you review any documents before you met with Mr. Basham in April of 2012?

A. No. I don't -- I make a habit of not reviewing documents because I like to go in there with a blank slate, hear what the defendant has to say in response to my questions without any preconceived notions either consciously or unconsciously. And that includes my neurological evaluation.

Q. Now, you evaluated Mr. Basham again in September of 2012. Can you tell us why you requested a second examination of Mr. Basham?

A. I was particularly interested at that point in looking into some of the details of his behavioral history, psychiatric history, and his psychiatric experiences within the realms of mood, obsessive compulsive disorder, anxiety and psychosis in order to make sure that, A, there was some consistency between the two visits and, B, to flesh out some of the details that I wanted some additional information on before rendering a final opinion.

Q. Now, when you first evaluated Mr. Basham in April of 2012 I think you testified one of the things that you were looking for was evidence of seizures, is that correct?

A. Yes.

Q. Did you come to any conclusions about whether Mr. Basham

suffers from seizures?

A.   Yes, I did.  Let me just flip to my report.  I think by history, both with an abnormal EEG in the past and the self-reporting of Mr. Basham, within a reasonable degree of medical certainty he has had seizures.  The frequency of those seizures and the disability associated with those seizures is somewhat difficult to assess.  But the presence of seizures present in the past and possibly into the present is an indication of organic or what we might call coarse, C-O-A-R-S-E, brain damage.  Seizures are an abnormal electrical phenomenon that is produced by abnormal brain tissue.

Q.   And Mr. Basham, you said that he had actually relayed to you some experiences of having seizures or blacking out, is that correct?

A.   Correct.

Q.   And to put this in proper context, this was in April -- April of 2012 at the time that Mr. Basham was wanting to waive his proceedings, is that correct?

A.   Correct.

Q.   Now I would like to turn, Doctor, to your findings with regard to Mr. Basham's psychiatric disorders.

A.   Yes.

Q.   You note in your report that Mr. Basham meets the criteria for bipolar disorder II, is that correct?

A.  Correct.

Q.  Okay.  Can you tell us what is that disorder and how does it differ from other types of bipolar disorder?

A.  Well, our concepts of bipolar disorder are undergoing somewhat of an evolution, but basically bipolar disorder is characterized by episodes of depression, fluctuating with or combined with, you can have alternating or mixed states, of depression and mania or and/or hypomania.

Q.  What is hypomania?

A.  Hypomania is basically a milder form of manic symptomatology.  So during those periods of time the person had a decreased need to sleep, attempts to talk a lot, they may have racing thoughts, difficulty focusing.  They often engage in excessive amounts of pleasurable activities.  They spend money recklessly, they often exhibit poor judgment during that period of time, and they often act irrationally.

However, the degree of those behaviors is much lower than during a full manic spell.  They usually do not have well-formed grandiose delusions, for example.  They are usually not floridly psychotic as you often see in patients who are in a typical manic episode.

Q.  And does the existence of hypomania versus mania, does that have an effect on whether or not the diagnosis is bipolar I or bipolar II?

A.  Correct.

Q.  Okay.

A.  Abnormalities, as I said before -- the DSM, which is the Bible of the descriptives of psychiatric symptomatology, has evolved since the initial DSM-I and soon to be released DSM-V in how they subdivide bipolar disorder.  To me it's a little bit of excessive seminology, but that's left up to the clinical practitioners who devise these exact sub-types of bipolar disorder.

Q.  Now, you are not the first mental health professional to diagnose Mr. Basham with bipolar disorder, are you?

A.  No, I'm not.  Sprinkled throughout his medical records dating back to his adolescence.

Q.  And in reaching your conclusion that he suffers from bipolar disorder, what information did you rely on, solely his self-reports, or what were you looking at?

A.  I was looking at his self-reports, I was looking at the information in some of the records that I had been given, as well as some of the testimony by other practitioners who have evaluated Mr. Basham over the years.  But primarily by observations of his behavior and some of the mood fluctuations that I observed during my time with Mr. Basham, and his descriptors and his responses to my questions.

Q.  Psychiatry is a confusing subject for lay persons and when I review reports it's difficult for me to understand why one professional would find bipolar disorder and another wouldn't.

You had an opportunity to look at Dr. Frierson's report in this case?

A.   Yes, I did.

Q.   And am I correct that Dr. Frierson concluded that Mr. Basham suffers from bipolar disorder?

A.   He did not.

Q.   And can you explain in simplest terms possible, is one of you right, or why don't you agree?

A.   Why didn't we find the same thing?  Well, one goes to how detailed the interview and the examination is with the individual.  There's an element of trust, also, when you are asking people to reveal details of their behavioral history. And one of the reasons why I think I was drawn to the field of neuropsychiatry as opposed to just regular neurology was that I think that I have the ability to work carefully and sensitively with patients to the degree that they are willing to divulge very personal, very intimate details of their behavior, which they often are not willing to give to somebody who does not approach them in the same way or establish what we call therapeutic relationship with the individual.

So I work very hard, even though I'm with the individual for a limited amount of time, to establish their trust, to tell them that I'm going to give them a fair hearing, that I'm going to listen to what they say, that I'm going to place import upon what they say.  But I also look to internal

consistencies in what they are saying, if there seems to be some fantastical or absurdity to what they are saying to try and formulate my opinions in individual cases.

So in this case he was quite specific in his responses to my questions. I avoid leading questions so I try not to lead people down the road. And he seemed to answer affirmatively. And the records seem to support somebody who had mood swings that were out of the ordinary, that there were aggressive episodes, suicidal gestures, and the other types of behavior that would be consistent with bipolar II.

I recognize that other people at other times have seen him and diagnosed him with bipolar I, bipolar NOS, a psychotic disorder NOS, NOS meaning not otherwise specified. And that is always a problem in psychiatry, because there's some evolution of symptoms, particularly with affective disorders, and bipolar has probably been one of the most difficult disorders to diagnose due to its intermittent and fluctuating nature and often the lack of insight and cognitive problems that is -- that are associated with bipolar disorder.

Q. Now, Dr. Frierson indicated in his report that Mr. Basham denied symptoms consistent with major depressive or manic episodes. That was the reason in Dr. Frierson's report he states that he is unable to diagnose him with bipolar disorder. Is that a -- is that the sole requirement for diagnosis with a bipolar disorder?

A.  In psychiatry, because it is a syndromic diagnosis, that is to say it is a checklist of behavioral experiences, one must have a trust relationship with the individual so that they are willing to participate in the examination and answer truthfully about their experiences, some of which they may be quite ashamed about or feel badly about.  And because of the social stigma attached to psychiatric disorders it often takes a fair amount of skill in order to elicit those responses.

I'm not going to toot my own horn, I'm not going to disparage Dr. Frierson's clinical abilities, all I can tell you is that with Brandon I was able to establish a good relationship, that I felt that he was being truthful, that I thought he answered my questions directly even though on occasion they had to be repeated or reworded in a way that he understood them.

Q.  And Mr. Basham shared with you this information about his mood swings and his behavior in your interview in April of 2012, correct?

A.  Both interviews.

Q.  Both interviews.  Okay.  Dr. Hyde, you also -- before I move on, have I provided you with an opportunity to describe your basis for diagnosing Mr. Basham with bipolar disorder? Is there anything else you would like to tell us about that or --

A.  Only that I observed during the course of my interview

that I thought on my second interview, in particular, he was in hypomanic state in that his speech was pressured, he was rushing through things, he was tangential.  His affect at times was inappropriate given the severity of the situations that we were discussing.  He was excessively jovial.  And he ascribed to himself some degree of grandiosity that did not reach the level of a grandiose delusion, but certainly was not in touch with his real abilities.

Q.  You also diagnosed Mr. Basham with attention deficit hyperactivity disorder, correct?

A.  Correct.

Q.  And what is that?

A.  It is a developmental disorder of the central nervous system that often presents early in childhood and can persist through adulthood, the ability to sustain attention, to filter out extraneous environmental stimuli.  It is a hallmark of advanced cognitive functioning, the inability to filter out what is going on around you to focus on the matter at hand.

So with somebody with attention deficit order it's like all of us sitting in a busy airport, like I was yesterday, trying to write while there are overhead announcements going on, people rushing by, people screaming at the desk clerks, carts beeping as they rush by, the inability to filter that out makes it extremely hard for these individuals to process information and to sustain attention.

Now, even in a quiet environment, with prolonged proceedings, such as a legal proceeding, their attention often fluctuates, they tend to daydream, blank out, and so they have large gaps in the information. And so it's a very difficult disorder, especially in extreme cases, it can be quite disabling. And it is something that we see much more in males than females. Usually the hyperactivity component disappears so there appears to be a genetic component, although it may be enhanced by other environmental factors on the central nervous system.

Q. And in your review of the reports and records of Mr. Basham's case are you the only medical expert who has diagnosed him with ADHD?

A. This has been fairly consistent since he was a child.

Q. How could ADHD -- I think you might have given us some idea but I want to make sure I give you the opportunity to explain to us fully, how could ADHD affect a defendant's competence to stand trial?

A. In most cases it doesn't because in most cases it's relatively mild or treatment responsive. In Brandon's case, probably due to other organic brain factors, he seems to have severe attentional deficits and, in fact, he still seems to have some degree of hyperactivity, frequently squirming in his seat, even on occasion during the course of our interview and examination asking me if it was okay for him to get up and

walk around.  That's a characteristic symptom of hyperactivity, and also see that type of psychomotor agitation in hypomanic and manic states.

But within the context of legal proceedings, particularly in a complex legal matter such as this where there's a lot of extended legal proceedings and a lot of complicated language and decision making going on, it can be very hard for this individual to retain that information, utilize that information because they are actually missing it, they are not assimilating that information, they blanked on the tape recorder.

Q.  Is that because he's incapable or unwilling to pay attention?

A.  This is an incapacity, this is hard wired in his brain.

Q.  Now, Dr. Tora Brawley is a neuropsychologist who testified at trial, testified that Mr. Basham's IQ in 2003 was, full scale IQ, 68.  How would that affect a person's ability to cope with ADHD?

A.  The average IQ is set at a hundred in this country.  And it's a measure of both verbal abilities and performance activities, and there are a bunch of sub-scales that go along with it.  It's a fairly standardized assessment of general intellectual function.  When you get down to 80 you are at the boundary between what we consider to be within the normal range.  Below normal range, between 70 and 80, there's

significant cognitive impairment but it's considered to be borderline cognitive impairment.  Anything below 70 is considered to be quite significant cognitive disability in that their general intellectual powers as measured by both their verbal abilities as well as their performance on a variety of tests is so substandard that it's going to affect their ability to take information in, retain it, process it and utilize it in a rational and considered fashion.

Q.  Did you have an opportunity to review the report prepared by a Dr. Bruce Capehart of the Butner facility in this case?

A.  Yes, I did.

Q.  And did Dr. Capehart conclude that Mr. Basham suffered from ADHD?

A.  Yes, he did.

Q.  And did Dr. Capehart conduct any type of test or exam to determine whether Mr. Basham's neurological deficits, or his cognitive deficits, excuse me, could be explained by his ADHD?

A.  He did.  And, in fact, I recall Dr. Capehart retested Brandon while he was on Concerta, which is a medication commonly used to treat attention deficit order, and the test, if I can quote my report quoting Dr. Capehart?

Q.  Certainly.  If you can let us know what page that you are looking at?

A.  Page eight.  Mr. Basham was re-administered several tests while he was taking Concerta.  All the tasks revealed very

similar results with minimal non-statistically significant improvements noted.  Suggesting that Mr. Basham had both a severe type and a treatment unresponsive form of attention deficit hyperactivity disorder.

Q.  Doctor, you ultimately conclude Mr. Basham was incompetent when he stood trial in 2004, is that correct?

A.  Yes.

Q.  How were you able to make that determination eight years after the fact?

A.  On the basis of several issues.  Number one, his long-standing diagnosis of attention deficit hyperactivity disorder and his treatment resistance to that disorder; number two, his history of seizures or seizure-like episodes that dated back to childhood which were reflective of organic brain damage; number three, his extensive history of inhalant abuse, which is particularly toxic to the developing brain, which is why there are well-recognized neuropsychiatric syndromes of organic brain damage produced my inhalants that include both fine motor dysfunction this defendant possesses as well as cognitive disability, which this defendant possesses.

His findings of this cognitive disability, which is significant, coupled with his attention deficit disorder, coupled with a long-standing mood disorder characterized by fluctuating mood states, led me to believe that there were sufficient evidence by history and examination that the

disability which I observed in 2012 was present at the time of his trial, present at the time of the acts for which he was on trial, and persisted to the current time. And, moreover, the organic basis, which is part of his neuropsychiatric syndrome, that is to say the brain damage, whether it's from closed head injury and/or substance abuse from a young age, particularly inhalant abuse, is acting in concert to amplify his psychiatric problems, make them more treatment resistant. And those events occurred remotely, that is to say they occurred before the events for which he is charged and before the proceedings for which he was previously engaged and persist through the present time.

Q. Now, because of the limited nature of the testimony you are providing today, which is with regard to his competency to stand trial in 2004, I've not asked a lot of questions I might normally ask in a typical evaluation because, for one, the court has heard extensive evidence throughout the years of Mr. Basham's deficits.

But I want to ask you about his neurological deficits, his brain damage. Are you able to say with any degree of medical certainty what caused his brain damage?

A. Yes.

Q. And what is that?

A. I believe that there are three factors at work here. One is a genetic basis, that is to say this is a person who comes

from a relatively low-achieving family environment, suggesting probably that the genetic determinants of his IQ were never going to be great under optimal circumstances.  They probably would have been within a minimal range, but he certainly was not coming of a family of widely accomplished individuals.

Number two, that he has had several environmental events which by both his description and the descriptions that I have read in the extensive records and testimony of other individuals suggested that he has had some significant closed head injuries, particularly a fall around five years of age.

Third, his educational achievement has been substandard all along the way, complicated by his behavior problems, but also reflective of developmental organic disorders, so-called learning disabilities, which are hard wired evidence of developmental brain dysfunction.

And then, lastly, his substance abuse from a young age, including marijuana and other inhalants, and compounded in his teenage years.  The developing brain is very sensitive to the toxic effects of these agents.  There's a lot of brain development that is going on between birth and adulthood.  And those developmental processes, once interrupted, are at least in the current time almost impossible for us to effectively remediate.  The brain has some reserve capacity, but repeated and sustained insults, particularly with inhalant abuse, particularly with a genetic predisposition toward either

intellectual deficit or mood disorder, lead to us an
individual such as the one that we are confronting here in
this case.

Q.  Now, you mentioned inhalant abuse.  Could you be more
specific?  What did Mr. Basham inhale and how does that damage
the brain?

A.  Well, he inhaled inorganic fumes, kerosene, paint thinner,
glue, just about any inhalant he could get his hands on.
People inhale it because it makes them feel a little
intoxicated and a mildly euphoric affect.  The agency by which
these inhalants work is that through the lungs there are
molecules that are given off, fumes is what we would call
them, most of us find unpleasant both in smell and, in fact,
actually go into the blood, circulate in the blood, pass
through the blood vessels, the blood barrier, go into the
brain.

Those molecules affect brain function to produce that
intoxicating effect so you feel a little bit high, a little
bit euphoric, you get a little bit of a, quote, buzz.  But as
they persist in the brain they are taken up by nerve cells and
by the supportive cells called the glial cells that nurture
the nerve cells and it causes those cells to be damaged.  And
there are particular parts of the brain that are particularly
vulnerable to those, and that includes the cerebellum, which
is in the back of the brain which controls fine motor

coordination, and also those parts of the brain that are actively undergoing extensive remodeling and development in childhood and adolescence. And those are primarily the frontal and to a lesser extent the temporal lobes.

So those late-maturing parts of the brain are particularly sensitive to the toxic effects of these agents. So I have frequently seen in the course of my clinical practice individuals who used alcohol, used drugs, use inhalants, were exposed to lead paints in the inner cities, and these individuals have permanent irreversible brain damage. These are well-known consequences of exposure to these agents. This is why we heartily discourage it. There's a huge amount of neurological and psychiatric literature about both the neurological and the behavioral consequences of these types of toxic exposures.

Q. In your report you describe Mr. Basham as permanently incompetent to stand trial, correct?

A. Yes.

Q. As a lay person I read that to mean that Mr. Basham at all times is incompetent. Is that what you are saying, that he never has moments of competency?

A. I'm talking about competency within the context of assisting his legal counsel in a thoughtful and rational way and understanding the details of the legal proceedings for which he is actively participating and consequences of his

choices and his actions during the course of these proceedings to weigh the information and make considered decisions, thoughtful decisions, instead of acting impulsively or acting on the basis of limited ability, a highly circumscribed ability to process information.

Q. Now, you've mentioned, Doctor, several factors that had contributed to Mr. Basham's incompetence, his mood disorders, his hyper -- his ADHD, his neurological deficits. Let me ask you, can medication or the lack of medication affect a defendant's competence to stand trial?

A. On many occasions. So, for example, there are some patients who have schizophrenia, for example, who have a dramatic response to that medication such that they may be floridly psychotic and incompetent but with medication, if they are that form of schizophrenia without a lot of associated cognitive deficits, medication can render them competent and withdrawal of that medication can render them incompetent.

You can see similar things with anxiety disorders, obsessive compulsive disorders, bipolar disorder. You can even see it with neurological disorders. There are patients with Parkinson's disease whose cognitive processing is extremely slow without medication, but you add on the proper dose of medication and you can restore their cognitive abilities such that they are competent to participate in legal

proceedings.

Q. Now, you are familiar with the medication known as Seroquel?

A. Yes.

Q. What is that medication?

A. Seroquel or quetiapine, Q-U-E-T-I-A-P-I-N-E, is an antipsychotic medication. It's considered an atypical or one of the modern antipsychotic medications which we use to treat patients with psychotic disorders, and it's a secondary treatment for bipolar disorder and refractory depression, even used sometimes as an adjunctive medication to treat severe obsessive compulsive disorder.

Q. Is Seroquel a medication a patient takes on a daily basis? How often do they take the medication?

A. It is designed to be used on a daily basis.

Q. And what effects could the failure to administer Seroquel have on a person who is taking that medication?

A. Particularly in people who have either severe anxiety problems or mood swings or psychosis there can be a rebound in their symptoms relatively quickly, because there's a short half life as it comes out of the brain.

Q. Does Seroquel have any affect on a patient's ability to stay alert or awake or --

A. One of the main problems with Seroquel is it tends to be a highly sedating medication. People in prisons and in hospital

situations like that because it sedates the patient. Unfortunately, on a functional basis many patients find Seroquel a difficult medication to tolerate because it makes them so sleepy.

Q. I would like to ask you for a moment about a subject that has repeatedly appeared in this proceeding, and that is what many people refer to as Mr. Basham's manipulative personality, the fact that he, quote unquote, manipulates. Did you have -- you had an opportunity, you told us, to review Dr. Frierson's report, correct?

A. Yes.

Q. And I believe Dr. Frierson at one point in his report referred to Mr. Basham as having shown great manipulation skills. Do you agree with that assessment?

A. From my reading of his records, both in prison and from the testimony of others, and the medical records, Mr. Basham has a highly regressed or childlike behavior pattern, such that he has difficulty formulating a rational considered response to most situations. He often acts in an extremely childlike manner trying to get very simple things in relatively simple ways, in the way you might see a child do that.

Hiding money in his pants, asking people to slip him a little money, trying to get people to buy him snacks, very reminiscent of a small child to those of us who work with

children or have children or are around children a lot.  I'm sure you've all been going through the candy aisle at the supermarket and sometimes Johnny will throw a tantrum if he doesn't get a candy bar or Susie may grab some M&Ms and stick them in her backpack thinking that they can get something relatively quickly and relatively easily in a very childlike and simplistic fashion.  I don't really consider that to be manipulation, I consider that to be regressive behavior of somebody with severely cognitive limitations and behavioral abnormalities.

Q.  When you examined Mr. Basham in Terra Haute, could you give us a little bit of a context as to where the evaluation took place?

A.  Sure.  It's in a nondescript room, I believe it's on the second floor of the facility, where there's a table, two or three chairs, you and the defendant.

Q.  When you evaluated Mr. Basham did he ask you to buy him snacks from the vending machine?

A.  Yes.

Q.  Did you consider that manipulation?

A.  No.  I hear that a lot from defendants, particularly those who have the types of neurological deficits Mr. Basham displayed in conjunction with the psychiatric problems. Usually say no in a nice way, say I don't think it's an appropriate thing for me to do in the context of the

relationship that I'm establishing with them.  I've never had any problem with them.  Once I explained my position I didn't have any problem with Mr. Basham.

Q.  So you told Mr. Basham no?

A.  Yes, correct, I said no.

Q.  Okay.  And did he go forward with the evaluation?

A.  Absolutely.

MR. BURKE:  One moment, your Honor.

THE COURT:  All right.

(There was a pause in the proceedings)

MR. BURKE:  Your Honor, we have no further questions.

THE COURT:  All right.  Cross-examination.

MR. WITHERSPOON:  Judge, may I ask for about a ten minute break first?

THE COURT:  We can take the morning recess at this time.  Let's take a ten minute recess.

(A recess transpired)

THE COURT:  All right.  Just for planning purposes, we received a call from the Bureau of Prisons wanting to know when we would break for lunch because apparently a guard has to be with the attorney who's out in Terra Haute, and I told him we would break at 12:20.  So let's resume.  I don't know if we'll take another break between now and 12:20, but that's where I plan to stop for lunch.  All right, cross-examination.

CROSS-EXAMINATION

BY MR. WITHERSPOON:

Q. Good morning, Dr. Hyde. And first let me apologize. I've been calling Dr. Hyde Dr. Frierson and Dr. Frierson Dr. Hyde, so if I make the mistake please forgive me.

Dr. Hyde, you are not a board certified psychiatrist, are you?

A. No, sir.

Q. And, in fact, you didn't go through a psychiatry residency, did you?

A. No, I did not.

Q. And you are not a member of the American Board of Psychiatry and Neurology, which is the group that certifies psychiatrists and neurologists, correct?

A. Well, actually, it's a joint board, but I have been certified in neurology, not in psychiatry.

Q. Not in psychiatry.

A. Not in psychiatry.

Q. So you've had no real formal training in psychiatry other than what, four years of medical school, correct?

A. No, that's not correct.

Q. What have you had?

A. I have had extensive training through some of the leading psychiatrists in the world at the National Institute of Mental Health, through frequent case conferences, rounds, teaching rounds, case discussions, case interviews, on literally

hundreds of cases over the course of the past 20 years.  I
have been asked to write chapters in books on psychiatry, I
have been asked to lecture to medical students, residents, and
fellows on purely psychiatric issues.  My research has been
devoted for 24 years now to the biological bases of
psychiatric disease.  So I have had training in psychiatry but
not through a formal residency program.

Q.  And you are not board certified in psychiatry.

A.  Correct, sir.

Q.  Okay.  Now, you mentioned in your discussion about Mr.
Basham that his brain damage was caused by genetic --
basically a bad family, that he had these closed head
injuries, am I correct?

A.  Yes, sir.

Q.  And his educational achievement was bad.

A.  Yes, sir.

Q.  And his substance abuse.

A.  Yes, sir.

Q.  Have you ever met Mr. Basham's family?

A.  No, I have not.

Q.  So you are making a determination that he has a bad
genetic family history and you've never met his family.

A.  Yes.

Q.  Isn't that a little strange to make that assertion if you
never met his family?

A.  No, it's fairly typical in clinical practice.

Q.  To determine how bad his genetics are without even talking to or meeting with the people that you are contending have these bad genetics?

A.  Well, look at the information contained in a variety of reports, people who have interviewed the family, as well as the patient's report and look for consistency within those documents.

Q.  And you said he has a low IQ which also causes him to have some problems with competence, correct?

A.  Yes, sir.

Q.  What was Mr. Basham's IQ when he was ten years old?

A.  If I can refer to my report?

Q.  Sure.

A.  So let's see.

Q.  Well, let's go back.  At seven years seven months, what was his IQ?

A.  Let's see.  IQ at seven years was 101.

Q.  And at eight years seven months what was his IQ?

A.  100.

Q.  And at ten years what was his IQ?

A.  88.

Q.  Does that indicate that he came from a bad genetic family?

A.  You know, the IQ measurements at a very young age are not usually that determinative and we usually don't rely upon

them.  There's a lot of problems with IQ testing in children, particularly under the age of 12.  So you have to look at the larger, broader sphere of achievement in individuals, in family members.  Did they go to college, what types of jobs have they had.  Particularly in contemporary American society you have to look at the genetics of the individuals involved, including his mother's genetics and her problems throughout life.

So I would say that there is a significant genetic load. When that appears as a consequence of cognitive disability it's quite variable, as genetic load can appear starting in infancy or that genetic trait can appear subsequently later in life.  So, for example, somebody who typically develops schizophrenia, which has a strong --

Q.  Let me stop you, Doctor.  Dr. Hyde, we're not talking about someone with schizophrenia, we're talking about --

A.  I'm using that as an example.

Q.  But my question was very direct about Mr. Basham here. Having that high IQ doesn't indicate that he came from a bad genetic family, does it?

A.  It does not in that limited context, sir, but that is not the way that these genes always play out in changing cognitive abilities.

Q.  But you don't know that because you haven't met and talked to his family, correct?

A.  I have lots of information about his family.

Q.  But you haven't met or talked to his family, have you?

A.  I have already answered that, sir.

Q.  It is yes or no, sir.

A.  You can check the record.

Q.  Have you met and talked with his family, sir?

MR. BURKE:  Objection, your Honor.  Asked and answered.

THE COURT:  All right.  He said he didn't talk to the family.

Q.  (MR. WITHERSPOON) And at 17 years old he had an IQ of 89, which is close to being normal, isn't it, Dr. Hyde?

A.  Yes, it is.

Q.  And this is from a person who came from a bad genetic family, correct?

A.  Yes.

Q.  Now, I want to talk about your testifying.  You have -- I think you told Mr. Burke that in 60 to 70 percent of the cases that you're called to consult you do not testify because you find the person competent, correct?

A.  Correct.

Q.  So in almost 30 or 40 percent of the time when you are called to testify do you find frontal lobe damage issues?

A.  In some of them.

Q.  What's the biggest diagnosis you find when you find a

person incompetent, Dr. Hyde?

A.   Most of the cases that I'm asked to testify on are complicated, they can have frontal lobe damage, they can have temporal lobe damage, they can have a combination of those two areas.  But frontal and temporal lobe damage are the areas most often involved in their competency issues.

Q.   And you saw Mr. Basham for two times, correct?

A.   Yes, sir.

Q.   How many hours in those two times did you visit with Mr. Basham?

A.   Probably somewhere between four, four-and-a-half hours.

Q.   Is that total, four, four-and-a-half hours?

A.   Yes.

Q.   And in that time you were able to discern that eight years ago he was incompetent.

A.   Yes.

Q.   Did you ever talk to his lawyers at that time to see about their discussions?

A.   No.

Q.   Wouldn't that be a better determination of what he can and cannot do, his functioning abilities, by listening to his lawyers, reading transcripts of conversations?  Wouldn't that be a better way to determine his functioning eight years ago than relying solely on these tests?

A.   It would be useful --

Q.   But you --

A.   -- but not better.

Q.   I'm sorry?

A.   It would be useful but not better.

Q.   So you didn't -- you didn't do that.

A.   No.

Q.   Okay.  And to determine his competence don't you need to determine his functioning, what skills, what he can and can't do?

A.   Yes.

Q.   And with a person who is incompetent, would he be able to -- you don't call it manipulation, you call it childlike tendencies, by getting someone to buy something for him that he wanted, correct?

A.   Yes, sir.

Q.   But what about if a person is able to listen and make decisions about his legal proceedings?  Is that a -- would be a good indication of a person who's competent?

A.   It depends upon the context.

Q.   What do you mean, it depends upon the context?

A.   Well, if I asked somebody did you throw a rock and break the window, that's a pretty simple issue.  If you ask somebody how they want to proceed with respect to plea bargains, deals, intricacies of their case, remembering the details of their case, how everything fits together, that can be a different

issue.

Q. That can be definitive?

A. A different issue.

Q. Okay. Would that indicate a person is competent?

A. Like I said before, it varies upon the context.

Q. Well, let me -- did you have a chance to review the transcript of Mr. Basham's guilty plea in West Virginia about approximately less than a year after his trial here?

A. No, I don't believe I did.

MR. WITHERSPOON: Your Honor, I'm moving at this point Government's Exhibit number 248 without any objection from the defense.

THE COURT: All right.

Q. (MR. WITHERSPOON) I want to read you part of a transcript. First of all, I want you to understand this, according to this transcript this hearing started at 9:30 in the morning and it lasted until 10:24, about an hour.

A. Yes, sir.

Q. During that entire hour, you haven't seen this, but as an officer of the court, there were no outbursts by Mr. Basham. Okay?

A. Yes, sir.

Q. During this transcript the judge specifically asked Mr. Basham and the other lawyers if there was any issue dealing with his competency and nobody had an issue dealing with his

competency. But you are saying at that point he was incompetent.

A. Yes.

Q. Wouldn't those lawyers have a better perspective about his competency than you did eight years later?

A. It depends upon how good those lawyers were.

Q. I'm sorry?

A. It depends upon how good those lawyers were, how knowledgeable they were, how they work with their client.

Q. I would presume since it was a death penalty case they spent a considerable amount of time with their client, wouldn't you?

A. I have seen lawyers of varying degrees of legal skill and commitment to their client despite billing hundreds or thousands of hours, including lawyers who have fallen asleep during trial.

Q. But we don't --

A. With all due respect, I don't make any presumptions about the capabilities of lawyers, even involved in death penalty case.

Q. But we're not talking about lawyers falling asleep here, are we?

A. I have no idea.

Q. And the court made a determination at that time that he was competent. If a federal judge in West Virginia made a

determination he was competent --

A.  Yes.

Q.  -- and you disagree with that federal judge.

A.  Yes.

Q.  And then we go on, Gayle, can you pull up page five of Exhibit number 248?  We will begin at line six.

The court, all right.  You don't have any other medical conditions or problems that would interfere with your thinking or cloud your judgment?  And Mr. Basham said no.  You disagree with that?

A.  Yes.

Q.  Line ten.  Are you able to understand fully what's going on here in court today?  Again, Mr. Basham says yes.  You disagree with that?

A.  Yes.

Q.  And then he asked the two lawyers if they have any issues with Mr. Basham's competency and they both say no.  You disagree with that?

A.  Yes, sir.

Q.  Line 18.  Now, Mr. Basham, you've had enough time to discuss this case fully with your lawyers.  He says yes.  Have they been able to answer your questions, questions about what you should do, and he says yes.  Are you completely satisfied with your lawyers' advice they have given?  He says yes.

At that point you are saying he wasn't competent to make

that determination?

A. Correct.

Q. Page 11, Gayle, line two. Now, Mr. Basham do you understand what this -- they have gone through the plea agreement that he has, seven page plea agreement that he has, the judge has gone through all the elements, and he asked Mr. Basham, do you understand what this agreement does and what it requires of you? Mr. Basham says yes, sir. You are saying he was incompetent, he had no idea.

A. Correct.

Q. And he asked -- the court asked him, did you go over each of these paragraphs with your lawyers before you signed this agreement? He says yes. He may have gone over it but you are saying he had no idea what he was doing.

A. He may have a little bit of an idea, but I don't think he had an idea that rises to the level of competence.

Q. What level does it take?

A. To fully understand, to digest that material, to consider his options, to engage with his lawyers and discuss the language and the consequences of the decision that he's making.

Q. Well, he knew he was pleading to get a life sentence here, so he knew the consequence of his guilty plea.

A. Like I said before --

MR. BURKE: Objection. It assumes facts not in

evidence.  And Dr. Hyde can't tell the court what Mr. Basham knew or did not know.

MR. WITHERSPOON:  Judge, he's opined he was incompetent.

THE COURT:  I think it's a fair question.  I'll allow it.

Q.   (MR. WITHERSPOON) But he knew he was pleading to get a life sentence here, didn't he?

A.   He may have known he was pleading to a life sentence, but the details of what a life sentence meant, he was incompetent to process all that information.  There are many different types of life sentences, as you well know.

Q.   So he knew he was pleading to a life sentence but he didn't know what a life sentence meant?

A.   In his case he probably did not know all the options.

Q.   Gayle, page 15.  After the judge has gone through and told him the elements of the offense he asked Mr. Basham, considering this explanation of the offense, do you believe you're guilty of the count -- the charge in count one?  And Mr. Basham said yes, sir.  Again, you don't believe he was competent to make that decision.

A.   I don't think he was competent throughout this whole proceeding.  You can go line by line, page by page, word by word.

Q.   But you didn't consider any of this when you made your

determination, did you?

A.   I considered his history, his examination, the information I had at hand.

Q.   Well, there are other information that was available to you, you just chose not to review it, correct?  Because this transcript was available to you, you just chose not to --

A.   I worked with materials that were given to me by counsel.

Q.   Okay.  So this was available to you, you chose not to use it.

A.   I don't understand your question.

Q.   You didn't use this transcript.

A.   I wasn't given a choice.

Q.   Did you ask for it?

A.   I didn't even know it existed, sir.

Q.   And even if it had it wouldn't have changed your opinion, would it?

A.   No, it wouldn't.

Q.   Page 45, Gayle, line 14.  This is his attorney.  I want you to listen to this.  Your Honor, in meeting with Mr. -- with Brandon over time preparing for this case, Brandon told me about the Burns family.  This is the family of the lady in West Virginia that he pled guilty to, he and Chad Fulks, to murdering.  Seeing them in South Carolina and seeing about them in the victim exact statement, so he read the victim impact statements, he told me something that I wrote down, and

I'm quoting him directly. This is what he asked me to read to the court as his allocution. Line 21.

I want the Burns family to know that Samantha was a good person. I know that she had something that I never had and never will have. She had a good family that loved her and cared for her. I helped Chad Fulks take that away. Even if I had never met Chad Fulks or her, no matter what I ever did in life, page 46, it would never come near to what she was or could have been in her life. I wish I could bring her back but I can't. Thank you.

Is that the mind of a person who's incompetent, Dr. Hyde?

A. It's a relatively limited statement.

Q. Is that the mind of a person who's incompetent, Dr. Hyde?

A. First of all, you are presuming that all that wording is directly coming from the client. I have some doubts about that.

Q. But the lawyers said it was. As an officer of the court he wouldn't lie to the court.

A. Lawyers have ways of working with clients to write statements for the court.

Q. He told me something that I wrote down and I'm quoting him directly.

A. Like I said before, there are ways of asking questions to derive information that somebody could not formulate on their own in a coherent way.

Q.  But wouldn't a person who has spent a considerable amount of time with him be able to make -- be better to make that determination?

A.  Like I said before, it depends upon the skill and the legal abilities and forensic abilities of the attorneys, the attention that they paid to the individual, and the depth to which they go in order no ascertain --

Q.  If you could just pull that mic -- I'm having a little hard time --

A.  I'm sorry.  And the degree to which they go to ascertain their cognitive abilities and how they are impacting their interaction.

Q.  So now you've spent four, four-and-a-half hours with Mr. Basham and you determined he was incompetent.

A.  Yes, sir.

Q.  What if I told you that his lawyers together spent more than 200 hours with him and made a determination that they were able to talk with him, he was able to talk with them, they were able to understand each other.  Would that give an indication that he's competent?

A.  From my perspective, what I found and what he has suffered from has been a persistent problem since he was a teenager, renders him incompetent then and rendered him incompetent throughout these proceedings and renders him incompetent now.

Q.  But his lawyers sitting there one on one with him for more

than 200 hours, wouldn't they have a good factual basis to determine if he's understanding them and they are understanding him and he knows what's going on?

A. It really depends upon the skill of the lawyers.

Q. But you don't know the skill of Greg Harris or Jack Swerling, do you?

A. Well, I would have some questions given my history, examination, and review of the records at hand.

Q. But you never met them, correct?

A. No.

Q. And you never read -- did you read their transcript of their testimony at this hearing back in October?

A. No.

Q. You have not?

A. No.

Q. So you are basing your total opinion upon four and four-and-a-half hours that you spent with Mr. Basham.

A. And the records that I did review.

Q. Well, let's talk about that. What records did you review? I write slow, so please take a while. Were there a lot of records?

A. There were some records, it wasn't a huge amount.

Q. Okay. What did you review?

A. I reviewed Mr. -- Dr. Capehart's report, I reviewed some of the testimony at various hearings, I reviewed some of the

medical records that were available to me, the EEG report that was abnormal.

Q. I'm sorry?

A. The EEG report that was abnormal.

Q. Did -- there were some normal EEG reports, too, weren't there?

A. Yes.

Q. There were normal EEGs before the abnormal, and normal ones after, correct?

A. Correct.

Q. Okay. What else?

A. I think that was -- that was most of what I reviewed.

Q. That's what you reviewed?

A. Yes.

Q. Did you review the testimony of Dr. Schwartz-Watts who was -- I'm sorry, go ahead -- the psychiatrist in the hearing who testified that she spent more than 40 -- saw Mr. Basham more than 40 times and spent more than a couple hundred hours with him?

A. Yes, I reviewed her testimony.

Q. And you disagree with her?

A. Yes, I do.

Q. You think she was wrong?

A. Yes, I do.

Q. And you only spent, four, four-and-a-half hours with him

and she spent more than 200 hours.

A.   I think that I stand by my judgment.

Q.   And, in fact, Dr. Hyde, you are the only medical expert who has found him incompetent, correct?

A.   As far as I know.

Q.   But you're right.

A.   I am right, yes, sir.

Q.   And you're right because Brandon trusted you but he didn't trust Dr. Frierson.

A.   That's not the reason why.

Q.   I'm sorry?

A.   That's not the reason why.

Q.   But you said that Dr. Frierson's report was invalid because Brandon didn't trust him but he trusted you.

A.   I said the reason why there was a difference in the psychiatric aspects has to do with trust.  But Dr. Frierson did not consider the neurological issues in his report, didn't consider the most recent IQ testing in his report.  So Dr. Frierson, with all due respect to his expertise, does not have the knowledge of the intersection between the neurological and the psychiatric in this case.

Q.   But, again, it goes back to his functioning, his functioning abilities, correct?

A.   That's part of it, yes.

Q.   Gayle, can you pull up Government's Exhibit number 247?

**JA 4790**

MR. WITHERSPOON: Your Honor, I move Government's Exhibit number 247 into evidence without objections.

THE COURT: All right. Is that correct, Mr. Burke?

MR. BURKE: Yes, your Honor.

THE COURT: All right. Without objection it's admitted.

Q. (MR. WITHERSPOON) Government's Exhibit number 247, number one, Gayle, this is a note that was passed between Mr. Basham and his lawyers during the trial. One of his lawyers asked do you want me to concede your involvement in the Samantha Burns case? He writes no. You are telling me he had no idea what that was?

MR. BURKE: Objection, your Honor, foundation. There's no indication who wrote the note on that piece of paper.

MR. WITHERSPOON: Your Honor, these were notes given to us by the defense they contend were notes in Mr. Swerling's file, notes between Mr. Swerling and Mr. Harris and Mr. Basham.

MR. BURKE: I will agree with Mr. Witherspoon up until his last statement. These were notes that we found in the file.

THE COURT: I'll admit it for what it's worth. It came from Mr. Swerling's files.

MR. WITHERSPOON: We got these from Mr. Burke who I

presume got them from Mr. Swerling's files.

THE COURT: All right. I'm going to admit it for what it's worth. I think it's a fair question.

Q. (MR. WITHERSPOON) That's a mind of a person who's incompetent, correct, Mr. -- who doesn't understand what's going on, who didn't want to concede this fact, who wanted his lawyers to continue to fight to defend that fact.

A. I can get somebody with end stage Alzheimer's to scribble a note on a piece of paper, doesn't mean they're competent to render that decision.

Q. Let's take a look at the second page then. We need to take pictures of all my injuries due to the attack by the officers that we can show to the jury how bad I was beat. Again, these were notes by Mr. Basham, he's writing to his lawyers giving them advice on things to do in his trial.

A. Yes.

Q. And that's an incompetent person?

A. Yes.

Q. The third page, Gayle. Please ask Stevens, and I think he could not spell Stevens so it's Cevens, to come see me at lunch break so I can talk to him, okay? Because I don't really talk to you about this stuff because you are busy, focused on this trial, which I understood, so please have Stevens visit me here today while on lunch break. He wants to talk to his lawyers about his case and realizes that Mr.

Harris and Mr. Swerling are busy, so he wants to talk to another lawyer so they can discuss the case at lunchtime. Doesn't that show his ability to communicate with his lawyers, to understand what's going on and to provide assistance to them?

A.   Only in a very limited context.

Q.   The next page, Gayle.  Okay.  Jack, I think there are a lot of things piling up.  One is I need to be able to look at all the jurors that have been qualified and I need to see the supplemental juror questionnaires for the qualified jurors. And you are going to have to send someone down to the jail tonight to take pictures of my injuries plus to drop the money order off so it will by in my account for Friday.  I'm going to need to have someone help me decide to my understanding and opinions on the ones that I feel is good and the ones that I feel is bad.

     He's involved with his lawyers on selecting jurors for his trial.

          MR. BURKE:  Objection, foundation, your Honor.  We have conceded these records are in the file.  There's no indication when they were written, if Mr. Basham received assistance from anyone.  This very well could have been written the night before at the jail and received assistance. There's no basis for Mr. Witherspoon's questioning to assume automatically that these were things done by Mr. Basham and

they were provided at an appropriate time, and I would add that his attorney even listens to him, because with regard to his Samantha Burns stuff if he in fact said no, his attorney did not listen to him.  So I object to the --

THE COURT:  Well, you know, what we're talking about here is authentication or identification, and the fact that they came from Mr. Swerling's records produced to current defense counsel and copied for the prosecutors, together with the totality of the circumstances in terms of the substance of the communication, it's strong circumstantial evidence they were written by Mr. Basham.  I'll hear argument that they may be construed some other way, but I think as a matter of admissibility a sufficient foundation has been laid, so the objection is overruled.

Q.   (MR. WITHERSPOON) But he's involved in helping his lawyers to select qualified jurors to sit at trial, on his trial.

A.   This assumes that he generated these on his own without any assistance, without any contact with paralegals, other lawyers, other inmates, which frequently work with individuals of very limited mental capacity to help them draft letters or even dictate to them what to say.

Q.   But you don't know he did, do you?

A.   We don't know he didn't, either.

Q.   Well, I know this is Mr. Basham's writing to his lawyers

telling his lawyers this is what we need to do and send somebody down tonight, which means he's in court that day.

MR. BURKE:  Objection.  Now Mr. Witherspoon is testifying.  He does not know that.

THE COURT:  All right.  I think that's a matter for argument.  I think you made your point, Mr. Witherspoon.

Q.   (MR. WITHERSPOON) The next page, Gayle.  This is another note from Mr. Basham to Mr. Swerling.  When we are done we need -- need, really, really need to talk downstairs in the cage before we go today.  I can really -- I can really turn this case around.

Does that cause you to doubt that he's competent?  He's involved in his case, he's telling his lawyers he's got information that can help them in their case.  Does -- is that an indication of a person who's incompetent, Dr. Hyde?

A.   Given the facts of this case I would suggest this borders on delusional.

Q.   It borders on delusional.  But that's your opinion again.

A.   I think I just said that, sir.

Q.   Okay.  Gayle, if you'd turn to this one.  Go to the first page right there.  This is, again, a note that we got from the defense that they got from Mr. Swerling's files.  And it appears to be Mr. Basham asserting some issues with his lawyers.  Jack, I don't know, but I feel I cannot go forward in this trial with an unconcerned, self-righteous and no team

player, which is Greg.  I feel he holds some kind of grudge
against me so I am -- I am now request that Greg Harris be
removed from this case due to the lack of communication.  I
feel he is not going to do his civic duty.  He's complaining
about his lawyers.

A.  Right.

Q.  Which means he doesn't think his lawyers are doing a good
job for him.

A.  Well, he doesn't like the lawyer, that's what he's talking
about.

Q.  He doesn't think he's doing his civic duty.

A.  Right.

Q.  And he wants his lawyer removed.

A.  Correct.

Q.  But doesn't that indicate that he's involved with his
lawyers, talking to hem, making a determination of what they
are and are not doing?

A.  Only in a very limited capacity.

Q.  How much capacity do you have to have to be competent, Dr.
Hyde?

A.  You have to have the potential ability and intellectual
ability to make rational judgments, to consider the facts that
are at work with your case, process that information, and
offer thoughtful interactions with your attorneys.

Q.  Can it be on a limited basis?

A.   Competency?

Q.   Yes.

A.   Yes.

Q.   So he's competent.  You said he's doing this in a limited basis, so he's -- may not be yours, may not be mine, but he's still competent.

A.   No.

Q.   Gayle, this one.  This letter was written on 3-20-2004. So a letter, it appears to be from Mr. Basham to his attorneys.  Dear Attorney Jack Swerling.  Jack, thank you for your able representation for my preparation and study as your client.  Would you please send to me a complete copy of my case file, to include all motions for discovery, investigative reports, petitions, motions, files, and briefs, et cetera. Your cooperation and assistance is greatly appreciated.  He's asking for records.

A.   Correct.

Q.   So he knows the records are out there.

A.   I'm sure that he knows that there are paper documents out there.

Q.   Well, he would know -- I'm sorry.  I didn't want to interrupt you.

A.   Given my interactions with Mr. Basham, I have never heard him talk in this fashion.  This suggests to me somebody helped him prepare this note.  This not the way he talks.  This is

not his grammar, this is not his syntax, this is not his vocabulary.

Q. And you made that determination after four hours?

A. Yes.

Q. You said his syntax and all that was not an indication you can use, those were not his words.

A. Doesn't sound like the words that I'm familiar with from the way he talks with me.

Q. But if he put somebody up to do this wouldn't he know what to ask for? I mean, these may not be his words but he knew to tell somebody this is what I want, and the person may have written the words but he can tell I want my records from Jack so I can review them.

MR. BURKE: Objection, your Honor. This question assumes facts not in evidence. All we have before us is a letter that was written presumably by Mr. Basham to his lawyer. We don't know the genesis of this letter, we don't if Mr. Basham requested or whether it was asked -- if he asked for assistance or whether someone just volunteered it to him in the jail. So I object on that basis, your Honor.

THE COURT: Well, again, I'm going to admit it for what it's worth. I agree there's much more of a possibility some jailhouse lawyer may have assisted in drafting this, unlike the mid-trial notations we looked at so far. I will admit it for what it's worth and we can argue later about how

much weight it deserves.

MR. BURKE:  Thank you.

Q.   (MR. WITHERSPOON) I want to read you a letter presumably from Mr. Basham to his attorney.  Dear Jack, I am writing to show you a plan that I have made out.  You said you could send me $40 every two weeks for my canteen, and I know you are a very busy man and you said to just remind you and it would be no problem.  So I've come up with a schedule to make it a little more easier on the both us because I know how hard it is for you to remember to get someone to bring it out here every week or two and how hard it is for me to catch you at the office to remind you.  That's a person who realizes that he's having a hard time getting in contact with his lawyer and coming up with a plan, isn't it?

A.   That's what the letter says.

Q.   Pardon me?

A.   You are assuming that he wrote this, that he derived this plan, that he did this all on his own, that there wasn't another inmate, another jailhouse lawyer.  There's a whole host of presumptions that go into your statement that I'm not willing to accede to.

Q.   So this is what I came up with, for you to just send $60 once a month.  That will give me $15 a week to spend on things I need to live in here.  I have also attached an order list on the back of this letter to show you what I get with the money

each week.  The last time you sent me a money order was on 10-17-03.  You sent $25.  Today's date is 11-10-03.  That's about it.  I hope you like my plan.  I put a lot of thought into it.  He's thought -- devising a plan to get money from his lawyer so he can buy items.

And, Gayle, if you go to the third page.  He's come up -- look at the third page.  He's come up with a budget, what he's going to buy every month with the $60 that his lawyer has bought, but that sends him the items and the amount.  Isn't that budgeting, isn't that functioning skills that Mr. Basham has?  So therefore if he -- even if he has this closed head injury or this frontal lobe injury he's able to still function.

A.  You could show me the Magna Carta, the Constitution of the United States, a revision to the Bill of Rights, Law Review article in Mr. Basham's handwriting, and unless I know that he generated that information on his own without counseling or assistance from either other members of his legal team, family members or other inmates then I am not willing to accede this represents anything other than something in his own handwriting.  I have no foundation as to the provenance of these notes whatsoever.

Q.  Well, he's in prison so his family members can't be coaching him, correct?

MR. BURKE:  Objection.  Assumes facts not in

evidence.

MR. WITHERSPOON: Judge, I think we can all stipulate that at this point Mr. Basham, once he was arrested, he was never allowed out of prison.

MR. BURKE: Your Honor -- Mr. Witherspoon, are you removing your request to admit Exhibit 252, a conversation with his mother?

THE WITNESS: No, I'm not.

THE COURT: So he did have some contact with his family. I'll accept that. All right. Go ahead.

Q. (MR. WITHERSPOON) So there's no indication that someone wrote this. This is his -- his thoughts. Even if he got a jailhouse lawyer he would have to come up with a plan to tell the lawyer this is what I need, these are the things I need, help me come up with a plan so I can purchase these items.

A. Your question is, sir?

Q. Isn't that an indication that he can function, he can sit there and talk to someone and give him ideas about things that he needs, how he can spend $60?

A. The foundation for your question is not available to me. I have seen no evidence that has been produced to me that shows that -- I can say it one more time, I'll try different language.

Q. You don't have to be condescending, Dr. Hyde.

A. I'm just --

Q.  Well, you and I both speak English.  You don't have to speak another language.

A.  I'm trying to put it in terms --

Q.  Well, you can use your terms, you don't have to be condescending.

A.  Well, if you keep repeating the question obviously you don't understand the answer, sir.

Q.  Probably because your answer may not be --

MR. BURKE:  Your Honor, I object to this.

THE COURT:  All right.  Let's just move forward.  Go ahead, ask the question.

Q.   (MR. WITHERSPOON) Simply because Mr. Basham had a closed head injury, frontal lobe damage, does not mean he's incompetent, does it, Dr. Hyde?

A.  No, it does not.

Q.  And as long as he can function, it may be less -- I'm sure it's less limited than you and I, he can still function, he can be found competent, isn't it, Dr. Hyde?

A.  People with closed head injuries and frontal lobe injuries can be found competent, yes.

Q.  And you diagnosed him with bipolar disorder, too, correct?

A.  Yes, sir.

Q.  What are the elements under the DSM, the Bible you talked about, for bipolar II?

A.  Bipolar II?

Q.  Yes, sir.

A.  Basically differentiates from bipolar I in that the severity of and symptomatology associated with the manic state is not nearly as severe.  So it's primarily hypomanic rather than full blown --

Q.  And he's hypomanic you have to have that hypomania for four days.

A.  Yes.

Q.  Now, according to your report his fluctuates hourly, so that -- doesn't that vary from the DSM, the Bible you said --

A.  Like I said before, there's a lot of discussion within the neuropsychiatric community as to the presence of rapid-cycling bipolar disorder.

Q.  If you will speak into the microphone, I'm having a hard time hearing you.

A.  I'm sorry.  I apologize.

Q.  It's my fault.

A.  There's a lot of discussion ongoing right now in the psychiatric community about rapid-cycling bipolar disorder, in which case there are people whose moods cycle hourly or every few hours rather than having the classic hypomanic duration of four to seven days.

Q.  But under the current state of psychiatry under the DSM-IV to be hypomanic you have to have it for four days, four consistent days.

A.   That is what the manual says, yes, absolutely.

Q.   But you disagree with that also?

A.   I think there is considerable evidence within the psychiatric community that within bipolar disorder there are those individuals who have bipolar disorder who have rapid cycling.  And I think that if you ask any psychiatrist, including your own psychiatrist, about rapid-cycling bipolar disorder, if they have any knowledge of bipolar disorder they will see that there's a small subset of patients who have rapid-cycling bipolar disorder.

Q.   But you disagree with the DSM-IV.

A.   Like I said before, I think there are forms of bipolar disorder that are not covered by this rigid definition within the DSM-IV.

Q.   So you made up your own diagnosis of bipolar II.

A.   I didn't make this up.  I think it's a best-fit diagnosis given his symptomatology.

Q.   What if Mr. Basham -- I think we heard today he was maybe intoxicated, and I presume disciplined.  The discipline record indicates that -- there will be a discipline record.  What if he worked with a person in the prison to defend himself in these prison disciplinary records?  Let me ask you this:  Did you review his disciplinary records?

A.   Yes, I have.

Q.   From those records does it indicate to you that he was

working with people when he got disciplinary records?

A. On some of them, yes.

Q. Isn't that an indication that he's able to understand what he's charged with and make a determination of what the facts are to help a person who is then going to defend him in these disciplinary records?

A. Like I said before, I think he can make very, very simple decisions. I think when you get into complex or protracted proceedings, due to his cognitive disability, his working memory deficits, his impulsivity, his fluctuating mood and his inattention, he's incompetent.

Q. Those four, four-and-a-half hours with you was he able to sit there than a talk with you?

A. Yes, he was.

Q. And you asked him questions about his family?

A. Yes, I did.

Q. You asked him questions about his, get my notes, his childhood?

A. Yes.

Q. You asked him about his behavior as a child growing up.

A. Yes.

Q. You asked him about his social abilities during that time frame.

A. Yes.

Q. You asked him about his psychological issues during that

time frame.

A.   Yes.

Q.   You asked him about his substance abuse and his educational history during that time.

A.   Yes.

Q.   And he was able to recount all of that back to you, wasn't he, Dr. Hyde?

A.   In some limited ways.

Q.   But he was able to do it.

A.   In limited ways.

Q.   Isn't that an indication that's a person's brain who's able to function sufficiently to be competent?

A.   Within the context of those interactions.  And in the four-and-a-half hours I frequently had to repeat questions, reword questions, draw his attention back in and work with him very closely in order to get this information.

Q.   Same type problem I'm having with you understanding -- understanding things that you say to me, correct?

A.   I don't understand the question, sir.

Q.   Well, you told me I wasn't understanding you.

A.   I said that I should reword things because you repeated the question so I don't think you understood the answer.

Q.   So I was having that same issue with you that Brandon had when he was not understanding some of the questions you were asking him.

A.  No.  I think that yours is more of a legal technique in order to manipulate the witness.

Q.  I don't -- I can never manipulate you Dr. Hyde.  I wouldn't even try.

A.  I wouldn't underestimate your intellectual ability, sir.

Q.  Thank you.  Now, when Dr. Frierson didn't find Mr. Basham to be bipolar you went into the discussion about it may have been because Brandon, Mr. Basham, didn't trust him but he trusted you, he gave you truer answers to tests than he gave Dr. Frierson.  Do you remember saying that?

A.  Yes, I do.

Q.  And that's based upon what?

A.  The fact that he did not make this diagnosis that had been made by multiple practitioners over the years and that Mr. Basham answered my questions in a way that gave me the information that was consistent with bipolar disorder.

Q.  But there are other doctors other Dr. Frierson who did not diagnosis him being bipolar, correct?

A.  Correct.

Q.  And these were doctors before and after when doctor -- were determined he was bipolar and another one found him not bipolar.

A.  Correct.

Q.  So Dr. Frierson just didn't come up with the theory or didn't find him not bipolar solely by himself.

A. There are other practitioners that have not diagnosed him with bipolar disorder.

Q. And, in fact, if he was bipolar in and of itself does not make him incompetent, does it, Dr. Hyde?

A. No, it does not.

Q. Because a person with bipolar can still be competent.

A. They can, yes.

Q. And a person who has ADHD also can be competent.

A. Yes, they can.

Q. Because even with his ADHD, in that West Virginia proceeding he was able to answer the judge's questions correctly, not with the help of a jailhouse lawyer. He said he had understood, he made a determination of what he wanted to do. Even with his ADHD he was able to stay focused for the entire hour. So simply because he had ADHD doesn't mean he's incompetent.

A. Well, he made several statements along the way that I might disagree with, especially saying well, he paid attention throughout the whole proceeding. We don't know that. Now, certainly there was no jailhouse lawyer with him but there was legal counsel with him. What they were whispering in his ear, what they are telling him, how they were redirecting him I have no idea. I have not seen the videotapes of -- of this. But I think from my examination and the history that I obtained and the record that I reviewed I sincerely doubt that

he was attending fully throughout those proceedings of the sentencing.

Q.  I may disagree with you.  I think having seen Rule 11 colloquies, judges pay very close attention to what the defendant is doing and not doing.  But, nevertheless, in the only -- the other report you cite in your report is Dr. Capehart and you disagree with him.

A.  Yes, I do.

Q.  And you read the testimony Dr. Brannon?

A.  Yes, I did.

Q.  He was a neurologist, too, wasn't he?

A.  Yes.

Q.  He didn't find any issues with Mr. Basham's competency, did he?

A.  No, he did not.

Q.  And he spent quite a few more hours with him than you did, correct?

A.  It's the quality of the time, not necessarily the quantity of the time, sir, that is of determinative value here.

Q.  You disagree with Dr. Brannon's report or determination?

A.  Yes, I do disagree with his determination.  Yes, sir.

Q.  And I think when Mr. Burke asked you a question you said he lacked the ability to assist his counsel and understand the proceedings and consider his decisions.

A.  Yes, sir.

Q.  But, again, his lawyers who were there with him would be in a better condition, better shape to make that determination.

A.  Not in my opinion.

Q.  Not in your opinion.

(There was a pause in the proceedings)

Q.  (MR. WITHERSPOON) Dr. Hyde, I want you to listen to a phone conversation between Mr. Basham and his mother while he's in prison, the way he's -- I want you to listen to it.

MR. WITHERSPOON:  Judge, I move Government's Exhibit number 252 into evidence.  I think there's no objection from the defense.

MR. BURKE:  Yes, your Honor.  It appears this CD is already an exhibit in trial, so we have no objection.  We have not listened to it or heard it, we do not have a copy of it.

THE COURT:  All right.  Admitted without objection.

MR. WITHERSPOON:  Could we play Government's Exhibit 252?

(Audio played)

Q.  (MR. WITHERSPOON) He's planning with his mother someone, third person, is going to call her and she's supposed to send him money.  Any indication that that person is incompetent, Dr. Hyde?

A.  I don't think that that is germane to demonstrating that he's competent.

Q.  But -- but he's planning, isn't he?

A.  He had some information that he's asking his mother for a way to get him some money.

Q.  That doesn't indicate a person who's functioning, who has the ability to function?

A.  Well, A, to get money to somebody is a very, very limited decision.  This is hardly a Wall Street scheme of complicated proportions.  Secondly, I have no idea if anybody helped him generate this idea about how he might get money, whether he came up with this on his own, if he said to somebody, for example, I wish I had more money and they said well, call your mom and have them call somebody to give it to you.

Q.  What about if Mr. Basham, if he wants to write to another inmate, sending a letter to that other inmate through a third person with a note to pass it on?  Isn't that -- doesn't that show functioning and ability and thinking and rationing?

A.  Only if you have the presumption that that was generated independently, without input from anybody else.

        (There was a pause in the proceedings)

Q.  (MR. WITHERSPOON) But you don't know if that's -- and all these things I've showed you, you are making a determination or an assumption that you don't know if Brandon did these himself or he had help, because you didn't interview him, you didn't ask questions and you didn't investigate these incidents, did you Dr. Hyde?

A.  I did not investigate these incidents.

MR. WITHERSPOON:  Your Honor, I think I have given the defense a number of incident reports from Terra Haute, Indiana for Mr. Basham and I move them into evidence now. They are Government's Exhibit number 249.

THE COURT:  Any objection?

MR. BURKE:  Yes, your Honor.  Just a point of clarification.  Mr. Witherspoon, I'm not sure, is this entire stack 249?

MR. WITHERSPOON:  No.

MR. BURKE:  Your Honor, we do object to the admission of these documents on foundation and hearsay.

THE COURT:  Tell me what they are again, Mr. Witherspoon.

MR. WITHERSPOON:  These are incident reports, Judge. And some of these incident reports contain statements from Mr. Basham concerning different disciplinary actions that he has or had including conferring with a staff counselor to help him devise a defense in these disciplinary actions.

THE COURT:  Well, they do contain statements of third parties who cannot be cross-examined but they might be a public record.  What about that, Mr. Burke?

MR. BURKE:  Your Honor, these were not -- these are not public records in the sense they are regularly kept public records.  These are something that they obtained through FOIA.

And each document contains fact-specific information about alleged incidents that occurred. Some of these documents are just charges created by unknown entities about monitoring phone calls.

We simply -- I can't possibly cross-examine -- I have no knowledge of the basis for these. There's no foundation, your Honor, and they clearly are hearsay. So if the government wants to lay the foundation and give me the opportunity to cross-examine these guards, these unknown guards who wrote these documents, then --

THE COURT: If the government lays a foundation and they are public records they come in as a hearsay exception without having the guards to be cross-examined.

MR. BURKE: But, your Honor, our position is these are not regularly kept public records. These are fact-specific reports filled with facts specific to incidents. So it is not something that is routinely kept by the Bureau of Prisons.

THE COURT: Well, Mr. Witherspoon, the principal point you want to prove is that he was able to actually consult with and seek the advice of some staff workers there at the prison about these reports, about these incidents?

MR. WITHERSPOON: Yes, sir. I'm not saying he did or didn't do it. That is -- but my thing is he was able -- a charge was made, he was able to consult with a staff member to

come up with a potential defense, to at least lay out his

position of the facts that happened in each one of those

incidents.

THE COURT:  How many are there?

MR. WITHERSPOON:  I only have four.

MR. BURKE:  Your Honor, Mr. Witherspoon could

certainly ask Dr. Hyde questions on a hypothetical basis on

these and I would have no objection to that.  But these

documents themselves it's our position do not meet the -- the

exception for being a public document and they are filled with

hearsay.

BY MR. WITHERSPOON:

Q.  Well, let me ask you questions, Dr. Hyde.  If he was

written up for incidents and he asked for a staff

representative to help him in defending his case would that be

an indication he's able to communicate and confer with the

staff representative to form a defense for these accusations?

A.  I would have to know the circumstances under which these

events occurred, I would have to interview him.  Did somebody

tell him, well, you can get some help with these.  Did one of

the guards, one of the social workers, one of the therapists

there say well, ask for somebody how to deal with these

issues.

I have no foundation, I have no knowledge of how these are

generated, circumstances under which they were generated, who

helped hem generate, were they self-generated or were they generated with information, input, and advice from other individuals.

Q. And the reason you don't know that is because you didn't review them.

A. I actually didn't just review them, I didn't see any notation in there about how these were generated.

Q. You only reviewed them this morning, is that correct?

A. Yes, sir.

Q. After you made your evaluations or determination that he was incompetent.

A. Correct.

Q. Prior to that determination you never reviewed any of his disciplinary records for any records from the prison to say how he was functioning on a day-to-day basis, did you, Dr. Hyde?

A. Only what he told me.

Q. I'm sorry?

A. Only what he told me.

Q. Only what he told you.

A. Yes.

Q. And he trusted you so he told you everything.

A. I wouldn't say he told me everything, but he told me a lot.

THE COURT: We don't have a ruling yet. Are you

moving --

MR. WITHERSPOON:  I'll move away from them, Judge.

THE COURT:  I'm going to ask you, did your expert rely on these reports in giving his opinion?

MR. WITHERSPOON:  He did.

THE COURT:  We may have to come back to it later then.  All right.

Q.   (MR. WITHERSPOON) And simply because -- I think you said in the transcript from West Virginia you weren't sure if his lawyers had to redirect him, explain things to him twice. Simply because they would have to redirect him and explain things twice doesn't say that he's incompetent, does it, Dr. Hyde?

A.  No, that doesn't.

Q.  And these outbursts that he has, could it have been because he just did not want to listen to what was being said about him during those outbursts?

A.  That's possible, but it's less likely within the context of his overall neuropsychiatric picture.

Q.  According to you.

A.  Yes, sir.

MR. WITHERSPOON:  Beg the court's indulgence one second.

(There was a pause in the proceedings)

Q.  You said your neurological exam indicated he had this

closed brain injury, correct?

A. By history, yes.

Q. Did you know in 1991 he had a neurological exam that was normal?

A. Yes.

Q. You disagree with that?

A. Yes.

Q. And in 1994 he had a neurological exam and it was normal. Are you familiar with that?

A. I'm familiar with it, yes.

Q. And you disagree with it?

A. I think I said in my report I don't know the background of these neurologists. I do have a lot of experience with the neurological examinations that are usually performed. Unfortunately, in psychiatric hospitals it's one of the more cursory types of examinations that are usually performed, at least looking for very gross neurological deficits.

Q. But you don't know that's the case because you didn't review it, correct?

A. I did see one report, Dr. Desai's report.

Q. And what year was that?

A. Let me see if I can -- I don't recall the exact year. It was sometime in his childhood or adolescence, and that was a very cursory report. The types of report I typically see from psychiatric hospitals are usually not helpful and oftentimes

not formative or useful in these cases.

Q.  And in 1996 he had another neurological exam and it was normal.

A.  Correct.

Q.  And in 1998 he had another neurological exam and it was normal.

A.  Correct.

Q.  And in 1999 he had another neurological exam and it was normal.

A.  Correct.

Q.  And you disagree with all of those.

A.  Like I said before, I have not seen what exactly they did. My experience has been these are often cursory examinations done in extremely short time, five minutes, ten minute examinations, and they often do not look for anything subtle in the neurological examination, it's just looking for gross findings such as weakness on one side, hemiplegia, paralysis, something like that.

Q.  Wouldn't a person in your position review those reports prior to or after your own examination?

A.  I reviewed the reports of -- Dr. Capehart's report when he summarized those.

Q.  But all these other neurological exams you did not.

A.  The only one I saw the actual paperwork was Dr. Desai's examination.

Q.  But wouldn't that be something you would take into consideration, a person as an expert in your field, take into consideration when he or she is making a determination on neurological --

A.  The more information --

Q.  -- deficits?

A.  The more information you have the better, but it does not disqualify my opinion.

Q.  I'm sure nothing would.  One second.

        MR. BURKE:  Objection, your Honor.

Q.  (MR. WITHERSPOON) One final question.

        THE COURT:  All right.  Do you object to the last editorial comment?

        MR. BURKE:  Yes, your Honor.

        THE COURT:  All right.  Sustained.

Q.  (MR. WITHERSPOON) There is indication in the record that Brandon told one of the marshals that they weren't going to be in court long that day.  Did you review that in the record?

A.  Yes, sir, I heard that, yes.

Q.  And, in fact, when he got to court shortly thereafter there was an incident and he had to be taken out.

A.  Yes.

Q.  Doesn't that indicate that he understands what's going on and is able to make decisions?

A.  Not necessarily.

Q. What does that indicate to you, Dr. Hyde? I almost called you Dr. Frierson.

A. Just don't call -- just don't call me late for dinner.

Q. As you can see, I'm never late.

A. Me neither. I would say that he could have been in an very irritable mood, he could be very depressed and knew he was not going to be in good control of his faculties at that present time, but not being complex beyond that.

Q. But he would know that I may not be in control of my faculties, which indicates he is in control of his faculties.

A. No, he can say I'm feeling extremely irritable and I just don't know how I'm going to cope.

Q. And I'm going to act up in court and get taken out.

A. Well, he's telling you that he is feeling irritable and that he may not be able to control himself.

        MR. WITHERSPOON: Thank you, Dr. Hyde. I hope you get back to Fort Lauderdale soon today, sir.

        THE COURT: Any redirect?

        MR. BURKE: Yes, your Honor.

                REDIRECT EXAMINATION

BY MR. BURKE:

Q. Dr. Hyde, Mr. Witherspoon mentioned the term numerous times during his cross-examination of you, he used the term functioning. Is that a psychiatric term?

A. There's a psychiatric context to functioning, and that is

called adaptive functioning.  That's one of the very important components of mental retardation.  It's also an assessment we make in people with organic brain damage, what is their functional ability.  It's something called GAF, global assessment of function that's part of the DSM.  And so it's hard to do a GAF on somebody who is incarcerated, particularly because it depends upon social employment, vocational activities.

So you have to do retrospective analysis of somebody's level of functioning, whether they hold gainful employment, what their interactions were with other people.  There's a cohort of questions and there's a cohort of information that has to be ascertained.  So functioning, I guess it's a long answer.  I'm sorry, I just should say yes, it has a psychiatric component.

Q.  Is functioning, though, equivalent or equal to the concept of competency?

A.  Well, I do think that functioning does play some role in competency because it is an indication of the person's ability to use their inherent cognitive parameters.

Q.  Okay.  Would Mr. Basham's ability to converse with prison employees about charges, disciplinary charges, against him preclude a finding that he was not competent to stand trial in a capital federal case?

A.  Because of the complexity of the issues, the length of the

proceedings, the information that has to be held, used, and manipulated in a meaningful fashion, like I said before, somebody can be competent to choose between apple juice and orange juice but they may not be competent to execute a will, for example.  So people have varying levels of function, but just because you can do some simple tasks does not make you competent from a legal standpoint of assisting your attorney and meaningfully participating in legal proceedings that you are engaged in.

Q.  Mr. Witherspoon asked you about your comments about Mr. Basham's family and his possible genetic predisposition to mood disorders and other psychiatric conditions, and he asked you about the fact that you did not personally meet with any member of Mr. Basham's family.  Did you review any records that involved investigation or discussion about the Basham family and it history?

A.  Yes.  Unfortunately, I didn't bring my file with me, but there were a variety of documents discussing his family history and family background, as well as my interviews with Mr. Basham.  And there was internal consistency within those records and testimony and things like that.

Q.  Mr. Witherspoon asked you about Mr. Basham's IQ.  And you have been provided with IQ scores, correct?

A.  Yes, I have.

Q.  Have you been provided with any of the raw data behind

those IQ scores?

A. No, I have not.

Q. So is it true that you would simply have to accept those numbers on face value?

A. They are what they are. We have the scoring. As I said before, there are a number of neurological syndromes and neurological conditions where you will see, and psychiatric conditions, for that matter, where you see in childhood relatively normal IQ and then a fall in IQ as a person advances in age. Especially if there are intervening processes.

Q. Could a person's use of inhalants such as gasoline be an intervening process?

A. Absolutely.

Q. So that could explain a decline in a person's IQ over time.

A. Absolutely.

Q. Okay. Mr. Witherspoon asked you some questions about Mr. Basham's guilty plea in his West Virginia case in which he pled guilty to the kidnapping and -- the kidnapping of Samantha Burns. And he read to you statements that Mr. Basham made at that hearing, correct?

A. Yes, he did.

Q. Okay. Would you agree with me that most of Mr. Basham's statements to the court that day were one or two word

statements, yes, no?

A.   That's what I was shown by Mr. Witherspoon.

Q.   Okay.  When a criminal defendant pleads guilty he's usually required to give what's called a factual basis for his guilty plea.  Would it be significant to you to know that in Mr. Basham's case his lawyer gave the factual basis for the court rather than Mr. Basham doing it himself?

A.   Given Mr. Basham's cognitive limitations I would expect that that would have happened.

Q.   Is a defendant who is capable of understanding when told by a lawyer if you plead guilty you won't get a death sentence, you will get a life sentence, is such a person necessarily competent if they can understand the benefit of such a deal?

A.   They can understand that and for that simple decision there is some competency.  But it has to be placed in the larger context of the entire proceedings, not just one question.  One question does not determine competency, one decision does not determine competency.  One has to look at the overall landscape of the person's neuropsychiatric condition, their overall intellect, their particularly deficits on testing, such as working memory deficits.  These are objective measurements, these are not assessments by lay personnel like lawyers, as talented as lawyers are.

     We have knowledge.  If he functions in the impaired range

we have etiological clues as to why he is functioning in the impaired range.  This is not trivial impairment, this is significant impairment.  This is a brain damaged individual. To look at him in any other way than being brain damaged in my opinion is not examining the full facts of this case.

Q.  And let me ask you, Dr. Hyde, Mr. Witherspoon asked you about your disagreement with other mental health professionals who have been involved in this case on some of your diagnoses. But don't all the mental health experts who opined in this case agree that Mr. Basham has cognitive disorders?

A.  Every one that I saw.

Q.  With regard to your diagnosis of bipolar disorder with regard to Mr. Basham, did you review the findings and reports of psychiatrists who evaluated Mr. Basham when he was in facilities in Kentucky as a child?

A.  I reviewed some the those reports, yes.  Rivendell, I believe it was.

Q.  Would it affect your decision whether to rely on those reports if those reports were made in the context of a patient who has been in treatment, in a treatment facility for a significant period of time and never been observed by mental health professionals?

A.  I'm sorry, I don't understand.

Q.  Some of these diagnoses of bipolar disorder Mr. Basham received is when he was in inpatient care facilities in

Kentucky, group homes, a whole variety of them, where he had been for an extended period of time, either weeks or months, in which the staff and the doctors were able to observe him. And those doctors made a diagnosis of bipolar disorder. Would you be more likely to give that more weight?

A. I think that is a very good clinical paradigm to making a proper diagnosis. It's a useful observation, it's useful material.

Q. Mr. Witherspoon asked you about whether a defendant -- again you were asked multiple times about functioning, functioning, functioning, functioning. Would you agree, can Mr. Basham function in some settings, whatever functioning means?

A. In a limited context, yes.

Q. The fact that he may have given a letter to a third person to be sent on to the intended recipient, does that change your opinion about Mr. Basham's competence to stand trial for federal capital kidnapping and carjacking?

A. Does not change my opinion.

Q. Do you remember grade school?

A. Yes.

Q. Did you ever pass a note?

A. Absolutely.

Q. Did you ask somebody who sat in front you to pass it to the person in front?

A.  And got in trouble many times.

Q.  That's a sign you are a manipulative genius, was it?

A.  Only my mother would say I'm a genius.  I haven't been called manipulative.

Q.  And, lastly, Dr. Hyde, you heard, and I heard for the first time, a telephone call between Mr. Basham and his deceased mother.  Was there anything that you heard in that telephone call that led you to change your opinion about his competence in this case?

A.  No.  In fact, it ratified a lot of my opinions.  He was sort of scattered, a little repetitive, got irritated with his mother at one point, she got irritated with him at one point.  It was just a -- not exactly a caliber of a conversation of great intellectual depth or cognitive planning.

        MR. BURKE:  Thank you, your Honor.  I have no further questions.

        THE COURT:  All right.  Are we finished with the witness?  Thank you, sir.  You may step down.

        THE WITNESS:  Thank you your Honor.

        THE COURT:  Let me ask one quick question before you go.  And don't -- obviously, I'm a political science major. I've always been curious about the type questions you said you asked Mr. Basham about who was the president, can you do long division, what city and state are we located in.

        How do you gauge whether someone is malingering or

faking answers to those type basic questions?

THE WITNESS: Usually when people are malingering they just say I don't know to everything. They don't do well on some and can't perform on others. And they oftentimes have inconsistencies, they'll tell you one thing once and then you recheck and they'd do it again differently. So you are looking for inconsistencies, you are looking for global patterns of people giving you answers or observed answers. Somebody says what state are you in and they go I'm in Russia, obviously unless you are incredibly delusional nobody thinks they are in Russia.

And then usually people, and I've seen a lot of malingering in my time, have feigned or hysterical deficits, and those are the most common you see. Amnesia, total amnesia, can't recognize anybody, fake paralysis of a limb and things like that. He exhibited none of those findings on examination. In fact, it was very straightforward for me and I thought there no time was I being played or manipulated by this individual.

THE COURT: All right. Thank you, sir.

THE WITNESS: Thank you, your Honor.

THE COURT: Anything further? Thank you, sir, you are excused.

THE WITNESS: Thank you, sir.

THE COURT: All right. What does our schedule look

like for the rest of this hearing? How many more witnesses do we have?

MR. BURKE: Your Honor, it was our -- let me ask you first, let me ask, when we spoke on Saturday you weren't clear whether you were going to be calling Dr. Frierson. I see him here so I assume you are going to call --

Then there will be two more witnesses, Dr. Frierson who is here today who will be called by the government. The other witness, as you know, is Mr. Littlejohn. And when I contacted Mr. Littlejohn it was my -- I really had no idea how long this hearing was going to go. He was not available today and there was some question if he would be available tomorrow. And so I had told him Wednesday morning would be the day that we would need him.

We have since spoken, and I know the government has attempted to reach him to see if he could change his schedule around. I don't know if he will be able to or not. So what we would ask, with the court's indulgence, is after Dr. Frierson is done if we can at least begin argument on most claims, and then if we're able to get Mr. Littlejohn early we certainly will, or otherwise at this point I know he has to be in Florence tomorrow in the afternoon, so if we can get ahold of him later on today we may be able --

THE COURT: Two more witnesses.

MR. BURKE: Two more witnesses.

1100

THE COURT: And maybe Mr. Littlejohn may not be available until Wednesday. If that's the case we'll figure on some argument on Tuesday.

MR. BURKE: Yes, your Honor.

THE COURT: That's fine with me.

MR. DALEY: Your Honor, I don't know if you want to go to lunch here in a minute, but I did want to introduce Government's Exhibit 245, it's a stipulation that the parties have agreed to.

THE COURT: All right.

MR. DALEY: And I would like to publish it to you, your Honor, having had an appeal recently where the actual stipulation was lost and it was by good fortune that the stipulation was read into the record.

THE COURT: All right.

MR. DALEY: I would like to do that.

THE COURT: All right.

MR. DALEY: So Government's Exhibit 245, stipulation of the parties. Counsel for the government and defendant Brandon Leon Basham stipulate to the following: One, defendant Basham has claimed that his trial counsel were ineffective for failing to determine that juror Cynthia Wilson was allegedly untruthful in responses on her juror questionnaire. Two, in his claim 27 defendant Basham claims that Juror Wilson was untruthful when she answered question 41

which reads, quote, Have you ever sued someone or been sued, end quote, to which she said quote, no, end quote.

Number three, defendant Basham contends that this response was untruthful, that this response was untruthful based upon two judgments filed against her in the Court of Common Pleas in Spartanburg County prior to her selection as a juror in this case.

Four, Government's Exhibits 184 and 185 are certified copies of these judgments. Five, upon further research the parties agree and stipulate that these judgments are actually administrative tax liens that were filed by the South Carolina Department of Revenue in the Spartanburg County Clerk of Court's office.

And, six, the parties now agree and stipulate that these tax lien judgments were filed administratively by the South Carolina Department of Revenue without either the South Carolina Department of Revenue or juror Cynthia Wilson filing suit in the Court of Common Pleas in Spartanburg County. And that's signed by me, Robert F. Daley, Jr., and Mr. Burke for Mr. Basham.

And obviously, your Honor, this relates to claim 27. So I would just -- that saves us one witness having to come in, your Honor.

THE COURT: Let's go ahead and start with Dr. Frierson, if we could, and go to 12:20.

MR. WITHERSPOON: Your Honor, I know the court's conscious about time, I am, too. I think by the time we got to 12:20 we'd really just be getting into it.

THE COURT: Suits me to stop now. I just was trying to maximize our time in Terra Haute. I don't know how long they will let the lawyer stay in the room out there.

MR. BURKE: Your Honor, Mr. Murray might have more information, but it's our understanding that the prison has indicated that even if Mr. Basham indicated that he wanted to come out this afternoon, unless he was willing to take a breathalyzer test they would not allow him. Is that correct, Mr. Murray?

MR. MURRAY: Yes. I just talked to Mr. Edwards. They said there are three conditions to see if he would come back. One, he has to be able to take and pass a breathalyzer, and willing. And, two, he has to say he wants to come here. And then, three, they have to be assured that they don't think there's a security problem. Mr. Edwards is going there now to check on what Mr. Basham's position is with respect to that, but they said if any one of those fails they will not bring him out.

THE COURT: All right. Well, you are going to stay there with us until at least after lunch?

MR. MURRAY: Yes.

MR. BURKE: Your Honor, I am confident that at least

in my experience one of those three conditions is going to be met in this case and Mr. Basham will not be able to participate this afternoon. And I hate to have Mr. Murray sit there throughout the lunch period, and if he leaves the prison --

THE COURT: I'm fine with releasing him right now if that's what you want to do. Mr. Murray, you are excused, you don't to sit there any longer.

MR. MURRAY: Thank you, your Honor.

THE COURT: Thank you for your help. It's 12:00 o'clock. You want to come back at say 1:15? Is that enough time? Let's say 1:20, an hour and 20 minutes. We will start back at 1:20. See you then.

(A recess transpired)

THE COURT: All right. Please call your next witness.

MR. WITHERSPOON: Your Honor, the government calls Dr. Richard Frierson.

(Richard L. Frierson affirms to tell the truth)

DIRECT EXAMINATION

BY MR. WITHERSPOON:

Q. Good afternoon, Dr. Frierson.

A. Good afternoon.

Q. There's a container there of water if you need anything. I would like to start out by getting some of your background

information.  Can you tell us a little bit about your education?

A.  Yes.  I attended the University of South Carolina School of Music here in 1980 to '84.  I got a bachelor's degree in music.  I then went straight to medical school at University of South Carolina School of Medicine, which I achieved my medical doctorate in 1988.  I then completed four years of residency in general psychiatry at the William S. Hall Psychiatric Institute, followed by one year of a forensic psychiatry fellowship at the William S. Hall Psychiatric Institute.  And I am board certified by the American Board of Psychiatry and Neurology in the specialties of general psychiatry and forensic psychiatry.

MR. WITHERSPOON:  One second, your Honor.

(There was a pause in the proceedings)

MR. WITHERSPOON:  Your Honor, I have spoken with defense counsel, and but we will be moving Government's, Exhibit number 253 into evidence, which will be Dr. Frierson's CV in this case.  And I think that's without objection.

MS. STONE:  That's correct, your Honor.

THE COURT:  All right.  Admitted without objection.

BY MR. WITHERSPOON:

Q.  All right.  From 1988 to 1992, tell us what you were doing then.

A.  That would be my residency in psychiatry.

Q.  And from 1992 to 1993 what were you doing?

A.  I was basically doing my fellowship in forensic psychiatry that year.

Q.  And to become a psychiatrist, what are the steps for a person after medical school to be board certified in psychiatry?

A.  In order to become board certified after medical school you have to undergo four years of rigorous training in the field of psychiatry at a training program that is accredited by the American Council of Graduate Medical Education, ACGME. If you graduate from an accredited residency you are eligible to sit and take the board certification examination which consists of, when I did it, a written test, if you pass the written test you then have to take an oral examination that involves actual interviewing patients, presenting them, and formulating a treatment plan in front of examiners.

Q.  And you completed all of that?

A.  Yes.

Q.  Now in '92, '93 you were a fellow in forensic psychiatry at the William S. Hall Psychiatric Institute.  Tell us a little bit about that.

A.  That is an entire year that is spent learning the interface between psychiatry and the legal system.  We learn, for example, how to perform competency to stand trial evaluations, how to perform evaluations about a person's

mental state at the time of their offense, whether they would be eligible for a defense of insanity. We also learn a variety of civil types of evaluations, how to evaluate somebody for competence to manage finances, for their testamentary capacity, for evaluating undue influence, for evaluating just about anything. Malpractice, look at standards of care, malpractice cases, anything on the civil side of things.

And then you spend a great deal of time studying law, studying what we call landmark cases in forensic psychiatry. The first case we do is Dusky versus U.S. which is very relevant to today's proceedings, but we study probably 120 landmark cases that you should become familiar with and have a working knowledge of.

Q. Now, since that time you have been in either a teaching position in psychiatry, correct?

A. Yes.

Q. In psychiatry. Tell us a little bit, since that fellowship in 1992, a little bit about your teaching and what you -- courses you taught, who you taught, and what issues were raised.

A. Well, early on in my career after I finished my fellowship I was actually hired by Hall Institute to stay on and run and develop an outpatient forensic evaluation service. Prior to that everybody who had a competency evaluation was admitted to

the hospital. That is very expensive to do, so they were interested in developing an outpatient forensic service, which I helped develop. And in that service I also taught general psychiatry residents and medical students who rotate through that were on their third year psychiatry rotation. I did that up until probably 2003.

Now, in '99 I was asked by the university to become the director of the forensic psychiatry fellowships, so even though I was still employed by DMH I ran the fellowship, which trains people outside of residency. After they have completed the four year residency it trains them in that extra year to become a forensic psychiatrist.

Q. And you are doing that even until today?

A. I am doing that way too long. Yes, until today.

Q. How many students do you think you trained since --

A. Well, we take, as far as fellows in forensic psychiatry, these are people that spent an entire year with me after their residency, we take two a year. So 20, 25 that I work with for an entire year. Am I doing the math right? Yeah. Yeah, 20, 25 people, somewhere in there. And then I still train medical students and residents.

Q. And today you are still a full professor of clinical psychiatry at the USC Medical School?

A. Yes, I am professor of clinical psychiatry and vice chair of the department of neuropsychiatry and behavioral science.

Q. What professional appointments have you had and tell me a little bit about that. First, in 2006 you were invited to be a faculty at the National Habeas Institute. What is that?

A. Yes. It was actually to assist defense attorneys who are involved in capital litigation involved in defending people who are on death row trying to get their appeals overturned, their cases overturned on appeal. So I did that in 2006. I did a lot of work, because we had the National Advocacy Center here in Columbia for so long with the National College of District Attorneys, going all over the country training prosecutors in state level -- at the state level about mental illness and legal issues that relate to mentally ill defendants.

Q. So it sounds like you have been an asset for both prosecutor and defense attorneys in this area of psychiatry.

A. Yeah, I made myself available to both sides.

Q. What board certifications do you have?

A. I'm board certified in psychiatry and I'm board certified in forensic psychiatry.

Q. And who -- what is the name of the -- the organization that certifies you in psychiatry?

A. The American Board of Psychiatry and Neurology.

Q. Okay. And the name of the board that -- and it's also who certifies you in forensic psychiatry, too, isn't it?

A. Yes. Separate exam.

Q. And during some of that time did you perform -- were you an examiner for oral examinations and other forensic psychiatrists?

A. Yes. I traveled the country to 30 separate exams and examined people who were trying to become board certified.

Q. Now, this is not your first time testifying in federal court, is it?

A. It's my second.

Q. Second. The first time you were qualified as an expert in forensic psychiatry in 2001 in the federal court here in South Carolina, correct?

A. Yes. We were in a different courthouse then.

Q. And the issue was what in that case, Dr. Frierson?

A. Competency to stand trial.

Q. And how -- what was your opinion in that case?

A. It was my opinion that the defendant in that case was not competent to stand trial.

Q. Have you been involved in any evaluations to determine competency, the competency to withdraw death penalty appeals?

A. Yes.

Q. Tell us a little bit about that.

A. Well, in South Carolina the -- there's a state Supreme Court decision that equates competency to withdraw appeals to competency to be executed. I mean, they declare it's one and the same. So when we have had capital inmates want to

withdraw their appeals and go ahead and be executed the court responds by issuing an order for competency to be executed. And I've probably performed a handful of those, maybe four or five.

Q. And since 1992 can you give us a rough estimate of the number of times you have provided psychiatric testimony in any courts in the United States?

A. It's well over 200 times.

Q. And during that time how many times have you been ordered -- how many times have you done court-ordered competency to stand trial or criminal responsibility evaluations?

A. How many of those have I done?

Q. Yes, sir.

A. Goodness.

Q. I'll look at your resume --

A. Probably well over -- and I think 1998 was -- I know I did 300. Normally I'm doing about a hundred a year, so it's probably 1,500 to 2,000.

Q. Your resume says 2,000, so that's about right. Now, during that time, during this time, Dr. Frierson, you -- have you published a number of articles, peer reviewed articles in the field of psychiatry?

A. Yes.

Q. I want to ask you about a couple of them in particular.

The study with R.G. Dwyer, The Presence of Low IQ in Mental Retardation Among Murder Defendants Referred to Pretrial Evaluation.  When was that?

A.  That study, that was actually sort of a sub-study of a larger study that we did.  Basically we collected information on 270 consecutive defendants referred to the South Carolina Department of Mental Health for either competency or criminal responsibility evaluation, or both.  And we looked at those who had an IQ below 70 and we compared those who received a diagnosis of mental retardation with those who did not receive a diagnosis of mental retardation to look at the differences, what led to them being tagged as with mental retardation.

Q.  And on a follow-up to that one was one with Dr. Finkenbine F-I-N-K-E-N-B-I-N-E, The Psychiatric and Neurological Characteristics of Murder Defendants Referred for Pretrial Evaluation.  That's a comparable, a sister --

A.  That was the defense study.  That was all 270, whether they had mental retardation or not.  All of those defendants at the time had EEGs, MRI scans, complete neurological evaluation by a neurologist, psychiatric -- psychological testing including IQ measurements.  And we took this on every murder defendant for years and years at the Department of Mental Health.  And it's no longer done, for monetary reasons. That's expensive.  They were stopping it around the time that we wrote the study and I just felt look, we have this wealth

of data that we can go back and pull and see what it shows as far as these individuals and their impairments.

Q. I may have already asked you this, but if I have please forgive me, you are a member of the Committee for Examination in the Subspecialty of Forensic Psychiatry, right?

A. I was for eight years. It was an eight-year term limit. That's where you -- there's ten people on that committee, we write the exam that people take, the written exam in forensic psychiatry. I'm serving on the committee that's doing the test for general psychiatry, so I'm writing questions every year.

MR. WITHERSPOON: Your Honor, at this time we move Dr. Frierson in as an expert in forensic psychiatry.

MS. STONE: No objection.

THE COURT: All right. Without objection you may proceed.

Q. (MR. WITHERSPOON) Now, Dr. Frierson, can you give us a rough estimate of the number of times you have testified in competency cases?

A. I think that I've appeared in court approximately 200 times. The majority of those have been for competency, some of them were for criminal responsibility. So I would say well over 150 for competency alone.

Q. Now, when you testify, I think it's South Carolina has a rule when there's an issue that they hire someone to come in

and make a determination on a competency, is that correct?  I
may be stating it wrong, so explain what that is.

A.  The way it works in South Carolina is the Department of
Mental Health, which is a state agency, provides the service
for the courts throughout the state, Circuit Courts all over
South Carolina.  So if they needed an evaluation the judge
issues an order, it's a court ordered evaluation.  So we work
for basically the court, but the court, DMH just offers it as
a service and they bring the person and we evaluate them.

Q.  And after your examination are you sometimes called by
both the state and the government and the defendant to testify
based upon your examination?

A.  I'm usually called by whoever likes my opinion, if I am
called.

Q.  Does that mean sometimes defendants like your opinion?

A.  Yes.

Q.  And, in fact, in a number of cases you have testified that
a defendant was incompetent, correct?

A.  Yes.

Q.  For instance, State versus Brigid Williams, you found her
incompetent.

A.  Yes.

Q.  State versus Lester Simmons, you found him incompetent.

A.  Yes.

Q.  State versus Brand, you found him, B-R-A-N-D, so State

versus Joseph Brand, you found him incompetent?

A. Yes.

Q. State versus Lester Simmons, you found him incompetent.

A. I found him incompetent twice. You mentioned him already.

Q. Oh, okay. And, in fact, who is Donald Jones? Were you involved in determination of competency of Donald Jones?

A. Donald Jones is currently a death row inmate in South Carolina. I have evaluated him at least twice, both times court ordered, both times I rendered an opinion that he, in my opinion, is not competent to be executed.

Q. Now I want to turn your attention a little bit to Mr. Basham. You were asked to give, render an opinion about Mr. Basham, correct?

A. Yes.

        MR. WITHERSPOON: Your Honor, at this time I move Government's Exhibit number 251, which is Dr. Frierson' report, into evidence without objection.

        THE COURT: All right. Without objection, admitted.

Q.  (MR. WITHERSPOON) Do you have a copy of your report there with you?

A. Yes.

Q. Okay. Turn to page two. Page two, three, and part of page four. You reviewed a number of documents prior to and after meeting with Mr. Basham, correct?

A. Yes.

Q.   Why would you review all of those documents, Dr. Frierson?

A.   Well, they have relevance to the questions that I have been asked to provide opinions for.  Namely, Mr. Basham's competence to proceed with his petition for collateral relief, his competence to be executed, and his competence to stand trial at the time of his 2004 death penalty trial.

Q.   Are these documents that give you some insight to what type questioning, what to be looking for when -- during your examination of Mr. Basham?

A.   Yes.  I want to make sure I know something about him before I see him so that I will know what might be specific areas that I need to ask him in-depth about.  For example, I knew going in that he had had IQ testing over the years that had declined.  I think it's important that I knew that before I went and met with him.  Because we were asked to look at competency at the time of the trial I thought it was important to know something about what happened at trial and also what his attorneys thought of working with him.

Q.   And so you reviewed the trial transcript?

A.   I didn't review the entire trial transcript.  I did review the transcript of all the experts that had testified about his mental state.  I believe that was Dr. Schwartz-Watts, Dr. Brannon, Dr. Brawley, Dr. Capehart and a social worker who provided mitigation testimony, Vogelsburg, I believe is her name.  I reviewed all of those because they had to do with his

mental state, people talking about his mental state. I reviewed any medical records where he had gotten some psychiatric treatment.

Q. And you know -- you were here in early October when we began these 2255 proceedings, correct?

A. Yes.

Q. And you understand his lawyers, a number of people testified during that first part of the proceedings.

A. Yes.

Q. Did you review those records, transcripts of those hearings?

A. I reviewed the transcript of the testimony of Mr. Monckton, Mr. Harris, and Mr. Swerling.

Q. Swerling.

A. Swerling.

Q. Why would you review those transcripts, Dr. Frierson?

A. Because they worked with Mr. Basham at trial. Normally, ideally when you are doing a competency evaluation you do it before the trial, not eight years later. And so normally we don't have that type of record. But because we were doing it after the fact it would be important for me to know what were the experiences like of his attorneys in working with him.

Q. Now, I think at some point you reviewed some disciplinary records on Mr. Basham at the prison, correct?

A. Yes.

MR. WITHERSPOON:  Beg the court's indulgence.

(There was a pause in the proceedings)

Q.   (MR. WITHERSPOON) Do you have your booklet with you?

A.  I do.

Q.  Did you review an incident report number 1385598 on or about September 26, 2005?

A.  What was the date?

Q.  September 26, 2005.

A.  Yes.

Q.  And did you review an incident report number 1641796 on August 16 of 2007?

A.  Yes.

Q.  Did you review incident report number 1610042?

A.  Yes.

Q.  Did you review incident report number 2008149 on or about April 27, 2010?

A.  Yes.

Q.  And do these reports help you in making a determination about competency for Mr. Basham?

A.  They assist and they provide a data point that I utilize in noting how he is able to respond with assistance to his disciplinary infractions for which he is charged in defending himself.

Q.  What do you mean by that, Dr. Frierson?

A.  For example, let me just give you a good example.  There

was one incident where he was accused of having tobacco products or not, giving tobacco back to a chaplain who had given it to him for the purposes of some sort of religious ceremony. I don't understand it, quite frankly, but apparently they smoke a peace pipe and it's Native American, and he was accused of holding onto tobacco that he was supposed to have turned in.

Q. Now, let me stop you there. So he went through a religious service, so he's able to understand what's going on in this religious service, presumably.

A. I didn't ask him so I don't know.

Q. So what about that incident formulated any part of your opinion about his competency?

A. Well, there's a form that someone fills out that asks do you have anybody that you want to call as a witness at a hearing related to this allegation, and do you want the assistance of counsel to represent you? He indicated that he did want the assistance of counsel and at one point had indicated that he would like two people to be called as potential witnesses who had seen what had happened.

And then there is a document dated June 17th, 2007 that is described as a statement for unit discipline committee. And it's signed or typed signed Basham with his inmate number. Now, whether or not he created this document is irrelevant to me. The fact that this document exists and eloquently gives

specifics of actually what happened with the tobacco is relevant. That somehow, whether even if Mr. Basham did not do it, he was able to get his version of events outlined in a logical, coherent-type statement to give to the disciplinary committee, which speaks to me of his ability to obtain defense for himself in the prison system.

Q. And that helps help you in your determination of competency?

A. Yes. Because he has to provide specifics about what actually happened that led to his charge. And he was able to do that to whoever prepared this document. I am not guilty of the charges. The tobacco was provided for me for smoking by the chaplain. I did return the leftover tobacco to him as indicated in the incident report. The only question is how promptly I did so. So he's able to -- I never left the area with the ceremonial pipe, the service was taking place. He's able to provide a very detailed account of what actually happened.

Q. Now, report number 1385598 is an incident report that deals with Mr. Basham contacting a David Hammer person through a third person. Do you remember that?

A. That's the first one that I read.

Q. Can you tell us about that report, sir?

A. Well, David Hammer is another death row inmate and apparently Mr. Hammer and Mr. Basham are at least

acquaintances. At one time he called him a friend, but he clarified that there are no friends on death row. But he is not -- and Mr. Hammer at the time of this incident had been transferred to another facility, I'm thinking Springfield, Missouri, which is the other federal medical center, is my understanding. And it is not allowed for death row inmates to mail each other. And Mr. Basham had mailed a letter through a third party to Mr. Hammer, knowing that the third party could send it to Mr. Hammer without the prison officials knowing about it.

Q. Now, when Dr. Hyde was asked about -- that I think Mr. Burke asked him did you send a note to a classmate when you were in elementary school. Is there a difference between sending a note through another person in elementary school and what Mr. Basham did in this case?

A. Yes. I mean, this involves actually correctly labeling a U.S. mailing address to get it to the person, it involves knowing who the person is that you could trust that you might be able to get him to send the letter on to Mr. Hammer. I think this involves a little bit more planning and execution than just passing a note in class in third grade.

Q. And in one report, number 1641796, there was an incident where Mr. Basham was using the telephone illegally and he was aware of it. Do you remember that?

A. Yes.

Q.   What was that -- tell us a little bit about that, if you can remember.

A.   He was using a telephone that is designed for legal consultation, to call attorneys, it's called the legal line, he was using it to call sex lines, sex talk lines to talk to women.

Q.   And was he aware that his phone calls were being listened to?  Was there a discussion about that on the phone, about him not being able to use it for a particular -- on a particular day?

A.   I don't recall without looking at the incident report the specifics of that.  I mean, during a period of time he completed, attempted to complete or completed, 27 calls from the legal line during a period of time between August 16th, I believe, and the 31st.  This was eventually discovered and I think he lost privileges.

Q.   Did that indicate anything to you about his ability to rationally understand what's going on?

A.   Well, it indicates to me his ability to scheme to get certain wants that he -- and desires met on his part.

Q.   Let me take that back from you.

          MR. WITHERSPOON:  Your Honor, at this time I move in Government's Exhibit number 249.  There's four reports.  I do have all the reports, I've given the defense these four plus the rest of them.  I'm only moving to introduce these four.

THE COURT: These are the incident reports from prison?

MR. WITHERSPOON: Correct. That he testified that he reviewed and was used in making a determination about competency.

MS. STONE: Your Honor, we don't object to the reports for the limited purpose Dr. Frierson relied on them. And accepting Mr. Basham was writing this report we do object to the truth of the matter asserted in those reports.

THE COURT: That's the gray area that the rules of evidence kind of leave up in the air. An expert can base an opinion on evidence otherwise inadmissible as long as it is the type of evidence that that expert normally relies upon in the field. And the rule goes on to say that the underlying data itself is, if it falls under a hearsay problem or something such as that, is not admissible unless it passes the reverse 403 balancing. That's where we are right now, does it pass reverse 403 balancing.

Mr. Witherspoon, I'm just not too sure how terribly important it is. You got in the fact your expert relied on this information to form his opinion. I'm going to sustain the objection. And just, you know, he used it to form his opinion, I think that's sufficient. I'll sustain the objection to the underlying incident reports.

MS. STONE: Thank you, your Honor.

MR. WITHERSPOON: Make sure -- I don't think she objected to them being introduced as something he relied upon, but they --

THE COURT: All right. Is that your understanding then, they can be part of the record to show what he relied upon?

MS. STONE: Yes, your Honor. I don't -- I agree that they are listed in his report and he relied on them.

THE COURT: With that understanding then they are admitted.

BY MR. WITHERSPOON:

Q. Now let's turn, Dr. Hyde, to your examination of Mr. Basham.

A. Dr. Frierson.

Q. I told you -- I apologize. Let me do this right now. I knew that was going to happen. I told Dr. Hyde I was going to do it, I'm doing it again.

Dr. Frierson, let's turn to your examination of Mr. Basham. When did you visit with Mr. Basham?

A. I visited him in November, on the 15th and 16th.

Q. And for how long did you interview Mr. Basham?

A. Unfortunately, on the 15th I was only allowed to stay until 3:00 o'clock. I thought I was going to be able to stay until 5:00, but -- so on the 15th it was one our hour and ten minutes.

Q.   On the 16th how long were you able to interview Mr.

Basham?

A.   Four hours.

Q.   And where did this interview take place?

A.   This took place in a visiting area off of federal death

row at the -- at the United States Penitentiary in Terra

Haute, Indiana.

Q.   And you and Mr. Basham were there in the room together?

A.   Yes, it was a contact visit.

Q.   Contact visit.  All right.  Let's talk about your clinical

information.  In your report you said -- say he's coy and

cagey.  I'm looking at page four, last paragraph.

A.   Yes.

Q.   Explain to us, please, what you mean by coy and cagey.

A.   Well, he appeared that way only in the way he reported his

auditory hallucinations.

Q.   Tell us what you mean by auditory hallucinations.

A.   I asked him if he heard voices, because hearing voices can

be a symptom of major mental illness.

Q.   Did he tell you he heard voices?

A.   He did.  But the way he told me that was what I thought

was both coy and cagey.

Q.   Tell us about that.

A.   Well, it's almost easier to almost imitate it.  I asked

him do you ever hear things, voices or anything talking to you

when -- and no one else is there?  And then he was silent for a while.  And then he's like well, are you going to write this down?  Well, I didn't tell the other doctors this, but yeah, I do hear some.  And then he turned his head to the side and started speaking as if he was speaking to someone who wasn't there, as if he were having a conversation with voices that he heard.

So we get in the interview and this behavior doesn't happen until I ask about it.  And then he described the voices in a manner that is not typical for mental illness, for people with genuine hallucinations.  He says they're continuous, they are from inside his head, they -- his mother tells him nice things like she loves him, and he hears the voice of Tommy, who is a person he states sexually abused him when he was six years old.  But Tommy tells him to move a bar of soap to one place and then move it back, and move it back again and move it back.  And I have never had a mentally ill person in my history of being a psychiatrist who said they heard voices telling them to move objects one place or another repeatedly. So that's just not typical of genuine auditory hallucinations. And it mirrors what has been observed by the psychology staff at Terra Haute as reflected in their medical records, on occasion.

Q.  And were you able to cause these -- him to act this way at a particular time?

A.  Yes.  It became clear there was a pattern.  Whenever I mentioned his mother or Tommy, the guy who sexually abused him, he would turn and start talking all of a sudden.  It was very dramatic and very sudden.  And then I'd just be quiet for a minute and he would jerk his head back around and say, what did you say?  So --

Q.  And I think you asked him about any delusional thinking?

A.  Yeah.

Q.  Did he tell you about a delusional thinking that he had?

A.  No, he denied -- he did not report anything that I thought it was delusional.  The statement I ask is do you have any unusual thoughts that other people don't believe or don't seem to share.  Because frequently paranoid people will say well, they're poisoning my food or something.  He said to me that, once again, it sort of relates to native American things.

Q.  Look on page five of your report.

A.  You are looking on what page?

Q.  Page five, first paragraph at the end.

A.  Oh, yes.  He said he believes that the world is eventually going to come to an end and that the human race has been very destructive.  He was referring to the earth.  He states we destroyed the ozone, we take from the earth.  The natives, meaning the Native Americans, gave back to the earth and we give nothing.  I did not consider that delusional.

Q.  Now, you did a psychiatric history of Mr. Basham, correct?

A.  Yes.

Q.  You asked him questions about hospitals and facilities where he had been treated?

A.  Yes.

Q.  Was he able to recount to you his history?  And how accurate was that history?

A.  He did an adequate job telling me all of the hospitals that he had been in that he remembered.  Now, if you had been in as many facilities as a child as Mr. Basham was I don't know that I would be able to name them all in order and correct order.  But he was able, and it was funny because one of them he called Carrot Toss, and I'm like what the hell's that?  And, you know, I said "Carrot Toss" and it's actually C-A-R-I-T-I-S, which is a spelling you might say Caritis or Carrot Toss or -- anyway.

But he was able to name that, Charter Louisville, Charter Evansville, Rice Otterman, Methodist Home, others, Western State Hospital.  So he was able to give me the names of the hospitals where he had been placed.  And it was my opinion that if he can tell me those things he could provide that information to an attorney, which would be of importance so the attorney could obtain those records.

Q.  And, in fact, we provided you the records from those hospitals, correct, because you reviewed those records?

A.  I did.  They are not full records but they are discharge

summaries and that sort of thing from those hospitals.

Q.  Now let's turn to your diagnosis of Mr. Basham.  What was your diagnosis of Mr. Basham?

A.  Well, there are several.  The first diagnosis I assigned was attention deficit hyperactivity disorder.  This disorder has been long-standing and is well-documented in records from his childhood and adolescence.  The symptoms of the disorder are well described in the records, so I had no doubt that he likely has attention deficit hyperactivity disorder.  He was fidgety at times during my evaluation, he was distracted at times by extraneous sounds outside of the room.  He would look around.  He was easily redirectable.  But I diagnosed attention deficit hyperactivity disorder.

The second diagnosis I assigned was cognitive disorder, not otherwise specified.  In looking at Mr. Basham's IQs they have declined for the most part over time.  There have been some few places where they got better, but overall there's been a significant decline in his measured intelligence.  He had an IQ of over a hundred when he was very young and by the time trial came around it was measured either by the defense expert at 68 or by the government's expert at 75.  But, be that as it may, there has been a significant decline.

And I don't think that's happenstance.  I wanted the court to be aware that that had occurred.  It's my opinion it's likely the result of his longstanding use of illicit

substances.  However, even though his measured IQ has gone down significantly there is not sufficient evidence that his daily functioning has declined.

Q.  Let me stop you there.  Because I used that word with Dr. Hyde, functioning, and Mr. Burke wanted to say that -- what is daily functioning?

A.  I mean, his ability to manage his things that he has to do to survive in incarcerated situations.  His ability to obtain canteen items, to maintain his hygiene, to get his basic needs met, to interact with attorneys, to do the things that people do in their everyday lives.  It's of course harder to assess functioning when you're incarcerated.  You are not going to be out having a job, you know.  But his functioning does not appear any different now on death row than it did pretrial.

Q.  And is that an indication about competency?

A.  Well, it's an indication that his overall functioning on a daily basis, his ability to do the things that he needs to do to survive as a human being is -- does not appear any different even though he's had this decline in his IQ, which I think is noteworthy and I think the court should be aware of.

Q.  And that would mean if he needs to be conferring with his attorneys?

A.  Yeah.  That's like getting his defense done when he's got disciplinary charges, doing the things -- he mentioned having access to a law library or the computer.

Q.   You also found him malingering?

A.   That was for the hallucinations, I diagnosed malingering and psychotic systems.  It had been the impression of -- first of all, he's not mentioned this to Dr. Hyde or Dr. Parker, who I believe was the court's expert.  He denied hallucinations to them and then he tells them to me, but then he does them in such a dramatic fashion in such a manner atypical of what you hear from genuinely mentally ill people who have had genuine hallucinations that I believe them to be feigned.

Q.   You also mentioned alcohol abuse.

A.   Yes.  He has continued to use alcohol in the United States Penitentiary.  He has been caught with it on numerous occasions.  He has had large -- relatively large blood alcohol levels measured.  And he knows that there are consequences for when he gets caught with alcohol, and his continued use despite the knowledge that there are potential adverse consequences would meet the diagnostic criteria for alcohol abuse.

Q.   And I think you also diagnosed him with being cannabis and cocaine dependent in a controlled environment.

A.   Yeah.  And you left out inhalant.

Q.   Okay.

A.   Inhalant dependence I put in full sustained remission because he quit on his own, he says, in adolescence.  He sort of got burned out on huffing so he hasn't used, even though

periods of time when he was not incarcerated.  He was smoking cannabis and using cocaine, specifically crack cocaine, up until his arrest on the current charges for which he is serving his sentence.  And he said he was addicted to them, he used more than he intended, he could use at one point up to $800 of cocaine a day, which is a pretty significant amount, which would indicate tolerance to the affects of cocaine.  For that reason he would meet diagnostic criteria for dependence of those substances, meaning he was addicted.  But on assigning in a controlled environment as a specifier to reflect the fact he's incarcerated and hopefully does not have access to those substances.

Q.  And you also diagnosed him with learning disorder?

A.  Yes, I did learning disorder, but you notice I put by history.  That's because very early on when he had his first IQ measured in the hundreds his achievement tests were remarkably low for that IQ.  That is a typical pattern that you see in a learning disorder.  And they assigned diagnosis of learning disorder at that time.

What is not clear to me is how much his behavior and inability to control himself in the classroom might have led to the lower achievement scores, given his IQ.

Q.  And, in fact, you asked him about not being able to control his -- or not being controlled in a classroom.  What did he tell you about that?

A.   Basically he said that he was never disciplined at home and when he got in school there was all of a sudden rules and he didn't want to follow them.

Q.   He made a choice?

A.   Yes.  He wanted to sleep and he would find ways to either go home or get expelled.  He was expelled from three separate school districts by the age of ten.

Q.   Now, his vocabulary, was it expected of someone with an IQ in the range that he has?

A.   His IQ on my exam -- well, his vocabulary was better than his grammar, but he used some very sophisticated words that I found surprising for someone with an IQ of 68.

Q.   What were some of those words?

A.   "Naive."  We were discussing his relationship with another inmate, Mr. Hammer, and he had said they were friends on Friday the 15th when I saw him, and on the 16th I said you said you were friends with Mr. Hammer, and he goes oh, no, we're not really friends.  I'm not that naive to think you can have friends on death row.  You have acquaintances.  But I thought that was a pretty sophisticated use of that word.  And he also used the word "incriminating" many times and used it correctly.

          THE COURT:  Used the word what?

          THE WITNESS:  Incriminating.

Q.    (MR. WITHERSPOON) And on Axis II you found him antisocial

personality disorder?

A.   Yes.

Q.   What does that mean?

A.   That means that he has a lifelong pattern beginning prior to the age of 15 of failing to conform to social norms.  He repeatedly has performed acts that are grounds for arrest, incarceration.  He's been very manipulative in a variety of settings.  He's been very impulsive, he has a chronic disrespect for authority figures, he's engaged in assaults on correctional officers.  So it is my opinion that he would meet diagnostic criteria for antisocial personality disorder.

Q.   You mentioned manipulative.  Did he try to manipulate you or did he manipulate you?

A.   I think he successfully manipulated me.

Q.   Tell us about that.

A.   Well, when I say manipulated, he got me to decide to do something that I don't normally do.

Q.   Tell us what happened.

A.   On the 15th when I saw him for the first evaluation I told him that I'd be coming back the next day.  I wanted to sort of outline for him my plan so that he would be mentally prepared. He made several statements on the 15th to me, or several requests, that I bring quarters on the 16th.  Can you bring some change, some quarters tomorrow?  You can bring up to $20 worth of quarters in here.  And I said what for?  And he said

so we could have some snacks out of the machines.

And I initially said well, I'm not sure I will be able to do that. And he implied well, it is legal. And so he made sure on the 15th that the person who escorted me out of the prison at the end of that interview, he made sure that that guy told me in his presence that it was okay to bring quarters in. He said tell Dr. Frierson it's okay to bring change and quarters in so he can get stuff out of the machines. And the guy looked at me and goes yeah, that's certainly -- there's nothing wrong with doing that. I said do people normally do that, he said yes, it's pretty common the people who visit him do that.

Now, to be fair he never said I'm not going to talk to you if you don't bring quarters, if you don't bring snacks. I was wrestling the whole night what do I do, do you bring the quarters in? It's not something I would normally do, could this be seen as me coercing him to talk to me on the 16th or bribing him to talk to me on the 16th. But in the end I decided I'm in Rome, I've never been in a U.S.P. death row before, this is commonly what's done there, so I am being told, so I decided I would bring some quarters.

Q. And you did?

A. I did.

Q. You bought him some snacks?

A. Yes. I bought him two Mountain Dews in the course of four

hours and some packaged sugared donuts and a danish.

Q. Now let's turn to your opinion regarding competency. Dr. Frierson, in your opinion is it best to determine competency at the time of an incident or look back in this case eight years?

A. It's clearly better to do it at the time of the incident.

Q. And why is that?

A. Because it's more reliable at the time. If you are seeing someone where you can assess right at the time that they are required to do something if they are competent to do it.

Q. What is your opinion as to whether or not Mr. Basham is competent, was competent at his trial in 2004?

A. Well, keeping in mind that retrospective determinations are less reliable, I chose to do several things with Mr. Basham. I chose, number one, to assess his current knowledge of the legal system, how court works, what the people do at court, how can he plead, what's a plea bargain.

Q. Did he know the role of a judge?

A. Yes. He was able to tell me who his two attorneys were at trial, he was able to explain how unhappy with them that he was, he was able to explain that he wished he still had Cam Littlejohn and Mr. Monckton, who were two initial attorneys that I believe were disqualified for some reason.

Q. Did he use those names?

A. Yeah.

Q.  Cam Littlejohn and Mr. Monckton?

A.  He stated all four names of his trial attorneys on his own.  He could not give me the last name of his current attorneys, he just referred to them by first name.  He was able to tell me what the -- that you wanted him to get killed, that was the role of the U.S. District Attorney, he wanted him to be found guilty.  He understood the judge makes decisions in the courtroom, the jury sits and watched the trial.  He remembers to talking to the jury -- to his attorneys about picking the jury at the time of his trial, and but he reported that he really didn't care who they picked.  He was able to recall aspects of the jury foreman, that she got in trouble for contacting the media and that he felt his case should be -- sentence should be overturned because of that juror misconduct.  I understand that was an issue on his direct appeal.

He was able to tell me he could plead guilty or not guilty, he understood the basic concepts that are involved in plea bargaining.  One thing he did not know, he did not realize that the jury's opinion had to be unanimous.  He thought that it could just be seven of the 12, it would be a majority.  Which I didn't find a bar overall to competency, because he was clearly able and told that it would have to be all 12.

So I examined his current knowledge of how court

proceedings work.  I also then looked at the trial transcript, because I was aware and I'd asked to be given particular transcripts of times when Mr. Basham did not appear to be doing well in court, where there were concerns during trial about potential competency issues, like assaulting the officers or appearing to fall asleep.  So I wanted to review those and I wanted to talk to him about those.

Q.  Did you talk to him about those?

A.  Yes.  He frequently said I didn't want to be in court many times, I didn't feel like I wanted to be there.  He complained that the attorneys, when he tried to help them and confer with them, that they wouldn't confer with him.

Q.  And particularly he gave -- related to you a specific incident in that case, correct?

A.  He indicated an incident which I thought demonstrated some significant trial-related abilities on his part.

Q.  Tell us about that incident.

A.  Well, it's sort of a convoluted story, but it begins with an incident that happened in the Alvin S. Glenn Detention Center.  Apparently he stated he had problems breathing with the flap on his cell door shut.  And I used the word claustrophobic in my report, he didn't use that word, so I don't want to suggest -- but he would feel short of breath.

So Dr. Morgan, the treating psychiatrist that had been hired by his defense attorney, had written an order for the

flap on his door where they insert the food tray to be left open. Well, some officer that he did not like would not allow that to happen and shut the flap. And then Mr. Basham popped open the flap somehow, I don't know how he did that, but he got it back open. And there was an officer setting there with the last name McMillan, and Mr. McMillan said, look, these other officers have been looking for an excuse to come in your cell and take you down and you've just given them one. So they may be coming in there after you since you popped the food flap. And he told this officer to -- said I told this officer step back so he didn't get hurt.

At his trial in the sentencing phase he said the officer that brought everybody into his cell to take him down had testified at trial that he was one of the worst inmates they had ever had and he realized this made him look bad. Then he said that I told Mr. Harris specifically, look, you need to call this Officer McMillan because he was there and saw what happened and knew that there was an order for the flap to be open and knew that they were looking for a reason to come in after me. And you need to call him as a rebuttal witness against Mr. -- the other, I forget the name, I want to say it was Bishop, but the other officer who was testifying in a manner that made him look bad.

So this told me first that he indicates he is able to recognize significant harmful testimony when he hears it.

Number two, he's able to understand how such negative testimony might be remediated with a rebuttal witness, that you can respond to it with a rebuttal witness, and, finally and importantly, it tells me that he realized the importance of letting his attorney know about this potential rebuttal witness.

Q. And did he let his attorneys know about this rebuttal witness?

A. He said he turned and told them that they needed to call Mr. McMillan and they shushed him, they told him shush.

Q. And how did he feel after that point?

A. He told them -- he told me he told them if you shush me again I'm going to knock you out of the chair. And that the one time he tried to do something to be helpful to them all they did was shush him.

Q. And I think the defense has indicated, you know, Mr. Basham was disruptive, falling asleep and other forms of disruption in the trial. Is that any indication of competency, Dr. Frierson?

A. It would depend on what's causing it. So just because you are disruptive in court doesn't mean you are not competent. If you are psychotic and you have symptoms of mental illness, you're out of touch with reality, you're paranoid in a manner that's not based on reality about what's going on against you and you act out, that might be a sign of incompetency. But

he's able to discuss exactly what happened with the assault, which I actually watched, against the officers after he was -- at a point where he felt the judge had reneged on something that had been promised to him.  And that was to be able to use dip.

Q.  And he was upset?

A.  Yes.

Q.  And that's --

A.  He was mad and at that point when he felt that -- found out that wasn't going to happen he didn't want to be in court anymore.

MR. WITHERSPOON:  Beg the court's indulgence one second.

(There was a pause in the proceedings)

Q.  (MR. WITHERSPOON) Do you have an opinion, Dr. Frierson, to a reasonable degree of medical certainty, concerning Mr. Basham's competency at trial?

A.  My opinion, to a reasonable degree of medical certainty, is there's insufficient evidence from the record, from reading what his attorneys said, from looking at his current functioning and from listening to what he has to say about what happened at his trial, to believe that he would not have been competent at that time.

Q.  Do you have an opinion, Dr. Frierson, to a reasonable degree of medical certainty, concerning Mr. Basham's current

competency?

A.   Yes.   It's my opinion that he is currently competent to proceed with his petition for collateral relief under 28 United States Code Section 2255.   He understands what's going on.   He doesn't understand a lot of the intricacies and legal maneuvering that his attorneys are undertaking under his behalf, and I doubt he has read through all these counts contained in the petition.   I don't know.   He understands reasons that he believes his case should be overturned and he would be able to communicate those with his current attorneys. I asked about the outburst when the judge put him on mute back in October?

Q.   Correct.

A.   You know, he's a frustrated individual with this process. Mr. Basham is somebody who does not like delayed gratification.   And he stated I wished they would either, and I hate to use this word, but this is a direct quote, need to either shit or get off the pot.

Q.   Did you ask him what he meant by that?

A.   I he asked him what you do mean by that?   Either they need to give me a new trial or go ahead and execute me.   He indicated that he's tired of coming to these proceedings, he's tired of listening to doctors talk about his mental health.

Q.   And how does he feel about doctors and lawyers talking about his upbringing?

A.  He doesn't like that either.  He told me I lived that life, I lived that horrible childhood, I don't like to sit there listening to people talk about it.

          (There was a pause in the proceedings)

          MR. WITHERSPOON:  Thank you, Dr. Frierson.  Please answer any questions Miss Stone may have for you.

          THE COURT:  Cross-examination.

                    CROSS-EXAMINATION

BY MS. STONE:

Q.  Good afternoon, Dr. Frierson.

A.  Good afternoon.

Q.  I want to jump right to your evaluation of Brandon Basham if that's okay.

A.  Sure.

Q.  It was just the two of you in the room for the evaluation?

A.  Other than when I was escorted in and out, yes.

Q.  Okay.  And it was a contact visit?

A.  Yes.

Q.  And you were not expecting a contact visit, is that correct?

A.  I wasn't.  Because I heard the testimony, I believe it was of Dr. Parker or else his report, that he did not have a contact visit.

Q.  And were there -- there were guards outside the door?

A.  Yes.

Q. Otherwise was there much distraction going on outside of the room?

A. You can occasionally hear noise, noises like moving door shutting, that kind of thing.

Q. And it's a room with blank walls and a window?

A. There was a window, that like if you are Mr. Basham and we're sitting across from each other at a table there's a window exactly like it's in the court door.

Q. In the doorway?

A. Well, next to the door.

Q. And there's no phone or video screen in the room.

A. No.

Q. And you testified you met with Mr. Basham on two occasions, two consecutive days?

A. Yes.

Q. Your first visit was an hour?

A. Hour and ten minutes.

Q. An hour and ten minutes. And can you clarify for me what you accomplished with Mr. Basham that first day?

A. I mean, I have my notes. He knew why I was there. He -- I said what's going on in your case, so he told me what was going on in his case. I asked him how old are you, your date of birth, how long have you been here, are you taking psychiatric medications? He was able to provide me not only the names of his medications but the actual doses. He's

taking Paxil, Neurontin, Seroquel, and Elavil.  He was also able to tell me the reasons he was taking all of those.

He is also -- he had just had a tele-psychiatry appointment with his treating psychiatrist, who I believe is in Springfield, Missouri.

Q.  Let me make this maybe a little easier.  Was the first day more of information gathering on your part?

A.  Yeah.  We talked about his schedule on death row, what happened at the last hearing, what is he convicted of, where does he get legal advice.  Then I asked him just about symptoms of mental illness in general, sleep, appetite, mood, voices, hallucinations, energy level.

And then I completed a mental status examination, which is evaluating, like Dr. Hyde, is he oriented, can he pay attention, can he think abstractly, can he perform a calculation, can he use abstract reasoning.  And then we did a little bit of family history and medical history.  We went through his medical history, history of surgeries, his seizure episodes that had happened in the past, and his family history.  That was on Friday.

Q.  Okay.  How about the questions on psychotic symptoms?  Was that Thursday or Friday?

A.  That was both, but first came up on Friday.  I'm sorry, I think I'm using the wrong days.  The 15th is Thursday, that was what I just told you about.

Q.   Okay.

A.   The hour long interview.  Friday was the four hour interview on the 16th.

Q.   And I just want to clarify, so your testimony is that you discussed psychotic symptoms on both days?

A.   Yes.

Q.   Okay.  The majority of the testing you performed was on the second four-hour visit, is that correct?

A.   I don't know what you mean by testing.

Q.   You note that you performed a malingering test.  Was that on the second day?

A.   That was -- that was the end of the second day.

Q.   Okay.

A.   And that only took -- that's a five minute test.

Q.   And you didn't perform any of the -- you discussed some of the neurological tests formed by Dr. Hyde but you yourself did not perform any of those, correct?

A.   I'm not a neurologist.

Q.   And prior to visiting with Mr. Basham you testified you reviewed numerous records in this case?

A.   I reviewed many records that were -- I reviewed a binder of records that I was told was the same binder that had been given to Dr. Parker.

Q.   Can you ballpark for me how much time you spent reading records?

A.   Now, when you say records, just those records or other records?

Q.   The records that you -- records, transcripts, everything that you read to prepare for this visit.

A.   Okay.  I spent just looking at transcripts, testimony of Vogelsang, Brannon, Brawley, Aiken, and Schwartz-Watts, and the motion for collateral relief, that took nine hours.  The testimony of Capehart took 1.25.  It took me two hours and 15 minutes to read through the 120 page report from Dr. Capehart, half an hour to review Dr. Parker's report.  I had a medical summary from Terra Haute that I reviewed that took 15 minutes.

I have not calculated the amount of time it took me yet to -- I have it written down in my notes on the margins but I haven't even added up to even bill for my review of this binder, of medical records or the testimony of the attorneys at the October hearing because I got those later.

Q.   Okay.  You note in your report that Mr. Basham may have embellished a number of institutions and hospitalizations he had, but there's no question he had spent an enormous amount of time in facilities.

A.   I would say the majority of his childhood and adolescence he was either going to a hospital or institutionalized somewhere.

Q.   Also that those records reflect drug use at an early age of various substances?

A.  Yes.  It's very interesting that inhalants are documented very early, at the time of his first hospitalization, which I believe was age ten.  He states that he started inhalants with his sister around age eight.

Q.  And would you agree with me that inhalants can be especially damaging to the brain?

A.  They are horrible for the brain.

Q.  Also, the records reflect evidence of sexual abuse?

A.  Yes.

Q.  Now, you were present for Dr. Hyde's testimony so you heard Mr. Witherspoon asking about talking to Mr. Basham's family members.  You did not do that either, correct?

A.  No.  His mother's dead, I believe.

Q.  She is.  So if that was a failure on Dr. Hyde's methodology that was -- for lack of a better word, methodology, that was something you did not do, as well.

A.  No, I don't agree that that was a failure of his methodology.  What was a failure is to testify that his parents are low IQ without ever having met them.

Q.  Were there records available of his parents' hospitalizations?

A.  I have not seen any, so I don't know.

Q.  Can a history of mental illness with that IQ be evidence of -- a family's mental illness be evidence of genetic pre-loading for an individual?

A. There's genetic pre-loading for mental illness, there's genetic pre-loading for intelligence. So certainly there is genetic pre-loading for mental illness.

Q. Those are things that one could look at in a family history?

A. Yes. I do know his mother was prescribed Prolixin, which is not a benign drug, it's an antipsychotic.

Q. And you are also aware his mother had fairly serious substance abuse problems herself.

A. Yes, he was very forthcoming with that.

Q. You also testified that you relied on some prison records that Mr. Witherspoon went over with you. You did not talk to the individuals who wrote those reports, is that correct?

A. No.

Q. And you accepted those reports on their face.

A. What's normally in a warden's jacket, is what we call it in our state system, I don't know what you call it in the federal system, but it contains the incident reports where Mr. Basham has been engaged in some activities that caused him to get in trouble. I don't know who wrote the responses that we -- I testified to on direct, as far as who wrote his statement to be given to the panel that was going to decide his punishment.

But to me it doesn't matter really who wrote it. The fact it got written and he was able to get it written is what

indicates that he has capacity to work with someone to defend himself.

Q. And your ability to rely on those is only as good as the information contained in them, correct?

A. Sure.

Q. And I want to show you one example, I apologize to the court, we don't have exhibit numbers on these, but incident report number 17938761, and that is from November 10, 2008. It discusses that Mr. Basham was given two breathalyzer tests. Do you recall looking at that report?

A. I recall looking at reports where he was given breathalyzer tests but I don't -- unless you show it to me I wouldn't off the top of my head remember it.

MS. STONE: Your Honor, may I approach? I don't know the number to bring it up on the screen.

THE COURT: All right, you may.

THE WITNESS: Can I read it for one second?

MS. STONE: No problem.

(There was a pause in the proceedings)

THE WITNESS: Okay.

Q. Thank you.

A. I recall reading that.

Q. Okay. And this report indicates that Mr. Basham was given two breathalyzers within 15 minutes of each other, and those breathalyzers he registered at .042 and then 15 minutes later

at a .144.  I realize that you testify in much more significant cases than DUIs, but are you aware that in a DUI case if a breathalyzer was that far apart within a 15 minute period it's unlikely in any jurisdiction it would be admissible?

A.  I'm not a DUI lawyer, expert.  I'm sorry, I do not know.

Q.  Okay.  So fair to say --

A.  I could --

Q.  When you reviewed this record you weren't aware of the possible problem with the information contained in it.

A.  The breathalyzer may not be accurate?

Q.  Correct.

A.  I don't know that I actually thought that at the time I reviewed it, gave it that much thought.

Q.  And, also, these records are prepared presumably by the same individuals who are letting Mr. Basham drink to the point of incapacity before this hearing, is that correct?

A.  Well, I don't know that he was incapacitated before this hearing, I just heard the report.  But these are, I would imagine, prison officials.

Q.  Going back to Mr. Basham's records, you testified that you agree early on that in Mr. Basham's history there was diagnosis of ADHD?

A.  Yes.

Q.  You've no dispute with that.

A.  I do not dispute that diagnosis.

Q.  In fact, you find it yourself.

A.  Well, it's just so well-documented in the records, I mean, if I were come along and say he doesn't have ADHD that would be sort of ridiculous at this point.

Q.  Dr. Hyde and Dr. Schwartz-Watts and pretty much everyone who has seen Mr. Basham throughout his history has agreed at least on that.

A.  Yes.

Q.  Would you agree with that statement?  You -- your experience with Mr. Basham in the two days that you interviewed him you noted you had to take breaks?

A.  That was more the second day.  We didn't break, I don't think, the first day.  But the second day he kept having to go to the bathroom.

Q.  And you also had to repeat things for him?

A.  Occasionally, yes.

Q.  And you noted that he was easily distracted.

A.  Yes.

Q.  You also noted in your report he had significant impulsivity.

A.  Yeah.  He has a lifelong history of impulsivity.

Q.  And all of those symptoms, distraction, needing repetition and impulsivity, you agree are part and parcel to an ADHD diagnosis.

**JA 4881**

A.   No.  I would agree that the difficulty concentrating is part of the ADHD, the fidgetiness is part of the ADHD.  The impulsivity I do not agree is attributed solely to ADHD, because impulsivity is also a symptom and characteristic of antisocial personality disorder.

Q.   You also found that some of his poor performance on tests that required concentration was consistent with his ADHD diagnosis.

A.   That's correct.  And, identical to Dr. Hyde, his ability like to spell "world" backwards, we ask people to do that because that's a specific test of concentration, and he had some difficulty with that.

Q.   And just to be clear, you did not believe he's malingering ADHD.

A.   No.

Q.   You do not believe he's malingering being easily distractible.

A.   No.

Q.   And you do not believe he's malingering impulsivity.

A.   I don't believe it's malingered but, like I said, I don't think it's all due to ADHD.

Q.   Okay.  Let's move on to some of the previous diagnoses that you disagree with, and I want to start with bipolar disorder.  On page four of your report you note that Mr. Basham lacks the symptoms of major depressive or manic

episodes and that for you was one of the issues with finding bipolar disorder, correct?

A. That was one of the data points, what he told me, that contributed to my arriving at a conclusion that he did not have bipolar disorder.

Q. And you -- that was my next question. You rely primarily on Mr. Basham's self-reporting on this.

A. No.

Q. Did you also review the records?

A. Yes.

Q. And his history?

A. Yes.

Q. And your position is that there is not evidence of major depressive or manic episodes.

A. No, this is my impression, is that the records where he was diagnosed with bipolar disorder primarily come from private hospitals, Charter, the Charter hospitals he was in. Bear with me one second. I have a list of all the hospitalizations so I can --

Q. No problem.

(There was a pause in the proceedings)

THE WITNESS: I made a three-page list all of his hospitalizations, and the first place that you see bipolar is Columbia Hospital Paris, which is also known as Stoner Creek Center. He had been sent there from the Methodist Home.

Now, in reviewing what I had from that record, which was a hospitalization from August 7, 1996 through August 19, 1996, there he gets a diagnosis of bipolar I disorder, but there's no documented record of manic symptoms or depressive symptoms. They are not well-outlined in the actual medical record in a manner that I would believe that they were present.

Q. You do note he underwent a treatment, on page seven of your report, underwent a treatment of lithium, which is --

A. Yes.

Q. -- which is a commonly used medication for bipolar disorder?

A. Yes.

Q. And that he apparently noted it was helpful, or the doctors noted it was helpful?

A. The record states it was helpful. But, once again, lithium can be used to treat a variety of symptoms whether they are due to bipolar or not.

Q. You also note on page nine of your report that Mr. Basham has engaged in numerous suicide attempts.

A. Yes.

Q. Is your testimony that suicide attempts cannot be major depressive episodes?

A. Yes.

Q. You also disagree with finding of psychotic symptoms, and

you described Mr. Basham as coy and cagey when discussing these. Are coy and cagey diagnostic terms?

A. No, they are not.

Q. Are they projections of the examiner?

A. I don't believe so.

Q. Have you had instances where people you believe are legitimately mentally ill are reluctant to discuss symptoms with you?

A. Yes.

Q. Is that common?

A. It depends on what kind of symptoms they are. It's more common for people not to want to discuss psychotic symptoms, like delusions and hallucinations. Other symptoms people are generally more amenable to talk about, especially anxiety and mood disturbance.

Q. Have you also had people who you believe are legitimately mentally ill ask you not to write things down?

A. Yes.

Q. And you are aware that Dr. Schwartz-Watts was the trial expert in this case, correct?

A. Yes.

Q. And you heard, again, Mr. Witherspoon cross-examining Dr. Hyde, and he discussed how many hours that she spent with Mr. Basham over a period of a couple of years. Did you -- you heard that?

A.   I heard that.  Yes, I was here.

Q.   And you are aware she spent a significant amount of time with Mr. Basham.

A.   Yes.  I mean, she was at the university at that time, so we were sort of colleagues and I knew that she was working on the death penalty case here.

Q.   You are aware that Dr. Schwartz-Watts did believe that Mr. Basham heard voices?

A.   Yes.

Q.   You also note in your report that Mr. Basham was incarcerated in Hopkins County Jail, the jail he escaped from prior to these offenses, on December of 2000, January of 2001, and he also was diagnosed with psychotic disorder there.

A.   Are you talking when he was sent to Western State?

Q.   I believe it's in the actual jail.

A.   I don't recall seeing records from the jail.  Maybe I did. But I do recall when he went to Western Psyche from the jail after.

Q.   I apologize, that's the one note I don't have the page number.  We will move on.  And let's move now to Mr. Basham's IQ scores.

     You testified that Mr. Basham started out with an IQ of a hundred and then experienced a period of decline?

A.   Yes.

Q.   And Mr. Basham was back then diagnosed with a learning --

at a young age diagnosed with a learning disorder, correct?

A. Yes.

Q. And, again, that's something you diagnosed, as well, basing it on history?

A. Basing it on the history, yes.

Q. And to reiterate, you are aware Mr. Basham started abusing drugs at a fairly young age.

A. Yes.

Q. And you would agree that drug abuse could contribute to decline in IQ?

A. Not only could, but it's my opinion it likely did.

Q. And, again, one of the substances was huffing gas and other inhalants.

A. Yes.

Q. And that is -- would you agree that is one of the worst substances as far as IQ decline?

A. Well, it's hydrocarbons are not good for the brain, so it's not good. It can certainly cause IQ decline if it's chronically and in sufficient amounts.

Q. You also note in your report, and it's noted throughout his records, that his IQ jumps back up in his late teens. That's something you saw in the records?

A. Yes.

Q. And you hypothesized it's possibly because Mr. Basham didn't have access to substances to abuse at that time?

A. Yes. After he was incarcerated by the state authorities in Kentucky, it was only after that that you see a little bit of recovery in his IQ from this continuous decline previously.

Q. And that is simply a hypothesis, you have no evidence in the record to support or disprove that.

A. Of course not.

Q. Are you aware that there's some anecdotal evidence that scores may have been inflated to get Mr. Basham into some of these facilities?

A. I have read that, I think from the mitigation expert, her testimony.

Q. And the only way to know if that was truly the case would be to get the raw data, is that correct?

A. I think it would depend on -- yes, to see if it was scored properly, yes. But I don't know, because the early scores, I don't know that it was -- they were done to get him into some facility, especially the Penny Royal outpatient scores.

Q. If you had information that caused you to have concern about the legitimacy of an IQ score would you want to see the raw data to see if it was correctly scored?

A. I wouldn't, but I would want a psychologist working with me to look at the raw data. I'm not a psychologist. You could show me the raw data and I wouldn't know what I was looking at.

Q. But you would want somebody to look at it that you

trusted.

A.  Yes.

Q.  You don't dispute the findings of Dr. Capehart and Dr. Brawley, is that correct?  IQ findings, I'm sorry.

A.  I don't have any reason to dispute them.

Q.  So that would put his IQ somewhere between 68 and 75, between their two scores?

A.  Yes.

Q.  At the time of trial.

A.  Which is also consistent with the screening that Dr. Parker did.

Q.  That would put Mr. Basham at best at borderline intellectual functioning, is that correct?

A.  Yes.

Q.  And you wrote an article on mental retardation that Mr. Witherspoon referenced, and in that article you note that the IQ of 71 to 84 is six to seven percent of the population?

A.  Yes.

Q.  You disagree with the trial diagnosis of dementia, is that correct?

A.  Yes.

Q.  You state in your report, however, that you do not believe Mr. Basham's decline in IQ has been happenstance.  Can you explain what your belief is that caused that IQ decline?

A.  I think it's his use of substances is the most likely

causative factor in his IQ decline.  There has been mention of possible head injuries.  But when -- for example, there was a big deal made of the falling out of the tree and bumping his head on the railroad tie.  In the very early records when he is seen at Penny Royal his mother says he was not unconscious and he had no ill effects from that, yet I read conflicting evidence in trial testimony that he was never the same after that.  So it's hard to know what the significance is, if any, of prior head injuries.

I do know that he abused substances, by his own report started at age eight, that's when he had his highest IQ, and it was heavily used between, inhalants, from eight to 13.  And I believe that is the most likely reason his IQ has declined. And I don't think it's just happened for no reason.

Q.  And you diagnosed Mr. Basham with cognitive disorder not otherwise specified?

A.  Yes.

Q.  And we had a phone conversation prior to this hearing, and I don't want to misstate this so correct me if I am wrong, but you said that essentially you agree with Dr. Hyde's static encephalopathy, that is essentially the same thing as cognitive disorder not otherwise specified.  Is that a correct statement?

A.  It's correct on what I'm assuming he means by that.  But, once again, a static encephalopathy, all that means is brain

pathology.  Encephalo is brain, opathy is fitness, static means stable.  Static brain fitness, if you do the Latin.  I'm not sure what this means.  If you look at the DSM-IV requirements for cognitive disorder not otherwise specified, it says mild neuro-cognitive disorder, impairment.  Cognitive functioning that's evidenced by mild neuro-cognitive disorder, impairment in cognitive functioning as evidenced by neuropsychological testing or quantified clinical assessment.  And I believe that's what we're seeing, that we have lower test scores as a result of something going on that I believe is likely due to his long-standing use of substances.

Q.  So to really dumb it down to lay person level, Dr. Hyde essentially testified Mr. Basham has a sick brain, and your finding of cognitive disorder NOS is essentially that Mr. Basham has a sick brain.  Would you agree with that statement?

A.  I'm not sure I'd use the term sick brain, but it's a brain that isn't functioning as well as it did before he started using substances.

Q.  And do you recall when you read Dr. Schwartz-Watts' testimony that she characterized Mr. Basham as having a bad brain?  Hers, of course, was because of her finding with dementia.  But you recall that testimony?

A.  Yes.

Q.  Going back to your article on mental retardation, you are

talking in the article in the context of MR, but you note that where a person lacks sufficient cognitive ability to manage a given event they can exhibit lack of judgment and planning resources. Would you agree that that applies to Mr. Basham?

A. I couldn't understand the last part.

Q. I'm sorry. When the article notes that's evidence that suggests where a person lacks sufficient cognitive ability to manage a given event, whether it be trial, daily living, they exhibit lack of judgment and planning resources. Does that also apply to someone with cognitive disorder or is that limited to MR?

A. Some people with cognitive disorder can plan and some cannot. I think there's some evidence that Mr. Basham has sufficient planning abilities.

Q. Do you think Mr. Basham's planning abilities are sophisticated?

A. Compared to?

Q. The majority.

A. You have a continuum. So to say someone's sophisticated or not, it depends on where you want to draw the line. He certainly doesn't have -- he can plan, he just doesn't like to delay gratification. He's really good at planning gratification things, like getting money from the canteen by calling his mother and getting her to try to send money to somebody else so that he can have money for the canteen.

Certain things he plans quite well. But his planning ability isn't going to be as good as you and I.

Q. And, again, if we agree that his IQ falls somewhere in between the range of Dr. Brawley's findings and Dr. Capehart's findings that would put him, best case scenario, at six to seven percent of the population, borderline intellectual functioning, is that correct?

A. If that's the accurate statistics from my article I would say yes. I have not read that in many years.

Q. Long-term alcohol abuse can contribute to decline in IQ as well, correct?

A. Yes.

Q. And you again have somebody with Mr. Basham, and there's evidence both in the record and from self-reporting, that Mr. Basham has engaged in alcohol abuse at least in his years in BOP?

A. He says he drinks. Whether those breathalyzers are accurate or not, I don't know. They would indicate numerous times where he either smelled of alcohol or they found alcoholic beverages in his cell. He tells me he can make it, he tells me he can make something stronger than just wine, that he can actually make pretty -- something you would need a still to do. And he would not go into the details with me about how he does that because --

THE COURT: Miss Stone, we have been going about an

hour and 45 minutes.  Is this a good place to break?

MS. STONE:  It's a fine place to break, your Honor.

THE COURT:  Let's take a 15 minute recess.

(A recess transpired)

THE COURT:  Ready to resume?

MS. STONE:  I am, your Honor.  Thank you.

Q.  Dr. Frierson, I want to jump back to talking about the prison briefly.  You note in your report you reviewed prison medical records in preparation for your evaluation.  Is that correct?

A.  Yes.

Q.  And your understanding is that Mr. Basham's evaluations at the prison are done by tele-psychiatry, is that correct?

A.  The psychiatric evaluations are done by tele-psychiatry.  They don't have a psychiatrist at the prison, they do have several staff psychologists.  And what I reviewed were the staff psychologists' notes from USP Terra Haute.  They did a summary of the psychiatric treatment that had been provided to me in letter form.

Q.  Okay.  And all of that psychiatric treatment, your understanding is by they call it tele-psych?

A.  The medication prescribing is done by psychiatrist via tele-psych.

Q.  You do not treat or evaluate your patients or people who you are asked to evaluate by video, do you?

A.  I don't do it by video, no.  There is tele-psychiatry used, however, in the South Carolina Department of Corrections.

Q.  But would you agree that it's not the ideal circumstance for evaluating an individual?

A.  Well, it's not as good as face-to-face, but there's been a lot of studies on tele-psychiatry that show it's really pretty good.

Q.  But not as good as face-to-face.

A.  Not as good as face-to-face.

Q.  You note in your report on page nine that the prison reports say Mr. Basham does not display signs of mental illness.  And then again on page 14 that psychiatrists found no psychotic symptoms, cognitive defects or disorganized thinking.  Your diagnosis of cognitive disorder NOS contradicts at least with their finding of cognitive defects, correct?

A.  I would say incorrect, and let me explain why.  The cognitive deficits that I found that led to my diagnosis of cognitive disorder not otherwise specified are the lower IQ scores that have gone down.  Absent sitting down and doing IQ scores with him, if you just talk with Mr. Basham on a daily basis, a clinical like little interview of him I'm not sure you are going to see that, which is why they probably said that they didn't see it.

Q. And, again, you did not perform any of the neurological testing that Dr. Hyde did, but you reviewed it, correct?

A. I reviewed his report, yes.

Q. And you did not specifically dispute his neurological findings in your report.

A. No.

Q. I want to very briefly talk about the second day you met with Mr. Basham. And you noted in your report that he may have been drinking alcohol.

A. Yes.

Q. And you based that belief on the fact he had bottles of liquid that were I believe you said pinkish in color?

A. It looked like pink lemonade. But I based my statement that he may have been drinking on the fact that he told me he was drinking, that that's what was in there, that was his homemade -- he called it wine.

Q. And you continued ahead with your evaluation of Mr. Basham that day.

A. Yes, I did. I had a lot of what's he drinking, what do I do now, do I stop and come back another time? How can I make sure he's not going to drink another time? And I thought to myself well, if he's able to function well enough with drinking then he should be able to without drinking. I also remembered that he had claimed he used cocaine during his trial and the direct screen was negative. So I made the

decision on that day as long as he does not appear intoxicated to me I was going to continue.

Q. And you also note in your report that Mr. Basham has been called a con artist and a manipulator, and you testified that he, and you note in your report that he manipulated you to bring money for snacks. Bringing money for snacks is not against the prison rules, is it?

A. No, but it's outside of something I would normally do.

Q. Okay. But --

A. It's not common for forensic examiners to feed people they are evaluating.

Q. You probably value your medical license and if it was against prison rules you would have told Mr. Basham no.

A. Yes.

Q. You wouldn't have snuck a McDonald's cheeseburger in your pocket for him.

A. No.

Q. And Mr. Basham asked the guard to speak with you about it. I just want to clarify something. The guard said it was normal for visitors. Now, that's not just visitors for Mr. Basham, it's visitors for anyone in that unit, is that correct?

A. Yeah. I mean, anybody who has a -- my understanding is there's machines that are available for anybody. So I'm sure other inmates probably have visitors who bring them snacks.

The guard specifically told me it's common when people visit Mr. Basham, he likes them to bring snacks.

Q.   Okay.  And you testified Mr. Basham never said he would not participate in the interview if you didn't bring him change.

A.   That's correct, he never said that.

Q.   And you were not aware until today that he asked Dr. Hyde the same request.

A.   Well, he said that he asked a doctor, I assumed it to be Dr. Parker, to do the same thing, but --

Q.   I'm sorry, go ahead.

A.   But it may have been Dr. Hyde he was referring to.

Q.   And you heard Dr. Hyde's testimony today that he declined to bring Mr. Basham --

A.   Yes.

Q.   -- any change.

A.   But let me add, he didn't see him two days in a row.

Q.   He did seem him two different occasions, correct?

A.   Not two days in a row.  There's a difference when you see them two days in a row because on day one they can make a request knowing you are coming back the very next day, which I already told him.

Q.   And you noted in your testimony you've never been to the federal prison in Terra Haute before.

A.   This was my first time.

Q.   And I think your words were, when in Rome.

A.   That's -- I did say that.  I said okay, if it's common practice I certainly -- even though he didn't say he wouldn't talk to me, that feeling, and it's a gut instinct, well, he may not if I don't do this.

Q.   Is it a fair assessment that your inexperience with Terra Haute and federal prisons, how they run visits there, also contributed to your decision to bring change for Mr. Basham?

A.   I think it may have.  I mean, it was difficult getting in and out of that prison.  It was very difficult.

Q.   All right.  I feel your pain on that one, believe me.

A.   They told me to be there at 8:00, I'll get right in.  I got there at 8:00 and waited 45 minutes.

Q.   That sounds about right.  Going back to your article on MR that we have talked about already, you note in there that the AAMR says that mental retardation is not always obvious to the casual observer.  Persons with MR can hide disabilities, can have jobs, can get married, have children, and interact with others.  The same goes for individuals with cognitive disorder, correct?

A.   Yes.

Q.   And people with cognitive disorders can lie?

A.   Yes.

Q.   People with mental retardation can lie?

A.   Yes.

Q.  People with brain damage or cognitive disorders -- I'm sorry, people with cognitive disorders can manipulate?

A.  Yes.

Q.  And people with mental retardation can manipulate.

A.  Yes.  Not as well, usually, as people without, but --

Q.  But they are still capable of the most basic definition of manipulation.

A.  Yes.

Q.  People with cognitive disorders can develop skills in certain areas?

A.  Yes.

Q.  And some people with mental retardation can develop skills in certain areas.

A.  Yes.  But what differentiates the two is their overall adaptive functioning and the actual measured IQ.  I would say that people with cognitive disorders not otherwise specified are not as impaired as people with mental retardation.  They are more likely to be married than people with mental retardation.  They are much more likely to obtain a driver's license, to be able to manage checking accounts, to do all sorts of things compared to someone with mental retardation.

Q.  But it's a fair statement that none of those are mutually exclusive to the other.

A.  No.  You have to look at the total package.

Q.  And I want to move now to the crux the matter that we're

here, and that is your finding that Mr. Basham is competent. You took it in a few stages.  First, you write in your report that Mr. Basham understands the legal process.  Is Mr. Basham able to understand more complex ideas?

A.   Such as?

Q.   Did you discuss with Mr. Basham individual claims in his 2255 petition?

A.   No, I did not.

Q.   You noted that Mr. Basham has great difficulty delaying gratification.  Is that -- would you agree with that, even when delaying gratification is in his best interest he has trouble seeing down that path?

A.   There is delayed and then there's delayed.  The legal process is a real big delay and I think that's more difficult for him because of his wanting what he wants when he wants it.

Q.   And you are aware that he talks with other inmates to help him with understanding his legal matters?

A.   Yes.  He mentions getting legal advice from David Hammer.

Q.   Are you aware that Mr. Hammer has written letters for him to send to this court previously?

A.   I believe so.  And it related to giving up his appeal?

Q.   Correct.

A.   Yes.

Q.   And Mr. Basham signed his name to a letter that Mr. Hammer typed up.

A.   I would not be surprised.

Q.   Do you know if Mr. Basham has the ability to discern when the information he gets from someone like Mr. Hammer or another inmate is accurate?

A.   Technically accurate, legally accurate?

Q.   Correct.

A.   Some things yes, some things probably not.  More technical things he's probably not as good at.  But those would be things I would expect him to not necessarily be able to do himself, but to be able to form a working relationship with an attorney or a real representative that he could trust enough to do that for him, what he does not know.

Q.   And you note in your report an example of the court setting an execution date for him.  Would it surprise you if I told you that he's been advised multiple times that the federal government would have to set that date but he still believes the information he received from Mr. Hammer, which is that this court can do it?

A.   That does not surprise me.

Q.   I want to move now to Mr. Basham's ability to control himself in court and his outbursts.  Again, you don't find that he's malingering, poor concentration.

A.   No.

Q.   Nor distractibility.

A.   No.

JA 4902

Q. Nor impulsivity.

A. No.

Q. The trial, you saw records that he was medicated for ADHD and he took Concerta, is that correct?

A. I do note from the Alvin S. Glenn records he was on Concerta.

Q. Is that a medication in your experience that has been used for ADHD?

A. Yes.

Q. And from your review of the prison records he is not medicated for ADHD now.

A. Correct.

Q. And that's really common in prison settings.

A. It's common not to have the medications that are commonly used because they are amphetamine or amphetamine-like substances and there's a tremendous black market. There are other medications that are not amphetamine and amphetamine-like substances that can be used in ADHD.

Q. In your review of the medical records, though, Mr. Basham is not receiving any medicinal treatment for his ADHD.

A. That's correct.

Q. And we talked briefly about Mr. Basham sitting through this hearing, and I believe your statement was that a TV screen was not ideal, is that correct?

A. I think he has the capacity to sit and watch proceedings

on the TV but it's less ideal than being live in court.

Q. And is it a fair statement the more complex the testimony, the more difficult it is for him to focus?

A. Yes.

Q. How about the more emotional the testimony? Does that also make it more difficult for him to focus?

A. I don't think it makes it more difficult to focus. In fact, I think the emotional testimony makes it easier for him to focus. I think what it does, however, is make him less comfortable. He doesn't want to hear it and he doesn't want to hear when his family, friends, uncle, and cousins that testified at his sentencing phase. He didn't want to hear that, he didn't want to sit there and listen. And he made a decision that no one is going to force me to sit here and listen.

Q. With ADHD though, if someone is hyper-stimulated for some reason, whether it be frustration, anger, fear, grief, doesn't that contribute to the inability to focus or exacerbate the inability to focus?

A. I think the inability to focus is likely to become more evident when the testimony is boring.

Q. Okay.

A. Like the psychiatric testimony, like I had trouble staying awake reading it.

Q. And Mr. Basham, you read, had trouble staying awake during

court during those sessions.

A.  Yes.

Q.  And you did note in your report that when there were problems with Mr. Basham court was stopped?

A.  I noted that in the record, yes.  The court was stopped and Dr. Schwartz-Watts was called to come evaluate him.

Q.  And that would be the scuffle with the marshals, would be one of those examples?

A.  Yes.

Q.  Would another -- did you read on October 26th, do you recall reading that there was a day when Mr. Basham did not get his Seroquel?

A.  I read that there was a day where he had not gotten his Seroquel, but then he got it in the morning because he had not gotten it the night before, and that might have made him sedated.

Q.  That was -- that's my next question.  What does Seroquel do?

A.  Seroquel, he's getting it now for an off-label use, which is to help him control his anger and frustration.  But normally it's used to treat schizophrenia or major mental illness, psychotic illness.  That's an antipsychotic.  But as a side effect it is very sedating, it can make people sleepy.

Q.  And do you recall that on that date that he didn't get it Mr. Basham's attorneys brought that issue to the court's

attention?

A.   I recall that, yes.

Q.   And you agreed with Mr. Witherspoon on direct testimony that at the time of trial, the best time to assess competency at the time of trial?  That was in inartful way of saying that, I apologize, but --

A.   Yes.  I mean, retrospective evaluations such as what I have been asked to do are inherently not as reliable as actually doing it at the time of trial.

Q.   And we briefly mentioned the scuffle with the marshals. You are aware that Dr. Schwartz-Watts evaluated him immediately following that scuffle and found him at that time to be incompetent?

A.   That's my understanding from reading the record.  It was very curious to me as to why she determined that.

Q.   The next part of competency that you addressed in your report is Mr. Basham's ability to work with his attorneys. And you believe that Mr. Basham is able to cooperate and assist his attorneys, correct?

A.   If he chooses to do so.

Q.   And you give an example in your report, and you also talked about it in direct testimony, where Mr. Basham wanted to call a rebuttal witness regarding an issue with a trap door in his cell.  Mr. Witherspoon was critical that Mr. Hyde didn't talk to Mr. Harris or Mr. Swerling about some of the

issues that Dr. Hyde addressed.  Did you talk to Mr. Harris or Mr. Swerling about Mr. Basham, bringing this issue to their attention?

A.  I did not, I just read their testimony about how he was at the trial.

Q.  And you don't know if Mr. Basham was able to talk to Mr. Harris or Swerling at an appropriate time, do you?

A.  I do not.

Q.  And would it surprise you to learn that Mr. Basham had to be given coloring books during trial?

A.  I was aware of that.

Q.  And is your understanding part of that reason was so that he wasn't constantly annoying his attorneys while they were trying to do the trial?

A.  I don't recall the reason.  I was under the impression it was done so he would stay focused on something.

Q.  And you don't know whether Mr. Basham was able to have a rational conversation with Mr. Harris and Mr. Swerling about the pros and cons of calling that witness.

A.  I do not know.

Q.  And you wrote another article that's listed in your CV, AAPL Practice Guideline for the Forensic Psychiatric, Evaluation of Competence to Stand Trial.

A.  I didn't write that, I participated in its writing.  I wrote one small section on ethics.

Q.   Okay.  Your name appears as one of the authors of the article.

A.   I wrote the ethics section.

Q.   The article is not footnoted that's the only section you signed on to, correct?

A.   Well, I'm just telling you what I actually wrote.  I know it's a larger document.

Q.   Do you agree with -- do you sign on to the rest of that document?

A.   I think it is a guideline for competency to stand trial, it is not a standard.

Q.   Okay.

A.   It is ideal practice.

Q.   It's --

A.   Ideal practice.

Q.   Is a fair assessment, does the section of the article summarize -- you talked about the Dusky case and some of the other major legal standards for competency, and then the second half of the article is practice guidelines.

A.   That sounds correct.

Q.   One of the practice guidelines that is discussed in the article says that even for experts who are retained by the prosecution you can request to talk with defense attorneys. Do you recall that?

A.   Yes.

Q.   And the specific quote is, that may provide valuable information about the attorneys' specific concerns about the defendant's competence and examples of defendant's limitations related to trial procedure.

You never made a request to talk to Mr. Burke or myself prior to writing your report, did you?

A.   No.  I read your petition for collateral relief.

Q.   You never spoke with us -- never requested to speak with us about any difficulties we had with Mr. Basham.

A.   I did speak with you Saturday.

Q.   And your report was already completed at that time.

A.   Yes.

Q.   And you had already made your competency determination at that time.

A.   Yes.

Q.   And are you aware that Mr. Burke and I have been on this case for approximately three years?

A.   I believe so.

Q.   Another thing that it's noted in the article is the importance of avoiding bias.  And one of the recommendations is avoid working with one side or another exclusively.  You noted that you taught at the 2006 National Habeas Institute.  Is there any other teaching that you've done that your CV does not reflect for the defense?

A.   Specifically for the defense bar?

Q. For the defense bar.

A. I don't think so.

Q. And I may have miscounted, but I count approximately 17 conferences you've taught at for district attorney associations.

A. Yes. They were based here in Columbia, and that's why they utilized me because I was convenient.

Q. All of the defense -- excuse me, district attorney teaching you've done were here in town?

A. A lot of them were here in town. A lot of them were in Charleston, and because they plan and coordinate they wanted someone local to work with them on the curriculum itself before they did them in other cities. And so they frequently used me.

Q. Okay.

A. I have been all the way to Alaska doing that.

Q. Did I recall seeing -- you also noted that you evaluated numerous cases on both sides for pretrial competency or to be executed. In death penalty cases you have never found anyone incompetent that did not have a psychotic disorder, is that correct?

A. I don't recall finding someone incompetent that didn't have a major mental illness.

Q. Finally, and I will finish up, you also evaluated Mr. Basham for competence to be executed. You understand that's

not the purpose of this hearing, correct?

A. Yes. I was doing what I was requested to by my retaining counsel.

Q. Okay. And going back to that practice guideline, it also notes that adjudication of competence should not take up other legal matters unless the jurisdiction requires it. This jurisdiction does not require that you also assess for competency to be executed, does it?

A. First of all, that guideline that you are reading you are taking the intention out of context. What that means is when you are doing a competence to stand trial evaluation pretrial, which is when it should be done, you should not address issues of criminal responsibility or mental state at the time of the crime unless you have been specifically asked to do so.

Q. And it also says if you do -- if you are specifically asked to do so a separate report should be done.

A. It says that. However, I can tell you there is a separate practice guideline on criminal responsibility determinations which will contrast what you just read and states the different jurisdictions require it done different ways.

Q. And your name is not on that practice guideline, is it?

A. The criminal responsibility one. It's currently undergoing revision, I have been asked to contribute to it and we will see.

Q. And you agree that that status, competency to be executed,

can change over time due to a variety of factors.

A.   Sure.

MS. STONE:  May I have just a moment, your Honor, to confer with counsel?

THE COURT:  You may.

(There was a pause in the proceedings)

Q.   I just want to clarify something briefly.  In the very last page of your report on the very last sentence you note you find insufficient evidence to suggest that Mr. Basham would not have been competent to stand trial at the time of his trial.  Does that mean that you find sufficient evidence he was competent or that --

A.   This is the way I prefer to word my finding when I'm asked to do it retrospectively.

MS. STONE:  Okay.  No further questions, your Honor. Thank you.

THE COURT:  Thank you.  Any redirect?

MR. WITHERSPOON:  Yes, sir, Judge.

REDIRECT EXAMINATION

BY MR. WITHERSPOON:

Q.   Just to make sure, Dr. Hyde --

A.   Frierson.

Q.   I apologize, please forgive me.  Just to be sure, Dr. Frierson, the way you wrote in the last sentence, again, it's your opinion -- what is your opinion, to a reasonable degree

of medical certainty, whether Mr. Basham was competent at the time of this hearing -- of the trial?

A. It is my opinion, and I'm specifically wording it this way, that I, from looking at the transcripts, from talking with him about trial, from assessing his legal knowledge now, from looking at how he's able to defend himself, or at least obtain defense to a disciplinary charges, I find insufficient evidence that he was incompetent. Therefore, I presume to a reasonable degree of medical certainty that he was competent.

But competent has to be a presumption because I did not evaluate him at that time and ask him all the questions that I asked him now. I do note that there was a defense expert who did that, who did not have concerns about his competency, and I find in reviewing this retrospectively little evidence to suggest that he was incompetent.

Q. Now, Miss Stone said that this study indicates that you could have an opportunity to talk to Miss Stone and Mr. Burke. Do you know what an attorney-client privilege is?

A. Yes.

Q. What is attorney-client privilege?

A. My understanding is that it prevents attorneys from divulging information they obtained from their client.

Q. So do you think that would preclude you from talking to them or them talking to you?

A. It may or may not.

Q.  Now, you said doctor -- I think she mentioned Dr. Schwartz-Watts found him incompetent on the day of his scuffle with the marshals.

A.  Yes.

Q.  What did she determine the very next morning when the judge stopped the proceedings that day?

A.  That he was competent.

Q.  And Miss Stone said that Mr. Basham, I think you may have said this, he can talk with other inmates to get legal advice. Is that like consulting with his lawyer or lawyers to get legal advice or --

A.  Well, hopefully he gets better legal advice from his lawyers than he does from the people on death row.  But it at least shows a willingness to consult with someone who might know more than he does and provide whoever it is that's assisting him information that they can include in briefs or what have you that they are sending to the disciplinary board, an accurate account from his perspective of what actually happened at the time of the disciplinary offense.

Q.  And Miss Stone asked about mental retardation.  Isn't it true that Dr. Schwartz-Watts and Dr. Brawley determined that Mr. Basham was not mentally retarded?

A.  Yes.

Q.  And are they capable as experts of making that determination?

A.   Yes.

Q.   And I think Miss Stone said Mr. Basham -- or indicating he had a sick brain or something of that sort.  That doesn't mean that he's incompetent, does it?

A.   No.  Despite what Mr. Basham has, whether it be bipolar disorder, whether it be cognitive disorder, you know, whether it be dementia, he still illustrates or is able to demonstrate a factual understanding of the legal proceedings and ability to consult with his attorney with a reasonable degree of rational and factual basis and an understanding of the proceedings against him.  Therefore, that's why I opine that he appears to have been competent.

        MR. WITHERSPOON:  Thank you very much, Dr. Frierson.

        THE COURT:  Anything further of this witness?

        MR. WITHERSPOON:  Nothing from the government your Honor.

        THE COURT:  Thank you, sir.  You may step down.

        How long do we need for argument?

        MR. WITHERSPOON:  Judge, I spoke with Mr. Littlejohn at the break.  He is available tomorrow morning at 11:00 o'clock.  He doesn't have to be in Florence until 2:30.  I spoke to Miss Stone, she has 30 minutes, I think we probably may have an hour.  So he's available at 11:00 o'clock to come and he's coming tomorrow at 11:00 o'clock, so we should be able to finish him between 11:00 and 1:00.

THE COURT: You want to wait until we get his testimony to start hearing the argument?

MR. WITHERSPOON: I think we can start probably first thing in the morning and then break and finish.

MR. BURKE: Your Honor, I think we can begin whenever you wanted to and argue until Mr. Littlejohn was available. And then we simply won't argue the issues that concern Mr. Littlejohn's testimony but we --

THE COURT: I'm pretty tired today. I'd rather not start the arguments today.

MS. STONE: Us, too.

THE COURT: You want to start at 9:30 and go until 11:00? And can you tell me now what you might want to argue tomorrow morning so I can re-read those sections? If you can, if you know?

MR. BURKE: Certainly, your Honor. I think what might make the most sense is if we begin by arguing the four competency claims four through seven. And that very well could take us up to the point of Mr. Littlejohn's testimony. And then we would like to argue the various claims of ineffective assistance of counsel that we have alleged, most particularly focusing on claims nine, 15, 16, and then claims one and two. That will involve at least in part the testimony of Mr. Littlejohn. And then --

THE COURT: You're outlining now all the ones you

want to argue sometime this week.

MR. BURKE: Well, my hope is that we can -- after Mr. Littlejohn is finished we can begin arguing and --

THE COURT: That's what I'm saying. You think the competency will take us until 11:00 o'clock, at least. Assuming you're almost finished or just about finished, we hear Mr. Littlejohn, then you start on the ineffective assistance claims you want to argue.

MR. BURKE: Yes, sir.

THE COURT: Tell me which ones you want to argue. Nine, 15, 16, one and two.

MR. BURKE: One and two. Let me just check. This is not an ineffective assistance of counsel claim, but I would like to argue claim 11, which is the Napue claim against the government with regard to the testimony of Sheriff Hewitt.

And, your Honor, one of the claims that we didn't previously indicate that we would rely on the brief but we are now simply going to rely on the brief is claim three, which is the jury selection issue. I don't think that there's anything that we can add to our argument that's not already in the pleadings.

THE COURT: All right. I'm not going to hold you to it. I just want kind of a preview of what you think you are going to be arguing.

MR. BURKE: Claim 20 with regard to -- no, excuse me,

not claim 20. I don't intend to argue that. We will rely on the evidence presented to you and our argument. Claim 19 I will briefly argue, as well, with regard to the issue of the investigation into mental retardation.

I think, your Honor, that that is the totality -- Mr. Daley, are there claims I'm overlooking?

MR. DALEY: Claim 30?

MR. BURKE: Oh, and we will argue claim 30, as well, your Honor. And briefly argue claim eight with regard to Juror Wilson and the evidence -- 28.

THE COURT: What does 30 deal with?

MR. BURKE: Thirty is the claim that the appellate counsel were rendered ineffective by Mr. Swerling's refusal, is our position, to provide him with the original trial file in this case.

THE COURT: All right.

MR. BURKE: And one other claim, your Honor, which I have to tell you I have not yet been able to answer the question which you raised in October with regard to claim 23, which is the inconsistent theories. You asked whether that issue had been resolved by the Fourth Circuit's opinion in Mr. Fulks' case. I have not had the opportunity to go back, I will tonight. My belief is that the Fulks decision does not in fact resolve the issue with regard to Mr. Basham. So I would like to argue that one, as well.

THE COURT: All right.

MR. BURKE: And claim 24 is our Tennard claims, and we also would like to argue that. I have a busy night ahead of me.

MR. DALEY: Your Honor, just so the record is complete, about a week-and-a-half ago Mr. Fulks filed his petition in Supreme Court, and one of the two issues that's raised is the inconsistent theories issue. So he's seeking certiorari on that issue.

THE COURT: He raised only two issues?

MR. DALEY: He raised a juror selection issue and the inconsistent theories issue, the government argued inconsistently in his case and Mr. Basham's case.

MR. BURKE: Your Honor, just also, since we're talking about the Supreme Court, we filed a certiorari petition from this court's order regarding the disclosure of trial counsel's files. It is my understanding that the court requested that the solicitor general respond, and the solicitor general's office contacted me about a week or so ago and asked for some additional time to respond. That's before the Supreme Court. I don't anticipate it would be -- would be conferenced any time before probably April or so.

THE COURT: All right. Well, as far as what you want to argue, I have written down what you said. Let me recap it, if I could. You want to argue the full competency claims

tomorrow morning first thing before Mr. Littlejohn, and hopefully finish. If not, we will finish after his testimony. And then ineffective assistance of counsel claims nine, 15, 16, one and two. They all relate in some way to the Sheriff Hewitt testimony or the strap testimony.

MR. BURKE: No, your Honor, claim nine concerns Mr. Harris and Mr. Swerling's concession of the elements to the jury.

THE COURT: All right.

MR. BURKE: Claim 15 concerns their failure to object to the admission and then scope of the evidence regarding Samantha Burns. And claim 16 involves their failure to request the use of the government's statements regarding Mr. Basham that were made in the closing argument in the Fulks trial.

THE COURT: All right. And then one and two deal with what?

MR. BURKE: Claim one is a claim against the original trial counsel for ineffective assistance in allowing Mr. Basham to --

THE COURT: Walk away.

MR. BURKE: To walk away. And claim two is ineffective assistance of counsel at the Jackson v. Denno hearing. And Mr. Hammond testified about that in his testimony in October.

JA 4920

THE COURT: All right.

MR. BURKE: One and two sort of go together, because much depends on what testimony we receive tomorrow. But I would say that one, two, and 11 all deal with the Hewitt testimony. Claim 11 is the proffer during the trial.

THE COURT: I wrote down what you said about the rest. I know you said 24.

MR. BURKE: Claim 24 is our claim that there was an improper argument made about causal nexus to the jury, that the jury was improperly informed that they needed to find a causal nexus to the mitigating evidence that was presented.

THE COURT: All right. We will be ready to hear from you tomorrow morning at 9:30. Anything else while you are all here?

MR. BURKE: Your Honor, just with regard to Mr. Basham, I wanted to let you know that we made the decision, speaking with Mr. Murray, that he should return to Arizona, that the possibility of Mr. Basham deciding to come out or being able to come out is so remote it was not worth his time or the court's staff time.

THE COURT: Very good. I have no problem with that. All right. Thank you, we will see you at 9:30 tomorrow morning.

(Recess, 4:14 p.m.)

1192

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  12-19-12                    s/  Daniel E. Mayo


                         DEFENSE WITNESSES

THOMAS M. HYDE

          DIRECT              1007

          CROSS               1043

          REDIRECT            1090



                       GOVERNMENT WITNESSES

RICHARD L. FRIERSON

          DIRECT              1103

          CROSS               1142

          REDIRECT            1182

**JA 4922**

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

# JOINT APPENDIX AND INDEX
# VOLUME 21

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

------------------------------

UNITED STATES OF AMERICA                     CR NO.: 4:02-992
                                             Columbia, SC
     -vs-                                    December 4, 2012

BRANDON LEON BASHAM,

          Defendant

------------------------------


               BEFORE HON. JOSEPH F. ANDERSON, JR.
                UNITED STATES DISTRICT COURT JUDGE
                        MOTION HEARING


APPEARANCES:


FOR GOVERNMENT:        HON. WILLIAM N. NETTLES
                       UNITED STATES ATTORNEY
                       BY:  ROBERT F. DALEY, JR.
                            JIMMIE EWING
                            JEFFREY M. JOHNSON
                            WILLIAM K. WITHERSPOON
                       Assistant United States Attorneys
                       1441 Main Street
                       Columbia, SC  29201

FOR DEFENDANT:         JULIA G. MIMMS, ESQ.
                       JULIA G. MIMMS LAW OFFICE
                       1001 Elizabeth Avenue, Suite 1A
                       Charleston, NC  28204

                       ARIZONA FEDERAL PUBLIC DEFENDER
                       BY:  MICHAEL L. BURKE
                            SARAH E. STONE
                       Assistant Federal Public Defenders
                       850 W. Adams, #201
                       Phoenix, AZ  85007

COURT REPORTER:      DANIEL E. MAYO, RDR
                     Certified Realtime Reporter
                     901 Richland Street
                     Columbia, SC  29201


            STENOTYPE/COMPUTER-AIDED TRANSCRIPTION

THE COURT: All right. I'll be pleased to hear from whoever's going to speak first on the arguments.

MR. BURKE: Good morning, your Honor. And may it please the court.

THE COURT: Let me ask, do we want to do this issue by issue going defendant, government, back and forth, or how do you think we should proceed?

MR. BURKE: Whichever you prefer. I think that might be easiest, although --

THE COURT: It seems to me it would be easier to hear the competing arguments back to back.

MR. BURKE: I would say that the claims one through -- excuse me, the ones that we're talking about, the competency claims here, they are --

THE COURT: All together.

MR. BURKE: All together.

THE COURT: All together on those, certainly, but then let me hear from the government on competency, then we will move on to the others.

MR. BURKE: That's fine, your Honor. Thank you.

THE COURT: Very good.

MR. BURKE: So this morning we would like to begin by addressing claims four, five, six, and seven, which concern the issues of Mr. Basham's competency to stand trial, his attorneys' effectiveness in representing him with regard to

his competency, this court's independent constitutional obligation to determine that Mr. Basham was competent at all points throughout the trial.

And then if the court requests argument on claim seven, claim seven is that the attorneys who represented Mr. Basham on appeal were ineffective in failing to raise the competency issue on his direct appeal. Obviously, that would not apply to claim five, which is an ineffective assistance of counsel claim. Our position is that we don't really need to go into claim seven because the claims that he's raised here are ones that cannot be waived and that this court must consider at any point. And we briefed those, the legal arguments for those, in our pleadings.

The question of Mr. Basham's competency, not only has it permeated the proceeding that we have had this fall but it's been an issue in Mr. Basham's case from the very, very beginning. Mr. Monckton's very first notes in this case ten years ago concern his observations and concerns about whether Mr. Basham was competent. One of the very first pleadings ever filed in this case was a motion by Mr. Monckton and Mr. Littlejohn to determine Mr. Basham's competency to proceed, and ten years later we're still debating it and it's still a very, very, live issue.

THE COURT: The first lawyers filed a motion and then Mr. Swerling and Mr. Harris withdrew it, right?

MR. BURKE: Yes, your Honor. Yes. And on that point, your Honor, we have heard testimony and the government has made arguments that Mr. Swerling and Mr. Harris made a strategic decision to withdraw that motion because they did not want to make Mr. Basham available to the government for an evaluation. And what I would submit is the record plainly indicates that whatever merit that, quote unquote, strategy might have had disappeared once Mr. Basham had been sent to Butner in early 2004. And many of the competency issues we're dealing with occurred after that point. And then more importantly, clearly an attorney, defense attorney cannot make a strategic decision to allow his client to be tried while incompetent. There's no strategy involved there.

But if we look at this case we see that from the very beginning even before you ever had a hearing --

THE COURT: I had forgotten, Mr. Basham was sent to Butner in 2004?

MR. BURKE: Yes, your Honor. He was sent to Butner twice. In fact, he had just returned from Butner when you held the Jackson v. Denno hearing in February of 2004. I believe he was at Butner from January through mid February of 2004. I'm not entirely sure on my dates, but that is the time frame.

THE COURT: I'm embarrassed to say I had forgotten that, and so they said he was competent.

MR. BURKE: They did a full evaluation for purposes of the fact that Mr. Basham was presenting mental health mitigating evidence, so that's why they were allowed to have Mr. Basham present and to evaluate him. They did not specifically do a competency evaluation because by that point Mr. Swerling and Mr. Harris had withdrawn any claim for that.

And, in fact, you may recall at one point when Mr. Basham -- Mr. Basham in 2003 was moved to the Columbia Care facility at the request of his attorneys and Dr. Schwartz-Watts so that he can receive care for his psychiatric illnesses. The attorneys then filed a motion with your Honor asking that that stay be extended and submitted an affidavit or letter from Dr. Schwartz-Watts saying that Mr. Basham had -- she had been unable to even evaluate Mr. Basham because of his mental condition once he was moved there.

At that point the government itself said that there was reasonable evidence to believe that Mr. Basham was incompetent and they filed a motion to have the competency determined. They later withdrew that based on statements made by counsel that they were not raising the issue of competency. But that gives a little bit of the process.

THE COURT: So the initial two attorneys, Littlejohn and Monckton, filed a competency motion, withdrew it, the government filed a competency motion and withdrew it also.

MR. BURKE: The original counsel filed the motion,

Harris and Swerling withdrew it. The government argued in response to the request that Mr. Basham be able to stay longer at Columbia Care that obviously there needed to be a competency determination. They withdrew that orally in a hearing with your Honor. So that's the history --

THE COURT: And along this time was Dr. Schwartz-Watts on board telling Harris and Swerling that he was competent?

MR. BURKE: Along this time they were not asking, as far as the record --

THE COURT: Was she in the case at that point?

MR. BURKE: Yes, she was, she was in the case. She did submit, as I said, a letter to your Honor, doesn't use the word competence but says that she -- in order for her to do her evaluation of Mr. Basham she needed him to stay longer at Columbia Care because his condition for the first few weeks he was there was so poor, I think she used the term he decompensated, she couldn't even do an evaluation. So then in 2004 Mr. Basham is sent to Butner, not for a competency evaluation but for the evaluation with regard to the defense's intention to put on mental health evidence at trial.

At that time, I believe in early February 2004, there's a suicide attempt by Mr. Basham and then on the 24th of February is when this court began its Jackson v. Denno hearing.

And, Susie, if you could bring up the morning transcript for February the 24th, 2004 and go to page two of that transcript for us, please.

So this was the morning, your Honor, of the joint hearing on the Jackson v. Denno motions filed in Fulks and Basham.  The very beginning of the hearing it begins with Mr. Swerling informing the court that Mr. Basham was incoherent and he didn't understand the nature or purpose of the proceedings.  And on page three he informs the court that Mr. Basham had attempted to -- apparently attempted to slash his wrists, and I think he uses the word "again" the night before he appeared in court.

Your Honor properly reacted to this information and requested that Dr. Schwartz-Watts determine Mr. Basham's competency to proceed that day.  And Dr. Schwartz-Watts did inform the court later that day that Mr. Basham had had some mix-up with the drugs in his system, the medications that he had been given, but that that he would become more alert throughout the day.  And so then the court began the actual evidentiary hearing portion of the hearing later that day.

As the case moved towards trial we learned at this evidentiary hearing that Mr. Swerling and Mr. Harris made the decision that the way that they thought they could control their client during their trial was to have him focus his energy and attention on drawing in a Scooby Doo coloring book

and other childlike activity books.  And we heard about a memorandum written by their chief mitigation specialist Lisa Watson in which she detailed her visit to Mr. Basham prior to trial in which she instructed him that this was what he needed to focus on, he needed to focus on his coloring books.

Now, Mr. Swerling may tell the court today and Mr. Harris may tell the court today that they didn't have any concerns about Mr. Basham's competency, but I'd submit those actions speak volumes.  The very idea that before the trial even started they were aware of Mr. Basham's limitations such that they felt they had to keep him preoccupied with busy work suggests, regardless of what they tell you today, that there were true concerns about whether he could be an active participant in his own defense.

And I know, your Honor, much of what I tell you is information and experiences that you've lived and I've only read about, but you know that throughout the trial there were ongoing issues regarding Mr. Basham's -- either his inability to stay awake during proceedings or his inability to control his behavior and his outbursts.

In our reply brief on the 2255 motion on pages 32 and 33 we cite to several of the record incidents in which this court, and I'll use the word diligently attempted to accommodate the defense in working with Mr. Basham.  And there were concerns about whether he was able to stay awake, there

were concerns about whether he can control himself in court.

THE COURT: Well, I'll say what I said back when we heard this testimony. Every time it appeared to me he was sleeping or trying to sleep I stopped and said something. I know you introduced a newspaper article that said he slept during trial, but to me that doesn't prove anything to me when I was here. I'm not sure how much actual sleeping he did. I'm certain maybe he tried to sleep, but --

MR. BURKE: Well, I would submit, your Honor, that he wasn't necessarily trying to sleep, but we know from even Dr. Frierson's testimony, we know that Mr. Basham was taking quite a bit of prescribed medication and one of those was an antipsychotic, the Seroquel, which had the effect of causing drowsiness. And you are aware that there were situations, there were times, and I'll talk about one specifically in a moment, at which Mr. Basham came to court not having been given his medication, something totally beyond his control.

So I would also point to the trial attorneys' handwritten notes that were admitted during the evidentiary hearing. They also, I think, speak more clearly about what Mr. Harris believed about Mr. Basham's ability to actively assist in his defense. They talk about his, and we use the term perseveration, but his complete focus during some of the most critical parts of the trial on whether he would be allowed to have dip.

And you will remember, your Honor, there are notes from Mr. Harris where he says morning, dip, afternoon break or afternoon, dip, break, dip, all he talks about is dip. There are other notes saying he can't -- he will not sit up, he cannot keep his head up. I tell him that the jury's looking at him and they are seeing this.

Now, with regard to the dip issue, Dr. Schwartz-Watts indicated at trial that in one of the conversations that you had with her that the dip -- I believe this is right, I don't -- if I misstate the record I do apologize, it's a voluminous record, but if my memory serves correctly Dr. Schwartz-Watts said the dip served the purpose for Mr. Basham, twofold, it kept him calm and it kept him awake.

THE COURT: Does dip have caffeine-type effects or not? I don't know.

MR. BURKE: From what I understand from speaking to experts about it, that the nicotine can have that effect.

THE COURT: I know I offered him coffee and other stimulants but he kept going back to the dip. And I thought if that's what it takes to make him happy, I actually sent my law clerk down to buy a can of dip. I think it's still in my desk drawer in my office. Out of my own pocket I bought the dip and we came back Monday and the marshal said can't do it. And I always defer to the marshal in matters of security. He said it creates a problem of him spitting something on our

guards and there had been some incidents of scuffles. And I had to go back on what I told him, unfortunately.

MR. BURKE: Your Honor, I would like to share something with you, but may I confer briefly with Miss Stone?

(There was a pause in the proceedings)

MR. BURKE: Your Honor, on the point of the dip, since you bring it up, I want to share something with you that you will -- we all remember how this hearing started in October and it wasn't very pleasant.

THE COURT: All right.

MR. BURKE: Mr. Murray was with Mr. Basham that day, and I will tell you that Miss Stone and I have represented Mr. Basham for three years and never once during those three years has Mr. Basham ever mentioned dip to me. Mr. Murray had no experience with Mr. Basham and when the hearing started, the very day, the very morning the hearing started when Mr. Murray indicated that he wanted to talk to us, Mr. Basham almost immediately began perseverating about dip again, which we thought was very telling, that -- and this goes to the fact that you heard the testimony from Dr. Parker, your expert, that Mr. Basham can have difficulty dealing with the stress of the courtroom setting.

But my point on the dip is we have heard continuously from the government that Mr. Basham is a manipulator, that he manipulates his defense team, he manipulates you, he

1205

manipulates experts. I'm not sure in this instance, to me it strikes me that Mr. Basham was seeking to control his behavior. He believes, and he may be right, that the dip helped him to stay calm and focused. And we all know what happened when the court made the decision that you could not give him the dip.

So the question comes down to is this a matter of what the government would have you believe, that Mr. Basham just doesn't care, just doesn't want to control his behavior, or if he's not able to control his behavior.

And I would like to just talk for a minute about Dr. Hyde and Dr. Frierson. And, your Honor, I can't imagine anything more frustrating for a jurist than a battle of experts, and when you have two experts who come forward and tell you two different things it has got to be extremely frustrating.

Dr. Hyde testified yesterday and he said in his report that Mr. Basham is permanently incompetent to stand trial. He says that he's incompetent because of his brain damage and his cognitive disorders, because of his ADHD and because of his bipolar disorder, his mood swings, which according to Dr. Hyde happened in a very rapid fashion.

Now, Dr. Frierson, you know, your Honor, Dr. Frierson used a phrase in his report and the government asked him about this phrase, or perhaps we did, but he said that he thought

that Mr. Basham was being coy and cagey with regard to his statements about hearing voices and auditory hallucinations. And, your Honor, frankly, I think that's a projection on Dr. Frierson's part. But I will tell you that I will do a projection, I believe that Dr. Frierson was being coy and cagey when he testified to you about Mr. Basham's competency at trial. He says that, there was essentially a double negative, there is insufficient evidence to show that he was not competent. He didn't say he wasn't competent, but that at this removed there's insufficient evidence to say he's -- say he was incompetent at trial.

THE COURT: Both doctors agreed that a look-back eight years after the fact is not desirable, not optimal.

MR. BURKE: Not the least bit.

THE COURT: But we did have Dr. Schwartz-Watts who has testified in this court many times, sometimes for the defense, sometime for the prosecution, who every step of the way said he was competent except for the one afternoon of the scuffle, and then the next morning she said he was good to go again.

MR. BURKE: And what she told you, your Honor, on that day of the scuffle, when she came back in she said he's not competent to proceed. And, your Honor, you did, you stopped the proceeding.

If you will look at her testimony, she said that the

good news is that his competency will fluctuate, he will have -- I'm paraphrasing, but basically she said he will be competent again. She did not say that -- she told you at least at that point that he was incompetent, but the good news was that he wasn't always going to be incompetent. That's what Dr. Schwartz-Watts said.

And I'll talk about that more fully in just a minute. But I want to focus just also on what Dr. Frierson and Dr. Hyde agree on. They both agree that Mr. Basham has ADHD and he has cognitive deficits.

Now, Dr. Parker, and he didn't testify about trial competency but he did testify about Mr. Basham's abilities to function. Said that he agreed with the ADHD, he agreed with the cognitive deficits, and he told your Honor that he thought Mr. Basham could only take a hearing such as this, so I would translate that certainly to a trial in front of a jury, in short segments, 15 minutes is what he suggested. There were not, and I'm not saying accusatorially, the fact of the matter is there were not breaks every 15 minutes during trial and, really, I can't imagine how a court could function if it had to do that.

But I think despite what arguments you hear today from the government about the fact that Mr. Swerling and Mr. Basham were not concerned, I think their actions at that time, we saw -- we saw notes yesterday and that were apparently

written by Mr. Basham. And one of the issues that came up was that when, and I think Dr. Frierson testified to this, the one time he apparently did try to participate in his defense with his attorneys and asked them about a witness that they could call, and he was shushed by his lawyers. He wasn't paying attention to his Scooby Doo book, which is what they needed him to do because they felt they could do their job.

Interestingly enough, I was looking back last night and it appears to me that this one thing that Mr. Basham showed interest in with regard to his trial really had to do with an incident at the jail, that didn't really go to anything about his guilt or innocence or his eligibility or appropriateness for the death penalty. So, I mean, it shows Mr. Basham's, his limited focus, his limited ability and his preoccupation with what Dr. Frierson said is his immediate gratification. Now, the question becomes is that because he's willfully trying to do that or is he simply unable.

You know, ADHD, we hear it all the time, but it has true meaning. I mean, I don't suffer from ADHD, but from what I understand and what I have been told by my experts is that for Mr. Basham with the type of ADHD that he has, sitting here today he would be unable to differentiate, and Dr. Hyde uses the term that it all has the same balance, was the word he used. But the fact that I was talking to you would not -- could not be the sole focus. He would notice you are rocking

in the chair, he would notice -- everything would be the same. He cannot -- he is physically incapable of bringing that focus in. And he's having to deal with that with an IQ in the lower six to seven percentile range.

No one disagrees about that either. Mr. Basham has an IQ that had it presented itself and we were able to prove it presented itself before the age of 18 likely would have made him constitutionally ineligible for the death penalty. I mean, he is a severely compromised human being.

And whether you believe he has bipolar disorder or not or whether or not you believe he hears voices or not really doesn't ultimately matter. I will say obviously the doctors who were giving him the antipsychotics felt there was a reason to give it to him. And we add on top of that then the fact that with his limited IQ, with his ADHD, he was then being given a medication that can have the effect of causing drowsiness.

And I -- I would point your Honor to some interesting language. There's a case called Riggins versus Nevada from the United States Supreme Court in 1992. And it's not a competency case. We do cite it in our pleadings in the reply brief. It isn't a competency case, per se, it's a question about whether the government could, could require that a defendant take antipsychotic medication. But Justice Kennedy wrote a concurrence in that decision where he talks, I think

very cogently, about the effects of medicating a criminal defendant with antipsychotic medication.

And to quote part of what he says, the Riggins cite is 504 U.S. 127. Justice Kennedy wrote in his concurrence, the side effects of antipsychotic drugs can hamper the attorney-client relationship, preventing effective communication and rendering the defendant less able or willing to take part in his defense. Render him less willing.

So even if this court were to think that there was some volitional aspect to Mr. Basham's actions that could in fact be attributable to the medications he was on, I would submit that Dr. Frierson did not address at all the effect that these medications would have had on Mr. Basham.

He also doesn't take any issue, because he's not qualified to do so, with Dr. Hyde's neurological findings that provide objective evidence that Mr. Basham is brain damaged. And today we have seen that Mr. Basham is a damaged young man, and ten years ago or eight years ago when he stood trial he was frankly barely more than a child, and emotionally I don't know how -- emotionally and intellectually he really has not gotten any better.

On the point of manipulation, I looked the other night at the definition of manipulation in the Oxford English Dictionary on line and it talks about skillful or unscrupulous control of the situation or of a person. It implies that the

person who manipulates is doing so to gain some advantage.

And I tried to think what advantage Mr. Basham was manipulating the court and his counsel to achieve through his outbursts at trial. He was alienating his defense team that was trying to save his life, he angered you, he alternately acted out and drowsed or maybe slept in front of the jury. He gave the jury the impression that perhaps he had no remorse, that he just didn't care. And alternatively that he was volatile. So we would ask you broadly to accept Dr. Hyde's testimony and his opinion that Mr. Basham is permanently incompetent to stand trial.

But I would like to focus on two particular issues, because even if you disagreed with that, your Honor, even if you were to reject Dr. Hyde's testimony, there are two incidents that occurred at this trial that I believe are dispositive of the issue in claim four, that indicate by a preponderance of the evidence that Mr. Basham was in fact tried while he was incompetent.

And I would like to begin with the September 20th, 2004 incident with regarding the dip and the struggle with the U.S. Marshals. Susie, could you go to the September 20th transcript at page 157?

And, your Honor, on that transcript at the bottom of 157 heading over to page 158, you have a statement from Mr. Harris that I think is interesting, because we heard during

this evidentiary hearing that Mr. Harris and Mr. Swerling never had concerns about Mr. Basham's competency. Well, they obviously weren't remembering the statements they made to you in candor at the -- in trial on September 20th when Mr. Harris said to you, and he's talking about the incident with the marshals, what I just saw in the courtroom didn't look like any attempt to manipulate that I had ever seen. Looked like someone who didn't have the ability to control the simple function of sitting down in a seat. That is why we have concerns about Mr. Basham's competency. That was the day that Dr. Schwartz-Watts evaluated Mr. Basham, came back and told you that he was not competent at that moment and that he could not assist his attorneys.

Now, the standard for competency concerns the present ability to assist counsel, and I think that becomes an important factor in this case. Now, there's no contrary evidence in this case, none, that Mr. Basham was competent on September 20th. The only evidence that you have, your Honor, is that he was incompetent and you had that from Dr. Schwartz-Watts, you had that from doctor -- well, you have it -- let's focus that. You have it from Dr. Schwartz-Watts and you have the statements from his attorney saying, your Honor, I have a legitimate and serious concern about his competency.

Your Honor, you did the appropriate thing that day,

you stopped court and you waited until Dr. Schwartz-Watts came in the next day and told you he was now competent to proceed.

THE COURT: Had she come in the next day and said he was still not competent I would have waited another day.

MR. BURKE: I entirely agree, your Honor. Here's the problem. That incident was videotaped and audio taped. And that videotape and that audio tape was played to the jury at the penalty phase.

THE COURT: I think I kept the audio out, didn't I?

MR. BURKE: I don't believe so. I can --

THE COURT: I thought because there was a lot of profanity used.

MR. BURKE: I think there might have been some editing done. But for the purposes of this the video alone is enough. The video was shown to the jury, and what we have is a record that says that Dr. Schwartz-Watts had said Mr. Basham was incompetent and the jury was shown a video of Mr. Basham at trial while incompetent. And even more egregiously, without any objection to competency from his trial attorneys that was admitted and the jury -- the jury heard argument from the government that this was evidence that they should give some weight to show what a dangerous man Mr. Basham was.

MR. WITHERSPOON: Your Honor, I'm going to have to object. This is a new claim. There was never an issue, excuse me, I'm sorry, Mr. Burke, the issue of whether or not

there was some error committed by the court by allowing this videotape to be shown to the jury. That is not a claim that's ever been raised.

THE COURT: Dangerousness in prison was definitely an issue. I thought the defense lawyers argued strongly to keep the whole thing out.

MR. WITHERSPOON: They did.

MR. BURKE: They did not argue on competency.

THE COURT: They argued it was prejudicial, unfairly prejudicial to let it in, I think. But you are saying that --

MR. BURKE: They never --

THE COURT: -- we've got a situation where he was incompetent and the jury got to see him behave on a day when he was incompetent.

MR. BURKE: And the due process clause prohibits that. And I disagrees with Mr. Witherspoon's suggestion this is a new claim. This is set forth in a couple of places, but fully set forth in our reply brief to this court on page 31. The record in this case indicates by a preponderance of the evidence at the very least Mr. Basham was incompetent when the videotape and audio tape were made of the struggle with the U.S. Marshals and the court deprived him of his right not to be tried while incompetent when it allowed the government to use his incompetence to its own advantage. That's in our pleadings, your Honor. That's not a new claim. And it's a

legitimate and troubling one.

THE COURT: I'm pretty sure I kept out the audio and let in the video. I think it was kind of a split decision there, because the government wanted the audio to come in, as well. Anyway, go ahead with your argument.

MR. BURKE: Thank you, your Honor. The next incident I would like to bring to the court's attention -- and I would submit to you that showing the jury that videotape alone violated Mr. Basham's rights to due process and requires that his conviction, at the very least his sentence, be reversed.

Then there is another incident which again standing alone requires relief in this case. And that is an incident that occurred, and it's discussed at length in our pleadings, on October 26th, 2004 during the penalty phase of Mr. Basham's trial.

But before I get to that I would like to give some context to Mr. Basham's mental state at that time and talk about Dr. Frierson's report and share with the court information that because of the attorney-client privilege prior to Dr. Frierson's report I was not able to share with the court.

On October 22, which was a Friday, the defense called as a witness a former counselor, program director, from the Charter Hospital in Evansville, Indiana, a woman whose name is Penny Titzer. And she testified about Mr. Basham's

hospitalization at Charter Hospital, and then she proceeded to testify about Mr. Basham's trauma from the molestation that occurred to him when he was a young boy.

If the court would like to review -- and, Susie, perhaps we could bring this up, October 22, '04 at 212. While one of the defense attorneys was examining Miss Titzer on direct appeal the other provided some signal to your Honor that they needed a break and that Mr. Basham was unable to go forward at that moment.

In our reply brief, so there's no question about this claim having been presented, we set forth the discussion with regard to Mr. Basham's statements that day. He is clearly in emotional distress. It's, obviously, it's not clear from the record why, but he was in clearly emotional distress. And again, your Honor, to your credit, you stopped court that day and you did not go forward. That was on Friday the 22nd.

When I read Dr. Frierson's report last week when we received it I saw a reference that frankly shocked me and leads me to question Dr. Frierson's -- the entirety of Dr. Frierson' findings. But if you look at Dr. Frierson's report, with I believe is government -- let me check the exact number, but it's government's exhibit -- your Honor, I'm afraid I don't have the exhibit number for you at the moment, but it was submitted during Dr. Frierson's testimony without objection. And it's his report that he just recently

authored.

And under the section on page 11 entitled social history, third paragraph, Dr. Frierson wrote he, meaning Mr. Basham, reports that his first sexual experience occurred around age 14 or 15 with a therapist at Charter Ridge Hospital. He states that he fell in love with the therapist. He denies history of long-term relationship and reports that the relationship with Penny lasted approximately six months.

I was shocked to see Dr. Frierson refer to this as a sexual experience and put it under Mr. Basham's social history. Mr. Basham was a hospitalized 14 or 15 year old who told Dr. Frierson that he had a sexual relationship with an adult female who was in a position of control and power and in whom he had great trust. This is not a sexual relationship, this is an act of sexual abuse, of molestation.

Now, the part with the attorney-client privilege I was going to mention to you is Mr. Basham told Miss Stone and myself early on in our representation about this Miss Titzer. And he is a limited individual, he is a very limited individual --

THE COURT: Let me see what Mr. Witherspoon --

MR. WITHERSPOON: Excuse me, but it seems like he's testifying, Judge. I don't know what Mr. Basham told Mr. Burke and Miss Stone, that's evidence that we can't -- have never had, and he's coming in here, and he's done it couple of

times, to come in, report about instances or during --
involved with Mr. Basham and what he has told them and what
has happened. There's no way for us to corroborate that. I
can't put Mr. Burke and Miss Stone on the stand and question
them. I think that's inappropriate at this point.

MR. BURKE: We have also made it clear, your Honor,
that we were -- Dr. Frierson made no request to speak to us
and so -- but, your Honor, I'll move on.

The facts speaks for itself that Mr. Basham was in
court on October 22nd when a person who had sexually abused
him, who had been called by his own defense counsel to
testify, testified about his own sexual abuse. Anyone, I
would submit, would be traumatized by that. But when you look
at Mr. Basham's limited psychiatric and cognitive abilities
it's no wonder he fell apart that day.

And your Honor you did stop the hearing, I understand
that, but that is preface, I think, for what happened next.
And that is on October the 26th, which was the very next court
date.

THE COURT: Did we know about this sexual episode
with the hospital worker --

MR. BURKE: No, your Honor.

THE COURT: -- by any other doctors?

MR. BURKE: No, your Honor.

THE COURT: So Frierson was the first one who

uncovered that.

MR. BURKE: The first -- I don't want to testify, he is the first health care professional who's ever reported that.

THE COURT: All right.

MR. WITHERSPOON: And that was from Mr. Basham.

MR. BURKE: That was from Mr. Basham. And that was reported by the government's expert. Again, your Honor, you stopped court that day. On October 26th, which was the next court day after a three-day break with the weekend, the court commenced and trial counsel informed you that Mr. Basham had not been given his Seroquel, the antipsychotic medication, and that he was not competent to go forward, in their opinion.

The judge, your Honor, you then held an ex parte hearing in which you instructed that Mr. Basham be sent back to the jail facility to be given his medication. Mr. Basham expressed concerns that the medication would make him drowsy, but he was sent back, you took a break for the morning. Reluctantly, but you did. You informed the jury that the case for no one's fault had to break for the morning, it was going to delay the trial, in fact it was going to delay the deliberations into the next week, but -- and asked the jury to come back at 1:00 o'clock.

At 1:00 o'clock when trial recommenced trial counsel informed your Honor that they still were not ready to go

forward with Mr. Basham and they asked for 15 minutes and you gave it to them. And after 15 minutes they came back and said we still can't go forward, Mr. Basham is not capable to assist us today.

And, Susie, could you go to the transcript for October 26th of 2004, page 14?

Your Honor, this is set forth in total in our reply brief but I think it bears repeating here, and I will read the portions of the transcript to you.

Mr. Harris states, my observation of Mr. Basham is that he is not going to be able to sit in the courtroom and pay attention to the testimony and remain silent. And I am concerned that he will -- that this jury will not look favorably upon the way he is appearing to me to be acting this afternoon. Your Honor asked the prosecutors for their position. Mr. Schools responded, our position is we need to go, Judge. We have rearranged everybody's schedule to accommodate Mr. Basham's feelings from moment to moment. I think we have done that enough. I think we now are to the point where he thought he would get this if he did this by habit. So we are there and I think we should bring the jury. At some point he is going to have to suffer the consequences of his own behavior and this is as good a time to start now as any.

Your Honor responded, well, I agree with everything

you said except the failure to take the medicine was not really his fault. And the prosecutor responded, once again, Judge, it is a medical problem. Dr. Schwartz-Watts should be here to testify about it. And I think that is why they are paying all of these doctors all of this money to treat him. I don't know where she is but she is not here. So now we go to Mr. Harris to opine about whether his own client is competent or not rather than have a doctor who might actually know.

And you said to Mr. Harris, Mr. Harris, I have tried to bend over backwards to do everything possible to keep the defendant on an even keel and a good frame of mind, and especially so that he won't show out in front of the jury. But the jury is really worn out, they have sent signals indirectly to me they really want to see this case move along. I think there is a danger to be balanced against what you say. These continued delays are going to be held against the defendant, I think. I think the jury will figure out that it is the defendant that is causing these delays. So I think I have got to weigh in the balance of the aspect of it versus the danger of going forward with him appearing to be a little bit disheveled over there.

Your Honor, with all due respect, I believe when you made the decision to go forward that day when Mr. Basham's attorneys were telling you that their client was not able to do that, when Mr. Basham's attorneys had apparently failed in

1222

their obligation to have their client evaluated by their expert and the decision was made to go forward not because there was any disbelief about the sincerity of Mr. Basham's problems but because the trial simply had to go forward, so that as a result even if you were to reject everything else that I've argued about competency, that day Mr. Basham's tried while he was incompetent and it occurred during the penalty phase --

THE COURT: This was after the scuffle incident on the 20th?

MR. BURKE: Yes, your Honor. It was one month after, one month and four days. It was near the very end of the trial on October 26th.

I believe what happened on the 26th implicates three of the claims that we have. As I just said, it supports our argument that by a preponderance of the evidence Mr. Basham was incompetent at this trial. And I can't think of a more critical proceeding than the penalty phase of a death penalty trial. It goes to claim five, our claim that trial counsel were ineffective in failing for have their client evaluated.

Now, we have argued and I still believe that they had an obligation much earlier to do so, but that day despite what they say today they can not take away their words there. They were genuinely concerned about Mr. Basham's competence to proceed and they failed to get their expert to evaluate him,

their expert who had previously only a month earlier said, yes, he's not competent at this moment but the good news is he will be competent again.

And I would point out, your Honor, it's just a matter of law, I was going to say a fine point, but it really is a matter of law, to succeed on claim five we need to prove that Mr. Basham's lawyers fell below the standard of competence of a federal death penalty lawyer. Mr. Hammond testified that with regard to their failure to have Mr. Basham evaluated for competency that they did so.

We then need to prove, not by a preponderance of the evidence standard that we would need to show for claim four, but by a lesser standard under Strickland that is there a reasonable probability that an expert would have found Mr. Basham incompetent had he been evaluated that day. I can give you a case that will support that position, we cite it in our briefing, but it's Futch, F-U-T-C-H, versus Dugger, 874 F.2d 1483. It's a 1989 decision from the Eleventh Circuit.

So our obligation on claim five is we have to underline competence in the question of whether had counsel had Dr. Schwartz-Watts evaluate Mr. Basham that day that she would have informed the court as she did the month before that at that time he was not competent.

And, finally, your Honor, with greatest respect, I believe that by not independently asking that Mr. Basham be

1224

evaluated for competency on the 26th that the court violated his rights under Drope versus Missouri, the court's independent observation to maintain that throughout a trial a defendant remains competent. And so with that, your Honor, we would argue that Mr. Basham is entitled to relief on claims four, five, and six.

With regard to claim seven, it goes to the issue of procedural default. I haven't focused on that because not much has been said about whether any of these claims would be considered procedurally defaulted. I submit to you and we argued in the pleadings they would not be. They cannot be. They are the most fundamental type of constitutional claim, and they go to not only a defendant's due process right but to the integrity of the entire judicial system.

But even if this court were to find that what we would ask to show is appellate counsel chose to -- did not include this viable claim in the direct appeal and that they did so at the -- where they included less viable claims. And we know from the Fourth Circuit's opinion in Mr. Basham's direct appeal that that is exactly what his appellate lawyers did, they raised a claim that the trial judge, they said that you, your Honor, had erred in not allowing information about the government's statements about Mr. Basham being a puppet at the Fulks trial and not allowing that to come in.

And the court came back and said Mr. Swerling and Mr.

Harris never asked him to do that. We can't even -- even review this for fundamental or for plain error, there's no way we can review this. That was a claim included by appellate counsel over these claims. So even if we had to, which we do not, but even if we had to show there was some way procedural default we would submit that satisfies the standard, your Honor.

THE COURT: All right. Mr. Littlejohn is here. Do you want to go ahead and take his testimony so as not to delay him? Does the government mind waiting on your responsive argument?

MR. WITHERSPOON: No, sir. I didn't know if Mr. Burke was finished.

THE COURT: Were you just about finished, Mr. Burke?

MR. BURKE: I am finished, your Honor.

THE COURT: Let's go ahead and allow Mr. Littlejohn to testify, then we will get back into the argument.

MS. STONE: Your Honor, very briefly before we call him, can I clear up the issue on the audio and videotape? I think I found the point in the transcript.

THE COURT: All right.

MS. STONE: On October 15, 2004 at page 18 your Honor makes your ruling and you state, it is my intention that much of the proceedings should be disclosed to the jury by way of testimony and publishing of the video and audio. Consistent

with my practice in other criminal cases I will allow the transcript to be distributed to the jury to use as an aid in the understanding of the audio.  I will do so with a cautionary instruction that it is the audio tape itself that constitutes the evidence.

And then the following day in court Exhibit 469A and B note that there are audio/video/transcript of courtroom scuffle.

THE COURT:  I was wrong, I did allow the audio and the video to be --

MS. STONE:  That's what it appeared to me.  There were redactions, it would be a lot longer portion of transcript for me to read all of that, but overall --

THE COURT:  There were some redactions from the audio?

MS. STONE:  From the audio, and I believe the video was shortened in the beginning.  There was concerns about the jury thinking it was a reaction to you rather than the marshals' ruling and there was a fairly detailed discussion of that.

THE COURT:  All right.  Very good.  All right.  Go ahead and call Mr. Littlejohn.

MS. STONE:  The defense calls Mr. Littlejohn to the stand.

(Cameron B. Littlejohn, Jr. duly sworn)

DIRECT EXAMINATION

BY MS. STONE:

Q. Good morning, Mr. Littlejohn.

A. Good morning.

Q. My name is Sarah Stone, and we have spoken briefly on the phone but we never actually met. Thank you for adjusting your schedule to get here today.

A. Yes, ma'am.

Q. Can you give us a little background about yourself before we start talking about your involvement in the Basham case?

A. Well, I guess you want academically? You don't want me to go all the way back -- okay. I graduated from Wofford College with a BA degree in 1972, I went to the University of South Carolina School of Law, graduated in 1975. I was an assistant attorney general until 1980 when I became an assistant U.S. attorney. I served in that capacity until 1987. Since then I have been in private practice. I did a little, about a year-and-a-half stint in the civil section of the attorney general's office, but I have been in private practice for the vast bulk of my practice years, which are I believe 36.

Q. Is a large part of your practice in criminal law?

A. Yes.

Q. And I know you have someplace to be today and I'm going to keep this fairly brief. There are just two areas I want to talk to you about, the Thanksgiving search and then competency

concerns with Mr. Basham.

A.   That's fine.  Take your time.

Q.   I would like to start with the search, but first a little background.  Can you -- do you recall your appointment to represent Mr. Basham in federal court here?

A.   I do.

Q.   Can you describe that?

A.   It was Wednesday, I believe the date was November 26, 2002.  Judge Tom Rogers called me, I was getting dressed to go to work.  He told me he had a situation involving a potential death penalty case, needed a death penalty qualified attorney, and asked me to come over to Florence and so I got dressed and went straight to Florence.  And met with -- I think I initially went to Judge Rogers and he told me basically what it was and he was appointing me to represent Brandon Basham.

Q.   And you had to make some decisions fairly quickly in this case, is that a fair statement?

A.   Very quickly, yes.

Q.   Where was your information coming from about the case at this point?

A.   Well, Billy Monckton was also appointed to represent Mr. Basham.  Mr. Monckton got to the district courthouse in Florence about 20, 30 minutes before I did.  He was meeting with Rose Mary Parham when I went to the U.S. Attorney's Office.  She had given him kind of a thumbnail sketch of what

had transpired in the last few days and the days preceding that with the events that Brandon was accused of being involved in. And so then I joined in the conversation and we learned through Rose Mary some of the basic details about what was alleged to have happened and what Brandon had done upon his arrest in West Virginia.

Q. Did you also have an opportunity prior to the search to talk to Richard Hughes?

A. No.

Q. Okay. Did you have many police reports or medical records at this point?

A. None.

Q. And when did you first meet Mr. Basham?

A. I met him that day.

Q. The day of your appointment or the day of the search?

A. The day of the appointment.

Q. And can you describe, where did you meet with him?

A. If I recall, I'm trying -- I was trying to think whether we met him at courthouse or just briefly talked to him in the courthouse and then went to the jail and talked to him. I can't remember exactly. But we did meet with him briefly on that day.

Q. And do you recall any initial impressions of Mr. Basham?

A. Well, without going into an attorney-client privilege, Mr. Basham was a young man who was in a lot of trouble. So it was

kind of hard to assess his basic personality or -- I mean, when somebody's in that situation they are obviously under a lot of stress and everything so you can't really tell exactly what they are like in a normal setting.

Q.  And you say your appointment was on November 26, 2002.  Is it your recollection that the search was the following day, November 27th, 2002?

A.  It was Thanksgiving day for sure.

Q.  And let's talk about the search itself.  Was that already put into motion prior to your appointment, the plan to do a search?  Were the wheels in motion on that search before you and Mr. Monckton were appointed for Mr. Basham's case?

MR. JOHNSON:  Your Honor, just on the date, I believe the Wednesday would have been November 27th and Thursday would have been the 28th, is my understanding, just for the record.

MS. STONE:  Thank you.

THE COURT:  All right.

THE WITNESS:  Thank you.  That was ten years ago.

Q.  (MS. STONE) I had it wrong in my notes, too, if it makes you feel better.

A.  Let's see.  On that Wednesday, the 27th -- no, as I understood it they had brought Mr. Basham down because Mr. Hughes had expressed to the government agents that Mr. Basham wanted to participate and help find Miss Donovan.  And so to that extent the plans had been made, because he was

brought down to South Carolina, as I understood, for that particular purpose. So that was kind of in the works, yes. As to the details and everything, no, that wasn't worked out until we talked to Mr. Basham.

Q. Okay. And do you recall the area where the search took place?

A. Yes. Brunswick County, North Carolina.

Q. And do you recall why that particular -- the search started in that particular area?

A. As I understood it, Mr. Basham had already identified that area or what he knew about that area to law enforcement prior to coming to Florence.

Q. Do you have any recollection that law enforcement had information that Mr. Basham and Mr. Fulks are believed to have been seen in the area, as well?

A. I understood from the agents that there was some people at a deer hunt clubhouse that had seen a vehicle matching the description of Miss Donovan's vehicle, and then there was also some mention of a vehicle, similar vehicle had been seen in a local cemetery, if I recall.

Q. And were those -- did you go to those locations during the search?

A. Well, we started out at the hunt club. I think it was Bee Tree Hunt Club, or something like that. And that's where -- when we got to Brunswick County that's where we stopped and

that's where the officers and the firemen and the volunteers and everybody who had volunteered to go out and search that day had assembled.

Q. And that brings me somewhat to my next question. There were a lot of people involved in the search. Do you have any recollection of a ball park number on how many law enforcement officers were there that day?

A. Well, in the actual two-vehicle search there would have been -- officer-wise there would have been about six. At the hunt club there must have been 25 or 30 folks who were with primarily local. I can't remember how many. We went in the clubhouse to use the facility and there were about 25 or 30 guys scowling at us.

Q. And you mention a lot of officers that were involved in the search were local officers from that area.

A. I believe so. I think the impression I got was they were going to stay there at the hunt club lodge until there was an area identified and then they were going to come in and search on foot.

Q. And did you know at that point if Mr. Basham had had any history with that area? Had he ever lived in South Carolina or do you have any of that type of information?

A. You mean historically?

Q. Historically did he have any prior -- besides the Donovan crime, had he had any other contact with the area?

A.  My understanding was no, he had never been to Myrtle Beach or Brunswick County, North Carolina.

Q.  And prior to Mr. Basham being brought down for the search, do you recall where he was being housed after he was transferred to South Carolina?

A.  Miss Stone, if I remember, he was -- I think he was housed somewhere in Kentucky when he supposedly escaped.

Q.  I'm sorry, I apologize.  Once he was -- where was he housed once he was transferred in here in South Carolina?  My question was not clear.

A.  The Wednesday night before Thanksgiving he was housed at Darlington County Detention Center.

Q.  And about how far away is that from the Bee Tree Hunt Club where the search started?

A.  Miss Stone, I'm not sure.

Q.  It's been a long time.

A.  Yeah.

Q.  How did Mr. Basham get from -- how was he transported, if you know, from the jail to the hunt club?

A.  I can tell you specifically, we rode in a van.  Apparently two Conway police officers had borrowed a van from a local dealership for this purpose and so we -- I met them at the Darlington County Detention Center, and there were two officers from Conway, to FBI agents, Brandon and I, and I don't believe there was anybody else in the van, and we went

up to Brunswick County and met the Brunswick County authorities.

Q. So did you get to talk to Mr. Basham a little more during that ride to the search?

A. I spoke with him briefly before we left the detention center and told him, you know, that this is what we're doing. And, you know, I feel like he understood.

Q. And it sounds like from the description there was law enforcement officers in the van with you when you drove with Mr. Basham.

A. Yes.

Q. So fair to say you didn't get into too many detailed discussions with Mr. Basham in the van?

A. No, not at all.

Q. And that's because there would have been no privilege. Is that because there would have been no privilege?

A. Well, our purpose was to go and try and find Miss Donovan, so I didn't know what Brandon had told officers before I got involved in the case, so I didn't want him giving any statements, and so I didn't want him to say anything that could be overheard by officers and later be questioned whether it was admissible or not.

Q. Okay. We will talk a little bit more about keeping Mr. Basham from speaking in a moment, but first I want to talk about the logistics of the search. You mentioned earlier

there were two law enforcement cars and Mr. Basham rode in one of them, and that was the van, as well? Is that the same van you guys rode down in?

A. Yes, that was the same van.

Q. Did more people join in with you and Mr. Basham and those two Conway officers in the van for the search?

A. Yes. The two FBI agents, I don't remember exactly what they did, I think they may have gone back to Florence. But in the van when we got to the hunt club and started the search there was an officer from Conway driving the van, there was Sheriff Hewitt, there was Brandon, there was I, there was Billy Monckton, Jeff Long with the FBI, and then the other Conway police officer.

Q. Okay.

A. And there were two FBI agents in a car that followed us.

Q. Do you recall where Mr. Basham sat in the van?

A. Yes.

Q. And where was that?

A. Well, I can tell you specifically. The Conway officer was driving, Sheriff Hewitt was the front passenger next to him, Brandon was in the seat, the captain's chair behind the driver, I was behind Sheriff Hewitt. The back bench was Billy Monckton, Jeff Long, and the other Conway officer.

Q. Did you or Mr. Monckton get any kind of proffer prior to doing the search with Mr. Basham?

A.  Proffer agreement?

Q.  Yes.

A.  No.

Q.  Did you try to get a proffer agreement?

A.  If I recall, we asked about it, but it was Miss Parham refused to give us one.

Q.  Did you nonetheless advise law enforcement officers that were there that day about speaking with Mr. Basham?

A.  From the very get go, yes, we advised them we were not there to give a statement and that Brandon was not to be questioned, that we were there specifically and only for the purpose of him giving directions as best he could to where Miss Donovan might be located.

Q.  And were you -- I think you may have already answered this question, but were you aware that Mr. Basham had already made some statements in Kentucky?

A.  Yes.

Q.  But it sounds like you weren't exactly clear at this point the specifics of those statements, is that a fair statement?

A.  That's correct.

Q.  Did that affect -- did the knowledge that he had already spoken with law enforcement affect your decision to go forward with the search?

A.  Yes.  It was my understanding that he had sat down with agents for some hours and had more or less confessed to he and

Mr. Fulks' involvement in Miss Donovan's situation. And Miss Parham, I mean, it was kind of Miss Parham said it's a given, he's confessed.

Q. The record will reflect that Mr. Monckton said he believed that this was your best chance to save Mr. Basham's life, participating in this search. Would you agree with that characterization?

A. Yes.

Q. Did you feel you had a lot of leverage at this point?

A. I don't know how you define leverage or a lot, so I don't have -- it was a chance, you know, it was the kind of thing that if we didn't do anything he was probably not going to get any sort of consideration either from the prosecution or the jury or the court or the family of the victim. So this was kind of something he had to do, it was -- you know, we took a chance.

Q. And back to the search itself, you talked that you specifically advised the officers that were there that day that you weren't there to make statements. Was Mr. Basham allowed to make some, I think they were described as directional comments?

A. Yes.

Q. Were all of his communications to go through counsel?

A. No, that was -- as we were going down the road for the hundreds of miles that we went that day, no. We allowed

Brandon to say, you know, this looks familiar or, you know, we're looking for this kind of thing, or that.  Anything that was directional, no, he made his own statements.

Q.  And did Mr. --

A.  I didn't want to run the risk of him saying something to me and me getting it wrong and then not finding Miss Donovan. So he communicated directly to the officers.

Q.  In your presence?

A.  Yes.

Q.  Did Mr. Basham ever try to blurt out comments during that day?

A.  There were a couple of times that he started to say something, yes, that were not directional in nature.

Q.  And did you make efforts to stop him from making comments that were not directional in nature?

A.  Yes.

Q.  And, again, there were officers in the van.  Did they observe you trying to manage those communications?

A.  Apparently they did, yes.

Q.  And Mr. Hewitt was -- was Mr. Hewitt one of those officers?

A.  Yes.

Q.  Was Mr. Hewitt kind of the main questioner as far as the directional questions?  That's the impression I got from the record.  Would that be correct?

A.   He was the only one in the van that knew that area so, yes, he was.

Q.   Was he able to build a little bit of a rapport with Mr. Basham by doing that?

A.   I don't know that he had any better rapport with him than any of the other officers, no.  I mean, he conversed with him more because they were obviously, you know, he was describing where the roads went and, you know, whether this looked familiar and that looked familiar.  And Brandon was, you know, speaking to him more than the other officers, yes.

Q.   Okay.  At some point as it got closer to the end of the day everybody stopped, and is it a fair assessment people were fairly frustrated by the end of the day?

A.   Yes, that would be a very fair statement.

Q.   Was there concern that Mr. Basham was playing games?

A.   That was expressed to me by the agents, yes.

Q.   And at some point, and this came up before, I'm not trying to get into another claim, trying to set the stage with a hypothetical, at some point you spoke with Mr. Basham and then presented a hypothetical to law enforcement.  Do you recall that?

A.   Yes.

Q.   And do you recall, for lack of a better word, the logistics of that?  Where did you talk to Mr. Basham prior to presenting the hypothetical?

A.   Well, as I recall, we had pulled up at one of the two cemeteries that we went to and the officers asked to speak, I say the officers, it would have been Jeff Long, Special Agent Merriman, I think the Conway police chief was there, he may have been the second one in the follow car, I believe Sheriff Hewitt was in that meeting.  But, anyway, they drew Billy and I aside and basically said we're not searching anymore, your guy's lying.

Q.   And was it in the van then you stepped away and was Mr. Basham still in the van when you --

A.   He was still at the van.  I don't know that he was in the van.

Q.   Or near --

A.   I think he was sitting in the open door of the van, if I recall.

Q.   And who was there when you spoke with Mr. Basham about -- who was there when you spoke with Mr. Basham prior to presenting the hypothetical to law enforcement?

A.   It would have been Billy Monckton and I.

Q.   And where -- did you move away from the van to present that hypothetical to law enforcement?

A.   Well, it was like the van would have been like at the back of the courtroom, and so the agents had gotten out, we were kind of milling around there with Brandon, and they said would you come over here, so Billy and I went over there.  And

that's when they told us that, you know, they thought Brandon was taking them on a wild goose chase. And one of the agents was particularly mad, I think it was Special Agent Merriman, he had waded around in a swamp or something a few days before, that's when he made the statement that Brandon's lying. So Billy and I said well, wait a minute, let us go talk to him. So we went back over to the van where Brandon was, and I think one of the Conway police officers was standing there, we asked him to kind of step away where we could speak in private. And so we spoke to Brandon for a few minutes and then we went back and spoke to the group of officers.

Q. And did -- if you recall, did Mr. Basham walk with you over to the officers or --

A. No, he did not. He stayed at the van.

Q. Do you recall when you spoke to the group of officers seeing Sheriff Hewitt? It's been a long time.

A. Do I recall whether Sheriff Hewitt was in that group?

Q. Right.

A. To the best my recollection, he was. I'm almost positive he was. I know he wasn't over at the van with Brandon at the time. But I believe he was in -- Sheriff Hewitt was trying to be involved in the process. By way of background, there was going to be a territorial fight between Horry County and Brunswick County as to who was going to prosecute this case and so Sheriff Hewitt had a keen interest in it. And so if I

recall, he was there during that conversation.

Q. And did you later learn through discovery through police reports that Mr. Hewitt claimed he walked off alone with Mr. Basham at some point near the end of that day?

A. I think I learned that before I testified in 2004. I didn't really -- before we got all the discovery and all the reports and everything the government had moved I be disqualified and that had happened. So I wasn't privy to all the discovery in the case.

Q. Okay. And again, was Sheriff Hewitt one of the officers who was advised that Mr. Basham was only to make directional statements and not there to make any other kind of statements?

A. I'm sure he was. I think, if I recall correctly, and I'm almost positive of this, I know at Darlington County when we first started out I told the Agent and Mrs. Agent Bray that, and the other officers. And then when we got to Bee Tree we started off on our trek I'm sure I repeated that and reiterated it to the officers that were in the van with us. That was a different group.

Q. Was it ever your intention that day to allow Mr. Basham to walk off alone with Mr. Hewitt?

A. No.

Q. Do you recall talking to Mr. Swerling or Mr. Harris prior to your testimony about your testimony at the Jackson v. Denno hearing, I don't believe it was what you were referencing

previously, prior to your testimony at that hearing about Mr. Hewitt taking Mr. Basham off alone?

A.  Do I recall discussing that with them?

Q.  Yes.

A.  Prior to the hearing?

Q.  Correct.

A.  Not in the hearing but --

Q.  But prior to.

A.  Miss Stone, it seems like we did discuss that.  I can't remember exactly what the discussion was.

Q.  If you had been asked specifically the question I just asked you, whether it was your intention to allow Mr. Basham to walk off alone, would you have said it was against your express direction to law enforcement if that happened?

A.  Well, now, let me put it in context.  We got out of that van several times to try and look for something that might be familiar with -- for Brandon, okay?  One of the things that came up was a thing about the purse strap.  And Brandon had said, well, if I recall, the purse strap went out of the car at a cemetery location.  If you can find the purse strap then, you know, this must be the right place.  And so we canvassed the cemetery area there to see if we could find a purse strap.

     Now, whether Brandon walked off with one of the officers or not, he was always within my sight.  I can't say he was always within my hearing.  But we were trying to find that

strap.  He might have wandered off with Sheriff Hewitt for a few moments but, you know, he wasn't far away from me at any time.

Q.  But I guess my question was would it be a fair statement that if Brandon made any statements other than directional to law enforcement that was against your requests --

A.  Yes.

Q.  -- of law enforcement that day?

A.  Yes.

Q.  Now I want to move to the other topic I wanted to cover with you, and that's concerns about competency.

Susie, can you bring up Exhibit 1?  And these are already in the record, these are not your notes.  Susie, if you can go to page two.

Do you see about a third of the way down the page, need an evaluation?

A.  Yes, two-thirds of the way, um-hmm.

Q.  And, again, these are not your notes, these have previously been admitted during Mr. Monckton's testimony.  But did you agree with that opinion that is reflected in these notes that Mr. Basham needed an evaluation?

A.  Would I agree he needed one prior to going into a death penalty case?

Q.  Yes.

A.  Yes.

Q. And can you talk a little bit about why you felt that about Mr. Basham?

A. Well, Mr. Basham, I mean, he had a history of mental health problems and, I mean, that's reason enough right there. But there were some things about Brandon's I guess I would say maturity for his age I thought would need the, you know, we would need the advice of a psychologist or psychiatrist as we went into the case later on. Of course, that never happened.

Q. And was it fairly -- well, you weren't on the case very long, but was it fairly, even for the period you were on the case, fairly early on you realized that this was something that would be important for Mr. Basham?

A. Yes.

Q. Were you aware that Mr. Basham had been on some medication? If you don't recall --

A. I don't know that I got into a history of -- prior to November of 2002 I don't know that I got into a real history of what his medications were. Now, during the time that he was being held and I represented him they had him at the old Craft Sparrow Hospital where he was incarcerated so he could get some sort of mental health counseling and treatment. And I know he was on some medications there. What they were, I can't remember.

Q. And, Susie, can you bring up Exhibit 6? And it's the last page that's marked page seven. And can you highlight the

second full entry there.  Thank you.

And, again, these are not your notes, these are previously admitted, Mr. Monckton's notes.  And can you see there the note he spoke with you, and extreme details concerning jurisdiction and Brandon's mental condition?

A.  Okay.

Q.  And this was from -- appears from December 4.  Do you recall talking with Mr. Monckton about Mr. Basham's mental issues?

A.  I don't recall specifically the conversation but I'm sure we talked about that, yes.

Q.  And shortly thereafter did you guys file a motion for a competency evaluation in Mr. Basham's case?

A.  Miss Stone, I don't recall whether we got to that point or not.

Q.  If the record reflects you did file one on December 10, 2002 you would not disagree with that?

A.  No, I would not.

Q.  And you already noted that you -- you were not on the case very long, the government moved to disqualify you.  And if the record reflects January 14, 2003 that that motion was filed would you dispute that?

A.  The government moved to have me disqualified?

Q.  Correct.

A.  No, they definitely did.

Q.   After that motion to disqualify was filed did you pull back from making key decisions in Mr. Basham's case until that issue was resolved?

A.   Well, yes.  I mean, but there weren't really any key decisions to be made at that time.  Whether the government was going to seek the death penalty or not, I don't know if that had gone through DOJ to a conclusion.  But at that point it would have been a matter of doing some of the early pretrial stuff, getting the discovery materials and reviewing them, et cetera.  So I don't know that there were really any great decisions to be made while that motion was pending until Judge Anderson heard it.

Q.   Okay.  And so you don't -- do you have any recollection of making any movement to make that competency evaluation go forward during that period?

A.   Did we push it?  I don't recall doing that, no.

Q.   Okay.  And ultimately you were removed from the case and Mr. Swerling and Mr. Harris replaced you and Mr. Monckton.  Do you recall any conversations with either of them about competency concerns with Mr. Basham?

A.   Miss Stone, we probably talked about his prior mental health conditions, but it was very briefly.  I really, I was surprised I didn't have that much contact with Jack or Greg as they were working this case up, which was kind of strange because we're in the same building.  But they didn't really

converse with me much, I didn't bring it up much.  And I was really surprised at how little communication there was.

Q.  Okay.

MS. STONE:  May I have just a moment, your Honor, to confer with counsel?  I have no further questions, thank you.

THE COURT:  All right.  Let's take our morning recess.  I didn't realize we had run so long.  Let's take a ten minute recess and finish.  How long do you think the cross will be?

MR. JOHNSON:  An hour.

THE COURT:  How long?

MR. JOHNSON:  An hour.

THE COURT:  Okay.  Take a ten minute recess.

(A recess transpired)

THE COURT:  Please continue.  I'm sorry, cross-examination.

CROSS-EXAMINATION

BY MR. JOHNSON:

Q.  Thank you, your Honor.  Good morning, Mr. Littlejohn.

A.  Good morning, Mr. Johnson.

Q.  And, like Miss Stone, I want to thank you for rearranging your schedule so you could pop in this morning and talk to us.

A.  That's no problem.

Q.  Than I'm going to do my best to avoid just repeating questions that Miss Stone asked you.  Some of them may be the

same just so I can get the lay of the land here.

I want to go back to that Wednesday, November 27th, 2002 when you were first appointed to represent Mr. Basham, all right?

As I understand your testimony, you were here in Columbia and you got a call from United States Magistrate Judge Tom Rogers asking if you would accept an appointment to represent Mr. Basham?

A. That's correct.

Q. Now, when Magistrate Rogers called you, and correct me if I am wrong, didn't he kind of explain some of the background, that Mr. Basham had been transported from Kentucky to South Carolina because he wanted to participate on the ground in the search for Miss Donovan?

A. Mr. Johnson, he told me he was being transported down to Florence. I don't know that he went into the search part of it. I mean, I don't recall, I just don't, whether he said that or not. But, obviously, Mr. Basham was on the way down because that's why Judge Rogers was interested in appointing South Carolina counsel.

Q. So he told you that he was on the way to Florence but he may not have gone into the other background information.

A. He may have, I don't recall. I was getting out of the shower, okay, when he called.

Q. That was in the morning on that Wednesday?

A.   Yes.

Q.   All right.  So obviously you get out of the shower, you get dressed and you go to Florence.

A.   Yeah, I got dressed.  Yeah, I did that.

Q.   Now, as I understand the sequence, the first place you went was to meet with Mr. -- because Mr. Monckton was already in Florence, correct?

A.   By the time I got there Billy was already there, yes.

Q.   And was that at the courthouse in Florence?

A.   Yes, the U.S. Attorney's Office.

Q.   And the U.S. Attorney's Office and the court are in the same building.

A.   Yes.

Q.   So when you arrived was Mr. Monckton already talking with AUSA Rose Mary Parham?

A.   I believe so, yes.

Q.   And you just kind of joined in that conversation.

A.   Correct.

Q.   And after you and Mr. Monckton spoke with Miss Parham is when you and Mr. Monckton went out to the Darlington County jail to meet with Mr. Basham.

A.   I'm thinking at some point in there we appeared before Judge Rogers and put it on the record about our appointment. And then I know we met with Brandon that day, I'm not sure whether it was at Darlington or there at the courthouse.  I'm

**JA 4980**

thinking it may have been at the courthouse, but they took him to Darlington that night because that's where we met the following morning.

Q. So you meet with Mr. Monckton and Miss Parham, then you have the appearance before Magistrate Rogers, and then you have a conversation with Mr. Basham?

A. I did all three of those, I'm not sure of the exact order.

Q. But all on Wednesday, November 27th.

A. Yes, sir.

Q. And after you met with Mr. Basham on that Wednesday arrangements were immediately made for Mr. Basham to assist law enforcement the next day, Thanksgiving day, in a search for Miss Donovan's body, correct?

A. Well, we talked to Miss Parham about it and then we talked to Brandon to make sure that he was, you know, down with that program. And then we told Miss Parham, yes, let's go ahead and line it up.

Q. And those arrangements were based on Mr. Basham's desire to help law enforcement find the body, correct?

A. Yes.

Q. And in your conversations, you know, without going into the substance of what you spoke about with Mr. Basham, did you learn that day that the reason Mr. Basham had been transported from Kentucky to South Carolina was to assist in the search for her body?

A.  Yes.

Q.  And obviously you and Mr. Monckton agreed to allow Mr. Basham to participate in that search.

A.  Obviously, yes.

Q.  And the reason that you agreed to let him participate is because you felt that it was in his best interests.

A.  Correct.

Q.  For example, if Mr. Basham helped find Miss Donovan that could assist you in plea negotiations, correct?

A.  That's one of the things it could help us with, yes.

Q.  Another thing it could help you with if Mr. Basham helped find Miss Donovan, that could be mitigating evidence you could present to a jury if plea negotiations failed.

A.  Correct.

Q.  And another reason was that at that time you still held out some hope that Miss Donovan might still be alive, correct?

A.  There was a slight chance.  I mean, that would have been ideal if that had come true, but, you know, we held out that hope.

Q.  So based on all those reasons it's safe to say, isn't it, that urgency was high and time was of the essence.

A.  Yes.  And the other thing is if we helped find Miss Donovan that might, you know, that might bode well for any recommendation by Miss Donovan's family on down the road.

Q.  And in all of that your ultimate objective was to save Mr.

Basham's life, correct?

A. That's right.

Q. Now, you spoke about having a discussion with Mr. Monckton and Miss Parham on that Wednesday prior to the Thanksgiving day search. And I think you testified a little while ago that Miss Parham, although she didn't go into all the details, she shared with you some information about interviews Mr. Basham had given to law enforcement agents?

A. Right.

Q. And the gist of that was I think, as you said earlier, he had for several hours given confessions about being involved at least in some capacity in the abduction and killing of Alice Donovan.

A. Correct.

Q. Now let's go to the Thanksgiving day search. You testified that Mr. Basham was there to provide directions, correct?

A. That's right.

Q. So, in other words, and I think you said you made it clear to the law enforcement officers there he wasn't there to give another statement about the substance of the crime itself, but he was there to provide them with directions on how they might find her body.

A. That's correct.

Q. And wasn't it your understanding that any of this

directional information that he may give the officers that day could be used against him in court?

A. Yes, certainly. I mean, we would hope that ultimately if we went to court it would come out that he had helped participate in a search for Miss Donovan. And, you know, we were hoping that we would find Miss Donovan.

Q. So you expected and in fact wanted it to be used if it went to trial.

A. Yes.

Q. Now, you testified in the van, I want to make sure I get the layout correct, I think you said that there was a Conway police -- and when I say the van I'm talking about the actual search at this point, once you embarked on the search and you started the search from the hunt club, right?

A. Correct.

Q. And so when you get into this van there's a Conway police officer driving, and I believe you said that Sheriff Hewitt from Brunswick County was in the front passenger seat.

A. Brunswick County.

Q. What did I say?

A. He was in the front passenger seat.

Q. Sheriff Hewitt was in the front passenger seat.

A. Right.

Q. And Mr. Basham was directly behind the driver?

A. Correct.

Q. You were directly behind Sheriff Hewitt.

A. Correct.

Q. And then on the back bench seat I believe it is was Agent Long, another Conway officer, and Mr. Monckton.

A. Correct. Billy was in the middle of the bench seat because he kept complaining about it.

Q. Now, I think you told Miss Stone that as you're riding along in the van there would be times when Sheriff Hewitt, and I'm imagining turning around because Brandon would have kind of been diagonal from him, right?

A. Right.

Q. So there were times he would turn around and ask Brandon questions about directions, correct?

A. Yes.

Q. And it's my understanding that Sheriff Hewitt had some photographs that at times he would show Brandon, maybe -- I don't know if they were aerial maps or pictures of landmarks, asking him if he recognized certain things. Do you remember that?

A. I remember there being pictures involved, I don't recall what was in the pictures.

Q. But you remember him showing Brandon pictures. And would he also ask Brandon questions, maybe point out things out the window, do you recognize this, does that look familiar?

A. Right. That was an ongoing process.

Q.  And during the ongoing process Brandon would answer those questions directly.

A.  Yes.

Q.  And at certain points during the van ride during the search there were occasions when Brandon would lean over to you and confer with you privately, weren't there?

A.  That happened on a couple of occasions, yes.

Q.  On a couple of occasions?

A.  Um-hmm.

Q.  And on one of those occasions he leaned over, you had a private conversation, and following the conversation you told the officers in the van that they should be looking for a purse strap, correct?

A.  Mr. Johnson, I don't remember whether that happened in the van or if that happened after we had gotten out of the van and were looking around one of the cemetery locations.

        MR. JOHNSON:  Beg the court's indulgence for one minute.

        (There was a pause in the proceedings)

Q.   (MR. JOHNSON) Do you recall, whether it happened in the van or out, do you recall whether it was prior to that final kind of showdown meeting you had at the cemetery at the end of the day when the officer said we think your client is lying?

A.  If I recall correctly, it was before, yes.

Q.  So he confers -- you agree there was at some point he

conferred with you and then you told the officers about the purse strap.

A. Right. Because I was telling them if we found the purse strap then we were probably in the right place.

Q. So the purpose of telling them about the strap was it could assist them in finding the body.

A. Exactly, it was directional.

Q. So you considered that directional information.

A. Right.

THE COURT: But this was not the hypothetical statement that you mentioned the purse strap at this time, right?

THE WITNESS: No, sir, that was not the hypothetical. This was before the hypothetical.

Q. This was before the hypothetical? You mentioned that towards the end of the day -- now, you started the search that day at the hunt club, correct?

A. Yes.

Q. Is the cemetery right by the hunt club, do you remember? Are those two adjacent to one another?

A. Mr. Johnson, we went hundreds of miles through rural Brunswick County. We irritated the heck out of I don't know how many deer hunters. But all of it is dirt roads, pine trees, scrub oaks, and it all looks basically the same. If I recall, there was one cemetery that was kind of as you came

out of the hunt club you went for a distance, the road kind of wound around, and it dead ended to another road. And the cemetery, that particular cemetery was right across the road it dead ended into. There was another cemetery somewhere else that we went past. And if I recall correctly there were two cemeteries. Which one it was, I can't tell you.

Q. But suffice it to say that at the end of the day when they told you we think Brandon's lying, you were at the cemetery when this happened?

A. We were at one of the cemeteries.

Q. At one of the cemeteries?

A. Um-hmm.

Q. And they said to you we think he's lying and we're calling off the search.

A. Basically, yes. And a few expletives.

Q. And you didn't want them to call off the search, did you?

A. No.

Q. And the reason you didn't want them to call off the search was that you thought it might be Brandon's only hope of finding Miss Donovan and helping himself, correct?

A. Correct.

Q. So at that point when they tell you he's lying, the search is off, expletives, you wanted his interaction with the law enforcement officers to continue because you wanted hopefully to find the body.

A.   Correct.  I knew if we ended it on that note that wouldn't happen again, there would be no further searches.

Q.   So after they make this, it's not really an ultimatum, but after they make this statement we're calling off the search, was it then that you and Mr. Monckton pulled Brandon aside and conferred with him?

A.   Well, Brandon was back at the van during this meeting. And like I explained before, we left the meeting, went back to the van, there was a Conway officer there, I think I asked him to step away so we could have some privacy, and Billy and I conferred with Brandon for a few minutes.

Q.   So when you are having the conversation with officers about whether he's lying, Brandon is back in or near the van.

A.   Yes.  He wasn't in a position to hear that.

Q.   So he didn't hear the conversation that he was lying.

A.   Right.

Q.   Then after you have that conversation with the officers you walk back over to where Brandon is and ask the officers to leave so that you can talk with him attorney to client.

A.   The one Conway officer.  If I recall, yes.

Q.   The one Conway officer left so you could talk, or who was still there?

A.   They always had somebody standing close to Brandon, so the officer, I asked him to stand away so Brandon, Billy and I could talk in privacy.

Q.   So that the officer was nearby because he was the security detail, but he wasn't in on the conversation with you.

A.   That's correct.

Q.   And it was after, it was after you had this private conversation with Brandon that you went back to the officers and gave the hypothetical, correct?

A.   Correct.

Q.   And my understanding is that the hypothetical -- the hypothetical was -- was based on hypothetical facts, and at that point the information you had on the case was obviously conversations with Brandon that I'm not asking you to get in the substance of, but you had talked to your client, and the other information was information that you had received from Miss Parham.

A.   And information I had gleaned from the officers that day. They had -- when they said we're calling off the search, your client's lying, they said, you know, what he's saying doesn't match up with the forensic evidence we have.  So what I was trying to do is put together, and I said hypothetical, I should have said theory, I should have said this is my theory, not Brandon's, mine, about what could have happened.  And so that's when I gave the hypothetical.

Q.   And, again, the purpose of the hypothetical is because you want the search to continue.

A.   Correct.  I wanted them to not think that Brandon was

trying to mislead them or lie to them.  Because I felt like Brandon, Brandon just -- well, let me back up.  Brandon never drove a car in his life, Fulks took him up there in the dark in the area he had never been before, there was nothing but dirt roads and pine trees, and for him to pick out where Miss Donovan was would have been -- I mean, it would have been surprising, but there was still a possibility that he could do that.

Q.  So the reason that you give them this hypothetical or you give them this theory is because they are thinking that Brandon's just leading them on a wild goose chase and you want to give them a theory of what could have happened that's plausible in light of the directions that he's giving them?

A.  In light of the directions and in light of their -- what I knew about the theory of the government's case, yes.

Q.  And the purpose is to convince them he's not lying, he's not leading you on a wild goose chase, he's doing the best that he can and so here's the theory of how all this could be fitting together to show maybe we are in the general area.

A.  Basically, yes.

Q.  And, obviously, the purpose was to assist the officers in the search and to assure them that he's being forthright?

A.  Right.

Q.  So it's fair to say that the information, the hypothetical information that you gave was relevant to helping them find

the body.

A. Well, I think that the information I gave them was in an attempt to show them that Brandon wasn't lying to them, that he wasn't leading them, consciously leading them on a wild goose chase.

Q. And I guess what I'm asking is understanding that we're still talking about the hypothetical here, you wouldn't have thrown out hypothetical facts just about the crime itself for the sake of their investigation or their curiosity, it would all be related to continuing the search, it would all be with the purpose of honing in directionally so that they could see that he was being honestly cooperative.

A. It was my hope that we would continue the search based on the hypothetical. It was my anticipation that the hypothetical would not go anywhere further than the cemetery. But apparently I was wrong.

Q. And the hypothetical that you gave included the hypothetical fact that Miss Donovan had been strangled with a purse strap, correct?

A. That Fulks had done it, yeah.

Q. But it included a purse strap statement.

A. Right.

MR. JOHNSON: Beg the court's indulgence one more time.

(There was a pause in the proceedings)

Q.  Mr. Littlejohn, I would like to show you a page from your testimony in the Jackson v. Denno hearing back in February of 2004.  It's on page 171, your Honor.  It's during your cross-examination, page 171, in which the government published and read aloud parts of the hypothetical.  And it continues on to page 172.

A.  Right, I read this.

Q.  Okay.  And I'm looking at line 17.  It says that after she was strangled with the pocketbook strap she was put in the trunk of the car.  That she was raped here and died here in the cemetery, she was put in the trunk and taken to a dumping area.

And then on page 172, line six, the question is, does any of that at least generally ring a bell as to what was part of your hypothetical that you provided to law enforcement?  And you answered generally, yes.  Correct?

A.  Right.  I answered generally yes, because I don't -- I can't say that all the details Sheriff Hewitt put in his report are true.  But it was generally right.

THE COURT:  Let me jump in here and be sure I understand.  So I'm a little bit rusty on this, I know we got deeply into it at the disqualification hearing, but you had already advanced the idea they should be looking for a strap earlier during the search.

THE WITNESS:  Yes, sir.

THE COURT: And then they had the powwow at the end of the day where they said your client's lying, we're going to go home. You consulted with Mr. Basham and came back with the hypothetical that included more than just the strap reference, it included Fulks used a strap, she was raped and put in the trunk and taken somewhere else and dumped. So that hypothetical statement went far beyond what you had already said about the strap.

THE WITNESS: Yes, your Honor.

THE COURT: I want to be sure I understood, because I was a little bit rusty what was in the hypothetical.

THE WITNESS: I'm not conceding that what Sheriff Hewitt put in his report about all these those details is true. I didn't write down the hypothetical.

THE COURT: I understand. But it was more comprehensive than just reference to the strap.

THE WITNESS: Yes, sir.

BY MR. JOHNSON:

Q. And I think you testified on direct today that at all times Mr. Basham was in your sight.

A. After we -- I think I can say that, yes.

MR. JOHNSON: Just one moment, your Honor.

(There was a pause in the proceedings)

Q. I just have one or two brief questions about competency. Now, I understand that Wednesday that you met -- Wednesday the

day before Thanksgiving was obviously the first day you had

met Mr. Basham, correct?

A.   Correct.

Q.   And it was that day that you made the decision to go ahead

and arrange the search for Thanksgiving.

A.   Yes.  Billy Monckton and I, after meeting with Mr. Basham,

told the authorities, yes, let's go ahead with the search.

Q.   And in authorizing for the search to proceed isn't it fair

to say that you were comfortable with his level of competency

to assist you during the search and to assist law enforcement

during the search?

A.   Based on my limited meeting with him, yes.

          MR. JOHNSON:  I don't have anything else, your Honor.

          THE COURT:  All right.  Any redirect?

          MS. STONE:  I just have two questions, your Honor.

                    REDIRECT EXAMINATION

BY MS. STONE:

Q.   You've stated that you found -- you had Mr. Basham in your

sight at all times.  Did you ever see him walk off with Mr.

Hewitt alone?

A.   The only time I think that could have happened was when we

were looking for the purse strap in the cemetery.  He may have

wandered off in the direction with Sheriff Hewitt because we

were all looking but, I mean, we were all there in an area not

much bigger than this courtroom and I don't -- I'm sure I

**JA 4995**

didn't let Brandon out of my sight.

Q. And the only other question I have is in regards to the questions of expecting Mr. Basham's statements to come in and that you had hoped they would come in and be helpful. Just to clarify, again, were those only directional statements that you intended to have come in?

A. Can you rephrase that for me?

Q. I apologize.

A. I want to make sure I --

Q. On Mr. Johnson's cross-examination he asked you about the statements that Mr. Basham made that day during the search and you responded you -- you intended for those or hoped that those would eventually come into the trial and be helpful to Mr. Basham.

A. The directional statements in which he attempted to find Miss Donovan, yes.

Q. And that's what I wanted to clarify, those statements that you were referring to were directional statements.

A. Correct.

MS. STONE: No further questions, your Honor. Thank you.

THE COURT: Anything further of Mr. Littlejohn?

MR. JOHNSON: Not from the government, your Honor.

MS. STONE: Not from the defense.

THE COURT: Thank you very much for your time.

THE WITNESS: Thank you, your Honor.

THE COURT: All right. I had just a couple of quick questions for Mr. Burke before we hear argument from the government on competency. Mr. Burke, just a couple of questions. The telephone call that we heard with your client talking to his mother, he sounded very normal to me in that call. I guess we don't have anything to characterize it other than just what we heard and the conversations that ensued, it just seemed like a very normal conversation by a very normal person to me. I'm not trying to pick a fight with you, I'm asking you to comment on it if you can.

MR. BURKE: I missed one point. You are saying Mr. Basham sounded very normal?

THE COURT: On the telephone call he sounded very normal talking with his mom from the prison.

MR. BURKE: Your Honor, when I listened to the telephone call it seemed not unlike a call that any person might have with their mother. I don't know that I can say anything about the Basham family as normal, but I think that that doesn't necessarily affect the argument that we have about competency.

THE COURT: I guess, if anything, I was a little bit surprised he seemed a little bit happy go lucky almost. Which might cut in your favor, actually.

MR. BURKE: I would say that it does, he's incapable

1268

of really appreciating the reality of his --

THE COURT: One other issue, I know I'm making way too much over this, every time competency became an issue at trial Mr. Gasser trotted out that 30-foot rope Mr. Basham made to try to escape with. You heard -- have you seen the rope?

MR. BURKE: I have not seen the rope, I heard about it.

THE COURT: What he did, I think the testimony supported it, he took his bedsheets and very carefully ripped it into one-inch-wide strips and used the turn arm on the bunk bed to turn that into a fine filament and then wove that into a part of a rope and then wove that into a bigger part of a rope. And the result was a rope that looked just like something you would buy at Home Depot. I guess that doesn't prove competency, but it sure proves -- I don't know what it proves, but it was impressive to me that he was able to structure that rope try to escape being held pretrial in this case.

MR. BURKE: Your Honor, I think you raise an important point, that it's critical, I don't believe that goes to competence at all. It might go to the question of Mr. Basham's cognitive deficits. But it's clear that mental health professionals who deal with mental retardation and the idea of adaptive behavior, that the concept of deficits doesn't exclude the possibility of capability. There are many

1269

people who are actually mentally retarded who can hold jobs, there have been television actors who are mentally -- have Down Syndrome, they aren't necessarily exclusive, and often people who have deficits will develop skills in other areas. And Mr. Basham developed survival skills from childhood, and I think that's what you are seeing. It doesn't preclude a finding that he was incompetent to stand trial or that he had a low IQ.

THE COURT: All right. One more thing. My law clerk pointed out this nurse who testified, I believe from Charter Hospital?

MR. BURKE: Yes, your Honor.

THE COURT: I mean, it just seems almost hard to believe that Mr. Basham would have told anybody about that episode before telling Dr. Frierson, because if he told his lawyers I don't think the lawyers would have called a nurse who had sexual relations with their client while in a professional relationship knowingly. And I don't think the nurse would have come to testify without alerting the lawyers to that possibility of being brought out under oath. That's sort of a bombshell, isn't it?

I'm not saying that Mr. Basham wasn't being truthful with Dr. Frierson, but it's just a very hard thing to swallow that that testimony came in with no -- that the social worker didn't bring it up and Mr. Basham didn't bring it up and the

lawyers for Mr. Basham put her on the stand.

MR. BURKE:  I can tell you it's not very hard to comprehend why the social worker would not have brought it up, it was a crime she committed if she did in fact engage in those acts with regard to Mr. Basham, and --

THE COURT:  Was she a mitigation witness?

MR. BURKE:  She was a mitigation witness, yes.

THE COURT:  I just don't remember her testimony at all.

MR. BURKE:  I cannot tell you whether trial counsel knew about this situation.  I don't know.  So I can tell you, I don't want to testify, but I was told about this but could not do anything about it because it was told to me at the time in confidence.

THE COURT:  You knew about it before you read it in the Frierson report.

MR. BURKE:  Yes, your Honor, I did.  I have known about it for quite some time.

THE COURT:  But Swerling and Harris weren't asked about it while they were here.

MR. BURKE:  No, your Honor.  There was no way that I -- that we could ask them about it and still maintain our confidentiality with the client.  So once he expressed that information to Dr. Frierson I felt that that freed us up to address that point.

THE COURT: Right. All right. Thank you very much. All right, Mr. Witherspoon.

MR. WITHERSPOON: Your Honor, a couple of housekeeping matters. As far as the transcript for that videotape, your Honor, I think, or the audio, I think what you did was you redacted it where the only part heard was your discussion with Mr. Basham concerning dip. All the other racial remarks, all the other comments were redacted or the audio was taken completely out so the jury only knew there was a scuffle and it appeared between you and Mr. Basham over some dip. And the transcript on October 15, 2004, and it looks like it starts on page 2206.

THE COURT: All right. I thought I remember trying to excise out the profanity, and so forth, during the scuffle.

MR. WITHERSPOON: So, Judge, I think where I want to start is Mr. -- we talk about competency. But the question is what is competency. And I think the court has the legal standard. The test for determining competency is whether the defendant has sufficient present ability, present ability, to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as a factual understanding of the proceedings against him.

Now, we just heard from Cam Littlejohn who said that when they met with Mr. Basham they -- he understood what was going on. He was being brought back from Kentucky to South

Carolina to help find the body of Mrs. Donovan that he and Chad Fulks had killed. That's a rational understanding of the factual basis why he was being charged.

Mr. Littlejohn said that he wanted, when they were asked about competence, he said he needed the advice of a psychologist or psychiatrist to help him later on in the proceedings. That's why he filed a motion for competency.

Judge, when you brought Jack Swerling and Greg Harris into the case you gave them from I think we have heard pretty much an unlimited budget, and they went out and hired all these professionals, Dr. Schwartz-Watts, Dr. Brawley, Dr. Brannon, I think Joel Vogelsang, and Dr. Moore, who was treating Mr. Basham, all of these professionals who have the expertise to determine Basham's competency.

At no time did anyone raise an issue about Mr. Basham's competency except on the date of the incident with the dip. Dr. Schwartz-Watts didn't say he was incompetent, that's why we had the fight, her comment I think is, and you can look in the record, that he had gotten worked up because of this fight, and as a result of him getting worked up in the fight he was at that point incompetent. So the jury -- what the jury saw in the video wasn't an incompetent person, it was a person who was upset with you.

Dr. Parker said on the video that he was doing everything he can, Mr. Basham was doing what he could to

punish you, the judge. Dr. Parker, a psychiatrist hired by the court, has examined him twice, said Mr. Basham's actions were to punish the court. Judge, that's a person who has a rational understanding of what's going on and is making a decision that he's going to do whatever he can to prolong this, to upset the judge, do whatever he can not to be compliant. That's a person who has a reasonable degree of rational understanding, Judge.

You appoint Jack Swerling, 40 years -- I think he testified he had 40 years of experience trying cases. And his testimony at this 2255, he said his job was to save Brandon Basham's life. What's the easiest way, Judge, to save his life? Find him incompetent. Why wouldn't he take that easy road out if it was available to him? It wasn't available to him.

Mr. Harris and Mr. Swerling both testified they are not specialists in that area, they are not psychologists, they are not psychiatrists, they depended upon their experts, paid by this court. Dr. Schwartz-Watts said she visited with Mr. Basham more than 40 times, more than 200 hours with him and his family and reading documents. She never made the determination that he was incompetent except after the fight. That was the only time any indication other than Dr. Hyde that he was incompetent.

Now, Dr. Hyde comes in and says I did a

four-and-a-half hour exam and he's incompetent now, he is incompetent eight years ago, and he's going to be incompetent 20 years from now. Nobody else has made that determination, Judge. He made that determination after four-and-a-half hours by doing a glabellar reflex test, he said tapping on his forehead, the horizontal nystagmus they give people who are intoxicated, because of some cranial nerve issues that he felt. But, Judge, every other neurologist who has examined Mr. Basham, no one else found that he had neurological damage.

Dr. Hyde is a very smart man and he very well may have thought that was the case. But one of the things he said was he disagreed with Dr. Frierson's report because he thought Brandon Basham trusted him, Dr. Hyde, but didn't trust Dr. Frierson. Whereas Mr. Burke has just said Mr. Basham told them about this sexual encounter with this social worker. Frierson, he told Dr. Frierson that, he didn't tell Dr. Hyde that. Who did he trust more? Dr. Frierson, not Dr. Hyde. He trusted him more, trusted Dr. Frierson more because he made that statement to him.

When you look at everything Dr. Frierson and Dr. Hyde said, Dr. Hyde said simply because he has frontal lobe damage and these other issues he doesn't have a rational understanding of what's going on. But remember even doctor -- I mean Mr. Basham told Dr. Frierson, hey, when that officer was up there testifying and he is making those statements, he

said those statements were wrong and he told his lawyers if you call this other person he will refute that. He's telling his lawyers, Judge, in the case, he's helping to defend himself.

Now, he may have told them that in an inopportune time, but he told them this was important to him. This was his words about an incident that he had involvement in, that he had recalled, and that he was providing his lawyers with help to defend him. Simply because he had -- potentially has frontal lobe damage as Dr. Hyde opined doesn't mean he's incompetent. But Dr. Hyde wants you to think you have got frontal lobe damage you are incompetent under this legal standard.

And also, Judge, remember the scuffle over the dip. Remember there was a discussion between you and Mr. Basham and there was even a note that we included in our documents where Mr. Basham is making an agreement with the court, you let me dip, put paper towel or toilet paper in the cup, I will spit into that and that way there won't be any reason for me to be able to throw this on the marshals. This is from a person who has realized that if I want to get this dip I've got to find a way to alleviate this problem the court and the marshals have. Is that a person who doesn't have a rational understanding of what's going on, who does not have a rational, factual understanding of the proceedings against him, Judge?

1276

As far as manipulative, he got you to buy him dip. The Fourth Circuit has in its opinion that he is manipulative. He's manipulative. He told Dr. Frierson that when he heard all this bad testimony or this recant -- recounting of his bad childhood, he tuned out. He said I lived that, why do I want to hear it again. You look a lot of the times when actions were happening, Judge, it was things concerning his bad childhood. This incident with miss -- on the 26th that we're talking -- that Mr. Burke talked about, when you look at Greg Harris' statement, Greg Harris' statement doesn't say my client is incompetent, he says he can't sit still. Being competent or incompetent doesn't mean you can or can't sit still.

THE COURT: Those are his words, my client can't sit still?

MR. WITHERSPOON: Those are his comments from Mr. Harris. He never said competent, he said my client can't sit still. Mr. Burke pulled that up in his statement. Can you pull that up again?

MR. BURKE: Sure, it's page 14.

MR. WITHERSPOON: Line 15. My observation of Mr. Basham is he's not going to be able to sit in the courtroom and pay attention to the testimony, remain silent. I am concerned that he will -- that this jury will not look favorably upon the way he is appearing to me to be acting this

afternoon. Nothing about competency, the way he was acting.

THE COURT: Is that all Mr. Harris said about the need to adjourn for the day?

MR. WITHERSPOON: That's all that Mr. Burke has pulled up and shown the court in his statement.

THE COURT: And this was the day after the social worker's testimony, I believe he said?

MR. WITHERSPOON: That was the social worker testified on Friday, this happened on Tuesday. I think you took Monday off for whatever reason. But this happened Tuesday.

THE COURT: All right. Go ahead.

MR. WITHERSPOON: And as far as making the strategic decision of sending Mr. Basham to Butner, Judge, again, they had Dr. Schwartz-Watts early on, she found him competent.

Now, Mr. Burke talked about this motion to move him from Alvin S. Glenn to the Columbia Care and extend it there. The reason for that was she says because of his medication, we need to get his medication regimented and then therefore we can make a determination about his competency. She didn't say he was incompetent. Before she could make an evaluation of him she had to be able to get his medicine regimented.

I think that motion is in the motion to transfer to the defendant, it was filed on June 9, 2003 in the record. And it also has her statements. She doesn't say that he's

incompetent. We've just to get his medicine regimented because they are not doing a good job at the detention center and before we can make that determination I've got to have his medicine regimented.

And while -- why would an attorney allow an incompetent person to go to trial, again, Judge? If they were trying to save -- given the facts of this case, this was a horrendous case. Given the facts of this case, having known that your codefendant has already been found guilty and had been given the death penalty, if you could show that your client was incompetent why wouldn't Mr. Harris and Mr. Gasser not take the opportunity to save his life? I think, as Dr. Hyde said yesterday, given these facts it was clear that the jury was going find him guilty. The best thing that they could -- they could have done is found him -- have him determined to be incompetent, which would have saved his life.

Judge, in your order where you determined that Mr. Basham was competent, you cited this case Walton versus Angelone. And there's a statement in that case, Judge, where the Fourth Circuit made this statement. Not every manifestation of mental illness demonstrates incompetence to stand trial. Let me go further. Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. This is on -- this is United States versus

Angelone, 321 F.3d 442. And that particular statement is found at 460.

Simply because Mr. Basham was using coloring books, asking for dip, talking when things were going on doesn't mean he's incompetent. Especially on a -- and as an officer of the court, if I have a medical expert who tells me my client is incompetent, or my client's competent, why would I disagree with that? Would I -- how many experts do I have to hire? Certainly have to hire Dr. Hyde to find someone who has found him incompetent --

THE COURT: I think I asked Mr. Burke that before when we were here in October, do the lawyers have an obligation to override the opinion of their court-appointed expert, their own retained expert, I should say, and seek to have him declared incompetent when their own doctors didn't support that?

MR. WITHERSPOON: They have to have -- as an officer of the court they have to be able to come into court for those reasons, Judge, I think my client has those issues and needs to be determined competent. They didn't have those reasons. They had this expert, and I think the court has said Dr. Schwartz-Watts has testified in this court for both the government and the defendants. As Jack Swerling said, he trusted all of them. He has worked with her a number of times. He thought she was fair. He had no reason to disagree

with her.  He had no reason to disagree with her.  He had no reason to come to court and say I think my client is incompetent.

And as far as going to Butner, that wasn't to go to determine competency, that was only, Judge, so the government would have an opportunity to meet their mitigation evidence at trial.  Dr. Capehart never determined competency.  He never went into the facts of this case.  Totally different issue.

And if dip helps him to stay concentrated, Judge, I mean helps him to concentrate, that certainly doesn't mean he's incompetent.  He, being Mr. Basham, knows it helps him concentrate so he's asking to help him concentrate.  That doesn't show he's incompetent.

Dr. Frierson did use the word coy and cagey.  But he also reported exactly why he used that.  He also reported about that incident where the person assaulted him or sexually -- the sexual experience.  You can call it a sexual experience, and I'm not trying to degrade assault, but that's just the words that Mr. Basham and he used, sexual experience.  I don't think that shows that Dr. Frierson is being coy or cagey.

Mindful, Judge, when the court initially was looking for a psychiatrist to be a court-ordered psychiatrist both the government and the defense had agreed upon Dr. Frierson.  This was someone based upon his qualifications everyone thought

could give an opinion about Mr. Basham to the court.  I think the court decided not to use him because of the flight, trying to do somebody in Terra Haute, but that goes to substantiate his credentials.  He was someone that everybody thought would give a fair assessment of Mr. Basham.

And, again, I hate to go back to Dr. Schwartz-Watts, but, again, every time she saw him she said he was competent except that one time when she said he's so hyped up because of the fight.  Not that he's incompetent and caused the fight, the fight -- he became elevated, his elevation and that was what caused incompetence.  And the very next morning she came in and said he's at his baseline.

And on the October 26th incident, Judge, the medication, I think there's incidents in there where his -- he was supposed to be given Seroquel at night and there was an issue at the jail where they didn't give it to him at night, they gave it to him that morning.  And that is the morning he came to court and he was sleepy.  You did all you could do.  You broke for the morning, came back at 1:00 o'clock, you broke for another 15 minutes.

At some point, Judge, you are in charge of the courtroom.  Simply because he's sleepy doesn't mean he's incompetent.  If we had allowed defendants to dictate the -- and I think that's what Mr. Schools was saying.  If we allowed defendants to dictate the court schedule we would never have

trials. You gave him every opportunity, you gave him dip, I think you gave him Mountain Dew, you gave him tea, you gave him whatever he asked for or needed to help stay awake.

Now, the medication made him a little bit sleepy, but as the court said at the hearing in October, whenever you noticed that he was dozing off you would stop, you addressed that issue, and we get back to where we were. No indication that the court had any indication that Mr. Basham was incompetent.

Now, they made a claim that you had an obligation to do that, but there's no evidence in the record to indicate that the court had any idea or any rational basis for making a determination of competency of the defendant. Especially in light of the fact that Dr. Schwartz-Watts was coming in and the attorneys were meeting with him and they were talking to him. I think Mr. Harris said he met with him at least 50 times for over a hundred and some odd hours, and he thinks that's underestimated. He would be in a better position to determine if his client has that rational basis, understands what is going on and to be able to provide them assistance more so than a court sitting in here eight hours a day.

Mr. Harris spent -- I mean Mr. Swerling said he spent more than 40 hours -- 40 times with him, more than 60 hours. Who's in the better position to determine if their client is able to communicate with them, understand what they were

talking to him about, and then be able to help him?

Say what you will, Judge, July 25, 2005 in West Virginia Mr. Basham, along with two attorneys, stood before another federal judge and said I am competent, the lawyers said I have no reason to doubt his competency. Two more lawyers in a case that Mr. Basham was being tried for the murder of this young lady in West Virginia stood before a federal judge and says I have no reason to doubt his competency. Neither did Mr. Swerling, neither did Mr. Harris. Only Dr. Hyde. Who says in 2004 he was incompetent so he had to be incompetent in 2005.

And you already found, Judge, in your ruling from the October hearing that Mr. Basham is competent now to go forward, which certainly contradicts what Dr. Hyde has opined. I think when you look at all the evidence that you have before you now you can opine that Dr. Hyde's statement that he was incompetent in '04 is also incorrect. Again, you have all the experts, including Dr. Frierson and Dr. Parker, who says he's competent and that he was competent to go forward. There's no evidence, Judge, no evidence of that, and it's by a preponderance of the evidence.

When you weigh the evidence it certainly weighs in favor of competency. It certainly weighs in favor of competency. And as far as ineffective for not raising competency, again, why would they do that? As Mr. Swerling

said, I wanted to save his life. I was doing whatever I could to safe his life. If he wanted to save his life the easiest and quickest way would be determine he's incompetent. But he had no reason to believe that, he had no reason to do that.

And as far as the lawyers and Jenner & Block who did the appeal, Miss Meister, I may be mispronouncing it, said they briefed the issue on competency and they made a determination that was not a strong issue, but they wanted to put the strongest issues that they had in front of the Fourth Circuit.

Now, sitting here today, you know, in 2012, we may be able to make some judgments about it, but that was their decision. Given the record, the same records you have, there's no indication that he was incompetent. That wasn't an issue that they thought would win in the Fourth Circuit. They wanted to put their best foot forward. You may disagree, we may disagree or Mr. Burke may disagree with what the issues were, but that was the issue they found. They briefed it but they didn't think that was going to be a strong issue, it wasn't going to be a stand alone issue, it was going to be part of another issue. But they determined to take that out because the facts, the record they had before them did not indicate to them that Mr. Basham was incompetent. So they were trying to put their best foot forward.

Judge, when you think again about competency, don't

think about his mental defects, don't think about him dipping, don't think about the fight. Think, Judge, what you have to focus on, that he had a sufficient present ability to consult with his lawyers. And the only people who can tell you that, Judge, are his two lawyers. Or in this case the four lawyers. Mr. Swerling, Mr. Harris and the two in West Virginia have said that he had the present ability to communicate with them and he had a rational as well as a factual understanding of the proceedings against him.

He keeps telling, I want to die, impose the death penalty, kill me. As Dr. Frierson said, shit or get off the pot. He understands that he has been imposed the death penalty for this murder of Miss Donovan. When I read from the transcript about what his statement to the court through his lawyer, again, the lawyer said on the record these are words from Mr. Basham. Very coherent statement apologizing to the Burns family for what he and Chad Fulks did to their daughter. Is he competent? Certainly he's competent. Does he have ADHD? He very well may have ADHD, but it doesn't affect his competency, his ability to help his lawyers.

Does he have cognitive impairments? He may have cognitive impairments but it certainly doesn't affect his capability to work with his lawyers. Does he have bipolar, does he not have bipolar? Whatever he had didn't affect his ability to work with his lawyers. Did not affect the way he

was working with his lawyers. Beg the court's indulgence one second.

THE COURT: All right.

(There was a pause in the proceedings)

THE COURT: All right. I think you pretty well covered your position. Anything else you want to add?

MR. WITHERSPOON: No, sir. I was waiting for the court in case the court had questions.

THE COURT: Anything in reply on competency and then we can break for lunch?

MR. BURKE: Yes, your Honor, just a few points. I think there is a serious danger in over-generalizing about what the record shows in this case. I would like to begin with what Dr. Schwartz-Watts actually said to this court, but first let me say that it is not accurate to say that every time Dr. Schwartz-Watts saw Brandon Basham she said he was competent. She's never testified to that. She wasn't asked except on one occasion, as far as we know, to determine whether he was competent. And on that time she said he is not competent. And I --

THE COURT: I thought Mr. Swerling, one of the e-mails Mr. Swerling sent to somebody, he said the reason we aren't raising competency is because our doctors don't say he's incompetent. Didn't he?

MR. BURKE: That was something he said to appellate

counsel a few years after the case. And he said because our -- but, of course, we showed you his notes from the hearing on the 20th of September when he wrote that she said he was not competent. Competency is not yes or no. And as Dr. Schwartz-Watts told you, the competency can be fluid. And it is fluid in Mr. Basham's case.

Now, Mr. Witherspoon said that Dr. Schwartz-Watts came out and said to the court on the 20th of September that Mr. Basham had become incompetent after the incident, that he was upset and that was why he was competent.

Sarah, do we have -- I would like to read you, your Honor, the transcript, and it's from September 20th, 2004. It's Dr. Schwartz-Watts testifying to the court. It begins on page 161 at the bottom, and she says, hello again. On 162, I saw Mr. Basham this afternoon probably for about 15 or 20 minutes. At this time I have a number of issues. Number one, he needs medical attention. He was -- specifically, I'm very concerned about looks like he's fractured his third metacarpal, his third knuckle. I don't know if those injuries were self-inflicted or from the circumstances in the courtroom.

Secondly, I do have concerns about his competency. It is my opinion right now that because of his mental defect that he can't assist his attorneys. Now, the problem with that, and the good news probably, and this is Dr.

Schwartz-Watts testifying, his mental state fluctuates and there is going to be times in this trial where he has competence fluctuation. A little time, perhaps tomorrow, there will be no reason that I can foresee that he wouldn't be calm enough that we can proceed.

That's what Dr. Schwartz-Watts said. She never came out and said he was competent during this struggle. And that videotape and that audio and transcript were shown to the jury as proof that Mr. Basham was a dangerous man. That is our claim with regard to September 20th.

With regard to the government's statements about no neurologist finding -- no other doctors finding the neurological deficits that Dr. Hyde found, first, Dr. Frierson, the government's expert, didn't dispute them. He's not qualified to dispute them. And it plainly misstates the record, because the defense counsel called Dr. Brannon at trial, a neurologist who testified about Mr. Basham's neurological deficits. So these types of closing arguments to the jury statements don't accurately reflect what the record, the cold, hard, established record in this case actually shows.

For example, you know, if you go back and you read Dr. Hyde's testimony, Dr. Hyde never said he's got frontal lobe, therefore he is incompetent. He was -- that was not his testimony, your Honor. And it's misleading to suggest that it

was.

Now, on September 26th, the day in which Mr. Basham was brought to court without his proper medication, there was an ex parte hearing that same day, it's a separate transcript, and I think I mentioned before, I didn't bring it up, but I think I mentioned to the court that it's worth a read because Mr. Basham speaks at length at that proceeding. And I think even from the cold record it's obvious that there are serious concerns about his abilities and his coherency and his competency on that day.

Oh, I'm sorry, October 26th and it's ex parte. And let me see if I can read to you -- I would like to read to you, your Honor, the government argued that all we were dealing with here is the prosecution saying that, or, excuse me, the defense counsel saying we're just worried that my client's not going to be able to sit still.

That is not what was transpiring that day. They had a client who was -- had not been properly medicated with an antipsychotic medication that he received, or he should have received, that he had been prescribed. And this wasn't a question about Mr. Basham just jumping up and down. And if you go to page three, the bottom of page three of the ex parte transcript, your Honor, you were directly conferring with Mr. Basham. And you say, your lawyers have convinced me because you are not on your medicine it is not fair for you to go

forward with this trial. So I sent the jury home. If you --
if you are not competent to go forward in front of a jury I
don't think you should be telling me things here on the record
and making a transcript of things when your lawyers don't know
what you are going to say. That's what transpired on
September -- October 26th.

Now, I agree with Mr. Witherspoon that you have the
patience of Job. You've dealt with this case for ten years,
you went out of your way to try to accommodate what some
people might say is a very difficult man and some people might
say is a mentally ill man. But on September 26th I think the
record shows that you had been pushed to your limit.

THE COURT: You keep saying September, you mean
October --

MR. BURKE: I'm sorry, October 26. But you had been
pushed to your limit, that you were faced with a situation
where counsel was still saying we have concerns about him
going forward. And if you look at the transcript of not the
ex parte, but from when you are back in court, there is -- and
we set this out, I believe, in our reply brief, where Mr.
Harris is saying, just so you are clear, your Honor, I want
the record to reflect that while I'm talking to you my client
is talking loudly to Mr. Swerling. I can hear him up here.
These are real concerns about his competency. They did not
ask -- you were told by the government a minute ago that they

always asked Dr. Schwartz-Watts and she said she's competent. They didn't ask her that day. They should have. They had an obligation to ask.

And as a result when the court went forward three things happened. Mr. Basham on the 26th of October during that period was tried while he was not competent. That is to be shown by a preponderance of the evidence. Second, his attorneys rendered constitutionally ineffective assistance of counsel by not asking that he be evaluated by their expert or some other expert that day, and he was prejudiced, necessarily, because he was tried while he was not competent.

And, finally, with all due respect, your Honor, pushed to your limits, you violated Mr. Basham's rights under Drope to have the court independently determine whether he was competent to proceed. You were pressured, understandably, but I believe the record speaks for --

THE COURT: Anybody know how many interruptions we had had up to that point? Y'all are obviously much more on top of the record in this case than I am even though I was the one who was here when it happened. But this was eight years ago. Just how many episode likes this did we have in all? I'm just curious.

MR. BURKE: Episodes --

THE COURT: Where we had to stop and make a decision whether to go forward that day or take a break and come back?

MR. BURKE: Well, you had several episodes, your Honor, and we set them forth on pages 32 and 33 of our reply brief, where you had ex parte hearings or you were trying to accommodate Mr. Basham's falling asleep or his inability -- and we cite September 7, September 8, September 17, September 20. September 20, page 88, you state last Friday there were two issues. You stressed that you were almost having a panic attack, supposedly, and then you are sleepy.

October 12, Mr. Harris felt it was necessary on October 12 during opening statements on the penalty phase of the case to bring this up to the jury. On October 12, 2004, page 69, he argued to the jury, why would someone after being charged and arrested and confronted with death penalty offenses sleep in his trial? And during his jury selection, why would someone argue with his lawyers during trial?

These things were real, they were happening, and the jury was seeing them. So I just want to stress that we ask that the court look closely at what the actual record is in this case.

And, finally, on the issue of appellate counsel, the facts speak for themselves. The appellate attorneys raised a claim that they had no basis raising because it was not even a legal claim that could be raised. Now, with regard to whether they made a knowing decision --

THE COURT: How many issues did they take up on

direct appeal?

MR. BURKE: I couldn't honestly tell you that at the moment. I think somewhere in the neighborhood of perhaps ten, but I don't -- I don't want to mislead the court. I just don't know. We can inform you after the break. But --

THE COURT: Ten lawyers with that firm, and I'm not sure they were all experienced criminal defense lawyers, necessarily.

MR. BURKE: Well, you will remember with regard to this decision, and Miss Meister testified and she reviewed some of the e-mails going back and forth at the very last minute. And David DeBruin, a very qualified lawyer and he is now the managing partner of Jenner Block, there were e-mails you recall where he expressed concerns about the competence issue, saying it's a very complex issue. But they were on the eve of filing the brief. And he then goes to another partner and he e-mails him saying, he says I have concerns about how I handled this case. I should not have put so much faith in these young attorneys. So, I mean, to say they made some foolproof and sound decision about what claims to preclude is not consistent with what the evidence presented would show. So thank you, your Honor.

THE COURT: All right.

MR. WITHERSPOON: Just one final thing and I'll shut up. I'll ask the court to read the entire transcript of the

ex parte hearing where the court, after the October 26th incident, read the entire transcript and look at Mr. Basham's conversation with the court.

MR. BURKE: We would encourage the court to do so, as well, your Honor.

THE COURT: All right. How long you want to break for lunch? An hour and 15 minutes, is that enough? Are we going to finish today or not? I've set aside the whole week, so it doesn't matter to me. And I don't want to rush you.

MR. BURKE: I would certainly like to try to finish today. Maybe Mr. Daley and I can confer when we break and see.

MR. DALEY: We may be able, I don't want to speak for you, but there are some other issues that might be submitted on the briefs. I think we're narrowing down what we really think are going to be the -- the key issues. Not all the issues, obviously.

THE COURT: All right.

MR. DALEY: I'm willing to stay late.

THE COURT: Well, I am, too.

MR. BURKE: Our goal is to finish today.

THE COURT: Let's, it's five minutes to one, come back at ten minutes after two? All right. We will be in recess until 2:10.

(A recess transpired)

THE COURT: All right. Ready to move forward?

MR. BURKE: Thank you, your Honor. Your Honor, I've spoken with Mr. Daley, and what we're going to do is, as you suggested, argue a claim and then switch back and forth. And I will try for the most part to go numerically through the claims. But there's some overlap and some intertwining, so there will be some exceptions to that.

And I would like to start first with claim one from the petition. And claim one is the claim involving ineffective assistance of counsel by Mr. Littlejohn and Mr. Monckton on the Thanksgiving day search.

Mr. Hammond testified about that incident, and I am going to try as much as possible not to repeat what he said because he can say it much better than I can. And I'll just leave it to the court to review his testimony, but most of these claims he did address them and opined that counsel fell below the standard of care expected of capital federal attorneys.

Mr. Hammond identified actually two aspects of deficient performance with regard to the first claim. The first concerns whether the Thanksgiving day search should have occurred at all. There was evidence, and we heard again today, that the government offered defense no guarantees about what would happen with regard to the evidence that was gathered, statements that were obtained during the search.

And that failing to have some type of guarantee about how evidence would be used, how statements would be used was deficient performance.

The attorneys had not been on the case for any length of time. They, as Mr. Littlejohn commented or testified this morning, he wasn't even sure exactly what statements Mr. Basham had made while he was in custody in Kentucky, and the U.S. Attorney's Office refused to give a proffer, so --

THE COURT: So they should have just clammed up and said we want a jury trial. But if they had done that, though, don't you know we would be here today arguing over whether the lawyers were ineffective for not participating in the search would have been the only way to save his life.

MR. BURKE: I disagree, your Honor. We know now that Miss Donovan's body wasn't even in that area. We would know that today. It would not be something we would be arguing. We know now that Miss Donovan's body was not even in the part of the state or the country where they were looking. And so we understand that the motivation and why they felt compelled to try some -- sometimes it's referred as a race to the body. They were trying to do their best.

But under these circumstances, given the fact that they did not have any guarantee and it was so ambiguous what would be used, what would not be used, statements about directions, I mean, from the outset it became obvious that

there were going to be problems with that.

THE COURT: Isn't this somewhat similar to the claim raised by Mr. Fulks, in that the argument there, as you know, was his lawyers were ineffective for letting him make a statement to the FBI without something in return. And Mr. Blume testified it was his strategy to do that to get his client's version before the jury without his client having to testify. There was something in it for him to do that without a reward in return.

MR. BURKE: Right. And Mr. Blume made that decision after he had represented Mr. Fulks for quite some time. He knew full well what the evidence would show and what it would not show and so he made that strategic decision. Mr. Hammond's testimony was that given these particular circumstances it was not an appropriate decision to make because the attorneys simply did not have enough information about what the evidence was and how it was going to be used.

More importantly, and I think the more clearcut issue with regard to claim one is the incident in which Sheriff Hewitt spoke to Mr. Basham outside the presence of his attorneys. Now, there's some confusion or ambiguity as to what exactly happened. If I remember correctly, Mr. Monckton said that he never saw Mr. Hewitt speaking to Mr. Basham.

THE COURT: He was surprised to hear that in the courtroom, wasn't he?

MR. BURKE: Yes. Mr. Littlejohn said this morning that he doesn't remember Mr. Hewitt talking to his client but that he was confident he never would have taken his eyes off of his client.

THE COURT: He said he was always within sight but not within earshot, I believe.

MR. BURKE: But he also has no recollection of any communication between those two. Which raises an interesting issue. Because either Sheriff Hewitt spoke to Mr. Basham or he didn't. If he didn't we have no IAC claim here, what we are saying was damaging never happened. But if he didn't that means that Sheriff Hewitt testified falsely. So I think given that neither Mr. Monckton nor Mr. Littlejohn are definitively able to say this never happened we have to at least assume that Mr. Hewitt, Sheriff Hewitt, did in fact talk to Mr. Basham.

THE COURT: And he did say that it was in response to his question, it was not something blurted out by Mr. Basham.

MR. BURKE: That's correct. There's never --

THE COURT: No provocation by the sheriff.

MR. BURKE: There was --

THE COURT: It was with provocation by the sheriff, I'm sorry.

MR. BURKE: Yes, your Honor. And so we have that situation. And Mr. Hammond's referred to it as the umbilical

1299

cord rule. That when you have your client, there are so many times when your client is outside of your control and they are in the jail and you can't control what happens to them. But in the situation such as this when you are actually with your client and for something this critical you simply don't allow your client to communicate with law enforcement outside of your presence.

If you -- Mr. Littlejohn said that he would have been within his eyesight and in an area about the size of this courtroom. But if he wasn't, if he didn't see this event occur then he wasn't doing his job. He needed to keep control of his client. And so that is the argument that we put forth with regard to claim one.

So it's twofold. This never should have happened, they should not have been out there. But once they were out there they had a very clearcut, unequivocal obligation to keep tabs on their client. And either this occurred when Mr. Littlejohn and Mr. Monckton were off talking to other law enforcement or it occurred when they just weren't paying attention. It doesn't matter. It occurred. And so much of the -- so many of the claims we're going to talk about this afternoon find their genesis in that one incident. So there can be no question that there was severe prejudice as a result of what happened.

Your, Honor that's all we have on claim one so I'll

let the government respond.

THE COURT: Let me hear from the government. Miss Ewing?

MS. EWING: Yes, your Honor. Under claim one, first of all, we believe that Mr. Basham is arguing the wrong standard. This umbilical cord standard seems to be something like strict liability, that whenever a defense attorney allows his clients out of his presence or away from him further than an umbilical cord it is per se ineffective assistance.

Well, that's not the standard. The standard is that what a reasonable attorney would do under prevailing norms based on the facts of the particular case and from counsel's perspective at the time. Well, what do we have the day of the search? First off, Mr. Basham's right, no, they hadn't had a lot of time, they didn't have time to put together a defense team. They got appointed the day before. However, they knew enough that Mr. Basham was in a lot of trouble, he had already admitted to being involved in the murder --

THE COURT: Didn't Mr. Littlejohn say he wasn't sure how much had been admitted up in Kentucky?

MS. EWING: He said he wasn't sure how much had been admitted. However, he did say I knew he was in a lot of trouble. He, or at least certainly Mr. Monckton said that he had no doubt that if they didn't find Alice Donovan's body that -- or had very little doubt if they didn't find Alice

Donovan's body that Mr. Basham would receive the death penalty. So they felt very, very strongly that this was Mr. Basham's one opportunity to save his life. So those were the circumstances that they were operating under.

At the Jackson v. Denno hearing Mr. Littlejohn had testified that the fact that he would go and attempt to point out the location where Miss Donovan's body was located, obviously there was no way of keeping that evidence out. They knew it was incriminating, but at the same time they were between the proverbial rock and a hard spot. So they chose to pursue the search route in hopes that they would find her body. And as it turns out her body wasn't there, but they didn't know that at the time.

And the court has to look at what the attorneys knew at the time, and at the time Mr. Basham was saying her body is at this Bee Tree Farm area. They hadn't -- they didn't have any basis to not believe him at that time.

As far as Mr. Basham speaking with Sheriff Hewitt, that was all part and parcel of finding the body. Mr. Littlejohn said, well, as I recall, we went back to the cemetery and it was an area about the size of the courtroom. And, yeah, Mr. Basham may have spoken to Sheriff Hewitt during that time, but they were all looking around for the purse strap.

Maybe he didn't see the discussion but it didn't take

a whole lot of time to walk over to the edge of a cemetery at the tree line that was testified to, Mr. Basham's talking about throwing the purse strap, look for the purse strap that was thrown in the tree line.

THE COURT: Let's stop. The sheriff already knew they were looking for a purse strap near a cemetery.

MS. EWING: Absolutely.

THE COURT: That was already out on the record through Mr. Littlejohn or with Mr. Littlejohn's consent.

MS. EWING: Yes, your Honor. He did not recall today talking about it in the van, but I believe that the record does show that when they were in the van Mr. Basham attempted to whisper something to Mr. Littlejohn and Mr. Littlejohn said yeah, go ahead and tell them. And Mr. Basham said you need to look for a purse strap. If you find the purse strap the body will be --

THE COURT: They knew that before this disputed conversation.

MS. EWING: Absolutely.

THE COURT: And what happened in the disputed conversation, I read that transcript a dozen times and I still don't know what the sheriff said. Did he say that Mr. Basham demonstrated how she was strangled, how the strangling occurred and how he threw it, or just demonstrated how he threw the strap? It wasn't clear to me.

MS. EWING: It is ambiguous.

THE COURT: And it's very ambiguous about whether Mr. Basham admitted he did the strangling. He said how she was strangled and how he threw the strap, passive tense and active tense in a dual sentence, or whatever the word is.

MS. EWING: It was. The question at trial was to the effect but he never said he strangled her, and Sheriff Hewitt in both the Jackson versus Denno hearing and the trial said something to the effect, no, he demonstrated, and may I show you? And he said -- he said Brandon, how did you do it? And he said like this, and apparently at that point Mr. Basham made some demonstration.

THE COURT: Of the strangling, not of the throwing but of the strangling leg.

MS. EWING: Of the throwing, also, though. Certainly one could interpret it to mean that he demonstrated how she was strangled and how it was thrown. But I think your Honor pointed out when we were back last month in hearings that it seemed to be one of those situations where neither side really wanted to --

THE COURT: Both sides were scared to touch it, I think. That's what it looked like to me. Because it surely could have been cleared up by one side or the other. But I think it's like both sides leave the record where it was and argue the inferences in their favor.

MS. EWING: And I think that's exactly what happened, or least from reading the transcript that's what happened.

But at the end of the day when everybody ended up at that little cemetery Brandon Basham's attorneys, their focus was on extending that search because the agents were frustrated, they were tired, they were ready to call the search off and leave.

And Mr. Monckton testified my biggest fear was --

THE COURT: Let me interrupt you. I've got the transcript of the Jackson v. Denno and the trial testimony. And the Jackson v. Denno hearing the sheriff said, let me just read it. We walked back down to the cemetery, this is page 66 at line 15. We walked back -- he walked down to the cemetery, he got tears in his eyes and tears rolled down his cheek and he showed me the length of strap. Yes, how did he do that? Answer: May I demonstrate? Certainly. Answer: Like this. Because he couldn't pull his hands very far apart, he was shackled, he showed me the length of the strap, says that he believed it to be a Liz Claiborne strap, and that he had thrown it in the woods. He then demonstrated the manner in which he threw it in the woods. And he didn't say that he demonstrated how she was strangled at the Jackson v. Denno, right?

MS. EWING: Right.

THE COURT: He said he demonstrated how he threw it

in the woods.  And then at the trial on cross-examination by Mr. Harris, Mr. Harris said refer to your notes.  Okay.  Question:  There's nothing in your notes nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?  Answer: No, sir, he did not tell me he used the strap.  He demonstrated, though.  He demonstrated?  Yes, sir.  Your notes nor Lieutenant Crocker's notes say that he did that, isn't that true?  This is true, because he didn't say, he showed.

But there, again, it's not clear from what he says he -- that he demonstrated how she was strangled or how he threw the strap.  To me it's very ambiguous.  And both sides had a full chance to clear that up and neither side took advantage of the opportunity to ask the sheriff what did you mean that he demonstrated.

MS. EWING:  I think that both sides were afraid to ask.  Certainly at that time the government did not know what had occurred or what had been said prior to the trial.  We now know that Mr. Swerling and Mr. Harris had found out that Mr. Basham told Attorney Hughes that they had killed Samantha Burns, that he and Mr. Fulks had each taken an end of Samantha Burns' book bag strap or backpack strap and had strangled her together.  So my guess is that maybe Mr. Harris was a little concerned about --

THE COURT:  Maybe they did the same thing here?

MS. EWING: Yes, your Honor. They certainly -- well, we know that they attempted to kidnap Andrea Francis and her mother in the same manner that they kidnapped Alice Donovan in. So certainly there seems to be an indication they had kind of an MO in the way they were committing these crimes.

THE COURT: All right.

MS. EWING: So, anyway, extending the search was what they needed to do, and they were focused on talking with law enforcement at the end of the day and trying to extend the search. So if Mr. Basham wandered off with Sheriff Hewitt briefly, it was reasonable under the circumstances.

THE COURT: Let me interrupt. Let me -- I'm interested to hear Mr. Burke on this. I know you say later the prosecutor argued that's all we need to hear right there is what Sheriff Hewitt said, but do you agree it's somewhat ambiguous and both sides agreed to just decide to stay away -- not agree to stay away from it, but decided it was just too dangerous to go there and they'd better leave it alone and try to argue the inferences to be drawn from it?

MR. BURKE: Your Honor, I will agree with that second point. But there is a very important distinction. The government does not have the right to shy away from an ambiguity like that. They have an obligation under the due process clause to clear up that ambiguity, and what happened in this case is when Mr. Hewitt, when Sheriff Hewitt --

THE COURT: The government elicited it. And you say that's ineffective assistance. But Mr. Harris really didn't know that was going to come out, did he?

MR. BURKE: No, he did not. He was surprised. But the government, interestingly, given how much time Mr. Gasser spent speaking during the trial, he did not redirect on this point. He didn't redirect at all, he just sat on his hands. He had an obligation -- and this goes to our next claim. Miss Ewing suggests that, yes, everybody was afraid of it. Well, perhaps defense counsel was afraid of it, the government doesn't have that right. They were the ones who were prosecuting this case and they could not simply say whoops, we don't know.

And another factor that is very important to consider is that at Mr. Fulks' trial Mr. Gasser said that Sheriff Hewitt had indicated that Brandon Basham had shown how Fulks had killed the victim. So you had directly conflicting information there. That goes to the claim --

THE COURT: Say it again. At the Fulks trial Mr. Gasser told the jury about Sheriff Hewitt --

MR. BURKE: Excuse me. It didn't come out in front of the jury. What happened, this came up in the context of the deer statement when the government -- let's see. Defense counsel wanted to bring in Mr. Basham's statement about the statement, I've never killed a deer, okay --

THE COURT: It was in that out-of-the-jury's-presence discussion about the deer statement that Mr. Gasser made the statement about the strap.

MR. BURKE: Exactly. And the government was asked, saying, wait a minute, that can't come in because this is what would come in in Mr. Fulks' trial. Mr. Gasser said to you, your Honor, remember Sheriff Hewitt demonstrating how Brandon Basham said that Chad Fulks took the purse strap and strangled her. That's from the Fulks transcript, June 22, '04 at 255. And so --

THE COURT: The reason he was saying that was I pointed out that to let the deer statement in by itself would be unfair because although it appears, you know, arguably it was an admission by Mr. Basham he had committed a crime or struck the fatal blow, Mr. Basham also said a lot of other things that have to be placed in context for the jury about the fact he didn't strike the fatal blow, right? That's why we got into that discussion.

MR. BURKE: Well, you also made the comment, your Honor, that that statement, the deer statement could have --

THE COURT: It's somewhat ambiguous, right?

MR. BURKE: Right.

THE COURT: All right. So the point is that Mr. Gasser didn't say that in front of jury at the Fulks trial, but he argued it to me.

MR. BURKE: Well, and I would say, your Honor, with regard to Miss Ewing's statement that everybody was afraid, it shows that the prosecution believed that the evidence indicated that Mr. Basham had told Sheriff Hewitt that Mr. Fulks was the actual killer.

THE COURT: Of course, all that could have been avoided if we had one trial. And it was the defendants who argued strenuously for separate trials.

MR. BURKE: Which --

THE COURT: Right? Wasn't it?

MR. BURKE: They have a constitutional right to be tried separately, your Honor. If they exercise their constitutional rights they can't be punished for that.

THE COURT: I thought, I may be wrong, I thought they gave me a reason. Normally you try defendants who are indicted together, they are tried together. But I thought they gave me a reason we needed separate trials here, some evidentiary or strategic reason. I'm very rusty, that's way back in the past.

MS. EWING: As I recall, they did. I haven't looked at it for this hearing. But as I recall when we were handling the Fulks one we did take a look at it.

THE COURT: All right. Let's go back to the argument. I just wanted to get the benefit of the defendant's input on that point. Go ahead.

MS. EWING: Your Honor, the government doesn't deny that Brandon Basham did say that Fulks did strangle Alice Donovan. It was prior to the demonstration, I believe. But, yeah, Mr. Basham did at various times say Fulks did it. I think this was part of the problem with doing a joint trial, each one said the other one did it. As I recall Mr. Gasser's term, it was -- you referred to it as the TODDT defense, the other dude did it.

And just in response to the comment that the government had an obligation, no, your Honor, I don't believe that the government has an obligation to explore everything. The government had an obligation to present its evidence, sure, and to show the jury the evidence to make its case. It doesn't necessarily have an obligation to respond to what Mr. Basham was raising.

But, moving on, it was difficult for any of Mr. Basham's counsel to stop him from talking. He likes to talk. He was the one who asked to be transported to South Carolina so he could help find the body while still in Kentucky. He reached out to the FBI Special Agent Pat Maley and one of the supervisors and left him a voice mail that said he wanted to talk. This occurred after he had been appointed counsel in Kentucky. While preparing the map with his counsel right there, and Agent Maley said that counsel Hughes was quite protective of Mr. Basham but even in that setting in a small

room trying to put together a map Mr. Basham pointed to a cemetery where he said there was a small cemetery and said, and this is where we did our thing. He didn't say this is where Fulks killed her, he didn't say this is where Fulks raped her, he said this is where we did our thing, with his counsel right there.

He also during the same time talked about Alice's body being within dragging distance of the road. This occurred before he ever came down to South Carolina and in the presence of counsel. Yes, it was difficult for counsel to control Mr. Basham.

And then after the interview where he was coming up with the map Attorney Hughes actually called Agent Maley the following evening and said that he had been talking with Basham and needed to let him know that Basham was providing directions to where, quote, they dumped the body, unquote, of the missing girl in West Virginia. So prior to even going to South Carolina he had made numerous statements incriminating himself.

During the search, again, he started talking about the purse strap, and in the Jackson v. Denno hearing Mr. Littlejohn said that, you know, he felt that was directional talking about the purse strap. They needed something to show that he was telling the truth and if they found that purse strap it was certainly an indication that Basham was being

straight up with them.

Also, during the search Mr. Basham said they pulled Alice Donovan out of the right side of the car and drug her 50 feet into the woods and covered her body with leaves.

THE COURT: Who did he say that to?

MS. EWING: I'm sorry, your Honor?

THE COURT: Who did Mr. Basham say that to?

MS. EWING: I believe he said that while they were in the van or at one point where they stopped and went into the woods. I believe that was just prior to going into the woods, because he also at the same time talked about cutting his leg on a stake. He said he remembered where they had gotten out because there was like a gopher hole with a stake in it and he had cut his leg. And I believe that at the Jackson v. Denno or one of the hearings that Mr. Littlejohn or Sheriff Hewitt commented about how he pulled his pants leg up to show them where his leg was cut going into this place in the woods where he had said that they drug her body.

So we have all these statements coming from Mr. Basham and then a month, less than a month later, actually Christmas Eve, Mr. Basham calls Clifford Jay and again incriminates himself. He calls him and says we killed them. Yes, sir, Mr. CJ, we killed them.

Now, is it ineffective assistance of counsel that if counsel weren't with him on Christmas Eve when he made this

phone call?  I don't think so.

But in addition to it not being ineffective assistance of counsel there was no prejudice.  This ambiguous purse strap demonstration certainly did not prejudice Mr. Basham.

Let's see what the evidence was against Mr. Basham.  In addition to his various admissions, Mr. Basham was the one on the videotape kidnapping Alice Donovan.  Had there not been Mr. Basham jumping into that car and kidnapping Alice Donovan Alice Donovan would still be alive.  It was Mr. Basham who sat in the back seat with Alice Donovan to make sure she didn't escape before Mr. Fulks found a place where they could do their thing.

In fact, it's interesting there is evidence that and was evidence on the record that that's exactly what Mr. Basham was doing.  If you will recall, there were two men who testified who had been at the deer camp cooking out and they testified -- at least one of them testified that he noticed the car and thought it was very odd because one young man was driving this blue BMW and in the back seat was another man and a woman sitting very close together in the back seat.  So there was that testimony that Basham was sitting in the back seat keeping her there.

Also, Mr. Basham was the one who purchased the camo gear.  There was testimony that he went into Wal-Mart and

purchased the camouflage gear that they wore the night that they kidnapped Samantha Burns.

Also, Mr. Basham was the one wearing Samantha Burns' ring. Beth McGuffin testified about the ring that he wore around his neck that he gave to her and then I guess took back. And then there was even a replica of the ring that Samantha's mother had gotten to show what this ring looked like. Mr. Basham also had a knife belonging to Alice Donovan on him when he was arrested.

Mr. Basham was the one who talked James Hawkins into leaving his house and giving them a ride, purportedly to their broken down vehicle the night that they kidnapped him. Mr. Basham was the one who went up to Margaret Moore's house and tried to talk her into coming out and giving them a ride, and when she couldn't do that he tried to talk her into letting them into her house. Mr. Basham was the one who crouched down in the motel room in Indiana and said if the policeman came through the door that he would shoot him.

THE COURT: This is all going to overwhelming evidence of guilt to show what whatever errors might have occurred was harmless. That's where you are going with this.

MS. EWING: Yes, your Honor. And I'm about to wrap up on this.

THE COURT: I'm not trying to rush you. I just wanted to be sure, you said there was no prejudice, but what

you are really saying is in the total scheme of things it wasn't that consequential because of the overwhelming other evidence.

MS. EWING: Yes, your Honor.

THE COURT: All right.

MS. EWING: And it was Mr. Basham who was ready -- who was caught trying to kidnap the third and fourth victims. Andrea Francis testified and her mother testified about how Mr. Basham held the gun into Andrea Francis' side and tried to get into the car on top of her. And it was Mr. Basham who attempted to shoot at the police or shoot the policeman as he was trying to avoid being captured.

And, finally, as far as this claim and the purse strap, the jury didn't find that Mr. Basham killed Alice Donovan. The jury found the fourth intent factor, threshold factor. Brandon Leon Basham intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to Alice Donovan. Such participation in the act constituted a reckless disregard for human life and Alice Donovan died as a direct result of the act. Mr. Gasser had argued this, jurors didn't need to find Mr. Basham specifically killed Alice Donovan, that it was his hand that killed her.

As to overall prejudice, the reference to the purse strap admission or whatever was three lines in a 76 page

1316

closing that continually, I don't know -- I didn't count how many times he said the team of Fulks and Basham in unison, acting as a team, a killing machine, they killed Alice Donovan. It was constantly they did it. So over --

THE COURT: I think the record is pretty clear on that. I think the government was smart enough to realize this could be an issue and they were very careful in both cases in their arguments to the jury to say they worked as a team.

MS. EWING: Yes, your Honor.

THE COURT: I think the Fourth Circuit already recognized that.

MS. EWING: Yes, your Honor, I think so. Beg the court's indulgence.

(There was a pause in the proceedings)

MS. EWING: Thank you, your Honor.

THE COURT: All right. Let's hear reply on this argument and then we will move on to the next one. Let me be sure I understand. Mr. Burke, you said the government has a constitutional obligation to clear up an ambiguity. You might be right, I just never thought about that before. The government cannot knowingly use false evidence.

MR. BURKE: And they have an obligation, your Honor, to investigate when they believe that there may have been false testimony.

THE COURT: Here the government is faced with

**JA 5046**

separate trials which they did not want, they opposed, and they are trying to not say something in one case that would hurt the other case. They are dancing on the head of a pin, so to speak. And one comment comes out on cross-examination that the government didn't bring out that might arguably signify that Basham struck the fatal blow, whatever you want to say. But knowing it's the government's position even if Basham struck the fatal blow, I mean Fulks struck the fatal blow, they were both equally culpable. The government had an obligation to clear that up, you say?

MR. BURKE: Well, your Honor, may I --

THE COURT: Yes, go ahead. I'm just saying, it's not a situation where the government knowingly used false testimony, they stayed away from a delicate subject that --

MR. BURKE: But under Napue and Giglio, your Honor, they have an obligation if they suspect there's false testimony to investigate that. And that is what happened here. And that's moving to the next claim. Let me briefly -- I'm turning to --

THE COURT: Go ahead on the next claim. Because they are all tied together.

MR. BURKE: A couple of points I would like to make is that Miss Ewing's statement that Mr. Basham said that the body was in the tree farm, that never occurred. They were at the tree farm because other people saw -- the believed they

saw the vehicle up there. Mr. Basham didn't say that, Mr. Basham didn't even know what little tree farm was.

And as far as the ambiguity is concerned, your Honor, it certainly wasn't ambiguous to Mr. Gasser. He argued to the jury in Mr. Basham's case in closing argument Sheriff Hewitt says he, Mr. Basham, didn't say I killed Alice Donovan, Sheriff Hewitt said to you in this courtroom in front of you, the jury, no, he demonstrated it.

There was no ambiguity for Mr. Gasser. He said it later in his closing arguments that the two key pieces of evidence, the ones that in his words sealed the deal, were Sheriff Hewitt's -- after seeing Sheriff Hewitt demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled.

THE COURT: But she was strangled, though. How she was strangled.

MR. BURKE: Yes, your Honor. But previously he said Mr. Basham didn't say I killed her, no, he showed, he demonstrated.

THE COURT: All right.

MR. BURKE: And so if this were so insignificant as the government is now arguing then why would Mr. Gasser have argued to the jury that this was -- this evidence sealed the deal? And it is clear from the 302 report that was done by Officer Long, by the testimony that was given to the grand

1319

jury, that the government believed even through Mr. Fulks' trial where Mr. Gasser said to you, your Honor, that the evidence showed that Mr. Fulks was the actual killer, they believed that that was the truth. And this Sheriff Hewitt, who is no longer a sheriff but is now I believe a prisoner, said on the stand, yes, on cross, he said that it was Brandon who was the actual killer. He said he didn't show me, he demonstrated. And so --

THE COURT: Looks to me like he was being cagey himself. He knew how to make a sentence and he could have said he didn't show me -- he didn't tell me she was killed, he demonstrated how he killed her. But he just said he didn't tell me, he demonstrated.

MR. BURKE: And it was left to the jury to --

THE COURT: All right.

MR. BURKE: The next issue ties into what I was --

THE COURT: I guess looking back that might have been one of the instances I would have been justified for asking a question. The judge can question witnesses. I don't think I ever have in a jury trial. But it would have been an awfully lot better if somebody had cleared that up.

MR. BURKE: Well, in claim 11, your Honor, we argue that there was governmental misconduct because they didn't clear up that ambiguity. Because the government had previously taken the position the actual killer was Mr. Fulks

and that when this came out on cross-examination that it should have been a red flag to the prosecution that they had the potential for false testimony. And that they have an obligation under the constitution to investigate that and clear it up. We have asked the government for any record that they have that shows that Mr. Gasser, Mr. Schools, investigated whether Mr. Hewitt testified truthfully and --

THE COURT: But -- I'm sorry. Go ahead.

MR. BURKE: And we have been told that there is no record, there was no investigation done.

THE COURT: But am I not correct that 302 report that you say gave the government its belief that Fulks was the actual killer, wasn't that based on the statement that Mr. Basham gave?

MR. BURKE: You are right, your Honor.

THE COURT: It was a self-serving statement by Mr. Basham that went into the 302, wasn't it?

MR. BURKE: You are right, your Honor. I brought that up with me because I want to clarify that. I was under the impression, and let me ask co-counsel, but I was under the impression that there is a reference, I may be wrong, in the 302 to Mr. Hewitt's conversation with Mr. Basham. But I will certainly concede -- I don't want to misstate that. And you are right, when I went and looked at that it's from the hypothetical that was given by Mr. Littlejohn, so --

THE COURT:  All right.

MR. BURKE:  But we do believe there was at least enough evidence for the government to have concerns about the veracity of Mr. Hewitt's testimony and they should have investigated that.  And they did not.  And they, in fact, not only did they not investigate it but they pounced on it in closing arguments to show that Mr. Basham was -- was the actual killer.

And that's a significant factor.  The government argued all along that the gentlemen could have been convicted under either, they didn't have to be actual killer, that didn't matter.  But even as the Fourth Circuit noted in the Fulks decision, that a sentencing jury can be harsher on a defendant if they believe that defendant is the actual killer.  So this is something that clearly the government thought that was important information.

And there was -- we use the term ambiguity, I think in light of the what we know about Sheriff Hewitt, had an investigation been done that it would have revealed that perhaps his testimony was false and that that led to Mr. Basham's conviction.  That's our argument on claim 11.

THE COURT:  All right.  What's next?

MR. BURKE:  Did you want to respond to claim 11?

MS. EWING:  Your Honor, I would point out the government had no reason to believe that Sheriff Hewitt lied,

still has no reason to believe that Sheriff Hewitt lied. And as far as the comment about Mr. Basham not providing information about Bee Tree Farms area, I believe when he was giving directions up in Kentucky he did mention an Amoco station.

In all fairness he did talk about an area and described an area that appeared to be Savannah Bluffs, but he also talked about this other area, too, as I recall. And certainly when he was there he was recognizing landmarks and recalling being out at Bee Tree Farms area cooking out. And Amoco station, he clearly remembered that.

And I think that's all the government --

THE COURT: Let me say, I have a short conference with some lawyers that should take about five minutes. I told them to be here at 3:00 o'clock today. Since we're in the middle of starting another issue could we take that break now and let me talk to them? It shouldn't take just a minute.

All right. Let's take a ten minute recess. Let's say 15 minute recess, to be safe.

MR. BURKE: Thank you.

(A recess transpired)

THE COURT: All right. What's next?

MR. BURKE: Your Honor, I would like to address claim two. I know that we have only gone through one, but we did throw some things in between. But now I would like to address

claim two, which concerns our Mr. Basham's claim of ineffective assistance of counsel with regard to the Jackson v. Denno hearing.

Mr. Hammond testified about his professional opinion that defense counsel, trial counsel fell blow the standard of care in their representation of Mr. Basham in Jackson v. Denno. He had two areas he discussed. One was Mr. Basham's inability to make a knowing and intelligent waiver of his constitutional rights. I'm going to let that testimony speak for itself because I would like to focus the court's attention on the second aspect of what Mr. Hammond testified to, and that concerns the failure of trial counsel to challenge the admissibility of any statements that Mr. Basham supposedly made to Sheriff Hewitt during that Thanksgiving day search.

MR. JOHNSON: And, your Honor, with respect, again we object because we think this is a subject matter that falls outside the scope of the claim they raised. The claim that they raised in the 2255 petition was that Mr. Swerling and Mr. Harris were ineffective based on Mr. Basham's history of diminished capacity and based on his drug use that he was not able to make a knowing and intelligent waiver of his Miranda rights. That's very different than arguing they should have filed a motion to suppress statements that he made to Sheriff Hewitt based on some improper conduct by Sheriff Hewitt.

THE COURT: It's been a while since I read the brief

on this point, but I did think the argument -- claim two was related to his mental capacity to make these statements and not some constitutional violation of the discussion with Sheriff Hewitt.

MR. BURKE: Your Honor, we made a very broad claim. Mr. Basham was denied effective assistance of counsel under the statutes and the Sixth Amendment when trial counsel failed to prepare for and effectively litigate the Jackson v. Denno hearing in this case. This issue has been the subject of testimony, and it is the government --

THE COURT: We're back to the statement to Sheriff Hewitt during the search, right?

MR. BURKE: Yes, your Honor.

THE COURT: It violated the constitution, basically.

MR. BURKE: It was a clear violation of Edwards versus Arizona. There's no question, we have been talking quite a bit about ambiguities. One thing that's not ambiguous is that Mr. Littlejohn and Mr. Monckton made it clear to law enforcement officers that were there that day that they were not free to question Mr. Basham.

THE COURT: All right. But at the time of the Jackson v. Denno hearing did we know that Sheriff Hewitt was going to make this statement at trial?

MR. BURKE: By that point we knew that -- in fact, at the Jackson v. Denno hearing Sheriff Hewitt did testify about

his conversations with Mr. Basham. So it was --

THE COURT: He did reveal they wandered off together, didn't he?

MR. BURKE: Yes, your Honor.

THE COURT: At the suppression hearing.

MR. BURKE: At the suppression hearing. And there's been no evidence presented to suggest what strategic reason there would have been for counsel not to move to preclude that clearly inadmissible evidence.

And as to prejudice, given that we have spent the last hour talking about the effect of those statements on Mr. Basham's trial, I think that the prejudice to Mr. Basham is quite evident. And so I'm trying to make very brief arguments on these issues, your Honor, because they have been briefed.

But and the Edward versus Arizona issue, a Jackson v. Denno hearing is an opportunity to move to preclude statements that are obtained in violation of the constitution, and these statements were obtained in violation of the constitution. Mr. Basham was denied his right to effective representation and he was prejudiced. And for that reason alone he would be entitled to relief.

THE COURT: All right. Mr. Johnson?

MR. JOHNSON: Your Honor, I think we have discussed this at some length so I'm not going to belabor. I do know that our argument is this portion of the claim has been

procedurally defaulted since I don't believe that it has been adequately raised in the pleadings. But to the extent it has I would like to discuss it briefly.

Sheriff Hewitt did not ask Mr. Basham anything that was outside of the scope of the reason they were there that day. Mr. Cam Littlejohn testified that the whole purpose of the Thanksgiving day search was just that, it was a search for Miss Donovan's body. And so while he told law enforcement officers that Mr. Basham would not be giving a statement about the details of the crime, he would be providing directional information.

And Mr. Littlejohn testified that he fully expected that the directional information would be used against Mr. Basham and, in fact, he wanted it to be used. Because if Mr. Basham was able to lead them to Miss Donovan's body, or at least to the extent that he was able to try and cooperate, that would be mitigating evidence on his behalf.

Mr. Basham wanted the interaction with law enforcement, Mr. Littlejohn and Monckton wanted the interaction with law enforcement because they all wanted to find Miss Donovan's body. Mr. Littlejohn testified as they were driving along in the van Sheriff Hewitt would turn around and ask questions about directions to Mr. Basham and Mr. Basham would answer directly.

And there was also a point in the van when Mr. Basham

turned to Mr. Littlejohn, they had a private conversation, and following the private conversation Mr. Littlejohn informed the officers you need to be looking for a purse strap. And he told them the reason you need to be looking for this purse strap is because it's going to be a clue to help you find the body. If you find the purse strap, you might find the body.

And so long before the end of the day confrontation at the cemetery Mr. Littlejohn had already told them you need to be looking for a purse strap, and he testified that he considered that to be directional information. And Mr. Littlejohn also testified that when they were at the cemetery at the end of the day Mr. Basham was constantly within his field of vision, he was right there.

He testified that there was a time when they were all walking around the cemetery looking for the purse strap, and this question that Sheriff Hewitt asked Brandon concerned the purse strap. And we have already been through it today so I'm not going to go back over it.

But the testimony at the Jackson v. Denno hearing was not about the crime itself, it was about how the purse strap had been disposed of. And all of that was an effort to help guide law enforcement officers to where the body might be in relation to the cemetery. Based on that testimony Mr. Swerling and Mr. Harris would have had no reason to raise an objection to that.

THE COURT: Let me jump in here. Another reason it's so confoundingly confusing is at the Jackson v. Denno hearing Sheriff Hewitt never tells us the question that he asked. He never recites a question that he put to Mr. Basham, he just talks about him getting tears in his eyes and then he says he showed me the length of the strap, and then the question was how did he do that? And the answer was, may I demonstrate: Question: Certainly. Like this, because he couldn't pull his hands very far apart. He showed me the length of the strap, said he believed it to be a Liz Claiborne strap, and he had thrown it into the woods. He then demonstrated the manner in which he threw it in the woods. Never did Sheriff Hewitt tell us what question he posed to initiate the conversation.

MR. JOHNSON: And a few lines down from that, Judge, where the question is, would you stand up and do that for the court so the record is complete, as well. Answer: Yes, sir, I will. We were standing at the corner of the cemetery, Brandon Basham is chained, I said Brandon, how did you do that, and he said like that, and I threw it over there.

THE COURT: He did say a question, he said how did you do that.

MR. JOHNSON: And in context, you know, the question is well, what is he referring to when he says that? What is the antecedent of that? And if you look back up at the most recent answer, the last sentence that Sheriff Hewitt said, he

demonstrated the manner in which he threw it in the woods. And then the sheriff asked how did you do that, and he said like that, and I threw it over there.

So there's no testimony at the Jackson v. Denno hearing where Sheriff Hewitt says, you know, Brandon showed me how I killed her or how she was killed and it happened like this. The testimony is he made a demonstration, and there's some ambiguity to it, but the whole context is about Brandon Basham demonstrating how the purse strap was disposed of. And in context that makes sense, because the whole purpose of the interaction there at the cemetery was to find the body. And to find the body they felt if we find the purse strap we will have a clue.

So they are walking around the cemetery, as Mr. Littlejohn testified, they are looking for the strap, and all of that was because Mr. Littlejohn and Mr. Monckton were afraid that law enforcement were going to pack it up and go home for the day and they didn't want that to happen. They wanted that interaction to continue so that hopefully they could find the strap, they could find the body, there would be a powerful mitigating argument on Mr. Basham's behalf.

So at the Jackson v. Denno hearing Mr. Swerling and Mr. Harris testified that while they wanted this court to make a finding on the issue of voluntariness, they also wanted to have an opportunity to put the law enforcement officers like

Sheriff Hewitt on the stand where they would have an incentive to talk about how cooperative and how helpful Brandon Basham was, hoping that this court would find his statements were voluntary and then later on in the trial they will have that testimony of the officers on record so that if the officers tried to deny that he was helpful they can be impeached, or so that they could -- they were building a foundation to show and have the opportunity to argue to the jury later that he was cooperative.

So they had no incentive to try to challenge this testimony because all it showed was that Brandon was being cooperative in helping them find the strap, helping to find the body.

THE COURT: And I guess you could argue that the sheriff asking how you -- how did you do it, i.e., how did you throw the strap, was relevant to the search because if he just tossed it with his wrist it might have gone a few feet. If he went back and threw it like a baseball pitch it might be way over in the woods. So you argue that that was relevant to the search, not to who killed her.

MR. JOHNSON: I agree with that. And that is what we argue. We think that's exactly why it was --

THE COURT: Why else would the sheriff want to know how he threw the strap, except to know how far to look out into -- away from the cemetery.

What about that, Mr. Burke? Would you agree with that, that's probably what the sheriff was going for?

MR. BURKE: No, I don't, agree, your Honor. First I would ask what relevance is it that it was a Liz Claiborne purse strap. How does that go to directions? It has nothing to do with directions, it has to do with -- and first let's make something clear. What we're arguing and what Mr. Johnson appears to be arguing is that you can ignore the violation of Mr. Basham's constitutional rights. They clearly had invoked his right to counsel. What we're saying now is, yeah, but he asked about directions. Well, A, he didn't ask about directions, he took Brandon apart. And we know later, we later found out that in fact he talked to him supposedly about how the murder was committed. What does that have --

THE COURT: I don't know that sheriff -- the sheriff ever said that Basham told him how the murder was committed from these two passages in these two days of testimony.

MR. BURKE: He testified --

THE COURT: That's what Mr. Gasser argued, I know, and that's what the 302 says that Basham said happened. But did the sheriff ever say he demonstrated how she was killed?

MR. BURKE: Yes. He said that he showed how it was done. He showed how it was done.

THE COURT: Yeah, well, the question was -- nothing in your notes to indicate that Basham told you he used the

strap, is there? No, sir, he did not tell me, he demonstrated, though. So I guess you're right, he did imply that it was a demonstration of how she was killed.

MR. BURKE: And I think going back to argue that there was no violation of the Fifth Amendment because Mr. Hewitt ultimately was only asking questions that can be construed as going to directions, it misses the point that once a defendant invokes his right to counsel you cannot --

THE COURT: But Sheriff Hewitt was leaning back and asking questions directed to Basham in the van, right?

MR. BURKE: In the presence of his attorney. With his attorney sitting right there whispering to him.

THE COURT: All right. Go ahead.

MR. JOHNSON: Very briefly in reply. The fact there is -- it was a Liz Claiborne strap was relevant because they needed to know if they find something that looks like a purse strap, is that what Mr. Brandon Basham is talking about.

And as to what Sheriff Hewitt testified at trial, on this point we're talking about whether Swerling and Harris were ineffective at the Jackson v. Denno hearing, and that didn't come out at the hearing, he's talking about what came out at trial. And the point is that what Sheriff Hewitt was asking him about was not outside the scope of the authorization that Mr. Littlejohn and Monckton had given them to ask questions.

Obviously, they were there to ask questions about directions. And Hewitt in the presence of Littlejohn was asking questions about directions. Littlejohn said that the purse strap was directional, and Littlejohn said that all of Sheriff Hewitt's interaction with Brandon Basham occurred in his presence as he was there watching them walk around the cemetery looking for this purse strap.

So at the Jackson v. Denno hearing Swerling and Harris had no reason to object or to raise any issue about what was going on because that was the very point that they wanted to be able to argue later on was that Brandon Basham was being cooperative with law enforcement. They had nothing to put them on notice that there was any type of constitutional violation committed by Sheriff Hewitt or by anybody else.

THE COURT: All right.

MR. BURKE: May I just sur-reply to two or three points?

THE COURT: Go ahead.

MR. BURKE: One, your Honor, Mr. Littlejohn also testified today that Mr. Swerling and Mr. Harris never spoke to him about what had occurred. So to suggest that they were acting strategically, or rationally, they had not spoken to Mr. Littlejohn. And the other part I would like to point to is that -- one moment, your Honor.

THE COURT: You can come back to it.

MR. BURKE: Okay.

THE COURT: You can come back to it. All right. Go ahead, Mr. Johnson. Anything on this point? Anything further?

MR. JOHNSON: Not on this issue.

THE COURT: All right. What's next?

MR. BURKE: Your Honor, our next claim is claim nine, which is the claim that trial counsel rendered ineffective assistance of counsel when they conceded in opening statements to the jury all of the elements of the offenses except that Mr. Basham committed a carjacking of Miss Donovan with the intent to cause death or serious bodily harm.

As we have argued, the result of those concessions was to concede to the jury in opening statements that Mr. Basham was death eligible, that he had committed a capital offense.

THE COURT: But in the Fulks case didn't the Fourth Circuit say there was nothing at all wrong with an outright guilty plea to both carjacking and kidnapping?

MR. BURKE: They did, your Honor.

THE COURT: What we have here is sort of a hybrid soft guilty plea, almost, wouldn't you say?

MR. BURKE: But there was no reason -- there was no strategic reason to do so. Mr. Swerling testified he wanted

essentially to show good faith to the jury that we were not going to contest charges that were so clearly easily proved. But yet that --

THE COURT: Refresh my memory. They pled guilty to count one and then count two, the carjacking count, they raised the intent element. But then Mr. Swerling actually told the jury I think we're going to have a penalty phase after all. Didn't he say something like that?

MR. BURKE: He did. And, in fact, Mr. Harris during jury selection even said you can count on having the penalty phase.

THE COURT: That's almost like a soft guilty plea.

MR. BURKE: But the differences in Mr. Fulks' case, the jurors didn't sit through a multiple week trial on claims that counsel had already conceded had been proven and they only heard so much of this damaging evidence one time. And so there was no strategic reason, no viable strategic reason, we would submit, to do what Mr. Swerling did.

And as Mr. Hammond argued, and again I'm reluctant to make any argument on these because I think he makes the point much more cogently than I am, but that an experienced capital trial attorney would not see the benefit in doing what Mr. Swerling did in this case. And he certainly did not engender any good will with the jurors by requiring them to sit through what was essentially a straw man, a trial on guilt when he

1336

conceded that Mr. Basham was eligible for the death penalty.

THE COURT: That was a point I raised at the hearing, at the 2255 hearing for Mr. Fulks, was that to put the jury through a trial risks the danger of really making the jury mad at the defendant for putting them through a guilt phase trial. And the expert who testified in that case said, well, the strategy is you might have some lingering doubt, some juror who was a little bit uncertain about guilt but went ahead with the guilt phase but then that lingering doubt came into play in the penalty phase and that juror may hold out for a life sentence at the penalty. That was the argument made then. Now, what about that?

MR. BURKE: Well, I think that --

THE COURT: Did you follow what I said?

MR. BURKE: No, I understand what you are saying, your Honor. I haven't really given it any thought.

THE COURT: She said, I don't know if that was her term or my term, but lingering doubt. If you have a guilt phase even though it's a pretty strong case there may by one or two jurors who are not quite convinced, firmly convinced, but they still vote for a conviction beyond a reasonable doubt. But then when you come back on phase two on penalty those two jurors are your strongest allies in terms of getting a life sentence.

MR. BURKE: But what Mr. Swerling gave away in this

case, which is what Professor Lyon was talking about, that he gave away that any juror would have doubt. But then he told them except for this one little thing, have no doubt, he did it, he's guilty.

And which is what Mr. Hammond sort of went to. He says juries understand. You courteously and professionally put the government to its test. If you are going to have a trial, then have a trial. But to do this hybrid made no sense, to tell the jury that he was guilty of a capital offense but we're going to make you sit through this trial was of no benefit.

THE COURT: Let me ask, you said something about hearing the damaging testimony twice. When we held the penalty phase trial in this case I didn't permit the government to replay all of the very damning testimony about the 17-day crime spree, did I? The jury already heard it once, there was no need to hear all those witnesses again.

MR. BURKE: Well, at the very least that evidence was reargued to the jury and they were reminded.

THE COURT: But harkening back, I think in the Fulks case the expert there said if you do have a guilt phase, strategically that's good because the jury hears all the damning bad stuff in phase one, they don't hear it again in phase two. And phase two is primarily a mitigation case and so the bad stuff is more attenuated, so to speak. I think she

argued that, too, in that case?

What about that? That you get all the bad stuff out of the way in the guilt phase and then the most recent things the jury hears before verdict on the penalty is the mitigation stuff?

MR. BURKE: Well, again, your Honor, I think that there's nothing wrong with that argument, except in this case the jury was doing that after they had been already told the guilt had been proven. So that's the distinction here.

I mean, the jury, you know, you are getting out to the jury and they're hearing it, but they are also doing it, well, why are we wasting our time. And, you know, I was thinking about this when we were arguing earlier this morning about what happened on October 26th with Mr. Basham wanting -- his attorneys wanting to stop, and you made the comment that the jury had had it, they were worn out. And I think you said they are indirectly giving you signals.

THE COURT: Well, I think through Miss Floyd. Periodically jurors ask me how much longer are we going, and I'm always reluctant to say anything back. And Miss Floyd is always careful about saying we don't have any way of knowing. But I think we got little subtle questions from the jury that we had been here longer than we predicted. There was no direct contact with the jury to me, but that's why I said that.

MR. BURKE: My point being the jury, the jury had been told at the very outset that they were dealing with a guilty man, a man guilty of a capital offense. And they were here for months.

THE COURT: All right. What is the government's response? Mr. Daley?

MR. DALEY: Your Honor, there couldn't be a more quintessential strategic decision. Both Mr. Harris and Mr. Swerling said that there's no doubt the kidnapping was a slam dunk, he was going to be convicted of the kidnapping. There was a videotape of him kidnapping here.

But two things. One, admitting what you did that was clear. That was what Mr. Harris said in his testimony. I think his testimony is at pages 308 and 309 of this transcript, 365 and 366, and 402 and 403. He said, Mr. Harris said, he was a hundred percent on board with the strategy to concede guilt on everything but the carjacking.

And if you look at Government's Exhibit 20, this was actually put on the record in an ex parte hearing. Obviously, seeing into the future that this might be a claim. Mr. Hammond made something of that as if as an officer of the court you shouldn't do that. Mr. Swerling explained why he did do it.

But perhaps --

THE COURT: Why did they do it on count two and not

count one?

MR. DALEY: Why did they not do it on count two? Here's what Mr. Swerling said. Again, a strategic decision. If you look at page 575 of the testimony in this case, Mr. Swerling said if you can come up with a legitimate reason to have a bifurcated trial you should have one. And even if you don't argue hard for innocence it gives you an opportunity to separate out guilt and innocence from the penalty.

And if you look later on he actually uses the phrase front loading. Let me give you the cites for Mr. Swerling's testimony regarding this issue, your Honor. Transcript pages 575 and 576, 609 through 612, 679 and 680. And I'm not going to go through it long, but I'll -- I will go to page 576. He says that it's sometimes better to front load in the guilt or innocence phase and not seriously argue though about guilt or innocence so that they can keep credibility with the jury, so you are only arguing the intent issue in the carjacking and then you can come back and still argue to the jury. Now, we promised that you were probably going to have it later. And he's doing exactly what I believe Andrea Lyon testified should be done.

THE COURT: It's coming back to me now. She also said if you have a guilt phase it allowed the jury to vent their anger with the defendant by finding him guilty and then the pressure is let out of the room and then the penalty phase

might go better.

MR. DALEY: Your Honor, I'm not trying to import her opinion into this case, but clearly there are several schools of thought on what to do in these cases. And it's not that -- Mr. Hammond might very well have tried it a little bit differently, he might have said I want -- we plead not guilty, go straightforward with it.

And you know what? I have no doubt that there would be an expert who might be able to get up and say, that's not how I do it, that's not how I do it. I think you need to do a hybrid or I think you need to do what Mr. Blume did in the Fulks case.

So I don't want to belabor the point. The only thing I would add is at the end of the whole case, at trial transcript -- if you look at November 1st, which I believe is volume 29 at pages, I think it's 93 and then 101 and 102 and then 104, Mr. Swerling comes back to say now, look, we were straight up with you. He's admitting what he -- what he had admitted in the very beginning of this case. So they actually used the concession at the very beginning of the case in the closing of the penalty phase. Which, again, I think is a strategic decision.

So the only other thing I guess that you might -- there's an interconnection with these issues so often when you start to think about it. And one of the things that comes out

is if you are front loading and you decide you want to get in this case I think we will be talking about the 404(b) evidence, supposedly, of Samantha Burns, if you can front load that in the guilt phase, as well, perhaps you are going to get that -- it's going to be a little more attenuated. So then it's not done in this instance, which it wasn't really done, in the penalty phase.

So and, again, this is an art, it's not a science. It's not as easy to just put in some facts, come up with a formula and you get your answer. The complexity of some of these issues demonstrates that. I think this is a clear instance where there was a strategic decision, they actually talked about it with Mr. Basham, and they pursued it.

THE COURT: All right.

MR. DALEY: Thank you.

THE COURT: Thank you, sir. Mr. Burke, anything in reply?

MR. BURKE: Your Honor, just one point. I would point out that I am still personally at a loss to know why Mr. Swerling would have Mr. Basham make a record that he conceded. There would be no reason to do that, and perhaps it shows itself that Mr. Swerling had concerns about this decision he was making. Other than that I'll leave it with the argument we made.

I will turn then, and I would like to each time

remind the court that Mr. Hammond said much more eloquently than I could these points on these IAC claims. So I will try and keep it short and ask that the court review his testimony.

On claim 15, claim 15 involves the Burns, Samantha Burns evidence, and trial counsels' failure to object in any way to the admission of extensive evidence about not only the kidnapping of and death of Samantha Burns, but also the life of Samantha Burns. And we heard no explanation from trial counsel -- well, I take that back. I guess we were told that they were of the impression that your Honor had already made the determination that this evidence was coming in because it was intrinsic to the crimes at issue in Miss Donovan's case. With regard to that I would say a few things.

There was an order that was discussed during the testimony, March order from 2004, in which the court discussed and made a ruling on whether the evidence for purposes of discovery can be considered intrinsic. But I think a review of the trial in Mr. Basham's case indicates that the court was open to the question of whether the evidence regarding Samantha Burns was intrinsic or not. And you gave counsel opportunities to argue that and they never did.

Also, even if that evidence were intrinsic to the crime that's not the end of the issue. There are certain things that trial counsel could have done to lessen the impact of this evidence, and they did none of them. They could

1344

have -- and Mr. Swerling commented he couldn't understand doing some of the things that were suggested because it would seem inappropriate to the jury. But the arguments are that outside the jury's presence counsel argued to you that bringing in Samantha Burns' mother, father, aunt, brother, child or college friends was beyond the scope of what was necessary to show that the Burns crime had occurred and that it could be done in many ways.

THE COURT: We heard from all those people, mother, father, aunts, brother, college friends?

MR. BURKE: At least two college friends, I believe. Are there others I'm missing? I think there were at least that many, your Honor, yes. And they talked about such things as that -- not about -- and, well, they talked about such things as the impact of Miss Burns' death on their life. And I will say this, the murder --

THE COURT: There was no objection at all.

MR. BURKE: None at all. The murder of Alice Donovan was tragic. The murder of Samantha Burns is even more tragic. She was a young woman who had not had the opportunity to start her life, she did not have a family of her own and that was something she had hoped for. And that was stuff -- that was information, that was testimony that the jurors in Mr. Basham's case heard. And it could easily -- even if this court had been given the opportunity ultimately to decide

JA 5074

whether the evidence was intrinsic, there are ways that it could have -- the impact could have lessened.

Defense counsel could have asked for a Rule 403 analysis. And the Fourth Circuit precedent is clear that even if evidence is intrinsic to a crime that the defendant is still entitled to a 403 analysis. And, your Honor, you offered to give a limiting instruction on this evidence, which was rejected.

There is no conceivable way in which the admission of this tragic evidence could have worked in any way to Mr. Basham's benefit. And I don't want to misstate the record, it's late in the day, but it's my understanding that trial counsel never did say that they made a strategic decision. I think, if I'm correct, their testimony was they thought you had ruled against them already. And that point they were incorrect.

So relying on what Mr. Hammond testified to, we will submit that of the claims that this is a clearcut case of deficient performance on the part of trial counsel, and there could really be no meaningful challenge to the fact that Mr. Basham was prejudiced by having the jury hear this extensive evidence. Thank you.

THE COURT: All right.

MR. JOHNSON: Just one moment, your Honor, please.

(There was a pause in the proceedings)

THE COURT: Mr. Johnson?

MR. JOHNSON: Your Honor, this was not the victim impact evidence, that was victim identity evidence. And if I may explain what I mean by that. The issue that was before the jury at trial was whether at the time that Brandon Basham abducted Alice Donovan from that Wal-Mart parking lot in Conway, South Carolina, did he have the intent to kill her, did he have the intent to cause serious bodily harm, did he know that this was going to happen to her? His argument, his theory at trial was no, I may have abducted her from the parking lot but I had no idea this was going to happen.

This evidence about Samantha Burns was intrinsic, as your Honor ruled, and it was relevant, if it was other act evidence it was relevant to show the very issue that was being contested at trial, which was what was Brandon Basham's intent at the time that he abducted her. And so the events leading up to Alice Donovan's abduction were very relevant. Because if Brandon Basham had participated in the abduction and killing of Samantha Burns in a very similar way to how Alice Donovan was abducted then the jury could infer from that that at the time he abducted Alice Donovan he intended to do the same thing that they had done to Samantha Burns.

So it became important for the government to prove not only that Samantha Burns went missing but that she had been abducted and killed by Chad Fulks and Brandon Basham.

And so the evidence that came out through Samantha's two friends and four family members was not about the impact that her death had on their life, they testified about her personality and her plans, that all of that was relevant to show that she didn't just run off with somebody, that she didn't go to sow her wild oats. She had a steady home life, she had steady plans, she had a vigorous personality that would not have done that. And it was all relevant to show that she was in fact abducted and killed by Brandon Basham.

And so in that case your Honor had already ruled that it was intrinsic. It was intrinsic, it was relevant. And we're talking about ten volumes of trial testimony, dozens of witnesses, over 80 witnesses, ten volumes of testimony, this was six witnesses and it was about 20 pages of trial testimony.

Similar testimony was introduced about Alice Donovan's disappearance. Her family members testified. They do not contend on appeal that it was error for that testimony to have come in. There's no indication that the testimony from Miss Burns' family members would have been any more damning than the testimony that came in from Miss Donovan's family members.

And we're talking about evidence that was introduced during the guilt phase of the trial. And Miss Ewing has gone over the overwhelming evidence, I'm not going to go back

1348

through that. But their contention is these handful of witnesses over a few pages of testimony was so damning that it overrode all of the other evidence that the jury heard, including the videotape of him committing the abduction, and including his confessions, these witnesses' testimonies overrode all of that and were an influence that the jury relied on, an impermissible influence they say, in concluding that he was guilty.

In fact, Mr. Swerling and Harris were able -- this is an example of the kind of evidence that they were able to front load. Because they were able to get out the testimony of the Burns family and it didn't come back in in the penalty phase. And so what that meant is they could focus in the penalty phase on the mitigating arguments that they wanted to present because the jurors had already heard about Samantha Burns' disappearance and they weren't going to go through that again.

But, again, during the guilt phase it was not testimony about how sad they were that she had died, it was testimony about her personality and the fact that she didn't just up and run off from her family.

And also the Fourth Circuit held, the Fourth Circuit didn't rule on the Samantha Burns evidence, but the Fourth Circuit in Brandon Basham's appeal did rule on the evidence of drug use and that sort of thing. And they held that one of

the reasons that it was not prejudicial to Brandon was that in going through all of the things that had happened in West Virginia they were able to argue that Chad Fulks was the leader of that crime spree, that they were going to places that Chad Fulks was familiar with.

And I submit the same thing is true with the Samantha Burns evidence. It fit in with their theory that Chad Fulks was the leader and that he was the one who was instigating these things. So in light of all the other evidence that came in at trial, how few witnesses there were, and the fact that this was relevant to the issue at trial, which was his intent in abducting Alice Donovan, there wasn't any error, there was no reason for them to object to that evidence.

THE COURT: All right. Mr. Burke?

MR. BURKE: Your Honor, the testimony regarding Samantha Burns began at page 160 of the transcript the day that the testimony was received and it went through page 277. We're not talking 20 pages here.

MR. JOHNSON: Your Honor, I think if you count up the pages that actually comprises witness testimony from these six witnesses, it's 20 pages.

THE COURT: All right. I'll take a look at that. You say there's --

MR. JOHNSON: On those limited subjects, your Honor. Mr. Burke may be correct that the total testimony of the --

but what he's talking about he's characterizing as victim impact evidence and which we consider is victim identity evidence, is 20 pages.

MR. BURKE: I'd appreciate if Mr. Johnson would let me make my on own arguments, your Honor, because what I'm saying is these witnesses should never have testified at all. There was no reason that Mr. Burns and Mrs. Burns and their son should have been on the stand. If Mr. Johnson is suggesting that the issue to which their testimony was relevant was that it went to Mr. Basham's intent, there were other ways that competent counsel would have convinced this court to let that testimony, that type of evidence in.

There were at least two West Virginia law enforcement officers who investigated the disappearance of Samantha Burns, who interviewed her family, who could have talked, could have testified to the jury about their investigation, about who Samantha Burns was. So what the jury did was they sat through close to a day of testimony from grieving friends and family of a victim who was not the victim in this case.

Now, the comment was made that this evidence was necessary to show that Samantha Burns did not just disappear. I have seen nowhere in this record where the defense ever suggested that Samantha Burns had run away, that she was not in fact gone and disappeared. So it was -- that's a red herring, your Honor. And so the issue is could counsel

even -- if Mr. Johnson is correct and this evidence did have some relevance to the question of intent with regard to the carjacking, was there other ways that the facts, the relevant facts could have been brought to the jury's attention, and there clearly was. And trial counsel made no effort to bring those possibilities to the court's attention. And I disagree with the government's assertion that you had definitively ruled that this was intrinsic evidence for purposes of the trial.

THE COURT: We looked at that when Mr. Swerling was on the stand and it was an order on discovery matters.

MR. BURKE: Yes, your Honor. And I was trying to find it a minute ago and I couldn't.

THE COURT: The defendant was seeking some discovery from the government.

MR. BURKE: Right. And the government's response was that this was intrinsic evidence, so it was excluded.

MR. DALEY: Your Honor, just for the record, I think it's order number 24, the handwritten with --

THE COURT: Order number 24. The government's argument was it was not 404(b), that had been disclosed because it was intrinsic evidence?

MR. BURKE: Yes, your Honor.

THE COURT: All right.

MR. BURKE: Moving on to claim 16 very briefly.

Claim 16 is another claim of ineffective assistance of counsel regarding trial counsel's failure to request that the government's argument and closing arguments in the Fulks case regarding Mr. Basham's lesser culpability or the fact that he was a puppet, trial counsel's failure to request to bring that information in.

There was significant discussion during Mr. Hammond's testimony with the court about the rule of completeness and whether the government would have been entitled to read into evidence the entire closing argument from the government's closing in Fulks.

Mr. Hammond's response was that assumes a lot of things. There was no argument with the judge, with your Honor, about what would be needed to satisfy this rule of completeness. And, more importantly, that had this court ruled that that evidence could come in, that the entire closing argument from the Fulks trial could come in, then trial counsel could have said if that's the case, your Honor, we withdraw our request, we don't need to have this.

But there was never any -- any request made to bring this evidence in. And what Mr. Hammond indicated is that to hear that the government itself describe Mr. Basham as a puppet would have been powerful evidence for the jury to hear. And so the evidence is in the record, it's in our briefing and it's in Mr. Hammond's testimony. So if the court has no other

questions on this claim --

THE COURT: Very good. And there was some testimony in this trial about Mr. Basham being a puppet, wasn't there, or being a follower?

MR. DALEY: I think in closing argument, I think he uses the term puppet, but --

MR. BURKE: We will just say that the statements made by the defense attorney would have much less impact than the --

THE COURT: I agree with you, I thought there was something I saw in something I read recently that told the jury here, some testimony that Mr. Fulks and Mr. Basham was more of the follower than the leader here. But I might be wrong. All right, Mr. Johnson.

MR. JOHNSON: Your Honor, this was the issue that prior to the guilt phase Mr. Basham's trial defense counsel filed a notice that they intended to introduce certain comments from the government's closing arguments in Chad Fulks' trial. And your Honor deferred the motion, saying you would take it under advisement and if during the trial the government presented conflicting evidence or contradictory theories that you would again entertain that motion if such contradictory evidence came out. And defense counsel never raised the motion again because there were no conflicting theories or contrary evidence.

The Fourth Circuit has held in the appeal from Mr. Fulks' 2255 that the government did not present contradictory theories at trial.  I note it's a discreet claim in the 2255 and it is related here.  I think as a threshold matter it's questionable whether the government's argument from the Fulks trial would have been admissible at all.  The courts of appeal hold an attorney can make certain admissions of fact on behalf of a client, they can be admissible at a later proceeding.

However, for example, the case of United States versus McKeon, the cite for that is, it's in the pleadings, but 738 F.2d 26, is a case from the Second Circuit which is cited in the Fourth Circuit decision of United States versus Blood, 806 F.2d 1218.  The McKeon case says speculations of counsel, advocacy as to the credibility of witnesses, arguments as to weaknesses in the opponent's case or invitations to a jury to draw certain inferences should not be admitted.

We submit that the statement that Fulks is a leader or Basham is a puppet or things to that -- of that nature are invitations to the jury to draw certain inferences rather than they are admissions of fact.  So we think it's questionable whether it would have been admissible at all.  However, it certainly would not have been admissible or equitable to admit that limited argument in the context of what the Fourth Circuit described are consistent theories, consistent

arguments in both cases.

Now, Mr. Burke suggests that counsel could have raised the issue and then if you said well, I'm not going to let it in unless it all comes in then he could have backed down. But the point is there was a prejudice to Mr. Basham because the reality is that there was no contradictory evidence, that this court likely would have ruled that, similar to the way it ruled in the deer statement, that if they wanted to introduce a portion of it then the court may well have said if we do that we're going to admit all of it.

And what the jury would have heard is that at both Mr. Fulks' trial and Mr. Basham's trial the government consistently contended that Fulks and Basham could not have killed Samantha Burns or Alice Donovan had they been acting alone, that they were working as a two-man team.

And, again, with all the other evidence that is in the record there is no reasonable probability that admission of the statement would have changed the result either during the guilt phase or the penalty phase.

THE COURT: All right. Thank you, sir.

MR. BURKE: Your Honor, the next claim, it's claim 19, the mitigation claim. Specifically, the claim that counsel rendered constitutionally ineffective assistance in failing to investigate and develop and present evidence that Mr. Basham was mentally retarded. Defense counsel learned

from their investigation -- their neuropsychologist that her testing of Mr. Basham indicated that he had an IQ of 68. We heard evidence that a diagnosis of MR, mental retardation, is a three-prong diagnosis that requires a finding of an IQ below 70, deficits in the adaptive behavior, and an onset of both of those conditions before the age of 18.

Dr. Schwartz-Watts and Dr. Tora Brawley both testified that Mr. Basham suffered from dementia because they were presented with IQ scores, and I want to emphasize this, they were presented with IQ scores that showed that Mr. Basham's IQ was above 70, had been tested above 70 before the age of 18. We have heard testimony about his declining IQ, and at one point his IQ went up from a 77 to I believe a 86, so there was some variability.

Trial counsel testified that they relied on their experts to tell them if they had a claim of mental retardation, and we had some discussion, your Honor, about what type of expert would be required. Dr. Frierson testified yesterday that both Dr. Schwartz-Watts and Dr. Brawley were qualified to diagnosis mental retardation. I take issue with that. I don't know any psychiatrist who would say that they are qualified to diagnosis mental retardation, and I know from personal experience that -- well, Dr. Brawley is a neuropsychologist, she does not specialize in the field of mental retardation. Now, they were given numbers to work with

and that was all they were given.  We presented evidence that the investigation in this case raised some concerns about the accuracy of the IQ numbers that were noted for Mr. Basham before the age of 18.

For example, there were witnesses who were interviewed who said that there was an unspoken, unwritten rule in Kentucky when Mr. Basham was a teenager that in order to be admitted to an in-care facility, of which there would be group discussions and the like, you had to have an IQ of 80 or above.  And there was concern from these witnesses that IQ scores for Mr. Basham that showed -- those two that showed him with IQs in the 80s were done in conjunction with his admission into those types of facilities.

There was also considerable anecdotal evidence from people who knew Brandon growing up who said that people considered Brandon to be mentally retarded.  That doesn't prove the case and I don't mean to suggest that it does.  But what it does is it puts a lawyer who is familiar with the relevant law on notice that a more thorough investigation is needed.

In this case the government admitted documents that they found in Mr. Swerling's files that had been provided to him by national resource counsel about the concept of mental retardation, about the Adkins decision.  They were unmarked by pen or highlighter, they had one notation that said "to read"

on them. And I think it's clear from reviewing Mr. Swerling's testimony that he really was not familiar with the nature of mental retardation and the nuances and really even how he would have gone about proving it to this court. And he was approached at -- by Justice Department employees at the authorization process who expressed interest in the possibility that Mr. Basham might be mentally retarded. No followup was ever done.

Mr. Hammond testified that under the facts presented in this case a reasonably competent federal death penalty lawyer, especially one in 2003 who should have been keenly aware of the Adkins decision, would have done everything within his or her power to investigate the possibility that Mr. Basham was mentally retarded. And what happened was really nothing. We have a file that shows no raw data.

And let me give a little bit of context here. An IQ score is a number, it can mean many different things. But one of the underlying concepts is is that you have to have faith in the fact that the test was properly administered, properly scored, and that there were just no errors made.

And we don't have the raw data available. I will avow to the court we have made every effort to try to obtain it and it no longer exists. Had that information been sought and obtained in 2003 this court could have been presented with evidence that Mr. Basham, at least to a reasonable degree of

1359

probability, would have been presented with evidence that Mr. Basham was mentally retarded, that those scores don't necessarily say what people think they say, that there are explanations. And it's not uncommon, and you can do the research on cases where there are defendants who have been found to be mentally retarded who have what are called outlier scores, whose scores are above the range. And there are explanations for that.

There are other explanations. If you look at the number of tests that Mr. Basham took as a child, IQ tests, there is something known as the practice effect. If a person takes an IQ test enough times they kind of learn it, they learn how to do it and it inflates their score. There is something called the Flynn effect where if a test -- this is a phenomenon that has been observed and validated by a professor from New Zealand that society as a whole becomes more intelligent over time. And that as a result an IQ test as time passes becomes antiquated and can't accurately reflect a person's IQ. It inflates the IQ by as much as ten points.

And the first test that Mr. Basham received when he was a child was a test that at the time I believe he was 16 years old. And so there was this type of evidence that could have been presented that is no longer available to us to present to you now.

And so the question becomes if trial counsel was

ineffective in failing to investigate this, and we believe that they were, this would have -- they testified several times what we wanted to do was save his life. This was a sure-fire way to save his life. He would have been constitutionally exempt from execution. It should have been given a top priority in their investigation and it was not.

There is a reasonable probability, and by that I mean under the Strickland standard, enough of a probability to undermine your confidence in whether had this evidence been brought to you you would have found Mr. Basham to be mentally retarded and as a result exempt.

And one last point on that. I make this point really I guess to preserve the record for future cases. But Dr. Frierson, Dr. Capehart, these doctors, they don't dispute that Mr. Basham has a low IQ. He does have a low IQ. The question is when did he finally cross that line and reach the 70 range. There's no question that Mr. Basham has the deficits of a mentally retarded person but because of the peculiarity of the Adkins decision which, as welcomed as it was, is a very narrow decision, it only applies to the mentally retarded.

So it says someone who on their 18th -- the day after their 18th birthday receives a traumatic brain injury and has an IQ of 50 and severe deficits in their adaptive behavior could not be found mentally retarded because the DSM doesn't define it that way. That is viewed as a developmental

disorder.

THE COURT: The Adkins decision relies upon the DSM entirely?

MR. BURKE: No, your Honor. The Adkins decision left it to these individual jurisdictions to rely -- to choose their own basis for defining it. Many, and I believe, I believe that the federal courts follow the DSM. There is an organization known as the -- now it is known as the AAIDD, the American Association for Intellectual Developmental Disabilities, but it was known as the AAMR, American Association on Mental Retardation, and it has sort of been the leader in developing this. And it sets forth those criteria, as well.

There isn't much distinction between the jurisdictions, all of them view that three-level, that three-prong. And what we have here is a case in which no effort was made to disprove that -- no effort was made to prove that Mr. Basham satisfied the critical age 18 prong. And as a result, now ten years after the investigation was done in this case the evidence that would enable us to do it has been destroyed, is no longer available, and that, we argue, raises sufficient concern that this court should have lack of confidence that it has sentenced a man to death who may in fact be mentally retarded.

THE COURT: Now, Mr. Swerling said he was asked to

1362

teach a course at the medical school here in Columbia, right?

MR. BURKE: I believe he did, yes, sir.

THE COURT: But did it deal with this type issue? I'm a little bit rusty on what he said.

MR. BURKE: I don't believe so, your Honor. We can go back and check, I don't want to misstate it. I have to say we interviewed Mr. Swerling and Mr. Harris together on numerous occasions before the testimony and the reaction, their reaction was, and, interestingly, it was -- it ties with a comment you made. Mr. Harris' response was have you seen that rope he made? And the idea that that was a disqualifier, he can't be mentally retarded, that type of -- so it was clear, I think it's clear from the testimony that there was not a knowledge of what Adkins held and what power Adkins held for defendants like Mr. Basham.

We don't -- no one is arguing he doesn't have a low IQ, he does. And there's that one aspect that was not developed when it should have been developed, and we submit that as a result Mr. Basham has been prejudiced, severely prejudiced.

THE COURT: All right, thank you. Mr. Daley?

MR. DALEY: I will keep it narrowly focused to the mental retardation. I think one of the things that happens in these cases is you do an enormous amount of work. I have to tell you about the hundreds of exhibits, talk about the

enormous amount of work that's done in this case on the mitigation side. This is one of those cases.

I think I told this court at the end of Mr. Fulks' 2255 I couldn't imagine another case where somebody spent more time and energy and effort in building a mitigation case and investigating a case. Well, your Honor, I believe I found that case. We're not sure how many witnesses were interviewed, but it looks somewhere between at least 600, but I think the count is closer to a thousand. So I'm not going to get into the weeds on that. You have an enormous number of exhibits that demonstrate what was done.

So, remember, this is all in the context of building a mitigation case, going through all of the institutions, interviewing enormous numbers of neighbors and friends and counselors and teachers. So having said that, though, let's go ahead and get to the mental retardation issue.

This is a case where there's no expert evidence in this record or was developed that Mr. Basham is mentally retarded. They failed to produce anybody. And the issue, of course, that they point to is the fact that the IQ scores, maybe they weren't scored right or maybe they should have been done differently. I do want you to know that it's not an instance where Dr. Brawley simply had the IQ scores, she had the reports. And I wanted to just point to the trial testimony just very briefly.

It's actually volume number 25, which was the October 26th hearing. I believe she takes the entire day of testimony after the issues that arose earlier in the day. One of the things that I think is important to note is at page 59 through I think 65 or 66, I believe it's six, I'm sorry, seven IQ tests that were done were admitted into the court's -- admitted into evidence, Defense Exhibits 1A through 7H. Not an instance where you simply have just the scores, they did go back and get the reports. So it's not an instance where we simply have raw data.

I will tell you that Dr. Brawley did testify that he was not mentally retarded. So, I mean, whether she was a specialist, an Adkins specialist, which is how -- I believe I'll have to tell you, I thought Mr. Hammond was a remarkably nice fellow, had a very nice disposition, but if you read his testimony he has absolutely no basis to say some of the things he said. He said -- he never, by the way, never read Dr. Brawley's testimony. If you look at the record, he says, I don't think she's qualified. He just says it.

And, I'm sorry, having just said it, and maybe he knows her by reputation, or maybe -- I don't know. But that sort of struck me when I went back, and I appreciate -- and, remember, he didn't come up with this opinion until a few days before the hearing, I think is how he put it on cross-examination. So but let's go ahead and just go through

why this issue doesn't have any merit.

If you look at Mr. Harris' testimony, he says that they retained Dr. Brawley to do IQ testing. That's the hearing transcript at 303. He goes through some testimony where he talks about the fact that when she found out that he had a 68 IQ, Basham did, he went and he talked with Mr. Swerling and their doctors and they talked about it. Harris said in the transcript at page 304 that he was familiar with the Adkins case. Asked pointedly a number of times why did you not pursue an Adkins hearing and he said we couldn't do it based on our doctor's evaluations.

Your Honor, both Dr. Brawley and Dr. Schwartz-Watts have been retained by numerous death penalty attorneys. I think, I don't want to -- I believe Mr. Burke, I think, has retained both of them. These are folks that are specialists in mental health in death penalty cases.

MR. BURKE: Your Honor, since my name has been invoked I will avow to the court that I have retained both of those experts. I have, having done several Adkins cases, I have never retained either of those experts in an Adkins-related case.

MR. DALEY: My point is not they're Adkins experts, which again I don't think --

THE COURT: You have retained them but not for Adkins purposes.

MR. BURKE: Yes, your Honor. I retained Dr. Schwartz-Watts because she's a psychiatrist, and I have retained Dr. Brawley to testify about neurological damage in one of my clients.

MR. DALEY: My whole point is simply that these folks are ones that if an issue comes up about mental retardation they know how to tell the attorneys what they need to pursue some of those other issues. And that if they had, Mr. Harris testifies that -- well, let me just go through it. He said we didn't have any testimony to put on the record for an Adkins issue. They knew about the anecdotal evidence. At page 305 of the transcript Mr. Harris says that. He said that Mr. Basham had a lot of IQ tests.

Well, I think maybe as important as anything is at 17 years and ten months old, not for the purpose of getting him into any sort of home or anything, he ends up scoring a full scale 89. We have heard discussions about the Flynn effect, the practice effect, we have heard assertions about it. There's absolutely no evidence in the record about it. But I will tell you this, at 17 years old and ten months he has an 89. That's well beyond any of the ranges that could even get you where you might be able to -- maybe there's somebody that's been found mentally retarded with a 89, I don't know. I haven't come across any in any court cases.

But, you know, Mr. Basham started off with a 101 full

scale IQ, this is just from Dr. Brawley's testimony and the exhibits introduced when he was seven years old and seven months. When he was eight years old and seven months he scores a hundred. When he's ten years old he scores an 88, when he's almost 11 he scores a hundred. When he's 13 years old and eight months he drops down to a 77. When he's 14 years old and eight months he goes back up to a full scale 86. And when he's 17 years old and ten months he's at an 89. Under the prevailing law I don't see how counsel could have pursued mental retardation.

Now, Dr. Brawley finds a 68, but it's a 68 well past the 18th birthday. And, your Honor, you know, it's one of those things defense counsel have to do the best they can with what they have. Mr. Harris says at -- let me give you the pages that he testified about this issue. He testified that Dr. Brawley was probably retained at the recommendation of Dr. Schwartz-Watts at page 343 of the transcript. He then testifies again about the mental retardation issue, pages 378 through 380. He says during that, page 379, the defense team talked about the IQ score and the issue at length, at some length, he actually says.

And then I believe on cross-examination he says at transcript 405 that Brawley was given everything I believe she needed to make a proper evaluation, and he goes through sort of what she did. I know she interviewed a number of people

because she was looking to see why the IQ had decreased. And she looked at drug usage, she looked at head trauma, she looked at a lot of environmental issues before rendering her opinion. So it was not based just on the records, but his testing was also the universe of information that she had available about Mr. Basham's life.

And then Mr. Swerling testified about this issue at some length. Pages 495 and 496, pages 720 through 723, page 724, as well, page 737, 736 and 37 through 742, talked more about mental retardation.

What Mr. Swerling said is that I would not have hesitated if we had been led in that direction towards pursuing the mental retardation issue, if someone had said he would qualify for mental retardation. That's in the transcript at pages 495 and 496. The bottom line is they didn't have experts who were supporting the fact that he might fit in the definition of mental retardation.

And so the one other thing I think I found a little interesting, because I didn't recall him testifying to this but he did, when I went back and looked at the transcript, the pages 739 and 740, Mr. Swerling says that he's pretty sure he remembers he thinks Dr. Brawley looking behind, trying to find the data behind a test, that's at pages 739 and 740, to try to check out whether there was, I guess, some validity of the test. He wasn't sure which one.

In short, the defense did not have an expert to say that Brandon Basham was mentally retarded, and the attorneys say that the experts that they retained didn't point them in that direction. So, your Honor, I don't want to belabor the issue, but I think --

THE COURT: I think you covered it.

MR. DALEY: It's pretty clear.

THE COURT: We need to take a recess here, unless you want to talk about a reply.

MR. BURKE: Very briefly, your Honor, on the reply, your Honor. Can I ask a question? Did you say Mr. Swerling testified if they had been led in that direction they would have -- the page?

(Mr. Burke and Mr. Daley confer)

MR. BURKE: Very briefly, your Honor. I was asking Mr. Daley about a quote that he had from Mr. Swerling and I wanted to make sure I had it correct, because I think it's exactly the problem here. Mr. Swerling said if we had been led in that direction we would have pursued it. The problem was that Mr. Swerling needed to do the leading, he was the one that was the head of this case. And I don't question the qualifications of Dr. Brawley or Dr. Schwartz-Watts. As the government noted, I have hired both of them before.

I would -- to assist the court, I know that you've had questions about what this means and I would like to just

throw out three names to you, and if you would like to Google them, feel free do so. But I think it would give you an idea of what a mental retardation expert is about.

There's a Mr. Marc, M-A-R-C, Tasse, T-A-S-S-E; a Mr. Denis, D-E-N-I-S, Keyes, K-E-Y-E-S, he's at the University of the South and that's in Charleston, and there's a Stephen with a PH, Greenspan. So when we talk about mental retardation experts those gentleman are the types of people that we are talking about. Dr. Brawley is a very accomplished neuropsychologist but she is not an MR expert and I think she would tell you the same thing.

And then she was not -- experts are only as helpful and only as reliable as the information that they are given. They have to be given the information. Dr. Brawley was given reports done by psychologists who had evaluated Mr. Basham who came up with scores. She wasn't given what's known as the raw data, the data that you can go back and look, how did he answer this question, did they have to prompt him on this question, did they properly take his raw scores and change them into scale scores. They are all of these things, and she was not given that information.

And so to hear Mr. Daley argue to you these scores as if they are gospel is exactly the issue that we have and why you should have doubts about whether counsel did an adequate job in this case. Thank you.

THE COURT: All right. Let's take a ten minute recess. How many issues do we have to talk through?

MR. BURKE: Actually two, both very brief.

THE COURT: I still would like to take a little break. Let's take a ten minute recess.

Which two are they? You had several more. You had three or four more you had itemized yesterday.

MR. BURKE: Your Honor, the only two we still want to address are the claim 23 of the inconsistent theory and claim 24, causal nexus, and claim 24B, which is the IACS?

THE COURT: All right. Let's take a ten minute recess.

(A recess transpired)

THE COURT: All right. Mr. Burke. I'm sorry, Miss Stone.

MS. STONE: That's okay. Mixing it up. The next claim we're going to address just very briefly is claim 23. Your Honor had asked us fairly early on in this case why that wasn't precluded by the Fourth Circuit decision. And so we agree that the issues are very similar, we can't make the arguments that they are not. It's the same pieces of testimony that are at issue.

We also agree that the testimony at the Jackson v. Denno hearing by Sheriff Hewitt was ambiguous. But at the Fulks hearing when they were arguing about keeping out the

1372

deer statement the government made a choice and that choice was to characterize that testimony as Fulks being the killer.

Then at the Basham trial in front of the jury, unlike in the Fulks case they made another choice after the testimony of Sheriff Hewitt and on 9-29-04 at page 80 they argue in closing Mr. Basham -- what did Mr. Basham say to Mr. Hewitt? He didn't say I killed Alice Donovan, I showed.

The other points at issue in inconsistent theory is the role. The court found that it was consistent throughout both trials to describe Mr. Basham and Mr. Fulks as a team. That's accurate, but there are some distinctions. To take the sports metaphor, in the Fulks trial Mr. Fulks was the captain of the team and Brandon was at best the kid you put in at the end of game when you're beating the other team by 40 points so he gets some playing time and everybody feels good.

In Mr. Basham's trial they were more equal partners, Fulks was the quarterback --

THE COURT: You are saying they used --

MS. STONE: I'm using that analogy, that -- I do not dispute in both trials they said team. But the emphasis on the roles there was some subtle distinctions. I concede they are subtle. Why it's different in Mr. Basham's case is it really does go to the core of his case. And that's what the case law talks about.

In Mr. Basham's case the testimony of Sheriff Hewitt,

1373

the testimony that we argue is inconsistent, is the testimony in Mr. Basham's case, not Mr. Fulks, the government said is one of the two most important pieces of evidence, the other being the Clifford Jay testimony. That didn't exist in the Fulks case and that makes the issue much more serious. And any inconsistency is much more of an insult to due process than it was in the Fulks decision.

And so for the reasons, because Mr. Basham's -- inconsistencies in Mr. Basham's case were in front of jury and in front of a sentencing jury, which the Fourth Circuit acknowledged can be tougher on the actual killer, because in Mr. Basham's case the evidence that is at issue was characterized by the government and themselves as one of the most important pieces that was before the jury, that makes the violation much more serious. And that's, we would submit, why the Fourth Circuit opinion doesn't apply.

THE COURT: All right. Thank you. Mr. Johnson?

MR. JOHNSON: Your Honor, this is going to be very brief so I'll just stay here if it's okay with you.

THE COURT: All right.

MR. JOHNSON: I don't have a lot to add, other than what's already been briefed. Of course, the government's contention is that the Fourth Circuit's decision in the Fulks 2255 appeal is controlling. And at the time that the Fourth Circuit rendered that decision it had all of the facts that we

1374

have now. The facts as to this issue haven't change. Obviously, by that point the Fulks trial had come and gone and the Basham trial had come and gone. And so the Fourth Circuit had the opportunity to look at the transcripts of both trials, this court did, as well, and had the opportunity to look at all the arguments that were made in both trials. And this court in Fulks and the Fourth Circuit in Fulks ruled that there was no inconsistency that went to the core of the cases.

Now, of course, when you are dealing with an argument that the government has taken inconsistent positions in two different trials there aren't two alleged errors, there's not an alleged error in Fulks and an alleged error in Basham, there's one alleged error or misconduct which is, government, you have taken inconsistent positions at these two trials. So there's nothing new as to Mr. Basham's case that was not before this court and the Fourth Circuit when this court and the Fourth Circuit decided Mr. Fulks' case.

And given the Fourth Circuit has ruled that there is no inconsistency that goes to the core of the cases our contention is that that ruling is, it's a published decision, it's controlling precedent, we respectfully contend that this court make the same decision that it made in Fulks and that it should follow the decision of the Fourth Circuit.

THE COURT: All right. Thank you. What is next?

MR. BURKE: Your Honor, the next is the last. The

last issue that we would like to discuss, and we will leave the others to submit on our pleadings and on the testimony that your Honor heard, concerns claim 24. And, in particular claim 24B, which concerns arguments that were made by the government in Mr. Basham's trial challenging the mitigating evidence that was presented by the defense, in that it lacked a -- what the government called a cause and effect with the crimes that were committed.

In our brief we set forth on page 103 of our 2255 motion portions of the argument that the government made, and I'll read, just to give you an idea to remind the court what we're talking about here. Mr. Gasser is talking about the defense experts, and he says, what is the most important thing they said? Brandon Basham knows right from wrong and there is no cause and effect between whatever issues Brandon Basham is dealing with in the kidnapping and carjacking, Brandon and two innocent women. And in that paragraph he goes on to say no cause and effect multiple times.

That similar issue came out during the cross-examination of defense mitigation witnesses. I think all of the defense doctors and I think Miss Vogelsang were all asked questions along the same lines about the evidence they presented, what's the cause and effect.

There was never any objection from counsel to this line of questioning and, more importantly, there was never any

attempt by counsel to explain to the jury that the constitution does not require that there be a cause and effect between mitigating evidence and the crime for which the defendant is convicted.

There are a series of cases beginning with Eddings from the United States Supreme Court, continuing through Lockett, and in 2004 shortly before the trial in this case the Supreme Court in the Tennard case again made it absolutely clear that it has never been a part of Eighth Amendment jurisprudence that there has to be a correlation, a cause and effect, a what is known as a causal nexus between mitigating evidence and the crime.

Now, can that evidence, can the lack of a causal nexus affect the weight of mitigating evidence? Yes, it can. But it cannot act as a bar to a jury considering the evidence and giving it the weight that it deserves, that it determines that it deserves.

In this case in this hearing we asked Mr. Swerling why he did not attempt to counter the government's argument. And his testimony will speak for itself, but I had the impression he was somewhat confused by our question because he said we weren't trying to show a causal nexus, which is exactly the point. Not only were they not trying to but they weren't required to. But what the jury heard from the prosecution throughout their cross-examination of the defense

witnesses is okay, so what? He's got brain damage. How does it prove that he committed these crimes? So he's got ADHD. Lots of people with ADHD don't go out and kill. What's the connection here?

THE COURT: But couldn't it have been corrected by my instruction on the law to the effect that they had mitigating factors?

MR. BURKE: I don't believe so, your Honor. Because your instructions don't go to that particular issue that they -- that the issue of --

THE COURT: I clearly didn't require a cause and effect.

MR. BURKE: You did not.

THE COURT: I think I stressed that any mitigating factor standing alone could be enough to find a life sentence is appropriate.

MR. BURKE: Our concern, though, is that the jury could very easily have the impression from the government's argument that evidence is not mitigating unless there's a causal nexus. So that you can consider -- you can instruct a jury consider any mitigating evidence, but if the jury thinks well, wait a minute, he does have ADHD but that doesn't tell me why he did this crime, so it must not be mitigating, then it doesn't get considered.

THE COURT: This is a little bit like my two-step

analysis that I invented that Fourth Circuit approved in the first appeal, right? I said you've got to consider whether it occurred, the mitigating factor, and then is it in fact mitigating to any extent at all, I think.

MR. BURKE: Exactly.

THE COURT: The reason I got kind of painted in the corner of doing that was in the first trial Mr. Blume wanted just, you know, just an enormous number of mitigating factors and the government said that's just -- it's repetitive and duplicative and it's just sandbagging, so to speak. And I said well, couldn't I solve it by saying you've got to determine if any of these occurred and was any of that mitigating.

It wasn't my idea to come up with this two-step approach, but I was kind of back-doored into doing it by the sheer number of mitigating factors that existed. I think the government was concerned if the jury went through and checked off a large majority of those factors they may conclude, well, we've got to return a life sentence. And so but wouldn't you say this is a little bit like that?

MR. BURKE: It does bear similarity, your Honor. It certainly does. I think the most important factor, though, is that the jury should not be misled, and that's why -- what I'm focusing on in this part is defense counsel's obligation to protect his or their client to make sure that the jury isn't

confused about whether this is a requirement. Jurors have no experience dealing with the concept of mitigating evidence, it's completely novel for the lay person, and so they do need guidance.

And there are concerns about if you first have to determine whether something happened and then whether it's mitigating, some people would say it's just a matter of semantics. Others would say well, if it occurred it is mitigating. It's a one-step process. But we're not challenging that aspect. But what we're saying here is trial counsel had an obligation to take the time to explain to the jurors don't be misled by what the government is telling you. You don't have to find that there is any connection whatsoever to find that these factors, whatever they may be, are something that would -- that leads you to feel that Mr. Basham should receive a life sentence. So that's all that we have on that claim, your Honor.

THE COURT: All right. Thank you, sir.

MR. JOHNSON: Judge, the claim and the argument, as I understand it, is that the government committed misconduct in the way it cross-examined certain witnesses in asking about was there a cause and effect, and then in argument to the jury that there was no cause and effect, and, relatedly, that Mr. Swerling and Mr. Harris should have objected to the cross-examination or least to the argument suggesting that the

government was implying that the jury had to find cause and effect before it could consider that mitigating evidence.

I think the lines that we're talking walking is the line between should and could. And the argument is that the government told the jury you cannot consider this evidence unless there's a cause and effect, whereas the government's argument was that you should give no weight to this evidence if there's no cause and effect.

In volume 29 of the trial transcript, volume 29, page 89, I would like to briefly read a portion of the argument to put it in context. The prosecutor is describing certain mitigating evidence that have been put forward by the defense, and he says defense experts opine that he has a self or induced, inhalant induced psychosis and that he has got dementia, memory loss. Dr. Watts on the witness stand in response to Mr. Schools acknowledged that those two problems don't explain his behavior.

So the government psychiatrist diagnosed him with something that explained his behavior against Samantha Burns and Alice Donovan. And the defense expert opines two problems in which she acknowledges does not explain his behavior. Who got it right? That's for you to decide. You know, deciding on who got it right on that issue clearly only goes to show what mitigating -- what weight you will consider to give that when you are deliberating as to what the appropriate

punishment will be.

Regardless of all the yelling, raising voices, and attacking someone for what school they went to, the facts speak for themselves, ladies and gentlemen. And one of the tougher points you can't forget, there's absolutely no question Mr. Basham knew right from prong. No question that whatever his issues are there is no cause and effect.

And in context what he was saying to the jury is not you can't consider this evidence at all unless there's cause and effect, he's saying we're asking you to give that evidence little or no weight because there is no cause and effect.

And, your Honor, you mentioned the jury instructions. And this court specifically instructed the jury that in addition to the statutory mitigating factors there was a whole list of nonstatutory mitigating factors for the jury to consider. And you also instructed them that they could consider any mitigating factor regardless of whether it was statutory or nonstatutory or whether it was even listed on the form that was given to them.

And so it was made clear they could consider these mitigating factors. And, in fact, of the nonstatutory mitigating factors the jurors found a number of these. All 12 jurors found that Mr. Basham had a family history of mental illness, that he grew up in a home filled with domestic violence, that his mother encouraged him to steal to support

1382

her drug habit, that he began using drugs at an early age. And there were other nonstatutory mitigating factors that a number of different jurors found, as well.

And I think the case of United States versus Fell, which is 531 F.3d 197, 2008 case from the Second Circuit, is directly on point. There the federal capital defendant made the same argument, essentially, that's raised here, which is that in his argument the prosecutor had suggested to the jury that they could not consider mitigating evidence unless there was shown to be a cause and effect. And the Second Circuit denied that argument and noted that not only did the court instruct the jury about what evidence they could consider, the jury in fact found a number of nonstatutory mitigating factors which mitigated against the argument that the jury was misled by anything that the prosecutor said.

And whenever you are making a claim that trial counsel should have made a certain argument and you're arguing it was ineffective for them not to have made that argument, obviously Strickland has two prongs. You have to show deficient performance and prejudice. And so when you're claiming they should have made a particular argument you've got to look at the merit of that argument, because if the argument lacks merit it wasn't deficient for them to fail to raise it, and if the argument lacks merit there was no prejudice for them not having raised it.

And in this case the claim simply has no merit because it's clear that the jury heard the mitigating evidence, were instructed that they could consider the mitigating evidence, and in fact and did consider the mitigating evidence. So in this context there's no error, no ineffective assistance on the part of trial counsel.

THE COURT: Thank you, sir. Any reply?

MR. BURKE: No, your Honor.

THE COURT: Well, I guess that does it today then, right? All right. Let me just say I've taken a whole bunch of notes again, as I did back in October. And I'm probably going to wait to get a transcript of everything we have done here this week, as well as in October, so don't look for an order for at least a couple of months. I mean, whatever I do I'm just going to take a while and get all used to writing.

MR. BURKE: Don't rush on our account.

THE COURT: Okay. I just want to tell you, don't expect something right away. I do want to get a transcript. It's all coming at me pretty fast and I've got a lot to deal with. But this case was well-briefed and well-argued, as I knew it would be. Thank you very much.

MR. DALEY: Thank you, your Honor.

THE COURT: Miss Floyd, normally at the end of a trial we return exhibits to the party who offered them to be held pending an appeal. But here we want to keep these. We

1384

may return them to you later at some time but we're going to keep them for now.

MR. BURKE:  Thank you.

THE COURT:  Very good.  We will be in recess.

(Recess, 5:12 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  12-22-12                    s/  Daniel E. Mayo

DEFENSE WITNESSES

CAMERON B. LITTLEJOHN, JR.

DIRECT          1227

CROSS           1248

REDIRECT        1265

**JA 5114**

No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

---

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

---

## JOINT APPENDIX AND INDEX
## VOLUME 22

---

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

# U.S. District Court
## District of South Carolina (Florence)
## United States V. Brandon Basham
## Case No. 4:02-cr-00992-JFA-2

## Evidentiary Hearing, October 09, 2012

## Defense Exhibit List

| EX. # | DATE | DOCUMENT |
|---|---|---|
| 001 | November 27, 2002 | Notes – Initial Visit with Basham |
| 002 | December 16, 2002 | Monckton Notes – Meeting with Basham |
| 003 | December 12, 2002 | E-mail from Bruck to et al. – Avoid Non-Confidential Court Evaluation |
| 004 | December 12, 2002 | Letter from Monckton to Littlejohn |
| 005 | | Monckton Notes – "Beginning of Representation" |
| 006 | January 16, 2003 | Monckton Calendar Notes |
| 007 | October 31, 2008 | E-mail from Meister to Sullivan – Internet Comment |
| 008 | January 7, 2008 thru October 23, 2008 | Time Reports (Jenner-Block) |
| 009 | May 9, 2008 | E-mail from Meister to DeBruin et al. – Proffer Facts |
| 010 | May 9, 2008 | E-mail from DeBruin to Ascher – Disqualification Motion |
| 011 | May 8, 2008 | E-mail from DeBruin to Ascher et al. – Competency |
| 012 | May 6, 2008 | E-mail from Cox to DeBruin – List of Motions |
| 013 | May 6, 2008 | E-mails Meister to Bacy – Competency |
| 014 | May 5, 2008 | E-mail from Meister to DeBruin et al. – Basham |
| 015 | May 4, 2008 | E-mail from Ascher to Haren – Samantha Burns |
| 016 | April 17, 2008 | E-mail from Bracey to Ascher and DeBruin – Competency Draft |

| EX. # | DATE | DOCUMENT |
|---|---|---|
| 017 | April 1, 2008 | E-mail from Meister to Sullivan |
| 018 | March 26, 2008 | E-mail from Meister to Haren et al. – Cam Littlejohn |
| 019 | March 25, 2008 | E-mail from DeBruin to Meister – Advice Needed |
| 020 | March 18, 2008 | E-mail from Meister to DeBruin et al – Attached Issues List |
| 021 | June 13, 2012 | Declaration of Shannon Burnett |
| 022 | September 13, 2004 | Memo from .Harris to Swerling (Jury Selection) |
| 023 | July 6, 2004 | Memo from Harris to Basham File (Conference with Basham) |
| 024 | June 1, 2004 | Memo from Harris to Basham File (Conference with Basham) |
| 025 | May 28, 2004 | Memo from Harris to Swerling (Call with Basham) |
| 026 | May 27, 2003 | Memo from Harris to Swerling (Call with Brawley) |
| 027 | July 22, 2003 | Memo from Harris to Basham File (Protocol Hearing) |
| 028 | | Shannon Burnett Juror Questionnaire |
| 029 | | Shannon Burnett Phone Number Search Results |
| 030 | December 7, 2004 | Memo from Carolyn Graham to Swerling & Harris |
| 031 | August 5 | Notes – Clifford Jay |
| 032 | August 5, 2004 | Memo from Harris to Basham File |
| 033 | February 4, 2004 | FBI 302 of Clifford Jay |
| 034 | | Harris Handwritten Notes Clifford Jay |
| 035 | December 24, 2002 | Lead Sheet Clifford Jay |
| 036 | September 20, 2004 | Memo from Carlisle McNair to Basham File (Det. Addison) |
| 037 | August 2, 2004 | E-mail from Swerling to Harris |
| 038 | July 16, 2003 | Memo from Swerling to Basham File (Clifford Jay) |
| 039 | September 7, 2004 | Memo from Swerling to Basham File (Clifford Jay) |
| 040 | July, 2003 | Paige Tarr Interview of Clifford Jay |
| 041 | February 4, 2004 | FBI 302 of Clifford Jay (Annotated) |

| EX. # | DATE | DOCUMENT |
|---|---|---|
| 042 | | Harris Questions for Brawley Cross-Examination |
| 043 | December 7, 2003 | E-mail from McNair to Swerling et al. – Carlisle's Plans |
| 044 | October 13, 2003 | E-mail from McNair to Addison et al. – Fulks & Basham |
| 045 | March 24, 2005 | E-mail from McCamic to Gaudio Regarding Basham Team |
| 046 | October 8, 2003 | Memo from Tarr – Interview of Tim Garry |
| 047 | October 9, 2003 | Memo from Tarr – Interview of Penny Titzer |
| 048 | October 13, 2003 | E-mail from Tarr – Mitigation Interview List |
| 049 | October 13, 2003 | Memo from Watson/Tara – Interview with Bollingers |
| 050 | October 15, 2004 | Journal Entry |
| 051 | November 14, 2003 | Memo from Tarr – Interview of Sheila Mills |
| 052 | November 14, 2003 | Memo from Tarr – Interview of Sharon Watkins |
| 053 | November 19, 2003 | E-mail from McNair to Swerling et al. – Interview of Ruby Spence Watson |
| 054 | December 2, 2003 | E-mail from McNair to Swerling et al. – Interview of Mark Phebus |
| 055 | December 2, 2003 | E-mail from Hisker to Swerling – Mike Ruschell Conversation |
| 056 | February 10, 2004 | Email from Tarr – IQ Testing |
| 057 | June 28, 2004 | E-mail from Tarr to Swerling et al. – Interview Paul Arson |
| 058 | June 30, 2004 | E-mail from Watson to Swerling et al. – Interview Sharon Watkins |
| 059 | July 12, 2004 | E-mail from Watson to Colias – Fetal Alcohol Syndrome |
| 060 | July 26, 2004 | E-mail from McNair to Swerling et al. – Interview of Marvin & Peggy Phillips |
| 061 | August 3, 2004 | Email from Watson to et al. – Lisa Potts |
| 062 | August 15, 2004 | E-mail from McNair to Swerling et al. – Interview of Ellis McKecnhie |
| 063 | August 18, 2004 | Memo from Swerling – Interview of Penny Titzer |

| EX. # | DATE | DOCUMENT |
|---|---|---|
| 064 | August 18, 2004 | Memo from Swerling – Interview of Lisa Claire |
| 065 | February 18, 2004 | Memo from Watson – Interview of Baker and Shaner |
| 066 | August 24, 2004 | Memo from Swerling – Interview of Brenda Shaner |
| 067 | September 7, 2004 | E-mail from Watson to Swerling et al.– Ellis McKechnie |
| 068 | September 7, 2004 | Memo from Watson – Interview of Regina Moore |
| 069 | January 24, 1998 | Charter Louisville Behavioral Psych Evaluation |
| 070 | February 16, 1998 | Charter Louisville Behavioral Discharge Summary |
| 071 | | Special Olympics Exam |
| 072 | December 18, 2004 | Psychiatric Diagnosis of Basham |
| 073 | December 21, 2000 | Petition for Involuntary Hospitalization – KY |
| 074 | February 12, 2001 | Jail Medical Expense Claim for Basham |
| 075 | December 16, 2003 | E-mail from Brown to Swerling – Penny Royal Hospital |
| 076 | February 29, 2004 | E-mail from Hisker to Paige et al. – Basham Status |
| 077 | | Connie Nolan Entry |
| 078 | | Beverly Basham Entry |
| 079 | September 22, 2003 | Journal Entry |
| 080 | December 5, 2003 | Journal Entry |
| 081 | | Journal Entry – "Defendant now says statements…" |
| 082 | February 14, 2004 | Journal Entry (Kathy and Charlotte) |
| 083 | February 24, 2004 | Journal Entry (Hearing) |
| 084 | February 29, 2004 | E-mail from Tarr – Brandon Basham Suicide Attempt |
| 085 | | Journal Entry on Tina-Fulks Letters |
| 086 | August 27, 2004 | E-mail from Watson to et al. – Telephone Call with Basham |
| 087 | | The Lord Is Great Drawing |

| EX. # | DATE | DOCUMENT |
|---|---|---|
| 088 | | Scooby Dooby Drawing |
| 089 | | Sun-Moon-Star Drawing |
| 090 | | Coloring Book |
| 091 | | Media – "Jury Starts Work In Abduction Trial" |
| 092 | | Opening Notes |
| 093 | September 17, 2004 | Afternoon Entry |
| 094 | September 17 | "Dr. Watt" Entry |
| 095 | September 20, 2004 | PM Proceeding Entry |
| 096 | September 23, 2004 | Every Day Dip Entry |
| 097 | | Candy Box Note |
| 098 | October 15, 2004 | Voir Dire Questions – Mental Retardation |
| 099 | November 15, 2003 | E-mail from Tarr – Kentucky Trip |
| 100 | May 6, 2008 | E-mail from Meister to Bracy (Competency) |
| 101 | November 4, 2004 | E-mail from Swerling to Team |
| 102 | | CV from Thomas Michael Hyde, M.D., Ph.D. |
| 103 | October 30, 2012 | Evaluation Conducted April 20 and September 28, 2012 by Dr. Hyde |

11/27/02　Brandon　Basham

① Cam Little John
② Billy Monckton

Interview

① Mr. Richard Hughes appt. to represent him in Ashland, Kentucky.

Richard A. Hughes
1116 Bath Avenue
Ashland, Kentucky 41101

(606) 325-8399
FAX: (606) 324-6500

WAL-MART ① ~~Chris~~ Jumped in backseat & told Donovan to drive. Basham thought steal credit cards, get money, & ~~then~~ leave. Basham thought same thing as Mr. Hawkins.

Chad did rape Ms. Donovan.



DEFENDANT'S
EXHIBIT

JA 5120

Been under Psychiatric care since age 9. Been in Hospitals Psychiatric.

Found Incompetent in a <u>Hospital Psychiatric</u> for 4 years.

Bi-Polar, Paranoid, Sychsophrenic, manic Depressant

<u>Mental Illness</u>

**History**

① Riverdale Psychiatric Hospital, Owensboro, Ky.
② Methodist Group Home, Lexington, Ky.
   – attempted suicide
③ Stoner Creek
④ Methodist Group Home,
⑤ Cincinatti Psychiatric Hospital

Need an Evaluation

Psychiatric Review

Possible Physical + Sexual Abuse

JA 5121

○ Been off meds since arrested.



Current Medication

① Ridlin     Concerta         54 mg   Morning
② Valium      5⁻⁵
③ Serquil   600 mg Nt.   Hallucinations + Paranoid Sytsophrinia
④ Benedryl    50 mg.    (4 x Day)
⑤ Paxil   20 mg   Depression Medication

①   Mental Health Center , Hopkins County, Ky

① Kathy Basham ~~□□~~ (270)   821-1870
         129   Oakdale   Ave.
       Madisonville,   Ky     42431

→ Mother has mental issues.

(270) 821-8874 —
       Dr. Sadiq

JA 5122

12/16/02 Meeting w/ Branden Basham
:30

    Agenda: ① Med. Auths, ② Status, ③ Other Facilities

    ⇒ seems very dazed & confused.
    ⇒ may have sent a letter to Beth confessing to the crime.
    ⇒ Concerned about who I spoke with.

① Beth McGuffin          Stop sending
   128 Morris St.         letters!!
   Huntington, W.Va. 25705

② Needs psychiatrist "ASAP."

③ Notified Marshall's @ 11:01 am/pm concerning/ Branden's possible imminent suicide.



DEFENDANT'S EXHIBIT

JA 5123

| Subj: | **US v. Basham (D SC)** |
|---|---|
| Date: | 12/12/2002 10:44:04 AM Eastern Standard Time |
| From: | david@brucklaw.com |
| To: | robert@brucklaw.com, dick@burrandwelch.com, freedman99@earthlink.net, judyclarke@attglobal.net, michael.burt@prodigy.net, lsgant@aol.com, kmcnally@dcr.net, mod@dcr.net |
| CC: | camlittlejohn@yahoo.com, williammonckton@aol.com |

*Sent from the Internet (Details)*

Kevin: I spoke yesterday with Billy Monckton, and discussed the importance of avoiding a non-confidential, court-ordered psychiatric eval., etc. The client is quite mentally ill, carrying diagnoses of schizophrenia, ADD and depression (and is on meds for all of them). However, I indicated that I'd been consulting with Bill Nettles, who represents Fulks, and despite the fact that there is presently no active prospect of a plea agreement for anyone, the Ds' positions are antagonistic, so it made sense for Billy to be in touch with Kevin rather than me so as to avoid any risk of conflict.

Project materials should go to Billy and to Cam Littlejohn. Contact info:

William H. Monckton VI
843-946-6556
fax 843-946-6996
williammonckton@aol.com
1300 Professional Drive
Suite 102
Myrtle Beach SC 29577

Cameron B. Littlejohn, Jr.
803-799-1888
fax 803-799-5888
1720 Main Street
Suite 202
Columbia SC 29201
camlittlejohn@yahoo.com


David Bruck
Federal Death Penalty Resource Counsel
P.O. Box 11744
Columbia SC 29211
(1247 Sumter Street, Suite 201,
Columbia SC 29201)
Telephone: 803-765-1044
Fax: 803-765-1143



DEFENDANT'S
EXHIBIT

JA 5124

# MONCKTON LAW FIRM, P.A.

## ATTORNEYS AT LAW

WILLIAM H. MONCKTON, VI
DEAN N. MUREDDU

1300 PROFESSIONAL DRIVE, SUITE 102
MYRTLE BEACH, SOUTH CAROLINA 29577
www.moncktonlawfirm.com

TELEPHONE: (843) 946-6556
FAX: (843) 946-6996

December 12, 2002

Cameron Littlejohn, Jr.
1720 Main Street, Ste 202
Columbia, South Carolina 29201

**RE:    Branden Basham**

Dear Cam:

I had the opportunity to meet with Branden today at Darlington County. I'm sending you a copy of a letter that I have put numerous copies in Branden's possession to hand out to any law enforcement officer if they attempt to contact him, I am also including a letter that I sent to Rose Mary Parham. I have had the opportunity to review Branden's custody status with Ms. Pringle over at Darlington County. The story that Branden gives me is quite different from what she tells me with regards to what he is being allowed to do. I am going to follow it fairly closely and if we have anymore problems with him being allowed out of his room for showers or recreation time I will notify you and it may be something we need to pursue with the Marshalls. I spoke with Tom Rogers today and informed him of the problem that we are having with the City of Conway going to serve warrants and attempt to interview Branden. He was reluctant to issue an Exparte Order keeping Branden from any law enforcement authorities so I'm going to attempt to do something with Rose Mary. What I'm scared about more than anything is that if North Carolina finds a body now that Conway and Horry County know the location of Branden I can invision some North Carolina Detectives coming over to Darlington and attempting to interview Branden. I'm hoping Rose Mary will issue a letter to the Marshalls and possibly do a Consent Order barring all law enforcement access to Branden without you or I present. I'm waiting to hear from Rose Mary at this time and will notify you when I do.

If you have any questions or concerns, please do not hesitate to contact me.

With warmest regards, I remain

Very Truly Yours,

William H. Monckton, VI

WHM/rmg

enclosure


DEFENDANT'S EXHIBIT 4

JA 5125

Notes For: Basham, Branden L. (Federal)
Client ID:  02-CRM-0206 (A)

Matter ID:  Federal


Re:  Beginning of Representation

I was initially contacted to represent, Branden Basham by United States
Magistrate Tom Rogers. Tom Rogers called me on Wednesday November 27, 2002, the
day before Thanksgiving and told me that they were going to appoint me as second
chair on a Federal Death Penalty case with the first chair being Cam Littlejohn,
Jr. out of Columbia. Tom told me that my client had confessed that he wanted to
assist in the search of the body and was being transported back down to South
Carolina from the State of Kentucky to aide in that search. Tom wanted Mr.
Basham to have lawyers appointed to assist him in that matter. He also stated
that it will probably been a case where the gov't will make a deal with Brandan.
I left MB went to the Federal Courthouse in Florence and met with Rose Mary
Parham along with Cam Littlejohn to get an update on the case. It was revealed
to us that our client had kidnapped the Donavan woman from the Walmart parking
lot in Conway, South Carolina. There was apparently a videotape of the abduction
and our client was seen with Ms. Donavan at a convenience store and at a hunting
camp in Brunswick County, North Carolina. It was revealed that our client had
confessed to being involved in the kidnapping and abduction of Ms. Donavan and
that she was in fact dead. She apparently had been duck taped to some degree,
killed, drugged into the woods somewhere off a dirt road in Brunswick Co. North
Carolina and Mr. Fulks fearing that she may still be alive went to her and slit
her throat. This was the information given to us by the US Attorney Rose Mary
Parham prior to us ever meeting with our client Mr. Basham. We met with Mr.
Basham and he was still intent on aiding in the search of Ms. Donavan. I spoke
on a conference call with Rose Mary Parham and the FBI Agent Jeff Long while I
was still at the US Attorney's Office we arranged to travel with our client
Branden from Darlington Co, SC to Brunswick Co, NC to aide in the search of Ms.
Donavan. I drove up with Jeff Long from MB, SC while Cam Littlejohn drove with
the Agents and Branden from Darlington. When I arrived in Brunswick Co. I went
to a recreational facility meeting hall where there was assembled approximately
40 to 60 Police Officers from the FBI and the local Sheriffs office and police
departments. I was introduced as Branden's attorney and that I was aiding in the
search for Ms. Donavan. After that meeting I was driven along with a female FBI
Agent and FBI Agent Jeff Long to a place called Bee Tree Farms. While I was at
Bee Tree Farms I again conversed with Jeff Long as well Agents of the Brunswick
Co. Sheriffs office and the lead FBI Agent from Wilmington, NC. There were
numerous officers at this hunting camp and I advised them that they needed to
stay out of sight of Branden due to the fact that I think, he would be spooked
by seeing so many officers. Sometime later the Sheriff of Brunswick Co arrived
along with a white van carrying 2 other FBI Agents Cam Littlejohn, Branden
Basham 2 officers from Conway Police Department. There were also a couple of
tail cars that included other FBI agents and the Chief of Police of Conway, Det
Larry Schilling and Det Rob Sessions. It was agreed that the only people that
would actually ride the roads in the search would be Det. Rizzo, Sheriff Hewitt,
Cam Littlejohn, myself, Jeff Long, another agent of the Conway Police and
Branden. In a trail car was an FBI Agent whom I believe was Clyde Merrymen and
Chief of Police Sam Hendricks. We attempted to negotiate the roads at the
directions of Branden with the leadership of Sheriff Hewitt trying to identify
areas that had been searched and areas where they had been. It came apparent
that all the roads in this area especially the dirt roads look the same and are



DEFENDANT'S
EXHIBIT

JA 5126

all lined by pine trees. The information that we had from the US Attorneys office that our client confessed to dragging Ms. Donavan into the woods approximately 50 feet. There were no identifiable landmarks other than some type of a park sign. After driving around we did turn down one dirt road in which Branden became visibly upset, crying believing that we were on the correct road. We drove for quite some time down this dirt road and I identified a metal stake that had been revealed to us by the US Attorney's office. I asked the van to stop and they did a cursory search of the area but located nothing. We then drove to a cemetery, which it was identified to us by Sheriff Hewitt that the BMW had been seen which was down from the hunting club. It was obvious to the party that the cemetery had recently been cleaned up as there were rake marks on the ground where the leaves had been removed. Sheriff Hewitt confirmed that the graveyard was not in the same condition as it was the night Branden was seen in the area and in fact had been cleaned up due to the fact Sheriff Hewitts office had actually dug up what they believed was a possibly a shallow grave. We then drove to another graveyard close by which there was no indication to believe that this was the correct one. For all intense and purposes it was believed that the first cemetery we were in was the correct cemetery. We continued to drive around again looking at numerous dirt roads but again nothing apparently stood out as there were no definite identifiable landmarks. We returned back to the cemetery when Branden stayed in the van and myself, Littlejohn, Sheriff Hewitt, Capt. Sam Hendricks, Jeff Long, and one or two other FBI Agents and a Detective with Conway Police Department were standing in a circle. It was revealed to us for the first time the officers did not believe Branden was cooperating they informed Mr. Littlejohn and us that Branden had drawn a map and had been quite explicit that Ms. Donavan's body had been dumped in the Savannah Bluff area of Conway to the point that an exact map had been drawn. One of the FBI Agents whom I believe was Clyd Merrymen actually stated that we had been in the water up to his chest in waders searching this area for approximately 2 days and he was quite irritated at the search efforts as of this date. Capt. Sam Hendricks relayed although I don't remember the exact words, something to the effect that they may believe that Branden was just yanking their chain. Cam and I not having the benefit of any statements or what had been told to the police had no idea exactly what statements Branden had actually made other than those relayed by the U.S. Attorney Rose Mary Parham and FBI Agent Jeff Long. We went and spoke with Branden in an attempt to get a better handle of what was going on and to attempt to bolster Branden's credibility so that he could possibly be used as a witness in the future in this case. After returning back to the officers Cam informed the officers "okay, hypothetically, and again reiterated the word hypothetically, because there was some laughter among the officers oh, okay, I understand 'hypothetically' and Cam began to give information in a hypothetical situation as what may have happened. This hypothetical is somewhat relayed in Paragraph 4 on Jeff Long's 302 transcribed 12/4/02. However, it is wrong in its details. The statement that is definitely not related to the FBI was starts with "some point between leaving the cemetery and dumping Donavan's body Fulks stabbed Donavan and slit her throat at no time in Mr. Littlejohn's hypothetical was it ever stated that Fulks stabbed Donavan. Also, it was never stated that Basham recalled Fulks taking the knife and placing it between Fulks thigh and driver seat in the BMW. It was relayed in the Hypothetical that Fulks gave Basham the knife and that Basham put the knife under his leg and the seat of the BMW and threw it out down the road also in Paragraph 5 of the same 302 Donavan's panties were disposed after leaving the area where they dumped the body. The panties and stuff in the back were apparently dumped in the State of West Virginia. The entire 302 doesn't mention the work "Hypothetical" and has some material misrepresentations in it and the majority of the information is a re-compilation of the information provided to us by AUSA Rose Mary Parham. At no time were the police allowed to question or interview Branden concerning this

incident. In fact they were advised that they would not be allowed to interview Branden in any way, shape or form other than for the search of Donavan. The hypothetical given to Cam was trying to assist the officers and possibly seeking out other information that could be collaborated by Branden's testimony if in fact they wanted him to testify. Rose Mary Parham was asked if she would be attending the search on Thanksgiving Day she said that she would not be able to attend due to the fact that she had family coming in for Thanksgiving but would be available to be contacted by phone. Throughout this entire process from the day we got appointed the intent was to negotiate a plea by removing the death penalty from the table and allowing Branden to be used as a witness against Fulks. Cam Littlejohn and I were told by Rose Mary Parham that we needed to help find the body because Columbia would do the right thing. At no time did we intend act as agents of the FBI or to question our Client and reveal details to them in a manner that would inculpate him. At no time did our client authorize us to make any statements, which would inculpate him.

JA 5128

Tue Dec 17, 02 - 10:28 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:26:19
Notes: Spoke with Cam Littljohn, Jr.

Fri Dec 13, 02 - 2:54 PM - Phone Call
To Kathy Basham - +1 (270) 821-1870
Spoke, duration 00:03:08
Notes: Charlotte Morris is his sister and I spoke with her and she is going to send me a chronology of everything.

Fri Dec 13, 02 - 2:49 PM - Phone Call
From Basham, Branden L. - 1
Spoke, duration 00:01:58
Notes: Branden call. They just let him out to take a shower. They still are not letting him use the phones. He wants to know if you have heard anything? He doesn't understand why he can't be out like the others, why is he is lock down? He would like to be able to call his family. He wants you to call him and let him know what you have found out so far.

Fri Dec 13, 02 - 12:58 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:02:25
Notes: Updated Cam on all the medical records.

Fri Dec 13, 02 - 11:57 AM - Phone Call
To Kathy Basham - +1 (270) 821-1870
Spoke, duration 01:00:34
Notes: Spoke with Ms. Basham and she told me that Branden has been in several facilities.  They are, Rivendale in Bowling Green, Charter Hospital in Evansville Indiana, ? in Versalles, Kentucky, Pennyroll Mental Health in Madisonville, Kentucky and also Hopkins County Detention Center.  Need to speak with Hester Chambers in Pennyroll Mental Health at (270) 821-8874 and fax (270) 821-8883.  She also said to speak with Mike Landtrip at the Hopkins County Jail and his cell number is (270) 853-7542. Also contacting all Hospitals and attempting to obtain their medical records.

Fri Dec 13, 02 - 11:39 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:17:42
Notes: Speak with Cam concerning Conway serving warrants and how we can protect our client from any other attempted interviews.  Also, spoke with him concerning our own treating psychiatrist.  Discussed an Order for securing protection.

Wed Dec 11, 02 - 4:46 PM - Phone Call
To David Bruck - +1 (803) 765-1044
Spoke, duration 00:20:25
Notes: Need to see Donna Scwartzcoff, works for USC Medical School (803) 434-4698, and her pager is (888) 542-4048.

Tue Dec 10, 02 - 3:25 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:14:56
Notes: Speak with Cam

Tue Dec 10, 02 - 8:31 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:16:58
Notes: Speak with Cam concerning the Feds position on the case compared with Nc.

Mon Dec 9, 02 - 2:41 PM - Phone Call
To Rex Gore - +1 (910) 231-3551 *cell*          (910) 253-8200
Spoke, duration 00:03:00                         Fax (910) 253-8759
Notes: Speak with Rex Gore

Mon Dec 9, 02 - 2:17 PM - Phone Call
To Rex Gore - +1 (910) 231-3551
Spoke, duration 00:18:28
Notes: Speak with Rex concerning his position on DP

Mon Dec 9, 02 - 12:11 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 799-1888
Spoke, duration 00:13:57
Notes: Spoke with Cam about N.C. wanting to meet with Branden


**DEFENDANT'S EXHIBIT**

**JA 5129**

Notes: Spoke with Cam about N.C. wanting to meet with Branden



Mon Dec 9, 02 - 11:51 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:18:30
Notes: Speak with Lt. Dave Crocker Brunswick County Sheriff's Office.

Mon Dec 9, 02 - 9:43 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:40:25
Notes: Speak with Cam Friday Night and Monday Morning, review all newspaper articles and speak with Sheriff Hewett.

Mon Dec 9, 02 - 9:13 AM - Phone Call
From Basham, Branden L. - 1
Spoke, duration 00:00:58
Notes: A inmate called and said that Branden needs to see Billy. Not being allowed to shower and is not getting his meds.

Thu Dec 5, 02 - 3:35 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:09:33
Notes: Spoke with Cam about DP and meeting with client



Thu Dec 5, 02 - 3:06 PM - Phone Call
To Mr. Greg Hembree - (843) 222-1001
Spoke, duration 00:29:17
Notes: Spoke with Greg on procedure and his intentions.

Thu Dec 5, 02 - 2:56 PM - Phone Call
To Branden L. Basham - 1
Spoke, duration 00:01:26
Notes: Spoke with Branden at the jail and I told him I would come see him at the jail

Thu Dec 5, 02 - 1:01 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:01:04
Notes: Told Cam that the guards won't let Branden use the phones

Thu Dec 5, 02 - 10:04 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:05:20
Notes: Speak with Cam about procedure and medical authorizations



Thu Dec 5, 02 - 9:00 AM - Phone Call
To Jeff Long - (843) 241-1682
Spoke, duration 00:16:41
Notes: Spoke with Jeff and he told me that Chad did not say anything and gave some information through his lawyer.



Wed Dec 4, 02 - 5:10 PM - Phone Call
To Joe Chicarelli - +1 (304) 638-1147
Spoke, duration 00:10:23
Notes: Spoke with Joe and he told me that there was no deal in place for the polygraph.



Wed Dec 4, 02 - 4:40 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 799-1888
Spoke, duration 00:10:00
Notes: Speak with Cam about conversation with Greg Hembree.



Wed Dec 4, 02 - 4:06 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 799-1888
Spoke, duration 00:20:51
Notes: Phone conference with Greg and Cam regarding Brandon's case.



Wed Dec 4, 02 - 3:54 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 799-1888
Spoke, duration 00:11:43
Notes: Spoke with Cam in detail about the plea offers.

**JA 5130**

Notes: Spoke with Cam in detail about the plea offers.



Wed Dec 4, 02 - 3:48 PM - Phone Call
To Rose Mary Parham - +1 (843) 665-6688
Spoke, duration 00:05:38
Notes: Discussed a deal with Rose Mary on passing a polygraph.

Wed Dec 4, 02 - 3:32 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:15:17
Notes: Spoke with Cam in extreme details concerning jurisdiction and Branden's mental condition.



Wed Dec 4, 02 - 1:57 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 799-1888
Spoke, duration 00:02:25
Notes: Spoke with Cam concerning the phone conference of prosecutors

Wed Dec 4, 02 - 12:02 PM - Phone Call
From Littlejohn, Jr., Cameron B. - +1 (803) 318-1888
Spoke, duration 00:00:36
Notes: He is going to fax me articles that he got from the Herald Dispatch newspaper regarding case.

Wed Dec 4, 02 - 10:10 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Spoke, duration 00:24:00
Notes: Discussed procedure with Cam and the problems with the different jurisdictions involved in this case.

Wed Dec 4, 02 - 9:23 AM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 799-1888
Left Message, duration 00:00:51
Notes: Left a message for Cam to call me back.

Wed Dec 4, 02 - 8:46 AM - Phone Call
To Jeff Long - (843) 241-1682

Spoke, duration 00:32:45
Notes: Spoke with Jeff at lenght about the procedure for cooperation.  He wants to do a polygraph of Branden.  I told him that we want to work something out with all jurisdictions before doing anything.

Tue Dec 3, 02 - 5:21 PM - Phone Call
To Joe Chicarelli - +1 (304) 540-7279
Spoke, duration 00:07:17
Notes: Spoke with Cam and left a message for Joe to call me back.  Rec'd a message from him that he had an update for me.

Tue Dec 3, 02 - 3:53 PM - Phone Call
To Cameron B. Littlejohn, Jr. - +1 (803) 318-1888
Voice Mail, duration 00:01:35
Notes: Left a voice mail message for Cam about the search in W. Va.

Tue Dec 3, 02 - 3:29 PM - Phone Call
To Joe Chicarelli - +1 (304) 638-1147
Spoke, duration 00:06:18
Notes: Spoke with Joe with the FBI and confirmed with him that I have received the pictures from the FBI in W. VA.  He told me that they did in fact find the truck with the rebel flag and are searching the river.  They had been searching the river about a mile closer to the OHIO and now feel that they are in the correct area and he will call me if they find anything.

① AUSA, Larry Ellison, Charleston, W. Va,
                            Southern District

— offered not to pursue DP in W. Va
   if cooperate & plea to State Court
   murder Charges to life.

JA 5131

| | |
|---|---|
| **From:** | Meister, Melissa A. <MMeister@jenner.com> |
| **Sent:** | Friday, October 31, 2008 12:40 AM |
| **To:** | tsullivan@bsm-legal.com; DeBruin, David W; Ascher, Stephen L.; Bracey, Kali N |
| **Cc:** | Haren, Eric R.; Pulham, Thomas G |
| **Subject:** | How much do you want to bet that Foreperson Wilson posted this? |

This was posted as a comment on an Internet news story about Fulks's appeal about a month ago:

Anonymous (9:12pm 09-24-2008)
I was on the jury for Brandon Basham. If you could have heard the stories from the families and the things they did to these women you would see they truly deserve to die!!!! But they need to suffer in prison for a while. Death is too easy.

---

Melissa A. Meister
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
http://www.jenner.com/

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

1



DEFENDANT'S
EXHIBIT

7

SULLIVAN EMAILS_00371

**JA 5132**

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|

Traveled to Greenbelt and met with T. Sullivan, M. Meister, and E. Haren re background of case and strategy for collecting and reviewing trial record in connection with drafting 4th Circuit brief.

| 01/07/2008 | 2089 | | MELISSA A. MEISTER | 0 | 5.75 | 2,558.75 | 5.75 | 0.00 | 80100 | | Billed |

Meet with T. Sullivan, M. Cox, and E. Haren regarding Basham trial below and strategy on appeal; review trial record.

| 01/08/2008 | 2170 | | ERIC R. HAREN | 0 | 7.00 | 2,450.00 | 7.00 | 0.00 | 80100 | | Billed |

Read jury trial record, flag potential issues for appeal, and research issue about custodial interrogation.

| 01/09/2008 | 2170 | | ERIC R. HAREN | 0 | 7.00 | 2,450.00 | 7.00 | 0.00 | 80100 | | Billed |

Read jury trial record volumes IX and X.

| 01/09/2008 | 2089 | | MELISSA A. MEISTER | 0 | 1.50 | 667.50 | 1.50 | 0.00 | 80100 | | Billed |

Review trial record.

| 01/10/2008 | 2020 | | CARRIE F. APFEL | 0 | 1.00 | 375.00 | 1.00 | 0.00 | 80100 | | Billed |

Researched cases re appellate counsel's right to counsel below's records.

| 01/10/2008 | 2089 | | MELISSA A. MEISTER | 0 | 1.00 | 445.00 | 1.00 | 0.00 | 80100 | | Billed |

Talk to C. Apfel re research into procuring attorney below's records in death penalty appeal; talk to appellate team about status of reviewing record.

| 01/11/2008 | 1906 | | THOMAS G. PULHAM | 0 | 0.25 | 102.50 | 0.25 | 0.00 | 80100 | | Billed |

Met with M. Meister re: background on project

| 01/11/2008 | 2089 | | MELISSA A. MEISTER | 0 | 0.50 | 222.50 | 0.50 | 0.00 | 80100 | | Billed |

Review trial record.

| 01/14/2008 | 0688 | | DAVID W. DEBRUIN | 0 | 1.00 | 700.00 | 1.00 | 0.00 | 80100 | | Billed |

Prepared for meeting with associates regarding appeal; met with appeal team regarding same.

| 01/14/2008 | 2170 | | ERIC R. HAREN | 0 | 0.50 | 175.00 | 0.50 | 0.00 | 80100 | | Billed |

Attended meeting w/ D. DeBruin, M. Cox., M. Meister, and T. Pulham to discuss case strategy.

| 01/14/2008 | 1906 | | THOMAS G. PULHAM | 0 | 4.00 | 1,640.00 | 4.00 | 0.00 | 80100 | | Billed |

Read opinion in Fulks appeal; met with team to discuss schedule; reviewed pre-trial record.

| 01/14/2008 | 2089 | | MELISSA A. MEISTER | 0 | 1.00 | 445.00 | 1.00 | 0.00 | 80100 | | Billed |

Meet with T. Pulham regarding reviewing trial record; meet with D. DeBruin, M. Cox, E. Haren, and T. Pulham regarding briefing schedule for Basham appeal.

| 01/15/2008 | 6849 | | KELLEN H. PARKER | 0 | 3.50 | 525.00 | 3.50 | 0.00 | 80100 | | Billed |

Compiled material from US v. Fulks case into binders. Created index for materials.

| 01/15/2008 | 2170 | | ERIC R. HAREN | 0 | 4.00 | 1,400.00 | 4.00 | 0.00 | 80100 | | Billed |

Drafted partial chronology of guilt phase of jury trial.

| 01/15/2008 | 1906 | | THOMAS G. PULHAM | 0 | 5.00 | 2,050.00 | 5.00 | 0.00 | 80100 | | Billed |

Reviewed pre-trial proceedings

DEFENDANT'S EXHIBIT

**JA 5133**

# Time Report

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/15/2008 | 2089 | | MELISSA A. MEISTER | 0 | 0.75 | 333.75 | 0.75 | 0.00 | 80100 | | Billed |
| Meet w/ M. Cox and E. Haren re trial record review. | | | | | | | | | | | |
| 01/16/2008 | 6849 | | KELLEN H. PARKER | 0 | 7.25 | 1,087.50 | 7.25 | 0.00 | 80100 | | Billed |
| Compiled material from US v. Fulks case into binders. Created index for materials. | | | | | | | | | | | |
| 01/16/2008 | 1906 | | THOMAS G. PULHAM | 0 | 1.25 | 512.50 | 1.25 | 0.00 | 80100 | | Billed |
| Reviewed pre-trial proceedings | | | | | | | | | | | |
| 01/17/2008 | 6849 | | KELLEN H. PARKER | 0 | 7.25 | 1,087.50 | 7.25 | 0.00 | 80100 | | Billed |
| Compiled material from US v. Fulks case into binders. Created index for materials. | | | | | | | | | | | |
| 01/17/2008 | 2170 | | ERIC R. HAREN | 0 | 6.00 | 2,100.00 | 6.00 | 0.00 | 80100 | | Billed |
| Drafted partial chronology of jury trial record. | | | | | | | | | | | |
| 01/17/2008 | 2089 | | MELISSA A. MEISTER | 0 | 0.25 | 111.25 | 0.25 | 0.00 | 80100 | | Billed |
| Read Judge's unsealing order in Basham case; confer w/ T. Sullivan re trip to review sealed record in South Carolina. | | | | | | | | | | | |
| 01/18/2008 | 6849 | | KELLEN H. PARKER | 0 | 6.75 | 1,012.50 | 6.75 | 0.00 | 80100 | | Billed |
| Compiled material from US v. Fulks case into binders. Created index for materials. | | | | | | | | | | | |
| 01/18/2008 | 2170 | | ERIC R. HAREN | 0 | 6.50 | 2,275.00 | 6.50 | 0.00 | 80100 | | Billed |
| Drafted partial chronology (continued) of jury trial record. | | | | | | | | | | | |
| 01/19/2008 | 2161 | | MELISSA A. COX | 0 | 8.75 | 2,843.75 | 8.75 | 0.00 | 80100 | | Billed |
| Reviewed jury selection transcript and created timeline that identifies potential appealable issues. | | | | | | | | | | | |
| 01/20/2008 | 2170 | | ERIC R. HAREN | 0 | 3.00 | 1,050.00 | 3.00 | 0.00 | 80100 | | Billed |
| Reviewed jury trial record and drafted partial chronology. | | | | | | | | | | | |
| 01/21/2008 | 2170 | | ERIC R. HAREN | 0 | 2.00 | 700.00 | 2.00 | 0.00 | 80100 | | Billed |
| Reviewed jury trial record and drafted partial chronology. | | | | | | | | | | | |
| 01/22/2008 | 2170 | | ERIC R. HAREN | 0 | 8.75 | 3,062.50 | 8.75 | 0.00 | 80100 | | Billed |
| Read jury trial transcript (end of guilt phase) and drafted partial chronology. | | | | | | | | | | | |
| 01/22/2008 | 2161 | | MELISSA A. COX | 0 | 4.50 | 1,462.50 | 4.50 | 0.00 | 80100 | | Billed |
| Conferred w/ E. Haren re potential double jeopardy claim; conferred w/ K. Parker re collection of trial records from PACER; reviewed and created timeline of jury selection transcript. | | | | | | | | | | | |
| 01/22/2008 | 1906 | | THOMAS G. PULHAM | 0 | 1.75 | 717.50 | 1.75 | 0.00 | 80100 | | Billed |
| Reviewed pre-trial proceedings | | | | | | | | | | | |
| 01/22/2008 | 2089 | | MELISSA A. MEISTER | 0 | 1.25 | 556.25 | 1.25 | 0.00 | 80100 | | Billed |
| Confer with E. Haren; confer with K. Parker re index of motions filed in case below; confer with E. Haren, M. Cox, and T. Pulham re index. | | | | | | | | | | | |
| 01/22/2008 | 6849 | | KELLEN H. PARKER | 0 | 6.00 | 900.00 | 6.00 | 0.00 | 80100 | | Billed |

JA 5134

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|

Printed documents from Pacer. Organized documents and created index.

| 01/23/2008 | 2170 | ERIC R. HAREN | | 0 | 8.00 | 2,800.00 | 8.00 | 0.00 | 80100 | | Billed |

Read jury trial record and completed chronology of section dealing with those issues and with post-trial motions before jury instructions.

| 01/23/2008 | 2161 | MELISSA A. COX | | 0 | 10.25 | 3,331.25 | 10.25 | 0.00 | 80100 | | Billed |

Reviewed and created timeline of jury selection transcript.

| 01/23/2008 | 1906 | THOMAS G. PULHAM | | 0 | 1.75 | 717.50 | 1.75 | 0.00 | 80100 | | Billed |

Reviewed pre-trial record

| 01/23/2008 | 6849 | KELLEN H. PARKER | | 0 | 2.50 | 375.00 | 2.50 | 0.00 | 80100 | | Billed |

Created indices of files not included in binders. Found docket for southern district of West Virginia for E. Haren.

| 01/24/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 0.25 | 175.00 | 0.25 | 0.00 | 80100 | | Billed |

Office conference with M. Meister regarding review of sealed materials.

| 01/24/2008 | 2170 | ERIC R. HAREN | | 0 | 7.00 | 2,450.00 | 7.00 | 0.00 | 80100 | | Billed |

Read jury trial record and drafted chronology of portions of trial and deliberations.

| 01/24/2008 | 2161 | MELISSA A. COX | | 0 | 0.50 | 162.50 | 0.50 | 0.00 | 80100 | | Billed |

Discussion with E. Haren, T. Pulham, M. Meister re schedule for completing timelines and list of issues for appeal.

| 01/24/2008 | 1906 | THOMAS G. PULHAM | | 0 | 3.00 | 1,230.00 | 3.00 | 0.00 | 80100 | | Billed |

Met with team on status; reviewed penalty binder 7.

| 01/24/2008 | 2089 | MELISSA A. MEISTER | | 0 | 2.75 | 1,223.75 | 2.75 | 0.00 | 80100 | | Billed |

Confer with E. Haren, M. Cox, and T. Pulham regarding record review, internal deadlines, and issues spotted.

| 01/25/2008 | 2170 | ERIC R. HAREN | | 0 | 7.00 | 2,450.00 | 7.00 | 0.00 | 80100 | | Billed |

Read jury trial record of penalty phase and draft chronology; review secondary materials about structure of Federal Death Penalty Act.

| 01/25/2008 | 2161 | MELISSA A. COX | | 0 | 0.25 | 81.25 | 0.25 | 0.00 | 80100 | | Billed |

Gathered motions per index. Conferred with E. Haren.

| 01/25/2008 | 2164 | MUSHTAQ GUNJA | | 0 | 3.00 | 1,125.00 | 3.00 | 0.00 | 80100 | | Billed |

Research re ownership of client files

| 01/25/2008 | 1906 | THOMAS G. PULHAM | | 0 | 7.00 | 2,870.00 | 7.00 | 0.00 | 80100 | | Billed |

Reviewed penalty binder 7

| 01/25/2008 | 2089 | MELISSA A. MEISTER | | 0 | 5.00 | 2,225.00 | 5.00 | 0.00 | 80100 | | Billed |

Coordinate review of Fulks briefs with E. Haren; review penalty phase of record and create chron.

| 01/26/2008 | 2170 | ERIC R. HAREN | | 0 | 2.50 | 875.00 | 2.50 | 0.00 | 80100 | | Billed |

Review jury trial penalty phase record and draft chronology.

| 01/27/2008 | 2170 | ERIC R. HAREN | | 0 | 4.00 | 1,400.00 | 4.00 | 0.00 | 80100 | | Billed |

JA 5135

| Date | SM/Task | Attorney Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|---------------|------|----------|----------|---------|---------|---------|----------|--------|
| Review jury trial penalty phase record and draft chronology. | | | | | | | | | | |
| 01/27/2008 | 1906 | THOMAS G. PULHAM | 0 | 3.50 | 1,435.00 | 3.50 | 0.00 | 80100 | | Billed |
| Reviewed penalty binder 7 | | | | | | | | | | |
| 01/28/2008 | 2161 | MELISSA A. COX | 0 | 0.50 | 162.50 | 0.50 | 0.00 | 80100 | | Billed |
| Reviewed post-trial motions in preparation for 4th Circuit appeal. | | | | | | | | | | |
| 01/28/2008 | 2170 | ERIC R. HAREN | 0 | 5.50 | 1,925.00 | 5.50 | 0.00 | 80100 | | Billed |
| Reviewed penalty phase jury trial transcript and prepared chronology. | | | | | | | | | | |
| 01/28/2008 | 1906 | THOMAS G. PULHAM | 0 | 8.50 | 3,485.00 | 8.50 | 0.00 | 80100 | | Billed |
| Reviewed penalty binder 7 and wrote chronology | | | | | | | | | | |
| 01/29/2008 | 2161 | MELISSA A. COX | 0 | 5.50 | 1,787.50 | 5.50 | 0.00 | 80100 | | Billed |
| Reviewed post-trial hearings and created timeline of motions, objections, and potential issues for appeal. | | | | | | | | | | |
| 01/29/2008 | 2170 | ERIC R. HAREN | 0 | 8.00 | 2,800.00 | 8.00 | 0.00 | 80100 | | Billed |
| Read jury trial record, drafted chronology, and researched issue re admission of prosecutor's statements in Fulks trial. | | | | | | | | | | |
| 01/29/2008 | 2164 | MUSHTAQ GUNJA | 0 | 3.00 | 1,125.00 | 3.00 | 0.00 | 80100 | | Billed |
| Research re ownership of client files; draft email of results | | | | | | | | | | |
| 01/29/2008 | 1906 | THOMAS G. PULHAM | 0 | 3.75 | 1,537.50 | 3.75 | 0.00 | 80100 | | Billed |
| Reviewed penalty binder 6, made list of issues on appeal from binders 6 and 7 | | | | | | | | | | |
| 01/30/2008 | 2089 | MELISSA A. MEISTER | 0 | 7.00 | 3,115.00 | 7.00 | 0.00 | 80100 | | Billed |
| Meet w/ T. Sullivan re appeal, review of sealed record, and meeting with trial counsel Swerling; review sealed record; travel back to DC from SC. | | | | | | | | | | |
| 01/30/2008 | 2161 | MELISSA A. COX | 0 | 8.50 | 2,762.50 | 8.50 | 0.00 | 80100 | | Billed |
| Created timeline of motions, objections, and potential issues for appeal; researched 4th Circuit law on what constitutes violation of 6th Amendment right to jury trial. | | | | | | | | | | |
| 01/30/2008 | 2170 | ERIC R. HAREN | 0 | 7.00 | 2,450.00 | 7.00 | 0.00 | 80100 | | Billed |
| Drafted partial list of issues for appeal and researched issue of "intrinsic" evidence under FRE 404(b). | | | | | | | | | | |
| 01/30/2008 | 6849 | KELLEN H. PARKER | 0 | 2.50 | 375.00 | 2.50 | 0.00 | 80100 | | Billed |
| Printed from Westlaw and created binder with citations from U.S. v. Basham Motion and Memorandum. | | | | | | | | | | |
| 01/31/2008 | 2161 | MELISSA A. COX | 0 | 0.25 | 81.25 | 0.25 | 0.00 | 80100 | | Billed |
| Conferred w/ T. Pulham and E. Haren re potential appealable issues in direct appeal. | | | | | | | | | | |
| 01/31/2008 | 2170 | ERIC R. HAREN | 0 | 2.50 | 875.00 | 2.50 | 0.00 | 80100 | | Billed |
| Continued drafting list of issues for appeal based on previously drafted summaries of transcript. | | | | | | | | | | |
| 01/31/2008 | 1906 | THOMAS G. PULHAM | 0 | 0.25 | 102.50 | 0.25 | 0.00 | 80100 | | Billed |
| Discussed status of record review with M. Cox and E. Haren | | | | | | | | | | |
| 02/01/2008 | 2170 | ERIC R. HAREN | 0 | 1.00 | 350.00 | 1.00 | 0.00 | 80100 | | Billed |

JA 5136

| Date | SM/Task | Attorney Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt Service | Activity | Status |
|------|---------|---------------|------|----------|----------|---------|-----------------|----------|--------|
| | | Scanned briefs of codefendant Fulks for similar issues and arguments therein. | | | | | | | |
| 02/01/2008 | 1906 | THOMAS G. PULHAM | 0 | 0.25 | 102.50 | 0.25 | 0.00 80100 | | Billed |
| | | Review of trial chronology | | | | | | | |
| 02/01/2008 | 2089 | MELISSA A. MEISTER | 0 | 0.25 | 111.25 | 0.25 | 0.00 80100 | | Billed |
| | | Confer with T. Pulham re status of record review. | | | | | | | |
| 02/02/2008 | 2089 | MELISSA A. MEISTER | 0 | 0.25 | 111.25 | 0.25 | 0.00 80100 | | Billed |
| | | E-mail T. Sullivan re extension of deadline. | | | | | | | |
| 02/04/2008 | 2170 | ERIC R. HAREN | 0 | 5.50 | 1,925.00 | 5.50 | 0.00 80100 | | Billed |
| | | Prepared chronology of day of penalty phase and researched potential Atkins v. VA issue under federal law. | | | | | | | |
| 02/05/2008 | 2161 | MELISSA A. COX | 0 | 3.50 | 1,137.50 | 3.50 | 0.00 80100 | | Billed |
| | | Reviewed jury selection transcript for potential issues for appeal. | | | | | | | |
| 02/05/2008 | 2170 | ERIC R. HAREN | 0 | 7.00 | 2,450.00 | 7.00 | 0.00 80100 | | Billed |
| | | Nearly completed draft of chronology of remaining day of penalty phase. | | | | | | | |
| 02/06/2008 | 2161 | MELISSA A. COX | 0 | 0.25 | 81.25 | 0.25 | 0.00 80100 | | Billed |
| | | Conferred w/ E. Haren re potential issue for appeal. | | | | | | | |
| 02/06/2008 | 2170 | ERIC R. HAREN | 0 | 7.00 | 2,450.00 | 7.00 | 0.00 80100 | | Billed |
| | | Research Supreme Court death-penalty cases for preceding year for information about aggravating and mitigating factors; research evidentiary standard under FDPA, as opposed to 404(b), beginning with recent 2d Cir opinion. | | | | | | | |
| 02/06/2008 | 2089 | MELISSA A. MEISTER | 0 | 0.25 | 111.25 | 0.25 | 0.00 80100 | | Billed |
| | | Conferred with E. Haren re Fulks brief. | | | | | | | |
| 02/07/2008 | 2170 | ERIC R. HAREN | 0 | 6.50 | 2,275.00 | 6.50 | 0.00 80100 | | Billed |
| | | Completed chronology of day of penalty phase, researched fourth circuit rules about page limits and researched recent federal cases applying FDPA. | | | | | | | |
| 02/07/2008 | 2089 | MELISSA A. MEISTER | 0 | 0.50 | 222.50 | 0.50 | 0.00 80100 | | Billed |
| | | Reviewed timeline prepared by E. Haren. | | | | | | | |
| 02/08/2008 | 2161 | MELISSA A. COX | 0 | 0.25 | 81.25 | 0.25 | 0.00 80100 | | Billed |
| | | Discussion w/ E. Haren re juror conduct as potential issue to raise on direct appeal. | | | | | | | |
| 02/08/2008 | 2170 | ERIC R. HAREN | 0 | 4.50 | 1,575.00 | 4.50 | 0.00 80100 | | Billed |
| | | Continued researching FDPA cases and read another Supreme Court death penalty case from last year, Abdul-Kabir v. Quarterman; began reading contempt hearing for jury foreperson. | | | | | | | |
| 02/08/2008 | 2089 | MELISSA A. MEISTER | 0 | 0.75 | 333.75 | 0.75 | 0.00 80100 | | Billed |
| | | Drafted and filed notice of appearance. | | | | | | | |
| 02/13/2008 | 0688 | DAVID W. DEBRUIN | 0 | 0.50 | 350.00 | 0.50 | 0.00 80100 | | Billed |

JA 5137

# Time Report

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

08/28/2012

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|
| Reviewed and responded to correspondence regarding plan for case going forward. | | | | | | | | | | | |
| 02/26/2008 | 2164 | MUSHTAQ GUNJA | | 0 | 3.00 | 1,125.00 | 3.00 | 0.00 | 80100 | | Billed |
| Research re ownership of client files | | | | | | | | | | | |
| 03/10/2008 | 2089 | MELISSA A. MEISTER | | 0 | 2.00 | 890.00 | 2.00 | 0.00 | 80100 | | Billed |
| Reviewed trial record. | | | | | | | | | | | |
| 03/11/2008 | 2089 | MELISSA A. MEISTER | | 0 | 1.50 | 667.50 | 1.50 | 0.00 | 80100 | | Billed |
| Prepared trial timeline. | | | | | | | | | | | |
| 03/12/2008 | 2089 | MELISSA A. MEISTER | | 0 | 3.50 | 1,557.50 | 3.50 | 0.00 | 80100 | | Billed |
| Prepared trial timeline. | | | | | | | | | | | |
| 03/14/2008 | 2170 | ERIC R. HAREN | | 0 | 0.75 | 262.50 | 0.75 | 0.00 | 80100 | | Billed |
| Retrieved PACER motions for M. Meister and discussed timeline and potential issues for appeal with M. Meister. | | | | | | | | | | | |
| 03/14/2008 | 2089 | MELISSA A. MEISTER | | 0 | 3.75 | 1,668.75 | 3.75 | 0.00 | 80100 | | Billed |
| Reviewed and drafted trial timeline. | | | | | | | | | | | |
| 03/15/2008 | 2170 | ERIC R. HAREN | | 0 | 5.00 | 1,750.00 | 5.00 | 0.00 | 80100 | | Billed |
| Drafted partial chronology of day 3 of guilt phase of trial. | | | | | | | | | | | |
| 03/15/2008 | 2089 | MELISSA A. MEISTER | | 0 | 2.00 | 890.00 | 2.00 | 0.00 | 80100 | | Billed |
| Drafted trial timeline. | | | | | | | | | | | |
| 03/16/2008 | 2161 | MELISSA A. COX | | 0 | 8.25 | 2,681.25 | 8.25 | 0.00 | 80100 | | Billed |
| Reviewed jury selection transcript and constructed timeline regarding same as background for 4th Circuit appeal. | | | | | | | | | | | |
| 03/17/2008 | 2170 | ERIC R. HAREN | | 0 | 2.50 | 875.00 | 2.50 | 0.00 | 80100 | | Billed |
| Completed chronology of day 3 of guilt phase. | | | | | | | | | | | |
| 03/17/2008 | 2161 | MELISSA A. COX | | 0 | 3.75 | 1,218.75 | 3.75 | 0.00 | 80100 | | Billed |
| Reviewed and created timeline of jury selection transcript to provide background context for 4th Circuit appeal. | | | | | | | | | | | |
| 03/17/2008 | 1665 | KALI N. BRACEY | | 0 | 0.25 | 131.25 | 0.25 | 0.00 | 80100 | | Billed |
| Reviewed timeline in preparation for meeting. | | | | | | | | | | | |
| 03/18/2008 | 2170 | ERIC R. HAREN | | 0 | 2.50 | 875.00 | 2.50 | 0.00 | 80100 | | Billed |
| Attended meetings with M. Meister and Basham team to discuss issues and briefing assignments; attended later meeting with M. Meister to get briefing assignment. | | | | | | | | | | | |
| 03/18/2008 | 2161 | MELISSA A. COX | | 0 | 5.00 | 1,625.00 | 5.00 | 0.00 | 80100 | | Billed |
| Reviewed jury selection transcript and created timeline regarding same, as background for 4th Circuit appeal; attended teleconference with D. DeBruin, K. Bracey, S. Archer, T. Pulham, E. Haren, and M. Meister regarding developing outline for 4th Circuit brief. | | | | | | | | | | | |
| 03/18/2008 | 1665 | KALI N. BRACEY | | 0 | 7.75 | 4,068.75 | 7.75 | 0.00 | 80100 | | Billed |
| Reviewed timeline and met with team re plan for brief. | | | | | | | | | | | |

JA 5138

# Time Report

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

08/28/2012

| Date | SM/Task | Attorney Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|---|---|---|---|---|---|---|---|---|---|---|

Conference with E. Haren and T. Pulham re 404(b) argument; reviewed 404(b) argument; drafted e-mails to T. Sullivan re outstanding requests to prior counsel; reviewed motions binders for disqualification of counsel and competency issues.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/24/2008 | 2170 | ERIC R. HAREN | 0 | 4.00 | 1,400.00 | 4.00 | 0.00 | 80100 | | Billed |

Drafted outline of argument for appellate brief.

| 03/24/2008 | 1906 | THOMAS G. PULHAM | 0 | 5.25 | 2,152.50 | 5.25 | 0.00 | 80100 | | Billed |

Reviewed trial timeline, penalty transcript.

| 03/25/2008 | 2161 | MELISSA A. COX | 0 | 7.00 | 2,275.00 | 7.00 | 0.00 | 80100 | | Billed |

Attended meeting with M. Meister and E. Haren to discuss workload regarding Basham case; outlined pleadings regarding motion for new trial based on juror misconduct.

| 03/25/2008 | 0688 | DAVID W. DEBRUIN | 0 | 0.25 | 175.00 | 0.25 | 0.00 | 80100 | | Billed |

Reviewed and responded to correspondence regarding hospitalization of client.

| 03/25/2008 | 2170 | ERIC R. HAREN | 0 | 4.00 | 1,400.00 | 4.00 | 0.00 | 80100 | | Billed |

Researched issues in preparation for beginning to draft brief.

| 03/25/2008 | 1906 | THOMAS G. PULHAM | 0 | 6.75 | 2,767.50 | 6.75 | 0.00 | 80100 | | Billed |

Reviewed penalty phase openings and summations.

| 03/25/2008 | 2089 | MELISSA A. MEISTER | 0 | 2.00 | 890.00 | 2.00 | 0.00 | 80100 | | Billed |

Conference with Basham team re organization of issues for appeal and production of records from counsel below.

| 03/26/2008 | 2170 | ERIC R. HAREN | 0 | 8.00 | 2,800.00 | 8.00 | 0.00 | 80100 | | Billed |

Researched issues for death penalty appeal, including interpretation of FDPA's non-statutory factors provision.

| 03/26/2008 | 1906 | THOMAS G. PULHAM | 0 | 7.25 | 2,972.50 | 7.25 | 0.00 | 80100 | | Billed |

Reviewed motions on admission of Fulks prior bad acts; researched admissibility; conf. with E. Haren re: construction of FDPA and admissibility of Fulks acts.

| 03/26/2008 | 2089 | MELISSA A. MEISTER | 0 | 1.50 | 667.50 | 1.50 | 0.00 | 80100 | | Billed |

Conference with C. Littlejohn re Basham trial; conference with J. Swerling re Basham trial and trial files; conference with Jenner team re list of items needed from Basham trial files.

| 03/27/2008 | 2170 | ERIC R. HAREN | 0 | 5.00 | 1,750.00 | 5.00 | 0.00 | 80100 | | Billed |

Began drafting sections of appellate brief.

| 03/27/2008 | 1906 | THOMAS G. PULHAM | 0 | 6.50 | 2,665.00 | 6.50 | 0.00 | 80100 | | Billed |

Researched admissibility of co-defendant's prior bad acts; conference on admissibility with E. Haren, M. Meister and M. Cox.

| 03/27/2008 | 2089 | MELISSA A. MEISTER | 0 | 0.75 | 333.75 | 0.75 | 0.00 | 80100 | | Billed |

Draft correspondence to J. Swerling re Basham trial files.

| 03/28/2008 | 1906 | THOMAS G. PULHAM | 0 | 4.25 | 1,742.50 | 4.25 | 0.00 | 80100 | | Billed |

Reviewed victim impact motions from trial court and submissions in Fulks trial; drafted argument section.

| 03/28/2008 | 2089 | MELISSA A. MEISTER | 0 | 0.50 | 222.50 | 0.50 | 0.00 | 80100 | | Billed |

**JA 5139**

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|
| | | | Conference with T. Pulham re Fulks evidence; conference with Clerk's office in D.S.C. re sealed transcripts. | | | | | | | | |
| 03/29/2008 | 2161 | MELISSA A. COX | | 0 | 6.25 | 2,031.25 | 6.25 | 0.00 | 80100 | | Billed |
| | | | Read post-trial transcript re juror misconduct; researched case law on presumptive prejudice arising from extra-judicial conduct with jurors, in preparation for writing section of 4th Circuit brief. | | | | | | | | |
| 03/29/2008 | 2170 | ERIC R. HAREN | | 0 | 3.50 | 1,225.00 | 3.50 | 0.00 | 80100 | | Billed |
| | | | Drafted portions of appellate brief. | | | | | | | | |
| 03/29/2008 | 1906 | THOMAS G. PULHAM | | 0 | 5.25 | 2,152.50 | 5.25 | 0.00 | 80100 | | Billed |
| | | | Reviewed Hughes testimony and colloquy re testimony. | | | | | | | | |
| 03/30/2008 | 2170 | ERIC R. HAREN | | 0 | 3.50 | 1,225.00 | 3.50 | 0.00 | 80100 | | Billed |
| | | | Drafted portions of appellate brief. | | | | | | | | |
| 03/30/2008 | 1906 | THOMAS G. PULHAM | | 0 | 6.75 | 2,767.50 | 6.75 | 0.00 | 80100 | | Billed |
| | | | Researched attorney client privilege and admissibility of attorney testimony; drafted memorandum on Hughes testimony. | | | | | | | | |
| 03/31/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 0.25 | 175.00 | 0.25 | 0.00 | 80100 | | Billed |
| | | | Met with T. Pulham regarding appeal issues. | | | | | | | | |
| 03/31/2008 | 1906 | THOMAS G. PULHAM | | 0 | 10.00 | 4,100.00 | 10.00 | 0.00 | 80100 | | Billed |
| | | | Drafted memorandum on Hughes testimony issue; reviewed trial materials on admission of prior government summation. | | | | | | | | |
| 03/31/2008 | 2170 | ERIC R. HAREN | | 0 | 11.00 | 3,850.00 | 11.00 | 0.00 | 80100 | | Billed |
| | | | Drafted portions of appellate brief and discussed issues on appeal with T. Pulham, M. Meister, and M. Cox. | | | | | | | | |
| 03/31/2008 | 2089 | MELISSA A. MEISTER | | 0 | 2.50 | 1,112.50 | 2.50 | 0.00 | 80100 | | Billed |
| | | | Conference with Jenner team re Basham trial files and issues on appeal; contacted J. Swerling re Basham trial file; conference with T. Pulham re Hughes testimony. | | | | | | | | |
| 03/31/2008 | 1665 | KALI N. BRACEY | | 0 | 0.25 | 131.25 | 0.25 | 0.00 | 80100 | | Billed |
| | | | Reviewed Folks decision. | | | | | | | | |
| 03/31/2008 | 2161 | MELISSA A. COX | | 0 | 7.00 | 2,275.00 | 7.00 | 0.00 | 80100 | | Billed |
| | | | Researched case law regarding the impact of juror misconduct on defendant's right to a fair trial; developed outline for section of Fourth Circuit direct death penalty appeal regarding same. | | | | | | | | |
| 04/01/2008 | 2170 | ERIC R. HAREN | | 0 | 5.00 | 1,750.00 | 5.00 | 0.00 | 80100 | | Billed |
| | | | Drafted sections of appellate brief. | | | | | | | | |
| 04/01/2008 | 1665 | KALI N. BRACEY | | 0 | 3.75 | 1,968.75 | 3.75 | 0.00 | 80100 | | Billed |
| | | | Reviewed Folks opinion and T. Pulham's memo re Hughes issue; discussed status with T. Putnam; discussed letter to counsel re documents with M. Meister. | | | | | | | | |
| 04/01/2008 | 2161 | MELISSA A. COX | | 0 | 10.00 | 3,250.00 | 10.00 | 0.00 | 80100 | | Billed |
| | | | Wrote section of Fourth Circuit brief pertaining to juror mis-conduct; discussed with E. Haren options for motion to Fourth Circuit to obtain trial records from attorney in case below. | | | | | | | | |
| 04/01/2008 | 2166 | KIMBERLY A. MORRIS | | 0 | 0.25 | 81.25 | 0.25 | 0.00 | 80100 | | Billed |

**JA 5140**

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Researched ABA guidelines for methods to compel trial attorney to hand over evidence. | | | | | | | | |
| 04/01/2008 | 1906 | THOMAS G. PULHAM | | 0 | 12.25 | 5,022.50 | 12.25 | 0.00 | 80100 | | Billed |
| | | | Researched and drafted section of brief on use of dip outburst evidence in penalty phase. | | | | | | | | |
| 04/01/2008 | 6849 | KELLEN H. PARKER | | 0 | 4.00 | 600.00 | 4.00 | 0.00 | 80100 | | Billed |
| | | | Sorted through court material and prepared for scanning and OCR. | | | | | | | | |
| 04/01/2008 | 2089 | MELISSA A. MEISTER | | 0 | 3.50 | 1,557.50 | 3.50 | 0.00 | 80100 | | Billed |
| | | | Drafted letter to J. Swerling re Basham trial records; conference with Jenner appeal team re status of brief sections and issues for appeal. | | | | | | | | |
| 04/02/2008 | 2161 | MELISSA A. COX | | 0 | 10.00 | 3,250.00 | 10.00 | 0.00 | 80100 | | Billed |
| | | | Researched and wrote section of 4th circuit brief pertaining to extrajudicial contact. | | | | | | | | |
| 04/02/2008 | 2170 | ERIC R. HAREN | | 0 | 4.25 | 1,487.50 | 4.25 | 0.00 | 80100 | | Billed |
| | | | Drafted portions of appellate brief. | | | | | | | | |
| 04/02/2008 | 1906 | THOMAS G. PULHAM | | 0 | 12.00 | 4,920.00 | 12.00 | 0.00 | 80100 | | Billed |
| | | | Researched and drafted section of brief on improperly admitted evidence of future dangerousness. | | | | | | | | |
| 04/02/2008 | 6849 | KELLEN H. PARKER | | 0 | 5.00 | 750.00 | 5.00 | 0.00 | 80100 | | Billed |
| | | | Sent materials to Pitney to be scanned. Began OCR process. | | | | | | | | |
| 04/02/2008 | 9210 | BENJAMIN ROBBINS | | 0 | 3.00 | 660.00 | 3.00 | 0.00 | 80100 | | Billed |
| | | | Assisted K. Parker in OCRing and Optimizing multiple PDF documents. | | | | | | | | |
| 04/02/2008 | 2089 | MELISSA A. MEISTER | | 0 | 1.00 | 445.00 | 1.00 | 0.00 | 80100 | | Billed |
| | | | Conference with T. Sullivan re issues on appeal and visit to trial counsel; drafted letter to J. Swerling re retrieval of trial documents; conference with district court to retrieve sealed filings. | | | | | | | | |
| 04/03/2008 | 1665 | KALI N. BRACEY | | 0 | 1.00 | 525.00 | 1.00 | 0.00 | 80100 | | Billed |
| | | | Met with associates and discussed issues in brief. | | | | | | | | |
| 04/03/2008 | 2161 | MELISSA A. COX | | 0 | 9.00 | 2,925.00 | 9.00 | 0.00 | 80200 | | Billed |
| | | | Researched and wrote section of 4th circuit brief pertaining to extrajudicial contact. | | | | | | | | |
| 04/03/2008 | 2170 | ERIC R. HAREN | | 0 | 10.00 | 3,500.00 | 10.00 | 0.00 | 80100 | | Billed |
| | | | Drafted and edited portions of appellate brief. | | | | | | | | |
| 04/03/2008 | 1906 | THOMAS G. PULHAM | | 0 | 10.50 | 4,305.00 | 10.50 | 0.00 | 80100 | | Billed |
| | | | Researched and drafted email on competence issue; drafted section of brief on use of prosecutor's statement; edited draft sections of brief on improperly admitted evidence. | | | | | | | | |
| 04/03/2008 | 6849 | KELLEN H. PARKER | | 0 | 5.25 | 787.50 | 5.25 | 0.00 | 80100 | | Billed |
| | | | Compiled, organized and performed OCR on trial documents. | | | | | | | | |
| 04/03/2008 | 2089 | MELISSA A. MEISTER | | 0 | 6.75 | 3,003.75 | 6.75 | 0.00 | 80100 | | Billed |

**JA 5141**

# Time Report

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

| Date | SM/Task | Attorney Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Traveled to South Carolina (working in transit) to review trial record; reviewed trial record and arranged for transport of key documents back to D.C.; conference with J. Swerling re Basham trial. | | | | | | | | |
| 04/04/2008 | 2161 | MELISSA A. COX | 0 | 9.00 | 2,925.00 | 9.00 | 0.00 | 80100 | | Billed |
| | | Researched and wrote section of 4th circuit brief pertaining to extrajudicial contact. | | | | | | | | |
| 04/04/2008 | 2170 | ERIC R. HAREN | 0 | 9.00 | 3,150.00 | 9.00 | 0.00 | 80100 | | Billed |
| | | Completed draft section of appellate brief. | | | | | | | | |
| 04/05/2008 | 2161 | MELISSA A. COX | 0 | 11.00 | 3,575.00 | 11.00 | 0.00 | 80100 | | Billed |
| | | Researched and wrote section of 4th circuit brief pertaining to extrajudicial contact. | | | | | | | | |
| 04/05/2008 | 2089 | MELISSA A. MEISTER | 0 | 7.00 | 3,115.00 | 7.00 | 0.00 | 80100 | | Billed |
| | | Researched and drafted disqualification of counsel argument for appellate brief. | | | | | | | | |
| 04/06/2008 | 2161 | MELISSA A. COX | 0 | 10.00 | 3,250.00 | 10.00 | 0.00 | 80100 | | Billed |
| | | Researched and wrote section of 4th circuit brief pertaining to extrajudicial contact. | | | | | | | | |
| 04/06/2008 | 2170 | ERIC R. HAREN | 0 | 5.00 | 1,750.00 | 5.00 | 0.00 | 80100 | | Billed |
| | | Researched question of pre-trial commitment. | | | | | | | | |
| 04/06/2008 | 2089 | MELISSA A. MEISTER | 0 | 5.75 | 2,558.75 | 5.75 | 0.00 | 80100 | | Billed |
| | | Researched and drafted disqualification of counsel argument for appellate brief. | | | | | | | | |
| 04/07/2008 | 2170 | ERIC R. HAREN | 0 | 5.50 | 1,925.00 | 5.50 | 0.00 | 80100 | | Billed |
| | | Draft section of appellate brief addressing commitment to Butner. | | | | | | | | |
| 04/07/2008 | 2161 | MELISSA A. COX | 0 | 8.00 | 2,600.00 | 8.00 | 0.00 | 80100 | | Billed |
| | | Researched and wrote section of 4th Cir. brief regarding jury misconduct. | | | | | | | | |
| 04/07/2008 | 6849 | KELLEN H. PARKER | 0 | 2.50 | 375.00 | 2.50 | 0.00 | 80100 | | Billed |
| | | Scanned and performed OCR on remaining documents. Performed quality control on completed scanned files. | | | | | | | | |
| 04/07/2008 | 2089 | MELISSA A. MEISTER | 0 | 4.25 | 1,891.25 | 4.25 | 0.00 | 80100 | | Billed |
| | | Researched and drafted disqualification of counsel argument for appellate brief. | | | | | | | | |
| 04/08/2008 | 2170 | ERIC R. HAREN | 0 | 3.00 | 1,050.00 | 3.00 | 0.00 | 80100 | | Billed |
| | | Drafted portions of appellate brief. | | | | | | | | |
| 04/08/2008 | 2161 | MELISSA A. COX | 0 | 5.00 | 1,625.00 | 5.00 | 0.00 | 80100 | | Billed |
| | | Researched and wrote section of 4th Cir. brief regarding jury misconduct. | | | | | | | | |
| 04/08/2008 | 2180 | KRISTINA FILIPOVICH | 0 | 7.25 | 2,356.25 | 7.25 | 0.00 | 80100 | | Billed |
| | | Researched case law regarding various aspects of the investigation/hearing a judge must conduct into potential juror misconduct and juror prejudice; conferred with M. Cox regarding my research and other issues related to the appeal motion. | | | | | | | | |
| 04/09/2008 | 2170 | ERIC R. HAREN | 0 | 1.50 | 525.00 | 1.50 | 0.00 | 80100 | | Billed |

JA 5142

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Drafted portion of appellate brief. | | | | | | | | | | | |
| 04/09/2008 | 2161 | | MELISSA A. COX | 0 | 10.00 | 3,250.00 | 10.00 | 0.00 | 80100 | | Billed |
| Researched and wrote section of 4th Cir. brief regarding jury misconduct. | | | | | | | | | | | |
| 04/09/2008 | 1906 | | THOMAS G. PULHAM | 0 | 1.50 | 615.00 | 1.50 | 0.00 | 80100 | | Billed |
| Researched competency issues. | | | | | | | | | | | |
| 04/09/2008 | 2089 | | MELISSA A. MEISTER | 0 | 2.50 | 1,112.50 | 2.50 | 0.00 | 80100 | | Billed |
| Researched and drafted disqualification of counsel argument for appellate brief. | | | | | | | | | | | |
| 04/10/2008 | 2170 | | ERIC R. HAREN | 0 | 0.50 | 175.00 | 0.50 | 0.00 | 80100 | | Billed |
| Completed draft section of appellate brief and sent to M. Meister. | | | | | | | | | | | |
| 04/10/2008 | 2161 | | MELISSA A. COX | 0 | 10.00 | 3,250.00 | 10.00 | 0.00 | 80100 | | Billed |
| Researched and wrote section of 4th Cir. brief regarding jury misconduct. | | | | | | | | | | | |
| 04/10/2008 | 1906 | | THOMAS G. PULHAM | 0 | 1.25 | 512.50 | 1.25 | 0.00 | 80100 | | Billed |
| Reviewed cases on competence hearing; drafted section on competence. | | | | | | | | | | | |
| 04/10/2008 | 6849 | | KELLEN H. PARKER | 0 | 1.50 | 225.00 | 1.50 | 0.00 | 80100 | | Billed |
| Had remaining binder scanned and performed OCR on it. | | | | | | | | | | | |
| 04/10/2008 | 2089 | | MELISSA A. MEISTER | 0 | 5.25 | 2,336.25 | 5.25 | 0.00 | 80100 | | Billed |
| Researched and drafted disqualification of counsel argument for appellate brief; conference with appellate team re record evidence and issues for appeal. | | | | | | | | | | | |
| 04/11/2008 | 1665 | | KALI N. BRACEY | 0 | 0.25 | 131.25 | 0.25 | 0.00 | 80100 | | Billed |
| Discussed brief with M. Meister. | | | | | | | | | | | |
| 04/11/2008 | 2170 | | ERIC R. HAREN | 0 | 1.50 | 525.00 | 1.50 | 0.00 | 80100 | | Billed |
| Submitted Butner commitment draft to M. Meister. Began researching competency issue. | | | | | | | | | | | |
| 04/11/2008 | 2089 | | MELISSA A. MEISTER | 0 | 1.75 | 778.75 | 1.75 | 0.00 | 80100 | | Billed |
| Conference with K. Bracey re issues on appeal; draft and edit appellate brief. | | | | | | | | | | | |
| 04/12/2008 | 2170 | | ERIC R. HAREN | 0 | 4.00 | 1,400.00 | 4.00 | 0.00 | 80100 | | Billed |
| Researched competency issue and drafted text listing competency standard and discussing court's obligation to raise issue sua sponte. | | | | | | | | | | | |
| 04/12/2008 | 2089 | | MELISSA A. MEISTER | 0 | 8.25 | 3,671.25 | 8.25 | 0.00 | 80100 | | Billed |
| Researched and prepared first draft of appellate brief. | | | | | | | | | | | |
| 04/13/2008 | 2170 | | ERIC R. HAREN | 0 | 1.00 | 350.00 | 1.00 | 0.00 | 80100 | | Billed |
| Completed and sent competency draft to M. Meister. | | | | | | | | | | | |
| 04/13/2008 | 2161 | | MELISSA A. COX | 0 | 1.75 | 568.75 | 1.75 | 0.00 | 80100 | | Billed |
| Call with M. Meister regarding her edits to draft of juror misconduct section of brief; discussion with E. Haren regarding same and regarding competency and disqualification issues for 4th Circuit brief. | | | | | | | | | | | |

JA 5143

# Time Report

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|
| | | | Reviewed initial draft of brief; telephone conference with K. Bracey and S. Ascher regarding same. | | | | | | | | |
| 04/16/2008 | 2170 | ERIC R. HAREN | | 0 | 1.00 | 350.00 | 1.00 | 0.00 | 80100 | | Billed |
| | | | Completed statement of the case. Conference with T. Pulham and M. Meister. | | | | | | | | |
| 04/16/2008 | 2066 | STEPHEN L. ASCHER | | 0 | 4.25 | 2,868.75 | 4.25 | 0.00 | 80100 | | Billed |
| | | | Reviewed background materials and reviewed and revised draft brief; office conference with K.Bracey, D.DeBruin. | | | | | | | | |
| 04/16/2008 | 2161 | MELISSA A. COX | | 0 | 4.00 | 1,300.00 | 4.00 | 0.00 | 80100 | | Billed |
| | | | Completed draft of factual background regarding juror misconduct issue; discussion with M. Meister regarding regarding-assignment of juror misconduct section of brief; email to M. Meister and D. DeBruin regarding same. | | | | | | | | |
| 04/16/2008 | 1906 | THOMAS G. PULHAM | | 0 | 8.25 | 3,382.50 | 8.25 | 0.00 | 80100 | | Billed |
| | | | Researched and drafted jurisdictional statement; drafted questions presented; researched and drafted cumulative error argument. | | | | | | | | |
| 04/16/2008 | 2089 | MELISSA A. MEISTER | | 0 | 5.25 | 2,336.25 | 5.25 | 0.00 | 80100 | | Billed |
| | | | Drafted and edited appellate brief and statement of facts; conference with J. Swerling re trial issues; conference with Jenner appellate team re brief sections; conference with USDC-SC re documents needed for appeal. | | | | | | | | |
| 04/17/2008 | 1665 | KALI N. BRACEY | | 0 | 1.50 | 787.50 | 1.50 | 0.00 | 80100 | | Billed |
| | | | Met with T. Pulham re facts section ; met with M. Meister re commitment section; reviewed competency section. | | | | | | | | |
| 04/17/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 1.00 | 700.00 | 1.00 | 0.00 | 80100 | | Billed |
| | | | Reviewed and responded to correspondence regarding possible further extension of time and other issues. | | | | | | | | |
| 04/17/2008 | 2170 | ERIC R. HAREN | | 0 | 2.00 | 700.00 | 2.00 | 0.00 | 80100 | | Billed |
| | | | Conference with T. Pulham and S. Ascher re reorganizations. Discussions with others about various aspects of case. | | | | | | | | |
| 04/17/2008 | 1906 | THOMAS G. PULHAM | | 0 | 4.25 | 1,742.50 | 4.25 | 0.00 | 80100 | | Billed |
| | | | Reviewed government argument from Fulks trial; conference call with S. Ascher re: changes to brief. | | | | | | | | |
| 04/17/2008 | 2066 | STEPHEN L. ASCHER | | 0 | 0.75 | 506.25 | 0.75 | 0.00 | 80100 | | Billed |
| | | | Office conference with Haren, Pullam. | | | | | | | | |
| 04/17/2008 | 6849 | KELLEN H. PARKER | | 0 | 2.00 | 300.00 | 2.00 | 0.00 | 80100 | | Billed |
| | | | Corrected scanning error with document. Re-scanned and performed OCR. | | | | | | | | |
| 04/17/2008 | 2089 | MELISSA A. MEISTER | | 0 | 7.50 | 3,337.50 | 7.50 | 0.00 | 80100 | | Billed |
| | | | Drafted and edited appellate brief and statement of facts; conference with Jenner appellate team re brief sections; drafted motions for extension of time, extension of the page limit, and deferred appendix. | | | | | | | | |
| 04/18/2008 | 1665 | KALI N. BRACEY | | 0 | 0.25 | 131.25 | 0.25 | 0.00 | 80100 | | Billed |
| | | | Reviewed draft motion. | | | | | | | | |
| 04/18/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 0.75 | 525.00 | 0.75 | 0.00 | 80100 | | Billed |
| | | | Reviewed and responded to correspondence with M. Cox regarding juror misconduct issue; reviewed and responded to correspondence regarding motion for extension of time and other issues. | | | | | | | | |

JA 5144

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|
| 04/18/2008 | 2170 | | ERIC R. HAREN | 0 | 10.00 | 3,500.00 | 10.00 | 0.00 | 80100 | | Billed |
| Edited portion of appellate brief. | | | | | | | | | | | |
| 04/18/2008 | 1906 | | THOMAS G. PULHAM | 0 | 3.25 | 1,332.50 | 3.25 | 0.00 | 80100 | | Billed |
| Read draft of brief; researched admissibility of evidence under the Federal Death Penalty Act. | | | | | | | | | | | |
| 04/18/2008 | 2089 | | MELISSA A. MEISTER | 0 | 0.75 | 333.75 | 0.75 | 0.00 | 80100 | | Billed |
| Prepared motions for extension of time, extension of page limit, and deferred joint appendix; conference with J. Swerling re trial documents needed for appeal. | | | | | | | | | | | |
| 04/19/2008 | 1906 | | THOMAS G. PULHAM | 0 | 4.00 | 1,640.00 | 4.00 | 0.00 | 80100 | | Billed |
| Researched admissibility of evidence in federal capital prosecutions. | | | | | | | | | | | |
| 04/20/2008 | 1665 | | KALI N. BRACEY | 0 | 1.50 | 787.50 | 1.50 | 0.00 | 80100 | | Billed |
| Reviewed draft of brief. | | | | | | | | | | | |
| 04/20/2008 | 2170 | | ERIC R. HAREN | 0 | 0.75 | 262.50 | 0.75 | 0.00 | 80100 | | Billed |
| Researched for new draft of appellate brief. | | | | | | | | | | | |
| 04/20/2008 | 1906 | | THOMAS G. PULHAM | 0 | 6.25 | 2,562.50 | 6.25 | 0.00 | 80100 | | Billed |
| Drafted relevant law subsection for penalty phase section of brief. | | | | | | | | | | | |
| 04/21/2008 | 0688 | | DAVID W. DEBRUIN | 0 | 0.50 | 350.00 | 0.50 | 0.00 | 80100 | | Billed |
| Met with M. Cox regarding case. | | | | | | | | | | | |
| 04/21/2008 | 2170 | | ERIC R. HAREN | 0 | 2.00 | 700.00 | 2.00 | 0.00 | 80100 | | Billed |
| Finished draft section of brief and sent to S. Ascher. | | | | | | | | | | | |
| 04/21/2008 | 2161 | | MELISSA A. COX | 0 | 10.00 | 3,250.00 | 10.00 | 0.00 | 80100 | | Billed |
| Researched and wrote section of 4th Circuit brief on juror prejudice from extrajudicial contacts; conferred with D. DeBruin regarding same. | | | | | | | | | | | |
| 04/21/2008 | 1665 | | KALI N. BRACEY | 0 | 0.25 | 131.25 | 0.25 | 0.00 | 80100 | | Billed |
| Reviewed competency draft. | | | | | | | | | | | |
| 04/21/2008 | 1906 | | THOMAS G. PULHAM | 0 | 10.50 | 4,305.00 | 10.50 | 0.00 | 80100 | | Billed |
| Revised penalty phase section of brief. | | | | | | | | | | | |
| 04/21/2008 | 2066 | | STEPHEN L. ASCHER | 0 | 1.50 | 1,012.50 | 1.50 | 0.00 | 80100 | | Billed |
| Review intrinsic evidence cases and various memos; revised draft of intrinsic evidence section. | | | | | | | | | | | |
| 04/22/2008 | 2161 | | MELISSA A. COX | 0 | 2.00 | 650.00 | 2.00 | 0.00 | 80100 | | Billed |
| Researched and wrote section of 4th Circuit brief on juror prejudice from extrajudicial contacts. | | | | | | | | | | | |
| 04/22/2008 | 1665 | | KALI N. BRACEY | 0 | 0.25 | 131.25 | 0.25 | 0.00 | 80100 | | Billed |
| Drafted email re competency issue; sent same to S. Ascher and D. DeBruin. | | | | | | | | | | | |
| 04/22/2008 | 1906 | | THOMAS G. PULHAM | 0 | 2.50 | 1,025.00 | 2.50 | 0.00 | 80100 | | Billed |
| Researched and drafted email re: Rule 801(d)(2)(D); reviewed transcript for citations. | | | | | | | | | | | |

**JA 5145**

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/22/2008 | 2066 | | STEPHEN L. ASCHER | 0 | 0.50 | 337.50 | 0.50 | 0.00 | 80100 | | Billed |
| Reviewed various materials. | | | | | | | | | | | |
| 04/22/2008 | 2089 | | MELISSA A. MEISTER | 0 | 8.50 | 3,782.50 | 8.50 | 0.00 | 80100 | | Billed |
| Drafted statement of facts and appellate brief. | | | | | | | | | | | |
| 04/23/2008 | 2170 | | ERIC R. HAREN | 0 | 1.50 | 525.00 | 1.50 | 0.00 | 80100 | | Billed |
| Researched issue forfeiture question and searched record. | | | | | | | | | | | |
| 04/23/2008 | 2089 | | MELISSA A. MEISTER | 0 | 3.25 | 1,446.25 | 3.25 | 0.00 | 80100 | | Billed |
| Met with E. Haren re 404(b) issues; met with M. Cox re juror misconduct issues; drafted and edited statement of facts. | | | | | | | | | | | |
| 04/24/2008 | 1906 | | THOMAS G. PULHAM | 0 | 0.25 | 102.50 | 0.25 | 0.00 | 80100 | | Billed |
| Reviewed draft brief. | | | | | | | | | | | |
| 04/24/2008 | 2066 | | STEPHEN L. ASCHER | 0 | 3.50 | 2,362.50 | 3.50 | 0.00 | 80100 | | Billed |
| Office conference with D.Tehrani (x3) regarding motion to dismiss brief and various research issues; reviewed and revised brief (x2). | | | | | | | | | | | |
| 04/25/2008 | 0688 | | DAVID W. DEBRUIN | 0 | 0.50 | 350.00 | 0.50 | 0.00 | 80100 | | Billed |
| Prepared and responded to correspondence with S. Ascher. | | | | | | | | | | | |
| 04/25/2008 | 2170 | | ERIC R. HAREN | 0 | 3.00 | 1,050.00 | 3.00 | 0.00 | 80100 | | Billed |
| Conference call to discuss statement of facts. Discussed 404(b) issues with S. Ascher. | | | | | | | | | | | |
| 04/25/2008 | 2161 | | MELISSA A. COX | 0 | 1.75 | 568.75 | 1.75 | 0.00 | 80100 | | Billed |
| Reviewed latest version of Statement of Facts; attended teleconference with S. Ascher, M. Meister, E. Haren, and T. Pulham regarding same. | | | | | | | | | | | |
| 04/25/2008 | 1906 | | THOMAS G. PULHAM | 0 | 6.50 | 2,665.00 | 6.50 | 0.00 | 80100 | | Billed |
| Reviewed draft; researched Rule 404(b); conference call re: statement of facts. | | | | | | | | | | | |
| 04/25/2008 | 2066 | | STEPHEN L. ASCHER | 0 | 7.50 | 5,062.50 | 7.50 | 0.00 | 80100 | | Billed |
| Office conference with K.Bracey, M.Meister et al. regarding appellate brief; office conference with E.Haren regarding brief; reviewed indictment and drafted section of brief; prepared for office conference; reviewed materials and emails regarding same; reviewed briefs and rulings regarding 404(b) issues, draft brief excerpt, and emails with E.Haren and T.Pulham regarding research questions on same. | | | | | | | | | | | |
| 04/25/2008 | 1665 | | KALI N. BRACEY | 0 | 2.25 | 1,181.25 | 2.25 | 0.00 | 80100 | | Billed |
| Reviewed draft; met with T. Pulham; participated in conference call with team. | | | | | | | | | | | |
| 04/25/2008 | 2089 | | MELISSA A. MEISTER | 0 | 1.00 | 445.00 | 1.00 | 0.00 | 80100 | | Billed |
| Prepared statement of facts for appellate brief. | | | | | | | | | | | |
| 04/26/2008 | 0688 | | DAVID W. DEBRUIN | 0 | 1.25 | 875.00 | 1.25 | 0.00 | 80100 | | Billed |
| Reviewed and responded to extensive correspondence regarding appeal issues. | | | | | | | | | | | |
| 04/26/2008 | 2170 | | ERIC R. HAREN | 0 | 4.00 | 1,400.00 | 4.00 | 0.00 | 80100 | | Billed |
| Researched 404(b) and conspiracy issues. | | | | | | | | | | | |

**JA 5146**

# Time Report

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|
| | | | Finished appellate brief and emails regarding same. | | | | | | | | |
| 05/12/2008 | 1906 | | THOMAS G. PULHAM | 0 | 6.75 | 2,767.50 | 6.75 | 0.00 | 80100 | | Billed |
| | | | Cite checked draft; reviewed and responded to correspondence re: final issues. | | | | | | | | |
| 05/12/2008 | 2089 | | MELISSA A. MEISTER | 0 | 13.50 | 6,007.50 | 13.50 | 0.00 | 80100 | | Billed |
| | | | Drafted, edited, and prepared opening appellate brief; arranged for filing of brief in 4th Circuit; drafted and edited appendix excerpt letter. | | | | | | | | |
| 05/13/2008 | 2161 | | MELISSA A. COX | 0 | 5.25 | 1,706.25 | 5.25 | 0.00 | 80100 | | Billed |
| | | | Cite-checked brief; drafted "summary of argument" for special verdict section of brief; proof-read brief; conferred w/ E. Haren, M. Meister, and T. Pulham regarding need for designation of sources to be cited in deferred joint appendix. | | | | | | | | |
| 05/13/2008 | 2170 | | ERIC R. HAREN | 0 | 3.00 | 1,050.00 | 3.00 | 0.00 | 80100 | | Billed |
| | | | Readied appellate brief for filing and sent brief to printer for filing. | | | | | | | | |
| 05/13/2008 | 2066 | | STEPHEN L. ASCHER | 0 | 1.00 | 675.00 | 1.00 | 0.00 | 80100 | | Billed |
| | | | Finalized brief. | | | | | | | | |
| 05/13/2008 | 1906 | | THOMAS G. PULHAM | 0 | 0.25 | 102.50 | 0.25 | 0.00 | 80100 | | Billed |
| | | | Reviewed filing related to deferred appendix. | | | | | | | | |
| 05/13/2008 | 2089 | | MELISSA A. MEISTER | 0 | 5.00 | 2,225.00 | 5.00 | 0.00 | 80100 | | Billed |
| | | | Drafted and edited appellate brief; arranged for filing of brief in 4th Circuit; drafted and edited appendix excerpt letter. | | | | | | | | |
| 05/15/2008 | 2089 | | MELISSA A. MEISTER | 0 | 0.75 | 333.75 | 0.75 | 0.00 | 80100 | | Billed |
| | | | Reviewed appellate filings; conference with Government counsel re extension of time to file responsive brief. | | | | | | | | |
| 05/29/2008 | 2089 | | MELISSA A. MEISTER | 0 | 0.25 | 111.25 | 0.25 | 0.00 | 80100 | | Billed |
| | | | Reviewed Government's motion for an extension of time. | | | | | | | | |
| 07/09/2008 | 2170 | | ERIC R. HAREN | 0 | 0.25 | 87.50 | 0.25 | 0.00 | 80100 | | Billed |
| | | | Talked with T. Pulham and M. Meister re issues in case and potential summer associate assignments. | | | | | | | | |
| 07/09/2008 | 2089 | | MELISSA A. MEISTER | 0 | 0.50 | 222.50 | 0.50 | 0.00 | 80100 | | Billed |
| | | | Coordinated assignments for reply brief. | | | | | | | | |
| 07/13/2008 | 1906 | | THOMAS G. PULHAM | 0 | 2.00 | 820.00 | 2.00 | 0.00 | 80100 | | Billed |
| | | | Reviewed final version of Basham brief to help prepare summer assignments. | | | | | | | | |
| 07/14/2008 | 2066 | | STEPHEN L. ASCHER | 0 | 0.50 | 337.50 | 0.50 | 0.00 | 80100 | | Billed |
| | | | Office conference with H. Horowitz re legal research. | | | | | | | | |
| 07/14/2008 | 9267 | | HAYLEY HOROWITZ | 0 | 0.50 | 80.00 | 0.50 | 0.00 | 80100 | | Billed |
| | | | Met with S. Ascher to discuss overview of case and possible assignments. | | | | | | | | |
| 07/16/2008 | 0688 | | DAVID W. DEBRUIN | 0 | 0.25 | 175.00 | 0.25 | 0.00 | 80100 | | Billed |
| | | | Office conference with M. Cox regarding reply brief. | | | | | | | | |

JA 5147

BASHAM BRANDON / DEATH PENALTY DIRECT APPEAL (63020-10004)

| Date | SM/Task | Attorney | Name | Rate | Orig Hrs | Orig Amt | Rev Hrs | Rev Amt | Service | Activity | Status |
|------|---------|----------|------|------|----------|----------|---------|---------|---------|----------|--------|
| 10/23/2008 | 2066 | STEPHEN L. ASCHER | | 0 | 3.00 | 2,025.00 | 3.00 | 0.00 | 89000 | | Billed |
| Prepared for moot court; listened to moot court. | | | | | | | | | | | |
| 10/23/2008 | 2170 | ERIC R. HAREN | | 0 | 2.00 | 700.00 | 2.00 | 0.00 | 89000 | | Billed |
| Participated in moot court. | | | | | | | | | | | |
| 10/24/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 1.00 | 700.00 | 1.00 | 0.00 | 89000 | | Billed |
| Met with M. Meister regarding comments on moot court; reviewed and responded to correspondence regarding splitting oral argument. | | | | | | | | | | | |
| 10/28/2008 | 1665 | KALI N. BRACEY | | 0 | 1.50 | 787.50 | 1.50 | 0.00 | 89000 | | Billed |
| Reviewed briefs in order to prepare for moot. | | | | | | | | | | | |
| 10/28/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 0.25 | 175.00 | 0.25 | 0.00 | 89000 | | Billed |
| Reviewed and responded to correspondence regarding oral argument. | | | | | | | | | | | |
| 10/28/2008 | 2066 | STEPHEN L. ASCHER | | 0 | 1.00 | 675.00 | 1.00 | 0.00 | 89000 | | Billed |
| Prepared for oral argument. | | | | | | | | | | | |
| 10/29/2008 | 6838 | SAMUEL C. GRAY | | 0 | 1.25 | 187.50 | 1.25 | 0.00 | 89000 | | Billed |
| Reintegrated case law into binders for M. Meister | | | | | | | | | | | |
| 10/29/2008 | 1665 | KALI N. BRACEY | | 0 | 4.75 | 2,493.75 | 4.75 | 0.00 | 89000 | | Billed |
| Reviewed briefs and participated in moot. | | | | | | | | | | | |
| 10/29/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 2.25 | 1,575.00 | 2.25 | 0.00 | 89000 | | Billed |
| Participated in second moot court and discussion. | | | | | | | | | | | |
| 10/29/2008 | 2066 | STEPHEN L. ASCHER | | 0 | 5.50 | 3,712.50 | 5.50 | 0.00 | 89000 | | Billed |
| Moot court; prepped for same and travel to DC for same. | | | | | | | | | | | |
| 10/29/2008 | 2170 | ERIC R. HAREN | | 0 | 2.50 | 875.00 | 2.50 | 0.00 | 89000 | | Billed |
| Attended moot court. | | | | | | | | | | | |
| 10/30/2008 | 1665 | KALI N. BRACEY | | 0 | 3.00 | 1,575.00 | 3.00 | 0.00 | 89000 | | Billed |
| Traveled to Richmond, VA for oral argument. | | | | | | | | | | | |
| 10/30/2008 | 0688 | DAVID W. DEBRUIN | | 0 | 1.00 | 700.00 | 1.00 | 0.00 | 89000 | | Billed |
| Worked on oral argument issues. | | | | | | | | | | | |
| 10/30/2008 | 2066 | STEPHEN L. ASCHER | | 0 | 3.50 | 2,362.50 | 3.50 | 0.00 | 89000 | | Billed |
| Travel to Richmond, VA, for oral argument; office conference with M. Meister re prep. | | | | | | | | | | | |
| 10/30/2008 | 2170 | ERIC R. HAREN | | 0 | 3.00 | 1,050.00 | 3.00 | 0.00 | 89000 | | Billed |
| Traveled to Richmond, VA, for oral argument. | | | | | | | | | | | |
| 10/31/2008 | 1665 | KALI N. BRACEY | | 0 | 4.00 | 2,100.00 | 4.00 | 0.00 | 89000 | | Billed |
| Attended oral argument and traveled from same. | | | | | | | | | | | |

**JA 5148**

| From: | Meister, Melissa A. |
|---|---|
| Sent: | Friday, May 09, 2008 11:38 AM |
| To: | DeBruin, David W; Ascher, Stephen L. |
| Cc: | Bracey, Kali N; Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G |
| Subject: | RE: Proffer Facts |

The case was originally handled out of the Florence Division, then transferred up to Columbia.

I apologize for not being clear...you asked for as many facts as possible regarding the actual proffer conference, which I attempted to provide. I do NOT think that what Littlejohn and Monckton were doing on the 28th was plea negotiations, though they argued that below. I think that's a loser argument, given that a government attorney was not present at the search.

The judge's order, like most of his orders, took the government's argument, the defense counsel's arguments, and mashed them up into a gruel of law. The judge seems to have attempted, rather poorly, to analyze the potential conflict inherent in Monckton and Littlejohn's continued representation without actually ruling on the issue. The exactly outline of his argument is the following:

1. It costs a lot to try a death penalty case, therefore, I need to foresee problems about representation.
2. Defense counsel might want to introduce their own statements in penalty phase, which would be awkward if they lost at guilt phase, which may color how they choose to use the Littlejohn statements.
3. Government could want to use Littlejohn statements in Fulks trial since, in that statement, Basham says Fulks strangled and stabbed Donovan.
4. There is a conflict as to whether Basham authorized his attorneys to make that statement (that's bull -- it was clear in the motions that counsel raised it to demonstrate that Littlejohn's statements were not within the scope of his authority)
5. Basham could use this as a potential ineffective assistance of counsel argument later on (though at hearing, the Judge acknowledged he'd probably get an appeal whichever way he ruled)
6. Court is unpersuaded that this would screw Basham because he's had the attorneys for such little time
7. Court is unpersuaded that this would hurt other defense counsel because this was a unique circumstance

I still think the strongest argument is that it was error to disqualify counsel without making a ruling on admission, and perhaps we need to augment that section. The law is clear that you can't disqualify counsel without an ACTUAL conflict or a SERIOUS POTENTIAL for conflict.

Second, though, and maybe this is just my criminal inexperience coming out, it strikes me as ludicrous that _everything_ that is said during a rather tense and moment-by-moment search is automatically admissible simply because a proffer was denied. I would agree that the details of the search, any statements made by Basham, any statement made by counsel regarding the scope of their authority would come in...counsel didn't contest that, and indeed, everything about that day other than the Littlejohn statement came in. Attorneys still have a right to say, look, I can try to help locate a body, but this isn't my client's confession, it's not within the scope of my authority, and if I tell you, this statement can't be used in court, either by you or me. The Government really hammered below that defense counsel was attempting to use this as both a sword and a shield, that had the body been found, defense counsel would have wanted this statement to come in, but that's bull. Had the body been found, defense counsel could have said - Basham led police on an expedition which resulted in Donovan's body being found. The actual statement would have been inadmissible for both the defense and the prosecution. The judge failed to focus on that below -- inadmissibility goes both ways.

| From: | DeBruin, David W |
|---|---|
| Sent: | Friday, May 09, 2008 9:31 AM |
| To: | Ascher, Stephen L.; Meister, Melissa A. |
| Cc: | Bracey, Kali N; Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G |
| Subject: | FW: Proffer Facts |

I am not sure I understand everything here, but it does seem to color and weaken the argument significantly.

First of all, you refer in the facts that "Columbia ... would be made aware," as if Parham were not Columbia. Can you explain?

JENNER_BLOCK



DEFENDANT'S
EXHIBIT

JA 5149

| From: | Ascher, Stephen L. |
|---|---|
| Sent: | Friday, May 09, 2008 10:32 AM |
| To: | DeBruin, David W; Meister, Melissa A. |
| Cc: | Bracey, Kali N; Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G |
| Subject: | RE: Proffer Facts |

The judge's opinion certainly seems reasonable enough, read in a vacuum.... Apparently, Basham also claimed that Littlejohn's statements to the police were not authorized, creating a significant potential conflict between lawyer and client. That conflict also seems like adequate grounds for disqualification.... If we retain this argument, I would move it to the end of the brief. I think it strains credibility to argue that Basham had a protectible relationship with appointed counsel who had represented him for only a few weeks and that he had already accused of disregarding his instructions. While all of our arguments are subject to powerful rebuttals by the government, this argument grabs me the least.

| From: | DeBruin, David W |
|---|---|
| Sent: | Friday, May 09, 2008 9:31 AM |
| To: | Ascher, Stephen L.; Meister, Melissa A. |
| Cc: | Bracey, Kali N; Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G |
| Subject: | FW: Proffer Facts |

I am not sure I understand everything here, but it does seem to color and weaken the argument significantly.

First of all, you refer in the facts that "Columbia ... would be made aware," as if Parham were not Columbia. Can you explain?

I also can't understand the judge's reasoning from your summary. As to the first point, was the judge's concern that Littlejohn and Munckton would have argued in the guilt phase that Basham was somehow innocent, and then have to turn around in sentencing and testify that they knew all along that Basham had made these statements to them? And as to the second point, why would the government want to introduce the statements at Basham's trial "to argue that Fulks had been the one who committed the murder"? That does not make any sense to me -- what am I missing? Why would the government ever so argue? The third concern also must somehow follow from the first two.

On balance, the additional facts, and the judge's reasoning (if clarified), seem to create a much greater risk that the statements could be admissible and, if so, create a conflict for the attorneys.

Your first paragraph suggests that you think an argument could be made that the statements were, in fact, part of negotiations with the government (because the government admitted the cooperation "would be considered"). I suppose we could develop that, but I am not sure it is different from what every cop tells every person who is arrested -- go ahead and confess, and the government will take that fact into consideration. The confession is still admissible, I believe.

And maybe the judge's logic was just wrong. But it seems that the argument perhaps must hinge more on that, which we don't presently do.

Let me know your thoughts on the above questions, and I will consider how best to revise the section. Thanks.

| From: | Meister, Melissa A. |
|---|---|
| Sent: | Thursday, May 08, 2008 3:32 PM |
| To: | DeBruin, David W |
| Subject: | Proffer Facts |

Here is a short workup of the facts regarding the declined proffer and the gov'ts argument and the district court's further reasoning. Please let me know if you require something further.

I'll get you a *Daniels v. Lafler* << File: Proffer Facts.doc >> footnote in a bit.

**Melissa A. Meister**

JENNER_BLOCK

1

**JA 5150**

JENNER_BLOCK

| From: | DeBruin, David W |
|---|---|
| Sent: | Friday, May 09, 2008 9:31 AM |
| To: | Ascher, Stephen L.; Meister, Melissa A. |
| Cc: | Bracey, Kali N; Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G |
| Subject: | FW: Proffer Facts |

I am not sure I understand everything here, but it does seem to color and weaken the argument significantly.

First of all, you refer in the facts that "Columbia ... would be made aware," as if Parham were not Columbia. Can you explain?

I also can't understand the judge's reasoning from your summary. As to the first point, was the judge's concern that Littlejohn and Munckton would have argued in the guilt phase that Basham was somehow innocent, and then have to turn around in sentencing and testify that they knew all along that Basham had made these statements to them? And as to the second point, why would the government want to introduce the statements at Basham's trial "to argue that Fulks had been the one who committed the murder"? That does not make any sense to me -- what am I missing? Why would the government ever so argue? The third concern also must somehow follow from the first two.

On balance, the additional facts, and the judge's reasoning (if clarified), seem to create a much greater risk that the statements could be admissible and, if so, create a conflict for the attorneys.

Your first paragraph suggests that you think an argument could be made that the statements were, in fact, part of negotiations with the government (because the government admitted the cooperation "would be considered"). I suppose we could develop that, but I am not sure it is different from what every cop tells every person who is arrested -- go ahead and confess, and the government will take that fact into consideration. The confession is still admissible, I believe.

And maybe the judge's logic was just wrong. But it seems that the argument perhaps must hinge more on that, which we don't presently do

Let me know your thoughts on the above questions, and I will consider how best to revise the section. Thanks.

| From: | Meister, Melissa A. |
|---|---|
| Sent: | Thursday, May 08, 2008 3:32 PM |
| To: | DeBruin, David W |
| Subject: | Proffer Facts |

Here is a short workup of the facts regarding the declined proffer and the gov'ts argument and the district court's further reasoning. Please let me know if you require something further.



Proffer Facts.doc

I'll get you a *Daniels v. Lafler*          footnote in a bit.

**Melissa A. Meister**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
http://www.jenner.com/

1

**JA 5151**

| From: | DeBruin, David W |
|---|---|
| Sent: | Friday, May 09, 2008 9:00 AM |
| To: | Ascher, Stephen L. |
| Subject: | RE: Basham: DQ motion |

Apparently, the day before the search for the body, Littlejohn and Munckton proposed that there could be a search, but that any statements made would only be by way of inadmissible proffer. The government rejected that proposal. Thus, it now seems to me that the government had a much better argument why the statements were, in fact, admissible. And why the judge's disqualification, based on potential admissibility, seems more reasonable. So the argument you always felt was weak may now be significantly weaker still. What I am about to check is whether the proposal was that any statements by BASHAM would be by way of inadmissible proffer, still preserving our claim that the lawyer's "hypothetical" statements were clearly inadmissible.

Melissa was very aware of this and had tried to "argue around it" in her draft, yet her extremely detailed facts had never mentioned the point. As a result, I had no idea why there were these cryptic passages in the argument, which I simply took out. That is what prompted Melissa to explain.

**From:** Ascher, Stephen L.
**Sent:** Friday, May 09, 2008 8:38 AM
**To:** DeBruin, David W
**Subject:** RE: Basham: DQ motion

What's the very harmful fact?

**From:** DeBruin, David W
**Sent:** Friday, May 09, 2008 8:32 AM
**To:** Ascher, Stephen L.
**Subject:** RE: Basham: DQ motion

I need to revise it, which I hope to do now. Unfortunately, Melissa had not disclosed a very harmful fact in her draft, which she told me about yesterday. I am exploring it further, but it could take a significant amount of wind out of our already somewhat weak sails on this argument.

In any event, no need to thank me. You have done a fantastic job here, and I am deeply grateful. I now realize that I handled this project very poorly. I assumed I could let the associates run with this, led by Melissa Meister. I should have been more involved, or gotten help, much earlier, in evaluating the facts and potential issues. But you are doing a great job of "damage control." And I do believe there are some substantial arguments, particularly the juror misconduct and penalty phase arguments (and maybe guilt phase too -- I have not yet read the redraft there, to see whether we are able to show relevance to a disputed issue at the guilt phase). I did not mean for this to fall so much on your shoulders.

**From:** Ascher, Stephen L.
**Sent:** Thursday, May 08, 2008 10:07 PM
**To:** DeBruin, David W
**Subject:** RE: Basham: DQ motion

Thanks again for stepping back in to do this piece.

**Stephen L. Ascher**
Jenner & Block LLP

1



DEFENDANT'S
EXHIBIT

JA 5152

| From: | DeBruin, David W |
| Sent: | Thursday, May 08, 2008 8:25 PM |
| To: | Ascher, Stephen L.; Bracey, Kali N; Meister, Melissa A.; Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G |
| Subject: | Competency |

I have reviewed some of the competency materials in the trial court. The original motion of Littlejohn and Monckton was very bare bones -- there is nothing that provides independent support of a competency issue, which should have put the court on notice of an independent obligation to assess competency. And, separately, counsel requested and received funds from the court for the retention of a psychiatrist. It appears the psychiatrist later produced an affidavit claiming that Basham was mentally ill, but not questioning his competency. The government then moved on its own for a competency determination (presumably because it wanted to conduct its own psychiatric exam of Basham), and Basham's subsequent counsel opposed that motion. So the competency issue appears mixed and complex, and I am reluctant to go down that road without knowing more than I do about the record.

1

JENNER_BLOCK



DEFENDANT'S
EXHIBIT

JA 5153

| From: | Cox, Melissa A. |
| Sent: | Tuesday, May 06, 2008 8:04 PM |
| To: | DeBruin, David W |
| Cc: | Bracey, Kali N; Meister, Melissa A. |
| Subject: | RE: List of Motions Made |

Dave,
Kali and I just spoke about this. We are convinced that there are issues here worth presenting on appeal, but, if you agree, we thought it would be helpful to talk to trial counsel below to see if he recalled anything that was troubling during the jury selection, which might not be apparent from the transcript.

Melissa,
What do you think, given our history with trial counsel, would be the best approach to convincing him to give us 5 minutes tomorrow? I can fill you in if you'd like to call. but I'm also happy to contact him myself or go through Sullivan. While he might not be responsive, there doesn't seem to be any harm in trying.

Thanks.

-----Original Message-----
From: Bracey, Kali N
Sent: Tuesday, May 06, 2008 6:55 PM
To: Cox, Melissa A.
Subject: FW: List of Motions Made

I took a quick look at this at Dave's request. I didn't see much here but I'd be interested to hear your opinion as someone who is more familiar with jury issues than I am. If you have a minute, shoot me an email or give me a call. I'll be here for a bit. X6871.

Thanks

-----Original Message-----
From: DeBruin, David W
Sent: Tuesday, May 06, 2008 12:13 PM
To: Bracey, Kali N
Cc: Ascher, Stephen L.
Subject: FW: List of Motions Made

Kali, do you think you could assess this? Are there any issues here that should be presented, even if very briefly?

-----Original Message-----
From: Cox, Melissa A.
Sent: Tuesday, May 06, 2008 11:26 AM
To: DeBruin, David W; Meister, Melissa A.; Ascher, Stephen L.; Bracey, Kali N
Cc: Haren, Eric R.; Pulham, Thomas G
Subject: RE: List of Motions Made

JENNER_BLOCK

1


DEFENDANT'S
EXHIBIT

JA 5154

Here is a condensed copy of the jury selection chronology. It shows details of the three jurors we discussed previously who the defense counsel moved to strike for cause - including Hartsoe and Doby, the two jurors Wilson telephoned repeatedly both before and after her calls to the media.

-----Original Message-----
From: DeBruin, David W
Sent: Tuesday, May 06, 2008 6:29 AM
To: Meister, Melissa A.; Ascher, Stephen L.; Bracey, Kali N
Cc: Haren, Eric R.; Pulham, Thomas G; Cox, Melissa A.
Subject: RE: List of Motions Made

Did you also include objections or oral motions, like to strike a juror for cause?

From: Meister, Melissa A.
Sent: Monday, May 05, 2008 2:54 PM
To: Ascher, Stephen L.; DeBruin, David W; Bracey, Kali N
Cc: Haren, Eric R.; Pulham, Thomas G; Cox, Melissa A.
Subject: List of Motions Made

Here are all the motions.  A number of Fulks' motions are included because Basham joined in on almost all of them.

These do NOT include motions made prior to Littlejohn and Monckton's disqualification. (i.e. the competency motion that Littlejohn and Monckton filed)

Melissa

------------------------------------------------------------------------
Melissa A. Meister
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
http://www.jenner.com/

Please note the Washington office of Jenner & Block will be moving. Effective May 24, 2008 our new address will be 1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412. Our telephone numbers will remain unchanged.

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

------------------------------------------------------------------------

JENNER_BLOCK

JA 5155

| From: | Meister, Melissa A. |
| Sent: | Tuesday, May 06, 2008 12:16 PM |
| To: | Bracey, Kali N; Ascher, Stephen L.; DeBruin, David W |
| Subject: | RE: Competency |

Agreed. I don't think it's weaker than others, and it does flavor the DQ. There are things we can scour from the record, they're just few and far between.

---

**From:** Bracey, Kali N
**Sent:** Tuesday, May 06, 2008 11:35 AM
**To:** Ascher, Stephen L.; DeBruin, David W; Meister, Melissa A.
**Subject:** RE: Competency

Agreed. Melissa?

---

**From:** Ascher, Stephen L.
**Sent:** Tuesday, May 06, 2008 11:24 AM
**To:** DeBruin, David W; Bracey, Kali N
**Subject:** RE: Competency

Sorry for not responding to this earlier, Kali, your email has been on my "to do" pile for some time.... This argument doesn't seem to me to be much weaker than any of our others, which is a backhanded way of saying I think we should include it. Eric seems to have laid the law out fairly well already, so it should not take too much work for him to restructure it into an argument.

---

**From:** DeBruin, David W
**Sent:** Tuesday, May 06, 2008 11:05 AM
**To:** Ascher, Stephen L.; Bracey, Kali N
**Subject:** FW: Competency

Did we make an affirmative decision not to pursue this? Should we include a short argument following the DQ issue, in that the motion filed by previous counsel should have pursued by the court? (It also underscores the potential prejudice from the DQ ruling.) I'm not sure falling asleep renders one incompetent, but there may be a stronger basis in the motion that was filed by previous counsel.

---

**From:** Bracey, Kali N
**Sent:** Thursday, April 17, 2008 11:47 AM
**To:** Ascher, Stephen L.; DeBruin, David W
**Subject:** FW: Competency

Here is the argument on whether the judge should have ordered a competency evaluation of Basham sua sponte.

Kali

---

**From:** Meister, Melissa A.
**Sent:** Thursday, April 17, 2008 11:19 AM
**To:** Bracey, Kali N
**Subject:** FW: Competency

1

JENNER_BLOC



DEFENDANT'S EXHIBIT
13
**JA 5156**

JENNER_BLOCK

| From: | Haren, Eric R. |
| Sent: | Tuesday, May 06, 2008 12:15 PM |
| To: | DeBruin, David W |
| Cc: | Ascher, Stephen L.; Bracey, Kali N; Meister, Melissa A.; Cox, Melissa A.; Pulham, Thomas G |
| Subject: | RE: Competency |

I don't have those motions. I worked on this issue with Melissa Meister and Tom. Has either of you seen those documents? My recollection was that the motion essentially sat on the docket forever and was never ruled upon.

---

**From:** DeBruin, David W
**Sent:** Tuesday, May 06, 2008 12:12 PM
**To:** Haren, Eric R.
**Cc:** Ascher, Stephen L.; Bracey, Kali N; Meister, Melissa A.; Cox, Melissa A.; Pulham, Thomas G
**Subject:** Competency

Eric, I don't mean to pile on you. I know that you prepared a draft of an argument that the district court should have independently assessed Basham's competency. We are thinking of including it. Do you have a copy of the motion to examine competency filed by original counsel? I am interested to see the basis asserted for the motion. Also, do you know how that motion was withdrawn? Did new counsel make a new filing, withdrawing the earlier motion? And if so, on what basis?

Thanks --
Dave

**David W. DeBruin**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6015
Fax (202) 637-6375
DDeBruin@jenner.com
www.jenner.com

*Please note the Washington office of Jenner & Block will be moving. Effective May 24, 2008 our new address will be 1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412. Our telephone numbers will remain unchanged.*

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

JA 5157

From:     Meister, Melissa A.
Sent:     Monday, May 05, 2008 3:52 PM
To:       DeBruin, David W; Ascher, Stephen L.; Bracey, Kali N; Cox, Melissa A.; Haren, Eric R.;
          Pulham, Thomas G
Subject:  RE: Basham

Re 2 -- all of Basham's statements were detailed in my DQ fact section 2 drafts ago (you guys suggested that I shorten and/or remove them). They were also brought in through Agent Vito and Maley at trial. Basham said that Fulks raped and killed Donovan, repeatedly. (There is an explicit rendition of Fulks killing Donovan, but that was Littlejohn's hypo, so it didn't come in.) As for what came out at trial, I think it was mostly that Fulks drove everywhere, everywhere they went was at the direction of Fulks, Fulks' semen was found in Donovan's car, Basham stated that he never killed or intended to kill Donovan, etc. As far as I can remember, the FBI lifted prints and forcibly removed hairs from both Fulks and Basham from Donovan's car. Also, I don't think this was made as an argument below, but Basham helped authorities try to find the bodies, whereas Fulks did not. The 4th Circuit's opinion in Fulks was based, quite a bit, on statements that Fulks made to the FBI about both Burns and Donovan. We have none of Basham's statements re Burns in this trial, only Donovan.

Re 3 -- lots of evidence that Fulks did drugs in the Basham trial, though nothing re sex. I don't know about that.

Re 4 -- I will circulate a list of motions shortly. I had circulated a list of motions to the team (when I retrieved them from Swerling's office) and asked them to go over every motion filed to see if there was anything else in their section of the trial, and no one brought up anything further, but let me know if anything jumps out when I circulate the list.

Melissa

From: DeBruin, David W
Sent: Monday, May 05, 2008 3:30 PM
To: Ascher, Stephen L.; Bracey, Kali N; Meister, Melissa A.; Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G
Subject: Basham

To get a better feel for the case for the brief introduction I would like to write, I read the CA4 opinion in Fulks. Several things struck me:

1. The most recent draft conveys very little sense of the facts of the case, which is essential to put the case in context. The CA4 opinion describes those facts (from the view of the evidence presented in Fulks) at some great length. I know that Steve is re-doing the facts, so hopefully we will have an objective review of what the evidence in our case showed.

2. It is interesting that in the court's discussion of the events between escape and arrest, Basham is depicted as more of the leader than Fulks, and potentially the only "killer." Of course, that may be because the principal evidence of the killings came from Fulks' statement, where Fulks presumably tried to put everything on Basham. Fulks' statement was not admissible in our case. Did Basham give a statement, on which we now rely to suggest that his role in the killings was minimal? What evidence do we have that Fulks was the killer? The government did not seem to have any such evidence in Fulks' case.

3. It also is interesting that in the court's discussion of the events between escape and arrest, there is ample reference to other crimes -- lots of other robberies, thefts, and assaults -- but virtually no discussion of sex and drugs. Was that evidence not presented in Fulks, but only presented in Basham? Or did CA4 just ignore it in its description of the case (essentially confirming that the evidence of sex and drugs was irrelevant -- although, if introduced in Fulks, perhaps harmless).

4. Lastly, I was struck that (a) the court took seriously some very specific legal issues (i.e., whether particular jurors should have been excluded, whether the government failed to give sufficient notice of two new witnesses, etc.), and (b) even addressed two issues that Fulks had failed to raise himself. Are we confident there are no additional issues that we need to consider? Were there other motions or objections made (such as, for example, to particular jurors, or to anything else during the trial), and denied, that we should discuss? I am not suggesting that we present every possible issue. But

1


DEFENDANT'S
EXHIBIT

JA 5158

before we file, I think we should at least collectively discuss whether there are any other issues that could be raised, which we are making a tactical decision not to pursue. Melissa Meister, I believe we talked at the outset about preparing a list of motions/objections made and denied. Do you have such a list? Again, I just don't want to waive anything without doing so consciously and deliberately.

**David W. DeBruin**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6015
Fax (202) 637-6375
DDeBruin@jenner.com
www.jenner.com

*Please note the Washington office of Jenner & Block will be moving. Effective May 24, 2008 our new address will be 1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412. Our telephone numbers will remain unchanged.*

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

JENNER_BLOCK

JA 5159

| | |
|---|---|
| **From:** | Ascher, Stephen L. |
| **Sent:** | Sunday, May 04, 2008 11:34 AM |
| **To:** | Haren, Eric R. |
| **Cc:** | DeBruin, David W; Bracey, Kali N; Meister, Melissa A. |
| **Subject:** | Samantha Burns Killing |

In reading the government's summation, I am struck by the extent to which the government tried to inflame the jury with all sorts of argument about the killing of Samantha Burns (she's a young girl, she's got a family, who knows what they did to her for 9 hours, etc.). It seems to me one thing to admit that killing as similar act evidence, which I understand that we have decided not to challenge, and another thing to use it to inflame the jury, particularly when Basham has already separately plead guilty and been punished for that evidence. Can you find any cases holding that the government used similar act evidence, even though properly admitted for one purpose, for a different improper purpose? It's almost a double jeopardy issue, although I doubt it meets the technical requirements for that. Dave, Kali, and Melissa, I'm copying you all in case you have any thoughts on this issue.

**Stephen L. Ascher**
Jenner & Block LLP
919 Third Avenue
37th Floor
New York, NY 10022-3908
Tel (212) 891-1670
Fax (212) 909-0803
SAscher@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

JENNER_BLOCK



DEFENDANT'S
EXHIBIT
JA 5160

| From: | Bracey, Kali N |
|---|---|
| Sent: | Thursday, April 17, 2008 11:47 AM |
| To: | Ascher, Stephen L.; DeBruin, David W |
| Subject: | FW: Competency |
| Attachments: | ComptencyDraft.doc |

Here is the argument on whether the judge should have ordered a competency evaluation of Basham sua sponte.


Kali

---

**From:** Meister, Melissa A.
**Sent:** Thursday, April 17, 2008 11:19 AM
**To:** Bracey, Kali N
**Subject:** FW: Competency

Here's the competency draft.


**Melissa A. Meister**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

**From:** Eric Haren [mailto:ericharen@gmail.com]
**Sent:** Sunday, April 13, 2008 2:40 AM
**To:** Meister, Melissa A.
**Cc:** Haren, Eric R.
**Subject:** Competency

Melissa,

Here is a draft of something on competency. The second paragraph contains a bit of text I added at the end of my drafting. It relates to how the district court's actions here might have been an abuse of discretion. That text may be out of place – it may more properly go in a section applying law to fact, or may need more factual explanation – but I included it anyway just so you know what I think might get a win on the issue, if one is even possible.

The remainder of the draft contains the competency standard and the factors that relate to how questions of competency are resolved. Hopefully it'll help you.

-Eric

1

JENNER_BLOCK

DEFENDANT'S
EXHIBIT
JA 5161

| From: | Meister, Melissa A. |
|-------|---------------------|
| Sent: | Tuesday, April 01, 2008 5:16 PM |
| To: | Timothy Sullivan |
| Subject: | RE: Letter Dated April 1, 2008 |

Tim,

Well, as I'm sure you can imagine, that letter got Mr. Swerling's attention and I got an earful from him about how much of a jerk I am to dare to impugn his record of 35 years and how he told you that you were welcome to review the boxes at any time and how you never made any such request.

Long story short, he'll make the boxes available for our review this week. I cannot go tomorrow, but am available Thursday and then is when I propose to go. Please let me know if you'd like to join to get whatever you think you might need.

Melissa

---

**From:** Timothy Sullivan [mailto:tsullivan@bsm-legal.com]
**Sent:** Tuesday, April 01, 2008 4:45 PM
**To:** Meister, Melissa A.
**Subject:** RE: Letter Dated April 1, 2008

Thanks and welcome to BB's world... I will call you to discuss "things" in a little bit. I am sitting on a conference call now.

TS

Timothy J. Sullivan, Esq.
Brennan Sullivan & McKenna LLP
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
301.474.0044 (telephone)
301.474.5730 (facsimile)
tsullivan@bsm-legal.com
www.bsm-legal.com

Notice: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including attachments, is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Service.

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

---

**From:** Meister, Melissa A. [mailto:MMeister@jenner.com]
**Sent:** Tuesday, April 01, 2008 4:51 PM
**To:** jacklaw@aol.com

1

JENNER_BLOCK

DEFENDANT'S
EXHIBIT
JA 5162

| | |
|---|---|
| **From:** | Meister, Melissa A. |
| **Sent:** | Wednesday, March 26, 2008 10:27 AM |
| **To:** | Haren, Eric R.; Cox, Melissa A.; Pulham, Thomas G |
| **Cc:** | Timothy J. Sullivan; DeBruin, David W; Ascher, Stephen L.; Bracey, Kali N |
| **Subject:** | Cam Littlejohn |

I spoke to Cam Littlejohn this morning, one of Basham's disqualified attorneys. Very nice guy. He said he no longer had any files, that he had given all of his files to Jack Swerling (to whom I have two unreturned calls). As for the competency issue, he said that he and his partner had thought of raising it, but got hit with the disqualification motion before they could get very far. Swerling and Harris do not appear to have ever questioned Basham's competency or raised that issue, which puts us in a tough position.

He stated that he and Monckton got along with Brandon very well and that they had a good relationship. In our conversation, he stated that he was still dumbfounded the the Court's ruling on the disqualification and felt that the Government should have never brought the motion.

I'm going to call the clerk's office today to see if they have some of the motions filed with the court, but not on PACER. Please let me know within the next hour or so whether you have a particular document that you would like. Thanks.

Melissa

---

**Melissa A. Meister**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

1

JENNER_BLOCK


DEFENDANT'S
EXHIBIT
18

JA 5163

From: DeBruin, David W
Sent: Tuesday, March 25, 2008 11:18 AM
To: Meister, Melissa A.; Ascher, Stephen L.; Bracey, Kali N
Subject: RE: Advice Needed - Basham

I would send them a letter detailing the history of when you asked for the files (and I would identify some of the material below that is essential to the appeal), when they agreed to provide the files, your subsequent efforts to obtain them, and the fact that the files still have not been provided. I would make clear that we will pay for copying and mailing. I would point out the deadline for our brief. And I would state that, unless arrangements are made immediately to provide us the files, we will file a motion with the court. And if necessary, I would file such a motion.

---

**From:** Meister, Melissa A.
**Sent:** Tue 3/25/2008 10:54 AM
**To:** DeBruin, David W; Ascher, Stephen L.; Bracey, Kali N
**Subject:** Advice Needed - Basham

David, Steve, and Kali,

I need your advice re problems with Basham's counsel below. They have steadfastly refused (and by refused, I mean that they have told us that they will give us what we want and then failed to return my co-counsel's phone calls) to give us their records from below. Of specific relevance would be the videotape of Basham's fight in the courtroom, his psychiatrist's report, and the defendant's response to the motion to disqualify counsel. When I last talked to Dave about this (near the time when we looked at the sealed records), he had suggested that Tim make contact and get the information. Tim did so, meeting with them personally, and secured their agreement to get us the stuff, but it has not yet been produced to us.

I had an associate look into the issue of whether the client files belong to Basham or to the attorneys, and he felt that the case law was not clear, but that it was likely that the files belonged to Basham (subject to a work product exception).

What do you think of the propriety of a court filing to compel the production of the file below? I think it's absolutely ludicrous and self-serving that the attorneys below will not help us (as I'm sure they are simply trying to avoid a better ineffective assistance case against them).

Melissa

**Melissa A. Meister**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.



DEFENDANT'S EXHIBIT
19
JA 5164

| | |
|---|---|
| **From:** | Meister, Melissa A. |
| **Sent:** | Tuesday, March 18, 2008 1:56 PM |
| **To:** | DeBruin, David W; Ascher, Stephen L.; Bracey, Kali N |
| **Cc:** | Cox, Melissa A.; Haren, Eric R.; Pulham, Thomas G |
| **Subject:** | Issue list for phone call today |
| **Attachments:** | Issues for March 18 Phone Call.doc |

Here is a draft issue list to help our conversations today.

Reminder - dial in info

1-866-319-3661

passcode = 202 639 6034

Conf Room E for those in DC

**Melissa A. Meister**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington DC 20005-3823
Tel (202) 639-6034
Fax (202) 661-4805
MMeister@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

JENNER_BLOCK



**DEFENDANT'S
EXHIBIT
JA 5165**

## POTENTIAL BASHAM ISSUES

*Pre-Trial:*

-- Basham's initial counsel excused as potential witnesses to botched proffer

*Guilt Phase:*

-- Jury instruction of kidnapping count (was intent to kill required; harmless error?)
-- Amount of Burns evidence introduced (double jeopardy, character evidence, etc.)
-- Prejudicial, non-relevant testimony introduced (Fulks high-speed chase, Jordan burglary/shooting, doing drugs and partying, pointing gun at Tina Severance)
-- 404(b) violations
-- Juror misconduct -- 4 jurors allegedly heard witness make remark about testimony, 1 alternate juror excused, the rest retained
-- Hughes, former Basham attorney, allowed to testify

*Penalty Phase/Post-Trial:*

-- Juror misconduct -- calling the press (prejudice?)
-- Juror misconduct -- premature deliberations (what's the standard?)
-- Extent of victim impact evidence
-- Introduction of "dip" videotape
-- Judge disallowed Fulks mitigating evidence
-- Ability of Basham to allocate not under oath (Tom?)
-- Inconsistent jury verdicts as to mitigating factors
--

*Throughout:*

-- Medication issues (medication was changed often and Basham was falling asleep during some days of trial)
-- Competency issue (but was it preserved and/or documented?)
-- Ineffective assistance of counsel (better deal with by habeas?)
-- Prosecution argued rape of both Burns and Donovan, though never proven, 403?

Others?

JENNER_BLOCK

## Declaration of Shannon Lee Burnett

I, Shannon Lee Burnett, declare under penalty of perjury, the following to be true to the best of my information and belief:

1. I, Shannon Lee Burnett, have resided at 123 Sheldon Drive in Moore, South Carolina, since 2003.

2. I did not serve as a juror in the Brandon Basham trial beginning in September 2004.

3. I do not know a male named Shannon Burnett who lives in Inman, South Carolina. I am unaware of a Shannon Burnett that was a juror in the Basham trial.

4. I have had the same home telephone number, (864) 587-2341, from 2003 thru the present.

5. I do not know a Cynthia Wilson and know nothing about a Brandon Basham trial. I do not recall receiving phone calls on the dates of October 15th, 18th, or 29th of 2004 from a Cynthia Wilson or anyone regarding the Basham trial.

6. I spoke with my husband, Joey Burnett, and he does not recall a Cynthia Wilson or receiving any calls on the previously mentioned dates.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this 13th day of June, 2012.

_____
Juror

_____
Witness



DEFENDANT'S
EXHIBIT
21

JA 5167

# MEMORANDUM

**To:** Jack Swerling
**From:** Greg Harris
**Date:** 09-13-04
**Subject:** Jury Selection - Basham

This memo is to briefly memorialize the two weeks of jury selection in the Basham case. Diane Follingstad was retained to assist us in the selection. She agreed to assist us every morning of jury selection with the new jurors. Before jury selection, she was provided with copies of all questionnaires from which she prepared an outline regarding the general impressions of each juror. Each morning of the jury selection she would review the death questionnaires and supplement her earlier impressions for our consideration. Each morning Branden, Jack and I were provided with an outline regarding each individual juror and Dr. Follingstad's impression regarding their tendencies. While Branden was not provided with a copy of every questionnaire and every death questionnaire, he was, upon his request, allowed to look over each questionnaire regarding an individual juror. The process established by Jack was that Branden would have available Dr. Follingstad's opinions and any other information relating to jurors upon his request. (There were occasions when Branden would request a juror's questionnaire, but because the juror was on the stand or Jack or I were preparing to question the juror we would not be able to allow him the opportunity to review the questionnaire before we questioned the juror. He was, after we questioned the juror, allowed to look at all questionnaires.)

During jury selection, Branden made several observations regarding individual jurors and these observations were always noted by either Jack or myself. My notes reflect on at least three occasions that Branden was dissatisfied with a juror. Normally his dissatisfaction was consistent with Dr. Follingstad's recommendation that a particular juror was a "bad juror."

At the conclusion of jury selection, Branden was given all 63 of the qualified juror questionnaires and allowed to spend enough time with them to formulate an opinion as to which jurors he did not want seated. Jack gave him blue tabs and yellow tabs and asked Basham to blue tab the jurors that he did not want on his jury and to use the yellow tabs for any comments he may have regarding those jurors. By the end of the day on Thursday (the day before jury selection), Basham had gone through all 63 jurors and indicated to us



DEFENDANT'S EXHIBIT

22

JA 5168    03509

that he had sufficient information and time to identify all jurors that he did not want seated in his jury. On Friday, September 10, 2004, Jack and I went to the courthouse to discuss our 23 strikes with Branden. Of the 23 strikes, we utilized 18 on individuals Branden had determined he did want on the jury. Branden agreed that the remaining five were also people that he did not want on his jury and indicated to Jack and me that he was satisfied with our strikes. During jury selection, the government struck at least three jurors that Branden had indicated that he did want on the jury. One of these jurors was our first alternate. At the conclusion of jury selection, Branden stated on the record that he was satisfied with his jury and he indicated off the record to us that he was very happy with jury selection.

A few observations:

1) Branden started out jury selection on a high note. He had new clothes and had a fairly good relationship with the U.S. Marshals as opposed to RCDC guards.

2) By the third day of jury selection, Branden's relationship with the Marshals had deteriorated and we was noticeably more distracted by the realization that his trial had begun.

3) After the third day, there were intermittent outbursts between Basham and the Marshals, Basham, Jack and me, and Basham and himself. These outbursts were mixed with periods of time when Branden would attempt to sleep through jury selection. (Branden's inability to stay awake during portions of jury selection is a matter of record.)

4) Basham made repeated requests during jury selection for pens, pencils, coloring books, clothes and money, all of which were taken care of by Jack or me. Specifically, during jury selection, Branden was provided with at least the three full sets of coloring pens and pencils, three tablets for writing all notes, coloring books, word connection games, new clothes, cash in his canteen, cokes, breath mints, coffee, among other things.

5) Other than sleeping through some of the jurors' voir dire, Basham's outbursts were relatively minor.

6) Jack has retained all notes by Basham for future reference.

**JA 5169**   03510

# MEMORANDUM

To: Branden Basham's File
From: Greg Harris
Date: 07-06-04
Subject: Conference with client

I went to visit Branden on July 2, 2004 to speak with him about the Fulks' verdict and to get an update on his review of the discovery. I found him to be alarmingly unaffected by Wednesday's verdict. He was actually in a very good mood because he had just purchased a new pair of tennis shoes with the money Jack had given him. Several matters that we discussed concerned me and are addressed herein.

1) Daniel has not visited Branden in the last 2 ½ weeks. Furthermore, Branden indicated that Daniel is no longer reading to him as we instructed, but is now simply discussing the discovery with Branden. (I spoke with Jack and Harrison about this and Jack will speak with Daniel to see what steps he is taking to make sure Branden understands the discovery.) Nonetheless, Branden indicated that he understands everything that he has read so far and has not had any problems digesting the material. I informed him again that we are available for conference about any issues he has with the discovery.

2) Branden indicated that Ceven and Daniel have agreed to bring him dipping tobacco. I explained to Branden that contraband was against regulations and that everyone could get in trouble if our staff brought contraband into the jail. (I addressed this with Ceven who knows the rules and with Jack who will speak with Daniel about the contraband issue.)

3) Finally, Branden stated that he is still hoarding his meds to take at night to sleep and that Dr. Morgan is increasing Branden's meds. I will call Dr. Morgan to discuss Branden's practice of hoarding meds.



**DEFENDANT'S EXHIBIT** 23

# M E M O R A N D U M

To:       Basham File
From:     Greg Harris
Date:     06-01-04
Subject:  Conference with Branden Basham

---

    I went to see Branden on Memorial Day to inform him that his family had been denied visitation because of his most recent outburst. During my 45 minute conference with him, he was extremely agitated. Branden repeatedly attempted to get his handcuffs from the back to his front so that he could "beat the shit out of Lee" if Lee came to escort him back to the cell. I instructed Branden that I believed this to be an unwise course of action and again stressed the importance of taking his medication and attempting to get along with jail personnel.

DEFENDANT'S
EXHIBIT
24

# MEMORANDUM

**To:** Jack Swerling
**From:** Greg Harris
**Date:** 05-28-04
**Subject:** Telephone conversation with Branden Basham

---

Branden called earlier today and told me that he had been placed on restriction for assaulting a prison guard. Evidently, he and Officer Lee got into another verbal altercation which resulted in Branden being physically restrained and sprayed with pepper mace. Branden indicated that he has affidavits from three inmates who are willing to state that Lee was, on this occasion, the aggressor.

I instructed Branden to provide Daniel Goldberg with the names of the inmates and if possible, the affidavits.

Because of his status on lock down, there may be some problem this weekend with the visitation of his family. I will call the jail to discuss the status of the previously arranged visit of his family.

I have told Branden 100 times to stop arguing with the guards. The next time you are there it may be helpful for you to remind him how such activity is detrimental to his case.



DEFENDANT'S EXHIBIT

25

JA 5172  03531

# M E M O R A N D U M

**To:** Jack Swerling
**From:** Greg Harris
**Date:** 05/27/03
**Subject:** Telephone conference with Dr. Brawley

---

Dr. Brawley's testing results indicated that Branden possesses a 68 "full scale" IQ. This is based on a 75 "verbal" score and a 65 "performance" score.

She has offered to prepare a short report regarding her findings or a six page detailed report. She is awaiting our instructions on her report.

Dr. Brawley has also requested any and all medical and school records that we have in case she is called upon to testify at a later date.

DEFENDANT'S
EXHIBIT
26

# M E M O R A N D U M

To:        Branden Basham File
From:      Greg Harris and Jack Swerling
Date:      07/22/03
Subject:   Protocol hearing on July 21, 2003

---

On July 21, 2003, Jack and I appeared before the Attorney General's Death Penalty Review in Committee in Washington. Present at the hearing were Peggy Griffey (chairperson), Charlie Kinsey, Deborah Long Doyle (by telephone conference), and Karen Gargerty, on behalf of the Attorney General and Scott Schools, Johnny Gasser and Strom Thurmond, Jr. on behalf of the United States Attorney's Office. The hearing was extremely informal and we were given the opportunity to present to the committee reasons mitigating against the death penalty. After our presentation, the chairperson of the committee, Ms. Griffey inquired about our M.R. allegations. We informed her that we were in the process of getting a more definitive opinion from Dr. Watts, but that we had no diagnosis yet. They agreed to let us revisit the issue once Dr. Watts formulates an opinion.



DEFENDANT'S
EXHIBIT

27

JA 5174

‖‖‖‖‖‖‖‖‖‖‖‖‖‖

SHANNON L BURNETT
100109744
301040401 - 0058

# JUROR QUESTIONNAIRE

**#93**

JUROR No. **100109744**

**PANEL 43**

UNDER PENALTY OF PERJURY, I DO SWEAR OR AFFIRM THAT THE ANSWERS TO THE FOLLOWING QUESTIONS ARE TRUE. *Please use ink to complete this form.*

1. Full Name: **Burnett**              **Shannon**              **L.**
   (Last)                    (First)                    (Middle Initial)

   Telephone: **864-472-6503**         **864-597-0350**
   (Home)                    (Work)

2. Do you have any vacation plans or business commitments between April 2004 and August 2004 (that cannot be rescheduled) that would make you unavailable to serve as a juror for a case that might be tried. If so, please indicate the specific dates you will be unavailable and the exact nature of your conflict. These dates are only being sought so that if you are selected, you can be scheduled for a trial at the time you are available.

   _____

   _____

   _____

3. Where do you reside? **1371 Hickory nut Rd     Inman     SC     29349**
   (Number)   (Street)          (Town or City)   (State)   (Zip Code)

4. What is your sex? **✓** Male _____ Female

5. What is your age? **32** Date of birth? **8-23-71** .

6. Where were you born? **Spartanburg          SC          USA**
   (City)              (State)         (Country)

7. What is your current marital status? *(mark X next to those that apply)*

   _____ Single          _____ Divorced          _____ Widowed

   **X** Married **11** years   _____ Never married   _____ Divorced & remarried

   _____ Separated          _____ Living with someone

8. Do you have children or step-children? **✓** Yes _____ No

   If yes, how many are under age 18? **2** What are their ages? **6 & 11**

   If yes, how many are age 18 or older? _____ For those age 18 and older only, provide the following:

   _____
   (Sex)        (Age)        (Education)                              (Occupation)

   _____
   (Sex)        (Age)        (Education)                              (Occupation)

   _____
   (Sex)        (Age)        (Education)

**DEFENDANT'S EXHIBIT 28**

JA 5175

00891

# Switchboard®
### It's the Yellow Pages. *Electrified.*℠

| FIND A BUSINESS | FIND A PERSON | SEARCH BY PHONE | WEB SEARCH | AREA & ZIP CODES | MAPS/DIRE |

**Search for:**    Search Tips    City      State List   or Zip

Sodfathers          SC      Search

### Narrow your search

**Home & Gardening** (1)
- Lawn & Garden (1)

**Services** (1)
- Contractor/Builder... (1)
- Home Services (1)

## Matching Name Results
Help

(Found 1 business)
Show businesses starting with: # A B C D E F G H I J K L M N O P Q R S T U V W X Y Z **ALL**

### *FEATURED SITES*

**Find Prescreened Landscape Designer Pros**   www.servicemagic.com
Get matched to prescreened landscape designer pros in your area. Fill out a short form to connect with up to four local pros interested and available for your ...

**Landscape Designer: Compare Prices**   www.bizrate.com
Compare prices from over 30,000 stores. At BizRate.com, find deals, consumer reviews, and store ratings to save money.

**Landscape Designers at Shopping.com**   www.shopping.com
Find, compare and buy products in categories ranging from home and lifestyle applications to furniture. Read product reviews and compare prices from thousands of ...

### *ALL BUSINESSES*

**Sodfather Inc**
205 Broadcast Dr
Spartanburg, SC 29303-4712
Phone: (864) 597-0350     **Find Pre-Screened Contractors**

**Business Types:** Landscape Designers, Landscape Contractors

Map | Directions | What's Nearby? | Email a Friend | Dun & Bradstreet Business Info

Show businesses starting with: # A B C D E F G H I J K L M N O P Q R S T U V W X Y Z **ALL**

### Modify Search

**Search For:**                     Search Tips

Sodfathers

**City**                         **State List**

SC

**or Zip**

☐ Include surrounding areas       *SEARCH*

DEFENDANT'S
EXHIBIT

29

# Switchboard®
It's the Yellow Pages. *Electrified.*℠

| FIND A BUSINESS | FIND A PERSON | SEARCH BY PHONE | WEB SEARCH | AREA & ZIP CODES | MAPS/DIRECTIONS |

Help

**People Search Results**

2 people found ((1-2 shown))
Modify Search | New Search

**Burnett, Joey**                                                             Update this listing
69 1/2 Spring St
Arcadia, SC 29320
(864) 587-2341
Email,Maps and What's Nearby
Find Old Friend Joey Burnett

**Burnett, Shannon**                                                          Update this listing
69 1/2 Spring St
Arcadia, SC 29320
(864) 587-2341
Email,Maps and What's Nearby
Find Old School Friend Shannon Burnett

Modify Search | New Search
* Denotes a Switchboard User

Can't find them? Try These alternatives:

About Switchboard | Contact Us | National Advertising | Privacy Policy | Help

Terms of Use

data by ACXIOM

Infospace Search Resources: Search engines at Dogpile    Yellow pages and White pages at InfoSpace

© 2004 InfoSpace INC. All Rights Reserved.
Switchboard is a subsidiary of InfoSpace, Inc.

JA 5177

00893



# Switchboard®
It's the Yellow Pages. *Electrified.*$^{SM}$

FIND A BUSINESS | FIND A PERSON | SEARCH BY PHONE | WEB SEARCH | AREA & ZIP CODES | MAPS/DIRECTIONS

Help

## People Search Results

1 people found (1-1 shown)

Modify Search | New Search

**Burnett, Shannon**                                                                Update this listing
1371 Hickory Nut Rd
Inman, SC 29349-8206
(864) 472-6503
Email,Maps and What's Nearby
Reunite with Old Friend Shannon Burnett

Modify Search | New Search
* Denotes a Switchboard User

**Can't find them?** Try These alternatives:

About Switchboard | Contact Us | National Advertising | Privacy Policy | Help

Terms of Use

data by ACXIOM

Infospace Search Resources: **Search engines** at Dogpile    **Yellow pages** and **White pages** at InfoSpace

© 2004 InfoSpace inc. All Rights Reserved.
Switchboard is a subsidiary of InfoSpace, Inc.

JA 5178   00894

# M E M O R A N D U M

TO:       JACK AND GREG
FILE:       BASHAM
FROM:      Carolyn Graham
DATE:      December 7, 2004
RE:        PHONE RECORDS

---

## VERIZON WIRELESS
\# 864-680-3240
Phone calls were made from Cynthia Wilson's cell phone to a Shannon Burnett on the following dates:

Shannon Burnett
#864-587-2341

October 15, 2004   Phone Call # 316       2 minutes
October 18, 2004   Phone Call # 325       13 minutes

Shannon Burnett is listed as a juror. <u>The phone numbers are not the same as the numbers listed on the Juror Questionnaire.</u> **I AM NOT SURE THIS IS THE SAME SHANNON BURNETT**.

I have attached a phone reference sheet and the original phone bills for Verizon.


## BELL SOUTH
\# 864-848-1362
Phone calls were made to a Shannon Burnett on the following dates:

Shannon Burnett
\# 864-587-2341

October 29, 2004   Phone Call # 106       11 minutes



DEFENDANT'S
EXHIBIT
30

**JA 5179**   00817

<u>Again, the phone number called is not the number listed on the Juror Questionnaire.</u>

Phone calls were made to the following:

| | | |
|---|---|---|
| October 29, 2004 | Phone Call # 119 | 2 minutes (Greenville News) |
| October 29, 2004 | Phone Call # 121 | 1 minute (Spartanburg Herald) |
| October 29, 2004 | Phone Call # 123 | 6 minutes(WSPA) |
| October 29, 2004 | Phone Call # 125 | 1 minute(WHNS 21) |
| October 29, 2004 | Phone Call # 127 | 1 minute(WHNS 21) |
| October 29, 2004 | Phone Call # 129 | 4 minutes(WHNS 21) |
| October 29, 2004 | Phone Call # 130 | 4 minutes(WHNS21) |
| October 29, 2004 | Phone Call# 132 | 2 minutes(WFYY4) |

**JA 5180**  00818

8/5    5:15

Clifford Jay

- BB 12 or 13 when he met CJ (BB) at Anton.
                                    school
- BB didn't act out at Anton
    as much as he did later.
- CJ - Instructional Aide at Anton and James Madison.
* 1999 Special Ed Act provided for
    inclusion in the classroom
        - every child had the right to be in
        school system w/out discrimination
EBD (Emotionally Behavioral, Disturbed) program
    - BB was in EBD program
BB  * Never phased out of EBD. He suffered
        at home and in class.
- CJ always tried to probe into every child
    to find out what his issues were. This
    was for the benefit of the child
- BB was always a puzzling child.
- Saw ADD in BBs file
- Always felt that BB was fetal alcohol baby
  Later found out about BBs hardships (family)
        - alcohol, drugs, abuse
* He didn't have a chance (BB) because of
    all the problems he had growing up.
- Used to see BB on bicycle with cigarette
    in mouth at age 10


DEFENDANT'S
EXHIBIT

JA 5181

- CJ filed an out of control petition on BB for trying to kill CJ.
  - BB put knife to CJ's throat at school.
  - Told Jimmy that he (CJ) knew that Brandon manipulated parents.
- BB admitted to $150 a week drug habit in front of Jimmy. CJ was visiting BB at Riverdale
- BB was the Robin Hood of the neighborhood
- BB took up for CJ at gas station
- BB would give kids in classroom candy and other things.
- BB helped with other people's children "He was a compassionate kid"
* These were the multiple personalities that he had because he didn't have a chance
  - His parents used to put whiskey in his milk. Made him dance naked on table.
- The system let him down from the superintendent to the teachers.
* People were exhausted with trying to fix BB. They improperly restrained him and didn't know how to deal with him.

JA 5182

Regan
Pardetta

John
Dieser

- BB resented women (Ms Medford) back in the 5th grade.
- CJ knew about BBs head injury.
- BB was very protective of Chase Pentecost who was retarded. BB took up for Chase when he was picked on.
- Saw BB every day for 2-3 years
  - only 1 incident
  - "I can remember the kids I use to fight and it wasn't him"
- Overall, BB was a good kid. "We bonded"
- You won't hear a lot of people give a good impression of this boy. But I had him more than his parents.
- CJ got petition because he was directing his aggression towards authority. He couldn't direct [properly] because of his (BB) problems.
- CJ has superhero powers because he can tell what is wrong with people. It is a gift from God,
- Saw BB cry a lot. In the beginning it was. "You don't know what I'm going through.
  Later, it was because of the lifestyle he was living.

JA 5183

- BB told CJ that his mother was a drug addict
- BB was the most vulnerable child that CJ ever saw. He couldn't believe that BB had never been shown affection.
  " I've never seen a child face what he faced "
  " I've never seen a boy go through what he's gone through "
  ie — not ever bonding w/ mother
     — at 12 months getting alcohol in bottle
     — exposed to cigarettes & partying

Q. Did he really have parents?
A. — They did the best they could but they had no parenting skills.
- Society has failed this child
- CJ was appointed by God to help children
- CJ & BB loved each other

Q. Why were you afraid of BB when he broke out?
A. Because I knew about his history —

- 5 things a jury should know about BB
1) BB - loving caring giving individual
2) Adorable kid.
3) Intelligent and bright - very perceptive

JA 5184

Q Was BB a racial person?
A. No. CJ never felt racism from BB. Children act out and do what they are taught. "Jimmy never had a problem with me."

Q "we killed her?"
A. "No, he said 'we killed them'?"

Interview over 6:40

JA 5185

# M E M O R A N D U M

**To:**       Basham File
**From:**     Greg Harris
**Date:**     08-05-04
**Subject:**  Interview with Clifford Jay

08/05/04 - 5:15 p.m.

### Clifford Jay

- Branden 12 or 13 when he met CJ at Anton School
- Branden didn't act out at Anton as much as he did later.
- CJ - Institutional Aide of Anton and James Madison
*1999 Special Ed Act provided for inclusion in the classroom
- every child had the right to be in school system without discrimination
EBD (Emotionally Behaved, Disturbed) program
- Branden was in EBD program
BB - * Never phased out of EBD. He suffered at home and in class.
- CJ always tried to probe into every child to find out what his issues were. This was for the benefit of the child.
- Branden was always a puzzling child.
- Saw ADD in Branden's file
- Always felt that Branden was fetal alcohol baby
- Later found out about Branden's hardships (family)
          - alcohol, drugs, abuse
* He didn't have a chance (Branden) because of all the problems he had growing up.
- Used to see Branden on bicycle with cigarette in mouth at age 10
- CJ filed an out of control petition on Branden for trying to kill CJ
          - Branden put knife to CJ's throat at school.
          - Told Jimmy that he (CJ) knew that Branden manipulated parents
- Branden admitted to $150 a week drug habit in front of Jimmy. CJ was visiting Branden at Rivendall.
- Branden was the Robin Hood of the neighborhood
- Branden took up for CJ at gas station
- Branden would give kids in classroom candy and other things
- Branden helped with other problem children



DEFENDANT'S
EXHIBIT

JA 5186

"He was a compassionate kid."

*These were the multiple personalities that he had because he didn't have a chance.

- His parents used to put whiskey in his milk. Made him dance naked on the table.

- The system let him down from the superintendent to the teachers.

*People were exhausted with trying to fix Branden. They improperly restrained him and didn't know how to deal with him.

- Branden resented women (Ms. Medford) back in the 5th grade.

- CJ knew about Branden's head injury.

- Branden was very protective of Chase Pentacost who was retarded. Branden took up for Chase when he was picked on.

- Saw Branden everyday for 2-3 years
      - only 1 incident
      - "I can remember the kids I used to fight and it wasn't him."

- Overall, Branden was a good kid. "We bonded."

- You won't hear a lot of people give you a good impression of this boy. But I had him more than his parents.

- CJ got petition because he was directing his aggression towards authority. He couldn't direct properly because of his (Branden) problems.

- CJ has superhero powers because he can tell what is wrong with people. It is a gift from God.

- Saw Branden cry a lot. In the beginning, it was ... "You don't know what I'm going through." Later, it was because of the lifestyle he was living.

- Branden told CJ that his mother was a drug addict.

- Branden was the <u>most</u> vulnerable child that CJ had ever seen. He couldn't believe that Branden had never been shown affection.

"I've never seen a child face what he faced."

"I've never seen a boy go through what he's gone through."
      -i.e. not ever bonding with mother
      - at 12 months, getting alcohol in bottle
      - exposed to cigarettes and party going

Q. Did he really have parents?

A. They did the best they could, but they had no parenting skills.

- Society has failed this child

- CJ was apppointed by GOD to help children

- CJ and Branden loved each other.

Q. Why were you afraid of Branden when he broke out?

A. Because I knew about his history.

2

JA 5187

- 5 things a jury should know about Branden
    1)Branden is a loving, caring, giving individual
    2)Adorable kid
    3)Intelligent and bright-very perceptive

Q. Was Branden a racial person?
A. No. CJ never felt racism from Branden. Children act out and do what they are taught.
"Jimmy never had a problem with me."

Q. "We killed her?"
A. "No, he said "We killed them."

Interview over at 6:40

<center>3</center>

**JA 5188**

D-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription  02/04/2004

Clifford Eugene Jay was advised of the identity of the interviewing agent and the identity of Assistant United States Attorney Jonathan S. Gasser. Jay was advised of the purpose of the interview and then provided the following information:

Jay has spoken on two separate occasions with legal counsel representatives for Branden Basham and Chadrick Fulks. Jay recalled that one set of defense counsel representatives were from New York. Neither set of defense counsel representatives asked Jay about a telephone conversation Jay had with Basham on approximately December 24, 2002.

Because of his religious beliefs, Jay does not want to see Basham and Fulks sentenced to death if they are found guilty in South Carolina. Jay stressed that his personal beliefs on this issue would not prevent him from being truthful with defense counsel or with the government.

Jay has been a Certified Instructional Aid (CIA) for the past eleven years. The children under Jay's supervision commonly call Jay "Mr. C.J.". In approximately 1996, Jay was the CIA for Basham at James Madison Middle School, in Madisonville, KY. At this time, Basham was a seventh grade student in the Emotional Behaved Disturbed (EBD) program at James Madison. Basham was approximately two years behind in school because of his learning disabilities. Monte Mefford, was Basham's teacher at James Madison. Mefford has since retired in Madisonville, KY. Mefford's phone number is (270) 821-9518.

Jay was Basham's CIA for approximately two to three years. During this time, Jay was able to gain Basham's confidence by disciplining Basham and even restraining Basham for volatile behavior. Jay recalled an occasion where Basham was laying down and sleeping in class. Jay tapped Basham to awaken him and Basham pulled a "one man straight blade knife," which Jay characterized as a knife that was similar to a switch blade. Basham sprung to his feet and swung the knife at Jay's neck. Jay fell back and was able to avoid being cut. Jay was then able to forcibly take the knife away from Basham. The following day, Jimmy Basham, who is Basham's father, came to school with Basham and asked Jay to return the knife. Jay refused and told Jimmy Basham that he was lucky that Jay

---

Investigation on  2/4/04  at Madisonville, KY

File # 7A-CO-27964  Date dictated  2/4/04

by  SA Jeffrey J. Bruning

03841

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.


DEFENDANT'S EXHIBIT

JA 5189

\-302a (Rev. 10-6-95)

7A-CO-27964

Continuation of FD-302 of ___Clifford Eugene Jay_____, On _2/4/04_____, Page __2__

did not file a motion to have Branden Basham institutionalized for being out of control.

Jay characterized Basham as a small kid who had "little kid syndrome." Jay described Basham as a fighter who would easily get into a fight and as a person who would never back down from a fight. Basham was also someone who wanted to help and protect people as a young man, but at the same time, he was also someone who would get into fights with students who made him angry. Jay recalled an occasion a couple of years after Jay was no longer Basham's CIA, where Jay and a friend were in a convenience store teasing each other as if they were about to fight. Basham came into the convenience store and stood between them and asked Jay if he needed help. Jay noted that Basham intervened even though Jay's friend was a big person.

In approximately 1996, Basham was institutionalized at Rivendale Behavior Clinic by his parents for "out of control behavior." Connie Kirkwood was Basham's court designated child advocate. After Basham was institutionalized, Cathy (phonetic) Basham, who is Basham's mother, told Jay that Branden Basham wanted to see Jay. Jay was concerned about seeing Basham because Jay played a role in the petition that was filed to institutionalize Basham. In spite of his concerns, Jay agreed to visit Basham and went to Rivendale Behavior Clinic with Basham's parents. Jay visited Basham with Jimmy Basham. During the visit, Jay asked Basham if he had been on drugs during the past couple of years. Basham told Jay that he had been on drugs and had a $150-a-week cocaine habit. Basham then told Jimmy Basham that he had stolen tools from him. Basham would have been fourteen to fifteen years old at this time.

Approximately four to five years later, Basham was working at Tyson Foods in Hanson, KY. Jay recalled an occasion around this time where Basham asked Jay to give Basham gas money for the week. Jay noted that Basham's complexion appeared clear and that it did not appear that Basham was on drugs at this time.

Jay is aware that Basham's parents gave him alcohol as a child and had Basham dance on a table. Jay is unaware of any allegations that Basham's parents physically or sexually abused Basham. Jay surmises that Basham had fetal alcohol syndrome. Jay bases this statement on his observations of Basham. Jay has no information regarding whether Basham was incarcerated as a child.

03842

**JA 5190**

7A-CO-27964

Continuation of FD-302 of ___Clifford Eugene Jay_____ , On _2/4/04_____ , Page __3__

      Jay learned that Basham escaped from the Hopkins County Jail by following the escape story in the newspaper. At this time, Jay became concerned that Basham may be coming to kill him. Jay already owned a gun, but after Basham's escape from jail and until his capture, Jay made sure he kept his gun loaded when he was at home because he was afraid Basham would kill him. Jay felt this way because Basham was so unpredictable, had attention deficit disorder, was hyperactive, might have fetal alcohol syndrome, and may have been on drugs.

      Prior to receiving a telephone call from Basham around Christmas 2002, Jay had not spoken to Basham for at least several months, and perhaps as long as two years. On approximately the evening of December 24, 2002, Jay received a collect telephone call from Basham. Jay knows that the telephone call was collect, because when he reviewed a subsequent phone bill, Jay was charged for the telephone call. Jay's mother answered the telephone call from Basham and informed Jay that "Branden" was on the phone. Jay believes his mother may have approved the collect telephone call from Basham to his home telephone number (270) 383-5259. At this time, Jay had seen the newspaper reports that Basham had already been captured.

      After taking the telephone from his mother, Jay asked Basham how he was doing. Basham told Jay that he was at the Columbia Care Center. Basham then told Jay, "I'm okay Mr. C.J., I'm okay, but you know I'm facing the death penalty." Jay then told Basham that we have all made mistakes and that Basham should be a man and admit it if he's done wrong. Jay told Basham that he needed to tell the truth. Jay then asked Basham if he had been "saved," to which Basham replied yes. Jay then asked Basham, "Did you do what they say you did?". Jay informed the interviewing agent that in asking this question, Jay was referring to the South Carolina murder because at this time, Jay was unaware of a second murder accusation against Basham. Basham responded to Jay, "Yes sir Mr. C.J., we killed them." Jay is 100 percent certain that Basham's exact response was "Yes sir Mr. C.J., we killed them." Jay found Basham's response upsetting because Jay did not believe that Basham was capable of killing someone, and because Basham's response indicated to Jay that Basham was involved in the killing of more than one person. Jay stated that he thought to himself, my goodness, who else did they kill? Jay characterized his telephone conversation with Basham as serious, and during the telephone call, Basham seemed clear and coherent. Basham was not in an excited or

03843

**JA 5191**

7A-CO-27964

Continuation of FD-302 of ___Clifford Eugene Jay_____ , On 2/4/04 ___ , Page __4__

agitated mood when Basham said, "Yes sir Mr. C. J., we killed them."

Jay then told Basham that it was not over, it was how Basham handled the situation, and all Basham had to do was to ask God for forgiveness and God would forgive him. Jay told Basham the biblical story about David having Uriah killed. Jay told Basham that after David had Uriah killed, he repented and confessed to God, and by doing so, David was still loved by God and was one of his people. Jay told Basham that all Basham had to do was to ask God for forgiveness and God would forgive Basham. Jay told Basham to be a man, to help "these people," and to tell them the truth. Basham replied, "Yes sir Mr. C.J."

Basham spoke to Jay about the location of "the woman from South Carolina." Basham told Jay, "We tied her up to a tree." Jay asked Basham where the woman was. Basham told Jay, "These woods, everything looks the same, I don't remember because everything looks the same." Jay is almost certain that at some point, Basham indicated that the missing South Carolina woman was tied to a tree in the woods of North Carolina.

During the telephone conversation, Jay thinks that Basham said he was afraid of Fulks. Jay is almost certain the telephone conversation with Basham ended with Jay telling Basham to always remember that Jay loved him, and with Basham responding, "I know that Mr. C.J." During the telephone conversation, Basham did not indicate how the missing woman from South Carolina was killed, or the roles that Fulks or Basham played in her death. Jay has not spoken with Basham since this telephone call.

Jay has known Deputy Sheriff David Morris, of the Hopkins County Kentucky Sheriff's Office, for a long time. After receiving Basham's telephone call, Jay telephoned the Hopkins County Sheriff's Office to report what Basham had told him. The Hopkins County Sheriff's Office then directed Jay's telephone call to Morris. Jay reported the information regarding his telephone call from Basham to Morris. SA Bruning showed Jay notes from Conway, South Carolina Police Department Detective Addison, and a Conway Police lead sheet associated with Addison obtaining information from the Hopkins County Sheriff's Office regarding Jays' conversation with Basham. Jay stated that he trusts Morris, and that if the notes indicate that Jay informed Morris that the missing woman from South Carolina was tied to a tree in North

03844

**JA 5192**

7A-CO-27964

Continuation of FD-302 of ___Clifford Eugene Jay_____ , On 2/4/04_____ , Page __5__

Carolina, then Jay is certain that Basham indicated the missing South Carolina woman was tied to a tree in North Carolina.

Within a few weeks of his telephone conversation with Basham, someone, who Jay believes may have been in law enforcement in South Carolina, told Jay that they were considering having Jay travel to South Carolina to obtain information from Basham. Jay stated that this did not occur and Jay did not travel to South Carolina to speak with Basham. Jay believes that he did speak with someone in law enforcement in South Carolina.

The people or institutions that would be familiar with Basham's behavioral problems are the James Madison Middle School, Sheila Mills at the Hopkins County Board of Education, Rivendale Behavior Clinic, and Monte Mefford.

Jay stated that Basham had a lot of problems growing up "but you can't blame crime on a tough childhood, people just can't go around killing people."

The following is a description of Clifford Eugene Jay:

DOB:                     10/6/53

SSAN:                    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

Address:                 301 S. Atkinson Ave
                         Earlington, KY 42410

Telephone:               (270) 383-5259
Employment:              CIA - Jesse Stuart (Phonetic)
                         Elementary
                         1710 Anton Road
                         Madisonville, KY
Military:                Air Force - 6/73 to 1977

03845

**JA 5193**

Clifford Jay

DIRECT

- Earlington Ky
- Instructional Aide for handicapped children

BB
- 3 to 4 years in class with C.J. (95-96)
- Knew BB's mother and father
- Maintained very little contact w/ BB
  after '96
- Emotionally Behaved Disturbed Students.
  - BB - ADHD and hyperactivity.

- December 2002 (Christmas eve)
  - CJ had read about BB escape
- Spoke n BB. (Collect call)

BB - I'm not so good. I'm in a lot of
  trouble"
- We killed them
- 30 Seconds later
- Story of man w/ 99 sheep & he killed
  another man's Ewe sheep.
  (King David
- Encouraged BB to help law enforcement
- BB told him "yes sir" Mr CJ.
  Do you know where the bodies are.
  "Everything look the same"
  The woods all look the same



DEFENDANT'S
EXHIBIT

JA 5194

- BB told CJ that he was afraid of Fulks.
- BB said yes sir, always
- BB respected CJ

## CROSS

- BBs counselor at Monte Medford in Special Ed.
- BB well behind his age group
- CJ knew of difficult home life
- BB cried about his family life

JA 5195

# LEAD SHEET

Lead No.: **72**

Subject of Interview: Clifford Jay
Officer/ Agent Conducting Interview: Addison
Purpose of Interview: Information concerning Brandon Basham.
Date Assigned: 12/24/02 1445 hrs.
Date Completed:

* On Tuesday 12/24/02 at 1440 hrs. I returned a phone call to a Deputy Sheriff from Hopkins Co. Kentucky (David Morris) # 270-836-3890.
  # 270-821-5664.

* He stated that he received a call from an old friend, who is a teacher for mentally unstable children, and had information concerning Brandon Basham. He gave me the phone # where he could be reached at a friend's house (270-821-6018 (Hedges Res.)

* Contacted Mr. Jay at that #. He stated that he received a call from Brandon Basham from a "Columbia Care center."

* He stated that he was Basham's teacher for years, and that Basham was treated for being unstable and had a problem growing up because he was so small.

* He stated that Basham told him that he was doing O.K., but was facing the death penalty. He told him that he was afraid of Fulks, and that is why he has not cooperated to this point.

* He did tell him that Ms. Donovan is tied to a tree in N.C.

* Mr. Jay stated that he believes that Basham will tell him where she is, due to the relationship they had in the past.

00272

Clifford Jay
(270)-383-5259
Home.

(270) 825-6055
Work.


**DEFENDANT'S EXHIBIT**

JA 5196

Tied her to a
tree.

1-270-821-5664.

David morris (Deputy Sheriff)
Hopkins co. Kentucky.

Join O.K.
but facing
Death penalty
small little man syndrome."

1-270-836-3890.

✱ Phone     Clifford Jay. (Teacher)
   call —    handicap children

This is not the     Bashem / Columbia Hospital.
p id.

Called mr. Jay concerning
where Donovan is /
                    (270) 821-6018 (#####
                                Hedges
                              residence
(in N.C.) (270) 383-5259
             Home.
                    (270) 825-6055
✱ Columbia care center.         (work)
   — no confidentiality in this.
   — Has agreed to cooperat w/ us
Using      fully.
drugs
since 13.   — # of years in behavior unit.
   — woke him up in the classroom.
      then swung blade. at him.

00273

_GH_

<div align="center">

## _MEMORANDUM_
## _ATTORNEY/CLIENT ONLY_

</div>

| | |
|---|---|
| _TO:_ | _Basham File_ |
| _FROM:_ | _Carlisle McNair_ |
| _DATE:_ | _September 20, 2004_ |
| _RE:_ | _Telephone conversation with Det. Addison_ |
| | _Conway SC Police Department_ |

_On September 20, 2004, I spoke to Det. Addison Conway Police Dept. Det. Addison advised he remembered talking to Clifford Jay and the lead sheet he generated from that conversation. Det. Addison was asked if Jay relayed to him any statements Basham made, such as, "we killed them" or if Basham made any statements to Jay about killing anybody? Addison advised his written report, dated December 24, 2002 at 1445hrs, lead # 72, records the conversation he had with Clifford Jay and what was stated. Nothing more to add._



DEFENDANT'S
EXHIBIT
36

**JA 5198**

00935 B

FindLaw | Legal Professionals | Students | Business | Public | News          Market Cent

# FindLaw
email @ Justice.com

**Looking for a Lawyer?**

City or Zip | State | Practice Area

POWERED BY WEST LEGAL DIRECT

Cases & Codes | Forms | Legal Subjects | Federal | State | Library | Boards          Law Firm FirmSites | Le

**Lawyer Search** | City or ZIP | State | Select a Practice Area

gregharris@justice.com          **Inbox** message 16 of 56

Check Mail
Write Mail
Log Out          Trash

**Folders**
**Inbox**
Sent
Drafts
**Trash**
Filters
Addresses
Preferences
Help
Empty Trash

From:    Jacklaw@aol.com
Date:    2 Aug 19:32 (PDT)
To:      gregharris@justice.com
Cc:      Jacklaw@aol.com
Subject: clifford james

Save Address
Print View
Show Headers
Show as Text
Report Junk Mail

## in reviewing my notes from 7/16/03 i see where i wrote down that he said brandon called and said "we killed her"

**Jack B. Swerling**
**803-765-2626-o**
**803-730-9400-c**
**803-799-4059 -f**

Change message text width in Settings.

FindLaw
RESOURCES

**LEGAL NEWS:** Top Headlines · Supreme Court · Commentary · Crime · Cyberspace · International
**US FEDERAL LAW:** Constitution · Codes · Supreme Court Opinions · Circuit Opinions
**US STATE LAW:** State Constitutions · State Codes · Case Law
**RESEARCH:** Lawyer Directory · Vendor Directory · Dictionary · Forms · LawCrawler · Library · Summaries of Law
**LEGAL SUBJECTS:** Constitutional · Intellectual Property · Criminal · Labor · more...
**GOVERNMENT RESOURCES:** US Federal · US State · Directories · more...
**INTERNATIONAL RESOURCES:** Country Guides · Trade · World Constitutions · more...
**COMMUNITY:** Message Boards · Newsletters · Greedy Associates Boards
**TOOLS:** Office · Calendar · CLE · West WorkSpace · FirmSite · Toolbar

Advertising Info · Add URL · Help · Comments          Jobs@FindLaw   Site Map
Company | Privacy Policy | Disclaimer          Copyright © 1994-2003 FindLaw



DEFENDANT'S EXHIBIT

**JA 5199**

# M E M O R A N D U M

TO: Branden Basham File
FROM: Jack B. Swerling                    DUPLICATE
DATE: July 16, 2003
RE: Interview with Clifford James

---

Greg, Paige and Jack met with Clifford James who is a former special ed teacher of Branden. The district always worried about money. James was trained in physical safe management. Had a deal with the kid if the kid acted out. Money was not being used. He complained about a lack of money for the defendant. Defendant was gone 2-3 days at a time; drinking; his parents drink. His parents gave him liquor when he was a child and stood him on the table. He saw the defendant bike 30 miles, no place to go. Has ADHD and possible fetal alcohol syndrome. Defendant got very angry once, very bad. He came up to him with a knife. He knocked him down hard. Defendant yelled out a racial slur. He recommended to the mother that he be put in a facility – she did – he went to see him.

Defendant admitted to coke since he was 12 years old and his habit was $150 week. He was stealing his father's tools and selling them. He had no chairs and no desks. He had the defendant for 3 years and he kept up with the defendant afterwards. Kids definitely picked on Branden because he was a small child and he didn't have much. He was kidding with one of his friends and the defendant came over where Mr. James was at a gas station and offered to help. Defendant tried to help others and would try and get money for them.

James has a high school GED degree. He served 6 years in the Air Force. He is a certified teachers aide. He still works for the Board of Education. He never saw the defendant get physical with anyone. The defendant jumped up in someone's face – just talk no action. Defendant was a protector, he would have cried not to do it. Defendant told him when he called on the phone from jail that "we killed her." Defendant has problems with anger.

JBS:lhb

1

DEFENDANT'S EXHIBIT

JA 5200

# M E M O R A N D U M

TO:        Branden Basham File
FROM:      Jack B. Swerling                    DUPLICATE
DATE:      Tuesday, September 7, 2004
RE:        Interview of Clifford Jay

---

On August 5, 2004, Lesa, Greg and I re-interviewed Clifford Jay. We have not spoken to him since the Fulks trial. Clifford Jay was the teacher's aide at James Madison. He has known Branden from his days at Anton. This is about 1996. Branden is a puzzling child. Branden was ADHD and hyperactive. He saw that in his folder. He also believes that Branden is suffering from fetal alcohol syndrome. The defendant was small and had small features. Branden had a hardship in his life and he had heard that from other sources. Among those problems were alcohol, drugs. He felt that Branden never had a chance to grow up. He saw no bonding with his mother. He saw Branden riding a bicycle by himself long distances. He filed an out of control petition on him after he put a knife to his throat. Jay describes this as a miniature switch blade. Branden admitted to using cocaine. Jay went to see him at Rivendell after he left school. Branden would come by his house periodically and would try and borrow money. One occasion, which is described in a previous memo, Branden came to his rescue. Branden grew up fast. He was the Robin Hood of the neighborhood. He had a big heart and shared with people. He helped kids who are less fortunate and he saw he was compassionate. He described a couple of people in the class who had difficulty and Branden sheltered them. He described the incident of mom putting alcohol in his bottle and Branden dancing naked on the table. Jay describes him as being angry against girls. He believe he was unnecessarily restrained in grades 1 through 4. One of the kids that Branden protected was a handicapped boy. Branden did get picked on because of his size. He said I remember kids who were a problem, not him. He was familiar with the head injury. He and Branden bonded together. I had a good impression of Branden. Branden directed his aggression toward authority. He and Branden hugged. He saw Branden cry a lot about his lifestyle experiences. The mother was a drug addict, not maternal. He described him as a vulnerable kid. He was actually the most vulnerable kid he had ever seen. Said he never saw a kid go through what he went through. That being a lack of bonding, alcohol in the bottle, no parenting skills, cigarette smoke and his parents had no skills in parenting. He cannot overemphasize how bad it was. We failed him. We loved each other. They had no interaction outside of school. Jay was aware that when Branden was not using drugs, he was not afraid of Branden per se, when he broke out he would have felt the same about his own brother. I asked him about 5 positive things that he could say about Branden, he said: loving, caring, giving, adorable, intelligent, perceptive, good heart, dealt with people less fortunate. The racial remark he made to him Jay never took as racial, just out of frustration. We would not be giving a death penalty to Branden, we would be giving it to all of us.

JBS:lhb

1

DEFENDANT'S
EXHIBIT
39

**JA 5201**

00953

Branden Basham
Paige Munn Tarr Mitigation Services
7/ /03 Interview with Clifford Jay - Certified Instructional Aid to Monte Mefford for many years in EBD classes

---

Home 301 S. Atkinson Ave, Earlington, KY (270)383-5259
Work Jesse Stuart Elementary, 1710 Anton Road, Madisonville (270) 825-6033

We drove out to CJ's house in Earlington after he didn't show up to meet us at Joe's Place. He had been warned by the Board of Education not to speak with us because we might be trying to help Branden sue them or hold them accountable in some way for the things that have happened to him. After convincing him on the phone that that was not our intention, he agreed to let us drive out to the house he shares with his mother in Earlington and speak with him there.

CJ, as he is called by everyone, always had a soft spot for Branden despite some of his behavior problems. CJ had been trained to use Safe Physical Management in the classroom to keep problem behavior contained without hurting a student that might have lost control. There were many occasions he had to resort to this with Branden, although CJ says he never felt personally threatened by Branden and knew that Branden loved him just as he loved Branden. In fact, one time a friend of CJ's was playing around at a convenience store and acted like he was going to attack CJ and Branden came running to his rescue. CJ had to convince Branden that they were just fooling around and that this guy wasn't going to try and harm CJ. This incident let CK know just how much Branden cared for him.

CJ assisted Monte Mefford, Branden's very favorite EBD teacher for many years. CJ and Monte worked together to keep Branden on an even keel (or as even as possible). On many occassions they had to hold Branden down to make him take his meds or bribe him with treats or special privileges to cooperate. They knew how difficult Branden's homelife was and that he was starting to go out a lot at night. This made him particularly sleepy and difficult to work with during the school day, but CJ knew that he and Monte were just about the only positive influences that Branden had going for him and that they were both going to try and do the best by him. CJ feels he knows Branden way better than his parents ever did because he spent 8 hours a day with him for years which amounted to a lot more time than anyone else in his life. CJ also heard the stories of how they would get him drunk as a little kid and have him dance naked on the table to entertain their friends or how they would give him illegal drugs, but not his prescribed medications.

Branden would spend a good bit of time in Time Out where CJ would go and check on him every 20 minutes to ensure his safety and see if he was ready to return to the classroom. Branden enjoyed the time outs and would stay there as long as he was allowed.

One very bad incident occurred on a day where Branden had obviously been out the night before and had not gotten any sleep. He was sleeping with his head on his desk in the classroom and CJ tapped him on the shoulder to wake him. Branden swung out with a blade (what CJ calls a 'One



DEFENDANT'S
EXHIBIT

JA 5202

Man Knife', sort of like a boxcutter) at CJ and narrowly missed slashing him. CJ knew this was a learned behavior from home where there were people around almost all the time who might be dangerous and that this had been a sort of involuntary reaction, not a personal attack against CJ. However, Jimmie was called to come up to the school and get Branden, but all Jimmie wanted to do was get his knife back. Kathy came up to the school to complain that CJ had pulled his hair and had been too rough when handling him after he came out swinging a knife.
The only times they ever saw Kathy, she was complaining that they weren't doing something right. For the day to day dealings, Jimmie was the one they tried to communicate with.

CJ knew Branden had been using cocaine since he was 12 years of age and that Kathy had him dealing and trading it for her. He developed a drinking problem very young and one time when he was 13 ingested so much that it shocked CJ he wasn't killed by it.

CJ feels Branden and the other special needs kids that went through this program at that time were very much mistreated - CJ calls them atrocities. Other teachers would harshly abuse and neglect these kids and not give them the positive attention they so desperately craved and needed. Monte Mefford quit her job because of the red tape of dealing with the other teachers, the school district, the state, etc. The special ed kids were the lowest of the lowest and no one wanted to be responsible for anything that went on with this program. There was also a huge problem with funding and when the new school building was built, there was no furniture or supplies for the EBD classes.

CJ says that the Board of Education is terrified to give us any information or cooperate in any way until after Branden's birthday. According to him, the state is still responsible for Branden until after he turns 22 and he will be 22 on 9/14/03. After this, they should be a little less difficult to deal with.

CJ says that although he cannot say it as a professional, that if Branden had been his son, he would have fought to make sure that Branden was institutionalized for the rest of his life. He knew that Branden could never live and function in the world on his own and that he needed the structure of specially designed programs with people trained to deal with the serious problems Branden had.

JA 5203

D-302 (Rev. 10-6-95)

-1-

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    02/04/2004

       Clifford Eugene Jay was advised of the identity of the interviewing agent and the identity of Assistant United States Attorney Jonathan S. Gasser. Jay was advised of the purpose of the interview and then provided the following information:

       Jay has spoken on two separate occasions with legal counsel representatives for Branden Basham and Chadrick Fulks. Jay recalled that one set of defense counsel representatives were from New York. Neither set of defense counsel representatives asked Jay about a telephone conversation Jay had with Basham on approximately December 24, 2002.

       Because of his religious beliefs, Jay does not want to see Basham and Fulks sentenced to death if they are found guilty in South Carolina. Jay stressed that his personal beliefs on this issue would not prevent him from being truthful with defense counsel or with the government.

       Jay has been a Certified Instructional Aid (CIA) for the past eleven years. The children under Jay's supervision commonly call Jay "Mr. C.J.". In approximately 1996, Jay was the CIA for Basham at James Madison Middle School, in Madisonville, KY. At this time, Basham was a seventh grade student in the Emotional Behaved Disturbed (EBD) program at James Madison. Basham was approximately two years behind in school because of his learning disabilities. Monte Mefford, was Basham's teacher at James Madison. Mefford has since retired in Madisonville, KY. Mefford's phone number is (270) 821-9518.

       Jay was Basham's CIA for approximately two to three years. During this time, Jay was able to gain Basham's confidence by disciplining Basham and even restraining Basham for volatile behavior. Jay recalled an occasion where Basham was laying down and sleeping in class. Jay tapped Basham to awaken him and Basham pulled a "one man straight blade knife," which Jay characterized as a knife that was similar to a switch blade. Basham sprung to his feet and swung the knife at Jay's neck. Jay fell back and was able to avoid being cut. Jay was then able to forcibly take the knife away from Basham. The following day, Jimmy Basham, who is Basham's father, came to school with Basham and asked Jay to return the knife. Jay refused and told Jimmy Basham that he was lucky that Jay

---

Investigation on    2/4/04    at   Madisonville, KY

File #   7A-CO-27964      Date dictated   2/4/04

by    SA Jeffrey J. Bruning

03841

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DEFENDANT'S EXHIBIT

JA 5204

7A-CO-27964

Continuation of FD-302 of ___ Clifford Eugene Jay ___ , On 2/4/04 ___ , Page __ 2 __

did not file a motion to have Branden Basham institutionalized for being out of control.

Jay characterized Basham as a small kid who had "little kid syndrome." Jay described Basham as a fighter who would easily get into a fight and as a person who would never back down from a fight. Basham was also someone who wanted to help and protect people as a young man, but at the same time, he was also someone who would get into fights with students who made him angry. Jay recalled an occasion a couple of years after Jay was no longer Basham's CIA, where Jay and a friend were in a convenience store teasing each other as if they were about to fight. Basham came into the convenience store and stood between them and asked Jay if he needed help. Jay noted that Basham intervened even though Jay's friend was a big person.

In approximately 1996, Basham was institutionalized at Rivendale Behavior Clinic by his parents for "out of control behavior." Connie Kirkwood was Basham's court designated child advocate. After Basham was institutionalized, Cathy (phonetic) Basham, who is Basham's mother, told Jay that Branden Basham wanted to see Jay. Jay was concerned about seeing Basham because Jay played a role in the petition that was filed to institutionalize Basham. In spite of his concerns, Jay agreed to visit Basham and went to Rivendale Behavior Clinic with Basham's parents. Jay visited Basham with Jimmy Basham. During the visit, Jay asked Basham if he had been on drugs during the past couple of years. Basham told Jay that he had been on drugs and had a $150-a-week cocaine habit. Basham then told Jimmy Basham that he had stolen tools from him. Basham would have been fourteen to fifteen years old at this time.

Approximately four to five years later, Basham was working at Tyson Foods in Hanson, KY. Jay recalled an occasion around this time where Basham asked Jay to give Basham gas money for the week. Jay noted that Basham's complexion appeared clear and that it did not appear that Basham was on drugs at this time.

Jay is aware that Basham's parents gave him alcohol as a child and had Basham dance on a table. Jay is unaware of any allegations that Basham's parents physically or sexually abused Basham. Jay surmises that Basham had fetal alcohol syndrome. Jay bases this statement on his observations of Basham. Jay has no information regarding whether Basham was incarcerated as a child.

03842

**JA 5205**

N-302a (Rev. 10-6-95)

7A-CO-27964

Continuation of FD-302 of ___Clifford Eugene Jay_____ , On _2/4/04_____ , Page ___3___

      Jay learned that Basham escaped from the Hopkins County Jail by following the escape story in the newspaper. At this time, Jay became concerned that Basham may be coming to kill him. Jay already owned a gun, but after Basham's escape from jail and until his capture, Jay made sure he kept his gun loaded when he was at home because he was afraid Basham would kill him. Jay felt this way because Basham was so unpredictable, had attention deficit disorder, was hyperactive, might have fetal alcohol syndrome, and may have been on drugs.

      Prior to receiving a telephone call from Basham around Christmas 2002, Jay had not spoken to Basham for at least several months, and perhaps as long as two years. On approximately the evening of December 24, 2002, Jay received a collect telephone call from Basham. Jay knows that the telephone call was collect, because when he reviewed a subsequent phone bill, Jay was charged for the telephone call. Jay's mother answered the telephone call from Basham and informed Jay that "Branden" was on the phone. Jay believes his mother may have approved the collect telephone call from Basham to his home telephone number (270) 383-5259. At this time, Jay had seen the newspaper reports that Basham had already been captured.

      After taking the telephone from his mother, Jay asked Basham how he was doing. Basham told Jay that he was at the Columbia Care Center. Basham then told Jay, "I'm okay Mr. C.J., I'm okay, but you know I'm facing the death penalty." Jay then told Basham that we have all made mistakes and that Basham should be a man and admit it if he's done wrong. Jay told Basham that he needed to tell the truth. Jay then asked Basham if he had been "saved," to which Basham replied yes. Jay then asked Basham, "Did you do what they say you did?" Jay informed the interviewing agent that in asking this question, Jay was referring to the South Carolina murder because at this time, Jay was unaware of a second murder accusation against Basham. Basham responded to Jay, "Yes sir Mr. C.J., we killed them." Jay is 100 percent certain that Basham's exact response was "Yes sir Mr. C.J., we killed them." Jay found Basham's response upsetting because Jay did not believe that Basham was capable of killing someone, and because Basham's response indicated to Jay that Basham was involved in the killing of more than one person. Jay stated that he thought to himself, my goodness, who else did they kill? Jay characterized his telephone conversation with Basham as serious, and during the telephone call, Basham seemed clear and coherent. Basham was not in an excited or

03843

JA 5206

-302a (Rev. 10-6-95)

7A-CO-27964

Continuation of FD-302 of ___Clifford Eugene Jay___ , On _2/4/04_ , Page ___4___

agitated mood when Basham said, "Yes sir Mr. C. J., we killed them."

Jay then told Basham that it was not over, it was how Basham handled the situation, and all Basham had to do was to ask God for forgiveness and God would forgive him. Jay told Basham the biblical story about David having Uriah killed. Jay told Basham that after David had Uriah killed, he repented and confessed to God, and by doing so, David was still loved by God and was one of his people. Jay told Basham that all Basham had to do was to ask God for forgiveness and God would forgive Basham. Jay told Basham to be a man, to help "these people," and to tell them the truth. Basham replied, "Yes sir Mr. C.J."

Basham spoke to Jay about the location of "the woman from South Carolina." Basham told Jay, "We tied her up to a tree." Jay asked Basham where the woman was. Basham told Jay, "These woods, everything looks the same, I don't remember because everything looks the same." Jay is almost certain that at some point, Basham indicated that the missing South Carolina woman was tied to a tree in the woods of North Carolina.

During the telephone conversation, Jay thinks that Basham said he was afraid of Fulks. Jay is almost certain the telephone conversation with Basham ended with Jay telling Basham to always remember that Jay loved him, and with Basham responding, "I know that Mr. C.J." During the telephone conversation, Basham did not indicate how the missing woman from South Carolina was killed, or the roles that Fulks or Basham played in her death. Jay has not spoken with Basham since this telephone call.

Jay has known Deputy Sheriff David Morris, of the Hopkins County Kentucky Sheriff's Office, for a long time. After receiving Basham's telephone call, Jay telephoned the Hopkins County Sheriff's Office to report what Basham had told him. The Hopkins County Sheriff's Office then directed Jay's telephone call to Morris. Jay reported the information regarding his telephone call from Basham to Morris. SA Bruning showed Jay notes from Conway, South Carolina Police Department Detective Addison, and a Conway Police Lead sheet associated with Addison obtaining information from the Hopkins County Sheriff's Office regarding Jays' conversation with Basham. Jay stated that he trusts Morris, and that if the notes indicate that Jay informed Morris that the missing woman from South Carolina was tied to a tree in North

03844

**JA 5207**

7A-CO-27964

Continuation of FD-302 of _____Clifford Eugene Jay_____ , On _2/4/04_____ , Page ___5___

Carolina, then Jay is certain that Basham indicated the missing South Carolina woman was tied to a tree in North Carolina.

Within a few weeks of his telephone conversation with Basham, someone, who Jay believes may have been in law enforcement in South Carolina, told Jay that they were considering having Jay travel to South Carolina to obtain information from Basham. Jay stated that this did not occur and Jay did not travel to South Carolina to speak with Basham. Jay believes that he did speak with someone in law enforcement in South Carolina.

The people or institutions that would be familiar with Basham's behavioral problems are the James Madison Middle School, Sheila Mills at the Hopkins County Board of Education, Rivendale Behavior Clinic, and Monte Mefford.

Jay stated that Basham had a lot of problems growing up "but you can't blame crime on a tough childhood, people just can't go around killing people."

The following is a description of Clifford Eugene Jay:

| | |
|---|---|
| DOB: | 10/6/53 |
| SSAN: | 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 |
| Address: | 301 S. Atkinson Ave<br>Earlington, KY 42410 |
| Telephone: | (270) 383-5259 |
| Employment: | CIA - Jesse Stuart (Phonetic)<br>Elementary<br>1710 Anton Road<br>Madisonville, KY |
| Military: | Air Force - 6/73 to 1977 |

03845

JA 5208

QUESTIONS      TORA BRAWLEY

Q:    WHAT DO YOU DO FOR A LIVING?

A:    I am a clinical neuropsychologist

*Q What is neuropsychology?*

Q:    WHAT IS A NEUROPSYCHOLOGIST?

A:    A neuropsychologist is someone who is a clinical psychologist with specialized training the area of brain behavior relationships

Q:    HOW LONG HAVE YOU BEEN A NEUROPSYCHOLOGIST?
A:  I have been working in the field of neuropsychology since I was a graduate student 17 years ago; I have been licensed in the field for independent practice for 11 years.

Q:    HOW DO YOU GET TO BE A NEUROPSYCHOLOGIST?
A:  It requires graduate training after college as well as a pre-doctoral internship and supervised post-doctoral experience before you are licensed to practice independently

Q:    WHERE DID YOU GO TO COLLEGE?

A:  I attended college at the University of Texas at Austin with Major fields of study in the area of pre-med and psychology and a minor in sociology.

Q:    WHERE DID YOU GO TO GRADUATE SCHOOL?

A:  I attended California School of Professional Psychology where I obtained both my Master's degree and PhD. in clinical psychology with Proficiency certification in the area of neuropsychology. This included extensive class work as well as Practicum placements in the school system, a rehabilitation hospital and an Air Force mental Health clinic.

Q:    WHAT TYPE OF TRAINING DID YOU DO AFTER THAT?

A:  After completing required class work and practicum placements I applied for pre-doctoral internship and accepted a position at Baylor College of Medicine in the Department of psychiatry. This included didactic training as well as work experience in the areas of.....

i



DEFENDANT'S
EXHIBIT
42

**JA 5209** A_24052

I also completed a post-doctoral fellowship at Duke University Medical School. My primary responsibilities there included....

Q:      CAN YOU DESCRIBE FOR US YOUR WORK EXPERIENCE?

A: After internship I was offered a position at BCM in the Dept of Neurology. Primary job descriptions included....
I was also co-director of the Baylor Post-Concussion Neurobehavioral Clinic.

I worked there for five years until I married and relocated to North Carolina where my husband was stationed with the Air Force. While there I worked at DUMC as described earlier and also worked as a Neuropsychologist at Wake Med Rehabilitation hospital. Primary job duties there included.....

At that time I also worked as a consultant for the NHL for the Carolina Hurricanes.

My husband then left active duty Air Force and accepted a position with the SCANG at McEntire, so we relocated to Columbia.

I accepted a position at DMH/WSHPI conducting court-ordered evaluations on criminal defendants for the State of SC. My primary job duties there included........ I conducted weekly evaluations on murder defendants both capital and noncapital cases.

At the same time I was seeing patients part-time through USC-SOM conducting neuropsychological evaluations.

After the birth of my son 2 and a half years ago, I opted not to return to full-time work so I could devote as much time as possible to him. I have continued to see patients on a part-time basis through my faculty position at USC-SOM. My practice there is 100% consultation. Patients are referred to me by their physicians for NP evals for a variety of reasons which include.....

I also conduct IME's for insurance companies and attorneys, and do some record reviews primarily for personal injury cases. In addition, I perform evaluations for the FAA on pilots who have lost, or are about to lose their medical certificate to assess their cognitive ability as it pertains to their return to the cockpit.

Q:      HAVE YOU GIVEN LECTUERS OR PUBLISHED IN THE AREA OF NEUROPSYCHOLOGY?

A: Yes, as part of my faculty position I give lectures as needed to medical students, fellows and residents. The primary topic areas include..... Topics that I have published about include......

2

JA 5210 A_24053

Q: HAVE YOU EVER BEEN CALLED AS A WITNESS TO TESTIFY ON BEHALF OF THE GOVERNMENT IN A CRIMINAL CASE?

A: Yes, as mentioned previously primarily through my work for the state as a court-appointed examiner.

Q: HAVE YOU EVER BEEN CALLED AS A WITNESS TO TESTIFY ON BEHALF OF A DEFENDANT IN A CRIMINAL CASE?

A: Same answer as above. Sometimes I was called to testify for the govt and sometimes for the defense depending on what my findings were.

Q: HAVE YOU BEEN QUALIFIED AS AN EXPERT WITNESS?

A: Yes, on multiple occasions in both criminal and civil proceedings.

Q: IN CLINICAL NEUROPSYCHOLOGY?

A: Yes.

**OFFER HERE AS AN EXPERT WITNESS**

JA 5211A_24054

Q: AT THE REQUEST OF DR. SCHWARTZ-WATTS DID YOU CONDUCT A NEUROPSYCOLOGICAL EVALUATION OF THE DEFENDANT BRANDON BASHAM IN-THIS CASE?

A: Yes, I conducted a neuropsychological evaluation on Mr. Basham on two occasions. I also reviewed and collected collateral information.

Q: COULD YOU BIREFLY OUTILINE YOUR EVALUATION PROCESS?

A: I first evaluated Mr. Basham on 5/20/03. This evaluation included an extensive clinical interview and a battery of tests that I will describe in more detail a bit later. After that evaluation, based on my results, I requested (and was provided by your office) collateral information in the form of educational records and previous medical/psychiatric and psychological records. Based on my review of these records I felt it necessary to speak with some of the individuals involved with Mr. Basham. I also repeated my evaluation of Mr. Basham in August of this year to assess for any change in his cognitive status. I also traveled to Kentucky to interview other professionals, jail personnel, educators, family and long-time acquaintances.

Q: DID YOU PREPARE SLIDES FOR YOUR TESTIMONY HERE TODAY?

A: Yes, I though it might help organize the information and keep us awake.

Q: WHAT ARE THE GOALS OF A NEUROPSYHCOLOGICAL EVALUATION?
   **SEE SLIDE**

Q: SO YOUR PURPOSE WITHTHIS EVALAUTION FOCUSES SOLEY ON A PERSONS BRAIN FUNCTION...HOW THEIR BRAIN WORKS?

A: Yes

Q: WHAT ARE THE ADVANTAGES OF NEUROPSYCOLOGICAL TESTS?
   **SEE SLIDE**

Q: SO THIS IS A STANDARD SET OF TESTS THAT YOU USE FOR YOUR EVALUATION?

A: Yes

Q: HOW DID THESE NEUROPSYCHOLOGICAL TESTS DEVELOP OVER THE YEARS?
   **SEE SLIDE**

Q: SO THESE TESTS AREN'T JUST THINGS YOU MADE UP ON YOUR OWN ONE NIGHT WHILE YOU WERE GIVING YOUR SON A BATH?

4

**JA 5212** A_24055

A: No sir, these are highly researched and developed tools used for these assessments which have proven to be effective.

Q: AND HOW DO YOU NORMALLY RECEIVE REFERRALS FOR NEUROPSYCHOLOGICAL EVALUATIONS?
    **SEE SLIDE**

Q: SO A PERSON CAN'T JUST REFER THEMSELVES FOR THESE TESTS, I COULDN'T JUST SHOW UP IN YOUR OFFICE ONE DAY AND SAY DOC I THINK I'M BRAIN DAMAGED CAN YOU TEST ME?

A: No sir, you would have to be referred by another source such as your neurologist or psychiatrist. These tests are lengthy, arduous and not something you do just for the heck of it.

Q: WHAT TYPES OF PATIENTS DOU YOU TYPICALLY SEE FOR NEUROPSYCHOLOGICAL EVALUATIONS?
    **SEE SLIDE**

Q: SO YOU CAN PERFORM YOUR TESTING ON ALL THESE DIFFERENT TYPES OF PATIENTS?

A: Yes sir, each type of neurological condition presents differently on testing, producing various patterns of results. In this way you can help to determine for example if a person has Alzheimer's disease or just normal patterns of memory loss associated with aging.

Q: WHAT AREAS ARE ASSESSED IN A NEUROPSYCHOLOGICAL EVALUATION?
    **SEE SLIDE**

Q: NOW, I AM GOING TO ASK YOU TO EXPLAIN EACH AREA YOU JUST DISCUSSED IN DETAIL AND THE TEST YOU GAVE ASSOCIATE WITH THESE AREAS. YOU MENTIONED INTELLECTUAL FUNCTIONING. CAN YOU EXPLAIN TO THE JURY WHAT THAT IS?
    **SEE SLIDE (WHICH MENTIONS WAIS-III)**

Q: AND CAN YOU EXPLAIN WHAT THE DIFFERENT IQ NUMBERS MEAN?
    **SEE SLIDE**

5

**JA 5213** A_24056

Q: SO IF SOMEONE HAS AN IQ BELOW 69 THEY ARE MENTALLY RETARDED?

A: Not necessarily. There are other reasons for low IQ which must be taken into account such as dementia, head injury or other causes of brain damage. For example if an AD patient has a very low IQ because of their disease you would not say he or she is MR. Instead you would say that they are functioning in the bottom 1-2 percentile of the population.

Q: IS PERCENTILE THE SAME THINGS AS PERCENT?

A: No, explain.....

Q: OKAY, AND BACK TO THE IQ CLASSIFICATIONS, SOMEONE WHOSE IQ FALLS BETWEEN 70-79 IS IN THE BORDERLINE RANGE, WHAT DOES THAT MEAN?

A: Well the DSM-4 actually extends this range to include up to an IQ of 84. This is someone functioning just above a MR level whose scores fall into the bottom 3-8 percentile).

Q: SO JUST TO MAKE SURE I UNDERSTAND THIS, IF SOMEONE'S IQ IS AT THE 5TH PERCENTILE THAT MEANS THAT 95 OUT OF A HUNDRED PEOPLE HIS SAME AGE ARE GOING TO SCORE BETTER THAN HE DID?

A: That's right.

Q: OKAY, DO YOU TAKE INTO ACCOUNT ACADEMIC FUNCTIONING WHEN DOING THIS EVALUATION?
    **SEE SLIDE**

Q: AND DID MR. BASHAM HAVE ACADEMIC TESTING PERFORMED ON HIM IN THE SCHOOL SYSTEM?

A: Yes, he was placed in special classes in school for learning and emotional problems. This required periodic testing for compliance with program standards. Mr. Basham probably has more previous testing performed on him than any other patient I have seen in the 17 years I've been working in this field.

Q: ANOTHER AREA YOU MENTIONED YOU ASSESSED WHEN DOING A NEUROPSYCHOLOGICAL EVALUATION IS ATTENTION AND CONCENTRATION. WHAT IS THAT?
    **SEE SLIDE**

6

JA 5214 A_24057

Q:  ANOTHER AREA YOU MENTIONED IS EXECUTIVE FUNCTIONING.
    CAN YOU EXPLAIN WHAT THAT IS?
        **SEE SLIDE**

Q:  SO EXECUTIVE FUNCTIONING IS BASICALLY HIGHER LEVEL
    FUNCTIONING THAT SHOULD DEVELOP NORMALLY AS WE GROW
    FROM CHILDHOOD AND BECOME RESPONSIBLE ADULTS?

A:  Exactly, our frontal lobes and executive functions are what separate us from the
    animals on the evolutionary chain.

Q:  LETS TALK ABOUT MEMORY FUNCTIONING. HOW DO YOU TEST FOR
    THAT?
        **SEE SLIDE**

Q:  YOU ALSO ASSESS LANGUAGE FUNCTIONING WHEN DOING AN
    EVALUATION. CAN YOU EXPLAIN THAT TO THE JURY PLEASE.
        **SEE SLIDE**

Q:  THE NEXT AREA YOU HAVE HERE IS VISUAL PERCEPTION, WHAT IS
    THAT?
        **SEE SLIDE**

Q:  SO SOMEBODY WHO WORKS WELL WITH THEIR HANDS OR MAKES
    THINGS HAS GOOD ABILITY IN THIS AREA?

A:  Yes. Artists, sculptors, mechanics, wood workers, etc all have good visual
    perceptual abilities.

Q:  THE NEXT AREA OF YOUR EXAM IS MOTOR FUNCTIONING, WHAT
    DOES THAT TEST?
        **SEE SLIDE**

Q:  SO MOTOR FUNCTIONG HAS NOTHING TO DO WITH MY CAR, RIGHT?

A:  No. sir, it refers to a person's motor ability with their hands.

Q:  THE LAST AREA YOU MENTIONED WAS EFFORT. CAN YOU EXPLAIN
    THE TESTING OF EFFORT?
        **SEE SLIDE**

7

JA 5215 A_24058

Q:  NOW, AFTER YOU ASSESS ALL OF THOSE AREAS IN AN EVALUATION, WHAT DO YOU DO WITH IT?

A:  You score the results and interpret your findings.

Q:  AND WHAT IS INTERPRETATION?
    **SEE SLIDE**

Q:  SO THAT'S WHERE YOU PUT ALL OF THE PUZZLE PIECES TOGETHER TO COME UP WITH THE WHOLE PICTURE?

A:  Exactly.

Q:  WHAT FACTORS DO YOU CONSIDER WHEN INTERPRETATE THE DATA AND MAKE A DIAGNOSIS?
    **SEE SLIDE**

Q:  WHAT KINDS OF FINDIGS CAN YOU HAVE IN SOMEONE WHO HAS BRAIN DAMAGE PRESENT?
    **SEE SLIDE**

Q:  DOES EVERY PATIENT HAVE ALL OF THESE PROBLEMS?

A:  No, everyone and everyone's brain is different. They are different to begin with then you add on life experiences like head injuries or concussions, drug and alcohol abuse, etc, and it changes the picture even further. No two brains are alike, just like different people have different reactions to the same medication.

Q:  WOULD YOU DISCUSS WITH US NOW THE RESULTS FROM YOUR NEUROPSYCHOLOGICAL EVALUATION ON BRANDON BASHAM PERFROMED IN MAY OF 2003?

A:  As mentioned previously, Mr. Basham was referred to me by Dr. Donna Schwartz-Watts. She consulted me because in the processes or her evaluation of Mr. Basham she became concerned about his cognitive abilities, specifically memory and attention and concentration problems that she noticed in her interviews. She had also noted several risk factors for cognitive problems when taking his clinical history.

8

**JA 5216** A_24059

Based on her referral I conducted a battery of tests and had the following results which are organized by functional area:

Q: AND TO MAKE SUER I RECALL CORERCTLY DOCTOR, A SCORE FALLING AT THE 1ST PERCENTILE IS THE WORST THAT YOU CAN GET.

A: That's right, it means that of 100 people your same age, everyone did better than you on this test.

Q: AND WHERE WAS THIS EVALUATION CONDUCTED?

A: For the May 2003 evaluation, Mr. Basham was brought to my office at the medical school by the Federal Marshals.

Q: DID YOU DO ANOTHER EVALUATION OF HIM?

A: Yes. I reevaluated him in August of 2004.

Q: AND WHY DID YOU DO THAT?

A: I requested to be able to reevaluate him because so much time had elapsed since my first evaluation. I wanted to asses him to see if his cognitive status had changed, and I wanted to have more up to date results for his trial.

Q: AND WHAT WERE YOUR FINDINGS FROM THAT EVALUATION?
**SEE SLIDE**

A: My results were basically consistent with the initial evaluation. There were a couple of areas that had decline, but most areas remained stable. This told me that his brain condition had not deteriorated further since my initial evaluation.

Q: FOR YOUR EVALUATION AND FORMUALTION OF A DIAGNOSIS ON THIS CASE, DID YOU USE ANY RESOURCES OTHER THAN YOUR TEST BATTERY RESULTS?

A: Yes. I had multiple other sources of collateral information.

Q: AND WHAT COLLATERAL INFORMATION DID YOU USE?
**SEE SLIDE**

9

**JA 5217** A_24060

Q:   COULD YOU LIST FOR US THE RECORDS THAT YOU REVIEWD AS PART OF YOUR EVALUATION?

A:   list....

Q:   WOULD YOU PLEASE TELL US ABOUT YOUR CONSULTATIONS WITH OTHER PROFESSIONALS?

A:   My consultations with other professionals included mental health and medical personnel, educators and jail personnel. Specifically I spoke with....

| | |
|---|---|
| Dr. Schwartz-Watts | Evaluating Forensic Psychiatrist |
| Dr. Brannon | Evaluating Neurologist |
| Dr. Morgan | Treating Psychiatrist |

**Eugene Gourley, Ph.D. –**      **Butner Federal Medical Center**

Believes his results similar to mine. Repeated some tests with medications.

**A. Dewey Sanders, Ph.D –**      **The Methodist Home**

~~Didn't initially remember him. Surprised by report.~~ Usually hold kids accountable for behavior but realized couldn't control his behavior because of past abuse. Food been denied. Very unusual report from perspective that felt his actions were completely out of his control..beyond his control. Report shorter than usually reports because not much to work with due to BB behavior being out of his control. Rewards that wee very desirable to him (such as food) couldn't even overcome behavior dyscontrol.

**Roger Laird, Ph.D –**      **Trover Clinic**

School records indicated working significantly below grade level, even in resource classes. Had to discontinue MMPI-A, could not comprehend questions and did not have adequate reading level. Progress notes (most accurate) state couldn't do Connors Scale because of being tired, lethargic and having decreased attention abilities. Very unusual that child cannot take Connors. Only occurs in about 1% of kids. Jimmy not interactive.

**Wendy Watts –**      **Hopkins County Schools**

Strong background of problems "didn't have a chance". Teacher ratings an overestimate of abilities, curriculum based not nationally standardized. Very supportive teacher, tries

10

JA 5218 A_24061

to accentuate positives. Had a great teacher, but could not have made it in an unstructured setting. WIAT more accurate estimate of academic functioning.

**Jeanne Bennett, Ph.D. –**          **Edelson and Associates (NP eval)**

Typo in report, did give MMPI-A not the MMPI-2. Does not think he could have done MMPI-2 because of all double negative, "not sure he could follow that". Does not recollect if read to, audio tape of self-admin and does not have the data since no longer at that office.

**Monte Mefford –**          **Special Ed Teacher, Hopkins Co.**

Special ed teacher 6-8[th], his last teacher. Brigance not standardized, "teacher-drive", "did better if I read to him". Gave lots of structure. WIAT given by Wendy more accurate testing. BB big problems with concentration, lives moment to moment. Could not retain things. Big difference in behavior and abilities when didn't take meds. Not able to sequence, plan or think ahead. More of a follower. Big mood swings, suspected drugs. Told her about huffing gas and how he did it. Could not have functioned in regular classroom. Know he did not know what a regular fourth grader knew. Many headaches.

**Lisa Anne Potts-**          **Cardinal Treatment Center**

MMPI-A given but had to use audiotape. Very impulsive. Not the type of child to sit down and plan something. On unit when in trouble usually because involved with older kid. Would do things to get emotional needs met. Gave lack of remorse example Wal-Mart to steal food. Presented and acted much younger than actually was.

**Paul Arison -**          **Hopkinsville Detention Center**

Taught GED classes at Hopkinsville County Detention. On pre-test scored below 3rd grade level for knowledge/ability. Wasn't able to sit through whole test, decree attention, bored. Made good attempt. Good attendance when allowed to attend. Any distraction would throw him off in class. Bounced around classroom, couldn't focus even with his medications. Don't think he retained anything. Would never have had the ability to get GED.

**Chris Shaffer –**          **Hopkinsville Detention Center**

Hanging attempt. Just hanging, not struggling. 1st deputy on scene having trouble holding him up so Schaffer took over. Immature, does immature things that are not though out. Could tell he was below average. Inwardly aggressive to self, not others. Anything set off, go from calm to bored. Didn't accept change well, not flexible at all. Not able to plan. Compared to an inmate have now who is retarded "very similar".

**JA 5219** A_24062

Q:    AND COULD YOU REVIEW FOR US THE INTERVIEWS YOU
      CONDUCTED WITH MR. BASHAM'S FAMILY AND LONG-TIME
      ACQUAINTANCES?

A:    Yes, when I traveled to KY I interviewed family members....

**Kathy and Jimmy Basham –**

Head injury age 5-6 fell from tree, hit head on metal railroad track. Did not take to the
hospital. Beaten up frequently by other kids, was small for age. Shunned as kid because
hyper. Not able to do school work. Depressed as a kid. Frequent severe headaches.
Used MJ when pregnant. Have smoked crack together. He would steal to get drugs.

**Charlotte Basham –**

Dropped on head two times as infant, once by aunt and another time by father.
Frequently beaten by mother. Fall off top of very high swing set. Fell from tree, missed
school but mom did not take to doctor. Used MJ as long as can remember, at least since
age 8. Would smoke together. Steal MJ from mother who grew it. Would dry the buds
in BB bedroom. He tried to stop fights between parents, would get hit. Started huffing
gas age 8. Started smoking crack age 12 was living with father. Go to school high and
say allergic to pet ferret. Came to live w/ in 99, both were smoking crack daily as much
as could get. Sell, trade, cheat dealers to get. ~~Also sex for drugs.~~ Used up to 5 grams a
day ($600 worth). Charlotte lost job, kids because of drug use. Also daily MJ during this
time. ~~Charlotte robbed, asked BB to move out, suspected he did it for drugs.~~ Mom
would welcome BB to home when he had drugs but when gone would say "get out MF
and don't come back". Feels mother emot abusive also would tell BB wished never had.
Mother still calls Charlotte for drug money. Tries to pawn jewelry if sees her wearing it
(recently as yesterday ..8/30/04).

Long-time Acquaintances:

**Barbara Massey Campbell –**

Known BB since age 8-9. One of first times met him he had a briefcase full of MJ. He
had a very rough childhood. Smoked crack coc, crank frequently. Mom abusive toward
mentally and physically. Mom got kids started on drugs. Has seen Mom smoking with
BB. BB couldn't think on own, more of a follower, didn't plan things, mentally not able.

12

**JA 5220** A_24063

**Jessica Stokes –**

Known BB for many years. Seen BB using acid, crank, MJ. Seen Charlotte and Mom do drugs together. BB did drugs frequently with Crystal Massey. Mom had him around bad drug crowd.

**Crystal Massey -**

Known BB for many years. Daily use of drugs. Has seen him smoking with Mom. Mom pulled a crack pipe out in front of her.

**Ruby Watson –**         **(By phone)**

Known BB since born, known his father since he was a teen. BB always had probs with attention, had to take meds. "mentally disabled". Mother on drugs when he was born and on drugs throughout BB life. BB in trouble because of drugs. Not a very smart person.

Q:     AFTER ALL OF THIS, DID YOU COME TO A DIAGNOSIS FOR BRANDON BASHAM?

A:     Yes

Q:     AND WHAT IS THAT DIAGNOSIS?
        **SEE SLIDE**

A:     Based on my testing and the collateral information I diagnosed Mr. Basham with Dementia due to multiple etiologies.

Q:     WHAT DOES THAT MEAN?

A:     As the slide shows, the DSM-4 describes this diagnosis as…..

Q:     THIS DECLINE OF FUNCTIONING YOU JUST MENTIONED, CAN YOU EXPLAIN THAT A LITTLE BIT BETTER?
        **SEE SLIDE**

A:     Well, this slide compares results obtained on the only other NP eval he has had which was conducted in 1999 by Dr. Bennett prior to his release from the juvenile justice system. As you can see from Dr. Bennett's results his scores were……

13

**JA 5221** A_24064

When you compare those results to the ones obtained on my testing you can see the areas of significant decline noted in red.

The next slide (**SEE SLIDE**) is a breakdown of the IQ subtests from 1999 and 2003. In order for a subscale score to be considered a significant decline there must be a change of 3 points. These points range from 1 (the worst) to approximately 16 0r 17 (the best). Again those marked in red represent a significant decline.

So, as you can see there is definite impairment in many areas of brain functioning and many of these areas of dysfunction represent a decline from scores obtained in 1999.

Q:    YOU HAVE DIAGNOSED MR. BASHAM WITH DEMNITA DUE TO MULTIPLE ETIOLOGIES. WHAT ARE THESE MULTIPLE ETIOLOGIES….ACTUALLY I'M NOT SUER EVEN WHAT AN ETIOLOGY IS MUCH LESS MULTIPLES?

A:    Etiologies is just a word that means causes. Mr. Basham's dementia comes from multiple causes. The causes that I have identified include repeated head injuries, drug use and possible anoxia.

Q:    AND WHAT EFFECTS DO REPEATED HEAD INJURIES HAVE ON A BRAIN?
        **SEE SLIDE**

Q:    PLEASE DISCUSS WITH US YOUR FINDINGS REGARDING MR. BASHAM'S HISTORY OF MULTIPLE HEAD INJURIES.

A:    There is a multitude of evidence that shows Mr. Basham has had multiple head injuries of varying severity. This information comes from school records, psychiatric records, family report and Mr. Basham. He was dropped several times as an infant, had a significant fall from a tree as a child, a blow to the face with a metal rail, multiple fights, as well as self-injurious behavior (banging head on cement floors or walls). Even if none of these were serious enough to require hospitalization, the repetitive nature of the head injuries is significant. It's like a football quarterback who has to retire because he has had several concussions.

Q:    AND THE NEXT CAUSE OR ETIOLOGY YOU MENTIOEND WAS DRUG USE, TELL US MORE ABOUT THAT?
        **SEE SLIDE**

A:    I identified several substances used on a regular basis by Mr. Basham that can have significant impact on the brain…...

14

**JA 5222** A_24065

Again, this substance abuse was confirmed through multiple sources, not just Mr. Basham.

Q:  AND THE LAST FACTOR YOU EMNTIONED WAS ANOXIA, CAN YOU TELL US WHAT THIS IS?
    **SEE SLIDE**

A:  Yes Sir, Mr. Basham has had several hanging attempts, at lest one of which resulted in some periods of un responsiveness. These periods of unresponsiveness could represent anoxia which means the brain is not getting OXYGEN. This leads to the death of brain cells which do not regenerate.

Q:  YOU JUST DISCUSSED ALL OF THESE ETIOLOGIES FOR BRAIN DAMAGE. DO THESE PROBLEMS LEAD TO PERMANT BRAIN DAMAGE?

A:  Yes sir they can. I believe in Mr. Basham's case they are permanent. He has several risk factors for permanent deficits and his neuropsychological test scores have remained stable over the past year. If these deficits were going to resolve or improve they would have done so by now.

Q:  WHAT EXACTLY ARE THE RISK FACTORS FOR HAVING PERMANENT BRAIN DAMAGE?
    **SEE SLIDE**

Q:  SO, IN SUMMARY, WHAT IS YOUR DIAGNOSIS OF BRANDON BASHAM?
    **SEE SLIDE**

15

**JA 5223** A_24066

**FILE COPY**

**jeans**

| | |
|---|---|
| **From:** | "Carlisle McNair" <cjm0501@alltel.net> |
| **To:** | "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com> |
| **Sent:** | Sunday, December 07, 2003 10:57 PM |
| **Subject:** | Carlisle's plans |

Going to Hopkinsville/Madisonville to locate & talk to:

1. Angel Eichelholz
   -wrote letters back & forth to Branden while in jail
2. Det. Paul Johnson
   -arrested Branden on Nebo Rd in 2001
3. Jimmy Hill
   -homosexual friend of Branden
   Looking forward to this one
4. Jeremy Babar
   -another homo friend of Branden's
   Can't wait
5. Linda McVay
   -in jail with Veronica
6. Charlotte Morris
   -follow-up on interview Paige had with ex-in laws
7. Tom DeFatte
   -attempt to locate
   -assaulted Branden as a child
8. Talk to Lindsey Clan's mother about possible three way calls she may have done for Veronica.
9. Attempt to locate and talk to inmates who were in jail with Fulks & Basham.
10. Serve two subpoenas for records in Nashville & Russellville, Ky.

Carlisle McNair
803-608-5576 cell
cjm0501@alltel.net



DEFENDANT'S
EXHIBIT
4/3

**JA 5224**

 Fw: Fulks & Basham
Carlisle McNair
to:
Addison, Domogauer, hendrick, hipp, Parker, perrit, rizzo, schilling, sessions, staples, wilkerson
10/13/2003 09:39 PM
Hide Details
From: "Carlisle McNair" <cjm0501@alltel.net> Sort List...

To: "Addison" <saddison@cityofconway.com>, "Domogauer" <jdomogauer@cityofconway.com>, "hendrick" <shendrick@cityofconway.com>, "hipp" <chipp@cityofconway.com>, "Parker" <dparker@cityofconway.com>, "perrit" <lperrit@cityofconway.com>, "rizzo" <rrizzo@cityofconway.com>, "schilling" <lschilling@cityofconway.com>, "sessions" <csessions@cityofconway.com>, "staples" <tstaples@cityofconway.com>, "wilkerson" <twilkerson@cityofconway.com>

*My name is Carlisle McNair. I retired October 2002, with 27 years, as Captain of Investigations, with the Lexington County Sheriff's Department. I am an FBINA Graduate, 184th Session, and currently have a Private Investigations agency in Columbia, McNair Investigations, SLED # 2188. I have been appointed by the Federal Court as an investigator, assigned to Jack Swerling, court appointed attorney for Basham. I know I am working on the other side, but the "FACTS DON'T CHANGE." I am, and will always be, a "cop" at heart. Fulks & Basham are in a heap of trouble and I am, in no way, attempting to change those facts. Swerling has directed me to conduct interviews of all parties, civilian and law enforcement, pertaining to this case. Reviewing the discovery, I saw your name on lead sheets. I just need you to take the time to answer one question:*

*Other than the leads you were assigned, and based on what you know about the case, is there anything, good or bad, you can share with me pertaining to Fulks & Basham?*

*Please e-mail me with your response. Thank you for taking the time to do so.*

*Be safe.*
*Carlisle McNair*
*803-356-2324 h*
*803-608-5576 cell*
*803-765-2626 w*
*cjm0501@alltel.net*



DEFENDANT'S EXHIBIT
4/4

US v. Branden L. Basham
Paige Munn Tarr Mitigation Services
10/08/03 Interview with Tim Garry, a neighbor who tried to help Branden from time to time

---

Tim and his wife Vickie live not too terribly far from the Bashams and the Bolingers. Their 21 year old son Bryan went through school with Branden, although they were never in class together. Bryan and everyone else would always pick on Branden for being in special classes and being different. He was a little punk with no dad and a screwed up mother that didn't look after him, according to Bryan.

The Garry's always considered Branden to be mentally retarded, or somewhere close to it. In fact, when asked they said they would give him an F for intelligence. Branden was always in his own little world, hyper and fidgety. He would just follow anybody's lead without question and that always placed him in with the wrong crowd. Branden did not have the ability to think for himself.

Tim and Vickie thought Branden abused drugs after he visited many times with red, bleary eyes. They also knew that his mother had a drug problem, as well as mental problems herself. Tim and Vickie felt sorry for Branden, so they tried to be good friends to him. They would have him over 2-3 hours at a time when he had nowhere else to go. Tim and Vickie would feed him, let him hang out or ride the four wheeler. They always talked about going fishing, but never went. Although they worried about him, they couldn't let him stay overnight because he might steel things from them.

He would often leave their house headed for the Colonial Motel. He stayed there often with some guy when his mother wouldn't let him stay at home. They knew he stayed there a good bit because he called them many times from the motel.

Although Tim and Vickie knew Branden to be troubled, they never knew him to be the least bit violent. When they heard what had happened, they instantly thought that the other guy got hold of him.



DEFENDANT'S
EXHIBIT
46

JA 5226

Penny is now a counselor at Castle Junior High School in Newburgh, Indiana (812)853-7347. She was a counselor at Charter of Evansville, now Deaconess Crosspoint, back in 1997 when Branden was an inpatient there. Penny returned to work at Charter after maternity leave in January of 1997 and Branden was admitted there on January 28, 1997. Penny assumed he was sent there for both a serious substance abuse problem coupled with obvious mental and emotional troubles.

Penny suggested we contact Kent Leslie (see Memo), Dori Branson and Vernell Hall to find out their opinions of Branden while working at Charter with him. She feels they share her feelings of exasperation with the situation because they all knew how troubled he was, but they were limited in what they could do for him while he was in their care. They were also aware of the horrific family situation that he came from.

Penny seemed to have a way with Branden and she could get more out of him than anyone else. Other kids would tease and say that his 'girlfriend' was sticking up for him again. Penny didn't baby him, she feels, but really knew what made him tick. She would try to encourage him to learn to play the social game with the staff he didn't get along with or the other kids, but he just couldn't or wouldn't do it. Penny has always struggled with establishing and keeping boundaries with Branden because he became very dependent upon her and at one point, Kathy Basham tried to sign over custody of Branden to Penny.

Penny is well aware of Branden's intellectual functioning (or lack thereof). Instead of having a Special Ed teacher in the Education Room at Charter, they hired a lady named Angela Matthews. Angela had a BA in Education and a Masters in Mental Health counseling, but she was not very good with the special needs kids. She would just sit at the front of the room as the children worked through their workbooks which were organized by grade level. There would be 9-10 year old kids working on 4th or 5th grade material while 15 year old Branden would sit and struggle with 2nd or 3rd grade books. The class was supposed to be self-paced and Branden would get easily frustrated with the materials and need assistance to better understand the work. Angela was not trained to deal with children like him and some of the others and she would become easily irritated. Penny would try to encourage Branden to avoid dealing with Angela - she would tell him to think of her as a scorpion that you should stay away from, or you'll get stung. Well, as Penny says, Branden would get stung over and over again and end up in time out or worse due to the fact that he could not learn from his mistakes or think ahead enough to tell himself that,"If I do this, she will punish me and I don't want that to happen."

While an inpatient there, Branden's day would go something like this: a group meeting to establish and discuss goals for the day; then to class for school; a break for lunch followed by an afternoon school period; after 3:00 they would all have various Group Time activities and some free time for games or outside; then dinner and a wrap up Group session that was handled by a


DEFENDANT'S
EXHIBIT
47

mental health counselor.

One thing Penny always thought interesting was that although Branden liked to present with a tough and gruff guy appearance, he was also always taking up for and protective of the little kids. If a little kid was upset because no family or friends had come to see them, for example, he would talk them through being sad. He was also always trying to seek female approval and attention which Penny attributes to the lack of attention he received from his disaster of a mother.

Penny left her job at Charter at the end of June of 1997 because she was starting her school counselor job. She had held the Charter job while she was finishing her Masters of Education in counseling and after she completed the program at Western Kentucky, she found a job in the school setting like she had planned. Even after she was gone, Branden would use his phone privileges to call Penny. He would just want her to hear about all the injustices that had occurred because no one there liked him or believed his side of a story. Kathy one time even called Penny and asked her to meet her and Jimmie at a McDonalds near the hospital while they had Branden out on a family pass. Penny bought everyone's lunch because she wondered if they had enough money to cover it.

As many have said, Penny never thought Branden would ever be involved with something like this, at least not on his own. Branden did not have the ability to plan and then carry out something like this unless he was led and told to jump here or sit there. When Penny heard he had escaped with a hardened criminal, she was afraid because she didn't know what they were capable of together. She would never fear Branden on his own, but if he came to her because he was scared, she didn't know what might happen with the other guy in tow. Penny called Tom Van Warmer about protecting herself and heard from the agent what she already knew about him. That Branden, it was believed, was not the type to intentionally plan to harm someone and was incapable of getting very far if left to his own devices. An agent by the name of Williamson from the Evansville FBI told Penny that James Hawkins had given that statement about how Branden had saved his life and tried to comfort him as best he could. This information was consistent with the picture Penny had painted of Branden.

After our lunch meeting with Penny, we went over to what was the Charter Hospital and took a tour of the facility. Penny was able to show us where everything was and give us additional little stories of Branden that she recalled as we walked around the hospital. We were then able to meet with someone from medical records and now it appears we will be able to retrieve his Charter of Evansville records after all.

**JA 5228** A_23826

**From:** "Paige Tarr" <paige@brucklaw.com>
**To:** <tthierolf@hotmail.com>; <ShealyBoland@hotmail.com>; <jacklaw@aol.com>; <gregharris@justice.com>; <cgrahamsc@aol.com>; <jgs@justice.com>; <lindab@justice.com>; <ecr@nmrs.com>; <sharrison@justice.com>; <wvcookpi@citynet.net>; <cjm0501@alltel.net>; <yetto@mis.net>; <gacollais@citynet.net>
**Sent:** Monday, October 13, 2003 7:18 AM
**Attach:** MITINTERVIEWSLIST.wpd
**Subject:** Mitigation Interview List

Here is a list (that will grow 10 fold very quickly) of possible mitigation witnesses. A date beside their name tells when they were interviewed. Please email any names that you would like to add. I know, for instance, that a number of names from discovery are not included just yet.

Also, trip to KY very productive. Interviews included: Danny Dees, James Lantrip, Mike Lantrip, Monte Mefford, Penny Titzer, Barry McGaw, Molly McGaw, Tim Garry, Vickie Garry, Randy Bolinger, Susie Bolinger, as well as Dillingham and Shafer from the jail. We did not catch up with Dianne Blair, James Hawkins or Sgt. Roden although we made a number of attempts. We did find the abandoned school bus belonging to Joe T. Jones where they spent their first night after escaping and possible paths on foot.
There were also some interesting records at the courthouse pertaining to Branden's extended family. So, a good bit accomplished and a bunch to be done.

Memos to follow this afternoon. Paige



DEFENDANT'S EXHIBIT
48

JA 5229
2/11/2011

MITIGATION INTERVIEWS

BEVERLY BASHAM - Aunt
JIMMIE BASHAM - (5/03 & 7/03 & 10/08/03) Father
KATHY BASHAM - (5/03 & 7/03 & 10/08/03) Mother
TOMMY BASHAM - Uncle
RANDY BOLINGER - (10/08/03) Neighbor and friend
SUSIE BOLINGER - (10/08/03) Neighbor and friend
CATHERINE "DORI" BRANSON - Charter of Evansville Sexual Assault Victim's Counselor; now    an MSW in Michigan
PETER BRILL, MD
AMBER BROOKS - Girlfriend from Western State Hospital
WILLIAM CLAPP, MD
GERALD CLARK, MD
DANNY DEES - (10/08/03) Probation officer in Madisonville
OLLIE DENNIS, MA
DILLINGHAM - (10/09/03) Supervising officer at jail on night of escape
CATHERINE DOSS - (5/03) Maternal grandmother
SYDNEY EDELSTEIN, OD
TIM GARRY - (10/09/03) Neighbor and friend
VICKIE GARRY - (10/09/03) Neighbor and friend
VERNELL HALL - Counselor at Charter of Evansville
DEBBIE HALEY - 5th Grade Special Ed teacher at Anton Elementary
JAMES HAWKINS - Victim
LAUNA HOUSTON, Ph.D. - (7/03)
CLIFFORD JAY - (7/03) Special Ed teacher
JOE T. JONES - an "uncle"; abandoned school bus owner where Branden and Chad spent first night
KENT JONES, MD
ROGER LAIRD, Ed.D.
JAMES LANTRIP - (10/08/03) Jailer
MIKE LANTRIP - (10/09/03) Madisonville Police Department Narcotics agent with favorable quote
KENT LESLIE - Counselor from Charter of Evansville
SCOTT LITTLETON, MD - (7/03) Formerly of Rivendell; read the bad EEG in 1991
LOSSNER
LOWES, MD
RICHARD LUNSFORD, MD
BARRY MCGAW - Big Brother (10/08/03)
MOLLY MCGAW - Special Ed Reading teacher and Big Sister (10/08/03)
BETTY 'BETH' MCGUFFIN -
SEAN MAGUIRE, MD
MONTE MEFFORD - (10/09/03) Special Ed teacher
SHEILA MILLS - Chairman of the Board of Education for Hopkins county

JA 5230

MING, MD
BUDDY RAY MORRIS, III - Charlotte Basham Morris' ex-husband
CHARLOTTE BASHAM MORRIS (5/03&7/03)
ENA MORRIS - Charlotte Morris' former mother-in-law
IRENE PASQUIN, MD - Western State Hospital doctor who diagnoses Psychotic Disorder in '00,'01 after suicide attempts at jail
ANNABELLE PENTECOST - Kathy Basham's former mother-in-law
WILLIAM PENTECOST - Kathy Basham's former husband
MARK PHEBUS - Charlotte Morris' boyfriend
SGT. RHOADIN - Officer at Hopkins County Detention Center in Medical
DE LA ROCHA, MD
ROZELLE
HASNAIN SADIQ, MD (7/03)
SHAEFER - (10/08/03) CO at jail
LAWRENCE SUESS, MD - (7/03)formerly of Trover Clinic; currently has Hopkinsville Jail contract
PENNY TITZER - (10/09/03) Favorite counselor from Charter of Evansville
WENDY VANESS
JANICE B. WALKER, Eds, LMFT
FRED WEBBER, MD
DOYLE WORTHINGTON, MD
MARGIE WOODS - Girlfriend

**JA 5231**

# M E M O R A N D U M

**To:**        Basham File

**From:**      Lesa F. Watson/Paige Tarr

**Subject:**   Randy Bolinger/Susie Bolinger

**Date:**      October 13, 2003

1925 McCloud Road
[Grapevine area] left off of Hwy 41 S
Madisonville, Kentucky

On October 08, 2003, LW/PT interviewed Mr. and Mrs. Bolinger. Mr. Bolinger is quite direct and open in his opinions. Mrs. Bolinger "chimes in" when "Dad" lets her . Mr. Bolinger immediately described BB as retarded and believed BB's mother to have drawn a disability check for BB. The Bolinger's feel that BB is on a 3rd or 4th grade level of intelligence. They do not know of BB ever driving a car and Mr. Bolinger opined that BB would have a wreck before he went very far. BB would not know to stop. The Bolingers related that BB would commit petty thefts i.e., cassette tapes, little things. BB could not comprehend that he was getting a criminal record for the petty acts that he was committed, even though Mr. Bolinger had tried to explain to him on numerous occasions. They described Mrs. Basham as a severe cocaine user, never a mother to BB and BB was virtually a street child. They further described BB's sister as a prostitute.

They related that the Madisonville police department had a hot list for alcohol abusing youth and made a practice of harassing lower income youths and manipulating them into pleading guilty when many times they were innocent. The Bolinger's appear to be kind-hearted, honest lower income, working people and seemed to take an interest in the youths of their community.

They relate that the harassment of the youths had caused the youths to use the local railroad grid as a means of foot transportation and avoidance of the MPD. They related that two young boys that were twins, had been abandoned by their mother and lived in a trailer on their

*CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGE*
*and/or*
*ATTORNEY WORK PRODUCT*



**DEFENDANT'S EXHIBIT**
**JA 5232**

own. Kept it spotless and were self-supporting. Their father LN Cannon was killed on this railroad track as well as both twins about five years ago. The Bolinger's related that BB was a friend of Tim Gary and an Elvis Gibson. After the interview, Mr. Bolinger showed us where Mr. Gary lived. The Bolinger's are the couple that offered to drive and go and see BB in SC when he was first arrested. Even though they are a plain spoken, common everyday couple of limited means, they would both, especially Mr. Bolinger make excellent witnesses. They are both very credible in their descriptions and recollections of the Basham family and the Grapevine community.

I:\Phoenix\Basham\Investigation\Evidentiary hearing\Documents from CD 2011 trip\2003.10.13 Memo from Watson-Tarr Interview Bollingers.wpd

**JA 5233**

DEFENDANT'S
EXHIBIT
50

10/15/09 While Miosi is Testifying,
Δ is Worried about his dip
At critical moments in Testimony
he is Wondering if Evan
is coming back to Butner

10/15/09 At break, Δ wanted his dip. I told
him Greg and I needed to talk he became
irate. Barb and I talked how to handle
Miosi. I then went to cell so Δ could
have his break. He jumped all over me
about not having his dip break. I got it
for him. He would not stop arguing about
this. Then he told me that I had no
right to speak with Greg without him
I explained what we were doing and

JA 5234

WHAT WE SAID. HE was highly agitated, yelling At me And being Abusive. I was trying TO THINK through The Structure of Approaching Mbosi. Finally I TOLD him To "SHUT UP" AND AFTER SEVERAL TIMES HE DID

10/18/04  D is crying during U's Testimony —
First time during Trial. I Told him that it was fine if sincere but not if it was staged

10/20/04

10/22

JA 5235

Branden L. Basham
Paige Munn Tarr Mitigation Services
11/14/03 Interview of Sheila Mills - Head of Special Ed for the Hopkins County Board of
Education
320 S. Seminary Drive, Madisonville, KY (270)825-6000

---

Sheila has been with the school district or school board for her entire career. She has been
dealing with Branden and the Basham's for many of the years she has been there. Although she
hasn't worked much on a one on one basis with Branden, she has tried to coordinate services and
assist the teachers and specialists who have struggled to help him over the years. So she feels she
knows the situation quite well.

Branden was identified as having problems early on - in the second grade. He was screened
initially for problems by a Pam Chandler who claimed he had no problems. However, not long
after testing Branden, she was dismissed for being mentally unstable and incompetent. When
tested a second time, huge learning and behavioral disabilities were uncovered. The district then
paid for him to be tested further at the Trover Clinic by neurologist Bindu deSai and
psychologists Sherry Spence and Paul Phillips. This was expensive testing and was only
approved due to the extreme disabilities Branden was facing. He was placed in EBD
(Emotionally and Behaviorally Disabled) classes from that point onward.

Sheila remembers a time when she thought she had found a program that really could have made
a big difference in Branden's life. It was called IMPACT and was through social services. The
program would have provided intense therapy, counseling and treatment for not only Branden,
but Jimmie, Kathy and Charlotte, as well. The program required the parents' consent and an
agreement to participate in family therapy as well as allow case workers access into the home on
a daily basis. Of course, Kathy would have no part of that (that might have interfered with her
social activities) and Branden wasn't accepted into the program.

Then Sheila proceeded to go with me through the records. We took each name, discussed them
and she gave me heads up as to how to get in touch with them now. She called the middle school
and the principal at Earlington Elementary and asked about speaking to me. Sheila is very
committed to helping us help Branden in any way she can. She also gave me the numbers of
Linda Hayes and Peggy Woods who were social services people who had worked with Branden.

Sheila wrote the names down of the people who tried to illegally obtain Branden's Special Ed
records. They were Bill Nettles and a John Rebold, who claimed to be a clerk for the Federal PD
reachable at (917)751-4073.


DEFENDANT'S
EXHIBIT
51

JA 5236

Branden Basham
Paige Munn Tarr Mitigation Services
Interview with Sharon Watkins of Earlington Elementary on 11/14/03

Earlington Elementary 229 West Thompson Sreet, Earlington 42410 (270)825-6154

Sharon was Branden's first first grade teacher at Anton Elementary before he was tested for Special Ed. From the way he looked and acted, he had not attended any sort of preschool or kindergarten before starting first grade. She supposes he was dropped off by Charlotte and knows either he or she had gotten him ready because he was dirty and disheveled. Once inside her classroom, it didn't take any time for him to try and take off running. She had to physically restrain him while he kicked and screamed in order to keep him in the room. She begged me not to write down her next comment which was that he was like a little animal that had raised itself in the woods and had never had any human contact. He over reacted to everyone and everything and he was angry a large part of the time. He was so needy that it was virtually impossible to get anything done with the class while he was in it.

Kathy was not living with the family at this point, but later in the year she appeared before Kathy and started accusing her of mistreating Branden. Sharon was shocked to even see Kathy, much less have her criticizing her. Sharon tried to tell Kathy she really did like Branden and that she knew he had a very sweet side. Sharon also knew from that first day of school onward that he needed to be evaluated for Special Education. Although he stayed in her class for the entire year, she retained him in first grade and waited patiently for her request to have him tested be carried out.

* It appears that they moved Branden to another school for the next year - probably because Kathy didn't want him to have to repeat first grade at Anton. He came back to Anton a year later to try regular second grade and had Susan Mayes. Susan retained him that year for second, but he was then placed into Special Ed at that point.



DEFENDANT'S
EXHIBIT
52

JA 5237

 Interview: Ruby Spence Watson
Carlisle McNair
to:
Traci Thierolf, Steve Hisker, Shealy Boland, Paige Tarr, Lesa Watson, Jean Strickler, Jack Swerling, Harrison Saunders, Greg Harris, Greg Cook, Gary Collias, ecr, Carolyn Graham, Carlisle McNair, Adrian Kandare
11/23/2003 06:23 PM
Hide Details
From: "Carlisle McNair" <cjm0501@alltel.net> Sort List...

To: "Traci Thierolf" <tthierolf@hotmail.com>, "Steve Hisker" <hisker@scbar.org>, "Shealy Boland" <Shealyboland@hotmail.com>, "Paige Tarr" <paige@brucklaw.com>, "Lesa Watson" <yetto@mis.net>, "Jean Strickler" <jeans@swerlinglaw.com>, "Jack Swerling" <Jacklaw@aol.com>, "Harrison Saunders" <saunders@swerlinglaw.com>, "Greg Harris" <GregHarris@justice.com>, "Greg Cook" <wvcookpi@citynet.net>, "Gary Collias" <gacollias@citynet.net>, "ecr" <ecr@nmrs.com>, "Carolyn Graham" <cgrahamsc@aol.com>, "Carlisle McNair" <cjm0501@alltel.net>, "Adrian Kandare" <akandare@justice.com>

## MEMORANDUM
## ATTORNEY/CLIENT ONLY

TO:        *Basham File*
From:      *Carlisle McNair*
Date:       *November 19, 2003*
RE:        *Interview: Ruby Spence Watson*

---

*On 11/19/03 I spoke to Mrs. Watson, Deanne's mother at her place of work, Big B Cleaners in Madisonville, Ky. 270-825-1561 (w).*

*Mrs. Watson advised she knows for a fact Cathy Basham used drugs during her pregnancy with Branden. She was a drug addict then, she is a drug addict now. Branden was retarded and very, very slow mentally. Branden never got a chance in life to grow up in a normal household. Cathy was always doing drugs & drinking and Jimmy was an alcoholic.*



DEFENDANT'S
EXHIBIT
53

FILE COPY

jeans

**From:** "Carlisle McNair" <cjm0501@alltel.net>
**To:** "Traci Thierolf" <tthierolf@hotmail.com>; "Steve Hisker" <hisker@scbar.org>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com>
**Sent:** Friday, December 05, 2003 11:39 PM
**Subject:** Interview: Mark Phebus

## MEMORANDUM
## ATTORNEY/CLIENT ONLY

**TO:** *Basham File*
**FROM:** *Carlisle McNair*
*Carolyn Graham*
**DATE:** *December 2, 2003*
**RE:** *Interview: Mark Phebus  w/m*
*270-399-0118 (cell)*

---

*On December 2, 2003, we spoke to Mark Phebus. Phebus is a convicted drug dealer. Served 26 months in state pen and lost $2m in drug assets. Advised he was considered a drug kingpin in Hopkins Co. Very proud of himself. Advised he made millions selling drugs. Started in the drug business in the 1970's off-loading boats in Florida, making $75,000.00 a boat. Advised he unloaded 3 boats a week. Advised he has been straight & clean for 9 years. Makes $200,000.00 a year building houses. Advised his brother-in-law is VP of Continental Airlines and helped him get back on his feet after prison. Met Charlotte Morris (Basham) through a stripper he was dating, who smoked marijuana with a Charlotte. Charlotte was never a stripper. First time he met Branden, it wasn't, "Hi, nice to meet you," it was, "Hey, you got $5.00." Branden has a very low IQ. He has never driven a car, nor does he have a drivers license. Branden would sit up in a tree and huff gas fumes while his father was trying to coax him to come down. Branden started smoking crack cocaine with his mother, Cathy. Cathy still smokes crack daily. Branden received a monthly disability check Cathy spent on drugs. Branden is borderline retarded. Branden and Bucky Emory were homosexual lovers. Shane Blanton, who works for Phebus when he isn't in jail, was in jail with Branden and told Phebus Branden was considered everyone's "bitch' in jail. Charlotte purchased a new pair of $50.00 shoes for her daughter and left them at Cathy's house. When she came back to get them, Cathy had traded the shoes for crack. Branden never had a chance in life. Cathy has boyfriends over when Jimmy is there. Jimmy drinks and passes out at the kitchen table and Cathy trades sex acts for crack. When Branden was small, Cathy would put him in a stroller and go to Wal-Mart and shoplift, putting the stolen items in Branden's stroller. Branden has been writing letters to Cathy from jail. Phebus was asked if he picked up Branden & Chad after they escaped, that Christy Baldwin gave law enforcement a statement saying he did. Phebus advised Christy is a lying, crack whore. Phebus bailed Christy out of jail in exchange for sex. Christy never paid up. Advised with the reputation he has in Hopkins County, if law enforcement had any indication he was involved with the escape, they would have been all over him. Phebus advised he didn't pick up Branden & Chad and doesn't know where that came from. Phebus advised when Charlotte & Branden were small children, Jimmy & Cathy would load them up and go to Florida, in the family stationwagon and smuggle dope back to Madisonville for Harold Tosh. Tosh was caught for drugs and is serving federal time in a medical unit in Minnesota. Tosh was sentenced out of McCracken Co. Ky, Paducah Federal Court about 6 or 7 years ago. (Unable to verify at this time. Still checking to see if Tosh is incarcerated.) Spoke to Phebus 12/05/03 and advised him I couldn't find Tosh in the federal system. He advised his son Jerry Tosh is also serving time in a federal facility in Florida. I will attempt to verify.*



DEFENDANT'S
EXHIBIT
54

JA 5239

FILE COPY

jeans

| | |
|---|---|
| **From:** | "Steve Hisker" <Steve@SwerlingLaw.com> |
| **To:** | "Traci Thierolf" <tthierolf@swerlinglaw.com>; "Yetto" <yetto@mis.net>; "Shealy Boland" <Shealyboland@hotmail.com>; "Paige Tarr" <paige@brucklaw.com>; "Gary Collias" <gacollias@citynet.net>; "Carlisle McNair" <cjm0501@alltel.net>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Jean Strickler" <jeans@swerlinglaw.com>; "Carolyn Graham" <CGRAHAMSC@aol.com>; "Steve Hisker" <steve@swerlinglaw.com> |
| **Sent:** | Monday, December 08, 2003 10:06 AM |
| **Subject:** | Conversation with Public Defender Mike Ruschell |

TO: Jack
FILE: Branden Basham
FROM: Steve
DATE: December 2, 2003
RE:
I spoke with Hopkins County Public Defender Michael Ruschell 270-824-7001. He described Basham as reasonably polite, but always highly agitated. He said that he probably should have had him evaluated.

Branden actually changed the way they did business in Hopkins District Court. Clients would usually sit unshackled in front of the judge while court was not in session. On this particular day Branden was the only person in the court room. Ruschell motioned for Branden to come talk to him about his case and at that time Branden jumped up and ran out of the court room and disappeared. Ruschell thinks that Branden might have been gone for a couple of days, but they eventually found him hiding in a dumpster. From now on the defendants are shackled in the court rooms. Ruschell believes that Branden has a very low IQ. He describes him as a sweet young man, not capable of any type of leadership role. He believes his office probably represented Fulks, so he doesn't want to give me any information about him. Ruschell said that out of the two, Fulks was probably the planner of the jail escape.

He remembers representing Branden on a felony charge 01-CR-095. He said there is another Public Defender by the name of Keith Virgin, who also represented Basham during the period of his escape.

Ruschell said that Branden had a very demanding family. They called the office frequently. It appears they had no understanding of how the legal process worked. Described them as a very marginal family. He said Branden had a very difficult upbringing.



DEFENDANT'S
EXHIBIT
55

JA 5240

**From:** "Paige Tarr" <Paige@brucklaw.com>
**To:** "Lesa Watson" <yetto@mis.net>; <traci@swerlinglaw.com>; <STEVE@swerlinglaw.com>; <SHEALYBOLAND@HOTMAIL.COM>; <SHARRISON@justice.com>; <linda@swerlinglaw.com>; <jeans@swerlinglaw.com>; <Jacklaw@aol.com>; <GREGHARRIS@justice.com>; "Greg M Cook" <wvcookpi@citynet.net>; <gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>; <CGRAHAMSC@aol.com>; <akandare@justice.com>; <Lisajkimbrough@yahoo.com>
**Sent:** Tuesday, February 10, 2004 11:25 AM
**Subject:** RE: IQ TESTING

Interesting. I will go back and pull test results, although there is at least one occasion where he scores a bit above the 80. Tora Brawley gives him dementia based on the decline.

---

**From:** Lesa Watson [mailto:yetto@mis.net]
**Sent:** Tue 2/10/2004 12:03 PM
**To:** traci@swerlinglaw.com; STEVE@swerlinglaw.com; SHEALYBOLAND@HOTMAIL.COM; SHARRISON@justice.com; Paige Tarr; linda@swerlinglaw.com; jeans@swerlinglaw.com; Jacklaw@aol.com; GREGHARRIS@justice.com; Greg M Cook; gacollias@citynet.net; ECR@NMRS.COM; CJM0501@ALLTEL.NET; CGRAHAMSC@aol.com; akandare@justice.com; Lisajkimbrough@yahoo.com
**Subject:** IQ TESTING

In my interview last night with Brenda Shaner and Connie Baker, they were noticing the difference between BB's verbal vs. performance IQ results and that the large point spread was indicative of his inability to verbalize his feelings, etc. Anyways, they said that back when BB was in the system, all facilities public and private had a minimum IQ of 80 standard. They would not take a child unless the child had an IQ of 80. It was intimated that BB's IQ testing could have been skewed to get him in facilities.
Need to figure out how to go about checking this out. Run this by Donna and see if she has any info or, has heard of this happening. I'll check with my sources.
Lesa F. Watson, C.C.D.I.
Paralegal/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net



DEFENDANT'S EXHIBIT 56



**jeans**

| | |
|---|---|
| **From:** | "Paige Tarr" <Paige@brucklaw.com> |
| **To:** | <jacklaw@aol.com>; <gregharris@justice.com>; <traci@swerlinglaw.com>; <steve@swerlinglaw.com>; <jeans@swerlinglaw.com>; <saunders@swerlinglaw.com>; <lisajkimbrough@yahoo.com>; <akandare@justice.com>; <gacollias@citynet.net>; <cjm0501@alltel.net>; <cgrahamsc@aol.com>; <yetto@mis.net>; "Paige Tarr" <Paige@brucklaw.com>; <ecr@nmrs.com>; <rawlae@yahoo.com> |
| **Sent:** | Monday, June 28, 2004 2:57 PM |
| **Subject:** | Deputy Paul Arson |

Branden Basham
Paige Munn Tarr Mitigation Services
June 23, 2004 Interview with Deputy Paul Arson of the Hopkins County Detention Center

---

Dep. Arson is in charge of the commissary at the Hopkins County Detention Center. His other main duty is running the GED program at the jail. The program entails 4 hours of classroom time per week. Typically, anyone interested is tested in the beginning to establish their educational level. If they score at 10th grade or above, they take a pre-GED test for practice and then they are allowed to take the real test 2 times a year until they pass.

When Branden came in, he was tested on a 3rd grade level. Dep. Arson knew then he would never be able to pass the test, even with a great deal of study and effort. On top of the low educational level, Branden's limited attention span made it even more difficult for him to learn anything. In a two hour class, Branden might be able to listen for the first 30 minutes, but was gone after that. Most of the time he wasn't even allowed to come to class because of misbehavior during the week. Branden did seem to genuinely want to get his GED, but Dep. Arson finally told him that no matter what he did, he just didn't have the ability to learn enough to pass.

Although a bit of a pain, Dep. Arson didn't think Branden was truly mean and realized he had some legitimate impairments.



DEFENDANT'S
EXHIBIT
57

**JA 5242**

FILE COPY

jeans

| | |
|---|---|
| **From:** | "Lesa Watson" <yetto@mis.net> |
| **To:** | <traci@swerlinglaw.com>; <STEVE@swerlinglaw.com>; <PAIGE@BRUCKLAW.COM>; <Lisajkimbrough@yahoo.com>; <linda@swerlinglaw.com>; <jeans@swerlinglaw.com>; <Jacklaw@aol.com>; <GREGHARRIS@justice.com>; "Greg M Cook" <wvcookpi@citynet.net>; <gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>; <CGRAHAMSC@aol.com>; <akandare@justice.com>; "saunders@swerlinglaw.com" <saunders@SwerlingLaw.com>; "Anna Rawl" <Rawlae@yahoo.com> |
| **Cc:** | <Vog12@aol.com> |
| **Sent:** | Wednesday, June 30, 2004 1:58 PM |
| **Subject:** | Interview of Sharon Watkins |



DEFENDANT'S EXHIBIT 58

# Memorandum

**To:** Basham File

**From:** Lesa F. Watson

**Subject:** Interview of Sharon Watkins, 1st grade teacher

**Date:** June 30, 2004

On June 24, 2004, Ms. Watkins met us at our hotel for an interview. She is currently a guidance counselor. She had been teaching since 1978 when she had BB in the 1987-1988 school year. She recalled that BB arrived for school on the first day without a parent and tried to run away. He was a child with no boundaries, very impulsive and obviously not socialized. BB experienced a very difficult time learning with obvious learning problems. He could not be left alone, frustrated easily, was not well fed, short for his age, but not thin. She found him to be socially and academically far behind his peers. He was at the lowest academic level. BB was living with his father at the time. The students were mostly from a rural setting and had never experienced anything like BB. Charlotte would try to help him as much as she could. Ms. Watkins saw no evidence of BB ever have attended kindergarten or pre school. At that time, in the school system, they did not have children that were EBD or, guidance counselors and she had never referred a child. She did retain him. Mr. Basham came to the school a couple of times for various things and told her he was an alcoholic and he and his wife abused drugs. He smelled of alcohol on these occasions. She feels that Mr. Basham tried, but BB just did not have a chance. She is now a licensed clinical counselor and looking back it is possible that BB displayed symptoms of FAS, but she believes there were a lot of environmental factors in play as well.

The most interesting day she ever had was the one and only time Kathy came to the school. She described Kathy as "high spirited." Kathy asked to spend the day observing the class room. Ms. Watkins had no problem with this and provided Kathy with a place to sit beside the children. From that moment on, Kathy was never still. She was all over the classroom and constantly asking questions. Totally disruptive and Ms. Watkins said she accomplished nothing while Kathy was there. The children were in awe all day. Kathy would constantly ask, "Why is he sitting there?" "Why isn't he there yet?" – referring to BB's reading group – "He can do it." Ms. Watkins said she then had BB begin to read for his mother and he could not accomplish the simplest of words. She then got up and went to the bathroom with BB. They then went to milk break and Kathy accused Ms. Watkins of beating her own fist against the wall. Kathy got up in her face and told her she would have her job, etc. Just a complete nightmare. Kathy left.

6/30/04

She does not remember BB ever hurting another child. BB went after whatever he wanted and just barreled over whatever was in his way. It was not intentional. BB received mixed signals, had no consistency and didn't know where the boundaries were. He would often sleep in class. Trauma could have possibly caused BB's behavioral/learning problems. Also, long term depression will effect all aspects of a person. BB just did not know right from wrong. In a small group, BB re-directed fairly easily. One on one, he was fine. Over the years she has often wondered what would happen to him. She saw him again when he was in school again in the EBD program in about the 5th grade.

She remembers Charlotte as very watchful, quiet, fearful, kind of shy – depressed. She did not smile much.

Ms. Watkins then reviewed BB's Hopkins County School Board records. They also do not have all information. She explained that stanine scores are as follows:

1-2-3 low level

3-4-5 mid to average level

7-8-9 high level

They are based on a percentile grouping.

She then reviewed his testing results over the years and explained to us how all the scores are interpreted. Very helpful.

Lesa F. Watson, C.C.D.I.
Paralegal/Investigator/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net

JA 5244

**From:** "Lesa Watson" <yetto@mis.net>
**To:** "Gary Collias" <gacollias@citynet.net>
**Cc:** <traci@swerlinglaw.com>; <STEVE@swerlinglaw.com>; <PAIGE@BRUCKLAW.COM>;
<Lisajkimbrough@yahoo.com>; <linda@swerlinglaw.com>; <jeans@swerlinglaw.com>;
<Jacklaw@aol.com>; <GREGHARRIS@justice.com>; "Greg M Cook" <wvcookpi@citynet.net>;
<gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>;
<CGRAHAMSC@aol.com>; <akandare@justice.com>; "saunders@swerlinglaw.com"
<saunders@SwerlingLaw.com>; "Anna Rawl" <Rawlae@yahoo.com>
**Sent:** Monday, July 12, 2004 4:42 PM
**Attach:** CASTOFCHARACTERSGEOINDEXED070504.wpd
**Subject:** Re: more memos
Updated as of today.


----- Original Message -----
**From:** Gary Collias
**To:** Paige Tarr ; jacklaw@aol.com ; traci@swerlinglaw.com ; steve@swerlinglaw.com ;
jeans@swerlinglaw.com ; saunders@swerlinglaw.com ; ShealyBoland@hotmail.com ; yetto@mis.net ;
gregharris@justice.com ; ecr@nmrs.com ; cgrahamsc@aol.com ; akandare@justice.com ;
lisajkimbrough@yahoo.com ; vog12@aol.com
**Sent:** Monday, July 12, 2004 7:47 PM
**Subject:** Re: more memos

Would someone email me the latest "cast of characters" I deleted mine.  Gary Collias


----- Original Message -----
**From:** Paige Tarr
**To:** jacklaw@aol.com ; traci@swerlinglaw.com ; steve@swerlinglaw.com ; jeans@swerlinglaw.com ;
saunders@swerlinglaw.com ; ShealyBoland@hotmail.com ; yetto@mis.net ;
gregharris@justice.com ; gacollias@citynet.net ; ecr@nmrs.com ; cgrahamsc@aol.com ;
akandare@justice.com ; lisajkimbrough@yahoo.com ; vog12@aol.com
**Sent:** Wednesday, January 28, 2004 6:23 PM
**Subject:** more memos

Just for information sake, everyone should go to the nofas.org website to learn more about Fetal
Alcohol Syndrome.  It is fascinating because it describes Branden perfectly and is the number one
cause of non-genetic mental retardation.  Also, the website for the Special Olympics is informative.

As far as the FAS goes, does anyone know of a pediatric dysmorphologist we might could have look
at Branden (that is if we could get one approved, that is)  I have never used one in a case, but have
heard good things about their testimony at trial.



DEFENDANT'S
EXHIBIT
59

**JA 5245**
2/14/2011

FILE COPY

**jeans**

**From:** "Carlisle McNair" <cjm0501@alltel.net>
**To:** "Traci Theirolf" <traci@swerlinglaw.com>; "Steve Hisker" <hisker@scbar.org>; "Paige Tarr" <paige@brucklaw.com>; "Lisa Kimbrough" <lisajkimbrough@yahoo.com>; "Lesa Watson" <yetto@mis.net>; "Jean Strickler" <jeans@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Greg Harris" <GregHarris@justice.com>; "Greg Cook" <wvcookpi@citynet.net>; "Gary Collias" <gacollias@citynet.net>; "ecr" <ecr@nmrs.com>; "Carolyn Graham" <cgrahamsc@aol.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Adrian Kandare" <akandare@justice.com>; "Anna Rawl" <Rawlae@yahoo.com>
**Sent:** Monday, July 26, 2004 11:36 PM
**Subject:** Interview: Marvin & Peggy Phillips

### MEMORANDUM
### ATTORNEY/CLIENT ONLY

**TO:** Basham File
**FROM:** Carlisle McNair
**DATE:** July 22, 2004
**RE:** Interview: Marvin & Peggy Phillips
279 LuLu Circle
Madisonville, Ky    270-825-0137 h   270-339-4946 Marvin's cell
270-836-4303 Peggy's cell

On July 22, 2004, I spoke to Marvin & Peggy Phillips. Both worked at HCDC for 7 years. Marvin was a correctional officer, Peggy was the dietician in the kitchen at HCDC. Peggy advised Basham worked in the kitchen on occasion. The Phillips described Basham as aggravating, mischievous, has a very low IQ, good natured individual, a follower. Marvin advised he has been around a lot of mean people working in the jail. Basham is not a mean person. Both are very concerned about Basham and will do whatever they can to help him. Marvin works part-time at the jail as a Chaplin.



DEFENDANT'S
EXHIBIT
60

**JA 5246**

**From:** "Lesa Watson" <yetto@mis.net>
**To:** "Lesa Watson" <yetto@mis.net>; <STEVE@swerlinglaw.com>; <PAIGE@BRUCKLAW.COM>; <Lisajkimbrough@yahoo.com>; <linda@swerlinglaw.com>; <jeans@swerlinglaw.com>; <Jacklaw@aol.com>; <GREGHARRIS@justice.com>; "Greg M Cook" <wvcookpi@citynet.net>; <gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>; <CGRAHAMSC@aol.com>; <akandare@justice.com>; "saunders@swerlinglaw.com" <saunders@SwerlingLaw.com>; "Anna Rawl" <Rawlae@yahoo.com>
**Cc:** <Vog12@aol.com>
**Sent:** Tuesday, August 03, 2004 8:50 AM
**Subject:** Lisa Potts Interview

# Memorandum



DEFENDANT'S EXHIBIT  
C1

**To:** Basham File

**From:** Lesa F. Watson

**Subject: Lisa Ann Potts, Psychologist from Cardinal Treatment Center**

**1997 psychological including MMPI**

**Date:** August 3, 2004

5212 Hassock Court

Louisville, Kentucky 40258

502.550.0491 Cell

502.384.2212 Home

Currently: Psychologist for Bullet County School Board

I had asked Danny Stringfield, via email over the weekend, if he would please try and contact Lisa and explain to her why I wanted to meet with her. She had not returned any of my previous phone calls. Lisa called yesterday afternoon and said that she had received my message that I had left last week with her mother and also spoken with Danny. She had thought I was someone they used to work with and had called several ex workers trying to figure out who I was. Lisa was very cooperative and offered to meet me half way from Louisville last night for an interview in Frankfort.

Before I explained anything about BB's case, I showed Lisa her report. Her response was, "Branden was a child. And I use the word child because that's how immature he was for his age. Follower, in no way a leader. This is a child we failed. The system failed him and now the system wants to fail him again by giving him the death penalty." BB was gullible and impulsive.

Lisa left DJJ in August of 1999, because DJJ had ordered staff to cease doing any psychological reports on children and she is of the opinion that they did not want to treat the children. BB was discharged from Cardinal because of the Habeas action brought by Lisa Clare, DPA.

In reviewing her report, Lisa explained that her report was for staff use only. It was not an absolute. She had to give every conceivable path/symptom/problem BB could develop, so the staff would be aware and be able to develop a treatment plan for him. She felt that if BB was not taught to be accountable for his actions, various problems could develop. BB was very much a conduct disorder because of criminal history and substance abuse. But she believed the cause of these traits were neurological in basis. She strongly felt that BB had neurological damage because of his earlier fall, drug use and exposure, etc., and that is why she recommended to Dr. Stocker that a full neurological be done on BB. She said these were generally not done because of budgetary problems, another reason why she left.

In making her report, she relied upon Dr. Laird's previous report and testing [due to closeness in time], the social workers social history report and an interview with BB. Her interview was very early on during BB's stay at Cardinal. Again, she reiterated that she had great concerns over organicism being the root of BB's behavioral problems. She did not believe he was sexually abused by a neighbor. She felt the abuse was by a family member. BB wanted acceptance by peers desperately. She remembered that he had broken his glasses so he would not have to wear them because he felt it would give peers another reason to tease him. BB was always led by an older/more mature/more sophisticated peer. BB would become involved in situations to gain peer acceptance and then get caught holding the bag. BB would relate three (3) different stories and not realize he was doing so. BB's higher verbal IQ score made him appear "to have more sense than he really did." BB's aggression that she reported was a natural response in someone who had experienced sexual abuse. He was angry/afraid. He did not want to be touched. His aggression was an explosion of this anger/fear from being abused.

Branden's conduct problem was because of his emotional issues. She wanted to determine if BB was abusing drugs not because of addiction, but because of self medication. Lisa described the "features" he displayed as follows: you begin with conduct disorder, then the next level would be anti social features and the psychopathic features. Conduct disorders/mental illness/organic brain damage can all display features of conduct disorders and anti social disorders. Couple organic brain damage with emotional issues and you will see even more of these features. It does not mean that he was anti social and she never saw any psychopathic features in BB.

When I questioned her about manipulation, she described it as the manipulation that a child will have with parents as well as that BB would be in a situation in the unit with 2 other peers. One peer would easily be considered psychopathic, then you would have BB seeking acceptance from the more "macho/mature" child and another child. BB would manipulate the other child to gain acceptance from the more mature child.

BB did show some remorse. Just not a lot. But that is not unusual in a child that has been sexually assaulted, abused by mother/father, has alcoholic/drug addicted parents. It is very difficult for these children to emote.

Lisa said that when she left DJJ she scanned all of her notes. She will check her files to see if she has any on BB. She also feels like she saw him somewhere else over the years and will try and check on that. She has done independent contract work all over the state. She asked if she could have a copy of her report and Dr. Laird's report and I told her that I would get them to her.

When she reviewed Dr. Laird's report, she said she had not caught it at the time, but that Dr. Laird had calculated BB's IQ based upon symbol search instead of coding. She said that this will cause the IQ to appear to be higher than it actually is. She took down the symbol and coding scores and said she was going to put it through a computer program she had, because she believes BB may have had a lower IQ.

When I did explain BB's circumstances, she said there was no way she saw any indicators that he was a

killer or violent to that degree. She would never believe this would happen to him. He had to be influenced by someone else and would have easily followed because of his dire need for acceptance.

Very willing to help and cooperate.

Lesa F. Watson, C.C.D.I.
Paralegal/Investigator/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net

**JA 5249**
2/10/2011

FILE COPY

jeans
_____

**From:** "Carlisle McNair" <cjm0501@alltel.net>
**To:** "Anna Rawl" <Rawlae@yahoo.com>; "Adrian Kandare" <akandare@justice.com>; "Carlisle McNair" <cjm0501@alltel.net>; "Carolyn Graham" <cgrahamsc@aol.com>; "ecr" <ecr@nmrs.com>; "Gary Collias" <gacollias@citynet.net>; "Greg Cook" <wvcookpi@citynet.net>; "Greg Harris" <GregHarris@justice.com>; "Harrison Saunders" <saunders@swerlinglaw.com>; "Jack Swerling" <Jacklaw@aol.com>; "Jean Strickler" <jeans@swerlinglaw.com>; "Lesa Watson" <yetto@mis.net>; "Lisa Kimbrough" <lisajkimbrough@yahoo.com>; "Paige Tarr" <paige@brucklaw.com>; "Steve Hisker" <hisker@scbar.org>
**Sent:** Sunday, August 15, 2004 9:06 AM
**Subject:** Interview: Ellis McKechnie

## MEMORANDUM
## ATTORNEY/CLIENT ONLY

*TO:*      *Basham File*
*FROM:*    *Carlisle McNair*
*DATE:*     *August 5, 2004*
*RE:*        *Interview: Ellis McKechnie w/m 61yoa*
                 *5830 Isley Rd. St. Charles, Ky.*
                 *270-669-4285*

_____

*On August 5, 2004, I spoke to Ellis McKechnie who advised the following:*
*-retired after 30 years as an engineer/technician & design for the State of Ky.*
*-married to Becky Blake for 10 years*
*-divorced in 1983*
*-knew Jimmy Basham since they were teenagers & before Cathy*
*-Jimmy can fix anything, but didn't/doesn't have the drive or ability to capitalize on his talent*
*-Jimmy has absolutely no book learning*
*-last time he saw Jimmy was in the mid 1990's*
*-Cathy has used drugs for as long as he can remember*
*-Cathy lived with he & Becky in St. Charles & Madisonville before she married Jimmy*
*-Cathy met Jimmy after he was involved in a vehicle accident with Becky and another guy*
*-Cathy started seeing Jimmy while he was in the hospital*
*-Cathy was married to Dean Latham at the time*
*-Ellis met Becky when he came to the hospital to see Jimmy*
*-Cathy & Jimmy started seeing each other & Ellis & Becky started seeing each other*
*-Advised Jimmy was head over heels in love with Cathy. Ellis never understood what Jimmy saw in Cathy*
*-Cathy divorced Dean Latham*
*-Becky was the only one of the siblings who had a high school education*
*-As far as BB is concerned, Ellis never got along with him*
*-BB had too much mouth and no respect for his elders*
*-BB would come visit Jerome, his son and spend a few days. Cathy would bring BB's medication, but Ellis would tell her medication was not what he needed, that if BB acted up he would discipline BB his own way*
*-BB never had a chance to have a decent life and grow up to become someone*
*-he never had a father figure to look up to*
*-Ellis advised he knows Cathy stopped using drugs while pregnant with Charlotte, but continued using drugs during her pregnancy with BB*
*Ellis is very proud of his Kentucky heritage and sees & tells it like it is.*



DEFENDANT'S
EXHIBIT
62

**JA 5250**

FILE COPY

# M E M O R A N D U M

TO:      Branden Basham File
FROM:    Jack B. Swerling               DUPLICATE
DATE:     Wednesday, August 18, 2004
RE:       Interview of Penny Titzer of Evansville

Penny said that when she left the institution Branden felt abandoned. She remembers an incident that she had him write down what he felt about the guy who abused him and then they went down to the lake, tore them up and threw them in the lake. She said the parents rarely came while other parents did. The mother is a drug addict. She would de-escalate Branden if necessary. She describes his teacher as witch. Kathy asked her to adopt Branden. She saw him as counseling his mother. Talking to her about eating and about drugs, etc. Penny was the program director an then in charge of social programs. She called him a year after she left and spoke with Kathy, Branden was working and she wanted to wish him a happy birthday. She was fearful when he escaped, not because of him personally, but because of the co-defendant and what he could do so she called the FBI. She was told if you are concerned, call the Sheriff. She called Kathy to find out how she was.

In school he could not read. He was older and so that was embarrassing. The kids looked up to him but started to tease him because of his intellectual capacity. She brought her daughter to school on the weekends. Branden spoke of how he would take care of her baby and he referred to Charlotte's baby, he wanted the child to look up to him. She said that Capehart asked her if there was anything else. She said you never asked about his family, he said they had that covered. Capehart said that Branden kept asking his opinion. Capehart said his opinion is not important. By doing this Branden was not getting any feedback and would change his attitude. Capehart told him to ask his lawyer. Capehart was telling him to speak to his lawyer. Penny believes if he told him that he would probably clam up. She remembers at 13 he was functioning at a 3rd grade level. The kids who were 10 years old read better. Branden never went back to school. She told Capehart it was the most dysfunctional family she ever saw. She doesn't believe Branden could find anything if he escaped. He had no survival skills. He is a verbal person but cannot maneuver. He could not find his way home. She said, "Every once in a while you run into a kid with special needs who you take to and give special attention." She points out she weighed 230 pounds when she was there, so Branden could not be attracted to her and that could not have been the issue. She said that everyone remembers a teacher who made a difference in their life. Capehart asked if he ever acted out, she said yes, but after being provoked by the staff. He would often set himself up to fail so he could not go home and then he would be disappointed.

JBS:lhb


DEFENDANT'S EXHIBIT
C3
JA 5251

# M E M O R A N D U M

TO:      Branden Basham File
FROM:    Jack B. Swerling               DUPLICATE
DATE:     Wednesday, August 18, 2004
RE:        Interview of Lisa Claire

---

On July 29, 2004, Lesa and I interviewed Lisa Claire. Lisa is a lawyer with the equivalent of the Kentucky Public Defender's system. Branden was the first habeas corpus motion she ever filed. Branden was a little goofy, he was not like other pre-high school kids. It is not likely that Branden would ever come up with any ideas on his own. She saw him at Cardinal Treatment Center where he had been sort of forgotten. He was in Evansville. His probation was revoked and he spent two years in Cardinal for what amounted to a joint of marijuana. She described him as being in legal never-never land. She never met the father. She did meet the mother however and the mother came to get him after she had Branden released. It took her all day to get there. Lisa has adopted 4 children with bipolar disorders and ADHD. She also has a degree in social work. She went to the facility every week or every other week. She saw Branden over a one a half year period. She has a master's in social work. She found Branden to be difficult to interview. He responded to every stimuli. He could not focus on anything but was distracted by everything. He could not volunteer important information very well. He wad fidgety, had pressured speech, does not follow instructions. She said that he could not follow instructions. He had a thought disorder and hyper focus. Branden was in Cardinal from the Fall of 1996 until February 1998 when she had him released. She ordered the records, but it took a long time to get the records from DJJ, hospitalizations, court records, and tapes of proceedings. She acted more like a mother rather than a lawyer. Based upon the fact that she has four children who are ADHD, she can say without equivocation that Branden has ADHD. He is an emotionally needy child. While she was waiting for Branden's mother to pick him up after his release, she kept Branden at her house and he interacted with her kids. They had a barbecue. She remembers Branden playing with little cars. Branden was on an 8th grade level, however he was 17 at the time.

JBS:lhb



DEFENDANT'S
EXHIBIT
64

JA 5252

# M E M O R A N D U M

**To:** Basham File

**From:** Lesa F. Watson

**Subject:** Interview with Connie Baker & Brenda Shaner

**Date:** February 18, 2004

3125 Woodsfield Street
Cincinnati Ohio 45213

On February 9, 2004, I met with Brenda Shaner and Connie Baker at Denny's in Cincinnati, Ohio. Brenda is a multi agency state coordinator for social services. She coordinates the efforts/goals of social service agencies in Ohio when more than one agency is involved in helping someone. Connie is a senior manager for senior citizens services. Brenda is originally from Dayton, Ohio and attended college at Eastern Kentucky University. Connie is from Carter County, Kentucky. Connie did not have as much one on one interaction with Branden because she was in a supervisory capacity at the Methodist Home.

Brenda has very strong memories of Branden and becomes tearful when she talks about him. Food was a big trigger factor for Branden. Brenda always listened to Branden and would not be confrontational with him. Many times he would end up in tears when she would ask him what the real problem was, and he would admit that there was no food at home and having enough food was an issue with him. One of the punishments used at the Methodist Home was to remove cafeteria privileges and the child could only have a sack meal at the cottage. This was a strong problem for Branden and many of his incident reports are for acting out over food issues.

Both Brenda and Connie said that back when Branden was in the system, money was the major factor in long term placements and there were no true long term placement facilities available for children in Kentucky.

*CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGE*
*and/or*
*ATTORNEY WORK PRODUCT*



DEFENDANT'S
EXHIBIT

JA 5253

Branden was never aggressive towards either of them while he was at the Methodist Home. Brenda referred to the records from the Methodist Home while we were talking and referenced the use of "extended arm" restraint. This is exactly what it means and is the minimum force used in restraint of a child.

Brenda said that Branden worried about things that a kid shouldn't have to worry about. He related to her that when he was at home he would look for food on the coffee table. She saw strong signs of depression evinced by his sleep problems.

Branden lied initially when he was caught doing something, but that was to avoid consequences of his actions. He would always admit to her what he had done. He never lied to her in one-on-one talks. Branden would display a "tough" front, but was really scared inside. Much of this was done to confront the teasing he would take for being smaller and he did not want to be seen as weak or inferior to others.

Branden would act out when he was in a confined area, received what he perceived to be unfair treatment and out of fear. Any time Branden was confined he would become agitated.

Branden reacted best to those who talked and listened. He had so many changes in therapists, they both felt he was unable to establish any form of significant bond and his treatment was hindered because of this. Branden was very good hearted. They did not notice evidence of fetal alcohol syndrom, but that was not fully recognized then and not within their field of expertise. They both said that it was obvious that he had been huffing chemicals and the effects of same. Branden's greatest problem was his inability to verbalize his feelings. Both opined that if Branden were born into different circumstances or, received help at a younger age, he would not be where he is today.

Many care providers treated Branden like a trouble maker or punk. When he was called this or, it was indicated that this is what they thought, Branden's feelings would be deeply hurt and he would act out. They refer to Branden as one of the most misunderstood kids in the system. It was obvious to them that he needed psychiatric help and was one of the few psychiatric cases in the system. He was not a thug.

*CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGE*
*and/or*
*ATTORNEY WORK PRODUCT*

**JA 5254**

They also pointed to the large skew between his verbal and performance IQ's. He did not have the mental ability to verbalize. This should be investigated or brought to the attention of his current care providers. Also, they questioned his IQ that was higher at a younger age. Back then, facilities would not take a child unless the IQ was 80 or greater. Many times a DSS worker would contact a doctor for a psychological evaluation and casually state that they had to place this child, needed a psychiatric evaluation and that they wouldn't be able to place the child unless the IQ was 80 or better. They feel that Branden's earlier IQ test was a false or inflated number and suggested that if that original testing could be found to have it interpreted again.

I asked Brenda about the incident when she took Branden fishing and he pushed her in the water. She said she knew he was going to do it. She heard him giggling behind her. She had to go down to the water's edge for something and told him not to push her in - don't even think about it. He did. She tried to turn the situation into a learning one and explained that it was funny and done in fun but, he could have hurt her and explained how she could have been hurt; how he should think before he does something about what might happen to the person.

Brenda nor, Connie were ever afraid or threatened by Branden. They described Branden as one that once he is in motion, it will take intervention to stop him. His impulsiveness controls him. Branden could not make his mind be still long enough to make a long range plan. There is no way he could have orchestrated any part of the crimes he is accused of committing. The plans Branden would make, never could come to fruition because he could not follow through.

Most moving, was Brenda's story about her sister Cindy. Cindy is mentally handicapped with cerebral palsy. Cindy would visit Brenda often at school. Brenda would ask many of her "troubled" students to help her with Cindy because it allowed them to channel their excessive energy. Branden cared deeply for Cindy. He was very compassionate and had great empathy for Cindy. He would care for her needs before Brenda would even have time to think to ask him. He was fully aware of all of Cindy's inadequacies. She said that if she walked her sister into a courtroom, her face would immediately light up and she would know Branden. He had that much of an impact on Cindy. It was truly amazing.

I asked Brenda if there was something she could say to a jury that she thinks they should know, she would tell them that although there are current victims and no one can

**JA 5255**

understand it now, but Branden was a victim first. He was a victim of his birth, environment, placements, the system and chemicals. He is 110% a follower and is still a victim. A victim of someone with greater intelligence and influence.

Brenda had always told her students to reach for the moon in everything and they might just reach a star one day. She would always ask them when they were having difficulties if they were going to be satisfied with being stuck in the mud or, try and reach for the moon [something better]. Branden created a work of art depicting himself reaching for the stars and the moon. Brenda kept this on her office door until last year when she moved for all her students to see. She is going to try and locate it for us.

Reviewing the incident reports, Brenda remarked that none of them were for mean acts. She said that if she could have time to review the records she would be able to recall the incidents behind each report. I have since copied the records and forwarded to her to help her refresh her memories. I will be back in contact with both Brenda and Connie. They were both very interested in helping Branden. I told Brenda that I felt sure she would be a witness because of her great insight into Branden and his problems; the confidences he shared with her; and her ability to explain how the system failed him.

They also were helpful in the locations of other Methodist Home employees:

Julie Brown is now in Michigan

Kristi Kirkwood is an elementary school teacher in Pike County, Kentucky

Kelly Mullins is now in Fayette County, at the Ridge 859.433.6464 Brenda is to let Kelly know I will be calling her about Branden.

*CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGE*
*and/or*
*ATTORNEY WORK PRODUCT*

**JA 5256**

FILE COPY

# M E M O R A N D U M

TO: Branden Basham File
FROM: Jack B. Swerling
DATE: Tuesday, August 24, 2004
RE: Interview of Brenda Shaner

Lesa and I interviewed Brenda Shaner on July 30, 2004. Brenda believes that Branden Basham should be held accountable. It is not safe for himself or others to be out of the penitentiary. Her opinion is he probably should have never come out of the prison. With the factors in his life, none of us would have done any better. He never had a chance to make a choice to do well. His ability was affected at his conception. It is not because he chooses that way or that course, it is driven that way. Adults should direct him. He had all the drugs he ever wanted, but not the food. Branden had suffered trauma and suffered from post-traumatic stress disorder. He is behaviorally disabled and he was learning disabled. There was a question of whether he was mentally retarded or mentally ill.

Brenda said the way he slept was done out of survival as a result of the trauma. He slept with his back against the wall. Branden cried at night frequently. Branden did best in one-on-one situations. Branden could not focus with all the day-to-day things going on. He did not have the ability to tell people what he needed. He could do that in a one-on-one situation. Brenda feels that people get caught up in the reaction and when people get caught up in the reaction, things deteriorate from there. She says that Branden woke up with headaches and that was very common. She spoke of _____ Nelson's report which referred to Branden as a con artist. She said that if a child is doing all of those things to survive, don't call him a con artist. She agreed with Dr. Sanders that Branden's problem was that he had emotional problems, rather than a calculated desire to hurt someone. She talked about Branden's huffing, where it is known the brain is destroyed from huffing. Even though the conduct is self-destructive, it is also self-medicating. She said you have to look at these things from a child's perspective. He sees other people doing things and they are in control so he copies it. If we looked at it as an adult, we could not understand, but as a child with his problems we could. His brain was hindered from the beginning. What was not hindered was his heart. After spiraling out of control, she remembers he would apologize because he could not control it. The defendant wanted to do different. He would be wiped out and crying. He got mad when he could not do things better. Branden was a follower. This was supported by the records.

Kids could not manipulate him and would get him to do things and then they would watch. People got mad at him because of problems he got into at the unit. She sees that as probably some issues of acceptance. Branden could not accept authority. He did not know how. He never had it. That assertion of authority is typical of the people who are in these jobs that Branden would be confronted with. Brenda said there was never any consistency. You could not give him any consistency because he was being thrown out. Branden would sense the correctional officers were unjust. He would want anything done to be just. People pushed his buttons. When

1

DEFENDANT'S
EXHIBIT
JA 5257

his dining privileges were revoked, he would flip out. He didn't think that would be just. He would lose control. He would get so mad, he would just try and leave. He blew it because things happened and he could not control it. He would try so hard and come up short. In other words it was flight or fight. Branden was at the Methodist Home for 11 years. Programming sometimes made angry kids angrier; depressed kids more depressed. AWOL was a sense of frustration or just being overwhelmed. Brenda's sister suffers from Cerebal Palsy and she would bring her sister to the institution. This would give kids a sense of responsibility. The child was also mentally retarded. Branden offered to help her get a plate for her sister. He was very compassionate toward her sister, which is something she would never forget. As far as Brenda was concerned he saw someone who had needs so he responded because he had needs as well. He was very proud of the way he handled her sister. Branden would ask questions about her sister. He has an innocence about some things we would not have. Branden could not verbalize or tell people how things were feeling to him. For example, some people would think he was a punk if he acted out. So it perpetuates itself and creates a scar in that area. He was not able to tell them he was just hungry and afraid that he would not be able to eat. Branden did not express his fear adequately.

Brenda was a supervisor. She described an example of how Branden would get frustrated and act out. For example, someone could be taking a shower. That person only had 10 minutes and was late. Branden was waiting. There was no staff there to move the person on from the shower so Branden could take his shower. When the defendant communicated that he wanted to take a shower they would take it as a problem. They would get in an argument. He would get in trouble, when all he wanted was to do good and get in bed after taking a shower so he did not need to be late, because if he was late he would lose his privileges. He had a certain time in which to shower and go to bed, at lights out. Branden felt he was doing the right thing, but he did not have the skills to act out properly. Brenda works in the inner city in Cincinnati. She said that Branden has more complicating factors than anybody else she has ever seen. Branden cannot think past the first event. He might have chosen not to do what was suggested, for example, like the chair being taken from someone else. He did not think what could happen after that.

We talked about the incident reports. She said that at school the teachers did not have his interest in mind. She could push his buttons, and he could not resist. In the morning there was so much chaos. Branden could not deal with it. There were 12 kids in one vacuum. He could shut down because he felt like nothing ever worked, so he slept. The biggest danger was when he felt he would not get the basis needs like food. If he thought he would be hurt at night, he would cause a problem so the staff would stay and not abandon him. As far as his aggression, he might be aggressive, but he was not trying to hurt anyone, he was just trying to flee. He would feel overwhelmed or simply be saying I cannot accept it. Not only did Branden have a bad childhood, but in addition he had a built in mental illness and a limited mental capacity.

JBS:lhb

2

**JA 5258**

 **COPY**

jeans
_____

**From:**   "Lesa Watson" <yetto@mis.net>
**To:**     <traci@swerlinglaw.com>; "Steve Hisker" <Hisker@SCBar.org>; <PAIGE@BRUCKLAW.COM>;
            <jeans@swerlinglaw.com>; <Jacklaw@aol.com>; <GREGHARRIS@justice.com>;
            <gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>;
            <CGRAHAMSC@aol.com>; <akandare@justice.com>; <Vog12@aol.com>; "Lesa Watson"
            <yetto@mis.net>
**Cc:**     "Lesa Watson" <yetto@mis.net>; <yetto@bellsouth.net>
**Sent:**   Tuesday, September 07, 2004 12:29 PM
**Subject:** Ellis McKechnie interview

# Memorandum

**To:** Basham File

**From:** Lesa F. Watson/Greg Harris/Carlisle McNair

**Subject: Ellis McKechnie**

**Date:** September 7, 2004

On August 17, 2004, GH/CMN and I interviewed Ellis McKechnie at his home. Ellis was married to Becky Basham McKechnie Jarvis until 1980. Ellis believes that BB would be too scared to kill anyone. Kathy used marijuana during her pregnancy with BB. Kathy would do any drug that did not include needle use. Kathy lived with Ellis and Becky during their marriage for various time periods. Kathy consistently and blatantly used drugs in their home when she lived with them for years. She never made any effort to hide the drug use. Whenever BB stayed with Ellis, he behaved well without medication. Ellis is a stiff disciplinarian and would not put up with BB's antics. Ellis told him all he needed was discipline. Jimmy offered no discipline and all Kathy did was holler and yell. She was always idle threats to BB. Jimmy was a laid back guy. Becky is the only Blake that ever amounted to anything. All the Blake's have mental illness. Becky and Kathy used to be inseparable, but have distanced over the years. All of the Blake's drank but Bobby. Kathy and Jimmy married when Kathy was young. They met when Jimmy, Ellis and Becky were in a wreck. Ellis and Jimmy had been friends for years, they still are.

Lesa F. Watson, CCDI
Paralegal/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net


DEFENDANT'S
EXHIBIT
67

**JA 5259**
9/7/04

From:     "Lesa Watson" <yetto@mis.net>
To:       <traci@swerlinglaw.com>; "Steve Hisker" <Hisker@SCBar.org>; <PAIGE@BRUCKLAW.COM>;
             <jeans@swerlinglaw.com>; <Jacklaw@aol.com>; <GREGHARRIS@justice.com>;
             <gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>;
             <CGRAHAMSC@aol.com>; <akandare@justice.com>; <Vog12@aol.com>; "Lesa Watson"
             <yetto@mis.net>
Cc:       "Lesa Watson" <yetto@mis.net>; <yetto@bellsouth.net>
Sent:    Tuesday, September 07, 2004 10:56 AM
Subject: Regina Moore Interview

# Memorandum



DEFENDANT'S EXHIBIT

68

**To:** Basham File

**From:** Lesa F. Watson/GH

**Subject: Interview of Regina Moore**

**Date:** September 7, 2004

On August 19, 2004, GH and I interviewed Regina Moore, ex HCDC employee. Regina worked at the jail for 7 years. Regina was a Major, but did not want the supervisory position on the floor. Prior to that time, 1993-1996, she ran Circus World/Fun Flicks video store in Madisonville. BB was like a lost dog. He would come into the video store and she caught him trying to steal videos. She asked him why and he told her he was hungry. She and her then husband had seen him going through the dumpsters behind the store and around town looking for food. BB was very little for his age. He needed someone to love him. He wore ratty clothes and was dirty. Regina even went to the Goodwill store and bought BB clothing. BB was the type of child that grew on you. BB was a child seeking love. The only way was through getting into trouble for attention. His only way of fending for himself for food was to steal. Around ages 11 or 12 BB just roamed the streets. Kathy came into the video store once. She had stringy long black hair – looked dirty and like a scrounge. Regina understood that Kathy drank all the time. BB told her that his mom drank a lot. Regina remembers BB being on Ritalin. It was easy to tell when he was on his medication and when he was not.

At the old jail, there were two (2) officers – they were responsible for booking, computer entry and the floor. At the new jail, Regina just worked in booking. At both jails, BB acted like he was bi-polar. He was mouthy, cussing all the time, but he never attacked anyone. BB was puffy like a Chihuahua – he never swung at any officer or fought. When they were at the old jail, Regina saw him everyday. At the new jail she would just see him occasionally.

BB still needs mental help. He is still wanting attention. Regina feels Fulks used BB. Fulks could easily intimidate BB. Cellmates/location is/was not allowed by inmates in either the new or old facility.

BB would intellectually be on a 5th grade level. BB was street smart, he could fend for himself, because that was all he had ever known. She was very surprised at the 13 day crime spree. On his own, BB could not have made it out of town. BB was never out of town except for his juvenile placements. BB never talked about his family ever going on a vacation. They had conversations

about her vacations and BB never mentioned anything. Regina does not recall BB using the phone around her. BB responded best to those deputies who talked with him. Often, BB would have problems and the jail staff would call Jewell Dickerson to come and talk to BB. Jewell could calm him down. Certain officers had the ability to deal with him. Schaffer talked with BB. She recalls BB getting extra charges for the pills. It would be like Lantrip to taunt BB that he was never going to get out of prison. BB would not have enough sense to know better.

Regina saw Fulks as arrogant. A manipulator that thinks he know it all. Willing to testify and excellent witness.

Lesa F. Watson, CCDI
Paralegal/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net

CHARTER LOUISVILLE BEHAVIORAL HEALTH SYSTEM

COMPREHENSIVE PSYCHIATRIC EVALUATION

BASHAM, BRANDON                          DATE OF ADMISSION:  1/24/98
HOSP. #009696

## IDENTIFYING INFORMATION

This 15 year old, Caucasian male, Brandon Leaon Basham, is single
and a student at Cardinal Treatment Center here in Louisville,
Kentucky, for the past 2 years.  He was accompanied by social
worker from C.T.C.

## REFERRAL SOURCE

Acute Psychiatric Services.

## CHIEF COMPLAINT

"I'm here because I tried to hurt myself last night . . . I took
the bottom of a plastic medicine cup and broke it and carved on my
left wrist."  The patient had intent to hurt self and die because
he is tired of being locked up.

He had gone AWOL for one week without meds.  He had been very
unstable since then, with lots of peer interaction problems.  He
has anger management problems and gets into numerous fights at the
center.  The patient also suffers from hives when he gets so
angered.  He is not functioning at all in the center.

## PRECIPITATING EVENTS

Yesterday he refused school.  He cut his wrist yesterday and would
not contract for safety.  He attempted to stab self with fork this
morning.  He was taken off the Depakote recently for unknown
reasons.  He was sleeping under the bed, and this morning he ate
Reynold's Wrap.  He has been very depressed since Thursday.

The patient has also had problems with social withdrawal and is
refusing to go to work or school.  He is not sleeping well because
he is often upset and "can't sleep."  The patient sleeps all day,
on the other hand.

## PAST MEDICAL HISTORY

ILLNESSES:  Acne (Cleocin solution to treat).

ALLERGIES:  Hives appear when patient is angry; no known drug
allergies.

*CONFIDENTIAL · NOT TRANSFERABLE*
*FED. REG. 42 C.F.R. · PART 2*

DEFENDANT'S
EXHIBIT
69

COMPREHENSIVE PSYCHIATRIC EVALUATION

01730

JA 5262

BASHAM, BRANDON
HOSP. #009696
COMPREHENSIVE PSYCHIATRIC EVALUATION

PAGE TWO


VITAL SIGNS: Vital signs are within normal limits, and his weight is 127 lbs. and height 64".

CURRENT MEDICATIONS

Benadryl p.r.n. Medications in the past have been Depakote, Ritalin, Imipramine, Lithium, and Cylert. The patient states that when he was on the Ritalin and Imipramine, it was most helpful.

PAST PSYCHIATRIC HISTORY

Cardinal treatment facility inpatient in September of 1997; Charter Evansville inpatient prior to September of 1997; Charter Lexington inpatient earlier than 1997; Cincinnati Psychiatric Hospital inpatient 1995; Columbus Hospital inpatient 1994; Methodist Group Home 1993 on and off until January of 1997.

SOCIAL HISTORY

The patient has been in treatment facility x 2 years. Parents are not really involved. He has a sister, age 21.

FAMILY HISTORY

Dad is alcoholic, as are paternal uncles. Mother is being treated for anxiety, dad for depression, and sister for depression.

PAST LEGAL HISTORY

Possession of marijuana, and AWOL from treatment center (arrests were made for both of these things).

CHEMICAL ABUSE HISTORY

Regarding cannabis use, he uses a half ounce, at least, each day for 6 months in 1990; cocaine, a gram a day, two years, starting in 1994; crank, on and off for 2 years starting in 1994; LSD, whenever he could get his hands on it, every two to three weeks in 1994; alcohol, occasionally in 1990; huffing everyday since started in 1990, though it is unclear as to how long he has been doing it the last 7 years, but he said the last usage was three days ago.

The patient suffers from tremors when he withdraws.


CONFIDENTIAL · NOT TRANSFERABLE
FED. REG. 42 C.F.R. · PART 2

01731


JA 5263

BASHAM, BRANDON
HOSP. #009696
COMPREHENSIVE PSYCHIATRIC EVALUATION

PAGE THREE

MENTAL STATUS EXAMINATION

The patient is neat in appearance with good hygiene. His speech is rapid and he is hypervigilant. Mood seems somewhat depressed and agitated, with restricted spectrum of affect. Flight of ideas is noted, with tangentiality at the time of assessment. Judgment is poor and insight is poor. Memory is intact x 3 spheres, but with some trouble with concentration.

Mental Capability: Is patient mentally able to participate in all aspects of programming? __/__ Yes _____ No

If not, list limits: _____

FORMULATION

This is a 15 year old male with two suicide attempts within 24 hours. Had to be retained four times in the past 24 hours. Sleeping all the time, agitated, feeling hopeless and helpless and worthless. Recently went AWOL from his treatment facility. He went off all his meds and has been depressed since. Also, very bizarre behavior with eating Reynold's Wrap, sleeping under the bed, and other, as noted above.

DIAGNOSTIC IMPRESSION

AXIS    I   Major depression with psychotic features and suicide
            attempts x 2 within the last 24 hours
AXIS   II   Deferred
AXIS  III   None
AXIS   IV   Severe--4
AXIS    V   Current GAF                          15

ESTIMATED LENGTH OF STAY

Three plus weeks.

RECOMMENDATIONS

Please see orders. We will await for laboratory data to return in order to decide what we will be using as far as a mood stabilizer, but we will start Imipramine, 50 mg., one q. a.m., with parental

*CONFIDENTIAL - NOT TRANSFERABLE*
*FED. REG. 42 C.F.R. - PART 2*

COMPREHENSIVE PSYCHIATRIC EVALUATION

01732

JA 5264

BASHAM, BRANDON
HOSP. #009696
COMPREHENSIVE PSYCHIATRIC EVALUATION

PAGE FOUR

consent and med teaching.  Also, we will send for records from the
Cardinal Treatment Center.


Miren Asumendi, M.D., Psychiatry                          Date  1/27/98

MA/tc
D:  1/24/98
T:  1/26/98

*CONFIDENTIAL · NOT TRANSFERABLE*
*FED. REG. 42 C.F.R. · PART 2*

COMPREHENSIVE PSYCHIATRIC EVALUATION                          01733

JA 5265

# CHARTER LOUISVILLE BEHAVIORAL HEALTH SYSTEM

## DISCHARGE SUMMARY

BASHAM, BRANDON  
HOSP. #9696

DATE OF ADMISSION: 1/24/98  
DATE OF DISCHARGE: 2/16/98

************************************************************************

### CIRCUMSTANCES LEADING TO PATIENT'S ADMISSION:

Brandon is a 15 year-old and a resident of the Cardinal Treatment Center for the past two years. He was sent here along with the social worker from that facility as he attempted to hurt himself and had thoughts of suicide. He reportedly broke a plastic medication cup and used that to carve on his left wrist with intent to hurt himself. He made states that he was tired of being locked up. A week before his admission, he also had an AWOL attempt. Since then, he had reportedly been very unstable with difficulty getting along with peers and numerous incidents of anger management. He had been into numerous fights at the center. Staff also reported that he developed hives whenever he gets angry and he was not able to be managed at the treatment center any longer unless his anger could be controlled.

### LABORATORY TESTS CONDUCTED DURING THE COURSE OF HOSPITALIZATION:

Urine examination was normal. Urine drug screen was negative. CBC was normal with a hemoglobin of 14.9. SMA-24 revealed normal serum electrolytes. Liver and kidney functions were normal. Thyroid functions were normal with a TSH of 1.45. Depakote level obtained on February 5 was subtherapeutic at 38 and repeated again on February 13 was also slightly subtherapeutic at 48.

### HOSPITAL COURSE:

Brandon Basham, after being admitted on the adolescent psychiatric history, had a history and physical examination ordered. He was placed on suicide precautions and AWOL precautions. Routine laboratory tests including urine examination, urine drug screen, CBC, SMA-24 and thyroid functions were ordered. Dr. Asumendi who was on call for that day conducted a comprehensive psychiatric evaluation. Imipramine 50 milligrams p.o. q. a.m. was ordered following consent from the parents. Benadryl 25 milligrams three times a day was also kept available by Dr. Asumendi. With no response to the Imipramine, the Imipramine was discontinued by me on January 27, 1998. He continued to have several incidents of impulsive behavior. Benadryl was also not effective and, hence, was discontinued and Thorazine at a dose of 25 milligrams q. 2 hours p.r.n. was kept available for agitation until further assessment and plan to

*CONFIDENTIAL - NOT TRANSFERABLE*  
*FEDERAL REG. 42 C.F.R. - PART 2*

*DISCHARGE SUMMARY*

01724



DEFENDANT'S  
EXHIBIT  
70  JA 5266

A_01723

BASHAM, BRANDON
HOSP. #9696
DISCHARGE SUMMARY

PAGE TWO

consider medication to control anger and mood swings. Treatment plan was conducted. The patient was seen by the multidisciplinary team and the patient was considered to be a better candidate to start valproic acid concentrate at a dose of 350 milligrams three times a day which was started on January 28, 1998. The patient remained extremely manipulative. He did not want to take medication and made several complaints that it was causing diarrhea in spite of the fact that staff had not noticed any evidence. He remained quite agitated off and on, requiring numerous redirection with no response to that medication, unlikelihood of compliance. He was also added on Thorazine 10 milligrams four times a day on February 2, 1998. He tolerated the medication fairly well but remained fairly impulsive, thereby, after discussing the treatment team with his manic symptoms, Thorazine dose increased to 25 milligrams three times a day on February 4, 1998. Due to the daytime drowsiness on February 5, we changed it to 25 milligrams in the morning and 50 milligrams every night with Depakote level subtherapeutic at 38, valproic acid concentrate was increased to 500 milligrams b.i.d. on February 6, 1998. Zantac 150 milligrams b.i.d. for stomach and acidity complaint was also started. Thorazine dose was later further increased at h.s. to 75 milligrams as he remained off and on agitated. He required seclusion on February 12 as he became extremely combative. Thorazine dose at night was later increased to 100 milligrams at night. The patient tolerated the medication fairly well. Depakote dose was also increased to 500 milligrams in the morning and 750 milligrams every night on February 14, 1998. This resulted in moderate to fairly good improvement on his agitation, angry behavior, with the patient felt to be able to be managed easily at the Cardinal Treatment Center setting. The treatment team agreed to discharge him on February 16, 1998.

FINAL PSYCHIATRIC DIAGNOSIS:

AXIS I:
1) Bipolar disorder, recurrent manic type with psychotic features.
2) Impulse control disorder.
3) Oppositional defiant disorder.

AXIS II:
Deferred.

AXIS III:
None.

AXIS IV:
Problems with anger, impulsivity; has been in residential treatment center for almost two years.

CONFIDENTIAL - NOT TRANSFERABLE
FEDERAL REG. 42 C.F.R. - PART 2

DISCHARGE SUMMARY

01725

**JA 5267**

A_01724

BASHAM, BRANDON
HOSP. #9696
DISCHARGE SUMMARY

PAGE THREE


FINAL PSYCHIATRIC DIAGNOSIS (CONTINUED):

AXIS V:                Current GAF 40, GAF highest past year 50.

DISCHARGE RECOMMENDATION(S):

The patient was discharged to go back to Cardinal Treatment
Center on February 16, 1998.

DISCHARGE MEDICATION(S):

Discharge medications include Depakote concentrate 500 milligrams
in the morning, 750 milligrams at night.  A Depakote level is
requested to be done in two weeks.  Thorazine 25 milligrams in
the morning and 100 milligrams every night and Zantac 150
milligrams b.i.d.  A copy of the MAI was also sent along with him
for followup medication.

PROGNOSIS:

Prognosis is dependent on compliance on medication.


_____
Nasiruddin A. Siddiqui, M.D., Psychiatry

NAS/jdb/MS
D:  4/14/98
T:  4/14/98

CONFIDENTIAL - NOT TRANSFERABLE
FEDERAL REG. 42 C.F.R. - PART 2

**JA 5268**

# HOPKINS COUNTY HEALTH DEPARTMENT
## NOTICE OF PRIVACY PRACTICES

"THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY."

All requested information shall be relevant to the care and well-being of the individuals served. All information should be considered Protect Health Information (PHI), in accordance with the Federal Health Insurance Portability and Accountability Act (HIPAA) of 1996.

This Privacy Notice shall serve as acknowledgement that Hopkins County Health Department may use and share information for treatment, payment and overall healthcare operations that may include counseling, billing and quality assurance. The use or sharing of any information not directly related to services and supports, shall have prior written authorization.

An example of information sharing that may be necessary without written consent or authorization is a life threatening medical emergency.

<u>Rights of the Individual</u>. The individual, in writing, may request restrictions on the use or sharing of information, receive confidential communication, inspect and receive copies of any shared information, receive an accounting of shared information and amend or revoke authorization.

<u>Duties of Hopkins County Health Department</u>. Maintain privacy and provide notice of legal duties and privacy practices. Abide by this effective notice and any restriction agreements. Provide notice of revised privacy practices.

For additional information or complaints regarding privacy practices contact the HIPAA Compliance Officer at (270) 821-5242.

Complaints against Hopkins County Health Department regarding privacy of PHI should be forwarded to:

> Department for Public Health
> Attn: Privacy Officer
> 275 E. Main
> Frankfort, KY 40621
> (502) 564-6663

*You may request a copy of this Notice at any time.

04-11-03 jb

DEFENDANT'S EXHIBIT 71

13664

JA 5269

A_13616

| PHYSICAL EXAMINATION | Normal | Abn | Comments |
|---|---|---|---|
| General Appearance | ✓ | | |
| Nutritional Status | | | c/o nerves + rash |
| Skin | ✓ | | |
| HEENT: Head: Fontanels, Scalp | | | wants benadryl |
| Eyes: PERRL, Red Reflex | ✓ | | ② ④ ear pain at distal |
| Ears: Canals, Drums | | ✓ | canal |
| Nose & Sinuses | ✓ | | |
| Mouth: Mucous Membrane | | | |
| Gums, Teeth | | | TMs clear cerodonee at |
| Palate, Tongue | | | entrance to ④ ear |
| Throat: Tonsils | | | |
| Neck: Thyroid | | | |
| Lymph glands | | | |
| Chest: Thorax | ✓ | | 09/11/00                    HLS 054054A |
| Lungs | ✓ | | BASHAM_LEON B |
| Heart | ✓ | | 406195195    DOB:09/14/1981 |
| Breast and axillae | | | |
| Abdomen | ✓ | | |
| Muscular Skeletal Back, Spine | | | |
| Hip: Symmetry | | | |
| Range of Motion | | | |
| Posture | | | |
| Extremities: Symmetry | | | |
| Neurological: Gait | | | |
| Balance | | | COPY |
| Reflexes | | | |
| Female: External Genitalia | | | |
| Male: Penis        Female: Vagina | | | |
| Testes             Cervix | | | HOPKINS CO. HEALTH DEPT. |
| Scrotum            Uterus | | | P. O. BOX 1266 – 412 N. KENTUCKY AVE. |
| Prostate           Adnexa | | | MADISONVILLE, KY 42431 |
| Rectum             Rectum | | | PHONE: 270-821-5242 |
| | | | |

CHEST X-RAY RESULTS: Taken _____ Read_____ Compared with _____  ( ) Neg/Non-remarkable ( ) Improved ( ) Worsening ( ) No Change
( ) 0. No TB Exposure, Not Infected    ( ) 1. TB Exposure, No Evidence of Infection    ( ) 2. TB Infection, Without Disease    ( ) 3. TB Infection, With Disease
( ) 4. Inactive Disease    ( ) 5. Suspect    Site of Infection: ☐ Pulmonary    ( ) Cavity    ( ) Non Cavity    ☐ Other _____

IMPRESSION/PLAN: _____ ① anxiety + rash
Benadryl 50g Tid prn

② cerodine (pimple) ④ ear - observe
+ await improvem't

SIGNATURE: _John Epps_          DATE: _9-11-0_

**JA 5270**   A_13617

A 13618

ASHAM LEON B
06195195    DOB:091481    PLS 0540540

## HEALTH CENTER:

| | SEX: M☐ F☐ | RACE: ☐Wht ☐Blck ☐Hsp ☐Am.In ☐Orn | MARITAL STATUS: ☐S ☐M ☐W ☐D ☐SEPO | BIRTHDATE: (MO.DY.YR.) |
|---|---|---|---|---|

| FOLDER LOCATION/DATE | MOTHER/ MAIDEN: | HOME PHONE: | SOCIAL SECURITY # | DATE |
|---|---|---|---|---|
| ACTIVE FILES ___ | FATHER: | WORK PHONE: | PSEUDO-NUMBER | DATE |
| INACTIVE FILES ___ | SPOUSE: | HEAD OF HOUSEHOLD: | FILE NO. | |
| ARCHIVES ___ | LEGAL GUARDIAN: | RELATIONSHIP: | ☐ MEDICAID ___ | |
| DESTROYED ___ | | | ☐ MEDICARE ___  ☐ Other ___ | |

Pertinent Health History /Problems: ___
(Allergies, Adverse Reactions, Others) ___
Diabetes: Yes☐ No☐     Smoker: Yes☐ No☐

| IMMUNIZATIONS/TESTS | | SERIES | | | | | BOOSTERS | | | | Date | Incidental Service/ Summary For Disposition | Results | Providers Initials |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DTP | Date | 1/82 | 3/82 | 11/82 | 5/83 | 8/15/86 | | | | | | | | |
| | Mfg/Lot No. | | | | | | | | | | | | | |
| | Injection Site/Provider | / | / | / | / | | | | | | | | | |
| Td (Adult) | Date | | | | | | | | | | | | | |
| | Mfg/Lot No. | | | | | | | | | | | | | |
| | Injection Site/Provider | / | / | / | / | / | | | | | | | | |
| Polio (Oral) | Date/Provider | 1/87 | 3/82 | 11/82 | 8/83 | 8/15/86 | / | | | | | | | |
| | Mfg/Lot No. | | | | | | | | | | | | | |
| Measles / Mumps / Rubella | Date | | | | 11/82 | 11/29/94 MStO 133ow aut/ 20 Rp | | | | | | | | |
| | Mfg/Lot No. | | | | | | | | | | | | | |
| | Injection Site/Provider | | | | / | | | | | | | | | |
| Hib | Date | | | | | | | | | | | | | |
| | Mfg/Lot | | | | | | | | | | | | | |
| | Injection Site/Provider | / | / | / | | | | | | | | | | |
| INFLUENZA | Date | | | | | | | | | | | | | |
| | Mfg/Lot No. | | | | | | | | | | | | | |
| | Injection Site /Provider | / | / | / | / | / | / | / | / | / | | | | |
| Other | Type (Specify) | | | | | | | | | | | | | |
| | Date | | | | | | | | | | | | | |
| | Mfg/Lot No. | | | | | | | | | | | | | |
| | Injection Site/Provider | / | / | / | / | / | / | / | / | / | | | | |
| P.P.D. | Date/Provider | 8/15/86 | / | / | / | / | / | / | / | / | | | | |
| | Mfg/Lot No. | | | | | | | | | | | | | |
| | Date /Provider | / | / | / | / | / | / | / | / | / | | | | |
| | Result | | | | | | | | | | | | | |

COPY

HOPKINS CO. HEALTH DEPT.
P. O. BOX 1266 – 412 N. KENTUCKY AVE.
MADISONVILLE, KY 42431
PHONE: 270-821-5242

13666

CH-2 Rev. 05/91

**JA 5271**

# SERVICE RECORD/PROGRESS NOTES

09/11/00                    HLS 054054A

BASHAM LEON B

406195195    DOB:09/14/1981

PATIENT ID NUMBER

| Date | Service | Local Use | Staff Notes (All notes must be signed and followed by staff title.) |
|---|---|---|---|
| 3/2/90 | 708 | | Special Olympic Exam — B. Huke K |
| 3/11/91 | 708 | | Special Olympics Exam — N. Clayton CPA |
| 11/29/94 | | | S- Well-Child + 6th grade physical. |
| | | | O- See CH-13 + CH-12 |
| | | | A- See CH-13 + School form |
| | | | P- Counseled re: ① food pyramid, ② health risk |
| | | | assessment ③ MMR #2 + side effects discussed |
| | | | ④ referrals given for vision and dental; ⑤ see |
| | | | CH-13 ——— R. Pityer, RN |
| 9-11-00 | | | MD Clinic @ detention Ctr. See |
| | | | CH-13. ——— P. Kennedy, PC |

HOPKINS CO. HEALTH DEPT.
P. O. BOX 1266 – 412 N. KENTUCKY AVE.
MADISONVILLE, KY 42431
PHONE: 270-821-5242

CONFIDENTIAL INFORMATION

COPY

13667                    CH-3a (Rev. 11/87)

JA 5272

A_13619

## [illegible]OUS SCREENINGS AND TESTS

BASHAM LEON B

LBB091481 091481 3/11/91

Birthdate | Patient ID Number

| SCREENINGS/TESTS | | RESULTS | |
|---|---|---|---|
| | | [illegible] | 3/11/91 |
| HEIGHT | | 49½ | 50 |
| WEIGHT | | 57¼ | 59 |
| BLOOD PRESSURE | | 110/60 | 90/60 |
| TEMPERATURE | | | |
| PULSE | | 92 | 76 |
| URINE DIP STICK | PROTEIN | | |
| | SUGAR | | |
| | NITRITES | | |
| | BLOOD | | |
| URINE | DIP SLIDE | | |
| | CULTURE | | |
| VISION | RIGHT | 20/40 | 20/50 |
| | LEFT | 20/30 | 20/30 |
| | BOTH | | |
| HEARING | | R L | R L |
| | 1000 | | |
| | 2000 | | |
| | 4000 | | |
| HGB/HCT | | | |
| | | | |
| RUBELLA TITER | | | |
| RH FACTOR | | | |
| ANTIBODY SCREENING | | | |
| BLOOD | TYPE TEST | | |
| SUGAR | RESULTS | | |
| STS | VDRL | | |
| | RPR | | |
| | FTA | | |
| GC | CULTURE | | |
| | SMEAR | | |
| | | | |
| PAP | | | |
| PREGNANCY TEST | | | |
| SPUTUM | SMEAR | | |
| | CULTURE | | |

CONFIDENTIAL INFORMATION

CH-12 (Rev. 1/

HOPKINS CO. HEALTH DEPT.
P. O. BOX 1266 - 412 N. KENTUCKY AVE.
MADISONVILLE, KY 42431
PHONE: 270-821-5242

COPY

13668

COPY

# MISCELLANEOUS SCREENINGS AND
# LABORATORY TESTS PERFORMED ON-SITE
Enter providers initials in same block with result

| Tests/Collection date: | | | 11/29/94 PP | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Height | | | 56 | | | | | | | |
| Weight | | | 80'4 | | | | | | | |
| Head Circumference (0-3) | | | | | | | | | | |
| Blood pressure | | | 136/64 | | | | | | | |
| Temperature | | | | | | | | | | |
| Pulse | | | 76 | | | | | | | |
| Respirations | | | 20 | | | | | | | |
| Vision | Right | | 20/50 | | | | | | | |
| | Left | | 20/50 | | | | | | | |
| | Both | | 20/50 | | | | | | | |
| Hearing | 1000 | | 25d / 25d | | | | | | | |
| | 2000 | | | | | | | | | |
| | 4000 | | √ / √ | | | | | | | |
| Collection time | | Units | 1:65p | | | | | | | |
| Cholesterol, whole blood | | mg/dL | | | | | | | | |
| Glucose, whole blood | test type | | | | | | | | | |
| | result | mg/dL | | | | | | | | |
| Hemoglobin | | g/dL | 12.2 | | | | | | | |
| Hematocrit | | % | | | | | | | | |
| INH urine metabolites | | | | | | | | | | |
| Pregnancy | serum | | | | | | | | | |
| | urine | | | | | | | | | |
| Streptococcus Group A rapid anitgen test | | | | | | | | | | |
| Urine dipstick | leukocytes | | Tr | | | | | | | |
| | nitrite | | N | | | | | | | |
| | protein | mg/dL | N | | | | | | | |
| | glucose | mg/dL | N | | | | | | | |
| | ketones | | N | | | | | | | |
| | blood | ery/uL | N | | | | | | | |
| Urine Microscopies | RBC | /hpf | | | | | | | | |
| | WBC | /hpf | | | | | | | | |
| | EPI's | /hpf | | | | | | | | |
| | Casts /Crystals (note type seen) | /lpf | | | | | | | | |
| | Bacteria, yeast, parasites, other | /lpf | | | | | | | | |
| Wet Mount | "Trich" = Trichomonas vaginalis present, "Yeast" = Yeast cell present, | | | | | | | | | |
| KOH Prep-aration | "FE" = Fungal elements present, "CC" = Clue cells present, "Neg" = none of the above seen | | | | | | | | | |
| Presumptive N. gonorrhoeae culture | (√) Check if Done Results on Epid-107 | | | | | | | | | |

HOPKINS CO. HEALTH DEPT.
P. O. BOX 1266 - 412 N. KENTUCKY AVE.
MADISONVILLE, KY 42431
PHONE: 270-821-5242

13669

CONFIDENTIAL INFORMATION          CH-12 7/94

**JA 5274**

A_13621

# HEALTH HISTORY AND PHYSICAL EXAMINATION

Current prescription or frequently used over the counter drugs
*Ritalin 20mg Tid by Dr. Lowe but doesn't take them regularly.*

History: Circle positive responses and briefly explain

FAMILY (PARENT, GRANDPARENT, SIBLING) HISTORY OF: (Diabetes) (stroke), high cholesterol, (high BP), (heart disease), (TB) (cancer) kidney disease, seizures, sickle cell trait/disease, genetic condition or birth defects *PGM diabetes, PGM stroke, PGM - TB/P + heart disease, PGM - TB, PGF - cancer of lung + bone*

PATIENT HEALTH HISTORY: Current or past problems with:

SKIN: rashes, moles, warts, sores that won't heal *had ringworm from ferrett*

HEENT: severe headaches, cataracts, glaucoma, vision, ear and throat infections, hoarseness, teeth or mouth *gingivitis + severe H/A after inhaling gas*

NECK: thyroid, goiters, tumors *N/A*

CHEST: Pain *N/A*

BREASTS: Mass, lumps, discharge *N/A*
HEART: Murmurs, disease, high cholesterol, high BP *N/A*
LUNGS: Shortness of breath, asthma, TB, recurrent pneumonia, persistent or productive cough *N/A*

GASTROINTESTINAL: Ulcer, blood in stool, frequent diarrhea/constipation, intestinal parasites or polyps *N/A*

LIVER AND GALLBLADDER: jaundice, hepatitis, mononucleosis, gallstones *N/A*

MUSCULAR SKELETAL/EXTREMITIES: (Joint/muscle pain), swelling, tenderness, arthritis *neck + back pain*

NEUROLOGICAL: seizures, tics, tingling/loss of feeling *N/A*

GENITOURINARY: hematuria, dysuria, hesitancy, frequency, stones, pelvic pain/infections, tumors, STDs, uterine or ovarian cysts, prostate, testicular lumps or tumors *N/A*

BLOOD CIRCULATION: easy bruising or bleeding, nose bleeds, anemia, blood clots, transfusion *N/A*    COPY

CONDITION OR DISEASE: diabetes, cancer, emotional/psychiatric, unexplained weight loss/gain, unexplained tiredness, bir defects or congenital conditions, DES exposure *N/A*

ALLERGIES: *Sylax, Aspirin*
SURGERIES/HOSPITALIZATIONS: *hernia repair '92; chin stitches '87*
CONDITIONS/DISEASES:

HOPKINS CO. HEALTH
P. O. BOX 1266 - 412 N. KENT
MADISONVILLE, KY 42
PHONE: 270-821-524

IMMUNIZATION STATUS: *updating today*

| FEMALES ONLY | AGES 0-10 ONLY |
|---|---|
| Age of menarche_____ menopause_____ spotting, bleeding/pain with intercourse _____ | CHILDHOOD DISEASE: Rubeola, rubella, pertussis, mumps, chicken pox scarlet fever _____ |
| Spotting, bleeding after menopause_____ . <br> Last pap_____ Result_____ <br> Last Mam_____ Result_____ <br> Full term_____ Preterm_____ Abortion Sp_____ El_____ Liv Child_____ <br> Total Pregnancies_____ | PREGNANCY AND BIRTH HISTORY: mother's age and health while pregnant_____ <br> Mother's Hepatitis Status_____ <br> Medication taken during pregnancy_____ |
| Document Rubella Imm_____ Titre_____ couns._____ | Substance use during pregnancy: Alcohol_____ Tobacco_____ Drugs_____ |
| Last Menstrual Period_____ | Duration of pregnancy_____ Type of Delivery_____ Birth WT._____ <br> Complications_____ Metabolic screening_____ |

Signature *R. Pittman, RN*     13670     11-29-94     CH-13 (TEST

**JA 5275**   A_13622

|  | Normal | Abn | Comments |
|---|---|---|---|
| General Survey | | | |
| Skin | | | |
| HEENT : Head: Fontanels, Scalp | | | Scar in top of scalp |
| Eyes: PERRL | | | |
| Red Reflex | | | |
| Ears: Canals | | | |
| Drums | | | |
| Nose: Structure | | | |
| Mouth: Mucous Membrane | | | |
| Gums | | | |
| Teeth | | | |
| Palate | | | |
| Tongue | | | |
| Throat: Tonsils | | | |
| Neck: Thyroid | | | |
| Lymph glands | | | |
| Chest: Thorax | | | |
| Lungs | | | |
| Heart | | | |
| Breasts and axillae | | | |
| Abdomen | | | |
| Muscular Skeletal Back, Spine | ✓ | | |
| Hip: symmetry | ✓ | | |
| Gluteal fold | | | |
| Adduction/Abduction | | | |
| Posture | ✓ | | |
| Extremities: Symmetry | ✓ | | |
| Neurological: Gait | ✓ | | |
| Balance | ✓ | | |
| Reflexes | ✓ | | |
| Genitalia: External Male/Female | | | |
| Vagina | | | |
| Cervix | N/A | | |
| Uterus | | | |
| Adnexa | | | |
| Rectum | | | |

See School form

IMPRESSION/PLAN: Normal Exam. Pt. appears very dirty. Has missed school today to help his Dad repair cars + then come here. Pt. states he doesn't like school. See CH-12 for counseling. toothbrush given

CHEST X-RAY RESULTS: Taken _____ Read _____ Compared With _____
( ) Neg/Non-remarkable ( ) Improved ( ) Worsening ( ) No Change
( )0 No TB Exposure, Not Infected ( ) 3. TB Infection, With Disease
( )1. TB Exposure, No evidence of ( ) 4. Inactive Disease
    infection ( ) 5. Suspect
( )2. TB infection, Without Disease
Site of Infection: ☐ Pulmonary ( ) Cavity ( ) Non Cavity ( ) Other

SIGNATURE: R. Pitzer, RN          DATE: 11-29-94

COPY CH-13 (TEST 10/9

13671

JA 5276

A_13623

# SCHOOL MEDICAL EXAMINATION FORM - Sixth (6th) Grade Form

.1 local boards of education shall require a second medical examination of each child within one (1) year prior to ent ..nto the sixth grade. Each board shall have an approved program of continuous health supervision in accordance w. urrent statutes and regulations, vision, hearing, and scoliosis scheduled screening tests. Local school districts sh establish a plan for implementation and compliance with the sixth grade physical.

PLEASE COMPLETE THE IDENTIFYING INFORMATION AND RECORDS

IDENTIFYING INFORMATION  11/29/94                    no.5 054054A

Student Name: ———————— BASHAM LEON B
Social Security Number: _____ 406195195   DOB: 091481
Parent or Guardian Name: ___

RECORD OF IMMUNIZATIONS TO BE REPORTED ON IMMUNIZATION CERTIFICATE FORM, EPID 230.

MEDICAL HISTORY

Seizures: _None_
Chronic Illness: _____
Allergies: _Mylar + Aspirin_
Medications: _Ritalin 20 mg TID but doesn't take it correctly_
Significant Historical Information: _Hernia repair '92_

Physical Exam:

| N. | Abn. | | |
|----|------|---|---|
| ✓ | | General Appearance | Hgt: _56_ Wgt: _80'14_ BP: _136_ _164_ |
| | | HEENT | Hearing: R _25db 1000, 2000, 4000_ L _25db 1000, 2000, 4000_ |
| | | Neck | Vision: R _20/50_ L _20/50_ |
| | | Chest | Amblyopia Screening _Neg._ |
| | | Heart | School Readiness - Normal: ____ |
| | | Abd·Genitalia | Needs Evaluation: ____ |
| | | Extremities-Back | Optional ······· HCT/HGB: _12.2_ |
| | | Neuro | Optional ·············· UA: _Neg_ |
| | | Scoliosis Screening _Negative_ | |

Explain Abnormal Exam: _____

Recommendations:

_____ No Restrictions: Normal Exam
__✓__ No Restrictons: Abnormal Exam - Explain: _Vision referral_

Special Seating Needed: YES _____ NO _____
RESTRICTIONS AND SUGGESTIONS TO SCHOOL: _____

Age Appropriate and Suggested Anticipatory Guidance (Health Assessments)

**HOPKINS CO. HEALTH DEPT.**
P. O. BOX 1266 – 412 N. KENTUCKY AVE.
MADISONVILLE, KY 42431
PHONE: 270-821-5242

1. How have things been going for you? _____
2. How do you rate your own health? _____
3. What concerns do you have about your own development? _____

Advise adolescents about the following good health habits and self-care.

(a) balanced diet          (b) maintain appropriate weight      (c) regular exercise
(d) sufficient sleep       (e) brush and floss teeth            (f) seat belt use
(g) muscular development    (h) avoid use of illicit drugs, alcohol, and tobacco

COPY

Signed: _R. Pitzer, RN_                      Date: _11-29-94_
Physician/ARNP/PA/EPSDT Provider

HOPKINS COUNTY HEALTH DEPT.                                    13672
Address: _____ P. O. Box 1266 - 412 N. Kentucky Ave.        Telephone: _____
JEMIC APPROVED 1671-410   MADISONVILLE, KENTUCKY 42431
                                                              Kentucky Department of Education

**JA 5277**

A_13624

# HEALTH HISTORY AND PHYSICAL EXAMINATION

**HEALTH HISTORY:**

(Exam on back of form)

Reason for today's visit _Left earache, Rash, Nerve problem._

_BASHAM LEON._
_4006195195_
ID Number

CURRENT CONDITION OR DISEASE: diabetes, cancer, ~~emotional/psychiatric~~, unexplained weight loss/gain, unexplained tiredness birth defects or congenital conditions, DES exposure. _____

Current Medications: (prescription and over the counter drugs) _SEE DETENTION CTR. Chart_

Allergies: _PENICILLIN — CYLERT_

PAST SURGERIES/HOSPITALIZATIONS/TRANSFUSIONS: _Hernia Repair 1993, Rt. Ring fi. Repair 19_

IMMUNIZATION STATUS: _UNKNOWN_

| FEMALES ONLY | AGES 0-10 ONLY |
|---|---|
| Age of menarche _____ menopause _____ spotting, bleeding/pain with intercourse _____ | CHILDHOOD DISEASE: Rubeola, rubella, pertussis, mumps, chicken pox scarlet fever, Fifth Disease _____ |
| spotting, bleeding after menopause _____ Last pap _____ Result _____ Last Mam _____ Result _____ Full term _____ Preterm _____ Abortion Sp _____ EI _____ Liv Child _____ Total Pregnancies _____ Document Rubella Imm _____ Titre _____ couns. _____ Last Menstrual Period _____ | PREGNANCY AND BIRTH HISTORY: mother's age and health while pregnant _____ Mother's Status: Hepatitis _____ HIV _____ Medication taken during pregnancy _____ Substance use during pregnancy: Alcohol _____ Tobacco _____ Drugs _____ Duration of pregnancy _____ Type of Delivery _____ Birth WT. _____ Complications _____ Metabolic screening _____ |

FAMILY HISTORY (PARENT, GRANDPARENT, SIBLING): Diabetes, stroke, elevated cholesterol or BP, heart disease, TB, cancer (kidney disease), seizures, sickle cell, genetic/birth defects, HIV ~~psychiatric~~ _MOTHER_ _PGM_

PATIENT HISTORY - REVIEW OF SYSTEMS: Current or past problems with:

SKIN: (rashes) moles, warts, sores/wounds that won't heal _CURRENTLY_

HEENT: headaches, vision problems, ear or throat infections, hoarseness, teeth, mouth _NONE_

ENDOCRINE/IMMUNOLOGIC: thyroid, goiter, tumor, (HIV) _NONE_ _Neg. in 1995 by pt. history_

CARDIOVASCULAR: chest pain, murmurs, elevated cholesterol or BP _NONE_

RESPIRATORY: shortness of breath, asthma, TB, pneumonia, cough _Smokes 1 pkg./day X 4 yrs._ _NONE_

GASTROINTESTINAL: nausea, vomiting, ulcer, jaundice, hepatitis, gallstones, bloody stool, diarrhea/constipation, intestinal parasites o polyps _NONE_

MUSCULOSKELETAL: joint/muscle pain, ROM, ~~swelling~~, tenderness, arthritis _BACK NECK_

NEUROLOGICAL: seizures, gait, coordination, tingling/loss of feeling _NONE_

GENITOURINARY: breast lumps or discharge, hematuria, dysuria, hesitancy, frequency, stones, pelvic pain or infections, tumors, STDs uterine or ovarian cysts, testicular lumps _NONE_

HEMATOLOGIC: bruising or bleeding, anemia, blood clots _NONE_

SIGNATURE: _P. Kennedy PC_  DATE: _9-11-00_  CH-13 (Rev. 7/97

HOPKINS CO. HEALTH DEPT.
P.O. BOX 1266 - 412 N. KENTUCKY AVE
MADISONVILLE, KY 42431
PHONE: 270-821-5242

13673

COPY

JA 5278 A_13625

# Record File Index
## Section 1

ORIGINAL RECORD INDEX

NAME __BASHAM__ __LEON__ __BRANDON__
          LAST          FIRST          MIDDLE

__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__
HOSPITAL NO.

### UNIT INDEX

| ADM. NO. | DATES FROM—TO | DIAGNOSIS, OPERATIONS, SPECIAL THERAPY AND PROCEDURES |
|---|---|---|
| WSH 1ST | 12/18/2000- 1.23.2001 | AXIS I: PSYCHOSTIC DISORDER NOS (PRINCIPAL). AXIS II: NO DIAGNOSIS ON AXIS II. (ANTISOCIAL PERSONALITY TRAITS). |
| | | AXIS III: NONE. |
| | | AXIS IV: PSYCHOSOCIAL AND ENVIRONMENTAL PROBLEMS: Being in jail. 3-Moderate. |
| | | AXIS V: GLOBAL ASSESSMENT OF FUNCTIONING: CURRENT: 60 |

CONFIDENTIAL
Reproduction or Disclosure
Not Permitted
Western State Hospital, Hopkinsville, KY
Medical Records Dept.

DEFENDANT'S EXHIBIT
72

00820

JA 5279

# Record File Index
## Section 1

CONTINUATION SHEET

NAME __BASHAM__ __LEON__ __BRANDON__
LAST        FIRST        MIDDLE

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
HOSPITAL NO.

UNIT INDEX

| ADM. NO. | DATES FROM—TO | DIAGNOSIS, OPERATIONS, SPECIAL THERAPY AND PROCEDURES |
|---|---|---|
| WSH 1ST | 12/18/2000– 1.23.2001 | AXIS I: PSYCHOSTIC DISORDER NOS (PRINCIPAL). AXIS II: NO DIAGNOSIS ON AXIS II. (ANTISOCIAL PERSONALITY TRAITS). AXIS III: NONE. AXIS IV: PSYCHOSOCIAL AND ENVIRONMENTAL PROBLEMS: Being in jail. 3-Moderate. AXIS V: GLOBAL ASSESSMENT OF FUNCTIONING: CURRENT: 60 |
| | | |
| | | |
| | | |
| | | |

CONFIDENTIAL
Reproduction or Disclosure
Not Permitted
Western State Hospital, Hopkinsville, KY
Medical Records Dept.

00820

JA 5280

| AOC-710 Doc. Code: PIH | VERIFIED PETITION | |
|---|---|---|
| Rev. 9-95 | FOR | Case No._____ |
| Commonwealth of Kentucky Court of Justice | INVOLUNTARY HOSPITALIZATION (Mental Illness) OR | Court_____ District |
| KRS 202A.051 202B. | INVOLUNTARY ADMISSION (Mental Retardation) | County_____ Christian |

5795

IN THE INTEREST OF:    Leon B. Basham    )
)
*Leon Basham* )
―――――――――――――――――― )
Respondent )
)
129 Oak Dale Avenue, Madisonville, KY 42431 )
―――――――――――――――――――――― )
Residence )
)
Western State Hospital )
―――――――――――――――――――――― )
Current Location )
)
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   09/14/81 )
―――――――――――――――――――――― )
Social Security Number / Date of Birth )

CONFIDENTIAL
Reproduction or Disclosure
Not Permitted
Western State Hospital. Hopkinsville, KY
Medical Records Dept.

1.  PETITIONER, _____ Irene Pasquin, M.D. _____, states that he/she is:
(Please print)

☒ a reputable resident of _____ Christian _____ County, Kentucky, at _____ P.O. Box 2200 _____
(Address)
Hopkinsville, KY 42241-2200 (270)886-4431, and is associated with the Respondent as
(Phone No.)

_____, OR,
(Relationship)

☒ a Qualified Mental Health Professional ☐ a Qualified Mental Retardation Professional located at

Hopkinsville _____, Kentucky, and is associated with the Respondent as ___ Psychiatrist ___,

employed at _____ Western State Hospital _____ (270)886-4431 ___.
(Hospital/Facility, etc.)                         (Phone No.)

2.  PETITIONER states that the Respondent: ☐ has been hospitalized in a hospital or a forensic psychiatric facility for a period of 30 days within the preceding six months under the provisions of KRS 202A or 504 (if 360 day proceeding) ☒ is a person with a mental illness, or ☐ is a person with mental retardation, and that he/she presents a danger or threat of danger to self, family or others if not immediately restrained.

3.  PETITIONER further states that the name, address, and residences of persons related to the Respondent are: (If unknown, so state)

Parents or guardian: ___ N/A ___

Spouse: ___ N/A ___

Person having custody: ___ Western State Hospital ___

Near relative: ___ Kathy Basham, Mother, 129 Oak Dale Avenue, Madisonville, KY 42431 ___

Other: ___ N/A ___

00829

DEFENDANT'S EXHIBIT
13

JA 5281

4. PETITIONER believes that the respondent is ☒ a person with a mental illness, ☐ a person with mental retardation because: (state reasons)

Patient needs stabilization and supervision of his medicines.

_____

_____

_____

5. PETITIONER states the following facts to indicate belief that Respondent is a danger or threat of danger to self, family or others because: (state reasons)

Patient responds to his hallucinations and has been banging his head on the wall.

He makes threatening remarks. He is impulsive.

_____

_____

6. PETITIONER requests that the Respondent be detained for examination, evaluation and hospitalization/admittance if he/she meets the criteria for a) ☒ involuntary hospitalization and that Respondent be hospitalized for ☒ 60 Days or ☐ 360 Days; or b) ☐ involuntary admission and that Respondent be admitted for an indeterminate period, to be reviewed within five (5) years of entry of this admission order.

* * * * * * * * * * * * *

_____12-21-00_____     _____
        Date                              Signature of Petitioner
                                          Irene Pasquin, M.D.

* * * * * * * * * * * *

SUBSCRIBED AND SWORN TO before me this __21st__ day of ____December____, 19XX 2000

_____
            Name/Title
        Judy C. Pryor, Notary Public

CONFIDENTIAL
Reproduction or Disclosure
Not Permitted
Western State Hospital, Hopkinsville, KY
Medical Records Dept.

__Christian/State At Large__
        County, Kentucky

Attach copy of Petition to copy of each Warrant; Summons; or Order Appointing Counsel, setting preliminary hearing and appointing Physician/QMHP/QMRP.

00830

JA 5282

**Number 1 Certification**

AFFIANT states that he/she has examined the Respondent, _____ Leon B. Basham _____ and in his/her opinion, Respondent ☒ is, or ☐ is not:

☒ Mentally Ill, or ☐ Mentally Retarded, and presents a danger or threat of danger to self, family or others, that he/she can reasonably benefit from this treatment, and for whom hospitalization is the least restrictive alternative mode of treatment presently available.

1. What facts support your belief that the Respondent is a danger or threat of danger to self, family or others if not hospitalized?

   _responds to his hallucination & becomes disorganized using angry/impulsive she has been on suicidal attempt restriction has been in + out of jail meds longer than req. 60 days + Transfer to acute ward._

2. What facts support your belief that hospitalization is the least restrictive alternative mode of treatment presently available?

   _stabilization and adjustment of his Medicare._

3. Diagnostic Impression:

   a. _"Psychotic Disorder NOS" on std. un_

   b. _Rx Hypomanic disorder NOS_

4. Date Examination Performed:

   12/21/00

   _12 - 21 - 00_          1. _Irene Pasquin_
   Date                              (Signature/Title)

   Irene Pasquin, M.D.

   SUBSCRIBED AND SWORN TO before me this ___21st___ day of _____December_____, ~~18X~~ 2000

   MY COMMISSION EXPIRES:          _Judy C. Pryor_
   08/18/04                                          Notary Public

   Judy C. Pryor

CONFIDENTIAL
Reproduction or Disclosure
Christian State At Large Not Permitted
County, Kentucky
Western State Hospital, Hopkinsville, KY
Medical Records Dept.

00831

JA 5283

**Number 2 Certification**

AFFIANT states that he/she has examined the Respondent *Leon Basham* _____, and in his/her opinion, Respondent ☒ is, or ☐ is not:

☒ Mentally Ill, or ☐ Mentally Retarded, and presents a danger or threat of danger to self, family or others, that he/she can reasonably benefit from this treatment, and for whom hospitalization is the least restrictive alternative mode of treatment presently available.

1. What facts support your belief that the Respondent is a danger or threat of danger to self, family or others if not hospitalized?

*Mr. Basham presents self-injurious behaviors. He has been banging his head on the wall and hitting wall with his fist. He makes threatening remarks. He has a low-frustration tolerance and is quite impulsive. He presents a danger to self/others. Prior to admission, in jail he attempted to hang himself.*

2. What facts support your belief that hospitalization is the least restrictive alternative mode of treatment presently available?

*Mr. Basham needs a secured treatment environment for stabilization. His symptoms can not be managed on an out-patient basis.*

3. Diagnostic Impression:
   a. *Posttraumatic Stress Disorder*
   b. *Antisocial Personality Disorder*
      *Borderline Personality Disorder*

4. Date Examination Performed: *12/21/00*

_____  2. _____ , MS
*12/21/00*                    (Signature/Title)
Date.

Paula Halcomb, MS
Western State Hospital, Hopkinsville, KY
Medical Records Dept.

CONFIDENTIAL.
Reproduction or Disclosure
Permitted

SUBSCRIBED AND SWORN TO before me this ___21st___ day of ___December___, 2000

MY COMMISSION EXPIRES:          _____
08/18/04                        Judy J. Pryor    Notary Public

00832                                                    13

**JA 5284**

PHYSICIAN'S CERTIFICATION
MEDICAL EXPENSE CLAIM
FOR INDIGENT PERSONS HELD IN COUNTY JAILS


DEFENDANT'S
EXHIBIT
74

PURPOSE OF CERTIFICATION:  The law - KRS 441.010(3)(a) Provides that "The physician or physicians attending the prisoners shall certify, under oath, that the prisoner's condition was such that the medical care could not pe postponed until after the period of confinement without hazard, that medical procedures were limited to those necessary to preserve the life or health of the prisoner and that they were not of an elective nature except for the initial examination by the physician to determine whether medical care is needed.

TO BE COMPLETED BY THE JAIL:
   1.   Name of Prisoner ___Basham Brandon Leon___
   2.   Release Date_____

TO BE COMPLETED BY PHYSICIAN:
   Name & Address of Doctor  _____
                                       _____
                                       _____

Comes ✓_____, and certifies to the Department of Finance, Commonwealth of Kentucky, under the penalties provided by law for perjury (KRS Chapter 523), as follows:

   1.   I am a physician, duly licensed to practice medicine in the Commonwealth of Kentucky in acordance with KRS Chapter 311.
   2.   On ✗ __2/12/01_____ (date) I treated the aforementioned person.
   3.✗   The symptoms exibited by the patient were:
      - Auditory hallucinations
      - Paranoid ideation
      + mood lability
   4.   If an initial diagnosis, indicate fee for the diagonsis (Office Visit)  $_____
   5.   My fee for treatment in addition to my normal office visit charge is $_____
   6.✗   The treatment I have performed on the aforementioned person is:
      _Psychiatric assessment_____
   7.   My fee for the services described above are my usual and coustomary charges for such services and are reasonable and in line with the prevailing medical fees for like services in this county.

   8.✗   In consideration of the remaining term of incarceration and nature of the aforementioned person's medical problem I have determined that: (Check one)

     ✓_____  The treatment could NOT wait until after the aforementioned release date without hazard to the life or health of the person.

     _____  The treatment COULD wait until the release date of the person shown above.

Signed _____     Date 2/12/01

00051

JA 5285

FILE COPY

**jeans**

| | |
|---|---|
| **From:** | "Linda Brown" <Linda@swerlinglaw.com> |
| **To:** | <Jacklaw@aol.com> |
| **Sent:** | Tuesday, December 16, 2003 11:16 AM |
| **Subject:** | Basham |

MEMORANDUM:

TO:     JBS

RE:     PENNY ROYAL HOSPITAL

DATE:     DECEMBER 16, 2003

I have reviewed the Penny Royal Hospital records and note the following:

Basham was seen at Penny Royal on December 18, 2000. He was sent there by the jail for attempting to hang himself two times. On one occasion he stuck his finger in an electric socket trying to kill himself. Ther eis a note that he was hallucinating about the man who abused him as a child. This note was by Dean Richardson.

On June 6, 2000, there is a note by Amy Melton regarding a Sherril Hopper in reference to the man who sexually assaulted Basham.

On November 10, 1999, there is a note by Laura Houston, a psychologist, who talks about the Audobon camp, September 4, 1999. Talks about a personality disorder and the use of crack cocaine and marijuana.

There is a note by Nurse Altman, dated February 27, 1998, who talks about the defendant having an oppositional defiant disorder.

There is a report by psychologist Arthur Lossner, dated May 18, 1993. This references complaints by Mrs. Basham to the school about the way Brandon was being treated.

There is an evaluation by Arthur Lossner, April 26, 1990. It talks about Brandon's fall from a tree and his mother reporting that he cries frequently. There is also reference to Mrs. Basham being treated by Dr. Bently.

There is an evaluation by Dr. Sadiq, August 23, 2000, wherein there is a note that Brandon suffers from no significant history of head injuries.

There is an evaluation on December 6, 1999 of a Dr. Emmanual DeLa Rocha that talks about Brandon's suicide attempts.

There is a note of a Dr. James Rozell, August 1, 1990. He talks about "Brandon being quite obnoxious today." Brandon is referred to as manipulative and uncontrolled.

Wendy Vaness, who is a social worker, has a note of January 3, 2000 that Brandon is there as a result of an attempt to hang himself and electrocute himself at the jail.

There is a note by Dr. Dela Rocha that the defendant is a psychopath and not much we can do.

There is a note that the defendant has an attention disorder and is non-compliant with any medicine. There is also a note that Mr. Basham said that his wife is too easy on the defendant --he is firmer and whips the defendant. These are under notes by Launa Houston.



DEFENDANT'S EXHIBIT 75

JA 5286

There is a note toward the end of the recods that says he has a drug history
of marijuana, coke, crack and alcohol. There is a note, "Strong genetic
disposition for chemical dependency on the part of both parents. This comes
from a May 3, 2000 admission. He was discharged on May 9 with the following
notes -- failure. No motivation. Disrputive. Doesn't care. Defiant.
Derails everyone else. Dr. Cavazos notes that Brandon is not homicidal or
suicidal. There is a note from his 9th grade teacher there, Joyce LaBell
that Brandon is totally out of control and has been kicked out of the
program.

JBS:lhb

JA 5287

jeans
_____

**From:** "Steven M. Hisker" <Steve@SwerlingLaw.com>
**To:** <Paige@brucklaw.com>; <yetto@mis.net>; <traci@swerlinglaw.com>;
<STEVE@swerlinglaw.com>; <SHEALYBOLAND@HOTMAIL.COM>;
<SHARRISON@justice.com>; <linda@swerlinglaw.com>; <jeans@swerlinglaw.com>;
<Jacklaw@aol.com>; <GREGHARRIS@justice.com>; <wvcookpi@citynet.net>;
<gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>;
<CGRAHAMSC@aol.com>; <akandare@justice.com>; <Lisajkimbrough@yahoo.com>
**Sent:** Sunday, February 29, 2004 9:16 PM
**Subject:** RE: Branden

Let's just make sure they don't send him to lexington. Its a pain to see clients there.

-----Original Message-----
From: Paige Tarr
Date: 2/29/04 2:18 pm
To: Lesa Watson, , , , , , , , , Greg M Cook, , , , ,
Subj: RE: Branden

He seems OK now, but he was given the blade and 15 Remeron by jail people who obviously wanted
him to off himself. Donna wants him out of this detention center since so many people there seem to be
unable to deal with him. We'll just have to see how things go.

_____

From: Lesa Watson [mailto:yetto@mis.net]
Sent: Sat 2/28/2004 8:48 PM
To: traci@swerlinglaw.com; STEVE@swerlinglaw.com; SHEALYBOLAND@HOTMAIL.COM;
SHARRISON@justice.com; Paige Tarr; linda@swerlinglaw.com; jeans@swerlinglaw.com;
Jacklaw@aol.com; GREGHARRIS@justice.com; Greg M Cook; gacollias@citynet.net;
ECR@NMRS.COM; CJM0501@ALLTEL.NET; CGRAHAMSC@aol.com; akandare@justice.com;
Lisajkimbrough@yahoo.com
Subject: Branden

Had no idea Branden slashed his wrists. Is he okay?
Lots of local coverage this weekend.

Lesa F. Watson, C.C.D.I.
Paralegal/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net



DEFENDANT'S
EXHIBIT
76

JA 5288

Connie Nolan: expert - Con artist

If a child is doing all those
things to survive, don't call
him a con artist

Dr. Sanders - emotional problems rather
than calculated decision to hurt
someone.

Huffing - brain destroyed - even though
self destructive, it was self-medicating

Look at from child's perspective -
he sees other people doing things, in
control, so he copies it.

If we looked at it as an adult we
could not understand, but as a
child with his problems.

His brain was hindered from the
beginning



DEFENDANT'S
EXHIBIT
77

Took Kids in during the marital Problems
Families just went Separate Ways—
     no Problems.


<u>Beverly Basham</u>
     28 yoA
     Had been Close To Charlette
     Charlette stayed with Them
     Mom always did drugs/Jalen or pregnant
     She created a monster
     I showed get what he deserves
     he has marital issues
     Charlette lived with her for a couple
          of years
     Charlette old enough To leave
     did not go over the house

DEFENDANT'S
EXHIBIT
78

9/2c/03 Review Committee meeting in Washington DC on W. Va case. JWH And Gary Collias As well As US Atty.

9/2c/03 ① Interview All cellmates of Fulks

② " Everyone in Ashland case
Crabtree
Francis
All officers

③ Beth McGuffin 128 Mann St. Huntington W.VA. 25705
Work @ 60-KAN or plant 304-736-7216

7/23/03 Conference w/ Donna, Dr. Morgan, Dr. Bronson, Dr. Brawley, Paige, Greg & Jim

① fetal alcohol component - Donna

② fried his brain w/ drugs

③ IQ 68
Verbal 75
Performance 65

DEFENDANT'S EXHIBIT 79

JA 5291

(3) A fits in the first percentile on most testable issues.

(4) not malingering

(5) EEG - if abnormal would need to do further test.

Ref Same as Baptist
Goal Visual
5 imaging specialists - Mark

Dr. Morgan - s is emotional off medicine

Send Dr. Brantley all hospital records
Using daily inhalents

(6) ADHD - Clumsy child syndrome - Brianna

Dementia - Brantley

Panic Disorder ⎫
Psychotic ⎬ Dr. Morgan
ADHD ⎭

Organic Mood Disorder w/ Psychosis

Dementia - Donna

JA 5292

12/5/03 PC w/ Paige - Told her to get me memos. - need records now.

12/5/03 Conf w/ Greg & Christina

12/5/03 Mtg with Dennis and Greg
Abnormal EEG @ 8
PET Scan - Baptist - Radiology
EEG. - Dr Brandon
No insanity under Federal or State
Retardation not - but we have physical causes - not before 18

Dr Scott Littleton - Riverdale 9/91
Stack w/ picture of Brandon

Kevin McNally

(Get parents tested)

DEFENDANT'S EXHIBIT
80

JA 5293

Dementia due to multiple et

Donnor

Dementia due to multiple etiologies
with psychosis

Impulsat abuse evidence psychosis with
hallucinations

Anxiety disorder with not otherwise
specified

ADHD

Test—   Neuropsychological Testing

Neuropsycholuma correlation

Examination

Records

12/4/03 PC with Kevin Mahady
Do Jackson & Donnor - No harm
Narrow answer re mental state

"...PCarf w/ Lara Watson

JA 5294

△ NOW SAYS STATEMENTS ARE
STATEMENT NOT VOLUNTARY

① NO MEDICINE

② CIGARETTES — HAVE TO SIGN

③ SNACKS — " " " "

④ IF YOU WANT TO CALL — " " "

⑤ HELP HIM IF HE TOLD EVERYTHING
KNEW (AND) WAS LEADER

⑥ HE WAS COERCED.

⑦ ADMITS HE KNEW RIGHTS TO LAWYER

⑧ TOLD HIM IF YOU TOLD THE TRUTH
WOULD NOT BE HELD AGAINST HIM,
ONLY CHAD — NO CHARGES

DEFENDANT'S EXHIBIT 81

JA 5295

1/19/09 Conf. w/ Kathy & Charlotte and
Paige.
Explained to Them The case
Told Them to co-op call Drs. at Botner
Help us get records.
Told Them how we are going to handle
case.

2/16/09 MTg with Scott and Greg re
Jackson v Denuo



DEFENDANT'S
EXHIBIT
82

JA 5296

2/19/04 Conf w/ Minton
Will get hypothetical w/p came
from Ripemang, proc B. than
memo

1:00 @
47.05  #10 - Billy spoke with Larry Olli?
Sheriff Hewlet. Beaumont County-
Contradict. Thanksgiving 2
Also spoke to Joe Ciavelli

2/19/04 Minton - Conf w/ they -
Did you advise Brandon be what he said
Ishall be used.

2/19/04 Conf with Nettles
Bill says he has guy in Clemson for
perth.

JA 5297

2/24/04 Spoke w/ Billy again - no proffer

Can't argue abut spontaneous utterance

A Thought statements he made to keep
worried not hurt.

Deward just freed N questions

They were told they could not tell
to them

He never spoke to A abut the use of
his testimony.


2/29/04 Spoke w/ Cam

A ~~staff~~
? If Cam told him what ~~that~~ could be used
against him. Cam thought it was protected
A Cam did not tell him hope could be
used against him.

JA 5298

Sharon Plon told them no questions
Source of hypoxia from ∆ —
   no stabbing or bloodletting in car

2/24/04  Hearing before Judge Anderson
   We agree to turn over records —
      everything on ∆r. sees.

2/29/04  Hearing before Anderson on Motions
   ∆ is incompetent
   Donna Watts called in

DEFENDANT'S
EXHIBIT
83
JA 5299


**From:** "Paige Tarr" <Paige@brucklaw.com>
**To:** "Lesa Watson" <yetto@mis.net>; <traci@swerlinglaw.com>; <STEVE@swerlinglaw.com>; <SHEALYBOLAND@HOTMAIL.COM>; <SHARRISON@justice.com>; <linda@swerlinglaw.com>; <jeans@swerlinglaw.com>; <Jacklaw@aol.com>; <GREGHARRIS@justice.com>; "Greg M Cook" <wvcookpi@citynet.net>; <gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>; <CGRAHAMSC@aol.com>; <akandare@justice.com>; <Lisajkimbrough@yahoo.com>
**Sent:** Sunday, February 29, 2004 12:18 PM
**Subject:** RE: Branden

He seems OK now, but he was given the blade and 15 Remeron by jail people who obviously wanted him to off himself. Donna wants him out of this detention center since so many people there seem to be unable to deal with him. We'll just have to see how things go.

---

**From:** Lesa Watson [mailto:yetto@mis.net]
**Sent:** Sat 2/28/2004 8:48 PM
**To:** traci@swerlinglaw.com; STEVE@swerlinglaw.com; SHEALYBOLAND@HOTMAIL.COM; SHARRISON@justice.com; Paige Tarr; linda@swerlinglaw.com; jeans@swerlinglaw.com; Jacklaw@aol.com; GREGHARRIS@justice.com; Greg M Cook; gacollias@citynet.net; ECR@NMRS.COM; CJM0501@ALLTEL.NET; CGRAHAMSC@aol.com; akandare@justice.com; Lisajkimbrough@yahoo.com
**Subject:** Branden

Had no idea Branden slashed his wrists. Is he okay?
Lots of local coverage this weekend.

Lesa F. Watson, C.C.D.I.
Paralegal/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net



DEFENDANT'S EXHIBIT 84

**JA 5300**
2/11/2011

Tina / Fulks letters

\* Can we introduce Chad Fulks bad
Character

\* Full scale 68 - doesn't qualify
\* Burns vehicle - no forensic evidence


8/12/04 In Court Hearing
To start ~~court~~ August 30

MU'Min 500 U.S. 515

Do we want to renew motion
MMPI-2

1999 MMPI-2

Q here is whether they can talk
to our doctors - HIPPA

DEFENDANT'S
EXHIBIT
85

JA 5301

**From:** "Lesa Watson" <yetto@mis.net>
**To:** "Lesa Watson" <yetto@mis.net>; <STEVE@swerlinglaw.com>; <PAIGE@BRUCKLAW.COM>; <Lisajkimbrough@yahoo.com>; <linda@swerlinglaw.com>; <jeans@swerlinglaw.com>; <Jacklaw@aol.com>; <GREGHARRIS@justice.com>; "Greg M Cook" <wvcookpi@citynet.net>; <gacollias@citynet.net>; <ECR@NMRS.COM>; <CJM0501@ALLTEL.NET>; <CGRAHAMSC@aol.com>; <akandare@justice.com>; "saunders@swerlinglaw.com" <saunders@SwerlingLaw.com>; "Anna Rawl" <Rawlae@yahoo.com>
**Sent:** Friday, August 27, 2004 8:30 AM
**Subject:** Telephone Call with Branden

Branden just called, twice. Wanted to tell me he is not pleading b/c he cannot say what he has to say b/c it is not true. He is very upset over the shock collar. I tried to explain to him that he has to behave in Judge Anderson's courtroom, it's like church. He then went into the conflict he had with the USM and that they provoked him. I told him they were going to do that and he had to focus strictly on his trial/this is his life and do what Jack and Greg tell him to do. He is in the USM's world and even if they are little things that are important to him, he must control his behavior. He said Morgan had changed his meds. He is upset over Dr. Morgan being called as a witness. I explained that Dr. Morgan is treating him and it is Jack and Greg's judgment call. He has a right to his opinion's and reasons, but he must listen to Jack and Greg and take their advice. Ask them to explain to him. He thinks his testimony is not in his best interest.

He said that he likes coloring books, connect the dot games and word seek and find puzzles. I told him Paige would have them for him. And he is to work on them and focus on that. He will be in trial a long time and he cannot have any outbursts. There will be many things he does not like when he hears them, etc. , etc.

He promised he would do his best to control himself. I told him if he didn't the judge would not stand for it. He felt good that his family is supporting him. Asked me to call his mother and tell her he loves her. Will do.

Lesa F. Watson, C.C.D.I.
Paralegal/Investigator/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net



DEFENDANT'S
EXHIBIT
8C



DEFENDANT'S
EXHIBIT
87

JA 5303



DEFENDANT'S
EXHIBIT
88

JA 5304

DEFENDANT'S
EXHIBIT
89

JA 5305



DEFENDANT'S
EXHIBIT

JA 5306

JA 5307

Use this area for drawing!

JA 5308



JA 5309



JA 5310



JA 5311



Help the mouse find the cheese. Close off the walls of the maze where the dots are to make it harder. Try the

JA 5312



JA 5313

Find and color three moons, three stars and a rocket ship.

JA 5314



JA 5315

I Don't under stand
why page is not
the salad order's her here.
here. and why
you can't talk
in front of me It
makes me feel that

JA 5316

# Crayola



WASHABLE

## COLORING FUN
### Reusable Activity Book
### with 3 Washable White Board Markers & Cloth Eraser

## DRY ERASE
## COLOR WIPEOFFS

Crayola® Color Wipeoffs are the hottest new way to color, draw, and erase. These washable white board markers come in the brightest colors, and are perfect for drawing, coloring, and writing on any white board surface.

### Transfer To Paper Steps:

Crayola® Color Wipeoffs allow you to save your favorite drawings to regular paper! Just follow these 3 easy steps:

### Helpful Hints For Use:
• For best results use Crayola® Color Wipeoff Markers with Crayola® Color Wipeoff Boards.
• If there is some hard to erase ink left on the drawing surface, just wet a paper towel with water and wipe the board clean. Be sure to remove all water from the board before use.

### Board Care:
• Do not use any objects on the board that may scratch the surface.
• Use a damp cloth to remove any hard to erase ink.
• Erase board before storing for an extended period of time.
• Only use Dry Erase Markers on the surface. The surface is not intended for traditional markers, pens or crayons.
• For best results use with Crayola® Dry Erase Color Wipeoffs White Board markers.

 **1**

Make a drawing on the white board drawing surface.

 **2**

With a damp sponge, moisten a piece of paper.

**3**

Press the paper wet side down onto the white board surface. Using your hand, rub the entire surface of the paper. Lift the paper off to reveal your print and place it on a flat surface to dry.

**Transfer Hint:** If the entire picture does not transfer, try using more water.

### For More Fun Try These Other
## DRY ERASE
## COLOR WIPEOFFS
### Products

 **White Board Markers**



 **White Board Drawing Sets**

 **White Boards**

There's only one childhood. And only one **Crayola**

Do not shake markers.

Crayola® Washable Color Wipeoff Markers wash from skin and most washable children's clothing.
• **For best results,** wash promptly in hot wash cycle. Do not use pre-wash or chlorine bleach. Repeat laundering may be required.
• **Advisement:** Keep away from wallpaper, painted walls, finished and unfinished wood, vinyl, carpeting and other materials that cannot be laundered.

 For more information including Fun Project Ideas, visit the **Crayola® INTERNET SITE** at: http://www.crayola.com

Questions? Comments? **Call 1-800-CRAYOLA** weekdays 9 AM to 4 PM EST.

AP NONTOXIC

CONFORMS TO ASTM D-4236





©2000 Binney & Smith Easton, PA 18044-0431, Made in U.S.A. Distributed

BINNEY


0 71662 04003 1

**JA 5317**

FD-350 (Rev. 6-8-81)

(Indicate page, name of newspaper, city and state.)

I A

The Sun News
Myrtle Beach SC

(Mount Clipping In Space Below)

Date: 9-14-04
Edition:

Title: Jury starts work in abduction trial

Character: 7A-CO-27964
or
Classification:
Submitting Office: Columbia

Indexing:

# Jury starts work in abduction trial

## Experts review choice of 17 jurors

BY KENNETH A. GAILLIARD
*The Sun News*

COLUMBIA | Lawyers made opening arguments in Branden Basham's death penalty case Monday, but it will be weeks before they know if their choices for jurors pay off.

Basham faces a death sentence for his role in the abduction and death of Alice Donovan in November 2002. He and co-defendant Chadrick Fulks were charged with taking Donovan from the parking lot of Wal-Mart in Conway. Her body hasn't been found.

On Monday, prosecutors told jurors to pay attention to the choices Basham made while he and Fulks were a "team." Defense lawyer Jack Swerling called Basham a follower in the crimes he and Fulks are accused of committing.

Swerling told jurors that the defense lawyers would not dispute much of the prosecution evidence but said Basham didn't intend to harm Donovan during the carjacking.

See TRIAL | Page 5A

7A-CO-27964-457

b6
b7C

DEFENDANT'S
EXHIBIT
91



JA 5318

# TRIAL

From Page 1A

Jury experts say how opening statements and evidence affect a jury depends on whom they choose.

Among the 17 jurors and alternates on Basham's jury are an engineer, pharmacist, former educator and production planner.

Shelley Sneed, a forensic psychiatrist from North Carolina who analyzes juries, said the jury for Basham's trial appears balanced, based on her review of juror information.

"Nothing really surprised me in the group," she said. "Prosecutors want people who believe the punishment should fit the crime, but the defense wants someone who seems hesitant to impose a death sentence."

About half the jurors have prior jury experience, which she said helps both sides because they are more likely to be attentive for the duration of a lengthy trial.

But despite publication of the crime throughout the region, nearly two-thirds said they didn't know the case.

"It surprised me they didn't know about it," said Linda Harmon president of Mississippi-based Trial Focus, who also reviewed information about Basham's jurors.

She said she thinks the group will be conservative, favoring the prosecution, because of their apparent educational levels and the jobs they hold.

She said such a group likely would sympathize with a person who became a victim of a random crime.

Choosing the panel involved the review of a 58-question survey each completed earlier this year.

The surveys covered such things as personal information about jurors and their families, as well as information about their friends, magazines they read, organizations they support and the bumper stickers they have on their vehicles.

"It's like the juror is on trial," Sneed said, who said the questionnaires are common in such trials. "The magazines they read give an idea of the person's intellectual level. They can't ask you your grade point average or your IQ."

When candidates arrived in Columbia, the lawyers distributed another survey which asked about their views on the death penalty.

A candidate's body language during questioning also is telling, Sneed said.

"Do the words, eye contact and body language match," she said.

People kept from service on Basham's trial included four who said they knew Fulks' sentence, and a woman whose daughter was raped more than 10 years ago.

U.S. District Judge Joe Anderson allowed lawyers to consider those who knew about Fulks, but lawyers struck them from the list in the end.

"You're just trying to get someone who you know is not biased," said Conway defense lawyer Morgan Martin. "It's not so much who you get on but who you want to keep off: those who can't set aside the biases and prejudices."

Basham's actions in court also can influence jurors.

He appeared disinterested during much of the jury selection, drawing with markers on a sketch pad or sleeping.

"They notice that," Sneed said. "If he's not paying attention, it shows he doesn't care."

➤ Contact KENNETH A. GAILLIARD at 626-0312 or kgailliard@thesunnews.com.

---

*Some details about the jurors, including sample of statements during jury selection.*

**WHITE MALE, IRMO**
Profession | Supervisor for a food products company.
Background | No knowledge of case from media. Served as a juror for other trials, including a rape trial.
Quote | "It has to be proven to me that a person maliciously killed someone."

**WHITE FEMALE, BOILING SPRINGS**
Profession | Special-education secretary.
Background | No knowledge of case from media. Served as juror on manslaughter trial.
Quote | "My jury experience was enjoyable."

**BLACK MALE, NORTH AUGUSTA**
Profession | Technician.
Background | No knowledge of case from media.
Quote | "Morally, I must be certain a person is guilty to vote for the death penalty."

**BLACK FEMALE, COLUMBIA**
Profession | Insurance clerk.
Background | No knowledge of case from media. Previously served on two juries. Volunteer for Sister Care, which helps domestic violence victims. Her mother once was a battered woman.
Quote | "I would not want to be in a position to make that decision [death penalty]; but if it's put before me, I will weigh all the factors."

**WHITE MALE, GILBERT**
Profession | Pharmacist.
Background | Has little knowledge of the case from media.
Quote | "I favor death in some cases but not all."

**WHITE FEMALE, HEATH SPRINGS**
Profession | Homemaker, former substitute teacher.
Background | No knowledge of case from media. She has worked with mentally challenged students before.
Quote | "I will try to stay open-minded."

**BLACK MALE, LUGOFF**
Profession | Retired.
Background | No knowledge of case from media. He was a juror in a Kershaw county case.
Quote | "Unfortunately, we live in a society where some people commit certain crimes that deserve the death penalty."

**WHITE FEMALE, WALHALLA**
Profession | Homemaker.
Background | No knowledge of the case from media. Her brother was a police officer in New York.
Quotes | "When it's necessary, with all the facts, the death penalty should be used."

**WHITE MALE, WEST COLUMBIA**
Profession | Engineer.
Background | No knowledge of case from media. He served on a jury in Lexington for a civil case.
Quote | "I'll wait to the very end of the evidence to make a decision because otherwise it's not fair."

**WHITE MALE, GAFFNEY**
Profession | Technician.
Background | No knowledge of case from media. He served once on a magistrate's court jury.
Quote | "When someone's life is on the line, you owe it to them to get everything right. I wouldn't want anyone to mess with my life."

**WHITE MALE, IRMO**
Profession | Systems analyst.
Background | No knowledge of the case from the media. He served on a jury about 12 years ago. His mother works at a mental health facility.
Quote | "The death penalty is appropriate in certain cases where there is a clear disregard for human life. In those situations, the death penalty is a just law."

**WHITE MALE, GAFFNEY**
Profession | Truck driver
Background | Has minimal knowledge of the case from media. He served on two juries in the past.
Quote | "If the evidence is there, the death penalty could be appropriate; but in some cases, a life sentence could be appropriate for intentional homicides."

**WHITE FEMALE, CHARLESTON**
Profession | Teacher.
Background | Has minimal knowledge of the case from the media. A man once exposed himself to her in her neighborhood.
Quote | "My opinion on the death penalty is based on my personal belief that life is precious. If a person took the life of someone, he could pay with his life."

**WHITE FEMALE, INMAN**
Profession | Manager.
Background | No knowledge of the case from media.

**WHITE FEMALE, MCCONNELLS**
Profession | Secretary.
Background | No knowledge of the case from media.

**WHITE MALE, CORDOVA**
Profession | Production planner.
Background | No knowledge of the case from media. He served once on a jury for a DUI case.
Quote | "I've never been put in the position to think about the death penalty. If I were voting on a referendum to outlaw the death penalty in all cases, I would vote no."

**WHITE FEMALE, LYMAN**
Profession | Nurse.
Background | No knowledge of case from media.
Quote | "Emotions won't get in the way of my making a decision."

JA 5319

## OPENING

Mr. Basham is an individual with low intellectual ability.
- Special education classes
- ADHD. Very low reading level

Told you you would hear a lot of the defendant, but also Chad Fulks and you could consider what we know about both.

Said it was a horrible story, a horrible series of events.
- They committed a number of acts.
- Abductions; impact on lives
- Samantha Burns case were not charges in this indictment

Conceded—
1) escape—motive
2) Hawkins kidnapping—who was in control, gave orders, made decision, capacity
3) Break-in at Talsma—who knew about him; who wanted weapons
4) Thefts
5) Fraud
6) Weapon Possession
7) Stole purses, checks and credit cards
8) Carl Jordan
9) Sam Jordan
10) Oleita Hyman's truck
11) Kidnapping but not to hurt or kill
12) ATM cards of Donovan
13) Confrontation with Andrea and Dean Franks
14) Confrontation with Officer

In all probability we would have a penalty phase; apparent we will.

Would discuss other non-charged issues later.

Chad Fulks—
1) familiarity with locations
2) who drove
3) who made decisions

1



DEFENDANT'S EXHIBIT

92

JA 5320

9/17/04 Afternoon

Bradon will not sit up. He has his head down. Then he sits back and sleeps back in chair. He has refused my request, Greg's request and Paige's request. He said "they can give him the D/P when I tell him the jury is looking at him"

We break. Judge Talks to D. Stuart he is tired of all this. Will not. Sign Death Warrant. Wants to leave. I said he needs to remain — Can't render effective assistance of Counsel.

We ask for break - Judge reports

DEFENDANT'S EXHIBIT 93

9/7 Dr. Watts comes.
In camera discussion
I ask the Judge about "Dip". Judge
approves.

9/10 Judge says he will not go to Greenville
One week off
on Tobacco Row
Warner (& Daughter) heard Tyson say re Hawkins "some
heroic story," on elevator. She said "You ain't
heard nothing yet"
Greg Price — I only person who overheard.
heard comment re Hawkins
heard " " n "you ain't seen
nothing yet"


Judge questioned each juror.
Gov't will produce Mrs Warner
S to Ob person'ng the whole time re
"Dip"

DEFENDANT'S
EXHIBIT
94

9/20 PM proceedings

Got letter from ~~Donna~~

Judge denied request

D asked to excuse him to decide

Judge refused

Branden facility & marshall's on his
way out

Called Donna — S incompetant

Court broke down Till AM


9/21 Met with Donna & S & Greg

S Told Donna he had a line of
Cocaine. He is competant because it is a
stimulant. Donna felt like she was in a
position to decide. I was concerned about

DEFENDANT'S
EXHIBIT

JA 5323

the Government finding out for apprehension.
They was concerned that if he come down
and did something to someone. We
made joint decision to tell Court because
if he is high, how can we proceed,
and the potential for a problem

Urine Test was Negative

PM  I wanted me to give Page $20. so
    he could smuggle back in
    jail. I refused. He is agitated now

Now he wants me to put $ in
another inmate's account. I refused —
more agitated

Constantly Talking loud, having problems
with Marshalls.

JA 5324

~~He bdin A~~

4 Minutes

Laughing, sitting inappropriately, looking inappropriately. Keep telling him to stop

Made a deal $5 per day if he is quiet

9/22/04 Starts right off with Dir

Before break Dir
During those - Dir
After Break Dir

Before lunch - Dir

Dan Fiber 222#14
This is brot D says was his

JA 5325

9/23 Every day the dip

Now he wants me to spend lunch
with him

Morning break with him

Says he wants to ask ?'s but
conversation is only about dip

9/24 Dip INCIDENTS

9/27

9/28 Need to do a Rule 29 motion

9/29 Argument

D would not let me argue Burns
except
1. left together
2. came back together
3. mad
4. Ring

DEFENDANT'S
EXHIBIT
96

JA 5326

5. Candy Box

6. location of body

I was only able to conceal the above.

O said I could conceal he got in

Car with Darren.

After Johnny's Closing, I just

wanted some "Dip."


9/30/04 Jury charge issue of Intent in Carjacking

Alston    376 F3d 135    3rd Cir.

- "At the precise moment"

* During this difficult discussion A is
driving me crazy about Dip —
what the jail told the Marshall
about a Valium.

DEFENDANT'S
EXHIBIT
97

JA 5327

# Voir Dire Questions on Issues of Mental Retardation

a. Do you know what mental retardation is?

b. Is an individual necessarily born with mental retardation?

c. Is this disability a temporary thing?

d. Can this disability be treated with drugs?

e. Do you think a person would falsely represent themselves to have mental retardation? How easy do you think it is to "fake" mental retardation?

1. You will learn that Mr. _____ has an IQ of _____. This means that he functions at about the level of [insert age equivalent].

What kinds of problems do you think a person with this IQ level would have performing the tasks of daily living?

    a. problems in school

    b. going to the grocery store

    c. taking a driving test

    d. trouble rememberng things or becomes easily confused

    e. Do you think they would be a leader or a follower, planner, central peripheral?

2. Do you think that someone with a low IQ would have problems planning fbr events in the future or able to anticipate the consequences of their actions?

3. Have you ever known someone who had a developmental disability or who was mentally retarded?

    a. Will you please tell me about it?

    b. How well do you know the person?

    c. What was it like for the person's family?

    d. Would you be willing to introduce this person who has mental retardation to your friends and neighbors in your hometown?

    e. Allow the person with mental retardation to play with your children?

    f. Do you think people who are mentally retarded could not <u>show themselves</u> equal in social situations to people who are not mentally retarded?



DEFENDANT'S EXHIBIT
98

JA 5328

4. How do you feel about a person who is mentally retarded?

Can you describe the ways in which their behavior was affected by their problems?

*** Do you know that Mental Retardation is an inability to think and reason well?

*** Inability to think effectively like most other adults

5. Has anyone here ever <u>helped</u> someone who was developmentally disabled or mentally retarded?

What kinds of things can be done to help a person who is mentally retarded?

What do you think society's responsibilities are to provide for people who are mentally retarded?

6. In what ways would you think people with mental retardation need to be protected?

7. Has anyone ever <u>worked</u> with someone who was mentally retarded?

***what kind of work did they do?

***how well did they perform their tasks?

***were they able to work by themselves?

8. Some people think mental retardation is like a mental illness.

*** Mental Retardation is not a mental illness

9. Have you ever known anyone you consider to be mentally ill?

10. How would you expect a person who is mentally ill to act?

11. How would you expect a person who is mentally retarded to act?

12. Do you feel that it is possible for a person who is mentally retarded to <u>behave normally</u> some of the time?

13. How can you tell if a person is mentally retarded?

14. Can you tell just be looking at them?

   a. listening to them talk?

   b. watching them write?

15. Give some examples of things which a mentally retarded person could not do.

**JA 5329**

a. give some examples, of things he/she would be able to do

16. Do you think that people who are mentally retarded are more prone to violent behavior than other people?

   a. what makes you believe they are more prone to violence than others?

17. Some people feel that mental retardation is really a weakness or an excuse for a person to act any way they want. What is your opinion?

18. Do you think that a mentally retarded person who commits a crime should be treated the same as any other criminal?

19. How difficult or easy do you feel it is to try to <u>rationalize</u> the actions of a person who is mentally retarded?

20. Some people believe that there is no sense in trying to understand the actions of a mentally retarded person. What are your feelings about this?

21. Would your feelings about mental retardation make it more difficult for you to consider evidence tending to show that Mr. _____ should not receive a sentence of death due to evidence of mental retardation?

22. Do you think school officials should place children who are mentally retarded and children who are not in the same classes?

23. If your child was attending a birthday party and you were aware that some of the children attending were mentally retarded would you allow your child to attend?

24. Would you allow your child to have a close fiend who is mentally retarded?

25. Do you feel children with mental retardation who attend public school will receive any education?

26. Would you rather not have dinner guests at your house who are mentally retarded?

27. Do you feel the state should provide <u>training</u> and education to people with mental retardation?

28. Do you think a person with mental retardation would be:

   ***More likely to confess?

   ***As likely?

   ***Less likely?

JA 5330

29. Do you think a person with mental retardation would understand their Miranda Rights?

**PSYCHOLOGISTS**

1. You will hear about certain tests which were performed on _____. How do you feel about psychological testing?

   How do you feel about an IQ level of an individual?

   Do you feel that a high IQ level is important to enable someone to function in society?

   a. read
   b. write
   c. develop social skills

3. If a psychologist testified in court that Mr. _____ 's mental retardation is partly due to his background, could you consider this testimony?

x:\rcp materials\litigation guides\jury\questionaires\Mental retardation questions.wpd

**From:** "Paige Tarr" <paige@brucklaw.com>
**To:** <Jacklaw@aol.com>; <cgrahamsc@aol.com>; <gregharris@justice.com>; <yetto@mis.net>; <jeans@swerlinglaw.com>; "Paige Tarr" <paige@brucklaw.com>; <ecr@nmrs.com>; <saunders@swerlinglaw.com>; <gacollias@citynet.net>; <cjm0501@alltel.net>; <tthierolf@hotmail.com>; <ShealyBoland@hotmail.com>
**Sent:** Saturday, November 15, 2003 8:32 PM
**Subject:** Kentucky 11/13 &11/14

Another exciting trip to Kentucky. Highlights include:

Interviewing, along with Carlisle, Veronica Evans for many hours
Obtaining a copy of Branden's Health Department records which show him getting yearly health screenings to participate in the Special Olympics (tell me how someone could give the death penalty to someone who competed in the Speical Olympics?)
Interviewing Shelia Mills of the Hopkins County Board of Education who gave me the names and current locations of about 12 special ed teachers. She then called a number of them herself and helped me set up interviews with 4 of them. She also gave me the names and numbers of some social services people who knew Branden and his family situation well.
Spoke with 3 doctors at Western State Hospital in Hopkinsville (the two with the best diagnoses have now retired, but I was given information on how to track them down)
And I also found out that Fulks' lawyers are going around town misrepresenting themselves as lawyers for both Branden and Chad. Bill Nettles and some clerk tried to talk the people at the Board of Education into copying Branden's Special Ed records for them. Luckliy, they all knew who Branden's lawyers were and told them that they were only interested in helping their boy. They don't care what happens to Fulks. Well said Hopkins County B of E employees!



DEFENDANT'S EXHIBIT 99

JA 5332
2/10/2011

**From:** Meister, Melissa A.
**Sent:** Tuesday, May 06, 2008 12:16 PM
**To:** Bracey, Kali N; Ascher, Stephen L.; DeBruin, David W
**Subject:** RE: Competency

Agreed. I don't think it's weaker than others, and it does flavor the DQ. There are things we can scour from the record, they're just few and far between.

---

**From:** Bracey, Kali N
**Sent:** Tuesday, May 06, 2008 11:35 AM
**To:** Ascher, Stephen L.; DeBruin, David W; Meister, Melissa A.
**Subject:** RE: Competency

Agreed. Melissa?

---

**From:** Ascher, Stephen L.
**Sent:** Tuesday, May 06, 2008 11:24 AM
**To:** DeBruin, David W; Bracey, Kali N
**Subject:** RE: Competency

Sorry for not responding to this earlier, Kali, your email has been on my "to do" pile for some time.... This argument doesn't seem to me to be much weaker than any of our others, which is a backhanded way of saying I think we should include it. Eric seems to have laid the law out fairly well already, so it should not take too much work for him to restructure it into an argument.

---

**From:** DeBruin, David W
**Sent:** Tuesday, May 06, 2008 11:05 AM
**To:** Ascher, Stephen L.; Bracey, Kali N
**Subject:** FW: Competency

Did we make an affirmative decision not to pursue this? Should we include a short argument following the DQ issue, in that the motion filed by previous counsel should have pursued by the court? (It also underscores the potential prejudice from the DQ ruling.) I'm not sure falling asleep renders one incompetent, but there may be a stronger basis in the motion that was filed by previous counsel.

---

**From:** Bracey, Kali N
**Sent:** Thursday, April 17, 2008 11:47 AM
**To:** Ascher, Stephen L.; DeBruin, David W
**Subject:** FW: Competency

Here is the argument on whether the judge should have ordered a competency evaluation of Basham sua sponte.

Kali

---

**From:** Meister, Melissa A.
**Sent:** Thursday, April 17, 2008 11:19 AM
**To:** Bracey, Kali N
**Subject:** FW: Competency

1



DEFENDANT'S
EXHIBIT
100

JA 5333

JENNER_BLOCK

| From: | Haren, Eric R. |
| Sent: | Tuesday, May 06, 2008 12:15 PM |
| To: | DeBruin, David W |
| Cc: | Ascher, Stephen L.; Bracey, Kali N; Meister, Melissa A.; Cox, Melissa A.; Pulham, Thomas G |
| Subject: | RE: Competency |

I don't have those motions. I worked on this issue with Melissa Meister and Tom. Has either of you seen those documents? My recollection was that the motion essentially sat on the docket forever and was never ruled upon.

---

**From:** DeBruin, David W
**Sent:** Tuesday, May 06, 2008 12:12 PM
**To:** Haren, Eric R.
**Cc:** Ascher, Stephen L.; Bracey, Kali N; Meister, Melissa A.; Cox, Melissa A.; Pulham, Thomas G
**Subject:** Competency

Eric, I don't mean to pile on you. I know that you prepared a draft of an argument that the district court should have independently assessed Basham's competency. We are thinking of including it. Do you have a copy of the motion to examine competency filed by original counsel? I am interested to see the basis asserted for the motion. Also, do you know how that motion was withdrawn? Did new counsel make a new filing, withdrawing the earlier motion? And if so, on what basis?

Thanks --
Dave

---

**David W. DeBruin**
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, DC 20005-3823
Tel (202) 639-6015
Fax (202) 637-6375
DDeBruin@jenner.com
www.jenner.com

*Please note the Washington office of Jenner & Block will be moving. Effective May 24, 2008 our new address will be 1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412. Our telephone numbers will remain unchanged.*

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

JENNER_BLOCK

**JA 5334**



basham
Jacklaw
to
lindab, Jacklaw, CGRAHAMSC, ECR, YETTO, jeans, PAIGE, CJM0501, traci,
SHARRISON, gacollias, GREGHARRIS, STEVE, akandare, LisajKimbrough,
Vog12, RAWLAE, donnasw1963, DOLPHF16
11/04/2004 02:38 PM
Hide Details
From: Jacklaw@aol.com Sort List...

To: lindab@justice.com, Jacklaw@aol.com, CGRAHAMSC@aol.com,
ECR@NMRS.COM, YETTO@MIS.NET, jeans@swerlinglaw.com,
PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET, traci@swerlinglaw.com,
SHARRISON@JUSTICE.COM, gacollias@citynet.net,
GREGHARRIS@JUSTICE.COM, STEVE@swerlinglaw.com,
akandare@justice.com, LisajKimbrough@yahoo.com, Vog12@aol.com,
RAWLAE@YAHOO.COM, donnasw1963@yahoo.com,
DOLPHF16@BELLSOUTH.COM

thank all of you for your hard work. greg and i spoke with the jurors after the
verdict and it appears that they just could not overcome the death of 2 women
and both bodies being unaccounted for. we were also handicapped by our
inability to go into fulks' background. my best to all of you

Jack B. Swerling
803-765-2626-o
803-730-9400-c
803-799-4059-f
----------------------------------------1099604299--



DEFENDANT'S
EXHIBIT
101

**JA 5335**

# Thomas Michael Hyde, M.D., Ph.D.
Suite 233, 4701 Willard Avenue, Chevy Chase, Maryland, 20815
301-652-8777.

## PERSONAL INFORMATION:

| | |
|---|---|
| Date of Birth: | June 5, 1957 |
| Place of Birth: | Toronto, Ontario, Canada |
| Citizenship: | United States of America |
| Marital Status: | Single |
| Residence: | 2829 Greenvale Street, Chevy Chase, Maryland 20815 |
| Telephone: | (301) 652-8777 |

## EDUCATIONAL BACKGROUND:

| | |
|---|---|
| 1974-1978 | B.A., Department of Biology, College of Arts and Sciences, University of Pennsylvania, Philadelphia, Pennsylvania. |
| 1978-1984 | M.D., School of Medicine, University of Pennsylvania, Philadelphia, Pennsylvania. |
| 1978-1984 | Ph.D., Graduate Group in Anatomy, Faculty of Arts and Sciences, University of Pennsylvania, Philadelphia, Pennsylvania. |
| 1984-1985 | General Medical Internship, Department of Medicine, Presbyterian-University of Pennsylvania Medical Center, Philadelphia, Pennsylvania. |
| 1985-1987 | Neurology Residency, Department of Neurology, Stanford University Medical Center, Stanford, California. |
| 1987-1988 | Chief Resident in Neurology, Department of Neurology, Stanford University Medical Center, Stanford, California. |
| 1990 | Board Certification in General Neurology, American Academy of Neurology. |

## EMPLOYMENT AND APPOINTMENTS:

| | |
|---|---|
| 1988-1996 | Director, Neurology Consultation Services, Clinical Brain Disorders Branch, National Institute of Mental Health, St. Elizabeths Hospital, Washington, D.C. |
| 1988-1996 | Special Volunteer, Laboratory of Neuropathology, Clinical Brain Disorders Branch, National Institute of Mental Health, Washington, D.C. |


DEFENDANT'S EXHIBIT

JA 5336

| | |
|---|---|
| 1996-present | Senior Staff Scientist, Neuropathology Section, Clinical Brain Disorders Branch, National Institute of Mental Health, IRP, NIH, Bethesda, Maryland. |
| 1990-present | Clinical Instructor, Department of Neurology, George Washington University Medical School, Washington, D.C. |

## AWARDS AND HONORS:

| | |
|---|---|
| 1974 | Valedictorian<br>Magruder Senior High School<br>Rockville, Maryland |
| 1974-1978 | Dean's List<br>University of Pennsylvania<br>Philadelphia, Pennsylvania |
| 1976-1984 | University Scholar<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |
| 1977 | Phi Beta Kappa<br>University of Pennsylvania |
| 1978 | B.A. Summa cum Laude<br>University of Pennsylvania |
| 1978 | Grass Foundation Research Award<br>Graduate Group in Anatomy<br>University of Pennsylvania |
| 1979-1984 | Predoctoral Fellow<br>Medical Scientist Training Program<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |
| 1983 | Roy G. Williams Award for Excellence in Research<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |
| 1984 | Outstanding Clinician-Researcher in Senior Class<br>School of Medicine and Graduate Group in Anatomy<br>University of Pennsylvania |
| 1999 | National Institutes of Health Director's Award<br>National Institutes of Health<br><br>Bethesda, Maryland |
| 2008 | Elected to membership in the American College of Neuropsychopharmacology |

JA 5337

## PROFESSIONAL ASSOCIATIONS:

Society for Neuroscience
American Medical Association
American Academy of Neurology
District of Columbia Medical Society
Society of Biological Psychiatry
American College of Neuropsychopharmacology

## RESEARCH FUNDING:

| | |
|---|---|
| 1989-1991 | National Alliance for Research on Schizophrenia and Depression Young Investigator Award |
| 1989-1991 | Tourette Syndrome Association Independent Research Grant |
| 1996-present | Research funding through the Intramural Research Program of the National Institute of Mental Health |

## ADDITIONAL ACTIVITIES:

| | |
|---|---|
| 1990-1993 | Volunteer, Whitman-Walker Clinic, AIDS Testing Section |
| 1992-present | Member, Program Committee, Winter Conference on Brain Research |
| 1992-1995 | Chairman, Radiation Drug Research Committee, Neuroscience Research Center, National Institute of Mental Health |
| 1993-1994 | Member, Montgomery County, Maryland AIDS Task Force |
| 1993-1995 | Member, Program Committee, Annual Meeting of the American Academy of Neurology |
| 1993-1994, 1998-2000 | Member, Program Committee, Annual Meeting of the Society of Biological Psychiatry |
| 1995-1997 | Member, Board, Epilepsy Foundation for the National Capitol Area |
| 1998-present | Member, Advisory Board to Board of Directors, Greater Washington Chapter, Tourette Syndrome Association |

JA 5338

| | |
|---|---|
| 1998-2002 | Member, Board of Directors, Winter Conference on Brain Research |
| 2000-present | Member, Editorial Advisory Board, Journal of Chemical Neuroanatomy |
| 2004-present | Member, Editorial Advisory Board, Current Psychiatry Reviews |
| 2006-present | Member, Scientific Advisory Council, American Foundation for Suicide Prevention |
| 2007-present | Member, Editorial Advisory Board, The Open Psychiatry Journal |

JA 5339

## PUBLICATIONS:

**ORIGINAL RESEARCH PUBLICATIONS:**

1. Hyde, T.M. and R.R. Miselis. Effects of area postrema/caudal medial nucleus of the solitary tract lesions on food intake and body weight. <u>American Journal of Physiology</u>. 244: 577-587, 1983.

2. Hyde, T.M. and R.R. Miselis. Effects of area postrema/caudal medial nucleus of the solitary tract lesions on water and sodium balance. <u>American Journal of Physiology</u>. 246: 173-182, 1984.

3. Miselis, R.R., T.M. Hyde, and R.E. Shapiro. The area postrema and adjacent solitary nucleus in water and energy balance. <u>Federation Proceedings</u>. 43: 2969-2971,1984.

4. Hyde, T.M., M. Gibbs, and S.J. Peroutka. Distribution of muscarinic cholinergic receptors in the dorsal vagal complex and other selected nuclei in the human medulla. <u>Brain Research</u>. 447: 287-292, 1988.

5. Hyde, T.M. and S.J. Peroutka. Distribution of cholecystokinin receptors in the dorsal vagal complex and other selected nuclei in the human medulla. <u>Brain Research</u>. 495: 198-202, 1989.

6. Hyde, T.M., J.R. Hotson, and J.E. Kleinman. Differential diagnosis of choreiform tardive dyskinesia. <u>Journal of Neuropsychiatry and Clinical Neurosciences</u>. 3: 255-268,1991.

7. Hyde, T.M., B.A. Aaronson, C. Randolph, K.C. Rickler, and D.R. Weinberger. The relationship of birthweight to the phenotypic expression of Tourette's Syndrome in monozygotic twins. <u>Neurology</u>. 42: 652-657, 1992.

8. Hyde, T.M., J.C. Ziegler, and D.R. Weinberger. Psychiatric disturbances in metachromatic leukodystrophy: insights into the neurobiology of psychosis. <u>Archives of Neurology</u>. 49: 401-406, 1992.

9. Egan, M.F., T.M. Hyde, G.W. Albers, A. Elkashef, R. Alexander, A. Reeves, A.O. Blume, and R.J. Wyatt. Treatment of tardive dyskinesia with vitamin E. <u>American Journal of Psychiatry</u>. 149: 773-777, 1992.

10. Hyde, T.M. and R.R. Miselis. The subnuclear organization of the human caudal nucleus of the solitary tract. <u>Brain Research Bulletin</u>, 29: 95-109, 1992.

11. Egan, M.F., T.M. Hyde, D.L. Tirschwell, J.E. Kleinman, and D.R. Weinberger. Laterality of appendicular tardive dyskinesia in chronic schizophrenia. <u>Biological Psychiatry</u>. 31: 1098-1109, 1992.

12. Hyde, T.M., L.-C. Wu, I.B. Krasnov, S.K. Sigworth, N.G. Daunton, and F. D'Amelio. Quantitative autoradiographic analysis of muscarinic cholinergic and $GABA_A$ (benzodiazepine) receptors in the forebrain of rats flown on COSMOS 2044. <u>Brain Research</u>. 593: 291-294, 1992.

13. Hyde, T.M., E.K. Fitzcharles, and D.R. Weinberger. Age-related prognostic factors in the severity of illness of Tourette's Syndrome in monozygotic twins. <u>Journal of Neuropsychiatry and Clinical Neurosciences</u>. 5: 178-182, 1993.

**JA 5340**

14. Randolph, C., T.M. Hyde, J.M. Gold, T.E. Goldberg, and D.R. Weinberger. Tourette's Syndrome in monozygotic twins: relationship of tic severity to neuropsychological function. <u>Archives of Neurology</u>. 50: 725-728, 1993.

15. Goldberg, T.E., T.M. Hyde, J.E. Kleinman, and D.R. Weinberger. The course of schizophrenia: neuropsychological evidence for a static encephalopathy. <u>Schizophrenia Bulletin.</u> 19: 797-804, 1993.

16. Gupta S., M.F. Egan, and T. M. Hyde. An unusual presentation of tardive dyskinesia with prominent involvement of the pectoral musculature. <u>Biological Psychiatry</u>. 33: 291-292, 1993.

17. Elkashef, A.M., M.F. Egan, J.A. Frank, T.M. Hyde, B.K. Lewis, and R.J. Wyatt. Basal ganglia iron content in tardive dyskinesia: an MRI study. <u>Biological Psychiatry.</u> 35: 16-21, 1994.

18. Abi-Dargham, A., M. Laruelle, J. Seibyl, Z. Rattner, R.M. Baldwin, S.S. Zoghbi, Y. Zea-Ponce, J.D. Bremner, T.M. Hyde, D.S. Charney, P.B. Hoffer, and R.B. Innis. SPECT measurement of benzodiazepine receptors in human brain with [$^{123}$]Iomazenil: kinetic and equilibrium paradigms. <u>Journal of Neurochemistry</u>. 35: 228-238, 1994.

19. Ohuoha, D.C., M.B. Knable, S.S. Wolf, J.E. Kleinman, and T.M. Hyde. 5-HT$_3$ receptor distribution in the human nucleus of the solitary tract and other structures of the caudal medulla: a quantitative autoradiographic study. <u>Brain Research</u>. 637: 222-226, 1994.

20. Sambunaris, A. and T.M. Hyde. Stroke-related aphasias mistaken for psychotic speech: two case reports. <u>Journal of Geriatric Psychiatry and Neurology</u>. 7: 144-147, 1994.

21. Hyde, T.M., S. Nawroz, T.E. Goldberg, D. Strong, J.L. Ostrem, D.R. Weinberger, and J.E. Kleinman. Is there cognitive decline in schizophrenia? A cross-sectional study. <u>British Journal of Psychiatry</u>. 164: 494-500, 1994.

22. Wolf, S.S., T.M. Hyde, and D.R. Weinberger. Malformations of the septum pellucidum: two distinctive cases in association with schizophrenia. <u>Journal of Psychiatry and Neuroscience.</u> 19: 140-144, 1994.

23. Hyde, T.M., H.A. Emsellem, C. Randolph, K.C. Rickler, and D.R. Weinberger. EEG abnormalities in monozygotic twins with Tourette's Syndrome. <u>British Journal of Psychiatry</u>. 164: 811-817, 1994.

24. Cantor-Graae, E., T.F. McNeil, K.C. Rickler, K. Sjöström, R. Rawlings, E.S. Higgins, and T.M. Hyde. Are neurological abnormalities in well discordant monozygotic co-twins of schizophrenic subjects the result of perinatal trauma? <u>American Journal of Psychiatry</u>. 151: 1194-1199, 1994.

25. Wolf, S.S., T.M. Hyde, T.W. Moody, R.C. Saunders, D.R. Weinberger, and J.E. Kleinman. The autoradiographic characterization of $^{125}$I-neurotensin binding in human entorhinal cortex. <u>Brain Research Bulletin</u>. 35: 353-358, 1994.

**JA 5341**

26. Egan, M.F., Y. Hurd, T.M. Hyde, D.R. Weinberger, J.E. Kleinman, and R.J. Wyatt. Alterations in mRNA levels of D2 receptors and neuropeptides in striatonigral and striatopallidal neurons of rats with neuroleptic-induced dyskinesias. Synapse. 18: 178-189, 1994.

27. Knable, M.B., T.M. Hyde, M. Tosayali, R.J. Wyatt, J.E. Kleinman, D.R. Weinberger, and M.F. Egan. Quantitative autoradiography of striatal dopamine D1, D2, and reuptake sites in rats with vacuous chewing movements. Brain Research. 646: 217-222, 1994.

28. Knable, M.B., T.M. Hyde, M.M. Herman, J.M. Carter, L.B. Bigelow, and J.E. Kleinman. Quantitative autoradiography of dopamine-D1 receptors, D2 receptors and dopamine uptake sites in post-mortem striatal specimens from schizophrenic patients. Biological Psychiatry. 36: 827-835, 1994.

29. Hyde, T.M., M.F. Egan, R.J. Brown, D.R. Weinberger, and J.E. Kleinman. Diurnal variation in tardive dyskinesia. Psychiatry Research. 56: 53-57, 1995.

30. Hyde, T.M. and D.R. Weinberger. Tourette's Syndrome: a model neuropsychiatric disorder. Journal of the American Medical Association. 273: 498-501, 1995.

31. Egan, M.F., T.M. Hyde, J.E. Kleinman, and R.J. Wyatt. Neuroleptic-induced vacuous chewing movements in rodents: incidence and effects of long-term increases in haloperidol dose. Psychopharmacology. 117: 74-81, 1995.

32. Hyde, T.M., M.F. Egan, L.L. Wing, R.J. Wyatt, D.R. Weinberger, and J.E. Kleinman. Persistent catalepsy associated with severe dyskinesias in rats treated with chronic injections of haloperidol decanoate. Psychopharmacology. 118: 142-149, 1995.

33. Hyde, T.M., M.E. Stacey, R. Coppola, S.F. Handel, K.C. Rickler, and D.R. Weinberger. Structural abnormalities in Tourette's Syndrome: a quantitative MRI study in monozygotic twins. Neurology. 45: 1176-1182, 1995.

34. Knable, M.B., D.W. Jones, R. Coppola, T.M. Hyde, K.S. Lee, J. Gorey, and D.R. Weinberger. Lateralized differences in Iodine-123-IBZM uptake in the basal ganglia activity in asymmetric Parkinson's disease. J. Nuclear Medicine. 36: 1216-1225, 1995.

35. Egan, M.F., J.N. Ferguson, and T.M. Hyde. Effects of chronic naloxone administration on vacuous chewing movements and catalepsy in rats treated with long-term haloperidol decanoate. Brain Research Bulletin 38: 355-363, 1995.

36. Wolf, S.S., T.M. Hyde, R.C. Saunders, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Autoradiographic characterization of neurotensin receptors in the entorhinal cortex of schizophrenic patients and control subjects. J. Neural Transmission., 102: 55-65, 1995.

37. Murray, A.M., T.M. Hyde, M.B. Knable, M.M. Herman, L.B. Bigelow, J.M. Carter, D.R. Weinberger, and J.E. Kleinman. The distribution of putative D4 dopamine receptors in post-mortem striatum from patients with schizophrenia. J. Neuroscience. 15: 2186-2191, 1995.

**JA 5342**

38. Lynn, R.B., G.-Y. Cao, R.V. Considine, T.M. Hyde, and J.F. Caro. Autoradiographic localization of leptin binding in the choroid plexus of *ob/ob* and *db/db* mice. <u>Biochemical and Biophysical Research Communications</u>. 219: 884-889, 1996.

39. Lynn, R.B., T.M. Hyde, R.B. Cooperman, and R.R. Miselis. Distribution of bombesin-like immunoreactivity in the nucleus of the solitary tract and dorsal motor nucleus of the rat and human: colocalization with tyrosine hydroxylase. <u>J. Comparative Neurology</u>. 369: 552-570, 1996.

40. Considine, R.V., E.L. Considine, C.J. Williams, T.M. Hyde, and J.F. Caro. The hypothalamic leptin receptor is humans: identification of incidental sequence polymorphisms and absence of the db/db mouse and fa/fa rat mutations. <u>Diabetes</u>. 45:992-994, 1996.

41. Hyde, T.M., M.B. Knable, and A. M. Murray. The distribution of dopamine D1- D4 receptor subtypes in human dorsal vagal complex. <u>Synapse</u>. 24: 224-232, 1996.

42. Wolf, S.S., D.W. Jones, M.B. Knable, J. Gorey, K.S. Lee, T.M. Hyde, R. Coppola, and D.R. Weinberger. Phenotypic variation in Tourette Syndrome twins correlates with dopamine receptor imaging in caudate. <u>Science</u>. 273: 1225-1227, 1996.

43. Knable, M.B., T.M. Hyde, A.M. Murray, M.M. Herman, and J.E. Kleinman. A postmortem study of frontal cortical dopamine D1 receptors in schizophrenics, psychiatric controls, and normal controls. <u>Biological Psychiatry</u>. 40: 1191-1199, 1996.

44. Egan, M.F., J.N. Ferguson, and T.M. Hyde. Effects of rating parameters on assessment of neuroleptic-induced vacuous chewing movements. <u>Pharmacology, Biochemistry, and Behavior</u>. 53: 401-410, 1996.

45. Egan, M.F., Y. Hurd, J.N. Ferguson, S.E. Bachus, E.H. Hamid, and T.M. Hyde. Pharmacological and neurochemical differences between acute and tardive vacuous chewing movements induced by haloperidol. <u>Psychopharmacology</u>. 127: 337-345, 1996.

46. Bachus, S.E., T.M. Hyde, M.M. Herman, M.F. Egan, and J.E. Kleinman. Abnormal cholecystokinin mRNA levels in entorhinal cortex of schizophrenics. <u>J. Psychiatric Research</u>. 31: 233-256, 1997.

47. Hyde, T.M. and D.R. Weinberger. Seizures and schizophrenia. <u>Schizophrenia Bulletin</u>. 23: 611-622, 1997.

48. Hurd, Y.L., M.M. Herman, T.M. Hyde, L.B. Bigelow, D.R. Weinberger, and J.E. Kleinman. Prodynorphin mRNA expression is increased in the patch versus matrix compartment of the caudate nucleus in suicide subjects. <u>Molecular Psychiatry</u>. 2: 495-500, 1997.

49. Shimon, H., G. Agam, R.H. Belmaker, T.M. Hyde, and J.E. Kleinman. Reduced frontal cortex inositol levels in postmortem brain of suicide victims and patients with bipolar disorder. <u>American J. Psychiatry</u>. 154: 1148-1150, 1997.

50. Krimer, L.S., T.M. Hyde, M.M. Herman, and R.C. Saunders. The entorhinal cortex: an examination of cyto- and myelo-architectonic organization in humans. <u>Cerebral Cortex</u>. 7: 722-731, 1997.

**JA 5343**

51. Krimer, L.S., M.M. Herman, R.C. Saunders, J.C. Boyd, T.M. Hyde, J.M. Carter, J.E. Kleinman, and D.R. Weinberger. A qualitative and quantitative analysis of the entorhinal cortex in schizophrenia. <u>Cerebral Cortex</u>. 7: 732-739, 1997.

52. Noga, J.T., T.M. Hyde, M.M. Herman , C.F. Spurney, L.B. Bigelow, D.R. Weinberger, and J.E. Kleinman. Glutamate receptors in the post-mortem striatum of schizophrenia, suicide, and control brains. <u>Synapse</u>. 27: 168-176, 1997.

53. Moore, K.A., G.W. Kunsman, B.S. Levine, M.M. Herman, J. Cervenak, and T.M. Hyde. A comparison of ethanol concentrations in the occipital lobe and cerebellum. <u>Forensic Science International</u>. 86: 127-134, 1997.

54. Vawter, M.P., H.E. Cannon-Spoor, J.J. Hemperly, T.M. Hyde, D.M. VanderPutten, J.E. Kleinman, and W.J. Freed. Abnormal expression of cell recognition molecules in schizophrenia. <u>Experimental Neurology</u>.149: 424-432, 1998.

55. Baca, S.M., B.K. Lipska, M.F. Egan, S.E. Bachus, J.N. Ferguson, and T.M. Hyde. Effects of prefrontal cortical lesions on neuropeptide and dopamine receptor gene expression in the striatum-accumbens complex. <u>Brain Research</u>. 797: 55-64, 1998.

56. Mulberg, A.E., R.T. Weyler, S.M. Altschuler, and T.M. Hyde. Cystic fibrosis transmembrane conductance regulator expression in human hypothalamus. <u>NeuroReport</u>. 9: 141-144, 1998.

57. Heinz, A., M.B. Knable, S.S. Wolf, D.W. Jones, J.G. Gorey, T.M. Hyde, and D.R. Weinberger. Tourette's Syndrome: [I-123]beta-CIT SPECT correlates of vocal tic severity. <u>Neurology</u>. 51: 1069-1074, 1998.

58. Hamid, E.H., T.M. Hyde, S.M. Baca, and M.F. Egan. Failure to down regulate NMDA receptors in the striatum and nucleus accumbens associated with neuroleptic-induced dyskinesia. <u>Brain Research</u>. 796: 291-295, 1998.

59. Vawter, M.P., J.J. Hemperly, T.M. Hyde, S.E. Bachus, D.M. VanderPutten, A.L. Howard, H.E. Cannon-Spoor, M.T. McCoy, M.J. Webster, J.E. Kleinman, and W.J. Freed. VASE-containing N-CAM isoforms are increased in the hippocampus in bipolar disorder but not schizophrenia. <u>Experimental Neurology</u>. 154: 1-11, 1998.

60. McNamara, R.K., T.M. Hyde, J.E. Kleinman, and R.H. Lenox. Expression of myristoylated alanine-rich C kinase substrate (MARCKS) and MARCKS-related protein (MRP) in the prefrontal cortex and hippocampus of suicide victims. <u>J. Clinical Psychiatry</u>. Supplement 2: 21-6, 1999.

61. Vawter, M.P., A.L. Howard, T.M. Hyde, J.E. Kleinman, and W.J. Freed. Alterations of hippocampal secreted N-CAM in bipolar disorder and synaptophysin in schizophrenia. <u>Molecular Psychiatry</u>. 4: 467-475, 1999.

62. Spurney, C.F., S.M. Baca, A.M. Murray, G.E. Jaskiw, J.E. Kleinman, and T.M. Hyde. Differential effects of haloperidol and clozapine on ionotropic glutamate receptors in rats. <u>Synapse</u>. 34: 266-276, 1999.

63. Holt, D.J., M.M. Herman, T.M. Hyde, J.E. Kleinman, C.M. Sinton, D.C. German, L.B. Hersh, A.M. Graybiel, and C.B. Saper. Evidence for a deficit in cholinergic interneurons in the striatum in schizophrenia. <u>Neuroscience</u>. 94: 21-31, 1999.

JA 5344

64. Shannon Weickert, C.,M.J. Webster, S.M. Colvin, M.M. Herman, T.M. Hyde, D.R. Weinberger, and J.E. Kleinman. Localization of epidermal growth factor receptors and putative neuroblasts in human subependymal zone. Journal of Comparative Neurology. 423: 359-372, 2000.

65. Bower, C.M., T.M. Hyde, M. Zaka, E.H. Hamid, S.M. Baca, and M.F. Egan. Decreased mu-opioid receptor binding in the globus pallidus of rats treated with chronic haloperidol. Psychopharmacology. 150: 260-263, 2000.

66. Meredith, GE, I.E.. De Souza, T.M. Hyde, G. Tipper, M.L. Wong, and M.F. Egan. Persistent alterations in dendrites, spines, and dynorphinergic synapses in the nucleus accumbens shell of rats with neuroleptic-induced dyskinesias. Journal of Neuroscience. 20: 7798-7806, 2000.

67. Weickert, C.S., M.J. Webster, T.M. Hyde, M.M. Herman, S.E. Bachus, G. Bali, D.R. Weinberger, and J.E. Kleinman. Reduced expression of GAP-43 mRNA in dorsolateral prefrontal cortex of schizophrenics. Cerebral Cortex. 11: 136-147, 2001.

68. Webster, M.J., C.S. Weickert, M.M. Herman, T.M. Hyde, and J.E. Kleinman. Synaptophysin and GAP-43 mRNA levels in the hippocampus of subjects with schizophrenia. Schizophrenia Research. 49: 89-98, 2001.

69. Winterer, G., M.F. Egan, T. Radler, T. Hyde, R. Coppola, and D.R. Weinberger. An association between reduced interhemispheric EEG coherence in the temporal lobe and genetic risk for schizophrenia. Schizophrenia Research. 49: 129-143, 2001.

70. Egan, M.F., T.E. Goldberg, T. Gscheidle, M. Weirich, R. Rawlings, T.M. Hyde, L.B. Bigelow, and D.R. Weinberger. Relative risk for cognitive impairments in siblings of patients with schizophrenia. Biological Psychiatry. 50: 98-107, 2001.

71. Noga, J.T., T.M. Hyde, S.E. Bachus, M.M. Herman, and J.E. Kleinman. AMPA receptor binding in the dorsolateral prefrontal cortex of schizophrenics and controls. Schizophrenia Research. 48: 361-363, 2001.

72. Crook, J.M., M. Akil, B.C.W. Law, T.M. Hyde, and J.E. Kleinman. Comparative analysis of group II metabotropic glutamate receptor immunoreactivity in the dorsolateral prefrontal cortex of patients with schizophrenia and normal subjects. Molecular Psychiatry. 7: 157-164, 2002.

73. Egan, M.F., T.M. Hyde, J.B. Bonomo, V.S. Mattay, L.B. Bigelow, T.E. Goldberg, and D.R. Weinberger. Relative risk of neurological signs in siblings of patients with schizophrenia. American Journal of Psychiatry. 158: 1827-1834, 2002.

74. Vawter, M.P., L. Thatcher, N. Usen, T.M. Hyde, J.E. Kleinman, and W.J. Freed. Reduction of synpasin in the hippocampus of patients with bipolar disorder and schizophrenia. Molecular Psychiatry. 7: 571-578, 2002.

75. Mattay, V.A., A. Tessitore, J.H. Callicott, A. Bertolino, T.E. Goldberg, T.N. Chase, T.M. Hyde, and D.R. Weinberger. Dopaminergic modulation of cortical function in patients with Parkinson's disease. Annals of Neurology 51: 156-164, 2002.

76. Hamid, E.H., T. M. Hyde, S.E. Bachus, M.F. Egan, B. Kinkead, C.B. Nemeroff, and J.E. Kleinman. Neurotensin receptor abnormalities in the mesial temporal lobe in schizophrenia. Biological Psychiatry 15: 795-800, 2002.

JA 5345

77. Tessitore, A.. R. Hariri, F. Fera, W.G. Smith, T. N. Chase , T. M. Hyde, D. R. Weinberger and V. S. Mattay. Dopamine modulates the response of the human amygdala: A study in Parkinson's disease. Journal of Neuroscience. 22: 9099-9103, 2002.

78. Vawter, M.P., J.M. Crook, T.M. Hyde, J.E. Kleinman, D.R. Weinberger, K.G. Becker, and W.J. Freed. Microarray analysis of gene expression in the prefrontal cortex in schizophrenia. Schizophrenia Research. Schizophrenia Research. 58: 11, 2002.

79. Weickert, T.W., A. Terrazas, L.B. Bigelow, J.D. Malley, T. Hyde, M.F. Egan, D.R. Weinberger, and T.E. Goldberg. Habit and skill learning in schizophrenia: evidence of normal striatal processing with abnormal cortical input. Learning and Memory. 9:430-42, 2002.

80. Matsumoto, M., C.Shannon Weickert, M. Akil, T.M. Hyde, M.M. Herman, J.E. Kleinman, and D.R. Weinberger. Catechol-O-methyltransferase (COMT) mRNA expression in human and rat brain: evidence for a role in cortical neuronal function. Neuroscience. 116: 127-137, 2003.

81. Lerhmann, E., J. Oyler, M.P. Vawter, T.M. Hyde, B. Kolachana, J.E. Kleinman, M.A. Huestis, K.G. Becker, and W.J. Freed. Transcription profiling in the human prefrontal cortex: evidence for two activational states associated with cocaine abuse. Pharmacogenomics Journal. 3: 27-40, 2003.

82. Akil, M., B.S. Kolachana, D.A. Rothmond, T.M. Hyde, D.R. Weinberger, and J.E. Kleinman. Catechol-o-methyltransferase genotype and dopamine regulation in the human brain. Journal of Neuroscience. 15: 2008-2013, 2003.

83. Halim, N.D., C.S. Weickert, B.W. McClintock, T.M. Hyde, D.R. Weinberger, J.E. Kleinman, and B.K. Lipska. Presynaptic proteins in the prefrontal cortex of patients with schizophrenia and rats with abnormal prefrontal development. Molecular Psychiatry. 8: 797-810, 2003.

84. Matsumoto, M., C.Shannon Weickert, S. Beltaifa, B. Kolachana, J. Chen, T.M. Hyde, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Catechol-O-methyltransferase (COMT) mRNA expression in the dorsolateral prefrontal cortex of patients with schizophrenia. Neuropsychopharmacology. 28: 1521-1530, 2003.

85. Weickert, C.S., T.M. Hyde, B.K. Lipska, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Reduced brain-derived neurotrophic factor in prefrontal cortex of patients with schizophrenia. Molecular Psychiatry. 8: 592-610, 2003.

86. Vawter, M.P., C. Shannon-Weickert, E. Ferran, M. Matsumoto, K. Overman,, T.M. Hyde, D.R. Weinberger, W.E.Bunney,, and J.E. Kleinman. Gene expression of metabolic enzymes and a protease inhibitor in the prefrontal cortex are decreased in schizophrenia. Neurochemical Research. 29: 1245-1255, 2004.

87. Ghose, S., C. Shannon Weickert, S. M. Colvin, M.D, J. T. Coyle, M. M. Herman, T. M. Hyde, and J. E. Kleinman. Glutamate Carboxypeptidase II gene expression in the human frontal and temporal lobe in schizophrenia. Neuropsychopharmacology. 29: 117-125, 2004.

88. Hashimoto, R., R.E. Straub, C.S. Weickert, T.M. Hyde, J.E. Kleinman, and D.R. Weinberger. Expression analysis of neuregulin-1 in the dorsolateral prefrontal cortex in schizophrenia. Molecular Psychiatry. 9:299-307, 2004.

**JA 5346**

89. Shannon Weickert, C., R.E. Straub, M. Matsumoto, B.W. McClintock, T.M. Hyde, M.M. Herman, D.R. Weinberger, and J.E. Kleinman. Human dysbindin (DTNBP1) gene expression: anatomical distribution in normal brain and altered expression in schizophrenic prefrontal cortex <u>Archives of General Psychiatry</u>. 61: 544-555, 2004.

90. Law, A.J., C. Shannon Weickert, T.M.Hyde, J.E. Kleinman, and P.J. Harrison. Neuregulin-1 (NRG-1) mRNA and protein in the adult human brain. <u>Neuroscience</u>. 127: 125-136, 2004.

91. Zhu, G., R.H. Lipsky, K. Xu, S. Ali, T. Hyde, J. Kleinman, L.A. Akhtar, D.C. Mash, and D. Goldman. Differential expression of human COMT alleles in brain and lymphoblasts detected by RT-coupled 5' nuclease assay. <u>Psychopharmacology</u>. 177: 178-184, 2004.

92. Egan, M.F., R.E. Straub, T.E. Goldberg, I. Yakub, J.H. Callicott, A.R. Hariri, V.S. Mattay, A. Bertolino, T.M. Hyde, C. Shannon-Weickert, M.Akil, J. Crook, R.K. Vakkalanka, R. Balkissoon, R.A. Gibbs, J.E. Kleinman, and D.R. Weinberger. Variation in GRM3 affects cognition, prefrontal glutamate, and risk for schizophrenia. <u>Proceedings of the National Academy of Sciences</u>. 101: 12604-12609, 2004.

93. Law, A.J., C. Shannon Weickert, T.M. Hyde, J. E. Kleinman, and P. J. Harrison. Reduced spinophilin but not MAP-2 expression in the hippocampal formation in schizophrenia and mood disorders: evidence for a pathology of dendritic spines. <u>American Journal of Psychiatry</u>. 161: 1848-1855, 2004.

94. Chen, J., B.K. Lipska, N. Halim, Q.D. Ma, M. Matsumoto, S. Melham, B.S. Kolachana, T.M. Hyde, M.M. Herman, J. Apud, M.F. Egan, J.E. Kleinman, D.R. Weinberger. Functional analysis of genetic variation in catechol-O-methyltransferase (COMT): effects on mRNA, protein, and enzyme activity in postmortem human brain. <u>American Journal of Human Genetics</u>. 75: 807-821, 2004.

95. Weickert, C.S. D.A. Kittell, R.C. Saunders, M.M. Herman, R.A. Horlick, J.E. Kleinman, and T.M. Hyde. Basic fibroblast growth factor and fibroblast growth factor receptor-1 in the human hippocampal formation. <u>Neuroscience</u>. 131: 219-233, 2005.

96. Deep-Soboslay, A., M.Akil, C.E. Martin, L.B. Bigelow, M.M. Herman, T.M. Hyde, and J.E. Kleinman. Reliability of psychiatric diagnosis in postmortem research. <u>Biological Psychiatry</u>. 57: 96-101, 2005.

97. Holt, D.J., S.E. Bachus, T. M. Hyde, M. Witttie, M.M. Herman, M. Vangeil, C.B. Saper, and J.E. Kleinman. Reduced density of cholinergic interneurons in the ventral striatum in schizophrenia: an *in situ* hybridization study. <u>Biological Psychiatry</u>. 58: 408-416, 2005.

98. Matsumoto, M., S. Beltaifa, C. S. Weickert, M.M. Herman, T.M. Hyde, R.C. Saunders, B.K.Lipska, D.R. Weinberger, and J.E. Kleinman. A conserved mRNA expression profile of SREB2 (GPR85) in the adult human, monkey, and rat forebrain. <u>Brain Research: Molecular Brain Research</u>. 138: 58-69, 2005.

99. Weickert, C.S., D.L. Ligons, T. Romanczyk, G. Ungaro, T.M. Hyde, M.M. Herman, D.R. Weinberger, J.E. Kleinman. Reductions in neurotrophin receptor mRNAs in the prefrontal cortex of patients with schizophrenia. <u>Molecular Psychiatry</u>. 10: 637-650, 2005.

100. <u>Perlman WR, Matsumoto M, Beltaifa S, Hyde TM, Saunders RC, Webster MJ, Rubinow DR, Kleinman JE, Weickert CS.</u>Expression of estrogen receptor alpha exon-deleted mRNA variants in the human and non-human primate frontal cortex. <u>Neuroscience</u>. 134: 81-95, 2005.

**JA 5347**

101. Lowe, R.H., A.J. Barnes, E. Lehrmann, W.J. Freed, J.E. Kleinman, T.M. Hyde, and M.A. Huestis. A validated positive chemical ionization GC/MS method for the identification and quantification of amphetamine, opiates, cocaine, and metabolites in human postmortem brain. Journal of Mass Spectrometry. 41: 175-184, 2006.

102. Lipska , B.K., T. Peters, T. M. Hyde, N. Halim, C. Horowitz, S. Mitkus, C.S. Weickert, M. Matsumoto, A. Sawa, R. Straub, R. Vakkalanka, M. M. Herman, D. R. Weinberger , and J. E. Kleinman. Expression of DISC1 binding partners Is reduced in schizophrenia and associated with DISC1 SNPs. Human Molecular Genetics. 15: 1245-1258, 2006.

103. Law, A.J., B.K. Lipska, C.S. Weickert, T.M. Hyde, R.E. Straub, R. Hashimoto, P.J. Harrison, J.E. Kleinman, and D.R. Weinberger. Neuregulin 1 transcripts are differentially expressed in schizophrenia and regulated by 5' SNPs associated with the disease. Proceedings of the National Academy of Sciences. 103: 6747-6752, 2006.

104. Lauriat, T.L., S. Dracheva, J. Kremerskothen, K. Duning, V. Haroutunian, J.D. Buxbaum, T.M. Hyde, J.E. Kleinman, L. Alison McInnes. Characterization of KIAA0513, a novel signaling molecule that interacts with modulators of neuroplasticity, apoptosis, and the cytoskeleton. Brain Research. 1121: 1-11, 2006.

105. Lipska, B.K., A. Deep-Soboslay, C.S. Weickert, T.M. Hyde, C.E. Martin, M.M. Herman, J.E. Kleinman. Critical factors in gene expression in postmortem human brain: focus on studies in schizophrenia. Biological Psychiatry. 60: 650-658, 2006.

106. Lipska, B.K., S. Mitkus, M. Caruso, T.M. Hyde, J. Chen, R. Vakkalanka, R.E. Straub, D.R. Weinberger, J.E. Kleinman. RGS4 mRNA expression in postmortem human cortex is associated with COMT Val158Met genotype and COMT enzyme activity. Human Molecular Genetics. 15: 2804-2812, 2006.

107. Lehrmann, E., Colantuoni, C., Deep-Soboslay, A., Becker, K.G., Lowe, R. Huestis, M.A. Hyde, T.M., Kleinman, J.E., Freed, W.J. Transcriptional changes common to human cocaine, cannabis and phencyclidine abuse. PLoS ONE, 1(1): e114.doi:10.1371/journal.pone.0000114, 2006.

108. Hyde, T.M., Goldberg, T.E., Egan, M.F., Lener, M., Weinberger, D.R. The relationship of frontal release signs and cognition in schizophrenics, their siblings, and normal controls. British Journal of Psychiatry. 191: 120-125, 2007.

109. Mathew, S.V., Law, A.J., Lipska, B.K., Davila-Gracia, M.R., Zamora, E.D., Mitkus, S.N., Vakkalanka, R., Straub, R.E., Weinberger, D.R., Kleinman, J.E., Hyde, T.M. α7 nicotinic acetylcholine receptor mRNA expression and binding in postmortem human brain are associated with genetic variation in Neuregulin 1. Human Molecular Genetics. 16: 2921-2932, 2007.

108. Hyde, T.M., Goldberg, T.E., Egan, M.F., Lener, M., Weinberger, D.R. The relationship of frontal release signs and cognition in schizophrenics, their siblings, and normal controls. British Journal of Psychiatry. 191:120-125, 2007.

109. Mathew, S.V., Law, A.J., Lipska, B.K., Davila-Gracia, M.R., Zamora, E.D., Mitkus, S.N., Vakkalanka, R., Straub, R.E., Weinberger, D.R., Kleinman, J.E., Hyde, T.M. α7 nicotinic acetylcholine receptor mRNA expression and binding in postmortem human brain are associated with genetic variation in Neuregulin 1. Human Molecular Genetics. 16: 2921-2932, 2007.

**JA 5348**

110. Halim, N.D., Lipska, B.K., Hyde, T.M., Deep-Soboslay, A., Saylor, E.M., Herman, M.M., Thakar, J., Verma, A., Kleinman, J.E. Increased lactate levels and reduced pH in postmortem brains of schizophrenics: medication confounds. <u>Journal of Neuroscience Methods</u>. 169: 208-213, 2008.

111. Mitkus, S.N., Hyde, T.M., Vakkalanka, R., Kolachana, B., Weinberger, D.R., Kleinman, J.E., Lipska, B.K. Expression of oligodendrocyte-associated genes in dorsolateral prefrontal cortex of patients with schizophrenia. <u>Schizophrenia Research</u>. 98: 129-138, 2008.

112. Weickert, C.S., Rothmond, D.A., Hyde, T.M., Kleinman, J.E., Straub, R.E. Reduced DTNBP1 (dysbindin-1) mRNA in the hippocampal formation of schizophrenia patients. <u>Schizophrenia Research</u>. 98: 105-110, 2008.

113. Lehrmann, E., Afanador, Z.R., Deep-Soboslay, A., Gallegos, G., Darwin, W.D., Lowe, R.H., Barnes, A.J., Huestis, M.A., Cadet, J.L., Herman, M.M., Hyde, T.M., Kleinman, J.E., Freed, W.J. Postmortem diagnosis and toxicological validation of illicit substance abuse. <u>Addiction Biology</u>. 13: 105-117, 2008.

114. Deep-Soboslay, A., Iglesias, J., Hyde, T.M., Bigelow, L.B., Imamovic, V., Herman, M.M., Kleinman, J.E. Evaluation of tissue collection for postmortem studies of bipolar disorder. <u>Bipolar Disorders.</u> 10: 822-828, 2008.

115. Colantuoni, C., Hyde, T.M., Mitkus, S., Joseph, A., Sartorius, L., Aguirre C., Creswell, J., Johnson, E., Deep-Sobolsay, A., Herman, M.M., Lipska, B.K., Weinberger, D.R., Joel E. Kleinman, J.E. Age-Related Changes in the Expression of Schizophrenia Susceptibility Genes in the Human Prefrontal Cortex. <u>Brain Structure and Function</u>. 213: 255-271, 2008.

116. Agarwal V, Kommaddi R, Valli K, Ryder D, Hyde TM, Kleinman JE, Strobel H and Ravindranath V. Drug metabolism in human brain: high levels of cytochrome P4503A43 in brain and metabolism of anti-anxiety drug alprazolam to its active metabolite. <u>PLoS ONE</u> 3: e2337, 2008.

117. Hyde, T.M., Deep-Soboslay, A., Iglesias, B., Callicott, J.H., Gold, J.M., Meyer-Lindenburgh, A., Honea, R.A., Bigelow, L.B., Egan, M.F., Emsellem, E.M., Weinberger, D.R. Enuresis as a premorbid developmental marker of schizophrenia. <u>Brain</u>. 131: 2489-2498, 2008.

118. Ghose, S., Crook, J.M., Bartus, C.L., Sherman, T.G., Herman, M.M., Hyde, T.M., Kleinman, J.E., Akil, M. Metabotropic glutamate receptor 2 and 3 gene expression in the human prefrontal cortex and mesencephalon in schizophrenia. <u>International Journal of Neuroscience</u>. 118: 1609-1627, 2008.

119. Sartorius, L.J., Weinberger, D.R., Hyde, T.M., Harrison, P.J., Kleinman, J.E., Lipska, B.K. Expression of a GRM3 splice variant is increased in the dorsolateral prefrontal cortex of individuals carrying a schizophrenia risk SNP. <u>Neuropsychopharmacology</u>. 33: 2626-2634, 2008.

120. Buerlein, R.C., Hyde, T.M., Lipska, B.K., Robinson Jr., W.E., Khosla, A., Kleinman, J.E. A comparison of human brain dissection by drill versus saw on nucleic acid quality. <u>Journal of Neuroscience Methods</u>. 179: 68-70, 2009.

121. Huffaker, S.J., Chen, J., Sambataro, F., Nicodemus, K.K., Yang, F., Mattay, V., Lipska, B.K., Hyde, T.M., Song, J., Rujescu, D., Giegling, I., Chang, J. Egan, M.F., Goldberg, T.E., Kleinman, J.E., Lu, B., Weinberger, D.R. A novel, primate specific brain isoform of KCNH2: role in cognition, hippocampal biology and association with schizophrenia. <u>Nature Medicine</u>15: 509-518, 2009.

**JA 5349**

122. Nakata, K., Lipska, B.K., Hyde, T.M., Ye, T., Newburn, E.N., Morita, Y., Vakkalanka, R., Barenboim, M., Sei, Y., Weinberger, D.R., Kleinman, J.E. DISC1 variants are upregulated in schizophrenia and associated with risk polymorphisms. <u>Proceedings of the National Academy of Sciences</u>. 106: 15873-15878, 2009.

JA 5350

123. Bristow, G.C., Lane, T.A., Walker, M., Chen, L., Sei, Y., Hyde, T.M., Kleinman, J.E., Harrison, P.J., Eastwood, S.L. Expression of Kinase Interacting with Stathmin (KIS, UHMK1) in human brain and lymphoblasts: effects of schizophrenia and genotype. <u>Brain Research</u>. 1301: 197-206, 2009.

124. Eastwood, S.L., Walker, M., Hyde, T.M., Kleinman, J.E., Harrison, P.J. The DISC1 Ser704Cys substitution affects centrosomal localisation of its binding partner PCM1 in glia in human brain. <u>Human Molecular Genetics</u>. Epub, 2010.

125. Lemaitre, H, Mattay, V.S., Sambataro, F., Verchinski, B., Straub, R.E., Callicott, J.H., Kittappa, R., Hyde, T.M., Lipska, B., Kleinman, J.E., McKay, R., Weinberger, D.R. Parkinson's disease associated variation in FGF20 modulates hippocampal biology. <u>Journal of Neuroscience</u>. In press, 2010.

**JA 5351**

**INVITED CHAPTERS, LETTERS AND REVIEWS:**

1. Hyde, T.M., R. Eng, and R.R. Miselis. Brainstem mechanisms in hypothalamic and dietary obesity. In: Neural Basis of Feeding and Reward., Edited by B.G. Hoebel and D. Novin., Haer Institute, 97-114, 1982.

2. Miselis, R.R., T.M. Hyde, and R.E. Shapiro. Disturbances in water balance controls following lesions to the area postrema and adjacent solitary nucleus. In: The Physiology of Thirst and Sodium Appetite., Edited by G. de Caro, A.N. Epstein, and M. Massi, Plenum Press, N.Y., pp. 279-285, 1986.

3. Miselis, R.R., R.E. Shapiro, and T.M. Hyde. The area postrema. In: Circumventricular Organs and Body Fluids., Edited by P.M. Gross, CRC Press, N.Y., Vol. II, Chap. 8, pp. 185-208, 1987.

4. Hyde, T.M. and D.R. Weinberger. The brain in schizophrenia. In: Seminars in Neurology. 10: 276-286, 1990.

5. Hyde, T.M., M.F. Casanova, J.E. Kleinman, and D.R. Weinberger. Neuroanatomical and neurochemical pathology in schizophrenia. In: Annual Review of Schizophrenia., Edited by A. Tasman and S.M. Goldfinger, APA Press, Washington, D.C., Vol. 10, Section 1, Chapter 1, pp. 7-23, 1991.

6. Khot, V., M.F. Egan, T.M. Hyde, and R.J. Wyatt. Neuroleptics and classic tardive dyskinesia. In: Drug-Induced Movement Disorders., Edited by A.E. Lang and W.J. Weiner, Futura Publishing, Mount Kisco, N.Y., pp. 121-166, 1992.

7. Kleinman, J.E. and T.M. Hyde. Structural foundations of mental illness and treatment: neuroanatomy. In: Current Psychiatric Therapy., Edited by D.L. Dunner, W.B. Saunders Co., Philadelphia, Pa., pp. 3-7, 1992.

8. Wolf, S. S., T.M. Hyde, and D.R. Weinberger. Neurobiology of schizophrenia. In: Current Opinion in Neurology and Neurosurgery. 6: 86-92, 1993.

9. Ohuoha, D.C., T.M. Hyde, and J.E. Kleinman. The role of serotonin in schizophrenia: an overview of the nomenclature, distribution, and alterations of serotonin receptors in the central nervous system. In: Psychopharmacology. (Supplement: Proceedings on Serotonin, Dopamine, and Their Interactions in Schizophrenia; Edited by R.S. Kahn and M. Davidson.) 112: S5-S15, 1993.

10. Hyde, T.M., J.C. Ziegler, and D.R. Weinberger. Response to letter re: psychopathology in metachromatic leukodystrophy. In: Archives of Neurology. 50: 131, 1993.

11. Egan, M.F., T.M. Hyde, A. Elkashef, and R.J. Wyatt. Response to letter re: treatment of tardive dyskinesia with vitamin E. In: American Journal of Psychiatry. 150: 992-993, 1993.

12. Clardy, J.A., T.M. Hyde, and J.E. Kleinman. Chapter 7. Postmortem neurochemical and neuropathological studies in schizophrenia. In: Schizophrenia: from mind to molecule. Edited by N.C. Andreasen. American Psychiatric Press, Washington, D.C., pp. 123-145, 1994.

13. Kleinman, J.E., T.M. Hyde, and M. M. Herman. Chapter 75. Methodological issues in the neuropathology of mental illness. In: Psychopharmacology: the Fourth Generation of Progress. Edited by F.E. Bloom and D.J. Kupfer. Raven Press: New York. pp. 859-864,

**JA 5352**

1995.

14. Coppola, R.C. and T.M. Hyde. Applied Electrophysiology. In: <u>Comprehensive Textbook of Psychiatry</u>.Edited by H. I. Kaplan and B.J. Sadock. Williams and Wilkins: Baltimore. pp. 72-79, 1995.

15. Daniel, D.G., K. Smith, T.M. Hyde, and M.F. Egan. Neuroleptic-induced tardive dyskinesia. In: <u>American Journal of Psychiatry</u>. 153: 734, 1996.

16. Katsetos, C.D., T.M. Hyde, and M.M. Herman. Neuropathology of the cerebellum in schizophrenia- an update: 1996 and future directions. In: <u>Biological Psychiatry</u>. 42: 213-224, 1997.

17. Bachus, S.E., T.M. Hyde, M. Akil, C.S. Weickert, M.P. Vawter, and J.E. Kleinman. Neuropathology of suicide: a review and an approach. In: <u>Annals of the New York Academy of Sciences</u>836: 201-219, 1997.

18. Kittell, D.A., T.M. Hyde, M.M. Herman, and J.E. Kleinman. The collection of tissue at autopsy: practical and ethical issues. In: <u>Using CNS Autopsy Tissue in Psychiatric Research</u>. Edited by B. Dean, T.M. Hyde, and J.E. Kleinman. Harwood: Melbourne, Australia. pp. 1-18, 1998.

19. Egan, M.F. and T.M. Hyde. The neurobiology of schizophrenia. In: <u>Comprehensive Textbook of Psychiatry</u>. Edited by H. I. Kaplan and B.J. Sadock. Williams and Wilkins: Baltimore. Volume I, pp. 1129-1146, 1999.

20. Hyde, T.M. and J.M. Crook. Cholinergic systems in schizophrenia: primary pathology or epiphenomena. In: <u>J. Chemical Neuroanatomy</u>. 22: 53-63, 2001.

21. Freed, W.J., Lehrman, E., Hyde, T.M., Kleinman, J.E., Vawter, M.P., and Becker, K. Gene expression profiling in drug abuse. In: <u>2001 ONDCP International Technology Symposium Proceedings: Counterdrug Research and Development.</u>. 1: 119-131, 2001.

22. Freed, W.J., T.M. Hyde, J.E. Kleinman, K. Becker, and M.P. Vawter. Analysis of gene expression in schizophrenia using DNA microarrays. In: <u>The Economics of Neuroscience</u>. 4: 48 – 57, 2002.

23. Hyde, T.M. Tourette syndrome. In: <u>The Encyclopedia of Cognitive Science</u>. Edited by L. Nadel. Nature Publishing Group: London. 2002.

24. Hyde, T.M. Cognitive Impairment in Demyelinating Disease. In: <u>The Neurobiology of Mental Illness</u>. Edited by D.S. Charney and E.J. Nestler. Oxford University Press: San Francisco; pp. 873-880, 2003.

25. Hyde, T.M. and S.W. Lewis. The secondary schizophrenias. In: <u>Schizophrenia</u>. Edited by S.R. Hirsch and D.R. Weinberger. Blackwell Science: Oxford, England; pp. 187-202, 2003.

26. Lehrmann , E., T.M. Hyde , M.P. Vawter , K.G. Becker , J.E. Kleinman and W.J. Freed. The use of microarrays to characterize neuropsychiatric disorders: postmortem studies of substance abuse and schizophrenia. In: <u>Current Molecular Medicine</u> 3: 437-446, 2003.

27. Hyde, T.M., J.A. Apud, W.C. Fisher, and M.F. Egan. Tardive dyskinesia. In: <u>Drug Induced Movement Disorders</u>. Edited by S.A. Factor, A.E. Lang, and W. J. Weiner. Futura Publishing Co.: Armonk, N.Y.; Chapter 9, pp. 213-256.

**JA 5353**

28. Mathew, S.V., S.N. Mitkus, B.K., Lipska, T.M. Hyde, and J.E. Kleinman. Postmortem Studies: A Focus on Susceptibility Genes in Schizophrenia . in: <u>The Handbook of Contemporary Neuropharmacology</u> Edited by D.R. Sibley, I. Hanin, M. Kuhar, and P. Skolnick. John Wiley & Sons, New York. 2006.

29. Hyde, T.M. Cognitive Impairment in Demyelinating Disease. In: <u>The Neurobiology of Mental Illness</u>. Edited by D.S. Charney and E.J. Nestler. Oxford University Press: San Francisco; pp. 1001-1009, 2009.

JA 5354

## THOMAS M. HYDE, M.D., PH.D.

2829 GREENVALE STREET
CHEVY CHASE, MARYLAND 20815
301-652-8777
301-652-3959 (FAX)
HYDETM@AOL.com

October 30, 2012

**Client:** Leon Brandon Basham (date of birth: September 14th, 1981).

**Evaluation Sessions:** April 20 and September 28, 2012.

**History:** Leon Brandon Basham (Brandon) is a 31-year-old right-handed Caucasian male referred for a forensic neuropsychiatric evaluation.

Early Developmental History: Limited as Brandon's mother Kathy Basham is deceased. According to Brandon's paternal cousin Tommy, Brandon's mother used marijuana, cocaine, and amyl nitrate ("Locker Room") while she was pregnant with Brandon.

Educational History: Brandon attended public elementary school in and around Madisonville, Kentucky. He attended a variety of public and private elementary schools due to frequent family moves, and academic and behavior problems in school. He was a poor student, often refusing to go to school and sleeping in class when he did attend. His best subject was arithmetic and his worst was writing. On account of his academic and behavior problems he was placed into full-time special education in the first grade, after failing it once. School records suggest he actually failed the second grade. From 13-18 years of age he was in a variety of academic settings for school through group homes, Boys' Homes, juvenile detention, and child psychiatry wards. Brandon estimates that he was in over 30 facilities as an adolescent. He never attended a regular senior high school. He never earned a GED.

Brandon's full scale IQ was 101 at 7 years of age, although the adaptive behavior was rated as 'moderately low'. At age 8 years his full scale IQ was 100. At 10 years of age, Brandon's full scale IQ was 88. By 13 years 8 months of age, his full scale IQ had fallen to 77. At 14 years of age, his full scale IQ was scored at 87. At 17 years of age, his full scale IQ was 89. Testing at 22 years of age showed a full scale IQ of 68. His testing at 8 years of age also suggested a learning disability in addition to attention deficit hyperactivity. His testing at 10 years of age diagnosed him with a specific learning disability in reading achievement.

Behavioral History: Brandon exhibited behavioral difficulties as a young child. In elementary school he was diagnosed with Attention Deficit Hyperactivity Disorder. This diagnosis was referenced in multiple psychological testing reports from childhood into adolescence. He had difficulty sitting still in class. He squirmed in his seat and frequently got up without permission, disturbing peers seated near him. He had difficulty paying attention, and often could not follow complex instructions. He talked excessively in the classroom. He was a

1



DEFENDANT'S
EXHIBIT

JA 5355

risk taker, and often would engage in dangerous activities without considering the consequences. While his hyperactivity symptoms gradually subsided with time, his attention problems have persisted through adulthood. Ritalin was started around 8 years of age, but made him emotionally flat and reduced his appetite. Concerta and Adderall were helpful and had fewer side effects.

Brandon often acted out in the classroom beginning in elementary school. He often would talk back to teachers and would not follow instructions. In therapeutic facilities he often fought with the staff and subsequently was frequently placed in restraints.

As a child, Brandon often engaged in rocking behaviors when anxious or upset, and still does so today. He also engaged in repetitive head banging as a child. This head banging has largely subsided but he will repetitively punch walls when upset. He also started cutting himself intentionally when depressed, frustrated or angry in childhood. This self-injurious behavior has subsided but has not disappeared.

Brandon denies any history of cruelty to animals. There was no history of significant arson or fire setting. He did run away from home multiple times as a child and adolescent.

Brandon admits to having poor impulse control since childhood. He has been in multiple fights over the years, usually in the response to provocations from others. Sometimes he has difficulty recalling his actions while angry. He often is remorseful afterwards.

Brandon was subjected to verbal, physical, and sexual abuse as a child and adolescent. His mother was particularly prone to making derogatory comments about his appearance and intelligence. She also was physically abusive. On one occasion at 9 years of age, he was burned with a frying pan. She also threw anything within reach at him, including hangers and frying pans. His father did not hit him regularly but once knocked Brandon unconscious at 12 years of age with a blow to the head. At around 6 years of age, a male family friend fondled Brandon. Again at 13 years of age, a male staff member at a group home also fondled him.

Depression was a problem for Brandon beginning in early childhood. A psychological evaluation at the Trover Clinic at 14 years of age diagnosed him with major depression. Neuropsychological testing at 17 years 10 months of age at Edelson and Associates documented a diagnosis of major recurrent depression. His depression has waxed and waned over the years but has never completely disappeared. As a child and adolescent he made suicidal threats on several occasions. He has also attempted suicide; some were serious attempts while others were attention-seeking behaviors. He attempted hanging himself at 18 years of age. He also has slit his wrists and on a few occasions required sutures. When depressed, Brandon is prone to tears, has difficulty enjoying himself, lacks motivation, and is fatigued. He tends to isolate himself and becomes unsociable. He tends to have difficulty sleeping at night and as a consequence often naps during the day. These episodes are characterized by feelings of intense sadness.

In addition to episodes of depression, Brandon has experienced manic interludes. Several mental health professionals have told him he suffers from bipolar disorder or manic-depressive illness. His manic phases are characterized by episodes of feeling high followed by a rapid

JA 5356

descent into depression. While manic, he is hyper talkative, hypersexual, and experiences racing thoughts. He has greater difficulty concentrating than normal. He has experienced the grandiose delusion that he has special insights so that he can predict the outcome of baseball games. His mood will alternate between manic and depressive swings over a several hour time course, often on a daily basis.

Psychotic symptoms have been present for Brandon, leading to the diagnoses of schizophrenia and schizoaffective disorder over the years. He denies any beliefs in mind reading, thought insertion, thought blocking, mind control, or ideas of reference. He describes vague experiences that might be auditory hallucinations. He denies any history of visual, tactile or gustatory hallucinations. Since childhood, he has had olfactory hallucinations like bad body odor. These would last anywhere from several hours to a few days. When they have occurred recently he would scrub his cell to try to make them disappear. Brandon has felt paranoid on occasion, thinking that the staff or officers at various institutions are conspiring against him. He denies any somatic delusions or delusional guilt. He is not hyper-religious and denies hypergraphia.

Brandon has had some obsessive preoccupations and compulsive behaviors since childhood. He has the obsessive need to keep things organized in their place and his surroundings neat. His clothes need to be folded in a precise fashion and stored in their designated area. He rearranges things frequently to get them 'just right'. He also used to iron his clothes compulsively. He has had periods of compulsive hand washing, up to 10-15 times per day. He obsessively ruminates about his mother and their relationship.

<u>Neurological History</u>: Brandon has suffered from multiple closed head injuries over the years. While he has never had a skull fracture, he has been to the emergency room on several occasions after being knocked unconscious. Most of his head injuries occurred through beatings from his parents, staff at residential facilities, and peers. A few were due to accidents in childhood. Notable injuries included falling out of a tree and hitting his head on a railroad tie at 5 years of age, and being hit in the head by his father at 12 years of age and with a baseball bat accidentally by a peer as an adolescent. He is unsure about post-traumatic concussive symptoms. However, his cousin Tommy Basham reported that Brandon's behavior markedly changed after he fell out of a tree at 5 years of age, becoming 'slower', and more irritable and impulsive.

A history of unusual episodes has been present since childhood. He has lost consciousness on numerous occasions without warning or prodromal symptoms. With these episodes he loses body tone and falls down, but there is no associated urinary incontinence. He has bitten his tongue and lips several times during these spells. Afterwards he often feels transiently confused, dizzy, and tingles diffusely. Brandon was placed on anticonvulsant medication around 16 years of age. He was last on medication in 2002 for this problem. Many of the anticonvulsants caused intolerable side effects. Dilantin led to diarrhea, Tegretol was associated with migraines, and Depakote caused nausea and vomiting. Gabapentin was effective at suppressing these events and had the added benefit of stabilizing his mood. However, he feels his current dose is too low to be effective. These episodes currently occur 1-2 times per week. Emotional distress can precipitate them. Brandon believes he has had multiple abnormal EEGs. He also has had MRI scans of the brain but cannot remember their results.

JA 5357

There is no history of strokes or stroke-like episodes. He occasionally feels lightheaded but denies any history of fainting or passing out. He suffered from enuresis until 10-12 years of age. Brandon denies any history of meningitis or encephalitis. He had chronic headaches in childhood, often associated with inhaling substances intentionally. They have been less frequent recently.

**Past Medical History:**

Medical History: Brandon reports that he has had hypertension for the past two years. He denies any history of diabetes, cardiovascular disease, tuberculosis, asthma, peptic ulcer disease, hepatitis, renal disease, or thyroid disease. He denies any history of sexually transmitted diseases.

Surgical History: Brandon noted that he had a surgery on the 4th digit of his right hand at 17 years of age for a traumatic injury. He also had a right inguinal hernia repair at 14 years of age.

**Medications:** Gabapentin, Elavil, and Clonidine.

**Allergies:** Penicillin and Wellbutrin.

**Substance Abuse History:**

Alcohol Abuse: Brandon claims that he has only abused alcoholic beverages while incarcerated. He has used illicit alcohol to treat his chronic insomnia. He believes he may have had a few alcohol-related blackouts in his life and possible withdrawal tremors on a few occasions.

Drug Abuse: Brandon started using marijuana regularly around 7 years of age. He would usually smoke until he felt intoxicated, and continued this pattern of use on a daily basis until he was incarcerated. Brandon's cousin Tommy reported that Brandon's mother would blow marijuana smoke in Brandon's face to calm him down as a child. Brandon began smoking crack cocaine around 13 years of age, and would use it as often as it was available until he was incarcerated. He has tried hashish, LSD, hallucinogenic mushrooms, and methampethamines. Brandon heavily abused inorganic solvents and inhalants beginning around 10 years of age through 13 years of age, on almost a daily basis, and thereafter whenever he could get a hold of them. He often 'huffed' the fumes from gasoline, paint thinner, paint, glue, and kerosene. The psychological report from Rivendell Psychiatric Center in Kentucky, when Brandon was 10, referenced his inhalation of gasoline fumes.

Tobacco: Brandon started smoking regularly at 15 years of age. He also started chewing tobacco around the same time.

**JA 5358**

## Social History:

Brandon's mother Kathy died ~42 years of age from pulmonary disease. She used to sell illicit drugs when Brandon was a child. His father Jimmy, a retired mechanic, is ~70 years of age and still lives in Kentucky. Brandon's parents had a tumultuous relationship, which Brandon attributes to his mother's emotional problems and chronic polysubstance abuse. Tommy Basham substantiated this. They periodically separated but never divorced. Brandon's sister is 35 years old and lives in Kentucky. She is married but separated from her husband, and has one daughter. Brandon is in contact with both his father and sister. His father has never remarried. Brandon describes his family as being lower middle class but not poor, which he attributes to his father's work ethic.

Brandon is exclusively heterosexual. He has never married nor does he have any children. He has never held a regular fulltime job.

## Family History:

Brandon's mother suffered from chronic emotional problems, and carried the diagnoses of bipolar disorder and schizoaffective disorder. She also heavily abused marijuana and crack cocaine. According to Tommy Basham, Kathy also used PCP. According to Brandon and his cousin Tommy, Brandon's father was an alcoholic. His sister has suffered from bipolar disorder and alcohol abuse. Brandon's paternal uncle was an alcoholic according to Brandon's paternal cousin Tommy Basham.

## Neurological Examination:

Mental Status Examination: The patient was awake, alert, attentive, and cooperative, with normal expressive and comprehensive language functions throughout the interview and examination. He was able to name simple objects and their component parts. He was able to repeat the phrase "no ifs, ands, or buts" without difficulty. He was able to spell the word 'world' forwards, but not backwards. Brandon had normal right-left differentiation and crossed the midline. There was no evidence of ideomotor apraxia. He was able to perform simple addition, subtraction, and multiplication but not division. He had difficulty performing serial three's. He was oriented to the year, season, month, and day of the week but not the exact date. He knew the name of the facility in which he was incarcerated, the floor of the building, and the city in which it was located, but not the county or state. He did not know the name of the current president of the United States. He was able to draw a clock, and accurately copied an alternating and a complex geometric figure, but not a three dimensional figure. Instant recall was excellent and he remembered two out of three items at five minutes without prompting and three out of three items with prompting. On a formal mini-mental state examination, he scored 23/30.

Cranial Nerve Examination: Cranial nerves II-XII were symmetric and intact on detailed testing, with the exception of five beats of horizontal nystagmus on far lateral gaze bilaterally, and decreased appreciation of pinprick, vibration, temperature, and light touch on the right side of the face (V1-V3).

5

**JA 5359**

Motor Examination: The patient had normal and symmetric tone, bulk, and strength proximally and distally to flexion and extension in all four limbs. No pronator drift was noted. Finger repetitive movements were clumsy bilaterally worse on the right than the left. Finger consecutive maneuvers were clumsy bilaterally. Rapid alternating hand movements were clumsy and uncoordinated bilaterally. Rhythmic foot tapping was slow and clumsy bilaterally. Finger-to-nose and heel-to-shin testing was normal bilaterally. No tics, tremors, or involuntary movements were noted even with induction procedures. Deep tendon reflexes were increased at the right triceps and knee compared to the left. Toes were down going bilaterally and no clonus was present at the ankles. Brandon had poor complex motor sequencing bilaterally. One frontal release sign, a glabellar reflex, was present.

Gait Examination: The patient stood without hesitancy and walked with a normal stride length and posture with symmetric arm swing bilaterally. He had normal heel, toe, and tandem walks. No Romberg sign was present.

Sensory Examination: The patient had decreased appreciation of pinprick, temperature, vibration, and light touch on the right side of the face, right arm, right leg, and right side of the body. Proprioceptive sense was normal bilaterally. Graphesthesia was abnormal on the palms of the hands bilaterally, while stereognosis was normal bilaterally. No Romberg sign was noted.

**General Physical Examination:**

Head: well healed scar on the top of the head.
Neck: normal with full range of motion and no bruits over the carotid arteries.
Skin: normal on exposed surfaces without rashes or lesions.
Cardiovascular: regular rhythm and rate without loud murmurs.

**Assessment:**

Brandon has an extensive neuropsychiatric history that includes evidence of developmental and acquired organic brain pathology, and behavioral problems.

From a genetic perspective, Brandon is predisposed towards mental illness, with a mother who suffered from a mood disorder and polysubstance abuse, a father who is an alcoholic, and a sister with bipolar disorder and alcohol abuse. This genetic liability increases the risk that Brandon himself would develop a major psychiatric disorder. The heritability of major psychiatric disorders, including bipolar disorder, depression, schizophrenia, and alcohol and other forms of substance abuse is well established. Brandon has suffered from major behavioral problems beginning in childhood, reflecting underlying neuropsychiatric disease that at least in part has a major genetic etiology.

Brandon's risk for the development of a major mental disorder has been amplified by environmental factors, especially his chaotic and stressful upbringing. His mother was a volatile and impulsive individual, with major problems with mood regulation compounded by polysubstance abuse. His father, while a steady breadwinner, took refuge in alcohol and by several accounts was a passive bystander to his wife's outbursts. Their marriage was troubled,

6

**JA 5360**

punctuated by infidelity, substance abuse, separations, and eventual divorce. Moreover, Brandon was directly subjected to emotional, physical, and sexual abuse. Brandon's mother was verbally and physically abusive towards Brandon. She frequently belittled and screamed at him, often throwing items at him when enraged. His father occasionally was physically abusive towards Brandon. Brandon was also sexually molested on at least two occasions. This dysfunctional family unit imposed extreme amounts of psychological stress upon Brandon during his formative years. In conjunction with his genetic predisposition towards major mental illness, these high and sustained stress levels had an adverse effect upon Brandon's neuropsychiatric development, behavior, and academic achievement.

Currently, Brandon meets clinical criteria for Bipolar Disorder II, with rapid mood cycling. While he has had recurrent psychotic symptoms, neither their severity nor intrusiveness satisfies the diagnostic criteria for schizoaffective disorder, bipolar type. Brandon's mood disorder is compounded by polysubstance abuse. Comorbid substance abuse is frequently seen in patients with bipolar disorder, perhaps at least in part as a form of self-medication. Brandon's mood disorder has been present since early childhood, and has played a crucial role in his behavior throughout this life.

Brandon has been previously diagnosed with bipolar disorder on several occasions, as documented in an extensive report submitted in October 2004 from the Mental Health Department of the Federal Medical Center in Butner, North Carolina by Dr. Bruce P. Capehart. In August and October 1996 at 15 years of age, Brandon was diagnosed with Bipolar Disorder, Type I, at Stoner Creek. He was also diagnosed with Bipolar Disorder, NOS, by a child and adolescent psychiatrist at Charter Ridge several months later. A discharge summary in early 1997 from Charter Ridge listed a discharge diagnosis of Bipolar Disorder, NOS. His final diagnosis was Bipolar Disorder, Recurrent Manic Type with Psychotic Features, from a hospitalization at Charter Louisville in 1998. Dr. Seuss, a psychiatrist at the Trover Clinic, diagnosed Brandon with Bipolar Disorder in 2001. Despite these multiple evaluations assigning Brandon the diagnosis of Bipolar Disorder based upon direct observation, often as a result of repeated clinical sessions with Brandon, Dr. Capehart did not concur with this diagnosis. Moreover, Dr. Capehart did not even choose to address this issue in the 'Impressions' section of his report.

As a child, Brandon was diagnosed with Attention Deficit Hyperactivity Disorder (most likely the combined type). His severe attention problems have persisted into adulthood, while the hyperactive components have largely subsided. On my examination, he had difficulty on two tests of attention. His inattention has important functional and behavioral consequences. He has difficulty sustaining his attention, which will be problematic for his active participation in prolonged legal proceedings. His mind tends to wander, he is easily distracted by extraneous stimuli, and he has difficulty assimilating and processing complex information. Combined with intellectual deficits, Brandon has difficulty processing the complexities of his legal status and making rational judgments. The severity of his problems limits his ability to sit through ongoing legal proceedings and make informed decisions. Consequently, he becomes anxious, frustrated and confused, leading to angry emotional outbursts.

JA 5361

Brandon has been previously diagnosed with Attention Deficit Hyperactivity on multiple occasions, by multiple clinicians including psychiatrists and psychologists, as detailed in an extensive report from the Mental Health Department of the Federal Medical Center in Butner, North Carolina by Dr. Bruce P. Capehart in October 2004. Dr. Capehart himself concurred with the diagnosis of Attention Deficit Hyperactivity Disorder, Combined Type, in his concluding remarks in his extensive report.

Neurological issues compound Brandon's psychiatric problems. He suffered from multiple closed head injuries as a child, adolescent and young adult. Some of these head injuries resulted in a loss of consciousness. Repeated closed head injuries can have a cumulative effect on brain function, leading to permanent damage. His cousin Tommy Basham testified that Brandon's behavior markedly changed after he fell out of a tree at 5 years of age, becoming 'slower', and more irritable and impulsive. Brandon's history of multiple closed head injuries may play a major role in his behavioral problems and cognitive deficits. On neurological examination Brandon had cognitive deficits and fine motor abnormalities, asymmetric deep tendon reflexes, and right-sided sensory problems. These findings are most likely the residual from multiple closed head injuries.

Dr. Bruce P. Capehart at the Mental Health Department of the Federal Medical Center in Butner, North Carolina, compiled a lengthy report on Brandon North Carolina in October 2004. According to testing performed by Dr. Bruce P. Capehart at the Mental Health Department of the Federal Medical Center in Butner, North Carolina in October 2004, Brandon had a full scale IQ of 75, which is in the borderline impaired range. Brandon had marked impairments on multiple tests of attention and concentration. His verbal fluency and expressive vocabulary performance ranged from impaired to borderline impaired. Most memory tests, including working memory performance, were scored in the impaired to borderline impaired range. He did a little better on tests of auditory/verbal memory. He scored in the impaired to borderline impaired range on tests of visual memory. His academic skills ranged from the low average to impaired range of function. Taken together, these findings are evidence of significant cognitive impairment. Dr. Capehart retested Brandon while he was on a Concerta, a sustained release from of methylphenidate that is commonly used to treat attention deficit disorder. Dr. Capehart reported:

"Mr. Basham was re-administered several tasks when he was taking Concerta. All the tasks revealed very similar results with minimal, non-statistically significant improvements noted."

The lack of improvement on testing while on a powerful stimulant medication, especially on tests of attention, speaks to the etiology and severity of Brandon's cognitive problems. This lack of therapeutic response suggests that acquired organic brain damage may play a causative role. Moreover, the lack of therapeutic response speaks to the permanence of his cognitive deficits. Coupled with attention deficits, the severity of Brandon's memory deficits are particularly important within the context of competency, as the ability to retain, recall, and use information is one of the most fundamental cognitive processes underlying the legal concept of competency. Given the presence of these cognitive deficits and adaptive dysfunction since childhood, and his subnormal IQ on recent testing, Brandon should be evaluated by an expert in mental retardation.

JA 5362

Dr. Capehart's report contained several questionable assessments. For example, during testing Dr. Capehart reported that Brandon's behavior:

"...during the evaluation included making frequent comments to staff outside of the evaluation room or attempting to yell out to individuals passing by, indicating a high degree of attention seeking behavior that may have contributed to his inconsistent focus during testing."

However, a more likely explanation would be the attribution of this behavior to attention deficit disorder, as one of the hallmarks of this disorder is frequent distraction by extraneous environmental stimuli. In fact, in the classroom setting, students with attention deficit disorder are given preferential seating in the front of the classroom and away from doorways and windows in order to minimize the interference imposed by extraneous stimuli.

Brandon's cognitive impairment has been caused by the interaction of several factors, including multiple closed head injuries and polysubstance abuse beginning in childhood, especially the intentional inhalation of the toxic fumes. The functional results consequences of this impairment is amplified by his concurrent attention deficit order and pathological fluctuations in his mood secondary to rapid cycling bipolar disorder. Taken together, his severe and widespread cognitive deficits combine with his underlying attention deficit and mood disorders render him incompetent.

According to testing performed by Dr. Bruce P. Capehart at the Mental Health Department of the Federal Medical Center in Butner, North Carolina in October 2004, Brandon's fine motor speed and dexterity were in the impaired range bilaterally. These abnormalities documented by Dr. Capehart are consistent with the abnormalities in motor function documented in my examination, including fine motor abnormalities and asymmetric deep tendon reflexes. These included clumsy finger repetitive movements bilaterally worse on the right than the left. Finger consecutive maneuvers also were clumsy bilaterally. Deep tendon reflexes were increased at the right triceps and knee compared to the left. Brandon also had poor complex motor sequencing bilaterally. One frontal release sign, a glabellar reflex, was present. Cumulatively, these findings are consistent with bilateral frontal lobe dysfunction, worse on the left than the right. Individuals with frontal lobe damage often suffer from deficits in impulse control, attention, problem solving, prioritization, and the capacity to make informed and rational judgments. Moreover, individuals with frontal lobe damage frequently suffer from organically based mood disorders, including depression and bipolar disorder. Brandon has evidence by history and examination of organic frontal lobe dysfunction, which may be causative and/or contributory to his cognitive deficits, attention deficit disorder, and bipolar disorder.

Puzzlingly, Dr. Capehart opined in his report that:

"We do not believe Mr. Basham suffers from clinically significant brain damage."

This conclusion was put forth *despite* Dr. Capehart's own findings of a subnormal IQ, widespread cognitive deficits, a lack of a therapeutic response to a stimulant on cognitive testing,

9

**JA 5363**

a history of repeated closed head injuries, a history of polysubstance abuse from a young age, and a developmentally based learning disability.

Brandon's frontal lobe dysfunction is the result of acquired damage from closed head injury and the toxic consequences of polysubstance abuse in childhood. As mentioned previously, Brandon has had multiple closed injuries in childhood. The frontal lobes, due to their size and location, are particularly vulnerable to damage from closed head injury. In addition, the frontal lobes are the last part of the brain to mature, and as such are especially vulnerable to the toxic effects of alcohol, marijuana, cocaine, and the repeated inhalation of the fumes from gasoline, glue, and kerosene.

Brandon has engaged in polysubstance abuse since childhood. The inhalation of inorganic solvents is of particular concern. The fumes from inorganic solvents such as gasoline, kerosene, and glue contain toxic substances that pass from the lungs, to the bloodstream, and into the brain. Repeated inhalation of these toxins often produces permanent brain damage. The greater the frequency of exposure, the greater the risk. Permanent cognitive and motor impairment are often seen in individuals with repeated exposure. By history and my neurological examination, Brandon had evidence of both. My testing revealed deficits on neurological mental status testing. Cranial nerve examination was notable for five beats of horizontal nystagmus on far lateral gaze bilaterally. He also had fine motor impairment. Finger consecutive maneuvers were clumsy bilaterally. Rapid alternating hand movements were clumsy and uncoordinated bilaterally. Rhythmic foot tapping was slow and clumsy bilaterally. Brandon had poor complex motor sequencing bilaterally. One frontal release sign, a glabellar reflex, was present. These neurological signs suggest damage to both cerebral hemispheres and the brainstem. The toxic effects of chronic inhalant abuse in combination with repeated closed head injuries work synergistically to produce brain damage in Brandon's case.

Brandon has suffered from unusual episodes since childhood and carries the diagnosis of a seizure disorder. He has been on multiple anticonvulsants over the years, with mixed therapeutic responses. Brandon's seizures are another consequence of his multiple closed head injuries and subsequent brain damage. According to a report from Morris L. Lovejoy, M.D., Brandon had an abnormal EEG at Rivendell Psychiatric Center in Rivendell, Kentucky at 10 years of age. This EEG was interpreted as diagnostic of epilepsy. The report stated:

> "Abnormal EEG. This EEG is markedly abnormal. The presence of generalized slow waves, paroxysmally derived on two separate occasions during hyperventilation, is diagnostic of epilepsy."

Brandon had another EEG performed at 16 years of age at Columbia Suburban Hospital in Louisville Kentucky. This study was normal. However, this study was inadequate for the evaluation of a seizure disorder as there is no indication that the patient was adequately sleep deprived. Moreover, there is no notation of Brandon's medication regimen at the date of the study; anticonvulsant medications can suppress the electrophysiological abnormalities typically associated with seizure disorders. Finally, Brandon had a non-contrast MRI scan of the brain in 2004. This was a technically suboptimal study due to motion artifact, although it did not show any major abnormalities.

**JA 5364**

Brandon has had repeated abnormal findings on psychometric testing since he was a child. Brandon had psychological testing at 10 years of age at Rivendell Psychiatric Center in Rivendell Kentucky. As part of the testing battery, he was 'screened for organicity' with the Bender Gestalt; there was no indication for impairment in the development of neurological functioning, perceptual organization, and psychomotor coordination. However, this test is neither as sensitive or specific as a detailed neurological examination by a qualified practitioner. At 13 years of age, Brandon had a neurological examination performed by Dr. Bindu T. Desai, a neurologist at the Trover Clinic in Kentucky. This report was available for my review. Dr. Desai did not find any neurological abnormalities on examination. However, Dr. Desai's report demonstrates that a cursory neurological examination was performed; Dr. Desai did not perform many of the tests that were performed as part of my report. Additionally, there is no indication from the report that Dr. Desai was a board certified neurologist with specialized training in behavioral neurology or neuropsychiatry.

According to a report from the Mental Health Department of the Federal Medical Center in Butner, North Carolina by Dr. Bruce P. Capehart, Brandon has had multiple neurological examinations over the years while in a variety of institutions. Dr. Capehart summarized the results of these evaluations. Brandon had a normal neurological examinations while at Columbia Hospital Paris, Children's Psychiatric Hospital of Northern Kentucky, and again at Charter Ridge at 15 years of age. While at Rice-Audubon in 1999, Brandon had another neurological examination that Dr. Capehart reported that this examination was normal. Brandon also had normal neurological examinations while at Rivendell and Western State Hospital at 19 years of age. Dr. Capehart also claimed that Brandon had a normal neurological examination while at the Federal Medical Center in 2004. However, the neurologist at that facility reportedly diagnosed Brandon with migraine headaches and a 'minor cognitive disorder'. Once again, the details of each of these examinations, including a list of all of the tests administered, were not included in Dr. Capehart's report, nor were there any details on the qualifications of the neurologists performing these evaluations. Moreover, regarding the conclusions of the neurologist at the Federal Medical Center, there is no recognized neurological diagnostic entity known as 'minor cognitive disorder'. If in fact this was the conclusion of the neurologist at the Federal Medical Center, it casts doubts over the validity of his report on Brandon.

Dr. William Lester Brannon Jr. also conducted a neurological examination of Brandon, in May 2003. He concluded that Brandon had a history of Attention Deficit Hyperactivity Disorder, polysubstance abuse (including inhalant abuse). On examination, Dr. Brannon also found that Brandon had nystagmus. This finding confirms my observation, suggesting that this problem has been present for many years. Nystagmus is an abnormality of eye movements that can be caused by numerous neurological disorders, ranging from inner ear disease to concussive brain damage. Within a reasonable degree of medical certainty, the presence of nystagmus is evidence of organic brain damage most likely due to either closed head injury or the toxic effects of chronic inhalant abuse. The brainstem, especially the cerebellum, is particularly vulnerable to damage from toxic inhalants.

Within in a reasonable degree of medical certainty, Brandon is permanently incompetent on the basis of attention deficit disorder, bipolar disorder, and organic brain damage resulting

**JA 5365**

from closed head injury, and polysubstance abuse (especially the toxic consequences of the inhalation of inorganic solvents). The proper classification of Brandon's brain damage is a static encephalopathy rather than a dementia as there is no evidence that he is suffering from a progressive degenerative illness such as early onset Alzheimer's disease. On the basis of his psychiatric and neurological conditions, Brandon is unable to attend to and fully comprehend the details of ongoing legal proceedings and offer effective assistance to his legal team based upon a reasoned evaluation of the information presented to him. Moreover, he has difficulty regulating his behavior under situations of great stress, such as court proceedings, due to organically based frontal lobe deficits.

If you have any questions concerning this report, please feel free to contact me at 301-652-8777.

Thomas M. Hyde, M.D., Ph.D.

*Diplomat, American Board of Psychiatry and Neurology*
*Member, American College of Neuropsychopharmacology*

**JA 5366**