No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## JOINT APPENDIX AND INDEX
## VOLUME 23
## PART J

JON M. SANDS
Federal Public Defender
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816   voice
(602) 889-3960   facsimile
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

Subj: **TPC from BB**
Date: 1/12/2004 2:19:40 PM Eastern Standard Time
From: yetto@mis.net
To: Jacklaw@aol.com, GREGHARRIS@justice.com

Brandon called last night. Seems his mother had told him that some investigator and some new lawyers were at the house last week. She did identify me as the investigator from the country. Brandon said that it was me. He called to check it out. He was concerned that someone else was there acting like they were his attorneys. I explained who everyone was. He was okay with it. Kathy had also told him about our meeting with his grandmother. He could not believe that his grandmother wanted to come to the trial. He said she never liked him. I assured him she loved him. He could not believe that she would cry over him, but said she told it like it was, didn't beat around the bush. I told him I thought it would be good for him to have a family member there to support him, since his mom would probably not be able to make the trip because of her health. He said he was just afraid of what his grandmother might say. I didn't go further with it. Told him she probably wouldn't say anything. That was about it. Very pleasant to me. He was into it with someone at the jail re: the phone call. I don't know if it was staff or an inmate. He did tell me he was going to Buckner soon, etc.

Lesa F. Watson, C.C.D.I.
Paralegal/Mitigation Specialist
859.236.7088 Home
859.583.1871 Cell
yetto@mis.net



GOVERNMENT
EXHIBIT
223

PENGAD 800-631-6989

JA 7174

# JENNER & BLOCK

Jenner & Block LLP          Chicago
1099 New York Avenue, NW    Los Angeles
Suite 900                   New York
Washington, DC 20001        Washington, DC
Tel 202-639-6000
www.jenner.com

David W. DeBruin

**BY OVERNIGHT MAIL**

Patty Layne
Clerk's Office
United States Court of Appeals for the Fourth Circuit
1100 East Main Street
Suite 501
Richmond, VA 23219-3517

Re:     Memorandum in Support of CJA30 Voucher Submission

Dear Ms. Layne:

I write to seek compensation on behalf of Jenner & Block LLP under the Criminal Justice Act for work performed by Jenner & Block attorneys in the death-penalty case of *United States v. Brandon Basham* (No. 05-05). Melissa A. Meister was appointed CJA co-counsel for Mr. Basham on appeal on November 16, 2007. When Ms. Meister left Jenner & Block to assume a position as an Assistant United States Attorney, the Court granted Ms. Meister's motion to withdraw and I was appointed as her replacement on April 7, 2009.[1] We have worked alongside Timothy B. Sullivan as CJA-appointed co-counsel for Mr. Basham.

The attached CJA30 voucher form reflects our request for compensation of $57,460.00 (338.0 hours at a rate of $170 per hour). Ms. Meister's and my hours as CJA-appointed counsel are reflected on Addendum #1, which is our firm's billing record sorted so that the work performed is categorized by the relevant CJA categories.[2] The hours listed on Addendum #1 add up to 338.05. However, the CJA30 voucher instructions require listing time in each category in tenths of an hour. If the resulting numbers for each category are rounded to the nearest tenth of an hour, their total is 338.20. We have rounded that number down to 338.0, below the amount in our accounting system.

The $170-per-hour rate listed on the form is an average rate. For all but 18.3 hours of the 338.2 hours at issue, $170-per-hour was the maximum CJA rate. When $166-per-hour was the maximum, Ms. Meister spent 9.8 hours working on the case. More recently, when $175 per hour was the maximum rate, I spent 8.5 hours on the case. The weighted average billing rate for these hours would be $170.01; we therefore simply used $170 for all hours. These rates are substantially lower than our ordinary hourly rates.[3]

---

[1] After the Court granted the motion, I filed an appearance-of-counsel form on July 13, 2009.

[2] Except for the addition of the CJA categorizations, the time entries are as recorded into our accounting system contemporaneously with the performance of the work.

[3] My current hourly rate is $750 per hour. Before she left Jenner & Block, Ms. Meister's hourly rate was $445 per hour.

GOVERNMENT
EXHIBIT
224

PENGAD 800-631-6989

Page 2

Many additional lawyers at Jenner & Block worked on Mr. Basham's appeal, for which we are not seeking compensation. In total, Jenner & Block attorneys spent a total of 1,739.00 hours on this case.[4] These hours are reflected on Addendum #2, which is the complete Jenner & Block financial record for this case.

This expenditure of resources was necessary. As reflected in the briefs filed in the case, Mr. Basham's appeal presented numerous substantive issues, which required full exploration and briefing on appeal. The firm thus devoted substantial attorney resources to reviewing the extensive record in this case and preparing the briefs for Mr. Basham. The complexity of the case is also reflected in the Court's 57-page opinion in the case.

For the foregoing reasons, I respectfully request that the Court award compensation under the Criminal Justice Act to Jenner & Block LLP in the amount of $57,460.00. Please let me know if the Court requires any further information.

Very truly yours,

David W. DeBruin

---

[4] In addition, Jenner & Block incurred more than $27,000 in disbursements on this case for travel, copying, research, and other matters, as reflected in Addendum #2. Jenner & Block is not seeking recovery of these expenses.

JENNER-BLOCK_00498

JA 7176

7/6/84 - Conference with Brandon

Δ mouthed off to Capt. Johnson - altercation
with four guards. Carried to room.
Let out after 30 min. Spent whole time
talking about incident and how manipulating me
5334 - to bring
him
"Dip."

Δ can read very well.
He also has complete comprehension
e.g. 5433 letter from Cabinet —
understands this was a
finding

5589
Basham Child Protective Services
"Δ + Charlotte never had a good life"

GOVERNMENT
EXHIBIT
225
PENGAD 800-631-6989

JA 7177

64524

Subj: **Fwd: Basham**
Date: 12/16/2003 1:33:23 PM Eastern Standard Time
From: Jacklaw
To: lindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET, jeans@swerlinglaw.com, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET, traci@swerlinglaw.com, SHARRISON@JUSTICE.COM, gacollias@citynet.net, GREGHARRIS@JUSTICE.COM, STEVE@swerlinglaw.com, SHEALYBOLAND@HOTMAIL.COM, akandare@justice.com, donnasw@gw.mp.sc.edu

MEMORANDUM:

FROM: JBS

RE: PENNY ROYAL HOSPITAL

DATE: DECEMBER 16, 2003

I have reviewed the Penny Royal Hospital records and note the following:

Basham was seen at Penny Royal on December 18, 2000. He was sent there by the jail for attempting to hang himself two times. On one occasion he stuck his finger in an electric socket trying to kill himself. Ther eis a note that he was hallucinating about the man who abused him as a child. This note was by Dean Richardson.

On June 6, 2000, there is a note by Amy Melton regarding a Sherril Hopper in reference to the man who sexually assaulted Basham.

On November 10, 1999, there is a note by Laura Houston, a psychologist, who talks about the Audobon camp, September 4, 1999. Talks about a personality disorder and the use of crack cocaine and marijuana.

There is a note by Nurse Altman, dated February 27, 1998, who talks about the defendant having an oppositional defiant disorder.

08204

There is a report by psychologist Arthur Lossner, dated May 18, 1993. This references complaints by Mrs. Basham to the school about the way Brandon was being treated.

There is an evaluation by Arthur Lossner, April 26, 1990. It talks about Brandon's fall from a tree and his mother reporting that he cries frequently. There is also reference to Mrs. Basham being treated by Dr. Bently.

There is an evaluation by Dr. Sadiq, August 23, 2000, wherein there is a note that Brandon suffers from no significant history of head injuries.

There is an evaluation on December 6, 1999 of a Dr. Emmanual DeLa Rocha that talks about Brandon's suicide attempts.

There is a note of a Dr. James Rozell, August 1, 1990. He talks about "Brandon being quite obnoxious today." Brandon is referred to as manipulative and uncontrolled.

Wendy Vaness, who is a social worker, has a note of January 3, 2000 that Brandon is there as a result of an attempt to hang himself and electrocute himself at the jail.

There is a note by Dr. Dela Rocha that the defendant is a psychopath and not much we can do.

There is a note that the defendant has an attention disorder and is non-compliant with any medicine. There is also a note that Mr. Basham said that his wife is too easy on the defendant --he is firmer and whips the defendant. These are under notes by Launa Houston.

There is a note toward the end of the recods that says he has a drug history of marijuana, coke, crack and alcohol. There is a note, "Strong genetic disposition for chemical dependency on the part of both parents. This comes from a May 3, 2000 admission. He was discharged on May 9 with the following

notes -- failure. No motivation. Disrputive. Doesn't care. Defiant. Derails everyone else. Dr. Cavazos notes that Brandon is not homicidal or suicidal. There is a note from his 9th grade teacher there, Joyce LaBell that Brandon is totally out of control and has been kicked out of the program.

JBS:lhb

**Jack B. Swerling**
**803-765-2626-o**
**803-730-9400-c**
**803-799-4059 -f**

------------------
## Forwarded Message:

| | |
|---|---|
| Subj: | **Basham** |
| Date: | 12/16/2003 11:17:23 AM Eastern Standard Time |
| From: | Linda@swerlinglaw.com |
| To: | Jacklaw@aol.com |
| Sent from the Internet (Details) | |

MEMORANDUM:

TO:       JBS

RE:       PENNY ROYAL HOSPITAL

DATE:    DECEMBER 16, 2003

I have reviewed the Penny Royal Hospital records and note the following:

Basham was seen at Penny Royal on December 18, 2000. He was sent there by the jail for attempting to hang himself two times. On one occasion he stuck

Subj:    **Fwd: Basham**
Date:   12/16/2003 1:37:03 PM Eastern Standard Time
From:  Jacklaw
To:     lindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET,
jeans@swerlinglaw.com, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET,
traci@swerlinglaw.com, SHARRISON@JUSTICE.COM, gacollias@citynet.net,
GREGHARRIS@JUSTICE.COM, STEVE@swerlinglaw.com, SHEALYBOLAND@HOTMAIL.COM,
akandare@justice.com, donnasw@gw.mp.sc.edu

**MEMORANDUM:**

FROM:     JBS

RE:      HOPKINS COUNTY SCHOOL RECORDS

DATE:   DECEMBER 16, 2003

I reviewed the Hopkins County School records. There were several evaluations done of Brandon during the course of his time in the school system. Among some of the comments were comments by Sheila Jones that he has terrible behavior, does not listen, interrupts. In an evaluation done by Pamela Chandler on April 24, 1989, there is a note that he has 101 IQ, low social coping skills, no special education was recommended. There is also something about a reference to a Nebo School. There is a note that he picks on students in 1989.

There is an evaluation by Brenda Tompkins on September 26, 1989, that Brandon suffers from an attention deficit, learning disability and there is a recommendation of special needs. There is a note that he is manipulative, has poor impulse control, hyperactivity, and distractability. There are notes dealing with his physical confrontations and his disrespect for teachers. There is a note that there is a gap between his IQ and his performance. There are notes concerning his being truant, the fact that he attacked instructors and assistants and has swung at teachers. He has threatened Ms. Haley who is a teacher, and has said he was "going to shoot some people."

There is a rather disgusting letter contained in the file to Ms. Debbie, who

Subj:  REVIEW OF CHARTER RIDGE RECORDS
Date:  1/8/2004 12:16:50 PM Eastern Standard Time
From:  Jacklaw
To:    lindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET,
       jeans@swerlinglaw.com, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET,
       traci@swerlinglaw.com, SHARRISON@JUSTICE.COM, gacollias@citynet.net,
       GREGHARRIS@JUSTICE.COM, STEVE@swerlinglaw.com, SHEALYBOLAND@HOTMAIL.COM,
       akandare@justice.com, DBTarr@msn.com, DONNASW1963@YAHOO.COM,
       donnasw@aw.mp.sc.edu

MEMORANDUM:


FROM:  JBS

RE:  REVIEW OF CHARTER RIDGE RECORDS

DATE: JANUARY 8, 2004

The records are fairly typical of Brandon. There are several orders to seclude him because of verbal and physical aggression. He is described throughout as manipulative and abusive, impulsive, dishonest, easily frustrated.

At page 472 there is a note of threatening.

At page 475 there is a note that he threatened.

At page 476 there is a note that he looks at himself in a derogatory manner, he used drugs and is noted to be crying.

At page 478, there is a statement that he wished he could be born again.

At page 482, he makes a statement that he does not like to be told what to do.

At page 486, he is noted to be argumentative and aggressive.

At page 487, he is noted to be manipulative, aggressive, and can't separate from negative peer behavior.

At page 496, he is noted to be aggressive, argumentative, disruptive, with poor impulse control.

At page 498, he is noted to be argumentative and manipulative.

At page 507, he is noted to be demanding, disruptive and with redirection

GOVERNMENT
EXHIBIT
228

difficult.

At page 510, he writes a letter of apology which should be reviewed by everyone.

At page 512, there are important notes. He pushes the limit, he debates, he's defiant, he's manipulative and he is ordered to seclusion.

At page 513, he is noted to instigate peers.

At page 516, he's noted to be put in seclusion because of threats again.

At page 533, he is ordered to seclusion.

At page 539, he's noted to be aggressive and manipulative.

At page 542, he's difficult to calm down when he gets overstimulated.

At page 544, it is noted he does not take responsibility for anything. He argues, he's aggressive and manipulative.

At page 549, there is a letter from him how he would change. His mom, his dad and money and how he would help his mom and dad.

At page 550, there is an interesting note that should be read. It also says that he tries to split his peers and the staff.

At page 557, there is a note that the anger relates to his sexual abuse.

At page 565 and 566, he is noted to be aggressive, bad behavior, assaulted behavior, seclusion.

At page 567, he is noted to split staff again.

At page 568, he is noted to be out of control with aggression.

At page 571, combative, opposition, non-compliant.

At page 575, dishonest, selective hearing.

At page 579, rage and crying.

At page 595, a very bad note.

At page 607, tearful in suicide group, emotional, story about his abuse.

**JA 7183**

07819

At page 622, speaks of friend's suicide.

At page 625, he tells his life story in his own writing. He does not like his grandmother. Describes sexual abuse, mom's depression. Describes failing of a tree and he was a good kid when he fell. When he was molested he changed.

At page 647, assault by a migrant worker and attempted seduction by a peer.

JBS:lhb

**Jack B. Swerling**
**803-765-2626-o**
**803-730-9400-c**
**803-799-4059 -f**

**JA 7184**

07820

Subj:  REVIEW OF RIDGE BEHAVIORAL RECORDS
Date:  1/8/2004 12:22:20 PM Eastern Standard Time
From:  Jacklaw
To:    lindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET,
       jeans@swerlinglaw.com, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET,
       traci@swerlinglaw.com, SHARRISON@JUSTICE.COM, gacollias@citynet.net,
       GREGHARRIS@JUSTICE.COM, STEVE@swerlinglaw.com, SHEALYBOLAND@HOTMAIL.COM,
       akandare@justice.com, DBTarr@msn.com, DONNASW1963@YAHOO.COM,
       donnasw@gw.mp.sc.edu

MEMORANDUM:

FROM:    JBS

RE:      REVIEW OF RECORDS FROM RIDGE BEHAVIORAL SYSTEMS

DATE:    JANUARY 8, 2004

Page 661 shows he was admitted after outburst at the Methodist Home in
Versai. His diagnosis is atypical bipolar disorder. Problems with being
little. Talks about 4 friends committing suicide recently.

At page 667, he talks about suicidal and bomicidal ideation. See notes of
Peggy Wood at 678. See notes of Susanne Walker at p. 676. See notes of
Carol Baker at p. 680. See notes of Dixie Moore at 680.

At page 683, he is described as manipulative, argumentative and disruptive,
and cannot spend any more than 2 hours in class.

At page 687, he is described as being sad and sexually abused.

At page 705, he is described as needing immediate gratification.

At page 707, he is described as being tearful during discussion of family
issues.

At page 711, there are discussions about immediate gratification, short
fuse, explosive outbursts, verbally abusive.

At page 715, he is noted to be tearful with sad effect.

At page 726, it is noted that he cannot stay in class for more than 2 hours
again.

At page 727, he is noted to be sad.



GOVERNMENT
EXHIBIT
229
PENGAD 800-631-6989

At page 748, noted to dominate group, being aggressive and manipulative.

At page 755, there is a dream that he relates of an assault and his dad did not help.

At page 768, he is noted to be argumentative, manipulative, with testing limits.

At page 781, he talks of being raped at the age of 8 -- appears to be inconsistent with other versions of being assaulted.

At page 782, laments not being able to spend time with dad when he was young. Also noted to be tearful about his family.

At page 795, noted to be impulsive, hyper, no acceptance of responsibility by him about anything.

At page 799, he is noted to be tearful with underlying sadness.

At page 802, he is noted to be non-compliant, oppositional and threatening staff and peers.

JBS:lhb

**Jack B. Swerling**
**803-765-2626-o**
**803-730-9400-c**
**803-799-4059 -f**

Subj:   review of rivendale
Date:   1/29/2004 11:09:56 PM Eastern Standard Time
From:   Jacklaw
To:     iindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET,
        DBTarr@msn.com, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET, akandare@justice.com,
        SHARRISON@JUSTICE.COM, aacollias@citynet.net, STEVE@swerlinglaw.com,
        jeans@swerlinglaw.com, traci@swerlinglaw.com, GREGHARRIS@JUSTICE.COM,
        SHEALYBOLAND@HOTMAIL.COM, LisaiKimbrough@yahoo.com

MEMORANDUM: steve/ harrison-take this with you with records

TO:   BRANDON BASHAM FILE
RE:   REVIEW OF RIVENDALE PSYCHIATRIC RECORDS
DATE: JANUARY 29, 2004

Page 3794 -- Entry by Dr. Scott Littleton that the defendant has ADHD, intermittent explosive disorder. The defendant is creating turmoil, is easily distracted. He stares into space. His mother refused prescriptions. Had a markedly abnormal EEG. Doctor recommended neuro-imaging and anti-seizure medication.

Page 3795 -- The mother took him out of the hospital against advice of physicians.

Page 3806 -- Dr. Littleton notes attacks teachers, peers, has uncontrollable behavior. manipulative. Easily distracted. Does not like the word "no." Mom wants him without drugs. Poor impulse control. Destructive tendencies. Sniffs gas.

Page 3808 -- There is a history with the following notes: tantrums, fidgety, expletives, short attention, temper, split his head, culturally deprived. Brain mapping. Family dysfunction.

Page 3811 -- There is a note by Ollie C. Dennis, MA. Shows defiant, dysfunctional and negative family. Low frustration tolerance.

Page 3812 -- Note that tests were administered.

Page 3813 -- Tests suggest no impairment in neurological functioning.

Page 3826 -- Mrs. Basham does not like the therapy.

Page 3828 -- Dr. Edmond Cavazos and Laurie Whitaker have a note that the defendant was referred from jail. They note drugs, alcohol, and genetic

GOVERNMENT EXHIBIT 230

predisposition.

Page 3829 -- They note that he has been in 13 treatment facilities. Diagnosis ADHD. He is referred to Penny Royal.

Page 3846 -- Again a note by Dr. Cavazos noting blackouts, loss of memory, huffing bleach, mood instability.

Page 3847 -- There is a note that he has unprovoked and uncontrollable crying. He has post-traumatic stress symptoms of past abuse. Has genetic predisposition. He suffers from sexual abuse.

Page 3877 -- Dr. Cavazos notes disruptive, throws sodas. Also present was Holly Williams, Grant Menton and Tony Deering.

Page 3880 -- The following names are noted: Gaymon Wilson and Eaton.

Jack Swerling
1720 Main Street, Suite 301
Columbia, South Carolina 29201
803-765-2626 (o)
S03-730-9400 (c)
803-799-4059 (f)

JA 7188

08269

Subj:    Re: Branden Basham
Date:    2/19/2004 4:48:45 PM Eastern Standard Time
From:    Jacklaw
To:      iindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET,
         jeans@sweriinglaw.com, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET,
         traci@swerlinglaw.com, SHARRISON@JUSTICE.COM, gacoilias@citynet.net,
         GREGHARRIS@JUSTICE.COM, STEVE@sweriinglaw.com, SHEALYBOLAND@HOTMAIL.COM,
         akandare@justice.com, LisaiKimbrough@yahoo.com

TO:      BRANDEN BASHAM TEAM
FROM:    JBS

RE:      REVIEW OF RECORDS OF CARDINAL CENTER

Page 4954 - there is a transcript of a family court hearing.

Page 4991 - psychological assessment dated September 11, 1997. This is a duplicate Lisa and Potts.

Page 5026 - notes a counselor Danny Stringfield. Treatment progress notes.

Page 5085 - defendant has a problem with the word "no."

Page 5087 - defendant talks about his family, problems with peers at special ed.

Page 5107 - defendant has a negative reaction to rules. Does not like authority.

Page 5124 - he is highly explosive.

Page 5118 - he has peer problems.

Page 5145 - he is aggressive, defiant, argues, manipulative, threatens.

Page 5153 - possible sexual abuse by his mom.

Page - report to Cheryl Dunham by Gillingham at Childrens' Psychiatric. Cheryl Dunham is 502-824-7556. The note is no remorse, is a con artist, manipulative, delinquent value system, impulsive, explosive, lies, switches when necessary, will assault, no treatable illness, severe conduct disorder. Also at the same page Michael Eastman at Charter Evansville, notes seems to

GOVERNMENT
EXHIBIT
231
PENGAD 800-631-6989

JA 7189

07796

be power based, impulsive, explosive.

Page 5190 - defendant is in a fight with Mr. Green, Mr. Clark, and L. Highfield.

Page 5195 - incident reports.

Page 5195 - assaults.

Page 5232 - defendant is AWOL.

Page 5356 - defendant exposed himself.

**Jack B. Swerling**
**803-765-2626-o**
**803-730-9400-c**
**803-799-4059 -f**

**JA 7190**

07797

Subj:    RE DJJ RECORDS
Date:    2/19/2004 4:58:42 PM Eastern Standard Time
From:    Jacklaw
To:      lindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET,
         jeans@swerlingiaw.com, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET,
         traci@swerlingiaw.com, SHARRISON@JUSTICE.COM, gacoilias@citynet.net,
         GREGHARRIS@JUSTICE.COM, STEVE@swerlingiaw.com, SHEALYBOLAND@HOTMAiL.COM,
         akandare@justice.com, LisaiKimbrough@yahoo.com

TO:      BRANDEN BASHAM TEAM

FROM:    JBS

RE:      REVIEW OF DJJ RECORDS

Page 4553 - notes personality disorder with histrionics borderline features.

Page 4566 - note about Cheryl Durham, phone number: 502-824-7566 and 502-824-7034. There is also a note of Jim Schuck of 889-6030. There is a note about Owensborough Detention Center. LESA: we need to get those records.

Page 4560 - note about his record.

Page 4563 - there is a note about Central Kentucky Treatment Center, 1998 and listed as the last school he attended. LESA: We need to try and get those records.

Page 4564 - notes defendant went through 7 out of home placements. Each facility was relieved when he left. He was manipulative, cries, no bond no trust by defendant. Impulsive, volatile, does not know or care about consequences, lies, can switch when victimized, alleges he's always picked on.

Page 4569 - report of Cheryl Durham.

Page 4577 - notes physicaliiy aggressive, explosive behavior, volatile.

Page 4586 - note of Cheryl Durham. No remorse, con artist, impulsive, explosive, lies. Reference to a Dr. Gillingham at the Childrens" Psychiatric. He notes no treatable mental health diagnosis. Severe conduct disorder. Also note of Dr. Michael Eastman at Charter indicates the

GOVERNMENT EXHIBIT 232

defendant is a power based individual, uses aggressive action.

Page 4589 - number of e-mails concerning his placement. Notes Rice Audubon can't handle him. He taunts people, he's restrained. Rice is located at 8711 LeGrange Road, Louisville, KY 40242. Phone number: 502-425-7521. Lists a name Leon Farley is the contact there.

Page 4614 - psychological dated September 11, 1997.

Page 4615 - there is a note that at Methodist he alleged anal and oral abuse.

Page 4516 - notes manipulative, charming, uses others to promote agenda.

Page 4616 - it appears there is someone named Lisa Potts who may be from Cardinal. Did an MMPi. Notes immature, impulsive, hedonistic, rebels against authority, aggressive, frustrated, no empathy, no remorse, insensitive to others, only his needs, no guilt. First appears charming. Diagnosed with conduct disorder, polysubstance abuse, antisocial personality, narcissistic personality.

Page 4620 - note Childrens' Psychiatric Hospital. November 6, 1996, Paul Gillingham, M.D., severe conduct problem.

Page 4623 - note from Childrens' Psychiatric Hospital, November 6, 1996 "looks he will explode," "walking timebomb." Defendant alleges anal and oral assault by two at the Methodist Home. Uses racial epitaphs. Note he is antisocial by Connie Knowland case worker.

Page 4626 - there is a note by Fred Stein.

Page 4628 - Columbia Hospital, Paris, Kentucky, notes hyperkenetic, impulsive, labial restraints used. Note by Dr. Daniel Cardona.

Page 4631 - more of the same from Columbia Hospital, Paris, Kentucky. Defendant's allegations of abuse. Notes name Sheila Schwartz, case worker. Notes mood and behavioral swings.

Page 4638 - note from Trover, May 9, 1996, Dr. Roger Laird.

Page 4673 - note from Rice Audobon has their records and contact Jennifer James, June 23, 1999.

Page 4755 - also Rice Audobon. There was a psychiatric evaluation done in June 1999. Indicates multiple losses and trauma. There is a doctor listed,

**JA 7192**

07860

Dr. Edwin Walker.

Page 4763 - Charter Behavioral of indiana. Consultation with Michael Eatman or Eastman, ACSW. He notes defendant to be power based. He needs legal consequences verses intensive therapy, for example a military type camp.

Page 4765 - there is a consultation with Christina Pinkston, social worker. She notes he is defiant, threatens staff, he's antagonistic, verbally and physically aggressive.

Page 4766 - there is a letter from Dr. Robert Aug to Peggy Wood dated December 16, 1996. Lists the defendant as atypical bipolar impulsive aggressive. Strong wish to control others, will not let anyone control him.

Page 4781 - Dr. William Platts, Columbia Hospital, Paris, Kentucky, August 7, 1996. Notes conduct disorder intermittent explosive disorder ADHD.

Page 4784 - Hopkins County Psycho Educational report, May 1, 1995. Borderilne functioning. Lists Wendy Watts, psychologist.

Page 4795 - Rice Audobon, 1999. Counseling service. Juvenile counselor M. F. Williamson (looks like Maurice Williamson). There are incident reports. Notes Peggy Young supervisor and Gail Hammond.

Jack B. Swerling
803-765-2626-o
803-730-9400-c
803-799-4059 -f

JA 7193

07861

Subj: RE- TEN BROECK HOSPITAL
Date: 11/11/2003 9:05:28 PM Eastern Standard Time
From: Jacklaw
To: lindab@justice.com, Jacklaw, CGRAHAMSC, ECR@NMRS.COM, YETTO@MIS.NET, JGS@JUSTICE.COM, PAIGE@BRUCKLAW.COM, CJM0501@ALLTEL.NET, TTHIEROLF@HOTMAIL.COM, SHARRISON@JUSTICE.COM, gacollias@citynet.net, GREGHARRIS@JUSTICE.COM, SHEALYBOLAND@HOTMAIL.COM

**SOME OBSERVATIONS ON REVIEW OF THESE RECORDS:**

**SUICIDE ATTEMPT WHILE HE WAS AT CARDINAL TREATMENT UNIT IN LOUISVILLE. TRIED TO CUT HIS WRIST. SAW DR. NASSIRUIDDIN SIDDIGUI , DR. MIREN ASUMENDI. HAD MANY EPISODES OF AGGRESSIVE BEHAVIOR. MANIPULATIVE. NOTED IN RECORDS IS THAT COUISN DIED 3 DAYS AGO. ALSO NOTED ABUSE AS CHILD FROM MALE BABY SITTER. ALSO OF NOTE IS HIS WILLINGNESS TO TAKE MEDICINE, AND MOTHER NOT WANTING HIM TO. OTHER FACILITIES**
**CHARTER EVANSVILLE 1997**
**CHARTER LEXINGTON 1997**
**CINNCINNATI PSYCHIATRIC HOSP-1995**
**COLUMBUS HOSPITAL 1994**
**METHODIST GROUP HOME 1993**

**PAIGE AND LESA- PLEASE NOTE THESE ON APPRORIATE LISTS TO OBTAIN RECORDS AND INTERVIEWS. PAIGE-CAN YOU GET ME DONNA'S EMAIL.**

**CAROLYN-PLEASE MAKE SURE GREG, PAIGE AND DONNA WATTS HAVE A COPY OF THESE RECORDS. THANK YOU.**

**I BELIEVE IT WOULD BE HELPFUL IF WHENEVER YOU READ SOMETHING OR THERE WAS SOMETHING SIGNIFICANT IN AN INTERVIEW THAT YOU E-MAIL WITH A SUMMARY LIKE THIS IN ADDITION TO MEMOS**

Jack Swerling
1720 Main Street, Suite 301
Columbia, South Carolina 29201
803-765-2626 (o)
803-730-9400 (c)
803-799-4059 (f)


GOVERNMENT EXHIBIT
233
PENGAD 800-631-6989

JA 7194

08377

# M   E   M   O   R   A   N   D   U   M

TO:        Branden Basham File
FROM:      Jack B. Sweriing              DUPLICATE
DATE:      July 15, 2003
RE:        Meeting with Dr. Sadiq

Did a very brief psychiatric evaluation. One in 1990, one in 1999 and recently. Impression is depressive. Impression he is anxious and mildly depressed. The defendant is scared of jail. The defendant is engaging. Branden is suffering from behavioral difficulties. Part of his problem is an abuse of drugs. Dr. Sadiq feels that he has antisocial personality disorder, narcissistic in nature. The doctor felt like there was some pressured speech, but not necessarily bipolar. Branden is manipulative and tried to manipulate the drugs. The doctor saw no psychosis.

December 3, 2000 described wellbutrin. Evidence of substance abuse, on crack cocaine. ADHD noted, wellbutrin can help in young people. Also gave stratterra. The previous doctor was Dr. Delalocher. The doctor had said he was a psychopath, which is actually now according to the doctor an antisocial diagnosis.

Dr. Lunsford had him as antisocial. Not sure whether or not he would be a follower. Saw him two years ago before the present incident.

JBS:lhb

1

GOVERNMENT
EXHIBIT
234
PENGAD 800-631-6989
JA 7195

08285

**PAIGE TO DONNA**

**DONNA - POST-ARREST**

**✱ HAS NOT CHANGED BEHAVIOR SINCE ARREST – DISCUSS**

1. Non-compliant with medicine

2. Selling medicine – money

*DEMENTIA* {

3. Exposing himself

4. Ejaculating, threatens to sodomize

5. No rehabilitation

    Continues after prison

*SITUATION AT JAIL*

*ADHD* {

6. Acting out

7. Resistance – *ANXIETY*

8. Manipulative

9. Medicine seeking

10. Incidents with Marshal – Agarette

11. Anger/disruptive

12. Attention seeking *ADHD*

13. Resistance to therapy *Not*

14. Blames others *like 5 or 6 years old*

15. No memory impairment

16. No rehabilitation

JA 7196

34098

17. Suicide _Borderline Personality Traits_

18. Self-mutilation – _"_          _"_

19. Lack of remorse ✓

20. Anti-social ✓

21. Childrens' Psychiatric Hospital

    a.   Anti-social – con artist

    b.   Cautious of this young man

    c.   Grandiose thinking ← _psychosis_

22. Mental illness vs. personality disorder _VOLITION_

23. Chose wrong _DOES NOT HAVE CAPACITY_

24. Wanting dip ✓

25. Incident in courtroom ✓

26. Tobacco ✓

27. Drug use ✓

28. Damaged brain – how does it affect him ✓

29. Sexual abuse – parent's reactions and effect on him ✓

30. Authority in jail

    Fight everything

    Does not listen

    Questions everything

_9 Batica – mother_
_Pentecost_

JA 7197

34099

Overreacts

Fighting

31. Why Waters can get along with him

32. Plays chess – intellect

33. Masturbation

34. Wants immediate stuff – can't wait

35. Stress

36. Fighting

37. Sexual issues

38. Getting his way

Being told "no"

Authority

39. Disappointment

40. Can he help himself – research

41. Can he control it – research

42. Possessive

43. Unjust conduct

44. I love pain

45. Told no – acts up

46. Dip incident in court – did not get vs. getting

47. Whole life of manipulation since 8

48. Statements about D/P

**JA 7198**

# M E M O R A N D U M

**To:**        Basham File

**From:**      Lesa F. Watson

**Subject:**   Dr. Cheryl Rivard [Methodist Home]

**Date:**      March 17, 2004

Ft. Logan Comprehensive Care
110 Somerset Street
Stanford, Kentucky
606.365.2197 office


On March 10, 2004, I interviewed Dr. Rivard in her Stanford, Kentucky office. Dr. Rivard is originally from Montana and came to Kentucky for her college career and stayed. At the time she treated BB, she was on a private contract with the Methodist Home. Dr. Rivard's initial report is still incomplete. She says there should be at least one (1) more page, if not, two (2) which would include her final diagnosis. I have made several calls to the Methodist Home to try and get the missing pages and no one has returned my calls. If I do not get anyone to response, I will go there and get the missing pages. She agreed to speak with me again when I get the missing pages.

Dr. Rivard's records do reflect that she had recommended following up on the abnormal EEG and EKG. This was done. Her note of 8/12 shows that the results were normal. This report also reflects the results of lab work she had ordered. All within normal limits for BB's age. This work was done at Woodford Memorial Hospital in Versailles, Kentucky. This is the _normal_ EEG that Dr. Taorimina reported. [Dr. Taoromina has not returned any of my calls]. Dr. Rivard also said that all of these test results should have been in BB's file from the Methodist Home. She did not conduct any neurological testing. This would have been done by the doctor who gave the children their physicals. Most likely someone in Versailles, Kentucky. She worked independently of Dr. Dewey Sanders and would not have seen his reports.

_CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGE_
_and/or_
_ATTORNEY WORK PRODUCT_



GOVERNMENT
EXHIBIT
236

JA 7199

08248

Dr. Rivard has some recollections of BB. She found him to be impulsive but, bright. She referenced her numerous notations of BB's behavior during their sessions. He would just get up and go out into the hallway if he heard something - mid conversation - without any warning - extremely impulsive, easily distracted. She attributes his decline in IQ primarily to drug use, specifically, huffing. In her opinion, this would have caused a decrease in brain cells. She was aware of FAS at the time she treated him and does not recall thinking of that condition in reference to BB. She believes that the child she treated would be capable of segmented planning. He could plan in 3 - 4 steps at a time. But this planning would be motivated or dictated by need. BB would be a follower in a group and a leader for himself BB's peers found him irritating. BB would use his charm in an effort to obtain what he wanted and when this did not work he would blow up. BB had a behavioral problem with a conduct disorder. The root of these conditions would first be determined by his genetic pre-loading and then the environmental factors that effect these conditions.

Her recommendation for BB would have been a long term, high security, residential care facility. The Methodist Home was not that type of institution. She would not envision him being returned home. If the Methodist Home, with a full staff, could not manage and control him, there was no way his parents could do so. And it appears that his home life exacerbated his problems. There were several facilities that offered this type of care in state and out of state during this time period.

Dr. Rivard saw BB for approximately six (6) hours of time in toto. She finds it hard to believe that if anyone had more interaction with him, they would not recall him. She was never afraid of BB. He was always very polite and very ingratiating when they would meet. She often had children she would not see alone. BB was not one of those children. BB did not strike her as a mean child. He was only mean "in the moment" She saw him as a good hearted child.

CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGE
and/or
ATTORNEY WORK PRODUCT

**JA 7200**

08249

# MATERIALS RELATED TO

# LITIGATING

# MENTAL RETARDATION IN

# FEDERAL CAPITAL PROSECUTIONS

**David Bruck**
P.O. Box 11744
Columbia, SC 29211

(803) 765-1044
fax (803) 765-1143
e-mail:
dbruck@mindspring.com

**Kevin McNally**
P.O. Box 1243
Frankfort, KY 40602

(502) 227-2142
fax (502) 227-4669
e-mail:
kmcnally@mis.net

**Dick Burr**
1630 Castle Court #1
Houston, TX 77006

(713) 523-2299
fax (713) 523-3822
e-mail:
dick@burrandwelch.com

**Federal Death Penalty Resource Counsel Project**

**March, 1999**

GOVERNMENT
EXHIBIT
237

JA 7201

30968

# Memorandum

**To:**     Counsel in federal capital cases

**From:**   David Bruck

**Re:**     Materials on Mental Retardation and Federal Capital Sentencing

**Date:**   February, 2000

---

Both the 1988 Anti-Drug Abuse Act and 1994 Federal Death Penalty Act procedures prohibit infliction of the death penalty on persons with mental retardation. 21 U.S.C. § 848(l), 18 U.S.C. § 3596(c)("A sentence of death shall not be carried out upon a person who is mentally retarded"). 11 death penalty states currently have similar exemptions for defendants with mental retardation. Denis W. Keyes and William J. Edwards, Mental Retardation And The Death Penalty: Current Status of Exemption Legislation, 21 MENTAL & PHYSICAL DISABILITY L. REP. 687 (1997). Simple as it is, this straightforward statutory provision has proven quite complex in its application.

## Definition

Neither federal statute defines mental retardation. However, the legislative history makes clear that Congress intended that the courts employ the generally accepted definition of mental retardation used in the mental health field. Attached is the record of the House debate on the 1988 amendment that first inserted a mental retardation bar into federal law. The definition employed by the amendment's sponsors in that debate, then in use in both the DSM-III-R and by the AAMR, was:

> significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.

144 Cong. Rec. H7283 (September 8, 1988) (statement of Mr. Levin, D-Mich.) A more detailed redefinition was adopted by the American Association on Mental Retardation in 1992:

> Mental Retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

1

GOVERNMENT
EXHIBIT
238

JA 7202          30970

In plain language, these essentially similar definitions have 3 elements:

- an IQ of approximately 70-75 or below;[1]

- demonstrated impairments in the normal activities of adult life; and

- evidence that this condition existed prior to age 18.

**Investigating and gathering evidence of mental retardation**

While a standardized intelligence test in the range of mental retardation is obviously an essential starting point in establishing mental retardation, the second element of the definition--limitations in adaptive skill areas--is equally important, and can require painstaking investigation and documentation. The attached affidavit of Ruth Luckasson sets out the nature and scope of the social history investigation that must be conducted by the defense in order to establish or reliably rule out mental retardation. This affidavit, which was submitted in support of an ex parte request for funding for a qualified mitigation specialist in a federal capital case, lists both the documentation and the interviews that should normally be conducted to ascertain the client's levels of functioning in the various adaptive skill areas to be assessed.

As Professor Luckasson's affidavit makes clear, reliable assessment of whether a client does or does not have mental retardation normally requires a specialist in the mental retardation field, or at a minimum a mental health professional with substantial background in mental retardation. At the same time, counsel should be mindful that mental retardation professionals who lack experience in criminal cases may not initially appreciate the extent of the legal system's skepticism toward claims of mental retardation, and thus the extent to which the defense must be prepared to "over-prove" the existence of the condition. For example, while the AAMR definition requires limitations in only 2 of 10 adaptive skill areas, the defense in a capital cases must exhaustively investigate the client's performance in all 10 areas, and must be prepared to explain any "islands of performance" in one or another area--e.g. artistic talent, ability to drive a truck or fix household appliances, or participation in a criminal conspiracy of some sort--which may strike lay people as inconsistent with preconceived stereotypes of mental retardation. In other words, both counsel and expert must approach the litigation of mental retardation issues in capital cases with an awareness that the legal system will demand a far higher level of certainty about the existence of the disability,

---

[1]The DSM-IV definition of mental retardation requires an IQ of "approximately 70 or below" on an individually administered IQ test, and many forensic examiners will refer to a "limit" of 70. This really means an IQ range of up to 75, since the standard error of measurement in IQ testing is plus or minus 5 points. The AAMR definition of mental retardation makes this point explicitly by specifying "approximately 70-75 or below" as the cut-off score for mental retardation. For this reason, mental retardation should never be ruled out solely on the basis of an IQ score of 71 or 74.

2

**JA 7203** 30971

and will likely tend to rely more heavily on stereotypical thinking, than do the educational, welfare or mental health care systems in which mental retardation professional are accustomed to working.

An example of such skepticism is provided by the enclosed report in *United States v. Arnold Mark Henry*. This report was the work of a government psychologist at Butner FCI who was given less than a day to determine whether the defendant had mental retardation, and who had little experience or background in the diagnosis of mental retardation. Professor Luckasson's critique of this report highlights some of the ways in which mental health professionals who lack a background in mental retardation can produce unreliable opinions when faced with relatively high-functioning criminal defendants.

## Procedure

The actual procedure to be used to implement the mental retardation protections in 21 U.S.C. § 848(l) and 18 U.S.C. § 3596(c)) has yet to be determined. Two early cases involving mental retardation produced no written opinions. In *United States v. Vernon Thomas* (E.D. VA CR No. 3-92-CR68), the government withdrew its death notice moments before a scheduled pretrial hearing on a mental retardation motion, one day prior to trial. In *United States v. Jean Claude Oscar, Frantz Oscar and Arnold Mark Henry* (E.D.VA CR No. 93 CR 131), *aff'd* 82 F.3d 419 (4th Cir. 1996) (unpub.), In *United States v. Jean Claude Oscar, Frantz Oscar and Arnold Mark Henry* (E.D.VA CR No. 93 CR 131), *aff'd* 82 F.3d 419 (4th Cir. 1996) (unpub.), the court simply listed mental retardation as a mitigating factor on behalf for one of the three defendants, apparently intending to issue a post-trial ruling on the presence or absence of mental retardation if the jury voted for death (it didn't). A jury instruction requested by the defense but not given in *Henry* would have made clear that no juror could vote for the death penalty without first determining that the defendant did not have mental retardation. To date, no special instructions appraising jury of the mental retardation bar in federal capital sentencing law have been given in such cases.

More recently, a district judge in the Northern District of West Virginia held in an unpublished order, reprinted here, that trial courts may **not** determine the existence *vel non* of mental retardation at a pre-trial hearing or in response to a pretrial motion. *United States v. Brown*, Cr. No. 1:98CR34 (NDWVa., Aug. 6, 1999) (Keeley, J.). According to *Brown*, the court may determine whether the statutory mental retardation bar prohibits the defendant's execution *only after the jury recommends the death penalty*. *Brown* is unpublished and also unavailable on Westlaw, but counsel should be prepared to respond to government arguments based upon it. Defense counsel in Brown pointed out that the FDPA also contains an 18-year-old age limitation, but that no one would seriously suggest that a court should refuse to entertain a pretrial showing that the defendant was under the age of 18 on the grounds that Congress intended age to operate as a post-conviction bar only.

A not-very promising first appellate construction of the statutory mental retardation bar is *United States v. Webster*, 162 F.3d 308 (5th Cir 1998). *Webster* upheld against plain-error

3

**JA 7204**  30972

challenge a trial judge's post-verdict finding that the defendant did not have mental retardation, after only 4 of 12 jurors indicated that they found the defendant had established as a mitigating factor that he "was or may by mentally retarded." Given the jury's failure to find even so ambiguous a mitigating factor (the "was-or-may-be" formulation had been submitted by the defense), the Fifth Circuit held that the trial judge's handling of the issue was not plain error. *Webster* does not, however, indicate what procedure *should* be followed in such cases.

In general, and notwithstanding *Brown,* it seems logical that defendants should be able to request pretrial MR determinations by the court, and presumably would be entitled, in the event of an adverse ruling by the judge, to a *de novo* jury determination of the question of mental retardation. Yet another plausible approach would be to allow the jury to make the initial determination of the existence *vel non* of mental retardation, subject to redetermination by the court if the verdict should be for death.[2]

Whatever procedure is employed, the statute is clearly intended to foreclose any possibility of procedural default, since it prohibits not the imposition of a death sentence, but the *carrying out* of such a sentence, on any person with mental retardation.

Any defense claim of mental retardation will normally trigger government requests for an evaluation by experts of the government's choosing. *See generally, United States v. Beckford,* 962 F.Supp. 748 (EDVa. 1997) (recognizing government right to rebuttal sentencing examinations, but establishing Fifth and Sixth Amendment safeguards). Since confirmation by the government's experts of the presence of mental retardation will normally terminate the government's pursuit of the death penalty, see, e.g., *United States v. Carlos Sanes,* Cr. # 96-0065 (D. U.S.V.I. 1997), it is important that the government experts be unbiased and knowledgeable in the field of mental retardation. Under some circumstances, sharing information and the defense evaluators' expertise with the prosecution experts can help ensure an accurate assessment of the client's mental retardation. Whether and to what extent the client's interest is best served by co-operation is a decision to be made on the circumstances of each case: the only safe generalization is that such co-operation should not be rejected out-of-hand. In that connection, defense counsel should consider whether there is any possibility of persuading the government, or, failing that, the court, to mandate the involvement of a bona fide expert in the mental retardation field, rather than relying on forensic examiners whose expertise lie in other areas.

x:\rcp materials\litigation guides\mr\dib mr memo.wpd

---

[2]A pretrial determination has the obvious advantage of simplifying all subsequent proceedings should the death penalty be ruled out. However, defense counsel should be certain that such a hearing is not held before the defense has had time to investigate fully the client's history and currently intellectual functioning.

4

JA 7205    30973

# MENTAL RETARDATION AND THE DEATH PENALTY: A GUIDE TO STATE LEGISLATIVE ISSUES

JAMES W. ELLIS·
REGENTS PROFESSOR OF LAW
UNIVERSITY OF NEW MEXICO SCHOOL OF LAW

The interest in State Legislatures in the topic of mental retardation and the death penalty has obviously heightened with the United States Supreme Court's decision in *Atkins v. Virginia*, 122 S.Ct. 2242 (June 20, 2002). The purpose of this document is to provide legislators and advocates with guidance in implementing the *Atkins* decision, so that each State's death penalty legislation is in full compliance with constitutional requirements.

In formulating these recommendations, principal attention is focused, of course, on the Supreme Court's *Atkins* decision itself. But there are three other major considerations worthy of careful consideration. First, it is worth considering the experience of States that have already worked with legislation in this area. Several of the States have had statutes in effect for more than a decade, and their experience merits attention, particularly on questions that affect ease of implementation in the criminal justice system. Second, developments in the field of mental retardation, particularly on questions of definition and clinical evaluation have been canvassed and incorporated. Finally, attention has been paid to other decisions by the Supreme Court that have been issued since the earlier State statutes were enacted, most prominently, *Cooper v. Oklahoma*, 517 U.S. 348 (1996), and *Ring v. Arizona*, 122 S.Ct. 2428 (June 24, 2002), on

1

GOVERNMENT
EXHIBIT
239

JA 7206    30975

the issues of burdens of persuasion and the role of juries. These decisions create constitutional concerns in this area, even in some of the States that already had statutes enacted prior to *Atkins*.

Some of these constitutional questions have answers that are quite clear. Others are issues for which the ultimate judicial resolution is more doubtful. This Legislative Guide attempts to analyze these different issues, and where there is room for doubt, to offer alternative legislative approaches. It is anticipated that legislators will want to address these questions both from the perspective of fidelity to constitutional principles and also from concern to avoid unnecessarily imperiling judgments in subsequent litigation where issues can be anticipated and resolved in advance.

JA 7207  30976

# I. BACKGROUND: THE SUPREME COURT'S DECISION IN *ATKINS*

In *Atkins v. Virginia*, 122 S.Ct. 2242 (June 20, 2002), the Supreme Court held that the execution of any individual with mental retardation violated the Eighth Amendment's prohibition on cruel and unusual punishment.

But the Court had begun its consideration of mental retardation and the death penalty thirteen years earlier, in *Penry v. Lynaugh*.[1] In that case, a majority of the Justices held that although there was evidence (particularly in the form of public opinion surveys and resolutions by professional organizations) of a national consensus against executing anyone with mental retardation, the form of that evidence was an inadequate basis for a constitutional prohibition. "The public sentiment expressed in these and other polls and resolutions may ultimately find expression in legislation, which is an objective indicator of contemporary values upon which we can rely. But at present, there is insufficient evidence of a national consensus against executing mentally retarded people convicted of capital offenses for us to conclude that it is categorically prohibited by the Eighth Amendment."[2]

At the time that *Penry* was before the Court, two States and the Congress had enacted laws prohibiting the execution of people with mental retardation. In the next dozen years, sixteen more States enacted such statutes. Following those enactments, the Court agreed to reconsider the issue in the *Atkins* case.[3]

The Court in *Atkins* began by noting that the Eighth Amendment prohibits "excessive" punishments as well as those that are cruel and unusual.[4] It also observed that the issue of whether a punishment was excessive could be illuminated by the way in which State legislatures had addressed it. But the ultimate judgment of assessing

---

[1] 492 U.S. 302 (1989).

[2] 492 U.S. at 335. Four of the Justices in *Penry* believed there was an adequate basis for invalidating the practice because of the reduced culpability of people with mental retardation. 492 U.S. at 341 (Justices Brennan and Marshall); 492 U.S. at 349 (Justices Stevens and Blackmun).

[3] The Court initially agreed to hear the issue in the case of *McCarver v. North Carolina*, No.00-8727. When that case was rendered moot, the Court accepted the *Atkins* case. See note __, *infra*.

[4] 122 S.Ct. at 2246.

JA 7208    30977

a punishment, as well as the nation's attitudes toward it, rests with the Court itself. "Thus, in cases involving a consensus, our own judgment is brought to bear by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators."[5]

The Court then surveyed the evidence from the State legislatures, including the number of enactments in the years since *Penry*, the margins by which the laws passed, legislative activity in States that had not yet completed action on the issue, and the report of the Governor of Illinois' recent commission on the death penalty.[6]

The *Atkins* opinion turned next to the public policy justifications offered in support of capital punishment, and the extent to which they applied to individuals with mental retardation. The Court concluded that the execution of persons with mental retardation would not "measurably contribute[]" to either deterrence or retribution in the criminal justice system.[7] Although the principal focus in the Court's opinion (as in the State legislatures) was on the culpability of defendants who had mental retardation, the Court also noted concerns about both factual innocence and the appropriateness of the death penalty. "Mentally retarded defendants in the aggregate face a special risk of wrongful execution."[8]

The opinion of the Court concluded that: "Our independent evaluation of the issue reveals no reason to disagree with the judgment of the legislatures that have recently addressed the matter and concluded that death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our evolving standards of decency, we therefore conclude that such punishment is

---

[5] 122 S.Ct. at 2247-48 (internal citation omitted).

[6] *Report of the Governor's Commission on Capital Punishment* (April, 2002). In a footnote, the Court also took note of other indicators of public opinion that appeared to confirm the consensus found in State legislation, including positions taken by professional organizations, religious bodies, international organizations, and surveys of public opinion. "Although these factors are by no means dispositive, their consistency with the legislative evidence lends further support to our conclusion that there is a consensus among those who have addressed the issue." 122 S.Ct. at 1249-50 n.21.

[7] 122 S.Ct. at 2251.

[8] 122 S.Ct. at 2252.

JA 7209    30978

excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender."[9]

## II. SUBSTANTIVE PROTECTION FOR DEFENDANTS WITH MENTAL RETARDATION

The inapplicability of the death penalty to people with mental retardation was resolved by the Supreme Court's holding in *Atkins* that the Eighth Amendment prohibits the execution of any such individual. Nevertheless, the issue should be addressed by State legislation.

One reason for a declaration that such executions violate State law is to make clear that such an execution is unacceptable regardless of the circumstances of timing. Several of the States that had enacted statutes prior to *Atkins* included a provision that the law would only apply to prosecutions subsequent to the law's effective date.[10] Other State laws were silent on the subject.[11] North Carolina's statute explicitly applied to both prospective cases and those that might be challenged by individuals already under a death sentence, and provided separate procedures for the retrospective cases.[12]

North Carolina's approach of addressing both prospective and retrospective cases has much to commend it. It will avoid (or at least reduce) extensive litigation about the procedures to be employed in both classes of cases.

In addition to whatever procedures the State chooses to adopt for both retrospective and prospective cases, the Legislature can assure clarity by including a simple provision that prohibits the execution of *any* individual with mental retardation. Language similar to that of the Federal

---

[9] 122 S.Ct. at 2252 (internal quotations omitted). Three members of the Court – Chief Justice Rehnquist and Justices Scalia and Thomas – dissented from the Court's opinion. The Chief Justice's dissent objected to the majority's methodology in ascertaining a national consensus, and was particularly critical of the footnote in the Court's opinion that discussed professional organizations, public opinion surveys, and the views of other nations. 122 S.Ct. at 2252-59. Justice Scalia's dissent was similarly critical of the majority's methodology, which he found to be inconsistent with the Court's precedents. 122 S.Ct. at 2259-68.

[10] [e.g. – perhaps Tennessee]

[11] [e.g. – perhaps New Mexico]

[12] [cite to NC statute]

5

JA 7210    30979

statute[13] will accomplish this substantive protection.  (Later sections of this Guide will address the procedural issues.)

All States that have capital punishment should pass legislation that protects people with mental retardation from the death penalty.

> **RECOMMENDED STATUTORY LANGUAGE:**
>
> **No person with mental retardation shall be sentenced to death or executed.**

## III. DEFINITION OF MENTAL RETARDATION

There is a broad consensus within the field of mental retardation as to the scope of the definition, and that consensus is reflected in the legislation in States passed prior to the *Atkins* decision, and in the Court's opinion itself.  Nevertheless, there are minor variations in wording that legislators will want to consider.

The Scope of the Constitutional Protection.  The Court's decision in *Atkins* makes clear that its holding extends to all defendants who "fall within the range of mentally retarded offenders about whom there is a national consensus." 122 S.Ct. at 2250. *See also id.* at 2250 n. 22.  This means that while States are free to adopt variations in the wording of the definition, *they cannot adopt a definition that encompasses a smaller group of defendants*, nor may they fail to protect any individuals who have mental retardation under the definition embodied in the national consensus.

The Definitions of Professional Organizations. The American Association on Mental Retardation (AAMR) is the principal professional organization in the field, and has propounded (and refined) the definition of mental retardation for many decades.  There are three versions of the AAMR definition worthy of consideration in legislating on this topic.

---

[13] [cite, and also perhaps a State statute that uses similar language]

JA 7211    30980

The common elements of the AAMR definitions address the three components of the concept of mental retardation: (1) substantial intellectual impairment; (2) impact of that impairment on everyday life of the individual; and (3) appearance of the disability at birth or during the person's childhood. Unless an individual meets all three requirements, he does not fall within the definition of mental retardation. The variations found in the three formulations of the AAMR definition differ only in the wording of how they describe the second component, i.e. the impact on the individual's life. But it is important to emphasize that the various formulations *describe the same group of individuals*, and therefore do not differ in scope in any significant way.

*The 1983 AAMR definition.* The definition propounded by AAMR (then identified as the American Association on Mental Deficiency) in 1983 forms the basis of the definitions adopted by most of the State legislatures that acted on this topic between the *Penry* decision in 1989 and the *Atkins* decision in 2002:

> Mental retardation refers to significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.[14]

*The 1992 AAMR definition.* AAMR's reformulation of the definition in 1992 was built on the same clinical and conceptual framework, but refined the component of adaptive behavior. The 1992 definition is the one cited by the Supreme Court in *Atkins*,[15] and was adopted by a few State legislatures in the 1990s. It provides:

> Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.[16]

---

[14] American Association on Mental Deficiency, *Classification in Mental Retardation* 11 (Herbert J. Grossman ed., 8th ed. 1983) (hereafter "*AAMD, Classification (1983)*").

[15] 122 S.Ct. at 2245 n.3.

[16] American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (Ruth Luckasson, ed., 9th ed. 1992) (hereafter AAMR, *Mental Retardation (1992)*. The American Psychiatric Association's formulation follows the 1992 AAMR version closely:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning

JA 7212 30981

*The 2002 AAMR definition.* The AAMR further refined the definition in 2002. The change from the 1992 version was, once again, modest, and again focused primarily on refining the description of the adaptive skills component:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.[17]

Again, it is important to emphasize that these definitions encompass essentially the same group of people. The choice for legislators in selecting one of the definitions therefore involves setting the terms under which clinicians will conduct evaluations of defendants, counsel for the defense and the prosecution will discuss and negotiate prospective cases, and when the cases are not resolved by pleas, the courts will resolve questions concerning a defendant's eligibility for the death penalty.

The clinical components of mental retardation. It may prove helpful to discuss briefly the three components common to all the clinical definitions.

*Limited intellectual functioning* is the pivotal component of any individual's diagnosis. The definition requires that an individual have an impairment in general intellectual functioning that places him in the lowest category of the general population. As measured by standard psychometric instruments, IQ tests, that means the individual's measured intelligence is two standard deviations below the statistical

---

(Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. Text Revision, 2000) (hereafter "APA, *DSM-IV-TR* ").

[17] American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (Ruth Luckasson ed., 10th ed. 2002) (hereafter "AAMR, *Mental Retardation (2002)* "). In addition to providing the current definition of mental retardation and explaining related concepts and terminology, the 2002 edition of this manual provides valuable background on such topics as the history of classification, clinical assessment of people with mental retardation, and an extensive bibliography of references to the clinical literature. AAMR's website is www.aamr.org.

8

**JA 7213** 30982

mean. That, in turn, indicates that he or she scores in approximately the bottom 2½ percent of the population.

The identification of the upper boundary of mental retardation cannot be stated with complete precision in terms of IQ scores. Generally, it will encompass everyone with a score of 70 or below, and additionally some individuals with scores in the low 70s (and even mid-70s), depending on the nature of the testing information.[18] As much as the criminal justice system might prefer to have a hard-and-fast limitation measurable by a single IQ score, it simply is not possible to exclude any consideration of other factors about the testing performed on the individual, nor is it possible to ignore the need for clinical judgment by experienced diagnosticians.[19]

Therefore the definition of mental retardation in a death penalty statute will produce unintended difficulties of administration if it specifies a particular IQ score. The absence of such a score has not produced difficulties in the States whose statutory definitions are more general, *i.e.* adoption of the text of a version of the AAMR definition.

*Adaptive behavior* is the component of the definition that requires that the intellectual impairment have produced real-world disabling effects on the individual's

---

[18] The necessity of considering differences among IQ tests, the importance of clinical judgment in assessing general intellectual functioning, and the inappropriateness and imprecision of arbitrarily assigning a single IQ score as the boundary of mental retardation has been long recognized. *See, e.g.* AAMR, *Mental Retardation (2002)* at 57-59 and sources cited therein; AAMR, *Mental Retardation (1992)* at 14 ("Mental retardation is characterized by significantly subaverage intellectual capabilities or 'low intelligence.' If the IQ score is valid, this will generally result in a score of approximately 70 to 75 or below. This upper boundary of IQs for use in classification of mental retardation is flexible to reflect the statistical variance inherent in all intelligence tests and the need for clinical judgment by a qualified psychological examiner."); AAMD, *Classification (1983)* 11 ("This upper limit is intended as a guideline; it could be extended upward through IQ 75 or more, depending on the reliability of the intelligence test used. This particularly applies in schools and similar settings if behavior is impaired and clinically determined to be due to deficits in reasoning and judgment."); APA, *DSM-IV-TR* at 41-42 ("Thus it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior."). *See generally,* American Psychological Association, *Manual of Diagnosis and Professional Practice in Mental Retardation* (John W. Jacobson & James A. Mulick eds. 1996); National Research Council, *Mental Retardation: Determining Eligibility for Social Security Benefits* 5 (National Academy Press 2002).

[19] This fact is reflected in the *Atkins* decision, where the Court noted that "an IQ between 70 and 75" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." 122 S.Ct. at 2245 n.5.

JA 7214   30983

life. The purpose of this element is to assure that the individual is not merely a poor test-taker, but rather, is a truly disabled individual.[20]

Most of the existing State legislation on this topic used a definition borrowed from the 1983 AAMR definition, and thus describes, in general terms, "concurrent deficits in adaptive behavior."[21] A few if the more recent State enactments have chosen as their model the 1992 AAMR definition, which described this element in terms of "related limitations in adaptive skill areas" and then provided a list of such areas, with the requirement that the individual face limitations in two of the listed areas.[22] The purpose of conceptualizing the behavioral prong of the definition around "limitations in adaptive skill areas" was to focus the attention of diagnosticians more directly on an individual's need for services and supports,[23] which is of great importance to clinicians working in the service delivery system, but obviously is less significant for evaluations performed for criminal cases potentially involving capital punishment.

The formulation in the 2002 AAMR definition appears to be somewhat better suited for forensic evaluations in death penalty cases. That version's requirement that the individual manifest "a disability characterized by significant limitations both in intellectual functioning *and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills*"[24] addresses the principal concerns of the criminal justice system. It requires that the intellectual impairment be manifested in real-world disability in the individual's life, but at the same time focuses on broad categories of adaptive impairment, instead of the somewhat arbitrary skill areas of the 1992 version.[25] As a result, the 2002 version is recommended to legislators.[26]

---

[20] In conjunction with the age-of-onset requirement, it also provides a check against any possibility of malingered claims of mental retardation. *See* discussion *infra*.

[21] *See, e.g.,* [a state statute or two].

[22] *See, e.g.,* [Missouri statute and perhaps Connecticut and North Carolina?].

[23] AAMR, *Mental Retardation (1992)* at 15-16.

[24] *See* note [4] *supra* and accompanying text.

[25] One other important consideration about adaptive behavior merits careful attention, even though it affects implementation rather than the actual drafting of legislation. The focus in evaluations (and ultimately adjudications) under the adaptive prong must remain focused on the individual's *limitations* rather than any skills he or she may also possess. AAMR and other clinical experts emphasize that the presence of skills cannot preclude the appropriate diagnosis of mental retardation. In the most recent edition, the definition of mental retardation is prominently accompanied by the admonition that "Within an individual, limitations *often* coexist with strengths." AAMR, *Mental Retardation (2002)* at 1 (emphasis supplied). *Accord*, AAMR, *Mental Retardation (1992)* at 1

10

JA 7215    30984

*Age of onset* is the requirement in many definitions of mental retardation that the disability have manifested during developmental period. In most States that has been identified as age 18.[27] The purpose of this third prong of the definition is to distinguish mental retardation from those forms of brain damage that may occur later in life. (Such later-developing mental impairment could result from causes such as traumatic head injury, dementia caused by disease,[28] or similar conditions.) This distinction is considerably more relevant to clinicians designing habilitation plans and systems of supports for an individual than it is to the criminal justice system, since later-occurring disabilities (assuming that the disability developed during adulthood but prior to the commission of the offense) would involve comparable reduction in culpability for any criminal act.[29]

---

("Specific adaptive limitations often coexist with strengths in other adaptive skills or other personal capabilities."). The skills possessed by individuals with mental retardation vary considerably, and the fact that an individual possesses one or more that might be thought by some laypersons as inconsistent with the diagnosis (such as holding a menial job, or using public transportation) cannot be taken as disqualifying. The sole purpose of the adaptive prong of the definition for the criminal justice system is to ascertain that the measured intellectual impairment has had real-life consequences, and thus it is the presence of confirming deficits that must be the diagnostician's focus.

[26] This is not to suggest that States that have already legislated on this topic are required to alter their statutory definition. But where a State is considering new legislation, or is considering amendments on other components such as procedures, legislators might wish to consider adopting the 2002 AAMR definition. Another reason to consider the 2002 version is that it will be the definition with which clinical evaluators, in future cases, will be most familiar. This increasing familiarity and consistency with evaluations performed in other contexts should facilitate evaluations in capital cases as well.

[27] It is not required that an individual have been *tested* with scores indicating mental retardation during the developmental period. Rather there must have been *manifestations* of mental disability, which will more frequently have taken the form of problems in the area of adaptive behavior at an early age. *See* APA, *DSM-IV-TR* at 42 ("Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation.").

[28] *See, e.g.,* APA, *DSM-IV-TR* at 163 (Dementia Due to HIV Disease).

[29] In fact, if there were a capital prosecution of an individual who met the definition of mental retardation *except for the age of onset*, principles of equality likely would require comparable exemption from capital punishment. State Legislatures concerned about the possibility of such cases could easily omit the age of onset requirement from their definition of mental retardation. But even where the statute contains an age of onset provision, other bodies would be well advised to consider arguments regarding comparative culpability. In some States, this could be addressed appropriately by the trial judge in ruling on an individual's eligibility for the death penalty. In other States, it might be addressed on appeal to the State's appellate court, either in performing statutorily mandated review under proportionality provisions, *see, e.g.,* N.J. Stat. Ann. sec. 2C: 11-3e (1995), or in interpreting the State Constitution's provisions regarding equal protection or excessive punishments. *See generally Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001). (State Constitution's punishment provision prohibited execution of a defendant with mental disability comparable to that of defendants protected by prospective-only mental retardation statute). If none of these bodies has ordered relief from a death sentence, it would be an appropriate function of the Governor or other relevant clemency-granting authority to commute the sentence of such an individual to a punishment other than death.

JA 7216  30985

The final consideration regarding age of onset is that although the third prong serves no independent purpose regarding a defendant's culpability, it may offer some reassurance against any concern that some defendants may feign mental retardation once charged with a capital offense. The issue of malingering, which has received considerable attention in the clinical literature regarding mental *illness*,[30] has not proven to be a practical problem in the assessment of individuals who may have mental *retardation*. But any concerns that an individual could somehow manage to feign cognitive impairment, undetected by clinical evaluators, should be dispelled by the fact that such deception would have had to begin during the individual's childhood. There are no reports in the clinical literature indicating that this is a practical problem in the assessment of individuals who are thought to have mental retardation.

<u>Taking all these considerations into account, it is recommended that States consider adopting the 2002 AAMR definition of mental retardation.</u>

> **RECOMMENDED STATUTORY LANGUAGE:**
>
> **For purposes of this Statute, "Mental Retardation" is defined as a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. Mental Retardation originates before age 18.**

## IV. CLINICAL EVALUATIONS

Although no specific statutory language is recommended here, the quality of clinical evaluations of a defendant's intellectual functioning will obviously be crucial to the successful implementation of *Atkins*. Although these issues do not appear to require legislative enactment at this time, there are a couple of issues that legislators and other policy planners should keep in mind.

The first is that *Atkins* implementation will clearly involve compliance with Supreme Court caselaw concerning the role of defense counsel and access to the assistance of clinical experts. The lead case on this subject is *Ake v. Oklahoma*, 470 U.S. 68 (1985). In that case, the Court held that, in order to assure "meaningful

---

[30] *See, e.g.,* Richard Rogers & Daniel W. Shuman, *Conducting Insanity Evaluations* 90-120 (2d ed. 2000).

JA 7217    30986

access to justice,"[31] an indigent capital defendant whose mental condition was at issue was entitled to the assistance of "a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."[32]

In the context of *Atkins* implementation, the need for professional clinical assistance to defense counsel is even clearer. But unlike *Ake*, which involved the insanity defense, the clinical assistance required will not always (or even very frequently) be from a psychiatrist. Although some psychiatrists have experience in assessing people with mental retardation, most do not.[33] The need of defense counsel, in the first instance, and ultimately the need of the court, is for an experienced and trained clinician whose expertise is the field of mental retardation. The evaluator (or in some cases, evaluation team) must not only be skilled in the administration and interpretation of psychometric (IQ) tests,[34] but also in the assessment of adaptive behavior and the impact of intellectual impairment in the individual's life.[35] A competent professional assessment will involve more than just the ascertainment of an IQ score.[36] It also requires the exercise of experienced clinical judgment in the field of mental retardation.[37] It is only with the assistance of skilled mental disability

---

[31] 470 U.S. at 77.

[32] 470 U.S. at 83.

[33] *See, e.g.,* James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 George Wash. L. Rev. 414, 487 (1985) ("[M]ental retardation differs sufficiently from other forms of mental disability that training in mental illness cannot, without more, qualify a physician to provide useful information about a mentally retarded person. Similarly, typical medical school training and the attainment of the academic degree of M.D. cannot, without more, qualify a physician to give expert testimony about mental retardation.")

[34] *See generally* AAMR, *Mental Retardation (2002)* at 51-71; American Psychological Association, *Manual of Diagnosis and Professional Practice in Mental Retardation* 113-126 (John W. Jacobson & James A. Mulick eds. 1996); John J. McGee & Frank Menolascino, *The Evaluation of Defendants with Mental Retardation in the Criminal Justice System* in *The Criminal Justice System and Mental Retardation: Defendants and Victims* 55, 65-68 (Ronald W. Conley, Ruth Luckasson & George N. Bouthilet eds. 1992).

[35] *See generally* AAMR, *Mental Retardation (2002)* at 73-91.

[36] "Courts should not operate under the illusion that the simple administration of any test will resolve all questions regarding a retarded person's status in a criminal case. Systematic assessment requires the thoughtful selection and administration of valid examination instruments together with careful observation, interviewing, and analysis of all the data by a professional with proper training and experience." Ellis & Luckasson, *supra* note __ at 487-88.

[37] *See generally* AAMR, *Mental Retardation (2002)* at 93-96.

JA 7218    30987

professionals that the protections of *Atkins* can be realized and the goals of the criminal justice system achieved in these cases.[38]

A final note on the clinical evaluation of these cases may be in order. Determination of which defendants have mental retardation cannot be accomplished by casual examination or impressionistic observations.[39] In *Ake*, the Court observed that the assistance of mental health clinicians is essential in insanity defense cases in order to identify and properly interpret the "elusive and often deceptive" symptoms of mental illness.[40] While the Supreme Court has noted, in another context, some of the differences between mental illness and mental retardation,[41] careful professional evaluations of mental retardation are no less crucial. Although the courts are generally careful about the evaluation of expert testimony,[42] particular care must obviously be taken in cases where a constitutional right is involved, and where the stakes are literally life and death.

## V. ADJUDICATION OF NEW CASES

With the possible exception of defining mental retardation, the procedure for the adjudication of new cases has received the greatest attention among State

---

[38] But while the provision of expert assistance to the defense will be essential to any successful implementation of *Atkins*, any fears that the States will face years of protracted "battles of the experts" of the sort associated with the insanity defense are likely to be unfounded. The experience in most States that have had statutory protections for people with mental retardation is that after a year or two, prosecutors, defense counsel, and judges become familiar with mental retardation and professionally competent mental retardation evaluations. And once that familiarization takes place, the number of contested cases is substantially lower than had been anticipated. It is the experience in several of these States that following exploration of defendants' mental impairments, many cases are resolved by pleas.

[39] Courts need to be particularly skeptical of evaluators who purport to be able to perform a clinical diagnosis regarding mental retardation based on isolated factors and abilities. Similarly, the defendant's own account of his skills and abilities is particularly suspect. *See* Caroline Everington & Denis W. Keyes, *Mental Retardation*, 8 *The Forensic Examiner* 31, 34 (1999) ("Although interviewing the person with mental retardation can provide some information on present and past abilities, such information should always be corroborated with external sources as reliability is questionable….Frequently people with mental retardation do not have accurate estimations of their abilities and often provide distorted versions of past accomplishments.").

[40] 470 U.S. at 80, quoting *Solesbee v. Balkcom*, 339 U.S. 9, 12 (1950).

[41] *See Heller v. Doe*, 509 U.S. 312, 322 (1993).

[42] *See generally Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

14

JA 7219    30988

legislators. Designing appropriate procedures for new cases must begin with a careful protection of the constitutional rights of defendants. Within that context, there are policy considerations that will affect the fair treatment of defendant's claims, the efficient operation of the criminal justice system, and judicial economy.

When the mental retardation issue should be addressed. Most of the States that have enacted legislation have chosen to have the issue addressed, in the first instance, in pretrial proceedings. This makes sense for a number of reasons. Most importantly, if the defendant has mental retardation, and therefore is ineligible for the death penalty, pretrial resolution of the issue saves the State the cost of an unnecessary capital trial.[43] (It is universally recognized that capital trials are vastly more expensive to conduct than noncapital trials.)[44]

States already have established rules and timetables for the resolution of pretrial issues in capital cases. The issue of a defendant's mental retardation can be accommodated into that schedule. The statute may require defendant to give notice to the court and to the prosecution of the intention to raise the issue of mental retardation as a bar to capital punishment. The time limits on the filing of such a notice will require some attention, and is a subject on which legislators may appropriately wish to consult both prosecutors and defense counsel in their State as to the practical considerations involved. Two general concerns may influence the setting of this deadline. The deadline should be sufficiently in advance of the date for the hearing on the issue to permit both sides, and particularly the prosecution, to investigate the claim. But the deadline must be late enough in the pretrial period to permit the defense to investigate and determine whether the client may actually have mental retardation. Requiring the defense to submit notification at a premature date may, paradoxically, produce a greater number of claims by defense lawyers who have not yet had a full opportunity to investigate the possibility, but who feel the need to

---

[43] Other reasons to handle the mental retardation issue prior to trial (where that is possible) include avoiding the constitutional problems that would arise from the trial of a defendant who is ineligible for the death penalty by a jury that has been death-qualified. *See generally Witherspoon v. Illinois*, 391 U.S. 510 (1968). (To grasp the constitutional implications, imagine a State law that did not give a capital defendant a pretrial opportunity to demonstrate that his age was below the constitutional minimum of 16 years. Affording such a defendant only a post-trial determination that he was death-eligible would surely be unconstitutional.)

[44] In addition, it is the experience of States that have had mental retardation statutes for several years that when the issue of mental retardation has been resolved prior to trial, a considerable number of cases can be resolved by pleas.

JA 7220    30989

preserve the option of filing such a notice if the investigation bears out the fact of the client's mental disability.[45]

Who should decide the issue in pretrial proceedings. Most of the States that have legislated on this topic have chosen to have the pretrial determination of the defense's claim concerning mental retardation made by a judge, rather than a jury. Having this issue addressed in a bench hearing has worked well in several States that have adopted this approach. Presenting the arguments on this issue to a judge is likely to result in a hearing that is less elaborate and less costly than doing so before a jury.[46]

Consequence of the judge's ruling on the mental retardation issue. *If the judge finds that the defendant has mental retardation,* the case should be denominated as noncapital, and in a subsequent trial, the defendant should be eligible for whatever penalty has been designated by the Legislature for the offense with which he is charged, except for the penalty of death.

*If the judge finds that the defendant does not have mental retardation,* the case may proceed as a capital trial. But almost every State that has chosen the pretrial model has enacted a provision that makes clear that a ruling on the mental retardation issue that is adverse to the defense cannot be communicated to the jury in the subsequent trial.[47] This is crucial, to avoid contaminating and undercutting issues properly before the trial jury, including the question of mitigation if the case proceeds to a penalty phase.

Burden of producing evidence. Clearly, the burden of raising the issue of mental retardation and initially bringing forth some evidence supportive of the

---

[45] This last concern is particularly important because of the fact that many individuals who have mental retardation persist in hiding their disability even from their defense counsel. *See* James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants,* 53 George Wash. L. Rev.414, 430-31 (1985). Thus, their mental retardation may not be apparent in the early stages of the preparation of the defense, and may only emerge as the individual's background is investigated.

[46] The efficiencies of a pretrial bench hearing are even clearer when the alternatives for the pretrial determination by a jury are considered. Serious constitutional concerns would arise if the same jury that will hear the actual trial was involved in resolving this pretrial question, and the assembling of a separate jury would involve substantial costs.

[47] E.g. _____.

contention can and should be placed on the defendant.[48] If the defense fails to raise the issue, the prosecution should not be required to demonstrate that a defendant did *not* have mental retardation.

Burden of persuasion. This is among the most intricate and perplexing constitutional issues involved in this legislation.

All eighteen States that had enacted legislation prior to *Atkins* had placed the burden of persuasion on the defense. Most of the States merely required the defense to demonstrate mental retardation by a "preponderance of the evidence,"[49] but a few placed the burden at "clear and convincing evidence,"[50] and one State required the defense to demonstrate mental retardation "beyond a reasonable doubt."[51]

But those statutes were enacted before the *Atkins* decision, which has changed the constitutional calculus on the issue. Although the States have considerable latitude in allocating the burden of persuasion on affirmative defenses that are discretionary options governed only by State law,[52] the issue is different if the claimed right is derived from the Constitution itself. In *Cooper v. Oklahoma*,[53] a unanimous Supreme Court held that it violated Due Process for a State to assign the burden of persuasion to the defendant on the issue of competence to stand trial at a level of "clear and convincing evidence."

---

[48] Among the factors that make it appropriate to assign a burden of producing evidence to the defense are: "whether the pertinent facts were peculiarly within the knowledge of the defendant, whether certain evidence was more readily accessible to one side than to the other, [and] whether in respect of an issue the proof of a negative was required." Barbara E. Bergman & Nancy Hollander, 1 *Wharton's Criminal Evidence* 22-23 (15th ed. 1997).

[49] E.g. NMStat Ann ____.

[50] E.g. Colorado ____.

[51] Ga ____. Georgia's statute, which was the first to be enacted by any State, grafts the protection for people with mental retardation onto its existing statute providing a verdict form of "guilty but mentally ill." See generally McGraw, Farthing-Capowich & Keilitz, *The "Guilty But Mentally Ill" Plea and Verdict: Current State of the Knowledge*, 30 Vill. L. Rev. 117 (1985). It is noteworthy that when the Georgia Supreme Court found that the execution of any person with mental retardation violated the Georgia Constitution, it assigned the burden to defendants in postconviction cases at the level of preponderance of the evidence. *Fleming v. Zant.*

[52] See *Patterson v. New York*, 432 U.S. 197 (1977).

[53] 517 U.S. 438 (1996).

17

JA 7222     30991

After *Atkins*, it is now clear that defendants with mental retardation have *constitutional* protection from being sentenced to death. The States' ability to restrict that Eighth Amendment right by placing a heavy burden of persuasion on the defendant is therefore constitutionally suspect. The reasoning of *Cooper* seems fully applicable here. Neither contemporary nor historical practices offer sufficient precedent for requiring a defendant to demonstrate his mental retardation at an elevated level of proof. Policy considerations point to the same conclusion. The mentally retarded individual's interest in being punished at a level less than death obviously is at the highest level. The State's interest in the fair implementation of its capital punishment law is considerable, but does not require the allocation of such a heavy evidentiary burden on the defendant.[54] As the Court noted in *Cooper*, "A heightened standard does not decrease the risk of error, but simply reallocates that risk between the parties."[55]

After *Atkins* and *Cooper*, it is clearly unconstitutional to assign to the defense the burden of persuasion at an elevated (*i.e.* "clear and convincing evidence" or "beyond a reasonable doubt) level.

States whose laws currently impose such a heightened burden on the defendant should amend their statutes to avoid unnecessary litigation over this constitutional infirmity.

Whether the burden of persuasion can be assigned to the defense at all, even at a "preponderance" level, is a considerably thornier issue. As noted earlier, all the States that acted before *Atkins* placed the burden with the defendant. But because of decisions in the Supreme Court's most recent term, there is some doubt as to whether that allocation is constitutional.

---

[54] The Court in *Cooper* rejected Oklahoma's argument that it needed to assign the elevated burden to the defendant out of concern for potential malingering of mental illness to avoid being tried. As noted in the earlier section on the definition of mental retardation, any concerns about malingering are substantially lower than is the case regarding mental illness. See note *supra*. And of course, if a defendant were somehow able to successfully feign mental illness (a success that has no precedents in the clinical literature), he would not avoid punishment altogether, as in *Cooper*, since the State would still have the ability to punish him non-capitally at the highest level provided by State law.

[55] 116 SCt at 1383 (get US).

JA 7223    30992

The doubt arises at the intersection of *Atkins* and the Court's most recent decision regarding the right to a jury trial. In *Ring v. Arizona*,[56] the Court held that States are required to afford capital defendants the right to have all factual questions that might influence the imposition of the death penalty resolved by a jury. Arizona law had provided that judges made the determination regarding the aggravating factors that could lead to a death sentence. "Because Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury."[57] And where something has been deemed to be an element or its equivalent, the prosecution must carry the burden of persuasion "beyond a reasonable doubt."[58]

It is not absolutely clear whether the post-*Atkins* question of whether a defendant has mental retardation is the "functional equivalent" of an element of the crime,[59] but it certainly bears most of the attributes described in *Ring*.[60] If the issue proves to be a *Ring*-equivalent, then both the Sixth Amendment's right to a jury determination of the issue *and* the State's obligation to carry the burden of persuasion "beyond a reasonable doubt" must apply. States that choose to ignore this very real possibility do so at the peril of having their new statute declared unconstitutional, and risk the necessity of re-trying capital defendants convicted and sentenced under that statute.[61]

---

[56]  122 S.Ct. 2428 (June 24, 2002). *Ring* was decided four days after the *Atkins* decision.

[57]  122 S.Ct. at 2443 (internal quotation omitted).

[58]  122 S.Ct. at 2439.

[59]  See generally *Harris v. United States,* 122 S.Ct. 2406, 2410 (2002) ("Yet not all facts affecting the defendant's punishment are elements."). (The *Harris* case, which did not involve capital punishment, was decided on the same day as the *Ring* decision.)

[60]  "The relevant inquiry is one not of form, but of effect." 122 S.Ct. at 2440 (internal quotation omitted). "If a State makes an increase in a defendant's authorized punishment contingent on the finding of fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." *Id.* at 2439. The Court even appears to anticipate a legislative change that was occasioned by a Supreme Court decision. "If a legislature responded to one of these decisions by adding the element we held constitutionally required, surely the Sixth Amendment guarantee would apply to that element." *Id.* at 2242.

[61]  One court has already declared one of the pre-*Atkins* statutes unconstitutional as a violation of the Sixth Amendment under *Ring*. See *State v. Flores* N.M. District Court, 5th Judicial Dist, No. CR 99-00028, September 20, 2002.

19

States are thus confronted with the dilemma of wishing to resolve the question at a pretrial bench proceeding, for both economic and constitutional reasons,[62] and the need to afford defendants the Sixth Amendment rights described in *Ring*. Happily, it is possible for both interests can be protected, and therefore, the constitutionality of the statute to be insulated from challenge.

Two alternative approaches are offered. Each attempts to satisfy the requirements of *Ring* and still preserve the fairest possible evaluation of the defendant's mental disability. The first (Alternative A) begins with a pretrial bench hearing on death eligibility, with a subsequent opportunity for the defense to present the issue to a trial jury. The second (Alternative B) addresses the mental retardation issue in a special pretrial hearing before a separate jury from the one that will ultimately hear the trial.

Under <u>Alternative A</u>, the resolution of this dilemma involves a hybrid procedure, in which the principal determination is made before the judge in a pretrial proceeding, but with the defendant retaining the right, if the pretrial decision on the mental retardation issue is adverse, to present the issue to the trial jury.[63] This follows the model approved by the Supreme Court in a case involving the admissibility of confessions in *Jackson v. Denno*.[64] It also approximates the structure adopted in the recent mental retardation legislation adopted by the North Carolina legislature.[65]

Under this approach, the question of whether a defendant has mental retardation will be addressed, in the first instance, in a pretrial bench proceeding at which the defendant bears the burden of persuasion by a preponderance of the evidence. It is anticipated that most cases will be resolved at this stage. But if the

---

[62] See notes __, *supra*.

[63] It is essential that the judge's adverse ruling on the motion cannot be communicated to jurors, out of concern that it could unduly influence their decision regarding a special verdict under *Ring* or their consideration of the defendant's mental disability (even if it does not amount to mental retardation) at the penalty phase. Several of the States that have passed laws on this topic have specifically prevented conveying this information to the jury. [a couple of examples cited here]

[64] 378 U.S. 368 (1964). See also *Crane v. Kentucky*, 476 U.S. 683 (1986). Although there is no direct parallel between the subject matter of the *Jackson* confession issue and the *Atkins* question, the bifurcated process lends itself to the resolution of the mental retardation issue.

[65] The primary differences between the model suggested here and the North Carolina legislation relate to the weight of the burden of persuasion. The Legislature in North Carolina did not have the benefit of the subsequent decision in *Ring*.

20

case proceeds to a capital trial, and the defendant is convicted, the defense retains the opportunity to present the issue to the jury in the form of a special verdict prior to the commencement of the penalty phase. This jury consideration would be governed by the constitutional requirements of *Ring v. Arizona*.

This bifurcated approach to the issue may at first appear awkward to some legislators, and some prosecutors may initially be concerned that it offers the defendant "two bites at the apple." But as in *Jackson*, the bifurcation makes sense because its two prongs address two separate (although factually related) questions. The first, to be addressed by the judge, is the *legal* issue of whether the defendant is a person who is eligible for the death penalty. If the court does not find the defendant death-eligible because of mental retardation, it would be unconstitutional to proceed with a capital trial. The second inquiry, by the jury, is whether the prosecution has demonstrated that the defendant is *factually* an individual upon whom the death penalty may be imposed. Condemning a defendant to death who has properly raised the issue of mental retardation then becomes "contingent on the finding of a *fact*" that is a necessary precondition to a capital sentence.[66]

Under Alternative B, the trial is also bifurcated, but the pretrial determination of a defendant's death eligibility under *Atkins* is before a jury, with the prosecution bearing the burden of persuasion at the level of beyond a reasonable doubt. For a variety of reasons concerning the integrity of jury evaluation of all aspects of the case, it is essential that this pretrial jury be a separate body from the jury that will ultimately hear the case.[67] Under this alternative, a defendant who was unsuccessful on this issue before the pretrial jury would not have an opportunity to re-litigate the issue of death eligibility, but would be free to raise mental disability in the trial on any issue to which it might be relevant, and, if convicted, would be free to offer such evidence as mitigation.

Of the two models, Alternative A would appear to be the more economical approach because it involves the costs attendant to only one jury proceeding. But either alternative would address defendants' rights under both *Atkins* and *Ring*.

---

[66] *Ring*, 122 S.Ct. at 2439 (emphasis supplied).

[67] This Legislative Guide takes no position on whether the separate jury in the pretrial proceeding on mental retardation may be death-qualified at voir dire.

JA 7226   30995

It is recommended that States adopt one of the following alternative bifurcated systems for adjudicating a claim that a defendant may have mental retardation.

*NOTE: The drafting of procedures for the adjudication of mental retardation cases under either alternative will need to be addressed in the context of particular State's rules for conducting capital trials. The language suggested here can be readily adapted into the capital procedures already in the State's statutes or rules of criminal procedure.*

---

**RECOMMENDED STATUTORY LANGUAGE [ALTERNATIVE A]:**

If defense counsel has a good faith belief that the defendant in a capital case has mental retardation, counsel shall file a motion with the court, requesting that the defendant be held to be not death eligible because of mental retardation. The motion shall include a proffer of supporting evidence. Such a motion shall be filed within [time period] after the prosecution files notice of intent to seek the death penalty, unless the information in support of the motion came to counsel's attention at a later date.

Upon receipt of such a motion, the trial court shall conduct a hearing for the presentation of evidence regarding the defendant's possible mental retardation. Both the defense and the prosecution shall have the opportunity to present evidence, including expert testimony. After considering the evidence, the court shall find the defendant to be not death eligible if it finds, by a preponderance of the evidence, that the defendant has mental retardation. If the defendant is found to be not death eligible because of mental retardation, the trial may proceed as a non-capital trial, and, if convicted, the defendant may be sentenced to any penalty available under state law, other than death.

If the court finds that defendant is death eligible, the case may proceed as a capital trial. The finding that the defendant has not been found to have mental retardation by the court shall not be communicated to jurors.

If the capital trial results in a verdict of guilty to a capital charge, the parties shall be entitled to present evidence to the jury on the issue of whether the defendant has mental retardation. Having heard the evidence and arguments, the jury shall be asked to render a special verdict on the

---

22

JA 7227    30996

issue of mental retardation. If the jury finds, beyond a reasonable doubt, that the defendant did not have mental retardation, the case shall proceed to a penalty phase under [state statute regarding penalty phase of capital trials]. If the jury does not find that the defendant does not have mental retardation, defendant may be sentenced to any penalty available under state law, other than death.

## RECOMMENDED STATUTORY LANGUAGE [ALTERNATIVE B]:

If defense counsel has a good faith belief that the defendant in a capital case has mental retardation, counsel shall file a motion with the court, requesting that the defendant be held to be not death eligible because of mental retardation. The motion shall include a proffer of supporting evidence. Such a motion shall be filed at least [time period] prior to the date for trial, unless the information in support of the motion came to counsel's attention at a later date.

Upon receipt of such a motion, the trial court shall conduct a hearing for the presentation of evidence regarding the defendant's possible mental retardation. The hearing shall be conducted before a jury, which shall be specially empanelled for this issue only. Both the defense and the prosecution shall have the opportunity to present evidence, including expert testimony. After considering the evidence, the jury shall be asked, by special verdict whether the defendant has mental retardation. If the jury finds, beyond a reasonable doubt, that the defendant does not have mental retardation, the case may be certified for a capital trial. Such a trial shall be conducted before a separate jury. The ruling that the defendant has not been found to have mental retardation shall not be communicated to the trial jurors, and shall not preclude the defense from offering evidence of the defendant's mental disability in the guilt/innocence phase or the penalty phase of the trial.

If the defendant is found by the jury's special verdict to be not death eligible because of mental retardation, the trial may proceed as a non-capital trial, and, if convicted, the defendant may be sentenced to any penalty available under state law, other than death.

23

JA 7228     30997

## VI. ADJUDICATION OF POST-CONVICTION CASES

It is clear that the Eighth Amendment protection for individuals with mental retardation announced in *Atkins* applies both to prospective and retrospective cases.[68] Many of the considerations already discussed in the earlier sections concerning prospective cases apply equally to review of post-conviction cases. But States should consider enacting procedural provisions for cases involving individuals already under death sentences.

In the absence of State legislative action on this topic, courts receiving petitions for post-conviction relief based on the Supreme Court's *Atkins* decision will be required to establish rules of their own making for the submission and consideration of such petitions. Although any State legislation on this subject will, of course, be subject to scrutiny in both Federal and State courts as to any constitutional challenge to its procedures, the States have the first opportunity to attempt to create a fair and orderly process for consideration of such claims.

Several of the States that legislated on the mental retardation issue prior to *Atkins* were either silent on the issue of retrospective relief or provided that the statute's protection extended only to defendants in new cases. (In two States, the State Supreme Court held that individuals under death sentences that pre-dated the legislative enactment in their States were entitled to equivalent relief under the punishment provisions of the State Constitutions.[69]) Therefore, in a number of the States that have enacted prospective-only legislation prior to *Atkins*, there is reason to enact new legislation that provides procedures for retrospective cases.

---

[68] Although the *Atkins* decision itself does not address the question of retrospective relief, it is a subject on which the Court had already spoken. In *Penry v. Lynaugh,* 492 U.S. 302 (1989), the Court noted that although another decision, *Teague v. Lane,* 489 U.S. 288 (1989), had placed obstacles to the consideration of "new rules" of constitutional law in habeas corpus actions, "the rule Penry seeks is not a 'new rule' under Teague." 492 U.S. at 315.

[69] *Fleming v. Zant,* 386 S.E.2d 339 (Ga. 1989); *Van Tran v. State,* 66 S.W.3d 790 (Tenn. 2001).

JA 7229    30998

Although few of the early enactments addressed the issue of retrospective relief, the North Carolina Legislature did so in 2001.[70] The general outlines of the North Carolina provisions merit consideration by other States.

Availability of a State forum. The centerpiece of the North Carolina approach is provision of a forum in State courts for the resolution of retrospective claims by defendants who may be entitled to relief after *Atkins*. While States obviously cannot prevent review of claimants in Federal court to relief under habeas corpus, providing a remedy at the State level will permit the resolution of most cases under procedures designed to fit within the context of State law. This will provide for a more orderly consideration of both initial claims and appellate review. The ability to manage the consideration of these cases may be particularly important in States with a substantial number of inmates currently under sentence of death.

Time limits for filing petitions for relief. States have an obvious interest in an orderly consideration of claims under this legislation. Requiring inmates currently under a death sentence to file potential claims in a timely and predictable manner obviously assists in the administration of justice.

The determination of the time period within which claims must be filed is somewhat more complex. One consideration arguing for a relatively short time period is to allow the State's criminal justice system to discover the magnitude of the body of cases to be considered. A reasonable time limit also may be thought to prevent dilatory tactics by defendants already under sentence of death.

But, paradoxically, a filing deadline that is too short may frustrate these very goals. Although some cases may have produced trial or post-conviction investigations into the possibility of a defendant's intellectual impairment, other cases may not have been explored thoroughly by counsel prior to *Atkins*. Requiring the filing of petitions on an excessively short deadline may lead some counsel whose clients' cases have not been carefully explored to file within the time limit even though there is incomplete evidence that the defendant may have had mental retardation. (One might speculate that a State that enacted a very short deadline

---

[70] 2001 N.C. Sess. Laws 346. It was the enactment of this statute, and in particular its provisions regarding retrospective relief, that raised the issue of potential mootness in the then-pending Supreme Court case of *McCarver v. North Carolina*, No. 00-8727. The Attorney General of North Carolina then requested that the Court dismiss the writ of certiorari as improvidently granted. After dismissing the writ in *McCarver*, the Court then granted a writ on the same issue in the *Atkins* case.

JA 7230   30999

would actually have to adjudicate more cases than if it had provided the opportunity for fuller investigation.) This problem may be exacerbated in those States that do not have an abundance of readily available trained clinicians with substantial experience in mental retardation.

North Carolina's legislation provided that cases should be filed within 120 days of the enactment of the statute. The language below recommends the somewhat more generous period of 180 days. It is hoped that this slightly longer period will reduce the flurry of claims experienced at the end of the time period in 2001 in North Carolina. Permitting a fuller investigation of the cases may assist in their orderly and fair consideration.

Conducting postconviction hearings. The language below recommends the employment of generic State court rules for consideration of postconviction cases. This assumes that the State provides such a forum on other issues, and that it provides for the appointment of counsel in such cases. In those States where those assumptions are not correct, it will be necessary to enact fuller procedural protections for the consideration of *Atkins*-related claims.

The recommended language below also does not address the issue of factual findings made by courts prior to the *Atkins* decision. The cases that will arise in postconviction will vary considerably. In some cases, the issue of potential mental retardation may not have been litigated at all, either because counsel was unaware of the client's mental disability or because of a concern that evidence of mental retardation might be considered a "two-edged sword"[71] whose mitigating significance might be misunderstood by jurors. In other cases, evidence may have been offered regarding the defendant's mental retardation, but with no resolution of the issue required under State law at the time.[72] In a third category will be cases in which some evidence was offered, but counsel lacked the incentive to pursue the issue fully, since it was not dispositive under then-applicable State law. In a final category, there may be cases in which there has been a direct finding by either the judge or jury that the defendant had mental retardation, or even a stipulation to that fact by the prosecution. Only in this final category of cases would a court, reconsidering the case following

---

[71] *Atkins*, 122 S.Ct. at 2252; *Penry*, 492 U.S. at 323-325.

[72] This would be true, for example, where evidence of mental retardation was offered in mitigation at the penalty phase of a trial, but where jurors were not required to specify whether they found an individual mitigation claim to have been proven.

JA 7231    31000

*Atkins*, appropriately grant the petition without requiring fuller exploration of proffered evidence regarding the defendant's mental disability.

Burden of persuasion. Traditionally, the burden of persuasion in postconviction cases rests with the applicant by a preponderance of the evidence. Although some of the considerations discussed in the earlier section on hearings in new cases raise some constitutional questions about the appropriateness of ever placing the burden of persuasion on the defendant on this issue, the language below makes no recommendation regarding transferring the burden of persuasion to the State.[73]

States should enact laws to provide for the fair and orderly consideration of post-conviction claims by defendants who claim to have mental retardation.

## VII. CLEMENCY

It is fervently to be hoped that the preceding provisions will suffice to prevent the execution of any individual with mental retardation. But experience teaches that sometimes the machinery of the criminal justice system works imperfectly, and for any number of reasons, an individual with mental retardation might end up on Death Row, facing the prospect of execution. Such an execution would, of course, violate the Eighth Amendment.

Clemency has long been justified as a last opportunity to prevent unjust punishment. "Clemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted."[74]

---

[73] Obviously, if a State were to place the burden on postconviction petitioners at a level heavier than a preponderance of the evidence, much graver constitutional issues would come into play. Assigning a burden on petitioner at the "clear and convincing" level or higher is *not* acceptable.

[74] *Herrera v. Collins*, 506 U.S. 390, 411-12 (1993). *See also Ohio Adult Parole Authority v. Woodard*, 119 S.Ct. 1244, 1248 (1998) ("a significant, traditionally available remedy for preventing miscarriages of justice when judicial process was exhausted.")

JA 7232   31001

Even before the Supreme Court's decision in *Atkins*, in several instances clemency has been exercised to prevent the execution of individuals with mental retardation.[75]

State laws vary widely on the subject of clemency. In many States, the Governor (or some other body) has plenary authority to grant clemency.[76] In other States, the authority to prevent the execution of a capital sentence may be more circumscribed.[77] Particularly in those States where there are limitations on the exercise of the clemency authority, it is essential for the Legislature to make clear that providing clemency for an individual who is discovered to have mental retardation is not only lawful, but also is to be expected.

---

[75] Although it is difficult to research gubernatorial actions fully, it is clear that there is substantial precedent for granting clemency on the basis of a defendant's mental retardation. On January 10, 1991, Governor Richard Celeste of Ohio commuted the death sentence of Debra Brown, Elizabeth Green, Leonard Jenkins, and Donald Maurer to life imprisonment with no parole eligibility. In each instance, the defendant's mental impairment was a key factor in the Governor's decision. (Information about Governor Celeste's clemency decisions can be obtained from the Ohio Public Defender Commission, 8 E. Long Street, Columbus, Ohio 43215.) In 1959, Governor Michael DiSalle of Ohio prevented the execution of Lewis Niday on the grounds of the defendant's mental retardation. See K. Moore, Pardons 140 (Oxford University Press, 1989), citing M. DiSalle, & G. Blochman, The Power of Life and Death (Random House, 1965). And although the record is less clear, it appears that mental retardation combined with traumatic mental illness constituted the grounds for California Governor Pat Brown's commutation of the death sentence of Vernon Atchley in 1961. See E. Brown & D. Adler, Public Justice, Private Mercy: A Governor's Education on Death Row 80 (Weidenfeld & Nicolson 1989). Similarly, it appears that mental retardation was a principal reason for Governor Nelson Rockefeller's action in the case of Salvatore Agron in the early 1960s. See Ringold, The Dynamics of Executive Clemency, 52 ABAJ 240, 242 (1966). In 1969, California Governor Ronald Reagan granted clemency to Calvin Thomas on the basis of his "record of epilepsy and brain damage." B. Boyarsky, Ronald Reagan: His Life and Rise to the Presidency 189 (Random House, 1981). More recently, Missouri Governor Mel Carnahan commuted the death sentence of Bobby Shaw, based on Mr. Shaw's mental retardation. Statement from the Governor on Bobby Lewis Shaw & Charles Mathenia, June 2, 1993. At the same time, Governor Carnahan granted a 60-day stay of execution to Charles Mathenia to investigate whether he was an individual with mental retardation, and ultimately Mr. Mathenia was found incompetent to be executed because of his mental retardation. Two of the best known cases of clemency involved inmates with mental retardation who were on Death Row – Anthony Porter in Illinois and Earl Washington in Virginia – although each was granted clemency when it was demonstrated that he was factually innocent of the crime for which he had been convicted. See Eric Zorn, *Questions Persist as Troubled Inmate Faces Execution*, Chi. Trib. Sept. 21,1998, at 1; Francis X. Clines, *Virginia Man is Pardoned in Murder; DNA Is Cited*, N.Y. Times, Oct. 3, 2000, at A20. It is impossible to determine how many other clemency decisions have been based on mental retardation.

[76] [e.g. a State provision]

[77] For an analysis of the various States' approaches to clemency see *National Governors' Assn. Center for Policy Research, Guide to Executive Clemency Among the American States* (1988); Clifford Dorne & Kenneth Gewerth, *Mercy in a Climate of Retributive Justice: Interpretations from a National Survey of Executive Clemency Procedures*, 25 New Eng. J. Crim. & Civil Confinement 413 (1999). *See generally*, Elizabeth Rapaport, *Retribution and Redemption in the Operation of Executive Clemency*, 74 Chi-Kent L. Rev. 1501 (2000).

JA 7233   31002

In addition, there may be cases of other individuals who do not have mental retardation (or where the evidence concerning mental retardation is inconclusive), but who have another mental disability of comparable severity. This may include an individual with an intellectual impairment that may fall short of the definition of mental retardation, but which was sufficient to affect the individual's understanding of his or her offense or impair the ability to conform his or her conduct to the law's requirement. Similarly, cases involving a defendant with severe mental illness or other developmental disabilities may indicate comparable culpability. Both the spirit of the *Atkins* opinion, as well as principles of equal protection and equity, require that the sentencing authority must have the power to provide comparable relief in such cases.

<u>States should enact legislation authorizing clemency for individuals with mental retardation.</u>

<div style="border:1px solid black; padding:10px;">

**RECOMMENDED STATUTORY LANGUAGE:**

**Notwithstanding any other provision of State law, the [Governor] [Board of Pardons and Paroles] shall have full authority to grant clemency and commute a capital sentence to a noncapital sentence for any inmate whom the [Governor] [Board of Pardons and Paroles] determines to have mental retardation or any other mental impairment that would make a sentence of death unconstitutional or inconsistent with principles of justice.**

</div>

JA 7234    31003

# INDEX

(1)   Introductory DIB memo on mental retardation in federal capital litigation.

(2)   The legislative history of the mental retardation bar in 21 U.S.C. § 848(l).

(3)   The current AAMR definition of mental retardation, with explanations of the operative terms.

(4)   Denis W. Keyes, William J. Edwards, Timothy J. Derning, *Mitigating Mental Retardation in Capital Cases: Finding The "Invisible" Defendant*, 22 Mental & Physical Disability L. Rep. 529 (1998)

(5)   An affidavit from Ruth Luckasson, a leading expert in the field of mental retardation, detailing for a federal judge in a recent capital case the investigation that must be undertaken to establish or rule out the existence of mental retardation.

(6)   An example of a superficial and unreliable evaluation by a government psychologist purporting to rule out mental retardation in a 1994 § 848(e) case, *United States v. Arnold Mark Henry* (EDVa).

(7)   Professor Luckasson's critique of the government's report (which critique was received in evidence at the penalty hearing in *Henry*), stressing the crucial importance of an adequate, reliable life history in the diagnosis of mental retardation.

(8)   An excerpt from the California Death Penalty Defense Manual dealing with the assessment and presentation of mental retardation in capital cases.

(9)   Excerpt from *United States v. Webster*, 162 F.3d 308 (5th Cir 1998), dealing with a plain-error challenge to the district court's handling of a claim of mental retardation in a federal capital sentencing hearing.

(10)  Requested defense jury instructions on mental in *United States v. Jean Claude Oscar, Frantz Oscar and Arnold Mark Henry* (E.D.VA CR No. 93 CR 131), *aff'd* 82 F.3d 419 (4th Cir. 1996) (unpub.)

x:\rcp materials\litigation guides\mr\index--MR materials.wpd

JA 7235    31004

122 S.Ct. 2242
70 USLW 4585, 2 Cal. Daily Op. Serv. 5439, 2002 Daily Journal D.A.R. 6937, 15 Fla. L. Weekly Fed. S 397
(Cite as: 122 S.Ct. 2242)

Supreme Court of the United States

Daryl Renard **ATKINS**, Petitioner,
v.
VIRGINIA.

No. 00-8452.

Argued Feb. 20, 2002.
Decided June 20, 2002.

Defendant was convicted, in the Circuit Court, York County, N. Prentis Smiley, Jr., J., of capital murder and was sentenced to death. The Virginia Supreme Court affirmed the conviction, 257 Va. 160, 510 S.E.2d 445, and sentence, 260 Va. 375, 534 S.E.2d 312. Certiorari was granted. The Supreme Court, Justice Stevens, held that executions of mentally retarded criminals were "cruel and unusual punishments" prohibited by Eighth Amendment.

Reversed and remanded.

Chief Justice Rehnquist dissented and filed opinion in which Justices Scalia and Thomas joined.

Justice Scalia dissented and filed opinion in which Chief Justice Rehnquist and Justice Thomas joined.

West Headnotes

[1] Sentencing and Punishment k1482
350Hk1482

Punishment is "excessive," and therefore prohibited by Eighth Amendment, if it is not graduated and proportioned to offense. U.S.C.A. Const.Amend. 8.

[2] Sentencing and Punishment k1435
350Hk1435

Claim that punishment is unconstitutionally excessive is judged by currently prevailing standards of decency. U.S.C.A. Const.Amend. 8.

[3] Criminal Law k1480
110k1480

[3] Criminal Law k1483
110k1483

Determination of whether punishment in particular case is unconstitutionally excessive in light of evolving community standards should be informed by objective factors to maximum possible extent, with clearest and most reliable one being legislation enacted by country's legislatures. U.S.C.A. Const.Amend. 8.

[4] Criminal Law k1134(3)
110k1134(3)

[4] Sentencing and Punishment k1480
350Hk1480

In deciding whether punishment in particular case is unconstitutionally excessive, Supreme Court may bring its own judgment to bear by asking whether there is reason to agree or disagree with judgment reached by citizenry and its legislators. U.S.C.A. Const.Amend. 8.

[5] Sentencing and Punishment k1642
350Hk1642

Execution of mentally retarded criminal is unconstitutionally "cruel and unusual punishment." U.S.C.A. Const.Amend. 8.

**\*2242** *Syllabus* [FN\*]

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Petitioner Atkins was convicted of capital murder and related crimes by a Virginia jury and sentenced to death. Affirming, the Virginia Supreme Court relied on *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256, in rejecting Atkins' contention that he could not be sentenced to death because he is mentally retarded.

**\*2243** *Held:* Executions of mentally retarded criminals are "cruel and unusual punishments"



GOVERNMENT
EXHIBIT
240

PENGAD 800-631-6989

prohibited by the Eighth Amendment. Pp. 2246-2252.

(a) A punishment is "excessive," and therefore prohibited by the Amendment, if it is not graduated and proportioned to the offense. *E.g., Weems v. United States,* 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793. An excessiveness claim is judged by currently prevailing standards of decency. *Trop v. Dulles,* 356 U.S. 86, 100-101, 78 S.Ct. 590, 2 L.Ed.2d 630. Proportionality review under such evolving standards should be informed by objective factors to the maximum possible extent, see, *e.g., Harmelin v. Michigan,* 501 U.S. 957, 1000, 111 S.Ct. 2680, 115 L.Ed.2d 836, the clearest and most reliable of which is the legislation enacted by the country's legislatures, *Penry,* 492 U.S., at 331, 109 S.Ct. 2934. In addition to objective evidence, the Constitution contemplates that this Court will bring its own judgment to bear by asking whether there is reason to agree or disagree with the judgment reached by the citizenry and its legislators, e.g., Coker v. Georgia, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982. Pp. 2246-2248.

(b) Much has changed since *Penry's* conclusion that the two state statutes then existing that prohibited such executions, even when added to the 14 States that had rejected capital punishment completely, did not provide sufficient evidence of a consensus. 492 U.S., at 334, 109 S.Ct. 2934. Subsequently, a significant number of States have concluded that death is not a suitable punishment for a mentally retarded criminal, and similar bills have passed at least one house in other States. It is not so much the number of these States that is significant, but the consistency of the direction of change. Given that anticrime legislation is far more popular than legislation protecting violent criminals, the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of legislation reinstating such executions) provides powerful evidence that today society views mentally retarded offenders as categorically less culpable than the average criminal. The evidence carries even greater force when it is noted that the legislatures addressing the issue have voted overwhelmingly in favor of the prohibition. Moreover, even in States allowing the execution of mentally retarded offenders, the practice is uncommon. Pp. 2248-2250.

(c) An independent evaluation of the issue reveals no reason for the Court to disagree with the legislative consensus. Clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial, but, by definition, they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand others' reactions. Their deficiencies do not warrant an exemption from criminal sanctions, but diminish their personal culpability. In light of these deficiencies, the Court's death penalty jurisprudence provides two reasons to agree with the legislative consensus. First, there is a serious question whether either justification underpinning the death penalty-- retribution and deterrence of capital crimes--applies to mentally retarded offenders. As to retribution, the severity of the appropriate punishment necessarily depends on the offender's culpability. If the culpability of the average murderer is insufficient to justify imposition of death, see *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution. As to deterrence, the same cognitive and behavioral impairments that make mentally retarded defendants less morally culpable **\*2244** also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the death penalty's deterrent effect with respect to offenders who are not mentally retarded. Second, mentally retarded defendants in the aggregate face a special risk of wrongful execution because of the possibility that they will unwittingly confess to crimes they did not commit, their lesser ability to give their counsel meaningful assistance, and the facts that they are typically poor witnesses and that their demeanor may create an unwarranted impression of lack of remorse for their crimes. Pp. 2250-2252.

260 Va. 375, 534 S.E.2d 312, reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, in

**JA 7237** 31145

which SCALIA and THOMAS, JJ., joined. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined.

James W. Ellis, for the petitioner.

Pamela A. Rumpz, for the respondent.

For U.S. Supreme Court Briefs See:

2001 WL 1663817 (Pet.Brief)

2002 WL 63726 (Resp.Brief)

2002 WL 225883 (Reply.Brief)

2001 WL 1682012 (Amicus.Brief)

2002 WL 83600 (Amicus.Brief)

2002 WL 126361 (Amicus.Brief)

For Transcript of Oral Argument See:

2002 WL 341765 (U.S.Oral.Arg.)

Justice STEVENS delivered the opinion of the Court.

Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants. Presumably for these reasons, in the 13 years since we decided *Penry* v. *Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal. The consensus reflected in those deliberations informs our answer to the question presented by this case: whether such executions are "cruel and unusual punishments" prohibited by the Eighth Amendment to the Federal Constitution.

I

Petitioner, Daryl Renard Atkins, was convicted of

abduction, armed robbery, and capital murder, and sentenced to death. At approximately midnight on August 16, 1996, Atkins and William Jones, armed with a semiautomatic handgun, abducted Eric Nesbitt, robbed him of the money on his person, drove him to an automated teller machine in his pickup truck where cameras recorded their withdrawal of additional cash, then took him to an isolated location where he was shot eight times and killed.

Jones and Atkins both testified in the guilt phase of Atkins' trial. [FN1] Each confirmed most of the details in the other's account of the incident, with the important exception that each stated that the other had actually shot and killed Nesbitt. Jones' testimony, which was both more coherent and credible than Atkins', was obviously credited by the jury and was *2245 sufficient to establish Atkins' guilt. [FN2] At the penalty phase of the trial, the State introduced victim impact evidence and proved two aggravating circumstances: future dangerousness and "vileness of the offense." To prove future dangerousness, the State relied on Atkins' prior felony convictions as well as the testimony of four victims of earlier robberies and assaults. To prove the second aggravator, the prosecution relied upon the trial record, including pictures of the deceased's body and the autopsy report.

> FN1. Initially, both Jones and Atkins were indicted for capital murder. The prosecution ultimately permitted Jones to plead guilty to first-degree murder in exchange for his testimony against Atkins. As a result of the plea, Jones became ineligible to receive the death penalty.

> FN2. Highly damaging to the credibility of Atkins' testimony was its substantial inconsistency with the statement he gave to the police upon his arrest. Jones, in contrast, had declined to make an initial statement to the authorities.

In the penalty phase, the defense relied on one witness, Dr. Evan Nelson, a forensic psychologist who had evaluated Atkins before trial and concluded that he was "mildly mentally retarded." [FN3] His conclusion was based on interviews with people who knew Atkins, [FN4] a review of school and court records, and the administration of a standard intelligence test which indicated that Atkins had a

**JA 7238** 31146

full scale IQ of 59. [FN5]

FN3. The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. *Id.*, at 42-43.

FN4. The doctor interviewed Atkins, members of his family, and deputies at the jail where he had been incarcerated for the preceding 18 months. Dr. Nelson also reviewed the statements that Atkins had given to the police and the investigative reports concerning this case.

FN5. Dr. Nelson administered the Wechsler Adult Intelligence Scales test (WAIS-III), the standard instrument in the United States for assessing intellectual functioning. AAMR, Mental Retardation, *supra*. The WAIS-III is scored by adding together the number of points earned on different subtests, and using a mathematical formula to convert this raw score into a scaled score. The test measures an intelligence range from 45 to 155. The mean score of the test is 100, which means that a person receiving a score of 100 is considered to have an average level of cognitive functioning. A. Kaufman & E. Lichtenberger, Essentials of WAISIII Assessment 60 (1999). It is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. 2 B. Sadock & V. Sadock, Comprehensive Textbook of Psychiatry 2952 (7th ed.2000). At the sentencing phase, Dr. Nelson testified: "[Atkins'] full scale IQ is 59. Compared to the population at large, that means less than one percentile .... Mental retardation is a relatively rare thing. It's about one percent of the population." App. 274. According to Dr. Nelson, Atkins' IQ score "would automatically qualify for Social Security disability income." *Id.*, at 280. Dr. Nelson also indicated that of the over 40 capital defendants that he had evaluated, Atkins was only the second individual who met the criteria for mental retardation. *Id.*, at 310.

He testified that, in his opinion, Atkins' limited intellect had been a consistent feature throughout his life, and that his IQ score of 59 is not an "aberration, malingered result, or invalid test score." *Id.*, at 308.

The jury sentenced Atkins to death, but the Virginia Supreme Court ordered a second **\*2246** sentencing hearing because the trial court had used a misleading verdict form. 257 Va. 160, 510 S.E.2d 445 (1999). At the resentencing, Dr. Nelson again testified. The State presented an expert rebuttal witness, Dr. Stanton Samenow, who expressed the opinion that Atkins was not mentally retarded, but rather was of "average intelligence, at least," and diagnosable as having antisocial personality disorder. [FN6] App. 476. The jury again sentenced Atkins to death.

JA 7239   31147

FN6. Dr. Samenow's testimony was based upon two interviews with Atkins, a review of his school records, and interviews with correctional staff. He did not administer an intelligence test, but did ask Atkins questions taken from the 1972 version of the Wechsler Memory Scale. *Id.*, at 524-525, 529. Dr. Samenow attributed Atkins' "academic performance [that was] by and large terrible" to the fact that he "is a person who chose to pay attention sometimes, not to pay attention others, and did poorly because he did not want to do what he was required to do." *Id.*, at 480-481.

The Supreme Court of Virginia affirmed the imposition of the death penalty. 260 Va. 375, 385, 534 S.E.2d 312, 318 (2000). Atkins did not argue before the Virginia Supreme Court that his sentence was disproportionate to penalties imposed for similar crimes in Virginia, but he did contend "that he is mentally retarded and thus cannot be sentenced to death." *Id.*, at 386, 534 S.E.2d, at 318. The majority of the state court rejected this contention, relying on our holding in *Penry.* 260 Va., at 387, 534 S.E.2d, at 319. The Court was "not willing to commute Atkins' sentence of death to life imprisonment merely because of his IQ score." *Id.*, at 390, 534 S.E.2d, at 321.

Justice Hassell and Justice Koontz dissented. They rejected Dr. Samenow's opinion that Atkins possesses average intelligence as "incredulous as a matter of law," and concluded that "the imposition of the sentence of death upon a criminal defendant who has the mental age of a child between the ages of 9 and 12 is excessive." *Id.*, at 394, 395-396, 534 S.E.2d, at 323-324. In their opinion, "it is indefensible to conclude that individuals who are mentally retarded are not to some degree less culpable for their criminal acts. By definition, such individuals have substantial limitations not shared by the general population. A moral and civilized society diminishes itself if its system of justice does not afford recognition and consideration of those limitations in a meaningful way." *Id.*, at 397, 534 S.E.2d, at 325.

Because of the gravity of the concerns expressed by the dissenters, and in light of the dramatic shift in the state legislative landscape that has occurred in the past 13 years, we granted certiorari to revisit the issue that we first addressed in the *Penry* case. 533 U.S. 976, 122 S.Ct. 24, 150 L.Ed.2d 805 (2001).

## II

[1] The Eighth Amendment succinctly prohibits "excessive" sanctions. It provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." In *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), we held that a punishment of 12 years jailed in irons at hard and painful labor for the crime of falsifying records was excessive. We explained "that it is a precept of justice that punishment for crime should be graduated and proportioned to the offense." *Id.*, at 367, 30 S.Ct. 544. We have repeatedly applied this proportionality precept in later cases interpreting the Eighth Amendment. See *Harmelin v. Michigan*, 501 U.S. 957, 997-998, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (KENNEDY, J., concurring in part and concurring in judgment); see also *id.*, at 1009-1011, 111 S.Ct. 2680 (White, J., dissenting). [FN7] Thus, even *2247 though "imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual," it may not be imposed as a penalty for "the 'status' of narcotic addiction," *Robinson v. California*, 370 U.S. 660, 666-667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), because such a sanction would be excessive. As Justice Stewart explained in *Robinson:* "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.*, at 667, 82 S.Ct. 1417.

> FN7. Thus, we have read the text of the amendment to prohibit all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive.

[2] A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the "Bloody Assizes" or when the Bill of Rights was adopted, but rather by those that currently prevail. As Chief Justice Warren explained in his opinion in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. ... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.*, at 100-101, 78 S.Ct. 590.

**JA 7240** 31148

[3] Proportionality review under those evolving standards should be informed by " 'objective factors to the maximum possible extent,' " see *Harmelin*, 501 U.S., at 1000, 111 S.Ct. 2680 (quoting *Rummel v. Estelle*, 445 U.S. 263, 274-275, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)). We have pinpointed that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Penry*, 492 U.S., at 331, 109 S.Ct. 2934. Relying in part on such legislative evidence, we have held that death is an impermissibly excessive punishment for the rape of an adult woman, *Coker v. Georgia*, 433 U.S. 584, 593-596, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), or for a defendant who neither took life, attempted to take life, nor intended to take life, *Enmund v. Florida*, 458 U.S. 782, 789-793, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Coker*, we focused primarily on the then-recent legislation that had been enacted in response to our decision 10 years earlier in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (*per curiam*), to support the conclusion that the "current judgment," though "not wholly unanimous," weighed very heavily on the side of rejecting capital punishment as a "suitable penalty for raping an adult woman." *Coker*, 433 U.S., at 596, 97 S.Ct. 2861. The "current legislative judgment" relevant to our decision in *Enmund* was less clear than in *Coker* but "nevertheless weigh[ed] on the side of rejecting capital punishment for the crime at issue." *Enmund*, 458 U.S., at 793, 102 S.Ct. 3368.

[4] We also acknowledged in *Coker* that the objective evidence, though of great importance, did not "wholly determine" the controversy, "for the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." 433 U.S., at 597, 97 S.Ct. 2861. For example, in *Enmund*, we concluded by expressing our own judgment about the issue:

"For purposes of imposing the death penalty, Enmund's criminal *culpability* must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts. This is the judgment of most of *the legislatures that have recently addressed the matter, and we have no reason to disagree with*

*that judgment* for purposes of construing and applying the Eighth Amendment." 458 U.S., at 801, 102 S.Ct. 3368 (emphasis added).

Thus, in cases involving a consensus, our own judgment is "brought to bear," *Coker*, 433 U.S., at 597, 97 S.Ct. 2861, by asking whether there is reason to disagree with *2248 the judgment reached by the citizenry and its legislators.

Guided by our approach in these cases, we shall first review the judgment of legislatures that have addressed the suitability of imposing the death penalty on the mentally retarded and then consider reasons for agreeing or disagreeing with their judgment.

### III

The parties have not called our attention to any state legislative consideration of the suitability of imposing the death penalty on mentally retarded offenders prior to 1986. In that year, the public reaction to the execution of a mentally retarded murderer in Georgia [FN8] apparently led to the enactment of the first state statute prohibiting such executions. [FN9] In 1988, when Congress enacted legislation reinstating the federal death penalty, it expressly provided that a "sentence of death shall not be carried out upon a person who is mentally retarded." [FN10] In 1989, Maryland enacted a similar prohibition. [FN11] It was in that year that we decided *Penry*, and concluded that those two state enactments, "even when added to the 14 States that have rejected capital punishment completely, do not provide sufficient evidence at present of a national consensus." 492 U.S., at 334, 109 S.Ct. 2934.

> FN8. Jerome Bowden, who was identified as having mental retardation when he was 14-years-old, was scheduled for imminent execution in Georgia in June of 1986. The Georgia Board of Pardons and Paroles granted a stay following public protests over his execution. A psychologist selected by the State evaluated Bowden and determined that he had an IQ of 65, which is consistent with mental retardation. Nevertheless, the board lifted the stay and Bowden was executed the following day. The board concluded that Bowden understood the nature of his crime and his punishment and therefore that execution, despite his mental deficiencies, was

JA 7241  31149

permissible. See Montgomery, Bowden's Execution Stirs Protest, Atlanta Journal, Oct. 13, 1986, p. A1.

FN9. Ga.Code Ann. § 17-7-131(j) (Supp.1988).

FN10. The Anti-Drug Abuse Act of 1988, Pub.L. 100-690, § 7001(*l* ), 102 Stat. 4390, 21 U.S.C. § 848(*l* ). Congress expanded the federal death penalty law in 1994. It again included a provision that prohibited any individual with mental retardation from being sentenced to death or executed. Federal Death Penalty Act of 1994, 18 U.S.C. § 3596(c).

FN11. Md. Ann.Code, Art. 27, § 412(f)(1) (1989).

Much has changed since then. Responding to the national attention received by the Bowden execution and our decision in *Penry,* state legislatures across the country began to address the issue. In 1990 Kentucky and Tennessee enacted statutes similar to those in Georgia and Maryland, as did New Mexico in 1991, and Arkansas, Colorado, Washington, Indiana, and Kansas in 1993 and 1994. [FN12] In 1995, when New York reinstated its death penalty, it emulated the Federal Government by expressly exempting the mentally retarded. [FN13] Nebraska followed suit in 1998. [FN14] There appear to have been no similar enactments during the next two years, but in 2000 and 2001 six more States--South Dakota, Arizona, Connecticut, Florida, Missouri, and North Carolina--joined the procession. [FN15] The Texas Legislature unanimously adopted a similar *2249 bill, [FN16] and bills have passed at least one house in other States, including Virginia and Nevada. [FN17]

FN12. Ky.Rev.Stat. Ann. §§ 532.130, 532.135, 532.140; Tenn.Code Ann. § 39-13-203; N.M. Stat. Ann. § 31-20A-2.1; Ark.Code Ann. § 5-4-618; Colo.Rev.Stat. Ann. § 16-9-401; Wash. Rev.Code § 10.95.030; Ind.Code §§ 35-36-9-2 through 35-36-9-6; Kan. Stat. Ann. § 21-4623.

FN13. N.Y.Crim. Proc. Law § 400.27. However, New York law provides that a sentence of death "may not be set aside ... upon the ground that the defendant is mentally retarded" if "the killing occurred while the defendant was confined or under custody in a state correctional facility or local correctional institution." N.Y.Crim. Proc. Law § 400.27.12(d) (McKinney 2001-2002 Interim Pocket Part).

FN14. Neb.Rev.Stat. § 28-105.01.

FN15. S.D. Codified Laws § 23A-27A-26.1; Ariz.Rev.Stat. Ann. 13-703.02; Conn. Gen.Stat. § 53a-46a; Fla. Stat. Ann. § 921.137; Mo.Rev.Stat. § 565.030; 2001-346 N.C. Sess. Laws p. 45.

FN16. House Bill No. 236 passed the Texas House on April 24, 2001, and the Senate version, S. 686, passed the Texas Senate on May 16, 2001. Governor Perry vetoed the legislation on June 17, 2001. In his veto statement, the Texas Governor did not express dissatisfaction with the principle of categorically excluding the mentally retarded from the death penalty. In fact, he stated: "We do not execute mentally retarded murderers today." See Veto Proclamation for H.B. No. 236. Instead, his motivation to veto the bill was based upon what he perceived as a procedural flaw: "My opposition to this legislation focuses on a serious legal flaw in the bill. House Bill No. 236 would create a system whereby the jury and judge are asked to make the same determination based on two different sets of facts .... Also of grave concern is the fact that the provision that sets up this legally flawed process never received a public hearing during the legislative process." *Ibid.*

FN17. Virginia Senate Bill No. 497 (2002); House Bill No. 957 (2002); see also Nevada Assembly Bill 353 (2001). Furthermore, a commission on capital punishment in Illinois has recently recommended that Illinois adopt a statute prohibiting the execution of mentally retarded offenders. Report of the Governor's Commission on Capital Punishment 156 (April 2002).

It is not so much the number of these States that is significant, but the consistency of the direction of change. [FN18] Given the well-known fact that anticrime legislation is far more popular than

**JA 7242**  31150

legislation providing protections for persons guilty of violent crime, the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal. The evidence carries even greater force when it is noted that the legislatures that have addressed the issue have voted overwhelmingly in favor of the prohibition. [FN19] Moreover, even in those States that allow the execution of mentally retarded offenders, the practice is uncommon. Some States, for example New Hampshire and New Jersey, continue to authorize executions, but none have been carried out in decades. Thus there is little need to pursue legislation barring the execution of the mentally retarded in those States. And it appears that even among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry*. [FN20] The practice, therefore, has become truly unusual, and it is fair to say that a national consensus has developed against it. [FN21]

FN18. A comparison to *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), in which we held that there was no national consensus prohibiting the execution of juvenile offenders over age 15, is telling. Although we decided *Stanford* on the same day as *Penry*, apparently only two state legislatures have raised the threshold age for imposition of the death penalty. Mont.Code Ann. § 45-5-102 (1999); Ind.Code § 35-50-2-3 (1998).

FN19. App. D to Brief for AAMR et al. as *Amici Curiae*.

FN20. Those States are Alabama, Texas, Louisiana, South Carolina, and Virginia. D. Keyes, W. Edwards, & R. Perske, People with Mental Retardation are Dying Legally, 35 Mental Retardation (Feb.1997) (updated by Death Penalty Information Center; available at http:// www.advocacyone.org/deathpenalty. html) (June 18, 2002).

FN21. Additional evidence makes it clear

that this legislative judgment reflects a much broader social and professional consensus. For example, several organizations with germane expertise have adopted official positions opposing the imposition of the death penalty upon a mentally retarded offender. See Brief for American Psychological Association et al. as *Amici Curiae*; Brief for AAMR et al. as *Amici Curiae*. In addition, representatives of widely diverse religious communities in the United States, reflecting Christian, Jewish, Muslim, and Buddhist traditions, have filed an *amicus curiae* brief explaining that even though their views about the death penalty differ, they all "share a conviction that the execution of persons with mental retardation cannot be morally justified." See Brief for United States Catholic Conference et al. as *Amici Curiae* in *McCarver v. North Carolina*, O.T.2001, No. 00-8727, p. 2. Moreover, within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved. Brief for The European Union as *Amicus Curiae* in *McCarver v. North Carolina*, O.T.2001, No. 00-8727, p. 4. Finally, polling data shows a widespread consensus among Americans, even those who support the death penalty, that executing the mentally retarded is wrong. R. Bonner & S. Rimer, Executing the Mentally Retarded Even as Laws Begin to Shift, N.Y. Times, Aug. 7, 2000, p. A1; App. B to Brief for AAMR as *Amicus Curiae* in *McCarver v. North Carolina*, O.T.2001, No. 00-8727 (appending approximately 20 state and national polls on the issue). Although these factors are by no means dispositive, their consistency with the legislative evidence lends further support to our conclusion that there is a consensus among those who have addressed the issue. See *Thompson v. Oklahoma*, 487 U.S. 815, 830, 831, n. 31, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (considering the views of "respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community").

**JA 7243** 31151

*2250 To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright,* with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." 477 U.S. 399, 405, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). [FN22]

> FN22. The statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, *supra.*

### IV

This consensus unquestionably reflects widespread judgment about the relative culpability of mentally retarded offenders, and the relationship between mental retardation and the penological purposes served by the death penalty. Additionally, it suggests that some characteristics of mental retardation undermine the strength of the procedural protections that our capital jurisprudence steadfastly guards.

As discussed above, clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. [FN23] There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. [FN24] Their deficiencies do not *2251 warrant an exemption from criminal sanctions, but they do

diminish their personal culpability.

> FN23. J. McGee & F. Menolascino, The Evaluation of Defendants with Mental Retardation in the Criminal Justice System, in The Criminal Justice System and Mental Retardation 55, 58-60 (R. Conley, R. Luckasson, & G. Bouthilet eds.1992); Appelbaum & Appelbaum, Criminal-Justice Related Competencies in Defendants with Mental Retardation, 14 J. of Psychiatry & L. 483, 487-489 (Winter 1994).

> FN24. See, *e.g.,* Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L.Rev. 414, 429 (1985); Levy-Shiff, Kedem, & Sevillia, Ego Identity in Mentally Retarded Adolescents, 94 Am. J. Mental Retardation 541, 547 (1990); Whitman, Self Regulation and Mental Retardation, 94 Am. J. Mental Retardation 347, 360 (1990); Everington & Fulero, Competence to Confess: Measuring Understanding and Suggestibility of Defendants with Mental Retardation 37 Mental Retardation 212, 212-213, 535 (1999) (hereinafter Everington & Fulero).

In light of these deficiencies, our death penalty jurisprudence provides two reasons consistent with the legislative consensus that the mentally retarded should be categorically excluded from execution. First, there is a serious question as to whether either justification that we have recognized as a basis for the death penalty applies to mentally retarded offenders. *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), identified "retribution and deterrence of capital crimes by prospective offenders" as the social purposes served by the death penalty. Unless the imposition of the death penalty on a mentally retarded person "measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." *Enmund,* 458 U.S., at 798, 102 S.Ct. 3368.

With respect to retribution--the interest in seeing that the offender gets his "just deserts"--the severity of the appropriate punishment necessarily depends on the culpability of the offender. Since *Gregg,* our jurisprudence has consistently confined the imposition of the death penalty to a narrow category

JA 7244    31152

of the most serious crimes. For example, in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), we set aside a death sentence because the petitioner's crimes did not reflect "a consciousness materially more 'depraved' than that of any person guilty of murder." *Id.*, at 433, 100 S.Ct. 1759. If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution. Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate.

With respect to deterrence--the interest in preventing capital crimes by prospective offenders-- "it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation,' " *Enmund*, 458 U.S., at 799, 102 S.Ct. 3368. Exempting the mentally retarded from that punishment will not affect the "cold calculus that precedes the decision" of other potential murderers. *Gregg*, 428 U.S., at 186, 96 S.Ct. 2909. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable--for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses--that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution. Thus, executing the mentally retarded will not measurably further the goal of deterrence.

The reduced capacity of mentally retarded offenders provides a second justification for a categorical rule making such offenders ineligible for the death penalty. The risk "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), is enhanced, not only by the *2252 possibility of false confessions, [FN25] but also by the lesser ability of mentally retarded defendants to make a persuasive showing of mitigation in the face of prosecutorial evidence of one or more aggravating factors. Mentally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes. As *Penry* demonstrated, moreover, reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury. 492 U.S., at 323-325, 109 S.Ct. 2934. Mentally retarded defendants in the aggregate face a special risk of wrongful execution.

> FN25. See Everington & Fulero 212-213. Despite the heavy burden that the prosecution must shoulder in capital cases, we cannot ignore the fact that in recent years a disturbing number of inmates on death row have been exonerated. As two recent high-profile cases demonstrate, these exonerations include mentally retarded persons who unwittingly confessed to crimes that they did not commit. See Baker, Death-Row Inmate Gets Clemency; Agreement Ends Days of Suspense, Washington Post, Jan. 15, 1994, p. A1; Holt & McRoberts, Porter Fully Savors First Taste of Freedom; Judge Releases Man Once Set for Execution, Chicago Tribune, Feb. 6, 1999, p. N1.

[5] Our independent evaluation of the issue reveals no reason to disagree with the judgment of "the legislatures that have recently addressed the matter" and concluded that death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the Constitution "places a substantive restriction on the State's power to take the life" of a mentally retarded offender. *Ford*, 477 U.S., at 405, 106 S.Ct. 2595.

**JA 7245** 31153

The judgment of the Virginia Supreme Court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Chief Justice REHNQUIST, with whom Justice SCALIA and Justice THOMAS join, dissenting.

The question presented by this case is whether a national consensus deprives Virginia of the constitutional power to impose the death penalty on capital murder defendants like petitioner, *i.e.,* those defendants who indisputably are competent to stand trial, aware of the punishment they are about to suffer and why, and whose mental retardation has been found an insufficiently compelling reason to lessen their individual responsibility for the crime. The Court pronounces the punishment cruel and unusual primarily because 18 States recently have passed laws limiting the death eligibility of certain defendants based on mental retardation alone, despite the fact that the laws of 19 other States besides Virginia continue to leave the question of proper punishment to the individuated consideration of sentencing judges or juries familiar with the particular offender and his or her crime. See *ante,* at 2248.

I agree with Justice SCALIA, *post,* at 2259 (dissenting opinion), that the Court's assessment of the current legislative judgment regarding the execution of defendants like petitioner more resembles a *post hoc* rationalization for the majority's subjectively preferred result rather than any objective effort to ascertain the content of an evolving standard of decency. I write separately, however, to call attention to the defects in the Court's decision to place weight on foreign laws, the views of professional and religious organizations, and *2253 opinion polls in reaching its conclusion. See *ante,* at 2249- 2250, n. 21. The Court's suggestion that these sources are relevant to the constitutional question finds little support in our precedents and, in my view, is antithetical to considerations of federalism, which instruct that any "permanent prohibition upon all units of democratic government must [be apparent] in the operative acts (laws and the application of laws) that the people have approved." *Stanford v. Kentucky,* 492 U.S. 361, 377, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (plurality opinion). The Court's uncritical acceptance of the opinion poll data brought to our attention, moreover, warrants

additional comment, because we lack sufficient information to conclude that the surveys were conducted in accordance with generally accepted scientific principles or are capable of supporting valid empirical inferences about the issue before us.

In making determinations about whether a punishment is "cruel and unusual" under the evolving standards of decency embraced by the Eighth Amendment, we have emphasized that legislation is the "clearest and most reliable objective evidence of contemporary values." *Penry v. Lynaugh,* 492 U.S. 302, 331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). See also *McCleskey v. Kemp,* 481 U.S. 279, 300, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). The reason we ascribe primacy to legislative enactments follows from the constitutional role legislatures play in expressing policy of a State. " '[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people.' " *Gregg v. Georgia,* 428 U.S. 153, 175-176, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.) (quoting *Furman v. Georgia,* 408 U.S. 238, 383, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C. J., dissenting)). And because the specifications of punishments are "peculiarly questions of legislative policy," *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), our cases have cautioned against using " 'the aegis of the Cruel and Unusual Punishment Clause' " to cut off the normal democratic processes, *Gregg, supra,* at 176, 96 S.Ct. 2909 (quoting *Powell v. Texas,* 392 U.S. 514, 533, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (plurality opinion)).

Our opinions have also recognized that data concerning the actions of sentencing juries, though entitled to less weight than legislative judgments, " 'is a significant and reliable index of contemporary values,' " *Coker v. Georgia,* 433 U.S. 584, 596, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion) (quoting *Gregg, supra,* at 181, 96 S.Ct. 2909), because of the jury's intimate involvement in the case and its function of " 'maintain[ing] a link between contemporary community values and the penal system,' " *Gregg, supra,* at 181, 96 S.Ct. 2909 (quoting *Witherspoon v. Illinois,* 391 U.S. 510, 519, n. 15, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)). In *Coker, supra,* at 596-597, 97 S.Ct. 2861, for example, we credited data showing that "at least 9 out of 10" juries in Georgia did not impose the death sentence for rape convictions.

**JA 7246** 31154

And in *Enmund v. Florida*, 458 U.S. 782, 793-794, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), where evidence of the current legislative judgment was not as "compelling" as that in *Coker* (but more so than that here), we were persuaded by "overwhelming [evidence] that American juries ... repudiated imposition of the death penalty" for a defendant who neither took life nor attempted or intended to take life.

In my view, these two sources--the work product of legislatures and sentencing jury determinations-- ought to be the sole indicators by which courts ascertain the contemporary American conceptions of decency for purposes of the Eighth Amendment. They are the only objective indicia of contemporary values firmly supported by our precedents. More importantly, however, they can be reconciled with the undeniable precepts that the democratic branches of government and individual sentencing juries are, by design, **\*2254** better suited than courts to evaluating and giving effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments.

In reaching its conclusion today, the Court does not take notice of the fact that neither petitioner nor his *amici* have adduced any comprehensive statistics that would conclusively prove (or disprove) whether juries routinely consider death a disproportionate punishment for mentally retarded offenders like petitioner. [FN*] Instead, it adverts to the fact that other countries have disapproved imposition of the death penalty for crimes committed by mentally retarded offenders, see *ante*, at 2249-2250, n. 21 (citing the Brief for The European Union as *Amicus Curiae* in *McCarver v. North Carolina*, O.T.2001, No. 00-8727, p. 2). I fail to see, however, how the views of other countries regarding the punishment of their citizens provide any support for the Court's ultimate determination. While it is true that some of our prior opinions have looked to "the climate of international opinion," *Coker, supra*, at 596, n. 10, 97 S.Ct. 2861, to reinforce a conclusion regarding evolving standards of decency, see *Thompson v. Oklahoma*, 487 U.S. 815, 830, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (plurality opinion); *Enmund, supra*, at 796-797, n. 22, 102 S.Ct. 3368 (1982); *Trop v. Dulles*, 356 U.S. 86, 102-103, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion); we have since explicitly rejected the idea that the sentencing practices of other countries could "serve to establish the first Eighth Amendment prerequisite, that [a] practice is accepted among our

people." *Stanford, supra*, at 369, n. 1, 109 S.Ct. 2969 (emphasizing that "*American* conceptions of decency ... are dispositive") (emphasis in original).

FN* Apparently no such statistics exist. See Brief for American Association on Mental Retardation et al. as *Amici Curiae* in *McCarver v. North Carolina*, O.T.2001, No. 00-8727, p. 19, n. 29 (noting that "actions by individual prosecutors and by juries are difficult to quantify with precision"). Petitioner's inability to muster studies in his favor ought to cut against him, for it is his "heavy burden," *Stanford v. Kentucky*, 492 U.S. 361, 373, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (internal quotation marks omitted), to establish a national consensus against a punishment deemed acceptable by the Virginia Legislature and jury who sentenced him. Furthermore, it is worth noting that experts have estimated that as many as 10 percent of death row inmates are mentally retarded, see R. Bonner & S. Rimer, Executing the Mentally Retarded Even as Laws Begin to Shift, N.Y. Times, Aug. 7, 2000, p. A1, a number which suggests that sentencing juries are not as reluctant to impose the death penalty on defendants like petitioner as was the case in *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), and *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

*Stanford*'s reasoning makes perfectly good sense, and the Court offers no basis to question it. For if it is evidence of a *national* consensus for which we are looking, then the viewpoints of other countries simply are not relevant. And nothing in *Thompson, Enmund, Coker*, or *Trop* suggests otherwise. *Thompson, Enmund*, and *Coker* rely only on the bare citation of international laws by the *Trop* plurality as authority to deem other countries' sentencing choices germane. But the *Trop* plurality-- representing the view of only a minority of the Court--offered no explanation for its own citation, and there is no reason to resurrect this view given our sound rejection of the argument in *Stanford*.

To further buttress its appraisal of contemporary societal values, the Court marshals public opinion poll results and evidence that several professional

**JA 7247**  31155

organizations and religious groups have adopted official positions opposing the imposition of the death penalty upon mentally retarded offenders. See *ante,* at 2249-2250, n. 21 (citing Brief for American Psychological Association et al. as *Amici Curiae;* Brief for American Association on Mental Retardation et al. as *Amici Curiae;* noting that "representatives of widely diverse religious communities ... *2255 reflecting Christian, Jewish, Muslim, and Buddhist traditions ... 'share a conviction that the execution of persons with mental retardation cannot be morally justified' "; and stating that "polling data shows a widespread consensus among Americans ... that executing the mentally retarded is wrong"). In my view, none should be accorded any weight on the Eight Amendment scale when the elected representatives of a State's populace have not deemed them persuasive enough to prompt legislative action. In *Penry,* 492 U.S., at 334-335, 109 S.Ct. 2934, we were cited similar data and declined to take them into consideration where the "public sentiment expressed in [them]" had yet to find expression in state law. See also *Stanford,* 492 U.S., at 377, 109 S.Ct. 2969 (plurality opinion) (refusing "the invitation to rest constitutional law upon such uncertain foundations" as "public opinion polls, the views of interest groups, and the positions adopted by various professional organizations"). For the Court to rely on such data today serves only to illustrate its willingness to proscribe by judicial fiat--at the behest of private organizations speaking only for themselves--a punishment about which no across-the-board consensus has developed through the workings of normal democratic processes in the laboratories of the States.

Even if I were to accept the legitimacy of the Court's decision to reach beyond the product of legislatures and practices of sentencing juries to discern a national standard of decency, I would take issue with the blind-faith credence it accords the opinion polls brought to our attention. An extensive body of social science literature describes how methodological and other errors can affect the reliability and validity of estimates about the opinions and attitudes of a population derived from various sampling techniques. Everything from variations in the survey methodology, such as the choice of the target population, the sampling design used, the questions asked, and the statistical analyses used to interpret the data can skew the results. See, *e.g.,* R. Groves, Survey Errors and Survey Costs (1989); 1 C. Turner & E. Martin,

Surveying Subjective Phenomena (1984).

The Federal Judicial Center's Reference Manual on Scientific Evidence 221-271 (1994) and its Manual for Complex Litigation § 21.493 pp. 101-103 (3d ed.1995), offer helpful suggestions to judges called upon to assess the weight and admissibility of survey evidence on a factual issue before a court. Looking at the polling data (reproduced in the Appendix to this opinion) in light of these factors, one cannot help but observe how unlikely it is that the data could support a valid inference about the question presented by this case. For example, the questions reported to have been asked in the various polls do not appear designed to gauge whether the respondents might find the death penalty an acceptable punishment for mentally retarded offenders in rare cases. Most are categorical (*e.g.,* "Do you think that persons convicted of murder who are mentally retarded should or should not receive the death penalty?"), and, as such, would not elicit whether the respondent might agree or disagree that all mentally retarded people by definition can never act with the level of culpability associated with the death penalty, regardless of the severity of their impairment or the individual circumstances of their crime. Second, none of the 27 polls cited disclose the targeted survey population or the sampling techniques used by those who conducted the research. Thus, even if one accepts that the survey instruments were adequately designed to address a relevant question, it is impossible to know whether the sample was representative enough or the methodology sufficiently sound to tell us anything about the opinions of the citizens of a particular State or the American public at large. Finally, the information provided to us does not indicate why a particular survey was conducted or, in a few cases, by whom, factors which also can bear on the *2256 objectivity of the results. In order to be credited here, such surveys should be offered as evidence at trial, where their sponsors can be examined and cross-examined about these matters.

\* \* \*

There are strong reasons for limiting our inquiry into what constitutes an evolving standard of decency under the Eighth Amendment to the laws passed by legislatures and the practices of sentencing juries in America. Here, the Court goes beyond these well-established objective indicators of contemporary values. It finds "further support to [its] conclusion" that a national consensus has

**JA 7248** 31156

developed against imposing the death penalty on all mentally retarded defendants in international opinion, the views of professional and religious organizations, and opinion polls not demonstrated to be reliable. *Ante,* at 2249-2250, n. 21. Believing this view to be seriously mistaken, I dissent.

## APPENDIX TO OPINION OF REHNQUIST, C. J.

Poll and survey results reported in Brief for American Association on Mental Retardation et al. as Amici Curiae in McCarver v. North Carolina, O.T.2001, No. 00-8727, p. 3a-7a, and cited by the Court, ante, at 2249-2250, n. 21:

| STATE | POLL | DATE | RESPONSE | QUESTION |
|---|---|---|---|---|
| AR | Arkansans' Opinion on the Death Penalty, Opinion Research Associates, Inc., Q. 13 (July 1992) John DiPippa, Will Fairchild's Death Violate the Constitution, or Simply Our Morality?, Arkansas Forum, Sept. 1993 | 1992 | 61% never appropr-iate 17% is appr-opriate 5% opposed to all executi-ons 17% undecid-ed | "Some people say that there is nothing wrong with executing a person who is mentally retarded. Others say that the death penalty should never be imposed on a person who is mentally retarded. Which of these positions comes closest to your own?" |
| AZ | Behavior Research Center, Survey 2000, Q. 3 (July 2000) | 2000 | 71% oppose 12% favor 11% depends 6% ref/-unsure | "For persons convicted of murder, do you favor or oppose use of the death penalty when the defendant is mentally retarded?" |
| CA | Field Research Corp., California Death Penalty Survey, Q. 22 (Dec.1989) Frank Hill, Death Penalty For The Retarded, San Diego Union-Tribune, Mar. 28, 1993, at G3 | 1989 | 64.8% not all right 25.7% is all right 9.5% no opinion | "Some people feel there is nothing wrong with imposing the death penalty on persons who are mentally retarded depending on the circumstances. Others feel the death penalty should never be imposed on persons who are mentally retarded under any circumstance. The |

| State | Source | Year | Results | Question |
|---|---|---|---|---|
| | | | death penalty on a mentally retarded person is ... ?" | |
| CA | Field Research Corp., California Death Penalty Survey, Q. 62D (Dec.1997) Paul Van Slambrouck, Execution and a Convict's Mental State, The Christian Science Monitor, Apr. 27, 1998, at 1 | 1997 | 74% disagree 17% agree 9% no opinion | "Mentally retarded defendants should be given the death penalty when they commit capital crimes." |
| CT | Quinnipac University Polling Institute, Death Penalty Survey Info., Q. 35 (April 23, 2001) | 2001 | 77% no 12% yes 11% don't know | "Do you think that persons convicted of murder who are mentally retarded should or should not receive the death penalty?" |
| FL | Amnesty International Martin Dyckman, Death Penalty's High Price, St. Petersburg Times, Apr. 19, 1992, at 3D | 1986 | 71% opposed | [not provided] |
| GA | Georgia State University Tracy Thompson, Executions of Retarded Opposed, Atlanta Journal, Jan. 6, 1987, at 1B | 1987 | 66% opposed 17% favor 16% depends | [not provided] |
| LA | Marketing Research Inst., Loyola Death Penalty Survey, Q. 7 (Feb.1993) | 1993 | 77.7% no 9.2% yes 13% unc-ertain | "Would you vote for the death penalty if the convicted person is mentally retarded?" |
| LA | Louisiana Poll, Poll 104, Q. 9 (Apr.2001) | 2001 | 68% no 19% yes 11% no opinion 2% won't | "Do you believe mentally retarded people, who are convicted of capital murder, should be executed?" |

**JA 7250** 31158

say

| State | Source | Year & Results | Question |
|---|---|---|---|
| MD | Survey Research Center, University of Maryland, (Nov.1988) | 1988 82% opposed 8% favor 10% other | "Would you favor or oppose the death penalty for a person convicted of murder if he or she is mentally retarded?" |
| MO | Missouri Mental Retardation and Death Penalty Survey, Q. 5 (Oct.1993) | 1993 61.3% not all right 23.7% is all right 15% don't know | "Some people feel there is nothing wrong with imposing the death penalty on persons who are mentally retarded depending on the circumstances. Others feel that the death penalty should never be imposed on persons who are mentally retarded under any circumstances. Do you think it IS or IS NOT all right to impose the death penalty on a mentally retarded person?" |
| NC/SC | Charlotte Observer-WMTV News Poll (Sept.2000) Diane Suchetka, Carolinas Join Emotional Debate Over Executing Mentally Retarded, Charlotte Observer, Sept. 13, 2000 | 2000 64% yes 21% no 14% not sure | "Should the Carolinas ban the execution of people with mental retardation?" |
| NM | Research & Polling Inc., Use of the Death Penalty Public Opinion Poll, Q. 2 (Dec.1990) | 1990 57.1% oppose 10.5% support 26.2% depends 6.1% don't know | 62% support the death penalty. Asked of those that support it, "for which of the following do you support use of the death penalty ... when the convicted person is mentally retarded?" |
| NY | Patrick Caddell Enterprises, N.Y. Public Opinion Poll, The Death | 1989 82% oppose 10% favor 9% don't | "I'd like you to imagine you are a member of a jury. The jury has found the defendant guilty of |

JA 7251 31159

| | | | |
|---|---|---|---|
| | Penalty: An Executive Summary, Q. 27 (May 1989) Ronald Tabak & J. Mark Lane, The Execution of Injustice: A Cost and Lack-of-Benefit Analysis of the Death Penalty, 23 LOY. L.A.L.Rev. 59, 93 (1989) | know | murder beyond a reasonable doubt and now needs to decide about sentencing. You are the last juror to decide and your decision will determine whether or not the offender will receive the death penalty. Would you favor or oppose sentencing the offender to the death penalty if ... the convicted person were mentally retarded?" |
| OK | Survey of Oklahoma Attitudes Regarding Capital Punishment: Survey Conducted for Oklahoma Indigent Defense System, Q. C (July 1999) | 1999 83.5% should not be executed 10.8% should be executed 5.7% depends | "Some people think that persons convicted of murder who are mentally retarded (or have a mental age of between 5 and 10 years) should not be executed. Other people think that 'retarded' persons should be subject to the death penalty like anyone else. Which is closer to the way you feel, that 'retarded' persons should not be executed, or that 'retarded' persons should be subject to the death penalty like everyone else?" |
| TX | Austin American Statesman, November 15, 1988, at B3 | 1988 73% opposed | [not provided] |
| TX | Sam Houston State University, College of Criminal Justice, Texas Crime Poll On-line (1995) Domingo Ramirez Jr. Murder Trial May Hinge on Defendant's IQ, The Fort Worth Star-Telegram, Oct. 6, 1997, at 1 | 1995 61% more likely to oppose | "For each of the following items that have been found to affect people's attitude about the death penalty, please state if you would be more likely to favor or more likely to oppose the death penalty, or wouldn't it matter ... if the murderer is severely mentally retarded?" |

**JA 7252** 31160

| | | | |
|---|---|---|---|
| TX | Scripps-Howard Texas Poll: Death Penalty (Mar.2001) Dan Parker, Most Texans Support Death Penalty, Corpus Christi Caller-Times, Mar. 2, 2001, at A1 | 2001 66% no 17% yes 17% don't know/no answer | "Should the state use the death penalty when the inmate is considered mentally retarded?" |
| TX | Houston Chronicle (Feb.2001) Stephen Brewer & Mike Tolson, A Deadly Distinction: Part III, Debate Fervent in Mental Cases, Johnny Paul Penry Illustrates a Lingering Capital Conundrum, The Houston Chronicle, Feb. 6, 2001, at A6 | 2001 59.9% no support 19.3% support 20.7% not sure/no answer | "Would you support the death penalty if you were convinced the defendant were guilty, but the defendant is mentally impaired?" |
| US | Harris Poll, Unfinished Agenda on Race, Q. 32 (Sept.1988) Saundra Torry, High Court to Hear Case on Retarded Slayer, The Washington Post, Jan. 11, 1989, at A6 | 1988 71% should not be executed 21% should be executed 4% depends 3% not sure/re- fused | "Some people think that persons convicted of murder who have a mental age of less than 18 (or the 'retarded') should not be executed. Other people think that 'retarded' persons should be subject to the death penalty like everyone else. Which is closer to the way you feel, that 'retarded' persons should not be executed, or that 'retarded' persons should be subject to the death penalty like everyone else?" |
| US | Yankelovich Clancy Shulman, Time/CNN Poll, Q. 14 (July 7, 1998) Samuel R. Gross, Second | 1989 61% oppose 27% favor 12% not sure | "Do you favor or oppose the death penalty for mentally retarded individuals convicted of serious crimes, such as |

JA 7253  31161

| | | | | |
|---|---|---|---|---|
| | Thoughts: Americans' Views on the Death Penalty at the Turn of the Century, Capital Punishment and the American Future (Feb.2001) | | | murder?" |

---

| | | | | |
|---|---|---|---|---|
| US | The Tarrance Group, Death Penalty Poll, Q. 9 (Mar.1993) Samuel R. Gross, Update: American Public Opinion on the Death Penalty-It's Getting Personal, 83 Cornell L.Rev. 1448, 1467 (1998) | 1993 | 56% not all right 32% is all right 11% unsure | "Some people feel that there is nothing wrong with imposing the death penalty on persons who are mentally retarded, depending on the circumstances. Others feel that the death penalty should never be imposed on persons who are mentally retarded under any circumstances. Which of these views comes closest to your own?" |

---

| | | | | |
|---|---|---|---|---|
| US | Public Policy Research, Crime in America, Q. 72 (July 1995 | 1995 | 67% likely to oppose 7% likely to favor 26% wouldn't matter | "For each item please tell me if you would be more likely to favor the death penalty, more likely to oppose the death penalty or it wouldn't matter ... if it is true that the murderer is severely mentally retarded?" |

---

| | | | | |
|---|---|---|---|---|
| US | Princeton Research, Newsweek Poll, Q. 16 (Nov.1995) Samuel R. Gross, Update: American Public Opinion on the Death Penalty-It's Getting Personal, 83 Cornell L.Rev. 1448, 1468 (1998) | 1995 | 83% oppose 9% favor 8% don't know refused | "If the convicted person was ... mentally retarded, would you favor or oppose the death penalty?" |

---

| | | | | |
|---|---|---|---|---|
| US | Peter Hart Research Associates, Inc., Innocence Survey, Q. 12 (Dec.1999) | 1999 | 58% stron- gly/som- ewhat favor 26% str- ongly/s- | "... for each proposal I read, please tell me whether you strongly favor, somewhat favor, have mixed or neutral feelings, somewhat |

**JA 7254** 31162

| | | | | |
|---|---|---|---|---|
| | | | omewhat | oppose, or strongly |
| | | | oppose | oppose that proposal ... |
| | | | 12% mix- | .prohibit the death |
| | | | ed/neut- | penalty for defendants |
| | | | ral 4% | who are mentally |
| | | | not sure | retarded." |

| | | | | |
|---|---|---|---|---|
| US | Peter Hart Research | 1999 | 72% much/- | "Suppose you were on a jury |
| | Associates, Inc., | | somewhat | and a defendant was |
| | Innocence Survey, | | less li- | convicted of murder. Now |
| | Q. 9 (Dec.1999) | | kely* *- | it is time to determine |
| | | | 19% no | the sentence. If you knew |
| | | | differe- | that the defendant was |
| | | | nce 9% | mentally retarded or |
| | | | not sure | otherwise mentally |
| | | | 47% much | impaired in a serious |
| | | | less | way, would you be much |
| | | | likely | less likely to support |
| | | | 25% | the use of the death |
| | | | somewhat | penalty in this specific |
| | | | less | case, somewhat less |
| | | | likely | likely, or would it make |
| | | | | no difference to you?" |

| | | | | |
|---|---|---|---|---|
| US | Houston Chronicle, | 2001 | 63.8% no | "Would you support the |
| | (Feb.2001) | | support | death penalty if you were |
| | Stephen Brewer & | | 16.4% | convinced the defendant |
| | Mike Tolson, A | | support | were guilty, but the |
| | Deadly | | 19.8% | defendant is mentally |
| | Distinction: Part | | not | impaired?" |
| | III, Debate | | sure/no | |
| | Fervent in Mental | | answer | |
| | Cases, Johnny | | | |
| | Paul Penry | | | |
| | Illustrates a | | | |
| | Lingering Capital | | | |
| | Conundrum, The | | | |
| | Houston | | | |
| | Chronicle, Feb. | | | |
| | 6, 2001, at A6 | | | |

Justice SCALIA, with whom THE CHIEF JUSTICE and Justice THOMAS join, dissenting.

Today's decision is the pinnacle of our Eighth Amendment death-is- different jurisprudence. Not only does it, like all of that jurisprudence, find no support in the text or history of the Eighth Amendment; it does not even have support in current social attitudes regarding the conditions that render an otherwise just death penalty inappropriate. Seldom has an opinion of this Court rested so obviously upon nothing but the personal views of its members.

I

I begin with a brief restatement of facts that are abridged by the Court but important to understanding this case. After spending the day drinking alcohol and smoking marijuana, petitioner Daryl Renard Atkins and a partner in crime drove to a convenience store, intending to rob a customer.

JA 7255 31163

Their victim was Eric Nesbitt, an airman from Langley Air Force Base, whom they abducted, drove to a nearby automated teller machine, and forced to withdraw $200. They then drove him to a deserted area, ignoring his pleas to leave him unharmed. According to the co-conspirator, whose testimony the jury evidently credited, Atkins ordered Nesbitt out of the vehicle and, after he had taken only a few steps, shot him one, two, three, four, five, six, seven, eight times in the thorax, chest, abdomen, arms, and legs.

The jury convicted Atkins of capital murder. At resentencing (the Virginia Supreme Court affirmed his conviction but remanded for resentencing because the trial court had used an improper verdict form, 257 Va. 160, 179, 510 S.E.2d 445, 457 (1999)), the jury heard extensive evidence of petitioner's alleged mental retardation. A psychologist testified that petitioner was mildly mentally retarded with an IQ of 59, that he was a "slow learne[r]," App. 444, who showed a "lack of success in pretty much every domain of his life," *id.*, at 442, and that he had an "impaired" capacity to \*2260 appreciate the criminality of his conduct and to conform his conduct to the law, *id.*, at 453. Petitioner's family members offered additional evidence in support of his mental retardation claim (*e.g.*, that petitioner is a "follower," *id.*, at 421). The State contested the evidence of retardation and presented testimony of a psychologist who found "absolutely no evidence other than the IQ score ... indicating that [petitioner] was in the least bit mentally retarded" and concluded that petitioner was "of average intelligence, at least." *Id.*, at 476.

The jury also heard testimony about petitioner's 16 prior felony convictions for robbery, attempted robbery, abduction, use of a firearm, and maiming. *Id.*, at 491-522. The victims of these offenses provided graphic depictions of petitioner's violent tendencies: He hit one over the head with a beer bottle, *id.*, at 406; he slapped a gun across another victim's face, clubbed her in the head with it, knocked her to the ground, and then helped her up, only to shoot her in the stomach, *id.*, at 411-413. The jury sentenced petitioner to death. The Supreme Court of Virginia affirmed petitioner's sentence. 260 Va. 375, 534 S.E.2d 312 (2000).

II

As the foregoing history demonstrates, petitioner's mental retardation was a *central issue* at sentencing.

The jury concluded, however, that his alleged retardation was not a compelling reason to exempt him from the death penalty in light of the brutality of his crime and his long demonstrated propensity for violence. "In upsetting this particularized judgment on the basis of a constitutional absolute," the Court concludes that no one who is even slightly mentally retarded can have sufficient "moral responsibility to be subjected to capital punishment for any crime. As a sociological and moral conclusion that is implausible; and it is doubly implausible as an interpretation of the United States Constitution." *Thompson v. Oklahoma*, 487 U.S. 815, 863-864, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (SCALIA, J., dissenting).

Under our Eighth Amendment jurisprudence, a punishment is "cruel and unusual" if it falls within one of two categories: "those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted," *Ford v. Wainwright*, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), and modes of punishment that are inconsistent with modern "standards of decency," as evinced by objective indicia, the most important of which is "legislation enacted by the country's legislatures," *Penry v. Lynaugh*, 492 U.S. 302, 330-331, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

The Court makes no pretense that execution of the mildly mentally retarded would have been considered "cruel and unusual" in 1791. Only the *severely* or *profoundly* mentally retarded, commonly known as "idiots," enjoyed any special status under the law at that time. They, like lunatics, suffered a "deficiency in will" rendering them unable to tell right from wrong. 4 W. Blackstone, Commentaries on the Laws of England 24 (1769) (hereinafter Blackstone); see also *Penry*, 492 U.S., at 331-332, 109 S.Ct. 2934 ("[T]he term 'idiot' was generally used to describe persons who had a total lack of reason or understanding, or an inability to distinguish between good and evil"); *id.*, at 333, 109 S.Ct. 2934 (citing sources indicating that idiots generally had an IQ of 25 or below, which would place them within the "profound" or "severe" range of mental retardation under modern standards); 2 A. Fitz-Herbert, *Natura Brevium* 233B (9th ed. 1794) (originally published 1534) (An idiot is "such a person who cannot account or number twenty pence, nor can tell who was his father or mother, nor how old he is, etc., so as it may appear that he hath no understanding of reason what shall be for

**JA 7256** 31164

his profit, or what for his loss"). Due to their incompetence, idiots were "excuse [d] *2261 from the guilt, and of course from the punishment, of any criminal action committed under such deprivation of the senses." 4 Blackstone 25; see also *Penry, supra,* at 331, 109 S.Ct. 2934. Instead, they were often committed to civil confinement or made wards of the State, thereby preventing them from "go[ing] loose, to the terror of the king's subjects." 4 Blackstone 25; see also S. Brakel, J. Parry, & B. Weiner, The Mentally Disabled and the Law 12-14 (3d ed.1985); 1 Blackstone 292-296; 1 M. Hale, Pleas of the Crown 33 (1st Am. ed. 1847). Mentally retarded offenders with less severe impairments--those who were not "idiots"--suffered criminal prosecution and punishment, including capital punishment. See, *e.g.,* I. Ray, Medical Jurisprudence of Insanity 65, 87-92 (W. Overholser ed.1962) (recounting the 1834 trial and execution in Concord, New Hampshire, of an apparent "imbecile"-- imbecility being a less severe form of retardation which "differs from idiocy in the circumstance that while in [the idiot] there is an utter destitution of every thing like reason, [imbeciles] possess some intellectual capacity, though infinitely less than is possessed by the great mass of mankind"); A. Highmore, Law of Idiocy and Lunacy 200 (1807) ("The great difficulty in all these cases, is to determine where a person shall be said to be so far deprived of his sense and memory as not to have any of his actions imputed to him: or where notwithstanding some defects of this kind he still appears to have so much reason and understanding as will make him accountable for his actions ...").

The Court is left to argue, therefore, that execution of the mildly retarded is inconsistent with the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion) (Warren, C. J.). Before today, our opinions consistently emphasized that Eighth Amendment judgments regarding the existence of social "standards" "should be informed by objective factors to the maximum possible extent" and "should not be, or appear to be, merely the subjective views of individual Justices." *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion); see also *Stanford, supra,* at 369, 109 S.Ct. 2969; *McCleskey v. Kemp,* 481 U.S. 279, 300, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Enmund v. Florida,* 458 U.S. 782, 788, 102 S.Ct. 3368, 73 L.Ed.2d

1140 (1982). "First" among these objective factors are the "statutes passed by society's elected representatives," *Stanford v. Kentucky,* 492 U.S. 361, 370, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); because it "will rarely if ever be the case that the Members of this Court will have a better sense of the evolution in views of the American people than do their elected representatives," *Thompson, supra,* at 865, 108 S.Ct. 2687 (SCALIA, J., dissenting).

The Court pays lipservice to these precedents as it miraculously extracts a "national consensus" forbidding execution of the mentally retarded, *ante,* at ---- 12, from the fact that 18 States--less than *half* (47%) of the 38 States that permit capital punishment (for whom the issue exists)--have very recently enacted legislation barring execution of the mentally retarded. Even that 47% figure is a distorted one. If one is to say, as the Court does today, that *all* executions of the mentally retarded are so morally repugnant as to violate our national "standards of decency," surely the "consensus" it points to must be one that has set its righteous face against *all* such executions. Not 18 States, but only seven--18% of death penalty jurisdictions--have legislation of that scope. Eleven of those that the Court counts enacted statutes prohibiting execution of mentally retarded defendants *convicted after, or convicted of crimes committed after, the effective date* of the legislation; [FN1] those already on *2262 death row, or consigned there before the statute's effective date, or even (in those States using the date of the crime as the criterion of retroactivity) tried in the future for murders committed many years ago, could be put to death. That is not a statement of absolute moral repugnance, but one of current preference between two tolerable approaches. Two of these States permit execution of the mentally retarded in other situations as well: Kansas apparently permits execution of all except the *severely* mentally retarded; [FN2]New York permits execution of the mentally retarded who commit murder in a correctional facility. N.Y.Crim. Proc. Law § 400.27.12(d) (McKinney 2001); N.Y. Penal Law § 125.27 (McKinney 202).

FN1. See Ariz.Rev.Stat. Ann. § 13-703.02(I) (Supp.2001); Ark.Code Ann. § 5-4-618(d)(1) (1997); *Reams v. State,* 322 Ark. 336, 340, 909 S.W.2d 324, 326-327 (1995); Fla. Stat. § 921.137(8) (Supp.2002); Ga.Code Ann. § 17-7-131(j) (1997); Ind.Code § 35-36-9-6 (1998);

**JA 7257** 31165

*Rondon v. State,* 711 N.E.2d 506, 512 (Ind.1999); Kan. Stat. Ann. §§ 21-4623(d), 21-4631(c) (1995); Ky.Rev.Stat. Ann. § 532.140(3) (1999); Md. Ann.Code, Art. 27, § 412(g) (1996); *Booth v. State,* 327 Md. 142, 166-167, 608 A.2d 162, 174 (1992); Mo.Rev.Stat. § 565.030(7) (Supp.2001); N.Y.Crim. Proc. Law § 400.27.12(c) (McKinney Supp.2002); 1995 Sess. N.Y. Laws, ch. 1, § 38; Tenn.Code Ann. § 39-13-203(b) (1997); *Van Tran v. State,* 66 S.W.3d 790, 798-799 (Tenn.2001).

FN2. The Kansas statute defines "mentally retarded" as "having significantly subaverage general intellectual functioning ... to an extent which substantially impairs one's capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law." Kan. Stat. Ann. § 21-4623(e) (2001). This definition of retardation, petitioner concedes, is analogous to the Model Penal Code's definition of a "mental disease or defect" excusing responsibility for criminal conduct, see ALI, Model Penal Code § 4.01 (1985), which would not include mild mental retardation. Reply Brief for petitioner 3, n. 4.

But let us accept, for the sake of argument, the Court's faulty count. That bare number of States alone--*18*--should be enough to convince any reasonable person that no "national consensus" exists. How is it possible that agreement among 47% of the death penalty jurisdictions amounts to "consensus"? Our prior cases have generally required a much higher degree of agreement before finding a punishment cruel and unusual on "evolving standards" grounds. In *Coker, supra,* at 595-596, 97 S.Ct. 2861, we proscribed the death penalty for rape of an adult woman after finding that only one jurisdiction, Georgia, authorized such a punishment. In *Enmund, supra,* at 789, 102 S.Ct. 3368, we invalidated the death penalty for mere participation in a robbery in which an accomplice took a life, a punishment not permitted in 28 of the death penalty States (78%). In *Ford,* 477 U.S., at 408, 106 S.Ct. 2595, we supported the common-law prohibition of execution of the insane with the observation that "[t]his ancestral legacy has not outlived its time," since not a single State authorizes such punishment. In *Solem v. Helm,* 463 U.S.

277, 300, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), we invalidated a life sentence without parole under a recidivist statute by which the criminal "was treated more severely than he would have been in any other State." What the Court calls evidence of "consensus" in the present case (a fudged 47%) more closely resembles evidence that we found *inadequate* to establish consensus in earlier cases. *Tison v. Arizona,* 481 U.S. 137, 154, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), upheld a state law authorizing capital punishment for major participation in a felony with reckless indifference to life where only 11 of the 37 death penalty States (30%) prohibited such punishment. *Stanford, supra,* at 372, 109 S.Ct. 2969, upheld a state law permitting execution of defendants who committed a capital crime at age 16 where only 15 of the 36 death penalty States (42%) prohibited death for such offenders.

Moreover, a major factor that the Court entirely disregards is that the legislation of all 18 States it relies on is still in its infancy. The oldest of the statutes is only 14 years old; [FN3]five were enacted last *2263 year; [FN4]over half were enacted within the past eight years. [FN5] Few, if any, of the States have had sufficient experience with these laws to know whether they are sensible in the long term. It is "myopic to base sweeping constitutional principles upon the narrow experience of [a few] years." *Coker,* 433 U.S., at 614, 97 S.Ct. 2861 (Burger, C. J., dissenting); see also *Thompson,* 487 U.S., at 854-855, 108 S.Ct. 2687 (O'CONNOR, J., concurring in judgment).

FN3. Ga.Code Ann. § 17-7-131(j).

FN4. Ariz.Rev.Stat. Ann. § 13-703.02; Conn. Gen.Stat. § 53a- 46a(h); Fla. Stat. Ann. § 921.137; Mo.Rev.Stat. §§ 565.030(4)- (7); N.C. Gen.Stat. § 15A-2005.

FN5. In addition to the statutes cited n. 3 *supra,* see S.D. Codified Laws § 23A-27A-26.1 (enacted 2000); Neb.Rev.Stat. §§ 28-105.01(2)-(5) (1998); N.Y.Crim. Proc. Law § 400.27(12) (1995); Ind.Code § 35-36-9-6 (1994); Kan. Stat. Ann. § 21-4623 (1994).

The Court attempts to bolster its embarrassingly feeble evidence of "consensus" with the following: "It is not so much the number of these States that is

significant, but the *consistency* of the direction of change." *Ante*, at 2249 (emphasis added). But in what *other* direction *could we possibly* see change? Given that 14 years ago *all* the death penalty statutes included the mentally retarded, *any* change (except precipitate undoing of what had just been done) was *bound to be* in the one direction the Court finds significant enough to overcome the lack of real consensus. That is to say, to be accurate the Court's "*consistency*-of-the-direction-of-change" point should be recast into the following unimpressive observation: "No State has yet undone its exemption of the mentally retarded, one for as long as 14 whole years." In any event, reliance upon "trends," even those of much longer duration than a mere 14 years, is a perilous basis for constitutional adjudication, as Justice O'CONNOR eloquently explained in *Thompson*:

"In 1846, Michigan became the first State to abolish the death penalty .... In succeeding decades, other American States continued the trend towards abolition .... Later, and particularly after World War II, there ensued a steady and dramatic decline in executions .... In the 1950's and 1960's, more States abolished or radically restricted capital punishment, and executions ceased completely for several years beginning in 1968 ....

"In 1972, when this Court heard arguments on the constitutionality of the death penalty, such statistics might have suggested that the practice had become a relic, implicitly rejected by a new societal consensus .... We now know that any inference of a societal consensus rejecting the death penalty would have been mistaken. But had this Court then declared the existence of such a consensus, and outlawed capital punishment, legislatures would very likely not have been able to revive it. The mistaken premise of the decision would have been frozen into constitutional law, making it difficult to refute and even more difficult to reject." 487 U.S., at 854-855, 108 S.Ct. 2687.

Her words demonstrate, of course, not merely the peril of riding a trend, but also the peril of discerning a consensus where there is none.

The Court's thrashing about for evidence of "consensus" includes reliance upon the *margins* by which state legislatures have enacted bans on execution of the retarded. *Ante*, at 2249. Presumably, in applying our Eighth Amendment "evolving-standards-of-decency" jurisprudence, we will henceforth weigh not only how many States have agreed, but how many States have agreed *by how much*. Of course if the percentage of legislators voting for the bill is significant, surely the number of people *represented* by the legislators voting for the bill is also significant: the fact that 49% of the legislators in a State with a population of 60 million voted *against* the bill should be more impressive than the fact that 90% of the legislators in *2264 a state with a population of 2 million voted *for* it. (By the way, the population of the death penalty States that exclude the mentally retarded is only 44% of the population of all death penalty States. U.S. Census Bureau, Statistical Abstract of the United States 21 (121st ed.2001).) This is quite absurd. What we have looked for in the past to "evolve" the Eighth Amendment is a consensus of the same sort as the consensus that *adopted* the Eighth Amendment: a consensus of the sovereign States that form the Union, not a nose count of Americans for and against.

Even less compelling (if possible) is the Court's argument, *ante*, at 2249, that evidence of "national consensus" is to be found in the infrequency with which retarded persons are executed in States that do not bar their execution. To begin with, what the Court takes as true is in fact quite doubtful. It is not at all clear that execution of the mentally retarded is "uncommon," *ibid.*, as even the sources cited by the Court suggest, see *ante*, at 2249, n. 20 (citing D. Keyes, W. Edwards, & R. Perske, People with Mental Retardation are Dying Legally, 35 Mental Retardation (Feb.1997) (updated by Death Penalty Informa-tion Center; available at http://www.advocacyone.org/ deathpenalty.html) (June 12, 2002) (showing that 12 States executed 35 allegedly mentally retarded offenders during the period 1984-2000)). See also Bonner & Rimer, Executing the Mentally Retarded Even as Laws Begin to Shift, N.Y. Times, Aug. 7, 2000 p. A1 (reporting that 10% of death row inmates are retarded). *If*, however, execution of the mentally retarded *is* "uncommon"; and if it is not a sufficient explanation of this that the retarded comprise a tiny fraction of society (1% to 3%), Brief for American Psychological Association et al. as *Amici Curiae* 7; then surely the explanation is that mental retardation is a constitutionally mandated mitigating factor at sentencing, *Penry*, 492 U.S., at 328, 109 S.Ct. 2934. For that reason, even if there were uniform national sentiment in *favor* of executing the retarded in appropriate cases, one would still expect execution of the mentally retarded to be "uncommon." To adapt to the present case what

**JA 7259** 31167

the Court itself said in *Stanford,* 492 U.S., at 374, 109 S.Ct. 2969: "[I]t is not only possible, but overwhelmingly probable, that the very considerations which induce [today's majority] to believe that death should *never* be imposed on [mentally retarded] offenders ... cause prosecutors and juries to believe that it should *rarely* be imposed."

But the Prize for the Court's Most Feeble Effort to fabricate "national consensus" must go to its appeal (deservedly relegated to a footnote) to the views of assorted professional and religious organizations, members of the so-called "world community," and respondents to opinion polls. *Ante,* at 2249-2250, n. 21. I agree with the Chief Justice, *ante,* at 2254-2256 (dissenting opinion), that the views of professional and religious organizations and the results of opinion polls are irrelevant. [FN6] Equally irrelevant are the practices of the "world community," whose notions of justice are (thankfully) not always those of our people. "We must never forget that it is a Constitution for the United States of America that we are expounding. ... [W]here there is not first a settled consensus among our own people, the views of other nations, however enlightened the Justices of this Court may think them to be, cannot be imposed upon Americans through the Constitution." *Thompson,* *2265 487 U.S., at 868-869, n. 4, 108 S.Ct. 2687 (SCALIA, J., dissenting).

> FN6. And in some cases positively counter-indicative. The Court cites, for example, the views of the United States Catholic Conference, whose members are the active Catholic Bishops of the United States. See *ante,* at 2249-2250, n. 21 (citing Brief for United States Catholic Conference et al. as *Amici Curiae* in *McCarver v. North Carolina,* O.T.2001, No. 00-8727, p. 2). The attitudes of that body regarding crime and punishment are so far from being representative, even of the views of Catholics, that they are currently the object of intense national (and entirely ecumenical) criticism.

### III

Beyond the empty talk of a "national consensus," the Court gives us a brief glimpse of what really underlies today's decision: pretension to a power confined *neither* by the moral sentiments originally enshrined in the Eighth Amendment (its original meaning) *nor even* by the current moral sentiments of the American people. " '[T]he Constitution,' the Court says, 'contemplates that in the end *our own judgment* will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment.' " *Ante,* at 2247 (quoting *Coker,* 433 U.S., at 597, 97 S.Ct. 2861) (emphasis added). (The unexpressed reason for this unexpressed "contemplation" of the Constitution is presumably that really good lawyers have moral sentiments superior to those of the common herd, whether in 1791 or today.) The arrogance of this assumption of power takes one's breath away. And it explains, of course, why the Court can be so cavalier about the evidence of consensus. It is just a game, after all. "[I]n the end," it is the *feelings* and *intuition* of a majority of the Justices that count--"the perceptions of decency, or of penology, or of mercy, entertained ... by a majority of the small and unrepresentative segment of our society that sits on this Court." *Thompson, supra,* at 873, 108 S.Ct. 2687 (SCALIA, J., dissenting).

The genuinely operative portion of the opinion, then, is the Court's statement of the reasons why it agrees with the contrived consensus it has found, that the "diminished capacities" of the mentally retarded render the death penalty excessive. *Ante,* at 2250-2252. The Court's analysis rests on two fundamental assumptions: (1) that the Eighth Amendment prohibits excessive punishments, and (2) that sentencing juries or judges are unable to account properly for the "diminished capacities" of the retarded. The first assumption is wrong, as I explained at length in *Harmelin v. Michigan,* 501 U.S. 957, 966-990, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (opinion of SCALIA, J.). The Eighth Amendment is addressed to always-and-everywhere "cruel" punishments, such as the rack and the thumbscrew. But where the punishment is in itself permissible, "[t]he Eighth Amendment is not a ratchet, whereby a temporary consensus on leniency for a particular crime fixes a permanent constitutional maximum, disabling the States from giving effect to altered beliefs and responding to changed social conditions." *Id.,* at 990, 111 S.Ct. 2680. The second assumption--inability of judges or juries to take proper account of mental retardation--is not only unsubstantiated, but contradicts the immemorial belief, here and in England, that they play an *indispensable* role in such matters:

"[I]t is very difficult to define the indivisible line

**JA 7260** 31168

that divides perfect and partial insanity; but it must rest upon circumstances duly to be weighed and considered both by the judge and jury, lest on the one side there be a kind of inhumanity towards the defects of human nature, or on the other side too great an indulgence given to great crimes ...." 1 Hale, Pleas of the Crown, at 30.

Proceeding from these faulty assumptions, the Court gives two reasons why the death penalty is an excessive punishment for all mentally retarded offenders. First, the "diminished capacities" of the mentally retarded raise a "serious question" whether their execution contributes to the "social purposes" of the death penalty, viz., retribution and deterrence. *Ante,* at 2250. (The Court conveniently ignores a third "social purpose" of the death penalty--"incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future," *Gregg v. Georgia,* 428 U.S. 153, 183, n. 28, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint **\*2266** opinion of Stewart, Powell, and Stevens, JJ.). But never mind; its discussion of even the other two does not bear analysis.) Retribution is not advanced, the argument goes, because the mentally retarded are *no more culpable* than the average murderer, whom we have already held lacks sufficient culpability to warrant the death penalty, see *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion). *Ante,* at 2251. Who says so? Is there an established correlation between mental acuity and the ability to conform one's conduct to the law in such a rudimentary matter as murder? Are the mentally retarded really more disposed (and hence more likely) to commit willfully cruel and serious crime than others? In my experience, the opposite is true: being childlike generally suggests innocence rather than brutality.

Assuming, however, that there is a direct connection between diminished intelligence and the inability to refrain from murder, what scientific analysis can possibly show that a mildly retarded individual who commits an exquisite torture-killing is "no more culpable" than the "average" murderer in a holdup- gone-wrong or a domestic dispute? Or a moderately retarded individual who commits a series of 20 exquisite torture-killings? Surely culpability, and deservedness of the most severe retribution, depends not merely (if at all) upon the mental capacity of the criminal (above the level where he is able to distinguish right from wrong) but also upon the depravity of the crime--which is

precisely why this sort of question has traditionally been thought answerable not by a categorical rule of the sort the Court today imposes upon all trials, but rather by the sentencer's weighing of the circumstances (both degree of retardation and depravity of crime) in the particular case. The fact that juries continue to sentence mentally retarded offenders to death for extreme crimes shows that society's moral outrage sometimes demands execution of retarded offenders. By what principle of law, science, or logic can the Court pronounce that this is wrong? There is none. Once the Court admits (as it does) that mental retardation does not render the offender morally *blameless, ante,* at 2250, there is no basis for saying that the death penalty is *never* appropriate retribution, no matter *how* heinous the crime. As long as a mentally retarded offender knows "the difference between right and wrong," *ante,* at 2250, only the sentencer can assess whether his retardation reduces his culpability enough to exempt him from the death penalty for the particular murder in question.

As for the other social purpose of the death penalty that the Court discusses, deterrence: That is not advanced, the Court tells us, because the mentally retarded are "less likely" than their non-retarded counterparts to "process the information of the possibility of execution as a penalty and ... control their conduct based upon that information." *Ante,* at 2251. Of course this leads to the same conclusion discussed earlier--that the mentally retarded (because they are less deterred) are more likely to kill--which neither I nor the society at large believes. In any event, even the Court does not say that *all* mentally retarded individuals cannot "process the information of the possibility of execution as a penalty and ... control their conduct based upon that information"; it merely asserts that they are "less likely" to be able to do so. But surely the deterrent effect of a penalty is adequately vindicated if it successfully deters many, but not all, of the target class. Virginia's death penalty, for example, does not fail of its deterrent effect simply because *some* criminals are unaware that Virginia *has* the death penalty. In other words, the supposed fact that *some* retarded criminals cannot fully appreciate the death penalty has nothing to do with the deterrence rationale, but is simply an echo of the arguments denying a retribution rationale, discussed and rejected above. I **\*2267** am not sure that a murderer is somehow less blameworthy if (though he knew his act was wrong) he did not fully appreciate that he could die for it; but if so, we should treat a mentally retarded

**JA 7261** 31169

murderer the way we treat an offender who may be "less likely" to respond to the death penalty because he was abused as a child. We do not hold him immune from capital punishment, but require his background to be considered by the sentencer as a mitigating factor. *Eddings v. Oklahoma,* 455 U.S. 104, 113-117, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

The Court throws one last factor into its grab bag of reasons why execution of the retarded is "excessive" in all cases: Mentally retarded offenders "face a special risk of wrongful execution" because they are less able "to make a persuasive showing of mitigation," "to give meaningful assistance to their counsel," and to be effective witnesses. *Ante,* at 2252. "Special risk" is pretty flabby language (even flabbier than "less likely")--and I suppose a similar "special risk" could be said to exist for just plain stupid people, inarticulate people, even ugly people. If this unsupported claim has any substance to it (which I doubt) it might support a due process claim in all criminal prosecutions of the mentally retarded; but it is hard to see how it has anything to do with an *Eighth Amendment* claim that execution of the mentally retarded is cruel and unusual. We have never before held it to be cruel and unusual punishment to impose a sentence in violation of some *other* constitutional imperative.

* * *

Today's opinion adds one more to the long list of substantive and procedural requirements impeding imposition of the death penalty imposed under this Court's assumed power to invent a death-is-different jurisprudence. None of those requirements existed when the Eighth Amendment was adopted, and some of them were not even supported by current moral consensus. They include prohibition of the death penalty for "ordinary" murder, *Godfrey,* 446 U.S., at 433, 100 S.Ct. 1759, for rape of an adult woman, *Coker,* 433 U.S., at 592, 97 S.Ct. 2861, and for felony murder absent a showing that the defendant possessed a sufficiently culpable state of mind, *Enmund,* 458 U.S., at 801, 102 S.Ct. 3368; prohibition of the death penalty for any person under the age of 16 at the time of the crime, *Thompson,* 487 U.S., at 838, 108 S.Ct. 2687 (plurality opinion); prohibition of the death penalty as the mandatory punishment for any crime, *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion), *Sumner v. Shuman,* 483 U.S. 66, 77-78,

107 S.Ct. 2716, 97 L.Ed.2d 56 (1987); a requirement that the sentencer not be given unguided discretion, *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) *(per curiam),* a requirement that the sentencer be empowered to take into account all mitigating circumstances, *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), *Eddings v. Oklahoma, supra,* at 110, 102 S.Ct. 869; and a requirement that the accused receive a judicial evaluation of his claim of insanity before the sentence can be executed, *Ford,* 477 U.S., at 410-411, 106 S.Ct. 2595 (plurality opinion). There is something to be said for popular abolition of the death penalty; there is nothing to be said for its incremental abolition by this Court.

This newest invention promises to be more effective than any of the others in turning the process of capital trial into a game. One need only read the definitions of mental retardation adopted by the American Association of Mental Retardation and the American Psychiatric Association (set forth in the Court's opinion, *ante,* at 2245, n. 3) to realize that the symptoms of this condition can readily be feigned. And whereas the capital defendant who feigns insanity risks commitment to a mental institution until he can be cured (and then tried and executed), *Jones v. United States,* 463 U.S. 354, 370, and n. 20, 103 *2268 S.Ct. 3043, 77 L.Ed.2d 694 (1983), the capital defendant who feigns mental retardation risks nothing at all. The mere pendency of the present case has brought us petitions by death row inmates claiming for the first time, after multiple habeas petitions, that they are retarded. See, *e.g., Moore v. Texas,* 535 U.S. ----, 122 S.Ct. 1814, 152 L.Ed.2d 668 (2002) (SCALIA, J., dissenting from grant of applications for stay of execution).

Perhaps these practical difficulties will not be experienced by the minority of capital-punishment States that have very recently changed mental retardation from a mitigating factor (to be accepted or rejected by the sentencer) to an absolute immunity. Time will tell--and the brief time those States have had the new disposition in place (an average of 6.8 years) is surely not enough. But if the practical difficulties do not appear, and if the other States share the Court's perceived moral consensus that *all* mental retardation renders the death penalty inappropriate for *all* crimes, then that majority will presumably follow suit. But there is no justification for this Court's pushing them into

**JA 7262** 31170

the experiment--and turning the experiment into a permanent practice--on constitutional pretext. Nothing has changed the accuracy of Matthew Hale's endorsement of the common law's traditional method for taking account of guilt- reducing factors, written over three centuries ago:

"[Determination of a person's incapacity] is a matter of great difficulty, partly from the easiness of counterfeiting this disability ... and partly from the variety of the degrees of this infirmity, whereof some are sufficient, and some are insufficient to excuse persons in capital offenses.
...
"Yet the law of England hath afforded the best method of trial, that is possible, of this and all other matters of fact, namely, by a jury of twelve men all concurring in the same judgment, by the testimony of witnesses ..., and by the inspection and direction of the judge." 1 Hale, Pleas of the Crown, at 32-33.

I respectfully dissent.

JA 7263 31171

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

22 MPHYDLR 529
**(Cite as: 22 Mental & Physical Disability L. Rep. 529)**

Mental and Physical Disability Law Reporter
August, 1998

Feature

## *529MITIGATING MENTAL RETARDATION IN CAPITAL CASES: FINDING THE "INVISIBLE" DEFENDANT

Denis W. Keyes, William J. Edwards, Timothy J. Derning [FNa1]

Copyright © 1998 by the American Bar Association; Denis W. Keyes, William J.

Edwards, Timothy J. Derning

### Introduction

For almost 20 years, the U.S. Supreme Court sought to ensure that the death penalty was reserved for those individuals for whom lesser sentences could not adequately serve as a deterrent or retributive punishment. In 1986, the U.S. Supreme Court held that a narrowly defined class of death row inmates with mental illness could not be executed. [FN1] Since this decision, no court ever has applied this holding to defendants with mental retardation. [FN2] Why has the Supreme Court refused to create a similar narrow class of people with mental retardation as exempt from capital punishment?

This article explores definitional considerations and legal aspects, characteristics, and concerns related to mental retardation in criminal justice. A thorough review of procedures, including the gathering of documentation, and preparation of experts follows. Finally, the article provides suggestions for lawyers on how to educate courts and juries about mental retardation and how to prepare their defendants for court.

It is important to note that although this article focuses on cases where defendants with mental retardation face the death penalty, the practical information and strategies presented herein apply to all criminal cases in which a defendant(s) either has or might have mental retardation. Defense lawyers' understanding of the implications of a defendant's mental retardation on both the alleged crime(s) and the proposed punishment is crucial to ensuring that the defendant gets adequate and fair representation in court.

### Recent History

It was hoped that the 1989 U.S. Supreme Court decision in Penry v. Lynaugh [FN3] would make sweeping changes to policies regarding the execution of people with mental retardation. Members of the disability community, particularly the American Association on Mental Retardation (AAMR), backed the development and publication of a thoroughly researched and strongly supported amicus brief that exposed the questionable constitutionality and logic of such extreme punishment. [FN4] It was, therefore, somewhat unexpected when the Court made relatively minor clarifications and few substantive changes to existing law [FN5] regarding execution of individuals with mental retardation.

Nevertheless, the changes that were made did make a difference, particularly the ruling that Texas jurors must be able to consider mental retardation as a mitigating factor when deciding whether to impose the death penalty. [FN6] The Court did not give guidelines for juries to follow because, generally, it is up to a jury to decide what evidence should be used as mitigating evidence. [FN7] This is a major reason why it is important for defense lawyers to educate juries



GOVERNMENT
EXHIBIT
241

JA 7264   31172

about the impact of mental retardation on the defendant's life and the crime.

Since 1976, when the U.S. Supreme Court reinstated the death penalty, 33 men with mental retardation have been executed in the United States. Most recently, despite IQ tests measuring in the 60s, Virginia executed inmate Tony Albert Mackall on Feb. 10, 1998, and Missouri executed inmate Reginald Powell on Feb. 25, 1988. Texas inmate Terry Washington, whose intellectual and adaptive functioning levels were described by one psychologist as "well within the range of mental retardation," died by lethal injection on May 6, 1997. Another man with an IQ estimated to be between 68-70, was executed in Florida on Oct. 21, 1996. An Arizona man who had an estimated IQ in the low 70s, but whose trial lawyers never introduced any evidence of his mental retardation, was executed in August 1996. Yet another man whose intelligence was estimated to be "in the sixties" was executed by Virginia in January 1996. [FN8] These numbers may decrease in the future in light of 12 state laws and one federal law prohibiting the execution of people with mental retardation. [FN9]

Recent research suggests that defense lawyers did not raise the issue of their defendants' mental retardation as a mitigating factor in nearly one-third of the capital cases where the evidence was relevant. [FN10] Important as such an omission is, appellate courts refuse to rule that these lawyers provided ineffective assistance of counsel. [FN11] In some cases, appellate courts have refused to review the issue of mental retardation merely because it was not raised at the trial level. [FN12]

**Nature and Extent of the Problem**

When a defendant is passive in defense decisions, shows a lack of understanding or judgment, has difficulty explaining why certain elements are relevant or important, cannot provide *530 accurate or detailed information, or defers to authority figures, [FN13] counsel should investigate thoroughly the possible existence of mental retardation. [FN14] Regrettably, many inmates with mental retardation who are facing the death penalty were not identified as intellectually impaired until after they were sentenced to death. [FN15]

By not presenting information that their defendant has mental retardation, defense lawyers are ignoring a vital piece of information. However, there are several reasons for such an oversight. The first is that the defense lawyers fail to recognize the defendant's mental retardation. [FN16] Most lay persons underestimate the possible existence of mental retardation, thinking that anyone with mental retardation is virtually incapable of almost any self-care. As a result, many people find it difficult to imagine that a person with mental retardation could drive a car, work, take the bus, or perform simple tasks with relative ease. [FN17] They assume mental retardation would be detected quickly and easily because it would be so "obvious." The capital cases discussed in this article have not involved defendants who have severe or profound retardation, because they are almost always more easily identified and diverted from the criminal justice system. Rather, it is people who have mild mental retardation that is, those who are able to function with the least assistance, who present the greatest obstacle to lawyers, the criminal justice system, and even their own defense. [FN18]

It is rarely considered by lawyers and judges that people with mental retardation will attempt to hide their disability. Defendants who have mental retardation often are characterized as quiet and cooperative. By attempting to "look like" persons of average ability, they are masking their disabilities because of the associated stigma of retardation. [FN19] This "cloak of competence," similar to the concept of "passing" is best done by keeping a low profile, not drawing attention to oneself, and agreeing with those asking the questions. [FN20] As a result, people with mild mental retardation rarely are suspected of, evaluated for, or identified as having severe deficits and mental retardation. This ironic twist is called "cheating to lose" [FN21] because the defendant with mental retardation deflects attention from his or her disabilities rather than bringing them to the attention of his or her lawyer or the court. The courts are generally more familiar with people who have mental illness and who are the "squeaky wheels" of competency evaluation requests. Quiet defendants with retardation will take great pains not to draw attention to their deficits, thus maintaining the all-important ruse that they are "normal" while failing to appreciate the disadvantages of hiding their disabilities. [FN22] Lawyers who suspect their defendants have mental retardation should consider writing a memorandum to the probation officer and the court informing them of the impact of mental retardation on one's intent to commit a crime.

2

JA 7265 31173

Professionals confuse mental retardation with mental illness. Mental retardation is not mental illness; the two conditions are distinctly unique, having different causes, different courses, different treatments, and different outcomes. Often, mental illness occurs after the age of 18, while mental retardation must begin prior to the age of 18 (see "Definitions of Mental Retardation," below). Mental illness includes such diagnoses as schizophrenia, bipolar disorder, depression, psychosis, post-traumatic stress disorder, etc. Mental retardation, on the other hand, is a developmental disability, not a mental illness. It is the result of impaired cognitive and intellectual functioning that affects many aspects of development. Confusion regarding the two types of disorders is easily avoided by education and training in basic awareness of disabilities. Such education and training can be included in most areas of professional preparation, particularly law, and should be sought when choosing experts to instruct courts and juries.

### Definitions of Mental Retardation

Mental retardation is defined by two national professional associations: The AAMR and the American Psychiatric Association (APA). [FN23] Both use very similar definitions, which have the same three central components:

(1) Significantly subaverage intellectual functioning (as measured by a valid, individually administered IQ test);

(2) Existing, concurrent related limitations in at least two of 10 adaptive skill areas (communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work); and

(3) Manifestation of the disability must occur during the developmental period, i.e., childhood, which ends somewhere between ages 18 and 22, depending on the definitions applied.

### Intelligence

"Significantly subaverage intellectual functioning" refers to individuals whose intellectual functioning is at or below approximately the third percentile of the general population. Compared to their age peers, an individual who has mental retardation typically scores lower than 97 percent of the general population on IQ tests. The IQ standard score that represents this very low percentile ranking is 70. The APA's Diagnostic and Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) (1994) notes there is a measurement error of approximately five points in assessing IQ, and that it is possible to diagnose mental retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. The AAMR (1992) definition includes IQ standard scores of approximately 70 to 75 in its definition of mental retardation. Both the DSM-IV and AAMR definitions note that deficits in adaptive skills support a diagnosis of mental retardation in individuals whose IQ standard scores fall between 70 and 75. Whichever definition is applied, mental retardation must be considered as a possibility whenever a defendant's IQ standard score is 75 or lower. While DSM-IV is the standard diagnostic reference text for mental disorders, AAMR is the primary professional organization specializing in mental retardation in the United States. AAMR's comprehensive manual, Mental Retardation: Definition, Classification, and Systems of Supports, 9th Edition, is the definitive text regarding the diagnosis and classification *531 of mental retardation. To the extent there may be differences between the two, the authors believe the AAMR text to be definitive in this area.

### Adaptive Skills

Scores on tests of adaptive ability and an analysis of coping skills must be significantly below average, as well. Often, too much is made of the IQ score alone as though it were the sole indicator of mental retardation. A low IQ score without deficits in adaptive functioning is not defined as mental retardation. Conversely, poor adaptive skills in the presence of average intelligence is not mental retardation, either. Such a problem could be related to severe mental illness, such as chronic schizophrenia, or other emotional, cultural or socioeconomic conditions. [FN24] It is important for defense lawyers to remember that their defendants need not have limitations in all 10 areas of adaptive behavior skills, only two. [FN25]

### Age of Onset

Perhaps the most important part of the definition of mental retardation (especially in criminal justice proceedings) is the one that gets the least attention: The cognitive disability must occur during the developmental period (childhood and

3

JA 7266 31174

adolescence), before the age of 18. If the defendant is over age 18 at the time of the evaluation, there must be evidence to show that the cognitive disability existed prior to age 18. [FN26] This part of the definition is required because, in addition to intellectual development, a child is developing emotionally, socially, morally, and psychologically. The child is developing a sense of "Self," of mastery and accomplishment, learning to get along in the world more independently each year. When a central disability such as severe intellectual impairment occurs during development, the entire developmental process is negatively affected. Personality is affected, self-confidence is undermined, social skills and moral reasoning are limited, accomplishments small, and failures typically are abundant. Critical developmental periods and related milestones are passed by uncompleted. Though the research here is conflicting, many critical periods, once passed cannot be retrieved later in life. The impact of the disability is compounded in children. For example, paralysis of an arm or leg in childhood will have a greater impact on a child's personality, self-perception, and social skills than the same loss occurring in a 40 year-old adult. Because of this difference, a defendant who sustained brain damage in adulthood (after age 18), would not be developmentally disabled. In that case, the proper diagnosis might be Dementia Due to Head Trauma. [FN27]

### Stereotypical Features and Functional Characteristics of Mental Retardation

Mental retardation often is accompanied by certain behavioral characteristics, which vary widely, and affect individuals with mental retardation differently but nevertheless have farreaching consequences on the life functioning of these individuals. Several of these characteristics have important implications in the criminal justice system.

First, individuals with mental retardation often develop compensatory behaviors to mask their disability. Second, these individuals may unknowingly waive their Miranda rights in order to please interrogating police officers or others in authority positions. Third, the level of suggestibility for individuals with mental retardation may result in erroneous or completely false confessions. [FN28]

### Learning and Reasoning

Individuals with mental retardation have a significantly limited ability to learn and use abstract reasoning. Individuals with mental retardation often may not understand more complex levels of planning and strategy formation, which may be necessary to carry out a crime or understand a legal defense. In addition, individuals with mental retardation have poor short-and long-term memory recall, and therefore, may be limited in the quality of the information they can share with their lawyers.

### Coping and Adapting

People with mild mental retardation often have significant difficulty coping and adapting. Skills such as communication, socialization, and functional academic abilities usually are quite limited. These skill deficits limit their ability to interact with their lawyer and to fully understand the significance of their Miranda rights. [FN29] This is especially problematic because defendants with mental retardation may waive their rights to remain silent or to speak with a lawyer, in favor of talking with interrogators to please them. Given this tendency, characteristics such as acquiescing to those in authority may hinder efforts to learn the truth. [FN30]

### Appearance

The individuals with mental retardation who end up in court usually do not have the stereotypical physical or behavioral characteristics associated with mental retardation. Such defendants may be hindered by their "normal" appearance. [FN31] Their appearance does not meet the expectation that people with mental retardation will look obviously different, slovenly, odd, and unaware of fashion. To the contrary many criminal defendants with mild retardation have no obvious atypical facial features, nor do they speak loudly, rock back and forth, grunt, grind their teeth, or pick at themselves. These are characteristics commonly found among people with severe retardation, who often are "weeded out" of the criminal justice system.

4

JA 7267 31175

People with mild mental retardation may attempt to compensate for their mental limitations through their appearance. While they may take pride in their appearance, this "masking" may throw off jurors, or even attorneys and mental health professionals. Likewise, defendants with mental retardation who have tattoos, earrings, or a "menacingly" large body do not fit the stereotype of the "childlike" individual with mental retardation. Both extremes are problematic. Nonetheless, the effects of mental retardation are always debilitating. It is critical to properly educate juries about the full spectrum of mental retardation, no matter how the defendant looks.

## *532 Vulnerability and Problems with Co-defendants

Interpersonally, many persons with mental retardation become dependent on others for direction. As a result, they often are vulnerable to coercion, both in and out of jail. [FN32] They often become the "fall guys" for higher functioning and dishonest individuals. In an effort not to feel lonely and isolated from their neighbors, friends, and families they may willingly go along with any scheme just to be included.

On some occasions, defendants with mental retardation may have been coerced into joining in criminal activity, or may have joined in the activity willingly to appear "more like the others" or to be "just one of the gang." When such events occur, co-defendants may identify the defendant with mental retardation as the instigator or the "'trigger man'" knowing that the defendant with mental retardation is less able to adequately defend his actions and thus hoping to reduce their own sentences in a plea agreement. [FN33]

As an example, consider that on Jan. 4, 1996, Virginia executed Walter Correll for capital murder. [FN34] At trial, Correll's lawyers did not offer evidence that his defendant could not spell simple words like "sun" and "clothes." His lawyers presented no evidence at sentencing of his estimated IQ level (68), well within the range of mental disability. [FN35] Even though his lawyer was aware of a previous head injury and a trauma sustained at birth, [FN36] no neurological testing was performed to determine if Correll had brain damage. In addition, Correll's co-defendants testified against him at trial, fingering Correll, a man with clear evidence of mental retardation, as the actual murderer.

Like all people, individuals with mental disabilities have some skill areas that are weaker than others. However, several behavioral characteristics are commonly found among those with mental retardation (see box, below).

## Determining Mental Retardation in a Defendant

The defense team should begin by developing a thorough social history. Counsel must obtain and review as many of the defendant's records as possible. [FN37] It is usually very important that lawyers obtain the services of a reliable and competent investigator. If a mental retardation expert is already retained, the expert should help direct the investigator's inquiry. An investigator who has had experience with a defense based upon mental retardation will be especially useful.

Even defense lawyers may fail to recognize signs of mental retardation when meeting with their defendants. In such cases, it may be easier to detect mental retardation in documents and records. For example, records that indicate "Borderline Intellectual Functioning" or "Learning Disabled" [FN38] may be helpful to discovering mental retardation. [FN39] The defense lawyer should make *533 every effort to obtain and review all medical, psychological, and educational records. These records will assist in developing a complete medical and social history, including (whenever possible) causes of the defendant's cognitive disability. Birth records (including the mother's admission records to hospital, APGAR scores, and any other related data) should be obtained and reviewed.

In many cases involving mild mental retardation, a cause (etiology) cannot be clearly established. However, investigators should have a thorough understanding of the defendant's mother's alcohol and drug history, especially during pregnancy.

## Interviewing the Defendant

People with mental retardation tend to think in concrete and literal terms. As a result, they may not understand the

5

JA 7268 31176

meaning of such concepts as plea bargain and waiver of rights. One of the safest ways of communicating with people with mental retardation is to use clear and simple words in open-ended questions. Always ask questions that require them to explain their reasoning. If possible, have present a social worker or an individual who is close to the defendant to assist him or her in interpreting what is being said and asked and to ensure that the defendant understands the process.

Keep in mind that the defendant may be unfamiliar with the jail setting and will find themselves wanting to talk to anyone. If possible, counsel should obtain a court order to prevent the prosecution from contacting the defendant. Many prosecutors send police personnel, investigators, or psychologists into the jail to interview the defendant. In most cases, a defendant with mental retardation will talk to these people, and may make false statements and admissions.

### Personal Interviews

Interviewing family members is important and necessary, but interviewing social workers, teachers, special education teachers, agency caseworkers, school psychologists, counselors, probation officers, ministers, principals, and other related educational/social personnel can offer rich professional opinions and information about the daily functioning of the defendant. These professionals can help articulate and document the defendant's functional limitations, including such areas of adaptive behavior as issues of self-care; social skills; and community standing. Use of a mitigation specialist in these situations may be important to assisting the court in gaining full awareness of the extent of the defendant's disabilities.

### Documentation

Records of the defendant's childhood injuries and diseases should be thoroughly researched and investigated. Not infrequently, serious childhood head trauma is overlooked in very young children because cognitive demands are minimal for two-or three-year-olds. [FN40] These deficits may become significant later in adolescence. Young children may "seem OK," after a head injury, even to doctors, although traumatic brain injury has occurred. Recent research has shown that young children are not as neurologically flexible as once believed and do not "bounce back" without consequences from head injuries as once thought. [FN41] Such findings may be very significant in future criminal proceedings.

All school records--including placement records and forms--should be searched for any evidence of special education services the defendant or any immediate family members may have received. The Education of All Handicapped Children's Act of 1975 and all of its progeny (the Individuals with Disabilities Education Act (IDEA)) [FN42] mandates careful documentation of special education services, so records for younger defendants likely will exist, either at the school district's record offices, or at the State Department of Education. It should be noted that these records often are put on microfilm or microfiche after five years. Several types of records and reports, which are described below, may be valuable to lawyers representing defendants with mental retardation.

### Psychoeducational Reports

All children who receive special education services will have psychoeducational reports in their files. All scores and data on the defendant's childhood functioning will be obtained. These reports usually are found in school records, but family members might recall other, independent psychological or educational evaluations. Whenever possible, investigators should obtain the raw test data notes of the actual evaluation process, which may be available from the evaluating psychologist who conducted the tests. Such raw data can be re-scored and re-examined, so inconsistencies may be identified. Unfortunately, many school districts discard raw test data, even testing scores and records, once a child matriculates. In some cases, school psychologists do not discard their raw data, so lawyers should talk with the school psychologists, if possible.

### Individualized Education Plans

All children who received special education services since 1975 are required to have a individual education program

6

**JA 7269** 31177

or plan (an IEP) developed for their specific social, curricular and personal needs. These plans, which document evaluation results and disabilities, also should be found with the school records. If they are not available through the school district, most states require that copies be sent to the State Education Agency for filing.

### Triennial Re-evaluations

Between 1975 and 1997, when the IDEA was reauthorized, [FN43] triennial re- evaluations of the child's placement in special education settings were required. This would include psychoeducational assessments every three years, in order to determine if special education placement is still needed and/or legitimate.

### Academic Records

Academic records include transcripts of grades, retentions, promotions, teacher comments, attendance records. Specifically, they show how many days a defendant was absent from school, *534 if any grades where repeated, and the date that he or she left the school or finished. [FN44] Often defendants with mental retardation are unclear about their academic history and claim to have achieved more education than they actually did. Most schools offer a diploma to people who finish their education in special classes, even though they may be at only a fourth-grade level. Note, however, that some schools that offer a diploma may not identify the holder as matriculating from a special curriculum. This can be confusing at first because such a diploma may look like everyone else's. But the transcript and the program requirements will not have been the same, which becomes obvious when reviewing the transcripts. In states requiring a Regents or State Board of Education Exit Examination, people with mental retardation will not be capable of successfully passing such an examination.

In reviewing school records from the early 1960s or 70s, and especially in southern states, counsel also should be aware of the role that race may have played in the identification of mental retardation. A minority student may have mental retardation but may not have been tested for or identified as having the condition while in school because school personnel were reluctant to label children as "mentally retarded" for fear of being labeled themselves as racists. [FN45]

### Vocational Education Records

If defendants have attended a vocational school, they probably were clients of agencies for individuals with developmental disabilities, such as Regional Centers. Therefore, vocational school records might not be located in the school district office, but in the regional center for vocational education or rehabilitation for people with mental retardation.

### Military and Employment Records

Investigators should seek information on the defendant's military history particularly for older defendants who might have served in wars. Today's Army would not recruit a person with mental retardation. Older defendants may have served in the military during wartime when all able-bodied men were readily enlisted. Intelligence testing, service performance records, and discharge records may be valuable. A military record does not rule out mental retardation. [FN46]

Any employment records also should be reviewed carefully for any evidence of problems related to adaptive behavioral functioning. Information such as who filled out the defendant's employment applications is relevant to the defendant's writing skills. [FN47] In addition, any history of firings should be closely examined to find the true reason for the dismissal. Inability to learn or follow instructions may be the cause.

### Criminal Records

Defense lawyers should investigate their defendants' criminal history, if any-including juvenile placement and any jail or prison sentences-and should review all relevant police reports. They also should review all typed, written, or recorded

7

JA 7270 31178

confessions or statements. [FN48]

## Prison/Institutional Records

Any prison/institutional records also should be reviewed by lawyers and experts. It is important that lawyers note any disciplinary "write-ups" of their defendants for not working in prison because they may indicate that a defendant may not be able to follow directions or pay attention, which could indicate mental retardation. Note that in institution settings, and sometimes in incarcerated living situations, a defendant's functional impairments may not be recognized as mental retardation. Moreover, the behavior of someone living on the streets will differ considerably from the behavior of someone living in a structured environment like jail or a home. Lawyers should take such points into serious consideration. Use of a prison expert in these situations may be helpful to enlighten the court on the implications that such events have on such an individual's mental and emotional functioning.

## State Agency Records

Defense lawyers should be aware that defendants who might have mental retardation may have been evaluated by the State Department of Mental Health or its equivalent agency, such as Regional Centers. Some state agencies may raise IQ scores in an effort to reduce or maintain the number of people eligible for services. [FN49] The prosecution may try to use those falsely-elevated IQ scores to show that a defendant was never diagnosed with mental retardation. However, lawyers must pay careful attention to the type of IQ test that was administered because many state agencies may administer group tests, such as the Revised Beta, which could yield inaccurate IQ levels.

Defense lawyers also should obtain all state agency records with respect to employment placement in the community as well as all records from the Department of Social Services, such as psychological scores and medical histories.

## Understanding the Causes of Mental Retardation and Proving its Existence

It is important to preface this section with a reminder: Counsel need not prove the cause of mental retardation, only its existence. The specific cause(s) of the retardation, unlike other forms of brain injury or cognitive impairment, may not be discoverable. What is important is illustrating the history of mental retardation functioning and related factors demonstrating its existence independent of the IQ, test scores, and psychological assessment.

First, certain physical and mental conditions of the defendant's parents may be directly or indirectly related to the defendant's mental disabilities and should be noted. Most important of these is the defendant's mother's exposure to neurotoxins-such as alcohol, drugs, pesticides, lead, and chemical wastes- during her childbearing years. In addition, prenatal maternal infections such as venereal diseases-particularly syphilis-can cause mental retardation and should be noted. Even chronic maternal illnesses, such as high blood pressure and kidney infections, also could have affected the fetus' cognitive development. Any drugs or alcohol ingested during pregnancy introduces a neurotoxin *535 that may cause Fetal Alcohol Syndrome or the partial syndrome, Fetal Alcohol Effects, in the child. [FN50]

Second, investigators should determine if the defendant's mother received proper prenatal care during pregnancy. It is important to know if the mother was a victim of malnutrition during her pregnancy or if the defendant was born prematurely. Information such as this usually can be determined by medical records.

Third, certain genetic disorders such as chromosomal anomalies and single gene disorders can be determined by blood testing. [FN51] Various birth traumas (anoxia, fetal distress, etc.), which should be recorded in medical records for hospital births, can also cause mental retardation. Anoxia, a lack of oxygen to the brain, may result when the umbilical cord gets caught around the fetus' neck. This is even more common in cases of multiple births. Other causes of anoxia later in childhood and adolescence include choking episodes, near drownings, and use of inhalants. Convulsions and seizures, frequently associated with, but certainly not limited to, conditions such as epilepsy, often result in further brain trauma. If the defendant has a long history of seizures, documentation and related medical records should be sought. No seizure, however minor, ever exists without some insult to the brain. [FN52]

8

JA 7271 31179

Roughly 85 percent of all cases of mental retardation fall within what was formerly called the "mild" range, and in about 75 percent of children with mild mental retardation, the cause of the condition is unknown. [FN53]

Potential post-natal causes of mental retardation-including injuries to the head that may have resulted in brain damage-should not be ruled out either. There may also be instances where neurological impairment occurred due to injury or abuse during childhood. In one capital case, it was significant that the defendants's mother had been diagnosed as mentally disabled, evidence of which was clearly documented. [FN54] The subsequent diagnosis of the defendant's mental disability was supported since a child's mental status may be influenced by a parent's (or parents') intellectual abilities. [FN55] Finally, lead poisoning can cause mental disabilities, and is more often found in families who have experienced extremely impoverished environments. [FN56]

### Finding and Using an Expert

Because mental retardation represents approximately 2 percent to 3 percent of the population, it is a small, specific subspecialty for mental health professionals. Typically, these professionals have little experience and training with people who have mental retardation. The assessment, diagnosis and treatment of this population is sometimes very different than the "typical" patient. Training in traditional mental health graduate programs includes little, if any, information about mental retardation. Clinicians who lack experience in this area may inadvertently use tests that are not normed or standardized for persons with mental retardation and therefore, are not appropriate for them. The commonly used projective psychological tests such as the Rorschach ("inkblot") Test and the Minnesota Multiphasic Personality Inventory (MMPI, MMPI-2) may not be appropriate for use with persons with mental retardation and are not recommended. These verbally demanding psychological tests require a clear understanding of test expectations and accurate expressive ability of internal states, and can be especially problematic for a defendant with mental retardation. [FN57]

Experts on the use of MMPI warn that there are serious limitations in administering the MMPI to subjects with very limited comprehension skills. Even special administrative adaptations such as reading the MMPI questions aloud, or using a tape format "...are still likely to encounter a lower boundary posed by severe intellective retardation." [FN58] Examiners should carefully screen subjects for reading and comprehension ability.

Psychological profile distortions are also likely with the Rorschach Test when interpreting the responses of defendants with mental retardation. Due to the limited intelligence and expressive verbal ability, the Rorschach profile may seem invalid and/or more "disturbed" (e.g., lower F+% and X+%) than is actually the case. [FN59] The Rorschach can be of limited value with subjects of low intelligence who do not have mental retardation, but it is more appropriate for subjects with limited talent. In standardizing psychological tests, the subjects selected are typically members of a target group for whom the test is being developed. Atypical subjects, such as those whose IQ is below 80, often are excluded from normative samples. The test results, therefore, are derived from norms that do not include subjects with mental retardation. Compare this to the use of a psychological test with a child, in which children were excluded from the test's normative sample. At trial, it is important for the lawyer to know the appropriateness of the test(s) used (if the normative sample included people with mental retardation), and if special precautions or modifications were used by the examiner in the administration of the test to the defendant. However, few such socioemotional tests are recommended for the rigorous demands of a forensic evaluation because few validity studies have been conducted on personality measures for people with IQ scores below 80.

In choosing someone to perform a forensic evaluation, it is important that the psychologist have some experience with and background in mental retardation. [FN60] It might be possible to identify a local expert by contacting a local college or university(check faculty in either the departments of special education, psychology, or school psychology). These experts may be valuable in explaining the significance of school records and special education placement forms. Additionally, the state or local chapter of the Arc of the United States (817-261-6003) or the AAMR (1-800-424-3688) often keep lists of experts for such purposes. [FN61] Attorneys for the local or state Protection & Advocacy Agency also might be a good resource, and represent defendants in court or help obtain defendants records.

9

JA 7272 31180

Involving such organizations as the Arc also may be useful in garnering public support because the local or state Arc leadership might induce its members to begin a campaign of letter writing to the prosecutors. As public servants, prosecutors often are prepared to listen to these private advocates who also happen to be voters. Such advocates may have an impact on the outcome of a case concerning an individual with mental retardation, and could even help facilitate a plea bargain.

*536 Additionally, the employees or the leadership of the local Arc or AAMR may be willing to serve as supportive witnesses at trial. These people often can attest to the availability of local services. If local direct or indirect services for people with mental retardation were unavailable or inadequate when compared to other areas, it may be argued that the defendants did not have sufficient benefit from or access to community services. As such, this could be considered mitigating evidence that potentially could have an impact on the jury's decisions.

Counsel should be aware that the testing instrument itself can become a variable in the diagnosis. Some tests, such as the Stanford Binet Intelligence Scale, and the Wechsler Adult Intelligence Scale-Third Edition (WAIS-3) are well established, cover multiple areas that provide a reasonably comprehensive profile, and are carefully researched IQ tests. Another test, the Kaufman Adolescent and Adult Intelligence Test (KAIT), is quite adequate for the purpose of this form of evaluation, provided that previous documentation of a mental disability exists. As noted above, group-administered IQ tests such as the Slosson Intelligence Test for Children and Adults (SIT) or the Revised Beta Examination-Second Edition (BETA-II) are inadequate tests to diagnose mental retardation. It important to know which so-called "IQ score" is a comprehensive and valid measure of intellectual functioning.

Counsel should be aware that a defendant's IQ scores from previous evaluations may be derived from abbreviated test administration in which a portion of the WAIS-R or Stanford-Binet, for example, is given. Again, brief tests of intelligence are commonly used, but do not meet the requirements of a mental retardation assessment. Professional opinions and conclusions based upon such testing practices should be questioned. It is important that defense lawyers educate themselves about the various psychological tests that were administered to their defendants throughout their lives. [FN62] In addition, if brain damage or fetal alcohol syndrome is suspected, defense lawyers should ensure that their defendants are also examined by neuropsychologists, neurologists or other doctors.

The defense lawyer should work with the mental retardation expert to educate the jury and the court about the defendant's limitations, such as, the defendant's inability to tell time, read a simple recipe, count change accurately, or write a letter.

### Preparing Experts and Presenting Data to the Jury

Defense counsel must explain mental retardation and its diagnostic process thoroughly and carefully so jurors will have a clear understanding of this often misunderstood disability. [FN63] Experts may discuss the effects of mental retardation on behavior and decision-making, which might help to explain the crime. In doing this, the following steps should be considered:

. The defense lawyer must educate the jury about mental retardation, its various presentations, and the distinct difference between mental retardation and mental illness. [FN64] Defense counsel may use a mental retardation expert to further explain the relevance of mental retardation in either the guilt or penalty phases of trial, or both (including relevant aspects of confessions, waiver of Miranda rights, and culpability). The "loaded" issue in the penalty area is the defendant's potential future dangerousness. In the penalty phase, when the prosecutor is arguing future dangerousness, the defense should focus on institutional adjustment needs.

. Jurors often expect people with mental retardation to be extremely low functioning and may not be expecting a quiet, mild-mannered individual. When the defendant fails to exhibit any stereotypical behaviors (such as drooling, giggling, smiling with a vacant appearance, rocking), jury members may think that the mental retardation defense is untrue or unwarranted. Defendants with mental retardation also may behave in a way that suggests a lack of remorse, which makes the jury believe that the defendant just does not care. For example, a jury may perceive a defendant's sitting slumped down in his chair as acting "cool," and not showing proper respect for the proceedings. One possible reason for this is that the defendant is, essentially, lost in these events and has no idea of what is happening. Rather than show the

10

JA 7273 31181

frustration and fears arising from the situation and risk admitting the presence of a disability, looking "cool" becomes a great "cloak" for the lack of competence. [FN65]

. Counsel must decide whether or not to put a defendant on the witness stand. The general rule is that one should not put a defendant with mental retardation on the stand. [FN66] However, in at least one case, one juror decided against the death penalty when she heard the defendant explain the case events on the stand: It did not take long for her to realize how disabled this defendant was. [FN67] Regardless of whether or not the defendant takes the stand, counsel should have teachers, psychologists, friends, ministers and family members testify using actual memories and anecdotes of the defendant's intellectual and adaptive limitations. Most importantly, counsel should have knowledgeable experts in mental retardation to explain issues and characteristics of the condition to the court.

### Conclusion

In 1972, the U.S. Supreme Court ruled all nonmandatory death penalty statutes in the United States unconstitutional, [FN68] but in 1976, a more conservative Supreme Court reinstated the death penalty. [FN69] Since 1976, the United States has executed at least 33 people who demonstrated clear and documented evidence of mental retardation. [FN70]

Mental retardation often is not explored as a mitigating factor because lawyers either do not discover that their defendant is so seriously disabled or do not fully realize the ramifications of such a diagnosis. Lawyers need to recognize that early identification of a defendant's mental retardation is crucial to the disposition of the case. Therefore, lawyers need to consider the possibility *537 that defendants with low reading, writing and expressive ability may have mental retardation. If so, the lawyers will want to incorporate the disabling nature of this condition into their case strategy and presentation, in order to educate the court and jury that mental retardation affects the entire case, particularly during arrest, interrogation, and court proceedings.

Counsel must seek out those people with mental retardation who become entangled in the criminal justice system, because often they do not easily or willingly expose their disability. While people with mental retardation are no longer put in dark asylums or locked up in attics, they are still being executed.

Counsel may wish to clearly point out to the jury that the imposition of the death sentence is typically reserved for the most criminally culpable and responsible offenders. The culpability and responsibility of a defendant with mental retardation, functioning below the lowest 5 percent of the population, should not include the imposition of the most extreme penalty possible. If the defense counsel properly identifies and addresses the severe deficits of mental retardation, the defendant's life can be placed in the proper context: disabled functioning, often with inadequate support. Although people with mental retardation should be held accountable, their accountability, like their intellectual abilities, is limited.

#### Basic Characteristics and Behaviors Commonly Found Among People with Mental Retardation

People with Mental Retardation may present with some or all of the following characteristics and behaviors:
. subaverage intellectual functioning (the lowest 2.27 percent of the U.S. population);
. deficits in adaptive skills (communication, socialization, daily living skills);
. impaired short-term memory (do not attend to details and poor recall);
. limited abstract reasoning ability (due to literal and concrete thought patterns);
. distractibility;
. require repeated learning opportunities (they do not learn incidental lessons easily or quickly);
. poor transference of information and generalization skills (impaired ability to make logical connections);
. perseverative and impulsive behaviors (tendency toward repetitive behaviors);
. poor planning and coping skills (limited ability to see cause/effect; easily frustrated);
. poor judgment and problem-solving skills (difficulty recognizing dangerous situations);
. a tendency to acquiesce (they want to please significant others and be accepted); and
. a propensity toward dependence.

11

JA 7274 31182

A Few Basic Facts:

1. Mental retardation is always a severe disability.

2. The social stigma of mental retardation is offensive even to most people with mental retardation.

3. People with mild mental retardation will go to extreme lengths in order to hide their disability. This is often called a "cloak of competence."

4. People with mild mental retardation often become quite adept at making others believe that they function on a higher level than is actually the case.

5. Professionals who are not trained or experienced in mental retardation may fail to adequately evaluate a defendant with mental retardation; thus failing to correctly diagnose the associated level of competence.

6. Only in the last decade has the criminal justice system taken steps to investigate mental retardation in pre-trial preparations.

FNa1. **Denis W. Keyes, Ph.D., FAAMR** is an associate professor of Special Education, at the College of Charleston in Charleston, SC. He has appeared on ABC's 20-20 and as a guest expert on CNN Presents OnLine conference. He is a Fellow of the American Association on Mental Retardation. **William J. Edwards, J.D. is a deputy public defender in the Office of the Riverside County Public** Defender, Indio, Calif., and the ABA Young Lawyer's Division's representative for the ABA Death Penalty Representation Project. Edwards would like to thank Kendall D. Berkey, deputy city attorney, Cathedral City, Calif. **Timothy J.** Derning, Ph.D., M.S.Ed. **is a clinical and forensic psychologist in Lafayette,** California. He is an expert in neurobehavioral deficits, mental retardation, and Fetal Alcohol Syndrome. He served on the Criminal Justice Task Force for Persons with Developmental Disabilities, sponsored by Arc-Calif., and is a consultant to the Institute on Disabilities, Temple University.

FN1. Ford v. Wainwright, 477 U.S. 399 (1986), 10 MPDLR 278.

FN2. The U.S. Supreme Court held that a narrowly defined class of death row inmates with mental illness could not be executed (Ford v. Wainwright, 477 U.S. 699 (1986)). This ruling, however, has not been held for defendant with mental retardation, and those who have tried have been unsuccessful (Martin v. Dugger, 686 F. Supp. 1523, 1572-1573 (S.D. Fla. 1988); Washington v. Rice, 757 P.2d 889, 913 (1988), Brogdon v. Butler, 824 F.2d 338 (5th Cir. 1987).) In Brogdon, the Court held that, "Mental retardation does not constitute insanity or the incapacity to know the difference between right and wrong. It is only the latter disability, not the former, that serves as a defense to conviction and also to punishment." Brogdon at 341.

FN3. 492 U.S. 302 (1989). In 1989, when the Supreme Court decided Penry, Georgia was the only state that prohibited the execution of individuals with mental retardation. The court simply refused to create a new class of persons to whom the death penalty can never be applied. See Denis W. Keyes et al., "Mental Retardation and the Death Penalty," 21 Ment. & Phys. Dis. L. Rep. 687 (1997).

FN4. J. Ellis & R. Luckasson, "Brief of American Association on Mental Retardation et al. As Amici Curiae in Support of Petitioner In re Johnny Paul Penry, Petitioner v. James A. Lynaugh, Director, Texas Department of Corrections, Respondent" in The Criminal Justice System and Mental Retardation: Defendants and Victims 245-278 (R. Conley et al. eds. 1992). See also ABA Resolution Report No. 100, 107, 303, adopted by ABA Section of Individual Rights and Responsibilities and ABA Section of Litigation (1997).

FN5. At the time that Penry was decided, the only state with a law specifically prohibiting execution of individuals with mental retardation was Georgia.

FN6. 492 U.S. 302, 310, 323, 328. The Penry court held that the jury must be able to "consider and give effect to" the defendant's mitigating evidence of organic brain damage, moderate retardation, and disadvantaged background.

FN7. Eddings v. Oklahoma, 455 U.S. 104, 113-114 (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978). Jurors

12

JA 7275 31183

in an individual case may be confused about the relevance of mental retardation to culpability and may even consider mental retardation as an aggravating factor. See Roach v. Martin, 757 F.2d 1463, 1483 (4th Cir. 1985); South Carolina v. Middleton, 368 S.E.2d 457, 461 (1988); Miller v. State, 373 So. 2d 882 (1979). In many cases the prosecutor may argue that because the defendant has mental retardation there is a probability that he or she will be dangerous in the future so why should the jury not sentence him or her to death.

FN8. Denis W. Keyes et al., "People with Mental Retardation Are Dying, Legally," Vol. 35 No. 1 Mental Retardation 59-63 (1997).

FN9. See Denis W. Keyes et al., "Mental Retardation and the Death Penalty: Current Status of Exemption Legislation," 21 Ment. & Phys. Dis. L. Rep. 687 (1997).

FN10. Id.

FN11. Duhamel v. Collins, 955 F.2d 962 (Texas 5th Cir. 1992). It is the lawyer's responsibility to present to the jury mitigating evidence of the defendant's mental retardation. The defendant is simply not going to come out and tell his lawyer that he/she is mentally retarded. See also Andrews v. Collins, 21 F. 2d 612, 624 (11th Cir. 1994), in which the U.S. District Court of Appeals held that it was not ineffective assistance of counsel for a lawyer not to present evidence of his defendant's mild mental retardation. But see Jones v. Thigpen, 788 F.2d 1101, 1102-1103 (5th Cir. 1986) in which the court held counsel rendered ineffective assistance of counsel by failing to present evidence of his defendant's mental retardation. The defendant had an IQ of less than 41.

FN12. Reams v. State, 909 S.W. 324, 322 Ark. 336 (1995); Ex parte Dunkins, 465 U.S. 1051 (1984); Sawyer v. Whitley, 945 F.2d 812 (1991); Prejean v. Smith, 889 F. 2d 1391 (5th Cir. 1989); Marquez v. Collins, 11 F. 3d 123 (5th Cir. 1994).

FN13. R. Perske, "Thoughts on the Police Interrogation of Individuals with Mental Retardation," 32 Mental Retardation 377 (1994).

FN14. D. Keyes & W. Edwards, "Documenting Mental Retardation by Thorough Investigation," 42 Capital Report 1 (1995).

FN15. D. Keyes et al., supra note 8.

FN16. Fairchild v. Lockhart, 744 F. Supp. 142 (D. Ct. Ark 1989).

FN17. In one recent case, one of the authors learned that the prosecutor's expert, a psychologist, suggested that because the defendant could wash his own laundry, ride the bus and watch TV on his own, he did not have mental retardation.

FN18. W. Edwards & L. Reynolds, "Defending and Advocating on Behalf of Individuals with 'Mild' Mental Retardation in the Criminal Justice System" Vol. 10 No. 2 Impact (Univ. of Minnesota, The College of Education and Human Development 1997). See also testimony of Ruth Luckasson in Fairchild v. Lockhart, 744 F. Supp 1429, 1435-49 (E.D. Ark. 1989) People with mild mental retardation statistically place in the bottom 2 percent of the population in intelligence.

FN19. J. McGee & F. Menolascino, "The Evaluation of Defendants with Mental Retardation in the Criminal Justice System," in The Criminal Justice System and Mental Retardation at 63 (R. Conley et al., eds., 1992). See also ABA Criminal Justice Mental Health Standards 7-9.2 and 7-9.3 (1986 and 1989).

FN20. R. Edgerton, The Cloak of Competence: Stigma in the Lives of the Mentally Retarded (1967).

JA 7276 31184

FN21. J. Ellis & R. Luckasson, "Mentally Retarded Criminal Defendants," 53 Geo. Wash. L. Rev. 414, 428-29 (1985).; S. Simpson, "Confessions and the Mentally Retarded Capital Defendant: Cheating to Lose," 6 Capital Defense Digest 30.(1994).

FN22. Edgerton, supra note 20.

FN23. Terminology and Classification Manual of the American Association of Mental Retardation ( R. Luckasson ed., 9th ed. 1992). See also, Mental Retardation: Definition, Classification, and Systems of Support (American Association on Mental Retardation 1992). Mental retardation is viewed as a disabling condition resulting from the interaction of a person with his or her environments. See S. Reiss, "Issues in Defining Mental Retardation," 99 Am. J. Mental Retardation 1-7 (1994); Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition (DSM-IV) (American Psychiatric Association ed., 1994).

FN24. People with mental retardation have limited abilities, while people with mental illness suffer disturbances in their thought process and emotions. Mental retardation is usually considered a permanent disability while mental illness may be temporary, cyclical and episodic. F. Menolascino, "Mental Illness in the Mentally Retarded: Diagnostic and Treatment Issues," in Mental Retardation and Mental Health: Classification, Diagnosis, Treatment, Services (J. Stark, ed. 1988).

FN25. Lawyers may want to create a notebook for all 10 areas of adaptive behavior skills and to interview family, friends, teachers, and employers regarding the defendant's abilities in these areas. See also W. Edwards & L. Reynolds, supra note 18.

FN26. While 18 is the age limit in the AAMR and APA definitions, this may vary somewhat from state to state. Certain states having statutes prohibiting the death penalty for people with mental retardation have extended the age of onset to as old as 22 years. See, e.g., Ind. Code §35-36-9-1 et seq.

FN27. See DSM-IV at 148.

FN28. See, e.g., Missouri v. Wilson, 83 S.W.2d 833 (Mo. 1991).

FN29. D. Keyes & W. Edwards, "Competence Assessment: Questions and (Some) Answers," The Champion at 11 (May 1996). See also Faretta v. California, 487 U.S. 815 (1975).

FN30. See M. Addison & D. Keyes, in Convicting the Innocent (D. Connery ed. 1996).

FN31. M. Atchison & Denis Keyes, "Why Johnny Lee Wilson Went to Prison," 118- 126 in Convicting the Innocent (Donald S. Connery ed. 1996).

FN32. D. Keyes & W. Edwards, "Competence Assessment: Questions and (Some) Answers," The Champion at 11 (May 1996).

FN33. See, generally, Hayes v. Florida, 581 So.2d 121 (1991).

FN34. Correll v. Virginia, 482 U.S. 931 (1987).

FN35. In tests conducted by Central State Hospital, Walter Correll was determined to have an IQ of 68. Correll v. Thompson, Petition for Writ of Habeas Corpus (In the U.S. District Court for the Western District of Virginia (1991). See also Correll v. Thompson, 872 F. Supp. 282 (W.D. Va. 1994); Correll v. Thompson, 63 F.3d 1279, 1291 (1995).

FN36. In an affidavit written by Dr. Neil Blumberg (1986), he revealed that shortly after birth, Mr. Correll

14

experienced an episode of atelectasis which resulted in cyanosis which may have caused brain damage.

FN37. D. Keyes & W. Edwards, supra note 14 at 8. "Thorough investigation includes not only full documentation of the defendant's family history, but also the educational health histories of the defendant and his or her family members."

FN38. It should be noted that mental retardation and learning disabilities are not the same. "Learning disabled" refers to significant discrepancies between intelligence and achievement. Average to above-average intelligence is expected in individuals who are diagnosed as learning disabled.

FN39. Missouri v. Wilson, 813 S.W.2d 833 (Mo. 1991); Bowden v. Kemp, 793 F.2d 272 (11th Cir. 1986); Fairchild v. Lockhart, 744 F. Supp 1429 (1989) .

FN40. J. Williams & T. Kay, Head Injury-A Family Matter (1991). See also D. Faust et al., Brain Damage Claims: Coping with Neuropsychological Evidence (1991). A dysfunctional brain can affect behavior and functioning in a wide variety of ways ranging from unprovoked rages to impairment of judgment for cause and effect.

FN41. M. Ylvisaker et al., "A framework for cognitive intervention," in Educational Dimensions of Acquired Brain Injury 35-67 (R. C. Savage & G. F. Wolcott eds., 1994). See also, H.S. Levin, H. S. et al., "Age and Recovery from Brain Damage: a Review of Clinical Studies," in Aging and Recovery of Function in the Central Nervous System 169-203 (S. W. Scheeff ed. 1984).

FN42. 20 U.S.C. §1400, et seq. Schools are required under the IDEA to write a letter to a child's parents advising them that their child is having problems in school. Lawyers should determine whether this letter was sent for their defendants, and if so, did parents follow up by contacting the school. If not, lawyers should interview the parents to find out why no follow up was done.

FN43. Id.; see Pub. L. No. 105-17.

FN44. Recently, one of the authors worked on a capital case in Tennessee, representing a defendant with mental retardation facing the death penalty. His school records from the 6th grade had shown that in one year the defendant had missed 65 days of school. In a case in Mississippi, the defendant's attendance records stated he had been withdrawn for lack of attendance. These facts are important because they speak to various issues in school, and lawyers must not stop here after reviewing such records. Lawyers must seek to find out facts such as why the defendant dropped out of school. What resources were available to the defendant during these years in school? Did the school do all it could to help the defendant? Is the blame for school failure entirely the defendant's, or the defendant's family, or perhaps the school's? For example, did any one in the school take the time to evaluate your defendant?

FN45. The California Death Penalty Defense Manual, Vol. III, Mitigation Workbook, Section II (A) Mental Retardation 30 (California Attorneys for Criminal Justice 1998). See also M. Smith et al., Mental Retardation (1994) at 210: Current national figures reported in a 1992 study by the U.S. Department of Education showed that "black youths are over two and one half times more likely to be identified as mentally retarded than would be expected. Interestingly, white students are under-identified and Hispanic students are much less likely to be identified as mentally retarded than expected." See also J. Banks & C. McGee Banks, Multicultural Education, Issues and Perspectives (1997).

FN46. Two of the authors worked on a case where the defendant was retarded and had been enlisted in the military. According to the military records, the defendant was able to shoot a gun. The prosecutor believed that since said defendant was enlisted in the military, he could not be mentally retarded. However, the defendant was discharged because he was frequently AWOL.

15

JA 7278 31186

FN47. In one case, a defendant told his lawyer that he had filled out his own employment applications. However, after gathering all employment records from eight different jobs, the lawyer determined that the defendant's wife had filled out the applications because the defendant could not read or write very well. Note, because this case is pending, please contact the authors if further information about this case is desired.

FN48. S. Kassin, "The Psychology of Confession Evidence," 52 Am. Psychologists 221, 227 (1997). S. Simpson, "Confessions and the Mentally Retarded Capital Defendant: Cheating to Lose," 6 Capital Defense Digest 28 (1994).

FN49. John Blume, "Representing the Mentally Retarded Defendant in a Capital Trial" The Champion 32 (Nov. 1987).

FN50. K. Stratton et al., Fetal Alcohol Syndrome, Diagnosis, Epidemiology, Prevention and Treatment (1996); Facts about Alcohol Use During Pregnancy, Q & A (The Arc (National Headquarters, 500 E. Border Street, S-300, Arlington, Texas 76010) 1992); See also A. Streissguth & J. Kanter, The Challenge of Fetal Alcohol Syndrome: Overcoming Secondary Disabilities (1997); A. P. Streissguth, Fetal Alcohol Syndrome, A Guide for Families and Communities (1997).

FN51. S. Davis & L. "Reynolds, Genetic Issues in Mental Retardation," Vol. 1, No. 3, A Report on the Arc's Human Genone Education Project (The Arc of the United States 1997).

FN52. Thomas L. Bennett, The Neuropsychology of Epilepsy (1992).

FN53. W. Heward, Exceptional Children--Introduction to Special Education (5th ed. 1996).

FN54. United States v. Webster, No. 4-94-CR-121-Y (N.D. Tex. 1994). Webster marks the first federal death penalty case in which a defendant has been sentenced to death after attempting to establish his inability for the death penalty due to his mental retardation. Only four jurors believed that the defendant had mental retardation. Out of those four, none felt that his mental retardation should have any bearing on whether the death penalty should be imposed.

FN55. M. Feldman & N. Walton-Allen, "Effects of Maternal Mental Retardation and Poverty on Intellectual, Academic and Behavioral Status of School-Age Children," 101 Am. J. Mental Retardation 352 (1997); J. Rojahn et al., "Biological and Environmental Risk for Poor Developmental Outcome of Young Children," 97 American Journal on Mental Retardation 702 (1993).

FN56. Mental Retardation: Definition, Classification, and Systems of Support- Terminology and Classification Manual of the American Association of Mental Retardation (R. Luckasson et al. ed., 9th ed., 1992). See also, S. Pueschel et al., Lead Poisoning in Childhood (1996).

FN57. Various tests of socio-emotional development have warnings that they should not be administered to individuals who are mentally disabled or who have not successfully completed at least six years of schooling. Additionally, the MMPI has some 566 items that must be read to or by the defendant, which can become incredibly tedious.

FN58. W. G. Dahlstrom, et al., An MMPI Handbook, Vol. 1, Clinical Interpretation (rev'd ed. 1982).

FN59. J. Exner, Jr. & I. Weiner, The Rorschach: A Comprehensive System, Vol. 3 (1982).

FN60. J. Ellis & R. Luckasson, supra note 4 at 485-489.

FN61. Citizen advocacy groups may help advocate for a defendant with mental retardation. While there may

16

**JA 7279** 31187

be concern about a possible adverse public reaction (that people with MR are more likely to commit violent offenses), this has not been the case in several unlikely places. In Louisiana, for instance, the state Arc erected a billboard requesting clemency for convicted offender Robert Sawyer.

FN62. One of the authors worked on a capital case in Tennessee and the defendant was administered the "Lorge-Thorndike Intelligence Test" to determine his IQ level for placement into special education. The defendant was African- American and the test was designed to see if pupils of different racial classes obtain similar mean IQs. The test was to be administered to all pupils attending fifth to seventh grades. However, the defendant was in fourth grade when the test was administered to him. This is why it is important for defense lawyers to research the history of each psychological test administered throughout the defendant's life. It is important to determine what year a test was designed, what was the purpose of the test and to what group of people should the test be administered. Lawyers should review the volumes of the books titled, Burrows, Mental Measurement Yearbook.

FN63. Edgerton, supra note 20.

FN64. Defense lawyers should consider tailoring voir dire questions to the jury to ascertain jury members' understanding or knowledge of mental retardation and its impact on the defendant. If possible, the lawyer should submit jury questionnaires for the judge to use or even consider having a survey conducted. In United States v. Webster, No. 4-94-CR-121-Y (N.D. Tex. 1994), Webster's lawyers hired the North Texas Survey Institute to conduct random telephone interviews of 386 residents of Tarrant county where the federal capital case was being tried. The respondents were asked questions designed to query their knowledge of issues relating to mental retardation and capital punishment. Questions such as "Should a person who is mentally retarded be subject to the same sentences, including the death penalty" were asked.

FN65. Edgerton, supra note 20.

FN66. For example, in one case, a lawyer in Texas put his defendant on the stand and asked him on re-direct examination: "... do you know what mental retardation is, do you know?" The defendant answered: "Someone ill." See Transcript, Texas v. Robert Smith, No. 71433 (1992, Harris County).

FN67. R. Perske, Unequal Justice? (1991).

FN68. Furman v. Georgia, 408 U.S. 238 (1972).

FN69. Gregg v. Georgia, 428 U.S. 325 (1976). After 10 years, executions in the United States resumed in 1977. By the end of 1992, 188 inmates in 20 states had been put to death since Furman. At least 10 percent of these inmates were people with mental retardation. See also D. Keyes et al., supra note 8.

FN70. D. Keyes et al., supra note 8.

END OF DOCUMENT

x:\rcp materials\litigation guides\mr\mr as mitigation . . . (1998).wpd

17

JA 7280 31188

12/19/03

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES........................................................................................ii

STATEMENT OF THE CASE.....................................................................................1

ARGUMENT................................................................................................................3

I.      An Overview of *Atkins*.................................................................................4

II.     Issues to be Resolved.....................................................................................7

        A. ...................................................What is the Definition of Mental Retardation?
        ...............................................................................................................8

        B. ..................................Who Makes the Mental Retardation Determination?
        ...........................................................................................................10

        C.......................................... When Should the Two Determinations be Made?
        ...........................................................................................................18

        D.      Procedures for Cases Where the Defendant was
        ...................................................................................................................
        ..............................................................Sentenced to Death Prior to *Atkins*.
        ...........................................................................................................21

CONCLUSION.........................................................................................................24

-1-

GOVERNMENT
EXHIBIT
242

JA 7281  31708

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)..................................................................10, 14

*Atkins v. Virginia*, 122 S. Ct. 2242 (2002)..................................................................*passim*

*Brownlee v. Haley*, 2002 WL 31050882, 27 (11th Cir. 2002)..................................................22

*Cabana v. Bullock*, 474 U.S. 376 (1986)..................................................................16, 17

*Coker v. Georgia*, 433 U.S. 584 (1977)..................................................................4

*Cooper v. Oklahoma*, 517 U.S. 348 (1997)..................................................................14

*Crane v. Kentucky*, 476 U.S. 683 (1986)..................................................................12

*Enmund v. Florida*, 458 U.S. 782 (1982)..................................................................15, 16

*Ford v. Wainwright*, 477 U.S. 399 (1986)..................................................................1, 3, 7

*Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002)..................................................................21

*Jackson v. Denno*, 378 U.S. 368 (1964)..................................................................12, 13

*Penry v. Lynaugh*, 492 U.S. 302 (1989)..................................................................3, 4, 14, 21

*Ring v. Arizona*, 122 S. Ct. 2428 (2002)..................................................................*passim*

*Walton v. Arizona*, 497 U.S. 639 (1990)..................................................................10, 11, 17

*Williams v. Taylor*, 529 U.S. 362 (2000)..................................................................22

## STATE CASES

*Roseboro v. State*, 317 S.C. 292, 454 S.E.2d 312 (S.C. 1995)..................................................................14

*Singleton v. State*, 313 S.C. 75, 437 S.E.2d 53 (S.C. 1993)..................................................................15

*State v. Adams*, 277 S.C. 115, 283 S.E.2d 582 (S.C. 1981)..................................................................11

*State v. Addison*, 343 S.C. 290, 540 S.E.2d 449 (S.C. 2000)..................................................................15

JA 7282 31709

*State v. Amerson*, 311 S.C. 316, 428 S.E.2d 871 (S.C. 1993)..............................................................15

*State v. Burkhart*, 350 S.C. 252, 565 S.E.2d 298 (S.C. 2002)..............................................................15

*State v. Cash*, 257 S.C. 249, 185 S.E.2d 525 (S.C. 1971)..............................................................11

*State v. Charping*, 313 S.C. 147, 437 S.E.2d 88 (S.C. 1993)..............................................................12

*State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (S.C. 1999)..............................................................12

*State v. Davis*, 309 S. C. 326, 422 S.E.2d 133 (S.C. 1992)..............................................................11

*State v. Doby*, 273 S.C. 704, 258 S.E.2d 896 (S.C. 1979)..............................................................16

*State v. Dyar*, 317 S.C. 77, 452 S.E.2d 603 (S.C. 1994)..............................................................15

*State v. George*, 331 S.C. 342, 503 S.E.2d 168 (1998)..............................................................15

*State v. Hyman*, 322 S.C. 59, 471 S.E.2d 466 (S.C. Ct. App. 1996)..............................................................12

*State v. Johnson*, 295 S.C. 215, 367 S.E.2d 700 (S.C. 1988)..............................................................21

*State v. LaRue*, 271 S.C. 256, 246 S.E.2d 890 (S.C. 1978)..............................................................11

*State v. Lee*, 274 S.C. 372, 264 S.E.2d 418 (1980)..............................................................14

*State v. McCaskill*, 300 S.C. 256, 387 S.E.2d 268 (S.C. 1990)..............................................................15

*State v. McDaniel*, 68 S.C. 304, 47 S.E. 384 (S.C 1904)..............................................................15

*State v. Milian-Hernandez*, 287 S.C. 183, 336 S.E.2d 476 (S.C. 1985)..............................................................21

*State v. Myers*, 301 S.C. 251, 391 S.E.2d 551 (S.C. 1990)..............................................................12

*State v. Nance*, 274 S.C. 372, 418 S.E.2d 442 (S.C 1996)..............................................................14

*State v. Peterson*, 287 S.C. 244, 335 S.E.2d 800 (S.C. 1985)..............................................................15

*State v. Simmons*, 308 S.C. 80, 417 S.E.2d 92 (S.C. 1992)..............................................................12

*State v. Washington*, 296 S.C. 54, 370 S.E.2d 611 (S.C. 1988)..............................................................11

*State v. Wilson*, 306 S.C. 498, 413 S.E.2d 19 (1992)..............................................................14

## RULES & STATUTES

Ca. Pen. Code§1026(a) (sanity)..................................................................20

Pa. St. 50 P.S.§7404(c) (sanity)................................................................20

S.C. Code §16-3-20(C)(b)(10)........................................................9, 19, 21

S.C. R. Crim. P. 5(f).................................................................................13

Vernon's Ann. Tx. C. C. Pr. Art. 46.02, §4 (competency)...........................20

## MISCELLANEOUS

American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (Ruth Luckasson ed., 10th ed. 2002)....................................................................................9

American Psychological Association, *Manual of Diagnosis and Professional Practice in Mental Retardation* (John W. Jacobson & James A. Mulick eds. 1996)................................................................................9

*Ellis & Luckasson, Mentally Retarded Criminal Defendants,* 53 Geo. Wash. L. Rev. 414, 432............................................................................14

*Mental Retardation: Definition, Classification, and Systems of Support* 5 (9th ed. 1992)....................................................................................9

National Research Council, *Mental Retardation: Determining Eligibility for Social Security Benefits* 5 (National Academy Press 2002)...................8

Statistical Manual of Mental Disorders-IV- TR at 41....................................9

**JA 7284** 31711

<u>**STATEMENT OF THE CASE**</u>

Petitioners, Ricky George, Larry Hall, Herman Hughes, Johnny Pearson, Ted Powers,

Kenneth Simmons, et al., filed a petition for writ of certiorari in this Court on July 17, 2002.

Petitioners requested that this Court establish constitutionally adequate procedures implementing

the United States Supreme Court's recent holding in *Atkins v. Virginia*, 122 S.Ct. 2242 (2002)

that the Eighth Amendment to the United States Constitution restricts "'the State's power to take

the life of a mentally retarded offender.'" *Id.* at 2252 (quoting *Ford v. Wainwright*, 477 U.S.

399, 405 (1986)). This Court granted the petition on September 19, 2002.

Petitioners are all either death sentenced inmates, or defendants against whom the State

has announced its intention to seek the death penalty. In each of their cases, credible evidence

that the petitioner is mentally retarded exists. The evidence of mental retardation and the

procedural posture of each case is briefly summarized below:[1]

> **Ellis Franklin** - Defense experts, evaluators at William S. Hall, and his PCR
> judge have found that Mr. Franklin is mentally retarded. The trial judge charged
> the mental retardation statutory mitigating circumstance. Mr. Franklin has scored
> in the mentally retarded range on every IQ test he has ever taken (testing just
> before his PCR hearing placed his full-scale IQ at 68, and his communications and
> memory test scores have been in the 40s and 50s). Evidence presented at the PCR
> hearing showed that Mr. Franklin has the "test age" of a seven year-old. Mr.
> Franklin is also mentally ill. Mr. Franklin's case is currently pending in state
> post-conviction proceedings.

> **Ricky George** - Mr. George was convicted of murder and armed robbery in the
> Horry County Court of General Sessions, and sentenced to death at a jury trial in

---

[1]  In some of the petitioners' cases, the State did (or may) contest that the individual petitioner is mentally retarded. However, for purposes of the questions presented by these cases, any contrary evidence the State has presented is irrelevant. As will be discussed in more detail below, the critical question is whether there is any credible evidence of mental retardation. And, in each petitioner's case, the answer is undoubtedly yes.

JA 7285 31712

1994. A post-conviction relief case is pending in Horry County. Psychological testing of Mr. George has shown his full scale IQ to fall within a range of 66-69. At trial, both a psychologist and a psychiatrist testified that Mr. George was mentally retarded. This evidence was not contradicted by the State. Mr. George consistently performed at very low levels in school, despite starting school at an older age, and was socially promoted in several instances. He failed the eighth grade twice, failed the ninth and tenth grades, and ultimately dropped out of school at age 18. The most recent tests administered by an expert in mental retardation reveal that Mr. George's full scale IQ is 66, and that he has significant limitations in adaptive functioning. The post-conviction relief court stayed the proceedings after the United States Supreme Court granted certiorari to determine whether the Constitution prohibits the death penalty for mentally retarded offenders.

**Larry Hall** - Defense experts testified at the sentencing phase of Mr. Hall's trial that he is mentally retarded, and that he has the mental age of a nine or ten year-old. His full scale IQ was measured at approximately 72, and there was significant evidence of adaptive functioning difficulties. Defense witnesses, for example, testified that Mr. Hall cannot perform even simple chores such as mowing the lawn or caring for pets without assistance and daily instruction. Mr. Hall was sentenced prior to the adoption of the mental retardation statutory mitigating circumstance. However, his counsel asked the jury to consider Mr. Hall's mental retardation during the closing arguments of the sentencing trial. Additional evidence that Mr. Hall is mentally retarded was presented at the post-conviction relief hearing. Mr. Hall's case is currently pending before this Court.

**Herman Hughes** - Experts at both Mr. Hughes' trial and PCR hearing testified that he is mentally retarded, based on his IQ scores and problems in adaptive functioning. The trial judge submitted the statutory mitigating circumstance of mental retardation. Mr. Hughes' intellectual impairments have been evident since testing that took place when he was in the second grade. He was placed in learning disabled classes as a result of the second grade test scores, and he failed two grades. He was in a remedial eighth grade class at the time of the offense which resulted in his death sentence. Mr. Hughes also suffers from significant neurological impairments which, according to a defense neuropsychiatrist who testified at the PCR hearing, were likely caused by congenital neurosyphilis. The post-conviction relief court stayed the proceedings after the United States Supreme Court granted certiorari to determine whether the Eighth Amendment prohibits the execution of mentally retarded defendants.

**Johnny Ringo Pearson** - Mr. Pearson is charged with murder in the Marlboro County Court of General Sessions. He has been detained since 1994, but has never been to trial. He was deemed incompetent to stand trial by state mental

**JA 7286** 31713

health professionals for approximately five years. Mr. Pearson has been determined to be mentally retarded by a variety of examiners -- including the staff of the South Carolina State Hospital -- since he was a child. He consistently performed at a very low level of academic achievement -- he failed the first grade, the sixth grade twice, and the seventh grade, before dropping out of school at the age of 16. He was in Educable Mentally Handicapped classes throughout his school years. The most recent tests administered by a leading expert in mental retardation reveal that Mr. Pearson's full scale IQ is 65. He is also mentally ill. This Court stayed the trial of his case after the Supreme Court granted certiorari to determine whether the Constitution prohibits the death penalty for mentally retarded offenders.

**Benji Powers** - At trial, evidence was presented indicating that Mr. Powers has an IQ of 69. A neurologist and psychologist testified that Mr. Powers has the "mind of a damaged ten year-old." The evidence at trial also showed that Mr. Powers was consistently categorized as developmentally and emotionally handicapped by the school system, starting when he was in the first grade. As a result of this evidence, the trial judge submitted the statutory mitigating circumstance of mental retardation. Mr. Powers' case is currently pending in state post-conviction proceedings.

**Kenneth Simmons** - The Chief Psychologist of the Department of Disabilities and Special Needs testified during a pre-trial hearing that Mr. Simmons has a full-scale IQ of 69, classifying him as "functioning in the lower one percent of the overall population." A psychologist called by the defense testified that Mr. Simmons is mentally retarded. The trial judge submitted the statutory mitigating circumstance of mental retardation. Mr. Simmons' case is currently pending on direct appeal.

## ARGUMENT

THE UNITED STATES SUPREME COURT'S RECENT DECISION IN *ATKINS V. VIRGINIA* REQUIRES THIS COURT TO ESTABLISH CONSTITUTIONALLY ADEQUATE AND RELIABLE PROCEDURES FOR ASSESSING CLAIMS OF MENTAL RETARDATION.

In *Atkins v. Virginia*, *supra*, the Supreme Court held that the Eighth Amendment's ban on

excessive and cruel and unusual punishments prohibits the execution of individuals with mental

retardation. Reversing its prior decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Court concluded that the Constitution "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." 122 S.Ct. at 2252.[2] After first discussing the Supreme Court's decision in *Atkins*, petitioners will address the issues which must be resolved by this Court.

### I. An Overview of *Atkins*.

In *Atkins*, the Court began by establishing that a fundamental "'precept of justice'" is that "'punishment for crime should be graduated and proportioned to the offense.'" 122 S.Ct. at 2246 (internal citations omitted). The Court made clear that determining whether a punishment is constitutionally excessive or cruel and unusual[3] is judged by current norms, not by those which existed at the time the Eighth Amendment was ratified. *Id.* at 2247. The core Eighth Amendment concept is the "'dignity of man'" and thus its constitutional content must be informed by "'the evolving standards of decency that mark the progress of a maturing society.'"122 S.Ct. at 2247 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)). The evolving standard, the Court declared, should be informed by "objective factors" to the maximum extent possible, the most reliable evidence of which is found in state legislative enactments and jury verdicts. *Id.* However, the Court adhered to the constitutional principle that "in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." *Id.* (quoting *Coker v. Georgia*, 433 U.S. 584, 597 (1977)).

---

2      *Quoting Ford v. Wainwright*, 477 U.S. 399, 405 (1986).

3      The Court left no doubt that the Eighth Amendment prohibits "all excessive punishments as well as cruel and unusual punishments which may or may not be excessive." *Id.*.

Its course set, the Court first reviewed the lay of the legislative land. The Court was impressed with the fact that at the time of *Penry* only two death penalty states and the federal government proscribed the death penalty for mentally retarded offenders. 122 S.Ct. at 2248. However, since *Penry*, an additional sixteen states had taken death off the punishment table for the mentally retarded. The Court noted that it "is not so much the number of States that is significant, but the consistency of the direction of change." *Id.* at 2249. These enactments, "[g] iven the well-known popularity of anticrime legislation," provided the Court with "powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* In its successful search for a national consensus, the Court relied upon the fact that the legislatures passing the laws voted "overwhelmingly in favor of the prohibition." *Id.* The Court also looked to the opinions of social and professional organizations with "germane expertise," such as the American Psychological Association, *id.* at 2249, n. 21, the opposition to the practice by "widely diverse religious organizations,"[4] international practice,[5] and polling data.[6] While "not dispositive," these factors bolstered the Court's opinion that there was a consensus opposing the practice "among those that have addressed the issue." *Id.* Finally, the Court also noted that even in those states that retained the death penalty for the mentally retarded, only five had actually carried out the execution of a mentally retarded individual since

---

4    The Court noted that representatives of Christian, Jewish, Muslim and Buddhist organizations believed that the execution of persons with mental retardation could not be justified. *Id.*

5    "[W]ithin the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved." *Id.*

6    "[P]olling data shows a widespread consensus among Americans, even those that support the death penalty, that executing the mentally retarded is wrong." *Id.*

JA 7289    31716

impairments. *Id.*[7]

In addition to concluding that retention of the death penalty for mentally retarded defendants would not further any legitimate interest in retribution or deterrence, the Court also opined that the reduced capacity of mentally retarded offenders provided a "second justification for a categorical rule making such offenders ineligible for the death penalty." *Id.* at 2251. Due to their impairments, there were a host of factors – the increased risk of false confessions, difficulties in communicating with counsel, lesser ability to effectively testify on their own behalf or express remorse due to limited communication skill – that, "in the aggregate," carried an unacceptable "risk of wrongful executions" for mentally retarded defendants.[8] *Id.*

Thus, the Court concluded that its "independent evaluation of the issue reveals no reasons to disagree with the judgment of the legislatures that have . . . concluded that death is not a suitable punishment for a mentally retarded criminal," and thus the Constitution "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)).

## II. Issues to be Resolved.

Since South Carolina was one of a dwindling number of states that permitted the execution of mentally retarded offenders, there was no mechanism in place at the time of *Atkins* for the adjudication of cases involving mental retardation. Therefore, it is now incumbent on this

---

7    The Court also concluded that exempting the mentally retarded from capital punishment would not diminish any other deterrent interests associated with the death penalty because those without mental retardation are "not protected by the exemption." *Id.*

8    The Court also noted the danger that a mentally retarded person's demeanor "may create an unwarranted impression of lack of remorse for their crimes" which could enhance the likelihood that the jury will impose the death penalty due to a belief that they pose a future danger. *Id.*

Court to establish procedures for cases where evidence of mental retardation is presented. Because of the clear need to bring the South Carolina death penalty scheme into compliance with *Atkins*, petitioners will turn to the questions they submit must be decided in light of the Supreme Court's recent decision. Petitioners will begin by addressing the threshold question of the definition of mental retardation. Petitioners will then discuss the question of the respective roles of the trial judge and the jury, the issues to be decided by each, and the timing of the trial judge's and jury's decisions on the mental retardation question. As will be discussed in detail below, theses issues have taken on added constitutional significance due to the Supreme Court's decision in *Ring v. Arizona*, 122 S.Ct. 2428 (2002), which held that any fact necessary to make a capital defendant eligible for the death penalty must be decided unanimously by the jury using the beyond a reasonable doubt standard. Finally, petitionerswill discuss the procedures to be used in cases where the defendant was sentenced to death prior to *Atkins*.

A.  What is the Definition of Mental Retardation?

The Court's decision in *Atkins* makes clear that its holding extends to all defendants who "fall within the range of mentally retarded offenders about whom there is a national consensus." 122 S.Ct. at 2250. *See also id.* at 2250 n. 22. This means that while States are free to adopt variations in the wording of the definition, they cannot adopt a definition that encompasses a smaller group of defendants, nor may they fail to protect any individuals who have mental retardation under the definition embodied in the national consensus. Fortunately, the definition of mental retardation is well established. The American Association of Mental Retardation defines mental retardation as referring to,

[S]ubstantial limitation in present functioning. It is characterized

by significantly subaverage intellectual functioning,[9] existing
concurrently with related limitations in two or more of the
following applicable adaptive skill areas: communication, self-
care, home living, social skills, community use, self-direction,
health and safety, functional academics, leisure, and work.[10]

*Mental Retardation: Definition, Classification, and Systems of Support* 5 (9th ed. 1992). The

American Psychiatric Association uses a similar definition. *See* Diagnostic and Statistical

Manual of Mental Disorders-IV- TR at 41. This commonly agreed upon understanding of mental

retardation, which the *Atkins* Court cited with approval, 122 S.Ct. at 2245, n. 3, has already been

incorporated into the South Carolina death penalty statute. The current mental retardation

statutory mitigating circumstance defines mental retardation as "significantly subaverage general

intellectual functioning existing concurrently with deficits in adaptive behavior and manifested

---

9      The identification of the upper boundary of mental retardation cannot be stated with complete precision in
terms of IQ scores. Generally, it will encompass everyone with a score of 70 or below, and additionally some
individuals with scores in the low 70s (and even mid-70s), depending on the nature of the testing information. This
upper boundary of IQs for use in classification of mental retardation is flexible to reflect the statistical variance
inherent in all intelligence tests and the need for clinical judgment by a qualified psychological examiner. AAMD,
*Classification* (1983) 11 ("This upper limit is intended as a guideline; it could be extended upward through IQ 75 or
more, depending on the reliability of the intelligence test used. This particularly applies in schools and similar
settings if behavior is impaired and clinically determined to be due to deficits in reasoning and judgment"); APA,
*DSM-IV-TR* at 41-42 ("Thus it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75
who exhibit significant deficits in adaptive behavior"). *See generally,* American Psychological Association, *Manual
of Diagnosis and Professional Practice in Mental Retardation* (John W. Jacobson & James A. Mulick eds. 1996);
National Research Council, *Mental Retardation: Determining Eligibility for Social Security Benefits* 5 (National
Academy Press 2002). As much as the criminal justice system might prefer to have a hard-and-fast limitation
measurable by a single IQ score, it simply is not possible to exclude consideration of other factors about the testing
performed on the individual, nor is it possible to ignore the need for clinical judgment by experienced diagnosticians.
This fact is reflected in the *Atkins* decision, where the Court noted that "an IQ between 70 and 75" is "typically
considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." 122 S.Ct. at
2245 n.5.

10      Adaptive behavior is the component of the definition that requires that the intellectual impairment have
produced real-world disabling effects on the individual's life. The purpose of this element is to assure that the
individual is not merely a poor test-taker, but rather, is a truly disabled individual. In conjunction with the age-of-
onset requirement, it also provides a check against any possibility of malingered claims of mental retardation.

JA 7292 31720

during the developmental period." *See* S.C. Code §16-3-20(C)(b)(10). This definition is substantially in accord with both the AAMR and American Psychiatric Association definitions approved in *Atkins*, and should be the benchmark for assessing post-*Atkins* claims of mental retardation.

Petitioners would inform this Court, however, that the AAMR further refined the definition in 2002. The change from the 1992 version was, once again, modest, and again focused primarily on refining the description of the adaptive skills component:

> Mental retardation is a disability characterized by significant
> limitations both in intellectual functioning and in adaptive behavior
> as expressed in conceptual, social, and practical adaptive skills.
> This disability originates before age 18.

American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (Ruth Luckasson ed., 10th ed. 2002) (hereafter "AAMR, *Mental Retardation* (2002)").[11]

The formulation in the 2002 AAMR definition appears to be better suited for forensic evaluations in death penalty cases. That version's requirement that the individual manifest "a disability characterized by significant limitations both in intellectual functioning *and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills*" addresses the principal concerns of the criminal justice system. It requires that the intellectual impairment be manifested in real-world disability in the individual's life, but at the same time focuses on broad

---

11    In addition to providing the current definition of mental retardation and explaining related concepts and terminology, the 2002 edition of this manual provides valuable background on such topics as the history of classification, clinical assessment of people with mental retardation, and an extensive bibliography of references to the clinical literature. *See* www.aamr.org.

categories of adaptive impairment, instead of the somewhat arbitrary skill areas of the 1992 version. Thus, petitioners suggest that the 2002 formulation be adopted by this Court. Furthermore, petitioners submit that the 2002 definition should be adopted because it will in fact be the definition with which clinical evaluators, in future cases, will be most familiar as it is now the "state of the art" understanding and definition of mental retardation.

B. Who Makes the Mental Retardation Determination?

Another issue this Court must resolve is who makes the determination whether the defendant is mentally retarded: the judge or the jury? An analysis of the current legal landscape, including another case decided by the Supreme Court this term, *Ring v. Arizona*, 122 S.Ct. 2428 (2002), indicates that both judge and jury have a significant role to play.

*Ring* involved a Sixth Amendment challenge to Arizona's judge-sentencing capital punishment scheme. Relying on the constitutional principles established in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (Sixth Amendment does not permit a defendant to be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone), Ring argued that *Apprendi* was irreconcilable with the Court's prior decision in *Walton v. Arizona*, 497 U.S. 639 (1990), which upheld Arizona's judge-sentencing procedure. The Court agreed, overruled *Walton*, and held that the Sixth Amendment requires that any finding of fact that makes a defendant eligible for the death penalty must be unanimously made by the jury beyond a reasonable doubt. *Ring*, 122 S.Ct. at 2440. Justice Scalia's concurring opinion crystallized the Court's holding as follows: "All facts essential to the imposition of the level of punishment that the defendant receives —whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be made by the jury beyond a

**JA 7294** 31722

reasonable doubt." 122 S.Ct. at 2444 (Scalia, J. concurring).

While *Ring* dealt specifically with statutory aggravating circumstances, it included "factfinding[s] necessary to . . . put [a defendant] to death." *Id.* at 2443. As set forth previously, *Atkins* held that the Eighth Amendment prohibits a mentally retarded defendant from being sentenced to death. In *Apprendi/Ring* parlance, a mentally retarded defendant is now constitutionally ineligible for the death penalty. 122 S.Ct. at 2252. Since mental retardation is now a factual issue upon which a defendant's eligibility for death turns, "that fact . . . must be found by a jury beyond a reasonable doubt." *Ring*, 122 S.Ct. at 2439.

However, while the Sixth Amendment requires that the jury decide the mental retardation issue, the trial judge also has a very important role to play. Much like the current practice with regard to the admissibility of a defendant's statements,[12] eyewitness identification,[13] and expert testimony,[14] the constitutionally required procedure occurs in two steps which will be discussed

---

[12] The trial court must first make a determination, using a preponderance of the evidence standard, whether law enforcement complied with the requirements of *Miranda* and whether the defendant received and understood his rights. Once the court determines that a defendant received and understood his rights, the court allows the confession into evidence. It then is for the jury to decide, using the standard of beyond a reasonable doubt, whether the confession was voluntary. *State v. Davis*, 309 S.C. 326, 422 S.E.2d 133 (1992); *State v. Washington*, 296 S.C. 54, 370 S.E.2d 611, 612 (1988); *State v. Adams*, 277 S.C. 115, 283 S.E.2d 582 (1981).

[13] When the defendant challenges an in-court identification as being tainted by a previous improper identification procedure, the trial court must first hold a hearing. *State v. Cash*, 257 S.C. 249, 185 S.E.2d 525 (1971). During the hearing the state must prove by clear and convincing evidence that the in-court identification of the defendant was not tainted by suggestive police action. *State v. LaRue*, 271 S.C. 256, 246 S.E.2d 890 ( 1978). If the court permits the in-court identification testimony, the court must instruct the jury in single-witness identification cases that the burden of proving the identity of the defendant still rests with the state. *State v. Simmons*, 308 S.C. 80, 417 S.E.2d 92 (1992).

[14] The trial court must first make a determination that the proferred expert possesses the necessary learning, skill, or practical experience to enable him to give opinion testimony. *State v. Myers*, 301 S.C. 251, 391 S.E.2d 551 (1990). The court must also determine whether the underlying science forming the basis for the expert testimony is reliable. *State v. Council*, 335 S.C. 1, 515 S.E.2d 508 (1999). If the court permits the testimony, the jury is instructed that expert testimony is to be given such weight and credibility as the jury determines. *See, e.g., State v. Hyman*, 322 S.C. 59, 471 S.E.2d 466 (Ct. App. 1996); *State v. Charping*, 313 S.C. 147, 437 S.E.2d 88 (1993).

**JA 7295** 31723

in detail below.

**Step 1: A judge must independently determine whether the defendant does (or does not) have mental retardation, and whether the defendant may be eligible for a death sentence under *Atkins*.**

The reasons for the requirement of a distinct *judicial* determination of fact and law are discussed in *Jackson v. Denno*, 378 U.S. 368 (1964), and reiterated in *Crane v. Kentucky*, 476 U.S. 683 (1986): the enforcement of a federal constitutional prohibition against exposing retarded persons to a death sentence at the jury's discretion can hardly be left solely to a procedure whereby the jury makes the ultimate factual determination of the existence *vel non* of the facts on which the prohibition turns. In *Jackson*, for example, the Court stated "the *requirement* that the court make a pretrial voluntariness determination does not undercut the defendant's traditional prerogative to challenge the statement's reliability during the course of the trial." 378 U.S. at 386 (emphasis added). There is, in short, a due process mandate that the trial court make the initial determination whether the defendant's constitutional rights were violated. *Crane*, 476 U.S. at 687-88. This is especially true since *Atkins* created the constitutional prohibition in part as a result of recognition of the handicaps that retarded persons suffer in litigating issues in front of juries, which in turn exposesthem to "a special risk of wrongful execution." 122 S.Ct. at 2252 (noting: (1) the difficulty a mentally retarded person may have in testifying; (2) the possibility that a mentally retarded person's "demeanor may create an unwarranted impression of lack of remorse;" and, (3) the possibility that the mental retardation evidence may enhance the likelihood that future dangerousness will be found by the jury).

Thus, upon notification that the defendant maintains he is not eligible for the death

**JA 7296** 31724

penalty due to his mental retardation,[15] petitioners submit that the trial court should conduct a hearing for the presentation of evidence regarding the defendant's possible mental retardation. Both the defense and the prosecution would have the opportunity to present evidence, including expert testimony. After considering the evidence, the court should find the defendant to be not death eligible if it finds, by a preponderance of the evidence, that the defendant has mental retardation.[16] If the defendant is found to be not death eligible because of mental retardation, the trial could proceed as a non-capital trial, and, if convicted, the defendant could be sentenced to any penalty available under state law, other than death. If, on the other hand, the court finds that the defendant is not mentally retarded, and thus potentially eligible for the death penalty, the case could proceed as a capital trial.[17]

> **Step 2: The defendant who presents evidence of mental retardation has a right to insist that he not be sentenced to death unless the jury finds unanimously, beyond a reasonable doubt, that he is not mentally retarded.**

---

15      The triggering mechanism will ordinarily be a defendant's assertion or notification that he is mentally retarded and thus ineligible for the death penalty. This Court may decide that a notification requirement such as that in S.C. R. Crim. P. 5(f) is in order. Rule 5(f) requires that upon written request of the prosecution the defendant shall notify the prosecution within ten days, or at such time as the Court may direct, of its intention to rely on the defense of insanity or to enter a plea of guilty but mentally ill.

16      This Court could decide that the prosecution would have the burden of establishing that the defendant is not mentally retarded by a higher burden, e.g., clear and convincing evidence or beyond a reasonable doubt. While a higher burden may not be constitutionally *required* at this stage, it would serve to save the costs of going through a capital trial in cases where it is likely the jury will ultimately determine, using the constitutionally required higher standard, that the defendant is mentally retarded at step two.

17      As in *Jackson*, the bifurcated approach makes sense because its two prongs address two separate (although factually related) questions. The first, to be addressed by the judge, is the *legal* issue of whether the defendant is a person who is eligible for the death penalty. If the court does not find the defendant death-eligible because of mental retardation, it would be unconstitutional to proceed with a capital trial. The second inquiry, by the jury, is whether the prosecution has demonstrated that the defendant is *factually* an individual upon whom the death penalty may be imposed. Condemning a defendant to death who has properly raised the issue of mental retardation then becomes "contingent on the finding of a *fact*" that is a necessary precondition to a capital sentence. *Ring*, 122 S.Ct. at 2439 (emphasis supplied).

*Ring* and *Atkins*, read together, say this very clearly: *Ring* is explicit that the procedural rights guaranteed by *Apprendi* attach to elements that are added by Supreme Court "interpret [ations] of the Constitution to require the addition of an . . . element to the definition of a criminal offense in order to narrow its scope." 122 S.Ct. at 2442. And, it is just as clear that *Atkins* adds just such an element. The Court stated: "Thus, *pursuant to our narrowing jurisprudence*, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate." 122 S.Ct. at 2251.

Even if the constitutional mandate of *Atkins* and *Ring* was not crystal clear, South Carolina law would require the same result.[18] State law ordinarily places the burden on the state to disprove a defense when the issue is raised by the evidence. An alibi defense, for example, places no burden on a criminal defendant, and the charge must emphasize that it is the State's obligation to prove the defendant was present and participated in the crime. *Roseboro v. State*, 317 S.C. 292, 454 S.E.2d 312 (1995). The state also bears the burden of disproving self-defense beyond a reasonable doubt. *State v. Burkhart*, 350 S.C. 252, 565 S.E.2d 298 (2002). "When self-defense is properly submitted to the jury, the defendant is entitled to a charge, if requested,

---

18    Were it not for *Ring*, the Supreme Court's decision in *Cooper v. Oklahoma*, 517 U.S. 348 (1997), would set the constitutional floor. In *Cooper*, the Supreme Court held that no standard of proof greater than a preponderance of the evidence could be placed on a capital murder defendant challenging his competency to stand trial. The Court's examination of both English common law and contemporary law revealed that the burden of proof for a competency determination has long been a preponderance of the evidence. *Cooper*, 517 U.S. at 356-361; *accord State v. Lee*, 274 S.C. 372, 264 S.E.2d 418 (1980); *State v. Nance*, 274 S.C. 372, 418 S.E.2d 442 (1996). Historically, mentally retarded persons, formerly referred to as idiots or imbeciles, have been viewed and treated similarly to incompetent persons by courts and under the law. *See, e.g., Penry v. Lynaugh*, 492 U.S. 302, 332 (1989), *rev'd on other grounds* (citing Ellis & Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash.L.Rev. 414, 432 March/May 1985); *accord State v. Wilson*, 306 S.C. 498, 509, 413 S.E.2d 19, 25 (1992). The *Cooper* Court found that the procedural consequences to a defendant of an erroneous determination of competency were dire, and outweighed any interest the state had in creating procedural rules or standards, especially those with little or no historical roots or modern acceptance. *Cooper*, 517 U.S. at 364-368. The consequence of an erroneous determination regarding mental retardation for a capital murder defendant is even more dire, because such a determination could result in the impermissible imposition of a death sentence.

that the State has the burden of disproving self-defense by proof beyond a reasonable doubt."

*State v. Addison*, 343 S.C. 290, 540 S.E.2d 449, 451 (2000).[19]

South Carolina also has a long history of requiring submission of issues in capital cases to a jury. The Supreme Court held in *Enmund v. Florida*, 458 U.S. 782, 797 (1982), for example, that the Eighth Amendment prohibits imposition of the death penalty on a person who may be guilty of felony murder as defined by the relevant jurisdiction, but who does not himself intend to kill. This Court, however, has required that the *Enmund* issue be submitted to and decided by the jury. *State v. Peterson*, 287 S.C. 244, 335 S.E.2d 800 (1985). This history is consistent with a requirement that the final determination whether a defendant is mentally retarded be made by the jury. Likewise, this history is consistent with requiring that the state prove the defendant is not mentally retarded in order to show that he is death-eligible. Thus in all cases proceeding to trial after *Atkins*, where mental retardation is at issue, this two step process sets the constitutional floor.[20]

---

19    Similarly, accident is not an affirmative defense because the existence of the requisite *mens rea* is an element of the offense that must be proven by the prosecution beyond a reasonable doubt. *State v. McDaniel*, 68 S.C. 304, 47 S.E. 384 (1904); *State v. McCaskill*, 300 S.C. 256, 387 S.E.2d 268 (1990). There are a number of other instances where the burdens shift under South Carolina law. *See, e.g., State v. Amerson*, 311 S.C. 316, 428 S.E.2d 871, 873 (1993) (once defendant has made *prima facie* showing of double jeopardy, the state bears burden of proving two separate offenses). *State v. Dyar*, 317 S.C. 77, 452 S.E.2d 603 (1994) (when a defendant challenges the state's use of peremptory strikes as discriminatory under *Batson*, and makes a *prima facie* showing, the burden shifts to the state to present a non-discriminatory, neutral explanation for the challenges; if the state meets that burden, the defendant then has the burden to prove that the allegedly neutral reasons are pretextual); *State v. George*, 331 S.C. 342, 503 S.E.2d 168 (1998) (if defendant makes a *prima facie* showing of discrimination in selection of grand jurors, the burden shifts to the State to rebut that showing); *Singleton v. State*, 313 S.C. 75, 437 S.E.2d 53 (1993) (initial burden in competency to be executed context is on the death-sentenced inmate to show by a preponderance of the evidence that he or she lacks the requisite competency for execution; once the defendant is found incompetent and a stay of execution granted, the burden shifts to the State to request a hearing and to prove by a preponderance of the evidence that the defendant has been restored to competence).

20    A ruling on the mental retardation issue that is adverse to the defense cannot be communicated to the jury in the subsequent trial. *See, e.g., State v. Doby*, 273 S.C. 704, 258 S.E.2d 896, 900 ( 1979) (judge should not comment on the fact that he has previously ruled on a confession's admissibility). This is crucial to avoid contaminating and undercutting issues properly before the trial jury, including the question of mitigation if the case proceeds as a capital

**JA 7299** 31727

In the return to the petition for writ of certiorari, respondents proposed an alternative set of procedures. Because respondents are likely to offer these same procedures to this Court in their brief on the merits, petitioners will briefly address some of the more questionable proposals. For example, respondents proposed (1) having the judge, not the jury, make the mental retardation determination, and (2) assigning the burden to the defendant to establish mental retardation by a preponderance of the evidence. Such a procedure would clearly, in petitioners' view, be inconsistent with the Supreme Court's decision in *Ring*, which establishes that eligibility determinations for the death penalty must be made by a jury using the beyond a reasonable doubt standard, and makes clear that any death sentence imposed without such jury findings violates the Sixth Amendment right to a jury trial.

Respondents asserted that the rule of *Ring* does not apply to the determination of whether a defendant is mentally retarded, and therefore ineligible for a death sentence. In support of this assertion, they rely upon *Cabana v. Bullock*, 474 U.S. 376 (1986), reasoning that if, as *Cabana* held, the Eighth Amendment does not bar an appellate court from deciding in the first instance whether a defendant possessed the requisite state of mind to be eligible for death under *Enmund v. Florida*, 458 U.S. 782 (1982), then the mental retardation determination necessitated by *Atkins* can also be made by a judge, rather than a jury. *See* Return at 7-8. Respondents' reliance on *Cabana*, however, is seriously misplaced. First, *Cabana* was concerned with the Eighth Amendment's restrictions on capital sentencing, while *Ring* involves the Sixth Amendment right to trial by jury. More fundamentally, *Ring* strongly suggests that *Cabana* is no longer good law.

---

case.

In *Ring*, the Court devoted a substantial portion of its opinion to examining, and ultimately

rejecting, its decision in *Walton v. Arizona*, 497 U.S. 639 (1990), which "drew support from

*Cabana*" in order to uphold the practice of permitting judges to determine the facts necessary to

increase a defendant's punishment from life to death. *Ring*, 122 S.Ct. at 2437. Given that *Ring*

expressly overruled *Walton*, it stands to reason that *Cabana*, which supplied the constitutional

rationale for *Walton*, did not survive. *See Ring*, 122 S.Ct. at 2443 ("we overrule *Walton* to the

extent that it allows a sentencing judge, sitting without a jury, to find an aggravating

circumstance necessary for imposition of the death penalty"). At the very least, the questions

*Ring* raises about the continuing vitality of *Cabana* render that decision far too unstable to serve

as the foundation for the framework this Court must fashion for dealing with mental retardation

issues.[21]

In the final analysis, the question comes down to this: why take a chance? Why adopt

procedures which may well be found to be constitutionally deficient in light of *Atkins* and *Ring*,

thus requiring additional litigation in these petitioners' cases and other cases where the issue of

mental retardation arises? Can petitioners say with absolute certainty that the Sixth Amendment

---

21    Another suggestion made by respondents in their return which would also clearly be unconstitutional – even had *Ring* not been decided – is the proposal that if the Department of Special Needs and Disabilities does a "prescreening" of the defendant, and determines that the defendant's I.Q. is above the "range for mental retardation," neither the court nor the jury can reach a contrary conclusion. In other words, the Department's prescreening evaluation – depending on the assessment of the defendant's I.Q. – is determinative of the mental retardation issue. Return at 10. Thus, for example, if the Department's examiners conclude the defendant's I.Q. is too high, even if the defendant's experts (or prior school psychologists) concluded that he is mentally retarded, the defendant would not even have the right to have a judge, much less a jury, decide whether he is eligible for the death penalty. Rather, the Eighth Amendment question would be resolved, in a completely unreviewable manner, by one or more state mental health professionals. It is hard to imagine a more unconstitutional procedure. Essentially, the procedure respondent proposes is equivalent to  authorizing the police to decide whether a defendant's confession was voluntary. If they conclude it was, then the defendant has no right to raise the issue before the judge or jury at trial. Neither the Eighth Amendment nor the Due Process Clause permit the ultimate and final determination of constitutional questions to be made by non-judicial officers without a jury's involvement.

principles of *Ring* will be held to apply to the mental retardation determination? No. But, as set forth above, the constitutional logic of *Ring* clearly applies to this issue since persons with mental retardation are, after *Atkins*, no longer eligible for the death penalty. Conversely, can respondents assure this Court that *Ring*'s jury unanimity and beyond a reasonable doubt requirements will not be deemed applicable to the mental retardation determination? No. But it can be said with assurance that if petitioners' proposed two-step procedure is adopted by this Court, then there will be no available legal challenges. And there is no legitimate countervailing interest. In most cases, the mental retardation issue will be relatively clear and the procedures will not play a significant role in the outcome. Thus, the most that respondents can place on their side of the scale is that if petitioners' proposed procedures are adopted, it is theoretically possible that a few individuals who may not be quite mentally retarded, but who are still quite impaired, will be sentenced to life imprisonment rather than the death penalty. Is that risk, if it can be called that, worth adopting procedures whose legality will certainly be attacked by these petitioners and may be subsequently invalidated? The answer is clear. No.

C. When should the two determinations be made?

The question arises as to when the constitutionally required determinations should be made. In cases where mental retardation is at issue, the first step – the judicial determination – should be made at the earliest opportunity prior to the commencement of trial. If the defendant is not death-eligible due to his mental retardation, then it makes no sense to summon the additional jurors, set aside several weeks of court, "death qualify" the jury, and make the additional preparations that attend a capital trial.

The second step – the jury determination – is analytically a slightly tougher nut to crack.

Three alternatives are available. The first is a jury trial on the mental retardation issue by a separate jury prior to trial.[22] The second is a determination by the trial jury after the guilt-or-innocence phase of the proceedings but prior to the commencement of the sentencing phase of the trial.[23] The third alternative is a determination by the trial jury during the sentencing phase of the proceedings.[24]

The first alternative has several benefits. The issue would be resolved by a jury, as is constitutionally required by *Ring*, but the jury determination would be at the earliest possible opportunity, and would thus potentially obviate the costs associated with a capital trial if the

---

[22] The procedure would essentially be as follows. Upon receipt of a motion, the trial court would order a hearing for the presentation of evidence regarding the defendant's possible mental retardation. The hearing would be conducted before a jury, which would be specially empanelled for this issue only. Both the defense and the prosecution would have the opportunity to present evidence, including expert testimony. After considering the evidence, the jury would be asked, by special verdict, whether the defendant has mental retardation. If the jury finds, beyond a reasonable doubt, that the defendant does not have mental retardation, the case could proceed as a capital trial, which would be conducted before a separate jury. The ruling that the defendant had not been found to have mental retardation would not be communicated to the trial jurors, and would not preclude the defense from offering evidence of the defendant's mental disability in the guilt/innocence phase or the penalty phase of the trial. If the defendant was found by the jury's special verdict to be not death eligible because of mental retardation, the trial could proceed as a non-capital trial, and, if convicted, the defendant could be sentenced to any penalty available under state law, other than death.

[23] This procedure would essentially "trifurcate" the proceedings. If the defendant is found guilty of murder, prior to the commencement of the sentencing phase of the trial, the jury would hear evidence on the mental retardation question and decide whether the defendant is mentally retarded. If the jury determines the defendant is mentally retarded, then the defendant would be sentenced pursuant to S.C. Code §16-3-20(A). If the jury determines that the defendant is not mentally retarded, then the case would proceed to the sentencing phase and the jury would be presented with additional evidence in aggravation and mitigation and then, assuming the jury finds the existence of an aggravating circumstance, determine whether the defendant should be sentenced to death or life imprisonment without possibility of parole. A proposed set of jury instructions and verdict forms for both the above options and this option can be found in Appendix A.

[24] This procedure would require the jury, prior to determining the existence of an aggravating circumstance to determine whether the defendant was mentally retarded. If the jury determined the defendant was mentally retarded, it would stop, inform the court of its decision ,and the defendant would be sentenced to any permissible punishment in S.C. Code §16-3-20. If the jury determined the defendant was not mentally retarded, it would then continue its deliberations as in the sentencing phase of any other capital case. A proposed set of jury instructions and verdict forms for this option can be found in Appendix B.

**JA 7303** 31731

defendant is found to be mentally retarded.[25] The second alternative, having the mental

retardation jury determination after the guilt-or-innocence phase of the proceedings and prior to

the sentencing phase would also satisfy *Ring* and *Atkins,* and also be substantially more efficient

than the third alternative. It would eliminate the need for the "full blown" sentencing hearing if

the defendant is found to be mentally retarded. Justice Chapel, in his concurring and dissenting

opinion in *Murphy v. State*, 2002 WL 2012428, *14 (Ok. Crim. App. Sept, 4, 2002) (footnotes

omitted), cogently set forth the reasons such a procedure is emminently reasonable and preferable

to the third alternative:

> There is a huge contrast in these two approaches. The majority procedure
> unnecessarily wastes judicial resources without providing any significant degree
> of protection to either the defendant or the State. Why should the state of
> Oklahoma pay for a capital trial, and why should judicial resources be consumed
> in conducting a capital trial, where the defendant is not eligible for the death
> penalty? Why should witnesses, including the grieving family members of the
> murder victim, be forced to endure a capital second-stage proceeding and even
> give evidence regarding their loved one, when that evidence can have no
> relevance because the defendant is not death-eligible? Why should jurors be
> presented with evidence of aggravating circumstances which cannot be charged,
> much less found, because the defendant cannot be executed? Partly due to a
> mentally retarded defendant's cognitive and behavioral impairments, aggravating
> circumstances in these cases are often horrible; the defendants frequently are poor
> witnesses and may not exhibit remorse, and evidence of mental retardation itself
> may be aggravating in some jurors' minds. What possible purpose is served by
> allowing a jury to hear evidence in aggravation, and victim impact evidence,
> which is irrelevant to sentencing and can only be inflammatory? The majority asks
> jurors to disregard what may be truly awful circumstances of the crime, and even a
> genuinely unpleasant defendant, because that defendant is more likely than not
> retarded. Why should jurors be put in this impossible position?

Justice Chapel's opinion suggests, at a minimum, that the mental retardation question,

---

25    While this procedure is not utllized in South Carolina, several states currently do use separate juries to
decide similar issues, *e.g.,* competency to stand trial and criminal responsibility. *See, e.g,.,* Vernon's Ann. Tx. C. C.
Pr. Art. 46.02, §4 (competency); Pa. St. 50 P.S.§7404(c) (sanity); Ca. Pen. Code§1026(a) (sanity).

JA 7304  31732

even if it is to be decided by the trial jury in the course of the trial itself, should be made before the commencement of the sentencing phase.

D. Procedures for Cases Where the Defendant was Sentenced to Death Prior to *Atkins*.

Most of the petitioners in this case have already been sentenced to death. However, there is no question that *Atkins* has full retroactive application and there are not, and cannot be, any procedural obstacles to these individuals having their mental retardation claims heard and decided.[26] Thus this Court must also establish constitutionally appropriate procedures for handling these petitioners' cases in light of *Atkins*. In cases where the evidence of mental retardation was not disputed at trial, or in post-conviction proceedings, petitioners submit the remedy is simple: the death sentence must be modified to a sentence of life imprisonment.[27] In cases where the evidence was disputed, the appropriate remedy would include a mental retardation determination and, if necessary, a new sentencing hearing. *See Murphy v. State*,

---

26   This is evident from *Penry, supra*. While the *Penry* Court rejected the petitioner's mental retardation claim, the Court held that if it were to conclude that the Eighth Amendment did not permit mentally retarded defendants to be sentenced to death – which it has now expressly done – that rule would have complete retroactive effect. 492 U.S. at 307-08. *See Hill v. Anderson*, 300 F.3d 679, 683 (6th Cir. 2002)(*Atkins* has full retroactive effect because any other interpretation would permit the state to commit an illegal act). Even if *Penry* did not decide the issue, basic fairness would. Any other conclusion would essentially be permitting a few last cruel and unusual punishments to occur before *Atkins* takes effect. As a retroactive new rule of law limiting the state's power to impose the death penalty, there also can be no questions of waiver or procedural default. Based on respondents' return, they apparently concur that *Atkins* is available to inmates sentenced to death prior to the date the decision was handed down.

27   A copy of a recent order doing precisely that in a Pennsylvania capital case is reproduced in Appendix C. *Commonwealth v. Karenbauer*, No, E534291-2 (Sept. 23, 1995). This is not only a matter of common sense, but is also in accord with the established practice in other analagous situations at the trial level. This Court has recognized, for example, that while entrapment is ordinarily a question of fact for the jury, the court need not submit the question when there is undisputed evidence and only one reasonable conclusion can be reached. *State v. Johnson*, 295 S.C. 215, 367 S.E.2d 700 (1988). Likewise, a criminal defendant in South Carolina has the burden to prove an insanity defense by a preponderance of the evidence. S.C. Code § 17-24-10. When the defendant has met that burden, however, and the state has presented no evidence from which a jury could find the defendant sane, this Court has recognized that the presumption of sanity alone is insufficient to create a jury issue and the trial court should direct a verdict. *State v. Milian-Hernandez*, 287 S.C. 183, 336 S.E.2d 476, 477-78 (1985). The defendant's parole eligibility would be determined by the law in effect at the time of the offense.

JA 7305 31733

*supra* at *10 (where evidence of mental retardation exists the matter should be "remanded for resentencing"). As noted above, since a mentally retarded defendant is not eligible for the death penalty, the ultimate decision must be made by the jury. Thus the only remedy consistent with both *Atkins* and *Ring* is for a new, properly instructed and guided jury to decide both the defendant's eligibility for the death penalty, as well as its appropriateness, in light of all the relevant evidence.

Even if the jury decides that the defendant is not mentally retarded, and thus is death "eligible," one or more jurors may well decide that the defendant's diminished intellectual capacity is sufficiently mitigating to warrant a life sentence. *Williams v. Taylor*, 529 U.S. 362, 397 (2000) (counsel rendered ineffective assistance in failing to present evidence that the defendant was "borderline mentally retarded"); *id.* at 398 ("Mitigating evidence unrelated to [death-eligibility] may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case"). Knowing that mental retardation makes the defendant ineligible for the death penalty, which the jury will know by the time it begins its final sentencing deliberations on the appropriateness of the death penalty, necessarily heightens the mitigating effect of a decision that the defendant falls just over the line into the "borderline" range of intellectual functioning. *See, e.g., Brownlee v. Haley*, 2002 WL 31050882, *27 (11th Cir. 2002) (finding counsel ineffective, in light of *Atkins*, for failing to present evidence of borderline mental retardation because an individual "right on the edge" of mental retardation suffers some of the same limitations of reasoning, understanding and impulse control as those persons described by the Supreme Court in *Atkins*). In other words, one or more jurors may conclude that the defendant is not mentally retarded – and thus "eligible" for the death penalty -- but still

conclude, due to the closeness of the question or some remaining doubt about whether the defendant is mentally retarded, that the death penalty is not the appropriate punishment. Thus, a new sentencing hearing at which the jurors have the opportunity to decide whether the defendant is eligible for the death penalty, and, if so, whether it is the appropriate punishment, is the only remedy which will permit full consideration of a capital defendant's mental retardation.

Thus in cases pending in post-conviction proceedings where evidence of mental retardation was disputed, the following variant of the above two step process should be adopted.

**Step 1: The post-conviction relief court should determine if the weight of the evidence establishes the defendant's mental retardation.**

If the court concludes that the defendant is retarded, the death sentence should be modified to a sentence of life imprisonment.

**Step 2: If the post-conviction relief court is unable to conclude that the weight of the mental retardation evidence warrants sentence modification under Step 1, then a mental retardation determination by a jury and, if necessary, a new sentencing trial should be ordered.**

Assuming there are no viable post-conviction claims warranting a new trial on the applicant's guilt-or-innocence, if the post-conviction relief court determines that the weight of the evidence does not conclusively compel sentence modification, then a new sentencing proceeding must be granted using the procedures discussed above. The sentencing jury would first decide whether the defendant is mentally retarded. If the jury determines that the defendant is mentally retarded, then the death sentence would be modified to life imprisonment. If the jury determines that the defendant is not mentally retarded, then, for the reasons discussed above, a new sentencing hearing on the appropriateness of the death penalty would be conducted.

## CONCLUSION

For the above stated reasons, this Court should establish constitutionally adequate

procedures, as set forth in this brief, for capital cases where evidence of mental retardation exists.

Respectfully submitted,

JOHN H. BLUME
  Cornell Law School
  Ithaca, N.Y. 14853
  (607) 255-1030

JEFFREY P. BLOOM
  1945 Blossom Street
  Columbia, S.C. 29205
  (803) 256-7001

ROBERT M. DUDEK
  S.C. Office of Appellate Defense
  1122 Lady Street Suite 940
  Columbia, S.C. 29201
  (803) 734-1330

DIANA L. HOLT
  P.O. Box 6454
  Columbia, S.C. 29260
  (803) 782-1663

ROBERT E. LOMINACK
  1247 Sumter Street Suite 201
  Columbia, S.C. 29201
  (803) 765-1044

TERESA L. NORRIS
  Center for Capital Litigation
  P.O. Box 11311
  Columbia, S.C. 29211
  (803) 765-0650

E. FIELDING PRINGLE
  P.O. Box 5962
  Columbia, S.C. 29250
  (803) 376-1582

DAVID P. VOISON
  P.O. Drawer 23786
  Jackson, M.S. 39225
  (601) 948-6882

KEIR M. WEYBLE
  P.O. Box 11744
  Columbia, SC 29211
  (803) 765-1044

COUNSEL FOR PETITIONERS

BY: _____
      JOHN H. BLUME

October 18, 2002

JA 7308  31736

*To read*

## A NEWSLETTER FOR DEFENSE COUNSEL IN FEDERAL CAPITAL CASES
### Prepared by the Federal Defender Capital Resource Counsel and the Federal Death Penalty Resource Counsel Project

April 2003

## Table of Contents

Upcoming Training (Mental Retardation) ............................................. 1

Recent Victories to Salute ......................................................... 2

Louis Jones, Executed March 18, 2003 ............................................. 3

Web Site Update ................................................................. 4
    Listserv ..................................................................... 4

DOJ Activity ................................................................... 4
    Authorized Case Statistics ................................................... 5

Relevant Cert Grants and Arguments Pending .................................... 5

Recent Federal Capital Case Summaries ......................................... 6
    Ring Activity ................................................................ 6
    Other Case Summaries ..................................................... 8

Investigating Mental Retardation ................................................ 9

Challenging Psychological Test Instruments ...................................... 12

********************************************************************************

### Upcoming Training on Mental Retardation

The Habeas Assistance and Training Counsel (HAT) is conducting a series of training programs on mental retardation–investigating, proving and presenting mental retardation claims. These programs are in collaboration with the Capital Habeas Units (CHUs) of three Federal Defender Offices in different regions of the country, under the auspices of the Administrative Office of the United States Courts.

The next training session is scheduled for May 1-2, 2003, in Philadelphia at the Hilton Garden Terrace, 1100 Arch Street, Philadelphia, ZIP 19107 (215) 923-0100. While the targeted attendees are primarily from the Mid-Atlantic region, it is expected that litigators from around the

1

GOVERNMENT EXHIBIT
243

JA 7309

69640

country will register as well.

To register for and receive further information about the Philadelphia program, contact Kathy Peirce at the Philadelphia CHU unit–email Kathryn_Pierce@fd.org. The first seventy-five (75) applicants will be guaranteed a conference slot. Please watch for further announcements with respect to the third training scheduled for Los Angeles.

*[Note: In this issue of our newsletter is an article on investigating Mental Retardation, see infra]*.

## Recent Victories to Salute

There have been a number of victories–since our January newsletter–congratulations to:

- David Ruhnke and Ron Travis for the life verdict for Michael O'Driscoll (MDPA), case involving a killing in prison;
- Frank Carter, David Baugh, Steven McCool and Barry Coburn for winning life sentences (for a total of 31 homicides) in a year-long drug/murder trial of their clients Kevin Gray and Rodney Moore (DDC);
- Reuben Cahn and Skip Gant for the life verdict for Jose Denis in a drug/murder trial (with the jury failing to find one of the gateway factors) (SDFL);
- Nina Ginsburg and Jon Shapiro for the guilt phase verdict excluding the death penalty for Brian Regan (EDVA);
- Terry Kindlon and Christopher Pogson for the withdrawn death notice during jury selection for their mentally retarded client, Christopher McMillian (NDNY);
- Gary Christopher and Sarah Gannett for a life plea for Jamal Barnes in a carjacking related killing (DMD);
- Valerie Jusselin and Ralph Whalen for a life plea for Derryl Franklin (EDLA), in a carjacking related killing;
- Scott Wendelsdorf for a successful *Ring* challenge to the death penalty before the penalty hearing began for T.D. Pennington (WDKY); and,
- David Bruck and Bob Tucker for persuading the district court to strike the death penalty as not retroactive to an air piracy case that occurred 8 years before the FDPA was enacted (DDC).

## Louis Jones
### Executed March 18, 2002

On March 18, 2003, Master Sergeant Louis Jones, a retired 22-year Army veteran, was executed by the United States. Lou was the third person to be executed by the government, following Tim McVeigh and Juan Garza, who were executed in June, 2001.

Lou's attorney, Tim Floyd, from Lubbock, Texas, did a magnificent job representing Lou in the final months, with help from Matthew Bobys, a young lawyer with Skadden Arps in

2

JA 7310    69641

Washington, DC, David Freedman (our mitigation expert with the Capital Resource Counsel project), Laura Burstein with the Justice Project in Washington, DC, and Dick Burr of the Federal Death Penalty Resource Counsel Project.

Tim developed a very powerful plea for clemency based on Lou's suffering from Gulf War Syndrome. Medical advances that occurred years after Lou's trial provided new information about brain damage suffered by some veterans during the Gulf War. Re-examination of Lou's medical records, together with newly-available blood testing, demonstrated beyond doubt that Lou's brain had been damaged by exposure to nerve gas and other chemical agents during his service in the Gulf War. The consequences for him were uncontrollable violent rages, the pattern of which fit the behavior underlying his crime and explained for the first time why a soldier with an exemplary record like his could have done what he did (for more Gulf War Syndrome information, see the previous newsletter). None of this information was presented at trial, nor could it have been, because the science had not developed sufficiently at that time. This made for a very powerful clemency plea since there was no judicial remedy for this particular unfairness.

In addition, Tim litigated the application of *Ring v. Arizona* to federal capital defendants, arguing that the failure of Lou's indictment to include the threshold mental state and statutory aggravating factors that *Ring* now requires to be included in the indictment violated Lou's rights under the Fifth Amendment's Indictment Clause. Not raised at trial or in any subsequent proceeding and facing questions concerning the retroactivity of this aspect of *Ring*, the courts were unwilling to intervene – notwithstanding very good arguments to excuse procedural default and to apply this aspect of *Ring* retroactively.

On the literal eve of the United States' invasion of Iraq, President Bush denied clemency. The only explanation that was alluded to in press reports was this: "A senior administration official said the decision stemmed from a belief that Jones was tried and convicted by a jury of his peers in a 'heinous, premeditated murder.'" This suggests a complete disregard for the difference between judicial review and clemency, and leaves little room for clemency except for the indisputably innocent.

Lou was supported to the end by Tim, Lou's 22-year-old daughter Barbara, and a host of long-time spiritual advisors. According to Reuters reports, Lou died with a smile on his face, quoting a passage from the Bible, "Though the Lord has chastised me forth he hath not given me over unto death," and singing a hymn, "Jesus keep me near the cross...," before losing consciousness.

Lou was much beloved on death row for his acts of kindness and wise counsel. He is sorely missed.

*[Note: Dick Burr is the FDPRCP expert on federal clemency work, and can be reached at dick@burrandwelch.com. Dick was actively involved in the clemency and final petition work for both Louis Jones and Juan Garza, as well as the final litigation for Tim McVeigh.]*

3

JA 7311   69642

## Web Site Update

The FDPRCP web site (www.capdefnet.org) contains a private page which can only be accessed through the use of a username and password. Because of the sensitive nature of the materials located on this portion of the site, access is limited to defense attorneys who currently have a pending federal capital trial, those defense attorneys who regularly work on federal capital trials, and federal defenders. To apply for a password, after clicking on the secure login link, click on the application link and provide the requested information.

The private page contains four litigation guides, Authorization, CJA & 3005, Instructions, and Victim Outreach.

Authorization: This section contains information about the authorization process within the Department of Justice, including Frequently Asked Questions, and sample requests for funds to appear before the Capital Case Review Committee. You can also find sample letters and memoranda to the Department of Justice opposing authorization.

CJA & 3005: This section contains Frequently Asked Questions about the Criminal Justice Act as well as sample case budgets and motions for expert funding.

Instructions: In addition to penalty phase instructions given in several cases, and the Project's recommended instructions, this section includes the Eighth Circuit Pattern Jury Instructions and a memo regarding these instructions as well as a Memorandum on Defendant's Requested Instruction that the Death Penalty is Never Required.

Victim Outreach: This section contains a sample Motion to Authorize the Services of a Defense-Based Victim Liaison. The sample motion contains three attachments, two relevant articles and a sample declaration.

*[For more information about the Website, contact Robert Lominack at robert@brucklaw.com.]*

## Fedtrials Listserv

If you are a federal defender anticipating a capital case, or a CJA lawyer with a federal capital case, and would like to be added to the federal capital trials listserv, please notify Kevin McNally (kmcnally@dcr.net).

## DOJ Activity

As of the end of March 2003, Attorney General Ashcroft has authorized U.S. Attorneys to seek the death penalty for 67 defendants of 286 cases reviewed. In the last two years, AG Ashcroft has directed death prosecutions in at least 30 cases where the local USA office did not

JA 7312    69643

seek death.

At a recent DOJ capital review meeting, defense counsel reported the following DOJ staff in attendance: Capital Case Unit Chief Peggy Griffey, Mary Lee Warren (long time participant on this Committee), Mark Miller (an AUSA in Kansas City), Paul Murphy, Charlie Kinsey, and Karen Borgerding.

## Authorized Case Statistics

The disposition of authorized cases (Reno and Ashcroft), as of April 7, 2003: clemency (1–Chandler, President Clinton); executed (3–Timothy McVeigh, Juan Garza, Louis Jones); sentenced to death and now pending direct appeal or post-conviction (23); awaiting retrial or re-sentencing after reversal on appeal (0); death sentence vacated and request withdrawn (2); capital prosecution discontinued by government due to plea bargain (84); sentenced to less than death after jury/judge voted against death (55); requests for the death penalty withdrawn (29); dismissal after notice by judge (13); acquittal/innocent (7); lesser included conviction (2); committed suicide/died (3); awaiting or on trial on capital charge (56).

Total authorized cases (to April 7, 2003): 278. By state: Alabama (4) ,Alaska (1), Arizona (1), Arkansas (5), California (15), Colorado (6), Connecticut (3), DC (11), Florida (10), Georgia (6), Hawaii (1), Illinois (12), Indiana (1), Iowa (3), Kansas (4), Kentucky (3), Louisiana (6), Maryland (11), Massachusetts (2), Michigan (15), Mississippi (3), Missouri (18), New Jersey (2), New Mexico (6), New York (26), North Carolina (8), Oklahoma (3), Pennsylvania (10), Puerto Rico (13), Tennessee (12), Texas (18), Vermont (2), Virginia (34), West Virginia (3).

*[Note: Kevin McNally's office maintains a substantial database, including valuable information on race of defendant and race of victim, that can be of use to federal capital defense counsel. Most of the statistical information is available on the website. We encourage you to continue to provide the statistical information requested by Kevin's office, as well as copies of significant motions for the Project's website, and use by other counsel.]*

Supreme Court Activity

## Recent Relevant Cert Grants and Arguments Pending

Recent Cert Grants:

*Castro v. United States,* below 290 F.2d 1270 (11th Cir. 2002), *cert. granted* 1/27/03: (1)When a U.S. District Court re-characterizes a pro-se federal prisoner's first post-conviction motion as a habeas petition under 28 U.S.C. §2255, does such re-characterization make the prisoner's subsequent attempt to file a §2255 petition a "second or successive petition" within the purview of the Antiterrorism and Effective Death Penalty Act (AEDPA)? (2) Does the Supreme Court have jurisdiction to review the 11th Circuit's decision affirming the dismissal of a §2255 petition for writ of habeas corpus as second or successive? The second question was added by the Supreme Court when it granted the certiorari petition.

JA 7313    69644

<u>Recent or Upcoming Arguments</u>:

*Price v. Vincent* (formerly *Jones v. Vincent*), below 292 F.3d 506 (6th Cir. 2002) (No. 02-524), *argument 4/21/03*: (1) Does state supreme court's conclusion that trial court did not direct verdict of acquittal constitute a factual finding entitled to deference on habeas corpus review? (2) Was habeas petitioner twice placed in jeopardy by action of trial court in first granting motion for directed verdict on issue of first-degree murder and shortly thereafter withdrawing its grant, when both initial decision and its recall occurred out of presence of jury? (3) Should this court grant certiorari to resolve split of opinion within federal courts of appeals and within Sixth Circuit and state courts on question of whether double jeopardy principles were violated in factually similar situations?

*Wiggins v. Smith* (formerly *Wiggins v. Corcoran*), below 288 F.3d 629 (4th Cir. 2002), (No. 02-311), *argued 3/24/03*: Does defense counsel in capital case violate requirements of *Strickland v. Washington* by failing to investigate available mitigation evidence that could have convinced jury to impose life sentence, as this Court concluded in *Williams v. Taylor* and as most courts of appeals have concluded, or is defense counsel's decision not to investigate such evidence "virtually unchallengeable" so long as counsel knows rudimentary facts about defendant's background, as Fourth Circuit held in this case?

*[Margaret O'Donnell maintains current information on relevant certs pending as well as oral argument information. She can be reached at mod@dcr.net. Transcripts of Supreme Court arguments can be found at www.semicustom.com/habeas.htm.]*

Recent Cases

**Recent Federal Capital Case Summaries**

**Ring Activity**

<u>Fell Argued</u>:

Alex Bunin alerted via the listserv that *United States v. Fell* (D. Vt., Federal Defenders Alex Bunin and Gene Primomo) was argued on April 8. The defendant's brief, also made available via the listserv, frames the <u>Ring</u> argument differently than did the district court, and points the way to the next round of <u>Ring</u> related issues, i.e., the unfairness of trying elements of death-eligible murder in the midst of a sentencing free-for-all. The argument summary, set forth in the brief is: "The Federal Death Penalty Act violates due process in all federal capital trials by providing less protection to proof of elements of a capital crime than to other elements of a crime. This is because these capital elements are considered at a hearing where the defendant's character, future dangerousness, victim impact, and hearsay are admitted. Allowing proof of elements, and traditional sentencing evidence, to be considered together is indefensible as a matter of law, logic or history."

<u>Statutory Aggravating Circumstances Adequately Charged</u>:

6

JA 7314    69645

*United States v. Jackson*, __ F.3d __ (4th Cir. 3/18/03), 2003 WL 1233044. Before the district court, Jackson alleged that the indictment was defective since it did not contain *any* statutory aggravating circumstances. The Court of Appeals agreed that after *Ring v. Arizona*, "an aggravating factor necessary to the imposition of the federal death penalty must also be alleged in the indictment," 2003 WL 123304 at *7, but found there were sufficient facts alleged concerning the two statutory aggravating circumstances–"death during the commission of another crime" and commission of the offense "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim." On appeal, Jackson argued that *all* statutory aggravating circumstances must be included in the indictment. The Court of Appeals reviewed this claim using plain error analysis because this claim was not raised below. The Court ruled that "[a]s long as the heaviest punishment is justified by a conviction on the offense charged in the indictment, any other facts relevant to sentencing are subject to" factfinding that does not implicate the Fifth Amendment. 2003 WL 123304 at *12. Since two aggravating circumstances were alleged in the indictment, there was no error.

Death Qualifying Offense Not Charged in Indictment:

In *United States v. Pennington* (WDKY, Federal Defender Scotts Wendelsdorf), the district court struck the death penalty on *Ring* grounds–first finding the case "procedurally unique..[i]t may be factually and procedurally one-of-a-kind", and then concluding "that Ring, *Jones* and *Apprendi* compel the conclusion that in a federal capital case, the grand jury must find the FDPA intent and aggravating factors upon which the death penalty is requested and must set forth those findings in the indictment." The defendant pled guilty pre-*Ring* to an indictment that did not include the intent and aggravating factors, and then prior to the penalty phase argued that *Ring* barred the death penalty. The district court found that neither the intent nor statutory aggravating factors were included in the indictment (bank robbery with murder), that there was no waiver, and if harmless error analysis applied, the error was not harmless. The government filed a motion to reconsider the day before the time to appeal expired.

*[The decision can be found on our website at www.capdefnet.org/pdf_library/ring8.pdf].*

Federal Death Penalty Survives Post Ring Constitutional Challenge:

*United States v. Sampson*, 2003 WL 352416 (D. Mass. 2/18/03). Defendant moved to plead guilty to the indictment which did not contain the allegations necessary for the imposition of the death penalty. Several days after the motion, the grand jury returned a superseding indictment alleging mental state factors and statutory aggravating circumstances which must be proven beyond a reasonable doubt for a defendant to be eligible for the death penalty. The defendant argued that the Federal Death Penalty Act (FDPA) was rendered unconstitutional by the Supreme Court's decisions which made these factors the functional equivalent to elements of a greater offense thus making it impermissible to have the Department of Justice rather than a grand jury decide who is subjected to the death penalty. The court agreed, and the government did not dispute, that after *Ring* the mental state factors and statutory aggravating circumstances must be charged in the indictment. However, according to the court the FDPA does not prohibit the grand jury from performing its function and, in fact, Congress enacted the FDPA with the intent that it be flexible

7

JA 7315   69646

enough to change with rulings of the Supreme Court.

**Other Recent Federal Capital Case Summaries**

Federal Death Penalty Constitutional, FRE Not Constitutionally Mandated

*United States v. Matthews*, 2002 WL 31995520 (N.D. N.Y. 12/31/02). Disagreeing with the rationale of *United States v. Fell*, 217 F.Supp. 2d 469 (D.Vt. 2002), the district court held that because the Federal Rules of Evidence are not constitutionally mandated, due process and confrontation rights are not offended by the relaxed evidentiary standard utilized in the sentencing phase. Due process simply protects against the admission of evidence which would render the trial fundamentally unfair; therefore, according to the court the Federal Rules of Evidence go beyond that which is constitutionally required. Furthermore, while the rules of evidence may not apply in the sentencing phase, the constitutional protections of due process and confrontation are still applicable and are satisfied by evidence that carries sufficient indicia of reliability and trustworthiness. Both 21 U.S.C. §848 and 18 U.S.C. §3593 expressly grant to the trial judge the discretion to exclude unreliable and/or prejudicial evidence the admission of which would be fundamentally unfair.

Victim Impact Litigation:

*United States v. O'Driscoll*, 203 F.Supp.2d 334 (M.D. Pa. 2002). The defense moved to strike "victim impact" as a non-statutory aggravating circumstance, or, in the alternative, for discovery regarding this non-statutory aggravator. In its motion for discovery, the defendant argued that the government's notice was vague since it did not identify the witnesses who would testify and did not set forth in detail the harm suffered by these witnesses. Thus, the defense was unable to investigate and prepare for the witnesses and/or evidence that the government would present. After ruling that "the consequences of O'Driscoll's action in taking the life of Mr. Frankhouser . . . are clearly an appropriate subject for the jury's consideration," *id.* at 340, the court addressed the motion for discovery. Noting that the court had an obligation to ensure that the emotional aspect inherent in victim impact testimony was tempered so the jury was not "influenced by passion or prejudice," *id.*, the court adopted procedures similar to those used in *United States v. Glover*, 43 F.Supp.2d 1217 (D. Kan. 1999) in which, *inter alia*, the government had to submit a written summary of the proposed testimony of each victim impact witness. Furthermore, the court indicated that it would seriously consider a motion that the victim impact testimony be videotaped and presented to the jury in that manner.

Appointment of Counsel:

*In re Sterling-Suarez*, 323 F.3d 1 (1st Cir. 2003). After being indicted for a death-eligible offense, Sterling-Suarez requested that "learned counsel" be appointed pursuant to 18 U.S.C. §3005. The district court refused to appoint a second attorney until the Department of Justice had decided whether to seek the death penalty. Sterling-Suarez sought mandamus in the First Circuit which determined that learned counsel should be appointed prior to DOJ's determination was made noting that "learned counsel could be useful in seeking to dissuade the

8

JA 7316  69647

Attorney General from seeking the death penalty." The court ordered that "learned counsel should be appointed forthwith." *In Re Sterling-Suarez*, 306 F.3d 1170 (1st Cir. 2003). The district court subsequently appointed a specific federal public defender as learned counsel, removed the FPD as the "non-learned" counsel and appointed another lawyer as co-counsel. The district court noted that the federal defender had recently served as co-counsel on a death penalty case though it had not gone to trial. The federal defender maintained that he was not qualified to serve as learned counsel and filed a Motion to Enforce Mandamus with the Court of Appeals. On this second time before the Court, it ruled that the previous mandamus dealt solely with *when* learned counsel was to be appointed; therefore, the district court's order does not violate the previous writ. The Court notes that the qualifications necessary to be learned counsel are open to debate and states that counsel can file a new mandamus though the Court suggests that this issue may not meet the qualifications for resolution by mandamus.

Penalty Phase Rebuttal:

*United States v. Jackson*, __ F.3d __ (4th Cir. 3/18/03), 2003 WL 1233044. After pleading guilty in state court for murder, Jackson was indicted and prosecuted in federal court for the same murder. He was convicted of using a firearm during and in relation to a crime of violence, specifically murder, kidnapping, and aggravated sexual abuse and sentenced to death. In addition to the *Ring* issue (see supra), Jackson also appealed the introduction over objection of a lengthy and rambling videotaped interview of him on FOX News. The tape was introduced by the government in rebuttal to the testimony of Jackson's adoptive mother who testified about his childhood problems, mental health and learning difficulties, social interaction skills, and marital problems. The government argued and the Court of Appeals agreed that the tape demonstrated in contrast to the mother's testimony that Jackson's home life was positive, that he was intelligent and articulate and that he functioned at a more normal level than described by his adoptive mother. Further, the Court found that even if some portions of the tape were not proper rebuttal, any error was harmless.

*[Robert Lominack summarizes recent federal capital cases for the website. He can be contacted at robert@brucklaw.com]*.

Mitigation Corner

**There's More to MR Than IQ:**
**An Investigative Overview**

In *Atkins v. Virginia* 122 S.Ct. 2242 (2002), the Supreme Court noted that "an IQ between 70 and 75" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." 122 S.Ct. at 2245, n.5. However, along with IQ scores in this range or below, you will need to investigate and document evidence related to adaptive functioning. The most important resource for those who suspect they have an MR client is the American Association on Mental Retardation's 2002 Mental Retardation: Definition, Classification, and Systems of Supports (AAMR Press, 2002; ordering information can be found at www.aamr.org)

Adaptive functioning: Adaptive behavior is the component of the definition of MR that

9

JA 7317   69648

requires that the intellectual impairment have produced real-world disabling effects on the individual's life. The purpose of this element is to assure that the individual is not merely a poor test-taker, but rather, is a truly disabled individual. In conjunction with the age-of-onset requirement (prior to age 18), it also provides a check against allegations that the mental retardation is malingered.

This is the area in which attorneys must do substantive independent factual development. For factual development purposes, MR has two parts: onset before age 18 (according to DSM-TR), and significant limitations in adaptive functioning. School records, youth authority records, social service records, family assessment records, juvenile assessments by law enforcement or medical professionals, lay witness observations and family history to explore multi-generational patterns of impairment are essential to substantiate a claim of mental retardation.

Client records and information: School records and psychological assessments conducted during adolescence and childhood, including custodial assessments; medical evaluations, hospitalizations, counseling referrals and previous assessments; reports of seizures, fever, infections, failure to thrive, physical or emotional abuse, head injury, and ingestion of toxic substances; previous testing, both raw testing data and reports prepared (either medical or forensic); prior criminal proceedings in which the client may have discussed legal rights or cognitive impairments; disability applications or social service contacts; nutritional information; information about day-to-day functioning (going to the store, doing homework, dealing with conflict, ability to care for self (hygiene, food, work history), relationships with neighborhood peers, reading a map or taking public transportation alone; memory problems; suggestibility, independence, ability to abstract information.

Family records and information: Relevant information may appear in the client's parents health records; parents' level of intellectual functioning; whether the mother used drugs or alcohol during pregnancy; whether the mother used home remedies to self-medicate illnesses during pregnancy; mother's age when pregnant; birth complications; whether there is a pattern of low intellectual functioning in siblings, or extended family; social service contacts with the family.

Neighborhood records and information: For a client you suspect to be mentally retarded, neighborhood information may include, exposure to neurotoxic agents which cause MR. These include, at least, heavy metals such as lead, but may also include numerous other toxic agents in the environment if the client was exposed in sufficient quantity (see dose-response below); level of support available to the client from social networks in the neighborhood or social institutions; positive influences from mentors or role models (or lack thereof); economic stability and status.

The historical component of MR also makes it almost impossible to fake. While some clients might be able to intentionally perform poorly on an IQ test, no one can retrospectively fabricate the historical pattern required for diagnosis. In fact, the vast majority of MR clients will seek to hide their impairments not make themselves appear worse (see below). You must develop facts that demonstrate developmental delays at critical periods of development of language, physical movement, personality, independence, and cognition and academic stages. Social history development is the basis for documenting the adaptive functioning component of MR, and will also

10

JA 7318  69649

provide you the details with which to explain MR to a jury.

<u>Working with a mentally retarded client</u>: Working with MR clients can be very challenging, especially working with a high functioning MR individual. Despite popular conceptions, most mentally retarded clients do not appear different than any other client. Most MR clients will not have facial or other physiological malformations, they will not be unable to speak or always be non-responsive to questions, they will not always demonstrate peculiar physical movements, and they are likely not going to be docile and trusting of you during the first interviews.

Working with an MR client requires that you spend a significant amount of time with him/her. Your first task, as with all clients, is to build trust and rapport. You might feel frustrated because the client only wants to talk with you about something that seems irrelevant to your work on the case (sports, for instance), but this repetitive talking on a subject is a hallmark of MR. Spending time with an MR client will allow you to see and understand:

- how the client is compliant with your requests even when he/she does not understand what you are asking;
- how the client attempts to minimize impairments by talking about a subject he/she feels competent in (sports);
- how the client makes sense of issues you raise and whether over time, he/she is able to progress to or beyond a rudimentary understanding of an issue;
- how difficulty expressing thoughts and emotions may at first appear to be callousness or indifference but actually reflects impairment;
- how words are created by the client (e.g., trickeration to describe the behavior of the police during interrogation) which convey a sense of being overwhelmed and taken advantage of;
- how an ability to use certain words or phrases masks the client's inability to comprehend meaningfully the concepts behind the phrase;

Mentally retarded (as well as mentally ill) clients require that someone on the defense team spend a great deal of time with them. High functioning mentally retarded clients in the criminal justice system will already have well-developed techniques for hiding the scope of their functioning and impairment. These clients probably will be able to hold a conversation and pay attention, but repeated visiting will begin to show you areas of conversation where the client is comfortable and returns to when he/she does not understand other areas.

Masking is the process by which mentally retarded people attempt to distract from or hide from view their true level of functioning (see, Edgerton 1993, The Cloak of Competence 2nd ed.). Many clients are successful at masking. Many clients are able to talk for hours on a single subject and appear to have extensive knowledge so long as the conversation remains within the area they have comfort. For instance, one client was able to recite backwards and forwards (starting at any point) the kings and queens of Europe over hundreds of years and their relationships to each other. This area of competence must be explored to assess the depth and width of the client's knowledge. This client was not able to calculate change from a dollar he would get back after buying a 60 cent

11

JA 7319   69650

soda. Mental retardation does not require that your client have no mental functioning at all, simply that your client is seriously impaired compared to the norm in cognitive and adaptive function.

Masking is an important concept for two reasons: first, because it means that you will have to work harder to recognize mental retardation in your client. Second, your client might face charges of malingering or lying as a result of those normal processes and you will need to carefully document how your client masks and examples to counter the charges of malingering.

The mentally retarded client is likely to be a very poor historian and may not be self-aware of the strength or weakness of his/her abilities. Some reasons why mentally retarded clients are poor historians include:

- an inability to recall details (impaired memory);
- inability to organize concepts and understand how things relate to each other;
- limited ability to communicate (receptive and expressive language deficits);
- masking illness (attempt to hide the extent of the disability);
- confabulation (filling in details to portray a coherent story despite not having actual knowledge of details provided);
- passivity, compliance and deference (likely to agree with interviewer in effort to please);
- rigidity in the face of contradictory evidence; and,
- lack of comprehension.

Given these features of mental retardation, development of accurate facts to prove up mental retardation requires very detailed interviewing of lay witnesses on the facts of pre-offense functioning as discussed above. In addition, you will need to retain a mental health expert with particular skills and training on mental retardation.

*[For more information about investigating mental retardation and other mental health issues, contact David Freedman, our Project's mitigation investigation expert. David can be reached at freedman99@earthlink.net].*

### Challenging the Government's Mental Health Evidence: Psychological Test Instruments

To effectively challenge government mental health evidence, defense counsel must demonstrate that the basis of the government expert's opinion is unreliable. Since government mental health evidence typically depends on the results of psychological testing, an understanding of these instruments and their vulnerabilities is essential. Counsel who decline to scrutinize and appropriately challenge – preferably *in limine* – the psychological test instruments relied upon by a government expert will miss a substantial (and enjoyable) opportunity to limit and shape the evidence the government will put forward in rebuttal of the mitigation case.

This was powerfully illustrated in *U.S. v. Rodney Moore*, a federal death trial in Washington, DC involving 31 drug-related homicides. Relying on two psychological test

12

JA 7320    69651

instruments, the *Validity Indicator Profile* and the *Malingering Probability Scale*, the government expert stated in his report that "[o]verall, significant concerns were raised regarding Mr. Moore's general level of effort in responding in a consistent and honest fashion." It was anticipated that at trial this psychologist would testify that the defense evidence of the client's extremely low cognitive functioning was malingered.

A defense motion *in limine* asked the court to exclude testimony about malingering based on *Daubert* and other grounds. Counsel pointed out that the computer-generated interpretation for one of these tests offered an alternative explanation for Mr. Moore's scores that the expert's report failed to mention: the client's weak reading skills. The motion also identified numerous weaknesses in the two test instruments themselves, as related in critiques published in the psychological literature.

In response to the defense motion, the government not only retreated from the malingering claim, but elicited on direct examination the following testimony from its expert, which affirmatively supported the defense:

Q. From your examination …did you conclude that Mr. Moore was faking or malingering in any way?

A. **Absolutely not.**

Q. You indicate in your report that caution should be used, indicated extreme caution regarding the interpretation of these tests in the clinical impressions portion of your instruction. Why did you say that?

A. Because on two of the measures that I administered to him, the Malingering Probability Scale and the Validity Indicator Profile, they came out indicating that he performed in questionable fashion and he may not have put forth his best effort. But in my estimation, in observing him and testing him, **I felt like he put forth his best effort and tried the hardest he could.**

Q. Is there any other possible explanation for why it would indicate that he may not have been putting forth his best —

A. **Reading difficulties.**

This extraordinary result challenges two justifications lawyers frequently offer for not raising *in limine* challenges to expert evidence: that this judge will never grant a *Daubert* motion, and that the defense will lose the advantage of surprise in its cross-examination. The effectiveness of a motion like this one, however, is not measured by whether it is won or lost. Here, the court never actually ruled on the motion. The government did not literally concede the issue, but declined to file a written response to the motion and asserted instead that it was moot because the expert would offer no testimony on malingering. The indirect benefits of filing this

13

challenge – avoiding the very damaging claim that the client was faking his disability, and obtaining the expert's affirmatively supportive testimony – were more valuable to the defense than a few points scored through surprise cross-examination. Had an evidentiary hearing been held, even if the outcome had been less dramatic, there would nevertheless have been an opportunity to preview and thus prepare for the government's evidence. In addition, an expert who recognizes that counsel is well-armed, knowledgeable and unawed by psychological jargon is likely to offer more conservative and thus less damaging testimony all around.

Information to support a motion like the one filed in *Moore* is not hard to obtain, nor does it require specialized training to access the psychological literature. Some suggestions:

Ask questions: What is the instrument? What is it designed to assess? Does it meet *Daubert* criteria? Is it appropriate given your client's age, gender, race, ethnicity, cognitive level, education, etc? What conclusions can and cannot appropriately be drawn from this test? Is it a screening instrument or a definitive assessment? Is it suitable for forensic purposes? What is the rate of false positives and false negatives? Is this the most up-to-date version of the test? Was it administered, scored and interpreted correctly and in the fashion indicated in the test manual?

Use the internet: an extraordinary amount of useful information is available on the Web. A description of almost any psychological test is available for free from the publishers of the Buros Mental Measurements Yearbook, at www.unl.edu/buros . (Click on "find tests.") For a $15 fee that you can pay on-line by credit card, you can instantly obtain reviews of the instrument published by Buros. (Click on "test reviews online.") Free, and sometimes more useful information may be located using a mainstream search engine like *google* (www.google.com) or a specialized search engine like *PubMed*, run by the National Library of Medicine (www.ncbi.nlm.nih.gov/PubMed) . In the *Moore* case, a *PubMed* search of the *Validity Indicator Profile* turned up an article entitled, "Post-Daubert Admissibility of Scientific Evidence on Malingering of Cognitive Deficits." A *google* search of the *Malingering Probability Scale* found a published test review that highlighted "significant limitations of the conceptual and empirical underpinnings of the MPS" that rendered it "inappropriate for clinical use at the present time."

Obtain the raw data: the government's expert must be required to turn over notes, test protocols and answers and other information forming the basis of his or her report, either to counsel (subject to a protective order to protect the integrity of test data) or to the defense expert. In either case, counsel must personally review this data with the assistance of the defense expert. Errors in arithmetic are not uncommon. Look to see what the expert has chosen to omit from the written report. What do the expert's handwritten notes reflect about the areas the clinical interview did and did not touch on?

Obtain the manual: for every instrument, a manual is published that describes the research basis for the test and its proper administration, scoring, and interpretation. These manuals often contain helpful language supporting potent cross-examination, e.g,. "this is a research tool and should not be relied upon for clinical purposes." Where an instrument requires the expert to assign numerical values to factors about your client or to the answers the client provides, the manual's

14

**JA 7322**   69653

scoring instructions may undermine the expert's ratings.

Rely on your expert: your expert can tell you what an instrument is used for, how it is administered, what its strengths and weaknesses are. Your expert can help you evaluate where the government expert's claims are supported and contradicted by the testing results.

Don't rely on your expert: your expert may use a particular test just as the government expert does. Do your own research. Just because the instrument is the best thing out there for a particular purpose doesn't mean it's good enough to be admissible at trial.

*[Lisa Greenman and Michael Burt assisted the trial team in Rodney Moore's case in developing one of the challenges this article addresses. Relevant pleadings should soon be available on the website, under the mental health litigation guide. Lisa also offered the Federal Death Penalty Strategy Session participants insights into researching the mental health instruments, much of which she has summarized in this article. For more information about this article or the Daubert challenge, please feel free to contact Lisa at lgreenman@starpower.net or Michael at michael.burt@prodigy.net.]*

Contributors: David Bruck, Dick Burr, Michael Burt, Judy Clarke, David Freedman, Skip Gant, Lisa Greenman, Robert Lominack, Kevin McNally and Margaret O'Donnell.

15

JA 7323    69654

# CAPITAL CASES

JOHN H. BLUME ■ PAMELA BLUME LEONARD

## Principles of Developing and Presenting Evidence of Mental Retardation

**Authors' Note:** This article is meant to supplement two previous articles, *The Elements of a Competent and Reliable Mental Health Examination*,[1] which describes the process for acquiring an accurate assessment of a client's mental condition and set mental health issues within the constitutional framework, and *Developing and Presenting Mental Health Evidence*,[2] which provides a general framework for developing and presenting mental health evidence in criminal cases. Both articles contain a number of suggestions that help place this column. All three articles are applicable to any criminal case but, in our view, are specifically relevant to death penalty cases where the development and presentation of mental health evidence often makes the difference between life and death.[3]

### Introduction

The groundswell of interest in the execution of mentally retarded individuals has brought scrutiny to larger questions about mentally retarded people in the criminal justice system, where their disability is often overlooked — by the police and even their own lawyers — or overshadowed by the offense with which they are charged.[4] Further, many of the common characteristics of mentally retarded people such as suggestibility, deference to authority, impulsivity, and the inability to assess risks and consequences, lead to harmful waivers, sometimes even false admissions or confessions, involuntary pleas, wrongful convictions and inappropriate pleas.[5] As a result, there are people with the mental capacity of children on death row today, and countless others are caught in a penal system that does not recognize their vulnerability. Far more training is needed for all the players, including law enforcement, prosecutors and judges. The purpose of article is to help defense attorneys identify mentally retarded clients and provide better representation for them. It is our hope that criminal defense attorneys will lead the way to more humane treatment of mentally retarded people throughout all stages of the criminal justice system, including arrest, trial incarceration and parole.

### Brief Historical Background

The idea of mental retardation has been recognized for thousands of years and was commented upon as early as 1500 B.C. in Egyptian writings.[6] Naming and defining the syndrome of mental retardation as well as the treatment of mentally retarded persons is still evolving, but over time experts have come to agree that mental retardation consists of a cluster of deficits in learning and everyday functioning that originates in childhood. Likewise, even though mentally disabled people have been consistently mistreated over the centuries, it has been generally understood that they should not receive the standard punishment for a given crime. Our laws have never held that mentally retarded defendants have no responsibility for their acts, but mental retardation must be recognized as a substantial impairment that should always be taken into account not only in sentencing, but at every step of the criminal justice system.

### Current Legal Climate

In 1989, a heroic effort was mounted to end the execution of mentally retarded persons in the United States. John Paul Penry's case,[7] supported by an eloquent *amicus* brief filed by the American Association on Mental Retardation *et al.*, was heard before the U.S. Supreme Court. A sharply divided Court found that only Georgia and Maryland had passed laws eliminating execution as an appropriate punishment for mentally retarded defendants, so there was no consensus that doing so was a violation of the Eighth or Fourteenth Amendment. In 2001, the Court agreed to revisit this question in the case of Ernest McCarver,[8] a capital defendant from North Carolina. Across the country advocates for mentally retarded people once again rallied to put an end to executing mentally retarded persons. Since *Penry*, 16 additional states have barred executing mentally retarded persons and the rising tide influenced the North Carolina legislature to do so before oral arguments were heard. On the same day *McCarver* was dismissed from the docket of the Supreme Court as moot, *certiorari* was granted in *Atkins v. Virginia*.[9] *Atkins* was argued February 20, 2001, and will be decided by the end of the Term around June 30. The sole question submitted to the Court is, "Whether the execution of mentally retarded individuals convicted of capital crimes violates the Eighth Amendment."[10] Subsequent to the granting of *certitorari* in *Atkins* the Tennessee Supreme Court found it unconstitutional on state and federal grounds to execute mentally retarded persons.[11]

The public voice has driven these changes, and opinion polls consistently show that a majority of Americans, including those who support the death penalty, oppose execution of mentally retarded persons. As they did on behalf of *Penry*, advocates for disabled Americans, particularly the American Association on Mental Retardation, filed eloquent, well-researched *amicus* briefs

AUTHOR:
Please fax changes to
**202-872-8690**
No later than noon
<u>Tuesday APRIL 9th</u>

See your Author box at the end:
      If you have not done so, please e-mail your color photo and bio to cathy@nacdl.org or FedEx to nacdl, Cathy Zlomek, 1025 Connecticut Avenue NW, Suite 901, Wash. DC 20036, before APRIL 9th. Thank you, Cathy 202-872-8600 x234

GOVERNMENT
EXHIBIT
244

PENGAD 800-631-6989

JA 7324    69763

in *McCarver* which were subsequently accepted in *Atkins*[12] In addition, organizations such as the American Bar Association,[13] the European Union,[14] and The American Psychological Association[15] have cried out for justice for mentally retarded defendants.

In this climate, defense attorneys must learn to identify the signs and symptoms of mental retardation, or risk allowing a disabled client to muddle through the criminal justice system without the benefit of effective counsel or adequate expert assistance, and therefore with little chance of a fair outcome. The first step in getting fair treatment for your mentally retarded clients is to become familiar with the concept of mental retardation.

## What Is Mental Retardation?

Mental retardation is a condition that is defined, diagnosed, observed, researched, measured, written about and taught by non-mentally retarded people who have lots of letters after their names. Consequently, we often hear about mental retardation in the abstract. Representing a mentally retarded client, however, forces us to confront what it means to be a mentally retarded person living in a world where virtually everyone else possesses a mental advantage. Support systems can diminish but never erase the confusion, fear, frustration and shame that accompany mental retardation. It's not just that most people are smarter. The differences in the cognitive abilities of mentally retarded people, as opposed to a person of normal intelligence, is sufficient to be one of kind, not of degree.[16]

There has been a bumpy but steady move away from the idea that mentally retarded persons are by definition grossly and globally impaired "idiots." Today, we recognize that mentally retarded persons often look normal and learn to mask their deficits even while suffering from a disability that delays learning, diminishes memory, curtails problem solving and distorts the understanding of cause and effect. Mental retardation leads to severely debilitated decision making. The result is a person who may appear normal but is, in fact, a very vulnerable person, particularly within the confines of the criminal justice system.[17]

### Definition

There are a number of technical terms and concepts in this section. Get comfortable with the formal language used by mental health professionals but never use it — or allow your witnesses to use it

when talking about mental retardation with non-professionals. The rest of the world, including your client, his family and jurors, don't talk like this kind of talk and they don't like or trust people who do.

For some decades, the American Association on Mental Retardation (AAMR) has taken the lead in defining mental retardation. State laws generally mirror the AAMR's 1983 definition, setting an upper IQ ceiling of around 75 with concomitant significant deficits in adaptive skills and onset before age 18.[18] AAMR refined that definition in 1992, most notably specifying the domains of adaptive skills to be considered: "Mental Retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."[19]

## Let's look at the three prongs of the definition.

### 1. *Significant intellectual deficits*

A person with significant intellectual deficits lacks a normal person's ability to reason and understand simple relationships (both similarities and differences) and therefore cannot relate to others on an equal footing. In a nutshell, he is profoundly impaired. In a room of 100 people, ninety seven of them would be more intelligent than him and his understanding of the world would be necessarily quite different. An individual with significant intellectual deficits is generally understood to have an IQ in the 70-75 range or below.[20]

### 2. *Significant deficits in adaptive skills concurrent with significant intellectual deficits*

Adaptive behavior focuses on how well an individual can function by meeting personal and social demands imposed on them by their culture. The most frequent categories appearing on adaptive skills tests are social/interpersonal skills, communication, and language skills.[21] Examples of communication and language skills are the ability to comprehend and express information through speaking, writing or body language. Social skills include initiating, interacting and terminating interaction

with others; regulating one's own behavior, making choices, controlling impulses and conforming conduct to laws.[22] These examples underline the obvious: a mentally retarded criminal defendant is particularly vulnerable at every step in the criminal justice system. Deficits in adaptive skills will profoundly affect your client's interactions with the defense team, jailers, law enforcement and court proceedings. In all likelihood, it was your client's deficits in adaptive skills that led in large part to the offense. They certainly influenced his or her responses when arrested and interrogated.

### 3. *Onset during the developmental stage*

Mental retardation is a developmental disorder, meaning it arises before adulthood, generally understood to be age 18. Cumulative deficits in intelligence and everyday functioning result in delayed or diminished development. Head injuries and illnesses in childhood can precipitate mental retardation but prenatal factors are by far the most common cause.[23] Even if your client was not diagnosed as mentally retarded during his childhood, in most cases an accurate and reliable social history will provide you with sufficient evidence to show onset during the developmental stage.

## Determining Mental Retardation

The best possible case scenario would be that prior to any charges, your client has previously been determined to be mentally retarded by a qualified mental health practitioner, for example a school psychologist. In that case, you may not need additional psychological testing. However, it is far more common that due to poverty, paucity of social services and the many tribulations that affect our clients' youth, the question of mental retardation was overlooked during your client's childhood. In that case, you will have to work harder to prove that your client is mentally retarded and is entitled to have the question of his innocence or guilt and the appropriate punishment considered in light of his disability.

## Steps in Determining Mental Retardation
*Conduct a Thorough Social History Investigation*

As with all mental health issues, the first step in an accurate assessment of mental retardation is to conduct a thorough social history of your client.[24] Remember that mental retardation usually begins before or around birth. Therefore, signs and symptoms of men-

JA 7325   69764

'tal retardation will be reflected throughout his life and the social history investigation will provide critical data that your expert must have to make an accurate and reliable determination of whether you client is mentally retarded. We have both seen so-called social histories consisting of no more than a few pages or even less.

Mentally retarded persons often try to hide their disability and may even lie about it to you and others. After all, just because you're slow doesn't mean you don't realize that society often shuns and ridicules mentally retarded persons. Imagine the fear your client has of being labeled as mentally weak while incarcerated. What you need is every document ever produced about your client, starting at least as far back as his mother's prenatal care records. Keep in mind that one or both of the client's parents may be mentally retarded as might the grandparents, and documenting a nexus of mental retardation can be very persuasive. We have seen an instance in which not only the client and his father were mentally retarded, but three of his four siblings were also mentally retarded. Leave no stone unturned.

### Do Not Prematurely Hire an Expert To Do Psychological Testing

If you rush out and hire an expert the moment you suspect a mental retardation issue, the result may well be unfavorable, leaving you with a plethora of irrelevant and unhelpful tests, including personality profiles like the MMPI-II. Such tests are sometimes useful in a clinical setting but they are never, in our opinion, appropriate in the forensic setting. Avoid these tests at all costs. Further, personality testing involves reading and communication skills that mentally retarded people lack, so test results are often skewed in a way that can be misleading, inaccurate and harmful. They simply have no value in a determination of mental retardation.

Most importantly, your expert cannot make an accurate and reliable determination of mental retardation without the social history data. Rushing into unnecessary psychological testing with a hastily chosen expert is the most damaging thing an attorney can do to a mental retardation claim. In fact, in any case, regardless of whether mental retardation is an issue, hasty expert selection, premature psychological testing and inadequate social histories are a recipe for disaster.

### Become Familiar with the Requirements of a Forensic Assessment for Mental Retardation

Most of our clients were given IQ screening tests of various sorts in school and other settings. Many of these were group tests. It is important to know that abbreviated intelligence tests and group screening tests of the sort given in schools, the military and prisons are inadequate to conclusively diagnose or rule out mental retardation.[25] A low score on a group intelligence test is only an indication that further investigation is required.

To fall within the generally recognized standard of care, a forensic mental health evaluation requires a comprehensive review of social history documents (including prenatal and birth records, school records, prior mental health evaluations and treatments, medical records and any other documents that give insight into the client's mental capacity), appropriate diagnostic testing, more than one interview with the client, and interviews of significant members of his family and close associates.[26] Ideally, the mental retardation assessment is conducted by a multi-disciplinary team of professionals who are trained and experienced in the field.

### Learn about Psychological Testing In Mental Retardation Cases

An assessment for mental retardation will require psychological testing, which includes intelligence testing, plus adaptive skills assessment. It is critical to use a competent, well-trained psychologist who understands the multi-dimensional nature of assessing mental retardation. We generally prefer using a neuropsychologist who is trained and experienced in mental retardation assessments.

Psychological test scores are a compilation of many numbers and great care must be taken in scoring. Your expert should check scores with a fine tooth comb. Likewise, you should acquire and have your expert review all raw data generated by state testing. The most common error in IQ test scoring is simple math mistakes.

Taking an intelligence test more than once will raise the score due to "practice effect." The impact of retesting can be critical — sometimes as much as a six point Full Scale IQ improvement[27] — and needs to be taken into consideration by your expert. Back to back administration of the same test will almost surely result in an inaccurate higher score so it might be appropriate to administer an IQ test from a different scale or wait a longer interval to admin-

ister another IQ test, or perhaps both. An experienced practitioner will know how to address this potential problem.

### Intelligence Tests[28]

There are various systems of measuring intelligence, known as scales, with the Wechsler (pronounced Wex-ler) scales being the most commonly used today. These scales are usually named for the original author, e.g. David Wechsler, and consist of a number of different tests that are periodically revised. For example, the Wechsler Scale contains separate tests for children and adults. Each of these tests has been repeatedly revised since Wechsler originated his system of measuring intelligence in 1939. The Wechsler Adult Intelligence Scale, is the IQ test most psychologists prefer.[29] The WAIS-III (rhymes with face) is the latest edition and like all currently accepted IQ tests, it consists of various subtests of verbal and performance skills. Verbal subtests measure a person's fund of general information, vocabulary, arithmetic, memory, comprehension and ability to identify similarities. Performance subtests typically require the manipulation of puzzles, blocks, or visual scanning of pictures or symbols. Points for correct answers are then translated into subtest scores. The subtest scores are then combined to produce a Full Scale IQ score. It is your client's Full Scale IQ score that will determine if he has significant deficits in intellectual functioning, the first criteria for a diagnosis of mental retardation.

The Stanford-Binet Scale is a widely used and respected scale with antecedents going back to the work of Alfred Binet, the father of modern intelligence testing, in the early twentieth century. The Stanford-Binet Fourth Edition (SBFE) intelligence test, which also has subtests that yield a performance and verbal IQ, was designed for ages up to 23. It can be used on its own or to supplement other IQ tests in a mental retardation assessment.[30]

The Kaufman Scales were developed in the 1980s and 1990s with a purpose akin to that of the Wechsler and Stanford-Binet IQ tests. The Kaufman Adolescent and Adult Intelligence Test (KAIT) is appropriate for ages 11 to 85 and it meets psychometric standards as well as any of the current generation of major intelligence scales.[31]

Over time, the analysis of thousands of IQ scores has shown that it is possible to predict intellectual performance through IQ testing. The ability of these tests to predict performance is based

CAPITAL CASES

JA 7326    69765

CAPITAL CASES

upon the uniform frame of reference that is established by comparing all of the results from tests administered under similar circumstances. Thus when an individual takes an IQ test, his IQ is determined by where he scores in relation to others who took the same test. Therefore, the prediction of intellectual performance for a given individual is actually based upon the predicted level of performance of a large group of individuals who have previously received the same score. The consequence of such a system is that the continuum of scores actually reflects percentiles, rather than exact and independent scores.

The tests themselves are designed such that an average score, usually 100, would fix an individual's IQ in the middle, that is, with 50 percent of all other test takers scoring higher, and fifty percent lower. As an individual's score falls to either side of 100, the corresponding percentile will adjust accordingly. This produces the well known bell curve, with a smaller and smaller percent of test takers achieving scores significantly lower or higher than 100.

Whenever a test is based upon percentile rank, there are deviations from the median. A deviation will determine a band of scores and corresponding percentiles and each test has a standard deviation. For example, in the Wechsler test the standard deviation is 15 points. This means that the vast majority of individuals will score within one standard deviation of the median, 100, plus or minus 15. Thus, the vast majority of people who take the WAIS-III will have an IQ of 85-115. Two standard deviations (30 points for the Wechsler) above or below the median is considered significant because anyone who scores near 70 is a member of a very small group, and is predicted to suffer from serious intellectual deficits.

It should be apparent that because these tests use a system of comparison in order to establish their predictions, the numbers produced can never be seen as exact. In fact, psychologists have found that a measurement error of up to five points is not uncommon. Thus anyone with a score of 75 may actually have a lower IQ, possibly 70. This is why the AAMR and DSM-IV, as well as most clinicians and service providers, recommend using a range of IQ scores (70-75 or below) when making a mental retardation evaluation.[32]

## Adaptive Skills Assessment

Among the 200 adaptive behavior measures currently available, the Vineland Adaptive Behavior Scales is the most commonly administered.[33] It is appropriate to assess individuals from birth through age eighteen as well as low functioning adults.[34] Another frequently used measure of adaptive skills is the Scales of Independent Living. Both of these adaptive behavior tests have a mean score of 100 with a standard deviation of 15.

Several instruments are needed to measure all ten domains. Again, be certain that your expert has reviewed your client's social history before selecting and administering adaptive skills tests. Most adaptive skills assessments entail a semi-structured interview with a person who knows the client being evaluated well, usually a teacher, parent or close relative. This person, called a respondent, is asked questions about the habits – the everyday behavior – of the client. Since it's close associates of the client who know this information, rather than a disinterested person, the biases of the respondent must be taken into consideration, even in a non-forensic evaluation. In a forensic evaluation, it is best to have more than one respondent for each scale in order to insure the reliability of the adaptive skills assessment. Engaging in firsthand social interaction with the client, a structured interview and thoroughly reviewing social history documents are also vital components of assessing adaptive skills.

## Neuropsychological testing

Neuropsychology applies what is known about behavior effects of brain damage, also called organicity. No one symptom or set of symptoms is common to all brain injury. A large number of tests have been specially designed to assess functions known to be affected by neuropsychological impairment, for example spatial relations and memory.[35] Neuropsychologists use a combination of such tests and sometimes administer tests that have been grouped into batteries, the most common being the Halstead-Reitan Neuropsychological Test Battery and the Luria Nebraska Neuropsychological Battery.[36] These batteries include intelligence testing, which is necessary in a mental retardation evaluation, and also provide additional information about problems in how your client's brain is functioning. Just as not all psychologists are qualified to conduct a mental retardation assessment, not all psychologists are qualified

to administer and interpret neuropsychological testing. Choose this expert carefully because a neuropsychological evaluation is a vital component of an accurate and reliable mental health assessment.

There is a tendency to rush into brain imaging when brain damage is suspected. However, no brain imaging process is more effective or thorough than a comprehensive neuropsychological evaluation at identifying evidence of brain damage. Imaging can altogether miss serious organicity and should be approached cautiously in forensic mental retardation evaluations and only in consultation with an experienced neurologist. Do not risk needlessly undermining your own expert's helpful findings.

## Select The Appropriate Expert or Experts

After the social history investigation is complete and you have become acquainted with the nature of intelligence and adaptive skills testing in mental retardation cases, you are ready to select qualified expert assistance. Provide the expert with the social history information you've gathered. This will help him select the appropriate intelligence, adaptive skills and neuropsychological tests for your client. Don't automatically go to the mental health professional you've hired for years in cases of mental illness—he may not have the necessary expertise for an assessment of mental retardation.

We strongly suggest starting with a neuropsychologist, a psychologist who has special advanced training in identifying and measuring brain abnormalities. While a mental retardation assessment does not have to include a neuropsychological assessment, neuropsychological deficits are often present in mentally retarded persons. Finding these neuropsychological deficits may provide an explanation — brain damage — for your client's mental retardation.

You will probably want to use a different expert to assess adaptive skills, perhaps a licensed psychologist who is specifically trained in adaptive skills assessments. Make certain that you select someone who has previously tested adults for mental retardation and understands the process of using social history data to demonstrate the onset of adaptive skills deficits during the developmental phase. The prosecution generally performs a perfunctory inquiry into the adaptive skills which cannot withstand comparison to an accurate and reliable social history.

In most states, only licensed psy-

JA 7327    69766

chologists may administer and interpret psychological testing, so a psychiatrist (a medical doctor specially trained in diseases of the mind) would generally be unable to make a diagnosis of mental retardation without input from a qualified psychologist. Be sure to check applicable state laws concerning which mental health practitioners can diagnose mental conditions and administer and interpret psychological testing.

## Identifying Our Mentally Retarded Clients

We have seen numerous cases where a criminal defendant's mental retardation has been missed. This is usually caused by the combination of defense counsel's lack of familiarity with mental retardation and the client's ability to hide it.

Conducting an accurate and reliable social history is the best way to get a full picture of your client. Defense attorneys must meticulously screen every case for mental health issues, and there are some consistent indicators of mental retardation to be found in documents and interviews. Poor school performance, including very low scores on standardized tests, placement in special education, failing a grade or dropping out of school, should be thoroughly investigated. Mentally retarded people often hold jobs, and work records should be scoured for evidence of simple repetitive task assignments, failure to advance and repeated injuries. Family, friends, teachers and co-workers may recall that the client was teased for being slow (we had one client who's nickname was "Dummy"). During school years, younger siblings may have surpassed them and helped with homework, adults may have had to repeat simple instructions several times, and parents may have grown frustrated by the inability to complete tasks, successfully help with household chores or get a driver's license. Also, having a mentally retarded parent increases the frequency of mental retardation in offspring.

Keep in mind that mentally retarded persons have strengths as well as deficits. Once they shed academic demands, their differences are less apparent. Adults with mental retardation often hold jobs and have families. Many mentally retarded people can read a little but never well and rarely as high as a sixth grade level on standardized tests.

Few people telegraph their mental retardation—whether they expect a response of pity or ridicule—because mentally retarded people feel shame. In fact, one of the most highly developed skills of many mentally retarded people is the ability to disguise their disability and pass as normal. This well-known phenomenon is sometimes called the "cloak of competence" and it allows mentally retarded people to go undetected in casual interactions. Mentally retarded folks go to great lengths to avoid calling attention to their limitations. For example, a mentally retarded person might take a longer bus ride to avoid complications of transferring to a more convenient one. In a restaurant, a mentally retarded person might order what another person did to cover up illiteracy.

Some clients will specifically deny symptoms of mental retardation and will actively try to keep you from finding out about his mental retardation. For example, we once had a consultation client mention his excellent memory. When asked to recall our full names, he did so. It was only through further questioning that we learned he had stayed up all night memorizing our names! Another client believed that if he could only learn to read, the state could not execute him. He constantly pretended to read in all settings and even the jail guards thought he could read. Sadly, he was never able to read and was only successful in passing as normal. The point is that brief encounters with your client, particularly in the controlled jail setting, will rarely reveal mental retardation.

Further, individuals disabled by mental retardation exhibit as many unique characteristics as non-retarded people. However, in society they tend to defer to and follow others — sometimes into crime. Once in the criminal justice system, they tend to acquiesce to authority, have difficulty understanding simple legal terms and processes and have poor insight into the seriousness of charges against them. They may concentrate on a single idea, perhaps even a fairly complex one, and persistently raise it. We've had a mentally retarded client who believed that if a psychiatrist did not testify at his trial he could not be given the death penalty. Whenever a mental health expert was mentioned, the client reiterated that if only there were no psychiatric testimony, he would be safe from the death penalty. No amount of logical persuasion could convince him differently. This is called perseveration and it is common in clients who are dually diagnosed with mental retardation and mental illness. It can seem like plain hardheadedness, but see it as a symptom of your client's limited means of assisting you.

## Dual Diagnosis of Mental Retardation and Mental Illness

The distinction between mental illness and mental retardation was articulated by Blackstone in the eighteenth century, but in our experience, there is still confusion between the two on the part of attorneys — including judges — and the public. Claims and procedures for mental illness and mental retardation are not interchangeable, although they are usually similar. Mentally retarded people are subject to the same array of mental illnesses as everyone else and they seem vulnerable in this realm. It has been consistently shown that there is a 20 to 35 percent frequency rate of mental illness in non-institutionalized mentally retarded persons compared to 15 to 19 percent in the general population.[37]

The presence of two mental disorders, for example a mental illness along with mental retardation, is referred to by practitioners as dual diagnosis. While the presence of mental illness along with mental retardation will certainly complicate your client's behavior and communication, it can also help you to understand and explain his behavior. Dual diagnosis means that your client not only has the debilitating disability of mental retardation but the added impairment of a mental illness. You will need to determine how the mental illness and mental retardation exacerbate each other. If your client has a mental illness requiring medication, look into whether he was taking it.

Mentally retarded persons have a very difficult time complying with the regular schedule of taking medicine, often skipping or double-dosing themselves. Again, it is highly likely that these ailments contributed in tandem to the offense for which your client is charged.

## Litigating Mental Retardation Claims

Central to litigating mental retardation claims[38] is overcoming popular stereotypes that mentally retarded people are obviously impaired — even drooling idiots. You must convey the severity of the impairment by making the client's profound disability real. One of the reasons readers feel pity for Lenny, the mentally retarded man in *Of Mice and Men*, is John Steinbeck's ability to take us into the confused and frightened head of a mentally retarded person. Like Steinbeck, you must also enable the judge and jury to see the world through the eyes of your mentally retarded client. Always remember that mentally retarded people, like children, are most successful

CAPITAL CASES



JA 7328    69767

CAPITAL CASES

in a predictable environment. When situations change rapidly, they don't understand and their access to options is shut down—they often panic. Try to find examples of your mentally retarded client's behavior under stress, perhaps when he was picked on or excluded at school. Also provide examples of his efforts to communicate and express himself as well as examples of ways he has tried to hide his disability.

### Review Applicable Law

Specific elements of mental retardation vary among statutes. For example, some states have a cutoff for IQ scores and age of onset while others do not. The burden of proof on the defendant varies among jurisdictions, as do the stage and procedure where evidence of defendant's mental retardation is heard. Likewise, disclosure requirements vary, so when and how you reveal your claim of mental retardation will depend upon applicable law and rules as well as your strategic plan.

Look closely at all steps of the criminal justice process and determine how pleas and challenges will be strengthened by the client's mental retardation. Also review civil as well as criminal statutes and case law to get a broad overview of how the law considers mental retardation. Civil cases involving assignment of guardians for mentally retarded people can be useful. You might also find cases that discuss the level of mental capacity required to give consent to have sex, sell property or sign contracts.

### State Access to Your Client

Raising a mental retardation issue will generally trigger either the court or the state to have their own expert examine your client. Take care to limit your claim so you can likewise argue for limitation on the state's examination, i.e., confine it to mental retardation and avoid the typical open-ended forensic mental health examination that nearly always results in a diagnosis of faking, malingering and anti-social personality disorder.[39] You need to make it clear that the only mental health issue you are raising is mental retardation and that the mental health evidence you will present will be confined to mental retardation. Therefore, the state's inquiry, made for the purpose of rebuttal, must be similarly limited and prevented from becoming "a fishing expedition."

### Criminal Responsibility

Mental retardation is not per se an avoidance of criminal responsibility, and we are not aware of a criminal case acquitting a defendant solely on the basis of mental retardation. However, cause and effect relationships are blurry to mentally retarded persons so your client may have lacked the ability to form the necessary intent to commit a crime. It is quite possible that in addition to mental retardation, he may have a co-existing mental illness that would constitute insanity.

The prosecutor will undoubtedly minimize your client's disability with some version of "he's not too dumb to pull the trigger," and you must have an answer that is credible and consistent with your overall theory. If you have determined that criminal responsibility is not an issue in your case, consider defusing the issue by acknowledging from the get-go that your client is not attempting to avoid responsibility.

### Competence

Mental retardation does not necessarily mean that a client is incompetent to stand trial. The threshold for competency to stand trial is so low that mentally retarded people routinely reach it. Most of the standard tests used in forensic competency evaluations are meant to determine mental illness — not mental retardation — and are of limited value in evaluating competency of a mentally retarded person.

Competency Assessment to Stand Trial (CAST-MR) is an instrument used to assess a mentally retarded person's competence to stand trial.[40] As all competency examinations, it should only be administered by a qualified professional, preferably one with experience in mental retardation. It is our opinion that many mentally retarded, as well as mentally ill defendants are pushed to trial when they have little understanding of the process and almost no ability to meaningfully assist their lawyers. This is another place where the attorney has to force the system to look realistically at the client's capacities. Can he understand the state's evidence, particularly scientific evidence like ballistics, crime scene evidence or identification evidence. Don't be fooled by your client's "street smarts," which will surely be raised by the prosecution. The ability to acquire a weapon or fence a stolen item hardly rises to the complexity of legal proceedings. However, keep in mind that if you hope to plead your case, you may not want to raise the issue of competency since the standard for competence to stand trial is the same one for entering a plea.[41]

### Waivers

Every waiver made by a mentally retarded client must be reviewed in light of their deficits.[42] In addition to cognitive limitations preventing them from understanding Miranda rights (generally understood to require sixth grade reading ability), their characteristic acquiescence to authority and inability to stop verbal interaction will be significant in any determination of voluntariness. The stress of custodial interrogations will exacerbate their impairments and heighten their vulnerability, making them more susceptible to police manipulation. Litigating voluntariness of waivers is an opportunity for you to educate the judge about the injustices mentally retarded criminal defendants endure. Consider using an expert witness who specializes in communication deficits and can explain the overwhelming confusion a mentally retarded person like your client would experience when confronted by authorities speaking about legal rights.

### Use Motions to Demonstrate Your Client's Limitations

Your motions will educate the court about your client's limitations. Write a paragraph about the rights and treatment of mentally retarded clients in the criminal justice system and insert it into every motion you file on his behalf. Describe the communication deficits of mentally retarded persons and outline their significance in all suppression motions. Move for regular breaks at all hearings to explain the proceedings to him.

You might want to file a motion in limine to prevent the prosecutor from arguing that your client isn't mentally retarded because he knew the difference between right and wrong. Unless you are arguing absence of criminal responsibility, such comments are irrelevant and misleading, and should be blocked.

In ex parte motions, ask for a wide array of experts — not just a psychologist to do testing. Consider asking for an expert practitioner who specializes in communicating with mentally retarded persons. You need someone to help you break down legal matters in a way your client can understand and to help you make certain that he does understand, perhaps a social worker who specializes in mental retardation. These considerations are necessary if your client is ever to be able to give meaningful assistance to his defense.

### Working with Experts

JA 7329    69768

Team defense is a given in a mental retardation case because you must investigate and present evidence about how your client's disability affected all aspects of his life. Select experts with experience in mental retardation litigation. Never allow an expert to see your client until you have interviewed the expert and are satisfied that he or she is not only qualified but vitally interested in fully exploring your client's mental condition.

A mitigation specialist is a must in a capital case. Gathering all the necessary documents, identifying and interviewing witnesses to develop and present a mental retardation claim requires special skill. The mitigation specialist will provide critical assistance in conducting a thorough and reliable social history and assist you in identifying necessary mental health experts.

A teaching witness is often very useful in presenting any mental health claim but especially in mental retardation cases. The finder of fact needs help—after all, the definition of mental retardation is three-pronged and entails numerous complex theories, processes and diagnoses. Even more importantly, an articulate teaching witness who is experienced in working with mentally retarded people can help explain in everyday terms what it's like to be in the skin of a mentally retarded person who was late to crawl, talk, and walk, who never learned to take medicine as instructed, who couldn't follow the rules of playground games so was excluded from play, and who didn't recognize social cues and was shunned by peers.

It is critical that you identify experts who are familiar with mental retardation in adults. Most universities have special education departments with professors who specialize in mental retardation and are potential teaching witnesses. Most large cities have a center that provides research and support on behalf of mentally retarded persons, adults as well as children. Local chapters of AAMR or the ARC can make referrals. However, credentials alone don't make a good expert witness. You have to interview every prospect. Is the expert up-to-date, meticulous, articulate, confident and punctual? Red flags are comfort with old methods, sloppy written material, speaking in technical language without explanation, over-confidence and tardiness. Just imagine how any of these would play out at trial.

### Lay Witnesses Are Critical to Credibility

Lay witnesses can offer compelling testimony in support of adaptive skills deficits. Teachers can turn the tide—they saw your client as a child, long before he became involved in the criminal justice system. We've seen this at trial—any doubt about a former client's mental retardation was dissolved when a teacher described his year-long effort to learn to print his name. Gather notes he's written and pictures he may have drawn that illustrate his expressive limitations. A word of caution: mentally retarded people often get someone to write letters for them or fill out jail forms. Don't assume that a letter you receive was actually written by your client and be prepared to answer questions about his writing ability while incarcerated.

Guidance counselors have often worked with children and their families over a period of years. They can also help you understand the presence or absence of resources for mentally retarded students at your client's school. Some mentally retarded people receive speech therapy—don't overlook such specialists.

Make alliances with advocacy organizations for mentally retarded persons like the ARC and AAMR. There you will learn about living and working with mental retardation and meet parents of mentally retarded kids who might be good lay witnesses. Even though they are not otherwise connected to the case, they can provide first hand examples of the day to day behavior of mentally retarded persons. They can help you break down the stereotype that you can spot a mentally retarded person a mile away by talking about the urge to mask deficits by the family as well as the mentally retarded person himself.

### Rebutting State Allegations of Faking and Malingering

In our experience, the vigor of the state's response to a mental retardation claim directly correlates to the severity of the offense. In death penalty cases, it is very rare for the state to concur in a finding of mental retardation, even when the court's inquiry finds mental retardation.

In a serious criminal case, you should expect charges of faking and malingering by the client on the psychological testing and in the mental health evaluation in general. Faking means that the person tries to appear in a falsely favorable light. For example, a person with schizophrenia might deny his hallucinations or a person with mental retardation might claim to have done well in school. Malingering means the person is exaggerating his symptoms, with a discrepancy between the disability and the objective findings. In mental retardation claims, this usually means trying to exaggerate deficits by intentionally trying to score low on intelligence and adaptive skills testing.

Make certain that the expert who administers tests to your client has prepared for strong rebuttal by administering several validity scales, which test for consistency in responses. This same expert should also compare the results of his testing with the state's test results to identify where they diverge. In fact, state test results are often quite similar to defense expert testing and this consistency is a strong rebuttal to malingering. You should also compare current psychological test results with any prior testing, again looking for consistency. An experienced neuropsychologist explained to us that it's very hard to look smarter than you are on intelligence tests but not so difficult to look less smart—you just give answers you know are wrong. He went on to say that even though he has a Ph.D. and twenty years of experience, it would be hard for him to avoid detection if he were given more than one IQ test. He just wouldn't be able to remember which questions he threw and which ones he had answered correctly.

In addition, certain neuro-psychological impairments predict poor performance on certain parts of intelligence testing, especially memory portions of IQ tests. Again, you are looking for consistency in your client's responses. The lesson is that you must acquire and thoroughly review the raw data (responses to individual questions) on all the psychological tests your client has ever had.

One of the great frustrations of defending a mentally retarded client is the way the prosecutor uses his "cloak of competency" against him. We've had state doctors say they saw a client "reading" the paper while he was in the hospital for a state evaluation. Playing basketball on the prison yard has been said to demonstrate that the client is faking mental retardation.

The most successful rebuttal to attacks on your mental retardation case is the credibility derived from an accurate and reliable social history investigation. It is the keystone of your mental retardation presentation.

### Mental Retardation Evidence as Mitigation

Results of the Capital Jury Project tell us that mental retardation is a powerful mitigator in death penalty cases.[43] It is hard to believe that mental retarda-

CAPITAL CASES



JA 7330    69769

tion was not raised in nearly one third of capital cases where the evidence was relevant.[44] Evidence of mental retardation should be included in any sentencing hearing.

Even if you find that your client does not meet the criteria for diagnosis of mental retardation, you still have valuable mitigating evidence. It has been understood for many years that an IQ under 85 is itself debilitating. In fact, 85 was the cutoff score for mental retardation until 1973 when mentally retarded persons gained the right to services. At that time, a compromise was reached limiting the number of people eligible for services.[45] Low intelligence is widely recognized as a hindrance to development and certainly can be used as evidence of lesser culpability.

## Working with Mentally Retarded Clients and Their Families

Mental retardation claims must be handled very sensitively. It is common for the defendant and his family to initially reject the idea of mental retardation. After all, the syndrome that has caused so much private anguish must now be raised in public. Our society teaches us to present ourselves and those we care about in a favorable light. To ask your client and his supporters to switch to meticulously outlining his deficiencies is asking a lot. However, if you develop a relationship with them, chances are the topic of your client's limited mental abilities will arise.

From the time you first consider using your client's mental retardation in the case, you should be prepared to explain the benefits and honestly discuss the additional embarrassment it will cause. Make sure the family knows how critical their input will be. Also take pains to explain the steps in proving mental retardation so the family and the client understand why you are asking so many questions about your client's everyday behavior apart from the offense. You will certainly have to have multiple discussions with all of them. After all, this is a complicated topic, both legally and emotionally. You might consider asking a member of one of the advocacy organizations for mentally retarded persons to contact the client's family to help them understand mental retardation more fully.

Your mentally retarded client will require frequent and repeated explanations of what is happening in court. Recognize that it is humiliating to be identified as mentally deficient, however beneficial it may be to your legal situation. If your client is on medication, make sure he is taking it in trial. Use extreme caution about putting your client on the stand — we've never seen it work to the client's advantage.

## Conclusion

Justice at every level of society often alludes mentally retarded persons. Members of the defense community and advocates for mentally retarded persons share a belief that the criminal justice system has yet to recognize the unique vulnerabilities of mentally retarded defendants at every step, from offense through incarceration and parole.

In many instances, the mental infirmities of our clients have been overlooked, their needs have not been met and here they are now, put in the position of having to prove the very syndrome they've likely been trying to hide for years.

A well-presented mental retardation case is an opportunity to right some of the wrongs your client has endured. It does not excuse criminal conduct but it surely will lead to a more just consideration of why the offense happened in the first place, and what is the appropriate punishment.


## Notes

1. John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, THE ADVOCATE, August 1995.

2. John Blume and Pamela Blume Leonard, *Developing and Presenting Mental Health Evidence*, THE CHAMPION, November 2000.

3. Steve Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998).

4. According to the American Association on Mental Retardation, approximately 4-10% of people in the U.S. criminal justice system are mentally retarded, while the rate is around 1.5 - 2.5% for the population at large. Sadly, mentally retarded defendants often are not diagnosed until the classification process in prison.

5. See James W. Ellis and Ruth Luckasson, *Mentally Retarded Criminal Defendants*. 53 GEO. WASH. L. REV. 414 (1985). This seminal article was one of the early calls for the fair treatment of mentally retarded criminal defendants.

6. Sandra Netherton, Deborah Lott Holmes, C.E. Walker. *Mental Retardation: A Symptom and a Syndrome* in CHILD AND ADOLESCENT DISORDERS: A COMPREHENSIVE TEXTBOOK (1999).

7. Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934 (1989).

8. McCarver v. North Carolina, No. 00-8727 (2001).

9. Atkins v. Commonwealth, 534 S.E.2d 312 (2000).

10. Atkins v. Virginia 00-8452 (2001).

11. Heck Van Tran v. Tennessee, No. 02-S-9909-CR-0087.

12. These briefs are available on the AAMR Web site at www.aamr.org

13. In 1989, the American Bar Association established a policy opposing the execution of mentally retarded persons.

14. See the comments of The Rt. Hon. Chris Patten, Commissioner for External Relations First World Congress Against the Death Penalty delivered by Angel Vinas, Director for Multilateral Relations and Human Rights at DG Relex, European Commission, Strasbourg, June 21, 2001. The European Union has consistently called for a global end to the death penalty and has specifically called upon the United States to end execution of the mentally retarded.

15. See American Psychological Association's August 2001 resolution pointing out deficiencies in the application of the

## USEFUL RESOURCES IN LITIGATING MENTAL RETARDATION CLAIMS

American Association on Mental Retardation. *Mental Retardation: Definition, Classification, and Support Systems* (9th ed. 1992).

American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* (4th ed 2000).

Anastasi, Anne and Susana Urbina, *Psychological Testing* (7th ed. 1996).

Conley, Ronald, Ruth Luckasson and George Bouthilet. *The Criminal Justice System and Mental Retardation: Defendants and Victims* (1992).

Human Rights Watch 2001 Report on mental retardation and the death penalty, available online at www.hrw.org/reports/2001.

Jacobson, John W. and James A Mulick, eds. *Manual of Diagnosis and Professional Practice in Mental Retardation* (1996).

Kaufman, Alan S. *Assessing Adolescent and Adult Intelligence* (1990).

Netherton, Sandra, Deborah Holmes and C. Eugene Walker. eds. *Child and Adolescent Psychological Disorders: A Comprehensive Textbook* (1999).

American Association on Mental Retardation Web site: www.aamr.org

American Bar Association Web site: www.abanet.org

Association for Retarded Citizens Web site: www.thearc.org

JA 7331   69770

death penalty and calling for a moratorium until the implementation of policies ameliorating these deficiencies can be shown, through psychological and other social science research, to have been effective.

16. John Blume and David Buck, *Sentencing the Mentally Retarded to Death: An Eighth Amendment Analysis*, 41 ARKANSAS L. REV. 723 (1988).

17. See James W. Ellis and Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 GEO. WASH. L. REV. 414 (1985).

18. American Association on Mental Retardation, MENTAL RETARDATION DEFINITION, CLASSIFICATION, AND SUPPORT SYSTEMS (9th ed. 1992) at ix.

19. *Ibid* at 5.

20. *Ibid* at 14.

21. John W. Jacobson and James A. Mulick, eds.. MANUAL OF DIAGNOSIS AND PROFESSIONAL PRACTICE IN MENTAL RETARDATION (1996) at 31.

22. See Alan S. Kaufman, *Assessing Adolescent and Adult Intelligence* (1990) at 549 for a discussion of adaptive skills. See also Jacobson and Mulick at 27.

23. See *Preventing Mental Retardation: A Guide to the Causes of Mental Retardation and Strategies for Prevention*, available on the ARC (Association for Retarded Citizens) Web site, *www.thearc.org.*

24. See John Blume and Pamela Blume Leonard, *Developing and Presenting Mental Health Evidence*, THE CHAMPION, November 2000.

25. The Army ALPHA and Army BETA are examples of group intelligence screening instruments; the Slosson Intelligence Test, Shipley Institute of Living Scales and the WAIS-R Short Form are examples of abbreviated IQ tests.

26. See John Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Examination*, THE ADVOCATE, August 1995.

27. Kaufman at 27.

28. For a more thorough understanding of psychological testing, see Anne Anastasi and Susan Urbina, PSYCHOLOGICAL TESTING (1997) and Alan S. Kaufman. ASSESSING ADOLESCENT AND ADULT INTELLIGENCE (1990).

29. Kaufman at 2.

30. Kaufman at 619.

31. Anastasi and Urbina at 225.

32. See American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS—TEXT REVISION (4th ed 2000). Also see American Association on Mental Retardation, MENTAL RETARDATION DEFINITION, CLASSIFICATION, AND SUPPORT SYSTEMS (9th ed. 1992).

33. Netherton, Holmes and Walker at 15.

34. Kaufman at 555.

35. Anastasi and Urbina at 515.

36. Kaufman at 641.

37. AAMR at 54.

38. There are additional suggestions for litigating mental health claims in *Developing and Presenting Mental Health Evidence, supra* note 2.

39. See John Blume and David Voisin, *Avoiding or Challenging a Diagnosis of Antisocial Personality Disorder*, THE CHAMPION, April 2000.

40. See George Baroff, *The Mentally Retarded Offender* in MANUAL OF DIAGNOSIS AND PROFESSIONAL PRACTICE IN MENTAL RETARDATION Also see Richard Bonnie, *The Competency of Defendants with Mental Retardation To Assist in Their Own Defense*, 82 JOURNAL OF CRIMINAL LAW AND CRIMINOLOGY at 419.(1990).

41. See Dusky v. U.S., 362US 402, 80 S.Ct.788 (1960) and Drope v. Missiouri 420 US 162,95 S.Ct.836 (1975).

42. See ABA Criminal Justice Section Mental Health Standards 7-5.8 through 7-5.10 regarding competence and confessions (available on line at *www.abanet.org/crimjust/standards/mentalhealth*). See also Robert Perske, *Thoughts on Police Interrogation of Individuals with Mental Retardation*, MENTAL RETARDATION, October 1994.

43. See John Blume, "An Overview of Significant Findings from the Capital Jury Project and Other Empirical Studies of the Death Penalty Relevant to Jury Selection, Presentation of Evidence and Jury Instructions," Summer 2001. On file with the authors.

44. See Denis W. Keyes et al., *Mental Retardation and the Death Penalty: Current Status of Exemption Legislation*, 21 MENT. & PHYS. DIS. L. REP. (1997).

45. Netherton, Holmes and Walker at 9. ∎

CAPITAL CASES

## About the Authors



**RUSH
John H. Blume, III**
Please send a
COLOR photo to
cathy@nacdl.org
or fedex to nacdl
by 4/9



John H. Blume, III
SC Death Penalty Resource Center
1247 Sumter Street
Suite 202
Columbia,SC 29201
(803) 765-0650
Fax (803) 765-0705
E-MAIL john@blumelaw.com

Pamela Blume Leonard
Multicounty Public Defender
985 Ponce de Leon Avenue
Atlanta,GA 30306
(803) 765-0650
Fax (803) 765-0705
E-MAIL john@blumelaw.com

John H .Blume is Director of the Cornell Death Penalty Project in Ithica,N.Y. He is also a Cornell Law School Professor and serves as Habeas Assistance and Training Counsel (HAT). The purpose of HAT is to provide training and resource materials for Federal Public Defender Offices and private appointed counsel representing death-sentenced inmates in federal habeas corpus proceedings and to consult with the Defender Services Committee of the Administrative Office of the United States Courts.

Pamela Blume Leonard is Chief Investigator and Chief Death Penalty Mitigation Specialist for the Multicounty Public Defender Office, which is the death penalty trial unit of the Georgia Indigent Defense Council in Atlanta. In her position, she provides advanced investigative services, training and consultation to attorneys throughout the state of Georgia who represent capital defendants. She has worked on capital cases in South Carolina and Texas and has been qualified as an expert in matters of investigation and mitigation in death penalty trials by judges in Georgia.



JA 7332    69771

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action No.:4:02-992 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BRANDON LEON BASHAM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## STIPULATION OF THE PARTIES

Counsel for the Government and Defendant Brandon Leon Basham stipulate to the following:

1. Defendant Basham has claimed that his trial counsel were ineffective for failing to determine that juror Cynthia Wilson was allegedly untruthful in responses on her juror questionnaire.

2. In his claim 27, Defendant Basham claims that juror Wilson was untruthful when she answered Question 41 which reads "have you ever sued someone or been sued" to which she said "NO".

3. Defendant Basham contends that this response was untruthful based upon two judgments filed against her in the Court of Common Pleas in Spartanburg County prior to her selection as a juror in this case.

4. Government's exhibits 184 and 185 are certified copies of these judgments.

1



GOVERNMENT
EXHIBIT

245

MODELS 800-783-0399

JA 7333

5.  Upon further research, the parties agree and stipulate that these "judgments" are actually administrative tax liens that were filed by the South Carolina Department of Revenue in the Spartanburg County Clerk of Court's Office.

6.  The parties now agree and stipulate that these tax lien judgments were filed administratively by the South Carolina Department of Revenue without either the South Carolina Department of Revenue or juror Cynthia Wilson filing suit in the Court of Common Pleas of Spartanburg County.

_____
Robert F. Daley, Jr
Attorney for the Government

_____
Michael Burke
Attorney for Defendant
Brandon Leon Basham

2

NO : NO

Do you WANT
me To Correcle
your involvement
in SAMANTHA BURNS
CASE ?

Govt. Exhibit 247

we need to take ~~pictures~~
Do to the attorn pictures of all my injurys
By the officers So we can
Show to the Jury how bad i was Beat !!!

JA 7336
BURKE_FILES_00044

Please Have ceven's to come to see
me at lunch Break, so i can talk to him
OK cause I can't really talk to you
about this stuff because you are to bussey
focusing on this trial which i under stand
so please have ceven's to visit me
here to day while on lunch Breake 1:00 pm

OK.. Thank you

He can visit me down stars
where ~~the~~ you have seen me
through the screen. OK.

Please make sure
ceven's see's me today at
lunch. That's all i aske
please....

Just tell the lody who always comes
inn that works for you or however to
let ceven's up here at 1:00 pm Lunch Break

JA 7337
BURKE_FILES_00046

OK, Jack, I think there are a lot of things, pilling up, one is I need to be able to look at all the Juror's that have been Quilifyed and, I need too see the Supplemental Juror Quistionaires. to the Quilified Jurors!!! and, you are going to have to send someone down to the Jail tonight to take pictures of my Injury's, plus to Drop the money order off so it will be on my account for friday so i can order!!! plus, I'm gonna need to have someone to Help me decide. on my understanding and, appinyone on the ones that I feel is good and, the ones i feel is Bad. Ok

Or you can

have Sonder's or, ceven

too come Bown on Lunch Break to go over some of this today!!!

JA 7338
BURKE_FILES_00047

When we are
doen we noed
really really need
too talke down
stare's or inn
the cage befor
we go today!
I con reelly
Turn this
lego drome

BURKE_FILES_00062

Pg. 1

mr. marshal, Riley stated that if
the Judge approve's, my Dip, that
he has no problem with me having
it!!.. But, the request as stated
that it would not be appropriate
for me to consume, the Dip, Today
Since I have already, been on
Nicotine gum as' of today 9-22-04
and, by there request if you
Judge anderson shall approve
the chew then, I am in respect
and, agreable to the athoritty and,
concern of the marshal's.!.,
and, do not detest the request
of it to Start tommarow 9-2304.
and, also thank the court and,
the marshal's for the understanding's
and, trust of all party's!!..

With much
Respect
Signed
Leon, Brandon, Bad Hom.

JA 7340
BURKE_FILES_00063

Pg 2.

I Leon, Brandon, Bastian also will submint to if it is approved as a gvarantee that my appropriate vs of the Dip! I agree to as a very competent mind!!! as if the concern of my miss use of the chew by any way of spitting or, throwing, or even any Kind of out burst with inn the presints of the marshal's or the court's! I approve of what ever consequence may be punishable by any punishment as of either the electrical belt and, or gagged and, bound if any incident may acure!! But, Just for the court and, the authority of the marshal's I can promise and Guarentee there will not be any problem's at all. So this is my own aggreement inn componsy and, inn stable mind! to agree and, obey any and, all Request by court and, marshal's, and, inn result of any Breach of this contract any and, all punishments are exceptable and, Requerd!!!

To all of this I Leon, Brandon, Bastian agree to and submit to In all comportant mind!

Thank you.

JA 7341
BURKE_FILES_00064

Signed

Georg Brands Roberson

Present to Judge anderson
as of my concent and,
contract of aggreement
to assure all party's involved
of my appropriate use of Dip, to
show my appriciation and, assurence of
appropriate use if approved by
your honor Judge anderson !!!            and
                                          time
Thank you for your understanding

JA 7342
BURKE_FILES_00065

Jack, I Don't know But I feel
I can not go forward inn this trial
with an unconcerned, self Richous
and, No Team Player which is
Greg, I feel He hold's
Some kind of Grudge against me
So, I am know Request that
Greg Harrison to be removed from
this case I do to Lack of concideration
and, I feel He is not going to
Do his sivici dotty of representing
me inn this case!!! So I ask
He Be removed from this case
imediatly !!!

I know will present this to

o to our sercumstances!!!,

or, I can get a
order, because I feel
very strongly that he is
not Quilified for this kind
of case!!!

JA 7344
BURKE_FILES_00073

greg, please make sure that you get the addresses and phone numbers of all the people on that list and put it in my Big envelope with my pictures and paper !!! So Jack can get me my Big envelope and money for canteen so i can order for sunday !!! ok. Thank you :)

I really need it to Be Brought down !!!

Thank you

JA 7345
BURKE_FILES_00077

RECEIVED MAR 2 4 2004

Dear, Attorney Jack Swerling                    3-20-04

## Re: copy of CASE File's

Jack Thank you for your Able Representation for my preparation and, study As your client. Would you please send to me A complete copy of my case file, TO Include: All motion's for Discovery, Investigative Report's, Petition's, Motion's, filing's, and, Brief's, ETC, ETC, ————

your cooperation and, Assistance IS Greatly Appreciated!!!

Sincerely your's
Leon, Brandon, Boshom

JA 7346
BURKE_FILES_00080

RECEIVED NOV 1 3 200

Dear, Jack                                    11-10-03

I am writing to Show you a Plan ~~schedule~~ that i have maid out! You said that you could Send me $40.00 dollars every ~~two~~ week's for my canteen. and, I know you are a very buissy man, and, you said to Just remind you and, it would be no problem. So ive come up with this schedule, to make it a little more easyer on the both of us, because i know how hard it is for you to remember to get someone to bring it out here every week or, two, ~~and, how hard it is~~ and, how hard it is for me to catch you ~~at the~~ at the office to remind you. So this is what i came up with. for you to Just Send $60.00 dollars once a month, That will give me $15.00, dollars a week to spend on the things i need to live inn here. I have also ~~attached~~ attached a order list on the back of this letter to Show you what i get with the money each week. The last time you sent me a money order was on 10-17-03 you sent $25.00 dollars. today's date is 11-10-03! well that's about it! ~~I~~ I hope you like my little plan i have put a lot of thought into it. ⟶

JA 7347
BURKE_FILES_00082