evening?

A.   Yes.   There are photographs of an individual, which the other defendant, Chadrick Fulks, has admitted is him wearing the camouflage clothing using the victim's ATM card.

Q.   Was the victim's vehicle subsequently discovered?

A.   Yes.   The vehicle was discovered in a rural part of Wayne County when the fire department was called to a vehicle on fire.

Q.   Was it burned or destroyed?

A.   Yes, it was completely destroyed.

Q.   Do both of the defendants acknowledge that they burned the vehicle?

A.   Yes, they do.

Q.   With respect to items that may have been in the possession of Miss Burns prior to her abduction, is there evidence these items were found or some of these items were found in a motor vehicle that the defendants were operating at a subsequent time?

A.   Yes.   A van that the defendants were traveling in at that time was later recovered in the State of South Carolina, and one of the items that was recovered was a candy box, which our victim, Samantha Burns, was selling candy for a fundraiser at Marshall University at the time of her disappearance.

Q.   Did either of the defendants indicate to you what happened to the body of Miss Burns?

JA 7372

Harper - Direct

A.   Yes.  They indicated that her body was placed into the river, most likely the Guyandotte River.

MR. MILLER:  Your Honor, that's all I have of the agent.

THE COURT:  All right.  Any questions of Agent Harper?

MR. MCCAMIC:  No, Your Honor.

THE COURT:  All right.  All right.  Mr. Basham, counsel, if you would again stand.

Mr. Basham, is the testimony that Agent Harper just gave substantially correct?

THE DEFENDANT:  Yes.

THE COURT:  Were you the person who had a gun and stopped Samantha Burns while she was getting in her car?

THE DEFENDANT:  Yes.

THE COURT:  And then did you take her car with her in it?

THE DEFENDANT:  Yes.

THE COURT:  And was she then handcuffed?

THE DEFENDANT:  I believe so.

THE COURT:  All right.  And for some period of time, then, through the course of that evening, did you and Mr. Fulks continue to force her to stay in the car by keeping her in there in handcuffs?

THE DEFENDANT:  Yes.  I believe she was not

handcuffed until later on.

THE COURT: All right. But she couldn't leave at any time.

THE DEFENDANT: Correct.

THE COURT: All right. And so did there come a time finally when the two of you and Miss Burns drove out into the woods somewhere?

THE DEFENDANT: Yes.

THE COURT: All right. And at that point did you know that either you or Mr. Fulks was going to do serious bodily injury or kill her?

THE DEFENDANT: Yes, sir.

THE COURT: And ultimately she was killed that night?

THE DEFENDANT: Correct.

THE COURT: All right. And did all this occur on or about November 11, 2002, near Huntington and Barboursville here in Cabell County and in the Southern District of West Virginia?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Counsel, are you satisfied that if this case went to trial, there would be no meritorious legal defense to this charge?

MR. MCCAMIC: Yes, Your Honor.

THE COURT: Are you satisfied that Mr. Basham's

constitutional and other rights have been observed fully?

MR. MCCAMIC: Yes.

THE COURT: All right. Mr. Basham, I find there's a sufficient factual basis for your guilty plea. Now I want to discuss the penalties that you're exposed to under this plea agreement, Mr. Basham.

Do you understand you're pleading guilty to a felony offense --

THE DEFENDANT: Yes.

THE COURT: -- and if I accept your plea, you'll be adjudged guilty of that felony?

THE DEFENDANT: Yes.

THE COURT: Do you understand that that judgment may deprive you of valuable civil rights, such as your right to vote, your right to hold public office, your right to serve on a jury, and your right to possess any kind of firearm or gun?

THE DEFENDANT: Yes.

THE COURT: Do you understand you expose yourself to a maximum penalty of life imprisonment under this plea agreement?

THE DEFENDANT: Yes.

THE COURT: Do you understand in addition to this, you would be subject, if you got less than life, to a term of supervised release of not more than five years?

THE DEFENDANT: Yes.

JA 7375

THE COURT: And do you understand if you were placed on supervised release and violated its terms, it could be revoked and you could be sent back to prison?

THE DEFENDANT: Yes.

