us, no matter how hard we claim our childhood was, had a basic framework of morality and a basic structure in the home, the basic notion that you keep a child out of harm's way. Branden didn't have that.

In over 20 years of practicing law and being a prosecutor in abuse and neglect cases, a defense attorney in abuse and neglect cases, a guardian ad litem in abuse and neglect cases, I've never seen a record of abuse and neglect on a child as in this case. The incident reports and medical records for Branden Basham fill a size of a shelf of that clerk's bench.

In the South Carolina case, numerous incidents were discussed. And I will not take the Court's time here today with that. Suffice it to say that his mother was shot-gunning marijuana to him when he was on the bottle. He was a drug abuser before he was in the third grade. He was huffing gasoline by age eight. He was given prescribed narcotics that were prescribed for his mother she gave to him.

At various times he was physically abused, sexually abused. He was put in homes and various placement centers over his childhood where he was also physically abused and sexually abused. He was given at various times psychotropic drugs, and up to this day, in an attempt to try to repair the damage in his brain chemistry. And we've seen the effect of not having those drugs. We don't quite know, us in the world today, in science, exactly how the brain chemistry works.

JA 7397

They just sort of guess, and they try the best they can.

Despite all that, the combined effect of all that, Branden Basham is in a jail in Kentucky with a criminal history of no violence, but thievery and drugs, and he meets Chad Fulks.

Chad Fulks -- his criminal history is full of violence, as the Court well knows. His criminal history is full of terrorizing women, carjacking type offenses, ATM type offenses. It's clear -- and the Government argued this in Chad Fulks' case in South Carolina, that it was Chad Fulks who was the leader and that Branden Basham was the follower.

Until Branden met Mr. Fulks, he'd never handled a gun, he'd never had an idea of how an ATM machine worked, he never knew how to operate a car, he had never exhibited violence toward women, he had no sense and he has none today of basic geography.

Huntington, West Virginia, and Myrtle Beach, South Carolina, those were Chad Fulks' stomping grounds. The plan and operation of what occurred, this was Chad Fulks' modus operandi. As we sat here, I witnessed Chad Fulks' sentencing, and butter would melt in his mouth as he said some sort of a story about how suddenly this all happened, that Branden showed up with a car without the woman -- in this case, Samantha Burns -- being present. The cynicism of that comment struck pretty hard when the Court reviews Branden's statement

JA 7398

as to what happened. Chad Fulks killed Samantha Burns.

But we're here today based on 18 U.S.C. 3553, and we ask the Court to look at the history and characteristics of Branden Basham and take those into consideration in sentencing. Thank you.

THE COURT: All right. Mr. Basham, do you want to address the Court before I impose sentence?

THE DEFENDANT: Mr. Jay T. McCamic will read a statement.

THE COURT: All right. Mr. McCamic is going to read a statement from you?

THE DEFENDANT: (Nods head up and down)

THE COURT: All right.

MR. MCCAMIC: Your Honor, in meeting with Branden over time, preparing for this case, Branden told me about the Burns family, seeing them in South Carolina and seeing about them in the Victim Impact Statements and that sort of thing. And he told me something that I wrote down, and I'm quoting him directly. And this is what he asked me to read to the Court as his allocution.

"I want the Burns family to know that Samantha was a good person. I know that she had something that I never had and never will have. She had a good family that loved her and cared for her. I helped Chad Fulks take that away. Even if I never had met Chad Fulks or her, no matter what I ever did in

my life, it would never have come near to what she was or could have been in her life. I wish I could bring her back, but I can't." Thank you.

THE COURT: All right. Well, Mr. Basham, together with Mr. Fulks, you've committed one of the most cold-hearted crimes any of us have ever heard about, much less seen happen in our community. Each of you has admitted your guilt in causing her death, but you blame each other in actually committing her murder. It doesn't matter; you're each equally guilty for causing that death.

This was a random abduction of Samantha. And the events that followed demonstrated how evil and cold-hearted you and Mr. Fulks could be. Her tragic death has caused immeasurable pain to her family. That pain hasn't lessened over time. I don't believe it ever will. I wish there was something I could do to help lessen that pain, but no sentence I give you is going to really change how they feel about this and what you have done to them and all the people that knew and loved Samantha Burns. But I do believe that a sentence of life imprisonment is the least sentence that you deserve.

So it will be the judgment of this Court that the defendant be committed to the custody of the Federal Bureau of Prisons for a term of life. That is the maximum sentence I can impose.

The Court finds the defendant does not have the resources

JA 7400

to pay a fine, it's unlikely he'd be able to pay any fine in the future. Accordingly, the Court imposes no fine. Likewise, the Court does not order any restitution. The defendant will be ordered to pay the $100 special assessment.

The Court finds, with the exception of the fine, this sentence reflects the nature and circumstances of the offense, the history and characteristics of this defendant, and the needs for deterrence.

Are there any reasons why this sentence should not be imposed as stated?

MR. MILLER: The United States knows of none, Your Honor.

MR. MCCAMIC: None, Your Honor.

THE COURT: All right. If not, I order the sentence imposed as stated.

Mr. Basham, you have a right to appeal this sentence. If you want to appeal, you have to file a written notice of appeal with the Clerk of this Court within 10 days of judgment being entered in your case. If you fail to file that written notice of appeal within this 10-day period, you may lose your right to appeal.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Also, if you file that notice of appeal and the Court finds you don't have the money to get documents

JA 7401

or transcripts or to pay for a lawyer on appeal, those costs will also be borne by the United States.

Do you understand that, Mr. Basham?

THE DEFENDANT: Yes.

THE COURT: All right. Mr. Miller, do you have a motion with respect to the other charges?

MR. MILLER: Yes, Your Honor. In light of the Court's acceptance and sentence of the defendant, the United States would move to dismiss Counts Two, Three, and Four of the indictment.

THE COURT: All right. The Court grants the Government's motion. The remaining charges against the defendant are dismissed.

Are there any other matters the Court should address in this case?

MR. MILLER: The United States has none, Your Honor.

MR. MCCAMIC: No, Your Honor.

(Mr. McCamic and the defendant conferred privately off the record.)

THE COURT: Anything else?

MR. MCCAMIC: No, Your Honor.

THE COURT: All right. If not, we'll stand in recess.

(Hearing concluded at 10:24 a.m.)

