No. 13-9

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
Appellee,

v.

BRANDON L. BASHAM,
Appellant.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
_____

APPELLEE'S SUPPLEMENTAL APPENDIX
_____

WILLIAM N. NETTLES
United States Attorney
District of South Carolina

ROBERT F. DALEY, JR
Assistant United States Attorney
District of South Carolina

LESLIE R. CALDWELL
Assistant Attorney General

SUNG-HEE SUH
Deputy Assistant Attorney General

THOMAS E. BOOTH
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-5201
Thomas.Booth@usdoj.gov

# TABLE OF CONTENTS

Page No.

Crocker Report ...................................................................................................................1

Excerpt of Jury Trial Transcript, September 13, 2004 ...............................................6

Excerpt of Jury Trial Transcript, September 17, 2004 ...............................................9

Excerpt of Jury Trial Transcript, September 20, 2004 .............................................21

Excerpt of Jury Trial Transcript, September 28, 2004 .............................................24

Excerpt of Jury Trial Transcript, September 29, 2004 .............................................34

Excerpt of Jury Trial Transcript, October 22, 2004.................................................36

# BRUNSWICK COUNTY SHERIFF OFFICE
# INTERVIEW REPORT
# LT DA CROCKER

PERSON INTERVIEWED: SHERIFF RONALD E HEWETT
ADDRESS: PO BOX 09 BOLIVIA NC, BCSO
TELEPHONE: 910 253 2736
DATE: 12/03/02
LOCATION: BCSO
CASE NUMBER: 02-3758

The case is reference the abduction of Alice Donovan (statements / actions made by Brandon Basham)

On November 28, 2002, Sheriff Hewett met with Brandon Basham as pre-arranged with FBI agt Jeff Long (case agt), Basham's two attorneys, Two Conway Officer assigned to security on Basham (Sgt Parker and Sgt Sarvis).

Basham was transported from Florence SC to Brunswick County NC for the purpose of showing the location of Alice Donovan. Basham was at all times in the presence of his attorneys; he was afforded consultation to same attorneys prior to any action or statement made by Basham.

The above arrived into Brunswick County at (approx) 0830 hrs on Hwy 211 from Hwy 74/76. Basham and company were in a private white ford van and followed Sheriff Hewett to Hwy 17 to which they turned south on 17 and went directly to the Dodge City Amoco in Shallotte NC.

On arrival, Basham was allowed to use the restroom and given cigarette and drink. Waiting at the Amoco station was Chief Hendricks (Conway SC Police Dept) and other SC officers. Sheriff Hewett then lead Basham and company to hwy 17 and straight to Bee Tree Farm road off Green Hill road (Winnabow area of Brunswick County)

00814

**1**

Once there, formal introductions were made by all to include Sheriff Hewett to Basham and his Attorneys. Attorney Littlejohn agreed that a local officer was needed to aid in the directions given by Basham and that Sheriff Hewett was agreed upon by Attorney Littlejohn and Agent Long.

Seated in the van was a Conway Officer driving and Sheriff Hewett in the front passenger seat, behind the driver was Basham and to his right was attorney Littlejohn, in the rear seat was Basham's other attorney. Agt Long and the other Conway Officer.

Again introductions were made and as they rode Sheriff Hewett showed Basham 8x10 digital photos of the local area. Several pictures Basham indicated of no knowledge of the area and other he made comments as to seeing before. Attorney Littlejohn also observed the all the photos during the process, and approved.

Basham was shown pictures (now marked 1,2&3) and Basham indicated that the picture of the Bee Tree Hunting Club was familiar, but not the sign. Basham stated that the sign that he saw before was either 4x6 or 4x8 and was green with white letters, stated it had "animal" on the sign.

Basham was shown pictures (now marked 4&5) and Basham stated it was the same hunting camp and that he remembered they turned around as there were men standing on the porch.

Basham was shown pictures (now marked 6,7&8) and Basham stated he recognized the cemetery shown as "that's the cemetery", stated he thought there was more of a broken down fence but that it looks like it. (NOTED: There was an older broken down fence, approx 10ft in front the current fence at the cemetery)

Basham showed sheriff Hewett where he did not remember the turn around on the photo and stated, "we pulled right in there and we cut to the left behind a fence" indicating on the photo the area discussed. (later Basham illustrates to the Sheriff at the actual location and states "I think this is it" as they drive by the cemetery)

00815

Sheriff Hewett states that as they rode in the van a left was taken out of Bee Tree Farm road onto Green Hill road and they follow the road for several miles to which at one point Basham points out a house and claims, "I remember that place".

The route taken continued onto Zion church road to Hwy 17 and turned north to the Gregory Poole (Industrial Area near Leland NC) business and Basham indicated that nothing meant anything to him there. They road back to Green Hill road area to the CC road going to the Prosper Community in Columbus County NC with still no indications of knowing the areas.

Sheriff Hewett states that once on the "CC" road there were several hunters lined up and down the road. At one point while riding along a Doe (female deer) jumped on the hwy and ran in front of the van, in view of all of those riding in the van. Basham at this time states, "you know, I could never kill a deer and here I have...." Sheriff Hewett states he observes attorney Littlejohn (sitting next to Basham) then touch Basham and shake his head left to right (in a negative nod) to Basham. Sheriff Hewett states that Basham never completed the statement he started. Sheriff Hewett states that throughout the day this was the only time attorney Littlejohn corrected Basham in any action or statement.

Sheriff Hewett states that at one point Basham motioned at his attorney to come closer so he could whisper and Attorney Littlejohn gets closer to which Basham is heard saying, "should I tell them about, ? (Sheriff Hewett could here no more, as they whispered) Then Attorney Littlejohn stated "go Ahead, that would be OK" to Basham. Then Basham describes with his hands 16' to 20' inches long (with fingers extended in shackles) it's a leather strap. You need to back to the cemetery and look for the leather strap. Basham further described it with possibly a Liz Claiborne tag on it. At this time Sheriff Hewett instructed Deputy's and other personnel to return to the cemetery and further look for the purse strap. (Note: search revealed no strap)

Sheriff Hewett states that once on Lewis Swamp road off Green Hill road, Basham stated "I think this could be it" and started obviously trembling. Sheriff Hewett states that at one time they located a stake near the road and again Basham became emotional. Basham further added that the trees (along the road) were closer together. Basham then states that, "Fulks was the leader that whatever Chad wanted to do, we did, Chad was driving".

Basham stated of remembering a Park and that Chad wanted to take her (victim) to the park and he (Basham) agreed to which Chad said to Basham, No there will be too many people around the park. Basham stated he remembered the park was on the right and just past the Park was the green Animal sign, further that the sign was on the left side of the road. Basham stated to Sheriff Hewett that he and Chad once had passed the park they turned around and traveled back to a road to which they drove down for a distance, a long way (maybe 20 minutes).

Basham stated that once on the road the trees got closer together and they stopped and pulled her out to the right side of the car, cut his (Bashams) leg, then they took her into the woods. Sheriff Hewett states at this point Basham is pulling on his leg irons in an attempt to show where he was cut by the stake, stating it scraped his leg. Basham states that after dragging her out, they got back in the vehicle. Basham states that the road was wide enough to do a turn around and go back the way they came. (maybe backed up one time).

Sheriff Hewett states they returned in the van onto Lewis Swamp road and Basham stated, "it's like this, but I don't think it's it"(referring to Lewis Swamp road). Sheriff Hewett states he observes Basham to be physically shaking and has red eyes. At one point the van is stopped in a possible area where there is a stake on the left hand side (ditch area of Lewis Swamp road) and Basham stated that that it won't (Donovan's body) be far from the road.

Sheriff Hewett showed Basham photo (now marked #9) and Basham states that he remembered the intersection that they turned right onto the road. (photo was of cherry tree and green hill road intersection)

Photos (now marked as 10&11) and Basham states, " that's the place where Chad paid for the gas and I was sitting in the back with her (victim)" (The photos was of Dodge City Amoco in Shallotte NC)

00817

4

Sheriff states they continued to check numerous areas to include Hwy 17, Governor's road and Funston road. States that over 50 to 60 miles were driven throughout the day and that at one time gas was obtained at the hwy 17 / hwy 87 Exxon station. (Basham again was given cigarette and a drink)

Sheriff Hewett states that at the end of the day (November 28 2002) the van and other officers gathered at the cemetery on Bee tree Farm road. States that at one point Basham was being descriptive to Sheriff Hewett as to what had happened and stated in response to Sheriff Hewett, " I'm trying sir (to help), but all the roads, pine trees and dirt look alike. Sheriff Hewett states that while talking at the cemetery Basham stated, "we parked right there", Basham pointing at an older fence and current fence (which is a location that was consistent to a witness had earlier observed the vehicle at the cemetery).

Sheriff Hewett states that while at the cemetery, Basham indicated how the (victims) pocketbook was used. (Sheriff Hewett was able to determine this meant, the pocketbook strap was used to strangle the victim to death)

Basham then walks to the left front edge of the cemetery (along with Sheriff Hewett and Conway Officers Sgt Parker and Sgt Sarvis. Basham demonstrates (visually) how he afterwards threw the strap into the wood line at the cemetery. Basham indicated that the strap was 16 to 20 inches in length and was a leather type. Basham also showed an area to the left of the cemetery and again stating "check in those trees and over there. Basham appeared to be breathing heavy and stated it was "a Liz Claiborne pocketbook". Sheriff Hewett asked Basham directly, is this where it happened and Basham replied, "yes, this is it". (Sheriff Hewett observes Basham again get emotional) Sgt Parker and Sgt Sarvis during this conversation had walked into the woodline to the left of the Cemetery looking for the purse strap.

