# No. 13-9

## In the United States Court of Appeals for the Fourth Circuit

_____

UNITED STATES OF AMERICA,
                        Appellee

v.

BRANDON L. BASHAM,
                        Appellant

_____

On Appeal from the United States District Court
for the District of South Carolina

_____

CAPITAL CASE

BRIEF FOR THE UNITED STATES

_____

WILLIAM N. NETTLES
United States Attorney

ROBERT F. DALEY, JR.
Assistant U.S. Attorney
District of South Carolina

LESLIE R. CALDWELL
Assistant Attorney General

SUNG-HEE SUH
Deputy Assistant Attorney
General

THOMAS E. BOOTH
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Suite 1511
Washington, DC 20530
(202) 514-5201
Thomas.Booth@usdoj.gov

TABLE OF CONTENTS

JURISDICTION.................................................1

STATEMENT OF THE ISSUES......................................2

STATEMENT OF THE CASE........................................2

   1. Procedural History. ...................................2

   2. Statement of Facts ...................................3

      a. The Offense Conduct ..............................3

      b. The Proceedings Below ............................5

      1. Pretrial and Trial Proceedings ....................5

      2. Direct Appeal ....................................8

      3. Collateral Attack ................................9

      c. Rulings under Review .............................9

SUMMARY OF ARGUMENT..........................................9

ARGUMENT....................................................11

   1 BASHAM WAS MENTALLY COMPETENT TO STAND TRIAL .............11

      A. Standard of Review ................................12

      B. Factual Background ................................13
         1. Pretrial Events ................................13
         2. Trial Events ...................................15
            a. September 20, 2004............................15
            b. October 22, 2004.............................20
            c. October 26, 2004.............................21
            d. Sentencing...................................23

      C. The Section 2255 Hearing ..........................24

      D. The District Court's Rulings ......................24

      E. Legal Principles ..................................26

F. Discussion.................................................27
   1. September 20, 2004 ....................................28
   2. October 26, 2004 .....................................31

2 BASHAM'S ATTORNEYS RENDERED EFFECTIVE ASSISTANCE
  OF COUNSEL ...............................................33

  A. Standard of Review ....................................34

  B. Legal Principles ......................................34

  C. Discussion ...........................................37

     1. Counsel Effectively Litigated Competency Matters ...38
      a. Courtroom Outburst Evidence.....................38
      b. Competency on October 26, 2004.................39

     2. Counsel Effectively Litigated the Burns Evidence ...41
      a. The Trial Evidence and Direct Appeal...........41
      b. Swerling's Explanation.........................44
      c. The District Court's Ruling....................45
      d. Discussion.....................................46

     3. Counsel Were Effective Regarding The Strap
       Evidence.........................................52
      a. Factual Background.............................52
      1. The Search for Donovan's Body..................52
      2. Pretrial Events...............................55
      3. Trial Events..................................57
      4. The Section 2255 Hearing......................60
      b. The District Court's Rulings...................61
      c. Discussion....................................63
      1. Littlejohn and Monckton.......................63
      2. Swerling and Harris...........................64

     4. Swerling Provided His Trial Files to Appellate
       Counsel..........................................71
      a. Factual Background.............................71
      b. The District Court's Ruling....................76
      c. Discussion....................................77

3 THE GOVERNMENT PRESENTED NO FALSE TESTIMONY AT TRIAL ......81

  A. Standard of Review ....................................81

  B. Factual Background ....................................82

C. The District Court's Ruling .............................81

D. Legal Principles ....................................82

E. Discussion ........................................84

CONCLUSION..................................................89

CERTIFICATE OF SERVICE......................................90

CERTIFICATE OF COMPLIANCE...................................91

**TABLE OF AUTHORITIES**

**CASES**

Anderson v. City of Bessemer City, N.C.,
 470 U.S. 564 (1985) ........................................ 30

Beck v. Angelone,
 261 F.3d 377 (4th Cir. 2001) ........................... 27, 40

Bell v. Cone,
 543 U.S. 447 (2005) ........................................ 48

Bobby v. Van Hook,
 558 U.S. 4 (2009) .......................................... 34

Boyd v. Commissioner, Alabama Dept. of Corrections,
 697 F.3d 1320 (11th Cir. 2012) ............................. 86

Boyde v. Brown,
 404 F.3d 1159 (9th Cir. 2005) .......................... 27, 30

Brooks v. Tennessee,
 626 F.3d 878 (6th Cir. 2010) ............................... 84

Burt v. Titlow,
 134 S. Ct. 10 (2013) ................................... passim

Cavazos v. Smith,
 132 S. Ct. 2 (2011) ........................................ 30

Clark v. Collins,
 19 F.3d 959 (5th Cir. 1994) ................................ 38

iii

Cooper v. California,
  517 U.S. 348 (1996) ....................................... 26

Cullen v. Pinholster,
  131 S. Ct. 1388 (2011) ............................ 35, 71, 80

Demosthenes v. Baal,
  495 U.S. 731 (1990) ....................................... 12

Duncan v. Ornoski,
  528 F.3d 1222 (9th Cir. 2008) ............................. 67

Dusky v. United States,
  362 U.S. 402 (1960) ....................................... 26

Early v. Packer,
  537 U.S. 3 (2002) ......................................... 68

Edwards v. Arizona,
  451 U.S. 477 (1981) .................................. passim

Edwards v. Carpenter,
  529 U.S. 446 (2000) ....................................... 12

Florida v. Nixon,
  543 U.S. 175 (2004) ....................................... 46

Futch v. Dugger,
  874 F.2d 1483 (11th Cir. 1989) ............................ 41

Giglio v. United States,
  405 U.S. 150 (1972) ....................................... 82

Godinez v. Moran,
  509 U.S. 389 (1993) ....................................... 26

Hale v. Gibson,
  227 F.3d 1298 (10th Cir. 2000) ............................ 37

Harrington v. Richter,
  131 S. Ct. 770 (2011) ...................... 34, 35, 47, 50

Jackson v. Denno,
  378 U.S. 368 (1964) ....................................... 55

Jackson v. Kelly,
  650 F.3d 477 (4th Cir. 2011) .............................. 71

Johnson v. Zerbst,
 304 U.S. 458 (1938) ...................................... 67

Jones v. Barnes,
 463 U.S. 745 (1983) .................................. 37, 81

Jones v. United States,
 527 U.S. 373 (1999) ...................................... 51

Jones v. Walker,
 540 F.3d 1277(11th Cir. 2008) ............................ 67

Kimmelman v. Morrison,
 477 U.S. 365 (1986) ...................................... 36

Knighton v. Mullin,
 293 F.3d 1165 (10th Cir. 2002) ....................... 51, 83

Knowles v. Mirzayance,
 556 U.S. 111 (2009) .................................. 35, 37

Lawrence v. Branker,
 517 F.3d 700 (4th Cir. 2008) ............................. 37

Maggio v. Fulford,
 462 U.S. 111 (1983) .................................. 29, 47

Medina v. California,
 505 U.S. 437 (1992) .................................. 26, 27

Miller v. United States,
 261 F.2d 546 (4th Cir. 1958) ............................. 67

Moody v. Polk,
 408 F.3d 141 (4th Cir. 2005) ............................. 71

Mueller v. Angelone,
 181 F.3d 557 (4th Cir. 1999) ............................. 81

Napue v. Illinois,
 360 U.S. 264 (1959) ...................................... 82

Nguyen v. Reynolds,
 131 F.3d 1340 (10th Cir. 1997) ..................... 13, 31, 58

Old Chief v. United States,
  519 U.S. 172 (1997) ....................................... 50

Payne v. Tennessee,
  501 U.S. 808 (1991) ....................................... 48

Premo v. Moore,
  131 S. Ct. 733 (2011) ..................................... 37

Reiter v. Sonotone Corp.,
  442 U.S. 330 (1979) ....................................... 68

Sexton v. French,
  163 F.3d 874 (4th Cir. 1998) .............................. 37

Smith v. Robbins,
  528 U.S. 259 (2000) ................................... 37, 38

Strickland v. Washington,
  466 U.S. 668 (1984) .................................. passim

Tuggle v. Netherland,
  79 F.3d 1386 (4th Cir. 1996) .............................. 49

United States v. Abad,
  514 F.3d 271 (2d Cir. 2008) ............................... 37

United States v. Abu Ali,
  528 F.3d 210 (4th Cir. 2008) .............................. 47

United States v. Aichele,
  941 F.2d 761 (9th Cir. 1991) .............................. 83

United States v. Bagley,
  473 U.S. 667 (1985) ....................................... 83

United States v. Bartko,
  728 F.3d 327 (4th Cir. 2013) .............................. 83

United States v. Basham,
  561 F.3d 302 (4th Cir. 2009), ........................ passim

United States v. Bortnovsky,
  879 F.2d 30 (2d Cir. 1989) ................................ 83

United States v. Boyd,
  55 F.3d 239 (7th Cir. 1995) ............................... 81

United States v. Brown,
   757 F.3d 183 (4th Cir.),............................... 63, 64

United States v. Crockett,
   435 F.3d 1305 (10th Cir. 2006)............................. 83

United States v. Cronic,
   466 U.S. 648 (1984)....................................... 84

United States v. Faris,
   388 F.3d 452 (4th Cir. 2004).............................. 86

United States v. Fisher,
   711 F.3d 460 (4th Cir. 2012).............................. 12

United States v. Fulks,
   454 F.3d 410 (4th Cir. 2006),.............................. 3

United States v. Fulks,
   683 F.3d 512 (4th Cir. 2012).......................... passim

United States v. Griley,
   814 F.2d 967 (4th Cir. 1987).............................. 83

United States v. Harmon,
   918 F.2d 115 (10th Cir. 1990)............................. 83

United States v. Harris,
   498 F.3d 278 (4th Cir. 2007).............................. 48

United States v. Higgs,
   663 F.3d 726 (4th Cir. 2011).............................. 35

United States v. Jimenez-Villasenor,
   270 F.3d 554 (8th Cir. 2001).............................. 27

United States v. Josephberg,
   562 F.3d 478 (2d Cir. 2009)............................... 83

United States v. Lespier,
   725 F.3d 437 (4th Cir. 2013).............................. 51

United States v. Mangual-Garcia,
   505 F.3d 1 (1st Cir. 2004)................................ 84

United States v. Mason,
  52 F.3d 1286 (4th Cir. 1995) ................................ 27

United States v. Meinster,
  619 F.2d 1041 (4th Cir. 1980) .............................. 84

United States v. Moussaoui,
  591 F.3d 263 (4th Cir. 2010) ........................... 26, 50

United States v. Neeley,
  189 F.3d 670 (7th Cir. 1999) ............................... 37

United States v. Nimrod,
  940 F.2d 1186 (8th Cir. 1991) .............................. 83

United States v. Oliver,
  626 F.2d 254 (2d Cir. 1980) ................................ 27

United States v. Robinson,
  404 F.3d 850 (4th Cir. 2005) ........................... 12, 26

United States v. Rommy,
  506 F.3d 108 (2d Cir. 2007) ................................ 66

United States v. Thornburg,
  645 F.3d 1197 (10th Cir. 2011) ............................. 48

United States v. Williams,
  610 F.3d 271 (5th Cir. 2010) ............................... 67

United States v. Yeager,
  557 U.S. 110 (2009) ........................................ 64

Walton v. Angelone,
  321 F.3d 442 (4th Cir. 2003) ....................... 26, 36, 40

Warren v. Baenen,
  712 F.3d 1090 (7th Cir. 2013) .............................. 36

Wiggins v. Smith,
  539 U.S. 510 (2003) ........................................ 36

Williams v. Head,
  185 F.3d 1223 (11th Cir. 1999) ............................. 35

Woods v. McBride,
  430 F.3d 813 (7th Cir. 2005) ....................... 27, 32, 40

## STATUTES AND RULES

18 U.S.C. § 371.................................................. 2

18 U.S.C. § 922(g).............................................. 3

18 U.S.C. § 922(j).............................................. 3

18 U.S.C. § 924(c).............................................. 3

18 U.S.C. § 924(o).............................................. 2

18 U.S.C. § 1201(a)............................................. 2

18 U.S.C. § 1331................................................ 1

18 U.S.C. § 2119................................................ 2

18 U.S.C. § 2255................................................ 1

18 U.S.C. § 2312................................................ 2

18 U.S.C. § 3591(a)(2)(A)-(D).................................. 6

18 U.S.C. § 3591(a)(2)(A)..................................... 59

18 U.S.C. § 3591(a)(2)(C.................................. 59, 88

18 U.S.C. § 3591(a)(2)(D)................................ 7, 67, 88

18 U.S.C. § 3592(c)(1)......................................... 6

18 U.S.C. § 3592(c)(8)......................................... 6

18 U.S.C. § 3593(a)........................................... 5

18 U.S.C. § 3593(c).......................................... 57

18 U.S.C. § 4241......................................... 25, 27

28 U.S.C. § 1291.............................................. 1

28 U.S.C. § 2253.............................................. 1

28 U.S.C. § 2255......................................... passim

Fed. R. App. P. 25(d)....................................... 90

Fed. R. App. P. 32(a)(5)................................... 91

Fed. R. App. P. 32(a)(6)................................... 91

Fed. R. App. P. 32(a)(7)(B)............................... 91

Fed. R. App. P. 32(a)(7)(B)(iii)........................... 91

Fed. R. Evid. 403......................................... 41

Fed. R. Evid. 404(b)...................................... 51

IN THE  UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

No. 13-9

————————

UNITED STATES OF AMERICA,
Appellee

v.

BRANDON L. BASHAM,
Appellant

————————

On Appeal from the United States District Court
for the District of South Carolina

————————

**CAPITAL CASE**

**BRIEF FOR THE UNITED STATES**

————————

**JURISDICTION**

This is an appeal from a final judgment denying relief under 28 U.S.C. § 2255.  The district court, which had jurisdiction over the case under 18 U.S.C. § 1331 and § 2255, issued its order on June 5, 2013.  The judgment was entered on May 6, 2013.  On August 21, 2013, the district court denied Basham's motion to amend the judgment.  Basham filed a timely notice of appeal on October 17, 2013.  This Court has jurisdiction under 28 U.S.C. § 1291 and 28 U.S.C. § 2253.

1

1. Whether Basham was mentally competent to stand trial.

2. Whether Basham's trial attorneys were ineffective by (a) not raising a mental incompetency defense at trial, (b) allowing Basham to be questioned before trial and in not objecting to the admission of his statements at trial, (c) not objecting to evidence of his other crimes at the guilt phase, and by (d) their delayed production of their trial files to Basham's appellate attorneys.

