No. 13-9

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

BRANDON LEON BASHAM, Defendant-Appellant.

Appeal from the United States District Court
for the District of South Carolina
Hon. Joseph F. Anderson, Jr., District Judge, Presiding
D.C. No. 4:02-cr-992-JFA-2

## REPLY BRIEF OF APPELLANT BRANDON LEON BASHAM

JON M. SANDS
Federal Public Defender
District of Arizona
MICHAEL L. BURKE
SARAH STONE
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2816
Facsimile: (602) 889-3960
michael_burke@fd.org
sarah_stone@fd.org

*Attorneys for*
*Defendant-Appellant Basham*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES .............................................................................. iii

ARGUMENT ........................................................................................................1

I. BASHAM'S INCOMPETENCE............................................................1

   A. September 20, 2004 ..........................................................................1

   B. October 26, 2004 .............................................................................8

II. INEFFECTIVE ASSISTANCE ON COMPETENCE ISSUES...................12

   A. Failure to challenge admission of the altercation videotape and audiotape on the grounds that it depicted Basham in an incompetent state ..............................................................................................12

      1. Deficient Performance.............................................................12

      2. Prejudice .................................................................................14

   B. Failure to consult with Schwartz-Watts on October 26.........................16

      1. Deficient Performance.............................................................16

      2. Prejudice .................................................................................17

III. INEFFECTIVE ASSISTANCE CONCERNING HEWETT'S INTERROGATION OF BASHAM .................................................................17

IV. INEFFECTIVE ASSISTANCE CONCERNING THE BURNS EVIDENCE ..........................................................................................19

   A. Counsel's performance was deficient ...................................................20

   B. The district court's decision was erroneous...........................................23

   C. This Court's ruling on direct appeal does not govern Basham's challenge to the Burns evidence. .........................................................24

   D. Basham was prejudiced. ......................................................................28

V. PROSECUTORIAL MISCONDUCT. .......................................................29

   A. Basham has overcome the procedural default. ....................................30

   B. The Government presented and capitalized upon false testimony at Basham's trial. ..................................................................................31

   C. The district court's ruling was in error. ...............................................36

VI. SWERLING'S REFUSAL TO TRANSFER THE TRIAL FILE .................38

CONCLUSION ....................................................................................................40

CERTIFICATE OF COMPLIANCE.................................................................41

CERTIFICATE OF SERVICE ........................................................................42

## TABLE OF AUTHORITIES

## FEDERAL CASES

*Banks v. Dretke*, 540 U.S. 668 (2004) ...................................................................34

*Beck v. Alabama*, 447 U.S. 625 (1980)..................................................................38

*Berger v. United States*, 295 U.S. 78 (1935) .........................................................37

*Brady v. Maryland*, 373 U.S. 83 (1963) ...........................................................32, 37

*Buckner v. Polk*, 453 F.3d 195 (4th Cir. 2006).....................................................29

*Carnel Const. Corp. v. Danville Redevelopment & Housing Authority*, 745 F.3d 703 (4th Cir. 2014) ....................................................................................25

*Coleman v. Thompson*, 501 U.S. 722 (1991).........................................................30

*Deck v. Missouri*, 544 U.S. 622 (2005) ................................................................38

*Drope v. Missouri*, 420 U.S. 162 (1975) ........................................................passim

*Dusky v. United States*, 362 U.S. 402 (1960) .........................................................2

*Evitts v. Lucey*, 469 U.S. 387 (1985) ....................................................................30

*Florida v. Nixon*, 543 U.S. 175 (2004) .................................................................21

*Futch v. Dugger*, 874 F.2d 1483 (11th Cir. 1989)................................................17

*Giglio v. United States*, 405 U.S. 150 (1972) ..............................................33, 34, 35

*Griffin v. Warden*, 970 F.2d 1355 (4th Cir. 1992)................................................23

*Lockett v. Ohio*, 438 U.S. 586 (1978) ...................................................................38

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ............................................................30

*Napue v. Illinois*, 360 U.S. 264 (1959) ...............................................................passim

*Nguyen v. Curry*, 736 F.3d 1287 (9th Cir. 2013).......................................................30

*Old Chief v. United States*, 519 U.S. 172 (1997)......................................................25

*Resolution Trust Corp. v. H—*, 128 F.R.D. 647 (N.D. Tex. 1989) .........................39

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................................13

*Strickler v. Green*, 527 U.S. 263 (1999) ..................................................................34

*United States v. Agurs*, 427 U.S. 97 (1976)........................................................34, 36

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) ..........................................24

*United States v. Brown*, 757 F.3d 183 (4th Cir. 2014) .............................................17

*United States v. Faris*, 388 F.3d 452 (4th Cir. 2004) ..............................................33

*United States v. Higgs*, 663 F.3d 726 (4th Cir. 2011) ..............................................29

*United States v. Kelly*, 35 F.3d 929 (4th Cir. 1994).............................................34, 36

*United States v. Mason*, 774 F.3d 824 (4th Cir. 2014) .............................................13

*United States v. Powell*, 666 F.3d 180 (4th Cir. 2011) .............................................13

*United States v. Zayvad*, 741 F.3d 452 (4th Cir. 2014) ............................................16

*Woods v. McBride*, 430 F.3d 813 (7th Cir. 2005).................................................11, 12

*Young v. Catoe*, 205 F.3d 750 (4th Cir. 2000).........................................................14

## FEDERAL RULES

Fed.R. Evid 403 ...............................................................................................19, 22, 24

Fed. R. Evid. 404(b) ........................................................................................19, 22, 24

**ARGUMENT**

## I. BASHAM'S INCOMPETENCE.

### A. September 20, 2004

The Government takes several different tacks in responding to Basham's claim that he was legally incompetent during his altercation with the U.S. Marshals. First, it attempts to portray Basham as a sly manipulator who somehow orchestrated the events of that day (including, apparently, the physical altercation initiated by the marshals) to achieve his own ends. Gov. Br. 28-29. Next, presented with defense counsel Harris's avowals to the court that day that he had concerns about Basham's competence, the Government argues that Harris, unlike his co-counsel Swerling, was simply fooled by Basham's manipulative and premeditated behavior. Gov. Br. 28 n.1. Finally, faced with Dr. Schwartz-Watts's unrebutted testimony that Basham was incompetent that afternoon, the Government argues that, after achieving his manipulative goal of leaving the courtroom, Basham suddenly and inexplicably became incompetent upon reaching his holding cell moments later. (The Government takes pains to emphasize that this incompetence did not begin until *after* Basham left the courtroom.) Gov. Br. 29-30. The Government maintains that this convoluted account of the events of September 20, 2004, is a more reasonable explanation of the incident than the possibility that Basham, a mentally and emotionally disturbed young man with an

IQ of 68, overcome by the stress of his capital trial and his frustration with what he viewed as the trial judge's broken promise, lost "the present ability to consult with his lawyer with a reasonable degree of rational understanding." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

The most persuasive response to the Government's argument is the audio recording of Basham's confrontation with the marshals. JA 7563. Although the quality of the recording is poor, it is unnecessary to decipher the specific words Basham shouted while the marshals restrained him to recognize that he was not in a rational state.[1] It is patently unreasonable to conclude that, as eight marshals attempted to restrain him, Basham was "present[ly] [able] to consult with his lawyer with a reasonable degree of rational understanding." *Drope*, 420 U.S. at 172.

