<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-9**

———————

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

BRANDON LEON BASHAM,

        Defendant – Appellant.

———————

Appeal from the United States District Court for the District of South Carolina, at Florence. Joseph F. Anderson, Jr., Senior District Judge. (4:02-cr-00992-JFA-2; 4:11-cv-70079-JFA)

———————

Argued: March 25, 2015                 Decided: June 15, 2015

———————

Before TRAXLER, Chief Judge, and KING and AGEE, Circuit Judges.

———————

Affirmed by published opinion. Judge King wrote the opinion, in which Chief Judge Traxler and Judge Agee joined.

———————

**ARGUED**: Michael L. Burke, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, for Appellant. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF**: Jon M. Sands, Federal Public Defender, Sarah Stone, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, for Appellant. William N. Nettles, United States Attorney, Robert F. Daley, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina; Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

KING, Circuit Judge:

In November 2002, Brandon Leon Basham and Chadrick Evan Fulks engaged in a seventeen-day multistate crime spree, for which they were both prosecuted. Basham was convicted in the District of South Carolina of multiple crimes and sentenced to death for two of them, carjacking resulting in death, in contravention of 18 U.S.C. § 2119(3), and kidnapping resulting in death, as proscribed by 18 U.S.C. § 1201. After we upheld Basham's convictions and death sentences on direct appeal, see United States v. Basham, 561 F.3d 302 (4th Cir. 2009), cert. denied, 560 U.S. 938 (2010), he moved for habeas corpus relief pursuant to 28 U.S.C. § 2255. By its opinion of June 5, 2013, the district court denied Basham's § 2255 motion. See United States v. Basham, No. 4:02-cr-00992 (D.S.C. June 5, 2013), ECF No. 1577 (the "Opinion"). The court subsequently denied Basham's motion to alter or amend the judgment, made under Federal Rule of Civil Procedure 59(e), by way of its August 21, 2013 order. See United States v. Basham, No. 4:02-cr-00992 (D.S.C. Aug. 21, 2013), ECF No. 1583 (the "Reconsideration Order").[1] Basham now appeals from those decisions. As explained

---

[1] The district court's unpublished Opinion is found at J.A. 177-374, and its Reconsideration Order is found at J.A. 375-82. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

below, we reject Basham's assignments of error and affirm the judgment of the district court.

I.

A.

Our 2009 opinion disposing of Basham's direct appeal, authored by our distinguished former Chief Judge Karen Williams, detailed the pertinent facts of Basham's 2002 crime spree as follows:

> In 2002, Basham, a lifelong Kentucky resident, was serving the final years of a felony forgery conviction sentence at the Hopkins County Detention Center in Kentucky. In October of that year, Chadrick Evan Fulks became Basham's new cellmate. In early November, Fulks was charged with an additional (and serious) state offense, first degree abuse of a child aged twelve years or younger. On November 4, 2002, Basham and Fulks escaped the detention center together by scaling a wall in the recreation area and leaving the area on foot.
>
> By the evening of November 5, Basham and Fulks reached the home of James Hawkins in nearby Hanson, Kentucky. Basham approached the dwelling, knocked on the door, and asked to use the telephone. Basham told Hawkins that his car had broken down and, after Basham made two calls, Hawkins agreed to drive him to a nearby convenience store. When Basham and Hawkins left the residence, Fulks joined them and the three men left in Hawkins's truck. The two men then told Hawkins that their vehicle was disabled in Robards, Kentucky, and they asked for a ride. During the drive, Fulks told Hawkins that the disabled vehicle was actually in Indiana and directed Hawkins to drive there. Fulks later changed the directions again; by this point, Basham was pointing a knife at Hawkins to keep him driving to their preferred destination. At some point, Fulks took the wheel, drove the truck into

a field, and ordered Basham to tie Hawkins to a tree. Fulks became dissatisfied with Basham's speed in tying and eventually completed the job himself. They left Hawkins clothed in shorts, flip-flops, and a short-sleeved vest. Fifteen hours later, Hawkins freed himself and flagged a passing motorist. When interviewed by police officers later that day, Hawkins identified Basham and Fulks as the individuals who kidnapped him.

After abandoning Hawkins, Fulks and Basham drove to Portage, Indiana, to visit one of Fulks's former girlfriends, Tina Severance. They abandoned Hawkins's vehicle at a hotel and walked to a trailer shared by Severance and her friend Andrea Roddy. The four then drove to a hotel in northern Indiana and stayed there for the next few days. At some point, Basham and Roddy began a consensual sexual relationship.

During their time in Indiana, Fulks asked Severance if she knew anyone from whom he could obtain firearms. Severance informed Fulks that a friend of hers, Robert Talsma, kept several firearms at his home; Severance and Roddy thereafter agreed to lure Talsma out of his house by offering to buy him breakfast. While Talsma was at breakfast with the women, Basham and Fulks entered Talsma's home and stole four firearms, a ring, and several blank checks. They then reunited with Severance and Roddy, and the four traveled in Severance's van to Sturgis, Michigan. That night, November 8, Basham and Roddy stayed at a hotel in Sturgis while Fulks and Severance drove to Goshen, Indiana, to smoke marijuana and methamphetamines with Fulks's brother, Ronnie Fulks.

That evening, two police officers began knocking on doors at the hotel where Basham and Roddy were staying in Sturgis. Basham opened his room door, saw the officers, closed the door, and cocked a .22 caliber revolver that he had stolen from Talsma. The officers ended up leaving before reaching Basham's door. Basham told Roddy, however, "I was about to shoot me a mother-f***er cop right. I was going to blow the f***ing cop away." The next morning, November 9, Basham and Roddy drove to a local Kmart to purchase sundries. Basham met a group of teenagers in the parking lot, and he reported to Roddy that they had some money and he wanted to kill them for it.

4

After purchasing sundries with some of Talsma's stolen checks, Basham invited the teenagers back to the hotel room. Severance and Fulks arrived back at the hotel shortly thereafter, and the teenagers left. Fulks, Basham, Severance, and Roddy then drove Severance's van to the home of Fulks's brother, Ronnie Fulks, in Goshen, Indiana.

On November 10, 2002, the group of four drove to Piketon, Ohio, in Severance's van. Basham again used Talsma's checks to buy sundries, which Roddy later returned for cash. Basham and Fulks also bought two sets of camouflage clothing and Fulks stole a purse and cell phone from a Wal-Mart parking lot. On November 11, they drove to Kenova, West Virginia, near Huntington, and rented a hotel room. Fulks and Basham, wearing their sets of camouflage clothing, left the hotel room by themselves and did not return until the morning hours of November 12.

Samantha Burns, a nineteen-year-old Marshall University student, worked at the J.C. Penney's store in the Huntington Mall. In addition, Burns also participated in a school fundraiser by selling candy boxes, which she kept in her car. On November 11, Burns met her aunt at Penney's to purchase clothing for one of Burns's nieces; they parked in separate locations at the mall. At 9:46 p.m. that evening, Burns called her mother to say she was staying at a friend's house that night. Burns has never been seen since.

During the early morning hours of November 12, 2002, a local fire department responded to a reported explosion and fire at a rural area three miles outside of Huntington. The responding firemen found a car later identified as belonging to Burns burned out at a cemetery.

Meanwhile, Fulks and Basham returned to the hotel carrying muddy clothing, and Fulks indicated that they had stolen some money. Later that morning, the group of four checked out of the motel and drove to South Carolina, where Fulks had lived for several years in the 1990s. Several facts emerged linking Basham and Fulks to Burns's disappearance. Roddy and Severance reported seeing mud, as well as one of Burns's candy boxes, in the van. In addition, Basham began wearing

5

a heart-shaped ring around his neck that belonged to Samantha Burns. Basham told the women that he had stolen the candy from a girl selling it and that he had stolen the ring from a car. Roddy also found Burns's photo ID discarded with other items linking Burns to Fulks and Basham. Moreover, it was later revealed that Fulks used Burns's ATM card twice on the evening of November 11 at local banks.

The evening of November 12, Fulks, Basham, Severance and Roddy arrived at a motel in Little River, South Carolina. The next day was a day of relative rest; Fulks and Basham stole several purses and wallets from unattended vehicles, went shopping, and then returned to the motel room to smoke marijuana, drink, and play cards. On November 14, the four moved to a motel in Myrtle Beach, South Carolina. Fulks and Basham left the women and drove to nearby Conway, South Carolina. Hoping to steal firearms, Fulks and Basham burglarized the Conway home of Sam Jordan. Carl Jordan, Sam's father, drove up to the home as Fulks and Basham were leaving. Fulks attempted to ram Jordan's car with Severance's van but stopped short; Basham exited the house and fired a shot at a nearby greenhouse. Fulks then fired a shot that shattered the back-window of Jordan's car. Jordan fled the area, with Fulks and Basham in pursuit, still firing. At some point, Fulks and Basham ceased their chase, abandoned Severance's van, and stole a truck, which they drove to the Wal-Mart in Conway.

Upon arriving at the Wal-Mart, Basham approached a blue BMW sedan driven by forty-four year old Alice Donovan. Basham entered the car and forced Donovan to drive to the back of the parking lot, where Fulks waited. There, Fulks entered the driver's side of the car and drove away; at 4:03 p.m., Fulks used Donovan's ATM card to purchase gas from a service station in Shallote, North Carolina. At 4:30 p.m., Donovan called her daughter to say she was shopping and would be home late. Later that day, several men at the Bee Tree Farms Hunt Club in Winnabow, North Carolina, saw two men and a woman in a blue BMW drive to the end of a road by the lodge, turn around, and leave the area. Donovan, like Burns, was never seen again.

Basham and Fulks returned to their Myrtle Beach motel later that day and told Severance and Roddy they had to leave town because Basham shot at some police officers and Severance's van had been seized. Basham and Fulks took Donovan's BMW and began driving to West Virginia, leaving Severance and Roddy behind in Myrtle Beach. Donovan's ATM card was used in Little River, Myrtle Beach, and Raleigh, North Carolina. Meanwhile, Severance filed a (false) police report alleging that her van had been stolen.