THE COURT: Do you understand you could also be fined up to $250,000?

THE DEFENDANT: Yes.

THE COURT: Do you understand you'll also be required to pay the $100 special assessment for having a felony conviction?

THE DEFENDANT: Yes.

THE COURT: Do you understand you've agreed in the plea agreement to pay the special assessment by participating in the Inmate Financial Responsibility Program of the Bureau of Prisons?

THE DEFENDANT: Yes.

THE COURT: Do you understand you may also be required to make restitution to any crime victims?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you've agreed to waive or give up your right to request DNA testing of any of the evidence in this case, including the right to request such testing after your conviction?

THE DEFENDANT: Yes.

THE COURT: Now, this plea agreement was signed on

JA 7376

June 1, 2005, and it was contingent upon the Attorney General authorizing the United States Attorney in this district not to seek the death penalty.

Mr. Miller, can you confirm that the Attorney General has authorized --

MR. MILLER: The United States -- excuse me. The United States has received authorization from the Attorney General to remove the death penalty, Your Honor.

THE COURT: All right. Mr. Basham, do you understand that in exchange for your plea agreement today, the Government will not seek the death penalty against you?

THE DEFENDANT: Yes.

THE COURT: Mr. Basham, do you understand that in exchange for your plea agreement today, the Government has agreed not to seek the death penalty against you?

THE DEFENDANT: Yes.

THE COURT: Now, have you and your lawyers discussed the sentencing guidelines and how they might apply to your case?

THE DEFENDANT: Yes.

THE COURT: Do you understand that the sentence I could impose may be different from any estimate your lawyer has given you?

THE DEFENDANT: Yes.

THE COURT: Do you understand that although I have

to consider the sentencing guidelines, I have authority to impose a sentence that could be more severe or less severe than the guidelines call for?

THE DEFENDANT: Yes.

THE COURT: Do you understand that even if you do not like the sentence I impose upon you, you will still be bound by this guilty plea and have no right to withdraw it?

THE DEFENDANT: Yes.

THE COURT: Now, there are appeal rights that I want to review with you, Mr. Basham.

Do you understand you may have the right to appeal your conviction if you believe your guilty plea was unlawful or involuntary or if there's some other fundamental defect in these proceedings that you haven't waived by pleading guilty?

THE DEFENDANT: Yes.

THE COURT: Do you understand that both you and the Government may have the right to appeal any sentence I impose?

THE DEFENDANT: Yes.

THE COURT: In the plea agreement, you agreed to give up your right to appeal any fine unless the fine is above the guideline range. Such waivers are generally enforceable, but if you want to challenge that waiver, you'd have to present that challenge in an appeals court.

Do you understand that?

THE DEFENDANT: Yes.

JA 7378

THE COURT: Do you understand that with few exceptions, any notice of appeal must be filed within 10 days of judgment being entered in your case?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Basham, I find you understand the nature of the charge and the consequences of a guilty plea.

Now I want to go over the constitutional and other legal rights you give up when you plead guilty, Mr. Basham. Do you understand you have a right to plead not guilty to this charge?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that by pleading guilty, you're giving up your right to a speedy and public jury trial?

THE DEFENDANT: Yes.

THE COURT: Do you understand that by pleading guilty, you're giving up your right to force the Government to produce witnesses and evidence against you?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you would be presumed innocent until the Government presented enough evidence to convince a judge and a jury beyond a reasonable doubt that you were guilty?

THE DEFENDANT: Yes.

THE COURT: Do you understand that when you admit your guilt, as you have here, you relieve the Government of the burden of proving your guilt?

THE DEFENDANT: Yes.

THE COURT: Do you understand you would have the right to the assistance of your lawyers at trial and that if the death penalty were sought, you'd have the right to two lawyers, one of whom is a learned counsel? That means someone who's experienced in handling death penalty cases in the past.

THE DEFENDANT: Yes.

THE COURT: Do you understand that you and your counsel would have the right to confront and cross-examine the witnesses and to test the truth of what they said?

THE DEFENDANT: Yes.

THE COURT: Do you understand that by pleading guilty, you're giving up that right?