I, Teresa M. Ruffner, certify that the foregoing is a

JA 7402

correct transcript from the record of proceedings in the above-entitled matter.

s/ Teresa M. Ruffner　　　　　　　November 28, 2012

_____　　_____

BP-S288.052 **INCIDENT REPORT** CDFRM
MAY 1994
U.S. DEPARTMENT OF JUSTICE

FEDERAL BUREAU OF PRISONS

| 1. Name of Institution | FCC Terre Haute | Incident Report Number | 1804845 |
|---|---|---|---|

### Part I - Incident Report

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time |
|---|---|---|---|
| Basham, Brandon | 98940-071 | 11-25-08 | 1955 |

| 6. Place of Incident | 7. Assignment | 8. Unit | |
|---|---|---|---|
| SCU Multipurpose Room #10 | Unassigned | SCU Cell C420 | |

| 9. Incident | Making, possessing, or using intoxicants.  Attempted assault on staff. | 10. Code | 222  224a |
|---|---|---|---|

| 11. Description of Incident | Date: | 11-25-08 | Time: | 1955 | Staff became aware of Incident |
|---|---|---|---|---|---|

At 1950 hours I S.O. Iseman pulled inmate Basham out of his cell to administer the Alcosensor IV on the inmate due to suspicion of being intoxicated. Myself and SCU Staff placed inmate Basham in the multipurpose room to conduct the test. Inmate Basham took the test and tested positive at .230. The inmate then asked if I would give him a "pass" on the test and I answered no. He became agitated and said "you guys just wanna fuck with me is all." At this time I noticed what appeared to be a bulge from the inmates front waist and I assumed it to be homemade intoxicants. The inmate then became verbally abusive and angry. He said "I'm hit for this ain't I?" I replied yes I would have to write it up. The inmate then leaned backwards in the chair he was sitting in and placed his arms in front of him while the mechanical restraints were still applied. At this time another officer observed what was happening and he stepped in to the room to assist us to calm and restrain the inmate. He continued to resist staff and attempted to kick us with his feet. Additional staff were called and as they responded, inmate Basham calmed down and said "no, no im calm now don't call anyone I`ll be good." We controlled the inmate until additional staff arrived and we located approximately one gallon of homemade intoxicants around the inmates waist which was tied off. I took possession of the intoxicant and tested the contents and results came back as .215 from the Alco-Sensor IV.

| 12. Signature of Reporting Employee | Date and Time | 13. Name and Title (Printed) |
|---|---|---|
| *R. Iseman S.O.* | 11-25-08 2046 | R. Iseman S.O. |

| 14. Incident Report Delivered To Above Inmate By: | 15. Date Delivered | 16. Time Delivered |
|---|---|---|
| *(signature)* | 11/25/08 | 10:45 pm |


GOVERNMENT EXHIBIT
249
LABELS 800-783-0399

JA 7404

BP-S294.052 **NOTICE OF DISCIPLINE HEARING BEFORE THE (DHO,** CDFRM
MAY 94
**U.S. DEPARTMENT OF JUSTICE**                  **FEDERAL BUREAU OF PRISONS**

| | USP TERRE HAUTE |
|---|---|
| | Institution |
| | 5·6·10 |
| | Date |

| TO: Basham | Reg. No.: 98940-071 |
|---|---|

ALLEGED VIOLATION(S): Refusing to take alcohol test

| DATE OF OFFENSE: 04-27-2010 | Code No.:223 |
|---|---|

You are being referred to the DHO for the above charge(s).

The hearing will be held on: _____ at _____ (A.M./P.M.) at the following location:

**TO BE SCHEDULED BY THE DHO**

You are entitled to have a full-time staff member represent you at the hearing. Please indicate below whether you desire to have a staff representative, and if so, his or her name.

I (do) _X_ (do not) _____ wish to have a staff representative.

If so, the staff representative's name is: ____D. Larsen____

You will also have the right to call witnesses at the hearing and to present documentary evidence in your behalf; provided, calling your witnesses will not jeopardize institutional safety. Names of witnesses you wish to call should be listed below. Briefly state to what each proposed witness would be able to testify.

I (do) _X_ (do not) _____ wish to have witnesses.

| NAME: D. Troya | Can Testify to: He is going to say |
|---|---|
| this is false | |

| NAME: D. Hammer 24507-077 | Can Testify to: Say what he seen |
|---|---|

| NAME: | Can Testify to: |
|---|---|

The Discipline Hearing Officer will call those witnesses (Staff or Inmate) who are reasonably available, and who are determined by the DHO to have information relevant to the charge(s). Repetitive witnesses and repetitive character references need not be called. Unavailable witnesses may be asked to submit written statements.

If additional space is needed, use the reverse side of this form. Date, sign, and return this form to the DHO.

| DATE: 5-6-10 | SIGNATURE: P Basham |
|---|---|

Notice of hearing before DHO given inmate by:      5-6-10 215       R English
                         Date/Time           Staff Printed Name/Signature

JA 7405

## STATEMENT OF BRANDON BASHAM #98940-071

This statement is being provided in reference to an Incident Report dated April 27, 2010 alleging a Code 223 violation i.e. Refusing a Breathalyzer. I was provided with a copy of the I/R at 3:15 P.M. on 4/27/10. The I/R stated in part "At Approximately 10:05 a.m., I ordered inmate Barrett to submit to a Breathalyzer test, at which time he refused". The I/R did not state that I had refused a Breathalyzer test because I had not done so, and I did not do so.

Knowing that all 200 series I/Rs must go to the DHO I declined to appear before the UDC. However, on 4/28/10 at 12:50 P.M. The UDC consisting of B. Shoemaker Unit Manager and B. English, Case Manager held my UDC on this I/R. They recommended the loss of Commissary and telephone for 180 days if found guilty of the I/R. The UDC did not alter or return the I/R to be re-written.

On May 3, 2010 at approximately 10:15 A.M. a second copy of the I/R was delivered to me. It had been re-written to read in part " At approximately 10:05 a.m., I ordered inmate Basham to submit to a Breathalyzer test, at which time he refused". This re-write occurred some six days after the incident is alleged to have happened and after the UDC had heard the I/R and ordered it to go to the DHO. Obviously someone in the DHO's office ordered the I/R be re-written, at least that's my assumption because the UDC didn't do so. The second I/R is not timely as it was not written within 24 hours of the reporting officer i.e. S. Lovett, Lieutenant becoming aware of the alleged incident. The first I/R did not charge me with having committed any prohibited act, but rather alleged inmate Barret had done so.

With the re-write of this I/R it appears that Lt. Lovett is attempting to some how indicate that I disobeyed his order to submit to a Breathalyzer. His memory must be faulty or he is confused. I never refused any order to submit to a Breathalyzer. Lt. Lovett now has provided two accounts of who he ordered to take a Breathalyzer, first inmate Barrett and now me. Due to the uncertainty of Lt. Lovett's recollection as evidenced by the two versions of this I/R. This I/R should be expunged and dismissed.