Sheriff Hewett observed that all through the day, Basham never denied participating in the crime.

After this Basham and his attorneys conferred privately in the van in an effort to grant time to discuss anything that had been missed throughout the day. Basham was with Sheriff Hewett from approx 0830 to 1500 hrs on November 28, 2002

00818

REPRESENT MR. BASHAM SOME TIME IN MAY 2003.  WE UNDERTOOK HIS REPRESENTATION AND CONTINUE TO REPRESENT HIM.  AND WE ARE THE ONES WHO ARE GOING TO BE HERE THROUGHOUT THIS TRIAL ON THE ISSUES RELATED TO GUILT OR INNOCENCE THAT YOU WILL DECIDE AND THEN, SHOULD YOU DECIDE THE GUILT ISSUE,  WE WILL BE HERE TO ADVOCATE HIS POSITION AS TO WHAT WE CONSIDER THE MITIGATION EVIDENCE IS IN THIS CASE, WHICH YOU ARE PROBABLY ALL TOO FAMILIAR WITH BY NOW,  THE VOIR DIRE WE HAD,  THE QUESTIONS WE HAD OF YOU THE LAST COUPLE OF WEEKS.

MR. BASHAM IS FROM WESTERN KENTUCKY.  PRIOR TO THIS ESCAPE FROM THE HOPKINS COUNTY JAIL,  HE HAD NOT BEEN OUT OF KENTUCKY EXCEPT FOR ONE TIME WHEN HE WENT TO A HOSPITAL IN CINCINNATTI, OHIO.  HIS FAMILY FOR ALL -- FOR A LONG PERIOD OF TIME HAILED FROM THAT AREA,  WESTERN KENTUCKY,  NEAR MADISONVILLE,  HOPKINSVILLE.  SOME OF YOU MAY BE FAMILIAR WITH IT.  BUT IT IS ABOUT 30 OR 45  -- ABOUT 45 MILES SOUTH OF EVANSVILLE,  INDIANA.  IT IS ALL IN THAT AREA WHERE THE STATES COME VERY CLOSE TOGETHER.

BRANDON IS AN INDIVIDUAL WHO, AT A VERY EARLY AGE, HIS FAMILY REALIZED THAT HE HAD SUFFERED SOME MENTAL INFIRMITIES. HE HAS A VERY LOW INTELLECTUAL LEVEL WHICH YOU WILL HEAR VARIOUS POINTS OVER THE NEXT FEW WEEKS ABOUT HIS INTELLECTUAL CAPACITY.  GENERALLY SPENT ALL OF HIS TIME IN SPECIAL-ED CLASSES AND NEVER GOT REALLY PAST THE FIFTH GRADE.  HE IS NOW 22 YEARS OF AGE AND ACTUALLY WILL TURN 23 DURING THE COURSE OF

THIS TRIAL.

HIS READING LEVEL IS VERY LOW, THAT OF A GRADE SCHOOL-TYPE OF INDIVIDUAL. AND HE SUFFERS FROM VARIOUS DISORDERS, ONE OF THEM, PARTICULARLY, ADHD. NOW, I AM TELLING YOU THOSE THINGS BECAUSE THEY WILL BE IMPORTANT IN THIS PART OF THE CASE TO KNOW A LITTLE BIT ABOUT MR. BASHAM'S BACKGROUND BECAUSE, AS MR. SCHOOLS IS TALKING ABOUT WITH RESPECT TO TEAMS, PEOPLE MAKING CHOICES, I WOULD LIKE YOU TO EXAMINE EVERYTHING THAT HAPPENS OVER THE NEXT COUPLE OF WEEKS WITH RESPECT TO THIS FIRST PART OF THE TRIAL IN THAT CONTEXT TO UNDERSTAND WHO MR. BASHAM IS, WHAT HIS CAPABILITIES ARE, HOW HE FUNCTIONS, AND THEN COMPARE THOSE TO CHAD FULKS WHO YOU WILL ALSO HEAR THINGS ABOUT OVER THE NEXT COUPLE OF WEEKS.

IT IS IMPORTANT WHEN YOU MAKE YOUR DETERMINATION IN THIS CASE, BOTH AT THIS STAGE OF THE TRIAL AND THE NEXT STAGE OF THE TRIAL, SHOULD YOU GET THERE, TO DECIDE AND TO LOOK AT THE DIFFERENT PEOPLE WHO ARE INVOLVED AND WHO ARE CHARGED IN THIS CASE. AND I WILL GO INTO THAT IN A LITTLE BIT MORE IN A MINUTE. SUFFICE IT TO SAY THAT, AT THIS POINT, I JUST WANT YOU TO KNOW A LITTLE BIT ABOUT BRANDON BASHAM'S BACKGROUND AND HIS LIMITED CAPABILITIES WITH RESPECT TO HIS INTELLECTUAL FUNCTIONING, HIS LOW IQ, HIS LACK OF EDUCATION, AND HIS INABILITY TO REALLY MAKE A LOT OF VERY OR ANY, LET'S PUT IT THIS WAY, SOPHISTICATED DECISIONS.

NOW, YOUR FUNCTION HERE IS AS JURORS AND TO DECIDE THE

BIGGER AND STRONGER INDIVIDUAL?  WHO IS THE INDIVIDUAL WHO IS MORE CUNNING? WHO IS THE INDIVIDUAL MORE IN CONTROL? WHO IS THE INDIVIDUAL WHO KNEW WHERE HE WAS GOING AND KNEW WHEN THEY WERE LEAVING? WHO WAS THE INDIVIDUAL THAT WAS DRIVING? WHO IS THE INDIVIDUAL THAT CONTROLLED THE MONEY? WHO IS THE INDIVIDUAL THAT MADE THE DECISIONS? THE RESPECTIVE PERSONALITIES OF EACH OF THESE PARTIES,  LOOK AT THOSE.   THE CONDUCT OF EACH OF THESE PARTIES,  PLEASE LOOK AT THOSE.   AND THE DECISIONS THAT THEY MADE AND THEIR ACTIONS.   IN SHORT, WHO WAS A LEADER AND WHO WAS A FOLLOWER?

NOW,  MR. SCHOOLS TALKED TO YOU BRIEFLY ABOUT SOME OF MR. BASHAM'S CONDUCT AFTER HE WAS ARRESTED.   ONE OF THE REASONS WHY I WANTED TO TALK TO YOU A FEW MOMENTS ABOUT BEFORE HIS INTELLECTUAL FUNCTIONING IS THAT IT SHOULD COME AS NO SURPRISE TO YOU,  FIRST OF ALL,  THAT WHEN PEOPLE ARE ARRESTED, MANY TIMES THERE ARE DIFFERENT VERSIONS OF WHAT THEY SAY TO THE POLICE.   THAT IS NOT SURPRISING.   BUT ALSO TAKE INTO CONSIDERATION MR. BASHAM'S LOW INTELLECTUAL FUNCTION AND IT BECOMES EVEN MORE APPARENT THAT THAT IS NOT INCONSISTENT.

MR. BASHAM, DURING THAT PERIOD OF TIME, DID GIVE DETAILS, DID ATTEMPT TO GIVE SOME DETAILS,  DID ATTEMPT TO HELP LAW ENFORCEMENT,  ALTHOUGH THAT MATTER IS IN CONTROVERSY AS TO WHETHER OR NOT, AS MR. SCHOOLS TOLD YOU, THEY FELT HE DID OR NOT.   BUT THE FACT OF THE MATTER IS,  WHEN YOU CONSIDER THE FACT THAT MR. BASHAM HAD NEVER BEEN OUT OF WEST HAMLIN,

Q.    IS THE CAROLINA FIRST BANK THAT YOU RESPONDED TO TO LOOK AT SURVEILLANCE IN THAT PICTURE?

A.    YES, SIR,  IT IS AT THE BOTTOM.

Q.    COULD YOU DRAW A CIRCLE AROUND IT?

A.    (WITNESS COMPLIES.)

Q.    DO YOU KNOW WHAT THIS STRUCTURE IS ON THE OTHER SIDE OF HIGHWAY 17 ALMOST DIRECTLY ACROSS THE STREET FROM CAROLINA FIRST?

A.    THAT IS THE LAKE SHORE MOTEL.

Q.    THAT IS THE ROAD RUNNING DOWN THE MIDDLE OF GOVERNMENT'S 71 IS HIGHWAY 17?

A.    YES,  IT IS.

          MR. SCHOOLS:  THANK YOU,  SIR.

          THE COURT:   THANK YOU,  SIR.  YOU MAY STEP DOWN.

          MR. HARRIS:  MAY WE APPROACH,  YOUR HONOR?

          THE COURT:   ALL RIGHT.

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

          MR. HARRIS:  JUDGE,  I KNOW THAT YOU HAVE NOTICED THIS.  MY CLIENT HAS SLEPT THROUGH THIS ENTIRE TESTIMONY.   I TRIED TO GET HIM UP.  PAIGE TARR HAS TRIED TO GET HIM UP. JACK SWERLING HAS TRIED TO GET HIM UP.  WE ARE IN THE PORTION OF THE TESTIMONY THAT, I THINK, IS CRITICAL.

          THE COURT:   LET'S SEND THE JURY OUT AND TAKE THIS UP.

MR. HARRIS: THANK YOU, JUDGE.