3. Whether the government presented false evidence at trial.

**STATEMENT OF THE CASE**

1. <u>Procedural History</u>

Following a jury trial in the United States District Court for the District of South Carolina in 2004, Basham was convicted of carjacking resulting in death, in violation of 18 U.S.C. § 2119; kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a); interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312; conspiracy to commit carjacking, kidnapping, interstate transportation of a stolen vehicle, felon in possession of a firearm, and possession of stolen firearms, in violation of 18 U.S.C. § 371; conspiracy to use and carry firearms during and in relation to, and to possess firearms in furtherance of, crimes of violence, in violation of 18 U.S.C. §

924(o); using and carrying firearms during and in relation to, and possessing firearms in furtherance of, crimes of violence, in violation of 18 U.S.C. § 924(c); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); and possession of stolen firearms, in violation of 18 U.S.C. § 922(j). He was sentenced to death on the carjacking and kidnapping counts and to 744 months of imprisonment on the other counts. This Court affirmed. United States v. Basham, 561 F.3d 302 (4th Cir. 2009), cert. denied, 560 U.S. 938 (2010).[1]

On June 1, 2011, petitioner filed a motion to vacate his sentence under 28 U.S.C. § 2255. After a seven-day evidentiary hearing, the district court denied the motion. J.A. 177-374. The district court also denied petitioner's motion to amend the judgment. J.A. 375-382. This appeal followed.

2. Statement of Facts

a. The Offense Conduct

In November 2002, Basham and Fulks escaped from a jail in Kentucky and went on a multi-state crime spree with two women. On November 11, Basham and Fulks left the women at a motel near

---

[1] Chadrick Fulks, Basham's accomplice, was also convicted and sentenced to death for his role in those offenses. United States v. Fulks, 454 F.3d 410 (4th Cir. 2006), cert. denied, 551 U.S. 1147 (2007). This Court affirmed the district court's denial of Fulks' motion to vacate his sentence under Section 2255. United States v. Fulks, 683 F.3d 512 (4th Cir. 2012), cert. denied, 134 S. Ct. 52 (2013).

3

Huntington, West Virginia. That evening, Samantha Burns, a college student who worked at a mall in Huntington, called home to say that she was at a friend's house. On November 12, a local fire department team went to a cemetery three miles outside of Huntington to investigate a report of an explosion and a fire. They found Burns' burnt-out car there. When Basham and Fulks returned to their motel room, Basham was wearing around his neck a ring that belonged to Burns. Burns was never seen alive again. Basham, 561 F.3d at 309-310.[3/]

Basham, Fulks, and the two women drove to South Carolina. On November 14, while the women stayed at a motel in Myrtle Beach, Basham and Fulks drove to Conway, South Carolina, where they made a thwarted attempt to steal firearms from a home. The two men then drove to a Wal-Mart in Conway. In the mall parking lot, Basham approached a BMW being driven by Alice Donovan. Basham forcibly entered the vehicle, and was joined by Fulks. The two men drove Donovan to North Carolina. Donovan was never seen alive again. Basham, 561 F.3d at 310-311.

Basham and Fulks returned to their motel in Myrtle Beach, telling the women they had to leave because the police were after them. On November 17, Basham forcibly tried to enter a

---

[3/] In 2005, in the United States District Court for the Southern District of West Virginia, Basham and Fulks pleaded guilty to carjacking resulting in Burns' death and were sentenced to life imprisonment. Basham, 561 F.3d at 316 n.5.

car occupied by a teenager in Ashland, Kentucky. When the police approached, petitioner tried to flee, firing a gun at the pursuing officer. After a short chase, Basham was arrested. In December 2002, Basham told Clifford Jay, a childhood friend, that he and Fulks had "killed them." Basham, 561 F.3d at 311-312, 314.

b. The Proceedings Below

1. Pretrial and Trial Proceedings

On November 20, 2002, the government filed a criminal complaint against Basham in the District of South Carolina. On November 27, a federal magistrate judge appointed attorneys Cameron Littlejohn and William Monckton to represent Basham. On December 17, a grand jury charged Basham and Fulks with carjacking, kidnapping, and interstate transportation of stolen vehicles. A superseding indictment was later filed, charging the two men with eight federal crimes. On September 13, 2003, the government filed a notice of intent to seek the death penalty on the carjacking and kidnapping counts under 18 U.S.C. § 3593(a). The notice alleged the four statutory intent factors under 18 U.S.C. § 3591(a)(2)(A)-(D), and two statutory aggravating circumstances: (1) that Basham and Fulks murdered Donovan for pecuniary gain (18 U.S.C. § 3592(c)(8)), and that Donovan's death occurred during a kidnapping (18 U.S.C. § 3592(c)(1)). As to Basham, the notice alleged multiple non-

statutory aggravating factors: (1) Basham's other violent crimes from November 4 to November 18, 2002, including the killing of Burns, (2) Basham's future dangerousness, and (3) the impact of Basham's conduct on Donovan's family.  Basham, 561 F.3d at 314, 321.

On April 9, 2003, the district court disqualified Littlejohn and Monckton as Basham's counsel on conflict of interest grounds.  The court then appointed Jack Swerling, an experienced capital litigator, and Gregory Harris, an experienced defense attorney, to represent Basham, 16 months before Basham's trial began.  Basham, 561 F.3d at 322, 325.

On January 29, 2004, the district court severed Fulks' case from Basham's case.  Fulks was tried first.  He pleaded guilty and was sentenced to death.  Basham's trial began on September 13, 2004, and ended 13 days later with the jury's conviction on all counts.  The penalty phase began on October 12, 2004 and ended on November 2, sixteen days later.  During the government's case, over defense objection, the district court admitted evidence that Basham had scuffled with his guards at one point during the trial.  Basham, 561 F.3d at 314, 332-333.

In mitigation, Swerling and Harris presented evidence of Basham's extensive mental deficiencies from William Brannon, a neurologist, Dr. Tora Brawley, a neuropsychologist, and Dr. Donna Schwartz-Watts, a forensic psychiatrist.  The experts

testified that Basham was diagnosed with learning disabilities at an early age, and that his IQ had deteriorated from 100 as a youth to approximately 68 due to drug use and other factors. Basham suffered from brain impairment, multiple-cause dementia, drug-inhalant psychosis, and anxiety. But Watts admitted that Basham's problems did not contribute to his offenses, and that Basham could distinguish between right and wrong. Basham, 561 F.3d at 315. By contrast, a government psychiatrist testified that Basham suffered from anti-social disorder, a learning disorder and substance abuse problems, but he did not suffer from brain damage or dementia. Id. at 315 n.4.

The jury recommended death on both the carjacking and kidnapping counts. The jury found the grave risk of death statutory intent factor under Section 3591(a)(2)(D), and the death-during-a-kidnapping statutory aggravating factor after the government withdrew the pecuniary gain factor. The jury also found all of the non-statutory aggravating factors except for the future dangerousness factor. Individual jurors found some of the 36 mitigating factors submitted by Basham. Basham, 561 F.3d at 314-316. Basham submitted a mitigating factor that he played a "lesser role" than Fulks in the crimes against Donovan, but no juror found that factor. J.A. 2472, 2484.

7

2.  <u>Direct Appeal</u>

Basham filed a notice of appeal on February 16, 2005.  This Court initially appointed Swerling and Harris as appellate counsel for Basham.  Later, this Court substituted Timothy Sullivan for Swerling.  In November 2007, this Court relieved Harris and substituted Melissa A. Meister, of the law firm of Jenner and Block, as lead appellate counsel.  Meister was assisted by five associates and three partners in the firm, including David DeBruin.  J.A. 190, 367, 3816; <u>Basham</u>, 561 F.3d at 308, 316.

On May 13, 2008, Basham filed an opening appellate brief that raised the following six issues on appeal: (1) a juror's extrajudicial contacts violated Basham's right to a fair trial; (2) the district court improperly admitted evidence of Basham's other crimes at the guilt phase; (3) at the penalty phase, the district court improperly (a) admitted the record of the guilt phase evidence, (b) admitted evidence of Basham's misconduct in prison and during the trial, and (c) excluded evidence that the government took inconsistent positions at his trial and at Fulks' trial; (4) Basham's death sentence was based on an arbitrary factor; (5) the district court omitted a defense mitigating factor from the jury's consideration, and (6) the district court improperly disqualified Basham's initial attorneys at trial.  See <u>Basham</u>, 561 F.3d at 308-309.

On March 30, 2009, this Court affirmed the judgment. <u>Basham</u>, 561 F.3d 302.

### 3. Collateral Attack

On June 1, 2011, Basham filed a motion to vacate his sentence under 28 U.S.C. § 2255. The district court held a seven-day evidentiary hearing. Basham's trial and appellate attorneys were the primary witnesses at the hearing. Attorney Larry Hammond testified as an expert witness for Basham.

On June 5, 2013, the district court denied Basham's Section 2255 motion. On August 21, 2013, the court denied Basham's motion to amend the judgment. J.A. 177-382.

### c. Rulings Under Review

The rulings under review are the district court's holdings that Basham was competent to stand trial (J.A. 263-275), Basham was not denied the effective assistance of counsel (J.A. 198-209, 227-250, 275-285, 298-305, 366-370), and the government did not present false evidence at trial (J.A. 222-226).

### SUMMARY OF ARGUMENT

1. The district court correctly found that Basham was mentally competent at trial based on its observations of Basham and Swerling's opinion that Basham was competent. Basham's courtroom outburst on September 24, 2004 resulted from his anger at the district court's reversal of its decision to permit Basham to chew tobacco in court, not mental incompetency.

9

Basham's drowsiness during the afternoon of October 26, 2004 did not constitute mental incompetency.

2.  Basham's trial counsel rendered effective assistance of counsel.

a.  Counsel reasonably did not raise a mental competency defense at trial because Basham was mentally competent.

b.  Counsel reasonably did not move to exclude evidence of Burns' murder at the guilt phase because that evidence would have been admitted at the penalty phase in any event.  Further, an objection would have been futile because the Burns evidence was properly admitted to show Basham's intent to harm Donovan. The district court's limiting instruction minimized any prejudice to Basham.  Finally, with one harmless exception, the Burns evidence did not include forbidden victim impact evidence.

c.  Littlejohn was not ineffective by failing to prevent Basham from leaving his side and making incriminating demonstrations to a law enforcement agent during a trip to locate Donovan's body.  Swerling was not ineffective because he objected to the admission of Basham's statements and demonstrations at a suppression hearing.  In any event, Basham was not prejudiced because his volunteered admissions and demonstrations did not violate the Fifth Amendment.  Finally, the jury's verdict did not rest on a finding that Basham was the actual killer of Donovan.

10

d.   Swerling gave Meister and Sullivan reasonable access to his trial files as they prepared Basham's appeal.   Swerling properly accommodated them at his office as both attorneys were willing to review the files there.   That review did not cause Meister to omit any issue on appeal that otherwise would have been presented.   Basham's contention that Meister omitted potentially meritorious issues is speculation.

3.   The government presented no false testimony at trial. At the outset, Basham has not shown "cause and prejudice" for not raising this issue at trial and on direct appeal.   On the merits, the government does not know who actually killed Donovan.   Hewett's testimony that Basham demonstrated how Donovan was strangled was at most ambiguous as to who actually killed her.   Basham could have clarified the matter at trial because he knows who killed Donovan.   Finally, the jury's death verdict did not rest on a finding that Basham actually killed Donovan.

**ARGUMENT**

**1**

**BASHAM WAS MENTALLY COMPETENT TO STAND TRIAL**

Basham contends (Br. 8-38) that he was not mentally competent to stand trial.  The district court's finding that Basham was mentally competent was correct.

11

A.  Standard of Review

In reviewing a district court's denial of a Section 2255 motion, this Court applies a clear error standard to the district court's factual findings, and a de novo standard to its legal conclusions.  United States v. Fisher, 711 F.3d 460, 464 (4th Cir. 2012).  Whether a defendant was mentally competent at trial is a question of fact.  See United States v. Robinson, 404 F.3d 850, 856 (4th Cir. 2005).  See also Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (on collateral attack, competency ruling is presumptively correct).

On collateral attack, if a claim was not raised at trial or on direct appeal, the claim is ordinarily forfeited unless the defendant can show "cause and prejudice" for his default.  E.g., United States v. Frady, 456 U.S. 152, 165-169 (1982).  The "cause and prejudice" test does not apply to a claim that a defendant was mentally incompetent to stand trial, but it does apply to a claim that the district court did not ensure that the defendant was competent.  See Nguyen v. Reynolds, 131 F.3d 1340, 1346 n.2 (10th Cir. 1997).

"Cause" can be established by counsel's constitutional ineffectiveness in failing to preserve the claim below.  See Edwards v. Carpenter, 529 U.S. 446, 451 (2000).  The "prejudice" prong means "actual prejudice," a standard that varies from claim to claim, but which is, at a minimum, higher than the

12

standard for prejudice on plain error review.  <u>Frady</u>, 456 U.S. at 165-169.

B.  <u>Factual Background</u>

1.  <u>Pretrial Events</u>

Basham's attorneys knew that Basham suffered from multiple mental problems for which he was treated with Seroquel (an anti-psychotic drug), Zoloft (an anti-depressant), Concerta (an anti-ADHD medicine), and Neurontin (an anti-pain medicine) before and during trial.  J.A. 437.  In December 2002, Monckton filed a motion for a competency evaluation of Basham.  That month, David Bruck, an experienced death penalty litigator, told Monckton that a government competency evaluation would result in an unwarranted interrogation of Basham.  J.A. 3754-3755.  After Swerling and Harris replaced Monckton and Littlejohn, they withdrew the competency motion because they wanted control over the mental health tests that would be given to Basham.  Swerling then hired numerous doctors, including Brannon, Brawley, and Schwartz-Watts, to evaluate Basham.  Schwartz-Watts alone interviewed Basham about 40 times over 200 hours.  J.A. 264-266.

In June 2003, Swerling moved the court to transfer Basham to a medical facility for evaluations by Schwartz-Watts.  The district court granted the motion, and ordered the transfer of Basham to that facility through October 2003.  J.A. 264-266.

Basham was a difficult client. Basham could communicate with his attorneys, but he lied to them on occasion, and his mental problems caused him to be distracted at times. Occasionally, Basham wanted to talk to his attorneys while they were trying to listen to evidence being presented at trial. Swerling gave Basham coloring books and other materials while he was sitting at the defense table so that he would not distract him, Harris, or the jury. Swerling believed that Basham was competent, street-savvy and smart, but he decided to keep Schwartz-Watts on-call in case an issue of Basham's competency arose. J.A. 4017-4019, 4026-4027, 4090-4092, 4288-4289, 4312-4313, 4402. Ultimately, Swerling did not raise an incompetency claim at trial because, as Harris later explained, the attorneys "[d]idn't have any witnesses to testify that Brandon was not competent to stand trial." J.A. 4095.

At a pretrial hearing on February 24, 2004, Swerling told the court that Basham appeared to be mentally incompetent as he had apparently tried to commit suicide by slashing his wrists the night before. Swerling added that Schwartz-Watts could evaluate Basham that day. The government opposed a recess on the ground that Basham, who had a history of failed suicide attempts, was trying to manipulate the system. The court granted the recess. J.A. 423-439.