*Manipulation*

The Government nevertheless maintains that Basham's behavior on September 20, 2004, was "manipulative" and thus not reflective of incompetence. Gov. Br. 28-29. Specifically, it asserts that Basham "decided to act up in court, as evidenced by his comment to his guards that he would not be in the courtroom long and would soon be returned to his holding cell as he was being led into court after

---

[1] The transcript of Basham's statements is located at JA 1159 through JA 1164.

the lunch recess." *Id.* The record contradicts this argument. First, Basham's statements to the guards when returning to the courtroom after the lunch break reveal only that he intended to return to his holding cell soon, not that he intended to "act up in court" or otherwise disrupt the proceedings. The deputy U.S. Marshal testified:

> We were bringing him up, he was tired. He made some statements about us not caring what he says or how he feels. I didn't respond to these because I knew the mood that he was in. We were up in the – coming up in the elevator. He made a comment about, trying to recall his words. He made a comment about he was going to be coming back down to the cell block. And I asked him what he meant by coming back down to the cell block. He said, "I am not going to be up there for that long. I am coming back down here." And I believe that was the extent of that conversation.

JA 1177.

This testimony does not demonstrate that Basham intended to orchestrate the violent scuffle that later ensued. The previous Friday, Basham had told the court that the afternoon court sessions were particularly difficult for him:

> I get so exhausted. First part of the morning is all right. Then I get frustrated. I get tired – I get tired, and it ain't the medication. It is just – I am like I have low capacity. I get tired, I get stressful, I get paranoid. It is already painful enough to sit in here.

JA 7523. Consistent with these earlier statements, a deputy marshal testified that Basham was "tired" as the guards brought him to the courtroom the afternoon of the altercation. Immediately upon the court's ruling that it would not allow him to use chewing tobacco ("dip"), Basham politely requested, "I'd like to go back

down, if I may. Go back. I don't feel good." JA 1159. The court denied Basham's request, telling him it was "not possible." Swerling apparently attempted to convince Basham to remain in court, but was unsuccessful, telling the court, "[H]e is not going to be here. It will be a problem. It is against my judgment, my wishes." JA 1160. Tellingly, Swerling then threw his hands up in exasperation and walk away from the defense table, visibly frustrated by his inability to communicate rationally with his client. *See* JA 7563 (video recording at approximately 46 second mark). At this point the marshals attempted to restrain Basham and a physical struggle ensued.

Second, the Government's argument relies on the mistaken assumption that Basham knew before returning to court that Judge Anderson would not allow him to have dip. Gov. Br. 28 and n.1. Judge Anderson's final words before recessing for lunch belie this assumption: "Let me think about it during the break. I will take it under advisement." JA 1156. Swerling's subsequent statements to the court reveal only that Basham asked if the dip issue could be resolved before he came back upstairs.[2] JA 1178. Swerling told Basham, however, that the matter had to

---

[2] The Government asserts that, in his lunchtime conversation with Swerling, Basham "demanded to stay downstairs instead of returning to the courtroom." Gov. Br. 28. The record cites it relies upon do not support the assertion that Basham "demanded" anything. Rather, Swerling stated that Basham was "anxious" and wanted to be able to remain downstairs until the judge decided whether to permit him chewing tobacco. JA 1178. Swerling never suggested, however, that Basham was intransigent on this point.

be resolved "in court." *Id.* It was only upon resuming the proceedings that the judge ruled that Basham could not have dip, despite the defense expert's letter saying that it would not interfere with Basham's medication. For the Government's argument (that Basham's statements to the guards reveal he planned the altercation in retaliation for not receiving dip) to make sense, Basham would have to have been not only manipulative, but clairvoyant, for the judge did not rule on the matter until after Basham returned to court.[3]

*Defense counsel's concern for Basham's competence*

The Government next argues that defense counsel Harris's concerns over Basham's competence are "not dispositive" because, unlike Swerling, Harris "did not have a complete view of Basham's motives." Gov. Br. 28 n.1. Again, the record refutes the Government's position.

Immediately upon Basham's removal from the courtroom on September 20, 2004, Harris informed the court that the defense's psychiatric expert, Donna

---

[3] In discussing the issue of Basham's outbursts during the §2255 evidentiary hearing, the district court's independent psychiatric expert gave the following opinion about Basham's allegedly "manipulative" personality:

> I don't think it's going to be manipulative. I don't know that he has long-term planning that is going to support that. So in the short term it might look manipulative, but I suspect it's more just impulsivity and frustration . . . that leads to the behavior.

JA 3886.

Schwartz-Watts, was "on the way." JA 1164. This prompt avowal suggests that, even before the altercation ended, the defense team must have sought Schwartz-Watts's assistance.

Harris expressly told the court that both he *and Swerling* were concerned about Basham's competence. JA 1164. The Government now suggests that Harris was simply in the dark about what had transpired and that Swerling did not share Harris's concerns about Basham's competence. Gov. Br. 28 n.1 This argument, however, not only disregards Swerling's statements to the court that day, but also improperly questions Swerling's candor to the court about an issue as important as his client's competence to proceed. Certainly, if Harris had misrepresented the defense's concern about Basham's competence, lead counsel Swerling, who was in the courtroom, would have spoken up. It is evident from the record that Swerling did not contradict Harris because he shared his concerns. As Swerling himself told the court that afternoon, Basham's actions were a result of his inability to "process" the judge's change of position regarding dip:

> He wanted to know before he came up to court whether that was going to be the case or not, he was going to be allowed to have it after you saw the letter. And he started getting anxious. And he came upstairs and, of course, you saw what happened while he was sitting here. That is one of the reasons why I requested the Court allow him to leave the courtroom because I could see what was developing. *He doesn't process that. That is – I think that is what Dr. Watts is trying to talk about. He doesn't process that sort of information after he was told he could have it, now he can't have it. So that is what happened.*

6

JA 1178. (Emphasis added.)

A decade later, at the evidentiary hearing on Basham's §2255 motion, Swerling would testify about his recollection of the events of September 20. The Government relies on that testimony as proof that Basham was competent during the altercation, Gov. Br. 28, but Swerling's statements are, at best, ambiguous. Swerling stated, "I don't believe he was incompetent when he had the fight, I think he was incompetent after the fight." JA 4288-89. Swerling also testified, however, that Basham "went ballistic" when the marshal "put his hand on him." JA 4289. He continued: "But I never thought he was incompetent at the moment, *I thought he was incompetent when the whole thing came about afterwards.*" *Id.* (Emphasis added.) The most reasonable interpretation of this testimony is that "the whole thing" to which Swerling referred was the altercation with the marshals. That altercation was video and audiotaped, and later played to the jury during Basham's penalty phase proceedings.