On November 15, 2002, Fulks and Basham arrived at the home of Beth McGuffin near Huntington, West Virginia. McGuffin, a childhood friend of Fulks, agreed to let Fulks and Basham stay at her home. Fulks introduced Basham to her as "Tommy Blake." Later on November 15, Fulks and Basham purchased crack cocaine to share. Basham and McGuffin also began a sexual relationship and had sexual intercourse three times over the next several days. Basham also gave McGuffin Burns's heart-shaped ring. On November 16, the three watched a news story about the disappearance of Samantha Burns. When McGuffin remarked that Burns was likely dead, Fulks stated, "[s]he is dead."

At the same time, the Federal Bureau of Investigation ("FBI") was investigating the kidnapping of James Hawkins, which it believed Basham and Fulks had committed after escaping from prison. The FBI learned that the two men might be in Myrtle Beach, South Carolina, and that Severance had reported her van stolen. On November 16, the FBI and local authorities interviewed Severance and learned that Basham and Fulks had left the area. The FBI also became aware of the disappearance of Alice Donovan and suspected that Fulks and Basham might be involved.

On Sunday, November 17, Fulks, Basham, and McGuffin smoked marijuana before Fulks and Basham left McGuffin's house, telling her they were headed to Arizona. Instead, they stopped at the Ashland Mall in Ashland, Kentucky, about 20 minutes from Huntington. Sometime that evening, in a Wal-Mart parking lot, Basham approached Deanna Francis's fifteen-year-old daughter as she entered the passenger side of their vehicle. Basham pointed a gun into the teenager's side, attempted to enter the car, and asked for directions to Greenville, Kentucky. When Basham

realized Deanna's daughter was talking on her cell phone, he said "[M]y bad, I didn't mean to scare you" and walked away. Deanna immediately called the police.

Ashland Police Officer Matt Davis was approximately four blocks from the Ashland Mall when he heard the dispatch about the attempted carjacking. Davis drove to the mall, where he saw Basham, who met the description of the suspected carjacker. Davis exited his patrol vehicle and approached Basham; Basham immediately began to flee. As Davis chased Basham through the mall area, Basham drew his weapon and fired a shot in the air. As the chase continued, Basham drew his weapon a second time, turned, and fired at Davis, who fired three shots of his own in return. Basham eventually made his way to a rail yard on the banks of the Ohio River where he hid. Davis radioed reinforcements, which surrounded the area. More than an hour later, at approximately 9:00 p.m., Basham surrendered to police, identifying himself as "Josh Rittman." Police recovered a knife — later identified as belonging to Alice Donovan — and a crack cocaine pipe on Basham's person. Basham's pistol was recovered from a rail car several days later.

Fulks returned to McGuffin's home that evening and watched a news report on Basham's arrest. The morning of November 18, Fulks left McGuffin's residence to drive Donovan's BMW to his brother's house in Goshen, Indiana. Fulks stopped at a rest area, where an Ohio state trooper, who had ascertained that the BMW was stolen, approached him; a high-speed chase then ensued at speeds in excess of 130 miles per hour. During this chase, Fulks nearly struck another trooper before managing to evade capture. Fulks eventually arrived at his brother's home in the early morning hours of November 20. Police officers were staking out Ronnie's home, however, and when Fulks, his brother Ronnie, and Ronnie's girlfriend drove to a barn to hide the BMW, Fulks was arrested. Fulks's semen and the bodily fluids from an unidentified female were later found in the back seat of the BMW.

Back in West Virginia, investigators determined that "Josh Rittman" was actually Basham, and that he was a recent prison escapee. At 2:00 a.m. on November

8

19, Basham was interviewed for the first time. Basham first told investigators that he and Fulks had escaped from prison and committed several crimes along the way. Later, he admitted that they had traveled to South Carolina and kidnapped a woman in Conway, South Carolina. Basham, however, insisted that the woman was alive and with Fulks.

At 9:45 a.m. on November 19, investigators re-interviewed Basham. Basham told investigators that he and Fulks kidnapped a man after escaping from prison, and carried firearms when kidnapping Donovan. He further told investigators that they used her credit cards to obtain cash, that they had driven Donovan to Ashland, Kentucky, and that Fulks was waiting for Basham when Basham was caught. This time, Basham said he thought Donovan was dead because she was not with Basham and Fulks at the Ashland Mall. During this interview, Basham also told investigators that Fulks "got a girl" in West Virginia as well.

On November 20, FBI agents interviewed Basham for seven hours. On this occasion, Basham told investigators that after they kidnapped Donovan, Fulks dropped Basham off at the hotel, drove Donovan to a resort area, raped her, tied her up, and left her. Basham also claimed that Fulks was the one who actually carjacked Donovan. Basham also clarified that when he said Fulks "got a girl" in West Virginia, that he meant they had stolen a girl's credit cards, not that they had kidnapped anyone else. At this point, investigators believed Donovan may have been still alive. Basham drew a map of the places Fulks and Basham had been with Donovan. This map roughly corresponded with the Savannah Bluff area of Horry County, South Carolina. A two-day search of the area, however, left investigators no closer to discovering Donovan's fate.

On November 25, Basham, now represented by counsel, agreed to further aid investigators in finding Donovan's body. He drew a map, mentioned passing through a cemetery, and informed investigators that Donovan's body was left covered but unburied in the woods. Basham was unable to identify any specific landmarks to aid investigators.

On November 26, through counsel, Basham informed investigators that Samantha Burns was dead and that he and Fulks had rolled her body down an embankment and into the Guyandotte River near Huntington.

Two days later, on November 28, FBI and state investigators organized a search team to search Brunswick County, North Carolina, for Donovan's body. Basham, now represented by Cameron B. Littlejohn, Jr. and William H. Monckton, VI, accompanied the agents. During the ride, Basham saw a deer and said, "I never could kill a deer and here I have," but was cut off before finishing his sentence. Later that day, Basham told the investigators that he and Fulks had driven past a park, taken Donovan's body out of the car, dragged it into the woods, and covered it. On two occasions, Basham became emotional as he identified landmarks where he and Fulks had taken Donovan. Later, Basham told the investigators he had thrown out a Liz Claiborne purse strap at the Bee Tree Farms Cemetery. When they arrived, the local sheriff asked, "Is this where it happened?" Basham responded, "This is it. It is." The cemetery was searched to no avail. . . .

Starting in late November 2002, while in jail awaiting trial, Basham began writing letters to McGuffin, telling her his real name, claiming that he loved her, that he had not "hurt that girl from South Carolina", and that Fulks was responsible for their crime spree. On this last point, Basham wrote that Fulks "lied to me" and "told me he had all kinds of money, and a new car, and all of this stuff just waiting on him, and all he needed me to do was to show him the way away from the jail because I was raised in that area." Basham was not entirely forthright with McGuffin, however, as he also wrote that Burns's ring, which he had given to McGuffin, was "not stolen or anything like that." Basham also confided that he "did a lot of bad s**t with [Fulks]."

On December 24, 2002, Basham called a former middle-school teacher in Madisonville, Kentucky, Clifford Jay. When Jay asked whether Basham had killed Alice Donovan, Basham replied, "Yes, Sir. We killed them." Jay was surprised by the use of the term "them," because he had only heard about the Donovan killing.

Basham, 561 F.3d at 309-14 (alterations in original) (footnotes and citations omitted). Following our opinion, it was confirmed that Donovan's remains had been found in a wooded area in Horry County, South Carolina.

On December 17, 2002, Basham and Fulks were charged in the District of South Carolina for their crimes against Donovan. The operative eight-count superseding indictment was then returned on April 23, 2003. The first two counts — carjacking resulting in death, in violation of 18 U.S.C. § 2119, and kidnapping resulting in death, in contravention of 18 U.S.C. § 1201(a) — carried with them the possibility of a death sentence. On September 13, 2003, the Government filed a notice of intent to seek the death penalty against Basham under 18 U.S.C. § 3593(a), the Federal Death Penalty Act.

Basham's and Fulks's cases were severed for trial on January 29, 2004.[2] Basham's trial commenced on September 13, 2004. The evidence during the guilt phase of the trial proceedings included testimony from eighty-nine witnesses; post-arrest statements made by Basham to the FBI, Clifford Jay, and

---

[2] Fulks pleaded guilty and, after a penalty phase, was sentenced to death. We affirmed his convictions and sentence on direct appeal. United States v. Fulks, 454 F.3d 410 (4th Cir. 2006), cert. denied, 551 U.S. 1147 (2007). We also affirmed the denial of his subsequent § 2255 motion. See United States v. Fulks, 683 F.3d 512 (4th Cir. 2012), cert. denied, 134 S. Ct. 52 (2013).

McGuffin; and surveillance videos of Donovan's abduction in the Wal-Mart parking lot as well as ATM withdrawals made by Fulks using Donovan's ATM card. During trial, the defense conceded Basham's culpability in the carjacking and kidnapping. The defense argued, however, that Fulks had committed Donovan's murder and was the instigator throughout the crime spree. To that end, during Basham's opening statement, defense counsel asserted that the only "issue in controversy" was Basham's intent to commit serious bodily harm to Donovan at the time of the abduction. After the thirteen-day guilt phase of the trial, the jury convicted Basham of all eight counts in the superseding indictment.

The penalty phase of the trial proceedings commenced on October 12, 2004. The prosecution introduced the trial record as its principal evidence. In addition, the prosecution presented testimony from correctional officers and a female nurse regarding Basham's misconduct, drug use, and sexual misconduct towards female employees in prison; testimony from Donovan's family regarding the impact of her death; and a videotape showing a courtroom scuffle between Basham and deputy U.S. Marshals that had occurred during the guilt phase of the trial. In mitigation, Basham put forth evidence that his parents encouraged his bad behavior, forced him to steal to support their drug habits, and introduced him to drugs, and that

12

Basham was sexually abused by one of his father's friends. Basham also introduced mitigation evidence regarding his mental condition and ability to adapt to prison life. On November 2, 2004, the jury returned a verdict recommending that Basham be sentenced to death on Counts 1 and 2.