THE DEFENDANT: Yes.

THE COURT: Do you understand that had you desired to go to trial and wanted to call witnesses, you'd be entitled to have the United States Marshal bring witnesses to court under subpoena?

THE DEFENDANT: Yes.

THE COURT: Do you understand that by pleading guilty, you're giving up your right to call witnesses except for the limited purposes of a sentencing hearing?

JA 7380

THE DEFENDANT: Yes.

THE COURT: Do you understand you would have the right to go to trial and remain silent? That is, you wouldn't have to testify or even present any evidence.

THE DEFENDANT: Yes.

THE COURT: And you understand I would instruct the jury that they couldn't even discuss the fact that you exercised your right of silence and that they could convict you only if the Government proved its case beyond a reasonable doubt?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Basham, I find you understand the constitutional and other legal rights you're giving up by pleading guilty.

Now, Mr. Basham, knowing all this, do you still want to plead guilty at this time?

THE DEFENDANT: Yes, sir.

THE COURT: Has anyone forced you or threatened you or intimidated you or talked you into pleading guilty against your will?

THE DEFENDANT: No.

THE COURT: Are you acting voluntarily and of your own free will in entering this guilty plea?

THE DEFENDANT: Yes.

THE COURT: Is pleading guilty your own idea?

THE DEFENDANT: Yes.

THE COURT: Has anyone promised you something or told you anything different from what we've talked about here in court today to get you to plead guilty?

THE DEFENDANT: No.

THE COURT: All right. Mr. Basham, I find your guilty plea is voluntary.

At this time do you have any questions or second thoughts about pleading guilty?

THE DEFENDANT: No.

THE COURT: If not, I'm going to ask that the court security officer bring you a plea of guilty. I want your lawyer to read it out loud to you. And then I'd like, if you want to plead guilty, for you to sign it and have your lawyer sign it.

MR. MCCAMIC: "Written Plea of Guilty. In the presence of Jay T. McCamic and Gary Collias, my counsel, who has fully explained the charges contained in the indictment against me, and having received a copy of the indictment before being called upon to plead, I hereby plead guilty to the charge contained in Count One of the indictment."

(The document was executed.)

THE COURT: All right. The record may reflect that Mr. Basham has signed the plea of guilty, counsel have signed it, and it's been tendered to the clerk for filing. In the

case of United States versus Branden Leon Basham, I find that Mr. Basham is fully competent and capable of entering an informed plea, there's a sufficient factual basis for his guilty plea, he understands the nature of the charge and the consequences of a guilty plea to the charge, he understands the constitutional and other legal rights he's giving up by pleading guilty, and his plea is voluntary.

Mr. Basham, you are now adjudged guilty and stand convicted of violating 18, United States Code, Sections 2119 and 2.

Are there any other matters the Court should address regarding his plea?

MR. MILLER: The United States has none, Your Honor.

MR. MCCAMIC: The defense has none other than a short statement, Your Honor, when the Court is ready.

THE COURT: All right. Well, for sentencing purposes?

MR. MCCAMIC: Yes.

THE COURT: All right. Given that, then the Court will now turn to sentencing.

Mr. Basham, do you need to sit down for a few minutes? I've had you standing for a long time.

THE DEFENDANT: I'm all right.

THE COURT: All right. If you need to sit down, just let your lawyers know. That will be fine. All right.

Mr. Basham, we're now going to proceed to sentencing. It's my understanding that you have told your lawyers and filed motions seeking that the Court sentence you immediately; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Counsel, have you discussed with Mr. Basham his right to be sentenced at a later date after a new presentence report has been prepared and he's had an opportunity to object to the contents of that report?

MR. MCCAMIC: Yes, Your Honor.

THE COURT: All right. Mr. Basham, do you understand now your counsel has filed a motion asking that you be sentenced immediately?

THE DEFENDANT: (Nods head up and down)

THE COURT: You understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And do you understand that you have requested that the Court use the presentence report that was prepared after your conviction in South Carolina? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Do you understand that you have a right to have a new presentence report prepared here, and that if one was prepared, you'd have the opportunity to object to the contents of that report?