*Brandon Basham*

Brandon Basham #98940-071

May 4, 2010

JA 7406

STATEMENT FOR UNIT DISCIPLINE COMMITTEE

From: Brandon Basham #98940-071
      SCU, Cell # C-418

Date: June 17, 2007

On 6/15/07 I received an incident report for having committed the prohibited acts of Code 305 Possession of Contraband and Code 307 Refusing an Order. The date of the alleged incident is 6/11/07 @5:23 pm. The incident report was written 17 minutes later on 6/11/07 @ 5:40 pm by Chaplain David Rabenecker. The institution was not on Lock Down status at the time of the incident or at the time the incident report was written. The I/R was not delivered to me until 3:00 pm on 6/15/07.

BOP P.S.5270.07 titled Inmate Discipline and Special Housing Units states at Chapter 2, page 3 , Table 2 that staff becomes aware of inmate's involvement and staff gives inmate notice of charges by delivering inciden report ordinarily within a maximum of 24 hours. These time limits are subject    to exceptions such as an institutional lock down. No such exceptions are present in this case. USP/Terre Haute was not on lock down status on 6/11/07, 6/12/07 and not until approximately 1400 hours on 6/13/07.    Chapter 5 page 2-3 outlines the steps to be taken if an I/R is under investigation. There is nothing in this case to indicate that an investigation by any agency was involved. However if that were the case a copy of the incident report and notice of the investigation should have been provided within the 24 hour time limit. See Chapter 5, P.2-3. Chapter 6, page 1 states: "staff shall give each inmate charged with violating a Bureau rule a written copy of the charges against the inmate, ordinarily within 24 hours of the time staff become aware of the inmate's involvement."

Clearly the time limits imposed upon staff as it relates to providing me with a copy of the I/R within 24 hours are applicable unless specific exceptions are at issue. No such issues are involved here. I am entitled to have this incident report dropped and expunged from my record. P.S. 5270.07 Chapter 6, P. 6 ¶e. states " The Unit Discipline Committee may drop or informally resolve any Moderate or Low Moderate Charge."

Additionally, I am not guilty of the charges. The tobacco was provided to me for smoking by the chaplain. I did return the left over tobacco to him as indicated in the I/R. The only question is how promptly I did so. This does not equate to possessing contraband. I had never left the area where the ceremonial pipe service was taking place. I provided the tobacco to the chaplain prior to leaving that area where I was allowed to smoke it. I gave it to him when ask. For each of these reasons the I/R should be dropped.

Brandon Basham #98940-071

JA 7407

BP-S288.052 INCIDENT REPORT       RM
MAY 1994
U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| 1. Name of Institution | U.S.P. Terre Haute, IN | Incident Report Number | 1641796 |
|---|---|---|---|

Part I - Incident Report

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time |
|---|---|---|---|
| BASHAM, Brandon | 98940-071 | August 16, 2007 | 8:58 pm |

| 6. Place of Incident | 7. Assignment | 8. Unit |
|---|---|---|
| C Range, Cell #420, SCU | Unassigned | Special Confinement Unit |

| 9. Incident | Use of the telephone for abuses other than criminal activity (e.g., circumventing telephone monitoring procedures) | 10. Code | 297 |
|---|---|---|---|

| 11. Description of Incident | Date: | 9-7-07 | Time: | 7:44 am | Staff became aware of Incident |
|---|---|---|---|---|---|

On September 7th, 2007, I completed a check of phone records that I had obtained form the institutions Communication shop. Theses records were for the legal line on C Range Upper, Special Confinement Unit. These records were for the period of time of August 16, 2007 to August 31, 2007. These records revealed that Inmate Basham made several calls to various phone numbers that are also associated with his ITS list of approved numbers. TRUFONE records also reveal that inmate Basham had access to the phone at the approximate times of these calls. These records are attached for verification. Particularly, records indicate that Inmate Basham completed two, fifteen minute ITS calls on August 16th, 2007 to 315-781-1587, one of these calls was placed at 7:46pm the other at 8:35 pm. Records obtained from the institutions communication shop reveals that on August 16th, 2007 at 8:58 pm., a call was placed to 315-781-1587 from the non-monitored legal line on C Range Upper, SCU that inmate Basham is housed on. The call is concluded at 9:07 pm. ITS records for inmate Basham then indicate that at 9:24 pm., he again calls 315-781-1587. Upon further research of these records, it reveals that inmate Basham attempted to complete or completed twenty-seven calls from the legal line on C Range upper during this period of time. I had obtained these records due to an ITS call that I monitored that took place on an ITS line on August 22nd., 2007, between inmate Basham and an individual he called at area code 315-781-1587. The person he called, was later identified as Kim Cascio per BOP records (signed CONDITIONS FOR TELEPHONE CONTACT WITH INMATES IN THE SCU). About five minutes and fifty seconds into the call, Inmate Basham states that he will not be able to call again for a period of time due to being out of phone minutes. Ms. Cascio states "CAN YOU TRY TO DO THE OTHER THING?" Basham replies that he will try to, but it will not be tonight. Based upon this phone conversation, I requested a copy of the C Range Upper, non monitored legal line records.

FOI-EXEMPT

| 12. Signature of Reporting Employee | Date and Time | 13. Name and Title (Printed) |
|---|---|---|
| *[signature]* | 9-7-07 8:45 am | Bruce Ryherd, Correctional Counselor |

| 14. Incident Report Delivered To Above Inmate By: | 15. Date Delivered | 16. Time Delivered |
|---|---|---|
| *[signature]* | 9-8-07 | 835 AM |

JA 7408

BP-S288.052 **INCIDENT REPORT** C1 4
MAY 1994
U.S. DEPARTMENT OF JUSTICE                                         FEDERAL BUREAU OF PRISONS

| 1. Name of Institution | USP Terre Haute | Incident Report Number | 1385598 |
|---|---|---|---|

### Part I - Incident Report

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time |
|---|---|---|---|
| BASHAM, Brandon Leon | 98940-071 | September 26, 2005 | 7:36 a.m. |

| 6. Place of Incident | 7. Assignment | 8. Unit |
|---|---|---|
| U.S.P. Terre Haute | Unassigned | SCU |

| 9. Incident | Unauthorized use of the mail | 10. Code | 410 |
|---|---|---|---|

| 11. Description of Incident | Date: | 09-26-05 | Time: | 7:36 a.m. | Staff became aware of Incident |
|---|---|---|---|---|---|

On September 26, 2005 at approximately 7:36 a.m. I read an outgoing inmate letter written by inmate BASHAM #98940-071 (unassigned) SCU. The envelope had inmate BASHAM's name and registration number on the return address. The envelope was addressed to Sam Young 58642 River Heights Rd., Three Rivers, Michigan 49093. SCU inmate HAMMER, David Paul #24507-077 who is currently housed at USP Lewisburg has been the only SCU inmate in the past who writes to Sam Young. Inside the envelope, BASHAM wrote a short note to Young asking him to please forward the other letter in the envelope to inmate David Paul HAMMER. The second letter in the envelope is dated 9-23-05 and starts out, Hey, David. In the letter, BASHAM tells HAMMER that upon his return to Terre Haute he has to get put in Phase 1 group 1 so they can be together again. BASHAM goes on to say that he's working out on recreation days so he can stay in shape for HAMMER. BASHAM closes the letter, Love always, signed your friend Brandon Basham.