(WHEREUPON, THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT: MEMBERS OF THE JURY, LET ME ASK YOU TO GO TO YOUR JURY ROOM FOR JUST A MOMENT, PLEASE.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: MR. BASHAM, YOU NEED TO STAND UP SO I CAN TALK TO YOU. MR. BASHAM, WE HAVE ALL NOTICED YOU HAVE BEEN DOZING OFF DURING THE PROCEEDINGS AFTER LUNCH. IS THERE SOME PROBLEM I NEED TO KNOW ABOUT?

THE DEFENDANT: I JUST GET EXHAUSTED. I AM TIRED. I AM EMOTIONALLY -- I JUST CAN'T TAKE THIS, YOU KNOW WHAT I AM SAYING? I CAN'T TAKE THIS. I AM READY TO, I MEAN, I AM TIRED OF COMING. I AM TIRED OF DOING THIS. I AM TIRED.

THE COURT: MR. BASHAM, YOU NEED TO TALK TO ME. I AM THE ONE THAT ASKED YOU THE QUESTION. SPEAK IN THE MICROPHONE SO THE COURT REPORTER CAN TAKE DOWN WHAT YOU SAY.

MR. BASHAM, I KNOW THIS IS AN UNCOMFORTABLE PROCEEDING FOR YOU. OBVIOUSLY, IT IS. OBVIOUSLY, YOU ARE UNDER A LOT OF STRESS. I KNOW YOU ARE TAKING MEDICATION. BUT, AS I TOLD YOU BEFORE THE TRIAL BEGAN, THIS TRIAL IS A VERY EXPENSIVE PROPOSITION FOR ALL PARTIES INVOLVED. AND EVERY DAY WE ARE HERE COSTS THE TAXPAYERS LOTS OF MONEY. AND I AM SYMPATHETIC TO YOUR NEED TO GET SOME REST. AND I AM SYMPATHETIC TO THE FACT THAT MAYBE SOME OF THE MEDICINE MAKES YOU DROWSY, BUT

YOU WILL HAVE TO STAY AWAKE DURING THESE PROCEEDINGS.    IF YOU NEED MORE COFFEE OR A SOFT DRINK FOR YOU, WE WILL BE GLAD TO GET IT FOR YOU.

THE DEFENDANT:   YES, SIR.

THE COURT:   DO YOU WANT SOME COFFEE?

THE DEFENDANT:   NO.   I TRY TO GO -- I TRY TO LOOK THROUGH STUFF.   TRY TO MAKE MYSELF DO IT, YOU KNOW WHAT I AM SAYING?   MAKE MYSELF DO IT.   I DON'T WANT TO BE HERE.   I DON'T WANT -- IS THERE ANY WAY I CAN GIVE THIS OVER TO THEM AND LET THEM DO IT? I MEAN -- AND LET ME JUST STAY IN THE JAIL DOWNSTAIRS?   I DON'T CARE.   I JUST CAN'T TAKE IT.   I CAN'T TAKE THIS STRESS.   I CANNOT.

THE COURT:   I HAVE THE OPTION OF PUTTING YOU DOWNSTAIRS TO WATCH IT ON THE MONITOR.

THE DEFENDANT:   YES, SIR.

THE COURT:   WE HAVE THAT TECHNOLOGY AVAILABLE, BUT I DON'T WANT TO DO THAT.   THERE ARE VERY PRECISE RULES OF THE RIGHT OF A CRIMINAL DEFENDANT TO BE PRESENT AT EVERY CRITICAL STAGE OF THE PROCEEDINGS AGAINST HIM.   AND I DON'T THINK THAT YOUR LAWYERS WOULD BE AS EFFECTIVE IN REPRESENTING YOU IF YOU ARE NOT PHYSICALLY BESIDE THEM AT COUNSEL TABLE.   DURING TRIAL, THERE ARE THINGS THAT COME UP WHERE LAWYERS NEED TO CONFER WITH THEIR CLIENT TO FIND THAT INFORMATION, OR PLAN STRATEGY, OR MAKE IMPORTANT DECISIONS.   AND WITH YOU DOWNSTAIRS,   YOU WOULD BE ABLE TO WATCH THE PROCEEDINGS ON A

**11**

VIDEO MONITOR, AND HEAR THE PROCEEDINGS, BUT YOU WOULDN'T BE ABLE TO MEANINGFULLY PARTICIPATE.

SO, I SUGGESTED THAT OPTION DURING JURY SELECTION BECAUSE, IN MY OPINION, THERE WAS NOT A LOT THAT YOU COULD CONTRIBUTE TO THE QUESTIONS THAT WERE PUT TO THE POTENTIAL JURORS BY YOUR ATTORNEY. BUT THIS IS A VERY DIFFERENT PART OF THE PROCEEDINGS NOW.

THE DEFENDANT: I MEAN, SIR. I UNDERSTAND. I GOT TO GO THROUGH AND TRY WHENEVER I DO FEEL GOOD, LIKE, IN THE MORNING OR WHATEVER, I GOT TO GO THROUGH AND GET -- JUST TO GET SOMETHING, YOU KNOW, STUFF. THEY DON'T CONFER. I DON'T CONFER. I DON'T CARE. I AM READY TO PLEAD GUILTY AND SIGN THE DEATH WARRANT. I AM TIRED OF THIS, YOU KNOW WHAT I AM SAYING? IF I COULD SIGN THE DEATH WARRANT RIGHT NOW, GIVE ME DEATH. GET ME EXECUTED AS QUICK AS POSSIBLE. I WILL SIGN IT. I AM THROUGH WITH IT. I DON'T FEEL GOOD. EMOTIONALLY, I CAN'T TAKE THIS. I AM -- I CANNOT TAKE THIS STRESS.

THE COURT: SLOW DOWN JUST A LITTLE BIT, MR. BASHAM. I THOUGHT THE PROBLEM WAS YOU WERE DROWSY, YOU CAN'T STAY AWAKE?

THE DEFENDANT: I AM DROWSY.

THE COURT: NOW YOU SEEM TO SAY YOU ARE EMOTIONALLY UPSET AND CAN'T STAND THE PRESSURE. TO ME, THOSE ARE TWO ENTIRELY, DIFFERENT THINGS.

THE DEFENDANT: IN THE MORNING TIME, YOU KNOW WHAT I

AM SAYING, I AM ALL RIGHT? I WILL GO. I CAN TAKE IT. BUT I GET EXHAUSTED. I MEAN, IT WEARS ME DOWN. I AM NOT A NORMAL PERSON LIKE THIS. I DON'T KNOW HOW TO EXPLAIN IT. IT AIN'T THE MEDICATION I TAKE.

THE COURT: WAIT A MINUTE, MR. BASHAM. YOU ARE TALKING TOO FAST. THE COURT REPORTER CAN'T TAKE DOWN WHAT YOU SAY. WOULD YOU LIKE US TO BRING YOU A SOFT DRINK OR SOME COFFEE?

THE DEFENDANT: I WOULD LIKE TO GO DOWNSTAIRS OR GO BACK TO THE FACILITIES, PLEASE.

THE COURT: WHAT IS THE LAWYER'S POSITION ON TAKING MR. BASHAM DOWNSTAIRS?

MR. SWERLING: JUDGE, I OBVIOUSLY AM NOT IN FAVOR OF IT. I AM OPPOSED TO IT. I DO NOT BELIEVE I COULD RENDER EFFECTIVE ASSISTANCE OF COUNSEL IF MY CLIENT, NUMBER ONE, IS SLEEPING OR HE IS DOWNSTAIRS. I THINK THAT WITH THE WEIGHTY DECISIONS THAT HAVE TO BE MADE, AND THE IMPORTANCE OF THIS CASE, HE NEEDS TO STAY AWAKE, AND HE NEEDS TO STAY HERE.

THE DEFENDANT: IS THERE ANY WAY I CAN MAKE SOME KIND OF PLEA AGREEMENT WHERE I CAN GO AHEAD AND SIGN FOR THE DEATH WARRANT? GET ALL OF THIS OVER SO I DON'T HAVE TO COME BACK AND DO THIS?

THE COURT: MR. BASHAM, I PREFER YOU NOT GO INTO WHETHER YOU WANT TO PLEAD GUILTY IN OPEN COURT. IF YOU WANT TO PLEAD GUILTY, YOU CAN TAKE THAT UP WITH YOUR LAWYERS.

THE DEFENDANT: WHATEVER IT TAKES TO GET ME OFF.

MR. SWERLING: I AM GOING TO CALL DR. WATTS. SHE IS SOMETIMES THE ONLY ONE THAT CAN --

THE COURT: GO AHEAD, GET HER OVER HERE. MR. BASHAM, DID YOU SAY YOU WANTED SOMETHING TO DRINK?

THE DEFENDANT: I DON'T CARE.

THE COURT: WE CAN'T HEAR YOU.

THE DEFENDANT: I DON'T KNOW WHAT I WANT. I JUST WANT TO GO LAY DOWN, THAT IS ALL.

THE COURT: THAT IS NOT AN OPTION RIGHT NOW, MR. BASHAM. THE DOCTOR IS ON THE WAY TO TALK TO YOU WHEN SHE GETS HERE. LET'S GO AHEAD AND BRING THE JURY BACK AND RESUME. BRING IN THE JURY.

THE DEFENDANT: LEAVE ME ALONE, JACK, LIKE I SAID. ALL RIGHT. I DON'T FEEL GOOD. I AM SICK. I AM NOT TALKING TO YOU. MOVE AWAY. I AM SAYING, PLEASE, LEAVE ME ALONE.