That afternoon, Schwartz-Watts told the court that Basham was competent. She explained that Basham was sleepy because he had taken Tylenol medicine with a prescribed drug, but the effect of those medications had peaked and Basham would become more awake as the afternoon progressed. J.A. 454-455. The court proceeded with the pretrial hearing.

Afterwards, the district court took measures to prevent Basham from falling asleep at trial. If the court noticed that Basham appeared to be drowsy, it would offer him short recesses, soft drinks, or a caffeinated substance to keep him alert. J.A. 291, 4022-4023, 4313-4314. In addition, the court issued a long break in the morning and a long break in the afternoon to accommodate Basham. J.A. 4029.

2. Trial Events

a. September 20, 2004

On Friday, September 17, 2004, Harris told the court that Basham had slept during the testimony of a government witness. Basham said that he was unable to stay awake by the afternoon because he was emotionally exhausted and stressed out; he then became emotional, saying he simply wanted to sign the death warrant and be executed. Supp. App. 9-16; Basham, 561 F.3d at 332.

Later that day, the court ordered a 10-minute recess after telling Basham that he should stretch or walk around because he

15

appeared to be dozing off. Supp. App. 17-18. During the recess, the court held an ex parte hearing with the defense. Schwartz-Watts told the court that she had examined Basham at Swerling's request, and that Basham's behavior was caused partly by his mental problems and partly by his deep suspicion of Harris (although Basham worked well with Swerling). She did not state that Basham was mentally incompetent. Schwartz-Watts recommended frequent trial breaks and examinations by his doctor. J.A. 7519-7521.

Basham said that the trial was causing him frustration and exhaustion. Swerling told the court that Basham needed nicotine to calm him down and that he especially liked to chew tobacco ("dip"). Basham agreed that "dip" would help him stay awake. The court told Basham that if he stayed awake for the rest of the day, it would allow him to chew "dip" during trial beginning Monday morning. J.A. 7523-7525; Basham, 561 F.3d at 332-333. At the end of the day, the district court noted that Basham had been staying awake and alert. Swerling agreed. Supp. App. 19-20.

That evening, while being escorted back to jail, Basham told a United States Marshal that he really didn't care about "dip;" he only wanted to annoy Deputy United States Marshal Kevin Riley, an African-American. Basham, 561 F.3d at 333.

At the beginning of the trial on Monday, September 20, the district court told Basham that he could not chew "dip" in the courtroom because a marshal had informed the court that Basham had a history of flinging bodily and other fluids at correctional officers, and he was concerned about what Basham might do with the spit created by "dip." As a compromise, the district court offered Basham nicotine gum and Mountain Dew, or a similarly caffeinated beverage, instead of "dip." Basham, 561 F.3d at 333.

When the trial resumed, Basham chewed nicotine gum. During a recess, Swerling told the court that Basham did not like it. The court told Swerling that Schwartz-Watts would have to justify Basham's need for "dip" in writing. The court told Basham that it did not know that Basham had previously thrown bodily fluids at the guards when it had promised him "dip" the day before. Basham disputed that allegation; he also said that he needed nicotine to calm him down during the trial. The court agreed to revisit the caffeine issue during a break. J.A. 1153-1156.

Before the lunch break, Basham asked Swerling whether the district court would rule on the "dip" issue before Basham returned to court after the lunch break based on the letter from Schwartz-Watts. Swerling told Basham that the court would have to rule on the issue in open court after lunch. Basham said

that he wanted to stay downstairs instead of returning to the courtroom. According to Swerling, Basham became very anxious because he could not understand why the court had broken its promise to him regarding the "dip." J.A. 1178; Supp. App. 22-23.

As he was returning to the courtroom after lunch, Basham told his jailers that he would be coming back down to his cell as he was "not going to be up there for that long. J.A. 1176-1177.

After the lunch break, but before the trial resumed, Swerling told the court that he had the letter. Supp. App. 21. The court stated that over the lunch break, the marshal had informed the court about Basham's desire to annoy Riley. Further, if Basham presented evidence that "dip" was medically necessary, the marshal wanted an opportunity to present rebuttal medical evidence. J.A. 1157.

Basham denied having said that he wanted to annoy Riley, but he admitted that they had argued. The court ruled that Basham could not use "dip" during the trial, but the court would consider another caffeine product if Basham could not stay awake. Basham became agitated and asked to go downstairs to a holding cell to watch the proceedings. The district court denied that request, because Swerling wanted Basham to be present during the trial. Basham disobeyed the district court's

18

instruction to take his seat.  Basham then scuffled and argued with the marshals as they restrained him, stating, among other things, that the district court judge had lied to him, that Riley was a racist, and that if was going to spit, he would be spitting now.  Once the situation was controlled, Basham was sent downstairs to his holding cell.  J.A. 1158-1164; Basham, 561 F.3d at 333.

Harris moved for a continuance so Schwartz-Watts could evaluate Basham for competency.  The court granted the motion. J.A. 1164-1165.  Later that day, Schwartz-Watts told the court that she had examined Basham for about 15 to 20 minutes, and that she:

> ha[d] concerns about his competency.  It is my opinion right now that because of his mental defect that he can't assist his attorneys.  Now, the problem with that and the good news probably is, his mental state fluctuates, and there is going to be times in this trial where he has competence fluctuation.  With a little time, perhaps by tomorrow, there would be no reason that I can foresee that he wouldn't be calm enough that we can proceed.

J.A. 1172-1174.  The district court recessed the trial until the next day, and told Schwartz-Watts to report to the court the next morning.  Supp. App. 23.

On September 21, Schwartz-Watts informed the court that she had examined Basham for 45 to 50 minutes, and that he was competent to stand trial.  Swerling agreed with her opinion. J.A. 1182-1183.  The trial resumed.

19

At the end of the day, Basham renewed his request for "dip," stating that it reduced stress and kept him from having to look at the jurors. J.A. 1195-1196. The district court granted that request in part by allowing Basham to have "dip" during breaks, and Basham behaved himself. Basham, 561 F.3d at 333.

b. October 22, 2004

On Friday, October 22, 2004, Penny Titzer, one of Basham's former counselors, testified during the defense case. At a bench conference, Swerling told the court that Basham wanted to know whether members of his family could visit him in the courthouse, even though the marshals were opposed to an impromptu visit without prior authorization. After consulting with the marshals, the district court told Swerling to tell Basham's jailer to try to arrange for Basham to see his family that weekend. Supp. App. 36-37.

Near the end of the day, Titzer testified that Basham had allegedly been sexually abused when he was young. Harris moved for a recess because Basham's condition had progressively worsened due to her testimony. Basham stated that he was "trying," but he could not "take it anymore," he was "out of emotions," he did not "know how to express it," and he wanted "to see my family." The district court adjourned the trial for the day. J.A. 1911-1914.

c. <u>October 26, 2004</u>

On the morning of October 26, before Dr. Brawley began her testimony, Harris told the court that Basham was agitated because he was not given his scheduled dose of Seroquel the night before. Harris moved for an order that Basham be promptly medicated and for a trial recess of one-hour to allow the Seroquel to take effect. Basham said his problems were caused by certain conditions at the jail, not the lack of Seroquel. The district court ordered that Basham be given his dose of Seroquel, and recessed the trial until 1:00 p.m. J.A. 1918-1927.

The court held an ex parte hearing to hear Basham's complaints about the conditions at the jail. At one point, the court told Basham that if he were not competent, he should not be revealing information that his attorneys were unaware of. J.A. 7535-7536. Basham said that he was competent despite the lack of medication, but he explained that his agitation was caused by abusive conduct by corrections officials the night before. J.A. 7535-7536, 7540, 7544.

Meanwhile, the marshal informed the court that Basham was supposed to be given Seroquel in the morning, not at night. The district court ordered Basham to be returned to jail to be properly medicated. The court told Swerling that Basham would

be given caffeine products to stay awake during the day's proceedings if the Seroquel made him drowsy. J.A. 7537-7544.

After the lunch recess, the district court granted a defense motion for an additional 15-minute recess. Afterwards, Harris told the court that Basham might have been overmedicated because he was telling Swerling in a loud voice that he would be good, Basham likely could not pay attention to the trial evidence, and the jury would hold Basham's behavior against him. J.A. 1927-1929.

The government opposed any further delay, stating that Schwartz-Watts could testify if necessary. The district court stated that the jury was worn out with delays, and then found that the benefits of resuming the trial would outweigh the danger of the jury's view of Basham's disheveled appearance. The district court asked Harris whether Schwartz-Watts was available. Harris replied that she was at her office. The court told Harris that the trial had to go forward. J.A. 1929-1930.

That afternoon, Brawley testified as a defense witness. Before cross-examination began, Swerling told the court that Basham was groggy, he had been slurring his words, and he had been sleeping during Brawley's testimony. Swerling suggested that Basham's medication was causing the problem because he was supposed to be medicated at night rather than in the morning.

22

The district court stated that the marshal had stated that Basham was supposed to be medicated in the morning instead. The court added that "maybe I need to be hearing from a doctor about these matters. Can Dr. Schwartz-Watts address it tomorrow when she comes?" J.A. 1936-1937. Swerling said that he would try to contact Dr. Morgan, Basham's treating physician, because the government had raised an objection to Schwartz-Watts during her previous testimony. The district court refused to delay the trial any further, stating that it would order coffee or a caffeine product to keep Basham awake. The district court also ruled that Basham could see his family later that evening, which would give Basham emotional support to get him through the trial. Brawley testified for the rest of the day. J.A. 1936-1940.

The next day, Schwartz-Watts testified as an expert witness for Basham. She did not raise an issue of Basham's mental competency.

d. Sentencing

During sentencing, the district court admitted evidence of Basham's courtroom outburst to show his future dangerousness over Swerling's objection that the evidence was overly prejudicial. To eliminate undue prejudice, the court excluded Basham's comments about racism and his hostile comments to the

23

court.  This Court affirmed the district court's ruling on direct appeal.  <u>Basham</u>, 561 F.3d at 332-333.

C.  <u>The Section 2255 hearing</u>

During the Section 2255 hearing, an issue was raised as to Basham's mental competency after he had an altercation with his guards.  Dr. Thomas Hyde, a behavioral neurologist, testified that Basham was presently incompetent and was also incompetent at his trial.  J.A. 3865.  Dr. Richard Frierson, a psychiatrist, testified that Basham was competent at trial based on his review of the record.  J.A. 4870-4871.

D.  <u>The District Court's Rulings</u>

The district court found that Basham was mentally competent at trial despite his bizarre, volatile, and irrational conduct at several points during the trial.  The court concluded that Basham was competent during his outburst on September 20, 2004 based on evidence that Basham deliberately planned to act up in court.  The court rejected Schwartz-Watts' opinion that Basham was incompetent.  J.A. 269-271.

The court also found that Basham was competent on October 22 and 26.  Although Basham was agitated and sleepy on October 26, that behavior was consistent with his general conduct throughout the trial.  J.A. 271-272, 274 n.42.

Further, Basham's mental defects and his general behavior at trial including his periodic drowsiness and his obsession

24

with "dip," did not show incompetency. The court accepted Frierson's expert opinion that Basham was competent and rejected Hyde's contrary opinion. J.A. 272-275.

The district court also ruled that trial counsel provided effective representation even though they did not raise a claim that Basham was incompetent at trial. Trial counsel constantly monitored Basham's behavior for signs of incompetency. No expert witness would have testified that Basham was incompetent. J.A. 275-279.

The district court rejected Basham's claim that it did not ensure that Basham was competent under 18 U.S.C. § 4241. The court found that Basham had procedurally defaulted that claim by not raising it on direct appeal, and that he did not show "cause and prejudice" to justify his default. Nevertheless, the court addressed the merits of Basham's claim and held that it did not abuse its discretion by failing to hold a competency hearing because Basham's behavior did not suggest that he was incompetent. J.A. 279-283.

Finally, the district court held that Basham's appellate counsel were not ineffective by failing to raise the issue of Basham's competency on direct appeal because they reasonably decided that a competency claim was weaker than the claims that were raised on appeal. J.A. 283-286.

E. <u>Legal Principles</u>

The Due Process Clause requires a defendant to be mentally competent to stand trial. See <u>Godinez</u> v. <u>Moran</u>, 509 U.S. 389, 396 (1993). A defendant is mentally competent if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him." <u>Cooper</u> v. <u>California</u>, 517 U.S. 348, 354 (1996)(quoting <u>Dusky</u> v. <u>United States</u>, 362 U.S. 402 (1960)).

A defendant is presumed to be competent, and has the burden to show that he was incompetent by a preponderance of the evidence. See <u>Cooper</u>, 517 U.S. at 355; <u>Robinson</u>, 404 F.3d at 856. The relevant factors include the court's observations of the defendant's conduct at trial, defense counsel's opinion as to the defendant's competency, and expert opinion. <u>United States</u> v. <u>Moussaoui</u>, 591 F.3d 263, 294-295 (4th Cir. 2010). Indeed, defense counsel may often have the best-informed view of the defendant's ability to participate in his defense. See <u>Medina</u> v. <u>California</u>, 505 U.S. 437, 450 (1992).

A defendant may be competent even though he suffers from a mental illness, low intelligence, or he exhibits bizarre, volatile, and irrational behavior at trial. <u>Walton</u> v. <u>Angelone</u>, 321 F.3d 442, 460 (4th Cir. 2003). A defendant is not rendered incompetent due to his treatment with anti-psychotic drugs, see

26

Beck v. Angelone, 261 F.3d 377, 387-388 (4th Cir. 2001), or his own drug use.  E.g., United States v. Oliver, 626 F.2d 254, 259 (2d Cir. 1980).  Finally, a defendant does not become incompetent merely because he becomes drowsy or sleeps during part of the trial due to prescription drugs.  E.g., Woods v. McBride, 430 F.3d 813, 817-822 (7th Cir. 2005); United States v. Jimenez-Villasenor, 270 F.3d 554, 559-561 (8th Cir. 2001).  A contemporaneous opinion as to a defendant's competency is more valuable than a retrospective opinion.  See United States v. Mason, 52 F.3d 1286, 1293 n.8 (4th Cir. 1995); Boyde v. Brown, 404 F.3d 1159, 1167 (9th Cir. 2005).

A district court has a continuing duty to ensure that a defendant is competent at trial.  Under 18 U.S.C. § 4241, a district court should conduct an evidentiary hearing to determine whether the defendant is competent if there is "reasonable cause" to believe that he is incompetent during the trial.  If a defendant is incompetent, due process requires a suspension of the trial until he regains competency.  Medina, 505 U.S. at 448-449.

F.   Discussion

The district court correctly found that Basham was mentally competent during the trial in general, and on September 20, 2004 and October 26, 2004 in particular.