*Schwartz-Watts's finding of incompetence*

Finally, the Government is forced to contend with the unrebutted testimony from Dr. Schwartz-Watts that Basham was incompetent that afternoon. JA 1173. At this point, the Government takes a particularly sharp tack in its argument. According to the Government, the previously manipulative defendant who orchestrated the altercation so that he could leave the courtroom suddenly

decompensated upon reaching his supposed goal of leaving the courtroom. Gov. Br. 29-30. The Government does not indicate at what point Basham would have decompensated, but rather simply emphasizes that "Schwartz-Watts testified only that Basham was incompetent *after* his outburst." Gov. Br. 29-30.

Once again, the most compelling contrary evidence is the audio and video of the altercation. It defies reason to argue, as the Government does, that Basham retained his competence throughout the altercation only to lose it once he was in the safety of his holding cell. Basham has demonstrated by a preponderance of the evidence that he was incompetent, at the very least, during some portion of the altercation. The audio and video of the altercation was later shown to the jury that was deliberating whether he would be sentenced to death. Permitting the jury to view Basham in that state violated his right to due process, and he is therefore entitled to relief.[4]

## B.    October 26, 2004

The district court's finding that "there is a lack of evidence that [Basham] was incompetent" on October 26, 2004, JA 0272, is insupportable, and the

---

[4] The Government misconstrues the argument made by Basham on page 23 of his Opening Brief. *See* Gov. Br. 30-31. Basham argued that the district court failed to "diligently inquire" into his competency. This is a reference to the district court's reasoning in its order denying relief on Basham's §2255 motion, not to the district court's failings during the trial itself. In other words, it is a challenge to the order under review by this Court; it is not a procedural competency claim challenging the judge's failure to inquire into Basham's competency at the time of trial.

Government's attempt to justify it is unpersuasive. In addition to the transcript excerpts cited in the Opening Brief (Br. 16-20, 28-30), Basham directs the Court to Harris's express statement to the trial court on the afternoon of October 26 that he did not believe that Basham was capable of going forward: "I just don't think that he is in a state, frame of mind to go forward today." JA 1929. Rather than challenge or refute Harris's description of his client's mental state, the trial court responded, "How many delays have we had in this trial because of the Defendant's behavior problem? We've had at least three or four, haven't we?" *Id.* These questions do not reflect doubt about the accuracy or sincerity of Harris's avowal that Basham was unable "to go forward," but rather frustration with the effect of Basham's condition on the progress of the trial.

Harris's clear expression of concern about Basham's ability to "go forward" on October 26, 2004, contradicts the district court's statement, made almost a decade later in its order denying Basham §2255 relief, that "the record shows that Basham's trial counsel never told the court that they were concerned about their client's competency that day." JA 0282. Certainly *the Government* believed that defense counsel was raising concerns about Basham's competency that afternoon: "So now, we go to Mr. Harris to opine about *whether his own client is competent or not,* rather than have a doctor here who might actually know." JA 1928. (Emphasis added.)

9

In its attempt to distance itself from its own reference to Basham's competence that day, the Government now relies on coy testimony from Swerling at the §2255 evidentiary hearing that he never specifically mentioned Basham's "competence" in his comments to the court on October 26, 2004. Gov. Br. 31; *see* JA 4325. The record reflects that Swerling made the following statements to the court that afternoon:

> Before you bring in the jury. . . . I just need to put this on the record to bring it to the Court's attention. Mr. Basham is slurring his words. He seems to be groggy and just out of it. That is for lack of a better word. He was sleeping when Mr. Harris was doing the direct examination of Dr. Brawley. I just think the record needs to reflect that, Judge. I understand that in the past he has caused delays, but I think that this particular situation is not his fault. His medicine, I think, is taking effect on him that he normally had at night when he would go to sleep.

JA 1936-37.

When presented with these statements at the evidentiary hearing in 2012, Swerling stated, "Doesn't talk about competence, just slurring his words. And I don't think I raised the issue of competency, I just said I wanted the court to be aware that he was slurring his words, he seemed to be groggy."[5]  JA 4325. When asked his purpose for informing the court of Basham's condition, Swerling demurred: "I don't remember. It's nine years ago, eight years ago." *Id.*

---

[5] Certainly a defendant's right to competence at trial cannot be waived by his lawyer's failure to utter the word "competence." The word itself is not talismanic.

No other reasonable explanation exists, however, for Swerling's professed "need" to make a "record" of Basham's condition other than his concern for his client's right to be competent during trial. Swerling told the court that Basham was "out of it." JA 1937. The district court's finding that counsel "never told the court that they were concerned about their client's competency that day" was thus incorrect. JA 0282. To the contrary, as the October 26 record reveals, Harris and Swerling told the court their client was sleeping, slurring his words, groggy, "out of it," and not "able to sit in the courtroom and pay attention."

Finally, the Government's reliance on *Woods v. McBride*, 430 F.3d 813 (7th Cir. 2005), is misplaced. Its citation to *Woods* seems to suggest that "temporary incompetence" is of no consequence. *See* Gov. Br. 31-32. This is an inaccurate description of *Woods*'s holding. Presented with a case involving a medicated defendant who had difficulty remaining awake during jury selection, the Seventh Circuit emphasized: "[W]e agree that Woods was, strictly speaking, 'incompetent' at the times he was asleep. It is beyond dispute that a slumbering defendant cannot be said to be capable of doing much of anything, let alone exhibiting the *present* ability to assist in his own defense." *Woods*, 430 F.3d at 819. The court agreed that the trial judge properly stopped the proceedings upon learning of the defendant's incapacity. *Id.* at 820. It further commended the trial judge for informing the jury that it was stopping the proceedings because the defendant's

11

drowsiness prevented him from "participat[ing] and work[ing] with his attorneys." *Id.* at 818, 820.

The judge's actions in *Woods* stand in stark contrast to the district court's October 26, 2004, decision to proceed with the penalty phase of a capital case despite counsel's repeated indications that their client was sleeping, groggy, slurring his words, and "out of it." Presented with a situation similar to that in *Woods*, the district court here simply responded, "I just think we need to go forward, Mr. Harris, I'm sorry." JA 1930. In deciding to "go forward," the court deprived Basham of due process. He is entitled to relief for this error.

## II. INEFFECTIVE ASSISTANCE ON COMPETENCE ISSUES

### A. Failure to challenge admission of the altercation videotape and audiotape on the grounds that it depicted Basham in an incompetent state

#### 1. Deficient Performance

The Government offers only one argument in response to Basham's claim that his attorneys rendered deficient performance in failing to challenge admission of the videotape and audiotape on the grounds that he was incompetent during some or all the altercation.[6] The Government's sole response is that Swerling's "sound reason" for not raising the argument was that "he did not believe that Basham was incompetent during the outburst." Gov. Br. 38. This argument,

---

[6] For the remainder of this argument, Basham will refer to the videotape and audiotape collectively as the "video."

however, misinterprets *Strickland v. Washington*, 466 U.S. 668 (1984). Deficient performance under *Strickland* is measured by an objective standard of reasonableness, not a subjective one. *United States v. Mason*, 774 F.3d 824, 828 (4th Cir. 2014). Thus, the appropriate inquiry is not whether Swerling personally believed Basham was incompetent during any part of the struggle, but whether a minimally competent capital defense attorney, presented with testimony from a psychiatric expert that Basham was incompetent when she evaluated him moments after the incident, would have argued to the court that the video should have not have been shown to the jury because of the very real possibility that Basham was incompetent, at the very least, during some portion of the incident. A minimally competent capital defense attorney presented with the Government's attempt to use the video as evidence against his client, and aware of Schwartz-Watts's testimony that Basham was incompetent when she evaluated him moments after the incident, would have argued the competency issue.[7]

More importantly, because the Government offers no other response concerning deficient performance besides its legally-flawed, subjective-standard argument, it has waived the issue of deficient performance on this claim. *United*

---

[7] Moreover, even if a subjective analysis were appropriate, the Government ignores Harris's role in Basham's representation. Arguably, under the Government's flawed analysis, if Harris believed Basham was incompetent (as his statements immediately following the incident suggest), he would have been deficient in failing to raise the argument.