Basham's convictions and death sentences were entered on February 16, 2005. An aggregate sentence of 744 months in prison was imposed on the remaining six counts.

B.

On appeal, we affirmed Basham's convictions and sentence in all respects. See Basham, 561 F.3d at 339. On June 1, 2011, Basham timely filed his motion for habeas corpus relief pursuant to 28 U.S.C. § 2255. That motion listed thirty-four claims for relief, two of which Basham subsequently withdrew.

After conducting an evidentiary hearing over eight nonconsecutive days in late 2012 (the "§ 2255 hearing"), the district court denied Basham's § 2255 motion for reasons explained in its thorough and well-crafted Opinion of June 5, 2013. The district court granted Basham a certificate of appealability as to Claims 1 through 7, Claims 9 through 30, and Claim 32. The court subsequently denied Basham's motion to alter or amend the judgment, made under Federal Rule of Civil Procedure 59(e), by way of its August 21, 2013 Reconsideration Order. Basham timely noticed this appeal on October 17, 2013,

13

and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253(a), and 2255(d).

## II.

We review de novo a district court's legal conclusions in denying a 28 U.S.C. § 2255 motion. See United States v. Fulks, 683 F.3d 512, 516 (4th Cir. 2012). Factual findings adduced from the evidence presented at a § 2255 hearing are reviewed for clear error. Id.

## III.

On appeal, Basham first pursues four claims relating to an inculpatory statement he made to a law enforcement officer demonstrating how Donovan had been strangled with a purse strap. Basham asserts that he was denied his right to the effective assistance of counsel when his lawyers permitted him to speak with investigators outside of their presence (Claim 1 of Basham's § 2255 motion), and later when his lawyers failed to challenge the admissibility of his inculpatory statement on the ground that it resulted from an unlawful interrogation (Claim 2). Additionally, Basham contends that the prosecution committed misconduct by presenting false testimony at trial to the effect that Basham's statement admitted that he was Donovan's killer (Claim 11), and that his lawyers were

14

ineffective by not raising the misconduct contention on direct appeal (Claim 12).

Second, Basham mounts two challenges relating to his competency to stand trial. That is, he maintains that he was tried while incompetent, in violation of his due process rights (Claim 4). Relatedly, Basham alleges that his trial lawyers were constitutionally ineffective by not ably litigating his competency (Claim 5).

Third, Basham asserts that his trial lawyers rendered ineffective assistance in their handling of evidence presented by the prosecution relating to the murder of the second victim, Samantha Burns (Claim 15). The Burns evidence was presented during the guilt phase of Basham's trial, and he contends that his lawyers were deficient by failing to challenge the admissibility and scope of that evidence.

Fourth, Basham raises a final ineffective assistance claim, arguing that his trial counsel's file was not properly provided to the lawyers handling his direct appeal (Claim 30). That deficiency, he maintains, impeded his appellate lawyers from identifying viable challenges on appeal.

A.

Basham's first set of claims arises from a statement he made to law enforcement authorities in November 2002, when he demonstrated how Donovan had been strangled with a purse strap.

15

To provide context to those claims, we first review the relevant background of the contested statement and how it was used by the prosecution at Basham's trial. We then address the merits of the claims.

1.

Following Basham's November 17, 2002, arrest, he made several statements to law enforcement officers, after being advised of his <u>Miranda</u> rights and on the advice of his state-appointed counsel, essentially admitting his involvement in the carjacking and kidnapping of Alice Donovan. Cameron Littlejohn and William Monckton, both death penalty-qualified lawyers, were appointed to represent Basham on November 27, 2002. The following day — Thanksgiving Day — Basham participated in a search for Donovan's body in Brunswick County, North Carolina (the "Thanksgiving search"). Littlejohn and Monckton had determined that participating in the Thanksgiving search could help Basham's case by possibly finding Donovan still alive, or by demonstrating his willingness to assist law enforcement. Basham had no proffer agreement from the government, exposing him to the risk that any statements he made during the search might be used against him. Littlejohn and Monckton therefore sought to limit Basham's participation to directing the search team in locating Donovan's body. Present during the search were FBI Agent Jeffrey Long, officers from the local Conway, South

16

Carolina police department, Brunswick County Sheriff Ronald Hewett, several sheriff's deputies, and approximately twenty local volunteers.

The first several hours of the Thanksgiving search were unsuccessful. After consulting privately with Basham, Littlejohn advised the investigators that, "hypothetically," Fulks had raped Donovan, strangled her with a purse strap, and then slit her throat.[3] Afterwards, in Littlejohn's presence, Basham told Sheriff Hewett that the search team should look for a Liz Claiborne purse strap at the Bee Tree Farms cemetery. The group then drove to that location.

At the cemetery, Basham, Sheriff Hewett, and two of Hewett's deputies wandered about forty-five feet away from the rest of the group, including Basham's lawyers. Basham and Hewett remained within the sight of Littlejohn and Monckton, but the lawyers could not hear Basham's words. During that encounter, Basham made a statement to Hewett — part oral and part demonstrative (the "cemetery statement"). Specifically, Basham told Hewett that he believed the strap was from a Liz Claiborne purse and that he had thrown the strap into the woods. Although the search team was unable to locate the strap, Basham

---

[3] The hypotheticals shared by Littlejohn led to Littlejohn and Monckton being disqualified, on April 9, 2003, from continuing to represent Basham.

17

confirmed to Hewett several times that he believed they were at the correct location, directing the team where they should search. Basham used his hands to estimate the length of the purse strap and to show how he (Basham) had tossed the strap into the woods. He also demonstrated a movement depicting how Donovan was strangled with the strap (the "strangling demonstration").

Leading up to trial, Basham moved to suppress all of his post-arrest statements. The district court conducted an evidentiary hearing from February 24 through February 26, 2004 (the "suppression hearing"), to assess whether Basham's statements were voluntary and admissible under Jackson v. Denno, 378 U.S. 368, 380 (1964) ("A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined."). By the time of the suppression hearing, Basham was represented by lawyers Jack Swerling and Gregory Harris. They sought to suppress all statements Basham made during the Thanksgiving search, other than statements providing directions to Donovan's body and the purse strap.

Given that the strangling demonstration was not a directional statement, it was encompassed within the lawyers' suppression efforts. They did not, however, focus directly on

18

that demonstration or contend that the broader cemetery statement was the product of an illegal interrogation pursuant to Edwards v. Arizona, 451 U.S. 477, 484–85 (1981) ("[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."). The lawyers, rather, focused primarily on suppressing Littlejohn's hypotheticals. The district court ultimately excluded the hypotheticals, but ruled that the statements Basham made during the Thanksgiving search — including the cemetery statement and the strangling demonstration — were admissible.

At trial, during the guilt phase, the prosecution introduced evidence from the Thanksgiving search through Sheriff Hewett. On direct examination, Hewett testified to a number of inculpatory statements Basham had made during the search in Littlejohn's presence. Hewett also testified regarding the cemetery statement, mimicking Basham's strangling demonstration for the jury. Hewett's testimony on direct gave no indication as to whether it was Basham or Fulks who had strangled Donovan with the purse strap. On cross-examination, attorney Harris returned to the cemetery statement. Harris was aware that Hewett's notes from the Thanksgiving search contained no

19

indication that Basham had suggested that he — rather than Fulks — had strangled Donovan. Seeking to draw out that point to the jury, Harris engaged in the following colloquy with Hewett:

> Q. Now, at the cemetery, and I would like you to refer to your notes if that will help you.
>
> A. Okay.
>
> Q. There is nothing in your notes, nor is there anything in Lieutenant Crocker's notes that indicate that Brandon Basham told you that he used the strap, is there?
>
> A. No, sir. <u>He did not tell me he used the strap. He demonstrated, though.</u>
>
> Q. He demonstrated?
>
> A. Yes, sir.
>
> Q. Your notes, nor Lieutenant Crocker's notes say that he did that; isn't that true?
>
> A. That is true because <u>he didn't say. He showed.</u>

J.A. 1358-59 (emphases added).[4] Basham posits on collateral attack that the underscored portions of the foregoing testimony could suggest that, although Basham had not said that he used the strap to strangle and kill Donovan, he demonstrated as much. That is, the underscored language might be construed as Basham's

---

[4] Lieutenant Crocker, a law enforcement officer from North Carolina's Brunswick County, interviewed Sheriff Hewett following the Thanksgiving search and prepared a report of those events. The district court observed that Crocker's report is vague and written in the passive voice. It does not indicate whether Basham stated or implied that he, rather than Fulks, had strangled Donovan.

admission that he killed Donovan (the "actual killer suggestion").

Neither the defense nor the prosecution followed up with Sheriff Hewett to clarify his testimony. In closing arguments at each trial phase, the prosecution briefly referenced Hewett's testimony regarding the strangling demonstration. During the guilt phase, near the end of its lengthy summation, the prosecution recounted that Basham had demonstrated that "a Liz Claiborne purse strap was used to kill Alice Donovan." See J.A. 1472. The prosecutor argued that, although Basham had not said he killed Alice Donovan, "he demonstrated it." Id. A few moments later, the prosecutor urged that after seeing Hewett "demonstrate how Brandon Basham demonstrated how Alice Donovan was strangled" — and hearing the testimony of Clifford Jay that Basham had admitted "we killed them" — the jury should return guilty verdicts. Id. at 1473-74. According to the prosecutor, that evidence, "alone, seals the deal." Id. at 1474. Thereafter, in its penalty-phase closing, the government again referenced the strangling demonstration in arguing that the statutory intent element had been proved.

2.

a.

The Sixth Amendment guarantees an accused the effective assistance of counsel, the familiar standards of which were

established in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a movant seeking collateral relief from his conviction or sentence through an ineffective assistance claim must show (1) that his counsel's performance was deficient and (2) that the deficiency prejudiced his defense. Id. at 687.

The deficiency prong turns on whether "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." Strickland, 466 U.S. at 688. A reviewing court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 689). The Strickland standard is difficult to satisfy, in that the "Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." See Yarborough v. Gentry, 540 U.S. 1, 8 (2003).