THE DEFENDANT: Yes, sir.

THE COURT: Now, I've reviewed the South Carolina presentence report. The guideline range was calculated based on conspiracy to commit carjacking. In this case, the defendant has entered a guilty plea to carjacking resulting in death or aiding and abetting such crime.

Having reviewed the guidelines, the Court has determined that it would not make any difference as to which guidelines apply.

Counsel, do you agree with the Court's interpretation?

MR. MCCAMIC: Yes, Your Honor.

THE COURT: Mr. Miller, do you also agree with that assessment?

MR. MILLER: Yes, Your Honor.

THE COURT: All right. Now, Mr. Basham, do you understand that the report I have from South Carolina does not address aiding and abetting a carjacking resulting in death, but that the aiding and abetting guideline instructs the Court to use the same offense level that was used for the underlying offense for carjacking?

THE DEFENDANT: Yes.

THE COURT: All right. Now, Mr. Basham, you have signed a waiver of the time requirements that apply under the Federal Rules of Criminal Procedure. Now, the Federal Rules provide that after a presentence report is prepared, you would

have a certain amount of time to review the report and to talk with your lawyers and to object to it or to get additional information and that you'd then be provided a copy of a final report before you were sentenced.

Do you understand that by asking me to use the South Carolina report, that you're waiving or giving up those requirements in order to be sentenced today?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Basham, given our discussion today, do you want to give up your right to have an additional presentence report prepared?

THE DEFENDANT: Yes, sir.

THE COURT: Now, ordinarily a defendant is sentenced at a later date with time in between the plea hearing and the sentencing during which you could submit additional information or challenge the report.

Do you understand that by proceeding today, you're giving up your right to be sentenced at a later date?

THE DEFENDANT: Yes, sir.

THE COURT: Has anyone forced you or threatened you or intimidated you or talked you into waiving your rights to an additional presentence report or additional time before sentencing?

THE DEFENDANT: No.

THE COURT: All right. Given defense counsel's and

JA 7386

the defendant's statements, the Court finds that the defendant has made a voluntary, knowing, and intelligent waiver of his right to have his presentence report prepared following his guilty plea in this case. Therefore, at the defendant's request, the Court will rely upon the South Carolina presentence report.

Now, counsel, have you had an opportunity to read the report in light of the defendant's plea here today?

MR. MCCAMIC: Yes, Your Honor.

THE COURT: Having read the report, is there any reason why sentencing should not take place today?

MR. MCCAMIC: No, Your Honor.

THE COURT: Mr. Basham, have you had a chance to reread the report and discuss it with your attorneys before this sentencing today?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand the contents of the report?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Does the defendant have any objections to the presentence report as it relates to his plea here today?

MR. MCCAMIC: No, Your Honor.

THE COURT: All right. My understanding is that in Mr. Fulks' case, he objected to the guideline range going

above 43. He argued at the time that 43 was the maximum. The Court observed at that point that even if that were accurate, it would not make any difference in the applicable guideline sentence that would follow. And the Court believes the same is true here.

Mr. Miller, has the Government reviewed the report?

MR. MILLER: No, Your Honor, I have not, but the United States is not -- will waive any right to review the report. I have not reviewed it, though.

THE COURT: All right. Does the Government have any objections to any part of the report?

MR. MILLER: No, Your Honor, we do not.

THE COURT: And does the Government have any objections to considering the report in sentencing the defendant and doing so today?

MR. MILLER: No, Your Honor.

THE COURT: All right. Because it appears neither party has any objections to the report that would affect the guideline range and because both parties consent to the Court relying upon this report, the Court grants the defendant's motion to proceed with his sentencing today.

I have reviewed the presentence report. I find that there's sufficient indicia of reliability to support the probable accuracy of the information in the report. Accordingly, the Court adopts the presentence report. If an

appeal is taken, the Court orders the probation office to submit a copy of the final presentence report to the clerk for filing under seal to transmit to the Court of Appeals under seal. In the event of an appeal, the probation office upon request from appellate counsel and without further order of this Court shall provide counsel with a copy of the final presentence report except for the recommendation section.