I check of authorized inmate to inmate correspondence revealed that BASHAM is not authorized to correspond with inmate HAMMER. BASHAM mailed out unauthorized inmate to inmate correspondence to a third party in order for the third party to forward it on to inmate HAMMER.

| 12. Signature of Reporting Employee | Date and Time | 13. Name and Title (Printed) | |
|---|---|---|---|
| D Moore | 09-26-05/7:55 a.m. | D. Moore, Telephone/Mail Monitoring Officer | |

| 14. Incident Report Delivered To Above Inmate By: | | 15. Date Delivered | 16. Time Delivered |
|---|---|---|---|
| JCH | | 9-26-05 | 1810 |

JA 7409

## FORENSIC PSYCHIATRY EVALUATION

November 15, 2012 and November 16, 2012
United States Penitentiary (USP), Terre Haute, Indiana

**NAME:**          Brandon Leon Basham

**CASE #:**        United States vs. Brandon Leon Basham
                   4:02-992-JFA

**EXAMINER:**      Richard L. Frierson, M.D., DFAPA
                   Professor of Clinical Psychiatry and
                         Vice Chair for Education
                   Department of Neuropsychiatry and Behavioral Science
                   University of South Carolina School of Medicine

## IDENTIFYING INFORMATION

Brandon Leon Basham is a 31-year-old Caucasian male who is currently serving a death sentence at the United States Penitentiary in Terre Haute, Indiana. This examiner was contacted by Assistant US Attorney Robert F. Daley, Jr. and was subsequently retained by the United States Attorney's Office for the District of South Carolina as an expert to provide consultation regarding mental health issues in Mr. Basham's case. Specifically, I was asked to travel to Terre Haute, Indiana to conduct a personal evaluation on Mr. Basham and to render opinions on Mr. Basham's current competency to proceed with his motion for collateral relief pursuant to 28 U.S.C. § 2255, his competency to be executed, and to examine issues and material relevant to his competency to stand trial at the time of his trial in October of 2004.

## LIMITATIONS OF CONFIDENTIALITY

Prior to interviewing Mr. Basham on November 15, I explained to him the limitations of confidentiality. I also explained to him that I was retained by the US Attorney for the District of South Carolina and was not paid by his attorney or by the judge. I informed him that I was working for the government. He remembered this information at the beginning of the interview on November 16 and it was reviewed with him again. I also contrasted my role and agency to the other experts involved in this case, namely Dr. Donna Schwartz-Watts, Dr. Thomas Hyde, and Dr. George Parker. I informed Mr. Basham that anything he told me could go into a report directed to the US Attorney. He was also informed that I could be called to court to testify at a hearing related to his

JA 7410

appeal. He understood this information and voluntarily agreed to participate in the evaluation.

## SOURCES OF INFORMATION

1. Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C., § 2255.
2. Review of a transcript of the testimony of Jan Vogelsang provided in the United States District Court for the District of South Carolina on October 19, 2004.
3. Review of transcript of the testimony of William Brannon, M.D. provided to the US District Court in the District of South Carolina during the trial of Brandon Basham (undated).
4. Review of a transcript of the testimony of Tora Brawley, Ph.D. in the United States District Court for the District of South Carolina on October 26, 2004.
5. Review of a transcript of the testimony of James Aiken in the United States District Court for the District of South Carolina on October 27, 2004.
6. Review of a transcript of the testimony of Donna Schwartz-Watts, M.D. in the United States District Court for the District of South Carolina on October 27, 2004 and October 28, 2004.
7. Review of a transcript of the testimony of Bruce Capehart, M.D. in the United States District Court for the District of South Carolina on October 28, 2004.
8. Review of a report letter to the Honorable Joseph Anderson written by George F. Parker, M.D., Associate Professor of Clinical Psychiatry at the Indiana University School of Medicine dated December 4, 2011.
9. Review of a forensic evaluation from the Mental Health Department of the Federal Medical Center in Butner, North Carolina written by Bruce P. Capehart, M.D. and Eugene Gourley, Ph.D. dated October 1, 2004.
10. Review of disciplinary reports on Brandon Basham from the Federal Bureau of Prisons.
11. Review of a letter to Judge Joseph F. Anderson from Dr. Steve Eckert, Chief Psychologist at the United States Department of Justice Federal Bureau of Prisons in Terre Haute, Indiana concerning Mr. Basham's treatment history.
12. Review of a letter to Judge Joseph F. Anderson from William Eric Wilson, M.D., Clinical Director of the Federal Correctional Complex at Terre Haute, Indiana regarding Mr. Basham's medical treatment.
13. Review of transcripts of court proceedings in the trial of Brandon Basham related to incidents where there were concerns about Mr. Basham potentially sleeping in the courtroom, Mr. Basham not wanting to remain in the courtroom during his trial, and Mr. Basham becoming agitated and assaulting officers in the courtroom.
14. Review of psychological records from the United States Penitentiary at Terre Haute, Indiana.
15. Review of trial transcripts for motion hearings on October 9, 10, 11, and 15 of 2012, including the testimony of William H. Moncton, VI, Melissa Meister, Thomas M. Hyde, M.D., George Parker, M.D., John Castro, Greg Harris, and Jack Swerling.
16. Review of medical records of Brandon Basham from the Pennyroyal Center (various dates 1990, 1998, 1999, 2000).