THE COURT: MR. HARRIS, DID YOU WANT TO SAY SOMETHING BEFORE THE JURY COMES IN? HOLD UP THE JURY JUST ONE MOMENT, PLEASE.

MR. HARRIS: I UNDERSTAND THIS IS AN EXPENSIVE PROPOSITION. I RECOGNIZE THE GOVERNMENT HAS, AT LEAST, SEVEN MORE WITNESSES WAITING OUTSIDE. IT IS MY UNDERSTANDING THESE ARE WITNESSES FROM IN-STATE, NOT PEOPLE THEY HAD TO FLY IN HERE. I AM GENUINELY CONCERNED WITH MR. BASHAM, BASED ON WHAT I HAVE OBSERVED THE LAST HOUR OR TWO, TO REMAIN SLEEPING

IN THE COURTROOM DURING THE REST OF THE TESTIMONY THIS AFTERNOON. I DON'T KNOW WHY -- HOW MUCH MEDICATION. I DON'T KNOW IF IT IS SOMETHING THAT CAN BE CLEARED UP BY A DOCTOR, BUT WE WOULD ASK FOR A BREAK EARLY THIS WEEK. I DON'T WANT THIS JURY --

THE COURT: THE TROUBLE -- MY CONCERN OF THAT, I DON'T WANT TO SET A PRECEDENT TO LET MR. BASHAM RUN THE SCHEDULE OF THIS TRIAL. THIS CASE, AND I CAN SAY THIS ON THE RECORD, WE ARE UP INTO THE MILLIONS OF DOLLARS THAT THE UNITED STATES TAXPAYERS HAVE PAID TO ARRANGE THIS TRIAL IN AN ERA WHERE WE HAVE LAID OFF 21 PROBATION OFFICERS BECAUSE WE COULDN'T PAY THEIR SALARIES. I JUST GOT A MEMO THAT THEY WANT TO CLOSE THE COURTHOUSE IN AIKEN AND BEAUFORT BECAUSE THEY DON'T HAVE THE MONEY TO RUN IT. WITH THAT, I CAN'T ALLOW ONE CRIMINAL DEFENDANT TO TELL ME WHEN WE HOLD COURT FOR HIS CONVENIENCE. IF HE HAD A MEDICAL PROBLEM, THAT WOULD BE ONE THING. HE SEEMS TO BE UPSET, SLEEPY, OR BOTH. BUT I AM RELUCTANT TO SET A PRECEDENT.

IF I FELT THAT THIS WAS A UNIQUE EMERGENCY OR A ONE-TIME DEVELOPMENT, IT WOULD BE A LITTLE BIT DIFFERENT. WHAT IS THE GOVERNMENT'S POSITION? DO YOU WANT TO ADJOURN NOW?

MR. SCHOOLS: NO, SIR. WE HAVE WITNESSES HERE FROM OUT OF TOWN. I THINK THE COURT IS CORRECT THAT MR. BASHAM'S EFFORTS THIS AFTERNOON ARE SIMPLY TO GET WHAT HE WANTS, WHICH IS WHAT HE HAS DONE HIS ENTIRE LIFE. WE DON'T THINK THE COURT

OR ANYBODY ELSE SHOULD CAVE INTO THAT ANYMORE.  THAT HAS HAPPENED ENOUGH FOR THE PAST 23 YEARS.

THE COURT:  I AM SYMPATHETIC WITH THE DEFENSE ATTORNEYS.  YOU ARE DOING A SUBURB JOB UNDER ADVERSE CONDITIONS.  I CANNOT PERMIT THE REQUEST TO LEAVE EARLY TODAY.

MR. BASHAM,  YOU NEED TO STAY AWAKE.

PLEASE BRING IN THE JURY.

(WHEREUPON, THE FOLLOWING WAS HEARD IN THE PRESENCE OF THE TRIAL JURY.)

THE COURT:   PLEASE CONTINUE.

MR. SCHOOLS:  WE CALL BOB JOHNSON.

BOB JOHNSON, HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAM

BY MR. SCHOOLS:

Q.    YOU ARE BOB JOHNSON; IS THAT CORRECT?

A.    YES, SIR.

Q.    MR. JOHNSON,  WHERE DO YOU WORK?

A.    I WORK FOR CAROLINA TRUST FEDERAL CREDIT UNION.

Q.    WHERE IS THAT LOCATED?

A.    LOCATED IN MYRTLE BEACH,  SOUTH CAROLINA.

Q.    WHAT DO YOU DO THERE?

A.    CARD SERVICES MANAGER.

Q.    HOW LONG HAVE YOU BEEN IN THAT JOB?

EXHIBIT 309?

A. YES, SIR. IT IS THE SUMMARY I REVIEWED AND INITIALED SHOWING THE TRANSACTIONS THAT WE JUST DISCUSSED.

Q. IT IS KIND OF HARD TO SEE, BUT I BELIEVE THOSE ARE YOUR INITIALS DOWN THERE IN THE CORNER?

A. YES, SIR.

Q. DOES THAT SUMMARY ACCURATELY REFLECT THE TRANSACTIONS WE HAVE BEEN DISCUSSING DURING YOUR TESTIMONY?

A. YES, SIR, IT DOES.

Q. AND THE SUMMARY -- THE NET EFFECT OF THE TRANSACTIONS WE HAVE DISCUSSED IS THE TOTAL APPROVED TRANSACTIONS OVER THE COURSE OF THE PERIOD FROM ABOUT 3:27 ON NOVEMBER 14TH OF 2002, TO ABOUT 22 MINUTES AFTER MIDNIGHT ON NOVEMBER 15TH IS $1,030.15.

A. YES, SIR, I THINK THAT IS CORRECT. A THOUSAND DOLLARS WORTH OF CASH AND $30.15 WORTH OF GASOLINE.

MR. SCHOOLS: THANK YOU, MR. JOHNSON.

THE COURT: ANY CROSS-EXAMINATION?

MR. HARRIS: NO, SIR.

THE COURT: THANK YOU, SIR. YOU MAY STEP DOWN.

MEMBERS OF THE JURY, LET'S TAKE ANOTHER QUICK RECESS AND ASK YOU TO GO TO YOUR JURY ROOM FOR JUST A MOMENT, PLEASE.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: MR. BASHAM, YOU DON'T SEEM TO BE DOING

**17**

MUCH BETTER. YOU SEEM TO BE DOZING OFF AGAIN. TAKE A 10-MINUTE RECESS, LET YOU GO TO YOUR HOLDING CELL OUT THERE AND WALK AROUND, STRETCH A LITTLE BIT. MAYBE THAT WILL DO SOME GOOD. TAKE A 10-MINUTE RECESS;

(WHEREUPON, A SHORT RECESS WAS HELD.)

MR. SWERLING: YOUR HONOR, MAY WE APPROACH?

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD.)

MR. SWERLING: I'M SORRY ABOUT THIS. DR. WATTS HAS BEEN BACK THERE TALKING WITH HIM. SHE WANTS TO PUT SOMETHING ON THE RECORD FOR YOU, SO CAN WE TAKE TWO MORE MINUTES AND ASK THE GOVERNMENT TO LEAVE SO THIS IS EX PARTE.

THE COURT: LET ME JUST SAY, WHILE YOU ARE UP HERE, I WOULD APPRECIATE IT IF Y'ALL COULD STOP HIM FROM MAKING COMMENTS ABOUT WANTING TO PLEAD GUILTY AND GET THE DEATH PENALTY WHERE THE NEWS REPORTER CAN HEAR IT. IT IS NOT HELPING ANYONE.

MR. SWERLING: I AGREE. I HAVE NO CONTROL OVER HIM.

MR. GASSER: I OPPOSE THE EX PARTE REQUEST THE DEFENDANT HAS MADE. I DON'T KNOW HOW MUCH IS EX PARTE AND HOW MUCH ISN'T.

MR. SCHOOLS: SOME OF THE COMMENTS MAY NOT BE ADMISSIBLE. I DON'T KNOW WHAT DR. SCHWARTZ-WATTS WANTS TO PUT ON THE RECORD THAT WE ARE NOT ENTITLED TO. SHE WILL TESTIFY TO HIS MENTAL CONDITION. I AM NOT SURE THAT IS SUBJECT TO EX PARTE.

THROUGH FRIDAY AND HAVE A FULL WEEK. THE WEEK AFTER THAT ARE THE DAYS WE WILL BE SKIPPING SOME DAYS. WE ARE AHEAD OF WHERE WE THOUGHT WE WOULD BE, AT THIS POINT IN THE TRIAL.

ALL OF US ASSOCIATED IN THIS CASE HAVE BEEN IMPRESSED BY THE WAY YOU HAVE PAID CLOSE ATTENTION TO THE EVIDENCE, THUS FAR. WE APPRECIATE THAT AND LOOK FORWARD TO WORKING WITH YOU NEXT WEEK. HAVE A NICE WEEKEND, DON'T DISCUSS THE CASE. DON'T WATCH ANYTHING OR LISTEN TO ANYTHING IN THE NEWS MEDIA. SEE YOU BACK 9:00 O'CLOCK MONDAY.

(WHEREUPON, THE FOLLOWING WAS HEARD OUTSIDE THE PRESENCE OF THE TRIAL JURY.)