1. <u>September 20, 2004</u>

The district court's finding that Basham was competent during his September 20 outburst was supported by the court's observations of Basham's behavior, Swerling's opinion (J.A. 4288-4289) and the independent evidence that Basham's outburst resulted from his anger at the district court's reversal of its decision to allow him chew "dip" in the courtroom, not mental incompetency. During the lunch break just before his outburst, Basham told Swerling that he wanted the district court to resolve the "dip" issue before he returned to the courtroom after lunch. When Swerling told Basham that the issue would have to be addressed in open court after the lunch break, Basham became frustrated and demanded to stay downstairs instead of returning to the courtroom. J.A. 1178; Supp. App. 22-23.[1] Basham then decided to act up in court, as evidenced by his comment to his guards that he would not be in the courtroom long and would soon be returned to his holding cell as he was being

---

[1] Basham ignores his remarks to Swerling that he wanted the "dip" issue resolved before he returned to court after the lunch break in arguing (Br. 27) that, before entering the courtroom, he did not know that the district court had reversed its decision to allow him to chew "dip" in the courtroom.

Basham's further argument (Br. 27) that Harris did not believe that he was being manipulative (J.A. 1168-1169), is also meritless. Harris's opinion was not dispositive because, unlike Swerling, he did not talk to Basham about the "dip" issue before Basham returned to court after lunch, so he did not have a complete view of Basham's motives.

led into court after the lunch recess.  During his scuffle with the guards, Basham had the presence of mind to say that if he had planned to spit, he would be spitting now.  And later, after the district court partially reversed itself and permitted Basham to chew "dip" during breaks in the trial, Basham was calm and generally well-behaved.[2]  See <u>Basham</u>, 561 F.3d at 333.

Consistent with the district court's finding, this Court, on direct appeal, noted that Basham was a "manipulative individual" in rejecting Basham's challenge to the admission of the courtroom outburst evidence.  <u>Basham</u>, 561 F.3d at 333.

Basham's argument (Br. 26-27) that Schwartz-Watts' unrebutted expert opinion established that he was incompetent on September 20 is unsound.  A district court does not have to accept an expert witness' opinion that a defendant is incompetent even if that opinion is unimpeached or unrebutted. See <u>Maggio</u> v. <u>Fulford</u>, 462 U.S. 111, 117-118 (1983).  The district court rightly rejected her opinion here.  Unlike the court and Swerling, Schwartz-Watts did not witness Basham's courtroom outburst and did not know the reasons for his outburst.  Indeed, Schwartz-Watts testified only that Basham was

---

[2]    Basham's argument (Br. 13-14) that his preoccupation with "dip" was proof of his mental incompetency overlooks that Swerling viewed Basham's repeated demands for "dip" as "Brandon's manipulation" (J.A. 4319), and that Basham's demands did not overwhelm him mentally.  J.A. 4322-4324 ("he got his mind off of it"), 4391.

incompetent <u>after</u> his outburst; she did not squarely state that Basham was incompetent during the outburst. Swerling also thought that Basham lost mental competency after he was placed in his holding cell, not during his outburst. J.A. 4288-4289. In these circumstances, the district court properly credited its observations of Basham and Swerling's opinion instead of Schwartz-Watts' opinion.[3] See <u>Anderson</u> v. <u>City of Bessemer City, N.C.</u>, 470 U.S. 564, 574 (1985) ("[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous").

In any event, even if Basham was incompetent when he was examined by Schwartz-Watts after his outburst, there was no due process violation because the trial was in recess at that point, and it did not resume until Schwartz-Watts concluded that Basham had regained his competency. At no point was Basham tried while he was allegedly incompetent.

Basham contends in passing (Br. 23) that the district court did not independently ensure that he was competent to stand trial. But that is a procedural competency claim that Basham

---

[3] Basham's reliance (Br. 23) on Hyde's expert opinion at the Section 2255 hearing is also unconvincing because Hyde's retrospective opinion approximately 8 years after Basham's trial had little value. See <u>Boyde</u>, 404 F.3d at 1167. As the factfinder, the district court properly credited Frierson's opinion that Basham was competent at trial instead of Hyde's opinion. Cf. <u>Cavazos</u> v. <u>Smith</u>, 132 S. Ct. 2, 6-7 (2011) (factfinder resolves competing experts' claims).

forfeited by not raising it on direct appeal.  Accordingly,

Basham must show "cause and prejudice" to excuse his default.

See Nguyen, 131 F.3d at 1346 n.2.  Basham has not done so.  In

any event, his claim fails on the merits.  The district court

took numerous steps to ensure that Basham remained competent,

including having Schwartz-Watts examine Basham for competency

several times during the trial, giving Basham caffeinated

products to prevent him from falling asleep, and by ordering

frequent breaks during the trial so Basham would not be mentally

overwhelmed by the trial.

   2.  October 26, 2004

The district court correctly ruled that Basham was mentally

competent on October 26 based on its observations of Basham's

conduct and on Swerling's opinion that Basham's mid-day

grogginess did not reflect incompetence.  See J.A. 4324-4325

(Swerling's remark did not refer to "competence, just slurring

his words.  And I don't think I raised the issue of

competency"); see also J.A. 4288 ("they were events, not general

incompetency").  Furthermore, even if Basham's drowsiness during

the afternoon of October 26 was caused by Seroquel, that did not

establish his mental incompetence as a matter of law.  Cf.

Woods, 430 F.3d at 819 ("[t]here is a big difference between the

sort of temporary incompetence stemming from Woods's Elavil-

induced drowsiness during voir dire and the sort that would

render Woods incapable of standing trial altogether."). And the effect of the Seroquel would have diminished as the day progressed. Further, on a previous occasion, Schwartz-Watts found that Basham was competent even though he was sleepy due to his drug ingestion. J.A. 455.[4]

Basham's suggestion (Br. 18) that the district court found that he was incompetent during the morning of October 26 is incorrect. During the ex parte hearing into Basham's complaints of abusive jail conditions, the court remarked that "if" Basham was incompetent, he should not be divulging potential damaging information to the court. The court's remark was simply a reminder to Basham to be cautious in revealing information because he had not been properly medicated. It was not a judicial finding that Basham was incompetent. J.A. 7535-7536; 7537-7538 ("since you are not on your medicine, I don't think you need to be saying things on the record here that might somehow hurt your case"). In any event, the district court halted the trial until Basham was medicated. Thus, Basham was

---

[4] Basham argues (Br. 28) that the district court's finding that he was competent on October 26 was flawed because the court allegedly stated only that it would have ordered expert testimony on the issue of competency if there were any indication that Basham was incompetent. J.A. 272. Basham's argument omits the district court's earlier statement that evidence was lacking as to Basham's incompetency on that date, ibid., and its subsequent statement that the court did not see any evidence of incompetency. J.A. 282. Viewed as a whole, the court's comments reflect correct reasoning that Basham's behavior simply did not rebut the presumption of competency.

32

not tried while he was allegedly incompetent due to lack of proper medication.

Basham implies (Br. 16-17) that his outburst on October 22, was further evidence of his incompetency. But that argument overlooks that Basham was upset because the district court denied his request for a family visit that day, postponing a potential visit until the weekend. Supp. App. 36-37; J.A. 1913 (Basham says he wants to see his family). Basham's outburst mirrored his angry reaction after the district court reversed its decision to allow Basham to chew "dip" at trial and was further proof of his manipulative nature. In addition, as Harris explained, Basham was upset by the testimony about his sexual abuse as child. J.A. 1913, 4026. Basham's behavior on October 22 did not establish that he was mentally incompetent.

**2**

**BASHAM'S ATTORNEYS RENDERED EFFECTIVE ASSISTANCE OF COUNSEL**

Basham contends (Br. 31-63) that his trial counsel were ineffective by (1) not taking reasonable steps to inform the court of his incompetency, (2) allowing him to make incriminating pretrial statements to government agents and by not objecting to the admission of those statements at trial, (3) not objecting to the admission of the Burns evidence during the guilt phase, and (4) not providing their trial files to Basham's

33

appellate counsel.  Counsel were effective.  In any event, Basham was not prejudiced.

A.  Standard of Review

This Court reviews a district court's ineffective assistance of counsel ruling de novo, and its factual findings for clear error.  United States v. Fulks, 683 F.3d 512, 516 (4th Cir. 2012).

B.  Legal Principles

To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was constitutionally deficient and that (2) the error prejudiced the defense.  Strickland v. Washington, 466 U.S. 668, 687-694 (1984).  In evaluating error, the test is whether the attorney's conduct satisfied an objective standard of reasonableness. Courts do not use a checklist to evaluate attorney performance, lest they restrict counsel's wide latitude in making tactical decisions.  A detailed set of rules would unduly restrict counsel's independence in choosing strategies and tactics for his client.  Strickland, 466 U.S. at 688-689; Bobby v. Van Hook, 558 U.S. 4, 7-8 (2009).  Counsel will rarely be limited to a particular technique or approach in making tactical decisions. He or she can balance limited resources in accord with effective trial tactics and strategies.  Harrington v. Richter, 131 S. Ct. 770, 789-790 (2011).

34

There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689; Fulks, 683 F.3d at 517. The reasonableness of counsel's actions must be judged at the time of counsel's conduct, rather than by hindsight or on the basis of an adverse verdict. Strickland, 466 U.S. at 690; United States v. Higgs, 663 F.3d 726, 739 (4th Cir. 2011). A strategic choice made after thorough investigation of the law and facts relative to plausible options is "virtually unchallengeable." Strickland, 466 U.S. at 690. That is particularly true where, as here, those strategic choices were made by experienced defense counsel. E.g., Williams v. Head, 185 F.3d 1223, 1228-1229 (11th Cir. 1999) (collecting cases) ("strong reluctance to second-guess" decisions by experienced counsel).

Further, counsel's actions are presumed to have resulted from strategy rather than neglect. Cullen v. Pinholster, 131 S. Ct. 1388, 1404 (2011). Counsel is not required to confirm every aspect of his strategic basis for a decision, to prepare for remote possibilities, to present all relevant defense evidence, or to counter all government evidence with corresponding defense evidence. Even a reasonable miscalculation will not make counsel ineffective. Richter, 131 S. Ct. at 789-791. The attorney does not have to raise every available nonfrivolous claim. See Knowles v. Mirzayance, 556 U.S. 111, 127 (2009).

35

When the record is silent on a point, the presumption is that counsel acted reasonably. See <u>Burt</u> v. <u>Titlow</u>, 134 S. Ct. 10, 17 (2013).

Prejudice is defined as a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694; <u>Fulks</u>, 683 F.3d at 517. As to a capital sentence, the defendant must show a reasonable probability that at least one juror would have struck a different balance in weighing the aggravating and mitigating factors in the case. <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 537 (2003); <u>Strickland</u>, 466 U.S. at 695. And as to a claim that counsel erred by not raising a mental incompetency defense, the defendant must show a reasonable probability that he was incompetent. See <u>Walton</u>, 321 F.3d at 462; <u>Warren</u> v. <u>Baenen</u>, 712 F.3d 1090, 1100 (7th Cir. 2013). See also <u>Knowles</u>, 556 U.S. at 127 (defendant must show reasonable probability that he would have prevailed on insanity defense had he pursued it).

To demonstrate that counsel was ineffective in failing to move to suppress evidence, the defendant must show that his suppression motion would have been meritorious, and a reasonable probability that verdict would have been different absent the excludable evidence. <u>Kimmelman</u> v. <u>Morrison</u>, 477 U.S. 365, 375 (1986). An attorney's decision regarding the suppression of

36

evidence is a classic tactical decision. <u>Sexton</u> v. <u>French</u>, 163 F.3d 874, 885 (4th Cir. 1998). The attorney can forgo an objection that he believes would be futile. See <u>Premo</u> v. <u>Moore</u>, 131 S. Ct. 733, 741 (2011). If evidence of the defendant's other crimes would have been admitted despite an objection, counsel does not err by foregoing an objection to that evidence. <u>United States</u> v. <u>Abad</u>, 514 F.3d 271, 276 (2d Cir. 2008); <u>United States</u> v. <u>Neeley</u>, 189 F.3d 670, 684 (7th Cir. 1999). Alternatively, there is no <u>Strickland</u> prejudice if the evidence would have been admitted despite an objection. <u>Hale</u> v. <u>Gibson</u>, 227 F.3d 1298, 1320-1322 (10th Cir. 2000).

To show that counsel was ineffective on direct appeal, a defendant must show that counsel omitted issues that were clearly stronger than those presented. <u>Smith</u> v. <u>Robbins</u>, 528 U.S. 259, 288 (2000). Counsel is more likely to be effective on appeal when he focuses on quality instead of quantity. See generally <u>Jones</u> v. <u>Barnes</u>, 463 U.S. 745, 753 (1983). As to prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, he would have prevailed on appeal. <u>Smith</u>, 528 U.S. at 285; <u>Lawrence</u> v. <u>Branker</u>, 517 F.3d 700, 709 (4th Cir. 2008).

C.  Discussion

1.  Counsel Effectively Litigated Competency Matters

Basham contends (Br. 35-38) that counsel were ineffective by (1) not objecting to the evidence of his courtroom outburst on September 20 on competency grounds, and (2) not moving for a recess to allow Schwartz-Watts to evaluate him on October 26. Neither contention has merit.

a.  Courtroom Outburst Evidence

Swerling did not object to the admission of Basham's courtroom outburst at the penalty phase for a sound reason: he did not believe that Basham was incompetent during his outburst. J.A. 4288-4289.  See Clark v. Collins, 19 F.3d 959, 966 (5th Cir. 1994) ("[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite").  Swerling reasonably limited his objection to that evidence on the ground that it was unduly prejudicial.

In any event, Basham was not prejudiced.  If Swerling had objected to the evidence on competency grounds, the district court would have overruled the objection on the ground that Basham was competent for essentially the reasons given by the court in rejecting Basham's competency claim here.  And on appeal, this Court likely would have rejected a claim that the evidence should have been excluded on competency grounds for essentially the same reasons that supported its observation that

38

Basham's courtroom outburst showed his manipulative nature. See Basham, 561 F.3d at 333.

b. Competency on October 26, 2004

Basham's argument (Br. 36) that counsel erred by failing to ask for a recess to allow Schwartz-Watts to examine him is factually flawed. Counsel made two implicit requests for a recess, but the district court denied them on the ground that the trial needed to go forward. A third request would have been futile.

Harris made the first request for a recess when he told the court that the jury would hold Basham's odd behavior against him and that Basham could not "go forward." J.A. 1927, 1929. The district court, however, overruled the request on the ground that the trial needed to "go forward." J.A. 1930.

Swerling made the second implicit request for a recess when he told that court that Basham was slurring his words and then offered to call Basham's treating doctor. J.A. 1936. After the parties discussed whether Basham was supposed to be medicated at night rather than in the morning, the district court stated that "maybe" it should hear from a doctor about the matter, but then asked whether Schwartz-Watts could address the issue when she testified the next morning. J.A. 1937. When Swerling stated that he would try to contact Basham's treating physician, the court asked the government for its views regarding a recess.

39

When the government objected, the court stated: "I think we need to at least make an effort to go forward.  I understand your request, Mr. Swerling, but I just respectfully disagree."  J.A. 1939.