*States v. Powell*, 666 F.3d 180, 185 n.4 (4th Cir. 2011) (Government abandoned arguments by failing to raise them in brief). This Court must therefore presume that defense counsel rendered deficient performance with regard to the video's admission.

### 2. Prejudice

The Government's argument concerning prejudice is equally flawed. According to the Government, if defense counsel had argued to the court that the video should have been precluded because of the possibility Basham was incompetent, the court "would have overruled the objection on the ground that Basham was competent for essentially the reasons given by the court in rejecting Basham's competency claim here." Gov. Br. 38. The Government's confidence on this point is misguided.

Pursuant to *Strickland*, Basham need only establish a reasonable probability that the district court would have ruled against the Government in its attempt to use the video. A "reasonable probability" is less than a preponderance of the evidence; "it need not be proved that counsel's performance more likely than not affected the outcome." *Young v. Catoe*, 205 F.3d 750, 759 (4th Cir. 2000) (citation omitted). Rather, Basham must only demonstrate a probability sufficient to undermine confidence in the outcome. *Id.*

Accordingly, Basham need only demonstrate a reasonable probability that the district court would have precluded the video if his attorneys had argued that, based on Schwartz-Watts's testimony, the possibility existed that Basham was incompetent during at least some part of the video. Given that the court expressed concerns throughout the trial about the expense of the proceedings and the troubling prospect of subsequent reversal, certainly a "reasonable probability" exists that it would have erred on the side of caution and precluded use of a video potentially showing the defendant in an incompetent state. *See* JA 1170-71, Appellant's Supplemental Appendix ("ASA") 001-005, 021-022.

For this reason, the Government is grossly mistaken when it asserts that "the district court would have overruled the objection on the ground that Basham was competent for essentially the reasons given by the court in rejecting Basham's competency claim here." Gov. Br. 38. Precluding a single piece of evidence (the video) because of concern that it might show Basham in an incompetent state would have been entirely consistent with the court's cautious attitude toward avoiding retrial; reversing Basham's death sentence eight years after it was imposed because of a retrospective determination of incompetency is a far different matter. Although, for the reasons set forth previously, Basham maintains that his death sentence should be reversed because of his incompetence, it is far more likely that the district court would have been receptive to defense counsel's

15

argument at trial that the video should have been precluded than it was to Basham's arguments in habeas.[8]

## B. Failure to consult with Schwartz-Watts on October 26

### 1. Deficient Performance

The Government maintains that Swerling and Harris were not deficient because "[t]here is no likelihood that the district court would have recessed the trial for a mid-day examination of Basham by Schwartz-Watts." Gov. Br. 40. The Government ignores that the district court expressly asked Harris whether he "thought about getting Dr. Schwartz-Watts over here." JA 1929. This inquiry is inconsistent with the Government's adamant assertion that the court would not have considered an expert opinion on Basham's competence that afternoon. In fact, a minimally competent capital defense attorney would have viewed the court's question as an indication that the court was looking for expert guidance. In fact, contrary to the argument it now makes, the Government itself maintained that

---

[8] The Government offers a secondary argument, Gov. Br. 38-39, that this Court, on direct appeal, would nevertheless have rejected a claim that the video should have been precluded because of Basham's incompetence. This argument is inapposite to a claim that trial counsel were ineffective in failing to argue for preclusion of the video. Had counsel made the argument, there would be no ineffectiveness claim. How this Court would have resolved a hypothetical challenge to a ruling the district court never made is beyond the scope of the issue presently before the Court. Nevertheless, Basham notes that, under the Government's hypothetical, this Court would have reviewed the district court's evidentiary ruling for abuse of discretion. *See United States v. Zayvad*, 741 F.3d 452, 458 (4th Cir. 2014). In the claim now before it, the Court must determine only whether a "reasonable probability" exists that the district court would have precluded the video.

Schwartz-Watts should have been called that afternoon: "[I]f it is a medical problem, Dr. Schwartz-Watts should be here to testify about it." JA 1928. Later, the court recognized the correctness of this argument: "I think Mr. Schools is right. Maybe I need to be hearing from a doctor about these matters." JA 1937. Nothing in the district court's statements on the afternoon of October 26, 2004, suggests that it would have been "futile" for defense counsel to contact Schwartz-Watts about Basham's condition. If anything, the court indicated a willingness to listen to the expert. Because counsel failed to contact her, it was unable to do so.

### 2. Prejudice

Basham's reliance on the principle set forth in *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989), is not misplaced. *See* Gov. Br. 41 n.5. Basham relies on *Futch* for the principle that he need only establish a reasonable probability that, had Schwartz-Watts evaluated him on October 26, she would have found him incompetent to proceed that afternoon.

## III. INEFFECTIVE ASSISTANCE CONCERNING HEWETT'S INTERROGATION OF BASHAM

The Government's reliance on *United States v. Brown*, 757 F.3d 183 (4th Cir. 2014), Gov. Br. 63-64, is inappropriate. This Court plainly stated in *Brown* that it was *not* adjudicating a Sixth Amendment claim of ineffective assistance. 757 F.2d at 191 (noting that Court "routinely declines" to address such claims on direct appeal and saw "no reason to depart from such a settled rule"). Here, in

17

contrast, Basham presented unrebutted expert testimony that Monckton and Littlejohn performed deficiently. Moreover, the facts of the two cases bear little similarity. The opinion in *Brown* does not indicate whether the defendant was actually in custody when, *after pleading guilty*, she asked her attorney to schedule a meeting with the police "[s]eeking sentencing credit." *Id.* at 187. Her attorney "elect[ed] not to attend," which suggests a conscious, strategic decision on counsel's part. Further, knowing that her attorney was not present, Brown went forward with the interview anyway. In contrast, Basham, chained and only feet from his attorneys, was in the middle of an active search for the victim. His attorney did not intend for him to be questioned outside of his presence. JA 4972. Failure to prevent this from happening demonstrates deficient performance.

Also, the Government misstates Basham's burden of proof on this issue. Gov. Br. 67. To succeed on his ineffective-assistance-of-counsel claim, he need not establish by a "preponderance of the evidence" that an *Edwards* violation occurred. Rather, pursuant to *Strickland*, he need only establish a *reasonable probability* that, had Swerling raised the *Edwards* claim at the *Jackson v. Denno* hearing, the district court would have precluded the use of the statements Basham made outside his lawyers' presence. Once again, given the court's concern about reversal and its resulting cautious approach to evidentiary rulings, it is highly likely the court would have precluded Basham's uncounseled statements to Hewett.