The prejudice prong of Strickland inquires into whether counsel's deficiency affected the judgment. See 466 U.S. at 691. The movant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In the context of a death sentence, "the

22

question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695. The prejudice analysis "requires the court deciding the ineffectiveness claim to 'consider the totality of the evidence before the judge or jury.'" Elmore v. Ozmint, 661 F.3d 783, 858 (4th Cir. 2011) (quoting Strickland, 466 U.S. at 695). In evaluating that evidence, "[w]e are not bound . . . to view the facts in the light most favorable to the prosecution." Tice v. Johnson, 647 F.3d 87, 111 (4th Cir. 2011).

b.

By way of his § 2255 motion, Basham advances three ineffective assistance claims relating to his cemetery statement and the resulting testimony offered by Sheriff Hewett at trial. With respect to the first two of those claims, Basham asserts, first, that Littlejohn and Monckton performed deficiently during the Thanksgiving search when they allowed Basham to speak to Hewett outside of their presence, and, second, that Swerling and Harris were deficient by not arguing at the suppression hearing that Basham's cemetery statement was the inadmissible product of an illegal interrogation.

Importantly, those two ineffective assistance claims rely on a shared argument as to Strickland's prejudice prong. Had

23

his lawyers performed competently — either by remaining with him during the Thanksgiving search and preventing him from making the cemetery statement (Littlejohn and Monckton), or by securing the suppression of the cemetery statement through an Edwards argument (Swerling and Harris) — Sheriff Hewett would not have testified to the cemetery statement at Basham's trial. In the absence of that testimony, Basham contends that there is a reasonable probability that he would not have been sentenced to death. For purposes of establishing prejudice, not all of Basham's oral and demonstrative cemetery statement is relevant, as most of the statement was cumulative to other, uncontroverted statements Basham made. The strangling demonstration is the only noncumulative portion of the cemetery statement. Basham's argument as to prejudice also homes in on the actual killer suggestion made by Hewett while testifying to the strangling demonstration.

The district court determined that Basham failed to show that his lawyers' alleged deficiencies prejudiced his defense under Strickland.[5] The court reached that conclusion through an

_____

[5] The district court did not analyze whether Littlejohn and Monckton rendered deficient performance when they permitted Basham to speak with Sheriff Hewett outside of their presence during the Thanksgiving search. As to Basham's claim relating to Swerling and Harris, the court extensively assessed the evidence presented during the suppression and § 2255 hearings, and concluded that, "based on the totality of the circumstances (Continued)

exceedingly thorough analysis of the issue, which we will briefly summarize. See Opinion 23-46, 74-75. The court began by examining Hewett's trial evidence on cross-examination, which the court acknowledged could be interpreted to suggest that Basham had demonstrated how he had used the purse strap to strangle Donovan. The court rejected Basham's contention that prejudice was evident simply from the prosecutor's references to Hewett's testimony. Those summations, the court found, repeatedly used passive language to indicate Basham had demonstrated how Donovan was strangled. From there, the court summarized the overall case against Basham, which, "viewed in its totality, was overwhelming." Id. at 39. Basham had not shown, the court explained, that Hewett's testimony regarding the strangling demonstration or his actual killer suggestion might have impacted the jury's overall analysis of the aggravating and mitigating factors. Id. at 43-46. Given that the controverted testimony had, at most, a "less than significant" impact only on one nonstatutory mitigating factor, id. at 45, and in light of the overwhelming support in the record justifying the death sentence, the court was "left with

----

. . . , no Edwards violation occurred. For at least this reason, then, trial counsel's performance was not deficient in failing to raise the issue" at the suppression hearing. See Opinion 74.

the firm conclusion that Basham has been unable to show that 'the decision reached [by the jury] would reasonably likely have been different absent the error[],'" id. at 46 (alterations in original) (quoting Strickland, 466 U.S. at 696).

On appeal, Basham urges that his lawyers' deficiencies prejudiced his defense at the penalty phase. Our task at this stage is to "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins v. Smith, 539 U.S. 510, 534 (2003). Basham contends that "the mitigating evidence presented to the jury might have carried greater weight had the jury not been told by the Government that Basham killed Donovan with his own hands." See Br. of Appellant 47.

The aggravating evidence against Basham was strong. The jury unanimously found, beyond a reasonable doubt, six of the seven nonstatutory aggravating factors alleged, including that Basham: escaped from a detention facility; carjacked and kidnapped Samantha Burns, resulting in her death; committed a first-degree burglary of Carl Jordan's residence and then attempted to murder him; kidnapped and carjacked James Hawkins; attempted to murder a police officer in Ashland, Kentucky; and impacted Donovan's families and friends. The jury did not find unanimously the future dangerousness factor. The trial record amply supported the six aggravators that the jury found against Basham. Because the aggravators do not directly concern

Donovan's death, moreover, omitting the actual killer suggestion and the strangling demonstration would not have affected the aggravating factors.

The defense submitted to the jury five statutory mitigating factors and thirty nonstatutory mitigating factors. On the statutory factors, at least one juror found that Basham had impaired capacity and committed the offense while severely disturbed, while no jurors found duress, minor participation, or insignificant prior history. See 18 U.S.C. § 3592(a). The nonstatutory factors included issues such as Basham's role in the offense, family background, substance abuse, history of abuse, mental and emotional problems, and low intelligence. The jury's findings on the nonstatutory factors differed between its special verdict forms on the kidnapping and the carjacking charges but, in all, most of those factors were found present by at least one juror. Relevant here, however, is that no juror found as to either offense that Basham had proved by a preponderance of the evidence that "Brandon Leon Basham played a lesser role than Chadrick Evan Fulks in the kidnapping and carjacking of Alice Donovan, and this factor is mitigating." See J.A. 2472, 2484. The district court determined the foregoing to be the only factor potentially impacted by the actual killer suggestion, and we agree. We also agree with the court's conclusion that, considering the totality of the

27

evidence, there is not a reasonable likelihood that the actual killer suggestion would have altered the jury's decision to recommend death.

First, the government's overarching theory in Basham's prosecution undermines the significance that Basham assigns to the actual killer suggestion. The prosecution took the position that Basham and Fulks aided and abetted each other in kidnapping, carjacking, and killing Donovan.[6] Neither of their convictions turned on which man killed Donovan. Rather, the prosecution maintained that, in their crimes against Donovan, Basham and Fulks "were acting together in unison as a team, a death squad, if you will." See J.A. 1404. As the prosecution explained in its closing argument at the guilt phase of Basham's

---

[6] The jury charge during the trial's guilt phase included an instruction on aiding and abetting, reflecting the prosecution's theory. The district court charged the jury:

> The guilt of a defendant in a criminal case may be proved without evidence that he personally did every act involved in the commission of the crime charged. The law recognizes that ordinarily, anything a person can do for himself may also be accomplished by acting together with or under the direction of another person in a joint effort. Simply put, to aid and abet means to assist the perpetrator of the crime. So, if the defendant aids and abets another person by willfully joining together with that person in the commission of a crime, then the law holds the defendant responsible for the conduct of that other person just as though the defendant had engaged in such conduct himself.

United States v. Basham, No. 4:02-cr-00992 (D.S.C. Mar. 27, 2006), ECF No. 951, at 214.

28

trial, "[t]he government does not have to prove, and more importantly, you jurors do not have to find who, specifically, killed Alice Donovan in order to convict Brandon Basham." Id. That was because, "but for the actions of Brandon Basham, Alice Donovan would be alive today. But for the actions of Chad Fulks, Alice Donovan would be alive today. The two of them are responsible for the death of Alice Donovan." Id. at 1405. The prosecution made no distinction between the hands of Basham and Fulks — if one had strangled her, so had the other. Thus, the prosecutor argued in Basham's penalty-phase summation: "Now, does that mean Brandon Basham's strangling of Alice Donovan is the only hand that caused Alice Donovan's death? The government doesn't submit that. The government submits, and submitted all along, that Chad Fulks is just as responsible." Id. at 2312. That sentiment was repeated on rebuttal, when the prosecutor declared that Donovan had died "at the hands of these two men." Id. at 2433.

Second, the record clearly establishes that Basham actively participated with Fulks in committing the crimes against Donovan, and in ultimately ending her life. Basham does not suggest otherwise. Nor could he credibly make such an argument. Basham's strangling demonstration was but one piece of the "overwhelming case" establishing Basham's involvement in Donovan's murder. See Basham, 561 F.3d at 328. Removing

29

Sheriff Hewett's contested testimony, the jury presentation

included the following evidence:

- Videotape footage of Basham carjacking Donovan in a Wal-Mart parking lot;

- A map drawn by Basham during a November 20, 2002 interview with law enforcement, where he indicated the location of Donovan's body;

- Basham's statement to investigators on November 25, 2002, that Donovan's body should be at a cemetery, which "is where [he and Fulks] did their thing," see J.A. 1280;

- Basham's participation in the Thanksgiving search on November 28, 2002, which indicated that he knew of the crimes committed against Donovan and the location of her body;

- Basham's directions to the search team during the Thanksgiving search, made with Littlejohn's express consent: "You need to be looking for a strap. It is about this long. . . . It has Liz Claiborne on the strap. . . . Back at the cemetery[,] you need to go back to the cemetery and look for that strap," see id. at 1332-33;

- Basham's statements during the Thanksgiving search, made in Littlejohn's presence, that after dragging Donovan's body out of the car, he and Fulks "pulled her into the woods" and "covered the body with leaves and what he described as limbs," see id. at 1337;

- Basham's statement during the Thanksgiving search when, while riding in the van with Littlejohn, Basham saw a doe jump onto the road and remarked, "You know, I never could kill a deer and here I have . . . ," see id. at 1329;

- Basham's admission to Clifford Jay on December 24, 2002, "Yes sir. We killed them," see id. at 1388; and

30

- Donovan's knife being found in Basham's possession
  when he was arrested.