At this time the Court accepts the plea agreement on the grounds that the defendant's plea adequately reflects the seriousness of his actual offense behavior and accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines. The Court's judgment and sentence will be consistent with the plea agreement.

Mr. Basham stands convicted of carjacking resulting in death or aiding and abetting carjacking resulting in death. The statutory maximum penalty for this violation is life imprisonment, supervised release of not more than five years, a fine of $250,000, restitution, and the $100 assessment.

The relevant sentencing guideline is found in Section 2B3.1(c)(1), which provides that if a victim was killed under circumstances that would constitute murder under 18, United States Code, Section 1111, then the Court must apply Section 2A1.1. That sets a base offense level of 43.

(The Court and Clerk Slack conferred privately off the record.)

THE COURT: Under Section 3C1.2 there's a two-level increase if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing. The Court finds this defendant created a substantial risk of death and serious bodily injury when he shot one bullet in the air and another at a police officer when he was trying to evade police during a foot chase on November 18, 2002. That brings his offense level up to 45.

Under Section 3E1.1(a) he's entitled to a two-level decrease for acceptance of responsibility. The Court finds the defendant has accepted responsibility for the offense by pleading guilty before trial and truthfully admitting the conduct comprising the offense. That reduces his offense level down to 43.

MR. COLLIAS: Your Honor, I believe the defendant is entitled to the three-point reduction because the timing of this offense was before the amendment to the guidelines.

THE COURT: I think that is correct. The Court would find he's entitled to the additional one-level decrease because he's assisted authorities in the investigation and prosection of his own misconduct by providing information to the Government concerning his involvement and timely notifying authorities of his decision to enter a guilty plea. That brings his offense level down to 42.

At the time of the report, the defendant had 22 criminal

history points. According to the sentencing table, 22 criminal history points establishes a criminal history category of VI.

Given a total offense level of 42 and a criminal history category of VI, the guideline range would be imprisonment of 360 months to life, supervised release of three to five years, a fine of $25,000 to $250,000, restitution, and the $100 assessment.

All right. Does the Government or the defendant's counsel have any comment or objection to my calculations?

MR. MILLER: We have none, Your Honor.

MR. MCCAMIC: None to the calculations, Your Honor.

THE COURT: All right. Mr. Miller, I understand that there may be members of the Burns family that would like to address the Court. Is that correct?

MR. MILLER: That's correct, Your Honor, Mr. and Mrs. Burns, the parents of Samantha Burns.

THE COURT: All right. Mr. Burns, if you'd like to step up here, you may address the Court.

MR. MILLER: Thank you.

MR. BURNS: When I think of what my daughter Samantha went through on her last day on Earth alive, it makes me so furious that it's hard to control my emotions. The fear and the pain you, Branden Basham, and Chad Fulks put her through, I can only imagine how scared she was. I can see her

in my mind every day begging you guys to let her go, but you were so cold-hearted that you abducted her, stole her money, abused and killed her for your own personal gain.

So I hope you think about what you've done to my daughter and it eats away at you all the day, every day for the rest of your life on Earth.

What you took from us, a daughter, a sister, a granddaughter, niece, cousin to her family. Samantha was never a day's trouble in her short life on Earth. She only brought us happiness. The pain you brought us is unexplainable.

My son Wesley has to go through the rest of his life without his big sister. What you've took from him and us can never be replaced. In four or five hours you took a life away from a girl that had big dreams of helping others in a career as a physical therapist, dreams of getting married and having children. What you took from us you'll never understand. You took my son's only sibling. Now he has to go through the rest of his life without his sister. You took my wife's best friend and my little girl.

The pain you've caused mine and my wife's mothers, fathers, aunts, uncles, family and friends, our whole community, cannot even be described in words. Now all we have left of Samantha is memories of her life, a softball field named after her in her honor, a tombstone in our family

JA 7392

cemetery with no body lying beneath it.

You took a life so sweet and innocent to all of us, a life that cannot be replaced. You guys are so cold-hearted that you won't even say what you've done with Samantha's body. You should tell us what you've done with her, with her body, so we can give her a proper burial.