JA 7411

17. Review of medical records of Brandon Basham from Rivendell Psychiatric Center (September 17, 1991 through October 2, 1991 and May 3, 2000 through May 9, 2000).
18. Review of medical records of Brandon Basham from the Trover Clinic (January 20, 1995 and May 9, 1996).
19. Review of a Hopkins County Schools Psychoeducational Report on Brandon Basham dated May 1, 1995.
20. Review of medical records of Brandon Basham from The Methodist Home dated June 28, 1996 through December 4, 1996.
21. Review of medical records of Brandon Basham from Columbia Hospital – Paris (Stoner Creek Center) dated August 7, 1996 to August 19, 1996.
22. Review of medical records of Brandon Basham from Columbia Hospital – Paris (Stoner Creek Center) dated October 23, 1996 through November 6, 1996.
23. Review of medical records of Brandon Basham from Children's Psychiatric Hospital of Northern Kentucky dated November 6, 1996 through November 20, 1996.
24. Review of additional medical records of Brandon Basham from The Methodist Home dated November 20, 1996.
25. Review of medical records of Brandon Basham from Charter Ridge of Lexington, Kentucky dated November 4, 1996 through January 28, 1997.
26. Review of limited medical record of Brandon Basham from Charter Behavioral Health of Evansville dated January 28, 1997.
27. Review of medical records of Brandon Basham from Cardinal Treatment Center from the Kentucky Department of Juvenile Justice dated September 11, 1997.
28. Review of medical records of Brandon Basham from Charter Louisville Behavioral Health Center dated January 24, 1998 through February 16, 1998.
29. Review of medical records of Brandon Basham from Rice Audubon Youth Development Center dated June 24, 1999 through September 14, 1999.
30. Review of a neuropsychological evaluation on Brandon Basham performed by Edelson and Associates dated July 1999.
31. Review of limited records of Brandon Basham from the CARITAS Center dated July 22, 1999.
32. Review of medical records of Brandon Basham from Western State Hospital dated December 18, 2000 through January 15, 2001.
33. Review of medical records of Brandon Basham from Just Care dated December 17, 2002 through December 20, 2002.
34. Review of medical records of Brandon Basham from Just Care dated August 19, 2003.
35. Review of medical records of Brandon Basham from the Alvin S. Glenn Detention Center.
36. Review of a report of psychiatric evaluation conducted on Brandon Basham by Donna Schwartz-Watts, M.D. dated January 9, 2012.
37. Observations of the defendant on satellite video conferencing in the United States District Court on October 9 and October 10, 2012.
38. Review of a report of a neurological evaluation conducted on Brandon Basham by Thomas M. Hyde, M.D., Ph.D. dated October 30, 2012.

JA 7412

39. A one-hour and 10-minute clinical forensic interview on the defendant at the United States Penitentiary in Terre Haute, Indiana on November 15, 2012.

40. A four-hour clinical forensic interview on the defendant at the United States Penitentiary in Terre Haute, Indiana on November 16, 2012.

## CLINICAL INFORMATION

Mr. Basham is currently housed in the Special Housing Unit at the United States Penitentiary in Terre Haute, Indiana. He was aware of the purpose of the evaluation. He stated that he knew that I was a doctor coming to do an evaluation related to his case, which he summarily described as "my attorneys are trying to get me off of death row." He related that he had been on death row for at least seven years. He describes that on death row he has a room to himself. He reports that he keeps no daily schedule, but can leave his room to go work on the computer or to the law library. He also states that he has an MP3 player available. He reports that he spends his time watching television in his cell and added that recently the prison has been outfitted with color televisions. However, he stated that there used to be 78 channels and now he only gets 33. He denies significant difficulties since he has been on death row. He initially described having one friend on death row, David Hammer. Later in the interview he clarified this relationship: "There are no friends in here. I'm not that naïve. There's no one to depend on. Hammer is the closest I got. Socialization is slim to none. You take what you can get or you'll go crazy."

Mr. Basham described his overall mood as not very good. When asked to elaborate he reports that he has rapid fluctuating moods between feeling happy or feeling upset and angry. He states that his mood can change every hour or so. He denied longstanding periods (days to weeks) of depression or elated moods. He denied symptoms consistent with major depressive or a manic episode (a requirement for a diagnosis of Bipolar Disorder). He describes that his energy is okay. However, he states that sometimes he does not feel like not getting out of bed or doing anything and then at other times he feels somewhat hyper. He reports occasional thoughts of suicide. He states, "I'm on death row and sometimes I think it would be easier to end it all." However, he denied current intent to harm himself. He denied homicidal ideation.

In regards to psychotic symptoms, he appeared both coy and cagey. When asked if he experienced hallucinations, he states, "I told the other fellow I didn't, but I do a little." He then asked me not to write this information down. He reported that he experiences pleasant hallucinations of his mother's voice. He also reports command hallucinations from "Tommy," a person he stated sexually abused him in the past. He reports these hallucinations command him to repeatedly do things. For example, he states that it would tell him to move a bar of soap and then move it back to its original location. He stated he could be commanded to do this several times. When asked about hallucinations in the interview, he would suddenly behave as if he were experiencing them (he would look to the side and begin mumbling to himself) and then dramatically move his head as if the hallucinations had stopped and that he was "shocked" back into reality. He would then look at this examiner and state, "What did you say?" These episodes became predictable when certain topics would come up. For example, any

4

JA 7413

reference to his mother or Tommy were mentioned, it would cause them to occur. By the end of the five hours of interview, I was able to produce them by asking certain questions. His description of his hallucinations is also atypical for psychosis. He describes them as continuous and not perceived as coming from outside of his head. Additionally, he lacked the subtle symptoms normally seen in psychotic disorders. (blunted, flat or inappropriate affect, lack of attention to hygiene, disorganized thinking) It was also noted that he had a tendency to repeatedly use the phrases "to be honest," "to tell the truth," and "honestly." He did not report delusional thinking. When asked about unusual thoughts that other people do not share, he states that he believes the world is eventually coming to an end and that the human race is very destructive. He states, "We destroyed the ozone, we take from the earth, the natives [Americans] gave back to the earth, and we give back nothing."

Mr. Basham reported that he is currently prescribed four psychiatric medications. He takes paroxetine (Paxil®), an antidepressant; gabapentin (Neurontin®), a medicine for chronic pain; quetiapine (Seroquel XL®), for anger and frustration control; and amitriptyline (Elavil®), another antidepressant used at a low dose as an adjunct to pain management. Prior to the interview on November 15, 2012, Mr. Basham had just completed a telepsychiatry consultation with his treating psychiatrist in Springfield, Missouri who he referred to as a "peckerhead". He reports being very upset and angry towards his treating psychiatrist due to medication issues. He does not want to be prescribed the extended release formulation of Seroquel and preferred to be on the regular formulation of Seroquel. He states that his psychiatrist has told him there is no clinical indication for making that change. (Note: The regular preparation of Seroquel has been discontinued on formularies in prisons throughout the United States because it has potential for abuse and has been an item sold in prison black markets.) He also is upset that he is not allowed to take an amphetamine stimulant to treat his Attention Deficit Hyperactivity Disorder. He stated, "Now that I need it, they won't give it to me – when I didn't want it [as a child], they shoved it down my throat."