THE COURT: LET THE RECORD REFLECT, SINCE THE LAST BREAK, MR. BASHAM HAS BEEN DOING MUCH BETTER IN TERMS OF STAYING AWAKE AND STAYING ALERT. DO YOU AGREE?

MR. SWERLING: YES, SIR. HE HAS BEEN MUCH MORE -- I'M SORRY, I AM GETTING TIRED MYSELF. HE HAS BEEN MUCH MORE ALERT. HE HAS BEEN PARTICIPATING.

THE COURT: NOW, MR. BASHAM, DID YOU SAY YOU DO WANT TO PARTICIPATE AT SIDEBAR CONFERENCES OR DO NOT? YOU UNDERSTAND THE TESTIMONY WILL BE TYPED FOR YOU ON THE COMPUTER SCREEN IN FRONT OF YOU, YOU WILL BE ABLE TO SEE WHAT IS BEING SAID. YOU WON'T BE ABLE TO COMMUNICATE DIRECTLY WITH YOUR LAWYER WHILE HE IS UP HERE. YOU HAVE A RIGHT TO BE PRESENT. AND IF YOU WANT TO BE PRESENT, WHAT I WILL PROBABLY DO IS, INSTEAD OF HAVING A CONFERENCE UP HERE, JUST LET THE JURY GO

TO THE JURY ROOM AND TAKE IT UP HERE IN THE COURTROOM WHILE THE JURY IS OUT. THINK ABOUT IT OVER THE WEEKEND. WE WILL TALK ABOUT IT NEXT MONDAY.

MR. DUANE?

MR. DUANE: MAY MR. WOODWARD BE EXCUSED?

THE COURT: ALL RIGHT. YOU ARE EXCUSED, I'M SORRY. WE ARE AT RECESS UNTIL 9:00 O'CLOCK MONDAY.

*** END OF REQUESTED TRANSCRIPT ***

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CERTIFICATE OF REPORTER

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM MY STENOGRAPHIC NOTES IN THE ABOVE-ENTITLED MATTER.

_____     _____

S/DEBRA R. JERNIGAN, RPR, CRR            DATE

**20**

THE DEFENDANT:  YEAH, I WOULD LIKE TO.  IF I CAN READ IT RIGHT HERE, IT IS FINE.

THE COURT:  MR. BASHAM, DECIDE ONE WAY OR THE OTHER. MR. BASHAM, MY POINT -- LISTEN TO ME.  YOU HAVE A RIGHT TO BE PRESENT AT EVERY CRITICAL STAGE OF THE PROCEEDING AGAINST YOU.  IF THE JURY IS IN THE COURTROOM AND YOUR LAWYERS WANT A SIDEBAR, WE CAN'T HAVE A SIDEBAR.  I HAVE TO EXCUSE THE JURY. I WILL HAVE TO PARADE THE JURY OUT.  I DON'T MIND DOING IT, IF YOU WANT TO DO IT.

THE DEFENDANT:  NO.  THIS IS EXCELLENT.

THE COURT:  THE OTHER OPTION IS TO HAVE A SIDEBAR HEARING HERE AND WITH YOU BACK AT THE TABLE READING IT ON THE SCREEN JUST AS IT IS HAPPENING.  ARE YOU SATISFIED TO STAY THERE AT COUNSEL TABLE, READ THE SCREEN OF WHAT IS BEING SAID UP HERE AT SIDEBAR?

THE DEFENDANT:  YES, SIR.

THE COURT:  ARE YOU CERTAIN?

THE DEFENDANT:  YES, SIR.

THE COURT:  MR. SWERLING, YOU WANT TO TELL ME SOMETHING AT SIDEBAR?

MR. SCHOOLS:  THE JURY IS NOT HERE.  I DON'T KNOW WHY IT IS NECESSARY.

MR. SWERLING:  I HAVE THE LETTER.

THE COURT:  THE LETTER FROM THE DOCTOR?

MR. SWERLING:  SAYING NO CONTRAINDICATION.

MR. SWERLING: NO. BUT I WOULD LIKE TO MAKE A STATEMENT.

THE COURT: ALL RIGHT.

MR. SWERLING: NO QUESTIONS.

THE COURT: YES, SIR.

MR. SWERLING: JUDGE, THIS MORNING WHEN WE HAD THAT DISCUSSION ABOUT THE DIP AND I TOLD HIM THAT WE HAD GONE AND ASKED DR. WATTS TO WRITE THE LETTER THAT THE COURT TALKED ABOUT, AND HE SAID, WELL, CAN YOU DEAL WITH THAT BEFORE I COME BACK UP FOR THE LUNCH BREAK, AFTER THE LUNCH BREAK? I SAID, NO, BECAUSE ACTUALLY IT IS GOING TO HAVE TO BE DEALT WITH IN COURT. AND SO HE WAS, AT THAT POINT, THE SITUATION WAS THAT HE WANTED TO STAY DOWNSTAIRS. HE WANTED TO KNOW BEFORE HE CAME UP TO COURT WHETHER THAT WAS GOING TO BE THE CASE OR NOT, HE WAS GOING TO BE ALLOWED TO HAVE IT AFTER YOU SAW THE LETTER. AND HE STARTED GETTING ANXIOUS. AND HE CAME UPSTAIRS AND, OF COURSE, YOU SAW WHAT HAPPENED WHILE HE WAS SITTING HERE. THAT IS ONE OF THE REASONS WHY I REQUESTED THE COURT ALLOW HIM TO LEAVE THE COURTROOM BECAUSE I COULD SEE WHAT WAS DEVELOPING. HE DOESN'T PROCESS THAT. THAT IS -- I THINK THAT IS WHAT DR. WATTS IS TRYING TO TALK ABOUT. HE DOESN'T PROCESS THAT SORT OF INFORMATION AFTER HE WAS TOLD HE COULD HAVE IT, NOW HE CAN'T HAVE IT. SO, THAT IS WHAT HAPPENED.

BUT THAT WHOLE DISCUSSION HE HAD ON THE WAY UP HERE WAS

BASED UPON MY DISCUSSION WITH HIM BEFORE LUNCH THAT WE COULD NOT TAKE IT UP UNTIL YOU SAW THE LETTER AFTER LUNCH IN OPEN COURT.

THE COURT: DOES EITHER SIDE WANT TO QUESTION THE OTHER TWO CONTRACT DEPUTIES WHO MIGHT HAVE HEARD A SIMILAR STATEMENT FROM THE DEFENDANT?

MR. SCHOOLS: NOT AT THIS TIME, YOUR HONOR.

MR. SWERLING: NO, SIR. I HAVE NO REASON.

THE COURT: ALL RIGHT. WE GOT TO LET THE JURY GO ONE WAY OR THE OTHER. I REALLY WOULD LIKE TO RUN THEM IN, IF WE COULD, AND LET MS. WARREN GET A LOOK AT THE JUROR WHO ALLEGEDLY MADE THE STATEMENT TO HOPEFULLY TAKE CARE OF THAT.

THE COURT: THANK YOU, DR. WATTS.

DR. SCHWARTZ-WATTS: WHAT TIME WOULD YOU LIKE ME IN THE MORNING?

THE COURT: WE WOULD LIKE TO RESUME AT 9:00 O'CLOCK. CAN YOU BE HERE BEFORE?

MR. SWERLING: JUDGE, I SPECIFICALLY TALKED WITH HIM ABOUT THE ISSUE CONCERNING THE JUROR AND THE FACT THAT MS. WARREN WAS HERE, HE SAID WE CAN PROCEED IN HIS ABSENCE AS TO THAT ISSUE. SO, I GOT A WAIVER AS TO THAT ISSUE SO WE WOULD NOT INCONVENIENCE THE WITNESS.

THE COURT: IF ALL I DO IS BRING THE JURY IN, HAVE THEM SEATED, TELL THEM WE HAVE TO ADJOURN AND COME BACK TOMORROW, I DON'T THINK THERE WOULD BE ANY STIGMA ATTACHED TO

**23**

MR. SWERLING: NO, YOUR HONOR.

THE COURT: WHAT IS NEXT?

MR. SCHOOLS: THAT IS ALL WE HAD OF A TECHNICAL NATURE.

THE COURT: ANYTHING FROM THE DEFENDANT OF A TECHNICAL NATURE BEFORE WE GET TO THESE FOUR FAIRLY SIGNIFICANT ISSUES?

MR. SWERLING: JUDGE, PAGE 11, IDENTIFICATION CHARGE. WE NEVER MADE AN ISSUE. WE STIPULATED TO THAT.

THE COURT: I HAD A BIG QUESTION MARK BY THAT. YOU WANT TO GO AHEAD AND DELETE THE WHOLE PAGE?

MR. SWERLING: THAT'S FINE, YES, SIR.

THE COURT: ALL RIGHT. DELETE ALL OF PAGE 11. WHAT ABOUT THE SIMILAR ACTS PAGE, DID YOU SEE MY NOTE THERE? A LOT OF TIMES THE DEFENDANT DOES NOT WANT A SIMILAR ACTS CHARGE. IT IS SUPPOSED TO BE A CAUTIONARY INSTRUCTION IN FAVOR OF THE DEFENDANT.

MR. SWERLING: JUDGE, WE DO NOT WANT THE CHARGE; HOWEVER, IF YOU ARE GOING TO GIVE THE CHARGE, WE WOULD ASK THE COURT TO CONSIDER -- LET THE RECORD REFLECT WE OBJECT TO THE CHARGE. BUT IF YOU ARE GOING TO GIVE THE CHARGE AT THE GOVERNMENT'S REQUEST, I ASK THAT YOU PUT IN WHERE IT SAYS, YOU MAY ALSO CONSIDER SUCH EVIDENCE TO PROVE, WE WOULD LIKE YOU TO PUT IN THERE INSERT, OR DISPROVE. I THINK IT COULD BE USED EITHER WAY.