Counsel reasonably did not ask for another recess to contact Schwartz-Watts because the district court had denied their previous requests and because the court expected that Schwartz-Watts would address the matter the next day.  There is no likelihood that the district court would have recessed the trial for a mid-day examination of Basham by Schwartz-Watts. See Woods, 430 F.3d at 821 (counsel not ineffective in failing to move for full competency hearing where it was unclear whether the court would have granted the motion).

The record is silent as to whether Swerling contacted Schwartz-Watts after the trial had ended for the day, but the presumption is that he did so.  See Burt, 134 S. Ct. at 17. Swerling often consulted her when an issue of Basham's mental health arose, and Swerling undoubtedly talked to her before she testified the next day.

In any event, Basham was not prejudiced because the district court found that Basham was competent on October 26. See Walton, 321 F.3d at 462 (defendant not prejudiced by counsel's failure to raise competency claim where the record established that the defendant was competent); Beck, 261 F.3d at

40

393.  Basham's assertion (Br. 38) that Schwartz-Watts might have concluded that he was incompetent if she had examined him that afternoon is speculative.[5]  Indeed, Schwartz-Watts had previously concluded that Basham was not rendered incompetent by an overuse of drugs earlier in the trial, so there is little likelihood that she would have reached a different conclusion here.

2.  Counsel Effectively Litigated the Burns Evidence

a.  The Trial Evidence and Direct Appeal

The government's death notice alleged the murder of Burns as a non-statutory aggravating factor.  At a pretrial hearing on February 26, 2004, Harris moved to exclude the crime spree evidence under Fed. R. Evid. 403.  J.A. 935-944.  At a pretrial hearing on August 4, the government moved to admit the Burns evidence as intrinsic evidence or under Rule 404(b) during the guilt phase.  Swerling deferred an objection to that evidence.  J.A. 298, 1010-1011, 1022.  On March 5, 2004, the district court ruled that the crime spree evidence was admissible as intrinsic evidence.  J.A. 4327.

In his opening statement, Swerling conceded that some of the evidence about the death of Burns was admissible, but he reminded the jury that the crimes against her were not part of

_____

[5]  Basham's reliance (Br. 38) on Futch v. Dugger, 874 F.2d 1483, 1487 (11th Cir. 1989), is misplaced because that case held only that a district court erred in denying the defendant's petition without an evidentiary hearing after the defendant alleged that a doctor had evaluated him and declared that he was incompetent.

the indictment.  Swerling also argued that Fulks was the leader in the crime spree, whereas Basham was a mere follower due to his mental problems.  J.A. 1069-1070, 1073, 1077; Supp. App. 6-8.

To prove that Burns did not simply disappear before she was kidnapped and killed, the government presented evidence that Burns was seen by friends and family members from November 8 until she vanished on November 11.  J.A. 1085-1125.  Burns had a close relationship with her family and was therefore unlikely to run away or otherwise leave her family without notice.  Also, Burns wore a heartshaped ring and she was selling candy for a fundraiser just before she vanished.  Further, Basham was wearing Burns' ring shortly after she disappeared, and one of the candy boxes was in Basham's van after Burns disappeared. Basham, 561 F.3d at 310.

That evidence was presented through the testimony of Burns' parents, Kandi and John Burns; her brother, Wesley Burns; her aunt, Melissa Jeffers; and three friends, Kara Aston, Whitney Collins, and Kristen Pritchard.  J.A. 1085-1125.  Afterwards, the district court asked Swerling whether he wanted a limiting instruction as to that evidence.  Swerling deferred an answer until the charge conference.  J.A. 1125-1126, 1129.

During the charge conference, the district court ruled that it would instruct the jury that the evidence of Basham's other

42

crimes were subject to Rule 404(b) because an intrinsic evidence instruction would be confusing.  Swerling objected to any limiting instruction, but, in the alternative, he objected to a proposed intrinsic ("complete the story") evidence instruction, and then proposed changes and limitations to the instruction. Supp. App. 24-33.

During closing argument, Swerling questioned whether the government had established that Basham had intended to hurt or actually hurt Burns because Basham, unlike Fulks, did not smell of gasoline or burnt hair when he and Fulks returned to their motel after Burns' car was burned.  J.A. 1518-1519.  That was consistent with Swerling's theory that Basham lacked the specific intent to harm Donovan.  Basham, 561 F.3d at 328.

The court instructed the jury that it could consider Basham's similar acts only to prove or disprove motive, intent, preparation, plan or knowledge.  Supp. App. 34-35.

On direct appeal, Basham raised a claim that some of the evidence of his other crimes, including his threats to kill two police officers outside his hotel room, was improperly admitted at trial under Fed. R. Evids 404(b) and 403.  Basham did not challenge the admission of the Burns evidence, but he did raise a claim that the prosecutor's reference to the Burns murder in his closing argument violated the ban on propensity evidence under Rule 404(b).  Basham, 561 F.3d at 325-330.

43

This Court rejected Basham's evidentiary and closing argument claims. First, the Court ruled that the evidence that Basham threatened to kill the police officers was properly admitted under Rule 404(b) to show his specific intent to kill Donovan. Basham, 561 F.3d at 328. Second, the Court held that the prosecutor did not err in his closing argument because he tied the Burns evidence to Basham's intent. Id. at 329-330.

b. Swerling's Explanation

At the Section 2255 hearing, Swerling explained that he did not object to the admission of the Burns evidence at the guilt phase or to the testimony of Burns' relatives for strategic reasons. First, because the Burns evidence would have been admitted during the penalty phase of the trial in any event, it was better to "desensitize" the jury by having it hear the evidence during the guilt phase ("front-loading") rather than at the penalty phase shortly before the jury would begin deliberating on the death penalty.[6] Second, Swerling believed that the jury would draw a negative inference against him if he aggressively cross-examined Burns' family members. Swerling had

---

[6] During a pretrial hearing, Basham consented to Swerling's general strategy of conceding most of the elements of the charged crimes, but to contest the element that Basham intended to hurt or to harm Donovan. J.A. 5422-5426. See Strickland, 466 U.S. at 691 (counsel's actions can be determined, in part, by the defendant's own statements).

a practice of not vigorously examining family members who were not hurting his case.  J.A. 4326-4328, 4419-4420.

At the Section 2255 hearing, Hammond opined that Swerling and Harris erred by not objecting to, or seeking to limit, the evidence relating to Burns.  In Hammond's opinion, the jury effectively heard the Burns evidence twice.  J.A. 4594-4596.

c.  The District Court's Ruling

The district court ruled that counsel were not ineffective by not objecting to the Burns evidence at trial because this Court subsequently ruled on appeal that the evidence was properly admitted to show Basham's intent.  J.A. 299-300.  The court also rejected Basham's subsidiary argument that counsel erred by not objecting to the evidence on the ground that it constituted improper victim impact evidence.  After reviewing the trial testimony of six witnesses, the district court concluded that no witness testified to improper victim impact evidence with one minor, harmless, exception.  Rather, the witnesses provided relevant evidence that Burns had not disappeared.  J.A. 300-305.

In denying Basham's motion to amend the judgment, the district court ruled that it would have admitted the Burns evidence even if Swerling had objected to it.  The court credited Swerling's "front-loading" rationale for not objecting to the Burns evidence at the guilt phase.  The court also held

45

that the government needed to present evidence that Burns was not a runaway because Basham did not stipulate that he kidnapped and killed her.  J.A. 379-381.

d.  Discussion

Swerling and Harris reasonably handled the Burns evidence. As Swerling explained, because the evidence would have been admitted during the penalty phase in any event, it was tactically sound to allow the jury to hear it at the guilt phase instead of at the penalty phase shortly before the jury began to deliberate on the death penalty.  See generally Florida v. Nixon, 543 U.S. 175 (2004) (counsel in capital case can concede facts at guilt phase to focus on avoiding death penalty).  In addition, Swerling made a wise decision not to cross-examine Burns' relatives and friends because their testimony about her disappearance did not directly incriminate Basham, and the jury might have drawn a negative inference towards Basham if Swerling had aggressively cross-examined them.  At the same time, Swerling sought to minimize the impact of that evidence by arguing that Basham did not intend to hurt or to kill her.  At the charge conference, Swerling tried to limit the court's proposed limiting instruction regarding the other crimes evidence to his advantage.[7]

_____

[7]  The district court's limiting instruction under Rule 404(b) and Swerling's objections refute Basham's broad argument (Br.

Basham suggests (Br. 59) that Swerling's "front-loading" explanation was not credible because Swerling first expressed his strategy after a lunch break in his testimony and he only described his strategy in terms of probabilities. But the district court (J.A. 380-381) expressly credited Swerling's explanation and this Court defers to a district court's credibility determination. E.g., United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008).[8] Cf. Harrington, 131 S. Ct. at 790 (courts may not require that "counsel confirm every aspect of the strategic basis for his or her actions").

Basham argues (Br. 56-57) that the district court erred by allegedly conducting an admissibility-of-the-evidence analysis instead of a Strickland analysis. But in evaluating a claim that counsel erred by not objecting to certain evidence, a Strickland analysis necessarily considers whether the evidence was admissible. See Abad, Neeley, both supra. The district court expressly, and repeatedly, cited Strickland in its original opinion, and also cited Strickland with respect to the Burns evidence in its motion to amend the judgment. J.A. 197-198, 250, 380, 381. Therefore, the lack of a citation to

---

58-61) that Swerling passively allowed the Burns evidence to be admitted on an intrinsic evidence theory.

[8] The district court properly rejected Hammond's expert opinion to the contrary even though, as Basham observes (Br. 59), the government did not rebut his opinion with its own experts. See Maggio, supra.

*Strickland* in the district court's legal analysis of the Burns evidence claim in its original opinion was insignificant. See *Bell* v. *Cone*, 543 U.S. 447, 455 (2005) (court does not err merely because it does not cite to specific authority). In sum, the district court did not ignore or misapply *Strickland*.

Basham's further argument (Br. 63) that the Burns evidence was improperly admitted because the court permitted 11 witnesses to offer improper victim impact evidence is unconvincing. At the outset, Basham's claim is underdeveloped and is therefore waived. See *United States* v. *Harris*, 498 F.3d 278, 290 (4th Cir. 2007); *United States* v. *Thornburg*, 645 F.3d 1197, 1210 (10th Cir. 2011). Basham alleges that 11 witnesses testified as to Burns' murder, but the district court found that only six witnesses so testified, and Basham makes no attempt to identify the other five witnesses. More importantly, Basham has not identified the precise testimony that he alleges was improper.

In any event, Basham's claim fails on the merits. Victim impact evidence refers to a murder victim's personal characteristics and the emotional impact of the crimes on the victim's family. See *Payne* v. *Tennessee*, 501 U.S. 808 (1991). The Burns evidence, with one minor exception, did not constitute victim impact evidence.

To establish that Burns was kidnapped before she was killed, the government needed to eliminate the possibility that

48

she had left home voluntarily or had simply disappeared. Thus, the testimony from Burns' family members and friends that Burns had a close relationship with her family was relevant and necessary to show that it was unlikely that she would have left home without telling them. That "close relationship" evidence did not dwell on Burns' personal qualities or describe the emotional impact of her murder on her family members. Further, the evidence as to Burns' ring and her candy sales was extremely relevant because Basham wore her ring after she disappeared and one of her candy boxes was seen in Basham's van.[9]

To be sure, as found by the district court, Kandi Burns' testimony that Burns never got to live in her family's new house was improper. J.A. 1095. But that isolated error in a 13-day trial was harmless under effectiveness principles, see Richter, 131 S. Ct. at 791, or under harmless error principles. E.g., Tuggle v. Netherland, 79 F.3d 1386 (4th Cir. 1996).

Basham's further contention (Br. 62-63) that the Burns evidence was not probative because Swerling conceded that Burns was dead in his opening statement is without merit. The government is ordinarily entitled to prove its case despite a

_____

[9]    Basham's observation (Br. 60) that Donovan's family members testified at the penalty phase of the trial is beside the point. Donovan's family members properly testified at the penalty phase because the impact of Donovan's death on them was an alleged aggravating factor. At the same time, Burns' family members did not testify at the penalty phase.

defendant's offer to stipulate to certain evidence.  A jury that hears evidence interrupted by gaps or stipulations might be puzzled by the lack of continuity in the government's case and could hold those omissions against the government when deciding the case.  See Old Chief v. United States, 519 U.S. 172, 189-190 (1997); Moussaoui, 382 F.3d at 486.

Here, the government properly presented the jury with details surrounding Burns' disappearance and the failed efforts to find her body to give the jury a concrete picture of the circumstances the led to her death and to prove circumstantially that she was kidnapped and carjacked before she was murdered. The government needed testimony from Burns' family members and friends to establish beyond any doubt that her disappearance was not willing or accidental.  Further, Swerling's concession in argument that Burns was dead was not a stipulation, much less one that required the government to limit its proof regarding her disappearance.  Thus, even if Swerling had objected to the Burns evidence on the ground that it was unduly prejudicial in light of his concession, the district court would likely have overruled the objection under Old Chief and admitted the evidence.  Cf. J.A. 381.  Thus, Swerling reasonably did not raise a futile, meritless, objection.

Basham was also not prejudiced by the admission of the Burns evidence.  First, the district court's limiting

instruction under Fed. R. Evid. 404(b) confined the Burns evidence to its proper purposes and removed any undue prejudice to Basham. E.g., United States v. Lespier, 725 F.3d 437, 448 (4th Cir. 2013). The jury presumably followed that instruction. Jones v. United States, 527 U.S. 373, 394 (1999).

Second, this Court's rulings on direct appeal implicitly refute Basham's argument that the Burns evidence was improperly admitted under Fed. R. Evids. 404(b) and 403. This Court held that the evidence of Basham's threats to the police officers was properly admitted to show his intent to harm Donovan. Basham, 561 F.3d at 328. Because the Burns evidence was even more compelling evidence of Basham's intent to hurt Donovan than his threats, the Burns evidence was also properly admitted on an intent theory. See Knighton v. Mullin, 293 F.3d 1165, 1170-1171 (10th Cir. 2002) (crime spree evidence properly admitted to show defendant's intent). And this Court's further ruling that the prosecutor properly argued that the Burns evidence was probative to prove Basham's intent, Basham, 561 F.3d at 329-330, implicitly compels the conclusion that the Burns evidence was properly admitted for the same reason.