18

**IV. INEFFECTIVE ASSISTANCE CONCERNING THE BURNS EVIDENCE**

The Government concedes that the Burns evidence was first discussed at a pretrial hearing on August 4, 2004, and Swerling deferred addressing the issue. Gov. Br. 41. The Government, however, omits that Swerling's deferral never ended; quite simply, he failed to mount *any* challenge to the Burns evidence. Without input from defense counsel, on March 5, 2004, the district court ruled the Burns evidence was admissible as evidence intrinsic to the Donovan crime. JA 4327.

Thus untethered, the Government proceeded early in the guilt phase to present the heartbreaking testimony of Burns's family and friends, who told the jury not only about her disappearance, but about her characteristics, personality, and the impact of her loss upon them. JA 1085-1125. Defense counsel did not challenge the introduction of any of this testimony.

The issue was not revisited until mid-trial, when the court itself raised concerns about the testimony and asked the defense if it wanted a cautionary instruction. Swerling again "deferred" the issue. JA 1125-1126, 1129. Upon request for input by the court, Swerling objected to any 404(b) instruction. Further, Swerling objected to the Government's proposed intrinsic evidence instruction only after the court voiced concern. SA 28-29. Ultimately, the court

instructed the jury that it could consider similar act evidence only to prove or disprove motive, intent, preparation, plan or knowledge. SA 34-35.

## A. Counsel's performance was deficient

Defense counsel rendered deficient performance by failing

1. to challenge the Government's claim that every crime committed between Basham's escape from jail and his arrest was "intrinsic" to the charges for which he was on trial;

2. to request that the court conduct a Rule 403 analysis of the unfairly prejudicial effect of the evidence on Basham's case;

3. to make sustainable objections to the scope of the testimony about Burns.

At the §2255 evidentiary hearing, Swerling testified that he had strategic reasons for failing to challenge even one iota of the Burns evidence.[9] JA 4326-28. The Government argues that Swerling made "a wise decision" in not cross-examining Burns's relatives and friends. Gov. Br. 46. Yet, Swerling's "strategy" and the Government's wholesale endorsement of it completely fail to address counsel's error in failing to challenge admission of the evidence *before* the jury ever heard it. Certainly, aggressive cross-examination of grieving family members is a poor strategy, but Swerling should have attempted to keep those witnesses off the stand entirely or at least to limit their testimony.

---

[9] Harris testified that Swerling was responsible for the decisions in Basham's case. JA 3874-75.

Swerling did not assert that his strategic decision was based on legal research about the evidence's admissibility, but instead testified that "he used his experience as a trial lawyer not to object, which is something that is instinctive in a trial lawyer." JA 4326-27. Remarkably, Swerling also stated that he did not find the Burns evidence particularly damaging.[10] JA 4327. Regarding his refusal to request a limiting instruction, Swerling was unable to point to anything specific that made the limiting instruction problematic, but said simply that he did not like them. JA 4331-32. Neither the district court in its denial of Basham's §2255 petition nor the Government even mention this unfounded and meritless strategy.

Swerling later testified that, because the Burns evidence would have been admitted in the penalty phase, he was "probably" thinking that he should "front-load" the damaging evidence. JA 4340. Accepting this eleventh-hour explanation, the Government argues that it was "tactically sound" to allow the jurors to hear the Burns evidence during the guilt phase instead of shortly before they deliberated the penalty phase. Gov. Br. 46. In support, it cites *Florida v. Nixon*, 543 U.S. 175 (2004). *Nixon*'s holding, however, is simply that it is reasonable to focus on a trial's penalty phase. 543 U.S. at 192. But *Nixon* is inapplicable here because, as the uncontradicted testimony of standard-of-care expert Larry Hammond made clear, Swerling's "strategy" resulted in the jury hearing the Burns evidence *twice*,

---

[10] Harris, in contrast, "absolutely" believed the Burns evidence affected the penalty phase of the trial. JA 4133.

21

and thus "rather than removing the sting from it they doubled the intensity of that information." JA 4595-96. Further, Swerling did not explain why he failed to seek to at least limit the scope and content of the Burns evidence.

Hammond opined that, regarding the Burns evidence, counsel's overall performance fell below the minimal standards of competence expected of a federal capital trial attorney. Hammond testified that whether the Burns evidence was intrinsic to the crime was debatable, but even if it were, "the lawyer's next responsibility is to limit so far as reasonably possible the development and use of that evidence in trial." JA 4594. Hammond testified that he did not see any efforts by defense counsel to do that, and that he would have expected to see "very straightforward and detailed arguments by counsel to limit the number of witnesses and the nature of the testimony." JA 4594-95. The Government offered no testimony to counter Hammond's opinion.

No reasonable strategy could have supported trial counsel's utter failure to attempt to limit the extensive and emotional Burns testimony. Counsel were deficient in their failure to challenge the Government's assertion that the Burns evidence was intrinsic, request a prejudice analysis pursuant to Fed. R. Evid. 404(b) and 403, and attempt to limit the extent of the testimony. No reasonable strategy could possibly have justified this inaction, nor was one even offered on the second two points. Finally, competent counsel would have, at a minimum,

22

requested the limiting instruction the court offered. Counsel's performance fell "below the range of professionally competent performance." *See Griffin v. Warden,* 970 F.2d 1355, 1357 (4th Cir. 1992).

### B. The district court's decision was erroneous.

Not once in its seven pages of analysis did the district court cite to *Strickland* or any other decision concerning ineffective assistance of counsel. It simply treated the issue as one of admissibility. JA 0298-0305. It was not until its order rejecting Basham's Motion to Amend the Judgment that the district court employed a *Strickland* analysis. Even then it failed to address counsel's failure to object to the extent of the Burns testimony. JA 0380-81.

The Government argues that Swerling was not deficient because the court had already ruled the evidence admissible. Gov. Br. 46. This argument ignores the fact that the court was forced to determine admissibility with no input or argument from Swerling. The failure to weigh in on such a critical evidentiary matter was, standing alone, below the standard of care of reasonably competent defense counsel.

Further, even if the evidence were admissible, counsel could have argued that the evidence should have been limited in scope or content. Accordingly, even if the court's focus on admissibility is correct, it addresses only the ineffectiveness related to the evidence's "intrinsic" nature; it does not address the additional

23

challenges Basham raised to counsel's performance in regard to the Burns evidence.

**C.    This Court's ruling on direct appeal does not govern Basham's challenge to the Burns evidence.**

The Government argues that this Court's analysis on direct appeal concerning whether evidence of Basham's threats to police officers was properly admitted implicitly refutes any argument that the Burns evidence was improperly admitted.  Gov. Br. 51.  This Court held that the evidence of Basham's threats to the police was admissible to show his intent to harm Donovan.  *United States v. Basham*, 561 F.3d 302, 328 (4th Cir. 2009).  The Government incorrectly argues that, because the Burns evidence was "even more compelling," that ruling implies the Burns evidence was properly admitted.  Gov. Br. 51.