The totality of the evidence leaves no doubt that Basham —
at the very least — aided and abetted the crimes committed
against Donovan. Moreover, as the district court aptly noted,

> elimination of the [strangling demonstration] would
> not have led the jury to the conclusion that Fulks was
> the one who strangled Donovan. Instead, the jury
> would have been left with an absence of testimony on
> the question of who did the strangling and a complete
> record of Basham and Fulks's seventeen-day cascade of
> misdeeds, which included two rapes and murders and at
> least five other attempted or potential murders.

See Opinion 44. The jury thus could have concluded that Basham
had actually strangled Donovan, even without Hewett's actual
killer suggestion. Or, the jury could have decided that Fulks
was the strangler, in which case Basham would still be deemed
the killer, given the prosecution's aiding-and-abetting theory.
Or, the jury could have chosen the path suggested by the
government and simply found that Basham and Fulks, together,
killed Donovan. The end result would be the same: Basham and
Fulks were equally culpable for all of their acts, meaning
Basham was responsible for killing Donovan.

Basham urges that "an overly mechanical analysis" of
prejudice is flawed, in that a reviewing court cannot "account
for the intangible factors at play in each juror's evaluation of
whether Basham was deserving of death." See Br. of Appellant
46. Nonetheless, to succeed on his ineffective assistance

31

claims, Basham is not entitled to satisfy the prejudice requirement through "rank speculation, defying calculation of a reasonable probability." See United States v. Fulks, 683 F.3d 512, 522 (4th Cir. 2012). The Supreme Court observed in Strickland that errors might impact the underlying facts and inferences to sharply different degrees, and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." See 466 U.S. at 695-96. Here, assuming Hewett's actual killer suggestion and strangling demonstration were erroneously admitted, the totality of the evidence remains unaffected.

Subtracting the strangling demonstration and Hewett's actual killer suggestion from the sum of evidence received by the jury, we are convinced that Basham has not established prejudice by a reasonable probability, "sufficient to undermine confidence in the outcome" of his proceedings. See Strickland, 466 U.S. at 694. We thus agree with the district court that Basham's ineffective assistance claims must fail, in that he cannot satisfy Strickland's prejudice requirement.[7]

---

[7] Having concluded that Basham cannot satisfy Strickland's prejudice prong on his ineffective assistance claims, we need not assess whether he can meet the deficiency prong on either claim. See Bell v. Cone, 535 U.S. 685, 695 (2002) ("Without proof of both deficient performance and prejudice to the defense (Continued)

32

3.

Basham advances two additional claims arising from the cemetery statement, and more specifically from Sheriff Hewett's actual killer suggestion. Basham contends, first, that his convictions must be reversed because the prosecution committed misconduct when it used that testimony knowing it was false, and, second, that his lawyers were ineffective in failing to raise the misconduct issue on direct appeal.

a.

In prosecuting a criminal trial, the Due Process Clause obliges the government "not [to] knowingly use false evidence, including false testimony, to obtain a tainted conviction." Napue v. Illinois, 360 U.S. 264, 269 (1959). Due process is violated "regardless of whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected." Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998) (citing Giglio v. United States, 405 U.S. 150, 153 (1972)). Testimony by a law enforcement officer that is knowingly false or misleading "is imputed to the prosecution."

_____

. . . , it could not be said that the sentence or conviction 'resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable,' and the sentence or conviction should stand." (quoting Strickland, 466 U.S. at 687)).

33

Id. On collateral attack, a movant alleging this sort of misconduct must demonstrate three elements: (1) that the testimony at issue was false; (2) that the prosecution knew or should have known of the falsity; and (3) that a reasonable probability exists that the false testimony may have affected the verdict. See United States v. Roane, 378 F.3d 382, 400 (4th Cir. 2004); United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994). If the movant shows each of those elements, relief must be awarded. See United States v. Bagley, 473 U.S. 667, 679-80 (1985).

Basham's prosecutorial misconduct claim relates to Sheriff Hewett's actual killer suggestion and the related portions of the government's closing arguments. Basham points to three instances in the record that, he contends, establish the prosecution knew or should have known that the testimony was false. First, FBI Agent Long prepared a report on December 4, 2002, summarizing the Thanksgiving search. In that report, Long recounted that Basham had informed investigators that "[a]fter FULKS raped [Donovan], FULKS used a purse strap, which was approximately 18 inches long, and strangled Donovan." See J.A. 2698. Second, on April 22, 2003, Long appeared before a grand jury to obtain the superseding indictment. Consistent with his report, Long testified that Basham had told law enforcement officers during the Thanksgiving search that Fulks had "actually

34

killed" Donovan.    Id. at 403.    Third, while arguing an evidentiary issue in Fulks's trial, and outside the presence of the jury, Assistant United States Attorney Johnny Gasser stated, "Brandon Basham said that Chad Fulks took the purse strap and strangled [Donovan]." Id. at 1004.

The district court rejected Basham's misconduct claim. Initially, the court determined that the claim failed because it had been procedurally defaulted. Alternatively, the court rejected the claim on its merits. First, the court observed that AUSA Gasser made his statement in the context of an evidentiary argument during Fulks's trial, outside the presence of the jury. Fulks had sought to introduce Basham's inculpatory statement, "'You know I have never even killed a deer and here I have . . . .'" See Opinion 26, 49 (quoting J.A. 1329). Citing the rule of completeness set forth in Federal Rule of Evidence 106, Gasser argued that Basham's deer statement should not be admitted in isolation, considering that "Basham had on numerous occasions indicated that Fulks was the killer." Id. at 49. The court concluded that "Gasser's reliance on the rule of completeness during debate over an evidentiary issue does not, by any means, require a finding that at the Fulks trial the government adopted Basham's self-serving statement that Fulks was the killer." Id. As to Agent Long, the court noted that his report — which was consistent with his grand jury testimony

35

— "was not introduced as an exhibit at Basham's trial and merely memorialized Basham's self-serving statement during the investigation." Id. at 50. Long's statements, the court determined, in no way "reveal an inconsistent position or false testimony employed by the government." Id. The court thus found that the prosecution had not presented false testimony and denied Basham's claim.

The district court returned to this claim in denying Basham's motion to amend or alter judgment. With respect to AUSA Gasser's argument during Fulks's trial, the court found that the prosecution "did not vouch for the accuracy of Basham's statement," and that "the government did not advance an argument to the court or to the jury that Basham was the one who used the strap to strangle Donovan." See Reconsideration Order 3. Similarly, although the prosecution presented Long's testimony to the grand jury, the court found that "the government did not in any way adopt" Long's statement that Fulks strangled Donovan "as its theory of the case regarding who actually strangled Donovan." Id. Further, the court observed that Basham "offered no evidence that Sheriff Hewett's testimony was perjured," compelling the court's determination that Basham had not demonstrated that Hewett gave false testimony. Id. at 3-4. Having found that Basham had "failed to satisfy the threshold requirement to show that the testimony of which he complains was

36

false," the court determined that "no further analysis is required." Id. at 4.

On appeal, Basham maintains that he has satisfied his burden of establishing his prosecutorial misconduct claim because, "prior to Hewett's testimony at Basham's trial, the Government's understanding from all sources was that Basham told Hewett that Fulks wielded the strap." See Br. of Appellant 70. Therefore, according to Basham, the prosecution engaged in misconduct "when it not only failed to investigate and correct Hewett's [actual killer suggestion], but seized upon that testimony [in closing arguments] to bolster its case in both guilt and penalty phases." Id. at 72.

To succeed on his prosecutorial misconduct claim, Basham must show that the district court's finding that no false testimony was presented is clearly erroneous. See Rosencrantz v. Lafler, 568 F.3d 577, 586 (6th Cir. 2009) (applying clear error review to district court's finding that government knowingly used false testimony); Pyles v. Johnson, 136 F.3d 986, 996-98 (5th Cir. 1998) (same); United States v. Boyd, 55 F.3d 239, 242 (7th Cir. 1995) (same). Our task, therefore, is to assess whether "the entire evidence" creates "the definite and firm conviction that a mistake [was] committed." Easley v. Cromartie, 532 U.S. 234, 243 (2001) (internal quotation marks omitted). Thus, "[i]f the district court's account of the

37

evidence is plausible in light of the record," we may not reverse that finding even if we "would have weighed the evidence differently." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985).

Basham does not suggest that Hewett committed perjury, and he therefore must demonstrate that the record compels the conclusion that Hewett's actual killer suggestion "create[d] a false impression of facts which are known not to be true." United States v. Bartko, 728 F.3d 327, 335 (4th Cir. 2013) (internal quotation marks omitted). Implicitly, Basham argues — as he must — that it was Fulks who strangled Donovan. But while Basham relies on isolated snippets of the record to establish that point, a fuller reading clarifies the uncertainty regarding the identity of Donovan's killer. For example, a complete reading of Long's report shows that his statement that "FULKS . . . strangled Donovan" derived from Littlejohn's hypothetical statements, which the government successfully moved to suppress. See J.A. 2698. In the grand jury proceedings, Long testified not only that Basham had blamed Fulks for actually killing Donovan, but that Fulks had blamed Basham. Id. at 403, 408. Similarly, AUSA Gasser's statements during the evidentiary dispute in Fulks's trial were not made for the truth of the matter. Gasser was simply arguing that Basham made both inculpatory and exculpatory statements during the Thanksgiving

38

search, and Fulks should not be permitted to admit only the favorable statements into evidence.

Basham suggests that Hewett's actual killer suggestion was false because at Fulks's trial, the prosecution took the position that Fulks — not Basham — had strangled Donovan. In addressing Fulks's § 2255 motion, we considered a similar argument. See Fulks, 683 F.3d at 523-25. Fulks contended that the prosecutors had violated his due process rights by pursuing mutually inconsistent theories against Basham and Fulks, and referenced many of the same statements that Basham now highlights. We rejected Fulks's claim because, "[v]iewed in the context of the entirety of both proceedings, the government's core theory was that Fulks and Basham were equally culpable in Donovan's murder and similarly deserving of the death penalty, regardless of which one physically ended her life." Id. at 524. Our reasoning in Fulks applies to Basham's claim here. The government's consistent position has remained that Basham and Fulks shared responsibility for Donovan's death.