In ending, I hope you get the maximum punishment allowed by law. You're pure evil. And I hope what you've done eats away at you, your mind and soul, for the rest of your life.

THE COURT: Mrs. Burns?

MRS. BURNS: You chose to take the life of a 19-year-old daughter, sister, granddaughter, cousin, niece, and friend, someone with dreams of a future full of life. Samantha was planning on graduating from college, finding a local job, and eventually wanted to get married and start her own family. All of her dreams were taken away in less than eight hours on a cold and, I'm sure, a very frightful November night.

Samantha will never get to experience all of her dreams that we had and she had. You probably didn't see the side of Samantha as we all knew her. You seen a very scared person that night that didn't deserve what you guys done to her. Samantha would have given you her car or her money. So why did you have to do the things you did to her?

I hope that every night for the rest of your life that

JA 7393

you will see the frightened girl when you close your eyes to go to sleep; and when you awake, you still see her. Every day in my life I remember her when I'm awake, throughout the day, and when I try to go to sleep. I always wonder how she died, the pain that she went through, the terror of being held against her will, the things you guys may have done to her and where she is.

She was there by herself. I feel so helpless not to be there to comfort her and help her. I have sleepless nights every night. Sometimes I see a car like hers. For a split second I think it's hers. Or I may see a girl in a crowd of people that is a resemblance of her.

Our world seems to have stopped on November 11, 2002. It was like we were stuck in this time zone waiting for her to return home to us safely, but the world around us keeps going on. We just go through the emotions with it.

Samantha was my very best friend. I had her when I was 16 years old. I thank God for giving her to me, and my son, at an early age. Samantha and I kind of grew up together I guess you could say. She could always talk to me about anything, the same from me to her. She had ups and downs as any other kid. She had victories and defeats. She had a love for her whole family.

You know, when someone dies, you get to have a viewing of the body, a funeral, a burial. This helps bring some closure

JA 7394

to the death of a loved one. Closure is something with her death I have not yet to experience because of the coldness, inhumane act that you guys have done to her. We will never give up on finding her remains, and that is when I will have closure.

So when one of your family members dies, I hope that all you can think about is the way you done Samantha and Alice. And always remember, what goes around comes around. And while you're sitting in your cell or in court, just think of all the ladies that you have hurt or killed instead of helping or instead of thinking about yourself, feeling sorry for yourself. You've done the crime; it's time to do the time. It's too late now to feel sorry.

Every holiday is a time which used to be, before November 11, 2002, that we all enjoyed. Now, it's difficult, going shopping to buy gifts, and now there is one less person to buy for. You just can't imagine how hard it is not to be able to buy for your daughter anymore. On these holidays, the one thing we do now is burn a candle in her memory.

We was in the process of building a house when all this took place. As a matter of fact, it was just about finished. And we was in the process of moving in, some things in. Samantha was so excited. She had painted her own room, helped on some other things, too. She was packing up her room that

JA 7395

weekend, too. Now we are living in a new house. It was so hard to move in knowing that we had one less child not there. She never got to spend one day or one night in the house.

You have forced this pain and sorrow on our family at such a fast pace it's like hitting a brick wall. I think that you deserve the death penalty. At least you're behind bars and you can't hurt anyone else now. This was nothing compared to the death that you chose for Samantha and Alice.

So today I hope that life without mercy is your sentence. She only brought us happiness and not a day's trouble. She will be forever missed and loved. I love you, Samantha, and will always miss you.

THE COURT: All right. Mr. Miller, do you want to address the Court before I impose sentence?

MR. MILLER: Your Honor, I think the facts speak volumes and don't have anything to add.

THE COURT: All right. Mr. McCamic, do you want to address the Court?

MR. MCCAMIC: If I could briefly, Your Honor. Good children are like fine roses as my grandmother used to say. They show their care. This case shows the opposite for Branden Basham. Most of us, our mothers when they were pregnant, took care of nutrition, didn't abuse drugs, didn't drink alcohol. Not the case with Branden. Most of us are not given illegal drugs when we're still on the bottle. Most of

JA 7396