## PSYCHIATRIC HISTORY

Mr. Basham reported that he had been in numerous hospitals and institutions as a juvenile. He states that at age 9 he was placed in Rivendell Psychiatric Hospital. He states he was placed there due to his behavior and use of inhalants. He describes further hospitalizations at The Methodist Home, where he states he was placed by "the government" due to his use of marijuana and methamphetamine. He reports being sexually abused while at The Methodist Home. He estimates that he was in approximately 50 different facilities from age 9 to age 18. This appears to be somewhat of an over-exaggeration. He states that he could not name all of the hospitals he had been in, but listed the following: "Carrot Toss" [CARITAS], Charter of Louisville, Charter of Evansville, Charter of Lexington, Rice Otterman, and others. He states that as an adult he had been hospitalized at Western State Hospital, the Federal Medical Center at Butner, North Carolina and the Columbia Care Center in Columbia, South Carolina.

The following information was derived from Mr. Basham's medical records that were provided to this examiner by the U.S. Attorney's Office:

5

JA 7414

It would appear that between the years of 1989 and 1993, Mr. Basham was treated for hyperactivity by primary care providers. He was placed on numerous stimulant medications and at one point his Attention Deficit Hyperactivity Disorder (ADHD) was described as severe. In 1991, his teacher actually came to the primary care providers. She had described Mr. Basham as an unsocialized child with numerous behavioral problems. She states that at times he appears to be a loving child and at other times his behavior was awful. She also described his verbal skills as being highly developed and that he was good in math compared to other subjects. This description is offered at a time in Mr. Basham's life after he allegedly fell from a tree and struck his head but before he had begun using drugs.

Due to ongoing behavioral problems, Brandon Basham was evaluated on May 2, 1990 at the Pennyroyal Center, a local mental health clinic. According to that evaluation he was having continued behavior problems and he had physically assaulted teachers in special education classes. These records also note that Brandon had apparently fallen out of a tree at age 5 and struck his head on a metal railroad tie. However, his mother reported that there was no indication of a concussion and no apparent aftereffects from the fall. (I note there was contrary information presented during the sentencing phase of his trial). During the Pennyroyal evaluation, he was administered the Wechsler Intelligence Scale for Children – Revised. His responses resulted in a verbal IQ of 103, a performance IQ of 96, and a full scale IQ of 100. This is considered in the average range of human intelligence (Note: This establishes the presence of a normal intelligence before Mr. Basham began abusing drugs). According to that evaluation, Mr. Basham was diagnosed with Attention Deficit Hyperactivity Disorder. Because of achievement scores that were lower than expected given his measured intelligence scores, he was also assigned diagnoses of Developmental Arithmetic Disorder, Developmental Expressive Writing Disorder, and Developmental Reading Disorder.

According to records, Mr. Basham was first hospitalized at the Rivendell Psychiatric Center at age 10 for approximately two weeks. At that time, his school had insisted on his being admitted to a psychiatric hospital. He was described as having oppositional and hyperactive behaviors. He had attacked teachers and peers, and by the age of 10 had been removed from three separate school districts. He had engaged in shoplifting. According to that record, he would throw temper tantrums and tended to be highly manipulative. It is of note that he had IQ testing performed at the Rivendell Psychiatric Center, which revealed a verbal IQ of 85, a performance IQ of 93, and a full scale IQ of 88. He also had an electroencephalogram performed, which was normal except during hyperventilation, which showed excessive slow waves. This was felt by the interpreter to be diagnostic of epilepsy. At the Rivendell Psychiatric Center, he received a diagnosis of Attention Deficit Hyperactivity Disorder, Intermittent Explosive Disorder, Oppositional Defiant Disorder, and a Seizure Disorder. There is documentation in that record that Brandon had been huffing gasoline with his sister, a behavior which he acknowledged on interview at the hospital.

At age 13, Mr. Basham was evaluated by Paul K. Phillips, M.D. of the Trover Clinic after being referred by the West Kentucky Educational Cooperative Diagnostic Center. Dr.

6

JA 7415

Phillips diagnosed Attention Deficit Disorder that was not responsive to typical stimulants.

Mr. Basham underwent further psychoeducational testing in May 1995 at age 14 by the Hopkins County School District. At that time he had been placed in Emotional Behavioral Disability (EBD) classes and was noted to also have a Learning Disorder. During that evaluation, he was readministered IQ testing which revealed a verbal IQ of 64, a performance IQ of 82, and a full scale IQ of 77.

He was once again evaluated at the Trover Clinic at age 14 for habitual truancy, terroristic threatening, and shoplifting. He was also noted to be doing 5th grade work when in the 7th grade. He had been placed on home instruction due to his disruptive behavior at school. He had another psychological evaluation which revealed a verbal IQ of 88, a performance IQ of 77, and a full scale IQ of 76. He was diagnosed with Attention Deficit Hyperactivity Disorder, Major Depression, and Conduct Disorder.

Brandon was admitted to The Methodist Home in June 1996. This followed three arrests for possession of cannabis. He admitted to using cannabis and methamphetamine. It is noteworthy that Mr. Basham attributed some of his own cognitive problems to his drug use, which he states occurred four to five times a week. While at The Methodist Home, depression was also added as a diagnostic consideration in August 1996. The Methodist Home assigned diagnosis of Conduct Disorder, Intermittent Explosive Disorder, Polysubstance Abuse, and Attention Deficit Hyperactivity Disorder.

Mr. Basham was sent from The Methodist Home to Columbia Hospital – Paris (Stoner Creek Center) at age 15 due to increasing verbal and physical aggression and assaultive behavior towards staff and residents at The Methodist Home. He was kept there approximately two weeks and received a diagnosis of Bipolar I Disorder, hypomanic. It is unclear why this diagnosis was made and what symptoms were used to make this diagnosis. It is noted that he underwent a trial of lithium, a medication commonly used in Bipolar Disorder and it was felt to be helpful. He was discharged from this hospital to the Children's Psychiatric Hospital of Northern Kentucky where he was admitted on November 6, 1996. During this hospitalization at Children's Psychiatric Hospital in Northern Kentucky, Mr. Basham revealed that he had been sexually molested in his childhood around age six by a homeless man that his father had taken into their home. His discharge diagnosis at Children's Psychiatric Hospital was Conduct Disorder, Adjustment Disorder with Anxious Mood, and Polysubstance Abuse. After this hospitalization, he returned briefly to The Methodist Home. However, once again due to unmanageable behavior, he was hospitalized.