THE COURT: TO PROVE OR DISPROVE THE DEFENDANT'S STATE OF MIND?

MR. SWERLING: RIGHT.

THE COURT: LET'S TALK ABOUT, FIRST, WHETHER IT NEEDS TO BE GIVEN AT ALL. DOES THE GOVERNMENT WANT IT TAKEN OUT?

MR. SCHOOLS: YES, SIR. WE THINK THE LAW IS CLEAR THE OTHER ACTS EVIDENCE ENTITLE THE GOVERNMENT TO ASK THE JURY TO MAKE CERTAIN INFERENCES FROM IT. AND THE JURY HAS NO IDEA, NO WAY TO KNOW THAT UNLESS THE COURT TELLS THEM.

THE COURT: ALL RIGHT. THE GOVERNMENT HANDED UP AN ALTERNATE VERSION OF SIMILAR ACTS CHARGED. MY LAW CLERK AND I KIND OF EDITED MY VERSION OF IT THIS MORNING. THE GOVERNMENT INCLUDED ALL OF THE 404(B) ELEMENTS OF MOTIVE, OPPORTUNITY, IDENTITY, AND ABSENCE OF MISTAKE. I AM NOT SURE THOSE FOUR REALLY ARE THE ISSUE HERE. WHAT WE ARE REALLY TALKING ABOUT IS INTENT, PREPARATION, PLAN, OR KNOWLEDGE, RIGHT? I THINK WE CAN DELETE SOME OF THOSE 404(B)-TYPE ELEMENTS. IN OTHER WORDS, MOTIVE.

MR. SCHOOLS: IDENTITY IS CONCEDED. WE CAN CERTAINLY DELETE THAT ONE.

THE COURT: RIGHT. LEAVE OUT IDENTITY. MISTAKE OR ACCIDENT, THE DEFENDANT DOESN'T CONTEND THIS WAS A MISTAKE OR ACCIDENT, DOES HE?

MR. SWERLING: WE HAVE NOT TAKEN THAT POSITION AT

ALL.

THE COURT: I MEAN, IT CERTAINLY WON'T BE ANY HARM DONE TO LEAVE ALL OF THOSE IN. IT IS SOMEWHAT CONFUSING TO THE JURY SOMETIMES. MOTIVE. I GUESS YOU COULD ARGUE THAT THE MOTIVE TO SEXUALLY ASSAULT SOMEONE OR ATTAIN SEXUAL GRATIFICATION WOULD BE MOTIVE FOR THE SECOND KIDNAPPING IF IT WAS PART OF THE FIRST KIDNAPPING. SO, MAYBE MOTIVE OUGHT TO STAY IN THERE.

MR. SCHOOLS: ALSO, FINANCIAL MOTIVE. THAT IS CONSISTENT WITH THE BURNS'S MATTER AND DONOVAN MATTER. THEY ATTEMPTED TO USE MS. BURNS'S ATM TO OBTAIN MONEY FROM HER BANK ACCOUNT WITH THE SAME WITH RESPECT TO MS. DONOVAN.

THE COURT: SO, YOU THINK MOTIVE NEEDS TO STAY, INTENT, PREPARATION, PLAN, OR KNOWLEDGE. THAT WOULD LEAVE OUT OPPORTUNITY, IDENTITY, AND ABSENCE OR MISTAKE; IS THAT SATISFACTORY?

MR. SCHOOLS: YES, SIR.

THE COURT: MR. SWERLING, HOW ABOUT TAKING OUT THOSE THAT AREN'T REALLY AN ISSUE? LET ME READ IT HOW IT WOULD GO IF WE DID IT AS I PROPOSED. IN LINE TWO AND THREE ON THE PAGE, PAGE 12, WE TOOK: AT A TIME OTHER THAN THE TIME CHARGED IN THE INDICTMENT, BECAUSE WE REALLY ARE TALKING ABOUT THINGS THAT OCCURRED RIGHT ABOUT THE TIME OF THE INDICTMENT. SO, IT WOULD READ AS FOLLOWS: DURING THE COURSE OF THE TRIAL, YOU HEARD EVIDENCE THAT THE DEFENDANT COMMITTED ACTS

SIMILAR TO THE ACTS CHARGED HERE. YOU MAY CONSIDER SUCH EVIDENCE, NOT TO PROVE THAT THE DEFENDANT DID THE ACTS CHARGED IN THIS CASE, BUT ONLY TO PROVE OR DISPROVE THE DEFENDANT'S MOTIVE, INTENT, PREPARATION, PLAN, OR KNOWLEDGE; THEREFORE, IF YOU FIND THE GOVERNMENT HAS PROVED, BEYOND A REASONABLE DOUBT, THAT THE DEFENDANT DID, IN FACT, COMMIT THE ACTS CHARGED IN THE INDICTMENT, AND THAT THE DEFENDANT ALSO COMMITTED SIMILAR ACTS AT OTHER TIMES, THEN YOU MAY CONSIDER THOSE OTHER SIMILAR ACTS AS THEY MIGHT RELATE TO MOTIVE, INTENT, PREPARATION, PLAN, OR KNOWLEDGE.

NOW, THAT IS WHAT I WOULD PROPOSE TO TELL THE JURY. ANY OBJECTION BY THE GOVERNMENT?

MR. SCHOOLS: YOUR HONOR, IT IS OUR POSITION THAT THAT FIRST SENTENCE OF THE SECOND PARAGRAPH, IF YOU FIND THAT THE GOVERNMENT HAS PROVED, BEYOND A REASONABLE DOUBT, THAT THE DEFENDANT, IN FACT, COMMITTED THE ACTS CHARGED IN THE INDICTMENT, CREATES A LOT OF CONFUSION BECAUSE IT IS ALMOST SAYING THAT YOU HAVE TO FIND THE DEFENDANT GUILTY OF THE CRIMES BEFORE YOU CAN EVEN CONSIDER THIS EVIDENCE. AND I DON'T KNOW HOW THE JURY RECONCILES THAT IN THEIR HEAD. AND I DON'T THINK THAT IS REALLY WHAT THE LAW REQUIRES.

THE COURT: THAT IS FROM A PATTERN CHARGE BOOK. WHAT I STARTED FROM WAS BOILERPLATE STOCK CHARGE FROM A PATTERN BOOK. IN OTHER WORDS, BEFORE THEY CAN -- I GUESS IT SAYS YOU GOT TO FIND THE DEFENDANT COMMITTED THE ACT FIRST

BEFORE YOU EVEN QUESTION THE INTENT FACTOR. THAT IS WHAT IT IS SAYING, I THINK. I UNDERSTAND YOUR CONCERN. IT SEEMS TO SAY, WELL, THE GOVERNMENT HAS TO PROVE HIS GUILT BEFORE YOU CAN CONSIDER THAT EVIDENCE.

MR. SCHOOLS: AT WHICH POINT THEY ARE NOT RELEVANT. WHICH IS, IN OUR PROPOSED CHARGE, WE JUST ESSENTIALLY REMOVED THAT SENTENCE. AND I DON'T THINK THE CHARGES WE PROPOSED ARE AN INACCURATE STATEMENT OF THE LAW. IT IS, FROM THE GOVERNMENT'S PERSPECTIVE, DOESN'T CREATE THAT CONFUSION THAT THAT PATTERN CHARGE CREATES.

THE COURT: WELL, I THINK THE SENTENCE THAT YOU OBJECT TO IS DESIGNED TO KEEP THE JUROR FROM JUST LUMPING IT ALTOGETHER TO SAY WELL, HE IS A BAD PERSON, HE DID A LOT OF BAD THINGS, LET'S FIND HIM GUILTY.

MR. SCHOOLS: I UNDERSTAND. THIS IS ALSO A 404(B) CHARGE. AND THE EVIDENCE WAS ADMITTED, AMONG OTHER REASONS, BECAUSE IT WAS INTRINSIC.

THE COURT: LET'S TALK ABOUT INTRINSIC. IN WHAT YOU HANDED UP, YOU WANTED THE SENTENCE TO BE ADDED THAT SAYS, THIS EVIDENCE IS ADMISSIBLE TO COMPLETE THE STORY OF THE CRIME BY PROVIDING THE IMMEDIATE CONTEXT OF THE EVENTS IN TIME AND PLACE. THAT IS BASICALLY SAYING IT IS INTRINSIC.

MR. SCHOOLS: YES, SIR.

THE COURT: THE JURY WOULDN'T UNDERSTAND WHAT THE WORD INTRINSIC MEANS. IT SEEMS TO ME, WHETHER SOMETHING IS

INTRINSIC OR NOT IS AN EVIDENTIARY ISSUE, NOT SOMETHING THAT

NEEDS TO BE EXPLAINED TO THE JURY WHY I LET IT IN.

MR. SCHOOLS: WE ARE SORT OF IN THE  -- I DON'T

NECESSARILY DISAGREE, JUDGE.  THE ONE THING I AM CONCERNED

ABOUT IS BY CHARGING 404(B) LANGUAGE WHEN THE EVIDENCE DIDN'T

COME IN SOLELY FOR THAT PURPOSE,  IT LIMITS US ON HOW WE ARGUE

IT TO THE JURY.  AND SO,  PERHAPS WE COULD CURE THAT BY

SAYING THAT THE EVIDENCE COMES IN, AMONG OTHER REASONS, TO

SHOW, TO PROVE THESE INTENT FACTORS OR THE DEFENDANT'S STATE

OF MIND,  IN ESSENCE.