Finally, in rejecting Basham's evidentiary claims at the guilt phase, this Court described the government's case against Basham as "overwhelming." Basham, 561 F.3d at 330. The district court also concluded that the evidence of Basham's

guilt was overwhelming.  J.A. 215.  That was true even without the Burns evidence.[10]  Thus, even if the district court had excluded the Burns evidence in full or in part, the jury would have convicted Basham on all charges.[11]

   3.  Counsel Were Effective Regarding The Strap Evidence

Basham contends (Br. 38-47) that Monckton and Littlejohn were ineffective in allowing Basham to make oral and demonstrative statements to Sheriff Ronald Hewett and that Swerling and Harris were ineffective by not objecting to the admission of those statements at trial on the basis of Edwards v. Arizona, 451 U.S. 477 (1981).  Those claims lack merit.

   a.  Factual Background

   1.  The Search for Donovan's Body

After his arrest, Basham was repeatedly interviewed by investigators.  Basham waived his rights and agreed to cooperate by helping investigators locate Donovan's body.  Basham drew a map and told investigators that Donovan's body was left covered

---

[10]   Basham observes (Br. 60) that Harris viewed the Burns' evidence as "damaging" (J.A. 4040), but Harris also believed that Basham would have been convicted without the Burns evidence.  J.A. 4133.  The Burns evidence was damaging primarily because the crimes against Burns were alleged as an aggravating factor in the case, which meant that the jury would hear evidence that Basham killed two people.

[11]   The Burns evidence was a minor part of the government's guilt phase case, which consisted of 89 witnesses and other evidence, including Basham's post-arrest statements, and videos of the Donovan kidnapping and carjacking.  Basham, 561 F.3d at 314-315.

but unburied in the woods in a cemetery in South Carolina. Basham, 561 F.3d at 312-313.

On November 28, Basham, Littlejohn, Monckton, and a team of investigators that included Hewett and FBI agent Jeff Long went to Brunswick County, South Carolina to search for Donovan's body. Basham's attorneys believed that if Basham could find Donovan's body, the government might offer Basham a plea agreement. If not, evidence of Basham's cooperation might be used as defense evidence to support a potential mitigating factor at sentencing. J.A. 862, 4982-4983. But Littlejohn wanted Basham to tell the agents only how to find Donovan's body, not to make other incriminating statements. J.A. 863-864.

During the search, Basham made several statements to the agents in Littlejohn's presence. He told Hewett that he and Fulks had dragged Donovan's body out of the car, covered her body, and left her in the woods. On the other hand, when Basham saw a deer and said, "I could never kill a deer, but her I have," Littlejohn cut him off before he could complete his sentence. Basham, 561 F.3d at 313.

The search produced no results. Near the end of the day, the investigators told Basham's lawyers that they thought that Basham was lying, but he would be given one final chance to help. Littlejohn consulted with Basham in private. Then, speaking "hypothetically" to the agents, Littlejohn said that

Fulks had raped Donovan, strangled her with a purse strap, and then slit her throat.  <u>Basham</u>, 561 F.3d at 321-322.  Afterwards, in Littlejohn's presence, Basham told Hewett that they should look for a Liz Claiborne strap at the Bee Tree Cemetery.  J.A. 1332-1333.

The search team drove to the cemetery and parked at a horseshoe circle.  There, according to Hewett, Basham "wanted to walk over towards the woodline and to show the area where the strap was thrown."  J.A. 1343.  Basham's attorneys and the other agents stayed behind at the circle.  J.A. 766.  Littlejohn could see Basham at the woodline, but he could not hear him.  J.A. 4973-4974, 4994.

Basham became emotional and got tears in his eyes, and "continued to talk."  J.A. 1344.  Basham (who was shackled), showed Hewett the length of the strap, and said it was a Liz Claiborne strap and he had thrown it in the woods.  J.A. 765.  Basham also demonstrated how he threw the strap.  Hewett asked Basham, "how did you do that?"  Basham replied, "like that, and I threw it" in the woods.  J.A. 765-766, 1344-1345.  Two members of Hewett's team searched the area but did not find the strap.  Hewett asked Basham, "Is this where it happened?"  Basham replied, "This is it.  It is."  J.A. 1345; <u>Basham</u>, 561 F.3d at 313.

On December 3, Lieutenant David Crocker interviewed Hewett about the search for Donovan's body at the cemetery.  The next day, Crocker wrote a report that summarized Hewett's recollections.  Supp. App. 1-5.

2.  Pretrial Events

In April 2003, before the grand jury, Agent Long testified that Fulks made pretrial statements implicating Basham as the actual murderer of Donovan, whereas during the cemetery trip, Basham stated that Fulks had killed Donovan by strangling her with a purse strap and then possibly by slashing her throat. Basham and Fulks then disposed of Donovan's body.  The government also told the grand jury that Donovan's body had not been found.  J.A. 403-411.

When Basham's case and Fulks' case were still joined for trial, the government moved to admit Basham's oral and demonstrative statements to Hewett and Long during the cemetery trip.  From February 24 to February 26, 2004, the district court held a hearing to determine whether the statements were voluntary and admissible under Jackson v. Denno, 378 U.S. 368 (1964).

Long testified that Littlejohn had said that Basham had indicated that Fulks raped Donovan, then strangled her with a purse strap, after which Basham threw the purse strap out of

Donovan's car as they were leaving the crime scene.  J.A. 723-724.

Hewett testified that Basham showed him the length of the strap and then demonstrated the manner in which he threw it in the woods.  J.A. 765-766.  On cross-examination, Hewett, referring to the Crocker report, testified that Basham gestured that the strap was used to strangle Donovan, but nothing was "verbalized."  J.A. 776-777.

During argument, Swerling acknowledged that Basham's "directional" statements to the agents were admissible, but his other incriminating statements were inadmissible because there was no knowing and intelligent waiver of Basham's rights.  J.A. 599-600, 427.  Swerling argued: "outside the issues dealing with directions, the statements made during the course of the day up to the hypothetical should be excluded for the same reasons, but clearly the statements also after the hypothetical or in the hypothetical" should be excluded.  J.A. 601.  Swerling also argued that there were discrepancies between Basham's statements to Long and Hewett that undermined the government's argument that they were actually Basham's statements.  J.A. 602-603.

The district court excluded only the Littlejohn "hypothetical" statements from Basham's trial.  <u>Basham</u>, 561 F.3d at 323.

3. Trial Events

Fulks went to trial first. During a motions hearing, Fulks moved to admit Basham's "deer" statement to show that Basham personally killed Donovan. The government objected. During a colloquy on the motion, the government stated that Basham had demonstrated to Hewett how Fulks had strangled Donovan with the purse strap. The district court excluded the "deer" statement on the ground that its tendency to confuse the issues outweighed its probative value under 18 U.S.C. 3593(c). J.A. 1003-1005; Fulks, 681 F.3d at 523-524. The government did not offer at Fulks' trial any evidence or argument about Basham's statements or his strap demonstrations implicating Fulks.

At Basham's trial, the government introduced Basham's "deer" statement into evidence through Hewett, who referred to the Crocker report to refresh his memory. The government asked Hewett "what Brandon Basham described to you as to what happened to Alice Donovan." Hewett testified:

> Brandon Basham had his hands like this once again. I have explained to you how he was shackled. He took his hands together and did this [indicating], "then I threw it over there. Check in those trees right over there."

J.A. 1344. Hewett added that Basham "did this and did that" but he did not identify the person who actually strangled Donovan. J.A. 1344. Hewett asked Basham, "Is this where it happened?" Basham replied, "This is it. It is." Id. at 1344-1345.

57

Before starting cross-examination, Harris obtained the Crocker report from Hewett. J.A. 1347-1348. Harris cross-examined Hewett:

> Q: There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
> A: No Sir. He did not tell me he used the strap. He demonstrated, though.
> Q: He demonstrated?
> A: Yes, Sir.
> Q: Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
> A: That is true because he didn't say. He showed.

J.A. 1358-1359.[12]

During its closing at the guilt phase, the government argued that Basham and Fulks were equally culpable for Donovan's death because they acted as a team during their crime spree, including in murdering Donovan. The government further argued that it did not have to prove, and the jury did not have to find, who actually killed Donovan. It expressly argued that the jury could find Basham guilty of carjacking even "if you actually believe that Chad Fulks actually killed Alice Donovan" and Basham had "nothing to do with it." J.A. 1404-1405, 1463.

The government also briefly referred to Hewett's testimony that Basham had demonstrated how Donovan was killed. J.A. 1471-1474. In its rebuttal, the government argued that Basham's

---

[12] Harris did not cross-examine Hewett further on that point because he believed that Hewett's answers were non-responsive. J.A. 4107-4108.

conduct during the carjacking and kidnapping of Donovan had resulted in the death of Donovan "even if you don't believe that Brandon Basham, himself, killed Alice Donovan, even if you disregard Sheriff Hewitt, and disregard Mr. Jay." J.A. 1565.

In his closing argument, Swerling contended that Basham's strap demonstration did not establish that he strangled Donovan. Based on the evidence as a whole, it was more likely that Fulks actually strangled her. J.A. 1552.

During its closing at the penalty phase, the government began by referring to the statutory intent factors. First, the government argued that the jury could find the intent factors under Section 3591(a)(2)(C) and (D) based on Basham's violent conduct toward Donovan if it did not find that Basham actually had a role in killing her. J.A. 2307-2310. Then, turning to the intentional killing factor under Section 3591(a)(2)(A), the government referred to Basham's purse strap demonstration to Hewett and argued that that element was established. The government contended, however:

> Does that mean Brandon Basham's strangling of Alice Donovan is the only hand that caused Alice Donovan's death? The government does not submit that. The government submits, and submitted all along, that Chad Fulks is just as responsible. Chad Fulks had every right, as well, to make sure Alice Donovan died.

J.A. 2312-2314. The government argued that all of the statutory intent factors applied because Basham killed Donovan, but the

jury could give him the benefit of the doubt by finding the third or fourth intent factor. It then argued that Donovan was killed by Basham and Fulks. J.A. 2317-2318.

In rebuttal, the government argued that Basham and Fulks were equally culpable, Basham had gestured about "doing this" with the strap, J.A. 2422, 2425, and Donovan died "at the hands of these two men." J.A. 2433.

4. The Section 2255 hearing

Littlejohn testified that he never intended for Basham to walk off alone with any agent during the search for Donovan's body. Even when he walked away, Basham was always within Littlejohn's sight, if not his hearing. J.A. 4972-4974.

Swerling testified that he objected to any evidence beyond Basham's directional statements to the agents at the suppression hearing, but he did not vigorously challenge Basham's statements because he believed that some of Basham's statements were voluntary, he wanted to show that Basham was cooperating with the agents, and he wanted to "lock-in" the testimony of the agents. J.A. 4202-4203, 4373-4375, 4381-4386.

As to Basham's strap demonstration, Swerling did not recall whether it occurred outside the presence of Littlejohn. Swerling was aware of the Edwards decision, but he did not explain whether he thought that Edwards was applicable to the case. J.A. 4217-4222.

60

Hammond opined that Littlejohn and Monckton were ineffective in allowing Basham to leave them to walk to the cemetery with Hewett because a criminal defense attorney should not allow his client to become separated from him during a meeting with law enforcement agents. J.A. 4572-4574. Hammond also opined that Swerling and Harris were ineffective by not raising an Edwards issue at the suppression hearing. Id. at 4578-4579.

b.  The District Court's Rulings

As to Littlejohn and Monckton, the district court did not decide whether they were ineffective by allowing Basham to leave them by walking to the cemetery woods where he made his strap demonstrations, because Basham was not prejudiced. The court emphasized that the government had an overwhelming case against Basham without the demonstrations, the government's arguments did not center on them, and the aggravating and mitigating factors would not have changed even if the demonstrations had been excluded. J.A. 210-222.

As to Swerling, the district court did not decide whether he actually moved to suppress Basham's statements under Edwards, although the court noted that Swerling made a general motion to exclude all of Basham's non-directional statements. J.A. 243 n.31. The court then found that Hewett asked Basham two questions at the cemetery: "Brandon, how did you do that?" and

"Is this where it happened." J.A. 244-245. The court ruled that those questions were asked outside the presence of Basham's lawyers, who were standing about 45 feet way from him and could not hear Hewett's questions. J.A. 246-248 & n.33.

The court held that Basham initiated the walk to the woods based on Hewett's testimony that Basham wanted to walk there and the independent evidence that Basham volunteered to take the officers to the cemetery to locate Donovan's body. Further, Basham knowingly and intelligently waived his rights to counsel. J.A. 249-250. Because no Edwards violation occurred, Swerling was not ineffective in not raising an Edwards issue at the suppression hearing. J.A. 250-251.

The district court then noted that even if there was attorney error, Basham was not prejudiced. Even if Hewett's testimony had been excluded, Basham still would have been convicted and sentenced to death. The government's case was overwhelming; the government's central theory was that Basham and Fulks jointly murdered Donovan. J.A. 215-220.

The court rejected Basham's argument that exclusion of Hewett's testimony would have caused the jury to find Basham's mitigating factor that he played a lesser role than Fulks in Donovan's murder. Even without that disputed evidence, the evidence as a whole showed that Basham and Fulks jointly murdered Donovan. J.A. 219-222.

62

c. Discussion

1. Littlejohn and Monckton

Basham summarily contends (Br. 42-43) that Littlejohn and Monckton were ineffective by allowing Basham to leave them behind while he walked to the cemetery and made his incriminating demonstrations. There is no merit to that claim.

In United States v. Brown, 757 F.3d 183 (4th Cir.), cert. denied, 135 S. Ct. 229 (2014), this Court rejected a defendant's claim that her counsel was ineffective when counsel arranged for her to meet with the police but then failed to accompany her to the meeting. The Court noted that it ordinarily does not consider ineffectiveness claims on direct appeal, and that the evidence did not conclusively show that counsel was ineffective. But the Court then stated that it is "patently insufficient" to show only that the defendant agreed to be interviewed outside the presence of counsel. Although counsel may have "unwittingly enabled" the defendant's belief that she could talk her way out of trouble, a "mere breakdown in communication between the [defendant] and her lawyer, however, does not compel the conclusion that the latter was constitutionally ineffective." 757 F.3d at 191.

Brown's reasoning applies here. At most, Littlejohn was distracted for the brief period when Basham left his side and walked with Hewett to the cemetery about 45 feet away where he

made his purse strap demonstrations.  Littlejohn's momentary

inattentiveness, however, did not constitute ineffectiveness

under Strickland.[13]

   2.   Swerling and Harris

   Basham's argument (Br. 43-45) that Swerling and Harris were

ineffective by not moving to exclude his strap demonstrations on

Edwards grounds is without merit.

   First, Swerling's objection to Basham's non-directional

statements before and after Littlejohn's hypotheticals and his

argument that there was no showing that Basham had waived his

rights was sufficient to raise an objection under the Fifth or

Sixth Amendments.  Swerling's objection to any post-hypothetical

statements clearly included Basham's demonstration to Hewett,

and his argument that there was no "knowing and intelligent

waiver" of Basham's rights obviously referred to the legal issue

of whether Basham had waived his constitutional right to

counsel.

   Second, even if Swerling's objection did not preserve an

Edwards claim, a more specific objection would have been futile

because there was no Edwards violation.  In Edwards, the Court

---

[13]  The district court did not address the error prong because it
concluded that Basham did not meet the prejudice prong.  See
Strickland, 466 U.S. at 697 (court can decide ineffectiveness
claim on either ground or both).  On appeal, however, this Court
can conclude that there was no attorney error because it may
affirm the district court on any ground in the record.  E.g.,
United States v. Yeager, 557 U.S. 110, 126 (2009).

held that once a suspect has invoked his right to counsel during custodial interrogation under Miranda, he is not subject to further interrogation until counsel has been made available to him, unless the suspect "initiates further communication, exchanges, or conversations with the police."  451 U.S. at 484-485.  If the suspect initiates the meeting, the Fifth Amendment would not "prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial."  Id. at 485.