This argument ignores both Rule 403's requirement that evidence must not be only relevant, but must outweigh potential prejudice, and Rule 404(b)'s requirement that the evidence not be unfairly prejudicial.  Although the Burns evidence may have been more compelling regarding Basham's intent, the unfair prejudice was exponentially higher.  The Burns evidence was some of the most emotional and damning presented.  The Rule 403 and 404(b) analyses this Court conducted regarding wholly different evidence cannot be transposed to deny individual analysis on this claim.

Further, contrary to the Government's assertion, the probative value of the evidence was marginal. Basham's counsel conceded the issue of Burns's death in opening statements. At the §2255 hearing, defense counsel acknowledged they never challenged that Burns was dead. JA 4040. When evidence has little probative value, and the risk of unfair prejudice is great, it should not be admitted. *See Carnel Const. Corp. v. Danville Redevelopment & Housing Auth.*, 745 F.3d 703, 720 (4th Cir. 2014). The Government argues that it needed the testimony from Burns's family and friends to establish that she was kidnapped and carjacked before she was murdered. Gov. Br. 50. The Government is correct that Swerling's concession that Burns was dead was not a stipulation, and as a general rule, the prosecution is entitled to prove its case. However, in this case, the defense's concession of Burns's death must factor into the probative-versus-prejudicial analysis. It is inconceivable that, had it been asked to make such a determination, the court would have found emotional testimony from six grieving witnesses (all to establish the same, uncontested issue) more probative than prejudicial. The Government's contention that *Old Chief v. United States*, 519 U.S. 172, 189-90 (1997), would have rendered any objection futile is thus incorrect

The Government points to Burns's ring and candy box, both found with Basham, as important items of evidence that proved her disappearance. Gov. Br. 49. However, other witnesses discussed both the existence and significance of

25

those items.  The candy box was admitted through the testimony of Tina Severance, who stated she found it in her van.  ASA 006-007.  Severance further testified that, although Fulks told her they had stolen it out of a car, Basham admitted "they had gotten it from a young girl."  ASA 008.  Andrea Roddy also testified that she saw the box in Severance's car and that Basham told her it was "taken off a girl selling it."  ASA 009-012.  Photographs of the box in the van were admitted through a federal agent's testimony.  ASA 016-017.  Finally, both Agents Harper and Arnold testified that Burns had been selling candy as a fundraiser at her college.  ASA 018-020.

Beth McGuffin testified that Basham gave her a ring, but it was too small and that she lost it.  ASA 013-015.  She described the ring in great detail and identified a picture similar to the heart-shaped ring.  ASA 015.  Agent Arnold testified that Burns's family told him she wore a heart-shaped ring.  He stated that a search of McGuffin's home did not produce the ring.  ASA 020.

Even if this unchallenged testimony were insufficient, one Burns family member could have testified on these limited subjects.  Instead, because of counsel's inaction, the Government was permitted to introduce the cumulative and prejudicial testimony of six witnesses, several of whom gave prejudicial victim-impact testimony.  This extensive evidence was unnecessary to show that Burns

did not run away voluntarily, and its probative value was vastly outweighed by its prejudicial effect.

The Government argues that, with the exception of Kandi Burns's testimony that Burns never got to live in her family's new house (testimony the district court conceded was improper), JA 1095, the evidence was not victim-impact evidence, and was simply admitted to eliminate the possibility that Burns had "left home voluntarily or simply disappeared." Gov. Br. 48-49. The Government fails to explain, however, how Burns's close relationships with her parents and brother, JA 1103, her desire to have children by the time she was 25, JA 1096, her "happy go lucky" personality, JA 1109, or the "kinds of things that made her happy," JA 1095, were more probative than prejudicial to any issue in dispute in Basham's trial. The evidence had only one purpose: to impress upon the jury the tragedy of Burns's death and the devastating loss experienced by those who loved her. To whatever extent such evidence might have been relevant in a trial concerning Burns's disappearance, it was wholly irrelevant in a trial concerning Donovan's disappearance. Yet, Basham's attorneys took no steps to preclude or limit the admission of this evidence, nor did they request that the jury be instructed about the very limited purpose for which evidence of Burns's disappearance was permissibly admitted.

Contrary to the district court's and Government's assertions otherwise, the prosecution could have presented the jury with the details of Burns's "disappearance and the failed efforts to find her body" without the testimony of the Burns family members. Five other witnesses testified about Burns's disappearance.[11] Accordingly, the Government is incorrect when it argues that any objection to the Burns evidence would have been both futile and meritless. Even if counsel failed to exclude all evidence, it defies belief that the court would have admitted all of the cumulative testimony.

## D. Basham was prejudiced.

Finally, the Government argues that, even without the Burns evidence, the case for Basham's guilt was overwhelming and he would have been convicted. Gov. Br. 51-52. This argument wholly ignores the effect upon the jury of hearing the Burns evidence twice and, more importantly, its impact upon the jury's

---

[11] The Government argues that Basham's claim is not fully developed because Basham alleges eleven witnesses testified and the district court only found that six witnesses testified as to Burns's murder, and Basham has not identified the other five witnesses. Gov. Br. 48. Basham has been clear: the family and friends of Burns (six witnesses) were the victim-impact witnesses. Basham consistently maintained that all evidence regarding Burns's murder should have been excluded on the ground that it was not intrinsic to the Donovan case. However, even if the evidence were admissible, Burns's disappearance "could have been discussed by an officer," rather than through the emotional testimony of the family members. JA 4596. At the §2255 evidentiary hearing, counsel made clear "[t]here were at least two West Virginia law enforcement officers who investigated the disappearance of Samantha Burns, who interviewed her family, who could have talked, could have testified [and in fact they did in fact testify] to the jury about their investigation, about who Samantha Burns was." JA 5080.

determination to sentence Basham to death. To establish *Strickland* prejudice, Basham need only establish a reasonable probability of a different outcome. *See United States v. Higgs*, 663 F.3d 726, 740 (4th Cir. 2011). A "reasonable probability" is less than a preponderance of the evidence. *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006). Had Basham's attorneys presented the district court with an argument that Rule 403 warranted exclusion of much of the Burns evidence, a "reasonable probability" exists that the court would have agreed and limited the scope of the evidence. Moreover, given that the court expressly asked counsel if they wanted a limiting instruction, JA 1125-26, it is almost certain that the court would have given the instruction. The Burns testimony was cumulative, emotional, improper, and its probative value was marginal. A reasonably competent attorney would have attempted to limit the harmful consequences of the Government's attempt to turn the Donovan trial into one for the murder of Samantha Burns as well.

## V. PROSECUTORIAL MISCONDUCT.

At trial the Government presented testimony from Sheriff Hewett that it knew or should have been known to be false. The failure to correct or at least investigate this testimony violated the Government's obligations under *Napue v. Illinois*, 360 U.S. 264 (1959). The Government then doubled down on the misconduct and repeatedly emphasized Hewett's testimony, which was material to

both guilt and penalty, in closing arguments at both trial phases. Basham's appellate lawyers' failure to raise this claim fell below the standard of a minimally competent capital appellate lawyer.