In all, Basham has not shown that the district court clearly erred in finding that the prosecution did not present false testimony at his trial. That finding is plausible based on the entire record, and therefore must be affirmed. As the Supreme Court has recognized, "[t]he trial judge's major role is the determination of fact, and with experience in fulfilling

that role comes expertise." Anderson, 470 U.S. at 574.    As such, Basham cannot satisfy the first element of his prosecutorial misconduct claim, and we affirm the court's ruling.[8]

### b.

Basham presents a separate ineffective assistance claim that is based on his lawyers' failure to raise the misconduct claim on direct appeal. The district court denied that claim in conjunction with its determination that Basham had not shown sufficient cause to excuse his procedural default. We affirm the court's ruling on this ineffective assistance claim, in that the underlying misconduct claim is plainly without merit. See Cooks v. Ward, 165 F.3d 1283, 1296-97 (10th Cir. 1998) (concluding that appellate counsel "cannot be said to have been ineffective for failing to raise [claim] on direct appeal" where claim determined on collateral attack to lack merit); see also United States v. McHan, 386 F.3d 620, 623 (4th Cir. 2004) (observing that "we are, of course, entitled to affirm on any ground appearing in the record, including theories not relied

---

[8] Because we agree with the district court's ruling that Basham cannot satisfy the first element of his prosecutorial misconduct claim, we need not decide whether Basham might establish the remaining elements of that claim, or address the court's alternative determination that the prosecutorial misconduct claim was procedurally defaulted.

upon or rejected by the district court" (alterations and internal quotation marks omitted)).

## B.

Basham also maintains that he was tried and convicted while being legally incompetent, and that his lawyers were constitutionally ineffective by failing to raise the competency issue to the district court during trial. His arguments focus on two specific days — September 20 and October 26, 2004.

### 1.

The Due Process Clause of the Fifth Amendment prohibits the federal government from trying and convicting a mentally incompetent defendant. See Pate v. Robinson, 383 U.S. 375, 384-86 (1966). The test for determining competency in a federal court is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam). A movant can pursue either substantive or procedural competency-related claims on collateral attack. In a substantive competency claim, the movant asserts that he was, in fact, tried and convicted while mentally incompetent. In a procedural claim, on the other hand, the movant contends that the trial court failed to properly ensure that the accused was competent to stand trial,

41

as required by 18 U.S.C. § 4241. See Beck v. Angelone, 261 F.3d 377, 387-88 (4th Cir. 2001). In pursuing a substantive competency claim, such as Basham raises in his § 2255 motion, the movant is presumed to have been competent during his trial. See Burket v. Angelone, 208 F.3d 172, 192 (4th Cir. 2000). In that situation, the movant bears the burden of proving, by a preponderance of the evidence, that he was incompetent. See United States v. Robinson, 404 F.3d 850, 856 (4th Cir. 2005).[9]

In its Opinion, the district court found that Basham was legally competent throughout his trial, including during the specific challenged incidents on September 20 and October 26, 2004. As explained below, the court's findings are not clearly erroneous, and its denial of Basham's competency-based claims must be affirmed.[10]

---

[9] In contrast to a substantive competency claim, the movant pursuing a procedural claim is presumed to have been incompetent during the trial proceedings, and the government bears the burden of showing competency. See Beck, 261 F.3d at 387-88.

[10] In the § 2255 proceedings in the district court, the government maintained that Basham's substantive competency claim was procedurally barred because it was not raised on direct appeal. The court disagreed, determining that substantive competency claims are not subject to procedural default. See Opinion 92. The courts of appeal are divided on that issue. Compare Hodges v. Colson, 727 F.3d 517, 540 (6th Cir. 2013) (holding that substantive competency claims are subject to procedural default rules), and LaFlamme v. Hubbard, 225 F.3d 663 (9th Cir. 2000) (unpublished per curiam decision) (same), with Sena v. N.M. State Prison, 109 F.3d 652, 654 (10th Cir. 1997) (concluding that substantive competency claims are exempt from (Continued)

42

a.

Basham first maintains that he was incompetent during an incident that occurred on Monday, September 20, 2004, while the trial was in its guilt phase.  Following the lunch break that afternoon, before the jury returned to the courtroom, the district court informed Basham that he could not use tobacco, referred to here as "dip," during the trial proceedings because the court was informed that Basham had previously thrown bodily fluids at deputy U.S. Marshals.  Basham then requested to return downstairs to his holding cell, saying "I don't feel good."  See J.A. 1159.  Of note, Basham had made previous requests not to attend trial, which the court had declined.  The court similarly denied Basham's request of September 20, ruled that the trial would proceed, and instructed Basham to sit down.  Basham refused to take his seat, however, and became agitated.  Soon, "a tussle ensued in the courtroom between [Basham] and the Marshals," which lasted approximately eight minutes.  Id. at

procedural default rules), Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995) (same), and Zapata v. Estelle, 588 F.2d 1017, 1021 (5th Cir. 1979) (same).  We weighed in on this issue in Smith v. Moore, 137 F.3d 808, 819 (4th Cir. 1998), concluding that "a claim of incompetency to stand trial asserted for the first time in a federal habeas petition is subject to procedural default."  Thus, the district court erred by failing to apply the procedural default rule to Basham's substantive competency claim.  We will nevertheless presume that Basham has not defaulted that claim.

43

1161. Six deputies sought to subdue Basham, but eight were ultimately required. Basham and the deputies maintained a dialogue during the tussle, with Basham cursing the officers, suggesting that one of them had lied in telling the court that he had thrown bodily fluids. Basham then told the court, prior to being escorted from the courtroom, "Judge, if I was going to spit, as mad as I am now, I would be spitting now. They just made that up." Id. at 1164.

Basham was then removed to his holding cell, and his lawyers requested a delay in the trial proceedings so that a psychiatrist could assess his competency. The district court granted that request, and Basham was evaluated that afternoon by forensic psychiatrist Donna Schwartz-Watts. Later that day, Dr. Watts testified that "[i]t is my opinion right now that because of his mental defect that [Basham] can't assist his attorneys." J.A. 1173. Dr. Watts stated that Basham's "mental state fluctuates," and opined that his competency would similarly fluctuate. Id. The court then adjourned the trial for the balance of that day.

Basham asserts in his § 2255 motion that he was not competent to stand trial during his scuffle with the deputy Marshals. Although the events of September 20, 2004, occurred outside the jury's presence, the video and audio of the tussle

44

were admitted into evidence during the trial's penalty phase on behalf of the prosecution to show future dangerousness.

The district court denied Basham's competency claim as to September 20, 2004, finding that he had not satisfied his burden, by a preponderance of the evidence, of showing that he was incompetent during the courtroom scuffle. In so ruling, the court recognized that certain evidence supported Basham's argument that he had been incompetent. For example, immediately following the scuffle, defense attorney Harris questioned Basham's competence and observed that he "[l]ooked like someone who didn't have the ability to control the simple function of sitting down in a seat." See J.A. 1168. Similarly, Dr. Watts opined that, based on her examination of Basham following the scuffle, he was not competent. See id. at 1173.

On the other hand, the district court deemed Dr. Watts's testimony unclear "as to whether she believed Basham was incompetent at the time of the altercation or whether she believed that he got worked up from the altercation and was incompetent as a result." See Opinion 93 n.37. The prosecutors also offered evidence that Basham had advised a deputy shortly before the incident that he would be "'coming back down'" to his holding cell from the courtroom, possibly indicating "that Basham may have planned to act out in court." Id. at 95 (quoting J.A. 1177). Additionally, the court related that

45

Basham made statements during the scuffle, prior to being taken from the courtroom, showing that he "apparently had the presence of mind to make a last-ditch argument as to why he should have been allowed [dip], even as he was being escorted out of the courtroom." Id. Assessing all of the evidence, the court found that Basham was not incompetent during the September 20 scuffle, and thus his "constitutional rights were not violated when the government later showed both videotape and audiotape of the altercation to the jury." Id.

Basham maintains on appeal that the district court's ruling was clearly erroneous because the court misconstrued Basham's statements prior to and during the September 20 scuffle, and because the court should have accorded greater weight to the opinions of Dr. Watts and lawyer Harris. We disagree, as the record amply supports the court's findings. See Anderson, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Basham's statement prior to the scuffle that he would soon be returning to his holding cell supports a finding that he intended to act up in the courtroom, in that the court had previously denied Basham's requests not to attend his trial. In light of that history, it is reasonable to infer that Basham would have known that he would not be permitted to return to his holding cell absent exigent circumstances. Basham's statements

46

to the court during the scuffle also support the court's competency finding, because they show that Basham's thinking was goal-oriented and motivated. His behavior might have been bizarre, volatile, or irrational, but that does not necessarily render a defendant incompetent. See Robinson, 404 F.3d at 858; Burket, 208 F.3d at 192; see also United States v. Lebron, 76 F.3d 29, 32 (1st Cir. 1996) ("[I]rrational and outrageous behavior in the courtroom . . . may be uncontrolled, manipulative, or even theatrical. It is not determinative of competency.").

Moreover, the evidence upon which Basham relies does not mandate a finding that he was incompetent during the September 20 scuffle. For example, Dr. Watts's testimony that Basham was incompetent when she examined him after the scuffle did not have to be accepted — even if unimpeached. See Maggio v. Fulford, 462 U.S. 111, 117-18 (1983). Indeed, Watts's opinion was limited to Basham's competency when she met with him following the scuffle. Although Basham suggests that it "defies reason" that he might have been competent during the scuffle and then incompetent a short while later, see Reply Br. 8, Watts testified that Basham's mental state and competence "fluctuate[d]," see J.A. 1173. Similarly, Harris's testimony does not mandate a finding that Basham was incompetent. Indeed, Swerling testified to the contrary at the § 2255 hearing,

47

stating that Basham was not incompetent during the scuffle. See id. at 4288-89.

In sum, the district court did not clearly err in finding that Basham was competent during the September 20 scuffle. As a result, Basham's rights were not violated when the video and audio recordings of the scuffle were shown to the jury during the penalty phase.

b.