He was admitted to Charter Ridge of Lexington, Kentucky at age 15 on December 4, 1996. He had been unmanageable at The Methodist Home and had been taken to the local Emergency Room from which he ran away. He was brought back by police officers. At Charter Ridge, he was diagnosed with "Atypical Bipolar Disorder," which was described as "impulsive and aggressive behavior and a strong wish to control others and not let anyone control him." While at this facility he reports he had an

7

JA 7416

inappropriate sexual relationship with a counselor. He was transferred directly from Charter Ridge of Lexington, Kentucky to Charter Behavioral Health of Evansville. The only record from that facility available is the admission record, which reveals a diagnosis of Dysthymia, Generalized Anxiety Disorder, and Obsessive-Compulsive Disorder. The symptoms that led to those diagnostic impressions are not clear from the record and they represent a significant departure from most other diagnostic impressions of Mr. Basham.

Mr. Basham was next admitted on September 11, 1997 to the Cardinal Treatment Center, a facility of the Commonwealth of Kentucky Department of Juvenile Justice. According to those records, he had been arrested in the past for possession of marijuana, possession of drug paraphernalia, possession of amphetamines, operating a moped without a license, receiving stolen property, terroristic threatening, habitual truancy, theft under $300, and second degree burglary. While at Cardinal Treatment Center that he had an electroencephalogram (EEG), which was reportedly normal.

He was at Cardinal for over a year when he reported suicidal thoughts. He had gone AWOL a week prior and when returned to Cardinal he had an increase in assaultive behaviors. He was therefore hospitalized at Charter Louisville Behavioral Health Center on January 24, 1998. While there, he received a diagnosis of Bipolar Disorder, recurrent, manic with psychotic features; Impulse Control Disorder; and Oppositional Defiant Disorder.

At age 17, he was placed at the Rice Audubon Youth Development Center for three months. While there, he was treated for Attention Deficit Disorder, Depression, Post-Traumatic Stress Disorder, and Polysubstance Abuse. While there, he had a neuropsychological evaluation, which included repeated IQ testing. He obtained a verbal IQ of 87, a performance IQ of 94, and a full scale IQ of 89. These all fall in the low average range of intelligence but represent an increase over his testing at the Trover Clinic at age 14. (This increase may be due to the fact he was incarcerated and did not have access to drugs for a sustained period.)

In 2000, he was admitted to the Rivendell Psychiatric Center at age 18 for chemical dependency treatment. He had just been released from the local jail where he had been incarcerated for six months. According to records from that facility, Mr. Basham was not cooperative with his chemical dependency treatment. Their record reflects that he "attempted to derail everyone in treatment." He was described as a treatment failure and he was discharged early with diagnosis of Cocaine Dependence, Cannabis Dependence, Attention Deficit Hyperactivity Disorder, and Polysubstance Abuse.

His last psychiatric hospitalization, prior to having incurred the legal charges for which he is now serving time, was at Western State Hospital from December 18, 2000 to January 15, 2001. At that time, he had been admitted from the Hopkins County Jail because he had reportedly attempted to hang himself and also electrocute himself. He was diagnosed with Psychotic Disorder, not otherwise specified; and Antisocial Personality Traits. The specific psychotic symptoms that he displayed are not clear from that record. He eventually fled this facility on January 15, 2001.

8

JA 7417

After his arrest, he was eventually hospitalized at the Columbia Regional Care Center in 2002. He was also admitted there in 2003. The 2003 record indicates a diagnosis of Attention Deficit Hyperactivity Disorder; Mood Disorder, not otherwise specified; and Cluster B Personality Traits. He reportedly had been very unhappy in the Alvin S. Glenn Detention Center because he had been placed on lock down. His treating doctor, Donald Morgan, M.D., had diagnosed him with "Organic Mood Disorder with Psychosis." This is not standardized or recognized terminology in the Diagnostic and Statistical Manual of Mental Disorders (DSM). He also received treatment in the Alvin S. Glenn Detention Center while he was awaiting trial. At one time, he was prescribed a psychostimulant Concerta® and was noted to be trading this medication to other inmates for canteen items or canteen money.

Mr. Basham reports a history of four previous suicide attempts. He reports that he once attempted suicide by cutting his wrist when his mother was pestering him to help her obtain crack cocaine. (He alleges she offered to perform sexual favors on him in exchange for his finding her crack.) He states he made one prior hanging attempt at the Hopkins County Jail. He also reports a hanging attempt at Charter Ridge Hospital when he became upset over a relationship with a counselor. Finally, he reports that when he was placed in solitary confinement ("the hole"), he once tried to kill himself.

Since his conviction and sentencing, at the USP he has continued to receive psychiatric treatment via telepsychiatry. His requests to be prescribed Concerta, a stimulant, have been repeatedly denied. According to the medical records, there have also been attempts on his part to feign psychosis. Most of the psychological notes from the USP indicate that he does not display signs and symptoms of mental illness.

## ALCOHOL AND SUBSTANCE USE HISTORY

During this evaluation, Mr. Basham informed this examiner that he was drinking homemade wine. He described how he makes it in general in the penitentiary, but refused to give details. He also claims to be able to make much stronger alcohol, referred to as "white lightening." He had two small 16-ounce plastic bottles, which were in a whitish duffle bag and contained a pinkish liquid. When he finished the first bottle, there was whitish sediment remaining. It is unclear whether he was actually using alcohol or not. He would make sure the correctional officer was not watching when he took it out of his bag and took a drink. In any event, it is noted that he has had numerous episodes of either being caught with alcohol or using alcohol in the prison. In 2008, he had a blood alcohol level of 0.23 and on another occasion 0.144, both above the level of legal intoxication. He also had slurred speech and smelled of alcohol on at least three or four other occasions between 2008 and 2009 and admitted to officers that he had been drinking. He did not report tolerance or withdrawal symptoms to alcohol. He told this examiner he drinks occasionally and that the officers generally leave him alone and do not search his cell.

Mr. Basham reports a history of very heavy inhalant use from the age of 8 until the age of 13. He reports being addicted to huffing gas and also paint. He reports that these

9

JA 7418

caused horrible headaches and at one point the headaches were so severe that the smell of gas became repulsive for him and he stopped using inhalants. He states at the time that he was addicted to them. We note that his highest measured IQ occurs after his fall from the tree but before he begins using inhalants.

He also has a history of early cannabis use and reports that he would use large quantities on a daily basis. He stated, "I grew up on weed. We had plenty. We grew weed. I learned to roll a joint before I learned to smoke." He also reports that they would cure cannabis in a barn at their house and eventually traded cannabis for other drugs. He stated that his dad tried to get him away from marijuana around age 13, but he stated that he was addicted and that stopping was not possible. He states he last used shortly before his arrest for the current charges for which he is incarcerated. He reports that he was exposed to cannabis at a very young age by his mother.