THE COURT:  WHAT IS THE DEFENDANT'S POSITION?

MR. SWERLING:  I DON'T LIKE, AMONG OTHER REASONS, THE

CHARGE.  IT DEFIES THE DEFINITION.  IT CAUSES THEM TO

SPECULATE.  I MEAN,  I WAS SPECIFICALLY GOING TO AND DO

OBJECT THAT "THIS EVIDENCE IS ADMISSIBLE," THAT SENTENCE IN

YOUR PROPOSED CHARGE.  I DON'T THINK THAT IS 404(B) EVIDENCE.

I THINK IT IS VERY CONFUSING AS TO WHAT THAT MEANS TO JUST

LEAVE IT IN THERE.  I UNDERSTAND IT IS NOT TRYING TO DEFINE

404,  BUT I THINK IT IS VERY CONFUSING AND MISLEADING TO THE

JURY TO SAY, COMPLETE THE STORY OF THE CRIME.  I THINK THAT

IS ALSO VERY PREJUDICIAL,  SOUNDS VERY PREJUDICIAL TO ME,

COMPLETE THE STORY OF THE CRIME.

THE COURT:  I THINK I HAVE HEARD FROM COUNSEL FULLY

ON THIS.  I WILL LEAVE PAGE 12, SIMILAR ACTS, AS I READ IT A

FEW MOMENTS AGO, WHICH MEANS I WILL NOT GIVE THE SENTENCE THE

DEFENDANT OBJECTS TO THAT BEGINS, THIS EVIDENCE IS ADMISSIBLE TO COMPLETE THE STORY. I AM NOT GOING TO SAY THAT. I AM GOING TO LEAVE IN LINES 8, 9, AND 10 ON PAGE 12 THAT THE GOVERNMENT OBJECTS TO. I AM GOING TO DELETE THE SENTENCES THAT TALK ABOUT ACCIDENT OR MISTAKE AND INSTEAD INSERT THE NOTIONS OF MOTIVE, INTENT, PREPARATION, PLAN, OR KNOWLEDGE. TO ME, THOSE ARE THE 404(B) ELEMENTS THAT THIS EVIDENCE REALLY RELATES TO. I DON'T THINK IT RELATES TO LACK OF -- EXCUSE ME, ABSENCE OF MISTAKE OR ACCIDENT. I DON'T THINK IT RELATES TO OPPORTUNITY OR IDENTITY. LET'S THINK ABOUT OPPORTUNITY. I GUESS MAYBE, ARGUABLY, OPPORTUNITY MIGHT COME INTO PLAY, AS WELL.

MR. SWERLING: JUDGE, I THINK THE MAIN ISSUE IS THE INTENT FACTOR. I MEAN, I DON'T KNOW THAT THE OTHERS REALLY APPLY. BECAUSE BOTH OF THE CRIMES, THE CARJACKING AND KIDNAPPING --

THE COURT: THE ABDUCTIONS WERE SO SIMILAR. FACTUALLY, THE ABDUCTIONS WERE SO SIMILAR, IT GOES TO PREPARATION, PLAN, INTENT, BOTH WOMEN, WHO COULD HAVE BEEN SEXUALLY ASSAULTED BEFORE BEING KILLED. I THINK I DEFINITELY NEED TO SAY MOTIVE, INTENT, PREPARATION, PLAN, OR KNOWLEDGE. THE ONLY QUESTION MARK I HAVE, IN MY MIND, IS WHETHER I SHOULD PLACE OPPORTUNITY IN THERE AS WELL. WHAT IS THE GOVERNMENT'S POSITION ON OPPORTUNITY?

MR. SCHOOLS: WE DON'T NEED IT.

THE COURT:   MR. SWERLING, DO YOU WANT IT IN THERE?

MR. SWERLING:  NO, SIR.

THE COURT:   THEN I WILL LEAVE IT AS I JUST READ IT A MOMENT AGO.  AND LET ME SAY,  I THINK ONCE WE CLEAN THIS UP TODAY AND GET IT IN FINAL FORM,  WE WILL SEND IT TO YOU, I GUESS, BY E-MAIL.  WE TRIED THAT LAST TIME, HAD A TECHNICAL GLITCH, THE LAWYERS GOT AN EARLIER VERSION,  WE WILL TRY TO GET IT RIGHT THIS TIME.   IF YOU CAN GIVE US YOUR E-MAIL ADDRESS BEFORE YOU LEAVE TODAY, WE WILL GET IT TO YOU SOME TIME TODAY.   UNLESS YOU WOULD RATHER SEND A RUNNER OVER TO PICK UP A HARD COPY.

MR. SWERLING:  THAT IS FINE.   E-MAIL IS FINE.

THE COURT:   BEFORE WHAT HAPPENED, WE WERE IN HERE SUNDAY AFTERNOON WORKING ON IT,  THUNDERSTORM,  THE SECRETARY WAS BACKING IT UP SO SHE WOULDN'T LOSE IT.   WHEN SHE E-MAILED IT, IT SENT THE BACKED-UP VERSION INSTEAD OF THE CURRENT VERSION.

MR. SWERLING:  BEFORE YOU LEAVE SIMILAR ACTS,  THE SECOND PARAGRAPH, WILL YOU ALSO PUT IN THERE, LANGUAGE DOWN THERE WHERE IT SAYS, YOU MAY CONSIDER OTHER SIMILAR ACTS IN DECIDING WHETHER OR NOT THE DEFENDANT COMMITTED THE ACTS TO BE CONSISTENT WITH WHAT WE ASKED FOR IN THE FIRST PARAGRAPH?

THE COURT:   WELL,  I HAD CHANGED IT.   I HAD SAID YOU MAY CONSIDER THOSE OTHER SIMILAR ACTS AS THEY MIGHT RELATE TO MOTIVE,  INTENT,  PREPARATION,  PLAN, OR KNOWLEDGE.   SO, I

KIND OF EDITED THAT SENTENCE A LITTLE BIT. PROVE OR DISPROVE, THE TWO OPPOSITES, BUT RELATE TO IS KIND OF BROAD ENOUGH TO COVER BOTH, I THINK. I WILL SAY PROVE OR DISPROVE UP IN THE FIRST PARAGRAPH. THE DEFENDANT DOESN'T HAVE TO DISPROVE ANYTHING, DOES HE?

MR. SWERLING: IT IS NOT A QUESTION OF -- WE DON'T LOOK AT IT AS -- FIRST OF ALL, WE OBJECT TO THE CHARGE. WE DON'T LOOK AT IT THE BURDEN IS ON THE DEFENDANT TO DISPROVE ANYTHING. IF THERE IS -- IF THERE ARE SOME SIMILAR ACTS WE BELIEVE ARE FAVORABLE TO US, WHICH DISPROVE INTENT OR MOTIVE --

THE COURT: YOU WANT -- ARE YOU OKAY WITH DISPROVE IN THERE? IS THE GOVERNMENT SATISFIED IT IS NOT ERROR TO PUT THE WORD DISPROVE IN THERE?

MR. SCHOOLS: YOUR HONOR, YOU MIGHT NEUTRALIZE THE SAME WAY YOU DID THE SECOND PARAGRAPH. SAY ONLY AS IT RELATES TO THE DEFENDANT'S STATE OF MIND OR HOWEVER THAT SENTENCE.

THE COURT: WHAT ABOUT IT, MR. SWERLING? YOU WANT THE WORD DISPROVE IN THERE?

MR. SWERLING: YES, SIR. WE WILL MAKE A DECISION TO GO AHEAD WITH THAT.

THE COURT: I WILL LEAVE PROVE OR DISPROVE IN THERE IN THE FIRST PARAGRAPH.

WHAT IS NEXT FROM THE DEFENDANT BEFORE WE GET TO THE FOUR

MAJOR AREAS, ANYTHING ELSE?

MR. SWERLING: JUDGE, I THINK EVERYTHING ELSE WE HAVE REALLY FALLS INTO ONE OF THOSE OTHER CATEGORIES.

THE COURT: ALL RIGHT. WE JUST TOOK UP 404(B), WHICH WAS ONE OF THE FOUR. LET'S TALK ABOUT AIDING AND ABETTING. THAT IS OVER THERE RIGHT IN FRONT OF COUNT 4, WHICH IS ON PAGE 45. WHAT IS THE GOVERNMENT'S POSITION WITH PAGE 45 AS IT PRESENTLY EXISTS?

MR. SCHOOLS: WE HAVE NO OBJECTION TO IT.

THE COURT: WHAT ABOUT IT FROM THE DEFENDANT?

MR. SWERLING: JUDGE, WE DO HAVE A CONCERN THE WAY IT EXISTS. WE SUBMITTED A PROPOSED CHARGE WHICH PARROTS LANGUAGE, PRETTY MUCH FOLLOWS LANGUAGE OF A SEVENTH CIRCUIT CASE. MY CONCERN IS, AND MR. HARRIS'S CONCERN IS, IT IS REALLY NOT MADE CLEAR TO THE JURY THAT THE AIDING AND ABETTING MUST BE AS TO THE ULTIMATE ACT COMMITTED HERE. IT SUGGESTS HERE THAT IF HE JUST MERELY PARTICIPATED IN THE KIDNAPPING, BUT DID NOT HAVE ANY -- DID NOT AID AND ABET IN THE DEATH BEING RESULTING FROM THE KIDNAPPING OR THE DEATH RESULTING FROM THE CARJACKING, STILL RESPONSIBLE FOR IT. IT SUGGESTS THE LAW DOESN'T GO THAT FAR. JUST BECAUSE YOU PARTICIPATED IN ONE POINT OF THE VENTURE, WE THINK THE VENTURE OUGHT TO BE AS TO THE ULTIMATE ACT. SO, THAT IS THE LANGUAGE WE WOULD USE OUT OF THAT CASE.