There was no violation of Edwards because Basham's strap demonstration did not result from interrogation by Hewett. Basham initiated the trip to search for Donovan's body because he wanted to cooperate with the authorities as part of his plan to avoid the death penalty.  After the agents told Basham and his attorneys that they believed that Basham was lying, Basham, in the presence of his attorneys, voluntarily told the agents to look for a purse strap and then directed the search team to the cemetery.  There, Basham initiated the walk to the woods where he believed the strap was located.  J.A. 765, 1343.

Once Basham arrived in the woods, without any questioning by Hewett, Basham got emotional, teared up, "continued to talk," and then showed Hewett the length of the strap and demonstrated how it was used and how he threw it into the woods.  J.A. 765-766, 1343-1344.  Basham's "voluntary, volunteered"

65

demonstrations did not violate his right to counsel.  See

Edwards, 451 U.S. at 485.

Hewett's questions: "Is this where it happened?" (J.A.
1345) and "How did you do that?" (J.A. 766) did not violate
Edwards.  The first question was a directional one ("where")
that Basham's lawyers had authorized the search team to ask
Basham.  The second question merely clarified Basham's
volunteered demonstration and was therefore admissible under
Edwards.  E.g., United States v. Rommy, 506 F.3d 108, 133 (2d
Cir. 2007) (questions that clarify suspect-initiated
conversations with the police do not violate Edwards)
(collecting cases).

Basham's answers to those specific questions were
insignificant.  Basham's answer that he threw the strap in
response to Hewett's question was admitted only at the
suppression hearing, not the trial.  In any event, it was
cumulative to the independent evidence that Basham had thrown
the strap away.  J.A. 1343.  Basham's demonstration that he
threw the strap did not add much to his earlier, volunteered,
admission that the search team should be looking for the strap.

Basham contends (Br. 43-45) that the district court's
Edwards analysis was flawed because it relied on the existing
trial record that was allegedly undeveloped on the Edwards issue
due to Swerling's ineffectiveness.  But on collateral attack,

unlike at trial, the defendant has the burden of showing, by a preponderance of the evidence, that his constitutional right to counsel was violated.  See Johnson v. Zerbst, 304 U.S. 458, 468-469 (1938); Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958); Jones v. Walker, 540 F.3d 1277, 1292 (11th Cir. 2008) (en banc).  Thus, to establish an Edwards violation, Basham had the burden to show that the existing trial record established that his demonstrations resulted from prohibited interrogation, or to make a record establishing such interrogation.  Having failed to do either, Basham cannot fault the district court for relying on the existing trial record to reject his Edwards claim.

In any event, Basham was not prejudiced.  The jury found that Basham had only the intent to commit an act of violence that created a grave risk of death to Donovan under Section 3591(a)(2)(D), the state of mind applicable to aiders and abettors.  See United States v. Williams, 610 F.3d 271, 284-290 (5th Cir. 2010).  The government expressly argued that the jury could find that factor if it believed that Basham did not actually kill Donovan.  J.A. 2309.  In short, the jury's death sentence was not based on a finding that Basham strangled Donovan with the purse strap.[14]

---

[14]  Basham's reliance (Br. 47) on Duncan v. Ornoski, 528 F.3d 1222 (9th Cir. 2008), is misplaced.  In that case, the defendant was convicted of capital murder under a theory that he personally killed the victim.  528 F.3d at 1227, 1244.  The jury

Basham contends (Br. 45-47) that the district court misapplied <u>Strickland</u>'s "reasonable probability" standard by stating that "it is not certain" that exclusion of the strangulation evidence would have caused the jury to give more weight to the lesser-role mitigating factor. But a reviewing court does not parse the language of a judicial opinion as though it were reviewing a statute. See <u>Reiter</u> v. <u>Sonotone Corp.</u>, 442 U.S. 330, 341 (1979). A court does not have to make a "formulary statement" in applying a Supreme Court decision if a "fair import" of the opinion shows that it did so. See <u>Early</u> v. <u>Packer</u>, 537 U.S. 3, 9 (2002).

Here, the district court repeatedly cited <u>Strickland</u> in its opinion and the "reasonable probability" test twice (J.A. 198, 263). In rejecting Basham's claim that exclusion of the purse demonstration would have caused the jury to find Basham's lesser-role mitigating factor, the court compared the purse strap evidence to the other evidence in the case and stated that

---

imposed a death sentence based on a special circumstance that required the government to prove that the defendant himself intentionally killed the victim or that he intended that the victim be killed by an accomplice. 528 F.3d at 1233, 1240. The Ninth Circuit reversed on ineffectiveness grounds because counsel failed to introduce evidence that the defendant had an accomplice, which would have cast doubt whether the defendant was the actual killer and whether he intended that the victim be killed. <u>Id</u>. at 1246-1247. In marked contrast, the jury did not find that Basham actually killed Donovan or that he intentionally killed her, so Basham was not prejudiced by the strap demonstration evidence.

68

the remaining evidence as to Basham's role in the offense would have remained the same. Therefore, according to the court, it "was not certain" that excluding the strap evidence would have caused the jury to give more weight to the lesser role mitigating factor. The court went on to reason that the government's aggravating factors did not require the jury to find that Basham was more culpable than Fulks because its theory was that Basham and Fulks were equally culpable. J.A. 220-222. It then concluded that Basham "has not satisfied the second prong [i.e., reasonable probability] of Strickland." J.A. 221. Viewed in the context of the court's analysis as a whole, the court's use of the term "it is not certain" meant only that Basham's claim was weak and insubstantial. The district court did not misapply Strickland.

Basham's argument (Br. 47-48) that at least one juror might have found the lesser-role mitigating factor without the strangulation evidence is meritless. The jury's finding as to the "grave risk of death" intent factor demonstrates that it did not find that Basham strangled Donovan in the first place. At the same time, the independent evidence demonstrated beyond any doubt that Basham and Fulks were equally culpable in killing Donovan.[15] It was Basham who initiated the carjacking and

---

[15] At sentencing, Swerling told the jury that the lesser role mitigator was based on the evidence presented at the guilt phase

kidnapping crimes when, armed with a pistol, he "entered [Donovan's] car and forced Donovan to drive to the back of the parking lot, where Fulks waited." Basham, 561 F.3d at 311. After Donovan was murdered, Basham and Fulks jointly disposed of her body in the woods. Later, Basham told Jay, "we killed them." Id. at 313-314.

Furthermore, Basham's independent violent crimes during and after his crime spree with Fulks refuted Basham's sentencing argument that he was merely led by Fulks. Several days before Donovan's murder, while Fulks was away, Basham threatened to kill any police officer who tried to enter his motel room. Shortly before Donovan's murder, Basham and Fulks jointly fired shots at an individual who surprised them as they were burglarizing a home. And after Donovan's murder, with Fulks absent, Basham pointed a pistol at a woman as he tried to enter her car in a parking lot. When confronted by the police, Basham fired shots at an officer. Basham, 561 F.3d at 310-312.

Finally, even if one juror had found that Basham played a lesser role than Fulks in the Donovan murder, that juror would not likely have found that the balance between the mitigating factors and aggravating factors warranted a life sentence. Under Strickland's "reasonable probability" test, there must be

that Basham was led by Fulks throughout their crime spree. J.A. 2404-2412.

70

a substantial, not just a conceivable, likelihood of a different result.  Cullen, 131 S. Ct. at 1403; Jackson v. Kelly, 650 F.3d 477, 493 (4th Cir. 2011).  Here, the government's evidence in aggravation showed that Basham had a long history of violent crime, including the killing of Burns.  See Basham, 561 F.3d at 339 (summarizing aggravating evidence).  Thus, even if the strangulation evidence had been excluded, Basham would have been sentenced to death.  E.g., Moody v. Polk, 408 F.3d 141, 154 (4th Cir. 2005) (no different result where defendant had earlier conviction for attempted murder).

4.  Swerling Provided His Trial Files To Appellate Counsel

Basham contends (Br. 74-88) that Swerling did not surrender his trial files to appellate counsel during the briefing process on direct appeal.  That claim is unpersuasive.

a.  Factual Background

In 2007, Meister and Sullivan were Basham's appellate attorneys, having replaced Swerling and Harris.  See Basham, 561 F.3d at 308.  On December 17, 2007, the Court entered a briefing order that required Basham's opening brief to be filed by February 29, 2008.  J.A. 7067.

By January 2008, Meister had obtained the trial record and most of the motions in the case, but she needed information from Swerling's trial files to complete her research, including information relating to Basham's competency.  J.A. 3797-3798.

71

On January 14, by letter, Sullivan asked Swerling either to provide him with a master set of Swerling's trial files, or, alternatively, to give him access to the files for inspection and copying as Basham's appellate attorneys anticipated being in Columbia (where Swerling's offices were located) the following week to review documents in the district court.  J.A. 7065, 7068.  That same day, the district court ordered production of any sealed records in the case to Basham's appellate attorneys. J.A. 7066.  On January 30, 2008, Sullivan reviewed Swerling's files in Swerling's office.  Swerling told Sullivan that he could copy the files if he wanted.  Sullivan said that he would get back to Swerling.  J.A. 4517, 7068, 7081.

On February 12, this Court extended the time for filing Basham's brief to April 29, 2008.  J.A. 7067.

On Wednesday, March 26, Meister called Swerling and asked him to produce certain records from his trial file.  By email, Meister listed: (1) a videotape of Basham's courtroom scuffle, (2) the motions regarding the disqualification of Littlejohn and Monckton, (3) Basham's motion for a competency evaluation, (4) any psychological report filed with the district court, (5) a transcript of a motion on August 2, 2004, (6) a transcript of the government's closing argument at Fulks' trial, and (7) if available, certain documents from Fulks' trial.  Meister volunteered to travel to Swerling's office on March 31 to copy

72

the documents if mailing them was too burdensome.  J.A. 7071-7075.

That same day, Swerling was en route to Florida.  Most of his paralegals would not have been able to locate the trial files quickly because they were not working for Swerling when Basham's trial was held in 2004.  J.A. 4519, 7081.

On March 27, Meister emailed Swerling, asking whether it would be easier for him to send her the files or whether she should travel to his office to obtain the documents.  J.A. 7071.

On Monday, March 31, Meister emailed Swerling, asking for a status report regarding the requested documents, and renewed her offer to travel to his office to obtain them.  In reply, Swerling said he had not mailed the requested documents because he had just returned from Florida and had not initially understood that her request was urgent.  He promised to talk to his support staff the next morning.  J.A. 7077.

On Tuesday, April 1, by fax and email, Meister told Swerling that if he did not produce the requested files by April 4, she would seek an order for production of those records from the Fourth Circuit.  Meister stated that she and Sullivan had made numerous requests for Swerling's trial files, but that Sullivan had not obtained them despite his meeting with Swerling in January because his subsequent phone calls to Swerling had gone unanswered.  Meister summarized her recent correspondence

with Swerling, and reminded him that Basham's brief was currently due on April 29.  J.A. 7079-7080.

That day, Swerling emailed Meister that he was looking for the requested documents, but he objected to the tone and content of her letter.  J.A. 7081.  Swerling also called Meister and accused her of impugning his integrity.  J.A. 3800-3801.  That afternoon, Swerling emailed Meister that she could travel to his office and copy any document she wanted.  He said that he might have been able to help her more if she had not waited until March 26 to make her first request for documents.  J.A. 7082.  In reply, Meister said that she was willing to travel to Swerling's office to copy the requested documents.  J.A. 7082-7083.

On April 2, by email and letter, Swerling notified Meister that he had copied a CD of Basham's court outburst, all motions from Swerling's motions notebooks, all motions regarding Fulks, and all orders from certain files regarding Basham.  J.A. 7086-7088.

That same day, Meister emailed Swerling that he did not have to ship the materials to her as she would be travelling to his office the next day and might miss them in transit.  J.A. 7085.

On April 3, Meister flew to South Carolina and inspected Swerling's trial files at his office.  That evening, Meister

74

emailed Swerling that she had designated two boxes of materials to be copied and shipped to her as Swerling did not want the files removed from his office overnight.  J.A. 3834-3835, 7089-7090.

That same day, Swerling emailed Meister that he did not let files out of his office because of bad experiences in the past.  J.A. 7089.  Swerling was concerned about the loss or destruction of files given to third parties.  J.A. 4526.

In April, as the deadline for Basham's brief was approaching, Meister and other attorneys frequently emailed questions about potential appellate issues, including the Burns evidence, to Swerling.  J.A. 7093-7113.

On April 18, Meister moved for an extension of time to file her opening brief on the ground, among others, that additional time was needed to review Basham's trial files.  J.A. 7067-7069.  This Court extended the time to May 13.

After reviewing the record with co-counsel, Meister concluded that a mental competency claim was not supported by the trial records, but she decided to raise it indirectly in connection with the attorney disqualification claim.  Meister only wanted to raise claims that had a reasonable chance of success on appeal.  J.A. 3823-3827.

75

Meister ultimately concluded that the delay in accessing Swerling's files did not cause her to omit any issues on appeal that should have been raised. J.A. 3835.

b. The District Court's Ruling

The district court ruled that Swerling gave appellate counsel reasonable access to his trial files. The court noted that Basham was represented by numerous attorneys during the direct appeal process that lasted from 2005 to 2008, and that at least one appellate attorney had access to Basham's physical file for more than two years. J.A. 367.

The court found that Swerling provided appellate counsel with reasonable access to his trial files even though he did not surrender the files to them. The court also found that appellate counsel obtained access to the trial files shortly after they requested it on each occasion. J.A. 368. On January 29, 2008, Swerling met Sullivan and indicated that he would have complete access to the files for inspection and copying. On April 3, Meister met Swerling for the purpose of copying anything she wanted from the files. Afterwards, Swerling assisted Meister in preparing and filing Basham's opening brief. J.A. 368.

The court stated that appellate counsel could obtain many documents from the court's docket, had access to the entire physical file, and were allowed to copy anything that they

76

wished even though their job would have been easier if they had had the entire file in their possession. Indeed, Meister admitted that she had sufficient access to Swerling's file, and that her difficulties with him did not cause her to omit any meritorious claim on appeal. Further, Basham had not identified any claim that was omitted on direct appeal but which would have been raised had Swerling surrendered the files. Thus, even if there was attorney error, Basham was not prejudiced. J.A. 368-370.