### A.    Basham has overcome the procedural default.

The parties agree that the underlying prosecutorial misconduct claim is reviewed de novo, and the district court's factual findings are reviewed for clear error. Both also agree that because Basham did not raise this claim at trial or on direct appeal, the claim is defaulted, and he must show cause and prejudice for that failure. Br. 67; Gov. Br. 81.

Basham disagrees with the Government's erroneous assertion that he has not overcome the presumption that appellate counsel omitted the claim for a strategic reason. Gov. Br. 85. Basham was entitled to the effective assistance of both trial and appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 395-96 (1985). The Government does not contest that cause for the default is established when counsel is "constitutionally ineffective or merely negligent," *Nguyen v. Curry*, 736 F.3d 1287, 1294 (9th Cir. 2013) (citing *Coleman v. Thompson*, 501 U.S. 722, 754 (1991)), nor that failure to raise a meritorious claim can establish that counsel was constitutionally ineffective. *See id.* (citing *Martinez v. Ryan*, 132 S.Ct. 1309, 1317 (2012)). The parties disagree, however, on whether the underlying claim is meritorious. Gov. Br. 85. Basham therefore turns to that issue.

**B.** **The Government presented and capitalized upon false testimony at Basham's trial.**

The Government presented and capitalized on testimony it knew or should have known was false. The false testimony affected both the guilt and penalty phases of Basham's trial. This issue hinges on the following guilt-phase testimony:

MR. HARRIS: There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?

SHERIFF HEWETT: No, sir. He did not tell me he used the strap. He demonstrated, though.

MR. HARRIS: He demonstrated?

SHERIFF HEWETT: Yes, sir.

MR. HARRIS: Your notes [sic], nor Lieutenant Crocker's notes say that he did that; isn't that true?

SHERIFF HEWETT: That is true because he didn't say. He showed.

JA 1358-59.

As Harris's questioning showed, the revelation that Basham allegedly showed Hewett how he strangled Donovan was not recorded in any prior report or statement. It was contrary to the report of FBI Agent Long, who testified to the grand jury that he wrote his report immediately after the search for Donovan's body. Long's report stated: "After FULKS raped her, FULKS used a purse strap,

which was approximately 18 inches long, and strangled Donovan." JA 2698. Most importantly, however, Hewett's testimony was contrary to the position the Government took at Fulks's trial concerning who wielded the strap. Specifically, in a colloquy outside the presence of the jury, the Government stated, "Remember Sheriff Hewitt [sic] demonstrating . . . how Brandon Basham said that Chad Fulks took the purse strap and strangled [Donovan]." JA 1004.

The Government argues in a footnote that Hewett's trial testimony did not contradict Long's grand jury testimony because Long's testimony was primarily based on the Littlejohn hypotheticals. Gov. Br. 86 n.19. This is of no moment. The records in both Basham's and Fulks's cases reveal that, prior to Hewett's testimony at Basham's trial, the Government's understanding from all sources was that Basham told Hewett that Fulks wielded the strap. If the Government had any indication otherwise, it would have been obligated under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose that information to Fulks's lawyers. Accordingly, prior to Hewett's testimony at Basham's trial, the Government had consistently maintained that Basham had demonstrated to Hewett that Fulks killed Donovan with the purse strap. JA 1003-04.

The Government argues that, because the evidence concerning the identity of the actual killer was conflicting, and because each defendant blamed the other, it did not know the identity of the killer. Gov. Br. 85. Undoubtedly, both Basham

32

and Fulks pointed the finger at the other and there were conflicting statements, but that did not give the Government license to argue that Fulks was the actual killer in one case, and Basham in the other. The Government does not contest that, at Fulks's trial, it argued that Hewett demonstrated how Basham said *Fulks* strangled Donovan. Moreover, in seeking to exclude the exculpatory statement Fulks's lawyers sought to admit, it told the court that Basham made multiple statements on the day of the search for Donovan's body and that he "was wholly consistent in all of those statements that day that the person that actually killed Alice Donovan was Chad Fulks." JA 1004.

Thus, the Government either (1) knew Hewett's testimony that Basham was the actual killer was false; or (2) was on notice that there was a factual discrepancy it needed to investigate. By failing to correct this false testimony, it violated its obligations under *Napue*, 360 U.S. 264, and *Giglio v. United States*, 405 U.S. 150 (1972). The Government's citation to *United States v. Faris*, 388 F.3d 452, 461-62 (4th Cir. 2004), is misplaced. Here, there was no failure to disclose Basham's statements to the defense: both Agent Long's report and Hewett's prior testimony did so. Rather, the issue is that the new testimony was contrary to what had previously been disclosed regarding Basham's statements.[12] Accordingly, when

---

[12] The Government argues that "Basham could have impeached Hewett by showing that Hewett did not identify Basham as the strangler in his prior statements or prior testimony." Gov. Br. 86. Basham does not dispute that defense

Hewett testified at Basham's trial for the first time (and contrary to all prior accounts) that Basham had identified himself, rather than Fulks, as the actual killer, the Government was obligated by *Napue* and *Giglio* either to correct that testimony or, at a minimum, explore the discrepancy in Hewett's varying accounts. It is unnecessary to prove the Government affirmatively knew the testimony was false; it is enough that it "should have known." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994). Once this standard is met, the conviction must be reversed if there is *any probability* that the evidence affected the jury verdict. *Napue*, 360 U.S. at 269-272; *Giglio*, 405 U.S. at 154.

Simply allowing Hewett's testimony to go uncorrected would itself have merited reversal. The Government, however, exacerbated its failure by relying heavily on Hewett's false testimony in closing arguments. The Government maintains that this claim lacks substance because it also told the jurors that they did not have to find that Basham killed Donovan to convict him. Gov. Br. 87. It

---

counsel's failure to do so was ineffective. *See* Claim 18 of Basham's §2255 petition at JA 3516-21. However, defense counsel's ineffective performance does not obviate the prosecution's duties to pursuant to *Napue* and *Giglio*. *See Strickler v. Green*, 527 U.S. 263, 281 (1999); *Banks v. Dretke*, 540 U.S. 668, 695-96 (2004) (rejecting argument that defendant has burden to discover evidence where "'potential existence' of a prosecutorial misconduct claim might have been detected" and concluding that a "rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process").

concedes that the prosecution "briefly argued that Basham had actually strangled Donovan with respect to the 'intentional killing' statutory intent factor," but notes that it later told the jury Fulks and Basham acted together. *Id.* Regardless, Hewett's testimony was the *only* evidence suggesting that Basham was the actual killer, and it was unquestionably damaging. As argued more fully in Claim III of the Opening Brief, the Government emphasized Hewett's testimony in *both* guilt and penalty phase closing arguments. Br. 41-42.