Next, Basham asserts that he was also incompetent on Tuesday, October 26, 2004, during the trial's penalty phase. That morning, before the jury was brought into the courtroom, Harris informed the district court that Basham "is in a very agitated state this morning," because he had not received one of his medications due to an error at the detention center where he was housed overnight. See J.A. 1919. The court then granted Basham's request to delay the trial until the afternoon, so that he could receive the missed dose of medication and allow for the medication to take effect. When the court reconvened that afternoon, however, Harris expressed concern that Basham "is not going to be able to sit in the courtroom and pay attention to the testimony, remain silent. And I am concerned that . . . this jury will not look favorably upon the way he is appearing to me to be acting this afternoon." Id. at 1927. The prosecution took the position that the trial should proceed,

arguing that the defense lawyers had not contacted Dr. Watts to evaluate Basham that morning, and contending that, "if it is a medical problem," she "should be here to testify about it."  Id. at 1928.  The following exchange then occurred:

> THE COURT:  Mr. Harris, I have tried to bend over backwards to do everything possible to keep [Basham] on an even keel and a good frame of mind, and especially so that he won't show out in front of the jury.  But the jury is really worn out.  They have sent signals indirectly to me.  They really want to see this case move along.  I think there is a danger to be balanced against what you say.  These continued delays are going to be held against [Basham], I think. I think the jury will figure out that it is [Basham] that is causing these delays.  So, I think I have got to weigh in the balance of that aspect of it, versus the danger of going forward with him appearing to be a little bit disheveled over there.
>
> MR. HARRIS:  Judge, I agree with all of those things.  Those are dangers that we had weighed.  And I will point out that as I am addressing the court right now, the record should reflect that my client is discussing over my shoulder, loud enough that I can hear, and certainly loud enough for the jury could [sic] hear, having discussions with Mr. Swerling about the fact that he will be good.

Id. at 1928–29.  Despite Harris's concerns, the trial proceedings went forward that day.  Later that afternoon, Basham's counsel stated to the court that Basham was "slurring his words" and appeared to be "groggy and just out of it."  Id. at 1936–37.

In his § 2255 motion, Basham claims that he was incompetent during the trial proceedings on the afternoon of October 26, 2004.  The district court rejected that contention, finding a

49

lack of evidence supporting Basham's assertion that he was incompetent. The court pointed out that Basham's lawyers had expressed concern about Basham's appearance, but offered no evidence going to competency. The record showed that Basham appeared disheveled and sleepy, but those behaviors were consistent with his conduct throughout the trial. See Opinion 96. The court further observed: "If there had been any indication that he was incompetent, the court would have sought the testimony of a doctor on Basham's competency, as this court did on other occasions." Id.

We are satisfied that the district court's finding that Basham was competent during the proceedings on the afternoon of October 26 is not clearly erroneous. In arguing that the record compels a finding that he was incompetent, Basham relies on evidence that he was groggy and slurring his words. Those factors, however, do not necessarily render a defendant incompetent to stand trial. See Woods v. McBride, 430 F.3d 813, 819 (7th Cir. 2005) ("[T]here is a big difference between the sort of temporary incompetence stemming from [medication]-induced drowsiness during voir dire and the sort that would render [the accused] incapable of standing trial altogether."). The finding that Basham was competent is further supported by the court's observations of Basham — both that day and throughout the trial. The record demonstrates that the court

50

was sensitive to Basham's mental state throughout the trial proceedings, and made sustained efforts to ensure that his fair trial rights were protected. For example, during the morning of October 26, 2004, the court commented on the importance of ensuring that Basham receive his prescribed medication so that he could participate in his defense, anticipating that "if the defendant receives the death penalty, . . . there will be a 2255 action" challenging his competency. See J.A. 7537. Given the court's commendable motivation to ensure Basham's competency, its decision to proceed with trial on the afternoon of October 26 supports a finding that Basham was competent. See United States v. Moussaoui, 591 F.3d 263, 294 (4th Cir. 2010) (noting that trial court's interactions and experience with defendant over several years of proceedings was "compelling" factor supporting conclusion that defendant was competent). The court's finding that Basham was competent during the afternoon of October 26 is thus well supported by the record. The court's denial of Basham's substantive competency claim must therefore be affirmed.

## 2.

Basham also argues that his defense lawyers were constitutionally ineffective with respect to his September 20 and October 26, 2004 instances of alleged incompetency. More specifically, with respect to the September 20 scuffle, Basham

51

contends that his lawyers acted deficiently — not on that day — but when they failed to object on competency grounds to the admission of the video and audio footage during the penalty phase. As to the events of October 26, Basham maintains that his lawyers were constitutionally ineffective by failing to contact Dr. Watts and request that she examine Basham's competency before the trial proceedings could be resumed.

The foregoing contentions against the defense attorneys lack merit because Basham cannot satisfy Strickland's prejudice requirement, which requires that he show "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Put simply, Basham was competent during the September 20 and October 24 incidents, foreclosing any suggestion that his trial was rendered unfair by his lawyers' decisions during those incidents. See Walton v. Angelone, 321 F.3d 442, 462 (4th Cir. 2003) (ruling that, under Strickland, accused was not prejudiced by counsel's failure to raise competency issue where record showed defendant had been competent); Beck v. Angelone, 261 F.3d 377, 393 (4th Cir. 2001) (same).

C.

Basham next claims that his defense lawyers were constitutionally ineffective with regard to the evidence presented during the trial's guilt phase about the crimes

52

committed against Samantha Burns (the "Burns evidence").[11]  The prosecution notified the defense during a pretrial hearing held on August 4, 2004, of its intention to use the Burns evidence during the guilt phase.  The prosecution's position was that the Burns evidence was intrinsic to the crimes on trial, in that Basham's and Fulks's crime spree constituted a single criminal episode.  Basham's lawyers — Swerling and Harris — raised no objections to the admissibility of the Burns evidence during the pretrial hearings, though Swerling preserved the right to later object.

The Basham defense, however, did not file a motion in limine with respect to the Burns evidence as it was presented during the guilt phase.  Swerling and Harris also declined the district court's offer to give the jury a cautionary instruction under Federal Rule of Evidence 404(b) with respect to that testimony.  At the charge conference in the guilt phase, the court again inquired whether the jury should receive an instruction limiting the purposes for which evidence of other acts — such as the Burns evidence — could be considered.

---

[11] Basham pleaded guilty in 2005 in the Southern District of West Virginia to the offense of carjacking resulting in the death of Samantha Burns, and aiding or abetting that offense, and was sentenced to life imprisonment.  See United States v. Basham, No. 3:03-00138-02 (S.D. W. Va. July 25, 2005), ECF Nos. 105, 109.

53

Swerling objected to such an instruction, and alternatively requested that the court's proposed instruction be modified to permit the jury to consider the evidence of other acts to either prove "or disprove" pertinent facts. See S.A. 24.[12] The court overruled that objection, but incorporated the modification proposed by Swerling. The Burns evidence was not presented to the jury during the sentencing phase.

On direct appeal, Basham argued that the prosecution had impermissibly used the Burns evidence in its closing argument in the guilt phase to show propensity, contravening Rule 404(b). We found no plain error, concluding that the government had "tied [the Burns] evidence entirely to a discussion of Basham's intent," and therefore did not run afoul of Rule 404(b). See Basham, 561 F.3d at 329-30.

Basham took a different tack on the Burns evidence in his § 2255 motion, maintaining that Swerling and Harris were constitutionally ineffective by not attempting to limit the scope and extent thereof. The district court rejected that claim. First, the court recognized that the record is "unclear as to whether [the Burns evidence] was admitted as being intrinsic to the crimes charged, or was admitted for one of the

---

[12] Our citation to "S.A. __" refers to the contents of the Supplemental Appendix filed by the government in this appeal.

not-for-character purposes allowed under Rule 404(b)." See Opinion 123 n.52. The court then relied on our decision rejecting Basham's direct appeal as foreclosing any challenge that the Burns evidence was admissible to show intent. Id. at 124. Additionally, given that "Basham's primary, if not sole, defense in this case was that at the time he and Fulks kidnapped Alive Donovan, he (Basham) did not have the requisite intent," the Burns evidence "was relevant to show intent." Id. The court deemed the Burns evidence as probative to showing that Burns had not voluntarily disappeared. Nonetheless, the court found that one piece of the Burns evidence constituted impermissible victim impact testimony. Id. at 128-29. Specifically, Burns's mother testified that Burns would never be able to move into the family's new home. The court then reasoned, however, that any error with respect to that statement was harmless beyond a reasonable doubt. Id. at 129.

In response to Basham's motion to alter or amend judgment, the district court clarified that Basham's claim with respect to the Burns evidence failed on both prongs of Strickland. First, the court determined that Basham's lawyers did not perform deficiently because their decisions on how to handle the Burns evidence were strategic. Predicated on the testimony of Swerling and Harris at the § 2255 hearing, the court found that they had both "concluded that the jury would probably find

55

Basham guilty, thereby necessitating a penalty phase." See Reconsideration Order 6. Counsel therefore adopted "the recognized practice" of front-loading the emotionally charged Burns evidence into the guilt phase, so that it would not be "fresh in the minds of the jury as they deliberated on Basham's sentence." Id. at 6-7. Second, the court reasoned that the deficiencies alleged did not prejudice Basham because the Burns evidence would have been admitted even if his lawyers had mounted the challenges he now maintains were required. Id. at 5-6. To that end, the court noted that "any objection to the admissibility of [the Burns evidence] would have been overruled." Id. at 6.