Mr. Basham describes his drug of choice as cocaine. He states he started using cocaine around the age of 11 or 12. He also states that he brought crack home and introduced it to his mother who subsequently became addicted. At his period of heaviest use, he states that he could go through approximately $800 or $900 worth of crack cocaine in a day. He admits to committing illegal acts to support his cocaine habit and denies that he was addicted. He states that the family hocked cars and other valuables in order to obtain cocaine. He denies ever using intravenous drugs.

He has tried other illicit substances, but has never been addicted or used them on a regular basis. He states that he tried methamphetamine but did not like it because it made him feel like he was on the stimulant medicines (like methylphenidate, [Ritalin]®). He admits to selling his psychostimulants that were prescribed to him in order to obtain other drugs.

## MEDICAL HISTORY

Mr. Basham denies significant ongoing medical problems. He reports that he has chronic neck and back pain for which he is prescribed two medications. He has had prior surgery to repair a finger which was injured after getting caught in a flywheel. (There is obvious deformation of the right fourth finger). He has also had a herniorrhaphy. He reports a remote history of seizures, but none recently. He reports that at age 5, he climbed a tree and fell out and hit a railroad tie. He does not know whether he lost consciousness. He states that his family told him he was weird for one year afterwards.

## FAMILY HISTORY

His mother, Cathy Basham, was treated for some unknown mental illness. In old records she is described as taking an antipsychotic medication, fluphenazine (Prolixin®). Other records mention a possibility of Bipolar Disorder. She is currently deceased and reportedly had a severe addiction to crack cocaine at the time of her death. Mr. Basham said she weighed less than 70 pounds at her death. She died shortly after his trial. She also had a history of Chronic Obstructive Pulmonary Disease (COPD). His

10

JA 7419

father, Jimmy Basham, is described as an alcoholic. According to Mr. Basham, his father is currently not in good health. He reports that he has orthostatic hypotension (gets faint when he stands up) and may be entering the first stages of dementia. His father worked as a mechanic. He has one sister, Charlotte, who he reports just got out of jail for DUI. He states that she has had a drinking problem in the past. There is no other known biological family history of mental illness. He reports that his mother's second husband, Larry Pentecost, committed suicide.

## SOCIAL HISTORY

Mr. Basham reports he lacked parenting as a very young child. When I asked him who raised him, he reported "nobody." He then stated that his mother was in charge of him, but frequently he lived with his father in a trailer on the mother's property and not in the mother's house. He states that his parents did not live together and he was frequently on his own. He states that his dad oversaw his Social Security (SSI) check, but frequently he would be left to his own devices and, in his own words, "ran wild." He describes his mother as "more like a running buddy" and less like a mother. He reported that she would hit him with frying pans, clothes hangers, and other objects when she got mad at him.

He denies significant developmental delays and denies enuresis. He reports a horrible initial adjustment to school. He states he never wanted to go to school. He added, "I never had rules at home and I didn't want anyone telling me what to do." He reports that he had trouble learning information in school, but added, "I didn't want to learn – I would go to sleep and they said I was uncooperative." He reports when they grabbed him to wake him up, he would fight the teachers. He also reports frequently leaving school and just going home. He reports that he was placed in special education classes because of escalating behavioral problems – "I kept fighting everybody." He reports he failed the first grade. He reports he was eventually removed from schools and placed in several facilities. He reports that he was sexually molested by a homeless man that his father brought into the home when he was young. He did not report ongoing difficulties related to this abuse other than a report of sometimes hearing the voice of his abuser. However, this report appeared suspicious in its validity.

He has never been married. He reports that his first sexual experience occurred around age 14 or 15 with a therapist at Charter Ridge Hospital. He states that he fell in love with the therapist. He denies a history of long-term relationships and reports the relationship with Penny lasted approximately six months.

He has never held competitive employment. He does report that he always has received Social Security Income. He reports working "under the table" for his father at Creek Paving Company where he would go out and tamper newly-laid asphalt. He states that he worked there for a few months until he got in trouble for stealing a drill.

Mr. Basham has an extensive legal history. He believes he was first arrested around age 11 for stealing an Ozzy Osbourne tape at a local K-Mart. He also reports prior arrests for driving without a license, receiving stolen property, possession of marijuana

11

JA 7420

(several counts), possession of methamphetamine, theft of bicycles, burglary, and possession of drug paraphernalia. He reports that as an adult he served 12 months for stealing a cousin's PlayStation. He also reports additional time added to the sentence due to violations of jail rules. He has a history of two prior escapes from custody.

## MENTAL STATUS EXAMINATION

On November 15, Mr. Basham appeared with good hygiene. He made good eye contact and was cooperative with the interview. He was bearded, but had very close-cut hair. There were no obvious tattoos. He was alert and oriented to person, place, month, year, and day of the week. He did not know the exact date. He was able to register three unrelated objects and recall two of them after five minutes. He was able to recall significant past personal information. There was no evidence of clinically significant memory impairment. Because he relied on visual clues to remember the three objects, I would suspect his visual memory is better than his verbal memory. He was able to name the current president, but could not name past presidents. He was aware of current events and that a recent hurricane had occurred on the eastern seaboard (he alleged that he does not watch the news because "everything is going to hell in a hand basket.") His performance on tests of concentration was very poor and consistent with his ADHD diagnosis. He was able to perform a calculation, correctly subtracting 57 cents from a dollar. He demonstrated a capacity for abstract reasoning as evidenced by his spontaneous use of proverbs and his ability to interpret a proverb and interpret similarities. He reported auditory hallucinations which were described in a manner atypical for a mental illness. He denied visual hallucinations. He denied paranoid or grandiose delusions. He denied ideas of reference. He appeared easily distracted throughout the interview. Also, at times he appeared to have word-finding problems, although he was able to communicate adequately. His vocabulary was much more complicated than would be expected with someone with his prior measured IQ. For example, he spontaneously used such words as "incriminating" and "naïve." Mr. Basham described his mood as up and down. His affect or outwardly observed mood was euthymic, full in range, and appropriate to conversation. On one particular test of concentration, when asked to subtract serial 3s from 20, Mr. Basham appeared to give a purposely wrong answer. He was administered the Rey 15-Item Test, a screening test, but not a definitive test, of memory malingering. On this test, he was only able to reproduce four of the 15 items, highly suggestive of purposeful poor effort on the test.

## DIAGNOSES

AXIS I:    Attention Deficit Hyperactivity Disorder
           Cognitive Disorder, Not Otherwise Specified.
           Malingering of Psychotic Symptoms.
           Alcohol Abuse.
           Inhalant Dependence, in full sustained remission.
           Cannabis Dependence, in a controlled environment.
           Cocaine Dependence, in a controlled environment.
           Learning Disorder, Not Otherwise Specified, by history.
AXIS II:   Antisocial Personality Disorder.

12

JA 7421