THE COURT: ALL RIGHT.

EXPERIENCE IN THAT TECHNICAL FIELD, ONE WHO IS CALLED AN EXPERT WITNESS, IS PERMITTED TO STATE HIS OR HER OPINION CONCERNING THOSE TECHNICAL MATTERS.

MERELY BECAUSE AN EXPERT WITNESS HAS EXPRESSED AN OPINION, HOWEVER, DOES NOT MEAN THAT YOU MUST ACCEPT THAT OPINION. THE SAME AS WITH ANY OTHER WITNESS, IT IS UP TO YOU TO DECIDE WHETHER TO RELY UPON IT.

EVIDENCE HAS BEEN RECEIVED CONCERNING STATEMENTS SAID TO HAVE BEEN MADE BY THE DEFENDANT. IT IS FOR YOU TO DETERMINE WHETHER THE DEFENDANT, IN FACT, MADE ANY STATEMENTS. IF YOU FIND THAT THE DEFENDANT DID MAKE A STATEMENT, YOU MUST DETERMINE WHAT WEIGHT, IF ANY, YOU FEEL THE STATEMENT DESERVES. IN DETERMINING WHAT WEIGHT, IF ANY, SHOULD BE GIVEN A STATEMENT, YOU SHOULD CONSIDER ALL MATTERS IN EVIDENCE HAVING TO DO WITH THE STATEMENT, INCLUDING THOSE CONCERNING THE DEFENDANT'S PERSONAL CHARACTERISTICS AND THE CONDITIONS UNDER WHICH THE STATEMENT WAS MADE.

DURING THE COURSE OF THE TRIAL, YOU HEARD EVIDENCE THAT THE DEFENDANT COMMITTED ACTS SIMILAR TO THE ACTS CHARGED HERE. YOU MAY CONSIDER SUCH EVIDENCE, NOT TO PROVE THAT THE DEFENDANT DID THE ACTS CHARGED IN THIS CASE, BUT ONLY TO PROVE OR DISPROVE MOTIVE, INTENT, PREPARATION, PLAN, OR KNOWLEDGE.

THEREFORE, IF YOU FIND THAT THE GOVERNMENT HAS PROVED BEYOND A REASONABLE DOUBT THAT THE DEFENDANT DID, IN FACT,

COMMIT THE ACTS CHARGED IN THE INDICTMENT; AND THAT THE DEFENDANT ALSO COMMITTED SIMILAR ACTS AT OTHER TIMES, THEN YOU MAY CONSIDER THOSE OTHER SIMILAR ACTS AS THEY MIGHT RELATE TO MOTIVE, INTENT, PREPARATION, PLAN, OR KNOWLEDGE.

QUESTIONS MIGHT BE RAISED ABOUT THE GOVERNMENT'S FAILURE TO USE OR ITS DECISION NOT TO EMPLOY CERTAIN INVESTIGATIVE TECHNIQUES. YOU MAY CONSIDER THESE FACTS IN DECIDING WHETHER THE GOVERNMENT HAS MET ITS BURDEN OF PROOF, BECAUSE YOU SHOULD LOOK TO ALL OF THE EVIDENCE OR LACK OF EVIDENCE IN DECIDING WHETHER THE DEFENDANT IS GUILTY.

HOWEVER, I ALSO INSTRUCT YOU THAT THERE IS NO LEGAL REQUIREMENT THAT THE GOVERNMENT USE ANY SPECIFIC INVESTIGATIVE TECHNIQUE TO PROVE ITS CASE; THEREFORE, THE GOVERNMENT IS NOT REQUIRED TO PRESENT SUCH EVIDENCE FOR YOU TO FIND THE DEFENDANT GUILTY. YOUR CONCERN IS WHETHER THE EVIDENCE, WHICH WAS ADMITTED, PROVES THE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT.

AS I TOLD YOU DURING THE JURY SELECTION PROCESS, THERE IS ANOTHER DEFENDANT CHARGED IN THIS MATTER ALONG WITH BRANDON BASHAM. THAT OTHER DEFENDANT IS CHADRICK EVAN FULKS. THE CHARGES AGAINST CHADRICK EVAN FULKS ARE NOT BEFORE YOU. THE CHARGES AGAINST MR. FULKS ARE BEING HANDLED SEPARATELY AND INDEPENDENTLY OF THIS CASE. YOU SHOULD NOT SPECULATE AS TO WHAT MAY HAVE HAPPENED, OR WHAT MAY BE HAPPENING TO THE CASE INVOLVING MR. FULKS. THE ONLY PERSON ON TRIAL IN THE CASE

THE COURT:  BRING IN THE JURY.

(WHEREUPON, A BENCH CONFERENCE WAS HELD ON THE RECORD IN THE PRESENCE OF THE TRIAL JURY, BUT OUTSIDE THE HEARING OF THE TRIAL JURY.)

MR. SWERLING:  MR. BASHAM ASKED THAT I ASK THE COURT WHETHER OR NOT HIS FAMILY COULD VISIT HIM HERE IN THE COURTHOUSE DOWNSTAIRS.  WE HAVE TALKED AND THE MARSHAL HAS AN OBJECTION TO IT.  BUT I DID WANT TO MAKE THE REQUEST.

THE COURT:  THE MARSHAL HAS AN OBJECTION?

MR. SWERLING:  I THOUGHT IT COULD BE DONE AT THE BENCH INSTEAD OF OPEN COURT.  MR. BASHAM, OF COURSE, IS READING THE TRANSCRIPT.  I DID WANT TO MAKE THE TRANSCRIPT.

COURT OFFICER:  WE SAW THAT MR. BASHAM'S FAMILY CAME IN EARLY THIS WEEK ON MONDAY.  WE ARE AWARE AND HE IS AWARE THERE IS A PROCESS AT RICHLAND COUNTY WHERE, WITH A 24-HOUR NOTICE, THEY CAN VISIT AN OUT-OF-TOWN FAMILY MEMBER.  HE WAS TOLD MONDAY TO GO AHEAD AND START ARRANGING THIS.  AGAIN, IT WAS ADDRESSED YESTERDAY.  WE SAID, YOU NEED TO GO AHEAD AND DO THAT PROCESS OUT AT RICHLAND COUNTY SO YOU CAN VISIT.

THE COURT:  THAT WASN'T DONE?

COURT OFFICER:  I OVERHEARD HIM TALKING TO JACK ABOUT TRYING TO REQUEST THIS PHYSICALLY.  I THINK WE ARE --

MR. SWERLING:  I AM READY TO CALL THE JAIL TONIGHT.

THE COURT:  I WOULD RATHER NOT PUT THE BURDEN ON THE MARSHAL.  TELL THE JAILER I HAVE ASKED YOU TO CALL THEM.  IF

THEY CAN, MAKE SOME ACCOMMODATIONS SINCE HIS FAMILY HAS BEEN IN TOWN ALL WEEK TO LET HIM SEE HIS FAMILY OVER THE WEEKEND.

MR. SCHOOLS: WILL HIS FAMILY BE HERE ALL WEEKEND?

(WHEREUPON, THE BENCH CONFERENCE WAS CONCLUDED AND THE FOLLOWING WAS HEARD IN OPEN COURT.)

THE COURT: PLEASE CONTINUE.

BY MR. SWERLING:

Q. MS. TITZER, LET ME ASK YOU THIS. WITH RESPECT TO SOCIAL HISTORY, WAS THERE EVIDENCE IN THE SOCIAL HISTORY ABOUT MR. BASHAM HAVING BEEN ABUSED IN THE PAST, SEXUALLY ABUSED?

A. YES.

Q. THAT WAS PART OF HIS HISTORY?

A. YES, PRIOR TO COMING TO CHARTER, YES.

Q. WHEN YOU STARTED THIS ONE-ON-ONE WITH BRANDON, DID YOU LEARN FROM HIM CERTAIN THINGS?

A. YES.

Q. COULD YOU RELATE THOSE TO THE JURY ABOUT SOME OF HIS PERCEPTIONS?

A. YES. THE FIRST TIME WHEN BRANDON WAS ADMITTED ON THE 28TH, IT WAS ON FEBRUARY 7TH, SO IT WAS MAYBE LESS THAN TEN DAYS. A NEW PATIENT HAD COME ONTO THE UNIT AND HAD -- BRANDON HAD REPORTED TO THE TEACHER ON FEBRUARY 7TH THAT THE PATIENT HAD ASKED HIM FOR ORAL SEX THE NIGHT BEFORE. AND, AT THAT POINT, THAT NEXT DAY, THE TEACHER BROUGHT IT TO ME AS

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2014, I electronically filed the foregoing document with the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that the following counsel of record for defendant–appellant will be served by the CM/ECF system:

Michael Burke
Sarah Stone

s/ Thomas E. Booth
THOMAS E. BOOTH
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-5201
Thomas.Booth@usdoj.gov