### c. Discussion

Swerling provided Meister and Sullivan with reasonable access to his trial files. At the outset, both Sullivan and Meister gave Swerling the choice of either mailing the files to them or allowing them to review the files at Swerling's office. J.A. 7065, 7071. In each case, Swerling allowed Sullivan and Meister access to his files at his office shortly after their requests. J.A. 368-369.[16]

Basham's argument (Br. 74-77) that Swerling unreasonably withheld his files from Meister overlooks that Swerling could not have assisted her from March 26 to March 31 because he was

---

[16] The record does not reveal why Sullivan failed to copy the trial files when he examined them in January 2008 or why Sullivan did not meet Swerling afterwards to arrange for copying. The silent record, however, does not rebut the presumption that Swerling acted reasonably in his dealings with Sullivan. See Burt, 134 S. Ct. at 17.

in Florida and his paralegals were unfamiliar with Basham's trial files. J.A. 4519. Upon returning to his office, Swerling immediately began copying the requested files, and finished copying a significant amount of them for mailing to Meister by April 2. J.A. 7087-7088. At that point, Meister stated that she preferred to review the files at Swerling's office the next day, which she did.

Basham argues (Br. 80-82) that Swerling violated professional norms by not "surrendering" his trial files to Sullivan and Meister. See S.C. Rules of Professional Conduct 1.16(d) ("[u]pon termination of representation, a lawyer shall take steps * * * to protect a client's interests, [including] surrendering papers and property to which the client is entitled"). That argument overlooks that Sullivan and Meister volunteered to review Swerling's files at his office as an alternative to having Swerling physically transfer the files to them and Swerling allowed them to review the files at his office. In providing appellate counsel with his files under terms that they proposed, Swerling did not fail to "surrender" the files.

Other norms state that it is sufficient that trial counsel provide his files to appellate counsel. See 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.13(B), 31 Hofstra L. Rev. 913, 1074

78

(2003) (trial counsel shall "provid[e] the client's files, as well as all information regarding all aspects of the representation, to successor counsel"). As explained above, Swerling complied with that norm in this case.

In any event, professional norms are only guides to determine whether counsel has acted reasonably under the Sixth Amendment. A violation of a professional norm does not make counsel per se ineffective. E.g., Burt, 134 S. Ct. at 18; Strickland, 466 U.S. at 688. Here, there was no Sixth Amendment violation because Swerling provided both Sullivan and Meister with access to his trial files shortly after they requested access to them.

Regardless, Basham was not prejudiced. Meister testified that the delay in reviewing Swerling's trial files did not cause her to omit any issue on appeal that otherwise would have been raised. Meister and her appellate team had sufficient time to review the materials requested from Swerling before completing their opening brief, especially after this Court granted Meister's motion to extend the time to file the brief to May 13.

The issues raised by Basham on appeal confirm that Meister and her team effectively used Swerling's trial files. The claims involving the admission into evidence of Basham's courtroom outburst, the disqualification of Littlejohn and Monckton, the Burns evidence, and the allegedly inconsistent

positions taken by the government at Fulks' trial and at Basham's trial (see <u>Basham</u>, 561 F.3d at 321-325, 329-330, 332-334, 335), correspond to many of the documents that Meister requested from Swerling on March 26.  J.A. 7071-7074.  Although Meister did not raise a competency claim on appeal, she did so only after she concluded that a competency claim would not succeed.  J.A. 3827.

Basham's argument (Br. 82-84) that Meister might have overlooked meritorious issues on appeal because her team was "stumbling in the dark" due to Swerling's alleged foot-dragging overlooks Meister's conclusion that Swerling did not cause her to omit any issue on appeal.[17]  Further, Basham has not identified a single meritorious claim that was omitted on appeal based on Meister's alleged rushed review of Swerling's trial files.  At most, Basham has demonstrated only a conceivable showing of a different result on appeal, not a substantial showing as required by <u>Strickland</u>.  See <u>Cullen</u>, 131 S. Ct. at 1403. [18]

---

[17]  Basham's reliance (Br. 78-79) on Meister's expressed concern to Swerling in mid-April 2008 that she might have missed something in reviewing Swerling's files ignores Meister's subsequent judgment at the Section 2255 hearing that no meritorious issue was omitted on appeal.

[18]  Basham's conclusory argument (Br. 86) that Meister ignored the numerous issues he subsequently raised in his Section 2255 motion is unconvincing.  Those claims lacked merit for substantially the reasons given by the district court in denying Basham's motion.  Meister did not err by omitting those

**THE GOVERNMENT PRESENTED NO FALSE TESTIMONY AT TRIAL**

Basham contends (Br. 64-74) that Hewett falsely testified that Basham strangled Donovan with the purse strap. That claim lacks merit.

A. <u>Standard of Review</u>

Basham did not raise his false testimony claim at trial or on direct appeal. Accordingly, he must show "cause and prejudice" for his default. See <u>Mueller</u> v. <u>Angelone</u>, 181 F.3d 557, 576 n.13 (4th Cir. 1999). On direct appeal, the Court reviews a prosecutorial misconduct claim de novo. But it reviews a district court's finding that a prosecutor knowingly used false testimony for clear error. <u>United States</u> v. <u>Boyd</u>, 55 F.3d 239, 242 (7th Cir. 1995).

B. <u>Factual Background</u>

The factual background to this issue is set forth at pp. 51-59, <u>supra</u>.

C. <u>The District Court's Ruling</u>

The district court reviewed Basham's false testimony claim for "cause and prejudice" because Basham did not raise that claim on direct appeal and concluded that Basham did not meet that standard. The court rejected Basham's argument that

---

insubstantial issues on direct appeal. See <u>Barnes</u>, 463 U.S. at 754.

appellate counsel's failure to raise the false testimony claim on direct appeal constituted ineffective assistance and therefore "cause." The court emphasized that appellate counsel expressly decided to raise only strong issues on direct appeal. J.A. 222-224.

The court nonetheless addressed the merits and rejected Basham's claim. The court found that the government did not knowingly present false testimony through Hewett's demonstration of how Basham allegedly used the strap to strangle Donovan. The court rejected Basham's argument that, at Fulks' trial, the government represented that Basham had stated that Fulks had strangled Donovan. The court noted that the government simply referred to a self-serving statement by Basham to oppose admission of evidence offered by Fulks. The court also ruled that Long's grand jury testimony merely "memorialized" Basham's self-serving pretrial statements. J.A. 224-226.

D. Legal Principles

Due process prohibits the government from knowingly introducing false testimony from a government witness and from allowing it to go uncorrected when it appears. Giglio v. United States, 405 U.S. 150, 154-155 (1972) (witness concealed promise from government); Napue v. Illinois, 360 U.S. 264, 269 (1959) (same). False testimony includes perjury and evidence that creates a false impression of a material fact. United States v.

82

Bartko, 728 F.3d 327, 335 (4th Cir. 2013). Reversal is required if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. That standard conforms to the constitutional harmless error standard. See United States v. Bagley, 473 U.S. 667, 679 n.9 (1985).

Inconsistent or contradictory testimony by a witness, or among witnesses, does not constitute false testimony or establish that the government knowingly presented false testimony. United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987); Knighton v. Mullin, 293 F.3d 1165, 1174 (10th Cir. 2002); United States v. Bortnovsky, 879 F.2d 30, 33 (2d Cir. 1989). Inconsistent testimony can result from a witness' memory defect or from confusion caused by defense counsel's cross-examination. See United States v. Crockett, 435 F.3d 1305, 1317-1318 (10th Cir. 2006); United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991) (false testimony prompted by cross-examination). In other cases, the government may not have concrete evidence on a particular point, making it difficult for it to know what actually happened. See United States v. Nimrod, 940 F.2d 1186, 1188 (8th Cir. 1991); United States v. Harmon, 918 F.2d 115, 117 (10th Cir. 1990). And when testimonial inconsistencies are revealed on cross-examination, the false statement claim fails because it is the jury's responsibility to decide witness credibility. See United States v. Josephberg, 562 F.3d 478,

83

494-495 (2d Cir. 2009). See also <u>Brooks</u> v. <u>Tennessee</u>, 626 F.3d 878, 896 (6th Cir. 2010) (both sides can clarify for the jury). Finally, if the defense is aware of facts that the prosecutor conceals at trial, but does not object to the concealment at trial, he waives the issue on appeal. See <u>United States</u> v. <u>Meinster</u>, 619 F.2d 1041, 1045-1046 (4th Cir. 1980); <u>United States</u> v. <u>Mangual-Garcia</u>, 505 F.3d 1, 10-11 (1st Cir. 2004).

E. <u>Discussion</u>

Basham concedes that he must show "cause and prejudice" for his failure to raise his false testimony claim at trial and on direct appeal, but he argues (Br. 67-70) that he satisfies the "cause" requirement because appellate counsel was ineffective in omitting that issue on direct appeal. Basham's argument is unpersuasive.

Basham's contention (Br. 68-69) that Meister had little prior criminal law experience before handling Basham's appeal overlooks that a general claim that counsel was inexperienced does not establish ineffectiveness. See <u>United States</u> v. <u>Cronic</u>, 466 U.S. 648, 665 (1984).

Basham's further argument (Br. 69) that DeBruin stated in an internal email that he had "handled this project very poorly" as he should have been more involved in "evaluating the facts and potential issues" (J.A. 5152) is beside the point. DeBruin's self-critical comment about his supervision skills did

not refer to the quality of Basham's appellate brief or to the omission of the false testimony claim from it. In any event, DeBruin did not purport to apply the <u>Strickland</u> standard to the brief, nor would his opinion have been dispositive if he had.

Meister reasonably omitted the false testimony claim on appeal because it was weak. Had it been raised, this Court would have limited review to plain error as to the law, and clear error as to the facts. And as demonstrated below, the government presented no false testimony at Basham's trial. In these circumstances, Basham has not overcome the presumption that Meister omitted the false testimony claim for strategic reasons rather than from ineffectiveness.

Basham's claim also fails on the merits. The government presented no false testimony at trial. The government did not know the identity of the actual killer of Donovan or the precise method by which she was murdered. It knew that Basham and Fulks jointly caused her death and then concealed her body to avoid detection. <u>Basham</u>, 561 F.3d at 322 n.10. But the evidence as to the identity of the actual killer was conflicting. Basham blamed Fulks; Fulks blamed Basham. Basham's strap demonstration indicated the manner in which Donovan was killed, but it did not expressly identify the strangler. See <u>Fulks</u>, 683 F.3d at 523 ("Basham did not indicate whether he or Fulks had performed the physical act of strangulation"). At the same time, the

government did not believe that the statements by Basham and Fulks that blamed each other for actually killing Donovan were true. J.A. 629-630; Basham, 561 F.3d at 322.

The government's case included no false testimony. Hewett testified on direct examination only that Basham indicated how the strap was used to strangle Donovan, but he did not identify the person who did the strangling. J.A. 1344.

On cross-examination by Basham, Hewett testified that Basham demonstrated how the strap was used to strangle Donovan, but, again, Hewett did not expressly identify Basham as the strangler. But if Hewett's testimony on cross-examination implied that Basham was the strangler, Basham had the means to correct it because he knew who killed Donovan and what he meant by his purse strap demonstrations. See United States v. Faris, 388 F.3d 452, 461-462 (4th Cir. 2004) (no due process violation from failure to disclose defendant's own statements to the defense) vacated on other grounds, 544 U.S. 916 (2005); Boyd v. Commissioner, Alabama Dept. of Corrections, 697 F.3d 1320, 1335 (11th Cir. 2012). Basham could have impeached Hewett by showing that Hewett did not identify Basham as the strangler in his prior statements or prior testimony.[19]

---

[19] Hewett's trial testimony did not contradict Long's grand jury testimony. Hewett's testimony was based Basham's demonstration to him, whereas Long's testimony was based primarily on the Littlejohn hypotheticals.

Basham contends (Br. 73-74) that the government compounded Hewett's false testimony by repeatedly arguing that Basham was the actual killer of Donovan at the guilt and penalty phases. That argument lacks substance. In the guilt phase arguments, the government explicitly argued that the jury did not have to find who actually killed Donovan to convict Basham, and it could disregard Hewett's testimony to the extent that it implied that Basham was the actual killer. J.A. 1404-1405, 1565. In the penalty phase argument, the government briefly argued that Basham had actually strangled Donovan with respect to the "intentional killing" statutory intent factor, but it immediately told the jury that Fulks and Basham had acted together to kill Donovan and then listed all of the incriminating evidence against Basham. J.A. 2312-2314, 2317. With respect to the Section 3591(a)(2)(C) and (D) statutory intent factors, the government expressly argued that the jury could find those factors if it believed that Basham did not actually kill Donovan. J.A. 2307-2309. In sum, the central theme of the government's argument was that Basham and Fulks were equally responsible for Donovan's death.

The jury's verdict that found that Basham had the intent applicable to aiders and abettors under Section 3591(a)(2)(D) demonstrates that the death verdict was not based on a finding that Basham was the actual killer of Donovan. J.A. 2467, 2479.

87

Basham's related argument (Br. 71-72) that the government changed theories as to the identity of Donovan's actual murderer from Fulks' trial to his trial is unconvincing. This Court rejected a similar argument in Fulks' appeal, holding that "the government's core theory was that Fulks and Basham were equally culpable in Donovan's murder, * * * regardless of which one physically ended her life." <u>Fulks</u>, 683 F.3d at 524. In addition, "there was no material variance in the facts proved to establish Donovan's death at the hands of Fulks and Basham," especially as "significant portions of the events resulting in the alleged inconsistencies occurred outside the jury's presence." <u>Id</u>. at 525. At most, there was an "inconsistent argument" as to the vagueness of Basham's statements. <u>Ibid</u>. That rationale applies to Basham's claim here.

**CONCLUSION**

The judgment should be affirmed.

Respectfully submitted.


WILLIAM N. NETTLES                 LESLIE R. CALDWELL
United States Attorney             Assistant Attorney General

ROBERT F. DALEY, Jr.               SUNG-HEE SUH
Assistant U.S. Attorney            Deputy Assistant Attorney General
Appellate Chief
District of South Carolina         s/ Thomas E. Booth
                                   THOMAS E. BOOTH
                                   Attorney, Appellate Section
                                   Criminal Division
                                   U.S. Department of Justice
                                   950 Pennsylvania Ave., N.W.
                                   Suite 1511
                                   Washington, DC 20530
                                   (202) 514-5201
                                   Thomas.Booth@usdoj.gov

**CERTIFICATE OF SERVICE**

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record certifies that the foregoing Brief for the United States was this day served upon Michael L. Burke and Sarah Stone, counsel for Basham, by notice of electronic filing with the Fourth Circuit CM/ECF system.


DATE: DECEMBER 5, 2014       s/ Thomas E. Booth
THOMAS E. BOOTH
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Suite 1511
Washington, DC 20530
(202) 514-5201
Thomas.Booth@usdoj.gov

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 19,736 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). On November 25, 2014, this Court granted the government's motion to file a brief not in excess of 21,000 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Courier New 12-point font in text and in footnotes.

DATED: DECEMBER 5, 2014

s/ Thomas E. Booth
THOMAS E. BOOTH
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Suite 1511
Washington, DC 20530
(202) 514-5201
Thomas.Booth@usdoj.gov