Finally, the Government notes that "[t]he jury's verdict that found that Basham had the intent applicable to aiders and abettors under Section 3591(a)(2)(D) demonstrates that the death verdict was not based on a finding that Basham was the actual killer of Donovan." Gov. Br. 87. Even if true, this argument ignores that Hewett's testimony was also used in the penalty phase. Despite defense counsel's argument that Basham was merely a follower and Fulks the leader, not a single juror found the Minor Participant statutory mitigator. JA 2471. As stated, Basham is entitled to relief if there is *any probability* that the evidence affected the jury verdict. *Napue*, 360 U.S. at 269-272; *Giglio*, 405 U.S. at 154. It defies commonsense to argue that evidence that Basham was the actual killer did not have some effect on at least one juror during the penalty phase. The due process requirements enunciated in *Napue* and *Giglio* mandate that Basham's convictions and sentences be vacated and that he be afforded a new trial.

### C.   The district court's ruling was in error.

The district court ruled that Basham did not show cause and prejudice to overcome appellate counsel's failure to raise this claim, but gave little analysis beyond noting that Basham was represented by ten appellate attorneys. Despite its procedural default finding, the court nevertheless reviewed the merits of the claim, but denied relief. Both rulings were in error.[13]

The Government notes that the district court found it "did not knowingly present false testimony through Hewett's demonstration of how Basham allegedly used the strap to strangle Donovan." Gov. Br. 82. As argued in the Opening Brief, this analysis misconstrues *Napue* and *Giglio*. Hewett's testimony was contrary to what the Government had previously disclosed, presented, and argued, both in Fulks's case and before the grand jury, and it triggered a duty to investigate. It is sufficient that the Government "should have known" the testimony was false. *Agurs*, 427 U.S. at 103; *Kelly*, 35 F.3d at 933. When a prosecutor allows false testimony to go unchecked, it violates due process. *Napue*, 360 U.S. at 269.

The Government also argues that the district court correctly found that (a) the prosecution did not represent that Fulks strangled Donovan at Fulks's trial, but

---

[13] Because the Government's defense of the district court's finding of procedural default rests on the premise that appellate counsel omitted this claim because it was weak, and Basham has argued the claim is in fact meritorious, counsel rests on the argument raised in his Opening Brief at 67-70 and the relevant aspects of Claim VI raised here and below that appellate counsel was ineffective and that Basham has shown cause and prejudice to overcome procedural default.

merely referred to a "self-serving statement by Basham to oppose admission of evidence offered by Fulks;" and (b) Agent Long's testimony only "'memorialized' Basham's self-serving pre-trial statements." Gov. Br. 82. As argued in the Opening Brief, however, the district court's primary error is its mistaken belief that the Government could have violated *Napue* and *Giglio* only if it actively took contradictory positions before the juries in the Basham and Fulks trials concerning which defendant actually killed Donovan, or if it otherwise "adopted" one version of events over the other. *See* JA 0224-26. Prior to Hewett's surprising testimony in Basham's trial, the information the Government had, whether self-serving or not, was that *Fulks* struck the fatal blow. Any information the Government had to the contrary would have been subject to disclosure under *Brady*, 373 U.S. 83. Accordingly, Hewett's testimony contradicting both his own prior statements and Agent Long's testimony and reports triggered a duty, at a minimum, to explore the discrepancy. In its failure to correct or investigate the new testimony, the Government struck "foul [blows]," and violated its dual obligations to secure a conviction without employing improper methods. *See Berger v. United States*, 295 U.S. 78, 88 (1935). Accordingly, Basham is entitled to guilt and penalty phase relief.

## VI. SWERLING'S REFUSAL TO TRANSFER THE TRIAL FILE

Basham rests on the arguments previously made on this claim, but reemphasizes that trial counsel violated not only professional norms but Basham's Fourteenth Amendment rights, and this violation rendered appellate counsel ineffective.

Capital cases require heightened reliability in the determination of both the defendant's guilt and sentence. *See Beck v. Alabama*, 447 U.S. 625, 637 (1980). When an individual's life is at stake, the Supreme Court insists upon higher standards of reliability and fairness. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (internal quotation omitted) ("[T]he penalty of death is qualitatively different from any other sentence. We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.").

The following facts are undisputed: Swerling did not provide appellate counsel with a copy of the file, despite numerous requests and appellate counsel's firm offering to cover all the expenses of the file transfer. JA 7079-80. Rather, under threat of a request for court-ordered production, Swerling allowed appellate counsel to come to his office and review the files. JA 7082. The Basham file is enormous, encompassing 77 boxes of materials, but appellate counsel Meister spent only one afternoon culling through it. JA 3716, 3804, 5390. From the 77

boxes, Meister culled only two boxes of documents and delivered them to a copying center for copying and shipment to her office. Swerling balked at the out-of-office copying and required the file to be returned to his office where some of the documents were copied. JA 7087-88. With the brief due date less than a month away and without access to the file, Meister had to contact Swerling about additional documents necessary for her preparation of the brief. JA 3727, 7093-7113.

Nevertheless, both the district court and the Government find it reasonable that appellate counsel spent only a single afternoon reviewing 77 boxes of files of a trial that lasted for months. Both likewise find that Swerling's steadfast refusal to surrender the file or make appropriate accommodations for duplication was reasonable. JA 0367, Gov. Br. 77. To deny a former client any documents produced in the course of representation is to "deny the client *the full benefit* of the services for which he paid, *often dearly*." *Resolution Trust Corp. v. H—*, 128 F.R.D 647, 650 (N.D. Tex. 1989) (emphasis added). Here, the cost to Basham was his life, yet Swerling refused to provide appellate counsel with the case file, something even the district court concedes would have made their job easier. JA 0368-0370. The court concluded that Basham had a ten-member appellate team that "was probably as good as any that could be assembled." JA 0367. It was Meister alone, however, who was tasked with the insurmountable responsibility of

reviewing a file room of documents in a day, and who then was denied the very reasonable request to copy a fraction of those documents. As a result, Basham's "ten-member team" prepared his appellate brief without access to the majority of the file. This cannot comport with the increased reliability required in capital cases. Accordingly, Basham is entitled to relief.

## CONCLUSION

For the foregoing reasons, Basham respectfully requests the Court reverse the order of the district court denying him relief on his §2255 Motion and grant him appropriate relief.

Respectfully submitted this 13th day of February, 2015.

s/Michael L. Burke
Michael L. Burke (Arizona Bar No. 013173)
Sarah Stone (Arizona Bar No. 022713)
Assistant Federal Public Defenders
District of Arizona
850 West Adams, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2818
Facsimile: (602) 889-3960
michael_burke@fd.org
sarah_stone@fd.org

Attorneys for Defendant-Appellant
Brandon Leon Basham

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(A)(7)(C) AND CIRCUIT RULE 28.1(E)**

I certify that this reply brief is being filed in a capital case pursuant to the type-volume limitations set forth at Circuit Rule 28.2(e) and is proportionately spaced, and has a typeface of 14 points or more and contains 9610 words.

By:  <u>Michael L. Burke</u>

Counsel for Defendant-Appellant

Dated: February 13, 2015.

# CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service of this document will be accomplished by the appellate CM/ECF system.

I further certify that five copies of the Appellant's Supplemental Appendix, consisting of 1 volume, will be sent by Federal Express to the Clerk of the United States Court of Appeals for the Fourth Circuit:


s/Stephanie King
Legal Assistant
Capital Habeas Unit