We agree that Basham's claim fails Strickland scrutiny because he has not shown that his defense lawyers performed deficiently. Basham urges that competent counsel would have pursued a number of avenues to exclude or limit the Burns evidence, such as arguing that the evidence was not intrinsic, was unfairly prejudicial, or was needlessly cumulative. To succeed on this ineffective assistance claim, of course, Basham "must overcome the presumption that, under the circumstances," his lawyers' handling of the Burns evidence "'might be considered sound trial strategy.'" See Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

56

Swerling and Harris each testified during the § 2255 hearing that, as they prepared for trial, they believed Basham would be convicted of the charged offenses. Their overarching goal was to save Basham's life and avoid a death sentence. In line with that goal, as Swerling explained, the defense chose to front-load certain evidence into the trial's guilt phase. The lawyers purposely "let a lot of evidence come in in the guilt or innocence phase" in order to "desensitize" the jury "to what we knew was going to be coming in the penalty phase of the trial." See J.A. 4410; see also Humphries v. Ozmint, 397 F.3d 206, 234 (4th Cir. 2005) ("[I]t is well established that failure to object to inadmissible or objectionable material for tactical reasons can constitute objectively reasonable trial strategy under Strickland.").

To rebut Swerling's testimony about trial strategy, Basham points out that Swerling made no mention of a front-loading strategy at the § 2255 hearing until he returned from a lunch break. Even then, Basham notes, Swerling testified that he "probably" employed that strategy. See Br. of Appellant 59 (quoting J.A. 4340). The district court credited Swerling's explanation, however, and the credibility determination warrants our deference. See United States v. Abu Ali, 528 F.3d 210, 232 (4th Cir. 2008) ("We particularly defer to a district court's credibility determinations, for it is the role of the district

57

court to observe witnesses and weigh their credibility." (internal quotation marks omitted)).

Basham's position that his lawyers acted unreasonably by not challenging the Burns evidence under Rule 403 overlooks the probative value of that testimony. See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Basham characterizes the probative value of the Burns evidence as "marginal," see Br. of Appellant 63, an assertion that is entirely inaccurate. During the guilt phase, Basham conceded his culpability to the offenses charged, except for the carjacking offense. On that charge, Basham disputed whether he had possessed the requisite "intent to cause death or serious bodily harm" when he and Fulks abducted Donovan. See 18 U.S.C. § 2119. To prove that intent element, the prosecution introduced the Burns evidence to show that Burns had neither voluntarily left home nor disappeared. Basham emphasizes that he had admitted Burns was dead in his opening argument, and further suggests that the prosecution could have used other evidence — such as testimony from the law enforcement officers who interviewed Burns's family — to introduce the same information in a less emotional way. The prosecution, however,

58

is entitled to fashion its own case and present a continuing, logical story to satisfy its ultimate burden.  See Old Chief v. United States, 519 U.S. 172, 189 (1997) ("[T]he accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense.  A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it.").  Therefore, it is unlikely that a Rule 403 challenge would have been successful — particularly given the district court's statement that any such objection would have been overruled.

Basham's focus on the heartbreaking and emotional nature of the Burns evidence lends substantial credence to his lawyers' strategy.  The government had provided notice that the crimes against Samantha Burns would be presented as an aggravating factor justifying a death sentence.  Swerling and Harris thus understood that, if the Burns evidence did not come in during the guilt phase, the prosecution would use it during the penalty phase.  Although the Rules of Evidence do not apply in the latter stage, an evidentiary restriction similar to Rule 403 is provided by statute:  "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  The probative value of the Burns evidence

would assuredly be high in the penalty phase, where the crimes against Burns were to be squarely at issue. Faced with the proposition that the Burns evidence would certainly be admitted at some point, Basham's lawyers cannot be faulted for ripping off the proverbial Band-Aid. See Lundgren v. Mitchell, 440 F.3d 754, 774 (6th Cir. 2006) ("[E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel . . . use objections in a tactical manner.").

As the Supreme Court has explained, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. The tactical decisions made by Swerling and Harris with respect to the Burns evidence were logical and strategic. In the context of a capital case, those decisions could not be characterized as being outside of the wide range of professional norms, and thus were not constitutionally deficient. See Florida v. Nixon, 543 U.S. 175, 191 (2004) ("Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. . . . In such cases, avoiding execution may be the best and only realistic result possible. Counsel therefore may reasonably decide to focus on the trial's penalty

60

phase, at which time counsel's mission is to persuade the trier that his client's life should be spared." (alterations and internal quotation marks omitted)). In sum, we are satisfied that Swerling and Harris did not render constitutionally ineffective assistance when they decided to allow the Burns evidence to be admitted without objection during the guilt phase of Basham's trial.[13]

D.

Finally, Basham contends that he was denied the effective assistance of counsel because Swerling failed to deliver Basham's complete file to the lawyers who represented Basham in his direct appeal. Basham noticed his direct appeal on February 17, 2005, and Swerling and Harris were appointed as his appellate lawyers the following week, on February 24, 2005. Thereafter, Swerling and Harris each were permitted to withdraw, on September 13, 2005, and August 14, 2007, respectively, and were replaced by lawyers from Jenner & Block, LLP. Timothy Sullivan was designated lead appellate counsel, although co-

---

[13] Although we need only decide that Basham's claim fails at Strickland's deficiency prong, that claim would similarly fail at the prejudice prong. The district court gave the jury a cautionary instruction during the charge in the guilt phase, limiting the purposes for which the jury could consider the Burns evidence. Moreover, the court emphasized in its Reconsideration Order that "any objection to the admissibility of [the Burns evidence] would have been overruled." See Reconsideration Order 6.

61

counsel Melissa Meister worked extensively on Basham's appeal and coordinated a team of associates.

Basham's appellate lawyers from Jenner & Block began requesting records from Swerling in January 2008. Sullivan requested, by letter of January 14, 2008, that Swerling "either provide me with a complete 'master set' [of Basham's files, pleadings, and records] or, alternatively, provide access to the 'master set' so it can be inspected and copied." See J.A. 7065. Also on January 14, 2008, the district court ordered "the clerk of court to provide [Basham's appellate lawyers] access to all documents which are reflected in the docket as sealed or otherwise restricted." Id. at 7066. On February 12, 2008, our briefing order was amended, extending the deadline for Basham's opening brief by sixty days, from February 29 to April 29, 2008. Meister made several requests during February and March 2008 that Swerling send Basham's file to Jenner & Block in Washington, D.C. Swerling, however, insisted on retaining physical possession of the file. Meister then travelled to Swerling's office in South Carolina on April 3, 2008, spent the afternoon reviewing the file, and had copies made of about two boxes of documents. On April 23, 2008, the deadline for Basham's opening brief was again extended, this time to May 13, 2008.

The district court rejected Basham's claim that Swerling's refusal to surrender possession of the file constituted constitutionally ineffective assistance, determining that the claim failed at both prongs of Strickland. First, as to deficient performance, the court found that Basham's appellate lawyers had reasonable access to his trial files. See Opinion 192-93. Although Swerling insisted on retaining the physical file, the court found that "when appellate counsel wanted access [to the file], they were given it, and Swerling did not deny them access to any document requested." Id. at 192. The court further noted that "Swerling assisted appellate counsel throughout the month of May 2008 in preparing and filing the opening appeal brief." Id. Because Swerling had provided the appeals team with reasonable access to Basham's file, the court determined that Swerling did not perform deficiently. Id. at 193. Similarly, although Basham's appellate lawyers' "task would have been easier had they had the entire file in their possession," the court reasoned that those lawyers did not perform deficiently because they "could obtain many documents from the court's docket, had access to the entire physical file, and were allowed to copy what they wished therefrom." Id.

Second, and in the alternative, the district court ruled that, even if Basham's lawyers had performed deficiently, his claim failed under Strickland's prejudice prong. See Opinion

63

193-94. The court emphasized that Basham had not identified any particular argument that appellate counsel failed to raise because Swerling retained the physical file. And, although Basham contended that his lawyers might have raised some of the ineffective assistance claims on direct appeal that he raised in his § 2255 motion, the court explained that "appellate counsel were not ineffective in failing to raise the issues Basham identifies." Id. at 193. The court further relied on Meister's testimony that she received sufficient access to Basham's file and that "there were no claims appellate counsel could not have raised because of Swerling's behavior." Id. at 193-94. Thus, the court concluded that Basham could not have been prejudiced by any deficiency relating to his file.

On appeal, Basham reiterates his argument that "[i]n denying appellate counsel unfettered access" to the "thousands of trial-related documents in his possession," Swerling had "compromised Basham's appeal to an unknowable extent." See Br. of Appellant 74. To show that Swerling performed deficiently, Basham relies on legal authority requiring a lawyer to deliver a client's file to the client upon the termination of representation. See id. at 80-81 (citing Restatement (Third) of the Law Governing Lawyers § 46(3) (2000) (requiring that "a lawyer must deliver to [his] client or former client, at an appropriate time and in any event promptly after the

64

representation ends, such originals and copies of other documents possessed by the lawyer relating to the representation as the client or former client reasonably needs"); S.C. Rules of Prof'l Conduct 1.16(d) ("Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled . . . .")).  Basham further disputes the court's finding that appellate counsel had reasonable access to the trial file, maintaining that "Meister's single day with the file" cannot constitute reasonable access "in light of the nature" of this capital case.  Id. at 85.

We are satisfied to affirm the district court's ruling that Basham cannot demonstrate prejudice.  Basham's prejudice argument relies on the "numerous claims of ineffective assistance of appellate counsel," as well as the competency claims that he raised in his § 2255 motion.  See Br. of Appellant 86.  That contention, of course, is entirely undercut by the fact that Basham has not advanced a meritorious claim in his § 2255 motion.

Finally, the record demonstrates that Basham's appellate lawyers made deliberate and considered decisions in selecting which claims to pursue.  Meister confirmed at the § 2255 hearing that the appellate team strategized on what issues to appeal in order to "present the best brief possible" with the "most

likelihood" of affording Basham relief.  See J.A. 3827-28.  As a result, Basham cannot show a reasonable probability that the result of the proceedings would have been different, "sufficient to undermine confidence in the outcome" of his direct appeal. See Strickland, 466 U.S. at 694.  Therefore, we also affirm the ruling of the district court on this ineffective assistance claim.[14]

IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

AFFIRMED

---

[14] Because we resolve this ineffective assistance claim under Strickland's prejudice prong, it is unnecessary to decide whether Swerling's failure to deliver Basham's file to his appellate lawyers constituted deficient performance.

66